**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 90-cv-181-JLK

MERILYN COOK, *et al.*,

                Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION
and THE DOW CHEMICAL  COMPANY,

                Defendants.

---

**DEFENDANTS' AMENDED BRIEF IN SUPPORT OF THEIR MOTION TO EXCLUDE
EXPERT WITNESS TESTIMONY RELATING TO DAMAGES**

---

Defendants respectfully request that this Court exclude plaintiffs' expert testimony

relating to damages—specifically, the testimony of plaintiffs' expert witnesses John Radke,

Wayne Hunsperger, James Flynn, and Paul Slovic—under Rule 702 of the Federal Rules of

Evidence, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire

Co. v. Carmichael*, 526 U.S. 137 (1998).  This brief incorporates by reference Defendants'

Introduction and Overview to Their Motion to Exclude Expert Witness Testimony ("Introduction

and Overview"), which is filed concurrently.

Plaintiffs offer the testimony of the following experts relating to damages:

**John Radke.**  Dr. Radke, an Associate Professor at the University of California at

Berkeley and an expert in ***geography***, seeks to testify about the results of a multiple regression

analysis that purports to use the "hedonic pricing model" approach to evaluate statistically

whether the location of single-family residential properties within the class area influenced their

value.  Dr. Radke specializes in making maps.  He is neither an economist nor a statistician.  He has used this case as an opportunity to conduct his first-ever multiple regression analysis of property values, a subject matter in which he has no expertise.  Dr. Radke has failed to document his work, and is unable or unwilling to produce significant portions of the material upon which he relied.  Dr. Radke's failure to produce such documentation is particularly important where, as here, Dr. Radke worked "iteratively," changing his analysis on the fly, a methodology that is inconsistent with standard scientific methods.  Dr. Radke also uses regression techniques (such as "factor analysis" and "weighted least squares") in a way that is not generally accepted within the scientific community — a reflection of Dr. Radke's non-statistical background and the fact that the multiple regression property analysis he ran for the case was his first ever.  Moreover, as described in greater detail below, Dr. Radke's analysis contains a number of other fundamental flaws that render it inadmissible under *Daubert*.

**Wayne Hunsperger.**  Mr. Hunsperger sponsors five methodologies that purport to estimate and quantify the amount of value supposedly lost by the class properties because of "the influence of the Rocky Flats Nuclear Weapons Facility and the 1989 FBI raid of the plant."  (Ex. 1, Hunsperger Report at 1.)  Mr. Hunsperger's five "approaches" are "Multiple Regression Analysis," "Public Opinion Surveys," "Use of Analogous Case Studies," "Market Sales Information," and "Real Estate Market Research."  As described below, all five methodologies are fundamentally flawed, and are inadmissible under *Daubert*.  In addition, two of these methodologies – multiple regression analysis and public opinion surveys – are co-sponsored by Dr. Radke and by Drs. Flynn and Slovic, respectively, and therefore suffer from all of the *Daubert* problems that apply to Drs. Radke, Flynn, and Slovic.

**James Flynn and Paul Slovic.**  Drs. Slovic (a psychologist) and Flynn (a Ph.D. in English) prepared a survey questionnaire designed to study respondents' attitudes and perceptions of Rocky Flats.  The survey was administered telephonically to 604 Denver area residents from August 31, 1995 to October 1, 1995.  (*Id.* at 46.)  As described below, Drs. Flynn and Slovic are not qualified to conduct a public opinion survey, the survey is severely flawed, and it cannot be used to estimate property values.

# I.   PLAINTIFFS' EXPERT TESTIMONY ON DAMAGES DOES NOT "FIT" THEIR CLAIMS.

The proffered opinions of plaintiffs' damages experts (Radke, Hunsperger, Flynn, and Slovic) do not meet *Daubert*'s "fit" requirement for several reasons.  Some of these "lack of fit" reasons apply in a particular way to an individual expert, and are discussed in Sections II-IV, which address plaintiffs' damages experts individually.  Other reasons for the "lack of fit" of plaintiffs' damages expert opinions apply to ***all*** of plaintiffs' damages experts generally, and are discussed in this Section I.

## A.   Plaintiffs' Damages Expert Opinions Do Not "Fit" the Liability and Damages Claims.

Under the Court's May 17, 2005 and December 17, 2004 Orders, plaintiffs may recover: (i) for plaintiffs' nuisance claims, by proving an increased "common, classwide health risk," created by either past or potential future releases from Rocky Flats (5/17/05 Order at 5-6); or (ii) for plaintiffs' trespass claims, by proving class-wide releases of plutonium from Rocky Flats (12/17/04 Order, Instruction No. 3.11, at 2).  The opinions of plaintiffs' damages experts must "fit" these claims for trespass and nuisance, such that the damages measured are "damages for the decrease in the value of their Class properties ***caused by the prospect of the alleged trespass and/or nuisance*** (if proved by Plaintiffs) continuing into the future."  (5/17/05 Order at 15-16 (emphasis added)); *see also Westric Battery Co. v. Standard Elec. Co.*, 482 F.2d 1307, 1318

(10th Cir. 1973) (it is "only the damage flowing legally from the defendant's misdeeds which counts"); *Davis v. Bonebrake*, 135 Colo. 506, 522 (Colo. 1957) ("must be some connection between injury and damages . . . the asserted consequences must be linked to the injury; otherwise, there is presented to the jury evidence of unrelated conditions and circumstances wholly prejudicial to the party against whom such evidence is being introduced").  In addition to having to "fit" plaintiffs' liability case, plaintiffs' damages expert opinions must also "fit" the measure of damages that may be awarded in this case pursuant to the Court's May 17, 2005 Order and Restatement § 930(3)(b).  *See* Introduction and Overview, Part II.

Plaintiffs' damages expert opinions generally do not "fit" for the following reasons (plus additional reasons that apply to particular experts addressed in Sections II-IV):

- Plaintiffs' damages experts assess neither "the date on which the injurious situation caused by Defendants became complete and comparatively enduring ('CCE date')" (5/17/05 Order at 16), nor "the average percentage diminution in property value that was caused by any trespass or nuisance found by the jury, as of the CCE date" (*id.* at 17).

- Plaintiffs' damages experts assess damages for different periods depending on the analysis they have used.  For example, Radke's various analyses cover the period from 1983 to 1995.  However, under the Court's May 17, 2005 Order, the jury is free to determine that the "complete and comparatively enduring" date (the "CCE date") occurred during any time, including dates outside of the time periods assessed by plaintiffs' damages experts.  Given that, under the Court's May 17, 2005 Order, damages are to be determined "as of the CCE date," plaintiffs' damages expert opinions cover only a portion of the dates for which the jury may be asked to determine damages.  This is particularly problematic where, as here, it is undisputed that 99.9% of plutonium contamination from Rocky Flats had occurred by 1970, a point in time for which plaintiffs' experts have not assessed damages.[1]

---

[1] (Ex. 2, ATSDR 9/2/04 report, at 1–2 ("Though Rocky Flats released plutonium to the air throughout its history, the overwhelming majority (> 99.9%) of plutonium emissions occurred between 1953 and 1969.").)  The ATSDR is an agency of the U.S. Department of Health and Human Services.  *See* http://www.atsdr.cdc.gov/about.html (ATSDR's website).

- Plaintiffs' damages experts do not assess the "decrease in the value of the land caused by the prospect of the continuance of the invasion" (as required to measure damages under Section 930(3)(b)) as of a CCE date or any date, but rather assess diminution in value attributable to "proximity" to Rocky Flats without determining what portion of the "diminution in value" they measure is caused by non-actionable factors versus defendants' tortious conduct.

- Even assuming *arguendo* that plaintiffs' damages experts did offer an opinion on "the average percentage diminution in property value that was caused by any trespass or nuisance found by the jury, as of the CCE date," (5/17/05 Order at 16-17), plaintiffs' damages experts do not assess what portion of that diminution in value was experienced by class members.

- Plaintiffs' damages expert analyses also do not assess damages for the class to the extent that those analyses are based on "sales data."  Rather, plaintiffs' "sales data" analyses are both overinclusive and underinclusive of the class.  Nor do plaintiffs' damages experts assess damages for any "subclass" identified in the May 17, 2005 Order.  (This issue is discussed further in Section II.E.2.)

     **1.**    **Plaintiffs' Damages Expert Opinions Do Not "Fit" Because They Do Not Assess Diminution in Property Value "as of the CCE Date."**

Plaintiffs' damages experts do not assess "the date on which the injurious situation caused by Defendants became complete and comparatively enduring ('CCE date')."  (5/17/05 Order at 16.)  The words "complete and comparatively enduring" are not found anywhere in the reports or depositions of plaintiffs' damages experts (nor of any other plaintiffs' expert).  Nor does "Section 930" appear anywhere in the report or deposition of any plaintiffs' expert.  Because plaintiffs' damages experts do not assess diminution in value as of a "CCE date" under the Section 930(3)(b) measure contemplated by the Court's May 17, 2005 Order, their opinions fail to meet *Daubert's* "fit" requirement.

     **2.**    **Plaintiffs' Damages Expert Opinions May Not "Fit" Because Plaintiffs' Experts Have Not Assessed Damages for Dates on Which the Jury May Determine That "the Injurious Situation Became Complete and Comparatively Enduring."**

Under the May 17, 2005 Order, "Plaintiffs will be required to prove . . . the date on which the injurious situation caused by Defendants became complete and comparatively enduring

('CCE date')." (5/17/05 Order at 16.)  The jury will then be asked to measure damages "as of

the CCE date." *Id.* at 17.

The parties disagree as to the CCE date.[2]  Yet the range of CCE dates that could

potentially be determined by the jury (and, thus, the range of dates for which the jury could

potentially be asked to determine damages) is wide.  The undisputed record evidence shows that,

if there were ever a class-wide "injurious situation" due to defendants' trespass or nuisance that

became "complete and comparatively enduring" as a result of plutonium contamination, the CCE

date may well fall in or before 1970 (Ex. 2, ATSDR 9/2/04 report, at 1–2), which is before the

time for which plaintiffs' experts have measured any diminution in value.  Because plaintiffs'

damages expert opinions do not cover most of the dates for which the jury may be asked to

assess damages, they may not satisfy the "fit" requirement of *Daubert*.

> **3.     Plaintiffs' Damages Expert Opinions Do Not Fit Because Plaintiffs'
> Experts Assess Damages Attributable to Non-Actionable Factors and
> Not "the Prospect of the Continuance of the Invasions" Due to
> Defendants' Actionable Conduct.**

Under the Court's May 17, 2005 Order, "compensatory damages for the first sub-class

(the 'Damages' sub-class) will be determined according to Restatement § 930(3)(b)." (5/17/05

Order at 16.)  Section 930(3)(b) provides that, in order to prove damages, a plaintiff must prove

"the decrease in the value of the land ***caused by the prospect of the continuance of the invasion***

measured at the time when the injurious situation became complete and comparatively

enduring."  Restatement § 930(3)(b) (emphasis added).

---

[2] Defendants' position is that there was no class-wide "injurious situation" caused by one or both
defendants' trespass or nuisance that ever became "complete and comparatively enduring," or,
alternatively, that any "injurious situation" became "complete and comparatively enduring" as of
various dates applicable to any such individual "injurious situations."

Plaintiffs' damages experts do not assess diminution in value attributable to:  (1) any class-wide increased health risk caused by one or both defendants' nuisance; (2) any releases of plutonium caused by one or both defendants; or (3) any other actionable conduct by defendants (class-wide or otherwise).  For example, Mr. Hunsperger declined to attribute any portion of his damage estimates to "invasions" that occurred while either Dow or Rockwell was operating the plant, much less to the "prospect of the continuance of the invasions."  (Ex. 3, Hunsperger Dep. 361:17-362:13 ("Q:  Is there any portion of that [damage] figure that you attribute to conduct by the Dow Chemical Company?  [Objection.]  A:  I can't answer that question because as I've said, I made no investigation into the conduct of Dow.  Q:  Same question with respect to Rockwell International.  [Objection.]  A:  I've made no investigation into the conduct of Rockwell.").)  The plaintiffs also proffer no opinion testimony that attempts to link the plaintiffs' alleged property damage to "health risks" associated with Rocky Flats.  (*Id.* 405:11-21 ("Q:  Is it important for the work you do to consider what scientists have determined the health risks to be from Rocky Flats? [Objection.]  A:  [T]he answer is no."); Ex. 4, Radke Dep. 217:7-10.)

