IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 90-cv-181-JLK

MERILYN COOK, *et al.*,

                Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION
and THE DOW CHEMICAL COMPANY,

                Defendants.

---

## DEFENDANTS' AMENDED MOTION TO EXCLUDE EXPERT WITNESS TESTIMONY RELATING TO RISK

---

Defendants respectfully request that this Court exclude the testimony of plaintiffs' expert witnesses Robert Goble,  K. Shawn Smallwood, Richard Clapp, and Lawrence Mayer under Rule 702 of the Federal Rules of Evidence, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1998).  This motion incorporates by reference Defendants' Introduction and Overview to Their Motions to Exclude Expert Witness Testimony (hereinafter cited as "Def. Overview"), which is filed concurrently.

## I.      ROBERT GOBLE'S PROPOSED TESTIMONY SHOULD BE EXCLUDED.

Dr. Robert Goble is plaintiffs' only expert who attempts to quantify (1) exposure to any substance allegedly released from Rocky Flats, and/or (2) any increased risk of serious disease allegedly resulting from exposures to substances from Rocky Flats.  However, none of Dr. Goble's exposure and risk assessments – i.e., for plutonium, americium, beryllium, volatile chlorinated hydrocarbons ("CHCs"), and ethylene oxide ("EtO") – can withstand scrutiny under *Daubert*.  First, Dr. Goble's analyses were prepared for the purpose of devising a medical

monitoring program and do not even purport to apply class-wide.  Consequently, his opinions do not "fit" the issues in this property damage trial, which is strictly limited to class-wide proof. Second, Dr. Goble's methodology is fundamentally flawed, unreliable, and based on assumptions with no scientific foundation.  Dr. Goble's proposed testimony – with respect to all four of the substances he examined – should therefore be excluded under *Daubert* and Federal Rules of Evidence 702, 402, and 403.

### A.      Goble's Plutonium Opinions Cannot Withstand Scrutiny Under *Daubert*.

#### 1.      Goble's Plutonium Analysis Does Not "Fit" The Issues In This Property Case.

Dr. Goble's analysis was directed at plaintiffs' ***medical monitoring*** claims – specifically, at "attempting to develop information for the use of assessing a particular hazard management option – namely medical monitoring."  (Goble Rep. at 2, attached hereto as Ex. 1)  The Court subsequently decertified the medical monitoring claims and bifurcated the remaining individual plaintiffs' claims.  Dr. Goble's medical monitoring opinions do not, and cannot, satisfy the *Daubert* "fit" requirement for the class-wide property damage claims – based on trespass and nuisance – that remain.

With respect to plaintiffs' trespass claims, there is nothing in Dr. Goble's proposed testimony that would "assist the trier of fact" in determining a fact relevant to those claims.  The existence (or non-existence) of plutonium on class properties can be, and in a few cases has been, tested through soil sampling.  Dr. Goble never undertook any soil sampling.  Nor did he make any determination or assessment of plutonium in the soil on all (or even any*)* class properties.

Alleged exposures and health risks may be pertinent to plaintiffs' nuisance claims – but only to the extent that they were experienced in "common" by **all property class members**.[1] (5/17/05 Order at 5-6)  Dr. Goble has not opined as to any class-wide, common exposure, dose or risk; to the contrary, he has testified that, in his opinion, class members' doses vary by at least 2.5 million times.  (Goble Dep. at 116-117, attached hereto as Ex. 2)  Dr. Goble never undertook to assess "class-wide exposure" or "common health risks" allegedly experienced by all property class members.  In fact, he did the opposite.  Because he was tasked to provide information for a medical monitoring program – where he contends "one must pay attention to possibilities which are not the most likely ones" (Ex. 1, Goble Rep. at 23) – he focused on the **highest** levels of potential exposures and risks, i.e. for the 95th percentile of the exposed group.  (*Id.* at 24-25)  His analysis never attempted to quantify the magnitude of the exposure and risk (if any) experienced by **every** class member – or to ascertain whether every class member in fact experienced **any** exposure or increased risk.

Nor could Dr. Goble's analysis say anything about class-wide exposure and risk applicable to the property class.  First, Dr. Goble did not examine the entire geographic property class area.   Instead, his concentration and exposure analysis is based on estimating concentrations of plutonium in the air at three "calculational points" used by ChemRisk.  (*Id.* at 29)  These three points, called 4B, 8B and 12B, do not all fall within the property class area.

---

[1]   The Court has also held that plaintiffs can show nuisance based on possible future exposures where "there is an objectively demonstrable risk of future harm" that is "based on objective conditions, such as existing contamination on-site and off-site that may be released or remobilized in some fashion that would result in human exposure and increased health risk, that have the potential to affect all of the Class Area."  (May 17, 2005 Order at 6)  Goble has not estimated any exposures after 1989 and has not sought to estimate any potential future exposure or associated health risk.

(*See* Figure 1, Comparison of Property Class Contour to Relevant ChemRisk points, attached hereto as Ex. 3)

Second, Dr. Goble never examined the broad range of time periods different property class members spent near the site.  These temporal variations would have a pronounced effect on the levels of exposure different property class members experienced.  For instance, a property class member who lived in the class area during the entire 37-year period of Rocky Flats operations would have received a significantly greater hypothetical dose than a class member who lived in the Class area for a month in 1989 (or never lived there at all).  (Ex. 1, Goble Rep., Table 8.2)  Because Dr. Goble's concern for medical monitoring purposes was the most exposed members of the medical monitoring class, Dr. Goble never examined the time periods during which ***all*** property class members lived near Rocky Flats (if that ever even occurred), never attempted to ascertain a dose level (if any) common to all property class members, and never ascertained a corresponding common level (if any) of increased risk to property class members.

Third, Dr. Goble only considered one exposure pathway – through air – and he readily concedes that there is "considerable inter individual variability" in a number of other "factors determining uptake of radioactivity and dose" through inhalation, including differences in the effect of houses in reducing exposures, differences in breathing rates from physiological differences and activity patterns, differences in distribution of radioactivity in the body, and differences in susceptibility to radioactivity.  (*Id.* at 47)  Dr. Goble has made no effort (either individually or statistically) to assess a common, class-wide level of exposure or risk to property class members that takes into account these factors.  (*Id.*)

Dr. Goble does purport to calculate exposure and risk factors for a number of specific individuals.  (*Id.*, Table 8.2)  But he offers no basis (statistical or otherwise) to determine

whether these calculations in any way relate to levels of exposure received by the entire property class or represent the magnitude of a "common, class-wide health risk."   Indeed, as his calculations for those few individuals show, exposures, doses, and risks among people living off-site the Rocky Flats plant varied widely.  (*Id.*; *see also* Ex. 2, Goble Dep. at 116:8-117:23)

Evidence that is applicable to some but not all class members cannot be used as class-wide proof.  As the Court has noted, "to allow the jury to consider forms of interference that do not apply to the class as a whole would impermissibly invite it to determine nuisance liability based on a non-existent composite class member who had suffered all of the interferences claimed by different class members."  (5/17/05 Order at 4 (citing *Broussard v. Meineke Discount Muffler Shops, Inc.,* 155 F.3d 331, 344-45 (4th Cir. 1998) (precluding use of "selective allegations, which may or may not have been available to individual named plaintiffs")))  This would improperly enlarge the substantive rights of some class members (*i.e.*, those who experienced lower exposures and risk than the "composite" class member), while potentially short-changing others (*i.e.*, those with greater exposure and risk).  (*See* 5/17/05 Order at 4-5)  Accordingly, Dr. Goble's testimony and report should be excluded because his analysis does not relate to any alleged invasion of all class properties, actual class-wide exposure, "common, class-wide health risk," or any future risk.  (*See* 5/17/05 Order at 5-6)

### 2.    Goble's Plutonium Methodology Does Not Satisfy *Daubert's* "Reliability" Requirements.

Dr. Goble's opinions should also be excluded because his methodology, and the assumptions he employed in applying his methodology, are not reliable.  The parties do not dispute how Dr. Goble came up with his exposure and risk estimates for plutonium.  Using an equation with four variables, Dr. Goble estimated plutonium-in-air concentration "ranges" for 1965-70 for three locations – one of which is largely outside the property class area.  (Ex. 2,

Goble Dep. at 32:20-33:5)   Using additional equations, he converted those air concentration estimates into dose "range" estimates for hypothetical persons at those same three locations and, using risk coefficients supplied by another expert, Dr. Goble estimated "ranges" of risks.  (*Id.* at 84:16-24)

Dr. Goble used a technique known as Monte Carlo analysis.  When he set up his equation to estimate air concentration ranges, for example, instead of picking a value for each of the four variables, he selected a range of values.  (Goble Dep. Ex. 26, attached hereto as Ex. 4)  The Monte Carlo program then ran the equation 2500 times, each time randomly selecting a different value for each variable, and combining those randomly selected variables 2500 times in the manner prescribed by Dr. Goble's equation in order to generate an answer that is expressed as the range of air concentrations for a given location for this time period, 1965-1970.  (Ex. 2, Goble Dep. at 46:6-48:2)  The equations that Dr. Goble uses to convert his air concentration ranges into dose ranges, and to convert those dose ranges into risk ranges, also are run through the same Monte Carlo method, generating ranges of doses and risks for a given location for this 1965-1970 time frame.

Dr. Goble expresses his ranges in tables in his report.  (Ex. 1, Goble Rep. at 48-61 and Tables 8.1, 8.2)  Dr. Goble's dose and risk ranges are actually a combination of ranges:  one set of ranges for what Dr. Goble calls "uncertainty" and a separate set for what he calls "variability." (*Id.* at 22-26)  For each of his "ranges," Dr. Goble calculated "distributions," representing the 5th through 95th percentile results for variability, and the 5th through 95th percentile results for uncertainty.  He provides these distributions in his report.

In order to convert Dr. Goble's estimated ranges of exposures for 1965-1970 into ranges that apply to any year after 1970, Dr. Goble multiplied his exposure range results by a

"multiplier" of 0.003.  (Ex. 2, Goble Dep. at 57:15-19)  That is, Dr. Goble used his equation to estimate directly exposures in the 1965-1970 time period.  He used the "multiplier" for all later years up through 1989.

Dr. Goble's opinions should be excluded because they suffer from the following fundamental reliability problems:

<strong>(a)      Goble's "Ranges" Are Far Too Broad To Be Reliable.</strong>

Dr. Goble's methodology does not produce a single estimate.  Rather, it produces a range of estimated exposures, doses and risks.  The ranges of Dr. Goble's estimates are staggeringly broad.  For example, Dr. Goble's average annual plutonium-in-air estimates for a single location, Section 4B, in any one year between 1965 and 1970 range from 0.00005 to 0.03 Bq/m$^3$ – a range in which the highest value is approximately 1,000 times the lowest value.  (Ex. 1, Goble Rep. at 48, Table 4.4)  Dr. Goble's beryllium-in-air estimates for one location and one time vary by even more from 0.000000028 to 0.24 $\mu$ g/m$^3$ – a range of 10,000,000 times.  (*Id.* at 77)  The same broad range characterizes Dr. Goble's *dose* estimates.  For example, Dr. Goble's estimate of the dose received by Michael Rice – who lived near Rocky Flats for less than a year – vary by a factor of 1,000.  Dr. Goble's *risk* estimates have the same enormously broad ranges.  For a resident of Sector 4, Dr. Goble's best estimate of risk varies by a factor of 10,000,000 times.  (Ex. 2, Goble Dep. 468:21-471:3)  Dr. Goble testified that he cannot be any more specific than to say that his best estimate of exposure, at a given place and time, falls somewhere within these broad ranges, but that he does not know where.  (*Id.* at 68:3-24; 468:21-471:3)

Plaintiffs' own experts have testified that confidence intervals as broad as Dr. Goble's are not reliable.  Richard Clapp, for instance, testified that he "always considers the confidence interval in interpreting any finding," and that his basic "litmus test" to assess the reliability of an estimate is that, if the estimate has confidence intervals that vary by as much as factor of 10, then

it is not a reliable estimate.  (Clapp Dep. at 305:19-308:23, excerpts attached hereto as Ex. 5)  In

fact, Dr. Clapp testified that he would not rely on an estimate of bone cancer risk that he

generated that had 5th and 95th percentile confidence intervals that varied from 0.7 to 4.8,

roughly a factor of only seven times, because, in his view, "well, that would be a very wide

confidence interval."  (*Id.*)  Likewise, Daniel Teitelbaum testified that when confidence intervals

have a wide range, "it means that the data that was put in has a very wide range, and you are not

really able to say which of those numbers is most likely to be correct."  (Teitelbaum Dep. at

81:23-82:1, excerpts attached hereto as Ex. 6)[2]  "A broad [confidence] interval signals that

random error is substantial . . .  It is not very impressive to be correct in a few instances, because,

by definition, such intervals are broad enough to ensure coverage 99% of the time."  *Reference*

*Manual on Scientific Evidence* at 376, n.129 (1994), excerpts attached hereto as Ex. 7.[3]

For this reason, courts have determined that statistical estimates that are surrounded by

confidence limits thousands of times more narrow than Dr. Goble's are scientifically unreliable.

