**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 90-cv-181-JLK

MERILYN COOK, *et al.*,

          Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION
and THE DOW CHEMICAL COMPANY,

          Defendants.

---

### DEFENDANTS' RESPONSE TO PLAINTIFFS' OMNIBUS MOTION IN LIMINE

---

Defendants respectfully submit their Response to Plaintiffs' Omnibus Motion in *Limine*.

Defendants have made efforts to meet and confer with plaintiffs regarding oral argument on these motions, including several communications on July 6, without reaching any agreement. Defendants expect to continue to meet and confer with plaintiffs regarding the prospect of oral argument on these motions, and have already scheduled the next such communication for early next week. Defendants reserve the right to seek oral argument on plaintiffs' and their motions in *limine* after they have an opportunity to review plaintiffs' written responses, and defendants request the opportunity to be heard on any motion where plaintiffs seek oral argument.

At this time, however, in an effort to communicate to the Court what defendants' present thinking on these matters is, defendants anticipate that they will request oral argument on their motions in limine to exclude evidence that does not apply class-wide (Defs' Mot. in *Limine* No.

1

12), to exclude evidence of substances other than plutonium to the extent plaintiffs cannot demonstrate support for a classwide nuisance (Defs' Mot. in *Limine* No. 6), and to exclude evidence about plutonium practices and incidents that plainitffs cannot link to their trespass and nuisance claims (Defs' Mot. in *Limine* No. 11).  Defendants also anticipate that they will request oral argument on plaintiffs' motion to exclude evidence of property values in the class area after 1992 (*see* Part I, *infra*) and plaintiffs' so-called motion to exclude evidence of what class members "knew, or should have known, about Rocky Flats" (*see* Part IV, *infra*).  In addition, defendant may seek oral argument on their motions in *limine* seeking to exclude evidence of the FBI raid (Defs' Mot. in *Limine* No. 1), the grand jury investigation  (Defs' Mot. in *Limine* No. 2), the Rockwell 1992 guilty plea (Defs' Mot. in *Limine* No. 3), inventory differences (Defs' Mot. in *Limine* No. 9), past "risks" that never occurred and now cannot happen (Defs' Mot. in *Limine* No. 10), releases and incidents that occurred wholly inside buildings (Defs' Mot. in *Limine* No. 8) and employee safety and health issues (Defs' Mot. in *Limine* No. 7), as well as plaintiffs' motion to exclude opinion testimony from defendants' real estate agent witnesses (*see* Part II, *infra*) and plaintiffs' motion to exclude evidence regarding the national security aspect of defendants' operations at Rocky Flats (*see* Part VI, *infra*), depending on plaintiffs' subsequent briefing on these motions.  Following additional meet and confer communications, defendants intend to convey to the Court at or before the time of their reply briefs (or sooner if possible, or if the Court so orders or requests) any additional information regarding defendants' position as to whether defendants request (or oppose) oral argument with respect to any of the parties' motions in *limine* and, if so, which ones.

## I.  EVIDENCE REGARDING POST-1992 PROPERTY VALUES IS RELEVANT AND ADMISSIBLE.

Plaintiffs move in *limine* to bar evidence of property values in the class area after 1992, claiming that such evidence "is irrelevant and carries a high risk of prejudice."  (Pls.' Mot. at 1–3.)  Plaintiffs' arguments rest on their assertion that the only relevant time period for property values is 1989 to 1992 because that is when they have now decided to claim the "CCE date" occurred.  (*Id.* at 1.)

Evidence of property values after 1992 is relevant, and therefore admissible, for the following six reasons:  (1) evidence of property values after 1992 is relevant to whether plaintiffs can establish that an "injurious situation" has become "complete and comparatively enduring," a prerequisite to recovering damages pursuant to Restatement (Second) of Torts § 930 (1979); (2) because the jury may determine that the CCE date falls after 1992; (3) evidence of property values after 1992 is relevant to whether there is any "diminution in value" at all; (4) evidence of property values after 1992 is relevant to prevent plaintiffs from opportunistically cherry-picking a "time window" of evidence that they think is best for them; (5) plaintiffs' own experts take into account evidence of property values after 1992; and (6) this evidence does not pose any risk of unfair prejudice.  Plaintiffs' attempt to exclude this evidence is nothing more than a transparent, impermissible attempt to focus the jury's attention on a narrow three-year period that happens to coincide with one of the worst periods for property value appreciation both for the class area and for the Denver metropolitan area as a whole (indeed one of the worst times for the **nation** as a whole).  (*See* Ex. 1, Dorchester Report at 4-6–4-8, Figure L-3; Ex. 2, Wise Supp. Report Ex. 3.)

Plaintiffs have not even tried to supply this Court with any support for their unilateral and self-serving assertion that the CCE date should fall between 1989 and 1992.  For example, they

point to no evidence in the record that would tend to suggest such a CCE date for their trespass claim (to take the simplest case).  No plaintiffs' expert has opined that the trespass (or the nuisance) became complete and comparatively enduring between 1989 and 1992; in fact, plaintiffs' own experts have offered contrary proof, such as plaintiffs' proffered property class contour that is supposedly based on plutonium contamination as of 1970.  Accordingly, plaintiffs never have come forward with any basis in fact for their assertion that there is anything special about 1989–1992.  Nor would it matter:  it is for the jury to determine the CCE date, not plaintiffs.  (5/17/05 Order at 15.)

### A. Evidence of Property Values post-1992 Is Necessary to Determining Whether Plaintiffs' Alleged "Injurious Situation" Has Become "Complete and Comparatively Enduring."

This Court stated:  "In order to recover damages for diminution in Class property values caused by the alleged nuisance pursuant to Restatement (Second) of Torts § 930 (1979), Plaintiffs must further demonstrate that it appears any nuisance they prove will continue indefinitely."  (5/17/05 Order at 2–3.)  Restatement § 930 makes clear that "the defendant is at liberty to dispute the averment that the situation is one that will probably continue indefinitely."  Restatement § 930, cmt. b.

Evidence that property values in the class area have increased since 1992 is relevant both to plaintiffs' contention that the "nuisance . . . will continue indefinitely" (5/17/05 Order at 2–3), as well as to defendants' contention that the "situation" is *not* "one that will probably continue indefinitely."  Restatement § 930, cmt. b.  This Court has recognized that "[e]vidence that the affected property's value has depreciated" may be evidence that "actual contamination or other

4

claimed factors of interference are substantial and unreasonable enough to give rise to nuisance liability":

> Evidence that the affected property's value has depreciated may be evidence, however, that actual contamination or other claimed factors of interference are substantial and unreasonable enough to give rise to nuisance liability.  *See* Prosser and Keeton § 88, at 627–28.  This conclusion flows again from the rule that the reaction of a normal member of the affected community is the measure of whether a claimed interference is substantial and unreasonable.  *See id.*  So long as the "market" on which the property values are based has substantially the same general characteristics and information base as the affected community, the reaction of the market to the claimed interference, as demonstrated by the value it places on the property, is also evidence of the normal community member's reaction to the claimed interference and whether the member would view the interference as substantial and unreasonable.

*Cook v. Rockwell Int'l Corp.* ("*Cook IX*"), 273 F. Supp. 2d 1175, 1209 (D. Colo. 2003).  Conversely, it is also true that "[e]vidence that the affected property's value has [re-ap]preciated" may in turn be evidence that "actual contamination or other claimed factors of interference are [no longer] substantial and unreasonable enough to give rise to nuisance liability."  5/17/05 Order at 2–3; Restatement § 930, cmt. b.

**B.    Evidence of Property Values post-1992 Is Necessary If the Jury Determines That the CCE Date Falls after 1992.**

Under the trial plan outlined by this Court's May 17, 2005 Order, the jury must find "the date on which . . . it appeared the trespass and/or nuisance asserted by Plaintiffs would continue indefinitely."  (5/17/05 Order at 15.)  The jury must then determine the average percentage diminution in property value as of the CCE date.  (*Id.* at 16–17.)

Plaintiffs attempt to unilaterally prescribe that the relevant time period only extends from 1989 to 1992.  (Pls.' Mot. at 1.)  That is not the case.  ***Plaintiffs' theory*** (for the time being, at least) apparently is that the complete and comparatively enduring date occurred between 1989

and 1992.  But relevance is not dictated by reference to the plaintiffs' present theory.  The complete and comparatively enduring date is yet to be determined by the jury:  "Plaintiffs will be required to prove . . . the date on which the injurious situation caused by Defendants became complete and comparatively enduring."  (5/17/05 Order at 16.)  Nor does the May 17, 2005 Order in any way limit the range of permissible CCE dates to the period between 1989 and 1992 (or, for that matter, limit how many CCE dates there will be).  For example, if the jury found that a continuing, injurious situation does exist, but that it did not become complete and compara- tively enduring until 1998, it would require evidence of property values from 1998 to determine damages under Restatement § 930.  Thus, evidence of property values after 1992 could prove to be not only relevant, but essential to the jury's task.

Plaintiffs incorrectly assert that defendants have "offered no competing theory of a CCE date."  (Pls.' Mot. at 2.)  Though defendants believe that there is no injurious situation attribut- able to any trespass or nuisance, let alone one that has become complete and comparatively enduring, defendants have alternatively stated that, depending on what (if any) continuing injurious situations specified by plaintiffs (plaintiffs have yet to specify which "injurious situa- tions" are at issue), and depending on what "injurious situations" the jury may find, the jury could select a number of possible CCE dates ranging from 1953, when the plant was first built, to the time of trial.  One obvious example is that the jury could potentially tie a CCE date to some milestone in the clean-up effort at Rocky Flats.

### C.  Evidence of Property Values after 1992 Shows Whether There Is Still Any Diminution in Value.

A jury cannot recover "damages" for a diminution in value that existed at one point in time, but that does not exist at the time of trial.  Were the rule otherwise, then whenever a

6

plaintiff's property experienced a temporary dip relative to other properties—as in the case of many alleged trespasses or nuisances—then the plaintiff could file a complaint based on that temporary dip, and recover damages by excluding all evidence that the value of his or her property had rebounded by the time of trial.

Figure 1 below illustrates why it is essential not to focus on a particular "window" of evidence cherry-picked by plaintiffs (including a period that is substantially smaller than the one plaintiffs' own experts analyzed).  The exclusion of evidence of property values after the time period claimed by the Group X plaintiffs to be "relevant" would not be permissible.  (Figure 1 is included for illustrative purposes only:  defendants do not suggest through Figure 1 that plaintiffs can show that properties in the Class Area have suffered any diminution in value due to Rocky Flats.)

