# EXHIBIT 1

# Report of
# John D.
# Dorchester, Jr.
## for the
# Rocky Flats
# Litigation

NOVEMBER 22, 1996

THE DORCHESTER GROUP, L.L.C.
7650 E. REDFIELD / SUITE D-7
SCOTTSDALE, ARIZONA 85260
(602) 596-8393

The Dorchester Group, L.L.C.

and was more than one mile from the nearest roadway, Highway 93 to the west. No access existed at that time to the eastern side of the Plant.

The Plant site drains into Woman Creek on the south and into Walnut Creek on the north. Woman Creek flows into Mower Reservoir before leaving the Plant's easterly boundary. Walnut Creek flows into nearby Great Western Reservoir east of the Plant. Figure 2-1, taken from the ChemRisk report, illustrates the site's location and its relationship to surroundings at the time it was selected.

Rocky Flats served as one of what was eventually seventeen plants and laboratories that were owned by the Atomic Energy Commission ("AEC")—now the Department of Energy ("DOE"). The Rocky Flats facility had two basic missions during its operating history. First, it was responsible for manufacturing and rebuilding of triggers ("pits") for nuclear weapons. Second, the Plant was used to reprocess retired weapons for plutonium recovery. These activities involved the purification, processing, machining and preparation of plutonium, uranium, beryllium and numerous other materials.

The boundaries of the Rocky Flats site were expanded to approximately 6,568 acres (10.26 square miles) between 1974 and 1976, with the addition of 4,008 acres as a second buffer zone around the former Plant and buffer lands. A Rocky Flats site plan is shown in Figure 2-2.

In July 1975 the operating contract for the Plant was transferred to Rockwell International Corporation, who continued in that capacity until 1990, when they were succeeded by EG&G. In 1992 production of W-88 warheads for Trident submarine based missiles was canceled, thus effectively ending Rocky Flat's production role in the U. S. weapons complex for the time.

**Economic Impacts and Other Rocky Flats Plant Evaluations**

When the Rocky Flats site was selected it was welcomed by local civic and government officials because it was expected to create more than 2,000 temporary construction job and 1,000 permanent positions.[4] As shown in Figure 2-3, Plant employment actually grew at a relatively steady rate to about 3,800 in 1970. After declining to a low of about 2,700 workers in 1975, employment rose steadily to about 3,800 in 1980 and about 6,000 in 1984. This employment made the Rocky Flats Plant one of the largest employers in the Denver area and exerted a powerful economic influence on the growth and development of surrounding communities.

---

[4] Colorado Council on Rocky Flats. *The Handbook on Rocky Flats*, (Colorado Council on Rocky Flats, January 1993), p. 10.

The Dorchester Group, L.L.C.

**Figure 2-3**

Employment at Rocky Flats



The economic importance of these jobs is magnified by the high wage rates paid to the Rocky Flats work force, including a high proportion of scientists, engineers, chemists, and other professional and highly skilled jobs. The average annual wage rate at this Plant in 1992 was $43,500.[5] This compares with $26,273 for the Denver CMSA.[6]

Many economic, social, and environmental studies have been published regarding Rocky Flats over its history. Findings from a number of these reports that further an understanding of Rocky Flats' contributions to the area are summarized below:

---

[5] Colorado Council on Rocky Flats. *The Handbook on Rocky Flats,* (Colorado Council on Rocky Flats, January 1993), p. 14.

[6] U.S. Bureau of the Census. *Statistical Abstract of the United States: 1993* (113ed) Washington D. C. 1993; Table 670, p. 425.

**The Dorchester Group, L.L.C.**

## Chapter 3: Relevant Analysis Foundations

**Overview**

Plaintiffs in the Rocky Flats litigation claim compensable economic harm to real property due to defendants' operations and management of the Rocky Flats Plant. Regardless of what general or specific assertions may be raised by the plaintiffs' property experts in forthcoming reports, there are a number of foundational issues and methods that should be understood as a background to our work, and as a basis for evaluating the work of the plaintiffs' experts that we have yet to receive.

