**EXHIBIT 6**

```
                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF LOUISIANA

MARILYN COOK, et al.,        )(
                             )(
    Plaintiffs,              )(
                             )(
VS                           )(      CASE NUMBER 90-K-181
                             )(      USDC District of Colorado
ROCKWELL INTERNATIONAL       )(
CORPORATION and the          )(
DOW CHEMICAL COMPANY,        )(
                             )(
    Defendants.              )(
```

VIDEOTAPED ORAL DEPOSITION OF ROY E. THIGPEN

NOVEMBER 20, 2004

# COPY

VIDEOTAPED ORAL DEPOSITION OF ROY E. THIGPEN, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and above-numbered cause on the 20th day of November, 2004, from 10:04 a.m. to 12:45 p.m., before Lisa J. Gretarsson, CSR in and for the state of Texas, reported by machine shorthand, at the residence of Roy E. Thigpen, 826 Voss Road, located in the city of Houston, state of Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record.

11/20/2004 Thigpen, Roy

```
              PREVIOUSLY MARKED COOK EXHIBITS
EXHIBIT                                              PAGE
114  Commercial Contract To Buy And Sell Real
     Estate, dated October 18, 1984..................  62

115  Appraisal of Triple "C" Farms...................  48

116  Appraisal of 14208 West 96th Avenue, Parcel #B..  50

117  Appraisal of 14328 West 96th Avenue.............  51

118  Appraisal of 9650 Indiana Street Vacant Land....  51

120  Letter to Denver West Bank & Trust, from
     Robert M. Snyder, dated March 6, 1987...........  52
144  Lease Agreement.................................  76
145  Worksheet For Real Estate Settlement............  12
          (previously marked exhibit index concluded)
```

00006

---

11/20/2004 Thigpen, Roy

P R O C E E D I N G S

THE VIDEOGRAPHER: We're now on the record. Today is November 20th, 2004. The time is approximately 10:04.

ROY E. THIGPEN, having been first duly sworn, testified as follows, to wit:

EXAMINATION

BY MR. BAKKE:

Q. Mr. Thigpen, could you state your name for the record.

A. Roy Thigpen.

Q. Where do you live, Mr. Thigpen?

A. My permanent address is Carmel Loop, Mansfield, Louisiana.

Q. What's the address?

A. It's Highway 509, at Carmel Loop, Mansfield, Louisiana 71052.

Q. Have you ever been deposed before, Mr. Thigpen?

A. Yes.

Q. You probably know how it works, then. I will ask questions, and Ms. MacNaughton-Wong may interpose objections, but you're still to answer the question, and those objections will be --

A. Yes.

00007

---

11/20/2004 Thigpen, Roy

Q. -- dealt with later by the Court, and the same when she's asking questions if I object.

A. Yes.

Q. What I want to talk today about primarily is any land deals that you had with Ms. Cook. Have you ever been involved in any land deals with Ms. Cook?

A. Yes.

Q. Was one of the land deals that you undertook with Ms. Cook related to her horse property at 14088 96th Avenue in Jefferson County, Colorado, sometime in late 1984?

A. I presume that's the correct address. There was only one. I don't recall the exact address. It was, I believe, in the city of Arvada, Colorado.

Q. Did you purchase Ms. Cook's horse property in Arvada in late 1984?

A. Yes, or one of the corporations that I own purchased it, or I purchased it personally. I don't recall how the title was structured.

Q. I'm going to get into some of the details of that transaction of the horse property later, but I want to get some generalities about it first.

Did you or your corporation spend any significant amount of money in purchasing the Cook horse property?

00008

---

11/20/2004 Thigpen, Roy

A. No out-of-pocket cash other than the loan proceeds from the bank.

Q. And what do you mean by "the loan proceeds from the bank"?

A. Well, there was a loan made at -- at a bank in Denver, and I guess technically those funds came to me and then passed on through. I did not bring any money from my side to the table.

