# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Case No. 90-K-181

---

DEPOSITION OF MERILYN COOK                                  Volume I

---

MERILYN COOK, WILLIAM JR. AND DELORES SCHIERKOLK,
RICHARD AND SALLY BARTLETT AND LORREN AND GERTRUDE
BABB, BANK WESTERN, A FEDERAL SAVINGS BANK, A
FEDERALLY CHARTERED SAVINGS BANK, AND FIELD
CORPORATION, A COLORADO CORPORATION, ON THEIR OWN
BEHALF AND AS REPRESENTATIVES OF A CLASS OF PERSONS
AND ENTITIES SUFFERING ECONOMIC HARM; AND MICHAEL DEAN
RICE, THOMAS L. AND RHONDA J. DEIMER, AND STEPHEN M.
AND PEGGY J. SANDOVAL, ON THEIR OWN BEHALF AND AS
REPRESENTATIVES OF A CLASS OF SIMILARLY SITUATED
RESIDENTS AND WORKERS,

        Plaintiffs,

  -vs-

ROCKWELL INTERNATIONAL CORPORATION, a Delaware
Corporation, and THE DOW CHEMICAL COMPANY, a Delaware
Corporation,

        Defendants.

---

        Pursuant to Notice and the Federal Rules of

Civil Procedure, the deposition, called by Defendants,

was taken at 9:00 a.m., Wednesday, July 14, 1993, at

633 - 17th Street, Suite 3000, Denver, Colorado,

before Sue A. Osbourn, Registered Professional

Reporter and Notary Public within and for the State of

Colorado.

*Walker Reporting, Inc.*

410-17th STREET    SUITE 820    DENVER, COLORADO 80202    (303) 623-3904

7/14/1993 Cook, Merilyn

1  the Dow Chemical years, was that things were mishandled
2  then, too.
3       And I believe that they had a
4  contributory    or were involved in something that would
5  damage me.   So I can only answer your question that way.   I
6  don't have anything written, if you're asking if I have in
7  my possession something written, that says Dow Chemical did
8  this on this date.   No, sir, I don't.
9       Q    But as you sit here today, can you tell me,
10 of your own recollection or point me to anything, as you
11 sit here today, that tells me what it is that Dow
12 Chemical did that caused you injury?
13      A    Just that Dow Chemical was mentioned in a
14 lot of media coverage as being the operator of the plant
15 during times they felt there was mismanagement and
16 wrongdoing.
17      Q    That is the only information that you have?
18      A    Right.
19      Q    Okay.   Now, Ms. Cook, before we take a
20 break, can you tell me how it is that you believe that
21 the operation of Rocky Flats has caused a loss or caused
22 loss in the value of your property at 96th and Indiana?
23      A    Would you please repeat that?
24      Q    As you sit here today, can you tell me how
25 it is that the operation of Rocky Flats caused a loss of

77

7/14/1993 Cook, Merilyn

1       A    Yes.
2       Q    Have you done, since the -- that point in
3  time, June of ' 89, any valuations or appraisals of the
4  land at 96th and Indiana that you owned or any of the
5  improvements of that land?
6       A    No, I haven't.
7       Q    Okay.   Are you aware of what the land at
8  96th and Indiana and the improvements on that land are
9  worth today?
10      A    Not really.
11      Q    So when you say that the publicity after the
12 FBI raid had a negative effect on the value of your
13 business and your property, that's your testimony,
14 correct?
15      A    Yes.
16      Q    That's really the claim that you're making
17 in the case, isn't it?
18      A    Yes.
19      Q    Is there any other claim that you're making
20 in the case?
21           Mr. Feagan:   Relative to the property
22 claim?
23           Mr. Bernick:   Yes.   Property and business
24 claim.
25      A    Just that the actions wrecked my property

