# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

### No. 90-K-181

───────────────────────────────────────────

**MERILYN COOK, et al.,**

     **Plaintiffs,**

        **v.**

**ROCKWELL INTERNATIONAL CORPORATION and
THE DOW CHEMICAL COMPANY,**

     **Defendants.**

───────────────────────────────────────────

### PLAINTIFFS' CONSOLIDATED MEMORANDUM
### IN OPPOSITION TO DEFENDANTS' SIXTEEN MOTIONS IN LIMINE

───────────────────────────────────────────

**Dated: July 8, 2005**

**TABLE OF CONTENTS**

Page:

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A. Overview . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B. Response to Specific Motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

        1. The 1989 FBI Raid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

            a. Vagueness and Overbreadth . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

            b. The Warrant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

            c. The Warrant's Aftermath and Rockwell's Supposed Exoneration . . . . 5

            d. Defendants' Authorities About Prior Bad Acts . . . . . . . . . . . . . . . . . 7

            e. Supposed Prejudice to Dow . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            f. The Burden of Rebutting Plaintiffs' Evidence . . . . . . . . . . . . . . . . . 10

        2. The Grand Jury Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            a. Grand Jury Secrecy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            b. Publicity About the Special Grand Jury Investigation . . . . . . . . . . . 12

        3. The Guilty Plea . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

            a. Actual and Threatened Offsite Harm . . . . . . . . . . . . . . . . . . . . . . . 13

            b. Remediated Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            c. The Guilty Plea and Plaintiffs' Damages Calculations . . . . . . . . . . . 15

        4. Indemnification by DOE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        5. DOE's Discovery Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

i

6. Substances Other than Plutonium . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

7. Worker Safety and Health . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

8. Events Occurring "Wholly Within Buildings" . . . . . . . . . . . . . . . . . . . . . . . . 24

9. Material Unaccounted For, a.k.a. "Inventory Difference" . . . . . . . . . . . . . . 25

10. "Past Risks" That Never Materialized . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

11. Plutonium-Related Incidents Not Causing Class-Wide Contamination . . . . 27

12. Evidence That Does Not Apply Class-Wide . . . . . . . . . . . . . . . . . . . . . . . . . 28

13. Opinion Testimony By Lay Witnesses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

14. & 15. Evidence of Other Litigation Against Defendants . . . . . . . . . . . . . . . 33

        a. The Criminal Prosecution of Rockwell- Rocky Flats . . . . . . . . . 34

        b. The *Church* Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

        c. Other Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

16. Costs of Remediation of the Rocky Flats Plant Site . . . . . . . . . . . . . . . . . . 38

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

## **TABLE OF AUTHORITIES**

**CASE**                                                                                    **PAGE(S)**

*Asplundh Mfg. Div. v. Benton Harbor Eng'g,*
    57 F.3d 1190 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

*Bailey v. Kawasaki-Kisen, K.K.,*
    455 F.2d 392 (5th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

*Bank of China, New York Branch v. NBM L.L.C.,*
    359 F.3d 171 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30, 31

*Bradbury v. Phillips Petroleum Co.,*
    815 F.2d 1356 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

*Charter v. Chleborad,*
    551 F.2d 246 (8th Cir.), *cert. denied*, 434 U.S. 856 (1977) . . . . . . . . . . . . . . . . . . . 18

*Conde v. Starlight I,*
    103 F.3d 210 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*Cook-O'Brien Constr. Co. v. Crawford,*
    26 F.2d 574 (9th Cir.), *cert. denied*, 278 U.S. 630 (1928) . . . . . . . . . . . . . . . . . . . .  18

*Cook v. Rockwell Int'l Corp.,*
    147 F.R.D. 237 (D. Colo. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6, 11

*Corbett v. Borandi,*
    375 F.2d 265 (3d Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*Davoll v. Webb,*
    194 F.3d 1116 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

*Ede v. Atrium S. OB-GYN,*
    71 Ohio St. 3d 124, 642 N.E.2d 365 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*Elliot v. Turner Constr. Co.,*
    381 F.3d 995 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Eppinger & Russell Co. v. Sheely,*
    24 F.2d 153 (5th Cir. 1928) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*Evans v. Robbins*,
 897 F.2d 966 (8th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Gilbert v. Cosco, Inc.*,
 989 F.2d 399 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Goeken v. Wal-Mart Stores, Inc.*,
 2001 WL 1159751 (D.Kan. Aug 16, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 33

*Gumbs v. International Harvester, Inc.*,
 718 F.2d 88 (3d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

*Hawthorne Partners v. AT&T Techs.*,
 831 F. Supp. 1398 (N.D. Ill. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Jaasma v. Shell Oil Co.*,
 No. 04-2095 (3d Cir. June 28, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Jetcraft Corp. v. Flight Safety Int'l*,
 16 F.3d 362 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Jones v. Southern Pacific R.R.*,
 962 F.2d 447 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Lifewise Master Funding v. Telebank*,
 374 F.3d 917 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

*McFarlane v. Caterpillar, Inc.*,
 974 F.2d 176 (D.C. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Mehojah v. Drummond*,
 56 F.3d 1213 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Moore v. United States*,
 864 F. Supp. 163 (D. Colo. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Moy Quon v. M. Furuya Co.*,
 81 Wash. 526, 143 P. 99 (1914) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*National Union Fire Ins. Co. v. L.E. Meyers Co. Group*,
 937 F. Supp. 276 (S.D.N.Y.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*,
    663 F. Supp. 1360 (D. Kan. 1987), *aff'd in part & rev'd in part*, 899 F.2d 951
    (10th Cir. 1990), *cert. denied*, 497 U.S. 1005 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Rimkus v. Northwest Colo. Ski Corp.*,
    706 F.2d 1060 (10th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Shoppin' Bag of Pueblo, Inc. v. Dillon Cos., Inc.*,
    783 F.2d 189 (10th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Silkwood v. Kerr-McGee Corp.*,
    769 F.2d 1451 (10th Cir. 1985), *cert. denied*, 476 U.S. 1104 (1986) . . . . . . . . . . 28

*Spesco v. General Electric Co.*,
    719 F.2d 233 (7th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Stump v. Gates*,
    211 F.3d 527 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Tucker v. Makowski*,
    883 F.2d 877 (10th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Unit Drilling Co. v. Enron Oil & Gas Co.*,
    108 F.3d 1186 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Biswell*,
    700 F.3d 1310 (10th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Burkhardt*,
    458 F.2d 201 (10th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Caballero*,
    277 F.3d 1235 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 33

*United States v. Martinez*,
    No. 00-2054, 2001 WL 289785 (10th Cir. Mar. 26. 2001) . . . . . . . . . . . . . . . . . . . 29

*United States v. Masters*,
    622 F.2d 83 (10th Cir.1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 36

*United States v. Reynolds*,
    345 U.S. 1 (1953) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Rockwell Int'l Corp.*,
No. 92-CR-107 (D. Colo. Mar. 26, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Rodriguez*,
192 F.3d 946 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36, 39

*United States v. Westbo*,
576 F.2d 285 (10th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## STATUTES & MISCELLANEOUS

Fed. R. Crim. P. 6(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Fed. R. Evid. 401, Advisory Committee Note . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. R. Evid. 403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 35, 38, 39

Fed. R. Evid. 406 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Fed. R. Evid. 407 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 40

Fed. R. Evid. 411 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Fed. R. Evid. 701 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29, 30

Restatement (Second) of Torts, section 930 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Jack B. Weinstein & Margaret A. Berger,
Weinstein's Evidence Manual §7.08 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Charles Alan Wright & Kenneth Graham,
Fed. Prac. & Proc. Evid. § 5284 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Charles Alan Wright & Kenneth Graham,
Fed. Prac. & Proc. Evid. § 5290 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

## I.  INTRODUCTION

Plaintiffs respectfully submit this consolidated memorandum in opposition to the sixteen motions in limine filed by defendants on June 16, 2005 [Ct. Rec. 1354-1370].  After a brief overview discussion, we respond below to each motion in numerical order.

## II.  ARGUMENT

### A.  Overview

As defendants correctly note,[1] the parties submitted their initial lists of trial witnesses and exhibits on December 10, 2003.  *See* Status Report Responding to the Court's Order September 11, 2003 Order (the "2003 Status Report") [Ct. Rec. 1218].  Attached to that submission as Appendix A was plaintiffs' list of approximately ninety specific trial witnesses, all of whom defendants have deposed at length (or have had an opportunity to depose).  Also attached to the 2003 Status Report, as Appendix C, was an 88-page list detailing plaintiffs' proposed trial exhibits.

Defendants have enjoyed at least eighteen months during which to commune with those evidentiary disclosures.[2]  That could have resulted in motions in limine focusing on specific

---

[1] *See* Defendants' Introduction and Overview to Their Motions in Limine, at 1 ("Defendants' Overview").

[2] Defendants now suggest that plaintiffs' exhibits were not described with sufficient particularity for defendants to identify them for the purpose of raising objections.  *See* Defendants' Overview, at 1.  That suggestion is utterly false.  Plaintiffs' list identified the exhibits by Bates range, date, and (where applicable) deposition exhibit number.  The Bates range alone would have been sufficient for defendants to identify the documents – the vast majority of which were produced in discovery (and Bates-stamped) by defendants themselves, or by their indemnitor, the United States Department of Energy ("DOE").  Defendants now fault plaintiffs for not having provided copies of the exhibits to defendants when the parties' exhibit lists were exchanged, but plaintiffs advised defense counsel in advance that plaintiffs did not propose to do so, as the material was voluminous and defendants were already in possession of it.  Defendants raised no protest

testimony and exhibits that defendants wanted to exclude.  But it did not.  Rather, defendants'

motions are concededly "general in character,"[3] focusing on entire conceptual categories of evidence,

sometimes with little attempt to identify or analyze the specific evidence falling into those categories.

