LEN ACKLAND, MAY 26, 2004

1

```
 1  27683ASG
    IN THE UNITED STATES DISTRICT COURT
 2  FOR THE DISTRICT OF COLORADO

 3  Civil Action No. 90-K-181

 4  _____

 5
    MERILYN COOK, et al.,
 6
    Plaintiffs,
 7
    vs.
 8
    ROCKWELL INTERNATIONAL CORPORATION and
 9  THE DOW CHEMICAL COMPANY,

10  Defendants.

11  _____

12
                DEPOSITION OF LEN ACKLAND
13                    May 26, 2004

14  Pursuant to Subpoena taken on behalf of the Defendants
    at 555 30th Street, Boulder, Colorado, at 8:05 a.m.,
15  before Sara Goldenberg, Registered Professional Reporter
    and Notary Public within Colorado.
16

17

18

19

20

21

22
                                                  COPY
23

24

25
```

1       MR. NORDBERG:  Form.
2       THE DEPONENT:  Yes, in this field.
3       MR. NORDBERG:  I object to the form of that
4  question.
5       Q.   (BY MR. POLAND)  Did you understand my
6  question, Mr. Ackland?
7       A.   I think so.
8            The other book that I used is a book by
9  Bill -- a former Chicago Tribune reporter, whose last
10 name I'm blanking on at the moment, who did a book on
11 investigative reporting.  I've used that a couple of
12 times with the class -- Bill Gaines, G-a-i-n-e-s.
13      Q.   I wanted to ask you about objectivity, and
14 specifically in journalism.  Does objectivity exist in
15 journalism?
16      A.   You know, objectivity is a very misused and
17 poorly understood term.  Most of the time, when you're
18 talking about objectivity in journalism, you're really
19 talking about objective method, you know, using a
20 research method that allows you to -- you look at
21 information, and be as accurate, fair, and open-minded
22 as possible.  So there is an objective method, not
23 unlike the scientific method.
24           In terms of objectivity, that is a term that
25 generally implies values, and we all carry our values.

1  So the idea that -- the way you phrase questions,
2  questions you ask, all has to do with a very subjective
3  knowledge.  So in that sense, there is an objective
4  method that's important, but none of us is fully
5  objective.
6         Q.   Is it important for a journalist to follow
7  objective methods in investigating and researching a
8  story?
9         A.   Yes.
10        Q.   Is that something that you teach your
11 students in your courses that you teach at the
12 University of Colorado?
13        A.   Yes.
14        Q.   And you mentioned that all of us have
15 certain values that we bring to things that we do.  Do
16 you have any personal values, biases, whatever you want
17 to call it, that you're aware of, that affect your work
18 as a journalist?
19        A.   Oh, I'm sure I do.
20        Q.   Can you identify any?
21        A.   Yeah.  I have a low threshold for injustice,
22 you know.  I don't like to see people either abused or
23 misused by those in power.  I have a strong sense that
24 authority needs to be questioned, that we need to be
25 skeptical.  Those are some.

```
 1              MR. NORDBERG:  Ellen Noteware?
 2              THE DEPONENT:  Yes.
 3              MR. NORDBERG:  N-o-t-e-w-a-r-e.
 4       Q.     (BY MR. POLAND)  How many times have you
 5  spoken with Ms. Noteware?
 6       A.     Once.
 7       Q.     And when was that?
 8       A.     Two weeks ago, maybe.  Yeah, two weeks ago I
 9  talked to her.  Prior to that, I'd actually had a call
10  from Jenna MacNaughton-Wong, but that's another
11  attorney, I guess.
12       Q.     Was that about this deposition specifically?
13       A.     That was about -- no.  It was prior to the
14  subpoena.  It was -- she was updating me about where
15  things stood and that the Defendants had expressed an
16  intention to depose everyone who was on the witness
17  list.  And so she expected I would be getting -- I would
18  be subpoenaed, and did I want her office,
19  Berger & Montague, to handle the subpoena.  And I said
20  no, you know.  Since I'm not being retained by anyone, I
21  just wanted to be a neutral party.  So I'd accept the
22  subpoena myself, if it were to come in.
23       Q.     And you did receive a subpoena, correct?
24       A.     I did.
25       Q.     And that came from my office,
```

1  who had some expertise in environmental cleanup and
2  seemed to be serious about it.
3          Now, there are still problems, as you can
4  read about almost weekly, but those are the three
5  periods.
6      Q.  Maybe you've explained this, but if you did,
7  I didn't quite hear it or understand it.  How would you
8  characterize the general press coverage during this
9  third period and how it differed, if at all, from the
10 press coverage in the earlier periods?
11     A.  The press coverage in the third period
12 was -- well, again, it depended.  It was much more
13 aggressive.  In sort of the last half of the second
14 period and the third period, more information was
15 available.  Reporters could have access to officials
16 that they couldn't have access to before.
17         And from my own experience, I interviewed
18 workers, but even then, in this third period, you know,
19 after cleanup, I can remember meeting with three
20 workers.  One was a union steward and then two other
21 workers.  And every time I would ask a question, the two
22 workers would look to the union steward and say, Can I
23 answer that question?
24         So there was still this sort of sense of
25 secrecy and feeling that they didn't know; the workers

