IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| THE GOOD FUND, LTD. - 1972, a Texas limited partnership, and GOOD FINANCIAL CORPORATION, a Texas corporation, )<br><br>Plaintiffs, )<br><br>v. )<br><br>MARCUS F. CHURCH AND MARCUS F. CHURCH, TRUSTEE;  THE DOW CHEMICAL COMPANY, a Delaware corporation;  ROCKWELL INTER-NATIONAL CORPORATION, a Delaware corporation;  and THE UNITED STATES OF AMERICA, )<br><br>Defendants ) | Civil Action No. 75-M-1111 |

------------------------------------

| | |
|---|---|
| MARCUS F. CHURCH AND MARCUS F. CHURCH, TRUSTEE, )<br><br>Plaintiffs )<br><br>AND )<br><br>WILLIAM C. ACKARD;  SAMUEL BUTLER, JR.; and BUTLER INVESTMENTS, LTD., a Limited Partnership, )<br><br>Intervening Plaintiffs, )<br><br>v. )<br><br>UNITED STATES OF AMERICA; DOW CHEMICAL COMPANY;  and ROCKWELL INTERNATIONAL CORPORATION, )<br><br>Defendants. ) | Civil Action No. 75-M-1162 |

------------------------------------

| | |
|---|---|
| GREAT WESTERN VENTURE, a Colorado Limited Partnership )<br><br>Plaintiff, )<br><br>v. )<br><br>UNITED STATES OF AMERICA, THE DOW CHEMICAL COMPANY, and ROCKWELL INTERNATIONAL COR-PORATION, )<br><br>Defendants. ) | Civil Action No. 75-M-1296 |

PRE-TRIAL STATEMENT

VOLUME I:  INTRODUCTORY

© Fairfield & Woods, 1978.

## GENERAL INTRODUCTION

Marcus F. Church and Marcus F. Church, Trustee, William C. Ackard, Samuel Butler, Jr., and Butler Investments, Ltd., a Limited Partnership, submit this Pre-Trial Statement. It is submitted pursuant to the Pre-Trial Conference of April 6, 1978.*

### Scope of Statement

We have attempted to concentrate on the most important subjects. Thus, as the Table of Contents shows, we have substantial sections concerning radioactive solid and oil wastes and fires. We have been forced by lack of time not to deal with other matters that are also of great concern to us. These include but are not limited to liquid and gaseous wastes and effluents, and the "solar evaporation ponds." We have just touched on the data from environmental monitoring, both what has been found and what has not been looked for or found. The Eberline testing program deals with some of those concerns but not others. We have not dealt with several large and very important areas of evidence. Two of these are the health effects resulting from Rocky Flats radiation, and the money damages to plaintiff's lands. Neither have we dealt in detail with the fear created in the public by Rocky Flats and the effect it has on the market value of land. This fear issue is linked with, but theoretically separable from, the health effects issue.

---

*One mundane but necessary detail to be stated here is that virtually all underlining within quotes is added by us. Some say "emphasis added," some do not, but unless we state "emphasis in original," we have added the emphasis.

1

Several statements from the April 6 conference have
shaped the development of this Pre-Trial Statement. The
Court expressed interest not in the legal theories but
the factual development of the case for trial. Similarly,
Mr. Chavez thought "the plaintiffs are in a position to . . .
start pinning the tail on the donkey if they think they can
do it." (Transcript at 45). As a result, we cite very few
legal authorities. Virtually everything here is facts,
gathered from the defendants' documents.

We pointed out on April 6 that we sought exemplary
damages based on "wanton and reckless disregard of the
injured party's rights and feelings" (CRS 1973 §13-21-102).
We have gone into much more detail here than we might have
if we were not concerned about this aspect of the case.
The detail, with emphasis on negligence, should not obscure our
other theories of the case, for we think the facts support
all our theories. The facts should be seen in the perspective
of proving that: 1) the corporate defendants are strictly
liable for damages resulting from their ultrahazardous
operations at Rocky Flats; 2) they are liable in nuisance;
3) the doctrine of res ipsa loquitur is applicable; and
4) both corporate defendants and the United States are
liable for trespass without proof of negligence. U. S. v.
Gaidys, 194 F. 2d (10th Cir. 1952).

Under any of these alternative theories, we would
need to prove much less and would have written much less.
For example, concerning trespass and nuisance, Colorado
has some very strong law stated in Miller v. Carnation Co.,
33 Colo. App. 62, 516 P. 2d 661 (1973) and Miller v.
Carnation Co., ___ Colo. App. ___, 564 P. 2d 127 (1977).

2

Plaintiffs (buyers and owners of land adjacent to an egg ranch) claimed and won claims of exemplary damages based on trespass and nuisance when defendants failed to remove chicken manure from beneath chicken houses, and allowed development of odors and flies which flew onto plaintiffs' property, annoyed plaintiffs and damaged plaintiffs' house with fly specks. Actual damages of $85,000 and exemplary damages of $300,000 were assessed, and the Colorado Supreme Court refused certiorari in both cases.

