**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 90-cv-181-JLK

MERILYN COOK, *et al.*,

        Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION
and THE DOW CHEMICAL COMPANY,

        Defendants.

---

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION TO
EXCLUDE TESTIMONY OF CERTAIN DEFENSE WITNESSES**

---

Defendants respectfully submit their Response to Plaintiffs' Motion to Exclude Testimony of Certain Defense Expert Witnesses.[1]

As with the motions in *limine*, defendants have met and conferred with plaintiffs regarding oral argument on these motions to exclude expert testimony, including several communications on July 6, without reaching any agreement. Defendants expect to continue to meet and confer with plaintiffs regarding the prospect of oral argument on these motions this week. Defendants reserve the right to seek oral argument on any of the parties' motions to exclude expert testimony after they have an opportunity to review plaintiffs' responses and replies, and

---

[1] Much of the expert testimony that plaintiffs now seek to exclude for the first time was disclosed to plaintiffs in defendants' experts' original reports in 1996. Plaintiffs have not given notice of any intervening authority, nor do they provide any other justification for waiting nine years before moving to exclude this testimony.

1

defendants request the opportunity to be heard on any motion where plaintiffs seek oral argument.

At this time, however, in an effort to communicate to the Court what defendants' present thinking on these matters is, defendants anticipate that they will request oral argument on each of their motions to exclude plaintiffs' expert testimony.  Defendants also anticipate that they will request oral argument on plaintiffs' motion to exclude expert testimony regarding property values in the class area after 1992 (*see* Part I, *infra*) and what class members "knew or should have known about Rocky Flats" (*see* Part II, *infra*), as well as plaintiffs' motion to exclude the entire testimony of Daniel Conway (*see* Part VI, *infra*) and John Dorchester (*see* Part VII, *infra*). In addition, defendant may seek oral argument on plaintiffs' motion to exclude expert opinions regarding the abatability of plutonium from class properties (*see* Part III, *infra*); the entire expert testimony of Drs. Jack Holl and Richard Hewlett (*see* Part VIII, *infra*), and Geneva Smart (*see* Part XII, *infra*), and the supplemental opinions of Dr. Ward Whicker (*see* Part X, *infra*), depending on plaintiffs' subsequent briefing on these motions.  Following additional meet-and-confer communications, defendants intend to convey to the Court at or before the time of their reply briefs (or sooner if possible, or if the Court so orders or requests) any additional information regarding defendants' position as to whether defendants request (or oppose) oral argument with respect to any of the parties' motions to exclude expert testimony and, if so, which ones.

## I. EXPERT TESTIMONY REGARDING POST-1992 PROPERTY VALUES IS RELEVANT AND NOT UNFAIRLY PREJUDICIAL.[2]

Plaintiffs move to bar the testimony of Daniel Conway, John Dorchester, and Dr. Kenneth Wise to the extent it relates to property values after 1992, claiming that such testimony is "irrelevant under the governing damages measure."[3]  (Pls.' Mem. at 5.)  Plaintiffs' arguments rest on their assertion that the only relevant time period for property values is 1989 to 1992 because that is when they have now decided to claim the "CCE date" occurred.  (Pls.' Mot. in *Limine* at 2.)[4]

Such testimony is not only relevant, however, but essential to this action for the following six reasons:  (1) testimony relating to property values after 1992 is relevant to whether plaintiffs can establish that an "injurious situation" has become "complete and comparatively enduring," a prerequisite to recovering damages pursuant to Restatement (Second) of Torts § 930 (1979); (2) because the jury may determine that the CCE date falls after 1992; (3) testimony relating to

---

[2] Plaintiffs' *Daubert* brief filed on June 16 requests the exclusion of expert testimony concerning "Rocky Flats' activities after the CCE time" and lists Frank Blaha and Dr. Chris Whipple as experts affected by this request.  (Pls.' Mem. at 1.)  Plaintiffs have subsequently informed defendants that the inclusion of this request is a "typo," and that plaintiffs do not seek to exclude such testimony.

[3] Plaintiffs similarly argue in their motion in *limine* that evidence of property values in the class area after 1992 is inadmissible (*see* Pls.' Mot. in Limine at 1–3) and incorporate that motion by reference into their motion to exclude defendants' expert testimony.  For the sake of completeness of the record, defendants set forth their response to plaintiffs' argument here in full.

[4] In their motion in *limine*, plaintiffs argue that 1992 is the point in time after which evidence of property values is irrelevant.  (Pls.' Mot. in *Limine* at 1–3.)  Plaintiffs apparently concede, however, in their *Daubert* motion that evidence of property values up until 1995 is relevant by moving only to exclude expert testimony concerning property values "during the late 1990's and beyond" (Pls.' Mem. at 5), perhaps because their **own experts** consider data up until 1995 (*see* Part I.E., *infra*).  Nevertheless, because plaintiffs incorporate their motion in *limine* by reference, defendants assume that plaintiffs' *Daubert* motion also seeks to exclude evidence of property values after 1992 and respond accordingly.

property values after 1992 is relevant to whether there is any "diminution in value" at all; (4) testimony relating to property values after 1992 is relevant to prevent plaintiffs from opportunistically cherry-picking a "time window" that they think is best for them; (5) plaintiffs' own experts take into account property values after 1992; and (6) this testimony does not pose any risk of unfair prejudice.  Plaintiffs' attempt to exclude this testimony is nothing more than a transparent, impermissible attempt to focus the jury's attention on a narrow three-year period that happens to coincide with one of the worst periods for property value appreciation both for the class area and for the Denver metropolitan area as a whole (indeed one of the worst times for the *nation* as a whole).  (*See* Ex. 1, Dorchester Report at 4-6–4-8, Figure L-3; Ex. 2, Wise Supp. Report Ex. 3.)

Plaintiffs have not even tried to supply this Court with any support for their unilateral and self-serving assertion that the CCE date should fall between 1989 and 1992.  For example, they point to no evidence in the record that would tend to suggest such a CCE date for their trespass claim (to take the simplest case).  No plaintiffs' expert has opined that the trespass (or the nuisance) became complete and comparatively enduring between 1989 and 1992; in fact, plaintiffs' own experts have offered contrary proof, such as plaintiffs' proffered property class contour that is supposedly based on plutonium contamination as of 1970.  Accordingly, plaintiffs never have come forward with any basis in fact for their assertion that there is anything special about 1989–1992.  Nor would it matter:  it is for the jury to determine the CCE date, not plaintiffs.  (5/17/05 Order at 15.)

### A.   Testimony Regarding Property Values Post-1992 Is Necessary to Determining Whether Plaintiffs' Alleged "Injurious Situation" Has Become "Complete and Comparatively Enduring."

This Court stated:  "In order to recover damages for diminution in Class property values caused by the alleged nuisance pursuant to Restatement (Second) of Torts § 930 (1979), Plain-

tiffs must further demonstrate that it appears any nuisance they prove will continue indefinitely." (5/17/05 Order at 2–3.)  Restatement § 930 makes clear that "the defendant is at liberty to dispute the averment that the situation is one that will probably continue indefinitely."  Restatement § 930 cmt. b.

Testimony that property values in the class area have increased since 1992 is relevant both to plaintiffs' contention that the "nuisance . . . will continue indefinitely" (5/17/05 Order at 2–3), as well as to defendants' contention that the "situation" is **not** "one that will probably continue indefinitely."  Restatement § 930 cmt. b.  This Court has recognized that:

> Evidence that the affected property's value has depreciated may be evidence, however, that actual contamination or other claimed factors of interference are substantial and unreasonable enough to give rise to nuisance liability.  *See* Prosser and Keeton § 88, at 627–28.  This conclusion flows again from the rule that the reaction of a normal member of the affected community is the measure of whether a claimed interference is substantial and unreasonable.  *See id.*  So long as the "market" on which the property values are based has substantially the same general characteristics and information base as the affected community, the reaction of the market to the claimed interference, as demonstrated by the value it places on the property, is also evidence of the normal community member's reaction to the claimed interference and whether the member would view the interference as substantial and unreasonable.

*Cook v. Rockwell Int'l Corp.* ("*Cook IX*"), 273 F. Supp. 2d 1175, 1209 (D. Colo. 2003).  Conversely, it is also true that "[e]vidence that the affected property's value has [re-ap]preciated" may in turn be evidence that "actual contamination or other claimed factors of interference are [no longer] substantial and unreasonable enough to give rise to nuisance liability."  *See* Restatement § 930 cmt. b.

### B.    Testimony Regarding Property Values Post-1992 Is Necessary If the Jury Determines That the CCE Date Falls after 1992.

Under the trial plan outlined by this Court's May 17, 2005 Order, the jury must find "the date on which . . . it appeared the trespass and/or nuisance asserted by Plaintiffs would continue

indefinitely." (5/17/05 Order at 15.) The jury must then determine the average percentage diminution in property value as of the CCE date. (*Id.* at 16–17.)

Plaintiffs attempt to unilaterally prescribe that the relevant time period only extends from 1989 to 1992. (Pls.' Mot. in *Limine* at 1.) That is not the case. ***Plaintiffs' theory*** (for the time being, at least) apparently is that the complete and comparatively enduring date occurred between 1989 and 1992. But relevance is not dictated by reference to the plaintiffs' present theory. The complete and comparatively enduring date is yet to be determined by the jury: "Plaintiffs will be required to prove . . . the date on which the injurious situation caused by Defendants became complete and comparatively enduring." (5/17/05 Order at 16.) Nor does the May 17, 2005 Order in any way limit the range of permissible CCE dates to the period between 1989 and 1992 (or, for that matter, limit how many CCE dates there will be). For example, if the jury found that a continuing, injurious situation does exist, but that it did not become complete and comparatively enduring until 1998, it would require evidence of property values from 1998 to determine damages under Restatement § 930. Thus, testimony regarding property values after 1992 could prove to be not only relevant, but essential to the jury's task.

Plaintiffs incorrectly assert that defendants have "offered no competing theory of a CCE date." (Pls.' Mot. in *Limine* at 2.) Though defendants believe that there is no injurious situation attributable to any trespass or nuisance, let alone one that has become complete and comparatively enduring, defendants have alternatively stated that, depending on what (if any) continuing injurious situations specified by plaintiffs (plaintiffs have yet to specify which "injurious situations" are at issue), and depending on what "injurious situations" the jury may find, the jury could select a number of possible CCE dates ranging from 1953, when the plant was first built,

to the time of trial.  One obvious example is that the jury could potentially tie a CCE date to some milestone in the clean-up effort at Rocky Flats.

### C.  Testimony Regarding Property Values after 1992 Shows Whether There Is Still Any Diminution in Value.

A jury cannot recover "damages" for a diminution in value that existed at one point in time, but that does not exist at the time of trial.  Were the rule otherwise, then whenever a plaintiff's property experienced a temporary dip relative to other properties—as in the case of many alleged trespasses or nuisances—then the plaintiff could file a complaint based on that temporary dip, and recover damages by excluding all testimony that the value of his or her property had rebounded by the time of trial.

Figure 1 below illustrates why it is essential not to focus on a particular "window" cherry-picked by plaintiffs (including a period that is substantially smaller than the one plain-tiffs' own experts analyzed).  The exclusion of testimony regarding property values after the time period claimed by the Group X plaintiffs to be "relevant" would not be permissible.  (Figure 1 is included for illustrative purposes only:  defendants do not suggest through Figure 1 that plaintiffs can show that properties in the Class Area have suffered any diminution in value due to Rocky Flats.)

**Figure 1**



To allow such a hypothetical plaintiff (or group of plaintiffs) to recover diminution-in-value damages would ignore the fundamental purpose of damages law: "to reimburse [the property] owner for the actual loss suffered." (5/17/05 Order at 15 (quoting *Bd. of County Comm'rs v. Slovek*, 723 P.2d 1309, 1314 (Colo. 1986).) *See also Slovek*, 723 P.2d at 1314 ("The trial court must take as its principal guidance the goal of reimbursement of the plaintiff for losses actually suffered, but must be vigilant not to award damages that exceed the goal of compensation and inflict punishment on the defendant."); *Zwick v. Simpson*, 572 P.2d 133, 134 (Colo. 1977) ("the goal of the law of compensatory damages is reimbursement of the plaintiff for the

actual loss suffered"); 1 Dan B. Dobbs, *Law of Remedies*, § 5.6 at 754 ("If the effects of the nuisance are more or less permanent, the diminution in land value due to the nuisance will be recoverable; *if temporary, the diminished rental value during the period of harm*.") (emphasis added).

### D.   Plaintiffs Cannot Unilaterally Pick the Time Period They Think Is Best for Them.

A plaintiff cannot unilaterally and opportunistically cherry-pick some "time window" and then limit the jury to considering only testimony from that window.  Nor can plaintiffs' selection of what they perceive as the most favorable window be justified by reference to Section 930. Plaintiffs *argue* that the complete-and-comparatively-enduring date was from "1989 to 1992," but defendants will offer contrary testimony, and ultimately the jury will decide.

### E.   Plaintiffs' Experts Use Property Values after 1992.

Plaintiffs' own expert work belies their assertion that testimony of property values after 1992 is irrelevant to this action.  When expert reports were first due in 1996, all of plaintiffs' experts considered evidence available to them up until the time of their reports.  Thus:

| Plaintiffs' Expert Analysis | Time Period Considered |
| --- | --- |
| Hunsperger's "real estate market research" | 1989–1995 |
| Hunsperger's market study of vacant land prices | 1988–1995 |
| Hunsperger's market study of residential resale prices | 1989–1995 |
| Hunsperger's market study of new residential construction | 1991–1995 |
| Radke's Phase I analysis | 1983–1993 |
| Radke's Phase II analysis of single-residential properties | 1988–1995 |
| Flynn & Slovic's public opinion survey | 1995 |

Plaintiffs' attempt to exclude a significant amount of the data upon which their own experts relied is opportunistic.  The fact that plaintiffs have chosen not to supplement these reports

to account for the latest property value data does not mean that such data is not relevant. Indeed, plaintiffs' effort to exclude testimony of property values after 1992 would eliminate plaintiffs' own expert testimony purporting to show that plaintiffs' property values were **headed upwards after 1992**. Below is a table prepared by plaintiffs' proffered expert Dr. Radke:

| Radke Report, Table 1, Phase II Property Value Findings | |
| --- | --- |
| **Year** | **"Mean Undervaluation"** |
| 1988 | -7.68% |
| 1989 | -7.29% |
| 1990 | -9.33% |
| 1991 | -7.69% |
| 1992 | -9.18% |
| 1993 | -8.56% |
| 1994 | -7.50% |
| 1995 | -5.45% |

(Ex. 3, Hunsperger Report at 36, 223.) Thus, even according to Radke's own data, the value of plaintiffs' properties (relative to non-class properties) were progressively higher following 1992, and continued on that path as of 1995.

### F. Testimony Regarding Post-1992 Property Values Is Not Unfairly Prejudicial.

Plaintiffs' argument that property values after 1992 should be excluded under Rule 403 as "prejudicial" should be rejected. There is no cause to exclude testimony regarding property values because there is no risk of prejudice. Plaintiffs set forth the following proposition in their brief as self-evident: "Real property eventually appreciates in price after the passage of a sufficiently long time due to inflation and a fifty-year history of rising property prices nation-wide." (Pls.' Mot. in *Limine* at 3.) Given what plaintiffs consider to be the self-evident nature of this statement, plaintiffs offer no reason to doubt that a jury would likewise be aware of the general appreciation of real estate and consider the testimony in that light. Any risk of confusion would be cured by this Court's anticipated instruction that the jury determine damages "for the decrease in the value of their Class properties caused by the prospect of the alleged trespass

and/or nuisance (if proved by Plaintiffs) continuing into the future, measured at the time when the injurious situation became complete and comparatively enduring." (5/17/05 Order at 15–16.) *See City of Los Angeles v. Retlaw Enters., Inc.*, 546 P.2d 1380 (Cal. 1976) (allowing the jury to consider evidence of property value that was potentially inflated by an irrelevant factor, where the "court properly cautioned the jury about reliance" on the evidence).

## II. TESTIMONY REGARDING WHAT PLAINTIFFS OR THE CLASS KNEW OR SHOULD HAVE KNOWN ABOUT ROCKY FLATS IS RELEVANT AND NOT UNFAIRLY PREJUDICIAL.

Plaintiffs move to exclude certain portions of John Dorchester's testimony discussing what class members "knew or should have known about Rocky Flats."[5] (Pls.' Mem. at 6.) In a single, conclusory paragraph, plaintiffs suggest that such testimony is irrelevant because neither the statute of limitations nor "coming to the nuisance" are available defenses. (*Id.*)

Plaintiffs' arguments about the "statute of limitations" and "coming to the nuisance" are red herrings. Mr. Dorchester will testify concerning what "plaintiffs or the class knew or should have known about problems at Rocky Flats" for reasons that have nothing to do with the "statute of limitations" and "coming to the nuisance." In fact, what "plaintiffs or the class knew or should have known about problems at Rocky Flats" is relevant to at least the three following issues: (1) property values in the class area as of the CCE date, or before the CCE date to support defendants' prior discount defense; (2) as a factor in determining whether any alleged nuisance is substantial and unreasonable; and (3) "the generic causation question of whether

---

[5] Plaintiffs similarly argue in their motion in *limine* that evidence "about what class members allegedly knew, or should have known, about Rocky Flats is irrelevant" (*see* Pls.' Mot. in *Limine* at 8) and incorporate that motion by reference into their motion to exclude defendants' expert testimony. For the sake of completeness of the record, defendants set forth their response to plaintiffs' argument here in full.

Defendants' activities and the conditions resulting from them were capable of causing Class members to suffer fear, anxiety or other mental or emotional discomfort."  (5/17/05 Order at 7.)

> **A.   What Class Members Knew or Should Have Known about Rocky Flats Is Relevant to Market Value.**

Under this Court's May 17, 2005 Order, plaintiffs will be required to prove, as of a CCE date yet to be determined, "the average percentage diminution in property value that was caused by any trespass or nuisance found by the jury, as of the CCE date, for each property category." (*Id.* at 16–17.)   As discussed below, contemporaneous market knowledge (including what "plaintiffs or the class knew or should have known about problems at Rocky Flats before they bought their property") is relevant to (and indeed is a vital component of) property value.

*First*, plaintiffs argue that what plaintiffs and class members—key market participants here—knew about activities at Rocky Flats and any alleged offsite impact of such activities is irrelevant.  That cannot possibly be so.  Plaintiffs rightly assert that the "variable at issue" is the "***market reaction*** to the nuisance and contamination caused by Rocky Flats."  (Pls.' Mem. at 14 (emphasis added).)  Of course that is true, and knowledge of market participants is a necessary prerequisite to such a market reaction; the market cannot react to that which it does not know. Assume a case where invisible contamination was released by a facility onto neighboring property in Year 1, but no one knew about it for twenty years.  Then, in Year 21, someone took measurements and found the presence of the contamination and publicized it to market participants.  The market could not react to such contamination prior to Year 21 because it was not known.  However, in Year 21 and thereafter, the market could react because market participants knew.  Thus, knowledge of market participants is a critical link in determining whether or not the market could have reacted.  Similarly, given that market reaction is the "variable at issue," then when the market gained that knowledge is critical to when the market could have reacted.

Testimony regarding market knowledge is essential to causation: did the trespass or nuisance *cause* a market reaction and, if so, when?

Nor can one distinguish meaningfully between plaintiffs and the class, on the one hand, and the market on the other. The class comprises more than 10,000 market participants. These market participants are the most important ones: they actually participated in the market because they all bought there, and many of them sold there. They *are* the market, to a large extent. And as for the plaintiffs, this court certified them as representatives of this class of market partici-pants. They have been held out to be the market participants from whom the jury will actually hear testimony—participants who are supposedly "representative" of the entire class of market participants. What was known by such market participants is relevant to what all market partici-pants knew, and when they knew it and "reacted" to.

*Second*, plaintiffs' own property valuation experts deem market knowledge to be relevant to property value. Plaintiffs' expert Wayne Hunsperger relies upon market knowledge in arriv-ing at his conclusions of market value: "[t]he effect measured in this report relates to 'stigma.'" (Ex. 3, Hunsperger Report at 71.) Mr. Hunsperger in turn defines "stigma" as "a function of the underlying facts (*assuming they are known and clearly understood*), as well as *the perception of what those facts really are*." (*Id.* at 74 (emphasis added).) In other litigation, Mr. Hunsperger opined that it was not contamination alone from Rocky Flats, but market knowledge of such contamination that affected property values in the vicinity in the 1970s:

> In the 1970's, the neighborhoods near Rocky Flats suffered a marketability prob-lem. During that time it became known that some contamination was escaping the Rocky Flats Plant by way of Walnut Creek in Jefferson County. At that time, homes in the surrounding neighborhoods became almost impossible to sell. Prop-erty values declined. For a period, FHA and VA declined to insure loan in the neighborhood. The consequences were severe. Negative market perceptions combined with lack of government insured financing caused real estate values in many instances to decline dramatically.

Wayne Hunsperger *et al.*, Community & Economic Impacts of the Rocky Mountain Arsenal on Commerce City, Colorado, Sept. 16, 1994, at 15.

Plaintiffs' other experts are in accord.  Drs. Flynn and Slovic conducted a so-called public opinion survey in 1995 in which they asked participants:  "Have you heard of [Rocky Flats, these events, etc.]?"  They seek to testify as to the responses to such questions.  Mr. Hunsperger incorporated the responses to those survey questions into his own report in which he attempts to convert such responses into diminution-in-value estimates.  (*See* Ex. 3, Hunsperger Report at 245–252.)

***Third***, defendants' property experts agree that the knowledge of market participants is relevant to determining property value.  The very definition of market value relies on the assumption that the participants in a transaction are "each acting prudently and ***knowledgeably***." (Ex. 1, Dorchester Report at 3-1 (emphasis added).)  For example, in analyzing whether plaintiff Merilyn Cook's property has suffered economic harm as a result of defendants' operations at Rocky Flats, defendants' expert John Dorchester found it significant that "Mrs. Cook had been an active market participant in the purchase and sale of Rocky Flats area lands [which] provided her with significant market experience and, presumably, market knowledge."  (*Id.* at 7-7.)

The relevance of market knowledge to this case is not affected by this Court's holding that "***individual*** Class member's knowledge regarding Rocky Flats and plutonium contamination [and] the effect, if any, this knowledge played in each Class member's property transactions" should not be considered in deciding compensatory damages.  (5/17/05 Order at 19 (emphasis added).)[6]  This Court went on to state that "diminution in value is a function of the market."  (*Id.*

---

[6] Though defendants preserve their position that any trial plan for this case must account for the knowledge of individual class members, they do not reargue that point here.

at 20.)  The market's knowledge regarding Rocky Flats—apart from the knowledge of any single individual—is a significant factor in determining what value the market placed on class properties at any point in time.  This Court earlier identified the "primary individual factor" affecting compensatory damages for each class member to be "whether they purchased their property at a time when the market had discounted the value of class properties as a result of Defendants' alleged trespass or nuisance."  (5/28/04 Order at 12–13.)  In order to determine whether the market had in fact made such a discount, it is necessary first to determine whether the market had knowledge of the alleged trespass or nuisance.

