**EXHIBIT 1**

# REPORT OF
# JOHN D.
# DORCHESTER, JR.
# FOR THE
# ROCKY FLATS
# LITIGATION

NOVEMBER 22, 1996

THE DORCHESTER GROUP, L.L.C.
7650 E. REDFIELD / SUITE D-7
SCOTTSDALE, ARIZONA 85260
(602) 596-8393

**The Dorchester Group, L.L.C.**

From available data it appears that the issue to be addressed is whether or not there is any evidence of systematic real property value diminution, or other economic harm to real property after June 7, 1989 which is attributable to operations of the Rocky Flats Plant.

Plaintiffs have made assertions regarding property damages but have furnished little information to support their claims. We expect to receive one or more expert reports from plaintiffs as a part of pre-trial discovery and believe we will be asked to rebut anything with which we may disagree. Depending upon what these reports contain, our response may require additional research and analysis.

**General Scope of the Engagement**

Beginning in 1993, we were asked to research property matters and to determine whether there was a basis for plaintiffs' claims that real property in the property class area had been economically harmed by operations and management of the Rocky Flats Plant. If relevant data indicated that compensable damages were due to the plaintiffs, we were then to estimate such damages.[6] We were also asked to provide advice and counsel to the trial team regarding general investigations of the real property issues, factual investigations, and trial preparation.

We were also asked to review and critique plaintiffs' real estate experts' work once it becomes available. Their work is not available to us as of the date of this report. If asked, we also intend to give testimony regarding our opinions.

To more fully understand the Rocky Flats story, it is necessary to study many historical facts. Accordingly, our services are partially retrospective and involve a good deal of historical analysis.

**Individual and Company Qualifications**

The author of this report is John D. Dorchester, Jr., MAI, CRE. I am a Member of The Dorchester Group, L.L.C., ("TDG") an Arizona limited liability company. My experience in real estate valuation dates back more than 45 years. I hold the MAI ("Member Appraisal Institute") designation of the Appraisal Institute and the CRE ("Counselor of Real Estate") designation of the Counselors of Real Estate. I have a Masters Degree in Land Economics, with specializations in urban development and planning. In 1981-82, I served as the national president of the American Institute of Real Estate Appraisers (now called the Appraisal Institute) and have served

---

[6] "Damages" are more properly referred to *as economic harm to real property*.

**The Dorchester Group, L.L.C.**

on the International Valuation Standards Committee since its founding in 1981.

My experience with environmental issues dates from at least the late 1970s. Most recently, my firm and I were principal real estate consultants to the Exxon trial team in the Exxon Valdez oil spill matters in Alaska.

My curriculum vitae is included as Appendix A and includes a list of publications I have authored over the past ten years. Appendix B contains a list of testimony I have given as an expert at trial or by deposition within the preceding four years.

**Purpose of the Report**

This report is written with the following specific objectives:

1. To set forth a description of our work relating to plaintiffs' property claims;

2. To explain the research program and the principal data, reasoning, analyses, and conclusions that are involved in our analyses;

3. To provide a foundation for understanding how research and analysis associated with plaintiffs' economic harm to real property assertions should be performed; and conversely, to comment upon less reliable or unacceptable practices that are sometimes suggested by others;

4. To establish a supportable basis for any damage estimates and related compensation determined from our research to be appropriate; conversely, to show why such compensation is not appropriate for any properties or groups of properties found from our research not to warrant compensation.

Because of the historical nature of substantial portions of our study, and because we were not permitted by the rules of the litigation to have direct conversation with named plaintiffs or members of the litigation class, we have sought information from diverse sources and have attempted to find verifying sources where possible. A statement of contingent and limiting conditions associated with our work is contained as Appendix C.

**Organization of the Report**

This report provides the following:

1. Chapter 1: An introduction to the nature of the property claims, the property in question, and our services;

2. Chapter 2: An historical overview of the Rocky Flats Plant and its operations;

3. Chapter 3: An explanation of a number of technical and procedural matters that are customary to discovering and quantifying

**The Dorchester Group, L.L.C.**

economic harm that may be associated with plaintiffs' assertions, and a review of the plaintiffs' property-related claims;

4. Chapter 4: A general analysis of the broader Denver community's development since about 1950, with a special focus on those areas more proximate to the Rocky Flats Plant;

5. Chapter 5: An analysis of the Rocky Flats Plant environs from a real estate perspective, with a special focus on historical pricing and market activities;

6. Chapter 6: A consideration of the Representative Plaintiffs' real property claims; and

7. Chapter 7: Our conclusions based on the work we performed.

**The Dorchester Group, L.L.C.**

and was more than one mile from the nearest roadway, Highway 93 to the west. No access existed at that time to the eastern side of the Plant.

The Plant site drains into Woman Creek on the south and into Walnut Creek on the north. Woman Creek flows into Mower Reservoir before leaving the Plant's easterly boundary. Walnut Creek flows into nearby Great Western Reservoir east of the Plant. Figure 2-1, taken from the ChemRisk report, illustrates the site's location and its relationship to surroundings at the time it was selected.

