**EXHIBIT 1D**

The Dorchester Group, L.L.C.

With regard to the latter Figure, the overall percentage difference from peak to valley measures approximately a plus and minus 25 per cent. More importantly, at any particular time the variation was in the order of a maximum of 10 per cent. More commonly it was under five per cent from what would be expected based on consideration of only long term and internal cyclical trends over time. Figure 5-27 illustrates the results from calculations shown in Figures 5-25 and 5-26. Differences between the red long-range trend line and the black price line measure the remaining price variations between the longer range trend and the prices that are not explained by time series analysis alone. The absence of "shocks" indicates there is apparently no significant price change effect in evidence.

Similar calculations were performed for central Jefferson County, Golden, the city of Broomfield outside Jefferson County, and the property class area. Figure 5-28 illustrates results for the property class area and can be compared with Figure 5-27. Data for each of these areas and a graphic showing the pattern of average annual prices for each area are included in Appendix L. The specific patterns for each area tested vary somewhat with influencing factors, but similar conclusions can be drawn for each area. First, prices in each area are highly correlated with the time series trends. Statistically we can say that the time series analysis explains about 98 or more per cent of the variations in average price within a standard error equal to about 10 per cent of the average price. Second, for the class area there are no spikes denoting significant average price shifts connected with major events at Rocky Flats, including the June 7, 1989 FBI raid.

There is an increase in prices above the time series forecast for the early 1970s, a decline between 1974 and 1978 during a period of economic recession, average price increases to 1980 during an inflationary period, price decreases thereafter to 1982 during a period of double-digit mortgage interest rates, a general increase to 1987 during a period of economic expansion, price decline to 1991 during another recessionary period, followed by an economic recovery.

Notably missing from these graphs is any evidence of a downward spike following the June 7, 1989 date. Price fluctuated upwards about seven per cent during 1989, reflecting both an upward and downward swing during the last six months of the year. Between January 1990 and the last quarter of 1991, prices fluctuated within a range of only two or three per cent of the time series expectation.

The time series price differences for each of the areas studied are combined into Figure 5-29. Similarities in the long range trends for each of these areas is obvious despite the relatively small individual differences.



Figure 5-27
Time Series Prices: Long Range Trend vs. Trend Adjusted Prices, Denver Area

Source: Denver MLS and TDG



Figure 5-28
Per cent Difference Between Actual and Trendline and Cycle-Based Forecast of Mean Prices in the Metropolitan Area: 1973-1994

Source: Denver MLS and TDG



Figure 5-29
Time Series Per cents: Actual vs. Estimated Trend in Prices, Selected Areas

The Dorchester Group, L.L.C.

**Aerial Photo Study**   Aerial photographs of the Rocky Flats environs were obtained for a number of years beginning in 1952. We examined the locations, type, and extent of development for a series of time frames to better understand the development reflected in other data we collected. Examples of these aerial photos are included as Appendix M.

These examinations confirm the continued growth of the Rocky Flats area throughout the time period of our studies as set forth in the data we have discussed.

**The Dorchester Group, L.L.C.**

Pricing trends for the Denver metropolitan area as a whole and Central Jefferson County are shown in Figure 5-21 With these average annual prices as a foundation for comparison purposes, we continued these analyses to the Rocky Flats environs of northern Jefferson County and to the property class area.

The purpose of our pricing analysis was first to examine each of the analysis areas to determine average price variability over time. By looking at each area separately, we can calculate the magnitudes of change over time and compare these changes with those that should be expected to occur with normal market shifts over time. Any unexplained variations provide indications that an abnormality, such as adverse economic effects of a contaminating situation or event, may have occurred. The extent of that adverse effect would also be expected to be contained within, but not necessarily constitute all of the unexpected variation.

Figure 5-22 illustrates how this concept would apply in a hypothetical situation and provides a foundation from which our actual analyses can be better understood. Assume for our example that the plotted line is average price in a study area over a number of years. Price is shown on the up and down scale (the Y-axis) and time in years is shown along the base line (the X-axis). Between time A and time B, prices vary from year to year, increasing for several years, then decreasing for several years, then increasing to time B.

