**EXHIBIT 6**

Supplemental Expert Report

# Plutonium in Soil Near the Rocky Flats Environmental Technology Site

F. Ward Whicker

August 6, 2004

## Introduction

This report was prepared in support of litigation in the case of Cook et. al. versus Rockwell International Corporation and the Dow Chemical Company. At issue in this case is the alleged loss of property values as a result of historic releases of plutonium to the environment from the Rocky Flats Plant, a facility located approximately 25 km northwest of Denver, CO. The Class Area, defined on the basis of published information on plutonium levels in surface soil (Krey and Hardy, 1970), lies mostly, but not entirely to the east of Indiana Street, which now forms the eastern boundary of the Rocky Flats Plant Site. To be a member of the Class, a person must have owned property within the Class Area on June 7, 1989 or earlier. The former mission of the Rocky Flats Plant was to manufacture components for nuclear warheads. Currently, the facility is known as the Rocky Flats Environmental Technology Site (RFETS), and the mission is now decontamination of facilities, cleanup of contaminated sites and environmental restoration. In addition, the buffer zone surrounding the industrial area is now managed by the U.S. Fish and Wildlife Service as a wildlife refuge.

This report is intended to supplement my earlier report submitted for litigation in this case. Most of this report was submitted earlier to the Dow Chemical Company and the Colorado Department of Public Health and Environment in 1994. This report covered studies that I and my colleagues conducted between 1991 and 1994. The 1996 report was updated for the purposes of this case to include additional work through November, 1996. By 2002, most of the information was published in peer-reviewed scientific journals, and the relevant articles have been made available. A significant portion of the 1996 report, and certain subsequent publications in the peer-reviewed literature, dealt with studies on plutonium in soil around Rocky Flats. It is this information and subsequent publications of it that is the starting point for this supplemental report.

In addition to my research experience at Rocky Flats and resulting reports and publications, I relied on other reports and peer-reviewed scientific articles in developing this supplement to my original report submitted for this case (Whicker and Ibrahim, 1996). The reports and publications used in developing this document are listed in the section "**References Cited, Examined or Pertinent to this Report**".

## Qualifications

I am a professor in the Department of Environmental and Radiological Health Sciences at Colorado State University, where I have been employed for 42 years. My primary duties have consisted of teaching and advising graduate students and conducting research, although I served as the Department Head from mid-1999 through mid-2002. My field of expertise is known as radioecology, which has to do with the occurrence and transport of radioactive substances in the environment, and resulting exposures to people and effects on the environment. I have authored or co-authored approximately 170 publications, including over 100 in peer-reviewed journals, 33 book chapters, and 5 books. I currently serve as Scientific Vice President for the National Council on Radiation Protection and Measurements in the areas of environment and waste management. I am currently the principal investigator on a study to independently assess current and future risks to the public from radioactive and chemical contamination originating at the Los Alamos National Laboratory. I have served on numerous committees and expert review panels for national and international organizations such as the National Academy of Sciences, the U.S. Environmental Protection Agency, the International Commission on Radiation Units and Measurements, and the International Atomic Energy Agency. I have similar experience advising private industry in areas such as uranium mining/milling, nuclear reactor decommissioning, nuclear waste management, etc. My experience related specifically to studies on radioactivity in soil includes work in Colorado and Utah to evaluate global fallout from nuclear testing by the U.S. and Former Soviet Union, work to evaluate regional fallout in several western states from nuclear tests at the Nevada Test Site, work around the Rocky Flats Environmental Technology Site near Denver to evaluate plutonium and americium deposition from historical releases and relevant work as a consultant on various legal cases. In addition, I have studied and formally peer-reviewed the works of many other scientists in the area related to radioactivity in soil. My complete curriculum vitae is provide as Appendix A. This provides a comprehensive list of my peer-reviewed publications, including those published in the last 10 years. Appendix B provides information on my current billing rate, and on legal testimony given within the last 4 years.

## Factors Affecting Plutonium Measurements in Soil

A reliable measure of the cumulative deposition of plutonium in surface soil can only be obtained when the soil itself has been relatively undisturbed during the interval of time between the first deposition of plutonium and the actual sampling event. This is true because nearly all the deposited plutonium will bind very strongly to soil particles, and the subsequent fate of the plutonium is essentially the same as the fate of the soil particles. Any significant soil loss, such as scraping for development, could remove a fraction of any plutonium that may be associated with that soil. Tillage, other human-caused disturbance, and even burrowing by small animals in local areas, can alter the depth distribution of the soil particles and associated plutonium. This in turn, can affect measurements of concentration in surface and near-surface soils. Most of the investigators appeared to be aware of this and tried to sample in locations with no known

Health and Environment), and the value is 2 dpm/g, or 2 decays per minute per gram soil (State of Colorado, 1970; 1973). The value 2 dpm/g converts to 0.9 pCi/g and to 33 Bq/kg soil. The relevant soil sampling depth to test for compliance with this standard is 0.25 inch, or 0.64 cm (Personal communication, Rob Terry, July 1, 2004). Using these values and Table 4, the 0.9 pCi/g over the top 0.64 cm converts to a value of 0.38 pCi/g over the top 5 cm (Table 6). The State of Colorado value, considered by its developers as "ultraconservative," was based on relationships between levels in soil and ambient air concentrations, inhalation parameters, metabolic and dosimetry information, and dose to risk conversions (CDH, 1976). This standard was re-examined a few years later and still found to be "ultraconservative" in light of newer information (CDH, 1976). The standard remains in effect (CDPHE, 2001).

