**EXHIBIT 23**

```
                                                                    1

 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF COLORADO

 3
    Civil Action No. 90-K-181
 4

 5  MERILYN COOK, et al.,

 6  Plaintiffs.

 7  vs.

 8  ROCKWELL INTERNATIONAL CORPORATION,
    et al.,
 9
    Defendants.
10
    ------------------------------------------------------
11
    DEPOSITION OF DANIEL CONWAY
12  March 5, 1997

13  ------------------------------------------------------

14                              Deposition location:
                                633 17th Street
15                              Suite 3100
                                Conference Room 31-1
16                              Denver, Colorado

17  APPEARANCES:

18
            DAVID F. SORENSEN, Esq.,
19          BERGER & MONTAGUE, P.C.
            1622 Locust Street
20          Philadelphia, Pennsylvania   19103

21                  For the Plaintiffs.

22

23

24

25
```



**AVERY WOODS REPORTING**

1000 Speer Boulevard • Denver, Colorado 80204
303-825-6119 • 1-800-962-3345 • FAX 303-893-8305

2

```
 1        S. JONATHAN SILVERMAN, Esq.,
          KIRKLAND & ELLIS
 2        200 East Randolph Drive
          Chicago, Illinois  60601
 3
               For the Defendant
 4             THE DOW CHEMICAL COMPANY.

 5

 6        The deposition of DANIEL CONWAY,
 7   called for examination by the Plaintiffs, was taken
 8   in the offices of SHERMAN & HOWARD, L.L.C., 633 17th
 9   Street, Suite 3100, Conference Room 31-1, Denver,
10   Colorado, commencing at 9:15 a.m., on March 5, 1997,
11   before Curtis J. Slettum of Avery/Woods Reporting
12   Service, Inc., 1000 Speer Boulevard, Denver, Colorado
13   80204, a Registered Professional Reporter and a
14   Notary Public in and for the State of Colorado,
15   pursuant to the Federal Rules of Civil Procedure.
16                  ***************
17
18
19
20
21
22
23
24
25
```

AVERY/WOODS REPORTING SERVICE, INC. (303) 825-6119

3/5/1997 Conway, Daniel

1   Have I done that accurately?
2   A.  Yes.
3   Q.  Just for the record.
4   Now who told you that the blue was the
5   class area?
6   A.  I'm sure it was Mr. Bronesky.
7   Q.  And when were you provided that map?
8   A.  Very early on, so it must have been
9   close to that March meeting, the March start-up date
10  of the study.
11  Q.  And when you took this drive that you
12  described before, the one with Peter Elzi and
13  Mr. Slade, did you have this map, Exhibit 2, with
14  you?
15  A.  We had it, but we also had the aerial
16  photographs with us.
17  Q.  And which aerial photographs are those?
18  A.  That would be this group of aerial
19  photographs that we provided to you for this
20  deposition.
21  Q.  I'd like for you to identify for me
22  which ones you had with you.
23  A.  Okay.
24  (Whereupon, a break was taken.)
25

25

3/5/1997 Conway, Daniel

1   Q.  Mr. Conway, I was asking you before
2   about the drive you took.
3   A.  Yes.
4   Q.  And you said you had the map, which is
5   Exhibit 2, with you, in the car?
6   A.  Yes.
7   Q.  And you also had books of photos?
8   A.  Right.
9   Q.  And have you now placed in front of us
10  the book that you have with you?
11  A.  Yes.
12  Q.  And that's the Landiscor book, the
13  cover is 7 County Denver Region, 1995-1996?
14  MR. SILVERMAN:  Just to clarify the
15  record, I'm not sure whether or not Mr. Conway did
16  testify that he had that map with him in the car,
17  Exhibit 2.
18  Q.  (By MR. SORENSEN)  All right.  I'll ask
19  it.
20  Did you have that map, the color
21  version of Exhibit 2, with you in the car?
22  A.  As best I can recollect, we did, yes.
23  Q.  And you had this book of aerial
24  photographs that's in front of us?
25  A.  Right.

