**EXHIBIT 26**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

MERILYN COOK et al

v.

ROCKWELL INTERNATIONAL CORPORATION

and

THE DOW CHEMICAL CORPORATION

CIVIL ACTION No. 90-K-181

DECLARATION OF

JOHN D. DORCHESTER, JR., MAI, CRE

2 AUGUST 1997

## DECLARATION OF JOHN D. DORCHESTER, JR.

I, John D. Dorchester, Jr., MAI, CRE, declare as follows:

### 1. Introduction

1.1  I am a real estate appraiser and consultant with over 40 years of real estate experience throughout the United States and a number of foreign countries. I am a former national president of the American Institute of Real Estate Appraisers (AIREA), now called the Appraisal Institute. I have represented the United States on the International Valuation Standards Committee for the past 15 years, serving as world chairman for three years. My experience includes analysis and valuation of properties included in environmental disputes and considerations of "stigma." My curriculum vitae is attached as Exhibit C to this Declaration.

1.2  I have been asked to make a Declaration in the Rocky Flats Case, United States District Court For the District of Colorado Civil Action No. 90-K-181. This statement follows my report of analyses and conclusions for this case dated November 22, 1996 ("Original Report") and my March 17, 1997 Response ("Response Report") to "Property Value Study By Wayne L. Hunsperger, MAI, SRA, For the Rocky Flats Litigation Dated November 21, 1996" ("Hunsperger Report").

1.3  The purpose of this Declaration is to amplify upon my earlier reports in the above submissions to the court and to make statements regarding certain methodologies included in Mr. Hunsperger's report. My statements and the basis for each follow.

### 2. Market Value Conclusions Are Absent in the Hunsperger Report.

2.1  It is fundamental to the valuation of real property interests in any application, but particularly for litigation matters, that the appraiser define and consistently apply a

defined and relevant type of property value. It is misleading to do otherwise. In his report, Mr. Hunsperger defines Market Value,[1] but makes only passing reference to its use. He does not apply Market Value concepts or definitions in arriving at his conclusions. Instead, he reports analysis and findings of "property value," "property value impact," or similar terms, none of which is defined or related to Market Value.

2.2  Market Value is the only applicable real property value type that is appropriate for the issues in this litigation. Because Mr. Hunsperger does not even claim to make Market Value estimates, his conclusions cannot be used to measure diminution of Market Values if in fact any diminution exists.

2.3  Mr. Hunsperger states that his work was performed in accordance with the Uniform Standards of Professional Appraisal Practice ("USPAP")[2] and that under USPAP his services constitute "consulting" services. USPAP precludes consultants from making Market Value estimates. They instead require that "appraisal" standards be applied to Market Value estimates. Mr. Hunsperger's work may purport to deal with a value type that is similar to or consistent with Market Value, but it cannot do so and comply with USPAP requirements. Thus, as a consultant, Mr. Hunsperger could not have reported Market Value conclusions, including estimates of diminution in Market Value.

## 3. Inapplicable Methodologies Were Applied by Mr. Hunsperger.

3.1  Principles and procedures for estimation of Market Value have been established and applied in the United States for more than one-half century. The orderly processes of our markets and system of wealth depend in part upon stable application of

---

[1] Hunsperger Report. p. 5.
[2] The Appraisal Foundation. Uniform Standards for Professional Appraisal Practice. Washington, D.C.

appraisal methodologies, as do fair and equitable decisions of the courts.  Market Value is not an aggregate concept.  By definition the concept applies to individual properties.

    3.2  Generally accepted appraisal practices require the appraiser to estimate highest and best use for each property valued, and then to find "comparable properties" from which cost, income, and other market (usually sales) comparisons can be made. Conclusions from individual property analyses can be aggregated, but there is no established and commonly accepted valuation procedure that derives from generalizations of aggregate information as the source.  Procedures do exist for "mass appraisals" when appropriate methodologies and standards are applied.

    3.3  Except perhaps for certain land transactions (which are commented upon below), Mr. Hunsperger does not apply Market Value concepts or Market Value procedures.[3]  Instead he presents a paradox: a) He states that his report is not an appraisal report; b) but it must be an appraisal report with appraisal conclusions dealing with Market Value under USPAP standards if he is to arrive at Market Value estimates; c) he further states that his report is a consulting report;  d) but it cannot be a consulting report because various analyses conclude specific (although undefined) value losses applicable to each plaintiff property, a practice standards directly relate to appraising.  To be credible and valid, Mr. Hunsperger's work must meet the community standards of generally acceptable appraisal practice as articulated by USPAP, which it does not.

    3.4  More specifically, while generally accepted appraisal practice requires application of Cost, Income, and Sales Comparison Approaches in value estimations, Mr. Hunsperger applies an "Analogous Case Studies" Approach, a "Multiple Regression"

---

[3] If Mr. Hunsperger's statement that he performed no appraisals is correct, then he has not applied Market Value procedures for any of his conclusions.

