**EXHIBIT 42**

# REAL ESTATE CONSULTING STUDY

Factors Affecting Value:
Certain Horse Properties,
Rocky Flats Class Area

November 20, 1996

**LAURIE VAN COURT, MAI**
**312 WILCOX STREET, SUITE 204**
**CASTLE ROCK, COLORADO 80104**

**LAURIE VAN COURT, MAI**

## DEFINITION OF THE PROBLEM

On January 30, 1990, a group of property owners filed a class action suit against Rockwell International Corporation and the Dow Chemical Company. The property owners claim they have suffered a variety of damages as the result of these two corporations' actions while managing the Rocky Flats plant. A critical date from which this damage is alleged to have occurred is June 6, 1989. On that date, the Federal Bureau of Investigation (FBI) conducted a highly publicized search of the Rocky Flats Plant.

At the time of the FBI search, three of the plaintiffs owned real properties near the Rocky Flats plant that were improved for the boarding, breeding and/or training of horses. All three of these plaintiffs claim that, as a result of the activities at Rocky Flats, their properties' values were significantly reduced. One plaintiff also claims that her horse business itself was adversely impacted.

A number of factors may have resulted both in reduced property values and diminished business operation. The problem to be considered in this consulting study is the analysis of reasons for declines in real estate values and business operations for horse-related properties in the defined Rocky Flats class area at the time of the FBI investigation in 1989. In addition, I have evaluated these three plaintiffs' allegations and analyzed the performance and marketability of their individual properties.

## PURPOSE AND INTENDED USE OF THE STUDY

The purpose of this study is to describe value influences on horse-related real estate and businesses, and, particularly, how those factors may have influenced three specific properties in subject neighborhood. It is my understanding that this study may be used in litigation relating to damages alleged to have been caused by the operation of the Rocky Flats plant. This report is intended for use only by Kirkland & Ellis and its client, the Dow Chemical Company. Use of this report by others is not intended by the appraiser.

## SCOPE OF THE STUDY

The scope of this study includes the following:

1.  Inspections of three referenced horse properties (former Babb property, Bartlett property and westerly portion of former Cook property).

2.  Verification of current and past ownership of these properties.

1

prepare a business plan or prospectus as part of their course work.  Gavin Ehringer, in his *Western Horseman* article, "Starting a Stable Business", comments:

> Planning is a key component of any business.  The first step in planning is to establish your goals, then determine the steps needed to reach those goals.  In other words, you need a business plan.

The recognition of the importance of sound business principles in the horse business is routinely described in leading horse industry publications, such as *The Quarter Horse Journal* and *Western Horseman*.  Horse and stable management information is widely distributed through county extension agencies and horse organizations, and formal college programs in equine management are offered throughout the U.S.

With these resources available, horse business owners who do not operate in a professional manner are unlikely to succeed compared with more professionally-managed competitors.

2.    **The U.S. horse industry suffered a tremendous decline in the late 1980s and early 1990s.**

Information compiled from the American Horse Council and the American Quarter Horse Association shows that, in recent history, horse breeding reached peak levels in the mid-1980s and then dropped precipitously, reaching its lowest levels in 1991.  Breeding activity closely followed the American economy as a whole, reflecting boom times followed by a "bust" period.

Charts on the following pages show that registration of new horses in the United States' major breeds grew to more than 330,000 in 1984, but fell steadily thereafter to a low of less than 230,000 in 1991.  Similarly, Quarter Horse registrations nearly reached 170,000 in 1984, before dropping to a modern low of 101,390 in 1991.

This drop in horse population had a number of implications to horse business operators.  As breeding decreased, the demand for stallion stud service plummeted, resulting in reduced stud fees.  The demand for broodmares also dropped, and gluts of breeding stock resulted in far lower prices for that stock.  In many cases, the lack of demand for brood mares and stallions rendered them unsalable.

5

**LAURIE VAN COURT, MAI**

In addition, the lower number of registrations meant that there were fewer young horses to be boarded and trained, reducing the already-lowered demand for stabling and training. It is important to remember, too, that this breeding decline occurred at a time when the American economy was in recession and the disposable income necessary to support largely recreational industries, like the horse business, had all but disappeared in many locations.

