# EXHIBIT 43

DEPOSITION OF LAURIE VAN COURT - 3/11/97

1.

```
1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLORADO

3    MERILYN COOK, et al.,            )

4                 Plaintiffs,         ) Civil Action

5                 vs.                 ) No. 90-K-181

6    ROCKWELL INTERNATIONAL           )

7    CORPORATION and THE DOW          )

8    CHEMICAL COMPANY,                )

9                 Defendants.         )

10

11              The deposition of LAURIE VAN COURT,

12   called by the Plaintiffs for examination, taken

13   pursuant to the provisions of the Code of Civil

14   Procedure and the Rules of the Supreme Court of

15   the State of Illinois pertaining to the taking of

16   depositions, taken before JUDITH A. WALSH, CSR

17   No. 84-2824, a Notary Public within and for the

18   County of Cook, State of Illinois, and a

19   Certified Shorthand Reporter of said state, at

20   the offices of Kirkland & Ellis, Suite 5900, 200

21   East Randolph Drive, Chicago, Illinois, on the

22   11th day of March 1997, at 9:00 a.m.

23   REPORTED BY:  JUDITH A. WALSH, CSR, RDR, CRR

24   LICENSE NO. 84-2824
```

VICTORIA COURT REPORTING SERVICES, INC. (312) 443-1025

1  whether the extension service had such
2  information.  I read books and periodical
3  articles.
4      Q   Have you ever owned a horse farm?
5      A   I have owned or been part owner of
6  three separate properties where horses were kept,
7  bred, and ridden.
8      Q   Have you been involved in the keeping,
9  breeding, or riding of those horses?
10      A   Yes.
11      Q   What were the three properties?
12      A   The first was located between the
13  towns of Frederick and Fort Lupton, Colorado.
14      Q   And when did you have an ownership
15  interest in this property?
16      A   Oh, Lord.  It would have been the
17  early 1980s.
18      Q   And how long did you have an interest?
19      A   Three years.
20      Q   And what did your interest consist of?
21      A   I owned it with my former husband.
22      Q   Did you run it?
23      A   Yes.
24      Q   Did you keep the books?

1      A   It was not a commercial property.
2      Q   How big was it?
3      A   Two and a half acres, maintained two
4  horses.
5      Q   Whose horses were they?
6      A   Mine.
7      Q   Oh, so it was your personal home?
8      A   That's right.
9      Q   So it wasn't a business?
10      A   No.
11      Q   I mean, you aren't    it was just for
12  your own pleasure and enjoyment?
13      A   By choice, made the conscious decision
14  not to make it a business.
15      Q   But I'm correct, it was your personal
16  home and you kept the horses for your own use?
17      A   Correct.
18      Q   Okay.  What's the second property?
19      A   The second property located on
20  Russellville Road in Douglas County ; owned it
21  from 1983 through 1988.
22      Q   With anyone else?
23      A   My former husband.
24      Q   How large was this property?

1      A   Had five acres with facility for -- it
2  was a four-stall barn.
3      Q   How many horses did you keep?
4      A   Maximum number at the time was five.
5      Q   And were they all your horses?
6      A   From time to time, we would board a
7  horse for a friend.
8      Q   Just one friend?
9      A   One friend.
10      Q   So is it fair to say that this farm
11  also was for your personal use and enjoyment?
12      A   Yes, though with both cases, there
13  were horses bought and sold and were also horses
14  bred.
15      Q   And the third property?
16      A   The third property is a current
17  property constructed in 1992.  I still live there
18  with my current husband.
19      Q   And what county is that in?
20      A   Douglas County.
21      Q   And how big is this property?
22      A   15 acres.
23      Q   And how many horses do you keep?
24      A   We currently have eight and a half.

1      Q   " And a half, " that means you have a
2  foal?
3      A   We will the first week of May.
4      Q   Do you own these horses, or are they
5  other people's horses?
6      A   Some of them we own, some of them we
7  board again.  The boarding at this point is for
8  members of the family.  It's not a commercial
9  business.
10      Q   So you never had a commercial business
11  horse farm?
12      A   No.  And as I said, it is a conscious
13  decision.  It is common practice in the horse
14  business to -- in the horse business, in horse
15  ownership to incorporate yourself as a farm.  I
16  chose never to do that.
17      Q   How many horse properties have you
18  ever appraised?
19      A   Oh, estimating over 19 years, I would
20  say 15 to 20.
21      Q   And of those, how many were farms that
22  were run as a business?
23      A   Probably half of them.
24      Q   Were any of them in Jefferson County?

