**EXHIBIT 45**

ROY E. THIGPEN - November 20, 2004

1

```
           UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF LOUISIANA

MARILYN COOK, et al.,         )(
                              )(
    Plaintiffs,               )(
                              )(
VS                            )(    CASE NUMBER 90-K-181
                              )(    USDC District of Colorado
ROCKWELL INTERNATIONAL        )(
CORPORATION and the           )(
DOW CHEMICAL COMPANY,         )(
                              )(
    Defendants.               )(
```

VIDEOTAPED ORAL DEPOSITION OF ROY E. THIGPEN

NOVEMBER 20, 2004

# COPY

VIDEOTAPED ORAL DEPOSITION OF ROY E. THIGPEN, produced as a witness at the instance of the Defendants, and duly sworn, was taken in the above-styled and above-numbered cause on the 20th day of November, 2004, from 10:04 a.m. to 12:45 p.m., before Lisa J. Gretarsson, CSR in and for the state of Texas, reported by machine shorthand, at the residence of Roy E. Thigpen, 826 Voss Road, located in the city of Houston, state of Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record.

11/20/2004 Thigpen, Roy

1  Q. Did you, in fact, pay on that judgment?
2  A. I paid in full. Promptly paid in full.
3  Q. Have you ever declared bankruptcy?
4  A. Yes.
5  Q. When was that?
6  A. I filed in 1977 or so. Then there was an
7  involuntary bankruptcy in 1986.
8  Q. That was a personal bankruptcy?
9  A. Uh-huh (affirmative).
10 Q. I'd like to go back to the transaction with
11 Merilyn Cook.
12     Do you recall the name of the bank that
13 loaned you the $500,000 to buy the Cook property?
14 A. It was Colorado National Bank, as I recall.
15 Q. Did Colorado National Bank order the appraisal
16 of the Cook property?
17 A. I have no idea.
18 Q. Did you order the appraisal of the Cook
19 property?
20 A. I don't think I did anything. I was just a
21 front man for Merilyn.
22 Q. In your experience, do banks usually want to
23 have control over the appraiser who goes out to check out
24 a property that they're about to give a substantial loan
25 on?

00044

11/20/2004 Thigpen, Roy

1  A. Merilyn had some kind of control over the
2  banker, and for some reason that banker had an obligation
3  to make this loan with no questions asked.
4  Q. What kind of control over the banker are you
5  talking?
6  A. I don't know.
7  Q. Do you have any proof that Merilyn Cook had
8  control over a banker?
9  A. I'm giving you my recollection.
10 Q. What is that recollection based on?
11 A. That they never asked for much supported
12 documentation, didn't care who I was at all. They were
13 just looking for some papers to be able to make a loan to
14 get Merilyn out of the trap.
15 Q. Did anybody at the bank tell you that Merilyn
16 Cook had control over them?
17 A. Not at the bank.
18 Q. Did Ken Shepherd tell you that Marilyn Cook had
19 control over the bank?
20 A. That was my understanding from talking to Ken.
21 Q. Can you recall exactly what Mr. Shepherd told
22 you?
23 A. That Merilyn had certain relations with the
24 banker, and that there would be a loan made with no
25 questions, and that's exactly how it came down.

00045

11/20/2004 Thigpen, Roy

1  Q. Did Mr. Shepherd describe what kind of control
2  Ms. Cook had over the banker?
3  A. Just enough control to get the loan made with no
4  problems.
5  Q. Did he mention blackmail?
6  A. Not that word.
7  Q. Did he mention that Ms. Cook was involved in
8  business dealings with the banker?
9  A. I don't know if there were business dealings.
10 Q. So you don't know what kind of control Ms. Cook
11 allegedly had over the banker at Colorado National Bank.
12 A. No, I don't know. She had enough control to get
13 a $500,000 loan with no problem.
14 Q. In your experience as a real-estate investor,
15 are banks typically happy when an appraiser appraises a
16 property for more than it's worth?
17 A. If they have something to cover up, they are.
18 Q. What do you mean by "something to cover up"?
19 A. I think it was more important to get Merilyn off
20 the loan at the bank than worry about what was going to
21 happen down the line.
22 Q. Talking in general now, is it a good situation
23 or a bad situation when a bank loans more money on a
24 property than it is actually worth?
25 A. Well, it could be either. Depends on what their

00046

11/20/2004 Thigpen, Roy

1  and result is.
2  Q. How do you mean, it depends on the end result?
3  A. Well, if -- if they're trying to cover up
4  something that needs to be covered up, then the end
5  results don't matter. It's better to cover it up and face
6  a loss down the road than let it go.
7  Q. Well, assuming no conspiracies behind the
8  scenes --
9  A. You're assuming that, right?
10 Q. Right.
11 A. Okay.
12 Q. Assuming that there are no conspiracies behind
13 the scenes, wouldn't you think, as an experienced
14 real-estate investor, that a bank would want to not loan
15 more money on a property than the property is actually
16 worth?
17 A. Assuming there aren't other hidden agendas,
18 that's correct.
19 Q. And an appraiser, who conducted an appraisal,
20 that stated that a property was worth more than it
21 actually is in the real world, would generally not find
22 himself employed by the bank any longer; is that correct?
23 A. No. That's probably not correct. In fact, he
24 would probably -- if he goes out, does what the bank says,
25 to justify their needs at the time, he'll be on the top of

