# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

No. 90-K-181

───────────────────────────────────────────────

MERILYN COOK, et al.,

      Plaintiffs,

          v.

ROCKWELL INTERNATIONAL CORPORATION and
THE DOW CHEMICAL COMPANY,

      Defendants.

───────────────────────────────────────────────

**PLAINTIFFS' CONSOLIDATED MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTIONS TO EXCLUDE EXPERT TESTIMONY**

───────────────────────────────────────────────

Dated: July 11, 2005

**TABLE OF CONTENTS**

I.    INTRODUCTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   GOVERNING LEGAL STANDARDS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    Helpfulness to the Trier of Fact Is the "Touchstone" of Admissibility . . . . . . . . 2

      B.    An Expert's Qualifications Should Not be Viewed in a Narrow or
            Restrictive Manner  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      C.    Daubert's Reliability Inquiry is Flexible  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III.  DAMAGES EXPERTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      A.    WAYNE HUNSPERGER  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            1.    Overview of Qualifications and Report  . . . . . . . . . . . . . . . . . . . . . . . 10

            2.    Defendants' Qualification Arguments  . . . . . . . . . . . . . . . . . . . . . . . . 11

            3.    Defendants' "Fit" Argument  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

            4.    Defendants' Reliability Arguments  . . . . . . . . . . . . . . . . . . . . . . . . . . 12

                  a.    Appraisals  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

                  b.    "Three Traditional Approaches"  . . . . . . . . . . . . . . . . . . . . . 13

                  c.    Market Participant Research  . . . . . . . . . . . . . . . . . . . . . . . 15

                  d.    Analogous Case Studies . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

                  e.    Market Sales Data  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

                  f.    MLS Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

                  g.    Vacant Land . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

i

5.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

B.    DR. JOHN RADKE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

1.    Qualifications . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

2.    Dr. Radke's Report  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

3.    Defendants' Attack on Dr. Radke's Qualifications  . . . . . . . . . . . . . . . 31

4.    Defendants' Relevance Arguments  . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

5.    Defendants' Reliability Arguments  . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

6.    Defendants' Spurious Charges of "Missing" Data . . . . . . . . . . . . . . . . 35

C.    DR. JAMES FLYNN AND DR. PAUL SLOVIC  . . . . . . . . . . . . . . . . . . . . . . . 36

1.    Drs. Flynn and Slovic are Qualified . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

2.    Drs. Flynn and Slovic's Testimony is Relevant and Reliable  . . . . . . . . 41

a.    The Flynn and Slovic Reports  . . . . . . . . . . . . . . . . . . . . . . . . . 41

i.    The Survey Report  . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

ii.    The Slovic Report  . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

b.    Defendants' "Fit" Objections Are Meritless  . . . . . . . . . . . . . . 43

c.    Drs. Flynn and Slovic's Methodology Is Sound  . . . . . . . . . . . 46

i.    Discount Amount and "Anchoring Bias"  . . . . . . . . . . . 47

ii.    Allegedly Biased Questions  . . . . . . . . . . . . . . . . . . . . 49

iii.    Unrealistic Survey Situation  . . . . . . . . . . . . . . . . . . . 50

iv.    Safety-for-Money Tradeoff  . . . . . . . . . . . . . . . . . . . . 51

v.    Accepted Survey Techniques  . . . . . . . . . . . . . . . . . . . 51

IV.   RISK EXPERTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    A.   DR. ROBERT GOBLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

        1.   Dr. Goble's Credentials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

        2.   Dr. Goble's Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

        3.   Defendants' Arguments Concerning Dr. Goble . . . . . . . . . . . . . . . . . . . 56

            a.   Defendants' "Fit" Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . 56

            b.   Defendants' Reliability Arguments . . . . . . . . . . . . . . . . . . . . . . . 57

                i.   Dr. Goble's Confidence Ranges . . . . . . . . . . . . . . . . . . 58

                ii.   Hypothesis-Testing . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

                iii.   Reliance on 95th Percentile Estimates . . . . . . . . . . . . . 61

                iv.   "Real World" Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

                v.   Deposition Velocity . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

                vi.   "Multipliers" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

    B.   DR. RICHARD CLAPP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

        1.   Overview of Testimony and Qualifications . . . . . . . . . . . . . . . . . . . . . 64

        2.   Defendants' Expert Used The Same Methodology . . . . . . . . . . . . . . . . 66

        3.   Dr. Clapp's Methods Are Sound . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

        4.   Dr. Clapp's Conclusions Are Sound . . . . . . . . . . . . . . . . . . . . . . . . . . 71

            a.   Statistical Significance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

            b.   Ecological Studies Are Reliable . . . . . . . . . . . . . . . . . . . . . . . . 78

            c.   Accounting for "Confounders" . . . . . . . . . . . . . . . . . . . . . . . . . 79

d.    The Data Support a Temporal Trend . . . . . . . . . . . . . . . . . . . . . . . 80

e.    There is No Evidence of Systematic Bias . . . . . . . . . . . . . . . . . . 81

f.    Dr. Clapp's Study is Complete . . . . . . . . . . . . . . . . . . . . . . . . . . 83

C.    DR. SHAWN SMALLWOOD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

1.    Overview of Testimony and Qualifications . . . . . . . . . . . . . . . . . . . . . . . 84

2.    Summary of Methods . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

3.    Defendants' Baseless Relevance Attack . . . . . . . . . . . . . . . . . . . . . . . . 87

4.    Defendants' Attack on the Chromium Example . . . . . . . . . . . . . . . . . . 92

V.    CONDUCT EXPERTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

A.    Defendants' Bad Acts That Exemplify Their Shoddy Management of Rocky Flats "Fit" with Plaintiffs' Claims . . . . . . . . . . . . . . . . . . . . . . . . . . 94

B.    DR. ROBERT BUDNITZ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

1.    Dr. Budnitz is Highly Qualified . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

a.    Dr. Budnitz's Qualifications . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

b.    Defendants' Challenges to Dr. Budnitz's Qualifications are Specious . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

2.    Dr. Budnitz's Opinions Are Helpful and Reliable . . . . . . . . . . . . . . . . 104

a.    Dr. Budnitz's Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

i.    The Fires Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

ii.    The 903 Pad Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

b.    Dr. Budnitz's Opinions Are the Result of Thorough and Independent Research and Analysis . . . . . . . . . . . . . . . . . . 107

           c.       Dr. Budnitz Assessed Defendants' Conduct
According to the Practices and Standards of Care
in the Industry  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

           d.       Dr. Budnitz's Analysis of Defendants' Environmental
Monitoring Practices is Relevant . . . . . . . . . . . . . . . . . . . . . . . . 114

   C.     DR. THOMAS COCHRAN . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

       1.     Dr. Cochran is Highly Qualified  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

       2.     Dr. Cochran's Opinions Are Reliable and Helpful to the Jury  . . . . . . . 119

           a.       Dr. Cochran's Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

               i.       The Overview Report  . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

               ii.      The MUF Report  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

           b.       Dr. Cochran's Opinions Are the Result of Thorough and
Independent Research and Analysis . . . . . . . . . . . . . . . . . . . . . . 122

           c.       Dr. Cochran Applied the ALARA Principle, an
Objective Standard of Care, to Defendants' Conduct  . . . . . . . . 124

           d.       Dr. Cochran's Testimony Regarding MUF is Relevant . . . . . . . 126

VI.   CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

## TABLE OF AUTHORITIES

**CASE**                                                                  **PAGE(S)**

*American Society of Composers, Authors and Publishers v. Showtime/*
    *The Movie Channel, Inc.*, 912 F.2d 563 (2d Cir. 1990) . . . . . . . . . . . . . 59

*Averitt v. Southland Motor Inn of Oklahoma,*
    720 F.2d 1178 (10th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

*Ayers v. Jackson Township,*
    106 N.J. 557, 525 A.2d 287 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*Bazemore v. Friday,*
    478 U.S. 385 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Bitler v. A.O. Smith Corp.,*
    400 F.3d 1227 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 49, 94

*Bradbury v. Phillips Petroleum Co.,*
    815 F.2d 1356 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97, 126

*City of Santa Fe v. Komis,*
    845 P.2d 753 (N.M. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Compton v. Subaru of America,*
    82 F.3d 1513 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

*Cook v. Rockwell Int'l Corp.,*
    151 F.R.D. 378 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Cook v. Rockwell Int'l Corp.,*
    273 F. Supp. 2d 1175 (D. Colo. 2003) . . . . . . . . . . . . . . . . . . . . . . . . 95, 111

*Cullen v. Ind. Univ. Bd. of Trs.,*
    338 F.3d 693 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Daubert v. Merrell Dow Pharms., Inc.,*
    509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7, 8, 49, 94, 112

vi

*Ellsworth v. Tuttle*,
　　No. 03-4253, 2005 WL 1427638 . . . . . . . . . . . . . . . . . . . . . . . . . . . 107, 122

*Escamilla v. Asarco, Inc.*,
　　No. 91 CV 5716 (Dst. Ct. Denver Cty., Colo.) . . . . . . . . . . . . . . . . . . . . . 20

*Goebel v. Denver & Rio Grande W. R.R. Co.*,
　　346 F.3d 987 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Gomez v. Martin Marietta Corp.*,
　　50 F.3d 1511 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 22

*Gust v. Jones*,
　　162 F.3d 587 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*Harolds Stores, Inc. v. Dillard Dept. Stores, Inc.*,
　　82 F.3d 1533 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 47

*Holbrook v. Lykes Bros. S.S. Co., Inc.*,
　　80 F.3d 777 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Hollander v. Sandoz Pharms. Corp.*,
　　289 F.3d 1193 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Jones v. Otis Elevator Co.*,
　　861 F.2d 655 (11th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Kieffer v. Weston Land, Inc.*,
　　90 F.3d 1496 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Kumho Tire Co. Ltd. v. Carmichael*,
　　526 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .67

*Lovato v. Burlington N. and Santa Fe R. Co.*,
　　No. Civ.A. 00-RB-2584, 2002 WL 1424599
　　(D. Colo. Jun. 24, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 6, 117

*Marder v. G.D. Searle & Co.*,
　　630 F. Supp. 1087 (D. Md. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Mitchell v. Gencorp Inc.*,
  165 F.3d 778 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

*New Mexico Sav. & Loan Ass'n v. U.S. Fidelity & Guaranty Co.*,
  454 F.2d 328 (10th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   108

*In re Paoli R.R. Yard PCB Litig.*,
  35 F.3d 717 (3d Cir. 1994), *cert. denied*, 513 U.S. 1190 (1995) . . . . .   5, 6, 89

*People Who Care v. Rockford Bd. Of Educ.*,
  111 F.3d 528 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   79

*Phillips v. Calhoun*,
  956 F.2d 949 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   107, 122

*Robinson v. Missouri Pacific Railroad Co.*,
  16 F.3d 1083 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4, 7, 112

*Sharpnack v. Secretary of Dep't of Health and Human Servs.*,
  27 Fed. Cl. 457 (Fed. Ct. Cl. 1993), aff'd, 17 F.3d 1442 (Fed. Cir. 1994) . .   60

*Silkwood v. Kerr-McGee Corp.*,
  667 F.2d 908 (10th Cir. 1981), *rev'd*, 464 U.S. 238 (1984) . . . . . . . . . . . . .   96

*Silkwood v. Kerr-McGee Corp.*,
  769 F.2d 1451 (10th Cir. 1985),
  *cert. denied*, 476 U.S. 1104 (1986) . . . . . . . . . . . . . . . .   95, 96, 97, 121, 126,

*Smith v. Ingersoll-Rand Co.*,
  214 F.3d 1235 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5

*Specialty Ins. Co. v. Myers*,
  111 F.3d 1273 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   103

*Stagl v. Delta Air Lines, Inc.*,
  117 F.3d 76 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . .   5, 6, 118, 119, 120

*Stover v. Eagle Products, Inc.*,
  1996 WL 172972 (D. Kan. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   80

*Summers v. Missouri Pacific Railroad Sys.*,
    132 F.3d 599 (10th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   9

*Turpin v. Merrell Dow Pharm., Inc.*,
    959 F.2d 1349 (6th Cir.), cert. denied, 506 U.S. 826 (1992) . . . . . . . . .   58, 59

*United States v. 0.161 Acres of Land in Birmingham, Ala.*,
    837 F.2d 1036 (11th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . 22, 25, 27, 30, 31

*United States v. 14.38 Acres of Land*,
    80 F.3d 1074 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

*United States v. American Society of Composers, Authors, and Publishers*,
    1989 U.S. Dist. LEXIS 13157 (S.D.N.Y. Oct. 12, 1989) . . . . . . . . . . . . .   59

*United States v. Call*,
    129 F.3d 1402 (10th Cir. 1997), cert. denied, 118 S.Ct. 2064 (1998) . . . . . .   9

*United States v. Cardenas-Tarango*,
    95 F.3d 1161 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   108

*United States v. Gomez*,
    67 F.3d 1515 (10th Cir. 1995), cert. denied, 116 S.Ct. 737 (1996) . . . . . . . . 4

*United States v. Kayne*,
    90 F.3d 7 (1st Cir. 1996), cert. denied, 117 S.Ct. 681 (1997) . . . . . . . . . .   8, 9

*United States v. McVeigh*,
    153 F.3d 1166 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

*United States v. Muldrow*,
    19 F.3d 1332 (10th Cir. 1994), cert. denied, 115 S.Ct. 175 (1994) . . . . . . . .   3

*United States v. Markum*,
    4 F.3d 891 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

*United States v. Rice*,
    52 F.3d 843 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   108

*United States v. Samara*,
    643 F.2d 701 (10th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*Werth v. Makita Elec. Works, Ltd.*,
   950 F.2d 643 (10th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7

*Wheeler v. John Deere Co.*,
   935 F.2d 1090 (10th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 39, 117

*Wiley v. Ohio/ Oklahoma Hearst Argyle Telev., Inc.*,
   No. 01-6062, 2002 WL. 511746 (10th Cir. Apr. 5, 2002) . . . . . . . . . . . . . 122

*Wilson v. Merrell Dow Pharmaceuticals*,
   893 F.2d 1149 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

STATUTES

Colo. Rev. Stat. Ann. § 13-21-102(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

Fed. R. Evid. 702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

TREATISES

Wright & Gold, Fed. Prac. & Proc. Evid. § 6265 (1997) . . . . . . . . . . . . . . . . . 2

Wright & Gold, Fed. Prac. & Proc. Evid. § 6264 (1997) . . . . . . . . . . . . . . . . . 5

J. Weinstein & M. Berger, Weinstein's Evidence, ¶ 702[02] . . . . . . . . . . . . . . 4

Restatement (Second) of Torts § 288C . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

# I.   INTRODUCTION

Many of plaintiffs' expert witnesses are leaders in their field, nationally and internationally recognized.  They brought their experience and expertise to bear in studying the claims and issues in this litigation, and prepared detailed written reports documenting their work and conclusions.  The jury will find them extremely helpful in understanding the evidence and determining the facts.[1]

Ignoring the Rules Advisory Committee's caution that the Rule 702 and the *Daubert* procedures were "not intended to provide an excuse for an automatic challenge to the testimony of every expert," Fed. R. Evid. 702, adv. cmte. note (2000), defendants have filed motions to exclude nearly every one of plaintiffs' experts.  Although defendants' motions purportedly address the *admissibility* of the testimony of plaintiffs' experts, defendants' motions repeatedly attack the *sufficiency* of the testimony.  Defendants object to the entire testimony of each expert, yet their arguments are often cursory and superficial, touching on only tiny portions of the expert's actual testimony.[2]  Not only are defendants' arguments substantively false, as will be demonstrated below, but also the majority of those arguments do nothing more than create a possible question of credibility or weight to be given each expert's testimony, a question best resolved by the jury.

---

[1]  Plaintiffs have not responded to defendants' motions to exclude Dr. Lawrence Mayer and Dr. Warner North because plaintiffs do not intend to call these experts to testify at trial. Defendants' motions regarding these experts are therefore moot.

[2]  Notably, for most of these experts, defendants' appendices to their briefs include only selected *portions* of their expert reports.  It is impossible for the Court to adequately weigh the entirety of an expert's testimony based on sound bites.  Accordingly, plaintiffs' Appendix to this Brief includes the complete versions of the relevant expert reports.

## II.   GOVERNING LEGAL STANDARDS

**A.     Helpfulness to the Trier of Fact Is the "Touchstone" of Admissibility**

Rule 702 of the Federal Rules of Evidence provides the basic legal standard governing the

admissibility of expert testimony.  The Rule provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to
> understand the evidence or to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or education, may testify thereto in
> the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts
> or data, (2) the testimony is the product of reliable principles and methods, and (3)
> the witness has applied the principles and methods reliably to the facts of the case.

*See Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 991 (10th Cir. 2003) ("The

admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence.").

In fulfilling its role as the gatekeeper of expert evidence, the Court must determine whether

the evidence is reliable, and whether it is relevant.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509

U.S. 579, 589 (1993); *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232-34 (10th Cir. 2005).  The

guiding principle for both of these inquiries is whether the testimony will ultimately assist the trier

of fact.  *See Lovato v. Burlington N. and Santa Fe R. Co.*, No. Civ.A. 00-RB-2584, 2002 WL

1424599, at *5 (D. Colo. Jun. 24, 2002) (quoting *Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777,

784 (3d Cir. 1996); Charles Alan Wright & Victor James Gold, Fed. Prac. & Proc. Evid. § 6265

(1997) ("The degree of 'knowledge, skill, experience, training, or education' sufficient to qualify an

expert witness is only that necessary to insure that the witness's testimony 'assist' the trier of fact.")

(quoting Fed. R. Evid. 702); *id.* § 6264 ("[T]he admission of unreliable expert testimony can hardly

be said to 'assist' since it undermines accurate factfinding . . ..").

2

"Helpfulness to the trier of fact is 'the touchstone' of admissibility." *Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643, 648 (10th Cir. 1991). "[E]xpert testimony satisfies the 'assist' requirement if it advances the jury's understanding to any degree." Wright & Gold, Fed. Prac. & Proc. § 6264; *see also U.S. v. McVeigh*, 153 F.3d 1166, 1190 (10th Cir. 1998) ("The scope of relevancy is bounded only by the liberal standard of [FRE] 401, which provides that evidence is relevant if it has 'any tendency of make the existence of any fact that is of consequence to the determination of the action more probable or less probable that it would be without the evidence.'").

This case involves a heavily guarded nuclear weapons facility whose operations have been secreted from public view for decades. The jury will be asked to comprehend a large body of complex evidence and subjects, including: the radiological properties of plutonium and the health hazards of exposure to it; dose reconstruction; epidemiology; the management of nuclear materials and wastes and risks of contamination and criticality; the meaning and significance of "material unaccounted for" or "MUF;" and the impact of environmental contamination and stigma on property values. The testimony of plaintiffs' experts will assist the jury "to understand the evidence or to determine a fact in issue." FRE 702. *Cf. United States v. Muldrow*, 19 F.3d 1332, 1338 (10th Cir. 1994) ("The amount of cocaine involved in the case before us is over four kilos, a fact having little significance to those unfamiliar with drug use.") (affirming admissibility of expert testimony on the significance of a quantity of cocaine), *cert. denied*, 115 S.Ct. 175 (1994).

An expert's testimony need not address an ultimate issue of fact in order to be helpful and admissible. *See United States v. Markum*, 4 F.3d 891, 896 (10th Cir. 1993) (affirming admission of testimony of fire chief against defendant accused of conspiracy to commit arson where fire chief

3

"did not opine that [the defendant] set the fire, but only that *someone* deliberately set it.") (emphasis added).  Conversely, under FRE 704, expert testimony "otherwise admissible, is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."  FRE 704(a).

In determining whether expert testimony is helpful, the Tenth Circuit (consistent with the policies behind the Federal Rules of Evidence) has expressed a preference for admissibility:

> Doubts about whether an expert's testimony will be useful "should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions.  The jury is intelligent enough . . . to ignore what is unhelpful in its deliberations."

*Robinson v. Missouri Pacific Railroad Co.*, 16 F.3d 1083, 1089 (10th Cir. 1994) (quoting J. Weinstein & M. Berger, *Weinstein's Evidence*, ¶ 702[02], pp. 702-30 (1988)).

## B.    An Expert's Qualifications Should Not be Viewed in a Narrow or Restrictive Manner

An expert must be qualified to give the testimony that is proffered, but the Tenth Circuit has emphasized that a district court should be mindful of the "liberal standard" established by FRE 702, in assessing an expert's qualifications.  *See U.S. v. Gomez*, 67 F.3d 1515, 1526 (10th Cir. 1995), *cert. denied*, 116 S.Ct. 737 (1996).[3]  An expert may be qualified by any of Rule 702's five bases for expert

---

[3]    The Advisory Committee Notes to FRE 702 state that:

> The rule is broadly phrased.  The fields of knowledge which may be drawn upon are not limited merely to the "scientific" and "technical" but extend to all "specialized" knowledge.  Similarly, the expert is viewed, not in a narrow sense, but as a person qualified by "knowledge, skill, experience, training, or education." Thus within the scope of the rule are not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, *but also the large group sometimes called "skilled" witnesses, such as bankers or landowners testifying to land values.* (emphasis added).

4

knowledge ("knowledge, skill, experience, training, or education"). There is no requirement that an expert witness have firsthand experience with the particular item or practice at issue in the case. *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1244 (10th Cir. 2000) (experts may testify about ergonomics and defendant's risk assessment in marketing milling machine, despite having no firsthand knowledge of the particular machine) (citing *Daubert*, 509 U.S. at 592).

"Rule 702 does not impose an 'overly vigorous' requirement of expertise. [ ] The trial court should not exclude expert testimony simply because the court feels that the proffered witness is not the most qualified or does not have the specialization considered most appropriate by the court." *Lovato*, 2002 WL 1424599, at *3 (internal citation omitted). *See also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994). There is no requirement that an expert's knowledge be minutely specialized to the exact issue involved in the case, as long as the expert's general qualifications are sufficient to allow him to form a reliable opinion. *See Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81-82 (2d Cir. 1997) (finding mechanical engineer was qualified to testify about airport baggage claim area design, even though he did not possess specific expertise on baggage claim design, only general mechanical engineering expertise).[4]  In most cases, "a lack of specialization does not affect the admissibility of the opinion but only its weight." *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991); *see also* Wright & Gold, Fed. Prac. & Proc. Evid. § 6265 ("[T]he witness's lack of specialization usually goes to the weight of the witness's testimony

---

[4]  Indeed, the *Stagl* court noted that requiring a high degree of industry-specific specialization, thus barring any experts who are not industry insiders, would be tantamount to allowing industries to set their own standards of care. *Stagl*, 117 F.3d at 81.

5

but does not disqualify the witness.").

As long as an expert meets the basic requirement of having relevant technical or specialized knowledge, any doubts about his qualifications are a matter for the jury. *See Lovato*, 2002 WL 1424599, at *4 ("Whatever shortcomings [defendant] may perceive in Mr. Wick's academic or professional background are more properly addressed in cross-examination."); Wright & Gold, Fed. Prac. & Proc. Evid. § 6265 ("Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility.").

## C.    Daubert's Reliability Inquiry is Flexible

*Daubert* and Rule 702 require that "the method employed by the expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements." *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999). The proponent of expert testimony "need not prove that the expert is indisputably correct or that the expert's theory is 'generally accepted' in the scientific community." *Mitchell*, 165 F.3d at 781 (citation omitted).  Where an expert's opinion has some basis in fact, it is sufficiently reliable to be admitted.  *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996); *Gomez v. Martin Marietta Corp.*, 50 F.3d 1511, 1519 (10th Cir. 1995).   "The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions." *Paoli*, 35 F.3d at 746.  In *Gomez v. Martin Marietta*, the Tenth Circuit explained that:

> Although an expert opinion must be based on "facts which enable [her] to express a reasonably accurate conclusion as opposed to conjecture or speculation, ... absolute certainty is not required." *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988) (citations omitted).  MMC did not establish that the challenged opinions had no basis in fact.  MMC cross-examined Mr. Gomez' expert on the asserted

6

weaknesses of her assumptions and presented expert testimony in its favor. *While the weaknesses in the data upon which Mr. Gomez' expert relied go to the weight the jury should have given her opinions, they did not render her testimony too speculative as a matter of law.*

*Gomez*, 50 F.3d at 1519 (footnote and citations omitted) (emphasis added).

Unless an expert's testimony is so clearly flawed as to be unreliable and thus unhelpful to the jury, any disputes regarding the basis of that opinion should be left to the jury. *See Daubert*, 509 U.S. at 596 ("vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *Robinson*, 16 F.3d at 1090 ("As to the substance of [the expert's] testimony ... 'the burden is on opposing counsel through cross-examination to explore and expose any weaknesses in the underpinnings of the expert's opinion.'") (citations omitted); *Werth*, 950 F.2d at 654 ("[The doubts suggested by the trial judge concerning the sufficiency of the factual basis to support [the expert's] opinion go to its *weight*, and not to its admissibility.") (italics in original) (reversing district court's exclusion of expert's testimony as overly speculative because expert had not tested his conclusions). *See also* Wright & Gold, Fed. Prac. & Proc. Evid. § 6264 ("[C]ourts usually conclude that defects in the underlying logic or basis of expert testimony are jury questions that go to weight, not admissibility.")

The *Daubert* opinion also provides a non-exhaustive list of factors that a district court may consider in evaluating the reliability of a particular scientific theory or technique.[5] These factors are

---

[5]    The factors discussed were: (1) whether the technique has been tested; (2) whether it has been subject to peer review and publication; (3) whether it has a known or potential rate of error; and (4) whether it has received general acceptance in the scientific community. *Daubert*, 509

"neither exclusive nor dispositive", Fed. R. Evid. 702, adv. cmte. note (2000), and courts are free

to consider other factors. *See Hollander v. Sandoz Pharms. Corp.*, 289 F.3d 1193, 1205 (10th Cir.

2002). Ultimately the *Daubert* inquiry must remain "flexible" in order to adapt to the facts of every

case. *United States v. Call*, 129 F.3d 1402, 1404 (10th Cir. 1997), *cert. denied*, 118 S.Ct. 2064

(1998); *see also Daubert*, 509 U.S. at 593 ("Many factors will bear on the inquiry, and we do not

presume to set out a definitive checklist or test.").

Not all disciplines operate by the scientific method. That does not render them less valid or

valuable, and it certainly does not mean they should be barred from the courtroom.[6] For example,

in *U.S. v. Kayne*, 90 F.3d 7 (1st Cir. 1996), *cert. denied*, 117 S.Ct. 681 (1997), the court upheld the

admissibility of expert testimony by coin dealers concerning the value of coins:

> The value of the coins involved in a prosecution for their fraudulent sale is
> indisputably relevant. The fact that the subject matter is not "scientific" is no bar to
> admissibility of expert testimony. Federal Rule of Evidence 702 specifies that expert
> testimony covering "scientific, technical, or other specialized knowledge [which] will
> assist the trier of fact to understand the evidence or to determine a fact in issue" is
> admissible. [citing *Daubert*, 509 U.S. at 589]. . . . *Opinions of value are a
> traditional subject of expert testimony*, and it is well within the discretion of the
> district judge to admit them. One could hardly expect a lay jury to form conclusions
> about such an esoteric subject as the value of rare coins without the help of experts.
> *The defendants complain, however, that the opinions were not based on consistent
> standards, and were subject to factors of taste and assessment of the market, and that
> the experts often disagreed among themselves. This is not unusual. These matters
> are properly the subject of searching cross-examination. See Daubert*, 509 U.S. at
> 595, 113 S.Ct. at 2798.

_____

U.S. at 593-95.

[6]    It would be ironic if the courtroom – home to a decidedly non-scientific process of fact
finding – were closed to all expert testimony that could not prove itself "scientific."

