# THE MAJOR ROCKY FLATS FIRES OF 1957 AND 1969

# AND OTHER INCIDENTS:

# INSIGHTS ABOUT MANAGEMENT PRACTICES

Prepared by

Robert J. Budnitz, Ph.D.
Future Resources Associates Inc.
2039 Shattuck Avenue, Suite 402
Berkeley, California 94704


Assisted by

Nathan Chan, Ph.D.
Decision Focus Incorporated
650 Castro Street, Suite 300
Mountain View, California 94041

November 21, 1996

[Attachment A is a statement of qualifica-
tions and background for Dr. Budnitz;
Attachment B is a list of Dr. Budnitz'
publications; Attachment C is a short
statement concerning Dr. Chan; Attachment D
is a statement concerning recent involvement
in judicial proceedings; Attachment E is a
list of documents considered in the prepara-
tion of this report; and Attachment F
consists of additional figures that support
the report.]

## 1.0  Objective

The objectives of this paper are (i) to discuss the two major fires at the Rocky Flats Plant in 1957 and 1969, including a discussion of the investigations that made certain safety recommendations following each fire; and (ii) from the discussion to obtain insights about management practices at Rocky Flats during the Plant's first approximately fifteen years, from its inception through 1969.  I will also discuss my conclusions about how much worse the 1969 fire might have been except for the heroic actions of the onsite firefighters and some just plain luck.

In the course of this discussion it will be demonstrated

> (i) that poor management practices after the 1957 fire, including the Plant's failure to implement appropriate fire-safety measures, were a major cause of the 1969 fire, and contributed to its severity;

> (ii) that during the period under discussion, the Rocky Flats Plant's senior management had (or should have had) full knowledge of the fire-safety needs of the facility, but failed to implement an adequate complement of them;

> (iii) that the fire-safety practices at Rocky Flats were considerably poorer than at other facilities managed contemporaneously for the U.S. Atomic Energy Commission (AEC) by other contractors; and

> (iv) that the 1969 fire might have been an environmental disaster of almost unprecedented size, had the actions of the onsite firefighters been a little less heroic and certain events unluckily turned not out as favorably as they did.

The underlying thrust of the discussion below is that the Rocky Flats Plant's poor management practices in the 1950s and 1960s were the root cause of the 1969 fire.  Had these management practices been competent, the 1969 fire would not have occurred in the first place; and had it occurred it would not have been as severe.  For the Rocky Flats Plant not to have implemented appropriate fire-safety practices, especially after the 1957 fire, was a breach of acceptable management practice.

2

## 1.1   Summary Overview Comments

Before launching into the detailed discussion below, I believe it useful to introduce some summary comments that provide an overview of the later discussion:

o   The 1957 fire revealed important weaknesses in the facility's design vis-a-vis fires.  Afterwards, a series of recommendations for improving fire safety were made, but many of them were not implemented.

o   My key criticism concerning Dow Rocky Flats' managerial competence in the fire-safety area is that the top management failed to learn either the technical or the managerial lessons of the 1957 fire, despite lots of advice based on the investigation of that fire.  Dow Rocky Flats failed to follow through to provide an adequate complement of fire-prevention and fire-mitigation capabilities; indeed, they allowed over-crowding and mission pressures to contravene appropriate fire protection strategies.  Sooner or later their laxness in the fire area was bound to lead to a major fire.  When it finally happened in May, 1969, it should not have been a surprise to anybody familiar with the situation.  As my analysis of the 1969 fire will show (see below), the Dow Rocky Flats management failed between 1957 and 1969 to consider adequately the range of potential consequences of a major fire, and to take fire-safety and other appropriate steps.

## 2.0   Chronology of the 1957 Fire and the Subsequent Investigations, and Recommendations for Improvement

To serve my purpose here, it is not necessary to write down a highly detailed chronology of the 1957 fire.  The literature has such detailed chronologies, including minute-by-minute actions and events.  However, I will provide an overview because it will be necessary as I develop my analysis.

3

<u>1957 Fire</u>[1]

9/15/57      10:10pm:  The fire started in Room 180 of Building 771[2]; manual suppression activities during the next 30 minutes; hot gases from the fire spread to the HEPA filter plenum

                          10:40pm:  Explosion in the Building 771 HEPA filter plenum; all personnel in 771 ordered evacuated

                          02:00am (next morning):  The fire in the filter plenum was under control

                          11:30am (next morning):  The fire was finally extinguished

10/7/57      First Dow investigation report issued[3]

12/10/57    Supplementary Dow investigation report issued[4]

This very brief chronological overview tells the bare-bone facts but does not, however, tell the <u>story</u> --- a story of poor management on the part of Rocky Flats Plant's senior managers. It is a story of continuing failures to implement fully the necessary suite of fire-prevention measures, of downright incompetence at the highest levels of Rocky Flats management --- despite some attempts at lower levels to do what was right.  As far as I can tell, the story is principally one of a concentrated effort to accomplish the major mission of the Rocky Flats Plant (making nuclear-weapons parts) to the neglect of proper management of fire safety.

--------

1       The 1957 fire chronology is extracted from the events reported in the principal investigation report on the 1957 fire:  "Report of Investigation of Serious Incident in Building 71 on September 1, 1957", Dow Chemical Company, October 7, 1957 (henceforth "<u>DOW INVESTIGATION 1957</u>")

2       The building numbering system changed sometime after 1957, and Bldg. 71 became 771 (and Bldgs. 76 and 77 became 776 and 777.)  Both notations will be used here interchangeably: I believe that this should not cause confusion.

3       Dow Investigation 1957, <u>op. cit.</u>

4       "Supplementary Report on Fire in Building 71, September 11, 1957", Dow Chemical Company, December 10, 1957 (henceforth "<u>DOW INVESTIGATION SUPPLEMENT 1957</u>")

2.1      Detailed Commentary on the 1957 Fire

2.1.1     Before 1957

**Building Characteristics**

Building 771 began operations in 1953 as the primary plutonium
processing facility at Rocky Flats.  The building is constructed
of reinforced concrete.  The original dry box equipment was
stainless-steel-laminated safety glass.  However, this material
was difficult to fabricate into contamination-tight joints, so
plexiglas was used in gloveboxes.[5]  As the 1957 Fire Investiga-
tion Report stated, "the use of plexiglas in glove box construc-
tion without metal separators between plexiglas panels contri-
buted to the spread of the fire."[6]

Within the glovebox system in Room 180 was a storage area
containing in-process materials and materials awaiting recovery,
including plutonium suspended in oil/carbon tetrachloride and
plutonium skulls (which are massive metallic residues).

The building was designed around its ventilation system: CWS
(Chemical Warfare Service) filters were used on the inlets to the
gloveboxes and in exhaust ducts from the gloveboxes to the main
plenum.  Room air exhausts also led into the main plenum.  The
main filter plenum was a long concrete-walled room containing a
number of stages of CWS filters.  A total of 620 24-inch square
CWS filters were held in a structural steel framework.  Four
exhaust fans were connected to the downstream side of the filters
and discharged into a concrete stack[7].  The investigation report
noted that "the flammability of the CWS filters had been known
for some time; however they were the only commercially available
filters adequate to do the filtration job from the contamination
point of view."[8]  Electrical utilities had also been run through
the length of the plenum.

