COPY                                    1

```
 1              UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
 2
        -----------------------------------------
 3
     MERILYN COOK, et al.,        :  Civil Action
 4                                :  No. 90-K-181
                                  :
 5                                :
                    Plaintiff(s)  :  DEPOSITION OF:
 6                                :
            vs.                   :  RICHARD W. CLAPP
 7                                :
     ROCKWELL INTERNATIONAL       :
 8   CORPORATION,                 :
     a Delaware Corporation       :
 9           and                  :
     THE DOW CHEMICAL COMPANY,    :
10   a Delaware Corporation,      :
                                  :
11                                :
                                  :
12                 Defendant(s)   :
```

```
13      -----------------------------------------

14              Wednesday, February 26, 1997

15      -----------------------------------------

16   R E P O R T E D   B Y:

17           LOUIS A. MANCHELLO, Certified Shorthand Reporter

18   (License No. X01418) and Notary Public of New Jersey, and

19   Commissioner of Deeds of Pennsylvania, on the above date,

20   commencing at 9:40 a.m., at the law offices of Berger &

21   Montague, 1624 Locust Street, 6th Floor Conference Room,

22   Philadelphia, Pennsylvania  19103.

23

24
```

1    purpose of the study is not to evaluate random error.

2    Q.      So if an epidemiologist obtains a positive

3    result from a study, then that epidemiologist would

4    seek to determine whether that outcome represents a

5    true association or whether it's the result of random

6    error, correct?

7    A.      Yes.  Most epidemiologists would do that as

8    part of their work, yes.

9    Q.      One way to do that would be to calculate some

10   value for a statistical significance, correct?

11   A.      Yes.

12   Q.      One way to do that is to calculate a P value,

13   correct?

14   A.      Yes.

15   Q.      A P value is the chance that a positive

16   association would result due to random error if no

17   association was in fact present, correct?

18           MR. AUERBACH:  Object to the form of the

19           question.

20   Q.      You can answer.

21   A.      You've said a P value is the chance.  It's

22   actually, specifically it's a probability, and if by

23   chance you mean a probability of a result occurring, by

24   random fluctuation, then yes, that is what a P value

1    is.

2    Q.      A P value is the probability that a result

3    occurs due to random error, correct?

4    A.      Well, I've used the term random fluctuation,

5    because I think random error usually refers to

6    measurement error, and it may be that it's other things

7    that are at issue, not measurement.

8    Q.      So the P value is the probability that an

9    association is due to random fluctuation?

10   A.      Yes.

11   Q.      Another way to say it would be the P value is

12   the probability that the true association actually

13   exists and the association found is due to random

14   fluctuation, correct?

15   A.      I mean the concept is correct.  That's not how

16   an epidemiologist would generally phrase it.

17   Q.      Well, what concept in my question was correct?

18           MR. AUERBACH:  Would you like him to

19           read back the question?

20           MR. KURTENBACH:  I can repeat the

21           question.

22   BY MR. KURTENBACH:

23   Q.      A P value is the probability that the true

24   association actually exists, and the association found

1    is due to random fluctuation?

2                    MR. AUERBACH:    That's a compound

3           sentence.

4    A.     Yes.    I guess I would not agree with the first

5    half of that.    The P value is the probability that the

6    result found is due to random fluctuation.    The P value

7    doesn't say anything about the probability that a true

8    association actually exists.    It just talks about, the

9    P value is just aimed at the result found.    It's based

10   on the result found.

11   Q.     Fair enough.

12                   A P value of .05, one-sided P value of .05

13   would mean that there is a five percent chance that an

14   affect at least as large as that found is due solely to

15   random fluctuation, correct?

16   A.     Is not due, I think the answer to that is that

17   it's the probability that it's not due solely to random

18   fluctuation.

19   Q.     So one-sided P value of .05 means that there

20   is a five percent chance that an affect at least as

21   large as that found is not due solely to random

22   fluctuation?

23   A.     Yes.

24   Q.     A one-sided P value of .05 would mean that

Richard W. Clapp                    13

1    five percent of all similar studies would be expected

2    to yield the same or larger association due solely to

3    random fluctuation, correct?

4    A.      No.

5    Q.      Why not?

6    A.      It's a rule-out process that we are going

7    through here.  It's the chance that it's not due solely

8    to random fluctuation.  If the P value is .05 or less,

9    that means that it's probably not due to random

10   fluctuation that you got that result, and that future

11   studies would also give you that result or a larger

12   result not due to random fluctuation.

13   Q.      A P value of .5 would mean 50 percent of all

14   similar studies would be expected to yield the same or

15   larger association due solely to random fluctuation?

16   A.      Yes, I think that's true.

17   Q.      And now let's go one way or another.

18           A P value of .6 would mean that 60 percent

19   of all similar studies would be expected to yield the

20   same or larger association due solely to random

21   fluctuation?

