**Public Stigma Responses and Property Values Adjacent to Rocky Flats, Colorado: A Response to Defendants' Daubert Motion**

James Flynn, Wayne Hunsperger, and C.K. Mertz

**Abstract.** There are many reasons why similar properties in the same market command different prices. A determination of whether the actions of a specific entity caused losses for nearby properties is often vigorously contested in legal suits for damages. Real estate appraisers have two responsibilities to demonstrate what has come to be called "stigma effects." First, they must demonstrate that property value differences exist between the stigmatized area and comparable properties. Then, once a price difference is determined by proper appraisal methods, they need to show a causal connection between the purported source of stigmatization and the responses of buyers in the market. Both the courts and the defendants can hold plaintiffs to stringent standards to substantiate such claims. This paper reports on survey data to be used as evidence in a litigation case over stigma effects. The case has been in court waiting trial for some time and the original data were collected in 1995. During the intervening decade, a number of changes have taken place in defining, measuring, and accounting for the links between property values and defendant's prior actions. This analysis of the 1995 data, a decade later, meets the current standards for legal and professional practices as presented in *The Appraisal Journal* article (Flynn, et al., 2004).

**Introduction:** Individual property values are determined in some degree by the reputation of the area where they are located. The association of properties with hazardous, noxious, or repugnant conditions including perceptions of health and environmental risks can adversely impact values (Chalmers & Jackson, 1996). The ***Dictionary of Real Estate Appraisal*** (Appraisal Institute, 2002) defines stigma as: "an adverse public perception regarding a property; the identification of a property with some type of opprobrium (environmental contamination, a grisly crime), which exacts a penalty on the marketability of the property and hence its value." (Appraisal Institute, 2002).

Property stigma is a socially based evaluation of a place, a "sign or mark" created and maintained by processes of social communication. The most powerful source of risk and stigma information is the news media, which often reports on dramatic stories involving technological accidents, hazards, and events with the potential to harm places and people. (Gregory, et al., 1995) The two major sources of technological stigma are the nature of the hazard and the responsibility of owners and agencies for managing it. (Kasperson, et al., 2000; Renn, et al., 1992; Kasperson, et al., 1988). In the case of the Rocky Flats Nuclear Weapons Plant, approximately 16 miles northwest of Denver, Colorado and adjacent to the towns of Arvada and Westminster, one dramatic media event was the June 6, 1989, raid by the U.S. Federal Bureau of Investigation (FBI). This was the first, and in our belief, the only time a facility of the nation's nuclear weapons complex had ever been the subject of a federal criminal investigation for environmental crimes. The event was a national news story featured in the major television and printed news media. An analysis of these media reports for the period 1990 to 1995 is presented in Flynn, et al (1998; 2001). A 23-member Grand Jury was impaneled to investigate the allegations against the Rocky Flats contract managers on August 1, 1989. This raid and subsequent news events over the following years continued to produce high levels of news media attention and focused public awareness on allegations of historical and ongoing environmental problems at the site and nearby properties.

The determination of economic costs due to stigmatization involves appraisals that demonstrate a loss of value for a property or class of properties in comparison with

2

other like properties, and a demonstrated link between the lost values and stigma responses attributed to specific sources by appropriate members of the public. Techniques for measuring damage have been well-documented in the appraisal literature by Patchin, Mundy, Roddewig and others.(Roddewig, 1999; Roddewig, et al., 2002). The quantitative techniques used in this analysis (identified in Table 1) are consistent with, and in fact were a precursor to those contained in the Appraisal Institute Seminar titled "Environmental Risk and the Real Estate Appraisal Process," as set forth by Tom Jackson in a proposed advisory opinion introduced in the April 2002 Appraisal Institute Environmental Symposium in Toronto.

Aside from stigma there are numerous conditions that influence property values and produce differences in value from one place to another. The real estate mantra of "location, location, location" refers to property profiles in geographical relationship to transportation, natural and recreational amenities, quality of existing development, and access to work, shopping, schools and other public services. Property stigmatization also has a number of possible sources, often related to health, environmental or investment risks. It may be due to natural hazards and aesthetic disamenities, social conditions such as the crime rate or other characteristics of the population, infrastructure conditions with potential obnoxious characteristics such as nearby highways, airports, industrial facilities, and public institutions (e.g., prisons), or the operations of industrial or waste sites, among other things.

The Rocky Flats case presented here motivated us to pay close attention to the issues of identifying both a loss of property values and the cause of that loss. In addressing this problem, we focused on obtaining responses from buyers familiar with the residential real estate market through a survey-based approach. Because this was a litigation case, we designed the survey process to meet litigation standards that have been established since the well-known Daubert (1993) case was decided by the U.S. Supreme Court.

