

1

```
 1            IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
 2                           - - -

 3   MERILYN COOK, ET AL        : CASE NO. 90-K-181
            VS.                  :
 4   ROCKWELL INTERNATIONAL      :
     CORPORATION, A DELAWARE     :
 5   CORPORATION; AND THE        :
     DOW CHEMICAL COMPANY,       :
 6   A DELAWARE CORPORATION      :
                                 - - -
 7

 8             Oral deposition of JAMES FLYNN, Ph.D.,

 9   taken at the law offices of Berger & Montague,

10   P.C., 1622 Locust Street, Philadelphia,

11   Pennsylvania, 19103, on Thursday, March 27, 1997,

12   beginning at approximately 8:15 a.m., before Kim

13   Casey, Court Reporter, Notary Public.

14

15                           - - -

16

17   APPEARANCES:

18             BERGER & MONTAGUE, P.C.
               BY: Jonathan Auerbach, Esquire
19             Peter Nordberg, Esquire
               1622 Locust Street
20             Philadelphia, Pennsylvania  19103
               Counsel for Plaintiffs
21                           - - -

22         DelCASALE, CASEY, MARTIN & MANCHELLO
                 Ten Penn Center Plaza
23           Suite 636 - 1801 Market Street
             Philadelphia, Pennsylvania 19103
24                 (215) 568-2211
```

1    from economics relating to survey methods for
2    placing values on market goods?
3    A.         Well, yes, of course.
4    Q.         Are you familiar with the literature
5    from the field of economics concerning survey
6    methods for asking people to place value on near
7    market goods?
8                   MR. AUERBACH:  I'm sorry,
9    counsel, near?
10                  MR. DUTTON:  Near.
11                  MR. AUERBACH:  Objection to form;
12   foundation.
13                  THE WITNESS:  I'm not an
14   economist.  I don't do contingent valuation.
15   BY MR. DUTTON:
16   Q.         I understand that, but I'm asking you,
17   are you familiar with the literature?
18   A.         No.  I've read some of the literature.
19   I wouldn't say that I'm familiar with the
20   literature.
21   Q.         You are aware, however, that economists
22   have been studying and using survey methodologies
23   to ask people to place values on specific goods
24   for many years, aren't you?

1             THE WITNESS: There may be other
2    reasons besides that, economy.
3    BY MR. DUTTON:
4    Q.       So is it your testimony today, Mr.
5    Flynn, that you can't tell me whether or not
6    there are any principal distinctions between the
7    methods that are used by socioeconomic impact
8    surveyors like yourself and economists in
9    contingent valuation surveys?
10               MR. AUERBACH: Object to the
11   form.
12               THE WITNESS: In contingent -- I
13   don't think that we did contingent valuation
14   surveys.
15   BY MR. DUTTON:
16   Q.       I'm not talking about the type of
17   survey. I'm talking about the methods used and
18   I'm asking you whether there are any principal
19   distinctions in your mind between the methods
20   that are used in the social science surveys that
21   you conduct and in the surveys that economists
22   conduct in contingent valuation?
23               MR. AUERBACH: I object to the
24   form of the question. Lack of foundation.

James Flynn, Ph.D.

49

1   BY MR. DUTTON:

2   Q.        Let me back up.  Is it your

3   understanding, Mr. Flynn, that contingent

4   valuation methodology applies only to non-market

5   goods?

6             MR. AUERBACH:  Before you answer,

7   although the witness is far too modest to point

8   this is out, he does have a Ph.D., so if you

9   could address him as Dr. Flynn.

10            THE WITNESS:  Could you repeat

11  the question?  I sort of lost the question.  I'm

12  sorry.

13  BY MR. DUTTON:

14  Q.        My question was, is it your belief, Dr.

15  Flynn, that contingent valuation methodology is

16  used only to elicit values for non-market goods?

17  A.        I don't have an opinion on that because

18  I don't do contingent valuation.  I'm not aware

19  of the uses that they necessarily attempt to put

20  the techniques to.

