

features

# A Survey Approach for Demonstrating Stigma Effects in Property Value Litigation

by James Flynn, PhD, Donald G. MacGregor, PhD, Wayne Hunsperger, MAI, SRA, C.K. Mertz, and Stephen M. Johnson, PhD

abstract

There are many reasons why similar properties command different prices. The determination that property value differences exist among comparable properties is a primary task for appraisers. Once a price difference has been determined, identifying the causes for such differences is central to legal claims of stigma. Plaintiffs have the burden of demonstrating a causal connection between the purported source of stigmatization and the responses of buyers. This article presents an approach for designing a survey to address stigma issues and meet the legal requirements for admitting survey data as evidence. The survey does not attempt to quantify dollar losses; it is intended to show a link between negative values in the sales data and negative perceptions of properties in the class area.

T he values of individual properties are determined to some degree by the reputation of the area where they are located. The association of properties with hazardous, noxious, or repugnant conditions, including perceptions of health and environmental risks, can adversely impact values.[1] The *Dictionary of Real Estate Appraisal* defines stigma as: "An adverse public perception regarding a property; the identification of a property with some type of opprobrium (environmental contamination, a grisly crime), which exacts a penalty on the marketability of the property and hence its value."[2]

Property stigma is a socially constructed evaluation of a place; it is a sign or mark created and maintained by processes of social communication. The most powerful source of risk and stigma information is the news media, which often reports on dramatic stories involving technological accidents, hazards, and events that have the potential to harm places and people.[3] The two major sources of technological stigma are the nature of the hazard and the responsibility for managing it.[4] The control and regulation of potentially hazardous or noxious conditions are the responsibility of government regulators and the managers of facilities identified as likely sources of public concern. As long as the management meets regulatory standards, including required upgrades, the potential liabilities for stigma effects may be controlled. If managers do not provide conscientious attention to regulations and safe operations, they can be liable for damages to human health, environmental contamination, and the economic costs of lost property values by

---

1. James A. Chalmers and Thomas O. Jackson, "Risk Factors in the Appraisal of Contaminated Property," *The Appraisal Journal* (January 1996): 44–58.
2. Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 4th ed. (Chicago: Appraisal Institute, 2002), 277.
3. Robin Gregory, James Flynn, and Paul Slovic, "Technological Stigma," *American Scientist* 83 (May/June 1995): 220–223.
4. Roger Kasperson, Nayna Jhaveri, and Jeanne Kasperson, "Stigma and the Social Amplification of Risk: Toward a Framework of Risk Analysis," in *Risk, Media and Stigma*, ed. J. Flynn, P. Slovic, and H. Kunreuther, 9–27 (London: Earthscan, 2001); R. E. Kasperson et al. "The Social Amplification of Risk: A Conceptual Framework," *Risk Analysis* 8, no. 2 (1988): 177–187; O. Renn et al. "The Social Amplification of Risk: Theoretical Foundations and Empirical Applications," *Journal of Social Issues* 48, no. 4 (1992): 137–160.

nearby owners. Claims for economic costs can include compensation for direct, physical contamination of properties, or as discussed in this article, the loss of market value due to stigmatization from association with a source of hazardous and noxious conditions.

The determination of economic costs due to stigmatization requires appraisals that demonstrate a loss of value for a property or class of properties in comparison with other like properties, and a demonstrated link between the lost value and stigma responses that are attributed to a specific source by appropriate members of the public. Techniques for measuring damage have been well documented in the appraisal literature by Patchin, Mundy, Roddewig, and others.[5] The quantitative techniques used in the analysis presented here and shown in Table 1 are consistent with those contained in the Appraisal Institute seminar, "Environmental Risk and the Real Estate Appraisal Process"[6] and as set forth by Jackson.[7] Aside from stigma there are numerous conditions that influence property values and produce differences in value from one place to another. The real estate mantra of "location, location, location" refers to property profiles in geographical relationship to transportation, natural and recreational amenities, quality of existing development, and access to work, shopping, schools, and other public services. Similarly, property stigmatization also has a number of possible sources, often related to health, environmental, or investment risks. It may be due to natural hazards and aesthetic disamenities, social conditions such as the crime rate, infrastructure conditions with potentially obnoxious characteristics such as nearby highways, airports, industrial facilities, public institutions (e.g., prisons), or the operations of industrial or waste sites.

