Center for Technology, Environment, and Development
of the George Perkins Marsh Institute
Clark University
Worcester, Massachusetts 01610, USA
Phone: (508) 751-4612    Fax: (508) 751-4600

March 10, 1999

## Declaration of Robert L. Goble

I have reviewed Defendants' Reply Brief dated February 4, 1999 together with Affidavits by Dr. John Auxier and Dr. John Frazier, by Dr. Otto Raabe, by Dr. Joseph Rodericks, and by Dr. M. Laurentius Marais. In my judgment these materials reflect i) an inappropriate characterization of the nature of scientific work, and ii) insufficient care in reading my report of November 1996 (Goble 1996), particularly in relating my methods and results to the questions I addressed. Since these issues are discussed in some detail in my report, I was tempted not to respond (a choice I made earlier in these proceedings). Three concerns have caused me to change my mind. First, the Defendants argue that the expert himself should offer an hypothesis or provide reasons for using or not using a data set and statements by the lawyers who retained the expert are not an adequate substitute. Second, they cite the decision to exclude my testimony in the Hanford case; that decision contains numerous misrepresentations of my reports; these misrepresentations were contained in Defendant's briefs and my corrections were not read by the Judge because he decided that I had submitted them too late in the process; I am not eager to repeat that experience. Third, while the admissibility of scientific evidence must ultimately be a legal judgment, I believe that a scientist's perspective on what we do in science should weigh in that judgment; I have become increasingly concerned that through legal and other debates, the public is losing sight of the centrality of consensus building in science; it is the development of consensus that gives science its particular power to discover new truths and to develop applications which help people's lives. Accordingly, I will try to clarify the considerable agreement there is between Defendant's experts and me on the underlying science, along with characterizing the main points of contention. I will also try to be brief (not usually my strong point and I write this more in hope than certainty) since I believe that at issue are concerns about the overall soundness of my approach and the appropriateness of my choice of methods, not small points of data interpretation or specific methodological detail over which particular scientists may differ. I do stand by my report[1], however, and probably can not resist responding to a number of the small points.

---

[1] The report was written in 1996; at that time, as discussed in the report, the RAC review had not been completed; based on the completed review, cited by the Defendant's experts, it is possible that I would

Defendants' assertions about my work and the organization of my response  Defendants
make seven main points in attacking my work (21-22): the first six refer to my plutonium
concentrations, the seventh to beryllium:

    a)  that I fail to generate hypotheses and assess rates of error

    b)  that the ranges of possible doses or other impacts are too great to be reliable
       and thus have an "unacceptable" rate of error

    c)  that I assert that an upper 95%ile estimate may be informative concerning
       medical monitoring, "but" testified that those estimates were only 5% likely
       to be correct

    d,e) that I fail to test my "computer generated" estimates against real world data
       for e) deposition velocities and d) historical air concentration measurements.

    f)  that I "inappropriately" use a multiplier to "generate" all my results for any
       time period relevant to this case; that is any time after 1970.

    g)  that I fail to demonstrate relevance to the case

    h)  that my beryllium estimates are similarly flawed (the above six reasons) and
       in particular that I "admit that my estimated 'ranges' for beryllium are
       unlikely to be true".

To avoid too much redundancy, I find it efficient to organize my response according to a
different sequence of issues, as follows:

    o  The appropriate use of scientific information in this context (here I address
       defendant's points a), b), c), and aspects of points, and d,e)).

    o  Mistaken characterization of what I did (here I address points d,e) and f),
       and there are small examples in other points).

    o  Particular issues raised by the beryllium analysis (point h)).

    o  The relevance of my testimony (point g)).

The appropriate use of scientific information  As indicated in my report, my scientific
background includes many years of research and teaching experience in high energy
physics and risk analysis. The report also explains the scientific approach based on risk
analysis I brought to the Rocky Flats case.

Defendants assert that I do not present a hypothesis and test it and that this demonstrates
that my work is not scientific. Hypothesis testing is only one of the many activities which

---

change somewhat the weighting I would ascribe to various data sets were I writing the report now. The
methodologies used would not be altered, nor the general picture of uncertainties, nor the relevant
conclusions. However, some numerical detail might be different.

constitute science and much important scientific activity neither involves hypothesis testing
nor even (except in the most general sense of characterization of ideas) hypothesis
formulation. Classic examples of scientific activity include <u>careful observational work</u> such
as that of Darwin (some of which led later to the theory of evolution) and Tycho Brahe
(whose astronomical observations established the basis for Kepler, Galileo, and Newton to
develop a model for planetary motion around the sun[2] and then a theory of gravitation), <u>the
formulation of a theoretical model which synthesizes concepts previously kept separate</u>
such as Maxwell's formulation of electrodynamics and much of Einstein's theoretical
work, <u>the careful measurement of an important property in nature</u> such as Milliken's
measurement of the charge on the electron. On a much less profound level good
fundamental science can be done by establishing (or showing reason to question) the
coherence of prevailing scientific ideas and models amongst themselves and with existing
or potentially attainable empirical data. A couple of old examples from my work in
theoretical physics are a paper I co-authored showing how classical and quantum
electrodynamics provide exactly the same information at energies where both should apply
(Brown and Goble 1968b) and a series of papers I wrote (again with collaborators) in the
late 1960's and early 1970's showing that certain generally accepted symmetry principles
plus one property of a then new partial theory[3] was sufficient to describe some known
observations (Brown and Goble 1968a, Goble and Brown 1971, Goble and Rosner 1972)
the message was partly a boost to the theory, but also an indication that present and future
experiments would not likely be able to distinguish between more complete theories that
still satisfied the one property. Fifteen years later, with a new generation of experimental
facilities new data emerged, and we finally were able to write a paper testing the predictions
(Rosner, Goble, and Rosenfeld 1989). Even so, testing the original hypotheses was still
not our main concern: particle theory had advanced quite a bit, and the point was really that
those systems still did not discriminate among theories that had the original basic
properties.

Risk analysis is a comparatively new scientific discipline which synthesizes information
from a number of scientific fields and focuses on the use of such (integrated) information to
answer questions about natural and technological hazards posed by public concerns. The
field has advanced substantially in the past 20 years, including the development of

---

[2]Note that there are no observations that test whether the earth moves around the sun or (as it appears) the
sun moves around the earth; it is just that the mathematics is easier; all of the tests come later as tests of
Newton's laws of motion and theory of gravity.
[3]This was an elaboration of a set of relationships among particles involved in nuclear forces called then by
its practitioners "current algebra". The working out of these relationships led to what is now known as the
"standard model" which is a much more complete description of particle interactions than we had then.

improved methodologies especially for analyzing uncertainties and human and ecosystem diversity, the acquisition of much more empirical data which can be used to illuminate many risk issues, and a better understanding of many processes and aspects of human behavior which lead to risks. Perhaps the most important intellectual developments have been refinements in our understandings of difficulties in and approaches to formulating the important questions to be addressed in a particular context. These advances have been documented in a series of three National Academy of Sciences reports, *Risk Assessment in the Federal Government* (National Research Council 1983) (known affectionately as the "red book"), *Science and Judgment in Risk Assessment* (National Research Council 1994), and *Understanding Risk* (National Research Council 1996).

Although many of the fields from which risk assessment draws its information, such as epidemiology and toxicology, place an emphasis on hypothesis testing, such testing is often not feasible or appropriate for a full risk analysis. A famous example is the Challenger accident in the space shuttle program. It is well known that NASA engineers had estimated the risk of an accident to be less than 1 in a hundred thousand. Less well known is that NASA had also commissioned a risk assessment by professional risk assessors (including William Colglazier, now executive director of the National Academy of Sciences) because of concerns about launching a plutonium reactor; NASA did not release this analysis which predicted a risk of around 1% (one in a hundred) (Colglazier 1987); most people would consider this too high a risk for launching a plutonium reactor (at least without further study of what might happen to the plutonium) and too high for sending tourists aloft. So the assessment(s) should have been informative; yet there was no testable hypothesis for either. Hindsight shows that there were indications of potential problems in earlier launches, and I believe that a judgment could and should have been made that the 1% figure was much more realistic based on both a priori grounds and on those indications. Such a judgment would have been based on consistency of the prediction with recent experience within the program and experience with other complex, highly engineered systems early in their development; it would have been an informed and objective judgment, but not one reducible to the testing of a hypothesis.

Similarly, when EPA or other regulatory agencies use a risk assessment to establish a regulation for a hazard, the assessment is generally not testable, yet it is still a scientific basis for regulation. EPA and the other agencies are obligated to develop regulations that are protective of the public. For any reasonable definition of protective, that means that harmful effects at hazard levels somewhat above the standard will not be detectable. (An

4

Rob Goble                              ☎ 617-566-8574                      ฿1 3/11/99      3 12 37 ΔΜ    ...

epidemiologist I know remarks that one can define an "environmental disaster" as an exposure so large that an epidemiological study will give statistically significant results.)

As discussed in my report, my concern in this case was to provide exposure and risk information relevant to this case, namely relevant to concerns about medical monitoring and losses in property values. It is clear that people were exposed to air borne plutonium and related radioactive isotopes. How large those exposures were is less clear, but given the very limited historical data base, it is clear that considerable uncertainty about the exposures will remain. Because of the large uncertainties, for both medical monitoring and losses in property values, understanding this uncertainty and the associated range of possible exposures is the most relevant objective. Among the concerns in determining the appropriateness of medical monitoring is estimating how much disease might be found, and would the benefits of a program outweigh possible harm caused by it. But this concern must be primarily with the possible range of magnitudes of exposure (and the range of possibilities for finding disease) not with a particular estimate of exposure.

