

123

## SUMMARY OF DATA

| Authors | Source of Pollution | Location | Methodology | Type of Contaminants | Impact Zone | Property Type | Diminution in Value |
|---|---|---|---|---|---|---|---|
| Beron Gartside Rosen Burke | Feed Materials Production Center | Fernald, Ohio | Descriptive Statistics and Multiple Regression Analysis | Uranium Trioxide | 1)Only those with view 2)Up to 4 miles | Single-family residential | Beron-negligible Burke & Rosen - Avg. of $6,500/house, or approximately 10%. |
| Kinnard | Radium contaminated fill material | New Jersey | Statistics and Multiple Regression Analysis | Radon & Gamma Radiation | Within superfund area outward to 500' | Single-family residential | No significant loss unless there was a sensory impact |
| Hunsperger | Lead smelter | Denver, Colorado | Opinion survey; Analogy | Arsenic, lead, cadmium | Entire neighborhood | Single-family residential | 10% to 30% per house ($2,300-$9,900 per house) |
| Center for Real Estate Education and Research, Ohio State University | Hazardous waste landfill | Toledo, Ohio | Multiple Regression Analysis | Hazardous waste (including nuclear) | 2.6 miles to 5.75 miles | Single-family residential | 20% to 50% depending on location ($9,000-$14,000/house) |
| Smith | Petro chemical facilities | Corpus Christi, Texas | Multiple Regression Analysis | Benzene, Toluence, Etc. | Up to ± 3 miles | Primarily SFR; some commercial | $10,000 per property on avg. (± 13% to 50%) |
| New Mexico Supreme Court Justice Franchini's Opinion | Potentially, transportation corridor to Waste Isolation Pilot Project | Santa Fe, New Mexico | Opinion survey | Nuclear waste material | Transportation corridor to WIPP | Single-family residential | 11% to 30% |

HUNSPERGER & WESTON, LTD.

124

| Kohlhase | Ten NPL sites | Houston, Texas | Multiple Regression Analysis | Various | Up to 6 miles | Single-family residential | Approx. $1,000-$18,000/house (2% to 36%) |
|---|---|---|---|---|---|---|---|
| Reichert Sheppard Wise | 30-acre landfill containing some radioactive waste | Uniontown, Ohio | Multiple Regression Analysis | Solid waste, ethane radinactive contaminants (properties themselves were not contaminated) | Depending on the researcher, < 2,500' out to approx. 1 mile | Primarily single-family residential | Nominal to 15%; verdict equates to ± $3,900/house |
| Slovic et al. | Potentially, transportation corridor from Hanford, WA plutonium processing site | Hanford, Washington | Opinion survey | Nuclear material | Transportation corridor through Oregon | Single-family residential | Rates risk but does not quantify diminution in value |
| Smith & Desvousges | Hazardous waste site nuclear power plant | Hypothetical (Boston, MA) | Opinion survey | Hazardous waste site power plant | 10 miles for waste site; 22 miles for power plant | Single-family residential | On ave. $4,100 for those closest to waste site |
| McClelland, Shulze & Hurd | OII landfill | Los Angeles, CA | Telephone survey and regression analysis | No known contamination | Immediate area | Single-family residential | Approx. 7% before closure of the landfill and 3.5% after closure ($4,800 to $9,500/house) |
| Bleich et al. | Landfill (no mention of possible pollutants) | Los Angeles, CA | Multiple Regression Analysis | No known contamination | Immediate area | Single-family residential | No significant loss |



## ANALOGY - CASE STUDY NO. 1

| | |
|---|---|
| Case Name: | Feed Materials Production Center |
| Location: | Fernald, Ohio |
| Source of Pollution: | Uranium processing facility |
| On-Site: | Yes |
| Off-Site: | Yes |
| Type of Contaminants: | Uranium trioxide powder |
| Groundwater: | Ultimately |
| Soil: | Yes |
| Air: | Yes |
| Class Action: | Yes |
| Effective Date of Study: | December 1, 1982 through December 31, 1988 (two years prior to an actual release and four years post release). All studies approximated this time period. |
| (Affected) Property Type: | Single-family residential properties and vacant land |
| No. of Affected Properties: | N/A |
| Case Study Summary: | On December 10, 1984, the Department of Energy announced that there had been an accidental release of uranium trioxide powder from the Feed Materials Production Center near Fernald, Ohio. Concerned citizens sued for loss of property value and a class was certified by the court. A research team was hired to determine if the anticipated diminution in property value existed. That team anticipated finding a diminished appeal for properties where the current owners could see the facility or where the release affected their water, air or perceptions of environmental purity. Concentric rings moving outward from the plant at one mile increments were created and sales within those increments were studied to determine loss in value. The study dealt primarily with single-family residential properties. |
| Methodology: | Methodology included both descriptive statistics (mean, median, mode, standard deviation and trend analysis) |

and multiple regression analysis.

Conclusions:

Test results demonstrated by Ms. Gail Beron indicated that there was essentially no measurable impact from proximity to the plant with the exception of those properties from which owners could see the facility.

Burke and Rosen found damage in the amount of $33.5 million to $38.1 million for 5,500 households. This equates to approximately $6,500 per house, or 10% loss in value. Their methodology consisted of several Multiple Regression Analysis scenarios. Gartside also used Multiple Regression Analysis to estimate loss in value. In the latter study, diminution was found up to four miles from the plant.

Source of Information:

Gail Beron, MAI, SRA
Peter S. Gartside, MS, Ph.D
John F. Burke, Jr., Ph.D.
Harvey S. Rosen, Ph.D.

Comments:

While Ms. Beron concluded that only those properties with a view of the plant were impacted, the plaintiffs' analysts disagreed. We understand that the defendants ultimately settled on the amount of $73,000,000 to be allocated among the affected property owners.

# ANALOGY - CASE STUDY NO. 2

| | |
|---|---|
| Case Name: | New Jersey Radium Contamination |
| Location: | Three adjacent towns in New Jersey |
| Source of Pollution: | Radium contaminated fill material |
| On-Site: | Yes - neighborhood homes were located on radium contaminated fill |
| Off-Site: | Properties adjacent to the superfund sites were studied to determine if proximity had any effect on property values |
| Type of Contaminants: | Radon and gama radiation |
| Groundwater: | No |
| Soil: | Yes |
| Air: | No |
| Class Action: | Yes |
| Effective Date of Study: | July 1, 1980 through June 30, 1989.  (Approximately 41 months prior to EPA's announcement of contamination findings and 67 months of post announcement experience.) |
| (Affected) Property Type: | Single-family residential properties and vacant land |
| No. of Affected Properties: | N/A |
| Case Study Summary: | In December 1983, the EPA and New Jersey Department of Environmental Protection jointly announced that concentrations of radon gas and levels of on-site gama radiation above regulatory standards had been found in three residential neighborhoods in three adjacent towns in New Jersey.  The elevated levels of radon and gama radiation resulted from the presence of radium contaminated fill material on many of the lots in the three affected neighborhoods, which are within ½ mile of each other.  In October 1989, a market research study of all SFR sales within the superfund sites, as well as one mile beyond was undertaken.  The purpose of the study was to analyze market behavior before the pronouncement and after the pronouncement and to |

determine if this market behavior resulted in a negative influence on property value.

Methodology:

Three quantitative models were employed: comparison of averages, trends and multiple regression analysis.

Conclusions:

Among the conclusions were:

- Short run effects on property values were reflected primarily in declines in sales volume.

- Negative effects on property values tended to decline as distance from the superfund site increased.

- Any negative price effects experienced by single-family residential properties tended to be confined to the superfund area itself and to distances no more than 500' from the outer boundary.

- Any negative effects on sale prices associated with proximity to a superfund site were not statistically significant unless there was a sensory impact associated with that proximity.

- Any negative effects from the December 1983 announcement were only temporary with the exception of one of the towns. In the other two towns, prompt effective clean-up and remediation efforts reportedly were effected.

Source of Information:

William N. Kinnard, Jr., MAI, SRA, Ph.D.

Comments:

The study identified above was concerned only with stigma loss in value; it did not address cost of clean-up. In June of 1990, a 10-year clean-up plan was announced which reportedly met with general public approval. Sellers of properties within the study area were required to reveal the most recent radon findings (if any) to all potential buyers. The researchers concluded that visual impact is an important influence on the duration of any negative price effect from proximity to a disamenity site. They also concluded that the degree, significance and duration or persistence of any negative price effects depend in large part on whether the contamination is perceived by potential buyers as an isolated event or a

continuing condition.   A public announcement was considered an event.  What matters is whether market participants expect a continuing long-term hazard to health.

## ANALOGY - CASE STUDY NO. 3

| | |
|---|---|
| Case Name: | Escamilla v. ASARCO |
| Location: | Globeville, a suburb of Denver, Colorado |
| Source of Pollution: | Lead smelter |
| On-Site: | Yes |
| Off-Site: | Yes |
| Type of Contaminants: | Lead, arsenic, zinc and cadmium |
| Groundwater: | Yes |
| Soil: | Yes |
| Air: | Yes |
| Class Action: | Yes |
| Effective Date of Study: | July 1992 |
| (Affected) Property Type: | Single-family residential properties and vacant land |
| No. of Affected Properties: | 570 |
| Case Study Summary: | In July 1989, a joint study by ASARCO and the State of Colorado was published indicating that Globeville residents faced elevated cancer and other health risks associated with pollution, and that the groundwater, air, soil, garden vegetables and drainage ditch sediments near the plant were contaminated with varying levels of lead, arsenic, cadmium and zinc (although cadmium was the primary metal of concern). In July 1992, a study was undertaken to determine if property values in Globeville had been negatively affected by pollution from the ASARCO plant and if so, to what extent. Initially, a sales search was undertaken to determine market reaction, but it was apparent that the market exhibited little knowledge of the facts relative to the contamination. Thus, most of the sale transactions were executed by less than knowledgeable buyers and sellers; therefore, there was no opportunity to measure the effect of the pollution, at least from direct sales. By interviewing market participants and considering sales |

and development activity that *did not* occur, it was possible to determine that indeed the neighborhood had been adversely affected.

