## Management of Wastes, Residues, and Risks
## by Rockwell International at the Rocky Flats Plant

Prepared by

D. Warner North, Ph. D.
Decision Focus Incorporated
650 Castro Street, Suite 300
Mountain View, California  94041-2055

Robert J. Budnitz, Ph. D.,
Future Resources Associates Inc.
2039 Shattuck Avenue, Suite 402
Berkeley, California  94704

Assisted by
Nathan Y. Chan, Ph. D.
Decision Focus Incorporated

November 21, 1996

---

A statement of qualifications and list of recent publications for Dr. North is included as Attachment A, for Dr. Budnitz as Attachment B, and for Dr. Chan as Attachment C.   Attachment D is a list of documents considered in preparing this report.   Attachment E is collection of additional materials relevant to the report.

## Table of Contents

TABLE OF CONTENTS ..................................................................................................... 2

LIST OF FIGURES............................................................................................................. 3

SUMMARY OF THE ISSUES AND THEIR IMPORTANCE................................................ 4

I. INTRODUCTION............................................................................................................ 5

A. WASTES AND RESIDUES AT ROCKY FLATS................................................................. 5
B. LEGACY FROM THE DOW ERA, 1952-75....................................................................... 7
C. ROCKWELL'S RESPONSIBILITIES ................................................................................ 8

II.  THE EVOLUTION OF LEGISLATIVE AND REGULATORY REQUIREMENTS. 10

A. GOVERNANCE UNDER THE AEA .................................................................................. 10
B. THE ONSET OF RCRA AND OTHER EPA-ADMINISTERED ENVIRONMENTAL REGULATION .. 11
C. ROCKWELL'S FAILURES TO COMPLY WITH ENVIRONMENTAL REGULATIONS ......................... 13

III.  ROCKWELL'S FAILURE TO ADAPT AND IMPLEMENT EFFECTIVE MANAGEMENT OF WASTES, RESIDUES, AND RISKS ................................................. 16

A. AN OVERVIEW OF THE EVIDENCE................................................................................ 16
B. MANAGEMENT RESPONSIBILITY ................................................................................. 18
C. SPECIFIC ISSUES IN THE U.S. V. ROCKWELL CRIMINAL INVESTIGATION ................................ 20
    (i) Pondcrete ......................................................................................................... 20
        Plans for Shipment and Disposal and Ensuing Problems .................................................24
        Rockwell's Response..............................................................................................25
        Rockwell's Management Failures.................................................................................33
    (ii) Saltcrete ........................................................................................................ 35
    (iii) Sewage Treatment Plant and the Chromic Acid Spill ................................................. 36
    (iv) Spray Irrigation .............................................................................................. 39
D. OTHER ISSUES NOT DEVELOPED IN THE CRIMINAL INVESTIGATION ...................................... 43
    (i) Beryllium Exposure ............................................................................................ 43
    (ii) Radiological Safety........................................................................................... 45
    (iii) Groundwater Contamination ................................................................................ 47
    (iv) Safeguards and Security...................................................................................... 49
    (v) Housekeeping and Fire Risk................................................................................... 50
    (vi) Plutonium Residues and Fire Risk............................................................................ 52
    (vii) Rockwell's Failure in Managing Plutonium Residues ................................................... 55
    (viii) Failure to Control Combustible Materials in Plutonium Processing Buildings............. 58
    (ix) Criticality ...................................................................................................... 62
    (x) Safety Analyses and Risk Assessments ..................................................................... 65

IV. SUMMARY AND CONCLUSIONS........................................................................................ 73

Rockwell Management of Wastes, Residues, and Risks
D. W. North and R. J. Budnitz
November 21, 1996    Page 3

## List of Figures

Figure 1.     Schematic of Rocky Flats Plutonium Processing
Figure 2.     Characterization of Wastes and Residues
Figure 3.     Timeline of Key Events during Dow and Rockwell Tenures
Figure 4.     Timeline of Emerging Regulation
Figure 5.     Aerial View of Solar Evaporation Ponds
Figure 6.     Solar Evaporation Pond
Figure 7.     Rocky Flats Ponds and Creeks
Figure 8.     Pondcrete in Triwall Boxes on Pad
Figure 9.     Pondcrete on 750 Pad
Figure 10.    Diagram of Pondcrete Process
Figure 11.    Removal of Solar Pond Sludge
Figure 12.    Pug Mill Mixer
Figure 13.    Pondcrete Process Cement Usage
Figure 14.    Size of Pondcrete Pads, with Standard NFL Football Field
Figure 15.    Slumping Pondcrete Box
Figure 16.    Leaking Pondcrete Box
Figure 17.    Crumbling Pondcrete
Figure 18.    Collapsing Pondcrete Box
Figure 19.    Timeline of Pondcrete Events
Figure 20.    Aerial View of B-series Ponds
Figure 21.    Map of Spray Irrigation Sites
Figure 22.    Spray Irrigation in Progress
Figure 23.    Runoff from Spray Field
Figure 24.    Frozen Spray Irrigation Sprinklers
Figure 25.    Location of Known Groundwater Plumes
Figure 26.    Poor Housekeeping Practices
Figure 27.    Formation of Plutonium Oxide on Metal
Figure 28.    Venting of Pressurized Residue Drums at Rocky Flats
Figure 29.    1994 Inventory of Rocky Flats Residues
Figure 30.    Common Packaging Configuration at Rocky Flats
Figure 31.    Incidence of Rocky Flats Fires, 1958-1990
Figure 32.    Vulnerability Ranking of DOE Facilities
Figure 33.    Barrel Storage in Building 776
Figure 34.    Barrel Storage in Building 776, Room 127B
Figure 35.    Barrel Storage Blocking Access to Office Equipment
Figure 36.    Plutonium Dust Buildup in Ventilation Ducts

Rockwell Management of Wastes, Residues, and Risks
D. W. North and R. J. Budnitz
November 21, 1996    Page 6

such as paper tissues[3] and filters with plutonium-contaminated dust; and machining oil, lubricating oil, or solid materials derived from such oils, containing low concentrations of plutonium. Clearly, recovery of plutonium from lean residues is much more difficult and costly than from rich residues. Much larger quantities of lean residues were generated from the manufacturing operations than of the rich residues. Lean residues become plutonium-contaminated waste if there is no recovery, and that is what happened at Rocky Flats during Rockwell International's management.[4]

Large quantities of wastes and residues resulted from the expanded production of nuclear weapons components that took place during the period of Rockwell International's management. There were plans for disposal of the wastes and recycling the residues to recover the valuable metals, but these plans were not always realized. Failures to bring into use new facilities and equipment needed for plutonium recovery, changes in the value of the plutonium, and new laws resulted in a situation in which large quantities of wastes and residues accumulated in storage configurations at Rocky Flats, especially in the old production buildings, 771 and 776-777. A new building for plutonium production and recovery, 371, was constructed but not placed in operation because of deficiencies in meeting applicable requirements.[5]   Through the end of the Rockwell era, plutonium

---

[3]   Such tissues are often referred to in the documents we have reviewed as "kimwipes," similar to the "kleenex" sold as a consumer product.

[4]   "Residues are now subject to Resource Conservation and Recovery Act (RCRA) regulation, as a result of a recent court decision (April 12, 1990). Existing residue storage areas are not permitted. Efforts to address this situation include a residue characterization study, attempting to obtain interim RCRA status, and seeking a new compliance agreement."
      -- Minutes of the Advisory Committee on Nuclear Facility Safety, April 25, 1990.

[5]   "Building 371 was constructed in the late 1970s to replace older buildings such as building 771. Because of building 771's poor conditions, DOE planned to phase out production there and move production to building 371. ... In building 371, most of the production process, except for waste recovery, never operated as intended because of poor process design, the use of inappropriate construction materials, and changes in safeguards and safety requirements."
      -- GAO, Summary of Major Problems at DOE's Rocky Flats Plant, RCED-89-53BR, October 1988, at 21.

   "The 371 Building was a white elephant. It was a production building that was constructed and finished about 1981, went on line in 1985; and to my understanding, as soon as it started, it went down, got contaminated."
      -- Testimony of Jon Lipsky, FBI, in Hearings before the Subcommittee on Investigations and Oversight of the Committee on Science, Space, and Technology, U.S. House of Representatives, 102nd Congress, No. 163, September 17, 1992. (Hereafter referred to as Hearings)

residues and waste continued to accumulate in Buildings 771, 776-777, and elsewhere, in areas and configurations not designed for safe long-term storage.

Rockwell's fundamental management deficiency was a failure to foresee that the original plans might not be implemented. Rockwell management needed to monitor carefully the progress under these plans and to develop alternative, or contingency, plans when deviations from expected progress under the original plans became likely. As such deviations occurred and the inventory of wastes and residues grew, Rockwell failed to recognize the changing nature of its waste/residue problem, and Rockwell failed to develop effective plans for safe storage of these materials with minimal risk.

## B. Legacy from the Dow Era, 1952-75

Rockwell International took over the management of Rocky Flats from Dow Chemical in 1975, as shown in the timeline in Figure 3. Six years before, in 1969, there had been a serious fire involving plutonium in Building 776-777. The integrity of the roof was almost completely lost.[6] If the roof had burned completely through, the extent of the plutonium release would have been much larger -- probably much larger than all previous plutonium releases at the Rocky Flats Plant. The history of fires in the plutonium operations buildings during the Dow era, and the risk implications of the large inventory of plutonium-contaminated materials stored in these buildings are discussed in a companion expert report (Robert J. Budnitz, "The Major Rocky Flats Fires of 1957 and 1969: Insights about Management Practices," hereafter referred to as the "Fires" Report).

Dow's waste management practices were seriously deficient in many areas. Plutonium-contaminated waste materials placed at the 903 Pad during the 1960s were released as the result of the loss of integrity of the metal barrels in which these wastes were placed. Rockwell management knew or should have known that the released plutonium from the 903 Pad had been blown by the winds off of the site in quantities readily measurable as elevated over the background level from fallout from the atmospheric testing of nuclear weapons. (Dow management activities are discussed in detail in a companion expert report: Robert J. Budnitz, "Waste-Management Practices Associated with the 903-Area Plutonium Releases." ). The plutonium contamination at the 903 Pad was understood as a top priority problem by the late Dominick Sanchini, the

---

[6] "Less than one percent of the total of almost 600 tons of Benelex and Plexiglas shielding was consumed in the fire. Only the heroic efforts of the firefighters limited this burning. Had an appreciable fraction of this shielding burned, there would have been a complete loss of Building 776-777 and its contents and a major release of plutonium to the environment."

-- AEC, Report on Investigation of Fire, Building 776-777 Rocky Flats Plant, Volume III, August 1969, at 2.

president of the Rocky Flats Division of Rockwell International.[7]  Any event that could cause a release of plutonium in fine particulate form into the air should have been regarded as a serious problem deserving the attention of Rockwell's senior management.

Rockwell should have learned from Dow's mistakes and their consequences that management of dangerous residues and wastes needed substantial top management attention. Both the fires and the releases from the contaminated area around the 903 Pad provided examples of serious failures in environmental health and safety management. These examples of serious failures  should have indicated to Rockwell that large releases of plutonium and other radioactive and toxic materials were possible from fires and from failures to assure containment integrity.  Concern about the risk to health and safety posed by releases of plutonium and other toxic substances was acknowledged as legitimate and appropriate by experts in the technical community.[8]  Rockwell management did not learn from Dow's experience. Rockwell should have placed a high priority on improving environmental, health and safety practices, and it did not do so.[9]

## C. Rockwell's Responsibilities

As Management and Operations (M&O) contractor, Rockwell had the responsibility to manage wastes and residues so as to minimize the risk of releases of radionuclides and toxic substances into the environment, in conformance with applicable

---

[7]    FBI Interview of Dominick Sanchini, June 10, 1989, Hearings, p. 645.

[8]    "A major fire at any one of the DOE's weapons plants would result in deaths and injuries, along with the contamination of the surrounding environment and the disruption of vital defense activities."
    -- Health and Safety at the Department of Energy's Nuclear Weapons Facilities, A Report by the Subcommittee on Oversight and Investigations of the U.S. House Committee on Energy and Commerce, June 1989, at 4.

    "Groundwater, surface water, and air pathways provide routes for the potential migration of hazardous substances, radioactive mixed wastes, or hazardous wastes or constituents thereof from the Rocky Flats facility into the environment.... The migration of such hazardous materials from the facility may present a threat to the public health, welfare, and the environment."
    -- U.S. EPA, U.S. DOE, Colo. Dept. of Health Compliance Agreement, July 31, 1986, at 1.

[9]    A long-time Rocky Flats senior environmental manager at the time of the Dow to Rockwell transition stated that:

    "I believe also Rockwell's approach was not to listen to or accept advice from the people that had been at the plant for 20 or 30 years but to come in and just with the belief that they had all the answers, even though they had no experience, and that's my judgment."
    -- Deposition of Milton Thompson, Cook v. Rockwell, July 25, 1995, at 43-44.

DOE regulations and state and federal laws.[10]   Rockwell did not take these management responsibilities seriously.  Rockwell failed to carefully and systematically assess the risk posed by wastes and residues, and   Rockwell failed to institute corrective actions whenever a dangerous or potentially illegal practice became apparent.   The evidence we have reviewed indicates a pattern that Rockwell management knowingly allowed continuation of practices that led to legal violations, expensive clean-ups, environmental releases, and risks to the offsite public. These adverse consequences should have been minimized (or avoided entirely) by timely corrective action when problems were first identified.    The few demands for shutdown and corrective action came from a small number of DOE inspectors who were at the site and discovered problematic practices and conditions.  Rockwell management appeared to ignore the growing disparity between the plans for disposal of wastes and recovery of plutonium from residues, and the reality of a large, unplanned, and dangerous accumulation of wastes and residues. Much of this unplanned accumulation of wastes and residues has persisted at Rocky Flats up to the present time.

In the discussion that follows we shall use the production of pondcrete as an example to illustrate the pattern of deficiency in Rockwell management.  We will then describe, in less detail, other examples illustrating the same pattern, including some issues which were pursued in the U.S. criminal investigation and some which were not.  The most significant of the areas we have investigated, from the standpoint of a past and continuing offsite threat, is the management of plutonium residues and plutonium-contaminated waste materials presenting a potential for large additional releases of

---

[10]   DOE repeatedly gave assurances that Rocky Flats was being managed so that releases such as those that occurred during the Dow era would not recur:

"[Rocky Flats Plant is] being operated in a safe and environmentally acceptable manner at technically acceptable levels of risk to the public."

— DOE, Nuclear Weapons Complex Modernization Report, quoted in Health and Safety ..., supra, at 3.

Rockwell should have interpreted these statements as clear and unambiguous policy guidance that a critical part of its management responsibility was to minimize the risk of releases of plutonium and other radioactive and hazardous materials, especially releases large enough to be detectable as an elevation over background levels off site.  Rockwell's obligation as the DOE contractor managing the Rocky Flats Plant is reaffirmed by the Compliance Agreement among DOE, EPA, and the Colorado Department of Health:

"... the parties to this Agreement, with the mutual goal to protect the public health, welfare, and the environment, and believing that the actions set forth herein are in the public interest, have entered into this Agreement to achieve hazardous and radioactive mixed waste compliance at the Rocky Flats facility...."

-- 1986 Compliance Agreement, at 1.

plutonium into the air from accidents such as fires.[11] The offsite threat from plutonium results from the same pattern of deficiency in Rockwell management illustrated by pondcrete. Rockwell failed to give sufficient attention to compliance with environmental laws and DOE safety guidelines, and to its obligation to assure the safety of the offsite public.

## II.    The Evolution of Legislative and Regulatory Requirements

### A.  Governance under the AEA

Rockwell International took over the M&O contract for Rocky Flats in 1975. The facility had been operating for about twenty years, and much experience had been obtained on working with plutonium, beryllium, uranium, and other dangerous materials used in the manufacturing and recycling operations.    The regulations and legal requirements associated with wastes, residues, and hazardous materials were at this time DOE regulations derived from the Atomic Energy Act (AEA).

DOE's rules were provided to the Facility Manager at each of the DOE Weapons Complex Facilities. Rockwell was responsible for managing a system at the Rocky Flats Plant for dealing with plutonium, beryllium, and other hazardous waste constituents. This system had evolved at Rocky Flats with the aid of technical advice from other parts of the Weapons Complex.    Rockwell had continuing access to such technical advice. But Rockwell failed to establish and maintain high standards for health, safety, and environmental protection at the Rocky Flats Plant. As judged by technical experts such as the Advisory Committee on Nuclear Facility Safety, an expert advisory task force set up to review safety issues in the DOE Weapons Complex by Secretary of Energy Watkins at the end of the Rockwell era, Rockwell's  management of this system was lax and badly in need of upgrading.[12]

---

[11]   We have not addressed the offsite threat from bioturbation discussed by Dr. Shawn Smallwood in his expert report.

[12]   "Several critical reports have been released on Rocky Flats, including those by DOE reviewers.... we found nothing at RF to counter these previous criticisms.
...
A safety culture must be established and the operating staff must assume the responsibility of making the facility a professional place - it is not today."
   -- Advisory Committee on Nuclear Facility Safety, letter from Chairman John Ahearne to Secretary of Energy J. Watkins, November 30, 1989.

See also the subsequent ACNFS letter of September 30, 1991 to Secretary Watkins.

Rockwell Management of Wastes, Residues, and Risks
D. W. North and R. J. Budnitz
November 21, 1996     Page 11

## B. The Onset of RCRA and Other EPA-administered Environmental Regulation

Beginning in the mid-1970s, the regulatory situation began to change, as shown in the timeline in Figure 4. The Resource Conservation and Recovery Act (RCRA) was promulgated by Congress in 1976 to provide "nationwide protection against the danger of improper hazardous waste disposal."[13]   Section 3006 of RCRA allows the U.S. Environmental Protection Agency (EPA) to authorize states to regulate hazardous wastes in lieu of EPA, if the EPA finds the state program is (1) "equivalent" to the federal program, (2) consistent with the federal program, and (3) able to provide adequate enforcement.   Final authorization was granted to the state of Colorado by EPA on November 2, 1984, based on EPA's analysis of the state's hazardous waste program regulations and resources.[14] After RCRA became effective in 1980, DOE resisted the application of the law to its sites, arguing that all operations at DOE facilities were governed only by the AEA.[15]  In opposition to DOE's position, the EPA and Colorado Department of Health (CDH) asserted the application at DOE sites of RCRA to mixed wastes, which are materials that are both hazardous and radioactive.

In 1985, DOE proposed the so-called "Byproduct Rule," which stated that "direct process wastes," including radioactive and nonradioactive constituents, would be excluded from RCRA.[16]  In May 1987, DOE promulgated the Final Byproduct Rule, in which the definition of byproduct material was significantly tightened to include only specific

---

[13]   5 U.S. Code Cong. and Ad. News 6238 (1976)

[14]   40 Fed. Reg. 41036, October 19, 1984.

[15]   E.g., "Under RCRA's scheme federal Atomic Energy Act facilities would require state permits to operate, would be governed by health and safety standards determined by the EPA or more stringent ones determined by the states, and all information regarding hazardous waste handling -- except only proprietary information described by 18 U.S.C. 1905 -- would be publicly available. Under the Atomic Energy Act federal facilities may not be subjected to state and local regulation, are governed by health and safety standards determined by DOE, and restricted data ... may be communicated only in the manner determined by DOE not to risk the common defense and security. As to these three requirements of the respective regulatory schemes it would be difficult to conceive of greater inconsistency. In each of these inconsistencies the scheme of RCRA must, by its own terms, yield to that of the Atomic Energy Act. Their cumulative effect is to exempt from RCRA's scheme of regulation the operation of DOE's Atomic Energy Act facilities."

