

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

- - -

MERILYN COOK, et al.     :  CIVIL ACTION
              :
 vs.           :
              :
ROCKWELL INTERNATIONAL    :
CORPORATION, a Delaware   :
Corporation         :
 and           :
THE DOW CHEMICAL CORPORATION :  NO. 90-K-181

- - -

Wednesday, March 26, 1997

- - -

Deposition of S. PAUL SLOVIC, taken

pursuant to notice, at the law offices of

Berger & Montague, 1622 Locust Street,

Philadelphia, Pennsylvania, beginning at

approximately 9:08 a.m., on the above date,

before Kenneth T. Brill, Registered

Professional Reporter and Notary Public.

- - -

DELCASALE, CASEY, MARTIN & MANCHELLO REPORTING
Ten Penn Center Plaza
Suite 636 - 1801 Market Street
Philadelphia, Pennsylvania 19103
(215) 568-2211

128

S. Paul Slovic

1   Q.        And, in fact, that's what the NOAA panel

2   was issuing conclusions on --

3   A.        Yes.

4   Q.        -- correct?

5   A.        Mm-hmm.

6   Q.        All right.  Are you an expert in that type

7   of contingent valuation survey?

8   A.        I don't do those kinds of surveys.

9   Q.        What was that?

10  A.        I don't do those kinds of surveys.

11  Q.        You have never done a contingent valuation

12  survey in any of your 30 years as a psychologist?

13  A.        It depends what you call a contingent -- I

14  mean, there are different -- I've done some small

15  surveys that at the margin might be considered a

16  contingent valuation survey.  But, I mean, I don't

17  really do surveys of the kind that the NOAA panel

18  were addressing.

19  Q.        Have you ever published the results of a

20  contingent valuation survey of the type that the

21  NOAA panel was discussing in a peer review journal?

22  A.        I can't remember directly.  I mean, we did

23  a study, basically a critique of contingency -- I'm

24  a critic of contingent valuation, as you know.

DelCasale, Casey, Martin & Manchello
(215) 568-2211

129

S. Paul Slovic

1          And I've done some experimental studies

2    designed to why -- some of the problems in

3    contingent valuation surveys. And if you call that

4    a contingent valuation survey, you know, that is

5    something, but it's not a contingent valuation

6    survey.

7    Q.       The survey that Decision Research

8    performed in this case, was that a contingent

9    valuation survey?

10   A.       Are you referring to the third document?

11   Q.       I'm referring to, I guess it's Appendix A

12   to Mr. Hunsperger's report, which I believe is a

13   survey --

14   A.       Mm-hmm.

15   Q.       -- Rocky Flats housing survey.

16   A.       And you asked if that was a contingent

17   valuation survey.

18   Q.       In your opinion?

19   A.       No.

20   Q.       Did you intend it to be a contingent

21   valuation survey?

22   A.       No.

23   Q.       Are some of the problems that you

24   identified with respect to contingent valuation

S. Paul Slovic

1    Q.        Well, did you know when your firm

2    conducted the survey, how Mr. Hunsperger intended to

3    use the data that you developed?

4    A.        It was our understanding that -- that this

5    survey was to examine the attitudes and opinions of

6    people of -- vis-a-vis the concept of

7    stigmatization, risk-induced stigmatization that

8    might be taking place here that would have relevance

9    for the property value work that Mr. Hunsperger was

10   doing.

11   Q.        Were you aware that Mr. Hunsperger would

12   use the survey data that you developed as to

13   estimate the diminution in property values in the

14   class area?

15              MR. NORDBERG:  May I have that

16              question read back?

17              (Whereupon, the pertinent portion of

18              the record was read back.)

