# ENVIRONMENT AND THE APPRAISER

## Choosing the Right Analytical Tool for the Job

*Richard J. Roddewig, MAI*

Appraisers with little experience evaluating the impact of environmental risks on real estate and real estate markets are often at a loss when approached by potential clients with a contaminated property assignment. Of course, if the appraiser has little or no experience with contaminated property, the appraiser must consider the applicability of the Competency Provision of the *Uniform Standards of Professional Appraisal Practice* (USPAP) and, among other questions, ask, "What steps must I take to complete this assignment competently?"[1]

But in taking on an assignment involving contaminated property or other kinds of environmental risks, an even more fundamental question arises under the Competency Provision of USPAP, "What is the most appropriate technique to address the real estate problem involved?" The Competency Provision of USPAP recognizes that the very first thing the appraiser must do before entering into any assignment is properly identify the problem to be addressed.

Many appraisers automatically assume that performing an appraisal is the only way to handle every real estate problem presented to them. For whatever reason, whether force of habit, inexperience with real estate consulting, uncertainty about the applicability of USPAP to consulting assignments, etc., they automatically structure the assignment as an appraisal of a specific piece of property at a particular date in time. Far too often, however, in dealing with contaminated properties and other forms of environmental risks, an "appraisal" is precisely what the client does not need and the assignment does not demand. In many situations involving environmental risks, it may actually do the client a disservice and potentially be misleading to perform an "appraisal" when another analytical technique, such as "consulting," market analysis, or a highest and best use study, is more appropriate. This may be especially true in many types of litigation-related assignments.

### CLASSIFICATION OF ENVIRONMENTAL RISK ASSIGNMENTS COMMONLY ENCOUNTERED BY APPRAISERS

The assignments in which appraisers may be asked to analyze the impact of environmental risks on property values and real estate markets can be broadly characterized by type of client; date, dates of valuation, and evaluation; and intended use of the appraiser's report. Once the assignment is properly characterized, the type of analytical approach—whether appraisal, consulting, market analysis, highest and best use analysis, or some combination of all of those approaches—will be more readily apparent.

---

1. For more discussion about the relationship between the Competency Provision and assignments involving environmental risk analysis, see Richard J. Roddewig, "Contaminated Properties and Guide Note 8: Questions, Answers, and Suggestions for Reform," *The Appraisal Journal* (January 1998): 99–105. See also, The Appraisal Foundation, *Uniform Standards of Professional Appraisal Practice* (Washington, D.C.: The Appraisal Foundation, 1998), 5.

**Richard J. Roddewig, MAI,** is president of Clarion Associates, with offices in Chicago, Denver, and Philadelphia. He codeveloped the Appraisal Institute's seminar, "Environmental Risk and the Real Estate Appraisal Process," and has taught the seminar nationwide. He is a regular contributor to *The Appraisal Journal* on environmental issues, and has been an adjunct lecturer on real estate valuation at DePaul University, Chicago.

The most common types of clients encountered in this practice field are current or potential lenders; past owners, current owners, or potential buyers; governmental units and public agencies; and attorneys and their clients.

The analytical problem may require consideration of the real estate at a single point in time or on a series of dates on which the contamination or environmental risks are to be considered. The potential consideration dates include: (1) consideration of one particular retrospective date, on the current (or near-current) date, and on a particular prospective date, and (2) consideration of a series of retrospective dates, on the current (or near-current) date, and on a prospective date or a series of prospective dates.

The use of the analysis can be broadly characterized as being for lending/collateralization decisions, purchase/sale/hold decisions, public policy decisions (e.g., zoning approvals, regulatory proceedings, administrative hearings, policy analysis, legislative processes, etc.), and estimating damages in litigation. Of course, the nature of the contamination or risk affecting or potentially affecting the property may also be a key consideration in classifying the assignment and selecting the method of analysis.

