# ENVIRONMENT AND THE APPRAISER

## Classifying the Level of Risk and Stigma Affecting Contaminated Property

*Richard J. Roddewig, MAI*

Every year the appraisal profession and the real estate marketplace become more comfortable in evaluating the impact of environmental contamination on the market value of real property. As appraisers in this practice area have learned, the impact of contamination on the market value of property depends on a number of factors including, but not limited to:

- The type/intensity of contamination;
- The type of property (e.g., commercial, industrial, residential);
- The extent to which contamination interferes with current use or most probable future use during and after remediation;
- Site topographical conditions and characteristics;
- Geographic location;
- The status of the site investigation/environmental assessment and the extent of information about the location of the contamination on site;
- The source of the contamination (e.g., on-site, off-site, groundwater, air pollution);
- The applicable regulatory review process and the degree to which additional remediation is mandated by law or regulation;
- The stage of cleanup or remediation plan approval;
- Appropriate past, present, or future cleanup or monitoring methods and costs;
- The availability and strength of available environmental indemnities, if any;
- The availability and cost of environmental insurance policies and programs, either private or public;
- The availability of mortgage financing for properties undergoing similar types of investigation, remediation, and ongoing environmental monitoring; and
- Perceptions of the public and knowledgeable buyers in the property's marketplace.

When faced with a new contaminated property assignment, an appraiser should, of course, evaluate the new situation against the factors that determine the impact of contamination on market value. These factors have been addressed over the past decade in many articles in *The Appraisal Journal*[1] and in the *Environmental Risk and the Real Estate Appraisal Process* seminar of the Appraisal Institute. Many of these articles and the seminar materials recommend the use of case

---

1. See, for example, Peter J. Patchin, "Valuation of Contaminated Properties," *The Appraisal Journal* (January 1988): 7–16; Peter J. Patchin, "Contaminated Properties — Stigma Revisited," *The Appraisal Journal* (April 1991): 167–172; Bill Mundy, "Stigma and Value," *The Appraisal Journal* (January 1992): 7–13; Mark Dotzour, "Groundwater Contamination and Residential Property Values," *The Appraisal Journal* (July 1997): 279–285; Richard J. Roddewig, "Stigma, Environmental Risk and Property Value: 10 Critical Inquiries," *The Appraisal Journal* (October 1996): 375–387; and Randall Bell, MAI, "The Impact of Detrimental Conditions on Property Values," *The Appraisal Journal* (October 1998): 380–391.

**Richard J. Roddewig, MAI,** is president of Clarion Associates, with offices in Chicago, Denver, and Philadelphia. He codeveloped the Appraisal Institute's seminar, "Environmental Risk and the Real Estate Appraisal Process," and has taught the seminar nationwide. He is a regular contributor to *The Appraisal Journal* on environmental issues, and is an adjunct lecturer on real estate valuation in the Finance Department at DePaul University, Chicago.

studies as one of the appropriate methods for determining the impact of contamination, especially the stigma impact of contamination, on market value.[2] Appraisers who regularly specialize in this practice area compile extensive case study information from their investigations when appraising a piece of contaminated or formerly contaminated (but now remediated) property.

What the various articles and seminar materials have not yet addressed in detail, however, is how to classify the case studies and the subject property in order to compare the contamination at the subject property with the indicated impact on value, if any, or the stigma impact identified in the case study research. Classification may also be especially helpful in some types of real estate decision making; for example, portfolio review or evaluation, or buy/sell decisions. Some major institutional investors and underwriters are beginning to develop their own standardized due diligence checklists and evaluation forms that allow them to analyze the environmental risks on properties or portfolios as part of a systematic underwriting process. Institutional investors may be heading toward a numerical scoring or rating system for environmental risks (more on this in a future edition of this environmental column) but a standardized system has not yet emerged.

In the meantime, appraisers can begin to develop their own internal evaluation systems and forms to assure analytical rigor and internal consistency from one assignment to the next in estimating the impact of contamination on market value. These evaluation systems can be used in two ways: first, as a way of pigeonholing each new case study or contamination comparable into a consistent analytical framework; second, as a way of then comparing the property being appraised to the outcomes of past assignments involving contaminated or potentially stigmatized property.

### USE OF CASE STUDIES TO ESTIMATE ENVIRONMENTAL STIGMA

The appropriate method for appraising property affected by contamination varies from one valuation situation to another, depending upon the particular set of factors from the list above that apply. Using sales of contaminated properties as direct evidence of the value of property after considering contamination is often difficult. This is because of the small number of such transactions and the problems involved in making proper adjustments to reflect distinguishing factors.

When contaminated property sales are not available or not truly comparable, analyzing case studies of contaminated properties to discern implications for market value arising from contamination is appropriate. Case study analysis is specifically recognized as an appropriate valuation technique by the Appraisal Institute in *Environmental Risk and the Real Estate Appraisal Process*, the Appraisal Institute's official seminar on the valuation of contaminated property.

