# PART II

# TAB 7

## IX.   WORKER SAFETY AND HEALTH (DEFENDANTS' MIL NO. 7)

Plaintiffs contend that defendants' motion should be denied without disputing a single one of the bases for an exclusion of worker safety and health issues from the trial. Defendants' motion should be granted.

### A.   Worker Safety and Health Issues Should Be Excluded For Numerous Reasons Explained in Defendants' Motion, None of Which Is Disputed By Plaintiffs.

In their motion to exclude evidence of worker safety and health, defendants list a substantial amount of testimony from plaintiffs' witnesses (including their experts) and a number of documents on their preliminary exhibit list dealing with worker safety and health issues. (Defs.' MIL No. 7 at 2-5.) Defendants then explain that such evidence should be excluded for several reasons. *First,* there is no claim in this case that would allow plaintiffs to recover for harm to workers, and such recovery is barred by the Worker's Compensation Act. (*Id.* at 5-6.) *Second,* worker safety and health issues are irrelevant to plaintiffs' class-wide nuisance and trespass claims in this case. (*Id.* at 6-9.) In fact, Magistrate Judge Borchers has ruled that evidence of releases within a building that affected only employees is not relevant in this case. (6/14/94 Order at 2.) Moreover, evidence about worker safety issues is impermissible "propensity" evidence because it would be used to show bad character, not anything about plaintiffs' claims. (Defs.' MIL No. 7 at 9-10.) And even if plaintiffs could link worker safety issues to their claims (which they cannot), such evidence would not be class-wide. (*Id.* at 10-11.) *Third,* worker safety and health issues and anecdotes are extremely, unfairly prejudicial because such evidence could inflame the passion of the jury against defendants and encourage them to base a verdict on issues other than the merits of the case, which involves class members who never experienced

such issues on a class-wide basis. (*Id*. at 11-12.)  ***Fourth***, spending time on worker issues also would waste trial time and distract the jury from the issues they will be called upon to decide. (*Id*. at 12-13.)

In response, plaintiffs ***do not dispute a single one of these reasons***.  Indeed, plaintiffs claim, despite the numerous worker safety and health issues raised in their trial exhibits, expert reports, and fact witness deposition testimony, that they do not intend to "turn this case into a trial on the issue of worker health."  (Pls.' Resp. at 23.)  Plaintiffs do not, however, deny their intent to use any worker-specific exposure and health evidence.  (*See* Defs.' MIL No. 7 at 2-5.) Furthermore, plaintiffs claim that a ruling excluding all worker exposure and worker health evidence "would be overbroad," further indicating their intent to use this evidence at trial.  (Pls.' Resp. at 23.)

**B.      This Court Should Prevent Evidence of Worker Safety and Health from Coming in by Granting Defendants' Motion.**

This Court should hold plaintiffs to their failure to dispute any of the reasons that worker safety and health should not be part of this trial, and should not allow them to get in worker safety and health evidence through the back door, allegedly for other reasons.

***First***, plaintiffs claim that evidence of worker compensation or other similar proceedings might be necessary because "such information might have some passing bearing on other issues such as motive or credibility."  (Pls.' Resp. at 22.)  But plaintiffs do not offer a single concrete example of when such information would be relevant.  Plaintiffs bear the burden of identifying any "passing reference" that would be admissible.  Obviously, any "passing reference" to workers' compensation proceedings would be irrelevant, because it would not be probative of "an issue of consequence to the determination of the action."  Fed. R. Evid. 401.  It would also

be unduly prejudicial for the reasons discussed above.  In addition, if this issue arose at trial, there is no reason the Court could not entertain a narrow exception to its ruling excluding worker health and safety related evidence at trial, as plaintiffs concede. (Pls.' Resp. at 22-23.)

*Second*, plaintiffs claim that their experts *may* rely on literature reflecting investigations of populations that include nuclear workers at Rocky Flats and elsewhere. (Pls.' Resp. at 23.) But plaintiffs do not cite a single such instance where their listed (and not yet withdrawn) expert witnesses do rely on such a study, and defendants are not aware of any.  Moreover, it is well-settled that experts typically may not testify about the bases for their opinions if those bases are inadmissible evidence.  *See* Fed. R. Evid. 703 ("Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the [expert] unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect")  Thus, granting defendants' motion would not prohibit any relevant expert testimony.

*Third*, plaintiffs claim that there may be situations in which evidence of worker safety and health issues are relevant for other reasons. (Pls.' Resp. at 23.)  Plaintiffs cite that evidence of "containment" of plutonium may involve worker safety. (*Id.*)  But this example or proposed use of employee safety evidence would be improper.  Evidence of "escapes of containment" within buildings is *not relevant* to either plaintiffs' class-wide trespass or nuisance claims, as Magistrate Judge Borchers specifically ruled. (6/14/94 Order at 2 ("any releases within a building that affected only employees within that building would not affect this case").)   While plaintiffs remark that a release must begin somewhere, releases limited to within buildings that

impact only worker safety (if even that), have nothing to do with any impact on the class, and plaintiffs cannot link such incidents to their class-wide trespass and nuisance claims.

**Finally**, plaintiffs argue, without any factual or legal support or record citation, that evidence that defendants were tolerant of onsite exposures (presumably affecting only employees) "permits an inference that they were similarly incautious as to offsite exposures." (Pls.' Resp. at 23.) Aside from the fact that plaintiffs provide no basis for drawing such speculative inferences from onsite worker health and safety data (and there is none), the suggested inference is not legally permissible, because it falls squarely within Rule 404(b)'s prohibition on character evidence used to show propensity to commit bad acts. (Defs.' MIL No. 7 at 9-10.) This argument reveals that plaintiffs seek to use evidence of onsite exposures or conditions affecting only workers to try to prove that defendants have a propensity to be incautious. Any such suggestion from this evidence is entirely improper. It would also encourage the jury to reach any verdict on a potentially improper basis, supporting exclusion under Rule 403. (*See id.* at 11-12.)

In short, plaintiffs have not disputed any of the reasons that evidence of employee safety and health should be excluded. Nor have they provided any justification for failing to exclude all such evidence at this time. Defendants' motion should be granted.

# TAB 8

## X.   RELEASES AND EVENTS OCCURRING WHOLLY WITHIN BUILDINGS (DEFENDANTS' MIL NO. 8)

Defendants move in *limine* to exclude evidence related to releases and incidents that occurred wholly within buildings. In their motion, Defendants describe a substantial amount of fact witness deposition testimony and expert opinion by plaintiffs' proposed witnesses, as well as a number of plaintiffs' trial exhibits, dealing with such releases and incidents. (Defs.' MIL No. 8 at 2-4.) Plaintiffs do not deny that they intend to use any of this evidence (or other evidence involving such releases and incidents). (Pls.' Resp. at 23-25.)

In their motion, defendants contend that these releases and incidents are irrelevant to any class-wide issue to be tried in this case, because any release or incident that occurred in, and was limited to, the interior of a plant building, did not cause any intrusion onto class properties, did not cause any actual exposure to class members, and has not been linked to any objectively demonstrable conditions with potential for future release and remobilization that would affect the entire class. (Defs.' MIL No. 8 at 5-10.) Defendants explained that such evidence is not (and could not be) class-wide. (*Id.*) In fact, Magistrate Judge Borchers has agreed in the context of discovery that "releases within a building that affected only employees within that building would not affect this case." (6/14/94 Order at 2.) Defendants also explained that Rule 403 balancing requires the exclusion of releases and incidents occurring solely within buildings, because the jury might base its damages on those issues rather than evidence related to the merits of plaintiffs' claims and mini-trials on these releases and incidents would waste trial time. (Defs.' MIL No. 8 at 10-12.)

In their response, plaintiffs do not attempt to explain how events occurring solely within buildings are relevant to any element of a claim *that will be tried in the class-wide trial*. (Pls.'

Resp. at 23-25.)  Nor do they even address Magistrate Judge Borchers' ruling.  (*Id.*)  They also say nothing about the reasons this evidence should be excluded under Rule 403.  (*Id.*)  Instead, plaintiffs offer a number of flawed reasons why the Court should allow them to introduce this type of evidence.  (*Id.*)

### A.     Incidents Occurring Wholly Within Buildings are Not Relevant for any Purpose.

Plaintiffs first claim that evidence of "***containment of plutonium***" is relevant "to a host of issues," "whether or not [disregard for containment] manifested 'wholly within a building'." (Pls.' Resp. at 23.)  Whether or not evidence of containment of plutonium that never breached the building is relevant "to a host of issues," it is ***not*** relevant to any issue that is at stake in the class-wide trial.  (*Id.*)  Plaintiffs have not linked (and cannot link) – as is their burden at this juncture – such evidence to any trespass onto all class properties or release and common, class-wide exposure and increased health risk, because there would be, by definition, no evidence that any plutonium ever left the building.  (*See Cook IX*, 273 F.Supp.2d at 1199-200; 5/17/05 Order at 2-5, 8-10.)  Similarly, plaintiffs have not linked (and cannot link), any releases or incidents occurring wholly within buildings to any objective conditions that exist and are continuing and that pose a real and verifiable risk of future harm to the entire class area, especially in light of the onsite building demolition and remediation efforts.  (5/17/05 Order at 5-6; *see further* Defs.' MIL No. 8 at 8 (discussing demolition and remediation).)  Evidence of "plutonium in the duct-work" is irrelevant for the same reasons (plaintiffs' failure to link the evidence to any issue at stake in the class-wide trial).  (*See* Pls.' Resp. at 23.)  Under these circumstances, such evidence is not admissible.

Nor is such evidence admissible because it is somehow relevant to "well-founded market perceptions" either. (*See id.*)  As discussed above, market perceptions are only relevant to this case where they stem from a recoverable trespass or nuisance, and plaintiffs have not proven that any such releases and incidents (including any containment issues solely within buildings) were known by the market, much less that they caused a market reaction.

Nor is such evidence relevant because it demonstrates general "waste storage practices that created risks of future release" or a "pattern or practice of negligent waste practices." (*Id.*) Plaintiffs make these vague assertions without linking any evidence of releases and/or incidents solely within buildings to any practices that created an objectively demonstrable condition that exists and is continuing and that constitutes a real and verifiable future risk to the entire class area.  Moreover, any such evidence of releases and/or incidents is simply improper propensity evidence. (*See further* Defs.' MIL No. 8 at 9.)

