**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 90-cv-181-JLK

MERILYN COOK, *et al.*,

              Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION
and THE DOW CHEMICAL COMPANY,

              Defendants.

_____

**DEFENDANTS' REPLY IN SUPPORT OF THEIR
MOTION TO EXCLUDE EXPERT WITNESS TESTIMONY**
_____

      Defendants respectfully submit this reply in support of their motion to exclude expert witness testimony.  This reply does not attempt a point-by-point refutation of plaintiffs' arguments in their response, though defendants reserve such a discussion for the upcoming *Daubert* hearing.  Rather, this reply briefly discusses a number of general issues raised by plaintiffs' response that merit a general reply.  To assist the Court, the names of plaintiffs' experts appear in bold and underlined text where they appear in the discussion below to identify the experts to which defendants' general arguments apply.

**I.      PLAINTIFFS HAVE FAILED TO MEET THEIR BURDEN OF PROVING THE
ADMISSIBILITY OF THEIR EXPERTS' TESTIMONY.**

      Plaintiffs bear the burden to demonstrate that the expert testimony they proffer is admissible under *Daubert* and Federal Rule of Evidence 702.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 n.10 (1993); *see also Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999) ("[T]he plaintiff must show that the method employed by the

1

expert in reaching the conclusion is scientifically sound and that the opinion is based on facts which sufficiently satisfy Rule 702's reliability requirements.").  Plaintiffs have failed to meet this burden; instead, they either fail to respond to defendants' challenges at all, or do so inadequately.

> **A.    Plaintiffs Have Failed to Respond to Many of Defendants' Arguments That Are Independently Sufficient to Exclude Plaintiffs' Experts' Testimony.**

Where a party bears the burden, as plaintiffs do here regarding the admissibility of their expert testimony, that party fails to satisfy that burden by not responding to the opposing party's arguments.  *See, e.g.*, *TV Communications Network, Inc. v. ESPN, Inc.*, 767 F. Supp. 1062, 1069 (D. Colo. 1991) ("Plaintiff did not address this argument in its response. . . .  Therefore, [Plaintiff] has not satisfied its burden of proof.").  Several of the grounds that defendants raised in their motion for the exclusion of plaintiffs' experts were not addressed at all in plaintiffs' response, even though each of these grounds serves as an independent and sufficient reason to exclude the testimony of the experts to which they pertain.  "Under *Daubert*, 'any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible."  *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) (quoting *Mitchell*, 165 F.3d at 782).  Because plaintiffs bear the burden to demonstrate the admissibility of their experts, their experts should be excluded on these unchallenged grounds:

1.    Plaintiffs do not contest that all of the opinions of plaintiffs' damages experts Mr. **Hunsperger**, Dr. **Radke**, Dr. **Flynn**, and Dr. **Slovic** should be excluded because they do not assess (i) damages attributable to defendants' allegedly actionable conduct, but instead assess (ii) diminution in value due to "proximity" to Rocky Flats.  (*See* Defs.' *Daubert* Mot. re Damages at 6–12; Ex. 5 to Defs.' *Daubert* Mot. re Damages, Transcript of Hunsperger Videotape, Nov. 25, 1996, at 1 ("I've been asked to study this neighborhood and others nearby to determine whether

or not their **nearness to the Rocky Flats Nuclear Weapons Plant has had any impact** on property values.") (emphasis added); Ex. 4 to Defs.' *Daubert* Mot. re Damages, Radke Dep. at 442 ("I only do proximity to Rocky Flats."); Ex. 1 to Defs.' *Daubert* Mot. re Damages, Hunsperger Report at 60 (survey conducted by Drs. Flynn and Slovic, which is incorporated into Mr. Hunsperger's report, concludes only that "[p]roximity to Rocky Flats makes housing less desirable"); id. at .)  However, according to plaintiffs' own experts, **"proximity" includes various non-actionable factors**, including that a "loss" attributable to "proximity" could exist "just because people don't like living next to a former nuclear weapons plant."  (Ex. 4 to Defs.' *Daubert* Mot. re Damages, Radke Dep. at 206.)  As the Reference Manual explains, "[i]f a damages analysis includes the effects not caused by the defendant, it is a defective analysis.  It has not followed the standard format for damages, which, by its nature, isolates the effects of the harmful act on the plaintiff."  Reference Manual on Scientific Evidence 307–08 (2d ed. 2000).  Plaintiffs do not respond to this argument concerning this fundamental flaw in the analyses of each of their property experts.

2.      The opinions of plaintiffs' expert Dr. **Radke** should be excluded because his multiple regression analysis is flawed in several respects that plaintiffs do not contest:  the improper use of factoring (*see* Defs.' *Daubert* Mot. re Damages at 18), arbitrary weighting (*see id.* at 23 n.10), mismatch between phases (*see id.* at 24–25), and a faulty control group (*see id.* at 25).

3.      Plaintiffs do not contest that the opinions of plaintiffs' damages experts Mr. **Hunsperger** and Dr. **Radke** should be excluded because, in assessing diminution in value, those experts do not determine whether the diminution in property value they purport to measure was experienced by class members.  (*See id.* at 15–17.)  Under Dr. Radke's own analysis (which Mr.

Hunsperger incorporated wholesale into his report), the 1,945 class members who purchased property in 1988 experienced no diminution in the value of their properties during the 1989–1992 period that plaintiffs now focus on.  (*See* Ex. 4 to Defs.' *Daubert* Mot. re Damages, Radke Dep. at 332–336 (testifying that his yearly estimates of diminution in value in the period 1988 to 1992 were not statistically different from one another).)  Under well-established principles of Colorado tort law, such plaintiffs may recover only the ***difference***, if any, between the discount that existed in 1988 and the discount during 1989–1992.  *See Bd. of County Comm'rs v. Slovek*, 723 P.2d 1309, 1316 (Colo. 1986) ("The trial court must take as its principal guidance the goal of reimbursement of the plaintiff for losses actually suffered.").  There is no basis in the record or in Hunsperger's and Radke's analysis to claim that the 1,945 plaintiffs who purchased properties in 1988 experienced any "difference" or "diminution" in value that purportedly existed in 1989–1992; Radke's testimony is to the contrary.  (*See* Ex. 4 to Defs.' *Daubert* Mot. re Damages, Radke Dep. at 332–336.)

