# Exhibit 2

/2-2-9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CIVIL ACTION NO. 90-K-181

---

MERILYN COOK, et al.,

      Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION and
THE DOW CHEMICAL COMPANY,

      Defendants.

---

CLASS PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO COMPEL THE PRODUCTION OF MATERIAL RELIED ON BY DR. JOHN RADKE AND FOR A PROTECTIVE ORDER POSTPONING THE DEPOSITION OF DR. DANIEL MCFADDEN

---

Class plaintiffs respectfully submit this response to Defendants' Motion to Compel the Production of Material Relied on by Dr. John Radke and for a Protective Order Postponing the Deposition of Dr. Daniel McFadden (filed Jan. 8, 1998).[1]

## I. THE MOTION TO COMPEL

Dr. John Radke, a tenured professor at the University of California at Berkeley, is one of several property experts retained by plaintiffs. He performed statistical analyses of property values within the Property Class area and other areas in the Denver metropolitan area, setting forth his findings in a lengthy report served in late 1996.

---

[1] The deadline for this response, as extended, had been February 16, 1998. On that date, counsel for plaintiffs phoned counsel for defendants to ask that plaintiffs be permitted to overnight the response today for delivery to defendants and the Court tomorrow, but have received no return call. Plaintiffs respectfully request that this final extension be granted.

produce defendants with the material they requested. On some occasions it was necessary to produce the same material more than once because defendants did not seem aware that they already had it. Between the January 13 letter and his deposition, Dr. Radke and his staff supplied defendants with over 266 megabytes of the requested data (much of it in compressed formats) in nine separate transmittals, as well as offering detailed explanations of the data structure and information about where defendants could obtain requested information not at Dr. Radke's disposal. See Exhibits A-J.

By the time of his two-day deposition, this effort consumed over 300 personnel hours on the part of Dr. Radke and his staff at the Berkeley labs, at considerable monetary cost, to say nothing of the demands on the busy schedule of a full-time university professor with substantial academic responsibilities. Because of the extraordinary demands on Dr. Radke's time posed by defendants' numerous requests, we eventually inquired, several times, whether defendants would agree to defray its costs.[6] Defendants ignored our inquiries. We nevertheless persisted in our efforts to supply the material requested.

It is, apparently, in the seven areas listed in Exhibit A to their motion that defendants have some remaining complaint. These complaints seem to derive largely from an unwillingness to accept our previous responses. We will address each area in turn.

**1. "The computer files memorializing the steps used in Dr. Radke's analysis."** Although defendants suggest that plaintiffs

---

[6]   See, e.g., Exhs. E & J.

*CLASS PLAINTIFFS' RESPONSE TO MOTION TO COMPEL AND FOR PROTECTIVE ORDER — PAGE 3*

have not provided "programs used to create Dr. Radke's data and run his multiple regression analysis,"[7] in fact plaintiffs have not only identified the various commercially available programs used by Dr. Radke but have also provided considerable information about Dr. Radke's use of the relevant programs. See, e.g., Exh. J at 2.

As Dr. Radke testified at his deposition, the compendious information already provided -- in Dr. Radke's report, his two-day deposition, and his responses to defendants' demands for more information -- is amply sufficient to enable a researcher knowledgeable in the field to understand Dr. Radke's methodology in detail and, indeed, to reproduce the same results from the same data (save for random variation in the sampling process). See Radke deposition at 129 (Exh K). Defendants need nothing more, that is, to analyze his methodology or evaluate his results.

