Tab 14

*Intellectual Property Library*

# McCarthy on Trademarks and Unfair Competition

J. Thomas McCarthy
Fourth Edition

Volume 5





THOMSON

WEST

*For Customer Assistance Call 1-800-328-4880*

© 2005 Thomson/West, 6/2005

resolved the split in the cases.[1]

The ability to raise "equitable principles" does not open the door to any and all defenses. It is not a catch-all category.[2] In the author's view, it is limited to defenses traditionally and historically in the same class as laches, estoppel and acquiescence.[3]

### § 32:152   Evidentiary status of incontestable registration—Exceptions to incontestability—Scope of the presumption as to goods and format

Section 33(b) makes it clear that incontestability is limited to use of the mark on the goods or services specified in the § 15 affidavit or in the § 9 renewal.[1] For example, the Fifth Circuit held that Incontestability status flowing from the registration of POLO for a "magazine on the subject of equestrian sports and lifestyles" did not apply to the new

---

[Section 32:151]

[1]Trademark Law Revision Act of 1988. Pub. L. 100-667, 102 Stat. 3935 (effective Nov. 16, 1989).

[2]Levi Strauss & Co. v. GTFM, Inc., 196 F. Supp. 2d 971, 62 U.S.P.Q.2d 1394 (N.D. Cal. 2002) (the challenge of "phantom registration" cannot be raised as against an incontestable registration under the guise of being an "equitable" defense.

[3]This is an application of the statutory interpretation doctrine of *ejustem generis*: general words are to be read as applying only to other things akin to or in the same class as the accompanying specific words.

[Section 32:152]

[1]Lanham Act § 33(b) expressly limits the "conclusive evidence" to use of the mark "on or in connection with the goods or services specified in the affidavit filed under the provisions of section 15, or in the renewal application filed under the provisions of section 9 if the goods or services specified in the renewal are fewer in number."

*See* cases involving scope of contestable presumption of validity: Miller Brewing Co. v. G. Heileman Brewing Co., 561 F.2d 75, 195 U.S.P.Q. 281 (7th Cir. 1977), cert. denied, 434 U.S. 1025, 54 L. Ed. 2d 772, 98 S. Ct. 751, 196 U.S.P.Q. 592 (1978) (registration for beer with no available carbohydrates is not prima facie evidence of rights when used by registrant on beer with available carbohydrates); Mushroom Makers, Inc. v. R. G. Barry Corp., 580 F.2d 44, 199 U.S.P.Q. 65 (2d Cir. 1978), cert. denied, 439 U.S. 1116, 59 L. Ed. 2d 75, 99 S. Ct. 1022, 200 U.S.P.Q. 832 (1979); Levi Strauss & Co. v. Blue Bell, Inc., 778 F.2d 1352, 228 U.S.P.Q. 346 (9th Cir. 1985) (a registrant cannot rely upon a registration for pants as prima facie evidence of secondary meaning in the shirt market).

version of POLO magazine directed at a mainstream audience of up-scale consumers. "The incontestable 'Polo' mark was used to title a magazine about the sport of polo and cannot be transferred to a fundamentally different magazine. Thus, the Incontestability of the mark as applied to the Old POLO magazine does not shield New POLO from attack."[1.1]

However, while the presumption of validity is limited, the remedies of the Lanham Act are not: they apply even though the infringement is not used on the exact goods specified in the registration.[2]

Similarly, the presumption of validity is limited to the exact format of the mark as registered.[3] "A registered mark is incontestable only in the form registered and for the goods or services claimed."[4]

## § 32:153   Evidentiary status of incontestable registration—Effect of proving an exception

Most courts have swept over the statutory exceptions to incontestability with a broad brush, assuming, without analysis, that they lay down a set of defenses on the merits of

---

[1.1]Westchester Media v. PRL USA Holdings, Inc., 214 F.3d 658, 55 U.S.P.Q.2d 1225 (5th Cir. 2000). See: Paco Sport, Ltd. v. Paco Rabanne Parfums, 86 F. Supp. 2d 305, 54 U.S.P.Q.2d 1205 (S.D. N.Y. 2000), aff'd without opinion, 234 F.3d 1262 (2d Cir. 2000) (incontestable status only applies to the mark as registered and to the goods listed in the registration. A registration for fragrances cannot create a presumption that the mark is distinctive when used on clothing.).

[2]Louis Rich, Inc. v. Horace W. Longacre, Inc., 423 F. Supp. 1327, 195 U.S.P.Q. 308 (E.D. Pa. 1976). See §§ 24:63-24:66.

[3]Beneficial Corp. v. Beneficial Capital Corp., 529 F. Supp. 445, 213 U.S.P.Q. 1091 (S.D.N.Y. 1982) (presumption of distinctiveness is limited to exact form of mark as registered); In re National Data Corp., 753 F.2d 1056, 224 U.S.P.Q. 749 (Fed. Cir. 1985); In re Bose Corp., 772 F.2d 866, n.5, 227 U.S.P.Q. 1, n.5 (Fed. Cir. 1985) (a registration of a composite mark affords prima facie rights only to the mark as a whole, not to any one component of the composite).

Compare Park 'N Fly, Inc. v. Park & Fly, Inc., 489 F. Supp. 422, 204 U.S.P.Q. 204 (D. Mass. 1979) ("Since a registrant is protected against confusingly similar names, 'incontestability' should afford at least equal protection.").

[4]In re Save Venice New York, Inc., 259 F.3d 1346, 59 U.S.P.Q.2d 1778 (Fed. Cir. 2001).

PROCEDURE                                    § 32:153

infringement.[1] However, by its literal terms, § 33(b)(1) through (9) is merely a list of exceptions, which if proven, do no more than destroy the conclusive evidentiary status of the registration. The moving force behind the 1946 Trade mark Act, Representative Lanham, explained this effect of § 33(b) in explaining the Senate-House Conference Report:

Do these seven[2] exceptions . . . lay down substantive rules of law or substantive defenses which go to the validity and enforceability of the mark, or do they relate only to the weight of the evidence to be given to the certificate of registration? . . . It is clear from the language of the act and from the congressional history of the act as it is found in the hearings and reports that the seven "defenses or defects" listed under paragraph (b) of section 33 are intended to relate to and to affect the weight of the evidence to be given to the certificate of registration where the owner claims the benefit of the incontestable rule and where the opposite party can, by the weight of the evidence, establish any one of the things listed in the seven paragraphs in paragraph (b); but these seven paragraphs are not intended to enlarge, restrict, amend, or modify the substantive law of trademarks either as set out in other sections of the act or as heretofore applied by the courts under prior laws. . . . Stated in other terms, proof of [one of the elements of § 33(b)] does not under this act destroy the validity of or the right of the registrant to continue to use the mark, but it places on him a burden of proof in the event of litigation which others do not have to carry, by diluting the weight the court is to give to his certificate of registration as evidence of ownership and the right to use the mark. This is the intent and effect and the only intent and effect of the seven subparagraphs of paragraph (b) of section 33.[3]

While this legislative history is clear and potent, for many

---

[Section 32:153]

[1]See, e.g., W. E. Bassett Co. v. Revlon, Inc., 354 F.2d 868, 148 U.S.P.Q. 170 (2d Cir. 1966) (§ 33(b)(3) false advertising); Phi Delta Theta Fraternity v. J. A. Buchroeder & Co., 251 F. Supp. 968, 149 U.S.P.Q. 159 (W.D. Mo. 1966) (§ 33(b)(7) antitrust); Mister Donut of America, Inc. v. Mr. Donut, Inc., 418 F.2d 838, 164 U.S.P.Q. 67 (9th Cir. 1969) (§ 33(b)(5) limited area).

[2]The original list of seven was expanded to eight by the 1988 Trademark Law Revision Act adding equitable defenses and expanded further to nine by a 1998 amendment adding the defense of functionality.

