Tab 14B

the jury.[1]

In an extreme case, an improperly conducted survey with slanted questions or serious methodological defects may be excludable as "irrelevant" of the true state of mind of potential purchasers.[1.1] But the majority rule is that while technical deficiencies can reduce a survey's weight, they will not prevent the survey from being admitted into evidence.[2]

[Section 32:170]

[1]J & J Snack Foods, Corp. v. Earthgrains Co., 220 F. Supp. 2d 358, 65 U.S.P.Q.2d 1897, 1905 (D.N.J. 2002), related reference, 2003 WL 21051711 (D.N.J. 2003) (Where the issue was the possible descriptiveness of a designation used on products advertised and sold only to commercial food distributors, a survey using inaccurate terminology and asked of consumers at shopping malls was held to be of the wrong universe and inadmissible at the summary judgment motion stage.).

[1.1]Sears, Roebuck & Co. v. All States Life Ins. Co., 246 F.2d 161, 114 U.S.P.Q. 19 (5th Cir. 1957), cert. denied, 355 U.S. 894, 2 L. Ed. 2d 192, 78 S. Ct. 268, 115 U.S.P.Q. 427 (1957)(2-1 decision on admissibility); Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc., 559 F. Supp. 1189, 217 U.S.P.Q. 1137 (E.D.N.Y. 1983) (while holding for plaintiff, court excluded plaintiff's survey from evidence, finding several deficiencies in methodology); Starter Corp. v. Converse, Inc., 170 F.3d 286, 50 U.S.P.Q.2d 1012 (2d Cir. 1999) (it was proper for district court to exclude a survey from evidence before the jury because the survey questions were irrelevant: "[A]ny probative value of the survey was outweighed by its potential to confuse the issues in the case.").

[2]Jellibeans, Inc. v. Skating Clubs of Georgia, Inc., 716 F.2d 833, 222 U.S.P.Q. 10, 20 (11th Cir. 1983) ("These alleged technical deficiencies affect the survey's weight, however, and not is admissibility. . . . Therefore, the district court properly admitted the survey evidence, however flawed. . . . Notwithstanding its technical deficiencies, the survey evidence is . . . probative."); Mobil Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 2 U.S.P.Q.2d 1677 (2d Cir. 1987) (criticisms of statistical deficiencies in a survey only affect the weight to be accorded the survey evidence, not its admissibility); Brunswick Corp. v. Spinit Reel Co., 832 F.2d 513, 4 U.S.P.Q.2d 1497 (10th Cir. 1987) (technical and methodological deficiencies "relate not [to] the survey's admissibility but to the weight to be given such evidence"); E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280 (9th Cir. 1992) ("[I]t is routine to admit a relevant survey; and technical unreliability goes to weight, not admissibility."); AHP Subsidiary Holding Co. v. Stuart Hale Co., 1 F.3d 611, 27 U.S.P.Q.2d 1758, 1764 (7th Cir. 1993) ("[A]ny shortcomings in the survey results go to the proper weight of the survey and should be evaluated by the trier of fact."); Southland Sod Farms v. Stover Seed Co., 108 F.3d 1134, 42 U.S.P.Q.2d 1097 (9th Cir. 1997) (objections that survey in false advertising case was only

This is especially true in a non-jury case.[3] As one court correctly observed, "No survey is perfect" and flaws in questions and methodology should only affect the weight accorded survey results.[4]

The Ninth Circuit has observed that once a survey has passed the threshold criteria of having a proper foundation, being relevant and having been conducted according to accepted principles, it can be admitted into evidence. Thereafter, flaws in the survey go to the weight, not admissibility, of the evidence: "Once the survey is admitted, however, follow-on issues of methodology, survey design, reliability, critique of conclusions and the like go to the weight of the survey rather than its admissibility."[4.1]

In a survey where the methodology of sampling, questioning and reporting is casual and informal, the probative worth of the survey may be "minuscule"[5] or of "little weight."[6]

Standard procedures are used to ensure that the survey

---

conducted in one location and asked leading questions "go only to the weight and not the admissibility of the survey").

[3]Hutchinson v. Essence Communications, Inc., 769 F. Supp. 541, 557 (S.D.N.Y. 1991) (in a non-jury case it is appropriate to admit the survey data into evidence but determine how much weight to accord them; court concluded that data were "not entitled to significant weight" because of defects in survey).

[4]Selchow & Righter Co. v. Decipher, Inc., 598 F. Supp. 1489, 225 U.S.P.Q. 77 (E.D. Va. 1984) (survey relied upon to find likely confusion).

[4.1]Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 58 U.S.P.Q.2d 1881 (9th Cir. 2001).

[5]King Research, Inc. v. Shulton, Inc., 324 F. Supp. 631, 169 U.S.P.Q. 396 (S.D.N.Y. 1971), aff'd, 454 F.2d 66, 172 U.S.P.Q. 321 (2d Cir. 1971).

[6]Exxon Corp. v. Xoil Energy Resources, Inc., 552 F. Supp. 1008, 216 U.S.P.Q. 634, n.16 (S.D.N.Y. 1981)(an informal survey taken by associates in plaintiff's law firm was accorded "no weight" because of survey deficiencies); Amstar Corp. v. Domino's Pizza, Inc., 205 U.S.P.Q. 128, 142, 1979 WL 25080 (N.D. Ga. 1979), rev'd, 615 F.2d 252, 205 U.S.P.Q. 969, 979 (5th Cir. 1980), cert. denied, 449 U.S. 899, 66 L. Ed. 2d 129, 101 S. Ct. 268, 208 U.S.P.Q. 464 (1980)("This unfair and biased survey is not entitled to any weight or credibility as evidence of confusion."); American Greetings Corp. v. Dan-Dee Imports, Inc., 619 F. Supp. 1204, 227 U.S.P.Q. 750, 756 (D.N.J. 1985), aff'd in part on other grounds, 807 F.2d 1136, 1 U.S.P.Q.2d 1001 (3d Cir. 1986) ("[T]he questions asked were biased and . . . the survey itself was performed in a haphazard and unprofessional manner. Accordingly, the court gives little weight to plaintiff's survey."); Hilson Research, Inc. v. Society for Human Resources Management, 27 U.S.P.Q.2d 1423, 1437, 1993 WL 290669 (T.T.A.B. 1993) (questionnaire

§ 32:170                          McCarthy on Trademarks

was administered in such a manner as to minimize error and bias.[7] Monitoring some interviews while in progress is a method commonly used for telephone interviews. Any doubts as to whether the recorded responses accurately reflect actual interviews can be dissipated by validation checks, which are common survey procedure. A validation check determines whether interviews were conducted, whether respondents qualified for the interview and, in some instances, whether the interviews were conducted in the proper manner. Validation is usually accomplished by contacting a sample of respondents (e.g. 15%) to quiz them as to their survey experience.[8] Another validation method is to compare the work done by individual interviewers for unexplained variations.

§ 32:171   Tests of properly conducted survey—
           Examples of methodological deficiencies

Various deficiencies in the mechanics of surveys have been criticized by the courts, leading them to give a survey little weight as evidence. Such deficiencies include the following:

*Location Problems:* Questioning consumers in a supermarket where the interviewee could see, or had just seen, the goods and labels in question;[1] questioning interviewees who

---

passed out by client to persons attending trade shows is not a proper "survey" and "is not entitled to any weight").

[7]Reference Manual on Scientific Evidence, 259 (Federal Judicial Center 1994).

[8]*See* Paco Sport, Ltd. v. Paco Rabanne Parfums, 86 F. Supp. 2d 305, 54 U.S.P.Q.2d 1205 (S.D. N.Y. 2000), judgment aff'd, 234 F.3d 1262 (2d Cir. 2000) ("The purpose of validation is to identify the interviewers who had probably fabricated the answers instead of completing interviews in accordance with instructions." Validation of only 17% of interviews conducted was criticized as inadequate and "cast further doubt on the reliability" of the survey.).

