Tab 16

Center for Technology, Environment, and Development
of the George Perkins Marsh Institute
Clark University
Worcester, Massachusetts 01610, USA
Phone: (508) 751-4612   Fax: (508) 751-4600

March 10, 1999

## Declaration of Robert L. Goble

I have reviewed Defendants' Reply Brief dated February 4, 1999 together with Affidavits by Dr. John Auxier and Dr. John Frazier, by Dr. Otto Raabe, by Dr. Joseph Rodericks, and by Dr. M. Laurentius Marais. In my judgment these materials reflect i) an inappropriate characterization of the nature of scientific work, and ii) insufficient care in reading my report of November 1996 (Goble 1996), particularly in relating my methods and results to the questions I addressed. Since these issues are discussed in some detail in my report, I was tempted not to respond (a choice I made earlier in these proceedings). Three concerns have caused me to change my mind. First, the Defendants argue that the expert himself should offer an hypothesis or provide reasons for using or not using a data set and statements by the lawyers who retained the expert are not an adequate substitute. Second, they cite the decision to exclude my testimony in the Hanford case: that decision contains numerous misrepresentations of my reports; these misrepresentations were contained in Defendant's briefs and my corrections were not read by the Judge because he decided that I had submitted them too late in the process; I am not eager to repeat that experience. Third, while the admissibility of scientific evidence must ultimately be a legal judgment, I believe that a scientist's perspective on what we do in science should weigh in that judgment; I have become increasingly concerned that through legal and other debates, the public is losing sight of the centrality of consensus building in science: it is the development of consensus that gives science its particular power to discover new truths and to develop applications which help people's lives. Accordingly, I will try to clarify the considerable agreement there is between Defendant's experts and me on the underlying science, along with characterizing the main points of contention. I will also try to be brief (not usually my strong point and I write this more in hope than certainty) since I believe that at issue are concerns about the overall soundness of my approach and the appropriateness of my choice of methods, not small points of data interpretation or specific methodological detail over which particular scientists may differ. I do stand by my report[1], however, and probably can not resist responding to a number of the small points.

---

[1] The report was written in 1996; at that time, as discussed in the report, the RAC review had not been completed; based on the completed review, cited by the Defendant's experts, it is possible that I would

epidemiologist I know remarks that one can define an "environmental disaster" as an exposure so large that an epidemiological study will give statistically significant results.)

As discussed in my report, my concern in this case was to provide exposure and risk information relevant to this case, namely relevant to concerns about medical monitoring and losses in property values. It is clear that people were exposed to air borne plutonium and related radioactive isotopes. How large those exposures were is less clear, but given the very limited historical data base, it is clear that considerable uncertainty about the exposures will remain. Because of the large uncertainties, for both medical monitoring and losses in property values, understanding this uncertainty and the associated range of possible exposures is the most relevant objective. Among the concerns in determining the appropriateness of medical monitoring is estimating how much disease might be found, and would the benefits of a program outweigh possible harm caused by it. But this concern must be primarily with the possible range of magnitudes of exposure (and the range of possibilities for finding disease) not with a particular estimate of exposure.

Accordingly my objective was to examine the historical data base and to use it to make a reasonable characterization of the uncertainties. The high range of such a characterization - unlikely, but not implausible, possibilities for relatively high exposures - is of particular concern for medical monitoring (as it is for protective regulation). My attitude in selecting data sets for use, therefore, was not to try to make informed judgments or inspired guesses about what most likely occurred, but rather to assess whether the data were strong enough to set limits on high exposures with reasonable confidence, while knowing that there was considerable public concern and that there would be controversy over interpretations. Thus I took an attitude which might be characterized as prudent skepticism; part of the assessment task was to consider what might go wrong in an analysis using a particular collection of information. Within the boundaries of prudent skepticism, however, I wanted to be careful not to exaggerate the uncertainty. As explained in my report, I expended considerable effort in modeling using relatively non-controversial data to avoid the exaggeration which can come from simply combining uncertainty estimates. The objective was to characterize the range of possible estimates a variety of analysts might come up with, depending on which data sets they chose to emphasize and how they treated uncertain parameters.

Such a characterization is, I believe, most pertinent to medical monitoring and to concerns about property values. It does not fall naturally into the hypothesis testing paradigm. Defendants' discussion on page 25 is illustrative. They begin with a comparison to case

concentrations near 4B. My mean value, in contrast is approximately 100 times greater, while Dr. Raabe's extend from a factor of 8 to 500 lower.

