Tab 21

Center for Technology, Environment, and Development
of the George Perkins Marsh Institute
Clark University
Worcester, Massachusetts 01610, USA
Phone: (508) 751-4612     Fax: (508) 751-4600

March 10, 1999

## Declaration of Robert L. Goble

I have reviewed Defendants' Reply Brief dated February 4, 1999 together with Affidavits by Dr. John Auxier and Dr. John Frazier, by Dr. Otto Raabe, by Dr. Joseph Rodericks, and by Dr. M. Laurentius Marais. In my judgment these materials reflect i) an inappropriate characterization of the nature of scientific work, and ii) insufficient care in reading my report of November 1996 (Goble 1996), particularly in relating my methods and results to the questions I addressed. Since these issues are discussed in some detail in my report, I was tempted not to respond (a choice I made earlier in these proceedings). Three concerns have caused me to change my mind. First, the Defendants argue that the expert himself should offer an hypothesis or provide reasons for using or not using a data set and statements by the lawyers who retained the expert are not an adequate substitute. Second, they cite the decision to exclude my testimony in the Hanford case: that decision contains numerous misrepresentations of my reports; these misrepresentations were contained in Defendant's briefs and my corrections were not read by the Judge because he decided that I had submitted them too late in the process; I am not eager to repeat that experience. Third, while the admissibility of scientific evidence must ultimately be a legal judgment, I believe that a scientist's perspective on what we do in science should weigh in that judgment; I have become increasingly concerned that through legal and other debates, the public is losing sight of the centrality of consensus building in science; it is the development of consensus that gives science its particular power to discover new truths and to develop applications which help people's lives. Accordingly, I will try to clarify the considerable agreement there is between Defendant's experts and me on the underlying science, along with characterizing the main points of contention. I will also try to be brief (not usually my strong point and I write this more in hope than certainty) since I believe that at issue are concerns about the overall soundness of my approach and the appropriateness of my choice of methods, not small points of data interpretation or specific methodological detail over which particular scientists may differ. I do stand by my report[1], however, and probably can not resist responding to a number of the small points.

---

[1] The report was written in 1996; at that time, as discussed in the report, the RAC review had not been completed; based on the completed review, cited by the Defendant's experts, it is possible that I would

which pretty much we agree. Drs. Auxier and Frazier and Dr. Raabe accept the basic equation expressing the relationship between air concentrations and amounts deposited in terms of a deposition velocity, and we all agree that this is a simplified representation of very complex physical processes and that because it is simplified, there are possibilities for misusing or misinterpreting it. I shall show in the next section that Drs. Auxier and Frazier and Dr. Raabe are simply mischaracterizing my methods when they assert that I am misusing the equation. For now it is worth pointing out that although the term "deposition velocity" can create a mental picture of a particle falling, the actual physics is quite different. Except for quite large particles (which do fall), most particles travel complex paths moving primarily with the surrounding air. Deposition occurs when a particle gets close enough to a surface to stick and that depends on local and instantaneous details about the surface, the particle, and the turbulence of the air flow[13]. None of these details are resolvable in environmental settings, and that is why it is appropriate to represent average amounts of deposition using a deposition velocity. Size of particle and wind speed affect deposition in systematic ways but only in some circumstances is it feasible to separate their effects from other influences.

Defendants (p. 36) and Drs. Auxier and Frazier (para 51) claim that my approach does not satisfy the requirement of logical coherence in that I assume that 100% of plutonium in soil was released during 1965-70 and that an additional 10% was released in the years 1958-64, so that, in effect, I am double counting the plutonium in the soil. This is a frivolous claim. Logical coherence is worthwhile <u>only at the level of accuracy of the analysis; we do not fault an analysis if because of rounding errors a column does not add up to exactly 100%. In this case we are considered with uncertainties of an order of magnitude (or more) and 10% can only be construed as a rounding error.</u> Indeed many scientists including myself (though I do not follow this perfectly), regard it as good scientific practice to avoid presenting more significant figures than the analysis justifies so as to avoid giving the impression of greater accuracy than the method provides.

Mistaken characterizations of my analysis

Drs. Auxier and Frazier and Dr. Raabe misread my analysis in their discussion of my treatment of particle size. We all agree that deposition velocities have a strong dependence on size of particle and that therefore one should not expect to apply a single deposition velocity to a very broad range of particle sizes. We also agree that the size of a particle very

---

[13] Sehmel, for instance, lists 80 factors that influence rates of deposition; humidity is a particularly important one (Sehmel 1980, U.S. Nuclear Regulatory Commission 1995b)

16

human activities such as the handling of the leaking tanks and attempts at clean up. Furthermore, in gusty configurations the wind may not be at the same speed for deposition as for resuspension. Most importantly, intermittent releases imply that we are very uncertain about actual surface conditions such as humidity and micro meteorology at the relevant times and these uncertainties are likely to be more important than the effects of wind speed on deposition velocity. The qualitative features of my analysis are thus not very sensitive to this choice.

Defendants mistakenly assert that I did not directly estimate plutonium exposures for periods other than 1965-70. As described in my report, I used independent data sets to estimate (uncertain ranges of) exposures from the 1957 fire and from resuspension during the period from 1971-89. I followed the RAC review to conclude that early releases - 1958-1964 - from the 903 pad were substantially smaller (10%) than in the later 1965-70 time period and expressed that assumption as a multiplier to the 1965-70 estimates making the assumption that the uncertainty in the proportion released would be subsumed under the very great uncertainty of the release estimates generally. With respect to the 1957 fire and the period from 1971-89, I did express my results from my analysis[15] as a multiplier of the 1965-70 results. The effect of doing so was to use the broad uncertainty range derived for 1965-70 also to characterize the uncertainties in the estimates for those two sets of releases. The use of the common uncertainty ranges was justified because the uncertainties in each of those other determinations were also very broad and because of its computational simplicity. An objective was to provide a readily understandable perspective for considering medical monitoring which showed what kinds of exposures might have happened over what time period. As I indicated before, there should be no issue regarding double counting of plutonium deposited since 1970 (or from the 1957 fire) since estimated concentrations are so much smaller than the estimates for the 1965-70 period. Defendants' do appear to acknowledge that my estimate of concentrations after 1971 was based on separate data in their discussion of my use Smallwood's study of bioturbation to make a release estimate. They fault Smallwood for not converting his resuspension estimate to a plutonium release; that analysis, as indicated in my report, was performed by me, and was the basis for the release estimate that I used which was one of the two bases for my post 1970 air concentration estimates.

---

[15] which was based on the RAC and Chem Risk analysis of the 1957 fire and used release estimates and the HASL air monitoring data for the 1971-89 period

18