Tab 64

# Soil Bioturbation and Wind Affect Fate of Hazardous Materials that were Released at the Rocky Flats Plant, Colorado

K. Shawn Smallwood, Ph.D.

109 Luz Place, Davis, CA  95616

*[signature]*

November 23, 1996

My curriculum vitae, which includes a list of my publications, is attached.  My list of documents relied upon is the same as my list of references in the report.  I have provided no testimony as an expert witness in any legal case.

elaboration. (*Id.* at 205:19-208:5) This is true for pondcrete (*id.* at 205:3-18); saltcrete (*id.* at 205:19-206:1); and spray irrigation (*id.* at 280:9-281:23). Nor could Dr. Smallwood testify how far off-site any material might have deposited or where any material might have been deposited off-site. (*Id.* at 190:21-24; 195:3-196:8)

**Off-site Chromium Releases** The only effort Dr. Smallwood made that approaches – but does not constitute – an estimate of a release from the plant was a hypothetical calculation of the amount of hexavalent chromium, a material that is not at issue in this case, that could "possibly" have been released due to bioturbation. Dr. Smallwood's hexavalent chromium "calculation" is an excellent example of the type of expert testimony prohibited by *Daubert* and its progeny. Dr. Smallwood's chromium calculation proceeded as follows:

1. Dr. Smallwood began with an initial chromium estimate that was taken from an on-site inventory that was prepared for the year 1974, an inventory that Dr. Smallwood admitted he had never seen. (*Id.* at 172:1-18; 176:22-177:4; 184:9-16) Despite having reviewed no documentation of the amount of chromium used at the plant other than for this single year, Dr. Smallwood assumed that *ten times* the amount listed on this inventory actually was present at the plant not just in the year of the inventory, but for 15 years. (*Id.* at 176:22-177:4, 183:11-187:4)

2. In order to get this artificially-inflated inventory of chromium out of the buildings in which it was used, Dr. Smallwood simply *assumed* that all of this chromium was deposited onto the ground outside of the buildings. As support for this assumption, Dr. Smallwood relied on a single one-page document provided to him by plaintiffs' counsel, even though he admitted at deposition that he believes that this one-page document is incomplete (*Id.* at 175:2-177:4); he does not know when it was prepared (*Id.* at 175:6-18); the document never mentions chromium (*Id.* at 174:9-19); and it relates to "volatile" compounds (*Id.* at 175:22-24), whereas chromium is a "non-volatile" compound. (*Id.* at 168:16-169:17)

3. In order to get these chromium deposits out of the soil and into the air, Dr. Smallwood fed them into an atmospheric dispersion computer model. Dr. Smallwood admitted that he is *not an expert* in atmospheric dispersion modeling, and that no one has ever asked him "to perform a calculation that determines the transportation of some contaminant through the air from one location to another

36

prior to [his] involvement in this litigation." (*Id.* at 167:16-168:1)[10] Dr. Smallwood could not testify that he had ever used this computer model before (*id.* at 165:24-167:1) and, in fact, he could not testify that he had ever "calculated an amount of material that has been transported from one point to another through the air." (*Id.* at 167:2-8) He did not know what the name of the model, "ISC," stands for. (*Id.* at 94:21-95:2)

4. This "calculation," taken thus far, provided Dr. Smallwood with his chromium-in-air values. Dr. Smallwood conceded that he did not know what location, if any, his calculated values applied to because he "didn't really think about it." (*Id.* at 190:21; 192:10). Dr. Smallwood "didn't think it was really necessary for [him] to designate an area," so "[he] didn't." (*Id.* at 195:3-196:3)

5. Dr. Smallwood then attempted to convert these values into risks. To do this, he first used an "inhalation risk factor," even though he admitted that he does not know what an "inhalation risk factor" is. (*Id.* at 192:11-19) In addition, he used risk coefficients from the EPA that he had never before encountered prior to his involvement in this litigation. (*Id.* at 165:11-22) Dr. Smallwood's calculations resulted in an estimate of "lifetime risk," but he could not identify a "risk of what," and instead he claimed that he was not an expert in performing risk calculations: "That's not my field." (*Id.* at 190:21-194:7)

6. Dr. Smallwood stressed that this "calculation" was hypothetical, and only "an illustrative example of what could happen." (*Id.* at 173:21-174:2. *See also Id.* at 191:24-192:4 ("It was intended to illustrate the *possible* concentration down wind."))

