Tab 65

# Reference Manual on Scientific Evidence

Federal Judicial Center 1994

This Federal Judicial Center publication was undertaken in furtherance of the Center's statutory mission to develop and conduct education programs for judicial branch employees. The views expressed are those of the authors and not necessarily those of the Federal Judicial Center.

A.169

A confidence interval is based on the standard error. If the standard error is small, the estimate probably is close to the truth. If the standard error is large, the estimate may be seriously wrong.

3.  What do standard errors and confidence intervals mean?

An estimate based on a sample will differ from the exact population value due to random error; the standard error measures the likely size of the random error. Confidence intervals are a technical refinement, and confidence is a term of art.[128] For a given confidence level, a narrower interval indicates a more precise estimate. For a given sample size, increased confidence can be attained only by widening the interval. A high confidence level alone means very little, but a high confidence level resulting in a small interval is impressive.[129] It indicates that the random error in the sample estimate is low.

Both the standard error and the confidence interval are derived using a particular model of statistical error. A statistical model expresses the way random error works and generally contains parameters that characterize the population from which the samples were drawn.[130] The data in our example came from a random sample, and that guaranteed the validity of the statistical calculations.[131]

---

128. In the standard frequentist theory of statistics, one cannot make probability statements about population characteristics. See, e.g., Freedman et al., supra note 12, at 351–53; infra § IV.B.1. Because of the limited technical meaning of confidence, it has been argued that the term is misleading and should be replaced by a more neutral one, such as frequency coefficient, in courtroom presentations. David H. Kaye, Is Proof of Statistical Significance Relevant?, 61 Wash. L. Rev. 1333, 1354 (1986).

129. Conversely, a broad interval signals that random error is substantial. In Cimino v. Raymark Indus., Inc., 751 F. Supp. 649 (E.D. Tex. 1990), the district court drew certain random samples from more than 6,000 pending asbestos cases, tried these cases, and used the results to estimate the total award to be given to all plaintiffs in the 6,000 cases. The court then held a hearing to determine whether the samples were large enough to provide accurate estimates. Id. at 664. The court's expert, an educational psychologist, testified that the estimates were accurate because the samples matched the population on such characteristics as race and the percentage of plaintiffs still alive. Id. However, the matches occurred only in the sense that population characteristics fell within very broad 99% confidence intervals computed from the samples. The court thought that matches within the 99% confidence intervals proved more than matches within 95% intervals. Id. Unfortunately, this is backwards. It is not very impressive to be correct in a few instances with a 99% confidence interval, because, by definition, such intervals are broad enough to ensure coverage 99% of the time. Cf. Michael J. Saks & Peter David Blanck, Justice Improved: The Unrecognized Benefits of Aggregation and Sampling in the Trial of Mass Torts, 44 Stan. L. Rev. 815 (1992).

130. In our example, one parameter is the pass rate of the 5,000 male applicants; another parameter is the pass rate of the 5,000 female applicants. These two parameters determine the probabilities of observing the various possible values for the sample difference, according to a set of mathematical equations. The statistical problem consists of working backwards from the sample data to the population parameters.
    When the parameters are known, the analyst may use the model to find the probability of an observed outcome (or one like it). This approach is common in cases alleging discrimination in the selection of jurors. E.g., Castaneda v. Partida, 430 U.S. 482, 496 (1977); David H. Kaye, Statistical Evidence of Discrimination in Jury Selection, in Statistical Methods in Discrimination Litigation, supra note 7, at 13. Cf. Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 311 n.17 (1977) (computing probabilities of selecting black teachers). Although such problems in applied probability theory are not explicitly treated in this reference guide, the Appendix presents some relevant calculations.

