Tab 4

Westlaw.

879 F.2d 1518    Page 1
879 F.2d 1518, 28 Fed. R. Evid. Serv. 400
**(Cite as: 879 F.2d 1518)**

879 F.2d 1518, 28 Fed. R. Evid. Serv. 400

United States Court of Appeals, Seventh Circuit.
AGFA-GEVAERT, A.G., and Agfa-Gevaert, N.V.,
Plaintiffs-Appellees,
v.
A.B. DICK COMPANY, Defendant-Appellant.
**No. 88-2729.**

Argued April 7, 1989.
Decided July 18, 1989.

Supplier brought breach of contract action against distributor and distributor counterclaimed for fraud. The District Court for the Northern District of Illinois, James B. Zagel, J., directed verdict for supplier on liability and rendered judgment on jury verdict awarding damages. Distributor appealed. The Court of Appeals, Posner, Circuit Judge, held that: (1) trial court properly dismissed distributor's fraud counterclaim; (2) issue of whether contract in question was a requirements contract was for jury; (3) jury improperly measured damages; and (4) trial court applied correct judgment-date rule for converting foreign into domestic currency.

Reversed and remanded, with directions.

Ripple, Circuit Judge, concurred and filed opinion.

West Headnotes

**[1] Federal Courts 170B €→412.1**
170Bk412.1 Most Cited Cases
(Formerly 170Bk412)
In breach of contract diversity action, district court sitting in Illinois was required to honor choice of law provision in contract since Illinois courts would do so.

**[2] Fraud 184 €→25**
184k25 Most Cited Cases
Defendant's fraud counterclaim against plaintiff alleging that plaintiff extracted amendment to contract by fraudulently stating that it could not supply defendant with number of products defendant requested was properly dismissed where defendant learned, prior to signing contract amendment, that plaintiff was both able and willing to supply requested number provided that price was right, and therefore defendant could not have been harmed by plaintiff's statement.

**[3] Federal Civil Procedure 170A €→2141**
170Ak2141 Most Cited Cases
Questions involving division of responsibilities between judge and jury are questions of federal law even in a case where the substantive issues are governed by state law.

**[4] Evidence 157 €→397(1)**
157k397(1) Most Cited Cases
Under the "four corners" rule of contract interpretation, if a written contract is clear "on its face," evidence may not be introduced to vary that apparent meaning.

**[5] Contracts 95 €→248**
95k248 Most Cited Cases
Whether amendment to distributorship agreement obligated distributor to take its requirements for low-volume plain-paper copiers from supplier presented question for the jury in supplier's breach of contract action against distributor.

**[6] Evidence 157 €→320**
157k320 Most Cited Cases

**Evidence 157 €→555.4(3)**
157k555.4(3) Most Cited Cases
Statements made by supplier's expert witness and by supplier's own board of directors regarding quality of product supplied were not hearsay merely because statements were based on what expert and directors had been told by customers and engineers; assessments of directors and expert were inferential, and as long as they were the sorts of inferences that businessmen customarily draw, they would count as personal knowledge. Fed.Rules Evid.Rules 602, 703, 28 U.S.C.A.

**[7] Sales 343 €→384(1)**
343k384(1) Most Cited Cases
In breach of alleged requirements contract, jury should not have been allowed to measure damages by sales that supplier would have had if distributor had promoted product as vigorously as supplier thought he could have done, but rather damages should have been based on how much distributor bought from his alternative suppliers.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case No. 1:90-cv-00181-JLK   Document 1427-4   filed 08/22/05   USDC Colorado   pg 3 of 9

879 F.2d 1518                                                                                              Page 2
879 F.2d 1518, 28 Fed. R. Evid. Serv. 400
(Cite as: 879 F.2d 1518)

**[8] Statutes 361 ⚷267(2)**
361k267(2) Most Cited Cases
Statutes regulating the details of procedure ordinarily are applied to pending as well as new proceedings.

