# Tab 2

1

1      UNITED STATES DISTRICT COURT

2      FOR THE DISTRICT OF COLORADO

3

4         Civil Action No. 90-K-181

5

6

7    MERILYN COOK, et al.,          )

8                 Plaintiff,        )

9                 vs                 )

10   ROCKWELL INTERNATIONAL          )

11   CORPORATION and THE DOW         )

12   CHEMICAL COMPANY,               )

13                 Defendants.       )

14

15

16

17      DEPOSITION OF STEVEN BENNETT WING, PH.D.

18           (Taken by the Defendants)

19           Durham, North Carolina

20             March 18, 1997

21

22   Reported by:  Jane Worthen Smith, RMR

23

24

25

3/18/1997  Wing, Steven

1   can we mark this as Wing Deposition Exhibit 1, please.

2          (Exhibit 1 marked for identification.)

3   BY MR. POLAND:

4      Q.   And attached to the back of that report -- I'm

5   sorry.  Let me ask you first.

6          This is the report that you submitted in this

7   case; is that correct, the Cook litigation?

8      A.   That's correct.

9      Q.   And this is -- we'll call it Wing Deposition

10  Exhibit 1.  Attached to the back of Wing Deposition

11  Exhibit 1, your report -- and if I call it your report,

12  you'll know what I'm talking about?

13     A.   Yes.

14     Q.   -- lists your curriculum vitae, right?

15     A.   That's right.

16     Q.   And it lists your academic degrees?

17     A.   Yes, it does.

18     Q.   And your first, your bachelor's degree, you

19  received a B.A. in psychology from Vassar in 1975,

20  correct?

21     A.   That's right.

22     Q.   And you got a Master's in sociology from Duke

23  in 1980?

24     A.   That's right.

25     Q.   And you received your Ph.D. in epidemiology

**3/18/1997  Wing, Steven**

1      from University of North Carolina at Chapel Hill in

2      1983?

3           A.    That's correct.

4           Q.    Do you have any other degrees other than those

5      that are stated here?

6           A.    No, I don't.

7           Q.    Dr. Wing, do you have any formal education in

8      chemistry?

9           A.    Not beyond routine education that I've

10     received in the course of my other training.  I don't

11     have a degree in chemistry.

12          Q.    Do you have any formal education in plutonium

13     chemistry?

14          A.    Not beyond what I've just alluded to.

15          Q.    Did you specifically study plutonium chemistry

16     in any place in your education?

17          A.    Only in relation to my work in radiation

18     epidemiology.

19          Q.    What type of formal education have you had in

20     plutonium chemistry?

21          A.    I've read about it in relation to my work in

22     radiation epidemiology.

23          Q.    You've read about it.  Is that outside of a

24     classroom context that you've read about it?

25          A.    That's correct.

**3/18/1997  Wing, Steven**

1    the Medical School at the University of North Carolina?

2        A.   No, it is not.

3        Q.   Are any of the classes that are listed on

4    pages 3 and 4 of your curriculum vitae classes that are

5    part of the core curriculum with the University of North

6    Carolina Medical School?

7        A.   No.

8        Q.   Dr. Wing, do you have any formal education in

9    historical methods?

10       MR. BERGER:  Objection to the form of the

11   question.  It's vague.

12   BY MR. POLAND:

13       Q.   Are you familiar with -- have you heard of a

14   subject called historical methods?

15       A.   I'm generally familiar with historical

16   methodology as it's applied in the sort of work that I

17   do.

18       Q.   Have you had any training in historical

19   methodology?

20       MR. BERGER:  Again, I object to the form of

21   the question.  But it's vague.

22       As the witness understands the term, I'll let

23   him answer the question.

24       THE WITNESS:  Are you referring to education

25   in the classroom?

**3/18/1997  Wing, Steven**

1    BY MR. POLAND:

2        Q.    That's right.  Have you ever received any

3    classroom education in historical methods?

4        A.    I have, as part of my master's curriculum in

5    sociology, received some general exposure to that area,

6    but not a class that was specifically addressing that

7    area, only as a part of other methodological approaches.

8        Q.    Have you had any formal education in medical

9    ethics?

10       A.    I am currently a member of the Institutional

11   Review Board on Research involving human subjects of the

12   School of Public Health at the University of North

13   Carolina.  And as a member of the board, I receive

14   materials that are used to educate board members about

15   the work that we do.

