**A Critical Review of the United States Department of Energy Efforts to Investigate the Human Health Effects of Plutonium**

by:

Steve Wing
Associate Professor
Department of Epidemiology
School of Public Health
University of North Carolina
Chapel Hill, NC  27599-7400

prepared for:

Berger and Montague, P.C.
1622 Locust Street
Philadelphia, PA  19103-6365

November 21, 1996

## BACKGROUND

Berger and Montague asked me to evaluate the adequacy of the US Department of Energy's efforts to investigate health hazards of plutonium exposure. This was done by searching and summarizing published documents as well as documents produced in support of governmental evaluations of DOE's epidemiology program, including records of research advisory committees on epidemiology, biology and medicine. The work was accomplished with the help of a team of research assistants comprised of students currently pursuing graduate degrees at the University of North Carolina School of Public Health. This review reflects my perspective as a professional epidemiologist working in the area of radiation health effects.

I received a Ph.D. in epidemiology from the University of North Carolina in 1983. After a post-doctoral fellowship I joined the UNC faculty in 1985. I have taught epidemiology at the University of Ulm, Germany, and the Federal University of Bahia, Brazil. A list of my academic appointments, research grants, scientific publications, presentations, and service as a reviewer for scientific journals is attached to the end of this report.

From 1987 through 1991 I worked under a sub-contract from Oak Ridge Associated Universities to the UNC School of Public Health. This work was part of DOE's Health and Mortality Study, which was, until 1991, the major national effort to study long-term health effects of occupational exposures among workers employed at DOE nuclear facilities. As a co-investigator I had primary responsibility during those years for research on radiation exposures and mortality among workers at Oak Ridge National Laboratory. Additionally, I served as a member of the Research Planning Group of the Center for Epidemiologic Research at Oak Ridge, and I participated in collaborative research involving other DOE facilities. Since 1991 I have received three competitive awards from the National Institute for Occupational Safety and Health. These projects entail evaluation of radiation health effects among DOE workers at Oak Ridge, Hanford, Los Alamos, and Savannah River. Applications for these research projects were subjected to peer review by a committee of scientists assembled to advise NIOSH on the quality of submitted applications. I am currently principal investigator on these three projects.

## SUMMARY

There are strong reasons to believe that plutonium is one of the most hazardous substances on earth, but there is a history of inadequate research on human health effects. As recently as May, 1996, risk estimates for plutonium in relation to Rocky Flats were released that rely heavily, for human evidence, on studies of A-bomb survivors.[1] Because this population is a highly selected group of survivors exposed primarily to external penetrating radiation at one point in time rather than to chronic contamination from internally deposited radionuclides such as plutonium, use of this study to evaluate plutonium risks involves extensive extrapolation. Use of A-bomb survivor data for purposes of plutonium risk estimation is indicative of the small amount of reliable human evidence available on health effects of plutonium in occupational and environmental settings.

2

Following inhalation, ingestion, or absorption plutonium may distribute throughout the body, concentrating in the lungs, liver, and skeleton. Once internally deposited, plutonium has been shown, in animals, to induce cancers of the lung, liver, and bone, as well as leukemias and lymphomas. Studies indicate that plutonium exposures received by workers are associated with damage to DNA, and that with increasing exposure increased chromosomal aberrations occurred. These observations are not surprising given that plutonium particles emit alpha radiation, and it is well accepted that other alpha-emitting radionuclides produce DNA damage. Epidemiological studies of plutonium workers are limited, with much of the research effort focused on the mortality experience of a small number of workers presumed to be more highly exposed than other workers. However, we found reports of excesses of liver cancer, bone cancer and lymphoma incidence (among Los Alamos radiation workers), excess mortality due to liver cancer, leukemia, and lymphoma (among Rocky Flats workers), greater mortality due to liver cancer, leukemia, and lymphoma among workers with measurable body burdens of plutonium at Rocky Flats, and greater mortality due to lung cancer, bone cancer, and lymphoma among Los Alamos workers with measurable body burdens of plutonium. Other studies reported higher cancer incidence in areas estimated to have been more exposed to plutonium contamination from Rocky Flats.

The influence of DOE and its predecessor organizations on the conduct of epidemiological research has been the subject of congressional hearings, a special panel convened by former Energy Secretary Watkins,[2] a panel of epidemiologists and physicians formed by Physicians for Social Responsibility,[3] and numerous others. These criticisms led, in 1991, to a Memorandum of Understanding that ended DOE's control of analytical epidemiological studies of nuclear workers. Based on these reviews as well as other documents, we found extensive evidence that DOE's funding and supervision of studies of the health effects of plutonium and other radiation hazards have been constrained by concerns about public perception of the nuclear industry, costs of exposure controls, and the expenses and public relations consequences of litigation. In a number of cases funding or administrative authority has been withdrawn from researchers who have reported estimates of radiation health effects that were viewed as contrary to continued promotion of the nuclear industry. Furthermore, health research has been pursued in a highly secretive environment that is contrary to the scientific need for open inquiry.[4] Under these circumstances it is impossible to accept assurances that the radiation health community, which has been largely funded by DOE or its predecessor organizations, has adequately investigated the human health effects of exposure to plutonium.

## INTRODUCTION

Health threats from plutonium first occurred during the Manhattan Project effort to build atomic bombs during W.W.II. Since then humans have been exposed to plutonium by research laboratories, production facilities, off-site releases from nuclear facilities, medical research on human subjects, and fall-out from weapons testing.

In the United States, research and development of nuclear weapons and nuclear power have been conducted by the Department of Energy and its predecessor organizations (the Manhattan Engineering District, the Atomic Energy Commission, and the Energy Research Development

Administration). Thus, these government organizations and their contractors (hereafter referred to as "DOE") have been in a unique position to be responsible for human exposure to plutonium, to conduct programs to protect workers and the public from radioactive exposures, and to conduct research into the forms and magnitude of health consequences of ionizing radiation. The potential for such health consequences was recognized during the earliest years of the Manhattan Project, and led to various efforts to protect workers, prevent excess contamination, and to study the biological effects of radiation. It was during these years that the discipline of health physics was recognized as an area of study concerned with radiation protection and health.

However, in the United States, as in other countries with nuclear technologies, nuclear research and production was developed under tight government control and in the context of great secrecy. The insulation of the nuclear community in the US began during W.W.II when DOE facilities, including major research institutions such as Oak Ridge National Laboratory (ORNL) and Los Alamos National Laboratory (LANL), were constructed in remote locations. During subsequent decades, with the Cold War and increasing public discomfort over nuclear weapons and nuclear power (stimulated in part by the environmental movement), DOE facilities maintained their isolation and secrecy while receiving high levels of funding, generally with little outside scrutiny. This situation is evident in the area of the scientific evaluation of radiation health effects, in which DOE provided the funding and was involved in studies of workers, populations exposed to weapons testing fall-out, and studies of survivors of the atomic bombings of Hiroshima and Nagasaki.

Research on human health effects of environmental contaminants may be conducted from a variety of perspectives. Some research involves clinical studies of patients, some entails laboratory investigation of human tissues or cells, and other research is conducted using non-human animals. Epidemiology generally involves comparing large numbers of people to evaluate whether disease or biological changes occur more frequently among persons exposed to an agent. Epidemiological studies are most directly relevant to human health effects because they do not necessitate extrapolation from other species and because they can evaluate the occurrence of diseases of interest in large populations of interest as opposed to selected groups of patients. However, experimentation on humans using hazardous substances is usually considered to be unethical, and it is often difficult to know precisely what people have been exposed to in the workplace or through air, water and food. Therefore animal and clinical studies are important parts of a more general health evaluation. The Department of Energy has conducted research into health effects of plutonium using all of these approaches, including human radiation experimentation.

DOE's role in assessing radiation health effects while at the same time promoting nuclear technology raises concerns about the extent to which health issues have been vigorously investigated.[2, 3, 5] Although others have provided general overviews of DOE's epidemiology program,[2, 3] critical reviews of DOE's efforts have not focused on research of plutonium health effects. This report provides an overview and interpretation of the scientific literature on human health effects of exposure to plutonium and a critical evaluation of the DOE's role in this effort.

4

## METHODS

This review and critique is based on two primary sources. First, a computerized bibliographic search was conducted of the biomedical literature on plutonium. Keywords were used with the MEDLINE bibliographic system, an international database of biomedical literature containing listings from approximately 3,600 journals, as well as monographs of congresses and symposia, from 1966 to 1996. Scientific articles were retrieved and classified into categories identified from the literature. Major categories for the literature review were toxicology, pharmacokinetics, medical follow-up studies, autopsy studies, molecular genetic studies, environmental epidemiology, occupational epidemiology, and human experimentation.

We initially retrieved 295 articles judged to be most relevant to the review and entered their citation information into a computerized bibliographic data base.[6] Six research assistants currently enrolled in graduate degree programs in epidemiology and environmental science participated in the review. The database was used to generate an abstraction form for each article to be used by the reviewer to note key features of the research including study setting, type and number of study subjects, study design, type of exposures, biological outcomes of interest, results, and comments. A form with a study identifier was produced for each article, and, where possible, the abstract of the article was included from the bibliographic database. In order to expand our review of the literature, bibliographies and citations from the retrieved articles were used to identify additional references and governmental reports. Each research assistant provided a review of documents on one or more topics. A copy of the resulting bibliography is attactched to this report. Articles, books, and monographs that are referred to directly in the text are cited by superscript numerals and listed in numerical order at the end of our report.

The second major source of information was a computerized data base of documents scanned in the Health Division of Los Alamos National Laboratory (LANL). Documents in the database included annual reports of the Epidemiology Advisory Committee, scientific reports, and research proposals. Scientific publications and reports from the database were used to augment the computerized bibliography and are referred to in the text by document numbers in parentheses, for example, (Document #001). Reports of the LANL Advisory Committee for Epidemiology were systematically reviewed for information having to do with evaluation of the LANL epidemiology program, which had primary responsibility for DOE's efforts to investigate plutonium health effects.

In addition to these sources, we reviewed minutes from the Atomic Energy Commission's Advisory Committee for Biology and Medicine (ACBM). We also reviewed transcripts of hearings of the Secretarial Panel for the Evaluation of Epidemiologic Research Activities (SPEERA), and work of the Advisory Committee on Human Radiation Experimentation (ACHRE), appointed by former Energy Secretary Watkins and President Clinton, respectively. References to minutes from the ACBM and transcripts of the SPEERA hearings are not given citation numbers but are available.

5

**FINDINGS**

**A. Literature Review**

**1.    Pharmacokinetics**

This review of the retention, excretion, and distribution of plutonium within the body is based primarily on a report by the International Commission on Radiological Protection of "The Metabolism of Plutonium and Related Elements".[7]  Our use of this source is not intended to be an endorsement of ICRP's work.

The rates at which plutonium is excreted from the body, and the sites in the body where it may be retained depend, in part, on the characteristics of the exposure.  The retention and distribution of plutonium in the body will depend on whether the exposure to plutonium was through inhalation, ingestion, or injection.  The retention and distribution of plutonium may also depend on the type of molecule (for example, plutonium citrate, plutonium dioxide, etc.), the size of the particle, and the isotope of plutonium.

