C

## DEFENDANTS' PROPOSED STIPULATIONS

1. The FBI's 1989 raid of the Rocky Flats plant was not based on any activities of Dow. (*Source*: 6/6/1989 Application and Affidavit For a Search Warrant.)

2. The FBI affidavit relating to the 1989 FBI raid made no assertion that Dow was engaged in any misconduct. (*Source*: 6/6/1989 Application and Affidavit For a Search Warrant.)

3. The FBI affidavit relating to the 1989 FBI raid made no assertion that Dow engaged in any unsound waste management practice. (*Source*: 6/6/1989 Application and Affidavit For a Search Warrant.)

4. The FBI affidavit relating to the 1989 FBI raid made no assertion that Dow was the source of any off-site pollution. (*Source*: 6/6/1989 Application and Affidavit For a Search Warrant.)

5. In August 1989, Chief Judge Finesilver empanelled a special grand jury to inquire into criminal activity, if any, at the Rocky Flats plant. (*Source*: March 1992 Government Sentencing Memo at 3.)

6. By subpoena and through other formal and informal requests, the grand jury gathered documents and heard witness testimony. (*Source*: March 1992 Government Sentencing Memo at 3-4).

7. The grand jury investigation commenced with the empanelling of the special grand jury in August of 1989 and lasted through the spring of 1992. No indictments resulted from this grand jury investigation.

8. The Clean Water Act was enacted in 1972. (*Source*: 33 U.S.C. § 1251 et seq.)

9. The Rocky Flats plant obtained its first National Pollution Discharge Elimination System ("NPDES") permit in 1974. (*Source*: Sept. 6, 1974 letter from EPA attaching NPDES permit.)

10. The U.S. Atomic Energy Commission was the permit holder for the first NPDES permit. (*Source*: Sept. 6, 1974 letter from EPA attaching NPDES permit.)

11. The first NPDES permit governed wastewater discharges from the Rocky Flats plant from 1974 until 1981. (*Source*: Sept. 6, 1974 letter from EPA attaching NPDES permit; April 8, 1981 letter from EPA attaching NPDES permit.)

12. The Rocky Flats plant obtained its second NPDES permit in 1981. (*Source*: April 8, 1981 letter from EPA attaching NPDES permit.)

13. The Department of Energy was the permit holder for the second NPDES permit. (*Source*: April 8, 1981 letter from EPA attaching NPDES permit.)

14. The second NPDES permit governed wastewater discharges from the Rocky Flats plant from 1981 until 1984. (*Source*: April 8, 1981 letter from EPA attaching NPDES permit; November 26, 1984 letter from EPA attaching NPDES permit.)

15. The Rocky Flats plant obtained its third NPDES permit in 1984. (*Source*: November 26, 1984 letter from EPA attaching NPDES permit.)

16. The Department of Energy was the permit holder for the third NPDES permit. (*Source*: November 26, 1984 letter from EPA attaching NPDES permit.)

17. The third NPDES permit governed wastewater discharges from the Rocky Flats plant from 1981 until after Rockwell ceased operating the plant in December of 1989. (*Source*: November 26, 1984 letter from EPA attaching NPDES permit.)

18. The sewage treatment plant at Rocky Flats was taken offline and dismantled in 2004. (*Source*: Technical Memorandum: Closure Strategy for the Rocky Flats Environmental Technology Site Sanitary Sewer System, Aug. 31, 2004.)

19. There have been no wastewater discharges of any kind from the Rocky Flats plant since October 2004. (*Source*: Technical Memorandum: Closure Strategy for the Rocky Flats Environmental Technology Site Sanitary Sewer System, Aug. 31, 2004.)

20. The Resource Conservation and Recovery Act ("RCRA") was enacted in 1976. (*Source*: 42 U.S.C. § 6901 *et seq.*)

21. RCRA was not applicable to any hazardous or radioactive wastes at the Rocky Flats plant prior to 1985. (*Source*: Proposed DOE Rules issued Nov. 1, 1985, 50 Fed. Reg. 45736.)

22. On November 1, 1985, the Department of Energy issued a proposed rule acknowledging that RCRA applied to hazardous wastes at DOE facilities, but finding that RCRA did not apply to radioactive or radioactive mixed wastes. (*Source*: Proposed DOE Rules issued Nov. 1, 1985, 50 Fed. Reg. 45736.)