Instead of measuring diminution in value attributable to "releases," "health risk," or any other tortious conduct by defendants, plaintiffs' experts measure diminution in value attributable to "proximity."  Dr. Radke testified that he only looked at the relationship between property values and proximity.  (Ex. 4, Radke Dep. 442:16-23 ("I only do proximity to Rocky Flats.").)  Indeed, Dr. Radke's report is titled "***Measuring the Effects of Proximity*** to the Rocky Flats Nuclear Weapons Plant on Property Values."  The analyses of plaintiffs' other damages experts are all indistinguishable from Dr. Radke's analysis in this respect — they all measure diminution in value attributable to "proximity" to Rocky Flats.  (*See, e.g.*, Ex. 5, Transcript of Hunsperger Videotape, November 25, 1996, at 1 ("I've been asked to study this neighborhood and others

nearby to determine whether or not their **nearness to the Rocky Flats Nuclear Weapons Plant has had any impact** on property values.") (emphasis added); *id.* at 6 ("The real estate market research indicates that the **nearness of these communities to Rocky Flats substantially impacts and reduces the value of property**.") (emphasis added); Ex. 1, Hunsperger Report at 60 (survey conducted by Drs. Flynn and Slovic, which is incorporated into Mr. Hunsperger's report, concludes only that "[p]roximity to Rocky Flats makes housing less desirable").)  As discussed below, Mr. Hunsperger wholesale incorporates Dr. Radke's proximity analysis into his report and adopts it as his own.

Any property diminution caused by proximity to Rocky Flats is not actionable in this case.  *See* Sen. Rep. No. 296, 85th Cong., 1st Sess. at 16 (1957) (Price-Anderson Act legislative history) ("It is not the intention of the committee to have the damage to property which is included in the term 'nuclear incident' include the diminution in value or other similar causes of action which may occur, namely, from the location of an atomic energy activity at a particular site.").[3]  As Dr. Radke testified, however, the "loss" attributable to "proximity" could exist "just because people don't like living next to a former nuclear weapons plant."  (Ex. 4, Radke Dep. 206.)  Plaintiffs' damages experts make no effort to segregate the impact of proximity (or other

---

[3] Colorado nuisance law is in accord.  *See Cook v. Rockwell Int'l Corp.* ("*Cook IX*"), 273 F. Supp. 2d 1175, 1208 (D. Colo. 2003); *Staley v. Sagel*, 841 P.2d 379, 382 (Colo. Ct. App. 1992) ("Plaintiffs admit that the limited injunction effectively restores their quality of life, but they argue that they are entitled to damages because the very existence of the hog facility decreases the value of their property.  However, plaintiffs are entitled to damages only for those activities which constitute a nuisance; they are not entitled to recover for any claimed diminution in their property's value for caused by any of defendant's actions that do not constitute a nuisance or other actionable wrong.").  Non-Colorado jurisdictions are also in accord.  *See A&P Food Stores v. Kornstein*, 121 So.2d 701, 705 (Fla. App. 1960) (plaintiff may not recover for nuisance caused by "the mere proximity of appellant's establishment to appellees' property"); *Winget v. Winn-Dixie Stores*, 130 S.E.2d 363, 369 (S.C. 1963) (same).

non-actionable factors correlated with proximity) from class-wide plutonium releases, present or future class-wide increased "health risk," or any other allegedly tortious conduct by defendants.

Courts have consistently held that a plaintiff's expert ***bears the burden*** of distinguishing the impact of a defendant's actionable conduct (*e.g.*, that "Dow or Rockwell or both of them intentionally undertook an activity that in the usual course of events caused plutonium to be deposited on the class properties," 12/17/04 Order, Instruction No. 3.11, at 2) from a defendant's nonactionable conduct (such as "people [just] don't like living next to a former nuclear weapons plant" (Ex. 4, Radke Dep. 206)).  If a plaintiff's expert does not discharge that burden, then that expert's analysis is ***inadmissible*** under *Daubert.  See, e.g., Schmidt & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415 (7th Cir. 1992) (Posner, J.) ("For years we have been saying, without much visible effect, that people who want damages have to prove them, using methodologies that need not be sophisticated but must not insult the intelligence. . . . The expert should have tried to separate the damages that resulted from the lawful entry of a powerful competitor - Nordisco - from the damages that resulted from the particular forms of misconduct allegedly committed by that competitor."); *see also City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1372 (9th Cir. 1992) ("[The expert] study failed to segregate the losses, if any, caused by acts which were not antitrust violations from those that were. . . . The question remaining is whether the district court was nevertheless required to allow Vernon to go the jury with its erroneous approach or to give it still another opportunity to refine a study that, according to Vernon, could not be refined.  We think not."); *Isaksen v. Vermont Castings, Inc.*, 825 F.2d 1158, 1164 (7th Cir. 1989) ("The jury pulled the figure of $100,000 out of a hat in which Isaksen's expert witness had done the usual magic tricks; but as there was no evidence of how much the antitrust violation, as distinct from unrelated market forces, contributed to Isaksen's losses, or of how much of the loss was an

antitrust injury as distinct from a purely private loss form being deprived of the opportunity to take a free ride on competing dealers, the expert's efforts to translate his losses into a present-value figure were irrelevant.  We do not allow antitrust plaintiffs or any other plaintiffs to obtain damage awards without proving what compensable damages were actually suffered as result of the defendant's unlawful conduct."); *Farley Transp. v. Santa Fe Transp. Co.*, 786 F.2d 1342, 1352 (9th Cir. 1986) ("In sum although Farley produced evidence it had suffered some injury due to Santa Fe's antitrust violation, Farley provided no evidence on the amount of damages attributable only to the unlawful conduct.  Farley's utter failure to make any segregation between damages attributable to lawful competition and that attributable to the unlawful scheme to deviate from the tariff rate requires reversal of the verdict and remand for a new trial on the amount of damages."); *In re Executive Telecard, Ltd. Securities Litig.*, 979 F. Supp. 1021, 1025 (S.D.N.Y. 1997) (excluding expert witness under reliability prong of *Daubert* on ground that expert "fail[ed] adequately to distinguish between fraud related and non-fraud related company specific influences on EXTL's stock price."); *In re Oracle Securities Litig.*, 829 F. Supp. 1176, 1181 (N.D. Cal. 1993) ("Mr. Hammerslough's analysis fails to distinguish between the fraud-related and non-fraud related influences on the stock's price behavior. . . . As a result of his failure to employ such a study, the results reached by Mr. Hammerslough cannot be evaluated by standard measures of statistical significance.   Hence, the reliability of the magnitude and direction of his value estimates are incapable of verification.").

Indeed, the Reference Manual on Scientific Evidence states

If a damages analysis includes the ***effects not caused by the defendant***, it is a ***defective analysis***.  It has not followed the standard format for damages, which, by its nature, isolates the effects of the harmful act on the plaintiff."

*See* Robert E. Hall & Victoria A. Lazear, Reference Manual on Scientific Evidence 307-308 (2d ed. 2000) (emphasis added).  This principle is often applied in antitrust cases, but "can arise in any type of case."  *Id.* at 305-06.[4]

Plaintiffs' own expert analyses affirmatively show that non-tortious factors can cause property value loss.  According to Mr. Hunsperger, "analogous case studies" demonstrate that mere proximity to an industrial site – without a contribution from any tortious conduct – lowers the value of nearby properties, thus underscoring the need to separate such a non-compensable proximity effect from any actual diminution in value caused by defendants' wrongful acts.  (*See, e.g.*, Ex. 6, Hunsperger Report, Exhibit F, Gerald E. Smolen, et al., Economic Effects of Hazardous Waste Landfills on Surrounding Real Estate Values in Toledo, Ohio at 22 ("***proposed*** Riga landfill" had "pronounced" effect on area real estate values) (emphasis added); Ex. 7, Hunsperger Report, Exhibit I, Santa Fe Property Value Opinion Research Regarding the WIPP Bypass at 42 (area residents believed that ***proposed*** nuclear waste transport highway would impact property values) (emphasis added).)

Plaintiffs' experts' analyses also inappropriately fail to exclude from their assessment of "diminution in value" any such diminution that is attributable to the "actual effects of prior invasions."  As discussed in Part II of the Introduction and Overview, the diminution in value associated with such "actual effects" of "past invasions" must be assessed under Section 929, not

_____

[4] *See also Isaksen*, 825 F.2d at 1164 ("We do not allow antitrust plaintiffs ***or any other plaintiffs*** to obtain damage awards without proving what compensable damages were actually suffered as a result of the defendant's unlawful conduct.") (emphasis added); *First Sav. Bank v. U.S. Bancorp*, 117 F. Supp. 2d 1078, 1085 (D. Kan. 2000) (trademark infringement); *Executive Telecard*, 979 F. Supp. at 1025-26 (holding that expert's analysis was unreliable and hence inadmissible in securities case since it failed adequately to distinguish between actionable and nonactionable factors).

under Section 930.  Restatement § 930, cmt. d ("[T]his depreciation [measured under Section 930] is distinct from the loss in value brought by the actual effects of past invasions (see Comment on § 929) such as damages by floods to the soil's fertility.").[5]

For the foregoing reasons, the failure of plaintiffs' damages experts to distinguish:  (1) what portion of the "diminution in value" measured by those experts attributable to non-actionable factors; from (2) the portion of "diminution in value" attributable to defendants' tortious conduct, renders the opinions of those experts inadmissible under *Daubert.*

> **4.     Plaintiffs' Damages Experts Impermissibly Fail to Differentiate Diminution in Value Experienced by Non-Class Members from That Experienced by Class Members.**

Plaintiffs' damages experts assess diminution in value experienced by certain ***properties*** in the class area (and elsewhere), but do not assess diminution in value experienced by ***class members***; accordingly, plaintiffs' damages expert opinions do not "fit" this class action for *Daubert* purposes.

The property class is defined as "All Persons and entities owning an interest (including mortgagee and other security interests) in real property situated within the Property Class Area, exclusive of governmental entities, defendants, and defendants' affiliates, parents, and subsidiaries" as of "June 7, 1989."  *Cook v. Rockwell Int'l Corp.* ("*Cook IV*"), 151 F.R.D. 378, 382 (D. Colo. 1993).  Individuals who owned an interest in properties within the Property Class Area, but sold those properties before June 7, 1989, are not part of the property class.

---

[5] Floods damage soil fertility by adding compounds such as salt and sand to the soil.  *See, e.g.,* <http://www.ag.ndsu.nodak.edu/flood/soilsdhb.htm> (Tips For Handling Flooded Soils:  "Sand deposits on top of silty or clay-type soils deeper than 4 inches may decrease potential crop yields.").)