*See Turpin v. Merrell Dow Pharm., Inc.*, 959 F.2d 1349, 1357 (6th Cir. 1992) (studies that had

confidence intervals for risk that were 500,000 times more narrow than those generated by Dr.

---

[2]   Teitelbaum was, but is no longer, one of plaintiffs' experts.

[3]   The Reference Manual on Scientific Evidence, a publication of the Federal Judicial Center,
     states that:  "A confidence interval is based on the standard error.  If the standard error is
     small, the estimate probably is close to the truth.  If the standard error is large, the estimate
     may be seriously wrong . . .   An estimate based on a sample will differ from the exact
     population value due to random error; the standard error measures the likely size of the
     random error.  Confidence intervals are a technical refinement, and confidence is a term of
     art.  For a given confidence level, a narrower interval indicates a more precise estimate.  For
     a given sample size, increased confidence can be attained only by widening the interval.  A
     high confidence level alone means very little, but a high confidence level resulting in a small
     interval is impressive.  It indicates that the random error in the sample estimate is low  . . .
     Conversely, a broad interval signals that random error is substantial."  (Ex. 7, *Reference
     Manual*, 376 & n.129)

Goble could not be relied upon because of their "scientific uncertainty"); *American Society of Composers v. Showtime/The Movie Channel, Inc.,* 912 F.2d 563, 591 (2d Cir. 1990) ("As an apparent result of the small sample size, the range of figures that one obtains by applying a 95 percent confidence interval to the various samples is so broad as to suggest little reliability in the median figures on which [defendant] relies."); *Haim v. Secretary of the Dep't of Health and Human Servs.,* No. 90-1031V, 1993 WL 346392, at *6 (Fed. Cl. Ct. Aug. 27, 1993) (striking the testimony of two experts, holding that they should not have relied on a particular study where the "statistical confidence interval on the estimates of ... risk was wide (between one in one hundred thousand and one in one million)" – a range of only a factor of 10), attached hereto as Ex. 8.

> **(b)     Goble Fails To Generate Any Hypothesis And Does Not Present Any Assessment Of His Rate Of Error, As Is Plaintiffs' Burden.**

Scientists develop theories by formulating and disproving hypotheses.  *See United States v. Bynum*, 3 F.3d 769, 773 (4th Cir. 1993) ("'Scientific' knowledge is generated through the scientific method – subjecting testable hypotheses to the crucible of experiment in an effort to disprove them.").  The Tenth Circuit has stressed the importance of hypothesis development to scientific research.  *See Mitchell v. Gencorp. Inc.*, 1999 WL 5105 at *6 (10th Cir. 1999) ("Scientific method today is based on generating hypotheses and testing them to see if they can be falsified") (*quoting Daubert*, 509 U.S. at 593), attached hereto as Ex. 9.  The *Daubert* court listed the development of a testable hypothesis as a "key" factor in determining whether an expert's testimony should be admitted pursuant to Rule 702.  *Daubert*, 509 U.S. at 593.  Here, Dr. Goble has failed to develop a testable hypothesis.

Dr. Goble should have, but did not, develop a testable hypothesis before he performed his study.  *See e.g., Johnston v. United States*, 597 F. Supp. 374, 393 (D. Kan. 1984).  Instead, Dr. Goble purports to use "confidence intervals" as a means of calculating error rates.  1/25/99 Plts.

Resp. to Defs. Mot. to Strike at 15.  But confidence intervals alone – without hypotheses – cannot be used to calculate the "rate of error associated with [a] theory."  *Mitchell*, 1999 WL 5105 at *3.  Rather, confidence intervals are merely a means of testing a scientific theory by examining ***whether a particular null hypothesis falls within a particular confidence interval***.  If the null hypothesis does overlap with the confidence interval, then a scientist cannot reject that hypothesis with any reasonable degree of statistical certainty.  *See, e.g., DeLuca v. Merrell Dow Pharmaceuticals, Inc.*, 911 F.2d 941, 948 (3rd Cir. 1990) ("If a 95% confidence interval thus contains '1,' or the null hypothesis, then . . . the null hypothesis has been disproved at a .05 level of significance").  However, without a null hypothesis to compare it to, Dr. Goble's "confidence intervals" are meaningless.

### (c)   Goble Improperly Relies Upon His 95th Percentile Estimates.

Dr. Goble's report states that he relies on his 95th percentile estimates:  "My specific recommendation in this setting is that a determination of significant exposure be made for the 95th percentile person in an exposed group; that is, the person who, because of variability in the exposures received by people in the group, had an exposure greater than or equal to the exposure received by 95% of the people in that group."  (Ex. 1, Goble Rep. at 23-24)  Yet, Dr. Goble testified that his 95th percentile estimates are only 5% likely to be correct.  (Ex. 2, Goble Dep. at 75:3-8)

Courts have characterized reliance on the upper range of a confidence interval as nothing more than mere speculation.  *See Marder v. G.D. Searle & Co.*, 630 F. Supp. 1087, 1092 (D. Md. 1986) ("The upper range of the confidence intervals signify the outer realm of possibilities, and plaintiffs cannot reasonably rely on these numbers as evidence of the probability of a greater than two-fold risk.  Their argument reaches new heights of speculation and has no scientific basis").  While use of such an upper confidence limit might be appropriate for a public health

10

agency charged with reducing public exposures to harmful substances, it is inappropriate to demonstrate an exposure sufficient to sustain a plaintiff's burden of proof in a court of law. *See Allen v. Pennsylvania Engineering Corp.*, 102 F.3d 194, 196 (5th Cir. 1996) (experts' methodology, though suited to the task of public health agencies to "make prophylactic rules governing human exposure," was not scientifically acceptable because it failed to produce an opinion that met the degree of reliability required by the Federal Rules of Evidence); *In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 781-82 (E.D.N.Y. 1984) ("The distinction between avoidance of risk through regulation and compensation for injuries after the fact is a fundamental one . . . Regardless of what regulatory action would be justified by current evidence . . . such evidence would not be sufficient to find an individual defendant liable to an individual plaintiff.").

### (d)   Goble Fails To Test His Computer Modeled Results Against Real World Data.

It is well-settled that scientists must test their models using real world data. Thus, proper scientific methodology dictates that a reality check be conducted to ensure that the estimates derived are within the range of plausible values. (Auxier/Frazier Aff. ¶¶ 11-12; Raabe Aff. ¶ 26, attached hereto as Exs. 10 and 11, respectively) Dr. Goble himself testified that he "believe[s] it is good practice to compare dose reconstruction models to good data" and that he "would criticize a program that was doing dose reconstruction . . . if it did not create . . . an appropriately assessed data base on environmental measurements." (Goble 12/19/96 *Hanford* Dep. at 63:8-9; 70:22-71:4, attached hereto as Ex. 13)[4] Plaintiffs' other experts have testified that it is essential

---

[4]   Plaintiffs' (former) expert, Dr. Teitelbaum, testified to the same point. (Ex. 6, Teitelbaum Dep. 57:13-59:9)

to "calibrate" any computer-generated predictions using real world data.   For instance, Teitelbaum, when confronted at his deposition with computer-generated estimates of Rocky Flats releases, testified that scientists must "go out and calibrate" computer models using "actual measurements" – "real world data" – in order to determine "whether there is any real-world relevance of this particular kind of modeling."   (Ex. 6, Teitelbaum Dep. at 57:13-58:24) Teitelbaum specifically recommended to plaintiffs that Dr. Goble's computer model calculations be calibrated using such real world data.   (*Id.* at 58:25-59:9)   And, in fact, a radiation dose reconstruction treatise prepared by the same government-affiliated entity whose procedures Dr. Goble claims to follow, the National Research Council, has recommended that when modeling environmental releases,  "every attempt should be made to validate the predictions of the models against relevant data sets."   (*Compare* Ex. 1, Goble Rep. at 2-3 *with* Radiation Dose Reconstruction, at 39, attached hereto as Ex. 28)

Dr. Goble has failed to test or calibrate his air concentration estimates – upon which all of his dose and risk opinions are based – against available real world data.  He simply took his unvalidated results and plugged them into additional computer models to generate his estimated doses and risks.  Using broad assumptions relating to his four variables (the key one – deposition velocity – is discussed below) in his critical air concentration model, Dr. Goble let his Monte Carlo analysis run amuck, and then never went back to validate it against real world data.

There was plenty of real world data available.  Tens of thousands of air monitoring measurements have been made over the past four decades at dozens of locations in and around Rocky Flats by many different groups, including the Colorado Department of Health ("CDH") and the EPA.  Air monitors were located on-site, as well as off-site.  In fact, in the 1960s, some of the on-site monitors were intentionally positioned immediately down wind of the 903 pad,

which is what Dr. Goble assumes is the source of the 1965-1970 releases.  (Ex. 2, Goble Dep. at 146:12-16)[5]  The results of those measurements have been public for decades.  Yet, neither Dr. Goble nor any other plaintiffs' expert cross-checked Dr. Goble's projections against any of this real world data despite recognizing the need to conduct such analysis.

A comparison of the concentrations Dr. Goble's unvalidated modeling predicts with the CDH's actual air sampling measurements demonstrates that Dr. Goble's computer predictions bear no relationship to "real world data."  For instance, the CDH operated an air monitor, APC-56, which it positioned immediately down wind from the 903 pad -- miles from the outskirts of the class area.  (Ex. 2, Goble Dep. 217:17-219:3; 220:12-19)  The CDH started making plutonium-in-air measurements with APC-56 in 1969.  The highest monthly average that the CDH measured at APC-56 in 1969 was 0.009 pCi/m$^3$.  (*Id.* at 218:23-219:23)  All of the other months' averages were much lower, rendering the annual average far lower as well.  (*Id.* at 219:24-220:19)  Dr. Goble's estimated air concentration for location 4B for 1969 are shown on the attached table from Dr. Goble's report.  (*See* Table, Goble's 1953-89 Estimates of Annual Plutonium-in-air Concentrations in Sector 4B, attached hereto as Ex. 16)  Unlike APC-56, this location is not immediately down wind from the 903 pad.  It is approximately two miles away.  Nevertheless, Dr. Goble's 95th percentile estimated 1969 annual average is 945 fCi/m$^3$ –

---

[5]   The so-called "S-8" monitor was located closest to the 903 pad.  (Ex. 2, Goble Dep. at 223:8-19; Goble Dep. Ex. 10, attached hereto as Ex. 14))  The monitors were positioned directly adjacent to the 903 pad area, less than a few hundred feet away from it.  As a result, the monitors were located almost two kilometers closer to the pad, the source, than the off-site location that Goble designates as Sector 4B.  These monitors were checked daily, and their results were compared against the federal release limits at the time.  (Putzier Dep. 145:6-147:20, attached hereto as Ex. 15)  Between the end of 1964 and 1970, more than 2,500 counts were taken at the S-8 monitor.  (*See* Ex. 14)  This exhibit shows daily counts taken at S-8, not annual averages, which Goble predicts. (*Id.*)

1,000 times higher than the amount actually measured by the CDH in the same year immediately down wind of the 903 pad.[6]  (Ex. 2, Goble Dep. at 218:23-220:16 and Ex. 1, Goble Rep. at 48, Table 44)   Similarly, Dr. Goble drew a diagram at his deposition to show where his plutonium-in-air estimates for Sector 4B for 1965-1970 would appear if plotted against the CDH's actual measurements of plutonium-in-air during the same period.  (Goble Dep. Ex. 12, attached hereto as Ex. 17)  Dr. Goble's drawing confirms that all of the CDH's measurements were less than Dr. Goble's 5th percentile confidence limit estimate.  (*Id.*)  In other words, the actual measured concentrations essentially fall outside the confidence interval Dr. Goble generated.

Dr. Goble has no explanation for why his calculated historical estimates are so far off the historically measured amounts.  He admits that he has no criticisms of the manner in which the CDH operated its samplers, and that, in fact, he has not taken a first step in trying to determine anything about the CDH's Rocky Flats sampling system.  (Ex. 2, Goble Dep. at 219)  He has "not examined in detail how that sampler [APC-56] functioned"; he has "not reviewed the raw data that went into APC-56"; he has "not gone to the primary data provided by APC-56"; he has "not talked with people that collected those samples"; he has "not spoken with people who processed the samples" in the laboratory; and he has "not consulted with people at Colorado Department of Health on their air-sampling data."  (*Id.* at 235:8-236:22)

Comparison of Dr. Goble's computer-generated projections against "real world data" demonstrates that Dr. Goble's modeled estimates are not only thousands of times too high, but

---

[6]   Because the APC-56 measurements were taken approximately two kilometers closer to the 903 pad than is the Sector 4B location for which Goble estimated his plutonium-in-air concentration, another factor of 100 would have to be added to the difference between reality and Goble's estimates, making Goble's predictions 100,000 times too high.

also that even his enormously broad estimates fail to capture historically measured amounts. Dr. Goble should have, but did not, calibrate his model accordingly. His purported results are not reliable and should be excluded.