**Figure 1**

## Hypothetical Value Trend



To allow such a hypothetical plaintiff (or group of plaintiffs) to recover diminution-in-value damages would ignore the fundamental purpose of damages law: "to reimburse [the property] owner for the actual loss suffered". (5/17/05 Order at 15 (quoting *Bd. of County Comm'rs v. Slovek*, 723 P.2d 1309, 1314 (Colo. 1986).) *See also Slovek*, 723 P.2d at 1314 ("The trial court must take as its principal guidance the goal of reimbursement of the plaintiff for losses actually suffered, but must be vigilant not to award damages that exceed the goal of compensa-

tion and inflict punishment on the defendant."); *Zwick v. Simpson*, 572 P.2d 133, 134 (Colo. 1977) ("the goal of the law of compensatory damages is reimbursement of the plaintiff for the actual loss suffered"); 1 Dan B. Dobbs, *Law of Remedies*, § 5.6 at 754 ("If the effects of the nuisance are more or less permanent, the diminution in land value due to the nuisance will be recoverable; *if temporary, the diminished rental value during the period of harm*.") (emphasis added).

**D.    Plaintiffs Cannot Unilaterally Pick the Time Period They Think Is Best for Them.**

A plaintiff cannot unilaterally and opportunistically cherry-pick some "time window" of evidence and then limit the jury to considering only that evidence.  Nor can plaintiffs' selection of what they perceive as the most favorable window be justified by reference to Section 930. Plaintiffs *argue* that the complete-and-comparatively-enduring date was from "1989 to 1992," but defendants will offer contrary evidence, and ultimately the jury will decide.

**E.    Plaintiffs' Experts Use Evidence of Property Values after 1992.**

Plaintiffs' own expert work belies their assertion that evidence of property values after 1992 is irrelevant to this action.  When expert reports were first due in 1996, all of plaintiffs' experts considered evidence available to them up until the time of their reports.  Thus:

| **Plaintiffs' Expert Analysis** | **Time Period Considered** |
| --- | --- |
| Hunsperger's "real estate market research" | 1989–1995 |
| Hunsperger's market study of vacant land prices | 1988–1995 |
| Hunsperger's market study of residential resale prices | 1989–1995 |
| Hunsperger's market study of new residential construction | 1991–1995 |
| Radke's Phase I analysis | 1983–1993 |

Radke's Phase II analysis of single-residential properties      1988–1995

Flynn & Slovic's public opinion survey      1995

Plaintiffs' attempt to exclude a significant amount of the data upon which their own experts relied is opportunistic.  The fact that plaintiffs have chosen not to supplement these reports to account for the latest property value data does not mean that such data is not relevant.

Indeed, plaintiffs' effort to exclude evidence of properties values after 1992 would eliminate plaintiffs' own expert evidence purporting to show that plaintiffs' property values were **headed upwards after 1992**.  Below is a table prepared by plaintiffs' proffered expert Dr. Radke:

### Radke Report, Table 1, Phase II Property Value Findings

| Year | "Mean Undervaluation" |
|------|------------------------|
| 1988 | -7.68% |
| 1989 | -7.29% |
| 1990 | -9.33% |
| 1991 | -7.69% |
| 1992 | -9.18% |
| 1993 | -8.56% |
| 1994 | -7.50% |
| 1995 | -5.45% |

(Ex. 3, Hunsperger Report at 36, 223.)  Thus, even according to Radke's own data, the value of plaintiffs' properties (relative to non-class properties) were moving upwards following 1992, and continued on that path as of 1995.

**F.      Evidence of Post-1992 Property Values Is Not Unfairly Prejudicial.**

Plaintiffs' argument that property values after 1992 should be excluded under Rule 403 as "prejudicial" should be rejected.  There is no cause to exclude evidence of property values because there is no risk of prejudice.  Plaintiffs set forth the following proposition in their brief as self-evident:  "Real property eventually appreciates in price after the passage of a sufficiently

long time due to inflation and a fifty-year history of rising property prices nationwide."  (Pls.' Mot. at 3.)  Given what plaintiffs consider to be the self-evident nature of this statement, plaintiffs offer no reason to doubt that a jury would likewise be aware of the general appreciation of real estate and consider the evidence in that light.  Any risk of confusion would be cured by this Court's anticipated instruction that the jury determine damages "for the decrease in the value of their Class properties caused by the prospect of the alleged trespass and/or nuisance (if proved by Plaintiffs) continuing into the future, measured at the time when the injurious situation became complete and comparatively enduring."  (5/17/05 Order at 15–16.)  *See City of Los Angeles v. Retlaw Enters., Inc.*, 546 P.2d 1380 (Cal. 1976) (allowing the jury to consider evidence of property value that was potentially inflated by an irrelevant factor, where the "court properly cautioned the jury about reliance" on the evidence).

## II.   DEFENDANTS' REAL ESTATE AGENT WITNESSES MAY OFFER LAY OPINION TESTIMONY ABOUT CLASS PROPERTIES.

Plaintiffs move in *limine* to bar opinion testimony by defendants' real estate agent witnesses about "whether and how the problems at Rocky Flats affected the market for class properties" (Pls.' Mot. at 3) and "how Rocky Flats affected prices in the overall market" (*id.* at 4). Plaintiffs claim that because these witnesses were not disclosed as experts, they should not be permitted to offer such opinion testimony.  (*Id.* at 3.)

Plaintiffs do not identify the specific witnesses against which this motion is directed, simply stating "Defendants' **real estate agent witnesses** should not be permitted to offer opinion

11

testimony." (*Id.* (emphasis added).)[1]  Defendants may offer the testimony of a handful of class-area real estate agents in support of their defense at trial.  Two examples illustrate:[2]

- <u>Debbie Millage</u>:  Ms. Millage is a class member.  (Ex. 4, Millage Dep. at 6–7.)  She has lived in Denver since 1978 and has been a real estate agent in northwest Denver since 1980 or 1981.  (*Id.* at 8–9, 39.)  Ms. Millage interacted with approximately 20,000 home buyers from 1980–89.  (*Id.* at 18–20.)  From 1990 to present, she has sold approximately 1000 homes in the Westminster, Arvada, Broomfield, and north Jefferson County (80 per year for 14 years).  (*Id.* at 27.)

- <u>Richard Moorehouse</u>:  Mr. Moorehouse is a real estate broker who has sold hundreds of houses in Westminister, Arvada, and Broomfield.  (Ex. 5, Moorehouse Dep. at 17–19.)  He estimates that he has sold 18–20 houses a year in these areas for over 30 years.  (*Id.* at 39, 104–05.)

Such witnesses have been present at numerous, relevant real estate transactions.  Thus, Defendants anticipate that these witnesses will testify and offer opinions based on their own personal experiences, personal observation, and first-hand knowledge.

###    A.    Defendants' Real Estate Agent Witnesses Can Testify to Facts within Their Personal Knowledge without Offering Opinion Testimony.

Strictly factual testimony is not subject to either Rules 701 or 702.  *See United States v. Caballero*, 277 F.3d 1235, 1247 (10th Cir. 2002) (witness testimony was admissible where witnesses testified (or would have testified) to "statement[s] of fact as to what they had witnessed during their respective careers"; thus, "the challenged testimony proffered no opinion, lay or expert.")  Thus, plaintiffs' motion would not bar defendants' witnesses from testifying about the facts of any transactions they observed.  For example, Ms. Millage would be permitted to

---

[1] Plaintiffs have not moved to bar the testimony of defendants' lay witnesses involved in real estate development, economic development, and city planning.

[2] These two examples are not intended to be exhaustive of all such potential real estate agent lay witnesses that defendants may call.

testify that during 1980–89, when she had to give disclosures about Rocky Flats, 30–40 people out of the 20,000 she worked with declined to purchase property because of Rocky Flats.  (Ex. 4, Millage Dep. at 18–20.)  She also would be permitted to testify that her sellers never offered a discount because of Rocky Flats (*id.* at 20); and that other issues, such as the Leyden Mines, Jefferson County Airport, and high tension power lines, were concerns in transactions in which she participated (*id.* at 32–33).  Likewise, Mr. Moorehouse would be permitted to testify that, of all his buyers, only two out-of-state buyers were concerned about Rocky Flats and had to be shown houses outside the area.  (Ex. 5, Moorehouse Dep. at 78, 101.)  He would also be permitted to testify that other than those two buyers, no one ever refused to buy property or sought a discount because of Rocky Flats in any of the transactions he witnessed (*id.)*; and that he has never taken Rocky Flats into consideration when helping a seller in the area set a list price (*id.* at 102).  All such factual testimony should be permitted regardless of how plaintiffs' motion related to lay opinion testimony is resolved.

> **B.    Lay Witness Opinions by Defendants' Real Estate Agent Witnesses Are Permissible under Rule 701.**

Opinion testimony about the market for class properties is permissible lay witness testimony under Rule 701.  Rule 701 permits testimony that is: (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witnesses' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.  Fed. R. Evid. 701; *see also United States v. Bush,* 405 F.3d 909 (10th Cir. 2005) (Rule 701 permits the admission of lay opinion testimony provided that it meets two criteria:  a rational basis in perception and helpfulness).  These requirements are met by the testimony at issue.

1.    **Defendants' Real Estate Agent Witnesses' Opinions about the Effect of Activities at Rocky Flats on the Market Would Be Based on the Witnesses' First-Hand Perceptions.**

Plaintiffs claim that opinions about the market for class properties constitute expert testimony because they "would necessarily be based on the realtor's specialized knowledge." (Pls' Mot. at 3–4.)  Not so.  Any opinions offered by real estate agent witnesses about the effect of Rocky Flats on the real estate market would be based on those witnesses' personal observations and personal participation in relevant real estate transactions, ***not*** any specialized expert-type knowledge.

Such opinion testimony is permissible under Rule 701.  According to the Advisory Committee Notes to the 2000 amendment to Rule 701, a witness can offer lay opinion testimony based on "particularized knowledge that the witness has by virtue of his or her position in [a business at issue]."  Fed. R. Evid, 701 advisory committee's notes.  For instance, a business owner/officer can "testify to the value or projected profits of the business" without being qualified as an expert.  *Id.*  A lay witness may also testify to opinions without expert qualification if the witness can show sufficient personal knowledge concerning an issue.  *Id.*  That is precisely the case here:  Defendants' real estate agent witnesses base their opinions on personal knowledge and experiences gained by virtue of their position in the real estate market and can thus testify to opinions about the effect of Rocky Flats on the market without being disclosed as experts.

In addition, Federal Rule of Civil Procedure 26(b)(4)'s advisory committee notes say that one is not subject to the expert disclosure requirements if one's "information was not acquired in preparation for trial but rather because he was an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit."  Fed. R. Civ. P. 26(b)(4), advisory

committee note; *see also In re Tess Communications Inc.,* 291 B.R. 535, 537 (Bankr. D. Colo. 2003) (Pretrial report requirements do not apply to fact witnesses who offer opinions in the limited context of their direct, personal knowledge as actors or viewers of facts); *Foster v. Lawrence Mem. Hosp.*, 1993 WL 156131 (D. Kan. 1993) (permitting lay opinion testimony on this basis). None of defendants' real estate agent witnesses acquired their information in preparation for this trial. They performed no expert analyses of the issues at hand, nor were they retained to do so. Instead, they were simply actors (or viewers) with respect to numerous class area real estate transactions.