This chapter provides a survey of matters that are important to the establishment of compensable economic harm, what is known of the plaintiffs' economic harm assertions, possible methodologies that may be used to support such assertions, and the approaches we applied in the work summarized in this report.

**"Damages" and Compensability**

Although the layman's word "damage" is often applied in estimating compensation due from one party to another, the case at hand requires a supportable demonstration that an action or actions of the defendants caused economic harm to the property of the plaintiffs. The concept of economic harm requires an acceptable standard against which such harm can be measured, and from which other possible adverse economic influences that are not attributable to defendants' actions may be discerned.

*Market Value* is a long established standard commonly applied in controversies involving economic harm to property and is the appropriate standard in this litigation. *Market Value* is defined as:

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. Buyer and seller are typically motivated;

2. Both parties are well informed or well advised, and acting in what they consider their best interests;

3. A reasonable time is allowed for exposure in the open market;

4. Payment is made in terms of cash or in terms of financial arrangements comparable thereto; and,

The Dorchester Group, L.L.C.

provides bases for the understanding of particular properties and locales as well.

**Economic Cycles and Inflation**

Business cycles are a normal and expected outgrowth of free markets and the overall design of the United States economy. They result from many causes, but their effect is to encourage construction and the purchasing of real estate during upswings of the economy, and to discourage construction and purchasing activity during downswings.

Economic or business cycles are actually more complex than they may seem without further study. What is important for our analysis is simply that business cycles have occurred over time as shown in Table 4-1, and they can be graphically illustrated as shown in Figure 4-1.

**Table 4-1**
**Business Cycle Expansions and Contractions—Months of Duration:**
**1919-1994**

| Business Cycle Reference Date | | Contrac-tion (trough from previous peak) | Expan-sion (trough to peak) | Length of Cycle | |
|---|---|---|---|---|---|
| Trough | Peak | | | Trough from prev-ious trough | Peak from prev-ious peak |
| March 1919 | January 1920 | [1] 7 | 10 | [2] 51 | 17 |
| July 1921 | May 1923 | 18 | 22 | 28 | 40 |
| July 1924 | October 1926 | 14 | 27 | 36 | 41 |
| November 1927 | August 1929 | 13 | 21 | 40 | 34 |
| March 1933 | May 1937 | 43 | 50 | 64 | 93 |
| June 1938 | February 1945 | 13 | 80 | 63 | 93 |
| October 1945 | November 1948 | 8 | 37 | 88 | 45 |
| October 1949 | July 1953 | 11 | 45 | 48 | 56 |
| May 1954 | August 1957 | 10 | 39 | 55 | 49 |
| April 1958 | April 1960 | 8 | 24 | 47 | 32 |
| February 1961 | December 1969 | 10 | 106 | 34 | 116 |
| November 1970 | November 1973 | 11 | 36 | 117 | 47 |
| March 1975 | January 1980 | 16 | 58 | 52 | 74 |
| July 1980 | July 1981 | 6 | 12 | 64 | 18 |
| November 1982 | July 1990 | 16 | 92 | 28 | 108 |
| March 1991 | (X) | 8 | (X) | 100 | (X) |
| Average, all cycles: | | | | | |
| 1919 to 1945 (six cycles) | | 18 | 35 | 53 | 53 |
| 1945 to 1991 (nine cycles) | | 11 | 50 | 61 | 61 |

X Not applicable. [1] Previous peak: August 1918. [2] Previous trough: December 1914.
Source: Statistical Abstract of the United States 1995, Table No. 880. Business Cycle Expansions and Contractions—Months of Duration: 1919 to 1994

The Dorchester Group, L.L.C.