Q. Did you ever intend to live on the horse property you bought from Ms. Cook?

A. Not to my recollection, no.

Q. Did you intend to use the Cook property at 96th Avenue yourself in any way?

A. I don't recall making any statements to that effect, and I don't believe so.

Q. Did you purchase the Cook property, Cook horse property, as an investment vehicle?

A. It was primarily at the request of Ken Shepherd.

Q. And when you say it was at the request of Ken Shepherd, why did you purchase that -- that --

A. Ken Shepherd and I were doing other transactions in Missouri, and Ken Shepherd contacted me about buying this, as I recall primarily to help Marilyn Cook consolidate some outstanding debts, and I agreed to do it.

Q. What was -- what understanding did you reach

00009

11/20/2004 Thigpen, Roy

1  with Mr. Shepherd about what role you would have, on an
2  ongoing basis, with Ms. Cook's horse property, after you
3  arranged for the loan?
4      A.  It was to be a very passive interest. Merilyn
5  Cook was to maintain physical possession of it and operate
6  her facility. And then at some point, Ken Shepherd or
7  Merilyn Cook, or some other party possibly, would take me
8  out.
9      Q.  What was the relationship between Mr. Shepherd,
10 who contacted you about the property, and Ms. Cook, who
11 you were -- who owned the property, when you were
12 purchasing that property?
13     A.  They were very close friends.
14     Q.  Now, the loans that you took out from the bank
15 related this transaction, did you have any personal
16 liability, or did your corporations have any liability
17 under those loans?
18     A.  Yes. To my recollection, we did.
19     Q.  So they were loans they could -- the bank could
20 seek recourse against you or your corporation to pay?
21     A.  To my recollection, that's correct.
22     Q.  Let's go back to the time when you were first
23 contacted. Where did you live in late 1984 when
24 Mr. Shepherd contacted you about the Cook property?
25     A.  In '84, I maintained a residence, which was my

00010

11/20/2004 Thigpen, Roy

1  permanent residence, in Shreveport; although, I was
2  spending most of my time between Tulsa and Joplin,
3  Missouri.
4      Q.  What was your primary business at that time, in
5  late 1984?
6      A.  During that time -- well, during that time
7  frame, '84/'85, I owned a number of hotels in Tulsa and
8  Missouri, and other real estate as well.
9          And it seems that maybe I purchased some
10 property, that Ken Shepherd owned an interest in, in
11 Missouri, and that was the beginning of our relationship.
12     Q.  Is that -- that original purchase of property
13 with Mr. Shepherd in Missouri, was -- was that the first
14 time you met Mr. Shepherd?
15     A.  I don't recall if it's the first time. If it
16 was earlier, it would've been a short time earlier, maybe
17 a matter of a few weeks or few months, at the most.
18     Q.  Were you aware of what Mr. Shepherd's business
19 was at that time?
20     A.  I knew that he had a furniture and liquidation
21 company, and also had real-estate holdings, to some
22 degree.
23     Q.  After Mr. Shepherd first contacted you about
24 purchasing Ms. Cook's property to consolidate her loans,
25 what happened next, related to that property?

00011

11/20/2004 Thigpen, Roy

1      A.  To the Arvada property?
2      Q.  Yes.
3      A.  I don't recall specifics. Although, I told Ken
4  that he would have to make the arrangements for the loan.
5  I was not willing to go to my bank and make a loan; that
6  he would have to find the loan in Denver, and that I would
7  use our financial statements to qualify for the loan.
8      Q.  Did Mr. Shepherd do that? Did he arrange for a
9  loan?
10     A.  Yes. The loan was arranged, and I -- I was in
11 touch with the bank through mail or through the phone. I
12 don't recall ever going to the bank prior to the closing.
13 If I did go to the bank, it was just a very brief courtesy
14 call to become acquainted.
15     Q.  Before the closing --
16         MR. BAKKE: Well, strike that.
17 BY MR. BAKKE:
18     Q.  Did the closing take place in -- somewhere near
19 Denver, in Colorado?
20     A.  Yes.
21     Q.  Before the closing date, did you ever go and
22 look at the property?
23     A.  Best of my recollection, I drove to the property
24 one time with Ken and just drove into it. I don't think
25 we went inside the barns or any of the mobile homes. Just