79

7/14/1993 Cook, Merilyn

1  property value in your land at 96th and Indiana?
2       A    The way in which Rocky Flats was operated,
3  the crimes that were committed, and the cover-up out
4  there, when they became public knowledge, they caused a
5  complete lack of confidence in the property, in the
6  banking community.
7            My customers panicked.   They didn't want
8  their kids drinking my water.   They didn't want their
9  loved animals -- I don't know whether you're a horseman
10 or not.   If you give a horseman a choice between their
11 stud and their kids, it's a tough decision.
12           They didn't want their animals drinking what
13 they thought might be contaminated water.   They don't
14 want them eating contaminated grass.   Anybody looking for
15 a potential place to build on or to operate a horse
16 facility with expensive animals standing on it when there
17 were stories in the newspapers and on the nightly news,
18 when they were barraged by stuff saying how dangerous
19 that was out there, just a total lack of confidence in
20 the -- in the property, in the use of the property, in
21 the value of the property, and people not wanting
22 anything to do with it because they were afraid.
23      Q    When did that occur?
24      A    In the period right after the raid.   1989.
25      Q    After June of ' 89?

78

7/14/1993 Cook, Merilyn

1  value, destroyed my financial security, my financial
2  future, and destroyed my horse operation.
3       Q    ( By Mr. Bernick )   But that all occurred as a
4  consequence of the publicity surrounding the FBI raid,
5  correct?
6       A    Correct.
7       Q    I want to ask you, Is your information on
8  that, the effects of that publicity on your property and
9  on your business -- that information comes from what
10 source?
11      A    The effect of it on my business, it came
12 from the source of my customers moving out, people
13 calling to inquire about the services I offered.   My
14 reputation in the horse breeding business and training
15 and management business was very good, one of the very
16 few people in the area that have won the world.   I have
17 won the world.   I have won nationals.   I won regionals.
18 I have some of the finest quarterhorses that have ever
19 stood in this state.   My reputation was excellent.
20           But when people incurred the risks -- felt
21 they were incurring risks to their family or their
22 animals or the possible unborn fetuses that would be made
23 on that property, on animals that could    in their
24 opinion could have been contaminated or had -- there was
25 stories of two-headed calves in the neighborhood -- those

80

## Page 109

7/14/1993 Cook, Merilyn

1  handwriting on that page your own?
2     A    No.
3     Q    What on the page is not yours?
4     A    Some of the notations down there on the
5  bottom.
6     Q    Well, at the bottom of the page it's written
7  in hand a list of three properties. Is it true that all
8  those properties are lots within the total land that you
9  bought at 96th and Indiana?
10    A    Yes.
11    Q    Okay. Now, did you write this listing of lots
12 down here?
13    A    I wrote the listing of lots. I didn't write
14 the figures that follow them. I didn't write " partially
15 pledged. " I didn't come up with the total at the bottom
16 of the page. It's not my writing.
17    Q    You just listed what the lots were?
18    A    Uh-huh.
19    Q    Respond orally.
20    A    Yes.
21    Q    Who put the numbers in?
22    A    Somebody at the bank, I suppose.
23    Q    Do you know?
24    A    ( No response. )
25    Q    Do you know?

## Page 110

7/14/1993 Cook, Merilyn

1     A    Someone at the bank, would be my best guess.
2  I don't know, no.
3     Q    Does this refresh your recollection by June of
4  1984 the improvements have already been made, or does
5  this refresh your recollection that by June of 1984 the
6  improvements have not been made and they're still in the
7  planning stage?
8     A    Doesn't tell me either way.
9     Q    Okay. Do you see the figure $112,600?
10    A    Yes.
11    Q    That would be the value of the raw land, which
12 is the 12-acre lot which we designated as B-east?
13    A    I don't know that at all. I can't tell from
14 that what that is.
15         Mr. Bronesky:   117.
16         Mr. Bernick:    I guess it's 7.
17    Q    ( By Mr. Bernick )  But it's the -- it's the
18 listed value for one of the 12-acre lots, correct?
19    A    No.
20    Q    What is it?
21    A    I don't know what it is because that doesn't
22 -- those 12-acre tracts were valued at 144,300 at that
23 time. They had already been appraised at that figure.
24    Q    Well, maybe we'll get to that in a minute.
25    A    I don't know what that number is. That's not