Certain evidentiary issues, such as DOE's indemnification of defendants, may lend

themselves to such categorical treatment.  But many others do not.    It is, for instance, an evidentiary

commonplace that specific documents or testimony, although irrelevant to one issue, may be highly

relevant to another.  "Relevancy is not an inherent characteristic of any item of evidence but exists

only as a relation between an item of evidence and a matter properly provable in the case."  *See* Fed.

R. Evid. 401 Advisory Committee Note.

Substantial quantities of plutonium, for example, were found in the ducts at Rocky Flats

following the departure of defendant Rockwell International Corporation ("Rockwell") as operating

contractor.  Defendants might well characterize that discovery as involving "incidents that occurred

wholly within buildings," as their eighth motion in limine puts the matter, and it is arguably true that

such evidence, by itself, is not directly probative of offsite human exposures.  But it remains very

relevant for other purposes, including a showing that plutonium could and routinely did escape

containment at the site.   More generally, evidence may be irrelevant (or only circumstantially

relevant) to show consummated offsite releases, but highly relevant to show events, policies, and

---

at that time, nor did they provide plaintiffs with copies of the exhibits on defendants' own
list.  Indeed, not long after the exhibit lists were exchanged, defense counsel informed
plaintiffs' counsel that defendants had resolved any ambiguities about the identities of
plaintiffs' exhibits to defendants' satisfaction and that further assistance from plaintiffs'
counsel on that issue was unnecessary.

[3] *See* Defendants' Overview, at 2.

practices contributing to rational apprehensions in the real estate market over the threat of such releases.  It depends on the specific incident and the detailed character of the evidence in question.

Likewise, objections under Fed. R. Evid. 403, which are prominent in defendants' motions, "call for *balancing* the probative value and need for the evidence against the harm likely to result from its admission."  *See* Fed. R. Evid. 403 Advisory Committee Note (emphasis added).  To undertake that sensitive balance, a court must commonly know not merely what general potential for prejudice the objecting party alleges, but also what specific evidence is being challenged, so that its role and importance for the proponent's case can be evaluated in the context of an overall factual record.

Such balancing is not easily undertaken in the abstract.  Unless some known and specific piece of evidence is clearly inadmissible on all potential grounds, evidentiary rulings should generally be deferred until trial "so that questions of foundation, relevancy and potential prejudice may be resolved in proper context."  *Hawthorne Partners v. AT&T Techs.*, 831 F. Supp. 1398, 1400 (N.D. Ill. 1993); *see also National Union Fire Ins. Co. v. L.E. Meyers Co. Group*, 937 F. Supp. 276, 287 (S.D.N.Y. 1996) (finding motion that "lacks the necessary specificity with respect to the evidence to be excluded or the purported reason for the introduction of such evidence" to be "too sweeping in scope to be decided in limine").

In the interim, plaintiffs can respond only to the arguments that defendants have actually raised.  Of necessity, plaintiffs' response may therefore be somewhat general itself in places.  We ask the Court to remember that in many instances, the proper application of the relevant legal and evidentiary principles will best be decided in the concrete context of specific testimony and exhibits offered by the parties at trial.  To accept defendants' invitation to issue sweeping and abstract rulings

*Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motions in Limine – Page 3*

in advance, so that defendants can announce later what specific consequences they believe to flow from those rulings, would do more to hinder the trial's orderly progress than to expedite it.

## B.  Response to Specific Motions

### 1.  The 1989 FBI Raid

Defendants' first three motions are closely related.  The first seeks exclusion of all evidence relating to the 1989 FBI raid; the second, all evidence relating to the investigation of the Special Grand Jury; the third, all evidence relating to Rockwell's guilty plea.  Many of plaintiffs' arguments concerning this first motion pertain to defendants' second and third motions as well.

### a.  Vagueness and Overbreadth

Plaintiffs note preliminarily that defendants' first three motions all suffer acutely from the vices of vagueness and overbreadth discussed above.  Much of defendants' first motion, for example, focuses on allegations in a search warrant that defendants say were not borne out in the subsequent criminal investigation of Rockwell.  That rhetorical focus on the search warrant may impart to defendants' first motion the illusion of concreteness and precision.  The relief defendants seek, however, is not confined, by any means, to the allegations in the search warrant, or to that document. Defendants do not merely seek exclusion of the search warrant from evidence, or redaction of specific paragraphs from the search warrant, or a limiting instruction concerning the search warrant's relevance.  The search warrant itself, in fact, would appear to be something of a straw man – one isolated piece of evidence on which defendants seize as a rhetorical vehicle in pursuit of much more ambitious relief.  The precise scope of defendants' motion is amorphous, but defendants apparently do seek to bar all proof, from whatever source, involving any topic covered in the warrant, as well as all evidence of the *occurrence* of the 1989 FBI raid at Rocky Flats, or *referring* to the raid, or

*generated* from the raid, or *relating* to the raid in any way.  Defendants have not remotely made the case for such relief.

### b.  The Warrant

Let us start with the warrant itself.  Plaintiffs recognize that the warrant would be hearsay if offered to prove the truth of its contents.  As defendants are aware, however, plaintiffs' witness list includes Jon Lipsky and William Smith, the FBI agent and EPA official whose investigations formed the basis for the search warrant's allegations, and under whose charge the warrant was executed.  Along with other witnesses, they can testify to those matters, and to relevant facts disclosed during the further progress of the criminal investigation, from personal knowledge.

Meanwhile, the warrant itself, and its widespread and dramatic public disclosure in press reports and otherwise, remain highly relevant for the nonhearsay purpose of establishing the sources of market awareness about events at the site and risks posed by residence in its vicinity.  Indeed, if the raid and consequent disclosures and publicity about Rockwell's tenure at the plant were all off-limits, it is difficult to see how plaintiffs' claims against Rockwell could even be articulated to the jury.  The environmental misconduct disclosed through the raid and in its aftermath have long been at the very core of plaintiffs' claims against Rockwell.  Class membership is even defined by reference to the date of the raid.

### c.  The Warrant's Aftermath and Rockwell's Supposed Exoneration

Defendants, as we have noted, seek exclusion not only of the search warrant, but also of evidence concerning the raid or generated as a result of it.  It will not avail defendants to seek exclusion of this enormous and vaguely defined category of evidence on the theory that Rockwell was somehow ultimately exonerated.  As the Court well knows, Rockwell pleaded guilty to ten

counts of felony environmental violations and paid one of the largest criminal environmental fines in the history of the United States.  The only real controversy over the denouement to this monumental environmental scandal is whether it amounted to a breathtaking whitewash.  One thing is sure.  If the prosecutors ultimately elected to settle for that plea bargain, rather than pressing for conviction on more serious charges, a host of reasons are available to explain that choice other than the supposed benignity of Rockwell's environmental stewardship.  Those other reasons include applicable criminal statutes of limitation, jurisdictional and institutional restrictions on the scope of the criminal investigation, and political considerations.  *See Cook v. Rockwell Int'l Corp.*, 147 F.R.D. 237, 246-47 & n.9 (D. Colo. 1993).

Those other reasons also include the apparent unavailability to Justice Department prosecutors of evidence currently at plaintiffs' disposal.  For example, as defendants are aware but fail to mention, plaintiff witness Ron Avery, a worker at the plant who was not called to testify before the Special Grand Jury, has offered first-hand testimony that he personally participated, at Rockwell's direction, in the secret operation of the Building 771 incinerator.  At deposition, Mr. Avery identified other Rockwell employees who did likewise.  Other witnesses listed by plaintiffs have corroborated Mr. Avery's account.  Defendants have a stonewalling response to this allegation: they say the events in question "never occurred."[4]  But defendants have identified no actual, competent evidence to rebut Mr. Avery's sworn testimony – only Rockwell's failure to plead guilty to the conduct in question, coupled with a few hearsay opinions and professions of agnosticism from prosecutors and other public officials.

---

[4] *See* Defendants' Motion in Limine No. 1, at 3.

*Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motions in Limine – Page 6*

Rather than present any competent evidence of Rockwell's actual innocence, defendants rely heavily on a quotation from Judge Matsch expressing his view that the criminal proceedings against Rockwell "were a lot about nothing."  Plaintiffs have the utmost respect for this Court and for Judge Matsch.  But Rockwell did not plead guilty to "nothing."  The opinions expressed by Judge Matsch were precisely that: preliminary opinions and impressions, stated extemporaneously at a status conference shortly after this case was reassigned to him and prior to its subsequent reassignment. His remarks were not part of any judicial ruling, were not made in the course of disposing of any legal claim or motion pending before him, and did not purport to be based on competing evidence presented by the parties at any hearing in this matter.  They did not and inherently *could* not express any finding by Judge Matsch in his official judicial capacity that the events leading to the FBI raid, or the facts revealed in the course of the subsequent criminal proceedings, were all extraneous to the class claims as a matter of law.

### d.  Defendants' Authorities About Prior Bad Acts

Defendants also rely heavily on authorities involving evidence about prior bad acts.  Those authorities are not controlling or even particularly relevant.   Defendants offer string-cites of inapposite decisions in lieu of even a single case on point.  The authorities that defendants do cite primarily involved efforts to prove a party's misconduct on one occasion through evidence of that party's misconduct on another, often in the context of criminal trials.