1  themselves didn't really know what they could say,
2  because they had grown up in a culture of secrecy.
3       Q.   Are you the first person to use the phrase,
4  or the only person to use the phrase, "culture of
5  secrecy"?
6            MR. POLAND:  Can you repeat it.
7       Q.   (BY MR. NORDBERG)  Are you the first person
8  to use the phrase, or the only person to use the phrase,
9  culture of secrecy?
10      A.   I think, actually, I was responding to a
11 question that Doug used in referring to the culture of
12 secrecy.
13      Q.   Have you used that expression yourself that
14 you recall?
15      A.   Have I used it myself?  I probably used it
16 myself.  I certainly didn't coin it.
17      Q.   Can you think of any governmental officials
18 who have either used that phrase or addressed the
19 concerns that that phrase might be used to address?
20      A.   Let me check.
21           You know, Watkins talked about DOE culture,
22 but I don't think he referred to it as a culture of
23 secrecy, per se.
24      Q.   You're referring to former Secretary of
25 Energy Admiral Watkins?

LEN ACKLAND, MAY 26, 2004

1   A.   Yes, Admiral Watkins.  Right.
2        If you want, I can look and see.  I just
3   remember that being a specific issue, that he talked
4   about trying to change the DOE culture.  I don't recall
5   that he used secrecy in that way.
6        Anyway, no, it's not a term that I've
7   coined.  It's a term that I think has been used to
8   describe other aspects of the nuclear weapons complex
9   and the government in general.
10  Q.   Did former Secretary of Energy O'Leary ever
11  comment publicly, to your knowledge, on issues involving
12  secrecy at the weapons complex?
13  A.   Oh, yes.
14  Q.   You can either refer to your book or tell me
15  from memory what you might remember or know about.
16  A.   Right.  I'm sorry.  I was back to your
17  question of culture.
18       Yeah.  I mean, Secretary O'Leary is
19  well-known, by researchers of the nuclear weapons
20  complex, for her openness initiative, which she
21  announced in December of '93, I believe, which was --
22  and at that time declassified a lot of documents about
23  what had been going in the production complex.
24  Q.   So the openness initiative was an effort on
25  the part of the Department of Energy to become more open

LEN ACKLAND, MAY 26, 2004

1  and to disclose more information about events in the
2  nuclear weapons complex, both currently and in the past?
3      A.   Yes.  And unfortunately, there's been
4  considerable sliding back towards secrecy, particularly
5  in the current administration.
6      Q.   How long have you been in journalism?
7      A.   Oh, since 1968.
8      Q.   And how long have you been teaching it,
9  again?
10     A.   13 years.
11     Q.   So in the course of your teaching and your
12 experience as a journalist, you've probably become
13 generally familiar with the standards and practices,
14 such as they are and whatever they are, that journalists
15 try to live by?
16     A.   Mm-hmm, yes.
17     Q.   Do those standards and practices vary from
18 place to place, time to time, and, indeed, period to
19 period to some extent?
20          MR. POLAND:  Object to the form of the
21 question.
22          MR. NORDBERG:  I'll rephrase the question.
23 I'll come at it from a different angle.
24     Q.   (BY MR. NORDBERG)  Is there some official
25 national standard from a government body describing what

Case No. 1:90-cv-00181-JLK   Document 1395-1   filed 07/08/05   USDC Colorado   pg 9 of 14

212

LEN ACKLAND, MAY 26, 2004

```
 1  those practices or standards should be?
 2       A.   No.
 3       Q.   How, then, as a journalist, would I know
 4  what the practices were or what the standards were?
 5  Where would I go to find out?
 6       A.   There are a number of organizations that
 7  attempt to teach good journalism.  Some of those are at
 8  journalism schools.  There are organizations of
 9  journalists who are organized around a particular theme
10  of coverage, for example, investigative reporters and
11  editors, Society of Environmental Journalists.  There's
12  the Society of Professional Journalists.  There are --
13  some of these groups try to set, like, ethical standards
14  and guidelines.
15            Most publications have their own set of
16  guidelines that they tell reporters about, but there's
17  no -- just as there's no license to be a journalist,
18  there's no set of standards or test that has to be
19  passed.  I mean, anybody can claim to be a journalist.
20  Matt Drudge is a good example.  There are a lot of
21  people posing as good journalists.
22            And, you know, I think that it's important
23  for the public to understand that journalism, like any
24  other field, there are good ones and there are bad ones.
25  And the standards, you know, vary considerably.
```