Another set of statements at the pre-trial conference induced such full disclosure on our part. The transcript says at 46 and 49:

> THE COURT: I think what Mr. Elliott is suggesting is probably right, that we need to know what you are really going to rely on at trial.
>
> MR. HOLME: Your Honor, we are prepared to do that, but the one thing I want, because we will be baring our soul in this and giving them opportunity to prepare everything to rebut it; and, of course, they have more resources to do that than we, but at any rate the thing that I would want in return is a prompt response in detail, in kind.
>
> *     *     *
>
> THE COURT: Well, I think the first response to that would be--and I have used this approach before--is a conference just like this at which we go through it and say, "What are you going to say about this? And what are you going to do about that?" Sure. We're not going to have one-sided disclosure. But how you get to the other side is a different thing, and I have experimented with both sides filing simultaneously their plans, and I don't think that is feasible for this particular case.
>
> I am here to try to be fair among the parties, and you file something within whatever time frame we have. We have a session like this to respond to it. Then at least we know the areas in which we would require detailed response and the areas in which there is going to be generalized agreement.

3

We have bared our case, and rely on the Court to require
equal candor in response. We do not think we got candor
in response to the sixty pages of Church's Request for
Admission of January 12, 1978, when the defendants did
not admit one single statement. They had a half dozen
objections to the request that they admit that Church's
property was adjacent to the Rocky Flats Plant (Request 7).
They had a dozen objections to the request that they admit
that an exhibit to Church's claim "is a letter from Perry
and Butler Realtors to plaintiff of February 25, 1972."
(Request 99).

### Differences Between Defendants

One of the matters discussed was the differentiation
or isolation of particular defendants. We responded at
43:

> . . . we want to show that Dow was
> primarily responsible for a given inci-
> dent, and then we want to show that the
> Government ratified it. And we want to
> show that a particular Government employee
> ratified that and ratified it negligently.
> That then allows us to recover against
> Dow and the Government, for example . . .
>
> So we intend to the maximum extent
> to make all the defendants liable for
> everything and there will be, you know,
> there is a long list of incidents on which
> we rely.

We show, throughout the Dow-AEC relationship, from 1952
to 1975, that most of the matters we allege were known by
both, but Dow was the independent contractor operating under
only very general supervision. We mention a couple of incidents
since 1975 where Rockwell is responsible for special contami-
nation. These include the 1978 beryllium fire in the filter

4

plenum associated with a uranium building, and the plowing
of the buffer zone in 1975, which led to substantial wind
erosion blowing contaminated onsite soil offsite.  Rockwell
has also maintained many of the dangers of the plant without
substantial change.  The recent Colorado Supreme Court case,
Gladin v. Von Engeln, ___ Colo. ___, 575 P. 2d 418 (March 6,
1978) is important to Rockwell, even though Rockwell is a
contractor and not the formal title holder to the land on
which the plant sits.  There, a predecessor in title to
real property created a condition which endangered adjacent
property and then sold to a successor in title.  The prede-
cessor in title was held strictly liable (at 420 - 421).
The Colorado Supreme Court held the successor in title liable
for failing to correct the dangerous condition, approving
the following instruction which should be applied to Rockwell:

> "Where land has been altered from its
> natural state so as to create a condition
> which a reasonably prudent person would
> anticipate might result in injury to ad-
> joining property, the owner of such altered
> land has a duty not to permit such condi-
> tion to remain on his land, but to correct
> such dangerous condition at the earliest
> practicable opportunity.  The owner of such
> altered land has such duty whether or not
> he initially created the condition or
> whether or not the condition was negligently
> created.
>
> The failure to perform such duty may
> constitute negligence on the part of owner
> of the land on which such condition exists."

5

## SUMMARY AND CONCLUSIONS

In this section we summarize a few of the key points made in the body of the Pre-Trial Statement. We do this not because we think reading this can be any substitute for reading the whole, but as a means of getting perspective on the forest before plunging into the trees.

### TYPES AND QUANTITIES OF MATERIALS

Rocky Flats handles large quantities of ultrahazardous materials. We concentrate on the radioactive materials, but do not denigrate the hazard posed by toxic non-radioactive materials. In fact, we have a list of hazardous materials and chemicals used at Rocky Flats, nearly all non-radioactive, which is over a hundred pages long.

Some of the most hazardous radioactive materials at Rocky Flats are plutonium, americium, uranium, thorium, tritium, curium, neptunium, and polonium. Some of the hazardous non-radioactive materials are beryllium, lithium, cadmium, hexavalent chromium, carbon tetrachloride, polychlorinated biphenyls, nickel carbonyl, cyanides, and nitric, sulfuric and hydrochloric acids.

Tens of tons of plutonium have been processed, machined or otherwise manufactured at Rocky Flats. By 1969, and presumably still, more plutonium had been handled at Rocky Flats than at all other AEC contractors combined. In one fire in 1969, about one ton of plutonium burned. A person who inhales a thousandth of an ounce of plutonium would be expected to die within weeks, and "lung cancer doses" are calculated in billionths of grams·

6

Americium is separated from plutonium at Rocky Flats. It is even more radioactive than plutonium and moves more easily through the food chain. From 1967-1976 an average of 1410 grams of americium have been shipped from Rocky Flats each year.