**B.    Testimony That Plaintiffs Knew about an Alleged Nuisance, and Acquired or Improved Their Land in Spite of It, Is a Factor to Be Considered in Determining Whether the Alleged Nuisance Is Substantial and Unreasonable.**

Plaintiffs make the misleading argument that "[t]he defense of 'assumption of the risk,' also known as 'coming to the nuisance,' is . . . unavailable," citing the Court's May 28, 2004 Order.  (Pls.' Mem. at 6.)  But the Court's prior decisions do not preclude consideration of whether "the timing of class members' acquisition of class properties is a ***factor*** for the jury to consider."  (5/28/04 Order at 7 (emphasis added).)

It is black-letter Colorado law that a plaintiff's knowledge about an alleged nuisance prior to his or her purchase of property is ***relevant*** to liability, even if it does not serve as an absolute defense to nuisance liability.  *See, e.g.*, *Platte & Denver Ditch Co. v. Anderson*, 6 P. 515, 521 (Colo. 1885) ("Where one buys a city lot bordering upon ground set apart or dedicated to any public use, he takes it subject to all the annoyances incident to the purposes of the dedication."); Restatement § 840D ("The fact that the plaintiff has acquired or improved his land after a nuisance interfering with it has come into existence is . . . a factor to be considered in determining whether the nuisance is actionable."); *Escobar v. Cont'l Baking Co.*, 596 N.E.2d 394, 397–98

(Mass. App. 1992) (stating that though "coming to a nuisance in itself does not bar relief, it, too, is a significant factor in determining what is fair and reasonable").

For example, in 1978, plaintiff Richard Bartlett knew that there had been a fire at Rocky Flats in 1969, that the fire was alleged to have released contamination offsite, and that people had claimed that Rocky Flats was not safe.  (Ex. 4, Bartlett Dep. at 58–59.)  Mr. Bartlett also testified that in 1978 he was concerned about possible contamination in the soil and water supply of property near Rocky Flats.  (*Id.* at 119.)  Despite his knowledge of Rocky Flats and his concerns, Mr. Bartlett decided to buy property and build a house on Alkire Street in 1978, which was closer to Rocky Flats than where he was living before.  (*Id.* at 91.)  The fact that Mr. Bartlett and other members of the class voluntarily chose to live near Rocky Flats, with full knowledge of the alleged contamination, undercuts plaintiffs' claims that the interference with use and enjoyment caused by defendants' conduct was either substantial or unreasonable.  (*Id.* at 161.)

> **C.    Testimony That "Plaintiffs or the Class Knew or Should Have Known about Problems at Rocky Flats before They Bought Their Property" Is Relevant to Whether "Defendants' Activities and the Conditions Resulting from Them Were Capable of Causing Class Members to Suffer Fear."**

Finally, testimony that plaintiffs knew of defendants' activities at Rocky Flats is elemental to the question "of whether Defendants' activities and the conditions resulting from them were capable of causing Class members to suffer fear, anxiety or other mental or emotional discomfort."  (5/17/05 Order at 7.)  Defendants' position is that this issue of "generic fear" has no place in a class-wide trial.  However, if the "generic fear" issue is made part of the class-wide trial, then it necessarily follows that the capability of such activities or conditions to cause "fear, anxiety or other mental or emotional discomfort" in any class member is dependent on the extent to which the "class members" knew of such activities or conditions.

III.  **DEFENDANTS' EXPERT TESTIMONY REGARDING THE ABATABILITY OF PLUTONIUM IS RELEVANT, RELIABLE, AND NOT UNFAIRLY PREJUDICIAL.**

Plaintiffs move to exclude the opinions of Drs. Frazier and Whicker "about the abatability of plutonium from class members' land." (Pls.' Mem. at 1, 6–7.) Plaintiffs assert that their testimony is irrelevant, unreliable, and prejudicial. (*Id.*) This testimony is relevant, however, because this Court has ruled that: (1) defendants may "preclude Plaintiffs from recovering prospective damages, by demonstrating that they or others have abated or remedied the trespass or nuisance or are about to do so," *Cook v. Rockwell Int'l Corp.* ("*Cook X*"), 358 F. Supp. 2d 1003, 1013 (D. Colo. 2004) (citing Restatement § 930 cmt. b); and (2) "[i]n order to recover damages for diminution in Class property values caused by the alleged nuisance pursuant to Restatement (Second) of Torts § 930 (1979), Plaintiffs must further demonstrate that it appears any nuisance they prove will continue indefinitely," (5/17/05 Order at 2–3; *see also* Restatement § 930 cmt. b ("the defendant is at liberty to dispute the averment that the situation is one that will probably continue indefinitely"). This testimony is also reliable and not unfairly prejudicial.

Both Drs. Frazier and Whicker seek to testify about the possibility of remedying plutonium contamination on class members' properties. Dr. Frazier notes in his report that, in order to remove over 90 percent of the plutonium above background levels from class members' properties, "one would need to remove the top 12 centimeters (or more) of soil from those properties." (Ex. 5, Frazier Supp. Report at 3.) Dr. Whicker agrees that "the only method of remediation for plutonium in soil is removal of the soil itself." (Ex. 6, Whicker Supp. Report at 12.)

Such remediation has already occurred on class properties. When grading and excavating a parcel of property for development (a process which many class properties have undergone since the early 1970s), at least the first one-to-two feet of soil must be disturbed, and some properties require further excavation to a depth of up to 20 feet. (Ex. 7, 1/14/05 Elzi Decl. ¶ 2.)

Some parcels in the Five Parks residential subdivision in the class area were excavated to a depth of 15 to 17 feet.  (*Id.* ¶ 11.)  This process has resulted in the complete removal of soil from certain class properties:

> [T]he process of over lot grading that is used to prepare a site for development can require cuts and fills up to fifteen to twenty feet.  In some areas (within the class area) that are actively developing parcels, including residential and commercial developments, this process has resulted in the removal of soil from individual properties, which has then been re-distributed onto other properties.  In fact, in the case of "stripping" the top-soil within the class area, when a large area of land is prepared for development, soils have been removed from final parcels/lots within the class area and never returned to those lots or parcels.
>
> *             *             *
>
> In the specific case of Westmoor Business Park, the entire site was over lot graded in 2001 and prepared for development.  I am familiar with this set of properties and have talked to Mr. Don Slack, who oversaw this development, about the grading process undertaken there.  As I stated in my prior declaration, many of the parcels were excavated to ten to twelve feet in depth.  For some of these parcels, the stripped soil was redistributed only to other parcels.  The stripped parcels thus had their soil removed and never returned.

(Ex. 8, 3/17/05 Elzi Supp. Decl. ¶¶ 2–3.)  This process is especially significant given that the vast majority of plutonium on offsite properties was deposited before 1970 (Ex. 9, 1/14/05 Whicker Decl. ¶¶ 1, 15), while most development in the class area has taken place well after that (Ex. 7, 1/14/05 Elzi Decl. at 1).

Plaintiffs' motion to exclude the testimony of Drs. Frazier and Whicker on the subject of abatability should also be denied for three additional reasons.

**First**, plaintiffs contend that "[t]his Court has ruled that abatability is not relevant because the continuing presence of these contaminants is a continuing trespass."  (Pls.' Mem. at 6–7) (citing *Cook X*).  In fact, in the opinion cited by plaintiffs, this Court held:

> In order to recover prospective damages under this authority, Plaintiffs must prove not only liability in trespass or nuisance, but also that the tortious invasion "will probably continue indefinitely" because "there is no reason to expect its termination at any definite time in the future."  *Id.*, § 930 cmt. b. Defendants may

> defeat this showing, and thus preclude Plaintiffs from recovering prospective damages, by demonstrating that they or others have abated or remedied the trespass or nuisance or are about to do so.  *See id.*

*Cook X*, 358 F. Supp. 2d at 1013 (citing Restatement § 930 cmt. b).  The opinions of Drs. Whicker and Frazier are clearly relevant to whether defendants "or others have abated or remedied the trespass or nuisance or are about to do so."  *Id.*  (*See also* 12/17/04 Order re Proposed Trespass Instructions, Instruction No. 3.11.)  Moreover, a showing that even **some** amount of plutonium has been removed from class members' properties is relevant to plaintiffs' ability to demonstrate a class-wide nuisance premised on an class-wide plutonium exposure and a resulting class-wide increase in health risk (*see* 5/17/05 Order at 5) that "will continue indefinitely" (*id.* at 3).

   **Second**, plaintiffs' criticism that "[n]either expert offers any estimates of removal costs or any methodology for determining how much plutonium abatement would cost the class," (Pls.' Mem. at 7), is misleading.  Under the Court's December 17, 2004 Order, defendants may "preclude Plaintiffs from recovering prospective damages, by demonstrating that they or others have abated or remedied the trespass or nuisance or are about to do so."  *Cook X*, 358 F. Supp. 2d at 1013.  Under the Court's December 17, 2004 Order, Defendants are not required to prove the "cost" of abatement.  Moreover, even if defendants **were** required to prove abatement "cost," there is no requirement that such testimony be provided by Drs. Frazier and Whicker (so long as Drs. Frazier and Whicker's testimony is otherwise relevant, which it is.)

   **Third**, plaintiffs argue that Drs. Whicker and Frazier's opinions are not based on "true expert knowledge."  (Pls.' Mem. at 7.)  In fact, Dr. Whicker, one of the world foremost radioecologists, has years of experience in dealing with the remediation of radioactive contamination of soil.  (Ex. 6, Whicker Supp. Report at 3.)  Moreover, unlike plaintiffs' experts, Dr. Whicker has extensively sampled the soil around Rocky Flats, and has formally peer-reviewed the worked

19

of other scientists in the field.  *Id.*  Dr. Whicker's years of expertise and sampling work provides a reliable basis for his opinions regarding the abatability of plutonium from the class area, including opinions relating to the depth at which plutonium may be found in the soil.  Similarly, Dr. Frazier's opinions regarding the depth to which soil must be removed in order for complete abatement to occur rely in part upon the RAC report's finding (the reliability of which is unchallenged by plaintiffs) that plutonium contamination is generally contained in the top 12–15 centimeters of soil.  (Ex. 5, Frazier Supp. Report at 3; Ex. 10, RAC Report Task 6 at 21.)

**Fourth**, contrary to plaintiffs' conclusory argument, testimony regarding the abatability of plutonium is not unfairly "prejudicial."  (Pls.' Mem. at 7)  Under the Court's rulings, defendants are entitled to show that the presence of plutonium on class properties has been and will be abated by defendants or others, to defeat plaintiffs' claims of continuing trespass and nuisance. *Cook X*, 358 F. Supp. 2d at 1013.  Rather, it would be unfairly prejudicial **to defendants** to **exclude** such testimony.  In such circumstances, defendants could be held liable for a condition which no longer exists, merely because the jury was unable to hear testimony about the abatement of that condition.

## IV.     TESTIMONY THAT DEFENDANTS COMPLIED WITH STATE OR FEDERAL STANDARDS IS RELEVANT TO PLAINTIFFS' CLAIMS.

Plaintiffs move to exclude the opinions of Drs. John Auxier, John Frazier, and Ward Whicker to the extent that those experts' opinions relate to the issue of defendants' compliance with regulatory standards.[7]  (Pls.' Mem. at 7–8.)  Plaintiffs contend that this issue is "irrelevant

---

[7] Plaintiffs similarly argue in their motion in *limine* that evidence of defendants' compliance with government standards is inadmissible (*see* Pls.' Mot. in *Limine* at 8–10) and incorporate that motion by reference into their motion to exclude defendants' expert testimony.  For the sake of completeness of the record, defendants set forth their response to plaintiffs' argument here in full.

to any claim or defense in this case." (Pls.' Mem. at 8.) Not so. The issue of compliance or non-compliance with regulatory standards is relevant in several ways: (1) defendants' compliance with government standards is probative of their reasonable, non-negligent conduct; (2) under Colorado law, plaintiffs must demonstrate non-compliance with an applicable government standard to establish their nuisance claims; (3) the regulatory standards and whether defendants have complied with them are relevant to whether class members have suffered an increased health risk; and (4) defendants' compliance is also probative of their good faith conduct, rendering an award of punitive damages inappropriate.

*First*, plaintiffs have indicated that they will "offer proof of liability on the nuisance claim through evidence of defendants' negligence." (12/10/03 Status Report at 2.) Testimony regarding defendants' compliance with government standards is probative to plaintiffs' claims of nuisance based upon negligence. It is well settled that, where there exists a government or industry standard, whether the defendant complied with such standard is relevant to whether the defendant breached its duty of care. *See Scott v. Matlack*, 39 P.2d 1160, 1171 (Colo. 2002) (holding that evidence concerning defendants' compliance with OSHA regulations "may be admitted as some evidence of [defendants'] standard of care); *Bayer v. Crested Butte Mountain Resort, Inc.*, 960 P.2d 70, 78 (Colo. 1998) ("Evidence of defendants' compliance with industry standards [is] relevant and admissible for determining whether the defendant breached its duty of care."); *see also Silkwood v. Kerr-McGee Corp.*, 485 F. Supp. 566, 580 (W.D. Okla. 1979) ("[T]he general rule should be no different for the atomic industry. Compliance with government safety regulations should be accepted as evidence of acting reasonably."), *rev'd in part on other grounds*, 667 F.2d 908 (10th Cir. 1982), *rev'd*, 464 U.S. 238 (1984); Dan B. Dobbs, *The Law of Torts* § 224, at 572 (2001) ("[T]he defendant's compliance with a statute that thoroughly

regulates the behavior in question tends to support the defendant's argument that he is not negligent.  So the defendant's compliance may be evidence for the trier to consider on the negligence issue even though it is not a defense."); Prosser & Keeton § 36 ("[W]here the statute does set up standard precautions . . . this is a relevant fact, having proper bearing upon the conduct of a reasonable person under the circumstances, which the jury should be permitted to consider."), *cited in Scott*, 39 P.2d at 1171.

*Second*, as defendants have previously discussed, defendants' compliance with both federal safety standards and state plutonium-in-soil standards are relevant to plaintiffs' nuisance claims.  (*See* Defs.' Proposed Nuisance Instruction Nos. 7, 14–15, 17–19, filed 8/6/04; Defs.' Resp. to Pls.' Br. re Statute of Limitations et al. at 8–19, filed 8/18/04; Defs.' Mem. re Federal Standards and Colo. Nuisance Law, filed 10/15/04.)  Colorado law requires that a plaintiff show that such standards were exceeded in order to demonstrate that any alleged nuisance was substantial and unreasonable.  *See Van Wyk*, 27 P.3d at 393 (stating that "[government] determination of reasonableness sets the standard for the balance between the social utility of the [activity] and possible harm to property").

In *Van Wyk*, the court ruled that if a governmental entity has "quantified the [invasion] level it deemed to be reasonable, then that [invasion] level would become the standard for the level at which [the invasion] would not constitute an invasion interfering with [plaintiffs'] use and enjoyment of their property."  *Id.*  Both the federal nuclear safety standards and Colorado's plutonium-in-soil standard are government quantifications of what is a reasonable level of emissions from a nuclear facility, and what is a reasonable level of plutonium in soil.  Compliance with these standards is relevant to whether there has been any class-wide substantial and

unreasonable interference.  (*See further* Defs.' Resp. to Pls.' Br. re Statute of Limitations et al. at 8–19, filed 8/18/04; Defs.' Mem. re Federal Standards and Colo. Nuisance Law, filed 10/15/04.)

**Third**, the Court ruled in its May 17, 2005 Order that proof of "class-wide exposure to plutonium and resulting class-wide increase in human health risk would be sufficient to establish an interference with . . . use and enjoyment of property," provided that the jury "may only consider the magnitude of the common, class-wide health risk in determining whether this and any interference(s) they find are substantial and unreasonable."  (*Id.* at 5.)  Whether defendants complied with state and federal standards would provide valuable guidance to the jury as to whether defendants' activities present an increased health risk to class members, because both standards were established after extensive scientific study of the relevant "health risks."

In setting its plutonium-in-soil standard, the state of Colorado "used the soil concentration as an index **below which a significant health impact on the population at risk is not anticipated**."  (Ex. 11, Albert J. Hazle 11/13/78 Letter to Peter Murphy (emphasis added).)  The Colorado Department of Health (now the Colorado Department of Public Health and Environment) confirmed in a risk evaluation report that "[t]he present state plutonium-in-soil standard does not have a significant impact on the life expectancy and genetic risks anticipated for a population so exposed," and the Department concluded that "the present standard can still be considered to be ultraconservative."  (Ex. 12, "A Risk Evaluation for the Colorado Plutonium-in-Soil Standard," Colo. Dept. of Health, Jan. 1976, at 13; *see also* Ex. 6, Whicker Supp. Report at 10 ("It is my opinion that the [state soil] standards described in this section are conservative and offer more than ample protection of the public from the potential health effects from plutonium in soil.").)  Thus, testimony regarding whether or not defendants complied these standards is

relevant to whether or not there was a class-wide "increased health risk" from Rocky Flats. (5/17/05 Order at 5.)

Another example is the federal nuclear safety standards, which were designed to ensure that compliance with those standards would result in no meaningful increased health risk.  (*See* Ex. 13, 1/29/97 Auxier Aff. ¶ 9 ("The standards for radionuclide concentrations were determined by the NCRP and ICRP to be levels that are protective of human health, based on data available at the time.").)  These standards are based on recommendations of the International Commission on Radiological Protection ("ICRP") and the National Council on Radiation Protection and Measurements ("NCRP") concerning permissible doses of radiation.  The ICRP is a venerable body of international scientists that is devoted to reviewing current biological and health risk data in creating both biological models of how radionuclides affect the human body, and setting standards for safe levels of radionuclides in the workplace and in the environment based on that extensive scientific groundwork.  The NCRP largely replicates such work in this country.  (*See* Ex. 13, Auxier Aff. ¶¶ 8–41.)  The health-risk-based standards that issue from these organizations, coupled with evidence as to whether or not defendants violated these standards, are also highly probative towards the questions of whether class members have, in fact, experienced an "exposure" and an "increased health risk."  (5/17/05 Order at 5.)

**Fourth**, defendants' compliance with government standards is relevant to plaintiffs' claims for punitive damages.[8]  This Court has already acknowledged that "evidence concerning

---

[8] Defendants maintain the position that the Price-Anderson Act bars plaintiffs from pursuing punitive damages entirely, but even under the law of the case, plaintiffs may only recover "with respect to occurrences, including releases of plutonium, they prove took place before August 20, 1988."  *Cook IX*, 273 F. Supp. 2d at 1212.  Thus, defendants alternatively argue that, given that "only damages for prospective invasions pursuant to Restatement (Second) of Torts § 930(3)(b) (Continued…)

Defendants' alleged compliance with these standards is likely relevant to at least Plaintiffs' claim for exemplary damages."  In discussing these same standards, the *Silkwood* trial court similarly noted:

> Good faith belief in, and efforts to comply with, all government regulations would be evidence of conduct inconsistent with the mental state requisite for punitive damages.  Defendants placed this matter in issue and introduced evidence in this regard.  Defendants were free to argue their good faith conduct in operating their facility safely.  The jury was instructed to judge that conduct in light of the standards for the imposition of punitive damages.  Had the jury believed this evidence, an award of punitive damages would not have been appropriate.

485 F. Supp. at 584.

Plaintiffs' discussion of the admissibility of *ex post* agency decisions (*see* Pls.' Mot. in *Limine* at 9) misses the point.  In each of the cases cited by plaintiffs, the court excluded an unreliable agency **after-the-fact** determination concerning the defendant's conduct.  *See Smith v. Hussman Refrigerator Co.*, 619 F.2d 1229, 1245 (8th Cir. 1980) ("exclud[ing] evidence of the NLRB's failure to issue a complaint **after** plaintiffs filed unfair labor practices") (emphasis added); *Cortes v. Maxus Exploration Co.*, 758 F. Supp. 1182, 1183 (S.D. Tex. 1991) (excluding EEOC determination finding no probable cause on plaintiff's "charge of sex discrimination against her **former** employer") (emphasis added); *Conaway v. Smith*, No. 84-2434, 1989 WL 36054, at *3 (D. Kan. Mar. 17, 1989) (excluding evidence of outcome in unemployment compensation appeal brought after the plaintiff's discharge from employ with defendant).  The probative nature of defendants' compliance with government standards here stems from the fact that such standards were in existence **at the time** defendants carried out the conduct at issue in

---

will be determined in the class trial" (5/17/05 Order at 15), punitive damages are not available for prospective invasions and should not be determined in the class trial.

this case.  Compliance with such standards demonstrates both an effort to "act[] reasonably" and

act in "good faith."  *Silkwood*, 485 F. Supp. at 580, 584.

## V.    DEFENDANTS' EXPERT TESTIMONY REGARDING THE RAC AND CHEMRISK REPORTS IS NOT DUPLICATIVE.

Plaintiffs have moved to exclude defendants' expert witnesses' testimony regarding

ChemRisk and Risk Assessment Corporation ("RAC") studies as cumulative.  (Pls' Mem. at 8.)

That motion should be denied.

To understand why plaintiffs' motion is without merit, it is helpful to briefly review the

background relating to the RAC studies.  Under contract with the Colorado Department of Public

Health and the Environment, ChemRisk investigated public exposures associated with releases

from the Rocky Flats Plant as phase one of the Rocky Flats Dose Reconstruction Project; spe-

cifically, it identified and collected records used to estimate offsite risks and developed an initial

calculation of those risks.  (*See* Ex. 14, RAC, "Final Report: Technical Summary Report for the

Historical Public Exposure Studies for Rocky Flats Phase Two," (Sept. 1999) at 2.)  As phase

two of the project, RAC investigated the potential doses and risks to the public from releases

from Rocky Flats; specifically, it verified the release estimates developed by ChemRisk during

phase one and independently assessed risk from Rocky Flats.  (*Id.*)  Plaintiffs concede the

ChemRisk and RAC studies' relevance and do not offer any other grounds, such as fit or reliabil-

ity, to exclude this expert evidence.  (Pls.' Mem. at 8 ("Defendants are free to present the RAC

and ChemRisk reports as evidence at trial . . . .").)  Rather, plaintiffs prematurely argue that

defendants will present cumulative evidence concerning the RAC studies.  Plaintiffs' motion

should be denied.

### A.   Any Determination That Potential Expert Testimony Is Cumulative Is Not Appropriate in Advance of Trial.

Plaintiffs provide no justification for barring any potential testimony at this juncture. In fact, there is no way to determine, prior to trial, whether testimony is cumulative, and cumulativeness thus is not an appropriate basis for a pretrial, in *limine* motion. *See* 20 Am. Jur. Trials, § 441 ("the term 'in *limine*' means 'in or at the beginning,' 'on the threshold,' or 'at the outset'"). Only upon comparing proffered evidence with admitted evidence and testimony can such a determination be made. In the only case plaintiffs cite, *Marsee v. United States Tobacco Co.*, 866 F.2d 319, 324 (10th Cir. 1989), the district court *did not* hold prior to trial that only one expert witness could testify on a given subject. Nor did the district court make *any* determination prior to trial that any expert testimony was cumulative and should be barred. Instead, in *Marsee,* the district court made determinations about the potential cumulativeness of witness testimony *during trial*. In that case, the district court did not allow plaintiff's expert testimony offered *in rebuttal* on causation issues because that issue had already been addressed by two separate plaintiff's experts in the case-in-chief. Noting that the admission of rebuttal testimony was within the trial court's discretion, the Tenth Circuit determined the trial court had not abused its discretion in excluding the evidence because, among other things, the same issue was raised during the plaintiff's case-in-chief by *two* of plaintiff's experts. *Id.* Therefore, plaintiffs' motion is not ripe for determination.