Rocky Flats served as one of what was eventually seventeen plants and laboratories that were owned by the Atomic Energy Commission ("AEC")—now the Department of Energy ("DOE"). The Rocky Flats facility had two basic missions during its operating history. First, it was responsible for manufacturing and rebuilding of triggers ("pits") for nuclear weapons. Second, the Plant was used to reprocess retired weapons for plutonium recovery. These activities involved the purification, processing, machining and preparation of plutonium, uranium, beryllium and numerous other materials.

The boundaries of the Rocky Flats site were expanded to approximately 6,568 acres (10.26 square miles) between 1974 and 1976, with the addition of 4,008 acres as a second buffer zone around the former Plant and buffer lands. A Rocky Flats site plan is shown in Figure 2-2.

In July 1975 the operating contract for the Plant was transferred to Rockwell International Corporation, who continued in that capacity until 1990, when they were succeeded by EG&G. In 1992 production of W-88 warheads for Trident submarine based missiles was canceled, thus effectively ending Rocky Flat's production role in the U. S. weapons complex for the time.

**Economic Impacts and Other Rocky Flats Plant Evaluations**

When the Rocky Flats site was selected it was welcomed by local civic and government officials because it was expected to create more than 2,000 temporary construction job and 1,000 permanent positions.[4] As shown in Figure 2-3, Plant employment actually grew at a relatively steady rate to about 3,800 in 1970. After declining to a low of about 2,700 workers in 1975, employment rose steadily to about 3,800 in 1980 and about 6,000 in 1984. This employment made the Rocky Flats Plant one of the largest employers in the Denver area and exerted a powerful economic influence on the growth and development of surrounding communities.

---

[4] Colorado Council on Rocky Flats. *The Handbook on Rocky Flats*, (Colorado Council on Rocky Flats, January 1993), p. 10.

The Dorchester Group, L.L.C.

Figure 2-3

Employment at Rocky Flats



The economic importance of these jobs is magnified by the high wage rates paid to the Rocky Flats work force, including a high proportion of scientists, engineers, chemists, and other professional and highly skilled jobs. The average annual wage rate at this Plant in 1992 was $43,500.[5] This compares with $26,273 for the Denver CMSA.[6]

Many economic, social, and environmental studies have been published regarding Rocky Flats over its history. Findings from a number of these reports that further an understanding of Rocky Flats' contributions to the area are summarized below:

[5] Colorado Council on Rocky Flats. *The Handbook on Rocky Flats*, (Colorado Council on Rocky Flats, January 1993), p. 14.

[6] U.S. Bureau of the Census. *Statistical Abstract of the United States: 1993* (113ed) Washington D. C. 1993; Table 670, p. 425.

The Dorchester Group, L.L.C.

## Chapter 3: Relevant Analysis Foundations

**Overview**

Plaintiffs in the Rocky Flats litigation claim compensable economic harm to real property due to defendants' operations and management of the Rocky Flats Plant. Regardless of what general or specific assertions may be raised by the plaintiffs' property experts in forthcoming reports, there are a number of foundational issues and methods that should be understood as a background to our work, and as a basis for evaluating the work of the plaintiffs' experts that we have yet to receive.

This chapter provides a survey of matters that are important to the establishment of compensable economic harm, what is known of the plaintiffs' economic harm assertions, possible methodologies that may be used to support such assertions, and the approaches we applied in the work summarized in this report.

**"Damages" and Compensability**

Although the layman's word "damage" is often applied in estimating compensation due from one party to another, the case at hand requires a supportable demonstration that an action or actions of the defendants caused economic harm to the property of the plaintiffs. The concept of economic harm requires an acceptable standard against which such harm can be measured, and from which other possible adverse economic influences that are not attributable to defendants' actions may be discerned.

*Market Value* is a long established standard commonly applied in controversies involving economic harm to property and is the appropriate standard in this litigation. *Market Value* is defined as:

The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. Buyer and seller are typically motivated;

2. Both parties are well informed or well advised, and acting in what they consider their best interests;

3. A reasonable time is allowed for exposure in the open market;

4. Payment is made in terms of cash or in terms of financial arrangements comparable thereto; and,

**The Dorchester Group, L.L.C.**

| | |
|---|---|
| **Tests of Economic Harm** | From a real estate perspective, there are a number of elements that are central to the determination of economic harm to property based on the plaintiffs' assertions: |

1. There must be supportable and reliable evidence that actions of one or more of the defendants (the "cause") resulted in economic harm (the "effect") to plaintiffs' properties.

2. The extent of any such economic harm can be measured as the difference between resulting *Market Values* of plaintiffs' properties and the *Market Value* of the properties if the alleged harm had not occurred. Temporary effects can be measured as a function of a reasonably supported rent loss over time.

3. Any general changes in price levels for plaintiffs' properties due to other factors should be separated from the alleged effect of defendant(s)' actions and are not compensable.