At time B a dramatic and uncharacteristic stimulus increases average price, continuing to time C. This aberration is obviously not in keeping with the area's history, and its increased level is maintained for only a short period until prices drop back to a more normal level. After a brief period between time C and D, a significant decline in average price occurs signaling another unusual situation, then returns to the more normal level at time E, continuing from there more normally to time F. Without other information we cannot explain either the B-C time or the D-E time, but the diagram permits us to visually locate significant changes that merit closer study. If a major economic harm situation developed, it would result in a downward movement of the average price line as shown for the D-E period.

The second reason for these calculations is that they also permit us to make comparisons among the areas analyzed. Comparisons between and among different areas allow us to further examine the extent to which a change in a given area is generally experienced in other areas. Real estate markets are sufficiently independent to have expected variances which are not necessarily representative of other markets, but general real estate cycles and other common trends can be found so as to differentiate possible aberrations. Again, these unexplained aberrations could indicate possible market departures attributable to economic harm.

The Dorchester Group, L.L.C.

With regard to the latter Figure, the overall percentage difference from peak to valley measures approximately a plus and minus 25 per cent. More importantly, at any particular time the variation was in the order of a maximum of 10 per cent. More commonly it was under five per cent from what would be expected based on consideration of only long term and internal cyclical trends over time. Figure 5-27 illustrates the results from calculations shown in Figures 5-25 and 5-26. Differences between the red long-range trend line and the black price line measure the remaining price variations between the longer range trend and the prices that are not explained by time series analysis alone. The absence of "shocks" indicates there is apparently no significant price change effect in evidence.

Similar calculations were performed for central Jefferson County, Golden, the city of Broomfield outside Jefferson County, and the property class area. Figure 5-28 illustrates results for the property class area and can be compared with Figure 5-27. Data for each of these areas and a graphic showing the pattern of average annual prices for each area are included in Appendix L. The specific patterns for each area tested vary somewhat with influencing factors, but similar conclusions can be drawn for each area. First, prices in each area are highly correlated with the time series trends. Statistically we can say that the time series analysis explains about 98 or more per cent of the variations in average price within a standard error equal to about 10 per cent of the average price. Second, for the class area there are no spikes denoting significant average price shifts connected with major events at Rocky Flats, including the June 7, 1989 FBI raid.

There is an increase in prices above the time series forecast for the early 1970s, a decline between 1974 and 1978 during a period of economic recession, average price increases to 1980 during an inflationary period, price decreases thereafter to 1982 during a period of double-digit mortgage interest rates, a general increase to 1987 during a period of economic expansion, price decline to 1991 during another recessionary period, followed by an economic recovery.

Notably missing from these graphs is any evidence of a downward spike following the June 7, 1989 date. Price fluctuated upwards about seven per cent during 1989, reflecting both an upward and downward swing during the last six months of the year. Between January 1990 and the last quarter of 1991, prices fluctuated within a range of only two or three per cent of the time series expectation.

The time series price differences for each of the areas studied are combined into Figure 5-29. Similarities in the long range trends for each of these areas is obvious despite the relatively small individual differences.

The Dorchester Group, L.L.C.

litigation. The study was not intended to be a comprehensive real estate analysis, but it appears that the scope of their studies and inquiry would likely have found and commented upon adverse real estate effects, and would have cited such comments from those they interviewed, if they had existed.

The OU-3 study, although completed after the effective date of the Rocky Flats litigation, notably ties together previous scientific inquiry and supports previous scientific conclusions that Rocky Flats health hazards to the public are less than the risks of everyday life. Even the risks of major catastrophe were considered deminimus.

According to materials produced by the plaintiffs, Mrs. Cook allowed testing to be performed on her property and no health hazard was found. The Schierkolks have not performed any testing and do not know of any contamination on their property. We understand that the same is true for the Bartletts and the Babbs. The Representative Plaintiffs for the medical monitoring class do not claim any economic harm to real property.

Claims of economic harm for the Bank Western and Field Corporation properties are general and do not give a specific basis for us to analyze. We reserve the right to make more extensive response regarding their claims, and those of other plaintiffs, once they are fully stated.

**Results of the Research and Analysis Program**

In addition to the background research and analysis reflected above, we performed a series of studies set forth in Chapter 3 and explained in subsequent chapters. Because we do not have access to the plaintiffs' experts reports, we cannot at this time respond to any specific assertions they may make, but intend to do so if asked. Such response may require additional analyses and expansions of the work we have completed to date.

The following discussions briefly summarize and conclude upon various elements of our research program.