It is my opinion that the standards described in this section are conservative and offer more than ample protection of the public from the potential health effects from plutonium in soil. For example, previous research (e.g., Hulse et al., 2000; Eisenbud and Gesell, 1997; Whicker and Schultz, 1982;) on natural radioactivity in soil in the area around Rocky Flats and elsewhere shows that concentrations of naturally-occurring alpha radioactivity from uranium and thorium isotopes and their radioactive decay products, excluding radon isotopes, can easily exceed 1,000 Bq/kg (27 pCi/g). Such levels, geographic variations in those levels, and variations in other sources of natural background radiation are far greater than the most restrictive standard, the Colorado 2 dpm/g (0.38 pCi/g in the top 5 cm of soil) guideline. To my knowledge, health effects from such variations in natural background radiation in the United States have never been shown.

**General Observations Concerning Plutonium Levels in Soils**

The vast majority of measured plutonium levels in soil within or near the portions of the Class Area that are not government-owned are well-below the extremely conservative Colorado standard of 2 dpm/g. Out of a total of 490 measurements in areas near the RFETS and not classified as background (See Appendix CD1), there are roughly eleven locations that appear to exceed the standard on what appears to be privately owned land within the Class Area. With possibly one or two exceptions, these locations do not appear to be in residential areas. Rather, they appear to be on land used for grazing of livestock. In most cases, these locations are near government-owned land and are some distance from residential areas. The range of values for these eleven locations is 0.40 to 2.1 pCi/g in the top 5 cm of soil.

These few apparent exceedences are just slightly above the Colorado soil standard and the locations mostly appear to be some distance from residential areas. The Colorado standard is extremely conservative. The values are well under NCRP (1999) standards which are also conservative, but more scientifically current and credible. The values are all much lower than the natural variations in natural alpha radioactivity in soils of the area. For these and other reasons, it is my opinion that these values do not currently pose a measurable health risk to members of the Class Area or to the environment, nor did they when the soil samples were collected.

12

The first point of relevance with regard to this matter is whether or not there is a demonstrable health risk to persons in the Class Area resulting from the presence of plutonium on Class properties. Based on the available data on plutonium in soil in and around the Class Area, the screening levels in soil that are permissible dose-based (NCRP, 1999), and various reports and studies on the health risks of off-site plutonium around Rocky Flats (e.g., DOE, 1996; Rood and Grogan, 1999; Rood et al., 2002), I do not believe that there is a demonstrable health risk to residents of the Class Area.

Over two decades of studies were undertaken by DOE (1996) investigating the human health and ecological risks from plutonium in soil, water and air in "OU 3" (Operable Unit 3), meaning offsite areas. These studies, which focused heavily on the areas just east of Indiana Street and east of the RFETS where plutonium levels were maximal for offsite areas, demonstrated very low risks to offsite residents and to the environment. To quote portions of the Executive Summary of the DOE (1996) report: *"The results of the OU 3 RI show that risks to the offsite neighbors of Rocky Flats do not exceed human health based standards set by the EPA and the CDPHE.---Given the low risk values for the soils and Great Western Reservoir, and the most likely current and future land use scenarios, further investigation or remedial action is not warranted to be protective of human health and the environment."* Subsequent independent scientific analysis of risks by a contractor to the State of Colorado produced essentially similar findings in terms of human health risks (Rood and Grogan, 1999; Rood et al., 2002).

If there is no demonstrable health risk to residents in the Class Area from Rocky Flats-derived plutonium, then any attempts to abate the lands owned and occupied by such residents would be pointless. Nevertheless, if one were to evaluate the possibility of abatement, the only method of remediation for plutonium in soil is removal of the soil itself, because the plutonium sticks very tightly to soil particles, and only strong acid leaching or chemical dissolution of the soil itself would allow the plutonium to be separated from the soil constituents. This is feasible for small soil samples in the laboratory, but it would not be feasible for yards or large outdoor areas. Soil removal from properties could, in principle, be carried out, but it would be extremely disruptive, very expensive, and it would entail occupational risks to the workers and, depending on the scope and nature of the remediation area, at least temporarily degrade air and water quality and potentially add small risks to residents of the area. Examples of the potential damage and costs associated with soil removal to abate radioactively contaminated lands on U.S. Department of Energy Sites are provided in Whicker et al. (2004). I believe strongly that high levels of radioactive contamination in soil, if such levels constitute an unacceptable health risk to people or are causing ecological impacts, should be remediated, even if the cost is very high. On the other hand, the financial costs and potentially damaging effects of any remediation itself cannot be justified when there is no demonstrated risk to people or the environment. In such cases, the "cure" is likely to be far worse than the "disease".

Abatement of any plutonium contamination in the Class Area that might have originated from Rocky Flats would be unjustified from a health risk standpoint. Furthermore, such action would cause extreme expense, significant disruption, risks to