26

3/5/1997 Conway, Daniel

1   Q.  Did you have any other books of aerial
2   photographs with you?
3   A.  No, probably the current one.
4   Q.  And why did you pick this book
5   particularly?
6   A.  Because it's an accurate aerial of the
7   subject area.
8   Q.  And you were driving, correct?
9   A.  Yes.
10  Q.  Was there someone else in the car in
11  charge of looking through this book?
12  A.  Well, we drove by it, yes, but I'm sure
13  Peter and Eric would have been taking notes as to
14  where buildings were located.
15  Q.  I'm going to walk around, because there
16  is only one book and it's upside-down to me.
17  Could you tell me, Mr. Conway, exactly
18  how you used this book during your drive?
19  A.  Well, we just drove it to identify
20  where the major roads were and where the
21  concentration of commercial real estate was.
22  Q.  Well, why did you need a book of
23  photographs, aerial photographs?
24  A.  To see where the major roads were,
25  where the commercial concentrations were.

27

3/5/1997 Conway, Daniel

1   MR. SILVERMAN:  Just for the record,
2   one of your co-counsel made a huge production of the
3   fact that Doug Kurtenbach at a deposition stood over
4   a witness in exactly the manner you are standing over
5   the witness now, for exactly the reason you are
6   standing over the witness now, which is to look at a
7   document, and your co-counsel considered this
8   absolutely outrageous and despicable behavior, but I
9   have no problem with it.
10  MR. SORENSEN:  For the record, I'm not
11  Doug Kurtenbach.
12  Q.  (By MR. SORENSEN)  I guess maybe I'm
13  just dense.  I'm just not quite understanding
14  something.
15  You have a map with you in the car,
16  Exhibit 2, which has a blue line, which you've told
17  us is the class area.
18  A.  Yes.
19  Q.  You certainly have access, if you want,
20  to street maps of area, correct?  I mean those exist?
21  A.  I'm sure they do.
22  Q.  So in driving the area, the class area,
23  why did you decide that you needed aerial photographs
24  to do that?
25  A.  Because it actually shows buildings.

28

3/5/1997 Conway, Daniel

1  Q. It shows buildings, is that your
2  answer?
3  A. Yes.
4  Q. In other words, if the picture shows a
5  building, then you drove to where that building is,
6  is that what you did?
7  A. No, we would drive that road, turn
8  around and come back a major arterial road and then
9  we'd come up and go over.
10      We would drive the neighborhood to see
11 exactly how development was occurring.
12  Q. Did you look at all the photographs in
13 this book?
14  A. No, just the ones that-- we only had
15 the ones with us that applied to the class area.
16  Q. And which were those, if you could
17 identify them?
18  A. We've got H-11.
19  Q. And I will put some information on the
20 record. That's photo date October 11, 1995, H-11. I
21 can't see any other identifying marks?
22  A. That's all you need.
23  Q. That one, and what else?
24  A. We had G-11 with us. That had the
25 northern.

29

3/5/1997 Conway, Daniel

1  Q. Where is G-11?
2  A. These are alphabetic.
3  Q. And the photo date is October 11,
4  1995.
5  A. We also would have had G-12.
6  Q. Photo date October 11, 1995.
7  A. And we would have had H-11 and H-12,
8  and then we would have--
9  Q. Just to stop you, H-12 photo date is
10 October 11, 1995.
11  A. We would have I-11.
12  Q. Also photo date October 11, 1995.
13  A. And I-12.
14  Q. Also photo date October 11, 1995.
15      Any others?
16  A. No.
17  Q. And who chose those particular photos
18 to take with you in the car?
19  A. I probably did.
20  Q. Do you recall doing it?
21  A. No.
22  Q. So when you say probably, you're not
23 sure?
24  A. No.
25  Q. And as you drove to any particular

30

3/5/1997 Conway, Daniel

1  location in this drive and you stopped at a building,
2  how did you know whether that building was inside or
3  outside the blue line on Exhibit 2?
4  A. We just looked to see if it was.
5  Q. Using Exhibit 2?
6  A. Yes.
7  Q. And you said, I believe, that someone
8  was taking notes in the car.
9  A. Well, they just were making a list, and
10 that's the list that appears in the report.
11  Q. All right, and would those notes still
12 exist, do you know?
13  A. No, they don't.
14  Q. You don't know or they don't exist?
15  A. I don't think they exist.
16  Q. They were disposed of?
17  A. They were used as a draft to make up
18 this list, and then the girls I'm sure tossed them.
19  Q. Other than the color version of
20 Exhibit 2 and the photos you've identified, did you
21 have anything else with you in the car when you took
22 this drive?
23  A. No, not that I recall.
24  Q. (By MR. SILVERMAN) What about another
25 road map?