John D. Dorchester, Jr.                                                                  Page 4

Approach, and a "Public Opinion Survey" Approach. These are not commonly accepted appraisal methodologies. He includes a limited application of market sales information in valuing predominately rural land, commented upon below.

3.5  Mr. Hunsperger's use of Analogous Case Studies as a valuation Approach is a remarkable departure from commonly accepted appraisal methods.  The case studies selected are not even claimed by Mr. Hunsperger to concern properties that are comparable to those in the Rocky Flats litigation.  No case study involves a situation like the Rocky Flats case.  Nonetheless, Mr. Hunsperger selects passages or interprets from his compendium those elements that support his views, then concludes a specific "loss in value" for properties in the property class area.   The real analogy here is an analogy to the Sales Comparison Approach and Mr. Hunsperger is nowhere near its rigorous requirements for relevant and accurate comparisons.

3.6  The absence of generally acceptable and commonly applied methodologies is not only a defect in estimating Market Value.  For an appraisal expert, the appropriate purpose of Mr. Hunsperger's work is to estimate the extent to which, if any, purported actions of the defendants (the cause) created economic harm to property owned by plaintiffs in the property class area (the effect).  Any negative effect should be measured in terms of Market Value.  Through his failure to reasonably identify and estimate Market Values, Mr. Hunsperger could not develop economic harm estimates that meet the requirements of contemporary appraisal standards or produce conclusions that are applicable and relevant to this litigation.

John D. Dorchester, Jr.                                                                   Page 5

**4. Mr. Hunsperger Relied Upon Dr. Radke's Analyses, But Dr. Radke Did Not Use Valid or Commonly Accepted Appraisal Methods**

4.1 Dr. Radke applied multiple regression analysis (MRA) as an analysis tool. MRA is a commonly used tool in real estate valuation work, but Dr. Radke's application of the tool, and Mr. Hunsperger's subsequent use of this application, are not consistent with commonly accepted appraisal methods.

4.2 Under USPAP, Mr. Hunsperger and Dr. Radke can apply MRA in estimating Market Value either in compliance with Standard 1 or Standard 6.[4] Results are customarily validated at the individual property level by such methods as determining whether the statistically produced Market Value estimates reasonably approximate actual sales prices of the properties from which the MRA model was derived. MRA could also be applied under USPAP Standard 4,[5] but under this consulting standard Mr. Hunsperger could not have dealt directly with estimates of Market Value loss.

4.3 Actual market validations were not performed by Mr. Hunsperger or Dr. Radke. Instead, a single statistic from what is now known to be a highly imprecise and inaccurate model is abstracted and applied as though it were an accurate, relevant, and absolute indicator of a Market Value effect. The process constitutes a highly improper back-door approach to estimating Market Value and is contrary to commonly accepted appraisal and consulting standards.

---

[4] The Appraisal Foundation. Standard 1 is directed toward the substantive aspects of developing a competent appraisal. Standard 6 is directed toward the substantive aspects of developing and communicating competent analyses, opinions, and conclusions in the appraisal of a universe of properties.

[5] Ibid. Standard 4 is directed toward the same substantive aspects of professional practice set forth in Standard 1, but addresses the performance of consulting services by an appraiser. Consulting is a broad term that is applied to studies of real estate other than estimating value.

## 5. Properly Analyzed, Mr. Hunsperger's Own Data Do Not Suggest Economic Impairment to Property

5.1  In addition to other analyses, Mr. Hunsperger made what he termed "a comparison of resale prices for residential properties in defined areas of the metropolitan area."[6]  His analysis relied upon Multiple Listing Service ("MLS") data "for homes that are typically listed by realtors."[7]  Notably, MLS sales reports do not normally include significant numbers of sales of new homes by builders or developers, an important omission for the property class area which has experienced significant new home construction and sale.  When newer homes are sold for the second time, however, they are more likely to be listed with Realtors, and can skew statistical calculations.

5.2  Market Values are not estimated by averaging incomplete data for different geographic areas and markets.  If economic harm were to exist in the property class area, such comparisons provide no evidentiary basis for appropriate Market Value estimates.  No actual comparisons of properties or transactions prices were made by Mr. Hunsperger in analyzing MLS sales, no adjustments were made for locational or individual property differences, and the commonly accepted appraisal comparison methods were not applied.  Notwithstanding, Mr. Hunsperger develops conclusions from these analyses he cites as a support for specific estimates of economic harm.

5.3  Even if otherwise merited, Mr. Hunsperger's analysis of MLS sales is seriously flawed.  For example, compound rates of change differ depending upon what starting and ending years are selected.  For his MLS data, different results are produced if one calculates the average annual price between 1989 and 1996 instead of his 1989 to

---

[6] Hunsperger Report. p. 202.
[7] Hunsperger Report. p. 202.

John D. Dorchester, Jr.

1995 period. More importantly, there is no market reason why the rates of change should be similar for different areas of a community, each of which has its own unique characteristics.