3.   **The national horse industry decline affected demand for horses in the Denver metropolitan area.**

One measure of reduced demand is the reduced average price paid for horses at sales. A sale of registered American Quarter Horses has been held in conjunction with Denver's National Western Stock Show for many years. On the following page is a chart showing the average sale price paid for horses at the sale between 1975 and 1995. The lowest average price of $1,625 per head was paid in 1990, compared with the highest average price per head in 1980 of $5,307. This represents a 227% decline over 11 years, or almost 21% per year.

4.   **The market for horse-related property is always more limited than for "typical" residential property because of 1) higher average prices and 2) a smaller pool of interested buyers.**

The market for single family residential real estate is often described as resembling a pyramid, whose volume is greatest at its base and least at its apex. That is to say, there is more demand for lower-priced properties and increasingly less demand as prices increase. By their very nature, horse properties are usually found on the higher end of the price range because of their requirement for larger sites, ancillary buildings and extensive site improvements. Thus, by price alone, the demand for horse properties is usually less than for other single family residences in the same or similar neighborhoods.

In addition, the number of people interested in horses compared to the total population of home buyers is relatively small. This, of course, is even more true in urban and suburban areas. While horse properties are sometimes purchased for alternative uses, in most cases they are most successfully marketed to horse owners who are limited in number.

8

LAURIE VAN COURT, MAI

5.   **Horse properties are "special-purpose properties", and, as such, often exhibit functional inutility.**

"Functional inutility" is described in *The Appraisal of Real Estate, 11th Edition*, published by the Appraisal Institute, as

> ...an impairment of the functional capacity of a property or building according to market tastes and standards.

Many horse properties are designed and constructed by prospective owner-users who consider primarily their own requirements, rather than marketability, in the design process. Because there are so many different horse-related activities and because those activities often have very different facility requirements, horse properties often reflect a high degree of functional obsolescence.   Further, they are often constructed to portray the taste and personality of specific owners:  potential buyers may not share the original owners' tastes or requirements.

6.   **Because of functional inutility, costs of constructing horse properties very often exceed those properties' value.**

*The Appraisal of Real Estate, 11th Edition*, states:

> Functional inutility must be judged in light of market standards of acceptability, specifically the standards of buyers who make up the market for a particular type of building within a particular period of time.

> As objectives of building design, functional inutility and aesthetics are sometimes in conflict; market standards generally reflect a compromise between the two...

> Functional utility represents more than practical utilitarianism. Superadequacies - i.e., superadequate structural components or space - are also items of functional obsolescence because their costs exceed their value.

Value does not necessarily equal cost.  Value results only when a number of buyers are willing to purchase a property:  the purchase price may or may not be the same as the cost to produce the property.  Rather, value represents the cost of producing a property of similar utility.  If cost was incurred in producing some aspect of a property that does not result in utility, that cost won't be recovered at sale.  Further, if the property lacks some necessary

9

element that a potential buyer must add, the buyer is likely to discount the purchase price in consideration of the effort, or "hassle factor", of making that addition.

7.   Because of national and local economic trends, exacerbated by the marketability problems often associated with horse properties even in strong economies, horse properties along Colorado's Front Range suffered severe value and marketability declines in the late 1980s and early 1990s.

The decline of the horse business in Colorado forced a number of expensive, well-designed and well-located horse properties onto the market in the late 1980s and early 1990s. All of these languished, without buyers, for long periods of time:

| Farm Name | Location |
|---|---|
| Morningstar Farm | Fort Collins, Larimer County |
| Long's Peak Arabians | Longmont, Boulder County |
| Bara Arabians | Pueblo, Pueblo County |
| Gambel Oaks | Parker, Elbert County |
| Dawn Arabians | Franktown, Douglas County |

Anecdotal information about three Front Range area horse properties illustrates the market's limitations.

A)   Columbine Farm was built in south Arapahoe County in 1983 by a local businessman to accommodate his daughters' horse-showing activity. The owner built the facility adjacent to his existing home, with the future plan of converting the state-of-the-art barn and indoor arena into a recreational facility to serve a future luxury subdivision on adjoining acreage. But the owner/developer died and his widow attempted to sell the property over a period of four years.