3/11/1997 VanCourt, Laurie

```
1      A   I can't remember offhand.
2      Q   How many appraisals in 19 years would
3  you estimate you've done?
4      A   Oh, gosh, I wouldn't even begin to
5  know how to estimate.
6      Q   Well, how did you estimate how many
7  horse property appraisals you did?
8      A   Because they stand out more clearly in
9  my mind.
10     Q   Why?
11     A   It's a particular area of interest for
12 me.
13     Q   When was the last horse property that
14 you appraised?
15     A   I'm hesitating because I'm currently
16 working on an appraisal that is for -- the last
17 one would have been in April of 1996.
18     Q   And where was that property?
19     A   Boulder County.
20     Q   And how close to Rocky Flats was that
21 property?
22     A   As the crow flies, maybe five to ten
23 miles.
24     Q   Do you have a copy of that appraisal?
```

105

3/11/1997 VanCourt, Laurie

```
1      A   Yes.
2      Ms. Rosello:   I'd like a copy of that,
3  please, Mr. Bakke.
4      Mr. Bakke:   As with the other request, put
5  it in writing and we'll take it under
6  advisement.
7  By Ms. Rosello:
8      Q   Before that horse appraisal, when was
9  the most recent one that you had done?
10     A   I can't recall without my job ledger.
11     Q   Do you have any educational background
12 in accounting?
13     A   Specifically in accounting?
14     Q   Yes, ma'am.
15     A   No.
16     Q   Do you have any educational background
17 in finance?
18     A   Yes.
19     Q   What educational background do you
20 have in finance?
21     A   In my appraisal training, there's
22 finance taught in most of the courses leading to
23 professional status as an appraiser.
24     Q   Other than your appraisal training,
```

106

3/11/1997 VanCourt, Laurie

```
1  have you had any finance courses?
2      A   I've taken finance seminars.  And I
3  can't remember in college if I had finance or
4  not.  I don't remember specifically.
5      Q   Have you taken any business management
6  courses?
7      A   I've taken seminars on business
8  management.  That's as close as I'll go.
9      Q   What type of seminars?
10     A   Oh, I've taken some offered through
11 horse organizations, International Arabian Horse
12 Association.  I know I've taken some continuing
13 education through the Appraisal Institute on
14 managing an appraisal office.
15     Q.  Have you ever done an appraisal of a
16 horse farm business as differentiated from the
17 real estate where the horse farm was run?
18     A   No, I have never valued, put a value
19 on the business.
20     Q   Have you ever done an appraisal of any
21 business?
22     A   No.
23     Q   Do you hold yourself out as an
24 appraiser capable of valuing businesses?
```

107

3/11/1997 VanCourt, Laurie

```
1      A   No.
2      Q   Have you ever done any type of
3  evaluation or consulting work other than this
4  case with regard to the value of a business?
5      A   Let me ask a question.  What do you
6  mean by " evaluate "?
7      Q   You were paid to prepare a report or
8  make some type of conclusions with regard to the
9  value of a business.
10     A   No.
11     Q   Have you ever written any literature
12 on how to value a business?
13     A   No.
14     Q   Have you ever given any seminars on
15 how to value a business?
16     A   No.
17     Q   Have you ever done any type of report
18 similar to that section of this report where you
19 discuss the business of Mrs. Cook beginning at
20 Page 16 and continuing to Page 18?
21     A   I have commented in other reports,
22 other appraisal assignments, on the reasons why
23 or the reasons affecting the success and failure
24 of a specific business.
```

108

**Page 109**

```
 1    Q   And were those appraisals?
 2    A   No.
 3    Q   What type of reports were those?
 4    A   Oh, excuse me.   They may have been
 5  appraisals where I felt it necessary to comment
 6  on why one or another use of a property either
 7  was appropriate or wasn't appropriate.
 8    Q   So that has to do with the value, the
 9  highest and best use of the property?
10    A   It could, yes.
11    Q   Okay.  Turning here to Page 16 of
12  Exhibit 1 where you discuss Business Summary,
13  have you ever prepared other than in this case
14  anything like this?
15    A   Without going over everything I've
16  done throughout my career, I can't definitively
17  answer that.
18    Q   To the best of your knowledge as you
19  sit here today, other than in this case, have you
20  ever prepared anything like Pages 16 to 19 of
21  Exhibit 1?
22    A   I have never had an assignment
23  precisely like this before.
24    Q   That wasn't my question.
```