00047

11/20/2004 Thigpen, Roy

1  A. Some years ago.
2  Q. Was it in the 1990s?
3  A. Probably at least -- I don't recall who it was,
4  but Dow chemical, I believe they were involved in a
5  coal-mining venture in Louisiana, and I had some friends
6  that were involved in that, but I don't recall the
7  specifics. And it's likely that I know someone involved
8  with Dow here in this area.
9  Q. You just don't know -- can't recall who that is?
10 A. Right. I can't recall.
11 Q. How long ago was this mining venture in
12 Louisiana that you spoke about?
13 A. Oh, that was 10 to 20 years ago.
14 Q. Do you have any friends or business associates
15 employed by Rockwell International?
16 A. Not to my knowledge.
17 Q. Do you have any friends or business associates
18 employed by the Department of Energy?
19 A. Not to my knowledge.
20 Q. Are you being paid for your testimony?
21 A. No.
22      MS. MacNAUGHTON-WONG: That's all I have.
23           EXAMINATION
24 BY MR. BAKKE:
25 Q. Okay. Plaintiffs' counsel, a number of times in

00084

11/20/2004 Thigpen, Roy

1  her questions, talked about the loan that you had with the
2  bank on the property, that you had fronted on for
3  Ms. Cook, going into default or being foreclosed. Was
4  that loan ever in default or foreclosure, to your
5  knowledge?
6  A. I don't recall the status of it.
7  Q. The $770,000 price, that was used to create the
8  loan to the bank and the note to Ms. Cook, was that a
9  price that you negotiated with Ms. Cook or with
10 Mr. Shepherd?
11 A. It was a figure that Ken came up with. And I
12 think, for some reason, Merilyn wanted to keep the value
13 of the property as high as she could. And that's why the
14 second mortgage was created, to show a higher value, and I
15 had no objection and that's how we reached it.
16 Q. Did you care what the price was on the Cook
17 property?
18 A. Not really.
19 Q. Now, Mr. Snyder, who wrote that appraisal for
20 $770,000 in late 1984, that you were shown, would it
21 surprise you, that in late 1986, after all the loans were
22 done, after Ms. Cook had the property back, that a
23 different appraiser appraised the same property for only
24 $330,000? Would that surprise you?
25 A. No, not really.

00085

11/20/2004 Thigpen, Roy

1  Q. Why wouldn't it surprise you?
2  A. Well, it's really only some vacant land and a
3  metal building and a trailer house or two out there.
4  There wasn't that much hard value or tangible value, other
5  than the dirt. And we were in a real-estate depression
6  during this time also.
7  Q. How many total business dealings or ventures
8  have you had with Mr. Shepherd over the years,
9  approximately?
10 A. Oh, two or three, maybe four larger-type
11 transactions, and then a few smaller-type transactions,
12 maybe three or four, five, where there was just a few
13 thousand dollars involved, large ones being two to 500,000
14 range.
15 Q. What about Mr. Bormaster? How many business
16 dealings over the years have you had with Mr. Bormaster?
17 A. I had probably a dozen. And one of those was a
18 multiple transaction, multiple properties. There were
19 probably 15 to 20 different pieces of real estate involved
20 in that.
21 Q. Now -- to the degree you know, how many types --
22 how many --
23      MR. BAKKE: Well, strike that.
24 BY MR. BAKKE:
25 Q. To the degree you know, what's the volume of

00086

11/20/2004 Thigpen, Roy

1  interaction and business transactions between Mr. Shepherd
2  and Mr. Bormaster?
3  A. They -- to my recollection, they had known each
4  other for a number of years. And they bought some -- a
5  few pieces of real estate together, maybe four, five, six,
6  something like that.
7       There were two or three fast-food
8  restaurants in -- in Joplin and in Springfield, Missouri.
9  They owned a motel together in Springfield -- I mean, in
10 Joplin, and then some other things I don't recall.
11 Q. Now, Ms. Cook testified that in the middle of
12 1984, Mr. Bormaster was looking at her property. Were you
13 aware that Mr. Shepherd had previously sought to have
14 Mr. Bormaster front the loan before coming to you?
15      MS. MacNAUGHTON-WONG: Objection:
16 Foundation.
17 A. I don't recall anything about that.
18 BY MR. BAKKE:
19 Q. What discussions did you have with Mr. Bormaster
20 and Mr. Shepherd together about that Cook property and the
21 loans?
22 A. I don't recall the specifics.
23 Q. What do you recall, generally?
24 A. That Merilyn was in a jam, and that Ken wanted
25 to help her out; and that because of his marital situation

00087