*Kayne*, 90 F.3d at 11-12 (emphasis added).

Even when applying *Daubert* to scientific testimony, "district courts must be careful not to 'don the amateur scientist's cap in ruling on scientific validity.'"   *Summers v. Missouri Pacific Railroad Sys.*, 132 F.3d 599, 604 (10th Cir. 1997) (citation omitted).  *See Daubert*, 509 U.S. at 595 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.").

### III.    DAMAGES EXPERTS

**A.      WAYNE HUNSPERGER**

####     1.      Overview of Qualifications and Report

Wayne L. Hunsperger, MAI, is a certified real estate appraiser, property consultant and president of Hunsperger & Weston, Ltd., located in Englewood, Colorado.  Mr. Hunsperger conducted an exhaustive, multi-faceted analysis of the impact of the Rocky Flats Plant and the 1989 FBI raid on the properties in the Property Class.  His work is detailed in a 259-page report (plus appendices).[7]

Mr. Hunsperger received his undergraduate degree from the University of Texas at Austin in 1970, and has close to three decades of experience in valuing and appraising real property.  He has written, taught, and testified on the subject of the impact of hazardous materials on the value of real property, and on the valuation of environmentally impaired properties.[8]  Mr. Hunsperger's clients have included the cities of Denver, Aurora, Littleton, Thornton, Westminster, and Colorado Springs; major banks and businesses; the United States Army and the United States Department of Justice.[9]

Mr. Hunsperger has particular experience and expertise in the valuation and evaluation of environmentally impaired properties and areas.  He has performed valuations of the Sand Creek and

---

[7]    *See* Wayne L. Hunsperger, *Rocky Flats Nuclear Weapons Plant Property Impact Study*, (Nov. 21, 1996) ("Hunsperger Report") (Ex. 19).

[8]    *See* Hunsperger Report at 260 (*vitae* of Mr. Hunsperger) (Ex. 19).

[9]    *Id.* (*vitae*) at 3.

Bluff Road Superfund Sites, both in Colorado;  area-wide analyses of sites affected by pollutants such as heavy metals;  a study of the economic impacts of the Rocky Mountain Arsenal; and other work relating to the impacts on property of hazardous materials and nearby toxic waste sites.[10]  He has presented courses, lectures and seminars titled: "Impact of HAZMAT on Appraisals"; "Valuation of Environmentally Impaired Properties"; "Valuation of Contaminated Properties"; "Landfills and Their Effect Upon Value"; and "Appraising Contaminated Property."[11]  He has authored published papers titled: "Impact of Hazardous Material on Value;" "Heavy Metal Pollution and Residential Property Damages;" and "Landfills and Their Effect Upon Value."[12]

In reaching his conclusions about Rocky Flats, Mr. Hunsperger relied on his education, training and experience, and used five complementary analytical approaches: (1) real estate market research; (2) analogous case studies;  (3) comparison of market sales data;  (4) multiple regression analysis;  and (5) public opinion survey.[13]  As Mr. Hunsperger stated in his report, all of these approaches are "reasonably and customarily relied upon" by experts in his field.  *Id.* at 5.

2.      **Defendants' Qualification Arguments**

Defendants say Mr. Hunsperger is not qualified to perform regression analyses or public opinion surveys himself.  But as an appraiser, he is qualified to interpret and apply their results.  *See* Hunsperger Dep. at 326-27, 438 (Ex. 20); USPAP Advisory Opinion G-9 (work within multi-

---

[10]    *Id.* at 3.

[11]    *Id.* at 1.

[12]    *Id.*

[13]    *See* Hunsperger Report at 5-6 (summary of approaches) (Ex. 19).

disciplinary groups) (Ex. 42).

### 3.    Defendants' "Fit" Argument

Defendants argue that Mr. Hunsperger's estimates are not relevant, on the theory that Mr. Hunsperger himself has not purported to determine the time at which the injurious situation presented by Rocky Flats' invasions became comparatively complete and enduring.  That, however, is not Mr. Hunsperger's function.  It is the jury's.  Mr. Hunsperger has estimated damages as of the time period that plaintiffs contend is the appropriate reference point under the Restatement (Second) of Torts, section 930, and he has estimated damages according to the legally governing damage measure – the differential in value attributable to defendants' invasions.

### 4.    Defendants' Reliability Arguments

#### a.    Appraisals

Defendants are correct that Mr. Hunsperger did not perform a formal appraisal of the thousands of properties in the property class.  It does not follow, however, that Mr. Hunsperger's testimony is inadmissible.  *None* of defendants' own property experts has performed an appraisal of any kind, yet each concludes that the property class has *not* suffered any diminution in value. Defendants' chief property expert, in fact, stated that performing an appraisal would be "impractical" in  a case such as this.[14]  Authorities in the field of real support the view that appraisals are not

---

[14]    John D. Dorchester, Jr., MAI, defendants' chief property expert, testified that:

> I'm reflecting in my work whether there is as a result of my
> research and analysis any reason to believe that there was an effect
> on the probable values of this marketplace as a result of the FBI

(continued...)

12

necessary for a property impact study such as Mr. Hunsperger's. *See* Richard J. Roddewig, MAI,

*Choosing the Right Analytical Tool for the Job*, Appraisal Journal, July 1998, at 321, 324 (in dealing

with environmental risks, an appraisal is often "precisely what the client does not need and the

assignment does not demand") (Ex. 39); *see also* Albert R. Wilson, CRE, *The Need for Standards*

*in the Application of Statistical and Survey Research to Real Estate Valuation Practice* 31, 34 (2002)

(Ex. 43).

       **b.**     **"Three Traditional Approaches"**

Defendants fault Mr. Hunsperger for not utilizing any of three "traditional" appraisal

approaches: the "cost approach"; the "income capitalization approach"; and the "sales comparison

approach."

None of these approaches is directly applicable[15] or suited to measuring the damages to the

_____

[14](...continued)
              raid in June of 1989.

              The purpose of my study was not to try to quantify any effects that
              might have occurred prior to that.  So first, *I'm not appraising any*
              *individual property nor am I dealing with the market value of any*
              *individual property in my work.*  But I am certainly dealing with
              information relative to market activities before and after the FBI
              raid.

Dorchester Dep. at 122:12-24 (Ex. 33) (emphasis added).  *See also* John D. Dorchester, *Report of*
*John D. Dorchester, Jr. for the Rocky Flats Litigation*, (11/22/96) ("Dorchester Report") at 3-8
(individual property analyses are "time consuming, expensive, and frequently impractical" where
numerous properties are involved) (attached as Ex. 6 to Plaintiffs' Brief in Support of their
Motion to Exclude Testimony of Certain Defense Expert Witnesses).

[15]    Mr. Hunsperger used a case study approach which is somewhat analogous to the "sales
                                  (continued...)

property class,[16] and defendants' own property experts did not use them.

The "cost approach" has been defined as: "The current cost of reproducing or replacing the improvements, minus the loss in value from depreciation, plus site value."[17] No expert in this case, for defendants or plaintiffs, attempted to estimate the "current cost of reproducing or replacing" the thousands of residences in the property class. This was not applicable or feasible.

The "income capitalization approach" is defined as: "The value of a property's earning power based on the capitalization of its income[.]"[18] This approach applies to *commercial* (income producing) property, and Mr. Hunsperger did not offer an opinion about damages to commercial property. One of defendants' experts (Daniel M. Conway) did, and he did not use the income capitalization approach.[19]

The "sales comparison approach" is defined as: "The value indicated by recent sales of comparable properties in the market[.]"[20] To appraise the value of an individual house, a real estate expert can typically look up recent sales of houses on the same block. That approach is not possible

---

[15](...continued)
comparison approach," as explained below.

[16] *See* Hunsperger Dep. at 26:19-27:4 (Ex. 20); USPAP 2004, at 249 (Ex. 42) ("Estimating the effects of environmental contamination on real property value usually involves the application of one or more specialized valuation methods.").

[17] Appraisal Institute, *The Appraisal of Real Estate* 81 (11th ed. 1996).

[18] *Id.*

[19] *See* Conway Dep. at 63:8-65:13 (Ex. 31) (Mr. Conway testified that he did not use the cost approach, the income approach, or the sales comparison approach).

[20] *The Appraisal of Real Estate* 81.

where, as here, an entire market has been adversely impacted.  There is no "market" for blocks of 12,000 residences.  Mr. Hunsperger, however, used something akin to this approach.  He gathered extensive data about studies of other communities similarly impacted by toxic and hazardous waste sites in other parts of the United States, and used this data to analyze the impact of Rocky Flats.  He used this approach in conjunction with other approaches to arrive at his damage estimate.

Mr. Hunsperger, like defendants' own property experts, chose market-wide approaches because that is the task at hand: to assess and measure property damages to an entire market. Defendants' own experts, in fact, use several of the same approaches as Mr. Hunsperger.

### c.   Market Participant Research

In order to form a qualitative judgment about the impact of the Rocky Flats Plant and the 1989 FBI raid on surrounding property values, Mr. Hunsperger conducted extensive field research about the property market in the area around Rocky Flats, including the Property Class.  Mr. Hunsperger, with the assistance of his staff, interviewed numerous leaders in government, business, real estate development and land use; and he studied numerous documents relating to governmental land use policies and current risks posed by the Rocky Flats Plant.  *See* Hunsperger Report at 7-15, 78-120 (Ex. 19).  Mr. Hunsperger's goal was "to understand the market for properties near Rocky Flats and the risk (if any) associated with it[.]"  *Id.* at 78.

Mr. Hunsperger and his staff interviewed government officials and other personnel in Arvada, Broomfield, Westminster, the Town of Superior, Golden, Louisville, Lafayette and Boulder; county officials at the Jefferson County Commissioners office, the County Board of Health, Planning and Zoning, the Tax Assessor's office, Economic Development, and the County Finance

15

Department; and state officials at the Colorado Department of Health and Environment. Mr. Hunsperger contacted personnel at the Jefferson County Airport; the North Jefferson County Recreation District; the Northwest Chamber of Commerce; the Denver Regional Council of Governments; the Ralston Valley Water and Sanitation District; the Jefferson Center Metro District; the Superior Metro District; and the W-470 Highway Authority. *See* Hunsperger Report at 78-103 (Ex. 19). He also spoke with residential lenders and mortgage insurance companies; other real estate appraisers and title companies; realtors and builders; and the Property Class representatives. *Id.* at 104-14.

Mr. Hunsperger set forth the salient points from these interviews in his report, for example:

- Kevin Nichols of the Jefferson County planning office, stated that there is a "'fear out there that Rocky Flats is dangerous.'" *See* Hunsperger Report at 96. Mr. Nichols reported that vacant land in the Property Class area likely would have been developed but for Rocky Flats. *Id.*

- Jane McVey, economic development officer for Arvada, reported that Rocky Flats is a "'negative issue no matter what'" and cost Arvada jobs because a manufacturer decided against relocating to the area because of Rocky Flats. *Id.* at 81-82.

- The City of Broomfield reported that it lost its ability to obtain bond insurance, apparently because of concerns by insurers about the risks associated with Rocky Flats. *Id.* at 80.

- Kathy Tully, real estate officer for the Jefferson County School District, reported that the school district turned down an offer of *free* land for a new football stadium because "'there is just a stigma'" associated with property near Rocky Flats. *Id.* at 98.

In addition to interviewing officials, Mr. Hunsperger obtained and studied numerous documents pertaining to the Rocky Flats Plant. For example, he reviewed a 1990 opinion survey of

16

Broomfield residents, which found that *62%* believed that Rocky Flats was a moderate or "very" serious threat to their health, and *67% disagreed* with the statement, "Rocky Flats has no effect on property values in Broomfield."[21]

Mr. Hunsperger also reviewed a 1995 report prepared by the "Rocky Flats Future Site Use Working Group," a Colorado citizens' group encompassing a broad spectrum of environmental and economic interests who share a concern about the Rocky Flats Plant.[22]  Mr. Hunsperger reported that:

> The [Working Group] reiterates that approximately 14.2 tons of plutonium remain at the site.  This is in addition to americium, uranium and tritium.  It is noted that many of these radioactive materials will continue to be handled at Rocky Flats as the plant proceeds with stabilization and consolidation of materials for safe, on-site storage and eventual transfer off site.  "These materials pose an on and off-site hazard as long as they are on the site."

Hunsperger Report at 93 (Ex. 19).

Based on this extensive field research, as well as his training and experience, Mr. Hunsperger concluded that:

> attitudes toward Rocky Flats are negative (particularly after the 1989 FBI raid) to the extent that property values are clearly affected.
> ...
> [T]he after effects of the 1989 FBI raid and proximity to the Rocky Flats Nuclear Weapons Plant combine to reduce the overall market demand for properties in this area.  The resulting loss in demand clearly places downward pressure on real estate prices.

*See* Hunsperger Report at 14, 15 (Ex. 19).

Mr. Hunsperger did not use market research to quantify property damages, but to form a

---

[21]   Hunsperger Report at 79 (Ex. 19).

[22]   Hunsperger Report at 89 (Ex. 19).

17

qualitative opinion and to inform and support the remainder of his work.  Defendants do not challenge Mr. Hunsperger's qualifications to conduct market research and to draw conclusions from it.  Defendants do not contend that Mr. Hunsperger has inaccurately reported the results of his research.  Defendants do not even contend that this type of research is not regularly relied upon by experts in Mr. Hunsperger's field.  Defendants' *lawyers*, however, dismiss this approach, when pursued by Mr. Hunsperger, with the epithet "anecdotal."  But defendants' own principal property expert, Mr. Dorchester, relies on "anecdotal" research.  *See* Dorchester Report at 2-2 n.3 (citing "Interview with Eugene Bowes"); *id.* 3-14 ("we sought interviews with . . . numerous public officials or officers as well as a number of real estate and other experts"); *id.* at 3-15 ("We conducted a number of interviews . . . . ") (Ex. 6 to Plaintiffs' Memorandum of Law in Support of their Motion to Exclude Testimony of Certain Defense Expert Witnesses).  According to Mr. Dorchester himself: "Common area-wide property analysis methods include the following: . . . Analysis of anecdotal information."  *Id.* at 3-9.

This analysis is unaffected by the evidentiary ruling from the *Escamilla* litigation on which defendants rely.  *See* Def. Damages Br. at 54.  That decision sustained a hearsay objection to Mr. Hunsperger's testimony concerning the contents of underlying expert reliance material, not a *Daubert* objection addressed to the admissibility of his opinion or the legitimacy of his reliance on the methods in question.

### d.    Analogous Case Studies.

Communities of 12,000 homes do not sell in the market, so there is no way to directly apply the "sales comparison" approach to the property class.  Other communities have, however, been

contaminated by hazardous substances from toxic waste sites, and other communities have suffered property damages as a result.

Mr. Hunsperger, drawing on his training and professional experience, searched for and selected property studies of other sites "from all over the United States" that, in his judgment, were relevant and useful to evaluating the impact of Rocky Flats on the property class. *See* Hunsperger Report at 16-22, 121-177 (Ex. 19);  Hunsperger Dep. at 249 (Ex. 20).  These other sites involved both non-radioactive and radioactive wastes.  Mr. Hunsperger not only studied available written material about these sites, he also contacted and interviewed a number of the researchers themselves. *See* Hunsperger Dep. at 238-39 (Ex. 20).

The use of analogous case studies is expressly recognized and endorsed by the Appraisal Institute, a non-profit corporation that sets professional standards for real estate appraisers, in situations "in which large numbers of property are affected by an environmental risk."[23]  Mr. Hunsperger confirmed this at his deposition:

> As the Appraisal Institute text recognized, if the neighborhoods or communities of 13,000 residential properties don't sell.  There aren't any properties to be used for direct sales comparison, so they recognize the use of analogous case studies for a variety of reasons.

---

[23]    *See* Appraisal Institute, *Environmental Risk and the Real Estate Appraisal Process* 150 (1994) ("Case studies and regression analysis are helpful in some situations.").  The Institute itself compared the case study approach (used by Mr. Hunsperger) to the "traditional" sales comparison approach.  "[A]nalysis of comparable sales is actually a form of case study analysis." *Id.* at 151.  *See also* Appraisal Institute, *Measuring the Effects of Hazardous Materials Contamination on Real Estate Values* 4 (1992) ("Valuation by analogy is an important technique, which might be called a 'comparable sales analysis' except that the history of the 'comparable' or analogous property has to be identified and studied in meticulous detail.").

Hunsperger Dep. at 234:20-235:1 (Ex. 20).

The Appraisal Institute itself cited two case studies that would be useful in evaluating the impact of a toxic waste site on nearby properties: the study of a uranium processing facility in Fernald, Ohio; and a radium contaminated landfill in New Jersey.[24]  Mr. Hunsperger obtained information about both sites, and he included both among his analogous case studies.[25]

Mr. Hunsperger also studied analyses of the impact of a lead smelter in Globeville, Colorado; a hazardous waste landfill in Toledo, Ohio; petro-chemical plants in Corpus Christi, Texas; property near a highway designated to transport nuclear waste in Carlsbad, New Mexico; and others.[26]

In the Globeville case, Mr. Hunsperger testified as a property expert and used the case study approach to measure property damages to more than 500 properties contaminated with heavy metals. *See* Hunsperger Report at 131-33 (Ex. 19).[27]

The New Mexico case involved a partial condemnation of property taken for construction of a highway to transport nuclear waste to the Waste Isolation Pilot Project ("WIPP") near Carlsbad.  The land owners sued and sought damages to the remainder of their property due to its proximity to the highway and the resulting negative public perception and stigma. To support their property damage claim, plaintiffs introduced a public opinion survey which measured the public's attitude

---

[24]   *See Environmental Risk and the Real Estate Appraisal Process* 151.

[25]   *See* Hunsperger Report at 126-30.

[26]   *See* Hunsperger Report at 130-40.

[27]   Based on Mr. Hunsperger's testimony, the jury found that plaintiffs' properties had suffered a diminution in value of more than $4 million.  *See* Hunsperger Report at 132 (Ex. 19). The case is *Escamilla v. Asarco, Inc.*, No. 91 CV 5716 (Dst. Ct. Denver Cty., Colo.).

toward the property near the WIPP, and which asked respondents to estimate the impact on property

value.

> Seventy-one percent of the respondents felt that residential property near the bypass would sell for less money because of its location and the same percentage also felt the property would decrease in value. Respondents were also asked their opinion of the percentage value increase or decrease to the property caused by the WIPP route. Forty-one percent of the residents of Santa Fe County believed that residential property near the road would sell for between eleven and thirty percent less than comparable property not in proximity to the road.

> There was no abuse of discretion in admitting the Zia poll. The poll was an effective way of showing public perception and it was relevant evidence[.]

*City of Santa Fe v. Komis*, 845 P.2d 753, 757 (N.M. 1992). The court held that the plaintiffs'

property expert could rely on the opinion survey (administered by another expert) in quantifying the

diminution in value. *Id.* at 759.

From his study of analogous situations, Mr. Hunsperger learned that opinion surveys and

multiple regression analyses were frequently employed to gauge the impact of toxic waste sites on

nearby properties. *See* Hunsperger Report at 123-24 (Ex. 19). Analyses of these other sites (analyses

that Mr. Hunsperger collected and studied) showed that perceived and actual risks associated with

toxic waste sites nearly always hurt property values. The losses were often substantial and ranged

up to a *50 percent* loss in value. Negative effects were measured as far as *22 miles* from one site.

*See* Hunsperger Report at 175-76 (Ex. 19). "Virtually all the case studies and available literature

suggest some impact on surrounding real estate due to actual contamination and/or proximity to an

environmental disamenity." *Id.* at 22. In addition, "The studies clearly indicate that the market has

a more negative reaction to nuclear issues than any other." *Id.*

Defendants say Mr. Hunsperger's reliance on case studies fails the relevance test.  The short answer to this objection is that the method is one of several employed by Mr. Hunsperger in the course of reaching overall findings that estimate damages according to precisely the measure that section 930 prescribes.

Defendants say Mr. Hunsperger is not qualified to evaluate the validity and reliability of the multiple regression analyses and opinion surveys that pertain to some of the case studies he uses. Defendants, however, do not challenge the validity or reliability of any of the multiple regression studies or opinion surveys that relate to any of the case studies.  Even if defendants had tried, "weaknesses in the data upon which" Mr. Hunsperger relied would "go to the weight the jury should . . . give[] [his] opinions, they [do] not render [his] testimony too speculative as a matter of law." *Gomez v. Martin Marietta*, 50 F.3d at 1519; *see also United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1079 (5th Cir. 1996)  (property expert permitted to predicate his expert opinion on second opinion by a civil engineer about the threat of flooding); *United States v. 0.161 Acres of Land in Birmingham, Ala.*, 837 F.2d 1036, 1039-40 (11th Cir. 1988) (property expert may testify about conclusions based on a computer printout of 145 land sales spanning eight years even though the expert was not familiar with, and could not testify about, the specifics of the sales).

The analogous case studies constitute data reasonably relied on by an expert in Mr. Hunsperger's field of expertise.  *See* Hunsperger Report at 5 (Ex. 19).  Mr. Hunsperger also testified:

> I didn't gather the data to try to replicate the studies . . . but I did take the published data and as many backup documents I could get and *studied those in meticulous detail* as I would any other real estate type situation.

Hunsperger Dep. at 294:17-23 (emphasis added) (Ex. 20).

Defendants contend that the case study approach is not "an accepted methodology."  In fact, however, the use of analogous case studies is not only accepted but affirmatively recommended for area-wide analyses.  *See* Thomas O. Jackson, *Methods and Techniques for Contaminated Property Evaluation*, Appraisal Journal, October 2003, at 311 ("professionally accepted methods and techniques for . . . estimating the effects of environmental contamination on the market value of real property" include "analysis of environmental case studies") (Ex. 38); *see also* Richard J. Roddewig, MAI, *Adjusting Environmental Case Study Comparables by Using an Environmental Risk Scoring System*, Appraisal Journal, October 2000, at 371 ("environmental risk/stigma is typically estimated based upon case studies of other properties affected by environmental risk") (Ex. 41); Richard J. Roddewig, *Classifying the Level of Risk and Stigmas Affecting Contaminated Property*, Appraisal Journal, January 1999, at 99 ("Case study analysis is specifically recognized as an appropriate valuation technique by the Appraisal Institute") (Ex. 40).

Defendants complain that Mr. Hunsperger's use of this method is not reproducible. However, Mr. Hunsperger's report describes each step he took in that analysis, and each piece of information he considered.  His analysis is therefore "reproducible" in the sense that defendants own experts can trace Mr. Hunsperger's reasoning and evaluate the information on which he relied, as well as his reasons for choosing the case studies he did.  Reproducibility does not mean that every expert in the field reach the same judgments based on the same underlying information.

Finally, defendants say Dr. Flynn (plaintiffs' survey expert) disagrees with Mr. Hunsperger's use of analogous case studies.  But even if Dr. Flynn were assumed to be a general authority on the methods appropriately to be employed by real estate appraisers (as neither he nor plaintiffs have held

him out to be), the deposition excerpt from which defendants quote merely states his view that the analogous case study method, by itself, would not permit a precise numerical calculation of Rocky Flats effects on the class property market. That view would be germane if this were the sole method on which Mr. Hunsperger relied. But it is not.

        e.      **Market Sales Data.**

        Mr. Hunsperger collected voluminous data on the sale prices of houses and vacant land in the property class and in surrounding areas. *See* Hunsperger Report at 23-33, 178-220 (Ex. 19). This data demonstrates that, in general, residences nearer the plant have appreciated over time at *lower* rates than houses farther away. *Id.* at 29-30. Vacant land within the class area, compared with land in nearby areas, had the *lowest* average sales prices. *Id.* at 27-28. These calculations support Mr. Hunsperger's  conclusion that houses and vacant land in the property class area have suffered a diminution in value due to Rocky Flats.

        f.      **MLS Data.**

        Mr. Hunsperger obtained data on residential sales from the MLS-Metro List Service, a well-recognized source of information on property sales that was used by defendants as well.[28]  The data, as it came from MLS, was categorized by submarkets within counties. Mr. Hunsperger compared the property class area to other submarkets within Jefferson County (the submarkets were identified in the MLS data as Jefferson North, Jefferson North Central, Jefferson West, Jefferson Central,

_____

        [28]    *See* Hunsperger Report at 202 (Ex. 19);  Dorchester Report at 3-12 (Ex. 6 to Plaintiffs' Memorandum of Law in Support of Their Motion to Exclude Testimony of Certain Defense Experts).

24

Jefferson South Central, and Jefferson South).  Mr. Hunsperger sought and included data pertaining

to Broomfield and Westminster which, though not in Jefferson County, are nearby.  For purposes

of comparison, Mr. Hunsperger collected data for areas near the Rocky Mountain Arsenal (identified

in the MLS data as North Suburban East), and the North Suburban Central submarket in Adams

County.  *See* Hunsperger Report at 202 (Ex. 19).

Sales information for the twelve-month periods ending in 1989 (the year of the FBI raid) and

1995 (the most recent date available when Mr. Hunsperger prepared his report) was compiled and

compared.  The difference in price can be used to calculate an average compound appreciation rate.

*See* Hunsperger Report at 202 (Ex. 19).  The data demonstrate that for the four areas closest to Rocky

Flats, the appreciation rates averaged 6.44% (range: 6.08% to 6.90%).  The average for the areas

farther from Rocky Flats, by contrast, was 7.62% (range: 5.30% - 8.44%).[29]

This difference in appreciation rates adds up over time, as Mr. Hunsperger explains:

Historically, in the Denver area, houses sell about once every seven years.  Thus, a
$91,000 house that sold in 1989 compounded at a 6.44% rate would sell again in
1996 for $140,850.  The same house growing at 7.62% would sell for $152,157 in
1996.  *Consequently, the homeowner near Rocky Flats would have lost about
$11,000 in appreciation over a typical holding period*.  Certainly, this is something
a prospective purchaser would take into account if so advised.  It could not help but
affect demand for housing and indicates that housing prices in this locale, all else
being equal, are less than they would be but for Rocky Flats.

Hunsperger Report at 256 (Ex. 19) (emphasis added).

Mr. Hunsperger testified at his deposition that he has used MLS data before, and its use is

customary in his profession.

_____

[29]   *See* Hunsperger Report at 214 (Ex. 19).

25

> Q.      All right. Have you done analyses before in real estate evaluations where you have looked at and analyzed MLS data?
>
> A.      Yes.
>
> Q.      Is this a customary approach for people in your business?
>
> A.      Yes.

Hunsperger Dep. at 43:11-17 (Ex. 20).  Mr. Hunsperger used the MLS data in conjunction with all other work he performed to arrive at his overall conclusions.  He did not quantify damages based solely on the MLS data, however.  *See* Hunsperger Report at 258 (Ex. 19).

Defendants complain that Mr. Hunsperger did not use his analysis of appreciation rates based on the MLS data to make an exact mathematical determination of diminution in value, and that the data, if used for that purpose, would not meet certain unspecified statistical tests.  But defendants do not contest the reliability of the MLS data, or that the data permit calculation of average appreciation rates, or that Mr. Hunsperger's calculations based on the data are accurate.  Defendants have had ample opportunity to obtain the same data and reproduce Mr. Hunsperger's results.