**Fire Protection**

At the time of design and construction of Building 771, automatic
sprinklers and floor drains were specifically excluded "because
of contamination, accountability and criticality problems, as

---

5        Dow Investigation 1957, op. cit., p. 10

6        Ibid., p. 17

7        Ibid., p. 10

8        Ibid., p. 18

well as the difficulty of extinguishing plutonium fires with water."[9].  Carbon-dioxide ($CO_2$) extinguishers in hand-held 15 lb. and cart-mounted 100 lb. sizes were located in the building.  The 1957 investigation report did not indicate whether or not fire detection equipment was located within the glovebox or plutonium storage areas; however, one of the post-fire recommendations was to "provide the storage areas with fire detection systems."[10] The filter bank did have fire detectors, which were supposed to sound an alarm and shut down the fan system.  However, prior to the 1957 fire, this equipment "had been blocked out to eliminate operating difficulties which were being experienced."[11]

### 2.1.2    The 1957 Fire

**Description of the Incident**

The 1957 fire began at approximately 10:10pm on September 11 in Room 180 of Building 771.  Two Plant Protection men discovered the fire in a glovebox and notified the Fire Department.  The first fire truck arrived at 10:12pm.  Fire Lt. Eminger arrived at the door to Room 180 simultaneously with Shift Supervisor Vandegrift.  Eminger stated that "at the doors I was stopped and told to not go in although I was properly dressed (bunker coat, asbestos gloves, booties and chemox mask ...  As I stood there, the fire gained great momentum ...."[12]  The guard who turned in the alarm was informally reprimanded: Vandegrift, the Shift Supervisor, said, "I informed him that no one should turn in an alarm for 71 Bldg. except Bldg. 71 supervision, and he replied that his instructions were to call the fire department whenever there was a fire.  No fire alarm rang in 71 Bldg."[13]

All personnel were kept out of the room until 10:24pm while proper contamination protection was being put on and $CO_2$ extinguishers were "gathered from various areas of building."[14]  At 10:24pm, Eminger and Vandegrift entered the room and emptied several small $CO_2$ extinguishers and one large $CO_2$ cart extinguisher on the fire with no effect.  At about the same time, Plant Protection Captain Eckert ordered the exhaust fans to high,

---

9        Ibid., p. 11

10       Ibid., p. 25

11       Ibid., p. 18

12       Ibid., p. 55

13       Ibid., p. 59

14       Ibid., p. 15

despite objections of Lieker who said it was "against his orders."[15]

When they found that the $CO_2$ extinguishers had no effect, Vandegrift and Health Physics Supervisor Owen debated the use of water on the fire.  The standing order apparently was that no water should be used on a plutonium fire because of concerns that a criticality accident might occur.[16]  At 10:37pm, use of water was initiated with a spray nozzle, the idea being that the spray could cool the room and help extinguish the fire without adding as much water as would a direct hose.  After a couple of minutes, the fire in Room 180 was essentially put out, although it would reignite from time to time for the next several hours.

At 10:39pm, an explosion occurred in the main exhaust plenum.  It appears to have been in the column of gas in the exhaust ducts, booster system, and filter bank.  All personnel in Room 180 and the hallway were ordered to evacuate outside, where several noticed "a large cloud of smoke coming from the stack of 71 Bldg."[17]  Plant Protection Captain Eckert said, "I looked up at the stack and a column of smoke 80 to 100 feet high was coming from it and was very dark in color."[18]  This explosion started the main plenum filters on fire and reignited fires in Room 180.  The re-kindled fires in Room 180 were put out with water.

A second fire truck was dispatched at 10:58pm.  Fire personnel had difficulty reaching the filter fire and had to move equipment through an access hatch.  In addition, the building power failed at 11:10pm due to the fire reaching utility conduits located in the filter plenum.

The filter bank was sprayed with water starting at 11:15pm.  The investigation report indicates that the filter fire was "knocked

---

15      *Ibid.*, p. 53

16      In the presence of water, a much smaller amount of plutonium is needed than in water's absence to comprise a so-called "critical mass" which would set off a very dangerous chain reaction, called a "criticality accident."  The physical role of water is that it is a moderator that can slow down the fast neutrons emitted by plutonium.  Because slower neutrons are more effective in propagating the chain reaction this would thereby allow a chain reaction to take place for plutonium masses much smaller than would be required otherwise.

17      Dow Investigation 1957, *op. cit.*, p. 60

18      *Ibid.*, p. 54

7

down" about 2:00am; however, J. Pringle indicates that after
3:30am the filters were still smoldering and burning progressive-
ly from one to the next[19]. A fire break was made by removing an
entire row of filters to stop the spread. The fire was finally
declared out at 11:28am on September 12.

**Contamination**

The investigation report[20] did not state any conclusions about
the possible spread of plutonium contamination from the burned-
out filters and stack. Because the fire resulted in a loss of
electrical power, it was not possible to determine the plutonium
concentration in the main exhaust duct from September 11 through
18. On September 19, the concentration emitted from the main
exhaust was measured at 2086 d/m/cubic-meter[21], compared to 0.68
d/n/cubic-meter during the ten days prior to the fire.

Health Physics Director T.S. Chapman initiated air sampling soon
after the smoke plume was sighted on the night of the fire. Two
sampling locations were established on-site and a third along the
highway at the southern boundary of Rocky Flats. Some radio-
activity was found at all three sites; at sunrise, meteorological
conditions changed and "airborne activity at the base of the
stack began to increase tremendously."[22] This continued until
mid-afternoon and "this prolonged increase in activity was very
alarming." Worker evacuations were considered, but not carried
out. Despite the "alarming" measurements during the fire,
Chapman concluded erroneously that "for all practical purposes,
the plutonium contamination resulting from the fire is negli-
gible."[23]

### 2.1.3    Initial Investigation

The Dow investigation report pointed out several factors that
contributed to the fire[24]:

---

19      Ibid., p. 70

20      Ibid.

21      Disintegrations per minute per cubic meter is one unit
        in which radioactivity is reported. 1 d/m = 2.22
        picocuries (pCi), or 2.22 x $10^{-12}$ curies.

22      Dow Investigation 1957, op. cit., p. 76

23      Ibid., p. 77

24      Ibid., p. 17 - 19

o   The building was handling several times the original [classified] quantity of delta-phase plutonium with a corresponding increase of personnel and a crowding of equipment"[25].

o   The procedures dealing with radiation-criticality problems in emergencies were "so well indoctrinated in the operating personnel"[26] that they may have clouded the response to the fire which was primarily a plexiglas fire with small amounts of plutonium.  In particular, the delay in entering the room until personnel could be suited up was due to these procedures.

o   The use of plexiglas in glove box construction without metal separators.

o   The delay in use of water allowed the filters to become ignited.

o   The blockage of heat-detecting equipment in the plutonium storage chests inside the gloveboxes.

o   The flammability of the filters.

o   Access to the filter plenum was limited to an equipment hatch.

o   The loss of power due to burn-through of conduit in filter plenum.

Dow's investigation led to a number of recommendations, including[27]:

o   Eliminate or minimize the use of flammable materials of construction [in dry boxes].

o   Provide plutonium metals storage areas separate from production areas.

o   Provide the storage areas with fire detection systems.

o   Provide automatic $CO_2$ extinguishing systems in lines where oils, plexiglas, etc. are used in conjunction with plutonium metal.

---

25      Ibid., p. 23

26      Ibid., p. 24

27      Ibid., pp. 25 - 27

o   Use flame resistant filters.  Large filter banks should be subdivided by non-combustible vertical partitions.

o   Do not run unprotected utilities through exhaust ducts or filter banks where service can be interrupted due to fires, etc.

o   Install standpipes and hose connections in processing buildings so that if water needs to be used to extinguish fire, it is close at hand.

o   Continued development in combating plutonium and other pyro-phoric radioactive metal fires is needed.

o   Design and build future plutonium facilities to provide positive separation of related units ....  Consider wing-type buildings with separate ventilation for each wing.

The AEC Division of Operational Safety, in one of its "Serious Accidents" bulletins, stated that "a peculiarity of this incident was the abnormally large extent to which the entire chain of events was influenced by hazards associated with a relatively small amount of metallic plutonium.  The chain started with spontaneous ignition of the metal – an unusual but far from unprecedented experience – which produced intense but localized heat during relatively slow combustion.  This heat was of itself of little significance beyond the important fact that it served to ignite adjacent flammable materials (primarily the plastic used in portions of dry box construction)".[28]  The Bulletin goes on to state, ".... it appears (by hindsight) irrational that facilities were ever designed in such a manner as to permit hazards from a relatively insignificant amount of material to so strongly influence the chain of events which led to a major loss."[29]

With regard to fire protection, the Bulletin goes on to say[30] that "fires involving radiological risks commonly result in con-

---

28      US Atomic Energy Commission, "Serious Accidents Bulletin", Issue No. 30, Nov. 27, 1957, "Small Metallic Plutonium Fire Leads to Major Property Damage Loss", in US Atomic Energy Commission, "Report on Investigation of Fire, Building 776-777, Rocky Flats Plant, Golden Colorado, May 11, 1969", five volumes, August 1969 (henceforth "AEC INVESTIGATION 1969"), Vol. II-B, Appendix J-1, page 2

29      Ibid., Appendix J-1, page 3

30      Ibid., Appendix J-1, page 5

siderable delay in initiating manual firefighting activities. Because of this, increased usage of automatic fire detection and control devices is certainly justified to a degree far exceeding the justifiable practice commonly used for identical risks in which radiation hazards are absent .... The incident provides tangible evidence to support the belief that failure to provide automatic fire detection and control measures for radiological risks will in general result in a level of personal injury and property damage risks exceeding that which would exist if automatic fire detection and control devices were used."[31]

### 3.0   Chronology of the 1969 Fire and the Subsequent Investigations, and Recommendations for Improvement

As with my discussion of the 1957 fire above, it is not necessary, to serve my purpose here, to write down a highly detailed chronology of the 1969 fire.  The literature has such detailed chronologies, including minute-by-minute actions and events. However, I will provide an overview because it will be necessary as I develop my analysis.