22   A.      Yes, I guess that's what it means, but when

23   you have a P value of .6, one is not usually talking

24   about causal associations.

1    may still be applicable.

2    Q.        They may not be applicable, correct?

3    A.        They may not be applicable and they may be

4    applicable is my answer.

5    Q.        It would depend upon how unrepresentative the

6    sample was, correct?

7    A.        If one -- yes.  If you are able to determine

8    how unrepresentative the sample was, that would be a

9    key determinant of how you would interpret the

10   applicability.

11   Q.        P values and confidence intervals permit an

12   assessment of the plausibility that the results of an

13   epidemiological study represent a true association or

14   random fluctuation, correct?

15             MR. AUERBACH:  I object to the form of

16             the question.  Could you read that question

17             back?

18   BY MR. KURTENBACH:

19   Q.        I'll ask it again.

20             P values and confidence intervals permit

21   an assessment of the plausibility that the results of

22   an epidemiologic study represent the true association

23   or random fluctuation?

24   A.        The reason I'm hesitating is the word

Richard W. Clapp                    23

1    plausibility here is a little bit different from how an
2    epidemiologist usually concedes a plausibility.
3    Plausibility in epidemiology has to do with biologic
4    coherence and the degree to which a result in a
5    particular study comports with other information in the
6    literature, and as you've described it plausibility is
7    simply a matter of weight or how strongly one would
8    consider the evidence from a particular study given its
9    P value or its confidence interval.

10                Confidence intervals are usually an
11   assessment of precision, how narrow the range around a
12   particular relative risk estimate is, so I would say it
13   has to do more with the precision of a study rather
14   than the plausibility of that study.

15   Q.      P values and confidence intervals permit an
16   assessment of the probability that the results of a
17   study represent the true association or random
18   fluctuation, correct?

19   A.      Yes.  I think you've asked that at least once
20   before, and the answer is still yes.

21   Q.      You would use the term biologic plausibility
22   synonymous with biologic coherence?

23   A.      Not synonymous with, but similar in intent to
24   coherence.  In other words, it fits with what's known

1     about mechanisms of disease.

2     Q.        Determining whether the results of a study fit

3     with what is known about the mechanisms of the disease

4     is something that is done as a part of an

5     epidemiological study?

6     A.        I would say it's part of the interpretation of

7     the epidemiological study.

8     Q.        Also determining the degree to which the

9     results of a study compare with other reports in the

10    literature about the same topic is also part of the

11    interpretation of an epidemiologic study?

12    A.        Yes, it is.

13    Q.        Systematic error is a concept in epidemiology,

14    correct?

15    A.        Yes.

16    Q.        It's also called bias, correct?

17    A.        Well, it's another source of bias, yes.  Bias

18    generally means error in your relative risk estimate,

19    and systematic error is definitely a source of error in

20    your relative risk estimate.

21    Q.        Even the best design and conducted studies can

22    still have biases, correct?

23    A.        Yes.

24    Q.        There is a concept in epidemiology known as

Richard W. Clapp                          25

1    selection bias, correct?

2    A.       Yes.

3    Q.       This is where there are differences in the

4    characteristics of those who are selected for a study

5    and those who are not, correct?

6    A.       Yes.

7    Q.       There is also a concept known as information

8    bias, correct?

9    A.       Yes.

10   Q.       That's some flaw in the measurement of the

11   exposure or the disease between study groups, correct?

12   A.       Yes.

13   Q.       In conducting an epidemiologic study, there

14   are certain factors that cannot be controlled by the

15   researcher, and these would include genetic background,

16   life style choices, and the amount and duration of

17   exposure, as examples, correct?

18   A.       Correct.

19   Q.       These factors that I've just listed may be

20   distributed unevenly between the different groups being

21   studied, correct?

22   A.       Correct.

23   Q.       That uneven distribution may be due to random

24   chance or some connection between the exposure status

1    and other factors, correct?

2    A.        Yes.

3    Q.        Epidemiology tries to control and assess the

4    influence of these factors through research design and

5    statistical analysis, correct?

6    A.        Yes.

7    Q.        Is it true that you must have a scientific

8    basis to hypothesize that certain effects could occur

9    due to an exposure?

10   A.        Yes.

11   Q.        There's a term in epidemiology known as

12   ecological study, correct?

13   A.        Yes.

14   Q.        Those are studies that collect data about a

15   group as a whole, correct?

16   A.        Yes.

17   Q.        Ecological studies attempt to identify

18   associations, correct?

19   A.        Yes.

20   Q.        Would you agree that ecological studies are

21   generally regarded by epidemiologists as weak?

22             MR. AUERBACH:  Object to the form of the

23             question.