This report focuses on the design of research to identify or exonerate a specific facility as the source of stigma effects and property value losses. In connection with this study, a competent, professional appraiser found that the property values in two communities in close proximity to the Rocky Flats facility, Arvada and Westminster,

Colorado, experienced a significant and measurable diminution of value. These two communities are hereafter referred to as the Class Area and are the focal point of the research. Our research task was to show whether or not the value loss identified by the professional appraiser was due to the operation of the Rocky Flats Nuclear Weapons facility either in whole or in part. Thus the appraiser measured the property value loss and the survey design and analyses measured the role of social-stigma in that loss. This survey study was designed with the expectation that the results would be presented in court and within the context of vigorously contested litigation.

The components of a case to support property value loss have been identified by Hunsperger (2001) and are slightly modified for the general case in Table 1, below. More specifically for this weapons site study, analysis of actual sales transactions, regression analysis and case studies were used to quantify the effect on property values. Control areas were selected for both the sales analyses and regression model. A study of land sale prices in the Class Area and a neighborhood comparison of improved residences were conducted and the results indicated generally lower prices in the Class Area, all else being equal. A regression model based upon data from control neighborhoods was also conducted and it too demonstrated lower property values in the Class Area, all else being equal. Although these techniques indicated that property values in the Class Area were lower than in comparable areas in the same housing market but more distant from Rocky Flats, a public opinion survey was commissioned to determine if the loss in value mathematically determined by these techniques was directly attributable to Rocky Flats and its effects. Particular care was used in designing and implementing the survey that produced the data for this article. Consequently, the results also meet the standards set forth in Roddewig's subsequent article on court applications for market surveys (Roddewig, 1999). The use of survey research to elicit responses from the appropriate populations in a community has several advantages, including the ability to help determine the causal link between appraisal-derived value losses based upon the evaluations of informed real estate buyers.

[Insert Table 1]

**Standards for Survey Research:** The courts have developed a number of criteria as guides in assessing surveys. These standards are summarized in two authoritative legal

references -- the Federal Judicial Center's Manual for Complex Litigation (1995) and McCarthy (2003). There are slight format differences between these two sources but they can be easily combined as shown in Table 2.

[Insert Table 2 here]

These criteria were also compared to the Reference Guide on Survey Research (Elements of Importance) and comments prepared by Mathews and Desvousges (2002), both of which appeared in the Appraisal Institute publication of materials from the 2002 Symposium on Environmental and Property Damages.

**The Case Study:** The specific case reported here is of the Rocky Flats nuclear weapons facility located northwest of Denver, Colorado, and a short distance from the Boulder highway. The facility, covering about 14 square miles and in operation since 1953, has been operated by contractors for the U.S. Atomic Energy Commission, the Energy and Development Research Agency, and the U.S. Department of Energy. Dow Chemical was the management contractor beginning in 1952. Rockwell International operated the facility from 1975 through 1989, being replaced by EG&G subsequent to the FBI raid. Rocky Flats was closed as a weapons production facility in 1992 and thereafter designated as the Rocky Flats Environmental Technology Site. The new mission at the facility was to clean up and restore contaminated buildings, facilities, soils, and ground water. This effort has been ongoing for more than a decade.

A legal motion for a class certification of plaintiffs was filed in June, 1993. The class action suit geographical boundaries for health and property claims were based on public exposure during the operations period to radioactive isotopes such as plutonium, in an area east and south, approximately 90 degrees downwind from the Rocky Flats operations facilities. The population claimed for the medical monitoring class was about 40,000 persons (in 1990) and the property value Class Area contained about 15,000 properties (Cook, et al., 1993).

The authors of this article were contracted by the plaintiff attorneys to conduct studies and determine the existence, extent, and value of any adverse economic effects on the class action properties. In the following sections we explain the process and outcome of the survey research conducted in this case.

**The Rocky Flats Survey Design:** Traditional housing stock variables (i.e., lot size, building square footage, number of bedrooms and bathrooms, etc.) were used by the appraiser in the regression model. A market study of land prices and a comparison of residential resale prices were also conducted to determine if prices near Rocky Flats were depressed relative to competitive locations. The results of the survey were used to help explain the results of these quantitative studies and to define the link between the source of stigma and the diminution of property values.

The survey was designed to interview an appropriate population and to elicit data showing if, and then how, knowledge and regard for real property in the Class Area were related to the conditions resulting from the operation of Rocky Flats. The variables selected for comparison between the Class Area and the two comparison areas described marketplace conditions within existing and well-defined markets. We believe that people active in the market are a suitable source of informed opinion about stigma effects and that a source of stigma prompts social behaviors that have economic effects. Thus there were clear roles for the social scientists and the appraiser in working together to design and analyze the survey and to estimate property losses due to stigma.