21  Q.        Is it correct for me to believe, Dr.

22  Flynn, that in preparing your survey that

23  Decision Research did in this case, that Decision

24  Research did not draw upon any of the substantial

DelCasale, Casey, Martin & Manchello

James Flynn, Ph.D.

106

1  contaminants as a result of these events.

2              We can look at the data from the

3  report to find out what the answers to those

4  questions are.

5  BY MR. DUTTON:

6  Q.         But you don't have them on the tip of

7  your tongue?

8  A.         No.

9  Q.         Now, back when Mr. Hunsperger hired you,

10 did he inform you that your survey was going to

11 be used in order to estimate the value or

12 diminution in value of properties in the Rocky

13 Flats area?

14 A.         I understood that he was going to use a

15 number of different approaches to making his

16 evaluation of property effects and that our

17 survey would be a part of that evaluation.

18 Q.         Did he tell you that he was going to use

19 the average discount measured in your survey in

20 order to calculate a diminution in property

21 values in the class area?

22 A.         This is before we designed and did the

23 survey?

24 Q.         When you were designing it, did you

DelCasale, Casey, Martin & Manchello

James Flynn, Ph.D.

107

1  design the survey with that knowledge?

2  A.        We designed the survey with the
3  knowledge that the survey, the results of the
4  survey would be used as information in his making
5  an evaluation of the property in the class area,
6  yes.

7  Q.        My question was, Mr. Flynn -- and I will
8  ask it until I get a responsive answer.  And I
9  move to strike your last answer as
10 non-responsive.

11            My question was, did Mr.
12 Hunsperger tell you that he was going to take the
13 average discount of Denver metropolitan area
14 residents as expressed in your survey, multiply
15 that times the number of properties in the Rocky
16 Flats class area and make an estimation of the
17 diminution in property value that had occurred
18 according to him.

19            MR. AUERBACH:  Now you have asked
20 a different question.

21            MR. DUTTON:  Well, that is my
22 question.

23            THE WITNESS:  My answer to that
24 one is no.

DelCasale, Casey, Martin & Manchello

James Flynn, Ph.D.

108

1  BY MR. DUTTON:

2  Q.        Did you design your survey with the
3  intent that Mr. Hunsperger could use the express
4  average discounts of Denver metropolitan
5  residents, multiply that times the number of
6  properties in the Rocky Flats area and come up
7  with a number that was an estimation of the
8  diminution of value of the properties?
9  A.        That was not an objective or goal of our
10 design of the survey.
11 Q.        If you had known that, would you have
12 designed the survey differently?
13 A.        I don't think that we would have because
14 we were trying to understand what people's
15 attitudes and opinions about the property were
16 and we used the questions and techniques that we
17 thought would be informative to that.
18              And I think that the use of the
19 data by another expert or specialist is sort of a
20 matter for them to make judgments about how
21 useful it is and what's the proper use of it.
22              I don't think that we -- we
23 aren't experts in the expertise of real estate
24 appraisal and we would not have designed our --

DelCasale, Casey, Martin & Manchello

1   we could not, I don't think, have designed our
2   survey to serve those purposes because those
3   purposes are simply too general for us to do
4   that.
5              I mean we designed it for -- in
6   order to contribute our own understanding to the
7   issue of how Rocky Flats had affected the
8   property values from our own prospective.  We
9   didn't do it as a task that had been assigned to
10  us by Wayne Hunsperger to generate data for him.
11             We are an independent research
12  group.  We do our research based on our own
13  independent judgment.
14  Q.       Do you think this is scientific
15  research?
16  A.       Yes.
17  Q.       Do you think that your research applies
18  scientific methods?
19  A.       I think it applies acceptable social
20  science methods, yes.
21  Q.       Are you familiar with the Supreme court
22  opinion in the Daubert case?
23  A.       No, I'm not an expert on constitutional
24  law, nor any legal law.