The case study presented here involves a landfill waste disposal facility that was charged with being the source of property value losses for a class of nearby property owners. The case study here pays close attention to the conceptual issues of identifying both a loss of property values and the cause of that loss. In working through this problem, the focus was on obtaining responses from buyers familiar with the residential real estate market. This led to the design and implementation of a survey. Because this study was prepared as part of litigation, the survey process was designed to meet litigation standards.

This article focuses on the design of research to identify or exonerate a specific facility as the source of stigma effects and property value losses. For the purposes of this case study, it is specified that a competent, professional appraisal found that properties in the class area had experienced a significant (8-10%) diminution of value. The research task was to show whether or not this value loss, in whole or in part, was due to the operation of the facility in question. Thus, the appraiser measured the property value loss and the survey design and analyses measured the social-stigma role in that loss. In designing this study, it was specified that judgments of the validity and reliability of the study results were expected to be presented in court and within the context of vigorously contested litigation.

The components of a case to support property value loss have been identified by Hunsperger.[8] These components have been slightly modified for the general case and are shown in Table 1. More specifically for this landfill study, paired sales, regression analysis, and case studies were used to quantify the effect on property values. Control areas were selected for both the paired sales analysis and regression model.

Approximately 60 paired sales were conducted. The results indicated generally lower prices for the properties in the area that was the subject of the class action lawsuit (the class area), all other factors being equal. A regression analysis model based on data from control neighborhoods was also used; it too demonstrated lower property values in the class area. While these techniques indicated that property values in the class area were lower than in comparable areas more distant from the landfill, a public opinion survey was commissioned to determine if the loss in value mathematically determined by these techniques was directly attributable to the landfill and its effects. Given Roddewig's summary of court applications for market surveys,[9] particular care was used in designing and implementing the survey that is the subject of this article.

If the studies undertaken include Components 1 through 4 of Table 1 and support the hypothesis

5. Richard J. Roddewig, "Junk Science, Environmental Stigma, Market Surveys, and Proper Appraisal Methodology: Recent Lessons from the Litigation Trenches," *The Appraisal Journal* (October 1999): 447–453; Richard J. Roddewig, ed., *Valuing Contaminated Properties: An Appraisal Institute Anthology.* (Chicago: Appraisal Institute, 2002), see Chapter 4, "Understanding, Analyzing, and Estimating Stigma" for articles by Roddewig, Peter Patchin, Bill Mundy, and Wayne Lusvardi.
6. Appraisal Institute, "Environmental Risk and the Real Estate Appraisal Process" (Chicago: Appraisal Institute, 2001).
7. Thomas O. Jackson, "Methods and Techniques for Contaminated Property Valuation," *The Appraisal Journal* (October 2003): 311–320.
8. W. Hunsperger, "The Effects of the Rocky Flats Nuclear Weapons Plant on Neighboring Property Values," in *Risk, Media and Stigma*, ed. J. Flynn, P. Slovic, and H. Kunreuther, 157–171 (London: Earthscan, 2001).
9. Roddewig, "Junk Science, Environmental Stigma, Market Surveys, and Property Appraisal Methodology."

**Table 1**  **Components of Model to Evaluate Property Value Impacts for Cases of Technological Stigma**

1. **Real Estate Market Research.** Perceptions in the marketplace directly affect real estate value; thus, it is necessary to interview various market participants in order to understand market attitudes. For example, sale transactions or projects that did not occur may be as telling as those that did. Additionally, if public attitudes about real estate values in the area are negative, implicitly there will be downward pressure on property value. Real estate impact should be measured in the market of well-informed and well-advised buyers, sellers, and users of real estate.
2. **Analogous Case Studies.** Examine other cases of environmental disamenities to (a) understand how real estate markets in other settings react to or perceive risk, (b) study how these reactions translate into overall value, (c) test the reasonableness of other valuation or evaluation techniques, and (d) apply these findings to the subject neighborhood context. Case studies may include academic research, other economic or appraisal studies, and the appraiser's own experiences. After taking into account appropriate differences, a range may be developed within which conclusions are likely to fall. This technique represents a test of reasonableness.
3. **Market Sales Information.** This category relates to the traditional study of actual sales data, including the study of individual sales, as well as descriptive statistics such as trend analysis, sampling, and averaging. For example, individual sales in one area can be compared to otherwise similar properties in a control area to determine if a price differential exists and to what it might be attributed. It is appropriate to consider a statistically valid number of paired data to reflect the value (or lack thereof) of an attribute across an entire area. This technique can then stand alone and/or serve as a field check of results from multiple regression analysis.
4. **Multiple Regression Analysis (MRA).** Multiple regression analysis is a particular statistical technique, similar to correlation analysis, used to analyze data in order to predict the value of one variable (the dependent variable), such as market value, from the known values of other variables (independent variables), such as lot size, number of rooms, and so on.* The application may involve a comparison of sales data in the subject neighborhood to multiple control areas to determine if any variance remains after accounting for all relevant independent variables. If some intangible variables, such as commuting time, cannot be statistically measured, they may be explained in a public opinion survey.
5. **Public Opinion Surveys.** The purpose of survey research is to understand how people relate to technological, environmental, and health risks because such beliefs are expressed in market prices. Formal market surveys are frequently undertaken to demonstrate how market participants might or should behave in a transactional setting.** Additionally, the survey may be used to elicit open-ended responses or explain intangible variables that may not be measured in a regression analysis.