Accordingly my objective was to examine the historical data base and to use it to make a reasonable characterization of the uncertainties. The high range of such a characterization - unlikely, but not implausible, possibilities for relatively high exposures - is of particular concern for medical monitoring (as it is for protective regulation). My attitude in selecting data sets for use, therefore, was not to try to make informed judgments or inspired guesses about what most likely occurred, but rather to assess whether the data were strong enough to set limits on high exposures with reasonable confidence, while knowing that there was considerable public concern and that there would be controversy over interpretations. Thus I took an attitude which might be characterized as prudent skepticism; part of the assessment task was to consider what might go wrong in an analysis using a particular collection of information. Within the boundaries of prudent skepticism, however, I wanted to be careful not to exaggerate the uncertainty. As explained in my report, I expended considerable effort in modeling using relatively non-controversial data to avoid the exaggeration which can come from simply combining uncertainty estimates. The objective was to characterize the range of possible estimates a variety of analysts might come up with, depending on which data sets they chose to emphasize and how they treated uncertain parameters.

Such a characterization is, I believe, most pertinent to medical monitoring and to concerns about property values. It does not fall naturally into the hypothesis testing paradigm. Defendants' discussion on page 25 is illustrative. They begin with a comparison to case

6175664574         PAGE.05

law as it might be applied to an epidemiological study. At issue could be whether or not a study demonstrates an effect (a disease caused by an exposure, for instance), and they describe a test criterion wherein the study would be considered to demonstrate the effect if the data are sufficiently strong to rule out (to 95% confidence[4]) the possibility of no effect (which can be called the "null hypothesis"). This example is not very helpful to the issues at hand, since in our case there is no natural null hypothesis. The evidence is overwhelming that concentrations of plutonium in the air were greater than zero, that people were exposed, and there is good reason to believe that even low exposures cause a (small) increase in risk. So there is nothing to prove by a comparison with a null.

Defendants then give a different example (drawn apparently from a brief by plaintiffs). Hypothetically, in presenting a range 3 to 12 picoCuries (with 90% confidence), I would be asserting that I can use the data set and associated information to rule out with reasonable confidence (90%) values greater than 12 picoCuries (and less than 3 picoCuries, though that may be less relevant for medical monitoring). Defendants apparently believe that it would be helpful to call some value inside this range a null hypothesis and for me to assert that given the information base I use, I cannot rule out this value. It is hard to see any useful information (or "scientific import") that could come from such an exercise. Furthermore, to do so would focus my attention and those using my results on that estimate of exposures while what is most relevant is the range of possibilities. More to the point would be to call 12 picoCuries or greater the "null hypothesis" and for me then to assert that I can use the information base to rule out (with 95%[5] confidence) that null hypothesis. That, in effect, is what I have done in my report, and it is useful information for those contemplating a medical monitoring program. But despite what they say on p. 25, I doubt that this phrasing will satisfy Defendants. They claim on p. 26 that I am obligated to calculate "a rate of error associated with a theory" and I do present a rate of error associated with my exposure estimates, that is I find only a 5% (or 10%) chance of reaching the "null", as now defined; but as for a rate of error in "my rate of error", I must disappoint them. The only theory I use is a simplified model representing the fundamental physics of particle transport and deposition and there are excellent reasons[6] to believe that this model structure has a relatively low rate of error (compared to the uncertainties in model parameters and in the data base). Then there are the uncertainties in parameters and data; it is these I am trying to describe and for these, as I note in my report,

---

[4]Of course other criteria, stronger or weaker, might be appropriate depending on the circumstances.
[5]if the range 3-12 were symmetric; or at least with 90% confidence if not.
[6]both from its theoretical basis and from the extensive experience that people have accumulated in using it to fit experimental data

> It would be absurd to attempt a mathematically precise characterization of
> uncertainty. My colleague Dale Hattis describes this absurdity in his "third
> law of uncertainty analysis": an estimate of the magnitude of uncertainty is
> more uncertain than the uncertainty itself (Hattis 1990).

I can not know precisely whether 12 picoCuries is the appropriate null (for a given
confidence level) or 10 or 15.

Defendants will surely not be satisfied with this approach to hypothesis testing for another
reason: their concern is that my upper limit (which we are now calling the "null") is too
high; yet to disprove it, according to this paradigm, they would have to demonstrate the
likelihood of still higher values. This concern is legitimate; I have already expressed my
worries about exaggerating uncertainty and we can agree that an analysis should be
susceptible to question on this matter. But that is another reason why hypothesis testing is
not a determinative activity for scientific endeavor.

Another illustration of these issues is provided by alternative model formulations for
estimating air concentrations in the period 1965-70 provided by Drs. Auxier and Frazier in
their affidavit paragraphs 44-48, and by Dr. Raabe paragraphs 20-22. Deferring for a bit
the question of what is a "scientifically defensible" choice of parameters and a discussion of
certain misreadings about my approach by these experts, we can note that all of these
models have the same structure. We agree on the basic physics and we all use the same
equation described at the end of my Table 4.1[7]. Drs. Auxier and Frazier alter the
probability distribution for one parameter, the deposition velocity, changing both the central
value and the spread of the distribution. Dr. Raabe uses single values within his
calculations (which he calls a "deterministic" calculation) and refers to a more elaborate
model based on the same physics, paragraph 22, from the Chem Risk effort. The
numerical comparisons for air concentrations in sector 4B are of some interest. The mean
of Drs. Auxier and Frazier's distribution is approximately 100 times lower than the mean of
mine; the mean of Dr. Raabe's first model is another 8 times lower than that; the mean of
his second model is yet another 8 times lower, and he quotes approvingly his (probably
mistaken) interpretation of the Chem Risk estimate as still another 7 times lower. So the
numerical spread of mean estimates presented by Defendants' experts is approximately a
factor of 500. And we have not included any estimates by them of their uncertainty. Drs.
Auxier and Frazier note that the mean value of their modified model provides a good fit to a
particular data set from one air collector which might be construed as representing

---

[7]And we agree on many of the complexities which the simple equation imperfectly represents

7

concentrations near 4B. My mean value, in contrast is approximately 100 times greater, while Dr. Raabe's extend from a factor of 8 to 500 lower.

More interesting, however, is a comparison on the point of real concern. With what certainty can one rule out higher exposure values. If we use Drs. Auxier and Frazier's probability distribution as a representation of their uncertainty - the point of my approach - we would discover that they are 95% confident that the average concentrations are less than 4 times their mean (which they found agreed with observations over a limited period of time at a single monitor) and, reminiscent of the NASA engineers, they would be confident to better than one part in one hundred thousand that the values do not exceed my mean estimate. Dr. Raabe does not provide an assessment of the uncertainties in his analysis so we can not conclude anything beyond that he considers it likely that the concentrations were very small, despite the readings of that one monitor.

Now in fairness to Drs. Auxier and Frazier, they do not present their modified model as something they endorse and they make other criticisms of my work (which we will discuss later) which suggest that they would not use this model to represent their uncertainties. But nowhere do the defendants' experts provide a detailed analysis of their uncertainty in assessing the possible exposures people may have experienced.[8]

It is unfortunate that the uncertainties in estimating air concentrations (and the doses that would result from breathing that air) are so large. But the broad range for such estimates is not the fault of the analyst, and disputes about factors of two or more here and there will not alter the fundamental circumstances. The problem stems from a failure of the plant operators and the U.S. government agencies to monitor and study the effects of releases while the releases were occurring; and this was compounded by the very long time lag before anyone made a serious comprehensive attempt to establish what the impacts of the plant were.

To wrap up this somewhat prolonged discussion: my analytic objective was a reasonable characterization of uncertainty in exposures that would reflect the evidence then available and would be accessible and useful to those considering developing a medical monitoring program. This effort did not provide testable hypotheses in the narrow sense of offering a

---

[8]One might speculate that they chose not to provide such an analysis because the range would fall into the Defendants' category of "simply too broad to be reliable" and, according to Defendants, grounds for exclusion of their testimony.

simple prescription by which the available data, taken together would refute it.[9]  However,
it was an objective scientific endeavor: it could be modified or refuted by reliable new
evidence, and it can be evaluated according to the demands of science: i) that the methods
be directed toward the questions asked and capable of providing answers, and that any
assumptions made be reasonable and clearly stated, ii) that it be grounded with suitable
empirical evidence, iii) that it be consistent with the laws of nature as we understand them,
and iv) that it be logically coherent. The first two items on the list correspond to the
definition presented by Dr. Rodericks (para 4, which he divides into three items) and I am
sure he would accept the remaining two items as well. A possible point of dispute between
me and Dr. Rodericks has to do with what stringency one treats the (necessary) use of
assumptions. My use of the word reasonable allows for assumptions whose (unverifiable)
details will not appreciably affect the final result (such assumptions are virtually ubiquitous
in scientific analysis) and for using assumptions which may have significant impact, when
the object is to learn what impact the assumed property or event may have. (Such
assumptions may not be verifiable in practice, that is with existing data, but they must, as
Dr. Rodericks asserts, be objective and (within the shorthand of normal scientific
discourse) explicitly described; the use of assumptions in this fashion is both very common
and an essential aspect of scientific practice.)

After this lengthy preamble, I can address the remaining complaints about the in my report
science rather briskly according to the demands i)-iv).