Methodology:

Primary research with market participants was initiated to determine attitudes and level of knowledge within the neighborhood. Subsequent to that determination, the researchers considered valuation by analogy (case studies involving similarly affected neighborhoods) and the concept of deferred marketability.

Conclusions:

In accordance with Colorado law, the jury included in its verdict awards for two distinct measures of property damage: loss in value and cost to repair or clean the property. An award was entered for $28 million for cleanup costs and $4,159,000 for decrease in residential property value, plus $8 million for annoyance and discomfort.

Source of Information:

Files of Hunsperger & Weston, Ltd.

Comments:

In the course of their analysis, the researchers made several relevant observations:

- Before and after sales analysis may lead to erroneous conclusions, if all transaction participants are not informed about the issues.

- Sales price is a function not only of risk as perceived by the purchaser, but also risk as reflected in the interest rate, loan to value ratio and amortization. Restrictive loan terms can result in reduced sale price.

- Time off the market is tantamount to a temporary taking. Contamination may result in an encumbrance on the property such that the owner does not control all the property rights comprising full fee simple interest.

- The market may form negative opinions about a neighborhood or particular property that result in reduced market values irrespective of demonstrable contamination (although in this case it was proved).

- Market participants generally lack expertise in

technical issues of environmental science or risk analysis but do form opinions based on what they have read or heard.

- Proximity or nuisance cases may differ from trespass cases. It is generally true that where there is a reduction in property value because of proximity to a contaminated site, the value diminution of the uncontaminated properties diminishes proportionate to their distance from the contamination. The same may not be true for contaminated properties regardless of their distance from the pollution source.

# ANALOGY - CASE STUDY NO. 4

| | |
|---|---|
| Case Name: | Economic effects of hazardous waste landfills |
| Location: | Toledo, Ohio |
| Source of Pollution: | Two hazardous waste landfill location were studied. One, a potential new site, and the other, an existing site. |
| On-Site: | N/A |
| Off-Site: | N/A |
| Type of Contaminants: | Hazardous (including nuclear) wastes |
| Groundwater: | N/A |
| Soil: | N/A |
| Air: | N/A |
| Class Action: | N/A - this was simply a market research study |
| Effective Date of Study: | February 1991. Actual sales were studied over the time from 1986 through 1990 |
| (Affected) Property Type: | Single-family residential properties and vacant land |
| No. of Affected Properties: | Not available |
| Case Study Summary: | Researchers at the University of Toledo developed, in effect, a two-part study. Housing prices near an existing low-level hazardous waste site were studied to determine effect on price due to proximity. In addition, sales were studied before and after the pronouncement of a planned nuclear dump site near Toledo. |
| Methodology: | Multiple regression analysis |
| Conclusions: | The researchers concluded that residential housing values proximate to a radioactive landfill are indeed adversely affected. Most notable of their findings was the considerable distance outward from the site of the landfill over which impacts were noticed; the effects were noticed in excess of 2.6 miles and up to 5.75 miles. With respect to the existing landfill, housing values were found to be diminished from $9,000 to as |

much as $14,000 in any particular year out to 2.6 miles. Beyond 2.6 miles, property values were not adversely affected. With respect to the proposed low level nuclear waste site, a more pronounced price effect was noted. The distance effect continued outward from the site to 5.75 miles. Statistical significance of the distance variable was first observed in 1989 data, the year the nuclear waste facility was announced. The distance variable became non-significant in 1990 once it was apparent the authorities would withdraw the proposal for the facility.

The local real estate market was clearly responsive to bad news announcements and demonstrated an ability to recover once the perceived adverse threat was removed. The results demonstrated the adverse economic impact extending outward well beyond the actual disposal site. In terms of approximate percentages, diminution in property value ranged from something on the order of 20% to as much as 50% for properties within two miles of the hazardous waste site.

Source of Information:                    Center for Real Estate Education and Research, Ohio State University

Comments:                                The study confirmed the contention that the mere announcement of bad news affecting the status of real estate such as the establishment of a potentially dangerous waste landfill adversely affects housing prices in the proximity to the site. The researchers were surprised, however, at the large distance outward from the site in which the reaction was negative. The results of the study clearly demonstrated that adverse economic impact extends outward well beyond the actual disposal site. In fact, the researchers concluded "no longer can we assume that merely planning a landfill for a given location will have no significant impact on the neighborhoods beyond site of the plan."

## ANALOGY - CASE STUDY NO. 5

| | |
|---|---|
| Case Name: | Garza, et al. v. Amerada Hess Corporation |
| Location: | Corpus Christi, Texas |
| Source of Pollution: | Petro chemical plants |
| On-Site: | Yes |
| Off-Site: | Yes |
| Type of Contaminants: | Benzine, toluene cumene, ethyl, benzene, 123-trimethyl benzene, xylene, cyclo hexane and hexavalent chromium |
| Groundwater: | Yes |
| Soil: | Yes |
| Air: | Yes |
| Class Action: | Yes |
| Effective Date of Study: | January 1, 1994 |
| (Affected) Property Type: | Primarily single-family residential properties, however, vacant land and improved commercial properties were considered as well. |
| No. of Affected Properties: | Within the primary impact area, there are approximately 2,035 residential properties, 90 parcels of vacant land and 203 improved commercial properties. |
| Case Study Summary: | Research was conducted by a professor at the University of Houston to determine the extent of the property value diminution in neighborhoods proximate to a number of petro chemical facilities in northwest Corpus Christi, Texas. The neighborhoods range from a few hundred feet to approximately one mile from the refineries. Values of homes in 12 impact neighborhoods were contrasted with home values in similar neighborhoods beyond the influence of the refineries. Housing in the impact area average 1,147 SF, 51 years of age and 7,428 SF of land. The average price per-square-foot of housing stock was $20. |
| Methodology: | In the initial study, the primary technique was multiple |

regression analysis, however, the researcher indicated that he intends to follow this report with an opinion survey and actual sales research.

Conclusions:

The researcher ran three statistical models, each indicating that the highest percentage losses were within close proximity to the refinery complex. No consideration was given to cost of clean-up or trespass. In summary, the researcher reported that "under the most conservative assumptions, my preliminary conclusion is that property values have been diminished in the range of 7.5% to 38.5% in the area of primary impact. These numbers could increase significantly, if later there is evidence of additional undisclosed pollution by the refineries."

Source of Information:

Barton Smith, Ph.D., Professor of Economics, University of Houston

Comments:

In his study, Dr. Smith recognized that the impacted neighborhoods were affected not only by proximity to polluting petro chemical plants, but also by proximity to other externalities such as non-polluting industrial uses. The impact of the latter was taken into account in his overall conclusions. We note also that he applied the same percentage of diminution in property value to the vacant land and improved commercial properties as to the residential properties. Dr. Smith testified in deposition that multiple regression analysis is something commonly used by real estate appraisers.

## ANALOGY - CASE STUDY NO. 6

| | |
|---|---|
| Case Name: | City of Sante Fe v. Komis |
| Location: | Sante Fe, New Mexico |
| Source of Pollution: | N/A |
| On-Site: | N/A |
| Off-Site: | N/A |
| Type of Contaminants: | Nuclear waste |
| Groundwater: | N/A |
| Soil: | N/A |
| Air: | N/A |
| Class Action: | No |
| Effective Date of Study: | July 24, 1990 |
| (Affected) Property Type: | Land |
| No. of Affected Properties: | One |

Case Study Summary:   In this case, land taken from Komis was to be used for the construction of a highway to transport nuclear waste to the Waste Isolation Pilot Project (WIPP) site near Carlsbad, New Mexico. The valuation issue was to determine compensation due Komis as a result of the acquisition and damage to his remainder property, if any, due to proximity to a highway used for hauling nuclear waste material. The city's real estate expert argued that there was no loss in value to the remainder property. He based his opinion on the safety record of transporting radioactive waste and his inability to find value discrimination from other types of toxic materials transported. On the other hand, the property owners' appraiser relied in part upon a public opinion survey and upon a video tape titled "The Wipp Trial, a Nations Crisis Dumped on New Mexico."

Methodology:   The primary method of determination by the property owner was a public opinion survey published by Zia

Research Associates of Albuquerque, New Mexico. In effect, Zia was commissioned to measure public perceptions of the value of property near the Sante Fe County bypass. The survey revealed that 93% of the residents in Sante Fe County were familiar with the Wipp property and 89% were familiar with the proposed bypass. 71% of the respondents felt that residential property near the bypass would sell for less money because of its location, and the same percentage also felt the property would decrease in value. Significantly 41% believed that residential property near the road would sell for between 11% and 30% less than comparable property not in proximity to the road. The court considered the survey an effective way of showing public perception and it was relevant evidence. The city's expert based his opinion of no damage, as previously stated, on the safety record of transporting radioactive waste and his inability to find value differential from other types of toxic materials transported. He gave no weight to the public opinion survey.

Conclusions:

Following a jury trial, Komis was awarded $884,192 in compensation representing $489,582.50 for the value of the land taken, $60,794.50 for severance damage to the buffer zone and $337,815 for severance damages for *perceived* loss due to public *perception*. The trial court's ruling was upheld by the New Mexico Supreme Court and the court's views were expressed in an opinion by Justice Franchini.

Source of Information:

Justice Franchini's opinion, the Zia Opinion Survey and various newspaper articles.

Comments:

Several relevant issues are addressed in this case. Among them include:

1.  If loss in value initiated by fear or public perception can be proved, it is compensable whether the fear is rational or not.

2.  The real estate expert was allowed to rely upon a public opinion survey as foundation for his opinion on damage testimony.