        -- Theodore J. Garrish, DOE General Counsel, Relationship of the Resource Conservation and Recovery Act to the Department of Energy's Activities Under the Atomic Energy Act, December 2, 1983, at 30, reproduced in Hearings, supra, at 1299.

[16]   50 Fed. Reg. 45736, November 1, 1985.

radioactive components.[17] Therefore, the final rule stated that "'any radioactive material' [as used in the AEA definition of byproduct] ... refer[s] only to the actual radionuclides dispersed or suspended in the waste substance. The nonradioactive hazardous component of the waste substance will be subject to regulation under the Resource Conservation and Recovery Act."[18]

With the determination of RCRA applicability to waste, there was still controversy about the definition of "waste." Many of the "waste" streams, such as contaminated paper tissues,[19] plutonium-contaminated lathe coolant, etc., contained quantities of plutonium which could potentially be recovered and reused. DOE maintained that their streams were not "wastes," but rather "residues," and not subject to RCRA. But Rockwell should have recognized the need for contingency planning for the possibility that RCRA would be determined to be applicable. The controversy was resolved when a 1990 court decision mandated that a number of items that DOE had claimed were "residues" should in fact be defined as waste.[20] For both wastes and residues, Rockwell failed to anticipate and plan for changes in operations at Rocky Flats based on the changes in regulatory requirements.

---

[17]   52 Fed. Reg. 15939 ff., May 1, 1987.
DOE indicated that in a number of instances, otherwise identical wastes were sometimes found subject to RCRA and sometimes only subject to AEA, "due solely to the physical process of producing and utilizing special nuclear material." DOE stated that "... RCRA's definitional exclusion of source, special nuclear and byproduct material assumes a narrower significance than was suggested in the proposed rule. Instead of referring to any waste stream in its entirety, the exclusion appears directed only to the radioactive component of a nuclear waste."

[18]   "From this point forward, with the exception of certain disputes about RCRA's application to various materials which are sometimes known as "residues" ..., RCRA's application to DOE mixed wastes was clear."
-- U.S. v. Rockwell, Plaintiff's Sentencing Memorandum, March 26, 1992, at 25.

[19]   Footnote 3, supra.

[20]   "The court's decision does not affect the [Environmental Protection] Agency's authority to regulate as hazardous wastes those secondary materials recycled in ways where the recycling activity itself is characterized by discarding as defined by the court. That is, manufacturing processes (or other types of recycling) involving an element of discard which do not involve secondary materials passing through a continuous, on-going manufacturing process remain within the Agency's jurisdiction."

Specifically, the court ruled that at Rocky Flats Plant, "dry combustible waste, kimwipes, aqueous waste, laboratory waste oil, rags, trash, and spent solvents that formerly were burned in the building 771 incinerator and now are stored pending resumption of plutonium recovery operations, as well as residues from the building 771 incinerator, although mixed with plutonium, are hazardous waste."
-- Sierra Club v. DOE, 734 F. Supp. 946, D. Colo. 1990

## C. Rockwell's Failures to Comply with Environmental Regulations

Given the evolution of regulatory authority to the point where RCRA applied to mixed wastes at DOE facilities, what was the RCRA process and its requirements, and how did Rockwell and DOE plan to meet these requirements? The lower half of Figure 4 shows the site-specific events that took place during this time.

RCRA requires a permit for any facility to treat, store, or dispose of hazardous wastes. The permit process consists of a Part A and a Part B application. Part A is general information, specifying the types and amounts of wastes handled at a facility, and describing the treatment processes used. A pre-existing facility (operating before November 19, 1980) can operate under "interim status" once a Part A application is filed, providing that it complies with all interim status standards and regulations. The Part B permit application requires much more detailed and comprehensive information regarding the facility's operation and procedures which will assure compliance with all environmental standards and regulations. The EPA, or an agency authorized by EPA to administer RCRA, may then grant or deny a RCRA permit, which has specific conditions tailored to the specific facility and operations. In Colorado, the EPA had granted RCRA regulatory authority to the Colorado Department of Health (CDH) in late 1984.

Beginning in 1980 Rockwell prepared for DOE an application for Rocky Flats as a RCRA hazardous waste facility. [21] The application was then withdrawn, resubmitted, and revised twice. On December 16, 1985, CDH issued a public notice of intention to deny Rockwell's permit application, citing an incomplete and deficient application.   In particular, CDH stated that

> Rockwell and the Department of Energy have repeatedly denied the state complete information on mixed wastes streams generated and managed at the Rocky Flats Plant. ... The application fails to contain chemical and physical analyses of the hazardous waste to be handled at the facility. The Department [CDH] cannot determine whether or not additional hazardous waste management activities are occurring which should be regulated. ... The applicant's failure to provide critical information necessary to accomplish the upgrading of the Rocky Flats Plant hazardous waste activities leaves the Department no alternative but to issue a notice of intent to terminate interim status and to deny the permit. [22]

---

[21]   Affidavit of Jon Lipsky, D. Colo., July 1989, at 30 ff.

[22]   Colorado Dept. of Health Public Notice of Intention to Deny a Permit, December 16, 1985, cited in Lipsky Affidavit, at 39.

Rockwell Management of Wastes, Residues, and Risks
D. W. North and R. J. Budnitz
November 21, 1996    Page 14

The CDH decision to deny the permit led to negotiations between DOE, EPA, and CDH that culminated in a Compliance Agreement, which was signed on July 31, 1986. Its stated purpose was to

> resolve issues related to, and to establish requirements for, hazardous waste, including radioactive mixed waste, compliance at the DOE's Rocky Flats Plant pursuant to CDH and EPA hazardous waste authorities.[23]

and also stated that

> DOE acknowledges its obligations under section 6001 of RCRA .... DOE agrees that the requirements of this Agreement that pertain to regulatory compliance with hazardous waste and radioactive mixed waste requirements[24] are requirements which have become effective pursuant to RCRA within the meaning of section 7002(a) of RCRA.[25]

As a contractor to DOE, Rockwell was bound under the terms of its contract to comply with the provisions of the Compliance Agreement.[26]

As part of the Compliance Agreement, the parties also stated another objective related to remedial and corrective action: "To the extent practicable, activities undertaken pursuant to RCRA, CHWA, and CERCLA shall be integrated into one technical program

---

[23]   1986 Compliance Agreement, at 1.

[24]   The agreement defined "radioactive mixed waste" as wastes "that contain hazardous wastes subject to RCRA and radioactive wastes subject to the AEA," but said the agreement did not apply to "transuranic material or to hazardous wastes mixed with transuranic material" (i.e., plutonium-contaminated material). However, the exclusion was not absolute, because "notwithstanding the definitions ... above, an intentionally created mixture of hazardous wastes and transuranic material, which mixture is not necessary in connection with processing or treatment operations, shall nevertheless be considered to be radioactive mixed wastes for the purpose of this Agreement."
    -- Ibid., at 4.

[25]   Ibid., at 3.

[26]   EPA and CDH, in their "Findings of Fact" in the Compliance Agreement, stated that
    "Under Contract DE-AC04-76DP 03533, DOE has, since July 1, 1975, engaged Rockwell International Corporation ('Rockwell') to perform management services in support of DOE's production activities at the Rocky Flats Plant. These services include activities required to meet the obligations of DOE under this Agreement."
    -- Ibid., at 6.

to avoid duplication of effort ...."[27]    The key first step in the remedial/corrective effort was completion of DOE's "Comprehensive Environmental Assessment and Response Program" (CEARP).

The CEARP effort had been launched by DOE in mid-1984 to "identify, assess, and correct existing or potential environmental problems," in response to DOE Order 5480.14 and the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA). Phase I of CEARP was an assessment of the installation, conducted by DOE staff from Los Alamos and Rockwell staff at Rocky Flats. The CEARP Phase I Report, released in April 1986, listed a preliminary assessment of potential contamination sites at the plant. Also included was an overview plan of how waste management activities were to be carried out at the plant, in compliance with all environmental laws and regulations.

The waste management plan, as described in the CEARP report, was heavily based on the assumption that various wastes could be shipped off-site for disposal.[28]   Once again, Rockwell failed to do contingency planning, that is, to anticipate that shipping waste offsite might not be immediately possible, and therefore, that Rockwell should make provisions to store waste safely on the site if such storage proved be to be necessary.

The plan described in the CEARP report maintained that waste management practices would be carried out in full compliance with all applicable regulations. Rockwell did not fulfill its obligation to achieve such compliance, in large part because it failed to monitor progress in implementing the plan, failed to note that assumptions in the plan proved not to be correct, and failed to acknowledge the resulting problems and to take timely action to correct them. Activities associated with the implementation of these plans would later be the target of a federal government investigation and lead to a number of criminal guilty pleas by Rockwell. In particular, practices planned in CEARP, which Rockwell failed to implement correctly, eventually led to Rockwell's guilty pleas. These

---

[27]    Ibid., at 18.

[28]    DOE-AL, Comprehensive Environmental Assessment and Response Program, Draft Phase 1 Report, April 1986. Examples:
   • "currently, all radioactive wastes are processed and shipped offsite for disposal at other DOE facilities"
   • "Both [low-level waste and transuranic waste] are shipped offsite from Rocky Flats Plant to other DOE facilities"
   • "The dried [radioactive] salts and sludge are packaged in drums to be shipped off-site to other DOE facilities as radioactive waste."
   • "Solid residues from the waste treatment spray dryer are cemented and packaged in tri-wall corrugated fiberboard boxes prior to shipment offsite"

practices included the clean-out of the solar evaporation ponds,[29] isolation of sanitary and process waste systems and operation of the sewage treatment plant,[30] and operation of the spray irrigation system.[31]

## III. Rockwell's Failure to Adapt and Implement Effective Management of Wastes, Residues, and Risks

### A. An Overview of the Evidence

As part of our investigation, we have reviewed a large number of documents. One primary reference was an extensive transcript of U.S. House Subcommittee Hearings on Environmental Crimes at Rocky Flats, which also reproduced many documents related to the FBI and grand jury investigations which culminated in Rockwell's guilty pleas to various environmental crimes in March 1992.

A key component of this analysis is understanding how contemporaneous experts viewed the situation at Rocky Flats, both those within the DOE and Rockwell organizations, as well as those outside. To this end, extensive searches were performed to locate reviews or evaluations of Rocky Flats from various sources. These included reports by DOE inspectors, reviews by the General Accounting Office, nuclear oversight bodies such as the Advisory Committee on Nuclear Facility Safety and the Defense Nuclear Facilities Safety Board, safety evaluations by DOE and Rockwell itself, award fee

---

[29] "During the 1980s, sludge was removed from the B ponds. Cleanup of pond A started in 1985." "A high priority item is to eliminate the ponds."
-- Ibid., at V-20.

[30] "Each building that has production, research, or support facilities in which radioactive materials are handled is equipped with a radioactive process waste collection system ... which is isolated from the sanitary waste collection system." "Effluent from this system meets all requirements for offsite release under limitations set forth in the existing NPDES permit."
-- Ibid., at V-59, V-70.

[31] "Liquid effluent from retention pond B-3 is evaporated at a spray irrigation plot located on the interdrainage area south of retention pond B-3 or is pumped to the onsite reverse osmosis facility where it is treated or is occasionally released through retention ponds B-4 and B-5 into Walnut Creek, after testing to show compliance with NPDES limitations." "[A 1984] technical [NPDES] violation was due to runoff from spray irrigation carrying nitrates into the McKay ditch and bypassing the plant's retention ponds."
-- Ibid., at III-6, III-15.

Rockwell Management of Wastes, Residues, and Risks
D. W. North and R. J. Budnitz
November 21, 1996    Page 17

evaluations by DOE, reviews/recommendations by other nuclear installations, and
testimony from federal investigators looking into Rocky Flats.[32]

All of these materials focus on Rocky Flats and its operations from different
angles.   Taken collectively, they form a coherent picture of the waste and residue
management situation at the plant.  The sections below discuss in further detail various
aspects of Rockwell's management practices.  During the later stages of Rockwell's
tenure, Rockwell's safety performance, environmental compliance, and waste management
were widely perceived as having serious deficiencies by contemporaneous expert
observers.  We agree with these perceptions.

> Rocky Flats, an NPL candidate, is in poor condition generally in terms
> of environmental compliance. ... We have basically no RCRA
> groundwater monitoring wells, our permit applications are grossly
> deficient (some of the waste facilities there are patently 'illegal').  We
> have serious contamination ....  Much of the good press we have gotten
> from the Agreement in Principle has taken attention away from just how
> really bad the site is.[33]

> In the view of DOE safety staff at headquarters, this [successive
> Technical Safety Appraisals making the same recommendation] showed
> a lack of commitment by the RFP contractor -- Rockwell International -
> - to correcting safety problems.[34]

---

[32]  As of mid-November, 1996, we are still trying to obtain important documents relevant to the issues
discussed in this report.  As one example, we have experienced a delay of at least three weeks in
obtaining copies of a large number of documents ordered from the librarian of the Defense Nuclear
Facility Safety Board on October 23, 1996.  As another example, one important document we had
expected to obtain from this source was only available as a partial copy, and efforts to obtain a
complete copy of this report from DOE or the organization that produced it have not yet been
successful.  See footnote 168, infra.

[33]  Briefing for Mary L. Walker, DOE Assistant Secretary for Environment, Safety, and Health, July 14,
1986.

[34]  GAO, Summary of Major Problems, supra, at 10.

## B. Management Responsibility

One key issue in the discussion of Rocky Flats is determining who had management responsibility for the way the plant was operated. Rockwell itself acknowledged its responsibility at the 1992 sentencing hearing:[35]

> By its pleas of guilty in this case, Rockwell has acknowledged wrongdoing in connection with the operation of the Rocky Flats plant. Rockwell has accepted the fact that regardless of the confused signals it received from the Department of Energy, Rockwell had an independent duty to conform its conduct to the emerging law and regulations that related to the protection of the environment. By its pleas Rockwell has acknowledged that it should have done better in this area.[36]

DOE trusted its contractors to do a good job, and Rockwell had legal responsibility under its DOE contract, the Compliance Agreement, and other applicable laws and regulations.[37] Rockwell was hired precisely because it was expected to operate the plant

---

[35]  In our opinion, DOE "culture" does not excuse Rockwell's management deficiencies and consequent environment, health, and safety shortcomings at Rocky Flats. The Government's Sentencing Memorandum in U.S. v. Rockwell noted that then-Energy Secretary Watkins "attributed the environmental problems at DOE nuclear weapons facilities, including Rocky Flats, to a 'long-term cultural misdirection' at DOE. Admiral Watkins referred to a culture that had tended over many years to place nuclear weapons production above all else, and especially above environmental and hazardous waste compliance."

-- Plaintiff's Sentencing Memorandum, at 10.

[36]  Transcript of U.S. v. Rockwell Sentencing Hearing, June 1, 1992, reproduced in Hearings, supra, at 1424 ff.

[37]  1986 Compliance Agreement states, at 6, "... DOE has, since July 1, 1975, engaged Rockwell International Corporation ("Rockwell") to perform management services in support of DOE's production activities at the Rocky Flats Plant. These services include activities required to meet the obligations of DOE under this Agreement."

"CDH may enforce DOE's compliance herewith pursuant to its authorities and procedures under CHWA, the Colorado Hazardous Waste regulations and as appropriate, RCRA." "The parties agree that the framework for compliance for the Plant's radioactive mixed waste units under this Agreement is HWSA [sic] and 40 C.F.R. Parts 260-271. However, if during the term of the Agreement, EPA ... authorized the State of Colorado to regulate radioactive mixed waste under RCRA, it is agreed that thereafter the regulatory framework for this paragraph 8 shall be the CDH hazardous waste regulations, in addition to HSWA."

-- Ibid., at 14.

effectively, safely, efficiently, and legally. DOE was not set up to provide detailed day-to-day oversight:[38]

> According to senior DOE management, it was not DOE's role to "micro-manage" a particular plant, but only to "oversee" the private company's performance. DOE officials told the investigation that a principal reason that generally large, sophisticated U.S. corporations were hired to run DOE's facilities was their presumed expertise in operating complex industrial facilities, and their ability to do so in compliance with all laws and regulations, including environmental laws. According to DOE officials, "that's part of what they [the company] were being paid to do." As another DOE official stated, "[t]he management and operating contractors that were chosen to run these facilities were not chosen under the assumption that their ability to run them in conformance with applicable statues had to be demonstrated on a regular basis by external oversight."

---

(continued)

Rockwell's 1989 contract renewal states "The Contractor ... shall comply with all applicable environment, safety and health regulations and requirements (including reporting requirements) of DOE."

-- Contract DE-AC04-76DP03533 between DOE and Rockwell, reproduced in Hearings, supra, at 1571.

[38] Plaintiff's Sentencing Memorandum, at 11. An illustration is provided by the following exchange during a Congressional Hearing:

REP. SYNAR [Chairman of Subcommittee on Environment, Energy, and Natural Resources, U.S. House Committee on Government Operations]: Now, Rockwell performed that operation [pondcrete processing]; did they not, Mr. Whiteman?

MR. WHITEMAN [DOE Albuquerque Operations Office]: That's true.

REP. SYNAR: Now, wasn't Rockwell brought in and continued at Rocky Flats because of the expertise that it offered?

MR. WHITEMAN: I would presume so.

REP. SYNAR: Didn't that expertise supposedly include the effective operation and maintenance of the Rocky Flats Facility, Mr. Whiteman?

MR. WHITEMAN: I would presume so, yes.

REP. SYNAR: Does this event demonstrate effective operation and maintenance of the facility, Mr. Whiteman?

MR. WHITEMAN: No, it does not.

-- Contractor Accountability at Department of Energy Nuclear Facilities, Hearing before the Environment, Energy, and Natural Resources Subcommittee of the U.S. House Committee on Government Operations, 101st Congress, 1st session, October 24, 1989, at 202.

Rockwell had considerable discretion as to how funds were spent. "When DOE approved ROCKWELL's budget, the Plant's operating funds were made available to ROCKWELL in a lump sum fashion, in the sense that DOE said to ROCKWELL, 'Here's the money, run the Plant.'"[39] The U.S. investigation found that Rockwell had substantial control over the budget and how it was spent.[40] Rockwell management was responsible for what happened at the plant, and, in particular, for the environmental crimes, for which Rockwell's corporate management collectively pled guilty.

## C. Specific Issues in the U.S. v. Rockwell Criminal Investigation

In this section, we examine evidence related to Rockwell's environmental compliance and waste management practices which led to the FBI raid on June 6, 1989 and the subsequent guilty pleas to 10 criminal charges.

### (i) Pondcrete

From the start of operations until at least 1983, liquid wastes generated at Rocky Flats were placed in large solar evaporation ponds.[41] Water was evaporated, and sludge, containing toxic and radioactive contaminants, remained in the ponds. (See Figures 5 and 6 and note the size of the tractor-trailer truck at the bottom of Figure 5.)

Liquid effluents would be routed to an open, asphalt-lined pond, where the water would evaporate, leaving a concentrated sludge at the bottom of the pond. Solar Pond 207A was the largest of the ponds, with a capacity of about 5 million gallons. Pond 207A and the three B ponds began to leak after the asphalt buckled. The leachate began to contaminate groundwater downgradient of the ponds. In addition, the hillside surrounding the ponds could slump when saturated, possibly damaging the ponds and releasing liquid

---

[39]   U.S. v. Rockwell, Plaintiff's Supplemental Sentencing Memorandum, May 28, 1992, at 7.

[40]   "Various environmental and waste program managers confirmed instances where, at their request, ROCKWELL moved money around internal to the Plant budget to meet various program needs."
       -- Ibid., at 8.