19              MR. NORDBERG:  Objection to form.

20              THE WITNESS:  We were aware that we

21              were going to collect data that bore upon

22              the possible stigmatization of property in

23              this region and that would have relevance

24              for property values, but we were not

140

S.  Paul Slovic

1            intending to produce estimates, precise
2            estimates of the devaluation.
3     BY MR. DUTTON:
4     Q.        If you had intended when you did this
5     survey to measure the precise devaluation of
6     property in the class area of Rocky Flats, would you
7     have designed the survey differently?
8     A.        I don't know.  I'd have to think about how
9     I would go about designing such a study.  That
10    wasn't our intent here.
11    Q.        Is it correct that this study was not
12    designed to determine the alleged diminution in
13    property values in the class area as a result of the
14    FBI raid at Rocky Flats?
15            MR. NORDBERG:  Objection, vague.
16            "Determine".
17            THE WITNESS:  This was designed to
18            examine the attitudes and opinions of
19            people in the class area at this time, and
20            impressions vis-a-vis Rocky Flats, and
21            that's what it was designed for.
22    BY MR. DUTTON:
23    Q.        Okay.  So it was not designed to estimate
24    with precision diminution in value in the class area

DelCasale, Casey, Martin & Manchello
(215) 568-2211

141

S. Paul Slovic

1   resulting from the FBI raid at Rocky Flats; correct?

2   A.       We did not design it to lead at the end to

3   a precise diminution value based on these questions.

4   Q.       Were you involved in the design of the

5   survey?

6   A.       Yes.

7   Q.       What involvement did you have in the

8   design of the survey?

9   A.       Well, I helped draft the questions.

10  Q.       Was it your role in drafting the questions

11  to try as much as possible to prevent any biases

12  from impacting the results of the survey?

13  A.       Our goal was to try to get a reading, an

14  accurate reading of people's attitudes and opinions

15  and impressions.  We don't try to design any biases

16  into the survey.

17  Q.       How did you determine what sample would be

18  selected for the use in your survey research?

19  A.       We were interested in people who had some

20  familiarity with the home buying market, who had

21  been in the market recently, or were thinking about

22  entering the market.  We were interested in people

23  who lived in the region, both in the Denver

24  metropolitan region, and the class communities.

153

S. Paul Slovic

1    courses.

2    Q.          Do you agree with me that certain

3    questions in your survey are designed to elicit

4    values?

5    A.          Our questions are designed to examine the

6    attractiveness of housing in these regions.  The

7    people, you know, in the context of knowledge about

8    Rocky Flats.  They're not designed to elicit precise

9    monetary values.  These are more attitudinal and

10   opinion questions than precise valuation questions.

11   Q.          Do you think it would be a fair use of the

12   answers to those questions to make precise estimates

13   of value?

14   A.          I'm not a valuation specialist.  I don't

15   know -- we -- we asked certain questions.  We -- we

16   got certain responses.  I would rather leave that to

17   a valuation specialist to infer what the

18   implications of that would be for value.  That's not

19   my -- that's not my task.

20   Q.          In your opinion as a social scientist who

21   conducts survey research, Dr. Slovic, would it be

22   proper to use the results of your survey as they

23   pertain to discounts required to purchase homes

24   within various disinstances from Rocky Flats to make

DelCasale, Casey, Martin & Manchello
(215) 568-2211

154

S. Paul Slovic

1    precise estimates of value?

2    A.        The survey was not designed to produce
3    precise estimates of value. It has -- it has
4    meaning for valuation. It reflects attitudes and
5    opinions that are indicative of stigmatization, and
6    that are, you know, relevant to the attractiveness
7    of housing near Rocky Flats. And you know, what
8    market -- you know, a valuation person would make
9    out of that, that's up to them.

10   Q.        I am asking for your opinion as a social
11   scientist.

12   A.        I believe that this -- that this survey,
13   the data in this survey reflect aversion and
14   stigmatization which have implications for value,
15   but in terms of leading to a precise estimate of
16   value, you know, I personally don't know how one
17   would take these calculations and produce an exact
18   precise valuation. So --

19   Q.        And you don't have an opinion on whether
20   or not it would be a scientifically valid method to
21   take responses to those questions and produce a
22   precise estimate of value; do you?

23              MR. NORDBERG: Objection to the
24              form, scientifically valid for whom?

DelCasale, Casey, Martin & Manchello
(215) 568-2211

156

S. Paul Slovic

1   Q.        Let me take it a little bit at a time.

2   A.        Yeah.

3   Q.        You understand that this case is about

4   alleged diminution in value; correct?

5   A.        Yes.

6   Q.        All right.  And you did a survey in this

7   case that asked people some questions about how much

8   of a discount they would require to live within

9   various distances from Rocky Flats; right?