## CLEANUP COSTS, STIGMA, TEMPORARY IMPACTS, AND FLUCTUATING VALUES

If each type of contamination and environmental risk permanently and uniformly affected all property types in every location on every date, then the proper analytical technique would be uniformly the same in virtually every assignment—an appraisal of the value of the property as of a specific date. As appraisers have learned, however, over the past two decades, it is not that simple, and a host of factors combine in a thousand different ways to make every contamination situation slightly different. But in every one of these situations, three essential questions emerge: (1) What will it cost to investigate and remediate the site? (2) How long will the environmental site assessment/remediation process last? (3) What is the stigma, if any, associated with the uncertainties that accompany the environmental site assessment and remediation process? Stigma may most simply be defined as the impact on value over and above the direct remediation costs.[2] It may or may not be present, and has been discussed in numerous *Appraisal Journal* articles.[3] The stigma impact can rise and fall in harmony with a variety of cycles.[4]

The basic stigma model shows that the property's market value typically takes a sudden plunge when contamination is discovered (see figure 1). Once remediation begins, the property's market value often starts to recover to its original level. However, even after remediation is completed, the market value may not have recovered to its precontamination level. In this model, environmental stigma is shown as the difference between the value of the property uncontaminated and the value of the property after remediation is completed. But even this oversimplified model shows that the level of environmental stigma can change over time (in this case, decrease) as the market value of the property gradually increases after remediation is completed.

In reality, the environmental stigma model is typically much more complex. Figure 2 shows how variables often present in environmental risk situations can complicate a situation: First, property values may decline slightly after the contamination is initially discovered, and then show a more precipitous decline until the full extent of the remediation cost is known.[5] Second, the value of the property can be reduced to less than zero if the remediation cost exceeds the value of the property disregarding the con-

---

2. Stigma is "an adverse effect on the market's perception of the value of property containing an environmental risk even after cleanup costs have been expended or considered an estimating value." See Appraisal Institute, "Environmental Risk and the Real Estate Appraisal Process," Seminar (Chicago, Illinois: Appraisal Institute, 1994), 128.

3. Peter J. Patchin, "Valuation of Contaminated Properties," *The Appraisal Journal* (January 1988): 7-16; Peter J. Patchin, "Contaminated Properties—Stigma Revisited," *The Appraisal Journal* (April 1991): 167-172; Bill Mundy, "Stigma and Value," *The Appraisal Journal* (January 1992): 7-13; and Mark Dotzour, "Groundwater Contamination and Residential Property Values," *The Appraisal Journal* (July 1997): 279-285.

4. Richard J. Roddewig, "Stigma, Environmental Risk and Property Value:" 10 Critical Inquiries," *The Appraisal Journal* (October 1996): 375-387.

5. In some situations, the reverse may also occur. Property values may drop precipitously when contamination is first discovered in expectation of substantial remediation costs, and then partially recover if the completed investigation reveals that a less costly remediation program is possible.



FIGURE 1 Basic Environmental Stigma Model

tamination.[6] Third, stigma is a component of the impact on value even during the remediation process. In other words, the value of the property may be even less than simply the difference between its uncontaminated value and the cost of the cleanup.

Of course, the trend lines representing the impact of contamination on property value and eventual recovery in value are usually not nice and straight in many environmental risk situations. Perceptions, prices, and therefore values may move in fits and starts in response to the complex interplay between various forces and cycles, including the remedial investigation and cleanup cycle, the legal, regulatory, and legislative cycle, the amount of attention in the media, and the degree of lenders' concerns about loans involving environmental risks. Often the more complex model will look like a stock market trend line, with



FIGURE 2 Typical Conditions That Complicate Environmental Stigma Situations

---

6. See Appraisal Institute, "Guide Note 8: The Consideration of Hazardous Substances in the Appraisal Process" in the Standards of Professional Appraisal Practice (Chicago, Illinois: Appraisal Institute, 1998): D23–D27. This guide note specifically recognizes that environmental contamination can create negative value.

peaks and valleys scattered along the general upward or downward pattern of movement.

As that model clearly shows, the stigma associated with the presence of contamination or environmental risk can change dramatically over time. Stigma can decline—and therefore property value increase—as site investigation and remediation proceed. Although in many situations, there is a lingering stigma even after cleanup, it too can dissipate over time or be suddenly eliminated in response to such factors as environmental insurance policies, seller indemnities, "no further action letters" from state or federal regulators, or simply market acceptance of any lingering risk.

## TAILORING THE ANALYSIS TO THE SITUATION

The following examples represent the types of environmental risk assignments that appraisers may be asked to evaluate.