Environmental stigma is "an adverse effect on the market's perception of the value of property containing an environmental risk even after cleanup costs have been expended or considered in estimating value." (Appraisal Institute, *Environmental Risk and the Real Estate Appraisal Process*, Chapter 6).

Indeed, in some situations, previously contaminated properties may suffer a diminution in value as a result of past contamination even after cleanup. This may also be true of some clean properties located in proximity to known contaminated property.

Stigma is not uniform, however, and is not always present. Factors such as type of contamination and type of property affect the possible presence and effect of stigma, if any. Buyer concerns about environmental stigma typically arise due to risks they may fear will result from the presence of contamination, including the risks of:

- Additional site investigation costs;
- Additional remediation costs;
- Additional environmental monitoring costs;
- Additional legal or administrative costs associated with ownership of the property;
- Potential adverse changes in regulations concerning required levels of investigation, remediation, and monitoring;
- Higher vacancies or lower rents due to tenant concerns or interference with occupancies and use by tenants;

---

2. See Appraisal Institute, "Environmental Risk and the Real Estate Appraisal Process," Seminar (Chicago: Appraisal Institute, 1994), 126. Also see Randall Bell, MAI, "The Impact of Detrimental Conditions on Property Values," The Appraisal Journal (October 1998): 388.

- Potential inability to obtain mortgage financing;
- Third-party claims against future property owners due to health or property value risks related to past occupancy or use; and
- Potential delays in ability to resell the property or potential inability to resell the property in the future.

Appraisers who have conducted a number of assignments involving contamination and potential stigma may begin to discern a pattern or patterns emerging from the case study research. What may at first appear to be a somewhat random collection of case studies showing no stigma in some fact situations and significant stigma in others, can, upon further analysis, be systematized. While every appraiser can come up with his or her own approach to classifying case studies, each of these contamination/stigma case studies can be placed into at least three basic categories: "high risk/high stigma" situations, "low risk/low stigma" situations, and "changing risk/changing stigma" situations.

### TYPICAL CHARACTERISTICS OF HIGH RISK/HIGH STIGMA SITUATIONS

Each of these types of risk/stigma relationships has a typical set of characteristics. The typical characteristics of high risk/high stigma situations are:

- Little or no site investigation has been completed as of the date of sale or offering.
- Site investigation that has been done indicates property-wide presence of contamination in relatively high concentrations.
- Remediation costs are unknown, unquantifiable, or hard to determine.
- The type of remediation plan and program likely to be required by regulators is uncertain.
- There are no federal, state or local programs to pay for some or all of the potential investigation, remediation, and monitoring costs.
- The length of the likely remediation program and monitoring is undetermined or uncertain.
- Prior owners or parties responsible for the contamination do not recognize a cleanup responsibility and have not indicated willingness to pay for remediation costs or potential stigma impacts, or to provide indemnities to future owners to offset potential risks.
- The property fails to qualify for private sector or public sector environmental risk insurance programs.
- The contamination situation at the particular property has received considerable adverse media attention emphasizing the severity of the problem or risks.
- Uncontaminated or remediated portions of the whole property cannot be subdivided and sold separately.
- Lenders indicate considerable unwillingness to make loans on this property or type of property.

### TYPICAL CHARACTERISTICS OF LOW RISK/LOW STIGMA SITUATIONS

Some of the typical characteristics of low risk/low stigma situations are as follows:

- Thorough site investigation has been completed.
- Remediation costs are known with considerable certainty.
- A remediation plan has been prepared, submitted for regulatory review, and approved by appropriate regulators.
- The approved remediation plan has been implemented.
- Regulators have issued "no further action" or "closure" letters indicating prospective future purchasers/owners will not be subject to any additional cleanup costs as long as specific requirements for future use of the property are followed.
- Prior owners or parties responsible for the contamination have recognized their cleanup responsibilities, paid for their appropriate share of remediation costs, and provided indemnities to current or future owners to offset potential remaining risks.
- The property qualifies for private sector or public sector environmental risk insurance programs.[3]
- Media attention has focused on the diminished contamination and risks associated with the property.

---

3. For a discussion of utilization of environmental insurance cost estimates in the appraisal process, see Richard J. Roddewig, MAI, "Using the Cost of Environmental Insurance to Measure Contaminated Property Stigma," *The Appraisal Journal* (July 1997): 304–308.