**B.      Defendants' Motion Seeks to Confine Plaintiffs to Triable Issues set Forth in the Court's May 17, 2005 Order.**

Plaintiffs assert that this motion "should be treated with caution," because it has "insidi-ous potential." (Pls.' Resp. at 24.)  They then take issue with they way defendants "envision" the case. (*Id.*) But there is nothing "insidious" about defendants seeking to limit the evidence to that which is relevant to the claims that will be tried in the class-wide trial as this Court has defined those issues.  In fact, that is the point of the Federal Rules.  *See* Fed. R. Evid. 402 (evidence that is not relevant should be excluded).  Nor is there anything "insidious" about defendants simply urging the Court to apply its Orders to determine what evidence is relevant.  *See Arizona v. California*, 460 U.S. 605, 618 (1983) (the law of the case doctrine provides "when a court

decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.").

Furthermore, plaintiffs' exaggerated portrayal of defendants' position is not fair or accurate. Defendants seek to require plaintiffs to show, as is their burden, that their evidence is relevant to an element of the claims that the Court has ruled will be tried in October. The Court's May 17, 2005 Order requires plaintiff to make certain showings to establish a class-wide trespass and nuisance. Under the Court's rulings, it will be necessary, at a minimum, for plaintiffs to demonstrate "the fate" of "some defined contaminant" (*i.e.*, plutonium), show that it was released from Rocky Flats, and "trace its detailed migrational path to the great outdoors." (*See* Pls.' Resp. at 24.) Certainly for a class-wide trespass and/or a class-wide nuisance based on actual releases and common, class-wide exposures, plaintiffs also would have to "portray in detail its dispersal offsite into a classwide environment," "document its permanent presence there," and "quantify the resulting health risks," as well as establish that they were common and class-wide. (*See id.*) For a class-wide nuisance based on threat of future harm, plaintiffs have to make additional showings described elsewhere. (*See* Section I.B. *supra.*) Then, to prove damages, plaintiffs must prove that the market possessed knowledge of these nuisances and/or trespasses and that property values were diminished as a result. There is nothing unfair or unduly burdensome about any of these requirements, as plaintiffs imply. Rather this is what this Court's Orders require of plaintiffs. (*See* 5/17/05 Order at 2-6.)

Plaintiffs' "veil of secrecy" accusation does not warrant any relaxation of the relevancy requirements either. (*See* Pls.' Resp. at 24.) Similarly, plaintiffs' argument that defendants and their indemnitor "decree[d]" which releases were within buildings lacks any foundation and

improperly attempts to shift the burden of proof on relevance from plaintiffs to defendants.  (*Id.*)

Plaintiffs cannot build a case on events that are so unrelated to their class-wide claims that those

claims must "be judged only indirectly and by inference" as they claim.  (*Id.*)  And the jury does

not have an option to simply reject "defendants' say-so" about consequences outside buildings

(*id.* at 25) rather, ***plaintiffs*** must show that an incident and/or release breached the building and

had an effect that meets the required elements of their trespass and/or nuisance claims.

> **C.**     **Defendants' Motion is Reasonably Designed to Exclude Only Irrelevant Evidence.**

Defendants' motion does not seek to exclude otherwise admissible evidence of events

that began within buildings that plaintiffs can link, as they must, to their class-wide claims to be

tried.  Thus, plaintiffs' claim that the motion goes too far is without merit.  (Pls.' Resp. at 24-25.)

In fact, the motion is tailored to exclude only entirely irrelevant evidence.

# TAB 9

## XI.    INVENTORY DIFFERENCE OR MUF (DEFENDANTS' MIL NO. 9)

Plaintiffs' response to defendants' motion in *limine* to preclude evidence related to "inventory difference" ("ID") is inadequate and insufficient to establish the admissibility of such evidence.  In their motion, defendants demonstrate that ID evidence has ***nothing*** to do with either actual releases of plutonium from Rocky Flats affecting all class members or the real verifiable threat of such releases.  Defendants also demonstrate that ID evidence cannot be used to calculate releases or actual exposure levels to all members of the class or to prove real verifiable threats, such as those due to on- or offsite contamination to all members of the class.  As defendants have already noted, even plaintiffs' purported "expert" testified that whether there were any releases to the environment containing ID is pure speculation:  "one simply doesn't know whether that [MUF] was released."  (Cochran Dep. at 261, 263.)

In response, plaintiffs have offered this Court roughly one page of conclusory statements containing a wealth of angry rhetoric but a dearth of facts.  Plaintiffs point this Court to ***no*** authority whatsoever to demonstrate the admissibility of ID evidence.  Indeed, they ***cannot*** do so.  Even plaintiffs' "expert" concedes in his report that there is no valid basis for drawing any inferences from ID evidence about the quantity of plutonium released to the environment.  (Cochran Rep. at 16.)  Plaintiffs have not demonstrated (and cannot show) that any amount of ID was either released or actually harmed ***any*** member of the class, let alone all members of the class.

Plaintiffs take this even farther by falsely claiming that MUF evidence demonstrates that defendants "habitually mislaid multi-kilogram chunks" of plutonium at the Rocky Flats plant.[1] (Pls.' Resp. at 26.)  By way of contrast to their latest statement, plaintiffs' own expert agrees that ID is a combination of such factors as measurement errors, "process holdup," and "unmeasured discards shipped to Idaho for burial." (*See* Cochran Report at 9.)  Plaintiffs' new accusation highlights exactly why ID evidence should not be admitted.  Rhetoric aside, the simple fact remains that they cannot prove that any amount of ID was released at all, let alone that it harmed every member of the class.

A.     **Plaintiffs Cannot Link ID to Any Amount of "Missing" Plutonium, Let Alone Prove That Any ID Material Was Released.**

Plaintiffs' response to Defendants' motion in *limine*, taken together with plaintiffs' response to Defendants' motion to exclude expert testimony, betray plaintiffs' fundamental failure to understand ID evidence or its application to the facts of this case.  Although plaintiffs offer no definition of "inventory difference" in their response to the motion in *limine*, their *Daubert* response defines ID as "nuclear material used at Rocky Flats that defendants cannot find." (Pls.' *Daubert* Resp. at 115, 121; *see also* Pls.' Resp. at 25.)  That is manifestly untrue.  An inventory difference or ID occurs when the "book value" of a substance is different from the values observed during a physical inventory -- it is not "missing" nuclear materials.  (*See* Ex. 1 to Defs.' MIL No. 9, N.J. Roberts, *et al.*, "A Discussion of Inventory Difference, Its Origin and Effect," at 1 (1994).)  This is the same definition as that employed by plaintiffs' expert Thomas Cochran. (*See* Cochran Report at 3-5.)

---

[1] This unsupported assertion does not meet the legal standard for evidence offered to show habit under Federal Rule of Evidence 406.  (*See* Section I.D *supra*.)

ID measurements *do not* measure amounts of "missing" plutonium or other nuclear materials. ID reflects differences in inventory and book value that are caused by numerous sources, including measurement errors, process holdup, and large quantities of unmeasured discards that have long been buried out of state. For example, there was significant process holdup at the Rocky Flats plant – perhaps as much as 300 kilograms of plutonium. (Cochran Rep. at 9 (quoting Roberts, *et al.*, *supra*, at 10).) In addition, much of the measured ID resulted from the limitations of the technologies used in measurement. Any ID measured in the 1950s, such as that associated with the 1957 fire, can be explained by the less-advanced measurement equipment and techniques that were used at that time. (*See* Roberts, *et al.*, *supra*, at T-6 (Table 3) (showing early measurement capabilities to be "poor").) At early stages of the plant's history, the ability to measure certain materials was not as accurate or precise as it later became, and measuring equipment did not have as low of a level of sensitivity, as in later times. (*Id.* at 5-7.) Further, according to plaintiffs' own expert, large amounts of the estimated ID figure are due to errors in estimating normal operating amounts as well as unmeasured discards shipped to Idaho for burial. (*See* Cochran Rep. at 9 (stating that the amount of plutonium in drums shipped to INEL for burial is underestimated by up to 800 kg) (citing Roberts, *et al.*, *supra* at 9); *see also* Ex. 2 to Def.'s MIL No. 9, Paul Voilleque, "Examination of Mass Balance Accounting as a Means for Estimating Plutonium Releases," at 5 (May 1995).) The discard amounts, combined with even low-end estimates of process holdup and measurement uncertainties, are sufficient to account for all or virtually all of estimated ID from Rocky Flats. (*See* Roberts, *et al.*, *supra* at 9; *id.* at 10; Cochran Rep. at 9.)

Plaintiffs do not offer any evidence to the contrary to show that ID or MUF equals missing nuclear material. (*See* Pls.' Resp. at 25.)   Plaintiffs have utterly failed to show that ID measures *any* "missing" plutonium, as opposed to measurement uncertainties, process holdup, and the like. They have even admitted that they cannot do so. (*See id.*)   Accordingly, ID has no relevance for this purpose.

**B.      Plaintiffs Cannot Link ID to Any Offsite Release or Impact.**

As discussed at length in defendants' motion in *limine* (Defs.' MIL No. 9 at 7-10), evidence of ID has nothing to do with whether defendants caused an intrusion on plaintiffs' real property or whether all class members experienced common, class-wide plutonium exposure and increased health risk. Although plaintiffs suggest that ID documents relate to "environmental contamination" (2/15/96 Hr'g. Tr. at 13), their experts did not (and cannot) estimate any releases to the environment – much less exposures with increased health risk to all members of the class – using mass balance accounting or inventory differences.

Nothing in plaintiffs' response brief changes the fact that Cochran cannot link ID to impact on all class members and cannot provide *any* estimate of the amount of plutonium that was released from Rocky Flats using a mass balance or inventory difference methodology. (*See* Cochran Dep. at 259-65.)   His suggestion that "releases *could be* orders of magnitude higher" than actual release measurements is not science, it is pure speculation. (*See* Cochran Rep. at 16-17.) (emphasis added))   The National Academy of Sciences found that "the engineering mass balance approach has no potential value in determining releases by difference." RAC found that it is not "it is not feasible to make quantitative estimates in this way." (*See* Voilleque, *supra*, at

4 (citing National Academy Press, "Tracking Toxic Substances at Industrial Facilities" (1990));
*id.* at 5.)