4.      Plaintiffs do not contest that the opinions of Mr. **Hunsperger** stemming from his analysis of Drs. Flynn and Slovic's public opinion survey are inadmissible because they are based on several faulty assumptions and calculations that plaintiffs do not respond to:  (1) taking the mean discount that the respondents to the survey indicated would be necessary for them to purchase a home near Rocky Flats, without regard to the fact that 70% of those willing to buy homes within two to four miles of Rocky Flats required ***no*** such discount; (2) arbitrarily assigning a discount value of $30,000 to those respondents who did not provide a discount value and including them in the final calculation of "average discount"; (3) assuming perfect correlation between his calculation of average discount and diminution in property value; (4) assuming that the average discount is entirely attributable to Rocky Flats contrary to Dr. Slovic's

admission that "I don't think that's 100% attributable to Rocky Flats" (*see* Ex. 15 to Defs.' *Daubert* Mot. re Damages, Slovic Dep. at 179).  (*See* Defs.' *Daubert* Mot. re Damages at 44–45.)  Each of these errors is independent and sufficient to render this analysis inadmissible.

5.  Plaintiffs do not contest that Mr. **Hunsperger**'s analysis of MLS data is inadmissible both because (1) it does not provide the relevant measure of damages but measures only varying rates of appreciation (*see id.* at 50–51), and (2) its underlying data, based on MLS sectors, is both geographically over-inclusive and under-inclusive of the class area, despite the fact that class-area-specific MLS data was used (for another purpose) by Dr. Radke and, in fact, was supplied to him by Mr. Hunsperger (*see id.* at 52–53).

6.  Plaintiffs do not contest that the opinions of plaintiffs' expert Dr. **Clapp** should be excluded because there is no way to determine the rate of error of his analysis.  (*See* Defs.' *Daubert* Mot. re Risk at 50–51.)

7.  Plaintiffs do not contest defendants' arguments that the opinions of plaintiffs' expert Dr. **Goble** regarding medical monitoring or substances other than plutonium are irrelevant and unreliable, but "confine [them]selves to addressing defendants' attacks on Dr. Goble's estimates relating to plutonium."  (Pls.' Mem. at 54.)

8.  Plaintiffs do not contest defendants' arguments that the opinions of plaintiffs' expert Dr. **North** are irrelevant and unreliable.  (Pls.' Mem. at 1.)

9.  Plaintiffs do not contest defendants' arguments that the opinions of plaintiffs' expert Dr. **Mayer** are irrelevant and unreliable.  (Pls.' Mem. at 1.)

**B.  Plaintiffs Inadequately Respond to Other Challenges.**

Plaintiffs employ a number of strategies in response to some other of defendants' arguments that are simply inadequate under *Daubert*.  These strategies include:  (1) defending the relevance of expert testimony by linking it to issues that are not to be tried; (2) simply

5

making lawyers' assertions that defendants' challenges are insufficient but failing to come forward with any substantive support to overcome defendants' well-supported challenges; (3) asserting that a combination of unreliable and insufficient methods can lead to an admissible result; (4) defending the reliability and qualifications of one expert by showing his reliance on another expert's work, but then failing to defend the specific relied-upon work of the second expert; (5) improperly attempting to justify the methodology of one of their experts by way of comparison to the methodology of a defendant's responsive or rebuttal expert; and (6) waving off their *Daubert* obligations by asserting that the analysis the expert should have performed is "impractical".

1. <b>Plaintiffs Do Not Link Their Expert Evidence to Their Class-Wide Claims.</b>

In discussing whether their expert testimony is relevant, plaintiffs almost completely ignore this Court's May 17, 2005 Order containing "rulings on the critical scope of trial issues," despite the fact that this Order was issued "[t]o assist the parties in preparing their *Daubert* motions" after over more than two years' effort by the Court and the parties to identify the issues to be tried on a class-wide basis.  (*See also* 5/17/05 Order at 20 (ordering that "the parties ***shall conform*** their upcoming *Daubert* motions and motions in limine to reflect the rulings set forth in this order") (emphasis added).)  That Order made clear that plaintiffs can prove the "interference" element of their nuisance claims in the following ways:  (1) by establishing "class-wide exposure to plutonium and resulting class-wide increase in human health risk"; provided that, in making this determination, the jury may only consider the magnitude of the "common, class-wide health risk" (5/17/05 Order at 5), and (2) by establishing "that there is an objectively demonstrable risk of future harm" that is "based on objective conditions, such as existing contamination on-site and off-site that may be released or remobilized in some fashion that

would result in human exposure and increased health risk, that have the potential to affect all of the Class Area" (*id.* at 6.)  These paths to nuisance liability require a demonstration of increased health risk to all class members, arising from the past or future release of plutonium from Rocky Flats.  (*Id.*)  In addition, the Court held that, in order to recover damages in the class trial under Restatement Section 930, "Plaintiffs must further demonstrate that it appears any nuisance they prove will continue indefinitely."  (*Id.* at 3.)