Defendants will not be satisfied, however, until they have roamed all the magnetic media in Berkeley for any computer file that may have been used or generated, by a human or a computer, in the course of Dr. Radke's work. We know of no precedent for such a demand, and Dr. Radke has testified that to satisfy defendants requests in this vein would "take an awfully long time." See Radke dep. at 131. Dr. Radke has already expended vast resources in responding to defendants' onslaught of requests for information. Absent a clear and compelling showing that defendants are unable to assess Radke's work without still more information, Dr. Radke should not be asked to suspend his academic duties to conduct an extensive search of compendious backup media from Berkeley's

---

[7]   Defendants' Exhibit A, item 1.

computer systems in the hope that he may discover there something that defendants may find tangentially useful.[8]

Indeed, defendants themselves apparently feel able to assess Dr. Radke's work without any additional material. In addition to serving a voluminous report attacking virtually every aspect of Dr. Radke's work, defendants have filed two separate motions for summary judgment on plaintiffs' property claims, as well as a motion <u>in limine</u> seeking to strike Dr. Radke's report. All three motions are currently pending.[9]

**2. "The x-y coordinates for the properties used in Radke's study."** There is apparently no existing computer file directly matching x-y coordinates with specific properties in the study, let alone in the format defendants specify. It is possible that Dr. Radke might be able to build such a file, but this would represent additional work by Dr. Radke, not the provision of an existing document.

**3. The dates of the transactions used in "Phase I" of Radke's study.** The sales data used in Phase I were rented from a commercial source known to defendants. A subset of the data were recoded, and the original data were then returned. The complete data are available to defendants from the same source that rented them to Dr. Radke obtained them.

---

[8] Dr. Radke estimates it would require four months for one full time staff person to perform this work, without considering any delays caused by competing demands on access to the university's computing resources.

[9] We have ourselves moved to strike two of those motions as untimely, but obviously any of these three motions, if heard and decided in defendants favor, would moot defendants' oppressive request.

*CLASS PLAINTIFFS' RESPONSE TO MOTION TO COMPEL AND FOR PROTECTIVE ORDER -- PAGE 5*

Phase I studied overall price effects for a ten-year period and did not attempt to measure temporal trends. The date of the sales transactions in the underlying database, therefore, were not relied upon in the analysis and are irrelevant to its conclusions. Nevertheless, plaintiffs provided, on March 16, a database including the variable "saleyr," giving the year of each sale, which plaintiffs decoded from the original data at defendants' request.

Plaintiffs have not generated and do not possess a document expressly stating the month and date of sale for the Phase I properties, and to provide one would entail additional work by Dr. Radke, not the provision of existing material. Plaintiffs believe the supplier's dating code is known to defendants -- it is, in any case, available to defendants from the supplier -- and we believe defendants could themselves construct such a table with equal if not greater ease. We are, however, prepared to share whatever information we have about the supplier's dating code.

**4. Dates of transactions used in "Phase II" of Radke's study.**
Phase II studied price effects in year-increments, and the year of sale has been provided to defendants. The sales data for Phase II were coded from MLS books that were returned once coding was complete and hence are not in plaintiffs' possession.[10] Defendants could themselves obtain and review the MLS books to determine the

---

[10] Dr. Radke's assistants photocopied some pages from the MLS listings to facilitate the coding process, but not all. If necessary, we can determine what photocopies, if any, were retained, and provide them to defendants. This seems pointless, however, as defendants would need to go to the multiple listing service for a complete set in any event.

precise month and date, but Dr. Radke does not possess any file that would give the month and date of sale for the properties studied in Phase II.[11]

**5. Geographic information.** The Tiger data was sent as Arc/Info export formatted data on March 5, 1997. See Exh. G. Dr. Radke intended to send township, range and section grids, and indeed believes he may have done so. If these have not been supplied, they will be produced.

**6. Output from Dr. Radke's regressions.** Output from Phase II has been supplied. The requested output from Phase I is unavailable. It could be generated by rerunning the regression, but this would be a considerable project, and would again entail additional work by Dr. Radke, not the provision of an existing document.

**7. Census data and related information.** Plaintiffs and Dr. Radke are uncertain what additional information defendants are seeking. Arc/Info export formatted data for city and county borders were sent to defendants in March 1997, as were census tract data. Defendants may be complaining that some of the census tract data were not geocoded. However, coverages for the counties were provided, and from that the geocoding can be derived. We are investigating whether any additional information is available.

---

[11] The month of sale may have been coded for some properties, and if necessary it may be practicable to consult the backup media to determine this. Again, however, defendants would still need to obtain the MLS data themselves for an exact date, or even a complete set of monthly data.