[3]Statement of Rep. Lanham preceding adoption by House of Representatives of the Conference Report on the Trademark Bill, 92 Cong. Rec. 7524 (June 25, 1946). See Statement of House Managers Regarding

years it was mentioned by only a few courts.[4] However, the
U.S. Supreme Court in the 1985 *Park 'N Fly* case, citing
Rep. Lanham's comments, stated that:

> Representative Lanham made his remarks to clarify that the
> seven defenses enumerated in § 33(b) are not substantive rules
> of law which go to the validity or enforceability of an incontest-
> able mark. 92 Cong.Rec. 7524 (1946). Instead, the defenses af-
> fect the evidentiary status of registration where the owner
> claims the benefit of a mark's incontestable status. If one of
> these defenses is established, registration constitutes only
> prima facie and not conclusive evidence of the owner's right to
> exclusive use of the mark.[5]

Thus, if the elements of one of the § 33(b) exceptions is
proven, the evidentiary status of the registration drops down
from "conclusive" to "prima facie" and defendant is permit-
ted to prove "any legal or equitable defense or defect which
might have been asserted if such mark had not been
registered."[6] One view is that this statutory scheme means
that once the registration is successfully challenged on a
§ 33(b) ground, the challenger is then free to also challenge
the mark on *any* other ground.[7] The other view is that in
such a situation, the challenger should be permitted to chal-
lenge the mark only on a ground factually related to the suc-

---

Conference Report on Trademark Bill, 92 Cong. Rec. 7523. *Compare* Sena-
tor O'Mahoney's comments at 92 Cong. Rec. 7873.

[4]*See, e.g.,* Carl Zeiss Stiftung v. VEB Carl Zeiss, Jena, 298 F. Supp.
1309, 161 U.S.P.Q. 414 (S.D.N.Y. 1969), modified, 433 F.2d 686, 167
U.S.P.Q. 641 (2d Cir. 1970), cert. denied, 403 U.S. 905, 29 L. Ed. 2d 680,
91 S. Ct. 2205, 170 U.S.P.Q. 1 (1971); Golden Door, Inc. v. Odisho, 437 F.
Supp. 956, 196 U.S.P.Q. 532 (N.D. Cal. 1977), aff'd, 646 F.2d 347, 208
U.S.P.Q. 638 (9th Cir. 1980). *See* discussion in Ooms & Frost, "Incontest-
ability," 14 Law & Contemp. Probs. 220, 228 (1949).

[5]Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 199 n.6, 83
L. Ed. 2d 582, 105 S. Ct. 658, 224 U.S.P.Q. 327 (1985).

[6]Lanham Act § 33(a), 15 U.S.C.A. § 1115(a). *See* Hank Thorp, Inc. v.
Minilite, Inc., 474 F. Supp. 228, 205 U.S.P.Q. 598 (D. Del. 1979) (success-
ful challenge on the ground of fraud as to ownership permits challenge to
ownership itself); Cullman Ventures, Inc. v. Columbian Art Works, Inc.,
717 F. Supp. 96, 13 U.S.P.Q.2d 1257 (S.D.N.Y. 1989) (citing treatise, held
that a § 33 defense, if proven, does no more than destroy the conclusive
evidentiary status of the registration).

[7]Top Producer Systems Inc. v. Software Sciences Ltd., 43 U.S.P.Q.2d
1853, 1854, 1997 WL 723049 (D. Or. 1997) (defendant will be able to chal-
lenge validity of the incontestably registered mark on the ground of

cessful § 33(b) ground.

However, as noted above, many courts view proof of one of the § 33(b) elements as a defense on the merits, thus compressing the evidentiary two-step process into one step. This is a harmless error if § 33(b) defines or restates traditional common law defenses. For most cases, this is true. For example, the courts have stated that § 33(b)(4) is merely a "statutory restatement of the corresponding common law defense."[8]

However, if a court reads a § 33(b) exception as being more narrow than the corresponding common law defense, problems are created if the court reads § 33(b) as defining defenses on the merits.[9] Another potential problem is created if a court reads the § 33(b)(1) fraud exception as defining a defense on the merits. While it is a defense on the merits to a count for infringement of the registered mark, it should not be a defense on the merits of a count based on common law rights.[10]

### § 32:154   Evidentiary status of incontestable registration—Incontestability, likelihood of confusion, and challenge to strength of mark—likelihood of confusion must be proven

Before the 1988 Trademark Law Revision Act, the majority of courts held that while incontestability grants a conclusive presumption of the "exclusive right to use" the registered mark, this did not relieve the registrant of proving likelihood of confusion. That is, incontestability relates

descriptiveness if defendant can also successfully challenge the validity of the registration on the ground of fraud).

[8]Venetianaire Corp. of America v. A & P Import Co., 429 F.2d 1079, 167 U.S.P.Q. 481 (2d Cir. 1970); M. B. H. Enterprises, Inc. v. WOKY, Inc., 633 F.2d 50, n.2 (7th Cir. 1980).

[9]*See, e.g.*, Golden Door, Inc. v. Odisho, 437 F. Supp. 956, 196 U.S.P.Q. 532 (N.D. Cal. 1977), aff'd, 646 F.2d 347, 208 U.S.P.Q. 638 (9th Cir. 1980). *See* discussion at §§ 26:43-26:52.

[10]National Trailways Bus System v. Trailway Van Lines, Inc., 269 F. Supp. 352, 155 U.S.P.Q. 507 (E.D.N.Y. 1965); Louis Ender, Inc. v. General Foods Corp., 467 F.2d 327, 175 U.S.P.Q. 449 (2d Cir. 1972), cert. denied, 410 U.S. 930, 35 L. Ed. 2d 592, 93 S. Ct. 1371, 176 U.S.P.Q. 513 (1973). *See* full discussion at §§ 31:59-31:60 *(Author's Comment)*.

to the validity of the mark[1] and does not eliminate the necessity of the registrant proving infringement.[2] Thus, while the status of incontestability is conclusive evidence of the exclusive right to use the registered mark, the plaintiff in litigation must still prove a likelihood of confusion and as a practical matter, even on the issue of validity, no plaintiff's attorney will introduce the registration as the sole evidence of rights in the mark. As one experienced practitioner observed:

> No one to my knowledge has relied in a court action upon his registration to prove his right to the trademark. Nor is anyone likely to do so. On the contrary, plaintiff's counsel will wish to show the nature and extent of plaintiff's use.[3]

In the 1988 Trademark Law Revision Act, effective in 1989, the view that incontestable status does not relieve the plaintiff from proving likelihood of confusion was codified in § 33(b) by expressly providing that: "Such conclusive evi-

---

**[Section 32:154]**

[1]*See* Sovereign Order of St. John of Jerusalem, Inc. v. Grady, 119 F.3d 1236, 43 U.S.P.Q.2d 1462 (6th Cir. 1997) ("The purpose of incontestability in federal trademark law is, quite simply, to avoid having the validity of trademarks litigated endlessly.").

[2]Car-Freshner Corp. v. Auto Aid Mfg. Corp., 461 F. Supp. 1055, 201 U.S.P.Q. 233, n.6 (N.D.N.Y. 1978); United States Jaycees v. Philadelphia Jaycees, 639 F.2d 134, 209 U.S.P.Q. 457 (3d Cir. 1981); Koppers Co. v. Krupp-Koppers GmbH, 517 F. Supp. 836, 210 U.S.P.Q. 711 (W.D. Pa. 1981); National Blank Book Co. v. National Data Products, Inc., 213 U.S.P.Q. 70, 1981 WL 48182 (N.D. Ind. 1981); Lindy Pen Co. v. Bic Pen Corp., 725 F.2d 1240, 226 U.S.P.Q. 17 (9th Cir. 1984), cert. denied, 469 U.S. 1188, 83 L. Ed. 2d 962, 105 S. Ct. 955, 226 U.S.P.Q. 23 (1985) (incontestable status does not relieve registrant from proving likelihood of confusion); Wells Fargo & Co. v. Wells Fargo Constr. Co., 619 F. Supp. 710, 229 U.S.P.Q. 938 (D. Ariz. 1985); Source Services Corp. v. Chicagoland JobSource, Inc., 643 F. Supp. 1523, 1 U.S.P.Q.2d 1048 (N.D. Ill. 1986) (validity and infringement are distinct issues and "an incontestability finding in no way concludes the confusion question"); Disenos Artisticos E Industriales, S.A. v. Work, 676 F. Supp. 1254, 6 U.S.P.Q.2d 1161 (E.D.N.Y. 1987) (Lanham Act incontestability provision § 33(b) does not create an independent cause of action: likelihood of confusion must be proven).