[Section 32:171]

[1]Marcalus Mfg. Co. v. Watson, 156 F. Supp. 161, 115 U.S.P.Q. 232 (D.D.C. 1957), aff'd, 258 F.2d 151, 118 U.S.P.Q. 7 (D.C. Cir. 1958) (questions related to the secondary meaning of a background symbol, and interviewees were in a supermarket where they could see that symbol with a word mark imposed on it). *Compare* La Maur, Inc. v. Revlon, Inc., 245 F..Supp. 839, 146 U.S.P.Q. 654 (D. Minn. 1965) (survey questions asked in store, but not near counter carrying products in issue); Novartis

PROCEDURE                                                  § 32:171

had just purchased plaintiff's product.[2]

*Irrelevant Questions or Exhibits:* Asking an irrelevant question[3] or an ambiguous question.[3.1] Showing interviewees photographs which are not true representations of the product as actually sold.[4] Questioning interviewees as to their re-

---

Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharmaceuticals Co., 129 F. Supp. 2d 351, 57 U.S.P.Q.2d 1522 (D.N.J. 2000), judgment aff'd, 290 F.3d 578, 62 U.S.P.Q.2d 1757 (3d Cir. 2002) (In a false advertising survey "the Court finds that leaving the products for the respondents to examine rather than taking the products away replicates market conditions.").

[2]Aerojet-General Corp. v. Cincinnati Screen Process Supplies, Inc., 172 U.S.P.Q. 114, 1971 WL 16663 (S.D. Ohio 1971) (the court saying that the issue is confusion before purchase, not after purchase).

[3]National Football League v. Governor of Delaware, 435 F. Supp. 1372, 195 U.S.P.Q. 803, 807 (D. Del. 1977) (Asking persons if they thought the reputation of the NFL would suffer if legalized betting on NFL games was run by a state agency in each state. The issue in the case was whether one state's lottery games will injure the NFL reputation. "The question asked in the 'national' survey addressed a far broader subject which the plaintiffs have not shown to be relevant."); Inc. Publishing Corp. v. Manhattan Magazine, Inc., 616 F. Supp. 370, 227 U.S.P.Q. 257 (S.D.N.Y. 1985), aff'd without op., 788 F.2d 3 (2d Cir. 1986) (Asking respondents whether defendant's magazine might be a regional version of plaintiff's magazine is irrelevant to the issue of a likelihood, or probability, of confusion: "Might," on the scale of probabilities, occupies a low station. "Might," suggests what is possible, not what is probable or likely."); J & J Snack Foods, Corp. v. Earthgrains Co., 220 F. Supp. 2d 358, 65 U.S.P.Q.2d 1897 (D.N.J. 2002), related reference, 2003 WL 21051711 (D.N.J. 2003) (survey questions using inaccurate definition of a "descriptive" mark: survey held inadmissible).

[3.1]Scotts Co. v. United Industries Corp., 315 F.3d 264, 65 U.S.P.Q.2d 1161, 2002-2 Trade Cas. (CCH) P 73911, 60 Fed. R. Evid. Serv. 330 (4th Cir. 2002) (Ambiguous question did not go the issue of alleged falsity of the challenged advertisement: "[T]hose responses shed no light on the question that is key to [plaintiff's] false advertising claims. . ..").

[4]American Luggage Works, Inc. v. United States Trunk Co., 158 F. Supp. 50, 116 U.S.P.Q. 188 (D. Mass. 1957), supplemental op., 161 F. Supp. 893, 117 U.S.P.Q. 83 (D. Mass. 1957), aff'd, 259 F.2d 69, 118 U.S.P.Q. 424 (1st Cir. 1958); Scotts Co. v. United Industries Corp., 315 F.3d 264, 65 U.S.P.Q.2d 1161, 2002-2 Trade Cas. (CCH) P 73911, 60 Fed. R. Evid. Serv. 330 (4th Cir. 2002) (It is improper to show interviewees only part of a package in a false advertising case where the issue is consumer reaction to the advertisement as a whole and in context.). *Compare* Sands, Taylor & Wood Co. v. Quaker Oats Co., 978 F.2d 947, 24 U.S.P.Q.2d 1001, 1012 (7th Cir. 1992), cert. denied, 507 U.S. 1042, 123 L. Ed. 2d 497, 113 S. Ct. 1879 (1993) (not error to use a stimulus in survey

action to the source of goods without showing them the point-of-purchase display cards which are always present in stores.[5] Asking questions about an unpackaged product which is always seen in actual purchasing conditions in its distinctive packaging.[6] Giving respondents less information than they would actually receive in a real purchasing situation.[6.1] Trying to prove secondary meaning for trade dress in a particular product feature by showing interviewees the whole product, which included non-protectable, functional features.[7] Directing survey questions at consumer response to labels not bearing the trademark in issue.[8] Showing respondents the conflicting branded products side-by-side and asking if they were made by the same company

which is not found in the marketplace where defendant's conduct preventing plaintiff from marketing a product in the national market).

[5]Zippo Mfg. Co. v. Rogers Imports, Inc., 216 F. Supp. 670, 137 U.S.P.Q. 413 (S.D.N.Y. 1963).

[6]Original Appalachian Artworks, Inc. v. Blue Box Factory (USA), Ltd., 577 F. Supp. 625, 222 U.S.P.Q. 593 (S.D.N.Y. 1983) (survey question about the source of defendant's unpackaged doll was not relevant because in actual purchasing conditions, customers see the doll in distinctive packaging).

[6.1]Mastercard Intern. Inc. v. First Nat. Bank of Omaha, Inc., 2004 WL 326708 (S.D. N.Y. 2004), related reference, 2004 WL 1575396 (S.D. N.Y. 2004) (bank employees were told it would take 10-15 minutes to complete an on-line survey about choosing a smart card program for the bank. "This exercise bears little resemblance to the lengthy and thoughtful decision-making process that occurs in the real world when large financial institutions make determinations about the services they provide to customers.").

[7]Thomas & Betts Corp. v. Panduit Corp., 65 F.3d 654, 36 U.S.P.Q.2d 1065, 1072 (7th Cir. 1995), ("A survey which asks consumers to identify the source of a product based on its overall configuration when most of the product's configuration is functional is worthless in determining whether a particular product feature has acquired a secondary meaning."), later proceedings, 138 F.3d 277, 46 U.S.P.Q.2d 1026 (7th Cir. 1998) (plaintiff took a later survey to change the stimulus shown respondents); OddzOn Products, Inc. v. Just Toys, Inc., 122 F.3d 1396, 43 U.S.P.Q.2d 1641 (Fed. Cir. 1997) (likelihood of confusion survey that focused on both functional and ornamental aspects was not probative of trade dress infringement; results showing confusion due to functional similarities in the products are not probative of trade dress infringement).

[8]In re Riviana Foods, Inc., 160 U.S.P.Q. 757, 1969 WL 9021 (T.T.A.B. 1969) (survey evidence rejected as not probative); Carter-Wallace, Inc. v. Procter & Gamble Co., 434 F.2d 794, 167 U.S.P.Q. 713 (9th Cir. 1970); Jenkins Bros. v. Newman Hender & Co., 289 F.2d 675, 129 U.S.P.Q. 355

where that is not how the products appeared in the marketplace.[9] Asking persons if they found a term in the abstract to be offensive, when the statutory bar was whether the term when used as a trademark was disparaging.[9.1]

*Personnel and Tabulation Problems:* Treating inconclusive responses as definite, unqualified responses in final survey tabulations.[10] Using low paid, part-time, non-professional investigators who may have exercised poor judgment in interpreting ambiguous interviewee responses,[11] failing to verify the validity of responses,[12] or changing recorded re-

---

(C.C.P.A. 1961) (when interviewee shown whole product or label, it is uncertain which part motivates responses).

[9]Jordache Enters. v. Hogg Wyld, Ltd., 828 F.2d 1482, 4 U.S.P.Q.2d 1216 (10th Cir. 1987) (giving survey respondents the products side-by-side and asking if they thought the products were produced by the same manufacturer "bears little resemblance to the actual workings of the marketplace," making the survey results entitled to only "little weight" as evidence). *Compare* Gucci v. Gucci Shops, 688 F. Supp. 916, 7 U.S.P.Q.2d 1833 (S.D.N.Y. 1988) (Showing interviewees several cards with famous designer trademarks on them and asking questions about the products sold under those marks is an appropriate survey method. The survey results are entitled to "significant weight.").