More interesting, however, is a comparison on the point of real concern. With what certainty can one rule out higher exposure values. If we use Drs. Auxier and Frazier's probability distribution as a representation of their uncertainty - the point of my approach - we would discover that they are 95% confident that the average concentrations are less than 4 times their mean (which they found agreed with observations over a limited period of time at a single monitor) and, reminiscent of the NASA engineers, they would be confident to better than one part in one hundred thousand that the values do not exceed my mean estimate. Dr. Raabe does not provide an assessment of the uncertainties in his analysis so we can not conclude anything beyond that he considers it likely that the concentrations were very small, despite the readings of that one monitor.

Now in fairness to Drs. Auxier and Frazier, they do not present their modified model as something they endorse and they make other criticisms of my work (which we will discuss later) which suggest that they would not use this model to represent their uncertainties. But nowhere do the defendants' experts provide a detailed analysis of their uncertainty in assessing the possible exposures people may have experienced.[8]

It is unfortunate that the uncertainties in estimating air concentrations (and the doses that would result from breathing that air) are so large. But the broad range for such estimates is not the fault of the analyst, and disputes about factors of two or more here and there will not alter the fundamental circumstances. The problem stems from a failure of the plant operators and the U.S. government agencies to monitor and study the effects of releases while the releases were occurring; and this was compounded by the very long time lag before anyone made a serious comprehensive attempt to establish what the impacts of the plant were.

To wrap up this somewhat prolonged discussion: my analytic objective was a reasonable characterization of uncertainty in exposures that would reflect the evidence then available and would be accessible and useful to those considering developing a medical monitoring program. This effort did not provide testable hypotheses in the narrow sense of offering a

---

[8] One might speculate that they chose not to provide such an analysis because the range would fall into the Defendants' category of "simply too broad to be reliable" and, according to Defendants, grounds for exclusion of their testimony.

8

Because plutonium is poorly absorbed when ingested and because the bulk of the releases appear to have been to the air, the exposures of interest resulted from inhalation of plutonium. Plutonium is sufficiently radioactive that its primary hazard is radiation. The isotope of most concern is plutonium-239 ($Pu^{239}$) which was the fissionable isotope used for making bombs. $Pu^{239}$ emits alpha radiation. Because their chemistry is the same and because they are produced in the reactors which produce $Pu^{239}$, other isotopes appear as well in the wastes from Rocky Flats. These include plutonium-240 which is an alpha emitter very similar to $Pu^{239}$, $Pu^{238}$ another alpha emitter, and $Pu^{241}$. $Pu^{241}$ is less significant as a radiation hazard itself, since it is a beta rather than an alpha emitter, but its decay product americium-241 ($Am^{241}$) does represent a significant component of the hazard. Because a certain amount of processing was performed to adjust the plutonium isotopic ratios, since only $Pu^{239}$ had desirable fissioning properties, the ratios among these isotopes was not totally fixed. For a significant period of time, the plant processed wastes to separate out the americium and even sold it commercially. (ChemRisk 1992, USDOE 1980) pages 111, 69.

Plutonium (and americium), once inhaled, will expose lung surfaces to radiation. In addition some of the material will be absorbed into the blood stream and travel to other organs within the body. The highest concentrations within the body and thus the highest exposures are to be found in bones, lungs, and the liver. The alpha radiation emitted by the plutonium and americium is very localized, so that, for purposes of assessing the potential health consequences of exposure it is appropriate to identify doses to the particular organs most affected.

### 4.1  History of releases

The efforts of ChemRisk, RAC, Cochran, and Budnitz (Budnitz 1996a, Budnitz 1996b, ChemRisk 1994a, ChemRisk 1994c, Cochran 1996a, Cochran 1996b, North and Budnitz 1996, RAC 1996b) have identified four principal sources of plutonium which traveled off-site: these are i) routine releases from operations and unplanned events throughout the production period, ii) releases from two plutonium fires, a large fire in 1957 and a more controlled one in 1969 (as Budnitz points out, however, control of the 1969 fire was very fortunate (Budnitz 1996a)), iii) plutonium in wind-blown soil from a contaminated storage area, the 903 pad, of leaking drums; after various attempts at dealing with this area it was paved over in late 1969; iv) resuspension of previously released plutonium from contaminated soil. ChemRisk and RAC concur in asserting that the largest releases were