Dr. Smallwood also ignored real-world data. When asked if he had considered any of the volumes of actual air sampling data collected by CDH, EPA, the plant and others around Rocky Flats for the exact time period he claimed to cover with his hypothetical calculations, he acknowledged there were 12-15 air samplers in the buffer zone and around the perimeter of

---

[10] Smallwood further admitted that, in order to use this model, he had to make certain assumptions regarding the particle size and the respirability of the material he was modeling. (*Id.* at 190:5-10; 188:20-189:1) He was not able to explain any of the bases for the assumptions that he made because he is not an expert in those areas: "Q. What is the particle size range that's associated with something being respirable? A. *I wouldn't know because I'm not an expert in that field.*" (*Id.* at 190:5-8) (emphasis added) "Q. Have you ever studied the issue of how far particles can travel based upon their particle size? A. I have read papers on that. *I'm no expert on it. . .* " (*Id.* at 210:7-12) (emphasis added)

37

Based on reported mound erosion due to winds (Cole 1932b, Black and Montgomery 1991, Litaor *et al.* 1996), it is reasonable to assume half the excavated soils become entrained in the wind each year, then 388 m$^3$ would occupy the top 3.88 cm, under which would occur most of the plutonium originally deposited. Nine percent of the contaminated horizon would add up to 70 m$^3$ after 16 years, of which 35 m$^3$ would have become entrained in the wind, and the other 35 m$^3$ would have mixed with the clean soil. After 16 years, 423 m$^3$ of clean soil would have been excavated over and mixed with 265 m$^3$ of contaminated soil, but gopher backfilling of tunnels within the top 10 cm would have removed 25 m$^3$ to greater depths and replaced that with clean soil. Also, plant biomass would have put 16 m$^3$ of predominantly clean soil above-ground as dry biomass (DOE 1993, App. C; Whicker *et al.* 1990), and assuming half blows off in the wind, then 8 m$^3$ would cover the contaminated soil. Therefore, 476 m$^3$ of clean soil would have been mixed with 220 m$^3$ of contaminated soil for a ratio of 2.2:1. This mixing ratio is conservative because it does not account for the amount of plutonium that was resuspended before burrow construction and plant growth buried the contaminated layer. The actual mixing ratio would more likely be about 3:1 to 4:1, which overlaps the ratio argued by Webb (1992) as needed to reconcile the difference in plutonium concentrations between studies.

The following is an illustrative example of how the rate of soil bioturbation can be used to estimate airborne releases of specific contaminants in the soil. There were thousands of chemicals in the Rocky Flats inventory (Chemrisk 1991, Appendix C of Task 2 Report), but for the purpose of illustration, I just chose to estimate the amount of chromium 6$^+$ that likely suspended in wind due to releases, such as following the chromic acid spill and subsequent spray irrigation onto the grassland area just to the east of the East Trenches. Chromium 6$^+$ is toxic to humans, especially when contaminated dust particles accumulate in lung tissues (Gough *et al.*, Gough and Shacklette 1976). Following the Chemrisk screening approach, and given the following conditions and relationships between variables:

(1) the 1974 inventory of chromium (Chemrisk 1991, Appendix C of Task 2 Report) represented 1/10 of the average amount used and deposited on the ground (Al Voight memo 1971) for 15 years spanning 1960 to 1975;

(2) 50% remained chromium 6$^+$, after the other half of the inventory reduced to chromium 3$^+$ (David Brenner, personal communication, October 30, 1996);

(3) all chromium excavated by burrowing animals can be suspended in wind;

(4) all chromium 6$^+$ on the ground occurred within the top 10 cm of soil;

(5) burrowing animals excavate 1.45% (range 0.75% to 2.9%) of the soil to the surface from the top 10 cm of the soil profile (0-10 cm depth horizon) every year;

(6) and the rate of soil excavation represents the rate of chromium exposure to winds;

(7) then 204 kg of chromium 6$^+$ in the 1974 inventory resulted in 102 kg of chromium 6$^+$ deposited on the ground, which multiplied by a usage rate of 10 times the inventory (Chemrisk 1991) and 15 years, gives 15,300 kg total inventory deposited and in equilibrium depth profile by 1967;

(8) and with no depletion and considering only one-third of the chromium is respirable (Goble 1996);

(9) then 1.45% (0.73% to 2.9%) soil excavation results in 222 kg (112 kg to 444 kg) excavated to the surface per year, of which 74 kg (37 kg to 148 kg) is respirable per year;

(10) and multiplying 74,000 g/year by the Sector 4 ISC dispersion factor of $5.3 \times 10^{-15}$ (taken from Table 5.1 of Goble 1996) yields $3.92 \times 10^{-4}$ µg m$^{-3}$, which when multiplied by the inhalation unit risk factor for chromium 6$^+$ of 0.012 µg m$^{-3}$ (from EPA's IRIS data base), predicts a lifetime risk of $4.7 \times 10^{-6}$. Using the California EPA risk factor of 0.15, the lifetime risk is $5.9 \times 10^{-5}$ ($2.9 \times 10^{-5}$ to $1.2 \times 10^{-4}$).