131. Partly because the Supreme Court used models giving rise to variables that are approximately normal in Hazelwood and Castaneda, courts and attorneys sometimes are skeptical of models and analyses that produce other types of random variables. See, e.g., EEOC v. Western Elec. Co., 713 F.2d 1011 (4th Cir. 1983), discussed in David H. Kaye, Ruminations on Jurimetrics: Hypergeometric Confusion in the Fourth Circuit, 26 Jurimetrics J. 215 (1986). But cf. Branion v. Gramly, 855 F.2d 1256 (7th Cir. 1988) (questioning an apparently

---

*Reference Manual on Scientific Evidence*

The choice of an appropriate model in other situations may be less obvious.[132] When a model does not describe well the process giving rise to the data, the estimate and its standard error are less probative.[133]

Furthermore, the standard error and the confidence interval generally ignore systematic errors, such as selection bias or nonresponse bias.[134] For example, one court—reviewing studies of whether a particular drug causes birth defects—observed that mothers of children with birth defects may be more likely to remember taking a drug during pregnancy than women with normal children.[135] This selective recall would bias comparisons between samples from the two groups of women. The standard error for the estimated difference in drug usage between the two groups ignores this bias, as does the confidence interval.[136]

arbitrary assumption of normality), *cert. denied*, 490 U.S. 1008 (1989), *discussed in* David H. Kaye, *Statistics for Lawyers and Law for Statistics*, 89 Mich. L. Rev. 1520 (1991). Whether a given variable is normally distributed is an empirical or statistical question, not a matter of law. That a particular model has been used in a previous case may be of limited value in deciding whether it is appropriate in the case at bar. *See generally* Statistical Methods in Discrimination Litigation, *supra* note 7, at iii; Laurens Walker & John Monahan, *Social Facts: Scientific Methodology as Legal Precedent*, 76 Cal. L. Rev. 877 (1988).

132. For examples of legal interest, see, *e.g.*, Mary W. Gray, *Can Statistics Tell Us What We Do Not Want to Hear?: The Case of Complex Salary Structures*, 8 Stat. Sci. 144 (1993); Arthur P. Dempster, *Employment Discrimination and Statistical Science*, 3 Stat. Sci. 149 (1988). One statistician describes the issue as follows:

> [A] given data set can be viewed from more than one perspective, can be represented by a model in more than one way. Quite commonly no unique model stands out as "true" or correct; justifying so strong a conclusion might require a depth of knowledge that is simply lacking. So it is not unusual for a given data set to be analyzed in several apparently reasonable ways. If conclusions are qualitatively concordant, that is regarded as grounds for placing additional trust in them. But more often, only a single model is applied, and the data are analyzed in accordance with it . . . .
>
> Desirable features in a model include (i) tractability, (ii) parsimony, and (iii) realism. That there is some tension among these is not surprising.
>
> *Tractability*. A model that is easy to understand and to explain is tractable in one sense. Computational tractability can also be an advantage, though with cheap computing available not too much weight can be given to it.
>
> *Parsimony*. Simplicity, like tractability, has a direct appeal, not wisely ignored—but r . . wisely over-valued either. If several models are plausible and more than one of them fits adequately with the data, then in choosing among them, *one* criterion is to prefer a model that is simpler than the other models.
>
> *Realism*. . . . First, does the model reflect well the actual . . . [process that generated the data]? This question is really a host of questions, some about the distributions of the random errors, others about the mathematical relations among the [variables and] parameters. The second aspect of realism is sometimes called robustness: If the model is *false* in certain respects, how badly does that affect estimates, significance test results, etc., that are based on the flawed model?

Lincoln E. Moses, *The Reasoning of Statistical Inference*, in Perspectives on Contemporary Statistics, *supra* note 22, at 107, 117–18.

133. It still may be helpful to consider the standard error, perhaps as a minimal estimate for statistical uncertainty.

134. For a discussion of such systematic errors, see *supra* § II.B.

135. Brock v. Merrell Dow Pharmaceuticals, Inc., 874 F.2d 307, 311–12 (5th Cir.), *modified*, 884 F.2d 166 (5th Cir. 1989), *cert. denied*, 494 U.S. 1046 (1990).

136. In *Brock*, the court held that the confidence interval took account of bias (in the form of selective recall) as well as random error. 874 F.2d at 311–12. With respect, we disagree. Even if sampling error were nonexistent, which would be the case if one could interview every woman who had a child in the period that the drug was available, selective recall would produce a difference in the percentages of reported drug exposure between mothers of children with birth defects and those with normal children. In this hypothetical situa-

*Statistics*

377

A.171