**[9] Contracts 95 ⚷127(1)**
95k127(1) Most Cited Cases
Parties cannot by contract require a court to follow procedures unfamiliar to it.

**[10] Contracts 95 ⚷354**
95k354 Most Cited Cases
In breach of contract action in which contract called for application of New York law, trial judge correctly applied New York's judgment-date rule for converting foreign into domestic currency to jury's verdict.

*1519 Michael J. O'Rourke, Mark E. Weber, Alan Salpeter, Mayer, Brown & Platt, Chicago, Ill., David J. Branson, Kaye, Scholer, Fierman, Hays & Handler, Washington, for plaintiffs-appellees.
Donald R. Harris, Barry Levenstam, Michael T. Brody, Andrea B. Friedlander, Jenner & Block, Steven P. Handler, Janet Koran, Mark E. Shure, McDermott, Will & Emery, Chicago, Ill., for defendant-appellant.

Before POSNER, EASTERBROOK and RIPPLE, Circuit Judges.

POSNER, Circuit Judge.
Two affiliated European firms (collectively Agfa) brought this breach of contract suit against A.B. Dick Company under the alienage component of the diversity jurisdiction (28 U.S.C. § 1332(a)(2)). The district judge directed a verdict for Agfa on the liability issues, and the jury then awarded Agfa $10.1 million-after conversion from Deutsche marks-in damages.

*1520 Agfa had designed a low-volume, plain (i.e., uncoated) paper copier that it called the A-1. In 1978 it signed a contract with A.B. Dick making Dick the exclusive North American distributor of the A-1, which at the time existed only in prototype form. The contract required Dick to buy a minimum of 3,750 A-1s in the first twelve months after Agfa reached a specified production level, and also provided that Dick would lose its exclusive unless it bought specified quantities of the A-1 in subsequent years.

At first Dick was extremely enthusiastic about the A-1-so much so that it wanted to buy 20,000 machines in 1980. Agfa refused, saying it didn't have the production capacity. Dick countered with the offer of a substantially higher price. Agfa relented, and in January 1980 the parties executed the "amendatory agreement" that is the focus of this lawsuit. Agfa agreed that it would sell Dick 16,000 machines in 1980 and that in subsequent years it "will furnish DICK its requirements for A-1 Copier Machines in accordance with DICK's orders, which AGFA-GEVAERT shall accept, but not more, without AGFA-GEVAERT's consent, than twenty thousand (20,000) machines in any one year." The agreement also provided that, after 1980, Dick's order for any month could not be more than 15 percent higher or lower than its order for the preceding month. The amended contract was to run through August 31, 1984.

Soon after the amendatory agreement was signed, Dick encountered problems with customer acceptance of the A-1, and its sales of the machine dropped; whether this was due to quality problems, obsolescence, Dick's own marketing weaknesses, or some combination of these factors is uncertain. From as early as January 1981 Dick had been exploring with the Japanese manufacturer Copyer the possibility of replacing the A-1 with a more up-to-date machine, and in August 1981 Dick notified Agfa that it was going to terminate the contract and gradually "order down to zero." It took delivery of A-1's for the last time the following June, having reduced its orders by 15 percent a month (the most allowed by the amendatory agreement) since the notification. In November (1982) Dick signed a contract with Copyer to distribute the latter's low-volume plain-paper copier in place of the A-1. At about the same time Agfa stopped making the A-1-which was obsolete-and began distributing in its European markets the same Japanese copier that Dick had just bought.