16       Q.    Have you received any formal in-classroom

17   training in medical ethics?

18       A.    Are you -- would you include seminars or are

19   you referring to credit course work given by a

20   university?

21       Q.    I guess I'm referring to credit course work

22   given by a university.

23       A.    Well, the only credit course work I've done

24   that would include those issues would be a routine part

25   of the courses that I took when I was in graduate school

3/18/1997  Wing, Steven

1      Q.   You're not a health physicist?

2      A.   I work with health physicists and utilize

3   information in my work, but I do not consider myself to

4   be a health physicist.

5      Q.   Well, health physicist -- there is a

6   certification, correct, to be a health physicist?

7           MR. BERGER:  Objection to the form of the

8   question.  Misleading.

9           THE WITNESS:  Well, you are referring to the

10   Society of Health Physicists?

11   BY MR. POLAND:

12      Q.   That's right.

13      A.   Yes.

14      Q.   Are you a member of the Society of Health

15   Physicists?

16      A.   No, I am not.

17      Q.   You are not a biophysicist?

18      A.   No.

19      Q.   And you are not a certified archivist, are

20   you?

21      A.   No, I am not.

22           MR. BERGER:  Object to the form of the

23   question.

24   BY MR. POLAND:

25      Q.   Okay, I want to talk about the TMI case that

**3/18/1997  Wing, Steven**

1    is a valid restriction?

2         A.   The correct wording is "the principal

3    investigator may use such estimates," not "must use such

4    estimates."

5              I have never seen such a requirement put on a

6    scientific investigator before, and I feel that it's

7    rather unbecoming to a scientific investigation to have

8    an option for assumptions which can only be used if the

9    results turn out a certain way.

10        Q.   Even if those restrictions, as you call them,

11   are placed on investigation by a Federal District Court

12   judge?

13        A.   It could be a restriction placed by the

14   President of the United States.

15        Q.   Was Environmental Health Perspectives the

16   first journal you submitted this article to?

17        A.   No.

18        Q.   What were the others that you submitted the

19   article to?

20        A.   The article was previously reviewed by three

21   other journals.

22        Q.   And what were those?

23        A.   The New England Journal of Medicine, the

24   Journal of the American Medical Association, and the

25   American Journal of Epidemiology.

**3/18/1997  Wing, Steven**

1          Q.    And they chose not to publish your article?

2          A.    That's correct.

3          Q.    Dr. Wing, you state in your article -- let me

4     find the precise references here.  This is on the first

5     page of Wing Deposition Exhibit 3, quote, "Although the

6     dosimetry model predictions used in the TMI study were

7     shown to be consistent with limited thermoluminescent

8     dosimeter readings at locations outside the boundary of

9     the plant, important instruments were inoperable at the

10    beginning of the accident, monitors were not

11    disseminated beyond the immediate off-site area until

12    days after the accident began, and there were large

13    angular gaps in placement of dosimeters.  Little

14    dosimetric evidence was available for releases that

15    occurred early in the accident and for releases that

16    traveled in plumes with low dispersion.  Low estimates

17    of local doses were extrapolated from measurements of

18    radioactive plumes from the accident at distance of 375

19    kilometers; however, those estimates were based on

20    extensive assumptions about atmospheric mixing over

21    great distances.  In contrast, there were reports of

22    erythema, hair loss, vomiting and pet death near TMI at

23    the time of the accident and of excess cancer deaths

24    during 1979 to 1984."

25          You state that in your article?

3/18/1997  Wing, Steven

1    understand.

2    BY MR. POLAND:

3        Q.    You understand he's had involvement in this

4    case with Mr. Berger's firm?

5        A.    You just told me that.

6        Q.    You didn't know that before?

7        A.    No.  Or certainly not that he had written

8    about -- what was it that you just --

9        Q.    The class contours, are you familiar with the

10   term "class contour"?

11       A.    I'm familiar with the term, the idea of

12   contours or environmental exposures, yes.

13       Q.    Did you know, do you know that there has been

14   a class that has been certified in this case?

15       A.    I believe so, yes.

16       Q.    And as a definition of that class, did you

17   know that it's based on a contour?

18       A.    I didn't know that.

19       Q.    So you didn't know that it was based on a

20   contour that Mr. Beyea drew?