When inhaled, the biological half-life of plutonium compounds ranges from a few days to years depending on the isotope of plutonium.  Inhaled plutonium is cleared from the body by a number of mechanisms.  Particles of plutonium may be transported along ciliated airways to the larynx and throat; there plutonium is swallowed.  Plutonium is also taken up by the bloodstream and lymphatic system where it is distributed to other organs and excreted. Consequently, once inhaled, plutonium deposits primarily in the lung, but is also distributed to the lymph nodes, liver, bone, and other tissues.  The rate of translocation of plutonium from the lungs to blood and lymph, as well as the deposition and retention of particles in the lung, is determined by solubility, size and mass of the particle; however, small size particles are more readily translocated from the lung, resulting in shorter biological half-lives.  Variability between individuals in clearance of particles from the lungs leads to a reduction in the sensitivity of epidemiological studies because of the inaccuracies in individual dose estimates that result from the use of average pharmacokinetic parameters.

Ingested Pu can be absorbed through the cells of the mucosa lining the gastrointestinal tract into the blood stream.  Again, the amount of absorption may depend on the chemical form, solubility, concentration and valence state of the radionuclide, as well as the pH of the solution, and the presence of inorganic and organic ions.  The rate of absorption also depends on individual characteristics such as age, fasting, calcium deficiency, diet, specific diseases, and drug use. Consideration of age may be particularly important for the youngest ages; absorption of plutonium from the gastrointestinal tract of infants is 1 to 3 orders of magnitude greater than in adults.

The Atomic Energy Commission established the United States Transuranium Registry (USTUR) in 1968 to collect information about transuranics in humans through the analysis of autopsies of former occupationally exposed persons.   Since its establishment, several studies have been conducted to determine where in the body plutonium is deposited.  Most of the studies

6

found that concentrations of plutonium appeared to be highest in the liver (50%), skeleton (25%) and lung (<25%). However plutonium is distributed to other tissue as well, including kidneys (0.3-1.3%) and gonads (0-0.3%). Results from one study of plutonium deposition in soft tissues revealed that the spleen and testes had the highest relative concentrations of plutonium compared to the liver.[8, 9]   There is substantial variation in reports of the distribution of plutonium to these organs between individuals studied, as well as in the microdistribution of plutonium within organs such as bone and lung tissue. Factors that may lead to variation in the distribution of plutonium in the body include age and smoking habits. It has been reported that concentration in the liver was positively correlated with age, while skeletal concentration was negatively correlated with age. Smoking may increase plutonium deposition in the liver. Once absorbed, plutonium remains in the body a long time. The biological half-life of absorbed plutonium in the whole body ranges from 40-204 years, in the liver 20 years, bone 50 years, and in gonads retention may be infinite, although there is large variation in these estimates. Studies have examined plutonium deposition in members of the general population, as well, through autopsies.[10]

*Summary.*   Plutonium may enter the body through inhalation, ingestion, dermal absorption, or injection.[11]   Once in the body plutonium has the potential to reach all tissues, although the highest concentrations are generally observed in the liver, skeleton, and lung. For a given exposure, human doses to plutonium can vary depending on the isotope, the chemical form, the particle size, and individual variation in pharmacokinetics. This variability introduces errors into estimated doses following a given exposure, which in turn reduces the sensitivity of studies of plutonium dose-effect relationships.

## 2. Toxicology

Toxicological investigations of the effect of hazardous substances on non-human animals are important because these animals can be experimented upon under controlled conditions. Although our review is focused on human health, and the relevance of animal studies is limited by interspecies differences including life span, toxicological studies are relevant to broadly identifying some of the biological effects that may be expected in humans. The consequences of plutonium exposure have been studied in laboratory situations on animals exposed through various routes, usually with large exposures to plutonium (Table 1).

Considering effects on the lung, when inhaled, plutonium exposures produce a spectrum of progressively more severe functional and morphological changes, ranging from radiation pneumonitis and fibrosis to lung tumors.[12, 13]   These changes were similar for different species, however lung tumors were observed as the principal late effect in many different animals studied.[14-24]

Decreased lymphocyte and leukocyte counts were observed in animals following acute inhalation, intravenous and intraperitoneal exposures to $^{238}$Pu and $^{239}$Pu compounds.[14, 19, 25-28] Intraperitoneal exposures to $^{239}$Pu nitrate produced leukemia in mice,[29] while intravenous exposures to $^{239}$Pu citrate produced "preleukemia" conditions in mice with a high spontaneous incidence of leukemia.[30]   Acute inhalation exposures to $^{238}$Pu and $^{239}$Pu compounds depressed antibody-forming cells, decreased pulmonary alveolar macrophage counts, and produced

7

lymphadenopathy in animals.[19, 31, 32]  Subcutaneous exposures to [238]Pu and [239]Pu compounds scarred lymph nodes in the areas adjacent to the exposure site.[12]

The liver has also been observed to suffer effects following plutonium exposure.  Acute inhalation and intravenous exposures to [238]Pu and [239]Pu compounds produced degenerative liver injury and functional impairment of the liver.[14, 25, 33-35]  Inhalation studies of [238]Pu oxide produced hepatic lesions in dogs,[36] and intravenous exposures to [239]Pu citrate produced hepatic tumors.[35]

Acute intravenous exposures to [238]Pu and [239]Pu compounds produced decreased breaking strength of bones.[37]  Inhalation studies of [238]Pu oxide and [239]Pu nitrates and citrates produced osteosarcomas in dogs.[14, 19, 36]  Intravenous and intraperitoneal exposures to [239]Pu citrate also produced osteosarcomas in laboratory animals.[37-39]

Studies of beagles have found that plutonium is more effective than americium, thorium, strontium, californium and radium in inducing bone sarcomas,[38] and that the relative effectiveness of exposure from subcutaneously deposited plutonium, for example from a wound, is 32 times that of radium.[40]  Results reported by researchers investigating the possibility of threshold effects (levels below which no tumors would be seen) and hormesis (small doses decrease cancer incidence) in beagles support the existence of a linear relationship between plutonium doses and bone cancer with no threshold.[38, 40, 41]  Mays et al. suggest the absence of a threshold may be understood as following from the uneven radiation doses from plutonium that occur within the body.  Even in tissue receiving an average dose of 0.01 Gy, approximately 1% of cell nuclei receive a dose of approximately 1 Gy, while the remainder receive essentially zero dose;  within the cylinder of ionization the dose from an alpha particle is about 70,000 Gy.[38]  In considering the hormesis hypothesis, Mays states that, "It may be a conceptual mistake to imagine that the local doses from $\alpha$ particles are 'small.'  The damage along the $\alpha$ particle track is so intense that it may be difficult to evaluate objectively whether beneficial effects might also occur."[38]

The Agency for Toxic Substances and Disease Registry (ATSDR) concluded that:  the respiratory effects associated with the high exposures in animal studies may occur in individuals receiving low environmental exposures;  there was considerable evidence from animal studies that plutonium produces adverse effects in the hematopoietic system;  the level below which hepatic effects are unlikely to occur has not been clearly defined, therefore the effects of plutonium on hepatic function and histology at levels encountered in the environment have not been identified; children could be more sensitive to radiation-induced bone damage based on animal studies;  the immunologic effects observed in animal studies could lead to alteration of immune system competence;  and, individuals exposed to plutonium could develop subtle changes in the immune system that may reduce immune competence at doses that may not induce overt signs of toxicity.[11]

Some people may be more susceptible to plutonium exposures than others.  Based on human and animal studies the ATSDR concluded that children may be particularly susceptible, due to the radiosensitivity of rapidly growing cells, and that persons with chronic obstructive lung diseases may be susceptible to inhalation exposures of plutonium.  Persons who are anemic were also

8

identified as more susceptible to plutonium due to increased absorption of ingested plutonium through the gastrointestinal tract.

*Summary.*      Toxicological studies show that biological effects of plutonium occur in lung, liver, bone, and lymphatic tissues.  Biophysical principles and evidence from animal studies suggest that increased cancer from plutonium and other alpha emitters can occur down to the lowest doses. Children and persons with lung diseases and anemia are among sub-groups that may be more highly susceptible to plutonium.  Animal studies are not a substitute for careful studies of humans, but indicate some of the biological effects and susceptibilities that may be important for human health.

### 3. Somatic and Genetic Effects

Plutonium exposure can damage chromosomes.  Ionizing radiation can cause single base nucleotide changes called point mutations which code for a change in amino acid sequence. Although a full account of the molecular basis of cancer has not been developed, point mutations could be involved in the malignant transformation of cells as part of a multi-step pathway of accumulated genetic "hits."  Plutonium can also cause chromosomal aberrations, which can be observed microscopically by cytogenetic means.  Aberrations can be numerical (number of affected chromosomes) or structural (effects on a particular chromosome).  Various outcomes associated with chromosome aberrations include cell death, carcinogenic transformation, and genetic diseases such as Down's syndrome.

Plutonium-induced damage to chromosomal DNA can be linked to human health outcomes by genetic, as well as somatic, effects.  Genetic effects are those which are caused by mutations of any germ cell (sperm or oocytes) which lead to permanent changes in genetic material which are inherited by offspring of exposed individuals.  Genetic effects may result in health outcomes such as decreased fertility, birth defects, or any chromosomal defect impacting offspring and future generations.  Somatic effects are those mutation events which occur to the cells which comprise all other tissue and organ systems and which are most commonly thought to be manifest in health outcomes such as cancer and immunosupression.

Studies of genetic effects in animals suggest that intravenous exposures of mice to plutonium compounds produced sterility of spermatocytes in males and dominant lethal mutations and killing of oocytes in females.[42-44]  Plutonium exposure in mice results in decreased fertility of both males and females, increase in intrauterine deaths in females mated to exposed males, and increased rates of intrauterine death in offspring born from the first generation.[42]  Increased intrauterine deaths in mice were also observed in unexposed females mated to plutonium exposed males and to offspring of plutonium-exposed males.[43, 44]  Increased fetal deaths were also observed in rabbits intravenously exposed to plutonium compounds,[45] although teratogenic effects were not observed.  Insufficient research has been conducted on the genetic effects of plutonium exposure in humans.  In general, genetic studies rely on extremely rare outcomes such as specific childhood cancers or birth defects.  Studies of reproductive success, indicated by fertility rates, or the ability to carry a pregnancy to term, may be a more useful for monitoring the genetic effects of plutonium.[46]

9

More research has been conducted on the somatic effects associated with plutonium exposure. In laboratory animals inhalation of [238]Pu and [239]Pu compounds produced chromosomal aberrations in blood lymphocytes[47] and blood cells,[48] but did not produce chromosomal aberrations in lung tumor cells of plutonium-exposed dogs.[49] Intravenous exposures of laboratory animals to plutonium compounds also produced chromosomal aberrations in bone marrow cells [28] and liver cells.[33, 50] Mice injected with [239]Pu showed increased chromosome aberrations compared to controls up to one year after exposure. Watson et al. recently demonstrated long-term chromosomal instability induced by plutonium irradiation of murine hematopoietic stem cells.[51] Endlich et al. performed experiments with rat cells to investigate the process of transformation induced by alpha particles and to characterize the molecular properties and mechanisms, the resultant transformants, and the associated molecular events. Cells exposed to irradiation transformed at a two-hundred fold rate over the unexposed cells. Molecular studies showed no alteration of structure or expression for the tumor suppresser gene, p53, nor for any of 14 other oncogenes.[52]

The effects of plutonium exposure on human lymphocytes were explored by Purrot et al.[53] Lymphocytes were exposed to [239]Pu citrate, cultured for 48 hours, and chromosome aberrations were measured. Increased formation of dicentrics, centric rings, and excess acentric aberrations were noted in exposed cells compared to controls. While results suggested a non-uniform sensitivity of cells to plutonium, high doses caused cell death, and there was a linear relationship between dose and dicentric aberrations. Recent work by Amudson et al. not only substantiates radiation-induced chromosomal damage in human lymphocyte cell lines through loss of functional gene products, but also suggests that certain cell types are more sensitive to mutation-induction by plutonium.[54]

Several studies examine the effects on DNA of plutonium exposure in occupational cohorts. Dolphin reported on the chromosome damage in lymphocytes of eight workers exposed to plutonium.[55] Samples were obtained from workers in the UKAEA who had an average of 7 years of exposure and who had excreted significant amounts of plutonium in their urine. Dicentric yield was 5 per 1000 cells in workers, versus 2.5 in controls. However, external radiation exposure appeared to exhibit a dose-response relationship with dicentrics, leading researchers to conclude that there was no effect due to internal plutonium exposure. An analysis of chromosome aberrations in one Sellafield worker contaminated through a puncture wound indicated substantial elevations of aberrations above normal.[56, 57]

Analyses of chromosome aberrations among the twenty-six Manhattan Project workers have been limited, and no specific results have been reported, however Voelz et al. suggest that no association between chromosome aberrations and plutonium body burdens was observed.[58] We have found no indication that the detailed analyses that were noted as forthcoming by Voelz et al. in their 1979 publication were ever reported. Voelz has noted recently that among these 19 surviving Manhattan Project workers, no correlation between aberrations and plutonium body burden estimates was observed; no data were presented.(Document #00463074) This may reflect

as poorly on the body burden estimates as on an use of chromosome aberrations as an indication of exposure.