23. On November 1, 1985, the DOE and Rockwell submitted a signed Part B Permit Application to CDH. DOE policy required that the permit application omit waste streams of "radioactive mixed wastes" because DOE took the position that such wastes were under the exclusive regulatory authority of the Atomic Energy Act. (*Source*: Nov. 1, 1985 RCRA Part B Application.)

24. Under the November 1, 1985 RCRA Part B Permit Application, DOE was the proposed permit holder.

25. DOE and Rockwell submitted to EPA and CDH a separate Part B Permit Application on November 8, 1985 that detailed the radioactive mixed wastes at RFP, but was not signed. (*Source*: Nov. 8, 1985 RCRA Part B Application.)

26. On July 31, 1986, DOE, CDH and EPA entered into a Compliance Agreement in which DOE agreed that RCRA would apply to radioactive mixed waste streams at the Rocky

Flats plant and requiring DOE to submit a revised RCRA Part B Permit Application for radioactive mixed waste streams by November 28, 1986. (*Source*: July 31, 1986 Compliance Agreement.)

27. As a result of the Compliance Agreement, DOE submitted revised RCRA Part A and B Applications on November 28, 1986 that included all radioactive mixed wastes. (*Source*: November 28, 1986 RCRA Part A and B Applications.)

28. Under the November 28, 1986 RCRA Part A and B Applications, DOE was the proposed permit holder.

29. CDH granted DOE RCRA interim status on January 29, 1987. (*Source*: Jan. 29, 1987 CDH letter to DOE re interim status.)

30. On May 1, 1987, DOE adopted the "By-Product Rule" in which it agreed that RCRA applied to all mixed wastes, regardless of the waste's radioactive content. (*Source*: 52 Fed. Reg. 15938 (May 1, 1987).)

31. Since May of 1987, RCRA has applied to all hazardous or radioactive mixed wastes at DOE facilities. (*Source*: 52 Fed. Reg. 15938 (May 1, 1987).)

32. The Comprehensive Environmental Response Compensation and Liability Act ("CERCLA") was enacted in 1980. (*Source*: 42 U.S.C. § 9601 et seq.)

33. On July 31, 1986, DOE, CDH and EPA entered into a Compliance Agreement in which DOE agreed that CERCLA would apply to the Rocky Flats plant from that point forward. (*Source*: July 31, 1996 Compliance Agreement.)

34. Operable Unit 3 includes the entire offsite area around the Rocky Flats Plant. (*Source*: OU3 ROD, April 1997.)

35. DOE and its contractors conducted an investigation of Operable Unit 3 pursuant to CERCLA. (*Source*: OU3 ROD, April 1997.)

36. The EPA issued a Record of Decision for Operable Unit 3. (*Source*: OU3 ROD, April 1997.)

37. The EPA Record of Decision for Operable Unit 3 concluded that "[n]o hazardous substances, pollutants or contaminants will remain within the boundaries of OU3 above levels that allow for unlimited use and unrestricted exposure[.]" (*Source*: OU3 ROD, April 1997, at 2.)

38. The EPA Record of Decision for Operable Unit 3 concluded that all sites "within OU3 are already in a state protective of human health and the environment." (*Source*: OU3 ROD, April 1997, at 2.)

39. The Agency for Toxic Substances and Disease Registry (ATSDR) is the principal federal public health agency involved with hazardous waste issues. The agency helps prevent or

reduce the harmful effects of exposure to hazardous substances on human health. ATSDR, an agency of the U.S. Department of Health and Human Services, was created by the Superfund Law in 1980. (*Source*: ATSDR website, http://atsdr1.atsdr.cdc.gov:8080/faq.)

40. ATSDR's headquarters are in Atlanta, Georgia. The agency has 10 regional offices and an office in Washington D.C. The multi-disciplinary staff of approximately 400 includes epidemiologists, physicians, toxicologists, engineers, public health educators, health communication specialists, and support staff. (*Source:* ATSDR website, http://atsdr1.atsdr.cdc.gov:8080/faq.)