The table below shows the dates when class members purchased and sold their

properties:

**The Years in Which Class Member
Parcels Were Bought and Sold**

| Year Bought | Number of Class Member Parcels Bought | | Year Sold | Number of Class Member Parcels Sold |
|---|---|---|---|---|
| 1901 | 1 | | 1989b | 1,381 |
| 1907 | 1 | | 1990 | 1,437 |
| 1908 | 1 | | 1991 | 1,463 |
| 1923 | 1 | | 1992 | 1,166 |
| 1947 | 1 | | 1993 | 1,009 |
| 1954 | 1 | | 1994 | 678 |
| 1955 | 1 | | 1995 | 550 |
| 1956 | 3 | | 1996 | 455 |
| 1957 | 1 | | 1997 | 461 |
| 1958 | 4 | | 1998 | 429 |
| 1959 | 2 | | 1999 | 346 |
| 1960 | 1 | | 2000 | 330 |
| 1961 | 1 | | 2001 | 261 |
| 1962 | 1 | | 2002 | 226 |
| 1963 | 1 | | 2003 | 140 |
| 1964 | 2 | | | |
| 1965 | 3 | | | |
| 1966 | 1 | | | |
| 1967 | 4 | | | |
| 1968 | 6 | | | |
| 1969 | 2 | | | |
| 1970 | 8 | | | |
| 1971 | 52 | | | |
| 1972 | 155 | | | |
| 1973 | 181 | | | |
| 1974 | 119 | | | |
| 1975 | 198 | | | |
| 1976 | 300 | | | |
| 1977 | 664 | | | |
| 1978 | 756 | | | |
| 1979 | 665 | | | |
| 1980 | 499 | | | |
| 1981 | 534 | | | |
| 1982 | 528 | | | |
| 1983 | 798 | | | |
| 1984 | 1130 | | | |
| 1985 | 1148 | | | |
| 1986 | 1713 | | | |
| 1987 | 1729 | | | |
| 1988 | 1851 | | | |
| 1989a | 965 | | | |

Colorado follows the universal rule that a tort plaintiff may only recover damages which that particular plaintiff has suffered.  *See Bd. of County Comm'rs v. Slovek*, 723 P.2d 1309, 1316 (Colo. 1986) ("The trial court must take as its principal guidance the goal of reimbursement of the plaintiff for losses actually suffered.").  Thus, any diminution in value that occurred before a class member purchased his property (meaning that the economic factor of the diminution in value was experienced by a non-class member) may not be recovered by that class member.  For example, assuming hypothetically that the evidence showed that a property decreased in value by $1,000 due to defendants' "continuing trespass/nuisance" in 1970, and a class member purchased that property in 1986, that class member could not recover for the $1,000 decrease that occurred prior to the purchase.  This Court has ruled that "Defendants may seek to mitigate any compensatory damages proved by Plaintiffs by demonstrating the fact and amount of any prior market discount the Damages sub-class received as a result of the ongoing trespass and/or nuisance when they purchased their Class property."[6]  (5/17/05 Order at 17.)

Plaintiffs' damages experts do not assess whether the diminution in value that they purport to determine for properties in the class area was experienced before or after the class members purchased their properties.  For example, as shown by the above table, 1,945 class members purchased their properties during 1988.  For "single-residential" properties, Dr. Radke opines that the "diminution in value"[7] as of 1988 was "7.68%," and that the diminution in value

---

[6] Defendants wish to preserve for the record their disagreement with the ruling that such a "prior market discount" constitutes "mitigation," or that defendants bear the burden of establishing such a "prior market discount."

[7] As defendants have explained in prior submissions, this "diminution in value" is actually a "difference in value," as Dr. Radke did not analyze whether it existed in prior years.

as of 1989 was "7.29%," as shown by the following table taken from page 6 of Dr. Radke's report:

**Radke Report, Table 1, Phase II Property Value Findings**

| Year | "Mean Undervaluation" |
|------|------------------------|
| 1988 | -7.68% |
| 1989 | -7.29% |
| 1990 | -9.33% |
| 1991 | -7.69% |
| 1992 | -9.18% |
| 1993 | -8.56% |
| 1994 | -7.50% |
| 1995 | -5.45% |

According to plaintiffs' own analysis, the 1,945 class members who purchased in 1988 received a 7.68% discount because of Rocky Flats. (Ex. 8, Radke Report at 6). That discount shrunk to 7.29% in 1989. (*Id.*) Thus, *according to plaintiffs' own analysis*, in the first year after their purchase, *the 1,945 class members who purchased class properties in 1988 had made an overall profit from the supposed declining "impact" of Rocky Flats* (equal to .39% of the value of their properties (the difference between the 1988 "impact" of Rocky Flats (7.68%) and the 1989 "impact" of Rocky Flats (7.29%)). (*Id.*) By 1995, according to plaintiffs' own analysis, the impact of Rocky Flats had shrunk to 5.45%. (*Id.*) Accordingly, by 1995, plaintiffs' own analysis shows that the 1,945 class members who purchased class properties in 1988 had increased their "profit" due to the declining "impact" of Rocky Flats to an amount equal to 2.23% of the value of their properties (the difference between the 1988 "impact" of Rocky Flats (7.68%) and the 1995 "impact" of Rocky Flats (5.45%)). Plaintiffs' experts do not analyze data

16

after 1995.  Accordingly, plaintiffs' own data shows that (according to plaintiffs' analysis) there is negative impact to these 1,945 class members—about 13% of the class.

All of plaintiffs' damages expert analyses suffer from this fundamental flaw.[8]  Rather than measuring diminution in value *experienced by class members*, plaintiffs' damages experts measure supposed diminution in value *experienced by __properties__ in the class area, regardless of whether the diminution occurred when the properties were not owned by class members*.  Accordingly, plaintiffs' damages expert analyses do not "fit" the class, and accordingly are inadmissible under *Daubert*.

## II.    JOHN RADKE.

Dr. Radke, an Associate Professor at the University of California at Berkeley and an expert in geography, seeks to testify about the results of his first-ever multiple "regression" analysis that purports to use the "hedonic pricing model" approach to evaluate statistically whether the location of single-family residential properties within the class influenced their value.  Regression analysis is a statistical technique that estimates the effect of one or more "explanatory" variables on a "dependent" variable.  For example, in the context of housing prices, one may attempt to use regression analysis to try to estimate the average effect of an additional square foot of living room space, or a garage, on the average value of a group of houses.  Used in this way, regression analysis is also called "hedonic" analysis.  In hedonic regression, the estimated price of properties is the dependent variable and each attribute or component of the property is an independent variable.

---

[8] Each of Hunsperger's damages analyses are designed to "determine the impact on property values within the Property Class Area" from "the 1989 FBI raid of the plant through 1995," with no inquiry into whether any such impact was borne by class members (all of whom, by definition, had acquired their property *before* the 1989 FBI raid).

Dr. Radke uses a regression technique known as "weighted least squares estimation," as opposed to the standard "ordinary least squares" method, ostensibly to "balance" the influence of different sample sizes inside and outside of the class on the regression results. As explained below, Dr. Radke's use of weighted least squares is fundamentally inconsistent with well-established scientific standards.

Dr. Radke does not regress traditional independent variables (e.g., square footage, number of rooms, lot size) against the dependent variable, "property value." Instead, attempting to use a process known as "factoring," Dr. Radke creates a series of "composite" independent variables (e.g., education, accessibility, traffic, minorities), supposedly "adjusting" those variables to render them "more interpretable." Dr. Radke's use of factoring is also inconsistent with accepted scientific standards.

Dr. Radke divided his regression analysis into two "phases." In Phase I, he collected data on sales of vacant land, commercial property, and "multi-family residential" properties from 1983-93. The Phase I model is not designed to estimate the effects of being inside or outside the class. Instead, Dr. Radke attempts to determine a radius within which proximity to the plant has an effect on the three types of property studied and then purports to estimate a linear, per-mile, effect of proximity to the plant on property values. The Phase I model is also not intended to determine the effect of proximity to the class in any year. The "effect" it estimates is modeled to be the same in every year from 1983-93.

Phase II focuses on single family residential property (by far the most prevalent property type in the class). The transactions studied in Phase II took place between 1988 and 1995. Dr. Radke employs two separate models in Phase II. In what he calls "Method 1," Dr. Radke attempts to estimate an effect of being inside the class for each of the eight years. His results

purport to show that properties within the class were worth 7.68% less than comparable properties outside the class in 1988 – the first year studied and the year ***before*** the class membership date.

Phase II, Method 2 uses the same single family residential data as Phase II, Method 1, but does not use the class boundary to define the study area.  Instead, as in Phase I, the residential model is set up to estimate a "radius" of impact and a per-mile diminution within that radius.  Not surprisingly, because the two models use the same data, the average diminution per year roughly follows the same pattern.  Dr. Radke concludes that Method 1 is a "slightly better model" than Method 2.  (Ex. 8, Radke Report at 46-47.)

Phase III of Dr. Radke's analysis purports to use the results of the regression analysis to calculate damages by multiplying the alleged diminution in value for each property type by Dr. Radke's estimate of the total amount of that type of property in the class.  As discussed below, among other problems, Dr. Radke does not take account of the fact that, in the case of the Phase I property types (vacant land, commercial real estate, and multi-residential), Dr. Radke himself found that the diminution did not extend to the entire class area.

The data used by Dr. Radke to populate his Phase II models were obtained from multiple listing service ("MLS") reports.  Using a process known as "address matching," Dr. Radke claims to have identified almost all of the residential single-family properties sold each month from 1988 to 1995 within the class.  Assuming that Dr. Radke correctly defined the contour, however, these properties would only have been those whose sale involved an MLS realtor.  Dr. Radke compared these properties with others selectively chosen from the rest of his study region: the five counties surrounding Denver.

After a series of unrecorded steps, Dr. Radke's model yields "coefficients" for each of the independent variables he specified.  According to Dr. Radke's theory, each coefficient represents the contribution of the independent variable, either positive or negative, to the value of the dependent variable — property value.  Dr. Radke measured the coefficient for a variable that he defined as "location within the class" for each year from 1988 to 1995, and translated the value of this coefficient into the "effect," expressed as a percentage, of location within the class on property value.

Dr. Radke's purported analysis is inadmissible for a number of reasons, including but not limited to the following:

- Dr. Radke is not qualified to perform the kind of analysis he claims to have undertaken.

- As discussed above, Dr. Radke's analysis does not "fit" for a number of reasons: (a) he only studied the relationship between property values and "proximity," not defendants' tortious conduct (Ex. 4, Radke Dep. 442); (b) he has not measured diminution in value attributable to the "prospect of the continuance of the invasion measured at the time when the injurious situation became complete and comparatively enduring;" and (c) he only measured "diminution in value" for a certain time period that may not cover a date that the jury determines to be the CCE date.

- Dr. Radke's analysis relies on sales data that is both under- and overinclusive of the class.

- Dr. Radke has failed to document his work, and is unable or unwilling to produce significant portions of the material upon which he relied (and, indeed, Magistrate Judge Borchers found that the programs and data no longer even exist (Ex. 9, 3/31/98 Order at 4–5) — a flaw that makes Dr. Radke's work non-replicable and inadmissible.  *See Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003).

A.      **Dr. Radke Is Not Qualified To Perform The Hedonic Analysis Of Property Values That He Undertook.**

Dr. Radke is unqualified to perform the "hedonic" valuation of real estate presented in his report.  The "hedonic" valuation of commodities in general, and real estate prices in particular, is an application of economics and statistics.  (*See generally* Ex. 10, McFadden Aff. at 42-63)  Dr.

20

Radke is not an expert in either of these fields.  His only advanced degree is in geography.  (Ex. 4, Radke Dep. 60.)  All of his research and published work as of the date of his deposition were in the area of geographic information science, "GIS," an application of computer science and geography.  (*Id.* 55-98.)  Dr. Radke is the director of a GIS laboratory at the University of California.  (*Id.* 78:10-18.)  Three of four courses he has taught relate to GIS.  (*Id.* 84:10-85:12.)  None of the courses he taught includes "as a subject matter" the statistical techniques used in his report here. (*Id.* 85:22-86:2.)  Dr. Radke has never taught a course where even a single lecture was devoted to the topics of hedonic modeling or real estate valuation. (*Id.* 91:1-92:14.)

Before this case, Dr. Radke had never done any research on property values.  (*Id.* 15:1-23.)  He has never been retained "by anyone for any purpose to do a study of property valuations other than Rocky Flats."  (*Id.* 23:13-18.)  ***He has never before attempted a "hedonic model" of any kind, let alone one for the purpose of valuing real estate***:  "I haven't done hedonic pricing modeling analysis — I haven't done this for anything other than this case, current case, Rocky Flats."  (*Id.* 173:17-174:2.)

Dr. Radke admits that he is not an expert in economics.  (*Id.* 72:1-12.)  His only training in economics were two courses in college taught by an "economic geographer."  (*Id.* 68:10-69:20.)  Dr. Radke's background in statistics is likewise insufficient.  He took two statistics courses in college and one while studying for his masters degree, "a lifetime ago for me back in Canada."  (*Id.* 56:20-59:4.)  Dr. Radke admits that these courses actually concerned "spatial modeling."  (*Id.* 57:21-58:4.)  He has not published a single paper that used multiple regression for any purpose, including the study of property values.  (*Id.* 171:10-24.)[9]

---

[9] Dr. Radke testified that he was relying on Mr. Hunsperger in various areas, whereas Mr. Hunsperger disclaimed expertise in those same areas and testified that he had been relying on Dr.