### (e)   Goble Fails To Take Into Account Real World Data In Selecting The Key Deposition Velocity Variable.

Dr. Goble's air concentration estimates (upon which the rest of his estimates hinge) are driven by only one of the four variables he used in that equation: deposition velocity. Over 80% of Dr. Goble's estimates are attributable to Dr. Goble's selection of values for that deposition velocity variable. (Ex. 10, Auxier/Frazier Aff. ¶ 38) Yet, although site-specific wind and particle size data were available for Rocky Flats, Dr. Goble did not use it to develop the value and uncertainty for this critical variable.

Instead, Dr. Goble selected his deposition velocity value, and the uncertainty that he associated with that value, from a single report, called NUREG 6244. (Ex. 1, Goble Rep. at 35-36) Two graphics in that report showed both a value for deposition velocity and associated uncertainty. (Ex. 2, Goble Dep. at 481:1-482:11; Goble Ex. 28 at 4-26, Figs. 4.39 and 4.40 attached hereto as Ex 18) NUREG 6244 was not related to Rocky Flats. (Ex. 11, Raabe Aff. ¶ 15) Rather, the report, and its assumptions, were designed to apply to a broad range of possible scenarios, covering all different sizes of particles, different geographical conditions, different conditions of soil and vegetation coverage and different wind speeds. (*Id.* ¶ 13) The broad range of possible values for deposition velocity set forth in NUREG 6244 therefore incorporates a similarly broad range of deposition velocities and associated uncertainties. (*Id.* ¶¶ 13-17) Dr. Goble, who has never made any measurements to determine the deposition velocities of any materials (Ex. 2, Goble Dep. at 483:20-484:1), selected his deposition velocity from two summary graphics in NUREG 6244. The two graphics (bar charts) – which did not deal with the

Rocky Flats Facility – incorporated all of the uncertainty associated with all of the different conditions covered in the report, only some of which (if any) could be applicable to the 903-pad release conditions that Dr. Goble was attempting to estimate.

In addition, the graphics from which Dr. Goble selected these critical deposition velocity values were based on ***equal weighting*** being given to the results of all of the experts whose opinions were solicited for NUREG 6244 (Dr. Goble was not among them).  (Ex. 11, Raabe Aff. ¶¶ 12, 16)  However, as NUREG 6244 makes clear, the opinions as to deposition velocity of these eight experts were tested, and only one of them, the so-called "Expert A," passed the test. (*Id.* at ¶ 16)  Nevertheless, Dr. Goble did not use Expert A's opinions, but relied on the graphic giving equal weight to all experts' opinions.  (*Id.*)

Dr. Goble selected from that equal weighting graphic his deposition velocity values.  (*Id.*) In so doing, he chose the lower of two different particle sizes shown on that graphic.  Namely, Dr. Goble selected the deposition velocity associated with one micron particles.   (Ex. 2, Goble Dep. at 481:14-19)

Dr. Goble admitted that his air concentrations would decrease if his deposition velocity assumption increased.  (*Id.* at 390:19-391:6)  He testified that the two were linearly related; that is, an increase by a factor of ten in his deposition velocity assumption would decrease air concentrations by a factor of ten.  (*Id.*)

In addition, much data has been collected, and much science has been written, concerning the particle sizes of dust blown from the 903-pad in the late 1960s.  (Ex. 10, Auxier/Frazier Aff. ¶ 33; Ex. 11, Raabe Aff. ¶¶ 15, 21)  That science indisputably reveals that particle sizes much larger than one micron – Dr. Goble's selected value –  were involved in that 903-pad event.  In

fact, the average particle sizes involved in that event, scientists have concluded, were in excess of 15 microns.  (Ex. 10, Auxier/Frazier Aff. ¶ 33;  Ex. 11, Raabe Aff. ¶ 15)

Much additional data has been collected to determine the wind speeds under which the 903-pad releases occurred.  (Ex. 10, Auxier/Frazier Aff. ¶ 41)  That science has indicated that wind speeds far in excess of five meters per second were responsible for the 903-pad releases. For example, RAC concluded that the primary 903-pad releases occurred on six days when winds at Rocky Flats exceeded 10 meters per second.  (*See* August 1999 RAC Final Report, *Development of the Rocky Flats Plant 903 Area Plutonium Service Term at IV-16* and August 1999 RAC Final Report, *Estimated Exposure and Lifetime Cancer Incidence Risk from 903 Area Plutonium Releases at Rocky Flats Plant* at 7-9, attached hereto as Ex. 19)  Dr. Goble selected his one micron value from the two graphics in NUREG-6244 for wind speeds of five meters per second.  (Ex. 2, Goble Dep. at 482:7-11)  Dr. Goble could have used wind and particle size data specific to the 903-pad releases at Rocky Flats.  He did not.  Had he, his air concentration estimates would have been thousands of times lower.  (Ex. 11, Raabe Aff. ¶ 21)

> **(f)     Goble Inappropriately Applies A "Multiplier" To Generate All Of His Results For Any Period Of Time Relevant To This Case; That Is, Any Time Between 1970 And 1989.**

The membership date for the property class is June 1989.  Dr. Goble calculated plutonium exposures and risks based on the 1965-1970 time period.  But rather than calculate separate exposures and risks for 1971-1989, Dr. Goble simply used a "multiplier."  (Ex. 1, Goble Rep. at 49; Ex. 2, Goble Dep. at 233, 312:14-317:10)  He assumes that the air concentrations for the years between 1970 and 1989 for Sectors 4B, 8B and 12B are 0.003 times what they were during 1965-70.  (Ex. 1, Goble Rep. at 49; Ex. 2, Goble Dep. at 314:23-315:16)

Dr. Goble offers no sound scientific basis for using this 1971-89 multiplier.  There are several problems with his method.  First, use of this multiplier results in double counting.  Dr.

Goble calculated the 1965-70 air concentrations (and exposures, doses and risks therefrom) based on amounts of plutonium in soil that was determined in studies conducted between 1969 and the mid-1990s.  (Ex. 1, Goble Rep. at 35-36)  Dr. Goble used up 100% of the plutonium in soil measured in those studies in back-calculating his 1965-1970 air concentrations.  After doing so, no plutonium in soil was left to contribute to any other "releases."  Dr. Goble has made no effort to attribute some part of the plutonium in soil measured to releases that occurred in years other than 1965-1970.  (Ex. 10, Auxier/Frazier Aff. ¶ 51)  Nor has he reduced his other results based on any such apportionment.

Second, Dr. Goble relies on Dr. Shawn Smallwood's work for the multiplier value for this post-1970 time period.  (Ex. 1, Goble Rep. at 40)  Dr. Goble states that "biotransport is likely to be an important mechanism as described by Dr. Smallwood; Dr. Smallwood estimates that roughly .7% of the inventory in the upper 20 cm of soil is blown away per year (Smallwood 1996)."  (*Id*)  As discussed below, Dr. Smallwood testified repeatedly that he never quantified any plutonium exposures of the named plaintiffs or class members, that he never calculated the amount of plutonium releases from Rocky Flats into the class area, and that he did not calculate the plutonium amounts that ever left the Rocky Flats site.  *(See infra* Section I.B.1)  In the face of those admissions, reliance upon Dr. Smallwood for the quantitative value of a multiplier for all years relevant to this case cannot be a valid or reliable methodology.  *See In re Paoli R.R Yard PCB Litig.*, 35 F.3d 717, 772-73 (3rd Cir. 1994) (criticizing proposed expert for failing to provide adequate methodological justification for multiplier).

Other than through an inadmissible reliance upon "multipliers," Dr. Goble has estimated no exposures or risks to any property class members as of June 1989.  No other plaintiffs' expert has either.  Accordingly, his testimony should be excluded.

**B.      Goble's Beryllium Opinions Must Be Precluded.**

**1.      Goble's Beryllium Opinions Do Not "Fit" The Issues In This Case.**

In the class-wide case, the Court has permitted plaintiffs to present only nuisance – and not trespass – claims based on substances other than plutonium.  (Def. Overview at 13-14) However, Dr. Goble's beryllium analysis does not purport to examine class-wide exposures or risk.  Like his plutonium opinions, Dr. Goble developed his beryllium opinions for purposes of the medical monitoring case.  His beryllium analysis accordingly focuses on exposures and risks at the upper end of his confidence levels (at the 90th and 95th percent levels).  (Ex. 1, Goble Rep. at 77)  Dr. Goble's study never attempts to calculate a common magnitude of exposure or risk (if any) that applies to all property class members.  Similar to his plutonium analysis, Dr. Goble also modeled beryllium exposures for a geographic area different from the class area (and including property outside the class area).

Finally, Dr. Goble based his entire analysis on 1971 soil measurements (Ex. 2, Goble Dep. at 430: 4-10), whereas the membership date for the class is June 1989, and many class members did not move to the class area until close to that date.  Dr. Goble has made no attempt to analyze the entire class in light of the wide variations in the amount of time different class members have spent near Rocky Flats.  Because his analysis is not class-wide, it does not "fit" the issues in the property class trial and must be excluded.  (*See* Section I.A.1., *supra*)

Even if Dr. Goble's analysis could somehow be considered representative of the exposure and risk to "all class members" (which it cannot), the ranges of exposures and risks he derives are far too broad to assist the jury.  For example, under his beryllium analysis, class members living in the tested area nearest the plant site (as compared to members living in the tested area farthest from the plant site) might have exposure difference in a range of 100,000,000 times. (Ex. 1, Goble Rep. at 77, Table 7.2)  Ranges of this scale cannot assist the jury in determining

the common magnitude of exposure and risk (if any) from beryllium.  As such they would not materially advance plaintiffs' case, and should be precluded.

### 2.        Goble's Beryllium Estimates Are Based On Flawed Methodology.

Dr. Goble's methodology for estimating exposures and risk purportedly caused by Rocky Flats beryllium emissions is similar to his methodology for plutonium, and suffers from the same fundamental methodological defects described above:

- Dr. Goble fails to generate any hypothesis.

- Dr. Goble's "ranges" are too broad to be reliable, and they present an unacceptable rate of error.  They are speculating about what possibly could have happened, not reliable science as to what did happen.

- Dr. Goble bases his opinions on his upper 95th percentile estimates, but testified that those estimates were only 5% likely to be correct.  (Ex. 2, Goble Dep. at 75: 3-8)

(*See* Section I.A.2., *supra*)

In addition to the methodological defects it shares with the plutonium analysis, Dr. Goble adds another layer of reliability problems by attempting to estimate beryllium concentrations in air based on "back-calculations" from a 1971 CDH study of beryllium levels in soil.  (Ex. 2, Goble Dep. at 430:4-10)  Dr. Goble has conceded that his "back calculation" is not reliable.  He admits being "skeptical" of his own estimates based on that back-calculation, testifying that those estimates are less than 10% likely to be correct.  (*Id.* at 428:23-429:23; 418:11-419:19; 422:12-423:13)[7]  Thus, like Dr. Goble's plutonium analysis, Dr. Goble's beryllium opinions are inadmissible because they reside in the realm of "possibility" rather than "probability."  Indeed,

---

[7]    He further characterized the results created by his back calculation methodology as "***unlikely.***"  (Ex. 2, Goble Dep. 422:12-423:13) (emphasis added)  He also testified that "I thought it was ***unlikely*** that the back calculation reflected the real situation."  (*Id.* at 445:18-446:5) (emphasis added).

Dr. Goble prefaces his entire report by noting that principal exposures only "possibly" come from beryllium. (Ex. 1, Goble Rep. at 2) Dr. Goble has reason to be skeptical of his back-calculated beryllium emission estimate, because an evaluation of the beryllium-in-soil data showed no discernable influence from Rocky Flats. (Rodricks Decl. ¶ 10, attached hereto as Ex. 20)

The sole basis for Dr. Goble's back-calculations are the concentrations shown on a map taken from a 1971 CDH beryllium-in-soil study, shown in Figure 2. (Ex. 2, Goble Dep. at 430:4-10; Goble Dep. Ex. 22 at 33, Figure 2, attached hereto as Ex. 21) Dr. Goble admits that the CDH, after completing that study, concluded that the pattern of beryllium-in-soil values exhibited on this map "is not consistent with what would be expected due to atmospheric dispersion from the Rocky Flats plant." (Ex. 2, Goble Dep. at 430:11-431:19) Even Dr. Goble agrees that the data shown on this map is not consistent with beryllium releases emanating from Rocky Flats: "The 1971 measurements did see positive results. However the largest concentrations observed (*i.e.*, the 58.5 and 60.0 figures highlighted on Figure 2) were to the west, up wind, of the plant (and far from the class area) and thus not the expected footprint." (Ex. 1, Goble Rep. at 73; Ex. 2, Goble Dep. at 433:22-435:24; Ex. 21, Goble Dep. Ex. 22, Fig. 2)

Meanwhile, the thousands of acres of land that lie between Rocky Flats and the class area actually had a lower beryllium-in-soil concentration – 2.0 µg/g – than the down wind area Dr. Goble assumes was impacted by Rocky Flats based on measurements of 4.5 µg/g. (*See* Ex. 21, Goble Dep. Ex. 22, Fig. 2)) Dr. Goble has no explanation for how beryllium released from Rocky Flats facilities could have contaminated the 4.5 µg/g sector while not contaminating, to a same or higher level, the thousands of intervening acres. Dr. Goble himself admits that it is "a

pretty unlikely possibility" that this is actually what happened.  (Ex. 2, Goble Dep. at 440:15-444:2)

Plaintiffs' other experts have testified, with the same 1971 CDH map in front of them, that background concentrations of beryllium in the soils in this region of Colorado are approximately 5 µg/g.  (Ex. 6, Teitelbaum. Dep. at 22:18-23:10; 26:17-27:3)  Thus, the 4.5 µg/g level that Dr. Goble treats as a "footprint" due to Rocky Flats emissions (albeit a "pretty unlikely" one) is actually a lower level than naturally-occurring background.