Moreover, the Tenth Circuit routinely allows this type of lay opinion testimony, which is based on the witnesses' past experience and personal knowledge. *See, e.g., United States v. Jackson*, 1998 WL 642410, at *7 (10th Cir. 1998) (permitting lay witness opinion testimony based on personal past experience and knowledge); *United States v. Stanley*, 896 F.2d 450, 451–52 (10th Cir. 1990) (same); *Malloy v. Monahan,* 73 F.3d 1012 (10th Cir. 1996) (permitting plaintiff to present opinion testimony on lost profits of plaintiffs' business venture where project was based on personal experience and plaintiff had sufficient expertise to make the projection); *State Office Systems, Inc. v. Olivetti Corp of America*, 762 F.2d 843 (10th Cir. 1985) (same); *Weese v. Schukman,* 98 F.3d 542, 550 (10th Cir. 1996) (doctor could testify as lay witness about his treatment of patient); *Davoll v. Webb*, 194 F. 3d 1116, 1138 (10th Cir 1999) (same); *Gossett v. Oklahoma ex. rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1180 (10th Cir. 2001) (abuse of discretion to exclude lay witness opinion that was "predicated upon concrete facts within [the witness's] own observation and recollection"). There is no reason to distinguish the

opinion testimony defendants' real estate agent witnesses may offer in this case – which squarely falls within the boundaries of Rule 701.

Tellingly, plaintiffs do not cite a single Tenth Circuit or District of Colorado case in support of their position on Rule 701.  (*See* Pls' Mot. at 4.)  And the various cases plaintiffs do cite are distinguishable from the instant situation.  In *United States v. Peoples*, 250 F.3d 630, 641 (8th Cir. 2001), the court refused to admit lay opinion testimony because the witness lacked first-hand knowledge of the matter about which she testified, and her opinions were based on her after-the-fact investigation, not on her perception of the facts.  That is not the case here.  In *Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1196 (3d Cir. 1995), the court found testimony inadmissible under Rule 701 where the witness's opinion was not rationally based on her personal observations and was not helpful to the jury's determination of a fact in issue.  By contrast, defendants' real estate agents base their opinions on their personal observations and those opinions would help the jury to determine a fact in issue, as discussed further below.

In *United States v. Conn*, 297 F.3d 548, 554 (7th Cir. 2002) – another case cited by plaintiffs – the court allowed testimony under Rule 702, not Rule 701, because the witness was not summarizing actual observations but drawing inferences from his law enforcement training and experience.  Here by contrast, defendants' real estate agents would merely be summarizing their personal observations of real estate transactions through the years.

Plaintiffs' also cite a tax court case, *Estate of Dunia v. Comm'r of Internal Revenue*, No. No. 6115-00, 2004 WL 1119603, at *5 (Tax Ct. May 20, 2004).  In that case, the tax court found that a general partner's lay witness testimony as to the value of partnership-owned property was inadmissible because any such valuation opinion would not be helpful unless it were based on

specialized knowledge derived from his experience as a real estate developer.  *Id.*  By contrast, here, defendants do not offer their real estate agents as appraisers offering testimony about the value of specific class properties.  Instead, defendants' real-estate agents' testimony would relate to the lack of an effect from Rocky Flats on transactions observed by the witnesses and would be derived solely from their personal perceptions, not any specialized knowledge.

In sum, any opinions defendants' real estate agents might offer would be rationally based on their own perceptions and should be permitted.

<strong>2.      Real Estate Agent Witnesses' Opinions about the Effect of Rocky Flats on Class Properties Would Assist the Jury.</strong>

Plaintiffs do not claim that defendants' real estate agents' opinions about whether Rocky Flats had an effect on the market or how problems at Rocky Flats affected the market would not assist the jury, and for good reason.  The jury likely would find it useful to hear the testimony of actual real estate agents who were operating in the area surrounding Rocky Flats during relevant time periods, where the case involves the purported impact of alleged activities at Rocky Flats on plaintiffs' property values.  *Cf. United States v. Borelli*, 621 F.2d 1092 (10th Cir. 1980) (lay opinion testimony was helpful to the jury in the determination of a fact in issue where the witness was in a better position to offer an opinion on the issue).

Plaintiffs claim that defendants' real estate agents would not be ***qualified*** to offer opinion testimony and would base such testimony on a "handful" of mere "anecdotes."  (Pls.' Mot. at 5.) That is simply not true.  As described above, defendants' real estate agent witnesses have had substantial personal observation of and involvement in relevant real estate transactions and the market.  Both Ms. Millage and Mr. Moorehouse, for example, have been part of ***at least*** several hundred transactions.  Plaintiffs do not point to any real estate agent on defendants' preliminary

trial witness list who does not have substantial experience in this area.  (*See id.* at 3–5.)  Thus, these witnesses meet the requisite requirement for lay witness opinion testimony:  they have had the ability to perceive the effect of Rocky Flats activities on the market through their personal experiences and observations.  Simply put, because summaries of these witnesses' personal, first-hand observations would be helpful to the jury, such testimony should be permitted under Rule 701.

## III.    DEFENDANTS' WITNESS ROY THIGPEN'S TESTIMONY IS ADMISSIBLE.

Plaintiffs move in *limine* to bar testimony by defendants' witness Roy Thigpen, claiming that Mr. Thigpen's testimony is not relevant to any issue in the case and is highly prejudicial. (Pls.' Mot. at 5–8.)  As an initial matter, plaintiffs' motion is premature, because the subject matter of Mr. Thigpen's testimony (and, indeed, whether he will testify at all) depends on Ms. Cook's testimony.  If the Court does reach the merits of plaintiffs' motions, it should be denied, because Mr. Thigpen's testimony rebuts plaintiffs' claims about Ms. Cook's property.  More-over, the evidence is not unfairly prejudicial, and would not take much trial time.

*First*, plaintiffs' motion regarding Mr. Thigpen is premature.  Whether defendants offer testimony from Mr. Thigpen, and what testimony defendants offer, depends upon what Ms. Cook testifies about.  Will Ms. Cook testify about her the value of her property?  Will Ms. Cook testify about transactions relating to her property?  The answers to these questions, and others, inform the issue of whether and to what extent defendants will seek to introduce evidence from Mr. Thigpen.  If defendants do introduce Mr. Thigpen's testimony to rebut Ms. Cook's testimony, it will likely be by deposition designation, and will likely take up only a small amount of trial time.

Mr. Thigpen's entire deposition took just over two hours, with only 35 minutes used by the defendants.

**Second**, Mr. Thigpen's testimony is clearly relevant to the value of Ms. Cook's property. Thigpen testified at his deposition that, in 1984, he entered an arrangement at the request of Ken Shepherd (a friend of named-plaintiff Merilyn Cook) for Mr. Thigpen to take out a $500,000 loan and a note to Ms. Cook, allegedly to "purchase" Ms. Cook's property for more than $770,000.[3]  (Ex. 6, Thigpen Dep. at 8–10, 13–14.)  Mr. Thigpen further testified, however, that he never intended to actually purchase the property and assume the loan payments, and that the whole thing was set up to allow Ms. Cook to consolidate her debts while keeping the property. (*Id.*)  In the course of the transaction, it was represented to Mr. Thigpen that Ms. Cook was unable to get a loan on the property because of her financial problems, which is why this transaction was set up.  (*Id.* at 19–20.)  Mr. Thigpen explained that, according to his deal with Ms. Cook and Mr. Shepherd, Ms. Cook was to remain in possession of the property despite the alleged "sale," that she and/or Mr. Shepherd would make the loan payments, and that eventually they would get him out of the deal so that Ms. Cook would own the property subject to the mortgage. (*Id.* at 15–20.)  This was supposed to happen within a relatively short period of time – "six months to a year, maybe two years max."  (*Id.* at 19.)  According to Mr. Thigpen, the purchase price used for this transaction did not reflect the actual value of the property, because the transaction was not an arms-length transaction, and Ms. Cook wanted to set the alleged purchase price as high as possible.  (*Id.* at 44–45, 84–85.)  Mr. Thigpen's testimony is corroborated by the fact

---

[3] The transaction also involved two condominiums outside of Denver.  (*Id.* at 16.)

that in late 1986, two years later, a different appraiser appraised the same property for $330,000 (approximately $425,000 less than in Mr. Thigpen's transaction with Cook), and other testimony about Ms. Cook's financial condition.  (*Id.* at 85; Ex. 7, Cook Dep. at 149–50, 166–67.)  Mr. Thigpen's testimony is thus highly relevant evidence of the value of Ms. Cook's property, and in turn is highly relevant to Ms. Cook's claim that defendants' conduct caused a "diminution in value" of that property.

Plaintiffs state in their motion that defendants will "seek to defend Mr. Thigpen's testimony on the theory that it shows the true baseline value of Ms. Cook's property to be less than claimed."  (Pls.' Mot. at 6.)  Plaintiffs essentially concede that Mr. Thigpen's testimony could establish "that the price he paid for the property in 1984 did not reflect its true value as of that time."  (*Id.*)  Plaintiffs suggest that this is not relevant because "damages in this case will be measured by reference to the time period between 1989 and 1992, not 1984."  (*Id.*)[4]  That is not the case:  the complete and comparatively enduring date has yet to be determined.  (5/17/05 Order at 16.)  Rather, under the May 17, 2005 Order, "Plaintiffs will be require to prove . . . the date on which the injurious situation caused by Defendants became complete and comparatively enduring."  (*Id.*)  Nor does the May 17, 2005 Order in any way limit the range of permissible

---

[4]  Plaintiffs incorrectly assert that defendants have "offered no competing theory of a CCE date." (Pls.' Mot. at 2.)  Though defendants believe that there is no injurious situation attributable to their activities at Rocky Flats, let alone one that has become complete and comparatively enduring, defendants have alternatively stated that, depending on what (if any) continuing injurious situation that the jury may find, the jury should select a number of possible CCE dates ranging from 1953, when the plant was first built, to the time of trial, and particularly the mid-1970s, by which time 99.9% of offsite plutonium releases had occurred.  (*See* Defs.' Resp. to Pls.' Proposed Plan for Determination of Compensatory Damages, filed 7/21/04, at 10; Ex. 8, ATSDR 9/2/04 report, at 1–2.)

CCE dates to the period between 1989 and 1992.  Thus, if the jury determines that the CCE date is (for example) 1984, then Mr. Thigpen's testimony of the Cook property value as of 1984 will be highly relevant.

Indeed, even if the jury were to determine that the CCE date was at some point between 1989 to 1992 (as plaintiffs claim), Mr. Thigpen's testimony concerning the value of the property in 1984 would *still* be relevant.  Among other reasons, the Court ruled in its May 17, 2005 Order, that "Defendants may seek to mitigate any compensatory damages proved by Plaintiffs by demonstrating the fact and amount of any prior market discount the Damages sub-class received as a result of the ongoing trespass and/or nuisance when they purchased their Class property." (*Id.* at 17.)