**Figure 4-1**

**Business Cycles**



For the time periods most proximate to the Rocky Flats litigation, the Denver area began a period of economic contraction in 1982-83 that continued until about 1989-90. This response to overall economic trends around the United States was exacerbated by changes in oil prices which significantly affected many Denver area businesses during this time, a period of overbuilding in the early-1980s that led to real estate over supply, and structural changes in real estate investments such as the Tax Reform Act of 1986. Since the early 1990s, the Denver area has rebounded.

Another measure which is important to understanding real estate pricing and purchasing power is the Consumer Price Index ("CPI"). Figure 4-2 illustrates quarterly CPI data between 1960 and 1994, also showing the annual rate of inflation these data represent

Mortgage interest rates are also a crucial factor in real estate analyses, and have substantial effect on real estate development and community growth. Average real estate mortgage interest rates for single family homes during the period 1978 to 1993 are shown in Figure 4-3.

**Denver Area Community Development**

Denver is located on the South Platte River in the north central part of the State of Colorado. Situated on a prairie landscape at an elevation of about one mile above sea level, Denver is on the western edge of the Great Plains and the Front Range of the Southern Rocky Mountains which rise abruptly

**The Dorchester Group, L.L.C.**



**Figure 4-2**
**CPI and Indicated Inflation: 1960-1994**

Source: Statistical Abstract of the United States 1995



**Figure 4-3**
**Single-Family Home Mortgage Interest Rates: 1978–1995**

Source: National Association of Homebuilders, TDG

**The Dorchester Group, L.L.C.**

compare with residential, commercial, or industrial income-producing properties such as those on Wadsworth Parkway or in the Interlochen project for example. Similarly, the Field Corporation and Bank Western properties are not directly comparable with those of the other Representative Plaintiffs. Thus, from a real estate perspective, we find no basis in the plaintiffs' claims that any economic harm that might be found on the properties of the Representative Plaintiffs can, by comparison, be extended to the remainder of the property class.

*Merilyn E. Cook*

It appears that Mrs. Cook's claim relates solely to the 12-acres at 14088 West 96th Avenue owned on June 7, 1989. Prior to that time Mrs. Cook had been an active market participant in the purchase and sale of Rocky Flats area lands dating back to at least 1975. These activities, and her interaction with others, provided her with significant market experience and, presumably, market knowledge.

There is a good deal of record regarding Mrs. Cook's real estate activities prior to June 1989. Mrs. Cook says that she makes no claims that Rocky Flats operations caused economic harm to any of her properties other than the 14088 W. 96th Avenue property. It is significant, however, to observe that of the six approximately 12-acre segments that were originally a part of the property Mrs. Cook owned at the southeast corner of 96th Avenue and Indiana Street, three were foreclosed upon and one was sold to Mr. and Mrs. Babb. If Rocky Flats were not a problem prior to June 1989, it is difficult to understand why, without more specific evidence, after four foreclosures on other portions of her land, Rocky Flats would suddenly be a source of economic harm after June 7, 1989.

Our economic studies show that in general the Rocky Flats environs reached the bottom of an economic downturn in 1988-1989. Rural and semi-rural properties are commonly the first to be adversely affected in periods of general market downturn and usually lag behind more urban properties when economic recovery occurs.

It is not at all unlikely, therefore, that if one were experiencing personal economic difficulties in 1988-1989 and needed to look to a sale of the 12-acre Cook property in June 1989 to satisfy real property or other debt, buyers might be scarce and prices would be less favorable than those in better market periods.

It is also not inconceivable that certain prospective purchasers, or "lookers" as some are called in the real estate trade, might cite Rocky Flats as a basis for their not purchasing a property. Market downturns tend to encourage some individuals to look for properties owned by people who are economically distressed under the adage, "buy low and sell high." Casual or anecdotal information about possible prospects



Figure L–3

Actual and Estimated Mean Price in the Metropolitan Area Based on Trend and Cycle
Forecasts: 1973–1994

Source: Denver MLS and TDG