00012

11/20/2004 Thigpen, Roy

1  drove to it, saw where it was.
2      Q.  Was that a different time than the closing date,
3  or was it the same trip?
4      A.  Don't know. I was in Denver on a regular basis.
5  During this time, I also owned a hotel in Monument, so I
6  was in Denver on a regular basis.
7      Q.  So is it correct that you didn't make any trips
8  to Denver or Arvada purely to see the property, it was
9  part of other business you were doing?
10     A.  I don't remember that.
11     Q.  I'm going to hand you a copy of what has
12 previously been marked Cook Exhibit 145. Do you recognize
13 the document that's Cook Exhibit 145?
14     A.  No. I have no memory of the document, other
15 than I see it says it's a settlement sheet, and I have no
16 reason to believe otherwise.
17     Q.  If you look through the settlement sheet, it --
18 it shows -- Cook Exhibit 145 indicates that the purchase
19 price for Ms. Cook's property was $770,000. Does that
20 sound correct to you? Is that about what you recollect
21 the purchase price being?
22     A.  I don't recall the exact figures. What's stuck
23 in my mind or sticks in my mind is the fact there was a
24 $500,000 or so loan to the bank, Colorado National Bank.
25     Q.  Cook Exhibit --

00013

11/20/2004 Thigpen, Roy

1  A.  This is probably correct, but I just don't
2  recall it.
3  Q.  Cook Exhibit 145 shows two different notes.
4  One, a note to the bank for $510,000
5  A.  Okay.
6  Q.  -- and then a note, as you can see, to Ms. Cook,
7  seller --
8  A.  Right.
9  Q.  -- for $270,000.
10  A.  Right.
11  Q.  Does that refresh your recollection, that there
12  were two separate notes, one to the bank and one to
13  Ms. Cook?
14  A.  I don't recall there being two notes, but there
15  were probably two notes.  I just don't recall it.  It's
16  been so long ago.
17  Q.  Now, Cook Exhibit 145 shows that the balance due
18  from the buyer, which would be you, the very bottom there
19  is $188.
20  A.  All right.
21  Q.  Is that about what you remember bringing to the
22  table?
23  A.  I don't really remember bringing that much, but
24  I knew it was quite small.
25  Q.  Now, before, you had stated that the purpose, as

00014

11/20/2004 Thigpen, Roy

1  you understood it with Mr. Shepherd, of buying this
2  property from Ms. Cook, was to allow Ms. Cook to
3  consolidate her debts.
4  A.  That's -- that was my understanding.  I don't
5  know that it was told to me exactly like that or -- but
6  that was my understanding, that it would help her in her
7  business and such, so I agreed to it.
8  Q.  Now, was that the understanding that you got
9  from Mr. Shepherd, or from Ms. Cook, or both?
10  A.  I would say 98 percent of my conversations were
11  with Ken Shepherd.  I talked to Merilyn Cook very little
12  about the transaction.
13  Q.  What I was going to ask is:  If you were
14  attempting to consolidate -- to get -- to get a loan with
15  your income statements on the property, why were you also
16  giving a -- a note to Ms. Cook, as part of the
17  transaction?
18  A.  I have no idea why it was structured like that.
19  Q.  Did you ever have an intention of paying
20  Ms. Cook the $270,000 on the note?  What was your
21  understanding about that, as you did this transaction?
22  A.  Well, Ken Shepherd had agreed to arrange that
23  I'd be taken out down the line, so that I  in my mind,
24  even though I had actual liability to the bank, I had Ken
25  Shepherd's agreement to take me out on the other side.  So