## Page 111

7/14/1993 Cook, Merilyn

1  clear by looking at this. It's too long ago. I can't
2  tell by looking at it.
3     Q    Can you tell by looking at this document
4  whether the improvements had already been made by June of
5  1984 to the land that you had bought?
6     A    No, I cannot.
7     Q    Taking a look at the second page, do you see
8  where it says " Bank of Applewood "? Next to it in the
9  right-hand column you have " 222,000. " See that?
10    A    Yes.
11    Q    And next to " Cora Ladwig " you have "$ 159,100 "?
12    A    Yes.
13    Q    And then you have other liabilities that are
14 listed further up above on the page.
15         Is that consistent with your recollection that
16 you had, as of June 1984, a $222,000 loan from the Bank
17 of Applewood in addition to your outstanding obligation
18 to Cora Ladwig of 159,300?
19    A    I really don't recall. That's what it would
20 appear from this document. You know, I have no
21 recollection of those numbers. From this piece of paper,
22 I would say that appears to be correct. But I --
23    Q    You just don't remember?
24    A    I don't remember.
25    Q    Is the figure, $1.7 million, an accurate

## Page 112

7/14/1993 Cook, Merilyn

1  reflection of your net worth as of June 1984, as you
2  recall?
3     A    Yes.
4     Q    Later on that year, your interrogatory answers
5  reflect that you sold one of the parcels to a Roy E.
6  Thigpen, T-h-i-g-p-e-n ; is that correct?
7     A    Yes.
8     Q    Was that the first piece or parcel or lot as
9  part of your property at 96th and Indiana that you sold?
10    A    Yes.
11    Q    When did you enter into the contract to sell
12 the land to Mr. Thigpen?
13    A    I don't recall.
14    Q    You have no recollection at all?
15    A    No.
16    Q    I want to show you what we'll mark as
17 Exhibit 114 ; ask you whether this was an unsigned
18 contract between you and Mr. Thigpen to sell him 12 acres
19 with, I assume, some improvements for a total of
20 $780,000?
21         ( Exhibit 114 marked. )
22    A    Would you ask the question again, please?
23    Q    ( By Mr. Bernick )  Is that a contract, an
24 unsigned contract, to sell one of the lots that you owned
25 at 96th and Indiana to Mr. Thigpen for 730,000?

7/14/1993 Cook, Merilyn

1  A   It's an unsigned contract.  It appears to be
2  basically the terms under which we did the transaction.
3  I don't know whether there is one that was negotiated
4  further, added or, you know, later.  I think that was
5  actually signed as the contract.  It appears to be, in
6  general, the situation that was closed upon.
7      Q   Does that refresh your recollection that you
8  entered into a contract to sell Mr. Thigpen some of your
9  property roughly October of 1984?  Does that square with
10 your recollection?
11     A   That seems about right, yes.
12     Q   As of that time had you established your horse
13 breeding business at the 96th and Indiana location, or
14 was it still being done elsewhere?
15     A   At the time of this sale?
16     Q   Yeah.  I mean, as I understand it, you bought
17 the land at 96th and Indiana in September of 1983.  You
18 got this contract with Thigpen in October of 1984.  What
19 I want to know is, Are you doing your horse raising
20 business on the land during this period of time?
21     A   Yes.
22     Q   Okay.  What was it that you contracted to sell
23 to Mr. Thigpen in the fall of 1984?
24     A   12 acres, an indoor arena, a home, a well,
25 fencing, property that appraised for $780,000.