Thus in *United States v. Westbo*, 576 F.2d 285, 289-92 (10th Cir. 1978), evidence of a separate uncharged forgery offense was held inadmissible against a criminal defendant in a prosecution for felony wire fraud.   In *Unit Drilling Co. v. Enron Oil & Gas Co.*, 108 F.3d 1186, 1194 (10th Cir. 1997), it was held that Unit Drilling could not establish Enron's breach of the

contract at issue by offering evidence that Enron had also breached a different contract with another party. In *Jetcraft Corp. v. Flight Safety Int'l*, 16 F.3d 362, 365 (10th Cir. 1993), a technical violation of an FAA record-keeping regulation was held inadmissible to prove that the pilot's negligence in piloting a plane caused a subsequent crash. And *Tucker v. Makowski*, 883 F.2d 877, 881 (10th Cir. 1989), involved a habeas petitioner who was convicted in separate trials for robbery and kidnaping, and who complained that prosecutors presented evidence of both crimes at each trial.

Similarly, in *Jones v. Southern Pacific R.R.*, 962 F.2d 447, 450 (5th Cir. 1992), a railroad engineer's safety citations from several years in the past were held inadmissible to prove he was speeding on the occasion at issue. In *United States v. Biswell*, 700 F.3d 1310, 1314-19 (10th Cir. 1983), it was held prejudicial, in the trial of a defendant charged with unlawful acquisition of food stamps, for prosecution witnesses to make repeated reference to alleged previous offenses involving gambling, receipt of stolen property, and other vaguely defined criminal endeavors with no apparent relevance to the offense charged. In *United States v. Burkhardt*, 458 F.2d 201, 203-08 (10th Cir. 1972), the defendant's guilty pleas to Dyer Act violations occurring in 1955 and 1966 were held inadmissible to prove that he violated the Dyer Act again in 1970. In *Shoppin' Bag of Pueblo, Inc. v. Dillon Cos., Inc.*, 783 F.2d 189 (10th Cir. 1986), a terminated FTC investigation was held inadmissible to prove an antitrust defendant's monopolistic intent – an outcome that could be defended purely on relevance grounds. And in *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 663 F. Supp. 1360, 1433-34 (D. Kan. 1987), *aff'd in part & rev'd in part*, 899 F.2d 951 (10th Cir. 1990), *cert. denied*, 497 U.S. 1005 (1990), it was held that the defendant's anti-competitive conduct in one product and geographic market could not be shown by evidence of its antitrust violations years earlier in a different product market and geographic area.

Here, by contrast, evidence from the criminal investigation into Rockwell's environmental conduct at Rocky Flats is being offered directly, to show that Rockwell engaged in *those very acts* – and not to support an inference, based on Rockwell's conduct at some other time or place, that it probably committed some different act in controversy here.  It is true that such evidence may also support a jury finding that Rockwell's handling of hazardous materials was negligent or reckless in general, or that the plant has posed dangers both known and unknown to area residents.  Some of this evidence may tend to show human exposures – or risks of exposure, or negligence – only circumstantially.  But significant reliance on circumstantial evidence is probably inevitable in a trial involving misconduct at a nuclear weapons facility where much information remains classified.  The fact that proof may be circumstantial does not turn it into prohibited proof of conduct through character.[5]

Moreover, evidence concerning the FBI raid and the criminal proceedings is not merely relevant with respect to liability, but is also highly material to the issue of damages.  A market cannot readily discount property values by virtue of problems of which the market has no inkling.  The Denver area was bombarded with news accounts involving the criminal proceedings in 1989 and the

---

[5] Exhibiting a similar confusion, defendants argue, in essence, that evidence is "relevant" to plaintiffs' claims only if it is direct evidence of specific past or potential future incidents demonstrably associated with releases causing class-wide contamination or health risks.  *See* Defendants' Motion in Limine No. 1, at 6-8.  For present purposes, we can leave to one side any quibbles with defendants over the proper interpretation of the Court's rulings on the elements of trespass and nuisance in the class trial.  It suffices here to observe that defendants' argument not only neglects the requirement that plaintiffs prove fault and damages; it wrongly confuses what the jury must find, by way of its ultimate conclusions on physical trespass or interference with use and enjoyment, with a notional *rule of evidence* that every individual exhibit or piece of testimony would have to satisfy.

early 1990's.  Indeed, the criminal investigation, and the facts it uncovered, were the primary focus of media coverage relating to the plant during that period.  To exclude all evidence making reference to those investigations would unfairly cripple plaintiffs' ability to tie events at the plant to public perceptions and the property market's reaction.  Defendants' submission does nothing to explain how the issue of damages or market perception could be tried to the jury, without mention of the information placed at the public's disposal.

### e.  Supposed Prejudice to Dow

Defendants argue in passing that evidence of the criminal proceedings against Rockwell might tar the jury's attitude toward Dow.  Carried to its logical conclusion, such an argument would bar evidence of any misconduct, whether criminal or merely tortious, committed during one defendant's tenure but not the other's.  The short answer is that the jury must be trusted to tell Rockwell from Dow.  If defendants hesitate to draw such distinctions for the jury's benefit, plaintiffs should not be penalized.  It is not plaintiffs who determined that Rockwell and Dow should both be represented by the same counsel.

### f.  The Burden of Rebutting Plaintiffs' Evidence

Defendants' final argument is that rebutting evidence from or about the criminal proceedings would be burdensome.  But as already discussed, the evidence in question is central to plaintiffs' claims.  Almost no evidence about Rockwell's conduct during its later years at the plant went wholly untouched by the criminal investigation.  Rockwell, meanwhile, has had fifteen years to marshall its evidentiary forces in this litigation.  Presumably it has attended to the problem by now.

### 2.  The Grand Jury Investigation

Much of what has already been said in connection with defendants' first motion is equally

applicable to defendants' motion concerning the Special Grand Jury's investigation.  Only a few points need be added.

### a.  Grand Jury Secrecy

The issue of grand jury secrecy, first of all, is simply irrelevant to most if not all of the potential evidence to which defendants' motion refers.  As this Court has previously ruled in this very case, the mere fact that a document may have been subpoenaed by a grand jury, or presented to a grand jury, does not bar the use of the evidence in a civil proceeding.  So too with witnesses.  Testimony in a civil proceeding by a witness who has also testified before a grand jury does not invade grand jury secrecy.  Such evidence may still be presented in a civil case, so long as it is relevant, and such a use does not implicate the secrecy provisions of Fed. R. Crim. P. 6(e).  *See Cook*, 147 F.R.D. at 245.

Indeed, Rule 6(e) does not even purport to include grand jury witnesses within the scope of its secrecy provisions.  So far as Rule 6(e) is concerned, those witnesses are at liberty to disclose their grand jury testimony to whomsoever they please.  Rockwell, for example, employed investigators to debrief its own employees about their grand jury testimony, and in fact it provided those debriefing notes to plaintiffs years ago in discovery.  It also provided a listing of documents subpoenaed by the Special Grand Jury.  If Rockwell believes that gaining access to such information somehow violates grand jury secrecy, Rockwell must be reckoned the primary offender.

The truth, of course, is that plaintiffs' mere use of evidence that may also have been presented to the Special Grand Jury does nothing to violate Rule 6(e) under even its most expansive interpretation.  The dire rhetoric about "compromising" grand jury secrecy with which defendants conclude this motion is thus wildly overblown.  Various other persons, known and unknown, have

already done far more to disclose the internal workings and deliberations of this Special Grand Jury than plaintiffs could ever possibly do.

### b.  Publicity About the Special Grand Jury Investigation

That leaves the question whether the jury should be permitted to hear about the fact of the Special Grand Jury investigation itself.  In arguing that it should not, the primary authority on which defendants rely is *Stump v. Gates*, 211 F.3d 527 (10th Cir. 2000).  That case involved a civil rights claim by children of a deceased parent who alleged that city employees had covered up the fact that their father's death was not a suicide as they had believed, but a homicide.  A grand jury report later released to the children recited the grand jurors' belief that the children's mother had in fact shot their father and placed the gun in his hand.  The grand jury report was presented in evidence in the trial of the children's civil rights claim, and the city appealed from a verdict against it.  Recognizing on appeal that the report would be hearsay unless offered to prove something other than its content, the children floated the theory that the report was relevant to support their claim of outrage, because on reading it they were horrified to learn of the city's role in concealing the true facts about their father's death.  However, the report was actually released to the children several months *after* they had already filed suit, and so even that slender reed on which to rest a claim of countervailing relevance was not available to them.

The fact pattern in this case is very different from what the Tenth Circuit called the "unusual circumstances" in *Stump*.  *See* 211 F.3d at 538.  Plaintiffs here are not even in possession of the Special Grand Jury's actual report, and are as much in the dark about its content as anyone else.  As matters stand, therefore, plaintiffs will be unable to awe the jury with any official documents issued by that panel.  Primarily at issue here is the admissibility of accomplished *publicity* concerning the

Special Grand Jury's investigations, and that *publicity* is directly material to the issue of damages. Those damages, after all, might not exist, or might have been negligible or transient, had the publicity in question never occurred. News reports relating to the Special Grand Jury's investigation was one major means by which the public learned of substantial environmental malfeasance at the plant, and thus one of the factors influencing perceptions of the site in the real estate market. So much so, that it would be virtually impossible to litigate the market's actual response to conditions at the site without addressing this information, which played a significant role in defining that response.

In addition, and unlike the situation in *Stump*, the pendency of the Special Grand Jury's investigation during the early 1990's will be highly relevant to the credibility of various persons whose denials and disclaimers of misconduct at the plant may have been influenced by the fear of criminal indictments (or a show of wrath from their employer).