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX 312.704.4950

1   Now, there are legal constraints, and that's
2   where we have libel and slander laws. But, you know,
3   it's an unregulated business on purpose, by the First
4   Amendment, in that the problem has always been who
5   regulates the media and for what purposes.
6   And it's very important to have freedom of
7   speech and freedom of the press in this country in order
8   to have -- I mean, the traditional thought is an
9   informed public, that makes a democracy possible.
10   Q.   If I understand your answer just now
11   correctly, there might be differences of opinion among
12   respectful journalists on what some of those standards
13   are or should be; is that fair to say?
14   A.   Well, there are always differences of
15   opinion in gray areas, and even good journalists will
16   disagree on exactly how far you go in a certain gray
17   area.
18   Q.   I want to talk about sourcing for a minute.
19   I want to talk about how many sources you need to print
20   a statement, what kinds of sources they have to be,
21   whether the number of them you need to have depends
22   on -- that kind of issue depends on what kind of
23   statement it is, all of that.
24   First of all, is there a fixed and general
25   set of accepted standards about the number of sources

```
 1  that you need to have to make a particular kind of
 2  statement or publish a particular kind of piece of
 3  information?
 4          A.   No.
 5          Q.   So there's no rule that there has to be
 6  three --
 7          A.   No.
 8          Q.   -- or one?  I suppose you would need at
 9  least one.
10          A.   Unless you're going to get into the area of
11  Jason Boyer and Jack Kelly, and fabrication, fiction.
12          Q.   Would it be fair to say that you might want
13  to consult a greater number of sources the more
14  controversial a proposition was, as a general rule?
15          A.   I'd say, as a general rule, that's true,
16  yeah.  Just to elaborate on that, the more
17  controversial -- there's some statements -- you know,
18  you could get into one sort of absolute, saying every
19  time you interview someone, everything they say, you
20  have to verify.  Well, that would make journalism
21  impossible.  I mean, you can't verify everything.
22               So there's a judgment call about what you
23  need to go after.  And certainly, the more
24  controversial, you know, you'd better figure out the
25  source of the controversy and try to get solid evidence
```

1  that supports one conclusion or another.
2          Q.   Is it also a factor, in deciding whether you
3  need corroboration or backup with more sources, to look
4  at whether the source that you've got is someone you
5  have good reason to think is in a position to know?
6          MR. POLAND:  If you could pause for a
7  moment.
8          Could you read the question back, please.
9          MR. NORDBERG:  I'll rephrase the question.
10         Q.   (BY MR. NORDBERG)  Does it also affect the
11 number of sources that you might want to consult, to
12 evaluate whether the person giving you the
13 information -- whether there's good reason to think that
14 the person giving you the information has good reason to
15 know what he's talking about, firsthand knowledge, so to
16 speak?
17         Did you understand my question, or was it
18 still --
19         A.   I think so.
20         You know, again, it depends.  It depends on
21 the person and the standing of that person.  It depends
22 on what that person is talking about, and from their own
23 experience.  Memory is fallible.  And, for example, you
24 know, in doing my book, when I heard a really amazing
25 story from someone, I tried to find corroboration.  I'll

1  give you an example.
2            One of the Dow security chiefs in my
3  interview -- I should have added him to your list, but I
4  can't remember everybody I talked to -- talked about a
5  meeting that he and a colleague had with Marcus Church
6  at his ranch, because there was a fight over setting
7  monitors up in Church's fields.  And Church was angry
8  about not being able to get his cattle from one pasture
9  to another.
10           And so they went to his house.  And so I
11 heard this story from that particular guy, and it was a
12 great story, but, you know, how accurate was it?
13           I found a copy of a letter in the McKay
14 files that was a follow-up to that meeting.  And so, you
15 know, even though I didn't have specific corroboration
16 because the other two men were both dead for that, it
17 corroborated you know, the general part of the meeting
18 that occurred and the consequences.
19           So by attributing the actual conversation
20 and sort of event with this one source, I felt
21 comfortable going with that.
22           There were other times when, you know, I
23 couldn't find corroboration for something that seemed,
24 you know, pretty extreme.  And I didn't use that, even
25 with -- you know, and even with individual sources -- I

1  mean, all of us tend to remember Dean Acheson's
2  wonderful comment about his autobiography: "I don't
3  remember everything, but I never remember anything to my
4  disadvantage." So Jim Kelly was a great example of
5  that.
6        Q.   Would you consider it standard journalistic
7  practice to rely exclusively on governmental sources for
8  information about important issues?
9        A.   Oh, absolutely not.
10       Q.   Have I ever spoken with you before today?
11       A.   No.
12       Q.   And Mr. Poland came and visited with you, I
13 guess, when he came, at least to look at your documents
14 and designate some for production, right?
15       A.   Yes, but I didn't invite him to.
16       Q.   He subpoenaed the documents?
17       A.   It was subpoenaed. I had to meet with him,
18 yes.
19            MR. POLAND:  For the record, I knocked
20 first.
21            THE DEPONENT:  You didn't barge in.
22            MR. NORDBERG:  I'm sure Mr. Poland was very
23 civil.
24       Q.   (BY MR. NORDBERG)  And you talked a little
25 bit about the documents, at least when he came to look