Enriched uranium (EU) has been used at Rocky Flats for making bomb parts, probably on a scale comparable to plutonium until about 1965. Hundreds of tons of depleted uranium (DU) have been used. Tens of tons of normal uranium have also been present, and presumably used, at Rocky Flats. Some bomb parts have been made of the more radioactive U-233 also. All forms of uranium are radioactive.

These materials have frequently been used in hazardous forms, in hazardous operations and in hazardous environments.

## SITE SELECTION

The Rocky Flats site was picked by Dow, the United States and the Austin Company after a hurried search from January to March, 1951. It was picked primarily because of convenience and cost. Very little consideration was given to matters of the public health and safety.

Colorado was picked largely to avoid air conditioning costs. The site picked was very small, four square miles, in contrast to the huge reservations picked for Hanford and Oak Ridge. Despite the danger of this plant, sites were preferred for their proximity to Denver, rather than their distance from populations subject to the radiation and other dangers.

7

The study of dangers was almost negligible. Apparently, no study of the site was made for its suitability for the storage of radioactive wastes, yet the Plant was not designed to prevent the accumulation of large quantities of such waste. No studies are cited for the conclusion (recently under substantial attack) that Rocky Flats is safe from major earthquake damage.

The site selection report claims that it is desirable for the site to be downwind of Denver, and that a windrose used in the study indicates that prevailing winds are from the south, favoring the Rocky Flats site. This windrose was apparently taken from Stapleton Airport, 27 miles from the site. The winds at Rocky Flats are, however, entirely different, being very strong at times and predominantly from the west (blowing toward, rather than away from, Denver).

If such a plant were being built today, concerns about the health risks would prevent its being built near a large metropolitan area, but when it was selected no part of the public was consulted, and even Colorado's top elected officials were not informed that the plant would be built until the decision had already been made.

### INTRODUCTION TO WASTE MANAGEMENT

Rocky Flats has always generated and handled wastes contaminated with plutonium, americium, uranium, and a great variety of other radioactive and non-radioactive toxins. In addition to its own wastes, Rocky Flats has accepted various known and unknown wastes from

8

other facilities in Colorado and elsewhere, mixing them with Rocky Flats waste without proper recordkeeping. The Rocky Flats and other radioactively contaminated wastes were a variety of liquid, solid and gaseous wastes, including oils, solvents, aqueous liquids, soils, machinery, paper and cloth trash, sewage sludge, ashes, etc. In 1973 recommendations by the head of the AEC Rocky Flats Area Office were made and rejected to test comprehensively to discover what radioactive poisons Rocky Flats was emitting.

There are a number of ways in which the radioactive waste operations were negligent. Planning was not done concerning feasibility and methods for proper handling of wastes. Cost and convenience outweighed health or safety considerations, and ad hoc solutions frequently resemble the mountain miner's solution of shoving waste out the door and down the hill, then forgetting about it. Rocky Flats ignored warnings that contamination would occur, used inadequate or no technology to prevent contamination, failed to monitor for radiation, and ignored or covered up contamination findings after contamination occurred. Rocky Flats repeated the same mistakes made earlier, waited years before taking corrective action, took ineffective corrective action, or downgraded their policies and standards to take less effective corrective actions than had been taken earlier. Rocky Flats has frequently cleaned up whatever has been cleaned up not because of any concern for health or the environment but only because of adverse publicity or other public pressure.

9

## PRE-OPERATIONAL PLANNING AND EARLY REMEDIES

Waste management was a low priority at Rocky Flats at least from 1952 to 1970. It was plagued by bad planning, stop-gap solutions and attempts to save a few dollars.

Rocky Flats is largely a machining plant, shaping radioactive metals with machine tools, cooling the parts and cutting tools with oil, and cleaning the oil from parts and shavings with solvent. Thus, it was obvious that wastes would include such oils, solvents, and cuttings, yet the plant was not planned or equipped to reprocess, store or package them for offsite shipment.

The first solution was to store these materials in the buildings. Then when room was needed they were stored on loading docks, slabs and fields near the major processing buildings. Federal transportation regula-tions inhibited shipping of containers which might leak radioactivity, and leaky containers were common at Rocky Flats. It was soon realized that surrounding a smaller drum with absorbent material in a larger drum, or cement-ing the liquids could help prevent leaks and facilitate shipment. These solutions, however, added cost.

## TWENTY-SIX OUTDOOR STORAGE AREAS

We summarize plant reports showing that many or most open spaces near buildings were used to store waste, specifying 26 such areas and discussing the wastes stored there. Many or most of the areas were

10

subjected to leaky drums containing radioactive waste.
Some attempts at decontamination were made, but generally
residual contamination was left, subject to resuspension,
erosion by water, etc.

In some of the areas large amounts of plutonium,
americium or uranium were known.  Some 8-14 kilograms
of plutonium were thought to be in 1700 barrels stored
near building 663.  This storage area was larger than
the 903 area and was partly "decontaminated by scraping
and removal of soil," (probably with substantial resuspension).