### B.   Testimony about Various Aspects of the ChemRisk and RAC Reports by Various Defense Experts in Offering Their Respective Opinions Is Not Cumulative and Does Not Waste Time.

In any event, defendants' proffered expert testimony is not cumulative or duplicative. Rather, the relevant defense experts—Drs. John Till, Chris Whipple, John Auxier, and John Frazier—rely on the ChemRisk and RAC reports in various and different ways in reaching their

conclusions and highlight different aspects of the reports through their work.  These experts each come from different disciplines and each discusses that aspect of the studies relevant to his discipline.

### 1. Defendants' Anticipated Expert Testimony Regarding RAC and ChemRisk Is Not "Cumulative."

Plaintiffs offer no authority for the proposition that only one expert may address a particular report or piece of evidence where the witnesses' areas of expertise and opinions differ.  It is perfectly acceptable for two experts to rely on the same materials in support of their opinions; this is frequently the case.  That alone does not make any *testimony* cumulative.  For example, in an automobile accident case, both the biomechanical expert and the accident reconstruction expert typically rely on the same evidence (the police report and scene witness testimony) in making their assessments; they then offer different types of opinions based on that evidence.  *See Dolan v. Mitchell,* 502 P.2d 72 (Colo. 1972) (both investigating officer and accident reconstructionist were allowed to testify as experts concerning a collision based in part on the physical facts admitted into evidence).  Indeed, in the only case cited by plaintiffs on this issue, two experts were permitted to address the same issues in the plaintiff's case-in-chief.  *See Marsee*, 866 F.2d at 324 (two experts testified about an oral cancer epidemic among young snuff users).  Here, defendants do not seek to have their experts address the exact same issues; instead, they will offer testimony and opinions in their respective areas of expertise and may discuss different aspects of and/or rely to varying extents on ChemRisk and RAC's reports.  Hence, here, it would be neither cumulative nor impermissible for multiple defense experts to discuss the ChemRisk and RAC studies among the bases for their various opinions.

Furthermore, where multiple experts discuss a report's different aspects and relate the evidence to their opinions on various topics, such evidence serves different purposes and is not

cumulative. Any cumulativeness finding must be based on a finding of specific, repetitive testimony, not vague claims of overlap. In *Nalder v. West Park Hosp.,* 254 F.3d 1168, 1774 (10th Cir. 2001), the district court barred plaintiffs' expert testimony as cumulative. The Tenth Circuit held that this was error where "aside from broad generalities, neither the magistrate judge, the district judge, nor defendants point[ed] to any specific overlapping or cumulative testimony . . . ." *Id.*; *see also Breidor v. Sears, Roebuck and Co.*, 722 F.2d 1134 (3d Cir. 1983) (exclusion of expert's testimony as to cause of fire on ground that testimony was cumulative was abuse of discretion, notwithstanding expert's and fire investigator's testimony that fire started inside refrigerator, where expert's testimony was necessary to rebut manufacturer's and retailer's contention that fire could not have been sustained in, and escaped from, a closed, airtight refrigerator); *United States v. Kizeart*, 102 F.3d 320, 325 (7th Cir. 1996) (evidence only cumulative where "it adds very little to the probative force of the other evidence in the case, so that if it were admitted its contribution to the determination of truth would be outweighed by its contribution to the length of trial, with all the potential for confusion, as well as prejudice to other litigants . . . that a long trial creates"). Here, plaintiffs do not point to any specific potential testimony or anticipated opinions that are repetitive of other potential testimony or opinions.[9]

### 2. Defendants' Experts Come from Different Disciplines and Discuss the ChemRisk and RAC Studies for Different Reasons.

**Dr. John Till:** Dr. John Till is the RAC President and has extensive experience and expertise in dose reconstruction. (*See* Ex. 15, Till Report at Appx. B2.) He was the principal investigator for RAC's study of Rocky Flats and the surrounding environment. (*Id.* at Appx.

---

[9] In fact, plaintiffs' own expert reports contain this kind of overlap, with multiple plaintiff experts addressing the same subjects (*e.g.*, the 903 pad). (*See* Ex. 18, Budnitz Report at 17–18; Ex. 19, Cochran Overview Report at 23–30; Ex. 20, North Report at 7–8.)

B4.)  Dr. Till's opinions involve releases, dose exposure levels, and risk.  He focuses his opinions on the RAC study's conclusions, and ChemRisk's work regarding the same topics.  (*See id.* at iii.)  Thus, at trial, defendants expect that Dr. Till will offer opinions about historical exposures, doses, and risks, explaining the work he did with RAC and that which was done by ChemRisk.

**Dr. Chris Whipple:**  Dr. Whipple is an expert in management of risks to health and to the environment whose experience includes work on risk assessment methods, risk management, regulation, and risk communication.  (Ex. 16, Whipple Supp. Report at Ex. A.)  He offers opinions about assessment of risks from the Rocky Flats facility.  (Ex. 17, Whipple Report at 1.) He rebuts and criticizes the work of plaintiffs' purported conduct experts, Warner North and Robert Budnitz.  (*Id.*)  In Dr. Whipple's initial report, he describes past quantitative and qualitative risk assessments of Rocky Flats that demonstrate that Rocky Flats does not pose a significant risk to the public.  (*Id.*)[10]  In his supplemental report, Dr. Whipple describes two developments since his 1996 report.  First, Dr. Whipple notes changes to the site due to ongoing remediation activities and anticipated closure.  He also discusses the completion of studies related to past operations, primarily the RAC study.  (Ex. 16, Whipple Supp. Report at 1.)  The RAC discussion about which plaintiffs complain is merely a short section in Dr. Whipple's supplemental report.  (Pls' Mem. at 8 (citing Ex. 16, Whipple Supp. Report at 6–11).)  In that section,

---

[10] Such studies include the Consortium for Environmental Risk Assessment, various risk assessments done during Rockwell's tenure at Rocky Flats, a DOE special task force report, a report by Stone & Webster Engineering, and a report by the CERE.  (*Id.* at 1–8)  Whipple criticizes North and Budnitz for failing to undertake such an analysis.  (*Id.* at 3 ("North and Budnitz did not consider the likelihood . . . of [releases] or of the likely exposures that would result from such releases. . . .  North and Budnitz did not consider the potential magnitude of any hypothetical releases nor did they describe quantitatively the consequences of such releases."))

Dr. Whipple compares the "anecdotal nature of the reports from Drs. North and Budnitz" to the "careful integration of relevant data into the risk assessments" by ChemRisk and RAC—as Dr. Whipple did with the various other risk assessments discussed in his initial report.  (Ex. 16, Whipple Supp. Report at 6; Ex. 17, Whipple Report at 1–8.)  Dr. Whipple offers an independent opinion that the RAC assessments reflect the state of the art for risk assessment.  (Ex. 16, Whipple Supp. Report at 6)  He then focuses on ChemRisk and RAC findings in the area of *future risks*.  (*Id.* at 8–12)  This is Whipple's only discussion of ChemRisk and RAC in his reports.  (*Id.*)  Thus, Dr. Whipple's opinions and anticipated testimony are not cumulative of other defense expert opinions.

**Dr. John Frazier:**[11]  Dr. Frazier, defendants' radiation exposure expert, has worked at the firm of Auxier and Associates, Inc., which specializes in radiation safety, health physics, and environmental consulting.  Dr. Frazier has experience in health physics, general radiation protection program planning and administration, internal and external dosimetry, environmental radiation dose and risk assessment, decontamination and decommissioning management, and site characterization.  (*See* Ex. 5, Frazier Supp. Report, CV at 1.)  In this case, Dr. Frazier offers opinions about Rocky Flats releases and exposures.  For instance, he covers issues such as federal standards, environmental monitoring, background exposures, and plutonium's effect on the human body.  (*See id.* at §§ III & IV.)

---

[11] Given Dr. Auxier's advanced age and health concerns, defendants identified Dr. Frazier as a substitute for Dr. Auxier as early as 1995.  (*See* Defendants' Identification of Anticipated Expert Subject Matters and Witnesses at 3.)  Dr. Frazier adopted Dr. Auxier's report and has supplemented it with his own.  Given that Dr. Frazier has adopted Dr. Auxier's report, the reports here are referenced as Dr. Frazier's.  Plaintiffs' implication that defendants will call both witnesses is misplaced.

Dr. Frazier's initial report indicates that he relies on many dozens of sources in reaching his conclusions, only two of which are reports from ChemRisk and RAC.  (*See id.* at i.)  The initial report also drew upon work done by plant staff, the Colorado Department of Health, groups from various universities, and many others.  (*Id.*)  In Dr. Frazier's supplemental report, he supplements Dr. Auxier's opinions about environmental sampling results, plutonium levels in offsite soil, and federal standards for radionuclides and radiation protection.  (Ex. 5, Frazier Supp. Report at 1–3.)  Four paragraphs of Dr. Frazier's supplemental report discuss the then newly completed study by RAC, which issued its final report in February 2000.  (Pls' Mem. at 8 (citing Ex. 5, Frazier Supp. Report at 2–3).)  Dr. Frazier specifically cites to the RAC report and states that he relies on "[n]umerous studies . . . performed to determine the distribution of plutonium in soil" that also are "reviewed and summarized in the 1999 report by RAC."  (Ex. 5, Frazier Supp. Report at 2.)

Simply put, this is not a case in which the probative value of testimony related to Chem-Risk and RAC's work is ***substantially outweighed*** by "needless presentation of cumulative evidence."  *See* Fed. R. Evid. 403.  Dr. Till provides foundation testimony for and describes RAC's work and its conclusions.  In contrast, the work of both ChemRisk and RAC is only one of several bases for Drs. Whipple and Frazier's opinions about Rocky Flats.  Moreover, Dr. Whipple discusses these studies in the context of risk assessment issues and highlights the studies' conclusions about ***future risk***, while Frazier addresses them in the context of his opinions about ***past or existing radiation exposure*** and highlights conclusions about ***plutonium levels in soil and the practicality of remediation***.

## VI.    MR. CONWAY'S OPINIONS ARE RELIABLE AND RELEVANT.

Plaintiffs move to exclude the entire testimony of Daniel Conway (Pls.' Mem. at 8–12), arguing that "his conclusions are unsupported by any discernable methodology" (Pls.' Mem. at

8).   Even plaintiffs themselves are able to "discern" Mr. Conway's methodology, however, because in their next breath, they explain that Mr. Conway has laid out "several types of data" and has demonstrated the methodologies he used to analyze this data "to conclude that . . . there must be no adverse impact on undeveloped land due to Rocky Flats."  (Pls.' Mem. at 9.)  Moreover, relying upon nothing more than the unsubstantiated assertions of plaintiffs' ***attorneys*** (unsupported by citations to either record evidence or case law), plaintiffs make the conclusory (and completely false) claims that:  (i) Mr. Conway's work does not relate to "property values"; and (ii) Mr. Conway's work cannot be used to determine a "but for" measure of property damages.  Plaintiffs' motion to strike Mr. Conway's opinions should be denied.

### A.        Mr. Conway's Methodology and Conclusions.

Because plaintiffs' discussion of Mr. Conway's methodology is both truncated and one-sided, defendants set forth a fuller explication here.  Mr. Conway's work is designed to evaluate "the effects, if any, of the Rocky Flats Plant . . . on undeveloped real estate values and improved commercial real estate values in the class area."  (Ex. 21, Conway Report at 1.)  To determine such effects (if any), Mr. Conway examines several "commonly relied upon property development and market performance indicators" and compares them "for the class area and surrounding communities."  (*Id.*)  These indicators are:

- Employment growth;

- Population growth;

- Household formations;

- The addition of office and industrial space in the area; and

- Retail/commercial construction in the area.

(*Id.* at 2.)

Mr. Conway finds that each of these indicators paints a picture in the class area that contradicts the premise that Rocky Flats has suppressed development in the class area (what development "would have been but for" Rocky Flats).  Since 1980, employment in the class area has grown at an annual rate of 4.9%, compared to an employment growth rate of 2.8% for Jefferson County and 2.3% for the Denver region as a whole.  (Ex. 22, Conway Supp. Report at 2–3.)  The population of the class area has grown by an annual rate of 3.0% since 1980, versus 1.6% for Jefferson County and 2.0% for the Denver area; the formation rate of new households in the class area similarly outpaces Jefferson County and the Denver area.  (*Id.* at 4–5.)  The square footage of office properties, industrial properties, and retail properties in the class area has increased at an annual rate of 14.7%, 8.3%, and 14.6%, respectively; the comparative growth rates in Jefferson County and the Denver area as a whole are significantly lower.  (*Id.* at 9–14.)

In addition to this core market-indicator analysis, Mr. Conway applies his own considerable experience in development forecasting in the Denver area to the issue of effects of Rocky Flats on property values in the class area.  Moreover, in conducting his supplemental analysis, Mr. Conway conducted interviews with, and reviewed the depositions of, numerous "public officials, developers, builders, and other stakeholders doing business in the class area and its environs."  (*Id.* at 20.)  In Mr. Conway's experience, the class area "is a vibrant, active and successful commercial corridor that has had significant development over time. . . .  This area's growth has been unimpaired by Rocky Flats."  (*Id.* at 15.)  Mr. Conway's interviews confirm his experience:  "The general perception" that arose from these interviews "is that Rocky Flats has not diminished the pace of development and construction, nor has it negatively impacted home values, commercial building values, or land values."  (*Id.* at 25.)

B.     **Mr. Conway's Methodology Is Reliable and Relevant.**

Plaintiffs argue that Mr. Conway:  (1) "fails to prove that his market performance indicators are . . . 'commonly relied upon' by development forecasters" (Pls.' Mem. at 9); (2) "fails to establish how his market performance indicators are tied to land prices, or how they can show harm to property values" (*id.* at 10); (3) "used entirely different sources for the data for the class area versus the other areas" (*id.* at 11); and (4) "makes no effort to show how his experience is a reliable basis" (*id.*).  These arguments are all without merit.

1.     **Mr. Conway's Methodologies Are Relevant.**

Plaintiffs contend that Mr. Conway "fails to establish how his market performance indicators ["employment growth"; "household formations"; "the addition of office and industrial space in the area"; and "retail/commercial construction in the area"] are tied to land prices, or how they can show harm to property values."  (Pls.' Mem. at 9–10.)  Plaintiffs' argument should be rejected for five reasons.

***First***, this Court ruled in *Cook IX* that "Defendants are, of course, entitled to argue and present evidence challenging Plaintiffs' assertion that any decrease in the value of their properties was caused by Defendants' alleged trespass and nuisance, rather than by mere proximity to the Plant ***or other factors***."  *Cook IX*, 273 F. Supp. 2d at 1210 n.39 (emphasis added).  Plaintiffs provide no authority for their argument that the market indicators analyzed by Conway—*e.g.*, "employment growth"—may not be considered by the jury as an "other factor" impacting the relative value of properties in the class area.

***Second,*** plaintiffs' provide no support whatsoever for their "irrelevance" argument.  Plaintiffs make the conclusory assertion that "Employment growth"; "Household formations"; "the addition of office and industrial space in the area"; and "retail/commercial construction in the area" all are irrelevant to "land prices."  (Pls.' Mem. at 10.)  But plaintiffs provide no support

for this conclusory assertion, either in the form of a citation to a case, a citation to the record, an affidavit, or otherwise.  Rather, plaintiffs rely solely on their *attorneys'* view that, for example, "employment growth" is irrelevant to "land prices."  But the say-so of plaintiffs' attorneys is not enough to exclude Mr. Conway's opinions under *Daubert*.

Plaintiffs' irrelevance argument confuses the *admissibility* of Mr. Conway's opinions with the *weight* of those opinions.  *See United States v. Cavely*, 318 F.3d 987, 997–98 (10th Cir. 2003).  Plaintiffs may wish to argue *to the jury* plaintiffs' attorneys' view that "employment growth" is not tied to "land prices" (provided that such a view can be supported by evidence at trial).  But the fact that plaintiffs' attorneys hold such an opinion is something for the jury to consider in weighing the evidence, not a ground for excluding Mr. Conway's testimony.

*Third*, as Mr. Conway testified, his analysis of "market performance indicator" data support his opinion that both "improved" and "undeveloped" "commercial property value in the class area did not suffer any adverse impact from Rocky Flats either before or after June 7, 1989" (Ex. 21, Conway Report at 1):

> Q.    On page one of your report, under Opinion I, you state, undeveloped property value in the class area did not suffer any adverse impact.
>
> What do you mean by adverse impact?
>
> A.    Didn't go down in value.
>
> Q.    You mean didn't go down in price?
>
> A.    Value.
>
> Q.    This is why I asked you more about what you mean by value.
>
> I thought you ended up defining value in terms of what price the land would bring, given I think you said a willing seller and a willing buyer.
>
> A.    Correct.
>
> Q.    So when you say it didn't have any adverse impact on value, are you using value the same way?

A.    Yes.

(Ex. 23, Conway Dep. at 56.)  Indeed, Mr. Conway's report indicates that the "market perform-ance indicator" data he relied upon is "typically relied upon" by those in Mr. Conway's disci-pline—development forecasting.  (Ex. 21, Conway Report at 1.)  Again, plaintiffs cite no author-ity to the contrary, other than the conclusory claims of plaintiffs' attorneys.

*Fourth*, Mr. Conway's opinions relating to "market performance indicators" are relevant to rebut the proffered opinions of plaintiffs' experts.  Plaintiffs' key damages expert, Wayne Hunsperger, opines that, if Rocky Flats did negatively impact land values in the class area, one should be able to observe such an impact on the pace of development.  (Ex. 3, Hunsperger Report at 63; *see also id.* at 252 ("There are uncertainties concerning future site users, waste and nuclear materials disposal options, the regulatory framework and federal funding.  These uncer-tainties affect use and development of adjacent land.").)  Mr. Conway's findings of "the consid-erable amount of development activity that has occurred in the class area" (Ex. 22, Conway Supp. Report at 15) stand in stark contrast to Mr. Hunsperger's findings, and cast doubt on Mr. Hunsperger's ultimate conclusions of diminution in property value.

*Fifth*, plaintiffs do not object to the relevance of Mr. Conway's opinions based on his ex-perience and his 2003–04 interviews, and for good reason.  Mr. Conway's own experience in observing growth trends in the Denver area allows him to conclude that the class area's "growth has been unimpaired by Rocky Flats."  (See Ex. 22, Conway Supp. Report at 15.)  The results of Mr. Conway's interviews provide strong confirmation that Rocky Flats has had no effect on vacant and commercial land values from the very individuals who set such values through their regulatory and market activity.  Mr. Conway's interviews also give cause for skepticism of the results from Mr. Hunsperger's interviews.  For example, both Mr. Hunsperger and Mr. Conway interviewed Kirk Oglesby, who is Director of Government Affairs of the City of Broomfield and

was previously the Director of Planning.  (Ex. 3, Hunsperger Report at 81; Ex. 22, Conway Supp. Report at 21–22.)  Mr. Hunsperger claims that Mr. Oglesby told him that "Rocky Flats created the need for a land use plan that would not allow residential development west of Simms Street."  (Ex. 3, Hunsperger Report at 81.)  Yet according to Mr. Conway, Mr. Oglesby dis-avowed that statement entirely, explaining that "Rocky Flats was never a consideration in this plan.  Broomfield did not want residential west of Simms Street because they could not sewer it.  This decision had nothing to do with Rocky Flats."  (Ex. 21, Conway Supp. Report at 22.)  Like Mr. Oglesby, most of the "class area stakeholders" that Mr. Conway interviewed reported that Rocky Flats has no effect on land use policies or property values in the class area.  This under-mines at least one of the five analyses that Mr. Hunsperger adopted to establish his conclusions of market value.  (*See* Ex. 3, Hunsperger Report at 78–120.)

### 2.    Mr. Conway's Methodology Is Reliable.

Plaintiffs also argue that Mr. Conway's opinions should be excluded because they are "unsupported by any discernable methodology."  (Pls.' Mem. at 8.)  Plaintiffs' "methodology" argument should be rejected for three reasons.

***First***, Rule 702 does not require an expert to justify his methodology in his report.  The cases cited by plaintiffs do not suggest otherwise.  Plaintiffs' cases instead establish only two points:  (1) that expert opinions should be excluded where the expert has no methodology at all, *see*, *e.g.*, *Zenith Elec. Corp. v. WHTB Broadcasting*, 395 F.3d 416, 418 (7th Cir. 2004) (denying testimony of expert that "either had no method or could not describe one.  He was relying on intuition, which won't do."); *Lovato v. Burlington N. and Santa Fe Ry. Co.*, No. 00-RB-2584, 2002 WL 1424599, at *10 (D. Colo. June. 24, 2004) (excluding expert whose opinions were developed in "the absence of any independent testing or data collection" and who ultimately "offers nothing more than an personal endorsement for [another expert's] causation opinions.");

and (2) expert opinions that rest on an unreliable or irrelevant basis should also be excluded, *see Joiner*, 522 U.S. at 146 (excluding opinion regarding incidence of cancer from exposure to PCB's, where studies underlying opinion were irrelevant or failed to support the expert's opinion).

Plaintiffs do not attempt to make any demonstration, through affidavits from their own experts, by discussing relevant treatises, or otherwise, that Mr. Conway's methodology is not reliable and generally accepted. Instead, plaintiffs only criticize Mr. Conway for "fail[ing] to prove" this in his own report. (Pls.' Mem. at 9–10.) The *ipse dixit* of plaintiffs' counsel that Mr. Conway's methodology is not generally accepted is insufficient as grounds for exclusion under Rule 702.

***Second***, Mr. Conway uses a number of generally accepted methodologies. For example, Mr. Conway compares market performance data ("employment growth"; "household formations"; "the addition of office and industrial space in the area"; and "retail/commercial construction in the area") for the class area to market performance data indicator for non-class areas. (Ex. 21, Conway Report at 3–8.) Plaintiffs do not argue that a developmental forecaster's use of such a "control group" analysis is ***not*** a "generally accepted" methodology. Instead, plaintiffs merely contend that Conway "did not undertake to show how a comparison of those indicators to the figures for Jefferson County and the Denver metro area was reliable or useful for determining the but-for prices or but-for measurements on those indicators." (Pls.' Mem. at 10–11.) But, other than the conclusory assertion of plaintiffs' attorneys (unsupported by citation to law or facts) that Conway's "control group" analysis is ***not*** a "reliable" or "useful" methodology for a developmental forecasters to use in determining "but-for" prices, plaintiffs offer no other criticism of Conway's methodology. Again, the *ipse dixit* of plaintiffs' attorneys that a control group

analysis cannot be used to support an opinion that there is no "but for" impact on property values is not enough.  Indeed, one of Mr. Hunsperger's analyses—the "market sales" analysis—relies on a similar control-group analysis of properties in close proximity to Rocky Flats versus properties in other regions of the Denver metropolitan area, though Mr. Hunsperger does not isolate the class area as a distinct geographical area for comparison purposes.  (Ex. 3, Hunsperger Report at 23–31.)