4. The measurement of alleged economic harm should be validated at the individual property level rather than left as general assertions on an area-wide basis.

Other than for property owned by the Representative Plaintiffs, we are unaware of any specific alleged economic harm to a particular property or properties in any of the documents filed with the court by plaintiffs. To the extent that such allegations may be made, the above tests should be applied. We are also unaware of any claims that involve physical damage to property or any relating to clean up or mitigation relating to real estate.

| | |
|---|---|
| **Possible Research Methodologies** | Location is an important issue for consideration in any real estate analysis. Construction of the Rocky Flats Plant preceded the development of the vast majority of properties currently existing in the class area. Thus, proximity to the Plant is a normal condition of the choice of location for the vast majority of the Rocky Flats area residents, and should not be confused by comparison with properties that have different locational characteristics. Thus, analysis of claims will require recognition of the unique underlying characteristics of the markets studied. |

Economic harm to real property, as alleged by plaintiffs, could be indicated through tangible evidence regarding reductions in market values of individual properties, systematic inability to market within a reasonable period, development that is slower or less intense than if factors causing the alleged harm did not exist, unusual or unexpected changes of land uses, a lessening of quality, requirements for accelerated maintenance and repair, direct costs for remediating physical problems, or combinations of these that can be shown to be directly attributable to defendants' actions. The analysis should, therefore, address these issues to the extent that data are available.

**The Dorchester Group, L.L.C.**

Although plaintiffs assert economic harm to property, they have not specified whether these assertions relate to temporary harm, permanent harm, or combinations. Permanent economic harm would require a movement of *Market Values* from a previously higher level to a lower level from which recovery will not occur due to the Rocky Flats Plant operations as the cause. To support this assertion it will be necessary to establish a specific time at which the diminution in *Market Value* occurred. Temporary economic harm will require both a beginning date and an ending date for the alleged economic harm.

Recognizing the need to establish cause and effect relationships in discovering and measuring economic harm, the use of relevant market information to support any such measures, and the avoidance of methods that may result in errors or abuses, a number of possible research methodologies can be briefly reviewed. No attempt is made here to be exhaustive. Instead, we focus on brief comments of representative methods and their applicability.

*Individual Property Analysis*

To establish market support for economic harm at the individual property level, several steps are normally required:

1. Value the property before the alleged damaging event or circumstance;

2. Value the property after the event or circumstance;

3. Separate from any indicated diminution in value those outside factors that contributed to the economic diminution, but were not related to the event or circumstance, leaving an indication of economic harm being measured;

4. Determine whether any diminution in value is temporary or permanent, and analyze the situation accordingly;

5. Consider any other factors that are not included in the above steps, such as costs of repairs or remediation, increased future costs of ownership or maintenance, or the like. (Note, however, that such considerations may already be reflected in the market data already analyzed.)

If as an addition to, or a substitute for, a claim of direct economic harm there is a more indirect claim of harm made on the basis of reduced or lost future opportunity, it is again essential that the analyst be able to establish that any such claim is not already measured in the market data considered in the direct analysis. Thus, the analysis will include:

1. Establish that there is an element of economic harm from the indirect consideration that is not already reflected in other analysis.

**The Dorchester Group, L.L.C.**

2. Establish a base value for the property in question from which it is alleged that economic harm began to occur.

3. Identify a time frame and establish both a "normal" and an actual market pattern that reflects the economic harm as a marginal difference over time.

4. Eliminate from the measurement any differences due to causes outside the alleged economic harm event or circumstances.

5. If the measurements deal with future time periods, discount the figures to a present value indication. (It is also possible to accrue from past periods.)

Basic to these considerations is the notion of relevant market evidence indicating specific economic harm as the effect of an alleged cause. Just as Market Value measures the attitudes of the market at large, the estimate of economic harm (if any) focuses on economic effect from the viewpoint of the market, not a particular owner or individual.

Although individual property analyses should normally result in the most accurate indications of any measurable economic harm, they are also time consuming, expensive, and frequently impractical. Although plaintiff experts may have access to individual plaintiff properties, defendants' experts do not have such access or the opportunity to obtain information from plaintiffs that might be crucial to analysis of an individual property. Further, there is an inordinate cost that would be imposed where large numbers of properties are involved.

*Sample Property Analysis*

To overcome practical and financial obstacles of individual property analysis for large numbers of properties, it is possible to analyze selected sample properties as a basis for judging any economic harm to the larger group. Possible methodologies include:

1. Individual property appraisals, as explained above, performed on a representative sample number of properties rather than all the properties involved in a controversy.

2. Hedonic modeling, in which statistical analyses are performed on properties that have sold, with some measure made of differences that are alleged to have occurred from the damaging event or circumstances.

3. Repeat sales analysis, in which properties that have sold more than once over a studied time period are analyzed to see differences over time; inferences are drawn from the data as to any adverse economic indications over time that may be associated with the damaging event or circumstances.