*Analysis of Urban Development*

Our research looked closely at the patterns of historical development in the Denver metropolitan area, its quadrants, the northwest quadrant in particular, and the Rocky Flats environs of northern Jefferson County. The patterns that developed appear reasonable and understandable, and do not evidence a reluctance of the market to develop towards or in proximity to the Rocky Flats plant. To the contrary, development in the Rocky Flats environs has outperformed many other areas' development in the Denver metropolitan area.

There are persuasive reasons why development in the Rocky Flats environs could have been less than what actually occurred over time. Development constraints, proximity to a major industrial complex, and

Case No. 1:90-cv-00181-JLK   Document 1398-6   filed 07/11/05   USDC Colorado   pg 10 of 18

The Dorchester Group, L.L.C.

Analysis of transaction frequencies by years also aided in understanding overall trends and the market histories for each area studied. From these analyses we found no subdivisions that appeared to have suffered a significant departure from normal market changes.

*Analysis of Prices and Other Value Indicators*

Pricing analyses were conducted for the Denver metropolitan area, areas of Jefferson County away from the Rocky Flats environs, and the property class area. We also compared these results with reviews of the pricing trend histories for each of the subdivisions we studied.

These studies provided statistical definition for what was observed visually. We found by plotting trends in average sales prices that there were no observable "shocks" that would evidence significant changes in pricing which might be attributable to economic harm. Instead, variations in price for the areas studied were closely related to time trending and were comparable among the various areas studied. These studies reject the notion of area-wide or market-wide economic harm to real estate in the Rocky Flats environs and in the property class area.

The combination of price growth over time, as seen from the average annual rates of price increase in our subdivision analyses, and the rate of development in the Rocky Flats environs, combine to confirm a picture of an area that is not significantly affected by economic harm attributable to Rocky Flats operations or other such causes.

**Consideration of Representative Plaintiffs' Specific Claims**

Although we alluded to the uniqueness of the Representative Plaintiff properties earlier, we believe the character of their properties bears special mention before more detailed analysis of the Representative Plaintiffs' allegations of economic harm.

The Bank Western and Field Corporation properties are apparently offered as representatives for other members of the property class who may have suffered income losses due to alleged economic harm. Because each of these properties was, as of June 7, 1989, an undeveloped property, it does not appear reasonable that they could be compared with office buildings, shopping centers, apartments, or other improved land uses that are producing income streams. Even if the claim of these two Representative Plaintiffs is that the income loss is attributable to lost income opportunities because Rocky Flats operations somehow reduced or eliminated their development potential, each of the properties is so unusual that even a direct comparison between the two properties would be difficult.

It is also possible that some or all of the remaining Representative Plaintiffs in the property class may claim that they suffered an income loss attributable to either a lost development opportunity or to losses in their businesses such as horse farm operations. Again, these do not reasonably

Page 7-6

**The Dorchester Group, L.L.C.**

compare with residential, commercial, or industrial income-producing properties such as those on Wadsworth Parkway or in the Interlochen project for example. Similarly, the Field Corporation and Bank Western properties are not directly comparable with those of the other Representative Plaintiffs. Thus, from a real estate perspective, we find no basis in the plaintiffs' claims that any economic harm that might be found on the properties of the Representative Plaintiffs can, by comparison, be extended to the remainder of the property class.

*Merilyn E. Cook*

It appears that Mrs. Cook's claim relates solely to the 12-acres at 14088 West 96th Avenue owned on June 7, 1989. Prior to that time Mrs. Cook had been an active market participant in the purchase and sale of Rocky Flats area lands dating back to at least 1975. These activities, and her interaction with others, provided her with significant market experience and, presumably, market knowledge.

There is a good deal of record regarding Mrs. Cook's real estate activities prior to June 1989. Mrs. Cook says that she makes no claims that Rocky Flats operations caused economic harm to any of her properties other than the 14088 W. 96th Avenue property. It is significant, however, to observe that of the six approximately 12-acre segments that were originally a part of the property Mrs. Cook owned at the southeast corner of 96th Avenue and Indiana Street, three were foreclosed upon and one was sold to Mr. and Mrs. Babb. If Rocky Flats were not a problem prior to June 1989, it is difficult to understand why, without more specific evidence, after four foreclosures on other portions of her land, Rocky Flats would suddenly be a source of economic harm after June 7, 1989.