31

3/5/1997 Conway, Daniel

1  A. Not that I recall.
2      MR. SILVERMAN: Okay.
3  Q. (By MR. SORENSEN) Did you take any
4  other drives for the same purpose, other than the one
5  you've just mentioned?
6  A. I've driven portions of the class area
7  before but never as comprehensive as when we were
8  looking at almost every street.
9  Q. And do you recall how long this drive
10 lasted, in terms of time?
11  A. Probably a half a day.
12  Q. And from the notes taken on this drive,
13 the list on pages 9 and ten of your report was
14 developed, is that right?
15  A. Yes.
16  Q. And to the best of your knowledge, all
17 of the buildings listed on pages nine and ten are
18 inside the blue line on the color version of
19 Exhibit 2?
20  A. Yes.
21  Q. In the actual writing of the report
22 during the thirty days or so you said you actually
23 wrote it as opposed to the preparatory work, did you
24 have any discussions with other experts retained by
25 the defendants about the content of your report?

32

3/5/1997 Conway, Daniel

1  Q. Well, have you done any studies of what
2  real estate values should have been or would have
3  been but for their location near a toxic waste site
4  other than the Cook case?
5      A. Not specifically, no.
6      Q. When you say not specifically, is that
7  a no or are you intentionally trying to qualify it?
8  I don't mean to argue with you. I'm just trying to
9  get if it's a no, no. If it's not specifically, are
10 you thinking of something else?
11     A. The City of Denver is our client for
12 forty-seven hundred acres at the new Denver
13 International Airport. The Rocky Mountain Arsenal is
14 adjacent to our study area. We are projecting land
15 use absorptions for that acreage. We have the Rocky
16 Mountain Arsenal influence. The historical
17 absorption patterns reflect that.
18        We are coming up with an economic model
19 for how that acreage will likely develop, and we are
20 making value interpretations to do some taxing bonds
21 that will put the infrastructure in for that
22 development.
23        We do similar studies like that and
24 have all around the country. Were they adjacent to
25 Rocky Flats types of facilities? I don't remember.

49

3/5/1997 Conway, Daniel

1  I wouldn't --
2      Q. And in your private work, are your
3  forecasts confined to any particular type of use of
4  real estate, residential, commercial, or is it --
5      A. No. We do large master plan
6  communities, do the economic modeling for large
7  master plan communities, so they are going to have
8  most types of land uses in the community.
9      Q. So your forecasts include forecasts for
10 use of land for retail?
11     A. Shopping centers, sure.
12     Q. And how about industrial?
13     A. Yes.
14     Q. On page one of your report, under
15 Opinion I, it states, the data typically relied upon
16 by developmental forecasters.
17        What data are typically relied upon by
18 developmental forecasters?
19     A. Socioeconomic data.
20     Q. Specifically what?
21     A. Population, employment, household
22 information, income statistics, reports that monitor
23 how the real estate markets are performing, telephone
24 books, just about anything that would indicate what
25 type of businesses are evolving in a certain

50

3/5/1997 Conway, Daniel

1  marketplace.
2      Q. Did you rely on any income data in
3  preparation of your report in this case?
4      A. Not specifically.
5      Q. Did you rely on it generally?
6      A. Not that I recall.
7      Q. Further in Opinion I of your report on
8  page one, it says, undeveloped property value in the
9  class area.
10        What do you mean by undeveloped
11 property value?
12     A. Real estate that does not have an urban
13 land use on it.
14     Q. That would be vacant land essentially?
15     A. Right.
16     Q. Do you know how many acres of vacant
17 land as you put it for undeveloped property there is
18 in the class area in this case in acres?
19     A. I've seen references to it, but I don't
20 recall the exact number.
21     Q. Well, in connection with preparation of
22 your report, did you undertake to find that out?
23     A. No.
24     Q. And when you say, undeveloped property
25 value in the class area did not suffer any adverse