5.4  If one were to adopt Mr. Hunsperger's MLS comparisons as a valid Approach, which it is not, a math error was found in his calculations. As a result, he incorrectly reported a 7.88 per cent rate of price increase for Jefferson County Central ("JFC") although the data factually indicate a 5.30 per cent change for his 1989-1995 time frame. (See supporting data in Exhibit A.)

5.5  If Mr. Hunsperger's math error is corrected, data for Jefferson County North ("JFN"), in which most of the property class lays, indicate that its performance is about average for the five areas Mr. Hunsperger considered. Indeed, the JFN area average annual price change indicators are generally higher than the surrounding districts which are farther removed from the site of the Rocky Flats plant. He incorrectly asserts that Jefferson County South ("JFS") is the most comparable to JFN, but provides no data to support this comparison. Although the difference in the compound rates of change for JFN and JFS is only slightly more than one per cent per year, there is no practical or scientific reason to believe that these numbers should be similar or that their difference is in any way significant. Accordingly, if Mr. Hunsperger's own numbers could be used at all, they would more likely support a conclusion that there is no proof from this analysis that the economic harm claimed in this litigation is evidenced for the property class area. Further, from his data, properties in the property class area appear to have equaled or exceeded the price performance of nearby areas over Mr. Hunsperger's study period.

John D. Dorchester, Jr.                                                        Page 8

## 6. Mr. Hunsperger's Consideration of Land Sales Did Not Apply Commonly Accepted Appraisal Methods

6.1  A significant majority of the plaintiffs' properties are other than vacant land. In his consideration of vacant (or essentially vacant) land in largely undeveloped areas near the western extremes of the property class area, Mr. Hunsperger looked at vacant land prices "in the aggregate," but did not apply the normal appraisal methodology of identifying individual properties and selecting known transactions for direct comparisons[8] Aggregate prices were developed for the property class area and four other areas, and weighted averages were compared. Specific, but undefined, values estimates were made along with an estimate of "diminution in value."[9]

6.2  Market Value estimates do not derive from averages or inferences from non-specific property considerations. Mr. Hunsperger's analysis failed to recognize differences in highest and best use among properties, sizes of properties, property locations, property features, and other comparison requirements for Market Value estimates. Further, he made an unstated assumption that all of his comparison areas must necessarily have the same underlying price levels and trends, a false and unwarranted assumption. He also developed weighted averages from samples too small to represent the populations of data from which he infers answers, or to have statistical significance, even if the methods were otherwise proper or commonly accepted.

6.3  Mr. Hunsperger's analysis and application of sales comparisons for vacant land did not apply commonly accepted appraisal methods. Even if it had, his conclusion by his own admission is not an appraisal conclusion and therefore could not have

---

[8] Hunsperger Report. p. 178.
[9] Again there was no identification or definition of the value type.

appropriately reflected Market Value as required by the function for which his work was applied.

### 7. Roof Top Maps In My Original Report Reasonably Portray Historical Development.

7.1  My Original Report included a discussion and graphical illustration of historical residential development in the property class area between 1950 and 1994.[10] The counts of properties and their geographic locations were based upon 1993 Jefferson County Assessor records.  From these records, I used computer routines to match each property's address to a specific geographic location, and then plotted each property in Figures 5-6 through 5-11.

7.2  Because portions of the area are rural, and because the Assessor's records have known short-comings, the address matching resulted in some properties for which there was no known location using this process.  However, our verification of the results indicates that the Figures accurately reflect nearly 85 per cent of the house addresses in the property class area.[11]

### 8. Although There Are No Historical Population Counts for the Geographic Rocky Flats Sectors Shown in the ChemRisk Task 7 Report, Reasonable Approximations Can Be Made

8.1  Data from which population estimates can be made for the Sectors shown in the ChemRisk Task 7 report are available from a number of sources.  Based upon this information, I have made population estimates for a number of years, as reflected in Exhibit B.

---

[10] A discussion begins on page 5-12 of my Original Report.
[11] Of 162,432 Assessor property records we were able to address-match 136,703 records.

8.2   To make these estimates, I began with the "roof top" property counts explained in section 7 above.  Using a Geographic Information System ("GIS"), I created polygons representing the property and medical monitoring class areas.  These were overlaid on GIS information received from ICF/Kaiser that showed the locations of each ChemRisk sector.  I then counted the properties our address matching had located in each sector.

8.3   From the above research, counts were made of properties by type for each year of our study.  Established tables of average population for the various numbers of bedrooms and/or housing type were applied to each property.  Results were compared with US Census data for 1970s, 1980, and 1990, and variances were accounted for by creating new multipliers.  These were then applied to each property by year, and by sector, to produce the results shown in Exhibit B.

Signed this 2nd day of August 1997 at Scottsdale, Arizona.

John D. Dorchester, Jr., MAI, CRE

Attested this 2nd day of August 1997 at Scottsdale, Arizona



Notary Public

My commission expires: _____May 30, 1999_____