In 1988, the asking price for the entire 34-acre tract, with luxury home, heated 37-stall barn and 14,400 square-foot heated indoor arena, was $2,750,000. In 1989, the appraised value for the property, in three separate parcels, was $1,934,200. The

property finally sold, to two separate buyers, in 1991. The luxury home and five acres sold for $430,000. The balance of the property was purchased in August 1991 for $900,000. The total eventual sale price represented only 48% of the 1988 asking price.

B)    The High Prairie Farm horse facility was to be the centerpiece of a luxury custom home subdivision of the same name, just south of Parker, in Douglas County. The developer originally envisioned an arrangement that is common on the East Coast and in the Los Angeles area, where property owners board their horses in the development's own stable and can have the stable's staff prepare the horses for riding at the owners' convenience. The concept failed.

The original cost to develop the horse facility in 1990 was $4,300,000. It is perhaps the highest-quality horse facility in Colorado: the barns feature cork floors to reduce sound, automatic fly control, windows in each stall and lavish finish. The facility included 48 enclosed stalls, a 100-foot by 250-foot indoor arena, outdoor arena/amphitheater with tiered seating, 3,600-square foot clubhouse with classroom and kitchen facilities, and a 6,400-square foot maintenance barn, all on 82 acres.

The High Prairie Farms development struggled for several years, and finally financial difficulties forced the developer to sell the horse property. It was purchased in October 1992 by a Connecticut family who now operate it as a thriving hunter/jumper operation. The purchase price, excluding equipment, was $1,714,000, or 40% of the original development cost.

C)    Holmestead Ranch is a 160.075-acre horse farm located 14 miles south of Franktown, in Douglas County. It was built between 1981 and 1986 to be a showplace breeding and training facility for Arabian horses. The property included 24 enclosed stalls in two barns, an indoor arena, single family home with attached guest house, modular foreman's home and assorted outbuildings. Holmestead Ranch also featured spectacular mountain views, some Ponderosa pine tree cover and sub-irrigated pastures.

11

LAURIE VAN COURT, MAI

The property was initially offered for sale in September 1990.  In September 1993, its listing price was $1,800,000.  The property was finally purchased in March 1995 by a religious order who planned to use it for a farm and retreat.  The reported purchase price was $1,350,000.  However, an alternative property in Larimer County has since been donated to the order and Holmestead Ranch is likely to be returned to the market, having been largely vacant for the last six years.

While these three properties are all located some distance from subject neighborhood, they provide good examples of the marketing difficulties of large horse properties.  In particular, they point out the difference between cost and value, and the marketing challenges presented by large specialized properties for which there was only a limited number of potential buyers.

# COOK REAL PROPERTY

### Property Summary

Merilyn Cook purchased 72 acres, in two 36-acre parcels, generally located at the southeast corner of West 96th Avenue and Indiana Street, in September 1983.  The reported purchase price was $306,000, or $4,250 per acre.  The easterly parcel had been legally subdivided into three 12-acre tracts by Jefferson County's "exemption" process.  The westerly parcel was not so subdivided, but apparently could also have been divided into three additional 12-acre sites by a similar exemption process.

Ms. Cook subsequently sold two of the easterly 12-acre tracts.  The middle tract, at 14208 West 96th Avenue (Parcel B2) was sold to Gertrude and Lorren Babb in December 1985.  The stated purchase price was $128,000, or $9,786 per acre.  However, $28,000 of the purchase price was a lot valued by Cook and Babb at $28,000:  the seller stated to an appraiser in 1986 that the effective sale price was closer to $9,600 per acre.

The westerly parcel of the east tract, at 14308 West 96th Avenue (Parcel A2), was sold in May 1987 to Helen Fogel Phillips for $100,000, or $8,333 per acre.   Both of the resold parcels were subsequently improved for rural residential use.

Of the remaining four 12-acre tracts, Ms. Cook improved two in 1984 for her own use.  Parcel C2, at 14088 West 96th Avenue, with a 1,962-square foot prefabricated, metal frame single family residence.  The residence was metal-sided, with added cedar shake and face brick trim.  An attached garage included 561 square feet.  A wood pole barn, with a total of 14,796 square feet of gross enclosed area, was also constructed.  This barn included a 108-foot by 60-foot indoor arena, 32 box stalls, office with restrooms and a feed/tack room.  The barn had a metal roof and walls, with fiberglass panels.  The property was served with private well and septic system.