**Page 111**

```
 1  student and as a horse aficionado from the time I
 2  was five years old, I took courses, I read books,
 3  I attended lectures.  I was instructed on a
 4  regular basis by a number of professionals in the
 5  horse business.
 6          In college, I made the decision
 7  not to pursue a career in veterinary medicine.
 8  But I continued my interest in horses and the
 9  horse industry.  I continued to receive
10  instruction.  I continued to read.  I continued
11  to attend lectures, belong to associations, and
12  participate in the management of those
13  associations, including the management of horse
14  shows.
15          In the course of my life, I've
16  owned at least 20 horses.  I have bred horses.  I
17  have sold horses.  I have bought horses.  I am
18  colleagues and professional associations with
19  people who own professional horse businesses.  I
20  have seen some succeed.  I have seen some fail.
21  Members of my family are professional horsemen.
22    Q   Have you ever rendered an opinion in a
23  professional capacity with regard to the value of
24  a horse business?
```

**Page 110**

```
 1    A   That is my answer.
 2    Q   Have you ever prepared a business
 3  summary similar to the one that you have in
 4  Exhibit 1 at Pages 16 to 19, to the best of your
 5  knowledge, before ; yes or no?
 6      Mr. Bakke:  Objection, asked and answered.
 7      Ms. Roselle:  No, it wasn't answered.
 8      The Witness:  In that case, I'll say yes
 9  because I can't say no.  I don't know.
10  By Ms. Roselle:
11    Q   I said, to the best of your
12  knowledge.
13    A   That's why I say, to the best of my
14  knowledge, yes, because I don't know
15  definitively.
16    Q   Okay.  What were the others instances
17  in which you prepared such a business summary?
18    A   I cannot specifically tell you.
19    Q   What is your educational background
20  that qualifies you, in your opinion, to render
21  the opinions that you render on Pages 16 to 19 of
22  Exhibit 1?
23    A   Until I was halfway through college, I
24  was a preveterinary student.  As a preveterinary
```

**Page 112**

```
 1    A   The value of a horse business, never,
 2  including this time.
 3    Q   Have you ever testified in a court of
 4  law in any case about a horse business?
 5    A   Yes.
 6    Q   And what case was that?
 7    A   It was the Drakovsky case.  That was
 8  the appraisal that I completed in April of 1996.
 9    Q   And what was the nature of your
10  testimony?
11    A   It was a case involving the
12  acquisition of a property for open space.  And
13  the owner of that property had purchased it and
14  was improving it, specifically because his wife
15  owned a carriage business.
16      Mr. Bakke:  Before we go any further, if
17  this is going to go into confidential material,
18  let us know.
19      The Witness:  As luck would have it, this
20  one has been resolved.
21  By Ms. Roselle:
22    Q   What court of law did you testify in?
23    A   Boulder.  And it was the City of
24  Boulder -- it was Boulder District Court.
```

3/11/1997 VanCourt, Laurie

```
1      Q    And who was the attorney who called
2  you as a witness?
3      A    Donald Ostrander, O-s-t-r-a-n-d-e-r.
4      Q    And what was the nature of your
5  testimony?
6      A    I talked about the suitability of this
7  property for the owner's use related to the
8  owner's carriage business.
9      Q    Were you talking about the real
10 estate, or were you testifying about the
11 business?
12     A    My assignment was to estimate value of
13 the real estate.  And a component of the real
14 estate's value was its suitability for operating
15 a horse business such as the owners had.
16          Mr. Bakke, I am ready for a
17 break.
18     Mr. Bakke:   Are you going to -- are you
19 going to conclude this section soon or do you
20 want to stop now?
21     Ms. Roselle:   That's fine.  We can stop
22 now.
23
24
```