Defendants' counsel asked Mr. Hunsperger at his deposition whether he performed various statistical tests on the MLS data.  Mr. Hunsperger explained that:

> No, I just reported the findings.  *And the findings are that generally the lowest appreciation rates are found around the Rocky Flats area.*

Hunsperger Dep. at 88:24-89:3 (emphasis added).  In attacking this portion of Mr. Hunsperger's testimony, defendants offer nothing, besides their own counsel's *questions* at Mr. Hunsperger's deposition, to support their suggestion that some statistical test (which defendants do not identify) was required in order for Mr. Hunsperger to rely upon these data in the manner he did.

g.        **Vacant Land.**

Mr. Hunsperger also analyzed vacant land.  He obtained data on sales of vacant land in the property class area, Jefferson County North outside the Class area, South Boulder County, Jefferson County South, and the Adams County - Rocky Mountain Arsenal area.  *See* Hunsperger Report at 180-90 (Ex. 19).  The data were obtained from Roddy Report/Realtrac, a reliable data service serving the Denver area. The data spanned the period from January 1, 1988, through December 31, 1995, and covered parcels of ten acres or more.  *Id.* at 179.

Mr. Hunsperger calculated an overall average price per acre (the sum total of sales prices divided by the sum total of acres sold) for each area for each year.  He also calculated cumulative figures.  *See* Hunsperger Report at 191 (Ex. 19).

Of the five areas studied, the property class area had the *lowest* cumulative average sales price: $10,351/acre.  Prices in the other areas ranged from $10,621/acre to $24,477/acre.  *Id.*

Mr. Hunsperger also investigated the circumstances of a number of the individual land sales in detail.  *See* Hunsperger Report at 193-98 (Ex. 19).[30]  Mr. Hunsperger concluded that:

•        Land sales within the Class Area represent the lowest average price per acre of any of the five geographic areas.

•        Jefferson County South, which in many ways is most similar to the Class Area in terms of school district, proximity to the mountains, mountain views, county government and proximity to major highways, has land prices substantially higher (146%) than the Class Area.

---

[30]    *Cf. 0.161 Acres of Land in Birmingham, Ala.*, 837 F.2d at 1039-40 (property expert may testify about conclusions based on a computer printout of 145 land sales spanning eight years even though the expert was not familiar with, and could not testify about, the specifics of the sales).

27

- Land within the Class Area, on average, sells for less than any of the four areas studied.

- The reasons for this are likely to include the lack of infrastructure in the area and the Jefferson County Airport.  However, in our opinion, the most significant factor is the Rocky Flats Plant.

- Data from the Rocky Mountain Arsenal area presents a compelling argument.  Lands at that location are affected by a number of negative externalities, not the least of which is the Rocky Mountain Arsenal superfund site.  Many residents in the area are aware of the Arsenal's status as one of the most polluted locations in the United States.  Many also are aware that contaminated groundwater flows off the Arsenal.  Other negative externalities include numerous heavy industrial sites, refineries and proximity to Stapleton International Airport.

- Thus, we believe much or all of the price differential between the Class Area at Rocky Flats and the Rocky Mountain Arsenal area can be attributed to the extreme negative perception associated with Rocky Flats.

- In our opinion, within the Class Area, vacant land prices have been diminished on the order of 20% to 50%.  Those parcels close to the plant would be diminished to the largest extent, whereas, those parcels more distant from the plant would have the least impact.  Overall, a 30% diminution in value is a reasonable estimate for vacant parcels within the class area.

*See* Hunsperger Report at 199-200 (Ex. 19).  Mr. Hunsperger applied the 30% estimate to the vacant property in the property class area, adjusted it to 1995 dollars, and estimated total damages to vacant land at $21 million.  *Id.* at 201.

Here again, defendants assert that Mr. Hunsperger was required to perform some (unidentified) statistical analysis of the underlying data in order for his testimony to be admissible.  Defendants cite nothing at all to support this argument.  Defendants do *not* contend the data are wrong or obtained from an unreliable source; and they do *not* contend that Mr. Hunsperger's calculations of average sale prices are inaccurate. In a word, defendants have no answer for the

28

simple fact that Mr. Hunsperger's analysis is accurate:  vacant land in the property class area sells for significantly less than land in comparable areas.  Defendants and their experts may attribute this fact to some other cause, but that does not make Mr. Hunsperger's testimony inadmissible.

Defendants also argue that Mr. Hunsperger's analysis of vacant land is not verifiable.  This is wrong, too.  The underlying data Mr. Hunsperger used is available, and defendants can check Mr. Hunsperger's math.   Defendants may disagree with the conclusions and judgments that Mr. Hunsperger ultimately makes based on those calculations, but the data he consulted and the calculations he performed are transparently reported in his testimony.

### 5.    Conclusion

All the methods employed by Mr. Hunsperger are legitimate and appropriate methods for the property impact study he performed.  *See generally* James Flynn, Donald G. MacGregor, Wayne Hunsperger, C.K. Mertz, & Stephen M. Johnson, *A Survey Approach for Demonstrating Stigma Effects in Property Value Litigation*, Appraisal Journal, Winter 2004, at 35-44 (Ex. 14).

### B.    DR. JOHN RADKE

### 1.    Qualifications

Dr. John Radke earned his Ph.D. in 1983 from the Department of Geography at the University of British Columbia.  In the past he has held teaching and research positions at Temple University and the University of Pennsylvania.  He is now a tenured professor at the University of California at Berkeley, where he holds appointments in the Department of Landscape Architecture and Environmental Planning, the Department of City and Regional Planning, and the Department of Geography.  He is also director of the Applied Environment Geographic Information Systems

Laboratory, also known as AEGIS, at Berkeley.  For a time he served as an associate dean of computing at Berkeley as well.

### 2. Dr. Radke's Report

Dr. Radke prepared a report entitled *Measuring the Effects of Proximity to the Rocky Flats Nuclear Weapons Plant on Property Values* (Ex. 23).  The report focuses on computerized multiple regression analyses performed by Dr. Radke and his staff on property values within the class area as compared to property values outside it.  Drawing on his recognized expertise in geographic information systems, Dr. Radke developed variables, for use in the regression, designed to capture a large number of factors with a potential effect on property values, including employment levels, demographic data, crime and poverty statistics, traffic volume, accessibility to open space, air pollution, commuting time, and numerous others.  *See* Radke Report at 26-32 (Ex. 23).

In Phase I of his study, Dr. Radke used a data set for commercial, multi-residential, and vacant properties for the 1983-1993 time period.  The data set, comprising approximately 10,000 records, was obtained from DRESCO, a company that collects real estate information in the Denver metropolitan region.  *Id*. at 23.  The results of Dr. Radke's Phase I regression are given on page 6 of his report in Table 1.  For the period as a whole, they reflected mean undervaluations for Rocky Flats area properties of approximately 22 percent for multi-residential properties, 32.14 percent for vacant land, and 53 percent for commercial properties.

In Phase II, Dr. Radke performed separate regressions for each year from 1988 through 1995. Because the DRESCO data set did not reflect sales of single-family residential properties, Dr. Radke instead employed data from the Multiple Listings Service, capturing essentially every sale of such

30

property within the class area during the period studied. *Id.* at 32. This enabled Dr. Radke to compare the sales prices for properties within the class area to prices of other properties with randomly selected properties elsewhere in the Denver region. The results of Dr. Radke's Phase II investigation are also reported in Table 1 of his report. Dr. Radke found significant undervaluation attributable to proximity to Rocky Flats for each of these years, with confidence levels equaling or approaching *100 percent*. *Id.* at 6.

### 3. Defendants' Attack on Dr. Radke's Qualifications

Defendants say Dr. Radke is not qualified to perform these regression analyses. Defendants say Dr. Radke's collegiate and graduate level work in the field was limited to two statistical courses in college and one taken while Dr. Radke was studying for his masters – courses that defendants say were actually in "spatial modeling." But here is the actual deposition testimony, in which defense counsel will not take yes for an answer:

Q.      . . . [H]ow many statistics courses did you take in college?

. . .

A.      Likely two.

Q.      One of those was a course in basic statistics?

A.      One was a course in basic statistics, and the other one would have been a course in regression.

Q.      Okay. Were these survey courses? These are introductory courses, I assume, since they're the first two courses you took; is that right?

A.      The first one was an introductory course. The second one was more advanced. . . .

31

. . .

Q.      How many statistics courses did you take while studying for your Master's Degree?

A.      At least one course that was a course, a statistics course.  During -- during that time I was studying there, my advisor was a spatial analyst, and the courses I took from him were all statistics courses, even though they may have been in spatial analysis.

Q.      How many courses is that, that were statistics courses?

A.      Yeah.  The courses that I would have taken with my advisor, and he -- he's one of the world renowned authorities on Thiessen polygons.  And I imagine I would have taken at least three courses from him.  I worked with this man for two years in incredibly close contact.  I am assuming I took every course he taught.

. . .

Q.      Did any of the work you did with [him] involve multiple regression analysis?

A.      It must have.  I can't recall.  This is -- this is a lifetime ago back in Canada.  And I can't recall what was in each of those courses, but I am sure it involved multiple regression.   All -- it would have involved all the standard tools, mathematical tools that one uses as a scientist. . . . So those were two fine years and I know I would have been immersed in quantitative methods, so --

Q.      None of the courses you took . . . when studying for your Masters Degree were courses that were *just* on multiple regression analysis; correct?

A.      Correct.  There -- at the time I don't believe there *were* any courses that would have pulled out one of the -- one of the subsets of statistics and said, this is -- this is the course.

*See* Radke Dep. at 56:20-59:12 (Ex. 24).  In other words, far from having only the desultory educational background in statistics that defendants say, Dr. Radke was immersed in advanced study of quantitative methods, including regression analysis, during his graduate education.

In addition to his student work in the subject, Dr. Radke *teaches* quantitative methods,

32

including regression analysis, at the University of California at Berkeley, one of the world's most prestigious educational and research institutions. *See, e.g.*, Radke Dep. at 85:22-86:15 (Ex. 24). Together with his undisputed expertise in computing and geographic information systems, where he is a recognized leader in his field, this amply qualifies him to have performed this work.

### 4.        Defendants' Relevance Arguments

Defendants say Dr. Radke's analysis does not link damages to defendants' conduct at Rocky Flats or to any health risk. But Dr. Radke is not an expert in plant operations or the health effects of exposure to ionizing radiation. His analysis does estimate damages under the legally governing damage measure as of the time when plaintiffs contend the injurious situation presented by the plant's invasions became complete and comparatively enduring.

Defendants say Dr. Radke's Phase II regressions are both overinclusive and underinclusive. His work is overinclusive, defendants say, because the regression relied on sales data for substantially all transactions within the class area, and some of those sales will not have involved a party having owned the property as of the defining date for class membership. It is underinclusive, they say, because not all class members sold their properties during the relevant years.

Defendants appear to misunderstand the very concept of statistical analysis. One principal aim of the regressions was to isolate value effects attributable to Rocky Flats for different years. Value effects reflected in market sales for a given year are probative of value effects even for properties in the same market that were not sold in that year. This is so whether or not each sale in the sample involved a class member.

Defendants argue that plaintiffs who purchased at a discount during one of the years covered

by Dr. Radke's regression would be subject to a set-off for damages found to have accrued in some subsequent year. Far from constituting an argument that Dr. Radke's testimony should be inadmissible, this argument presupposes that testimony's admissibility. In plaintiffs' belief, defendants' argument would also depend on a jury's finding that the purchase in question happened subsequent to the time that the injurious situation became complete and comparatively enduring (because otherwise, only damages for past invasions would have been recoverable – presumably by the *seller* – at the time of the plaintiff's initial acquisition of the property). For present purposes, however, it suffices to note that this argument does not concern the relevance or reliability of Dr. Radke's calculations – only their application.

### 5. Defendants' Reliability Arguments

Defendants say Dr. Radke should not have used a regression variation known as "weighted least squares," which according to defendants' experts should be used only to correct for "heteroscedasticity" (a technical term denoting a statistical attribute of the data on which the regression is performed). Other than their own experts, defendants cite no authority for this claim. They quote their expert Dr. McFadden as stating that "major economics textbooks . . . give these results," but an actual quotation from *any* authoritative text is lacking. Defendants offer only Dr. McFadden's claim that the idea could be found somewhere in "William Greene, *Econometric Analysis.*" Nor do defendants even attempt to explain *why* the use of weighted least squares is appropriate only for the purposes they contend, or *in what way*, if at all, their use for other purposes

would have materially affected Dr. Radke's results.[31]  We do know this much.  Dr. Wise, one of the experts on whom defendants rely, will go only so far as to opine that the use of weighted least squares to address concerns other than heteroscedasticity will not "give the best results."  *See* Wise Dep. at 64 (Ex. 37).  Dr. Wise also opines, meanwhile, that the data employed by Dr. Radke may well be heteroscedastic in any event.  *Id.*

Differences between experts in their choice of regression variables, or disputes over the underlying data on which the experts rely, go to weight, not admissibility.  *See, e.g., Bazemore v. Friday*, 478 U.S. 385, 400 (1986); *Cullen v. Ind. Univ. Bd. of Trs.*, 338 F.3d 693, 701 n.4 (7th Cir. 2003).

## 6.    Defendants' Spurious Charges of "Missing" Data

As the record in this case reflects, and plaintiffs will be prepared to discuss at greater length at the hearing in this matter, Dr. Radke was subjected, immediately upon provision of his report, to a massive and aggressive discovery campaign, in response to which he and his lab at the University of California provided enormous quantities of digitized information to defendants.  Unsated by that material, defendants continued to pursue requests for any and all electronic media, including backup tapes, that might contain some memorialization of some step, however small or tangential, in Dr. Radke's computer runs.   Defendants refused to compensate Dr. Radke or the University of

---

[31]    Defendants say that Dr. McFadden, one of their experts, ran Dr. Radke's regression "while correcting for [Dr.] Radke's weighting error" and that any proximity discount attributable to Rocky Flats was completely eliminated.  But defendants will not go so far as to say that these results were produced *because* Dr. McFadden eschewed weighted least squares, which in fact represents only one of several changes or "corrections" that Dr. McFadden adopted.  *See* McFadden Dep. at 85-89 (Ex. 36).

California, however, for the very substantial costs of compliance with their requests.  Nor did defendants renew their requests for any such material during the several years available to them between the filing of their original *Daubert* motions and this round.  This, plaintiffs believe, is because defendants are more interested in finding a procedural pretext for excluding Dr. Radke's opinions than they are in actually obtaining any additional information.

The ruling from Magistrate Borchers on which defendants rely is erroneous insofar as it concludes that any data was discarded or destroyed.  Plaintiffs could not and did not appeal from that ruling, because the ultimate disposition was favorable to plaintiffs and adverse to defendants. Magistrate Borchers, that is, awarded defendants no relief as to which plaintiffs might seek review, and defendants themselves chose, for reasons of their own, not to appeal his ruling denying the relief they had requested.

At the end of the day, the truth is that the DRESCO and MLS data employed by Dr. Radke were commercially available to anyone who requested them, including defendants, and that Dr. Radke's report, and the voluminous information he provided in discovery, were sufficient, by defendants' own admission, to permit their expert Dr. McFadden to reproduce Dr. Radke's regressions on those very data.   That by itself negates any claim that Dr. Radke withheld any information necessary to permit other investigators to test his results.

## C.      DR. JAMES FLYNN AND DR. PAUL SLOVIC

### 1.      Drs. Flynn and Slovic are Qualified.

Drs. Slovic and Flynn are both leaders in the field of risk assessment and public perception of risk.  They were retained to gauge public perception of the risks posed to the well being of persons

and property by the Rocky Flats Plant.  Relying on their years of experience and training, Drs. Flynn

and Slovic devised a methodology to measure these perceptions, including analysis of media

coverage of Rocky Flats and public opinion surveys.  Ultimately, they concluded that there is a

stigma attached to the property in the Class area.

Dr. Paul Slovic is a preeminent authority in the areas of human judgement, decision making,

and risk assessment.[32]  He is the president of Decision Research and a professor of psychology at the

---

[32]  Dr. Slovic summarized his lengthy *Curriculum Vitae*:

My name is Paul Slovic.  I have a bachelors degree in Psychology from Stanford
University and Masters and Ph.D. degrees in Psychology from the University of
Michigan.  I am currently professor of Psychology at the University of Oregon and
President of Decision Research, a nonprofit research institute specializing in the
study of human judgement, decision making, and risk assessment.  I have been
conducting research on human behavior in situations of risk for more than 30
years.  I was one of the first social scientists to study people's perceptions of risk
and I have written numerous articles based on my research in this area.  I was
elected President of the Society for Risk Analysis in 1983... and in 1991 I received
the Distinguished Contribution Award from the Society for my research on risk
perception.  In 1993 I was selected by the American Psychological Association as
the recipient of the Association's Distinguished Scientific Contribution Award.  In
1995, I received the Outstanding Contribution to Science Award from the Oregon
Academy of Science.  I serve on the editorial boards of numerous journals and
have been a member of a number of committees of the National Research
Council/ National Academy of Sciences dealing with issues of risk assessment,
including the committee that produced the 1983 report titled "Risk Assessment in
the Federal Government: Managing the Process" (National Academy of Sciences,
1983).  I was also a member of the National Academy of Sciences Committee on
risk characterization that recently produced a report titled "Understanding Risk:
Informing Decisions in Democratic Society" (National Academy of Sciences,
1996).  I am a member of the National Council on Radiation Protection and
Measurements and currently serve on the Council' Board of Directors.  I also
serve on the Board on Radioactive Waste Management of the National Research
Council/ National Academy of Sciences.

(continued...)

37

University of Oregon.  *See Curriculum Vitae* of Paul Slovic (attached to Slovic Report).  While

defendants attempt to characterize Dr. Slovic as simply a "psychologist who teaches at the University

of Oregon,"  Def. Conduct Br. at 33, defendants neglect to include any discussion of Dr. Slovic's

nineteen-page *curriculum vitae* in their discussion of his expertise.  Defendants also launch into their

mis-characterization of the Survey Report as a property valuation study by pointing out that Dr.

Slovic is not an expert in property valuation.  As argued in detail below, neither Dr. Slovic nor Dr.

Flynn claim that the Survey Report can yield a precise measure of diminution in property values.

They properly left that task to Mr. Hunsperger, plaintiffs' property valuation expert.  *See* Flynn Dep.

at 106-09 (Ex. 12); Slovic Dep. at 139-41, 153-54 (Ex. 26); Flynn, Hunsperger & Mertz, "Public

Stigma Responses and Property Values Adjacent to Rocky Flats, Colorado: A Response to

Defendants' Daubert Motion" (7/7/2005) ("Flynn & Hunsperger Response") at 3-4, 13-14 (Ex. 10).

Dr. James Flynn is a senior research associate at Decision Research.  He has authored dozens

of articles published in peer-reviewed journals regarding risk perception, stigma, and related topics.

*See* Flynn, Peters, Slovic & Mertz, "The June 6, 1989 FBI Raid at Rocky Flats, Colorado: Risk,

Media, and Stigma" (11/19/96) ("Survey Report"), Attachment: *Curriculum Vitae* of James Flynn

(Ex. 13); *Curriculum Vitae* of James Flynn (Ex. 11).

Defendants attempt to divert the Court's attention from Dr. Flynn's voluminous credentials

by focusing on the fact that he has a Ph.D. in English (Def. Damages Br. at 32-33).  Apparently the

---

[32](...continued)
"Factors Influencing Risk Assessment, Risk Perception, and Risk Acceptance" (11/19/96)
("Slovic Report"), at 1.  *See also* attachment to Slovic Report, *Curriculum Vitae* of Paul Slovic.

DOE, the Nuclear Regulatory Commission, the Department of Defense, the National Council on Radiation Protection, the National Academy of Sciences/ National Research Council, and numerous other high-profile government and private organizations have found Dr. Flynn's English Ph.D. to be no detriment to his expertise as a social science researcher.  As Dr. Flynn's original and updated *curricula vitae* reflect, he has performed various high-level research tasks for these organizations. *See* Exs. 13 & 11.  Dr. Flynn is an expert, in the true sense of the word, in the study of public perception of risk, especially regarding risks from radiation.  He relies on over twenty years of field experience in arriving at the methodologies and conclusions offered in his reports, satisfying both Rule 702 and Tenth Circuit precedent.  *See Wheeler*, 935 F.2d at 1100.  Dr. Flynn further expounded on his qualifications at his deposition:

> A.     Well, I think that in some ways my background is not the usual one to achieve an expertise in a particular field.  But the experience that I've had, going back to 1976, is strong in the areas of social impact assessment, community studies.  I've done community studies, in particular, involving nuclear facilities and nuclear technology.  I began working on these issues in 1978, when I participated in a four year study for the Nuclear Regulatory Commission.  And the purpose of the study was to develop the social and economic regulations for permitting and licensing nuclear power plants.  And we conducted 12 case studies and provided a summary and report, which are published as new regs.  And that was completed about 1982.

> And then subsequent to that, I worked on the environmental impact statement for Pudget Power Company.  They had proposed a nuclear power plant.  It was called the Skagit/Hanford Plant, which is a fairly complex history, but was probably the last nuclear power plant that a license was attempted for.  Also worked on other EIS type of work in a social impact assessment type of work for oil shales for development in Colorado, for landfills, for - And then in 1985, I did some work for the state of Mississippi on the proposed high-level waste site in Mississippi at Richton Dome.

> And in 1986, began work on a project that has lasted to the present day for the state of Nevada on the high-level waste site at Yucca Mountain, Nevada.  On that project, I served as the project manager and project director.  I was responsible for

the conduct of the research.  It produced in excess, I think, of 300 reports and documents to the state of Nevada.  125 or 30, maybe more by now, publications in the peer review literature.  It covered the complete gamut of socioeconomic studies.

Since coming to Decision Research in 1990, -91, I've worked on a number of research projects, including national surveys on nuclear power, national surveys in Canada on health and environmental hazards, surveys on the use of the  public responses to forest, vegetation management.  And this work, some of it has been completed recently and some of it continues.  So basically, that's - I don't know how many articles and chapters of books and such things that I've completed, but I think there's a couple pages in the C.V.

Flynn Dep. at 212:7-214:15 (Ex. 12).

Additionally, Dr. Flynn's updated resume (Ex. 11) reflects further experience in opinion research in general, and in public responses to radiation issues in particular.  The majority of the newly added materials – about 20 peer-reviewed articles and more than 25 invited presentations since 1997 – deal with public perceptions of radiation risks, many incorporating questionnaire results from survey and/or experimental data.  Notably, Dr. Flynn acted as the Principal Investigator for the DOE Low Dose Radiation Program for a three-year study (1998-2001) of radiation risk communication.  In 2001 Dr. Flynn was a visiting scientist at the Sandia National Laboratory on risk communication issues associated with responses to weapons of mass destruction (commissioned by the Defense Threat Reduction Agency USDOD). He made presentations at the Gordon Conferences in 1998 and 2000 on nuclear technology, radiation and risk communication.  In 1997 he presented papers on public views of technological risks at conferences in Lisbon, Portugal and for the Atlantic Council on public responses to nuclear power at their seminar on the future of nuclear power in Asia. In 2003, he served on an advisory panel to the Atlantic Council and made a presentation on public opinion and the future of nuclear power that is cited in the Council's Bulletin of March 2004.

40

Between 2002 and 2004, he served as a member of Scientific Committee 87-5 for the National Council on Radiation Protection.  He contributed major portions to the NCRP's Report No. 146, "Approaches to Risk Management in Remediation of Radioactively Contaminated Sites," specifically on risk perceptions, site specific decision-making, and the summary of implications for risk management and public participation.  He has been asked to make presentations to three National Academy of Sciences/ National Research Council committees between 1999 and 2004 on public responses to radioactive wastes.  In 1999, he was invited to present a paper on Nuclear Stigma at a workshop in London sponsored by the UK Health and Safety Executive.  This paper was subsequently published as Chapter 14 in the book, *The Social Amplification of Risk* (2003).  In sum, Dr. Flynn's qualifications are more than adequate to enable him to perform the research task he has completed for this case.

      **2.**        **Drs. Flynn and Slovic's Testimony is Relevant and Reliable.**

          **a.**        **The Flynn and Slovic Reports**

     **i.**        **The Survey Report**     Drs. Flynn and Slovic's Survey Report, based on a public opinion survey they conducted, measures the public's perceptions of the problems at Rocky Flats and their attitudes toward buying property in the class area.  The survey found a significant degree of stigma associated with Rocky Flats.  Flynn & Hunsperger Response at 7-9, Fig. 3, Table 4 (Ex. 10); Survey Rep. at 21-23 (Ex. 13).  The survey has been peer reviewed and published.[33]

     Defendants' selective description of the survey (Def. Damages Br. at 31-32) conveniently

---

[33] *See Risk Analysis*, Vol. 18, No. 6, 1998.  *Risk Analysis* is a publication of the Society for Risk Analysis.

omits the extensive procedures the survey team used to ensure accurate results. To summarize the survey methodology, first a target population for the survey was chosen, limited to adults in the Denver metropolitan area who were actual or likely home buyers. *See* Survey Rep. at 2 (Ex. 13). During the first half of the survey, the respondents were asked general questions about four communities: Arvada, Westminster, Ken Caryl, and Highland Ranch. *Id*. at 4-5. The questions at this stage did not mention Rocky Flats; rather, they asked the respondents to rate the communities on a list of ten characteristics, and asked open-ended questions about the communities. The second half of the survey isolated the respondents' impressions of Rocky Flats. This phase included questions intended to gauge how much each respondent knew about Rocky Flats, *id*. at 6, and asking them to provide images of Rocky Flats and rate them from "strongly negative" to "strongly positive", *id*. at 6. Then the questions turned to the respondents' impressions of the effects of Rocky Flats on the desirability of the area, including their perception of how far their homes lay from Rocky Flats, *id*. at 7-8,[34] how much distance respondents would want between themselves and the plant, *id*. at 9-10; and what combination of extra distance and/or price discounts respondents would want before buying a home within 4 to 6 miles of Rocky Flats, *id*. at 11-14. *After* the stigma-quantification section, the survey asked about the respondents' knowledge or opinions about specific issues involving Rocky Flats, such as whether Rocky Flats posed a health risk, *id.* at 17-18; their knowledge

---

[34] This perception of how far they lived from the plant was compared to their actual zip codes in order to compare the respondents' perceptions to reality. *See id*. at 8. This exercise yielded an interesting correlation: "The Arvada/ Westminster respondents who said Rocky Flats made their home's location less desirable ... were likely to estimate a correct or closer distance (61.2%) rather than thinking they were farther away (25.5%)." *Id*. at 8.

about the FBI raid, *id*. at 18-19; and whether they felt Rocky Flats was currently safe, *id.* at 19-21. A thorough examination of the questions asked, and the order in which they were presented, shows that the questions asked were balanced and unbiased, and that specific details about Rocky Flats were not inserted until the end of the survey so as to avoid coloring the respondents' views. Moreover, the survey was "double-blind" controlled: neither the survey takers nor the respondents knew the identity of the party who had commissioned the survey. Flynn & Hunsperger Resp. at 12. The survey was designed to be objective and scientifically accurate.

  **ii.**  **The Slovic Report**  The Slovic Report focuses on risk and factors influencing perceptions of risk. Two circumstances or events may, for example, pose the same *numerical* risk of injury, but people *perceive* and *react* to these risks in very different ways depending on the nature and source of the risk. People react more strongly when: "exposure to the hazard is involuntary;" "the risk is not under one's control;" "the risk evokes feelings of dread;" "the outcomes are catastrophic;" "the benefits are not fairly or equitably distributed among those who bear the risks." *See* Slovic Report at 5. All these factors are relevant and support plaintiffs' claims.

  **b.**  **Defendants' "Fit" Objections Are Meritless.**

  Defendants raise two "fit" arguments that are easily disposed of: that the Survey Report was not intended to be used as evidence of property values, and that the Slovic Report does not fit with the elements of this case. First, defendants have conflated Drs. Flynn and Slovic's work with Mr. Hunsperger's. Drs. Flynn and Slovic administered the survey because that type of research is within their expertise. Neither of them attempted to measure property damages to the Property Class, using the survey or any other approach, because that is outside their expertise. Mr. Hunsperger, who *is*

<div align="center">43</div>

expert at measuring damages to property, took the results of the survey and combined it with a wealth of other information and data that he collected and analyzed in the preparation of his report. Mr. Hunsperger calculated several damage estimates, including one using the opinion survey. His final, overall estimate of damages ($190 million), however, derives from the totality of his work, combined with his training and professional experience.