### 1969 Fire[32]

5/11/69        2:30pm:  The fire started in Building 776 in a storage cabinet in the North Foundry Line, when pressed plutonium briquettes spontaneously ignited. It spread through many hundred glove boxes that were interconnected.

3:20 to 4:10pm: Smoke was observed emerging from the Bldg. 776 exhaust fans on the roof.

4:00pm: Stack samplers in the booster systems were disabled by a power failure

6:40pm: Fire contained

8:00pm: Fire extinguished, except that some small fires continued in the North Foundry line through the night.

---

31        AEC Investigation 1969, op. cit., Vol. II-B, Appendix J-1

32        The 1969 fire chronology is extracted from the events reported in the principal investigation report, AEC Invesitigation 1969, op. cit.

About 9:00am (next morning): Last fire in North Foundry line finally put out.

August '69    AEC Fire investigation report issued[33]

As was the case with the very brief chronology (above) for the 1957 fire, this very brief chronological overview tells the bare-bone facts about the 1969 fire but does not, however, tell the <u>story</u> --- a story of poor management on the part of Rocky Flats Plant's senior managers.  This story will emerge as I provide more detail below.

3.1     <u>Detailed Commentary on the 1969 Fire</u>

3.1.1   <u>Before the fire</u>

Between 1957 and 1969, a number of modifications were made to the Rocky Flats processing buildings, some of them in response to various recommendations that emerged from the 1957 fire, and others simply because the materials-production processes and program needs evolved in the intervening years.  I will highlight a few of the relevant changes here as an introduction to dis-cussing the fire itself.

**Shielding Modifications**

Marked increases in radiation exposure to workers were noted in the late 1960s.  According to Dow, the cause was the increased fraction of Pu-241 in the plutonium that was processed as feedstock.  The isotope Pu-241 decays into Am-241 and U-237, which contributed about 60% of the penetrating gamma radiation.[34] In addition to recommendations regarding this feedstock, the AEC also studied the installation of additional shielding to protect the workers.  The AEC authorized the additional shielding in January 1968, consisting of "lead, leaded glass, and both Benelex and Plexiglas of various thickness on the gloveboxes and conveyor lines."[35]  About 1,170,000 pounds of Benelex and Plexiglas were used in the shielding project.[36]  This work was carried out despite a Dow report of October 6, 1967 which concluded that "Benelex will sustain combustion after ignition whereas Plexiglas SE-3 will not."[37]  An October 12, 1967 Dow memo stated that[38]

─────────────────

33    <u>Ibid.</u>

34    M. Biles, "Report on Radiation Problems at the Rocky Flats Plant", U.S. Atomic Energy Commission, February 8, 1968

35    AEC Investigation 1969, <u>op. cit.</u>, Vol. I, p. 19

36    <u>Ibid.</u>, Vol. I, p. 20

37    <u>Ibid.</u>, Vol. II-B, p. H-7

"Each situation should be given individual attention in
light of the following factors:
    a. Benelex is combustible,
    b. The extent of proposed use,
    c. the type of area involved and extent of other
       combustible materials present,
    d. sprinkling systems in the area."

The engineer who wrote the 10/12/67 memo was the one who made the
decision to use Benelex.  He also requested the views of the Fire
Protection Engineer, who advised him that consideration should be
given to installing sprinklers in Building 776.[39]  Sprinklers
were never installed.

The shielding project also nullified the heat sensors in Glovebox
134-24.  Originally, the glovebox was designed to hold several
covered cans, each holding one plutonium briquette, with a heat
sensor placed on top of each can.  In 1966, to increase storage
capacity, the design was modified to have the cans sit· on heat-
conducting stainless steel troughs.  The troughs would conduct
heat to the sensors which were permanently installed on the
glovebox floor.  When the shielding project was undertaken,
additional exterior shielding on the outside of the glovebox was
impractical because of crowding, so a Benelex "storage chest" was
installed inside the glovebox, with walls and floor constructed
of at least 4 inches of Benelex.  No change was made to the heat
detectors, so the low thermal conductivity of Benelex effectively
insulated the heat detectors from any fire that might occur
within the storage chest.[40]

**Building Characteristics**

Another change that was made in Building 776-777 was the removal
of the concrete wall formerly separating the two buildings.
Originally, only a single glovebox conveyor section and a single
personnel door provided connections between the buildings.  In
1961, the wall was removed to accommodate additional equipment.[41]
This was contrary to the 1957 recommendation to "provide positive
separation of related units," ideally in "wing-type buildings."

---

38       "Ramifications of Manufacturing Engineering Report --
       Flammability of Benelex", letter, H. Moss to D. Auten,
       October 12, 1967, in AEC Investigation 1969, op. cit.,
       Vol. IV, Appendix L-4, pp. L-38 ff.

39       AEC Investigation 1969, op. cit., Vol. IV, pp. 30-31

40       Ibid., Vol. I, p. 21

41       Ibid., Vol. I, p. 17

The roof of Building 776-777, which in the 1969 fire was to prove to be the last line of defense between the plutonium and the environment, was "a metal pan deck, 3/4 inch styrofoam insulation nailed to this deck, covered with asphalt-saturated felt, ... 1/2 inch fiber hardboard nailed through the preceding layers and a final ply of butyl membrane ...."[42]  "As a result of recurrent wind damage, the roof is presently being held in place by concrete blocks randomly placed on the butyl sheet ...."[43]

The poor condition of fire safety and protection at Rocky Flats was known, specifically in Building 776/777.  A DOE official from the Albuquerque Operations Office said that "Dow Rocky Flats has the least technically capable industrial safety and fire protection organization among the AEC contractor-operated plants under AL jurisdiction."[44]  A Dow official from its Midland, Michigan headquarters characterized Rocky Flats' program and procedures for assessment and review of fire safety as "below average" relative to Dow's private plants.[45]  Dow Midland did a "Safety and Loss Prevention Audit" on March 13, 1969 (less than two months before the fire), in which they pointed out the need for "increased fire protection for many areas not now adequately protected, in the form of either automatic sprinklers or fire detection systems."[46]

On March 13, 1969, the Chief of the AEC Industrial Safety and Fire Protection Branch visited Building 776-777, and he noted that "this facility is one of the most important to the program, but had practically no built in fire protection or suppression equipment."[47]

Dow itself acknowledged the situation before the 1969 fire.  The AEC report states,[48] "In March 1969, AL [Albuquerque Operations Office] safety personnel had discussions with Dow officials, who acknowledged that Building 776-777 represented a serious fire hazard and inquired when AL was going to require that something be done about it.  However, no report or recommendations were made to AL management."

---

42      Ibid., Vol. I, p. 15

43      Ibid., Vol. I, p. 16

44      Ibid., Vol. IV, p. 23

45      Ibid., Vol. IV, p. 22

46      Ibid., Vol. IV, Appendix L-3

47      Ibid., Vol. IV, Appendix O-1

48      Ibid., Vol. IV, p. 63

### 3.1.2    The 1969 Fire

**Description of the Incident**

Building 776-777 was the primary plutonium production building from October 1957 through the May 1969 fire.  The fire started in mid-afternoon on May 11, 1969 near Glovebox 134-24.[49]  The first alarm was received from a glovebox heat detector at 2:29pm, followed by a manual alarm at 2:33pm, triggered by a Utility Operator who smelled and saw smoke.  Four firefighters responded; when they arrived "the fire was out of the top of the line with flames about 18 inches high."  As in the 1957 fire, $CO_2$ extinguishers were tried first, with no effect.  At 2:34, the fire captain decided to initiate the use of water.  The fire moved down two glovebox lines, fed by the ventilation system and the Benelex shielding, and unconstrained by firebreaks.