24   A.        No, I don't agree with that.

Richard W. Clapp                          27

1    Q.        Why not?

2    A.        Especially recently there has been a

3    resurgence of interest in ecology studies and in

4    circumstances where good information about the

5    underlying group from which a population for a study

6    has arisen may render it a desirable approach, a

7    desirable or one term that's used is an apt study

8    design.

9    Q.        Depends upon your goal, correct?

10   A.        Yes.

11   Q.        Just because something is of interest in a

12   scientific community does not mean that it is powerful

13   in terms of its ability to detect the truth, correct?

14             MR. AUERBACH:  Object to the form of the

15             question.

16   A.        Could you tell me what you mean by powerful?

17   Q.        I can rephrase it.

18             Just because something is of interest to

19   epidemiologists does not mean that epidemiologists

20   would use that system in every situation in which they

21   were trying to analyze whether an agent caused an

22   exposure, correct?

23   A.        That is obviously correct, yes.  That's

24   tautological.

1    correct?

2    A.        One method of controlling for the effects of

3    confounding is stratification, is the way I would

4    answer that.

5    Q.        Stratification evaluates the effect of an

6    exposure at different levels of exposure of the

7    confounding variable, correct?

8    A.        Correct.

9    Q.        By holding the subject's exposure constant and

10   stratifying the confounding exposure an epidemiologist

11   can evaluate whether the confounding exposure truly

12   confounds, correct?

13   A.        Yes.

14   Q.        There are several factors that epidemiologists

15   use in testing an association between an agent and a

16   disease, correct?

17   A.        Yes.

18   Q.        One of those factors would include the

19   strength of the relationship, correct?

20   A.        Yes.

21   Q.        Another one of those factors would include the

22   temporal relationship or chronological relationship,

23   correct?

24   A.        Yes.

1    Q.        Another of those factors would include the

2    consistency of the association, correct?

3    A.        Yes.

4    Q.        Another factor would include biologic

5    plausibility, correct?

6    A.        Yes.

7    Q.        Another factor would include alternative

8    explanations, correct?

9    A.        Yes.

10   Q.        Another factor would include dose response,

11   correct?

12   A.        Well, when data are variable to assess dose

13   response.  They often are not in studies of humans.

14   Q.        There are often surrogates available that can

15   be used in order to test dose response?

16   A.        Yes.

17   Q.        Those surrogates must be assessed as to

18   whether they are truly surrogates or not to determine

19   if they are to be used as dose response?

20   A.        Well, yes, before they can be allowed to stand

21   for dose response, I would say, yes.

22   Q.        The higher the relative risk the stronger the

23   association, correct?

24   A.        Yes.

Richard W. Clapp                50

1    findings is a fundamental aspect of science?

2    A.      Yes.

3    Q.      Is it true that inconsistencies between the

4    results of studies signal a need to question whether a

5    relationship is causal?

6    A.      Yes.  And also that it suggests the need to

7    explain the inconsistencies.

8    Q.      Would you agree that a potential problem with

9    ecologic studies is the problem of multiple

10   comparisons?

11   A.      That is a potential problem of ecological

12   studies and any other kind of study.

13   Q.      Would you agree that, well, how would you

14   define the problem of multiple comparisons?

15   A.      When you are looking at many different

16   exposure disease associations in the same study, for

17   example in a cohort study, you may be looking at dozens

18   of health outcomes in the same cohort, all of which you

19   may associate with a particular exposure.

20   Q.      Would you agree that the more comparisons in a

21   study one makes the more likely one is to generate

22   associations by chance?

23   A.      Yes.

24   Q.      Would you agree that in such circumstances the

1    conventional key value can be misleading?

2    A.      Yes.  And that's another reason not to hang

3    one's interpretation to P values.

4    Q.      Is it true that if you look for results in 20

5    different groups you would expect to find one

6    statistically significant result by random fluctuation?

7    A.      Yes.  By the usual P less than .05 convention,

8    yes.

9                (Whereupon Clapp-1 was marked for

10               identification.)

11   BY MR. KURTENBACH:

12   Q.      I will hand you what I have marked as Exhibit

13   1.  Exhibit 1 is a copy of the report that you

14   submitted in this case with your resume attached,

15   correct?

16   A.      Yes, and some other things attached.

17   Q.      Listing -- well, let's be clear on it.

18               Exhibit 1 constitutes a copy of your

19   report with the attached appendices, correct?

20   A.      Yes.

21   Q.      And it also includes a copy of your resume

22   with a single page of litigation experience attached at

23   the end, correct?

24   A.      Correct.

Richard W. Clapp                    72

1    Codes that are called the innermost contour.   Even

2    though the exact boundaries may not be the precise same

3    boundaries as what I've called contour number 1.

4    Q.        Okay.  So in doing your study you included in

5    the innermost contour those people who live in Zip

6    Codes 80005 and 80021, correct?

7    A.        Correct.

8    Q.        And if there were people who live in Zip Code

9    80005, whose residence is not located inside of what

10   you have defined as the innermost contour that we've

11   marked with an I on Exhibit 2, you still included them

12   in your analysis, correct?