This paper reviews the legal standards that apply to survey data in litigation. The examination addresses the issues and procedures described in McCarthy (2003) on Survey Evidence and Proper Survey Methods (pp. 32-243 to 32-330) and in the Federal Judicial Center (1995). As the text below demonstrates, the survey was designed to meet both the spirit and the letter of these standards and guidelines. For example, respondents were asked to rate alternative areas on a variety of social, geographical, and environmental measures prior to any questions about the Rocky Flats.

The survey consisted of more than 75 questions, the exact number answered by any individual depended upon certain key responses and the pattern of questions these responses logically initiated. An overview of the survey design is shown in Figure 1.

[Insert Figure 1]

The first set of survey questions qualified respondents with regard to their activity and involvement in the real estate market. The next set of questions identified three housing areas with a random selection of order for each respondent (Arvada,

Westminster, and Highland Ranch or Ken Caryl if the respondent was unfamiliar with Highland Ranch). Each person was asked for three existing "images" of each area. The Comparison Areas of Highland Ranch and Ken Caryl were selected by the appraiser based on similarities of housing stock, relative location, and demographic variables.

Respondents were then asked to rate the areas on ten characteristics: 1) Quality of schools, 2) Access to shopping, 3) Stability of home values, 4) Access to work, 5) Overall visual appearance, 6) Air quality, 7) Water quality, 8) Overall environmental quality, 9) Reputation of the area, 10) Overall as a place to live. These characteristics were chosen because they are meaningful to people looking for housing and this short list can be rated quickly for the different housing areas.

[Insert Table 3]

[Insert Figure 2]

Following these ratings, a number of questions clarified the relative locations of the Rocky Mountain Arsenal and the Rocky Flats nuclear weapons facility, elicited evaluations to Rocky Flats, and using a decision pathway method, questioned the respondents about the effects of thinking about buying a home in the Arvada/Westminster areas in the context of knowledge about Rocky Flats issues.[1] This was followed by some questions on the overall evaluation of Rocky Flats and basic social, demographic questions.

**Key Survey Results:** A total of 391 Denver metropolitan area residents completed the evaluation of the decision pathway scenarios to measure the effects of distance and price on their willingness to buy in the Class Area (Arvada/Westminster). The order of the presentation was from the least costly to the most costly, from the seller's point of view. The order and outcome of the questions is shown in Figure 3. If the respondents accepted the conditions at any point in the question set, this answer was recorded as their final outcome decision.

[Insert Figure 3]

The first two questions in this set asked people if they would accept an otherwise desirable house located 2-4 miles from Rocky Flats, which is the approximate distance to the Class Area from the location of the production facilities on the government controlled property. A total of 67 people (17.1%) said "yes" to this question. Of those who answered "no" 63 people (16.1%) accepted at a distance of 4-6 miles. The remaining two-thirds of the respondents (66.8%) were then offered price discounts (of $5,000, then $10,000, and finally at a price of their own choosing) for a house at the 4-6 mile distance. Those who negotiated a price discount at 4-6 miles were asked if they would also accept the same conditions for the 2-4 miles distance. The acceptance results are shown on the bottom row of Figure 3. The completed results were allocated to three categories as shown in Table 4: those who would: 1) "Buy with no price reduction at either the 2-4 or the 4-6 distances," 2) "Buy with a price reduction at either distance," and 3) "Not buy at all."

A set of cross-tabulations of these decision pathway outcomes with questions answered by respondents earlier during the interviews produced the results shown in Table 4. The prior questions used in the table are identified by question number and a brief summary taken from the survey instrument.

[Insert Table 4]

The overall impression of Rocky Flats (Question 40) is reflected in the buying decisions.  Those who would Buy with No Discount (BWND) responded with 41.6% negative or strongly negative impressions, while the figure was 66.6% of those who would Buy with a Discount (BWD) and 78.3% for those who would Not Buy at All (NBA). For Question 50A about whether being near Rocky Flats would make a house more or less desirable, no respondent said such a location was desirable. A majority (59.4%) of BWND said Rocky Flats did "not make a difference" while the percentage for BWD was 22.8% and just 12.6% for NBA. The reciprocal percentage shows 87.4% of NBA and only 40.6% of the BWND respondents said Rocky Flats made nearby properties somewhat or considerably less desirable.

Taking the questions in the order the respondents answered them in the survey; we can see that Rocky Flats has a wide ranging and widely recognized adverse effect on

---

[1] The theory and rationale for use of decision pathways in this survey design are discussed in Decision Research, 1995, Flynn, 1996, and Gregory, et al, 1997.

how these people viewed the Class Area. Almost two-thirds of the respondents thought a house would be more desirable without Rocky Flats nearby (Question 61). Almost exactly the same proportion thought that Rocky Flats was a health risk (Question 62). There was a 91.7% response, nearly total agreement, that the culpability of Rocky Flats operators as recorded in the record $18.5 million fine paid by Rockwell prompted negative evaluations of nearby homes (Question 67). Even a greater proportion of responses, 99.2%, thought there was an adverse influence on the view of other people about the Class Area properties. Clearly some of these responses were related to concerns about ongoing safety; 72.1% said that Rocky Flats was unsafe (Question 70) and four-fifths (79.5%) thought that even "very small" amounts of contaminants in the residential areas resulting from Rocky Flats operations were a moderate or high health risk, with 43% of the opinion these conditions constituted a high health risk. Questions 67 and 68 ask specifically about the FBI raid and the associated events that followed up to the time of the survey in 1995.