1   did not do that analysis so, therefore, I cannot
2   answer the question of whether or not our
3   research suggests or supports the idea, the
4   finding opinion that Rocky Flats has, because of
5   its reputation, a downward pressure effect on
6   property in Arvada, Westminster.  That is our
7   opinion that it does.
8   Q.         Rocky Flats or the FBI raid?
9   A.         Rocky flats.
10  Q.         Rocky Flats, per se?
11  A.         Per se.
12  Q.         You can't distinguish between the effect
13  of Rocky Flats before the raid and the effect of
14  Rocky Flats after the raid, can you?
15  A.         I think that this information on the
16  media reporting of the raid strongly suggests
17  that the raid contributed to the influence of
18  Rocky Flats on people's attitudes and
19  perceptions.  That this is consistent with this
20  theory of the social amplification of risk and
21  that it's consistent with the data that we got in
22  the survey when we asked people if they had heard
23  about the raid.  And those who answered yes were
24  more likely to have a negative opinion about

1    property in Arvada, Westminster.

2    Q.         You can't say whether or not the
3    downward effect that you claim is attributable to
4    Rocky Flats is attributable to Rocky Flats before
5    the raid or after the raid?

6                    MR. AUERBACH:  Form.

7                    THE WITNESS:  I think that part
8    of the effect, that it's our opinion that it is
9    due to the raid

10   BY MR. DUTTON:

11   Q.         You don't know how much of whatever
12   effect is due to the raid?

13   A.         I don't have a precise exact numerical
14   figure to apply to that, although there are
15   numerical figures on the difference in the
16   responses between the people who report they
17   heard of the raid then those who report that they
18   had not.

19   Q.         But that doesn't translate into a
20   percentage of downward effect before or after the
21   raid, does it, in your opinion?

22   A.         Probably not.  I certainly didn't
23   attempt to calculate it that way.

24   Q.         It would be incorrect to assume that all

1  questions we are talking about.  We are talking

2  about the distance and the discount questions and

3  the outcomes of those questions.

4  Q.      Do you think that the discounts observed

5  for Denver metro residents would also be observed

6  for residents in the Arvada, Westminster area?

7  A.      I don't think that they would, no.

8  Q.      How were the value increments

9  determined?

10 A.      The discount values?

11 Q.      Yes.

12 A.      I determined the discount values.

13 Q.      Based on what training?

14 A.      Well, I think not training so much but

15 my own experience in buying and selling real

16 estate.

17           Real estate is a peculiar market

18 in some ways because the price, the asking and

19 selling prices are negotiable prices so that

20 there's always the range of -- there's always a

21 range of negotiation in buying for a house.

22           And I have bought and sold

23 property.  And I know -- I had a real estate

24 license in the state of Kansas for two years,

1   both for my own -- primarily for purposes of my

2   own and for some people that I invested with.

3                   But I think I understand that the

4   range is often between -- up to ten percent of

5   the asking price.  And so a normal offer on a

6   house in the hundred thousand dollar range, or

7   something like that, is very often a five

8   thousand dollar discount, or even more.  And this

9   seemed like a significant amount to me and one

10  that was in the range of the normal negotiation

11  process between buyers and sellers.

12  Q.        You're not a real estate expert, are

13  you?

14  A.        No.

15                  MR. AUERBACH:  I object to the

16  form of the question.

17  BY MR. DUTTON:

18  Q.        You are not an expert on real estate

19  values, are you?

20  A.        No.  I have some experience in home --

21  you know, in buying and selling homes, so I'm not

22  testifying as a real estate expert or an

23  appraiser or market analyst.