\* Appraisal Institute, *The Dictionary of Real Estate Appraisal*, 4th ed. (Chicago: Appraisal Institute, 2002), 190.
\*\* See Albert R. Wilson, "The Need for Standards in the Application of Statistical and Survey Research to Real Estate Valuation Practice," (paper presented at Environmental & Property Damages symposium, cosponsored by The Centre for Advanced Property Economics and the Appraisal Institute, Toronto, April 4–6, 2002).

that an area of residences and business properties are devalued because of a specific noxious or hazardous source, then a public opinion survey can be conducted to determine the causal link between appraisal-derived value losses and the evaluations of informed real estate buyers. The use of survey research to elicit responses from the appropriate populations in a community has a number of advantages.[10] It can provide an efficient, valid, and reliable way to obtain data about potential stigma effects in cases of documented property value losses.

Courts have developed criteria for assessing the validity of surveys and their admissibility in court. These standards are summarized in two authoritative legal references: the *Manual for Complex Litigation*[11] and *McCarthy on Trademarks and Unfair Competition*.[12] There are slight format differences between these two sources but they can be easily combined as shown in Table 2.

These criteria were also compared to the "Reference Guide on Survey Research" (Elements of Importance)[13] and comments prepared by Mathews and Desvousges,[14] both of which appeared in the mate-

---

10. Marcus T. Allen and Grant W. Austin, "The Role of Formal Survey Research Methods in the Appraisal Body of Knowledge," *The Appraisal Journal* (October 2001): 394–403.
11. Federal Judicial Center, *Manual for Complex Litigation*, 3d ed. (Washington, DC: Federal Judicial Center, 1995); available online, see http//www.fjc.gov.
12. J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, 4th ed. (Eagan, MN: Thomson/West 2003).
13. Shari Seidman Diamond, "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, 2d ed., 229–276 (Washington, DC: Federal Judicial Center, 2000).
14. Kristy E. Mathews and William H. Desvousges, "The Truth, the Partial Truth, and Anything But the Truth: Survey Reliability and Property Valuation," (paper presented at Environmental and Property Damages: Standards, Due Diligence, Valuation, and Strategy symposium, cosponsored by The Centre for Advanced Property Economics and the Appraisal Institute, Toronto, April 4–6, 2002).

**Table 2  Property Value Survey Standards: Criteria for Admissibility of a Survey According to the Federal Judicial Center *Manual for Complex Litigation* (MCL) and *McCarthy on Trademarks and Unfair Competition* (McCarthy)**

1. The population was properly chosen and defined. (McCarthy)
2. A representative sample of that universe was selected. (MCL)
3. The questions to be asked of interviewees were framed in a clear, precise and non-leading manner. (MCL)
4. Sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted. (MCL)
5. The data gathered were accurately reported. (MCL)
6. The data were analyzed in accordance with accepted statistical principles. (MCL)
7. The process was conducted so as to ensure objectivity, e.g. the survey was not conducted by persons connected with the parties or counsel and the interviewers were unaware of its purpose in litigation. (McCarthy)

Note: The criteria defined by the *Manual for Complex Litigation* and *McCarthy on Trademarks and Unfair Competition* are very close and often use exact or similar phrases. In this table, to reduce the redundancy we have chosen the more descriptive of the guideline statements for each of the seven criteria.

rials of the 2002 symposium on Environmental and Property Damages.[15]

### A Case Study

The specific case reported here involves a publicly owned municipal landfill located in the Pacific Northwest adjacent to Interstate 5 and close to the coastline. A private firm under a contract with the county operated the facility for more than 50 years. A class action suit was filed on behalf of property owners located within 1½ miles of the boundaries of the landfill. The complaint asked for damages and injunctive relief to the property owners due to exposure from the landfill to hazardous substances, odors, gases and fumes. The claim was that these conditions, along with the birds attracted to the landfill, interfered with the use and enjoyment of the owners' property and reduced the value of their property. In addition, the landfill was claimed to have imposed personal costs to the residents and visitors in terms of annoyance, irritation, discomfort, and other physical ailments.