The previous discussion covers many of the main issues about the use of the methods.
Ranges of exposures are an appropriate objective if the concerns are medical monitoring or
loss of the use, enjoyment, and value of property, and it is the analyst's duty to identify
how broad it is, not to pretend to an unattainable accuracy. The method I followed is a
standard one as described for instance in the NAS report *Science and Judgment in Risk
Assessment.* which Dr. Rodericks also recommends. It makes use of commonly applied
relationships (such as the deposition velocity equation). The method focused on these

---

[9]Here I might go back to the Challenger example. Suppose we had had better luck and successfully
launched another 50 shuttle flights. Such success would not have proved the NASA engineers correct, and
indeed, there may well have emerged other, less fatal, indicators of potential problems. Similarly we do not
have experience with hundreds of (properly monitored) Rocky Flats plants to learn what the distributions of
exposures actually are, or whether on some few occasions air concentrations and doses at the upper end of
my probability distributions would be found. However, like the Challenger accident there is available one
warning against too much confidence that we have very accurate knowledge of what has happened here.
This comes from the closest analog to the Rocky Flats plant, the plutonium refining plant at Hanford
which was operated in the same time period by the same contractors. It is by now clear (Cochran 1997)
that plutonium emissions from that plant were hundreds of times greater than was claimed by the operators
and than were estimated in the extensive dose reconstruction efforts of the past few years.

principal concerns: setting limits on the possibilities for high exposures, and concentrating on the respirable portion of the plutonium aerosol which is the hazardous portion. Defendants' argument that the ranges presented are unscientifically broad is essentially an assertion that science can not provide relevant information when there are large uncertainties. I dispute this and I would expect that so would most risk analysts and many scientists in a variety of fields.[10] Defendant's related assertion that I based my medical monitoring opinions on my "upper 95th percentile estimates, but (sic) testified that those estimates were only 5% likely to be correct" is tautologous. The point, presumably, is that science has no business in making estimates for such low likelihood occurrences, or it is that Courts should not trouble themselves with such estimates. As discussed before, low likelihood possibilities are often of great concern, as in the cases of the space shuttle program and protective regulation. Scientific analysis which can distinguish between low likelihoods of a few percent, and very low likelihoods of a chance in a hundred thousand is needed in a variety of settings, including, in my opinion, assessing the suitability of medical monitoring. The Monte Carlo methods I chose and the selection of probability distributions within the analysis were specifically directed toward making that distinction. to avoid exaggerating uncertainty, yet to maintain a prudent skepticism toward the various sources of information so as not to minimize or overlook real but unlikely possibilities. The methods were not directed toward making best estimates of exposure as that is not the primary concern in this setting.

With regard to empirical grounding, Defendants assert that I fail to use relevant data regarding air concentrations and regarding deposition velocity; they also suggest that I show a pattern of disregarding data and cite Judge MacDonald's ruling in the Hanford case to support this suggestion. My reasoning concerning the air concentration data is briefly discussed in my report and was pursued further in my deposition. My judgment at the time I wrote my report based on the draft review by RAC was that the various data sets from before 1970 were potentially informative but not sufficiently strong to constrain air concentration levels with very high confidence. The final RAC task 4 draft of 1997 provides some more detail on those data, but does not substantially alter my judgment.

I can explain my concerns pertaining to low likelihood but not negligible possibilities by contrasting one of the data sets I did use - the extensive set of measurements of plutonium in soil performed by HASL in the early 70's with the air concentration data. The soil data may be regarded as robust in the following senses: i) the measurements were taken by an

---

[10]We were often coping with orders of magnitude uncertainty in considering applications of elementary particle physics to cosmology and cosmic ray physics, for instance.

Bob Goble                                    ☎ 617-566-8574                       ꝓ3/11/99      ⌐ 12 15 AM      ⌐ 11⌐1

experienced independent laboratory with the purpose of identifying the extent of
contamination (rather than performing measurements to demonstrate compliance with a
standard); ii) protocols for these measurements were extensively documented and quality
assurance and measurement capabilities were addressed at the time the measurements were
made; iii) soil samples in the same general area have been analyzed by several groups over
the following years with compatible findings; iv) the pattern of contamination is clearly
defined and can be directly interpreted as resulting from Rocky Flats operations; v) this
interpretation is bolstered by further isotope ratio studies. There is thus very little chance
that a much greater plutonium "footprint" could exist in the soil around Rocky Flats and not
have been detected. So the data are useful not just for giving a picture of what the most
likely events were at Rocky Flats, but also to set limits on how much plutonium might have
been in the air.

The various sets of air monitoring data that have been reviewed by RAC are not so
satisfactory: i) air measurements are necessarily transient - they can not be repeated, while
soil will hold plutonium for substantial periods of time and there has been effective
repetition and confirmation of soil concentration determinations; ii) air measurements are
dependent on the reliable performance of collectors that must operate unsupervised for
substantial periods of time over a wide range of weather conditions; iii) air sampler
performance is very sensitive to the performance of filters and changing and maintaining
them is a continuing operating problem; iv) there was little systematic spatial coverage of
the contaminated region even in the later years and for 1970 and earlier there are only a very
few sampling stations with sustained records over long time period; furthermore samplers
close to the area of release may well not have been in the path of some significant releases;
v) many of these samplers, particularly in the early years, operated only intermittently; for
instance, the sampler S-18 that Drs. Auxier and Frazier discuss in their earlier report was
programmed to operate only five minutes out of an hour; vi) there was very little off-site
sampling which was sustained through the period of maximum releases; vii) historical
reconstruction of operating protocols and quality assurance has been necessary, and we are
dependent on memories and modern reconstructions to assess how well the measurements
were made in practice; viii) it was necessary to transcribe the data and there are known
examples of discrepancies between the initial recording of values and subsequent reporting;
ix) contrary to Defendants' experts' assertions, we are not absolutely certain about the
conditions when most of the releases occurred; however, it is likely that they were
intermittent, and at least sometimes occurred with unusual weather conditions such as high,
or gusty winds; this means that average performance of air monitors, especially those that

11

operate intermittently, may not be fully informative; x) there are inconsistencies among the various data sets which have not been fully explained.[11]

Despite these difficulties, air concentration data may well prove useful in attempting to assess plausible exposure scenarios and RAC has made progress along those lines. The difficulties do seem to rule out using the sampling data as the primary tool for setting bounds to exposures with a high (5%-95%) degree of confidence. Contrary to the assertion of Drs. Auxier and Frazier (para 26) I did choose to use some of the air concentration data from 1971 on in estimating ranges of exposures in that time period; the primary data set I used were measurements by HASL. For this time period considerably more data sets were available with better spatial and temporal coverage and better documentation of operating protocols and opportunities for comparisons between measurements taken by different organizations. Even so, the measurements do not give rise to a clearly defined spatial pattern. My confidence in using them was enhanced because for this time period I could also set reasonable limits on amounts of plutonium released, so I had an independent approach for establishing upper bounds.

Along with my primary data sets - the soil concentrations relating to the 903 pad releases and the air concentrations and potential releases from 1971, I reviewed a substantial body of empirical data, much of it site specific, on other key properties used for inferring the ranges of potential exposure. This review is summarized in my report and includes discussion of other data sets which can be used along with the HASL data, evidence regarding size distributions of particles both in the air and in the soil, evidence regarding the retention of plutonium in soil, and evidence regarding the mix of related isotopes, especially americium. Defendants and the experts assert that I should have been much more selective among those data sets and known somehow with very high confidence that there was only a small percentage of respirable particles in the areas where people were residing and that the plutonium in those soils was exceedingly well retained. As described

---

[11]An indication of the problems in interpreting the data is the difficulty in detecting from off-site air concentration measurements, the high releases inferred by RAC during early 1969 from on-site air monitoring information. The Colorado Department of Health sampler APC-56 which provides data for two years 1969-70 from the 903 pad release period shows moderately enhanced readings in the first six months of that period - the period that RAC concludes was one of the highest release periods - namely readings that are approximately 4 and 1/2 times greater than the average for the next 18 months. The January value, identified by RAC as a particularly high release time was 9 times greater than this average. The corresponding ratios from the on-site sampler S-8 which was used by RAC in developing its picture of release timing are a much greater 30 times over the six month period and 120 times for January. Furthermore, there are subsequent occasions in 1971 and 1972 when APC-56 gives readings similar to or larger than the January 69 value, while there is no evidence of massive releases at these times nor are there elevated readings on other monitors (RAC 1997). The S-18 monitor that Drs. Auxier and Frazier study gives no indication of the early 1969 releases.

in my report, the data on both of these issues show considerable variability which in my view should be taken into account rather than ignored. And there are further considerations. As both Drs. Auxier and Frazier and Dr. Raabe point out, the deposition velocity for large particles is higher than for small ones; the consequence is that much of the plutonium contained on very large particles will have fallen out before we reach that portion of the plutonium footprint where people were living. Similarly the bioturbation work of Smallwood and the analysis of Webb show that there are mechanisms from which we expect losses of plutonium from soil, even if it is tightly bound.