3.  Justice Franchini noted, "it is difficult to prove market value loss when there are no actual sales of comparable property, yet damages should not

be denied because they are difficult to prove."
As a final comment, we note that in 1993, the
New Mexico State Highway and Transportation
Department commissioned their own opinion
survey for purposes of determining loss in value
along the Wipp route.

## ANALOGY - CASE STUDY NO. 7

| | |
|---|---|
| Case Name: | The Impact of Toxic Waste Sites on Housing Values |
| Location: | Houston, Texas |
| Source of Pollution: | This study analyzes the effects on housing prices by virtue of proximity to 10 different toxic waste sites in Houston, Texas. |
|     On-Site: | Yes - the study relates to prices of houses merely proximate to toxic waste sites. The homes themselves were not actually contaminated. |
|     Off-Site: | No |
| Type of Contaminants: | The 10 sites contain myriad contaminants including, among others, benzene, heavy metals, pcb's, asbestos, creosote and voc's. |
|     Groundwater: | Yes |
|     Soil: | Yes |
|     Air: | Yes |
| Class Action: | This study was not prepared for litigation. It was a research study published by a professor at the University of Houston. |
| Effective Date of Study: | April 1989 |
| (Affected) Property Type: | Single-family residences |
| No. of Affected Properties: | Thousands |
| Case Study Summary: | "This study analyzes the impact of the EPA announcements and policy actions on housing markets. When the EPA announces that a toxic waste site is on a superfund list, the findings of this paper showed that a new market for "safe" housing is created. A premium to be located farther from a waste site appears only after a site has been added to the superfund list. Empirical analysis of the housing market calculates the marginal prices in this new market and importantly shows that the marginal price to avoid a toxic waste site disappears after a site has been cleaned." |

In effect, the study investigates the effect of publicity surrounding toxic waste sites on local housing markets. Ten different toxic waste sites were considered. The researcher indicates that a major finding in her paper is that the EPA announcements created a new market for safe housing. In other words, a significant discount in the price of homes located close to toxic waste dumps is found only after the sites have been identified and publicized by the EPA. The gist of the study was to examine home prices before the Superfund Act and after. Thus, housing sales in Houston's Harris County were studied between 1976 and 1985.

Methodology:

Hedonic pricing or multiple regression analysis

Conclusions:

In her study, the researcher concluded that home owners living within six miles of a toxic site experience a sudden drop in the value of their homes after EPA announcements. Yet homeowners located beyond six miles experience no loss in home value. The researcher also found no anticipation effect. That is, consumers did not internalize the dangers until confronted with federal government documentation and ensuing publicity. Nonetheless, the researcher was unable to show that the market distinguishes between the severity of the sites. Depending upon the toxic site, diminution in property values differ and negative effects on housing price seem to disappear after about 6.2 miles from a toxic site. For example, a house located one mile farther from the Crystal site is worth $1,738 more, while a house one mile farther from the Sol-Lynn site is worth $3,310 more. Yet, Crystal is the worst site in the data set, while Sol-Lynn is not considered nearly so hazardous. These differentials relate to housing priced in the range of $50,000.

Source of Information:

*Journal of Urban Economics* and Janet E. Kohlhase of the University of Houston

Comments:

While this is an older study that was intended to measure the effect of EPA pronouncements, several relevant issues are noted:

1.   The market was unable to distinguish the severity of the sites.

2.   A price discount could be found only after the

sites were identified and publicized.   This suggests that knowledge is a key ingredient to market reaction.

3.    The spacial extent of the disamenity relates to the market's perceptions.  Depending upon the level of anxiety, loss in value may extend for a period of several miles.

4.    Evidence exists that if the information available to the public is incomplete or not internalized, marginal prices do not significantly correlate with the degree of toxicity of the site.

5.    It was observed that clean-up efforts can enhance property values.  This, of course, relates to nature, timing and certainty of clean-up.

# ANALOGY - CASE STUDY NO. 8

This analogy actually represents a summary of Hedonic property value studies. The summary is published in a paper titled "An Evaluation of Public Preferences for Superfund Site Clean-up." The paper was published in December 1994 and written by Schulze, McClelland, Balistreri, Boyce, Doane, Hurd, and Simenauer. The study described in this paper attempts to evaluate public preferences for clean-up of hazardous waste sites. Within the paper is a subheading entitled, "Property Value Losses Near Hazardous Waste and NPL Sites." A summary of the referenced studies is attached.

### Conclusions

The authors conclude, among other things, that the public views hazardous waste or NPL sites as serious and this is demonstrated in the often large loss in nearby property values. The paper points out that a necessary condition for public concern is the close proximity of a substantial population.

The authors of this paper interpret the property value studies as revealing that property value losses often exceed $10,000 for homes near (one mile or less) NPL sites. This appears to be regardless of the type of contaminant. The authors also state that the evidence from the studies suggest that measurable property value losses can extend three or more miles from a site. One of the studies (developed by Kohlhase) illustrates loss in value extending out as far as six miles. The authors opine, not only from their own work, but also from the summary of studies identified that property value losses are consistent with the view that the public has both a genuine fear of potential health risks of such sites and a substantial desire to pay for site clean-up.

### Comments

While the above conclusions relate primarily to one subsection of the report, the authors identify several points that are worth emphasis. For example, they contrast public reaction to two landfills. In one instance (the Suffolk City landfill in southeastern Virginia), the nearby residents were satisfied with a remedy of "no action with groundwater monitoring." The decision was based on findings that: a) there was no off-site migration of groundwater, b) surface waters were safe for aquatic life, c) no unacceptable risk to human health was expected from the site, and d) monitoring would identify any changes in site conditions. In the second instance (the OII landfill) public reaction was quite different. The authors provide several reasons for these reactions, but primary among them are: 1) OII was a commercial landfill serving many interests outside the community. Consequently, they were not received in as favorable a

light as would have been a PRP vital to the local economy, and 2) at Suffolk City, on the other hand, the city and by extension, its taxpayers were the PRP's. In the OII scenario, conditions were ripe for considerable media interest. In the Suffolk City scenario, conditions were such that news stories were unlikely to create an image of a dreaded risk imposed by an outside villain and few news stories were likely to be generated about the site.

The authors also identified the role of perceptual cues. These are physical aspects of a site that are perceived by local residents and are suggestive of risks. Examples might include odors, water discoloration, etc. The statement is made that "proximity to a site increases the frequency and duration of contact with, or observation of, perceptual cues which contributes directly to the intensity of risk beliefs." The authors cited another study that indicated when these perceptual cues were alleviated that risk estimates and magnitude of loses were reduced. This suggests buyers and sellers, as well as other market participants, may at least temporarily be acting out of lack of knowledge, or loss in value is analogous to a latent defect.

146

Table 1: Summary of Hedonic Property Value Studies*

| Authors | Method | Location | Subject | Year(s) | Sample Size | Reported Values | Values in 1993 dollars |
|---|---|---|---|---|---|---|---|
| Harrison and Stock (1994) | HPV | Boston, MA | hazardous waste sites | 1977-81 | 2,182 | $1,600 at 1½ miles from site<br><br>$13,500 at ½ mile from the site | $2,810 at 1½ miles<br><br>$23,715 at ½ mile |
| Ketkar (1992) | HPV average | 64 municipalities in New Jersey | # hazardous waste sites in region | 1980 | 64 | $2,000/site | $3,500/site |
| Kohlhase (1991) | HPV | Houston, TX | NPL sites | 1976, 1980 and 1985 | 4,800 | $17,740 @ < 1 mile<br>$12,800 @ 1-2 miles<br>$8,542 @ 2-3 miles<br>$5,066 @ 3-4 miles<br>$2,460 @ 4-5 miles<br>$790 @ 5-6 miles | $23,690 @ < 1 miles<br>$17,090 @ 1-2 miles<br>$11,400 @ 2-3 miles<br>$6,770 @ 3-4 miles<br>$3,280 @ 4-5 miles<br>$1,055 @ 5-6 miles |
| McClelland et al. (1990) | HPV | Monterey Park, CA | NPL site | 1983-85 | 178 | $9,790 (7.2%) in the absence of the site | $13,175 |
| Mendelsohn et al. (1992) | HPV | New Bedford, MA | PCB contamination of harbor | 1969-88 | 780 properties; 1916 sales | $9,000 per household in nearest zone<br>$7,000 per household in more distant zone | $10,500 per household<br><br>$8,200 per household |
| Michaels et al. (1992) | HPV | 3 unidentified sites | hazardous waste sites | 1: 1983-91<br>2: 1984-91<br>3: 1983-91 | 1: 3,474<br>2: 741<br>3: 1,683 | 1: $14,000/mile<br>2: $13,300/mile<br>3: $4,410/mile | 1: $14,770/mile<br>2: $14,030/mile<br>3: $4,650/mile |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Michaels and Smith (1990) | HPV | Boston, MA | hazardous waste sites | 1977-1 | 2,182 | $1,150/mile | $2,225/mile |
| Reichert et al. (1992) | HPV | Cleveland, OH | sanitary landfills | 1985-89 | 2,243 | $6,000 for homes in immediate vicinity | $7,000 |
| Rowe et al. (1985) | HPV | Eagle, CO | NPL site | 1985 | 151 | $24,000 per household | $32,050 |
| Schulze et al. (1986) | HPV | West Covina, CA | NPL site | 1983-85 | 185 | $8,800 in the absence of the site | $11,840 |
| Smolen et al. (1993) | HPV | Toledo, OH | hazardous waste site | 1986-90 | 1,237 | $12,000 per mile of distance up to 5.75 miles | $13,290 |
| Thayer et al. (1992) | HPV | Baltimore, MD | hazardous and non-hazardous waste disposal sites | 1985-86 | 2323 | $2,194 per miles | $2,930 per mile |
| Walker and Hoehn (1993) | HPV average | 253 counties in the U.S. | # of NPL sites in county | 1980 | 34,353 | $107 per year per household per site | $190 per year per household per site |