       "The investigation asked both DOE and ROCKWELL budget and program managers to identify any instance, from 1987 to 1989, in which DOE had denied ROCKWELL funding in a situation where ROCKWELL had explained to DOE that lack of funding would cause the Plant to break the law. No witness, either from DOE or ROCKWELL, identified such an instance."
       -- Ibid., at 11.

[41]   This historical context is adapted from Plaintiff's Sentencing Memorandum and CEARP Report, supra.

Rockwell Management of Wastes, Residues, and Risks
D. W. North and R. J. Budnitz
November 21, 1996    Page 21

to nearby Walnut Creek. Figure 7 shows the location of the watercourses in and near the plant. Because of these potential consequences, the ponds were scheduled to be closed as part of the 1986 Compliance Agreement.

In order to close the ponds, Rockwell had to remove the remaining liquid and bottom sludge from the ponds. Pond 207A was scheduled to be the first to be closed. Rockwell developed a process to solidify the sludge by mixing it with cement to form "pondcrete." The pondcrete was formed into blocks approximately 40 inches deep by 40 inches wide by 26 inches tall, comprising about 20 cubic feet and weighing between 1500 and 1800 pounds, and placed in cardboard boxes. Figure 8 shows the size of the boxes, with a worker for scale. DOE estimated that 48,000 boxes of pondcrete (800 boxes per month for 60 months) would be generated by closure of the solar ponds.[42]    Figure 9 shows an area filled with such boxes (for scale, note the person at the lower left).

How was the pondcrete actually manufactured? A diagram of the process is shown in Figure 10. According to the technical foreman, the sludge was first pumped from the bottom of the drained pond (Figure 11) to a clarifier, where the sludge settled and separated from excess water. The thickened sludge would then be pumped to a pug mill (Figure 12), which was a 6-foot long trough with a mixing blade down the middle. Here the sludge would be mixed with cement. The cement flowed from a large cement silo through a star valve into the pug mill.[43]

There was apparently no official procedure for making the pondcrete, and no written guidelines for how much cement was required.[44]    One pondcrete foreman estimated about 400 pounds of cement with 800 pounds of sludge to form a block of 1200 pounds.[45] (This is a lower estimate than the 1500 to 1800 pounds described above.) The

---

[42]    Letter from A. Whiteman, DOE to R. Duprey, EPA, November 5, 1986, reproduced in Documents before the Subcommittee on Investigations and Oversight of the Committee on Science, Space, and Technology, U.S. House of Representatives, 102nd Congress, No. 164, September, 1992, at 542. (Hereafter referred to as Documents)

[43]    Deposition of Ronald Teel, Cook v. Rockwell, May 9, 1995, at 34-37.

[44]    "We had no procedure, first of all."
    -- Deposition of Howard Long, Cook v. Rockwell, June 15, 1995, at 170.

    "Q. Do you know how that [cement to sludge] ratio was arrived at?
    A. No, I don't.
    Q. Do you know who calculated it?
    A. No, sir."
    -- Teel deposition, at 37.

[45]    Teel deposition, at 37.

star valve was not capable of measuring the actual amount of cement added to the mixture, and the operator would rely on the color of the mixture to judge whether enough had been used.[46]  Neither of the pondcrete foremen during the period most of the pondcrete boxes were filled recalled any effort to weigh the cement and the sludge, or otherwise taking further steps to assure a mixture that would become solid.[47]  This lack of quality control is evident in Figure 13, which shows a rough analysis done at the time illustrating a decrease in the average amount of concrete in each box, with a high variability month-to-month.[48]

The pondcrete blocks were formed in plastic-lined triwall cardboard boxes, then inspected for adequate consistency before being moved to the storage pad.  Initially, the waste inspectors simply pressed on the top of the block with their thumbs "to see if it was hard."[49]  Later, a mechanical device called a penetrometer was used.  Evidently, the

---

[46]  "Q. Was there any means to measure the amount of cement that went into a block?
   A. No."
   -- Deposition of Daniel S. Tallman, Cook v. Rockwell, June 20, 1995, at 20-23.

   "Q. Were there any quality assurance -- written quality assurance policies or procedures for the operations at the solar pond area?
   A. Not that I was aware of."
   -- Ibid., at 83.

   "Q. So how did this person, whoever was doing it, know that there was about 400 pounds being dumped?
   A. Just the knowledge of how it dumped it.
   Q. Just by watching it?
   A. Yes."
   -- Teel deposition, at 46.

[47]  DOE inspector Candice Jierree describes her recollection of the process based on a description from Rockwell senior manager Bill Weston, as follows:
   " ... for pondcrete mixture in the pug mill, Bill Weston stated that they maximize waste and minimize the amount of cement that was thrown in, and that was done to push lots of waste through the pug mill and to minimize the cost of cement. That's why pondcrete fell apart. When you put in any additive to cement other than water, you don't have cement. Also, when I toured the sewage treatment plant I saw they were just eyeballing the amount of cement that went into the sewage sludge, and they just used it to absorb water. If you want a complete system that has no free liquids in it, you have to determine ahead of time the moisture content of your sludge to determine how much cement you need to put into it. That's controlling your process. That way you get a solid waste form."
   -- Deposition of Candice Jierree, Cook v. Rockwell, May 21, 1996, at 177-78.

[48]  Contained in Plaintiff's Deposition Exhibit 1088, Deposition of George H. Setlock, Cook v. Rockwell, August 7, 1995.

[49]  Tallman deposition, at 34.

criteria for passing inspection and outside storage was that the material was of a "putty, Play-Dough type of consistency."[50]   The pondcrete operators at the time, as well as Rockwell itself, imply that this "putty" consistency was technically a "solid", and thus met the criteria for an acceptable waste form to move outside and then be shipped.

> I knew we weren't making bricks, for instance, or anything as hard as this table, but we were producing a product that was consistent, to me, you know, it was a putty, and if they passed the inspection by the waste inspection people, personnel, then they were okay.[51]

The original method for preparing the solar pond sludge for shipment to Nevada was drawn in accordance with Department of Transportation ("DOT") regulations for determining whether a substance was a liquid or a solid. The federal regulations on point adopt the relevant American Society for Testing and Materials ("ASTM") Standards; ASTM D4359-84 defines a solid as:

> Solid means a material which has a vertical flow of two inches (50 mm) or less within a three minute period.

*It is clear that neither the process designed to make the sludge a 'solid,' nor the container in which it was packaged, ever contemplated long term storage of the waste forms, much less when placed outside.*

...

It is incorrect, however, to imply that the waste form was ever supposed to be a hard solid ...[52]   (emphasis added)

Rockwell thus claims that a "hard solid" consistency was never the criterion for pondcrete, but statements from personnel in DOE's offices receiving the waste indicate

---

(continued)

"Q. On the bottom of the page [of the EPA memorandum], it says: The inspection of the pondcrete consisted of pressing the cured block with your thumb and if water wasn't present on the surface and the block felt solid, then it was passed. Is that an accurate description of the test, to your knowledge?
A. Yes."
-- Ibid., at 138.

[50]   Tallman deposition, at 44.

[51]   Ibid., at 59.

[52]   U.S. v. Rockwell, Defendant's Sentencing Memorandum, March 26, 1992, at 43-47.

that they were expecting exactly that. After a spill in May 1988,[53] which alerted DOE to
a serious problem with the solidification of pondcrete, DOE Las Vegas wrote to Rocky
Flats, "As you may be aware, the Nevada Operations Office (NV) was under the
impression that the pondcrete was, as the name implies, a 'concrete' waste form. After
examining the product at your facility and receiving the briefing, it became apparent that
such adjective descriptions are imprecise."[54]

After curing, the pondcrete blocks were moved to outside storage at the 750 Pad,
and later, the 904 Pad. These were essentially large asphalt-paved parking lots. Figure 14
shows the size of these pads, with a standard NFL football field for scale.

### Plans for Shipment and Disposal and Ensuing Problems

Shipments began of the pondcrete blocks to the Nevada Test Site for ultimate
disposal as low-level radioactive waste. In September 1986, however, after approximately
2,000 pondcrete blocks had been shipped to NTS,[55] chemical analyses as part of the 1986
Compliance Agreement revealed the presence of RCRA hazardous wastes in pondcrete.
NTS immediately stopped accepting shipments, because it was not authorized to accept
mixed waste. A DOE team reviewed the issues surrounding the shipment of Rocky Flats
pondcrete to NTS and agreed that pondcrete was a mixed waste and that NTS was not
authorized to accept it. The team recommended that NTS not receive additional mixed
wastes from any generators, and that DOE should seek an agreement to allow interim
shipment of mixed wastes at NTS while at the same time pursuing appropriate permits for
NTS to allow disposal.    Significantly, the team also made a recommendation to
generators, including Rocky Flats:

> Generators who are found to have mixed waste or suspect waste
> (insufficient waste characterization) should assess the potential impact if
> negotiations under Recommendations 2 or 3 fail. This should include
> *developing contingency plans for onsite interim storage and permitting*
> or possibly process changes.[56] (emphasis added)

---

[53]    Footnotes 74 and 76, infra.

[54]    Quoted in Plaintiff's Sentencing Memorandum, at 43. Original document being sought.

[55]    GAO, Problems with Cleaning up the Solar Ponds at Rocky Flats, RCED-91-31, January 1991, at 3.

[56]    Report of the Review Team on the Mixed Waste Issues at the Nevada Test Site and DOE Facilities
Shipping Low-Level Radioactive Waste to the Nevada Test Site, December 19, 1986, at 14.

Rockwell personnel evidently also recognized that shipments might not resume quickly and that
contingency plans might be required: "no guarantees how soon (or if) Rocky Flats will be authorized

In addition to the mixed waste issue, there were early indications that the pondcrete was not being processed in a form suitable for storage or shipment. According to a senior health physicist at NTS, in July 1985 there was a spill of pondcrete which had been shipped from Rocky Flats. The pondcrete was not solid and had "sloughed." The NTS employee informed Rockwell of the problem and assumed it had been corrected. His understanding was that pondcrete was supposed to be solid concrete, like a driveway.[57]

## Rockwell's Response

What did Rockwell do in response to these emerging problems? At the time the NTS mixed waste issue had been identified, by November 1986, 408 boxes of pondcrete were stored on the 750 Pad.[58] Rockwell continued to make pondcrete as usual, storing it on the 750 Pad. By the end of September, 1987, the inventory on the 750 Pad totaled 10,828 boxes, and the 904 Pad began to also be used for pondcrete storage.[59] In spite of the NTS Review Team's explicit recommendation, there is little evidence that, over the intervening time, Rockwell management made any contingency plans or any changes to pondcrete procedures to take into account the possibility that shipments to NTS might not resume immediately.[60] "Putty-like" pondcrete blocks were stored outside in cardboard

---

(continued)

to ship mixed waste to NTS. ... If and when the NTS receives approval..., NTS has provided no positive indication that they will be willing to accept mixed waste from out of state. ... [W] e may be in the position of having a critical need for mixed waste storage facility in a very short timeframe."

  -- "Hazardous and Mixed Waste Storage Facility," Letter from W. Weston to C. Bader, Rockwell International, July 31, 1986.

[57] EPA Interview of John Boland, June 26, 1991, reproduced in Hearings, supra, at 437.
See also the deposition of Albert Whiteman, Cook v. Rockwell, March 12, 1996, at 144: "When it was cemented properly, it [pondcrete] looked like your driveway."

[58] Waste Operations Weekly Highlights, January 9 and 30, 1987, reproduced in Documents, supra, at 339 and 467. Calculated as 2,083 on Pad minus 1,927 made to date in FY87 (starting October 1986) plus 252 made during October 1986.

[59] Waste Operations Weekly Highlights, September 25, 1987, reproduced in Documents, supra, at 268.

[60] A Rockwell employee responsible for pondcrete storage stated
"I recall Mr. Wickland [Rockwell's Manager of Waste Operations] wanted to store pondcrete and saltcrete both in buildings so they would be protected from the weather, and Mr. Sanchini did not want to spend the money or ask DOE for the money to build the buildings."

  -- Deposition of Ann Kercher, Cook v. Rockwell, May 25, 1995, at 78. See also 87, which indicates that this conversation occurred in October 1986.

boxes protected only by non-waterproof tarps. DOE employee Candice Jierree recalled her astonishment on learning how pondcrete was being stored:[61]

> I was amazed that there was not indoor storage facility for the waste. I was amazed that we stored low-level radioactive waste outdoors. And I was amazed that we had only little tarps on top of the pondcrete and saltcrete.
> Q. Was it your view that the storage of the waste materials on 750 and 904 was appropriate?
> A. No.
> Q. And what do you base that view on?
> A. The fact that the tarps kept blowing off. In a high wind, the tarps would blow off...

We share Ms. Jierree's opinion that Rockwell's pondcrete manufacture and storage procedures were clearly deficient.

Rockwell was evidently very concerned about meeting the compliance date for closure of the solar ponds. One pondcrete worker received a "surprise" award of $300 for "meeting production," and there was the threat of a $25,000 a day fine if the deadline was not met.[62] What is not evident is that Rockwell top management took any steps to assure the quality of the pondcrete, or took seriously the potential for deterioration and leaks from pondcrete as it was stored temporarily at Rocky Flats awaiting shipment elsewhere for final disposal. There is evidence that Rockwell attempted to hide the problems by obstructing access of at least one DOE inspector to the 904 Pad in early 1989.[63]

Outside audits such as the one conducted by REECO in December 1987, as well as statements by lower-level Rockwell employees, indicate that there was concern over the impact of the weather and outdoor storage on the integrity of pondcrete.[64]    Rockwell

---

[61]    Jierree deposition, at 25, 28. At 107-108, Jierree explains that the problem was not only the weather, but also failure to process the waste properly. "The box did not degrade from the outside in, it degraded from the inside out."

[62]    Teel deposition, at 47, 50.

[63]    "Harry Pettengill and I were asked to leave the 904 Pad pondcrete area by J. Ortiz [RI employee]. ... I believe that this is another form of RI harassment against site rep. Site rep has been writing in daily and weekly reports about the problems at the Pondcrete pads and RI is trying to keep me away from the pads."
    -- Logbook of Joseph Krupar, January 20, 1989.

management was evidently more concerned about maintaining high production of the blocks.[65] Apparently, most were convinced that the storage would be very temporary and that the blocks would be shipped to Nevada soon.[66]

---

(continued)

[64] "Triple-wall waste containers ... at the 750 storage pad are sufficiently damaged, because of exposure to wet weather, to require recertification. The triple-wall boxes are not constructed of weather proof materials nor are the covering tarps waterproof."

-- DOE/NV-Review and REECO/RWMP-Audit Report of Rockwell International Rocky Flats Plant Waste Generation and Certification Operations, December 23, 1987.

"Q. You also mentioned that you were worried about the actual containers for the pondcrete deteriorating?

A. Uh-hum.

...

Q. Was any part of your concern based upon the fact that the pondcrete blocks were of a putty consistency and you were concerned that the pondcrete blocks would lose their form?

A. Yes.

Q. And you were concerned that if that happened, if the pondcrete blocks lost their form, there might be significance [sic] spillage onto the pads?

[defense objection]

A. Yes.

-- Tallman deposition, at 77.

"The potential exists for leachate release as sloughing of waste materials could be caused by exposure to precipitation and temperature changes with attendant contamination of [the] area adjacent to the storage pad ...."

-- Rockwell memorandum, November 1986, quoted in Plaintiff's Sentencing Memorandum, at 34. Original document being sought.

[65] "Q. It says that Long and Swenson performed maintenance on the equipment that had broken down to keep the operation going, though it was not their responsibility to do so, and that you did this as a result of management pressure to maintain the high level of pondcrete production. Is that true?

A. Yes.

Q. Who specifically pressured you to do this?

A. That would be the management above Teel.

Q. Who would that be?

A. I am thinking Naimon and Weston. I don't know if they were pressured above that. We never saw the management much above Weston, but those two I knew were telling Teel to get the thing going no matter what."

-- Long deposition, at 164.

DOE inspector Krupar wrote that "Problem with pondcrete packaging occurred after foreman was transferred out because he was not meeting production goal."

-- Krupar logbook, supra, November 17, 1988.

[66] "My understanding while I was a foreman, and I think everybody's understanding, that we'd be given permission to ship any date. They [pondcrete boxes] weren't designed to withstand the weather for that reason."

And the waste was indeed leaking. Weekly inspections of the pondcrete storage
areas were carried out, and one of the items inspected was "evidence of leaking from any
container (i.e., puddles, wet spot, discoloration, etc.)." Every weekly inspection of the
area from July to November 1987 checked "Yes" to this item. Several weekly inspections
also answered "Yes" to inspection of "corrosion or dents" on containers.[67]    Rockwell
pondcrete workers recognized the problems with deteriorating blocks, but were
overwhelmed by the number of problems and the pressure to maintain production.[68]    By
the end of 1987, Rockwell staff were rejecting a significant number of blocks for leakage
and deficiencies.[69]    In September 1987, sampling results from the 750 Pad showed
"significantly elevated" alpha and beta readings "for the period after pond-crete storage
began."[70]    Despite this evidence, Rockwell claimed in February 1988 that "to date, no
confirmed leaching of hazardous constituents out of the pondcrete has been identified. ...
No response action is necessary for the above mentioned waste management activities."[71]

---

(continued)

-- Teel deposition, at 44.

[67]   Hazardous Waste Management Facility Solid Waste Container Storage Area, Weekly Inspection
Log, March - November 1987.
One week, the inspector mentioned "substantial water damage from rain to some stacks on 6/29 &
6/30 - 1987."

[68]   "... there were so many blocks that we had over 20,000 blocks [sic] by the time we got done that 15
operators could not keep up with that many deteriorating blocks, and the weather would not
cooperate .... I mean Teel would do the best that we could do ... did the best we could do for what we
saw coming, but we just couldn't -- couldn't handle it. It was way out of control."
-- Long deposition, at 169.

"Q. Did you also state to the interviewer that the reason unusual occurrence reports were not being
consistently prepared for spills on the 904 pad was that it was no longer an unusual occurrence?
A. I don't recall that. That may have been true because it was -- there were so many it was
ridiculous to investigate every single one of them."
-- Tallman deposition, at 139.

[69]   16 blocks rejected in December 1987, 21 rejected in January 1988, 11 of 19 less than 40% solid in
February 1988. Cited in Plaintiff's Sentencing Memorandum, at 41. Original documents being
sought.

[70]   750 Parking Lot Storage of Pond-Crete, memorandum from F. Blaha to G. Potter, September 28,
1987.

[71]   Implementation Plan for Environmental Survey Findings, Revision 1.0, Rockwell International,
February 1988, at 2.5.14.

Rockwell did not install any berms at the 904 pad to contain or control runoff from spills or from precipitation impinging on the boxes until at least June 1988.[72]

On May 23, 1988, a pondcrete box fell and broke open on the 904 pad. This was the first incident that Rockwell reported to DOE as a "spill." Figures 15, 16, 17, and 18 show the slumping, leaking, crumbling blocks after this incident and a similar one in October 1988. Subsequently, additional environmental sampling at and near the 904 pad showed that

> the [ponded] water [on the 904 pad] is high and nitrates and gross Beta and the soils are high in nitrates. The contamination is coming from the stored pondcrete.[73]

The final Unusual Occurrence Report on the May 23 incident was the first admission by Rockwell of problems in the pondcrete process.[74]    Rockwell senior management resisted filing this report.[75] The report concluded that

---

[72]  Pondcrete Storage 904 Pad, Memorandum from R. Hawes to F. Blaha, May 26, 1988.

[73]  Memorandum from Rockwell environmental manager to Director of Plutonium Operations, June 15, 1988, cited in Plaintiff's Sentencing Memorandum, at 43. Original document being sought.