10  A.        (Witness nods head).

11  Q.        Is that a yes?

12  A.        Yes.

13  Q.        All right.  And those questions, don't you

14  agree, were not designed to result in precise

15  estimates of the diminution in value of properties

16  in the class area?

17  A.        They were designed to elicit people's

18  evaluations of the attractiveness of purchasing a

19  house at these distances at these discounts that is,

20  you know, a form of attitude or opinion that we

21  deemed to be relevant to market value, although it

22  is not a precise measure of market value.

23  Q.        Were any questions in your survey

24  structured to identify the relationship between

160

S. Paul Slovic

1   Q.          Was that any part of the consideration?

2   A.          No.

3   Q.          How were the value increments or the

4   discount increments of 5,000 and $10,000 determined?

5   A.          They were determined -- they were

6   determined as increments that we thought would be

7   significant, non-trivial increments meants. And we

8   could have started and said $100, would you accept

9   $100 to do this? We thought that was too small.

10          We wanted to try to get people to buy, you

11  know, to buy into this market. And so we selected

12  these as sort of small percentages of the total

13  value that would be meaningful to people, as

14  significant amounts.

15  Q.          What is the economic foundation for these

16  amounts?

17  A.          What do you mean by economic foundation?

18  Q.          Do these amounts have any foundation in

19  economics?

20  A.          I don't understand your question.

21  Q.          Did you consult any economic literature to

22  determine whether or not five and ten thousand --

23  A.          No.

24  Q.          -- discounts were proper amounts?

161

S. Paul Slovic

1   A.          Well, what do you mean "proper amounts"?

2   We decided to use an amount.  We wanted the amount

3   to be non-trivial given the price of the house.  And

4   we also wanted to, you know, give value that people

5   might feel is a meaningful discount.  We selected

6   five thousand, ten thousand.  That was a judgment on

7   the part of us as designers of the survey.

8   Q.          A judgment on the part of you?

9   A.          Dr. Flynn and myself.

10  Q.          And you're not an expert in the value of

11  properties; are you?

12  A.          This was not designed to value properties

13  directly.  It was designed to be an indicator of

14  aversiveness of properties as a function of

15  proximity to Rocky Flats.

16  Q.          But you didn't consult any economic

17  literature to determine these amounts?

18  A.          No.

19  Q.          You didn't consult any literature to

20  determine these amounts?

21  A.          No.

22  Q.          And you didn't conduct pretests or focus

23  groups to determine these amounts?

24  A.          No.

162

S. Paul Slovic

1    Q.        Did you read Dr. Kahneman's report?

2    A.        Yes.

3    Q.        Have you seen his criticism of potential

4    of anchoring of these amounts?

5    A.        Yes.

6    Q.        Do you agree with his report?

7    A.        No.

8    Q.        Why don't you agree with it?

9    A.        Because Dr. Kahneman thinks we were trying

10   to create a precise measure of value, when that was

11   not our intent.  Our intent was to ask questions

12   relevant to valuation, relevant to the possibility

13   of stigmatization to get more of a -- kind of a

14   picture of stigmatization and aversion.  And in that

15   sense the precise values really aren't critical.

16   Q.        But if someone were to use the values that

17   were achieved as a result of these questions, about

18   5,000 and $10,000 discounts in order to estimate the

19   precise diminution in value that resulted from the

20   FBI raid at Rocky Flats, would Dr. Kahneman's

21   criticism on an anchoring effect be valid?

22   A.        Not necessarily, because there are, you

23   know, there are different sorts of anchoring

24   effects.  I mean, if anchoring -- one of the

S. Paul Slovic

1    questions asked, you know, how much would it take,
2    you know, how much of a discount would you need to
3    buy, if you suggest a value, that would work against
4    people asking for larger discounts, if there was
5    anchoring.

6            So I mean, anchoring is a phenomena that
7    may lead people to stay too close to the anchor.  If
8    people want greater discounts, that flies in the
9    face of the anchoring effect.

10           I mean, without those values there might
11   be even larger discounts requested.  So it's not an
12   obvious thing to determine exactly what the effect
13   of using 5 and $10,000 was on these values.

14   Q.       You're aware that Mr. Hunsperger used the
15   answers to these discount questions in order to
16   estimate the diminution of value of property in the
17   Rocky Flats -- to the class area; are you not?