**Assignment 1:** An electric utility company proposes an extension of an existing high-voltage power line. Residents in a new subdivision adjacent to one stretch of the proposed new right-of-way become concerned about the potential impact of the proposed line on the value of their property. There are 200 homes in the existing subdivision, including 20 immediately adjacent to the new power line corridor. Some residents even one-quarter mile away in the subdivision express concern that the corridor will adversely affect the value of their homes. The line must be approved by a state utility commission before it can be constructed. A group of concerned residents retains a real estate appraiser to analyze the potential impact of the proposed power line on home value in the subdivision. The electric utility company does the same.

**Assignment 2:** A real estate development company has recently completed the purchase of a piece of property for $1.0 million. The improvements on the property generate some income now, but the intention of the developer is to combine it with an adjacent site for redevelopment at its highest and best use. The developer investigated the property prior to acquisition and discovered some contamination that it believed could be readily remediated at a small cost. After acquisition, more extensive testing by an environmental assessment firm reveals much more significant contamination than was first believed. The *estimated* cost of total cleanup is now at $4.0 million–$7.0 million, depending on the remediation program and cleanup level achieved, and it is not clear yet whether state regulators will require the entire site to be cleaned or if something less than complete cleanup will be needed under the state's new "brownfield" program. More onsite testing is necessary to better qualify the appropriate remedial technique, cleanup timetable, and cost. Before starting a complete site investigation to determine the full nature and extent of contamination and the costs of remediation, the developers approach an appraiser for assistance in understanding the impact of the contamination on the property's value for advice on what to do with the property.

**Assignment 3:** An attorney calls on an appraiser to be an expert witness in complicated environmental litigation involving a hotel property. The contamination was discovered 10 years earlier, at a time when the then-owners of the hotel were in the process of negotiating a sale of the property. The hotel market at the time was extremely strong, and the sale had a high probability of being completed at a low capitalization rate and a high value. When the contamination was discovered, however, the potential buyer refused to sign the purchase contract that had been negotiated.

The hotel owners then started the long process of investigating the site and dealing with state regulatory agencies to discern the degree of cleanup that would be required or needed. Shortly after the discovery of the contamination, the national hotel market crashed. Prices that were paid for hotels in this market and nationwide plummeted in response to overbuilding, high vacancies, declining room rates, and lack of mortgage financing for hotel acquisitions. Occupancy and income at this hotel suffered along with other hotels in the same marketplace.

Attempts to sell the hotel were unsuccessful until recently when three things happened to change the situation: First, environmental investigations and state-mandated remediation were completed. Second, state environmental regulators issued a "no further action" letter clarifying that future owners of this property would not be responsible for any further environmental remediation so long as the existing use continued and no further disturbance of the site occurred. Third, the hotel market recovered to the point that buyers were once again interested and mortgage financing became available.

As a result of the changed market conditions and the completed remediation, the hotel was recently sold, but at a price substantially lower than the price negotiated 10 years before the contamination was discovered.

The hotel owners have recently sued the owners of a nearby property that was the source of the underlying contamination. One count of the claim is for damages to real estate. The attorneys for each side need a real estate analyst to evaluate the real estate damages, if any.

Each of the three case studies involves valuation issues, but in none is an appraisal in the traditional sense and format necessarily the best analytical solution. In assignment 1 involving the proposed power line, it might be possible to prepare an appraisal of the prospective value of the homes after the date of completion of the proposed new transmission line right-of-way. However, there are 200 homes in the subdivision, and to appraise them all and estimate the impact, if any, of the proposed power line on each one could be a time-consuming and expensive undertaking. For example, it could be that the potential impact, if any, might depend on the type of power line and the poles and pole configuration, the width of the right-of-way, setbacks, and prospective views of the poles from different locations in the subdivision. Each of those factors, among others, would have to be considered for each house.

This power line assignment is clearly one in which consulting rather than appraising is the better technique. USPAP defines consulting as "the act or process of providing information, analysis of real estate data, and recommendations or conclusions on diversified problems in real estate, other than estimating value."[7] Determining the potential impact, if any, of the proposed power line might also involve market analysis defined by USPAP as "the study of real estate market conditions for a specific type of property."[8] Both the homeowners and the power company are most likely interested in two central questions: (1) Will the proposed line have any impact on the market value of nearby property values? (2) If the proposed line will adversely impact nearby residential property values, which properties will be affected, how far from the power line will that impact extend, and what will be the likely percentage impact on home values?