**TABLE 1   Analysis of Risks Associated with Contaminated Real Property**

| Characteristic of Low Risk/Low Stigma Property | Property Address | | Comments |
|---|---|---|---|
| Thorough site investigation completed | Yes | No | |
| Remediation costs are known with considerable certainty | Yes | No | |
| Remediation plan prepared, submitted for review, and approved | Yes | No | |
| Regulators have issued no further action or closure letter | Yes | No | |
| Prior owners or other parties take responsibility and provide indemnity | Yes | No | |
| Property qualifies for private/public environmental risk insurance | Yes | No | |
| Media attention has focused on diminished contamination/risks | Yes | No | |
| Portions of the property little contaminated and can be subdivided & sold | Yes | No | |
| Lenders indicate ready willingness to make loans | Yes | No | |
| Total low risk/low stigma "yes" answers | | | |
| Total low risk/low stigma "no" answers | | | |
| **Characteristic of High Risk/High Stigma Property** | **Property Address** | | **Comments** |
| Little or no site investigation completed | Yes | No | |
| Site investigation conducted indicates property-wide contamination | Yes | No | |
| Remediation costs are unknown, unquantifiable, or hard to determine | Yes | No | |
| Type of remediation plan required by regulators is uncertain | Yes | No | |
| No federal, state or local programs to pay for investigation/remediation | Yes | No | |
| Length of likely remediation/monitoring undetermined | Yes | No | |
| Prior owners/others do not accept responsibility and/or no indemnity | Yes | No | |
| Property does not qualify for private/public environmental risk insurance | Yes | No | |
| Considerable adverse media attention | Yes | No | |
| Uncontaminated portions of the property cannot be subdivided and sold | Yes | No | |
| Lenders indicate considerable unwillingness to make loans | Yes | No | |
| Total high risk/high stigma "yes" answers | | | |
| Total high risk/high stigma "no" answers | | | |

**TABLE 2   Degree of Potential Risks Associated with Future Ownership**

| Risks | Low | Med | High | Comments |
|---|---|---|---|---|
| Additional site investigation costs | | | | |
| Additional remediation costs | | | | |
| Additional environmental monitoring costs | | | | |
| Risk of additional legal/administrative costs | | | | |
| Potential adverse change in regulations | | | | |
| Higher vacancy or lower rents due to environmental issues | | | | |
| Inability to obtain mortgage financing | | | | |
| Third-party claims | | | | |
| Delays in ability to resell the property or inability to resell | | | | |
| Totals | | | | |

- Uncontaminated portions of the property can be subdivided and separately sold.
- Lenders indicate ready willingness to make loans on this property or type of property.

In many situations, as site investigation, regulatory review, remediation, and environmental monitoring continues, an initially high risk/high stigma property may later become a low risk/low stigma property. Of course, lots of gradients exist between high risk/low stigma and low risk/low stigma properties.

### FACT SITUATIONS SHOWING HIGH RISK/HIGH STIGMA CHANGING TO LOW RISK/LOW STIGMA

Sometimes, case studies reveal that risks and stigma have changed with the passage of time. As environmental investigation, regulatory review, remediation, and environmental monitoring continues, properties that once had significant stigma may evolve into ones with little or no stigma. Finding and evaluating such case studies may be important in some valuation situations, especially in many litigation assignments. For example, an appraiser might be asked to provide an opinion concerning damages over time or the likelihood that risks and stigma may change if particular changes in the underlying facts are assumed.

### A FORM FOR CLASSIFYING THE CASE STUDIES AND THE PROPERTY APPRAISED

Based on the review of the respective contamination and environmental remediation/ monitoring situations, using table 1 an appraiser can "score" each case study and the property being appraised on the set of factors that distinguish a property as low risk/ low stigma or high risk/high stigma. By tallying the number of "yes" and "no" answers, the appraiser can categorize the case study and the subject property properly within the risk/stigma universe.

As a check on the comparison of the appraised property with the case study, the appraiser might also want to undertake a risk evaluation of the subject property. In table 2, most of the various risks associated with owning a contaminated or remediated property have been included. Those types of risks are the essential elements of stigma.

### USING THE SCORECARDS

Once the scorecards have been completed, an appraiser can use them as a point of comparison. The appraiser can compare the number of "yes" and "no" answers for a case study on the risk/stigma scorecard with the "yes" and "no" answers for the property being appraised. If analysis of the case study or case studies with the pattern of "yes" and "no" answers closest to the appraised property indicated a stigma impact of 5.0 to 10.0%, then there would be support for (all other things being equal) a deduction of 5.0 to 10.0% against the market value of the appraised property to account for stigma impact.[4] The second scorecard indicating the low/medium/high risks for the appraised property serves as a check on the results of the first analytical approach.

### CONCLUSION

This system is only one possible approach to systematizing the analysis of stigma impacts on contaminated or remediated properties. There are many others. Appraisers with considerable experience with contaminated properties may want to assign points or otherwise weight the various answers in the scorecards based on what their expertise and the marketplace tell them about the relative significance of each factor in contributing to stigma. But even the simplest of scorecards such as those shown here can help provide consistency in appraisers' efforts to understand stigma and how it may vary from one contaminated property situation to another.

---

4. Of course, the appraiser also has to be aware that the comparison tables do not account for all of the potential differences between a case study and the appraised property.