Plaintiffs' only response to this fatal flaw is the conclusory assertion that "[e]veryone should" agree that "MUF data do shed light on some known releases," followed by the assertion (without any citation to supporting documents) that an internal report on the 1957 fire includes ID calculations. (Pls.' Resp. at 25)  Plaintiffs' assertions are spurious for reasons already spelled out in defendants' motion.  (*See* Defs.' MIL No. 9 at 9-10.)  The presence of ID, whether positive or negative, simply does not prove that any plutonium was released either onsite or offsite, let alone that it contaminated the class properties or causes common, class-wide exposure with increased health risk.  Plaintiffs have made no showing otherwise.  (*See* Pls.' Resp. at 25-26)

### C.    ID Evidence is Irrelevant to Plaintiffs' Future Risk Based Claims and is Highly Prejudicial.

Faced with the obvious fact that ID evidence is irrelevant to their claims, plaintiffs have shifted their strategy and now offer the conclusory statement that ID evidence is "plainly germane to the risk of future harms, public perception, market discounts, and fears generically experienced by persons residing near the plant."  (Pls.' Resp. at 25.)  But plaintiff point to no evidence that any ID either caused on or offsite contamination that could be released or remobilized, let alone in such a way as to cause increased health risk to all class members or to affect the entire class area.  In their response brief, plaintiffs make no effort to link ID with any "real, verifiable threat" or "objectively demonstrable risk of future harm" that is "based on objective conditions, such as existing contamination on-site and off-site that may be released or remobilized in some fashion that would result in human exposure and increased health risk, that have the potential to affect all of the Class Area." (5/17/05 Order at 6.)

Nor could they show that evidence of MUF was relevant to any such future risk from plutonium. All fissile material (*e.g.,* all special nuclear material including all weapons-grade plutonium) has been removed from the plant. Plutonium operations at the plant have ceased. (*See generally* www.rfets.gov/doe; Whipple Suppl. Rep.; Blaha Suppl. Rep.) All plutonium processing buildings have now been dismantled and removed. (*See* Ex. 1 to Defs.' MIL No. 16, www.rfets.gov/doe/NewRelease/B771fnl.pdf; Ex. 2 to Defs.' MIL No. 16, www.rfets.gov/doe/EndVision/ENO5-0418.pdf; Ex. 3 to Defs.' MIL No. 16, www.rfets.gov/doe/EndVision/ENO5-0119.pdf.) Thus, it is not surprising that plaintiffs fail to show any impact from MUF that is enduring or that will continue indefinitely, as required by the Court's May 17, 2005 Order.

As discussed more above (*see, e.g.,* Section I.B.3 supra), linking ID or MUF to public perception or market reaction is insufficient to render it probative of plaintiffs' class-wide claims to be tried. Publicity or market reaction is only relevant if it relates specifically to the class-wide claims of trespass or nuisance.

Similarly, plaintiffs' assertion, without any citation to the record, that MUF contributed to anxiety or fears of people living near the plant is not enough to make it admissible. (Pls.' Resp. at 25.) Plaintiffs do not suggest that this was a class-wide response – "people living near the plant" does not equal, and cannot simply be substituted for, the class. Moreover, the Court has already found that injury or harm based on plant proximity is insufficient for liability here. *Cook IX*, 273 F. Supp. 2d at 1208. Even as to the generic causation of fear and anxiety, plaintiffs must still link their evidence an actionable class-wide basis for liability.

Plaintiffs' response to defendants' *Daubert* brief actually underscores the highly prejudicial nature of ID evidence and shows precisely why such evidence should not be admitted. Plaintiffs contend that Thomas Cochran's testimony regarding MUF is relevant because it "shows that the magnitude of plutonium unaccounted for renders ***uncertain*** and ***unreliable*** any attempt to quantify releases from Rocky Flats by reference to records of known, measured releases." (Pls.' *Daubert* Resp. at 127 (emphasis added).)  That statement captures plaintiffs' problems in a nutshell.  Plaintiffs suggest that the fact that some aspect of plant operations may be unknown or uncertain itself gives rise to the nuisance.  Uncertain and unreliable evidence cannot be a "real and verifiable" threat and therefore cannot be a basis for plaintiffs' class-wide claims.   Plaintiffs cannot link ID evidence to any releases (let alone class-wide releases) and cannot use ID evidence to prove class-wide harm.  Plaintiffs do not even know *if* any ID (or how much, if any) is actually "missing" plutonium, as opposed to measurement errors, process holdup, unmeasured discards buried out-of-state, etc.  Plaintiffs have not even attempted to show class-wide effects.  Rather, they want to use ID evidence for the explicit purpose of ***speculating*** about what "could have" happen based on the uncertainty inherent in MUF.  That is not a proper basis for admitting otherwise irrelevant evidence; indeed, it is a basis for excluding it.  *See generally* Fed. R. Evid. 403.

ID evidence also should be excluded because its non-existent probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury. *See* Fed. R. Evid. 403. (*See* Defs.' MIL No. 9 at 11.)  The suggestion that high volumes of materials have been released into the class area and impacted the class members (without any support whatsoever) is highly inflammatory and could bias the jury against the defendants.

Plaintiffs' comments in their response brief make clear that plaintiffs intend to use evidence of ID or MUF to fan undue prejudice by making wild and unsupported allegations about hypothetical releases that could turn Colorado into a "wasteland." (Pls.' Resp. at 25.) Furthermore, such evidence creates a high likelihood that the jury would confuse ID with actual releases to the environment and class area, as plaintiffs apparently do. What is more, the non-existence probative value of ID or MUF evidence does not justify the substantial amount of trial time that would need to be devoted to explaining and responding to such evidence. (*See* Defs.' MIL No. 9 at 11.)

In sum, defendants' motion to exclude evidence of inventory difference or MUF should be granted.

# TAB 10

## XII.   PAST "RISKS" THAT NEVER OCCURRED AND NOW CANNOT HAPPEN (DEFENDANTS' MIL NO. 10)

Defendants have moved in *limine* to preclude evidence of past "risks" at Rocky Flats that, people once hypothesized could potentially occur but that never actually happened and now cannot occur because the conditions giving rise to the alleged risk no longer exists.  These so-called "risks" would include risks of fires, criticalities, theft, airplane crashes, earthquakes, and major plant accidents.[1]   Contrary to plaintiffs' assertion, this motion is not amorphous.  (Pls.' Resp. at 27.)  Defendants provided very concrete examples of the category and type of evidence, documents and testimony that they seek to preclude.  (*See* Defs.' MIL No. 10 at 3-6.)

### A.   Plaintiffs Have Failed To Rebut Defendants' Arguments that Evidence of Past "Risks" That Never Happened Is Irrelevant and Unduly Prejudicial.

Nothing in plaintiffs' response brief changes the fundamental truth that evidence of things that could have happened at Rocky Flats, but did not, and now can no longer happen, does not make anything with respect to plaintiffs' claims more or less probable.  Neither plaintiffs nor their experts link risks of incidents that never happened to contamination of all class properties, actual exposure to all class members, or any objectively demonstrable conditions that will continue indefinitely, much less any common, class-wide increased health risk.  It remains true that things that did not happen, by definition, cannot have caused a class-wide intrusion, nor a class-wide exposure, nor any objectively demonstrable conditions.  Thus, such issues and incidents are wholly irrelevant to plaintiffs' trespass and nuisance claims.

---

[1] That the very evidence of such risks that forms the basis for defendants' motion is inherently speculative is a key argument that plaintiffs never address in their response.  (*See* Pls.' Resp. at 26-27.)

Plaintiffs do not deny that the plant conditions that gave rise to this speculation about past "risks" no longer exist today.  (*See* Defs.' MIL No. 10 at 6-7 (discussing the Rocky Flats plant remediation); *see also* Pls.' Resp. at 26-27.)  Rocky Flats is nearing the end of an extensive and comprehensive remediation; all fissile material (including all special nuclear material including all weapons-grade plutonium) has been removed from the plant.  (*Id.*)  Hence, there is no possibility, for example, of future criticality events or plutonium-related explosions, fires or major plutonium-based accidents.  These "risks" are not conditions that are enduring or that will continue indefinitely and therefore are not probative of the claims to be tried.  (*See* 5/17/05 Order at 3.)

Plaintiffs do not respond to defendants' Rule 403-based arguments either.  It remains certain that allowing into evidence what ***might have*** happened in the past at Rocky Flats (but did not, and now cannot, happen) would prejudice defendants, confuse the jury, and divert focus away from what actually happened, including whether there were offsite releases or exposures and, if so, what their effects were.  It would also result in an undue waste of trial time and resources.  (*See* Defs.' MIL No. 10 at 12-13.)

### B.    Past "Risks" That Never Happened And Now Cannot Occur Cannot Form a Any Basis For Plaintiffs' Damages.

Plaintiffs contend that evidence of past risks that never materialized is relevant to the measure of ***damages*** under Section 930.  (Pls.' Resp. at 26.)  Plaintiffs' argument is incorrect for two separate and independent reasons.  First, plaintiffs' interpretation of Section 930 is incorrect.  Second, in order to be relevant to plaintiffs' damages claims, plaintiffs must prove "damages for the decrease in the value of their Class properties ***caused by the prospect of the alleged trespass and/or nuisance*** (if proved by Plaintiffs) continuing into the future."  (5/17/05 Order at 15-16

(emphasis added).)[2]  Plaintiffs' claims relating to "past risks that never occurred and now cannot happen" are not relevant to any theory of liability recognized under this Court's May 17, 2005 Order.

*First*, plaintiffs claim that, under Section 930, "[t]he existence of a risk of future harm is observed at the time the harm became complete and comparatively enduring," regardless of whether the risk is "less in the future." (Pls.' Resp. at 26.)  But Section 930 says no such thing. In order to recover under Section 930, a plaintiff must, as an initial hurdle, meet the criteria set forth in Section 930(1).  *See* Restatement (Second) of Torts Section 930(1).  Section 930(1) states:

> [i]f one causes continuing or recurrent tortious invasions on the land of another by the maintenance of a structure or acts or operations not on the land of the other and it appears that the invasions will continue indefinitely, the other may at his election recover damages for the future invasions in the same action as that for the past invasions.

Restatement (Second) of Torts 930(1).