With respect to damages, the Court stated in its May 17, 2005 Order that plaintiffs may only recover damages on a class-wide basis "according to Restatement § 930(3)(b)" with respect to a sub-class of class members who owned property on the later of January 30, 1990 or the CCE date.  (5/17/05 Order at 14–20.)  In order to prove Section 930 damages, plaintiffs must establish:  "(1) the date on which the injurious situation became complete and comparatively enduring ('CCE date'); (2) the average percentage diminution in property value that was caused by any trespass or nuisance found by the jury, as of the CCE date, for each property category [residential, commercial, vacant land]; (3) the value of the properties in the Damages sub-class, by property category, as of the CCE date; and (4) by multiplying the total value of each property category in the sub-class by the average percentage diminution in value for each property category as of the CCE date, and summing these amounts, the aggregate damages for the Damages sub-class."  (5/17/05 Order at 15.)  Section 930(3)(b) allows damages for "the decrease in the value of the land caused by the prospect of the continuance of the invasion measured at the time when the injurious situation became complete and comparatively enduring."  Restatement (Second) of Torts § 930(3)(b).  Diminution in value attributable to the "actual effects of past invasions" is measured in accordance with Restatement (Second) of Torts § 929, and thus cannot be part of the classwide trial.

Plaintiffs' 128-page-long response brief cites this Order only twice (*see* Pls.' Mem. at 68, 95); the rest of plaintiffs' brief ignores the Court's May 17, 2005 Order altogether.  Plaintiffs apparently contend instead that their expert testimony is relevant if it relates to any of the following:

- **Rocky Flats Generally**:  "the impact of Rocky Flats" (*id.* at 15); "proximity to Rocky Flats" (*id.* at 31, 65, 66); "attributable to Rocky Flats" (*id.* at 33, 54); "just one factor, Rocky Flats" (*id.*); "Rocky Flats' history" (*id.* at 107); "Rocky Flats operations" (*id.* at 114).

- **So-Called Misconduct Generally:**  "defendants' reckless operation of Rocky Flats" (*id.* at 68); "chronic mismanagement of Rocky Flats" (*id.* at 95); "defendants' management of a specialized weapons manufacturing plant" (*id.* at 122).

- **So-Called Risk Mismanagement:**  "mishandling of radioactive and toxic materials" (*id.* at 94); "mismanagement of criticality risks" (*id.* at 120).

- **Waste Handling and Storage:** "waste management practices and policies" (*id.* at 91); "waste management practices of Dow and Rockwell" (*id.* at 119); "waste management operations of Rocky Flats" (*id.* at 122).

- **Public Perceptions and Market Reaction:** "the public's perceptions of the problems at Rocky Flats" (*id.* at 41); "perceptions of risk" (*id.* at 43); "Rocky Flats' stigma" (*id.* at 49); "public reaction to Rocky Flats" (*id.* at 50).

- **Uncertainty:** "the ***uncertainty*** and ***variability*** associated with Rocky Flats exposure and risk estimates" (*id.* at 54).[1]

These arguments of relevance improperly disregard whether such testimony relates to the forms of interference that "are legally sufficient to prove interference with Class members' use and enjoyment of their properties and capable of determination on a class-wide basis" (5/17/05 Order at 4), or whether it relates to the measure of class-wide damages, as these issues have been defined by this Court.

---

[1] (*Compare* Defs.' Reply in Support of Their MILs at Part I.B.3 (also listing subjects that are irrelevant to plaintiffs' class-wide claims).)

This fundamental failure to link the evidence to an issue to be tried afflicts much of plaintiffs' expert testimony:

- Dr. **Goble** does not establish any common, class-wide dose, exposure, or health risk, which plaintiffs do not dispute.  (*See* Defs.' *Daubert* Mot. re Risk at 3–5.)

- Dr. **Smallwood**'s opinions of off-site releases are not tied in any way to the class area, and his opinions about chromium are also irrelevant because that substance is not at issue in the case.  (*See id.* at 31–32.)  Plaintiffs do not dispute either of these statements.

- Dr. **Clapp** did not study present or future health risk in the class area or class members, but instead studied past health risk in 1979–1992 inside a different geographical area.  (*Id.* at 41–43.)

- Plaintiffs fail to link each of the areas of defendants' conduct upon which plaintiffs' experts Drs. **Budnitz** and **Cochran** seek to testify with any alleged class-wide nuisance.  (*See* Defs.' *Daubert* Mot. re Conduct at 4–17.)  As defendants discuss in their reply brief in support of their motions in *limine*, two particularly egregious examples are plaintiffs' failure to tie (1) non-plutonium contamination and (2) conduct that can impact only water-based pathways to any alleged class-wide nuisance.

### 2.    Plaintiffs Have Failed to Overcome Defendants' Substantiated Arguments.

Though defendants do not bear the burden to prove that plaintiffs' expert testimony is inadmissible, their original motions were supported with numerous reports and affidavits from Nobel laureates and other highly-respected authorities, including defendants' experts whose qualifications and reliability have not been questioned by plaintiffs.  In many instances, plaintiffs do not come forward with any objective evidence in response to this proof.  The *ipse dixit* assurances of reliability made by plaintiffs' experts and plaintiffs' counsel are insufficient to overcome defendants' evidence.  *See Mitchell*, 165 F.3d at 781 (requiring expert to "us[e] techniques subject to objective, independent validation in the scientific community"); *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) ("[Proof of reliability] requires some

objective, independent validation of the expert's methodology.  The expert's assurances that he has utilized generally accepted scientific methodology is insufficient.").

Defendants demonstrated in their motion to exclude Dr. **Radke**'s testimony that his purported "regression" suffered from serious methodological errors and failed to meet the minimal standards of the economics profession.  (*See* Defs.' *Daubert* Mot. re Damages at 22–26.)  Among these errors was Dr. **Radke**'s inappropriate use of "weighted least squares," which Dr. McFadden (a Nobel laureate in this precise field) noted, *inter alia*, is "a blatant and obvious statistical error that contradicts the Gauss-Markov theorem, the most fundamental result in regression theory."  (*Id.* at 22–23 (quoting Ex. 10 to Defs.' *Daubert* Mot. re Damages, 2/1/99 McFadden Aff. at 54).)  In their reply, the best plaintiffs can do is complain that defendants did not provide a page citation to one of several treatises cited by Dr. McFadden, but plaintiffs altogether fail to address the point substantively.  Indeed, they ***cannot*** do so, because any review of the field's texts supports Dr. McFadden's statement and shows that Dr. **Radke**'s analysis violated a fundamental principal of econometrics.  *See*, *e.g.*, William H. Greene, Econometric Analysis 225 (5th ed. 2003); Robert S. Pindyck & Daniel L. Rubinfeld, Econometric Models and Economic Forecasts 129 (3d ed. 1991); George G. Judge, et al., The Theory and Practice of Econometrics 420–21 (2d ed. 1985).  There has been no showing to the contrary.