*Compare* Weil Ceramics & Glass, Inc. v. Dash, 878 F.2d 659, 11 U.S.P.Q.2d 1001 (3d Cir. 1989), cert. denied, 493 U.S. 853, 107 L. Ed. 2d 114, 110 S. Ct. 156 (1989). Discussed *infra* at § 32:156.

[3]Taggart, "The Trial of a Trademark Case Before and After the Lanham Act," 62 Trademark Rep. 103, 105 (1972).

PROCEDURE                                         § 32:155

dence of the right to use the registered mark shall be subject
to proof of infringement as defined in section 32."[4] Section 32
of the Lanham Act defines the test of infringement as unau-
thorized use which is likely to cause confusion, mistake, or
deception.[5]

### § 32:155   Evidentiary status of incontestable registration—Incontestability, likelihood of confusion, and challenge to strength of mark—Challenge to strength of an incontestably registered mark

.While the 1985 *Park 'N Fly* decision holds that the *valid-
ity* of the incontestably registered mark cannot be chal-
lenged, the majority of courts hold that this does not prevent
defendant from questioning the *strength* and hence the scope
of protection of the mark as to different goods in determining
likely confusion.[1] As the Fifth Circuit correctly observed,
incontestable status does not preclude defendant from argu-
ing that the mark is weak and not infringed because:

------

[4]Trademark Law Revision Act of 1988. Pub. L. 100-667, 102 Stat. 3935
(effective Nov. 16, 1989); Coherent, Inc. v. Coherent Technologies, Inc.,
935 F.2d 1122, 19 U.S.P.Q.2d 1146, 1148 (10th Cir. 1991)(the 1988 statu-
tory revision clarified that incontestability does not relieve the owner of
an incontestable registration from the burden of proving likelihood of
confusion); Gruner + Jahr USA Publishing v. Meredith Corp., 991 F.2d
1072, 26 U.S.P.Q.2d 1583, 1587 (2d Cir. 1993) (the 1988 amendments
"made clear that incontestability does not relieve the trademark owner
from the requirement of proving likelihood of confusion").

[5]*See* § 23:76.

**[Section 32:155]**

[1]M-F-G Corp. v. EMRA Corp., 626 F. Supp. 699, 228 U.S.P.Q. 568
(N.D. Ill. 1985), aff'd, 817 F.2d 410, 2 U.S.P.Q.2d 1538 (7th Cir. 1987);
Source Services Corp. v. Source Telecomputing Corp., 635 F. Supp. 600,
230 U.S.P.Q. 290 (N.D. Ill. 1986) ("These conclusive presumptions,
however, do not prove the strength of plaintiff's incontestable marks.");
Majorica, S.A. v. Majorca International, Ltd., 687 F. Supp. 92, 7
U.S.P.Q.2d 1872 (S.D.N.Y. 1988) (accord with previous cases); Cullman
Ventures, Inc. v. Columbian Art Works, Inc., 717 F. Supp. 96, 13
U.S.P.Q.2d 1257 (S.D.N.Y. 1989)(The Supreme Court in *Park 'N Fly*
"certainly did not mean to prevent an accused infringer from questioning
the *strength* of the mark and the scope of its protection."); Knaack Mfg.
Co. v. Rally Accessories, Inc., 955 F. Supp. 991, 42 U.S.P.Q.2d 1649 (N.D.
Ill. 1997) ("[Plaintiff's] ownership of three incontestable registrations for
its WEATHER GUARD mark creates no presumption of strength in its
mark nor does it broaden the scope of the mark's protection.").

© 2005 Thomson/West, Rel. 34, 6/2005

"Incontestable status does not make a weak mark strong."[2] Other circuits agree.[3]

However, the Eleventh Circuit in *Dieter* has taken a contrary position, holding that incontestable status is a "factor" to be taken into consideration in the likelihood of confusion analysis: "Because [ plaintiff's] mark is incontestable, then it is presumed to be at least descriptive with secondary meaning and therefore a relatively strong mark."[4] The Sixth Circuit also has taken this position.[5]

---

*See* Port, "The Illegitimacy of Trademark Incontestability," 26 Indiana L. Rev. 519, 570-87 (1993) (surveying the cases in various circuits on this issue).

[2]Oreck Corp. v. U.S. Floor Systems, Inc., 803 F.2d 166, 231 U.S.P.Q. 634 (5th Cir. 1986), cert. denied, 481 U.S. 1069, 95 L. Ed. 2d 871, 107 S. Ct. 2462 (1987).

[3]Miss World (UK), Ltd. v. Mrs. America Pageants, Inc., 856 F.2d 1445, 8 U.S.P.Q.2d 1237 (9th Cir. 1988) ("[A]n incontestable status does not alone establish a strong mark."); Munters Corp. v. Matsui Am., Inc., 909 F.2d 250, 15 U.S.P.Q.2d 1666 (7th Cir. 1990), cert. denied, 498 U.S. 1016, 112 L. Ed. 2d 595, 111 S. Ct. 591 (1990)(*Park 'N Fly* does not prevent consideration of the strength of an incontestably registered mark in order to determine the issue of likely confusion); Lone Star Steakhouse & Saloon v. Alpha of Virginia, 43 F.3d 922, 33 U.S.P.Q.2d 1481, 1490 (4th Cir. 1995) (Strength can be challenged. "[I]ncontestability affects the validity of the trademark but does not establish the likelihood of confusion necessary to warrant protection from infringement." Court can determine whether mark is descriptive or suggestive for purposes of the confusion issue.); Petro Shopping Centers L.P. v. James River Petroleum, 130 F.3d 88, 44 U.S.P.Q.2d 1921 (4th Cir. 1997) ("The [Supreme Court in *Park 'N Fly* did not hold, however, that the descriptive nature of a mark may not be considered in the separate likelihood of confusion enquiry."); Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 61 U.S.P.Q.2d 1705 (9th Cir. 2002) (incontestable status of the registration of ENTREPRENEUR for magazines does not prevent proof that the mark is weak and is one in a market of many similar marks. Summary judgment for plaintiff was reversed.).

[4]Dieter v. B & H Indus., 880 F.2d 322, 11 U.S.P.Q.2d 1721 (11th Cir. 1989), cert. denied, 498 U.S. 950, 112 L. Ed. 2d 332, 111 S. Ct. 369 (1990). *Accord*: Frehling Enterprises, Inc. v. International Select Group, Inc., 192 F.3d 1330, 52 U.S.P.Q.2d 1447 (11th Cir. 1999) ("Moreover, the district court failed to consider the fact that [plaintiff's] mark is incontestable and therefore constitutes a 'relatively strong mark.' ").

[5]Wynn Oil Co. v. American Way Serv. Corp., 943 F.2d 595, 19 U.S.P.Q.2d 1815 (6th Cir. 1991) (court equates strength with incontestability); Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr., 109 F.3d 275, 42 U.S.P.Q.2d 1173 (6th Cir. 1997) ("[I]ncontestable

PROCEDURE                                    § 32:155

The Second Circuit said that while a mark covered by an incontestable registration is by that fact made "strong" for the purpose of validity, at the same time that mark may be "weak" for the purpose of infringement.[6] While not clearly expressed, the Second Circuit apparently takes the position that the marketplace strength of a mark covered by an incontestable registration can be challenged.[7] The court later somewhat clarified its position, stating that independent indicia of strength are relevant to determining the strength of even an incontestable mark.[8] However, it is not clear if the Second Circuit favors the position that incontestable status per se is relevant evidence helping to prove strength.

*Author's Comment*

The Eleventh Circuit statement in *Dieter* is a non-sequitur because it focuses solely on the *inherent* distinctiveness of a mark and ignores the *acquired* distinctiveness and strength

---

status serves to confer upon a mark the strength accorded to a descriptive mark with secondary meaning." But if the mark is inherently distinctive, incontestability is irrelevant, for the incontestable status of registration does not add to the strength of such a mark.); Jet, Inc. v. Sewage Aeration Systems, 165 F.3d 419, 49 U.S.P.Q.2d 1355 (6th Cir. 1999) (following *Wynn* and *Junky Music* to find incontestable registration makes mark strong for infringement analysis). *Contra:* Therma-Scan, Inc. v. Thermoscan, Inc., 295 F.3d 623, 63 U.S.P.Q.2d 1659, 2002 FED App. 0227P (6th Cir. 2002) (disapproving of any presumption that a mark is strong merely because it's registration is incontestable and it has been in use for five years. The mark here, although the subject of an incontestable registration, was found "not an especially strong mark" because it lacks "public recognition.").