[9.1]Pro-Football, Inc. v. Harjo, 284 F. Supp. 2d 96, 132, 68 U.S.P.Q.2d 1225, 1253 (D.D.C. 2003).

[10]General Motors Corp. v. Cadillac Marine & Boat Co., 226 F. Supp. 716, 140 U.S.P.Q. 447 (W.D. Mich. 1964); National Biscuit Co. v. Princeton Mining Co., 137 U.S.P.Q. 250 (T.T.A.B. 1963), aff'd, 338 F.2d 1022, 143 U.S.P.Q. 422 (C.C.P.A. 1964). *See* Hershey Foods Corp. v. Cerreta, 195 U.S.P.Q. 246, 1977 WL 22535 (T.T.A.B. 1977) (survey was designed by party to suit; it had ambiguous questions and answers; and interviewers referred to party's name); Waples-Platter Cos. v. General Foods Corp., 439 F. Supp. 551, 196 U.S.P.Q. 50 (N.D. Tex. 1977) (ambiguous questions); Revlon Consumer Prods. Corp. v. Jennifer Leather Broadway, Inc., 858 F. Supp. 1268, 32 U.S.P.Q.2d 1659 (S.D.N.Y. 1994), aff'd without op., 57 F.3d 1062 (2d Cir. 1995) (methodological and coding defects; survey held entitled to no weight).

[11]Sears, Roebuck & Co. v. Allstate Driving School, Inc., 301 F. Supp. 4, 163 U.S.P.Q. 335 (E.D.N.Y. 1969).

[12]Sheller-Globe Corp. v. Scott Paper Co., 204 U.S.P.Q. 329, 1979 WL 24890 (T.T.A.B. 1979) (several defects of methodology in conduct of mail survey found to result in no weight accorded survey; defects included failure to check on accuracy and validity of responses, no check on who completed mail questionnaire, and insufficient explanation of selection of sample).

§ 32:171                     McCarthy on Trademarks

sponses and failing to record unfavorable responses.[13]

*Bias Problems:* The fact that a survey is conducted specifically for the purpose of creating evidence for this litigation does not lessen its weight in any way.[14] Some courts have found a problem with inducing survey responses by flattering letters and by offers of prizes in return for prompt replies,[15] or by discounts on products.[16] The courts fail to explain how such modest and minimal inducements could skew results.

*Timing Problems:* Conducting a survey to prove plaintiff's secondary meaning at the time of defendant's entry into the market, where the survey was taken some years later.[17]

*Copyright Problems:* In some survey formats, to replicate actual materials as used in the marketplace, a party will

---

[13]Amstar Corp. v. Domino's Pizza, Inc., 205 U.S.P.Q. 128, 142, 1979 WL 25080 (N.D. Ga. 1979), rev'd, 615 F.2d 252, 205 U.S.P.Q. 969, 979 (5th Cir. 1980), cert. denied, 449 U.S. 899, 66 L. Ed. 2d 129, 101 S. Ct. 268, 208 U.S.P.Q. 464 (1980)("In the Darden study, there were a substantial number of erasures and changes in the recorded answers. There was a deliberate failure to record the answers of persons who obviously were confused. Interviewees were counted who should have been disqualified as a result of young age, relationship with defendants, or knowledge of this litigation. This unfair and biased survey is not entitled to any weight or credibility as evidence of confusion.").

[14]United States Surgical Corp. v. Orris, Inc., 983 F. Supp. 963, 45 U.S.P.Q.2d 1125(D. Kan. 1997) ("It is axiomatic that a court may admit such a survey despite its being conducted for the purpose of litigation.").

[15]Dupont Cellophane Co. v. Waxed Products Co., 85 F.2d 75 (2d Cir. 1936), cert. denied, 299 U.S. 601, 81 L. Ed. 443, 57 S. Ct. 194 (1936) (the court stated that responses in such a survey "might well have been stimulated by such inducements").

[16]Kroger Co. v. Johnson & Johnson, 570 F. Supp. 1055, 223 U.S.P.Q. 29 (S.D. Ohio 1983) (Junior user's 152 affidavits from customers that they were not confused were not given much weight because of possible bias: those persons received a double rebate on price paid for the product as an inducement to be interviewed. But senior user's five-second viewing survey of a shelf of junior user's products was given weight as evidence of likely confusion: substantial percentage of persons said they saw senior user's TYLENOL on the shelf when in fact it was not there.).

[17]Zippo Mfg. Co. v. Rogers Imports, Inc., 216 F. Supp. 670, 137 U.S.P.Q. 413 (S.D.N.Y. 1963). *Contra* Faberge, Inc. v. Saxony Products, Inc., 605 F.2d 426, 204 U.S.P.Q. 359 (9th Cir. 1979) (held that trial court's reliance on 1974 consumer survey, along with other evidence, to prove secondary meaning in 1970 was not error and finding of 1970 secondary meaning was not clearly erroneous).

32-282

reproduce and use in the survey an advertisement or promotional piece of its adversary. It has been held that such a use constitutes an exempt "fair use" that is not an infringement of the adversary's copyright in the advertisement or promotional materials.[18]

*Memory Tests:* A survey which does little more than test respondents' memory of a controlled exposure to a trademark stimulus has been held to prove "something, but not very much."[19] In that case, in Phase One, respondents were shown advertisements of four companies, including the plaintiff. Then in Phase Two, respondents were shown advertising promotions of three companies, including defendant and asked, "Was there a product or service in the booklet I showed you [in Phase One] that is from the same source or company as [shown in this exhibit in Phase Two]?" Positive answers linking plaintiff and defendant were counted by the survey taker as evidence of likely confusion. A "noise" or "error" rate was developed which was then deducted.[20] The court found that the results were only of "slightly probative value."[21]

*Insufficient Number of Respondents:* Conducting a survey with a number of respondents too small to justify a reason-

---

[18]Lucent Information Management, Inc. v. Lucent Technologies, Inc., 5 F. Supp. 2d 238, 48 U.S.P.Q.2d 1041 (D. Del. 1998) (defendant in a trademark infringement suit ran a survey using a reproduction of an actual promotional letter sent out by plaintiff; plaintiff supplemented the complaint to add a claim for infringement of copyright in the letter; the claim was dismissed on the ground that the reproduction was a fair use).

[19]Franklin Resources, Inc. v. Franklin Credit Management Corp., 988 F. Supp. 322, 45 U.S.P.Q.2d 1872, 1884 (S.D.N.Y. 1997) ("I think that [the survey] evidence is of slight probative value." No likelihood of confusion was found and the court held for defendant). *See* Starter Corp. v. Converse, Inc., 170 F.3d 286, 50 U.S.P.Q.2d 1012 (2d Cir. 1999) (it was proper for district court to exclude survey from evidence before the jury because the survey questions were irrelevant. Survey question was characterized as "little more than a memory test" which was not probative of the likelihood of confusion issue).

[20]An "error rate" was developed by treating as "errors" those respondents who "incorrectly" failed to link two ads from the same company and who "incorrectly" linked a mark in Phase Two with Phase One even though that mark did not appear in Phase One.

[21]The survey "proves that most of the respondents could read the name "Franklin" in the booklet and remember it long enought to recognize the name when shown one of the three letters immediately thereafter. . . . Surveys which do nothing more than demonstrate the respondents' ability

§ 32:171                    McCarthy on Trademarks

able extrapolation to the target group at large will lessen the weight of the survey.[22]

_____

to read are not probative on the issue of likelihood of confusion." 45 U.S.P.Q.2d at 1883.

[22]Lisa Frank, Inc. v. Impact Int'l, Inc., 799 F. Supp. 980, 994 (D. Ariz. 1992) (sample of only 32 persons reduced evidentiary weight accorded the survey, but was "some probative evidence" of a likelihood of confusion in support of a preliminary injunction. "Due to the small sample size, the survey results cannot be accorded great weight."); In Re Kimpton Hotel and Restaurant Group, Inc., 55 U.S.P.Q.2d 1154, 2000 WL 562603 (Trademark Trial & App. Bd. 2000) (survey of 100 respondents was an "insufficient number of survey respondents."); Mastercard Intern. Inc. v. First Nat. Bank of Omaha, Inc., 2004 WL 326708 (S.D. N.Y. 2004), related reference, 2004 WL 1575396 (S.D. N.Y. 2004) (survey excluded in jury trial because of, among other issues, small number of respondents: "[T]he number of respondents surveyed is too small to provide meaningful results. . . . Only 52 respondents completed the survey, resulting in just 27 individuals reviewing the test cell materials and 25 individuals commenting on the control group materials.").