The approach illustrated for chromium 6$^+$ could be applied to all other nonvolatile hazardous materials deposited on the ground surface at Rocky Flats.

Another illustrative example can be demonstrated for buried waste. Buried waste sites are vulnerable to intrusion by burrowing animals, as clearly evident at Trench T-9, where the burrow-ridden soil cap has subsided below grade to a depth at least equal to the thickness of the original soil cap (0.62 m, Owen and Steward ca. 1975). Based on the summary in Table 8, about 62 m$^3$ ha$^{-1}$ yr$^{-1}$ would be excavated from the East Trenches. Given the dimensions of T-9 (Chemrisk 1992), about 23.4 m$^3$ ha$^{-1}$ yr$^{-1}$ was excavated since ca. 1966, or about 703 m$^3$. If half of this amount of soil blew away in the wind, and the trench depth extends to 3.5 m below-grade, then 352 m$^3$ of material left the trench. That is, almost 3% of the trench contents, including the soil cap, would have moved downwind in 30 years, and the rest likely mixed within the confines of the trench boundary. Considering only the contaminated layer of material under the soil cap, about 7.42 m$^3$ was likely excavated to the surface every year by burrowing animals (collective burrow volume from 51 to 350 cm below grade multiplied by 0.378 ha area of the trench), or about 223 m$^3$ after 30 years. If the trench was 3.5 m deep, then this amount of material excavated to the surface accounts for nearly 4% of the original inventory. In my judgment, this estimate is conservative of what actually occurred at Trench T-9.

This pathway involving the mixing of contaminants in soils (soil bioturbation) and chronic release to the airstream has not been studied adequately, and it was not considered by Chemrisk nor studied or monitored by the operators of the Rocky Flats Plant. The fact that this pathway has not been investigated, combined with the fact that the Rocky Flats Plant included thousands of other hazardous nonvolatile chemicals, together provide another reason for medical monitoring.

*Future Risk of Resuspended Contaminants at Rocky Flats*

My preceding assessment of bioturbation impacts, and the soil samples taken in 1972-74 and 1989 (Webb 1992), indicate a changing distribution of plutonium. Some plutonium is missing from the top 3 cm of soil due to erosion. The remainder is more thoroughly mixed in the upper 30 cm of soil, and some probably was transported to greater depths. Similar changes can be assumed for other contaminants that adhere strongly to soil particles. Rates of exposure to the winds due to animal burrowing and plant growth will be more chronic. However, the magnitude of bioturbation will likely increase because prairie dog populations are expanding onto the RFP property (DOE 1992b). The presence of prairie dogs also increases the population densities and burrowing activity of other burrowing animal species (O'Meilia *et al.* 1982). Therefore, residents downwind of Rocky Flats can expect a more steady entrainment of contaminants in the airstream than they experienced during the years of Plant operations, and they can expect greater quantities of airborne contaminants than they experienced during the last several years.

threatened future invasions of class property interests must take the form of quantitative modeling. They err as well in assuming that evidence of health risks must be presented in the form of quantitative risk coeficients. Even if such a requirement were germane to testing the *sufficiency* of plaintiffs' evidence (as it is not),[71] it manifestly is not a precondition for *relevance*. Dr. Smallwood's qualitative descriptions and analysis are highly relevant to proving plaintiffs' claims on a diverse array of facts at issue. For instance, Dr. Smallwood's study:

1) characterizes the types of contaminants buried and otherwise present on the Plant site;[72]

2) describes the processes by which biological activity can make those contaminants available for suspension by wind into the off-site environs;[73]

3) explains how the ambient air monitoring stations on and off the Plant site were inadequate, poorly positioned in terms of height and spacing, and insufficiently

---

[71] Although the medical monitoring claims in this litigation have been decertified and severed, medical monitoring precedents remain instructive in evaluating the permissible forms of proof to show significant increased health risks attributable to carcinogen exposures – one core element of such claims. Courts have consistently held that such proof need not include quantification of risk. *See Paoli*, 35 F.3d at 788 ("Nor do we think that an expert must quantify the increased risk."), *cert. denied*, 513 U.S. 1190 (1995); *Ayers v. Jackson Township*, 106 N.J. 557, 525 A.2d 287 (1987) (holding that where medical experts testified that plaintiffs who had consumed contaminated well water were subject to a significant but unquantifiable increased risk of cancer, the plaintiffs had made out a medical monitoring claim).