[1] [2] The contract stated: "Construction of this Agreement shall be in accordance with the laws of the State of New York." The district court was required in this diversity case to honor the choice of law provision if an Illinois court would do so, and it would. See *SCA Services, Inc. v. Lucky Stores,* 599 F.2d 178, 180 (7th Cir.1979). Applying New York law therefore, the district judge held that the January 1980 amendatory agreement was a requirements contract that obligated Dick to buy its entire requirements of low-volume plain-paper copiers from

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

879 F.2d 1518                                                                                             Page 3
879 F.2d 1518, 28 Fed. R. Evid. Serv. 400
**(Cite as: 879 F.2d 1518)**

Agfa. The judge also held (having excluded on various grounds much testimony, and a number of exhibits, that Dick had offered to show that the A-1 was of unacceptable quality) that Dick had broken the contract by ceasing to buy the A-1, because Dick's requirements for low-volume plain-paper copiers had not fallen to zero in August 1981. The judge also dismissed Dick's counterclaim, which charged that Agfa had extracted the January 1980 agreement by fraudulently stating that it was unable to supply Dick with the 20,000 machines a year that Dick wanted. The dismissal was clearly correct. Before signing the agreement Dick learned that Agfa was both able and willing to supply that many machines provided the price was right. Therefore Dick could not have been harmed by Agfa's original statement-which in any event obviously meant, not "can't," but, consistent with the existing contract, "won't at the current price."

With all liability issues thus disposed of, the case went to the jury only for an assessment of damages. Agfa based its damages estimation not on Dick's sales of the Japanese copier that it had substituted for the A-1 but on the sales that Agfa's expert thought Dick would have made had *1521 it promoted the A-1 effectively. The judge then converted the jury's verdict of 11,844,570DM into dollars, using the exchange rate on the date of judgment; had he used the date of breach instead, as urged by Dick, the judgment would have been for $7.4 million rather than for $10.1 million.

On the central question raised by the appeal we find ourselves in respectful disagreement with the district judge's holding that the January 1980 amendment to the distributor agreement unambiguously obligated Dick to take its requirements for low-volume plain-paper copiers from Agfa. The natural reading of the agreement is to the contrary. The amendment requires Agfa to furnish Dick with the latter's "requirements for A-1 Copier Machines." A-1 is not a generic term for low-volume plain-paper copiers, nor even the type of well-known brand name that frequently (to the great distress of the trademark owner) is mistaken for the generic name, such as "Kleenex" or "Xerox." A-1 is the name of a particular brand and model of low-volume plain-paper copiers. At first glance the amendment obligates Agfa to sell Dick as many A-1 copying machines as Dick requires, starting with 16,000 in 1980 and rising to a maximum of 20,000 in subsequent years, and obligates Dick only to pay a specified price for the machines it buys. But let us not ignore the 15 percent cap on monthly purchase changes, which in combination with Dick's obligation to buy 16,000 machines in 1980 assured Agfa substantial sales regardless, and the history of the parties' dealings over the A-1. Dick wanted more machines than Agfa could comfortably supply, and to get them agreed to pay a high price. Agfa would not agree to supply *all* of Dick's requirements even at the high price, but only 16,000 machines in the first year and 20,000 in each of the subsequent years of the contract. So read, the agreement is perfectly intelligible and *not* a requirements contract, which obligates the buyer to buy all his requirements from the seller. Looked at from the seller's side, a requirements contract guarantees him a market for his good; in exchange he must offer the buyer a price break. The January 1980 amendatory agreement looks like the opposite of a requirements contract, despite the presence of the word "requirements"; for it merely assures the buyer, Dick, a greater supply, and in exchange Dick agrees to pay a premium. It does not *seem* to obligate Dick to take more than it wants.

[3] We hesitate to conclude, however, that the judge should have directed a verdict *for* Dick. To explain this conclusion requires us to consider two ways of looking at the question of the respective role of judge and jury in a case involving the interpretation of a contract, a procedural way and a substantive way. The black-letter procedural rule is that the meaning of a written contract is a question of law and is therefore to be decided by the judge rather than by the jury. Like a number of other questions involving the division of responsibilities between judge and jury, see, e.g., *Abernathy v. Superior Hardwoods, Inc.,* 704 F.2d 963, 970-71 (7th Cir.1983), it is a question of federal law even in a case where the substantive issues are governed by state law. See *Cooper Laboratories, Inc. v. International Surplus Lines Ins. Co.,* 802 F.2d 667, 671 (3d Cir.1986) ; *Meyers v. Selznick Co.,* 373 F.2d 218, 222 n. 1 (2d Cir.1966) (Friendly, J.). The old rule has, however, largely given way to a new one, that the question of meaning is for the jury unless it can be answered in only one way. See, e.g., *id.* at 223; *LaSalle National Bank v. Service Merchandise Co.,* 827 F.2d 74, 78 (7th Cir.1987) ; Restatement (Second) of Contracts, § 212 (1981).