21       A.    No.

22       Q.    Do you know what the contour is?

23       A.    You mean could I draw it on a map?

24       Q.    Do you know what the contour represents, the

25   class contour?

3/18/1997  Wing, Steven

1     A.   I'm not familiar with the specific definition

2  of the contour in this case.

3     Q.   Do you know what it's based on?

4     A.   I haven't read what it's based on.

5     Q.   So you don't know whether it's based on

6  air-monitoring data?

7          MR. BERGER:  I think he answered the

8  question.

9  BY MR. POLAND:

10    Q.   Do you know whether it's based on

11 air-monitoring data?

12         MR. BERGER:  Objection to the form of the

13 question.  Asked and answered, several times.

14    A.   I assume that it's based on information about

15 releases, but I'm not specifically familiar with how the

16 releases were calculated, what substances are included,

17 and so on.

18    Q.   Dr. Wing, I'm going to hand you an article

19 that I know that you're familiar with.  This is an

20 article that you wrote entitled "Limits of

21 Epidemiology."

22         MR. POLAND:  If you could mark this as Wing

23 Deposition Exhibit 5.

24         (Exhibit 5 marked for identification.)

25         BY MR. POLAND:

**3/18/1997  Wing, Steven**

1           BY MR. POLAND:

2           Q.    The additional materials that you reviewed,

3    that Mr. Berger mentioned that he provided to me last

4    week, have those changed your opinions in this case?

5           A.    I would say that they've reinforced or added

6    details or provided insights about issues that are

7    discussed in my report.

8           Q.    Have they changed your opinions?

9           A.    Well, that's an interesting question in the

10   sense that, I guess I would review opinions or knowledge

11   about a matter as something which is constantly changing

12   at least in the -- in some way or another.

13          Q.    Who contacted you to work in this case,

14   Dr. Wing?

15          A.    Mr. Berger.

16          Q.    Mr. Berger was the first one to contact you.

17   When did you begin your work?

18          A.    I believe it was in August of 1996 or --

19   August or September, sometime in that period.

20          Q.    What did Mr. Berger ask you to do when he

21   contacted you?  Can you recall, independent of your

22   report, can you recall what it was he asked you to do?

23          A.    Generally, although I did write it down

24   specifically at the introduction to this report.  Would

25   you prefer for me not to refer to the report?

**3/18/1997  Wing, Steven**

1        Q.    If you can tell me generally what Mr. Berger

2    said, and then we can take a look at the report.

3        A.    He asked me to conduct a review of the

4    Department of Energy and its predecessor organizations'

5    efforts to understand the human health effects of

6    exposure to plutonium.

7        Q.    And was that it; did he ask you to do anything

8    else, generally?

9        A.    No, that was the focus of my work.

10       Q.    And you mentioned it states specifically in

11   your report what Mr. Berger asked you to do?

12       A.    Yes.

13       Q.    And can you point out for me where that is?

14       A.    It's in the first sentence of the report.

15       Q.    And that's where it says, quote, "Berger and

16   Montag asked me to evaluate the adequacy of the U.S.

17   Department of Energy's effort to evaluate health hazard

18   of plutonium exposure."

19       A.    That's right.

20       Q.    In your report, Dr. Wing -- and this is

21   Exhibit 1, and I'll refer to it as your report, and we

22   will know it's Exhibit 1 -- you state at the bottom of

23   page 3 and the top of page 4, quote, "In the United

24   States, research and development of nuclear weapons and

25   nuclear power have been conducted by the Department of

3/18/1997  Wing, Steven

1      A.    That's correct.

2      Q.    Articles.  And you say in here, this is page 5

3    of Wing Deposition Exhibit 1, you say the second major

4    source of information was a computerized data base of

5    documents scanned in the health division of Los Alamos

6    National Laboratory; is that correct?

7      A.    That's correct.

8      Q.    Do you know how these documents were selected

9    to be placed on the data base?

10     A.    My understanding is that they were scanned in

11   relation to this case.

12     Q.    Do you know how the documents were chosen to

13   be scanned and placed on the data base?

14     A.    My understanding is that the documents were --

15   represent a census of materials in the health division,

16   certain areas of the health division of the Los Alamos

17   group.

18     Q.    Do you know who selected those documents to be

19   placed on the data base?

20     A.    My understanding is that they were scanned

21   by -- in connection with this case by, I believe, people

22   at the facility, but because of the request from the

23   attorneys.