Chromosome aberrations in peripheral lymphocytes have been measured among 12 of 25 Rocky Flats workers who were estimated to have received depositions of greater than 16 nCi of plutonium oxide in their lungs following a 1965 fire at the facility. Although results have not been published, a draft paper reported a positive correlation between aberrations and plutonium burdens.(Document #00463005)

Recently, several larger studies have reported evidence of increased chromosomal aberrations in humans occupationally exposed to plutonium. Doloy examined 8,400 cells from 30 controls and 54 French workers with $^{238}$Pu body burdens, reporting significantly increased structural chromosome aberrations among the workers. Tawn examined 7,450 cells among British workers and reported associations between plutonium body burdens and chromosome aberrations. Tawn et al. performed chromosome analyses on 55 plutonium workers with estimated body burdens of at least 296 Bq.[59] Frequencies of stable and unstable chromosome aberrations were compared with 39 new worker controls without previous history of plutonium exposure. When stratifying by dose of plutonium, all groups of exposed workers showed an increase in both symmetrical and asymmetrical aberrations as compared to the controls. A dose-response relationship only occurred with the asymmetrical aberrations.[59]

Brandom et al.'s research on chromosome aberrations among Rocky Flats workers has given more detailed attention to potential confounding factors and has examined a larger number of nuclear workers. In 1979, Brandom et al. reported on chromosomal aberrations in 68 controls and 343 plutonium workers with an estimated body burden of at least 40 nCi based on urine analysis.[60] Controls were selected from unexposed workers at the same institution, and another group of controls was selected from volunteers in the local community. 47,000 cells were examined and outcomes included complex aberrations (dicentrics, rings, translocations, and inversions), as well as deletions. Subjects were excluded if they had been exposed to toxic substances outside the workplace, therapeutic radiation, recent low dose medical radiation, severe sunburn, or family history of congenital defects. A significant monotonic increase in complex aberrations from the lowest to the highest exposure groups was reported, after controlling for external radiation.

Brandom extended this research to 640 workers, analyzing 63,000 cells, and collecting extensive information on potential confounding exposures; the study provided one of the most extensive sources of data on human radiation cytogenetics relating to internal alpha-emitters. The trends observed in the sample of 411 workers are similar in the larger sample, with a monotonic increase in aberrations with increasing estimated burdens of plutonium.

Brandom et al. further strengthened interpretation of these results by conducting a study of sister chromatid exchange and chromosome aberrations in a subgroup of workers at the Rocky Flats facility.[61] Sister chromatid exchange is expected to be most strongly associated with chemotoxic exposures, rather than radiation; an association between sister chromatid exchange and plutonium body burdens would suggest confounding due to chemical exposures. In these

analyses, 18 workers versus 4 controls were examined. No significant increase in sister chromatid exchange was observed; in contrast, an association between plutonium body burden and chromosome aberrations was observed. As expected, since this was a small subgroup of the 640 workers previously examined, the association between plutonium burden and chromosome aberrations was statistically weaker than the association for the larger population; however, a significant increase in the frequency of aberrations was again observed among the workers with plutonium depositions greater than 740 Bq.

*Summary.*        Compared to studies of cancer and birth defects, which are relatively rare events that may take years or decades to be manifest, cytogenetic studies of chromosomal aberrations can detect more immediate biological impacts of plutonium exposures in humans. Although cytogenetic studies of plutonium-exposed have been underway since the 1970's, they have received less attention than some other human studies that have lower sensitivity to detect biological consequences of plutonium exposure (see below). Although cytogenetic studies do not necessitate waiting for disease or death before outcomes can be assessed, they may suffer from the same problems of dose misclassification that afflict other studies. For example, when chromosome aberration rates are compared between groups with different doses from internally deposited plutonium, uncertainties in estimates of the types and amounts of exposure, and of biological fate of the plutonium in each individual, lead to insensitivity to detect effects of plutonium on chromosomes. Despite this problem, many studies have observed evidence of the effects of plutonium on human genetic material.

### 4.   Medical follow-up studies

Medical follow-up studies of a small group of plutonium exposed workers has been a primary part of the DOE's effort to understand plutonium health effects. This research has focused on mortality, and has suffered from consideration of a small numbers of workers and a lack of a suitable comparison population to which to compare the group's mortality experience.

The Manhattan Project Workers study is the primary medical follow-up study of plutonium exposed workers. Subjects for the study were chosen because they were judged to have the highest internal depositions of plutonium as a result of their work in 1944 and 1945.[62] The subjects selected were young healthy white men working in four types of plutonium operations who were judged by the researchers to have "measurable body burden." Only 26 workers total were chosen to be included in the long term study. It is not clear why only 26 workers were followed. The authors themselves note in the 32 year follow-up that "the major limitation in the study is the small number of individuals studied, which places a limit on the probability of detecting an increased incidence of disease."[58]

Gofman has stressed the problem, in the study of the LANL Manhattan Project workers, of estimating initial lung depositions 10 to 27 years after the exposure.[63] There are several areas of uncertainty that affect the measurement of plutonium exposure. These include uncertainties about the solubility of plutonium compounds,[63] the measurements themselves, and inference of effective dose from measured quantities.[64] Voelz points out that the estimated plutonium depositions in the subjects at the end of 1987 or date of death cover the spectrum from 52 to 3180 Bq.[62]

12

Standardized Mortality Ratio (SMR) analyses, which compare the mortality experience of the 26 workers to the mortality pattern US white males, were reported after 32 years of follow-up.[58] SMR analyses are a poor method for evaluating health outcomes when so few workers are studied; such comparisons lack statistical power because of a small sample size. Furthermore, an implicit assumption of SMR analyses is that the mortality experience of the Manhattan project workers should be comparable to the mortality pattern US white males. The SMRs reported in the final two updates of the 26 workers indicate lower mortality than the US population. A low SMR is a typical finding when the general population is used as a comparison group because employed persons are healthier than the general population, a phenomenon often referred to as the "healthy worker effect." In the 42 year follow-up, the authors also compare the mortality experience of the plutonium exposed men to 876 contemporary Los Alamos workers who are believed to be unexposed. It is not clear how much more appropriate this control group is than the general population. The calculation of the cancer mortality SMR was based on 1 cancer compared to a expected 2.21 cancers; the authors note that after the end of follow-up there were three additional deaths among workers who had cancer.[62]

While analyses of non-fatal events such as cancer incidence would be more appropriate for a group of workers, the majority of whom are still living, these non-fatal outcomes received less attention. For example, data on chromosome aberrations were collected, however, the DOE opted not to fund these analyses.(Document #00429583) The Manhattan Project worker study reports physical exam and test results by individual. In general, potentially suggestive findings were buried in text rather than highlighted. Examples relevant to the skeleton include bone islands, Paget's disease, and osteosarcoma, which are all related to bone growth and dysplasia, and cytology of exfoliated cells.

Medical follow-up has, more recently, been reported for 241 workers with estimated plutonium depositions of 10 nCi or greater.[65-67] These reports are limited by their small numbers of subjects, few observed deaths, and consequently unstable SMR analyses. In a report on an average follow-up of thirty-three years, 43 deaths were reported, of which eight deaths were due to malignant neoplasms. Cancer mortality was low compared to the general population.[65]

An unpublished medical follow-up effort involves the follow-up of twenty five workers at Rocky Flats who received significant lung burdens of plutonium during a fire in 1965.[63] This group is expected to have much better plutonium body burden estimates than the earlier Manhattan project workers; however, this study suffers the same limitations of small numbers and lack of a comparison population. Furthermore, a shorter period of follow-up has been conducted for this group of workers. In a report on 22 years of follow-up, only four deaths had so far been observed. Chromosome analyses, which might be of more immediate interest, were conducted on only 12 of the 25 workers; the results indicated a positive correlation with plutonium body burden.(Document #00463005)

An example of epidemiological surveillance that avoided some of the previously described limitations is the follow-up of patients exposed to another alpha emitter, thorium, which was in Thorotrast, a compound used for angiography in the 1940-50s. Thorium is not plutonium;

13

however, both are radionuclides and alpha-emitters. This review will focus on two most recent papers by Andersson.[68, 69] The Danish cohort of 1003 Thorotrast patients, (566 males and 437 females), was followed from 1935 to 1992 for a total of 20,361 person-years. A careful tracking system was constructed with links to the central population registry, municipal population registers, and local parish registers. Cancer cases were identified by computerized linkage with the Danish Cancer Registry, which receives reports from hospital departments, pathology institutes, and practicing physicians. To reduce influence of selective differences between the Thorotrast-exposed patients and controls, the Thorotrast group was compared to a group of neurosurgical patients, supposedly suffering from the same conditions as the Thorotrast patients, who also underwent cerebral arteriography but with other radiographic agents than Thorotrast.[68]

Rate ratios for all-cancer mortality were significantly increased among patients injected with Thorotrast compared to controls (2.6, 95% CI 1.9,3.6). The adjusted relative risk (RR) for liver was 1243.9 (95%CI 64.7, >$10^6$). The leukemia  adjusted RR was 12.7 (95%CI 2.4, 138), metastases at unspecified sites had a RR of 10.3 (2.2, 78.5), brain cancer had a RR of  6.0 (1.7, 23.7), and ovarian cancer had a RR of 4.8 (0.6, 47.8).  Analyses were conducted to evaluate a dose-response relationship between Thorotrast and cancer morbidity and mortality.  As noted in BEIR V, "follow-up studies of Thorotrast-exposed patients have provided conclusive evidence of carcinogenic effects on the liver from chronic alpha irradiation by internally deposited $^{232}$Th and its radioactive decay products."[70]

DOE researchers also injected plutonium into 18 patients who were not informed that they were being used as experimental animals.[4, 71]  Although these patients were referred to as "all gravely ill at the time of plutonium injections,"[71] it was later noted that "all the patients were not hopelessly or terminally ill . . . and that some had been misdiagnosed." One African American man had been hospitalized only for broken bones and was otherwise healthy.[4] At least five of the patients lived more than 20 years.[71]  Three patients were finally brought in for examination in 1973 but were still not told that they had been subjects in an experiment.[4] The 1976 report on the plutonium injections reviewed death certificates, an insensitive source of information about biological effects of plutonium, and concluded that "these cases serve to demonstrate that plutonium does not appear to be more carcinogenic than expected."[71]  (This is another example of unwarranted conclusions from studies whose sample size is too small to find the effect being investigated.)  The authors  did not mention that clinical exams had been performed in 1973 which found "subclinical bone 'changes' that an Argonne radiologist characterized as 'suggestive of damage due to radiation.'"[4]  They also did not report that bodies of some deceased persons had been exhumed for research purposes,[4] or any of the subsequent findings. The "significant gaps" in experimental records noted by the Presidential Committee,[4] as well as the fact that researchers from Argonne National Laboratory waited until the 1970's to exhume bodies of some deceased patients, shows that this research was not only highly unethical, but of little scientific value.