41. ATSDR is required by the Superfund law to become involved with all sites that are on or proposed for the National Priorities List (NPL). Specifically, ATSDR conducts public health assessments of NPL sites, as well as of all sites proposed for the NPL. ATSDR is a public health agency that advises EPA on the health aspects of hazardous waste sites or spills. ATSDR makes recommendations to EPA when specific actions are needed to protect the public's health. (*Source*: ATSDR website, http://atsdr1.atsdr.cdc.gov:8080/faq.)

42. The mission of the ATSDR is to serve the public by using the best science, taking responsive public health actions, and providing trusted health information to prevent harmful exposures and disease related to toxic substances. (*Source*: ATSDR website, http://atsdr1.atsdr.cdc.gov:8080/about.html.)

43. ATSDR is directed by congressional mandate to perform specific functions concerning the effect on public health of hazardous substances in the environment. These functions include public health assessments of waste sites, health consultations concerning specific hazardous substances, health surveillance and registries, response to emergency releases of hazardous substances, applied research in support of public health assessments, information development and dissemination, and education and training concerning hazardous substances. (*Source*: ATSDR website, http://atsdr1.atsdr.cdc.gov:8080/about.html.)

44. In May 2005, ATSDR released a final Public Health Assessment for Rocky Flats that evaluated past, present and future exposures to environmental contamination associated with the Rocky Flats Environmental Technology Site (RFETS), formerly called the Rocky Flats Plant, located in Jefferson County, Colorado. The ATSDR prepared the Public Health Assessment for Rocky Flats because it is required to perform a Public Health Assessment at all National Priority List sites to determine whether local residents who did not work at the Rocky Flats Plant could be harmed from contacting environmental contamination and to make recommendations to protect public health in the future. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 1.)

45. When preparing its Public Health Assessment for Rocky Flats, ATSDR gathered and reviewed a large volume of reports, studies and sampling data generated by numerous parties, including the U.S. Environmental Protection Agency (EPA), the Colorado Department of Public Health and Environment (CDPHE), the U.S. Department of Energy

(DOE) and its contractors and local community groups, universities and private researchers. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 1.)

46. A study that weighed heavily in the ATSDR's public health assessment was the dose reconstruction study performed by ChemRisk and RAC, under contract with the Colorado Department of Public Health and Environment. ATSDR concluded that the study presents the most extensive and thoroughly peer-reviewed account of past exposures to contaminants released from the Rocky Flats Plant. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 1, 32, 46.)

47. ATSDR concluded in its Public Health Assessment for Rocky Flats that, overall, the available sampling data, epidemiological studies, exposure investigations and other relevant reports paint a consistent picture of the public health implications of environmental contamination near the Rocky Flats Plant. Past, current, and future exposures are below levels associated with adverse health effects. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 1, 76.)

48. ATSDR concluded in its Public Health Assessment for Rocky Flats that the overwhelming majority (>99.9%) of plutonium emissions from the Rocky Flats Plant occurred between 1953 and 1969. Exposures to plutonium were well below levels associated with adverse health effects. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 1-2, 33, 78.)

49. ATSDR concluded in its Public Health Assessment for Rocky Flats that, even assuming that 100% of the carbon tetrachloride used at Rocky Flats between 1953 and 1989 evaporated into the air, the estimated air quality impact at off-site locations would have been approximately half the ambient-air concentrations of carbon tetrachloride typically observed in suburban and urban locations throughout the United States today. Thus, past exposures to carbon tetrachloride near the Rocky Flats Plant were not considerably different than carbon tetrachloride exposures observed at locations across the country. ATSDR believes the estimated carbon tetrachloride exposure concentrations are reasonable. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 2, 45, 62, 78.)

50. For noncancer effects, ATSDR has derived a Minimal Risk Level for repeated exposures to carbon tetrachloride. The ATSDR Minimal Risk Level represents an exposure concentration that is to be without an appreciable risk of noncancer adverse health effects. In other words, persons who inhale carbon tetrachloride at concentrations lower than the Minimal Risk Level will not experience noncancer health effects. The estimated carbon tetrachloride exposure levels when the Rocky Flats Plant operated were more than 500 times lower than the Minimal Risk Level; therefore, ATSDR concluded that persons residing near the Rocky Flats Plant were not exposed to carbon tetrachloride at levels that would cause noncancer effects. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 64.)