(Continued…)

In short, Dr. Radke is not "proposing to testify about matters growing naturally and directly out of research [he] ha[s] conducted independent of the litigation." *Daubert v. Merrell Dow Pharm., Inc.* ("*Daubert II*"), 43 F.3d 1311, 1317 (9th Cir. 1995).  Dr. Radke has developed his opinion "expressly for the purposes of testifying."  *Id.*  Accordingly, Dr. Radke's proffered analysis is inadmissible under *Daubert*.

> **B.      Radke's Regression Analysis Is Inadmissible Because Of Fundamental Methodological Errors, Including Inappropriate Use Of Statistical Techniques Such as "Factor Analysis" and "Weighted Least Squares."**

Dr. Radke's lack of any previous experience in running a "hedonic pricing modeling analysis" showed.  Dr. Radke committed numerous methodological errors in his inaugural property value regression study.  Those methodological defects undermine Dr. Radke's opinions, as explained in the affidavit of Dr. Daniel McFadden, a world-renowned econometrician who received the Nobel Prize in 2000 for his contributions to econometric analysis.

Dr. McFadden explains that Dr. Radke's fundamental error is that he used a type of regression that was not appropriate for his study.  (*See* Ex. 10, McFadden Aff. at 54.)  Dr. Radke's model uses a variant of multiple regression analysis called "weighted least squares" which increases the weight on observations outside of the class area and results in statistically inconsistent estimates of standard errors of the weighted least squares estimates.  (*Id.*)  Dr. McFadden notes that the use of weighted least squares under these circumstances is "a blatant

---

Radke.  For example, Dr. Radke could not identify or testify about any literature on hedonic modeling of real estate prices other than the few items listed in the bibliography in his report, and he was directed to these by Hunsperger.  (*Id.* 176:4-19; 178:1-19.)  Yet, Hunsperger testified that he is not an expert in this area. (Ex. 3, Hunsperger Dep. 435:1-436:21.)  Dr. Radke also relied on Hunsperger for advice on how to specify his multiple regression model.  (Ex. 4, Radke Dep. 178:1-19.)  Yet, Hunsperger disclaimed any expertise in statistics, economics or multiple regression analysis, and testified that he is relying completely on Dr. Radke's expertise in these areas. (Ex. 3, Hunsperger Dep. 435:1-436:21.)

and obvious statistical error that contradicts the Gauss-Markov theorem, the most fundamental result in regression theory."  (*Id.*; *see also id.* at 5 ("Dr. Radke's statistical errors regarding factor analysis and weighted least squares are basic and obvious violations of . . . the first result taught in a graduate course in econometrics.").)  "Weighting of observations in least squares is appropriate for data that is randomly sampled (including stratified sampling based on an explanatory variable such as location inside or outside the class) *only* to correct for heteroscedasticity, a non-constant variance of the regression disturbances across observations." (*Id.* at 54.)  In fact, according to Dr. McFadden, "[a]ll major econometrics testbooks, such as William Greene *Econometric Analysis*, give these results."  (*Id.*)

Dr. Radke was unable to cite to any statistical literature that supports his use of weighting.  (Ex. 4, Radke Dep. 407:2-22)  In fact, he was unable to cite to any literature suggesting the use of weighted least squares for any purpose other than heteroscedasticity (*Id.* 394:3-8), and he did not test for heteroscedasticity prior to adopting his weighting scheme here. (*Id.* 394:9-395:1)  Unable to justify the use of his chosen regression method, Dr. Radke testified that his use of weighting was simply irrelevant, and that his use of a ***weighted*** regression — as opposed to an ordinary least squares approach — did not affect his results:  "It would have no effect."  (*Id.* 379:2-14)[10]

Dr. Radke never ran his regression without weighting, however.  Dr. McFadden did.  Dr. McFadden demonstrates that running Dr. Radke's analysis while correcting for Dr. Radke's

_____

[10]A separate and independent ground to strike Dr. Radke's opinions is that the manner in which he weighted his regression was arbitrary.  When asked why he chose a weight of .15 as opposed to some other number, Dr. Radke testified, "I just chose .15."  (*Id.* 406:8-11)  Expert opinions generated by such arbitrary assumptions are inadmissible.  *See, e.g.*, *MTX Communications Corp. v. LDDS/WorldCom, Inc.*, 132 F. Supp. 2d 289 (S.D.N.Y. 2001) (excluding expert study whose methodology incorporated an arbitrary multiplier).

weighting error (and correcting Dr. Radke's erroneous use of "factoring" discussed below) completely eliminates any purported "discount" due to proximity to Rocky Flats in Dr. Radke's regression.  (*See* Ex. 10, McFadden Aff. at 54-59.)  When Dr. McFadden ran Dr. Radke's model without weighting and factoring, Dr. Radke's "proximity discount" disappeared.  (*See id.* at 57 (finding "no statistically significant" proximity effects).)[11]

Dr. Radke's statistical errors have a major effect on his conclusions.  Dr. McFadden concludes that "Dr. Radke's work is "deeply flawed by errors and documentation lapses that make it non-replicable, inaccurate, and unreliable."  (*Id.* at 63.)  These are mistakes one might expect of an inexperienced student of regression analysis such as Dr. Radke, but certainly not of an expert in this subject.

### C.    Other Methodological Flaws in Dr. Radke's Analysis.

Dr. Radke's analysis contains several other methodological flaws.  For example, Dr. Radke calculates a dollar number for "damages" to vacant, commercial and multi-residential land based on the proximity effects he (incorrectly) determined in Phase I of his study.  Phase I, as noted above, did not use the class boundary or class properties.  Instead, Dr. Radke estimated the distance from Rocky Flats within which there was a proximity effect and then estimated the per mile-effect within that distance.  At and outside the boundary of the effect, Dr. Radke

---

[11]By weighting his regression, Dr. Radke inadvertently proved the opposite of what he intended.  The entire premise of his analysis is that his model captures all property differences *except* for proximity to Rocky Flats, and can therefore determine the property diminution "attributable" to Rocky Flats while controlling for all other variables.  The fact that weighting leads to different results indicates that this is not the case.  Dr. McFadden confirmed this fact with a test called the Hausman test, which looks for systematic differences within the class and outside the class that are not captured by Dr. Radke's model.  (*See id.* at 58-59.)  He concluded that Dr. Radke's control failed the Hausman test and, therefore, is inadequate, and that Dr. Radke's model "cannot be reliably used to estimate damages associated with proximity."  (*Id.* at 59)

determined that there was *no* proximity effect.  For example, in the case of vacant land, Dr. Radke calculated that the "effect" of Rocky Flats extended 4.5 miles from the center of the plant. Significant portions of the class are thus outside of the area that Dr. Radke determined was damaged.  (Put differently, Dr. Radke's best estimate in Phase I is that significant portions of the class are unaffected by their proximity to Rocky Flats.)

Nevertheless, when calculating dollar damages, Dr. Radke includes all of the properties in the class, not just the class properties within the area where he estimated damages. Defendants' expert Laurentius Marais compares this procedure to "multiplying the price of apples by a count of oranges.  Even if his estimates had no other defects, this mismatch alone would make them unreliable and invalid."  (Ex. 11, Marais Decl. ¶ 60.)

Dr. Radke's work contains other methodological flaws as well.  For his "control area," Dr. Radke claims to have used a random sample of about three percent of the transactions in the Denver metropolitan area.  As shown in Dr. McFadden's affidavit, the methodology used by Dr. Radke in selecting this "three percent" was "insufficiently documented."  (*See* Ex. 10, McFadden Aff. at 52.)  Moreover, the "three percent" of transactions selected by Dr. Radke "is spread over the Denver metropolitan area, with relatively thin coverage in the areas to the northwest of downtown Denver that share many locational characteristics and development patterns with properties inside" the class.  (*Id.*)  According to Dr. McFadden, Dr. Radke's own description suggests a biased sample of sales and under-sampling of some areas.  (*Id.*)  Dr. McFadden points out, moreover, that "*[a]ny* systematic differences between properties in the [class] and control areas that are *not* captured by variables in the hedonic price model may lead to systematic price differences that hedonic price analysis will attribute, incorrectly, to location with the [class]." (*Id.*)  These flaws "increase the probability that there are broad regional variations in the Denver

housing market, not completely captured in the location variables included in the model, that

introduce variations from the [class] area for reasons other than proximity to Rocky Flats."

>        **D.      Dr. Radke's Analysis Is Also Unreliable Because of His Failure to Document
>                His Work and Make It Available for Review.**

In an egregious departure from both the Federal Rules of Civil Procedure and the

standards of performing and documenting statistical work, Dr. Radke refused to produce

significant portions of the material upon which he relied for his statistical analyses.  On January

8, 1998, Defendants filed a Motion to Compel the materials that Dr. Radke had failed to produce.

Based on plaintiffs' representations in their Opposition to Defendants' Motion to Compel,

Magistrate Judge Borchers determined that the following material simply ***no longer exists***:[12]

- The programs used to run Dr. Radke's regressions and the formulas describing how certain variables were created;

- The x-y geographic coordinates of the properties analyzed in his study necessary to recreate the dozens of variables Dr. Radke created using his GIS software including variables describing the distance of properties from Rocky Flats;

- The dates of the transactions sought by defendants used in his study;

- Certain regression output.

(Ex. 9, 3/31/98 Order at 4-8.)  In addition, Magistrate Judge Borchers ordered plaintiffs to

produce certain geographic data on or before July 30, 1998, but plaintiffs have failed to do so.

---

[12] On April 21, 1998, Defendants also filed a motion under Rule 37(c)(1) to preclude Dr. Radke's testimony based on his failure to document his work and make it available for review. That Motion was denied in *Cook VIII* on the grounds that "Plaintiffs have not . . . yet sought to rely on Dr. Radke's evidence."  181 F.R.D. at 488–89.  Now that plaintiffs seek to rely on Dr. Radke's testimony at trial, however, relief under Rule 37(c)(1) is appropriate.

1.      **Dr. Radke's inadequate documentation fails to meet the customary standard for research results among economists.**

As Dr. McFadden explains in his affidavit, "the National Science Foundation and major journals require that data, programs, and materials necessary to replicate published economic studies be archived and made available to any interested scientist." (*See* Ex. 10, McFadden Aff. at 21.) This is also the customary standard for research results circulated among economists. Dr. McFadden points out that "[a] failure to provide full documentation increases the probability of errors that will go undetected and produce false and misleading results. This was precisely the reason that the National Science Foundation and the major journals have adopted formal documentation standards." (*Id.* at 22.) As Dr. McFadden notes:

> In ordinary scientific discourse, the give and take of ideas and results provides some protection against an erroneous analysis. Results are rarely given unqualified acceptance unless they are established independently by other researchers, and the analyst concerned with his scientific reputation and career has strong incentives to make sure that his conclusions are correct. That errors appear despite these incentives is indicative of the many ways in which mistakes can occur in applied regression analysis. ***In a litigation setting*** where review by opposing experts is one of the main protections against erroneous analysis, it is my opinion that ***the standards for documentation and replicability should be as high or higher than they are in ordinary scientific discourse***.

(*Id.* (emphasis added).) The Reference Manual on Scientific Evidence directly addresses the documentation that is expected of a statistician carrying out a multiple regression analysis:

> A party that offers data to be used in statistical work, including multiple regression analysis, should be encouraged to provide the following to the other parties: (a) a hard copy of the data when available and manageable in size, along with the underlying sources; (b) computer disks or tapes on which the data are recorded; (c) complete documentation of the disks or tapes; (d) computer programs that were used to generate the data (in hard copy, on a computer disk or tape, or both); and (e) documentation of such computer programs. A party proposing to offer an expert's regression analysis at trial should ask the expert to fully disclose: (a) the database and its sources; (b) the method of collecting the data; and (c) the methods of analysis.

(*Id.* at 23 (quoting Reference Manual on Scientific Evidence, at 201–02).)

As a result of Dr. Radke's poor documentation, "[s]ubstantive questions on Radke's procedure, data sources, and variable construction remain unanswered." (*See* Ex. 10, McFadden Aff. at 3.)  Dr. McFadden's affidavit discusses in detail some of the specific consequences of Dr. Radke's failure to document his work.  (*See id.* at 27–42.)