Finally, Dr. Goble admits that the 58.5 µg/g and 60.0 µg/g data points highlighted on this same 1971 CDH map are not attributable to Rocky Flats, and that they must be due to some other source or sources.  (Ex. 2, Goble Dep. at 433:22-434:7)  Dr. Goble further admits that it is possible that any levels shown elsewhere on Figure 2, including the 4.5 µg/g that Dr. Goble treats as a Rocky Flats "footprint," are attributable to the same alternate source or sources.  (*Id.* at 444:17-445:12)[8]  Dr. Goble admitted that he has done absolutely nothing to rule out that possibility.  (*Id.* at 445:13-17)[9]

Disregarding all of these impediments, Dr. Goble simply assumed that his 4.5 µg/g of beryllium-in-soil as shown on this 1971 CDH map represented a "footprint" caused by Rocky Flats releases.  Using another Monte Carlo computer run similar to those he ran for plutonium, Dr. Goble calculated a "range" of beryllium-in-air concentrations based upon these

---

[8]   Plaintiffs' expert Teitelbaum testified that there are many other facilities in northwest Denver that have handled or processed beryllium and could be responsible for those higher levels far from the class area.  (Ex. 6, Teitelbaum Dep. at 93:2-95:10)

[9]   These higher beryllium-in-soil levels of 58.5 and 60.0 µg/g that Goble does not attribute to Rocky Flats also are *not* in the class area.  Thus, according to plaintiffs' own experts, beryllium exposures in the class area are *less* than the levels outside of the class.

beryllium-in-soil levels. The breadth of Dr. Goble's estimated "range" of beryllium concentrations varies from 0.000000028 to 0.24 micrograms/cubic meter – a range of 10,000,000 times for a single location. (Ex. 1, Goble Rep. at 77).

Furthermore, Dr. Goble's back-calculated beryllium estimates bear no relationship to those reached by ChemRisk based on its four-year analysis of actual beryllium monitoring data collected by the plant, the CDH and others. In fact, Dr. Goble's back calculation estimate is 10,000,000 times higher than ChemRisk's "real world data" estimate. (Ex. 2, Goble Rep., Table 7.1, Goble Rep. at 76) ChemRisk estimated that, over the operating history of the plant, 16 grams of beryllium had been released through the stacks in the production facilities, creating an air concentration of 0.000000085 µg/m3 in Sector 4. (Ex. 2, Goble Dep. at 454:6-16) Dr. Goble, on the other hand, estimates an air concentration for the same Sector 4 of .24 µg/m3, approximately 10,000,000 times higher than ChemRisk's estimate. Dr. Goble testified that, by setting up a simple ratio, one could determine the amount of beryllium that must have been released from the plant in order to have caused a level in air equivalent to his "back calculation" estimate of .24 µg/m3. (*Id.* at 454:20-456:2) Applying this simple test, however, Dr. Goble's "back calculation" would require 7,529,412 grams of beryllium to have been released from Rocky Flats, an obviously super-inflated estimate compared to ChemRisk's estimated emission, based on actual monitoring data, of only 16 grams. (*Id.*)

Dr. Goble's decision to rely on back-calculations in the face of obviously contradictory real-world measurements does not pass muster under *Daubert*. Good scientific practice would require Dr. Goble to evaluate quantitatively the contribution of non-Rocky Flats sources to soil concentrations. Instead, Dr. Goble makes an arbitrary assignment to background sources and assumes that air sources from Rocky Flats are responsible for the remainder of the beryllium in

soil. (*Id.*)  Dr. Goble did not consider the variability in soil measurements, nor did he undertake any assessment of migration from areas of high beryllium concentrations in soil (which Dr. Goble concedes are not site related) to areas of substantially lower concentrations (which Dr. Goble believes may be site related).  (*Id.*)  Dr. Goble claims that he can compensate for these obvious problems by assigning the back-calculated estimate to the "tail" of the distribution of probable values - i.e. by claiming that there is only a 5% chance that the back-calculated values are correct.  (*Id.*)  However, he disregards the very real possibility that his back-calculated values are so far off that his estimate may actually be outside the distribution of probable values altogether.  (*Id.*)

### C.   Goble's Opinions Regarding Ethylene Oxide And Volatile Chlorinated Hydrocarbons Should Be Precluded.

#### 1.   Goble's CHC And EtO Analyses Do Not "Fit" Because His Exposure And Risk Assessments Do Not Apply On A Class-Wide Basis.

Like Dr. Goble's beryllium analysis, Dr. Goble's CHC and EtO analyses are not relevant to plaintiffs' trespass claims because the Court has limited those claims to contamination by plutonium.  (Def. Overview at 13)  With respect to plaintiffs' nuisance claim, Dr. Goble's opinions must be excluded because he has not assessed, and provides no basis to assess, the magnitude of exposures or increased risk (if any) experienced by all class members.  (*Id.*)

As with his analysis of plutonium and beryllium, Dr. Goble has never looked at the issue of whether all class members were exposed and, if so, suffered increased risk.  His opinions - which were targeted entirely at the now-decertified medical monitoring claims - sought to ascertain levels of risk at the upper end (95th percentile) of the spectrum, not to determine the common magnitude of exposure and risk to all class members.  He never examined the composition of the class (individually or statistically) to analyze the time periods in which they

lived in the vicinity, how much time they spent outside, and other factors that might impact their exposure and risk.

Moreover, Dr. Goble's concentration and exposure analysis for CHCs and EtO was also limited to three specific "down wind" locations, one of which was largely outside the class area. (Ex. 1, Goble Rep. at 65)  He did not analyze the entire geographic class area and therefore cannot offer exposure estimates for the entire class area, let alone all of the class members.  (*See* Table, The Years In Which Class Member Parcels Were Bought and Sold, attached hereto as Ex. 22)  Because Dr. Goble does not offer any opinions that pertain to the class as a whole, his opinions are irrelevant and should be excluded both on grounds of relevance and unfair prejudice as discussed above.  (*See* Section I.A., *supra*)

In addition, Dr. Goble's CHC opinion is irrelevant because Dr. Goble offers only the cancer risk coefficient for one of the CHCs - carbon tetrachloride.  (Ex. 1, Goble Rep. at 67-68) As such he offers no risk assessment of the other five CHCs individually or any risk assessment of the "total CHCs."  Thus, even if Dr. Goble's analysis was otherwise applicable to the class as a whole (which it is not), his opinion on CHCs is irrelevant because he has not addressed the risk associated with the mix of compounds that he himself contends class members were exposed to – particularly when most class members moved to the area after the mid-1970s, when Dr. Goble admits Rocky Flats sought to replace carbon tetrachloride with other solvents.  (Ex. 1, Goble Rep. at 64)  Dr. Goble's opinions regarding risk from carbon tetrachloride are not relevant and would only serve to confuse and unfairly prejudice the jury.  They should be precluded under the *Daubert* "fit" requirement and Rule 403.

    2.      **Goble's EtO and CHC Analyses Are Based On Speculative Assumptions Unsupported By Any Scientific Foundation.**

Like his beryllium analysis, Dr. Goble's CHC and EtO analyses are based on the same methodology he used for plutonium and suffer from the same fundamental methodological flaws: Dr. Goble fails to generate any hypothesis and does not present any assessment of his rate of error, as is plaintiffs' burden; Dr. Goble's "ranges" are too broad to be reliable, and they present an unacceptable rate of error; and they are based on his upper 95th percentile estimates, even though he believes those estimates are only 5% likely to be correct.  Thus, for the reasons discussed in connection with the plutonium opinions above, his CHCs and EtO analyses should be excluded.  (*See* Section I.A., *supra*)

In addition, and as described below, Dr. Goble's CHC and EtO estimates rely on a number of arbitrary and scientifically unjustified assumptions that cannot pass muster under *Daubert*.  Experts must explain and defend each step in their proposed methodologies, because "any step that renders the analysis unreliable … renders the expert's testimony inadmissible." *Dodge*, 328 F.3d at 1222 (*quoting Mitchell v. Gencorp Inc.*, 165 F.3d 778, 782 (10th Cir. 1999). Dr. Goble has not done this.  Instead, he has made a series of assumptions without attempting to proffer any scientific or factual basis.  His results are pure speculation.  *United States v. Sowards*, 370 F.2d 87, 92 (10th Cir. 1966) ("To have probative value expert opinion must be founded upon substantial data, not mere conjecture, speculation or unwarranted assumption.  It must have a rational foundation.") (internal citations omitted);  *Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142 (4th Cir. 1994) ("An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record.") (cited with approval in *Stover v. Eagle Products, Inc.*  1996 WL 172972, *11 (D.Kan) (D.Kan.,1996)).  *See also* Def. Overview at 5-6.

(a)     **EtO Analysis**

Dr. Goble's EtO exposure and risk estimates are based on yearly emissions estimates derived entirely from a single hazardous materials inventory from 1974.  Based on that one inventory document, Dr. Goble has come up with a yearly emissions estimate for each of Rocky Flat's 37 years of operations.  Dr. Goble simply assumes that the quantity of EtO used at Rocky Flats annually was 2.5 times the 1974 inventory amount and applies that usage level to each year for a 20-year period (1963-82), arbitrarily assigning this figure the 90th percentile value in his distribution.  He then uses "multipliers" to calculate the emissions for the years prior to 1963 and from 1983-1989.  The result is that Dr. Goble's EtO estimates are based on a series of completely speculative assumptions:

- First, the relationship between the usage and inventory quantities assumed by Dr. Goble is completely arbitrary.  (Ex. 20, Rodricks Decl. ¶ 16)  Dr. Goble has made no effort to ascertain how EtO was used at Rocky Flats or for what purpose; he has not examined the type of equipment EtO was used in; and he has not examined the emissions systems or attempted to quantify emissions rates.  Instead, he simply assumes - supplying no justification for the assumption - that yearly emissions were 2.5 times the amount shown in the single 1974 inventory. (Ex. 1, Goble Rep. at 68-70)

- Second, he assumes that the 192,400 **liters** shown in the 1974 inventory is equivalent to 192,400 **kilograms**.  (Memorandum from Barrick to Owen of 1/25/74 attached hereto as Ex. 23; Ex. 1, Goble Rep. at 68; Ex. 20, Rodricks Decl. ¶ 17)  As Dr. Goble notes, EtO "is a gas at standard conditions."  (Ex. 1, Goble Rep. at 68)  192,400 liters of EtO gas is 380 kilograms.  (Ex. 20, Rodricks Decl. ¶ 17)  Dr. Goble himself appears to recognize that the 192,400 **kilogram** figure is inconsistent with the lack of information in the records concerning EtO use:  he found it likely "that there would have been more discussion of EtO use had there been regular long term consumption consistent with the amounts in the 1974 inventory (as there was for some of the chlorinated hydrocarbons)."  (Ex. 1, Goble Rep. at 69)

- Third, he applies his assumed emissions rate - based on a single 1974 inventory - across a 20-year period (1963-82) without making any effort to ascertain how long EtO was actually used at Rocky Flats or whether usage increased or decreased during that time period.  This is arbitrary and unjustifiable.  (Ex. 20, Rodricks Decl. ¶ 18)  Indeed, even Dr. Goble admits that "[w]ith only one piece of information from a particular year, even more uncertainty shrouds the attempt

to define the time periods for release." (Ex. 1, Goble Rep. at 69) Defendants' risk assessment expert, Dr. Joseph Rodricks, interviewed witnesses and reviewed documents indicating that ethylene oxide was used as a sterilizing agent for respirator cartridges during a relatively short period in the late-1960s and early-1970s. (Ex. 20, Rodricks Decl. ¶ 17) Thus, Dr. Goble's assumptions are not only unfounded, they contradict available evidence. (*Id.*)

- Fourth, Dr. Goble applies a "multiplier" of .1 to derive emissions rates for 1953-1962 and 1982-1989 based on his 1963-1982 emissions. (Ex. 1, Goble Rep. at 71) He fails to offer any scientific justification for the apparently arbitrary multiplier he chose. In fact, Dr. Goble has not offered any justification for assuming that Rocky Flats had any EtO emissions throughout its entire 37 years of operations. (Ex. 20, Rodricks Decl. ¶ 18) His use of arbitrary multipliers and assumption that there were continuous EtO emissions compounds his reliability problems. (Def. Overview at 5)

- Fifth, Dr. Goble arbitrarily assigns his series of assumptions the 90th percentile in his confidence distribution. He then assumes one-twentieth of this usage as the 50th percent value, without any scientific justification. The result is a distribution that is completely arbitrary, unscientific and unreliable. (Ex. 20, Rodricks Decl. ¶ 18)

- Sixth, Dr. Goble estimates risk based on a lifetime exposure period of 70 years, even though Rocky Flats operated for only 37 years and there is no information suggesting that EtO was used for more than a few years. (*Id.*. ¶ 22)

Dr. Goble attempts to rationalize his arbitrary assumptions by claiming that the information available to him was limited. But any such limitations were due to Dr. Goble's (and plaintiffs' counsel's) failure to investigate EtO use fully and review all available records and information sources – some of which make clear that EtO was not used for anywhere near 37 years. (*Id.* ¶ 18) Furthermore, a lack of knowledge is not license to present purported expert testimony to a jury based on unfounded and arbitrary assumptions; just the opposite:  it is grounds to exclude such testimony.