In sum, plaintiffs' property values are central to this dispute, and Mr. Thigpen's testimony directly relates to the property value of the named plaintiff in the case.

Plaintiffs also suggest that defendants will introduce Mr. Thigpen's testimony "to show that Ms. Cook had debts."  (Pls.' Mot. at 6.)  Plaintiffs never explain, however, why Mr. Thigpen's testimony is not relevant for that purpose.  Indeed, Mr. Thigpen's testimony would be relevant to any testimony by Ms. Cook's that Rocky Flats somehow harmed her business,[5] by showing that Ms. Cook had financial and business solvency problems prior to any alleged impact by Rocky Flats (*e.g.,* a complete and comparatively enduring condition).  In her deposition, for instance, Ms. Cook claims that the publicity surrounding the plant following the FBI raid had a

---

[5]  As a threshold matter, Ms. Cook's testimony that activity at Rocky Flats allegedly harmed her business is not relevant, class-wide evidence and should be excluded.  (*See* Defendants' Motion to Exclude Evidence That Is Not Class-Wide.)

negative effect on the value of her business and property.  (Ex. 7, Cook Dep. at 79–80.)  To rebut

that testimony, defendants would be entitled to show the horse business was not doing well

before that point (such as through Mr. Thigpen's testimony).   Plaintiffs do not dispute the

relevance of Mr. Thigpen's testimony in this regard; in fact, they concede that defendants "may

of course attempt to rebut Ms. Cook's testimony that Rocky Flats harmed her business."  (Pls.'

Mot. at 7.)  *See also Cook v. Rockwell Int'l Corp.* ("*Cook X*"), 358 F. Supp. 2d 1003, 1013 (D.

Colo. 2004) (plaintiffs seek recovery of "the decrease in the value of the land **caused by** the

prospect of the continuance of the invasion measured at a time when the injurious situation

became complete and comparatively enduring") (emphasis added).[6]  Such testimony is especially

important in light of Ms. Cook's admission that there is no document or source that can be

looked at to determine how much income or how much cash was derived from her horse breed-

ing operations from year to year.  (Ex. 7, Cook Dep. at 154–55.)[7]

---

[6]  Contrary to plaintiffs' assertions, it is not defendants' intention at this time to offer this evidence to show an ulterior motive for the suit.  Thus, *Caldwell v. Wal-Mart Stores, Inc.*, 229 F.3d 1162 (10th Cir. 2000), which involved financial evidence offered to show an ulterior motive for the lawsuit, is inapposite here.  The other case cited by plaintiffs for this proposition, *Whiteley v. OKC Corp.*, 719 F.2d 1051, 1055 (10th Cir. 1983), involved financial evidence offered to show inability of the **defendant** to pay the verdict and does not support plaintiffs' position.

[7] Plaintiffs claim that "Mr. Thigpen had no first-hand knowledge of her financial situation, so his testimony on that issue would be inadmissible speculation or hearsay."  (Pls.' Mot. at 6.)  If Ms. Cook is allowed to testify that Rocky Flats harmed her business, Mr. Thigpen should be allowed to testify, based on his first-hand knowledge, that he entered the 1984 transaction with Ms. Cook based on representations that he would be helping Ms. Cook consolidate her debts and that it was his understanding that he was asked to do so because she could not get a loan.  That is not based on any hearsay or speculation, but rather explains his own state of mind, the actions he took with respect to Ms. Cook and her property, and his perception based on the transaction.  *See* Fed. R. Evid. 801 (defining hearsay); Fed. R. Evid. 803(a)(3) (statement of the declarant's state of mind, such as intent, is an exception to the hearsay rule).

***Third***, Mr. Thigpen's opinion testimony about Ms. Cook's character for untruthfulness goes directly to her credibility, and thus is relevant, admissible evidence under Rule 608(a). Plaintiffs claim that "Defendants true intent . . . is to use [Mr. Thigpen's] testimony to attack Ms. Cook's character . . . ."  (Pls.' Mot. at 6.)  However, plaintiffs misread and misconstrue both defendants' intent and the relevant rules.  Far from being an impermissible ***character*** attack, defendants may attack Ms. Cook's ***credibility*** through opinion testimony by Mr. Thigpen.  Such testimony is considered probative and is admissible under the Federal Rules.

Rule 404(a) provides that evidence of a person's character is not admissible to show action in conformity therewith.  However, Rule 404(a)(3) expressly provides that evidence of the character of a witness ***is permissible*** as provided in Rules 607, 608, and 609.  Fed. R. Evid. 404(a)(3).  Rule 608(a) provides, in relevant part, that "[t]he credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation [so long as] the evidence [ ] refer[s] only to character for truthfulness or untruthfulness . . . ."  *See* Fed. R. Evid. 608(a); *see also* Fed. R. Evid. 608, advisory committee note (the rule that character evidence is not admissible to show conformity therewith is subject to several exceptions, "one of which is character evidence of a witness as bearing upon [her] credibility.")  As the Advisory Committee recognized, allowing evidence attacking a witness's credibility rather than all character evidence "sharpen[s] relevancy" and reduces "waste of time, and confusion."  *Id.*

Thus, testimony by Mr. Thigpen about Ms. Cook's character based on the transaction he participated in with her is permissible testimony under Rule 608(a).[8]  This testimony is relevant to Ms. Cook's credibility, which defendants have every right to address.  As the named plaintiff in this case, Ms. Cook likely will be one of plaintiffs' star witnesses at trial.  To exclude testimony that calls into question her credibility would be fundamentally unfair to defendants.

**Fourth**, plaintiffs further claim that Mr. Thigpen's testimony should be excluded because it is "more prejudicial than probative on the issue of Ms. Cook's character."  (Pls.' Mot. at 7.)  That is not the test:  Evidence may be excluded under Rule 403 only if its potential for **unfair** prejudice "**substantially** outweighs" its probative value.  *See* Fed. R. Evid. 403 (emphasis added).  As explained above, Mr. Thigpen's testimony may be relevant to rebut plaintiffs' claims about the effect of Rocky Flats on Ms. Cook and her property.  That is a perfectly legitimate purpose that does not impose any **unfair** prejudice on Ms. Cook.  *See United States v. Tan,* 254 F.3d 1204, 1211 (10th Cir. 2001) (unfair prejudice does more than damage a party's position at trial); *Deters v. Equifax Credit Information Services, Inc.*, 202 F.3d 1262, 1274 (10th Cir. 2000) (same).

---

[8]  Moreover, defendants would be permitted to cross-examine Ms. Cook about the transaction under Rule 608(b).  *See* Fed. R. Evid. 608(b) (allowing inquiry on cross-examination into specific instances of conduct if the conduct relates to truthfulness or untruthfulness); *see also* Rule 405(a) (testimony about character may be through opinion or reputation evidence).  *Cf. United States v. Fairchild,* 46 F.3d 1152 (10th Cir. 1995) (evidence of failure to file tax returns was relevant credibility evidence under Rule 608); *United States v. Morales-Quinones,* 812 F.2d 604, 613 (10th Cir. 1987) ("Where the testimony of a witness is critical to the Government's case, the defendant has a right to attack the witness' credibility by wide ranging cross-examination . . . [Under Rule] 608(b) a defendant may impeach a Government witness by cross-examining him about specific instances of conduct not resulting in conviction if such conduct is probative of the witness' character for truthfulness or untruthfulness.").

IV.     **EVIDENCE SHOWING WHAT PLAINTIFFS OR THE CLASS KNEW OR SHOULD HAVE KNOWN ABOUT AN ALLEGED NUISANCE FROM ROCKY FLATS IS RELEVANT TO PLAINTIFFS' NUISANCE CLAIMS.**

Plaintiffs move in *limine* to exclude evidence of what class members "knew, or should have known, about Rocky Flats."  (Pls.' Mot. at 8.)  In a single, conclusory paragraph, plaintiffs suggest that such evidence is irrelevant because neither the statute of limitations nor "coming to the nuisance" are available defenses.  (*Id.*)  Plaintiffs do not even specify the type of evidence of knowledge they seek to exclude, other than vaguely describing it as:  "what class members allegedly knew, or should have known, about Rocky Flats."  (*Id.*)

Plaintiffs' arguments about the "statute of limitations" and "coming to the nuisance" are red herrings.  Defendants will offer evidence of what "plaintiffs or the class knew or should have known about problems at Rocky Flats" for reasons that have nothing to do with the "statute of limitations" and "coming to the nuisance."  In fact, what "plaintiffs or the class knew or should have known about problems at Rocky Flats" is relevant to at least the three following issues:  (1) property values in the class area as of the CCE date, or before the CCE date to support defendants' prior discount defense; (2) as a factor in determining whether any alleged nuisance is substantial and unreasonable; and (3) "the generic causation question of whether Defendants' activities and the conditions resulting from them were capable of causing Class members to suffer fear, anxiety or other mental or emotional discomfort." (5/17/05 Order at 7.)

A.      **What Class Members Knew Or Should Have Known About Rocky Flats Is Relevant To Market Value.**

Under this Court's May 17, 2005 Order, plaintiffs will be required to prove, as of a CCE date yet to be determined, "the average percentage diminution in property value that was caused by any trespass or nuisance found by the jury, as of the CCE date, for each property category."

(*Id.* at 17.)  As discussed below, contemporaneous market knowledge (including what "plaintiffs or the class knew or should have known about problems at Rocky Flats before they bought their property") is relevant to (and indeed is a vital component of) property value.

*First*, plaintiffs acknowledge the link between what "plaintiffs or the class knew or should have known" and property value in their *Daubert* briefs, when plaintiffs identify the "variable at issue, namely, *market reaction* to the nuisance and contamination caused by Rocky Flats."  (Pls.' Mem. in Support of Their *Daubert* Mot. at 14 (emphasis added).)  One component of "market reaction" is what plaintiffs or the class knew or should have known, because the class constitutes property owners in the area—market participants who are part of the market.

Plaintiffs argue that what plaintiffs and class members—key market participants here—knew about activities at Rocky Flats and any alleged offsite impact of such activities is irrelevant.  That cannot possibly be so.  Plaintiffs rightly assert that the "variable at issue" is the "*market reaction* to the nuisance and contamination caused by Rocky Flats."  Of course that is true, and knowledge of market participants is a necessary prerequisite to such a market reaction; the market cannot react to that which it does not know.  Assume a case where invisible contamination was released by a facility onto neighboring property in Year 1, but no one knew about it for twenty years.  Then, in Year 21, someone took measurements and found the presence of the contamination and publicized it to market participants.  The market could not react to such contamination prior to Year 21 because it was not known.  However, in Year 21 and thereafter, the market could react because market participants knew.  Thus, knowledge of market participants is a critical link in determining whether or not the market could have reacted.  Similarly, given that market reaction is the "variable at issue," then when the market gained that knowledge

is critical to when the market could have reacted.  Evidence of market knowledge is essential to causation: did the trespass or nuisance *cause* a market reaction and, if so, when?