00015

11/20/2004 Thigpen, Roy

1  it was a wash, in my mind, at that time.
2  Q.  Other than whatever kind of appraisal the bank
3  may have done to run through this loan, did you do any
4  investigation into property values in or about at the time
5  or whether this was an appropriate price for this
6  property?
7  A.  I was given some type of appraisal.  I'm not
8  sure what it was.  It was some type of valuation report or
9  appraisal, or something.
10  Let me back up just one moment on this
11  270,000.
12  Now, there were some other properties
13  involved besides the farm.  There were two condos out at
14  Eagle Vale, and that 270 may have been related to those
15  condos.
16  Q.  I was going to ask you that later, but I'll go
17  ahead and ask you now.
18  What other land and land swaps and trades
19  were involved in this transaction, to the degree you can
20  recall it?
21  A.  There were two condos at Eagle Vale.
22  Q.  And whose condos were those?
23  A.  I think they belonged to Merilyn or to Merilyn
24  and Ken jointly.  I'm not sure the titles, but they were
25  in this transaction.

00016

11/20/2004 Thigpen, Roy

1  Q.  And what role did the condominiums in Eagle
2  Vale, Colorado, have in this transaction relating to
3  Ms. Cook's horse property?
4  A.  Well, they weren't directly related to the horse
5  property, other than I believe I was to buy those with the
6  same understanding, that Ken Shepherd would take those
7  back at some point.
8  Q.  Did -- did you discuss with Mr. Shepherd --
9  MR. BAKKE:  Well, strike that.
10  BY MR. BAKKE:
11  Q.  Did you personally have any interest in owning a
12  horse property in Colorado in 1984/1985?
13  A.  Well, I owned another horse property at that
14  time in Colorado.  I owned 200 acres down at Parker.  But
15  I didn't -- decided not to keep it and I sold it.
16  So -- my interest tends to come and go
17  pretty quick, so -- I never intended to live at Arvada,
18  certainly never intended to operate a horse facility.
19  Q.  Well, was it your intention to resell this
20  property at a profit, the Cook property, or was that --
21  was whatever profit down the line was going to be made off
22  the property, if any, going to be realized by Ms. Cook or
23  possibly Mr. Shepherd?
24  A.  My intent was for Ken Shepherd to take the
25  property from me at some point.  And whether it was titled

00017

11/20/2004 Thigpen, Roy

1  back to Merilyn or to Ken directly, I didn't know, but I
2  was intending for Ken Shepherd to take me out.
3    Q.  Now, the bank note for approximately $500,000,
4  that loan, I assume -- is it correct that there were
5  monthly payments that would have to be made on that note?
6    A.  I don't recall that.
7    Q.  Do you recall if there's any understanding
8  between you and Ms. Cook regarding who would make any
9  monthly payments to service the debt on the property for
10 the bank?
11   A.  Yes.  My recollection and understanding was that
12 she would maintain possession of the horse farm, and the
13 payments would come from Merilyn or Ken as lease payments
14 in an amount equal to the payments on the note.
15   Q.  Did you reach that understanding about payments
16 on the note with Mr. Shepherd, with Ms. Cook, or both?
17   A.  I did all my negotiations, or the vast majority,
18 with Ken Shepherd.
19   Q.  Did you put any of your understandings about
20 what would happen going into the future with the horse
21 property --
22       MR. BAKKE:  Strike that.
23 BY MR. BAKKE:
24   Q.  Did you and Mr. Shepherd memorialize, in
25 writing, any of your understandings or agreements about

00018

11/20/2004 Thigpen, Roy

1  the horse property you were purchasing from Ms. Cook?
2    A.  I don't recall.
3    Q.  What was the time frame under which you were
4  going to return full ownership and title of the horse
5  property, that you purchased from Ms. Cook, back to
6  Ms. Cook or to Mr. Shepherd?
7    A.  I don't recall.
8    Q.  Was it -- was it ten years or one year?  What
9  was your understanding, in general, about the time frame?
10   A.  It was to be a shorter term than ten years.  It
11 would've probably been more six months to a year, maybe
12 two years max, when everything was arranged where the --
13 they had a loan for it and such, but it was not a
14 long-term situation.  And I certainly wasn't going to sit
15 there and make the payments while Merilyn maintained
16 possession of the property.
17   Q.  Why was it that --
18       MR. BAKKE:  Well, strike that.
19 BY MR. BAKKE:
20   Q.  Why did -- what did Mr. Shepherd convey to you
21 about why he wanted you to purchase the property and get
22 the loan, as opposed to why he or Ms. Cook would not just
23 get the loan on the property?
24   A.  It was possibly because Ms. Cook had had some
25 financial difficulties, or at least she didn't have enough