113

7/14/1993 Cook, Merilyn

1  Q   Okay.  Would it be fair to say that the
2  particular lot that you agreed to sell to Mr. Thigpen
3  with improvements that you just listed is the one that
4  you denominated as C-east on Exhibit 109?
5      A   Yes.
6      Q   Okay.  And the purchase price Mr. Thigpen
7  agreed to pay was $780,000?
8      A   ( Deponent nodded head. )  Yes, as I recall,
9  yes.
10     Q   Okay.  And you're saying there was an
11 appraisal on that particular lot?
12     A   Yes.
13     Q   With improvements?
14     A   Yes.
15     Q   Is Exhibit 115 that appraisal?
16         ( Exhibit 115 marked. )
17     A   ( Deponent examined exhibit. )  Yes.
18     Q   ( By Mr. Bernick )  Okay.  Was this an appraisal
19 that was done for the bank, or was it done at your
20 request?
21     A   It was done by the bank.
22     Q   Okay.  And this was an appraisal for C-east as
23 improved?
24     A   Yes.
25     Q   Okay.  You said that the total was $770,000.

114

7/14/1993 Cook, Merilyn

1  The portion of that value which represented the 12 acres
2  of land, is that $144,000?
3      A   Yes.
4      Q   And that would amount to roughly how much an
5  acre?
6      A   12 -- I need a pencil if I'm going to be the
7  one that does it.
8      Q   It's probably 12 into 144, which is 12?
9          Mr. Feagan:   I think we can stipulate to that.
10
11         The Deponent:   We'll stipulate to that.
12     Q   ( By Mr. Bernick )  What we're stipulating is
13 would it be fair to say that the appraisal that was done
14 of Lot C-east as improved, which is the property that you
15 agreed to sell to Mr. Thigpen, used an appraised value
16 for the land that was now $12,000 an acre?
17     A   Yes.
18     Q   Did you believe that that was the market value
19 of that property, that land at that time?
20     A   Yes.
21     Q   Did the same appraiser then proceed to
22 appraise many of the other lots that comprised your land
23 at 96th and Indiana?
24     A   Yes.
25     Q   And I'm going to show you what we'll mark as

115

7/14/1993 Cook, Merilyn

1  Exhibits 116, 117, and 118 and ask you whether these were
2  additional appraisals done in approximately the same time
3  period of other 12-acre lots within your land?
4          ( Exhibits 116 through 118 marked. )
5      A   Yes.
6      Q   ( By Mr. Bernick )  Okay.  Would it be fair to
7  say that all of these appraisals that were done of your
8  land in the fall of 1984 and early 1985 found that the
9  market value of the land itself was approximately $12,000
10 an acre?
11     A   Yes.
12     Q   Do you have any explanation, Miss Cook, as to
13 how it can be that when you bought the land in September
14 of 1983 it was appraised by the bank's appraiser, by the
15 bank, at $6,700 an acre, and was appraised -- a year
16 later it was appraised at $12,000 an acre for just the
17 land?
18     A   Yes.
19     Q   What's the explanation?
20     A   It had changed from a cow pasture to a very
21 elicit horse operation with a pipe fence around the
22 outside and trees planted on it and a view of the lake.
23 And it had changed in character.
24     Q   But the land itself was appraised -- forget
25 the improvements -- the land itself was appraised for

116

7/14/1993 Cook, Merilyn

```
1    A    No.
2    Q    These income tax returns, Miss Cook, are the
3    only income tax returns that we have seen for you.  Are
4    you aware of any other income tax returns that you have?
5    A    My income tax is on the extension from ' 89
6    onward.  The records or the copies of the income tax
7    prior to that have been lost.
8    Q    So you don't have any more copies of income
9    tax forms or documents for years 1986 and earlier,
10   correct?
11   A    Correct.
12   Q    You don't know of anyone else who does?
13   A    No.
14   Q    With respect to ' 89 forward, I believe you
15   said that your income tax is what?
16   A    Is under an extension.  It's being worked on
17   now for those years.
18   Q    Okay.  And who is doing that work?
19   A    Accounting firm in Springfield.
20   Q    According to these income tax forms for 1987
21   and 1988, isn't it a fact that your horse raising
22   business was operating at a loss?
23   A    Well, I'm not really qualified to assess that,
24   to say it was operating at a loss, to make it that
25   simple.  There is a difference between a paper loss and a
```