It is possible that some specific evidence concerning the Special Grand Jury's investigation may require evaluation under Rule 403 at trial, or perhaps a cautionary instruction. The relief defendants seek here, however, is far too broad.

### 3.  The Guilty Plea

Rockwell apparently understands that the plea agreement is a party admission, and so defendants rest their arguments against its admissibility primarily on arguments concerning its alleged irrelevance. Their arguments are sophistical and spurious.

### a.  Actual and Threatened Offsite Harm

Defendants first argue that the conduct to which Rockwell pleaded guilty resulted in no actual or threatened offsite harm of a classwide nature. For this proposition defendants rely almost exclusively on a self-serving affidavit from their own expert, Frank J. Blaha, P.E., and on supposedly

exculpatory statements for whose inclusion in its sentencing memorandum Rockwell bargained during its plea negotiations.

The criminal investigation was not a roving charter for either the prosecutors or the Special Grand Jury to investigate offsite environmental impacts.  That said, plaintiffs will candidly acknowledge that the specific conduct to which Rockwell pled guilty has not resulted, or been shown to result, in the same demonstrable and measurable offsite contanimation attributable to known releases of plutonium under Dow.  The fact remains that the conduct admitted in Rockwell's plea agreement involves objective manifestations of Rockwell's casual disregard for the safe and lawful storage and disposal of radioactive waste at the site.  That conduct is thus relevant to show the potential release of not only the specific substances narrowly at issue in Rockwell's admitted violations, but also other wastes known to have been managed by Rockwell – wastes whose continuing presence at the site has been documented, and which will remain there in large part even if the much ballyhooed cleanup, whose projected completion date has consistently receded in time throughout the fifteen-year pendency of this litigation, now goes completely according to plan.

Much of this evidence would also be relevant under FED. R. EVID. 406 to show the habitual and routine waste practices in which Rockwell engaged – including the systematic skirting and fudging of environmental documentation as a method for avoiding detection of its practices.

A brick, meanwhile, is not a wall, and the specific conduct to which Rockwell pleaded is not the only evidence involving Rockwell in the case.  The guilty plea is part of a larger picture that also includes conduct to which Rockwell did not plead, or with which the criminal investigation was never concerned to begin with.  That overall picture is germane not only to the threat of future releases but also to the public's objectively legitimate apprehension thereof.

### b.  Remediated Conditions

Defendants argue that any specific condition that has been remediated since Rockwell's guilty plea is irrelevant, because section 930 applies only where it appears that the defendant's invasions will continue "indefinitely."  But as comment b to section 930 explains:

> When the private structure or enterprise that is producing the invasions is substantial and relatively enduring in character and not readily alterable so as to avoid future injury, its maintenance or operation ordinarily indicates that the owner intends to continue indefinitely to cause invasions upon the neighboring land. "Indefinitely," as used in this Section does not mean that the situation may be expected to last forever, but merely that there is no reason to expect its termination at any definite time in the future.

Plaintiffs need not show, then, that each and every *event* at the site, standing alone and considered in isolation, resulted in a separate permanent invasion.  Each release or threatened release is not a new and separate nuisance.  Plaintiffs need establish only that the maintenance and operation of the site established an injurious situation not expected to terminate at an ascertainable future time.  A collection of impermanent or even transient events can contribute to that persistent injurious situation, even if no single event would suffice by itself.

### c.  The Guilty Plea and Plaintiffs' Damages Calculations

Defendants argue that plaintiffs' experts on damages did not specifically isolate the economic effects of the guilty plea.  But the damages that plaintiffs' experts did estimate include the overall economic harm to which the facts surrounding the guilty plea contributed.  Plaintiffs are required to offer evidence of damages attributable to the nuisance and trespass, not to parse damages separately

attributable to each act or event contributing to the trespass and nuisance. The conduct to which Rockwell pleaded guilty, and that guilty plea itself, contributed to those damages, and are directly relevant to show that market valuations were rationally tied to objective events involving the plant.

Defendants argue that the guilty plea cannot be relevant to classwide damages, because it occurred in 1992, by which time some class members had sold their properties. Defendants' reasoning, apparently, is that evidence involving the guilty plea can be relevant only if the injurious situation became complete and comparatively enduring at the time of the plea or after (as defendants, we note, may well contend). Among other logical defects, this argument neglects that the *conduct* of which the plea constitutes an admission all occurred prior to 1990. Defendants' argument is also in significant tension with defendants' apparent position that they may disprove the enduring character of the invasions by pointing to subsequent favorable developments and arguing that everything turned out alright in the end. If defendants may indeed proceed in that fashion, then plaintiffs must be at liberty to show otherwise.

### 4. Indemnification by DOE

Plaintiffs' counsel have great respect for the presiding district judge in the *Hanford Nuclear Reservation Litigation.* But it is believed that Judge Nielsen erred in the ruling on which defendants rely, in which he barred mention at trial of DOE's status as the contractor defendants' indemnitor. That issue will be resolved, at least for purposes of Ninth Circuit jurisprudence, in the pending *Hanford* appeals.

Judge Nielsen's ruling, in any event, involved a different set of circumstances. He was not dealing, for one thing, with an indemnitor-contemnor. He was not dealing with DOE's credibility on liability issues either, having held the Hanford contractors strictly liable under Washington law.

The Hanford trial involved only causation and damages for personal injury.

Apart from Judge Nielsen's order, defendants cite no authority to support their contention that the provisions on insurance in Fed. R. Evid. 411 even apply to this situation, which does not involve a contract of insurance, but rather a statutory indemnity under the Price-Anderson Act.

Even assuming that Rule 411 does apply to these Price-Anderson claims, defendants are mistaken in suggesting that it embodies any blanket rule that would bar evidence of insurance (or indemnity) under any and all circumstances. The actual prohibition contained in Rule 411 is far narrower, and more precisely circumscribed, than defendants imply.

Rule 411 reads as follows (the emphasis is plaintiffs'):

> Evidence that a person was or was not insured against liability is not admissible upon the issue whether the person acted negligently or otherwise wrongfully. *This rule does not require the exclusion of evidence of insurance against liability when offered for another purpose, such as proof of agency, ownership, or control, or bias or prejudice of a witness.*

According to the Advisory Committee Notes from the time of the rule's adoption in 1975, "The second [italicized] sentence points out the limits of the rule, using well established illustrations." Under the rule's plain language, and under the decisional law from which it evolved, evidence of insurance (or indemnity) is barred only if offered to show that defendants' conduct was wrongful. Such evidence is not prohibited, under the precedents or the rule, if relevant and material for some other purpose. As the authors of one leading treatise have observed: "Evidence of defendant's insurance against liability is relevant and therefore admissible if its existence tends to prove some material issue and it does not require use of the forbidden hypothesis that 'an insured person tends to be more careless (or more careful) than one who is uninsured.'" *See* Jack B. Weinstein & Margaret A. Berger, WEINSTEIN'S EVIDENCE MANUAL § 7.08 (2003).

Thus courts have routinely held, both before and after the adoption of Rule 411 (and parallel state law provisions), that evidence of insurance is admissible where it materially bears on a witness's credibility or the trustworthiness of a party's evidence. *See, e.g.*, *Conde v. Starlight I*, 103 F.3d 210, 213-14 (1st Cir. 1997) (witness's employment as insurer's "adjuster" relevant to show bias); *Charter v. Chleborad*, 551 F.2d 246, 248-49 (8th Cir.) (error to bar evidence of witness's employment by defendant's insurer), *cert. denied*, 434 U.S. 856 (1977); *Corbett v. Borandi*, 375 F.2d 265 (3d Cir. 1967) (upholding instruction advising jury that expert's employment by insurance company could be considered in evaluating expert's credibility); *Eppinger & Russell Co. v. Sheely*, 24 F.2d 153, 154 (5th Cir. 1928) (proper for plaintiff to examine defense expert on whether he was retained by defendant's surety, because "the inquiry is aimed at revealing the interest of the . . . witness"); *Cook-O'Brien Constr. Co. v. Crawford*, 26 F.2d 574, 575 (9th Cir.) ("If [insurance-related documents] were admissible upon an issue, which, as we have seen, was material, they were not subject to exclusion on the ground that they might tend to prove a fact which the plaintiff was not permitted to prove."), *cert. denied*, 278 U.S. 630 (1928); *Moy Quon v. M. Furuya Co.*, 81 Wash. 526, 532, 143 P. 99, 102 (1914) ("not only proper, but necessary, that the jury be advised of the relation of the witness and his consequent interest in the suit"); *Ede v. Atrium S. OB-GYN*, 71 Ohio St. 3d 124, 642 N.E.2d 365 (1994) ("The second sentence of Evid. R. 411 exists for a reason – it recognizes that testimony regarding insurance is not always prejudicial.").

In this case, DOE's indemnity of defendants is relevant to show its interest and substantial stake in the outcome of the litigation. That interest, in turn, is highly relevant to the credibility of numerous witnesses. Those witnesses include not only the various DOE officials and employees who may serve as fact witnesses, but also such defense experts as Dr. John Till, who has served

recurrently as an expert witness for DOE contractors, in between his organization's equally recurrent performance of governmentally sponsored dose reconstructions at various DOE sites.  DOE's indemnification of defendants also sheds necessary light on the various studies, reports, and investigations at Rocky Flats conducted under its auspices, and on the documents generated by DOE personnel in connection with the ordinary course of the plant's business.  It will help the jury understand the fate of investigators whose reputations have been attacked when DOE found their views uncongenial.  And last but not least, DOE's indemnification will assist the jury to understand the range of DOE's plausible motivations in refusing to provide highly material documents in declassified form.