THE MOUND AREA

By the third year of Plant operations (1954),
hundreds of drums of contaminated waste had accumulated
outside production Building 444.  In April 1954, 862
drums of wastes were put in an area north of the east
access road and covered with dirt.  In November an
additional 118 barrels of liquid wastes were added to
the Mound, as it has been called.

Some of these drums contained solid wastes and
presumably could and should have been shipped offsite.
No precautions of double drumming or concreting of
liquid wastes were taken.  Other barrels (creating "a
fire hazard of high degree") were buried in a trench
near the Mound.  More burials were made in the next
four years, by July 1958 the mound had filled up; a
total of 1606 barrels of waste were buried there.

Most of the barrels of waste were contaminated
with depleted uranium.  Others were contaminated with
enriched uranium and an estimated 285 grams of plutonium.
Similar plutonium contaminated liquid waste (from the
903 area) contained 300,000,000 pCi/l -- or 20,000
"Maximum permissible lung burdens" per liter.

11

Meetings of Dow, the Plant Union and the Joint
Committee on Atomic Energy in April 1970, show that
many people at the Plant had not known when the original
barrels were buried at the Mound, virtually everyone
had forgotten that the burial was there, records of
the burial were incomplete, people were uncertain of
what regulations might have been violated, and how
to clean up the area was unknown. Much of the discussion
concerned how best to avoid bad publicity upon the
disclosure or discovery of the Mound.

The drums were removed from the Mound beginning
shortly after the meeting with the JCAE, but without
extensive protective or monitoring measures.

### THE TRENCHES AND OTHER BURIALS

Besides the Mound, many other burials were made
at Rocky Flats between 1954 and 1970. Recordkeeping
was poor, and new burials were discovered as recently
as the soil sampling hearings in 1977.

Uranium was buried in huge quantities. In Trench
number 1, used 1954-1962, two Dow estimates are 25,000 kg,
and tens of thousands of kgs, of depleted uranium chips.
Similar material was not taken back into production
buildings because of the fire hazard it created.

The sanitary waste treatment plant, a basic common
sewer treatment facility, supposedly for non-process
uncontaminated domestic waste, has been a source of
other huge amounts of radioactive waste. Rocky Flats
has identified seven trenches in which over one hundred
tons of this sludge has been buried. The original

12

Dow authorization of this type of burial in 1954, recognized that it was "30% above the tolerance quoted in the AEC GM Bulletin on Disposal of Radioactive Wastes." Other burials, which continued until 1972 contained sewage sludge up to 100 times this quoted "tolerance." Trenches were used from 1952 to 1968, when this sludge was put in the "sanitary" landfill, "intended" only for "uncontaminated waste." Some of the sludge measured up to 250,000 d/m/g.

Also buried in trenches were some of the ashes from the unfiltered plant incinerator. Other of these ashes were dumped, buried elsewhere, or lost.

### RADIOACTIVE WASTE BURNING

Open air burning of Rocky Flats waste began on or before April 16, 1954, and continued at least until 1968. Contaminated oils were burned in large quantities. Contaminated waste was routinely burned in the Rocky Flats incinerator. The practices were not justifiable to begin with, and they continued far too long.

Waste cutting oil contaminated with depleted uranium (DU), enriched uranium (EU) and plutonium began to accumulate early. Uranium contaminated oils, from which any recovered uranium would be of relatively low value, was in the way and posed fire and contamination hazards. To avoid burial, shipment or storage, Dow began burning oils contaminated with DU and EU by August 1956, in burning pits. Over one thousand barrels of this contaminated oil were burned.

13

"Safety analyses" of this procedure were planned in 1957 and 1960, but apparently were not carried out at least until 1961. We have seen no results of any tests or sampling of these burnings, but a better means of contaminating the countryside with large quantities of insoluble particles of uranium oxide of respirable size can hardly be imagined. The lack of records, lack of monitoring, and lack of separation of DU, EU and Pu bearing wastes at Rocky Flats gives little assurance no plutonium oils were burned.

One incident illustrates the sloppiness of radioactive materials handling and accountability. Three sheets of DU, weighing 60 kg, were accidently burned between two sheets of plywood. Rocky Flats claims that 40 kg of the uranium was left at the burning site (in soil which was shipped to Idaho) and that the rest was buried in the old "sanitary" landfill. No one knows how much went up in the smoke.

From 1952-1968, Rocky Flats maintained "the kind of incinerator you used to see at the Safeway Stores," near the West Gate. Contaminated waste was regularly burned there, and the ashes were regularly monitored, showing levels orders of magnitude above background. Ashes contaminated with DU, EU and Pu measuring up to 10,000 d/m/g were dumped on the slopes near Woman Creek or buried in trenches until about 1968, when they were buried in the "sanitary" landfill. The incinerator stopped operations, ironically, because it could not meet air pollution standards relating to "emission visibility." So it was the blackness of the smoke, not its radioactivity that led Dow finally to stop this operation.