*Third*, plaintiffs' expert themselves support Mr. Conway's approach of using market performance indicators — instead of appraisal techniques — to evaluate commercial properties.  Plaintiffs' own experts assert that vacant land and commercial properties do not yield well to an appraisal of value.  Mr. Hunsperger "recognize[s] that commercial properties . . . are not easily analyzed by accepted mass appraisal techniques" and does not offer any quantification of the effect of Rocky Flats on the value of class-area commercial properties.  (Ex. 3, Hunsperger Report at 71.)  Dr. Radke observed "that investing in vacant land is often done for real-estate speculation," which results in high data variability in the value of vacant land.  (Ex. 24, Radke Report at 7.)  Thus, Mr. Conway's reliance upon market performance indicators to evaluate the effect on land values is consistent with the assertions of plaintiffs' experts; as explained above, this analysis is generally accepted as a reliable methodology in forecasting the development of vacant land and commercial properties.

### 3.       Mr. Conway's Data Is Reliable.

Other than plaintiffs' counsel's conclusory (and unsupported) assertions that Mr. Conway's methodologies are not "reliable" or "useful," plaintiffs only other criticism of Mr. Conway's methodology relates to his use of data.  However, plaintiffs misconstrue the record of how Mr. Conway obtained data for the class area in several respects.  Defendants therefore set forth an accurate account here.

To inventory the class-area commercial properties, Mr. Conway and his staff first obtained aerial photographs of the class area. (Ex. 23, Conway Dep. at 26–27.)  Armed with these photographs and a map of the outline of the class area, they then proceeded to drive up and down the streets in the class area. (*Id.* at 29.)  At each location where the photographs showed a commercial property, they determined whether that property fell inside the class contour and, if it did, added that property to their list. (*Id.* at 30–31.)  From this list, they developed the commercial properties list that appears on pages 9–10 of Mr. Conway's report. (*Id.* at 31–32, 69; *see also* Ex. 21, Conway Report at 9–10.)  Mr. Conway and his staff conducted several subsequent drives through the area to ensure that the list was complete. (Ex. 23, Conway Dep. at 69–70.)

Plaintiffs misrepresent this record in at least two respects. ***First***, they claim that "it is impossible to verify [Mr. Conway's] data" because he discarded his notes. (Pls.' Mem. at 11.) This is not candid. Mr. Conway's notes have been preserved in the list of properties on pages 9–10 of his report. The contents of this list could easily be verified. Mr. Conway did testify that his notes were discarded, but only after "[t]hey were used as a draft to make up this list." (Ex. 23, Conway Dep. at 31.)

***Second***, plaintiffs claim that the list of properties included in Mr. Conway's report is "representative" only and that Mr. Conway does not "provide any method by which he ensured that his list of 'representative' properties in the class area are truly representative." (Pls.' Mem. at 11.)  Again, this is not true. Mr. Conway did not include some properties and exclude others when compiling the list of properties on pages 9–10; rather, this list captures all of the commercial properties in the class area that Mr. Conway identified. This may be confirmed by adding the 134,382 square feet of office space in the class area to the 192,365 square feet of industrial space and 1,136,700 square feet of retail/commercial space that Mr. Conway reports (Ex. 21,

41

Conway Report at 5–7); the total of 1,534,089 square feet matches the total square footage of the properties on pages 9–10 of Mr. Conway's report.

### 4.      Mr. Conway's Experience Is a Reliable Basis for His Opinions.

Finally, plaintiffs claim that "Mr. Conway makes no effort to show how his experience is a reliable basis for [his] conclusion[s]."  (Pls.' Mem. at 11.)  This argument, too, should be rejected.  Mr. Conway has performed economic studies for real estate markets all over the country, but he has conducted the most analysis in his home market—the Denver area—having spent the last 27 years at THK Associates, a Denver-area market and economic research firm. (Ex. 21, Conway Supp. Report at 27–29.)  Mr. Conway's opinions are highly regarded by developers and city planners in the area, including Charles McKay, who is a major developer in the area and is also a class member and a witness for the plaintiffs, and the city of Westminster. (*See* Ex. 25, D. Conway 7/22/03 letter to C. McKay; Ex. 23, Conway Dep. at 54.)

## VII.   MR. DORCHESTER'S OPINIONS ARE RELIABLE AND RELEVANT.

Plaintiffs move to exclude the testimony of John Dorchester in its entirety.  (Pls.' Mem. at 12–17.)  Plaintiffs claim that Mr. Dorchester "does not identify or use any methodology that can measure the effects (or lack thereof) of Rocky Flats."  (Pls.' Mem. at 12.)  Mr. Dorchester's methodology, however, is an appropriate and accepted analysis for determining the effects of external factors on an area-wide basis.

Mr. Dorchester's detailed and comprehensive report that he filed in this case is organized into seven chapters.[12]   Mr. Dorchester discusses the methodology underlying his analysis in

---

[12] Mr. Dorchester's supplemental report follows the same methodologies as his original report and is both relevant and reliable for the same reasons that his original report is, for the reasons that defendants discuss below.

Chapter 3.  Because this is the focus of plaintiffs' arguments, defendants begin their discussion with this chapter.[13]

>     1.     **Chapter 3 of Mr. Dorchester's Report Sets Forth a Methodology That Is Relevant to This Case and Is Generally Accepted.**

In Chapter 3, Mr. Dorchester discusses the requirement that the plaintiffs must satisfy to recover damages—to "supportabl[y] demonstrat[e] that an action or actions of the defendants caused economic harm to the property of the plaintiffs"—and the "possible methodologies that may be used to support such assertions."  (Ex. 1, Dorchester Report at 3-1.)  This discussion begins with a definition of "Market Value," which "is a long established standard commonly applied in controversies involving economic harm to property."  (*Id.*)  Mr. Dorchester defines Market Value as:  "The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus."  (*Id.*)  Mr. Dorchester in turn adopts a definition of "economic harm" as "the difference between resulting Market Values of plaintiffs' properties and the Market Value of the properties if the alleged harm had not occurred."  (*Id.* at 3-6; *see also* Dorchester Supp. Decl. ¶ 2.1. ("Economic harm for an

---

[13] There is nothing improper about Chapters 1 and 2 of Mr. Dorchester's report that warrants their exclusion or the exclusion of related testimony.  In Chapter 1, Mr. Dorchester provides an introduction to the study and lays out the issue "to be addressed":  "whether or not there is any evidence of systematic real property value diminution, or other economic harm to real property after June 7, 1989 which is attributable to operations of the Rocky Flats plant."  Such an introduction is common to a testifying expert's report, and plaintiffs provide no basis for their characterization of this introduction as "convoluted."  (Pls.' Mem. at 15.)  Chapter 2 contains an overview of the history of Rocky Flats that provides useful historical background to the inquiry of whether Rocky Flats has affected class-area property values.  As Mr. Dorchester notes in his declaration, "To more fully understand the Rocky Flats story, it is necessary to study many historical facts."  (Ex. 1, Dorchester Report at 1–5.)  Plaintiffs' expert Mr. Hunsperger includes a similar section in his own report.  (Ex. 3, Hunsperger Report at 73.)

individual parcel of real estate is generally recognized in my field to be a diminution in market value caused by a particular external event or circumstance.").)  *Cf.* Restatement § 930 cmt. d ("Depreciation in the value of the land . . . will be gauged by calculating how much less a reasonable purchaser would give for the land because of the prospect that the land would be subjected to the invasions permanently or for an indefinite time in the future.").

After laying this theoretical groundwork, Mr. Dorchester discusses three types of possible research methodologies for assessing economic harm:  (1) individual property analysis; (2) sample property analysis; and (3) area-wide property analysis.  (Ex. 1, Dorchester Report at 3-7– 3-10.)  Mr. Dorchester notes that the first of these analyses imposes "an inordinate cost . . . where large numbers of properties are involved" (*id.* at 3-8), while the second "may not result in fairness to all properties or to all parties in litigation" (*id.* at 3-9).  The third type, area-wide property analysis, commonly includes analysis of the following:  (1) "development histories and trends;" (2) "trends in average sales prices;" (3) "trends in time on market, time off market, sales volumes, or other indicators of market activity;" (4) "assessed value patterns and trends;" (5) statistical analyses applying averaging or trending methods;" and (6) "anecdotal information." (*Id.* at 3-9.)  "These methods can be particularly useful as a first step in searching for possible market aberrations for larger numbers of properties" (*id.* at 3-10); thus, this is the first step in Mr. Dorchester's analysis.

Mr. Dorchester's area-wide analysis was designed to "determine whether any of the fol- lowing could be reasonably concluded . . . :

1.  A failure of the real estate in the class area or nearby to develop from rural or urban uses in an expected way. . . .

2.  An apparent reduction in demand for properties of a given type or class that would have observable effect on development of additional properties of similar type or class.

3.  Other applicable evidences of economic harm to real property in the class area.

(*Id.* at 3-11.)  Mr. Dorchester's research begins "by first studying the entire Denver community," narrowing to "Denver's northwest quadrant . . . and even smaller areas within and outside the property class boundaries."  (*Id.*)  This research captures "similarities and differences in growth patterns, rates of growth, and other indicators that might signal the existence of systematic economic harm in the Rocky Flats area if it existed."  (*Id.*; *see also* Ex. 26, Dorchester Supp. Decl. ¶ 2.4 ("The first [step] was a broad study of economic trends and conditions in the Class Area, in keeping with the kinds of study that are commonly performed for these purposes.").)

Mr. Dorchester's methodology is both relevant and reliable.  This methodology coincides with the relevant measure of damages under Restatement § 930:  both measures evaluate whether the market value of the subject properties has depreciated because of an external effect.  Not only does "Mr. Dorchester mention[] the actual versus but-for price comparison as a valid method for determining economic harm to property" (Pls.' Mem. at 14 n.6), that the fundamental concept of economic harm, as measured by Mr. Dorchester, rests upon such a comparison.  The area-wide analysis eventually adopted by Mr. Dorchester is the "most appropriate and generally expected" research methodology to test for such economic harm.  (Ex. 26, Dorchester Supp. Decl. ¶ 2.11.) Plaintiffs cite no contrary authority.

### 2.  Chapters 4 and 5 and Appendix L of Mr. Dorchester's Report Are Relevant and Reliable.

Chapter 4 of Mr. Dorchester's report reviews a variety of socioeconomic factors affecting the Denver area.  "This background information is fundamental to an understanding of the dynamics of real estate development near the Rocky Flats Plant and a study of possible economic harm from the Plant."  (Ex. 1, Dorchester Report at 4-1; *see also* Ex. 26, Dorchester Supp. Decl. ¶ 3.1 ("Chapter 4 is an integral part of developing data and understanding as a foundation in

which to study and evaluate economic harm or other specific property issues, and is not only in accordance with standard practices in my field, but is required.").)  A summary of these factors demonstrates that the Denver area "has shown significant growth over the past four decades" and that "[t]he Rocky Flats environs are indicated to have received considerable growth in the 1970–1979 period."  (Ex. 1, Dorchester Report at 4-23.)  Mr. Dorchester does note that, "[f]or the time periods most proximate to the Rocky Flats litigation, the Denver area began a period of economic contraction in 1982–83 that continued until about 1989–90."  (*Id.* at 4-7.)

Chapter 5 continues the discussion of Chapter 4, but at a more specific level to the class properties at issue and including additional factors that affect the value of those properties.  Mr. Dorchester discusses general considerations for property development in the Rocky Flats area (*id.* at 5-1–5-7), land use and ownership in the area (*id.* at 5-7–5-12, 5-25–5-32), the development history (*id.* at 5-12–5-25, 5-32–5-36, 5-52), news and anecdotal information about Rocky Flats (*id.* at 5-36–5-39), and real estate price trends (*id.* at 5-39–5-51).  "These are precisely the types of analyses that must be performed if quantifications of economic harm are to be attempted, but they also provide foundations for a determination of whether any such economic harm is indicated on an area wide or Class Area basis."  (Ex. 26, Dorchester Supp. Decl. ¶ 4.2.)

By analyzing price trends, Mr. Dorchester is able to "calculate the magnitudes of change over time and compare these changes with those that should be expected to occur with normal market shifts over time. . . .  Any unexplained variations provide indications that an abnormality, such as adverse economic effects of a contaminating situation or event, may have occurred." (Ex. 1, Dorchester Report at 5-40.)  Price trends in the class area showed "no spikes denoting significant average price shifts connected with major events at Rocky Flats, including the June 7, 1989 FBI raid" (*id.* at 5-48)—the class membership date and a proposed CCE date (Pls.' Mot. in

*Limine* at 2). Rather, any decline in prices coincided with periods of economic recession or high mortgage rates observed in Chapter 4. (*Id.*) Appendix L provides more statistical details for this conclusion, although a visual inspection of Figure 5-29 sufficiently illustrates the lack of an anomalous spike in the trend data.

This time series analysis is appropriate for the task at hand. By analyzing price trends in this matter, Mr. Dorchester does "isolate the independent variable at issue, namely, market reaction to the [alleged] nuisance and contamination caused by Rocky Flats." (Pls.' Mem. at 14.) The generally accepted hypothesis underlying this analysis is that such market reaction will manifest itself as an unexplained departure from otherwise known market trends (thus necessitating a thorough knowledge of other factors affecting value). The use of a time series analysis to detect market reaction is a generally accepted methodology. *See* Reference Manual on Scientific Evidence 191 & n.31 (2d ed. 2000) (noting that "time-series models" are appropriate statistical methods "when nonlinearities are important"); (Ex. 26, Dorchester Supp. Decl. ¶ 4.4 ("Analysis of price information over time is a standard procedure within the Valuation Process.")). *See also Allapattah Servs., Inc. v. Exxon Corp.*, 61 F. Supp. 2d 1335, 1348 (S.D. Fla. 1999); *In re Indus. Silicon Antitrust Litig.*, No. 95-2104, 95-1131, 96-2003, 96-2111, 96-2338, 1998 WL 1031507, at *2–3 (W.D. Pa. Oct. 13, 1998). Nor do plaintiffs cite any authority—other than referring to the views of plaintiffs' attorneys—for the proposition that a trend analysis cannot be used to support a relevant opinion with respect to a "but for" measure of damages.

Plaintiffs' argument that a trend analysis cannot be used to support a relevant opinion with respect to a "but for" measure of damages is not only unsupported, but also counterintuitive. Plaintiffs contend that the "injurious situation" became "complete and comparatively enduring" from "1989 to 1992." (Pls.' Mot. in *Limine* at 1–3.) Indeed, plaintiffs state in their Consolidated

Memorandum in Opposition to Defendants' Motion in *Limine* that the market was "bombarded" with information about "problems" from Rocky Flats in 1989:

> [E]vidence concerning the FBI raid and the criminal proceedings is not merely relevant with respect to liability, but is also highly material to the issue of damages.  A market cannot readily discount property values by virtue of problems of which the market has not inkling.  The Denver area was bombarded with news accounts involving the criminal proceedings in 1989 and the early 1990's.

(Pls.' Consol. Mem. in Opp. to Defs.' Mots. in *Limine* at 9–10.)  Plaintiffs' arguments only underscore the value of a time trend analysis in determining a but-for measure of damages. Plaintiffs contend that, prior to 1989, the market had "no inkling" of "problems" at Rocky Flats, but that, "in 1989 and the early 1990's," the "Denver area was bombarded" was information about such "problems."  *Id.*  If that were true, then a time trend analysis incorporating the period "1989 and the early 1990's" would constitute a highly probative and reliable method of answering the question:  "But for the 'problems' from Rocky Flats which allegedly came to light in 1989, what would the value of class properties have been?"

For example, if the value of class properties continued on an essentially steady upward trend until 1989 (the period when the public allegedly had no "inkling" of problems at Rocky Flats), but then decreased in 1989 when the market was allegedly "bombarded" with information about problems at Rocky Flats, such a time trend analysis may support the conclusion that the problems at Rocky Flats did have a "but for" impact on the value of class properties.  By contrast, if the value of class properties continued on an essentially steady upward trend until 1989, and continued on that trend from 1989 to 1992 when the market was allegedly "bombarded" with information about problems at Rocky Flats, such a time trend analysis would support the conclusion that the problems at Rocky Flats did have a "but for" impact on the value of class properties.

Such an analysis also comports with the measure of damages under Section 930 of the Restatement (Second) of Torts.  Section 930(3)(b) requires an analysis of "the decrease in the

value of the land caused by the prospect of the continuance of the invasion measured at the time when the injurious situation became complete and comparatively enduring."   Restatement (Second) of Torts Section 930(3)(b).   But Section 930 says nothing about the ***method*** used to determine "the decrease in the value of the land caused by the prospect of the continuance of the invasion measured at the time when the injurious situation became complete and comparatively enduring."   A time trend analysis is one such method.   For example, if the CCE date is January 2, 2000, a time trend analysis showing that the value of a property was $150,000 on January 1, 2000, $100,000 on January 2, 2000, and $100,000 on January 3, 2000, would support the conclusion that the measure of damages under Section 930(3)(b) — "the decrease in the value of the land caused by the prospect of the continuance of the invasion measured at the time (January 2, 2000) when the injurious situation became complete and comparatively enduring"—was $50,000.

### 3.   Chapters 6 and 7 of Mr. Dorchester's Report Are Reliable and Relevant.

Chapters 6 and 7 contain a discussion of factors affecting the values of the representative class members' properties and whether an analysis of those factors supports a finding of economic harm caused by Rocky Flats operations.   Because Mr. Dorchester did not have the opportunity to interview these representatives, he studied their depositions and any available background materials concerning their properties.   (Ex. 26, Dorchester Decl. ¶ 4.3.)   The purpose of this discussion was to "better understand whether their accounts supported the plaintiffs' claims," given that Mr. Dorchester's area-wide analysis did not.   (*Id.*)   Mr. Dorchester concluded that no representative plaintiff presented evidence of economic harm from Rocky Flats.   (Ex. 1, Dorchester Report at 7-6–7-13.)   This discussion is not only relevant and reliable, but essential; Mr. Dorchester's "analysis would have been considered incomplete under GAVP [Generally

Accepted Valuation Principles] had [he] not considered their own information." (Ex. 26, Dorchester Supp. Decl. at 3.3.)

> ### 4.   Mr. Dorchester's Testimony Rebuts Plaintiffs' Damages Testimony.

Mr. Dorchester's testimony is also helpful to the trier of fact as a counterpoint to Mr. Hunsperger's assertions that Rocky Flats has hampered development in the area. Mr. Dorchester's testimony points out other "persuasive reasons why development in the Rocky Flats environs could have been less than what actually occurred over time." (Ex. 1, Dorchester Report at 7-3.) For example, Mr. Dorchester notes that the terrain around Rocky Flats may impose certain development constraints. (Ex. 1, Dorchester Report at 5-2.) Mr. Hunsperger, on the other hand, does not discuss terrain in his report.

> ### B.   Plaintiffs' Argument That the Data Analyzed by Mr. Dorchester Are Not Relevant to Property Values Goes to the Weight of Mr. Dorchester's Testimony, Not to the Admissibility of That Testimony.

Plaintiffs contend that Mr. Dorchester "[f]ails to show how his chosen market indicators correlate in any meaningful way with property values." (Pls.' Mem. at 12.) As in the case of Mr. Conway, this argument fails.

*First*, this Court has ruled that defendants may "argue and present evidence" that any decrease in the value of plaintiffs' properties was not "caused by Defendants' alleged trespass and nuisance," but instead resulted from "other factors." *Cook IX*, 273 F. Supp. 2d at 1210 n.39. Mr. Dorchester analyzed a number of such "other factors," including, for example, median income, construction volume, water availability, terrain, access, public service utilities, harmonious and inharmonious land uses. *See, e.g.*, Ex. 1, Dorchester Report, at 4-21–4-23.

*Second*, plaintiffs provide no support whatsoever for their "irrelevance" argument. Plaintiffs make the conclusory assertion that the "other factors" analyzed by Mr. Dorchester are all irrelevant to property values. *Id.* Plaintiffs provide no support for this conclusory assertion.

Again, plaintiffs' irrelevance argument confuses the admissibility of Mr. Dorchester's opinions with the weight of those opinions. *See Cavely*, 318 F.3d at 997–98. Plaintiffs may wish to argue to the jury that, for example, "median family income" is irrelevant to property values (Ex. 1, Dorchester Report at 4-17), but such arguments do not impact the admissibility of Mr. Dorchester's testimony.

## VIII.   THE OPINIONS SET FORTH IN THE REPORT PREPARED BY DRS. HOLL AND HEWLETT ARE RELEVANT AND ADMISSIBLE.

Plaintiffs seek to prevent the jury from being presented with the opinions set forth in the report prepared by Dr. Jack Holl and Dr. Richard Hewlett, both of whom are eminent historians of the Cold War and the nuclear weapons complex. (*See* Pls.' Mem. at 18–19.) Plaintiffs raise two arguments in support of their motion. First, they contend that the Holl/Hewlett report is "highly prejudicial, while having no probative worth . . . ."[14] (*Id.* at 18.) Second, they argue that the opinions expressed in the Holl/Hewlett report are "[e]ssentially . . . improper character evidence." (*Id.*) As is demonstrated below, plaintiffs are wrong on both counts, and the opinions expressed in the Holl/Hewlett report, which defendants intend to present at trial through the testimony of Dr. Jack Holl, are relevant and admissible.

### A.   The Opinions of Drs. Holl and Hewlett Are Relevant to and Probative of Plaintiffs' Nuisance Claims.

Plaintiffs are wrong that the opinions contained in the Holl/Hewlett report are not relevant to or probative of the claims and issues to be tried. Opinions expressed in the Holl/Hewlett

---

[14] Plaintiffs similarly argue in their motion in *limine* that evidence "offered to show that defendants' conduct was justified by the demands of national security" is inadmissible (*see* Pls.' Mot. in *Limine* at 10–12) and incorporate that motion by reference into their motion to exclude defendants' expert testimony. For the sake of completeness of the record, defendants set forth their response to plaintiffs' argument here in full.

report, including national-security-related evidence, are relevant to, among other things, the "social utility of the act causing the invasion," and, in turn, the reasonableness of emissions from the Rocky Flats plant. *See Van Wyk*, 27 P.3d at 391. As the Colorado Supreme Court held in *Van Wyk*, "the elements of a claim of nuisance are an intentional, negligent, or unreasonably dangerous activity resulting in the ***unreasonable*** and substantial interference with a plaintiff's use and enjoyment of her property." 27 P.3d at 391 (emphasis added).

Moreover, as the *Van Wyk* Court recognized:

> A ***determination*** that the social utility of the act causing the invasion that interferes with the use and enjoyment of the land does not outweigh the harm of that invasion is ***necessary*** for a finding of ***unreasonableness***. Restatement (Second) of Torts § 826.