Our economic studies show that in general the Rocky Flats environs reached the bottom of an economic downturn in 1988-1989. Rural and semi-rural properties are commonly the first to be adversely affected in periods of general market downturn and usually lag behind more urban properties when economic recovery occurs.

It is not at all unlikely, therefore, that if one were experiencing personal economic difficulties in 1988-1989 and needed to look to a sale of the 12-acre Cook property in June 1989 to satisfy real property or other debt, buyers might be scarce and prices would be less favorable than those in better market periods.

It is also not inconceivable that certain prospective purchasers, or "lookers" as some are called in the real estate trade, might cite Rocky Flats as a basis for their not purchasing a property. Market downturns tend to encourage some individuals to look for properties owned by people who are economically distressed under the adage, "buy low and sell high." Casual or anecdotal information about possible prospects

**The Dorchester Group, L.L.C.**

for purchases are difficult to assess in any market conditions. In the absence of actual offers, the ability to interview those involved, and a more specific analysis of the market for the property at the time of such offer, the information available to us can only be considered speculative.

Mrs. Cook's property has apparently been tested for contamination and was found to have no indication of a health hazard. This disclosure could, and should, have been made to any serious purchaser. Sufficient information was available for a serious purchaser, or their representative, to ascertain that Mrs. Cook's property could have been used for any use permitted by zoning. Thus, there is no apparent reason why an informed buyer could not have purchased the Cook property in a normal market transaction with a normal market price for the property.

Without evidence to the contrary, and in the light of the other studies we performed, we can find no basis to determine that Mrs. Cook suffered economic harm to her real property at 14088 W. 96th Avenue after June 7, 1989 as a result of Rocky Flats operations.

Except for the property-specific details cited above for Mrs. Cook, the general market observations explained for Mrs. Cook's property also apply to the other property class plaintiffs.

*William H. and Delores B. Schierkolk*

Mr. and Mrs. Schierkolk have appraisals that were made of their property in 1978, 1983, and 1993. None reflects any negative influence on the value estimate of their approximately 3.9-acre property at 9445 Alkire Street because of Rocky Flats operations.

These appraisals show a price growth between 1978 and 1993 of over $80,000, and a compound annual rate of price increase of over four per cent for this period. The earliest appraisal was at a time that overall prices were just beginning an increase into the 1980s. The 1983 valuation was made when average prices had climbed substantially and were above the longer range trend for the period. The 1993 valuation, with shows little increase over 1983, is consistent with the general pattern of semi-rural prices over the 10 year period.

The Schierkolks' stated basis for their property damage was not supported by any empirical data or professional studies. Their estimate of nearly $275,000 for their property is substantially above valuations before and after the June 1989 analysis date, and appears well above the expected price trend that resulted from our other studies. For this price to be realistic, the Schierkolks would likely have had to make substantial improvements beyond what the records indicate they

The Dorchester Group, L.L.C.

actually made and the market would have to recognize at least a portion of this cost as added property value.

Without evidence to the contrary, and in the light of the other studies we performed, we can find no basis to determine that Mr. and Mrs. Schierkolk suffered economic harm to their real property at 9445 Alkire Street after June 7, 1989 as a result of Rocky Flats operations.

*Richard and Sally Bartlett*

Mr. and Mrs. Bartlett's property at 8895 Alkire Street was appraised at various times before and after June 1989. A 1987 appraisal apparently valued existing real property at about $360,000, citing $12,000 per acre as the value for unimproved land. (These numbers do not include an allowance which was made in the appraisal for proposed improvements). Improvements were added at a cost of about $165,000 in 1987. A 1990 appraisal also used a $12,000 per acre figure and stated that the market had been flat over the previous two years.

Each of the Bartletts is experienced in the real estate industry. There was apparently no particular basis for their selecting an asking price of $675,000 when they decided to sell their property. They reportedly listed all or part of the property for sale, but without success. They produced several examples of possible buyers who cited Rocky Flats as a reason for not purchasing their property. However, their examples do not include any actual contract offers.

Mr. Bartlett used the refusal of five banks to make a loan on the property as a partial support for his claim in this litigation. However, it appears that the Bank of Denver cited too little cash flow and not enough property value as the reasons for not making a loan. No mention was made of an adverse economic effect due to Rocky Flats. Additionally, Mr. Bartlett did obtain a bank loan on the property in the fall of 1989, shortly after the June FBI raid.