51

3/5/1997 Conway, Daniel

1  impact, when you use the word value, what do you mean
2  by that? I'm reading from your report. Do you mean
3  sale price or what?
4      A. Yes, the worth of the property.
5      Q. What price it will bring? I'm not
6  trying to put words in your mouth. I'm just trying
7  to understand what you're saying.
8      A. What price you could sell for, I guess,
9  given a willing buyer and a willing seller.
10     Q. In preparation of your report, did you
11 undertake to review any sales price data relating to
12 sales of vacant land in the property class area in
13 this case?
14     A. Not specifically, no.
15     Q. How about generally?
16     A. We are always looking at values of real
17 estate, certainly.
18     Q. Well, did you review any data, numbers,
19 about what different vacant parcels sold for over the
20 period 1980 through the present, in the class area?
21     A. Not specific to parcels, no.
22     Q. How about generally? And I'll explain
23 to you, the reason I'm asking you generally is when
24 you say not specifically, I want to get it clear, are
25 you saying you looked at something generally? That's

52

--- Page 53 ---

3/5/1997 Conway, Daniel

1  why I'm doing this.
2       So did you generally look at--
3       A.   Well, we were doing a lot of other
4  studies in that area for private clients, and we're
5  looking at values all the time.
6       Q.   So in preparing your report, you in
7  part relied on in general terms the information you
8  gathered from the work you've done for these private
9  clients, is that right?
10           MR. SILVERMAN:  Objection.
11  Mischaracterizes what he said.
12           MR. SORENSEN:  It's just a question.
13           MR. SILVERMAN:  You started with so,
14  which implies-- okay.  Go ahead.
15           MR. SORENSEN:  Have you finished your
16  objection?  I apologize for interrupting.
17           MR. SILVERMAN:  Mischaracterizes what
18  he said.  He never said he relied upon this
19  information.
20       Q.   (By MR. SORENSEN)  Okay.  In preparing
21  your report, did you rely in any way upon information
22  that you've learned or obtained in connection with
23  the work for the private clients that you've just
24  referred to?
25       A.   When you say relied upon, I'm aware of

--- Page 54 ---

3/5/1997 Conway, Daniel

1  it and probably did rely on it.
2       Q.   And what projects specifically were you
3  referring to?  Do you recall any specifics about
4  them?
5            MR. SILVERMAN:  Objection.  Again
6  mischaracterizes what he said.  He didn't say he
7  relied upon the study.  He said he relied upon the
8  information that he sought in doing the private
9  study.
10           MR. SORENSEN:  And I'm just trying to
11  get clarification as to what studies, that's all.
12       Q.   (By MR. SORENSEN)  What particular
13  ones?
14      A.   You know, I would rather characterize
15  it as types of projects.  We do a lot of business
16  park consulting, and we're consultants to
17  Interlocken, we're consultants to the City of
18  Westminster, we're consultants to a project called
19  the Promenade, we've been consultants to the Church
20  family, we've been consultants to Ball Corporation.
21      Q.   Ball, did you say?
22      A.   Ball.  They are owners of business
23  parks in or adjacent to the class area, and we're
24  helping them determine what is the best land use and
25  what is the value of their property.

--- Page 55 ---

3/5/1997 Conway, Daniel

1       Q.   Well, on page eight of your report, if
2  you would flip to that for a second, do you see at
3  the top of the page it says, I have provided
4  consulting services on numerous projects in or
5  adjacent to the class area?
6            Do you see that?
7       A.   Yes.
8       Q.   The projects that you are referring to
9  in that sense on page eight, are those the projects
10  that you've just listed?
11      A.   Those are some of them, yes.
12      Q.   Are there others that you can
13  specifically identify?
14      A.   Not that I can recall, but, you know,
15  in thirty years, we've been involved in most
16  development parcels up in that area.
17      Q.   And for most or all of these various
18  projects, would you have prepared written work
19  product?
20      A.   Yes.
21      Q.   And would you still have all that work
22  product at your office?
23      A.   I would hope we have copies of market
24  studies, but you know, all our market research is
25  proprietary information.