The tract at 9470 Indiana Street (Parcel B1) was improved with an additional pole barn having gross enclosed area of 7,838 square feet.  This barn was laid out with two sets of stalls, in prefabricated metal structures extending north and south from a central indoor arena.  There were a total of 20 stalls, with two tack rooms.  Another well provided water, but the barn included neither heated nor interior water.  There were no restroom facilities.

LAURIE VAN COURT, MAI

## Opinions

1.  Cook's stated plan of further subdividing her land for higher-density residential use would have been inconsistent both with surrounding land uses and with Cook's own improvements.

    The neighborhood surrounding Cook's property was, and still is, largely rural residential. A higher-density development would have had a pioneering aspect that likely would have affected its market acceptance. Further, creating such a development adjacent her own horse facility could have reduced her structure's economic lives: they would have, in effect, become an interim use even though relatively new. Compatibility would have been compromised: according to *The Appraisal of Real Estate, 11th Edition,* "Compatibility means that a building is in harmony with its use and its environment."

2.  It is likely that between 1984 and 1989, Cook's property became overencumbered, probably as the results of banks' incautious lending policies, bolstered by inadequately supported appraisals and Cook's unsubstantiated net worth statements.

    By 1986, it appears that Cook owed well over $600,000 on property that may not have been worth that much. Initial appraisals performed in 1983 and 1985 were poorly supported and not credible. Purported rising land values, in particular, were not well proven, and appraisers routinely equated reproduction cost of the improvements with value, even though, as previously described, cost in horse properties may often exceed value.

    Cook's net worth statements, apparently provided for lending purposes, included no basis for claims of personal property value. This is especially true of value claims for her horses, which on one statement are estimated to be worth $700,000. Given the demonstrated decline in the horse industry, that value estimate is suspect without documentation.

3.  While the improvements on Cook's property were serviceable, they were modest and lacked the "curb appeal" found in other large horse properties.

    Horse properties described earlier in this report featured significant, site-built residences, landscaping and decorative exterior finish. In an oversupplied horse property market, these

14

LAURIE VAN COURT, MAI

may have had more appeal to potential buyers. Further, the improved property at 9470 Indiana Street displayed substantial functional obsolescence in its lack of a residential structure and lack of plumbing within the barn itself. These shortcomings would have considerably reduced the marketability of this portion of the property.

4.  **The Thigpen purchase of 14088 West 96th Avenue involved very high risk and likely did not reflect market value at the time it occurred.**

Thigpen's 1984 contract purchase price was not supported either by Cook's own purchase of the land one year earlier nor by appraisals performed about at that time. Thigpen was an out-of-state purchaser who may not have been familiar with the Denver area real estate market. In addition, Thigpen paid virtually no cash in the transaction, reducing his risk to virtually nothing. Given that 36% of the purchase price was carried back by the seller, the stated $780,000 purchase price almost certainly was not cash equivalent.

5.  **The marketing difficulties described by Cook in trying to sell her property likely were due to the typical problems associated with horse properties identified earlier in this report.**

Briefly, these problems were described earlier to include higher-than-typical levels of functional inutility, costs that exceed value and markets limited both in number and purchasing power. In a property featuring a very large horse breeding, training and boarding facility and an reported asking price of $780,000, those problems are even more clearly delineated. There were few potential buyers at that time with that much money, and those who had the money had many other facilities across the Front Range from which to choose. Further, a buyer with that financial strength, as well as the interest in having a facility so heavily invested in the horse business might easily have chosen to construct a facility to their own specifications.

15

## COOK BUSINESS

### Business Summary

Cook improved 24 of her 72 acres in 1984 for the purpose operating a horse breeding, training and boarding facility. Various documents provided the appraiser indicate that the property's capacity was between 32 and 47 head of horses: appraiser's descriptions of Cook's two barns suggest a carrying capacity in excess of 50 horses. Income tax returns from 1983 through 1988 (not all complete) suggest that Cook's horse business never generated a positive cash flow.