113

3/11/1997 VanCourt, Laurie

```
1      ( Recess for lunch had at 12: 30
2       p. m. , and the deposition resumed
3       at 1: 35 p. m. )
4  By Ms. Roselle:
5      Q    Please turn to Page 2 of Exhibit 1.
6          Do you have any banking
7  experience?
8      A    Do you mean, have I been employed as a
9  bank?
10     Q    Have you been employed by a bank or
11 involved in commercial lending or residential
12 lending decisions or done any analysis of loans?
13     A    No.
14     Q    Okay.  At the top of Page 2, Item 4,
15 " Analysis of the elements that maximize value in
16 horse-related real property, " what did that
17 analysis consist of?
18     A    That analysis consisted of studying,
19 reading standard textbooks related to real estate
20 appraisal to refresh my memory on particularly
21 obsolescence, functional obsolescence, cost
22 versus value ; consideration of those factors that
23 I found motivated people in other situations to
24 buy or sell horse-related real property ;
```

114

3/11/1997 VanCourt, Laurie

```
1  researching literature for specific articles
2  about horse property.  That research involved an
3  information search through the Lum library of the
4  Appraisal Institute.
5          I also contacted some colleagues
6  in other states where there is a more thriving
7  horse industry than there is in Colorado to see
8  if they were aware of any monographs or pamphlets
9  written on such a thing.  That's all that I
10 recall.
11     Q    In your reference list at the back of
12 your report, could you tell me which of the
13 references have to do with Item 4?
14     A    The Janet English monograph, the
15 Appraisal Institute textbook, the annual
16 publications of the American Horse Council, the
17 Ehringer article.  That's it.
18     Q    Item 5, " Analysis of recent national
19 trends affecting demand for and profitability in
20 the horse industry, " did you do anything for Item
21 5 in addition to what you did for Item 4?
22     A    Yes.
23     Q    What did you do?
24     A    I specifically studied written
```

115

3/11/1997 VanCourt, Laurie

```
1  information, published information about the
2  horse business, national horse industry through
3  the ' 80s and early ' 90s.
4      Q    Do you hold yourself out as an
5  economist?
6      A    No.
7      Q    Do you have any formal education in
8  economics?
9      A    No.
10     Q    Do you have any formal education in
11 business or in the business school at Colorado
12 State University or the University of Colorado or
13 anything like that?
14     A    I'm not a graduate of either of those.
15     Q    Did you take any business courses when
16 you were in school?
17     A    I can't recall.
18     Q    Have you published any articles or
19 given any lectures with regard to the economics
20 of the horse industry?
21     A    No.
22     Q    Have you published any articles or
23 given any lectures with regard to the horse
24 industry in any respect?
```

116

3/11/1997 VanCourt, Laurie

1  appraisal, this was a parcel that was
2  significantly larger than the Cook property and
3  that had not yet already been improved or
4  partitioned.
5          And furthermore, I say there is
6  an apparent current demand for rural residential
7  land, but such use effectively freezes land value
8  at low density levels.
9          Ms. Roselle:  Would you please read back
10 the question?
11          ( Record read as requested. )
12 By Ms. Roselle:
13     Q    Yes or no.
14          Mr. Bakke:  Objection, asked and answered.
15          The Witness:  For this 228-acre tract with
16 no improvements and no partitioning, yes.
17 By Ms. Roselle:
18     Q    You were recommending higher density
19 residential use?
20     A    For this parcel.
21     Q    Now, Item 2 on Page 14, you say, " It
22 is likely that between 1984 and 1989, Cook's
23 property became overencumbered, probably as the
24 results of banks ' incautious lending policies,

173

3/11/1997 VanCourt, Laurie

1  bolstered by inadequately supported appraisals
2  and Cook's unsubstantiated net worth
3  statements. "
4          What are your qualifications to
5  render that opinion?
6     A    There were no bases for claims of
7  personal property value.  There were no
8  appraisals backing those up.  There was a claim
9  of value for her horses which in my experience as
10 a horseman were not at all substantiated.
11     Q    Okay.  I'll ask you again.  I'm not
12 asking why you said this.  I'm asking what your
13 credentials are to make the statement.  You have
14 no banking experience.  You aren't an
15 accountant.  You aren't a financial expert.  You
16 aren't an economist.  You didn't major in
17 business.  And you've never worked for a bank.
18          So what are your credentials to
19 make the statement that Cook's property became
20 overencumbered probably as a result of banks '
21 incautious lending policies bolstered by
22 inadequately supported appraisals and Cook's
23 unsubstantiated net worth statements?
24     A    The two appraisals that I reference --