Defendants' claim that the survey was "not designed to be used by anyone to estimate any diminution in property values" (Def. Damages Br. at 38) is false. As Dr. Flynn testified:

> We designed the survey with the knowledge that the survey, the results of the survey would be used as information in his [Mr. Hunsperger] making an evaluation of the property in the class area, yes.

Flynn Dep. at 107 (Ex. 12).

Dr. Slovic testified as follows:

Q: Well, did you know when your firm conducted the survey, how Mr. Hunsperger intended to use the data that you developed?

A: It was our understanding that- that this survey was to examine the attitudes and opinions of people of- vis-a-vis the concept of stigmatization, risk induced stigmatization that might be taking place here that would have relevance for the property value work that Mr. Hunsperger was doing.

. . .

Q: Were you aware that Mr. Hunsperger would use the survey data that you developed as to estimate the diminution in property values in the class area?

A: We were aware that we were going to collect data that bore upon the possible stigmatization of property in this region and that would have relevance for property values, but we were not intending to produce estimates, precise estimates of the devaluation.

Slovic Dep. at 139-140 (Ex. 26). Both Drs. Flynn and Slovic, as well as Mr. Hunsperger, found the

survey results to be relevant and useful information in determining property value diminution. This is a permissible use of survey evidence. *See Harolds Stores, Inc. v. Dillard Dept. Stores, Inc.*, 82 F.3d 1533, 1547 (10th Cir. 1996) (finding sufficient evidence to sustain jury's damages award, where plaintiff's damages expert based his damages estimate on survey). Defendants have not impugned the usefulness of the survey for that purpose.

Defendants' second argument, that the Slovic Report is irrelevant, is belied by the fact that defendants have submitted an expert report addressing nearly the same subject. *See* Kahneman Rep. (11/25/96) (discussing general principles regarding public reactions to information about risk).[35] As defendants apparently realize, an expert's testimony regarding risk perception is needed to explain to the jury *why* home buyers and sellers behaved as they did in reaction to the problems at Rocky Flats. The Slovic Report explains that when people are presented with the type of risks presented by Rocky Flats – that is, the risk of radioactive contamination, as opposed to the risk of a sudden, discrete disaster like a car accident – they want stricter safety standards. *See* Slovic Rep. at 10-11 (Ex. 25). Defendants cite no authority for the proposition that an expert may not testify to explain

---

[35] Dr. Kahneman introduced the specific subject of his report as follows:

> Specifically, I have been asked whether there is any inconsistency between there having been widespread adverse publicity following a well-publicized FBI raid in June of 1989 . . . and the results of a study [by defendants' expert] of the residential housing market from that time until the present that shows no adverse effect on housing prices in an area near the plant known as the "class" area.

*Id.* at 1. His methodology for reaching that conclusion is simply to discuss other studies and principles of psychology and economic behavior (as he interprets that information). *See id.*, passim.

general principles.  In fact, the Rules Advisory Committee specifically recognized that this type of

expert testimony can be desirable:

> [I]t might also be important in some cases for an expert to educate the factfinder
> about general principles, without ever attempting to apply these principles to the
> specific facts of the case.  For example, experts might instruct the factfinder on the
> principles of thermodynamics, or bloodclotting, or on how financial markets respond
> to corporate reports, without ever knowing about or trying to tie their testimony into
> the facts of the case.  The amendment does not alter the venerable practice of using
> expert testimony to educate the factfinder on general principles.

Fed. R. Evid. 702, adv. cmte. note (2000).

Defendants also fault the Survey Report for not distinguishing between the public's

perception of risk due to Rocky Flats' tortious conduct, as opposed to the perception of risk inherent

in any nuclear facility.  Def. Damages Br. at 39-40.  A number of the survey's results indicate that

the market stigma is tied to negative perceptions due to Rocky Flats' environmental problems.  Flynn

& Hunsperger Resp. at 9 (Ex. 10); *see also* Flynn Dep. at 197-98 (Ex. 12).  For example, the majority

of respondents felt that Rocky Flats is probably or definitely unsafe, that even very small amounts

of contaminants from Rocky Flats in residential areas posed a health risk, and that the FBI raid and

Rockwell's guilty plea had adversely affected the desirability of housing near the plant.  *See* Survey

Rep. at 17-19 (Ex. 13); Flynn & Hunsperger Response at 8-9 (Ex. 10).  In any event, it is defendants'

burden, not plaintiffs' or their experts', to prove that any market stigma existed independent of the

raid; thus far defendants and their experts have been reluctant to make that claim.

### c.    Drs. Flynn and Slovic's Methodology Is Sound.

Instead of propounding actual proof that the Survey Report is unreliable as a matter of law,

defendants have prematurely written their script for cross-examination at trial.  Drs. Flynn and

Slovic's methodology used in their Survey Report has survived peer review and has been published in *Risk Analysis*.[36]  Even if defendants' objections to the survey methodology had any merit, none of their objections renders the survey unreliable; instead, they simply create an issue of fact to be decided by the jury.  *See Harolds Stores*, 82 F.3d at 1544 ("Technical and methodological deficiencies in the survey . . . bear on the weight of the evidence, not the survey's admissibility.").

Dr. Flynn and Mr. Hunsperger's Response addresses the two bases of defendants' arguments: the mischaracterization of the survey report as a contingent valuation study, which it is not, and the claim that Drs. Flynn and Slovic did not follow proper survey methodologies.  *See* Flynn & Hunsperger Resp. (Ex. 10).  As the Response demonstrates, even though the standards for proper survey techniques have been more clearly defined since the initial Survey Report was completed in 1995, the new standards have validated Drs. Flynn and Slovic's methodology.

Defendants' specific objections are groundless, as discussed below.

**i.     Discount Amount and "Anchoring Bias"**     Defendants' arguments about the survey's discount amounts are truly a red herring.  Drs. Flynn and Slovic designed their survey to measure the degree of respondents' reactions to Rocky Flats as a possible stigma, rather than to measure the actual property value diminution by way of their survey questions.  *See* Flynn & Hunsperger Response at 3-4, 13-14 (Ex. 10); Flynn Dep. at 106-09 (Ex. 12); Slovic Dep. at 139-41, 153-54 (Ex. 26) ("Our questions are designed to examine the attractiveness of housing in these regions.  The people, you know, in the context of knowledge about Rocky Flats.  They're not

_____

[36] Vol. 18, No. 6, 1998.

designed to elicit precise monetary values.  These are more attitudinal and opinion questions than precise valuation questions."  Slovic Dep. at 153.).  The dollar amount of the discount requested by survey respondents is not the defining result of the study; rather it is the fact that the respondents requested *any* discount, or progressively higher discounts.  Slovic Dep. 167-69 (Ex. 26); *see also* Flynn & Hunsperger Response Fig. 3 (Ex. 10) (chart of survey responses to distance and discount questions).  Some amount of discount needed to be chosen in order to encourage the respondents to think about the issue and define their response.  *See* Slovic Dep. at 156 (Ex. 26) ("[The questions] were designed to elicit people's evaluations of the attractiveness of purchasing a house at these distances at these discounts that is, you know, a form of attitude or opinion that we deemed to be relevant to market value, although it is not a precise measure of market value."); *id*. at 160 ("[The discounts] were determined as increments that we thought would be significant, non-trivial increments [ ]. ...  And we could have started and said $100, would you accept $100 to do this?  We thought that was too small. ...  And so we selected these as sort of small percentages of the total value that would be meaningful to people, as significant amounts.").

The values Drs. Flynn and Slovic chose approximate as closely as possible the real-world decision making process of purchasing a home.  The starting values for the discounts, $5000 and $10,000, were based on common knowledge of real estate pricing, in order to best approximate the real-world conditions of the real estate market.  *See* Flynn Dep. at 201-04 (Ex. 12); Slovic Dep. at 160-61 (Ex. 26).  It is common knowledge that real estate purchasers generally will not walk away from a deal over a few hundred dollars, or even one or two thousand.  Defendants provide no evidence that the starting discounts in the survey had any effect, let alone an upward bias, on the

48

survey results.

There is no evidence of an anchoring bias in the Survey Report study. Defendants raise only the hypothetical possibility of an anchoring bias; they offer no evidence to support their allegations.[37] Dr. Slovic testified that, based on his knowledge as an expert in survey design, it is unlikely that an anchoring bias inflated the survey results, especially in light of the fact that 46 % of the survey respondents would not have purchased a home in the class area at *any* price. Slovic Dep. at 167-69 (Ex. 26). Also, it is equally likely that the survey respondents would have sought a *larger* discount had different initial discount values been used. *See id.* at 162-63.

### ii.     Allegedly Biased Questions

Drs. Flynn and Slovic designed their study to be as accurate as possible. Slovic Dep. at 141 (Ex. 26). The questions were carefully designed to be neutral on their face and to be presented in such an order that the respondents' opinions about Rocky Flats' stigma rested on their pre-existing opinions, not on any information given to them by the interviewer. The questions first define the general parameters of people's perception of the

---

[37] Although defendants refer to their experts' critiques of Plaintiffs' Survey Report, these critiques are phrased in terms of hypothetical problems with the Survey Report. Neither of these experts attempted to reproduce Drs. Slovic and Flynn's results or test the impact of any alleged flaws or biases in the survey. *See* D'Arge 3/18/97 Rep. at 14 (Ex. 32) (asking but not answering question, "Did the range itself determine the final estimate?"); *id.* at 23 ("The presence of 'starting point' bias or lack of it cannot be assessed . . .").

This and other disagreements between plaintiffs' and defendants' experts are matters that must be resolved by the trier of fact. *See Daubert*, 509 U.S. at 595 ("The focus ... must be solely on the principles and methodology, not on the conclusions that they generate."); *Bitler*, 391 F.3d at 1238 ("Here, the expert testimony 'fits' because it involves a reliable method that would aid the jury in resolving a factual dispute; whether the jury finds that the testimony 'fits' their best assessment of the truth of the matter is an altogether different issue.").

housing market, then ask general questions about people's reactions to Rocky Flats, then ask about

value discounts, and lastly ask about specific perceptions of Rocky Flats.  *See supra* pp. 42-44

(summary of Survey Report).  While defendants claim that the survey asked questions about Rocky

Flats early in order to focus attention on Rocky Flats as a negative attribute, Def. Damages Br. at 34-

36, they offer nothing but their own speculation that the way the questions were framed caused any

change in the survey responses.[38]  Neither do defendants suggest how a survey could measure public

reaction to Rocky Flats without mentioning Rocky Flats – a task that is clearly impossible. As Dr.

Slovic testified, "if you are drawing attention to Rocky Flats, if drawing attention to Rocky Flats

triggers an aversive response in someone in the survey, you know, this seems relevant to the

possibility that anything that brings Rocky Flats to their attention out in the world will also trigger

that aversive response."  Slovic Dep. at 201; *see also* Slovic Dep. at 198-202 (Ex. 26).

> **iii.    Unrealistic Survey Situation**        Defendants argue that the survey was

unrealistic because it isolated Rocky Flats as a factor in the often multi-faceted decision-making

process of home buying.  They ignore the simple fact that, in any study, it is necessary to isolate the

factor at issue in order to properly measure its effects.  Dr. Slovic testified that an individual's real-

world perception of Rocky Flats would be incorporated into that person's global decision-making

process:  "If Rocky Flats is an element in your associative structure to your image of a place, or to

your knowledge of a place, then the negativity associated with Rocky Flats will influence your

---

[38]    Dr. Kahneman's argument about the order of the survey questions, Kahneman 3/18/97
Rep. at 3-6 (attached to Def. Damages Br. as Ex. 17), is entirely unsupported.  Neither he nor
defendants have attempted to prove that any bias occurred.

decision. . . . If it becomes part of the conscious attention of a home buyer, then I think it will elicit an aversive response that will have a strong impact on whether a person would even consider a property in that area." Slovic Dep. at 202 (Ex. 26). The Survey Report aims to measure a social condition that has had an economic effect; the Report did not create that condition out of thin air. As such, the Survey Report approximated real-world conditions to the degree necessary to accurately measure the effect of just one factor, Rocky Flats.

      **iv.**    **Safety-for-Money Tradeoff**    It bears repeating that the Survey Report does not purport to measure an exact dollar amount of diminution in property values due to Rocky Flats, *see* Flynn Dep. at 106-09 (Ex. 12); Slovic Dep. at 139-41, 153-54 (Ex. 26), so any potential inaccuracy between the dollar figures and the actual damages measured by Mr. Hunsperger and Dr. Radke would not affect the admissibility of the report. The importance of the results is that they measure the respondents' perception of risk as an order of magnitude. Slovic Dep. at 160, 162 ("Our intent was to ask questions relevant to valuation, relevant to the possibility of stigmatization to get more of a -- kind of a picture of stigmatization and aversion. And in that sense the precise values really aren't critical."). The results of the Survey Report are relevant to damages in this case because fact that people are reluctant to live near Rocky Flats should show up in their behavior in the marketplace. Slovic Dep. at 203-04 (Ex. 26).

      **v.**    **Accepted Survey Techniques**    The Survey Report follows the standard, accepted methods followed by practitioners in the field, as well as the accepted methods for surveys used in litigation. *See* Flynn & Hunsperger Resp. at 9-13 & table 2 (Ex. 10). As explained in Dr. Flynn and Mr. Hunsperger's Response, which is incorporated here by reference, the survey questions

51

and methodology were designed to ensure accuracy and objectivity.  *Id.*, *passim*.

Defendants' critique of the Survey Report singles out the wrong set of survey techniques. Defendants cite only the NOAA Panel Guidelines for contingent valuation studies.  Def. Damages Br. at 36-37; D'Arge 8/6/04 Rep. (attached to Def. Damages Br. as Ex. 18); Kahneman 3/18/97 Rep. (attached to Def. Damages Br. as Ex. 17).   As both Drs. Flynn and Slovic testified, they did not design their survey to be a contingent valuation study.  *See* Flynn Dep. at 38, 47, 49 (Ex. 12); Slovic Dep at 128-29 (Ex. 26).  Contingent valuation is a means to approximate monetary values for things that are not bought and sold in normal markets, such as a nature preserve.  *See* Slovic Dep. at 207-08 (Ex. 26).  Drs. Flynn and Slovic did not design their survey to be a contingent valuation study; rather, the survey was meant to explore the causal link between Rocky Flats and the real-market property value effects that Mr. Hunsperger and Dr. Radke observed:

> The survey did not attempt to quantify in dollar terms the lost value of property in the Class Area since this was established with standard appraisal methods including the use of case studies, an investigation of sales data, and multiple regression analysis. Even though these techniques did show loss in value there may be a question as to the causal link between environmental disamenities and the loss in value. What the survey did was to link the Rocky Flats facility with a stigma effect on public opinion about the desirability of housing and property in the Class Area.

Flynn & Hunsperger Response at 13-14 (Ex. 10).   As such, the NOAA Panel Guidelines for contingent valuation surveys simply do not apply here.

The Survey Report's methodology fits the actual, current standards for survey research for use in litigation.  *See* Flynn & Hunsperger Resp. at 9-13 & Table 2 (Ex. 10).  Drs. Flynn and Slovic's methodology is sound, and their conclusions are highly relevant and informative to the jury.  Their testimony is therefore admissible.

# IV.    RISK EXPERTS

## A.    DR. ROBERT GOBLE

### 1.    Dr. Goble's Credentials

Dr. Robert Goble earned his Ph.D. in physics from the University of Wisconsin in 1967. Since then, he has held faculty and research positions at several universities, including the physics departments at Montana State University, the University of Utah, the University of Minnesota, and Yale University.   He is a former fellow of the Princeton University Center for Energy and Environmental Studies.  Since 1976 he has taught at Clark University, where he is currently Research Professor of Environmental Science and Policy as well as Adjunct Professor of Physics.

As his *vitae* discloses, Dr. Goble has performed research in the past for the United States Environmental Protection Agency, the Office of Technology Assessment, the National Science Foundation, and the United States Department of Energy.  Defendants deposed Dr. Goble for two days and challenge neither his credentials nor his expertise.

### 2.    Dr. Goble's Report

Dr. Goble authored an 82-page report entitled *Exposures from Releases of Plutonium and Other Toxic Substances at Rocky Flats* (Ex. 15).  An overview is given in the report's opening pages. To summarize, Dr. Goble provides numerical estimates of offsite concentrations of plutonium (with accompanying americium) and other hazardous substances within the class area.  He also describes how such information may be used in assessing exposures and risks in the exposed population.  *See* Goble Report at 1 (Ex. 15).

Dr. Goble's report was originally prepared for purposes going beyond the class property

claims, including the presentation of opinions pertinent to the now-decertified and severed medical monitoring claims.  Dr. Goble will offer no testimony on medical monitoring at the trial of the class property claims.  Nor do plaintiffs intend to present Dr. Goble's testimony at that trial on the subjects of beryllium, ethylene oxide, or  volatile chlorinated hydrocarbons.  The Court therefore need not reach defendants' motion as to those issues at this time.  We confine ourselves here to addressing defendants' attacks on Dr. Goble's estimates relating to plutonium.

In that vein, it is important to note Dr. Goble performed this work within a certain context. It is a conceded and undisputed fact that plutonium has been released from Rocky Flats.  Indeed, not long ago, Mr. Bernick stipulated in open court to the class-wide presence of plutonium.  Dr. Goble's report focuses on quantitative aspects of that contamination and the associated health risks.  One of the principal aims of Dr. Goble's work was to express in statistical terms the *uncertainty* and *variability* associated with Rocky Flats exposure and risk estimates.  *Id.* at 1-2.

The two terms just mentioned merit elaboration.  As Dr. Goble explains, *uncertainty* involves "the question of whether we are making overestimates or underestimates of exposures, doses, and the likelihood of disease attributable to them."  *Id.* at 6.  It would be misleading, that is, to suggest that scientists can identify, to the level of exactitude implied by a single numerical figure, the precise level of exposures, doses, or risks associated with past releases from Rocky Flats.  Although defendants chide Dr. Goble for not himself conducting measurements of these things, the problem here is rather that *defendants* repeatedly failed to do so on a reliable and contemporaneous basis.  *Id.* at 10.  Nor could other persons generally conduct such measurements; operations at the plant were secret.  *Id.* at 16.  As a consequence, any candid assessment of exposures attributable to Rocky Flats

54

must address considerable *uncertainties* presented by the relative scarcity of available and reliable data.

*Variability*, by contrast, involves issues presented by individual variations in exposure, dose, and susceptibility. *Id.* at 7. As Dr. Goble explains, "The quantitative representation of variability better describes the group as a whole by giving numerical values for how exposures or doses are distributed among the members." *Id*. at 23. It would be misleading, that is, to hold out a putative "average" value as representative of the exposure or risk of every member of the exposed population. It is more accurate, and more forthright, to state the likely range of exposures or risks within the population, and to portray their probable statistical distribution. *Id.*

In light of these considerations, Dr. Goble employed recognized statistical methods to develop estimates of the quantitative *ranges* within which releases, exposures, doses, and risks in the class area have likely fallen -- at stated levels of confidence. *See, e.g., id.* Table 4.7, at 51-57. These "confidence intervals" are a common probabilistic expression of the likelihood that the true value falls within the stated range. For example, if a value is estimated as falling between three and twelve picocuries at a 90% confidence level, there is a probability of 90% that the true value falls within the given range.

Dr. Goble also comments in his report on prudential reasons why it is appropriate to consider "the 95 percentile person in an exposed group; that is, the person who, because of variability in the exposures received by people in the group, had an exposure greater than or equal to the exposure received by 95% of the people in that group." *Id.* at 24. He nowhere suggests, however, that those 95th percentile figures represent the most accurate single estimates for the relevant values. Indeed,

Dr. Goble assiduously avoids the suggestion that any such single numerical estimate could faithfully portray the relevant exposures and risks. His ranges do.

### 3.    Defendants' Arguments Concerning Dr. Goble

In many ways, defendants' attack on Dr. Goble is most remarkable for what defendants do *not* challenge. Defendants have not questioned Dr. Goble's expertise. They have not denied that Dr. Goble's methods and results are fully and transparently described in his report. They have not challenged his computational accuracy. They have not identified any specific statistical technique, any computer model or computer software, or any methodological approach adopted by Dr. Goble that defendants allege to be anything other than well-established scientific procedure. Defendants merely think that all of Dr. Goble's testimony should be inadmissible.

### a.    Defendants' "Fit" Arguments

Defendants imply that Dr. Goble's analysis does not apply to the class area as a whole. It is true that Dr. Goble's report presents estimates for certain specific points within the class boundaries, but as Dr. Goble's report clearly states, those are representative results for a model encompassing the entire class area. *E.g.*, Goble Report at 31.

Defendants also argue that health risks attributable to past exposures under Dr. Goble's analysis are subject to variability, depending largely on the time periods during which members of the former medical monitoring class resided in the area, and the duration of their residence there. But the medical monitoring class, it will be recalled, was not defined by reference to property ownership on any given date, but rather by reference to residence within a somewhat larger class area for any amount of time following commencement of operations at the plant in the early 1950's. *See*

56

*Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378, 382 (D. Colo. 1993).  To be sure, a medical monitoring trial might focus on individual variations in past personal exposures, but individual variability in past exposures for members of a class spanning four decades was obviously much larger.  The class property trial, in any event, will focus on injury to use and enjoyment *of land*, going forward from the time when the injurious situation became comparatively complete and enduring. Individual personal variations in past exposure might still be relevant to that issue, insofar as they illustrate potential *ranges* of prospective exposures.  But it can safely be said, plaintiffs believe, that calculating individuals' risks from previous exposures is not a necessary element of plaintiffs' claims for future harms.

Plainly, an analysis quantifying releases of plutonium to the class area and the resulting contamination and risk is *relevant* to plaintiffs' claims.

### b.   Defendants' Reliability Arguments

Defendants list four bases for their reliability attack on Dr. Goble: (a) the breadth of the ranges in Dr. Goble's estimates; (b) Dr. Goble's alleged failure to engage in hypothesis-testing; (c) what defendants call Dr. Goble's "reliance" on his upper 95th percentile confidence limits; (d) defendants' contention that Dr. Goble's estimates do not agree with what defendants call "real-world data," which turn out primarily to involve a couple of plutonium air monitors with a proclivity toward readings of which defendants approve; (e) arguments with Dr. Goble's estimates for deposition velocity; and (f) Dr. Goble's use of a "multiplier" to discount air concentrations for the period from 1970 to 1989.  These criticisms have previously been addressed in a March 1999 declaration from Dr. Goble (*see* Ct. Rec. 1116) (the "Goble Declaration") to which defendants'

renewed *Daubert* motion is unresponsive.  We address them again below.

      **i.**      **Dr. Goble's Confidence Ranges**     The gist of defendants' first objection to Dr. Goble's estimates is that his ranges are too broad.  Although defendants dress this up as a putative problem with Dr. Goble's methodology, it is in fact simply a quarrel with Dr. Goble's *results* -- i.e., his findings that at the stated confidence intervals, the data permit only an estimate within the stated ranges.  Defendants do not argue that Dr. Goble is *mistaken* in these findings, nor do they identify any accepted canon of statistical methodology that  Dr. Goble allegedly violated in *reaching* them.  Nor do defendants raise a challenge to the accepted practice of offering such estimates in the form of ranges, or state what breadth of confidence interval defendants would consider acceptable.

      What Dr. Goble has done is to present probabilistically distributed estimates of exposure, dose, and risk.  Defendants would evidently prefer estimates that honed in on one putatively true value, or a narrower range, but Dr. Goble has given reasons, in his analysis of uncertainty, why the data do not permit that.  *Portraying* the uncertainties, meanwhile, is highly germane to the issues at hand.  The cases cited by defendants all involved contexts where such a portrayal was not probative in itself.  In any event, defendants cite no decision in which an expert's testimony was stricken because confidence intervals were too wide.

      The first decision on which defendants rely is *Turpin v. Merrell Dow Pharm., Inc.*, 959 F.2d 1349, 1357 (6th Cir.), *cert. denied*, 506 U.S. 826 (1992), a Bendectin case.  In *Turpin*, the Sixth Circuit, far from *excluding* any testimony or finding it scientifically unreliable, opined that the epidemiologic studies on which the defendants in *Turpin* relied "*constitute evidence on which a jury*

*might ground a defendants' verdict*." *Turpin*, 959 F.2d at 1357 (emphasis added).[39]  Nor was the

*Turpin* court's language about "scientific uncertainty" addressed to the acceptable or unacceptable

breadth of any confidence intervals, as defendants claim.   Rather, it was part of a general,

nonstatistical discussion to the effect that the etiology of congenital anomalies is not well

understood.  *Id.*

    The second case invoked by defendants did not involve plutonium, risk estimates, or a

nuclear weapons plant.  It involved the fee for a blanket license for musical performance rights under

an antitrust consent decree: *American Society of Composers, Authors and Publishers v.*

*Showtime/The Movie Channel, Inc.*, 912 F.2d 563 (2d Cir. 1990).   Defendants cite to page 591 of

that decision and offer a quotation about confidence intervals.  In fact, however (as we pointed out

years ago, when defendants first cited this case), the Second Circuit's opinion ends on page 571 and

does not contain defendants' quotation, which can rather be found in the unpublished "Redacted

Memorandum and Order" of the magistrate below: *United States v. American Society of Composers,*

*Authors, and Publishers*, 1989 U.S. Dist. LEXIS 13157, at *64 (S.D.N.Y. Oct. 12, 1989).   In the

magistrate's quotation, the small sample size in a database of film studio cost information is given

as one of several reasons why the magistrate, sitting as a trier of *fact*, accorded certain statistical

evidence little *weight*.   It follows, of course, that the evidence at issue was in fact *admitted* and

*considered*.

---

    [39]    This, we note, is a *sufficiency* point, and in fact the *Turpin* appeal was decided on *sufficiency*
grounds.  *See Turpin*, 959 F.2d at 1353.  The ultimate question on summary judgment in *Turpin*,
decided in the negative, was whether certain animal studies could sustain plaintiffs' burden to prove
that Bendectin was more probably than not the actual cause of their birth defects.

The third and final case adduced by defendants is an unpublished decision by a special master under the Childhood Vaccine Injury Act: *Haim v. Secretary of the Dep't of Health and Human Services*, 1993 U.S. Claims LEXIS 145 (Fed. Ct. Cl. Aug. 27, 1993). Defendants assert that in *Haim* the testimony of two experts that a vaccine caused petitioner's encephalopathy was stricken because the experts relied on an epidemiological study (the National Childhood Encephalopathy Study, or "NCES") with an unacceptably wide confidence interval. In fact, however, the testimony was not stricken. Indeed, although she took the Supreme Court's *Daubert* decision as a guide in *weighing* the experts' testimony, the special master (sitting, again, as the *trier of fact*) was careful to note:

> *Daubert* concerned the admissibility of scientific evidence, whereas the present focus of this court is in weighing previously admitted evidence. The *Federal Rules of Evidence* do not bind this court because Congress intended to speed resolution of vaccine cases by creating a more *informal forum*.

*Id.* at *27-28 (emphasis added). Moreover, as defendants omit to mention, the Court of Claims has subsequently *published* a carefully reasoned opinion upholding the decision of a different special master, who found reliance on the NCES study wholly appropriate. *See Sharpnack v. Secretary of Dep't of Health and Human Servs.*, 27 Fed. Cl. 457 (Fed. Ct. Cl. 1993), *aff'd,* 17 F.3d 1442 (Fed. Cir. 1994).