The firefighting conditions were difficult, including the loss of lights in the main fire area and crowded conditions which limited firefighter access.  The AEC report says that "it was virtually impossible to size up the situation and provide effective direction of the firefighting efforts.  In the main, the firefighting was carried out by individual instinct based on previous training and experience."[50]  A fortuitous element involved the timing of the fire: it began just prior to the shift change time, so the current shift personnel were joined by additional personnel reporting for duty.  "This provided, in effect, nearly twice as large a firefighting force as would have been available otherwise."[51]

The fire continued spreading and burning intensely for a number of hours, until it was contained at 6:40pm.  Although there were no signs of fire on the roof, it did get soft in one area, prompting firefighters to spray the roof with water and maintain a fire watch.  A door to Building 776 was opened at 7:00pm to help clear the smoke from the building.  The fire was mainly out by 8:00pm, although small reignitions occurred until about 9:00am the next morning.[52]

In spite of the assurance that "a continuous fire watch is being provided in Building 76" in the Supplementary Report on the 1957 fire,[53] only one person was on duty when the fire started.  The

---

49      *Ibid.*, Vol. I, p. 50

50      *Ibid.*, Vol. I, p. 54

51      *Ibid.*, Vol. I, p. 58

52      *Ibid.*, Vol. I, p. 56

53      Dow Investigation Supplement 1957, *op. cit.*, p. 16

Assistant Area Manager in the AEC's Rocky Flats Area Office was interviewed by the <u>Denver Post</u> on June 29, and "he did confirm that only one man was on duty May 11 in the building which stored plutonium .... Normally, the building contains up to 350 workers, many of them safety personnel especially to contain fires .... Dow spokesmen have no explanation why only one person was on duty May 11 in an area that had experienced more than 200 small fires since the plant opened in 1953."[54]

### Contamination

Smoke was seen coming from the roof of Building 776, which "billowed over the side of the building toward Buildings 778 and 750."[55]  A smoke plume was seen from the Denver-Boulder turnpike about 10 miles away.  Smoke also came out of the Building 776 doors when they were opened.

The power failed to the exhaust air samplers for Booster Systems 1 and 2 and the Glovebox Dry Air system at about 4:00pm on May 11.  The AEC stated that there was evidence of fire downstream of the fourth and final stage of HEPA filters of Booster System 1, meaning that these filters were likely breached with potential release of plutonium.  Although the main exhaust system sampler continued to operate without interruption, the Booster System 1 exhausted directly to the atmosphere without passing through the main exhaust; therefore the main exhaust sampler results did not capture the potential release through the Booster System 1 breach.[56]  Even so, the exhaust air-sampling results for the two days prior to the fire, up until the time that electric power was lost to the samplers (about 1.5 hours into the fire) showed airborne alpha concentrations between 400 and 3000 times higher than normal.  Since these were averaged over two days, the concentrations were probably much higher still during the 1.5-hour period when the fire was burning but before the electric power was lost.[57,58]

---

54      M.J. Sunderland (AEC Rocky Flats Area Office, Assistant Manager), in <u>Denver Post</u>, June 29, 1969, p. 23

55      AEC Investigation 1969, <u>op. cit.</u>, Vol. I, p. 56

56      <u>Ibid.</u>, Vol. II-A, p. A-26

57      <u>Ibid.</u>, Vol. I, p. 84

58      <u>Ibid.</u>, Vol. I, p. 81

### 3.1.3     The AEC Investigation

The AEC empaneled a special investigation team.  Their investi-
gation report reached some strong conclusions concerning the
factors influencing the fire and its potential consequences.  The
short excerpt below is taken from the "Conclusions" section of
that Report[59] (more detail will be presented below in Section 4):

o     "Building 776-777, a vital weapons production facility, did
      not meet even the minimum AEC fire safety standards.  This
      increased the fire loss and unnecessarily exposed firemen to
      fire, plutonium, and nuclear criticality hazards.

o     "The Plexiglas windows contributed heavily to the spread of
      the fire and the extent of the loss.  These windows, a major
      structural part of the containment system, provided a fuel
      surface on the inside of the glovebox-conveyor systems....

o     "Less than one percent of the total of almost 600 tons of
      Benelex and Plexiglas shielding was consumed in the fire.
      Only the heroic efforts of the firefighters limited this
      burning.  Had an appreciable fraction of this shielding
      burned, there would have been a complete loss of Building
      776-777 and its contents and a major release of plutonium to
      the environment.

      ----

o     "The recycling of scrap, chips and skull materials has been
      the source of almost all the reportable plutonium fires in
      Building 776-777....

      ----

o     "Without the large cellulosic fuel source (the Benelex-
      Plexiglas storage container), it is unlikely that a pluto-
      nium briquette burning in an open metal container in
      Glovebox 134-24 would have ignited the Plexiglas windows.

o     "Nullifying the heat sensing system in Glovebox 134-24 by
      the addition of the Benelex-Plexiglas storage container pre-
      sented an earlier warning of fire which probably would have
      greatly reduced the size of the fire and consequent damage."

The AEC investigation also concluded that the fire had smoldered
for some time, with one plutonium briquette causing "other
briquettes to ignite and [initiate] a slow burning of the storage

_____

59        AEC Investigation 1969, op. cit., Vol. III, pp. 1-2

container .... After a period of smoldering, flames erupted on the outer surfaces of the container and spread to the combustible gloves and Plexiglas windows ... At this point in time, the fire probably was still undetected because no one was in the area and the heat detectors were located outside and under the glove-box."[60]

I believe that except for some lucky circumstances and some heroic firefighting, the 1969 fire could have been <u>much worse</u>. This will be discussed in more detail below (Section 5).

## 4.0     <u>Issue-by-Issue Comparison of Pre-1969 Recommendations with The Situation at the Time of the 1969 Fire</u>

For a large number of issues related to the 1969 fire, a striking finding emerges from the written record: the finding is that <u>numerous recommendations made after the 1957 fire to improve fire safety were not implemented properly; these management failures were revealed by the events during the 1969 fire</u>.

I will demonstrate this finding by comparing various pre-1969-fire recommendations with various post-1969-fire observations by contemporaneous experts. The record will then "speak for itself" in calling attention to the blatant disregard by Dow Rocky Flats management of appropriate concern for fire safety. Both fire-prevention and fire-mitigation aspects are involved, and the pattern that emerges is, to me, extremely troubling, because the pattern reveals significant Dow Rocky Flats management deficiencies.

## 4.1     <u>Building Layout</u>

<u>Between the 1957 and the 1969 Fires</u>

<u>Dow recommendation 10/57:</u> "Design and build future plutonium facilities to provide positive separation of related units in such fashion that fire, explosion, ventilation failure, etc., will not shut down the whole facility."[61]

<u>Dow recommendation, 1957:</u> "It is recommended for all future construction of plutonium processing plants that the various component operations be independent and isolated by separation or physical cutoff so that a fire or serious contamination incident will not cause a shutdown of operations other than the component

---

60      <u>Ibid.</u>, Vol. III, p. 9

61      Dow Investigation 1957, <u>op. cit.</u>, p. 27

immediately involved."[62]

<u>AEC recommendation, 10/57:</u>   "The separation of facilities is also suggested for reduction of the total risk."[63]

<u>AEC statement, 8/69:</u>   "Originally Building 776 was separated from Building 777 by a common concrete block wall."[64]   "In 1961, the concrete block wall between the buildings 776 and 777 was removed in order to accommodate additional equipment."[65]

<u>AEC statement, 3/69:</u>   "On March 14, we visited a Manufacturing Building No. 776-777.  This is a very large undivided complex with glovebox lines.... During the close out we met with the top Dow staff and discussed for an hour many of the problems encountered during our tour.  The question of the large undivided Manufacturing Building No. 776-777, and its vulnerability, was raised by Mr. D.M. Bassler before we broached the subject."[66]