13   A.        Yes.

14   Q.        Okay.  And similarly if there are people who

15   live within Zip Code 80021, but who did not live within

16   what we have defined as I on Exhibit 2, you still

17   included them in your analysis, correct?

18   A.        Yes.

19   Q.        And that means that whenever you were

20   referring to people who lived within the innermost

21   contour you were referring to all of the people whose

22   residence at the time the diagnosis was made was within

23   Zip Codes 80021 and 80005, correct?

24   A.        Correct.

Richard W. Clapp                                    99

1    make the assumption that the previous diagnosis and

2    where they lived at the previous diagnosis was what was

3    operative, and you would not double count them, so to

4    speak.

5    Q.        Do you know whether the Central Colorado

6    Cancer Registry makes any effort to obtain information

7    concerning cancer diagnoses for persons listed in that

8    registry from locations outside of Colorado?

9    A.        No.

10   Q.        Do you have an assumption as to when the

11   maximum releases occurred from the Rocky Flats Plant as

12   you used in your study?

13   A.        Yes.

14   Q.        What is that?

15   A.        The maximum releases were in the '50's,

16   perhaps late '50's and '60's.

17   Q.        What do you base that on?

18   A.        Krey and Hardy.  Numerous other investigators

19   who have looked at this issue.  I think I've listed

20   them all.

21   Q.        Okay.  Isn't it true, sir, that Krey and Hardy

22   concluded that the maximum releases from the Rocky

23   Flats Plant occurred in connection with an event called

24   the 903 Pad Release?

DelCasale, Casey, Martin & Manchello
(215) 568-2211          (609) 482-7207

Richard W. Clapp                    100

1    A.        I believe that was the maximum one.  There

2    were others as well, there were other fires and so

3    forth that occurred prior to the 903 Pad Release I

4    believe.

5    Q.        In fact, Krey and Hardy concluded that those

6    other incident contributed less than 10 percent of what

7    was contributed to releases by the 903 Pad, correct?

8    A.        I don't remember off the top of my head

9    whether it was less than 10 percent.

10   Q.        Does that square with your recollection

11   generally as to the proportion between any releases

12   prior to the 903 Pad and the releases from the 903 Pad

13   according to Krey and Hardy?

14   A.        I have no opinion about that.  I have no

15   specific proportion in mind about that.

16   Q.        Is this important to your analysis in any way

17   when the maximum releases would have occurred?

18   A.        It's important to me that the maximum releases

19   occurred in the '50's and '60's.  Beyond that, in terms

20   of the latency that I'm looking at?  Beyond that

21   whether it was on a specific day or in a specific event

22   is not critical to my analysis.

23   Q.        What do you assume is the maximum latency

24   period for the cancers that you were studying?  Start

Richard W. Clapp                                101

1    with lung.

2    A.        For most things you look at a range, and I

3    would say the range for lung cancer is 20 to 35 years

4    typically.

5    Q.        That's the latency period for lung cancer?

6    A.        Yes.

7    Q.        What would you base that on?

8    A.        Atomic bomb survivors, studies of other

9    radiation exposed populations, people, patients who

10   have been exposed because of a disease called

11   spondylitis, et cetera.

12   Q.        Those people were exposed to external

13   radiation, correct?  Do you know?

14   A.        The only reason I'm hesitating in answering is

15   that I believe they were all, those people that I've

16   just listed, atomic bomb survivors and ankylosing

17   spondylitis patients were definitely exposed to

18   external ionizing radiation.  I believe that the atomic

19   bomb survivors may also have been exposed to some

20   internal ionizing radiation as well.

21   Q.        Do you know with respect to lung cancers what

22   the maximum latency periods or the range of latency

23   periods is or has been calculated with respect to any

24   studies that have been done for internal emitters, for

Richard W. Clapp                              122

1    scenarios that you used, correct?

2    A.      Yes.

3    Q.      Now, in fact, you divided your analysis in

4    each scenario between four separate time periods,

5    correct?

6    A.      Well, three, and then an all-inclusive time

7    period.  I guess you could say they are separate, but

8    the fourth one combines all the previous three.

9    Q.      Okay.  And that you also divided your analysis

10   between males and females, correct?

11   A.      Yes.

12   Q.      Did you do a combined analysis for lung cancer

13   where you put males and females together and looked at

14   the results?

15   A.      No.

16   Q.      Why not?

17   A.      Well, rates of lung cancer are quite different

18   in males and females.  I felt that might obscure more

19   than it revealed by lumping males and females together.

20   Q.      On what do you base the statement that rates

21   of lung cancer are different in males than females?