**Summary of the Survey in Relation to the Criteria for Evidence in the Class Action Case:** In this review of the findings and the survey methods, we also analyzed documents on this project to determine how well the approach, methods, and techniques applied to the 1995 Rocky Flats survey meet the admissibility requirements as a legal document according to the criteria outlined by the Manual for Complex Litigation (1995) (MCL) and McCarthy (2003). The criteria are very similar for both MCL and McCarthy although the specific language is not exactly the same. The criteria descriptions presented here in modified form are those shown in Table 2 and accurately represent these two authoritative sources.

Criterion 1: *The population was properly chosen and defined.*

The population chosen for this survey was defined as residents living active in the residential real estate market, who actually moved their residence at some time during the period 1990 to 1995. This definition of the survey population provides actual and potential buyers that are informed about property values and the relative attractions of the key residential areas. Individual respondents were screened to meet the following criteria: they had to have (1) bought a house or (2) have been in the real estate market at some

time during the period 1990 to 1995 and (3) be familiar with the residential areas of Arvada and/or Westminster, and Ken Caryl or Highland Ranch.  It was not necessary that the respondents had actually purchased real estate but that they had been looking actively at residential real estate in the market area.

Criterion 2: A *representative sample of that universe was selected.*

Two sample frames were used for this study. A list of telephone numbers for new residents and for households that had moved from one residence to another in the Denver metropolitan area during the period 1990-1995 was obtained from U.S. West telephone company, and a random digit dial (RDD) sample was generated by the University of Maryland, Survey Research Center. A total of 604 respondents were interviewed during the period August 31, 1995, to October 1, 1995. The resulting data base included 416 respondents from the Denver metropolitan area (excluding the Arvada/Westminster area), and 188 respondents from Arvada/Westminster. A more detailed report of the survey data is provided in Flynn, et al. (July 5, 1996). The selection and qualification of the respondents provided subjects that met the criteria described above in Criteria 1. This report also includes an appendix prepared by the University of Maryland, Survey Research Center (October, 1995) that provides information on the sample, questionnaire and data collection, survey rates and results and sample weights. The following information is abstracted from this report.

*Telephone protocol*:  The University of Maryland Survey Research Center released a total of 2137 numbers to interviewers; 604 from the U.S. West Sample and 1533 from the Random Digit Dial sample. Non-households were subtracted from these numbers leaving 1382 potential households. A single telephone number was attempted up to 20 times, with subsequent dial attempts moved around a seven day schedule that guaranteed that each number would be called on different days and at different times of the day. Respondents from these households were qualified or not qualified based upon an affirmative answer to one of three questions: 1) home bought between 1990-1995; 2) plan to buy in the next couple years; and 3) in the market to buy a home since 1990. This process qualified 888 potential households and 494 for whom eligibility was not determined, for a maximum potential sample of 1165.

*Response Rate*: If all 494 households for whom eligibility was not determined are assumed to be eligible the survey response rate would be 51.8%. If the eligibility for these 494 is assumed to be the same rate as for those who were asked the qualifying questions, the response rate can be calculated by applying the appropriate proportion for each of the two samples (U.S. West and RDD). The formula shown below displays the proportion of the sample from U.S. West sample times the response rate for that proportion of the completed interviews added to the proportion of the RDD sample times that response rate, which sums to a combined response rate for the 604 completed interviews of 63.9%. Thus the calculation would be (320/604)*.675 (U.S. West sample) + (284/604)*.598 (RDD sample) to produce a response rate of 63.9%.[2]

*Margin of error*: A sample of 400 produces a margin of error no worse than 4.9% when generalized to the larger metropolitan Denver population. For the split sample portion of the survey, where approximately 200 subjects were asked specific questions, the margin of error is +/- 6.8%, also at the 95% confidence level. The data should be considered as experimental in the case of Highland Ranch ratings where as few as 40-80 responses were collected, noting of course that these responses track closely with the larger number of responses to the Ken Caryl comparison area.