24  Q.        And you're not qualified to, correct?

1    A.         Well, I think I am qualified to make the
2    observation of what is knowledge to almost anyone
3    who has been through -- negotiated purchases or
4    sale of real estate which is commonly reported in
5    the newspapers as the range of discount between
6    asking and purchase prices.
7    Q.         Such discounts occur all the time,
8    right?
9    A.         That's exactly my point.
10   Q.         Regardless of Rocky Flats, right?
11   A.         Yes.  But that just means that discount
12   that we ask is within the normal range of
13   behavior for people in the market.
14   Q.         Objection.  Nonresponsive.
15   A.         We are not asking people to consider
16   something that's extraordinary or something
17   that's out of the scope of the normal process of
18   buying and selling homes, you know.
19   Q.         So you believe that if someone said,
20   "Yeah, I would buy that at a five thousand
21   dollar discount," there would be nothing unusual
22   about that that could be attributable to Rocky
23   Flats because that's a normal every day discount
24   that people offer in real estate markets,

1   according to you?

2              MR. AUERBACH: Objection, form.

3   BY MR. DUTTON:

4   Q.    Right?

5   A.    I think that the value of the discount
6   is a meaningful amount that is common to
7   negotiations for real estate and, therefore, it
8   has a heuristic effect. In a scenario condition,
9   it's an amount that is a reasonable one to
10  provide for an evaluation of the scenario.

11  Q.    But the fact that somebody would agree
12  to buy at a discount and only at a discount
13  doesn't indicate that there's anything unusual
14  about the house at all, because people offer to
15  buy houses at a five thousand or ten thousand
16  dollar discount all the time?

17  A.    Certainly.

18             MR. AUERBACH: Form.

19  BY MR. DUTTON:

20  Q.    Did you review the NOAA panel conditions
21  relating to CVM surveys?

22  A.    I just got a copy of that yesterday. I
23  haven't looked at it yet.

24  Q.    Do you have any objection to any of the

1  education and about, I think, formal training, is
2  there any other education, training or experience
3  that you rely on in rendering the opinions that
4  you have given here in testimony today and in the
5  reports you prepared in connection with this
6  case?
7  A.      Well, I think that in some ways my
8  background is not the usual one to achieve an
9  expertise in a particular field.
10             But the experience that I've had,
11 going back to 1976, is strong in the areas of
12 social impact assessment, community studies.
13 I've done community studies, in particular,
14 involving nuclear facilities and nuclear
15 technology.  I began working on these issues in
16 1978, when I participated in a four year study
17 for the Nuclear Regulatory Commission.
18             And the purpose of the study was
19 to develop the social and economic regulations
20 for permitting and licensing nuclear power
21 plants.  And we conducted 12 case studies and
22 provided a summary and report, which are
23 published as new regs.  And that was completed
24 about 1982.

1              And then subsequent to that, I
2     worked on the environmental impact statement for
3     Pudget Power Company.  They had proposed a
4     nuclear power plant.  It was called the
5     Skagit/Hanford plant, which is a fairly complex
6     history, but was probably the last nuclear power
7     plant that a license was attempted for.
8              Also worked on other EIS type of
9     work in a social impact assessment type of work
10    for oil shales for development in Colorado, for
11    landfills, for --
12             And then in 1985, I did some work
13    for the state of Mississippi on the proposed
14    high-level waste site in Mississippi at Richton
15    Dome.
16             And in 1986, began work on a
17    project that has lasted to the present day for
18    the state of Nevada on the high-level waste site
19    at Yucca Mountain, Nevada.
20             On that project, I served as the
21    project manager and project director.  I was
22    responsible for the conduct of the research.  It
23    produced in excess, I think, of 300 reports and
24    documents to the state of Nevada.  125 or 30,

1   maybe more by now, publications in the peer
2   review literature. It covered the complete gamut
3   of socioeconomic studies.
4              Since coming to Decision Research
5   in 1990, '91, I've worked on a number of research
6   projects, including national surveys on nuclear
7   power, national surveys in Canada on health and
8   environmental hazards, surveys on the use of the
9   public responses to forest, vegetation
10  management. And this work, some of it has been
11  completed recently and some of it continues.
12             So basically, that's -- I don't
13  know how many articles and chapters of books and
14  such things that I've completed, but I think
15  there's a couple pages in the C.V.
16             MR. AUERBACH: I have no further
17  questions.
18             (Deposition concluded at 4
19  o'clock p.m.)
20
21
22
23
24