A major focus of the suit was the claim that operations of the landfill resulted in damage to the property of the plaintiffs and class members, including permanent and measurable loss of property value.

The case study and survey discussed in this article were contracted by the plaintiffs' attorneys to determine the existence, extent, and value of any adverse economic effects on the class action properties. The following sections explain the process and outcome of the survey research conducted in this case.

### The Landfill Survey Design

It is important to understand that traditional housing stock variables (i.e., lot size, building square footage, number of bedrooms and bathrooms, etc.) were used by the appraiser in the regression model and paired sales analyses. The results of the survey were used to help explain the results of these quantitative studies and to define the link between the source of stigma and the diminution of property values.

The survey was designed to interview an appropriate population and to elicit data showing if, and then how, knowledge and regard for real property in the class area were related to the conditions resulting from the operation of the landfill. The variables selected for the survey described marketplace conditions within existing and well-defined markets. Use of a survey presupposes that people active in the market are a suitable source of informed opinion about stigma effects and that a source of stigma prompts social behaviors that have economic effects. Thus, there were clear roles for the appraiser and for the social scientists that designed and analyzed the survey to estimate property losses due to stigma or other effects.

The first step in the survey design was to conduct a thorough review of the legal standards that apply to the use of survey data in litigation. This focused on examination and discussion of the "Survey Evidence and Proper Survey Methods" in *McCarthy*.[16] Subsequently, the survey was designed to meet both the spirit and the letter of these standards and guidelines. For example, respondents were asked to rate three areas on a variety of social, geo-

---

15. The Centre for Advanced Property Economics and the Appraisal Institute.
16. McCarthy, 32-243–32-330.

graphical, and environmental measures prior to any questions about the landfill. In a similar approach, conditions outlined in the class action suit were elicited by asking for volunteer images of the class area before any identification of the landfill.

The survey consisted of 50 questions. An overview of the survey components is shown in Figure 1.

In the survey, Questions 1 through 8 qualified respondents; Questions 9 through 27 identified three housing areas and elicited ratings on seven attributes. These areas were selected by the appraiser based on similarities of housing stock, relative location, and demographic variables. Two comparison areas were used to validate the results. The housing areas were described by a unique set of geographical descriptors. For example, the class area was identified in relation to Interstate 5 and a major interchange. Comparison area 1 was described in relation to a major state highway, a lake, and a golf course. Comparison area 2 was described relative to the local airport, Interstate 5, and a major river. Each of the areas was rated on seven characteristics: (1) access to place of work, (2) general traffic conditions, (3) access to shopping, (4) overall visual appearance, (5) air quality, (6) overall environmental quality, and (7) future value of homes. These characteristics were chosen because buyers commonly consider them when looking for housing and this short list can be rated quickly for the three areas. The results allow for a comparative overview of survey responses and facilitate analyses of other data, especially those provided by responses to open-ended questions. The scale and responses to these characteristics are shown in Table 3. All respondents (N = 400) rated the class area and one of the comparison areas, with one-half of respondents (n = 200) rating comparison area 1 and one-half of respondents rating comparison area 2.

Questions 28 and 29 asked respondents who rated the class area as below average (n = 68) or much below average (n = 5) why these ratings were given. The verbatim responses were recorded.

Question 30 identified for the first time the landfill in the middle of the class area by name and location and asked if the respondent had heard anything about the landfill over the past few years. Questions 31 through 43 asked a series of questions about the landfill and its effect on adjacent properties.

Questions 44 and 45 asked about the recently completed improvements to the Interstate 5 interchange located in the class area. Questions 46 through 50 collected basic demographic information.

**Survey Results**

The survey results supported the class action suit. Table 3 provides the response data for of three comparison areas. Comparative distributions of the average scores for each of the tested attributes are shown in Figure 2.