I also conducted an extensive review of the literature on deposition and its representation in terms of a deposition velocity. Contrary to the implication of Defendants, there is not a representative set of real world data on deposition velocities for the broad region from which the HASL soil samples were taken. There were some important studies performed at the Rocky Flats plant by Sehmel, and these have contributed importantly to the literature on both deposition and resuspension; I referred to this work both directly and indirectly since it informs the analyses compiled in NUREG 6244 (U.S. Nuclear Regulatory Commission 1995a, U.S. Nuclear Regulatory Commission 1995b, U.S. Nuclear Regulatory Commission 1995c), my final source for selecting uncertainty distributions for deposition velocities. NUREG 6244 is in fact an excellent compilation of both theory and empirical data on deposition since it presents in Appendix A, eight separate detailed analyses each by an expert of a set of practical problems regarding possible radiation exposures resulting from the deposition of respirable particles. It is this very substantial body of information which defendants and their experts apparently believe should be ignored. Drs. Auxier and Frazier and Dr. Raabe both assert that I have chosen inappropriately to use values for small (1 micron) particles since, according to them most of the aerosol will consist of large particles; they also assert that even for small particles the distribution is too broad because it was designed for a broad range of conditions. As I will discuss shortly, their comments on the choice of size is a misinterpretation of my method which focuses specifically on small particles. A careful reading of Appendix A to NUREG 6244 shows convincingly, I believe, that the uncertainties in deposition velocity are already very large even when evaluated by a particular expert for a particular type of terrain. When one considers that surface conditions and weather conditions are not well specified for the region from which the pertinent soil samples were drawn, this seems strong empirical evidence that the deposition velocities for a locale are not well known.[12]

---

[12]Dr. Raabe leaves the impression that the 1 micron choice minimizes the deposition velocity, maximizes its uncertainty, and thus gives the highest possible air concentrations. The data presented in Appendix A shows that this is not generally correct; deposition velocities are expected to be even lower for still smaller

Dr. Raabe and the Defendants argue that I am mistaken in using the expert solicitation results presented in the main text of NUREG 6244 since in Appendix D we can learn that seven of the eight did not satisfy a calibration exercise using a particular set of experimental data. Dr. Raabe states that this means that the "report itself indicated that seven of the eight deposition velocity estimates used in composite by Goble cannot be relied on at all." This is a complete misreading of Appendix D and the entire report. The calibration procedure was an experimental one that was being tested in this exercise and Appendix D carefully describes its potential advantages and disadvantages including its possibility for arbitrarily excluding expert elicitations based on an inappropriate choice of test data. The authors themselves who are experts in expert elicitation chose to present as their primary elicitation that based on an equal weighting. And one of the authors, Roger Cooke, provides his interpretation of the result of the exercise (p. D-5): that seven of the eight brought theoretical considerations (from the fundamental physics of fluid motion) to their estimates as well as their experience with experimental data, and these theoretical considerations skewed their distribution compared to the particular test experimental data set that was used. But perhaps if seven of eight international experts choose to include theory as one consideration, one should not ignore that in assessing a range of values that experts might reasonably assign. Furthermore to use only the distribution provided by that one expert would not alter the basic character of my results. Drs. Auxier and Frazier question (para 40) my use of a log normal distribution to characterize the uncertainties in the deposition velocity. Log normal distributions are a standard default as described in *Science and Judgment in Risk Assessment* (National Research Council 1994), and my prescription is also recommended by Seiler and Alvarez (Seiler and Alvarez 1996) in the paper cited by Dr. Raabe. While NUREG 6422 (U.S. Nuclear Regulatory Commission 1995a, U.S. Nuclear Regulatory Commission 1995b, U.S. Nuclear Regulatory Commission 1995c) does not use a particular distributional form, its focus on the median and symmetric 5th and 95th percentiles is conducive to log normal fitting.

Drs. Auxier and Frazier task me for using ICRP-56 for calculating inhalation doses from plutonium and the other radioisotopes. In preparing the report I reviewed the extensive literature on inhalation dosimetry including published and unpublished work on variability among individuals. The choice I made then to use ICRP-56 is explained in my report; it had been the standard reference, was familiar to many people and had been extensively

---

particles (down to a .1 to .3 microns) and if the mix of respirable particles was weighted toward these smaller ones that could lead potentially to higher concentration estimates. In my judgment most experts implicitly (and sometimes explicitly) assume the possibility of a mix of particle sizes around the specified one micron, and so their uncertainty estimate includes this.

reviewed. It is important to remember that there is considerable uncertainty in radiation dosimetry (and the differences between ICRP-56 and 71 partly reflect this uncertainty), though these uncertainties are not nearly so great as those found in my exposure estimates. The uncertainty estimate I used for relative biological effectiveness referred to by Drs. Auxier and Frazier was taken from the RAC review.

One final aspect of empirical grounding I wish to emphasize is the problem of expert overconfidence. The evidence for this phenomena is not simply anecdotal as when I mention the NASA engineers. The phenomenon has been widely studied in the psychometric literature; Roger Cooke provides a helpful review as of 1991 (Cooke 1991) and there has been much study since. It is a major challenge to the expert elicitation process as discussed in NUREG 6422, and should be taken into account in any characterization of uncertainty.

Defendants imply, by bringing up the Hanford case, that I have a propensity not to use data for validation purposes. There is an apparent paradox in their doing so, since their fundamental objection in that case was that I had used monitoring data to correct the Hanford Dose Reconstruction Model which had (with its original choice of parameters) failed to fit the data. I had also compared the correction to the other monitoring data sets that the Hanford program had prepared as suitable for validation and found significant improvement compared to the original model. Their position, based on a supporting expert affidavit, was that I should either have used the original model despite its failings or created a new data set to test my modifications. Now the circumstances in the Hanford case were different: in it I was trying to make exposure estimates for individuals who wished to demonstrate that their already manifest injuries had been caused by their exposures, so my primary concern was with making the best estimate rather than with developing an uncertainty range (hence the quote of mine provided by Defendants on page 29) - although I felt it appropriate to estimate my uncertainties as well. And the different circumstances meant that the problem of evaluating the validity of my methodological approach was also different. The ruling by Judge MacDonald including some of the excerpts submitted by defendants in their brief here contain serious misinterpretations of my work; most of these came from defendants filings in that case. I prepared a reply to that brief; it was not, however, considered by the Judge in his ruling. I attach a copy of my reply and should the ruling and/or the excerpts be considered relevant, I would urge the Court to read it.

After spending so much time with the empirical data base that I used, much of which has been ignored by Defendants and their experts, it is a relief to turn to the basic science on

which pretty much we agree. Drs. Auxier and Frazier and Dr. Raabe accept the basic equation expressing the relationship between air concentrations and amounts deposited in terms of a deposition velocity, and we all agree that this is a simplified representation of very complex physical processes and that because it is simplified, there are possibilities for misusing or misinterpreting it. I shall show in the next section that Drs. Auxier and Frazier and Dr. Raabe are simply mischaracterizing my methods when they assert that I am misusing the equation. For now it is worth pointing out that although the term "deposition velocity" can create a mental picture of a particle falling, the actual physics is quite different. Except for quite large particles (which do fall), most particles travel complex paths moving primarily with the surrounding air. Deposition occurs when a particle gets close enough to a surface to stick and that depends on local and instantaneous details about the surface, the particle, and the turbulence of the air flow[13]. None of these details are resolvable in environmental settings, and that is why it is appropriate to represent average amounts of deposition using a deposition velocity. Size of particle and wind speed affect deposition in systematic ways but only in some circumstances is it feasible to separate their effects from other influences.

Defendants (p. 36) and Drs. Auxier and Frazier (para 51) claim that my approach does not satisfy the requirement of logical coherence in that I assume that 100% of plutonium in soil was released during 1965-70 and that an additional 10% was released in the years 1958-64, so that, in effect, I am double counting the plutonium in the soil. This is a frivolous claim. Logical coherence is worthwhile only at the level of accuracy of the analysis; we do not fault an analysis if because of rounding errors a column does not add up to exactly 100%. In this case we are considered with uncertainties of an order of magnitude (or more) and 10% can only be construed as a rounding error. Indeed many scientists including myself (though I do not follow this perfectly), regard it as good scientific practice to avoid presenting more significant figures than the analysis justifies so as to avoid giving the impression of greater accuracy than the method provides.

Mistaken characterizations of my analysis

Drs. Auxier and Frazier and Dr. Raabe misread my analysis in their discussion of my treatment of particle size. We all agree that deposition velocities have a strong dependence on size of particle and that therefore one should not expect to apply a single deposition velocity to a very broad range of particle sizes. We also agree that the size of a particle very

---

[13]Sehmel, for instance, lists 80 factors that influence rates of deposition; humidity is a particularly important one (Sehmel 1980, U.S. Nuclear Regulatory Commission 1995b)

strongly influences the likelihood that if breathed it will lodge in the lungs. For that reason it is important, as Drs. Auxier and Frazier recommend, to "stratify" an analysis on the basis of particle size (they also recommend stratifying on the basis of wind speed and I will return this issue shortly) and contrary to their assertion (para 36), that is exactly what I do by focusing on respirable particles as I characterized them.[14] Contrary to the impression created by Dr. Raabe (para 10) there is no unique generally accepted characterization of respirable. Indeed for any particle size there is both considerable uncertainty and variation among individuals as to what proportion of particles will be deposited internally and how they will be distributed in the respiratory tract. Furthermore the experimental literature uses a wide variety of characterizations often specific to the particular characteristics of the measuring equipment used in a particular study. The characterization I used for my analysis was the small particle fraction of the overall mix where the definition of small was not based on a particular cutoff or any particular assumption about the mix of (small) sizes in the aerosol but was rather a functional characterization: that portion of the ensemble of particles which would behave sufficiently like particles of one micron aerodynamic diameter for a consistent analysis within the uncertainty modeling framework. The choice of one micron as providing a rough definition of characteristic properties was not arbitrary: one micron represents the range of sizes considered in the dosimetry analysis of ICRP. Given the uncertainties in all of the key properties and the disparate sources of data, a rough functional definition is most appropriate and most suitable for interpreting the uncertainty displayed in the experimental data.

As described in my report, I specifically chose not to assume that the distribution of particle sizes could be specified mathematically in advance as in done in the fugitive dust models of Chem Risk and the EPA as described by Dr. Raabe. The evidence to support such presupposed distributions is limited; most importantly, to draw conclusions about the proportion of small particles at distances well removed from the Rocky Flats plant from a fit based almost exclusively on the distribution of large particles near the plant is an extrapolation which should be viewed as having a very substantial uncertainty. For the objective of my effort, I believe that it is better to work in a model independent framework with the direct focus on the small particles of most concern.

For related reasons I did not stratify by wind speed. While it is most plausible that the bulk of the releases occurred intermittently and with an association with high wind speeds, the details of this picture have not been filled in. Other considerations are important, especially

---

[14]Elsewhere, see for instance their footnote 20, they do seem to have noticed this stratification.

human activities such as the handling of the leaking tanks and attempts at clean up. Furthermore, in gusty configurations the wind may not be at the same speed for deposition as for resuspension. Most importantly, intermittent releases imply that we are very uncertain about actual surface conditions such as humidity and micro meteorology at the relevant times and these uncertainties are likely to be more important than the effects of wind speed on deposition velocity. The qualitative features of my analysis are thus not very sensitive to this choice.