* published in "An Evaluation of Public Preferences for Superfund Cleanup" - supported by USEPA

# ANALOGY - CASE STUDY NO. 9

| | |
|---|---|
| Case Name: | DeSario v. Industrial Excess Landfill, Inc. |
| Location: | Uniontown, OH |
| Source of Pollution: | Approximately a 30-acre landfill containing hazardous solvents and other toxic liquid and solid wastes. The solid wastes were the source of explosive methane gas. In addition, radioactive waste reportedly was found at the site. |
| On-Site: | Yes |
| Off-Site: | No |
| Type of Contaminants: | Various types of hazardous waste, methane gas and reportedly radioactive materials |
| Groundwater: | Yes |
| Soil: | On-site |
| Air: | No |
| Trespass or Proximity: | Proximity -- the various studies relate to diminution in property values of properties proximate to the landfill. Their appears to be no assumption that any of the properties were actually contaminated. |
| Class Action: | Yes |
| Effective Date of Study: | Primarily three real estate experts provided opinions. These are: |

- Alan K. Reichert, Ph.D, 9/94
  Dr. Reichert used data current through 5/31/94.
- Stephen Sheppard, 10/94
  Mr. Sheppard compared sales between 1977 and 1987 against sales between 1988 and 1994.
- Dr. Kenneth T. Wise, 10/94
  Dr. Wise considered sales data between 1977 and 1994.

| | |
|---|---|
| (Affected) Property Type: | Primarily single-family residential properties with some consideration given to vacant land and commercial properties. |

HUNSPERGER & WESTON, LTD.

No. of Affected Properties:

Approximately 1,500

Case Study Summary:

On April 11, 1989, a class action complaint was filed against numerous defendants arising out of the operation and use of the industrial excess landfill in Uniontown, Ohio. The plaintiffs were seeking damages for loss to property value due to proximity to the landfill.

From 1965 until approximately 1980, large quantities of waste were dumped and accepted at the subject 30-acre landfill. It is undisputed that hazardous solvents and other toxic liquid waste were dumped there specifically during the period of 1968 through 1972. In addition, the site accepted trash and other solid wastes, which became the source of explosive methane gas. Subsequently, radioactive contaminants were also found. In 1980, the landfill was closed as a result of a consent decree ordered by the Court of Common Pleas of Stark County. Those homes within ¼ mile of the landfill were provided an alternative water supply. The landfill itself was identified as a superfund site.

Defendants unsuccessfully sought to overturn certification based on a variety of issues. Certification was upheld and in trial a jury found for the plaintiffs in the amount of $500,000.

The plaintiffs asked for a new trial on the basis that the judgement was too small given the weight of the evidence. The court agreed and a new trial was held. The second trial was as the judge put it, a battle of experts. Plaintiffs hired two real estate experts and defendants countered with one.

Methodology:

Each of the three real estate experts relied upon a form of multiple regression analysis. The results varied and each expert criticized the other for improper technique.

Conclusions:

Dr. Reichert used the concentric circle theory to estimate damages and consistent with most other cases the greatest damage occurred nearest the source and the least damage farthest from the source. Dr. Reichert found approximately 15% loss of value in the first circle, approximately 6% in the second circle and approximately 5% in the third circle. In total dollars, this translates to a range of loss per house of

approximately $5,000 to $16,000. Total property value loss was $11,368,109.

Mr. Sheppard found total dollar loss of $13,559,887. On a per residence basis, this appears to range from approximately $5,000 to as high as $17,000.

Dr. Wise found total value loss of $594,515, which on a per-house basis, appears to range from only approximately $20 to as much as $4,000. In addition to dollar impacts Dr. Wise arrived at a number of other conclusions. Primary among them are:

- Periodic losses appear to coincide with media coverage.
- The initial property value impact was temporary and subsequently disappeared.
- The statistical evidence indicated to Dr. Wise that there is no remaining effect from this initial impact on the property values of houses that are beyond 2,500' from the landfill.
- He found evidence suggesting that homes within 2,500' of the landfill experienced a greater initial property value impact than more distant homes. He concluded that the remaining impact was not statistically significant and his analysis suggested that if the impact exists at all, it will continue to diminish and soon disappear.

Evidently Dr. Wise allocated value loss to only those properties that sold during the time period. He had previously calculated a "paper loss" of $1,660,000 to properties that had not sold. The judge pointed out that in his view this paper loss set a minimum level of damages.

As a result of the second trial, an Ohio jury awarded 1,713 property owners $6.7 million in stigma damages.

Source of Information:                 Expert reports and judgement entry of the Stark County Court.

Comments:                 There were several significant issues to this case. First of all, a new trial was granted because the initial judgment was insufficient in the judge's opinion given the weight of the evidence. On the other hand, defendants were denied recision of class certification.

While the court considered a variety of issues, it did ultimately take the position that in Ohio to recover damages under a private nuisance theory, the plaintiffs need not show a physical intrusion onto their land.

Based upon the premise that property values were recovering, the defendants argued that only "X" number of properties would eventually sell and that loss in the future could only be $28,300, the projected loss from actual sales within the class. However, according to the court, *"the measure of present damages at time of trial is the diminution in value of the property, not whether or not the parties are going to sell their properties in the future. In other words, class members need not have sold their properties to have established their damages."* The court went on to say, *"the loss to plaintiffs was legally permanent even if not perpetual and the measure of damages is at least the current loss, the diminution in value of the class members property."*

In summary, 1) the methodology employed by plaintiffs and defendants experts was multiple regression analysis, 2) properties were found to be damaged by virtue of proximity to a polluting source; none of the properties was itself contaminated, and 3) damage and effects flowed to the real estate at time of trial; it did not matter whether a house was to be actually sold in the future.

## ANALOGY - CASE STUDY NO. 10

| | |
|---|---|
| Case Name: | An Evaluation of the Impact of a Well-Designed Landfill on Surrounding Property Values |
| Location: | Los Angeles, California |
| Source of Pollution: | Landfill on-site |
| On-Site: | N/A |
| Off-Site: | N/A |
| Type of Contaminants: | N/A |
| Groundwater: | N/A |
| Soil: | N/A |
| Air: | N/A |
| Class Action: | No |
| Effective Date of Study: | 1978-1988 |
| (Affected) Property Type: | Single-family residential properties |
| No. of Affected Properties: | 1,628 sale transactions were studied. The sales were from three neighborhoods located within six miles of the landfill. |
| Case Study Summary: | In this article, a theoretical framework was presented for analyzing the effect of a landfill on surrounding property values. Whether a landfill's negative impact can be reduced or removed through the use of modern laws, restrictions and management skills was also evaluated. |

The landfill used in this study is located in the northern central portion of the San Fernando Valley in Los Angeles. The landfill presumably was designed and is managed to minimize its effect on the surrounding neighborhoods. The landfill is on the north slope of a hill. The south slope, which abuts the neighboring homes, is undeveloped land owned by the county. Therefore, the actual dumping area is not visible from the neighboring homes.

Housing prices in the neighborhood adjacent to the landfill were compared to housing in comparable neighborhoods some distance away. In effect, the comparison was used to test the hypothesis that with the help of modern laws, restrictions and management techniques, it is certainly quite possible that a landfill would have no worse impact than that of the average neighbor.

| | |
|---|---|
| Methodology: | Multiple Regression Analysis. |

Conclusions:

According to the authors, the results "suggest that a well designed and managed landfill can be a good neighbor and have no statistically measurable negative impact on the surrounding property values."

Source of Information:

An article published in the April 1991 Appraisal Journal authored by Donald Bleich, Ph.D., M. Chapman Findley, III, Ph.D. and G. Michael Phillips, Ph.D.

Comments:

It is implicit in the article that the landfill is a "good neighbor" and the results seem to be predicated upon that assumption. However, other studies suggest that, if the landfill is anything other than a good neighbor or if perceptual cues abound, quite the opposite results may be found. The authors in their article did not address the scientific issues. That is, the reader has no knowledge as to whether the landfill was generating or was capable of generating methane gas or whether contaminants could leach into the groundwater. One can only assume that none of these circumstances was the case or at least if it was, no one had knowledge of it. Of course, if there were contaminants associated with the landfill and nearby property owners had no knowledge, the regression model would have led to a misleading conclusion.

# SURVEY ANALOGY NO. A

| | |
|---|---|
| Title: | "Perceived Risks of Radioactive Waste Transport Through Oregon: Results of a Statewide Survey" |
| Author: | MacGregor, Slovic, Mason, Detweiler, Binney, and Dodd |
| Publication: | *Risk Analysis*, Volume 14, No. 1, 1994 |
| Acknowledgments: | This study was done with support of the U.S. Department of Energy and State of Oregon, Department of Energy. The study was funded in part by a grant to Decision Research from the Alfred P. Sloan Foundation. |
| Date: | The study was completed in 1993 and published in *Risk Analysis* in 1994. |
| Key Words: | Risk perception: nuclear waste transportation: hazmat transportation: trust |
| Methodology: | Public opinion survey with accompanying statistical analysis. A total of 1,006 households were surveyed. Each household survey took approximately 25 minutes to administer. |
| Summary of Study: | The published study presented the results of a survey conducted to assist public reactions to a longterm nuclear waste transport program planned to follow a route through a portion of rural Oregon. As part of the DOE plan to clean-up the Hanford site in Washington state (these facilities were for many years used to produce plutonium for nuclear weapons), nuclear waste products were to be shipped to a repository near Carlsbad, New Mexico over a period of approximately 25 years. Beginning in 1988, a public information involvement program was established to inform communities along the transport corridor of the waste transportation program and to train local emergency service providers and nuclear hazmat emergency procedures. The survey was designed to examine public reactions to the program, both along the transport corridor and in parts of the state relatively distant from the transport route. |
| Findings: | The majority of survey questions pertained in various ways to perception of risk. The majority of respondents believed that accidents involving the transport of |

hazardous wastes are inevitable. Approximately half the respondents thought that nuclear waste could be transported in a way that is acceptably safe. Similarly, respondents were evenly split in their perceptions of the risk of transporting radioactive waste in comparison to other highway risks. It is significant to note that initially the majority of the respondents believed the transportation risk to be much greater or slightly greater than the storage risk; that is, leaving the nuclear waste on-site. Subsequent to the latter reaction, additional information was added to the survey and the response was different. Ultimately, the results of the survey suggested that the respondents viewed transportation risks as lower than storage risks.