[74]  There is mounting evidence that top Rockwell management in fact did know of pondcrete problems well before the May 1988 spill. The case of U.S. ex rel. Stone v. Rockwell (Colo. 89-C-1154) alleges that Rockwell knowingly concealed the problems and made false statements to DOE regarding the pondcrete issue. The "Supplemental Declaration of John Kolar," U.S. Attorney, dated December 20, 1995 and its exhibits present two key pieces of evidence. The first is a handwritten note dated September 9, 1987 "alluding to a meeting involving Mr. Sanchini [Rockwell manager] indicating that 'Dom' was 'looking or ideas' 'to really make a solid block.'" A sworn statement from the author of the note, Wayne Meyers, who was Director of Safety, Safeguards, and Security, and who reported directly to Sanchini, authenticated the note and confirmed that "Dom" was Mr. Sanchini. The second key piece of evidence is a deposition of Gary Potter on April 22, 1994. In 1987, Potter was a Rockwell mid-level manager. According to Kolar, "Mr. Potter testified that this information about pondcrete not solidifying and the leaching of hazardous constituents from the blocks was conveyed to Mr. Sanchini and his general staff, consisting of his division Directors, and was a topic of concern to them in that time period (Fall 1987)." A statement by Tod Anderson dated August 27, 1987 indicates that some individuals within DOE may also have known about the condition of the pondcrete as of this date. (Deposition of Edwin Naimon, Cook v. Rockwell, August 15, 1995, at 147 and Exhibit 1072.)

[75]  According to DOE inspector Jierree:
"Q. Do you recall ever being concerned whether Rockwell intended to file an unusual occurrence report over the matter?
A. Yes. I asked for an unusual occurrence report, and Ed Naimon and Bill Weston argued with me, saying it was not required.
Q. You felt they were resisting you on that?

Incorrect cement/sludge ratios ... resulted from inadequate process control .... Also, a star valve used to introduce cement into the mixer plugged intermittently which prevented cement being introduced into the process. This condition existed since *as early as 1985*.

...

The tri-wall boxes are shipping containers and were not designed for long term storage, especially of a non-solid product.

...

Quality control inspections procedures were inadequate.... No specifications had been developed for pondcrete to meet.[76] (emphasis added)

Between the suspension of shipments to NTS in September 1986 and the May 1988 spill, more than 16,500 blocks of pondcrete were produced and stored outdoors. After the May 1988 spill, "DOE estimated that about 2,000 of the pondcrete blocks stored had deteriorated, but later it determined that over 9,000 blocks, or almost half of the blocks stored outdoors, had deteriorated."[77]   A DOE inspector noticed additional problems in December 1988 and reported that

the cardboard boxes, the containers and the plastic liners were deteriorating, that the material inside the boxes was not, in fact, solid concrete like it was supposed to be, that the context -- contents of the boxes when you pushed on them was soft like mud, the contents were -- some of them had precipitated with solids on the bottom, liquids on top. ... the containers were losing their integrity because of the weather....[78]

---

(continued)

A. Yes."
-- Jierree, deposition, at 60-61.

[76]   Final Unusual Occurrence Report, Pondcrete Destabilization, RFP #88-7--778 88-1, February 23, 1989.

[77]   GAO, Problems with Cleaning up the Solar Ponds ..., supra, at 4.

[78]   Deposition of Joseph Krupar, Cook v. Rockwell, November 13, 1995, at 73.

"Q. Did you ever notice on your inspections of the 904 pad any of the material spilling or leaking out onto the pad itself?
A. Yes, I did."
-- Ibid., at 75.

After the May 1988 incident, Rockwell stopped making pondcrete and began to assess the corrective repackaging and remixing actions that would be needed. However, even after the large scale of pondcrete problems had been made known, Rockwell still was reluctant to take preventive or remedial action.[79] In September 1988, a DOE team from the Rocky Flats Area Office (RFAO) noted a large number of defective boxes, and asked Rockwell to prepare a plan for managing the pondcrete on the pads until it could be remixed and repackaged.[80] The RFAO explicitly mandated that "The written plan must address the following concerns as a minimum ... 2. Methods for safe storage of pondcrete for a minimum of three years." In response, Rockwell proposed two alternatives: a series of tent-like structures to be erected over the pads to prevent precipitation from reaching the blocks, or a series of earthen berms around the pads to collect precipitation which would then be transferred to Building 374 for treatment.[81]  Tent structures were not installed until over a year later, in January 1990, despite recommendations from DOE officials and Rockwell staff:

> The potential for violation of the NPDES Permit exists without considerable expenditure for containment structures.  Also, public perception of Rocky Flats as a storage site for radioactive waste will be difficult to dispel with two football field-sized pads full of waste.[82]

---

[79] "Rask [DOE RFAO official] had to argue with Rockwell about fixing the problem at the 904 pad. Rask had an arguement [sic] with Rockwell concerning installation of a berm around the 904 pad. Rask had a problem and arguement [sic] with Rockwell to get them to monitor the water that was puddling on the 904 pad. Rask also had a problem getting them to pump the water off the 904 pad. DOE even went so far as to obtain six trucks for Rockwell to use to pump the water off the 904 pad. Rask said he had a yelling match on these issues with Rockwell staff. Rask said he dealt with Ed Naimon, William Weston, and Dominick Sanchini on these issues."

-- EPA Interview of William Rask, September 19, 1990, reproduced in Hearings, supra, at 496.

[80] "The RFAO observed that many boxes of pondcrete were slumping. One box had leaked fluid onto the pad which had subsequently dried, leaving only a stain which had yet to be monitored. These boxes of pondcrete suffered matrix failure subsequent to the initial transfer of uncured boxes which occurred after the first spill of pondcrete had been identified on the 904 pad in May of this year."

-- Management of Pondcrete Pending Repackaging, Letter from A. Whiteman to D. Sanchini, September 21, 1988.

[81] Management of Pondcrete Pending Repackaging, letter from D. Sanchini to A. Whiteman, October 3, 1988.

[82] Cemented Solar Evaporation Pond Sludge Disposal, Letter from B. Twining, Albuquerque Operations Office Manager to T. Wade II, Acting Assistant Secretary for Defense Programs, Spring 1989.

"The RFAO agreed that erection of sprung structures [tents] would provide the best solution by preventing precipitation from landing on the pondcrete, protecting the mixed waste from wind dispersion and providing a coved [sic: covered] flooring for prevention of runoff. Rockwell

The most recent batch of data from the monitoring conducted on the puddles at the 904 and 750 pondcrete storage areas continues to show that the plant guides for nitrate and gross beta are being exceeded. We reiterate our recommendations that all run-off be controlled at the pads or structures constructed to prevent precipitation from contacting the stored boxes.[83]

In addition, Rockwell's newly-developed quality assurance plan stated that: [84]

> ... at the time this quality assurance plan was prepared, there was no plan to store pondcrete filled plywood boxes for more than a period of *one month* prior to shipment. Thus this document *does not address long term storage concerns and requirements.* Should long term storage of pondcrete plywood boxes develop, this quality assurance plan will have to be reviewed and revised to address long term storage requirements. (emphasis added)

Given the history of the pondcrete issue and the explicit directive to consider safe storage of (the current stacks of) pondcrete for a minimum of three years, the limitation of the time horizon to one month is questionable.

NTS received interim status as a mixed waste disposal facility in September 1987, and in November 1987, the CDH authorized restarting shipments of pondcrete and saltcrete to NTS. Additional time was required for Rockwell to update its quality assurance plans and demonstrate compliance with applicable regulations, so the first shipment of pondcrete was not made until December 21, 1988. Remixing, repackaging, shipment, and storage has continued since then. DOE estimates of the overall cost of

---

(continued)

determined that twelve structures would be required in order to protect the pondcrete .... Due to the high cost, this project was not immediately supported. However, now Rockwell is finding high nitrates in the B-series ponds ... The primary source of the nitrates is runoff from the 904 and 750 pads .... Because of this increased risk of violating the NPDES permit and because these types of violations risk community uprise, ... there is a need to consider special funding for these sprung structures .... I would like to recommend that consideration be given to providing funding for these structures."

  -- Weather Protection for Pondcrete, Letter from C. Jierreo to A. Whiteman, December 19, 1988.

[83]   Monitoring Data from 904 and 750 Pondcrete Storage Areas, letter from F. Lawton and C. Sunblad to F. Hobbs, Rockwell International, June 21, 1989.

[84]   Rockwell International, Quality Assurance Plan Pondcrete Process, WO-4050-B, February 6, 1989.

solar pond cleanup dramatically increased several times as a result of these problems. The estimate was raised to $27 million in July 1989, then to $119 million in April 1990, then to $169 million in July 1991.[85]

### Rockwell's Management Failures

The pondcrete fiasco provides a clear example of Rockwell's management deficiencies. First, Rockwell did not assure that the pondcrete was well-made. Although technically a "solid" by the ASTM standard, pondcrete, as Rockwell produced it, had wet, putty-like characteristics that made it clearly unsuitable for prolonged outdoor storage in cardboard boxes.

Second, Rockwell did not take any corrective action when it became evident that the pondcrete process was experiencing problems. Rockwell manufactured a massive amount of pondcrete by a very crude process without any serious quality control. There is no evidence management took any effective action to prevent possible leakage from putty-like blocks in cardboard boxes that did not withstand the combination of weather and semi-liquid contents.

Third, Rockwell did not anticipate the potential for radioactive releases, resulting environmental contamination, and legal violation. Rockwell created a huge mess. While the original estimate for corrective action was $650,000 for remixing the contents of the 5,000 non-solid boxes with an adequate amount of cement to achieve a solid block,[86] it soon became apparent that cleaning up the two football field sized pads, the piles of bulging boxes on them, and the contaminated areas from runoff would require hundreds of millions of dollars in clean-up expense (GAO estimates, supra), increased exposures of the workers to toxic and radioactive materials, and the potential for additional environmental releases during the clean-up process. The added expense of doing the job correctly the first time might have been the cost of about three million additional pounds of cement at $.05 per pound: $150,000.[87] Or perhaps more careful attention to assuring that enough cement was in each box might have solved the problem, at an even lower cost. Or more careful attention could have been paid to making sure that the chemistry was correctly determined, so that the mixture of the pond sludge and cement would indeed solidify even

---

[85]  GAO, Problems Continue for Rocky Flats Solar Pond Cleanup Program, RCED-92-18, October 1991, at 4.

[86]  Comparison of Pondcrete Cost, Rocky Flats Plant, letter from W. Shannon to F. Harter, reproduced in Contractor Accountability.... supra, at 201.

[87]  Ibid.

when a particular lot of pond sludge contained materials that inhibited solidification. Our judgment is that assurance that all of the pondcrete blocks placed on the pads were solid throughout might easily have been attained, at relatively low cost.

Even while admitting guilt in the 1992 Plea Agreement, Rockwell defended itself by pointing to the unexpected cessation of shipments to NTS, and suggesting that DOE and CDH knew of the problems, yet forced Rockwell to continue making inadequate blocks by pressuring it to meet the clean-out deadline. The evidence we have reviewed does not indicate that Rockwell informed DOE, EPA, or CDH that it was having problems making and storing pondcrete, until the May 23, 1988 spill occurred with two football fields worth of pondcrete boxes made and stored outside on pads. The US Attorney team comments on Rockwell's excuses for its management failures as follows:

> The fundamental fallacies in Rockwell's discussion of pondcrete and saltcrete are twofold. First, Rockwell focuses its attention on the deficient cardboard packaging and the evidence that such packaging deteriorated when stored outdoors, instead of the more basic problem that pondcrete was not a solid block, but instead a semi-liquid putty. If pondcrete had been the solid concrete (brick-like) block that it was supposed to be (and as DOE, EPA, and the Colorado Department of Health thought it to be), the cardboard box would have made little difference.    Concrete streets and brick houses are exposed to the weather for many years without becoming silly putty.    Second, Rockwell has the temerity to suggest that EPA and CDH made them do it.  Again, EPA and CDH didn't know about the pondcrete problem. When CDH allowed Rockwell to store pondcrete on an outdoor pad, CDH believed that (a) the pondcrete was a solid block, and (b) that Rockwell would store it in accordance with RCRA requirements.  In a like manner, when CDH told Rockwell to continue making pondcrete instead of leaving the sludge in the solar ponds, it was choosing between (a) leaving toxic waste in leaking ponds which were known to be contaminating Rocky Flats groundwater, and (b) properly storing what it believed were solid concrete blocks.  DOE, EPA, and CDH were not aware 'of all significant problems as they developed.'    The runoff problems were concealed or minimized ....[88]

We agree with and amplify these comments of the US Attorney team. Rockwell's management had a poor plan, and Rockwell poorly executed that plan. Rockwell gave the impression that "pondcrete" was to be like a solid block of concrete, yet generated

---

[88]   Plaintiff's Supplemental Sentencing Memorandum, at 12-13.

thousands of blocks of putty. There was evidently no plan or procedure to assure consistency of the waste form, other than the eyes of the operators and the thumbs of the inspectors. When leakage, runoff, and other problems began to occur, Rockwell management was apparently more concerned about meeting the deadline than in good waste management practices, preventing violations of its permits, and preventing environmental contamination. The timeline shown in Figure 19 demonstrates that Rockwell resisted oversight and delayed corrective action, even after repeated problems became widely known. Rockwell management created a situation in which hazardous materials were released to the environment, which required a huge clean-up and remediation expense, and which ultimately led to guilty pleas for felony criminal violations.

### (ii) Saltcrete

"Saltcrete" is a material similar to pondcrete. The Building 374 mixed waste treatment facility produced concentrated brine and evaporator salts, mainly nitrates, resulting from neutralization of the nitric acid used in chemical processing. Rockwell developed a process to mix these salt wastes with cement into blocks approximately the same size as pondcrete blocks. About 140 boxes per month of saltcrete were produced,[69] starting in about April 1985[90]. These were also placed in plastic-lined cardboard boxes. Initially, the boxes were stored indoors in Building 374, but after the building was filled up, Rockwell began to store the blocks outdoors at the 750 Pad, where the pondcrete was also located.

Hazardous waste constituents were detected in saltcrete in September 1986, at the same time that similar constituents were found in pondcrete. Rocky Flats and the NTS Review Team concluded that both pondcrete and saltcrete were mixed waste, and so shipments to NTS ceased. The saltcrete processing continued, with the blocks stored on the 750 pad.

Like pondcrete, saltcrete also experienced deterioration problems when stored outdoors. The U.S. sentencing memorandum notes that "as a result of moisture attacking the saltcrete blocks (which were largely composed of nitrate salts) and repeating freezing and thawing, saltcrete had a tendency to expand and crumble, causing a number of spills."[91] Also like pondcrete, there were evidently little or no guidelines or quality control determining the makeup of the saltcrete blocks.

---

[69]   Plaintiff's Sentencing Memorandum, at 32.

[90]   Report of the Review Team on the Mixed Waste Issues [at NTS], supra, at 7.

[91]   Plaintiff's Sentencing Memorandum, at 48.

Rockwell evidently did not have, or did not execute, any contingency plans to address this weather deterioration problem, even when their own study pointed out the issue:

> RFP then plans to store saltcrete outdoors on covered asphalt pads. These pads may not offer sufficient protection to avoid container deterioration. Condensation that would be produced under the plastic cover could cause deterioration of the cardboard boxes. It has also been determined by RFP personnel that saltcrete would leach nitrates if exposed to precipitation.[92]

The U.S. Attorneys commented on the saltcrete problems as follows:

> These [saltcrete] problems and the ultimate need to repackage a substantial number of saltcrete blocks were the foreseeable results of poor manufacturing controls and storage conditions.[93]

The saltcrete issue again shows Rockwell management failed to appropriately plan for adequate quality control of the blocks, to take corrective action when problems were identified, or to make contingency plans when the original plans for shipment to NTS were stymied, even when such contingency plans were explicitly recommended. These management failures led to the discharge of hazardous wastes into the environment, violation of applicable permits, and ultimately to criminal guilty pleas.

### (iii) Sewage Treatment Plant and the Chromic Acid Spill

Rocky Flats' sewage treatment plant (STP), located in Building 995, is a standard design built in 1952 and intended to treat sanitary sewage before discharge into the B-series ponds and subsequent discharge to South Walnut Creek and the Great Western Reservoir, which provided drinking water for neighboring communities. Figure 20 shows a photo of the B-series ponds to the left. The B-series ponds, being tributaries to "waters of the United States," are considered "navigable waters" according to the Clean Water Act, and so discharges from the ponds require a National Pollutant Discharge Elimination System (NPDES) permit.

---

[92]   Implementation Plan for Environmental Survey Findings, Revision 1.0, supra, at 2.5.10.

[93]   Plaintiff's Sentencing Memorandum, at 48.

The NPDES compliance location for the B-series ponds was established at the effluent of the B-3 pond (Outfall No. 001), as shown in Figure 7. Water from the B-3 pond was removed either by releasing it to the B-4 and B-5 ponds, or by "spray irrigating" the water onto various spray fields. A release to the downstream ponds was considered a "discharge" and was required to meet the NPDES permit limitations.

Rockwell's stated plan was to keep process wastes separated from sanitary wastes, and it gave no indication that any other wastes other than nonhazardous sanitary wastes were being routed to the STP.[94] However, the U.S. criminal investigation revealed (and Rockwell agreed in the Plea Agreement) that

> Rockwell negligently discharged and released non-sanitary industrial wastes (including toxic and hazardous substances) to Rocky Flats' sewage treatment plant ....
>
> ...
>
> Rockwell's Management Practices Plan negligently failed to prevent or minimize the release of toxic and hazardous substances to the sewage treatment plant.[95]

The U.S. investigation also revealed that Rockwell had information on this situation well beforehand. A 1987 consultant report, even though it stated that process wastes were not being sent to the STP, found at least 53 industrial wastes being sent to the STP, including acid rinses, photographic solutions, cooling tower blowdown, and various other wastes.[96] However, although Rockwell had a Management Practices Plan,

---

[94]   "Sanitary effluents are processed through a tertiary sanitary treatment system. Effluent from this system meets all requirements for offsite release under limitations set forth in the existing NPDES permit.
...
Each building that has production, research, or support facilities in which radioactive materials are handled is equipped with a radioactive process waste collection system ... which is isolated from the sanitary waste collection system.
...
[Nonradioactive hazardous chemical wastes] are commercially disposed of, commercially recycled, or mixed with the radioactive waste stream and treated in the radioactive waste treatment facilities and shipped offsite to other DOE facilities as radioactive waste."
--CEARP report, supra, at V-59, V-70.

[95]   U.S. v. Rockwell Plea Agreement, at 17.

[96]   Plaintiff's Sentencing Memorandum, at 70, citing Waste Stream Identification and Characterization, WESTON, Inc., April 6, 1987. Original document being sought.

A DOE oversight team found that medical staff at Rocky Flats under Rockwell's management "routinely disposes of out-of-date chemicals in the toilets that are plumbed to the sanitary sewer."

it again apparently did nothing to correct the situation. Two years later, in 1989, another consultant pointed out the same problems, stating that

> Toxic substances, as broadly defined, are routinely released into the effluent.
>
> ...
>
> Monitoring of the wastewater system is inadequate.
>
> ...
>
> There is no accountability for the release of toxicants into the wastewater system. Since the proper functioning of such a system is dependent upon living organisms, the release of toxic materials must be avoided ....[97]

The hazardous industrial wastes sent to the STP substantially impaired its performance, and led to violations of the NPDES permits at Outfall 001 at the discharge of the B-3 pond. Rockwell's lack of corrective action and their mismanagement of the STP situation led to five guilty pleas of negligence and one guilty plea of knowing violation.