18   A.       I haven't seen his calculations.

19   Q.       You haven't seen how he did that?

20   A.       No.

21   Q.       And it's your testimony that even though
22   he used the answers to the discount questions to
23   render an estimate of the diminution in value, that
24   Mr. Kahneman's criticisms are not valid?

S. Paul Slovic

1    value for the class area.  Do you see that?

2    A.        Yes, mm-hmm.

3    Q.        I believe my original question was, and we

4    don't have to assume anymore, but in light of the

5    fact that Mr. Hunsperger used the Decision Research

6    survey data to estimate a loss in value in the class

7    area, do you think that Dr. Kahneman's criticisms

8    are valid about anchoring, I guess the criticisms

9    are talking about?

10   A.        Anchoring is a phenomenon that can take

11   place.  I think the implications of anchoring for

12   these questions are not obvious.  I think that the

13   key factor here is that there was 46 percent of

14   people who said that they would not purchase under,

15   you know, under any reduction.  I think that my view

16   is that these data indicate a strong aversion to

17   buying property in Rocky Flats vicinity.

18            I, you know, whether these calculation

19   also are, you know, precise, a valid precise

20   estimate of the market value diminution, I don't

21   know.  I wasn't, you know, a party to these

22   calculations.

23   Q.        How can you say the implications of

24   anchoring are not obvious when you didn't do any

S. Paul Slovic

1    pretests to determine whether anchoring existed, and

2    you didn't conduct any focus groups to determine

3    whether anchoring existed?

4    A.       Because anchoring could work towards --

5    towards reducing the amount that people would --

6    would want as a reduction if they didn't accept the

7    5 or $10,000.

8    Q.       But you don't know because you didn't do

9    any testing on it; did you?

10                    MR. NORDBERG:  Objection to the form

11                    of the question.  It's been asked and

12                    answered, whether you did any focus group

13                    testing, it's been asked an answered.

14                    MR. DUTTON:  I asked him if he still

15                    wants to say that in light of the fact

16                    that he doesn't know because he didn't do

17                    any testing.  It's a different question.

18                    MR. NORDBERG:  Argumentative.

19                    Objection to the form.  We can get a

20                    cleaner question.

21                    THE WITNESS:  I guess I would.

22                    MR. NORDBERG:  And maybe we'll get a

23                    clean answer.

24                    THE WITNESS:  I would base that

169

S. Paul Slovic

1              opinion on, you know, as an opinion based

2              on knowledge of anchoring, much as Dr.

3              Kahneman's opinion was based on his

4              knowledge of anchoring without having done

5              a precise study.

6    BY MR. DUTTON:

7    Q.        Do you agree with me that to totally

8    exclude the fact that the anchoring effect had an

9    impact on the survey results, you would have to

10   conduct some type of test to determine whether or

11   not an anchoring effect existed?

12   A.        To exclude the possibility that it

13   affected?

14   Q.        Yes.

15   A.        That would be a good way to evaluate that,

16   yes.

17             THE WITNESS:  Can we take a break?

18             MR. DUTTON:  Sure.

19             (Brief recess.)

20   BY MR. DUTTON:

21   Q.        Dr. Slovic, do you have any opinion as to

22   whether or not Mr. Hunsperger's use of the results

23   of the Decision Research survey data to estimate a

24   diminution in value in the class area has any

198

S. Paul Slovic

1           about which opinions?

2    BY MR. DUTTON:

3    Q.       Okay.  Well, you read the reports; right?

4    A.       Yeah, yeah.

5    Q.       Do you recall off the top of your head

6    that any of his opinions were wrong?

7    A.       Well, I can't remember the specifics.  I

8    mean, he had a number of specific points he was

9    making, such as the anchoring.  But if you give me

10   his report, I could look at it.

11           MR. DUTTON:  Why don't we mark this

12           as Exhibit 5.

13           (Document marked as Exhibit Slovic-5

14           for identification.)

15   BY MR. DUTTON:

16   Q.       Dr. Slovic, I've just handed you what's

17   been marked as Exhibit No. 5, which is the rebuttal

18   report of Daniel Kahneman.  That's the report that

19   you read prior to your deposition today; correct?