Case studies of other subdivisions near power lines could be conducted, and adjustments made as necessary to account for locational and situational differences. Each of the appraisers involved could estimate the percentage impact, if any, likely to be experienced by homes near the power line, and their findings could be reviewed. The analysis could discuss whether such factors as the type of power line, view lines, type and price point of the homes, etc., make a difference. In any event, the assignment could be completed without estimating the market value of a specific house before and after considering the proposed power line.

In assignment 2, the full nature and extent of the contamination are not yet known, nor complete site investigation completed. Further, a remediation plan still has to be prepared and approved by regulatory authorities. However, the appraiser can prepare the following for the developer client at this early stage:

- He or she can prepare an estimate of the highest and best use and market value of the property disregarding the contamination. This can then be compared to the range of estimated cleanup costs.
- Next, the appraiser can compare the range of cleanup costs to the property's market value at its highest and best use or value in current use. The appraiser might also provide consulting to the developer on the types of stigma and the potential magnitude of the stigma (expressed as a percentage of market value) that people might associate with the property before, during, and after an approved remediation.

It may be premature for the appraiser to estimate the exact market value of the property considering the contamination, unless the market value uncontaminated was less than the likely cost of remediation, in which case the property would have "negative value."

Assignment 3 may be the most difficult of the three for the typical appraiser accustomed to valuing property at one particular point in time. The case is coming to trial 10 years after the discovery of the contamination. Even though it may be tempting for an appraiser to estimate the market value as of one particular point in the past "before and after" consider-

---

7. USPAP, 9.
8. USPAP, 10.

ing the contamination, doing so may lead to an inaccurate estimate of the true damages resulting from the discovery of the contamination. For example, if, on the second of the two previous stigma models presented, an appraiser picks year 4 as the key point and looks only at market value before and after considering the contamination, he or she might conclude that the damages are only $1.0 million. The same analysis process done one year later in year 5 may result in a damage estimate of $8.0 million. If year 9 is selected, the damage estimate may be only $5.0 million.

Values are changing over time in harmony with the total interplay between market forces and the environmental investigation and remediation process. It may be best for the appraiser in this situation to step back and ask, "What are the components of the damages to the property owner?" What the owner has lost as a result of the entire process of discovery, investigation, remediation, and eventual resale might include:

- Proceeds from the sale of the property before the discovery of the contamination and lost income in the net proceeds of that sale.
- An opportunity to sell the property due to the collapse of the hotel market that occurred after the discovery of the contamination.
- The difference between net income from the operation of the hotel before and after the discovery of the contamination and the subsequent downturn in the hotel market. (The income was lower than before the discovery of the contamination because occupancies, room rates, and net operating income were lower due to the downturn in the hotel market.)
- An inability to refinance at lower interest rates.
- Expenditures on environmental investigation and remediation.
- An inability to construct site improvements and hotel additions that would disturb the existing condition of the site.
- Additional marketing costs to find buyers.
- Upon the hotel market's recovery, the difference between the prediscovery price and the eventual sale price.
- Interest on the difference between the two prices and on the other losses.

The owner's gains might include:

- An increase in value due to remediation expenditures, completion of remediation process, and issuance of a "no further action letter"
- Interest on the positive net operating income, if any, that was generated

In litigation, all the losses and gains would need to be tallied as of the date of the trial in which damages are to be determined. Of course, underlying legal principles will determine which of the elements of measurable potential damage are recoverable, given underlying law, the particular jurisdiction, and type of case.

In other situations somewhat similar to assignment 3, it may be possible to measure damages by looking forward and undertaking discounted present value calculations to arrive at an estimate of damages on a particular date before the completion of all remediation and before full market value recovery.

## CONCLUSION

Measuring the impact of contamination and environmental risks on property values and property markets is not always simple. The complex interplay between the forces and factors at work in the marketplace usually means that estimating environmental stigma is like shooting at a moving target. In some situations, it is perfectly appropriate to select one particular date in time and compare the market value that considers the contamination to the market value that disregards all environmental risks. In other situations involving environmental risks and real estate, it may do the client little good to fix on one point in time or even on one particular property. It may be in conflict with established legal principles for measuring damages. When the appraiser has the advantage of looking back at a completed contamination investigation and remediation, the pattern of market value or sales price impacts may be more discernible than if the appraiser has to look forward from a vantage point before the remediation is completed. What all appraisers must do in these types of assignments is clear: They must understand the nature of the real estate assignment and correctly apply the appropriate technique to complete the analysis in a professional manner.