Consistent with the language of Section 930, no reported case has ever allowed a plaintiff to recover under Section 930 where it appeared *as of the date that the injurious situation became complete and comparatively enduring* that the invasions will continue indefinitely, but where it did not appear *as of the time of trial* "that the invasions will continue indefinitely."  The comments to Section 930 suggest otherwise, by allowing the defendant to "dispute the averment

---

[2]  *See also Westric Battery Co. v. Standard Elec. Co.*, 482 F.2d 1307, 1318 (10th Cir. 1973) (it is "only the damage flowing legally from the defendant's misdeeds which count"); *Davis v. Bonebrake*, 135 Colo. 506, 522-23 (1957) ("must be some connection between injury and damages . . . [t]he asserted consequences must be linked to the injury; otherwise, there is presented to the jury evidence of unrelated conditions and circumstances wholly prejudicial to the party against whom such evidence is being introduced").

that the situation is one that will probably continue indefinitely as by proof that he has remedied the cause of harm *or is about to do so*." Restatement § 930 cmt. a (emphasis added); *see also Cook X*, 358 F.Supp.2d at 1013 ("Defendants may . . . preclude Plaintiffs from recovering prospective damages, by demonstrating that they or others have abated or remedied the trespass or nuisance or are about to do so.")

To allow class members to recover for "risks" that appeared within a particular "time window" — but can no longer occur — would ignore the fundamental purpose of damages law: "to reimburse [the property] owner for the actual loss suffered." (5/17/05 Order at 15 (quoting *Bd. of County Comm'rs v. Slovek*, 723 P.2d 1309, 1316 (Colo. 1986); 5/28/04 Order at 12-14.) *See also Slovek*, 723 P.2d at 1314 ("The trial court must take as its principal guidance the goal of reimbursement of the plaintiff for losses actually suffered, but must be vigilant not to award damages that exceed the goal of compensation and inflict punishment on the defendant."); *Zwick v. Simpson*, 572 P.2d 133, 134 (Colo. 1977) ("the goal of the law of compensatory damages is reimbursement of the plaintiff for the actual loss suffered"); 1 Dan B. Dobbs, *Law of Remedies*, § 5.6 at 754 ("If the effects of the nuisance are more or less permanent, the diminution in land value due to the nuisance will be recoverable; *if temporary, the diminished rental value during the period of harm*.") (emphasis added).

*Second*, apart from the fact that risks that can no longer occur are not compensable as *damages* under Section 930, such fleeting "risks" are not a compensable *injury*. The requirement of an actionable injury is separate and distinct from the requirement that the plaintiff show damages. (*See* 5/17/05 Order at 9 (while "[d]iminution in property value is an element of nuisance damages," a "decrease in the market value of property simply is not an actionable

interference with the right to use and enjoy property"); *see also Cook IX,* 273 F. Supp. 2d at 1208

("Colorado law does not permit a finding of substantial interference with the use and enjoyment

of property based solely on the existence of a neighboring facility that causes property values to

diminish"); *id.* at 1209 ("[A] decrease in the value of Plaintiffs' properties is not, in and of itself,

an interference with the Plaintiffs' use and enjoyment of these properties.")) Thus, regardless of

whether a risk that can no longer occur is compensable under Section 930 (it is not), plaintiffs

must also demonstrate that such a risk constitutes an "injury." In the context of nuisance, an

injury is an "actionable interference with the right to use and enjoy property." (5/17/05 Order at

9.)

Plaintiffs fail to cite any authority for the proposition that a risk that once existed but that

now cannot happen constitutes an interference with the right to use and enjoy property. To the

contrary, this Court ruled in *Cook IX,* and again in its May 17, 2005 Order, that "'a threat of

injury that is a ***present*** menace and interference with enjoyment' can constitute an interference

with a plaintiff's use and enjoyment of property." (5/17/05 Order at 6 (*quoting Cook IX,* 273 F.

Supp. 2d at 1202-03) (emphasis added).) Thus, under *Cook IX* as well as the May 17, 2005

Order, risks that can no longer occur — such as risks of "criticality" events resulting from fissile

materials that have been removed from the plant — by definition are not a "present" interference

with use and enjoyment, as required for plaintiffs to prove a nuisance claim. (*Id.)*

Plaintiffs fail to cite to any case in the history of American jurisprudence where a Court

has allowed a plaintiff to recover under a risk-based theory for a "risk" that no longer existed at

the time of trial. Plaintiffs have argued in the past that they do not need to show that the likeli-

hood of risk occurring in the future is fifty percent or greater in order for the risk to be action-

able.  But plaintiffs have never argued that they do not need to show that the likelihood of a risk occurring in the future is greater than *zero* percent in order for the risk to be actionable, nor have plaintiffs cited a single case to support such a novel proposition.   Accordingly, defendants' motion to exclude evidence of past "risks" that never occurred and now cannot happen should be granted.

# TAB 11

## XIII.  PLUTONIUM-RELATED INCIDENTS AND PRACTICES THAT PLAINTIFFS CANNOT PROVE IMPACTED (OR COULD SOMEDAY IMPACT) THE ENTIRE CLASS AREA (DEFENDANTS MIL. NO. 11)

Defendants move in *limine* to preclude evidence of incidents and practices related to plutonium that did not impact plaintiffs on a class-wide basis and cannot do so in the future. Defendants' motion encompasses the 1969 fire, various other fires, and other evidence related to plutonium-related practices that cannot be linked to class-wide, continuing impact, such as plutonium storage and "housekeeping" issues (including fire and criticality risk). (Defs.' MIL No. 11 at 1.)  In their motion, defendants set forth detailed examples of plaintiffs' evidence related to each of these events and incidents, which are nothing short of voluminous. (Defs.' MIL No. 11 at 2-3 n.1-3.)  Plaintiffs do not deny that they intend to use any of this evidence (or other such evidence). (Pls.' Resp. at 27.)

### A.  Plaintiffs' One Paragraph Response Does Not Attempt to Refute Any of the Bases for Barring this Evidence.

In their motion, defendants contend that these incidents and practices are irrelevant to any triable claim in this case, because any plutonium-related incident or practice that did not impact plaintiffs on a class-wide basis and cannot do so in the future by definition did not cause any intrusion onto class properties, did not cause any actual exposure to all class members, and has not been linked to any objectively demonstrable conditions with potential for future release and remobilization that would affect the entire class area. (Defs.' MIL No. 11 at 3-10.)  Defendants then explain in detail why evidence of specific events and incidents should be excluded.  Plaintiffs make no attempt whatsoever to rebut any of Defendants' points:

| Plutonium-Related Practice or Incident | Unrebutted Points From Defendants' MIL No. 11 |
|---|---|
| **1969 Fire** | <ul><li>1969 fire occurred in Building 776 and did not breach the building's integrity; in the words of plaintiffs' own expert, it was a ***near miss*** (Defs.' MIL No. 11 at 5 (emphasis added).)</li><li>Plaintiffs' experts have not opined that the 1969 fire caused any class-wide release; instead, they offer only opinions that it ***could have been*** worse (*Id.* at 6.)</li><li>None of plaintiffs' experts opine that the 1969 fire caused an offsite release of plutonium that deposited plutonium on class properties or caused a class-wide exposure resulting an increased health risk for the entire class (*Id.*)</li><li>Plaintiffs experts concede that there is no evidence that the 1969 fire had any substantial offsite impact that affected all class properties or class members (*Id.* at 6-7.)</li><li>Plaintiffs have not come forward with admissible evidence that there is a class-wide real and verifiable threat of future harm (*Id.* at 7.)</li><li>All gloveboxes have been decontaminated and removed, and the plutonium operations buildings no longer exist (*Id.*)</li></ul> |
| **Various Minor Fires** | <ul><li>Plaintiffs have come forward with no evidence that any of the smaller fires led to any environmental release or offsite exposure (or potential future offsite exposure), much less any impact on properties class-wide (*Id.* at 7-8.)</li><li>Plaintiffs' purported expert, Thomas Cochran, discusses 163 fires (only 31 involving plutonium) but does not opine that any of these fires led to any offsite contamination and did not calculate any release estimates related to them (*Id.* at 8.)</li><li>Plaintiffs' own exhibit states that the plutonium-related fires were very minor (*Id.*)</li><li>No evidence links any of these fires to any onsite or offsite deposits, or any potential future releases, much less any objectively demonstrable condition with the potential for class-wide increased health risk (*Id.*)</li></ul> |
| **Other Plutonium Practices[1]** | <ul><li>Plaintiffs have not linked handling, use, and storage of plutonium at Rocky Flats to any class-wide plutonium release or exposure (*Id.* at 8-9.)</li><li>Plaintiffs have not linked any of that evidence to potential future harm to the whole class (*Id.* at 9.)</li><li>Plutonium-handling operations have ceased and will not resume, and the plant is near the end of an extensive and comprehensive remediation (*Id.*)</li><li>All plutonium processing buildings have been dismantled and removed (*Id.*)</li><li>There is neither evidence nor possibility of future criticality events or plutonium-related explosions and fires (*Id.*)</li></ul> |

Rule 403 provides an additional and independent basis for exclusion of this evidence.

***First***, evidence of these events is extremely and unfairly prejudicial, because it creates a risk that

---

[1] Plaintiffs no longer intend to use their purported expert Warner North at trial; hence, his criticisms of Rockwell's radiological safety management, housekeeping and fire risk, management of plutonium residues, and failure to control combustible materials in plutonium processing buildings should be excluded. (*See* Pls.' *Daubert* Resp. at 1 n.1.)

the jury will base its liability and damages determinations on these incidents and practices as opposed to those that actually relate to plaintiffs' claims to be tried. There is also a risk that this evidence could inflame the passion of the jury against the defendants. (*See* Defs.' MIL No. 11 at 10-11.) Plaintiffs do not deny the substantial risk of such unfair prejudice from this evidence. (Pls.' Resp. at 27.) *Second*, evidence of the 1969 fire alone would add a substantial amount of time to the trial. Plaintiffs' criticisms of Dow's fire prevention and handling of the 1969 fire are complex and substantial, with plaintiffs' purported expert Robert Budnitz spending more than 30 pages in his report setting forth what Dow allegedly did wrong, and defendants' 1969 fire defense is even more voluminous and complex. (*See further* Defs.' MIL No. 11 at 11-12.) Plaintiffs fail to dispute that presenting evidence of the 1969 fire and forty years of plutonium storage and handling practices at a facility primarily working with plutonium, as well as defendants' necessary response to this evidence, will waste a substantial amount of trial time.[2] (Pls.' Resp. at 12-13.) For these reasons, this evidence should be excluded.