Nor are plaintiffs correct when they falsely claim that defendants cited "no authority" "other than their own experts" for the observation that Dr. **Radke** should not have relied on least weighted squares.  (*See* Pls.' Mem. at 34.)  In fact, had plaintiffs bothered to read the expert declaration of Dr. McFadden, they would have noticed that ***at the very same page defendants cite*** (in fact, in the ***very next sentence*** after the quoted language that plaintiffs criticize), McFadden specifically points to one of the authorities that plaintiffs claim defendants do not cite.

(Ex. 10 to Defs.' *Daubert* Mot. re Damages, 2/1/99 McFadden Aff. at 54 ("An explicit citation for the proposition that weighting is incorrect in the case of stratified random sampling with stratification on an explanatory variable is given by William DuMounchel and Greg Duncan (1983) 'Using Sample Survey Weights in Multiple Regression Analysis of Stratified Samples,' *Journal of the American Statistical Association*.").)[2]

### 3. The Whole of Plaintiffs' Expert Testimony Is Not Greater Than the Sum of Its Parts.

Plaintiffs attempt to counter defendants' arguments against a given expert analysis by pointing out that they are offering other analyses, too.  In addressing the testimony of plaintiffs' expert Dr. Flynn that Mr. **Hunsperger**'s analogous case studies method could not yield a calculation of diminution in value, plaintiffs' sole response is that Dr. Flynn's "view would be germane if this were the sole method on which Mr. Hunsperger relied.  But it is not."  (Pls.' Mem. at 24.)  But plaintiffs' theory that the whole of their testimony is somehow greater than the sum of its parts does not square with the requirements of the Federal Rules of Evidence.  Under the Rules, each particular expert opinion must satisfy Rule 702 on its own.  *See*, *e.g.*, *Frey v. Chi. Conservation Ctr.*, 119 F. Supp. 2d 794, 796–797 (N. D. Ill. 2000) ("When resolving a motion to exclude, federal courts must evaluate each proffered opinion individually against the standards of the federal rules of evidence, rather than evaluate a witness's testimony in aggregate.").

---

[2] McFadden's affidavit also cites other sources demonstrating the fundamental nature of Dr. **Radke**'s errors.  (*See*, *e.g.*, Ex. 10 to Defs.' *Daubert* Mot. re Damages, 2/1/99 McFadden Aff. at 5 ("For example, a leading econometrics textbook, William Greene *Econometric Analysis* (Second Edition) states and proves the Gauss-Markov theorem just nine pages after first introducing the method of least squares (pp. 155–159, 182–183).").)

**4.     Plaintiffs' Expert "Shell Game" Leaves Many of Their Experts Without a Reliable Basis for Their Opinions.**

The bases for an expert's opinion must be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject."  Fed. R. Evid. 703. Where one expert relies upon the work of another, the proffering party must prove the reliability of the other expert's analysis as well.  *See Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 588 (7th Cir. 2000) ("Expert testimony relying on the opinions of others should, of course, be rejected if the testifying expert's opinion is too speculative or the underlying basis is faulty."); *Owens v. Ford Motor Co.*, 297 F. Supp. 2d 1099, 1108 (S.D. Ind. 2003) ("Although a testifying expert may rely on another expert's opinion, the testifying expert's opinion should be rejected if the underlying basis is unreliable.").  Where the underlying expert opinions were developed in litigation, they cannot serve as a reliable basis for another expert's work.  *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1012 (C.D. Cal. 2003) ("The rules do not permit an expert to rely upon excerpts from opinions developed by another expert for the purposes of litigation.")

Plaintiffs' experts, by their own admission, rely on the analysis and opinions of other plaintiffs' experts developed for this litigation.  Mr. **Hunsperger** based two of his five analyses on the work of Dr. **Radke** and Drs. **Flynn** and **Slovic**; the additional work that Mr. **Hunsperger** performed on his own part was so minimal that plaintiffs did not devote any discussion to this work in their response (*see* Pls.' Mem. at 11–12) (though defendants have made well-substantiated challenges to it).  In the "conduct" area, plaintiffs note that "Dr. **Cochran** relied on and sought assistance from Dr. **Budnitz** and Dr. **North** in any area, such as fire safety, in which Dr. Cochran felt that additional specialized expertise would be helpful."  (Pls.' Mem. at 118.)

In such instances, plaintiffs have failed to demonstrate that the underlying expert analysis on which their experts have relied is in turn reliable. Instead of defending the reliability of each of their experts on their own merits, they engage in a "shell game" by pointing to one expert's work to defend another expert's work, and then defending the second expert by pointing back to the first expert, or else not at all, as follows:

- Plaintiffs admit that Drs. **Flynn** and **Slovic**'s survey was not designed "to measure the actual property value diminution by way of their survey questions" (Pls.' Mem. at 47), but then fail to answer defendants' challenge to Mr. **Hunsperger**'s attempt to do just that other than to argue that Hunsperger relied on Flynn and Slovic (*see* Defs.' *Daubert* Mot. re Damages at 44–45.)

- Despite Dr. **Cochran**'s reliance on the opinions of Dr. **North**, plaintiffs attempt to deflect defendants' criticism of the reliability of this underlying basis for Dr. Cochran's testimony by claiming that defendants' criticisms of Dr. North's testimony are "moot" because plaintiffs have withdrawn Dr. North as an expert. (*Id.* at 1.)