[6]Gruner + Jahr USA Publishing v. Meredith Corp., 991 F.2d 1072, 26 U.S.P.Q.2d 1583, 1586-87 (2d Cir. 1993) ("First, Judge Knapp found that the mark PARENTS was strong since it was an incontestable registered trademark, having necessarily acquired secondary meaning. Thus, [plaintiff's] descriptive registered trademark was correctly found to be strong for the purposes of protectability. . . . [T]he finding by the district court that the "parents" portion of the mark—divorced from the stylized typeface and its particular placement on the magazine cover—was extremely weak was not clearly erroneous.").

[7]"[W]e think it now established that the strength of a descriptive mark made incontestably distinctive for protectability purposes by registration for more than five years is a matter also properly considered by a trial court on the issue of likelihood of confusion." 26 U.S.P.Q.2d at 1587.

[8]Sports Authority, Inc. v. Prime Hospitality Corp., 89 F.3d 955, 39 U.S.P.Q.2d 1511 (2d Cir 1996)(strength was found from the five years of use of the mark).

© 2005 Thomson/West, Rel. 34, 6/2005                        32-251

of the mark in the real world marketplace. In the author's opinion, the majority view of the courts is correct because the strength of a mark is, and always has been, a factor in the infringement analysis of whether there is a likelihood of confusion. The minority position as in *Dieter* confuses the validity of a designation as a trademark, which is incontestable under *Park 'N Fly*, with the separate issue of whether that valid trademark has sufficient strength that the junior user's usage is likely to cause confusion.[9] The later issue is one of infringement, which should not be foreclosed by incontestable status.[10]

### § 32:156  Evidentiary status of incontestable registration—Third Circuit view of incontestability

In dictum, the Third Circuit in *Weil Ceramics* in 1989 read the § 33(b) incontestability provisions as providing "an equitable remedy to the holder of a registered trademark whose ownership or entitlement to use of the trademark has been challenged by another party."[1] The court seemed to indicate that § 33(b) provides an *independent* ground for a federal claim for asserting infringement along with the traditional § 32 likelihood of confusion ground. This new § 33(b) claim was said to be violated only by use of the exact and identical mark on different goods when the defendant challenges the validity of the mark.

*Author's Comment*

In the author's opinion, the Third Circuit's view is a peculiar, illogical, and unsupported misreading of the § 33(b) incontestability provisions. It purports to create out of a

---

[9]*See* discussion at §§ 11:79-11:84.

[10]*See* Petro Shopping Centers L.P. v. James River Petroleum, 130 F.3d 88, 44 U.S.P.Q.2d 1921 (4th Cir. 1997) (finding further support for the majority view in the statutory revision effective in 1989 which amended the incontestability provision of Lanham Act § 33(b) to clarify that "[s]uch conclusive evdience of the right to use the registered mark shall be *subject to proof of infringement*"; emphasis added by the court).

[Section 32:156]

[1]Weil Ceramics & Glass, Inc. v. Dash, 878 F.2d 659, 11 U.S.P.Q.2d 1001 (3d Cir. 1989), cert. denied, 493 U.S. 853, 107 L. Ed. 2d 114, 110 S. Ct. 156 (1989).

statutory presumption an independent ground for a federal trademark claim unlike anything seen heretofore. It is believed that the 1988 amendments to § 33(b) will effectively remove the statutory springboard from which the court drew these inferences. Agreeing with this view, the federal court in Chicago disagreed with *Weil Ceramics* and held that § 33(b) does not create an independent right of action, either expressly or impliedly.[2]

## § 32:157    Comment: effect of defenses to incontestability

The nine "defenses or defects" listed in Lanham Act § 33(b) have been interpreted by the courts on two levels: (1) as merely reducing the status of a conclusive presumption down to that of prima facie, with the challenger allowed to raise common law defenses; and (2) as providing a list of defenses on the merits of the case. Legislative history reveals that the first interpretation was the intent of Congress.

However, it is not improper for the courts to view the statutory exceptions as a kind of "restatement" or partial "codification" of traditional common law defense so long as the common law is not distorted in the process to the detriment of the registrant. That is, there will be no harm in courts "taking the shortcut" and treating the exceptions as defenses on the merits so long as they do not read the statute as expanding the traditional scope of those defenses. But if a court reads a § 33(b) exception as granting a challenger an easier-to-prove defense than it would have at common law, the two step strict evidentiary process must be followed to avoid the error and absurdity of a challenger finding it easier to prove a defense to an incontestable registration than to an unregistered, common-law mark.[1]

---

[2]Storck USA, L.P. v. Levy, 18 U.S.P.Q.2d 1965, 1991 WL 60562 (N.D. Ill. 1991), later proceeding, 1991 U.S. Dist. LEXIS 4966 (N.D. Ill. 1991).

[Section 32:157]

[1]*See* discussion at §§ 26:43-26:52.

§ 32:158                     McCarthy on Trademarks

## X.  SURVEY EVIDENCE

### A.  PROPER SURVEY METHODS

### § 32:158  Introduction to survey evidence

**Research References**
Evidence ☞   150
Trade Regulation ☞   366, 725

In cases of trademark infringement, unfair competition and false advertising, the subjective mental associations and reactions of prospective purchasers are often an issue. Evidence of such mental associations may consist of evidence as to the quantity and quality of advertising coverage, testimony of dealers and consumers, testimony of experts in the field,[1] or merely an appeal to the subjective impressions of the trier of fact.[2] However, a more scientific means of evidencing mental associations is to introduce the actual responses of a group of people who are typical of the target group whose perceptions are at issue in a case. Survey evidence is often introduced for this purpose and a large body of legal literature has developed around the subject.[3]

Surveys as to the state of mind of prospective purchasers

---

.[Section 32:158]

[1]*See, e.g.,* Yamaha International Corp. v. Hoshino Gakki Co., 231 U.S.P.Q. 926, 1986 WL 83747 (T.T.A.B. 1986), aff'd, 840 F.2d 1572, 6 U.S.P.Q.2d 1001 (Fed. Cir. 1988) (The Board held admissible, but gave only "modest weight," to the opinion testimony of experts in the making and playing of guitars. The testimony was that guitar buyers perceive the head shape as source identifying and not merely ornamental. The experts were qualified because of a "lifetime of observation and experience." The Federal Circuit held that a Board decision to admit expert testimony will not be basis for reversal unless "manifestly erroneous.").

[2]*See* § 23:90.

[3]*See generally* Note, "Consumer Polls as Evidence in Unfair Trade Cases," 20 Geo. Wash. L. Rev. 211 (1951); Note, "Public Opinion Surveys as Evidence: The Pollsters Go to Court," 66 Harv. L. Rev. 498 (1953); Sorensen & Sorensen, "The Admissibility and Use of Opinion Research Evidence," 28 N.Y.U. L.Q. 1213 (1953); Caughey, "The Use of Public Polls, Surveys and Sampling as Evidence in Litigation, and Particularly Trademark and Unfair Competition Cases," 44 Cal. L. Rev. 539 (1956); Barksdale, *The Use of Survey Research Findings as Legal Evidence* (1957); Shryock, "Survey Evidence in Contested Trademark Cases," 57 Trademark Rep. 377 (1967); Symposium, "The Structure and Uses of Survey Evidence in Trademark Cases," 67 Trademark Rep. 97 (1977); Sorensen, "The Use