PROCEDURE                                                    § 32:172

### § 32:172    Tests of properly conducted survey—
Slanted or leading questions—avoiding
leading questions

Survey questions should not be slanted or leading.[1] Some commentators[2] and courts have indicated that it is improperly leading to imply that there could be a business relationship where the respondent may previously have not thought of any such connection. For example, the question: "Do you think that there may or may not be a business connection between Beneficial Capital Corp. and the Beneficial Finance System Companies?" was rejected as a leading question, "not well suited to eliciting an uninfluenced reaction."[3] Similarly, in a secondary meaning survey, it is leading to phrase the

---

[Section 32:172]

[1] Philip Morris, Inc. v. R.J. Reynolds Tobacco Co., 188 U.S.P.Q. 289, 1975 WL 21170 (S.D.N.Y. 1975) (survey held tailored to elicit some brand identification through use of slanted questions in attempt to prove secondary meaning); In re Jockey International, Inc., 192 U.S.P.Q. 579, 1976 WL 21154 (T.T.A.B. 1976) (answers given to choose from held to elicit the desired choice, resulting in "loaded" survey: held probative anyway); WGBH Educational Foundation, Inc. v. Penthouse International, Ltd., 453 F. Supp. 1347, 203 U.S.P.Q. 432 (S.D.N.Y. 1978), aff'd without op., 598 F.2d 610 (2d Cir. 1979) (Defendant's survey question asking what the "word" Nova means rather than what the "name" Nova means held to "seriously undercut whatever validity the survey might otherwise have." "Name" would have focused attention on plaintiff's product, whereas "using the term 'word' diffuses that focus."); American Footwear Corp. v. General Footwear Co., 609 F.2d 655, 204 U.S.P.Q. 609 (2d Cir. 1979), cert. denied, 445 U.S. 951, 63 L. Ed. 2d 787, 100 S. Ct. 1601, 205 U.S.P.Q. 680 (1980) (Phone survey question, "With whom or what do you associate a product labelled Bionic?," held improper as "self-serving." Court said question should have been, "With whom or what do you associate a 'Bionic' boot?"); Johnson & Johnson * Merck Consumer Pharmaceuticals Co. v. Smithkline Beecham Corp., 960 F.2d 294, 22 U.S.P.Q.2d 1362, 1367-68 (2d Cir. 1992) (several questions held misleading in false advertising cases, such as: "Based on the commercial you just saw, how do you feel about taking a product for heartburn that contains aluminum and magnesium?").

[2] See Boal, "Techniques for Ascertaining Likelihood of Confusion and the Meaning of Advertising Communications," 73 Trademark Rep. 405, 422 (1983) (A question to the effect of "Do you think these two products are made by the same or different producers?" is not neutral. "[T]he question does strongly suggest a possibility that might not have occurred to the interviewees—that the products are made by the same company.").

[3] Beneficial Corp. v. Beneficial Capital Corp., 529 F. Supp. 445, 213 U.S.P.Q. 1091 (S.D. N.Y. 1982). See Universal City Studios, Inc. v.

© 2005 Thomson/West, Rel. 34, 6/2005

question in a way that presumes that the designation identi-
fies some single source.[3.1]

However, other courts have found nothing improperly lead-
ing in a question asking if the respondent thinks there is or
is not a connection between the owners of the contesting
marks.[4]

*Author's Opinion:* In my view, it is not improperly leading

---

Nintendo Co., Ltd., 746 F.2d 112, 223 U.S.P.Q. 1000 (2d Cir. 1984), judg-
ment aff'd, 797 F.2d 70, 230 U.S.P.Q. 409 (2d Cir. 1986) (The following
survey question was held improperly leading in that it presented
respondents with the connection rather than permitting them to make
their own association: "To the best of your knowledge, was the Donkey
Kong game made with the approval or under the authority of the people
who produce the King Kong movies?") Hutchinson v. Essence Communica-
tions, Inc., 769 F. Supp. 541, 564 (S.D. N.Y. 1991) (a question that asks
persons to assume that some entity sponsors or promotes or is associated
with the junior user and then asks who that entity would most likely be
was held to be improperly leading in the context of the facts) Marshall
Field & Co. v. Mrs. Fields Cookies, 25 U.S.P.Q.2d 1321, 1334, 1992 WL
421449 (T.T.A.B. 1992) (Asking if the two stores "have a business connec-
tion or a business association with one another, or not?" is an improperly
leading question that "tends to deliberately plant in the respondent's
mind the idea that there is a connection between the stores. . . . Such a
question is certainly highly prejudicial to the results." Survey found to be
"seriously flawed and the results to be of little probative value.") Riviana
Foods Inc. v. Societe Des Produits Nestle S.A., 33 U.S.P.Q.2d 1869, 1994
WL 761242 (S.D. Tex. 1994) (survey question held leading: "Do you think
the weight loss product "Sweet Success" and "Success Rice" are more
likely made by the same company or more likely made by different
companies?").

[3.1]Straumann Co. v. Lifecore Biomedical Inc., 278 F. Supp. 2d 130 (D.
Mass. 2003) (the question "What company do you think puts out these
products?" is leading because it "presume[s] the existence of the key ele-
ment in a secondary meaning enquiry, namely the association of the design
with a *single* source.").

[4]McGraw-Edison Co. v. Walt Disney Productions, 225 U.S.P.Q. 512,
1984 WL 1394 (N.D. Ill. 1984), judgment rev'd, 787 F.2d 1163, 229
U.S.P.Q. 355, 362 (7th Cir. 1986) (The district court said that presenting
respondents with pictures of the two products and asking them if the
products were put out by the same or different companies is leading and
will always produce high results connecting the two products. The court of
appeals disagreed, saying that the district court improperly rejected the
35 percent response that the products were put out by the same company.)
Clicks Billiards, Inc. v. Sixshooters, Inc., 251 F.3d 1252, 58 U.S.P.Q.2d
1881 (9th Cir. 2001) (responses to question: "Do you think that the bil-
liard parlor in these photos [of defendant's operation] is owned or oper-
ated by [plaintiff] or do you think that the billiard parlor in the photos is

to present the respondent with a fair and accurate representation of the contesting marks and ask in a neutral manner if the respondent thinks there is or is not some connection, affiliation or sponsorship relation between the owners of the marks - or that the respondent doesn't know. I think that the criticism that this is leading because it suggests that there may be a relationship that the respondent may not have previously thought about is overblown and exaggerated. Any survey questions about genericness, descriptiveness, source confusion or business affiliation necessarily asks ordinary persons about trademark relationships that they probably never thought about before. If the respondent is given a fair opportunity to say "yes," "no," or "I don't know," I fail to see how such a question is so improperly leading that responses should be discounted or ignored. Responses to such questions should be given their fair weight and considered along with other evidence in the case.

It may be improperly leading to expose the surveyed person to a desired response before asking the critical question about a connection between the owners of the contesting marks. Responses were given little weight by the court in a survey where questions twice exposed respondent to both parties' marks before asking the question: "Do you feel that there is some connection between Penta Hotels and Penta Tours or do you feel that there is no connection between these companies?" The Court said that the questions were "designed and placed in such a sequence so as to elicit the intended response."[4.1] Similarly, in a secondary meaning survey, it was held to be improperly leading to phrase the question in a way that presumes that the designation identifies some single source.[4.2]

A critical survey question may be slanted if it has been

---

owned and operated by a different company?" were held to be sufficient proof of infringement to avoid dismissal on summary judgment).

See discussion of "product line-up" surveys at § 32:177.

[4.1]Penta Hotels Ltd. v. Penta Tours, 9 U.S.P.Q.2d 1081, 1988 WL 384940 (D. Conn. 1988).