[72] Smallwood Report at 14-29 (Ex. 27).

[73] Smallwood Report at 29-44, 45-47 (Ex. 27).

numerous to detect the past and continuing chronic releases of contaminants that are the focus of his analysis;[74] [75]

4) demonstrates how the processes of bioturbation threaten the structural integrity of buried waste trenches and landfills, permitting the formerly buried waste to come to the surface;[76]

5) shows how all contaminated materials which spilled, leaked, or were buried on-site would be subject to soil bioturbation and wind entrainment, and available for dispersion off-site;[77]

6) concludes that the suspended and resuspended plutonium and other chemicals pose a significant risk of respiration and ingestion by nearby inhabitants as borne out by local animal sampling showing ingestion and uptake of plutonium;[78]

---

[74] Smallwood Dep. at 64:1-5; 69:7-70:2; 225:6-12; 228:2-22 (Ex. 28); *see also* Smallwood Report at 25-28 (Ex. 27).

[75] Defendants are mistaken in asserting that Dr. Smallwood disregarded air sampling data. To the contrary, Dr. Smallwood reviewed some of those data, but testified that he had little confidence in them because there were too few air samplers to measure the types of chronic releases of hazardous materials he described in his report. He also stated that the samplers were inadequate because they were not at the appropriate height, nor were they sufficiently sensitive. *See* Smallwood Dep. at 55:10-56:3; 63:21-64:5 (Ex. 28). Although defendants attack Dr. Smallwod's credentials in the area of air monitoring, he has considerable experience evaluating air monitoring programs. *See* Smallwood Dep. at 65:24-66:9 (Ex. 28). He has also published a paper in a peer-reviewed journal explicitly evaluating air monitoring at nuclear weapons production facilities, including Rocky Flats – a paper that grew out of his work in this very case. *See* Morrison, M.L., K.S. Smallwood, and J. Beyea. 1997. *Monitoring the Dispersal of Contaminants by Wildlife at Nuclear Weapons Production and Waste Storage Facilities. The Environmentalist,* 17: 289-295 (Ex. 29).

[76] Smallwood Report at 3-14 (Ex. 27).

[77] Smallwood Dep. at 205:3-206:16 (Ex. 28).

[78] Smallwood Report at 48-49 (Ex. 27).

Appendix 8. Rate of mound construction per year.

| Species | Site | Mounds animal$^{-1}$ yr$^{-1}$ | Duration | Citation |
|---|---|---|---|---|
| *Thomomys talpoides* | Utah | 391 | 5 months | Richens 1966 |
| *Thomomys talpoides* | Colorado | 1496.5 | 2 days | Reid *et al.* 1966 |
| *Thomomys talpoides* | | 1043.9 | | Bailey 1929 |
| *Thomomys bottae* | Arizona | 76.9 | 3 yrs | Bandoli 1981 |
| *Thomomys bottae* | Davis alfalfa | 379.6 | 28 days | Miller 1957 |
| *Thomomys bottae* | LANL | 1818.6 | 401 days | Hakonson *et al.* 1982 |
| *Thomomys bottae* | Davis, fallow | 2737[a] | | Miller 1948 |
| *Geomys bursarius* | Indiana | 445.3 | 2 yrs | Tilman 1983 |
| *Geomys bursarius* | | 686.2 | 4 days | Mohr & Mohr 1936 |
| *Dipodomys microps occidentalis* | Nevada | 2.5[b] | | Anderson & Allred 1964 |
| *Dipodomys heermanni* | California | 1.4[b] | | Fitch 1948b |
| *Spermophilus tridecemlineatus* | Ohio | 3.6[c] | | Koprowski 1989 |
| *Spermophilus tridecemlineatus* | Oklahoma | 7.5 | | Desha 1966 |
| *Spermophilus tridecemlineatus* | Michigan | 3.6 | | Evans 1951 |
| *Spermophilus townsendii* | Hanford-ALE | 2.68[b] | | Voth 1976 |
| *Spermophilus townsendii* | Nevada | 2.17[b] | | Alcorn 1940 |
| *Spermophilus beecheyi* | Madera, California | 17.2[c] | | Fitch 1948a |
| *Spermophilus beecheyi* | Madera, California | 19.4[b] | | Fitch 1948a |
| *Taxidea taxus* | Idaho | 2952 | | Messick & Hornocker 1981 |

[a] Calculated soil plugs as 25% of volume of soil mounds.
[b] Used 1 burrow per year in calculations.
[c] Used one hole per animal per year in calculations.

Case No. 1:90-cv-00181-JLK   Document 1426-71   filed 08/22/05   USDC Colorado   pg 9 of 9

91