[4] The black-letter substantive rule, sometimes called the "four corners" rule, see *FDIC v. W.R. Grace & Co.,* 877 F.2d 614, 620-22 (7th Cir.1989), is that if a written contract is clear "on its face"-that is, clear to someone who can read English but does not know the background of the contract-evidence may

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

879 F.2d 1518                                                                                                                    Page 4
879 F.2d 1518, 28 Fed. R. Evid. Serv. 400
**(Cite as: 879 F.2d 1518)**

not be introduced to vary that apparent meaning. The practical effect is to confine the power to decide in such cases to the judge, for the issue of interpretation can be answered only one way. As explained in *Grace,* the four-corners rule has now pretty much yielded to a rule that "extrinsic" evidence may be introduced*1522 not only if the written contract is ambiguous on its face, but also to show that it is ambiguous. This evolution of substantive law parallels that on the procedural side, the upshot being that the jury decides the meaning of the contract in all cases in which that meaning has for any reason been fairly drawn into doubt.

[5] The wisdom of the trend may be questioned; modern commercial disputes often are complex, and few jurors are drawn from the ranks of the commercially sophisticated. More to the point, New York has resisted the trend, retaining the four-corners rule. See, e.g., *Schmidt v. Magnetic Head Corp.,* 97 A.D.2d 151, 468 N.Y.S.2d 649 (1983) ; *Bank Itec N.V. v. J. Henry Schroder Bank & Trust Co.,* 612 F.Supp. 134, 138-39 (S.D.N.Y.1985) (applying New York law). And that is a substantive rule which binds the federal courts in this diversity case. However, the January 1980 amendatory agreement is sufficiently ambiguous on its face to make its meaning a question for the jury under the New York rule. For the use of the word "requirements" *may* have been intended to sort the contract into the requirements-contract bin, and the term "A-1 Copier Machines" *may* have been a maladroit shorthand for "low-volume plain-paper copier machines."

So the case must be remanded for a new trial on liability. All the other issues presented by Dick's appeal will be moot if the jury finds that the January 1980 agreement was not a requirements contract and hence was not broken when Dick stopped buying the A-1. But as the jury may not find this, we shall go on and resolve the other issues (besides the one we have already resolved, dealing with the counterclaim) to avoid a subsequent appeal if possible.

The first such issue is whether, assuming the January 1980 agreement did create a requirements contract, Dick acted in good faith, and therefore without incurring liability, in reducing its requirements to zero. Dick points to the quality problems and unexpectedly early obsolescence of the A-1 as showing good faith. The district court rejected the argument as an afterthought, believing that Dick had simply misread the contract as not being a requirements contract and had acted accordingly.

There is some merit, certainly, to the proposition that the concern with poor quality and obsolescence was an afterthought. If the A-1 didn't conform to the contract, Dick could have rejected it. See UCC § 2-601(a). Dick never rejected a shipment of A-1s. In any event, the question whether Agfa may have breached an express or implied warranty accompanying the sale of the A-1 is distinct from the question whether Dick lowered its requirements in good faith. We are assuming (solely for the sake of argument) that on remand the jury finds that the amendatory agreement signed in January 1980 obligated Dick to buy all its requirements of *low-volume plain-paper copiers* from Agfa. If the agreement did so obligate it, logically this would make the question of good faith whether Dick had a good commercial reason-independent of the terms of the contract-for discontinuing its purchase of low-volume plain-paper copiers, see *Empire Gas Corp. v. American Bakeries Co.,* 840 F.2d 1333, 1339-41 (7th Cir.1988), not whether the particular A-1s that Agfa supplied on particular occasions were of conforming quality. If they were not of such quality Dick could have rejected them, demanded a conforming substitute, perhaps rescinded the contract. But this would have had nothing to do with lowering its requirements for low-volume plain-paper copiers. It could lower those requirements and still be acting in good faith if some change in its business reduced or eliminated its need for the product. But there was no such change. We know this because Dick continued buying low-volume plain-paper copiers-it just switched suppliers.