24     Q.    Do you know who actually selected the

25   documents to be placed on the data base?

**3/18/1997  Wing, Steven**

1   A. You mean who chose each piece of paper?

2   Q. That's right.

3   A. No.

4   Q. Do you know whether these documents that were

5 scanned and placed onto the computerized data base at

6 Los Alamos National Laboratory represent all of the

7 holdings of the health division of Los Alamos National

8 Laboratory?

9   A. Oh, I'm quite sure they don't.

10   Q. Do you know how many documents there are in

11 the health division files at Los Alamos?

12   A. In the entire health division?

13   Q. That's correct, in the epidemiology section.

14   MR. BERGER:  Different question.  What are you

15 asking him?  How many documents are in the epidemiology

16 section, or how many are in the entire health division?

17   MR. POLAND:  In your report you say health

18 division, so let's keep it with health division.

19   THE WITNESS:  I don't know the total number,

20 but I've been in the area myself and am aware that there

21 are large rooms full of documents that are both hard

22 copy and microfilm, and not all of those are represented

23 in the data base.

24   BY MR. POLAND:

25   Q. Did you ever go in to review those documents

70

3/18/1997  Wing, Steven

1     copies of all of them that you reviewed?

2          A.   We reviewed the files that we had to look for

3     documents provided by the committee.

4          Q.   And those documents that you had were the ones

5     on the scanned data base from the Los Alamos health

6     division files?

7          A.   They were either on the scanned data base or

8     Xerox copies.

9          Q.   Xerox copies of documents on the scanned data

10    base?

11         A.   I believe so, yes.

12         Q.   On page 5 of your report, Dr. Wing, you also

13    state, "In addition to these sources, we reviewed

14    minutes from the Atomic Energy Committee on Biology and

15    Medicine (AECBM)," correct?

16         A.   That's correct.

17         Q.   Do you know where these are located, where the

18    Advisory Committee for Biology and Medicine minutes are

19    located?

20              MR. BERGER:  The originals?

21              MR. POLAND:  The originals.

22         A.   No, I don't.

23         Q.   Who sent you the copies of these documents

24    that you received?

25         A.   Mr. Berger.

**3/18/1997  Wing, Steven**

1       Q.   So you never went where the originals are

2   located to personally inspect them?

3       A.   That's correct.

4       Q.   And none of your researchers did either?

5       A.   No.  I believe you are suggesting that there

6   might be -- if you are suggesting that the documents

7   were somehow not the correct or true minutes of the

8   ACBM, I should note that the documents that we have --

9       Q.   I can actually stop you right there.  I'm not

10   suggesting they weren't true or correct copies at all.

11   I'm not suggesting that.  Do you know whether you had

12   the full set of Advisory Committee for Biology and

13   Medicine meeting minutes that you reviewed?

14       A.   Well, I know for a fact that some of the

15   materials we had were censored or redacted.

16       Q.   Okay.  Other than redactions, do you know

17   whether you had a full set of minutes from the Advisory

18   Committee for Biology and Medicine?

19       A.   I don't believe we had all of the documents.

20       Q.   Did you make any attempts, or did your

21   researchers make any attempts, to get minutes that you

22   didn't have?

23       A.   We received minutes, some of the minutes from

24   Mr. Berger's office and made a request for additional

25   materials.

**3/18/1997  Wing, Steven**

1      Q.    Did you receive additional materials?

2      A.    Yes, from the Advisory Committee.

3      Q.    Other than the materials you received from Mr.

4   Berger, you did not seek any other copies of Advisory

5   Committee minutes; is that correct?

6      A.    We may have reviewed some in connection with

7   the data base which was constructed by the President's

8   Advisory Committee on Human Radiation Experimentation,

9   which is available over the Internet.

10     Q.    Do you know whether that contains a full set

11  of all Advisory Committee on Biology and Medicine

12  meeting minutes?

13     A.    I would have to consult with one of the other

14  people who worked with me on the report.

15     Q.    So you don't know, though, as you sit here

16  today personally?

17     A.    I don't personally know.

18     Q.    You also reviewed transcripts from the SPEERA

19  transcripts; is that correct?

20     A.    We reviewed transcripts from hearings that

21  were held by the SPEERA Commission.