*Summary*.      Contrary to epidemiological principles that emphasize the importance of adequate study sample sizes, the use of appropriate comparison populations, and the preferability of studying morbidity to mortality, the medical follow-up efforts of DOE have been limited in size and required decades of follow-up to obtain a small amount of information on outcomes.  The surveillance effort has neglected problems of inadequate monitoring of initial and continuing

14

exposure, dosimetry, and measurement of potentially confounding factors that could mask or accentuate differences between the exposed groups and controls. These studies are of limited scientific value for determining the human health effects of plutonium exposure.

## 5. Occupational epidemiology

Occupational studies offer the scientific opportunity to study humans who have been exposed in a relatively uniform environment, who can be followed through employment records and occupational medical departments, and who can be traced through pension benefits and other record sources. Because occupational exposures are often higher than exposures of the general public, smaller sample sizes are needed than would be the case for environmental studies. DOE has had a special responsibility to conduct such studies among plutonium exposed workers because plutonium is primarily used in the nuclear industry.

Epidemiological studies of the health effects of plutonium on workers have focused on analyses of mortality. This is despite counsel from the Epidemiology Advisory Committee, and the acknowledgment by Voelz and others[72] of the limitations of mortality studies which include: the fact that non-fatal health effects could not be assessed in mortality studies; that mortality studies based on US, State, or County death rates are not likely to provide valid results; that the distribution of potential confounding factors (which are obtainable only by interview) may be very different for plutonium workers, and these factors could not be controlled; and, that official scientific bodies place little emphasis on studies of mortality for cancers which are not highly fatal.

Of course, there are reasons to conduct mortality studies. Wilkinson noted, that the health effects of "greatest concern, namely cancer of the lung, bone, liver, and lymphoid/ hematopoietic systems, are known to result in relatively short survival times and high mortality rates. Furthermore, death certificates are the only universally collected data on health endpoints that allow us to complete nationwide follow-up studies at a reasonable cost."[73] The data collection could be done relatively quickly (though this certainly hasn't been the case for these DOE reports).

Many of these studies have tended to emphasize rather than minimize the problems which are associated with mortality studies. Most of the published studies compare the mortality experience of plutonium workers to that of the general population using Standardized Mortality Ratios (SMRs). All cause and all cancer SMRs at these facilities are extremely low. It has been repeatedly noted that people hired to work at DOE facilities tend to be a select group of people who have low mortality. Low mortality is expected in a highly selective, well educated, well paid workforce. For years DOE continued to fund studies subject to this form of bias rather than initiating studies which compare mortality rates between groups of workers who received different levels of exposure.[74]

Some of the facilities for which SMR analyses are emphasized include Rocky Flats,[72] Pantex,[75] Savannah River Plant,[76] and Mound.[77] The observation of low SMRs for all causes and all cancers is noted throughout these studies, and these observations even have been cited as

15

grounds for discounting findings of positive dose response relationships, for example between plutonium body burdens and lung cancer.[78, 79]

It is important to note the logic of considering different causes of death for different analytical approaches. SMR analyses are most appropriate to use when examining causes of death which do not occur in sufficient number to support dose response analyses. SMR analyses may be very useful for detecting an excess of a disease which is uncommon in the general population and is hypothesized to be etiologically associated with plutonium; such diseases may include liver, bone, and hematapoietic cancers. In contrast, SMR analyses are of less use for studying common cause of death categories, such as all cause, all cancer, or lung cancer mortality, that are expected to be affected by a broad range of exposures and to differ significantly between a working population and the general public.

Interpretation of SMR analyses of plutonium workers which note deficits of all cause and all cancer mortality, despite observed excesses of cancers which might be expected to be related to plutonium exposure,[78-80] reflects an important logical error. Wilkinson, Wiggs, and Voelz have noted excess mortality due to many causes of death which etiologically are of interest; however they note that these excesses are statistically weak. These findings are often countered by noting deficits overall in all cause and all cancer mortality, which are based on larger numbers of deaths. Again, however, deficits in broad categories of death are expected due to selection factors in employment. Emphasis on statistical significance confuses tests of statistical variability with evaluation of a priori hypotheses about etiological associations.

Some reports have attempted to address weaknesses inherent in SMR analyses. It is important to note the consequences of these efforts. Several reports of SMR analyses fail to separate subgroups with longer and shorter lengths of follow-up. Consequently, these studies mix populations in which average latency times have passed with those in which average latency times have not passed. SMR analyses which have examined differences in mortality among workers with longer follow-up have more often reported positive results; it should be noted that workers hired at earlier periods also tended to have higher plutonium exposures than those hired later. Cragle's SMR analyses of Savannah River Plant,[76] considered stratifying the cohort by period of hire; elevated SMRs for leukemia were observed among the workers hired before 1955. Among workers at Mound, average follow-up was 19 years; among the workers hired before 1960 however elevated SMRs were observed for lung cancer.

In contrast, analyses of workers at Pantex[75] and Rocky Flats[80] examined the subgroup of workers with longest duration of employment. While workers with longer employment may have greater potential for exposure, considering duration of employment might also be expected to increase the problem of different mortality among employed DOE workers when compared to the general population. It has been repeatedly observed, and described as a healthy worker effect, that workers who remain employed longer tend to be of better health than those who are employed only a short period of time. Workers from Oak Ridge National Laboratory, where plutonium has been produced, show an elevated SMR for leukemia that is concentrated among those workers who were monitored for internal radionuclide contamination and among workers who were hired during the 1940s and 1950s.[81]

16

Another consideration is latency, which is an assumption that a certain number of years must pass between exposure to plutonium and any plutonium related mortality. Wilkinson, in an unpublished paper,[80] reported that SMRs were noted to increase when latency periods of 5, 10, 15 years were considered. Elevated SMRs under a 15 year lag can be noted for liver (289), brain (293), leukemia (249), lymphopoietic (143) and benign or unspecified neoplasms (585). All the benign and unspecified neoplasms were intracranial.

Another approach to strengthening SMR analyses is to consider subgroups of workers believed to have experienced the highest occupational exposures. Wilkinson examined SMRs among the group of white males exposed to >=2nCi, reporting, "SMR's for neoplasms of the liver, the lymphopoietic system and leukemia are higher than expected although not significantly so."[80] Wilkinson used a strict cutpoint for who was considered exposed, however, which limited numbers and led to there being only 14 cancers total observed in those workers at Rocky Flats who were classified as exposed.

Problems of classifying exposure are a significant limitation of the occupational studies of plutonium health effects. This is a problem which has been poorly addressed in the occupational epidemiology literature. The poor ability to classify workers by level of exposure is likely to lead to nondifferential misclassification by level of plutonium exposure, and would be expected to lead studies to underestimate plutonium-related health effects. Knowledge about retention of plutonium has been used to estimate the systemic burden of plutonium in worker using variations of Langham's equation. Information from excreta samples (urine/fecal analysis) or field data (nose swipes, air samples, skin and clothing contamination estimates) are traditionally employed to estimate body burdens. Accuracy of this type of measurement was assessed in several studies that compared systemic body burden estimates from urine samples, to those obtained from autopsy tissue analysis. The autopsy specimens were mostly small tissue fragments that were assumed to be representative of the entire organ and ultimately, the entire body. These studies revealed a large discrepancy between urine and autopsy estimates, where the urine based assessments overestimated the plutonium exposure/burden by approximately five fold.[82, 83] This large difference may have been due to several potential sources of error including precision of measurement of plutonium in the urine, individual variability, and assumed mode, form and time of plutonium exposure. Given the poor ability to classify plutonium exposure in the body, another approach might have been to more carefully monitor types of plutonium contaminants, their concentrations in the work environment, and the potential for indirect exposure. Studies could also have made more use of job titles as indicators of probable exposure. Finally, studies of the relationship between plutonium exposure and mortality have given little attention to issues of latency, or age at exposure. These factors are also important for classifying exposure status, and have been demonstrated as important factors in occupational studies of the health effects of external radiation.

Despite the problems of measuring plutonium exposures, analyses which compare cancer mortality rates between groups of workers presumed to have different levels of plutonium exposure avoid the biases associated with comparing workers' mortality experience to that of the general population. Dose response analyses require substantial numbers of events in order to

17

examine mortality differences within the cohort; consequently, such analyses are better suited to larger categories of death which support such analyses. Nonetheless, interpretation of dose response analyses have focused primarily on rare events. For example, a case-control study of brain cancer among Rocky Flats workers examined only 16 cases of brain cancer, among which 12 had been tested for plutonium exposure and 4 had positive results.[84, 85] Tietjen reports on the effects of plutonium exposure on lung cancer, considering Rocky Flats workers with >=74 Bq exposure. One case occurred among these workers.[86] Tietjen first presents SMRs for lung cancer for white males with >=2nCi internal dose (SMR= 0.14); then presents a rate ratio comparing >=2nCi to <2nCi, again based on one case. Such comparisons lack basic epidemiological validity.

Wilkinson, in a study of Rocky Flats workers, considers various latency assumptions when categorizing workers by exposure status.[87] Plutonium exposure, while simply categorized, is discussed in the analyses in terms of measurement problems. Broad categories of death, which provide adequate numbers to support dose response analyses, are examined and given attention in the interpretation of results. Standardized rate ratios increased as plutonium body burdens increased for all causes, all cancers, and digestive cancers. Elevated rate ratios among workers with ≥2nCi were reported for all causes of death and all lymphopoietic neoplasms, under the different induction periods considered. An excess of brain cancer was reported for the cohort as a whole.

A paper examining Los Alamos workers was reported by Wiggs et al.[78] Wiggs examines 15,727 white males at Los Alamos, first presenting SMR analyses which are generally low. Analyses comparing workers with plutonium exposure greater and less than 2nCi exclude those workers never monitored (they argue that those not monitored may be different). Only 303 workers were considered exposed (22 cancer deaths). At the start it was noted that "tumors of the bone, lung and liver represent...the cancers of primary concern." Elevated rate ratios (RRs) are found for lung (1.78), bone (1 case/ approximately zero expected). RRs are not reported for liver. Elevated RRs, interestingly, are also reported for other cancers such as brain (1.2), bladder (6.4), and lymphoma (1.3). Subsequent analyses exclude those workers with more than 10 mSv external dose; of the 303 workers counted in the previous analyses only 136 remained. The authors note that following this reduction "None of the resulting rate ratios was significantly elevated." In this paper a priori categories of interest were ignored, the cohort was repeatedly subdivided into smaller groups, reducing the statistical power of the study, and SMR analyses were given priority in interpretation of results.