51. ATSDR concluded in its Public Health Assessment for Rocky Flats that any health risks associated with normal "background" levels of carbon tetrachloride clearly outweigh the

very small risks that were associated with air emissions of carbon tetrachloride from the Rocky Flats Plant. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 64-65.)

52. ATSDR concluded in its Public Health Assessment for Rocky Flats that best estimates of past exposure concentrations for beryllium, dioxins and uranium are all considerably lower than levels associated with adverse health effects. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 65.)

53. ATSDR concluded in its Public Health Assessment for Rocky Flats that, based on the best available and most thoroughly peer-reviewed information, past inhalation exposure of nearby residents to plutonium and carbon tetrachloride released by the Rocky Flats Plant were below levels associated with health effects and are of minimal public health significance. The appropriate ATSDR conclusion category used for such scenarios is "no apparent public health hazard." (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 2, 62, 65, 78.)

54. ATSDR concluded in its Public Health Assessment for Rocky Flats that plutonium emissions from routine operations at the Rocky Flats Plant between 1953 and 1989 had minimal air quality impacts at off-site locations; these impacts were estimated to be comparable to the plutonium levels that have been attributed to fallout from past testing of nuclear weapons. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 45.)

55. The environmental data presented in the ATSDR's Public Health Assessment for Rocky Flats of releases from Rocky Flats were documented in various reports prepared by DOE, CDPHE, ChemRisk and other parties. After evaluating the data, ATSDR determined that the quality of environmental data available in site-related documents for the Rocky Flats Plant is adequate to make public health decisions. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 54.)

56. ATSDR followed well-established procedures to assess the public health implications of exposure to environmental contaminants at RFETS. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 55.)

57. ATSDR concluded in its Public Health Assessment for Rocky Flats that the on-site contamination at the Rocky Flats Plant is no public health hazard to the community. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 55, 76.)

58. In its OU3 investigation, DOE examined the health implications for people living offsite Rocky Flats by calculating the radiation exposure dose that a hypothetical resident living at the point with the highest surface soil contamination would experience. The calculation includes contributions from soil ingestion, inhalation, external radiation and ingestion of vegetables, milk and meat that were raised or grown on the property. Even in this scenario that clearly overstates actual exposures, the total effective dose equivalent for the resident was estimated to be 0.12 millirem/year. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 57.)

59. The exposure level to a hypothetical offsite resident at the point with the highest surface soil contamination that DOE calculated in its OU3 investigation is not only far lower than ATSDR's Minimal Risk Level for ionizing radiation exposure (100 mrem/yr), but is also far lower than the average exposure to ionizing radiation experienced by United States residents (360 mrem/yr). Similarly, exposure calculations revealed incremental cancer risks well within levels EPA considers protective of human health. Based on these evaluations, CDPHE, DOE and EPA concurred that the off-site surface soil contamination does not need to be cleaned up to be protective of human health. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 57.)

60. In 1997, ATSDR reviewed the conclusions set forth in the OU3 investigation. ATSDR concurred with the risk assessment's findings, supported the approach used to select contaminants of concern, indicated that off-site contamination of heavy metals is at levels below health concern and concluded that no additional activities are needed to ensure the public's health. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 57.)

61. In its Public Health Assessment for Rocky Flats, ATSDR continued to support the conclusions that it reached in its 1997 review of the OU3 investigation's conclusions because its review of environmental data collected since the remedial investigation provides no evidence of significant migration of contaminants from the Rocky Flats Plant to off-site surface soils. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 57.)

62. In its Public Health Assessment for Rocky Flats, ATSDR concluded that off-site private wells and municipal wells have not been affected by site-related contamination and past and current use of water from these wells presents no public health hazard. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 58, 76.)

63. In its Public Health Assessment for Rocky Flats, ATSDR observed that both CDPHE and DOE have collected thousands of off-site air samples between 1989 and 2005 to characterize potential air quality impacts from air emissions sources at RFETS. These sampling results found no site-related contaminants at concentrations associated adverse health effects. ATSDR concluded that the radioactive contaminants of greatest concern are consistently found at concentrations more than 100 times lower than levels that would trigger emissions control measures. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 62.)