> ### 2.     Dr. Radke's inadequate documentation fails to meet the standards of the Federal Rules of Civil Procedure and the requirements of *Daubert*.

In addition to violating the economics profession's commonly-accepted standards, Dr. Radke's failure to provide the programs and data requested by defendants violates the Federal Rules of Civil Procedure and is inadmissible under *Daubert* and its progeny.  As defendants have argued at length in their April 21, 1998 motion under Rule 37(c)(1) to preclude Dr. Radke's testimony (incorporated by reference herein), Magistrate Judge Borchers' March 31, 1998 Order made all of the findings necessary to require preclusion under Rules 26(a)(2) and 37(c)(1).  *See* Fed. R. Civ. Pro. 37(c)(1) ("A party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.")  First, the materials at issue are essential, and Dr. Radke's analysis cannot be replicated and fully tested without them.  Second, these materials "no longer exist," thus preventing replication of Dr. Radke's work.  Third, failure to disclose this information cannot be cured.  Magistrate Judge Borchers found that plaintiffs' failure to disclose certain data underlying Dr. Radke's study "may form the foundation of a motion to preclude Dr. Radke's testimony."  (Ex. 9, 3/31/98 Order at 6.)

Dr. Radke's testimony is inadmissible for this reason alone.  The discovery sanction of Rule 37(c)(1) is automatic:  "A party that without substantial justification fails to disclose information required by Rule 26(a) . . . shall not, unless such failure is harmless, be permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed."

Plaintiffs have provided no justification whatsoever for the disappearance of this pivotal data and analysis, much less a "substantial" one. "A party may not simply retain an expert and then make whatever disclosures the expert is willing or able to make notwithstanding the known requirements of Rule 26." *Reed v. Binder*, 165 F.R.D. 424, 430 (D.N.J. 1996); *Nguyen v. IBP, Inc.*, 162 F.R.D. 675, 681 (D. Kan. 1995). To the contrary, "[i]f the expert is unable or unwilling to make the disclosures he should be excluded as a possibility for retention as an expert witness in the case." *Nguyen*, 162 F.R.D. at 681. Plaintiffs' failure to comply with Rule 26(a)(2) is certainly not harmless – neither defendants nor the Court can replicate or otherwise test Dr. Radke's results. (*See* Ex. 10, McFadden Aff. at 4 ("I have made an extensive effort to replicate Dr. Radke's results, and am unable to do so.").)

In addition to violating the Federal Rules, Dr. Radke's failure to document his work and make it available for review renders Dr. Radke's analysis and testimony inadmissible under *Daubert*. *Daubert*'s "gatekeeper" function "requires the judge to assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts." *Dodge*, 328 F.3d at 1221. Here, however, the Court will face an insurmountable obstacle in its effort to assess fully the reliability of Dr. Radke's analysis, because Dr. Radke's analysis can no longer be replicated. As Magistrate Judge Borchers concluded: "To this Court it would appear doubtful that Dr. Radke could replicate his own results." (*See* Ex. 9, 3/31/98 Order at 7.) Where, as here, an expert has failed to document his work and make it available for review — thereby rendering his opinions non-replicable and non-testable — courts have consistently excluded such testimony under *Daubert*. *See, e.g., Reed*, 165 F.R.D. at 430; *Nguyen*, 162 F.R.D. at 681.

      **E.**     **Dr. Radke's Analysis Fails to Satisfy the "Fit" Requirement of *Daubert*.**

In Section I, *supra,* defendants set forth a number of reasons why all of plaintiffs'

damages experts fail to satisfy the "fit" requirement of *Daubert*.  In addition to each of those

reasons addressed above, Dr. Radke's analysis also does not meet *Daubert's* "fit" requirement

for several additional reasons, which are set forth below.

      **1.**     **Dr. Radke's Testimony Does Not "Fit":  He Cannot Link Property Value Differences to Class-wide Plutonium Releases or to a Common, Classwide Increased Health-Risk.**

Dr. Radke has not attempted to link diminution in value to any alleged "health risk."  (Ex.

4, Radke Dep. 217:7-10).  Nor has Dr. Radke attempted to link plaintiffs' alleged property

damage to ***any*** conduct by either of the defendants (Dow and Rockwell), much less to a nuisance

or trespass of either.  (*Id.* 196: 6-11.)  Dr. Radke's study of residential property values addresses

no year prior to 1988 — thirteen years after Dow left Rocky Flats.  Nor can Dr. Radke tie his

property value opinions to Rockwell.  Indeed, Dr. Radke was not even sure who the defendants

in this case were (*id.* 195:17-24), let alone what they had done (*id.* 196:4-14).  Dr. Radke does

not even claim to have linked property values with defendants' conduct, but rather only with

proximity to Rocky Flats:  "All I'm showing is that proximity to Rocky Flats diminishes the

property [] value.  I'm — there is something about Rocky Flats, and I'm — I'm not an expert to

answer what it is, but the pattern is there."  (*Id.* 206:14-18.)

      **2.**     **Dr. Radke's Analysis Is Both Underinclusive and Overinclusive of the Class, And Is Also Underinclusive and Overinclusive of the "Damages Sub-class."**

The class that has been certified includes "[a]ll Persons and entities owning an interest

(including mortgagee and other security interests) in real property situated within the Property

Class Area, exclusive of governmental entities, defendants, and defendants' affiliates, parents,

and subsidiaries" as of "June 7, 1989."  *Cook IV*, 151 F.R.D. at 382.  However, Dr. Radke's

analysis is not based on data relating to the class as a whole.  Rather, in Phase II of his analysis, Dr. Radke used "sales data" for each year from 1988 to 1995 to generate estimates of diminution in value for those years.  (Ex. 8, Radke Report at 5).  Dr. Radke's reliance on sales data makes his analysis both overinclusive and underinclusive of the class.

Dr. Radke's analysis is underinclusive because many class members did not sell their properties during any of the years analyzed by Dr. Radke.  Thus, for example, Dr. Radke's analysis of 1995 necessarily excludes all of the properties of class members that were not sold during that year.

Dr. Radke's analysis is overinclusive because it includes analysis of sales transactions that did not include a class member as either a buyer or a seller.  For example, if a class-area property was sold by a class member in 1990, and then subsequently sold again in 1995, that 1995 sales transaction could be included in Dr. Radke's analysis even though neither the buyer nor the seller was a class member.

For all of the foregoing reasons, Dr. Radke's expert testimony should be excluded in full.

## III.    JAMES FLYNN AND PAUL SLOVIC.

Drs. Flynn and Slovic prepared a survey questionnaire designed to study respondents' attitudes and perceptions of Rocky Flats, which was administered telephonically to 604 Denver area residents from August 31, 1995 to October 1, 1995.  (Ex. 1, Hunsperger Report at 46.)  This sample included 416 persons from the Denver metropolitan area outside of Arvada and Westminster, and 188 persons from Arvada and Westminster.  (*Id.*)  The survey presented the 416 people outside of Arvada and Westminster with four scenarios:

(1)     After being told that the federal government required a "buffer zone" around Rocky Flats and prohibited residences within two miles, people were first asked if they would accept an otherwise-desirable house within two to four miles of the plant without any further

inducement.  Those who said "yes" had this choice recorded as their final decision.  (Ex. 13, Flynn, Slovic, and Mertz Report ("Final Report:  Rocky Flats Health and Housing Survey"), Addendum A to Hunsperger Report, at 11.)

(2)     Those who said "no" in scenario one were offered the same house, but at a distance of four to six miles from the plant.  If a respondent answered "yes" to this question, that was recorded as the final decision.  (*Id.*)

(3)     Those who said "no" to both distances were then offered a $5,000 discount to the price of the house at four to six miles from the plant.  If they still said "no" after a $5,000 discount, they were asked if they would buy the house at a $10,000 discount.  If they still said no to the $10,000 discount, they were asked to name a price of their own choosing.  (*Id.* at 11–12.)

(4)     If the respondents said "yes" to either scenario at four to six miles, they were then asked if they would accept the house within two to four miles under the same terms.  The results from this series of questions are graphically depicted in Figures 4.7 and 4.8 in Mr. Hunsperger's report.  (*Id.* at 12.)

Drs. Flynn and Slovic's analysis is inadmissible under *Daubert* for three reasons:  (1) Drs. Flynn and Slovic are not qualified to perform public opinion surveys; (2) Drs. Flynn and Slovic's analysis do not meet *Daubert's* "fit" requirement; and (3) Drs. Flynn and Slovic's survey is methodologically flawed.

A.     **Drs. Flynn And Slovic Are Not Qualified To Perform "Public Opinion Surveys."**

Neither Dr. Slovic nor Dr. Flynn has any credentials that qualify them as experts in designing or conducting opinion surveys for the purpose of gauging alleged property value diminution.  Dr. Flynn has a Ph.D. in English, and no training in economics, psychology, or in any other social science.  (Ex. 14, Flynn Dep. 9:7-20)  He also lacks any training in statistics or

mathematics, and admits that he has none in real estate valuation. (*Id.* 10:1-5) Dr. Flynn

testified that he has no formal training in the design or conduct of survey research. (*Id.* 29:19-

30:8)

Dr. Slovic, a psychologist who teaches at the University of Oregon, admits that he is not

an expert in valuing properties, and does not intend to express any opinions on the value of

properties in the class area. (Ex. 15, Slovic Dep. 99:14-19)  Nor is he an expert on markets, or

how markets react. (*Id.* 118:23-119:5)  He freely admits that he is not testifying, and has no

opinion in this case, as to whether the Denver-area real estate market has been affected by any

"stigma" regarding Rocky Flats and that he has no opinion as to whether there has been any

property devaluation in those markets. (*Id.* 121:3-13)  He has no evidence that any group of

individuals has altered its behavior in these real estate markets due to Rocky Flats, much less a

trespass or nuisance by one or both defendants. (*Id.* 124:24-125:21.)

### B.    Drs. Flynn and Slovic's Survey Suffers From Fundamental Methodological Flaws.

The opinion survey designed by Drs. Flynn and Slovic was inherently biased.  They

asked people about what discounts they would require for living near Rocky Flats, and arbitrarily

chose starting discount values of $5,000 and $10,000.  This results in what is known in the

literature as an "anchoring bias:"  the amount of discount that people required was "anchored" by

the survey designer's selection of $5,000 and $10,000 as the starting increments to use in the

questionnaire, when they just as easily could have started with $100 and $200, $500 and $1,000,

or simply posed an open-ended question.  Both Drs. Flynn and Slovic recognized this significant

bias in their survey.  Dr. Flynn admitted that the fact that someone would only buy at a discount

"doesn't indicate that there is anything unusual about the house at all, because people offer to

buy houses at a five thousand or ten thousand dollar discount all the time." (Ex. 14, Flynn Dep.

204:11-17.)  Dr. Slovic agreed that to exclude the possibility of anchoring, some kind of pre-test or focus group would be required.  (Ex. 15, Slovic Dep. 169:7-16.)

Drs. Flynn and Slovic could not support their choice of starting discount values of $5,000 and $10,000.  They did not consult any literature to determine these amounts, nor they did conduct any pretests or focus groups to set these amounts.  (Ex. 15, Slovic Dep. 160:3-161-24.)  Instead, Dr. Flynn, based solely upon his *personal* experience in buying and selling his own homes, simply "decided" that these amounts were appropriate.  (Ex. 14, Flynn Dep. 201:4-208:23)[13]

Their survey is itself flawed, biasing upward the estimation of any adverse effect of Rocky Flats on neighboring property values, and thereby making extrapolation from the survey even less reliable.  In essence, the survey's design makes it almost inevitable that the responses will show a substantial negative effect of "Rocky Flats," regardless of market realities.  As Dr. Daniel Kahneman explained in his expert report, this survey is biased and therefore an unreliable basis for extrapolating to diminution in market values for four reasons.  (Ex. 17, Kahneman Rebuttal Report at 1.)   First, the survey produces biased results because its design draws specific attention to Rocky Flats as a negative attribute.  It does so in three steps:

(1)  Respondents are asked a series of preliminary questions that draw their attention to Rocky Flats and activate any latent dislike of nuclear weapons facilities.  Those who indicate that they have heard of Rocky Flats are asked for the first, second and third things that come to mind

---

[13] The results of this survey are incapable of verification:  No determination can be made of the accuracy of the results or the survey's potential rate of error.  (Ex. 16, d'Arge Report at 5 ("Preservation of a particular environmental asset might be worth $0.05, $0.50, or $50.00 to an individual.  There is no present way of comparing this value through independent means to establish its degree of accuracy or its potential error.").)

when they think of Rocky Flats and for their overall impression of Rocky Flats.  Those who say that they have not heard of Rocky Flats are asked the same questions about nuclear weapons plants in general.