### (b)     CHC Analysis.

Dr. Goble purports to estimate exposure and risk to plaintiffs from a composite of six volatile CHCs, including carbon tetrachloride, perchloroethylene, trichloroethylene, 1,1,1 trichlorethane, methylene chloride and chloroform. The starting point for Dr. Goble's analysis is

the ChemRisk estimates for releases during each year.  (Ex. 1, Goble Rep. at 62)  However, rather than adopting ChemRisk's estimates, Dr. Goble develops distributions based on ChemRisk's release estimates (*id.* at 63) that effectively disregard those estimates.  Dr. Goble then uses his distributions to develop aggregate emissions rates for three time periods -1953-1964, 1965-1976, and 1977-1989 - which he uses as inputs in a dispersion model.  (*Id.* at 66)  Dr. Goble only examines risk based on risk estimates for carbon tetrachloride.  (*Id.* at 67-68)

Several aspects of Dr. Goble's analysis are based on unsupported and arbitrary assumptions.  First, there is no scientific basis for Dr. Goble's decision to re-work ChemRisk's emissions estimates.  As Dr. Goble readily concedes, ChemRisk conducted interviews and reviewed records to derive its estimates.  (*Id.* at 62)  Dr. Goble does not rely on the underlying data and information developed by ChemRisk and has offered no scientific justification for his arbitrary use of the ChemRisk estimates to derive his own distributions.  (Ex. 20, Rodricks Decl. ¶ 21)  Furthermore, by re-working ChemRisk's estimates, Dr. Goble comes up with a distribution that essentially uses the "tails" (*i.e.*, the ends) of the distribution – which Dr. Goble arbitrarily determined  – to determine the central values on which his exposure and risk estimates turn.  (*Id.*)

Second, Dr. Goble's risk estimates are based on lifetime exposures:  he calculated his final risk estimates from the product of the air concentration and the unit risk, where the unit risk assumed a body weight of 70 kg, a breathing rate of 20 m$^3$/day, and a lifetime exposure period of 70 years (continuous exposure).  But Rocky Flats operated only for 37 years (1953-1989), and the vast majority of class members lived near the site for considerably less time.  (*See* Ex. 22, Table, The Years In Which Class Member Parcels Were Bought and Sold.)

In short, Dr. Goble has made selective assumptions that result in greater exposure and risk estimates, ignoring real world data that was available for determining the outside parameters for risk to plaintiffs here.  As a result, Dr. Goble's risk estimates are unreliable under *Daubert*. *See, e.g., TMI II,* 911 F. Supp. at 798 (finding expert analysis unreliable when the expert disregards primary data that conflicts with the outcome of his methodology); *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 423 (5th Cir. 1987) (same).

Dr. Goble's testimony should be excluded in its entirety.

## II.    SHAWN SMALLWOOD'S TESTIMONY SHOULD BE EXCLUDED.

Shawn Smallwood  is a self-described "systems ecologist" whose area of expertise appears to be studying the habitats and behavior of animals and birds, and, according to his own testimony, "synthesizing" or "integrating" information that he receives from others. (Smallwood Dep. at 163:19-164:21, attached hereto as Ex. 24)  Dr. Smallwood's work in this litigation consisted of making several visits to the Rocky Flats Environment Technology Site in 1996 and, while there, observing the burrowing habits of several types of small mammals and insects.  Generally, Dr. Smallwood purports to testify about "bioturbation," the process by which he claims that materials deposited in Rocky Flats plant site soils by Dow and Rockwell during historical plant operations can now be disturbed by the digging of burrowing animals and insects. 6/2/97 Pls. Memo. in Opp. to Defs. Mot. for Sum. Jud. and Decertification at 16-17)  Plaintiffs' counsel have stated their intention to elicit from Dr. Smallwood the following opinions at trial:

- "[T]he ambient air monitoring stations on and off the plant site were inadequate, poorly positioned in terms of height and spacing, and insufficiently numerous to detect the past and continuing chronic release of contaminants" (1/25/99 Pls. Resp. to Defs. Mot. to Strike at 125 & n.119).

- The process of bioturbation caused "substantial quantities" of plutonium "and other hazardous substances" to be released from Rocky Flats into "the off-site environs" (*id.* at 118, 123-24).

30

- "[T]he suspended and resuspended plutonium and other chemicals pose a significant risk of respiration and ingestion by nearby inhabitants as borne out by local animal sampling showing ingestion and uptake of plutonium" (*id.* at 126).

- "[C]hronic releases of plutonium and other contaminants will accelerate into the future, posing a continuing risk of exposure to off-site residents" (*id.*).

Dr. Smallwood's opinions should be excluded because they:  (1) are irrelevant to the above issues and lack the "fit" with plaintiffs' class-wide claims as *Daubert* requires; and (2) also fail to meet the criteria for reliability required under *Daubert*.

### A.    Smallwood's Opinions Fail To Satisfy *Daubert's* "Fit" Requirements.

#### 1.    Smallwood Has No Opinion On Off-Site Releases Of Any Substance That Is Any Way Tied To The "Class Area."

Dr. Smallwood seeks to offer opinions regarding off-site releases of plutonium, saltcrete, pondcrete, and other substances due to bioturbation, the process by which Dr. Smallwood claims that materials deposited in Rocky Flats Plant site soils can be disturbed by the digging of burrowing animals and insects.  However, Dr. Smallwood's opinion are irrelevant to any past or future increased "common, classwide health risk."   (5/17/05 Order at 5)   Dr. Smallwood admitted that he could not relate any opinions that he might hold to releases to the property ***class area*** specifically.   Instead, Dr. Smallwood testified that he only had an opinion that materials were released "off-site" to the east of the Rocky Flats plant, without relation to any specific area or distance from the plant (much less to the property class area).  (Ex. 24, Smallwood Dep. at 190:21-24; 195:3-196:8.)  Dr. Smallwood could not say where materials allegedly released from Rocky Flats most likely traveled.  (*Id.* at 162:1-2)  Because Dr. Smallwood could not link any alleged releases from Rocky Flats to deposits of material ***on all class properties***, Dr. Smallwood's opinions regarding off-site releases fail to meet *Daubert's* "fit" requirement.

### 2. Smallwood's Opinions Regarding Off-Site Releases Of Chromium Do Not "Fit."

Among the substances that Dr. Smallwood claims was released due to "bioturbation" is chromium. Chromium is not a substance at issue in this case. Because plaintiffs have failed to list chromium as a "substance at issue" for the last nine years, chromium should not be part of the class-wide trial, and Dr. Smallwood's opinions regarding chromium should be excluded. (*See* Defs. Mot. in Limine to Exclude Other Substances at.

In any event, Dr. Smallwood does not opine that chromium was released to all properties in the "class area." Indeed, Dr. Smallwood never determined where any chromium released from the Rocky Flats Plant might have traveled. (Ex. 24, Smallwood Dep. 191:14-23) And none of plaintiffs' experts (including Dr. Smallwood) have any exposure, dose, or risk opinions regarding chromium releases from Rocky Flats. As such, plaintiffs can show no "common, class-wide health risk" from chromium.

### B. Smallwood Is Not Qualified To Render Opinions On Off-Site Dispersal of Materials, Health Risk, Or Air Monitoring.

Plaintiffs seek to stretch Dr. Smallwood's testimony by having him render opinions on issues in this lawsuit with which he admittedly lacks expertise and for which he admittedly has not performed any independent analysis. Fed. R. Civ. P. 702 and *Daubert/Kumho Tire* standards preclude Dr. Smallwood from being permitted to render these opinions at trial. As shown in detail in the sections that follow, Dr. Smallwood admits that he has conducted no analysis to determine whether any material brought to the surface soil at Rocky Flats has actually been dispersed off-site; he admits that he is not an expert in air monitoring; he is not an expert in dispersion modeling; he is not an expert in assessing radiation dose or health risk; and he has no basis on which to render an opinion that any releases of hazardous materials from the Rocky Flats site will continue into the future.

*Daubert*'s standards for admissibility and reliability of expert testimony are designed to prevent just what Dr. Smallwood is trying to do here – take opinions of other experts, rendered in fields in which Dr. Smallwood admittedly lacks expertise, and "integrate" or "synthesize" those opinions and express them as his own.  (*See* Def. Overview at 6)  Dr. Smallwood's proffered opinions should be stricken because he is not qualified to give them, they are irrelevant, unreliable, and not helpful to the jury.

## 1.    Smallwood Is Not Qualified To Render Such Opinions.

**Air Monitoring** – Plaintiffs present Dr. Smallwood as an air monitoring expert, sufficiently credentialed to critique the Rocky Flats 1953-89 air monitoring program.  In fact, as Dr. Smallwood's own deposition testimony shows, he is no expert on air monitoring. (Ex. 24, Smallwood Dep. at 65:21-23; 66:19-21; 57:11-16)  Even if, contrary to Dr. Smallwood's own candid testimony, he had sufficient expertise to critique the Rocky Flats air monitoring program, he has no factual foundation on which to do so, and his opinions would be without basis.

Dr. Smallwood did not conduct any investigation that would give him a factual foundation to render an opinion on the Rocky Flats air monitoring program.  Dr. Smallwood testified that he did not review Rocky Flats air sampling data before he wrote his report:  (*Id.* at 68:7-10, 62:3-63:20)  Indeed, he has no idea *how many* air samplers are located at Rocky Flats or *what kind of samplers* are used.  (*Id.* at 56:19-21; 67:9-13)  Nor does Dr. Smallwood have a basis for his conclusion relating to the supposed inadequacy of the Rocky Flats air monitoring program – that the air samplers were located one meter above the ground – because in Dr. Smallwood's own words, he cannot name *any* other facility would not be subject to the same criticism.  (*Id.* at 64:6-8)

Dr. Smallwood admitted that he cannot render the opinion that the plaintiffs say he will give at trial, namely, that the Rocky Flats air monitoring program is, to a reasonable degree of

scientific certainty, inadequate.  Instead, all he can say is that the air samplers at Rocky Flats "possibly" do not work.  (*Id.* at 67:14-68:4)

**<u>Off-Site Plutonium Releases</u>** – Plaintiffs also present Dr. Smallwood as possessing sufficient expertise to render opinions that, not only were hazardous materials in soil located *on* the Rocky Flats Plant site disturbed and brought to the soil surface by burrowing animals, but that those materials subsequently were re-entrained into the atmosphere and deposited in property located *off-site* Rocky Flats.  (See, e.g., Pls.' Resp. to Defs. Mot. to Strike at 118, 123-24)  However, Dr. Smallwood has no qualifications or basis upon which to render such an opinion, and disclaims any such expertise.  (*Id*. at 167:2-23)  Despite Dr. Smallwood having purported to include a chi over Q equation in his own report, Dr. Smallwood testified that he had never heard that term before, doesn't know what it means, didn't  know that he had included such a value in his report and again disclaimed any expertise in this field.  (*Id*. at 170:1 – 171:3; Ex. 35, Smallwood Rep. at 47)

Dr. Smallwood  has *not* calculated or otherwise determined that any amount of plutonium has  actually  been  released  from  the  Rocky  Flats  plant,  much  less  into  the  class  area,  from bioturbation or otherwise.  Dr. Smallwood has done nothing to determine whether any soil from any mounds that he personally witnessed on the Rocky Flats Plant site blew off the site.  (*Id*. at 163:13-16)  He "didn't conclude what amount," if any, "of plutonium has been released from Rocky Flats due to soil bioturbation."  (*Id*. at 200:16-201:17)  Nor did he ever calculate "an amount  [of  plutonium]  which  was  actually  dispersed  from  the  soil  into  the  air"  (*Id*.  at 225:13-226:11), or make any effort "to quantify the amount of plutonium that would be carried off-site by wind."  (*Id.* at 142:23-143:13)  Dr. Smallwood did not make a determination of the amount of any material that was in the soil at Rocky Flats that could potentially get into the air.