Nor can one distinguish meaningfully between plaintiffs and the class, on the one hand, and the market on the other.  The class comprises more than 10,000 market participants. These market participants are the most important ones:  they actually participated in the market because they all bought there, and many of them sold there.  They *are* the market, to a large extent.  And as for the plaintiffs, this court certified them as representatives of this class of market participants.  They have been held out to be the market participants from whom the jury will actually hear testimony—participants who are supposedly "representative" of the entire class of market participants.  What was known by such market participants is relevant to what all market participants knew, and when they knew it and "reacted" to.

*Second*, plaintiffs' own property valuation expert deems market knowledge relevant to property value.  Plaintiffs' expert Wayne Hunsperger relies upon market knowledge in arriving at his conclusions of market value:  "[t]he effect measured in this report relates to 'stigma.'" (Ex. 3, Hunsperger Report at 71.)  Mr. Hunsperger in turn defines "stigma" as "a function of the underlying facts (*assuming they are known and clearly understood*), as well as *the perception of what those facts really are*." (*Id.* at 74 (emphasis added).)  In other litigation, Mr. Hunsperger opined that it was not contamination alone from Rocky Flats, but market knowledge of such contamination that affected property values in the vicinity in the 1970s:

> In the 1970's, the neighborhoods near Rocky Flats suffered a marketability problem.  During that time it became known that some contamination was escaping the Rocky Flats Plant by way of Walnut Creek in Jefferson County.  At that time, homes in the surrounding neighborhoods became almost impossible to sell.  Property values declined.  For a period, FHA and VA declined to insure loan in the neighborhood.  The consequences were severe.  Negative market perceptions

combined with lack of government insured financing caused real estate values in many instances to decline dramatically.

Wayne Hunsperger *et al.*, Community & Economic Impacts of the Rocky Mountain Arsenal on Commerce City, Colorado, Sept. 16, 1994, at 15.

Plaintiffs' other experts are in accord. Drs. Flynn and Slovic conducted a so-called public opinion survey in 1995 in which they asked participants: "Have you heard of [Rocky Flats, these events, etc.]?" They seek to testify as to the responses to such questions. Mr. Hunsperger incorporated the responses to those survey questions into his own report in which he attempts to convert such responses into diminution-in-value estimates. (*See* Ex. 3, Hunsperger Report at 245–252.)

***Third***, defendants' property experts agree that the knowledge of market participants is relevant to determining property value. The very definition of market value relies on the assumption that the participants in a transaction are "each acting prudently and ***knowledgeably***." (Ex. 1, Dorchester Report at 3-1 (emphasis added).) For example, in analyzing whether plaintiff Merilyn Cook's property has suffered economic harm as a result of defendants' operations at Rocky Flats, defendants' expert John Dorchester found it significant that "Mrs. Cook had been an active market participant in the purchase and sale of Rocky Flats area lands [which] provided her with significant market experience and, presumably, market knowledge." (*Id.* at 7-7.)

The relevance of market knowledge to this case is not affected by this Court's holding that "***individual*** Class member's knowledge regarding Rocky Flats and plutonium contamination [and] the effect, if any, this knowledge played in each Class member's property transactions"

should not be considered in deciding compensatory damages.  (5/17/05 Order at 19 (emphasis

added).)[9]  This Court went on to state that "diminution in value is a function of the market."  (*Id.*

at 20.)  The market's knowledge regarding Rocky Flats—apart from the knowledge of any single

individual—is a significant factor in determining what value the market placed on class proper-

ties at any point in time.  This Court earlier identified the "primary individual factor" affecting

compensatory damages for each class member to be "whether they purchased their property at a

time when the market had discounted the value of class properties as a result of Defendants'

alleged trespass or nuisance."  (5/28/04 Order at 12–13.)  In order to determine whether the

market had in fact made such a discount, it is necessary first to determine whether the market had

knowledge of the alleged trespass or nuisance.

### B. Evidence That Plaintiffs Knew About An Alleged Nuisance, And Acquired Or Improved Their Land In Spite Of It, Is A Factor To Be Considered In Determining Whether The Alleged Nuisance Is Substantial And Unreasonable.

Plaintiffs make the misleading argument that "[t]he defense of 'assumption of the risk,'

also known as coming to the nuisance,' is . . . unavailable," citing the Court's May 28, 2004

Order.  (Pls.' Mot. at 8.)  But the Court's prior decisions do not preclude consideration of

whether "the timing of class members' acquisition of class properties is a ***factor*** for the jury to

consider." (5/28/04 Order at 7 (emphasis added).)

It is black-letter Colorado law that a plaintiff's knowledge about an alleged nuisance

prior to his or her purchase of property is ***relevant*** to liability, even if it does not serve as an

---

[9] Though defendants preserve their position that any trial plan for this case must account for the knowledge of individual class members, they do not reargue that point here.

absolute defense to nuisance liability.  *See, e.g.*, *Platte & Denver Ditch Co. v. Anderson*, 6 P. 515, 521 (Colo. 1885) ("Where one buys a city lot bordering upon ground set apart or dedicated to any public use, he takes it subject to all the annoyances incident to the purposes of the dedication."); *Escobar v. Cont'l Baking Co.*, 596 N.E.2d 394, 397–98 (Mass. App. 1992) (stating that though "coming to a nuisance in itself does not bar relief, it, too, is a significant factor in determining what is fair and reasonable").

For example, in 1978, plaintiff Richard Bartlett knew that there had been a fire at Rocky Flats in 1969, that the fire was alleged to have released contamination offsite, and that people had claimed that Rocky Flats was not safe.  (Ex. 9, Bartlett Dep. at 58:12–59:3.)  Mr. Bartlett also testified that in 1978 he was concerned about possible contamination in the soil and water supply of property near Rocky Flats.  (*Id.* at 119:17–23.)  Despite his knowledge of Rocky Flats and his concerns, Mr. Bartlett decided to buy property and build a house on Alkire Street in 1978, which was closer to Rocky Flats than where he was living before.  (*Id.* at 91:6–8.)  The fact that Mr. Bartlett and other members of the class voluntarily chose to live near Rocky Flats, with full knowledge of the alleged contamination, undercuts plaintiffs' claims that the interference with use and enjoyment caused by defendants' conduct was either substantial or unreasonable.  (*Id.* at 161:4–11.)

### C.   Evidence That "Plaintiffs Or The Class Knew Or Should Have Known About Problems At Rocky Flats Before They Bought Their Property" Is Relevant To Whether "Defendants' Activities And The Conditions Resulting From Them Were Capable Of Causing Class Members To Suffer Fear."

Finally, evidence that plaintiffs knew of defendants' activities at Rocky Flats is elemental to the question "of whether Defendants' activities and the conditions resulting from them were capable of causing Class members to suffer fear, anxiety or other mental or emotional discom-

fort." (5/17/05 Order at 7.) Defendants' position is that this issue of "generic fear" has no place in a class-wide trial. However, if the "generic fear" issue is made part of the class-wide trial, then it necessarily follows that the capability of such activities or conditions to cause "fear, anxiety or other mental or emotional discomfort" in any class member is dependent on the extent to which the "class members" knew of such activities or conditions.

## V.   EVIDENCE THAT DEFENDANTS COMPLIED WITH STATE OR FEDERAL STANDARDS IS RELEVANT TO PLAINTIFFS' CLAIMS.

Plaintiffs move in *limine* to bar evidence of defendants' compliance with state and federal regulatory standards, arguing that such evidence is irrelevant or, at least, should not be given "undue emphasis." (Pls.' Mot. at 8–10.) This evidence however, is relevant for the following four reasons:  (1) defendants' compliance with government standards is probative of their reasonable, non-negligent conduct; (2) under Colorado law, plaintiffs must demonstrate non-compliance with an applicable government standard to establish their nuisance claims; (3) the regulatory standards and whether defendants have complied with them are relevant to whether class members have suffered an increased health risk; and (4) defendants' compliance is also probative of their good faith conduct, rendering an award of punitive damages inappropriate.

*First*, plaintiffs have indicated that they will "offer proof of liability on the nuisance claim through evidence of defendants' negligence." (12/10/03 Status Report at 2.) Evidence of defendants' compliance with government standards is probative to plaintiffs' claims of nuisance based upon negligence. It is well settled that, where there exists a government or industry standard, whether the defendant complied with such standard is relevant to whether the defendant breached its duty of care. *See Scott v. Matlack*, 39 P.2d 1160, 1171 (Colo. 2002) (holding that evidence concerning defendants' compliance with OSHA regulations "may be admitted as

some evidence of [defendants'] standard of care); *Bayer v. Crested Butte Mountain Resort, Inc.*, 960 P.2d 70, 78 (Colo. 1998) ("Evidence of defendants' compliance with industry standards [is] relevant and admissible for determining whether the defendant breached its duty of care."); *see also Silkwood v. Kerr-McGee Corp.*, 485 F. Supp. 566, 580 (W.D. Okla. 1979) ("[T]he general rule should be no different for the atomic industry.  Compliance with government safety regulations should be accepted as evidence of acting reasonably."), *rev'd in part on other grounds*, 667 F.2d 908 (10th Cir. 1982), *rev'd*, 464 U.S. 238 (1984); Dan B. Dobbs, *The Law of Torts* § 224, at 572 (2001) ("[T]he defendant's compliance with a statute that thoroughly regulates the behavior in question tends to support the defendant's argument that he is not negligent.  So the defendant's compliance may be evidence for the trier to consider on the negligence issue even though it is not a defense."); Prosser & Keeton § 36 ("[W]here the statute does set up standard precautions . . . this is a relevant fact, having proper bearing upon the conduct of a reasonable person under the circumstances, which the jury should be permitted to consider."), *cited in Scott*, 39 P.2d at 1171.

*Second*, as defendants have previously discussed, defendants' compliance with both federal safety standards and state plutonium-in-soil standards are relevant to plaintiffs' nuisance claims.  (*See* Defs.' Proposed Nuisance Instruction Nos. 7, 14–15, 17–19, filed 8/6/04; Defs.' Resp. to Pls.' Br. re Statute of Limitations et al. at 8–19, filed 8/18/04; Defs.' Mem. re Federal Standards and Colo. Nuisance Law, filed 10/15/04.)  Colorado law requires that a plaintiff show that such standards were exceeded in order to demonstrate that any alleged nuisance was substantial and unreasonable.  *See Van Wyk*, 27 P.3d at 393 (stating that "[government] determina-

tion of reasonableness sets the standard for the balance between the social utility of the [activity] and possible harm to property").