00019

11/20/2004 Thigpen, Roy

1  financial strength to get the loan.
2       And Ken may have been going through a
3  divorce, or some such problem, at that time, and he didn't
4  want to get that involved, get this involved with that
5  problem.  I'm not sure about that, but it was just a
6  better situation for me to buy it.
7    Q.  What were the circumstances under which you
8  turned the property back over to Ms. Cook?
9    A.  Physically, or by title?
10   Q.  By title.  I assume -- well, first, physically,
11 she always had possession, correct?
12   A.  Right.  Right.
13   Q.  So title, when did you turn the title back over
14 to Ms. Cook?
15   A.  Ken Shepherd got in touch with me, and Ken was
16 going to pay it off on her behalf, or make arrangements
17 for it in some manner, and I signed the deed over, and
18 that was basically the end of it.
19   Q.  Between when you purchased the property and
20 obtained the loan on it in late 1984, and when you deeded
21 it back to Ms. Cook, did you have any interaction with the
22 property or with the banks or with Ms. Cook at all
23 relating to the property?
24   A.  I don't recall any.  That's not to say that
25 there weren't some minor discussions, but nothing major.

00020

11/20/2004 Thigpen, Roy

1    Q.  When you -- when you gave the title back to
2  Ms. Cook, was that -- was everyone agreed about how that
3  was going to work, you and the bank, Ms. Cook,
4  Mr. Shepherd, or were there any concerns, were any of the
5  parties unhappy about how that worked out?
6    A.  I don't recall if anyone was unhappy.  I don't
7  think -- I was not there.
8       And I think, at the time, I came -- or I
9  got a little upset that Merilyn had possession and wasn't
10 paying anything.  And then the bank had sent me notices
11 and I had to get a little tough to, you know, do
12 something, or make the other side do something.
13      So, yes, there were probably some people
14 that weren't happy.  It was just a situation that there
15 was a lot of money owed, and Merilyn wanted to get the
16 farm back, and I didn't want to have to pay, and so there
17 were probably some people unhappy.
18   Q.  When you said you had to get tough with the
19 other side, do you mean that was with Ms. Cook and
20 Mr. Shepherd, to get them to take the property back as
21 they had agreed to?
22   A.  Well, I don't think -- there weren't -- there
23 weren't any harsh words.  But as I recall, I said
24 something to Ken that, you know, Merilyn's not going to
25 pay, and she's got possession, and this has got to be

00021

## 11/20/2004 Thigpen, Roy

1  Shreveport. On April 11th, Thigpen transferred the funds
2  to the account of Florida Investments."
3     A.  Uh-huh (affirmative).
4     Q.  "On April 13th, 1978, Thigpen received a check
5  for $87,730.64 from Florida Investments. On April 13th,
6  1978, the sum of $77,730.64 was deposited in a savings
7  account of Thigpen as an agent for Florida Investments.
8  On April 14th, this sum was withdrawn by Thigpen, thus the
9  entire purchase price of the timber went to Thigpen."
10    A.  Okay.
11    Q.  Are these events correct?
12    A.  I don't recall, but possibly.
13    Q.  Did you, in fact, withdraw the purchase price of
14 the timber from the bank accounts of these various
15 corporations that you owned?
16    A.  I don't recall, but it's possible.
17    Q.  When the Plaintiffs in this case filed this
18 lawsuit claiming that you had -- excuse me -- the
19 Plaintiffs being Vancouver Plywood Company -- filed this
20 lawsuit claiming that you had defrauded them out of the
21 purchase price of the timber rights on that land --
22    A.  Uh-huh (affirmative).
23    Q.  -- did you attempt to shield yourself from
24 liability by claiming that the transaction was done by
25 your corporations that you owned?