149

7/14/1993 Cook, Merilyn

```
1    -- but, yes, there is a last figure that is a minus or
2    loss.
3    Q    Both income tax forms for ' 87 and ' 88 are
4    reporting to the government for taxation purposes that
5    the horse raising business is operating at a loss,
6    correct?
7    A    Correct.
8    Q    Okay.  Was it any different in 1986, ' 85, and
9    ' 84, to your recollection?
10   A    I don't know.
11   Q    I'm sorry?
12   A    I don't remember.  I don't know.
13   Q    From a point of view of your providing income
14   for yourself, did you have any sources of income during
15   the period 1984 to 1990, other than the horse raising
16   business?
17   A    No.
18   Q    Okay.  If we begin in 1984 and go forward to
19   1990, roughly how much money, how much cash, did the
20   horse raising business produce over those years?
21   A    I don't know.
22   Q    Is there any record of that anywhere?
23   A    Not that I know of.
24   Q    Okay.  Is there anywhere we can find out?
25   Apart from the one financial statement that we had for
```

150

7/14/1993 Cook, Merilyn

```
1    you, this Exhibit 113, is there any document that sets
2    forth your assets and your liabilities in the years after
3    1984?
4    A    No.
5    Q    Are there any documents that set forth your
6    income in the years 1984 going forward, apart from these
7    two tax returns?
8    A    No.
9    Q    Do you have any copies of bank statements
10   during that period of time, that is ' 84 to ' 90?
11   A    No.
12   Q    Just so we're clear, at any given time during
13   the period 1984 to 1990, can you tell me how much money
14   you owed the banks?
15   A    No.
16   Q    How did you -- if you go back to the period of
17   time, 1984, 1985, 1986, 1987, from your testimony, I
18   opine that in 1984 you were building out property that
19   you had bought, correct?
20   A    Yes.
21   Q    And you were operating this horse breeding
22   business, correct?
23   A    Yes.
24   Q    And that 1985, ' 86, ' 87, ' 88, ' 89 you were
25   basically pursuing the horse breeding business, correct?
```

151

7/14/1993 Cook, Merilyn

```
1    A    And the property, yes.
2    Q    Well, were there -- I think I asked you, Were
3    there any source of business, other than the horse
4    breeding business?  Your answer was no?
5    A    What period?
6    Q    ' 84, ' 85.
7    A    You just covered a bunch of sales that were
8    sources of income.
9    Q    Sales of properties?
10   A    Yes.
11   Q    During the period ' 84 to ' 90, your sole source
12   of income is as a result of the horse breeding business?
13   A    Breeding and boarding.
14   Q    And selling property?
15   A    Yes.
16   Q    What properties did you own during that period
17   of time, ' 84 to ' 90?
18   A    The property that is 96th and Indiana and 7610
19   Newman.
20   Q    What?
21   A    And my home at --
22   Q    7618?
23   A    7618 Newman.
24   Q    Any other properties that you owned during the
25   period 1984 to 1990, apart from these two properties?
```

152

7/14/1993 Cook, Merilyn

```
 1    A    What I got from Lorren and Babb.
 2    Q    Rimrock?
 3    A    Yes.
 4    Q    Any others?
 5    A    Not that I recall.
 6    Q    Now, I just need to figure this out a little
 7   bit.  7618 Newman, you bought when?
 8    A    Let's see.  About the same time I bought
 9   Westgait Stables.
10    Q    So that would have been 1977, thereabouts?
11    A    That seems too early.  1977 was the Stud &
12   Filly, I believe.
13    Q    '75?
14    A    '75?  Dates really get me going.  I bought it
15   -- the Newman Street piece right in the same -- within a
16   few months of buying Westgait Stables.  So whatever that
17   date is.
18    Q    You never sold 7618, did you, the residence?
19    A    Yes, I did.
20    Q    When did you sell it?
21    A    1990.
22    Q    Rimrock.  Did you ever sell Rimrock?
23    A    Yes.
24    Q    When?
25    A    '88, '89, to the best of my recollection.
```