In sum, it is difficult to see how a jury can evaluate the evidence in this case in a fair and comprehensive fashion, unless it knows of defendants' indemnification by DOE.  It would distort matters beyond fair recognition, if DOE were allowed to be portrayed in this litigation as a disinterested agency, whose only ambitions were to promote a clean environment and protect the national security.

### 5.  DOE's Discovery Conduct

Defendants seize on the occasion of these motions in limine to re-argue their position that the jury should not be advised of DOE's recalcitrance in document discovery in this litigation or given an instruction that it may draw an adverse inference from the withholding of documents by defendants' indemnitor.

Whatever may be defendants' intention, plaintiffs' case-in-chief will focus on facts surrounding the operation of the plant, and the resulting invasions of plaintiffs' interests in land.  It is not plaintiffs' intention to divert the jury's attention from those issues by detailing at length the

tortured history of third-party document discovery in this litigation.  But motions in limine designed to obscure very basic facts are another matter.

The actual issue primarily in controversy here is relatively simple.  Despite having been held in contempt for withholding information in violation of a stipulated discovery order, defendants' indemnitor, which enjoys the statutory right to control the defense of this litigation and is liable for any judgment, systematically exercised its classification power to expurgate information on missing plutonium from records subject to production in discovery.  It did this despite its failure to invoke the State Secrets Privilege in lawful fashion.  *See United States v. Reynolds*, 345 U.S. 1, 7 (1953) ("There must be a formal claim of privilege, lodged by the head of the department which has control over the matter, after actual personal consideration by that officer.").  It did so without actual individualized consideration, by anyone, of the specific items of data redacted, and despite statements from plant management that responsive material could and should be provided.  The jury is entitled to know those facts in evaluating what significance to ascribe to DOE's failure to produce the information.

> Jury instructions on the adverse inference rule are permissible in federal court when there exists an "unexplained failure or refusal of a party . . . to produce evidence that would tend to throw light on the issues." *Gumbs v. International Harvester, Inc.*, 718 F.2d 88, 96 (3d Cir. 1983).  *See also* 3 Edward J. Devitt et al., Federal Jury Practice and  Instructions 72.16 (4th ed. 1987).  For the adverse inference rule to be  applicable, certain factors must generally be present. The Eighth Circuit, for example, requires the following: "(1) it appears that the documentary evidence  exists or existed; (2) the suppressing party has possession or control of the evidence; (3) the evidence is available to the suppressing party, but not to the party seeking production; (4) it appears that there has been actual suppression or withholding of evidence." *Evans v. Robbins*, 897 F.2d 966, 970 (8th  Cir. 1990) (citing 31A C.J.S. Evidence 156(2) (1964)). *See also Spesco v. General Electric Co.*, 719 F.2d 233, 239 (7th Cir. 1983); *Gumbs*, 718  F.2d at 96.

*Gilbert v. Cosco, Inc.*, 989 F.2d 399, 406 (10th Cir. 1993); *see also Moore v. United States*, 864 F.

Supp. 163, 165 n.2 (D. Colo. 1994).

### 6.  Substances Other than Plutonium

To plaintiffs' understanding, based on the Court's rulings concerning the class trial, health risks accruing from actual exposures to hazardous substances released from Rocky Flats will not be addressed in the class trial as a form of interference with use and enjoyment, to the extent the exposures occurred before the time (during the period from 1989 to 1992, in plaintiffs' estimation) at which the injurious situation became comparatively complete and enduring.  Specific evidence of interference with use and enjoyment in the form of health risks associated with future exposures to substances already released  from the site as of that time will not be presented for any substance except plutonium.

That said, it is necessary to raise a few caveats.  First, property market reactions, legitimate apprehension over future releases, and generic emotional distress have all been fueled in part by the general risks of residence near a nuclear weapons facility whose operators demonstrably engaged for many years in reckless practices involving the storage and disposal of a wide variety of hazardous wastes both known and unknown, radioactive and non-radioactive.  There is not, and has never been, any complete and reliable inventory of all of those materials, or of locations where they may remain buried at the site, nor has there ever been a systematic canvassing of offsite concentrations for all hazardous materials routinely handled at the site.  These and other objective considerations mean that residence in areas near the site has always been attended by considerable uncertainty over existing and  potential  future  releases  and  contamination.   Public  concern  over  the  site,  therefore,  as manifested in the property market and well-grounded fears over risks from past and future releases, cannot be cabined to plutonium, and cannot ultimately be parsed on a substance-by-substance basis.

This is particularly true insofar as those concerns reflect uncertainty not only about what future releases may occur, but also about the identity of substances released in the past, the scope of such releases, and, indeed, the very occurrence of past and future releases. Such classwide uncertainties form a legitimate part of the basis for plaintiffs' damage claims, whether or not precise onsite or offsite measurements or estimates of concentrations are available for each particular substance. *Cf. Jaasma v. Shell Oil Co.*, No. 04-2095 (3d Cir. June 28, 2005). Concern over those uncertainties is not speculative but enjoys a solid factual and historical foundation. It would be highly inappropriate, therefore, to bar evidence involving any hazardous substance except plutonium, whether in general or in specific.

Second, evidence of defendants' mishandling of hazardous substances other than plutonium may be relevant and probative as to such matters as waste storage and disposal practices. It would be highly misleading and prejudicial to permit defendants to suggest, or the jury to infer, that defendants' operation of the facility was without risk or environmental blemish except for plutonium.

### 7.  Worker Safety and Health

Plaintiffs do not seek, and have never sought, to raise or prove any claims for personal injury in this litigation, on behalf of workers or anyone else. Plaintiffs do not expect to introduce any evidence that any individual worker has suffered from disease as the result of onsite or offsite exposures to any substance from Rocky Flats. Nor do plaintiffs contemplate introducing evidence of any workers' compensation or similar proceedings, except as may become necessary because such information might have some passing bearing on other issues such as motive or credibility. In the event some passing reference to such proceedings becomes necessary, the parties can first approach

the Court for further guidance, and an appropriate limiting instruction can be issued if necessary.

In short, plaintiffs have no ambition whatsoever to turn this case into a trial on the issue of worker health. Such a strategy presumably would not stand plaintiffs in good stead with the jury, given the elements of plaintiffs' property claims and the instructions the jury is expected to receive.

A blanket ruling excluding all material relating or pertaining to worker exposures or worker health, however, would be overbroad. For example, plaintiffs' health experts may rely in part on literature reflecting epidemiological investigations of populations that include nuclear workers, at Rocky Flats and elsewhere. To cite another example, incidents when plutonium escaped containment in the workplace may be relevant to show that such escapes of containment could and did occur, and to rebut defense claims that defendants exercised due care and kept the plutonium in the gloveboxes at all times. All releases, after all, *begin* with an escape from some defined location, and such locations would commonly represent a work environment. Evidence that defendants were tolerant of onsite exposures also permits an inference that they were similarly incautious as to offsite exposures, perhaps by virtue of private conviction that the health risks of such exposures were negligible, overblown, or simply something to be tolerated in the interests of production.

## 8.  Events Occurring "Wholly Within Buildings"

Evidence of chronic disregard for containment of plutonium and other hazardous waste is relevant, on grounds already largely covered, to a host of issues, whether or not that disregard manifested "wholly within a building." As with the plutonium in the ductwork, such evidence can be circumstantially probative of past releases. It can be relevant to well-founded market perceptions and fears. It can be probative of waste storage practices that created risks of future release. And it can show a pattern or practice of negligent waste handling.

This motion in limine should be treated with special caution, because it has especially insidious potential in virtue of the theory of proof it tacitly embodies. As defendants appear to envision this case, all proof must track the fate of some specific batch of a defined contaminant, released at some specific location onsite during some discrete event (documented, necessarily, by defendants themselves), trace its detailed migrational path to the great outdoors, portray in detail its dispersal offsite into a classwide environment, document its permanent presence there, measure and map the resulting concentrations and exposures, quantify the resulting health risks, and demonstrate on that basis that the concentrations and releases resulting from that incident alone would constitute an actionable trespass or nuisance (even if the incident has yet to occur). Plaintiffs must then prove that the market possessed accurate and detailed knowledge of that specific incident and the concomitant health risks, and allocate some precise fraction of value diminution to the incident.

It is understandable that defendants and their indemnitor should favor this vision of the case. They ran the plant, documented the events, maintained the monitoring equipment, funded the studies, and controlled the classification regime that prevented independent monitoring of their activities. All of this effectively gave them the power to *decree*, by fiat, which releases would be deemed to have "occurred wholly within buildings" – or not to have occurred at all.

As the result of investigations in the wake of incidents that defendants could not conceal – e.g., the FBI raid – much evidence has come to light to begin piercing that veil of secrecy, and to establish some of the consequences of defendants' conduct, through direct internal documentation or offsite measurements and dose reconstructions. But much necessarily remains uncertain, and can be judged only indirectly and by inference. Facts supporting such inferences will involve many events that happened, or at least began, "within buildings." When employees punched holes in filters

that were intended to contain the plutonium within the workplace environment, the holes were punched wholly within a building.  The 1957 and 1969 plutonium fires began wholly within a building.  But how those and similar events may be tied to consequences outside the buildings is not a subject on which the jury may be required to accept defendants' say-so.