14

## THE 903 OIL DRUM STORAGE AREA

Rocky Flats admits causing a major offsite plu-
tonium release to some of plaintiffs' lands from the
903 area.  The Environmental Monitoring Laboratory
(formerly called the AEC Health and Safety Laboratory)
estimated an 11.4 curie or 160 gram release at and
from the 903 area.  Defendants  claim, though we disagree,
that the 903 area was responsible for 99% of all offsite
radioactivity from Rocky Flats.  Plutonium, uranium
and probably other radionuclides were stored there
for up to ten years, outside and unprotected while
the barrels of contaminated oil and solvents leaked,
all under Dow's and the United States knowing supervision.

The same types of waste had been buried in the
mound, across the road from the "bullpen" and the 903
area.  As a Dow employee (later General Manager) said,
"We buried them and then all of a sudden one day we
stuck them out -- quit burying them and put them on
top of the ground."  When the mound was no longer used,
the "bullpen" (a fenced area) was filled, then the
area east of the bullpen was progressively filled,
from October 1958 until 1967.  From 1967 - 1969 the
903 area was emptied, as the triangle area was filled.

Dow management knew they had built a plant un-
equipped to recover the metals from the cutting oils
which constituted a major component of its waste, and
Dow Health Physics personnel warned management of the
contamination from the beginning.  The tragedy of the
903 area need never have happened, if a 1954 Dow document

15

is correct. It sounded the warning and proposed a
solution. It said, "It has long been a problem of what
to do with the contaminated oils and similar organics....we
have found that a very simple and cheap method of sludg-
ing the oils, perclene, etc. can be accomplished by
using bentonite clay" to form "a thick and very coherent
sludge that can be shipped from the plant site as such."
Bentonite clay, along the Front Range, is literally
dirt cheap.

Before the 903 area was started, in September
1958, a drum of Building 76 oil (Pu) ruptured on a
loading dock. Despite this and other warnings, apparently
used oil drums were put on this field at least from
1961 on. Defendants frequently claim, as in their
Offer of Proof, that "In January, 1964, the first
evidence of large scale deterioration of drums was
reported and an increase of plutonium laden oil in the
soil was noted." In reality, the barrels leaked from
before the time they were placed at the 903 area, which
is why, in 1959, Rocky Flats transported barrels to
the 903 area from the buildings on a metal tray fitted
to a wooden pallet to avoid contaminating the roads.
Leaks seen in 1959 led to the addition of rust inhibitor
to newly added drums, but apparently not to drums
already at the 903 area. By 1962, a Dow memorandum
said, "About 50 - 60 percent of these drums are badly
corroded. The contents of several has [sic] already
spilled out on the ground."

Later, contaminated rabbits were observed there.
A drum was punctured by a fork lift, contaminating the
area further. In 1966, Dow even stopped keeping

16

records of how many drums and from where, were there. The final accumulation of drums, before the "cleanup" began in 1967 was over 5,200 barrels.

The cleanup began with an attempt to prefilter the oil in a small shack called Building 903, which was replaced by "drum-to-drum [transfers] in the field," apparently unprotected by the Building. "In October, 1968, weeds and vegetation were burned off the 903 contaminated barrel storage area preparatory to applying an asphalt cap over the area. No airborne contamination problems were encountered," according to Dow, though very high air contamination was measured at a permanent outside air monitor nearby. In November 1968, grading of the area began. Not until July was the first layer of fill put down, and not until October 1969 was asphalt applied. Dow and AEC were disagreeing over whether to use asphalt or concrete.

Dow claims that 85.81 grams of plutonium is the total spilled. HASL reported 160 grams (assuming the pad is no more contaminated than the surrounding area). Both figures are serious underestimates, but, conveniently, no one took any soil samples before the area was paved. Later Dow removed, from one hole dug through the pavement, 100 kg of "dirt," 25 kg of which was uranium metal.

Looking back, and quoted in a newspaper article, C.W. Piltingsrud, Dow health physicist said, "In those days there was nothing wrong with letting this stuff blow around.... We knew what was going on." Management said, "Hell... what's wrong." Dow's head health physicist, E. A. Putzier, in his deposition in this case said "technically there would be nothing wrong with burning the weeds off the 903 area."

17

## THE TRIANGLE AREA

The triangle area, north of Central Avenue and east of the solar ponds, was the area on which a huge amount of waste was put after waste was no longer generally being added to the 903 area. It began in late 1966 with the removal of "a large number of drums from a field north of Building 883 due to construction of a new decontamination facility in that area." "The type of drum being used during this period of time was routinely a 55-gallon drum, bought used from off site, and re-used several times after arrival on the plant site." Not surprisingly, the drums leaked.

By 1968, there were more than 6,000 drums of "<u>burnables</u> and washables awaiting recovery, waste drums awaiting disposition to the burial site, and ZPPR residues." "High winds have blown over as many as 150 drums at one time." These drums, awaiting <u>recovery</u>, contained much more plutonium than those admitted to be at the 903 area. One reference is to drums, each containing over one kilogram of plutonium. In 1969, "all drums of accumulated [May 1969] fire waste were moved into the triangle area for storage." Probably many kilograms of plutonium oxide from that fire were in those drums.