27 P.3d at 392 (emphasis added). Similarly, in *Cook IX*, this Court ruled:

> Under Colorado law, whether the defendant has unreasonably and substantially interfered with the plaintiff's use and enjoyment of his property is a factual question to be decided by the trier of fact. *Van Wyk*, 27 P.3d at 391. In making this determination, ***the trier of fact must weigh the gravity of the harm and the utility of the conduct causing the harm***.

*Cook IX*, 273 F. Supp.2d at 1201 (emphasis added).

Plaintiffs attempt to distort this test, by narrowly framing "the social utility ***of the act causing*** the invasion" as "the social utility of the invasions"—simply omitting the words "of the act causing" from the middle of the *Van Wyk* test. But if courts analyzed "utility" in terms of the "utility of defendant's invasions," then no invasion-causing activity would ever meet *Van Wyk*'s balancing test for reasonableness, making the test entirely superfluous. *See Van Wyk,* 27 P.3d at 392 ("A determination that the social utility of the act causing the invasion that interferes with the use and enjoyment of the land does not outweigh the harm of that invasion is necessary for a finding of unreasonableness.")

In fact, in determining "the social utility of the act causing the invasion," Section 826 of the Restatement (which was relied upon by and cited by the *Van Wyk* court, 27 P.3d at 392) requires an analysis of the social utility of the ***intended consequence of the defendant's actions*** — that is, ***not*** the "social utility of pollution" but instead the "social utility of the ***primary purpose*** of the defendant's enterprise." Restatement § 826 cmt. d ("The factors to be considered in determining the utility of conduct are stated and explained in § 828."); Restatement § 828 cmt. b ("The amount of utility that the particular conduct has depends primarily upon the amount of social value that the law attaches to ***its primary purpose*** . . . .") (emphasis added). This is made clear by an examination of the very language of comment d, which states:

> By '***primary purpose of the conduct***' is meant the ***actor's main or predominant objective*** in acting or failing to act when he knows that his conduct will interfere with another's use or enjoyment of land. One may be seeking to advance or protect a number of different interests in carrying on a particular activity and he may have a number of reasons for doing what he is doing, but it is the main or primary objective of his conduct that is of the most importance in determining whether it has utility or not. In most cases the actor does not want to invade the interests of others. He is primarily concerned with the pursuit of his own interests and the invasion, although intentional in the sense that he knows it will result, is merely incidental to his main objective. In this case it is ordinarily immaterial, so far as the utility of his conduct is concerned, whether he is glad or sorry that his business is harming his neighbor. The law looks to the primary purpose of his conduct.

Restatement § 828 cmt. d (emphasis added).

As examples of the type of "primary purpose" that might be found to have social utility, the comments to the Restatement do not identify "the utility associated with specific acts of pollution," but instead identify the ***overall*** "operation of farms, factories or other lawful businesses," which they list as examples of enterprises that are "ultimately as essential to the general public good as the operation of hospitals and fire departments":

> The utility of the conduct depends to a great extent upon whether its ***primary purpose*** has social value and upon how much social value it has. It has social value if the general public good is in some way advanced or protected by the encouragement and achievement of the purpose. It does not have social value if the general

public good is impaired by the encouragement or achievement of the purpose. If the ***primary purpose*** of the conduct is malicious, illegal or contrary to common standards of decency, it quite clearly lacks social value since the achievement of malicious, illegal or indecent purposes and objectives is destructive of the general public good. Conduct carried on for these purposes thus lacks utility, and the invasion that it causes is unreasonable as a matter of law. (*See* § 829). ***If, however, the primary purpose of the conduct is not malicious, illegal or indecent, it usually has some social value***, even though it is a purely private purpose. The general public good may be advanced by the promotion of purely private enterprises as well as by the promotion of public or quasi-public enterprises. The ***operation of farms, factories or other lawful businesses***, for example, is ultimately as essential to the general public good as the operation of hospitals and fire departments.

Restatement § 828 cmt. e (emphasis added).

Clearly, in the case of the "operation of [a] farm[]," in analyzing the "the social utility of the act causing the invasion," the Restatement test adopted by the *Van Wyk* court does not look (for example) to the "social utility of a farmer's release of pollutant onto his neighbor's property." *Id.* Instead, it looks to the social utility from the "primary purpose" of the "operation of the farm" ***as a whole***. *See id.*

Here, there is no question that the "primary purpose" of defendants' actions at Rocky Flats, as described in the Holl/Hewlett report, was to produce component parts for nuclear weapons that the U.S. President, Congress, and military determined to be necessary for national security. (*See, e.g.*, Ex. 27, Holl Report at 26–29, 36–38.) Plaintiffs' experts acknowledge that the waste management practices, fires, and other events that plaintiffs contend caused an interference with the use and enjoyment of their properties occurred as a result of nuclear weapons production at Rocky Flats. (*See, e.g.*, Ex. 19, Cochran Overview Report at 1–2; Ex. 28, Goble Report at 4; Ex. 29, Budnitz Fires Report at 2–3.) Thus, the implications to "national security" of Dow's and Rockwell's actions, as described in the Holl/Hewlett report, are relevant to assessing the social utility of those actions and, in turn, determining whether the interferences of which plaintiffs complain were "substantial and unreasonable."

54

Finally, plaintiffs argue that "defendants do not appear to contend that such releases and criminal misconduct were logically incident, or necessarily consequent, to any legitimate industrial mission." (Pls.' Mot. in *Limine* at 11.) This argument fails for four reasons. First, plaintiffs cite **no authority** recognizing the relevance of plaintiffs' argument that, if the defendant does not show that the invasions were "logically incident" to the defendant's industrial mission, then *Van Wyk's* balancing test does not apply. The *Van Wyk* opinion contains no such exception. 27 P.3d at 391. Second, the above-quoted Restatement comments demonstrate that plaintiffs' argument is not the law. Third, plaintiffs cite no record evidence for the proposition that the alleged "invasions" (which plaintiffs have yet to specify, including in the context of the alleged "threat" from Rocky Flats) were **not** "incident" to the operation of the Rocky Flats plant. Fourth, other courts likewise have recognized that the "social utility" to be assessed is not a specific, narrow act that might be the immediate cause of the harm complained of, but rather is the larger purpose of the defendant's conduct regardless of whether the harm is "logically incident" to that conduct. *See*, *e.g.*, *Prijatel v. Sifco Indus., Inc.*, 353 N.E.2d 923, 925–26 (Ohio 1974) (focusing upon utility of defendants' conduct over entire period of enterprise and noting that "defendants' forging operation [which] began in 1928 . . . is a lawful one necessary to modern industry" even though wrongful conduct alleged was restricted to misuse of oil during "several months in 1973," when "the Hasenclever 3000 ton hydraulic forging press not infrequently did produce a peculiarly excruciating whine or squeal . . . attributable to a type of oil not suited to this particular machine"), *cited in* Restatement § 828, reporter's note.

**B.     The Opinions Expressed in the Holl/Hewlett Report May Be Necessary to Rebut Plaintiffs' Own Claims, Allegations, and Evidence That They Intend to Introduce at Trial.**

Several of plaintiffs' experts discuss the national security and historical aspects of Dow's and Rockwell's work at Rocky Flats in their expert reports. Accordingly, the opinions expressed

in the Holl/Hewlett report may be necessary to rebut plaintiffs' own claims, allegations, and evidence.[15]   For example, in his so-called "Overview of Rocky Flats" report submitted on November 21, 1996, plaintiffs' expert Thomas Cochran explains in detail the "nuclear weapons complex" established by the Atomic Energy Commission during the Cold War; the function of Rocky Flats within that complex; nuclear weapon design generally; different types of nuclear weapons; a "History of Rocky Flats Operations," which begins with a reference to the Manhattan Project during World War II; and Rocky Flats operations generally.   (*See* Ex. 19, Cochran Overview Report at 1–9.)   Cochran ties the processing of fissile materials at Rocky Flats to the weapons complex and nuclear weapon production.   (*Id.* at 1–2.)   The fundamental premise of Cochran's opinion is that Dow and Rockwell failed to exercise due care in handling the materials that were part and parcel of nuclear weapon production.   (*See also* Ex. 28, Goble Report at 4 ("The Rocky Flats Nuclear Weapons Plant was established in 1951 and continued to operate until 1990.  Its primary mission was to produce atomic bombs made of fissionable plutonium that served as triggers for hydrogen bombs; numerous other military-related manufacturing activities were conducted there as well.").)

In addition, there are several specific issues on which plaintiffs' experts offer opinions that illustrate the relevance of the opinions set forth in the Holl/Hewlett report.  As to each of those issues, defendants will seek to introduce opinions expressed by Drs. Holl and Hewlett for the purpose of demonstrating to the jury that defendants' conduct was reasonable and that any alleged interference with the plaintiffs' use and enjoyment of their properties was not unreasonable.  Among those issues are the following:

---

[15]  Defendants have sought to exclude plaintiffs' proffered testimony.

**Site Selection:**  Plaintiffs criticize the placement of the Rocky Flats plant as being un-suitable.  They have argued that Rocky Flats was "deliberately sited in close proximity to densely populated urban areas—sixteen miles northwest of downtown Denver, and closer still to the cities of Boulder, Golden, Westminster, and Arvada. . . . The facility's siting cemented the potential that a major accident or release could result in catastrophic consequences."  (Pls.' Br. on Stat. of Lim. and Other Issues, filed 8/4/04, at 16.)  Plaintiffs' experts, furthermore, have stressed the physical aspects of the site that, they contend, are responsible for much of the offsite contamination, such as high winds and the low permeability of soil.  (*See*, *e.g.*, Ex. 30, Smallwood Report at 17–18.)

Defendants intend to present testimony at trial, primarily through Dr. Holl, that neither Dow nor Rockwell made the decision to site the Rocky Flats plant, but that the Atomic Energy Commission instead determined that it was necessary to build the Rocky Flats plant.  The AEC developed the criteria by which the site was to be selected and approved the final siting of the plant at its current location.  (*See* Ex. 27, Holl Report at 26–31.)

**"Profit Over Safety":**  Plaintiffs and their experts have sounded a persistent theme that Dow and Rockwell placed corporate profits and production demands related to contracts with the U.S. government over the health and safety of Rocky Flats workers and the population living near the facility.  (*See*, *e.g.*, Ex. 19, Cochran Overview Report at 30 ("The contractors placed highest priority on meeting warhead component production quotas, and failed to exercise the due diligence and meticulous attention to detail required to insure the public's health and safety. . . . [T]he contractors placed profit ahead of public health and safety.").)

To rebut such opinions, defendants must be permitted to introduce evidence relating to the contract payment provisions, which fixed the amount of profit that defendants earned.

Defendants also must be permitted to introduce evidence relating to national defense require-ments and defendants' contractual obligations to the U.S. government to fulfill those require-ments, particularly in times of war and great national need.  Dr. Holl's report directly addresses this issue and explains the exigent circumstances that, from a national security standpoint, affected defendants' efforts to fulfill their contractual obligations to the U.S. government to deliver nuclear weapon component parts.  (*See*, *e.g.*, Ex. 27, Holl Report at 1, 26–31, 33–38.) Certainly, plaintiffs' experts' trial testimony on this issue makes a discussion of the Rocky Flats plant's national security role relevant in this litigation.

**Major Release Events:**  Plaintiffs may argue that certain release events at Rocky Flats— such as the 903 pad—caused the vast majority of the offsite plutonium contamination and are the major bases for plaintiffs' trespass and nuisance claims.  (*See*, *e.g.*, Ex. 28, Goble Report at 9 ("Plutonium was released from a waste storage area, now known as the 903 pad, from two fires in 1957 and 1969, and from accompanying routine manufacturing operations.").)  To support their nuisance claim, therefore, plaintiffs may seek to introduce evidence that such events resulted from defendants' failure to exercise proper care in handling hazardous materials, which consequently unreasonably interfered with plaintiffs' use and enjoyment of their properties. (*See, e.g.,* Ex. 19, Cochran Overview Report at 23–25.)

To rebut this anticipated argument and evidence, defendants may seek to introduce opin-ions set forth in the Holl/Hewlett report showing that such events resulted from national security needs and, therefore, were not unreasonable.  For example, plaintiffs may argue that Dow's conduct in handling plutonium led directly to the 1957 fire, which, they will further contend, caused the release of plutonium to the offsite environs.  (*See id.* at 23–24.)  Dow, to rebut this argument, would seek to introduce evidence that the particular type of plutonium that self-ignited

and caused the 1957 fire was a brand new, highly experimental form of plutonium that had been specially invented and was being used because it permitted special warhead designs, which the U.S. military and U.S. government had determined were necessary for national defense. Indeed, plaintiffs' expert, Thomas Cochran, has identified weapons design changes—which defendants' experts will explain were dictated by the needs of the U.S. government's weapons designers—as a contributing cause of the 1957 fire. (*See id.* at 4–6.)

Similarly, plaintiffs apparently will attempt to prove defendants' handling of plutonium caused the 1969 fire. (*See id.* at 24.) In particular, plaintiffs may seek to introduce evidence to the jury that the building in which the fire occurred was over-crowded with plutonium because defendants supposedly placed production demands ahead of safety, and that the fire occurred as a result of that over-crowding. (Ex. 29, Budnitz Fire Report at 3 ("Dow Rocky Flats failed to follow through to provide an adequate complement of fire-prevention and fire mitigation capabilities; indeed, they allowed over crowding and mission pressures to contravene appropriate fire protection strategies.") To rebut these opinions, defendants seek to introduce Drs. Holl and Hewlett's opinions that the way in which the U.S. government recycled nuclear weapons and sent them to Dow for reprocessing, as well as national security exigencies during a time of war and Dow's contractual obligations to the U.S. government, required Dow to process the amount of plutonium that was present in the building and, therefore, that its conduct was reasonable.

As yet another example, plaintiffs may seek to introduce expert opinions that Dow's handling of steel drums containing plutonium waste residues and cutting oils caused the releases of plutonium from the 903 pad. (*See* Ex. 19, Cochran Overview Report at 24–25; Ex. 20, Budnitz Waste Management Report at 11 ("The story is principally one of a concerted effort to accomplish the major mission of the Rocky Flats Plant (making nuclear-weapons parts) to the neglect

of proper management of the resulting radioactive wastes.").)   Defendants seek to introduce opinions expressed in the Holl/Hewlett report demonstrating that the nuclear weapons design change dictated by the U.S. government out of national security concerns due to the geopolitical circumstances of the time led to the build-up of drums and the subsequent release of plutonium-contaminated waste oils to the soil on the 903 pad.   Again, plaintiffs' own expert, Thomas Cochran, appears to concede the role that the weapons design change played in creating the waste drum issue.  (*See* Ex. 19, Cochran Overview Report at 8.)  Certainly, Dow's fulfillment of its contractual obligations to the U.S. government and the needs of national security are relevant to explaining to the jury why these events occurred and why Dow was not negligent in causing them to occur.

**Secrecy:**  In a variety of contexts, plaintiffs and their trial witnesses repeatedly have re-ferred to the "secrecy" surrounding Rocky Flats and its operations.  For example, plaintiffs have listed and may call Len Ackland, a University of Colorado journalism professor, to testify about "the history of the plant and the culture of secrecy concerning plant operations."  (Ex. 31, E. Noteware 4/16/04 letter to E. Ahern.)[16]  At his deposition, Ackland testified about that subject:

> Q.  Are you prepared to testify about the culture of secrecy con-
> cerning the Rocky Flats plant and its operations?
>
> A.  Yes.
>
> Q.  What does that mean to you? . . . .

---

[16] Plaintiffs' own stated intention to call Len Ackland as a witness to testify about "this history of the [Rocky Flats] plant" and the opinions expressed by plaintiffs' expert Thomas Cochran on the history and role of nuclear weapons in the U.S. arsenal belie the contention stated in plaintiffs' motion to strike the Holl/Hewlett report that the historical role that Rocky Flats played in U.S. defense during the Cold War is "common knowledge" that is not helpful to the jury.  (*See* Pls.' Mem. at 19.)

A. The Rocky Flats plant, from the very get-go, as you recall, it was part of what was called Project Apple, which was the search for a site to process plutonium and manufacture plutonium bombs. It was to be an industrial-scale site that would take over the job from Los Alamos. And that search began in 1950 and was secret, as most nuclear things were in those days, and things nuclear. . . . At that time, the information about Rocky Flats, what Rocky Flats would be doing, was secret. And at the news conference, the government declined to answer questions. . . . *[T]here was a culture of secrecy, of national security, that pervaded the operations of nuclear weapons facilities*. . . . So that's the beginning of what I mean by the culture of secrecy. There was a secrecy throughout the period of production at Rocky Flats. And in terms of what I mean by the culture of secrecy, secrecy breeds unaccountability. And the record shows a number of occasions where, *because of secrecy, behavior took place that plant officials were not held accountable for*."

(Ex. 32, Ackland Dep. at 39–41 (emphasis added).)

Similarly, plaintiffs may call Thomas Cochran, one of their proposed experts, to testify at trial about "Material Unaccounted For," or "MUF" (also called by the more accurate term, "Inventory Difference" or "ID").[17]  (*See generally* Ex. 33, Thomas Cochran, Plutonium Inventory Differences At The Rocky Flats Plant And Their Relationship To Environmental Releases" ("Cochran MUF Report".)  In his MUF report, Cochran repeatedly refers to the government's system of classifying information and documents, and he specifically refers to how that system has affected his opinions.  (*See, e.g., id.* at 1 ("[I]t should be noted that this analysis has been severely limited by the Department of Energy's (DOE's) refusal to release the following two

---

[17] As defendants have previously discussed, evidence relating to inventory differences or MUF is irrelevant and unduly prejudicial because it cannot be used to show class-wide exposures, class-wide increased health risks, or real and verifiable threats of future harm.  (*See* Defs.' Mot. to Exclude Evid. of "Inventory Differences".)

categories of data: a) with rare exceptions inventory difference data for specific material balance areas and buildings, and b) rates of plutonium processing, or production.").)[18]

Plaintiffs also apparently intend to seek to present evidence relating to the supposed "culture of secrecy" that they contend surrounded Rocky Flats operations as well as the operations of the United States' nuclear weapons complex generally.  Dow and Rockwell, through Dr. Holl's opinion testimony, intend to rebut any such purported evidence (if necessary) by presenting their own evidence about the government's classification policy—under which Dow and Rockwell were mandated to operate *by statute*—and by presenting evidence that will explain the national security basis for the need to maintain the classified nature of documents and other information. (*See*, *e.g.*, Ex. 27, Holl Report at 23–25.)

### C.   Opinions Expressed in the Holl/Hewlett Report Are Admissible to Demonstrate the Positive Impact That Rocky Flats Employment Had on Area Property Values.

In addition to the social utility of the Rocky Flats plant for the purpose of strengthening national security and defense, the plant also provided a social benefit to the immediate community by providing jobs for area residents.  The main reason that the Rocky Flats plant was located in Colorado was due to the efforts of the two Colorado Senators at the time, who out of their concern to bring "jobs" and "contracts" to Colorado, engaged in what has been described as "pork barrel politics" to ensure that the facility that eventually became known as Rocky Flats

---

[18] As with evidence of "inventory differences," evidence relating to the DOE's discovery conduct in this litigation including any classification decisions is inadmissible because it is irrelevant to the claims the Court has ruled will be tried and would be unduly prejudicial to defendants. (*See* Defs.' Mot. to Exclude Evid. of Document Classification Issues and Discovery Conduct by DOE.)  Plaintiffs should not be permitted to comment at trial on the unavailability of documents based on the DOE's classification determinations.  (*Id.* at 5–6.)

was located in Colorado.  (*See* Ex. 32, Ackland Dep. at 109–110.)  The intentions of those two

Senators bore fruit.  When the siting of the plant was released to the public:

> [T]he response from [public] officials and the local press was highly favorable.
> Elected officials and the public-at-large understood that the new plant would not
> only be an economic boon to the Denver area but also would contribute to the na-
> tional defense effort.  'There's Good News Today,' the Denver Post announced in
> bold face headlines.  "U.S. TO BUILD $45 MILLION A-PLANT NEAR
> DENVER."

(Ex. 27, Holl Rep. at 30–31.)  Indeed, as Dr. Holl notes, construction and expansion at Rocky

Flats occurred at a steady pace during the 1950s, with construction contracts valued in the tens of

millions of dollars.  (*Id.* at 36–37.)  The Rocky Flats plant provided tremendous employment to

the surrounding area, with employment (during the production years) reaching nearly 6,000 by

the late 1980s.  (*Id.* at 37.)  "This employment made the Rocky Flats Plant one of the largest

employers in the Denver area and exerted a powerful economic influence on the growth and

development of surrounding communities."  (Ex. 1, Dorchester Rep. at 2–3.)  That was true not

only because of the sheer number of local residents that the Rocky Flats plant employed but also

because the jobs were high-salary positions, paying well above the average annual salary earned

by most Denver-area residents.  (*Id.* at 2–6.)

### D.  Plaintiffs Have Made No Showing That the Opinions Expressed in the Holl/Hewlett Report Are "Unduly Prejudicial" under Fed. R. Evid. 403.

Plaintiffs claim that the opinions expressed in the Holl/Hewlett report should not be ad-

mitted because they would be "highly prejudicial."  The sole cause of any prejudice that plain-

tiffs identify in their moving papers is that such evidence supposedly would "play upon patriotic

sentiments in the jury, and thereby try to trivialize the harm Rocky Flats unnecessarily inflicted

upon its neighbors."  (Pls.' Mem. at 18.)  Plaintiffs' argument, in essence, is that the opinions

expressed in the Holl/Hewlett report constitute "improper character evidence to bolster Dow's

and Rockwell's image in the jury's eyes." (*Id.*)  Plaintiffs' arguments are mistaken for several reasons.

*First*, plaintiffs fail to cite the correct standard for assessing admissibility under Fed. R. Evid. 403, and they fail to explain how national security-related evidence would be inadmissible under the proper Rule 403 analysis.  Plaintiffs cannot show that the probative value of the opinions in the Holl/Hewlett report are "***substantially outweighed by*** the danger of ***unfair*** prejudice . . . ."  Fed. R. Evid. 403 (emphasis added); *see also Tan*, 254 F.3d at 1211; *Deters*, 202 F.3d at 1274.  Any possible prejudice caused to plaintiffs by defendants' evidence relating to the importance to national security of their operations at Rocky Flats would not be "unfair" to plaintiffs, especially where their own experts repeatedly refer to the Rocky Flats "mission" and deem it helpful and relevant to discuss issues relating to nuclear weapon production in rendering their ***own*** opinions.  Plaintiffs have articulated no reason why any prejudice to their case stemming from the opinions set forth in the Holl/Hewlett report are somehow unfair.  Indeed, plaintiffs' own witnesses, including Thomas Cochran and Len Ackland, have presented opinions on many of the same topics as Drs. Holl and Hewlett, including national security, the role of Rocky Flats in the U.S. nuclear weapons complex, and similar issues.  It cannot be that the opinions of Drs. Holl and Hewlett are "unfairly" prejudicial simply because they are presented differently than plaintiffs' evidence on the same topics.