The Bartletts' property has extensive improvements, but the main house is situated at the rear of the property. This complicates the sale of portions of the property closer to Alkire. Such a sale must either restrict how any future development of the front 7-acres would occur, or risk having the current rear-property home located behind another house. This is not to say there is no solution for these difficulties, but the property and its analysis are more complex because of these issues. Full detailed analysis of the property should also deal with the issue of the improvements possibly constituting an overimprovement of the land.

From the records it appears that the Bartletts have spent approximately $455,000 or slightly more on the Alkire property. Land was acquired

**The Dorchester Group, L.L.C.**

in 1977 for $55,000. About $200,000 was spent in improvements for the rear three-acres. Approximately $165,000 was spent for a horse stable and arena on the front portion of the property in 1987, and a double-wide home was added in 1989-1990 for $35,000.

The most significant evidence as to possible price changes for this property appears to be the two appraisals which surround the June 1989 date. As was true for most of the remainder of the market, the appraisals reflected little, if any, change in value over the 1987 to 1990 period.

Without evidence to the contrary, and in the light of the other studies we performed, we can find no basis to determine that Mr. and Mrs. Bartlett suffered economic harm to their real property at 8895 Alkire Street after June 7, 1989 as a result of Rocky Flats operations.

*Lorren and Gertrude Babb*

Mr. and Mrs. Babb's property is located at 14208 W. 96th Avenue. Like Mrs. Cook, the Babbs did not live on the property involved in this litigation. Their 1985 purchase of the property is considered to have had a price of $128,000. The property was purchased from Mrs. Cook, another Representative Plaintiff.

In 1989 the property was offered for sale at $200,000 after spending about $70,000 on the property. The property was sold in June 1990 for approximately $137,000 after a complex title problem involving their former daughter-in-law. The records also show that the Babbs believe the property was not well managed as a horse farm, a factor that could have significant effect on its marketability.

The period in which this property was sold by the Babbs was near the bottom of the mid- to late-1980s economic downturn. Detailed analysis of the property would be required to determine whether the improvements made to the property were appropriate, or whether they might constitute overimprovements.

Rocky Flats was apparently not an issue for the Babbs when they purchased the property, and there is no indication of general market price change or property contamination to warrant a claim of economic harm due to Rocky Flats operations. The Babbs have anecdotal information to suggest marketing difficulties when they decided to sell, but no written documentation that permits further study. Additionally, the timing for a sale of this type property in 1989-90 was ill-timed for general market conditions at that time.

It appears that the Babbs relied on information supplied by Mrs. Cook, the seller, in determining the price they paid for the property, and may be relying on information they believe they received from Mr. Bartlett to judge an economic loss. Mr. Bartlett did not confirm their

The Dorchester Group, L.L.C.

recollection that he had suggested their property would sell for $30,000 per acre if it were not for Rocky Flats, and this figure is not supported by actual professional appraisals, some which considered the Rocky Flats proximity in their analysis.

Without evidence to the contrary, and in the light of the other studies we performed, we can find no basis to determine that Mr. and Mrs. Babb suffered economic harm to their real property at 14208 West 96th Avenue after June 7, 1989 as a result of Rocky Flats operations.

*Bank Western*

Bank Western apparently owned a security interest in a parcel known as the Bank Western property. As a major security holder, the bank could enter into any of a number of possible transactions to solidify or improve their security, but those steps are separate from the underlying property and must look to the underlying property for the ultimate protection of the security interest. We will, therefore, deal with Bank Western's interest as a real property matter without regard to separate security issues.

The Bank Western property contains about 355 acres and is substantially larger than the vast majority of others in the property class area. It has irregular shape and is divided into two adjacent parcels separated by easements and the Broomfield water treatment plant. The property is adjacent on two sides to the Walnut Creek subdivision which was the first filing of a PUD that earlier included the Bank Western property.

Significant development problems were in evidence for this property long before the FBI raid. The first PUD filing, Walnut Creek, was relatively slow to develop. Its prices have performed well over time, but the average has been boosted by extending development over the period of the area's price growth, moving the average upwards over time by building more expensive homes.