--- Page 56 ---

3/5/1997 Conway, Daniel

1       Q.   Well, when you say all, you mean
2  anything your office prepares you consider
3  proprietary?
4       A.   Absolutely.
5       Q.   On page one of your report, under
6  Opinion I, you state, undeveloped property value in
7  the class area did not suffer any adverse impact.
8            What do you mean by adverse impact?
9       A.   Didn't go down in value.
10      Q.   You mean didn't go down in price?
11      A.   Value.
12      Q.   This is why I asked you more about what
13  you mean by value.
14           I thought you ended up defining value
15  in terms of what price the land would bring, given I
16  think you said a willing seller and a willing buyer.
17      A.   Correct.
18      Q.   So when you say it didn't have any
19  adverse impact on value, are you using value the same
20  way?
21      A.   Yes.
22      Q.   And it says, continuing on on Opinion I
23  on page one of your report, adverse impact from Rocky
24  Flats either before or after June 7, 1989.
25           When you say before, how far back are

3/5/1997 Conway, Daniel

1  you undertake to determine what those indicators for
2  the class area would have been but for the existence
3  of Rocky Flats?
4      A.  No.
5      Q.  Now on page two of your report, under
6  employment, you say employment in the class area was
7  estimated by first inventorying all existing office,
8  industrial and commercial space within the class area
9  by date of construction.
10         Do you see that sentence?
11     A.  Yes.
12     Q.  Now when you say inventorying, what do
13 you mean?
14     A.  Writing a list of them.
15     Q.  Is that the list on pages nine and ten
16 of your report?
17     A.  Yes.
18     Q.  And that's derived from that drive you
19 were talking about?
20     A.  Yes.
21     Q.  Is that the only drive like that that
22 you took in preparation of your report, like that
23 meaning you, you know, the purpose of going around
24 the class area and locating the various structures?
25     A.  My staff went back out to make sure it

3/5/1997 Conway, Daniel

1  was complete.
2      Q.  Did you go personally?
3      A.  I had made other drives, but not as
4  detailed as that one was.
5      Q.  So on page two, the inventory that's
6  being referred to is the same drive?
7      A.  Right.
8      Q.  When was that again, that drive?
9      A.  Sometime thirty to sixty days prior to
10 that report.
11     Q.  And then it says, by date of
12 construction.
13        So if we look at pages nine and ten of
14 your report, there's a column that says, year built,
15 and how was that information obtained?
16     A.  We called the assessor's office and
17 they gave us the date of construction.
18     Q.  Did you call?
19     A.  No, Eric and Peter did.
20     Q.  Eric Slade and Peter Klzi?
21     A.  Right.
22     Q.  And who did they call, do you know?
23     A.  The Jefferson County Assessor.
24     Q.  Then it says in your report-- I'm
25 talking about on page two-- then, by utilizing

3/5/1997 Conway, Daniel

1  industry standards, blah blah blah.
2      Q.  What standards are you talking about
3  there?
4      A.  Well, in office space, there is usually
5  two hundred thirty square feet per capita.
6      Q.  Two hundred thirty square feet per
7  what?
8      A.  Per employee.
9      Q.  For office, and where did you get that
10 number from?
11     A.  The Urban Land Institute I think
12 publishes that number.
13     Q.  For the purposes of your report, did
14 you use the figure two hundred thirty square feet for
15 office?
16     A.  Right.
17     Q.  Did you first check some written
18 publication for that before using it?
19     A.  I'm sure we did.  We've used it for
20 years.  It used to be two hundred square feet, and
21 now with the computerization, it's moved up to two
22 hundred thirty square feet, but we use it every day.
23     Q.  So again, my question is, in
24 preparation of your report, did you check that two
25 hundred thirty foot figure against any written

3/5/1997 Conway, Daniel

1  material?
2      A.  Not that I recall.
3      Q.  And you used that for office?
4      A.  Yes.
5      Q.  How about for retail?
6      A.  Five hundred square feet per employee.
7      Q.  And again, where does that figure come
8  from?
9      A.  Again, it would be out of the Urban
10 Land Institute.
11     Q.  And again, is that a figure that you
12 checked--
13     A.  No.
14     Q.  I'm sorry.  Just let me finish.  I know
15 you know the question.  I just want to finish it for
16 for the record.
17        Is that a figure that you checked in
18 preparation of your report against any written
19 material?
20     A.  Not that I recall.
21     Q.  And has that number changed over time?
22     A.  No.
23     Q.  So as far as you know, that five
24 hundred number is the same back to 1950, or how far
25 back would you say it pertains?