### Opinions

1. **The failure of Cook's horse business likely resulted, in large part, from the nationwide decline of the horse industry, and particularly, the Quarter Horse industry.**

   As previously described, the horse industry experienced a significant decline in the late 1980s and early 1990s. Registrations of purebred horses, and especially Quarter Horses, dropped precipitously and sale prices similarly decreased. No horse business operator, including Cook, could have fully escaped the effects of this decline. Cook's claim that in 1989 she could no longer command $5,000 stud fees was most likely attributable to the fact that average Quarter Horse sale prices at that time were closer to $2,000.

2. **The failure of Cook's horse business was probably also the result of Cook's inadequate management practices.**

   Elements necessary for a successful horse business were described earlier in this report. Information from Cook's files suggest that some of these elements were missing from Cook's business. No business plan appeared to have been prepared prior to the establishment of Cook's horse business: the only document resembling a business plan was a draft partnership agreement that apparently was never finalized. Given her multiple bank loans, Cook appeared not to have had adequate financial backing for an enterprise of this size. In her deposition, Cook did not reveal any special education in the field of equine management.

16

There was no evidence of an aggressive marketing effort of Cook's business and Cook admitted in her deposition that she did not know well many of the customers in her barn. The horse business relies heavily on "word-of-mouth": it is critical for the successful professional horsemen to know many people and, conversely, be known to many people.

Other materials provided by Cook indicate that day-to-day management of her business may have been less than ideal. Income and expense statements are not well-documented, and, in some cases, expenses seem to have been understated. For example, Cook apparently intended to provide at least some hay from her own property. Budgeted hay expenditures were low for the 40 to 50 horses she apparently could house. However, her property was not irrigated and so could produce only a limited amount of hay. Further, Cook's personal property lists included no haying equipment.

In addition, some of her income tax returns suggest that she received little or no gross income. However, she clearly was receiving boarding fees, stud fees and training fees in the years her business operated. Further, one income and expense projection, apparently prepared for bank loan purposes, shows no vacancy in her boarding operation. Virtually no income-producing real estate commands 100% occupancy in perpetuity. This is particularly true in the horse business, which is seasonal and dependent on disposable income. Even when a stable is well-occupied, board fees are frequently late or in default. The best-managed stable will experience at least some vacancy and bad debt loss.

<u>LAURIE VAN COURT, MAI</u>

3.. The fact that elements other than Rocky Flats were responsible for the failure of Cook's horse business is borne out by the apparent success of the horse business operated on the nearby Bartlett property.

A successful horse breeding, boarding and training business has been in continuous operation on the Bartlett property since the late 1980s.  Even with the well-publicized activities at Rocky Flats, the Bartlett's daughter, Karen Banister, has bred, raised, trained and showed Paint horses at the national level.  The Bartlett's barn has many boarding clients and Banister has numerous students riding horses bred, raised and trained on-site.  It is possible that this success results from the relative strong success of the Paint Horse breed as a whole.

LAURIE VAN COURT, MAI

## BABB REAL PROPERTY

### Property Summary

Lorren W. and Gertrude Babb purchased a 13.08-acre tract at 14208 West 96th Avenue (Parcel B2) from Merilyn Cook in December 1985. The purchase price was $128,000, of which $100,000 was provided by a loan from Colorado National Bank and $28,000 was represented by the Babbs' deeding to Cook a lot in the Rimrock subdivision in Golden, Colorado. The price, at $9,786 per acre was not cash equivalent: Cook reportedly later told appraiser Lowell Bridwell that the sale was at about $9,600 per acre.

Babb purchased the tract to help his son and daughter-in-law start a horse boarding business, with the possible future plan of subdividing for a more dense residential or commercial use. Neither the Babbs nor their son had previous experience in developing or operating a horse property. They did no investigation as to the feasibility of a boarding facility at this or any other location.

In 1986, the Babbs drilled a well and built an 11-stall barn with tack room. The barn was a wood pole structure, with metal siding and roof. The boarding business was begun that year. Additional sheds and site improvements were constructed in 1987 and 1988, but no residence was built. Receipts from the boarding business never were enough to cover the accumulated debt service on the property and it was listed for sale in 1988. The property was sold in October 1990 to Bill and Donna Amen for $137,500. Babb's records indicate that his total cost to acquire and improve the property was $203,100.