174

3/11/1997 VanCourt, Laurie

1     Q    No, I'm not asking about appraisals. '
2  I'm asking about your credentials.
3     A    My credentials?  I am a real estate
4  appraiser who is competent to review and comment
5  on other's appraisals.  And I am a lifelong
6  horseman who has bought and sold many horses,
7  including in this time frame.  And as a horseman,
8  I find the lack of support for this figure
9  suspect.
10    Q    What figure?
11    A    $700,000.
12    Q    Well, I showed you a whole bunch of
13 appraisals today that you told me you couldn't
14 even tell me whether or not you had ever seen
15 them, correct?
16    A    I'm reading my own statement from my
17 own report.
18    Q    I know.  Where did you get the
19 information that you base Opinion 2 on?
20    A    This is especially true of value
21 claims in her net worth statements, of which I
22 have copies.
23    Q    How much did the banks lend her?
24    A    I can't report how much.

175

3/11/1997 VanCourt, Laurie

1     Q    Do you know how much?
2     A    Do I know for a fact, no.
3     Q    How much was the real estate worth?
4  Forget the horses for a moment.  Tell me what the
5  real estate was worth.
6     A    I have no idea.  I did not appraise
7  it.
8     Q    So how can you make the statement that
9  her property was overencumbered if you don't know
10 what it was worth?
11    A    Because there were appraisals that
12 were poorly supported and evidence of continuing
13 borrowing.
14    Q    Where are those appraisals?  Is it the
15 Bridwell appraisal?
16    A    No.  1983 and 1985.  Bridwell is
17 1986.
18    Q    Here is a December 1984 appraisal.  Is
19 that the one?
20    A    I say in my report, 1983 and 1985.
21    Q    But you can't identify them when I
22 showed you the appraisals earlier?
23    A    You have a stack of appraisals, all of
24 which look alike.  And without sitting down and

176

1    Q    Maintained.
2    A    -- maintained in 1989?
3    Q    Yes.
4    A    No.
5    Q    Now, under 3, you say, " While the
6    improvements on Cook's property were serviceable,
7    they were modest, and lacked the ' curb appeal '
8    found in other large horse properties. "
9         I'm somewhat confused in that
10   when I asked you about the various properties,
11   you did not mention to me as a difference, for
12   example, between the Cook property and Columbine
13   Farm that the Cook property was modest and lacked
14   curb appeal.   Could you tell me why you didn't
15   mention that?
16   A    I believe I did mention that the
17   Columbine Farm property was larger.
18   Q    But you didn't mention that there was
19   any difference in curb appeal.
20   A    No, I didn't.
21   Q    Are you now changing your testimony to
22   include lack of curb appeal as a difference
23   between the Cook property and Columbine Farm?
24        Mr. Bakke:   Objection, mischaracterizes

1    prior testimony.
2         The Witness:   No, I'm not changing my
3    testimony.
4    By Ms. Roselle:
5    Q    What is the Thigpen purchase on Page
6    15?
7    A    The documents that I received
8    indicated that there was a contract purchase of
9    Cook's property in 1984 and that -- that's what
10   I'm describing.
11   Q    How much land was under contract?
12   A    Without my file here, I can't tell
13   you.
14   Q    Are you saying that Thigpen was going
15   to pay more than the property was worth?
16   A    No, because I don't know what the
17   property was worth, but I do know that from my
18   reading of the documents surrounding the Thigpen
19   contract, there were elements about it that would
20   alert any appraiser that it might not have been a
21   cash equivalent sale.
22   Q    Okay.   You say that Thigpen paid
23   virtually no cash in the transaction reducing his
24   risk to virtually nothing.