**ii.    Hypothesis-Testing**    Defendants fault Dr. Goble for not formulating and disproving a hypothesis. But not all scientific endeavor is hypothesis-testing. As Dr. Goble has noted:

> My concern in this case was to provide exposure and risk information relevant to this case, namely relevant to concerns about medical monitoring and losses in property values. It is clear that people were exposed to air borne plutonium and related radioactive isotopes. How large those exposures were is less clear, but given the very limited historical data base, it is clear that considerable uncertainty about the exposures will remain. Because of the large uncertainties, for both medical

monitoring and losses in property values, understanding this uncertainty and the associated range of possible exposures is the most relevant objective.

Goble Declaration at 6 (Ex. 16).  As for "rates of error," confidence intervals inherently characterize the probability that actual values fall outside the stated range.

**iii.    Reliance on 95th Percentile Estimates**    Defendants quote from a portion of Dr. Goble's report urging that 95th percentile estimates be used for purposes of determining inclusion in a medical monitoring program.  Dr. Goble did testify to prudential reasons why a medical monitoring program should be designed with an eye toward high-end risk levels to which as many as five percent of a large exposed population are subject.  As already noted, however, claims for medical monitoring are not at issue in the class property trial.

Defendants go on to cite three cases in which they say that courts have found reliance on 95th percentile estimates inappropriate.  We can locate such a discussion in only one of the three cited cases, *Marder v. G.D. Searle & Co.*, 630 F. Supp. 1087, 1092 (D. Md. 1986), but we have little doubt that other such decisions could be unearthed.    In those cases, however, as in *Marder*, the issue will have been whether it is more likely than not that some numerical threshold for proof of causation of personal injury has been satisfied by a preponderance of the evidence (a *sufficiency* point).  In such a case, plaintiffs generally cannot satisfy their burden simply by propounding a numerical estimate that confessedly has only a five percent chance of being true.  Plaintiffs here, by contrast, need *not* show causation of personal injury, are *not* required to satisfy any numerical threshold, and do *not* ask the Court, or the jury, to rely "solely" on the figures at the upper bounds of Dr. Goble's confidence intervals.  Plaintiffs simply want to present the estimated ranges as they

are.  The rules of evidence do not forbid that.

     **iv.**    **"Real World" Data**     Defendants set up a false dichotomy between the use of computer models and reliance on observed data.  As defendants cannot dispute, computer modeling is routine in dose reconstruction.  And as defendants *must* concede, Dr. Goble's estimates are derived from legitimate data.  *See* Goble Report at 35 (Ex. 15) (listing sources including Krey and Hardy, Whicker, ChemRisk, Litaor, and RAC task 4).  The plutonium measurements on which Dr. Goble relied did not come from a fortune teller.  They came from the soil.

     This brings us to the apparent crux of this objection, which is that defendants prefer the values reported by certain air monitors.  It is tempting here to discuss the technical controversy about the efficacy of the Rocky Flats air monitors: their problematic effectiveness during the high-wind events so frequent at Rocky Flats, their uneven reliability in capturing particles of different sizes, the tendency of their caretakers to treat anomalously high readings as something to be explained away, the limitations of data captured from a single preselected geographical point, and so forth.  For a general critique of environmental monitoring at Rocky Flats, the Court may consult, for example, the report of Dr. Budnitz.  *See* Budnitz 903 Pad Report at 3-10 (Ex. 1).  For present purposes, however, it suffices to observe that defendants have simply attacked Dr. Goble for using soil data instead of air monitoring data whose reliability defendants do not even pretend to establish.  This is a paradigmatic example of a quarrel with the expert's results, rather than the scientific *bona fides* of his methods.

     **v.**    **Deposition Velocity**     The technical bases for Dr. Goble's choice of deposition velocity values are stated in his report (*e.g.*, at page 40), and defendants' critique is answered in Dr.

Goble's 1999 declaration (*e.g.*, at pages 13-15) (Ex. 15), which defendants make no attempt to rebut. Plaintiffs also note that this variable would be of interest largely for the purpose of estimating past exposures during the release incidents themselves.

vi. **"Multipliers"**       The "multiplier" that defendants attack involves Dr. Goble's estimate of a  a roughly 300-fold *reduction* of estimated air concentrations for 1970-89 as compared with 1965-70.  Those estimates are explained and defended in Dr. Goble's 1999 declaration, at pages 18-19.  As described in Dr. Goble's report, he used independent data sets to estimate (uncertain ranges of) exposures from the 1957 fire and from resuspension during the period from 1971-89.  He followed the RAC review, conducted under the auspices of one of defendants' own experts, to conclude that early releases (1958-1964)  from the 903 pad were substantially smaller (10%) than in the later 1965-70 time period.  Dr. Goble expressed that assumption as a multiplier to the 1965-70 estimates, on the ground that the uncertainty in the proportion released would be subsumed under the very great uncertainty of the release estimates generally.  With respect to the 1957 fire and the period from 1971-89, Dr. Goble likewise *expressed* the results from his analysis as a multiplier of the 1965-70 results.  The effect of doing so was to use the broad uncertainty range derived for 1965-70 also to characterize the uncertainties in the estimates for those two sets of releases.  There should be no issue regarding double counting of plutonium deposited since 1970 (or from the 1957 fire) since estimated concentrations are so much smaller than the estimates for the 1965-70 period.  *Id.*

**B.      DR. RICHARD CLAPP**

     **1.      Overview of Testimony and Qualifications.**

Dr. Richard Clapp will testify that the residential areas immediately adjacent to the Rocky

Flats Plant, specifically those areas bounded by the inner plutonium dispersion contours derived by

Atomic Energy Commission scientists, have an increased incidence of lung and bone cancers

compared to more distant areas of Jefferson County.  Defendants concede that Dr. Clapp is an

experienced epidemiologist, fully qualified to undertake this analysis – they do not question his

qualifications in their motion.

Dr. Clapp received a Master of Public Health degree from Harvard University and a Doctor

of Science degree from the Boston University School of Public Health where he is currently a

Professor in the Department of Environmental Health.  He teaches courses in environmental

epidemiology.[40]  From 1980 to 1989, Dr. Clapp served as a Director of the Massachusetts Cancer

Registry in the Massachusetts Department of Public Health.  He is also a distinguished member of

several professional organizations and has published studies on cancer and other diseases in

numerous peer-reviewed scientific journals.  *See* Clapp Report at ¶1 (Ex. 4).

Dr. Clapp recently served as a member of the Governing Council of the International Society

for Environmental Epidemiology and as a Consultant to the Environmental Protection Agency's

Science Advisory Board Dioxin Reassessment Review Subcommittee, among other positions.

---

    [40]    Dr. Clapp has advised graduate students who researched the health effects of emissions
from U.S. nuclear facilities.  This research on health effects of U.S. nuclear facilities was
supported by a Co-operative Agreement with the Agency for Toxic Substances and Disease
Registry (ATSDR).

Dr. Clapp's study analyzed cancer incidence data supplied by the Colorado Central Cancer Registry. Dr. Clapp compared the odds of a person developing lung or bone cancer in geographic areas to the immediate South and East of the Rocky Flats plant with the odds of developing those cancers in more distant, but adjoining areas of Jefferson County. To perform his analysis, Dr. Clapp segregated the Cancer Registry data into three distinct time periods: 1979-1983, 1984-1988, and 1989-1992,[41] and, in the case of lung cancer, analyzed the sexes separately.

Dr. Clapp employed a standard epidemiologic methodology, known in the relevant literature as age-standardized odds ratio analysis. *See* Clapp Report at ¶ 8 (Ex. 4). Using the cancer case information he retrieved from the Cancer Registry, Dr. Clapp computed cancer odds ratios by dividing the number of lung and bone cancer cases in his defined study areas (as reflected by the Zip Codes closest to the plant) by the sum of all other cancers in the same geographic area. By comparing the odds ratios for the target group with the corresponding odds ratios for the reference populations, the study found that the incidence of two cancers under study increased with proximity to Rocky Flats. *See* Clapp Report at ¶¶ 8-9 (Ex. 4).[42] Dr. Clapp testified that he has used "the exact

---

[41] The 1993 data was unavailable at the time his report was submitted. *See* Clapp Report at ¶ 8 (Ex. 4).

[42] Dr. Clapp's study group is located in the plutonium-in-soil isopleth contours situated around the Rocky Flats plant which were derived by Atomic Energy Commission scientists. *See* Clapp Report at ¶¶ 8-9 (Ex. 4). The population used for comparison is located just outside the inner-most exposed areas.

same method" in several published, peer-reviewed, works,[43] and in his expert testimony in at least

four trials.  *See* Clapp Dep. at 301:6-303:2 (Ex. 5).

Dr. Clapp's study found an increased incidence of both bone and lung cancers in the study

area, and concluded that there was a significant "on-going health effect" directly related to proximity

to Rocky Flats.  *See* Clapp Report at ¶¶ 8-12 (Ex. 4).

### 2.     Defendants' Expert Used The Same Methodology.

Defendants' expert, Dr. Geoffrey Howe, conducted a similar epidemiological analysis of

cancer incidence around the Rocky Flats Plant in his rebuttal report.  *See* Howe Report (2/19/97) (Ex.

34).  In fact, Dr. Howe employs the *same underlying methodology* as Dr. Clapp.[44]  Like Dr. Clapp,

Dr. Howe has used this method several times in a number of published works, although, at times,

Dr. Howe calls it by a different name.  *See* Howe Dep. at 182:6-183:18.  Dr. Howe also relies on the

same data set,[45] which he defended as "complete,"[46] and "good quality data."[47]  Defendants freely

acknowledge that Dr. Howe was able to "recreate[] [Dr.] Clapp's study."  *See* Def. Risk Br. at 45

---

[43]     Clapp Dep. at 300:19-301:5 (Ex. 5).

[44]     As Dr. Howe testified: "I am assuming in fact that we were following the same process." *See* Howe Dep. at 165:15-166:2 (Ex. 35).

[45]     Howe Dep. at 164:7-17 (Ex. 35); Howe Report at 2 (Ex. 34) ("The  analysis is based on data provided by the Colorado Central Cancer Registry, and as far as I am aware, is the same data as that provided to Dr. Clapp on which he based his report.").

[46]     Howe Dep. at 164:13-164:17 (Ex. 35).

[47]     Howe Dep. at 159:4-5 (Ex. 35).

n.14.  The parties' experts conducted essentially the same analysis using the same methods; the study can be replicated, one of the hallmarks of any *Daubert* analysis.

The dispute between Drs. Clapp and Howe concerns only the interpretation and relative weight of the study's results, not its reliability, which is the operative inquiry under *Daubert*.  As Dr. Clapp described the disagreement during his deposition: "I don't disagree with his re-analysis . . . I'd have to just disagree with his *interpretation* of the re-analysis." *See* Clapp Dep. at 305:9-14 (Ex. 5) (emphasis added).

Dr. Howe, in his study, chooses to downplay his study's conclusion that there are statistically significant excesses in lung cancer for men in the 1989-1992 period in the area closest to the plant.[48] Instead, he prefers to emphasize, and draw his conclusions from, the combined data for the three time periods and both genders,[49] even though this lumping of data tends to obscure any observed effect, and makes it impossible to observe a temporal trend.  The bottom line, however, is that the debate about the relative weight of the results of a study is a classic merits issue, not one pertinent to the question of admissibility under *Daubert*.

### 3.      Dr. Clapp's Methods Are Sound.

Defendants' main attack focuses on an irrelevancy – they claim that Dr. Clapp's epidemiological research concerning cancer rates in the area surrounding the plant failed to consider the health of only those people who owned property in the class area on June 1989.  *See* Def. Risk

---

[48]     Howe Dep. at 194:3-194:14 (Ex. 35).

[49]     Howe Dep. at 197:22-25 (Ex. 35).

Br. at 41.  There is no reading of *Daubert* or its progeny that would require an epidemiological study to have such a narrow focus in order to be admissible.  Defendants manufacture requirements for Dr. Clapp's study that do not exist under the law and then attempt to exclude his study based upon their "reading" of these imagined legal precedents.

It is important to note that Dr. Clapp's study is *not* being used to demonstrate that any specific individual or group's cancer was caused by defendants' reckless operation of Rocky Flats. Thus, defendants' argument that Dr. Clapp's study is irrelevant because it considers the cancer rate among some people who are not members of the property class lacks any arguable merit.  Dr. Clapp's study shows the increased rate of disease in the area surrounding the plant – it is not intended to or designed to show that any specific individual contracted a disease from the defendants' activities.

The fact that Dr. Clapp's study shows a comparative increase in the cancer rate in the area immediately surrounding Rocky Flats is certainly relevant to the inquiries on which this Court has asked the parties to focus: the degree of "current human health risk arising from past or on-going exposure to plutonium released from Rocky Flats as a result of one or both of the defendants' activities there" and the "demonstrable threat of future injury arising from one or both of defendants' activities at Rocky Flats."  *See* May 17, 2005 Order at 3, 5-6.  Exact correspondence between the data and the property class area is simply unnecessary. An elevated incidence of cancer demonstrated by an epidemiological study would greatly assist a jury considering the nuisance claims that form the basis of the *property* class case.

Defendants charge that Dr. Clapp "admits" that he did not study the people who owned property in the class area as of June 1989. *See* Def. Risk Br. at 41. Dr. Clapp "admitted" no such thing. In fact, the target group for the Clapp study included all cancers diagnosed in the two zip codes whose centroid appeared within the inner-most plutonium contours that describe the property class area (i.e., 80021 and 80005). These zip codes include residences closest to the plant to the South and East -- the areas with the highest measured plutonium levels.[50] *See* Clapp Report at ¶¶ 8-9 (Ex. 4); Clapp Dep. at 72:4-7 (Ex. 5). Data from the eight next closest zip codes to the plant (in all directions) made up the reference group.

The mere fact that the study area was slightly larger than the property holder class area is irrelevant to the question of the study's admissibility. Given that the study area is larger and extends further from the plant, it includes people who resided in areas with *lower* levels of plutonium in soil and fewer airborne contaminants than those actually residing in the property class area. If anything, this tends to *lessen* the differences between the target and reference groups, making it more difficult to demonstrate a contamination effect. Moreover, as described previously, defendants' own expert, Dr. Howe, used the same method, dividing the zip codes according to the plutonium contours surrounding the plant. *See* Howe Report 2/19/97 at 16-17 (Ex. 34).

Without citing a single case precedent, defendants simply conjure up a "requirement" that an epidemiological study must conform to the precise class boundaries of a legal action in order to

---

[50]   *See* the map attached to the Clapp Report as Appendix 3, entitled: "Plutonium Isopleths and Corresponding Zip Codes in Jefferson County, Colorado."

satisfy *Daubert*'s "fit" requirement and be admissible.  That requirement does not exist in any cited

case law – or in any case plaintiffs' have discovered through independent research.

      Defendants also quibble with the fact that Dr. Clapp, an epidemiologist by training, did not

personally measure the amount of plutonium to which the population that was the subject of his

report was exposed.  Def.'s Risk Br. at 42.  Rather, Dr. Clapp testified that he relied upon the work

of researchers who examined the plutonium releases, such as Krey and Hardy. Clapp Dep. at 99:10 -

100:17 (Ex. 5).   Thus, although Dr. Clapp does not specifically rely upon "exposure data," he does

utilize contamination data, *i.e.*, the plutonium in soil contours, as a reasonable proxy for exposure.

Defense expert Dr. Howe similarly uses the plutonium contours as a "dose response gradient,"

implicitly assuming that the exposures decline with the drop off in soil levels.  *See* Howe Report

2/19/97 at 16-17 (Ex. 4).  Defendants conveniently ignore this testimony.

      Defendants' "exposure" argument is nothing more than another defense red herring.[51]

Exposure data is not crucial to Dr. Clapp's study because his findings of increased cancer incidence

are based on geographic considerations (proximity to Rocky Flats) -- albeit geographic

considerations informed by a pattern of contamination and exposure -- but not "upon concentrations

---

[51]    Defendants also criticize Dr. Clapp for combining cancer incidence data for the 1980s
and 1990s with plutonium exposure data reported in 1970.  *See* Def. Risk Br. at 41- 42.  The
argument is specious.  Given the long latency period for the cancers under study, this is precisely
the data comparison that is relevant to measuring a potential exposure effect.  Defense expert, Dr.
Howe, used exactly the same data in his own study, explaining that "it makes sense to look for
any lung cancer effect in that time period [1979-1992] since the necessary latent period should
have passed by then."  He concluded simply: "[T]he use of data between 1979 and 1992 [for both
lung and bone cancer] makes biological sense."  *See* Howe 2/19/97 Report at 16 (Ex. 4).

of any substance....It's a pattern of disease in relation to an exposure source."  *See* Clapp Dep. at

213:24-214:17 (Ex. 5).

###    4.    Dr. Clapp's Conclusions Are Sound.

Defendants next claim that Dr. Clapp's study is not "reliable" because, in their view, it does

not sufficiently address a laundry list of factors, such as statistical significance, temporal trend,

biologic plausibility, and dose response.  *See* Def. Risk Br. at 43 - 53.  Although defendants label

their attack as a "reliability" challenge, in reality, the issues raised by defendants concern a dispute

about the power of the study's conclusions, not the appropriateness of the methodology used to reach

those conclusions.  The criticisms of Dr. Clapp's study are certainly proper cross-examination topics;

they are not reasons to exclude Dr. Clapp's study from evidence in the case.

The Tenth Circuit recognized this distinction in *Wilson v. Merrell Dow Pharmaceuticals*, 893

F.2d 1149 (10th Cir. 1990).  In *Wilson*, the court upheld the admissibility of epidemiologic studies

which compared the national incidence of birth defects with the number of Bendectin tablets sold

– even though the studies did not distinguish between sales to women that took place during

gestational limb development periods and those that were not in such periods.  Although the Tenth

Circuit agreed that the failure of these studies to take this factor into account might "weaken their

value as the basis for expert testimony," it nevertheless concluded that, "*this failure affects the

weight, not the admissibility*" of the studies.  *Id*. at 1153 (emphasis added).[52]

---

[52]  *See also Compton v. Subaru of America*, 82 F.3d 1513, 1519-20 (10th Cir. 1996), *overruled on other grounds by Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137 (1999) ("As long as an expert stays 'within the reasonable confines of his subject area,' our case law establishes a 'lack
                                                                                                    (continued...)

Defendants provide no support for the view that their proffered study requirements measure the "reliability" of Dr. Clapp's study.   Defendants do not cite a single case in which an epidemiological study similar to Dr. Clapp's was excluded based upon arguments resembling those advanced by defendants.  Rather, using tactics familiar to them,  defendants string together a series of generic quotations from Dr. Clapp's testimony (often taken entirely out of context) along with the conflicting representations of their expert Dr. Howe, in hopes of discrediting Dr. Clapp's work.

For instance, at his deposition, Dr. Clapp affirms only that the factors defendants identify are used by epidemiologists to assess the strength of "an association between an agent and a disease." *See* Clapp Dep. at 45:14-46:21 (Ex. 5).  Dr. Clapp does not endorse defendants' view that these factors bear on the *reliability* of the underlying methodology.  Nevertheless, defendants argue that Dr. Clapp "agreed" that the stated factors decreased the reliability of his study, when that is not the case. *Compare, e.g.*, Def. Risk Br. at 44 *with* Clapp Dep. at 26:11 - 27:8 (Ex. 5).

Second, contrary to defendants' assertions, the factors cited by the defense are neither necessary nor exclusive means of judging the strength of an association.  These factors are not rigid "tests" which studies pass or fail but rather are lenses through which study results can be evaluated.[53]

---

[52](...continued)
of specialization' does not affect the admissibility of [the expert] opinion, but only its weight.").

[53]   Dr. Rothman, another epidemiologist, states similarly with respect to these criteria:

If these viewpoints are used by some as a checklist for inference, we should recall that they were not proposed as such.  Indeed, it is dubious that the inferential process can be enhanced by the rote consideration of checklist criteria. (Lanes and Poole, 1984).  We know from Hume, Popper, and others that causal inference is at

(continued...)

As Sir Austin Bradford Hill, the author of the postulates defendants invoke without attribution, stated:

> What I do not believe – and this has been suggested is that we can usefully lay down some hard-and-fast rules of evidence that *must* be obeyed before we accept cause and effect.  None of my *nine* viewpoints can bring indisputable evidence for or against the cause-and-effect hypothesis and none can be required as a *sine qua non*.[54]

### a.   Statistical Significance

"Statistical significance" represents a measure of the probability that a particular outcome is due to random variation in the study population, *i.e.*, to chance.  *See* Clapp Dep. at 10:2-13:12. It does not measure other types of errors, flaws, biases or uncertainties in a particular study. Defendants ask this Court to exclude Dr. Clapp's scientific testimony because it does not meet some arbitrary confidence level defendants have created, even though defendants do not identify what their preferred arbitrary level actually is.  *See* Def. Risk Br. at 43- 46.[55]

---

[53](...continued)
best tentative and is still a subjective process.

Rothman, K.J., *Modern Epidemiology*. Little, Brown; Boston (1986) (p. 20).

[54]   Hill, A.B., "The Environment and Disease: Association or Causation," Proceedings of the Royal Society of Medicine. Vol. 58 (1965), p. 299 (emphasis added).

[55]  Defendants make a similar argument concerning the rate of error for Dr. Clapp's epidemiologic studies.  Def. Risk Br. at 50-51.  After citing some of Dr. Clapp's generic testimony concerning "rates of error" in epidemiological studies, defendants inexplicably conclude that his study should be excluded because Dr. Clapp did not "meet [his] burden" of establishing the study's rate of error to their satisfaction – even though defendants do not identify what the applicable rate of error is, and even though defendants do not cite a single case in support of their position that Dr. Clapp's study should be excluded.

73

Defendants' failure to pick an arbitrary cut-off level for statistical significance is perhaps due to the fact that most epidemiologists have rejected the practice. Even defendants' own experts do not consider the 95% level, or any fixed level, of "statistical significance" a necessary element of establishing an association. *See* Howe Dep. at 201:7-203:14 (Ex. 35) ("There is actually quite a movement, particularly in epidemiology, to try to do away with the term 'statistically significant.' . . . Ken Rothman, who wrote a standard textbook called 'Modern Epidemiology' . . . spends an entire chapter decrying 'statistically significant.'").

Further, there is no sound legal basis to *strike* probative epidemiological evidence merely because there might be a small likelihood that the study's results are due to random variation. There is no logical reason to import arbitrary cut-offs -- which have largely been rejected by the relevant scientific community -- to exclude evidence from reaching the jury in a civil courtroom. If a measure of the statistical significance is reported, the jury has ample information from which to assess the power or credibility of a study's results.

Dr. Clapp himself testified that he does not "hang [his] hat on statistical significance in order to interpret the meaning of studies such as this." *See* Clapp Dep. at 127:2-8 (Ex. 5). That does not mean, however, as defendants misleadingly suggest, that Dr. Clapp reported no measure of statistical significance. In fact, he reported confidence intervals for each of his risk estimates. *See* Clapp Report at App. 2 (Ex. 4). It also does not mean that Dr. Clapp's results were not statistically significant, or near so, even at the stringent 95% confidence level.

Defendants next assert that Dr. Clapp found no "statistically significant" results in his study (*see* Def. Risk Br. at 43-46), but they (misleadingly) neglect to mention that the results they highlight

74

are drawn from the two *uncorrected* study scenarios.  In order to explain why the uncorrected results are less credible, a brief explanation of the problems in the underlying data, and the means by which Dr. Clapp corrected for them is necessary.

The available data from the Colorado Cancer Registry had two problems that required correction.  First, the Registry did not provide Zip Codes for areas that reported only a single case of lung or bone cancer (for a given year).  *See* Clapp Report at ¶ 8 (Ex. 4).  Second, the Zip Codes were fairly large relative to the plutonium contours,[56] and therefore, parts of land in the Zip Codes in the reference group were relatively highly contaminated, while parts of Zip Codes in the target group were relatively uncontaminated.  *See* Clapp Report at App. 3 (Ex. 4).  Exposure misclassification of this kind tends to minimize differences between the target and reference groups.

To address these problems, Dr. Clapp employed three separate scenarios.  *See* Clapp Report at ¶ 8, App. 2 (Ex. 4).  Only the third scenario corrected for the two main problems in the data, and thus the results from the third scenario are the best source for analysis.   In the first scenario, Dr. Clapp used Zip Codes with centroids in the first and second plutonium contours as the target group, and all other Zip Codes in Jefferson County - including the "unspecified" Zip Codes - as the reference group.  This method biased the study *against* finding a proximity effect because it: 1) assumed all lung and bone cancers in "unspecified" Zip Codes were in the reference group when some likely occurred in the target area; and, 2) used as the reference area all Zip Codes located

---

[56]     Clapp Report at App. 3 (Ex. 4).

directly adjacent to the innermost two contours, and within the third plutonium contour, thereby including a relatively contaminated area as part of the control group.

In the second scenario, Dr. Clapp corrected for one of the two problems by excluding the "unspecified" Zip Codes from his analysis entirely.  Dr. Howe agreed that this correction was appropriate. *See* Howe Dep. at 159:15-19 (Ex. 35).  Finally, in the third scenario, he corrected for both underlying problems.  Dr. Clapp both excluded the "unspecified" Zip Codes entirely, and - in order to reduce misclassification bias - also excluded from the reference group those Zip Codes with centroids in the third plutonium contour (the one just outside the target group).

Thus, given the uncorrected problems inherent in the first two scenarios, it is not surprising that certain deficits were found.  In addition, the deficits appeared in the early period of the study -- less than a decade after the largest plutonium releases from the Rocky Flats plant, and thus in the very early part of the latency period.  Significantly, these "deficits" are not found when appropriate steps are taken in the third scenario to reduce the misclassification bias.  Nor are deficits found in any of the scenarios in the most recent time period; indeed, there is a significant *excess*.

Next, defendants claim that their expert, Dr. Howe, "replicated Dr. Clapp's study" and found high "p values."[57]  As noted above, however, in interpreting and reporting his results, Dr. Howe lumped both genders, all age groups, and each of the three time periods together.  *See* Howe 2/19/97

---

[57]    A "p value," like a confidence interval, is one means by which epidemiologists represent the likelihood that a study's outcome reflects random fluctuation.  *See* Clapp Dep. at 10:21-11:16 (Ex. 5).  Both permit an assessment of the probability that the results of a study represent a true association rather than the result of chance.  *See* Clapp Dep. at 22:24-25:21 (Ex. 5). Accordingly, there is no need to report both "p values" and "confidence intervals" in the same study, and epidemiologists rarely do.

Report at 18-19 (Ex. 34).  Among other problems, since rates of lung cancer are quite different in males and females, lumping them together serves to obscure the results.  *See* Howe Dep. at 122:12-123:10.[58]  The lumping of time periods also fails to account for a possible temporal trend in the data.  Indeed, when appropriately separated, Dr. Howe's results reveal statistically significant excesses in lung cancer for men in the 1989-1992 period for the area closest to the plant.[59]  In any event, these disputes are about the interpretation of results, *not* the methodology employed to reach them.  They are therefore irrelevant to the threshold question of admissibility presented here.

Defendants next argue that Dr. Clapp intentionally designed his study to increase the likelihood of finding a statistically significant result "purely by random chance" by dividing his study population into a number of different groupings.  *See* Def. Risk Br. at 46.  The sole support cited for this argument is Dr. Clapp's agreement with the general idea that the more health outcomes one particular study examines in relation to a particular exposure, the more likely it is that one would expect to find an association by chance.  *See* Clapp Dep. at 50:13-51:3 (Ex. 5).  In fact, Dr. Clapp did not look at dozens of health outcomes -- he looked at only two diseases.  In addition, the "24 different groupings" are not all that different.  As he testified, he used "overlapping groupings" that "basically all look at essentially the same issue."  *See* Clapp Dep. at 125:24-126:12 (Ex. 5).