<u>After the 1969 Fire</u>

<u>AEC and Dow recommendations, 7/69:</u>   This report offers several recommendations for separation in 771, e.g., "The original north building wall on column line V should be restored to its original integrity to serve as a fire cutoff between the building operations and the office-cafeteen areas ...."[67]

<u>AEC recommendation, 8/69:</u>   "Recommendations for Meeting Improved Risk Fire Standards: ... a. Fire and smoke barriers which subdivide the room into acceptable fire areas."[68]

<u>Factory Insurance Association recommendation, 2/70:</u>   "Improved

---

62      H.A. Spavin to J. Epp, "Suggested Recommendations for Committee Report on Rocky Flats Incident of September 12, 1957", 1957 (undated)

63      "Serious Accidents Bulletin, 1957 Fire", reproduced in AEC Investigation 1969, <u>op. cit.</u>, Volume II-B

64      AEC Investigation 1969, <u>op. cit.</u>, Vol. I, p. 14

65      <u>Ibid.</u>, Vol. I, p. 17

66      Letter to D. Patterson, AEC Division of Operations, "Trip Report to Rocky Flats Plant, March 11, 1969", in AEC Investigation 1969, <u>op. cit.</u>, Volume IV, Appx. O-1

67      N. Glover, K. Hess, T. Eckert, "Fire Protection Survey of Building 771", July 14, 1969

68      AEC Investigation 1969, <u>op. cit.</u>, Vol. III, p. 27

fire cut-offs [for Building 771] should be established as follows ...." [followed by a series of specific recommendations][69]

Factory Insurance Association recommendation, 2/70:  "Plans being developed for further compartmentalization of the major production areas [of Building 776-777] should be completed and implemented as soon as possible."[70]

Factory Insurance Association recommendation, 2/70:  [Currently in Building 771,] "several concrete block partitions exist in both the first and second floors to provide a basis for establishing multiple fire areas at each level.  Many of the necessary openings are either completely unprotected or have been provided with non-fire rated doors or windows to reduce the effectiveness of the separating partitions."[71]

Factory Insurance Association recommendation, 2/70:  [Currently in Building 776,] "Aside from temporary decontamination partitions and other non-fire rated walls, Bldg. 776/777 is one fire area.  This includes the second floor where duct work and piping pass through the floor to reduce the effectiveness of the cutoff."[72]

To summarize, building layout issues were identified after the 1957 fire as very important for fire safety, but at the time of the 1969 fire the contribution of layout problems to the overall fire-risk situation was still very important.  In part this is because activities in the intervening years had compromised sound fire-layout principles, in the interests of increasing the production throughput of bomb parts.  The situation appears to me to be one of willfully ignoring accepted fire-safety layout practices.

4.2  Building Construction and Materials

Between the 1957 and the 1969 Fires

Dow recommendation, 12/57:  "Fire Protection Improvements Under Consideration: ... 8. Elimination or reduction of the fire hazard inherent in metal pan roof decks with built-up roofing and insulation."[73]

---

69    Factory Insurance Association, "Final Report, Fire Protection Survey", February 1, 1970

70    Ibid.

71    Ibid.

72    Ibid.

73    H.A. Spavin to J. Epp, op. cit.

20

<u>Dow recommendation, 12/57:</u>  "Due to problems of roof construction in the new buildings, sprinkling and other protection for roofs is being planned ...."[74]

<u>AEC conclusion, 9/69:</u>  "Rocky Flats reported that the present roof [of 776] on which construction was completed in 1964-1965 consists of styrofoam in immediate contact with, and fastened with, metal fasteners to the deck.  In that styrofoam is considered 'a combustible material,' this construction is not in compliance with the provisions of AEC Appendix 6301, Part I.B.8.a. ... [quote of the manual]  It should be noted that the criteria and standards in effect during design of the original roof was permissive in the use of combustible material in contact with the metal deck.  However, the manual section referred to above was issued in May 1963, prior to construction of the present roof."[75]

<u>AEC statement, 8/69:</u>  "In March 1969, AL [AEC Albuquerque Operations Office] safety personnel had discussions with Dow officials, who acknowledged that Building 776-777 represented a serious fire hazard and inquired when AL was going to require that something be done about it.  However, no report or recommendations were made to AL management."[76]


<u>After the 1969 Fire</u>

<u>AEC statement, 8/69:</u>  "The frame [of Building 776-777] is constructed of unprotected (i.e., no fire proofing) steel ...."[77]

<u>AEC statement, 8/69:</u>  "The styrofoam insulation on the roof of Building 776 also melted in the vicinity of the high bay area; but the roof was not breached."[78]

<u>Factory Insurance Association conclusion, 2/70:</u>  "The plant is deficient in the following major areas:  1.  Construction

---

[74]     F.H. Langell Jr. (Dow Rocky Flats Manager) to S.R. Woodruff, Jr. (AEC RFAO Manager), "Safety Measures at Rocky Flats", letter of December 20, 1957

[75]     J. Derry (AEC Division of Construction) to J.A. Erlewine (AEC General Manager), "Construction of Roofs – Buildings 776-777", Letter, September 2, 1969

[76]     AEC Investigation 1969, <u>op. cit.</u>, Vol. IV, p. 63

[77]     <u>Ibid.</u>, Vol. I, p. 15

[78]     <u>Ibid.</u>, Vol. I, p. 69

shortcomings which may contribute to the loss picture, consisting of the use of foamed plastic as wall insulation and for metal deck roof insulation, and the lack of sufficient fire and contamination cut-offs in certain buildings ...."[79]

Factory Insurance Association recommendation, 2/70: "Replace the plastic foam insulation on the main building [776-777] roof with an approved noncombustible material, or as an alternative provide a minimum 30 minute fire thermal barrier on the underside of the metal deck."[80]

Factory Insurance Association statement, 2/70:  "As a result of recurrent wind damage, the roof is presently being held in place by concrete blocks ...."[81]

AEC conclusion, 8/69:  "Building 776-777, a vital weapons production facility, did not meet even the minimum AEC fire safety standards."[82]

AEC conclusion, 8/69:  "Building 776-777 complex was not designed or constructed to meet AEC fire safety standards - nor does it appear that any concerted efforts over the years have been made to achieve these standards."[83]

To summarize, building construction and materials issues were identified after the 1957 fire as very important for fire safety, and specific recommendations were made concerning roof construc-tion.  However, at the time of the 1969 fire the contribution of poor roof materials vis-a-vis fires represented an important con-tributor to the overall fire-risk situation at Rocky Flats.

In fact, the AEC's 1969 conclusion is one of the most important comments, namely that the "776-777 complex was not designed or constructed to meet AEC fire safety standards - nor does it appear that any concerted efforts over the years have been made to achieve these standards." [emphasis added]  To me, this seems to be willful rather than inadvertent behavior, the respon-sibility for which clearly rests with Dow Rocky Flats management.

---

79      Factory Insurance Association, "Final Report, Fire Protection Survey", February 1, 1970

80      Ibid.

81      Ibid.

82      AEC Investigation 1969, op. cit., Vol. III, p. 1

83      Ibid., Vol. V, p. 1

## 4.3   Glovebox Construction

### Between the 1957 and the 1969 Fires

Dow conclusion, 10/57:   "The use of Plexiglas in glove box construction without metal separators between Plexiglas panels contributed to the spread of the [1957] fire."[84]

Dow recommendation, 10/57:   "Dry box enclosures should be designed to eliminate the propagation of fire consistent with other requirements."[85]

AEC recommendation, 12/57:   "When these facts are viewed in retrospect, it appears (by hindsight) irrational that facilities were ever designed in such a manner as to permit hazards from a relatively insignificant amount of material to so strongly influence the chain of events which led to a major loss....  The same facts suggest the desirability of approaching design of dry boxes used for radioisotope handling by applying the same 'containment' philosophy applied to reactors, namely, to design facilities to withstand and to contain all radiological hazards in the event of the worst creditable incident."[86]

### After the 1969 Fire

AEC and Dow recommendation, 7/69:   "The excessive window areas in gloveboxes, particularly those in R&D areas, should be reduced and stainless steel firebreaks should be provided every four lineal feet."[87]

AEC conclusion, 8/69:   "The long interconnected conveyor system without physical barriers provided a path for the fire to spread and cause a large loss."[88]