22   A.      My degree in epidemiology and specifically

23   cancer epidemiology, and I studied rates of cancer in

24   genders, and age groups, and various populations as

Richard W. Clapp                          123

1       part of my work, and it's documented many times in many

2       places that rates of lung cancer are different in males

3       than in females.

4       Q.        Just name a few places.

5       A.        Surveillance in Epidemiology Program, the SEER

6       Program, National Annual Reports, the Colorado Cancer

7       Registry Annual Reports, the Massachusetts Cancer

8       Registry Annual Reports, the American Cancer Society

9       Cancer Facts and Figures that comes out annually.  All

10      of those documents what I just said.

11      Q.        Do you believe that the Colorado Cancer

12      Registry Reports that set forth the cancer rates during

13      the same time periods that you've studied here for

14      Jefferson County have shown a difference between the

15      cancer rates in Jefferson County between males and

16      females?

17      A.        That's a complicated question.  I wonder if we

18      could break it down.

19                I'm not aware of a Colorado Cancer

20      Registry Report for the years 1979 to 1983 for

21      Jefferson County for example.  So I can't answer your

22      question whether or not it exists or whether it shows a

23      difference in rates between males and females in lung

24      cancer.  I would be astonished, however, if there was

1     comparing to having some other type of cancer if you

2     are a male and you live within the two contours that

3     we've been describing this morning, compared to the

4     rest of Jefferson County.

5     Q.       And you have determined in this report 24 such

6     odds for lung cancer, correct?  I should say odds

7     ratio.  I don't want to take a lot of time with it.

8     A.       I think it's 18.

9     Q.       Is it 18?

10    A.       Yes.

11    Q.       You have three scenarios, correct?

12    A.       Yes.

13    Q.       Each of which you did males and females,

14    correct?

15    A.       Right.

16    Q.       So that's three times two is six, correct?

17    A.       Yes.

18    Q.       And you calculated odds ratios for four

19    separate time periods, correct?

20    A.       That's true.  You are right.  The fourth time

21    period I was looking at the three different time

22    periods.  You are right.  There is a fourth that

23    includes all three, so you are right, it is 24.

24    Q.       So you analyzed the results from 24 different

Richard W. Clapp                    126

1    groupings, correct?

2    A.        Yes.   They are overlapping groupings, and they

3    basically all look at essentially the same issue.

4    Q.        Okay.  You would have expected by dividing

5    that into 24 different groupings to see at least one

6    statistically-significant result purely by random

7    fluctuation, correct?

8              MR. AUERBACH:   Objection, foundation,

9              form.

10   A.        When you look at 24 or 20 different

11   comparisons, you might expect one of those to be

12   statistically significant by random fluctuation, yes.

13   Q.        Now, in fact, you found

14   statistically-significant results in the manner that

15   you presented them for these odds ratios for lung

16   cancer for the population you studied, correct?

17   A.        Yes.

18   Q.        But they were all deficits, correct?

19   A.        All the, quote, statistically-significant

20   results were for decreased risk, yes.

21   Q.        Okay.  Now, you never mentioned in the text of

22   your report in any of the 12 numbered paragraphs or in

23   any of the other text of your report that you found

24   such statistically-significant deficits, do you?

Richard W. Clapp                     127

1    A.      I do not.

2    Q.      Why not?

3    A.      I don't refer to statistical significance at

4    all in interpreting the results of these analyses.

5    Q.      Any other reason?

6    A.      I don't, as I said earlier this morning, hang

7    my hat on statistical significance in order to

8    interpret the meaning of studies such as this.

9    Q.      Okay.  Now, although you did show your odds

10   ratios and then you followed those odds ratios for

11   these this 24 different groupings with, by showing the

12   confidence intervals, correct?

13   A.      Yes.

14   Q.      And those are 95 percent or they are five

15   percent -- they are one-sided five percent confidence

16   intervals?

17   A.      Yes.  The other way is to say it as you

18   started to, 95 percent confidence intervals.

19   Q.      Okay.  So when I was referring to

20   statistically-significant results, previously I was

21   referring to those results that would at the 95th

22   percent confidence intervals exclude the null value of

23   one.  Were you also referring to the same procedure of

24   defining statistical significance?

Richard W. Clapp                    213

1    Rocky Flats to know whether the people who you believe

2    demonstrate such an excess were actually exposed to

3    levels of plutonium that were higher than those levels

4    to which other people are exposed?

5              MR. AUERBACH:  Object to the form.

6    A.        Yes, what was the first part of your question?

7    Q.        Don't you believe it's relevant as a test of

8    whether the conclusions you've reached in your study,

9    whether the people who obtained cancers and who were

10   included in your study who lived within the inner two

11   contours were exposed to levels of plutonium in the air

12   that are higher than the levels to which the people who

13   lived in Jefferson County who were not within the inner

14   two contours were exposed?