Criterion 3: *The questions asked of interviewees were framed in a clear, precise and non-leading manner.*

The survey instrument asked about perceptions, attitudes, actual and intended behaviors, and trade-offs in a scenario format. In order to achieve the goals of a clear, precise, and non-leading set of questions, the survey was designed so that the ratings of the comparison residential areas were completed before respondents were introduced to the evaluations of Rocky Flats. More complex questions, about responses to radiation effects and the respondent knowledge and perceptions of Rocky Flats, were elicited through the use of a pathways, or "branching" design. This allowed the flow of questions to proceed based upon prior answers. Not every subject answered all the available questions; rather they answered a series of questions that led to an explanation of a final

---

[2] Response and refusal rates are reported as recommended in Frankel (1983). The American Association for Public Opinion Research (AAPOR) defines the response rate as "the number of complete interviews with reporting units divided by the number of eligible reporting units in the sample". AAPOR (2000), pp. 35-40.

answer. This is especially the case in asking respondents how they would view the idea of buying a house if the distance from Rocky Flats and the price were negotiable. While the design of these modules of the survey instrument was somewhat complex, it was straightforward from the view of the respondents. The series of questions each individual answered allowed them to reach an outcome statement by considering the problems in a consistent, logical manner. This design was only possible because of the computer-based technology used by the interviewers. The extensive pre-testing and the actual data collection demonstrated that the design complexity was no barrier to respondents.

Criterion 4: *Sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted.*

All interviewers were experienced and extensively trained personnel employed at the University of Maryland, Survey Research Center. Specific training for interviewer use of this survey instrument was under the direction of Professor Stanley Presser[3] and Mr. Johnny Blair.

Continuous supervision and monitoring was provided during the data collection period. Interviewers and respondents were told the survey was being conducted on behalf of "Decision Research," with the appropriate name and contact information provided. Respondents were introduced to the survey by being told the questions were about "the quality of life in areas around Denver." Neither the interviewers nor the respondents were told that the survey would be used in litigation.

Criterion 5: *The data gathered were accurately reported.*

In the design of the survey instrument, the applications of the interview procedures, analysis of the data and reporting the results, the American Association for Public Opinion Research guidelines for survey implementation and outcome reporting were followed (AAPOR 2000). All data collected from this survey have been provided

---

[3] Stanley Presser, Ph.D. is a professor of Sociology at the University of Maryland. He has served as editor of *Public Opinion Quarterly*, was president of the American Association for Public Opinion Research, and is an elected fellow of the American Statistical Association. He was director of the Maryland Survey Research Center from 1989 to 2000. Johnny Blair is the associate director of the Survey Research Center and also serves since 2001 as a survey methodologist for Abt Associates, Bethesda, Md. A recent book is: Blair, J. and Czaja, R. (2004) *Designing Surveys: A Guide to Decisions and Procedures*. Thousand Oaks, CA: Sage Books.

with the exact questions and answers recorded by the interviewers and complied by the survey research firm. The responses are listed according to the scales or parameters allowed for respondent answers.

Criterion 6: *The data were analyzed in accordance with accepted statistical principles*.

Since the survey instrument was very concise and clear most results are reported with simple descriptive statistics. These include distributions for question scales, mean scores and differences for selected questions, recording and categorization of open-ended responses, and some basic cross-tabulations for bivariate analysis.

Criterion 7: *The process was conducted so as to ensure objectivity (e.g. was the survey conducted in anticipation of litigation and by persons connected with the parties or counsel aware of its purpose in litigation?)*.

The purpose of the survey was not communicated directly to the interviewers or the respondents, although it was known to the designers of the survey. The objectivity of the residential area ratings was assured by eliciting the ratings and responses prior to any mention of the Rocky Flats facility and then presenting the questions and recording the responses to Rocky Flats questions at the back-end of the survey, but prior to the factual questions on social-demographic items.

**Summary:** This survey provided a design approach, question preparation, and implementation methodology to meet the criteria for the admissibility of surveys as prescribed in the Federal Judicial Center (1995) and McCarthy (2003). Our conclusion is that the negative property values shown in the plaintiffs' case (developed by paired sales, regression analysis and case studies) were due to the public perceptions of the Rocky Flats facility and its stigma characteristics as evaluated by potential real estate buyers in the larger community. The survey did not attempt to quantify in dollar terms the lost value of property in the Class Area since this was established with standard appraisal methods including the use of case studies, an investigation of sales data, and multiple regression analysis. Even though these techniques did show loss in value there may be a question as to the causal link between environmental disamenities and the loss in value. What the survey did was to link the Rocky Flats facility with a stigma effect on public

opinion about the desirability of housing and property in the Class Area. This allowed the appraiser to account for the negative values identified in the sales data and to understand the causal link between public responses to the stigmatized neighborhood and the diminution this caused in property values.

## References

[1] AAPOR (American Association for Public Opinion Research). (2000). <u>Standard Definitions: Final Dispositions of Case Codes and Outcome Rates for Surveys</u>. AAPOR: Ann Arbor, Michigan.