The average scores for access to place of work, general traffic conditions, and access to shopping were similar with only slight variations across the comparison areas. Comparison area 2 showed somewhat higher ratings for traffic conditions. In terms of overall visual appearance, air quality, environmental quality, and future value of homes, the class area was rated lower than the other two areas. Most noticeable were the ratings of much below average for the class area for each of these questions. Air quality for the class area was identified as much below average by 7.3% of the respondents, but no respondents provided that rating for the other two areas. For overall environmental quality, for the class area over 30% of the respondents said this characteristic was much below or below average compared to 6.7% below average for comparison area 1 and 5.4% below average for comparison area 2. A similar dis-



**Figure 1** Components of Survey Protocol

**Table 3** Ratings of Characteristics for Three Areas by Attributes with Mean Scores and Difference Scores

|  | Much Below Average % | Below Average % | Average % | Above Average % | Much Above Average % | Mean | N | Difference Scores |
|---|---|---|---|---|---|---|---|---|
| Access to your place of work |  |  |  |  |  |  |  |  |
| Class area | 3.8 | 21.4 | 39.3 | 28.9 | 6.6 | 3.13 | 346 |  |
| Comparison area #1 | 3.4 | 27.6 | 51.7 | 13.2 | 4.0 | 2.87 | 174 | 0.31** |
| Comparison area #2 | 3.0 | 25.4 | 43.2 | 21.9 | 6.5 | 3.04 | 169 | 0.06 |
| General traffic conditions |  |  |  |  |  |  |  |  |
| Class area | 9.3 | 39.1 | 39.4 | 11.4 | 0.8 | 2.55 | 386 |  |
| Comparison area #1 | 8.8 | 36.6 | 41.8 | 12.4 | 0.5 | 2.59 | 194 | 0.04 |
| Comparison area #2 | 1.5 | 21.4 | 53.1 | 23.0 | 1.0 | 3.01 | 196 | -0.48**** |
| Access to shopping |  |  |  |  |  |  |  |  |
| Class area | 1.8 | 24.7 | 50.0 | 21.1 | 2.3 | 2.97 | 384 |  |
| Comparison area #1 | 1.5 | 16.8 | 59.2 | 20.9 | 1.5 | 3.04 | 196 | -0.08 |
| Comparison area #2 | 1.5 | 24.2 | 41.9 | 31.8 | 0.5 | 3.06 | 198 | -0.05 |
| Overall visual appearance |  |  |  |  |  |  |  |  |
| Class area | 3.3 | 41.5 | 41.2 | 12.7 | 1.3 | 2.67 | 393 |  |
| Comparison area #1 | 0.0 | 16.2 | 48.5 | 34.3 | 1.0 | 3.20 | 198 | -0.48**** |
| Comparison area #2 | 1.0 | 21.6 | 50.3 | 27.1 | 0.0 | 3.04 | 199 | -0.42**** |
| Air quality |  |  |  |  |  |  |  |  |
| Class area | 7.3 | 35.5 | 43.4 | 13.6 | 0.3 | 2.64 | 369 |  |
| Comparison area #1 | 0.0 | 4.7 | 54.7 | 37.9 | 2.6 | 3.38 | 190 | -0.74**** |
| Comparison area #2 | 0.0 | 3.2 | 60.8 | 33.9 | 2.2 | 3.35 | 186 | -0.73**** |
| Overall environmental quality |  |  |  |  |  |  |  |  |
| Class area | 2.7 | 27.8 | 56.5 | 12.2 | 0.8 | 2.81 | 370 |  |
| Comparison area #1 | 0.0 | 6.7 | 58.8 | 32.5 | 2.1 | 3.30 | 194 | -0.52**** |
| Comparison area #2 | 0.0 | 5.4 | 58.9 | 34.6 | 1.1 | 3.31 | 185 | -0.52**** |
| Future value of homes |  |  |  |  |  |  |  |  |
| Class area | 1.1 | 23.5 | 39.2 | 33.1 | 3.1 | 3.13 | 357 |  |
| Comparison area #1 | 0.0 | 8.4 | 39.5 | 48.4 | 3.7 | 3.47 | 190 | -0.34**** |
| Comparison area #2 | 0.0 | 10.2 | 49.2 | 39.5 | 1.1 | 3.32 | 177 | -0.19* |

Coding used for calculating means: Much below average = 1, below average = 2, average = 3, above average = 4, much above average = 5.
Difference scores: Positive score mean class area has higher score, negative score means class area has lower score
* p <= .05; ** p < .001; **** p < .0001

tinction was made for future value of homes, with almost a quarter of the class area evaluations at much below average and below average compared to 8.4% below average for comparison area 1 and 10.2% below average for comparison area 2. The perceived disadvantages of housing in the class area were for visual appearance, air quality, environmental quality, and future home values.