Defendants mistakenly assert that I did not directly estimate plutonium exposures for periods other than 1965-70. As described in my report, I used independent data sets to estimate (uncertain ranges of) exposures from the 1957 fire and from resuspension during the period from 1971-89. I followed the RAC review to conclude that early releases - 1958-1964 - from the 903 pad were substantially smaller (10%) than in the later 1965-70 time period and expressed that assumption as a multiplier to the 1965-70 estimates making the assumption that the uncertainty in the proportion released would be subsumed under the very great uncertainty of the release estimates generally. With respect to the 1957 fire and the period from 1971-89, I did express my results from my analysis[15] as a multiplier of the 1965-70 results. The effect of doing so was to use the broad uncertainty range derived for 1965-70 also to characterize the uncertainties in the estimates for those two sets of releases. The use of the common uncertainty ranges was justified because the uncertainties in each of those other determinations were also very broad and because of its computational simplicity. An objective was to provide a readily understandable perspective for considering medical monitoring which showed what kinds of exposures might have happened over what time period. As I indicated before, there should be no issue regarding double counting of plutonium deposited since 1970 (or from the 1957 fire) since estimated concentrations are so much smaller than the estimates for the 1965-70 period. Defendants' do appear to acknowledge that my estimate of concentrations after 1971 was based on separate data in their discussion of my use Smallwood's study of bioturbation to make a release estimate. They fault Smallwood for not converting his resuspension estimate to a plutonium release; that analysis, as indicated in my report, was performed by me, and was the basis for the release estimate that I used which was one of the two bases for my post 1970 air concentration estimates.

[15]which was based on the RAC and Chem Risk analysis of the 1957 fire and used release estimates and the HASL air monitoring data for the 1971-89 period

Particular issues pertaining to beryllium

Defendants assert that many of the points they made about my plutonium estimates pertain as well to Beryllium: There is no hypothesis testing or comparisons to on-site monitoring data, and the uncertainty ranges in this case are even larger. In my view, my previous discussion applies here as well. Two specific issues are raised by Dr. Rodericks. One is the low probability I assign to the Chem Risk estimate; the second is whether there is any plausibility to the back calculation I performed analogous to the plutonium estimates using some very limited 1970's data on concentrations of beryllium in soil.

With regard to the Chem Risk estimates, contrary to Defendants' imputation on page 42, I meant no disrespect to them; I have heavily relied on their review efforts in my work. However, I disagree with them on this point (and as noted earlier, their reliance on a fugitive dust model with a presupposed distribution of particle sizes). As indicated in my report, when one looks at plant documents regarding the lack of care in handling beryllium scrap, the experience with plutonium and the 903 pad, the analogous situation at the plutonium plant at Hanford where routine air measurements failed to reveal massive releases of plutonium, and the continued reluctance to perform systematic off-site air and soil monitoring despite public concerns, it is difficult for me to be confident that the routine on-site air measurements have captured the full story.

With respect to the back calculation, it is clear as Dr. Rodericks points out and as is apparent in the Chem Risk and RAC reviews that there is no clearly discernible footprint left in the soil by beryllium releases from the plant The closest suggestion of a footprint is the slight excess (which may not be significant) found downwind from the plant in the only set of off-site measurements from the period of extensive use of beryllium, that made by Colorado Department of Health in 1971. I used that possibility of an excess to set a reasonable upper bound for air concentrations following the same methodology as for the plutonium concentrations[16]. Any higher concentrations would have been likely to leave a clear footprint My primary result is that the lack of a clear footprint in the soil does not place very stringent limits on the amounts of beryllium which may have been released. The procedure for combining the back calculation with the Chem Risk estimate, that is for using a high and a low uncertainty estimate to create a single log normal distribution is standard as described by Seiler and Alvarez (Seiler and Alvarez 1996). The uncertainties are very large, as noted by Dr. Rodericks, and that reflects the paucity of detailed information.

---

[16]in this case, since I began with the assumption that this was an unlikely possibility, the Monte Carlo distribution was only sensitive to average, rather than unusual values of the deposition velocity.

## The relevance of my testimony to this case

Defendants assert that I have not demonstrated the relevance of my testimony to this case. I doubt that that is primarily my task, since I have not been involved in preparing the case, nor do I know very much about the legal context. However, I might make a few observations.

I presented my results in several categories representing different levels of uncertainty. Some matters are known very well: plutonium was released from the plant with the largest releases occurring in the 1960's; plutonium continued to be released but at much lower levels through the period of plant operations; people inhaled some of the plutonium; control of releases and the measurement of off-site exposures were inadequately managed; there is great uncertainty as to the magnitude of exposures and this uncertainty is likely to persist. Some conclusions are about possibilities with a "substantial" likelihood (that is they may or may not have occurred and the evidence is not strong against them): these include the possibility that some people had exposures that lead to elevations of risk considered significant by regulatory agencies. These conclusions appear relevant to the issues pertaining to claims of property value loss and to concerns that may have led people to apprehend a need for medical monitoring. The history of exposures extending before 1971 seems relevant in this context.

In addition some conclusions concern possibilities that have a significant likelihood, but are not of high probability; these include the possibility that some people were exposed at levels which present serious public health concerns. Such possibilities are relevant to medical monitoring considerations and to the presence of public concerns which may have affected people's comfort and the value of their property.

And there are unquantifiable conclusions that suggest that more is to be learned about events and impacts of Rocky Flats: these too may be relevant to property value loss and medical monitoring.

Submitted under penalties of perjury

Robert L. Goble, March 10, 1999
Research Professor, Clark University

MAR 11 '99 11:53

Attachments:
    List of references
    C.V.
    Response Brief in Hanford Case

References:

Brown. Lowell S., and Robert Goble. 1968a. Pion-Pion Scattering, Current Algebra, Unitarity, and the Width of the Rho Meson. Physical Review Letters 20 : 346.

Brown. Lowell S., and Robert Goble. 1968b. Soft Photons and the Classical Limit. Physical Review 173 : 1505.

Cochran. T. 1997. Plutonium Releases to the Environment from the 26-Inch (Hg) Process Vacuum System at the Hanford Z Plant. Hanford Litigation.

Colglazier. William. 1987. Personal communication.

Cooke, Roger M. 1991. Experts in Uncertainty. New York. Oxford: Oxford University Press.

Goble, Robert L. 1996. Exposures from Releases of Plutonium and Other Toxic Substances at Rocky Flats. Merilyn Cook et al. vs Rockwell International Company and the Dow Chemical Company in the U.S. District Court for the District of Colorado. NTIS, Civil Action # 90-K-181.

Goble, Robert L., and Lowell S. Brown. 1971. Current Algebra and Analyticity: Bootstrapping the rho and sigma with the Pion Decay Constant Setting the Scale. Physical Review D 4 : 723.

Goble, Robert L., and Jonathan Rosner. 1972. Soft Pion Production in Electron-Positron Collisions. Physical Review D 5 : 2345.

National Research Council. 1983. Risk Assessment in the Federal Government: Managing the Process. Washington, DC: National Academy Press.

National Research Council. 1994. Science and Judgement in Risk Assessment. Washington, DC: National Academy Press.

National Research Council. 1996. Understanding Risk. Washington, DC: National Academy Press.

RAC. 1997. The Rocky Flats Nuclear Weapons Plant Dose Reconstruction Project. Phase II: Toxicity Assessment and Risk Characterization. Task 4: Evaluation of Historical Environmental Data. Radiological Assessments Corporation. NTIS, RAC Report #1, CDPHE-RFP-1997-FINAL.

Rosner, J., R. Goble, and R. Rosenfeld. 1989. The reaction gamma gamma to pi pi at low energy. Physical Review D 39 (11)

Sehmel, G.A. 1980. Particle and Gas Dry Deposition: A Review. Atmospheric Environment 14 : 983-1011.

Seiler, Fritz A., and Joseph L. Alvarez. 1996. On the Selection of Distributions for Stochastic Variables. Risk Analysis 16 (1) : 5-18.

U.S. Nuclear Regulatory Commission, and Commission of European Communities. 1995a. Probabilistic Accident Consequence Uncertainty Analysis: Dispersion and Deposition Uncertainty Assessment. Volume 1 Main Report. US Nuclear Regulatory Commission and Commission of European Communities.

U.S. Nuclear Regulatory Commission, and Commission of European Communities. 1995b. Probabilistic Accident Consequence Uncertainty Analysis: Dispersion and Deposition Uncertainty Assessment. Volume 2 Appendices A and B. US Nuclear Regulatory Commission and Commission of European Communities.

U.S. Nuclear Regulatory Commission, and Commission of European Communities. 1995c. Probabilistic Accident Consequence Uncertainty Analysis: Dispersion and Deposition Uncertainty Assessment. Volume 3 Appendices C,D,E,F and G. US Nuclear Regulatory Commission and Commission of European Communities.