Additional results indicated that an overwhelming majority of the respondents believed that areas in which radioactive wastes were to be transported were likely to be unattractive to business development and tourism. Additionally, consistent with previous studies, an overwhelming majority of respondents reacted with negative images to nuclear waste transport.

Comments:

The results of the study are not surprising and are completely consistent with previous findings in that the public has a negative image of hazardous waste (particularly nuclear) and the risks associated with transporting it. This study was contradictory to the thought that, one might predict that any detailed information on hazards of radioactive waste transport, particularly involving material release and contamination, would only serve to exacerbate concerns about a transport program. In this case, the opposite was found. That is, hypothetical hazard information tended to reduce perceived risks of transport. This appears to have been a surprise to the authors and they speculated that:

1.     The scenarios given to respondents depicted events that were less extreme than those that they would have imagined on their own, or

2.     The structure of the questionnaire served to highlight transportation risks and by default to diminish storage risks.  Information relative to these risks was not introduced until later in the questionnaire.  A follow-up study was conducted to further investigate the reason for this reaction. Based upon the additional questions, the authors concluded "the likely cause of the apparent decrease in concern over transportation risks relative to storage risks observed in the original survey was not a mollifying effect of the information presented in the scenarios but rather a heightened salience of storage risk information in the introductory passage."

# SURVEY ANALOGY NO. B

| | |
|---|---|
| Title: | "The Value of Avoiding a LULU: Hazardous Waste Disposal Sites" |
| Author: | Smith & Desvousges |
| Publication: | *The Review of Economics and Statistics* |
| Acknowledgments: | Although the study was funded in part by the United States EPA, it does not necessarily reflect the views of that agency. No official endorsement should be inferred. |
| Date: | The survey was conducted late Spring and Summer of 1984. The summary paper was published in 1986. |
| Key Words: | Disamenity, hedonic property value model, demand survey, interviews |
| Methodology: | Hedonic demand model based on public opinion survey or interviews. A total of 609 interviews was completed. However, after accounting for missing values for variables used in the analysis and confining it to homeowners the sample was reduced to 268 observations. |
| Summary of Study: | The paper identifies a demand model used to describe a household demand for distance from a landfill with hazardous wastes. In essence, it describes the demand for distance from a disposal site and quantifies the willingness to pay for a more distant location. The model was estimated using responses from homeowners in suburban Boston. |
| Findings: | In developing this study, the authors made a number of significant findings and compared them to other similar studies. Among the findings were: |

- The results confirmed that nuclear power plants and hazardous waste disposal sites are the most undesirable of land uses.

- The survey indicated a threshold of about 10 miles from majority of respondents to accept a hazardous waste site and about 22 miles for a nuclear plant. This contrasted with a 1980 study done by Mitchell who found that a nuclear

power plant or hazardous waste site will need to be 100 miles from respondents residences before 51% would voluntarily accept it. Mitchell also found that only 10-12% of the population would voluntarily live a mile or less from a nuclear power plant and only about 9% would live that close to a hazardous waste disposal site.

- The authors anticipated that distance responses would be determined by household features and other features of the house in the neighborhood, attitudes toward the degree of harm posed by hazardous waste and the information and experience respondents had with hazardous waste and the number of individuals in the household that might be exposed to the waste. Generally, the demand estimates agreed with theoretical expectations.

- The authors' findings were contrasted with a study involving properties near Three Mile Island. Nelson found that proximity to the power plant did not seem to affect property values once the initial accident period was over and the reactors shut down. The authors found this to be not surprising since any source of risk is not present once the plant is shut down.

- In quantitative terms, the authors found that the average household would realize a consumer surplus between $333 to $495 annually for each mile between its residence and a landfill containing hazardous waste. Stated another way, diminution in property value is greatest near the source and diminishes as one moves more distant from the source. Assuming this diminution extends outward the full 10 miles as earlier explained, those houses nearest the source would have been impacted on the order of approximately $4,140 (in 1984 dollars).

Comments:

It is interesting to note that the authors did not discuss the types of hazardous waste that might be stored in their hazardous waste site. Nonetheless, their conclusions, as well as others, suggests that greater risk (or impact) is associated with proximity to nuclear plants, nuclear reactors or nuclear storage facilities. The public seems

to make a greater negative association with the term "nuclear." Similarly, this study suggests that reduction in value diminishes outwardly from the source. In other words, those properties nearest the source suffer the greatest loss in value.

The outward distance for acceptance of hazardous waste site or nuclear plant is also striking. The authors of this study found that distance to be 10-22 miles, depending upon the use, while Mitchell found that the distance would have to be 100 miles before 51% of the respondents would voluntarily accept it. In contrast the Kohlhase study found loss in value to extend outward approximately six miles.

- It is also evident that the respondents' reactions and conclusions reached by the authors were driven by risk perceptions. That is, the distance homeowners are willing to live from a disamenity if a function of their perception of risk. The authors make it a point to explain that the Three Mile Island study found no diminution in value because risk had been eliminated. This suggests that as long as risk is apparent or is perceived to be apparent that there will be some diminution in value.

- In a companion study, the authors found that surveys can be used to elicit valuation information for risk changes. (See An Empirical Analysis of the Economic Value of Risk Changes.)

# SURVEY ANALOGY NO. C

Title:                        "The Effect of Risk Beliefs on Property Values: A Case Study of a Hazardous Waste Site"

Author:                      McClelland, Schulze & Hurd

Publication:                 *Risk Analysis*, Volume 10, No. 4, 1990

Acknowledgments:             The authors acknowledge several individuals with the U.S. Environmental Protection Agency, the California Department of Health Services and the South Coast Air Quality Management District, as well as the California Department of Health Services.

Date:                        The survey was conducted in 1985 and a summary of the study was published in *Risk Analysis* in May of 1990.

Key Words:                   Health risk, toxic wastes, benefit/cost analysis, perceived risk, property values

Methodology:                 Telephone survey and multiple regression analysis. In the Fall of 1985, a mail survey to assess judgements of health risks for people living near the OII landfill was conducted. This represented approximately 4,100 homes. In addition, a model was established to use psychological and sociodemographic variables to explain the assessments of health risk. The hedonic price method or regression analysis was used to value the environmental disamenity represented by the OII landfill.

Summary of Study:            The purpose of the paper was to document public perceptions of health risk and compare those perceptions to actual scientific studies.

                             The OII landfill is located between the communities of Montebello and Monterey Park in the Los Angeles, California metropolitan area. OII opened in 1948 as a municipal landfill and began accepting hazardous wastes in 1976. OII stopped accepting hazardous materials in January 1983. In October 1984, the landfill reached its capacity and was closed. At that time, it was proposed for inclusion on the superfund list. After monitoring by the Regional Water Quality Board and a California Department of Health survey, it was concluded that while the OII landfill is not a pleasant place, the experts

believe there is no indication that it has caused serious health problems and based on water and air monitoring that major health problems in the future are unlikely. The possibility does remain, however, that there is some as yet undetected toxic chemical that may cause a future health risk.

Given the absence of any scientific evidence with respect to the potential for adverse health affects, the surveyors conducted a study to analyze the comparison of expert and resident health risk beliefs. The study was expanded to attempt to determine the reason for the perceptions and their effect on property values.

Findings:

In developing this study, the authors made a number of significant findings. Among them were:

- Among the 4,100 homes near the site, the estimated depression in property values was estimated to total about $40.2 million before the site was closed and about $19.7 million after closure. Based on a mean selling price of $135,733, this equates to loss in value of 3.5% after closure to 7% before closure.

- The distribution of responses was bimodal. That is, some residents believe the risk to be very large, whereas others judge the risk to be very small. Schulze, et al., obtained a similar bimodal distribution of responses and a laboratory study of risky decision making with low probability risks. (See Valuing Risk: A Comparison of Expected Utility with Models from Cognitive Psychology.) The surveyors report that other researchers have also observed a similar bimodality. For example, in a national telephone survey regarding the proposed high level nuclear waste repository at Yucca Mountain, Nevada, the two most frequent responses of risk were: 1) not at all serious and 2) very serious. The researchers determined that with respect to low probability risks, some people dismiss it, while others may exaggerate its importance. It was further explained that denial is the reason for dismissal.

- Schulze, et al. stated that, "it is reasonable to

conclude that the subject health risk beliefs for many respondents differ substantially from the true risk, whatever it may be."

- "In selling one's house, it makes no difference what the seller thinks the house is worth or whether the individual seller thinks the local health risks are high or low if one's neighbor down the street is selling a comparable house for $5,000 less because of concerns about the health risks."

- Although residents may be willing to sell at a below market price to avoid any subjective risk associated with the proximity to a landfill, they are likely to list their homes at the current market rate. The reason for this is if other in the neighborhood are not as concerned about the health risk as the seller, than the seller may well be able to obtain a price higher than believed. The markets collective risk judgment is the appropriate predictor of price rather than the risk judgement of the seller.

- Despite local requirements regarding disclosure, the surveyors found that 62% of recent purchasers were not aware of the landfill site when they bought their homes. Schulze, et al. went on to say that if buyers were to become more aware of the landfill and its problems, then the likely losses in property values would be even larger.