A particularly serious incident, leading to one of Rockwell's guilty pleas on negligent violation of Clean Water Act permit conditions, occurred on February 22, 1989, when a tank of chromic acid overflowed and 750 gallons of chromic acid entered a drain leading to the sewage treatment plant.[98] Rockwell failed to contain this spill or divert it into a diversion basin, and the spill killed a substantial portion of the biological organisms involved in treating sanitary waste. At least five days passed before Rockwell learned that the green material entering the STP was chromic acid. Despite not knowing what the material was, Rockwell continued to spray-irrigate the wastewater (see discussion in next section). From February 23 through March 4 (ten days after the spill and five days after Rockwell knew it was chromic acid), Rockwell spray-irrigated over 2 million gallons of water contaminated with chromic acid exceeding NPDES discharge limits. Because of weather conditions at the time, rather than evaporating or sinking into the soil, this water ran off over frozen ground and back into the pond drainages, thereby bypassing the

(continued)
  -- Disposal of Out-of-Date Chemicals via Sanitary Waste, Letter from E. Goldberg to D. Sanchini, June 19, 1989.

[97]  Cited in Plaintiff's Sentencing Memorandum, at 73. Original document being sought.

[98]  See Plaintiff's Sentencing Memorandum, at 98 to 106, and Memo from Chromic Acid Investigating Team to D.J. Sanchini, April 28, 1989.

compliance point and violating the conditions of the NPDES permit, which is designed to protect against offsite contamination of surface waters.

### (iv) Spray Irrigation

Spray irrigation is the practice of spraying water through large sprinklers onto a field, with the objective that the water would evaporate or soak into the soil, rather than running off over the surface. Rockwell considered spray irrigation to be an alternative to discharging contaminated water from a pond of limited capacity to flow into streams whose water quality is regulated. So if Rockwell released waste water into the pond in such large quantities that the pond reached its capacity, Rockwell was forced either to release the water through the outfall, risking an NPDES violation, or use spray irrigation to reduce the quantity of water in the pond.

Spray irrigation was practiced at a number of locations in the plant's buffer zone over areas ranging from about one-half to 168 acres. Figure 21 shows the locations of the spray fields in the eastern buffer zone (the areas outlined in bold and denoted by the numbers 216.1, 2, and 3) and their proximity to the ponds and creeks. Figure 22 shows an example of spray irrigation in progress.

In managing water quality at Rocky Flats, Rockwell was attempting to achieve a "zero-discharge" goal: no release of contaminated waste water downstream through the outfall. One of the key mechanisms for achieving this goal was planned to be a reverse-osmosis treatment facility, which would take STP effluent and further treat it, with its effluent recycled back to the Plant for non-drinking water use. This was to comprise the majority of the wastewater volume, with a small minority disposed of by spray irrigation. However, the reverse-osmosis plant never worked properly, and it was abandoned by the mid-1980s. "The system that was supposed to account for the vast majority of Rocky Flats' wastewater never really existed, and the Plant's wastewater was not reused."[99]

We have found no evidence that Rockwell made any contingency plans for the fact that its original plans for dealing with a large amount of wastewater were not going to be realized. Rather, Rockwell continued its practice of spray irrigating and discharging from the B-3 pond. Rocky Flats' NPDES permit required the plant to spray irrigate "in accordance with good engineering practices," and prohibited any discharges which would bypass Outfall 001.[100] Spray irrigation was an attempt to evaporate the water and reduce the need for discharges through Outfall 001. This practice began in the late 1970s and was continued through the early 1980s. In 1985, the largest spray field was closed, even

---

[99]    Plaintiff's Sentencing Memorandum, at 65.

[100]   Plaintiff's Sentencing Memorandum, at 64 and 80-81.

though the volume of water to be disposed of by spray irrigation was increasing. After an
NPDES permit violation in October 1984, Rockwell revised its written procedure:
"Runoff from spray irrigation must be avoided... When runoff is observed the spray
irrigation operation will be ceased."[101]

Despite this written procedure, runoff problems began to be observed.  Figure 23
is a photo showing runoff over a frozen field in March 1987.[102]   Figure 24 shows columns
of ice, apparently formed over each sprayhead when operated at temperatures below
freezing.    Rockwell personnel and outside consultants all indicated that the spray
operation would not be able to handle the required volume of effluent.[103]

> Spray irrigation is not [a] feasible water disposal method in [Rocky
> Flats'] buffer zone due to the geology of the site.  It is recommended
> that alternatives to spray irrigation be pursued.
>
> ...

---

[101]   Environmental Analysis and Control, Control Procedure for Spray Irrigation of Nitrate Sump Water,
EAC-C-13, November 12, 1984.

[102]   The attached photograph is several photocopy generations from the original.  We are attempting to
obtain a better copy.

[103]   "[East Spray Field might not be able to] accommodate the existing water volumes without some
sheet surface flows."

   -- B-3 Spray Irrigation: Background/Alternatives, G. L. Potter, Rockwell International, December
   5, 1986.

"DOE identified an NPDES Permit violation due to run-off flowing directly into Woman Creek ....
Rockwell did not have an adequate system of monitoring in place, and failed to act properly when
the issue was brought to their attention."

   -- DOE CPAF evaluation for October 1, 1986 to March 31, 1987, quoted in Plaintiff's Sentencing
   memorandum, at 90.  Original document being sought.

"[N]either of the two sites considered for the relocated spray irrigation field will adequately absorb
the quantities of water generated .... [A Colorado School of Mines] model indicates that there are no
suitable sites on plantsite to accept the water.  (The existing site has been in violation of current
permit several times in the recent past.)  Applying the treated water to any of these sites would, after
a short period of absorption and percolation through soils, result in *essentially discharging the
treated effluent directly offsite*, a direct violation of current permits."

   -- Alternate Spray Irrigation Site, Internal Rockwell Letter from G. Williams to C. Bader,
   December 7, 1987.

Neither site [considered for spray irrigation] can handle one-sixth of
sewer plant effluent/year without excessive surface runoff problems into
adjacent drainages.[104]

It is recommended that alternatives to spray irrigation be investigated,
or that only a fraction of the 80 million gallons of treated sanitary waste
water be spray irrigated.[105]

In light of these warnings that spray irrigation would not be adequate to dispose of
the waste water accumulating in the pond, Rockwell did consider alternatives, such as
evaporative towers and revising existing plumbing and piping so as to use treated pond
water onsite for toilet flushing and other suitable applications.[106] Rockwell rejected these
alternatives as not cost effective.[107] Instead, Rockwell planned to delay, to apply for a
revision in eighteen months at the time of permit renewal, and if necessary to release waste
water through the outfall under a clause in the permit allowing direct discharge in times of
freezing temperatures or when "adequate engineering practices will not allow spray
irrigation."[108] Rockwell nevertheless continued to spray irrigate the majority of plant
wastewater. Recommendations for containing the runoff from spray irrigation also went
unheeded:[109]

(March 1985)
Runoff water from the spray irrigation system from Pond B-3 may be
entering Mower Reservoir or Standley Lake via Woman Creek.

---

[104]    Spray Irrigation at Rocky Flats, G. H. Setlock, Rockwell International, December 11, 1987.

[105]    Ground-water Modeling of Impacts of Proposed Spray Irrigation, S.S. Papadopulos & Associates,
Inc., December 1987, at 11.

[106]    Alternate Spray Irrigation Site, supra.

[107]    "Q. Are there any [alternatives] that you know of; such as, for example, the alternatives on the
recommendations page, the last bullet, discharge around Great Western, aggressively pursue water
minimization at Rocky Flats Plant, construction of holding pond, twenty million gallons, replumbing
plant for water recycle, reverse osmosis plant use, scope/cost estimates for evaporative towers or
other innovative technologies?
A. Right. We were looking at those alternatives.
Q. So there were other ways to achieve zero discharge other than using spray irrigation?
A. Right. But they turned out not to be cost effective."
  -- Setlock deposition, at 394.

[108]    Alternate Spray Irrigation Site, supra.

[109]    Quoted in Plaintiff's Sentencing Memorandum, at 88. Original document being sought.

...
Provide engineering support to survey a ditch line to divert runoff water
to the south interceptor ditch and/or Pond C-2.

...
The proposed collection ditch is necessary to prevent a NPDES
discharge permit violation.

(February 1987)
Will recommend to Mgmt to build culvert that will intercept water and
send it to Pond C-2. Note: This recommendation was made 2 yrs ago,
but was not accepted.

DOE inspector Candice Jierree provides a graphic description of Rockwell's disregard for
proper procedure:

Q. ... was there any other time when the spray irrigation incident [sic]
was not turned off in a timely manner?
A. Yes. In the winter when you could ice-skate on the land because the
water kept going and going and going even though it was frozen over,
there is no land to absorb it, it would just run off.[110]

The spray irrigation situation again demonstrates Rockwell management's failure
to foresee problems, take corrective action, or adjust their plans and practices. Rockwell
management failed to adapt to the problems with the reverse-osmosis facility. It could
have implemented other alternatives, such as improved treatment. It considered and
rejected other alternatives based on their alleged lack of cost effectiveness. If the water
had been cleaned up to meet the NPDES criteria, there was no reason that Rockwell could
not simply discharge it directly from the B-3 pond. A Rockwell manager noted that "in the
past several years, NPDES technical violations are increasing at an alarming rate."[111]
Evidently, because the treated water would *not* meet the NPDES criteria, and to avoid
NPDES violations from the discharge, Rockwell chose to continue and even increase
spray irrigation under conditions in which it knew runoff would occur.[112]    This

---

[110] Jierree deposition, at 203.

[111] National Pollutant Dishcarge [sic] Elimination System (NPDES) - Rocky Flats Compliance/
Responsibility Issues, Rockwell letter from G. Setlock to W. Kirby, May 22, 1989.

[112] "Rockwell (a) spray irrigated more effluent from Pond B-3 than the East Spray Field had capacity to
properly dispose of by evaporation and/or infiltration; (b) spray irrigated during times when the
spray fields were saturated, during sub-freezing temperatures, at night and when snow and ice were
on the ground; and (c) spray irrigated over and adjacent to the 'East Trenches.'"
      -- Plea Agreement, at 23.

mismanagement led to a situation in which toxic or hazardous substances were released
into watercourses which lead to offsite drinking water sources.[113]

## D. Other Issues Not Developed in the Criminal Investigation

In addition to the issues described above, which ultimately led to guilty pleas by
Rockwell in 1992, we have identified additional issues which, although not showing a
definitive criminal violation, nevertheless point out a continuing and widespread pattern of
management deficiencies and negligence. These issues are briefly elaborated in this
section. In our judgment, the most significant of these was the build-up of residues in
conjunction with poor safety practices, leading to an increased risk of an accident causing
an uncontained release of plutonium.

The laxness and deficiency of Rockwell's management contrasted sharply with
stated Department of Energy policy. James Watkins, the Secretary of Energy during the
last year of Rockwell's operation, emphasized the potential for harm and the necessity of
good safety practices to prevent accidents before they happen.[114]

### (i) Beryllium Exposure

Rocky Flats used a number of hazardous substances in addition to radionuclides.
Beryllium is a key component of nuclear weapons design and manufacture, and weapons
parts were fabricated at Rocky Flats since 1958. Beryllium is a probable inhalation
carcinogen, and chronic or acute exposure can result in lung disease. A primary safety
concern is inhalation of fine beryllium dust.[115]

The U.S. investigation turned up evidence that beryllium machining was
generating beryllium dust and exposing workers.[116]

---

(continued)

[113]  "Rockwell was aware and otherwise knew that its spray irrigation practices caused substantial runoff
into the North Walnut Creek drainage ... the South Walnut Creek drainage ... and the Woman Creek
drainage."
-- Plea Agreement, at 24.

[114]  Deposition of James D. Watkins, Cook v. Rockwell, April 22, 1996.

[115]  It is our understanding that other plaintiff expert reports address offsite beryllium exposure and its
health consequences.

MR. WOLPE: These workers were exposed over many years to a
material that was known to be highly toxic by the managers of this
project; is that correct?

MR. LIPSKY: There was awareness, yes by the managers.
...
MR. WOLPE: But even before the [National Jewish Hospital] testing
occurred, it was understood by those who were responsible for
overseeing this manufacturing process that the beryllium was indeed a
toxic product; had these elements of toxicity and would, in fact, produce
physical harm?

MR. LIPSKY: Yes. Yes.[117]

DOE had issued an order mandating that OSHA standards apply to its facilities,
but DOE had neglected to publish the order in the Federal Register as required. Since the
rule was not properly promulgated, the US Attorney's Office believed there was not an
adequate basis for criminal charges. Therefore, the federal investigation did not further
pursue the beryllium exposure issue.

Up to 2,500 workers were potentially exposed, and DOE provided a grant to the
National Jewish Hospital in Denver to run tests on the workers. At least 26 workers have
been diagnosed with chronic beryllium disease since 1984.[118]  One was a secretary who
was exposed when her work area was renovated in February 1989. After duct work was
opened, she developed itching and raised lesions on her scalp which she attributed to the
dust generated from the renovation.

(continued)
[116] "Anyway, before the search we were told about the problem that beryllium parts were machined
without the use of a cutting oil. So the dust and the chips were unabated and went up into the air.
People were not necessarily wearing respirators, and they were breathing this beryllium."
-- Testimony of Jon Lipsky, Hearings, supra, at 663.

[117] Hearings, supra, at 664. Mr. Wolpe is Congressman Howard Wolpe, Chair of the House
Subcommittee on Investigations and Oversight.

[118] K. Kreiss et al., Epidemiology of Beryllium Sensitization and Disease in Nuclear Workers, Am. Rev.
Respir. Dis, v. 148, 1993, at 985-991.
According to the Rocky Flats Crossroads, Vol. 2, No. 18; September 9, 1996, 62 cases of chronic
beryllium disease have now been diagnosed among current and former Rocky Flats employees, and
117 other employees have been diagnosed as sensitized, implying that they are at significant risk of
developing chronic beryllium disease.

A DOE Special Assignment Environmental Team review in August 1989 found that the Rocky Flats procedures for monitoring beryllium emissions did not comply with either the requirements of the EPA National Emissions Standards for Hazardous Air Pollutants (NESHAPS) or the Colorado Air Pollution Regulations.[119]    This review recommended supplementing the existing monitoring to determine the maximum emissions in a 24-hour period from the beryllium monitoring and processing areas. Rockwell had failed to determine what monitoring was required to assure compliance with federal and state law.

A recent review for the Department of Energy compared the management of beryllium exposures at Rocky Flats, two other sites in the US nuclear weapons complex (Oak Ridge Y-12 plant and Lawrence Livermore National Laboratory), and a site in the United Kingdom (Atomic Weapons Establishment Cardiff Facility).[120]    The authors concluded that:

> The Rocky Flats plant implemented significantly less controls on beryllium processing than the three [other] facilities. In addition, records were less available, management and industrial hygiene staff turned over regularly, and less control was evident from a management perspective.[121]

Compared to other facilities in the US and United Kingdom weapons complex, Rocky Flats was significantly worse in its management of exposure to beryllium.

## (ii) Radiological Safety

Radiological safety and practices have been criticized over a period of time by outside auditors and by Rockwell itself. A number of Technical Safety Appraisals (TSAs) have been conducted on a plant-wide and individual building basis, by DOE Headquarters and by Rockwell. In one instance, in October 1988, the safety margins in Building 771 became so inadequate that DOE Albuquerque Operations ordered the shutdown of the

---

[119]  Assessment of Environmental Conditions at the Rocky Flats Plant, Golden Colorado, Special Assignment Environmental Team, U.S. Department of Energy, August 1989, at 2-5.

[120]  J.S. Johnson, K.L. Foote, J.W. Slawski, and G.C. Cogbill, Estimation of Beryllium Exposure Assessment and Control Programs at AWE, Cardiff Facility, Rocky Flats Plant, Oak Ridge Y-12 Plant and Lawrence Livermore National Laboratory, Phase I Report, UCRL-ID-120878, June 1995.

[121]  Ibid., at 12.

Rockwell Management of Wastes, Residues, and Risks
D. W. North and R. J. Budnitz
November 21, 1996     Page 46

building the next day.[122]    Radiation protection has been a recurring problem noted by successive TSAs in September 1986, January 1987, March 1988, and September 1988.[123] In particular, the March 1988 TSA noted that

> ... the large number of repeat concerns from previous technical safety appraisals of Rocky Flats facilities found in this appraisal (39) raises questions regarding management's full commitment to, and/or involvement with, safety.
>
> ...
>
> The pervasiveness of the deficiencies in the radiological protection program are symptomatic of a program that has not had adequate management attention.[124]

Rockwell management failed to instill a priority on safety commensurate with the potential consequences.    Rockwell's own self-assessment reached much the same conclusion:

> Management at Rockwell - Rocky Flats Plant is not fully committed to the safety and health of its workers *and the public among whom they live nor the environment in which they live.*  Management at the Director level and above is committed to safety of the plant and workers ... They are not necessarily committed to meeting all the requirements, standards and criteria promulgated by DOE.
>
> ...

---

[122]   GAO, Award Fees at Rocky Flats Do Not Adequately Reflect ES&H Problems, RCED-90-47, October 1989, at 16. See also the deposition of Albert Whiteman, at 174.

[123]   Technical Safety Appraisal for Building 707, DOE Headquarters, September 1986. Technical Safety Appraisal for Building 771/774, DOE Headquarters, January 1987. Technical Safety Appraisal for Building 776/777, DOE Headquarters, March 1988. Overview Technical Safety Appraisal, Rockwell International, September 1988.

[124]   Building 776/777 TSA, supra, at 4.

"The lack of a positive safety attitude at all levels within the organization was observed; this was judged to be the most significant concern in the personnel protection area.

...

A good share of the deficiencies found by the appraisal team indicates a breakdown in the classical management responsibilities to organize, direct, plan and assess the safety of the activities."
    -- Ibid., at 4, 8.

> All Building Managers interviewed portrayed their primary function to
> be meeting production goals but safety as an important, but lower,
> priority.[125] (emphasis added)

Rockwell's occupational safety and health performance also points out the
deterioration in safety practices. An analysis of Rockwell's performance for 1981-1986
notes that "Rockwell's safety and health performance is significantly higher (worse) than
the Department's production contractor averages for the same period."[126]     This same
document noted that the performance "has degraded since 1984" so that by the time of the
analysis, Rockwell was ranked *last* among 15 DOE production contractors.

Albert Earl Whiteman, who had management responsibility for Rocky Flats from
the DOE Rocky Flats Area Office, had recognized shortly after his arrival in the spring of
1986 the need for closer oversight of Rockwell by RFAO with regard to safety and
facilities operations.[127] Rockwell failed to correct deficiencies that had been clearly
apparent for years prior to the TSAs and the FBI investigation.

### (iii) Groundwater Contamination

During the course of operations during both the Dow and Rockwell tenures as
contractor, routine and nonroutine releases of hazardous and radioactive materials
occurred, which transported contaminants into contact with the soil and into groundwater
underneath the site.[128] In fact, groundwater is known to be contaminated in many
locations, as shown in Figure 25.[129] As one example, the pondcrete issue came about after
the solar evaporation ponds were ordered closed and drained, because they were found to

---

[125]  Rockwell Overview TSA, *supra*, at 3.

[126]  Analysis of the Occupational Safety and Health Performance of Rocky Flats Plant/Rockwell
International 1981-1986 (thru [sic] 3rd quarter), R. Lee, revised by R. Eigher, January 21, 1987.

[127]  Whiteman deposition, at 177-8, citing Factual Accuracy Comments for Draft Report of the Rocky
Flats Safety Performance Review, letter from A. Whiteman to B. Twining, December 22, 1988.