20   A.       Yes.

21   Q.       Dr. Kahneman indicates that the four bias

22   inducing aspects of the survey are present, those

23   are drawing special attention to Rocky Flats as a

24   negative attribute, unrealistic reputation of the

S. Paul Slovic

1    house purchase decision, framing the question as a

2    trade of safety for money, and anchoring on high

3    dollar values.

4    A.        Mm-hmm.

5    Q.        Did you disagree with any of those

6    conclusions?

7    A.        Well, he says on Page 3 that these are

8    likely to influence respondents in the direction

9    on -- large effects on housing values.

10             In some cases these may relate to large

11   effects, but in terms of whether these are biasing

12   factors that invalidated the survey as a meaningful

13   indicator of people's, you know, evaluation, I don't

14   agree that -- with his conclusions.

15   Q.        Did you say valuation or evaluation?

16   A.        Evaluation.

17   Q.        Okay.  Insofar as the survey was used by

18   Mr. Hunsperger to make an estimate of value, do you

19   disagree with any of the --

20   A.        Well, yes.

21   Q.        -- criticisms of Dr. Kahneman?

22   A.        Yes, I disagree.  He is implying that

23   these effects always bias things in the direction of

24   ism applying larger values than what might otherwise

200
S. Paul Slovic

1    be the case.  I don't think that they necessarily

2    induce that direction of bias.

3    Q.      Well, do you think that he is wrong in

4    concluding that they had that bias in this case with

5    respect to this survey?

6    A.      Oh, no.

7    Q.      Mr. Hunsperger's use of it?

8    A.      I don't agree that they have this effect

9    in this case.  I, you know, there may have been some

10   influence.  I don't -- I think that -- I don't agree

11   with that.

12   Q.      You don't agree with any of these things?

13   A.      I agree with his comments about the fact

14   that -- that contextual factors are important in

15   judgment and decision-making.  I certainly agree

16   with that.

17   Q.      But you don't agree with his comments

18   about contextual factors in the survey that you put

19   together?

20   A.      I don't agree that it is, you know, the

21   case that the contextual factors in this survey

22   necessarily biased the values upwards.  That's what

23   he's saying.

24   Q.      Do you agree they could have?

201

S. Paul Slovic

1    A.          Well, it depends what you mean by bias.  I

2    mean, if you are drawing attention to Rocky Flats,

3    if drawing attention to Rocky Flats triggers an

4    aversive response in someone in the survey, you

5    know, this seems relevant to the possibility that

6    anything that brings Rocky Flats to their attention

7    out in the world will also trigger that aversive

8    response.

9              I don't call that a biasing factor.  I

10   think that's part and parcel of what we're talking

11   about here in terms of stigmatization associated

12   with Rocky Flats.

13   Q.          What about his criticism that the survey

14   presents an unrealistic representation of the house

15   purchase decision, do you agree with that?

16   A.          Let me look at that.

17             I agree that decisions are often made in a

18   global manner.  I think that while we have evidence

19   that -- that places -- our decisions about places

20   are influenced by a variety of attributes of those

21   places which often take the form of -- of images,

22   thoughts, associations, that that is -- that's a

23   natural way that we -- we make these -- these

24   decisions.

DelCasale, Casey, Martin & Manchello
(215) 568-2211

202

S. Paul Slovic

1          These images and associations are -- are
2     linked to positive and negative feelings.  And that
3     these feeling states then influence our behavior.
4          I mean, that's an alternative model of how
5     he presents -- he doesn't exactly present a model
6     except to say it's a multi-dimensional process.
7          And as I say, the way these decisions are
8     often made, agreeing that it's a global type of
9     evaluation, it's a global valuation.  It's the way
10    stigmatization works.
11         If Rocky Flats is an element in your
12    associative structure to your image of a place, or
13    to your knowledge of a place, then the negativity
14    associated with Rocky Flats will influence your
15    decision.
16         So I don't see that there is, you know,
17    necessarily a biasing factor here in terms of what
18    people would would do out in the world.
19         Rocky Flats is, you know, is a reality.
20    It's a factor here.  If it becomes part of the
21    conscious attention of a home buyer, then I think it
22    will elicit an aversive response that will have a
23    strong impact on whether a person would even
24    consider a property in that area.