### B.   Plaintiffs' Various Rationales for Admission of This Evidence do not Prevent its Exclusion.

Plaintiffs repeat the same faulty reasons for the relevance of this evidence that they offer in response to defendants' other motions: (1) market perceptions and fears; (2) waste storage practices that created risks of future release; and (3) overall pattern of waste handling. But as with the other types of evidence, none of these alleged purposes for the evidence justifies its admission. As discussed above (*see Sections* I.B. & II.C. *supra*), market perceptions are only relevant where they stem from a recoverable trespass or nuisance. Plaintiffs have not linked the

---

[2] Plaintiffs have listed more than one hundred exhibits addressing the 1969 fire. (*See* Defs.' MIL No. 11 at 2 n.1.)

3

1969 fire, other fires, or other plutonium-related incidents to any past release or risks of future release. In addition, plaintiffs have not linked any of the evidence encompassed in defendants' motion to any waste storage or handling that caused a past class-wide release or that created an objectively demonstrable condition that exists and is continuing and that constitutes a real and verifiable future risk to the entire class area. Moreover, when used for such purposes, such evidence is nothing more than improper propensity evidence. *See* Fed. R. Evid. 404(b). Such evidence thus should be excluded. (*See further* Defs.' MIL No. 11 at 11.)

Plaintiffs also claim – without any citation to the record or factual support whatsoever – that any plutonium incident that resulted in a release "*likely* added to the contamination present in the Class area, and/or increased the risk of future harm to the Class *in case* those plutonium deposits are ever disturbed and re-suspended." (Pls.' Resp. at 27 (emphasis added).) Plaintiffs offer no evidence that links any of these plutonium-related incidents and practices to a *real* and *verifiable* risk of future harm. Moreover, plaintiffs' speculative statement (its speculative nature is epitomized in the use of the words "likely" and "in case") does not meet plaintiffs' burden of proof with respect to showing that the evidence at issue passes muster under Rule 401 and the Court's Orders. Without an affirmative showing from plaintiffs that these events and incidents created an objective condition that has the potential to be released or remobilized, resulting in class-wide increased health risk (which plaintiffs have not made), plaintiffs cannot meet that burden.

In sum, the Court can substantially streamline and focus the trial by limiting evidence about plutonium to only that evidence which specifically relates to plaintiffs' claims of offsite, class-wide impact. Defendants' motion should be granted.

4

# TAB 12

## XIV.  EVIDENCE THAT DOES NOT APPLY CLASS-WIDE  (DEFENDANTS' MIL NO. 12)

Plaintiffs grossly misstate the scope of defendants' twelfth motion in *limine* to exclude evidence "that does not apply class-wide."  Defendants do not seek to exclude "any event or problem at Rocky Flats that plaintiffs cannot prove resulted in the dispersal of pollution to the entire class." (Pls.' Resp. at 27.)  Instead, defendants request that plaintiffs not be permitted to offer evidence that does not apply to each class member.  In other words, plaintiffs may rely only on evidence in a class-wide setting that would be admissible in each of the individual trials for each class member, were such trials to occur.  Any lesser standard would impermissibly enable plaintiffs to enlarge their substantive rights through the class action device.

Much of plaintiffs' evidence would be irrelevant for at least some class members if those claims were tried on an individual basis.  For example, plaintiffs do not explain how the testimony of Ms. Cook that she believed she had "an increased risk of contracting a serious disease as a result of Rocky Flats" (*see* Ex. 1 to Defs.' MIL No. 12, Cook Dep. at 59) would be admissible in the individual trial of Ms. Schnoor, who testified that neither she nor her family were at any increased health risk from living near Rocky Flats (*see* Ex. 7 to Defs.' MIL No. 12, Schnoor Dep. at 76.).  Nor is it apparent how Dr. Goble's analysis, limited as it was to an area smaller than the class area, would be relevant to the claims of a class member living outside of Dr. Goble's study area.  Finally, evidence of water-based releases from Rocky Flats could not be admissible in the individual trials of any class members living in Arvada, given that all of Arvada's water comes from Ralston and Arvada Reservoirs which do not receive any water from Rocky Flats. (*See* Defs.' MIL No. 12 at 9.)  Because each of these pieces of evidence would not

be admissible at the individual level, class members should not be able to rely upon such evidence in the class action setting.

Plaintiffs' assertion that "it is not each piece of evidence that must be class-wide; it is plaintiffs' claims that are" (Pls.' Resp. at 27) overlooks the key principle behind defendants' motion; given that plaintiffs' claims are class-wide, any evidence admissible in the class trial must be relevant to those class-wide claims. Plaintiffs attempt to sidestep this requirement through their (apparent) theory that evidence of non-class-wide incidents led to a "market[]" perception" of "risk of class-wide releases" that was "founded on objective evidence." (Pls.' Resp. at 28.) But it is not only the evidence that must be objective, but also the risk of class-wide releases itself that must be "objectively demonstrable." (5/17/05 Order at 6.) None of plaintiffs' evidence rises to the level of establishing an objectively demonstrable risk of future class-wide releases. Rather, the most that plaintiffs can show, with respect to the vast majority of their evidence, are past releases that did not have a class-wide scope and that resulted from conditions that have since been remedied.

Finally, plaintiffs' reliance on *Bradbury v. Phillips Petroleum Co.*, 815 F.2d 1356 (10th Cir. 1987), and *Silkwood v. Kerr-McGee Corp.*, 769 F.2d 1451 (10th Cir. 1985), both cited for the proposition that evidence of a pattern of conduct is admissible, is misplaced. The claims at issue in *Bradbury* included outrageous conduct, and the court held that evidence of other incidents was admissible to show the recklessness and pattern of bad conduct under those claims. *See* 815 F.2d at 1364 (holding that evidence of other incidents was probative on the issue of whether the incident involving the plaintiffs was "part of a series of incidents that might illustrate outrageous conduct on the part of [defendant] toward the rights and feelings of others"). In

*Silkwood*, the court noted that evidence of "a pattern of negligence" is admissible to a point, but only if such negligence is "likely to cause [the] ***particular*** kind of injury at issue." 769 F.2d at 1456 (emphasis added).   These decisions do not stand for the proposition that plaintiffs may conduct a class trial about a "pattern of conduct," without regard to whether most or all of the alleged misconduct in fact impacted the class or was of the kind that had the potential to do so in the future. *See Bradbury*, 815 F.2d at 1364-65 ("Phillips correctly points out that the plaintiffs in this case are not entitled to compensation for alleged mistreatment of other property owners.").

# TAB 13

## XV.   LAY WITNESS OPINION TESTIMONY BY ACKLAND, BIGGS AND POET (DEFENDANTS' MIL NO. 13)

Plaintiffs do not dispute that they seek to elicit opinion testimony at trial from Mr. Ackland, Dr. Biggs, and Dr. Poet.  (Pls.' Resp. at 28-33.)   Nor do they dispute that those three witnesses were not disclosed as experts and did not submit expert reports as Fed. R. Civ. P. 26(a) requires.  (*Id.* at 31; *see* Defs.' MIL No. 13 at 8-10)  Plaintiffs further concede that they will not offer any opinion testimony at trial from Ackland, Biggs, or Poet that falls within the realm of "expert" testimony under Fed. R. Evid. 702, and that they instead intend to present opinion testimony from these three witnesses solely to the extent that it is admissible under Fed. R. Evid. 701.  (Pls.' Resp. at 28)  Thus, in the first instance, whether the challenged opinion testimony of Ackland, Biggs, and Poet is admissible rests on resolution of a threshold question:  Does the opinion testimony that plaintiffs seek to elicit from Ackland, Biggs, and Poet fall within the type of opinions that lay witnesses are permitted to render under Fed. R. Evid. 701, or, instead, does it fall within the type of opinion testimony that depends on "scientific, technical, or other specialized knowledge" that only may be given by expert witnesses within the confines of Fed. R. Evid. 702?  Defendants have demonstrated that it is the latter.  Indeed, plaintiffs fail even to argue that the work of Ackland, Biggs, or Poet, and the lay opinions that they intend to express are not based on their "scientific, technical, or other specialized knowledge," that such knowledge is not necessary to the work that they performed or the opinions that they intend to offer, or that "any ordinary person" could render such opinions.  Thus, the opinion testimony of Ackland, Biggs, and Poet falls within Fed. R. Evid. 702.

Even if the Court were to conclude that the opinion testimony of Ackland, Biggs, and Poet fell within Fed. R. Evid. 701, however, that testimony still would not be admissible for

other reasons:  Ackland's testimony, which apparently will consist of his "opinions" of what newspaper articles said in the 1970s, is entirely hearsay and will not be helpful to the jury; Biggs's opinions are, for the most part, similarly based on hearsay, are not relevant to conditions that existed at Rocky Flats before Biggs conducted his work in the late 1980s or early 1990s, extend beyond his areas of claimed expertise, and are without foundation; and Poet's purported opinion testimony would – by his own admission – be limited to facts that are laid out in a paper that he co-authored, and thus are not helpful to the jury.

A.   **The Applicable Law Does Not Support Plaintiffs' Contention That Opinion Testimony By Ackland, Biggs, And Poet Is Based Solely On Their Perceptions And Not On "Scientific, Technical, Or Other Specialized Knowledge."**

The Tenth Circuit has clearly stated that lay witness opinion testimony *cannot* be admitted under Rule 701 if it is "based on 'specialized knowledge.'"   *Lifewise Master Funding v. Telebank*, 374 F.3d 917, 929 (10th Cir. 2004) (cited in Pls' Resp. at 29).  Further explaining what it means to be "based on" such knowledge, the Tenth Circuit held:

> [A] person may testify as a lay witness only if his opinions or inferences *do not require* any specialized knowledge and could be reached by any ordinary person.

*Id.* at 929 (emphasis added) (citation omitted).   In *Lifewise*, the Tenth Circuit applied the amended version of Rule 701, holding that the president of a lending company could not testify to a damages model that involved "moving averages, compounded growth rates, and S-curves" because those constituted "technical, specialized subjects."  374 F.3d at 929.  By contrast, the court held that the lay witness could have testified "based on his personal knowledge and his experience as president of the company" and could have "given a straightforward opinion as to lost profits using conventional methods based on Lifewise's actual operating history." *Id.* at 930.

Thus, under Tenth Circuit law, lay witness opinions cannot be admitted if they require the lay witness to possess scientific, technical, or specialized knowledge (rather than personal knowledge or observation alone) and could not have been reached by any ordinary person.

> **1.    Opinion Testimony From Ackland, Biggs, and Poet, Would Be Based on Their Scientific, Technical, or Specialized Knowledge.**

The opinions plaintiffs may seek to elicit from Ackland, Biggs, and Poet required them to possess scientific, technical, or specialized knowledge to reach those opinions and that those opinions could not have been reached by "any ordinary person."