### 5. Plaintiffs Cannot Compare Their Experts to Defendants' Responsive or Rebuttal Experts.

Plaintiffs wrongly attempt to justify their experts' unreliable methodologies by identifying supposed similarities with the methodologies of defendants' experts. Thus, plaintiffs compare Mr. **Hunsperger**'s valuation analyses with those of defendants' experts Dorchester and Conway (Pls.' Mem. at 12, 14, 18), Dr. **Slovic**'s opinions on psychology with the report of defendants' expert Kahneman (*id.* at 45), their expert Dr. **Clapp**'s analysis with the analysis of defendants' expert Dr. Howe (*id.* at 66), and the testimony of defendant's expert Blaha with the testimony of their expert Dr. **Budnitz** (*id.* at 109) and Dr. **Cochran** (*id.* at 124). Plaintiffs cannot, however, hold their expert proof, being offered to carry plaintiffs' burden of proof on the substantive elements of their claim, to the same standards as defendants' expert work offered to rebut such proof.

For plaintiffs' property damages expert testimony to be admissible, plaintiffs' expert testimony must distinguish the alleged impact caused by defendants' actionable conduct from other, non-actionable factors, *inter alia*.  (*See* Defs.' *Daubert* Mot. re Damages at 9–11.)  By contrast, defendants' expert testimony may rebut plaintiffs' claims of causation in a number of ways, including showing that a non-actionable factor contributed to the alleged effect, *see Cook v. Rockwell Int'l Corp.* ("*Cook IX*"), 273 F. Supp. 2d 1175, 1210 n.39 (D. Colo. 2003), or showing that the claimed effect did not occur at all.  Because plaintiffs and defendants are seeking to prove different things, they are subject to different *Daubert* requirements.  *See, e.g.*, *Samuel v. Ford Motor Co.*, 112 F. Supp. 2d 460, 474 (D. Md. 2000) ("[B]ecause Carr was called by the Defendant to rebut Plaintiffs' theory of causation, and not to prove a fact for which the Defendant bore the ultimate burden of proof/persuasion, the cases cited by the Plaintiffs that discuss the sufficiency of evidence that a plaintiff must produce on a fact for which he or she has the burden of proof are not controlling.").

Plaintiffs also misconstrue the purpose of many of defendants' expert analyses, which consciously adopt the methodologies of plaintiffs' experts.  The intent behind these analyses is not to endorse the methodologies of plaintiffs' experts, but rather to better expose the flaws in those methodologies and to demonstrate that the conclusions drawn by plaintiffs' experts do not stand once those flaws are remedied.  Thus, Howe replicates Dr. **Clapp**'s analysis to demonstrate that it does not, in fact, support a finding of greater cancer incidence in the Rocky Flats area, not to condone Dr. Clapp's flawed methodology.  (*See* Ex. 27 to Defs.' *Daubert* Mot. re Risk, Howe Aff. ¶ 59.)

6.    **Plaintiffs Cannot Dodge** *Daubert*'s **Requirements By Complaining That They Are Unachievable.**

Plaintiffs cannot meet their burden by saying that the work that an expert would normally be required to do in order for his analysis to be admissible is "impractical" in this case.  (Pls.' Mem. at 12.)  Plaintiffs admit that Mr. **Hunsperger** "did not perform a formal appraisal of the thousands of properties in the property class" (*id.*), and that he did not apply any of the three traditional appraisal approaches.  Their attempted justification for this failure is that following generally accepted appraisal techniques is "impractical," "not applicable or feasible," and "not possible where, as here, an entire market has been adversely impacted."  (*Id.* at 12–15.)  In the same way, plaintiffs excuse Dr. **Clapp**'s failure to apply his study to the class area "because there were too few cases in the class to do a 'meaningful' analysis."  (*Id.* at 41.)  But plaintiffs do not cite any exception to the requirements of *Daubert* for circumstances where the work that expert would be required to in order to meet generally accepted scientific standards cannot be done because the case is being tried as a class action.

Plaintiffs' contention that a mass appraisal would be "impractical" (Pls.' Mem. at 12) conflicts with their representations to the Court at the time of class certification "that common methods of proof are available to assess diminution of value on a classwide basis," including "mass appraisal" as that technique is defined by the Uniform Standards of Professional Appraisal Practice ("USPAP").  (*See* Ex. 1, Pls' Reply Mem. in Supp. of Mot. for Class Certification at 66 (citing USPAP at 8 (1992 ed.)).)  But plaintiffs now do not dispute that their property valuation expert failed to meet the very same USPAP standards that plaintiffs warranted could be met at the time the property class was certified.  (*See* Defs.' *Daubert* Mot. re Damages at 40 ("Nor has he prepared a 'mass appraisal,' as that term is defined by the Appraisal Institute and [USPAP].").)  The fact that a mass appraisal cannot be done is an argument against class

15

certification, not an argument in favor of the admissibility of plaintiffs' proffered expert testimony.

## II.    SOME OF PLAINTIFFS' EXPERTS HAVE FAILED TO KEEP AND PRODUCE DOCUMENTATION OF PARTS OF THEIR WORK, OR TO FOLLOW A VERIFIABLE METHODOLOGY, AS THE SCIENTIFIC METHOD REQUIRES.

Certain of plaintiffs' experts have failed to document their work, as required by the Federal Rules of Civil Procedure, *Daubert*, and basic scientific standards.  Under Rule 26(a)(2), plaintiffs' experts were required to provide defendants with the "data or other information considered by the witness in forming the opinions."  "A party that without substantial justification fails to disclose information required by Rule 26(a) . . . ***shall not***, unless such failure is harmless, ***be permitted to use as evidence*** at trial, at a hearing, or on a motion any witness or information not so disclosed."  Fed. R. Civ. P. 37(c)(1) (emphasis added).  Furthermore, the Court's "gatekeeper" function under *Daubert* "requires the judge to assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts."  *Dodge*, 328 F.3d at 1221.