32-254

PROCEDURE                                    § 32:158

have been offered as evidence of the existence of secondary
meaning in a mark,[4] of the existence of a likelihood of confu-

of Survey Evidence in Trademark Law & Unfair Competition," in PLI
Current Developments in Trademark Law 71 (1978); Jacobs, "Survey Evi-
dence in Trademark and Unfair Competition Litigation," 6 A.L.I.-A.B.A.
Course Mat'ls 97 (1982); Symposium containing six articles on trademark
surveys, 73 Trademark Rep. 4 (1983); Evans & Gunn, "Trademark
Surveys," 79 Trademark Rep. 1 (1988); Weiss, "The Use of Survey Evi-
dence in Trademark Litigation: Science, Art or Confidence Game?," 80
Trademark Rep. 71, 86 (1990); Jacoby & Handlin, "Non-Probability
Sampling Designs for Litigation Surveys," 81 Trademark Rep. 169 (1991);
Bird, "Streamlining Consumer Survey Analysis: An Examination of the
Concept of Universe in Consumer Surveys Offered in Intellectual Property
Litigation," 88 Trademark Rep. 269 (1998); V.N. Palladino, Secondary
Meaning Surveys in Light of Lund, 91 Trademark Rptr 573 (2001); W.W.
Vodra & R.K. Miller, "Did He Really Say That?" Survey Evidence in Decep-
tive Advertising Litigation, 92 Trademark Rptr 794 (2002); V.N. Pal-
ladino, Assessing Trademark Significance: Genericness, Secondary Mean-
ing and Surveys, 92 Trademark Rptr 857 (2002); J. Jacoby, Experimental
Design and Selection of Controls in Trademark and Deceptive Advertising
Surveys, 92 Trademark Rptr 890 (2002); M. Rappeport, Litigation Surveys:
Social Science as Evidence, 92 Trademark Rptr 957 (2002).

See Annotation, "Admissibility and Weight of Surveys or Polls of Pub-
lic or Consumers' Opinion, Recognition, Preference or the Like," 76
A.L.R.2d 619; Annotation, "Admissibility and weight of consumer survey
in litigation under trademark opposition, trademark infringement, and
false designation of origin provisions of Lanham Act (15 U.S.C.A. §§ 1063,
1114, and 1125)," 98 A.L.R. Fed. 20.

[4]See, e.g., Laskowitz v. Marie Designer, Inc., 119 F. Supp. 541, 100
U.S.P.Q. 367 (D. Cal. 1954) (secondary meaning in descriptive term proven
by survey evidence); Marcalus Mfg. Co. v. Watson, 156 F. Supp. 161, 115
U.S.P.Q. 232 (D.D.C. 1957), aff'd, 258 F.2d 151, 118 U.S.P.Q. 7 (D.C. Cir.
1958) (secondary meaning in red oval used as background for word mark
not proven by survey evidence); Anheuser-Busch, Inc. v. Bavarian Brew-
ing Co., 264 F.2d 88, 84 Ohio L. Abs. 97, 120 U.S.P.Q. 420 (6th Cir. 1959)
(survey relied upon to find secondary meaning); Roselux Chemical Co. v.
Parsons Ammonia Co., 299 F.2d 855, 132 U.S.P.Q. 627 (C.C.P.A. 1962)
(secondary meaning not proven by survey data); In re Riviana Foods, Inc.,
160 U.S.P.Q. 757, 1969 WL 9021 (T.T.A.B. 1969) (secondary meaning not
proven by survey); Federal Glass Co. v. Corning Glass Works, 162 U.S.P.Q.
279, 1969 WL 9105 (T.T.A.B. 1969); In re Levi Strauss & Co., 165 U.S.P.Q.
348, (T.T.A.B. 1970) (secondary meaning proven in pocket tab as mark for
LEVIS); Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366, 188
U.S.P.Q. 623 (7th Cir. 1976), cert. denied, 429 U.S. 830, 50 L. Ed. 2d 94,
97 S. Ct. 91, 191 U.S.P.Q. 416 (1976); Monsieur Henri Wines, Ltd. v.
Duran, 204 U.S.P.Q. 601, 1979 WL 24898 (T.T.A.B. 1979); Harlequin
Enterprises, Ltd. v. Gulf & Western Corp., 644 F.2d 946, 210 U.S.P.Q. 1
(2d Cir. 1981); Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 12

sion,[5] or of both elements in one case.[6] Surveys have been of-
fered to prove that a famous mark has been diluted under
an anti-dilution statute.[7] Surveys have also been offered to
prove that prospective purchasers regard a given trade
symbol as a trademark indicating origin, rather than a ge-
neric term and vice-versa.[8] In false advertising cases, proof
of what an advertisement means to the general public is
often made by way of a reliable consumer survey.[9] The

---

U.S.P.Q.2d 1740 (9th Cir. 1989) (survey supported finding of secondary
meaning in logo for sportswear).

    *See* §§ 15:28-15:31, 32:190-32:191.

  [5]*See, e.g.,* Standard Oil Co. v. Standard Oil Co., 252 F.2d 65, 116
U.S.P.Q. 176 (10th Cir. 1958); Jenkins Bros. v. Newman Hender & Co.,
289 F.2d 675, 129 U.S.P.Q. 355 (C.C.P.A. 1961); James Burrough, Ltd. v.
Sign of Beefeater, Inc., 540 F.2d 266, 192 U.S.P.Q. 555 (7th Cir. 1976);
Exxon Corp. v. Texas Motor Exchange, Inc., 628 F.2d 500, 208 U.S.P.Q.
384 (5th Cir. 1980); Piper Aircraft Corp. v. Wag-Aero, Inc., 741 F.2d 925,
223 U.S.P.Q. 202 (7th Cir. 1984) (45 percent confusion results are "high"
and a factor "weighing strongly" in support of a likelihood of confusion);
McDonald's Corp. v. McBagel's, Inc., 649 F. Supp. 1268, 1 U.S.P.Q.2d
1761 (S.D.N.Y. 1986) (25 percent level supports finding of likely confu-
sion); Mutual of Omaha Ins. Co. v. Novak, 836 F.2d 397, 5 U.S.P.Q.2d
1314 (8th Cir. 1987), cert. denied, 488 U.S. 933, 102 L. Ed. 2d 344, 109 S.
Ct. 326 (1988).

    *See* §§ 32:184-32:189.

  [6]*See, e.g.,* American Luggage Works, Inc. v. United States Trunk Co.,
158 F. Supp. 50, 116 U.S.P.Q. 188 (D. Mass. 1957), supplemental op., 161
F. Supp. 893, 117 U.S.P.Q. 83 (D. Mass. 1957), aff'd, 259 F.2d 69, 118
U.S.P.Q. 424 (1st Cir. 1958) (neither proven by survey); Ronson Corp. v.
Maruman of California, Inc., 224 F. Supp. 479, 139 U.S.P.Q. 436 (S.D.
Cal. 1963) (survey evidence held to prove both); Zippo Mfg. Co. v. Rogers
Imports, Inc., 216 F. Supp. 670, 137 U.S.P.Q. 413 (S.D.N.Y. 1963); Carter-
Wallace, Inc. v. Procter & Gamble Co., 434 F.2d 794, 167 U.S.P.Q. 713
(9th Cir. 1970); Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366,
188 U.S.P.Q. 623 (7th Cir. 1976), cert. denied, 429 U.S. 830, 50 L. Ed. 2d
94, 97 S. Ct. 91, 191 U.S.P.Q. 416 (1976) (both proven); National Football
League Properties, Inc. v. Wichita Falls Sportswear, Inc., 532 F. Supp.
651, 215 U.S.P.Q. 175 (W.D. Wash. 1982)(both proven).

  [7]*See* Ringling Bros.-Barnum & Bailey Combined Shows, Inc. v. Utah
Div. of Travel Dev., 170 F.3d 449, 50 U.S.P.Q.2d 1065 (4th Cir. 1999)
(survey evidence did not support claim of dilution). *See* § 24:94.1.

  [8]*See* §§ 12:14-12:17 for discussion of types of surveys used in generic
vs. trademark disputes.

  [9]*See, e.g.,* Rhodes Pharmacal Co. v. Federal Trade Comm'n, 208 F.2d
382 (7th Cir. 1953), rev'd, in part, 348 U.S. 940, 99 L. Ed. 736, 75 S. Ct.
361 (1955); American Brands, Inc. v. R. J. Reynolds Tobacco Co., 413 F.