[4.2]Straumann Co. v. Lifecore Biomedical Inc., 278 F. Supp. 2d 130 (D. Mass. 2003) (the question "What company do you think puts out these products?" is leading because it "presume[s] the existence of the key element in a secondary meaning enquiry, namely the association of the design with a *single* source." In the Author's Opinion, this is an overly rigid and strict criticism of a relatively neutral question.).

© 2005 Thomson/West, Rel. 34, 6/2005

§ 32:172                         McCARTHY ON TRADEMARKS

preceded by questions which lead the interviewee "along the garden path" to the desired response. For example, a question "What brand do you think of when you hear this slogan?" was held slanted where previous questions had already mentioned the critical brand name.[5] Similar examples include: preceding the critical question by questions which, if correctly answered, elicited the trademark which was a favorable response to the critical question;[6] and presenting respondents with particular similarities between the marks rather than letting persons questioned respond to the marks as a whole.[7] In the same vein is directing a questionnaire to sympathetic retailers, telling them about the pending litigation, and asking them to respond to a question like: "Would it be in your opinion that (sic) the use of the name SLEEX upon girdles for women would import a derogatory effect to slacks sold under the identical trademark for men so that men would not buy the slacks merchandised under that name?" This is obviously a leading question, with a favorable response prompted by the retailers' self-interest. It also asks for a retailer's opinion about the mental reactions of consumers.[8]

Caution must be exercised in evaluating the results of some open-ended survey questions about brands because respondents who merely guess will likely just play back the

[5]Ralston Purina Co. v. Quaker Oats Co., 169 U.S.P.Q. 508, 1971 WL 16472 (T.T.A.B. 1971).

[6]Sears, Roebuck & Co. v. Allstate Driving School, Inc., 301 F. Supp, 4, 163 U.S.P.Q. 335 (E.D.N.Y. 1969); Frisch's Restaurants v. Shoney's, Inc., 759 F.2d 1261, 225 U.S.P.Q. 1169 (6th Cir. 1985) (presenting respondents with the desired response six times before asking the critical question gives the results "diminished probative value": survey was discounted as evidence).

[7]Inc. Publishing Corp. v. Manhattan Magazine, Inc., 616 F. Supp. 370, 227 U.S.P.Q. 257 (S.D.N.Y. 1985), aff'd without op., 788 F.2d 3 (2d Cir. 1986)(questions were held leading where they presented respondents with particular similarities or associations rather than permitting respondents to arrive at the association themselves, unaided by prompting; proper questions would be: "Do you think there is any relationship between any of these magazines? Which ones? What is the relationship?").

[8]Esquire Sportswear Mfg. Co. v. Genesco, Inc., 141 U.S.P.Q. 400, 1964 WL 7842 (T.T.A.B. 1964) (likely confusion found, notwithstanding deficient "survey" evidence).

names of the best-known and dominant brands.[9]

### § 32:173   Tests of properly conducted survey—Slanted or leading questions—Aided awareness questioning

As with direct examination of a witness at trial, in framing survey questions one must resist the temptation to lead responses to a desired end or to "help" the witness to reach the "correct" answer. Trial judges have considerable experience in spotting this kind of defect. For example, in one survey, after asking a neutral question about the interviewee's opinion as to products put out under defendant's mark, a further "aided awareness" question asked the interviewee to choose from among various named products, with the desired response featured prominently in the choices. The percentage naming products made by plaintiff jumped from only 7 percent on the neutral question to over 50 percent on the "aided awareness" question. Judge Stapleton found that while the responses to the neutral question were supportive of plaintiff's position, the responses to the "aided awareness" question were "of little probative value," as they led the interviewee to the desired response.[1]

### § 32:174   Tests of properly conducted survey—Survey formats—*Eveready* confusion format

A now-standard survey format used to prove likely confu-

---

[9]Mennen Co. v. Gillette Co., 565 F. Supp. 648, 220 U.S.P.Q. 354 (S.D.N.Y. 1983), aff'd without op., 742 F.2d 1437 (2d Cir. 1984) (Following survey question held leading and survey found "fatally defective": "Please look at this picture and this list of stick deodorant brand names. Among the leading brands of stick deodorant now on the market, which of the brands listed here would you say uses these stripes on their package?" 63 percent response naming plaintiff Mennen found to be only a "playback of brand share," as Mennen was the major producer of such deodorants.).

[Section 32:173]

[1]Scott Paper Co. v. Scott's Liquid Gold, Inc., 439 F. Supp. 1022, 195 U.S.P.Q. 707 (D. Del. 1977), rev'd, dismissed on other grounds, 589 F.2d 1225, 200 U.S.P.Q. 421 (3d Cir. 1978). *See* Johnson & Johnson-Merck Consumer Pharmaceuticals Co. v. Rhone-Poulenc Rorer Pharmaceuticals, 19 F.3d 125, 30 U.S.P.Q.2d 1112, 1119-20 (3d Cir. 1994) (accepting expert witness's view that only open-ended questions were valid, and criticizing follow up with repeated probing questions: "A survey is not credible if it relies on leading questions which are 'inherently suggestive and invite guessing by those who did not get any clear message at all.' ").

sion in cases where plaintiff makes some products which defendant does not is the *Eveready* format.[1] To prove that consumers were likely to confuse the source of defendant' s EVER-READY lamps with plaintiff Union Carbide's EVEREADY batteries, flashlights and bulbs, Union Carbide introduced the results of a survey with the following questions:

1. [Screening question to eliminate persons in the bulb or lamp industries.]
2. Who do you think puts out the lamp shown here? (A picture of defendant's EVER-READY lamp with its mark is shown).
3. What makes you think so?
4. Please name any other products put out by the same concern which puts out the lamp shown here.

The results were that the number who associated the products displayed with Union Carbide were:

By answering "Union Carbide": 6 (0.6 percent)

By indicating Union Carbide products such as batteries as being put out by the same concern: 551 (54.6 percent)

TOTAL 557 (55.2 percent)

While the district court said that the survey was entitled to "little, if any, weight," the Seventh Circuit held that the trial court was clearly erroneous in not crediting the survey: "Those who indicated that they believed other Carbide products were manufactured by the same company that produced the bulbs or lamps shown must be considered cases

---

**[Section 32:174]**

[1]Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366, 188 U.S.P.Q. 623 (7th Cir. 1976), cert. denied, 429 U.S. 830, 50 L. Ed. 2d 94, 97 S. Ct. 91, 191 U.S.P.Q. 416 (1976). Cases explicitly approving *Eveready*-type surveys include: James Burrough, Ltd. v. Sign of Beefeater, Inc., 540 F.2d 266, 192 U.S.P.Q. 555, 564 (7th Cir. 1976); Scott Paper Co. v. Scott's Liquid Gold, Inc., 439 F. Supp. 1022, n.55, 195 U.S.P.Q. 707, 724 n.55 (D. Del. 1977), rev'd, dismissed, 589 F.2d 1225, 200 U.S.P.Q. 421 (3d Cir. 1978); E. & J. Gallo Winery v. Gallo Cattle Co., 12 U.S.P.Q.2d 1657, 1674, 1989 WL 159628 (E.D. Cal. 1989), modified, aff'd, 955 F.2d 1327, 21 U.S.P.Q.2d 1824 (9th Cir. 1992), amended, 967 F.2d 1280 (9th Cir. 1992).