The defendant in *Empire Gas,* shortly after agreeing to buy its requirements of propane and propane-conversion kits from the plaintiff, changed its mind about converting its fleet of trucks from gasoline to propane; as a result it no longer had any "requirements" for propane or for propane-conversion kits. The question of good *1523 faith was whether the plaintiff had changed its mind for a reason independent of the terms of the contract-such as a decision to sell its bakery business-or simply had thought better of the contract and wanted "out." In the latter case, the lowering of requirements would not be in good faith; for a requirements contract is not just an option to buy. Dick merely substituted another low-volume plain-paper copier for Agfa's. That is, it sought to fulfill its requirements from another supplier, which it could *not* do if it had promised to buy its requirements for low-volume plain-paper copiers from Agfa.

But all this may be a bit too logical. Dick's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case No. 1:90-cv-00181-JLK   Document 1427-4   filed 08/22/05   USDC Colorado   pg 6 of 9

879 F.2d 1518                                                                                                           Page 5
879 F.2d 1518, 28 Fed. R. Evid. Serv. 400
(Cite as: 879 F.2d 1518)

agreement to buy its requirements of low-volume plain-paper copiers from Agfa was conditioned on assumptions and undertakings concerning the quality of the A-1, and a breach of those undertakings might be a ground for termination. So at least Dick tried to prove, but its ability to do so was crippled by the judge's wholesale exclusion of evidence on the quality problems of the A-1, an exclusion that paved the way for the judge's conclusion (itself an encroachment on the jury's factfinding domain) that concern with those problems played no role in Dick's decision to order down.

Since the case must be retried, since the issue of good faith may become moot, and since not all the same evidence may be offered, we hesitate to discuss every item of excluded evidence. Some of it certainly was redundant and some predated the amendatory agreement and was of only tenuous relevance to the dispute over that agreement, but we are left with a concern that in several instances the judge may have disregarded the presumptive admissibility of probative evidence under Fed.R.Evid. 403.

[6] The items whose exclusion we especially question were statements by the plaintiff's expert witness and by Agfa's own board of directors regarding the quality of the A-1. The principal ground for exclusion was that these statements were based on what the expert and the directors had been told by customers and engineers and were therefore hearsay. We agree only up to "therefore." Business executives do not make assessments of a product's quality and marketability by inspecting the product at first hand. Their assessments are inferential, and as long as they are the sorts of inference that businessmen customarily draw they count as personal knowledge, not hearsay. See *Navel Orange Administrative Comm. v. Exeter Orange Co.*, 722 F.2d 449, 453 (9th Cir.1983) ; *Robinson v. Watts Detective Agency, Inc.*, 685 F.2d 729, 739 (1st Cir.1982) ("most knowledge has its roots in hearsay"); *Kaczmarek v. Allied Chemical Corp.*, 836 F.2d 1055, 1060 (7th Cir.1987) (dictum). All perception is inferential, and most knowledge social; since Kant we have known that there is no unmediated contact between nature and thought. Knowledge acquired through others may still be personal knowledge within the meaning of Fed.R.Evid. 602, rather than hearsay, which is the repetition of a statement made by someone else-a statement offered on the authority of the out-of-court declarant and not vouched for as to truth by the actual witness. Such a statement is different from a statement of personal knowledge merely based, as most knowledge is based, on information obtained from other people.

The same principles apply to the acquisition of knowledge by expert witnesses. See Fed.R.Evid. 703 , and Note of Advisory Committee thereto; *Soo Line R.R. v. Fruehauf Corp.*, 547 F.2d 1365, 1377 (8th Cir.1977).