22     Q.    Did you review all the transcripts?

23     A.    Do you mean did we read all of the testimony

24  from all of the hearings?

25     Q.    That's correct.

**3/18/1997  Wing, Steven**

 1    United Nations meeting.

 2        Q.    And what you're referring to now are documents

 3    that Mr. Berger has provided to me, correct?

 4            MR. BERGER:  That's correct.

 5        Q.    That's not what I'm getting at here, I guess.

 6    There are documents in a lawsuit that -- different

 7    parties produce documents to each other.  Okay?

 8        A.    Okay.

 9        Q.    Are there any other documents that were

10    produced by either parties or third parties in this

11    case, which are people other than the plaintiffs and the

12    defendants, that you reviewed?

13        A.    Not that I recall right now.  I think we have

14    a pretty comprehensive list of the materials.

15        Q.    And that's represented in your report, which

16    is Wing Deposition Exhibit 1?

17        A.    That's right.

18        Q.    Did you know that Dow Chemical Company

19    produced documents in this case to the plaintiffs?

20        A.    No.

21        Q.    So you did not review those?

22        A.    No.

23        Q.    Did you know that Rockwell International

24    Corporation produced documents in this case to the

25    plaintiffs?

**3/18/1997  Wing, Steven**

1        A.   I am not familiar with any of those.  I guess

2   I would assume that these individuals being involved in

3   the case would produce documents, but I have not

4   reviewed their documents.

5        Q.   The documents produced by Rockwell?

6        A.   Right.

7        Q.   For your work on this case, Dr. Wing, have you

8   gone to any other document depositories in the United

9   States to collect primary materials, and that's

10   specifically for your work in this case?

11        A.   We used the materials available at local

12   universities.

13        Q.   Any others?

14        A.   No.

15        Q.   How did the people who were working for you,

16   your research associates, prepare, or how do they report

17   their results to you?

18        A.   We produced a form in which the review of an

19   article could be reported.

20        Q.   Is this under Methods on page 5 of your

21   report; is that what you talk about where you say "The

22   data base was used to generate an abstract form for each

23   article to be used by the reviewer to note key features

24   of the research," and the sentence continues on?

25        A.   Yes, that's correct.

**3/18/1997  Wing, Steven**

1    clear.  And that was the reason for the way that I made

2    the statement earlier as being very general.  I think

3    there are times at which there are clear differences of

4    opinion and responsibilities and actions on the part of

5    DOE and its contractors, and there are other times when

6    they act more in concert.

7          So, from the general point of view, I believe

8    much of what DOE has done has been through the work of

9    its contractors.  And so I wouldn't want to definitely

10   exclude the contractors.

11         On the other hand, in this particular

12   statement, I'm not referring to a specific activities

13   that I'm aware of that Rockwell or Dow were involved in.

14         Q.   Are you aware of any evidence that Rockwell

15   influenced the conduct of epidemiological research?

16         A.   It would depend on how you define that.  As a

17   contractor, they have had responsibility for the

18   industrial operations which create the conditions for

19   the exposure of workers and people off-site.  So their

20   operations in terms of the production activities and the

21   worker protection activities have consequence for the

22   exposures which are studied by epidemiologists and the

23   collection of information about those exposures.  So,

24   obviously, there is a connection to the work that's done

25   by epidemiologists to investigate the health of those

**3/18/1997  Wing, Steven**

```
1    external dose.  And that's not with respect to Rocky

2    Flats or any place in particular; it's a general

3    statement about the question that you raised about

4    external doses.

5         Q.   That's right.  And just so I'm clear on this,

6    is it your testimony that you do not know whether

7    radionuclides were released specifically from the Rocky

8    Flats plant in sufficient quantities to impart a dose

9    from external penetrating radiation to members of the

10   class?

11        A.   I have not investigated that issue as part of

12   my work here.

13        Q.   Have you spoken with anybody about that?

14        A.   You know, I may have run across some

15   information about that, but it's not something that I

16   focused on in my review here.  So I'm not prepared to

17   make a statement for the record about this question.

18        Q.   Is it a possibility?

19        A.   That I would --

20        Q.   No, is it a possibility that radionuclides

21   would have been, that radionuclides were released from

22   the Rocky Flats plant in sufficient quantities to impart

23   a dose to members of the class here, a dose?

24        A.   You mean an external radiation dose?  I can't

25   rule it out.
```