The only published studies to consider incidence of non-fatal cancers among these workers are analyses of malignant melanoma among LANL and LLNL workers. In the studies of LANL workers, melanoma incidence for workers from 1969-78 was compared to New Mexico rates.[88] Six cases of melanoma were identified among the workers where 5.69 were expected. This study was limited in ability to detect any effect, and addressed a hypothesis which is only loosely suggested to be related to plutonium exposure. A later case control study of the same disease suggests that plutonium may be a causative factor and further investigates the association between melanoma cases identified through a tumor registry and through death certificates (20 cases).[89] Malignant melanoma was never one of the primary sites expected to be related to plutonium, and

in this study indicators of exposure which are examined in relation to cancer are internal contamination not skin exposure. These two melanoma studies appear to have occurred as a consequence of a published report of a threefold melanoma incidence excess between 1972-1977 among LLNL workers.[90] A subsequent DOE-funded study, never published, examined occupational and non-occupational factors in much greater detail, and reported that exposure to radioactive materials and being present at a nuclear test were important predictors of melanoma incidence among these workers.(Database Document 00453687)

An unpublished report examined the incidence of different types of cancer among LANL workers using a tumor registry for the period 1969-78.[91] These results, while presented at a Health Physics Society conference, and referenced by Wilkinson,[87] were never published. This study is of particular interest because it examines the incidence of a range of cancer outcomes, and, in contrast to malignant melanoma, considers cancer sites which might be more generally expected to be related to plutonium exposure. Reporting on the sites identified as of interest (lymph nodes, lung, liver, bone), for men Standardized Incidence Ratios (SIRs) were as follows: liver cancer=1.11; bone cancer=2.04; lymphosarcoma=2.49; confidence intervals were wide. Similar to interpretation of SMR analyses, the select group of workers employed at Los Alamos may tend to have lower disease rates than the general population. All cancer incidence, as in other studies of DOE workers, was low; particularly due to a deficit of smoking related cancers. Lung cancer incidence was much lower than expected SIR=0.25. It can be noted that a cross-sectional study by Mahoney and Wilkinson in the 1980s indicated that men at LANL smoked at a much lower rate than the general US population.[92] While, in general, morbidity was lower among LANL workers than in the general population, the incidence study reports finding increased cancer incidence at sites of a priori interest. These findings are particularly important given the reasons to expect underascertainment of cancer cases. Similar to the published studies of malignant melanoma incidence, this study would be expected to underestimate cancer incidence among LANL workers, for example, due to underascertainment in the tumor registry, failure to identify cases which occurred among workers who migrated out of the area, and the ability to only consider incidence among those were employed at the time of study thereby limiting latency assumptions.

Recent studies of workers at a radiochemical plant at Mayak (Russia) have reported elevated lung cancer among plutonium exposed workers, although their exposures tended to be much higher than workers in DOE studies. A case control study of 500 workers, 162 of whom were lung cancer cases, reported associations between plutonium body burdens and lung cancer, despite little attention to latency.[93, 94]

*Summary.*    Occupational epidemiology studies of plutonium exposed workers conducted by DOE researchers have often failed to take adequate measurements of exposures, potential confounding factors, and biological outcomes. A cancer incidence study of LANL workers that was presented at a professional meeting was not published in the open literature. Published studies have emphasized results that are methodologically weak over those which are suggestive of untoward health effects of plutonium. Nonetheless, findings of elevated cancer rates among certain groups of DOE workers have been reported for diseases that would be expected to be

elevated based on what is known about the biological fate of plutonium and its toxicological
effects.

## 6.   Environmental epidemiology

Johnson evaluated cancer incidence patterns for the period between 1969-1971 in areas with
varied estimated levels of contamination from plutonium and other radionuclides emitted by the
Rocky Flats plant near Denver, Colorado.[95, 96]  He compared the cancer incidence rates of four
geographic regions around Rocky Flats that were determined using isopleths from an area-wide
survey by the AEC in 1970.  The Pu content in the soil reported in the AEC survey was used as
the measure of exposure.  There was a 24 % higher cancer incidence in males in Area I (highest
exposure) vs. Area IV (lowest exposure), and a 15 % higher cancer incidence in Area II vs. Area
IV.  For females, there was a 10 % increase in Area I, and 10 % increase in Area II.  An unusual
discovery was the high incidence of cancer in the testis and ovary when Area I-III were compared
with Area IV.  This may be supported by the propensity of plutonium to deposit in the gonads
(based on animal data).  When the ratio of cancers of radiosensitive organs to other cancers was
examined in Area I vs. Area IV, there was found to be greater proportion of excess cancers in the
exposed area than the unexposed.  Johnson concluded that exposure of general populations to Pu
and other radionuclides may have an effect on cancer incidence rates and that further study is
warranted to investigate the poorly understood dose response relationship between Pu exposure
and cancer in populations living near nuclear facilities.

In a re-analysis based on Johnson's work, Crump obtained similar results for 1969-71 and
extended the analysis to 1979-81.[97, 98]  Positive findings were diminished by adjustment for
distance from the State Capitol.  Crump argued that distance from the State Capitol was a
measure of socioeconomic factors related to cancer incidence, however, he does not present
findings for conventional measures of socioeconomic status, and provides no quantitative
evidence for this assertion.  Crump's re-analysis of Johnson's work was funded by DOE.

Dreyer et al., funded by the Nuclear Regulatory Commission, gave reasons for not
conducting an epidemiological investigation of cancer incidence around Rocky Flats.[99]  They
recognized the serious fire in 1969 but did not consider the fire at the Rocky Flats Plant that
occurred in 1957.  They did not consider exposures through routes other than inhalation.  Also,
Johnson asserted that the authors did not consider exposure to all isotopes of plutonium.[100]  Dryer
et al. assumed that if there were substantial population exposure, the most likely health effects
would be bone and lung cancer.  However, plutonium is found in many other tissues, especially
the liver, and other studies suggest that malignancies of the blood-forming tissues would be
important to consider.  Dryer et al. used a logical approach to evaluate the feasibility of an
epidemiological study based on expectations about levels of exposure, magnitude of effects, and
sample size, however, their assumptions and omissions assured their conclusion that no study was
warranted.

Johnson noted reasons why environmental studies are needed as well as studies of
occupational cohorts exposed to plutonium.[101]  Johnson argued that plutonium in the environment
may be much more readily absorbed than at the facilities.  For example, in the presence of

fluoride, chlorine, or carbonate ions the solubility and gastric absorption of plutonium rises from very poor to near 100% absorption. In the Denver area drinking water is chlorinated, and contains fluoride as well as considerable carbonate ions. Plutonium is absorbed much more by children and nursing animals; these effects can not be assessed in occupational cohort studies which only consider adults. Through the food chain, plutonium may be incorporated and uptake increased as well. Finally, Johnson noted that workers are monitored, have health care, and wear protective masks, while the general public has neither the same exposure or health care experience. We have not found that these criticisms have been addressed by DOE researchers.

*Summary.*     Despite poor exposure measures and migration effects that lead to an inability to separate populations with lower from those with higher plutonium exposures, geographical incidence studies around Rocky Flats have found evidence of higher cancer incidence in areas with higher estimated plutonium deposition. DOE-funded critiques of the published work have emphasized the potential for confounding factors to lead to observing associations due to differences in other cancer risk factors. Crump's re-analysis used a highly unorthodox measure of urbanization that was not supported by any quantitative data in order to control for confounders. DOE critiques have not noted that confounding, in addition to migration and errors in dose estimates, could also lead to masking or underestimation of exposure effects.

## B.   Evidence regarding role of DOE

Plutonium is not a substance that is in general use. Therefore, DOE and agencies of other governments that have been responsible for nuclear weapons and nuclear research programs have had the ability and unique responsibility for conducting adequate investigation of potential effects of plutonium on workers in facilities that have used plutonium as well as on members of the general public who have been exposed through off-site releases from DOE facilities and nuclear weapons tests. As noted by Nussbaum and Kohnlein, "practically all epidemiological studies of nuclear worker populations in the industrialized world have been funded by government agencies."[102] This section of our report considers the DOE's historical role in research on human health effects of plutonium exposure by drawing on evaluations of DOE's research program made by its own researchers and advisory committees as well as critical reviews conducted by independent researchers.

Although there have been historical concerns about the potential conflict of interest between DOE's roles in both promoting nuclear technology and evaluating its health effects, we assume that most researchers have honorable motives and are committed to goals of protecting public health. Nonetheless, a traditional model of discovery through scientific discourse relies on the ability for prevailing opinions to be challenged, and opposing positions to be voiced and evaluated. Access to data relevant to assessing health effects has been and continues to be restricted. The history of DOE research shows that contesting voices, even at the highest levels of the organization, were silenced. Examples of leading DOE researchers who were silenced include Dr. Thomas Mancuso, who was the original director of the epidemiological studies of DOE workers, and whose research funding was terminated after reporting positive associations between cancer mortality and radiation exposure. This silencing also includes Dr. John Gofman, who was head of the bio-medical research division at Lawrence Livermore National Laboratory

21

and one of LLNL's Associate Directors. Dr. Gofman's funding was cut after he published dissenting opinions about the human health effects of plutonium. Dr. Gregg Wilkinson, one of the lead epidemiologists at Los Alamos National Laboratory, lost his funding and position after reporting positive associations between radiation at Rocky Flats and cancer mortality. Dr. Brandom's funding for his highly praised work on chromosome aberrations following plutonium exposure was cut following his report of positive associations. By its treatment of well-known researchers who have exerted their independence, DOE sets an example for others of what will happen to them if they do not conform to expectations.

## 1. Views of DOE Advisory Committees

### The Advisory Committee for Biology and Medicine

Another element influencing DOE research on the health effects of plutonium is the evidence that researchers were influenced by concerns other than the protection of public health in planning, conducting and interpreting studies of plutonium health effects.

The Advisory Committee for Biology and Medicine (ACBM) was established in 1947 as an external committee by the Division of Biology and Medicine (DBM) of the US Atomic Energy Commission (AEC) to formulate basic policies related to medical, biological and physics problems. The activities of the committee included the review of proposed research and the allocation of funds for research at US AEC facilities, universities and research institutions. Following each meeting, the chairman of the ACBM provided recommendations of the Committee in a letter to the chairman of the AEC.

The early meetings of the ACBM were full of conflicting positions regarding protection of health and safety vs. concerns over cost and bad publicity. At their seventh meeting, in March, 1948, "The committee thoroughly discussed the medical aspects of hazard pay and recommended that exposure to permissible dosage of radiation and exposure to toxic material under satisfactory safeguards be regarded as not hazardous to health." It is noteworthy that the committee on biology and medicine decided to discuss wages as an issue at all. Decisions about research as well as about worker protection were affected by such considerations. At their thirteenth meeting in December, 1948, the committee rejected a proposal to study morbidity and mortality of workers to determine special hazards, noting that the cost of the study would include "insurance problems and labor relations." Recommendations were considered that terminated employees be informed about radiation exposures exceeding permissible standards and that they be given records that could be used by new employers to make a more complete exposure history. These recommendations were rejected in favor of telling a terminated employee about "the care that the A.E.C. utilizes in protecting each employee."

The ACBM also took apparently contradictory positions regarding the open conduct of scientific inquiry. At its seventeenth meeting in September of 1948, the ACBM unanimously approved a statement that,

22

> Science will not long thrive in secret because intellectual restraints and taboos hamper the type of probing and wide-ranging thought essential to scientific discovery. Political restrictions do two dangerous things to scientists: alienate them by reason of lack of freedom of inquiry, which will merely retard progress; or distort their thought processes by orienting them about political points of reference, a process of substituting dogma for truth, deadly both to science and to polity.