64. In its Public Health Assessment for Rocky Flats of releases from the Rocky Flats Plant, ATSDR concluded that plutonium emissions between 1970 and 1989 posed virtually no health risk to off-site residents. In earlier years, plutonium emissions posed a very small, theoretical cancer risk to residents who lived southeast of the facility at the time of the 1957 fire. This theoretical risk is impossible to detect with epidemiological studies, might be zero, and it is substantially smaller than the theoretical cancer risks associated with inhalation exposures to current levels of carcinogenic compounds in urban air pollution. The highest theoretical cancer risk predicted for the site is more than 25 times lower than the theoretical cancer risk Denver-area residents currently receive from

inhaling carcinogenic compounds that are ubiquitous to urban environments. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 62, 63, 78.)

65. ATSDR observed in its Public Health Assessment for Rocky Flats that, since 1989, ambient air-monitoring data for isotopes of americium, plutonium, and uranium have never been measured at concentrations greater than their health-based comparison values and have consistently been several orders of magnitude below levels of health concern. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 65.)

66. ATSDR observed in its Public Health Assessment for Rocky Flats that three years of recent ambient air-monitoring data show that the highest annual-effective-radiation-dose equivalent associated with exposure to americium, plutonium, and uranium at off-site locations was 0.14 millirems per year, with naturally occurring uranium accounting for the majority of this exposure. This exposure level is more than 500 times lower than ATSDR's Minimal Risk Level for ionizing-radiation exposure of 100 millirems per year. Therefore, ATSDR concluded that the air surrounding the Rocky Flats Plant clearly does not contain radionuclides at levels of health concern. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 66.)

67. ATSDR concluded in its Public Health Assessment for Rocky Flats that, overall, ambient-air-monitoring data collected since 1989 indicate that the air near RFETS has been safe to breathe. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 66, 78.)

68. ATSDR concluded in its Public Health Assessment for Rocky Flats that although off-site surface soil contamination of materials released from Rocky Flats, primarily of americium and plutonium, clearly exists, estimated total exposures to radiation from the soil are far lower than levels associated with adverse health effects and are 3,000 times lower than the average exposure to ionizing radiation experienced by United States residents. These levels of off-site surface soil contamination are no apparent public health hazard for past, current and future exposures. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 76.)

69. In its Public Health Assessment for Rocky Flats, ATSDR observed that fish tissue sampling from Standley Lake found no evidence of radioactive contaminants in the fillets of channel catfish, rainbow trout, smallmouth bass and walleye. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 77.)

70. ATSDR concluded in its Public Health Assessment for Rocky Flats that, taken together, the deer meat studies, the OU3 remedial investigation and the CDPHE's dose reconstruction study all suggest that contamination levels in food items raised or grown at off-site locations are not a public health hazard for past or current exposures and probably will not be a public health hazard in the future. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 68.)

71. ATSDR concluded in its Public Health Assessment for Rocky Flats that several epidemiology studies have tried to identify relationships between proximity to the Rocky

Flats Plant and cancer incidence but the studies have provided no clear evidence of cancers in the community being associated with environmental contamination. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 68.)

72. ATSDR concluded in its Public Health Assessment for Rocky Flats that the epidemiology studies' failure to identify increased cancer rates is consistent with ATSDR's review of the public health implications of environmental contamination levels as well as the results of multiple exposure investigations that found that residents in the immediate vicinity of RFETS do not have unusually high levels of plutonium in their bodies. Multiple parties have concluded that further epidemiological studies of communities neighboring RFETS are not warranted, and ATSDR concurs with that finding. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 68.)

73. In 1998, the Colorado Central Cancer Registry analyzed whether cancer incidence is related to distance from the former Rocky Flats Plant. The study considered incidence data from 1980 to 1989 for total cancer and for ten individual cancers. Overall, CCCR concluded that its data show that communities in the general vicinity of Rocky Flats had cancer incidence during 1980-1989 that was comparable to the remainder of the Denver Metro area. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 73.)

74. In its Public Health Assessment for Rocky Flats, ATSDR concluded that, overall, the epidemiological studies provide no consistent evidence of cancer incidence being higher in areas nearest Rocky Flats as compared to rates for the Denver metropolitan area. ATSDR's review of the environmental data strongly suggests that the epidemiological studies failed to detect increased cancer incidence primarily because the estimated increased theoretical cancer risk is extremely low. (*Source*: ATSDR Public Health Assessment for Rocky Flats, at 73.)