(2)  Next, Denver metro residents are asked whether proximity to Rocky Flats would affect the desirability of a house that was otherwise "just right."  This question focuses the attention of the respondents on the possible impact of Rocky Flats on property values.

(3)  Individuals are informed that the "Federal Government does not permit homes within two miles of the buildings that were used for weapons production" (apparently a veiled reference to the non-production areas on the Rocky Flats plant site).  They are then asked whether they would buy a "just right" house within two to four miles of Rocky Flats or four to six miles.  If respondents say no, they are asked to assume that they have found a house in their target price range that is "just right in every way" and are then asked if they would purchase the house if it were within four to six miles and the seller reduced the price by $5,000 or $10,000.  If both offers are rejected, the respondent is asked if there is "any price reduction that would prompt you to purchase the house near Rocky Flats" and if so, how much.  (*Id.* at 4-5.)

These questions establish the "demand characteristics" for the remainder of the survey: the respondents receive the implication that the interviewer is probing the intensity of their dislike for nuclear weapons plants, is expecting that dislike to be strong, and anticipates that it will affect the decision whether to buy a home near a nuclear weapons facility.  Respondents who had never thought of this issue previously are, in effect, given strong guidance to treat proximity to Rocky Flats as a major negative attribute.  Furthermore, by drawing the respondents' attention to Rocky Flats, the survey fails to give the respondent the option of paying

little or no attention to Rocky Flats, an option that is available to real buyers in the market.  (*See id.* at 5-6.)

Second, the survey produces biased results because it employs an unrealistic representation of the house purchase decision.  In essence, the survey presents the decision to buy a house as a two-stage process:  first, a house is found, which is "just right" except for its proximity to Rocky Flats; and second, the buyer is asked to assign a price to that flaw.  Available research and theory suggests that home purchase decisions are commonly made by a global evaluation of numerous factors, not by considering trade-offs between selected pairs of attributes.  By requiring this discrete trade-off, the salience of Rocky Flats in the context of the survey, compared to the salience of Rocky Flats in the context of a long list of other attributes, is increased, leading to biased estimates of impact.  Because the housing purchase decision set forth in the survey is unrealistic, extrapolation of the survey results to real market behavior is dubious. (*See id.* at 6-7.)

Third, literature confirms that the trade-off invited by the survey – trading safety for money – also produces substantial upward bias.  The source of upward bias from surveys that elicit such trade-offs derives from the strong social norms against trading safety for money. Attempts, such as that by Decision Research, to predict market behavior by eliciting such trade-offs yield estimates that are unreliable and biased upward.  Any extrapolation from the results of such a survey to actual market behavior is dubious.  (*See id.* at 7-11.)

In addition to these flaws, the survey designers failed to consider the substantial body of literature in economics concerning survey methodology and contingent valuation methodology – an experimental method to estimate the value of various commodities through surveys.  (Ex. 14, Flynn Dep. 49:14-50:10)  In 1992, a blue-ribbon panel of economists commissioned by the

36

National Oceanic and Atmospheric Administration ("NOAA") reviewed this extensive body of literature.  The NOAA panel, which included two Nobel laureates, was asked to assess the reliability of contingent valuation methodologies in the wake of the Exxon-Valdez oil spill.  The critical issue was whether contingent valuation methodologies – *i.e.*, opinion surveys used to estimate the value of a commodity – were reliable and could be reasonably relied upon to estimate damages to natural resources from the spill.  Because the literature suggests that the results of valuation surveys can be determined to a substantial extent by choices made in the design of the survey, the question was critical.  (Ex. 17, Kahneman Rebuttal Report at 2); *see also* Rep. of the NOAA ¶ 1 on Contingent Valuation, 58 Fed. Reg. 4601 (June 15, 1993).

The NOAA panel set guidelines that the panel believed should be followed in order to make estimates of value derived from survey methodologies reliable.  While not necessarily applicable to all surveys, the NOAA guidelines apply with special force to a survey like the Decision Research survey that are used to estimate values in response to hypothetical questions and then to extrapolate from estimated values to market values.  A review of the Decision Research study, prepared by Professor Ralph d'Arge of the University of Wyoming, demonstrates that the Decision Research survey violates over 75% of these guidelines; that the survey designers failed to meet their burden to demonstrate reliability; and that there are additional sources of bias in the Decision Research survey.  (*See* Ex. 18, d'Arge Supp. Report at 9-29.)

## C.   Drs. Flynn and Slovic's Analysis Fails to Satisfy the "Fit" Requirements of *Daubert*.

As described in Section I, *supra*, **all** of plaintiffs' damages expert analyses (including that of Drs. Flynn and Slovic, as well as those of Dr. Radke and Mr. Hunsperger) fail to satisfy *Daubert's* "fit" requirements, for the reasons outlined therein.  In addition, Drs. Flynn and

Slovic's analysis fails to meet *Daubert's* "fit" requirements for several additional (separate and independent) reasons.

First, the opinion survey designed and conducted by Drs. Flynn and Slovic has no "fit" with any issue in this case because it was not designed to be used by anyone to estimate any diminution in property values attributable to a trespass or nuisance by one or both defendants. Dr. Slovic admitted that the survey was "not intend[ed] to produce estimates, precise estimates of the devaluation" (Ex. 15, Slovic Dep. 139:11-140:2; 153:2-154:22), that it was "not the intent of [the] survey" to identify any relationship between perceptions of risk and a precise estimate of any loss in property value (*id.* at 156:23-157:3). He could not testify that Mr. Hunsperger's use of the opinion survey data to estimate a diminution in value in the class area was a scientifically valid methodology. (*Id.* 169:21-170:5.) Dr. Flynn never suspected that Mr. Hunsperger would use the survey as a means to estimate the diminution in value in the class area (Ex. 14, Flynn Dep. 58:21-59:21), and Mr. Hunsperger never told Drs. Slovic and Flynn that he would use their survey to estimate property value diminution. (Ex. 15, Slovic Dep. 139:1-140:2.)

The testimony and opinions concerning opinion surveys is irrelevant for several additional reasons. Initially, the survey has nothing to do with the class members or class properties. Indeed, the people surveyed were not class members, and the 188 respondents from Arvada and Westminster were not asked the discount questions used to calculate the alleged diminution. Moreover, the survey fails to demonstrate that the value of properties in Arvada and Westminster are somehow affected by the prospect of a continuing trespass or nuisance due to one or both defendants.

If there has been real economic harm to class members, the starting point for a measurement of such harm is the amount of money those class members actually received for

their property if they sold it, or the amount of money they could receive for their properties in the market today.  However, the purported "discount" required by a portion of 416 Denver metropolitan area residents as of 1995 (some of whom were not even looking to buy property, let alone looking to buy property in the northwest suburbs of Denver), measured by Drs. Flynn and Slovic in response to hypothetical questions during a half-hour phone interview, is not probative of actual market value diminution.

Dr. Slovic has also submitted a report in this case concerning the perception of risk among laypeople.  (See Ex. 19, Slovic Report.)  This report is unconnected with the survey that Dr. Slovic conducted with Dr. Flynn, but rather abstractly discusses "the social and psychological factors that influence the perception and acceptance of risk in our society."  (*Id.* at 2.)  Dr. Slovic opines that "lay people's risk perceptions and attitudes are closely related to" the presence of certain factors, such as the extent to which the risk is "unknown" and the extent to which "the risk evokes feelings of dread."  (*Id.* at 5–7.)  Rocky Flats itself is only mentioned briefly as possessing some of these factors.  (*Id.* at 6, 10.)

These opinions also do not "fit" plaintiffs' claims, either on liability or on damages issues.  Dr. Slovic does not opine as to whether there is actually an increased common, class-wide health risk created by actual or potential releases from Rocky Flats, or whether there have been class-wide releases of plutonium from Rocky Flats.  To the contrary, his report suggests that, to the extent that laypeople perceive any risk from off-site releases from Rocky Flats, there is an "extraordinary divergence" between such perception and the actual risk (if any) found by experts.  (*Id.* at 11.)  Furthermore, Dr. Slovic's opinions regarding the perception of risk are equally unhelpful to plaintiffs' damages analysis.  Dr. Slovic's report does not address at all the impact of risk perception on property value, let alone quantify such an impact.  Nor would Dr.

Slovic be in a position to segregate (1) the perception of the risk from the normal operations of a nuclear weapons plant (which is purportedly very high) (*see id.* at 6), from (2) the perception of the risk from the tortious conduct of one or both defendants, if he were to opine on the perception of the risk from Rocky Flats.

For the foregoing reasons, the proffered expert testimony of Drs. Flynn and Slovic should be entirely excluded.

## IV.   WAYNE HUNSPERGER.

Mr. Wayne Hunsperger is the primary sponsor of evidence regarding the amount of the class properties' alleged market value diminution.  Mr. Hunsperger is an appraiser, yet he has not performed a single appraisal of any of the properties that comprise the property class, including the class representatives' properties.  Nor has he prepared a "mass appraisal," as that term is defined by the Appraisal Institute and the Uniform Standards of Professional Appraisal Practice ("USPAP").  (Ex. 20, Dorchester Decl. ¶ 7.2.)  Mr. Hunsperger failed to utilize any of the three approaches traditionally used by professional appraisers for estimating the market value of properties – the "Cost Approach," the "Income Capitalization Approach" or the "Sales Comparison Approach."  *The Appraisal of Real Estate*, p. 50 (12th Ed. 2001).

As outlined in Section I, *supra*, Mr. Hunsperger's analyses (like those of Drs. Radke, Flynn, and Slovic) fail to satisfy the "fit" requirements of *Daubert*, for reasons that are applicable to all of plaintiffs' damages experts.  In addition, Mr. Hunsperger's work is inadmissible under *Daubert* for several additional reasons:  (1) Mr. Hunsperger is not qualified to interpret multiple regression studies, and his reliance upon Dr. Radke's analysis is unreliable and inadmissible; (2) Mr. Hunsperger's use of Drs. Flynn and Slovic's "Public Opinion Survey" is improper; (3) Mr. Hunsperger's "Valuation by Analogy" approach is not a valid property valuation methodology; (4) Mr. Hunsperger's "MLS" opinions do not quantify damage, are not

related to the class area, and cannot be verified; and (5) Mr. Hunsperger's "Market Participants" approach is an improper mechanism to introduce lay hearsay testimony.

>    A.    **Mr. Hunsperger Is Not Qualified To Interpret Multiple Regression Studies, And His Reliance Upon Dr. Radke's Analysis Is Unreliable And Inadmissible.**

>    <u>**Mr. Hunsperger Relies on Dr. Radke's Flawed Analysis**</u>:  Mr. Hunsperger relies upon Dr. Radke's multiple regression analysis of sales prices.  Because Dr. Radke's study is flawed and inadmissible, Mr. Hunsperger's reliance upon it is likewise flawed and inadmissible.  *See*, *e.g.*, *Truck Ins. Exch. v. Magnetek, Inc.*, 360 F.3d 1206, 1213 (10th Cir. 2004) (excluding testimony relying on theory put forth by another expert that the court had found unreliable); *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732-33 (10th Cir. 1993) (excluding expert opinion relying on another expert's report because witness failed to demonstrate a basis for concluding the report was reliable and showed no familiarity with methods and reasons underlying the hearsay report).