(*Id.* at 211:1-11)  Dr. Smallwood "didn't bother to estimate" how much, if any, plutonium was released due to soil bioturbation.  (*Id.* at 255:8-20)  The key testimony demonstrates Dr. Smallwood's lack of any basis for an opinion regarding off-site releases:

> Q.    What amount?
>
> A.    No, I didn't conclude what amount.
>
> Q.    Is there any quantification at all that you've made of an amount of plutonium that has been released from the Rocky Flats Plant due to soil bioturbation?
>
> A.    Let me look at my other example.  Trench T-9.  I did not, no.
>
> Q.    Did you ever inform Dr. Goble of any amount of plutonium that was released from the Rocky Flats Plant by any cause between 1970 and 1989?
>
> A.    I informed Dr. Goble the amount of soil that would be excavated at Rocky Flats Plant during that time period, but not necessarily the amount of plutonium.
>
> Q.    That would have been released?
>
> A.    Yes.
>
> Q.    When you say not necessarily, did you inform Dr. Goble of an amount of plutonium that would have been released from the Rocky Flats Plant at any time during 1970 to 1989?
>
> A.    I don't think I would have, because it really wouldn't – I mean, I think he could have done it better than me.
>
> Q.    So you didn't do it?
>
> A.    No.

(*Id.* at 201:02-202:02)

As discussed above, Dr. Goble did not do it either.  Nor has Dr. Smallwood determined that any other material has been released off-site the Rocky Flats plant.  When pressed at deposition, Dr. Smallwood only could testify that it is "likely" that materials brought to the soil surface at Rocky Flats through bioturbation were deposited off-site, but provided no further

elaboration.  (*Id.* at 205:19-208:5)  This is true for pondcrete (*id.* at 205:3-18); saltcrete (*id.* at 205:19-206:1); and spray irrigation (*id.* at 280:9-281:23).  Nor could Dr. Smallwood testify how far off-site any material might have deposited or where any material might have been deposited off-site.  (*Id.* at 190:21-24; 195:3-196:8)

**Off-site Chromium Releases**  The only effort Dr. Smallwood made that approaches – but does not constitute – an estimate of a release from the plant was a hypothetical calculation of the amount of hexavalent chromium, a material that is not at issue in this case, that could "possibly" have been released due to bioturbation.  Dr. Smallwood's hexavalent chromium "calculation" is an excellent example of the type of expert testimony prohibited by *Daubert* and its progeny.  Dr. Smallwood's chromium calculation proceeded as follows:

1.   Dr. Smallwood began with an initial chromium estimate that was taken from an on-site inventory that was prepared for the year 1974, an inventory that Dr. Smallwood admitted he had never   seen.  (*Id.* at 172:1-18; 176:22-177:4; 184:9-16)   Despite having reviewed no documentation of the amount of chromium used at the plant other than for this single year, Dr. Smallwood assumed that *ten times* the amount listed on this inventory actually was present at the plant not just in the year of the inventory, but for 15 years.  (*Id.* at 176:22-177:4, 183:11-187:4)

2.   In order to get this artificially-inflated inventory of chromium out of the buildings in which it was used, Dr. Smallwood simply *assumed* that all of this chromium was deposited onto the ground outside of the buildings.  As support for this assumption, Dr. Smallwood relied on a single one-page document provided to him by plaintiffs' counsel, even though he admitted at deposition that he believes that this one-page document is incomplete (*Id.* at 175:2-177:4); he does not know when it was prepared (*Id.* at 175:6-18); the document never mentions chromium (*Id.* at 174:9-19); and it relates to "volatile" compounds (*Id.* at 175:22-24), whereas chromium is a "non-volatile" compound.  (*Id.* at 168:16-169:17)

3.   In order to get these chromium deposits out of the soil and into the air, Dr. Smallwood fed them into an atmospheric dispersion computer model.  Dr. Smallwood admitted that he is *not an expert* in atmospheric dispersion modeling, and that no one has ever asked him "to perform a calculation that determines the transportation of some contaminant through the air from one location to another

prior to [his] involvement in this litigation." (*Id.* at 167:16-168:1)[10]   Dr. Smallwood could not testify that he had ever used this computer model before (*id.* at 165:24-167:1) and, in fact, he could not testify that he had ever "calculated an amount of material that has been transported from one point to another through the air." (*Id.* at 167:2-8)  He did not know what the name of the model, "ISC," stands for. (*Id.* at 94:21-95:2)

4.   This "calculation," taken thus far, provided Dr. Smallwood with his chromium-in-air values.  Dr. Smallwood conceded that he did not know what location, if any, his calculated values applied to because he "didn't really think about it." (*Id.* at 190:21; 192:10).  Dr. Smallwood "didn't think it was really necessary for [him] to designate an area," so "[he] didn't." (*Id.* at 195:3-196:3)

5.   Dr. Smallwood then attempted to convert these values into risks.  To do this, he first used an "inhalation risk factor," even though he admitted that he does not know what an "inhalation risk factor" is. (*Id.* at 192:11-19)  In addition, he used risk coefficients from the EPA that he had never before encountered prior to his involvement in this litigation. (*Id.* at 165:11-22)  Dr. Smallwood's calculations resulted in an estimate of "lifetime risk," but he could not identify a "risk of what," and instead he claimed that he was not an expert in performing risk calculations:  "That's not my field." (*Id.* at 190:21-194:7)

6.   Dr. Smallwood stressed that this "calculation" was hypothetical, and only "an illustrative example of what could happen." (*Id.* at 173:21-174:2. *See also Id.* at 191:24-192:4 ("It was intended to illustrate the *possible* concentration down wind."))

Dr. Smallwood also ignored real-world data.  When asked if he had considered any of the volumes of actual air sampling data collected by CDH, EPA, the plant and others around Rocky Flats for the exact time period he claimed to cover with his hypothetical calculations, he acknowledged there were 12-15 air samplers in the buffer zone and around the perimeter of

---

[10]   Smallwood further admitted that, in order to use this model, he had to make certain assumptions regarding the particle size and the respirability of the material he was modeling. (*Id.* at 190:5-10; 188:20-189:1)  He was not able to explain any of the bases for the assumptions that he made because he is not an expert in those areas:  "Q. What is the particle size range that's associated with something being respirable?  A. *I wouldn't know because I'm not an expert in that field*." (*Id.* at 190:5-8) (emphasis added)  "Q. Have you ever studied the issue of how far particles can travel based upon their particle size?  A. I have read papers on that. *I'm no expert on it*. . ." (*Id.* at 210:7-12) (emphasis added)

Rocky Flats, but could not say he had ever reviewed any of the data from those samplers during this time.  (*Id.* at 60:5-61:6; 62:3-63:24; 70:7-24)   He further testified that, even if the air-monitoring data around the Rocky Flats plant was directly contrary to the conclusions that he reached (as it was), he "wouldn't rely on it anyway."  (*Id.* at 64:21-65:1)  Dr. Smallwood could provide no valid basis for excluding consideration of all this air sampling data from his analysis, and admitted that he is not an expert in air sampling and has taken no air samples in other environmental situations.  (*Id.* at 63:15-64:8; 65:21-23; 66:10-21)

**Potential Health Risks** – Plaintiffs also seek to elicit trial opinions from Dr. Smallwood on the risks to property class members of off-site releases.  (See, e.g., Pls.' Resp. to Defs.' Mot. to Strike at 126)  In this area-- radiation health physics or toxicology -- Dr. Smallwood disclaims any expertise.  (*Id.* at 217:16-17, 218:11-15)  Dr. Smallwood has never before performed a risk assessment or risk factors.  (*Id.* at 165:4-23, 216:1-5)

To assess the potential risk from many of the airborne contaminants (such as plutonium) allegedly released off-site the Rocky Flats plant would require knowledge of the particle size of the material released.   (See, e.g., Ex. 34, RAC Report No. 13-CDPHE-RFP-1999-Final, Comprehensive Assessment of Exposure and Lifetime Cancer Incidence Risk From Plutonium Released from the Rocky Flats Plant, 1953-1989, at 9)  Dr. Smallwood admitted as much, testifying that to use the dispersion model to estimate chromium releases, he had to make certain assumptions regarding the particle size and respirability of the material he was modeling.  (Ex. 24, Smallwood Dep. at 188:20-189:12; 190:5-11)  Dr. Smallwood, however doesn't know the range of respirable particle sizes.  As he admitted when asked about that range:  "I wouldn't know because I'm not an expert in that field.  I'm a systems ecologist, I drew the information from an expert who does know, and I synthesize information for this calculation which is purely

illustrative, but still very serious." (*Id.* at 190:5-11)  As Dr. Smallwood repeatedly testified, Dr. Goble is the plaintiffs' risk expert, and he (Dr. Smallwood) is not qualified to answer questions about risk.  (*Id.* at 192:11-19)  Dr. Smallwood's opinions merely rely on data from plaintiffs' other experts who were not willing to make the desired calculations themselves to arrive at results that support the plaintiffs' position, even though Dr. Smallwood has no expertise in those areas and does not understand the foundation for his own opinions.

For example, Dr. Smallwood could not identify what kind of "risk" he purported to calculate was caused by bioturbation releases at Rocky Flats.  When asked what he meant when he used the term "lifetime risk" used in his report, Dr. Smallwood could not answer, claiming it was not his field.  (*Id.* at 192:20-193:4)  Nor could Dr. Smallwood identify the period of time over which the health risk he supposedly calculated would endure.  (*Id.* at 193:2-7)

Dr. Smallwood disclaimed any responsibility for selecting or calculating any human risk factors in this litigation.  Again, instead, he turned to Robert Goble for that information:  "I told him [Dr. Goble] that I was interested in illustrating the potential impact from soil bioturbation on chromic acid, and various forms of chromic acid, and its suspension into the atmosphere, yes, and what the risk factors might be for humans down wind." (*Id.* at 97:7-12)

**Continuing Releases and Future Off-Site Risk** – Dr. Smallwood also is not qualified nor does he have a reliable basis on which to give opinions that any release of materials from Rocky Flats will continue in the future and that any such releases pose a risk of potential harm to class members.  First, as demonstrated above, Dr. Smallwood lacks expertise in airborne dispersion modeling and should not be permitted to render any opinions on airborne releases, either past, present, or future that require such modeling, as he attempts to do.  Second, as shown above, Dr. Smallwood lacks expertise in the area of risk assessment and should not be permitted

to render any opinions relating to actual or potential health risks from possible exposure to materials released from Rocky Flats.

Third, Dr. Smallwood visited the Rocky Flats Plant only three times in 1996. It is beyond dispute that the Rocky Flats on-site soils, and, in particular, the waste disposal and burial areas that Dr. Smallwood examined in 1996, have been dramatically altered since Dr. Smallwood examined them. The entire area formerly encompassed by the 903 Pad has been excavated with all contaminated soil removed and replaced by clean soil. (Ex. 25, 12/08/03 Rocky Flats News Release re "Rocky Flats Completes Milestone Cleanup of 903 Pad.") Thus, the factual bases for Dr. Smallwood's "future risk" opinions rendered in 1996 have changed dramatically, leaving those opinions with no foundation and certainly would provide no assistance to the jury in determining "future risk," if any.

For the above reasons, all of the Dr. Smallwood's proffered testimony is inadmissible.

## III. RICHARD CLAPP'S TESTIMONY SHOULD BE EXCLUDED.

Plaintiffs offer Richard Clapp's opinions regarding the incidence of lung and bone cancer based on his study of proportionate cancer analysis for the years 1979-1992. Defendants seek to exclude Dr. Clapp's entire report and any testimony for the following reasons: (A) there is no "fit" because Dr. Clapp's opinions do not relate to the property class; and (B) his analysis is scientifically unreliable because (1) Dr. Clapp found no statistical significance; (2) Dr. Clapp's ecologic study is scientifically unreliable; (3) Dr. Clapp failed to account for many known confounders; (4) Dr. Clapp found no temporal trend; (5) Dr. Clapp found no dose-response relationship; (6) Dr. Clapp's results are biologically implausible; (7) Dr. Clapp failed to assess a rate of error; and (8) Dr. Clapp admits that his work is incomplete.