In *Van Wyk*, the court ruled that if a governmental entity has "quantified the [invasion] level it deemed to be reasonable, then that [invasion] level would become the standard for the level at which [the invasion] would not constitute an invasion interfering with [plaintiffs'] use and enjoyment of their property." *Id.* Both the federal nuclear safety standards and Colorado's plutonium-in-soil standard are government quantifications of what is a reasonable level of emissions from a nuclear facility, and what is a reasonable level of plutonium in soil. Compliance with these standards is relevant to whether there has been any class-wide substantial and unreasonable interference. (*See further* Defs.' Resp. to Pls.' Br. re Statute of Limitations et al. at 8–19, filed 8/18/04; Defs.' Mem. re Federal Standards and Colo. Nuisance Law, filed 10/15/04.)

***Third***, the Court ruled in its May 17, 2005 Order that proof of "class-wide exposure to plutonium and resulting class-wide increase in human health risk would be sufficient to establish an interference with use and enjoyment of property," provided that the jury "may only consider the magnitude of the common, class-wide health risk in determining whether this and any interference(s) they find are substantial and unreasonable." (*Id.* at 5.) Whether defendants complied with state and federal standards would provide valuable guidance to the jury as to whether defendants' activities present an increased health risk to class members, because both standards were established after extensive scientific study of the relevant "health risks."

In setting its plutonium-in-soil standard, the state of Colorado "used the soil concentration as an index ***below which a significant health impact on the population at risk is not anticipated***." (Ex. 10, Albert J. Hazle 11/13/78 Letter to Peter Murphy (emphasis added).) The

Colorado Department of Health (now the Colorado Department of Public Health and Environment) confirmed in a risk evaluation report that "[t]he present state plutonium-in-soil standard does not have a significant impact on the life expectancy and genetic risks anticipated for a population so exposed," and the Department concluded that "the present standard can still be considered to be ultraconservative."  (Ex. 11, "A Risk Evaluation for the Colorado Plutonium-in-Soil Standard," Colo. Dept. of Health, Jan. 1976.)  (*See also* Ex. 12, Whicker Supp. Report at 10 ("It is my opinion that the [state soil] standards described in this section are conservative and offer more than ample protection of the public from the potential health effects from plutonium in soil.").)  Thus, evidence of whether or not defendants complied these standards is relevant to whether or not there was a class-wide "increased health risk" from Rocky Flats.  (5/17/05 Order at 5.)

Another example is the federal nuclear safety standards, which were designed to ensure that compliance with those standards would result in no meaningful increased health risk.  (*See* Ex. 13, 1/29/97 Auxier Aff. ¶ 9 ("The standards for radionuclide concentrations were determined by the NCRP and ICRP to be levels that are protective of human health, based on data available at the time.").)  These standards are based on recommendations of the International Commission on Radiological Protection ("ICRP") and the National Council on Radiation Protection and Measurements ("NRCP") concerning permissible doses of radiation.  The ICRP is a venerable body of international scientists that is devoted to reviewing current biological and health risk data in creating both biological models of how radionuclides affect the human body, and setting standards for safe levels of radionuclides in the workplace and in the environment based on that extensive scientific groundwork.  The NCRP largely replicates such work in this country.  (*See*

Ex. 13, Auxier Aff. ¶¶ 8–41.)  The health-risk-based standards that issue from these organiza-

tions, coupled with evidence as to whether or not defendants violated these standards, are also

highly probative towards the questions of whether class members have, in fact, experienced an

"exposure" and an "increased health risk."  (5/17/05 Order at 5.)

*Fourth*, defendants' compliance with government standards is relevant to plaintiffs'

claims for punitive damages.[10]  This Court has already acknowledged that "evidence concerning

Defendants' alleged compliance with these standards is likely relevant to at least Plaintiffs' claim

for exemplary damages."  In discussing these same standards, the *Silkwood* trial court similarly

noted:

> Good faith belief in, and efforts to comply with, all government regulations would
> be evidence of conduct inconsistent with the mental state requisite for punitive
> damages.  Defendants placed this matter in issue and introduced evidence in this
> regard.  Defendants were free to argue their good faith conduct in operating their
> facility safely.  The jury was instructed to judge that conduct in light of the stan-
> dards for the imposition of punitive damages.  Had the jury believed this evi-
> dence, an award of punitive damages would not have been appropriate.

485 F. Supp. at 584.

Plaintiffs' discussion of the admissibility of *ex post* agency decisions (*see* Pls.' Mot. at 9)

misses the point.  In each of the cases cited by plaintiffs, the court excluded an unreliable agency

***after-the-fact*** determination concerning the defendant's conduct.  *See Smith v. Hussman Refrig-*

---

[10] Defendants maintain the position that the Price-Anderson Act bars plaintiffs from pursuing
punitive damages entirely, but even under the law of the case, plaintiffs may only recover "with
respect to occurrences, including releases of plutonium, they prove took place before August 20,
1988."  *Cook IX*, 273 F. Supp. 2d at 1212.  Thus, defendants alternatively argue that, given that
"only damages for prospective invasions pursuant to Restatement (Second) of Torts § 930(3)(b)
will be determined in the class trial" (5/17/05 Order at 15), punitive damages are not available
for prospective invasions and should not be determined in the class trial.

*erator Co.*, 619 F.2d 1229, 1245 (8th Cir. 1980) ("exclud[ing] evidence of the NLRB's failure to issue a complaint *after* plaintiffs filed unfair labor practices") (emphasis added); *Cortes v. Maxus Exploration Co.*, 758 F. Supp. 1182, 1183 (S.D. Tex. 1991) (excluding EEOC determination finding no probable cause on plaintiff's "charge of sex discrimination against her *former* employer") (emphasis added); *Conaway v. Smith*, No. 84-2434, 1989 WL 36054, at *3 (D. Kan. Mar. 17, 1989) (excluding evidence of outcome in unemployment compensation appeal brought after the plaintiff's discharge from employ with defendant).  The probative nature of defendants' compliance with government standards here stems from the fact that such standards were in existence *at the time* defendants carried out the conduct at issue in this case.  Compliance with such standards demonstrates both an effort to "act[] reasonably" and act in "good faith."  *Silkwood*, 485 F. Supp. at 580, 584.

## VI.   DEFENDANTS' EVIDENCE REGARDING THE IMPORTANCE TO NATIONAL SECURITY OF THEIR CONTRACTUAL OPERATIONS AT ROCKY FLATS IS RELEVANT AND ADMISSIBLE.

Plaintiffs seek to preclude defendants from introducing any evidence at trial "in support of an argument that any harm caused by their conduct was outweighed by the benefit to national security secured by the weapons components produced at Rocky Flats."  (Pls.' Mot. at 10–11.) Plaintiffs contend that any such evidence is inadmissible because it is irrelevant and prejudicial. This national-security-related evidence, however, is relevant to the claims and allegations that the plaintiffs themselves have brought and is necessary to rebut the arguments and documents that the plaintiffs have indicated they may use at trial.   Additionally, such evidence, which defendants will introduce primarily through Dr. Jack Holl's testimony, is not "unduly prejudicial," and is not barred by Fed. R. Evid. 403.

A.   **National Security Evidence Is Relevant Because Colorado Nuisance Law Requires the Jury to Weigh Social Utility against the Harm of the Alleged Invasion.**

Plaintiffs are wrong that national security evidence is not relevant to the claims to be tried.  National-security-related evidence is relevant to, among other things, the "social utitility of the act causing the invasion," and, in turn, the reasonableness of emissions from the Rocky Flats plant.  *See Van Wyk*, 27 P.3d at 391.  As the Colorado Supreme Court held in *Van Wyk*, "the elements of a claim of nuisance are an intentional, negligent, or unreasonably dangerous activity resulting in the ***unreasonable*** and substantial interference with a plaintiff's use and enjoyment of her property."  27 P.3d at 391 (emphasis added).

As an initial matter, plaintiffs contend that "[t]he general social utility of a defendant's overall enterprise may concededly be pertinent to a court's ***legal*** determination of whether a duty of reasonable care exists."  (Pls.' Mot. at 11 (emphasis added).)  In fact, the Colorado Supreme Court has held that "[i]n making any determination of unreasonableness, ***the trier of fact*** must weigh the gravity of the harm and the utility of the conduct causing that harm."  *Van Wyk*, 27 P.3d at 391 (emphasis added).

Moreover, as the *Van Wyk* Court recognized:

> A ***determination*** that the social utility of the act causing the invasion that interferes with the use and enjoyment of the land does not outweigh the harm of that invasion is ***necessary*** for a finding of ***unreasonableness***.  Restatement (Second) of Torts § 826.

27 P.3d at 392 (emphasis added).  Similarly, in *Cook IX*, this Court ruled:

> Under Colorado law, whether the defendant has unreasonably and substantially interfered with the plaintiff's use and enjoyment of his property is a factual question to be decided by the trier of fact.  *Van Wyk*, 27 P.3d at 391.  In making this determination, ***the trier of fact must weigh the gravity of the harm and the utility of the conduct causing the harm***.

*Cook IX*, 273 F. Supp.2d at 1201 (emphasis added).

Plaintiffs attempt to distort this test, by narrowly framing "the social utility *of the act causing* the invasion" as "the social utility of the invasions" – simply omitting the words "of the act causing" from the middle of the *Van Wyk* test.  But if courts analyzed "utility" in terms of the "utility of defendant's invasions," then no invasion-causing activity would ever meet *Van Wyk*'s balancing test for reasonableness, making the test entirely superfluous.  *See Van Wyk,* 27 P.3d at 392 ("A determination that the social utility of the act causing the invasion that interferes with the use and enjoyment of the land does not outweigh the harm of that invasion is necessary for a finding of unreasonableness.")

In fact, in determining "the social utility of the act causing the invasion," Section 826 of the Restatement (which was relied upon by and cited by the *Van Wyk* court, 27 P.3d at 392) requires an analysis of the social utility of the *intended consequence of the defendant's actions* — that is, *not* the "social utility of pollution" but instead the "social utility of the *primary purpose* of the defendant's enterprise."  Restatement § 826, cmt. d ("The factors to be considered in determining the utility of conduct are stated and explained in § 828."); Restatement § 828, cmt. b ("The amount of utility that the particular conduct has depends primarily upon the amount of social value that the law attaches to *its primary purpose* . . . .") (emphasis added).  This is made clear by an examination of the very language of comment d, which states:

> By '*primary purpose of the conduct*' is meant the *actor's main or predominant objective* in acting or failing to act when he knows that his conduct will interfere with another's use or enjoyment of land.  One may be seeking to advance or pro-tect a number of different interests in carrying on a particular activity and he may have a number of reasons for doing what he is doing, but it is the main or primary objective of his conduct that is of the most importance in determining whether it has utility or not.  In most cases the actor does not want to invade the interests of others.  He is primarily concerned with the pursuit of his own interests and the in-

vasion, although intentional in the sense that he knows it will result, is merely in-
cidental to his main objective.  In this case it is ordinarily immaterial, so far as the
utility of his conduct is concerned, whether he is glad or sorry that his business is
harming his neighbor.  The law looks to the primary purpose of his conduct.