00042

## 11/20/2004 Thigpen, Roy

1        MR. BAKKE: Objection to the form.
2     A.  I have no idea, no recollection.
3  BY MS. MacNAUGHTON-WONG:
4     Q.  Would you please look at page 6, the last page
5  of this document.
6     A.  Okay.
7     Q.  Second -- second column, first full paragraph.
8     A.  Okay.
9     Q.  The record reflects that Thigpen concealed facts
10 known to him, which if known to Vancouver would have
11 prevented the sale, with the intent to take unjust
12 advantage of Vancouver by insulating himself from personal
13 liability for return of purchase price. The assets of the
14 two corporations used were clearly not substantial.
15 Thigpen, the sole owner of the two corporations, used both
16 corporate structures to avoid personal liability.
17       MR. BAKKE: I object. You misread that.
18       I also object to reading repeatedly from
19 documents to the witness.
20 BY MS. MacNAUGHTON-WONG:
21    Q.  Does that refresh your recollection, that you
22 tried to avoid liability?
23    A.  No, it does not. That's not true.
24    Q.  But that is what the trial judge found.
25    A.  That's beside the point. It's not true.

00043

## 11/20/2004 Thigpen, Roy

1     Q.  Did you, in fact, pay on that judgment?
2     A.  I paid in full. Promptly paid in full.
3     Q.  Have you ever declared bankruptcy?
4     A.  Yes.
5     Q.  When was that?
6     A.  I filed in 1977 or so. Then there was an
7  involuntary bankruptcy in 1986.
8     Q.  That was a personal bankruptcy?
9     A.  Uh-huh (affirmative).
10    Q.  I'd like to go back to the transaction with
11 Merilyn Cook.
12       Do you recall the name of the bank that
13 loaned you the $500,000 to buy the Cook property?
14    A.  It was Colorado National Bank, as I recall.
15    Q.  Did Colorado National Bank order the appraisal
16 of the Cook property?
17    A.  I have no idea.
18    Q.  Did you order the appraisal of the Cook
19 property?
20    A.  I don't think I did anything. I was just a
21 front man for Merilyn.
22    Q.  In your experience, do banks usually want to
23 have control over the appraiser who goes out to check out
24 a property that they're about to give a substantial loan
25 on?

00044

## 11/20/2004 Thigpen, Roy

1     A.  Merilyn had some kind of control over the
2  banker, and for some reason that banker had an obligation
3  to make this loan with no questions asked.
4     Q.  What kind of control over the banker are you
5  talking?
6     A.  I don't know.
7     Q.  Do you have any proof that Merilyn Cook had
8  control over a banker?
9     A.  I'm giving you my recollection.
10    Q.  What is that recollection based on?
11    A.  That they never asked for much supported
12 documentation, didn't care who I was at all. They were
13 just looking for some papers to be able to make a loan to
14 get Merilyn out of the trap.
15    Q.  Did anybody at the bank tell you that Merilyn
16 Cook had control over them?
17    A.  Not at the bank.
18    Q.  Did Ken Shepherd tell you that Merilyn Cook had
19 control over the bank?
20    A.  That was my understanding from talking to Ken.
21    Q.  Can you recall exactly what Mr. Shepherd told
22 you?
23    A.  That Merilyn had certain relations with the
24 banker, and that there would be a loan made with no
25 questions, and that's exactly how it came down.

00045

11/20/2004 Thigpen, Roy

1  or maybe oil-and-gas holdings, along the way, but nothing
2  major and nothing for a long time.
3     Q.  Do you recall when these deals with Dow
4  occurred?
5     A.  No.  I can't even be sure if it was direct or
6  indirect.
7     Q.  Would this be in the 1990s?
8     A.  Probably more like the '80s, or maybe even in
9  the '70s.
10    Q.  And what kind of dealings were these?
11    A.  Well, I don't recall the specifics.  But Dow has
12 lots of -- they have interest in mining properties and
13 chemical factories and such, or right-of-ways, so it's not
14 uncommon to have to get permission to cross land or
15 permission for something, or environmental checks, so I
16 don't recall exactly.
17    Q.  Did you ever purchase any property from Dow?
18    A.  If I did, I can't recall it.
19    Q.  Did you ever sell any property to Dow?
20    A.  Not to my recollection.
21    Q.  Before being contacted by defense counsel in
22 this lawsuit, have you had any prior dealings with
23 Rockwell International Corporation?
24    A.  Not to my recollection.
25    Q.  Prior to this lawsuit, have you had any dealings