153

7/14/1993 Cook, Merilyn

```
 1    Q    How much did you sell it for?
 2    A    Mid-20's.
 3    Q    To whom?
 4    A    Ken Shephard.
 5    Q    Where does he live?
 6    A    Springfield, Missouri.
 7    Q    Is he a relation, or did you have some prior
 8   relationship with him at all?
 9    A    Just friends.
10    Q    Was that an arm's-length transaction?
11    A    Yes.
12    Q    Well, did you go get it appraised?
13    A    He did.  He had three realtors look at it in
14   the city.
15    Q    On a year-to-year basis, how much cash did the
16   horse breeding operation throw off?  Do you have any
17   recollection at all?
18    A    I have no idea.
19    Q    I asked you whether you had any bank
20   statements.
21    A    You asked me.
22    Q    You don't?
23    A    No.
24    Q    So as we sit here today, there is really
25   nothing we can go to, to find out how much income or how
```

154

7/14/1993 Cook, Merilyn

```
 1   much cash would be derived from the horse breeding
 2   operation from year to year, correct?
 3    A    Correct.
 4    Q    Do you have any documentation of the accounts
 5   that you had or your clients and how much as individuals
 6   they may have paid you during that period of time?
 7    A    No.
 8    Q    Can you even ballpark the amount of income
 9   that came, gross income that came from the horse breeding
10   operation?
11    A    No.
12    Q    If we take a snapshot in 1989, say, January
13   1989, I take it then you can't tell us how much money you
14   owed the banks, correct?
15    A    Correct.
16    Q    Can't tell us how much income you were
17   deriving from the horse breeding operation, correct?
18    A    Correct.
19    Q    Is it a fact, Miss Cook, that by 1989 you were
20   in default on some of your payments to some of the banks
21   to which you owed money?
22    A    I may have been.  I don't recall.  It's
23   possible.
24    Q    Is it a fact that the bank that had the
25   mortgage for Newman Street -- or I should say one of the
```

155

7/14/1993 Cook, Merilyn

```
 1   banks that had a security interest in Newman Street began
 2   foreclosure proceedings in 1989, January of 1989?
 3    A    That's possible.
 4    Q    Okay.  By January of 1989, isn't it a fact
 5   that the income that you were deriving from either the
 6   sale of property or the horse operation was not
 7   sufficient to service the debts that you had?
 8    A    No.
 9    Q    Was there any proof of that that you can point
10   us to anywhere?  Is there any -- I guess maybe rephrase
11   the question.
12         Is there any piece of paper that we can go to,
13   Miss Cook, which will show us that you were solvent, that
14   you had net worth in 1988 or 1989?
15    A    No.
16    Q    Is there anyplace that we can go that will
17   show that you had a positive cash flow, that is, that you
18   were getting enough cash to service your expenses and
19   your debt obligations during the period 1988, 1989, 1990?
20    A    No.
21    Q    How many different banks instituted legal
22   proceedings to collect on obligations that you owed them
23   during the period 1988 to 1990?
24    A    Two or three.
25    Q    Okay.  Which banks?
```