## 9.  Material Unaccounted For, a.k.a. "Inventory Difference"

As defendants do not and cannot dispute, it is known from such MUF data as DOE has already released to the public or produced in discovery that defendants and DOE are unable to account for tons of plutonium at the site.  Everyone agrees that not all of that plutonium was released to the environment.  Some of the inventory discrepancies are accounting artifacts.  How far such explanations could account for all or nearly all the MUF cannot be quantitatively characterized with any precision, as DOE has refused to release the data.  But if anything resembling a release of all missing plutonium at Rocky Flats had occurred, Colorado would be a wasteland.

Everyone should also agree, however, that MUF data do shed light on some known releases.  Among the documents produced by DOE, for example, is an internal report that performs MUF calculations to estimate plutonium releases from the 1957 fire.  To say that MUF has "nothing to do" with quantifying releases is thus at loggerheads with defendants' own documents and plain common sense.

Defendants are also wrong, meanwhile, to suggest that the MUF would be relevant only to prove or measure offsite plutonium releases.  The inability to account for large sums of radioactive material known to have entered the site, but whose departure from it remains undocumented, is plainly germane to the risk of future harms, public perception, market discounts, and fears generically experienced by persons residing near the plant.  It also bears on the credibility of

defendants and government agencies who purport to be able to monitor plutonium in the external environment in microscopic quantities, but who habitually mislaid multi-kilogram chunks of it at the site.

If defendants or DOE wished to demonstrate that the relevant material can now in fact be "accounted for," the remedy would have been more data.

### 10.  "Past Risks" That Never Materialized

Evidence about so-called "past risks" is relevant both to the Class members' (and the market's) perception of the Class properties, and to plaintiffs' discussion of defendants' safety precautions, or more accurately, the lack of adequate precautions.  Plaintiffs will show that defendants' inadequate risk management practices fit with the overall pattern of their ongoing recklessness in the face of very serious dangers.  That neglect proves, for the class-wide generic causation element of nuisance, that the normal, reasonable person in the community would be frightened (and justifiably so) about the continuing and possibly unknown risks from living downwind of Rocky Flats.  May 17, 2005 Order at 5-7; *see also supra* pp. 21-22.

Defendants also misinterpret the meaning of "future risk" under the Court's May 17 Order and under the Second Restatement of Torts, section 930.  The existence of a risk of future harm is observed at the time the harm became complete and comparatively enduring (the "CCE time").  The applicable damages measure is, the amount property value diminution measured at the CCE time.  Order of May 17, 2005 at 15.  The market discount on Class properties as of that time exists because the market at that time takes into account all risks of future harm to the property due to Rocky Flats (as well as the uncertainty that the threat may one day change, so that some risks may be greater or less in the future).

Defendants' Motion is somewhat amorphous, as defendants seek a very broad preclusion order without identifying more concrete examples of the type of evidence at issue. Plaintiffs intend to present their case on safety precautions primarily through their experts Dr. Budnitz and Dr. Cochran, who are the subject of further briefing on defendants' motions to exclude expert testimony. Accordingly, defendants' relevance objections to exhibits would more properly be directed to the applicable exhibits plaintiffs will identify as part of the joint pre-trial order.

### 11.  Plutonium-Related Incidents Not Causing Class-Wide Contamination

Defendants once again rest on the imaginary rule that plaintiffs are limited to presenting evidence about events that they can prove (even before presenting such evidence) contaminated the entire class area at once. As with the "incidents inside buildings" motion (Deft. Motion No. 8), evidence of plutonium accidents or small-scale releases is relevant to well-founded market perceptions and fears; defendants' waste storage practices that created risks of future release; and defendants' overall pattern of negligent waste handling. Moreover, any plutonium incident that resulted in a release of plutonium into the environment likely added to the contamination present in the Class area, and/or increased the risk of future harm to the Class in case those plutonium deposits are ever disturbed and re-suspended.

### 12.  Evidence That Does Not Apply Class-Wide

Most of defendants' other motions could easily be subsumed in this sweeping motion to preclude from the trial any event or problem at Rocky Flats that plaintiffs cannot prove resulted in the dispersal of pollution to the entire class. Defendants' arguments rest on a fundamental error: it is not each piece of *evidence* that must be class-wide; it is plaintiff's *claims* that are. Defendants' environmental mismanagement is relevant to the existence of risk, and the rationality of the public's

perception of risk (including their perception of past events and the risk of future harm).  These incidents prove that risk of class-wide releases, and the market's perception of that risk, were founded on objective evidence.  These events fit with plaintiffs' theory of the case, that defendants engaged in a pattern of misconduct throughout the history of Rocky Flats.  There is no legal requirement that plaintiffs may present evidence only of incidents that physically affected every plaintiff.  *See Bradbury v. Phillips Petroleum Co.*, 815 F.2d 1356, 1364-66 (10th Cir. 1987) (evidence of a pattern of trespass and property damage was admissible to prove recklessness and other elements of the plaintiffs' case, even though none involved personal injury as plaintiff's case did); *Silkwood v. Kerr-McGee Corp.*, 769 F.2d 1451, 1455-56 (10th Cir. 1985), *cert. denied*, 476 U.S. 1104 (1986) (holding that evidence of other nuclear safety incidents, including MUF, was relevant to prove negligence, even when that evidence was not limited to the specific incidents that harmed the plaintiff).

### 13.  Opinion Testimony By Lay Witnesses

Plaintiffs have listed Mr. Ackland, Dr. Biggs, and Dr. Poet as fact witnesses because Plaintiffs intend to present their factual, not expert, testimony.  The fact that a witness happens to possess specialized knowledge does not transform every statement uttered by that witness into an expert opinion.  *See United States v. Caballero*, 277 F.3d 1235, 1247 (10th Cir. 2002) ("[W]itnesses need not testify as experts simply because they are experts – the nature and object of their testimony determines whether the procedural protections of Rule 702 apply."); Fed. R. Evid. 701, adv. cmte. note (2000) (revised Rule 701 "does not distinguish between expert and lay *witnesses*, but rather between expert and lay *testimony*.") (emphasis in original).

Courts draw the line between expert and lay testimony based on how closely the witness

adheres to describing events, versus extrapolating from the evidence and employing his specialized knowledge to reach a conclusion. The classic example is the treating physician called to testify about his personal observations based on examining a patient. "'A treating physician is not considered an expert witness if he or she testifies about observations based on personal knowledge, including the treatment of the party.'" *U.S. v. Martinez*, No. 00-2054, 2001 WL 289785, at *3 (10th Cir. Mar. 26. 2001) (quoting *Davoll v. Webb*, 194 F.3d 1116, 1138 (10th Cir. 1999)). The 2000 amendment to Rule 701 did not alter the general rule that a lay witness, even one who happens to have specialized knowledge, may offer factual and opinion testimony based on his or her observations and personal knowledge. *See Lifewise Master Funding v. Telebank*, 374 F.3d 917, 930 (10th Cir. 2004) ("[T]he district court acknowledged that Mr. Livingston could have testified solely as a businessperson based on his personal knowledge and his experience as president of the company. He could have given a straightforward opinion as to lost profits using conventional methods based on LifeWise's actual operating history . . . .."); *Goeken v. Wal-Mart Stores, Inc.*, No. 99-4191, 2001 WL 1159751, *2-3 (D.Kan. Aug 16, 2001) ("The court agrees that a treating physician may testify to prognosis, the extent of present and future disability, and the need for future medical treatment." *Id*. at *3.). The distinction is drawn between knowledge the expert gained during the normal course of events, versus knowledge developed for the purpose of trial. *See Lifewise*, 374 F.3d at 929-30 (distinguishing between testimony about damages model developed for trial, an expert opinion, and testimony about lost profits based on normal methods and actual observations from running the business, a lay opinion).

Moreover, a lay witness, even one with specialized knowledge, may offer opinion testimony as long as that opinion meets the requirements of Rule 701; that is, the opinion is "rationally based

on the perception of the witness." Fed. R. Evid. 701.  Rule 701 allows lay witnesses to express an opinion where the witness would have trouble describing the constituent facts that make up his opinion, or where describing those constituent facts would be unduly cumbersome.  *See* Fed. R. Evid. 701, Advisory Committee Note (1972) ("Witnesses often find difficulty in expressing themselves in language which is not that of an opinion or conclusion.").  The test is not the identity of the witness, but rather whether "the personal knowledge, rational basis, and helpfulness standards of Rule 701 are met."  *Asplundh Mfg. Div. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1198 (3d Cir. 1995).

Mr. Ackland, Mr. Poet, and Dr. Biggs have acquired personal knowledge of certain facts based on work they conducted wholly apart from this litigation.  Their testimony, including lay opinions, where necessary, is admissible because it involves facts and perceptions derived entirely from those investigations.  A Second Circuit case interpreting the recent amendments to Rule 701, *Bank of China, New York Branch v. NBM L.L.C.*, 359 F.3d 171, 180-82 (2d Cir. 2004), is instructive. In that case, the bank sued several corporations, alleging they defaulted on their loans and conspired under RICO to deprive the bank of the loan proceeds.  At trial, the bank offered the testimony of one of its employees who was assigned to investigate the defendants' activities.  The Second Circuit held that the employee's opinions were a mix of both lay and expert opinion testimony.  *Id.* at 181.  The court properly drew the line between lay testimony based on the witness' investigation, versus testimony that could only be derived from his specialized knowledge (in other words, testimony based on facts extrinsic to the investigation):

> The fact that Huang has specialized knowledge, or that he carried out the investigation because of that knowledge, does not preclude him from testifying pursuant to Rule 701, so long as the testimony was based on the investigation and

reflected his investigatory findings and conclusions, and was not rooted exclusively in his expertise in international banking.