Dow knew from 1967 or 8 on, that contamination at high levels was occuring at the triangle area. They neither had nor instituted any quality controls on their waste packaging until 1973 or 1974. Along with used drums, Dow used flammable and leaky wooden boxes to store highly contaminated waste at the triangle area. About 1971 "a new 'one trip' drum was put into use." Also

in 1971 drums were transferred into rail/truck-type
cargo containers. Whether waste in old drums was
transferred then to new drums is doubtful. In any
event, the cargo containers also leaked, and at least
some waste boxes, not in cargo containers, leaked.

The triangle area was as bad as the 903 area in
many respects, and in some respects was worse. Yet
it remains, not cleaned up, not "stabilized" by an
asphalt pad, and defendants have done construction
projects in the area as recently as during the soil
hearings. Here and elsewhere the discovery of soils
contaminated to levels which have required special
treatment in an earlier Plant incident, have been treated
less carefully than in the earlier incident.

The triangle area lies just east of the solar
ponds, another source of great contaminantion which
we just summarize in this statement. The solar ponds
are the source of the "nitrate fields," also called
the "plutonium watershed," and have leaked a variety
of contaminants since they were built in 1954. Analyses
have found Pu, Am, U, T, Th-230 and Cm-244 in these
ponds.


## SANITARY LANDFILLS


Rocky Flats has used two areas designated as landfills.
The "original" landfill is located south of the security
area and generally in the Woman Creek drainage, and
was used from 1952 to 1968. The "present landfill"
is north of the security area and generally in the

19

Walnut Creek drainage, and has been used since 1968.
Neither of these landfills were supposed to receive
contaminated waste, but both have.

Little is known about the contamination present
in the original landfill other than that 20 kg of uranium
ash was put there after 60 kg of depleted uranium was
accidently burned outside. Depleted uranium and chemical
contaminants are reported in the landfill; enriched
uranium and plutonium are reported as possible. Probably
the landfill has substantial quantities of radioactivity
present, but we know of no adequate monitoring ever
done there.

The current landfill has been monitered more carefully,
and has operated more recently when, presumably, practices
were better. It has been contaminated with plutonium,
americium, uranium, strontium - 90, tritium, and chemicals.
In excess of one hundred tons of sewage sludge, contaminated
from hundreds to thousands of d/m/g (Pu, Am, U) were
buried at various locations on site. From 1968 to
1970 the sludge was buried in the new landfill.

As part of the Colorado Department of Health's
tritium investigation in 1973, the Colorado Department
of Health sampled the water seeping from the landfill
and found strontium - 90, tritium and americium. The
strontium finding of the Colorado Department of Health
apparently surprised Dow and the AEC. The tritium
and americium findings, first made by Lawrence Livermore
Laboratories and then confirmed by the Colorado Department
of Health were also "surprises." The tritium was from
an area of landfill used in 1970. This indicates that
Rocky Flats unwittingly handled tritium not only in
1973, 1974, and 1968, but also in 1970.

20

Following these embarrassments, Rocky Flats built a dam to try to contain seepage water and began more careful monitoring. In the period from July 1974 to July 1975, 23 incidents were reported in Waste Disposal Group monthly reports. Drainage waters contained plutonium and other radioactive elements, in addition at least one chemical (phenol) at levels a hundred times above the most restrictive standard. Dow decided, apparently against the advice of its consultants, to sprinkle this water on hillsides above the ponds. This practice further redistributed radionuclides through the water spray and erosion of the hillsides.

## THE 1957 FIRE

The September 11, 1957 fire is the ninth worst reported AEC accident, in terms of the money damages admitted. It appears to us to be the single largest release of plutonium in the Plant's history. From 28 to 42 kilograms of plutonium were estimated to be in Room 180 of Building 771 during the fire. The difference of 14 kilograms of plutonium could not be accounted for after the fire. Apparently no tests were done at the time to estimate the quantity of plutonium or other radioactive materials on the filters at the time of the fire, but we present evidence from studies of related filters to indicate the amount of plutonium on the filters, almost all of which burned, may have been many kilograms (in comparison with HASL's estimate of 160 grams released at the 903 area).

21

Building 771 at the time was the main plutonium
building, had numerous design defects, few fire breaks,
and was overcrowded.  The fire apparently started by
spontaneous combustion of plutonium in one of its most
pyrophoric forms, stored in a flammable plexiglas plutonium
storage glovebox.  Original gloveboxes had been made
of fire resistant steel and laminated safety glass,
but Dow deliberately changed over to Plexiglas, knowing
of but not "appreciating" its flammability.  The storage
glovebox was not equipped with fire detection devices,
and the fire was discovered by plant protection workers,
who wanted to fight the fire immediately, but instead
were ordered out of the room and reprimanded for calling
the fire department.  A fireman who arrived was ordered
not to fight the fire for ten minutes while the fire
gained great momentum.  Despite a request by the fireman
to use water, carbon dioxide was used for 13 minutes
without effect.  Then water was used for one or a few
minutes and put out the initial fire.