In any event, any potential "unfair" prejudice would be outweighed by the probative value of the evidence.  Plaintiffs are pursuing a negligence-based nuisance case against defendants.  Plaintiffs seek to prove that defendants' actions at Rocky Flats were unreasonable and were not undertaken with due care.  Defendants, on the other hand, seek to demonstrate that their actions were reasonable and were undertaken in the context of the processes, technologies, and

demands placed on defendants by the U.S. government and its national security needs, including during times of war and national emergency.  Defendants will, therefore, seek to show the jury, in part through the opinions expressed in the Holl/Hewlett report, that their conduct, under the circumstances, was reasonable.  Moreover, plaintiffs' nuisance claim expressly requires considering the social utility of the activity that supposedly caused them harm.  Defendants' national-security-related evidence, much of which is set forth in the Holl/Hewlett report, thus is critical to rebut any showing by plaintiffs that the interference with the use and enjoyment of their properties outweighed the social utility of Rocky Flats operations.  In sum, the opinions expressed in the Holl/Hewlett report are relevant and their probative value outweighs any potential unfair prejudice.

*Second*, the opinions expressed in the Holl/Hewlett report are not "improper character evidence," and Fed. R. Evid. 608 does not apply to preclude those opinions.  The evidence is not presented to "bolster Dow's and Rockell's image in the jury's eyes," but rather, as shown above, to rebut many of the opinions set forth in the plaintiffs' own experts' reports and depositions, and to disprove critical elements of plaintiffs' case-in-chief.  (*See supra*)

In addition, Rule 608 does not apply to bar the opinions of Drs. Holl and Hewlett.  As an initial matter, the rule expressly applies only to "witnesses":  "The credibility of a *witness* may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise."  Fed. R. Evid. 608 (emphasis added).  Clearly, Dow and Rockwell are not "witnesses," and plaintiffs fail to cite any authority for construing Rule 608 to preclude evidence pertaining to corporations, rather than

"witnesses," as the rule expressly provides.  *See Fujisawa Pharmaceutical Co., Ltd. v. Kapoor*, 1999 WL 543166, at *17 n.17 (N.D. Ill. 1999) (corporation not a "witness" for purposes of Rule 608).

Furthermore, Rule 608(a) expressly applies only to testimony that addresses the "credibility" of a witness.  As the rule further explains, that involves only "character for truthfulness or untruthfulness."  Fed. R. Evid. 608(a).  The sole case that plaintiffs cite in support of their "improper character evidence" argument, *United States v. Toledo*, 985 F.2d 1462 (10th Cir. 1993), holds as much.  In that criminal case, the prosecution elicited testimony at trial from two expert witnesses that set forth their opinions that the victim's version of events was truthful and accurate.  *See id.* at 1469–70.  The Tenth Circuit noted generally that "[t]he credibility of witnesses is generally not an appropriate subject for expert testimony," although it held that the district court did not err in admitting the expert testimony on the victim's credibility.  *Id.* at 1470. Thus, both Rule 608(a) and *Toledo* apply only where a party seeks to introduce evidence that bears on a witnesses' truthfulness or untruthfulness.  Nowhere in the report prepared by Dr. Holl and Dr. Hewlett is there any opinion as to the truthfulness or untruthfulness of Dow or Rockwell, and plaintiffs have failed to cite any specific instance in that report expressing any such opinion. Thus, neither Rule 608(a) nor *Toledo* apply to the Holl/Hewlett report, and neither operates to preclude testimony setting forth opinions contained in the report.

Finally, plaintiffs make a half-hearted effort—in a footnote—to argue that the Holl/Hewlett report is inadmissible because it "is not a proper supplement."  (Pls.' Mem. at 18 n.10.)  Plaintiffs argue that the report is a "somewhat edited version" of Dr. Hewlett's original report (tendered in November 1996) that addresses "historical events that occurred before this lawsuit was even filed" and contains "information . . . [that] could easily have been included in

Hewlett's earlier report . . . ."  (*Id.*)  As discussed below, plaintiffs fail entirely, however, to establish the grounds that they must demonstrate under Fed. R. Civ. P. 26(a) or 37(c)(1) to show that the report was untimely or prejudicial or that defendants acted in bad faith (a claim that plaintiffs do not make) in tendering the Holl/Hewlett report.

In point of fact, the Holl/Hewlett report is an edited version of the report submitted by Dr. Hewlett in 1996, made necessary by circumstances that now prevent Dr. Hewlett from testifying at trial.  After Dr. Hewlett submitted his report in 1996 and was deposed the following year, he developed pancreatic cancer.  Although Dr. Hewlett survived the ordeal, he is quite elderly and in an ill state of health.  In 2003, defendants determined that Dr. Hewlett's ill health most likely would prevent him from testifying at trial.  They subsequently engaged Dr. Jack Holl, formerly the official DOE historian and a former colleague of Dr. Hewlett's, as well as a co-author with Dr. Hewlett in the third installment of Dr. Hewlett's three-volume history of the AEC and DOE, to serve as a replacement for Dr. Hewlett, if the need arose.  Defendants included Dr. Holl's name on the witness list that they tendered in December 2003, timely submitted the supplemental Holl/Hewlett report, and tendered Dr. Holl for deposition.  Plaintiffs declined to depose Dr. Holl by the Court-imposed deadline.

Given the circumstances, it is not unfair or prejudicial for the supplemental Holl/Hewlett report to contain some additional information.  Dr. Holl was not involved in preparing the original report submitted by Dr. Hewlett.  Thus, before he could agree to substitute for Dr. Hewlett, he had to review Dr. Hewlett's original report, review the materials that Dr. Hewlett had relied on, and review other literature in the field with which he was familiar.  After doing so, although he found that he could, in fact, adopt Dr. Hewlett's report, he furthermore believed that it would be helpful to include more detailed information on some topics that was not included in

Dr. Hewlett's original report.  None of the information that Dr. Holl added is beyond the scope of the topics addressed in Dr. Hewlett's original report, and plaintiffs do not even argue that it is. Not surprisingly, Dr. Holl also wished for the report to reflect his own writing style.  Thus, although there are some differences between the Hewlett report and Dr. Holl's supplement, plaintiffs fail to identify any such differences that are beyond the scope of Dr. Hewlett's original report, are prejudicial, were submitted untimely, or were submitted in bad faith.  Accordingly, the Court should not strike the opinions in the Holl/Hewlett report as improper supplementation.

## IX.    DR. WISE'S EXHIBITS ARE NOT PREJUDICIAL.

Dr. Wise's original and supplemental reports contain, among others, charts that illustrate (1) the parallel upward trend of property values in the class area and in the metropolitan Denver area as a whole (*see* Ex. 34, Wise Report Ex. 5; Ex. 35, Wise Supp. Report Ex. 6); and (2) the parallel trends of the average number of days that properties were marketed in the class areas and in the metropolitan Denver area as a whole (*see* Ex. 36, Wise Report Ex. 8; Ex. 37, Wise Supp. Report Ex. 9.)  Plaintiffs do not assert any challenge to these exhibits based on *Daubert* or Rule 702.  Instead, plaintiff claims that these charts are "highly prejudicial," primarily because they show improved market conditions over time, and, in the case of the price index charge (Ex. 5 to Dr. Wise's initial report and Ex. 8 to Dr. Wise's supplemental report) because they are "upwardly sloping."  (Pls.' Mem. at 19.)  Plaintiffs' arguments concerning Dr. Wise's charts should be rejected for eight reasons.

*First*, plaintiffs' attack on Dr. Wise's charts are not directed at either the reliability or "fit" of those charts under *Daubert*.  Plaintiffs do not claim that Dr. Wise is not qualified to render the opinions set forth in his report.  Nor do plaintiffs' argue that Dr. Wise's charts (or the methodology used to derive those charts) are "unreliable."  Nor do plaintiffs argue that Dr. Wise's charts do not "fit" the claims or defenses in this case.

*Second*, plaintiffs' arguments about Dr. Wise's charts are an attack on the **sufficiency** of the evidence, masquerading as a challenge to the **admissibility** of the evidence. *See Cavely*, 318 F.3d at 997–98 (10th Cir. 2003) (affirming district court's rejection of *Daubert* challenge that "went to the weight of the evidence and not its admissibility"). For example, with respect to the "Average Days on Market" charts, that "the **largest** difference in the relevant time period (June 1989 through the end of 1992) is only about **eleven or twelve days**, which occurred in December 1992." (Pls.' Mem. at 20.) This is not an argument about **admissibility**, but instead is an argument about the **weight** of the evidence that plaintiffs could make to the jury. Similarly, plaintiffs object to the price-index charts on the ground that they shows that "prices are going up," when the "real issue' is "whether or not prices in the class area were depressed (relative to the 'but for' price) by Rocky Flats' sordid history of contamination." (*Id.* at 19–20.) Again, this is an argument about the weight of the evidence that plaintiffs can make to the jury.

*Third*, plaintiffs' arguments underestimate jurors' intelligence. Plaintiffs purport to be worried that the four charts in question will lead jurors to believe that "if prices are going up, nothing is wrong." (Pls.' Mem. at 19) In fact, jurors understand that, because of inflation, prices generally tend to go up over time. Indeed, most, if not all, jurors deal with inflation in their everyday lives. Plaintiffs may seek to **argue to the jury** that the issue is **not** simply whether "prices are going up," but instead whether "prices are going up less than they should be because of defendants' negligent conduct." Jurors have sufficient experience with inflation to understand such an argument. (Of course, whether jurors will agree with plaintiffs' various arguments is a separate issue.)

***Fourth***, plaintiffs' experts themselves use relative rates of appreciation to support their opinions. For example, the report of plaintiffs' expert Mr. Hunsperger states that, for the period from 1989–1995:

> The four areas around Rocky Flats had compound appreciation rates of between 6.08% to 6.90%. Those six areas more removed from Rocky Flats had compound appreciation rates of between 7.43% to 8.44% during the study period.

(Ex. 3, Hunsperger Report at 214–215.) Plaintiffs opportunistically claim that, while Mr. Hunsperger's analysis of relative rates of appreciation is admissible, Dr. Wise's analysis of relative rates of appreciation is "prejudicial." (Pls.' Mem. at 19–22.)

***Fifth***, plaintiffs make the conclusory assertion that, whereas "Dr. Wise main regression study purports to control for basic physical differences between houses," the four challenged charts "contains no controls to ensure the two areas are truly similarly enough for that comparison to hold any meaning." (*Id.*) However, plaintiffs fail to specify a single "control" that Dr. Wise should have accounted for in these charts, but did not. Moreover, Dr. Wise accounted for any applicable "controls" in other sections of his report, and plaintiffs point to no requirement that an expert incorporate all components of his analysis into each and every chart included in his report. Finally, Mr. Hunsperger's analysis of rates of appreciation does not purport to contain ***any*** "controls," but nonetheless claims to compare "four areas around Rocky Flats" to "six areas more removed from Rocky Flats." (Ex. 3, Hunsperger Report, at 214)

***Sixth***, plaintiffs argue that Dr. Wise "testified he could not base an opinion on those charts ***alone***." (Pls.' Mem. at 21 (emphasis added).) In fact, Dr. Wise did not testify that he had "no opinion," but instead that he could not base a "precise quantification of the impact" from the data underlying the charts. (Ex. 38, Wise Dep. at 132.) Plaintiffs cite no authority for the proposition that Dr. Wise is required to provide a "precise quantification" from each single chart in order for those charts to be admissible. In any event, even assuming that plaintiffs were

correct that Dr. Wise "testified he could not base an opinion on those charts alone," expert opinions are typically on various analyses and sources of data. Often, a single "datum" or a single analysis alone is not enough to entirely support an expert's opinion, but various data and analysis taken together do support such an opinion.

*Seventh*, the charts will be very helpful to the jury. Plaintiffs' claims—for diminution in property value (5/17/05 Order at 17)—have a number of timing-related components, as do the defenses to those claims. Plaintiffs claim that the "injurious situation" became "complete and comparatively enduring" from "1989 to 1992." (Pls.' Mot. in *Limine* at 1–3.) In addition, as the Court ruled in its May 17, 2005 Order, "Defendants may seek to mitigate any compensatory damages proved by Plaintiffs by demonstrating the fact and amount of any prior market discount the Damages sub-class received as a result of the ongoing trespass and/or nuisance when they purchased their Class property." (*Id.* at 17.) The challenged price index charts will help the jury to understand and evaluate these various timing-related claims and defenses, by showing the fluctuation in class and non-class property values over a relevant time period (1984–2003). *See* Ex. 2, Ex. 6 to Wise Supplemental Report.

*Eighth*, plaintiffs' citation to *Perlmutter v. United States Gypsum Co.*, 4 F.3d 864 (10th Cir. 1993), is inapposite. In that case, the court excluded evidence of the mall's *value* where such evidence was wholly irrelevant to the measure of damages that the plaintiffs were seeking—"***the cost of removing and replacing*** the plaster" that contained asbestos. *Id.* at 867–71 (emphasis added). Here, under Restatement § 930, the class members' properties' value does relate to the relevant measure of damages, and Wise's exhibits are designed to illustrate these values.

## X.    DR. WHICKER PERMISSIBLY SUPPLEMENTED HIS OPINIONS, AND SUCH OPINIONS ARE ADMISSIBLE.

Plaintiffs have moved to exclude certain of the opinions of Dr. F. Ward Whicker ex-pressed in a supplemental report dated August 6, 2004, and in an affidavit dated January 14, 2005.  (Pls.' Mem. at 22–23.)  In particular, plaintiffs move to exclude Dr. Whicker's opinions relating to four subject areas.  Those areas are:

- The difficulty of measuring plutonium in soil.

- Various governmental or agency standards for permissible levels of plutonium in soil and Dr. Whicker's observations about the levels near Rocky Flats compared to those guidelines.

- Possible ways in which plutonium in soil can be disturbed.

- The unfeasibility of abating plutonium in soil from class members' properties.

Plaintiffs argue that Dr. Whicker must not be permitted to render trial opinions in these four areas because, they contend, Dr. Whicker's original report (submitted in November 1996) never addressed these issues and because Dr. Whicker's supplemental opinions in these four areas "exceed[] the scope of permissible supplementation."  (*Id.* at 23.)  As will be shown below, Dr. Whicker's original report addressed each and every one of the four subject areas at issue, and the opinions set forth in Dr. Whicker's August 6, 2004 supplemental report and his January 14, 2005 affidavit are proper supplementation.  Furthermore, even if the Court were to conclude that any of Dr. Whicker's specific supplemental opinions were outside the scope of his original report, those opinions are admissible because the complexity of the case and the technical nature of the scientific evidence warrants the consideration of those opinions, and because the opinions were submitted pursuant to a timetable imposed by the Court that specifically permitted plaintiffs to conduct discovery on those opinions well in advance of the scheduled trial date, and thus plain-tiffs are not prejudiced.

### A.    Background:  Dr. Whicker's Original Expert Report and Deposition.

Dr. Whicker's November 22, 1996 report consisted of a 15-page Executive Summary followed by twelve separate "chapters."  This report was an outgrowth of work that defendant Dow retained Dr. Whicker to perform, beginning in 1991, that was designed "to generate new data on the distribution and transport of, and human exposure to, plutonium and other radionuclides in the offsite environs of the Rocky Flats Plant near Denver, Colorado."  (Ex. 39, Whicker 11/96 Rep. at ES-1.)  The report was also prepared as part of a contract with the Colorado Department of Public Health and Environment to sample in the buffer zone around Rocky Flats "and to conduct related studies to better understand the transport processes affecting plutonium" and other radioactive materials.  (*Id.*)  As part of his study, Dr. Whicker compared the results of plutonium concentrations in soil that he and his team measured with results obtained in prior studies by Dow and Rockwell personnel, as well as by third-party researchers such as AEC scientists Phil Krey and Ed Hardy (upon whose plutonium contour the class is based) and NCAR researcher Ed Martell.  (*See, e.g.,* Ex. 39, Whicker 11/96 Rep. at ES-3–5; Ch. 1 at 4–5; Ch. 2, "Inventory Estimates of [239,240] Pu in Soil East of Rocky Flats, Colorado," at 498, 501–507; Ch. 2, "A Three-Dimensional Spatial Model of Plutonium in Soil Near Rocky Flats, Colorado," at 346–47; Ch. 11, "Comparison of [241] Am, [239,240] Pu and [137] Cs Concentrations in Soil around Rocky Flats," at 275; Ex. 40, Whicker Dep. at 11:6–22, 16:19–17:18; 245:9–246:16; 415:5–417:3; 426:13–427:1.)

The Executive Summary contains an introduction, which explains the background to Dr. Whicker's work in this case as of 1996, outlines the studies addressed in the chapters, and presents further work that Dr. Whicker expected to perform as of the date that the report was prepared.  (Ex. 39, Whicker 11/96 Rep. at ES-1–3.)  The Executive Summary then presents the findings of Dr. Whicker's study as of that time, with several different subjects indicated by

separate headings.  The findings outlined in the Executive Summary are:  Soil Studies (ES-3–7); Vegetation Studies (ES-7–8); Urine Bioassay Study (ES-8–9); Plutonium in Great Western Reservoir Sediment (ES-9–10); Gamma-Emitting Radionuclides in Soil (ES-10); Background Variation along the Front Range (ES-10–12); and Implications of Data for Human Doses from Plutonium (ES-12–15).

Each chapter addresses a different area of inquiry, although many of the areas are closely related.  Some chapters consist of articles or studies conducted or prepared by Dr. Whicker, whereas other chapters are articles or studies conducted by others (who worked with Dr. Whicker) that were among the bases for Dr. Whicker's opinions.  Among the titles of articles and studies included in Dr. Whicker's 1996 report are the following:[19]

- Soil Sampling Site Characterization Near the Rocky Flats Plant.

- Inventory Estimates of Pu-239 in Soil East of Rocky Flats, Colorado.

- Comparative Distribution of Am-241 and Pu-239, 240 in Soil Around the Rocky Flats Environmental Site.

- Vertical Movement of Actinide-Contaminated Soil Particles.

- Sources of Misinterpretation for Environmental Plutonium Measurements.

- Plutonium Excretion in the Urine of Residents Living Near the Rocky Flats Environmental Technology Site.

- Spatial Variations in Natural Background Radiation:  Absorbed Dose Rates In Air In Colorado.

---

[19] Defendants do not tender a full copy of Dr. Whicker's 1996 report to the Court at this time because it is a very large document that is several inches thick.  If it would assist the Court in assessing the scope of topics addressed in Dr. Whicker's report, defendants will provide a full copy of Dr. Whicker's report at the Court's request.

Because Dr. Whicker's report, which was directed both to Dow and to the CDPHE, was prepared in support of studies that were ongoing and contained chapters that consisted of scientific articles intended to be published, Dr. Whicker noted in his report that "the data are still subject to further critique, analysis and interpretation" and that "certain interpretations may be altered after critical scientific review." (*Id.* at 1.)

Indeed, after Dr. Whicker submitted his report in this litigation, many of the chapters of his report were accepted for publication and were, in fact, published in the peer-reviewed literature. The material presented in Chapter 2 of Dr. Whicker's 1996 report alone yielded three separate articles published in the peer-reviewed, scientific literature:

- "Inventory Estimates of $^{239,240}$Pu In Soil East Of Rocky Flats, Colorado," which was published in *Technology*, Vol. 7, pp. 497-507 (2000);

- "A Three-Dimensional Spatial Model Of Plutonium In Soil Near Rocky Flats, Colorado," which was published in *Health Physics*, Vol. 73, No. 2, pp. 340-49 (1997); and

- "Contributions Of Rocky Flats Releases To The Total Plutonium In Regional Soils," which was published in *Health Physics*, Vol. 72, No. 1, pp. 42-48 (1997).

Other chapters also later were published in the peer-reviewed scientific literature:

- Chapter 9 was published in 1999 as "Plutonium Excretion In Urine Of Residents Living Near The Rocky Flats Environmental Technology Site," in *Health Physics*, Vol. 76, No. 4, pp. 368-379 (1999);

- Chapter 11 was published in 1999 as "Comparison of $^{241}$Am, $^{239,240}$Pu and $^{137}$Cs Concentrations In Soil Around Rocky Flats," in *Health Physics*, Vol. 76, No. 3, pp. 275-287 (1999);

- Chapter 12 was published in 1999 as "Spatial Variations In Natural Background Radiation:  Absorbed Dose Rates In Air In Colorado," in *Health Physics*, Vol. 76, No. 5, pp. 516-523 (1999).[20]

---

[20] Dr. Whicker's work presented in Chapter 12 also yielded another article published in the peer-reviewed scientific literature, although that article addressed environmental concentrations of

(Continued…)

In April 1997, plaintiffs' counsel took Dr. Whicker's deposition over a two-day period. Dr. Whicker's November 1996 report was marked as Exhibit 1 to the deposition, and plaintiff's counsel questioned Dr. Whicker in extensive detail about his report.  The deposition lasted approximately 12 hours (over both days), and the transcript covers 440 pages.  As will be shown below, the subjects addressed and opinions expressed in Dr. Whicker's August 6, 2004 supplemental report and his January 14, 2005 affidavit cover topics expressly addressed in Dr. Whicker's November 1996 report and are proper supplementation.

> **B.      Dr. Whicker's November 1996 Report Expressed Opinions about the Difficulty of Measuring Plutonium in Soil.**

Plaintiffs first contend that Dr. Whicker's supplemental report and January 2005 affidavit are improper in that they "deal with subjects such as the difficulty of measuring plutonium in soil . . . ."  (Pls.' Mem. at 22), which plaintiffs contend exceeds the scope of Dr. Whicker's original 1996 report.  Plaintiffs seek to convince the Court that Dr. Whicker's original report "dealt only with his research for the DOE and the [CDPHE], which consisted of measuring plutonium in the environment near Rocky Flats."  (*Id.* at 23.)  Plaintiffs' contention that Dr. Whicker's supplemental work exceeded the scope of his original report is just plain wrong.

Plaintiffs acknowledge that Dr. Whicker's original report discussed the studies that he (and others under his direction) conducted to measure plutonium in the environment around Rocky Flats.  What plaintiffs fail to acknowledge, however, is that part and parcel of making measurements of plutonium in soil is accounting and correcting for the difficulties of measuring such concentrations.  Dr. Whicker's report expressly discusses those difficulties:

radionuclides that are not at issue in this litigation.  (*See* "Concentrations of $^{232}$Th, $^{226}$R, and $^{40}$K In Soil Around Rocky Flats And Along Colorado's Front Range Corridor," *Technology*, Vol. 7, pp. 415-430 (2000).)

> Interpretation of radionuclide concentrations in soils must take into consideration variables that may affect inventories and distributions in the [soil sample] profile. Variations in soil type, density, and moisture; vegetation density, and type; and other factors such as slope, stoniness, land use practices, disturbance levels, soil erosion and deposition may influence transport distribution of radionuclides in the environment.

(Ex. 39, Whicker 11/96 Rep., Ch. 1 at 1.)