We understand that to obtain annexation, the property may have been required to commit to paying for portions of off-site water and/or other utility costs. This is an additional financial burden that would be an important factor in developmental analysis.

Plans for Interstate W-470 which were included in the Jefferson Center Comprehensive Development Plan elements approved in August 1989 showed an expressway path that would pass through, or near, portions of the Bank Western property's western portions. Although this possibility would be attractive for some land speculators, it also creates further highest and best use questions for the remaining lands. The location of W-470 has been debated for some time, but would have

The Dorchester Group, L.L.C.

been viewed as a distinct possibility for the Bank Western property as of June 1989.

We do not have sufficient facts at this time to perform a highest and best use study for this property, but see no reason why any circumstance related to Rocky Flats would have changed that determination as of our study date. More important, in addition to the expressway issue, are the series of basic physical and economic issues faced by any developer of the site.

Without evidence to the contrary, and in the light of the other studies we performed, we can find no basis to determine that the Bank Western real property suffered economic harm as a result of Rocky Flats operations.

*Field Corporation*

Bank Western retained the rights to participate in the Rocky Flats litigation when the Field Corporation property was sold. The property, now in Boulder County's open space program, has serious development problems further complicated by the property's location divided between two Counties and resulting in jurisdictional issues that would cloud development planning.

Based on our review of the record and exhibits produced in pre-trial discovery, we do not see that Rocky Flats posed any problems for this property's development following the June 1989 analysis date. Sufficient data were apparently available as of that date to allow any reasonable land use permitted by zoning to occur if it were economically feasible.

Without evidence to the contrary, and in the light of the other studies we performed, we can find no basis to determine that the Field Corporation real property suffered economic harm as a result of Rocky Flats operations.

*Medical Monitoring Representative Plaintiffs*

In addition to the Representative Plaintiffs in the property class, we also reviewed the depositions and exhibits of Representative Plaintiffs in the medical monitoring class. These included Michael Dean Rice, Thomas L. and Rhonda J. Deimer; and Stephen M. and Peggy J. Sandoval.

None of these individuals as class representatives claimed that there was any property damage or other economic harm to their properties. To the contrary, Mr. Rice said his home and the entire area were going up in value. The Deimers expressed concern over neighborhood problems that have nothing to do with Rocky Flats. Mrs. Sandoval

**The Dorchester Group, L.L.C.**

said that the enjoyment of their property was not affected in any way by Rocky Flats.

Without evidence to the contrary, and in the light of the other studies we performed, we can find no basis to determine that the Representative Plaintiffs in the medical monitoring class suffered economic harm as a result of Rocky Flats operations.

**Conclusions Regarding Elements of Economic Harm**

Portions of our work were designed to find any economic harm that could reasonably be attributed to Rocky Flats as its cause and, if such discovery occurred, to measure the economic harm suffered. Our research did not discover any area-wide or market-wide economic harm attributable to Rocky Flats. Closer consideration of individual properties owned by Representative Plaintiffs was also unable to discover economic harm.

To the contrary, our research indicated that Rocky Flats has been a positive factor in historic growth and has been a significant element in inducing more rapid growth of the Rocky Flats environs than might have occurred had the Plant not been built. We can only speculate as to what other land uses might have developed in this area if Rocky Flats had not been built, but the principal evidence indicates that the Rocky Flats vicinity would either have attracted another large-scale industrial plant or would have been involved for years in Jefferson County's struggle between developing certain lands while retaining open space on others.

Without the Rocky Flats Plant, it is likely that the absence of economic benefits generated by the Plant, which were a significant factor in the area's growth, would have slowed development from the pattern that actually occurred. This is principally because Rocky Flats existed as an attracter of development prior to the area's improved access and the extension northward of the urbanized areas to the south.

We sought to determine whether there was either a reduction in demand for properties of a given type or class that would have observable effect on development of additional properties of similar type or class. Our studies showed that there has been normal competition among real estate developments, and among land uses, but no particular adverse economic effects of Rocky Flats were noted.

As further tests of possible economic harm we considered a number of additional factors. These are summarized below:

1. **Loan availability.** There is no evidence of any time during the history of Rocky Flats that mortgage loans were not available. There is historical evidence of a brief period during which limited



Figure L-3
Actual and Estimated Mean Price in the Metropolitan Area Based on Trend and Cycle
Forecasts: 1973-1994

Source: Denver MLS and TDG