### Opinions

1.  **The Babbs' inexperience with horse properties was a major contributing factor to their own property's failure.**

    By their admission, the Babbs' sole experience prior to developing this horse boarding facility was the ownership of one pleasure horse. As described previously in this report, the successful operation of any horse-related business, including boarding, requires experience, capital and good management skills. Further, the development of horse-related real property requires specialized expertise.

Janet English, in *Complete Guide for Horse Business Success*, indicates that in choosing a location for a horse facility, one must consider a site's proximity to the market it will serve, its ease of access, the economic climate of the surrounding area, room for expansion and the proximity of support services. For development of a small-scale boarding facility, the Babbs' site fell short on all of these.

2.    **Babbs' development cost did not equal real property value because of its inherent functional inutility.**

As previously described, a special purpose property like this one often displays a high degree of functional obsolescence because it is designed and constructed for the needs of one owner. This was the case with the Babb property, in that it was constructed for the operation of one couple's particular business, rather than for the demands of the market as a whole. A particularly difficult example of functional obsolescence in this case was the lack of a residence: any interested purchaser would have been forced to seek rental housing in a sparsely-populated neighborhood or to build a house immediately. This shortcoming likely resulted in a market discount.

3.    **Babb's list of development costs may have been overstated in that it included some non-realty items.**

The development cost list created by Lorren Babb included entries for water tanks and corral panels. The former are nearly always considered personal property and the latter are often so considered. It is notable that the Amen's contract to purchase the Babb property specifically excludes some corral panels.

4.    **Babb's reported future plan to subdivide the tract was not consistent with the surrounding neighborhood nor with his own improvements.**

As with the Cook property, the neighborhood surrounding Babb's property was, and still is, largely rural residential. A higher-density development would also have had the pioneering aspect that likely would have affected its market acceptance. Further, creating such a development adjacent his own horse facility would have reduced his structure's economic

20

life:  it would have also, in effect, become an interim use even though relatively new. Compatibility would also have been compromised in this case.

5.  **That the Babbs were largely responsible for the failure of their horse property is supported by the fact the eventual purchasers, the Amens, apparently operate the property successfully.**

The Amens had both lived in the class area and operated other horse property prior to purchasing the Babbs' property. They were knowledgeable both about the neighborhood's strengths and drawbacks, and also were experienced in the horse boarding business. After acquiring the Babb property, the Amens added both a permanent residence and more horse boarding facilities. All of these factors apparently contribute to a successful operation.

6.  **The marketing difficulties reported by the Babbs in trying to sell their property likely were due to the typical problems associated with horse properties described earlier in this report.**

Briefly, these problems were described earlier to include higher-than-typical levels of functional inutility, costs that exceed value and markets limited both in number and purchasing power. There were few potential buyers for horse properties in 1989, and those few interested buyers had many other facilities across the Front Range from which to choose.

21

## BARTLETT REAL PROPERTY

### Property Summary

Richard S. and Sally A. Bartlett purchased a 10-acre tract at 8895 Alkire Street in July 1977 for $55,000. The site is long and narrow, backing to a local irrigation canal. The Bartletts subsequently rezoned the site, from A-2 to SR-2, and divided it into two parcels. On the westerly 3.05-acre parcel, the Bartletts built a 2,784-square foot Spanish-style single family residence and 1,320 square foot horse barn, in 1978. Richard Bartlett estimated that total development cost, including land, was around $200,000. Bartlett had experience both in real estate sales and residential construction.

In 1987, the Bartletts built a large horse barn and indoor arena on the easterly 6.995 acres of the site. These improvements were to house the family's horse business, to be managed by the Bartletts' daughter, Karen Banister. According to Richard Bartlett, this barn and arena cost approximately $165,000 to build. In later years, a 1,738-square foot modular home was also constructed on this larger tract.

The total property was listed for sale around 1988. Richard Bartlett indicates that the reason for listing the property was the need to find a larger property for the family's expanding horse business. The total asking price was $675,000. The original house and smaller barn, on 3 acres, were also offered separately, for $250,000. The price for this smaller property subsequently was reduced, first to $235,000 and then to $225,000. The Bartletts hoped to realize $500,000 for the 6.995-acre property. Total reported development costs for the entire property were $455,000.