1         Wouldn't you agree with me that
2    if someone signs a note that obligates him to
3    make statements that he still has risk?   Can't he
4    be sued on the note?
5         Mr. Bakke:   Objection, calls for a legal
6    conclusion.
7         The Witness:   No, I wouldn't agree with
8    that.
9    By Ms. Roselle:
10   Q    You're saying that someone can come in
11   and buy a piece of property with no money down or
12   very little down, sign a note, and give a
13   mortgage for the property and that person has no
14   financial risk in the transaction?   Is that what
15   you're saying?
16   A    Yes.
17   Q    Have you ever heard of suing somebody
18   for a deficiency balance?
19   A    Yes.
20   Q    And what is that?
21   A    That's going to take a legal opinion
22   that I can't give.
23   Q    But it is your testimony that if
24   somebody comes in and buys something for very

1    little down and signs a note and a mortgage that
2    they have no risk in the transaction?
3         Mr. Bakke:   Objection, mischaracterizes
4    prior testimony.   And objection, it is vague and
5    ambiguous as to what type of note you're speaking
6    of.
7         The Witness:   I don't say in the report
8    that he has no risk.   He reduces his risk.
9    By Ms. Roselle:
10   Q    To virtually nothing.   What does
11   " virtually nothing " mean?
12   A    It means exactly what it says.
13   Q    It means no risk, doesn't it?
14   A    On the evidence of the number of
15   contracts like this that were signed throughout
16   the metropolitan area of Denver in the late ' 80s,
17   I believe they were called nonrecourse loans.
18        This was a very common
19   occurrence.   And lots of contract purchasers
20   walked away from these contracts with no loss.
21   Q    You don't say in here anywhere that
22   this was a nonrecourse note.   Do you have the
23   note?
24   A    Not with me.

3/11/1997 VanCourt, Laurie

```
 1   ran a horse farm for profit?
 2      A    That's incorrect.
 3      Q    Who did you work for?
 4      A    I worked for Dotty Van Bleet.
 5      Q    And when did you work for her?
 6      A    I worked for her in 1975.
 7      Q    While you were in college?
 8      A    No.   After college.
 9      Q    How long did you work for her?
10      A    The better part of a year.
11      Q    What did you do?
12      A    With my former husband, we were
13   managers of her horse property.
14      Q    And how big was her horse property?
15      A    Oh, golly.   I can't remember the
16   acreage.
17      Q    How many horses did she have?
18      A    At the time, I would estimate between
19   10 and 20.
20      Q    And did your responsibilities include
21   doing her accounting work?
22      A    No.   My responsibilities involved
23   keeping good enough records so that her
24   accountant could do her accounting work.
```

193

3/11/1997 VanCourt, Laurie

```
 1      Q    Did you develop a business plan for
 2   her?
 3      A    No, but she developed a business plan
 4   as owner.
 5      Q    Did you ever meet with her bankers?
 6      A    I don't remember.
 7      Q    At the time that you worked on this
 8   farm, did you have any special education in the
 9   field of equine management?
10      A    Yes.
11      Q    And what education did you have?
12      A    All the years as a child going through
13   4-h showing horses, reading, taking seminars.
14      Q    Any other time that you worked on a
15   farm for profit, that the farm was for profit?
16      A    That was the one time I was paid.   I
17   took a leave of absence from work in 1983 -- no,
18   '82, 1982, to learn more about the horse
19   business.   And I spent a substantial amount of
20   time for about six months with the owner and
21   operator of a horse breeding, boarding, and
22   training facility.
23      Q    And how big was that facility?
24      A    The land at that time was about 3,000
```

194

3/11/1997 VanCourt, Laurie

```
 1   acres.
 2      Q    What did you do there?
 3      A    I helped with exercising the horses.
 4   I helped with composing advertising.   I helped
 5   with veterinary work.   I helped at horse shows.
 6      Q    All right.   Turn to Page 18, please.
 7   You say that, " The fact that elements other than
 8   Rocky Flats were responsible for the failure of
 9   Cook's horse business is borne out by the
10   apparent success of the horse business operated
11   on the nearby Bartlett property. "
12             Is it your testimony that the
13   Bartlett horse farm was successful?
14      A    By my observation -- well, as I say in
15   the report, the Bartlett's daughter bred, raised,
16   trained, and showed Paint horses.
17             By observation when inspecting
18   the property, there were many boarding clients.
19   And by my involvement in the Paint horse
20   industry, I know that Ms. Banister has a number
21   of students that ride with her and a number of
22   horses that she has bred, raised, and trained on
23   that property.
24      Q    So it's your testimony that that horse
```