---

[58]   Moreover, in defendants' view even the weakest of Dr. Howe's results were "40% likely due to random chance," and thus 60% likely to reflect a true association.  *See* Def. Risk Br. at 45. As long as the jury is told these probabilities, there is no reason to bar testimony of this kind.

[59]   Howe Dep. at 194:3-194:14 (Ex. 35).

Moreover, as shown above, Dr. Clapp did not run separate estimates without sound justification.  For instance, he separated males and females because "rates of lung cancer are quite different in males and females,"[60] and because stratification by gender is necessary to test for possible confounding.  Stratification by time period is necessary to look for trend over time.  And, finally, the three geographic classification scenarios, as explained above, are not vastly different from each other, and were employed to correct for problems in the underlying data.

### b      Ecological Studies Are Reliable

Relying solely upon their expert Dr. Howe's opinion, defendants next try to exclude Dr. Clapp's study because it is an "ecological study."   According only to defense expert Dr. Howe, ecological studies should not be considered by this Court.  *See* Howe Aff. ¶ 22 (attached to Def. Risk Br. as Ex. 27).  Obviously, Dr. Clapp, whose credentials as an epidemiologist are beyond reproach, disagrees with Dr. Howe's conclusion about the use of an ecological study in this case.  *See* Clapp Dep. at 305:4-14 (Ex. 5).

Again, it is important to bear in mind that the ecological study is not being used to show that a particular individual developed cancer as a result of defendants' recklessness at Rocky Flats.  Rather, the Clapp study will show the heightened risk associated with living near the plant – a conclusion an ecological study focusing on the rate of disease proximate to the plant, is well-equipped to demonstrate.  Defendants cite no case support for their argument that Dr. Clapp's study should be excluded merely because it is an ecological study – beyond their paid expert's opinion.

---

[60]      *See* Clapp Dep. at 122:12-123:10 (Ex. 5).

c.      Accounting for "Confounders"

Although defendants purport to be concerned that Dr. Clapp's study did not attempt to correct for "potential confounders," such as tobacco use, duration of residence, and occupational history, defendants never explain why such corrections are necessary or even possible in this case. Defendants provide no reason to doubt Dr. Clapp's reasonable assumption that "potential confounders" - such as ethnicity, smoking, diet, occupation or health status - will not vary significantly over the small distances included in the study.  *See* Clapp Dep. at 215:12-216:14.[61] Indeed, Dr. Clapp testified that the "potential confounders" cited by defendants would have little impact on his results: "[The possibility of confounding] doesn't detract from the finding of an excess of lung cancer in the two Zip Codes closest to the Rocky Flats Plant."  *See* Clapp Dep. at 215:17-20. Defendants do not challenge this testimony.

Defendants cite two legal cases that mention the concept of "confounding." Neither case involves the use of any type of epidemiological evidence of disease, and thus lack any arguable relevance here.  The first, *People Who Care v. Rockford Bd. Of Educ.*, 111 F.3d 528, 537 (7th Cir. 1997), involved the use of a study of school performance of black vs. white children who qualified for school lunch programs.   The Court ruled that the study was not sufficient evidence of the allegation that school officials intentionally discriminated against children based upon their race. That case is wholly different from Dr. Clapp's report.  Dr. Clapp's report is not intended to prove

_____

[61]   Dr. Howe made similar assumptions about smoking in his own study.  *See* Howe Dep. at 171:9-14 (Ex. 35).

injury causation in this case.  Dr. Clapp's work is not at all like the *People Who Care* study, which took a cognitive leap to show discrimination from an unrelated study; that is why it was excluded.

The second cited case is even more far-afield.  *Stover v. Eagle Products, Inc.*, 1996 WL 172972 (D. Kan. 1996) involved a claim by an "expert" veterinarian that a certain brand of dog food caused plaintiffs' dogs to suffer health problems.  That case involved the veterinarian's unsupported conclusory opinion that the food caused the dogs' disease.  *Stover* did not involve, as here, the research findings of a qualified epidemiologist who undertook a study.  *See Stover*, 1996 WL 172972 at *11.

### d.    The Data Support a Temporal Trend

Next, without explaining why it is relevant to this inquiry at all, defendants assert that Dr. Clapp found no temporal trend.  *See* Def. Risk Br. at 49.  In fact, Dr. Clapp did find such a trend. Dr. Clapp reported an elevated incidence of lung and bone cancer for both genders during the most recent period, 1989-1992.  *See* Clapp Report at ¶¶ 8, 9, 11 (Ex. 4).  Moreover, each of his three scenarios shows consistently increasing lung cancer risk for women from 1979-1983 through 1989-1992, with odds ratios that are elevated during the 1989-1992 period with confidence intervals nearly reaching statistical significance at the stringent 95% confidence level.  *See* Clapp Report at App. 2 (Ex. 4).[62]

---

[62] Dr. Michael Gochfeld, plaintiffs' medical monitoring expert, also discerned a temporal trend: "In my reading, [Dr. Clapp] found a trend in that the levels were higher in the latest period that he looked at than in previous periods.  This suggested that this corresponded to the long latency from the maximum plutonium emissions."  *See* Gochfeld Dep. at 235:19-24 (Ex. 17).

Dr. Clapp testified that there is a "public-health imperative," to conduct medical monitoring precisely because "there seems to be a *continuing excess* of...lung [and bone] cancer...[through] this most recent time period." *See* Clapp Dep. at 236:19-238:12 (Ex. 5) (emphasis added).[63]

####         e.         There is No Evidence of Systematic Bias

Defendants next point to several potential sources of bias theoretically pertinent to the epidemiologic methodology Dr. Clapp (and Dr. Howe) employed in this case. *See* Def. Risk Br. at 49. Defendants do not explain, support, or even suggest that any of the factors they point to would affect, or could affect, Dr. Clapp's findings in any material way. These defense arguments should be rejected on their face.

Defendants assert that Dr. Clapp is unable to guarantee that the individuals who are exposed are the same as those who develop the disease. *See* Def. Risk Br. at 42. Defendants also assert that Dr. Clapp did not rule out the theoretical possibility that the people who developed cancer were those who migrated into the area just prior to diagnosis. *See* Def. Risk Br. at 49. Once again, defendants neglect to explain why this particular issue biases Dr. Clapp's results in any material way. There is no reason to believe that dozens of persons at increased risk of cancer are moving into the class area just prior to diagnosis. Indeed, unless it is assumed that most immigrants to the inner contours hail from highly contaminated areas, it is more likely that relatively unexposed persons are moving in, and exposed persons are moving out. Over time, this would tend to bias the study *against* finding

---

[63] Dr. Gochfeld concurred, explaining that the temporal trend Dr. Clapp identified is strong evidence in support of a medical monitoring program for class members. *See* Gochfeld Report at 16 (Ex. 18).

a positive correlation over time.  In light of this trend, the fact that Dr. Clapp's study has found a positive temporal trend is quite remarkable.

Biological plausibility is the last of the "Hill Postulates" defendants raise.  Defendants contend that the results of Dr. Clapp's study are "implausible" because they allege that the results do not correspond with defendants' view of the case and of the latency period for disease.  Again, the defense position is supported only by the testimony of their paid expert, Dr. Howe.

There are numerous problems with defendants' argument.  First, the latency period is longer than 5-15 years, as defendants contend.  Dr. Clapp testified that the latency range for lung cancer is 20 to 35 years. *See* Clapp Dep. at 100:23-101:4 (Ex. 5).[64]  Second, excess cancers will continue to accumulate in the exposed population for many decades.  Dr. Edward Radford, who before his death was a leading authority on the subject of the relationship between radiation and cancer, and a plaintiffs' expert in this case, explained that as the exposed population ages, their risks from exposure increase proportionally.  Therefore, "even after the late effects begin to appear, they may continue to be observed in others in the exposed population for many decades later."  *See* Radford Report at 6-7 (Ex. 22).  Indeed, "excess risk in the A-Bomb survivors [of Hiroshima and Nagasaki] is continuing well beyond 40 years after exposure." *See id.* at 7.  Thus, it is entirely plausible that Dr. Clapp's findings of increased incidence in the most recent period reflect this phenomenon.

---

[64]   As noted above in the discussion on temporality, Dr. Gochfeld agreed with Dr. Clapp's conclusions about the latency period.  *See* Gochfeld Dep. at 235:19-24 (Ex. 17).

Moreover, contrary to defendants' assertion, no expert on either side has "opined that plutonium releases occurred no later than 1970." *See* Def. Risk Br. at 50.[65]   In fact, the most that even the defense experts have said is that the *maximum exposures* took place pre-1970.  *See* Howe Report 2/19/97 at 16 (Ex. 34).  Plaintiffs' exposure and risk expert, Dr. Robert Goble, concluded that "the residents near the plant in the period from the mid 1950s *through the 1980s* experienced significant exposures and risks to their health from their exposures." *See* Goble Report at 11 (Ex. 15)  (emphasis added).  Dr. Goble also notes that some releases from the site continued even after the plant shut down.   *See* Goble Report at 11, n.3 (Ex. 15).   Thus, defendants' "biological plausibility" attack is unsupported by both the relevant science, and the facts about exposures.

### f.      Dr. Clapp's Study is Complete

Defendants close their attack on Dr. Clapp with the following assertion: "[Dr.] Clapp has not finished his work."  *See* Def. Risk Br. at 51.  This final swipe is emblematic of defendants' entire motion: it is hopelessly misleading, false, or both.   If what defendants mean is that the study appearing in Dr. Clapp's report is in some way incomplete or unfinished, then defendants' assertion is both unsupported, and plainly false.  Dr. Clapp's findings and conclusions are not in "draft."  They are based on a completed analysis of all facts and data pertinent to the study.  At the time of his deposition, however, Dr. Clapp anticipated obtaining data on additional cancers in order to conduct

---

[65]     We note that defendants reference here to plutonium releases is misleading.  The relevant issue as far as latency period is concerned is not when the contaminant was released, but when the population was exposed.  Exposure to plutonium, for instance, can occur well after a release because, once in the off-site environment, plutonium is continually available for re-entrainment into the air.  *See, e.g.*, Goble Report at 11 (Ex. 15).

a separate study.  *See* Clapp Dep. at 312:21-314:18 (Ex. 5).  If that is all that defendants are complaining about, their point would be irrelevant to their motion, which, of course, it is.

Dr. Clapp's study is methodologically sound and directly pertinent to numerous facts at issue in this case.  There is no basis to strike any of his testimony.

## C.     DR. SHAWN SMALLWOOD

### 1.      Overview of Testimony and Qualifications

Dr. K. Shawn Smallwood is a systems ecologist, specializing in wildlife, ecosystem and landscape ecology.  His research is focused on quantitative methods of sampling and analyzing biological data across large geographic areas.  Dr. Smallwood performed a study evaluating the role of bioturbation – soil turnover due to biological activity – in exposing soil contaminants to winds at the Rocky Flats site.  He will testify, based on his study, that substantial quantities of the hazardous materials Dow and Rockwell spilled, buried, dumped, and released at the Rocky Flats site were exposed to winds by burrowing animals and other biological phenomena, and subsequently entrained by winds and moved off-site.  He will testify further that due to bioturbation, and the poor waste management practices of the plant's former operators, residents downwind of the Rocky Flats Plant can expect a continued chronic resuspension of hazardous contaminants, including plutonium, to settle on their properties for many years to come.  *See* Smallwood Report at 48-49 (Ex. 27).

Dr. Smallwood earned his Ph.D. from the University of California at Davis.  He has worked as an environmental consultant for a commercial environmental consulting firm, specializing in environmental planning and regulatory compliance, and as a research scientist for the Institute for

Sustainable Development, a non-profit research and consulting firm which informs policy makers and environmental planners on scientific issues.

He has published dozens of articles in professional publications, many in peer-reviewed journals.  In particular, he has now published the core aspects of his report – and the specific on-site research conducted for this case – in eight separate articles in established scientific journals.[66]  He

---

[66]

Smallwood, K.S., M.L. Morrison, and J. Beyea, *Animal Burrowing Attributes Affecting Hazardous Waste Management*, 22 Environmental Management 831-847 (1998).

Smallwood, K.S. and M.L. Morrison, *Animal Burrowing in the Waste Management Zone of Hanford Nuclear Reservation*,  33 Proceedings of the Western Section of the Wildlife Society Meeting 88-97 (1997).

Smallwood, K.S. and M.L. Morrison, *Estimating Pocket Gopher Burrow Volume*, Southwestern Naturalist (Accepted.)

Smallwood, K.S. and M.L. Morrison, *Spatial Scaling of Pocket Gopher (Geomyidae) Density*, Southwestern Naturalist (Accepted).

Morrison, M.L., K.S. Smallwood, and J. Beyea, *Monitoring the Dispersal of Contaminants by Wildlife at Nuclear Weapons Production and Waste Storage Facilities*, 17 The Environmentalist 289-295 (1997).

Smallwood, K.S., *Spatial Scaling of Pocket Gopher (Geomyidae) Burrow Volume*, Abstract in Proceedings of 44th Annual Meeting, Southwestern Association of Naturalists, Department of Biological Sciences, University of Arkansas, Fayetteville (1997).

Smallwood, K.S., *Estimating Prairie Dog and Pocket Gopher Burrow Volume*, Abstract in Proceedings of 44th Annual Meeting, Southwestern Association of Naturalists, Department of Biological Sciences, University of Arkansas, Fayetteville (1997).

Smallwood, K.S., *Animal Burrowing Parameters     Influencing Toxic Waste Management*, Abstract in Proceedings of Meeting, Western Section of the Wildlife

(continued...)

has also presented important aspects of his Rocky Flats report at the 1997 meeting of the Southwestern Association of Naturalists, and the meeting of the Western Section of the Wildlife Society.

### 2.    Summary of Methods

As part of his study, Dr. Smallwood traveled to the Rocky Flats Plant on three separate occasions over a three month period to examine the site and the surrounding environs. *See* Smallwood Report at 3-14 (Ex. 27). He observed, studied, and reported abundant animal burrowing in buried waste trenches and other areas of known contamination at the plant. *Id.* Among other significant observations, he noted that: burrowing animals were abundant on the shorelines of dried out pond beds loosening soils historically contaminated with plutonium and other hazardous substances;[67] animal burrowing, and harvester and honey ant mounds, occurred all around the perimeter of the 903 Pad, the acknowledged source of a large percentage of the plutonium historically released from the Plant into the off-site environs;[68] there was extensive burrowing underneath the "protective" asphalt cover on the 903 Pad; foraging animals had denuded of vegetation and loosened much of the ground surface of the 903 Lip Area;[69] and cracks were

---

(...continued)
  Society (1997).

[67] *Id.* at 5 (Ex. 27).

[68] *Id.* at 8-9.

[69] *Id.* at 9.

developing across the entire expanse of the asphalt pad through which sizable plants were sticking

through.[70]

He also reviewed a vast array of documentation on historical contaminant releases and

burials, and on the physical and biological characteristics of the Rocky Flats Plant and surrounding

environs. *See* Smallwood Report at 14 (Ex. 27).  Finally, he synthesized data on burrowing and soil

characteristics with the information he compiled on contamination at the numerous burial areas on

the plant site. *See* Smallwood Report at 29-39.

Based on the characteristics of animal burrowing and other biological phenomena, he

evaluated the fate of hazardous materials released, spilled, and dumped during the periods Dow and

Rockwell operated the Rocky Flats Plant.  In his estimation:

> [T]he fate of most of the hazardous materials buried or deposited on the soils of RFP has
> since been out of the control of the Plant operators.  Large quantities of these materials likely
> moved off-site, and the rest is likely distributed in RFP soils at locations and depths that are
> unknown to the Plant operators.

*See* Smallwood Report at 14.

### 3.   Defendants' Baseless Relevance Attack

Defendants have asked this Court to strike Dr. Smallwood's expert testimony primarily on

relevance grounds.  Defendants apparently believe that none of it – not one word – is relevant to *any*

fact at issue in this case.  Specifically, defendants seek to strike Dr. Smallwood's entire report

because he does not *quantify* the precise levels of plutonium released from the Rocky Flats Plant to

the off-site environment or map the affected offsite locations.  Defendants' attack is without merit.

---

[70]   *Id*. at 9.

First, a word about what Dr. Smallwood did conclude.  He found and testified that the process of bioturbation has caused plutonium and other hazardous substances to be released from Rocky Flats into the off-site environs.  The Court will not learn that crucial fact from reading defendants' motion, which includes the following section purporting to be Dr. Smallwood's testimony:

> He "didn't conclude what amount," *if any*, "of plutonium has been released from Rocky Flats due to soil bioturbation."

*See* Def. Risk Br. at 34, quoting Smallwood Dep. at 200:16-201:17 (emphasis added).  There are at least two problems with defendants' use of this quotation.  First, it is not actually Dr. Smallwood's testimony, but rather the words of the questioner.  Second, the insertion of "if any" completely alters the meaning of the actual testimony.

In fact, if the Court turned to the testimony cited, it would find the following exchange:

Q.      [H]ave you determined that any amount of plutonium has been released from the Rocky Flats Plant due to soil bioturbation?

A.      Have I determined that any amount has been released?

Q.      Yes.

A.      *It's one of the conclusions of my paper*.

*See* Smallwood Dep. at 200:16-201:1 (Ex. 28) (emphasis added).

While Dr. Smallwood did not specifically quantify the precise levels, he concluded that *significant quantities* of soil contaminated with plutonium and other hazardous substances were released from the Rocky Flats Plant into the off-site environs through the process of bioturbation. *See* Smallwood Report at 14, 45-49.  Defendants err in their assumption that all evidence of past or

88

threatened future invasions of class property interests must take the form of quantitative modeling. They err as well in assuming that evidence of health risks must be presented in the form of quantitative risk coeficients. Even if such a requirement were germane to testing the *sufficiency* of plaintiffs' evidence (as it is not),[71] it manifestly is not a precondition for *relevance*. Dr. Smallwood's qualitative descriptions and analysis are highly relevant to proving plaintiffs' claims on a diverse array of facts at issue. For instance, Dr. Smallwood's study:

1)      characterizes the types of contaminants buried and otherwise present on the Plant site;[72]

2)      describes the processes by which biological activity can make those contaminants available for suspension by wind into the off-site environs;[73]

3)      explains how the ambient air monitoring stations on and off the Plant site were inadequate, poorly positioned in terms of height and spacing, and insufficiently

---

[71]      Although the medical monitoring claims in this litigation have been decertified and severed, medical monitoring precedents remain instructive in evaluating the permissible forms of proof to show significant increased health risks attributable to carcinogen exposures – one core element of such claims. Courts have consistently held that such proof need not include quantification of risk. *See Paoli*, 35 F.3d at 788 ("Nor do we think that an expert must quantify the increased risk."), *cert. denied*, 513 U.S. 1190 (1995); *Ayers v. Jackson Township*, 106 N.J. 557, 525 A.2d 287 (1987) (holding that where medical experts testified that plaintiffs who had consumed contaminated well water were subject to a significant but unquantifiable increased risk of cancer, the plaintiffs had made out a medical monitoring claim).

[72]      Smallwood Report at 14-29 (Ex. 27).

[73]      Smallwood Report at 29-44, 45-47 (Ex. 27).

numerous to detect the past and continuing chronic releases of contaminants that are the focus of his analysis;[74] [75]

4)      demonstrates how the processes of bioturbation threaten the structural integrity of buried waste trenches and landfills, permitting the formerly buried waste to come to the surface;[76]

5)      shows how all contaminated materials which spilled, leaked, or were buried on-site would be subject to soil bioturbation and wind entrainment, and available for dispersion off-site;[77]

6)      concludes that the suspended and resuspended plutonium and other chemicals pose a significant risk of respiration and ingestion by nearby inhabitants as borne out by local animal sampling showing ingestion and uptake of plutonium;[78]

---

[74]     Smallwood Dep. at 64:1-5; 69:7-70:2; 225:6-12; 228:2-22 (Ex. 28); *see also* Smallwood Report at 25-28 (Ex. 27).

[75]     Defendants are mistaken in asserting that Dr. Smallwood disregarded air sampling data. To the contrary, Dr. Smallwood reviewed some of those data, but testified that he had little confidence in them because there were too few air samplers to measure the types of chronic releases of hazardous materials he described in his report.  He also stated that the samplers were inadequate because they were not at the appropriate height, nor were they sufficiently sensitive. *See* Smallwood Dep. at 55:10-56:3; 63:21-64:5 (Ex. 28).  Although defendants attack Dr. Smallwod's credentials in the area of air monitoring, he has considerable experience evaluating air monitoring programs. *See* Smallwood Dep. at 65:24-66:9 (Ex. 28).  He has also published a paper in a peer-reviewed journal explicitly evaluating air monitoring at nuclear weapons production facilities, including Rocky Flats – a paper that grew out of his work in this very case. *See* Morrison, M.L., K.S. Smallwood, and J. Beyea. 1997. *Monitoring the Dispersal of Contaminants by Wildlife at Nuclear Weapons Production and Waste Storage Facilities. The Environmentalist,* 17: 289-295 (Ex. 29).

[76]     Smallwood Report at 3-14 (Ex. 27).

[77]     Smallwood Dep. at 205:3-206:16 (Ex. 28).

[78]     Smallwood Report at 48-49 (Ex. 27).

7)       finds that Dow and Rockwell failed to account for the impacts and effects of bioturbation in their waste management practices and policies;[79] and,

8)       warns that these chronic releases of plutonium and other contaminants will accelerate into the future, posing a continuing risk of exposure to off-site residents.

Moreover, while Dr. Smallwood did not himself quantify the precise amount of contaminants transported off-site from bioturbation, another of plaintiffs' experts used Dr. Smallwood's findings to do just that. A centerpiece of Dr. Smallwood's analysis is a calculation and quantification of the fraction of soils bearing contaminants that will be made available for suspension each year by the high winds of the area. *See* Smallwood Report at 29-39 (Ex. 27); Smallwood Dep. at 201:9-15 (Ex. 28). This information was transmitted to Dr. Goble, plaintiffs' exposure and risk expert. *See* Smallwood Dep. at 201:9-201:15 (Ex. 28). Dr. Goble then used Dr. Smallwood's findings to assist in quantification (and characterization) of the amount of plutonium and other hazardous contaminants released into the off-site environment, and the corresponding risks to human health. *See* Goble Report at 40-41 (Ex. 15).[80]

In short, Dr. Smallwood's testimony is highly relevant to a number of the qualitative and quantitative elements of plaintiffs' claims. His testimony also bears on a number of defendants' breaches of their legal duties, including their poor environmental monitoring, and reckless waste management practices. There is no reason to strike his testimony.

_____

[79]    Smallwood Report at 14 (Ex. 27).

[80]    Furthermore, Dr. Smallwood's findings are directly pertinent to Dr. Goble's "legitimate worry that we are only seeing a portion of the iceberg," lending credence to, among other things, his uncertainty analysis. *See* Goble Report at 20 (Ex. 15).

91

### 4.        Defendants' Attack on the Chromium Example

Defendants spill a good deal of ink on Dr. Smallwood's illustrative hexavalent chromium release demonstration, which comprises just half a page in Dr. Smallwood's forty-nine page report. *See* Smallwood Report at 46-47 (Ex. 27).  Defendants' attacks are unfounded and overblown.

First, as even defendants appear to understand, this calculation was presented simply as "an illustrative example" of how the process of bioturbation can move significant quantities of contaminants off-site.  Second, Dr. Smallwood used accepted methods to estimate the amount of soil excavated by burrowing animals at Rocky Flats Plant.  Indeed, as noted above, the methods employed were subsequently peer reviewed and published in multiple scientific journals, and have been presented at two professional meetings.[81]  He also employed a standard screening method to

---

[81]    While Dr. Smallwood is not in the specifically defined field of risk assessment, he does have considerable experience performing risk assessments.  Dr. Smallwood described his expertise as follows:

> Q:       Now, let's go to your calculation on page 46.  Now, you make this calculation with respect to hexavalent chromium, correct?
>
> A.       I make part of it, yes.  I mean, I make the whole thing, but with assistance.
>
> Q:       The assistance of Dr. Goble?
>
> A:       Right.  *This is the kind of thing I would do as a systems ecologist, which is my area of specialty.*
>
> Q:       You've never done this before, this report, right?
>
> A:       *I have done things like this.  This is my profession.  This is what I do.  I collect information from multiple disciplines, I integrate information, I synthesize, and I assess its impact on the target variable.*

(continued...)

92

estimate the inventory of chromium that was used at Rocky Flats during the specified time period. *See* Smallwood Dep. at 172:6-7 (Ex. 28).[82]

Dr. Smallwood's illustrative analysis is highly relevant because it explains the very process by which materials the defendants dumped, buried, and stored on the plant site can move, have moved, and will continue to move off-site, and onto plaintiffs' land.  As Dr. Smallwood explained at his deposition:

> Q:    Now, when you say you think it's likely that some of that material would leave the Rocky Flats Plant, what do you mean likely?
>
> A:    Well, I've established in this report that animal burrows, the mounds created by animal burrows, excavated by animals, are subject to entrainment in wind, the particles are so because Saltcrete and Pondcrete were released onto the soils surrounding the 750 and 904 Pads, and I can't remember if it happened elsewhere, but where it did, it entered the soil profile, then that soil would be subject to soil bioturbation.  *So the same process would apply to Pondcrete and Saltcrete as it does for the nitrates and all the other chemicals that occur across Rocky Flats Plant*.

*See* Smallwood Dep. at 206:2-16 (Ex. 28) (emphasis added); *see also id.* at 207:3-14.  Dr. Smallwood's testimony is plainly relevant to describe the release pathways by which contaminants at the site have  been and will continue to be subject to offsite release.

_____

[81](...continued)
*See* Smallwood Dep. at 163:18-164:8 (Ex. 28) (emphasis added).

[82]    Contrary to defendants' assertion,  Dr. Smallwood relied on more than a one page document (the contents of which defendants do not dispute) to estimate the amount of chromium spilled directly onto the soils.  In fact, he relied on numerous documents that reported on how sloppily and recklessly hazardous materials were handled at Rocky Flats.  *See* Smallwood Report at 14-29; 46-47; Smallwood Dep. at 176:1-21.

# V.    CONDUCT EXPERTS

## A.    Defendants' Bad Acts That Exemplify Their Shoddy Management of Rocky Flats "Fit" with Plaintiffs' Claims.

Drs. Cochran and Budnitz[83] will testify, based on their investigations, about numerous examples of mishandling of radioactive and toxic materials, routine disregard for elementary safety standards, spills and leakage of radioactive and hazardous waste, and mishaps including a catastrophic fire in 1969 that gutted the plant's main plutonium fabrication building.  In an attempt to keep this persuasive evidence from the jury, defendants repeat the same misreading of the law of this case as they propounded in their motions *in limine*.  That is, defendants first argue that the various incidents either did not affect the entire class, did not result in an off-site release of some harmful substance, did not result in a health risk, or no longer present a continuing threat to the class, and argue that as a result these incidents do not fall within the elements of plaintiffs' nuisance and trespass claims.  Def. Conduct Br. at 4-17.[84]  This argument glosses over the fact that plaintiffs' claims are based on a *pattern* of conduct, not on isolated incidents.  Defendants essentially attempt to segment plaintiffs' case into smaller claims based on discrete accidents or releases.  However,

_____

[83] Plaintiffs will not call Dr. Warner North as an expert witness at trial, so defendants' objections to his testimony are moot.  Dr. Budnitz will testify to only those portions of the Warner-Budnitz reports that he authored, namely the sections on criticality.