AEC recommendation, 8/69:   "Recommendations for Additional Fire Protection:  ... d.  Isolation of fire to small areas of the glovebox-conveyor systems ....  This may be achieved by either physical separation or by the use of automatic operating fire breaks."[89]

---

84      Dow Investigation 1957, op. cit., p. 17

85      Ibid., p. 24

86      "Serious Accidents Bulletin, 1957 Fire", reproduced in AEC Investigation 1969, op. cit., Volume II-B

87      N. Glover, K. Hess, T. Eckert, op. cit.

88      AEC Investigation 1969, op. cit., Vol. III, p. 2

89      Ibid., Vol. III, p. 29

<u>AEC concern 9/69:</u>   "Safety Factors in Buildings 707 and 776 at Rocky Flats ... Building 776:  2. I understand there are only three guillotine doors in the whole new production line.  The value of guillotine doors in preventing the spread of fire was demonstrated quite dramatically in the fire on May 11, 1969."[90]

<u>Factory Mutual Research Corporation concern 6/69:</u>   "... if a fire should start, and the most likely place for it to start is in the North Foundry line area, there is sufficient continuity of combustibles through the glove box area to involve the entire area and sufficient heat content to breach the integrity of the building."[91]

To summarize, <u>glovebox construction</u> -- specifically, designing glovebox layouts to reduce the potential for fire propagation -- was identified after the 1957 fire as very important for fire safety, but at the time of the 1969 fire the contribution of glovebox construction problems to the overall fire-risk situation remained very important.  The Dow Rocky Flats fire-safety program simply failed to implement an appropriate set of glovebox design features.


## 4.4   Glovebox Materials

### Between the 1957 and the 1969 Fires

<u>AEC conclusion, 12/57:</u>   "The chain started with spontaneous ignition of the [plutonium] metal - an unusual but far from unprecedented experience - which produced intense but localized heat during relatively slow combustion.  This heat was of itself of little significance beyond the important fact that it served to ignite adjacent flammable materials (primarily the plastic used in portions of dry box construction)."[92]

<u>Dow recommendation, 10/57:</u>   "[Recommendations:]  Eliminate or minimize the use of flammable materials of construction [in dry boxes].  If flammable plastic windows must be used, build the boxes so that flammable panels are separated by metal framing of suitable width to act as a fire break."[93]

---

90      G. Dunning to H. Roser, "Safety Factors in Buildings 707 and 776", Letter, September 26, 1969

91      G. Weldon, Factory Mutual Research Corporation, to G.M. Dunning, "Safety in Buildings 707 and 776", Letter, June 4, 1969

92      "Serious Accidents Bulletin, 1957 Fire", reproduced in AEC Investigation 1969, <u>op. cit.,</u> Volume II-B

93      Dow Investigation 1957, <u>op. cit.,</u> p. 25

**Dow, 12/57 conclusions:**  "Plexiglas was used in spite of the following objections: ...

"3.  Fire Properties

   "a.  Ease of Ignition  (It was not appreciated until after the fire that this material could be ignited at an edge by a match.)

   "b.  Heat of Combustion  (Also not appreciated was approximately 11,000 BTU/# heat of combustion.)

   "c.  Ease of Flame Propagation  (All Plexiglas boxes would not have been used if this had been understood.)

   "d.  Flammability of gases produced by thermal decomposition."[94]

**Dow, 12/57 conclusions:**  "Alternate Materials  ...  2.  Other Glass.  No serious consideration was given to other commercial forms of glass -- i.e., plate glass, wired safety glass, tempered glass -- because of lack of suitability, cost, availability, etc."[95]

**Dow, 12/57 recommendation:**  "Various other materials have been proposed.... The most promising of the three appears to be Plexiglas 5009.  Its fire resistance is good, as is its chemical resistance."[96]

**Dow, 12/57 recommendation:**  "Fire Protection Improvements Under Consideration:  ... Maximum use of glass or other non-combustible transparent material for dry boxes instead of Plexiglas or similar flammable material.  Firebreaks where Plexiglas is used."[97]

**Dow conclusion, 10/67:** "Flammability of Benelex.  ...  The use of Benelex as a neutron shield in place of methacrylate plastics has been proposed.  This proposal was prompted by a cost savings that would result from the lower cost of Benelex over the methacrylate plastics ...  The most common type of methacrylate plastic used at Rocky Flats is Plexiglas SE-3, which is a self-extinguishing type.  Methacrylate plastics that do not contain a

---

94        Dow Investigation Supplement 1957, op. cit., p. 5

95        Ibid., p. 5

96        Ibid., p. 6

97        Ibid., p. 10

flame retarding additive burns quite vigorously.... [Conclusions:] Benelex will sustain combustion after ignition whereas Plexiglas SE-3 will not. The rate of burning of Benelex is approximately one-third that of Plexiglas G [which burned completely]. Benelex rates between Plexiglas G and Plexiglas SE-3 in its burning characteristics."[98]

Dow statement, 12/67: "Ramifications of Manufacturing Engineering Report, 'Flammability of Benelex' ... These data do not preclude the use of Benelex for shielding purposes..... Each situation should be given individual attention in light of the following factors: a. Benelex is combustible, b. the extent of proposed use, c. the type of area involved and extent of other combustible materials present, d. sprinkling systems in the area. Thus, each possible application should be weighed on the basis of cost and safety factors."[99]

Rohm & Haas Co. recommendation [Plexiglas brochure]: "The allowable service temperature for Plexiglas - 180-200 deg. F - are sufficiently high for fluorescent lighting and exterior applications. Plexiglas should not be installed near high heat sources, such as high-wattage incandescent or mercury vapor lamps, which exceed the temperature limits of the material, unless special design features to dissipate the heat are specified."[100]

AEC statement, 8/69: ".... a decision was made [in 1968] to install additional shielding on the glovebox systems in Building 776-777 in order to reduce the exposure of employees."[101]   "As of the date of the fire, most of the shielding work in building 776 had been completed. Approximately 1,170,000 pounds of Benelex and Plexiglas were used."[102]

AEC statement, 8/69: "a decision was made [by Dow] to install in such [storage] gloveboxes, storage containers made of Benelex and Plexiglas.... The container installed in Glovebox 134-24 for

---

98      "Flammability of Benelex", reproduced in AEC Investigation 1969, op. cit. , Volume II-B

99      "Ramifications of Manufacturing Engineering Report -- Flammability of Benelex", letter, H. Moss to D. Auten, October 12, 1967, AEC Investigation 1969, op. cit., Volume IV, Appendix L-4, pp. L-38 ff.

100     Plexiglas brochure, reproduced in AEC Investigation 1969, op. cit., Volume II-A

101     AEC Investigation 1969, op. cit., Vol. I, p. 19

102     Ibid., Vol. I, p. 20

this purpose was a Benelex chest with an upper and lower storage shelf.... The chests sets on the glovebox floor.  The bottom of the chest is a 4 inch thickness of Benelex....  This Benelex container was built and installed by Dow personnel in the summer of 1968...."[103]

AEC statement, 8/69:  "The use of Benelex-Plexiglas storage containers was decided upon by Foundry Supervision after consultation with other departments, including Safety and Facilities Engineering.... The Foundry Superintendent was aware of the 1966 experiment on the location of sensors, and considered that Benelex was 'relatively noncombustible.'"[104]  "The Fire Protection Engineer was not aware that these containers existed prior to the fire."[105]


After the 1969 Fire

AEC conclusion, 8/69:  "The plexiglas windows contributed heavily to the spread of the fire and the extent of the loss.  These windows, a major structural part of the containment system, provided a fuel surface on the inside of the glovebox conveyor systems."[106]

AEC conclusion, 8/69:  "No drawings for installation of Benelex and Plexiglas were submitted to or reviewed by the Dow Fire Protection Engineer or the Fire Department.... [The Dow Fire Protection Engineer verbally] advised the Dow Project Engineer that AEC had pointed out Benelex was a combustible material and consideration should be given to installing sprinklers in the operating area of Building 776."[107]

AEC conclusion, 8/69:  ".... combustible shielding materials were installed without full fire safety evaluations.  These actions moved the facility further away from AEC fire safety standards."[108]

AEC concern 9/69:  "Safety Factors in Buildings 707 and 776 at Rocky Flats ...  Building 776:  1. There are many large Plexiglas

---

103     Ibid., Vol. I, p. 22

104     Ibid., Vol. IV, p. 33

105     Ibid., Vol. IV, p. 34

106     Ibid., Vol. III, p. 1

107     Ibid., Vol. IV, p. 31

108     AEC Investigation 1969, op. cit., Vol. V., p. 2

windows in the glovebox system.  As you recall, such windows were
the major contributors to the fire in Building 776....  If
substitute (for Plexiglas) windows can be used in 707, why should
they not be used in 776?"[109]

Dow recommendation 8/69:  "4c. Proposal: ... b. For new Plexiglas
shielding to be installed under Part V, provide solid Plexiglas
SE-3 on the remainder of the job instead of the originally
specified Plexiglas G." [110]  [This shows that up to this point,
Dow was still planning new installation of flammable Plexiglas.]