15   A.        No.

16   Q.        Irrelevant as far as you're concerned?

17   A.        That's right.

18   Q.        And if they were both exposed to the same

19   amount of plutonium, then as far as you're concerned

20   you would have reached the same conclusions as you have

21   reached?

22   A.        Yes.

23   Q.        And why is that?

24   A.        You've limited all these questions to

Richard W. Clapp                    214

1   plutonium, either in soil or in air, and I don't assume

2   those are the only exposures to which people who live

3   in these Zip Codes have been subjected.  The analysis

4   that I have done is based on geographic considerations,

5   the centroid of the Zip Code, where the centroid of the

6   Zip Code is located.

7                It's not based upon concentrations of any

8   substance, specifically plutonium or solvents.  It's a

9   pattern of disease in relation to an exposure source.

10               So the specific question that you've asked

11  me, complicated though it was, bears no relevance to

12  the interpretation of the data as I've analyzed them.

13  Q.       There are all kinds of factors that could lead

14  to what you claim is an excess of lung cancer in those

15  individuals who at the time of their diagnosis resided

16  in the Zip Codes that were included within either of

17  your two inner contours, correct?

18  A.       What do you mean by all kinds of factors?

19  Q.       Many.

20  A.       Many, yes.

21  Q.       And you have not taken any steps to exclude

22  any of them, correct?

23  A.       Well, age distribution has specifically been

24  taken into account.

1    Q.      Any others?

2    A.      In the case of lung cancer, gender was

3    specifically examined.

4    Q.      Any others?

5    A.      No.

6    Q.      So on what basis do you conclude that these

7    other factors are not confounding and thereby

8    disrupting the results of your study?

9    A.      You've used words, you've used the word now

10   disrupting.  I don't know what you mean by disrupting.

11   Q.      Affecting?

12   A.      Having an effect on the factors such as global

13   fallout, differential rates of cigarette smoking are

14   not controlled for in this analysis, and my assumption

15   is that there is no different pattern of global fallout

16   or pattern of cigarette smoking in the population of

17   Jefferson County in these various Zip Codes, and it

18   doesn't detract from the finding of an excess of lung

19   cancer in the two Zip Codes closest to the Rocky Flats

20   Plant.  It's a --

21   Q.      Let me ask --

22           MR. AUERBACH:  I don't think he's

23           finished.

24   Q.      Go ahead.  Are you finished?

Richard W. Clapp                           216

1    A.        No, I wasn't finished.  My point in doing this
2    study was to say whether there appears to be an ongoing
3    excess of disease in a particular population in
4    Jefferson County, and my conclusion is there does
5    appear to be that ongoing excess.  I do not attempt to
6    ascribe that excess to plutonium concentration in air
7    or ethylene oxide concentration in air, or, you know,
8    beryllium concentration in house dust.  I don't get
9    into any of those specific cause-and-effect
10   relationships.

11             I am simply from a public health point of
12   view pointing out there does seem to be a continuing
13   excess of a disease or several diseases in a particular
14   population.

15   Q.        Actually, sir, you said that you were finding
16   an excess in the two Zip Codes closest to Rocky Flats.
17   That's not true.

18   A.        Thank you for correcting me.  The 10 Zip Codes
19   closest to Rocky Flats.

20   Q.        And they're not necessarily closest to Rocky
21   Flats, they just happen to be within the contours that
22   you chose, correct?

23   A.        Well, south and east of Rocky Flats is maybe
24   the specific way to put it.

Richard W. Clapp                    236

1      cancer in 1984 to 1988, right?

2                      MR. AUERBACH:  I object to the form of

3              the question.

4      A.      The two time periods differ by five years.  I

5      mean obviously there is a difference.

6      Q.      By defining the range of the latency as 20 to

7      35 years, and defining the period of highest exposures

8      as 1953 to 1970, are those statements correct so far?

9      A.      No.  I said late '50's and '60's was the

10     period of highest --

11     Q.      So by defining the range of latency between 20

12     and 35 years, and defining the period of maximum

13     exposure from the late 1950's through the 1960's, then

14     if you simply take your period of maximum exposure and

15     add your latency range to it, the years that you would

16     calculate would be 19, the late 1970's all the way

17     through 1995, correct?  2005?

18     A.      2005, right.

19     Q.      So because the latency period would encompass

20     the late 1970's and the year 2005, how is it that you

21     think that a finding of excessive lung cancer in 1989

22     to 1992 is any more relevant than a finding of a

23     deficit of lung cancer in 1979 to 1983 or a deficit in

24     1984 to 1988?