Appraisal Institute (2002). <u>Dictionary of Real Estate Appraisal</u> (4th edition), Chicago: Appraisal Institute.

Allen, M. and G. W. Austin (2001). "The Role of Formal Survey Research Methods in the Appraisal Body of Knowledge." <u>The Appraisal Journal</u> 69(4): 394-403.

Chalmers, J. and T. Jackson (1996). "Risk factors in the appraisal of contaminated property." <u>The Appraisal Journal</u> 64 (1): 44-58

Cook, et al., v. Rockwell International Corp., et al. No. 90-K-181 (D. Colo.)

Daubert v. Merrell Dow Pharmaceuticals, Inc. 509 U.S. 579, 113 S. Ct. 2786, 2796-99, 27 U.S.P.Q.2nd 200 (1993).

Decision Research (1995). <u>Vegetation Management in Ontario's Forests: Survey Research of Public and Professional Perspectives</u>. (Report). Sault Ste. Marie, Ontario: Ontario Ministry of Natural Resources.

Federal Judicial Center (1995). <u>Manual for Complex Litigation</u>, 3rd ed. Washington, DC: Federal Judicial Center.

Flynn, J. (1996). <u>Constructing and reconstructing respondent attitudes during a telephone survey</u>. American Statistical Association 1996 Proceedings of the Section on Survey Research Methods. (Vol. 2, pp. 895-899). Alexandria, VA: ASA.

Flynn, J., D. MacGregor, W. Hunsperger, and C.K. Mertz. (2004). A Survey Approach for Demonstrating Stigma Effects in Property Value Litigation. <u>The Appraisal Journal</u> 72 (1): 35-44.

Flynn, J., E. Peters, C.K. Mertz, and P. Slovic. (1998). Risk, Media and Stigma at Rocky Flats. <u>Risk Analysis</u>. 18 (6) 715-727; reprinted as Chapter 20, pp. 309-327 in

Flynn, J., P. Slovic and H. Kunreuther (Eds). (2001). Risk, Media and Stigma. London: EarthScan.

Flynn, J., P. Slovic, and C.K. Mertz (July 5, 1996) Final Report: Rocky Flats Health and Housing Survey, Eugene, OR: Decision Research

Frankel, L.R. (1983). The Report of the CASRO Task Force on Response Rates," in Improving Data Quality in a Sample Survey, (Frederick Wiseman, Ed.). Marketing Science Institute: Cambridge, MA.

Gregory, R., J. Flynn, S. Johnson, T. Satterfield, and R. Wagner (1997). Decision-pathway surveys: A tool for resource managers. Land Economics. 73, 240-254.

Gregory, R., J. Flynn, and P. Slovic. (1995). "Technological Stigma." American Scientist 83: 220-223

Hunsperger, W. (2001). The Effects of the Rocky Flats Nuclear Weapons Plant on Neighboring Property Values. Risk, Media and Stigma. Chapter 9, pp 157-171 in J. Flynn, Slovic, P., and Kunreuther, H. (Eds.). (2001) Risk, Media and Stigma. London: EarthScan.

Kasperson, R., N. Jhaveri, et al. (2000). Stigma and the social amplification of risk: Toward a framework of risk analysis, Chapter 2, pp. 9-27 in J. Flynn, Slovic, P., and Kunreuther, H., (Eds). Risk, Media and Stigma. London: EarthScan.

Kasperson, R. E., O. Renn, et al. (1988). "The social amplification of risk: A conceptual framework." Risk Analysis 8: 177-187.

Mathews, K. &. Desvousges, W. (2002). The Truth, the Partial Truth, or Anything But the Truth: Survey Reliability and Property Valuation. The Appraisal Institute Symposium, The Appraisal Institute: Chicago, IL.

McCarthy, J. Thomas (2003). McCarthy on Trademarks and Unfair Competition, 4th ed. Eagan, MN: Thomson/West.

Renn, O., W. Burns, et al. (1992). "The social amplification of risk: Theoretical foundations and empirical applications." Journal of Social Issues 48(4): 137-160.

[1] Roddewig, R. (1999). Junk Science, Environmental Stigma, Market Surveys, and Property Appraisal Methodology: Recent Lessons from the Litigation Trenches," The Appraisal Journal 67(4): 447-453.

Roddewig, R., P. Patchin, B. Mundy, and W. Lusvardi (2002). "Understanding, Analyzing and Estimating Stigma." Chapter 4 in: Roddewig, R. (Ed.). Valuing Contaminated Properties: An Appraisal Institute Anthology. Chicago: The Appraisal Institute.

Wilson, Albert R. (2002). The Need for Standards in the Application of Statistical and Survey Research to Real Estate Valuation Practice," The Appraisal Institute Symposium on Environmental and Property Damages, The Appraisal Institute: Chicago, IL.