The open-ended questions asked of respondents who rated the class area as below average (n = 104) or much below average (n = 10) produced a number of direct references to the landfill. These were voluntary references since at this point in the interview no mention had been made of the landfill on the part of the interviewers. The 110 respondents that said this area was below average included 56 who identified the landfill as a reason for the poor rating, 22 said odors in the area were connected to the landfill, and 9 said there were environmental problems from the landfill. Of the 10 respondents who rated the area much below average, 7 cited the landfill and 4 of those 7 identified the landfill with odors.

Questions 30 through 43 identified for the first time the landfill in the center of the class area and asked a series of questions about the landfill and its effects on respondent evaluations. When asked if they had heard anything about the landfill in the past few years, 253 respondents (63.3% of the 400 respondents) said they had. These respondents were then asked, "When you think about the landfill, what comes to mind?" The exact responses were recorded and each respondent was asked to say if this memory was positive or negative. More than half these responses (53.0%) were negative; 40.3% were positive,

**Figure 2** Mean Scores on Seven Attributes by Survey Area

[Chart showing Mean Rating (2.0 Below Average to 4.0 Above Average) across seven attributes: Access to your place of work, General traffic conditions, Access to shopping, Overall visual appearance, Air quality, Overall environmental quality, Future value of homes. Three series plotted: Class area, Comparison area #1, Comparison area #2.]

and almost 7% said they did not know or had no answer to the positive versus negative question. Negative responses referred to adverse effects of the class area environment, appearance, and neighbors while positive responses focused on the community service provided by a solid waste disposal facility.

This same subset of the sample answered the follow-up questions in this way: 95.7% reported they had a some time driven by the landfill, 84.2% said they had visited the landfill, 59.3% said that "odor" strongly or moderately came to mind in reference to the landfill, while 26.1% associated garbage trucks with the landfill. When asked about birds and the landfill, 71.5% said this was a strong or moderate association, with 51.0% recording a strong association. Almost all respondents, 92.1% agreed that the landfill was a health risk. Respondents were asked about the effect of the landfill on their evaluation when they were in the housing market, i.e., did proximity to the landfill make houses much more, somewhat more, somewhat less, much less desirable, or did it not make a difference? One person responded that houses were much more desirable and two people said somewhat more desirable. About one-fifth of the respondents (19.4%) said proximity made houses somewhat less desirable and about one-third (32.0%) said proximity made houses much less desirable. Almost one-half (47.0%) said the landfill made no difference.

The 130 respondents who said the landfill made nearby property somewhat less or much less desirable were asked if price reductions would compensate for the adverse desirability. Four people (3.1%) said no price reduction would be necessary, 23 (17.7%) said a slight price reduction, 42 (32.3%) said a moderate price reduction, and 28 (21.5%) said a large price reduction would be necessary. A fifth category, "no amount of reduction would compensate" was selected by 29 (22.3%) of the respondents. Respondents were not asked to quantify their responses in terms of money values because the appropriate quantification was measured with the professional analyses of the sales data. The qualitative responses were elicited to determine the validity of the mathematical techniques.

In the lawsuit at issue, a substantial part was initiated and pursued by a large commercial prop-

erty holder whose business operations were especially damaged by the operation of the landfill. We suggest that there are a number of cases of adverse environmental impacts on neighboring properties due to the operations of landfills and other industrial sites. However, many cases are not formally addressed because the property owners have neither the resources nor the knowledge to seek redress. Understanding the sources of property-value impacts should provide appraisers with a more informed context for their valuations, whether they are involved in complex litigation or not.

## Summary of the Survey in Relation to the Criteria for Evidence in the Class Action Case

This section is a modified version of the declaration prepared for the class action lawsuit. It describes the approach, methods, and techniques applied to the property value survey conducted in April 2002, and its admissibility as a legal document according to the criteria outlined by the *Manual for Complex Litigation*[17] and *McCarthy*.[18] These criteria are very similar for both sources, although the specific language is not exactly the same. The criteria descriptions presented here in modified form are those shown in Table 1 and accurately represent the two sources. Two of the survey designers and article authors are members of the American Association for Public Opinion Research (AAPOR). The survey methodology follows the AAPOR's most recent guidelines for survey implementation and outcome reporting.[19]

### Criteria 1: The population was properly chosen and defined.

The population chosen for the survey was defined as residents living near the class area, active in the residential real estate market, and who actually moved their residence (but did not necessarily buy their new residence) at some time during the period 1995 through 2000. This definition of the survey population provides actual and potential buyers that are informed about property values and the relative attractions of the key residential areas. The geographical area included three zip codes. These three zip code areas covered the general area from the airport on the western boundary to the rural areas to the eastern boundary of the metropolitan area. The class area was not part of these zip code areas.