ROBERT L. GOBLE
Resumé
February 1999

Center for Technology, Environment, and Development
  and Department of Physics
Clark University, Worcester, MA  01610
(508)793-7683, (508) 751-4612 FAX (508) 751-4600
eMail (internet) rgoble@clarku.edu

112 Franklin Street
  Brookline, MA  02445-6702
  (617) 566-4574

## PRESENT POSITION

Clark University (1991-) Research Professor of Environmental Science and Policy, Adjunct Professor of Physics

## EDUCATION

B.A. (Honors), Physics, Swarthmore College, June 1962
Ph D., Physics, University of Wisconsin, January 1967

## PREVIOUS EMPLOYMENT

| | |
|---|---|
| 1984 -85 | Princeton University, Center for Energy and Environmental Studies and Department of Philosophy: Hewlett Fellow |
| 1976 -91 | Clark University, Physics Department and Program on Environment, Technology, and Society: Research Associate Professor, Visiting Assistant Professor (on leave 1984-85) |
| 1974 -76 | Montana State University, Physics Department: Assistant Professor, Adjunct Assistant Professor |
| 1972 -74 | University of Utah, Physics Department: Research Associate/Associate Instructor |
| 1969 -72 | University of Minnesota, Physics Department: Research Associate |
| 1966 -69 | Yale University, Physics Department: Research Staff, Instructor |
| 1962 -66 | University of Wisconsin, Physics Department: NSF Cooperative Fellow, Research Assistant |

## AWARDS, HONORS, AND MEMBERSHIPS ON ADVISORY PANELS

Consultant to Citizens Advisory Panel - Massachusetts Military Reservation

National Academy of Sciences/National Research Council, Committee on Applications of Digital Instrumentation and Control Systems to Nuclear Power Plant Operations and Safety (1995-7)

Advisory Panel on the Rockwell, Santa Susanna Epidemiological Study for the California Public Health Foundation (1992-98)

U.S. EPA Visiting Scientist Award (1991-1994)

Senior Advisor to the Global Information Network of the Rockefeller Foundation Leadership for the Environment and Development (LEAD) Program (1992 - )

Intergovernmental Panel on Climate Change, Experts Workshop on Country Studies, Berkeley, (Sept. 1992)

Advisory Panel on Information Systems for Agenda 21 for the U.N. Conference on Environment and Development (1991-92)

Mathematics Curriculum Evaluation Panel for the Brookline Public Schools (1989-91)

National Science Foundation/National Endowment for the Humanities: Individual Incentive Award (January 1984-January 1986)

Princeton University: Hewlett Fellow (September 1984-June 1985)

American Association for the Advancement of Science: Summer Fellowship in Environmental Science (Summer 1982)

## RECENT RESEARCH ACTIVITIES

**Risk assessment methodology, environmental and occupational impacts on health** - interindividual variability and the assessment of non-cancer risks, interindividual variability in the risks from particulate matter, guidelines for the evaluation of risks from electromagnetic fields, effective use of epidemiology for cancer risk assessment, interspecies extrapolation of risks, radon exposures, epidemiology, and risk assessment, development of a curriculum for ecological risk assessment, technology use and public health in Poland. (Funding from the U.S. EPA, California Public Health Institute, National Council for Soviet and East European Research)

**Sustainable development and climate change** - technology characterization for systems to limit greenhouse gas releases, alternative definitions of sustainable development, the role of sustainable cities in preventing climate disruption, a risk assessment perspective on the threat of climate change. (Funding from the World Bank Global Environment Facility, the U.S. DOE, the Mercedes Foundation, the MacArthur Foundation)

**Nuclear safety and economics** - Institutional issues affecting the growth of nuclear power, nuclear emergency planning alternatives, radioactive waste management, risks from Nevada Test Site activities, power plant performance and economics (Funding from ATSDR, NIEHS, the Three Mile Island Public Health Fund, the Ontario Nuclear Safety Review Board, the Massachusetts Attorney General's Office, the State of Nevada, Lincoln County Nevada, Citizens Against Nuclear Trash, U.S. DOE, Scientist's Institute for Public Information)

**Ethical issues in hazard management** - Risk prioritization at the EPA, Sensitive populations, differences between occupational and environmental protection, Citizen participation and stengthening community health infrastructure, Risk assessment methodologies and their effects on environmental justice (Funding from the NSF, State of New Jersey, Resources for the Future, NIEHS, ATSDR, Sierra Club)

## OTHER RESEARCH

Methodology for assessing hazards from seafood (Funding from R.I. DEP, Sierra Club Legal Defense Fund)

Acid deposition assessment (Funding from the U.S. EPA)

Review of implementation of the Occupational Lead Standard (Funding from U.S. OTA)

Development of a taxonomy for classifying technological hazards (Funding from the U.S. NSF)

Assessment of health hazards from EMF exposures (Funding from the Town of Milbury)

Experimental studies of pollutant dispersal in an urban environment (Funding from Clark Univ.)

Demonstration of grid-connected cogeneration at Clark University (Funding from the U.S. DOE, Fairbanks-Morse Corporation, U.S. HUD)

## TEACHING

**Graduate and undergraduate courses in environmental science and policy** - limits of the earth, quantitative risk assessment, advanced quantitative risk assessment, senior seminar, alternative energy laboratory, science writing seminar, science - uncertainty - decisions

**Graduate and undergraduate courses in physics** - quantum mechanics, advanced quantum mechanics, electrodynamics, mechanics, introductory physics, Einstein's ideas, cultural astronomy.

**Ph.D. supervision** - Atmospheric Turbulence and Diffusion in an Urban Environment, Radon Deposition in Nose and Lungs, Pharmacokinetic models for Lead and Lead-210 and models for Radon-induced lung cancer

**Graduate and undergraduate project advising** - Supervision of more than 60 graduate and undergraduate students in energy, air pollution, and physics; High Energy Cosmic Ray Showers; Clark Energy Use Profiles and Models; Environmental Tradeoffs in Cogeneration; Cogeneration Road Map for Colleges and Universities; Measurements of Worcester Weather; Pollutant Dispersal in Urban Areas; Effects of Buildings on Pollutant Dispersal; Cogeneration System Monitoring; Radon in Indoor Air; Radon - Induced Health Effects; AIDS and Health Care Programs in Zaire; Modeling the AIDS Epidemic; Rural Electrification Alternatives, Models for Ecological Risk Assessment, Environmental Labeling of Consumer Products, Risk Analysis from Activities at the Nevada Test Site

2

## PUBLICATIONS

### Articles (Energy/Hazards/Air Quality)

"A Practical Approach to Using Epidemiological Data in Cancer Risk Assessments I: Risk Projections when there are Piece-wise Constant Exposure Histories" by R. Goble and C. Chen, to be submitted for publication 1999

"Distributions of Individual Susceptibility Among Humans for Toxic Effects--For What Fraction of Which Kinds of Chemicals and Effects Does the Traditional 10-Fold Factor Provide How Much Protection?" By Hattis, D., Banati, P., and Goble, R.; Presented at the International Workshop, Uncertainty in the Risk Assessment of Environmental and Occupational Hazards, Bologna, Italy September 25-26, 1998, Annals of the New York Academy of Sciences, 1999, in press.

"Human Interindividual Variability in Parameters Related to Health Risks" "Nugget Session" paper presented at the annual meeting of the Society for Risk Analysis, by Hattis, D. Banati, P., Goble, R., and Burmaster, D. December 1997. Risk Analysis, 1999, in press

"The Assessment of Exposures to Native American Communities from Nuclear Weapons Testing in Nevada." by Frohmberg, E., R. Goble, V. Sanchez and D. Quigley, 1999 to be published in *Risk Analysis*

"A Regional Concept of Qualitative Growth and Sustainability: Support for a Case Study in Baden-Wurtemberg"*Int. J. Sustain. Dev. World Ecol.* v. 3, p. 1-22 1996 by Ortwin Renn and R. Goble

"Comparison of Contact Site Cancer Potency Across Dose Routes: Case Study with Epichlorohydrin", by G. Ginsberg, D. Hattis, and R. Goble, *Risk Analysis* v. 16 #5 p. 667-681, 1996

"Social and environmental factors in lung cancer mortality in post-war Poland" by H. Brown and R. Goble, *Environmental Health Perspectives* V. 103, No. 1, Jan. 1995

"Current Priority-Setting Methodology: Too Little Rationality or Too Much?" by Dale Hattis and Robert Goble in *Worst Things First*, ed, A. Finkel and D. Golding, Resources for the Future 1994 p. 107-133

"What Nuclear Emergency Planning Can and Can Not Accomplish" in *Preparing for Nuclear Power Plant Accidents: Selected Papers* ed. D. Golding, J.X. Kasperson, and R.E. Kasperson, Westview Press, Boulder CO, 1994

"Implications of the Accident at Chernobyl for Emergency Planning" by R. Goble and C. Hohenemser, in *Preparing for Nuclear Power Plant Accidents: Selected Papers* ed. D. Golding, J.X. Kasperson, and R.E. Kasperson, Westview Press, Boulder CO, 1994

"The Use of Probabilistic Risk Assessment in Nuclear Emergency Planning" by R. Goble and G. Thompson, in *Preparing for Nuclear Power Plant Accidents: Selected Papers* ed. D. Golding, J.X. Kasperson, and R.E. Kasperson, Westview Press, Boulder CO, 1994

"Prospects for Upgrading Emergency Planning near the Fermi II Nuclear Power Plant" Chapter 7 in *Safety Concerns in Essex County Regarding the Fermi II Nuclear Power Plant*, W. Hutchinson, H. Disch, eds. ILER Research Foundation, January 1994

"Nuclear Power: Past and Future" by C. Hohenemser, R. Goble, and P. Slovic, in *The Energy Environment Connection*, J. Hollander ed. Island Press, 1992.

"Expected Values for Projected Cancer Risks from Putative Genetically-Acting Agents" by Dale Hattis and R. Goble *Risk Analysis* V. 11, No. 3 (1991) pp. 359-363.

"Institutional Aspects of the Future Development of Nuclear Power" (with C. Hohenemser and P. Slovic). *Annual Review of Energy*, Vol. XV, 123-200 (November 1990).

"The Role of Scientists in Risk Assessment" (with H. Brown). *Risk: Issues in Health and Safety* V. I, 283-311 (October 1990)

"Sensitivity Analysis for the Effect of Meteorological and Radioactive Release Conditions on Radiation Doses from Nuclear Power Plant Accidents"(with W. Du) *GeoJournal* V. 23No. 3, 273-282 (1990).