- In comparing perceptions before closure and after, the researchers concluded that subjective damages were reduced from approximately $40.2 million to $19.7 million which results in a savings of $20.5 million attributable to closing the landfill.

- Perceptual cues that provide people with continual reminders about the hazard appear to lead to higher health risk judgments. For example, a change in perception of the odor after closure of the landfill is associated with a large reduction in health risk beliefs.

- The results of this research demonstrate that the economic consequences of over-estimating a risk are just as real as those of underestimating risk. Losing $5,000 of the value of one's house because of the neighborhoods risk beliefs is just as damaging as suffering an uninsured $5,000 property loss in a flood.

Comments:

This study points out that the marketplace does not often agree with the science. That is, even when scientific evidence suggests there is no possibility of an adverse health effect, public perception may differ and this may result in a negative impact on property value. Reasons for perceptions of high risk include, odor, exposure to media coverage, having children living at home, age (younger respondents are typically more concerned) and gender (females generally are more concerned). In this case, the researchers concluded that the risk was probably no different after closure than before, but some of the perceptual cues had disappeared. This study is useful to point out the opposite but equal reaction. That is, if a true health risk exists, the more people know about it, the greater their risk perception is likely to be. The more negative the perception, the greater the loss in value.

## SUMMARY OF CASE STUDIES

While it is not possible to include every paper or case study written on the effects of contamination, we have included a representative sample. The 20 or so analogies or case studies previously presented illustrate a wide range of loss in value; some suggest nominal loss (one even suggests no loss) while others suggest a much greater impact due to proximity to a negative environmental condition.

Only Analogy - Case Study No. 10 suggests no loss in value due to proximity to a landfill. The authors point out that there are no (visual) perceptual cues associated with the landfill. That is, the landfill is on the north slope of a hill, and the south slope which abuts neighboring homes, is undeveloped land owned by the county. Therefore, the actual dumping area is not visible from the neighboring homes nor is the landfill entrance visible. Additionally, litter is carefully controlled and is not allowed to accumulate. Absent any comments, we assume there are no known leachate or methane problems; thus, presumptive in the study is that the landfill is a "good neighbor."

We contacted one of the authors (Dr. Bleich) of Study No. 10 who indicated that his client was the operator of the (Sunshine) landfill and until requested to do the study, he had no knowledge of the landfill, even though he works near it and drives by it every day. No investigation was made with respect to contamination; the authors did not know if the landfill was the source of any pollution and did not interview any neighborhood residents. Thus, the study involved only an analysis of the sales data. Dr. Bleich did say that the landfill is the source of much controversy today, and nearby residents are attempting to block expansion.

Similarly, the authors of Case Study No. 8 contrast public reaction to the Suffolk city landfill in Virginia with the Operating Industries, Inc. landfill (OII) in Monterey Park, CA. The Suffolk landfill covers 67 acres and it is estimated that 129 people live within one mile of the site. Even though the site was added to the NPL, city officials and residents found removal and disposal of the contamination acceptable, while incineration of the contaminants and relocation of effected residents were unacceptable. Ultimately, the community accepted a plan of "no action." This diminished concern is explained by the authors as being due to "a paucity of perceptual cues and the lack of people to perceive."

In contrast, the OII landfill covers 190 acres and is located 10 miles east of Los Angeles in the suburb of Monterey Park. More than 20,000 people are estimated to live within one mile of the site. In 1979, residents near the landfill formed a group to address problems such as leachate seepage, methane buildup and declining property values. This was precipitated by high volumes of truck traffic and odors

(perceptual cues).   McClelland et al. found a significant correlation between recognition of these perceptual cues and the high risk beliefs of many residents living near the site.   McClelland also demonstrated there were significant property value losses associated with these risk beliefs.

The differing reactions to the two landfills are explained by the authors as attributable to: 1) the PRP for the OII landfill was an outside corporation that had provided no significant economic benefit to the community, 2) most of the waste was brought (to OII) from outside the community, 3) at Suffolk the city and by extension the residents were the PRP's, and, 4) the potentially hazardous wastes at Suffolk came from agricultural chemicals which had benefitted the local economy.   In other words, conditions at OII were such that news stories were likely to create an image of risk; such was not the case at Suffolk.

In addition to the Suffolk and OII studies, the authors cite 13 studies indicating loss in value to properties near pollution sources.

These studies suggest proximity to an environmental disamenity can result in loss of value ranging from just over $1,000 per house to as much as $24,000 per house.

Please note that the McClelland study previously referenced is identified as our Survey Analogy No. C.  McClelland, Schulze & Hurd published their survey findings with respect to the OII landfill in *Risk Analysis* Volume 10, No. 4, 1990.  The methodology used in their study was both telephone survey and regression analysis.  The purpose of their paper was to document public perceptions of health risk and compare those perceptions to actual scientific studies.  Some of the more significant aspects of their findings were:

1. Among the approximately 4,100 homes near the site, the estimated loss in property value was approximately 7% before the landfill was closed and 3.5% after the landfill was closed.

2. Despite local requirements regarding disclosure, 62% of the respondents were not aware of the landfill when they bought their homes.  That finding suggests that with more awareness the likely losses in property values would have been even larger.

3. Even when scientific evidence suggests there is no possibility of adverse health effect, public perception may differ and may result in a negative impact on property value.

---

These examples are illustrative of a very significant point: perception of risk results in loss of property value even in the absence of proven contamination; once a neighborhood understands that properties are contaminated, the loss may be even greater.  With respect to Rocky Flats, it is uncontroverted from the various interviews and surveys that much of the market believes Rocky Flats to be a health risk.  (See "Rocky Flats Health and Housing Survey" by Decision Research as well as additional surveys and data in the Real Estate Market Research of this report.)  An overwhelming majority of the population near Rocky Flats believes the plant to be a health risk even in the absence of considerable information that was not available to them at the time of the surveys.  For example, the December 20, 1995 headline in the Rocky Mountain news is "Rockwell Hid Flats Leak"; that information obviously was not made available to the public at the time of the surveys and it would not be unreasonable to conclude (given the information) that the survey respondents would have expressed even greater concern.

Additionally, we reference a December 27, 1995 article in the Rocky Mountain News indicating that both Jefferson County and Broomfield adopted new resolutions with respect to Rocky Flats. Jefferson County officials condemned plans to store nuclear waste at Rocky Flats, "worried that it poses a threat to residents."  Broomfield officials "reluctantly support" temporary storage of wastes at the plant. They prefer that it be sent to the WIPP facility in New Mexico.  (That transportation corridor has already been the subject of one law suit - See Case Study No. 6, City of Santa Fe v. Komis).  The article goes on to say that according to John Stone, incoming chairman of the Board of Commissioners, "We are the local government that governs that area up there, and they have not been a responsible neighbor as far as keeping us informed of what's going on."  (See Case Study No. 10 which resulted in no loss in value but the study was predicated on the landfill being a good neighbor.  Intuitively, that suggests that loss in value would be found if the externality were not a good neighbor.)

Case Studies 4 and 9 also involve landfills.  In No. 4, researchers at the University of Toledo developed in effect a two-part study.  Housing prices near an existing low-level hazardous waste site were studied to determine effect on price due to proximity.  In addition, sales were studied before and after the pronouncement of a planned nuclear dump site near Toledo.  With respect to the existing landfill, housing values were found to be diminished from $9,000 to as much as $14,000 in any particular year out to 2.6 miles.  Beyond 2.6 miles, property values were not adversely affected.  With respect to the proposed low-level nuclear waste site, a more pronounced price effect was noted.  The distance effect continued outward from the site to 5.75 miles.  The results of the study clearly demonstrated that adverse

economic impact extends outward well beyond the actual disposal site.

Case Study No. 9 (DeSario v. Industrial Excess Landfill, Inc.) presents an interesting study. From 1965 to approximately 1980, large quantities of waste were dumped and accepted at the 30-acre landfill. It is undisputed that hazardous solvents and other toxic liquid wastes were dumped there. In addition, the site accepted trash and other solid waste which became the source of explosive methane gas. Subsequently, radioactive contaminants were also found. In April of 1989, a class action complaint was filed against numerous defendants arising out of the operation. The plaintiffs were seeking damages for loss to property value due to proximity to the landfill. An initial trial verdict was entered but for various reasons, a second trial was held and for that trial each of three real estate experts used a form of multiple regression analysis to analyze the impact on neighboring property values.

Dr. Reichert found loss in value ranging from $5,000-$16,000 per house or from about to 5% to 15% of property value. Mr. Sheppard found total dollar loss of approximately $13,600,000 which represents $5,000 to as high as $17,000 per house. On the other hand, Dr. Wise found nominal loss in value. His analysis included "paper loss" of $1,660,000 in addition to approximately $600,000 for those home within 2,500' of the landfill. Ultimately, an Ohio jury awarded 1,713 property owners $6.7 million in stigma damages. While the court considered a variety of issues it did ultimately take the position that in Ohio to recover damages under a private nuisance theory, the plaintiffs need not show a physical intrusion onto their land. Further, the Court opined that one need not have actually sold a house in order to incur damage.

It is significant to note in the latter two studies (Analogies No. 4 and 9) that the landfill contained in addition to hazardous waste, nuclear waste materials. Loss of value in these two case studies was fairly significant. While No. 4 was not tested in court, the researcher did find up to 50% of loss or as much as $14,000 per house. The effect extended from 2.6 to 5.75 miles. In Case Study No. 9, the impact zone was not as far reaching, but the magnitude of loss found by two of the three researchers was substantial. Applying the court's verdict at $6.7 million to the 1,713 affected properties, loss of value equates to $3,900 per house on average. The landfill cases are not unlike the Rocky Flats issue in that residential properties (as well as some commercial industrial and vacant land) surround a negative environmental condition. The more pronounced the perceptual cues, the greater the market perceives the risk to be. It is axiomatic in real estate that as risk increases, value diminishes. One can also argue that even in the absence of perceptual cues, the "real" risk of the environmental disamenity is unchanged and in fact there remains diminution in value akin to a latent defect concept.