[128]  "By the time ROCKWELL began operating Rocky Flats in 1975, it was well known that the [solar
evaporation] ponds were leaking and contaminating the surrounding groundwater."
-- Plaintiff's Sentencing Memorandum, at 51.

"Certain hazardous substances, radioactive mixed wastes, hazardous wastes, or constituents thereof
remain on, under, or near the facility, and have been detected in groundwater at the facility."
-- Compliance Agreement, at 7.

[129]  Accelerated Site Action Project, DOE, Draft Revision 1, February 1996. The boundaries of the dark
plumes shown represent 100 times Maximum Contaminant Levels.

be leaking into the ground. According to DOE, "[i]t is known that in the past some of the
contaminated groundwater and seepage reached North Walnut Creek and migrated
offsite."[130]  Other examples include chlorinated hydrocarbon solvents that were routinely
dumped by Dow onto the ground just outside Building 444 up until 1970, and a 1,000
gallon leak of radioactive liquid from a process waste line southeast of Building 774 on
July 21, 1980.[131]  There have been hundreds of incidents of leaks, spills, or dumping over
the plant's history.  At present, 178 Individual Hazardous Substance Sites (IHSS) have
been identified, each representing a location of known or suspected environmental
contamination.  Many of these contamination incidents involved liquids which migrated to
groundwater.

The surficial soil underneath Rocky Flats is known as the Rocky Flats Alluvium,
comprised of a topsoil layer underlain by sand, silt, clay, and gravel up to a depth of about
100 feet. This alluvium is permeable and allows unconfined groundwater flow toward the
east, and toward the stream drainages. The alluvium thins toward the east, in the direction
where most of the nearby population is located. The groundwater flow emerges to seeps
along the edges of valleys and stream channels.[132]  Due to this topography, contamination
in shallow alluvial groundwater underneath the site can reach surface waterways and
migrate to offsite surface water bodies such as Standley Lake and the Great Western
Reservoir.

Underneath the surficial alluvium lie the silt Arapahoe Formation and the clay
Upper Laramie Formation, down to a depth of approximately 800 feet. Below these lies
the Lower Laramie Formation, which is permeable sandstone and forms a part of the
regional Laramie-Fox Hills aquifer.     The Upper Laramie Formation is relatively
impermeable and would not normally be expected to allow migration of surface
contaminants to the deep aquifer; however, the presence of faults could potentially
provide a migration pathway.

Studies and monitoring conducted to date show the presence of several
contaminated groundwater plumes in the surficial Rocky Flats Alluvium.[133]     The

---

[130]   Historical Release Report for the Rocky Flats Plant, DOE, June 1992, at 000-14.

[131]   Ibid., at 400-9 and 700-50.

[132]   This discussion is adapted from Final Phase I RFI/RI Work Plan (Alluvial) for Operable Unit 2,
DOE, August 19, 1991, at 1-16.

[133]   Footnote 129, supra.

maximum depth of contamination is approximately 120 feet.[134]    In late 1988, the GAO
assessed the situation as follows:

> In 1986, a Rockwell monitoring report revealed numerous types of
> contaminants in the groundwater at Rocky Flats Plant.
>
> ...
>
> Levels of solvents in the groundwater were as high as 1,000 times the
> drinking water standards at some locations. ... Radioactive material has
> been detected in the groundwater at levels above EPA's drinking water
> standards.
>
> ...
>
> Existing monitoring wells and data were inadequate to accurately define
> the horizontal and vertical extent of groundwater contamination. RFP is
> conducting a major effort to install additional groundwater monitoring
> wells.[135]

The large number of spill and leakage incidents, coupled with the dangerous nature
of the constituents, should have led Dow and Rockwell to plan for careful monitoring and
prompt response whenever an incident occurred. Instead, the evidence shows that
monitoring was inadequate, and many contamination or release incidents have no
documented cleanup response at all.


(iv) Safeguards and Security

With the large inventory of plutonium and other special nuclear material at Rocky
Flats, the safeguards and security at this facility should have been outstanding. Instead,
nuclear materials safeguards and security were rated "marginally satisfactory" in 1985 and
"unsatisfactory" in two successive reviews (1989 and 1990) by the Albuquerque
Operations Office of DOE. "Unsatisfactory" is the *lowest possible rating* in DOE's
evaluation system. In a summary of the 1989 evaluation, DOE stated that

> Due to Rockwell's failure to address prior survey concerns and the
> deterioration of the inventory program ... AL does not have sufficient
> confidence that Rockwell would detect missing SNM in a timely
> manner. Therefore, AL considers the inventory program unsatisfactory.

---

[134]   Consortium for Environmental Risk Evaluation (CERE), Health and Ecological Risks at the U.S.
Department of Energy's Nuclear Weapons Complex: A Qualitative Evaluation, Interim Risk Report,
March 1995, at 5-23. (D. W. North and N. Chan were among the many contributors to this report.)

[135]   GAO, Summary of Major Problems..., supra, at 16.

...

It is apparent from the observation of this physical inventory that there
was insufficient consideration and attention given to safeguards
requirements and necessities. *The attitude of Rockwell management
toward safeguards must be improved immediately.*[136] (emphasis added)

Despite these serious concerns and warnings, the "Unsatisfactory" rating was
repeated in the 1990 evaluation. This time, the Safeguards and Security assistant manager
noted "a serious deterioration of the program," and stated that Rocky Flats had "a serious
breakdown in the defense-in-depth of the program and renders the facility unacceptably
vulnerable to the theft and diversion of SNM."[137]

Failures by Rockwell to comply with DOE policies and to accomplish adequate
protection of special nuclear material at Rocky Flats were serious breaches in Rockwell's
obligation to protect the health and safety of United States, including properties adjacent
to the Rocky Flats Plant.

## (v) Housekeeping and Fire Risk

During the Rockwell period, crowded facilities, extensive amounts of waste and
litter, and failure to develop a culture of cleanliness were important issues. They, along
with other pervasive fire safety issues,[138] led to the increased risk of fires and a greater

---

[136] Significant Inventory Comments, 1989 Annual Safeguards Survey, Rocky Flats Plant, Facsimile
transmission from C. Cruz, DOE-AL to N. Roberts, RFO, July 10, 1989.

[137] Rocky Flats Plant Nuclear Safeguards Survey Report AL No. 095, Letter from R. Inlow to R. Nelson,
August 21, 1990. An Albuquerque Operations Office summary of the survey made a number of
recommendations to improve security, including "implement[ing] a strict two-person rule within all
material access areas." This implies that heretofore this common-sense, fundamental principle was
not consistently being applied.

[138] "DOE Headquarters identified pervasive health and safety problems at the Rocky Flats Plant
involving inadequate fire protection .... Fire doors had ventilation holes drilled in them in obvious
disregard for fire safety. This would be inexcusable at any DOE nuclear facility, but a disastrous
plutonium fire occurred at Rocky Flats in 1969."
-- Health and Safety ..., June 1989, supra, at 3.

"We recommend that this Rocky Flats SEP [Systematic Evaluation Program] address all outstanding
current safety uses and include ... effects of severe internal events, with particular emphasis on fire."
-- Defense Nuclear Facilities Safety Board, Recommendation 90-5, May 24, 1990, in 55 Fed. Reg.
21429.

potential severity if a fire should break out. Figure 26 shows some examples of poor housekeeping and accumulation of combustible materials noted by DOE inspectors.[139]

Given the history of major fires at the plant, Rockwell knew or should have known that a major fire would have the potential for a breach of containment and significant offsite consequences, and should have taken all appropriate steps to minimize this possibility.[140] Rockwell also knew that a large amount of plutonium-containing materials and residues were located throughout the major plutonium processing buildings. However, the Technical Safety Appraisals indicate that while the crowding and fire loading problems were known for a number of years,[141] and despite repeated recommendations for correction, management failed to eliminate these increased risks.[142]

---

[139]  The attached photograph is several photocopy generations from the original. We are attempting to obtain a better copy.

[140]  "The principal risks to the public from RF are associated with external events, such as earthquakes and high winds, or with fires."
  -- ACNFS, Ahearne to Watkins letter, November 30, 1989, supra.

[141]  "Recommendation: Eliminate the use of hallway areas for the storage of combustibles ...."
  -- Building 707 TSA, September 1986, supra, at 60.

"The major technical problem in Fire Protection concerns reduction in risks from accidental fires."
  -- Ibid., at 3.

"Building 371 ... was observed to be one area that needs improvement in the general storage of materials in hallways and elsewhere.
...
Building 776: Excessive combustible materials are stored in the Waste Processing and Packaging area."
  -- Rockwell Overview TSA, September 1988, supra.

"The inability to control, store and dispose of contaminated wastes, obsolete equipment, maintenance supplies and debris efficiently and expeditiously is causing and compounding safety related problems in these buildings [707 and 771]."
  -- J. Henderson, Area Reviews of 707 and 771, August 19, 1988, reproduced in Hearings, supra, at 711.

"The aisle space in [Building 884] is insufficient to allow unobstructed movement of personnel, fire protection equipment, etc., in the event of an emergency. This deficiency was noted in an CDH inspection of June 13-17, 1988, ... and had not been corrected by July 6, 1989."
  -- Assessment of Environmental Conditions, supra, at 5-11.

[142]  Building 776/777 TSA, supra, at 1 and II-198.

The principal hazards presented by operations in this facility are a fire [and radiation, and dispersal of radionuclides].

...

There were many cardboard boxes throughout the facility.    These combustibles represent a significant fire loading which increase the fire severity potential in these areas.   ... There is no management control system that prohibits the unnecessary use or storage of combustible materials in Bldgs. 776/777.

### (vi) Plutonium Residues and Fire Risk

As described in Section IIB above, effective in May 1987, DOE's final "By-product Rule" applied RCRA to all mixed waste.    However, "residues" were still excluded, if the plutonium-containing waste were to be processed to recover the plutonium.    These residues were stored in anticipation of a recovery process for the plutonium. Lean residues such as ash, combustibles such as rags, ceramics, and insulation contain low concentrations of plutonium (an average of 2.9 percent by weight for solid lean residues).[143]    In contrast, rich residues are those which contain high concentrations of plutonium (as high as 99 percent) in materials such as plutonium oxides and site returns from retired weapons.

Plutonium residues pose special risks.[144]  Plutonium metal fines are pyrophoric, and can spontaneously ignite when exposed to oxygen in the air. Plutonium metal can also react with water or water vapor to form plutonium oxide hydride, which is more pyrophoric than the pure metal. Plutonium can also react with oxygen to form plutonium oxide, which has a volume approximately seven times that of the original metal, and thus could volumetrically expand and rupture a container. Figure 27 shows an example of how degraded packaging could allow plutonium oxide formation on the surface of plutonium metal. In addition, radioactive decay generates alpha and gamma rays which decompose water and organic materials (e.g. plastics) and can generate highly flammable and explosive hydrogen gas. In addition to flammability, gas generation can also pressurize

---

[143]  GAO, Removing Plutonium Residues from Rocky Flats will be Difficult and Costly, RCED-92-219, September 1992, at 12.

[144]  This discussion is summarized from

- DOE, Plutonium Working Group Report on Environmental, Safety and Health Vulnerabilities Associated with the Department's Plutonium Storage, DOE/EH-0415, Vol. 1, November 1994, at 8.

- W. Conner, EG&G, Evaluation of Residue Drum Storage Safety Risks, March 23, 1994, at 8-11.

Rockwell Management of Wastes, Residues, and Risks
D. W. North and R. J. Budnitz
November 21, 1996    Page 53

sealed drums and potentially rupture them. Recently, a large number of waste and residue
drums at Rocky Flats have been vented to attempt to eliminate this pressurization. An
example of a drum being vented by this procedure is shown in Figure 28.

The magnitude of residue storage at Rocky Flats is staggering. In 1992, a GAO
audit stated about 213,000 pounds of solid lean residues containing about 6,100 pounds of
plutonium, and 14,000 liters of liquids containing 200 pounds of plutonium are stored at
Rocky Flats.[145] The solid residues are typically stored in 55-gallon drums. The liquid
residues are stored in tanks and in over 400 4-liter plastic bottles, which are located in
gloveboxes or in 55-gallon drums. The total plutonium inventory in September 1994 was
12.7 metric tons (almost 28,000 pounds) at Rocky Flats, meaning that approximately
22,000 pounds of plutonium are in the form of rich residues.[146]    Figure 29 shows the
breakdown graphically.

Many of these residues were packaged in various configurations suitable for short-
term storage. One of these was shown previously in Figure 27, which involved placing
plutonium metal inside a plastic bag, which was then placed inside a metal can. Another
common configuration, shown in Figure 30, involved placing plutonium inside a metal can,
then inside two layers of plastic bags, then inside a larger metal can. Many of these
configurations are not suitable for long-term storage, because the plutonium may radiolyze
the plastic bag, causing both a loss of integrity and creation of hydrogen gas.

As mentioned above and in the expert report on fires in the Dow era (R. Budnitz,
"Fires"), plutonium fires have been a recurring occurrence and concern at Rocky Flats.
The Advisory Committee on Nuclear Facility Safety noted an increase in the number of
fires, both inside and outside of gloveboxes, toward the end of the 1980s, as shown in
Figure 31. A large fire, fed by combustibles and plutonium scrap and residue, could
potentially involve many barrels of residues and liberate enough energy to breach
containment and release large amounts plutonium to the external environment.

Over the last few years, several studies have reached similar conclusions, pointing
out the risks and vulnerabilities associated with residue storage at RFP, especially with
regard to fires. One of DOE's Technical Safety Appraisals stated that

> Fire separators and glove box enclosures with installed heat detectors
> are *marginally satisfactory* to eliminate the potential for an *off-site*

---

[145]    GAO, Removing Plutonium Residues ..., supra, at 12-13.

[146]    Plutonium: The First 50 Years, DOE, February 1996, at 20.

*release* of toxic chemicals and radioactive materials.[147]     (emphasis
added)

(We interpret the phrase, "marginally satisfactory," as implying a need for improvement,
rather than assurance that existing conditions are adequate for safety.)

A 1994 DOE Report ranked Rocky Flats Buildings 771 and 776 as the highest
vulnerability facilities across the whole DOE complex, and listed 5 Rocky Flats buildings
among the 9 buildings complex-wide having "high" or "highest" vulnerability, as shown in
Figure 32.[148] Also in 1994, a Defense Nuclear Facilities Safety Board (DNFSB) report
stated that "Rocky Flats has more unencapsulated plutonium than all other sites combined.
The DNFSB staff is convinced that Rocky Flats is also the one site with serious,
immediate problems in dealing safely with its inventory." The DNFSB report also pointed
out the threat of flammable gas generation in plastic bags, noting that if the bag were to
break and admit air,

... there will be an exothermic reaction as the hydride oxidizes, possibly
sparking and flaming, and the risk of a larger fire if combustibles are
nearby ... A great deal of plutonium scrap, some containing high
concentrations of both plutonium and americium, was also packaged
*without adequate consideration* of long-term chemical and radiological
effects... Many scrap packages are poorly vented. Any mishap that
results in the sudden introduction of air into such a container ... could
cause a fire or small explosion.... There are thousands of scrap
containers, mostly 55-gallon and 10-gallon drums, stored in several
different buildings. They are generally located in operating areas.[149]
(emphasis added)

---

[147]  Building 776/777 TSA, supra, at II-191.

[148]  DOE Plutonium Working Group Report Volume 1, at 23.

As of November 1994, Building 771/774 had over 2,600 packages of plutonium-containing
materials, including 380 containers with more than 8,000 liters of plutonium solutions. Building
776/777 had over 6,000 items of scrap/residues or waste materials. Sitewide, much of the plutonium
is in contact with plastic packaging; of the 27,679 packages of plutonium-containing material stored
sitewide, 12,935 had plutonium in direct contact with plastic.

[149]  Defense Nuclear Facilities Safety Board, Plutonium Storage Safety at Major Department of Energy
Facilities, April 14, 1994, at 2-3.

And in March 1995, another DOE report commented on the fire hazards at Rocky
Flats:[150]

> Large internal fires and explosions in Buildings 559, 707, 771, 776, and
> 779 could breach confinement through failure of the ventilation systems
> or structures. ... These buildings have over 8,000 drums with plutonium
> scrap/residues that contain combustible materials, increasing the
> likelihood of energetic releases of plutonium during building fires or
> explosions.

Figures 33, 34, and 35 show that those many thousands of drums containing plutonium
residues, some containing combustibles, are packed into almost every conceivable space in
the major buildings at Rocky Flats. Note in particular that barrels are pressed up against
file cabinets in office areas, and up against glovebox lines in operating areas.

### (vii) Rockwell's Failure in Managing Plutonium Residues

Rockwell's plans to recycle the residues went awry beginning in the early 1980s. A
residue storage buildup was anticipated, but Rockwell did not develop a plan to manage
the residues, even after the issue was explicitly pointed out by DOE.[151] The GAO noted
that

> The processing of residues at Rocky Flats to recover plutonium did not
> keep pace with the generation of residues after the early 1980s. Large
> quantities of plutonium residues ended up in storage because the plant's
> processing capability and capacity declined as facilities aged. In the
> early 1980s, DOE built a new facility for processing residues to replace

---

[150]   DOE, Plutonium Vulnerability Management Plan, DOE/EM-0199, March 1995, at 7.

[151]   A 1985 DOE study (based in part on site-specific information from Rockwell) noted a buildup of
over 124,000 kg of plutonium-contaminated residues, containing an estimated 7,400 kg of
plutonium. The study noted that "many of the low-level residues ... will continue to accumulate ..."
and that "Prior to [the redesigned] Building 371 startup in FY 93, total processing capability at RFP
alone is insufficient to prevent continued buildup of plutonium in residue backlogs ...."

> -- Long Range Recovery of Plutonium Scrap in the DOE Defense Programs Complex, DOE
> Office of Nuclear Materials Production, September 1985.

Also in 1985, DOE's Performance Evaluation stated "The drum backlog continues to be an area of
concern. ... the present inventory ... is very near the plant storage capacity. ... [A]dditional emphasis
in reduction of drum backlogs is needed."

> -- DOE Performance Evaluation Report for April 1, 1985 through September 30, 1985, at 5.

facilities built in the 1950s; however, this facility has never operated as planned because of design, materials, and mechanical problems.[152]

Building 371, the new plutonium recovery facility, never went into full operation.[153]    Rockwell and DOE then developed a plan to use the Building 771 incinerator to "recover" plutonium. Rockwell and DOE believed that this recycling process was outside the scope of RCRA,[154] but Rockwell did not plan for how to manage plutonium residues if this belief should prove incorrect. A court rejected DOE's argument in 1990, RCRA did apply, and so the incinerator was not used, presumably because the incinerator could not meet the applicable standards. The U.S. investigation concluded that, at least since 1980, the incinerator was never used to recover plutonium.[155]    By failing to do contingency planning and naively assuming that an adequate plutonium recovery process would eventually be developed, Rockwell allowed these dangerous plutonium residues to accumulate. Rockwell evidently made no contingency plans for long-term storage or other actions if recovery of plutonium from the residues became infeasible.[156]

In 1985, a DOE review concluded that the processes currently in place were "insufficient to prevent continued buildup of plutonium in residue backlogs."[157]    Four years later, another DOE review echoed exactly the same concern:[158]

---

[152]   GAO, Removing Plutonium Residues..., supra, at 9.

[153]   Albert Whiteman stated in his deposition that it became known during the 1983 time period that Building 371 was not going to work. Whiteman deposition, at 47.

[154]   "The apparent driving force behind Rockwell's and DOE's opposition to RCRA regulation for the Building 771 incinerator and residues was that (a) the incinerator did not meet the requirements of a RCRA incinerator and could only be upgraded to a RCRA-quality incinerator at great expense, if at all; and (b) storage of residues (if RCRA-regulated) would require a RCRA permit or interim status, would require more storage space and would be more expensive. The 'residue' classification of many materials seemed calculated to allow long-term non-RCRA storage."
-- Plaintiff's Sentencing Memorandum, at 26.