DelCasale, Casey, Martin & Manchello
(215) 568-2211

S. Paul Slovic

1   Q.        Rocky Flats has been a factor for years in
2   that matter; hasn't it?
3   A.        Well, Rocky Flats has been around for a
4   long time, causing problems for a long time, yes.
5   Q.        A lot of the fears and perceptions you're
6   talking about existed back in the '40s and '50s with
7   respect to Rocky Flats; didn't they?
8   A.        Yeah, but a lot of the home buyers didn't
9   exist them.  They're coming into the market.
10  Q.        They came into the market after those
11  years; right?
12  A.        Well, they came in at various times.
13  Q.        Yes, throughout that time there were
14  newspaper media and other articles in the paper
15  expressing dread fears; right?
16  A.        This has been an ongoing process, yes.
17  Q.        What about trading safety, do you think
18  that had the potential to bias Mr. Hunsperger's use
19  of the survey data upwards?
20  A.        Well, the point being made here is that
21  people are reluctant to trade safety for economic
22  gain.  I think that's true.  I think that if people
23  feel that they are -- that they are sacrificing
24  safety, that their -- that they are, you know,

204

S. Paul Slovic

1    exposing themselves or their family to hazard,

2    hazardous conditions, that they are reluctant to do

3    that for monetary compensation.

4            I think that's relevant for the

5    marketplace, if people feel that in the marketplace,

6    and that will have an effect on the market behavior.

7    So I think that's a phenomena that is very relevant

8    here for the marketability of homes in this area.

9    Q.      My question was, do you believe that that

10   could have biased Mr. Hunsperger's use of your data

11   upwards, or Mr. Hunsperger's results from your data

12   upwards?

13   A.      No.

14   Q.      Do you agree with Dr. Kahneman's analysis

15   of the survey results in Part B of his rebuttal

16   report?

17           Let me ask a more specific question.  Do

18   you agree with Dr. Kahneman's conclusion based on

19   his analysis of the open-ended questions in your

20   survey that the evidence is simply not consistent

21   with the idea that the image of Arvada and

22   Westminster is dominated by the dread of Rocky

23   Flats?

24   A.      Where are you reading from?

207

S. Paul Slovic

1    being inconsistent.

2         I would say that this is not evidence for

3    the imagery of Arvada and Westminster being

4    dominated by Rocky Flats, but I do not agree that it

5    is inconsistent with the notion that such imagery

6    exists and is important for people.

7    Q.       What is the difference between the survey

8    that you did in this case and a contingent valuation

9    survey as we discussed earlier the NOAA panel

10   discussed?

11   A.       My understanding of the contingent

12   valuation referred to by the NOAA panel are

13   situations in which there is no market and a

14   hypothetical market is posited for some public good

15   that is not marketed.

16   Q.       Isn't it correct that contingent valuation

17   surveys have been performed with an attempt to place

18   values on market goods?

19   A.       My knowledge of contingent valuation

20   surveys, and the definitions that I have read by the

21   people who I -- who have created that field, that

22   methodology, those definitions have emphasized that

23   this is a method developed for situations in which

24   there is no market.  And that a respondent is asked

208

S. Paul Slovic

1    to hypothesize a market and the responses are

2    contingent upon this hypothetical market.

3                So in this circumstance there is a market.

4    I don't consider this a contingent valuation study.

5                MR. DUTTON:  Objection.  Move to

6                strike, not responsive.

7    BY MR. DUTTON:

8    Q.        My question was, are you aware that

9    contingent valuation surveys have been done on goods

10   for which there is a market?

11               MR. NORDBERG:  Objection to the

12               form.  Objection, asked and answered.

13               THE WITNESS:  If contingent

14               valuation surveys are defined as surveys

15               where there is no market, then I would not

16               call those contingent valuation surveys.

17   BY MR. DUTTON:

18   Q.        What would you call them?

19   A.        Surveys.

20   Q.        Are you aware that contingent valuation

21   surveys were performed on market goods as an effort

22   to gauge the reliability of such surveys in

23   predicting people's actual behavior?

24   A.        Well, I am aware of surveys that have done

DelCasale, Casey, Martin & Manchello
(215) 568-2211