**Ackland**:  As demonstrated in defendants' opening motion, Ackland is a journalism professor and author whose sole connection to this case is the book on Rocky Flats that he published in 1999 based on research that he began in 1991.  (*See* Defs.' MIL No. 13 at 2.)  In writing his book, Ackland researched archive records, interviewed witnesses, and submitted FOIA requests to the federal government.  (*Id.*; Ackland Dep. at 51:17-20 ("Q: In researching and investigating and writing your book, did you use your previous education, training, and experience as a journalist? A. Yes.").)

**Biggs**:  Biggs holds a Ph.D. in meteorology and it was in his capacity as a scientist with knowledge of meteorology and air dispersion modeling that he served on a scientific panel convened by former Governor Romer in 1989.  Biggs's knowledge and opinions of Rocky Flats, on which his opinion testimony at trial would be based, admittedly rest on Biggs's involvement in that panel.  (*See* Defs.' MIL No. 13 at 3-4.)  Biggs candidly testified that the work and conclusions reached by the scientific panel, which form the basis for the opinions that he will express at trial, *could not* have been conducted by "any ordinary person" and instead required technical training and specialized knowledge:  "Q. Do you think that the work that you did on the scien-

tific panel could have been done by somebody without the education, training, and experience that you had in your field?  A. *Absolutely not.*"  (Biggs Dep. at 235:7-11(emphasis added).)[1]

**Poet**:  Poet's work with Ed Martell, which consisted of formulating a soil sampling program to sample soil to the east of the Rocky Flats plant and performing laboratory analyses to determine the radionuclide content of the soil samples, similarly rested on his scientific training and experience.  (*See* Defs.' MIL No. 13 at 4-5.)

### 2.    Plaintiffs' Cases are Inapplicable and/or Distinguishable.

Plaintiffs' sole attempt to show that the lay witness opinions fall within Rule 701 is to argue that the testimony of Ackland, Biggs, and Poet is no different from the type of testimony that federal courts have admitted under Rule 701.  (*See* Pls.' Resp. at 29-31.)  The authorities that plaintiffs cite, however, are unavailing and easily distinguishable.[2]

Plaintiffs cite an unpublished Tenth Circuit criminal decision holding that the trial court did not err in admitting the testimony of a treating clinical psychologist where the criminal defendant failed to challenge the psychologist's opinions at trial and the district judge "had considerable evidence of [the psychiatrist's] training and professional experience."  *United States v. Martinez*, No. 00-2054, 2001 WL 289785, at *3 (10th Cir. Mar. 26, 2001)  In holding that the psychiatrist's testimony was admissible as lay opinion so long as it involved "observations based

---

[1] Plaintiffs are incorrect in their assertion that Dr. Biggs was a "member of the Health Advisory Panel." (Pls.' Resp. at 32.)  Rather, Dr. Biggs was a member of a subcommittee, the "Citizens Soil Sampling Committee," formed by HAP to assist Rocky Flats Area Citizens in formulating and conducting their own soil sampling program.  (Biggs Dep. at 111:1-113:18.)

[2] *United States v. Caballero*, 277 F.3d 1235 (10th Cir. 2002) (cited in Pls.' Resp. at 32), does not apply at all because the testimony at issue was purely factual and "expressed neither a lay nor an expert opinion." *Id.* at 1247.

on personal knowledge," the Tenth Circuit cited to authority interpreting the version of Rule 701 that pre-dated the 2000 amendments. *Id.* Contrary to plaintiffs' contention that the 2000 amendments did not alter the general rules governing the admissibility of lay opinion testimony, the Advisory Committee notes indicate that the amendments did work a change to ensure that expert testimony not be "evaded through the simple expedient of proffering an expert in lay witness clothing." Fed. R. Evid. 701 Advisory Committee Notes, 2000 Amendments.[3] The Rule 701 amendments have clarified the scope of the rule. Accordingly, plaintiffs' reliance on *Martinez's* application of a pre-amendment reading of Rule 701 is not persuasive.

Plaintiffs' citation to *Goeken v. Wal-mart Stores, Inc.*, an unpublished Kansas district court opinion, is similarly unavailing. (*See* Pls.' Resp. at 29 (citing No. 99-4191, 2001 WL 1159751, at *2-*3 (D. Kan. Aug. 16, 2001)).) In *Goeken*, the district court also applied a pre-amendment interpretation of Rule 701 and held that a treating physician could testify to lay opinions "[s]o long as [they are] based on the physician's personal knowledge gained from the care and treatment of the plaintiff." 2001 WL 1159751, at *3. Neither Ackland, Biggs, nor Poet is seeking to testify to lay opinions based on their personal knowledge in this case, and the

---

[3] The Committee Notes state that "[u]nder the amendment, a witness' testimony must be scrutinized under the rules regulating expert opinion to the extent that the witness is providing testimony *based on* scientific, technical, or other specialized knowledge within the scope of Rule 702." (*Id.* (emphasis added)) The Committee Notes further state that "any part of a witness' testimony that is *based upon* scientific, technical, or other specialized knowledge within the scope of Rule 702 is governed by Rule 702 and the corresponding disclosure requirements of the Civil and Criminal Rules." (*Id.* (emphasis added)) As noted above, in *Lifewise*, the Tenth Circuit interpreted and applied "based on" scientific, technical, or other specialized knowledge to mean testimony that "doe[s] not require" such knowledge and that could be given "by any ordinary person." 374 F.3d at 929.

current version of Rule 701 precludes any reading of *Goeken* to permit admissibility of their lay opinions here.

Plaintiffs unsuccessfully attempt to create an exception to Rule 701 for after-the-fact investigations which, plaintiffs contend, are admissible under Rule 701 so long as the lay witness formulated any opinions from information gained during the course of an investigation. (*See* Pls.' Resp. at 30-31.) Citing a Second Circuit opinion that they contend is "instructive," plaintiffs argue that all of Ackland's, Biggs's, and Poet's testimony, including opinions, is admissible "because it involves facts and perceptions derived entirely from [their] investigations." (*Id.* at 30.) But the case that plaintiffs cite, *Bank of China v. NBM LLC*, 359 F.3d 171, (2d Cir. 2004), does not aid plaintiffs here and does not state the scope of Rule 701 as applied by the Tenth Circuit. In *Bank of China*, the court determined in a fraud action involving the bank that the trial court had abused its discretion by allowing a bank employee to testify as a lay witness where the testimony was based on the employee's experience and specialized knowledge in international banking. *Id.* at 181. The Second Circuit further held that a portion of the bank employee's testimony about his personal role in looking into and uncovering the fraud – *as a bank employee* – was permissible lay witness testimony where it was "based on his perceptions." *Id.*

Here, by contrast, there are no lay opinions that Ackland, Biggs, or Poet can render that are based on their "personal observations" as percipient witnesses. Unlike the bank employee, Ackland, Biggs, and Poet never undertook any investigations in their capacities as lay witnesses; rather, they undertook those investigations precisely because they possessed scientific, technical, or specialized knowledge in the areas in which they conducted their analyses. Moreover, neither Ackland, Biggs, nor Poet can be said to have "personal" or "firsthand" knowledge of the facts on

which their conclusions were based.[4]  What is more, if *Bank of China* were read to permit the lay witness opinion testimony that plaintiffs proffer through Ackland, Biggs, and Poet, that reading would conflict with the scope of permissible lay witness opinions set forth by the Tenth Circuit to the extent that it would permit lay witnesses to testify to opinions that "require" scientific, technical, or other specialized knowledge and that could not be rendered by "any ordinary person."

**B.  Even If The Testimony At Issue Did Not Fall Within The Scope Of Rule 702, It Would Not Be Admissible For A Number Of Additional, Independent Reasons.**

Even were plaintiffs to show that certain of the lay opinions proffered by Ackland, Biggs, and Poet were not based on "scientific, technical, or other specialized knowledge" within the meaning of Fed. R. Evid. 702, those opinions still would not be admissible.

---

[4] Ackland did not begin his investigation until 1991; thus, any conclusions that he reached as to any events at Rocky Flats involving Rockwell or Dow necessarily were based *solely* on documents and materials that pre-dated his investigation.  Ackland's opinions, therefore, could not be based on "personal" or "first-hand" knowledge at the time Rockwell or Dow operated the plant. Likewise, Biggs did not participate in any investigation of Rocky Flats until the late 1980s or early 1990s.  Although Biggs did visit one building on the Rocky Flats site, that visit did not occur until 1989 or possibly 1990, after operations at Rocky Flats had ceased.  (Biggs Dep. at 144-148.)  Plaintiffs fail to provide any evidence or testimony showing that Biggs possessed "personal" or "firsthand" knowledge of the conditions evaluated by the scientific panel of which he was a member.  Similarly, although Poet does possess some firsthand and personal knowledge of certain aspects of his investigation, such as where he sampled soil, how the soil samples were collected, and the results of the laboratory analyses that he conducted, he admitted has absolutely *no* firsthand knowledge of (or expertise in) *any* issues relating to potential risks posed by plutonium in the environment; that, Poet testified was solely within the province of Dr. Martell's expertise.  (*See* Defs.' MIL No. 13 at 4-5, 13.)

1. **Plaintiffs have failed to demonstrate that the challenged testimony is based on the witnesses' own personal knowledge and firsthand observation.**

Contrary to plaintiffs' assertion that lay witnesses who conduct investigations may testify to everything that they discover during those investigations (*see* Pls.' Resp. at 32), Fed. R. Evid. 602 precludes a lay witness from testifying to a matter unless the proponent of the evidence can show that the witness has "personal knowledge of the matter." The requirement of personal, firsthand knowledge extends to *all* testimony by lay witnesses, including lay opinion testimony. *See United States v. Bush*, 405 F.3d 909, 915-16 (10th Cir. 2005) (perception requirement of Rule 701 "requires a lay witness to have first-hand knowledge of the events he is testifying about"). Here, as shown above, plaintiffs say that they will seek to have Ackland, Biggs, and Poet testify to "facts" that they learned through their after-the-fact investigations, interviews, meetings, historical documents, conversations with others, and reviews of materials and documents prepared by others, *not* through their own first-hand experiences. Plaintiffs identify those "facts" only in very broad-brush strokes that fail to demonstrate that they hold the personal, first-hand knowledge required by Rule 602.