Here, several of plaintiffs' purported experts have failed to disclose the data and information required under Rule 26, and the Court (and defendants' experts) cannot fully assess the reliability of plaintiffs' experts' reasoning or methodology because their analyses cannot be fully replicated without the missing data.  Accordingly, their testimony and reports are inadmissible.

### A.    Plaintiffs Demonstrate A Shocking Disregard For Magistrate Judge Borchers's March 1998 Order; Radke's Inadequate Documentation Renders His Report And Testimony Inadmissible.

Dr. **Radke**'s failure to produce significant portions of the materials that he allegedly relied on for his statistical analysis violates the Federal Rules of Civil Procedure.  Plaintiffs suggest in their reply that defendants sought "small or tangential" information.  That is false.  In

his March 31, 1998 Order concerning what was then a year-long discovery dispute, Magistrate

Judge Borchers determined that the following materials *do not even exist*:[3]

- The programs used to run the regressions and the formulas describing how certain variables were created;

- The x-y geographic coordinates of the properties analyzed in his study necessary to recreate the dozens of variables Radke created using his GIS software including variables describing the distance of properties from Rocky Flats;

- The dates of the transactions used in his study;

- Certain of his multiple regression output.

(*See* Ex. 9 to Defs.' *Daubert* Mot. re Damages, 3/31/98 Order at 4–8.)

Magistrate Judge Borchers already has made the findings necessary to require preclusion

under Rules 26(a)(2) and 37(c)(1). *See* Fed. R. Civ. Pro. 37(c)(1) ("A party that without

substantial justification fails to disclose information required by Rule 26(a) …is not, unless such

failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any

witness or information not so disclosed.")  *First*, the materials at issue are *essential*, and Radke's

analysis cannot be replicated and fully tested without them.  (*See* Ex. 9 to Defs.' *Daubert* Mot. re

Damages, 3/31/98 Order at 4, 6, 7 (ruling that the missing data and documents are fundamental

to Radke's methodology and conclusions).)  *Second*, these materials "*no longer exist*," thus

*preventing replication* of Radke's work.  (*See id.* at 4–7.)  *Third*, failure to disclose this

information *cannot be cured*.  (*See, e.g.*, *id.* at 4–5 ("This Court cannot compel was does not

exist.  Even if Dr. Radke's staff did the work anew, it would not be the same.").)  Magistrate

---

[3] On April 21, 1998, defendants also filed a motion under Rule 37(c)(1) to preclude Radke's testimony based on his failure to document his work and make it available for review.  That motion was denied in *Cook VIII* on the grounds that "Plaintiffs have not . . . yet sought to rely on Dr. Radke's evidence."  181 F.R.D. at 488–89.  Now that plaintiffs seek to rely on Radke's testimony at trial, however, relief under Rule 37(c)(1) is appropriate.

Judge Borchers found that plaintiffs' failure to disclose certain data underlying Radke's study "may form the foundation of a motion to preclude Dr. Radke's testimony." (*Id.* at 6.)

Radke's testimony is inadmissible for this reason alone. *See Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 954 (10th Cir. 2002) (reversing the district court's denial of motion to strike expert report where expert had failed to disclose information required by Rule 26). The discovery sanction of Rule 37(c)(1) is automatic. Plaintiffs never have provided any justification whatsoever for the disappearance of this pivotal data and analysis, much less a "substantial" one. "A party may not simply retain an expert and then make whatever disclosures the expert is willing or able to make notwithstanding the known requirements of Rule 26." *Reed v. Binder*, 165 F.R.D. 424, 430 (D.N.J. 1996); *Nguyen v. IBP, Inc.*, 162 F.R.D. 675, 681 (D. Kan. 1995). *See also Jacobsen*, 287 F.3d at 951–54. To the contrary, "[i]f the expert is unable or unwilling to make the disclosures he should be excluded as a possibility for retention as an expert witness in the case." *Nguyen*, 162 F.R.D. at 681.

Plaintiffs' failure to comply with Rule 26(a)(2) is certainly not harmless. Plaintiffs lamely suggest in their reply that "by defendants' own admission" Dr. McFadden was able to reproduce Radke's regressions. To the contrary, as defendants pointed out in their motion and in several prior motions to this Court, Dr. McFadden was unable to replicate substantial portions of Radke's analysis. (*See* Ex. 10 to Defs.' *Daubert* Mot. re Damages, 2/1/99 McFadden Aff. at 4 ("I have made an extensive effort to replicate Dr. Radke's results, ***and am unable to do so***.") (emphasis added).) Lest there be any doubt about this, Dr. McFadden further explained:

> There are major gaps in Dr. Radke's description and documentation of the data he has collected, the processing of these data into the variables appearing in his statistical models, and the statistical calculations he has done. ***These gaps make it impossible or impractical to replicate substantial portions of Dr. Radke's work***, in order to determine if it is consistent with his Report, free of mechanical errors, and based on plausible assumptions. Dr. Radke has systematically violated the

> documentation standards … that are widely accepted in economic analysis and that form the basis for customary scientific practice and scientific courtesy.… [T]he documentation [] is needed, for the expert himself or opposing experts, to evaluate and verify the analysis.  Dr. Radke's documentation falls short at every stage . . . .

(*Id.* at 27–28.)  Dr. McFadden devoted three pages to the scientific principles (with citations) that require documentation of expert work (*id.* at 21–24) and devoted fifteen more pages to explaining in detail exactly how Dr. Radke failed to conform with these principles and the resulting inability to replicate Dr. Radke's work (*id.* at 27–42).  Plaintiffs have not challenged any of Dr. McFadden's submission, and there has been no showing to the contrary.