Federal Judicial Center has noted that surveys and polls are admissible evidence in many types of cases.[10] As the Second Circuit observed: "Surveys are, for example, routinely admitted in trademark and false advertising cases to show actual confusion, genericness of a name or secondary meaning, all of which depend on establishing that certain associations have been drawn in the public mind."[11]

The Supreme Court in the 1993 *Daubert* case held that a court analyzing the admissibility of scientific opinion testimony under Federal Rule of Evidence 702 must ensure that the testimony is based on scientifically valid principles and is relevant to the facts of the case.[12] The Supreme Court in *Kumho Tire* later expanded the *Daubert* rule to all types of expert testimony and emphasized that a trial judge has a "basic gatekeeping obligation" to ensure that expert testimony is both relevant and reliable:

> [T]his is not to deny the importance of *Daubert's* gatekeeping requirement. The objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the

---

Supp. 1352 (S.D.N.Y. 1976) (no consumer surveys introduced: claims dismissed); American Home Products Corp. v. Johnson & Johnson, 436 F. Supp. 785, 196 U.S.P.Q. 484 (S.D.N.Y. 1977), aff'd, 577 F.2d 160, 198 U.S.P.Q. 132 (2d Cir. 1978); U-Haul International, Inc. v. Jartran, Inc., 522 F. Supp. 1238, 212 U.S.P.Q. 49 (D. Ariz. 1981), aff'd, 681 F.2d 1159, 216 U.S.P.Q. 1077 (9th Cir. 1982).

See discussion at §§ 27:24-27:39 for the need for surveys in false advertising cases. See also § 32:193.

[10]Federal Judicial Center, *Manual for Complex Litigation* 114-15 (5th ed. 1981) ("[P]olls have been held admissible to prove statements of interviewees as evidence of state of mind in unfair competition and antitrust cases."). The *Manual for Complex Litigation*, Third § 21.493, pp. 101-103 (1995), contains a highly truncated reference to survey evidence as compared to the 1981 edition. The Federal Judicial Center's 1994 Reference Manual on Scientific Evidence, contains a very useful chapter IV describing survey evidence and its proper use in detail. Reference Manual on Scientific Evidence, pp. 223-271 (Federal Judicial Center 1994).

[11]Schering Corp. v. Pfizer Inc., 189 F.3d 218, 51 U.S.P.Q.2d 1705 (2d Cir. 1999).

[12]Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 2796-99, 27 U.S.P.Q.2d 200 (1993).

practice of an expert in the relevant field.[13]

The Ninth Circuit has said that, ordinarily, survey evidence should be found sufficiently reliable and admissible under the test in *Daubert*.[14] However, there is no doubt that a trial court, in the exercise of its "gatekeeping function" may, in an appropriate case, exclude a survey report from being received into evidence.[15] Similarly, an appellate court can find that the district court abused its discretion by placing reliance on a deficient survey.[15.1]

In 2000, Federal Rule of Evidence 702 was amended to embody some of the principles of the *Daubert* and *Kumho* cases:

> F.R.E. 702: If scientific, technical, or other specialized knowl- edge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the

[13]Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167, 50 U.S.P.Q.2d 1177 (1999). *See:* Weisgram v. Marley Co., 528 U.S. 440, 455, 120 S. Ct. 1011, 1021, 145 L. Ed. 2d 958, Prod. Liab. Rep. (CCH) P 15745, 53 Fed. R. Evid. Serv. 406, 45 Fed. R. Serv. 3d 735 (2000) ("Since *Daubert*, moreover, parties relying on expert evidence have had notice of the exact- ing standards of reliability such evidence must meet.").

[14]Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, n.8, 42 U.S.P.Q.2d 1097, n.8 (9th Cir. 1997) ("However, 'as long as they are conducted according to accepted principles,' . . . survey evidence should ordinarily be found sufficiently reliable under *Daubert*. Unlike novel scien- tific theories, a jury should be able to determine whether asserted techni- cal deficiencies undermine a survey's probative value. Defendants have not demonstrated that the survey was not conducted according to accepted principles.").

[15]National Football League Properties, Inc. v. Prostyle, Inc., 57 F. Supp. 2d 665, 668-670 (E.D. Wisc. 1998) (a survey report was excluded from evi- dence because, among other reasons, survey failed to have a control); Mastercard Intern. Inc. v. First Nat. Bank of Omaha, Inc., 2004 WL 326708 (S.D. N.Y. 2004), related reference, 2004 WL 1575396 (S.D. N.Y. 2004) (survey was excluded from evidence in a jury trial because of small sample size and variance from actual purchasing conditions. "The flaws in the Survey diminish its relevance in predicting actual confusion among FNBO customers such that the potential for the Survey's results to preju- dice unfairly, to confuse, and to mislead the jury substantially outweighs any limited relevance.").

[15.1]Scotts Co. v. United Industries Corp., 315 F.3d 264, 65 U.S.P.Q.2d 1161, 2002-2 Trade Cas. (CCH) P 73911, 60 Fed. R. Evid. Serv. 330 (4th Cir. 2002) (The district court abused its discretion by placing reliance on a survey that suffered several deficiencies of form and substance.).

testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.[15.1]

The usual procedure is for one of the parties to the litigation to hire a survey taker to run an appropriate survey. The survey expert for the opponent may then attack the substance and form of the other side's survey and/or counter it with a different survey producing different results. Then ensues the "battle of the experts," a process that takes place in many trials of all kinds. Judge Posner has suggested that each party's survey expert be asked by the court to designate a third, neutral expert who would be appointed by the court to conduct surveys.[16] In another case, a survey was jointly designed and executed by the experts for each side, with the experts taking different views as to the proper interpretation of the survey results.[17]

As Weiss wryly remarked: "One might sum it all up by saying that the function of surveys in trademark litigation is to plumb the minds of the public in order to make up the minds of the judges."[18]

---

[15.1]*See* Advisory Committee Notes on the Dec. 1, 2000 amendment to Rule 702.

[16]Indianapolis Colts v. Metropolitan Baltimore Football Club Ltd. Partnership, 34 F.3d 410, 414-15, 31 U.S.P.Q.2d 1811, 1815 (7th Cir. 1994). *See* Welter, "A Call to Improve Trademark Survey Evidence," 85 Trademark Rep. 205 (1995) (commenting on Posner's proposal and suggesting an alternative under which the court simply appoints one survey expert from a list submitted by the parties); Rappeport, "The Role of the Survey 'Expert': A Response to Judge Posner," 85 Trademark Rep. 211, 217 (1995) ("Because their job is to test hypotheses that grow out of specific theories of cases, and because opposing lawyers typically develop quite different theories of the same case, it is completely natural that there are often totally different surveys with totally different results.").

[17]SunAmerica Corp. v. Sun Life Assurance Co. of Can., 890 F. Supp. 1559, 33 U.S.P.Q.2d 1865, 1872 (N.D. Ga. 1994), aff'd on liability and remanded on remedy, 77 F.3d 1325, 38 U.S.P.Q.2d 1065 (11th Cir. 1996).

[18]Weiss, "The Use of Survey Evidence in Trademark Litigation: Science, Art or Confidence Game?" 80 Trademark Rep. 71, 86 (1990).

### § 32:159  Relevant "universe" surveyed—defining the universe

**Research References**

Trade Regulation ☞  11, 13, 333, 334.1, 345.1, 367

The first step in designing a survey is to determine the "universe" to be studied. The universe is that segment of the population whose perceptions and state of mind are relevant to the issues in the case.[1] Selection of the proper universe is a crucial step, for even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant.[2] Once the "universe" is selected, a sample to be surveyed is selected from that universe. A "census" involves questioning each and every member of the universe. But a "survey" involves taking a "sample" by selecting some subset of the universe, and questioning persons in that subset. The sample selected may be a probability sample or a non-probability sample.[3] While each type of sample can reasonably be projected to the universe at large, only a prob-

---

[Section 32:159]

[1]*See* Note, "Public Opinion Surveys as Evidence: The Pollsters Go to Court," 66 Harv. L. Rev. 498 (1953); Reiner, "The Universe and Sample: How Good Is Good Enough?" 73 Trademark Rep. 366 (1983); Jacoby, "Survey & Field Experimental Evidence," at 179 in Kassin & Wrightsman, *The Psychology of Evidence and Trial Procedure* (1985); Jacoby & Handlin, "Non-Probability Sampling Designs for Litigation Surveys," 81 Trademark Rep. 169, 170 (1991) ("In scientific parlance, a 'universe' (sometimes also called a 'population') is defined as the totality of all individuals (or elements) possessing a particular trait or feature in common.").