*See* Simonson, "The Effect of Survey Method on Likelihood of Confusion Estimates: Conceptual Analysis and Empirical Test," 83 Trademark L. Rptr. 364 (1993) (comparing the inherent bias of an *Eveready* format with a "line-up" survey—dubbed a *Squirt* format).

of confusion." The questions were held not to be leading, for "this is not a case where the interviewer stated the similar parts of the plaintiff's name several times in questions and then asked about the defendant company."[2]

Further, although the survey was not designed to prove secondary meaning, the court of appeals held that it tdid prove secondary meaning because the results support the conclusion that "an extremely significant portion of the population associates Carbide's products with a single *anon ymous* source." Thus, if the survey results are so strong and conclusive as to establish *actual* confusion, then some courts view the results as also being evidence of secondary meaning.[3]

In a reverse confusion case, an *Eveready*-type question should be asked of potential customers of the *plaintiff's* products, not of the defendant's products.[4]

## § 32:175    Tests of properly conducted survey—Survey formats—Formats eliciting responses as to confusion of sponsorship, affiliation or connection

One often-used two-part format for eliciting responses as to both source confusion and confusion as to sponsorship, affiliation and connection is the following. The respondent is shown the accused product or advertisement and is asked: "What company do you think makes this product?" Responses naming the senior user evidence actual confusion as to source. Respondents who did not name the senior user are then asked a second question: "Do you think this product was approved, licensed or sponsored by another company or not?" If the answer is yes, respondent is asked: "What company do you think this product is approved, licensed or sponsored by?" Responses naming the senior user evidence

---

[2]*See* Sterling Drug, Inc. v. Bayer AG, 14 F.3d 733, 29 U.S.P.Q.2d 1321, 1326 (2d Cir. 1994) (The following question was found "not suggestive of any particular response": "What type of product or products, if any, are made by the company or companies mentioned in the sign?").

[3]*See* § 15:11.

[4]Sterling Drug, Inc. v. Bayer AG, 14 F.3d 733, 29 U.S.P.Q.2d 1321, 1326 (2d Cir. 1994) (since the issue is whether the senior user's products, such as BAYER aspirin, are made by the junior user, it is appropriate to survey customers of the senior user's BAYER aspirin product).

© 2005 Thomson/West, Rel. 34, 6/2005

actual confusion as to sponsorship, affiliation or connection, which is actionable.[1] Both questions should be followed up by the important question: "Why do you say that?" Often, an examination of the respondents' verbatim responses to the "why" question are the most illuminating and probative part of a survey, for they provide a window into consumer thought processes in a way that mere statistical data cannot.

It is not leading to posit the possibility to respondents that there may be some form of affiliation or licensing behind a junior user's operation. In one survey, to determine likely confusion, consumers were asked, "Though you may or may not have seen or heard of this restaurant, who do you believe sponsors or promotes MCBAGELS?" This was held not to be a leading question: "It was not unfair to hypothesize a larger entity's sponsorship of defendant's restaurant to determine whether an association with McDonald's was triggered by the name "McBagel's."[2]

However, it will probably be improperly leading to suggest the desired response in the form of a yes or no question. The following survey question was held improperly leading in that it presented respondents with the connection rather

---

**[Section 32:175]**

[1] *See* §§ 24:5-24:12.

[2] McDonald's Corp. v. McBagel's, Inc., 649 F. Supp. 1268, 1 U.S.P.Q.2d 1761 (S.D.N.Y. 1986). *Compare* Wuv's International, Inc. v. Love's Enterprises, Inc., 208 U.S.P.Q. 736, 755, 1980 WL 30296 (D. Colo. 1980) (The following question was held to be "suggestive," such that the court would not consider the results as a "reliable figure": "Do you believe that this restaurant is connected with or related to any other restaurants?"); Wendy's International, Inc. v. Big Bite, Inc., 576 F. Supp. 816, 223 U.S.P.Q. 35 (S.D. Ohio 1983) (The following question asked in a survey by party trying to prove no likely confusion of sponsorship or endorsement was said to be "unnecessarily suggestive" of a favorable response: "Does the commercial give you the impression that any other restaurant chains actually endorses the Big Bite sandwich?" Plaintiff's survey was criticized as "probing" respondents until no further responses were given, thereby prodding respondents to identify more sources than they really had in mind. "At best these surveys are inconclusive."); Hutchinson v. Essence Communications, Inc., 769 F. Supp. 541, 564 (S.D.N.Y. 1991) (a question that asks persons to assume that some entity sponsors or promotes or is associated with the junior user (a rap music performer) and then asks who that entity would most likely be was held to be improperly leading under *Universal City Studios*; the *McDonald's* question was distinguished because "restaurants are often franchises; singers rarely are").

than permitting them to make their own association: "To the best of your knowledge, was the Donkey Kong game made with the approval or under the authority of the people who produce the King Kong movies?"[3]

In the *NFL* case, defendant sold without authority football jersey replicas imitating the design, names and colors of those licensed by the National Football League. The NFL's survey asked several questions probing for consumer beliefs as to the sponsorship or affiliation by the NFL of these jerseys. The survey then asked what, in many of these cases, is the critical enquiry: "Did the company that made this jersey have to get authorization or sponsorship, that is permission, to make it?" The court viewed the high percentage of affirmative responses as persuasive evidence of confusion as to sponsorship, affiliation or connection.[4] Jacoby, who designed the question, says it was worded in this way because "it was believed that the younger and lesser educated members of the relevant universe would not

---

[3]Universal City Studios, Inc. v. Nintendo Co., 746 F.2d 112, 223 U.S.P.Q. 1000 (2d Cir. 1984). *See* IDV North America, Inc. v. S & M Brands, Inc., 26 F. Supp. 2d 815, 830-831 (E.D. Va. 1998) (Held leading because it suggested an association between the products was the question: "Do you think there is any connection between (BAILEY's Irish Cream/BAILEY's liqueur/BAILEY's alcohol, if mentioned by a respondent in the previous question) and Bailey's cigarettes?"). For other examples, *see* §§ 32:172-32:173.

[4]National Football League Properties, Inc. v. Wichita Falls Sportswear, Inc., 532 F. Supp. 651, 215 U.S.P.Q. 175, 181-83 (W.D. Wash. 1982). *But compare* Major League Baseball Properties v. Sed Non Olet Denarius, Ltd., 817 F. Supp. 1103, 26 U.S.P.Q.2d 1731, 1744 (S.D.N.Y. 1993), vacated pursuant to settlement, 859 F. Supp. 80 (S.D.N.Y. 1994) (The following survey question was found to be impermissibly "leading": "Do you believe that the restaurant had to get authorization, that is, permission to use the name, 'The Brooklyn Dodger?'"); Sports Authority, Inc. v. Abercrombie & Fitch, Inc., 965 F. Supp. 925, 42 U.S.P.Q.2d 1662 (E.D. Mich. 1997) (Survey question "Do you believe [junior user] needed permission from [senior user] to use [contested mark]?" was found "leading" because interviewees were shown two marks not usually seen side-by-side and "were implicitly directed to find a relationship between them." Court entered a summary judgment of no infringement.). *See* Mutual of Omaha Ins. Co. v. Novak, 836 F.2d 397, 5 U.S.P.Q.2d 1314 (8th Cir. 1987), cert. denied, 488 U.S. 933, 102 L. Ed. 2d 344, 109 S. Ct. 326 (1988) (results of between 10 percent and 12 percent of affirmative responses to the survey question whether the senior user "goes along with" defendant's parody t-shirts supports finding of infringement, even though there is "some ambiguity" in this question).

---

© 2005 Thomson/West, Rel. 34, 6/2005

understand the legal connotation of the terms sponsored and authorized."[5]

Jacoby asked a similar survey question in the imitation golf course case.[6] The Fifth Circuit held that the survey question "Did defendant get permission?" was a proper inquiry and was probative of confusion.[7] The court noted that another court had accepted a variation of the question which asks: "Did defendant *need* to get permission?"[8] The Fifth Circuit felt that the latter "need to get" question was "problematic" because it "allows for the consumer's misunderstanding of the law."[9] However, as the author has pointed out, it is consumer perception that creates "the law" of

---

[5]Jacoby, "Survey & Field Experimental Evidence" 187 in Kassin & Wrightsman, *The Psychology of Evidence and Trial Procedure* (1985).

[6]Pebble Beach Co. v. Tour 18 I, Ltd., 942 F. Supp. 1513 (S.D. Tex. 1996), aff'd, 155 F.3d 526, 48 U.S.P.Q.2d 1065 (5th Cir. 1998). Defendant's golf course consisted of imitations of golf holes at famous golf courses. On behalf of plaintiffs, Jacoby surveyed defendant's customers, asking in one question:

> 7 c. Tour 18 also uses the names of these other golf courses to advertise its holes and course to the public. Do you think the owner of Tour 18: (1) did get permission from the owners of these other courses to use their names at Tour 18 and to advertise Tour 18 to the public; (2) did not get permission from the owners of these other courses to use their names at Tour 18 and to advertise Tour 18 to the public; (3) or you don't have any idea about this?; (4) Don't know.