[7] The next issue that may or may not wash out on remand concerns damages for breach of a requirements contract. The jury should not have been allowed to measure these damages by the sales the seller (Agfa) would have had if the buyer had promoted the product as vigorously as an expert witness (or any other witness) thinks the buyer could have done. When a distributor obligates himself to use his best efforts to promote a product and then breaks his contract, the remedial question is indeed how much he would have sold had he used his best efforts, implying diligent and energetic promotion. See *Bloor v. *1524 Falstaff Brewing Corp.*, 601 F.2d 609 (2d Cir.1979) (Friendly, J.); *Perma Research & Development v. Singer Co.*, 542 F.2d 111 (2d Cir.1976). But when he agrees merely to take his requirements of a particular product from the seller, and breaks his contract by satisfying those requirements elsewhere, the question is how much he bought from his alternative supplier(s). See *Universal Power Systems, Inc. v. Godfather's Pizza, Inc.*, 818 F.2d 667, 672 (8th Cir.1987). What he required, he bought; what he did not buy, he must not have required.

[8] The last issue that merits discussion is the proper date for converting a judgment denominated in a foreign currency into U.S. dollars. The judge used the date of the judgment, as expressly required by section 27(b) of the New York Judiciary Law. Although that section was added in 1987, years after the events giving rise to this suit (though before the trial, which took place in 1988), statutes regulating the details, even the important details, of procedure ordinarily are applied to pending as well as new proceedings. We are given no reason to believe that New York courts would do otherwise here, especially given the pre-1987 trend in the New York courts (weak though it was), toward use of the judgment date rather than the breach date. See *Teca-Print A.G. v. Amacoil Machinery, Inc.*, 138 Misc.2d 777, 525 N.Y.S.2d 535 (S.Ct.N.Y.Cty.1988). Moreover, the judgment-date rule is generally favored, on the ground that it yields the same judgment regardless of which country the case is tried in, see Restatement (Second) of Conflict of Laws, § 144 (1971), though

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

879 F.2d 1518 Page 6
879 F.2d 1518, 28 Fed. R. Evid. Serv. 400
**(Cite as: 879 F.2d 1518)**

only if the litigation would have taken the same amount of time in every country. In this connection we point out that the contract in this case contains a forum-selection clause, whereby the suit was to be brought in Illinois if (as turned out to be the case) Dick was the defendant and in Germany if Agfa was the defendant. Perhaps the strongest consideration is that the judgment date is a day certain, whereas it may be difficult to pinpoint the day on which the breach of contract occurred.

The issue of breach date versus judgment date may have little importance in the larger scheme of things. Upon it turns only the risk of currency fluctuations between the date of breach and the date of judgment, and either party can hedge against the risk by buying currency futures, now readily available. All that is important is that the rule be clear, if possible before the contract is signed. Indeed, as an original matter it is far from obvious why conversion is required-the defendant could be ordered to pay the judgment in the same currency denominated in the contract. Yet if there is to be conversion, perhaps the judgment-date rule really is the better rule even apart from its greater certainty. It orders the defendant to pay on the date of judgment the amount of dollars necessary to purchase the exact amount of foreign currency specified in the judgment, and this is the equivalent of ordering the defendant to pay in foreign currency directly, without conversion.