Later at the same meeting it was noted that training of scientists was a national need in light of the successful atomic explosion in the U.S.S.R, and that the Atomic Energy Commission was the best agency to direct a fellowship program to train scientists, who must be "both loyal and discrete." Despite the lofty proclamation of commitment to scientific ideals, the ACBM spent much time at subsequent meetings discussing problems with dissemination of information that would have "serious repercussions from a public relations standpoint" (23rd meeting). It was important to "get the general scientific groups to avoid contradictory statements by competent scientists . . . [especially] those associated with the AEC" (60th meeting). The sixty-third meeting in April, 1957, was dominated by discussion of public relations problems, including those attributed to independent scientists such as Drs. Pauling and Schweitzer.

Excerpts of minutes from the ACBM's fortieth meeting on October 9-10, 1953, at Los Alamos, suggest concerns of the committee for the cost of radiation protection and public relations issues that could affect the scientific evaluation of health effects and public education about radiation and health. In considering proposed AEC safety regulations, one committee member noted,

> the need for establishing a policy arose from the fact that there has been exaggerated use of additional safety factors by the contractor. On general principles the contractor wants to be on the safe side, so the expense to the AEC is quite appreciable. According to this policy, the contractor should not have to take so many precautions . . . if this information or policy should be released to the public it would create a rather bad impression if the AEC requires the contractors to assume the attitude that they must not take so many precautions for health protection.

The minutes further quote the Advisory Committee member directly,

> from the public relations point of view that is a bad situation especially at this time when, with the bomb tests in Nevada there is considerable amount of radioactivity there, and if the newspapers got hold of that--and this new policy too--they may say there has been a relative change in the attitude of the AEC.

Another committee member, again referring to the new safety regulations,

> brought out that the language could be changed somewhat to make it a little less mandatory and a little more permissive with which the Committee

23

concurred. He stated, however, that one of the reasons for making the policy mandatory was the fact that at the recent hearings before the Bureau of the Budget the question was asked as to what was being done by the AEC to reduce the cost of health protection.

It is noteworthy that these statements are excerpted from what was released from minutes for this meeting, which were heavily censored. In the portion of the minutes available to us, no member of the committee expressed discomfort with these statements, although one member, "following the meeting . . . urged great caution in reaching a waste disposal policy" due to the potential for genetic effects in future generations.

The ACBM routinely reviewed funding for studies at AEC facilities and universities as well as research being conducted on A-bomb survivors. One theme of committee discussions was the inadequacy of funding for biological research. However, committee chair Failla observed at the sixty-third meeting that, while more money was needed for the biology and medicine program, the weapons program needed the money to compete with the Russians. Furthermore, more funding for biological research "would not have prevented the present emotional reaction on the part of the public."

Discussions at ACBM meetings suggest that the conflict of interest of the AEC and its biomedical research program as both promoters of the nuclear industry and monitors of health and safety was acknowledged and of concern to some. At the ACBM's seventy-fourth meeting in April 1959, AEC Chair McCone questioned "to what extent an agency that contributed to a national (and also international) health hazard should be charged with monitoring and interpreting that hazard." Mr. W.E. Johnson, Vice President of General Electric Co. and Manager of the Hanford Atomic Products Operation, said his concerns about the biomedical research program included "that the Hanford staff and the AEC were being placed in the position of judge, jury and offender with respect to its monitoring activities. It would be better for an outside organization to be the judge or jury."(78th meeting, January, 1960)

### The LANL Advisory Committee for Epidemiology

In 1976 a protocol for an epidemiological study of all workers at major DOE facilities processing plutonium, the National Plutonium Workers Study, was reviewed and approved by a DOE Ad Hoc Advisory Committee.(Document 00440616) The study was to be conducted at LANL, and it was to include past and present workers at LANL, Rocky Flats, Mound, and Savannah River. In the same year an external review committee for the epidemiology program at LANL was established. The purpose of the Committee was to provide an unbiased critique and review of epidemiology research of plutonium workers. At their first meeting the Committee reviewed proposed and ongoing studies of morbidity (including genetic effects) and mortality in plutonium workers. LANL staff described plans for the morbidity study of plutonium workers and requested input from the Committee regarding study design. The Committee recommended that LANL consult with genetic epidemiologists and develop a proposal to study genetic effects in plutonium workers.(Document 00463578, 1976)

24

Beginning in 1977, Dr. Saxon Graham provided a written summary of the Committee's recommendations. The Committee immediately raised questions about the usefulness of the mortality studies in identifying non-fatal cancers and the lack of exposure assessment for other types of radiation. The proposed morbidity study engendered enthusiasm on the part of the Committee, which provided detailed recommendations on study design issues. The Committee also recommended investigating potential genetic effects related to plutonium exposure as part of the proposed morbidity cohort study.(Document 00463554, 1977)

The Committee reiterated its support of the longitudinal study of morbidity, describing the proposed study as the "backbone" of research efforts of specific individuals exposed to various levels of irradiation by plutonium at the various work sites throughout the country.(Document 00463547, 1979) The Committee considered the mortality studies of Los Alamos County compared to other New Mexico counties, and related mortality studies being conducted by LANL, to be of limited use.

The Committee continued to advise LANL in 1981 regarding design of the morbidity study and urged LANL to begin data collection as soon as possible. The Committee reiterated the value of the morbidity study, including the opportunity to test a variety of hypotheses using cohort and case-control study designs. The Committee again expressed its concerns regarding the limitations of the mortality study,

> I think we made explicit our reservations about comparing mortality rates from various causes in the work forces with that to be expected in similar populations residing in the United States or the states or counties in which the locations are located. Ideally, mortality should not only be studied in the above fashion, but should be assessed in terms of the degree of exposure of worker. Certainly, state-county comparisons are necessary to assess the possibility that anyone working in the vicinity of plutonium may have experienced some effect whether or not exposure was measured. (Document 00463523, 1981)

In 1983, a DOE epidemiology site review committee disagreed with the program of research recommended by LANL researchers and the Advisory Committee for Epidemiology: "The proposed morbidity study should not be conducted as planned. A small pilot study may be warranted but should not be pursued until the protocol is reviewed and approved by the DOE Project Officer." In response, Dr. George Voelz from the LANL Health Division wrote to Dr. Charles W. Edington, Associate Director of Energy Research at the Office of Health & Environment Research, US Department of Energy, "We believe that the purpose of the plutonium workers study is to provide the most definitive answer possible to the concern about plutonium-related health effects and that a morbidity study is necessary to achieve this end. Total reliance on mortality studies would result in both scientific and public criticism for DOE and the eventual results of the plutonium workers study." (Document 00453348)

Soon thereafter, Dr. Saxon Graham resigned as Chairman and member of the Advisory Committee, expressing disgust at the DOE site reviewers' conclusions about the morbidity study. Dr. Graham stated, "The DOE will never convince anyone that there are no untoward effects of

plutonium without carrying on the incidence study.  Nested case-control studies cannot do the job." (Document 00442878, 1983)

The Epidemiology Advisory Committee continued to advise LANL on the design of the morbidity study in 1986.  They noted that the morbidity study remained a high priority, but they recommended that the study should be pursued only if it can be done expeditiously and without draining resources from other important studies.  The Committee also advised completion of mortality studies at LANL, Mound and Zia to confirm the results reported at Rocky Flats, but reiterated the limitations of mortality studies and the interpretation of the Rocky Flats study results.

In November 1989, the Secretarial Panel for the Evaluation of Epidemiologic Research Activities (SPEERA) recommended changes in the organization of epidemiological research activities at DOE facilities that would have significant impact on future plutonium research activities at LANL.  Aware of the SPEERA Committee recommendations, the Epidemiology Advisory Committee recommended that LANL significantly improve their health surveillance programs and records to provide opportunities for future epidemiological studies. The Committee continued to advise LANL on mortality study issues and recommended that special consideration be given to the study of excess bone tumors observed in the Zia cohort mortality study.  The Committee continued to recommend that the morbidity study of plutonium workers as an important priority that has not been undertaken (Document 00423090, 1990).

The proposed incidence study was designed to interview 5000 workers with positive Pu body burdens and 20,000 workers without confirmed Pu exposure.  (Database document 00424419, [72]) The study would collect information on confounders and track workers to detect incident cancers. This protocol was repeatedly referred to in publications[73], suggested and approved by the LANL Advisory Committee for Epidemiology, yet rejected by DOE scientific advisory committee.  To date, the study originally conceived in 1976 has not been initiated.

## 2. The Scientific Culture at DOE

The conflict between the commitment of researchers to serving the public health and the interests of DOE in promoting nuclear technology has been noted by many scientists.  Karl Z. Morgan, sometimes called the "father" of the discipline of health physics, who directed the radiation protection program at the Oak Ridge National Laboratory for many years, observed that "there were times when some of my associates were demoted or lost their jobs because they refused to yield to pressures to lower our standards or compromise for unsafe conditions."[103]  He continued: "We were constantly resisting pressures of engineers and production supervisors to relax what they called our ridiculous conservatism.  Sometimes we were forced to set exposure limits that were lower than our management wanted and perforce they were often little better than guesses because in some areas we had almost no experience or supporting experimental data.  For example, one of the earliest papers showing how to calculate dose from internally deposited radionuclides and giving values of permissible body burden and permissible concentration of some 20 radionuclides was delayed for almost a year when I presented it for publication in 1945

because some of the permissible occupational exposure values I calculated were much lower than those in use in weapons production operations."[103]

Morgan's statement concerns standard setting, which depends on assumptions about the magnitude of health damage that results from a particular quantity of exposure, known as dose-response. As Greenberg noted, "The reduction of exposure to [radiation], whether by substitution, containment, or personal protection, of course, has important commercial, energy and defense policy considerations. Deliberations over dose-response relations have, in consequence, been hard fought over."[104]  Greenberg goes on to point out that, "Data that are available for these exercises, both in terms of the gross epidemiological data and the finer information that deals with the biological effects of the agent and with the mechanisms by which disease processes proceed, are not all that good." In such a situation it is important "to appreciate all the considerations that went into the formation of the value judgments involved [in dose-response assumptions]."[104]  Such a situation suggests why the views of advisory committees and the social context in which DOE researchers operate are so important.

Sterling investigated the decision making at DOE involved in establishing the Health and Mortality Studies in the mid-1960's.[5]  He notes that DOE's decision to initiate these long term studies neglected the advice of scientific reviewers because the design of the study was anticipated to produce ambiguous findings that could be interpreted as evidence that there are no untoward effects of occupational radiation exposures. Marks, a DOE-funded researcher, said, "This study probably will not confirm or refute any important hypothesis but should permit a statement to the effect that a careful study of workers in the industry has disclosed no harmful effects of radiation." A study consultant from Harvard who served as the chair of the ad hoc advisory committee to the federal radiation council of the National Academy of Sciences wrote to the AEC, "In my opinion this study does not have, never did have, and never (in any practical sense) will have, any possibility of contributing to knowledge of radiation effects in man . . . . I recognize that much of the motivation for starting this study arose from the 'political' need for assurance that AEC employees are not suffering harmful effect." These assessments turned out to be wrong, as over the ensuing fifteen years numerous researchers reported evidence of radiation health effects among DOE workers. Nevertheless, it is an important indication of the scientific climate at DOE that studies were readily funded (although under-funded) even though they were thought to be scientifically useless when it was believed that their results would have political utility. As Sterling notes, the funding was cut when the investigators reported positive findings.