75. From the 1950s to the present, the *Denver Post* and the *Rocky Mountain News* were widely circulated throughout the Denver area.

76. During the 1970s, newspapers, including the *Denver Post* and the *Rocky Mountain News*, published articles stating, in part, that activities at Rocky Flats permitted plutonium to be released into areas that were located beyond the boundaries of the plant, including areas located within the class contours. (*Source*: "Hearings Air Broomfield Fears: Citizens, Officials at Odds on Rocky Flats Peril, *The Denver Post*, April 20, 1973, at 3, 16; " Soil East of Rocky Flats: New Test Rates Plutonium Above Limits, *The Denver Post*, October 13, 1975; "Study of Plutonium Effects On Plant Neighbors Urged, *The Denver Post*, January 12, 1979, at 1.)

77. During the 1970s, newspapers, including the *Denver Post* and the *Rocky Mountain News*, published articles containing statements ascribed either to scientists or to public health officials which stated, in part, that activities at Rocky Flats had permitted plutonium to be released into areas that were located beyond the boundaries of the plant, including areas located within the class contours. (*Source*: "Hearings Air Broomfield Fears: Citizens, Officials at Odds on Rocky Flats Peril, *The Denver Post*, April 20, 1973, at 3, 16; "Study

of Plutonium Effects On Plant Neighbors Urged, *The Denver Post*, January 12, 1979, at 1.)

78. During the 1970s, hearings and meetings were held in the greater Denver area that were open to the public, and at which either scientists or public health officials stated, in part, that activities at Rocky Flats had permitted plutonium to be released into areas that were located beyond the boundaries of the plant, including areas located within the class contours. (*Source*: *Lamm-Wirth Task Force Final Report*, at 4; "Hearings Air Broomfield Fears: Citizens, Officials at Odds on Rocky Flats Peril, *The Denver Post*, April 20, 1973, at 3, 16.)

79. During the 1970s, publicly available papers, authored either by scientists or by public health officials, stated, in part, that activities at Rocky Flats had permitted plutonium to be released into areas that were located beyond the boundaries of the plant, including areas located within the class contours. (*Source*: E.A. Martel & S.E. Poet, "Plutonium-239 and Americium-241 Contamination in the Denver Area," 23 *Health Physics* 537 (1972).)

80. In the 1970s, newspapers in the Denver area published articles revealing allegations of fact relating to the 1957 fire, purporting to describe the fire and its causes, and reporting, in part, that the fire was claimed to have caused plutonium releases. (*Source*: "Report On Rocky Flats Health Threat Debated," *The Denver Post*, February 12, 1970, at 3; "The Case For Closing Rocky Flats," *Rocky Mountain News*, April 30, 1978, at 3.)

81. During the 1970s, newspapers, including the *Denver Post* and the *Rocky Mountain News*, published articles stating, in part, that plutonium, tritium, and other hazardous substances had been released from the Rocky Flats plant into area waters. (*Source*: "Rocky Flats 'Negligent' on Tritium Leak," *The Denver Post*, July 7, 1974.)

82. In 1975, three plaintiffs — Marcus Church, the Good Fund, Ltd., and Great Western Venture — sued Dow, Rockwell, and the U.S. government, alleging that the plant had been negligently operated, allowing hazardous and radioactive materials to escape onto their land and rendering it "unfit for human habitation" or development. (These lawsuits are referred to collectively hereinafter as the "Church" lawsuits.) (*Source*: *Good Fund, Ltd. -- 1972 v. Church*, 540 F.Supp. 519, 522 (D. Colo. 1982).)

83. Some of the land at issue in the Church lawsuits fell within the plutonium contour that defines the outer boundaries of the class area in this case. (*Source*: *Good Fund, Ltd. -- 1972 v. Church*, 540 F.Supp. at 522 (D. Colo. 1982).)

84. The Good Fund's property was directly across Indiana Street from the plant, and directly across 96th Avenue from the property owned by plaintiff Merilyn Cook.

85. The pretrial statement filed by the Church plaintiffs in 1978 contained a sixty-two page section entitled "The 1957 Fire." (*Source*: App. Vol.V at 295-357.)