>    <u>**Not Qualified**</u>:  Mr. Hunsperger is not an expert in multiple regression analysis.  (Ex. 3, Hunsperger Dep. 435:1-4.)  He has had no formal training with respect to multiple regression analysis.  (*Id.* 438:11-12.)  He has never testified in court about a multiple regression analysis that he either performed or directed.  (*Id.* 435:21-24.)  Nor has he ever testified about the results of a regression analysis performed by someone else.  (*Id.* 438:20-23.)  Mr. Hunsperger admitted that he is incapable of assessing the validity and reliability of Dr. Radke's multiple regression model in this case, and that he took no steps to independently analyze Dr. Radke's model.  (*Id.* 48:14-21.)  His testimony further reveals that he is completely incompetent to interpret the output of Dr. Radke's regression runs; he could not answer even the most basic questions concerning regression analysis:

Q.      How is the standard error of a coefficient used in interpreting the results of a regression?

A.      I don't know how it relates to regression.

Q.      What does it mean to test if a coefficient is statistically significant?

A.      I don't know.

Q.      What is a T statistic?

A.      I don't know.

Q.      Do you know how it is used?

A.      No.

Q.      I take it then that you do not know how Dr. Radke used T statistics in this report; is that a fair statement?

A.      That's correct.

(*Id.* 441:14-442:2.)

### B.      Mr. Hunsperger's Use of Drs. Slovic and Flynn's "Public Opinion Survey" Results Is Improper.

**Mr. Hunsperger's "Public Opinion Survey" Method**:  The use that Mr. Hunsperger seeks to make of Drs. Flynn and Slovic's analysis is not admissible.  Based on the survey results, Mr. Hunsperger calculated an "average discount" for those persons willing to buy homes within two to four miles of Rocky Flats at a discount and for those persons willing to buy homes within four to six miles at a discount.  (Ex. 1, Hunsperger Report at 24; Ex. 15, Slovic Dep. 165:7-166:4.)  Next, the discounts required were averaged together with the "no discount" responses to calculate an "average reduction" for homes within two to four miles, and for homes within four to six miles.  (Ex. 1, Hunsperger Report at 24; Ex. 15, Slovic Dep. 165:7-166:4.)  Mr. Hunsperger then calculated his own average reduction in value and used that estimate to calculate damages:  "The survey research leads us to the conclusion that Rocky Flats creates [an]

apprehension in the market place to the extent that there is a reduction of approximately $17,486 in value for houses, on average."  (Ex. 1, Hunsperger Report at 252.)  He multiplies this $17,468 figure by the number of residential properties in the class (12,019) to estimate an "amount of diminution in value" – $210 million dollars.  (*Id*.)

Because the public opinion survey is unreliable, Mr. Hunsperger's analysis (which relies on that survey) is also unreliable.  *See*, *e.g.*, *Truck*, 360 F.3d at 1213; *TK-7*, 993 F.2d at 732-33.

**Not Qualified**:  Mr. Hunsperger should not be permitted to testify about *his* conclusions or *his* interpretation of the Drs. Flynn and Slovic's survey.  Mr. Hunsperger admitted that he has no expertise in the design, administration, or even the interpretation of public opinion surveys: "I'm not an expert in survey research, let alone social science, and they are" (Ex. 3, Hunsperger Dep. 318:4-7); "you're asking me if I am an expert in conducting and understanding opinion surveys, and the answer is no" (*id*. 325:5-14); "if you're asking me am I an expert in taking raw data from opinion surveys and interpreting it, no, I would leave the interpretation of the raw data to a survey research expert" (*id*. 327:19-328:6).

**Opinion Survey Not Designed For Use In Estimating Property Value Diminution**: The very idea that Drs. Flynn and Slovic's survey could be used to estimate diminution in value is belied by the survey authors' testimony that (i) the survey was not designed to be used to make estimates of diminution in value, (ii) the survey was not designed to be used as Mr. Hunsperger uses it, and (iii) the survey was not intended to be a "contingent valuation" survey. (Ex. 14, Flynn Dep. 107:11-108:10; Ex. 15, Slovic Dep. 129:7-22, 140:4-10, 140:23-141:3.) Extrapolating from an average reduction determined in a hypothetical "survey market" to real world market behavior has no justification, especially where Drs. Flynn and Slovic did not design the survey to be put to such use.

**Methodological Flaws**:  Mr. Hunsperger's use of public opinion survey data is based on several faulty, unsupported assumptions.

First, Mr. Hunsperger's calculation of the total diminution in value from this survey data is flawed.  Each of the calculations made – "average discount required," "average reduction" and Mr. Hunsperger's "average diminution" – lacks any scientific, statistical or economic basis.  For example, the vast majority of persons who indicated that they would be willing to buy homes within two to four miles of Rocky Flats (n = 96) indicated that they would do so without a discount (n = 67).  Only 30% indicated that they would require a discount (n = 29).  Moreover, the average discount required by these 29 respondents ($30,740) is clearly driven upwards by the handful of respondents who indicated that they would require extreme discounts exceeding $50,000.

There is no basis for Mr. Hunsperger's assumption that, because some potential market participants would require a discount, property values may be reduced.  Without some underlying analysis of the supply and demand of properties, Mr. Hunsperger's use of an average discount expressed in a survey to determine the average reduction in property value amounts to a meaningless mathematical exercise.  There is no basis for assuming that, even if there are people who require a $20,000 "discount" in order to purchase a home within six miles of Rocky Flats, such people will ever participate in the market.  Buyers who required such a discount would be competing with buyers who would not require any discount at all.  Dr. Slovic conceded this much at his deposition (Ex. 15, Slovic Dep. 174:11-176:12), and Professor d'Arge, an economist, explained that this "average" would not translate into an actual reduction in market price.  (Ex. 18, d'Arge Supp. Report 29-30.)

In any event, Mr. Hunsperger does not use the "average reduction" of $6,825 calculated by the survey to estimate damages.  (Ex. 1, Hunsperger Report at 251.)  Instead, he created a new average diminution number by:  (i) making up a "required discount" value for persons who indicated that they would not be interested in buying a house within two to six miles of Rocky Flats at any discount, and (ii) averaging these new values with the other data.  (Ex. 3, Hunsperger Dep. 351:11-352:7.)  Specifically, Mr. Hunsperger took the responses of the 192 respondents who indicated that they would not buy with any discount, arbitrarily assigned them a "required discount" value of $30,000, and then included these new data points back into his calculation of the average.  (*Id*.)  With this new average discount number, Mr. Hunsperger purports to find a $17,486 diminution in "value for houses" – a reduction nearly three times the "average reduction" yielded by the flawed survey itself.  (Ex. 1, Hunsperger Report at 251–52.)  Mr. Hunsperger further exacerbates these flaws by assuming perfect correlation between the average reduction he calculates from the survey and reduction in value, when there is no support for this assumption.  (Ex. 15, Slovic Dep. 174:11-176.)

Second, Mr. Hunsperger's assumption that the average discount required by Denver area residents to move into the Arvada/Westminster area is entirely attributable to Rocky Flats (but not necessarily a trespass or nuisance by one or both defendants) is baseless.  (Ex. 1, Hunsperger Report, Figure 4.8.)  There are literally hundreds of reasons why someone might require a "discount" to move into the Arvada/Westminster area from somewhere else, as Dr. Slovic admitted:  ". . . I think that our survey indicates that there are other negative features to property in the area.  There are some disadvantages other than Rocky Flats.  So to that extent, if someone did not want to buy in this area, I don't think that's 100% attributable to Rocky Flats."  (Ex. 15, Slovic Dep. 179:5-11.)

C.      Mr. Hunsperger's "Valuation by Analogy" Approach Is Not A Valid
        Property Valuation Methodology, As Plaintiffs' Experts Admit.

**Mr. Hunsperger's "Valuation by Analogy" Approach**:  Mr. Hunsperger selected 13

"case studies" prepared by various other authors in several different contexts.  (Ex. 1,

Hunsperger Report at 126-163.)  In 9 of these 13 studies, the authors purport to measure the

impact on property values of various types of "environmental disamenities" in several different

parts of the country (none in or near the class area) by examining varying data from the subject

area.  (*Id.* at 126-153.)  In three of the remaining four studies, various forms of opinion surveys

were used to analyze the perception of risk of transporting radioactive waste, the willingness of

property owners to pay for a more distant location from a hazardous waste landfill, and the

judgments of health risks associated with a landfill near Los Angeles.  (*Id.* at 154-163.)  The final

case study is merely a bibliography of additional case studies.  These studies are asserted to be

relevant for three reasons:  "1) they are illustrative of methodology commonly relied upon,

2) they are illustrative of findings in similar court cases, or 3) they are illustrative of reaction to a

similar environmental issue."  (*Id.* at 121.)  Mr. Hunsperger further asserts that the studies

consist of a "representative sample" of a larger universe of such studies.  (*Id*. at 164.)

        Mr. Hunsperger reviewed all thirteen "case studies," commented on each, and identified

the amount or percentage of "diminution" supposedly found in each.  (*Id.* at 126-63.)  After

analyzing each study separately, Mr. Hunsperger prepared an overall  "summary" of the case

studies.  (*Id*. at 164-75.)  From this analysis and summary, Mr. Hunsperger concludes:  "there is

no doubt that property values around Rocky Flats are less than they would be had it not been for

past releases of hazardous substances and continuing risk associated with materials stored on

site."  (*Id*. at 176.)  Finally, the methodology purportedly yields a damage estimate:  "We have

concluded from the analogies that loss in value after the 1989 FBI raid would likely have been at

least an average of 10% across the class area.  This equates to $10,444 per attached residence and $15,000 per detached residence," or $166,000,000.  (*Id*. at 177.)

**Not Relevant**:  This damages analysis does not relate to the framework of the case and suffers from the same problems of "fit" that afflict plaintiffs' other damages analyses, as discussed in Part I.  Simply, this approach does not even purport to measure diminution in value caused by a continuing trespass or nuisance due to one or both defendants as of a complete-and-comparatively-enduring date.

Furthermore, price changes that may have occurred in different neighborhoods, different real estate markets, different cities and different states, as a result of different events, different types and levels of contamination, different news media coverage, and different levels of supply and demand, all of which occurred over different periods of time, are not probative of damages in this case.  A methodology that does not even consider behavior patterns in the market for class properties does not "fit" and should be excluded.

**Not Qualified**:  Mr. Hunsperger's proffered "valuation by analogy" testimony is even further afield from his area of expertise than his testimony about Dr. Radke's multiple regression analysis or his misapplication of Drs. Flynn and Slovic's survey data.  Mr. Hunsperger's "valuation by analogy" depends upon the validity and reliability of the analogous case studies used.  Yet Mr. Hunsperger is unqualified to assess the validity and reliability of the multiple regression analysis and opinion surveys from which he "analogizes."  (Ex. 3, Hunsperger Dep. 48, 318, 325–27.)  Mr. Hunsperger has absolutely no qualifications whatsoever to give his opinions on this topic.

**Not an Accepted Methodology**:  Mr. Hunsperger's "valuation by analogy" is not a reliable methodology.  It is not a methodology at all.  He does not cite any authority setting out

the appropriate steps to be taken, the criteria for selecting the so-called analogous studies, or directing how and when the results of such analogous studies can be applied to an entirely different case.  While Mr. Hunsperger cites two "authorities" in his report, neither source comes close to describing what the method consists of, when it should be used, how the analogous case studies are to be selected, and how the case studies should be applied.  (Ex. 1, Hunsperger Report at 69.)  Defendants' experts, each of whom has served on either the international, regional or State of Colorado boards governing appraisal standards, have opined that Mr. Hunsperger's analogous case studies is not an accepted appraisal methodology and that it violates appraisal standards to estimate value from that method.  (Ex. 21, Roerig Aff. ¶¶ 5-7, 10; Ex. 20, Dorchester Decl. ¶¶ 7.4, 7.5.)

In addition, Mr. Hunsperger's rationale for using the analogous case studies method makes no sense.  While he claims that "the use of case studies as a surrogate for [the] *sales comparison approach* is widely documented in the appraisal literature" (Ex. 3, Hunsperger Dep. 236:11-13 (emphasis added)), the sales comparison approach, like all standard appraisal methods, is founded upon the "principle of substitution."  *See The Appraisal of Real Estate*, at 418 ("The principle of substitution holds that the value of a property tends to be set by the price that would be paid to acquire a substitute property of similar utility and desirability within a reasonable amount of time.  This principle implies that the reliability of the sales comparison approach is diminished if substitute properties are not available in the market.").  But according to Mr. Hunsperger, the principle of substitution "isn't even relevant" to the analogous case studies method.  (Ex. 3, Hunsperger Dep. 309:5-310:8.)