A. **Clapp's Opinions Do Not Meet** *Daubert's* **"Fit" Requirement For At Least The Following Three Reasons.**

*First*, Dr. Clapp did not study the property class area.  Like Dr. Goble, Dr. Clapp was engaged to conduct a study related to plaintiffs' now-dismissed medical monitoring claims-- claims that involved not only different issues but an entirely different class of people,  a different period of time,  and a different geographical area.  Dr. Clapp studied an area that included ten Zip Codes, only two (*i.e.,* 80005 and 80021) of which cover an area that roughly approximates – but does not equal – the class area.  (Ex. 5, Clapp Dep. at 68-75; Ex. 26, Clapp Dep., Ex. 2)  Dr. Clapp cannot say whether the results of his study apply to the class area because he did not study the class area because there were too few cases in the class to do a "meaningful" analysis.  (Ex. 5, Clapp Dep. 74:12-15; 87:9-16)  As such, Dr. Clapp does not-- and cannot-- purport to opine on increased cancer risk to all property class members.  Dr. Clapp's study is not relevant to either to a common, class-wide increased health risk from Rocky Flats, or to class-wide releases of plutonium.  Nor does Dr. Clapp's study encompass any assessment of future risk.

*Second*, Dr. Clapp did not analyze risks for persons who owned property in the class area as of June 1989 – the class membership date.  Many class members moved into the class area after 1984.  (*See* Ex. 22,  The Years In Which Class Member Parcels Were Bought and Sold) 3,000 class members moved into the class area in 1988 or after and many never lived in the class at all.  (*See id.*)  Dr. Clapp admits that the minimum latency period for lung and bone cancer (the two cancers that Dr. Clapp analyzed) are 20 to 35 years and 10 to 25 years, respectively.  (Ex. 5, Clapp Dep. at 234:22-235:18; 103:11-16)  As a result, any exposures received by persons as of June 1989 would not be expected to demonstrate cancer, at the earliest, until the late-1990s for bone or until 2009 for lung.  Dr. Clapp used cancer incidence data for the years 1979-92.  Thus, the latest data that Dr. Clapp analyzed was for 1992 – only three years after the class

membership date, and not long enough after June 1989 to expect any cancer incidence to be apparent for the majority of class members, given the latency periods to which Dr. Clapp testified.  As a result, Dr. Clapp failed to analyze data that would relate to the property class members' risk.

Plaintiffs have argued in the past that using 1979-92 data makes sense in light of the latency periods for lung and bone cancer, given that maximum exposures are assumed to have occurred between 1965-1969.  (1/25/99 Pls.' Resp. to Defs.' Mot. to Strike at 79, n.82)  That misses the point.  Only approximately 41 class members (less than one percent) lived in the class area between 1965-69.  (*See* Ex. 22, The Years In Which Class Member Parcels Were Bought and Sold)  As such, Dr. Clapp's opinions cannot be tied to any common, class-wide increased health risk, and therefore do not meet the "fit" requirement of *Daubert*.

***Third,*** Dr. Clapp's study does not take into account "exposures" to the property class members.  Dr. Clapp failed to take into account "exposures" to Rocky Flats contaminants, either in the property class area or any other area.  Dr. Clapp testified that "exposure assessment is an important aspect of epidemiologic studies concerning the potential effects of exposure."  (Ex. 5, Clapp Dep. at 40:4-11)  He agrees that "the route, duration and intensity of exposure are important factors in assessing disease causation."  (*Id.*)  But Dr. Clapp made no effort to assess the amount of plutonium in the air and available for people to breathe in, or "respirate." (*Id.* at 104:11-14; 107:23-108:3; 211:24-212:3)  Nor did he analyze any other data to determine what amount of plutonium any people had in their bodies.  (*Id*. at 107:18-22)

Dr. Clapp made no effort to perform any exposure assessment as a part of his study.  (*Id.* at 107:18-108:3; 221:2-24)  Dr. Clapp failed to assess the exposures of the persons who lived in the areas he studied or to link any particular exposures to the persons who contracted cancers in

the areas that he studied.  As such, his analysis cannot establish any common classwide exposure to property class members from Rocky Flats releases.

### B.       Clapp's Opinions Are Scientifically Unreliable.

#### 1.       Clapp Finds No Statistically Significant Results.

Dr. Clapp placed little, if any, stock in his bone cancer estimates.  In fact, Dr. Clapp did not produce his bone cancer analysis results in this case.  He did not include those results in his report (except one, discussed below), and he produced no tables containing his calculations of odd ratios with respect to the bone cancer data he analyzed, as he did with respect to lung cancer.  (*Id.* at 111:15-24)  Instead, he generated bone cancer analysis "worksheets," but he *threw them away*.  (*Id.* at 112:1-5)  When asked how the defense could figure out what his bone cancer data showed, Dr. Clapp testified that the defense would need to gather all of the data and generate its own odds ratios.  (*Id.* at 132:8-15)

Dr. Clapp looked at bone data for three time periods.  He testified that he found that the first and the third time periods showed bone cancer *deficits* (for the non-class area that he was studying), and the middle time period showed a non-statistically significant excess (for the same non-class area).  (*Id.* at 132:16-133:6)  Dr. Clapp considered the confidence intervals around these bone cancer estimates.  When confidence intervals are wide, they indicate less reliability, as discussed in the *Reference Manual* quoted above.  The confidence intervals surrounding Dr. Clapp's statistically insignificant bone cancers estimates were wide.  (*Id.* at 306:09- 307:15)  Dr. Clapp's remaining results relate to lung cancer.  Dr. Clapp found no statistically significant

results, other than *deficits*.  Dr. Clapp agreed that his only "statistically-significant results were for decreased risk." (*Id.* at 126:13-20)[11]

To prove with expert evidence that it is more likely than not that plaintiffs were placed at an increased risk by exposure to hazardous substances, a party must make a threshold showing that the expert's study reveals statistically significant results.[12]  Dr. Clapp himself acknowledges that, through testing of statistical significance, epidemiologists "seek to determine whether the outcome [of a study] represents a true association or whether it's the result of random error" and to "calculate some value for statistical significance." (*Id.* at 10:2-11)  Dr. Clapp testified that one test for statistical significance is to calculate a "p value" which is the "probability that an association is due to random fluctuation." (*Id.* at 10:12-11:10)[13]  Dr. Clapp, however, did not calculate any p values in connection with his work on this case. (*Id.* at 226:11-14)

A p value represents the percentage of time that similar studies would be expected to yield the same or larger association *due solely to random chance*. (*Id.* at 13:13-24)  In order "to avoid a false positive error, epidemiologists use a convention that the p value must fall below some selected level." (*Id.* at 15:2-5)  "That level is known as alpha." (*Id.* at 15:6-7)  Dr. Clapp

---

[11]   Clapp's inability to identify any statistically significant excess risk is particularly noteworthy given that he designed his analysis so as to substantially increase his chances of finding a statistically significant result purely by random chance.   Clapp divided his "study" population into 24 separate groups. (*Id.* at 125:24-126:12)  By looking in so many different categories, Clapp testified, one also would expect to find at least one statistically significant result by pure chance. (*Id.* at 50:8-23)

[12]   Statistical significance does not address any of the basic problems of bias (Pl. Br. 82) to which ecologic studies – including Clapp's – are prone. (Ex. 27, Howe Aff. ¶ 59)

[13]   A p value of .05 means that there is a "5% chance that an effect at least as large as that found is not due solely to random fluctuation." (*Id.* at 11:23-12:23)  "A p value of .5 would mean a 50% chance of all similar studies would be expected to yield the same or larger association due purely to random fluctuation." (*Id.* at 13:13-24)

agrees that "the most common level of alpha used is a one-sided p value of .05." (*Id.* at 15:14-16)  "Using a one-sided p value of .05 accepts as statistically significant those studies where a positive association erroneously is found no more than five times out of a hundred due to random fluctuation." (*Id.* at 15:17-22)

Dr. Howe replicated Dr. Clapp's study so that he could calculate p values.[14]  According to Dr. Howe, there is no evidence from these results of any positive association between exposure and risk for cancers.  (Ex. 27, Howe Aff. ¶ 45)  Not all of the results are exactly equal to the null hypothesis of 1.0, of course.  But "the slight variation in the relative risks from the null value of 1.0 is simply that which one might well expect by chance." (*Id.*)  The p values bear this out:  "None of the individual relative risks are statistically significant, and, more importantly, all p values for trend are greater than 0.48." (*Id.*)  As Dr. Howe explains, a p value of .4 "means that if one does 100 studies of a non-existent association, 40% of the time one will obtain a result greater than that observed and 60% of the time less than that observed.  This, obviously, is what one might expect to see when there is no true association." (*Id.* at ¶ 59)  Dr. Clapp does not disagree with Dr. Howe's analysis.  (*Id.* at 305:19-306:8)

The problem of multiple comparisons is another indication that Dr. Clapp's study lacks significance.  Dr. Clapp agrees that a potential problem with ecologic studies is the multiple comparisons problem – *i.e.*, "the more comparisons in a study one makes the more likely one is

---

[14]  Howe recreated Clapp's study so as to examine Clapp's methodology.  (Ex. 27, Howe Aff. ¶ 37)  This was necessary, in part, because Clapp did not retain and produce his results for bone cancer.  In addition, Howe obtained the p values for the odds ratios generated because Clapp did not do so.  Howe has criticized Clapp's methodology and his study's lack of statistical power, lack of biologic plausibility, lack of dose-response relationship, and other deficiencies.  (*Id.* at ¶¶ 5, 12-18, 60)  Howe's recreation of Clapp's study so as to analyze it does not endorse Clapp's study (*Id.* at ¶ 59), nor does it  render Clapp's study admissible.

to generate associations by chance."  (*Id.* at 8-12, 50:20-23)  Applying the p value of .05, as is the most common convention of epidemiologists, it is "true that if you look for results in 20 different groups you would expect to find one statistically significant result by random fluctuation." (*Id.* at 51:4-8)

Dr. Clapp's lung cancer study involved 24 comparisons.  Dr. Clapp testified:  "When you look at 24 or 20 different comparison, you might expect one of those to be statistically significant by random fluctuation."  (*Id.* at 126:10-12)  In a study involving so many comparisons, one would expect to see some statistically significant results by purely random chance.  (Ex. 27, Howe Aff. ¶ 15)  Still, Dr. Clapp "found no statistically significant excesses of lung cancer in any of these 24 different groupings."  (Ex. 5, Clapp Dep. at 128:2-5)  Defendants' point is not that Dr. Clapp's study shows less cancer than would be expected (although it does), but rather that the statistical insignificance of Dr. Clapp's results are further evidence as to the lack of probative value of his study.

## 2.      Ecologic Studies Such As Clapp's Are Misleading And Not Useful.

Dr. Clapp's study is an ecological study.  (Ex. 27, Howe Aff. ¶ 5)  The National Academy of Sciences has explained that such studies "have large potential for bias and can, therefore, be misleading (Stidley and Samet, 1994).  They should be avoided wherever possible." (Ex. 28, NAS 1995 at 79-80)  The same NAS publication states that, while ecological analyses under some circumstances may be useful to generate hypotheses, they *cannot* be used to test hypotheses.  (Ex. 27, Howe Aff. ¶ 22)

Ecologic studies like Dr. Clapp's are generally regarded as the weakest of epidemiologic studies.  (*Id.* at ¶ 12)  Such studies lack statistical power, in part because they do not have an adequate measure of exposure which can severely dilute any potential effect.  (*Id.* at ¶ 14)  An

additional bias, discussed further below, can arise from migration patterns if the exposure of interest takes time to manifest in itself, as is the case with the cancers here.  (*Id.*)

Such studies also tend to generate spurious associations.  (*Id.* at ¶ 15)  One reason for this is the problem of "multiple comparisons," namely, when many comparisons are made, for different types of cancers, different groups, genders, ages, *etc.*, then the probability of obtaining "statistically significant" results purely by random chance increases.  (*Id.*)  Another serious problem with ecologic studies is that of confounding variables.  (*Id.* at ¶ 16)  Finally, such studies do not have a biologically plausible basis.  (*Id.* at ¶ 17)  While their objective is to assess any relationship between environmental radiation exposure and cancer incidence, the average environmental doses are likely to be far too small to produce any measurable increase in cancer risk compared to natural background cancer rates.  (*Id.*)

### 3.    Clapp Failed To Account For Known Confounders.

Dr. Clapp testified that various potential confounders impacted the results of other proportionate cancer incidence studies involving Rocky Flats, including tobacco use, location, and duration of residence.  (Ex. 5, Clapp Dep. at 260:24-261:24)  Dr. Clapp admitted that he did nothing to account for these potential confounding effects in his own study, and that his study did not take into account tobacco use, residence time, or location.  (*Id.* at 120:24-121:4)  Dr. Clapp testified that he has done nothing to take into account the medical history of any of the individuals whose diseases he considered in his "study," nor has he done anything to take into account occupational history, though he concedes these are additional serious potential confounders.  (*Id.* at 118:10-21)  While Dr. Clapp criticizes other ecologic studies like his "primarily because the estimates of radiation exposures have been inadequate or unavailable for the subjects of these studies," he has not taken exposures into account in any way in his own study.  (*Id.* at 113:11-114:22)

Dr. Howe has explained that the failure of studies like Dr. Clapp's to account for confounders such as smoking, as well as other confounders, such as other exposures, occupational history, duration of residence, location, *etc.*, greatly diminishes the usefulness of such studies. (Ex. 27, Howe Aff. ¶ 16; *see also* Ex. 7, *Reference Manual on Scientific Evidence-Epidemiology* at 158 ("Even when an association exists, researchers must determine whether the exposure causes the disease or whether the exposure and disease are caused by some other confounding factor.")) Numerous courts have ruled that when the expert's opinion does not take into account or explain exclusion of alternative causes that conflict with the expert's theory. *See*, *e.g.*, *People Who Care v. Rockford Bd. of Ed.*, 111 F.2d 528, 537 (7th Cir. 1997); Ex. 29, *Stover*, 1996 WL 172972, at *11.