Restatement § 828, cmt. d (emphasis added).

As examples of the type of "primary purpose" that might be found to have social utility,

the comments to the Restatement do not identify "the utility associated with specific acts of

pollution," but instead identify the ***overall*** "operation of farms, factories or other lawful busi-

nesses," which they list as examples of enterprises that are "ultimately as essential to the general

public good as the operation of hospitals and fire departments":

> The utility of the conduct depends to a great extent upon whether its ***primary pur-
> pose*** has social value and upon how much social value it has.  It has social value if
> the general public good is in some way advanced or protected by the encourage-
> ment and achievement of the purpose.  It does not have social value if the general
> public good is impaired by the encouragement or achievement of the purpose.  If
> the ***primary purpose*** of the conduct is malicious, illegal or contrary to common
> standards of decency, it quite clearly lacks social value since the achievement of
> malicious, illegal or indecent purposes and objectives is destructive of the general
> public good.  Conduct carried on for these purposes thus lacks utility, and the in-
> vasion that it causes is unreasonable as a matter of law.  (*See* § 829).  ***If, however,
> the primary purpose of the conduct is not malicious, illegal or indecent, it usu-
> ally has some social value***, even though it is a purely private purpose.  The gen-
> eral public good may be advanced by the promotion of purely private enterprises
> as well as by the promotion of public or quasi-public enterprises.  The ***operation
> of farms, factories or other lawful businesses***, for example, is ultimately as es-
> sential to the general public good as the operation of hospitals and fire depart-
> ments.

Restatement § 828, cmt. e (emphasis added).

Clearly, in the case of the "operation of [a] farm[]," in analyzing the "the social utility of

the act causing the invasion," the Restatement test adopted by the *Van Wyk* court does not look

(for example) to the "social utility of a farmer's release of pollutant onto his neighbor's prop-

erty."  *Id.*  Instead, it looks to the social utility from the "primary purpose" of the "operation of the farm ***as a whole***.  (*See id.*)

Here, there is no question that the "primary purpose" of defendants' actions at Rocky Flats was to produce component parts for nuclear weapons that the U.S. President, Congress, and military determined to be necessary for national security.  (*See, e.g.*, Ex. 17, Holl Report at 26–29, 36–38.)  Plaintiffs' experts acknowledge that the waste management practices, fires, and other events that plaintiffs contend caused an interference with the use and enjoyment of their properties occurred as a result of nuclear weapons production at Rocky Flats.  (*See, e.g.*, Ex. 14, Cochran Overview Report at 1–2; Ex. 15, Goble Report at 4; Ex. 18, Budnitz Fires Report at 2–3.)  Thus, the "national security" aspects of Dow's and Rockwell's actions are relevant to assessing the social utility of those actions and, in turn, determining whether the interferences of which plaintiffs complain were "substantial and unreasonable."

Finally, plaintiffs argue that "defendants do not appear to contend that such releases and criminal misconduct were logically incident, or necessarily consequent, to any legitimate industrial mission."  (Pls. Mot. at 11.)  This argument fails for four reasons.  First, plaintiffs cite ***no authority*** recognizing the relevance of plaintiffs' argument that, if the defendant does not show that the invasions were "logically incident" to the defendant's industrial mission, then *Van Wyk's* balancing test does not apply.  The *Van Wyk* opinion contains no such exception.  27 P.3d at 391.  Second, the above-quoted Restatement comments demonstrate that plaintiffs' argument is not the law.  Third, plaintiffs cite no record evidence for the proposition that the alleged "invasions" (which plaintiffs have yet to specify, including in the context of the alleged "threat" from Rocky Flats) were ***not*** "incident" to the operation of the Rocky Flats plant.  Fourth, other courts like-

wise have recognized that the "social utility" to be assessed is not a specific, narrow act that might be the immediate cause of the harm complained of, but rather is the larger purpose of the defendant's conduct.  *See*, *e.g.*, *Prijatel v. Sifco Indus., Inc.*, 353 N.E.2d 923, 925–26 (Ohio 1974) (focusing upon utility of defendants' conduct over entire period of enterprise and noting that "defendants' forging operation [which] began in 1928 . . .  is a lawful one necessary to modern industry" even though wrongful conduct alleged was restricted to misuse of oil during "several months in 1973," when "the Hasenclever 3000 ton hydraulic forging press not infrequently did produce a peculiarly excruciating whine or squeal . . . attributable to a type of oil not suited to this particular machine"), *cited in* Restatement § 828, reporter's note.

### B. The Challenged Evidence May Be Necessary to Rebut Plaintiffs' Own Claims, Allegations, and Evidence That They Intend to Introduce at Trial.

Several of plaintiffs' experts discuss the national security aspects of Dow's and Rockwell's work at Rocky Flats in their expert reports.  Accordingly, the challenged evidence may be necessary to rebut plaintiffs' own claims, allegations, and evidence.[11]  For example, in his so-called "Overview of Rocky Flats" report submitted on November 21, 1996, plaintiffs' expert Thomas Cochran explains in detail the "nuclear weapons complex" established by the Atomic Energy Commission during the Cold War; the function of Rocky Flats within that complex; nuclear weapon design generally; different types of nuclear weapons; a "History of Rocky Flats Operations," which begins with a reference to the Manhattan Project during World War II; and Rocky Flats operations generally.  (*See* Ex. 14, Cochran Overview Report at 1–9.)  Cochran ties

---

[11]  Defendants have sought to exclude plaintiffs' proffered testimony.

the processing of fissile materials at Rocky Flats to the weapons complex and nuclear weapon production.  (*Id.* at 1–2.)  The fundamental premise of Cochran's opinion is that Dow and Rockwell failed to exercise due care in handling the materials that were part and parcel of nuclear weapon production.  (*See also* Ex. 15, Goble Report at 4 ("The Rocky Flats Nuclear Weapons Plant was established in 1951 and continued to operate until 1990.  Its primary mission was to produce atomic bombs made of fissionable plutonium that served as triggers for hydrogen bombs; numerous other military-related manufacturing activities were conducted there as well.").)

In addition, there are several specific issues on which plaintiffs' experts offer opinions that illustrate the relevance of the "national security" evidence.  As to each of those issues, defendants will seek to introduce evidence that might be construed as relating to "national security" for the purpose of demonstrating to the jury that their conduct was reasonable and that any alleged interference with the plaintiffs' use and enjoyment of their properties was not unreasonable.  Among those issues are the following:

**Site Selection** – Plaintiffs criticize the placement of the Rocky Flats plant as being unsuitable.  They have argued that Rocky Flats was "deliberately sited in close proximity to densely populated urban areas – sixteen miles northwest of downtown Denver, and closer still to the cities of Boulder, Golden, Westminster, and Arvada. . . . The facility's siting cemented the potential that a major accident or release could result in catastrophic consequences."  (Pls.' Br. on Stat. of Lim. and Other Issues, filed 8/4/04, at 16.)  Plaintiffs' experts, furthermore, have stressed the physical aspects of the site that, they contend, are responsible for much of the off-

site contamination, such as high winds and the low permeability of soil.  (*See*, *e.g.*, Ex. 16, Smallwood Report at 17–18.)

Defendants intend to present testimony at trial, primarily through Dr. Holl, that neither Dow nor Rockwell made the decision to site the Rocky Flats plant, but that the Atomic Energy Commission instead determined that it was necessary to build the Rocky Flats plant.  The AEC developed the criteria by which the site was to be selected and approved the final siting of the plant at its current location.  (*See* Ex. 17, Holl Report at 26–31.)[12]

**"Profit Over Safety"** – Plaintiffs and their experts have sounded a persistent theme that Dow and Rockwell placed corporate profits and production demands related to contracts with the U.S. government over the health and safety of Rocky Flats workers and the population living near the facility.  (*See*, *e.g.*, Ex. 14, Cochran Overview Report at 30 ("The contractors placed highest priority on meeting warhead component production quotas, and failed to exercise the due diligence and meticulous attention to detail required to insure the public's health and safety. . . . [T]he contractors placed profit ahead of public health and safety.").)

To rebut such opinions, defendants must be permitted to introduce evidence relating to the contract payment provisions, which fixed the amount of profit that defendants earned. Defendants also must be permitted to introduce evidence relating to national defense require-ments and defendants' contractual obligations to the U.S. government to fulfill those require-ments, particularly in times of war and great national need.  Dr. Holl's report directly addresses this issue and explains why, during certain times, the exigencies of the circumstances, from a

---

[12]  It is unclear whether this is evidence plaintiffs seek to preclude.

national security standpoint, made defendants' efforts to fulfill their contractual obligations to the U.S. government to deliver nuclear weapon component parts on a reasonable schedule.  (*See*, *e.g.*, Ex. 17, Holl Report at 1, 26–31, 33–38.)  Certainly, plaintiffs' experts' trial testimony on this issue makes a discussion of the national security role of the Rocky Flats plant relevant in this litigation.

**Major Release Events** – Plaintiffs may argue that certain release events at Rocky Flats – such as the 903 pad – caused the vast majority of the offsite plutonium contamination and are the major bases for their trespass and nuisance claims.  (*See*, *e.g.*, Ex. 15, Goble Report at 9 ("Plutonium was released from a waste storage area, now known as the 903 pad, from two fires in 1957 and 1969, and from accompanying routine manufacturing operations.").)  To support their nuisance claim, therefore, plaintiffs may seek to introduce evidence that such events resulted from defendants' failure to exercise proper care in handling hazardous materials, which consequently unreasonably interfered with plaintiffs' use and enjoyment of their properties.  (*See, e.g.,* Ex. 14, Cochran Overview Report at 23–25.)

To rebut this anticipated argument and evidence, defendants may seek to introduce evidence showing that such events resulted from national security needs and, therefore, were not unreasonable.  For example, plaintiffs may argue that Dow's conduct in handling plutonium led directly to the 1957 fire, which, they will further contend, caused the release of plutonium to the offsite environs.  (*See id.* at 23–24.)  Dow, to rebut this argument, would seek to introduce evidence that the particular type of plutonium that self-ignited and caused the 1957 fire was a brand new, highly experimental form of plutonium that had been specially invented and was being used because it permitted special warhead designs, which the U.S. military and U.S.

government had determined were necessary for national defense.   Indeed, plaintiffs' expert, Thomas Cochran, has identified weapons design changes—which defendants' experts will explain were dictated by the needs of the U.S. government's weapons designers—as a contributing cause of the 1957 fire.  (*See id.* at 4–6.)

Similarly, plaintiffs apparently will attempt to prove defendants' handling of plutonium caused the 1969 fire.  (*See id.* at 24.)  In particular, plaintiffs may seek to introduce evidence to the jury that the building in which the fire occurred was over-crowded with plutonium because defendants supposedly placed production demands ahead of safety, and that the fire occurred as a result of that over-crowding.  (Ex. 18, Budnitz Fire Report at 3 ("Dow Rocky Flats failed to follow through to provide an adequate complement of fire-prevention and fire mitigation capabilities; indeed, they allowed over crowding and mission pressures to contravene appropriate fire protection strategies.")  To rebut these opinions, defendants seek to introduce evidence that the way in which the U.S. government recycled nuclear weapons and sent them to Dow for reprocessing, as well as national security exigencies during a time of war and Dow's contractual obligations to the U.S. government, required Dow to process the amount of plutonium that was present in the building and, therefore, that its conduct was reasonable.