00082

11/20/2004 Thigpen, Roy

1  with the United States Department of Energy?
2     A.  I've leased land from the government, and
3  drilled oil wells, but I don't think that goes through
4  energy, I think that goes just straight to the BLM.
5     Q.  That's the only dealing you've had with -- with
6  the government?
7     A.  I don't recall anything else.
8           MS. MacNAUGHTON-WONG:  Could we take a
9  break for a second?  Do you need to change the tape?
10          THE VIDEOGRAPHER:  Yes, ma'am.
11          MS. MacNAUGHTON-WONG:  Sorry about that.
12          THE VIDEOGRAPHER:  This is now the end of
13 tape number one.  We're going off the record.  The time is
14 approximately 12:25.
15          (Recess taken from 12:25 to 12:26)
16          THE VIDEOGRAPHER:  Back on the record with
17 tape number two.  The time is approximately 12:26.
18 BY MS. MacNAUGHTON-WONG:
19    Q.  Mr. Thigpen, do you have any friends of
20 personal -- excuse me.  Let me start over.
21          Do you have any friends or business
22 associates who work for Dow Chemical Company?
23    A.  Not that I can recall right offhand.  I think I
24 have had some, but I don't remember who.
25    Q.  How long ago was this?

00083

11/20/2004 Thigpen, Roy

1     A.  Some years ago.
2     Q.  Was it in the 1990s?
3     A.  Probably at least -- I don't recall who it was,
4  but Dow chemical, I believe they were involved in a
5  coal-mining venture in Louisiana, and I had some friends
6  that were involved in that, but I don't recall the
7  specifics.  And it's likely that I know someone involved
8  with Dow here in this area.
9     Q.  You just don't know -- can't recall who that is?
10    A.  Right.  I can't recall.
11    Q.  How long ago was this mining venture in
12 Louisiana that you spoke about?
13    A.  Oh, that was 10 to 20 years ago.
14    Q.  Do you have any friends or business associates
15 employed by Rockwell International?
16    A.  Not to my knowledge.
17    Q.  Do you have any friends or business associates
18 employed by the Department of Energy?
19    A.  Not to my knowledge.
20    Q.  Are you being paid for your testimony?
21    A.  No.
22          MS. MacNAUGHTON-WONG:  That's all I have.
23                EXAMINATION
24 BY MR. BAKKE:
25    Q.  Okay.  Plaintiffs' counsel, a number of times in

00084

11/20/2004 Thigpen, Roy

1  her questions, talked about the loan that you had with the
2  bank on the property, that you had fronted on for
3  Ms. Cook, going into default or being foreclosed.  Was
4  that loan ever in default or foreclosure, to your
5  knowledge?
6     A.  I don't recall the status of it.
7     Q.  The $770,000 price, that was used to create the
8  loan to the bank and the note to Ms. Cook, was that a
9  price that you negotiated with Ms. Cook or with
10 Mr. Shepherd?
11    A.  It was a figure that Ken came up with.  And I
12 think, for some reason, Merilyn wanted to keep the value
13 of the property as high as she could.  And that's why the
14 second mortgage was created, to show a higher value, and I
15 had no objection and that's how we reached it.
16    Q.  Did you care what the price was on the Cook
17 property?
18    A.  Not really.
19    Q.  Now, Mr. Snyder, who wrote that appraisal for
20 $770,000 in late 1984, that you were shown, would it
21 surprise you, that in late 1986, after all the loans were
22 done, after Ms. Cook had the property back, that a
23 different appraiser appraised the same property for only
24 $330,000?  Would that surprise you?
25    A.  No, not really.

00085