156

7/14/1993 Cook, Merilyn

```
1     Q    Okay.  Did you ever make money on the horse
2  breeding business, Ms. Cook?
3     A    Yes.
4     Q    What year?
5     A    All the years I paid taxes, sent them a check.
6     Q    We know you didn't pay taxes in ' 87, ' 88.
7     A    That's what it says.
8     Q    I'm sorry?
9     A    That's what those indicate, yes.
10    Q    The question is, During what year, if any, did
11 you make money on the horse breeding business?  Do you have
12 any recollection that you actually made money in any given
13 year?
14    A    ' 70, probably ' 71, ' 72, ' 73, ' 74.  This was
15 during a period when I was doing a lot of capital
16 improvements, spending a lot of money into the ranch.
17 And I -- if I was smart enough to read this, and look at
18 this, I would do it myself and wouldn't have paid
19 somebody else to do it.  This was -- this was at a time
20 when -- that the situation was just not -- you know.
21    Q    Well, Ms. Cook, I'll focus on my question of, Do
22 you have a recollection of making money in any year on your
23 horse breeding business -- any year, in your horse breeding
24 business at 96th and Indiana in particular?
25    A    I made money at Westgait.  I made money at
```

165

7/14/1993 Cook, Merilyn

```
1  Stud & Filly.  1982, made a lot of money selling horses.
2           Without the tax returns and stuff, I am at a
3  loss to really tell you when.
4     Q    I want to put the pre -' 83 years to one side
5  and ask you about 96th and Indiana.  I recognize your
6  testimony is you put money in to improve 96th and Indiana.
7  I'm asking you, recognizing that you made those
8  improvements at 96th and Indiana that required putting
9  money into the property, do you specifically recollect
10 making any money at 96th and Indiana in any given year?
11    A    Also I recall billing $50,000 worth of
12 boarding, training, and stud fees in any of those -- in
13 those years.  At least that or around those figures.
14    Q    Which years?
15    A    I don't have the documents in front of me to
16 make -- you know, know.
17    Q    I'm not sure what the question was.
18    A    I'm not either.
19    Q    What I'm getting at is this:  You put money down
20 to buy the property.  You then have to invest a certain
21 amount of money into improving it, and building or
22 continuing -- and then you have the expenses for the
23 business.
24          And really, what I want to know is, Can you
25 tell us that there was any year at 96th and Indiana where
```

166

7/14/1993 Cook, Merilyn

```
1  the income that you realized from those billings to your
2  clients actually exceeded the expenses and the debt
3  service obligations that you had?  Can you specify any year
4  in which that was true?
5     A    No.
6     Q    Is there anywhere that we can go to find out
7  if there was even a single year where you made money at
8  96th and Indiana?
9     A    No.
10    Q    Now, on the Newman Street property, I just
11 want to ask you one more time to be real clear.
12          Is your recollection that was not deeded in
13 lieu of foreclosure, that you kept the deed to the Newman
14 Street property until the sale?
15    A    I went to the closing and signed the papers to
16 transfer it to the new buyer.  The foreclosure -- there
17 was no foreclosure.
18    Q    Did you make any effort to sell any part of
19 your property at 96th and Indiana at any given point in
20 time?
21    A    Yes.
22    Q    When?
23    A    After June of 1989, I called several realtors,
24 and asked to list the property.  There was a general
25 disinterest in listing the property.  A few that were
```

167

7/14/1993 Cook, Merilyn

```
1  willing to list it wanted to add disclaimers of various
2  lengths from a page to three pages.  They indicated,
3  because of the public conception or belief -- feeling
4  about that area after all that publicity, that if the
5  property was marketed, it would have to be marketed at a
6  fire-sale price.
7     Q    Any other efforts that you made to sell any
8  property at 96th and Indiana apart from what you just
9  described?
10    A    No.
11    Q    What realtors -- during what period of time,
12 or over what period of time, did you make these contacts
13 and engage in these activities?
14    A    Late ' 89, ' 90.
15    Q    What part of ' 90?
16    A    Early ' 90.
17    Q    Would that have been before the note was taken
18 over by the other bank?
19    A    Yes.
20    Q    Okay.
21    A    The bank -- never mind.
22    Q    Who took -- what other bank took over this
23 note?  This was the Colorado National Bank note, right?
24    A    Yes.
25    Q    What bank took over the notes in 1990?
```

168