*Id*. at 181.

Plaintiffs have not sought to qualify Mr. Ackland, Mr. Poet, or Dr. Biggs as experts because plaintiffs seek to use only their first-hand observations and perceptions of events. Len Ackland is a journalist who has become quite familiar with the media coverage of Rocky Flats. He will testify about what information was available to the public about Rocky Flats, and when, based on his knowledge of the media coverage over the years. He will not be asked to testify to the truth of any of the statements found in the news articles. Additionally, Mr. Ackland may testify about his own experiences with Rocky Flats' culture of secrecy, as he experienced in trying to obtain documents and information from DOE and other government sources. *See, e.g.* Ackland Dep. at 208-09, 210-11 (Ex. 1).[6]

Dr. Gale Biggs and Stuart Poet were both scientists who participated major events in Rocky Flats' history.[7] Mr. Poet, working with Dr. Edward Martell, completed the first soil sampling study

_____

[6] Although such matters are not relevant for the purposes of determining admissibility, Plaintiffs strongly take issue with defendants' portrayal of Mr. Ackland as "biased". *See* Def. Motion in Limine No. 13, at 10. Mr. Ackland is sensitive to the need for journalists to strive for objective methods: that is, "using a research method that allows you to -- you look at information, and be as accurate, fair, and open-minded as possible." Ackland Dep. at 21 (Ex. 1); *see also id.* at 21-22, 212-17. He took great care to ensure that his book would present a fair picture of the history of Rocky Flats. *E.g. id.* at 215-17. He wishes to remain a neutral party in this litigation. *Id.* at 29.

[7] Similarly, defendants' December, 2003 witness list includes a number of individuals with specialized knowledge or training, yet presumably will testify as eyewitnesses based on their experiences, not as experts offering opinions based on research conducted for this litigation. For example, Lee Foreman, Rockwell's attorney during the criminal investigation, and Rocky Flats employees Ferrell Hobbs, Ed Naimon, and William Weston, who all underwent special training regarding nuclear materials and the

that found the soil in the class area was contaminated with plutonium from Rocky Flats.  *See*

*Plutonium-239 and Americium-241 Contamination in the Denver Area*, S.E. Poet and E.A. Martell,

Health Physics, Oct. 1972, 537-48 (Ex. 2).  He will testify about the study in the sense of presenting

the history, events, and findings of the study.   Dr. Biggs is a meteorologist who has participated in

several groups and projects dealing with environmental issues and Rocky Flats.  Notably, Dr. Biggs

was part of the panel appointed to the Rocky Flats Scientific Monitoring Panel (which later became

the Citizens Advisory Board) by Gov. Romer in or around 1989.  He was also a member of the

Health Advisory Panel, specifically the Citizen's Soil Sampling Committee.  He will testify about

the historical events surrounding his work, and will relate the fact that the governor's panel found

Rocky Flats' environmental monitoring systems were inadequate in a number of ways.  To the extent

plaintiffs chose to introduce into evidence the documents produced by Mr. Poet and Dr. Biggs,  it

is logical for plaintiffs to introduce the documents through the testimony of their authors.

Much of these witnesses' testimony will be in the form of facts, not opinions, so the

requirements of Rule 701 will not apply.  *Cf. Caballero*, 277 F.3d at 1247 (testimony of INS officials

about agency procedures, and testimony of financial analyst summarizing defendants' records, were

not expert or lay opinion testimony).  To the extent it becomes necessary for these witnesses to

express themselves in the form of an opinion, their lay testimony will be subject to the same

restrictions as that of a treating physician – that is, it must be based on, and derived in the course of,

the investigations they conducted.  *Cf. Lifewise*, 374 F.3d at 929-30; *Goeken,* 2001 WL 1159751,

at *2-3.

_____

manufacturing processes they oversaw, all have some specialized training that will
inevitably color their testimony.

These three witnesses' testimony is relevant to establishing major historical events in the history of Rocky Flats, which are a part of the overall pattern of reckless and negligent mishandling of dangerous materials on which plaintiffs' claims are based. Defendants' arguments against the relevancy of this evidence are grounded on a contorted reading of this Court's May 17, 2005 Order, a reading that defendants have perpetuated throughout their various motions. *See also* supra p. 28 (response to Motion No.12). As that entire history is relevant to Plaintiffs' claims, Mr. Ackland, Mr. Poet, and Dr. Biggs' testimony is admissible.

### 14. & 15.  Evidence of Other Litigation Against Defendants

Defendants have moved for a blanket exclusion of evidence of other lawsuits or criminal proceedings against them, including the criminal investigation of Rocky Flats that was the triggering event for this lawsuit. The criminal case and the *Church* lawsuit grew out of and became another chapter in the legacy of criminally negligent and reckless management that lies at the heart of this case. Plaintiffs do not intend to offer evidence about the other lawsuits themselves, so defendants' objections to those are moot.

### a.  The Criminal Prosecution of Rockwell- Rocky Flats

The criminal case against Rocky Flats – including the FBI raid, the grand jury investigation, Rockwell's guilty plea, and later charges by the grand jurors that the Department of Justice gave Rockwell an easy deal under political pressure – is a pivotal event in this lawsuit, and is highly relevant to the claims at issue. This evidence was already discussed at length, supra, at pages 4-15. The FBI raid on June 7, 1989, was the triggering event for this lawsuit. The history of the criminal case itself was a source of anxiety for the Class and therefore was part of the nuisance caused by

Rockwell's conduct.[8]   Additionally, the criminal case evolved out of the same pattern of environmental neglect and mis-management that gave rise to this case. *See, e.g.* Information, *United States v. Rockwell Int'l Corp.*, No. 92-CR-107 (D. Colo. Mar. 26, 1992), Counts 1 & 2 (pondcrete and saltcrete storage), Count 3 (spray irrigation) (Ex. 3); Application and Affidavit for Search Warrant, at 12-13 (illegal operation of incinerator) (Ex. 4).[9]  It would be impossible for Plaintiffs to tell the story of Rocky Flats while under a gag order not to speak about the criminal case. *Cf. United States v. Masters*, 622 F.2d 83, 86-87 (4th Cir. 1980) (finding evidence of extrinsic crimes relevant to proving the setting or "*res gestae*" of the case).  The facts that Rockwell faced criminal charges for its conduct, that it pled guilty to several violations, and that the grand jury intended to indict the company and several of its managers but was silenced by the DOJ, tell the jury that Rockwell's neglect was so severe as to be criminal.

Defendants have failed to show that the high probative value of this evidence is "substantially outweighed" by any unfair prejudice. Fed. R. Evid. 403.  It is difficult to see where prejudice could arise here, as Rockwell's wrongful acts at issue in the criminal case are a subset of the very same acts alleged by Plaintiffs in this case.  "Unfair prejudice" does not mean, evidence that is unfavorable to one party. *United States v. Rodriguez*, 192 F.3d 946, 9550-51 (10th Cir. 1999).  Rather, "unfair

---

[8] Plaintiffs urge the Court to reject the absurd suggestion, which defendants have raised on several occasions and which plaintiffs anticipate they will raise here, that any nuisance caused by news of the criminal investigation was the fault of the news media or the FBI, not Rockwell.  Rockwell's terrible environmental stewardship triggered the investigation and the media attention; the media and the FBI simply informed the public about Rockwell's bad conduct.  *See also* Plaintiffs' Response to Defendants Memorandum Regarding The Facts and Evidence Warranting an Intervening Cause Instruction.

[9] The relevance of the criminal investigation is discussed in more detail in Plaintiffs' Responses to Defendants' Motions in Limine Nos. 1, 2, and 3.

prejudice" is defined as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  Fed. R. Evid. 403, adv. cmte. note (1972).  It is not improper for the jury to conclude that Rockwell's environmental violations were serious, as evidenced by the fact that they were the subject of a criminal investigation.

In a similar situation, the Tenth Circuit found that evidence of prior negligent conduct was admissible.  In *Elliot v. Turner Constr. Co.*, 381 F.3d 995, 1003-04 (10th Cir. 2004), the plaintiff was a worker who was injured during the construction of a bridge, and sued the subcontractor for negligence.  The plaintiff sought to present several examples of other mishaps and problems at the construction site caused by the defendant's negligence.   The Tenth Circuit, upholding the admissibility of the evidence, held that the evidence "was offered to prove the central theory of plaintiff's case: the unpreparedness of the defendant B & C Steel for the project and their lack of planning for it." *Id*. at 1004 (internal quotation marks omitted).  The court also found that any potential prejudice "was not so overwhelming as to trump the relevance of this evidence."  *Id*. Similarly, the criminal investigation is central to the theme of this case, that the entire history of Rocky Flats was pervaded by haphazard environmental practices, an emphasis on production over safety, and the contractors' belief that they were immune from any form of accountability.

Exclusion on Rule 403 grounds "is an extraordinary remedy and should be used sparingly." *Rodriguez*, 192 F.3d at 949 (10th Cir. 1999).  Defendants have not shown that such an extraordinary remedy is warranted.  Moreover, they can easily counter any alleged prejudice at trial.  Rockwell is expected to dispute the criminal charges, as it has shown it is willing to dispute all of Plaintiffs' allegations of wrongdoing.  Defendants can also prevent any "spillover effect" by clarifying for the jury that the criminal proceeding involved only Rockwell, not Dow.  In light of the central

importance of the criminal proceeding to this case, and the minimal or nonexistent risk of unfair prejudice, exclusion under Rule 403 is not warranted.