While carbon dioxide was being used, the fans
were turned up to high speed, contrary to the design
of heat detectors in the filters, which were supposed
to turn the fans off in event of fire, and contrary
to the standing orders to the boiler operator in charge
of the fans.  The fans helped spread the fire from
the glovebox to the main one-stage final filter plenum.
Shortly after the use of water was stopped on the initial
fire, an explosion occurred in the filter ducts or
main plenum.  Then the fans and other utilities (lights,
radiation monitors and alarms) in the building were
cut off by the destruction of much or all of the building's
electric power supply which had been run through the filter bar

The 620 HEPA flammable filters in the filter bank had never been changed in the four years of operation of Building 771. The filter bank had no fire protection features other than the heat detectors which had been deliberately blocked out. The filters began burning about 10:40 p.m. and burned until 11:28 the next morning.

Columns of plutonium contaminated smoke were reported 80-100 feet above the 150 foot building stack. Smoke continued through the night and was measured offsite on portable radiation monitors. The winds blew most directions from the Plant during the fire, but for a long period toward the southeast and Denver. The filter fire was fought with an estimated 30,000 gallons of water in an area with no criticality or other drains. The next morning radiation levels rose alarmingly and consistently until mid-afternoon.

Little environmental monitoring was available during the fire and little monitoring was done to attempt to locate the plutonium released in the fire.

Recommendations were made for Building 771 after the 1957 fire, and again in 1969. These recommendations generally state considerations which were known and should have been followed when the Building was built, and from then until the 1957 fire. Both nuclear reactors and explosive manufacturing facilities provide helpful analogies. Buildings and small areas within them should be built to contain the worst creditable accidents. Very limited amounts of material should be present in very clean, fire resistant, small areas. The materials should be stored in separate, non-flammable areas, in inert atmospheres, protected with effective heat

23

detectors and fire extinguishers.  Instead, at Rocky Flats, large amounts of flammable materials, both radioactive pyrophoric metal and other flammable liquids and solids were put together, and stored, in large flammable areas without effective heat detectors or extinguishers, both before and after the 1957 fire.

Particular recommendations concerned flammable Plexiglas (used in place of fire resistant Plexiglas or more fire resistant materials like steel and glass), flammable liquids, fire detection systems, automatic sprinkler systems, various extinguishing agents other than water and carbon dioxide, and the ventilating system.  In many instances recommendations for Building 771 were not carried out for it or for other production buildings with similar or worse hazards.

### 1969 FIRE

The May 11, 1969, fire at Rocky Flats caused an estimated $45 million in damage, and burned an additional $22 million of plutonium.  This accident caused more than half of all damages admitted by the AEC in its history.  Approximately one ton of plutonium burned in the fire, but it released only about 5% of the heat released in the fire.  The fire started in a plutonium storage glovebox, spread through large parts of a very large plutonium manufacturing room, spread into the filters and ultimately breached some filters, releasing an unknown amount of plutonium to the environment.

Building 776/777, the location of the fire, was the biggest plutonium manufacturing operation after

24

the 1957 fire badly damaged Building 771. Building 776/777 was badly designed. Its walls and roof were not designed to withstand major fires. The roof was shoddily built and was, at the time of the fire, being held in place by common concrete blocks. It was over-crowded and forced to handle more plutonium than it had been designed to handle. Dow had removed the wall between Building 776 and Building 777, and made one fire and contamination area throughout the very large building. The building was not originally designed to meet minimum AEC fire and safety standards, and ad hoc decisions and topsy-like growth made conditions worse instead of better.

Key decisions to add flammable Benelex and Plexiglas as neutron shielding were made in about 1967. These materials were added after a fire analysis which showed them to be flammable. They were chosen primarily because they cost a little less than more fire resistant materials. They were put in an area without automatic sprinklers despite a policy to require sprinklers in the design of all new construction.

As part of the shielding program, a massive Benelex and Plexiglas chest for storing plutonium was added to Glovebox 134-24. Thereafter, particularly pyrophoric forms of plutonium were stored in open cans surrounded by flammable Benelex and Plexiglas, and all the heat detectors in the glovebox were nullified. The 1969 fire is said to have started in this chest and to have spread from it to the flammable Plexiglas and Benelex glovebox lines. No heat detectors or firebreaks existed in part of the first glovebox line where the fire spread. The building fire alarms were obsolete.

25

The Dow Rocky Flats program and procedures for
assessment of fire safety were below average for Dow
facilities, and a former Albuquerque Operations
Office official said Rocky Flats had the least capable
industrial safety and fire protection organization under
AEC jurisdiction. No fire protection engineer was hired
by Dow until 1967, and the man hired had no fire engineer-
ing experience. There had been no formal fire fighting
training since 1967. Audits by Dow and AEC officials
had warned of possible fantastic losses and unsafe conditions.

Carbon dioxide had had "no effect" on the 1957
fire, and water quickly put out the fire. Nevertheless,
carbon dioxide was used first on the 1969 fire and
authors of the 1969 fire report were so badly informed
they thought water had never before been used on a
plutonium fire. Carbon dioxide had no effect on the
1969 fire and huge amounts of water were then used,
in this building which was not equipped to deal with
the criticality hazards.

The different ventilation systems were not segre-
gated from one another, and even where they were supposed
to have doors and locations of zero air flow, doors
were left open and air flow existed when one booster
system clogged. Booster System No. 1 had no sprinklers,
apparently no roughing filters, baffles, etc., and lost
its monitors of contaminated air and smoke early in
the fire. No one knows how much plutonium was released.