An entire chapter of Dr. Whicker's 1996 report, Chapter 6, addresses the difficulty of measuring plutonium in soil generally. That chapter is entitled "Sources of Misinterpretation for Environmental Plutonium Measurements." The introduction expressly includes the following paragraph:

> Although $^{239, 240}$Pu levels from fallout can be detected in soil and other environmental samples, concentration tends to be very low in most environments. This automatically necessitates the assay of large sample size and the use of low-level radiochemical proce- dures. Particular attention must be paid to method specificity since Pu separation starts with samples containing many possible inter- ferences in large amounts. Unless plutonium is isolated in a pure form, one or more of the similar alpha emitters naturally abundant in environmental samples can be mistaken for $^{238}$Pu. These appar- ent artifacts can lead to spurious conclusions regarding the differ- ential behavior between $^{238}$Pu and $^{239, 240}$Pu such as in the reported presence of $^{238}$Pu in cement kiln dust discussed below.

(Ex. 39, Whicker 11/96 Rep. Ch. 6 at 213.) At Dr. Whicker's deposition, plaintiffs' counsel questioned Dr. Whicker on this very subject. (*See* Ex. 40, Whicker Dep. at 392–402.) At the time, Dr. Whicker explained that when conducting laboratory analysis of soil samples for plutonium, "you can get peaks in the alpha spectrum that are about the same energy of some of the plutonium isotopes. And so particularly at very low levels of plutonium, it can be misinter- preted as being plutonium when in fact it may be alpha particles from a little bit of some uranium and thorium isotopes that might have gotten through." (*Id.* at 393:24–394:6.)

In addition, Dr. Whicker's report is replete with discussions that identify specific sources of difficulty in measuring plutonium in soil. Specifically, Dr. Whicker's original report notes the following:

- **Difficulty in locating undisturbed locations:** To obtain a representative and accurate sample of amounts of plutonium that might have been deposited and accumulated in an area over the preceding 40 years, is important to sample a location that has not been disturbed. (Ex. 39, Whicker 11/96 Rep., Ch. 1 at 2.) "[S]ome properties had clearly been disturbed or permission could not be obtained to sample. In these cases, the nearest undisturbed property where permission to sample could be obtained was used." (*Id.* at 1; *see also id.* at 8–9.)

- **Difficulty in locating level sampling locations:** The preferred sampling locations had a slope of less than 5 degrees, with top and midslope areas limited to those with broad, flat areas. Areas in valley floors that "tend to pond or puddle" were to be avoided. (*Id.* at 10.)

- **Difficulty in accounting for the presence of rocks:** "One of the more unique soil sampling problems encountered by this project was the abundance and large size of rocks at some of the sampling locations. . . . The presence of large amounts of rock in the soil profile displaces soil and therefore reduces the quantity of soil that contaminants can sorb to. Large rocks in some soils may also provide an additional conduit for water movement and consequently affect radionuclide transport." (*Id.* at 13.)

- **Difficulty in measuring bulk density of soil:** To arrive at an accurate total inventory of plutonium deposited in soil and to take accurate in situ gamma measurements, it is important to have accurate information on the bulk density of the soil sampled. (*Id.* at 13.) The initial samples that Dr. Whicker's team took to estimate bulk density, after processing, "were not useful for our needs because the samples contained varying amounts of rock." (*Id.*) Dr. Whicker continues on to note that because plutonium "would not be present in rock material, the bulk density calculation (including rocks) overestimated the density of soil and the total Pu inventory calculation." (*Id.*) Accordingly, Dr. Whicker and his team had to remove rocks less than 2 millimeters from the soil samples and determine the rock volumes "in order to adjust the soil volumes to reflect the soil density . . . without rocks." (*Id.*) Chapter 4 of Dr. Whicker's report further explains the difficulties that variations in bulk density, which changes during wetting and drying cycles, poses for measuring plutonium in soil. (Ex. 39, Whicker 11/96 Rep. Ch. 4 at 32–33.)

- **Difficulty posed by variations in soil moisture:** Yet another difficulty that Dr. Whicker and his team encountered in measuring the concentration of plutonium in the soil was the need to determine soil moisture levels. Dr. Whicker notes that soil moisture levels "were determined gravimetrically . . . then adjusted for rock

content." (Ex. 39, Whicker 11/96 Rep. Ch. 1 at 14.)  Dr. Whicker then was able to perform a calculation to determine an adjusted soil moisture content. (*Id.*)

- **Difficulty of laboratory plutonium analysis of soils:**  Attached as Appendix B to Chapter 2 of Dr. Whicker's original report are the "Plutonium Analysis Procedures" that Dr. Whicker and his team followed in measuring the plutonium concentration in soil samples that they took near Rocky Flats.  (Ex. 39, Whicker 11/96 Rep. Ch. 2, Appx. B.)  As even a cursory review of those laboratory procedures shows, it is beyond dispute that the procedures are both extensive and demanding.  Without going into detail, the procedures involved in the laboratory analysis include:  soil acid leaching; iron co-precipitation; solvent extraction; plutonium electrodeposition in $H_2SO_4$; alpha spectroscopy; and applying formulas to calculate concentrations.  Finally, measured concentrations of plutonium were put through a rigorous quality assurance and quality control program.  (Ex. 39, Whicker 11/96 Rep. Ch. 2, "A Three-Dimensional Spatial Model of Plutonium in Soil Near Rocky Flats, Colorado," at 343.)

- **Difficulties associated with minimum levels of detection:**  Chapter 5 of Dr. Whicker's report, entitled "A Gamma Monitoring Technique for Estimating Plutonium Contamination Around Nuclear Weapons Facilities," notes the difficulties of measuring plutonium in soil using certain techniques because the minimum levels of detection are often times higher than the concentrations of plutonium in the soil.  The article notes that "[d]etailed characterization of the Pu distribution in the vicinity of the RFP could be accomplished by gathering soil samples for radiochemical analysis; however, this procedure is labor-intensive and time-consuming because of the need for sample acquisition, preparation, and pretreatment, in addition to complex analytical procedures." (Ex. 39, Whicker 11/96 Rep. Ch. 5 at 117.)  The more rapid and less costly method that the article describes, however, in-situ gamma spectroscopy, has a lower limit of detection that is five times higher than for radiochemical analysis and also is higher than the concentrations of plutonium in soil that were measured by radiochemical analysis while the study authors were testing the gamma spectroscopy technique. (*Id.* at 125, 128–30, Figs. 5, 8.)  And, furthermore, as described in Chapter 6 of Dr. Whicker's report and as he stated at his deposition, at very low levels of plutonium concentration in soil, even radiochemical analysis, if not performed carefully, can lead to the mistaken conclusion that some of the radioactivity measured is from plutonium, when it actually is from other radionuclides naturally present in soil.  (Ex. 39, Whicker 11/96 Rep. Ch. 6 at 213; Ex. 40, Whicker Dep. at 393–394.)

Given the frequency with which Dr. Whicker's 1996 report discusses the difficulties encountered with measuring plutonium in soil and the fact that plaintiffs' counsel questioned Dr. Whicker at deposition on this topic, plaintiffs should not be heard to complain now that Dr. Whicker's supplementation on this issue is improper and beyond the scope of his original report.

**C.    Dr. Whicker's November 1996 Report Expressed Opinions about Govern-mental Standards and Compared Measurements of Plutonium in Soil to Those Standards.**

The next basis on which plaintiffs challenge Dr. Whicker's supplemental report and January 2005 affidavit is their contention that those submissions improperly express opinions on "various governmental or agency standards for permissible levels of plutonium in soil and [contain] Dr. Whicker's 'observations' about the levels near Rocky Flats compared to those guidelines" (Pls.' Mem. at 23), which plaintiffs contend exceeds the scope of Dr. Whicker's original 1996 report.  Again, plaintiffs are wrong.  Dr. Whicker's report expressly refers to governmental standards for plutonium in soil and compares sampling results to those standards:

> The State of Colorado has for a number of years promulgated a guideline for plutonium in soil of 2 dpm/g or 33Bq/kg.  Levels of plutonium in surface soil that are below this guideline have been considered to be below a level that might warrant consideration in the use and development of land.  The average levels of plutonium $^{(239, \, 240}$Pu) in 0–3 cm surface soil that we measured offsite ex-ceeded this value in only two study macroplots, DX1 (95 Bq/kg) and DX2 (34 Bq/kg) . . . [both of which are] on government-owned land."

(Ex. 39, Whicker 11/96 Rep. ES-15; *see also id.* Ch. 2, "Inventory Estimates of $^{239, \, 240}$Pu in Soil East of Rocky Flats, Colorado," at 497 ("[R]egulatory mandates have . . . contributed to the need to quantify and understand the inventory, transport, distribution, and health risk of plutonium and other contaminants in the environs of the RFETS."); *id.* Ch. 12, "Spatial Variations in Natural Background Radiation:  Absorbed Dose Rates In Air In Colorado," at 516 ("Regulatory and legal issues have motivated extensive research concerning the sources and magnitude of exposures to anthropogenic ionizing radiation.").)

The other standards discussed in Dr. Whicker's supplemental report and January 2005 af-fidavit were issued after Dr. Whicker's original report and deposition.  For example, NCRP-129, which is a soil screening standard issued by the National Commission on Radiation Protection

and Measurements ("NCRP") that contains dose-based standards for permissible concentrations of plutonium in soil, was not issued until 1999.  (*See* Ex. 41, NCRP Report No. 129 at 1.)  Similarly, the dose and risk-based "Recommended Soil Action Levels" for the remediation of soils on the Rocky Flats Environmental Technology Site, had not been adopted at the time of Dr. Whicker's original report and deposition.  (*See* Ex. 48, 5/28/2003 Final RFCA Attachment 5, "Rocky Flats Environmental Technology Site Action Levels and Standards Framework for Surface Water, Ground Water, and Soils," at 5-1–5-2, 5-15–5-21, 5-34–5-35.)  As shown below, such new information is proper and appropriate to include in supplemental reports.  *See, e.g., Blue Cross and Blue Shield of New Jersey, Inc., v. Philip Morris, Inc.*, 199 F.R.D. 484, 486–87 (E.D.N.Y. 2001).

Dr. Whicker's supplemental opinions comparing measured concentrations of plutonium in soil to NCRP-129 and the RSALS, as well as other dose- or risk-based standards, is an extension and update of opinions that Dr. Whicker rendered in his original report.  In his 1996 report, Dr. Whicker performed screening calculations to estimate the dose to Rocky Flats-area residents from plutonium contained in soil.  (*See* Ex. 39, Whicker 11/96 Rep. at ES-12–14.)  As noted above, Dr. Whicker then compared the annual dose rate to Rocky Flats area residents to dose rates calculated for the U.S. population by the NCRP in a different report, NCRP-97.  (*Id.* at ES-14.)  At Dr. Whicker's deposition, plaintiffs questioned Dr. Whicker on this comparison.  (Ex. 40, Whicker Dep. at 348–352.)  Dr. Whicker concluded from his work that the "actual doses to offsite residents from plutonium of RFETS origin are . . . likely to be very small."  (*Id.*)  In his supplemental report, Dr. Whicker similarly compares the annual dose rate to Rocky Flats-area residents from plutonium concentrations measured in soil to annual doses that would occur from concentrations of plutonium in soil set by NCRP-129 and RSALS.  The screening concentrations

permitted by NCRP-129 would result in annual radiation doses of less than 25 mrem/year, and the screening concentrations permitted by RSALS would limit annual radiation dose to less than 50 mrem/year—both of which constitute a small fraction of the background radiation we all receive annually (Ex. 40, Whicker Dep. at 150).  Thus, Dr. Whicker's comparison of measured concentrations of plutonium in the soil around Rocky Flats to the NCRP-129 and RSALS limits, and his conclusion that the measured concentrations are far below the levels permitted by those standards and would, therefore, result in annual radiation doses less than those standards allow, is the same type of comparison made in his original report.

### D.  Dr. Whicker's November 1996 Report Expressed Opinions about Possible Ways in Which Plutonium In Soil Can Be Disturbed.

Plaintiffs further contend that Dr. Whicker's supplemental report and January 2005 affidavit should be stricken to the extent that they contain opinions on "possible ways in which plutonium in soil can be disturbed" because his original report did not address that issue.  (Pls.' Mem. at 23.)  Again, plaintiffs are wrong, as Dr. Whicker's original report is replete with discussions about ways in which soil can be disturbed.  Listed below are some examples of portions of Dr. Whicker's report addressing soil disturbance (all emphasis is added):

- "It is clear that historical use and **disturbance** of the land, soil type, slope, vegetation cover, and other numerous factors can modify the depth distribution and total inventory of soil contaminants."  (Ex. 39, Whicker 11/96 Rep. at ES-3.)

- "Interpretations of radionuclide concentrations in soils must take into consideration variables that may affect inventories and distributions in the profile.  Variations in soil type, density, and moisture; vegetation density, and type; and other factors such as slope, stoniness, land use practices, **disturbance levels**, soil erosion and deposition may influence transport distribution of radionuclides in the environment. (*Id.* Ch. 1 at 1.)

- "Where possible, **undisturbed** properties were selected for soil sampling in order to get a record of depositional history from global fallout and any contributios from the RFP."  (*Id.* at 2.)

- "The specified locations for soil sampling . . . were used whenever possible. However, some properties had clearly been *disturbed* . . . In these cases, the nearest *undisturbed* property where permission could be obtained was used. . . . Three locations sampled were on land that had been *tilled* in the past." (*Id.* at 3.)

- "The CSU-RG sampling consisted of compositing 10 randomly selected samples from each of the 17 areas (Figure 4). Portions of the land, near the east entrance to RFP *were plowed* to test this as a remediation method for reducing plutonium levels." (*Id.* at 4.)

- "All other previous study area locations were selected by land use type. Some are still *undisturbed* areas except for minor *disturbances* from pasturing the past while others were *tilled* until 1985 for crop farming." (*Id.* at 4–5.)

- "*Disturbance* levels were ranked from *undisturbed* natural areas (level 1) to highly *disturbed* areas where the soil profile had been *disturbed* (homogenized) by *tilling* in the past (level 5). *Disturbance* is generally associated with land use. For example, overgrazed land is likely to become more *disturbed* with time . . . Most locations sampled showed *disturbance* levels of < 2. Disturbance levels of < 3 are suggestive of minimal erosion conditions and should maintain a depositional history indicative of relatively *undisturbed* soils suitable for profile sampling." (*Id.* at 8–9.)

- "We realize that all soils are "*disturbed*" by natural bioturbation and other physical processes, but here we define the term as *obvious significant processes that would measurably alter the soil profile* (tilling, overgrazing, erosion, animal burrow, etc.)." (*Id.* Ch. 2, "Inventory Estimates of [239, 240]Pu in Soil East of Rocky Flats, Colorado," at 498.)

- "Since accurate estimates of concentrations and deposition per unit area depended on soil profiles which had not been physically *disturbed*, sampling sites were selected in natural, *undisturbed* areas where possible. Lack of *disturbance* was judged primarily by plant community composition which is expected to be typical of the shortgrass plains." (*Id.* Ch. 2, "A Three-Dimensional Spatial Model of Plutonium in Soil Near Rocky Flats, Colorado," at 341.)

- "Krey & Hardy reported that most Pu contamination was released from the vicinity of the 903 Pad as the result of soil dispersion during *remedial activities*." (*Id.* Ch. 5, "A Gamma Monitoring Technique for Estimating Plutonium Contamination around Nuclear Weapons Facilities," at 117.)

- "Contaminated soil may be transported by resuspension processes. Resuspension occurs when the soil is *disturbed* by wind, animals, mechanical equipment, rain splash, etc." (*Id.* Ch. 7 at 1.)

- "Plutonium in [Great Western Reservoir] may have originated from different sources and pathways. . . surface erosion from soils surrounding GWR . . . and

*remediation efforts* at the 903 pad potentially contributed to the plutonium in GWR . . . ." (*Id.* Ch. 10 at 19.)

- "Redistribution caused by *disturbance* and natural erosion following initial dispersion has probably affected current deposition patterns of $^{241}$Am and $^{239,240}$Pu around Rocky Flats." (*Id.* Ch. 11, "Comparison of $^{241}$Am, $^{239,240}$Pu and $^{137}$Cs Concentrations in Soil around Rocky Flats," at 275.)

- "Specific objectives of this study were to . . . Examine the effect of soil *disturbance* on the distribution of $^{137}$Cs and thus $^{241}$Am, $^{239,240}$Pu . . . ." (*Id.* at 276.)

- "Rates at which soil concentrations of $^{137}$Cs decreased with depth, as described by estimates of *m*, were similar at all macroplots around Rocky Flats except where soil had been *disturbed*. . . . In addition to uniform soil concentrations of $^{137}$Cs in samples from all depths, there was visual evidence of *disturbance* in the 0 to 21 cm soil column at these sites—for example, nails and other man-made debris as well as compaction at the base of plowed layers (plow soles) in previously tilled fields. *Tillage* that followed deposition of $^{137}$Cs appeared to be the primary cause of *disturbance* at these sites . . . " (*Id.* at 280–81.)

- "Approximately 60% of $^{137}$Cs was retained in the top 3 cm of soil and 86% was within the top 6 cm except where *tillage*, erosion, and other kids of *disturbance* had occurred . . . ." (*Id.* at 285.)

In addition, at Dr. Whicker's deposition, plaintiffs' counsel explored Dr. Whicker's opinions on the topic of soil disturbance and its effect on concentrations of plutonium in soil and potential exposures to residents. (*See, e.g.*, Ex. 40, Whicker Dep. at 21:13–23; 231:13–232:16; 249:14–251:23; 257:2–258:1; 264:19–267:18; 417:3–418:21; 439:18–440:5.)

As both Dr. Whicker's original report and his deposition make abundantly clear, the topic of soil disturbance and its effect on plutonium concentrations in soil and the resulting effect on potential exposures plays a prominent role in Dr. Whicker's original opinions and was extensively addressed by plaintiffs' counsel at deposition. In addressing that topic, Dr. Whicker's supplemental report and January 2005 affidavit do not exceed the scope of his original report and opinions that he expressed.

**E.      Dr. Whicker's November 1996 Report Expressed Opinions About The Unfeasibility Of Abating Plutonium In Soil.**

Plaintiffs' final contention in seeking to exclude portions of Dr. Whicker's supplemental report and January 2005 is that those submissions address the topic of "the unfeasibility of abating the plutonium from the class members' properties," which plaintiffs claim Dr. Whicker's original report did not address.   (*See* Pls.' Mem. at 23.)   Contrary to plaintiffs' argument, the feasibility of removing plutonium from soil was addressed in Dr. Whicker's original report and opinions.

Dr. Whicker's original opinions did, in fact, address the question of abatability of plutonium in soil.   Several times in his report and again at his deposition, Dr. Whicker expressed opinions about the ability of plutonium in soil to be remediated and whether it would be more potentially harmful to try to remove the plutonium than it would be simply to leave it in place. For example, at his deposition Dr. Whicker explained that:

> "[T]here is a large push to remediate sites that are contaminated. By remediation in this instance, it would mean taking bulldozers and digging up plutonium or cesium-contaminated soil, and, quote, disposing of it.   In my opinion, this would lead to the expenditure of billions of dollars, it would not reduce risks to the public, it would devastate the local environments. . . . It's my belief, based on what I know now, that the best thing to do is leave it [contamination in soil] alone, because I don't think it is posing a hazard . . . .

(Ex. 40, Whicker Dep. at 104–105; *see also* Ex. 39, Whicker 11/96 Rep. Ch. 2, "Inventory Estimates of $^{239,240}$Pu in Soil East of Rocky Flats, Colorado," at 497–98; Ch. 5, "A Gamma Monitoring Technique for Estimating Plutonium Contamination around Nuclear Weapons Facilities," at 117; Ch. 10 at 19; Ch. 11, "Comparison of $^{241}$Am, $^{239,240}$Pu and $^{137}$Cs Concentrations in Soil around Rocky Flats," at 275; Ex. 40, Whicker Dep. at 108–109.)

F.    **The Complex Scientific Nature of This Case and the Lack of Prejudice to Plaintiffs Merit Admitting the Supplemental Opinions.**

Plaintiffs have not and cannot demonstrate that opinions expressed in Dr. Whicker's August 1996 supplemental report and January 2005 affidavit are beyond the scope of his original report and deposition.  The supplemental report and affidavit therefore are admissible.  Even if the Court were to conclude that Dr. Whicker's supplemental opinions were, however, outside the scope of Dr. Whicker's original opinions, plaintiffs' motion to exclude Dr. Whicker's supplemental opinions should be denied for each of the following reasons.

*First*, plaintiffs misread Rule 26.  Plaintiffs claim that "[t]o be a 'supplement' under Rule 26, the report must normally correct an inaccuracy or incorporate new information."  (Pls.' Mem. at 22.)  Pursuant to Fed. R. Civ. P. 26(a)(2)(C), parties must make disclosures of proposed expert testimony "at the times and in the sequence directed by the court."  Where the court is silent and the parties have not agreed, "the disclosures shall be made at least 90 days before the trial date."  *Id.*  In this case, Dr. Whicker's supplemental report and January 2005 affidavit were submitted "at the time[] . . . directed by the court," including the Court's June 17, 2004 scheduling order setting due dates for the submission of supplemental reports.  (*See* 6/17/04 Order.)  Thus, defendants did not engage in improper supplementation.  The cases cited by plaintiffs are inapposite in this respect; in those cases, the parties were seeking to supplement after the passing of a court-imposed deadline.  *See Beller v. United States*, 221 F.R.D. 689, 691 (excluding expert report filed "[a]fter the close of discovery and without seeking or obtaining the Court's permission"); *Keener v. United States*, 181 F.R.D. 639, 642 (D. Mont. 1998) ("The defendant's disclosure of substantive evidence about its medical position in this case was provided two months after the deadline imposed by the scheduling order for this case."); *Schweizer v. DEKALB Swine Breeders, Inc.*, 954 F. Supp. 1495 (D. Kan. 1997) (excluding testimony not disclosed "pursuant to the

court's revised scheduling order"); *McEachron v. Glans*, Nos. 98-CV-17 & 97-CV-885, 1999 WL 33597331 (N.D.N.Y. Feb. 24, 1999) (same).

*Second*, plaintiffs' criticisms ignore the fact that, between the date of his original report and his supplemental report, the Court issued several opinions that help to define the claims and issues to be tried in this case.  For example, in its July 24, 2003 opinion, the Court ruled:

> [S]ection 930 of the Restatement provides such a departure from the ordinary rule by allowing a party injured by continuing tortious invasions on its property to elect to recover damages for both past and future invasions, including diminution in property value, so as to avoid the necessity of having to bring successive actions as the invasions continue. Restatement § 930(1) & cmt. b.  I agree with Judge Matsch that this approach to measuring damages is appropriate under the circumstances of this case to compensate Plaintiffs and class members for losses they claim to have suffered as a result of Defendants' alleged trespass and nuisance.

*See Cook IX*, 273 F. Supp. 2d at 1210.   Certain of the opinions contained in Dr. Whicker's supplemental report relate to such rulings by the Court that came after Dr. Whicker's original report.  For example, Dr. Whicker's opinions on abatement of plutonium in the class area are directly relevant to whether or not the trespass or nuisance is "continuing."