Though the property was marketed extensively, it has not sold. One potential buyer, who intended to convert the property into housing for the elderly, later decided to buy elsewhere, citing the proximity of Rocky Flats as a reason.

LAURIE VAN COURT, MAI

Opinions

1.    The Bartletts had little or no experience in developing horse property.  As previously
described, this is a specialized type of property requiring special expertise to successfully
develop and market.

2.    It was unreasonable for the Bartletts to expect in 1988 to sell their property for 48% more
than its actual development cost.

As described earlier in this report, both the local and the national horse industry had
experienced declines by 1988, and the local real estate market was becoming oversupplied
with horse properties.  A sale of any kind was likely to be difficult, and such a sizable profit
over development cost was not at all realistic.

3.    The marketing difficulties encountered by the Bartletts in trying to sell their property likely
were due to the typical problems associated with horse properties identified earlier in this
report.

Briefly, these problems were described earlier to include higher-than-typical levels of
functional inutility, costs that exceed value and markets limited both in number and
purchasing power.  In a property featuring a very large horse breeding, training and boarding
facility and an asking price of $675,000, those problems are even more clearly delineated.
There were few potential buyers at that time with that much money, and those who had the
money had many other facilities across the Front Range from which to choose.  Further, a
buyer with that financial strength, as well as the interest in having a facility so heavily
invested in the horse business might easily have chosen to construct a facility to their own
specifications.

4.    The Bartletts' property displays very specific functional obsolescence in its site layout.

The property's best-quality and most attractive structures, the original house and smaller barn
adjoining the irrigation canal, are obstructed from view from Alkire Street by the very large
newer barn and indoor arena.  Potential buyers must go past quantities of fencing, equipment
and the detritus of a horse facility in order to see the property's most appealing aspects.  By

the same token, the view from the easterly rooms of the original house is primarily of the back side of a horse facility, not generally seen as attractive even by horsemen.

5.     **The potential sale of the property for use as elderly housing that reportedly failed due to proximity to Rocky Flats was predicated on a speculative use that likely would not have proven either legally or financially feasible.**

As described previously, subject neighborhood is largely rural residential and any denser uses would have been incompatible. Further, it is unlikely that the local authorities would have approved such an alternative use, given their earlier-stated concerns about fire protection access and the character of the surrounding land uses. In addition, the likelihood of an elderly housing facility's succeeding in such a relatively remote location, distant from medical and other support, is very limited.

LAURIE VAN COURT, MAI

## SUPPORTING DATA AND INFORMATION SOURCES

**General**

Monographs Include, But Are Not Limited To:

English, Janet E. *Complete Guide for Horse Business Success*. Grand Prairie, Texas: Equine Research, Inc. 1995

Appraisal Institute. *The Appraisal of Real Estate, Eleventh Edition*. Chicago, Illinois: Appraisal Institute. 1996

Appraisal Standards Board. *Uniform Standards of Professional Appraisal Practice, 1996 Edition*. Washington, D.C.: The Appraisal Foundation. 1995

Periodicals Include, But Are Not Limited To:

"1996 Breed Reports." *Western Horseman*, October, 1996, pp. 74-102.

Various Annual Publications of the American Horse Council.

Various Issues of *Rocky Mountain Quarter Horse Journal*, between 1975 and 1994.

Kadash, Kathy. "Where Have All the Horses Gone?" *Western Horseman*, May, 1993, pp. 150-175.

Butler, Doug, Ph.D. "Outline of an 440 Business Plan or Prospectus." Outline included in course material, Equine Sciences Program, Colorado State University, 1995.

Ehringer, Gavin. "Starting a Stable Business." *Western Horseman*, March, 1996, pp. 154-158.

**Cook Real Property and Horse Business**

Deposition of Merilyn Cook, July 14, 1993.

Various produced documents, including appraisals, federal income tax returns, financial statements, correspondence and others.

**Babb Real Property**

Deposition of Lorren W. Babb, July 7, 1993.

Various produced documents, including appraisals, federal income tax returns, cost tabulations, financial statements, correspondence and others.