195

3/11/1997 VanCourt, Laurie

```
 1   farm is successful?
 2      A    Yes.
 3      Q    And you've given me all the bases for
 4   your opinion?
 5      A    Correct.
 6      Q    Let's turn, please, to the Babb
 7   property.   Your first opinion is that " The Babbs '
 8   inexperience with horse properties was a major
 9   contributing factor to their own property's
10   failure. "
11             Does the fact that they weren't
12   experienced horsemen affect the marketability of
13   their property?
14      A    Yes.
15      Q    In what way?
16      A    The facility that they built had a
17   number of instances of functional inutility.
18      Q    So it wasn't properly designed?
19      A    Correct.
20      Q    Could you tell me specifically what
21   about it you didn't think was properly designed?
22      A    As I say on Page 20, the first design
23   flaw was actually perhaps the choice of this site
24   for developing a boarding facility alone at that
```

196

3/11/1997 VanCourt, Laurie

time.

2  Q   What else?

3  A   The property as it appeared in 1989
4  under Babb's ownership -- now, I don't know that
5  Babb owned it in 1909.   Yes, he did -- had no
6  single-family residence.

7  Q   What else?

8  A   That's all.

9  Q   What is the basis for your statement
10 that the Babbs ' listed development costs may have
11 been overstated?

12 A   As I explain on Page 20, the
13 development list that Mr. Babb prepared included
14 entries that are not typically considered real
15 estate costs.

16 Q   And you list two there, water tanks
17 and corral panels?

18 A   Correct.

19 Q   Are those the only two on his
20 development cost list that you question?

21 A   Yes.

22 Q   How much did those two items come to?

23 A   I don't recall.

24 Q   Were the water tanks and corral panels

197

3/11/1997 VanCourt, Laurie

attached to the land such that when the land was
2 sold, they were sold, also?

3  A   I don't know for a fact about the
4 water tanks.   In the case of the corral panels,
5 my reading of the Aman's contract to purchase the
6 Babb property specifically excluded corral
7 panels.

8  Q   Item 4, " Babb's reported future plan
9 to subdivide the tract was not consistent with
10 surrounding neighborhood nor with his own
11 improvements. "   That's the same statement that
12 you're making about the Cook property, correct?

13 A   Correct.

14 Q   Even though you thought the highest
15 and best use for the Alkire Investment property
16 was residential, you don't think that's true for
17 the Babb and the Cook property, correct?

18 A   Given that the Alkire property was 228
19 acres with no improvements, that is correct.

20 Q   How much acreage do you need to
21 develop residential?

22 A   That's such an open-ended question, I
23 couldn't answer it.

24 Q   Well, you would agree with me that you

198

3/11/1997 VanCourt, Laurie

can develop residential on as small as two or
2 three acres, you could put two or three houses,
3 correct?

4  A   No, I wouldn't agree with you.

5  Q   If you look around Denver, aren't they
6 putting houses on quarter acres?

7  A   Where?

8  Q   Westaminster, some of the other
9 areas.   Aren't they putting houses on very small
10 lots that are a quarter acre or less?

11 A   But they're lots already.

12 Q   Yes.

13 A   In this case, those weren't lots.

14 Q   You'd have to develop them.

15 A   But this had already been developed.

16 Q   Okay.   My question to you is, don't
17 you agree that there isn't -- that you could put
18 single-family residential houses on as small as a
19 three or four-acre plot?   You could subdivide
20 that into houses?

21 A   No.   Actually, I don't know that
22 because it's my recollection that that plan was
23 not approved by Jefferson County.

24 Q   What is the smallest lot size for a

199

3/11/1997 VanCourt, Laurie

house that you're allowed in Jefferson County?

2  A   Oh, gosh, I couldn't answer that.   I
3 don't know.

4  Q   What is the smallest piece of land
5 that you've seen subdivided into houses?

6  A   I don't have -- I really don't have
7 any way to answer that.

8  Q   How many houses was Alkire Investment
9 going to put on their 220 acres?

10 A   They had no plan to put any houses.

11 Q   What were they going to put there?

12 A   To my knowledge, there were no plans.
13 It was vacant speculation land.

14 Q   When you determined that the highest
15 and best use for that property was residential,
16 how many houses did you envision?

17 A   I made no specific estimate.

18 Q   Would you agree with me that there are
19 houses in Jefferson County on lots as small as a
20 quarter acre?

21 A   In all of Jefferson County, there are
22 houses on lots as small as a quarter acre.

23 Q   So the fact that the Babbs had 12
24 acres would not have prevented them from

200