[84]  Plaintiffs disagree with defendants' assertions that many of these incidents did not result in off-site harm.  However, a *Daubert* motion is not the place to decide disputed factual questions. *See Daubert*, 509 U.S. at 595 ("The focus ... must be solely on the principles and methodology, not on the conclusions that they generate."); *Bitler*, 391 F.3d at 1238 ("Here, the expert testimony 'fits' because it involves a reliable method that would aid the jury in resolving a factual dispute; whether the jury finds that the testimony 'fits' their best assessment of the truth of the matter is an altogether different issue.").

plaintiffs and the Class members are not worried about tritium alone, or the 1969 fire alone, or water contamination alone.  Rather, they are concerned about the chronic mismanagement of Rocky Flats through both the Dow and Rockwell eras.  That mismanagement – of which the incidents described in defendants' brief are but examples – pervaded all of Rocky Flats' operations and led, perhaps inevitably, to the contamination of the class area with plutonium and the increased health risks suffered by the class (the two factors that defendants have no cause to disagree are class-wide, actionable harms).

Dow and Rockwell's continual mismanagement, and their policy of promoting faster weapons production at the cost of safety, is at the core of plaintiffs' claims.  That pattern of mismanagement proves the *mens rea* element of nuisance, *i.e.* intent or negligence.  *Cook v. Rockwell Int'l Corp.*, 273 F. Supp. 2d 1175, 1202 (D. Colo. 2003) ("*Cook IX*").  It also proves, for the class-wide generic causation element of nuisance, that the normal, reasonable person in the community would be frightened (and justifiably so) about the continuing and possibly unknown risks from living downwind of Rocky Flats.  May 17, 2005 Order at 5-7.  And it proves "fraud, malice, or willful and wanton conduct," that is, "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff," as required for punitive damages.  Colo. Rev. Stat. Ann. § 13-21-102(1)(a) & (b) (West 2000).

Courts recognize that events connoting a pattern of misconduct are relevant and admissible evidence of negligence or recklessness, even when those events are not those that caused the immediate harm to the plaintiff.  For example, in *Silkwood v. Kerr-McGee Corp.*, 769 F.2d 1451,

1455-56 (10th Cir. 1985), *cert. denied*, 476 U.S. 1104 (1986), the Tenth Circuit held that evidence
of other nuclear safety incidents, including MUF, was relevant to prove negligence.  The Karen
Silkwood story is well known.  She worked at the Kerr-McGee plant that fabricated fuel pins,
containing plutonium, for nuclear reactors.  She and her property became contaminated with
plutonium.  She was killed in a car accident, but her husband sued on her and his own behalf.  At
trial, the jury awarded $500,000 on the personal injury claim;  $5,000 on the property claim; and $10
million in punitive damages.  *See* 769 F.2d at 1453-54.

Following an initial appeal and reversal and remand by the Supreme Court,[85] the Tenth
Circuit considered Kerr-McGee's contention that it was entitled to judgment as a matter of law on
the punitive damages claim because, for among other reasons, there allegedly was "no evidence that
malicious or wanton conduct on their part resulted in the plutonium contamination of Ms.
Silkwood's apartment."  769 F.2d at 1453.

The Tenth Circuit's discussion of the evidence and its analysis of Kerr-McGee's argument
is worth quoting at length:

> In support of his punitive damages claim, plaintiff presented evidence relating to
> plant security, worker training, management, radiation detection, medical evaluation,
> and contamination incidents.  Dr. Karl Morgan, who for 29 years directed the
> government's health physics program at Oak Ridge, Tennessee, described
> defendant's operations as one of the worst, from the standpoint of safety, that he had
> ever reviewed.  He testified that he "could not imagine such a lackadaisical attitude
> could be developed in an organization in reference to the health and safety of the
> people," and concluded that defendants' practices reflected a "callous" and "wanton"
> disregard for the health and safety of employees.

---

[85]   *See Silkwood v. Kerr-McGee Corp.*, 667 F.2d 908 (10th Cir. 1981), *rev'd*, 464 U.S. 238
(1984).

96

In addition to this and other expert evidence, plaintiff introduced substantial testimony of individuals who worked at defendants' plant that related to *defendants' disregard for employee safety and to their endangerment of the public*.

Plaintiff offered considerable documentation and statistical evidence on this issue as well, *the most notable of which was evidence indicating that during the period from 1972-76 Kerr-McGee was unable to account for as much as 10.4 kilograms of plutonium*.

....

[W]e are confined to the assessment of whether plaintiff has presented evidence sufficient that a reasonable person might conclude that gross negligence on the part of Kerr-McGee caused damage to Ms. Silkwood's property.

It is true, as defendants contend, that plaintiff offered no direct evidence that the general pattern of gross negligence it sought to establish by the above evidence was the specific *cause* of the escape of plutonium in this particular instance.  However, *a jury may permissibly infer from a pattern of negligence likely to cause a particular kind of injury that such negligence did indeed cause the injury.  See Averitt v. Southland Motor Inn of Oklahoma*, 720 F.2d 1178, 1181-82 (10th Cir. 1983).

769 F.2d at 1455-56 (emphasis added).[86]  *See also Bradbury v. Phillips Petroleum Co.*, 815 F.2d 1356, 1364-66 (10th Cir. 1987) (evidence of a pattern of trespass and property damage was admissible to prove recklessness and other elements of the plaintiffs' case, even though none involved personal injury as plaintiff's case did).

---

[86]    The Court reversed and remanded the punitive damage award, however, because of an improper jury instruction regarding the evidence of Ms. Silkwood's personal injury.  769 F.2d at 1461.

**B.    DR. ROBERT BUDNITZ**

**1.    Dr. Budnitz is Highly Qualified.**

**a.    Dr. Budnitz's Qualifications**

Dr. Robert J. Budnitz is a former senior officer for the United States Nuclear Regulatory Commission (NRC), and a frequent consultant to the NRC, the DOE, and other government agencies, both in the United States and abroad.  He will testify about the major plutonium fires that occurred at Rocky Flats in 1957 and 1969; the infamous 903 Pad plutonium drum storage area; and other incidents at the Plant.[87]  He also contributed to an expert report, with Dr. Warner North, relating to Rockwell's conduct, including the events leading up to Rockwell's guilty pleas in March 1992 to five felony and five misdemeanor criminal violations of environmental law.[88]

Dr. Budnitz is president of Future Resources Associates, Inc., a technical consulting firm.[89] He received a B.A. in physics from Yale University and  an M.A. and Ph.D in physics from

---

[87]    Robert J. Budnitz, *The Major Rocky Flats Fires of 1957 and 1969 and Other Incidents: Insights about Management Practices*, (Nov. 21, 1996) ("Fires Report") (Ex. 2);  Robert J. Budnitz, *Waste Management Practices Associated with the 903-Area Plutonium Releases*, (Nov. 21, 1996) ("903 Pad Report") (Ex. 1).

[88]    North & Budnitz, *Management of Wastes, Residues and Risks by Rockwell International at the Rocky Flats Plant*, (Nov. 21, 1996) (Ex. 21).

   While plaintiffs no longer intend to call Dr. North as a witness, Dr. Budnitz will testify to those portions of the joint report to which he contributed.

[89]    *See* Fires Report, Attachment A, Statement of Qualifications and Background:  Robert J. Budnitz, Ph.D ("Budnitz CV") (Ex. 2).

Harvard.[90]   From 1967 to 1978, he worked at the University of California's Lawrence Berkeley Laboratory ("LBL").   During that time, he worked for more than three years on a survey of instrumentation for measuring radioactivity in the environment.   Budnitz CV at 1-2.   By the time he left the post, in 1978, Dr. Budnitz was Director of the LBL Energy and Environment Division, and an LBL Associate Director, with 350 employees under his supervision. *Id*. at 2.   While at LBL, Dr. Budnitz became thoroughly familiar with ERDA/DOE operations, regulations and contracting programs.   He served as LBL's environmental sciences representative to ERDA/DOE's Division of Biomedical and Environmental Research.   *Id*.

In the mid-1970s, Dr. Budnitz began focusing on nuclear power reactors and other nuclear installations and was appointed to the United States Nuclear Regulatory Commission's 1977-78 "Risk Assessment Review Group."   In 1978, Dr. Budnitz took a two-year leave of absence form LBL to become Deputy Director of the Office of Research at the U.S. Nuclear Regulatory Commission in Washington, D.C.   In 1979, he was appointed Director of Research of the NRC office in D.C., and in 1979-80, he was Technical Coordinator of the NRC's Special Inquiry into the Three Mile Island nuclear accident.   *Id*.

In 1981, Dr. Budnitz founded his own consulting firm, Future Resources Associates, specializing in nuclear safety and environmental-impact analysis.   He has written widely on these topics, and has worked with nuclear regulatory bodies in Hungary, Slovenia, Armenia, Lithuania, and Bulgaria.   *Id*. at 3-4.

---

[90]   *Id*. at 1.

Dr. Budnitz has worked extensively for the U.S. Department of Energy, the NRC, and other government agencies, dealing with nuclear facilities, the environment and nuclear waste. *Id.* at 3-10. For example, from 1988-95, he was a member of the outside Peer Review Group for the Performance Assessment of the nuclear Waste Isolation Pilot Project in New Mexico.  In 1989-91, he was NRC's principal advisor in reviewing a methodology for studying fire risks at nuclear power plants.  *Id.* at 8.  He prepared a report for the NRC relating to the fire safety of nuclear installations nationwide based on site evaluations conducted using the guidance and criteria that Dr. Budnitz himself helped develop.[91]  Since 1994, he has assisted the United States Army in the development of safe methods of incinerating hundreds of thousands of obsolete chemical weapons.  Analysis of fire safety is an important component of this work.  Budnitz CV at 9.

Dr. Budnitz has worked on several projects directly relating to safety issues at Rocky Flats outside the context of this litigation.  *Id.* at 9-10.   He has published ninety articles and reports.[92]

### b.      Defendants' Challenges to Dr. Budnitz's Qualifications are Specious.

Defendants' objections to Dr. Budnitz's qualifications are nothing short of frivolous.  To support their absurd contention that Dr. Budnitz is not qualified to testify about fire safety, defendants cite (but do not quote) pieces of his deposition testimony.  *See* Def. Conduct Br. at 22. A more complete selection of Dr. Budnitz's testimony shows he has ample experience assessing fire safety in nuclear installations:

---

[91]      Budnitz Dep. at 621-23 (Ex. 3).

[92]      Fires Report, Attachment B, List of Publications (Ex. 2).

100

Q.    What is your training in fire protection, fire prevention?

[....]

THE  WITNESS:       Ah.   I  have  extensive  experience  and  important credentials in fire prevention.  The -- the experience is in nuclear facilities, although not Rocky Flats.

And I want to insist that although nuclear facilities are all different, one from the other, the rules, regulations, philosophies, and approaches, are very similar; because nearly everybody begins with the underlying fire codes that are prevalent nationally.

And my experience is as follows.  Beginning in the -- I could -- I have experience in 1978 through 1980, when the Nuclear Regulatory Commission, at which I was a senior officer, was developing fire regulations to improve the safety of nuclear plants.  And I'll come back to that in a minute, but I'm going to say the more recent.

Beginning in 1987, the Nuclear Regulatory Commission began a program that ultimately ended up asking every operating nuclear power reactor to reevaluate the fire safety of their facility, using modern safety analysis methods.

In order to make that evaluation consistent from one plant to the next, guidance was developed about how to do those analyses so that all hundred and ten would use similar methods.

I was the NRC staff's principal consultant in developing the guidance for those methods; which have, in the intervening years, been used by all hundred and ten nuclear plants in a reevaluation of their fire safety.

I have been involved in, or in a review capacity, in ten or more nuclear power plant evaluations for that kind, using the methodology that I have been -- that I have participated in reviewing and have overseen.

And at the very moment, the Nuclear Regulatory Commission is performing an evaluation of the lessons learned from those hundred and ten -- from the hundred and ten evaluations that were done at a hundred and ten plants.

101

> And a report that is drawing the lessons learned from those evaluations, and evaluating, therefore, the fire adequacy of the nuclear commercial industry, is under development, and I'm going to be one of its principal authors.

> I attended a meeting last -- a week ago today at NRC on that subject.  I have other credentials, if you'd like; or if you want to use the time for something else.

Budnitz Dep. at 620:11-12, 621:5--623:17 (Ex. 3).[93]

Defendants also argue that Dr. Budnitz should not be permitted to criticize the gloveboxes used at Rocky Flats in the 1960s because he has not personally built or tested a glovebox.  Def. Conduct Br. at 22.  Dr. Budnitz, however, testified that he has studied flammability tests on gloveboxes, and understands their flammability properties.  Budnitz Dep. at 619:13-14, 21-24 (Ex. 3).  *See also Stagl*, 117 F.3d at 80-82.

Defendants raise yet another unsupported objection by questioning Dr. Budnitz's qualifications to testify about Dow's management of Rocky Flats.  Def. Conduct Br. at 22.  No mere summary of Dr. Budnitz's experience begins to convey the depth and breadth of his expertise, and we encourage the Court to study the *curriculum vitae* attached to Dr. Budnitz's reports.  In addition, Dr. Budnitz testified as follows:

Q.   Have you ever managed a large industrial facility?

A.   Yes.

Q.   What facility was that, sir?

---

[93]   Defendants' counsel declined Dr. Budnitz's offer to provide additional detail about his experience and expertise in fire safety.  Budnitz Dep. at 625:13 (Ex. 3) ("I am moving on.") (statement of defendants' counsel).

A.    The Lawrence Berkeley Laboratory, which is one of the Department of Energy's large national laboratories.  I had a twelve-year career.  And the last three years I was an associate director, under the director at the time, I think there were seven associate directors, each of whom managed a large division.

And I managed the largest of those divisions, with several hundred employees, and many millions of dollars, carrying out a wide range of extensive activities in research and engineering development, that covered most of the disciplines involved in, for example, managing an installation like Rocky Flats; ranging from radiation measurements in the environment, to industrial protection, to mechanical engineering, to electrical engineering, to air pollution work and the like.

Budnitz Dep. at 307:20-308:17 (Ex. 3).  *See also id.* at 369-71 (Dr. Budnitz has extensive experience dealing with both high-level and low-level nuclear waste); *id.* at 380-81 (Dr. Budnitz *chaired* for three years a committee created by the National Academy of Sciences to study management of nuclear waste); *id.* at 384-85 (Dr. Budnitz is a member of the American Nuclear Society, the principal professional association in the area of hazardous or nuclear waste management; and Dr. Budnitz was elected to *chair* the Nuclear Installations Safety Division of that Society); *id.* at 390-400 (Dr. Budnitz has evaluated and investigated the nuclear waste management programs at Three Mile Island, Chernobyl, Savannah River in South Carolina, the Hanford Nuclear Reservation in Washington State, a nuclear waste disposal site in West Valley, N.Y. and another at Niagara Falls, and a portion of Rocky Flats in 1991, separate from, and prior to his involvement in this litigation).[94]

---

[94]    Here again, defendants' counsel declined to elicit additional testimony about Dr. Budnitz's qualifications.

Q.  I'll tell you what, *why don't we move on.*  And if you think of any others, feel free to let me know.

A.  The list is not complete.  If you want to move on--

(continued...)

Plaintiffs do not wish to belabor the issue of Dr. Budnitz's qualifications.  However, the defendants treat Dr. Budnitz (and many of plaintiffs' experts) so shabbily that plaintiffs wish to make sure that the record accurately reflects his level of accomplishment and professional stature. Plaintiffs encourage the Court to study Dr. Budnitz's *curriculum vitae* at length.

**2.      Dr. Budnitz's Opinions Are Helpful and Reliable.**

**a.      Dr. Budnitz's Reports**

**i.   The Fires Report**   Dr. Budnitz, drawing on his vast experience and expertise relating to nuclear facilities nationwide, has analyzed the major plutonium fires that occurred at Rocky Flats in 1957 and 1969, as well as other radiological incidents during Dow's tenure.  He has studied numerous documents relating to these incidents and events, and reached a number of conclusions, including:

> •      that poor management practices after the 1957 fire, including the Plant's failure to implement appropriate fire-safety measures, were a major cause of the 1969 fire, and contributed to its severity;
>
> •      ... the Rocky Flats Plant's senior management had (or should have had) full knowledge of the fire-safety needs of the facility, but failed to implement an adequate complement of them;
>
> •      that the fire-safety practices at Rocky Flats were considerably poorer than at other facilities managed contemporaneously for the U.S. Atomic Energy Commission (AEC) by other contractors....

------

[94](...continued)
      Q.  All right.

      A.  I'm just -- *so far I've only gotten back about seven or eight years*.

Budnitz Dep. at 401:5-12 (Ex. 3) (emphasis added).

- For the Rocky Flats plant not to have implemented appropriate fire-safety practices, especially after the 1957 fire, was a breach of acceptable management practice.

Fires Report at 2 (Ex. 2).

Dr. Budnitz provides a detailed description and analysis of the 1957 and 1969 plutonium fires, and explains why and how Dow's actions contributed to and caused these incidents, both of which resulted in releases of plutonium into the off-site environment. *Id.* at 3-38.

After the 1957 fire, many recommendations were made to improve fire safety, but by the time of the 1969 fire the concerns that underlay a large fraction of these recommendations had not been properly addressed.

Other serious fire-safety concerns also existed such as a failure to implement appropriate training and to follow appropriate fire codes.

Taken as a whole, the pattern is clear: (i) in my view, there simply was nowhere near enough attention paid in the 1957 - 1969 period to fire-safety issues; (ii) because of this lack of attention, I believe that there was a systematic failure in that period to provide enough in the way of fire safety at Rocky Flats.

Fires Rep. at 36-37 (Ex. 2) (emphasis omitted).

Dr. Budnitz also assesses how close the 1969 fire came to being a Chernobyl-like catastrophe. *See* Fires Rep. at 39-46 (Ex. 2). By luck and the heroics of firefighters, it was not. The importance of this analysis is best summarized in Dr. Budnitz's words: "The fact that such a large accident did not actually occur should not have been a cause for complacency in the immediate post-1969-fire period. But ... complacency about this danger was present in the senior levels at Dow Rocky Flats." Fires Rep. at 43 (Ex. 2).

105

Dr. Budnitz also discusses and analyzes other incidents that occurred during the Dow era, including the 1973 release of up to 2,000 curies of radioactive tritium into the environment. *See* Fires Rep. at 46-53 (Ex. 2).

**ii.    The 903 Pad Report**    Dr. Budnitz prepared another report specifically about the 903 Pad, an outside storage area where Dow placed thousands of barrels containing plutonium-contaminated oil. Dow left the barrels there for years and many corroded and leaked. Plutonium was released into the off-site environment as a result.

Dr. Budnitz analyzed this episode, and the events and practices that led up to it. Among his conclusions are:

(i) that some of these practices led to important offsite releases of plutonium from the 903 Area to the environment around the plant;

(ii) that at the time the releases occurred the Dow Rocky Flats management and staff had not taken the steps necessary to understand how large these releases were or where they went;
...
(iv) that the principal releases of plutonium from the 903 Area occurred due to a pattern of poor waste-management practices that would not have occurred had the plant been well managed;

(v) that when the principal plutonium releases occurred, or prior to their occurrence, the Dow Rocky Flats management and staff had available to them easily implemented measures that could have prevented the major part of the releases; and

(vi) that the state-of-the-art of environmental monitoring and analysis at the time when the plutonium releases from the 903 Area occurred, and thereafter, was sufficiently mature that measurements could have been made and analyses could have been performed -- but were not -- to understand the radionuclides' transport and environmental fate.
....

>For the Dow Rocky Flats Plant not to have prevented the 903-Area releases in the first place, nor to have monitored and analyzed them when and after they occurred, was an egregious breach of acceptable waste-management practice.

*See* 903 Pad Rep. at 2-3 (Ex. 1).

###### b.  Dr. Budnitz's Opinions Are the Result of Thorough and Independent Research and Analysis.

In his critique of defendants' management of Rocky Flats, Dr. Budnitz reviewed numerous plant records, including internal reports analyzing problems at the plant.  As a preeminent expert in environmental management and safety at nuclear facilities, Dr. Budnitz was able to critically assess the reliability of those records and use them (in addition to his own extensive experience) to draw conclusions about defendants' management of Rocky Flats.  However, defendants argue that because Dr. Budnitz reviewed and summarized Rocky Flats documents in his reports, his work is nothing more than a reiteration of those documents.  Def. Conduct Br. at 18-21.  Essentially, defendants complain that Dr. Budnitz documented his work too well.  Even a cursory reading of Dr. Budnitz's reports will show that he did more than simply summarize documents; he fit the evidence he reviewed into the context of Rocky Flats' history and defendants' (mis)management practices, and he relied on that evidence to draw his conclusions.

Dr. Budnitz's testimony elucidates the management practices of a highly specialized, scientifically advanced facility.  Experts are needed to interpret the evidence where their technical or specialized training will assist the jury, especially when the evidence is technical in nature (and thus not readily comprehensible to the layman).  *See Ellsworth v. Tuttle*, No. 03-4253, 2005 WL 1427638 (10th Cir. Jun. 20, 2005) (slip op.) (expert testimony needed to summarize and interpret

water rights certificates); *Wiley v. Ohio/ Oklahoma Hearst Argyle Telev., Inc.*, No. 01-6062, 2002

WL 511746, at *2 (10th Cir. Apr. 5, 2002) (affirming summary judgment for defendant because

plaintiff could not prove media negligence without expert testimony); *Phillips v. Calhoun*, 956 F.2d

949, 952 (10th Cir. 1992) (expert needed to interpret city charter).  This is not a situation like those

in the cases cited by defendants, where an expert seeks to testify about documents or evidence about

subjects that fall within the average juror's ordinary experiences,[95] or to opine on a matter such as

witness credibility that is properly left to the trier of fact.[96]

A plain reading of Dr. Budnitz's reports shows that they are much more than mere

"summaries" (Def. Br. at 18) of factual evidence.  Nonetheless, defendants rest on a snippet of Dr.

Budnitz's deposition testimony that states, not that Dr. Budnitz performed no independent analysis,

but that he felt that, based on the evidence, defendants' negligence was obvious.  Def. Conduct Br.

at 19 (quoting Budnitz Dep. at 567).  The obvious point of the testimony defendants quote is that,

---

[95] *Cf. Gust v. Jones*, 162 F.3d 587 (10th Cir. 1998) (expert not needed to testify as to whether plaintiff was speeding at the time of his car accident); *Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1281 (10th Cir. 1997) (expert not required to interpret contract devoid of "ambiguous provisions or confusing technical terms"); *United States v. Cardenas-Tarango*, 95 F.3d 1161 (10th Cir. 1996) (table) (cultural expert not needed to explain why defendant appeared nervous when questioned by the police); *United States v. Rice*, 52 F.3d 843, 846-47 (10th Cir. 1995) (attorney expert not needed to testify regarding sufficiency of the prosecution's evidence); *New Mexico Sav. & Loan Ass'n v. U.S. Fidelity & Guaranty Co.*, 454 F.2d 328 (10th Cir. 1972) (expert not needed to opine that business records showing accounting concealment evidenced deliberate or negligent conduct) (cited at Def. Conduct Br. at 18-19, 23).

[96] *Cf. U.S. v. Samara*, 643 F.2d 701, 705 (10th Cir. 1981) (in tax prosecution, accounting expert not needed to testify that certain items should be deleted from the government's summary of defendant's gross receipts because of lack of documentation and because witnesses for those items lacked credibility) (cited at Def. Conduct Br. at 18-19).

in Dr. Budnitz's expert opinion, the 903 Pad represents so flagrant a violation of the norms and standards that pertain to the management of hazardous nuclear waste that the jury will undoubtedly agree with his conclusions.  *See* Budnitz Dep. at 561-68 (discussing management's response to leaking barrels at the 903 Pad) (Ex. 3).

It was entirely appropriate for Dr. Budnitz to rely on documentary evidence and on pre-existing investigative reports, and to assemble the materials so as to make them more comprehensible to the jury.  Essentially defendants fault Dr. Budnitz for not "reinventing the wheel" because he relied on investigative reports about several incidents -- reports that in Dr. Budnitz's professional judgment were reliable and informative – rather than performing his own investigations.  While defendants selectively cite sound bites from his deposition, elsewhere in the transcript Dr. Budnitz explicitly corrects defense counsel's mischaracterization of his work:

> And to characterize the report as predominantly that of others is incorrect. These citations support my conclusions, which are in each section . . ..

> I'm just trying to be careful that I – my report couldn't be characterized as merely a compilation.  I made the compilation to support my evaluation.  And the citations are here, in order that the reader can easily see the support completely.

Budnitz Dep. at 599:17-600:8 (Ex. 3).

Defendants' criticism of Dr. Budnitz is not only unsupported but ironic, because defendants have proffered an expert witness, Frank J. Blaha,[97] to testify about many of the same subjects covered by Dr. Budnitz (and by Drs. Cochran and North).  Although Mr. Blaha worked at Rocky

---

[97]   *See* Frank J. Blaha, *Report on Waste Management History of the Rocky Flats Plant* (11/25/96) (Ex. 30).

109

Flats under Rockwell, much of his proffered expert report is based purely on a review of documents. *See, e.g.* Blaha Report at 4 (Ex. 30) ("The following discussion is primarily based upon information presented in ChemRisk Tasks 3 & 4 report (ChemRisk 1992) and the 1980 Environmental Impact Statement for Rocky Flats (USDOE, April 1980)."). Similarly, Dr. Budnitz brought his expertise and experience to bear in analyzing the events described in the documents, and measured defendants' operations against accepted standards and against the ALARA ("as low as reasonably achievable") principle (discussed as well by Dr. Cochran). *See, e.g.* Budnitz Dep. at 408-14 (Ex. 3) (describing the objective criteria he used in evaluating defendants' conduct and operations); and at 571:11-572:9 (discussing application of the ALARA principle). Dr. Budnitz, however, takes a less cheerful view of defendants' operations that Mr. Blaha.

> The practices observed [at the 903 Pad] are so far beyond the normal expected care and diligence with which normal chemical operations occur throughout the world, and did then, as to appall me.

Budnitz Dep. at 566:2-5 (Ex. 3).

      c.      **Dr. Budnitz Assessed Defendants' Conduct According to the Practices and Standards of Care in the Industry.**

As an experienced, respected authority on safety and risk management at nuclear facilities, Dr. Budnitz was able to assess defendants' conduct according to proper industry practices. Where appropriate, Dr. Budnitz cites established procedures and guidelines, or compares Rocky Flats directly to other facilities. *See, e.g.* 903 Pad Rep. at 9 (Ex. 1) ("An adequate quality-assurance program ordinarily would have included the sort of routine activities common throughout the AEC complex and competent industrial laboratories . . . ."); *id.* at 9 ("[B]y that time (1973) the AEC HASL

110

group had long since published a radiological-measurements procedures guide . . ..”); Fires Rep. at 2 (Ex. 2) (“[T]he fire-safety practices at Rocky Flats were considerably poorer than at other facilities managed contemporaneously for the U.S. Atomic Energy Commission (AEC) by other contractors . . ..”). Rather than focus on the minutiae of whether defendants technically complied with a given standard, Dr. Budnitz focused on the more pertinent issue of whether defendants’ conduct fell short of the ALARA principle, the guiding principle for all radiation exposure guidelines and for the duty of care that defendants owed the public. *See, e.g.* Budnitz Dep. at 571 (Ex. 3) (“The philosophy of radiation protection has, from its inception, included the principle to keep radiation exposures and impacts as low as reasonably achievable, as low as reasonably achievable.”).