To summarize, glovebox materials issues -- specifically, atten-
tion to choosing materials to reduce the potential for fires, and
building the boxes so that flammable panels would be separated
for fire-break purposes -- were identified after the 1957 fire as
very important for fire safety; but at the time of the 1969 fire
the contribution of flammable glovebox materials to the fire
itself was a central reason why the fire spread so fast and so
far.  It appears to me that fire safety was not given enough
priority in the selection of glovebox materials.  Also par-
ticularly disturbing is that aspects of the design involving a
compromise of certain fire sensors, that directly contributed to
the 1969 fire, had not been cleared with the Fire Protection
Engineer.  This is symptomatic of a serious management problem.


### 4.5   Fire Detection/Alarms

### Between the 1957 and the 1969 Fires

Dow conclusion, 10/57:  "Heat detecting equipment installed in
the filter did not function.  It was later found that this
equipment had been blocked out to eliminate operating difficul-
ties which were being experienced."[111]

Dow recommendation, 10/57:  "Recommendations:  B. 2.  Provide the
[plutonium] storage areas with fire detection systems."[112]

Dow recommendation, 12/57:  "Fire Protection Improvements Under
Consideration:  1.  Fire detection systems for final filter banks
(partially present in Buildings 44, 47, 76, 81, and 83.) ...  2.
Fire detection system particularly for Buildings 71 and 76 dry

---

109     G. Dunning to H. Roser, "Safety Factors in Buildings 707
        and 776", Letter, September 26, 1969, op. cit.

110     N. Glover, K. Hess, T. Eckert, op. cit.

111     Dow Investigation 1957, op. cit., p. 18

112     Ibid., p. 25

boxes where fire hazard is present and in other buildings at especially hazardous points."[113]

AEC recommendation, 11/57:   ".... fires involving radiological risks commonly result in considerable delay in initiating manual firefighting activities.  Because of this, increased usage of automatic fire detection and control devices is certainly justified to a degree far exceeding the justifiable practice commonly used for identical risks in which radiation hazards are absent....  Increased provisions of automatic fire detection and control devices on radiological risks are expected."[114]


After the 1969 Fire

AEC statement 8/69:  "Most, but not all, of the gloveboxes are equipped with heat detection units or sensors ('flower pots') which hang from the ceiling of the gloveboxes.  These units are available for placing on cans of chips, for example, to monitor can temperature when the operators are absent.  In Glovebox 134-24 on the North Foundry Line the heat detectors are mounted underneath the bottom of the glovebox."[115]

AEC conclusion 8/69:  "In 1966, when the decision was made to relocate the heat sensors to the outside of Glovebox 134-24, Dow personnel conducted experiments to determine the number and location of sensors to provide adequate fire protection."[116] "There is no evidence that the drawings for the [Benelex and Plexiglas] containers installed in Glovebox 134-24 (or Gloveboxes 134-7 and 70) were reviewed by the Fire Protection Engineer or the Fire Department; nor that any evaluations were made of the effect the containers would have on the integrity of the heat sensors located on the bottom of Glovebox 134-24, or the 'flower pot' sensors in Gloveboxes 134-7 and 70."[117]

AEC recommendation, 8/69:  "Recommendations for Additional Fire Protection.  b.  A system should be developed which will be capable of detecting incipient fires within the glovebox-conveyor system."[118]

---

113     Dow Investigation Supplement 1957, op. cit., p. 10

114     "Serious Accidents Bulletin, 1957 Fire", reproduced in AEC Investigation 1969, op. cit., Volume II-B

115     AEC Investigation 1969, op. cit., Vol. I, p. 32

116     Ibid., Vol. IV, p. 32

117     Ibid., Vol. IV, pp. 33-34

118     Ibid., Vol. III, p. 28

AEC statement, 8/69: "On the first floor of Building 776-777 there is approximately 100,000 square feet of open space, without any built-in automatic fire suppression system."[119]

To summarize, fire detection and alarm issues -- specifically, the failure to use automatic fire detection and control devices as recommended after the 1957 fire, and the use of glovebox containers that compromised certain fire sensors without the review of the Fire Protection Engineer or the Fire Department -- represented a serious compromise of fire safety, and these failures directly contributed both to the initiation of the 1969 fire and to its severity.  The Dow Rocky Flats fire-safety program simply did not include adequate attention to fire detection and alarm aspects.

## 4.6  Dow Rocky Flats Firefighting Equipment and Techniques

### Before the 1957 Fire

AEC conclusions, 12/55:  [regarding a small plutonium chip fire] "Plutonium chips had been processed into a briquette .... the briquette had started to smoke and burn.   Burning material ignited a glove in the dry box.  The operator immediately secured a $CO_2$ extinguisher .... Several extinguishers were used to control the burning, with little success."[120]

### Between the 1957 and the 1969 Fires

Dow conclusions, 10/57:  ".... attempts to fight the fire with $CO_2$ from hand extinguishers and a hundred pound cart proved to be ineffective."[121]

Dow recommendations, 10/57: "B. 5.  ... Provide automatic $CO_2$ extinguishing systems in lines where oils, Plexiglas, etc., are used in conjunction with plutonium metal."[122]

Dow conclusions, 12/57:  "Standard extinguishers, like vaporizing liquid and $CO_2$, are useless on plutonium fires since they react with the hot metal.  $CO_2$ has been used external to the box to

---

119     Ibid., Vol. I, p. 34

120     "Serious Accidents # 92, December 14, 1955", reproduced in AEC Investigation 1969, op. cit., Volume II-B

121     Dow Investigation 1957, op. cit., p. 14

122     Ibid., p. 25

cool the box bottom to slow down and control the reaction."[123] "The following dry powders [extinguishers] were also tried:  Met-L-X,  Dow Magnesium Flux #230,  Houghton Liquid Heet 235 .... Met-L-X was the least effective of the powders tried for this purpose.  (The melting point of sodium chloride is too high.)"[124]

Dow recommendations, 12/57:  "If the fire exceeds the boundaries of the glove box, a new situation exists at which time more standard fire fighting procedures are needed and used. ... if more than the metal is on fire (i.e., plastic dry boxes), the fire must be fought as a conventional Class A fire with the plutonium contamination and criticality hazards thrown in."[125]

### After the 1969 Fire

AEC statement 8/69:  "The fire was out of the top of the line with flames about 18 inches high.  Captain Jesser directed the fireman with him to attack the fire at this point with a hand-carried $CO_2$ extinguisher.  He then proceeded to ... attack the fire with a 50-pound $CO_2$ extinguisher mounted on a cart.  He discharged the $CO_2$ extinguisher without effect .... The $CO_2$ extinguishers being used by the firemen on the North Foundry Line also had no effect."[126]

To summarize, issues related to firefighting equipment and techniques were an important area where lessons learned from the 1957 fire were not adequately incorporated into plant training in 1969.  Specifically, all Dow Rocky Flats onsite firefighters should have had training on what $CO_2$ could and could not do, and why, to help extinguish plutonium fires, but the evidence is that this training was not done.