Richard W. Clapp                    237

1    A.        Here we go, I mean you've asked this before.
2    I've answered it before.  I'm now going to answer it
3    again.
4              There are two aspects to this, one of them
5    is latency, the other is a public-health imperative,
6    which is to do surveillance of a population at risk of
7    disease.  And I think the most recent time period
8    creates or adds to that public-health imperative.  That
9    there seems to be a continuing excess of, in this case,
10   lung cancer, in this most recent time period.
11   Q.        Let me put it this way then:  The findings
12   that you have made for the time periods 1984 to 1988
13   and 1979 to 1983 are just as consistent with what you
14   understand the latency period for lung cancer to be as
15   the findings that you've made for 1989 to 1992?
16   A.        No, I don't believe that's the case.
17   Q.        Why not?
18   A.        I think the earlier time period is at the
19   early end of the latency window, and that the time
20   period '88, or '89 to '92 is either in the middle of or
21   toward the end of the time window of most relevance.
22   Q.        Even having said that you can't cite to me any
23   data with respect to internally-deposited alpha
24   emitters or more specifically plutonium that would

Richard W. Clapp                    238

1    support your conclusion that the period of latency, the

2    range of latency is from 20 to 35 years after exposure,

3    correct?

4    A.      Correct.  And again, we are not just talking

5    about alpha emitters here.  We're talking about

6    emissions from the Rocky Flats Plant.  So I'm not sure

7    how directly relevant the radium dial painter studies

8    or the radon miner studies are on this issue.

9    Q.      Name another emission that you assume occurred

10   that is associated with lung cancer.

11   A.      Beryllium.  Potentially other organic

12   compounds.

13   Q.      So you assume that beryllium releases

14   occurred?

15   A.      Yes.

16   Q.      And do you base that upon Dr. Goble's

17   analysis?

18   A.      Yes.

19   Q.      Do you think that was a rigorous scientific

20   analysis that he did for beryllium?

21   A.      Yes.

22   Q.      Can you describe for me what that analysis

23   was?

24   A.      If I would go back and reread that section of

Richard W. Clapp                          300

1    Q.        Did he suggest that any further steps be taken
2    with respect to the data that you generated in this
3    study?
4    A.        No.
5    Q.        He had no suggestions whatsoever as to what
6    could be a next step?
7    A.        No, not as far as a next step.  He actually
8    liked the idea of presenting all three scenarios.
9    Q.        Was there some discussion about whether to not
10   present all three scenarios?
11   A.        Yes.  One sentence discussion:  Oh that's a
12   good idea, let's do it.
13   Q.        Who came up with the idea?
14   A.        He did.
15   Q.        Prior to that time you were planning on just
16   doing the first scenario?
17   A.        No.  I think prior to that time I was thinking
18   of doing the third scenario.
19   Q.        Have you ever presented in a court of law this
20   type of morbidity odds-ratio analysis that I've called
21   proportionate cancer analysis?
22   A.        In two or three cases having to do with dioxin
23   exposure I have presented results of my research on
24   Vietnam veterans and their odds of soft tissue sarcoma,

1   and which appear in published journal articles using

2   this exact same method, what you are calling the

3   proportional incidence analysis.

4   Q.      And that was all in the 1980's?

5   A.      The most recent article was published in 1991.

6   Q.      I mean the -- maybe I misunderstood what you

7   said.

8           You presented your data in a court of law

9   with respect to that, correct?

10  A.      Yes.

11  Q.      And you presented your data in a court of law

12  during the 1980's, correct?

13  A.      No.   I think all those court matters were in

14  the 1990's.

15  Q.      What was the most recent?

16  A.      A year ago or last spring probably.

17  Q.      And you presented this kind of odds ratio

18  there?

19  A.      Yes.

20  Q.      And when you say you presented it what do you

21  mean?   You testified in court?

22  A.      Yes.

23  Q.      And so that would have been in one of the

24  cases that you listed on the last page of Exhibit 1?

Richard W. Clapp                    302

1    A.        Yes.  I think in the one called DiPetrillo.

2    Q.        Maybe I misunderstood.  The DiPetrillo case

3    was one in which you presented this kind of analysis

4    about Vietnam vets?

5    A.        Yes.

6    Q.        And the attorney you were working with there

7    was Phil Weinstein?

8    A.        Yes.

9    Q.        In any of the other cases listed on this last

10   page of Exhibit 1, have you presented this kind of

11   morbidity odds-ratio analysis?

12   A.        No.

13   Q.        And in any other case, in any other court of

14   law have you testified in court concerning this type of

15   morbidity odds-ratio analysis?

16   A.        In any of the cases that had to do with dioxin

17   exposure, I can list them here.  I list as one of my

18   credentials the conduct of morbidity odds-ratio

19   analysis of Vietnam veterans in Massachusetts, so those

20   would be on this list, Pickering versus Chevron, page 1

21   of the two-page list, Slewett V Chevron, and Wilkins V

22   CSX.

23   Q.        Okay.  In any case have you attempted to

24   present this type of morbidity odds-ratio analysis and

1    not been permitted to do so?