**Table 1:  Components of a Model to Evaluate Property Value Impacts for Cases of Technological Stigma**

*1. Real Estate Market Research*. Perceptions in the marketplace directly affect real estate value; thus, it is necessary to interview various market participants in order to understand market attitudes. For example, sale transactions or projects that did not occur may be as telling as those that did. Additionally, if public attitudes about real estate values in the area are negative, implicitly there will be downward pressure on property value. Real estate impact should be measured in the market of well-informed and well-advised buyers, sellers and users of real estate.

*2. Analogous Case Studies*. Examine other cases of environmental disamenities to: (a) understand how real estate markets in other settings react to, or perceive, risk, (b) study how these reactions translate into overall value, (c) test the reasonableness of other valuation or evaluation techniques, and (d) apply these findings to the subject neighborhood context. Case studies may include academic research, other economic or appraisal studies and the appraiser's own experiences. After taking into account appropriate differences, a range may be developed within which conclusions are likely to fall. This technique represents a test of reasonableness.

*3. Market Sales Information*. This category relates to the traditional study of actual sales data, including the study of individual sales, as well as descriptive statistics such as trend analysis, sampling and averaging. For example, individual sales in one area can be compared to otherwise similar properties in a control area to determine if price differential exists and to what it might be attributed. It is appropriate to consider a statistically valid number of paired data to reflect the value (or lack thereof) of an attribute across an entire area. This technique can then stand alone and/or serve as a field check of results from Multiple Regression Analysis (MRA).

*4. Multiple Regression Analysis (MRA)*. MRA is "a particular statistical technique, similar to correlation analysis, used to analyze data in order to predict the value of one variable (the dependent variable), such as market value, from the known values of other variables (independent variables), such as lot size, number of

17

rooms and so on" (*The Dictionary of Real Estate Appraisal*, 2002).The application may involve a comparison of sales data in the subject neighborhood to multiple control areas to determine if any variance remains after accounting for all relevant independent variables. If some intangible variables, such as commuting time, cannot be statistically measured, they may be explained in a Public Opinion Survey.

*5. Public Opinion Surveys*.  The purpose of survey research is to understand how people relate to technological, environmental and health risks because such beliefs are expressed in market prices. Formal market surveys are frequently undertaken to demonstrate how market participants might or should behave in a transactional setting (Wilson, 2002). Additionally, the survey may be used to elicit open ended responses or explain intangible variables that may not be measured in a regression analysis.

**Table 2: Property Value Survey Standards;** Criteria for Admissibility of a Survey as a legal document according to the Federal Judicial Center's ***Manual for Complex Litigation (MCL)*** (1995) and McCarthy (2003):

1. The population was properly chosen and defined (McCarthy).
2. A representative sample of that universe was selected (MCL).
3. The questions to be asked of interviewees were framed in a clear, precise and non-leading manner (MCL).
4. Sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted (MCL).
5. The data gathered were accurately reported (MCL).
6. The data were analyzed in accordance with accepted statistical principles (MCL).
7. The process was conducted so as to ensure objectivity (e.g. was the survey conducted in anticipation of litigation and by persons connected with the parties or counsel aware of its purpose in litigation) (McCarthy).

----------

Note: The criteria defined by the Manual for Complex Litigation (MCL) and McCarthy are very close and often use exact or similar phrases. In this table to reduce the redundancy we have chosen the more descriptive of the guideline statements for each of the seven criteria.

19

**Table 3:  Mean Attribute Ratings and Difference Scores for Two Areas: Class Area and Comparison Area.**

|  | Mean | N[a] | Difference Scores[b] |
|---|---|---|---|
| **Quality of schools** |  |  |  |
| Class Area | 3.20 |  |  |
| Comparison Area | 3.85 | 187 | -.66**** |
| **Access to shopping** |  |  |  |
| Class Area | 3.39 |  |  |
| Comparison Area | 3.23 | 239 | .16* |
| **Access to your place of work** |  |  |  |
| Class Area | 2.71 |  |  |
| Comparison Area | 2.64 | 259 | .07 |
| **Stability of home values** |  |  |  |
| Class Area | 3.18 |  |  |
| Comparison Area | 3.97 | 240 | -.79**** |
| **Air quality** |  |  |  |
| Class Area | 2.96 |  |  |
| Comparison Area | 3.55 | 246 | -.59**** |
| **Water quality** |  |  |  |
| Class Area | 2.96 |  |  |
| Comparison Area | 3.29 | 145 | -.33**** |
| **Overall environmental quality** |  |  |  |
| Class Area | 3.04 |  |  |
| Comparison Area | 3.71 | 253 | -.67**** |
| **Reputation** |  |  |  |
| Class Area | 3.07 |  |  |
| Comparison Area | 3.95 | 272 | -.89**** |
| **Personal safety of residents** |  |  |  |
| Class Area | 3.10 |  |  |
| Comparison Area | 3.88 | 225 | -.78**** |
| **Overall as a place to live** |  |  |  |
| Class Area | 3.13 |  |  |
| Comparison Area | 3.78 | 271 | -.65**** |