Individual respondents were screened to meet the following criteria: they had to have (1) lived in the metropolitan area for more than two years, (2) be familiar with the class area, and (3) have been in the real estate market at some time during the period 1995 to 2000. It was not necessary that the respondents had actually purchased real estate but only that they had been looking actively at residential real estate in the market area.

### Criteria 2: A representative sample of that universe was selected.

QwestDex[20] maintains a record of telephone connections and moves by zip code. Telephone numbers for this survey were purchased from QwestDex. These numbers included all listed new telephone numbers for new residents and for households that had moved from one residence to another in the target zip codes during the period 1995–2000. The total count of these telephone numbers was 6,240, from which 2,700 were randomly selected and used to complete the survey. The selection and qualification of the respondents provided subjects that fully met the specifications of Criteria 1.

### Criteria 3: The questions asked of interviewees were framed in a clear, precise, and non-leading manner.

The survey instrument consisted of 50 questions of which 43 questions were answered by selection from a response scale, 5 questions were about social-demographic characteristics (e.g., age, gender), and 2 questions were open ended with the verbatim responses being recorded. The interviews took 10–12 minutes on average. Only after the ratings of the comparison residential areas were completed were respondents introduced to the evaluations of the subject landfill. The survey was designed and pretested under the supervision of three PhD social scientists. These colleagues reviewed the survey criteria described in *McCarthy* and the *Manual of Complex Litigation* prior to beginning their work and incorporated these guidelines into the survey design.

---

17. Federal Judicial Center.
18. McCarthy.
19. American Association for Public Opinion Research, *Standard Definitions: Final Dispositions of Case Codes and Outcome Rates for Surveys* (Ann Arbor, MI: AAPOR, 2000).
20. QwestDex Direct (Englewood, CO: Qwest Dex, Inc., 2002).

**Criteria 4: Competent interviewers, who had no knowledge of the litigation or the purpose for which the survey was conducted, followed sound interview procedures.**

All interviewers were experienced and extensively trained personnel employed by a professional survey research and data services firm. Specific training for this survey instrument was conducted by the director of the survey research firm (a PhD sociologist) with the project director (a PhD social scientist) in attendance. Continuous supervision and monitoring was provided during the data collection period by supervisors. Data were collected during the period April 10 through April 24, 2002.

Interviewers and respondents were told the survey was being conducted on behalf of real estate appraisers, with the name and contact information for the survey research firm that was conducting the survey, and that the subject was "things that affect the quality of life in local residential areas." Neither the interviewers nor the respondents were told that the survey would be used in litigation.

**Criteria 5: The data gathered were accurately reported.**

All data collected from this survey are provided with the exact questions and answers recorded by the interviewers and complied by the survey research firm. The responses are listed according to the scales or parameters allowed for respondent answers.

**Telephone Protocol.** The 2700 randomly selected telephone numbers were called seven days a week starting as early as 10 a.m. and continuing until 9 p.m. A single telephone number was attempted up to 11 times, with subsequent dial attempts moved around a seven-day schedule that guaranteed that each number would be called on different days and at different times of the day. Partial interviews were completed on an appointment basis with appointment times determined by the respondent's schedule.

**Response Rate.** A response rate of 34% was achieved for this study, with a refusal rate of 9%.[21] At the end of the survey, 837 telephone numbers had been determined to be ineligible either because the respondent failed to qualify, or because the number did not lead to a residential telephone. In addition, 1,217 telephone numbers still had an unknown status (primarily because all calls to them had resulted in an answering machine). Four hundred interviews were completed and there were 23 final refusals.

**Margin of Error.** This survey has a margin of error of +4.7% when generalized back to the entire universe of 6,240 telephone numbers supplied by QwestDex. This margin of error is based on a worst-case scenario of a 50/50 proportional split and is at the 95% confidence level. Since there is every reason to believe that this QwestDex sample is representative of a larger population of area residents who may have been in the real estate market, it is worth noting that a sample of 400 produces a margin of error of no worse then +4.9% for a population of up to one million. For the split sample portion of the survey, where 200 subjects were asked about either comparison area 1 or comparison area 2, the margin of error, when generalized back to the entire QwestDex universe of 6,240 telephone numbers, is +6.8%, also at the 95% confidence level.