3

"Estimating the Financial Consequences of a Severe Nuclear Accident in Canada" (with S.C. Lonergan and C. Cororaton), *Energy*, 15(6)507:522 (1990).

"The Social Amplification of Risk: A Conceptual Framework" (with R.E. Kasperson, O. Renn, P. Slovic, H.S. Brown, J.E. Emel, J.X. Kasperson, and S. Ratick). *Risk Analysis*, (1988) pp 177-187.

"Methodology for Assessing Hazards of Contaminants in Seafood" (with H.S. Brown, and L. Teitelbaum). *Regulatory Toxicology and Pharmacology*. 8.76-101 (1988).

"Turbulence Parameters in an Urban Environment" (with M. Yersel). *Boundary Layer Meteorology*, V. 37, #3 p 271 (1986)

"Methods for Analyzing and Comparing Technological Hazards: Definitions and Factor Structures" (with C. Hohenemser, J. Kasperson, R. Kasperson, R. Kates, P. Collins, P. Slovic, B. Fischoff, S. Lichtenstein and T. Layman). In *Risk Evaluations and Management*, V. Covello, J. Menkes and Y. Mumpower, eds. Plenum Press, New York, 1986

"Protecting Workers, Protecting Publics: The Ethics of Differential Protection" (with P. Derr, R. Kasperson, R. Kates). In V.T. Covello (ed.) *Risk Analysis in the Private Sector*, Plenum Press, New York, 1985.
"Time Scales in the Radioactive Waste Problem" *Equity Issues in Radioactive Waste Management*, R. Kasperson, Ed. Oelgeschlager Gunn, Hain, Cambridge 1983, Chapter 6, p. 139-174.

"Short Distance Diffusion in an Urban Atmosphere" (with M. Yersel, J. Morrill). *Atmospheric Environment*, V. 17, No. 2, 275 (1983).

"Responding to the Double Standard of Worker/Public Protection (with P. Derr, R. Kasperson. R Kates) *Environment* V. 25, No. 6, 6 (1983).

"Airborne Lead: A Clear-cut Case of Differential Protection" (with D. Hattis and N. Ashford). *Environment* V. 24, No. 1, 14 (1982).

"Technological Risk Perception and Nuclear Power Costs: The Quantification of Uncertainty" (with D. Shakow). *Technological Forecasting and Social Change*, V. 21, No. 3, 185 (1982).

"Worker/Public Protection: The Double Standard" (with P. Derr, R. Kasperson, R. Kates). *Environment*, V. 23, No. 7, 6 (1981)

"Nuclear Power Plant Performance: An Update" (with C. Hohenemser). *Environment* V. 21, No. 8, 32 (1979).

"Power Plant Performance" (with C. Hohenemser). *Environment* V. 20, No.3, 25, (1978)

### Technical Reports and Monographs

*Preliminary Analysis of a Data Base of Human Interindividual Variability Observations--Implications for Generic Occupational Health Risk Assessments for Chronic Toxic Responses* Hattis, D., Banati, P., Sirovic, I., and Goble, R. Report to the Occupational Safety and Health Administration, May 27, 1997.

*Perspectives on Risk at the Nevada Test Site: Feasibility and Methods for Assessing Cumulative Radiological Exposure Risks Associated with Department of Energy Activities at the Nevada Test Site* Phase I Report to Lincoln County Nevada, Clark University, June 1994

*Slope Factor Comparison Across Dose Routes: Case Study with Epichlorohydrin*, by Ginsberg, G. L., Goble, R. L., and Hattis, D. B. Report to the U.S. Environmental Protection Agency by TRC Environmental Corporation, April, 1994.

*A Data Manager for the Global Environmental Facility* Report to the World Bank by G. Thompson and R. Goble Institute for Resource and Security Studies, January 1994, 38 pages.

*Learning from GEF projects* Report of a Workshop held in Washington Sept. 9, 1993, by G. Thompson and R. Goble, Institute for Resource and Security Studies, September 1993

*Technological Development and Population Health in Poland: Results of a Pilot Study of Industrial Trends and Selected Cancers*, by Brown, H.S. and Goble, R. L., CENTED Publication, Clark University (1992).

*Managing Nuclear Accidents : A Model Emergency Response Plan for Power Plants and Communities* by D. Golding, J. Kasperson, R. Kasperson, R. Goble , J. Seley, G. Thompson and C. Wolf. Westview Press. 1992, 117 pages

*Design of an Information System on Technologies That Can Limit Greenhouse Gas Emission.* Report of an International Workshop. Washington, D. C. 18-19 February 1992, by G. Thompson, R. Goble, S. Bush- Center for Strategic and International Studies. 1992, 24 pages.

*Perspectives on Possible Health Effects from Exposure to Electromagnetic Fields from Electric Power Lines* A letter report to the Town of Millbury, Massachusetts. July 1990. 8 pages

*Developing Practical Measures to Prevent Climate Disruption* (with G. Thompson). CENTED Research Report #6, 1990. 30 pages

*High Radon Houses: Implication for Epidemiology and Risk Assessment* (with R. Socolow). CENTED Research Report #5, 1990. 35 pages.

*Potential Retrieval of Radioactive Waste at Proposed Yucca Mountain Repository: A Review of Risk Issues* (with D. Golding, R. Kasperson). 1988 17 p.

*Postclosure Risk at the Proposed Yucca Mountain Repository: A Review of Methodological and Technical Issues* (with J. Emel, R.E. Kasperson. and O. Renn). 1987 53 p.

*Methodology for Assessing Hazards of Contaminants in Seafood* (with H. Brown, and L. Teitelbaum) the Narragansett Bay Project. U.S. EPA, Rhode Island Department of Environmental Management, 1987 47p.

*Preclosure Risks at the Proposed Yucca Mountain Repository* (with R.E. Kasperson. J. Emel. J.X. Kasperson, and O. Renn). 1987 40 p.

*Nuclear Waste System Risks at the Proposed Yucca Mountain Repository* (with J. Emel, J.X. Kasperson, R.E. Kasperson. and O. Renn). 1987. 116 p.

*Evaluation of the Radtran III Model: Usefulness and Practicability* (with O. Renn), CENTED. Clark University. 1986.

*Site-Characterization Risks at the Yucca Mountain Site: A Preliminary Review* (with J. Emel, R. Kasperson, O. Renn). CENTED, Clark University. 1986.

*The Proposed Sebago Lake Nuclear Waste Repository Area: A Preliminary Assessment of Selected Risk and Social Impact Considerations* (with J. Emel, J. Kasperson, and R. Kasperson). Worcester, MA: Hazard Assessment Group, CENTED. Clark University. 1986.

*Risk Issues Associated with a Salt-dome Repository at Richton, Mississippi* (with H. Brown. J. Emel, J. Kasperson, and R. Kasperson). New York: Social Impact Assessment Network. 1985.

*Methods for Analyzing and Comparing Technological Hazards: Definitions and Factor Structures* (with C. Hohenemser, J. Kasperson, R. Kasperson, R. Kates, P. Collins, A. Goldman, P. Slovic, B. Fischoff, S. Lichtenstein, and M. Layman), CENTED Research Report #3, October 1983.

*Atmospheric Processes Affecting Acid Deposition: Assessing the Assessments and Suggestions for Further Research.* AAAS, Fall 1982.

*Cogeneration: A Campus Option* (with W. Goble) Association of Physical Plant Administrators, Washington, 1980).

*Statistical Analysis of Nuclear and Coal Power Plant Performance* (with C. Hohenemser) Scientists Institute for Public Information, New York, 1978.

### Government Papers

*When the Ceteris Aren't Paribus: Contrasts between Prediction and Experience in the Implementation of the OSHA Lead Standard in the Secondary Lead Smelting Industry*, Report to the Office of Technology Assessment, Robert Goble, Dale Hattis August 1995

*The Acid Deposition Phenomenon and Its Effects: Critical Assessment Document* (with D. Bennett, R. Linthurst) U.S. EPA. EPA/60018-851001. August 1985.

"Implementation of the Occupational Lead Standard " (with D. Hattis, M. Ballew, D. Thurston), CENTED Working Paper HAG/WP 83-1, October 1983; in *Preventing Illness and Injury in the Workplace*, Vol. 2, NTIS, Office of Technology Assessment. Washington, Spring, 1985.

"Grid-Connected Integrated Community Energy System, Clark University":
    Phase I, Preliminary Feasibility Study,
    v. 1: Executive Summary. DOE Report #C00-4211-1/1 (NTIS, 1977)
    v.2  Final Report, DOE Report #C00-4211-1/2 (NTIS, 1977).

Phase II. Detailed Feasibility and Preliminary Design
    Preliminary Report, DOE Report #C00-4211-2 (NTIS, 1978). v.1: Final Report, DOE Report
    #C00-4211-3/1 (NTIS, 1978). v.2: Appendices, DOE Report #C00-4211-3/2 (NTIS, 1978).