Case Study No. 7 seems to be a standard in the industry when studying housing prices due to proximity to an environmental disamenity. At least we have found this study to be identified and referenced for comparison in a number of other studies. Janet Kohlhase of the University of Houston, analyzed the impact of EPA announcements and policy actions on housing markets surrounding 10 NPL sites. The gist of her study was to examine home prices before the Superfund act and after. Thus, housing markets in Houston's Harris County were studied between 1976 and 1985. Methodology was multiple regression analysis. Significant findings included:

1. Diminution in value occurred out to a limit of approximately six miles.

2. The market did not distinguish between severity of the sites. For example, diminution in value was greater near one site that was considered less severe than another.

3. Loss in value was due to perception that in some cases flew in the face of scientific evidence.

4. Clean-up efforts can enhance property values depending, of course, upon the nature, timing and certainty of clean-up.

The findings in the Kohlhase study are completely consistent with conclusions found elsewhere in this report. Like the NPL sites in the Kohlhase study, Rocky Flats, of course, is a superfund site and impact on value extends outward at least six miles. Depending upon the specific site, Kohlhase found diminution in value ranging from as low as 2% to as high as 36%. We point out that the neighborhoods in the Kohlhase study were not actually contaminated; loss in value was due solely to proximity to an environmental disamenity. In the case of Rocky Flats, not only are the neighborhoods proximate to the disamenity, but scientific evidence indicates that the neighborhoods have been exposed to toxic releases and continue to be subject to considerable risk associated with plutonium, uranium and other hazards on and off the Rocky Flats site.

Of additional relevance locally (the Denver metropolitan area) is the Escamilla v. ASARCO case involving heavy metal contamination of an entire north Denver neighborhood. In this case, a nearby neighborhood was effected by years of releases from a smelter. According to the smelting company's own isoplaths elevated levels of cadmium were pervasive throughout the entire area. Despite publication of a public health study and numerous newspaper articles, neighborhood residents had little knowledge of the contamination facts or their potential adverse health effects. A survey of realtors indicated that

---

no disclosure of these facts was being made to prospective purchasers. Thus, a study of the actual sales transactions was of little help because the purchasers and their lenders were not acting from a sufficient level of knowledge. In other words, the price could not have been affected by the facts because the facts were not widely known. Ultimately, however, the impact of the contamination did show up in reduced sales volume compared to other similar neighborhoods. Despite arguments to the contrary, the court did determine that just because damage was difficult to quantify, that did not mean it did not exist.

With respect to the ASARCO case, one of the real estate experts had no opinion about diminution in value, only methodology; we calculated loss in value to be $4,159,000, which equates to about 10%. Based on the Colorado case, <u>Weld County Commissioners v. Slovek</u>, the jury concluded in its verdict, awards for two distinct measures of property damage: loss in value and cost to repair or clean the property. An award was entered for $28,000,000 for clean-up costs and $4,159,000 for decrease in residential property value plus $8,000,000 for annoyance and discomfort. In our study of the Globeville neighborhood, the findings were consistent with many of the other analogies or case studies available in the literature. For example:

1.  If all transaction participants are not reasonably informed, statistical analysis may provide an erroneous conclusion or at least set the lower limit of value loss. We can predict from other case studies that given knowledge of the facts, market participants will react adversely to pollution or proximity to pollution.

2.  Sales or development that did not occur are as important in the analysis of value impact as those that did occur.

3.  The market seldom understands the technicalities of environmental science. Instead it forms opinions based upon what has been read or heard. This is particularly relevant to Rocky Flats given all the adverse publicity associated with alleged cover-ups and releases. Evidence of this perception is amplified in the various surveys and studies found elsewhere in this report.

For illustration of methodology and value impact, we have included Case Study No. 5 which involves analysis of residential properties near petro-chemical refineries. The study is relatively recent and involves residential property, vacant land and improved commercial properties. Values of homes in 12 impact neighborhoods were contrasted with home values in similar neighborhoods beyond the influence

of the refineries.  The researcher did not assume that the impacted properties were actually contaminated; they were analyzed based on their proximity to a source of pollution.  Multiple regression analysis was used and a range in loss in value of approximately 7.5% to 38.5% was found.  The researcher indicated that these numbers could increase significantly if actual pollution of the affected properties was found and disclosed.  The relevance of this case to Rocky Flats is two-fold:

1.      Multiple regression analysis was the method of study.

2.      In terms of relative risk, it is our experience that the market reacts more negatively to nuclear issues than to almost any other form of potential contamination.

Because Rocky Flats has nuclear materials at issue, we have specifically considered case studies dealing with nuclear risk analysis.  These include No. 1, 2, 6, A and B.  We emphasize, however, that in a few of the landfill cases previously cited, fill materials did include some nuclear waste.

Case Study No. 1 involves the analysis of property values by several researchers around the Feed Materials Production Center in Fernald, Ohio.  On December 10, 1984, the Department of Energy announced that there had been an accidental release of uranium trioxide powder from the uranium processing facility near Fernald.  In the context of a law suit, studies were done by Beron, Burke, Gartside and Rosen to determine if nearby properties had suffered loss in value due to proximity to the Fernald plant.  Methodology just as in the Rocky Flats case included descriptive statistics and multiple regression analysis.  Beron found no measurable impact due to proximity except to those properties from which owners could actually see the facility.  The other researchers disagreed.  Burke and Rosen found damage in the amount of $33.5 million to $38.1 million for 5,500 households.  Gartside also found loss in value.  Diminution was found to occur up to four miles from the plant.  Ultimately, we understand that the property case was settled for $73 million.

Case Study No. 2 involves properties adjacent to radium contaminated fill material.  In October 1989, a market research study of all single-family residential sales within the Superfund sites, as well as one mile beyond, was undertaken.  The purpose of the study was to analyze market behavior before the pronouncement and after the pronouncement and to determine if this market behaviors resulted in a negative influence on property value.  As was the case in the Fernald study, these same researchers found some loss in value attributable to only those properties within site of the disamenity.  Perhaps equally significant, they also concluded that the degree, significance and duration or persistence of any negative price effect depends in large part on whether the contamination is perceived by potential buyers as an

isolated event or a continuing condition. One would be hard pressed to argue that Rocky Flats is anything other than a continuing condition, at least for the next 25 to 50 years. Therefore, as events or negative media exposure continue diminution in property value will probably continue as well.

Case Studies 6 and A are particularly significant to Rocky Flats because they are indicative of market resistance to location along highway corridors used for the transport of radioactive materials. Case Study No. 6 is identified as the court case <u>City of Santa Fe v. Komis</u>. In this case, the New Mexico Supreme Court upheld the trial court's award of severance damages for loss due to *public perception*. In summary, land taken from Komis was to be used for the construction of the highway to transport nuclear waste to the Waste Isolation Pilot Project (WIPP) site near Carlsbad, New Mexico. This began as an eminent domain issue in which the city's real estate appraiser argued that there was no loss in value to the remainder property. On the other hand, the property owner's appraiser relied in part upon a public opinion survey. The survey was designed to measure the market's knowledge and opinions with respect to diminution in property value, such as the one prepared by Decision Research for this Rocky Flats case. An overwhelming majority of respondents were familiar with the proposed bypass and 71% believe that residential property near the bypass would sell for less money because of its location. 41% of the respondents believed that residential property near the road would sell for between 11% and 30% less than comparable property not in proximity to the road.

With respect to Rocky Flats, several issues are relevant. First of all, it differs from the Komis case in that properties near Rocky Flats have been subject to releases of hazardous materials. On the other hand, it is similar to Komis because there are concerns about the safety of transporting materials off site. In the Rocky Flats issue, it is yet undecided as to whether materials will stay on-site or be transported off-site. Additionally, the New Mexico Supreme Court allowed the real estate expert (in the Komis case) to rely upon a public opinion survey that measured the market's perception of risk. This is an important concept because an appraiser's job is to measure market perception and in the absence of true sales data, (or confusing data) a survey of market participants is one way to understand and measure the market. As Justice Franchini noted, "it is difficult to prove market value loss when there are no actual sales of comparable property, yet damages should not be denied because they are difficult to prove."

We note that a September 14, 1992 newspaper article appeared in the Las Vegas Sun, the subject of which was the Komis verdict applied to the proposed Yucca Mountain repository in Nevada. In summarizing the Komis case, the newspaper reported that *"the legal issue was not that the site and*

nuclear shipments to it necessarily constituted a health threat to the couple and their property, it was only necessary to show that a public apprehension of the site exists, and that results in lower property values." The newspaper article goes on to say, "if you bring prospective buyers to a property next to which trucks are rumbling by, hauling radioactive material, you can be sure that will affect the value of the property. Land next to landfill access is understandably less valuable than that on a shady lane. Public perception determines the value of property."

In response, Las Vegas advertising executive Don Williams, who is consulting with the American Nuclear Energy Council on the proposed Yucca Mountain nuclear dump, said that property values do not decrease "in association with nuclear plants or facilities." He goes on to say that even if all his nightmares are true, even if nuclear waste transportation does affect property values, Nevada doesn't have any maneuvering room. In others words, the population has no choice, so they might as well accept it.

A study similar to the one done for the Komis case was developed by MacGregor, Slovic etal. and published in *Risk Analysis* Volume 14, No. 1, 1994. Their paper presented the results of a survey conducted to assist public reaction to a long-term nuclear waste transport program planned to follow a route through a portion of rural Oregon. This paper is summarized as our Survey Analogy No. A. This study was done with support of the U.S. Department of Energy and State of Oregon Department of Energy. The survey was administered by telephone to a sample of individuals chosen by random digit dialing. In effect, this study analyzed perceived risks associated with nuclear waste transport and a number of findings are considered relevant to the Rocky Flats case:

1. In addition to the obvious problems that arise from the health and safety risk associated with nuclear materials, public reactions to some nuclear technologies and to nuclear waste in general have been unfavorable. (That unfavorability was amplified in a paper identified as *Perceived Risk, Trust, and the Politics of Nuclear Waste* prepared by Slovic, Flynn and Layman. That study found an extremely negative association with nuclear waste. For example, most of the survey respondents did not want to live within 200 miles of a nuclear waste repository. This was due in part to the probability of accidents and lack of trust with the U.S. Department of Energy.)