[155]   Ibid., at 27.

[156]   W. Conner, Evaluation of Residue Drum ..., supra, at 1.

[157]   DOE, Long Range Recovery ..., supra, at 26.

[158]   Solid Waste and Residue Management Systems at Rocky Flats Plant, DOE Operations and Management Assessment Team, July 25, 1989, at 26, 19.

For instance, there are several residues which have <u>never</u> been processed at Rocky Flats and have been stored for decades. No plans are in place to build or develop practical processes for them. ... One member of the contractor management team indicated that operations within residue recovery and residue storage have been "at the ragged edge (of capacity) for the last 12 years." (emphasis in original)

The DOE Special Assignment Environmental Team and other DOE inspectors agreed:

... there is *no approved management plan* at the Rocky Flats Plant to reduce the large backlog of over 4,600 drums of residue on-site. Several hundred drums of residue are created monthly. Some residue drums have been in storage for more than ten years. Reduction of residue backlog has always been relegated to a *much lower priority* than production of metal.... Space is limited and the site has almost reached its storage capacity. *Definite long-range plans are needed...*[159] (emphasis added)

The process and support areas are heavily congested with radioactive waste containers, most of which were filled more than a month ago. Controls for storage of radioactive waste are less rigorous than those for hazardous waste. In some areas workers are forced by the congestion to lean against equipment and walls to get around. Several glovebox lines are surrounded by filled drums.[160]

Rockwell's pattern of short-sighted management is clearly shown in its handling of residues. Rockwell management failed to take into account factors which might invalidate its plans for plutonium recovery and recycling, and in doing so, it allowed very large quantities of pyrophoric and flammable materials to accumulate in inappropriate packaging configurations. Fourteen tons of plutonium, combined with large quantities of combustibles, yield a significant potential for another large fire, a breach of containment, and additional offsite releases of plutonium with serious health and environmental impacts.

---

[159]   Assessment of Environmental Conditions, <u>supra</u>, at 5-47.

The team also noted poor storage conditions:
"no clear aisle spaces are maintained ..."
"drums are only checked for nuclear safeguards purposes and are not inspected for potential problems such as corrosion, leakage, or bulging ..."

[160]   J. Henderson, Area Review of Building 771, September 29, 1988, reproduced in Hearings, <u>supra</u>, at 731.

Given the history of major fires at Rocky Flats, when the plans for plutonium recovery from lean residues were not realized, Rockwell should have taken steps to minimize the risk by giving a high priority to reducing the amount of residues or to preparing them for possible long-term safe storage.[161] It did not.

## (viii) Failure to Control Combustible Materials in Plutonium Processing Buildings

One of the major contributing factors in the 1969 fire was the extensive use of flammable Benelex and Plexiglas materials in gloveboxes in the plutonium processing buildings. The danger of this usage was recognized in the early years of the Rockwell era, and plans were made to replace the old gloveboxes with new ones. A new facility, Building 371, was to be constructed for plutonium processing.

> In general, the glove boxes in 371 are of double-walled construction, using formed and welded stainless steel plate. ... The space between the walls is filled with water to create a radiation shield. [162]

> The major structural components of glove boxes and process equipment are specially chosen for their resistance to fire, radiation, and corrosive chemicals. In most cases, the material is stainless steel. Glove box inner windows are made of laminated or wire safety glass. Electrical wiring is housed in conduits or sealed raceways. The use of combustible plastics is minimal.[163]

> Combustible construction materials are essentially excluded from the design of this facility. This, in conjunction with sprinkler systems and other fire-suppression systems, precludes the possibility of a major fire.[164]

---

[161]   Repackaging of plutonium for long-term storage is expected to be completed in 2002. Stabilization activities, including repackaging, removal of holdup, residues, and wastes, is not expected to be completed in the major plutonium processing buildings until at least 2015.

-- DOE, 1996 Baseline Environmental Management Report, June 1996, at Colorado-24. We consider these dates optimistic, given the budgetary situation at Rocky Flats. See the Deposition of Mark Silverman, Cook v. Rockwell, July 23-24, 1996.

[162]   Building 371 Final Safety Analysis Report, Rockwell International, July 1981, at 4-66.

[163]   Ibid, at 4-269.

[164]   Ibid, at 17-2.

But Building 371 did not work. It was never used for plutonium processing, but only for storage. The old buildings, such as 771, with old gloveboxes and other equipment continued to be used for plutonium processing.

Were the combustible plastic components in the old glove boxes replaced and other sources of combustibles appropriately minimized? The importance of this issue is recognized in the 1976 TERA Report. This report states that, "... most production areas have eliminated extensive Plexiglas and Benelex shielding" and "audits are required to assure that ... day to day operations do not introduce quantities or combustibles and contaminants which could increase the probability of a fire and its severity beyond the capability of protection and control systems."[165]   "The small quantities of Benelex shielding which remain in production areas have a minimum protection of intumescent paint which covers area surfaces. Intumescent paint is a special fire retardant coating which expands when heat is applied to provide an insulating protection to the surface of the material." [166]

We note that the title of the TERA Report is a Fire Safety Design Review. It seems like an excellent plan for reducing the flammable plastic materials in the gloveboxes and minimizing the use of in-process combustible materials. We have not as yet been able to verify from a detailed inventory that the large quantity of flammable plastics in old gloveboxes was replaced. The discussion in the Building 771 FSAR, prepared a decade later, gives the impression that the TERA report recommendations were implemented, but the statements include qualifiers: "Construction materials are noncombustible or fire resistant *wherever practicable.* ... *Major* structural components of gloveboxes and process equipment are made of noncombustible materials." (emphasis added)[167]    Our investigation on the extent of combustible materials in gloveboxes and other equipment in the plutonium processing buildings is continuing. However, what we have found so far indicates that the statements above from the TERA report and the Building 771 FSAR

---

[165]    Fire Safety Design Review: Rocky Flats Plant, TERA Corporation, Berkeley CA, December 1976, at 11. Similar language appears in the Draft Environmental Impact Statement for Rocky Flats Plant Site, ERDA-1545-D, September 1977, at 3-51 under a list of "Improvements Subsequent to 1969 Fire":
"Major combustible loading was almost entirely eliminated by removal of large quantities of combustible radiation shielding. Removal was made possible by discontinuing the use of glove boxes for storage. Combustibles are restricted inside glove boxes, and all production materials [plutonium] are now enclosed in tight-fitting containers."

[166]    Ibid, at 12.

[167]    Building 771 Final Safety Analysis Report, Rockwell International, June 1987 with October 1988 revisions, at 5-34, 5-35.

about the replacement of the combustible plastic shielding are misleading and incomplete.
Substantial quantities of the Benelex shielding were in Building 771 in 1990.

Many old gloveboxes in Building 771 continued to be used in plutonium
processing through the Rockwell era. The Factory Mutual Research Corporation
(henceforth, FMRC) report of November 1990, following the end of the Rockwell's
management, states that "substantial quantities of combustible 'Benelex shielding' is [sic]
still present in the building." Their formal finding 90-38 and supporting reason are as
follows: [168]

A substantial reduction in the amount of combustible "Benelex"
shielding should be initiated; throughout Building 771.

Reason:

There are areas with major amounts of "Benelex" shielding creating
greater than average combustible loading and continuity of
combustibles. A small fire in a glovebox line could be dramatically
intensified by this material.

There are other problems in addition to the presence of the combustible shielding.
Many of the administrative controls on combustible materials described in the TERA
Report were not carried out, even though this 1976 report describes them as required
under "current operating criteria."

In addition to limiting the in-process plutonium inventory to only that
required for ongoing operations, other in-process combustible materials
such as paper, wood, oil, and plastics are minimized. The use of glove
boxes and conveyor lines for the long-term storage of plutonium is not
permitted. An inerted, in-line storage vault for plutonium in production
operations is now used as a repository for all plutonium in process
which is not immediately required. In-process short-term storage of
plutonium utilizes non-combustible metal containers with lids for
storage of all forms of plutonium. [169]

The above quote does not match at all with the findings of the Plutonium Vulnerability
report for what Rockwell left at the end of its era of management: a very large inventory

---

[168]  Fire Protection Survey Visit No. 4, Factory Mutual Research Corporation, November 1990, at 117-
118. We have only a partial copy; full document is being sought.

[169]  TERA Report, at 12-13.

of in-process plutonium stored in plastic containers and in processing equipment, including gloveboxes and conveyors. The FMRC report noted the need in another plutonium processing building, 707, to interlock the lines supplying high-pressure hydraulic oil with the fire protection system so that in the event of a fire the supply of this flammable oil would be automatically shut off.[170]  The FMRC report also noted Benelex shielding in Building 707. [171]

Another finding from the FMRC report was that the old, combustible roof was still in place below the new roof added after the 1969 fire to Building 776. This issue was highlighted in the summary as one of the most serious findings in the FMRC report:

> For example, an unprotected concealed space between roofs in Building 776, left in place after the 1969 fire, represents a severe exposure due to combustible roof covering. It is estimated that a fire in this space could cause in excess of $10,000,000 damage and *a loss of building containment.*[172]  (emphasis added)

Another example of a high-risk situation involving combustible fuel is the presence of a one-inch natural gas line into Room 164 of Building 771.    This line is "nonconforming" to safety criteria, which specify that little or no flammable gas should be piped into plutonium processing buildings, that any such gas should be at low pressure (less than 6 inches of water), and that there should be no possibility of a gas leak into plutonium facilities.[173]

Just as the CEARP report presented a good plan for dealing with waste, the TERA report presented a good plan for improving fire safety. The problems with pondcrete and other waste materials occurred when there was a deviation from the plan, and management failed to respond appropriately.  The deviation from plan for plutonium processing was that the new facility, Building 371, did not work, and plutonium processing was continued in the old buildings.  The processing equipment was old, the buildings were not well designed for fire and seismic safety, and violations of good fire protection practices were extensive, especially in the failure to minimize combustible materials in the plutonium processing areas.[174]

---

[170]    Factory Mutual Research Corporation, op cit., at 103-110.

[171]    Ibid., at 110.

[172]    Ibid., at x.

[173]    Building 771 FSAR, at B-23.

#### (ix) Criticality

Criticality denotes a potential chain reaction of neutron-induced fissions in special nuclear materials, such as plutonium. The reaction would generate an intense burst of radiation and, in some cases, heat which could trigger a fire. Only a small amount of solid plutonium (a sphere about 5 inches in diameter, or an even smaller one if submerged in water) is necessary to cause a criticality. For plutonium solutions, at concentrations typical of process operations, less than a 4 inch depth of liquid accumulating in a 2 ft. by 2 ft. pit would be sufficient to trigger a criticality.[175] The possibility of inadvertent criticality should mandate considerable caution and the careful development of appropriate safety procedures in handling plutonium and plutonium residues.

An independent assessment in 1989 strongly criticized Rockwell's laxity in assuring criticality safety.[176] A criticality accident at the Rocky Flats Plant could produce a lethal dose of neutron and gamma radiation to workers, could generate heat and fission products, and, in some circumstances, could result in release of radioactive material to the environment. The team carrying out the assessment found many instances of inadequate conditions and management practices, including a buildup of plutonium dust in ventilation ducts, as shown in Figure 36.

> For example, the Team looked for and discovered several kilograms of plutonium in a pipe that serves as an exhaust ventilation duct for some of the gloveboxes in Building 771. ... The plutonium was *downstream* of the high efficiency particulate air (HEPA) prefilters relied upon to keep plutonium in the gloveboxes. Thus, this plutonium was outside the normal envelope used to control fissile material inventory. This plutonium was in the form of a slurry, and the quantity found was more than enough fissile material for a criticality accident if consolidated geometrically and if a neutron 'reflector' such as water or a human body were present in certain configurations. ... Previous to this study, plant managers had

---

(continued)

[174]  A number of concerns and specific problems related to fire safety are listed among the preexisting conditions listed by Kaiser-Hill at the time that they took over management of the site from EG&G in 1994. See Kaiser-Hill Preexisting Conditions Report of Noncompliance, June 1995. See also the list in the FMRC report, the full text of which we have not yet obtained (footnote 168, supra).

[175]  T. Cochran, Overview of Rocky Flats Operations, Expert Report for Cook v. Rockwell, Table of "Critical Mass Data."

[176]  An Assessment of Criticality Safety at the Department of Energy Rocky Flats Plant, July-September, 1989. Scientech Inc., SCIE-DOE-201-89.

insisted that this type of plutonium holdup (accumulation) was not happening at
the plant, even though exhaust ducts had been specifically suggested by a former
employee and ventilation system designer of plant contractor Rockwell
International, Mr. James Stone, as a probable location for dangerous quantities of
plutonium to collect. The Team found that there may be holdup of significant
quantities of plutonium in several other exhaust ducts in the plant. The Team also
found evidence that fissile material had been found in the ventilation systems in
several buildings at Rocky Flats during past renovations.[177]

The assessment team noted other evidence of lax operational practices, indicating
failure of Rockwell International plant management to carry out their responsibilities to
assure criticality safety: [178]

> The response to the [newspaper] article prepared by plant managers did
> not address the substance of the criticality allegation raised. This lack of
> inquisitiveness by Rocky Flats Plant managers regarding potential safety
> concerns is viewed by the Team as a significant failure of management.
> Failure to follow up on such an allegation of unsafe practices should
> never be tolerated in DOE facilities.

A third example involved the storage of lean plutonium residues in a basement area subject
to flooding:[179]

> In the basement of Building 776, where about 300 55-gallon drums of plutonium
> residue are stored, the team found that the sump pump was inoperable. ... the
> criticality safety analysis ... could not be found, so it was not clear whether a
> criticality accident would occur if the room was inadvertently flooded. ... Some of
> the drums in the room had rusted, and water marks and mineral deposits from
> external ground water were found... In addition, there are no water level or
> radiation alarms... such a combination of factors is unacceptable.

Another example was an observed failure to restrain plutonium residue drums against
falling in an earthquake:[180]

---

[177]   Ibid., at ES-1 to 2.

[178]   Ibid., at 2-12.

[179]   Ibid., at ES-2 to 3.

[180]   Ibid., at ES-3.

Rockwell Management of Wastes, Residues, and Risks
D. W. North and R. J. Budnitz
November 21, 1996     Page 64

The Team is also concerned about the storage of residue drums in Building 371 in a vertical arrangement that makes the drum susceptible to falling during an earthquake. While this and other buildings are themselves reportedly designed to withstand an earthquake, the arrangement of vertical shelving and the presence of only partially restrained drums on the shelves are considered by the team to be inadequate to protect against the effects of an earthquake. The drums could fall off of the shelves and might create the potential for a criticality accident by piling up on the floor of the building in a configuration for which criticality safety has not been evaluated.

The assessment team reviewed the history of the more than 600 known procedural infractions recorded by the criticality safety program at Rocky Flats Plant since 1962. While the Scientech team did not find evidence of a past criticality accident, the team did find extensive indications of continuing lax practices, "judged to be primarily due to complacency or poor communication on safety matters." .... "[S]ince 1962, there have been about eight serious procedural infractions involving kilogram quantities of plutonium in such a manner that the remaining safety margin to a criticality accident was unacceptable."[181]

Rocky Flats plant management failed to implement the nuclear safety philosophy of defense in depth, and in particular the concept in the DOE nuclear criticality safety guidelines known as the double contingency principle: there must be two independent barriers or impediments between a normal operating condition and a criticality accident. And rather than a vigorous effort to improve safety, the assessment team found that workers were afraid to tell managers their concerns about problems and questionable practices. The assessment team concluded, "The Team ... is not satisfied with criticality safety practices or with the understanding of nuclear safety standards by the workers in the plant."[182]

The overall conclusion we draw from the information available to us is that Rockwell did a poor job in its management of criticality safety.

---

[181]  Ibid., at ES-4. These serious procedural infractions "involved loss of control of a significant amount of fissile material." Two of the eight are from the Rockwell era. In 1981 a worker intentionally loaded five cans containing a total of ten kilograms of plutonium into a "bird cage," a transportation cart limited to only two cans. In 1985 about 12 kilograms of plutonium were allowed to accumulate in a glovebox with an 8-kilogram limit. The report goes on to state, "Almost as significant as these serious infractions is the recurring nature and quantity of the less serious infractions. On the average, about 25 infractions have occurred *each* year since 1962." (emphasis in original).
     -- Ibid., at 5-9 to 5-11.

[182]  Ibid., at ES-5.

### (x) Safety Analyses and Risk Assessments

The large inventory of dangerous residues and the threat of potential release from fires certainly warranted a significant effort to determine the potential risks and consequences, and all possible steps to preclude accidents. Beginning in the mid-1980s, a series of safety analyses and risk assessments were carried out on the Rocky Flats buildings used for plutonium handling and processing.

As we have investigated further into the practices for assuring safety and the procedures for assessing the risk to ascertain if it is indeed appropriately low, *we have found little reassurance of safety and substantial indications that critical safety issues received far less attention than they deserved through the end of the Rockwell era.* The old buildings continued to be used for plutonium processing, and conditions were permitted that adversely impacted safety, such as poor housekeeping and crowded conditions of plutonium residue storage. Rockwell failed to carry out numerous measures to reduce the threat of fire and explosions by reducing or eliminating combustible material in the plutonium processing buildings, as described in a previous section. Moving plutonium operations into the much-better-constructed Building 371 was not accomplished in the Rockwell era. Moving the plutonium into Building 371 is now being recommended as the best way to accomplish safer interim plutonium storage, and construction of an even more secure onsite plutonium storage facility is being considered.[183] This problem of correcting unsafe storage for plutonium is a legacy of the Rockwell era, because Rockwell failed to address this problem and solve it.[184]

The Defense Nuclear Facility Safety Board (DNFSB) recommended in 1990 that:[185]

A specific program and process should be developed at the Rocky Flats Plant to assure proper evaluation and coordination of the facility changes under consideration. ... it would be useful to consider in the same integrated fashion, the safety issues regarding a comparison of

---

[183]  Accelerated Site Action Project, supra, Appendix A.

[184]  The risk is not eliminated by the termination of plutonium processing operations, because the risk comes primarily from dangerous materials in unsafe storage conditions. See, for example, ACNFS Meeting Minutes, July 29, 1991, at 9-10.

[185]  Defense Nuclear Facilities Safety Board, Recommendation 90-5, May 17, 1990.

existing facility design features with those required by commercial
criteria and standards, such as fire protection ...

...

We recommend that this Rocky Flats [Systematic Evaluation Plan]
address all outstanding current safety issues and include ... effects of
severe external events, with particular emphasis on seismic events and
high winds; effects of severe internal events, with particular emphasis
on fire ....

These recommendations were made after the Rockwell era had ended, to address
problems not resolved under Rockwell's management. The DNFSB recommended to
DOE "... a process that is flexible to accommodate the levels of protection to public health
and safety appropriate to the differing operations carried out in various buildings at Rocky
Flats."[186] Clearly, in buildings with many potential ignition sources, large quantities of
combustible material, and tons of plutonium, appropriate levels of protection should have
been strict indeed. Rockwell failed to manage this issue adequately.

While safety assessments were made in the late 1980s and presented to outside
oversight and review groups such as the ACNFS Committee, it appears to us that their
results were weakened by flaws in the methodology, by inappropriate or unsupported
assumptions, and by problems in the data. There was little effective, in-depth peer review
of these assessments by busy oversight groups such as ACNFS, and the ACNFS and
DNFSB investigations took place at or after the end of the Rockwell era.[187]

One such peer review that we have located addressed the 1985 Rocky Flats Risk
Assessment Guide (RFRAG85) and the 1987 Building 707 Final Safety Analysis Report
(707FSAR).[188] This review identifies many problems in adapting the probabilistic risk
assessment methods used for nuclear reactors to the operations at Rocky Flats. It

---

[186]   Ibid.