It is indisputed that the only "facts" of which Ackland, Biggs, and Poet have first-hand knowledge are the "facts" of how they conducted their investigations and the identity of the materials that they reviewed or the type of information that they received.[5] That is not the kind of first-hand, personal knowledge on which lay witness testimony may be based.

---

[5] Plaintiffs also suggest that they might use Dr. Biggs and Mr. Poet as vehicles for the introduction of certain documents. (*See* Pls.' Resp. at 32.) Plaintiffs fail to identify any such documents, however, that they would seek to introduce through these witnesses, and thus fail to carry their burden to show how such testimony would be relevant or admissible.

### 2.    The proffered testimony of Ackland, Biggs, and Poet is irrelevant, unfairly prejudicial, and not helpful to the jury.

As noted above, among the areas of testimony which plaintiffs state they intend to elicit from Ackland, Biggs, and Poet, there might be some limited and narrow facts of which those witnesses have personal, first-hand knowledge.  Those areas of testimony, however, are either irrelevant, unfairly prejudicial, or not helpful to the jury.

**Ackland**:  If Ackland's testimony is to be given for the purpose of demonstrating "what information was available to the public about Rocky Flats," the jury can just as easily read on their own newspaper articles submitted by the parties and draw their own conclusions about what was in those articles.  In addition, the testimony that plaintiffs seek to elicit from Ackland about his dealings with the U.S. Government, and the supposed "culture of secrecy," are irrelevant and unfairly prejudicial to defendants since they involve actions of the government, rather than the defendants.  In addition, they are not relevant to the time period at issue, since Ackland's personal experiences occurred after this lawsuit was filed, well after both Dow and Rockwell had ceased to operate Rocky Flats.

**Biggs**:   Biggs might have first-hand knowledge of certain events, such as the ultimate conclusions and recommendations reached by the governor's scientific panel.  But that testimony is not relevant to the condition of Rocky Flats during the time that it was operated by Dow and Rockwell prior to 1989.  Biggs's testimony about conclusions that are stated in a document are not helpful to the jury; the panel concluded what it concluded, and those conclusions are recorded in the report.  The "history" of the governor's panel's investigation also is irrelevant, and plaintiffs have failed to show any connection between that "history" and any issues to be tried.

**Poet**:  Finally, with respect to Poet's testimony, the only "facts" of which he has personal knowledge are those that surround the soil sampling program that he set up, his own taking of soil samples, and the results of those samples.  Again, however, those results are included in a published report, which the jury can read; they do not need to have Poet tell them what the report says.  His testimony, therefore, would not be helpful to the jury and would waste time.  As with testimony by Dr. Biggs about the "history" of the scientific panel, any testimony by Poet about the "history" and "events" surrounding the soil sampling that he performed would be irrelevant and potentially unfairly prejudicial.

Accordingly, the testimony of Ackland, Biggs and Poet should be barred.

# TAB 14

## XVI.   OTHER LAWSUITS AGAINST DEFENDANTS (DEFENDANTS' MIL NO. 14)

With the exception of the various litigation encompassing the criminal investigation against Rockwell and *Church* lawsuit-related materials, plaintiffs have said that they do not intend to seek admission of evidence of other lawsuits against defendants. (*See* Pls.' Resp. at 33, 37-38.) Other than these exceptions, plaintiffs do not deny that materials related to other cases against defendants are irrelevant to any issue to be tried and that evidence of other lawsuits would be potentially confusing and misleading to jurors and unduly prejudicial to defendants. (*Id.*) Accordingly, defendants' motion to bar evidence of other lawsuits – including defendants' separate motion related to Rockwell's Santa Susana plea agreement – should be granted.

With regard to the evidence of other litigation plaintiffs do seek to admit, plaintiffs have failed to establish the relevancy of these lawsuits and have failed to rebut defendants' arguments regarding the prejudice that would flow from their admission, including references to such lawsuits, at trial.

### A.        Evidence of the Criminal Cases Against Rockwell Should Be Barred.

As defendants demonstrate above (*see* Sections III-V *supra*), evidence of FBI raid, the grand jury investigation and Rockwell's 1992 plea is not probative of any issue of consequence to be tried.   While plaintiffs claim these criminal cases against Rockwell are central to their themes against ***Dow and Rockwell*** in this action (Pls.' Resp. at 33), the criminal cases could not possible relate to any theory of the case against Dow, and they are not probative of Rockwell's liability either.   Plaintiffs cannot rely on the criminal cases against Rockwell to advance their claims or meet their burden of proof here.  (*See* Defs.' MIL No. 14 at 4.)  Plus, the issues raised in the criminal cases are not sufficiently similar to plaintiffs' instant civil claims to warrant their

admission in this case.  None of the criminal actions against Rockwell have anything to do with the deposition of plutonium class property nor do they support any form of interference that this Court has identified to be tried against either defendant.[1]  (*See id*. at 4-6.)

The fact that Rockwell can be "expected to dispute the criminal charges" that were brought against it (Pls.' Resp. at 35) does not dispel the undue prejudice inherent in such evidence.  Plaintiffs make no attempt to distinguish the multitude of cases defendants cite excluding evidence of other lawsuits because their minimal or non-existent relevance does not outweigh their high potential for prejudice and waste of time.  (Def.'s MIL No. 14 at 6-9;  *see also* Pls.' Resp. at 33-36.)  In the context of evidence of other lawsuits, exclusion of evidence under Rule 403 is not extraordinary, it is the norm.

Plaintiffs' citations to *United States v. Masters*, 622 F.2d 83, 86-87 (4th Cir. 1980) and *Elliott v. Turner Constr. Co.*, 381 F.3d 995 (10th Cir. 2004) do not compel a different result. Plaintiffs assert that evidence of Rockwell's criminal cases is admissible to provide the setting (or the "res gestae") of this lawsuit.  (Pls.' Resp. at 34.)  But as defendants have shown, the underlying facts and issues related to the FBI raid, the grand jury investigation and Rockwell's plea are not "intricately related to" or inexorably intertwined with the "immediate context" of plaintiffs' trespass and nuisance claims, nor are they necessary to an understanding of plaintiffs' claims. *See Elliott*, 381 F.3d at 1004;  *Masters*, 622 F.2d at 87.  (*See further* Section I.D. *supra*.)

---

[1] Contrary to plaintiffs' assertion, "the entire history of Rocky Flats" is not on trial in this case. The plant's forty-year history of environmental practices, production issues, worker safety and contractor accountability (*see* Pls.' Resp. at 35) are well beyond the scope of plaintiffs' class-wide nuisance and trespass claims.  Such subjects are irrelevant unless they can be linked to the claims to be tried.

**B.      Any Admissibility of *Church*-Related Materials Should be Limited.**

Defendants do not dispute that some reference to the well-publicized *Church* lawsuit may

be appropriate for purposes such as notice or to demonstrate that activities at and/or risks from

the Rocky Flats facility were common knowledge in the 1970s.[2]  In any event, the proponent of

evidence related to the *Church* lawsuit would still need to ***link*** that evidence to a proper purpose

probative of some issue of consequence to the determination of the issues to be tried.

Nevertheless, much of what plaintiffs say about the *Church* lawsuit is faulty or untrue.

For example, plaintiffs' comments characterizing the *Church* settlement are misleading.  Plain-

tiffs suggest that the fact that *Church* lawsuit settled rather than proceeding to a verdict at trial

somehow makes evidence of that case more suitable for admission here.  (Pls.' Resp. at 37.)

However, the settlement should be inadmissible here.  *See* Fed. R. Evid. 408; *Wallis v. Carco

Carriage Corp., Inc.*, 124 F.3d 218 (10th Cir. 1997) (explaining prejudicial effect of settlement

evidence); *Towerridge, Inc. v. T.A.O., Inc.*, 111 F.3d 758, 770 (10th Cir. 1997) (admission of

other settlement evidence may implicate the same concerns of prejudice and deterrence of

settlements that underlie Rule 408); *see also Bradbury v. Phillips Petroleum Co.*, 815 F.2d 1356,

1363-64 (10th Cir. 1987) (Rule 408 applies to prior civil settlements of related claims; "when the

issue is doubtful, the better practice is to exclude evidence of compromises or compromise

offers"); *Atkins v. GE Capital Mortg. Servs.*, 993 F. Supp. 1406, 1414 n.5 (M.D. Ala. 1998)

(granting the defendant's motion to exclude evidence of its prior settlement of a separate action

---

[2] While plaintiffs offhandedly suggest that *Church* was the ***first*** vehicle by which information related to Dow's conduct was made public (*see* Pls.' Resp. at 36), it is undisputed that much information related to site conditions and related events under Dow's management was available earlier through public hearings and public investigations.  (*See* Defs.' 12/9/96 Statement of Undisputed Facts and Combined Brief at Section II.B; *see also id.* at 135.)

brought against it based upon similar – but not identical – allegations).   Specifically, plaintiffs'

assertions about the level of contamination of the buffer zone (Pls.' Resp. at 36) are false, and do

not reflect current conditions.   (*See* http://www.rfets.gov/doe/ (discussing remediation progress).)

With regard to the *Church* settlement, plaintiffs assert that jurors are entitled to know "how close

such badly contaminated land is to the class area" and that "this 'open space' was not donated

willingly, but was a concession achieved only after protracted litigation."   (Pls.' Resp. at 36-37.)

But these statements, even if they were true, would have absolutely nothing to do with the class-

wide trespass and nuisances claims to be tried.

# TAB 15

## XVII.  ROCKWELL'S SANTA SUSANA PLEA AND ANY PLEA-RELATED CONDUCT (DEFENDANTS' MIL NO. 15)

Defendants move in *limine* to exclude all evidence of Rockwell's unrelated plea of guilty arising out of events that occurred at an unrelated facility that was operated by Rockwell in Santa Susana, California, including evidence of any underlying conduct related to the plea.   In response, plaintiffs do not dispute the inadmissibility of this evidence; rather they represent that they "do not intend to present evidence about the Santa Susana . . . litigation."  (Pls.' Resp. at 37.)  Thus, defendants' motion should be granted.  (*See further* Def.'s MIL No. 15.)