Though plaintiffs' counsel contend (without citation to any independent support) that the information they did produce was sufficient "to permit . . . McFadden to reproduce Dr. Radke's regressions" (Pls.' Mem. at 36), this is only partially true, as substantial portions of Dr. Radke's work could not be replicated, even with "extensive effort."  (*See* Ex. 10 to Defs.' *Daubert* Mot. re Damages, 2/1/99 McFadden Aff. at 4, 27–28.)  As Judge Borchers found, even Dr. Radke himself would not be able to replicate his own work.  (*See* Ex. 9 to Defs.' *Daubert* Mot. re Damages, 3/31/98 Order at 7.)  Nor is it adequate for plaintiffs to respond that "the DRESCO and MLS data employed by Dr. Radke were commercially available," (Pls.' Mem. at 36), because this data, as McFadden and Judge Borchers both found, was insufficient to attempt a reconstruction of Dr. Radke's work.  As discussed further below, the public availability of the data alone does not relieve an expert of his obligation to retain documentation of his work under Rule 26.

Furthermore, this Court also cannot assess Radke's reasoning and methodology or determine its scientific validity.  *See Dodge*, 328 F.3d at 1221.  In fact, Judge Borchers found it doubtful that even Radke *himself* could reproduce his own results.  (*See* Ex. 9 to Defs.' *Daubert* Mot. re Damages, 3/31/98 Order at 7.)  Where an expert fails to document his work and make it

19

available for review—thereby rendering his opinions non-replicable and non-testable—courts consistently exclude such testimony under *Daubert*. *See, e.g., Reed*, 165 F.R.D. at 430; *Nguyen*, 162 F.R.D. at 681.

In response to the overwhelming authority outlined above, plaintiffs simply shrug aside Magistrate Judge Borchers's ruling—calling it "erroneous insofar as it concludes that any data was discarded and destroyed," notwithstanding Magistrate Judge Borchers's findings to the contrary—and blame the ***defendants*** for the plaintiffs' failure to produce the required information. (*See* Pls.' Mem. at 35–36.) Plaintiffs' attempt to ignore Judge Borchers's ruling is misguided. Judge Borchers's findings were based, in part, upon plaintiffs' own ***admission*** to the Court that these critical materials has disappeared and were no longer available. (*See* Ex. 2, 2/18/98 Opposition to Motion to Compel at 3–7.) Judge Borchers specifically noted this fact throughout his Order. (*See*, *e.g.*, Ex. 9 to Defs.' *Daubert* Mot. re Damages, 3/31/98 Order at 5 ("Plaintiffs' counsel state that such coordinates do not exist."); *id.* ("Plaintiffs are affirmatively stating that Dr. Radke does not have the information concerning the dates of the transactions."); *id.* at 6–7 ("Plaintiffs' counsel state that 'Dr. Radke does not possess any file that would give the month and date of the sale for the properties studied in Phase II.'"); *id.* at 7 ("Plaintiffs have responded by indicating that Phase II information has been provided, but Phase I information is unavailable.").) Defendants are certainly not obligated to renew requests for materials that this Court has held ***do not exist***.[4]

_____

[4] Furthermore, plaintiffs' assertions that Judge Borchers erred would be of no help to plaintiffs even if it were true. If the materials *do* exist, plaintiffs have nonetheless failed to produce them as required under Rule 26.

It is galling that after all of this, plaintiffs' counsel would now claim that it is ***defendants'*** fault that such materials were not produced.  The sanctions of Rule 37(c)(1) are automatic and, because plaintiffs have offered no substantial justification, mandatory.  *See Musser v. Gentiva Health Servs.*, 356 F.3d 751, 756 (7th Cir. 2004) (holding that exclusion sanction "is automatic and mandatory under Rule 37(c)(1) unless non-disclosure was justified or harmless"); *see also Cook VIII*, 181 F.R.D. at 488 (noting that Rule 37(c)(1)'s preclusion sanction is "automatic").  Radke's failure to document his work and retain that documentation, and plaintiffs' failure to provide full discovery under Rule 26, render Radke's report and testimony inadmissible.

### B.      Several Of Plaintiffs' Experts Fail To Apply Any Verifiable Methodology.

As noted above, the Court's "gatekeeper" function under *Daubert* "requires the judge to assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts."  *Dodge*, 328 F.3d at 1221. This cannot be done, however, for a number of plaintiffs' experts who failed to employ any verifiable methodology whatsoever.  As defendants have previously explained in detail, Mr. **Hunsperger**'s vacant land "analysis" lacks ***any*** methodology at all, let alone a verifiable one whose validity could be tested by the Court or the defendants.  (*See* Defs.' *Daubert* Mot. re Damages at 52.)  Mr. Hunsperger ***admitted*** that he did not use any specific scientific, technical or specialized steps to arrive at his vacant land diminution conclusion (*see* Ex. 3 to Defs.' *Daubert* Mot. re Damages, Hunsperger Dep. at 387), and that there was no formula of any type underlying the vacant land analysis (*id*. at 389).  He admitted that his vacant land analysis is not an appraisal and that no formal standards apply against which his opinions can be checked and analyzed.  (*Id*. at 396.)  He further admitted that he did not check his analysis against any objective data and, accordingly, ***he is not certain of the accuracy or reliability of the data***:  "To be honest, I'm not certain of the accuracy of that number because there may be some government

lands included in it which we didn't intend to include, but if that's true and we may do some final checking, the damage estimate would go down, not up."  (*Id.* at 390–391.)

Other experts' reports (or parts thereof) are similarly unreliable.  Richard **Clapp**'s entire study of proportionate cancer analysis fails to assess any rate of error, even though Clapp acknowledges that errors in design can yield incorrect relative risk estimates.  (*See* Ex. 5 to Defs.' *Daubert* Mot. re Risk, Clapp Dep. at 19.)  Clapp admitted other rates of error:  "[A]n epidemiologic study can find a positive association where there is no true association."  (*Id.* at 20.)  "[A]n epidemiologic study can find an association that is greater than the true association." (*Id.* at 20-21.)