[2]*See* Bird, "Streamlining Consumer Survey Analysis: An Examination of the Concept of Universe in Consumer Surveys Offered in Intellectual Property Litigation," 88 Trademark Rep. 269, 276 (1998) ("Determination of the universe represents one of the most significant challenges a survey expert will face in drafting a consumer survey. A misaligned universe can doom otherwise competent research and trigger an adverse decision by the court."); Evans & Gunn, "Trademark Surveys," 79 Trademark Rep. 1, 31 (1988) ("Errors in this stage [of selecting the universe] are more likely to prove fatal than errors in the content of the questions, for there is some value in a slanted question asked of the right witness, but no value in asking the right question of the wrong witness.").

[3]*See* Jacoby, "Survey & Field Experimental Evidence," at 182 in Kassin & Wrightsman, *The Psychology of Evidence and Trial Procedure* (1985) ("Probability sampling involves the random selection of elements (e.g. people) from the universe, where each element has a known probability of being selected."). *See* discussion at §§ 32:164-32:165.

ability sample can be projected to the entire universe by the use of definite mathematical and statistical probability models.

In a traditional case claiming "forward" confusion, not "reverse" confusion, the proper universe to survey is the potential buyers of the *junior user's* goods or services.[4] But in a "reverse confusion" case, it is appropriate to survey the senior user's customer base.[5]

The universe may be narrowed from the population at large in various ways: geographically (people living in California); commercially (retail dealers or consumers); according to buying habits (prospective purchasers of pleasure boats); or by any other meaningful criteria which the law sets down as limiting or defining the class of persons whose state of mind is at issue.[6] A survey of the wrong "universe" will be of little probative value in litigation.[7]

A survey is really an attempt to derive from a part of the

---

[4]Hutchinson v. Essence Communications, Inc., 769 F. Supp. 541, 559-60 (S.D.N.Y. 1991) ("It is well-settled in this circuit that the universe of the survey must include potential purchasers of the junior user's product." A survey of only potential users of the senior user's product was held improper.); Paco Sport, Ltd. v. Paco Rabanne Parfums, 86 F. Supp. 2d 305, 54 U.S.P.Q.2d 1205 (S.D. N.Y. 2000), aff'd without opinion, 234 F.3d 1262 (2d Cir. 2000) (in a case of "forward confusion," the proper universe to survey is composed of purchasers of the junior user's goods). Regarding the difference between "forward" and "reverse" confusion *see* § 23:10.

[5]Sterling Drug, Inc. v. Bayer AG, 14 F.3d 733, 29 U.S.P.Q.2d 1321, 1326 (2d Cir. 1994) (the court, finding a likelihood of confusion, said that since the issue is whether the senior user's products, such as BAYER aspirin, are perceived to be made by the junior user, it is appropriate to survey customers of the senior user's BAYER aspirin product).

[6]*See, e.g.*, International Milling Co. v. Robin Hood Popcorn Co., 110 U.S.P.Q. 368, 1956 WL 8002 (Comm'r Pat. 1956) (survey of 513 householders in Minneapolis); Zippo Mfg. Co. v. Rogers Imports, Inc., 216 F. Supp. 670, 137 U.S.P.Q. 413 (S.D.N.Y. 1963) (all American smokers over 18); In re Riviana Foods, Inc., 160 U.S.P.Q. 757, 1969 WL 9021 (T.T.A.B. 1969) (survey of veterinarians); In re Levi Strauss & Co., 165 U.S.P.Q. 348, (T.T.A.B. 1970)(survey of "young people" who are prospective buyers of LEVIS); Brunswick Corp. v. Spinit Reel Co., 832 F.2d 513, n.6, 4 U.S.P.Q.2d 1497 (10th Cir. 1987)(proper universe for confusion survey relating to appearance of fishing reel was persons over fourteen who had fished in fresh water in the last twelve months).

[7]National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc., 532 F. Supp. 651, 215 U.S.P.Q. 175, 180 (W.D. Wash. 1982).

© 2005 Thomson/West, Rel. 34, 6/2005                     32-258.3

universe, facts which can be reasonably expected to apply to the entire universe. If a probability sample survey is fairly and scientifically conducted, its results are capable of being projected as evidence of the state of mind of the whole "universe" of prospective purchasers in issue. For example, if the "universe" constitutes some 200 million American potential consumers, if the survey is accurate, it should produce data from which one can reasonably predict what the results would be if each member of the total "universe" were questioned in a census.[8]

The Federal Judicial Center Manual for Complex Litigation notes that the burden is on the proponent of the survey to show that the sampling of the universe conforms with recognized statistical standards:

> [T]he reliability and validity of estimates about the population derived from sampling are critical. The methods used must conform to generally recognized statistical standards. Relevant factors include whether:
>
> - The population was properly chosen and defined;
> - The sample chosen was representative of that population;
> - The data gathered were accurately reported;
> - The data were analyzed in accordance with accepted statical principles.
>
> Laying the foundation for such evidence will ordinarily involve expert testimony and, along with disclose of the underlying data and documentation, should be taken up by the court well in advance of trial.[9]

The Federal Judicial Center's 1994 Reference Manual on Scientific Evidence emphasizes that: "Identification of the proper universe is recognized uniformly as a key element in the development of a survey. . . . A survey that provides information about a wholly irrelevant universe of respondents is itself irrelevant. More commonly, however, either the target population or the sampling frame is underinclusive or overinclusive."[10]

Bird has suggested that determination of the proper uni-

---

[8]Zippo Mfg. Co. v. Rogers Imports, Inc., 216 F. Supp. 670, 137 U.S.P.Q. 413 (S.D.N.Y. 1963); Astatic Corp. v. American Electronics, Inc., 201 U.S.P.Q. 411, 1978 WL 21384 (N.D. Ohio 1978).

[9]The Manual for Complex Litigation, Third § 21.493, p. 102 (1995).

[10]Reference Manual on Scientific Evidence, 235, n.38 and 236 (Federal Judicial Center 1994).

PROCEDURE                                    § 32:160

verse be treated as an issue of law to be settled by the judge before the litigants take their surveys."

### § 32:160   Relevant "universe" surveyed—Examples of appropriate universe

Examples of the proper universe as defined by the courts include the following:

To prove secondary meaning and likely confusion among purchasers of bulbs, lamps, batteries and flashlights, the relevant universe is the general population since everyone buys such goods. The court noted that a survey is more helpful where low value items are involved, because purchasers of high priced items are likely to study the product more carefully.[1]

To prove likely confusion among purchasers of lemonade flavor drink mix, the survey universe was found appropriate where it consisted of female heads of households in Cook County, Illinois, aged 18-65 who had personally, or a member of whose household had, served or drunk lemonade during the year prior to the survey.[2]

To prove that people would be confused as to an association between defendant's BEEFEATER restaurant and plaintiff's BEEFEATER gin, a survey conducted among 500 male and female heads-of-household of within a five-mile radius of defendant's proposed restaurant was found proper. The court noted that the results could be extrapolated to all potential customers of the restaurant.[3]

To prove likely confusion of defendant's TEXON auto

---

[11]Bird, "Streamlining Consumer Survey Analysis: An Examination of the Concept of Universe in Consumer Surveys Offered in Intellectual Property Litigation," 88 Trademark Rep. 269, 288 (1998) ("Predetermination of universe by the judge provides the parties with an equal playing field with which to conduct their surveys.").

[Section 32:160]

[1]Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366, 188 U.S.P.Q. 623 (7th Cir. 1976), cert. denied, 429 U.S. 830, 50 L. Ed. 2d 94, 97 S. Ct. 91, 191 U.S.P.Q. 416 (1976), superseded by statute as stated in Scandia Down Corp. v. Euroquilt, Inc., 772 F.2d 1423, 227 U.S.P.Q. 138 (7th Cir. 1985).

[2]General Foods Corp. v. Borden, Inc., 191 U.S.P.Q. 674 (N.D. Ill. 1976).