942 F. Supp. at 1549. The court found that survey results showing that 29 percent of those unaware of the dispute were confused into believing that plaintiffs gave defendant Tour 18 permission to use their marks in advertising and to name its golf holes supported a finding of a likelihood of confusion.

[7]Pebble Beach Co. v. Tour 18 I, Ltd., 155 F.3d 526, 48 U.S.P.Q.2d 1065 (5th Cir. 1998) (however, the court said that it preferred the word "approval" to the word "permission," because the court believed that it was more easily understood. 48 U.S.P.Q.2d at 1077, n.10).

[8]Indianapolis Colts v. Metropolitan Baltimore Football Club Ltd. Partnership, 34 F.3d 410, 415, 31 U.S.P.Q.2d 1811, 1816 (7th Cir. 1994) (Jacoby asked potential buyers of decedent's football merchandise whether the seller needed someone's permission to use the name in dispute).

[9]48 U.S.P.Q.2d at 1077. *See* National Football League Properties, Inc. v. Prostyle, Inc., 16 F. Supp. 2d 1012, 1018 (E.D. Wisc. 1998) (criticizing the question "Do you think that, in order to put out this shirt, the company that put it out did need to get permission, did not need to get permission, or you have no thoughts about this?" as improperly asking for a legal conclusion).

whether permission is needed.[10]

A survey dubbed the "mystery shopper" method was judicially approved as a method of proving confusion over similar trade dress. In a case in which plaintiff alleged that defendant's table lamp design was an infringement of plaintiff's expensive high-style halogen lamp, interviewers masqueraded as shoppers and asked in lamp stores for the identification of a lamp shown in a photograph, under the pretext of wanting to buy such a lamp for a friend. The interviewer showed the sales clerk a photograph of plaintiff's table lamp and asked the clerk to identify it.[11]

### § 32:176  Tests of properly conducted survey—Survey formats—Word association questions

The courts have used the term "word association survey" in different senses, leading to confusion as to what is intended. The most obvious meaning is a survey question which merely asks, "What is the first thing that comes to mind when looking at this word?" Without further probing, such a question may well be meaningless and irrelevant.[1] It is irrelevant because "calling to mind" is far removed from

---

[10]See § 24:9.

[11]Lon Tai Shing Co. v. Koch + Lowy, 19 U.S.P.Q.2d 1081, 1093-97, 1991 WL 170734 (S.D.N.Y. 1990) (the survey method was approved as one that "closely approximates real market conditions" and the result supported a finding of infringement). See: I.P. Lund Trading ApS v. Kohler Co., 118 F. Supp. 2d 92, 56 U.S.P.Q.2d 1776 (D. Mass. 2000) (mystery shopper survey failed to prove secondary meaning in a faucet product design trade dress).

[Section 32:176]

[1]See Exxon Corp. v. Texas Motor Exchange, Inc., 628 F.2d 500, 208 U.S.P.Q. 384, 389 (5th Cir. 1980) ("Surveys that involve nothing more than showing an individual a trademark and asking if it brings anything else to mind are given little weight in this circuit. . . . These surveys are seen as little more than word-association tests."); Charles Schwab & Co. v. Hibernia Bank, 665 F. Supp. 800, 3 U.S.P.Q.2d 1561 (N.D. Cal. 1987) (a survey asking "what comes to your mind?" is a "word-association" test of little weight in proving that a mark is weak); Major League Baseball Properties v. Sed Non Olet Denarius, Ltd., 817 F. Supp. 1103, 26 U.S.P.Q.2d 1731, 1744 (S.D.N.Y. 1993), vacated pursuant to settlement, 859 F. Supp. 80 (S.D.N.Y. 1994) (Criticized this survey question: "Do you associate this name with anyone or anything or do you think that it's just the name of the restaurant without any other association, or don't you know?" Court: "[T]he issue here is not whether defendants' name brings to mind any other name. . . . Rather, the issue here is one of actual

"likelihood of confusion."[2]

Another meaning of "word association survey" is a survey question which shows respondents a stimulus that does not accurately represent the mark in issue in the case. Responses may be so ambiguous and off-the-point as to be of little aid in resolving the issue in the case.[3] However, using a card with a mark shown in block letters as the survey stimulus is appropriate in Trademark Board inter partes proceeding where only registered or applied-for marks in block-letter format are in issue, without regard to special type or background.[4]

Another possible meaning of a "word association" survey is one in which the respondent is presented with the marks alone, out of context, and asked if there is a connection. This type of survey question can be criticized as deviating too far from actual market conditions to be helpful.[5]

---

confusion. Plaintiff's survey questions regarding association are irrelevant to the issue of actual confusion.").

[2]See §§ 23:5-23:9.

[3]See discussion in Jellibeans, Inc. v. Skating Clubs of Georgia, Inc., 716 F.2d 833, n.24, 222 U.S.P.Q. 10, n.24 (11th Cir. 1983); Boal, "Techniques for Ascertaining Likelihood of Confusion and the Meaning of Advertising Communications," 73 Trademark Rep. 405, 413-16 (1983) ("Because a showing of association leaves a thoughtful court pondering where to go from there (and how), it appears to have utility only when a better technique for some reason is not available."); WE Media, Inc. v. General Elec. Co., 218 F. Supp. 2d 463, 68 U.S.P.Q.2d 1108 (S.D. N.Y. 2002), judgment aff'd, 94 Fed. Appx. 29 (2d Cir. 2004) (survey responses prompted by word lists were rejected for measuring "word associations devoid of context" and for not using pictures or advertisements that approximated what a potential customer would encounter.).

[4]Miles Laboratories, Inc. v. Naturally Vitamin Supplements, Inc., 1 U.S.P.Q.2d 1445, 1986 WL 83319 (T.T.A.B. 1986). See §§ 20:14-20:18.

[5]Beneficial Corp. v. Beneficial Capital Corp., 529 F. Supp. 445, 451, 213 U.S.P.Q. 1091, 1096 (S.D.N.Y. 1982) (Respondents were asked: "Do you think that there may or may not be a business connection between Beneficial Capital Corp. and the Beneficial Finance System Companies?" The question was criticized "because when faced with the prospect of borrowing money from either plaintiffs or defendant, a consumer or business would necessarily know more about the company than the minimal information provided to the survey respondents: the names of the companies. . . . However, this proposition provides no indication of public reaction under actual market conditions, and we conclude that there is no meaningful evidence of actual confusion."). See Franklin Resources, Inc. v. Franklin

### § 32:177   Tests of properly conducted survey—Survey formats—Product "line-up" survey methods

A survey method sometimes used to test for likelihood of confusion, especially in trade dress cases, involves some variation of a method in which respondents are shown a "line-up" of products or containers and asked which, if any, of them are made by the same company.[1]

In one variation, respondents are shown the plaintiff's

---

Credit Management Corp., 988 F. Supp. 322, 45 U.S.P.Q.2d 1872 (S.D.N.Y. 1997) (applying the *Beneficial* critique to a different type of survey format to discount its probative value).