Dick further argues, however, that the law of the forum state (Illinois) governs procedural questions, rather than New York law as specified in the contract's choice of law provision. (If nothing else, the present case abundantly illustrates the slipperiness of the legal terms "procedure" and "substance.") This complex issue can be simplified by asking first what the parties intended. Although read literally the choice of law provision in the contract concerns only issues of interpretation, we think it more likely than not that the parties intended New York law to govern not only the question whether there was a breach of contract but also the question of the extent of liability for any breach-indeed, Dick does not argue otherwise. That is the usual approach to choice of law questions. See, e.g., *Patton v. Mid-Continent Systems, Inc.,* 841 F.2d 742, 750 (7th Cir.1988); Leflar, American Conflicts Law § 126 (3d ed. 1977). In contract cases especially, the issue of the proper remedy often is just as important as the issue whether the contract was broken; so the choice of law clause would be broken-backed if it excluded issues of remedy, including the conversion date. We are supported in this interpretation of the clause by the cases, **1525** applying Illinois law, which hold that entitlement to prejudgment interest is governed by the law of the state whose law determines liability. See *American Home Assurance Co. v. Dykema, Gossett, Spencer, Goodnow & Trigg,* 811 F.2d 1077, 1088 (7th Cir.1987), and cases cited there. And *SCA Services, Inc. v. Lucky Stores, supra,* 599 F.2d at 180, interpreted a choice of law provision (albeit one more broadly worded than the one in this case) to cover "the measure of recovery in the event of breach."

It is true that *Ingersoll Milling Machine Co. v. Granger,* 833 F.2d 680, 692 (7th Cir.1987), can be read to suggest that the choice of currency-conversion rule to apply is governed by the law of the forum state regardless, which seems to be Dick's position (Dick is strangely silent on the choice of law provision in the contract). But the issue of which state's law applied seems not to have been raised in *Ingersoll,* and anyway the court's conclusion in that case-that Illinois would apply the judgment-day rule (also the view of the district judge in the present case)-can hardly be a comfort to Dick, which wants the breach-day rule. Arbitrators, although technically empowered only to interpret contracts, invariably decide issues of remedy as well. See, e.g., *Miller Brewing Co. v. Brewery Workers Local Union No. 9,* 739 F.2d 1159, 1163-64 (7th Cir.1984). That is another reason to construe the choice of law provision as applicable to the currency-conversion issue.

[9] [10] We are not done with that issue. We must decide whether Illinois would enforce a choice of law provision construed to incorporate New York's rule on currency conversion, since in a diversity case the federal court must, as we said earlier, apply the forum state's choice of law rule. *SCA, Dykema,* and the cases they cite make clear that Illinois *would* enforce a choice of law provision so construed, which distinguishes Illinois from New York and therefore this case from *Newmont Mines Ltd. v. Hanover Ins. Co.,* 784 F.2d 127, 138 (2d Cir.1986), on which Agfa relies. This does not quite complete our inquiry, however, because there is a residuum of federal judicial authority to refuse to enforce a choice of law provision in a diversity case even when the forum state would enforce it. Suppose the parties had agreed that any dispute over the contract would be litigated under New York's Civil Practice Act. It is most unlikely that Illinois courts would enforce such a provision but even if they would the federal courts in Illinois would not have to follow suit. Parties cannot by contract require a court to follow

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

879 F.2d 1518 Page 7
879 F.2d 1518, 28 Fed. R. Evid. Serv. 400
**(Cite as: 879 F.2d 1518)**

procedures unfamiliar to it. Cf. *In re Air Crash Disaster Near New Orleans,* 821 F.2d 1147, 1159 (5th Cir.1987). No such problem is presented here, however, and we conclude at long last that the district judge correctly applied New York's judgment-date rule for converting foreign into domestic currency to the jury's verdict. See *Vishipco Line v. Chase Manhattan Bank,* 660 F.2d 854, 865-67 (2d Cir.1981). Unfortunately that verdict cannot stand.

The judgment is reversed and the case remanded for further proceedings consistent with this opinion.

Reversed and Remanded, with Directions.

RIPPLE, Circuit Judge, concurring.
I join the judgment of the court. The contract is not unambiguous and, consequently, further proceedings in the district court are necessary. Having reached that conclusion, it is appropriate, of course, to refrain from any further elaboration with respect to the merits.

In my view, we should also refrain from addressing those issues that, because of our disposition, are unnecessary to our decision. In some cases, the inevitability of the recurrence of the issue and the certainty of the proper application of legal principles may justify an appellate court's proceeding beyond the issues necessary to its decision. In this case, however, where it is quite uncertain that the issues will arise again and where resolution requires that, at least in some instances, we address complex matters of state law, prudence requires that we refrain from making pronouncements about future litigation whose contours we can only vaguely perceive. This is especially true when, as here, those issues have been addressed by the parties in rather perfunctory fashion.