Pressure on DOE researchers to come up with the "right" answer is exemplified by the experience of Gregg Wilkinson, formerly epidemiology group leader at LANL and principal investigator of the plutonium workers study. Wilkinson, who described his experiences before the SPEERA committee, considered his "mission as a public health professional [was] to investigate whether or not there were health effects, ostensibly associated with exposure to internal radiation, primarily, but also external radiation."(page 211)  After finding evidence of excess cancer at Rocky Flats, Wilkinson "decided to inform some of my superiors at the laboratory . . . [one of whom] was very upset and made the statement that, if these findings are true, this will shut the nuclear industry down." (page 211)  He was "called to the Director's office at Los Alamos and berated and accused of not having these results properly reviewed," and told that, "we should not

be publishing using or trying to please peer reviewers, but rather we should be publishing to please the Department of Energy because they were a customer of ours." He further stated that, "at that time, pressure was put on me to withdraw the paper and which I refused to do."(page 207) Pressure to withdraw the paper came not only from his superiors at LANL. "There was very definite pressure from several sources within the Department of Energy to withdraw the results of that study to change the findings or the interpretation."

The experience of a British epidemiologist suggests that the scientific climate at DOE is similar in other countries in which the government has a vested interest in promoting nuclear technology. According to Geoffrey Rose, a participant in an inquiry into the relationship of childhood cancer to environmental exposures from the Sellafield, United Kingdom, nuclear facility, "We were given information (which, it later transpired, was incorrect) of the total radioactive emissions from the plant, but the exposure levels of the children were a matter of speculation. The radiation experts on the committee calculated 'best estimates' and they concluded, on theoretical grounds, that these could not have caused any major excess risk: 'It couldn't have happened, so it didn't happen.'"[105] Rose went on to note that "From experience at Sellafield and elsewhere I have become aware that in investigating the environmental health impact of large industries (especially if they have military interests) we are confronting the seat of immense economic and political power."[105] Rose's experience suggests that problems with governmental and industry influence on radiation health researchers is international.

### *Advisory Committee on Human Radiation Experiments (ACHRE)*

The ACHRE was created by President Clinton to investigate experiments on individuals involving intentional exposure to ionizing radiation, and experiments involving intentional environmental releases of radiation. The Advisory Committee on Human Radiation Experiments Final Report (1995) and related documents describe Atomic Energy Commission (AEC) policies, procedures and activities in releasing information related to the human radiation experiments, occupational exposures, environmental emissions and nuclear fallout studies conducted by the Manhattan Engineering District and the AEC.

The AEC established a written policy of security classification which controlled access to information by the scientific community and the public. The written policy was adopted in 1947 following recommendations of the Advisory Committee on Declassification[106] and the AEC Medical Board of Review. The Medical Board of Review recommended that, "in so far as it is compatible with national security, secrecy in the field of biological and medical research be avoided."(Letter from David E. Lilienthal to Dr. Robert F. Loeb, Chairman, Atomic Energy Commission Medical Board of Review, June 27, 1947)

However, in practice the AEC consistently violated this policy. Instead, criteria other than national security were used to prevent release of information, creating classification categories of restricted and confidential, in addition to secret and top secret classifications, to control access to information. These criteria are described in several documents obtained by ACHRE. For example, documents were classified by the AEC as Confidential if, "while not endangering the National security, would be prejudicial to the interests or prestige of the Nation or any

Governmental activity, or individual, or would cause administrative embarrassment, or be of advantage to a foreign nation."

Questions regarding the AEC policy for declassification of previously classified medical and biological research documents were raised by the Biological Research Department at Oak Ridge Operations office in 1947 following publication of the AEC Board of Medical Review recommendations. The Oak Ridge Operations Office cited numerous documents that caused considerable concern to the Atomic Energy Commission Insurance Branch and would compromise the public prestige and best interests of the commission.

> Papers referring to levels of soil and water contamination surrounding Atomic Energy Commission installations, idle speculation on the future genetic effects of radiation and papers dealing with potential process hazards to employees are definitely prejudicial to the best interests of the government. Every such release is reflected in an increase in insurance claims, increased difficulty in labor relations and adverse public sentiment. (October 8, 1947 memorandum from Medical Advisor's Office, Oak Ridge Directed Operations to Advisory Board on Medicine and Biology, Re: Medical Policy).

Of particular interest to the present investigation, the AEC's classification activities extended beyond the human experimentation studies to include documents related to medical reports of injury, programmatic medical research, records of exposure to classified substances, public health hazards, and "documents and correspondence relating to matters of policy planning and procedures, the given knowledge of which might compromise or cause embarrassment to the Atomic Energy Commission and/or its contractors" (Report of Meeting of Classification Board During Week of September 8, 1947, Oak Ridge Operations Records Holding Center, TN).

Numerous examples of AEC actions in restricting publication of research results are described in the ACHRE report and supporting documents. Public and scientific access to documents describing occupational and public health hazards associated with specific AEC sites, and studies of nuclear fallout was controlled by classification of the research reports. For example, the AEC classified documents as Confidential or Secret that summarized uranium toxicity using published literature, the establishment of maximum allowable concentrations for uranium exposure, descriptions of medical follow-up and exposure monitoring programs for AEC workers, and measurements of radionuclides in the general public from nuclear fallout. AEC policies and practices on declassifying research activities and publications were publicly criticized by Bak et al.,[106]

> Inaction by itself becomes a block to communication. If, for example, the Commission were to determine that publication in certain fields would not adversely affect the common defense and security, then more important investigations would be carried out in theses fields than under the present uncertain circumstances. Declassification by fields would also remove some of the difficulties of free scientific discussion.

The AEC Insurance Branch also became actively involved in the classification process, evaluating the potential liability to the AEC and its contractors if specific documents were declassified. Their review of a study evaluating changes in the blood of humans chronically exposed to low level gamma radiation noted the following:

> The results of the studies indicate that the tolerance levels for chronic exposure to gamma radiation which have been accepted both within the A.E.C. and elsewhere may be too high. We can see the possibility of a shattering effect on the morale of the employees if they became aware that there was substantial reason to question the standards of safety under which they are working. In the hands of labor unions the results of this study would add substance to demands for extra-hazardous pay. We can also see the definite possibility that general knowledge of the results of this study might increase the number of claims of occupational injury due to radiation and place a powerful weapon in the hands of a plaintiff's attorney. (Memorandum from Clyde E. Wilson, Chief, Insurance Branch to Anthony C Vallado, Deputy Declassification Officer, Declassification Branch dated December 20, 1948).

In describing the AEC research activities on nuclear fallout, the ACHRE noted that, "By the mid-1960s the possibility that data gathering could only get the AEC into more trouble became an incentive to 'not study at all.'"[4]

*The Secretarial Panel for the Evaluation of Epidemiologic Research Activity*

It was such experiences that, in part, led Admiral Watkins to create the Secretarial Panel for the Evaluation of Epidemiologic Research Activity (SPEERA). On September 13, 1989, the panel heard testimony from Robert Goldsmith, head of DOE's epidemiology program. He noted that the goals and objectives of the program were "to determine the presence, the magnitude and the causes of adverse human health effects associated with, number one, the generation and use of energy, and number two, working at or living near Department of Energy facilities." Referring to the study of atomic bomb survivors, Goldsmith stated that, "this has been the source of just about everything we know on the effects of ionizing radiation of humans," noting that this has been the largest component of the epidemiology budget. It is interesting to compare the goals and aims stated by Goldsmith with the focus on A-bomb survivors, a population in which epidemiological studies of plutonium and other alpha-emitting radionuclides have not been conducted, and which is distinctly unlike the populations supposedly of interest to DOE. The major components of the program to study health effects of internally deposited alpha emitters were listed as studies of radium dial painters, residential exposure to radon, and studies of uranium miners, only the last of which has to do with energy generation and DOE facilities. Despite his reference to health effects from living near DOE facilities, Goldsmith said, "we probably haven't addressed the question of health effects in off-site population categories yet."

The discrepancy between DOE's goals and objectives and the actual studies that were conducted suggest lack of a strong vision about what avenues of research are important and how they fit together into a research agenda that would be carried out over a period of many decades. This problem might have been addressed, in part, through independent peer review. However,

30

when asked if the research plans were subjected to "typical peer review," Goldsmith replied, "As far as submitting a proposal to do the studies that we've talked about, generally not." When asked, "Who and what drives a research agenda," Goldsmith said, "It kind of drives itself, really."

Other aspects of Goldsmith's testimony provide an interesting commentary on the outlook of DOE epidemiologists. In commenting on Wilkinson's brain cancer findings at Rocky Flats, Goldsmith stated that "[excess mortality from brain tumors] wasn't due to -- you couldn't find a trend due to internal exposure to radiation, to external radiation. We have not yet had enough information to look at chemical exposure which is probably the reason for the excess." Thus, despite well-known deficiencies in the ability to quantify radiation doses from internal alpha emitters in general and plutonium in particular, Goldsmith is willing to conclude that radiation does not account for the brain cancer findings, however, even though there had been no investigation, chemical exposure is probably the explanation. Despite a total lack of epidemiological studies that record health experiences of humans in relation to well-quantified measures of plutonium, Goldsmith is very optimistic about what DOE has learned from the Transuranium registry: "So we know what happens to plutonium, and then from that, we can tell what diseases to expect, very unique."

Others speaking to SPEERA had different interpretations of DOE's performance. Edward Radford, who at one time headed the National Academy of Sciences Committee on the Biological Effects of Ionizing Radiation, expressed concern over the lack of emphasis on human studies in the budget for programs on health, safety and the environment. In a budget of about $200 million, Radford noted that $86 million was devoted to animal research and $26 million to research on humans, of which $17 million supported the A-bomb survivor studies, and $3.7 million went to the Health and Mortality Studies, DOE's occupational epidemiology program. Noting that this amount included substantial overhead charged by DOE contractors, Radford's conclusion was "that epidemiology has a very low priority in the Department of Energy's scheme of things, extremely low."

Tom Cochran, a physicist and senior staff scientist with the Natural Resources Defense Council, challenged the scientific culture at DOE, stating that "there is a collective bias in this profession. Most of the health physics profession is associated in one form or another, either with the Department of Energy laboratories, the weapons laboratories, or the commercial nuclear power industry, and most of the research has been funded by the Department of Energy and its predecessor, the AEC . . . ." Referring to the inability of independent investigators to gain access to DOE records representing 50 years of data on worker exposures and causes of death, information that could be used to study health effects, he said, "Here, you have a case where you have this huge database that we can utilize to get a better understanding about what the cancer risk coefficient is. It's controlled entirely by none other than the Department of Energy."