86. The pretrial statement filed by the Church plaintiffs in 1978 contained a sixty-six page section entitled "The 1969 Fire." (*Source*: App. Vol. V at 358-424.)

87. The pretrial statement filed by the Church plaintiffs in 1978 contained a twenty-two page section entitled "Other Fires and Explosions." (*Source*: App. Vol. V at 425-447.)

88. The pretrial statement filed by the Church plaintiffs in 1978 contained a 206-page section entitled "Waste Management," which contained separate sections labeled, in part, "The Mound Area," "the Trenches and Other Burials," and "Sanitary Landfills." (*Source*: App. Vol. V at 136-294.)

89. The pretrial statement filed by the Church plaintiffs in 1978 contained an eleven-page section entitled "Radioactive Waste Burning." (*Source:* App. Vol. V at 198-209.)

90. The Church plaintiffs' 1978 pretrial statement contained a seven-page section entitled "Tritium in the Landfill." (*Source*: App. Vol. V at 279-286.)

91. The Church plaintiffs' 1978 pre-trial statement contained a section discussing a beryllium fire that occurred at the Rocky Flats plant on February 23, 1978. The pre-trial statement attached four newspaper articles. (*Source*: App. Vol. V at 448-52.)

92. The Church plaintiffs claimed that activities at Rocky Flats had permitted plutonium to be released into areas located beyond the plant's boundaries, including areas located within the class. ( *Source*: *Good Fund, Ltd. -- 1972 v. Church*, 540 F.Supp. 519 (D. Colo. 1982).)

93. The DOE produced all existing documents requested by plaintiffs' November 7, 1994 request by December 22, 1995. (*Source*: *Cook v. Rockwell Int'l Corp.*, 935 F. Supp. 1452, 1455 (D. Colo. 1996) ("*Cook VII*").)

94. By February 1, 1996, the DOE located 1,500 reels of microfilm containing documents at Rocky Flats. Each reel contained an index. (*Source*: *Cook VII*, 935 F. Supp. at 1456).) These indices were produced to plaintiffs.

95. The DOE had previously estimated the MUF collection to consist of 11,000 pages of classified documents. (*Source*: *Cook VII*, 935 F. Supp. at 1456.)

96. On December 7, 1995, plaintiffs' counsel advised the request for MUF documents included "MUF-related" documents. (*Source*: *Cook VII*, 935 F. Supp. at 1456 n.1.)

97. On February 2, 1996, DOE advised counsel there were 670,000 pages of MUF documents requiring declassification. (*Source*: *Cook VII*, 935 F. Supp. at 1456.)

98. The DOE subsequently increased the declassification staff from fourteen to twenty-eight and expended significant additional resources in an effort to comply with plaintiffs' request. (*Source*: *Cook VII*, 935 F. Supp. at 1456, 1463.)

99. As an alternative to current procedures, the DOE on February 13, 1996, proposed the First Proposed Alternative Plan, namely, that the DOE could expedite the clearance process for a reasonable number of individuals, in addition to the two representatives of Plaintiffs who already had appropriate clearance to review classified documents, to allow Plaintiffs' attorneys and expert witnesses access for a pre-declassification and/or sanitization review of the classified documents. (*Source*: *Cook VII*, 935 F. Supp. at 1458–1460.)

100. As part of the First Proposed Alternative Plan, DOE proposed that documents identified by Plaintiffs as priority would go to the head of the review and production line. (*Source*: *Cook VII*, 935 F. Supp. at 1458–1460.)

101. Plaintiffs rejected DOE's First Proposed Alternative Plan. (*Source*: *Cook VII*, 935 F. Supp. at 1458–1460.)

102. The DOE offered another alternative plan on February 13, 1996 for modification of the stipulation and discovery process. (*Source*: *Cook VII*, 935 F. Supp. at 1459.)

103. Under the DOE's Second Proposed Alternative Plan, Plaintiffs and Defendants would designate attorneys and expert witnesses for expedited clearance processing. (*Source*: *Cook VII*, 935 F. Supp. at 1459.)

104. Under the DOE's Second Proposed Alternative Plan, the DOE would immediately provide two copies of classified documents and indices located in separate secure facilities for access and use by the parties and preliminary use by individuals holding clearances. (*Source*: *Cook VII*, 935 F. Supp. at 1459.)