Mr. Hunsperger's analogous case studies "method" was applied selectively in this case. In selecting the studies that were used (Ex. 3, Hunsperger Dep. 231:13-15; 233:8-16), Mr.

Hunsperger used no set criteria, methodology, or protocol to select the studies (*Id.* 248:24-249:19).  He has not explained why he chose the case studies that he did, or why he omitted others.  Though the studies were not randomly selected, Mr. Hunsperger's report asserts that the studies he selected are "representative."  (Ex. 1, Hunsperger Report at 34.)  Random selection is necessary (though not sufficient) for a representative sample.  (*Id.* at 22.)  Mr. Hunsperger then jumps to the conclusion that because "virtually all" of the studies he selected show diminution, it is safe to import their results into this case.  (*Id.* at 22.)  Even a cursory review of the literature demonstrates that many studies have found no damage from an environmental disamenity, including a Three Mile Island study (referred to but not relied upon by Mr. Hunsperger), and several studies reproduced in the Appraisal Institute seminar materials Mr. Hunsperger relied upon.  (*See* Ex. 22, *Environmental Risk and the Real Estate Appraisal Process,* Seminar Workbook Addendum N:  "Case Studies in the Professional Literature.")

**Not Reproducible**:  Mr. Hunsperger could not identify any steps he took or protocol he followed in connection with this "approach" to ensure its reliability.  (Ex. 3, Hunsperger Dep. 236:14-238:5.)  Instead, he agreed that there are no "standards" promulgated by USPAP nor any codes or regulation promulgated by local appraisal associations for analogous case studies.  (*Id.* at 238:1-5.)  Nor could he identify any objective criteria that he applied to this type of analysis.  He could not even reproduce the steps he followed to establish how he arrived at his 10% diminution figure:

> Q.     Okay.  Is there any sort of paper, a worksheet of any sort, or a document of any sort in which you have specified how you arrived at the ten percent number?
>
> A.     There was a document.  I no longer have it.  But I did get out a piece of scratch paper and put the similarities, dissimilarities of each of the case studies, the amount of the diminution property value in terms of the range, the types of houses, and considered the whole thing in the aggregate,

relative to the facts as I understand them at Rocky Flats, and ultimately made the decision at 10 percent, but I no longer have that worksheet.

(*Id.* at 258.)  This failure renders his testimony inadmissible.  *See, e.g., Reed*, 165 F.R.D. at 430; *Nguyen*, 162 F.R.D. at 681.

**Plaintiffs' Experts Disavowed this Method**:  Dr. Flynn testified that Mr. Hunsperger could not properly use analogous case studies as a means of estimating diminution in value of properties in the class area:  "For instance, [Mr. Hunsperger] was looking at analogous cases which, obviously, couldn't supply any precise estimate of diminution in value at Rocky Flats. . . ."  (Ex. 14, Flynn Dep. 59:9-10.)

> **D.     Mr. Hunsperger's "MLS" Opinions Do Not Quantify Damage, Are Not Specific to the Class Area, and Cannot Be Verified.**

**Mr. Hunsperger's MLS Approach**:  Mr. Hunsperger presents data from Multiple Listing Service reports of annual average prices for condominiums and single family residential homes in two years — 1989 and 1995.  Based on these two years' data, he computed an average annual rate of appreciation over this six-year period.

**No Measure of Statistical Significance**:  Mr. Hunsperger's MLS results have no statistical significance:  His data are completely inconclusive and the variances between them cannot be explained with any degree of confidence.  At his deposition, Mr. Hunsperger admitted that he did not "determine any percent of error with respect to [his] MLS analysis," nor did he "determine the statistical significance of any of [his] results," or even bother to "undertake any effort to determine the explanatory power of [his] analysis from a statistical point of view."  (Ex. 3, Hunsperger Dep. 83:15-84:1.)  He cannot explain differences in the rates of appreciation as between one MLS area and another as anything more than purely random.  (*Id.* 88:4-89:21.)

**No Fit — Mr. Hunsperger Did Not Use His MLS Approach to Quantify Value**:  Mr. Hunsperger's MLS results are not helpful because they merely constitute varying rates of

appreciation, not any actual alleged property value diminution.  He made no effort whatsoever to take these rates of appreciation and determine what impact, if any, they represented as to property values over the period of his study.  He admitted that, at most, his MLS results were merely "suggestive" of a decreased rate of appreciation.  (Ex. 1, Hunsperger Report at 253.)  He testified that he "didn't use the MLS data as a basis for a mathematical quantification of the number other than in the context that the spread of the appreciation rates over time might be suggestive of – or is suggestive of some larger loss in value," and that he had "not incorporated those MLS statistics into an exact mathematical quantification of diminution in value," and that his MLS analysis was merely "a piece of evidence that suggests property values around Rocky Flats might be diminished."  (*Id*. at 49:9-19; 96:23-98:6.)

**Mr. Hunsperger's Vacant Land Analysis**:  Mr. Hunsperger purports to analyze vacant land values in two ways.  First, he looks at "aggregate land prices" of vacant land transactions around Rocky Flats and five other metro-Denver areas.  (Ex. 1, Hunsperger Report at 178-192.)  Second, he selected several "individual land sales" in the Rocky Flats area—none owned by class representatives—and purports to perform a 'mini-case study' on the particular vacant land transaction.  (*Id.* at 193-201.)  This approach should be stricken.

**Speculation**:  Mr. Hunsperger's entire vacant land approach is merely an exposition of raw, unfiltered data points lacking any analysis.  Mr. Hunsperger admitted that he did not "compute any margin of error for the vacant land analysis," that he "did no statistical analysis of this data," and that he has "not calculated any statistical significance to this."  (Ex. 3, Hunsperger Dep. 202:19-23; 395:12-19.)  He testified that his vacant land analysis was merely "intended to be illustrative" (*id.* 383:15-18), was "not meant to represent any kind of trend line analysis" (*id.*

369:19-370:9), and was "just a method of looking at all the sales transactions that are available involving vacant lands" and "purely a search for data" (*id.* 365:3-10).

**No Verifiable Methodology**:  Mr. Hunsperger's vacant land analysis lacks any methodology, let alone a verifiable or reliable one.  Mr. Hunsperger admitted that he did not use any specific scientific, technical or specialized steps to arrive at his vacant land diminution conclusion (*id.* 387:8-18), and that there was no formula of any type underlying the vacant land analysis (*id.* 389:12-20).  He admitted that his vacant land analysis is not an appraisal and that no formal standards apply against which his opinions can be checked and analyzed.  (*Id.* 396:17-20.)  He further admitted that he did not check his analysis against any objective data and, accordingly, he is not certain of the accuracy or reliability of the data:  "To be honest, I'm not certain of the accuracy of that number because there may be some government lands included in it which we didn't intend to include, but if that's true and we may do some final checking, the damage estimate would go down, not up."  (*Id.* 390:15-391:8.)

**No Relevance to Plaintiffs' Claims and No Relevance to the Class**:  Mr. Hunsperger's MLS analysis is both over-inclusive and under-inclusive of the class area to which it purports to apply.  None of the MLS sectors for which Mr. Hunsperger presents data the property class members, or even the class area, as Mr. Hunsperger admitted.  (*Id.* 81:21-82:2.)  Although Mr. Hunsperger could have used the class-specific MLS data (that he provided to Dr. Radke) to perform his analysis of comparing the average sale prices of properties at year-end 1989 and year-end 1995, he did not do so.  Had Mr. Hunsperger done so, those data would have shown that the average sale price for class properties appreciated between year-end 1989 and year-end 1995 from $107,000 to $125,000, while the value of real estate in the rest of suburban Denver

did not appreciate at all.  (All data was adjusted by Dr. Radke to 1993 dollars.  *See* Ex. 8, Radke

Report at Figure 4.4.)

This approach also suffers from the same "fit" problems as plaintiffs' other damages

approaches, as discussed in Sections I and II.E.2.  It does not assess damages as of a "complete

and comparatively enduring" date, and it does not attempt to link those damages to an actionable

factor.  Additionally, the data underlying this approach fails to capture the hundreds of class

members who had sold their properties in 1989.

### E.    Mr. Hunsperger's "Market Participants" Approach Is an Improper Mechanism to Introduce Lay Hearsay Testimony.

Mr. Hunsperger purports to opine on alleged property diminution based on his personal

"interviews" of selected "market participants," including certain of the plaintiffs in this case.

(Ex. 1, Hunsperger Report at 1.)  He attempts to formulate value opinions based on these

anecdotal views of Rocky Flats (but not limited to any alleged trespass or nuisance by one or

both defendants) and its impact on nearby property values.  (Ex. 3, Hunsperger Dep. 512:11-16.)

Mr. Hunsperger admits that no measure of damages was made using the market research

approach.  (Ex. 1, Hunsperger Report at 14-15.)  The only purported "usefulness" of the work

appears to be as a mechanism for Mr. Hunsperger to tell the jury what other people – who

plaintiffs do not proffer as experts or witnesses – supposedly told him were their "opinions"

concerning "Rocky Flats'" effect on property values.  Accordingly, such testimony is irrelevant

because it does not address diminution in property value due to a trespass or nuisance caused by

one or both defendants as of a complete-and-comparatively-enduring date; it also obviously

constitutes an attempt to end-run the legal limitations on expert testimony.

Mr. Hunsperger has tried in the past to testify about such conversations with "market

participants" in a property diminution class action, and the court ruled that testimony was

inadmissible.  *See generally Escamilla v. Asarco, Inc.*, No. 91 CV 5716 (D. Colo. 1993).

Specifically, when the plaintiffs' lawyer wished to elicit testimony from Mr. Hunsperger about

his conversations with various "market participants" (*e.g.*, homeowners, appraisers, and

government employees – the same groups of individuals interviewed by Mr. Hunsperger in this

case) regarding their perceptions of the real estate market in the class, the court excluded such

evidence, ruling that:

> I think what 703 really means is that this witness can rely on evidence that is
> otherwise inadmissible, but not – but, as I indicated earlier, I think that 703
> doesn't extend the principles of admissibility, the hearsay objection is sustained.
> (*Escamilla* Tr. at 51-53, 60-63.)

*See also Finchum v. Ford Motor Co.*, 57 F.3d 526 (7th Cir. 1995) ("Under Rule 703, experts can

base their opinions on information of the type reasonably relied upon by experts, but this 'does

not automatically mean that the information itself is independently admissible in evidence.'"

(quoting *Gong v. Hirsch*, 913 F.2d 1269, 1273 (7th Cir. 1990)).

The above discussion applies to all of Mr. Hunsperger's expert opinions; therefore, his

expert testimony should be excluded in total.

## V.      CONCLUSION

As discussed above, the testimony of plaintiffs' experts James Flynn, Paul Slovic, John

Radke, and Wayne Hunsperger does not meet the requirements of *Daubert*, *Kumho Tire*, and

Rule 702.  Therefore, defendants respectfully request that this Court exclude their testimony.


Dated:  June 21, 2005                          Respectfully submitted,

s/Joseph J. Bronesky
Joseph J. Bronesky
SHERMAN & HOWARD LLC
633 Seventeenth Street, Suite 3000
Denver, CO  80202
(303) 297-2900

David M. Bernick
Douglas J. Kurtenbach
KIRKLAND & ELLIS LLP
200 E. Randolph Drive
Chicago, IL 60601
(312) 861-2000

Attorneys for Defendants ROCKWELL
INTERNATIONAL CORPORATION and THE
DOW CHEMICAL COMPANY

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 21, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

pnordberg@bm.net  Peter B. Nordberg, Esq.
         BERGER & MONTAGUE, P.C.
         1622 Locust Street
         Philadelphia, PA  19103-6365


blumg@s-d.com   Bruce H. DeBoskey
         SILVER & DEBOSKEY
         The Smith Mansion
         1801 York Street
         Denver, CO  80206


            s/Joseph J. Bronesky