Dr. Clapp testified that "the distortion caused by confounding can lead to an erroneous result in a study." (Ex. 5, Clapp Dep. at 44:13-15) Dr. Clapp considers lung cancer to be a tobacco-related cancer. (*Id.* at 115:18-23) Dr. Clapp's report points out what he considers to be a persistent concern with ecologic studies regarding tobacco, namely: "The basis of the concern is that there may be differential rates of tobacco use such that people living closer to the Rocky Flats plant use more tobacco and this would cause their elevated rates of lung cancer rather than exposure to plutonium in soil or dust." (Ex. 30, Clapp Rep. at ¶ 7) Dr. Clapp goes on to explain that this "inability to adjust observed disease rates for potential confounding by tobacco use has limited the interpretation of the respiratory cancer findings" in other ecologic studies concerning Rocky Flats. (*Id.*) "It is the duty of an epidemiologist to assess a range of factors that could influence confounding." (Ex. 5, Clapp Dep. at 44:19-22) Dr. Clapp admits that his study did not control for these same confounders. (*Id.* at 120:24-121:4) While Dr. Clapp criticizes earlier studies for not taking into account the additional potential confounders of

"medical history," "occupational history," and "durational residence," he admits that his study has done nothing to take into account any of these three confounders either.   (*Id.* at 118:10-119:8)

### 4.   Clapp Found No Temporal Trend.

Epidemiologists assess whether data reflect a temporal trend in assessing a study's usefulness.   (Ex. 27, Howe Aff. ¶ 61; Ex. 7, *Reference Manual on Scientific Evidence-Epidemiology* at 162 ("A temporal or chronological relationship must exist for causation.")) Dr. Clapp testified that "temporal relationship or chronological relationship" is one of the factors that epidemiologists assess in testing an association between an agent and a disease.   (Clapp Dep. at 45:14-24)   But Dr. Clapp *testified* unequivocally that he found no temporal trend.   (*Id.* at 130:24-131:2; 166:19-20)   He specifically testified that he found no trend for lung or bone cancer.   (*Id.* at 131:10-14; 131:15-132:1)

### 5.   Clapp Found No Dose-Response Relationship.

As explained above, a principal methodological flaw in Dr. Clapp's study is that there is no link between the 1979-92 cancer cases upon which Dr. Clapp relies and the exposures that he assumes occurred in the 1950s and 1960s.   Dr. Clapp candidly admitted that, "in [his] study, there is no guarantee that the individuals who have the exposure of interest are the same individuals who are developing the disease."   (*Id.* at 239:15-19)   Dr. Clapp testified that "as far as [his] study goes, [he has] no idea whether the people who actually obtained any of the cancers that [he] identified in [his] study lived for more than a day in the Zip Code in which they did reside at the time they were diagnosed."   (*Id.* at 97:8-13)   Dr. Clapp further conceded that it may well be the case "that there are individuals who may have contracted lung cancer prior to the time that they moved into one of the Zip Codes that he used in his analysis, and only after they moved in were they diagnosed for the first time with that lung cancer."   (*Id.* at 97:19-98:8)

### 6.    Clapp's Results Are Biologically Implausible.

The reliability and usefulness of an epidemiologic study is judged, in part, by whether the results are biologically plausible.   (Ex. 27, Howe Aff. ¶ 17)   Dr. Clapp agrees.   (Ex. 5, Clapp Dep. at 45:4-6)   Plaintiffs offer no evidence to support the biologic plausibility of any finding in Dr. Clapp's study.   Dr. Howe has demonstrated that "there is no biological plausibility to finding any association" in Dr. Clapp's ecological analysis.   (Ex. 27, Howe Aff. ¶ 61)   The appropriate latency period for radiation induced lung cancer is between 20 and 35 years.   (Ex. 5, Clapp Dep. at 234:22-235:18)   Plaintiffs' experts have opined that any plutonium releases occurred no later than 1970.[15]   Dr. Clapp found no statistically significant excesses of cancers during the period from 1970-1985 but rather found several statistically significant *deficits* during that period.   (*Id.* at 128:10-129:4)   Dr. Clapp's results are biologically implausible because they do not demonstrate an excess of cancer in the expected time period, namely, that period of time following the assumed maximum exposures, during which latent cancers would be expected to be manifested.

### 7.    Rate Of Error.

Dr. Clapp admits that epidemiologic studies have potential rates of error.   Dr. Clapp testified that errors in design can yield incorrect relative risk estimates.   (*Id.* at 19:16-21)   Dr. Clapp admitted other rates of error:   "[A]n epidemiologic study can find a positive association where there is no true association."   (*Id.* at 20:18-21)   "[A]n epidemiologic study can find an association that is greater than the true association."   (*Id.* at 20:22-21:1)   "Sampling error can

---

[15]   At best, Dr. Goble opines that any exposures after 1970 were 0.003 times those in 1965-70. (Ex. 2, Goble Dep. at 62:19-63:8).   As described *infra*, even under Dr. Goble's flawed methodology, his results for that time period show insignificant releases.

result where a study is based on a small proportion of a larger population where that small proportion is not a representative sample of the larger population." (*Id.* at 21:6-10) Yet Dr. Clapp testified that he has no way of estimating the rate of error of his analysis. (*Id.* at 308:11-16) Having failed to meet their burden of establishing Dr. Clapp's rate of error, plaintiffs should be barred from using Dr. Clapp's testimony. (*See* Def. Overview at 5)

### 8. Incomplete Work.

Dr. Clapp has not finished his work. Dr. Clapp testified that he ***plans*** to analyze additional data that he has yet to obtain from the Colorado Cancer Registry, including data on brain cancers, liver and breast cancers, as well as data with respect to the differentiations between benign and malignant tumors. (Ex. 5, Clapp Dep. at 312:21-314:4) Plaintiffs have never supplemented Dr. Clapp's report. Conclusions that are not the result of a completed analysis of all pertinent facts and data are inadmissible. *See e.g., TMI II*, 911 F. Supp. at 790-91 (hypotheses, proposals and "draft" opinions are irrelevant, because they do not convey a scientifically valid conclusion).

For all the reasons enumerated above, Dr. Clapp's opinions do not comply with the standards set out by the Supreme Court in *Daubert.* Accordingly, he should be precluded from testifying or otherwise offering these opinions at trial.

## IV. LAWRENCE MAYER'S TESTIMONY SHOULD BE EXCLUDED.

Dr. Lawrence Mayer seeks to opine about "the evaluation of the handling of unusual observations (outliers) in the analysis of environmental and exposure data from Rocky Flats," and "the issue of susceptibility with respect to radiation risk models." (1/25/99 Pls.' Resp. to Defs.' Mot. to Strike at 196). Defendants seek to exclude all of Dr. Mayer's opinions because (1) his opinions do not satisfy the *Daubert*-"fit" requirement, and (2) his methodology and opinions are unreliable.

### A.      Mayer's Opinions Do Not Satisfy The *Daubert*-"Fit" Requirement.

***First***, Dr. Mayer's opinions do not correspond in any way to the property class, which "is defined with reference to geographical representations of the area bounded by the plutonium contour and the complaint supplies the operative date of ownership as June 7, 1989." *Cook v. Rockwell Intern. Corp.*, 151 F.R.D. 378, 382 (D. Colo. 1993). Dr. Mayer does not opine that any of the "outliers" that are the subject of his report fall within the property class area. Because Dr. Mayer does not opine that the "outliers" that are the subject of his opinion relate in any way to the property class, his opinions do not satisfy *Daubert's* "fit" requirement for this class trial.

***Second***, Dr. Mayer's opinions cannot be linked in any way to an ***increase*** in human health risk to "all property class members." The "conclusion" of Dr. Mayer's report (based solely on ten papers cited in his report) is that "the summary dismissal of extreme values as outliers . . . suggests a pattern that ***could*** lead to underestimates of exposure." (Ex. 31, Mayer Rep. at 19) (emphasis added) But Dr. Mayer does not opine that the "proper treatment" of the "outliers" discussed in his report would lead to an ***increase*** in exposure estimates – on the contrary, it is equally likely that the "proper treatment" of such outliers would lead to a ***decrease*** in exposure estimates. Accordingly, Dr. Mayer's failure to link his opinions to an "***increase*** in human health risk" constitute a second – separate and independent reason why Dr. Mayer's report cannot meet *Daubert*'s "fit" requirements here.

***Third***, the remainder of Dr. Mayer's opinions relate to certain characteristics that might apply to any "susceptible group" that may be "identified as part of a medical surveillance program." (*Id.* at 21-22) Dr. Mayer's conclusion with respect to this portion of his report is that "the equivalent level of the mean exposures calculated by Dr. Goble (and the associated risks) may increase for any susceptible subgroup that can be identified as part of the medical surveillance program." (*Id.*). At the time Dr. Mayer was retained and drafted his expert report,

plaintiffs also had medical monitoring claims.  But the medical monitoring class now has been decertified.   (*See* 7/29/98 Order)   Accordingly, Dr. Mayer's opinions concerning any "susceptibility" are not relevant to the class-wide trial and must be excluded under *Daubert*.

### B.  Mayer's Opinions Also Should Be Excluded Because They Are Not Based On Reliable Facts Or A Reliable Methodology.

In arriving at his opinion, Dr. Mayer departed from sound scientific principles.  This departure constitutes a separate and independent reason (in addition to Dr. Mayer's inability to meet *Daubert's* "fit" requirement) why none of Dr. Mayer's proposed testimony is admissible and why Dr. Mayer should be excluded from testifying in this matter.

Dr. Mayer selectively (*i.e.* without any scientific basis) cites to ten reports[16] and refers to a sentence or a figure contained in each one that he claims relates in some way to an "outlier." (Ex. 32, Mayer Dep. at 9-17)  Significantly, Dr. Mayer discarded Rocky Flats studies where there were no reported "outliers" and only focused on reports where an unusual or extreme value had been characterized as an "outlier."   (Ex. 32, Mayer Dep. at 43:7-12)   Under similar circumstances, courts applying *Daubert*'s reliability test have identified "data selectivity" as a tell-tale sign that an expert has unacceptably departed from standard scientific methodologies. *See TMI II*, 911 F. Supp. at 798 (the expert disregards primary data that conflicts with the outcome of his methodology); *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 423 (5th Cir. 1987) (same); Ex. 33, *United Phosphorous, Ltd. v. Midland Fumigant, Inc.*, Civ. A. Nos. 91-2133-EEO, 95-2267-EEO, 173 F.R.D. 675, 1997 WL 378999, at *8 (D. Kan. June 13, 1997) (same).

---

[16]   Many, if not all, of these studies have already been subjected to extensive peer review in the scientific community, especially the RAC reports, which comprise three of the ten reports. "Subjecting a theory to the scrutiny of the scientific community may help validate an otherwise infirm theory by decreasing the likelihood that substantive flaws in the methodology exist."  *Mitchell*, 165 F.3d at 780.

For these reasons, all of Dr. Mayer's proffered testimony should be excluded.

## CONCLUSION.

As discussed above, the testimony of plaintiffs' experts Robert Goble, Shawn Smallwood, Richard Clapp, and Lawrence Mayer does not meet the requirements of *Daubert*, *Kumho Tire*, and Rule 702.  Therefore, defendants respectfully request that this Court exclude their testimony.

Dated:  June 21, 2005                        Respectfully submitted,


                                             s/Joseph J. Bronesky_____
                                             Joseph J. Bronesky
                                             SHERMAN & HOWARD LLC
                                             633 Seventeenth Street, Suite 3000
                                             Denver, CO  80202
                                             (303) 297-2900

                                             David M. Bernick, P.C.
                                             Douglas J. Kurtenbach, P.C.
                                             KIRKLAND & ELLIS LLP
                                             200 East Randolph Drive
                                             Chicago, IL  60601
                                             (312) 861-2000

                                             Attorneys for Defendants
                                             ROCKWELL INTERNATIONAL
                                             CORPORATION and
                                             THE DOW CHEMICAL COMPANY

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on June 21, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

pnordberg@bm.net   Peter B. Nordberg, Esq.
         BERGER & MONTAGUE, P.C.
         1622 Locust Street
         Philadelphia, PA  19103-6365


blumg@s-d.com   Bruce H. DeBoskey
         SILVER & DEBOSKEY
         The Smith Mansion
         1801 York Street
         Denver, CO  80206



          s/Joseph J. Bronesky