As yet another example, plaintiffs may seek to introduce expert opinions that Dow's handling of steel drums containing plutonium waste residues and cutting oils caused the releases of plutonium from the 903 pad.  (*See* Ex. 14, Cochran Overview Report at 24–25; Ex. 18, Budnitz Waste Management Report at 11 ("The story is principally one of a concerted effort to accomplish the major mission of the Rocky Flats Plant (making nuclear-weapons parts) to the neglect of proper management of the resulting radioactive wastes.").)  Defendants seek to introduce

evidence demonstrating that the nuclear weapons design change dictated by the U.S. government out of national security concerns due to the geopolitical circumstances of the time led to the build-up of drums and the subsequent release of plutonium-contaminated waste oils to the soil on the 903 pad. Again, plaintiffs' own expert, Thomas Cochran, appears to concede the role that the weapons design change played in creating the waste drum issue. (*See* Ex. 14, Cochran Overview Report at 8.) Certainly, Dow's fulfillment of its contractual obligations to the U.S. government and the needs of national security are relevant to explaining to the jury why these events occurred and why Dow was not negligent in causing them to occur.

**Secrecy** – In a variety of contexts, plaintiffs and their trial witnesses repeatedly have referred to the "secrecy" surrounding Rocky Flats and its operations. For example, plaintiffs have listed and may call Len Ackland, a University of Colorado journalism professor, to testify about "the history of the plant and the culture of secrecy concerning plant operations." (Ex. 20, E. Noteware 4/16/04 letter to E. Ahern.) At his deposition, Ackland testified about that subject:

> Q. Are you prepared to testify about the culture of secrecy concerning the Rocky Flats plant and its operations?
>
> A. Yes.
>
> Q. What does that mean to you? . . . .
>
> A. The Rocky Flats plant, from the very get-go, as you recall, it was part of what was called Project Apple, which was the search for a site to process plutonium and manufacture plutonium bombs. It was to be an industrial-scale site that would take over the job from Los Alamos. And that search began in 1950 and was secret, as most nuclear things were in those days, and things nuclear. . . . At that time, the information about Rocky Flats, what Rocky Flats would be doing, was secret. And at the news conference, the government declined to answer questions. . . . *[T]here was a culture of secrecy, of national security, that pervaded the operations of nuclear weapons facilities*. . . . So that's the beginning of what I

> mean by the culture of secrecy.  There was a secrecy throughout
> the period of production at Rocky Flats.  And in terms of what I
> mean by the culture of secrecy, secrecy breeds unaccountability.
> And the record shows a number of occasions where, ***because of
> secrecy, behavior took place that plant officials were not held ac-
> countable for***."

(Ex. 21, Ackland Dep. at 39–41 (emphasis added).)

Similarly, plaintiffs may call Thomas Cochran, one of their proposed experts, to testify at trial about "Material Unaccounted For," or "MUF" (also called by the more accurate term, "Inventory Difference" or "ID").  (*See generally* Ex. 22, Thomas Cochran, Plutonium Inventory Differences At The Rocky Flats Plant And Their Relationship To Environmental Releases" ("Cochran MUF Report".)[13]  In his MUF report, Cochran repeatedly refers to the government's system of classifying information and documents, and he specifically refers to how that system has affected his opinions.  (*See*, *e.g.*, Ex. 22, Cochran MUF Report at 1 ("[I]t should be noted that this analysis has been severely limited by the Department of Energy's (DOE's) refusal to release the following two categories of data: a) with rare exceptions inventory difference data for specific material balance areas and buildings, and b) rates of plutonium processing, or produc-tion.").)[14]

---

[13] As defendants have previously discussed, evidence relating to inventory differences or MUF is irrelevant and unduly prejudicial because it cannot be used to show class-wide exposures, class-wide increased health risks, or real and verifiable threats of future harm.  (*See* Defs.' Mot. to Exclude Evid. of "Inventory Differences".)

[14] As with evidence of "inventory differences," evidence relating to the DOE's discovery con-duct in this litigation including any classification decisions is inadmissible because it is irrelevant to the claims the Court has ruled will be tried and would be unduly prejudicial to defendants. (*See* Defs.' Mot. to Exclude Evid. of Document Classification Issues and Discovery Conduct by
(Continued…)

Plaintiffs also apparently intend to seek to present evidence relating to the supposed "culture of secrecy" that they contend surrounded Rocky Flats operations as well as the operations of the United States' nuclear weapons complex generally.  Dow and Rockwell, through the testimony of Dr. Jack Holl, intend to rebut any such purported evidence (if necessary) by presenting their own evidence about the government's classification policy – under which Dow and Rockwell were mandated to operate **by statute** – and by presenting evidence that will explain the national security basis for the need to maintain the classified nature of documents and other information.  (*See, e.g.,* Ex. 17, Holl Report at 23–25.)

### C.    National-Security-Related Evidence Is Admissible to Demonstrate the Positive Impact That Employment at Rocky Flats Had on Area Property Values.

In addition to the social utility of the Rocky Flats plant for the purpose of strengthening national security and defense, the plant also provided a social benefit to the immediate community by providing jobs for area residents.  The main reason that the Rocky Flats plant was sited in Colorado was due to the efforts of the two Colorado Senators at the time, who out of their concern to bring "jobs" and "contracts" to Colorado, engaged in what has been described as "pork barrel politics" to ensure that the facility that eventually became known as Rocky Flats was located in Colorado.  (*See* Ex. 21, Ackland Dep. at 109–110.)  The intentions of those two Senators bore fruit.  When the siting of the plant was released to the public:

> [T]he response from [public] officials and the local press was highly favorable. Elected officials and the public-at-large understood that the new plant would not only be an economic boon to the Denver area but also would contribute to the na-

---

DOE.)Plaintiffs should not be permitted to comment at trial on the unavailability of documents based on the DOE's classification determinations.  (*Id.* at 5–6.)

tional defense effort.  'There's Good News Today,' the Denver Post announced in bold face headlines.  "U.S. TO BUILD $45 MILLION A-PLANT NEAR DENVER."

(Ex. 17, Holl Rep. at 30–31.)  Indeed, as Dr. Holl notes, construction and expansion at Rocky Flats occurred at a steady pace during the 1950s, with construction contracts valued in the tens of millions of dollars.  (*Id.* at 36–37.)  The Rocky Flats plant provided tremendous employment to the surrounding area, with employment (during the production years) reaching nearly 6,000 by the late 1980s.  (*Id.* at 37.)  "This employment made the Rocky Flats Plant one of the largest employers in the Denver area and exerted a powerful economic influence on the growth and development of surrounding communities."  (Ex. 1, Dorchester Rep. at 2-3.)  That was true not only because of the sheer number of local residents that the Rocky Flats plant employed but also because the jobs were high-salary positions, paying well above the average annual salary earned by most Denver-area residents.  (*Id.* at 2-6.)

   **D.    Plaintiffs Have Made No Showing That Evidence Relating to the National Security Aspects of Rocky Flats Operations Is "Unduly Prejudicial" under Fed. R. Evid. 403.**

   Plaintiffs claim that national security-related evidence should not be admitted because it would be "prejudicial."  The sole cause of any prejudice that plaintiffs identify in their moving papers is that such evidence supposedly would "divert the jury with debates over the value of nuclear weaponry during the Cold War."  (Pls.' Mot. at 11–12.)  Plaintiffs fail to cite the correct standard for assessing admissibility under Fed. R. Evid. 403, and they fail to explain how national security-related evidence would be inadmissible under the proper Rule 403 analysis.  Plaintiffs cannot show that the probative value of national security evidence "***is substantially***

*outweighed by* the danger of *unfair* prejudice . . . ."  Fed. R. Evid. 403 (emphasis added); *see also Tan*, 254 F.3d at 1211; *Deters*, 202 F.3d at 1274.

Any possible prejudice caused to plaintiffs by defendants' evidence relating to the importance to national security of their operations at Rocky Flats would not be "unfair" to plaintiffs, especially where their own experts repeatedly refer to the Rocky Flats "mission" and deem it helpful and relevant to discuss issues relating to nuclear weapon production in rendering their *own* opinions.  Plaintiffs have articulated no reason why any prejudice to their case stemming from national security evidence is somehow unfair.  It cannot be said that defendants' evidence on the issue is "unfairly" prejudicial simply because it is presented differently than plaintiffs' evidence on the same topic.

In any event, any potential "unfair" prejudice would be outweighed by the probative value of the evidence.  Plaintiffs are pursuing a negligence-based nuisance case against defendants.  Plaintiffs seek to prove that defendants' actions at Rocky Flats were unreasonable and were not undertaken with due care.  Defendants, on the other hand, seek to demonstrate that their actions were reasonable and were undertaken in the context of the processes, technologies, and demands placed on defendants by the U.S. government and its national security needs, including during times of war and national emergency.  Defendants will, therefore, seek to show the jury that their conduct, under the circumstances, was reasonable.  Moreover, plaintiffs' nuisance claim expressly requires considering the social utility of the activity that supposedly caused them harm.  Defendants' national-security-related evidence thus is critical to rebut any showing that the interference with the use and enjoyment of their properties outweighed the social utility of

Rocky Flats operations.  In sum, national-security-related evidence is relevant and its probative value outweighs any potential unfair prejudice.

## VII.    CONCLUSION

For the foregoing reasons, plaintiffs' omnibus motion in *limine* should be denied in all respects.

Dated:  July 8, 2005                                   Respectfully submitted,


                                                       /s/Joseph J. Bronesky
                                                       Joseph J. Bronesky
                                                       SHERMAN & HOWARD LLC
                                                       633 Seventeenth Street, Suite 3000
                                                       Denver, CO  80202
                                                       (303) 297-2900

                                                       David M. Bernick
                                                       Douglas J. Kurtenbach
                                                       KIRKLAND & ELLIS LLP
                                                       200 E. Randolph Drive
                                                       Chicago, IL 60601
                                                       (312) 861-2000

                                                       Attorneys for Defendants ROCKWELL INTER-
                                                       NATIONAL CORPORATION and THE DOW
                                                       CHEMICAL COMPANY

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on July 8, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

       Merrill Davidoff, Esq.
       Peter Nordberg, Esq.
       Berger & Montague, P.C.
       1622 Locust Street
       Philadelphia PA 19103-6365

       Gary B. Blum, Esq.
       Silver & DeBoskey
       The Smith Mansion
       1801 York Street
       Denver, Colorado  80206

                  <u>/s/Sharon Brookshire</u>