**b.  The *Church* Litigation**

The claims and facts involved in the *Church* litigation, like the criminal case against Rockwell, are also a subset of the facts alleged by plaintiffs in this case.  *See, e.g.* Pre-Trial Statement, *Church v. Dow Chem. Co.*, No. 75-M-1162 (D. Colo.), Vol. 1: Introductory, at 9 (negligent waste handling practices), 10-21 (outdoor storage of radioactive waste and leakage therefrom), 21-24 (1957 fire), 24-26 (1969 fire), 29-31 (cover-up of problems) (Ex. 5).  At the beginning of this litigation, Dow insisted that the only documents that plaintiffs needed regarding Dow's operations were the set produced in the *Church* case.  The *Church* lawsuit and settlement itself is an additional chapter in the story of Rocky Flats, and it would be impossible to excise the fact of the *Church* litigation from testimony about its results and repercussions.  *Cf. United States v. Masters*, 622 F.2d 83, 86-87 (10th Cir.1980) (evidence is admissible under Rules 403 and 404 when necessary to a full presentation of case).  The suit was the first time *anyone* had attempted to hold the plant responsible for its terrible environmental management, and it marked the beginning of a process by which information about Dow's misconduct began to come to light.

The lawsuit was also another chapter in defendants' history of denial and dishonesty with the public about the problems at Rocky Flats.  After ten years of litigation, defendants finally agreed to a settlement, pursuant to which Jefferson County agreed to purchase from the plaintiffs (with financial contribution from Rockwell) some of the most heavily contaminated land for use as "public space."  However, the land is so heavily contaminated it cannot be used for human recreation.  *See* Appraisal of Vacant Tract of Land, Effective on August 13, 1993, by Justin H. Haynes & Co., at 2

("Although the appraised property is owned by Jefferson County Open Space, it is currently closed to public use due to radioactive contamination.") (Ex. 6);[10] *Park Sought on Radioactive Land*, Denver Post, Dec. 7, 1985, 1-B (Ex. 7). It is important that the jury understand how close such badly contaminated land is to the class area, and that they know this "open space" was not donated willingly, but was a concession achieved only after protracted litigation.

Compared to the probative value of this evidence, the chance of any prejudice is minute. The *Church* lawsuit took place twenty years ago, so it is difficult to envision the case provoking an emotional reaction in the jury. Moreover, the fact that the suit ended in a settlement rather than a verdict against defendants renders the result "inconclusive" in the jury's mind, and thus jurors will be less tempted to view the lawsuit alone as proof that defendants committed the acts alleged in the *Church* suit. In any event, plaintiffs plan to introduce independent evidence proving that defendants did commit those acts, and defendants will undoubtedly present their own evidence contesting those facts, so any potential prejudice from the *Church* lawsuit will be minimized by this thorough examination of the evidence.

### c. Other Cases

Plaintiffs do not intend to present evidence about the Santa Susana, *Stone*, workers' compensation, or asbestos litigation. However, plaintiffs reserve the right to use evidence that was developed during those cases. A relevant document or witness should not be excluded simply

---

[10] This appraisal examines the land that Jefferson County acquired pursuant to the *Church* settlement. *See* Appraisal at 11 (Ex. 6) (describing property history; property was acquired as a result of Civil Action No. 75-M-1162, *i.e.* the *Church* lawsuit). As the appraisal's title reflects, the City of Westminster later acquired the former Church settlement land for its Standley Lake Protection Project

because it was unearthed during the course of another lawsuit.  Appropriate redactions or limiting instructions can adequately exclude the fact of the other lawsuit from the jury.

### 16.  Costs of Remediation of the Rocky Flats Plant Site

The cost to decontaminate Rocky Flats – which has thus far amounted to at least $473 million,[11] and has been projected to total $7.3 billion by the time the work is finished[12] – is relevant to give the jury an idea how severely contaminated the site was (and still is), and to put in perspective the difficulty of cleaning up radioactive contamination.  These facts will in turn inform the jury that the plant was and is a continuing nuisance because it is a continuing source of anxiety for Class members and it poses a continuing threat of further off-site releases.

Defendants have failed to show that the high probative value of this evidence is "substantially outweighed" by any "unfair prejudice."  Fed. R. Evid. 403.  Defendants apparently intend to introduce evidence about the cleanup (*see, e.g.* Whipple 8/8/04 Rep. (attached as Ex. 20 to Plaintiffs' Motion to Exclude Expert Testimony)), so once they open the door there is no reason to believe that informing the jury of the *amount* of the cleanup costs will add to any supposed prejudicial effect. Exclusion on Rule 403 grounds "is an extraordinary remedy and should be used sparingly." *Rodriguez*, 192 F.3d at 949 (internal quotation marks omitted).  "Unfair prejudice" does not mean, evidence that is unfavorable to one party. *Id.* at 950-51.  Rather, "unfair prejudice" is defined as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an

---

[11] *See* LeRoy Moore, "The Bait-and-Switch Cleanup," Bulletin of the Atomic Scientists, January/ February 2005, at 56 (Ex. 8).

[12] Report, Accelerating Cleanup:  Path to Closure, Rocky Flats Environmental Technology Site, Draft February 1998, at 4-3 (Ex. 9)

emotional one." Fed. R. Evid. 403, adv. cmte. note (1972). It is not improper for the jury to find that

the Class perceived Rocky Flats as a nuisance based on the fact that the plant site was grossly

contaminated, a fact evidenced by the expensive and laborious cleanup operation. Despite

defendants' suggestion that the jury could use the cost of cleanup to assume that a trespass occurred,

defendants will assuredly take great pains to distinguish their purely on-site conduct from any off-site

trespass, so even this remote possibility of prejudice will be cabined.

The cleanup is not a "subsequent remedial measure" under Rule 407. The remedial measures

were taken by DOE and its new contractors, Kaiser-Hill and EG&G, not by defendants, so the Rule

does not apply. *See Mehojah v. Drummond*, 56 F.3d 1213, 1215 (10th Cir. 1995) (Rule 407 does

not apply to subsequent remedial measures implemented by non-defendants).[13] In any event, the

Rule proscribes use of remedial measures evidence only "to prove negligence, culpable conduct, a

defect in a product, a defect in a product's design, or a need for a warning or instruction." Fed. R.

Evid. 407. Evidence about the cleanup has other, permissible uses besides showing culpable

conduct; the evidence will help quantify for the jury the extent of contamination on the plant site and

the difficulty of removing it. The use of remedial measures evidence to show the condition of a site

or item before an accident is permissible. *See Rimkus v. Northwest Colo. Ski Corp.*, 706 F.2d 1060,

1063-66 (10th Cir. 1983) (affirming admissibility of evidence that ski resort marked area where

plaintiff was injured after his accident; "The fact that the rocks in issue were unmarked at the time

---

[13] The two policies behind Rule 407 – encouraging remedial measures, and preventing the jury from viewing the remedial measures as an admission of negligence, *see* Fed. R. Evid. 407, adv. cme. note (1972) – do not apply when a third party carries out the repairs. The threat of a lawsuit against the defendant would not deter the third party would from making repairs, and repair by a third party cannot be considered an implied admission by the defendant. *See generally* Wright & Graham, Fed. Prac. & Proc. Evid. § 5284 (1980).

of the accident tended to raise the inference that they must have been clearly visible on the day of the accident. To deprive Rimkus of an opportunity to rebut this inference would be unfair." *Id.* at 1066.); *McFarlane v. Caterpillar, Inc.*, 974 F.2d 176, 181-82 (D.C. Cir. 1992); *Bailey v. Kawasaki-Kisen, K.K.*, 455 F.2d 392, 395-96 (5th Cir. 1972); *see also* Charles Alan Wright & Kenneth Graham, Fed. Prac. & Proc. Evid. § 5290 (1980) ("One permissible use of subsequent remedial measures that was recognized at common law and that will continue to apply under Rule 407 ... is as proof of prior conditions.").

### III.  CONCLUSION

For all the foregoing reasons, plaintiffs respectfully request that the Court DENY all of Defendants' motions in limine.

Respectfully submitted,

Dated: July 8, 2005

   /s  Jennifer MacNaughton      
Merrill G. Davidoff
Peter Nordberg
Jennifer MacNaughton
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000

Gary B. Blum
Steven W. Kelly
Silver & DeBoskey, P.C.
1801 York Street
Denver, CO 80206
(303) 399-3000

Attorneys for Plaintiffs
And the Class

## CERTIFICATE OF SERVICE

I certify that today, July 8, 2005, I electronically filed the foregoing, Plaintiffs' Consolidated Memorandum In Opposition to Defendants' Sixteen Motions in Limine, and accompanying exhibits, with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail address:

> Joseph J. Bronesky, Esq.
> **SHERMAN & HOWARD**
> 633 17th Street, Suite 3000
> Denver, CO  80202
> (303) 297-2900
> (303) 298-0940 (Fax)
> jbronesk@sah.com

I also hereby certify that I have mailed the document to the following non CM/ECF participants via e-mail and Federal Express:

> Douglas J. Kurtenbach, Esq.
> **KIRKLAND & ELLIS**
> 200 East Randolph Drive
> Chicago, IL  60601
> (312) 861-2000
> (312) 861-2200 (Fax)

> /s  Jennifer MacNaughton
> Jennifer MacNaughton
> Attorney for Plaintiffs and the Class
> Berger & Montague, PC
> 1622 Locust St.
> Philadelphia, PA  19103
> tel  (215) 875-3000
> fax (215) 875-4604
> jmacnaughton@bm.net