26

## OTHER FIRES AND EXPLOSIONS

In addition to the 1957 and 1969 fires, Rocky
Flats has had hundreds of fires involving, and frequently
started by, radioactive metals.  In the briquetting
operation in Building 776-777 alone, fire detectors
were not installed and approximately a fire a day occurred.
Even though many fires were never reported, the fires
and explosions which were reported number in the hundreds.
Many of these were caused by the same problems, including
defective design and carelessness.  Apparently, after
the use of relatively inert atmospheres fires quickly
dropped to a small number.

We point out that Rockwell is not immune from
negligently caused fires, such as the February 23,
1978 beryllium fire, which burned numerous filters
in a filter plenum.  Uranium may also have been involved
in the fire, caused by welding operations in a filter
plenum while the ventilation system was running.

## ENVIRONMENTAL MONITORING

Rocky Flats environmental monitoring has been very inadequate. We do not cover this comprehensively, but illustrate it by certain "surprises" that defendants have had, when others have found contaminants for them. Dr. Martell and CCEI undertook soil sampling around Rocky Flats in 1969 only after Dow refused. Martell found offsite plutonium, americium, and probably strontium in levels exceeding background. Plutonium was up to 210 times background. Dow and the AEC tried to discredit Martell's results but failed. Finally Dow and the AEC admitted their accuracy, and HASL confirmed them.

Dow then said that offsite contamination might be the result of the 1957 fire and the 903 area. Monitoring during and after the 1957 fire confirmed that it and other operations (such as the plant incinerator) were causing contamination, but no follow up studies were done. Instead, monitoring was decreased until the 1969 fire. After the 1969 fire, the Colorado Health Department and Jefferson County Health Department began monitoring and made other discoveries which surprised Rocky Flats. The Colorado Health Department found tritium in 1973. After denying it for 5 months Rocky Flats admitted a 500 - 2,000 curie tritium release, and then admitted for the first time a 600 curie 1968 tritium release. Looking for more tritium, the Colorado Health Department found strontium in the Rocky Flats landfill. Probably in response to the urging of Church's attorneys, Rocky Flats analyzed some soil near the 903 area and found excess cesium. Rockwell ignored

28

its employee's suggestion to test further, but Dr. Carl Johnson of the Jefferson County Health Department did not and found excess cesium offsite.

Excess cesium and strontium indicate a criticality accident which defendants stoutly deny. However, Rocky Flats had no beta monitoring (which would monitor fission products such as strontium and cesium which are produced in a criticality) during much of the 1960's, and has no results for beta monitoring during the 1957 fire, when alarming levels of short-lived activity were measured.

Rocky Flats monitoring has failed, within large factors, to quantify most Rocky Flats releases of radio-activity, including the 1957 and 1969 fires, the 903 and triangle areas, the tritium releases, the solar ponds, and the burnings of radioactively contaminated oils and trash. That is one of the reasons defendants are now spending over $300,000 to test plaintiff's lands, though that testing ignores many radionuclides.

## DISCLOSURE OF ENVIRONMENTAL CONTAMINATION

Rocky Flats operated in nearly total secrecy and nondisclosure until Dr. Edward Martell and the Colorado Committee on Environmental Information did its own soil tests and found that Rocky Flats had contaminated the surrounding countryside. When CCEI informed the Colorado Department of Health, it reacted angrily to the fact that Rocky Flats had not kept it informed of Rocky Flats contamination and accidents.

Rocky Flats has not been candid with the public, public agencies, public officials or, frequently, even the higher levels of the AEC. In accidents, Rocky

Flats monitoring has frequently been more notable for what was not measured than what was. Rather than attempting to evaluate the real extent of releases, Rocky Flats has classified reports of the incidents, made underestimates with little basis in fact, and made misleading statements to the public which are inconsistent with secret internal reports. We illustrate this with one of the first purportedly detailed disclosures ever made by the AEC. The AEC wrote Governor John Love six weeks after the 1969 fire, making a series of extremely carefully worded claims which we believe were designed to mislead the Governor completely concerning the dangers, contamination and environmental monitoring of Rocky Flats. Rocky Flats, claimed, "During the 18-year history of the Rocky Flats plant, there has never been an increase in the level of naturally occurring background radiation detected...," when there had been many discoveries of plant caused contamination orders of magnitude above fallout levels.

"Continuous monitoring" was claimed, without mentioning the huge lapses in time, place, and types of contaminant in past monitoring. The Governor was told concerning Walnut Creek, "We have never found any radioactive material except that which is indigenous to the area," when routinely, process and other wastes contaminated with plutonium and uranium were released there. Results of vegetation samples were said to "have always fallen within the levels found in the initial [1952 pre-operational] survey." In fact, gross alpha contamination far in excess of those levels had been measured repeatedly.

We believe this sort of non-disclosure disclosure to the public and public officials, has been the rule rather than the exception at Rocky Flats. If we are right, this may affect various areas of the lawsuit, not least of which is the willingness of the public to accept Rocky Flats continuing reassurances about health and safety and to buy the plaintiffs' property.