Indeed, Rule 26(a) disclosures provides for supplementation "if the party learns that in some material respect the information disclosed is incomplete."  Fed R. Civ. P. 26(a)(2)(E)(1).  In *Blue Cross and Blue Shield of New Jersey, Inc., v. Philip Morris, Inc.*, 199 F.R.D. 484 (E.D.N.Y. 2001), Judge Weinstein allowed the supplementation of an expert's opinions during the course of the trial to "accommodate the scientific process seeking truth" and because "admitting Dr. Krosnick's supplemental report will enable the trier to get closer to the merits of the case."  *Id.* at 486–87.  Judge Weinstein further noted that "[i]n complex cases . . . the court has time to ensure that the opposing parties will not be unduly surprised by disclosure of a supplemental expert report."  *Id.* at 487.  Similarly, any material of Dr. Whicker's that the Court might

deem to be new should be allowed, especially insofar as they take into account intervening rulings by the Court and in light of the complexity of the scientific issues of the case.

*Third*, even if this Court should find a failure to comply with Rule 26(a), such testimony may not be barred under Fed. R. Civ. P. 37(c)(1) if such failure "was justified or harmless." *Mid-America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1363 (7th Cir. 1996).  To determine whether the failure was justified or harmless, a court should consider the following factors:  "(1) the prejudice or surprise to the party against whom the testimony is offered;  (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness."  *Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999).  In *Mid-America Tablewares*, the court held that an expert's failure to disclose his opinions in his report (remedied by a supplemental report) was harmless under Rule 37 because the delay did not materially impact the ability of the opposing party to depose the expert or for the opposing party's expert to formulate his opinions.  *Id.* at 1363.

Plaintiffs cannot, and do not, claim that any alleged failure to comply with Rule 26 was anything but harmless.  These supplemental opinions were filed well before trial, in accordance with this Court's June 17, 2004 scheduling order, which gave plaintiffs' opportunity to depose Dr. Whicker on his supplemental opinions.  Defendants, in fact, tendered Dr. Whicker (and other experts who had supplemented their opinions) for deposition in 2004 in connection with the supplemental reports.  Plaintiffs chose not to depose Dr. Whicker.  Any "prejudice" to plaintiffs resulting from their failure to depose Dr. Whicker is of plaintiffs' own making.

Finally, defendants did not act in bad faith in tendering Dr. Whicker's supplemental opinions, nor do plaintiffs make such a claim.  Thus, application of Rule 37 to exclude Dr. Whicker's

supplemental opinions is not justified.  Accordingly, plaintiffs' motion to strike portions of Dr. Whicker's August 2004 supplemental report and January 2005 affidavit should be denied.

## XI.    MS. VAN COURT'S OPINIONS ARE RELEVANT AND ADMISSIBLE, AND SHE IS QUALIFIED TO OPINE ON THE MATTERS IN HER REPORT.

Plaintiffs' suggestion that some of Laurie Van Court's opinions are inadmissible is flawed and unsupported, and should be rejected for four reasons.  *First*, Ms. Van Court's opinions are relevant to plaintiffs' claim for diminution in the value of their properties.  *Second*, Ms. Van Court's opinions are not outside the scope of her expertise.  *Third*, Ms. Van Court's opinions pertaining to the market value of the Cook and Babb properties are admissible.  *Fourth*, Ms. Van Court's opinions about Ms. Cook's debts are also admissible.

*First*, plaintiffs' brief claims that "Ms. Van Court's opinions about the horse industry and about other possible causes for the problems these plaintiffs experienced in their businesses are irrelevant" to the class trial, because the class trial concerns "damages for the diminution in property values."  (Pls.' Mem. at 24.)  But plaintiffs offer *no support* whatsoever for the conclusory assertion that Ms. Van Court's opinions do not relate to whether or not plaintiffs experienced "diminution in property values" as a result of defendants' allegedly actionable conduct.  Plaintiffs fail to cite a single case in support of their theory that Ms. Van Court's opinions do not relate to whether or not there was "diminution in property values" caused by defendant's allegedly actionable conduct, nor do they cite any affidavit or any portion of the immense factual record in this case to support their claim.  The mere bald assertion of plaintiffs' *attorneys* is not enough.

In fact, contrary to plaintiffs' conclusory and unsupported assertion, Ms. Van Court's opinions clearly do relate to diminution in property values, or the lack thereof.  As this Court has ruled:  "Defendants are, of course, entitled to argue and present evidence challenging Plaintiffs'

assertion that any decrease in the value of their properties was caused by Defendants' alleged trespass and nuisance, rather than by mere proximity to the Plant *or other factors*." *Cook IX*, 273 F. Supp. 2d at 1210 n.39 (emphasis added).  In her report, Ms. Van Court offers opinions as to "other factors" that impacted the value of class properties.  (Ex. 42, Van Court Report at 1 ("A number of factors may have resulted both in reduced property values and diminished business operation.").)

The majority of the class representatives (Merilyn Cook, the Babbs, and the Bartletts) owned horse properties.  (*Id.* at 13–25.)  As set forth in Ms. Van Court's report, among the "other factors" that impacted the value of those properties during the relevant time period were: the decline in the United States horse industry in the late 1980s and early 1990s (*id.* at 5); the impact of the horse industry decline on the demand for horses in the Denver metropolitan area, (*id.* at 8); the impact of national and local economic trends, exacerbated by the marketability problems often associated with horse properties, on the market values of horse properties (*id.* at 10); and the impact of poor management of a horse business on the value of a horse property, (*id.* at 13–24).[21]  (*See, e.g.*, Ex. 42, Van Court Report at 15, 16 ("The marketing difficulties described

---

[21] As Ms. Van Court notes in her report, horse properties are special-purpose properties whose value is correlated to their functional capacity.  (*See id.* at 9.)  The marketability (and thus the value) of a given property depends in large part upon the factors described by Ms. Van Court.  (*See, e.g., id.* at 17 (noting that Cook's property "was not irrigated and so could produce only a limited amount of hay").)  Moreover, given the "special purpose" for which these properties are generally purchased, *i.e.*, operating a horse business, the marketability and thus the value of a given property is influenced by the failure of any prior or current horse business on that property. Indeed, as Ms. Van Court noted in here testimony, she has commented in other reports and appraisal assignments on "the reasons affecting the success and failure of a specific business." (Ex. 43, Van Court Dep. at 108–09; *see also id.* at 112–13 (describing testimony before another court about a horse business).)  If plaintiffs' own actions caused these business failures, that fact is one that would assist the trier of fact in determining facts in issue as they relate to the alleged diminution in plaintiffs' property values. *See* Fed. R. Evid. 702.

by Cook in trying to sell her property likely were due to the typical problems associated with horse properties identified earlier in the report. . . .  The failure of Cook's horse business likely resulted, in large part, from the nationwide decline of the horse industry, and particularly, the Quarter Horse industry.").)  Thus, Van Court's opinion supports the defense that—to the extent that plaintiffs succeed in demonstrating diminution in the value of plaintiffs' properties in the late 1980s and early 1990s—any such alleged "diminution in value" experienced by plaintiffs' properties was caused not by defendants' allegedly actionable conduct, but by non-actionable "other factors."  *Cook IX*, 273 F. Supp. 2d at 1210 n.39 (defendants are "entitled to argue and present evidence" that any "decrease in the value of [plaintiffs' properties] was caused by . . . other factors.")

Nor are Ms. Van Court's opinions "irrelevant" to the extent they relate to plaintiffs' "businesses."  (Pls.' Mem. at 23–24.)  Plaintiffs themselves defined the class as including persons whose "real or personal property or business or commercial interests were damaged or who otherwise suffered economic harm" because of alleged releases from Rocky Flats.  (Ex. 44, 2d Am. Compl. at 18.)  Ms. Van Court's opinions are relevant to whether—and to what extent— plaintiffs' businesses by defendants' allegedly actionable conduct, as opposed to being harmed by other, non-actionable factors such as nationwide trends in the horse industry.

***Second***, plaintiffs' vague criticism that Ms. Van Court "is not qualified to opine about these plaintiffs' businesses" (Pls.' Mem. at 24) is similarly without merit.  Plaintiffs suggest that Ms. Van Court's testimony exceeds the valid scope of her expertise, arguing that "[s]he is not qualified to opine on how a horse business should operate, or on the profitability of such a business."  (*See id.* at 24.)  To the contrary, Ms. Van Court discussed at length in her deposition her experience as owner or part owner of three separate properties where horses were kept, bred,

and ridden.  (*See* Ex. 43, Van Court Dep. at 101–04.)  She also testified, as plaintiffs themselves acknowledge, that she was the manager of a "for profit" horse property.  (*Id.* at 193.)  Additionally, her educational background includes finance and business administration, including seminars offered through horse organizations.  (*Id.* at 106–07.)  Ms. Van Court has appraised between 15 and 20 horse properties, roughly half of which were also run as a business.  (*Id.* at 104.)  As noted above, Ms. Van Court has also commented in other reports and appraisal assignments on "the reasons affecting the success and failure of a specific business" (*see id.* at 108–09) and has previously testified in court about a horse business (*id.* at 112–13).  Plaintiffs' contention about Ms. Van Court's qualifications should be rejected.

Plaintiffs next state that Ms. Van Court "does not hold herself out as qualified to appraise the value of a business."  (Pls.' Mem. at 24.)  That point is wholly irrelevant—Ms. Van Court ***did not*** appraise the value of any of plaintiffs' businesses, and specifically disclaimed doing so in her deposition.  (Ex. 43, Van Court Dep. at 111–12.)  Rather, as discussed above, Ms. Van Court's opinions concern "other factors" that have affected the value of plaintiffs' properties, such as nationwide trends in the horse industry in the late 1980s and early 1990s.

Finally, plaintiffs argue that Ms. Van Court is "not an accountant," but provide no further explanation as to how or why not being an accountant would have *any* affect on the relevance or veracity of Ms. Van Court's testimony.  (*See* Pls.' Mem. at 24.)  As plaintiffs themselves acknowledge, the Class trial concerns "diminution in property values."  (*Id.*)  The Class trial does not concern taxation or accounting practices, and neither does Ms. Van Court's testimony.

The case law cited by plaintiffs actually undermines plaintiffs' claim that Ms. Van Court's testimony should be excluded.  Plaintiffs point to *Wheeler v. John Deere Co.*, 935 F.2d 1090 (10th Cir. 1991), where the Tenth Circuit cautioned against expert testimony where the

expert seeks to render opinions "on an entirely different field or discipline." *Id.* at 1100. The *Wheeler* court, however, allowed the challenged testimony and held that "an expert witness is not strictly confined to his area of practice, but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight." *Id.*

The only other case cited by plaintiffs, *Randolph v. Collectramatic, Inc.*, 590 F.2d 844 (10th Cir. 1979), is completely inapposite. In *Randolph*, the court did not allow *lay witness* testimony under Fed. R. Evid. 701, where the plaintiff himself sought to testify about the design of pressure cookers but *no* facts were introduced to indicate that he even knew how pressure cookers were manufactured or designed. *Id.* at 848. That has nothing to do with the present case. Ms. Van Court was the manager of a "for profit" horse property (Ex. 43, Van Court Dep. at 193); has educational background in finance and business administration (*id.* at 106–07); has appraised roughly ten horse properties which were run as a business (*id.* at 104); and has commented and even testified on such issues before (*see id.* at 108–09, 112–13).

*Third*, plaintiffs argue that because Ms. Van Court did not "appraise" the class representatives' properties, she cannot opine that "[t]he Thigpen purchase . . . likely did not reflect market value at the time it occurred" or that "Babbs' development cost did not equal real property value . . . ." (Pls.' Mem. at 24–25.)

First, with respect to the Thigpen purchase, Thigpen himself testified that the purchase price used for this transaction did not reflect the actual value of the property, because the transaction was not an arms-length transaction, and Ms. Cook wanted to set the alleged purchase price as high as possible. (Ex. 45, Thigpen Dep. at 44–45, 84–85.) Mr. Thigpen's testimony is corroborated by the fact that in late 1986, two years later, a different appraiser appraised the same property for $330,000 (approximately $425,000 less than in Mr. Thigpen's transaction with

Cook), and other testimony about Ms. Cook's financial condition.  (*Id.* at 85; Ex. 46, Cook Dep. at 149–50, 166–67.)  Similarly, Ms. Van Court testified that, even without knowing the property value, she concluded from the documents surrounding the transaction that it was likely not a "cash equivalent sale" and that Thigpen reduced his risk by paying very little cash.  (*See* Ex. 43, Van Court Dep. at 186.)  Plaintiffs do not offer any legal authority or evidentiary support (either by affidavit or otherwise) for the conclusory assertion that it was necessary for Ms. Van Court to have "appraised" the property for her to offer these opinions.  Nor is it enough for plaintiffs to offer a conclusory argument by plaintiffs' ***attorneys*** as to when an "appraisal" is required.

Likewise, other than attorney say-so, plaintiffs offer no support—evidentiary, legal, or otherwise—for their conclusory assertion that it was necessary for Ms. Van Court to know the market value of the Babbs' property in order to state that their development cost did not equal real property value.  Irrespective of the specific numbers assigned to those values, the Babbs' property suffered from functional inutilities (such as the lack of a house) which Ms. Van Court highlighted in her expert report.  (Ex. 42, Van Court Report at 19–21.)  Furthermore, she stated both in her report and her deposition that Mr. Babb's development list included items that are not considered "real estate costs," such as corral panels (which were, in fact, specifically excluded form the Amen's contract to purchase the Babb property).  (*See* Ex. 43, Van Court Dep. at 196–98; Ex. 42, Van Court Report at 20.)

***Fourth***, and finally, plaintiffs' argument that "Ms. Van Court's opinion about Ms. Cook's alleged debts . . . is also inadmissible" (Ex. 42, Van Court Report at 25) should also be rejected.  Ms. Van Court's opinion that Ms. Cook's property was "overencumbered" has sufficient factual support.  As she stated in her deposition, there were no bases for Ms. Cook's claims of personal property value.  (Ex. 43, Van Court Dep. at 174 ("There were no appraisals backing

those up.  There was a claim of value for her horses which … were not at all substantiated."); *id.* ("[T]here were appraisals that were poorly supported and evidence of continued borrowing."); *id.* at 176.)  Ms. Van Court is a real estate appraiser and is competent to review and comment on others' appraisals (or lack thereof), as she did.

Plaintiffs claim that "Ms. Van Court had no idea how much debt Ms. Cook was carrying in 1989."  (Pls.' Mem. at 25.)  In fact, in response to the question "How much did the banks lend [Ms. Cook?]," Ms. Van Court testified that she could not "report how much."  (Ex. 43, Van Court Dep. 175–76.)  But while Ms. Van Court could not specify precisely how much Ms. Cook was lent by banks, she specifically noted in her reported that "Cook owned well over $600,000." (Ex. 42, Van Court Report at 14.)  It was not necessary for Ms. Van Court to know the ***exact*** amounts of Ms. Cook's debts or property to opine that a debt of more than $600,000 overencumbered a property whose value was unsubstantiated.

For the foregoing reasons, plaintiffs' motion to exclude several of Ms. Van Court's opinions should be rejected.

## XII.   MS. SMART'S TESTIMONY IS RELIABLE AND ADMISSIBLE.

Ms. Geneva Smart is a certified appraiser and real estate broker who has appraised or reviewed the appraisals of more than 5,000 homes in the counties surrounding the Rocky Flats plant.  Ms. Smart is also a real estate and appraisal educator who has written several course and seminar offerings.  In connection with this case, Ms. Smart undertook a thorough investigative process, which included examination of area maps, depositions of the plaintiffs, appraisals of homes, the Denver and Jefferson County MultiList Services, and Jefferson County Assessor Records.  Ms. Smart also relied on visual observations; telephone interviews with the Jefferson County Assessor's Office, Mapping Office, and School Administration; and discussions with real estate agents and appraisers.  As a result, she prepared a report entitled "Report on Value

Influences on Residential Real Estate in Northeast Jefferson County," wherein she concluded that "there is nothing to indicate that Rocky Flats has had any negative value impact" on a number of specific properties, including those of the named plaintiffs.  (*See* Ex. 47, Smart Report at 14.)  Plaintiffs' motion to exclude Ms. Smart's testimony should be denied for several reasons.

*First*, plaintiffs challenge Ms. Smart's report based on unsubstantiated charges of "pervasive bias," (Pls.' Mem. at 27), using only their own conclusory allegations as support for this allegation.  Plaintiffs' brief begins with the contention that "Ms. Smart designed her inquiry to reach a pre-determined conclusion," followed by their assertion that Ms. Smart's opinion was formed before she began her work.  (*See* Pls.' Mem. at 26.)  Plaintiffs claim that, as a result, Ms. Smart's testimony suffers from a "pervasive bias."  (*Id.* at 27.)

Once again, plaintiffs confuse the admissibility of the evidence with the sufficiency or weight of the evidence.  Accusations of a witness' bias go to the *weight* of the evidence, *not to its admissibility*.  *See* 4 Weinstein's Federal Evidence § 702.06[8] at 702-59 (Joseph M. McLaughlin ed., 2d ed. 2000) ("*An expert witness's bias goes to the weight, not the admissibility of the testimony, and should be brought out on cross-examination*.") (emphasis added); *United States v. Ewell*, 252 F. Supp. 2d 104, 115 (D.N.J. 2003) ("Defendant's sole objection appears to be that, in light of the role the FBI has played in developing forensic technology, the Government's expert is biased in favor of the FBI. . . .  Questions of bias go to the credibility and weight of the evidence rather than its admissibility.") (emphasis added); *DiCarlo v. Keller Ladders, Inc.*, 211 F.3d 465, 468 (8th Cir. 2000) ("The DiCarlos object to the testimony of Jon VerHalen, Keller's expert witness.  They claim that VerHalen's testimony was unreliable because he was biased in favor of Keller.  Determining the credibility of a witness is the jury's province, whether the witness is lay or expert.")  Assuming *arguendo* that plaintiffs were correct

that Ms. Smart's opinions suffer from "pervasive bias" (Pls.' Mem. at 27), plaintiffs could attempt to bring out Ms. Smart's bias "on cross-examination."  4 Weinstein's Federal Evidence § 702.06[8] at 702-59 (Joseph M. McLaughlin ed., 2d ed. 2000)

*Second*, plaintiffs criticize Ms. Smart for reviewing (1) appraisals "selected for her by the attorneys for the defendants" (Pls.' Mem. at 26–27); and (2) other sources not selected by the attorneys for the defendants, but (according to plaintiffs' conclusory assertion) "designed to give the appearance of having conducted research, rather than to yield useful information."  (*Id.* at 26–27.)  As an initial matter, plaintiffs cite no authority for the proposition that where *some* of an expert's reliance materials were selected by attorneys, that expert's testimony must be excluded under *Daubert*.  The more pertinent question is whether the information reviewed by the expert represent a fair, adequate, and balanced sampling of the relevant universe of data.  Plaintiffs do not—and could not—claim that the appraisal data reviewed by Ms. Smart were one-sided or inadequate.[22]

In any event, as discussed above, plaintiffs concede that Ms. Smart also gathered data on her own—including through interviews with governmental officials, a review of individual plaintiffs' properties, and interviews with appraisers.  (Ex. 47, Smart Report at 2, 10, 11.)  Plaintiffs attack this work by questioning Ms. Smart's motives—plaintiffs baldly claim that the data gathered by Ms. Smart "designed to give the appearance of having conducted research, rather than to yield any useful information."  (Pls.' Mem. at 27.)  Plaintiffs offer no basis for their divination of Ms. Smart's purposes in conducting this work, other than to harken back to

---

[22] Plaintiffs acknowledge that Ms. Smart reviewed roughly 100 appraisals.  (*Id.* at 26.)  Plaintiffs do not attempt to show that this sampling of appraisals in any way biased Ms. Smart's conclusions, or that some other number or sampling of appraisals would have better served her inquiry. (*See id.* at 26–27.)

charges of "bias." (*Id.*) Again, however, bias is an issue for the trier of fact, not an issue that goes to admissibility under *Daubert*.

**Third**, plaintiffs claim that the "[i]n the majority of instances in which [Smart] consulted an outside source, her work was grossly inadequate." (*Id.*) But plaintiffs' argument in this respect is based on misrepresentations of Ms. Smart's deposition testimony. Plaintiffs cite pages 143–44 of her deposition for the following parenthetical: "Jefferson County mapping office; asked only for maps." (*Id.*) In fact, at those pages Ms. Smart states that she purchased two copies of a map of the area from that office. At her deposition, Plaintiffs asked Ms. Smart no questions regarding what else Ms. Smart "asked for" or inquired about, and Ms. Smart gave no answers even implying that she either had or had not inquired about Rocky Flats. Plaintiffs likewise cite pages 147–50 of the deposition for the following parenthetical: "Jefferson County Assessor's Office; asked only if the assessor treats the class area differently for tax purposes." (*Id.* at 27.) Again, in the actual deposition transcript there are no questions from plaintiffs, and no answers from Ms. Smart, indicating that the question plaintiffs cite was in fact the **only** one Ms. Smart asked of the assessor's office.

**Fourth**, plaintiffs contend that "[b]y her own admission, Ms. Smart's methodology was not capable of reaching any reliable conclusion about the property value effects of Rocky Flats." (*Id.* at 28.) In support of this argument, plaintiffs contend that "when pressed, she was unable to conclude that Rocky Flats had caused property values to go up." (*Id.* at 28 (*citing* Smart Dep. at 175–76).) Plaintiffs' argument is not candid. Ms. Smart's opinion, which is clearly set forth in her report, is that "[t]here is nothing to indicate that Rocky Flats has had **any negative** value impact on any of these properties." (Ex. 47, Smart Report at 14 (emphasis added).) Plaintiffs'

argument that Ms. Smart did not express an opinion in her deposition about a ***positive*** impact from Rocky Flats is unconvincing.

## XIII.   CONCLUSION

For the foregoing reasons, plaintiffs' motion to exclude testimony of certain defense expert witnesses should be denied in all respects.

Dated: July 11, 2005                                 Respectfully submitted,


                                                     /s/Joseph J. Bronesky_____
                                                     Joseph J. Bronesky
                                                     SHERMAN & HOWARD LLC
                                                     633 Seventeenth Street, Suite 3000
                                                     Denver, CO  80202
                                                     (303) 297-2900

                                                     David M. Bernick
                                                     Douglas J. Kurtenbach
                                                     KIRKLAND & ELLIS LLP
                                                     200 E. Randolph Drive
                                                     Chicago, IL 60601
                                                     (312) 861-2000

                                                     Attorneys for Defendants ROCKWELL
                                                     INTERNATIONAL CORPORATION and THE
                                                     DOW CHEMICAL COMPANY

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on July 11, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

       Merrill Davidoff, Esq.
       Peter Nordberg, Esq.
       Berger & Montague, P.C.
       1622 Locust Street
       Philadelphia PA 19103-6365

       Gary B. Blum, Esq.
       Silver & DeBoskey
       The Smith Mansion
       1801 York Street
       Denver, Colorado  80206

                   /s/Sharon Brookshire