While defendants criticize Dr. Budnitz for allegedly not considering the contemporaneous regulatory standards for releases into the environment (Def. Conduct Br. at 21), those regulations do not set the standard of care in this case. *See* Plaintiffs’ Brief on the Statute of Limitations, State Regulatory Standards, Ultrahazardous Liability, Spoliation, and Negligent Trespass, filed Aug. 4, 2004, at 9-14 (state regulatory standards do not set the duty of care); *Cook IX*, 273 F. Supp. 2d at 1198-99 (proof that defendants violated federal standards not required element of plaintiffs’ claims); 5/28/04 Order at 5-6. *See also* Restatement (Second) of Torts § 288C (“Compliance with a legislative enactment or an administrative regulation does not prevent a finding of negligence where a reasonable man would take additional precautions.”). Moreover, Dr. Budnitz concludes that defendants used the “official” radiation exposure and release standards as an excuse to not try harder. Defendants falsely concluded that any exposure below state or federal standards was not a problem, and refused to take readily available safety precautions that could have lowered environmental

111

releases or workplace exposures even further. *See* 903 Pad Rep. at 6-7 (Ex. 1) ("*Dow Rocky Flats Management had been simply lulled into complacency by being told that the regulatory limits were not being exceeded . . ..*" *Id*. at 7.); *id*. at 19-20 ("[T]he ... conclusion that permissible levels of Pu contamination in air were not exceeded seems to be offered as a reason – an excuse – for why nobody at Dow Rocky Flats was concerned." *Id*. at 20.). If defendants wish to argue that Dr. Budnitz should have reached a different conclusion based on defendants' alleged compliance with regulatory standards, this argument is more appropriately addressed to the jury. *See Daubert*, 509 U.S. at 596; *Robinson*, 16 F.3d at 1090.

Moreover, Dr. Budnitz provides copious evidence of measures that Rocky Flats could have taken, but chose not to take, to prevent further accidents and releases. *See* 903 Pad Rep. at 41-46 (Ex. 1) (section entitled, "Availablility of Easily Implementable Measures to Prevent the 903-Area Releases"); Fires Rep. at 18-38 (Ex. 2) (comparison of pre-1969 recommendations for fire safety with recommendations after 1969 fire; "[N]umerous recommendations made after the 1957 fire to improve fire safety were not implemented properly . . ..", *id*. at 18.). No regulatory standard or written procedure is needed for the jury to see that the failure to undertake basic safety precautions is negligence. For defendants to insist that Dr. Budnitz produce a written safety standard governing every particular action involved in the management and operation of the Rocky Flats plant is absurd; it is not unreasonable for the class members to expect Dow and Rockwell to use common sense. *See, e.g.* Budnitz Dep. at 562-66 (Ex. 3).[98]

---

[98]         Q.    Dr. Budnitz, once the drums in the barrel storage area were leaking,

(continued...)

_____

[98](...continued)

what's the standard industry practice for dealing with them, in the 1960s?  If there was one?

. . .

A.    And if you want to know what the standard is, the standard is that competent management would have seen to it that some combination of those activities -- one or  more -- would have put a stop to the incipient and continuing corrosion and leakage.

. . .

Q.    Okay.  And as you pointed out, those were not written down anywhere in the 1960s, "this is  what you do if you've got leaking drums"?

A.    Look, look.  I haven't procedures in my house for all the things you do when things happen.  But I've got to tell you, when we spill – when we break a glass on the dining room floor, we don't have a procedure, we pick it up, so the kids don't step on it.

. . .

I don't think that the absence of a procedure -- and I doubt that there was such a procedure -- is an adequate, in fact, any, any possible rationale for the lack of the sensible set of activities that I mentioned.

I believe that not only was there not such a written procedure; but I couldn't imagine that the Atomic Energy Commission or anybody else would have written a procedure that says, "now, when the drums leak, you've got to do one, two, three, four, five, six, or seven, or a combination".

It's not something that even in 1997 I believe would ever be written down anywhere.  It's common sense.   It is normal adequate safety management practice. It is the thing that the Atomic Energy Commission expected, and had a right to expect when it hired what it thought was a  world-class chemical company to run a complex operation like Rocky Flats.

. . .

(continued...)

113

      **d.**     **Dr. Budnitz's Analysis of Defendants' Environmental Monitoring Practices is Relevant.**

The relevance of Dr. Budnitz's critique of defendants' environmental monitoring program should be obvious:  the deficiencies he cites are evidence of negligence, and they cast doubt on the "official" estimates of releases from Rocky Flats.  Defendants cite nothing to support their suggestion that for his testimony to be *admissible*, Dr. Budnitz was required to quantify releases or make measurements.  *See* Def. Conduct Br. at 22.

**C.**     **DR. THOMAS COCHRAN**

     **1.**     **Dr. Cochran is Highly Qualified.**

Dr. Thomas B. Cochran is a senior scientist at the Natural Resources Defense Council, Inc., in Washington, D.C., director of its nuclear program, a consultant to the United States Department of Energy, and a renowned authority on nuclear weapons, nuclear facilities, and arms control.  He authored two expert reports in this case: one an overview of Rocky Flats operations, the other

---

[98](...continued)

     The standard that I would apply is, as I've said, and I believe that the Dow Rocky Flats management and operation fails that common sense, normal safety management standard; and it fails it with the opposite of flying colors.

Budnitz Dep. at 562:16-19, 563:9-15, 564:4-12, 564:15-565:10, 565:21-566:1 (Ex. 3).

specifically about "material unaccounted for," or MUF,[99] and he testified at the DOE contempt hearing on July 26, 1995.

Dr. Cochran received his undergraduate degree in electrical engineering, and a master's and a Ph.D. in physics from Vanderbilt University.  His work on a master's level involved health physics, and his Ph.D dissertation was on nuclear physics.  *See* Tr. of Proceedings (7/26/95), at 59-60 (Ex. 9).  In 1973, Dr. Cochran joined NRDC, "one of the premier environmental organizations in the U.S."  *Id.* at 60.  He researched and wrote a book about the proposed liquid metal fast breeder reactor, which would have used plutonium.  *Id.* at 60-61.  He has written several books on U.S. nuclear weapons and the nuclear weapons manufacturing complex, including Rocky Flats (prior to his involvement in this litigation).  *Id.* at 64.  He has extensive knowledge and experience relating to MUF, which is "really the principal means of measuring how well you know the disposition of the material that is in or flowing through these various facilities."  *Id.* at 66.

Dr. Cochran has been an advisor to both the U.S. Department of Energy, and the U.S. Nuclear Regulatory Commission ("NRC").[100]  He has served on DOE's Fusion Energy Advisory Committee, the Environmental Management Board, and the Energy Research Advisory Board.  For the NRC, he has served on the Advisory Panel for the Decontamination of the Three Mile Island Unit

---

[99]    *See* Thomas B. Cochran, *Overview of Rocky Flats Operations* (11/21/96) (Ex. 6); Thomas B. Cochran, *Plutonium Inventory Differences at the Rocky Flats Plant and Their Relationship to Environmental Releases* (11/22/96) (Ex. 7).

"Material unaccounted for" or "MUF" (also known as "Inventory Difference" or "ID"), is plutonium, uranium and other nuclear material used at Rocky Flats that defendants cannot find.

[100]    *See* Cochran CV at 2.

2;  the Peer Panel on Nuclear Reactor Operations Qualifications; and the Safety Goals Workshop.[101]

He also was a member of the American Nuclear Society's Working Group to develop criteria for

disposing of radioactive waste.[102]

In 1987, he was awarded the Public Service Award by the Federation of American Scientists,

and NRDC has gained recognition for his work as well.[103]  He has written numerous articles and

papers on nuclear facilities, nuclear weapons and waste and related issues, and worked extensively

with the former Soviet Union on arms control.  He also has testified on numerous occasions before

Congressional committees on nuclear energy, weapons and waste.  *Id.*

Defendants object to Dr. Cochran's qualifications to testify about waste management, fires,

criticality safety, and MUF.  Def. Conduct Br. at 26-28.  Dr. Cochran is more than qualified, as even

a quick review of his *curriculum vitae* and testimony at the contempt hearing demonstrates.  In

addition, he testified about his qualifications at his deposition:

> I've been responsible for ensuring adequate health physics practices at Vanderbilt
> University which had nuclear wastes that required disposal.

Cochran Dep. at 106:11-13 (Ex. 8).

> I was on the advisory committee to the Department of Energy that was asked to
> examine the processes being developed for decontamination of the Rocky Flats
> facilities and disposal of the materials and the management of materials.  And as part
> of that work I spent a couple of days at Rocky Flats with a committee of other nuclear
> chemists and materials experts where we reviewed the material handling problems

---

[101]   *Id.*

[102]   *Id.* at 3.

[103]   *Id.* at 5.

at Rocky Flats and were briefed by staff at Rocky Flats and of course major consideration and topic of discussion was the issue of criticality and problems associated with criticality as they related to removal of plutonium from glove boxes and containers and processing lines....

For example, it went into discussion of the need to recalculate the criticality, redo the criticality calculations for miles of piping that had plutonium in it prior to transfer of plutonium from areas within Rocky Flats to a glove box, for example, where material could be processed and removed, so that was a major subject of our review.

Cochran Dep. at 40:5-41:9 (Ex.8).

A.      I have published reports that discuss the criticality - problems associated with - criticality problems associated with the use of plutonium.

Q.      And those are listed on your resume?

A.      Yes.

Cochran Dep. at 42:14-19 (Ex. 8).

I believe I have expertise in the adequacy of the fire protection procedures as they relate to [plutonium] pit manufacturing facilities.
...
[T]he issues of fire safety in a broader context arise in conjunction with my work as a consultant -- as an advisor to the Department of Energy on the management of radioactive waste and other materials that the department is currently trying to dispose of.

Cochran Dep. at 16:3-6; 16:14-19 (Ex. 8).

Defendants' specific objection relating to MUF is disingenuous.  While they claim Dr.

Cochran "purports to measure MUF by way of mass balance accounting"[104] (Def. Conduct Br. at 28),

---

[104] "Mass balance accounting" is nothing more mysterious than the process of comparing the amount of material received, versus the amount known to have left the plant in one form or another.  *See* Cochran MUF Rep. at 3-4 (Ex. 7) (explaining the basic equation for calculating Inventory Difference).

Dr. Cochran does not calculate MUF himself.  The DOE refused to produce sufficient documentation regarding quantities of nuclear material to allow him to make such a calculation.  Instead, Dr. Cochran was forced to rely on defendants' and DOE's own estimates of the quantity of MUF.  *See* Cochran MUF Rep. at 1-2 (Ex. 7).  Moreover, Dr. Cochran's conclusions are that the massive amount of MUF indicates defendants' management practices were deficient, and that existing estimates of off-site releases could have underestimated actual releases.  *Id.* at 15-17.  In light of Dr. Cochran's use of defendants' and DOE's own figures for MUF, and the fact that his conclusions do not rely on any precise amount of MUF, but rather on the bare fact that the quantity was extremely large, it is unclear how additional training in mass balance accounting would change his conclusions.

A lack of specialization, in any event, affects the weight of an expert's testimony, not its admissibility.  *See Wheeler*, 935 F.2d at 1100; *Lovato*, 2002 WL 1424599, at *4.  Moreover, Dr. Cochran relied on and sought assistance from Dr. Budnitz and Dr. North in any area, such as fire safety, in which Dr. Cochran felt that additional specialized expertise would be helpful.  *See* Cochran Dep. at 165-67 (Ex. 8).

Defendants criticize Dr. Cochran because he "has never managed a nuclear facility." Def. Conduct Br. at 27.  Dr. Cochran, it is true, has never managed Rocky Flats or one of the other nuclear weapons plants owned by DOE and operated by contractors such as Dow and Rockwell.  However, there is no legal requirement that an expert must have worked inside the industry about which he seeks to testify; indeed, it would be undesirable to require all experts who critically assess a given industry to be industry insiders.  *See Stagl*, 117 F.3d at 80-82 ("[T]to require the degree of specificity the court imposed came close to letting that industry indirectly set its own standards. . . . [W]here,

118

as here, well-trained people with somewhat more general qualifications are available, it is error to exclude them." *Id.* at 82.).

    **2.**    **Dr. Cochran's Opinions Are Reliable and Helpful to the Jury.**

        **a.**    **Dr. Cochran's Reports**

**i.**    **The Overview Report**    In his Overview Report, Dr. Cochran provides a basic primer on nuclear weapons and their manufacture, then focuses on plutonium operations at Rocky Flats. *See* Overview Report at 2-9 (Ex. 6). As part of his regular professional work, Dr. Cochran has developed extensive knowledge and expertise regarding the nuclear weapons manufacturing complex in the United States, including Rocky Flats. In connection with this litigation, he has studied numerous documents, many produced by defendants and DOE during discovery, relating to Rocky Flats in particular. In analyzing these materials, Dr. Cochran brought to bear his considerable experience and expertise on issues relating to nuclear weapons and plutonium.

The jury in this case will hear much about radioactivity and radiation, plutonium and health physics. Dr. Cochran provides an introductory lesson on these and related topics. *See* Overview Report at 9-14 (Ex. 6). He discusses health physics, the health effects of exposure to radiation, and the "basic" rule of health physics that "radiation exposures must be kept as low as reasonably achievable." This is known as the "ALARA" concept. *Id.* at 14. Dr. Cochran also discusses plutonium's physical, radiological, and toxic properties. *Id.* at 18-22.

Dr. Cochran then discusses the major known releases of plutonium from Rocky Flats, as well as the waste management practices of Dow and Rockwell. *See* Overview Report at 23-30 (Ex. 6). The facts of the 1957 and 1969 plutonium fires; the notorious 903 Pad where thousands of barrels

containing plutonium-contaminated waste were left to rot outdoors;  the stack releases of plutonium; the mismanagement of criticality risks; and the waste management practices of Rockwell that culminated in its pleading guilty to ten environmental crimes; will all be presented to the jury.  Dr. Cochran, together with Dr. Robert J. Budnitz (on whom Dr. Cochran relies, in part), will help the jury understand this evidence and evaluate defendants' conduct.

Defendants' record on managing the risks of criticality, for example, was abysmal: a 1989 outside study found that there had been more than 600 violations of criticality safety procedures since 1962.  *See id.* at 28-29.  Dr. Cochran can help the jury understand what "criticality" means (namely, the circumstances in which fissile material will undergo an uncontrolled chain reaction, depending on its mass, shape, surrounding material, and other factors).

Another striking example of defendants' neglect was the 903 Pad, an outside storage area where Dow kept thousands of barrels containing plutonium contaminated waste.  Many of the drums leaked, and the plutonium eventually dispersed off-site.  *See id.* at 24-25.

In his Overview Report, Dr. Cochran concludes that:

The contractors placed highest priority on meeting warhead component production quotas, and failed to exercise the due diligence and meticulous attention to detail required to insure the public's health and safety.  As a consequence there were fires that could have been prevented and should not have occurred.  In violation of the ALARA principle, there were releases of plutonium to the environment that could have been prevented and should not have occurred, unnecessarily exposing the public to an increased risk of cancer.  Private property was contaminated effectively forever. One contractor, Rockwell International, in 1992 pleaded guilty to committing ten environmental crimes, five of which were felonies.  There was a huge unnecessary buildup of radioactive waste.  When the plant was shut down in 1989 for safety violations, it was left in a condition that has made cleanup of the site an expensive nightmare for the government.  There were 12.7 metric tons (t) of plutonium left at the plant.  Some of the plutonium was stored in temporary plastic packaging, which

has since begun to deteriorate, producing hydrogen gas that can contribute to pyrophoric conditions. Even today there are thousands of drums of hazardous wastes stored in available spaces throughout the various buildings at Rocky Flats -- another fire hazard waiting to happen. The site may never be cleaned up adequately, largely because of the egregious manner in which the plant was operated for more than three decades resulting in extensive contamination of the site and the accumulation of large volumes of toxic wastes.

Overview Report at 30 (Ex. 6) (citations omitted).

    **ii.    The MUF Report**    Dr. Cochran authored a second expert report pertaining to

"material unaccounted for" or "MUF" (also known as "Inventory Difference" or "ID").[105]   MUF

refers to plutonium, uranium and other nuclear material used at Rocky Flats that defendants *cannot*

*find*.  During defendants' stewardship of Rocky Flats, the amount of "missing" plutonium climbed

to more than *2,600 pounds*, enough to make *hundreds* of nuclear weapons.  By way of comparison,

in *Silkwood*, the Tenth Circuit considered Kerr-McGee's inability to locate 23 pounds of plutonium

to be  "notable" evidence of its "disregard for employee safety and to their endangerment of the

public."  *See* 769 F.2d at 1455.

    In his report on MUF, Dr. Cochran concluded that:

•    Dow Chemical Company was "grossly negligent" for allowing the amount of missing plutonium to routinely top a *hundred pounds* in a *single year*; even into Rockwell's tenure, annual MUF measured in the tens of pounds, and DOE itself characterized Rockwell's performance one year as "deplorable."[106]

---

[105]   *See* Cochran MUF Rep. (Ex. 7).

[106]   MUF Rep. at 15, 12 (Ex. 7).

- Dow made no serious effort to analyze its massive MUF problem until 1964, and by then the amount of plutonium that Dow could not find exceeded a *thousand* pounds.[107]

- Today, the amount of MUF casts doubt on official estimates of the amount of plutonium released to the off-site environment because such estimates carry large uncertainties and "could be increased by orders of magnitude and still be consistent with the MUF."[108]

- Defendants' indemnitor, the Department of Energy, has continued to withhold large amounts of MUF data, "severely" harming plaintiffs' ability to perform a quantitative analysis of MUF.[109]

### b.    Dr. Cochran's Opinions Are the Result of Thorough and Independent Research and Analysis.

The jury will need expert assistance in understanding the plutonium and waste management operations of Rocky Flats, health physics, radiation, the properties of plutonium, and more. Defendants do not contend otherwise.  Defendants argue, however, that Dr. Cochran's testimony would not be "helpful" under FRE 702 because "his opinions are summaries of selected exhibits, from which Dr. Cochran has drawn conclusions that could just as easily be drawn by the jury."  Def. Conduct Br. at 23.   This argument rests on a fundamental mischaracterization of Dr. Cochran's work.  His reports do not merely summarize other evidence; they explain and interpret highly technical evidence in light of Dr. Cochran's specialized knowledge, and draw conclusions about the adequacy of defendants' management of a specialized weapons manufacturing plant.  Like Dr.

---

[107]    *Id*. at 10.

[108]    *Id*. at 16-17.

[109]    *Id*. at 1.

122

Budnitz, Dr. Cochran's expertise makes these materials, and their overall significance to this case, comprehensible to the jury.  Expert testimony is not only desirable, but necessary, when the jury must sort through scientific or technical information.  *See Ellsworth*, 2005 WL 1427638; *Wiley*, 2002 WL 511746, at *2; *Phillips*, 956 F.2d at 952; *see also* supra pp. 110-13 (Budnitz discussion).

Defendants assert, for example, that, "[Dr.] Cochran testified that his entire criticality analysis" is a reiteration of a single document that he read.  Def. Conduct Br. at 24. Defendants' representations about the record are not trustworthy.

Dr. Cochran testified that:

> *I have a 25-year history of studying nuclear safety issues, which includes criticality safety*, from the very beginning of my studies at Vanderbilt University in 1962. You know, I'm a nuclear physicist, I know how fission process works.  I know how you get [a] criticality event, I know what it does, I know it gives radiation[.]

Cochran Dep. at 97:14-21 (Ex. 8) (emphasis added).

> However, as I've indicated previously, *I relied not only on the Scientech document but my experience, historical experience on this issue*.

Cochran Dep. at 103:15-18 (Ex. 8) (emphasis added).

> *I've also relied* on my participation as a DOE - as an advisor to the Department of Energy, who was hired as a consultant for the Department of Energy, for the purposes of reviewing practices related to cleaning up the plutonium at the plant, and part of that review, an extensive part of that review, dealt with concerns about criticality safety as it related to cleanup, and the lack of up-to-date criticality analyses that met current DOE orders with respect to performing and documenting the criticality calculations before one engages in the movement of plutonium.

> BY MR. KURTENBACH:
> Q.  Were any of those managing practices the management practices of Dow or Rockwell?

A.  I think if Dow and Rockwell had better managed that plant we wouldn't have the plant in such a poor state as it is today with respect to the storage of waste and the disposition of plutonium, and the inability to move the plutonium out and shut it down in a reasonable time and at a reasonable cost.

Cochran Dep. at 101:2-102:3 (Ex. 8) (emphasis added).

[T]he management of this particular issue [criticality], I think, is important, particularly with respect to Rocky Flats, in revealing a pattern of behavior of management with regard to safety issues more generally.  And there I would include criticality, waste management practices, fire safety, and environmental releases.

Cochran Dep. at 83:8-14 (Ex. 8).

It is interesting to note that defendants' own proffered expert on waste management at Rocky Flats, Mr. Blaha, has relied extensively on documents despite the fact that he worked for Rockwell at Rocky Flats.[110]  Mr. Blaha stated that he relied on documents and used his familiarity with "standard industry practices regarding waste management that were in place in the 1970s and 1980s" to opine that the practices of defendants at Rocky Flats "exceeded" those standards.  Blaha Report at 58 (Ex. 30).  It is entirely proper for an expert to rely on contemporaneous studies or documents in forming a conclusion, as both plaintiffs' and defendants' experts have done.

c.    **Dr. Cochran Applied the ALARA Principle, an Objective Standard of Care, to Defendants' Conduct.**

Defendants complain that Dr. Cochran's testimony cannot be "verified" because he does not evaluate defendants' conduct against any "objective" criteria.  *See* Def. Conduct Br. at 25.  Again,

---

[110]  *See* Blaha Report, at 4 (Ex. 30) ("The following discussion is primarily based upon information presented in ChemRisk Tasks 3 & 4 report (ChemRisk 1992) and the 1980 Environmental Impact Statement for Rocky Flats (USDOE, April 1980)."); and at 58 ("As the basis for my opinions set forth in this report, I have relied on hundreds of documents[.]").

it helps to examine Dr. Cochran's actual report and testimony.  Dr. Cochran assessed defendants' performance under the ALARA principle, which requires that radiation exposures be kept "as low as reasonably achievable."  Cochran Overview Rep. at 14 (Ex. 6).  The ALARA principle is a guiding standard of care recognized by the major authorities on radiological safety and exposure, including the Nuclear Regulatory Commission, the National Council on Radiation and Protection and Measurements, the National Academy of Sciences, and the Federal Radiation Council.  *See* Cochran Overview Rep. at 14-15 (Ex. 6).

Dr. Cochran testified that:

[T]he contractors have an obligation to ensure that exposures are below the standards as far as practicable, and I do not believe they are in compliance with that requirement.
...
On the basis of my analysis and expert opinion, I do not believe that the Rocky Flats contractors maintained releases of plutonium off-site as low as practicable.
...
ALARA means as low as reasonably achievable, taking into account economic and practicality.
...
It's pretty evident to me, and I think anybody who looked at this evidence, that the management of the 903 pad was inconsistent with the ALARA principal.

It's pretty evident to me, and I think others would agree that the management of the fire hazards, particularly as associated with the '69 fire -- period leading up to the '69 fire, were inconsistent with the ALARA principal.

It's pretty evident to me that the management of the pondcrete and [salt]crete issues were inconsistent with the ALARA principal.

I don't think these contractors engaged in prudent health physics practices in their conducts during the 37 years they operated the plant.

Now, the issue of plutonium standards is very tricky.  As you know from my resume, I was involved extensively in rule makings in the early '70s about the adequacy of the plutonium standards.

The contractors of the Department of Energy and its predecessors, in general ... over the years, together with AEC and DOE and other people, have systematically ensured that their standards -- that they didn't have to reduce their radiation protection standards in sort of lock step as they were reduced for the commercial industry, and they maintained a self-regulation and, in effect, a separate set of standards that I have long felt were inappropriate and inadequate.

And the practices under which they engaged have left a legacy of waste at Rocky Flats that leaves the, as you call them, the people in the class, the people right around Rocky Flats, with a, I think, a risk that is -- of future exposure that is very high and -- unacceptably high and needlessly high because of the way they operated this plant for 37 years.

Cochran Dep. at 218:22-24, 219:1-3, 219:24-220:4, 220:21-222:11 (Ex. 8).

As discussed *supra* pp. 114-15, regulatory standards do not set the standard of care in this case.  Rather, defendants were subject to the same common-law duty of care as all landowners owe to their neighbors.  The ALARA principle more closely matches that duty than the various regulatory limits on releases of hazardous materials.

### d.     Dr. Cochran's Testimony Regarding MUF is Relevant.

Dr. Cochran's primary opinions regarding MUF are that defendants breached their duty of care in failing to adequately account for plutonium, and the extremely high amount of material unaccounted for (cumulatively, *1191 kilograms* for the plant's lifetime)[111] casts doubt on the official estimates of the amount of plutonium released from Rocky Flats.   Plaintiffs are entitled to present evidence of Dow's and Rockwell's pattern of gross mismanagement and negligence. *See Bradbury*,

---

[111] *See* Cochran MUF Rep. at 9 (Ex. 7).

815 F.2d at 1364-66; *Silkwood*, 769 F.2d at 1456 (citing *Averitt v. Southland Motor Inn of Oklahoma*, 720 F.2d 1178, 1181-82 (10th Cir. 1983)).  Dr. Cochran's opinions and analysis of MUF are relevant to plaintiffs' claims and helpful to the jury.

Defendants, insisting on a degree of accuracy that their own conduct has rendered impossible, attack Dr. Cochran's second conclusion as irrelevant because Dr. Cochran does not quantify a release of plutonium that resulted from defendants' conduct.  *See* Def. Conduct Br. at 25-26.  The point of Dr. Cochran's analysis is not to pinpoint the amount of MUF released into the environment.  Rather, Dr. Cochran shows that the magnitude of plutonium unaccounted for renders uncertain and unreliable any attempt to quantify releases from Rocky Flats by reference to records of known, measured releases.  *See* Cochran MUF Rep. at 25-26 (Ex. 7).

## VI.    CONCLUSION

For all the foregoing reasons, plaintiffs respectfully request that that the Court deny all of defendants' motions to exclude plaintiffs' expert witness.


Respectfully submitted,



Dated: July 11, 2005                                  /s   Jennifer MacNaughton
                                                    Merrill G. Davidoff
                                                    Peter Nordberg
                                                    Ellen T. Noteware
                                                    Jennifer MacNaughton
                                                    Berger & Montague, P.C.
                                                    1622 Locust Street
                                                    Philadelphia, PA 19103
                                                    (215) 875-3000

                                                    Gary B. Blum
                                                    Steven W. Kelly
                                                    Silver & DeBoskey, P.C.
                                                    1801 York Street
                                                    Denver, CO 80206
                                                    (303) 399-3000

                                                    Attorneys for Plaintiffs
                                                    And the Class

## CERTIFICATE OF SERVICE

I certify that today, July 11, 2005, I electronically filed the foregoing, Plaintiffs' Consolidated Memorandum in Opposition to Defendants' Motions to Exclude Expert Testimony, and accompanying exhibits, with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail address:

> Joseph J. Bronesky, Esq.
> **SHERMAN & HOWARD**
> 633 17th Street, Suite 3000
> Denver, CO  80202
> (303) 297-2900
> (303) 298-0940 (Fax)
> jbronesk@sah.com

I also hereby certify that I have mailed the document to the following non CM/ECF participants via e-mail and Federal Express:

> Douglas J. Kurtenbach, Esq.
> **KIRKLAND & ELLIS**
> 200 East Randolph Drive
> Chicago, IL  60601
> (312) 861-2000
> (312) 861-2200 (Fax)

> /s  Jennifer MacNaughton
> Jennifer MacNaughton
> Attorney for Plaintiffs and the Class
> Berger & Montague, PC
> 1622 Locust St.
> Philadelphia, PA  19103
> tel  (215) 875-3000
> fax (215) 875-4604
> jmacnaughton@bm.net