### 4.7   Dow Rocky Flats Fire Personnel and Procedures

Between the 1957 and the 1969 Fires

Dow Statements, 12/57:  "At the present time, and until safe-guards are installed in 76 Building, an additional 24-hour fire patrol is maintained."[127]  "Fire training for production

---

123     Dow Investigation Supplement 1957, op. cit., p. 13

124     Ibid., p. 14

125     Ibid., p. 15

126     AEC Investigation 1969, op. cit., Vol. I, pp. 51-52

127     Dow Investigation Supplement 1957, op. cit., p. 12

personnel will be increased."[128]   "Fire fighting procedures for
the operating personnel of Building 71 and 76 have been reviewed
and revised."[129]

Dow concern 3/69:   "Fire fighting training of Plant Protection
Dept. people has fallen off with no formal training sessions
given since 1967."[130]


## After the 1969 Fire

AEC conclusions 8/69:   "In general, supervisors and foremen did
not have a clear understanding of the assignment of respon-
sibilities for safety and fire protection."[131]   "The position of
Fire Protection Engineer was first established in 1967 following
a recommendation of AL. ... The individual employed as the Fire
Protection Engineer had no previous experience in this func-
tion."[132]

AEC conclusions, 8/69:   "The Dow Rocky Flats program and proce-
dures for assessment and review of fire safety were characterized
by a Dow Midland official as 'below average' in relation to those
followed at Dow private plants.  A former AL [DOE Albuquerque
Operations Office] official stated that Dow Rocky Flats has the
least technically capable industrial safety and fire protection
organization among the AEC contractor-operated plants under AL
jurisdiction."[133]

To summarize, Dow Rocky Flats fire personnel and procedures
issues were an important area where lessons learned from the 1957
fire were not adequately incorporated into plant fire-safety
training in 1969.  The most telling statement in this regard is
the AEC's conclusion in August of 1969 that, "In general,
supervisors and foremen did not have a clear understanding of the
assignment of responsibilities for safety and fire protection."
The direct responsibility of Dow Rocky Flats management for this
serious lapse in fire safety should be clear from Dow's March,
1969 statement [before the fire!] that "Fire fighting training of

---

128      Ibid., p. 13

129      Ibid., p. 13

130      Safety & Loss Prevention Audit, March 1969, reproduced
         in AEC Investigation 1969, op. cit., Volume IV

131      AEC Investigation 1969, op. cit., Vol. IV, p. 17

132      Ibid., Vol. IV, p. 18

133      Ibid., Vol. IV, p. 23

Plant Protection Dept. people has fallen off with no formal training sessions given since 1967."

## 4.8   Sprinklers and Water Supply

### Between the 1957 and the 1969 Fires

**Dow recommendation, 10/57:** "Recommendations.  D.  Fire Protection:  1.  Install standpipes and hose connections in processing buildings so that if water needs to be used to extinguish fire, it is near at hand."[134]

**AEC statement, 12/57:** "It is quite probable that the provisions of one or two automatic sprinklers within the dry box involved in this fire [1957] would have permitted earlier fire detection, much earlier establishment of fire control, and limited fire and contamination damage to immediate surroundings.  The provision of automatic sprinklers admittedly may introduce new risks of contamination spread in water runoff, and in the case of fissionable materials, the danger of inducing an accidental criticality incident.  The incident provides tangible evidence to support the belief that failure to provide automatic fire detection and control measures for radiological risks will in general result in a level of personal injury and property damage risks exceeding that which would exist if automatic fire detection and control devices were used."[135]

**Dow recommendation, 12/57:**  "We do not plan external box line sprinkling systems; however we are in the process of providing fire hoses distributed at 50 to 75 feet intervals throughout Building 76 and 77, so that in the event of a Class A fire, adequate extinguishing means will be readily available."[136]

**AEC statement, 8/69:**  The Basic Design Criteria prepared by Dow for Building 776-777 provided that, "No sprinkler system or other water fire-fighting equipment will be installed in the exclusion areas of Building 76-77 or the entire second floor area of Building 76, except in the supply air system area."[137]

**AEC statement, 8/69:** "On the first floor of Building 776-777 there is approximately 100,000 square feet of open space, without

---

134     Dow Investigation 1957, op. cit., p. 26

135     "Serious Accidents Bulletin, 1957 Fire", reproduced in AEC Investigation 1969, op. cit., Volume II-B

136     Ibid.

137     AEC Investigation 1969, op. cit., Vol. I, p. 16

any built-in automatic fire suppression system."[138]

<u>AEC statement, 3/69:</u>  "On March 14 we visited a Manufacturing Building No. 776-777.  This is a very large undivided complex with glovebox lines.  This facility is one of the most important to the program, but had practically no built in fire protection or suppression equipment."[139]

## After the 1969 Fire

<u>AEC and Dow recommendation, 7/69:</u>  "A standard installation of automatic sprinklers arranged as wet pipe systems should be installed throughout both floors of Building 771.... Provide complete automatic sprinkler system on first and second floors. Consists of 1303 sprinkler heads."[140]

<u>Factory Insurance Association conclusions, 2/70:</u>  "The present [water supply] system, which combines domestic, industrial and fire protection water, does not adequately meet the fire protection needs in volume, pressure or reliability."[141]

To summarize, <u>sprinkler and water-supply</u> issues were another important fire-safety problem area.  For example, firefighter problems in getting adequate water onto the 1957 fire produced recommendations on water availability, but they were not adequately implemented.  In my opinion, one key finding here is from the Factory Insurance Association report, which in early 1970 concluded that "the present system ..... does not adequately meet the fire protection needs."


## 4.9  Glovebox Fire Protection

### Between the 1957 and the 1969 Fires

<u>Dow recommendation, 10/57:</u>  "Recommendations ...  B. 5.  Provide automatic $CO_2$ extinguishing systems in lines where oils, Plexiglas, etc., are used in conjunction with plutonium metal."[142]

<u>Dow recommendation, 1957:</u>  "a.  Fire fighting procedures should

---

138     <u>Ibid.</u>, Vol. I, p. 34

139     D. Patterson, Trip Report, March 11-15, 1969, reproduced in AEC Investigation 1969, <u>op. cit.</u>, Volume IV

140     N. Glover, K. Hess, T. Eckert, <u>op. cit.</u>

141     Factory Insurance Association, <u>op. cit.</u>

142     Dow Investigation 1957, <u>op. cit.</u>, p. 25

be developed for future fires which may involve both the contents of dry-boxes and the dry-boxes themselves.  b. An adequate supply of prepared graphite, G-1 powder or other suitable material for controlling metal fires should be stored in metal process areas and within dry-boxes where a serious metal fire could be expected.  c. Special covers enclosing a sufficient volume of powdered graphite or G-1 powder to blanket the contents of a container should be used to cover storage of pyrophoric materials.  Such a cover should be designed to automatically release the powder into this container in event of fire ...."[143]

## After the 1969 Fire

AEC recommendation 8/69:  "Recommendations for Additional Fire Protection ...  c.  A fire suppression system, which will operate automatically in the event of fire, should be developed for use within the glovebox-conveyor system.... The use of controlled quantities of water, inert gases, and Halon 1301 should be investigated.  As an alternative, a glovebox-conveyor operating atmosphere which is deficient in oxygen (i.e., less than 10% oxygen), may be used without a special fire suppression system."[144]

AEC recommendation, 5/70:  "We have assembled a list ... of the fires that have occurred within the glovebox system in Building 776/777 during an approximate four year period, 1966 through 1969. During this period there have been 40 fires (an average of 1 every 5 weeks) ....  As you are aware, the Division of Operational Safety (OS) has continually questioned Dow about the feasibility of inerting the lines ... In spite of these recommendations, Dow has been reluctant to adopt an inerting system.... In our opinion, inerting (or an acceptable fire suppression system) is essential within all of the boxes."[145]

To summarize, glovebox fire protection systems were not adequate before the 1969 fire, despite recommendations for improvements on this subject after the 1957 fire.  Concerning one issue in this category, inerting of the gloveboxes, Dow Rocky Flats was, as cited just above, apparently "continually questioned" but "reluctant", pointing to a serious management deficiency.

---

143    H.A. Spavin to J. Epp, "Suggested Recommendations for Committee Report on Rocky Flats Incident of September 12, 1957", 1957 (undated), op. cit.

144    AEC Investigation 1969, op. cit., Vol. III, pp. 28-29

145    M. Biles (AEC Division of Operational Safety) to J. Erlewine (AEC General Manager), "Glovebox Fire Safety", Memorandum, May 22, 1970