2    A.      No.

3    Q.      Now, based on the data that's shown in

4    Appendix 2, scenario C, I'm sorry, three, if you were

5    taking the number for, let's just take the first number

6    for males from '79 to '83, the age-adjusted odds ratio,

7    are you with me as to what I'm referring to?

8    A.      Yes.

9    Q.      How would you get the best estimate of risk,

10   what number in the numbers that follow the term AOR

11   there for males would you use as the best estimate of

12   risk?

13   A.      1.05 or five percent excess.

14   Q.      You would not use either the .8 or the 1.39 in

15   defining the best estimate of risk?

16   A.      Correct.

17   Q.      Would you agree that in that particular cell

18   the number .8 could be characterized as five percent

19   likely?  So could the number 1.39?

20   A.      Well, in the general sense, yes, but that's

21   not actually what a confidence level means.  We went

22   through in this morning, I believe, and it's something

23   called a coverage probability that it's, you know, in

24   repeated, a hundred repeated trials of a study like

Richard W. Clapp                               305

1    A.       Yes.

2    Q.       Two such reports?

3    A.       Yes.

4    Q.       Do you take issue with anything that's

5    contained within Dr. Howe's report where he is

6    specifically addressing your analysis?

7    A.       As I remember he describes ecologic studies in

8    a somewhat more negative light than I would describe

9    them, so I take issue with that.  I think he's

10   attempted to duplicate the analyses that I conducted

11   and I believe he got the same answers in general that I

12   got, and so I don't disagree with his reanalysis.  I

13   then would say I'd have to just disagree with his

14   interpretation of the reanalysis.

15   Q.       Anything else that -- let me get it.

16                  (Whereupon Clapp-14 was marked for

17              identification.)

18   BY MR. KURTENBACH:

19   Q.       I hand you Clapp Exhibit 14 which is Dr.

20   Howe's rebuttal report in this case where he addresses

21   the analysis that you performed.

22   A.       I mean he described his discussion of ecologic

23   studies which is really what's relevant to my analysis.

24   He draws in risk projections which he has made in a

1    have no idea.

2    Q.      Which counsel asked you?

3    A.      Ron Simon, and then shortly after that I had a

4    meeting with Mr. Simon and Mr. Auerbach.

5    Q.      When did the contact with Mr. Simon occur?

6    A.      As I recall it, it was summer of 1994.

7    Q.      And did you do any work in connection with

8    this case prior to the latter part of 1995?

9    A.      No.

10   Q.      Have you ever communicated with any of the

11   plaintiffs in this case?

12   A.      No.

13   Q.      Do you know who the plaintiffs are in this

14   case?

15   A.      I assume one of them is named Cook.  Other

16   than that I don't know any others.

17   Q.      Have you ever taken any steps to cause to have

18   delivered to them any of the work that you prepared in

19   connection with this case?

20   A.      No.

21   Q.      With respect to the work that you plan to do

22   that you have not yet done in connection with this

23   case, I want to make sure I have a clear list of that

24   work.

1                    First, you plan to analyze the additional

2       data that you have received from the Colorado Cancer

3       Registry, correct?

4       A.       Yes.

5       Q.       And that includes data on brain cancer,

6       correct?

7       A.       Yes.

8       Q.       And what other data does it include?

9       A.       That's the only data we've actually received.

10      I am told that additional data on liver cancer and

11      breast cancer are in process, but I don't have it in

12      hands.

13      Q.       When you obtain any data on breast cancer do

14      you intend to analyze it in connection with your work

15      in this case if you obtain it?

16      A.       Yes.

17      Q.       You have sought it, correct?

18      A.       Yes.

19      Q.       And then you've asked for some data with

20      respect to the differentiations between benign and

21      malignant tumors, correct?

22      A.       Yes.

23      Q.       If and when you receive that information you

24      plan on analyzing it, correct?

Richard W. Clapp                                    314

1    A.       Yes.

2    Q.       Any other information from the Colorado Cancer

3    Registry that you have taken efforts to obtain?

4    A.       No.

5    Q.       Anything other than obtaining, processing and

6    analyzing this information that we have listed from the

7    Central Colorado Cancer Registry that you intend to do

8    on this case that you have not yet had an opportunity

9    to do or you've not yet done?

10   A.       Well, I mean depending on how long this goes

11   on there may be an additional year of data for 1993 or

12   five more years.  We could have up to 2000.

13   Q.       Is there anything other than analyzing such

14   data from the Colorado Cancer Registry that you intend

15   to do in connection with your opinions in this case?

16   A.       Not in connection with my opinions.  I would

17   like to write this up at some point for scientific

18   publication, but that won't impact my opinions.

19   Q.       Now, have you compared or contrasted the lung

20   cancer data that you generated from Central Colorado

21   Cancer Registry data in this case with similar data for

22   lung cancer for any other metropolitan community as

23   opposed to the Denver area, which is what I asked

24   earlier?