[a] N = Number of respondents who rated both Arvada and/or Westminster with Ken Caryl or Highlands Ranch on each criteria item.
[b] * = p<.05
**** = p<.0001

20

| Table 4: Evaluations of Rocky Flats Prior to Home Purchase Scenario By Buying Outcome Decision | | | | |
|---|---|---|---|---|
| Survey Question | Buy With No Reduction | Buy With Discount | Would Not Buy at All | Total |
| **Q 40 ($n$ = 320) Overall Impression of Rocky Flats:** | | | | |
| Positive/Strongly Positive | 15 (4.7%) | 2 (0.6%) | 3 (0.9%) | 20 (6.3%) |
| Neither positive nor Negative | 51 (15.9%) | 15 (4.7%) | 31 (9.7%) | 97 (30.3%) |
| Negative/Strongly Negative | 47 (14.7%) | 33 (10.3%) | 123 (38.4%) | 203 (63.4%) |
| *Note: Q 40 was asked immediately after respondents provided "images" of Rocky Flats.* | | | | |
| Q 50A: ($n$ = 389) Near Rocky Flats is: | | | | |
| Somewhat/Considerably More Desirable | 0 | 0 | 0 | 0 |
| Neither more nor less Desirable | 79 (20.3%) | 13 (3.3%) | 25 (6.4%) | 117 (30.3%) |
| Somewhat-/Considerably Less Desirable | 54 (13.9%) | 44 (11.3%) | 174 (44.7%) | 272 (69.9%) |
| **Q 61: ($n$ = 250) Absence of Rocky Flats Makes a House:** | | | | |
| Much More/Somewhat More Desirable | 0 | 39 (15.6%) | 145 (58.0%) | 184 (73.6%) |
| Does Not Make a Difference | 0 | 14 (5.6%) | 41 (16.4%) | 55 (22.0%) |
| Somewhat/Considerably Less Desirable | 0 | 3 (1.2%) | 8 (3.2%) | 11 (23.2%) |
| *Note: Q 61 not asked if respondent earlier said she/he would buy without reduction.* | | | | |
| Q 62: ($n$ = 349) Rocky Flats a Health Risk? | | | | |
| No | 65 (18.6%) | 12 (3.4%) | 17 (4.9%) | 94 (26.9%) |
| Yes | 50 (14.3%) | 40 (11.5%) | 165 (47.3%) | 255 (73.1%) |
| **Q 67: ($n$ = 132) Did $18.5 Million Environmental Violations Fine make your evaluation of nearby Property Values:** | | | | |
| Positive/much more Positive | 1 (0.7%) | 0 | 1 (0.7%) | 2 (1.5%) |
| Neither Positive nor Negative | 4 (3.0%) | 0 | 5 (3.8%) | 9 (6.8%) |
| Negative/much more Negative | 30 (22.7%) | 24 (18.2%) | 67 (50.8%) | 121 (91.7%) |
| *Note: Q 67 Asked only of those who recalled the news media reports.* | | | | |
| **Q 68: ($n$ = 266) Did FBI Raid and the Fines Influence Other People to View Property Near Rocky Flats as:** | | | | |
| More Desirable | 0 | 1 (0.4%) | 1 (0.4%) | 2 (0.8%) |
| Less Undesirable | 92 (34.6%) | 41 (15.4%) | 131 (49.2%) | 264 (99.2%) |
| **Q 70: ($n$ = 383) Would You Say Rocky Flats is:** | | | | |
| Safe/ Probably Safe | 61 (15.9%) | 12 (3.1%) | 17 (4.4%) | |
| Unsafe/Probably Unsafe | 68 (17.8%) | 36 (9.4%) | 129 (33.7%) | 233 (72.1%) |
| **Q 72: ($n$ = 263) Are *VERY SMALL* levels of Rocky Flats Contaminants in Residential Areas:** | | | | |
| Almost no/ Slight health Risk | 35 (13.3%) | 3 (0.1%) | 16 (6.1%) | 54 (20.5%) |
| A Moderate/High health Risk | 52 (19.8%) | 38 (14.4%) | 119 (45.2%) | 209 (79.5%) |

**Figure 1:  Components of Survey Protocol**





Figure 2. Mean scores on ten attributes by survey area: Class Area vs. Comparison Area

**Figure 3: Design and distribution of results from a question set with distance and discount options applied to a hypothetical house purchase in the Arvada/Westminster communities (Class Area).**



Dr. James Flynn

July 7, 2005
Date

Wayne L. Hunsperger, MAI, SRA

7/7/05
Date