**Criteria 6: The data were analyzed in accordance with accepted statistical principles.**

Since the survey instrument was very concise and clear, most results are reported with simple descriptive statistics. These include distributions for question scales, mean scores and differences for selected questions, recording and categorization of open-ended response, and some basic cross-tabulations for bivariate analysis.

**Criteria 7: The process was conducted so as to ensure objectivity.**

The purpose of the survey was not communicated directly to the interviewers or the respondents. It was known to the designers of the survey. The objectivity of the residential area ratings was assured by eliciting the ratings and responses prior to any mention of the landfill and then presenting the questions and recording the responses to landfill questions at the back-end of the survey (but prior to the factual questions on social-demographic items).

## Summary

This survey provided a design approach, question preparation, and implementation methodology to meet the criteria for the admissibility of surveys as prescribed in *McCarthy* and the *Manual for Complex Litigation*. The survey conclusion was that the nega-

---

21. Response and refusal rates are reported as recommended in Frankel and other sources; see Lester R. Frankel, "The Report of the CASRO Task Force on Response Rates," in *Improving Data Quality in a Sample Survey*, ed. Fredrick Wiseman (Cambridge, MA: Marketing Science Institute, 1983). The response rate is defined as "the number of complete interviews with reporting units divided by the number of eligible reporting units in the sample." Also see, American Association for Public Opinion Research, 35–40.

tive property values shown in the plaintiffs' case (developed by paired sales, regression analysis, and case studies) were due to the public perceptions of the landfill and its stigma characteristics as evaluated by potential real estate buyers in the larger community. The survey did not attempt to quantify in dollar terms the lost value of property in the class area since this was established with standard appraisal methods including the use of case studies, paired sales analyses, and multiple regression analyses. Even though these techniques did show loss in value, there may be a question as to the causal link between an environmental disamenity and the loss in value. What the survey did was link the landfill with a stigma effect on public opinion about the desirability of housing and property in the class area. This allowed the appraiser to account for the negative values identified in the sales data and to understand the causal link between public responses to the stigmatized neighborhood and the diminution this caused in property values. In other lawsuits of this type, defendants might show alternative sources of property loss or challenge the survey design, methods, analyses, and conclusions. In terms of the subject class action lawsuit, the outcome was a settlement of the case shortly before it was scheduled for trial.

**James Flynn, PhD,** is a senior research associate at Decision Research in Eugene, Oregon, and a senior fellow at the Pacific World History Institute in Stockton, California. He graduated from Eastern Washington State University and completed his graduate degrees at the University of Washington. He has published more than 50 articles on public perceptions and responses to technological and environmental risks. In 2001, he published *Risk, Media and Stigma,* with Paul Slovic and Howard Kunreuther. **Contact: jflynn@decisionresearch.org**

**Donald G. MacGregor, PhD,** is president of MacGregor-Bates, Inc., and a senior research associate at Decision Research, both in Eugene, Oregon. He graduated from California State University, Sacramento, and completed his graduate education at the University of Oregon. He has published extensively on judgment, decision making, and the perception of risk. **Contact: donaldm@epud.net**

**Wayne Hunsperger, MAI, SRA,** is a principal with the appraisal firm of Hunsperger and Weston, LLC, in Greenwood Village, Colorado. The firm is a full service real estate appraisal company with special capabilities in the valuation of open space, eminent domain takings, and properties impacted by disamenities or contamination, including entire residential neighborhoods and special properties of various kinds. He often works with multidisciplinary teams including engineers, economists, statisticians, and social scientists. He is a graduate of the University of Texas, with a degree in business. **Contact: wayne@hwltd.net**

**C. K. Mertz, MRCP,** is a research associate at Decision Research, in Eugene, Oregon. She graduated from Oklahoma State University and received her master's degree in regional and community planning from Kansas State University with additional graduate studies in statistics at the University of Oregon. She has coauthored more than 40 articles in journals such as *Human and Ecological Risk Assessment, Risk Analysis,* and *Health, Risk & Society.* **Contact: ckmertz@decisionresearch.org**

**Stephen M. Johnson, PhD,** is president of Northwest Survey & Data Services, in Eugene, Oregon and is a research associate at Decision Research. His undergraduate and doctorate degrees are from the University of Oregon. He has published more than 40 articles and book chapters on a wide variety of subjects in social science and science journals, including *The Journal of Psychology and Financial Markets, Journal of Behavioral Decision Making, Journal of Risk and Uncertainty, American Scientist,* and *Journal of Geophysical Research.* **Contact: stevej@nsdssurvey.org**