### Conference Proceedings, Discussion Papers, and Book Reports (Energy, Hazards, Air Quality).

"Approaches and obstacles to the characterization of risks from the use of digital systems in nuclear power plants" By R. Goble and D. Chapin *Proceedings of the 5th Annual Conference on Probabilistic Safety Analysis and Management, PSAM V*, New York, September 1998

"Risk-informed public participation" by R. Goble, *Proceedings of the 5th Annual Conference on Probabilistic Safety Analysis and Management, PSAM V*, New York, September 1998

Review of *Public Reactions to Nuclear Waste: Citizens' Views of Repository Siting* by Riley E. Dunlap, Michael E. Kraft, & Eugene Rosa, editors, in Risk Abstracts: June 1996

"How Technical Experts can Contribute to the Democratization of Risk Assessment" by Robert Goble and Gordon Thompson, *Childhood Cancer Research Institute Newsletter* October 1994 p. 8-12

Goble, Robert L. "Information Management for Regional Sustainability: Practical Recommendations for Baden-Wurttemberg" Invited paper for the International Workshop on Regional Sustainability, Stuttgart, Germany, June 8-10, 1994

Goble, Robert L. and Thompson, Gordon T. "Institutionalizing the Obvious: How to incorporate practical experience in policies and programs for environmental protection and sustainable development" A note for discussion. 3 p., March 1994

Goble, Robert L. "How Nuclear Power Controversies become Amplified: Contrasts between Technical Analysis and Public Expectations." Invited paper for Symposium on Perception of Risk and the Future of Nuclear Power: Confronting the Crisis of Public Confidence in Science and Technology, Washington, DC April 1993: *Physics and Society*, v. 23, No. 1, 10-11, January 1994

Brown, H.S. and Goble, R. L., Industrial Development and Population Cancer in Poland. In Levy, B., Ed. *Environment and Health in Eastern Europe*. Proceedings of the Symposium on Occupational and Environmental Health. Pultusk, Poland, June 29-July 2, 1992.

Review *The Nuclear Energy Option*, by B. Cohen, for Am. J. Phys. V. 60, No. 3, 283-285 March, 1992.

"Uncertainties in Population Risk Estimates Arising from Different Conditions of Exposure to Indoor Radon" (with D. Hattis and R. Socolow), 29th Hanford Symposium on Health and the Environment, Indoor Radon and Lung Cancer: Reality or Myth, Oct. 1990, Richland, WA

"High Radon Houses - Log normal Distribution and Implications for Risk Assessment and Epidemiology." (with R. Socolow) Proceedings of the International Symposium on Radon and Radon Reduction Technology, Atlanta, February 1990.

"The Use of Probabilistic Risk Assessment in Emergency Response Planning for Nuclear Accidents" (with G. Thompson). Proceedings of Society for Risk Analysis Annual Meeting. October 1988, Washington, D.C.

Radioactive Wastes and the Social Amplification of Risk (with R.E. Kasperson, J. Emel, C. Hohenemser, J.X. Kasperson, and O. Renn). In R.G. Post (ed.) Waste Management '87. Tucson, AZ: Arizona Board of Regents (1987)

Can Risk Assessment be Transplanted to Developing Countries? (with H. Brown). Invited paper for the Fourth Tallories Seminar on International Development Entitled "Managing Environmental Risk in the Economic Development of Newly Industrializing Countries." May 12-14, 1987, Tufts University Tallories European Center, France.

"Potential use of $^{210}$Pb as a Biological Marker of Exposure to Radon (with H. Brown). "First International Symposium on Environmental Health, Pittsburgh, PA, June 1987.

"The Variation in Worker Response to Occupational Hazards" in Symposium on Managing High Risk Workers, Society for Risk Analysis, October 1985.

"Acid Rain." Invited talk presented at American Institute of Hydrology Conference, Future Issues in Hydrology, May 31, 1984.

"Short Range Dispersion from a Point Source in an Urban Area" (with M. Yersel). Proceedings of the 6th Symposium on Turbulence and Diffusion American Meteorological Society, Boston (1983).

"A Participatory Approach to Undergraduate Energy Education: the Case of Clark University" (with D. Ducsik). Proceedings of the International Conference on Energy Education, Providence, Rhode Island. 1981.

"Clark University's Grid-Connected Cogeneration Plant" (with J. Rodousakis, J. Cook). *District Heating,* V. 67, No. 1, 4 (1981).

"A Micro meteorological Study in the Worcester Area" (with A. Molod, M. Yersel). Proceedings of the Conference on the Meteorology of Northern New England and the Maritime Provinces, Gorham, ME (1979).

"Grid-Connected Cogeneration at Clark University: The Effect of Terms of Utility Interconnection (with S.E. Nydick) Proceedings of the International Conference on Energy Use Management, Tucson (1978).

"Energy Profiles at Clark University: Implications for Cogeneration" (with R. Collins, A. Gottlieb). Proceedings of the First National Conference on Technology for Energy Conservation, Washington, D.C. (1977).

### Testimony

Goble, Robert L. 1998 Declaration of Robert L. Goble regarding Iodine Dose Estimates prepared for Berger and Montague, and Roy S. Haber, filed March 1998 in the Jaros, Hamilton, and Criswell cases, Hanford Litigation. March 13, 1998

Goble, Robert L. 1997 <u>Estimating Exposures from Releases of Plutonium at Hanford: Supplementary Report</u> Report prepared for Berger and Montague, and Roy S. Haber, filed March 1997 in the Jaros, Hamilton, and Criswell cases, Hanford Litigation. March 23, 1997

Goble, Robert L. 1996d <u>Exposures from Releases of Plutonium and Other Toxic Substances at Rocky Flats</u> Report prepared for Berger and Montague, Rocky Flats Litigation November 26, 1996

Goble, Robert L. 1996a. <u>Estimating Exposures from Releases of Radioactive Elements at Hanford: Implications for Medical Monitoring</u>. Report prepared for Berger and Montague, and Roy S. Haber, filed April 1996 in the Jaros. Hamilton, and Criswell cases, Hanford Litigation. April 22, 1996

Goble, Robert L. 1996b. <u>Estimating Exposures from Releases of Radioactive Elements Other than Iodine at Hanford</u>. Report prepared for Berger and Montague, and Roy S. Haber, filed April 1996 in the Jaros, Hamilton, and Criswell cases,Hanford Litigation. April 4, 1996

Goble, Robert L. 1996c <u>Estimating Exposures from Releases of Radioactive Iodine at Hanford and Implications for Assessing the Significance of these Exposures in Causing Disease: Supplementary Report</u>. Report prepared for Berger and Montague, and Roy S. Haber, filed April 1996 in the Jaros, Hamilton, and Criswell cases, Hanford Litigation

Goble, Robert L. 1995 <u>Estimating Exposures from Releases of Radioactive Iodine at Hanford and Implications for Assessing the Significance of these Exposures in Causing Disease</u>. Report prepared for Berger and Montague, and Roy S. Haber, filed November 1995 in the Jaros, Hamilton, and Criswell cases, Hanford Litigation

Goble, Robert L.1993. <u>Potential Consequences of Severe Accidents at CANDU Reactors: Implications for the Nuclear Liability Act</u>. Energy Probe et al. vs The Attorney General. Filed April 1993, Supplementary Testimony filed July 1993, Further Testimony filed August 1993, presented in Federal Court, Toronto, Ontario, October 1993

Affidavit U.S. Court of Appeals: Inadequacies in Emergency Plans for Seabrook Reactor. March 1990.

Nuclear Regulatory Commission. Before the Atomic Safety Licensing Board - Deficiencies in the June 1988 Exercise of the Massachusetts and New Hampshire plans, by R. Goble, presented June 1989.

Nuclear Regulatory Commission. Before the Atomic Safety Licensing Board - Deficiencies in the Seabrook Plans for Massachusetts Communities - by G. Thompson, R. Goble, J. Beyea, filed February, 1989.

Nuclear Regulatory Commission. Before the Atomic Safety Licensing Board: Sheltering in the New Hampshire Radiological Emergency Response Plans for the Seabrook Reactor—Concord, N.H. (R. Goble, O. Renn, R. Eckart, V. Evdokinoff) presented May 1988, 118 pages.

Nuclear Regulatory Commission Before the Licensing Board: Rebuttal Testimony on the choice of protective response for the N.H. beach population in New Hampshire Radiological Emergency Response Plan (G. Thompson, R. Goble, and J. Beyea), 35 pages, filed June 30, 1988.

Estimation of Economic Consequences of a Severe Accident at the Pickering Nuclear Power Station (with S. Lonergan, C. Corcoraton). Brief to Ontario Nuclear Safety Review Board, September 24-25, 1987.

Before Department of Energy, Office of Civilian Radioactive Wastes Management: Social and Economic Consequences of a Proposed Sebago Lake Repository—Naples, Maine. April 1986.

### Articles and Conference Proceedings (Theoretical Particle Physics)

"The reaction $\gamma\gamma \longrightarrow \pi\pi$ at low energy." (with R. Rosenfeld, J. Rosner) *Physical Review*, Volume 39. Number 11 (June, 1989).

"Pion Pair Production by Two Photons at Low Energy." Proceedings from the VIII International Workshop on Photon-Photon Collisions (with Rogerio Rosenfeld and Jonathan L. Rosner) Sheresh, Jerusalem Hills, Israel (April 1988) edited by U. Kafshon (World Scientific Press, Singapore, 1988).

"Determination of the $\Delta^{++}$ - $\Delta^0$ Mass Difference (with J.S. Ball), Phys. Rev. D 11, 1971 (1975).

"Two Pion Intermediate States in Decay $K^S_0 \longrightarrow 2\gamma$ ," Phys. Rev. D 4, 931 (1973).

"Pion Form Factor and Inelastic $\pi$ - $\pi$ Scattering." Proceedings of the International Conference on $\pi$ - $\pi$ Scattering (Tallahassee, 1973).

"Soft Pion Production in Electron-Positron Collisions" (with J.L. Rosner), Phys. Rev. D 5 2345 (1972).

"Current Algebra and Analyticity: Bootstrapping the $\rho$ and $\sigma$ with the Pion Decay Constant Setting the Scale" (with L.S. Brown), Phys. Rev. D 4 723 (1971).

"Pion-Pion Scattering, Current Algebra, Unitarity, and the Width of the Rho Meson" (with L.S. Brown), Phys. Rev. Lett. 20 346 (1968).

"Soft Photons and the Classical Limit" (with L.S. Brown). Phys. Rev. 173, 1505 (1968).

"Cross Section for the Production of a Possible Bound Cascade-Nucleon System" (with M.E. Ebel) Phys. Rev. B 140 1675 (1965).