2. The majority of respondents strongly agree that accidents involving the transport of hazardous waste are inevitable.

3. Depending upon the scenarios given, 70.5% of the respondents indicated that transportation risks were greater than storage. However, in some instances, that number fell to only 43.3%.

4. Respondents were generally satisfied with their local community but believed that areas

in which radioactive waste are transported are likely to be unattractive to business development and tourism.

5.    Overall, negative images accounted for approximately 88% of the responses related to *nuclear waste transport*.

6.    Perceptions of the public that risks are immense and unacceptable stand in contrast to the prevailing view of the technical community which believes that radioactive waste can be transported and disposed of safely.  Many of these same issues were visited in an earlier article entitled *"Perceived Risk, Stigma, and Potential Economic Impacts of a High Level Nuclear Waste Repository in the Nevada"* written by Slovic, Flynn et al.  The authors concluded in that study, *"adverse impacts may be expected to result from perceptions of risk, stigmatization and socially amplified reactions to unfortunate events associated with the repository (major and minor accidents, discoveries of radiation releases, evidence of mismanagement, attempts to sabotage or disrupt the facility, etc."*  Of course, the same types of adverse reactions may be associated with unfortunate events, either past, present or future at Rocky Flats.  According to the authors, in addition "to unfortunate events" the second process that may trigger significant adverse impacts is that of stigmatization.  In this particular article, imagery associated with a nuclear waste storage facility and the nuclear test site was extremely negative and, in fact, not unlike the responses found in our own surveys.  Ultimately, the authors concluded that their study demonstrated that the so-called standard effects of large engineering projects on local employment, housing and transportation have the potential to be dwarfed by the special effects of stigma.

In a related article Hoyt, Schwer and Thompson investigated the attitudes of recent home purchasers toward the establishment of a high level nuclear depository and the transportation of nuclear materials through the community.  Not surprisingly, the authors found that an overwhelming majority of the respondents prefer to live more than three miles away from a nuclear transportation route.  However, their findings did suggest that the awareness of and knowledge about the siting of a hazardous facility reduces home buyers' concerns.  One would have to assume that the level of "knowledge related to good" things.  On the other hand, if the public's level of knowledge related to a history of negligence, accidental releases and cover-ups, in addition to on-going risk, we believe home buyers concerns might have been elevated.

As a final analogy, we have included Survey Analogy No. B, which is entitled The Value of Avoiding a LULU: Hazardous Waste Disposal Sites.  The authors are V. Kerry Smith and William H. Desvousges and their article was published in *The Review of Economics and Statistics*.

Their paper develops a model to describe a household demand for distance from a landfill with hazardous wastes.  Under the premise that nuclear power plants and hazardous disposal sites seem to be the least acceptable "locally undesirable land uses" the authors pose an economic framework for

---

estimating a dollar measure of a household desire to avoid having such a use near its residence. Using a hedonic property value model and demand surveys, the authors arrived at a number of conclusions. In fact, they found that the average household would realize a consumer surplus of $330-$495 annually for each mile between its residence and a landfill containing hazardous wastes. Stated another way, diminution in value is greatest near the source and diminishes outward. Extrapolating their mathematics, it would appear that if diminution extends outward 10 miles (as the author suggests it does) those houses nearest the source would have been damaged on the order of approximately $4,140 in 1984 dollars. (That might equate to something over $6,000 per house in 1995 dollars.)

Smith & Desvousges stated that clearly the results confirmed nuclear power plants and hazardous waste disposal sites as the most undesirable land uses. Their results for suburban Boston households indicated a threshold of about 10 miles for a majority of respondents to accept a hazardous waste site and about 22 miles for a nuclear plant. The authors contrast their own findings with those of Nelson who in 1981 found no effects of proximity to nuclear power plants on property values using actual data. Nelson found that proximity to the Three Mile Island power plant did not seem to affect property values once the initial accident period was over and their reactors shut down. Smith and Desvousges reasoned that this should not be surprising since any source of risk is not present once the plant is shut down. This statement seems to be in marked contrast with the Rocky Flats issue in which the plant is shut down, but the neighboring communities are exposed to continuing risk by virtue of plutonium and uranium storage on site, as well as recent releases and discoveries. (Much of the continuing risk is detailed in the pamphlet entitled *Rocky Flats Future Site Use Working Group Recommendations* produced by Rocky Flats Future Site Use Working Group. Additional examples of recent releases include releases of water from the A&B series ponds located on Walnut Creek into Great Western Reservoir in the Spring of 1995, and May 1995 disclosure by officials at the Rocky Flats Nuclear Weapons Plant that the complex is so polluted and so strapped for cash, that it will be years before workers can dig up 55,000 pounds of uranium now buried in leaking drums. With respect to that issue, the Denver Post quotes Mr. Hestmark of the EPA as saying, "We have more than 50,000 pounds of potentially flammable uranium in a shallow trench. We have doubts about the integrity of the drums. We have a significant groundwater plume. We've got a problem."

In addition to the specific studies previously cited, we considered an article titled Indirect Methods of Assessing Natural Resource Damages Under CERCLA by Kenneth E. McConnell published in *Valuing Natural Assets*. Mr. McConnell identified nine case studies *"in support of the idea that risks to life and*

---

*property are capitalized in housing markets. "* In two of the studies, no impact was found due to proximity to nuclear power plants. One is the Nelson study of Three Mile Island (previously discussed). In that instance, the lack of negative response was explained by the fact that the plant was closed and no longer posed any risk. Gamble and Downing (1982) found no effect on surrounding housing markets as well, but they argued that *"houses in the vicinity of nuclear reactors do not sell for lower prices because households believe that the government will compensate them for damages. "* Mr. McConnell goes on to say that this response to Superfund would not eliminate damages. The author concludes by saying, *"where no data are available, it would help greatly to be able to use models that were estimated in other locations. "* This supports our use of this very methodology.

**Conclusions:**                        We have used valuation by analogy: 1) to illustrate the appropriate methodology, 2) to illustrate market reaction to pollution and 3) to provide an indication of possible loss in value around Rocky Flats. Our conclusions are as follows:

- Virtually all the case studies and available literature suggest some impact on surrounding real estate due to actual contamination and/or proximity to a negative environmental condition. Sound reasons are provided in those few instances in which no effect was found.

- Impacts vary, but in almost all cases, nearby properties were found to suffer some loss in value. This loss may vary from nominal to as much as 50%.

- In some cases, the amount of loss diminishes the further from the source.

- Impacts can extend outward for several miles. While some cases suggest that only those homes able to view the disamenity are effected, Kohlhase found the effect extending about six miles, and Smith and Desvousges in the case of a nuclear power plant found the effect extending some 22 miles.

- In most cases, an effect is observed, even in the absence of confirmed contamination; confirmation of actual contamination in our view likely results in even greater loss in value.

- With the exception of nuclear issues, the market does not always equate its perception of risk with scientific evidence. The studies clearly indicate that the market has a more negative reaction to nuclear issues than any other.

- Multiple regression analysis and opinion surveys are commonly used techniques for measuring market reaction. In the absence of reasonable knowledge, these techniques may understate the true loss. We emphasize that, "Real estate impact should be measured in the market of well-informed and well-advised buyers, sellers and users of real estate."[20]

- The case studies are from all over the United States. Commonality of reaction indicates that use of analogies can be a reliable predictor of market behavior.

- Most of the studies involved toxic materials perceived to be less dangerous than plutonium. Since Rocky Flats involves nuclear materials, including plutonium and uranium, the studies suggest that real estate values are diminished for properties proximate to a nuclear weapons facility.

- It is relevant to note that only one of the studies shows no loss. However, the author indicated he had not explored the level of knowledge in the marketplace; it is noteworthy that not even he was aware of the problem (he drives by it daily) prior to being retained.

Based on the studies presented, there is no doubt that property values around Rocky Flats are less than they would be had it not been for past releases of hazardous substances and continuing risk associated with materials stored on site.

Dr. Paul Slovic, in addition to the public opinion survey presented herein, has prepared a report indicating that exposure of those misdeeds leads to loss of trust, which also in turn, contributes to loss in value. Dr. Slovic is an expert in the field of risk analysis and has opined that the findings in the

---

[20]   "Environmental Risk and the Real Estate Appraisal Process," The Appraisal Institute, March 1994, Pg. 23.

HUNSPERGER & WESTON, LTD.                                                                    176

survey analogies are consistent with his own experience.

We have concluded from the analogies that loss in value after the 1989 FBI raid would likely have been at least an average of 10% across the class area. This equates to $10,444 per attached residence and $15,000 per detached residence. This is based on 1995 average sale prices reported by the Multiple Listing Service. The calculations are shown below:

| SFR Homes | | Attached Residences |
|---|---|---|
| Average Price: | $135,000 | $94,000 |
| | ÷ .90 | ÷ .90 |
| | $150,000 | $104,444 |
| | -135,000 | -94,000 |
| Loss/Residence: | $15,000 | $10,444 |

Total loss in value is calculated as:

| | | |
|---|---|---|
| 8,979 detached residences x $15,000 = | | $134,685,000 |
| 3,040 attached residences x $10,444 = | | 31,749,760 |
| Total loss expressed in 1995 dollars: | | $166,434,760 |
| | Rounded: | $166,000,000 |

The above figures do not include loss to vacant land.