[187]   ACNFS supported the criticisms in the criticality review carried out by Scientech (Footnote 176,
supra) with respect to probabilistic risk assessment: "... the Mattson study pointed out weaknesses in
operations, attitudes, and in the probabilistic risk assessment (PRA) analysis done by RF. The
Mattson study recommended further analysis of human errors and component reliability, including
common mode failures. We support these recommendations."
    -- ACNFS letter to Secretary Watkins, November 30, 1989.

[188]   B. Walsh, C. Fisher, and G. Zigler, Evaluation of Safety Assessment Methodologies in Rocky Flats
Assessment Guide (1985) and Building 707 Final Safety Analysis Report (1987). Report prepared
by Science and Engineering Associates, Inc., Albuquerque, NM, SEASF-TR-90-009, November
1990.

provides many examples of assumptions and data that seem inappropriate or highly questionable:[189]

> The multitude of potential fire scenarios were very critical for Building
> 707, some of which were not considered in detail or the results of these
> considerations were not documented. Page 8-11 of the 707FSAR states
> that the damage owing to a glovebox fire would be limited to the
> glovebox itself and the contamination of the room for credible accident
> scenarios. This does not address the lack of exhaust HEPA filters on
> some gloveboxes and the loss of production resulting from dispersal of
> the plutonium combustion products throughout the exhaust ventilation
> plenum up to and including the second floor filtration components and
> ducting. Page 8-11 also addresses fire outside of a glovebox and states
> a mitigating feature is that combustible material in a module will only be
> present 1% of the time. Since the plant has been shut down for 9
> months, and the aisles of many of the modules had lots of combustible
> material during our recent inspection, following resumption the module
> would have to have no combustible material present for 900 months to
> retain the validity of the estimate. In other words, the 1% sounds very
> low.

This paragraph indicates that crucial issues involving fire safety were not properly included
in the assessment, and that the assumption on the extent of combustible material was
highly inconsistent with the reviewers' own observations in the building.

Another serious problem SEA reports is that fire frequency data were adjusted
downwards by a factor of ten with little analysis or other justification:[190]

> Combustion. The subject of fires is only briefly addressed in the
> RFRAG85 (see page 10). It appears that the intent with respect fire
> fires of various types, as indicated in implementation of RFRAG85 in
> FSARs, is to use historical data on fire incidents, coupled with an
> arbitrary "improvement factor" of ten.    The Building 771 FSAR
> references RFRAG85 and applies an "assumed improvement factor of

---

[189]  Ibid., at 14.

[190]  Ibid., at 21. This arbitrary adjustment may have come from the 1976 TERA report (footnote 165,
supra), where such a reduction in fire ignition probability was justified by major system and
operational improvements. Some anticipated system improvements, such as those associated with a
move to Building 371, were not made, and the administrative controls described in the TERA report
do not appear to have been enforced.

1E-1" for fire inside incinerator gloveboxes (page 8-11), fire in small furnace operations (page 8-12), and fire in non-inerted gloveboxes (page 8-12). We suggest that each category of fire be analyzed with fault tree methodology to define each factor and probabilities that led to occurrences of fire, instead of an arbitrary adjustment of historical data.

...

Multiple Phenomena. RFRAG85 ignores the potential for accident sequences with multiple energy release, such as an explosion followed by fire and *vice versa*. We suggest that event trees be extended to all phenomena that can occur before the situation is stabilized.

The ACNFS also noted that severe accident sequences had not been adequately included in the existing risk assessments. [191]

While the FSARs carried out in the late 1980s were supposedly done to address risks to the public, they did not do this job well, even for smaller and simpler buildings like the Analytical Chemistry Laboratory, Building 559:[192]

Shirley Olinger, Director, Safety Division, RFO [Rocky Flats Operations, DOE] reviewed the results of the special task force review of the building 559 FSAR. She noted that previous peer reviews found that the building 559 FSAR was inadequate due to documentation shortcomings. Member Powers asked what consideration had been given to worker risks, especially for chemicals. Shirley Olinger noted that the focus of the FSAR reviews was primarily on public risk.

The FSARs were not accurate in their descriptions of current safety-related features of the buildings. The failure of the Building 771 FSAR to acknowledge clearly the continuing use of Benelex shielding has been noted in a previous section. The FSAR for Building 559 probably received the greatest scrutiny because the efforts to restart plutonium processing there and the Operational Readiness Reviews of Building 559. The report on the second of these ORRs notes that, "several discrepancies were noted between the description of the facility fire protection systems and features and what actually exists in Building 559."[193]

---

[191] "Committee member Kastenberg said that risk assessments had already been performed for many RFP facilities and supported including severe accidents in such assessments."
-- Minutes of ACNFS meeting, October 30, 1990.

[192] ACNFS Meeting Minutes, June 27, 1991.

Toward the end of the Rockwell era, application of probabilistic risk methods to
Rocky Flats was beginning, a commendable effort that should have been undertaken
earlier. But the results depended on the data and assumptions for the scenarios leading to
large releases of plutonium and other dangerous materials. The ACNFS concluded in their
final report:[194]

> Rocky Flats has undertaken a review of the 'reasonableness' of risks
> calculated in the Final Safety Analysis Reports for the individual
> buildings used in plutonium processing. ... To date, changes made in the
> analyses have little altered the public risk ascribed to buildings 559 and
> 707 and have established that the estimated risks are probably small.
> These conclusions rest upon analysis of releases of radioactive materials
> which are not well supported by experimental data. Source terms used
> in the Final Safety Analysis Reports may deserve future examination by
> oversight bodies.

In our judgment, "may deserve" in the last sentence should have been replaced by
"must receive," and "probably small" at the end of the second sentence is not good enough
for adequate safety assurance when offsite releases of significant quantities of plutonium
are at issue. In the early 1990's efforts were made to upgrade the FSAR analysis. One of
us (Budnitz) was directly involved in this effort, visited plutonium processing facilities,
and was appalled at the tightly packed processing configuration and poor housekeeping.

The methodology and the approach used in the FSARs suffer from a problem that
has affected much use of probabilistic risk assessment: too much emphasis on the risk
conclusion, often in the form of a numerical estimate of risk to the public, and not enough
emphasis on the insights that could be attained on how to make the facility safer.[195]   A
review for DNFSB on the Building 707 FSAR noted that

> A more detailed and extended description and discussion of fires that
> involve plutonium are needed. In particular, the serious fires of 1957
> and 1969 should be examined... The question of interest is, how close

---

(continued)

[193]  Operational Readiness Review of the Analytical Chemistry Laboratory, Building 559 at the Rocky
Flats Plant, DOE, January 3, 1992, at 16.

[194]  ACNFS Final Report, November 12, 1991, at 143.

[195]  H.W. Lewis, R.J. Budnitz, H.J. C. Kouts, F. von Hippel, W. Lowenstein, and F. Zachariasen, Risk
Assessment Review Group Report to the U.S. Nuclear Regulatory Commission, U.S. Nuclear
Regulatory Commission, Washington, D.C., NUREG/CR-0400, 1978.

were these fires to causing a serious release? Or, to put the question
another way, what structure, engineered safeguard, more severe
condition would have allowed a serious release of Pu aerosol? ... These
sections should be reviewed by fire safety engineers.[196]

It is our impression that detailed review as part of the FSAR process by experienced fire
safety engineers such as those from Factory Mutual Research Corporation would have
pointed out a large number of specific factors involving the structures, the loadings of
combustible materials, and lack of maintenance that made scenarios leading to serious
plutonium releases more likely than necessary.

As one example, we will use the natural gas line into Building 771 and the risk of
explosion and fire from an equipment failure that resulted in a gas leak and a subsequent
ignition. This scenario is analyzed in the Building 771 FSAR.[197] The discussion makes
clear that an explosion could occur, with a force of up to two kilograms (four pounds) of
TNT, which would "most likely destroy the contents of the room in which it occurs."
Could such an explosion ignite nearby combustible material, creating a large, very-
difficult-to-control fire? Could the explosion plus an ensuing fire (and use of sprinklers)
destroy the integrity of the paper-like HEPA filters, resulting in a release of plutonium to
the outside environment?[198] From the information provided in the FSAR, we are not
reassured that a natural gas explosion in Building 771 is extremely unlikely (probability of
$9 \times 10^{-6}$ per year), and that any resulting release of plutonium to the environment will be
extremely small ($2 \times 10^{-5}$ grams or less).[199] Serious accident scenarios should be carefully

---

[196] Review of Rocky Flats Building 707 Complex Final Safety Analysis Report and review of FSAR
Team Report on Rocky Flats Building 707, Memorandum from William R. Stratton and Gordon E.
Hansen to H.J.C. Kouts, Defense Nuclear Facilities Safety Board, 1992, at 1 and 3.

[197] Op. cit., at 8-24 to 8-25.

[198] Compare with the summary of vulnerabilities from the Plutonium Working Group Report, footnote
144, supra, at 26-27:
"The effectiveness of three of four stages of high efficiency particulate air (HEPA) filters iin all
buildings cannot be tested. Untested, ineffective filters could result in higher than expected releases
of plutonium to the environment."
"In Buildings 771,776, and 779 the backlog of preventive maintenance items for ventilation system
fans and HEPA filters could cause failures, thus releasing plutonium into the facility or the
environment."
"Water-spray systems are used to protect HEPA filters from fires. Water-soaked filters could fail,
thus releasing plutonium off-site."

[199] Ibid. We note that DOE in June, 1991 approved an exemption from the National Fire Protection
Association requirement for fire dampers in certain ventilation ducts, because the dampers could
"disrupt designated ventilation flow patterns." (Memo from Paul L. Ziemer to Richard A. Claytor,

examined, both to ascertain possible sequences of failures in safety systems that could lead
to releases, and to identify available design and operational changes that could mitigate the
consequences of such accidents and ensuing releases. We are not persuaded that
Rockwell did an adequate job, either in replacing high-risk equipment and activities (such
as a gas line at standard pressure into a plutonium processing facility, which is
"nonconforming" to safety criteria), or in carrying out the careful analysis of scenarios for
potentially serious accidents involving fires, explosions, earthquakes, airplane crashes, or
other events that could result in large offsite releases of plutonium.

The problem is not simply a failure to do good safety analysis. It was the
deficiency in safety culture. The ACNFS noted this failure, and also criticized the
Rockwell reliance on "vital safety systems" as defense against radioactive releases:

> It is standard for nuclear reactors and other non-reactor nuclear facilities
> to provide multiple physical barriers to the release of radioactivity,
> consistent with the operating philosophy of defense-in-depth. However,
> at Rocky Flats the operating staff has opted to limit the safety
> considerations for the process operations at Rocky Flats to involve only
> a single barrier called the vital safety systems.[200]

The ACNFS noted "repeated difficulties with the vital safety systems," and the 1994 DOE
Plutonium Vulnerability Assessment indicated over 2,000 open, urgent repair requests for
these systems, some dating back to early 1988.[201]  The effort to restart plutonium
operations in Building 559, the Analytical Chemistry Laboratory,  proved extremely
difficult, as two attempts in 1991 to pass an operational readiness review were
unsuccessful.[202] The legacy of deficiencies in  maintenance, in building design and
operating procedures, and in personnel training left by Rockwell was very difficult to
overcome, even for a laboratory building that handled only small quantities of plutonium.

The 1995 report by the Consortium on Environmental Risk Evaluation carried out
an assessment of public concerns, and reported their finding as follows: [203]

---

(continued)

DOE, June 27, 1991.) Dampers or baffles in the ventilation ducts might be critical in assuring that
ventilation systems and HEPA filters would not be damaged by an explosion.

[200]  Ibid., at 145. See also footnote 12.

[201]  DOE Plutonium ES&H Vulnerability Assessment, Working Group Assessment Team Report for
Rocky Flats Plant, August 18, 1994.

[202]  Op. cit.

[203]  Consortium for Environmental Risk Evaluation, supra, at 5-23.

The most repeated source of risk to public health is the 14 tons of
plutonium stored at the installation. Many believe that this material is
vulnerable and that an accidental release due to fire, a safety violation,
or a criticality event could potentially expose off-site receptors to
plutonium (a substance widely recognized as highly toxic).

We have reviewed information, such as the presence in 1990s of Benelex shielding
in Building 771, suggesting that Dow and Rockwell failed to implement many of the
recommendations for improving fire protection following the 1969 fire. (Further
discussion of these recommendations for improved fire protection is found in the expert
report, Robert J. Budnitz, "Fires.") The risk assessments from the Rockwell era failed to
deal adequately with scenarios for severe accidents (e.g., a fire similar to 1969 but with a
large breach of containment).   Rockwell and its successor were unable to restart
plutonium processing, because the buildings used for plutonium processing did not meet
DOE's safety requirements. It is unlikely that these buildings would have met these safety
requirements in earlier years, had they been properly enforced. But compliance with these
requirements had been left as the responsibility of the M&O contractor, Rockwell, and
Rockwell failed to take this  responsibility seriously.     Rockwell should also have
conducted thorough, well-documented safety analyses to identify and evaluate potential
accidents. The safety analyses that were done were not adequate.  By these omissions,
Rockwell caused unnecessarily elevated risks to its workers, to the offsite public, and to
the environment. These risks have not been eliminated.

Plutonium processing operations ceased in 1989 and will not resume. Putting the
plutonium and other dangerous materials into safe storage and cleaning up the mess is
taking longer and costing far more than DOE, its contractors, or its advisory groups
anticipated in 1990. The remaining risk from plutonium is acknowledged in the 1995
DOE Plutonium Vulnerability Management Plan,[204] in the 1995 CERE Report,[205] and in
public briefings by the DOE Rocky Flats site manager[206] to be among the worst risks to
the offsite public in the DOE weapons complex.

(continued)

[204]   Op cit.

[205]   Op cit.

[206]   Rocky VI: The Final Chapter, Closing the Site, DOE Briefing, May 22, 1996.
        Plutonium Vulnerabilities: Reducing Risk in a Time of Change, by Mark Silverman, Manager,
        Rocky Flats Environmental Technology Site (undated).
        The New Era at Rocky Flats, by Mark Silverman, April 10, 1995.
        It's the Plutonium, DOE slide package, (undated).
        See also the Deposition of Mark Silverman, supra,at 260-261.

In our judgment, the risks posed by plutonium, as well as the risk from other wastes and dangerous materials, could have and should have been much better managed by Rockwell.

## IV.    Summary and Conclusions

Rockwell's poor waste and residue management at Rocky Flats led to them being replaced as contractor in late 1989 because DOE was "fed up."[207]  It led to Rockwell pleading guilty to ten criminal violations of environmental laws. It led to a huge amount of waste and residue stored haphazardly at the plant, often in dangerous configurations, and a likely cleanup cost of at least hundreds of millions of dollars. It led to elevated risks to workers and the public, an increased likelihood of a catastrophic fire, and actual and potential onsite and offsite environmental impacts.

Why did Rockwell not do better?  Rockwell was responsible for its own actions. It had a legal and contractual obligation, and an acknowledged "independent duty" to manage the plant safely and responsibly. It was hired precisely because of its supposed expertise in doing exactly that.

---

(continued)

Energy Secretary Hazel O'Leary was quoted in *Inside Energy*, May 15, 1995, about a proposed cut in the DOE budget as follows:

"O'Leary said the proposed cut could force agency officials to delay making improvements in fire emergency systems and radioactive waste monitoring devices. 'I cannot tell you exactly where or when a safety incident will happen, but the nature of these risks is too great to test the margins,' she said."

Thomas Grumbly was quoted in *Inside Energy*, May 1, 1995 on the same proposed budget cut: "He warned that reductions of that magnitude 'would endanger the safety of the nation.' "

[207]  "'They wanted out, and we were not happy with their performance and wanted to see change a lot faster,' the [Energy Department] official said. 'They weren't moving fast enough to make environmental compliance a No. 1 priority.'"

-- The Washington Post, September 23, 1989, at A2.

"A Federal official was quoted today as saying the Rockwell International Corporation did not withdraw as operator of the Rocky Flats nuclear weapons [plant] but was dismissed because the Government was 'fed up.' ... W. Henson Moore, the Deputy Secretary of Energy, said the decision was the Government's."

-- New York Times, September 25, 1989, at A-15.

Rockwell Management of Wastes, Residues, and Risks
D. W. North and R. J. Budnitz
November 21, 1996    Page 74

Rockwell's failures led to the guilty pleas and the fines. When things began to go wrong, it could have alerted DOE management, it could have bargained with the regulators in CDH for more time, and it could have asked DOE for more money to "do things right." Rockwell could have done more analysis to distinguish high risks from low risks, and Rockwell could have implemented corrective measures to reduce the high risks. We have not found evidence that they took such actions. Rather, the information we have reviewed shows the same recurring pattern in a number of areas spanning many types of waste and residue storage and operations: When circumstances diverged from the assumptions in its plans, Rockwell management failed to reassess their plans adequately in light of this divergence, then failed to take adequate corrective actions.

Is there elevated risk now to those living and working near Rocky Flats, and is this elevated risk the direct result of Rockwell's management deficiencies? In our judgment, the answer to both questions is yes. During Rockwell's tenure, Rocky Flats accumulated a large inventory of highly dangerous materials stored in a fashion that was not planned to assure long-term safety. While recent progress has been made in alleviating some of the risks, a large portion of Rockwell's legacy still remains. Planning for safe storage, and implementation of the plans, should have been carried out by Rockwell, the M&O contractor responsible for this facility from 1975 to 1989. Rockwell failed in this responsibility. In our judgment, toward the end of the Rockwell era Rocky Flats was the most dangerous facility across the entire DOE weapons complex, in the sense of elevated offsite risk. While other factors may have also contributed,[208] it is our judgment that Rockwell's negligence and poor management contributed substantially to this elevated risk. When Rockwell left Rocky Flats in 1989, it left a dangerous mess. In the words of *Time* magazine, Rockwell was "frighteningly careless."[209]

---

[208]  Candice Fierce, who served on DOE's onsite health and safety staff during the latter part of the Rockwell period and who is currently working at Rocky Flats for a DOE subcontractor, responded as follows to a question about current risk:

"Q. Do you have any personal concerns about being at an increased risk because of being near Rocky Flats?

A. I do now.

Q. What do you mean by that?

A. The facilities have not been well-funded for maintenance. They are leaking, they are rusting, things keep getting changed to accommodate systems that don't work any more, whether they are fan systems, pipes that leak, repairing those things. It's getting in a worse state of disrepair.

Q. So you are concerned about possible problems for the future?

A. Yes."

-- Fierree deposition, at 199.

[209]  Footnote 2, supra.

Rockwell Management of Wastes, Residues, and Risks
D. W. North and R. J. Budnitz
November 21, 1996    Page 75

**Signatures of Authors:**

D. Warner North,

Robert J. Budnitz

November 21, 1996
Date

November 21, 1996
Date

**Figure 1.**    **Schematic of Rocky Flats Plutonium Processing**
[Source:  DOE, Long Range Recovery of Plutonium Scrap, September 1985, p. 41]



FIGURE 3.2.   Schematic of RFP WG Pu Flow

Figure 2.    Characterization of Wastes and Residues
[Figure generated by Litigraphics]

**Figure 3.    Timeline of Key Events during Dow and Rockwell Tenures**
[Figure generated by Decision Focus Incorporated]



**Figure 4.**   **Timeline of Emerging Regulation**
[Figure generated by Decision Focus Incorporated]