# TAB 16

## XVIII.  COSTS OF REMEDIATION (DEFENDANTS' MIL NO. 16)

Defendants move in *limine* to exclude evidence of the costs of remediation, including (i) costs expended by third parties as part of the current remediation efforts and (ii) costs expended by the defendants for various cleanup efforts throughout the plant's history.  (*See* Defs.' MIL No. 16 at 2-3.)  Plaintiffs do not deny their intent to introduce evidence of cleanup costs and/or characterize those costs as substantial.  (Pls.' Resp. at 38-40.)  Plaintiffs assert that evidence of remediation costs are somehow relevant, but they never link the evidence to any issue to be tried. (*Id.* at 38.)  Plaintiffs also claim that the Rule 403 balance favors admission of the evidence, but do not refute the point that the ***costs*** evidence of the cleanup is prejudicial.  (*Id.*)  Such evidence is not relevant and would prejudice the defendants by suggesting to the jury that defendants could be liable based merely on the magnitude of the costs of the plant cleanup or of other remedial measures.

### A.      Plaintiffs Have Not Met Their Burden of Showing Relevance of Evidence of Costs of Remediation.

Plaintiffs do not link evidence of ***the costs*** for any onsite cleanup at Rocky Flats to any element of their class-wide trespass and nuisance claims to be tried.  Those costs do not establish that plutonium or any other contaminant was deposited on any class property, that plaintiffs were exposed to plutonium or any other contaminant, or that there is a demonstrable risk of future harm based on an objective condition such as contamination that may be "released or remobilized" in such a way such as to result in human exposure and increased common, class-wide health risk.  (*See* 5/17/05 Order at 5-6; *See further* Defs.' MIL No. 16 at 4-7.)  Nor do plaintiffs link the costs of onsite remediation to damages, as plaintiffs do not dispute that they have not

sought damages in the form of any alleged costs to remediate their properties. (Pls.' Resp. at 38-40.)

Plaintiffs claim that cleanup costs are relevant "to give the jury an idea how severely contaminated the site was (and still is), and to put in perspective the difficulty of cleaning up radioactive contamination." (Pls.' Resp. at 38.) Plaintiffs claim these facts are somehow relevant to show "anxiety" and "a continuing threat of further offsite releases." (*Id.*) For a threat-based nuisance, however, plaintiffs have the burden to link their evidence to an "objectively demonstrable risk of future harm" that is "based on objective conditions, such as existing contamination on-site and off-site that may be released and remobilized in some fashion that would result in human exposure and increased health risk, that have the potential to affect all of the Class Area." (5/17/05 Order at 6.) The objective condition must exist and be continuing at the time of trial. (*Id.* at 3.) Thus, these suggested purposes for the use of cost evidence are in no way probative of plaintiffs' class-wide claims as defined by the Court.

*First*, how severely contaminated the site *was* does not have anything to do with an objective condition that *currently exists* and *is continuing*. (*Id.*) How contaminated the site "still is" would be relevant only if plaintiffs could show that such contamination may be "released or remobilized" in a way that would result in human exposure and increased common, class-wide health risk, which they have not done (and cannot do with evidence of remediation costs). (*Id.* at 5-6.) Plaintiffs do not even attempt to make such a showing. (*See* Pls.' Resp. at 38-40.) Moreover, there is no need to "put in perspective the difficulty of cleaning up radioactive contamination," because that has nothing to do with any element of a claim in this case to be tried.

*Second*, evidence of cleanup costs does not tell the jury anything about contamination type (*e.g.*, plutonium or non-plutonium), levels (*e.g.*, within standards), locations (*e.g.*, distance from plant boundaries), and conditions (*e.g.*, protected from re-suspension). Nor does it tell the jury anything about what cleanup of contamination would be like offsite, something that cannot be extrapolated from onsite cleanup costs. From 1990 through 1996, the entire area offsite of Rocky Flats was studied as part of the CERCLA site characterization and cleanup work at the plant. The end result of that study was the following: The DOE, EPA, and CDPHE determined no further cleanup action is necessary for areas outside the Rocky Flats site (commonly called Operable Unit 3). The three agencies, in a Record of Decision, determined the minimal contaminated areas are in a condition that is protective of human health and the environment and poses no health risk. The areas include land east of the Site, Great Western Reservoir, Standley Lake, and Mower Reservoir. (Resource Conservation and Recovery Act Facility Investigation/Remedial Investigation Report Operable Unit 3 (Offsite Areas), Vol. I of III at ES-1 (June 1996); *see further* Defs.' 5/11/99 Status Report at 16-18.)

In short, plaintiffs cannot show that the expenditure of a certain amount of funds for remediation equates to any probative evidence of offsite releases, class-wide exposure, common increased health risk, or any impact on the entire class area.

**B.      Plaintiffs' Argument in this Case Demonstrates the Huge Potential Unfair Prejudice from this Evidence, Which Plaintiffs have not Refuted.**

Even assuming that cleanup cost evidence has some minimal probative value (which it does not), that value would be substantially outweighed by the danger of undue prejudice. Such evidence could improperly suggest to the jury an amount of damages by allowing them to improperly infer that if such a large sum can be spent on the Rocky Flats cleanup, plaintiffs

should receive a large sum as well.  In fact, remedial measure evidence may confuse the jury into believing that onsite remediation costs somehow apply to actual or estimated amounts that might be needed to remediate class properties, especially because no evidence of offsite contamination cleanup costs will be presented.  (*See further* Defs.' MIL No. 16 at 7-10.)  These purposes all demonstrate the ***unfair*** prejudice that flows from this evidence, because they each demonstrate an "undue tendency to suggest decision on an improper basis."  Fed. R. Evid. 403, advisory committee note (1972).

Plaintiffs argue that they should be allowed to present evidence of cleanup costs despite any prejudice because defendants will open the door by introducing evidence of the cleanup efforts and any evidence of costs will only add to the supposed prejudice.  It is evidence of the cleanup ***costs*** themselves, not any evidence about the cleanup efforts or results, that is prejudicial.  Defendants' motion is narrowly focused to avoid the prejudice and undue expenditure of resources related to a trial about the reasonableness and context of such costs.  Moreover, defendants will not open the door to evidence of ***costs*** by presenting evidence about the cleanup, because nothing about those ***costs*** is necessary to help the jury fairly evaluate evidence of the cleanup efforts.  *See, e.g., People v. Miller*, 890 P.2d 84, 98-99 (Colo. 1995) (the concept of "opening the door" represents an effort by courts to prevent one party from gaining and maintaining an unfair advantage by the selective presentation of facts that, without being elaborated or placed in context, create an incorrect or misleading impression.)

**C.     The Subsequent Remedial Measures Rule Applies to Cleanup Costs Expended by Defendants.**

Plaintiffs misunderstand defendants' argument concerning subsequent remedial measures.  Rule 407 applies to ***defendants'*** cleanup efforts, which plaintiffs do not dispute.  (*See*

Defs.' MIL No. 16 at 8 n.3 & 10; Pls.' Resp. at 38-40.)[1]  Indeed, plaintiffs do not directly address cleanup efforts by *defendants*.  Thus, plaintiffs never attempt to explain why evidence of costs of cleanup efforts completed by defendants throughout plant history have any relevance for any of their proposed purposes.

Plaintiffs claim that subsequent remedial measure evidence generally is permissible to show the condition of a site or item before an accident, citing a number of irrelevant cases.  In *Rimkus v. Northwest Colo Ski Corp.,* 706 F.2d 1060, 1063-66 (10th Cir. 1983), the court held that evidence that a ski resort put up bamboo poles to mark a rock after a ski accident involving the rock was not prejudicial error where it was used to rebut the defendants' claim that the rock was clearly visible.  In *McFarlane v. Caterpillar, Inc.,* 974 F.2d 176,181-82 (D.C. Cir. 1992), the court held that evidence that a spool in the hydraulic system of a bulldozer did not meet manufacturer specifications could have been admitted in a case involving a bulldozer accident even though it was in a post-accident service report.  The court explained that the portion involving the spool did not describe a subsequent remedial measure and that any portions that did could be redacted.  *Id.*  Finally, in *Bailey v. Kawasaki-Kisen, K.K.,* 455 F.2d 392, 395-96 (5th Cir. 1972), the court held that evidence that excess oil and grease had been removed from cables holding the

---

[1]  Moreover, defendants argued that the improper inference logic of Rule 407 applies to remedial measure evidence regardless of who is doing the cleanup.  *See Gray v. Hoffman-La Roche, Inc.,* 2003 WL 22854643, at *4 (10th Cir. Dec. 3, 2003) (Rule 403 scrutiny applies even if Rule 407 does not technically apply); *Hull v. Chevron U.S.A., Inc.,* 812 F.2d 584, 587 (10th Cir. 1987) (evidence excluded where it trespassed "inferentially into the Rule 407 prohibited terrain of proof of culpable conduct").  These cases make clear that a jury may improperly view remedial measures as evidence of negligence no matter who does the cleanup.  The potential for prejudice exists regardless of whether DOE conduct is at issue in the trial, but it will be even more pronounced if plaintiffs are permitted to introduce evidence of DOE conduct and to conflate defendants and DOE.  (*See* Defs.' MIL No. 4.)

boom after it fell during unloading operations was admissible to show the operational cause of the accident and that the danger could easily be eliminated.  These cases do not illustrate how "prior condition" evidence is relevant to plaintiffs' trespass and nuisance claims in this case. And plaintiffs fail to explain what the "prior condition" is that they suggest is relevant here. Furthermore, these cases do not deal with remedial measure *costs* and thus do not shed any light on plaintiffs' contention that evidence of such costs is somehow relevant "prior condition" evidence.

## XIX.   CONCLUSION

For the foregoing reasons, and for the reasons set forth in each of defendants' individual

motions in *limine*, each of defendants' motions should be granted in full.


Dated:  July 22, 2005                              Respectfully submitted,



                                                   s/Joseph J. Bronesky
                                                   Joseph J. Bronesky
                                                   SHERMAN & HOWARD LLC
                                                   633 Seventeenth Street, Suite 3000
                                                   Denver, CO  80202
                                                   (303) 297-2900

                                                   David M. Bernick
                                                   Douglas J. Kurtenbach
                                                   Ellen Therese Ahern
                                                   Stephanie A. Brennan
                                                   KIRKLAND & ELLIS LLP
                                                   200 E. Randolph Drive
                                                   Chicago, IL 60601
                                                   (312) 861-2000

                                                   Attorneys for Defendants ROCKWELL INTER-
                                                   NATIONAL CORPORATION and THE DOW
                                                   CHEMICAL COMPANY

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing was served this 22nd day of July upon the following counsel by facsimile and U.S. mail:

Peter B. Nordberg, Esq.
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103-6365

Gary B. Blum, Esq.
SILVER & DEBOSKEY
The Smith Mansion
1801 York Street
Denver, Colorado 80206

s/Patricia Eckman