Plaintiffs bear the burden of demonstrating an acceptable rate of error for Clapp's analysis, as discussed above and in defendants' opening brief (*see* Defs.' Intro. to *Daubert* Mot. at 3).  No such demonstration has been made, nor could it ever be, because Clapp has testified:

> Q.   What would you define as the rate of error applicable to the analysis that you've done with respect to lung cancer data based on this Colorado Cancer Registry information?
> A.   I don't think I have any way of estimating the rate of error in the analysis.

(*See* Ex. 5 to Defs.' *Daubert* Mot. re Risk, Clapp Dep. at 308.)

Clapp's failure to establish the rate of error for his study renders it inadmissible.  *See*, *e.g.*, *McGuire v. City of Santa Fe*, 954 F.Supp. 230, 233 (D.N.M. 1996) ("Plaintiff's hedonic loss, 'has been found to be moderately reliable and that moderate reliability and validity means that results are greater than chance.'  This is hardly a quantifiable error rate and ***it hardly seems useful to prove the fact finder with 'expert' testimony on figures that are only touted as more reliable than those which might be drawn out of a hat***.") (emphasis added).  (*See* other "rate of error" cases *cited in* Defs.' Intro. to *Daubert* Mot. at 9.)

This failure on the part of plaintiffs' experts to use a verifiable methodology is exacerbated by their failure, like Dr. Radke, to retain and produce documentation of their work. It is no response, as plaintiffs tersely suggest, that the underlying data that Mr. **Hunsperger** used is "available," and defendants hypothetically could go out, gather it, and then try to reassemble it in ways Mr. Hunsperger apparently did.  (Pls.' Mem. at 29.)  Plaintiffs altogether fail to address the substance of defendants' complaint, *i.e.*, that defendants cannot check the math (or other aspects of the expert's work) because they have no way of knowing the math that Hunsperger did.  Similarly, plaintiffs have expended much time and energy over the course of this litigation briefing bone cancer, but plaintiffs' expert Richard **Clapp** did not even produce the results of his bone cancer analysis.  Instead, he generated "worksheets" for his bone cancer analysis, but he testified that he ***threw them away***.  (*See* Ex. 5 to Defs.' *Daubert* Mot. re Risk, Clapp Dep. at 112).

### III.   DEFENDANTS' MOTION GOES TO THE ADMISSIBILITY OF PLAINTIFFS' EXPERT TESTIMONY, NOT JUST THE WEIGHT.

In their defense of Drs. **Flynn** and **Slovic**'s survey, plaintiffs cite *Harolds Stores, Inc. v. Dillard Dept. Stores, Inc.*, 82 F.3d 1533 (10th Cir. 1996), for the proposition that methodological deficiencies in the survey bear on its weight rather than its admissibility.  (*See* Pls.' Mem. at 47.) Plaintiffs are very selective, and misleading, in their citation to *Harolds Stores*.  A complete reading of that case actually cuts against plaintiffs' reliance on surveys here.

In *Harolds Stores*, the Tenth Circuit stated that courts allow the use of survey evidence only "if the survey is ***material***, ***more probative on the issue than other evidence***, and if it ***guarantees trustworthiness***."  82 F.3d at 1544 (emphasis added); *see also* 5 Weinstein & Berger, *Weinstein's Evidence* ¶ 901(b)(9)[03] at 901-140 (1995) ("The admissibility of survey or sampling results depends upon two factors:  ***necessity*** and trustworthiness.") (emphasis added).

A survey is "trustworthy" *only* "if it is shown to have been conducted according to generally accepted [] principles." *Harolds Stores*, 82 F.3d at 1544 (quoting *Brunswick Corp. v. Spirit Reel Co.*, 832 F.2d 513, 522 (10th Cir. 1987)).

Plaintiffs' use of surveys here meets none of the Tenth Circuit's criteria. *First*, defendants have already explained in detail why the Flynn and Slovic survey is irrelevant. (*See* Defs.' *Daubert* Mot. re Damages at 38–40.) *Second*, the survey is certainly not *more* probative than other evidence. If there has been real economic harm to class members, plaintiffs can and should rely on the sales prices that those class members actually received for the property if they sold it, or the amount of money they could receive today, rather than the results of a lengthy 1995 over-the-phone survey of people who resided *outside the class area*. This is particularly true here because many of those surveyed were not looking to buy property inside the class area, and many were not even looking to buy any property at all—and these critical errors are just a few of the serious methodological flaws with this "survey." (*See* Ex. 18 to Defs.' *Daubert* Mot. re Damages, d'Arge Supp. Report at 9–29.) Plaintiffs offer no objective evidence of their own to respond to this challenge. *Third*, the survey is not trustworthy because Flynn and Slovic did not follow generally accepted principles. (*See id.*)

## IV.   CONCLUSION

For the foregoing reasons, and for those reasons that defendants stated in their original motion and will state at the hearing on this matter, defendants' motion should be granted in its entirety.

Dated:  July 21, 2005                  Respectfully submitted,


                                        s/Joseph J. Bronesky
                                        SHERMAN & HOWARD LLC
                                        633 Seventeenth Street, Suite 3000
                                        Denver, CO  80202
                                        (303) 297-2900

                                        David M. Bernick
                                        Douglas J. Kurtenbach
                                        KIRKLAND & ELLIS LLP
                                        200 E. Randolph Drive
                                        Chicago, IL 60601
                                        (312) 861-2000

                                        Attorneys for Defendants ROCKWELL
                                        INTERNATIONAL CORPORATION and THE
                                        DOW CHEMICAL COMPANY

## <u>CERTIFICATE OF SERVICE</u>

I, Joseph J. Bronesky, hereby certify that a true and correct copy of the foregoing was served this 21st day of July upon the following counsel by facsimile and U.S. mail:

Peter B. Nordberg, Esq.
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103-6365

Gary B. Blum, Esq.
SILVER & DEBOSKEY
The Smith Mansion
1801 York Street
Denver, Colorado 80206

s/Patricia Eckman