[3]James Burrough, Ltd. v. Sign of Beefeater, Inc., 540 F.2d 266, 192 U.S.P.Q. 555 (7th Cir. 1976), appeal after remand, 572 F.2d 574, 197

© 2005 Thomson/West, Rel. 34, 6/2005                    32-258.5

repairs with plaintiff's EXXON gasoline, plaintiff conducted a survey during daytime hours in two high-traffic shopping centers on four different days, interviewing 515 licensed drivers. The court noted that, "while this universe is not perfect, it is close enough," such that the survey results were entitled to "great weight."[4]

To prove secondary meaning and likely confusion where defendant sold football jersey replicas imitating the design, names and colors of those licensed by the National Football League, the NFL took a survey whose universe was the entire population of the continental United States between the ages of 13 and 65. This universe was broken down into sub-groups of prior purchasers of NFL football jersey replicas, "fans" of professional football and "fans plus." The court noted that taking a survey with sub-groups moots any challenge that the universe was too broad.[5]

Secondary meaning and confusion surveys of children ages 8-18 were held to be proper as to the significance of a trademark in the sole pattern of children's sneakers.[6] A survey of persons fourteen years or older who either in the past year bought a slogan or picture T-shirt or were likely to do so in the next six months was held to be a sample of the proper universe of potential purchasers of defendant's "New Jersey Giants" wearing apparel.[7] The proper universe for a confusion survey relating to the appearance of a fishing reel was held to be persons over fourteen who had fished in fresh water in the last twelve months.[8]

---

U.S.P.Q. 277 (7th Cir. 1978). *See* Scotch Whiskey Ass'n v. Consolidated Distilled Products, Inc., 210 U.S.P.Q. 639 (N.D. Ill. 1981) (universe is drinkers of after-dinner liqueur).

[4]Exxon Corp. v. Texas Motor Exchange, Inc., 628 F.2d 500 (5th Cir. 1980)(survey questions reproduced in opinion).

[5]National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc., 532 F. Supp. 651, 215 U.S.P.Q. 175 (W.D. Wash. 1982).

[6]In re Sneakers with Fabric Uppers & Rubber Soles, 223 U.S.P.Q. 536 (Int'l Trade Comm'n 1983).

[7]National Football League Properties, Inc. v. New Jersey Giants, Inc., 637 F. Supp. 507, 229 U.S.P.Q. 785 (D.N.J. 1986).

[8]Brunswick Corp. v. Spinit Reel Co., 832 F.2d 513, n.6, 4 U.S.P.Q.2d 1497 (10th Cir. 1987).

## §32:161   Relevant "universe" surveyed—Examples of inappropriate universe

A universe may be improperly over-inclusive by encompassing a group of people that includes those whose perceptions are not relevant, thus skewing the results by introducing irrelevant data.[1] For example, a shopping mall survey of persons planning on buying gifts for girls under twelve years of age was said to cover too broad a universe. The court said that the survey should have focused only upon prospective purchasers of plaintiff's CABBAGE PATCH dolls.[2] In a case where WEIGHT WATCHERS sued for use of its mark on

---

[Section 32:161]

[1] *See, e.g.,* WGBH Educational Foundation, Inc. v. Penthouse International, Ltd., 453 F. Supp. 1347, 203 U.S.P.Q. 432, 435 (S.D.N.Y. 1978), aff'd without op., 598 F.2d 610 (2d Cir. 1979) (Target audience for defendant's publication was persons in the eighteen to thirty-four-year-old range, and plaintiff's television program concerned serious science topics. But survey was not selective as to age or scientific interest. Disparity between the universe in the survey and "some optimal universe of people to whom such a survey should be directed reduces the evidentiary weight to be accorded its findings."); Piper Aircraft Corp. v. Wag-Aero, Inc., 741 F.2d 925, 223 U.S.P.Q. 202, 205-206 (7th Cir. 1984) (Survey of all owners of private planes as to source of defendant's parts. While the survey could have been restricted to only those plane owners who use parts to work on or build their own aircraft, any deviation from a perfect universe "goes to the weight to be given the survey results, not the admissibility of the survey."); Kournikova v. General Media Communications, 31 Media L. Rep. 1201, 64 U.S.P.Q.2d 1614, 2002 WL 31628027 (C.D. Cal. 2002) (a survey of the general public was too broad when testing the alleged false endorsement of plaintiff of Penthouse Magazine, an adult publication which was purchased by less than 10% of the sample population.).

*See* Reference Manual on Scientific Evidence, 237 (Federal Judicial Center 1994) (An overinclusive universe "generally presents less of a problem" than an underinclusive universe if responses from a relevant subset of respondents can be separated out and examined.).

[2] Original Appalachian Artworks, Inc. v. Blue Box Factory (USA), Ltd., 577 F. Supp. 625, 222 U.S.P.Q. 593 (S.D.N.Y. 1983)(the court observed that adult purchasers looking for a CABBAGE PATCH doll might exercise special care in order not to disappoint the child by accepting an imitation). *See* General Motors Corp. v. Cadillac Marine & Boat Co., 226 F. Supp. 716, 140 U.S.P.Q. 447 (W.D. Mich. 1964) (in case involving possible confusion by use of CADILLAC on boats, survey of persons in general, including those with no interest in boats, and was over inclusive); Centaur Communications, Ltd. v. A/S/M Communications, Inc., 830 F.2d 1217, 4 U.S.P.Q.2d 1541 (2d Cir. 1987) (survey of "people in executive positions in marketing in American business enterprises and institutions" was held

---

LEAN CUISINE frozen diet entrees, the court found over-inclusive a survey of women between the ages of eighteen and fifty-five and who had purchased frozen food entrees in the past six months and who tried to lose weight through diet and/or exercise in the past year. The court said that the universe should have been limited to women who had purchased a *diet* frozen entree.[3] Similarly, a survey of women who had purchased or intended to purchase a table or desk lamp was held over-inclusive where the proper universe was persons who buy expensive halogen lamps.[4]

Or, a universe may be improperly defined as under-inclusive by defining a group narrower than the ideal universe, thus leaving out a group of persons whose perception is relevant. For example, to prove secondary meaning in its red, white and blue basketball, the American Basketball Association surveyed males between twelve and twenty-three years old who had played basketball within the last year. The court held that because no attempt was made to survey all persons who were in the market to buy a basketball, the universe selected was too narrow to allow the survey to be given any substantial weight.[5] Similarly, a universe of spectators and participants at running events was held to be

---

too broad a universe in determining secondary meaning for a marketing trade magazine title where the relevant group is "executives in the international marketing and advertising community in the United States".

[3]Weight Watchers Int'l, Inc. v. Stouffer Corp., 744 F. Supp. 1259, 19 U.S.P.Q.2d 1321, 1331 (S.D.N.Y. 1990) ("[S]ome of the respondents may not have been in the market for diet food of any kind and the study universe therefore was too broad.").

[4]Lon Tai Shing Co. v. Koch + Lowy, 21 U.S.P.Q.2d 1858 (S.D.N.Y. 1992), recons. granted, in part, recons. denied, in part, 1992 U.S. Dist. LEXIS 20783 (S.D.N.Y. July 17, 1992), on recons., 25 U.S.P.Q.2d 1375 (S.D.N.Y. 1992) ("Since [alleged infringer's] survey failed to narrow the universe of customers in order to encompass only the potential buyers of the products at issue, it fails to refute [trademark owner's] survey and its probative value is minimal.").

[5]American Basketball Ass'n v. AMF Voit, Inc., 358 F. Supp. 981, 177 U.S.P.Q. 442 (S.D.N.Y. 1973), aff'd without op., 487 F.2d 1393, 180 U.S.P.Q. 290 (2d Cir. 1973), cert. denied, 416 U.S. 986, 40 L. Ed. 2d 763, 94 S. Ct. 2389, 181 U.S.P.Q. 685 (1974). *See* King-Size, Inc. v. Frank's King Size Clothes, Inc., 547 F. Supp. 1138, 216 U.S.P.Q. 426 (S.D. Tex. 1982) (survey to disprove secondary meaning in "king size" for large mens' clothing; held too narrow a universe when restricted to men 6' 2" in height or over; did not include other large men who were not so tall); Universal City Studios, Inc. v. Nintendo Co., 746 F.2d 112, 223 U.S.P.Q. 1000 (2d