[Section 32:177]

[1]*See* Simonson, "The Effect of Survey Method on Likelihood of Confusion Estimates: Conceptual Analysis and Empirical Test," 83 Trademark Rep. 364 (1993) (comparing the inherent bias of a "line-up" survey (dubbed a *Squirt* format) with other methods, such as an *Eveready* method).

trade dress, and then, after a short delay, shown a line-up of other brands, including the accused product. Respondents are asked if any of them are made by the same company as makes the product initially seen. This is an attempt to replicate the marketplace process of advertising exposure to a brand or trade dress, followed by being confronted in the market with both similar and differing brands or trade dresses. For example, in one case, respondents were first shown plaintiff's candy wrapper claimed as trade dress, then in a second room were shown a line-up of several other brands, including the accused package. Respondents were then asked if any were the one they saw previously: "Do you think candy number—— — is made by the same company as the candy I showed you a minute or two ago in the other room, or do you think it is made by a different company?"[2] If a brand was named, a follow-up question probed for reason: "What is it that makes you think candy number ——— is made by the same company as the candy I showed you in the other room?" The court found that results of 48 percent and 34 percent linkage of plaintiff's and defendant's trade dress were probative of likely confusion and supportive of the finding that a preliminary injunction should issue against the infringing trade dress.[3]

In another variation, respondents are shown a line-up of products or brands which includes the accused mark or trade dress, but not the plaintiff's mark. After seeing the line-up, respondents are asked to recall the brand names they had seen. Those who name plaintiff's mark as one of the brands

---

[2]Storck USA, L.P. v. Farley Candy Co., 797 F. Supp. 1399, 25 U.S.P.Q.2d 1927, 1932 (N.D. Ill. 1992) (In a four-package line-up, the accused package was selected by more respondents than the packages of the three other brands in total; the court also noted that such a survey format is probative of likelihood of confusion, but not of secondary meaning, for it does not attempt to measure existing consumer awareness of plaintiff's alleged trademark or trade dress. 25 U.S.P.Q.2d at 1935.).

[3]After 48 percent linkage was found in the format where respondents were shown four non-plaintiff's packages at once, defendant criticized the format as suggesting to respondents that there is a "right" answer, encouraging guessing. Another version was run producing 34 percent linkage where respondents were shown each of three brands separately, which the court said eliminated the "right answer" bias, apparently because respondents would feel no pressure to say "yes" to any of the brands when presented singly. 25 U.S.P.Q.2d at 1933.

are counted as evidence of confusion.[4]

An adaptation of this approach is to show respondents in Phase One advertisements of four companies, including the plaintiff. Then in Phase Two, respondents are shown advertising promotions of three companies, including defendant and asked, "Was there a product or service in the booklet I showed you [in Phase One] that is from the same source or company as [shown in this exhibit in Phase Two]?" Positive answers linking plaintiff and defendant will be counted by the survey taker as evidence of likely confusion and a "noise" or "error" rate deducted.[5]

## § 32:178   Tests of properly conducted survey—Author's comment: being realistic about surveys

As Professor Perlman has noted, any survey is of necessity an imperfect mirror of actual customer behavior under real life conditions:

> The treatment of survey evidence is simplified once it is recognized that such evidence is circumstantial rather than direct evidence of confusion. The issue becomes how strong an inference of confusion can be drawn from the particular survey.[1]

It is notoriously easy for one survey expert to appear to tear apart the methodology of a survey taken by another.[2] Similarly, cross-examination of a survey expert sometimes focuses strongly on the "road not taken": Why did you not

---

[4]*See* AHP Subsidiary Holding Co. v. Stuart Hale Co., 1 F.3d 611, 27 U.S.P.Q.2d 1758 (7th Cir. 1993) (summary judgment for defendant reversed, court saying that "[w]e believe that the district court was premature in rejecting the survey evidence").

[5]Franklin Resources, Inc. v. Franklin Credit Management Corp., 988 F. Supp. 322, 45 U.S.P.Q.2d 1872, 1884 (S.D.N.Y. 1997) (The court found that the results were only of "slightly probative value." No likelihood of confusion was found and the court held for defendant).

[Section 32:178]

[1]Perlman, "The Restatement of the Law of Unfair Competition: A Work in Progress," 80 Trademark Rep. 461, 473 (1990).

[2]*See, e.g.,* President & Trustees of Colby College v. Colby College-New Hampshire, 508 F.2d 804, 185 U.S.P.Q. 65 (1st Cir. 1975); U-Haul International, Inc. v. Jartran, Inc., 522 F. Supp. 1238, 212 U.S.P.Q. 49 (D. Ariz. 1981), aff'd, 681 F.2d 1159, 216 U.S.P.Q. 1077 (9th Cir. 1982).

ask a different question? Why did you not include more people in your sample? Why did you not sample in different locations? The experienced survey expert Robert Sorensen stated that:

> It has sometimes been my experience that the more scrupulous the survey methodology and the more attention paid to survey detail, the more harassing the cross examination, and, sometimes, the more dubious the judge.[3]

One must keep in mind that there is no such thing as a "perfect" survey.[4] The nature of the beast is that it is a sample, albeit a scientifically constructed one. As Rappeport observed, there are three unavoidable constraints that render all surveys less than perfect reflections of actual human behavior and perception: (1) Persons never behave exactly the same in a survey setting as in real life. The mere fact of being observed and questioned itself compromises "normal" behavior; (2) There are never infinite resources of time and money with which to conduct a survey and explore all of the permutations and combinations; (3) Sometimes, respondents simply do not know the answer to the question that the law seeks to resolve. Rappeport concludes: "[E]ven imperfect surveys, generally speaking, can and do clarify the issues in a case. In other words, surveys are clarifying evidence, not proof."[4.1]

One must remain cognizant of the fact that, as Judge Anderson said of the survey evidence in the famous "Ther-

---

[3]Sorensen, "Survey Research Execution in Trademark Litigation: Does Practice Make Perfection?," 73 Trademark Rep. 349, 352 (1983).(Sorensen explains that this occurs because a requirement of the survey model that is explicitly stated in the report draws the cross-examiner like a magnet to find shortcomings between execution and goal. On the other hand: "A requirement unstated is a requirement ignored by the interviewer, which sometimes (but only sometimes) goes unmonitored by cross examination and court alike.").

[4]Selchow & Righter Co. v. Decipher, Inc., 598 F. Supp. 1489, 225 U.S.P.Q. 77, 86 (E.D. Va. 1984) ("It must be recognized that no survey is perfect. . . . The Court is of the opinion that the flaws exposed by the defendant should be taken into consideration in determining the weight that the Court attributes to the survey. . . . The Court, therefore, diminishes the weight it affords to the survey, but still relies upon it as evidence of the likelihood of confusion between the two products.").

[4.1]M. Rappeport, Litigation Surveys: Social Science as Evidence, 92 Trademark Rptr 957, 961 (2002).

mos" case, "any conclusion in this area cannot be reduced to a figure of unimpeachable accuracy but must, at best, be an approximation."[5] Like any scientific method related to statistics in the social sciences, every survey, no matter how carefully constructed and conducted, has some potential flaws somewhere.[6]

The proper approach is to view such evidence with some understanding of the difficulty of devising and running a survey and to use any technical defects only to lessen evidentiary weight, not to reject the results out-of-hand.[7]

*Author's Opinion*: Sometimes, the most illuminating and probative parts of a survey are not the numbers and percentages generated by the responses, but the verbatim accounts of the responses. The respondents' verbatim responses to "why" question may provide a window into consumer thought processes in a way that mere statistical data cannot.

## D.  USE OF SURVEYS IN THE PTO AND COURTS

### § 32:179  Handling objections to survey procedures

**Research References**

Trade Regulation ⬤ 23, 580

An obvious, but impractical suggestion for handling objections to survey accuracy was made by Judge Wyzanski:

It may be helpful for this Court to make certain additional observations for guidance in future cases. In every case where the results of a poll or similar survey are offered, there arises as preliminary problems the propriety of the universe, the choice of the sample, the qualifications of the experts and investigators, the manner of interviewing, the questions asked by the investigators, and the scope of freedom of the interviewee to frame an answer in his own terms. Ordinarily if the

[5]American Thermos Products Co. v. Aladdin Industries, Inc., 207 F. Supp. 9, 134 U.S.P.Q. 98 (D. Conn. 1962), aff'd, 321 F.2d 577, 138 U.S.P.Q. 349 (2d Cir. 1963).

[6]Sorensen, "Survey Research Execution in Trademark Litigation: Does Practice Make Perfection?," 73 Trademark Rep. 349, 351 (1983) ("I know of no survey, in trademark litigation or elsewhere, which fulfills one hundred percent the requirements of its model.").

[7]*See* SquirtCo v. Seven-Up Co., 628 F.2d 1086, 207 U.S.P.Q. 897, 900 (8th Cir. 1980) ("In evaluating survey evidence, technical deficiencies go to the weight to be accorded them, rather than to their admissibility."); similar cases cited *supra* at § 32:170.