*1526 It is especially important that we observe such self-restraint with respect to the matter of the currency conversion rate. While Congress may well have the authority to resolve this issue, there can be no question that a federal court, exercising jurisdiction on the basis of diversity of citizenship, is bound to apply the law of the state in which it sits. See *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Illinois has not indicated whether, in a case where the substantive law of another state governs the rights and liabilities of the parties, it would consider the matter of the conversion rate one of substance (and therefore governed by the law of that other state) or one of procedure (and therefore governed by the law of Illinois). This substance-procedure dichotomy in choice of law is an elusive issue. See Restatement (Second) of Conflict of Laws § 122 comment a (1971). States have not followed a uniform path through its labyrinth. See, e.g., *Henry v. Richardson-Merrell, Inc.,* 508 F.2d 28 (3d Cir.1975); *Heavner v. Uniroyal, Inc.,* 63 N.J. 130, 305 A.2d 412 (1973) (applying the statute of limitations of the state whose substantive law applied). It is certainly not a matter simply governed by party choice but, as our colleagues in the Second Circuit recognized in *Newmont Mines Ltd. v. Hanover Insurance Co.,* 784 F.2d 127, 138 (2d Cir.1986), and *Vishipco Line v. Chase Manhattan Bank, N.A.,* 660 F.2d 854, 865-67 (2d Cir.1981), *cert. denied,* 459 U.S. 976, 103 S.Ct. 313, 74 L.Ed.2d 291 (1982), involves a significant public policy determination that, in our federal system, states have the right to make. Its resolution ought not be suggested gratuitously-and therefore to a large extent practically controlled-by a federal court of appeals. Restraint is especially indicated when the suggested analogy to Illinois' choice of law rule with respect to prejudgment interest, while helpful, is hardly compelling.

The currency conversion issue is an important one and the increase in international commercial litigation has brought it increased recognition. Uniformity of approach will necessarily be achieved. To date, however, Illinois has not spoken on the matter and, apparently, only one federal district judge in Illinois has offered a view with respect to the matter. See *Factofrance Heller v. I.P.M. Precision Mach. Co.,* 627 F.Supp. 1412, 1418-19 (N.D.Ill.1986) (Shadur, J.); *Newman-Green, Inc. v. Alfonzo-Larrain R.,* 612 F.Supp. 1434, 1440-41 (N.D.Ill.1985) (Shadur, J.), *vacated on other grounds,* 854 F.2d 916 (7th Cir.1988) (en banc), *rev'd,* 490 U.S. 826, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989). In the related area of the recognition and enforcement of foreign judgments, we have assumed, in *Ingersoll Milling Machine Co. v. Granger,* 833 F.2d 680, 692 (7th Cir.1987), that, in the absence of any authority to the contrary, Illinois would follow the Restatement (Second) of Conflict of Laws approach and apply the exchange rate on the date the judgment was recognized and enforced. See Restatement (Second) of Conflict of Laws § 144 comment g (1971). It may be that necessity will once again require the federal judiciary to take its best guess as to how Illinois would handle a specific problem in this area. See *Bernhardt v. Polygraphic Co.,* 350 U.S. 198, 204-05, 76 S.Ct. 273, 277, 100 L.Ed. 199 (1956). However, until that necessity arises, it is best, in my view, that we refrain from

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

879 F.2d 1518                                                                                              Page 8
879 F.2d 1518, 28 Fed. R. Evid. Serv. 400
**(Cite as: 879 F.2d 1518)**

setting a course that Illinois, or perhaps Congress, has the right to chart.

C.A.7 (Ill.),1989.
Agfa-Gevaert, A.G. v. A.B. Dick Co.
879 F.2d 1518, 28 Fed. R. Evid. Serv. 400

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.