*The Physicians Task Force on the Health Risks of Nuclear Weapons Production*

A panel of independent physicians and scientists, in a critical review of DOE's epidemiology program, found that "The AEC/ERDA/DOE epidemiology program is seriously flawed, inadequate in scope and pace of work, underfunded in relation to the studies that are needed, and

31

burdened by an intrinsic conflict of interest," and that "Secrecy has plagued the entire AEC/ERDA/DOE operation and is totally inappropriate in investigations of health and safety."[3] The panel's evaluation is based on a list of problems in past studies including inadequate measurements of radiation doses and health outcomes. They conclude: "In summary, the findings of DOE-sponsored studies offer no firm basis for the repeatedly expressed official position that the health of workers and the public has been fully protected and that there are no excess risks of disease and death in the nuclear worker cohorts."[3]

## CONCLUSIONS

My own experiences conducting occupational epidemiology studies of DOE workers under DOE epidemiology program funding are concordant with these critical evaluations of the DOE programs. In 1990, at a meeting of the Epidemiology Advisory Subcommittee at Oak Ridge, TN, I presented evidence that low-dose radiation was associated with cancer mortality among Oak Ridge workers. One member of the committee told me that such effects were impossible in these workers, and that the only reason to conduct the epidemiological study that I was working on was to show that the data are consistent with current estimates of an unobservable level of health effects. Another committee member, after suggesting that the results be re-calculated based on switching the two lowest dose groups, told me, "Go back to Chapel Hill and get the right answer." Our findings also showed excess mortality for leukemia, especially among workers monitored for internal radionuclide contamination (including plutonium). After preparing a paper for submission to a scientific journal, I was asked not to submit the paper to a journal with a broad readership, but rather to submit the paper to a specialty journal. The paper eventually appeared in the Journal of the American Medical Association.[81] Although many individual radiation researchers are highly skilled, including some who I consider to be colleagues and friends, most radiation health scientists work in a highly partisan environment. The physical and social isolation of the national labs, the mentality associated with military production, and an historical lack of funding from outside sources, even in the universities, have conspired to produce an untrustworthy body of scientific knowledge.

DOE has been in a unique position to be able to evaluate plutonium health effects and has therefore had a unique responsibility to conduct health research with integrity. Unfortunately this has not been the case. Quotations from a recent report from the US Agency for Toxic Substances and Disease Registry identify some of the current gaps in the literature:

> No studies were located regarding gastrointestinal, cardiovascular, renal, or dermal/ocular effects in humans or animals after inhalation exposure to plutonium.

> No studies were located regarding hematological effects in humans after inhalation exposure to plutonium.

> No studies were located regarding hepatic effects in humans after inhalation exposure to plutonium.

No studies were located regarding immunological effects in humans after inhalation exposure to plutonium.

The same statement was made regarding neurological, developmental, reproductive and genotoxic effects after inhalation exposure to plutonium.

No studies were located regarding death or lifespan shortening in humans after oral exposure to plutonium.

No studies were located regarding gastrointestinal effects in humans after oral exposure to plutonium.

The same statement was made regarding immunological, neurological, developmental, reproductive and genotoxic effects after oral exposure to plutonium. An even greater paucity of evidence was found for dermal exposure to plutonium.[11]

The evidence shows that:

1.   Health effects of plutonium have been insufficiently investigated despite the evidence that it is a serious health threat.

2.   DOE has removed funding from investigators who have found evidence of radiation health effects.

3.   A climate of research has been created that makes it difficult for critical research to be conducted.

4.   DOE has been more interested in producing nuclear weapons, promoting nuclear energy, protecting its public image, and guarding against litigation than in vigorously pursuing research into radiation health effects in general and plutonium health effects in particular.

Considerable scientific uncertainty exists regarding the human health effects of environmental and occupational exposures to plutonium. However, this state of knowledge differs from situations in which the uncertainty is due primarily to non-systematic errors in measurement, lack of sensitive methodologies, or ambiguities in interpretation of evidence. Scientific evaluation of plutonium health effects under the aegis of DOE and its predecessor organizations has been distorted by the fear that knowledge about the dangers of plutonium would compromise support for nuclear weapons and energy programs. The result is a biased body of scientific evidence. A less biased evaluation of health effects depends on adequate monitoring of both exposures and outcomes, activities that have been inadequate in the past because the authorities who were responsible for these exposures did not want those exposed to know that there was a reason to be concerned. As a consequence, workers and off-site populations exposed to plutonium have not, in the past, received reliable information on environmental releases, occupational and

33

environmental exposures, or the health risks of plutonium, nor have they been offered medical evaluations that could help to detect and treat diseases related to their exposures. This situation could be partially redressed by carefully planned monitoring and medical surveillance of exposed populations by clinicians and researchers who are committed to serving public health needs.


_____
Steve Wing

November 21, 1996
_____
Date

34

Table 1:  Health effects from exposure to plutonium compounds

| Health Effect | Organ or Organ System | Animal Species | Route, Frequency and Duration | Level (pCi/kg) | Outcome Measure | Reference | Chemical Species |
|---|---|---|---|---|---|---|---|
| Death | Organism | Rat | Inhalation 1 day | $4.9 \times 10^{5}$ | decreased life span | Metivier et al., 1986 | $^{239}PuO_2$ |
| | Organism | Rat | Inhalation 1 day / 30 min | $2.5 \times 10^{6}$ | decreased life span | Sanders et al., 1977 | $^{238}PuO_2$ |
| | Organism | Mouse | Inhalation 1 day | $2.1 \times 10^{6}$ | decreased life span | Lundgren et al., 1987 | $^{239}PuO_2$ |
| | Organism | Hamster | Inhalation 1 day / 30 min | $2.1 \times 10^{4}$ | decreased life span | Sanders, 1977 | $^{239}PuO_2$ |
| | Organism | Dog | Inhalation 1 day | $6.2 \times 10^{3}$ $2.8 \times 10^{4}$ | decreased life span | Park et al., 1988 | $^{238}PuO_2$ $^{239}PuO_2$ |
| | Organism | Mouse | Inhalation 1 yr/ bimonthly | $4.1 \times 10^{5}$ | decreased life span | Lundgren et al., 1987 | $^{239}PuO_2$ |
| | Organism | Rat | Intravenous 1 dose | $1.6 \times 10^{8}$ | 30 day $LD_{50}$ | Mahlum and Sikov, 1969a | $^{238}Pu$ citrate |
| | Organism | Rat | Intravenous 1 dose | $9.7 \times 10^{7}$ | 30 day $LD_{50}$ | Mahlum and Sikov, 1974 | $^{239}Pu$ citrate |
| | Organism | Rat | Intravenous 1 dose | $9.8 \times 10^{7}$ | 30 day $LD_{50}$ | Mahlum and Sikov, 1969a | $^{238}Pu$ nitrate |
| | Organism | Rat | Intravenous 1 dose | $4.7 \times 10^{7}$ | 30 day $LD_{50}$ | Mahlum and Sikov, 1974 | $^{239}Pu$ nitrate |
| | Organism | Rat | Intravenous 1 dose | $7.9 \times 10^{7}$ | decreased life span | Ballou et al. 1967 | $^{239}Pu$ citrate |
| | Organism | Mouse | Intravenous 1 dose | $4.9 \times 10^{6}$ | decreased life span | Svoboda et al., 1980a | $^{239}Pu$ citrate |
| | Organism | Hamster | Intravenous 1 dose | $2.0 \times 10^{6}$ | decreased life span | Brooks et al., 1983 | $^{239}Pu$ citrate |

Health effects from exposure to plutonium compounds (Continued)

| Health Effect | Organ or Organ System | Animal Species | Route, Frequency and Duration | Level (pCi/kg) | Outcome Measure | Reference | Chemical Species |
|---|---|---|---|---|---|---|---|
| Systemic | Respiratory | Rat | Inhalation 1 day / 30 min | $1.6 \times 10^6$ | pneumonitis | Sanders and Mahaffey, 1979 | $^{239}PuO_2$ |
| | Respiratory | Rat | Inhalation 1 day | $1.6 \times 10^5$ | fibrosis | Sanders et al., 1988 | $^{239}PuO_2$ |
| | Respiratory | Rat | Inhalation 1 day | $4.3 \times 10^5$ | increased collagen deposition | Metivier et al., 1978a | $^{239}PuO_2$ |
| | Respiratory | Dog | Inhalation 1 day | $1.1 \times 10^8$ | decreased respiratory function | Muggenburg et al., 1988 | $^{239}PuO_2$ |
| | Respiratory | Dog | Inhalation 1 day | $1.0 \times 10^5$ | pneumonitis | Muggenburg et al., 1987a | $^{239}PuO_2$ |
| | Respiratory | Dog | Inhalation 1 day | $1.0 \times 10^6$ | fibrosis | Mewhinney et al., 1987a | $^{238}PuO_2$ |
| | Respiratory | Hamster | Inhalation 1 yr/ bimonthly | | pneumonitis | Lundgren et al., 1983 | $^{239}PuO_2$ |
| | Respiratory | Dog | Inhalation 2 doses/yr or single dose | $1.1-1.4 \times 10^5$ | pneumonitis, fibrosis, pulmonary cancer | Diel et al., 1992 | $^{239}PuO_2$ |
| | Respiratory, Other | Rat | Inhalation 1 day / 30 min | $1.4 \times 10^6$ | pneumonitis | Sanders et al., 1977 | $^{238}PuO_2$ |
| | Respiratory, Other | Mouse | Inhalation 1 day | $8.4 \times 10^5$ $8.4 \times 10^5$ | biochemical effects, increased lung weight | Talbot and Moores, 1985 | $^{239}PuO_2$ |
| | Respiratory, Other | Hamster | Inhalation 1 dose/ 30 min | $1.4 \times 10^6$ | metaplasia | Sanders, 1977 | $^{238}PuO_2$ |
| | Respiratory, Other | Hamster | Inhalation 1 day / 30 min | $1.4 \times 10^6$ | pneumonitis | Sanders, 1977 | $^{239}PuO_2$ |

Health effects from exposure to plutonium compounds (Continued)

| Health Effect | Organ or Organ System | Animal Species | Exposure Frequency / Duration | Level (pCi/kg) | Outcome Measure | Reference | Chemical Species |
|---|---|---|---|---|---|---|---|
| Systemic (Continued) | Respiratory, Hematological, Hepatic | Dog | Inhalation 1 day | $1.3 \times 10^5$ | pneumonitis, lymphopenia, altered enzymes | Dagle et al., 1988 | $^{239}Pu(NO_3)_4$ |
| | Respiratory, Hematological, Hepatic | Dog | Inhalation 1 day | $4.6 \times 10^5$ $6.1 \times 10^3$ | pneumonitis, decreased lymphocytes | Park et al., 1988 | $^{239}PuO_2$ |
| | Respiratory Hematological | Rat | Intraperitoneal 1 dose | $2.0 \times 10^5$ $8.2 \times 10^6$ | pneumonitis lymphopenia | Sanders, 1973a | $^{239}PuO_2$ |
| | Gastrointestinal | Rat | Oral 1 dose | $1.0 \times 10^5$ $3.3 \times 10^8$ $3.3 \times 10^8$ | hypertrophy, intestinal hemorrhage, growth inhibition | Fritsch et al., 1987 | $^{238}Pu$ citrate |
| | Gastrointestinal | Rat | Oral 1 dose | $1.6 \times 10^{11}$ | pathological changes in epithelium and superficial layers of large intestine | Sullivan et al., 1960 | $^{239}PuO_2$ |
| | Hematological | Human | Intravenous 1 dose | $7.3 \times 10^3$ | no effect | Langham et al., 1980 | $^{238}Pu$ or $^{239}Pu$ citrate |
| | Hematological | Mouse | Intraperitoneal 1 dose | $3.6 \times 10^5$ | decreased stem cell counts | Svoboda et al., 1987 | $^{239}Pu$ citrate |
| | Hematological | Dog | Intravenous 1 dose | $2.9 \times 10^6$ | decreased lymphocyte count | Dougherty and Rosenblatt, 1971 | $^{239}Pu$ citrate |
| | Hematological, Hepatic | Dog | Inhalation 1 day | $6.1 \times 10^3$ | lymphopenia, increased enzymes | Park et al., 1988 | $^{238}PuO_2$ |
| | Hematological Hepatic | Rat | Intravenous 1 dose | $3.6 \times 10^7$ $7.5 \times 10^7$ | decreased WBC/RBC count liver damage | Ballou et al., 1967 | $^{238}Pu$ citrate |

37