105. Under the DOE's Second Proposed Alternative Plan, the access would be granted while preserving the classified designation of the documents. Except for use by expert witnesses who had received clearances, parties would designate those documents they wished for further use in discovery or at trial. DOE would process those documents for declassification and/or sanitization. (*Source*: *Cook VII*, 935 F. Supp. at 1459.)

106. Under the DOE's Second Proposed Alternative Plan, if there were any disagreement concerning this effort, upon written request, DOE would re-review the documents and render a final opinion on declassification and/or sanitization. The review would be subject to in camera review by the Court. (*Source*: *Cook VII*, 935 F. Supp. at 1459.)

107. Under the DOE's Second Proposed Alternative Plan, expert witness reports could be prepared both by identifying and containing the classified information and documents being relied upon. (*Source*: *Cook VII*, 935 F. Supp. at 1459.)

108. Under the DOE's Second Proposed Alternative Plan, all reports and supporting documents should be provided for declassification and/or sanitization review of only those portions that contain or are derived from classified information. (*Source*: *Cook VII*, 935 F. Supp. at 1459.)

109. Under the DOE's Second Proposed Alternative Plan, the results thereof would be returned to the submitting party and upon written request, be subject to a final re-review and opinion on the declassification and/or sanitization decision. The final review would be subject to in camera review by the court. (*Source*: *Cook VII*, 935 F. Supp. at 1459.)

110. Plaintiffs rejected DOE's Second Proposed Alternative Plan. (*Source*: *Cook VII*, 935 F. Supp. at 1459.)

111. On May 10, 1996, the plaintiffs asked the DOE to suspend the review for fourteen of fifteen categories of MUF documents. (*Source*: *Cook VII*, 935 F. Supp. at 1467.)

112. On August 8, 1996, the Court ordered the DOE relieved of its duty to conduct a classification review of those documents which plaintiffs had suggested they cease reviewing. (*Source*: *Cook VII*, 935 F. Supp. 1467, 1469.)

113. On August 8, 1996, the Court found that plaintiffs had not produced any evidence of bad faith concerning the manner in which the DOE had conducted the declassification process. (*Source*: *Cook VII*, 935 F. Supp. at 1470.)

114. A Q clearance is a clearance granted by the DOE that permits access to classified information. (*Source*: 7/21/95 Hr'g Tr. at 130.)

115. Louise Roselle, a lawyer for plaintiffs, has had a Q clearance since July 18, 1994. (*Source*: U.S. DOE's Resp. to Pls.' Objections to and Appeal from Order dated Feb. 9, 1995, filed 3/20/95, at 8 n.10.)

116. In a January 1995 meeting, the DOE proposed providing Ms. Roselle access to review the classified documents so that plaintiffs could identify specific documents for declassification review. Plaintiffs did not object to this procedure. (*Source*: 7/20/95 Hr'g Tr. at 95.)

117. The AAAP Program (Accelerated Access Authorization Program) allows the DOE to grant interim security clearances to individuals who require access to classified material. (*Source*: 7/21/95 Hr'g Tr. at 364.)

118. Two of plaintiffs' counsel, Jonathan Auerbach and David Sorensen, applied for, and received, Q clearances through the AAAP program.

119. The DOE did not unreasonably delay processing these two additional security clearance requests. (*Source*: *Cook v. Rockwell Int'l Corp.*, 907 F.Supp. 1460, 1466 (D. Colo. 1995) ("*Cook VI*").)

120. Once Mr. Sorensen and Mr. Auerbach were Q-cleared, they reviewed classified information contained in the MUF documents.

121. Classification guides are written materials created by and/or approved by the U.S. Department of Energy and that describe the categories of information that must remain

classified pursuant to federal statute and related regulations. (*Source*: Siebert Dep., at 403).

122. On March 21, 1997, the DOE produced unclassified portions of the classification guides used to redact the classified information contained in the MUF documents to plaintiffs' counsel. The DOE also provided the plaintiffs with copies of two "Official Use Only" classification guides in their entirety. (*Source*: 6/23/99 DOE Status Order ¶ 4.)

123. Since March 21, 1997, plaintiffs have not sought an order from the court compelling the production of additional information from the classification guides. (*Source*: 6/23/99 DOE Status Order ¶ 4.)