1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLORADO

3   Civil Action No. 90-CV-00181

4   MERILYN COOK, et al.,

5      Plaintiffs,

6   v.

7   ROCKWELL INTERNATIONAL CORPORATION, and
    THE DOW CHEMICAL COMPANY,

8      Defendants.

9

_____

10                  REPORTER'S TRANSCRIPT
11                  PRETRIAL CONFERENCE

_____

12

13          Proceedings before the HONORABLE JOHN L. KANE, JR.,

14   Senior Judge, United States District Court for the District
of

15   Colorado, commencing at 1:30 p.m., on the 22nd day of
September,

16   2005, in Courtroom A802, Alfred A. Arraj United States

17   Courthouse, 901 19th Street, Denver, Colorado.

18                  APPEARANCES

19          MERRILL GENE DAVIDOFF, PETER NORDBERG, LOUISE
ROSELLE,

20    BERGER & MONTAGUE, 1622 Locust Street, Philadelphia, PA. 19103,

21    and;

22          Suzanne M. Claar, Official Reporter
                901 19th Street
23          Denver, Colorado 80294-3589
                (303)825-8874

24

          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25          TRANSCRIPT PRODUCED BY COMPUTER


68


1          APPEARANCES (Continued)

2          GARY BLUM, SILVER & DEBOSKEY, 1801 York Street, Denver,

3    Colorado, appearing for Plaintiffs.

4          DAVID M. BERNICK, DOUGLAS J. KURTENBACH, MARK J.

5    NOMELLINI, ELLEN T. AHERN, KIRKLAND & ELLIS, 200 East Randolph

6    Drive, Chicago, IL. 60601, appearing for the Defendants.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

69

1                    P R O C E E D I N G S

2        (Proceedings resumed at 1:40 p.m.)

3            THE COURT:  Thank you.  Be seated, please.

4            Okay.

5            MR. BERNICK:  I have a couple things to report which

6    may represent some progress here.  One is that we had a fairly

7    extensive discussion about the courtroom equipment, and with

8    Ms. Bush in particular, who has been extremely helpful and

9    accommodating, and managed to locate in the storage area here in

10   the courthouse, what I am told is an ADA podium for the

11   vertically challenged, and I mean that in reference to myself.

12   I should not make light of that, probably, but it looks like

13   that will be available.  We really appreciate that, and of

14   course the message again was brought home of the importance --

15        THE COURT:  I think Judge Matsch designed it.  I am not

16   sure.

17        MR. BERNICK:  I think it was actually used for the

18   Oklahoma bombing case because one of the U.S. Attorneys was

19   confined to a wheelchair.  And I remember actually when this

20   case was before Judge Matsch, we were over in that courtroom,

21   and the podium was there, and I looked at them and said, I kind

22   of like that.

23        THE COURT:  It goes up too.

24        MR. BERNICK:  We have also had some further

25   discussions, just among ourselves, and rather than air some of

70

1    the ideas and musings and aspirations of both sides, we thought

2    the best thing to do was to begin by sharing with the court all

3    of our information about equipment, and getting a dialogue going

4    so that we can see, you know, what might be possible, and that

5    will happen immediately, and we know how busy staff is, so there

6    aren't going to be any more hangups in communication.

7         We have instructed our people, and I am sure the same

8    thing is true for the plaintiffs, that now is not the time to be

9    so careful.  Let's just get it done.

10         THE COURT:  Right.

11         MR. BERNICK:  Whatever we bring in, obviously the

12    plaintiffs will be free to use and the like, so nothing more

13    specific, and I don't know whether it's worthwhile spending much

14    more time talking about, as fervently as we wish to have

15    something worked out for the trial.

16         Second, with respect to demonstratives and models, we

17    explained the two models for the court's benefit.  All that

we

18   are doing is we are taking the aerial photographs, which are

19   actually very, very large and very detailed, and we are creating

20   a styrofoam base, that includes the contours of the land, and

21   then these bases will be -- they are basically two scenes. One

22   is the plant, and the other is the plant then with the class

23   area.  And they are pretty portable.

24        The plant with the class area will also be -- there are

25   three different versions of it with time, so we have '57, '69

71

1   and '89.

2        Now the aerial photographs, the models are right now

3   being built, and it's a very sophisticated process, such that

4   the aerial photograph is matched by computer to the contours as

5   they appear in the software that exists apparently of -- this

6   whole world now is computerized in contour.

7        So that process is now underway.  We have agreed to

8   furnish the aerial photography, which I think previously has

9   been agreed upon, furnished to the other side.  As soon as

the

10   model is done, it will be available.  But we are really kind of

11   running up against the stubs.  It's going to be available just

12   before trial.

13        THE COURT:  Okay.

14        MR. BERNICK:  In terms of where they will be located, I

15   understand it's pretty portable so we can move it around.  If

16   it's in the way we can put it off there.

17        THE COURT:  That or we can use the jury conference

18   room.

19        MR. BERNICK:  Although it's such a --

20        THE COURT:  There is something else out there I think.

21   Isn't there?

22        MR. BERNICK:  No.  We have the witness room and the

23   attorney --

24        THE COURT:  Right behind you.  Isn't that a hallway

25   behind you?

72

1        THE COURTROOM DEPUTY:  That's the marshal's holding

2    cell.

3         THE COURT:  We might use that, unless you misbehave.

4         MR. BERNICK:  Well, I am bound to misbehave.  I hope it

5    doesn't warrant that kind of sanction.

6         THE COURT:  Okay.

7         MR. BERNICK:  But they are pretty plain, descriptive

8    and helpful, and we think that probably a lot of people are

9    going to want to use them.

10         The second thing is we have also developed a 3D, what I

11   will call foundation or platform, that really is the same kind

12   of thing.  It's in a 3D computer-generated design framework.

13   But it's the same thing.  It's the plant, the class area, so

14   that you can impose on that same accurate -- GIS accurate,

15   whatever it is, format, things to -- by way of demonstratives

16   that show where does Womans Creek go.  Here it goes.

17         Also, the members of the class, where they are located,

18   when they moved in.  You can even do the basic arithmetic

19   calculations of the torsiometry based upon their location.

20         So that is also in the process, and that's why we

21   identified one of the witnesses, Spitzy, who is a geneticist or

22   something like that.  He works for the company that does all

the

23    graphics work, so if there are any issues about the foundation

24    of how these things got put together, he is available to be able

25    to be examined.


73

1          But all the underlying databases have already been

2     produced, so the information has been used in our expert

3     reports.  It's simply a question of developing the graphic

4     capability that goes along with the analysis.

5          So we have disclosed those to the other side, and we

6     are prepared to, as the materials become available, make them

7     available, and that I think takes care of kind of very

8     labor-intensive things.

9          Now, with respect to demonstratives more generally, I

10    know the standing order or Pretrial Order it will all be

11    disclosed on the first day of trial.  I would like to ask for,

12    and I think the plaintiffs probably concur in this, relief from

13    that requirement, because inevitably in my experience the

14    demonstratives get played around with all the way to the last

15    minute, and I think that's likely to occur here.  As much as we

16    like to plan it, there are always things that change.

17          THE COURT:  As long as you tell the other side what

18    they are, it's okay.

19          MR. BERNICK:  Okay.

20          THE COURT:  You don't have to have them exchange them

21    or present them, if you know what they are.  What I am really

22    trying to avoid is somebody coming in with demonstrative exhibit

23    saying, we haven't seen it.  We don't even know what it is.

24          MR. BERNICK:  That's not going to be a problem.  This

25    is a class where the sauce rule has huge utility.

74

1          So the last thing I had, I guess, before we turn to the

2    outstanding matters of the discovery and the impact that might

3    have on the schedule which we have been talking about, is just

4    to require with respect to opening statement.

5          Is the court -- well, put it differently maybe more

6     hopefully -- would it be appropriate in connection with opening

7     statement for counsel to be able to address the jury rather than

8     from an angle standing here?

9          THE COURT:  Yes, yes.

10          MR. BERNICK:  Okay.  That will be helpful.  As I

11     understand it in terms of timing, what is your Honor's

12     predilection in terms of how long you will permit us to ramble

13     on before the jury before we start the evidence?

14          THE COURT:  Well, neither of you are ordained Baptist

15     preachers, so I think we can kind of cut it down.  But again I

16     don't like to put an iron collar on you, but what do you think

17     you need?

18          MR. BERNICK:  I kind of think that if we basically

19     devote a day to it; morning the plaintiffs go, afternoon the

20     defense goes.

21          THE COURT:  So you are talking about three hours

22     apiece?

23          MR. BERNICK:  Basically three hours apiece.

24          THE COURT:  Mr. Davidoff, what do you think?

25          MR. DAVIDOFF:  Generally, I am in agreement, your

75

1    Honor.  I have a couple of caveats that -- and it may impact on

2    this witness -- these witness issues, as to which there is still

3    considerable disagreement.

4          The latest request for discovery.  We have obviously --

5    we are going to be the ones that are introducing a lot of terms,

6    technical terms, geographic terms, to the jury.

7          My experience is that, you know, a good bit of the

8    plaintiffs' opening statement is just taken up trying, you know,

9    even if it's just writing it on the white board, as opposed to

10   even having a graphic, some of the terms and trying to

11   familiarize the jury with some of the terms that they are going

12   to be hearing about, not just during the opening statements, but

13   throughout the trial.

14          That, of course, is something that -- that's our burden

15   because by the time the defense gets up, the jury has heard

16   those terms and has heard the introduction of those terms, and

17   the only other concern I have is, your Honor, I think has us

18   scheduled now for October 7th, and depending on what is agreed

19   to be done or ordered to be done between now and then, I don't

20   want to -- I don't want to have a situation where we don't

21   finish Mr. Bernick's opening statement so that he is leaving

22   them before a three-day weekend.

23       THE COURT:  We are going to take care of that right

24   now.

25       I thought about that over the noon hour, and it seems

76

1   reasonable to me that we are going to pick the jury on Thursday.

2   And so that we will have all day on Friday to do the opening

3   statements.  And if we don't, then I'm not going to put a lawyer

4   in the position of splitting the opening statement from one day

5   to the next.

6       So we will either start at nine, and we will take a

7   break in the morning, and then come back in the afternoon, and

8   we will divide it up that way.  And if you need a little bit

9   more time because of the terms you are going to be defining and

10   so on, that sounds reasonable to me, to do so, so we might go

11   from, say, nine until 12:30, get an extra half hour, and cut off

12   a half hour of yours.

13       MR. BERNICK:  Cut off a half hour of ours.

14       THE COURT:  If he takes an extra half hour to define

15   terms that you will be using as well, I want that to go without

16   interruption so we do that until 12:30, and then we can't come

17   back at 1:15.  There isn't the facility around here to let

18   people go out and have lunch in that length of time.  So we

19   would have to say come back at 1:45 and then go.

20       MR. BERNICK:  But then how much time would I get?

21       THE COURT:  The rest of the afternoon.

22       MR. BERNICK:  Okay.

23       THE COURT:  I mean probably be a break, but you would

24   be able to go until five.

25       MR. BERNICK:  Okay.  That's fine.

77

1          THE COURT:  Is that fine?

2          MR. BERNICK:  Oh, that's fine.  I mean I would also --

3    I would not like to have it be that we have the plaintiffs, then

4    a weekend, and then --

5          THE COURT:  No.  We are going to get it done.

6          MR. BERNICK:  Yes.

7          THE COURT:  And then I will be giving some instruction

8    to the jury, so if we don't finish in time on Thursday, then I

9    will be instructing on Friday, and we just won't have opening

10   statements until Monday, but if we -- if we get the jury done

11   and I can instruct that same afternoon, then I will do that.

12          But the opening instructions about the statement of the

13   case and the duties and obligations of the jury, and what

14   constitutes evidence, what doesn't, and the distinctions between

15   direct and indirect circumstantial evidence, and so forth.

16          MR. BERNICK:  It is -- I mean -- and I defer to the

17   question of definition of terms -- I suspect I will be doing a

18   lot of definition too.  Because there are certain things that

19   are important to me technically that aren't important to the

20   other side.

21        But be that as it may, my only concern is as to whether

22   at a certain point feasibility creeps into the equation.  If we

23   start at nine and finish at 12:30, and people come back -- it

24   ends up being two by the time -- we have a mid-afternoon break,

25   for me to even get three hours, not the three and a half, puts

78

1   us at 5:15, 5:30, it's kind of less than ideal, I suppose, and

2   that doesn't consider the possibility of your introductory

3   instructions.

4        Maybe one thing to do is to start a little bit earlier.

5   I --

6        THE COURT:  The difficulty I have, and sometimes you

7   can do that, but our jury area comes from Jackson County on the

8   Utah border on the other side of the Continental Divide, and

9   then following the Continental Divide all the way down to Buena

10   Vista, Colorado, all the way to the Kansas border, and we get

11   people that come in for jury service from all over this region

12   and sometimes -- if they are far enough away, they stay in

13   motels, but if they are from, say, Fort Collins, they will

14   commute.  And getting them here at 8:30 is not easy, and

15   especially you have been here enough that -- we are going to

16   charge you rent anyway -- but you know that, I mean we have this

17   terrible traffic problem with only one interstate going north

18   and south, and it's bumper to bumper, and then the one going

19   east and west isn't much better.  It has bridges fall on people,

20   so --

21       MR. BERNICK:  Maybe we should kind of put a hyphen on

22   those things.  But I am just worried.  The opening statement is

23   very important.

24       THE COURT:  Sure.

25       MR. BERNICK:  And I don't want to be there in the late

79

1    afternoon on Friday afternoon.  They will probably do that

2    anyhow but I want to minimize as much as possible.

3        THE COURT:  I understand.  And I also understand it

4    isn't the kind of thing that you can give the opening statement

5    like a Gettysburg address.  You have to go through and talk

6    about the case, and it will take some time, so we will try to do

7    it to get both of you in on Friday, to the best we can do that.

8        MR. BERNICK:  That's fine.

9        With respect to the witnesses, maybe -- we have talked

10   and, kind of unsuccessfully, about the discovery deeds that we

11   have going forward here, and maybe I can make a proposal that's

12   designed to short-circuit this, but the basic problem is that

13   both sides, of course, shocking surprises that as it might be,

14   have come up with a short list of additional witnesses that

15   weren't previously identified.

16        Amazing.  So they have four.  Two folks who are the

17   children of the Bartletts, and then a U.S. Attorney, an AUSA

18   named Kaufman, and then Wes McKinley, who was head of the --

19   foreman of the grand jury.

20          So those are their four witnesses.  We have three

21    witnesses, this guy Spitzy, who has put together the model.  I

22    don't know if they want to depose him or not.  But they can.

23    And then two historical witnesses Calkins and Freiberg.  Those

24    people are really being called because one of our old witnesses

25    Dr. Putzier, is not in good health.  He will probably have to

80

1    appear through a deposition taken on the weekend, and we just

2    can't rely on him like we once thought we could, so we have a

3    couple of witnesses who will fill in.  One of them has been

4    deposed before, but neither one has been listed as a witness

5    before.

6          So both sides have a small number of new witnesses.

7    Then we have another category.  There are four witnesses who

8    were listed previously by the plaintiffs, whose depositions were

9    not taken.  Basically in the fall of '04, a decision was made to

10    put off their depositions, and basically to do so pending your

11    Honor's decision with respect to all the various matters that

12   were outstanding.

13       I can show you the e-mail correspondence in November,

14   March and August.  They were deferred.  And it's the position of

15   the plaintiffs that we should not be permitted to take their

16   depositions.

17       There are four such people.  One is Mr. McKay.

18   Mr. McKay was one of the original property owners right a

19   adjacent to the plant.  He was involved in the litigation that

20   was settled in the mid 1980s.

21       Another is Mr. Lipski, who was an FBI agent.  And then

22   there are two individuals, one is an absent class member, Lacy,

23   another is a percipient witness with respect to the incinerator

24   issue, Williams.  So there are four such witnesses.

25       All people who were disclosed, their depositions were

81

1   deferred.

2       And then we have the four representative plaintiffs.

3    Last time they were deposed was 1993 to 1995.  And a lot of

4    water has gone under the bridge, and we want to know anything

5    more they have to offer.  There are very significant changes at

6    Rocky Flats.  The Bartletts apparently sold their property

7    within that period of time for something like twelve times what

8    they paid for it, so there are some fairly significant effects.

9         Now, the proposal that was made by the other side was,

10   let's focus on the new people, that is the two Bartlett kids,

11   Kaufman, the AUSA, McKinley, the grand jury foremen, and then

12   our three new people, but confine the depositions to an hour.

13   Just that's it.

14        And we can't possibly live with that.  It may be that

15   some of the these people don't go more than an hour, but we

16   can't have that absolutely set in stone.

17        I think it's probably safe to say that, with respect to

18   all of the new people, I am not sure what Kaufman is going to

19   say, and I am not sure what he will be permitted to testify

20   about.  McKinley, the grand jury foreman, if your Honor's

21   determination holds which is that all the jury knows is fact of

22   the grand jury, I don't know why he has to be called at all,

but

23   I don't know what it is he is going to have to say.

24        We can't be constrained by an artificial limit, but

I

25   think we can probably say in all cases on average we will not

82

1   exceed an average of two hours of each witness, which I think

is

2   a very reasonable limited period of time.

3        With respect to the named plaintiffs, we would agree

on

4   three hours per witness.  There is no effort here to have a

huge

5   amount of discovery.

6        When it comes to the four people whose depositions

we

7   agreed to defer, we strenuously take issue with the idea that

8   now we are kind of out of luck.  We have been diligently

9   pressing for those.  Apparently Mr. McKay is one of their

first

10   witnesses.  He is a substantial witness.  He has never been

11   deposed in this case.  He has not been deposed for 25 years.

I

12   don't have a clue what the guy will say.

13          With respect to these people, we would agree again to a

14     two or three-hour limitation.  But at this point in time after

15     fifteen years, and the plaintiffs having a witness list of 43

16     different people to, by virtue of discovery restrictions, to

17     prevent us from getting access to their witnesses for purposes

18     of cross-examination is a cart-before-the-horse argument, so we

19     are prepared to abide by very severe limitations on time.

20          And as I say, with respect to the new witnesses,

21     averages of two hours apiece.  With respect to the four that we

22     have identified, and four representative plaintiffs, two, three

23     hours apiece, but I think the most important thing is just to

24     get these depositions done, and not to have a situation where,

25     because we agreed to defer discovery, we don't get discovery at

83

1     all.

2          MR. DAVIDOFF:  Um, if your Honor please, I -- once in a

3   while we are going to, at least at some point try to speak first

4   before the defendants do.  It's becoming almost characteristic

5   that they do.  And both myself and Mr. Nordberg need to speak on

6   these issues.

7       I am going to give an overview, and then I am going to

8   ask Mr. Nordberg, who has been involved in the day-to-day,

9   week-to-week, month-to-month interplay with the defendants to

10  amplify what I say.

11      They have raised the issue of renewed depositions of

12  the class representatives going back over a year ago, and I

13  think your Honor ordered it over -- or approximately a year ago.

14  It was during one of the status conferences in the middle of

15  2004.  Your Honor said, I am going to permit them to do it, and

16  we can go back and find that.

17      THE COURT:  I know I did.

18      MR. DAVIDOFF:  Yeah.  And they just -- you know,

19  they -- so that's one category.  Then there is another category,

20  people that have been on a witness list, at least since December

21  of 2003, and have long been well known to DOE and the

22   defendants.  Rockwell, as Mr. Bernick mentioned, litigated with

23   Mr. McKay and his family for nine years from, I believe, 19 --

24   maybe more than nine years -- from the mid '70s until the mid

25   1980s.


84

1           A year ago they basically went and ripped Mr. McKay's

2    files apart and copied approximately 12,000 more documents

3    beyond what they had from the church litigation, where

4    Mr. McKay's family were parties.

5           And I understand from somebody in Mr. McKay's office

6    that there was a lawyer from Kirkland & Ellis there for two or

7    three days, basically ripping their files apart, and ordering

8    this be copied, that thing be copied, the other thing be copied.

9    That was over a year ago.

10          You know, it just is calculated to wreak the maximal

11   disruption of our case and our trial preparation to come back --

12   and many of these depositions were not deferred by us.  We don't

13    control all -- we don't control hardly any of these
witnesses.

14           They were deferred by the defendants, for whatever

15    reason.  They were deferred by the defendants.  They just
didn't

16    come back.  And to come back two weeks before trial as to the

17    witnesses who were known for a long time and have been known
for

18    a long time, that's just fundamentally unfair.

19           And we have missed our chance to take many
depositions

20    or renewed depositions of their witnesses who have been known

21    for a while.

22           Now, as to the new witnesses, I -- you know, I
concede

23    that there should be a severely limited right to take

24    depositions.  But to say an average of two hours is no

25    limitation at all, because some of these witnesses are on
very

85

1    discrete areas.  For example, the two, I will call them,

2    Bartlett children.  One of them's name is not Bartlett
anymore,

3    but the two Bartlett children, I don't think those need to be

4   lengthy depositions, so when you average a ten or fifteen-minute

5   deposition of them with what might be a six or seven-hour

6   deposition of someone else, that can come out to two hours.

7        They took 27 depositions last summer and we took 20.

8   This was all during 2004.  That was our count, anyway.  We went

9   back.

10       We exchanged witness lists in December of 2003, and

11   approximately 45 to 50 depositions were taken, more by them than

12   by us.  Many of those depositions were five, six, seven-hour

13   depositions.  Seven hours of testimony.

14       They were, in our view, quite harassing, and I would

15   say some of our prospective witnesses were daunted, and perhaps

16   even dissuaded, from further cooperation by going through the

17   experience.  It's probably a little worse than a root canal.

18       So to do this now, on the eve of trial, and adhere to

19   the exact same schedule that we have been talking about now for

20   the last -- at least the last four to six weeks, is unfair.

21       I am willing to agree to a maximum of one hour for

22   newly-designated witnesses, and I don't know this GIS fellow

23   that's creating these beautiful elaborate models for them, I

24   don't know whether we are going to want to take his deposition

25   or not.  I don't know if he will testify or if he is going to

86

1   say I built this model.

2        MR. BERNICK:  He is just there for foundation.

3        MR. DAVIDOFF:  Right.  And I mean on some of these

4   witnesses like Wes McKinley, I would agree his testimony is

5   going to be circumscribed by your Honor's ruling, and I don't

6   think he is that new.

7        I think we can do it by agreement and stick at or close

8   to the schedule that your Honor is dictating, if we confine it

9   to the new witnesses, but if we are going to reopen discovery of

10   witnesses that have long been known to both sides, two weeks

11   before we pick a jury, I don't know how we are ever going to get

12   this done, and I have to tell your Honor this is a major strain

13   on the plaintiffs' counsel.

14        It's a major strain on us, both in economic and strain

15   on our schedules.  We are really extending ourselves to do what

16   is necessary to get this trial done, and this is just something

17   that shouldn't be sprung on us.

18           We are not at fault, and I would ask Peter to speak, if

19   I may, your Honor.

20           THE COURT:  Yeah.

21           MR. DAVIDOFF:  We are not at fault -- I would ask Mr.

22   Nordberg to speak -- for Mr. Lipski who has been retired since

23   2005, we are not at fault for the delays in taking Mr. McKay's

24   deposition.  We are just not at fault.

25           And I think the lack of diligence has been bilateral.

87

1   There is some of their people now that I would have liked to

2   have deposed, and we let it slip and they let it slip.  So be

3   it.  Let's go to trial.

4           MR. NORDBERG:  I don't know how much to add to what

5   Mr. Davidoff has already said, but I did hear two things in

6   Mr. Bernick's presentation that, frankly, I took issue with.

7        The first was that these depositions were deferred at

8   plaintiffs' instance, and there may be a deposition somewhere

9   that has been deferred at plaintiffs' instance.  I cannot think

10   of it offhand.

11        Again, in the categories that Mr. Bernick discussed,

12   there are four class reps.  The court -- defendants sought and

13   received permission to take supplemental deps of them a year

14   ago, and there has been effective radio silence on the subject

15   since then.

16        We got an e-mail from one of defendants' counsel on

17   August 26th wanting to depose these listed people, and, um, I

18   spoke with defense counsel at that time, and reminded them that

19   we had taken -- I see them now.  I am trying to speak up as best

20   I can.

21        That we had -- what happened, your Honor, is this.

22   There were various witnesses who, for one reason or another,

23   hadn't gotten done by the deadline, so Mr. McKay had objected to

24   being deposed.

25        Defendants ran into a problem of Justice when they

88

1    tried to depose Lipski.  Not with us but with Justice.

2         Zimmie Saye Williams has been disclosed to them for

3    quite some time.  This is the incinerator witness down in
Texas.

4    She is represented by counsel.  Nobody has scheduled

5    depositions, and certainly we didn't defer the depositions of

6    Cindy Williams, defer the deposition of Charlie McKay, defer
the

7    deposition of John Lipski.  We didn't do that.  We didn't say

8    defer the depositions of the class reps.

9         They were deferred.  And I am not going to ever
accuse

10   defense counsel of a want of diligence, but the fact is that

11   even after this was raised in kind of a -- with new urgency
on

12   August 26th, we went an entire month without hearing about
this.

13         We went through an entire status conference without

14   this being brought up.  This was raised in a motion we
brought

15   up, and I believe we conferred about this yesterday, although

16   the time is a little fuzzy in my mind.

17         So I am not sure what else to say, except I can

18    remember multiple occasions on which I have been on the phone

19    with defense counsel and said, yes, we are not going to harangue

20    you about the discovery cutoff in July of 2004, but don't worry,

21    we understand we are not going to try to jam you.  If there is a

22    legitimate reason why some of these depositions couldn't be

23    taken, we were not going to hang you out to dry on it.

24          But also in other conversation that I can remember, I

25    also said I don't want to have them scheduled on the eve of

89

1    trial.  I can remember a conversation last spring -- I honestly

2    can't remember the counsel I spoke to.  Defendants may want to

3    defer these depositions until other legal issues are decided,

4    that's something that defendants want, that's not something that

5    plaintiffs agreed should be done, as Mr. Bernick suggested.  We

6    simply agreed that they requested to defer.

7          But in every conversation I can remember, we said we

8    don't want it done in September of 2005.  We don't want it

done

9   on the eve of trial.  We are not going to be screwing around

10   voluntarily during final pretrial preparations for the

11   depositions of witnesses who have been disclosed to defendants

12   for six months, a year or longer.  So that's my personal

13   recollection on some of the day-to-day discussions about some of

14   these specific witnesses, your Honor.

15        MR. KURTENBACH:  Your Honor, may I address this issue?

16        THE COURT:  Go ahead.

17        MR. KURTENBACH:  There was absolutely no effort here to

18   spring depositions on the plaintiffs on the eve of trial, and

19   there never has been.

20        What has happened here is we got an extremely broad

21   list of witnesses in December of '03.  And we took the

22   depositions, as Mr. Davidoff said, of virtually all of those

23   people.

24        THE COURT:  Yeah.

25        MR. KURTENBACH:  The whole effort was, who is on the

90

1    list.  Let's depose them.  We made absolutely no secret, and

2    there has never been any secret, that we wanted to take the

3    depositions of everyone they were going to call as a witness at

4    trial.

5         There was also always operating in the backdrop, that

6    we had a great number of issues pending before the court, and we

7    were going to be limiting our witnesses.

8         And there was never any impression on my part, and I

9    have -- it's never been communicated to me by any other defense

10    counsel, that there was anything other than agreement between

11    the parties that we would defer these depositions until the

12    court's rulings.

13         And that if then the parties decided they still wanted

14    to call these people, we would take up these depositions.  I

15    look back at this e-mail and correspondence record, and we have

16    confirmed, with respect to each of these witnesses, and we have

17    from the plaintiffs an agreement that we will not do anything to

18    prevent you from taking these depositions.

19         Now, with respect to them individually -- and I will

20    say this.  A great deal of people who were listed on the

21    December '03 list, who we deposed and spent an enormous amount

22    of time and money deposing, are now not going to be called, and

23    our only purpose was to take the depositions of the people who

24    were going to be called at trial.

25        We don't want to take depositions of anyone who wasn't

91

1    going to be called as a witness at trial.  And we made that

2    absolutely clear.

3        If you are going to drop them, tell us you will drop

4    them, and we aren't going to depose them.  And now we find

5    ourselves with, under changing circumstances, we have the

6    rulings of your Honor.  Immediately after the August 22nd

7    conference, we got on the phone with the plaintiffs and said,

8    okay, the rulings have come in, not all of them but some of

9    them, let's take up this issue, and for the first time, for the

10    first time we hear too late.

11        Now, and there is a tear in the fabric here.  I mean we

12   have an agreement we were operating under.  We are not going
to

13   go waste your time taking depositions of people who aren't
going

14   to be called as witnesses.  We understand there are a lot of

15   these people who will fall away once his Honor rules, and lo
and

16   behold your Honor rules, and the witnesses don't fall away,
and

17   we said, okay, let's schedule them.  And for the first time
it's

18   too late.  Now we are preparing for trial.  Well, that was
the

19   deal.

20        We put off four or five people who were on their
list

21   for that reason.  With respect to Mr. McKay, I mean the fact

22   that he turned over 12,000 pages of documents is some sort of

23   evidence that we don't need to take his deposition.  I mean
he

24   is going to be a principal witness in this case.  We noticed
up

25   his deposition.  It didn't get taken because of timing

92

1   restraints.  We have an e-mail record saying we will come
back

2   and take his deposition.  They were part of a larger group of

3   people who were let's see what the judge rules, and now we don't

4   get to take a deposition for two or three hours because

5   August 26th, after your Honor ruled, we got on the phone and

6   they said, now it's too late.

7        That is a tear in the fabric of anything that will be

8   able to be a sustainable relationship between these parties

9   going forward.

10        So with respect to Mr. Lipski, Mr. Nordberg says not

11   our problem, the FBI won't produce him.  Well, it's not our

12   problem either, and they are apparently calling him as a

13   witness.

14        There is a dead-bang, straight-on-point e-mail that

15   says, we aren't going to do anything to prevent you from taking

16   Mr. Lipski's deposition.  We agree on that.

17        With respect to these named plaintiffs, they are

18   calling some of their named plaintiffs, and we are not standing

19   there asking to depose the people who they are not calling.

20        But for those who they are going to call, particularly

21   now it seems like the Bartletts, who turned over a lot of

22   documentation, we did follow up when your Honor told us to do

23    so, we went out and got that documentation, and then we had to

24    deal with the plants.

25        We will see what happens with the rulings, and then we

93

1    will come back and take these depositions.

2        The other aspect of that is we didn't want to be taking

3    lengthy depositions because there might be six or seven

4    different issues at play.  We didn't know.  It made all the

5    sense in the world to see what your Honor's rulings were, come

6    back and take very discrete, targeted depositions, after we knew

7    what the issues in the case were going to be.

8        So to come back now and say, now it's too late, there

9    is no question that we were willing to put forward the resources

10    to take these depositions, and the only reason -- we took 54 of

11    them of anybody who they named as a witness, and the only reason

12    we put these people off is because for one reason or another

13   they didn't get taken at that point in time, and we had an

14   agreement that we would come back and take them after your

15   Honor's rulings.

16        MR. DAVIDOFF:  May I say something?

17        MR. KURTENBACH:  Just let me finish.  To come back now

18   and to say, now it's too late, is the ultimate gotcha, and as I

19   say, it just tears at the fabric of any relationship between

20   these parties that we can have an agreement and move forward

21   with it.

22        THE COURT:  Thank you.  Okay.

23        MR. DAVIDOFF:  There was never any such agreement.  I

24   mean the desire to defer the depositions, if there was one or

25   some of the residual untaken depositions until after your

94

1   Honor's ruling, that may have been their desire.  That was not

2   only not part of our agreement.  I know that I directed, and I

3   know that Mr. Nordberg said many times, we are not going to do

4   depositions on the eve of trial because we know how

disruptive

5    that is, so, um, I don't know what fabric is being torn, but

6    there was no meeting of the minds, the minds were very far
apart

7    on that one.

8         On the new witnesses on both sides, I am asking your

9    Honor to set a very, very tight maximum time limit of one
hour

10   or less for any of those witnesses who are deposed.

11        MR. KURTENBACH:  Your Honor, if I could just
briefly.

12        An e-mail from Ms. Noteware of Mr. Davidoff's firm
on

13   November 10th of 2004, to a colleague of mine who has since

14   passed away, her writing, "Brett, as we discussed earlier, we

15   will work together to complete any outstanding discovery

16   completed of our intended witnesses Lacy, McKay and Thigpen,
and

17   any other loose remaining ends before trial?

18        A subsequent e-mail confirming a conversation to the

19   same effect between my partner, Mr. Nomellini, and Mr.
Nordberg,

20   also attached to these materials in March of '05.  Mr.
Nordberg

21   himself under tab 5 of our materials, Ms. Ahern, who is
sitting

22   here with me, writes to them and says, "Should permission be

23   received for him to testify," this is Mr. Lipski, "in the

24   future, it is my understanding that you do not object to our

25   taking a discovery deposition of Mr. Lipski at that time."


95

1        Mr. Nordberg, "Ellen, you are quite correct."  There is

2    an agreement.

3        MR. DAVIDOFF:  Well, those are ancient communications

4    relative to the last year and a half for trial preparation in

5    this case, and may I just say one thing.  To hit us with a

6    motion on the eve of a pretrial conference -- they didn't even

7    raise it at the pretrial conference we had nine days ago.  To

8    hit us with a motion that we get when we are trying to get ready

9    for this conference, we are all flying in here last night, we

10   are trying to get ready for this conference, and to expect us to

11   spend overnight searching our e-mail trails from the last year

12   and a half to prove what is quite obvious in what we have said

13   repeatedly, fine, we will cooperate with you, but cooperation

14   does not entail disrupting our final trial preparation in the

15   last two weeks before trial.  That is absurd.  Respectfully.

16       THE COURT:  Well, okay.  That's enough.  Thank you.

17           I have said this before, and I don't want to sound like

18   a broken record about this.  But given the difficulty in trying

19   to get a trial date with counsel's on both sides schedules, and

20   the fact that you do, speaking to all of you, you do specialize

21   in an area of law that takes certain demands on the system that

22   the system isn't really able to deal with.  You have got, for

23   instance, a trial, or you had one that lasted five or six

24   months.

25       MR. BERNICK:  Nine.

96

1       THE COURT:  Okay, nine.  Another trial, you know, to

2   get you people in is more difficult than it was to find a

3   filming date for John Wayne.  Your time is taken up.

4           And we are accustomed, we are not accustomed anymore,

5   but the system itself was designed for trials lasting three

or

6    four days, and the system itself was one where -- in fact, I

7    wish we were there now -- but where you could have term days,

8    and all the lawyers that had cases for a whole year would show

9    up and the whole calendar was set at that time.

10          We aren't there anymore.  We are talking about

11    different times for this case to go to trial, and you saw what

12    happened last time.  It was over a year before we could get

13    everybody together, and I am not trying to fault anybody with

14    that, it's the nature of what we are trying to do.

15          Another aspect is that these rules of procedure were

16    never designed for cases like this, and so there is plenty of

17    authority that says once you reach the discovery cutoff date,

18    that's it.

19          Well, they are talking -- I think the higher courts

20    are, and trial courts rarely make these rulings -- they are

21    talking about single party, individual parties, kinds of

22    litigation.  Traffic accidents, and personal injury, and perhaps

23    a breach of contract.  They are not talking about something like

24    this where it's well nigh impossible to keep track of everything

25    that's going on, so I am, on the one hand, I am very

97

1   sympathetic; on the other, I am forced not to look at what the

2   usual kind of decisions are made.

3        The kind -- and I don't mean to demean anybody by

4   saying this, but the kind of routine rulings that are made, we

5   are not there.

6        I also have to look at this in the sense of allowing

7   counsel the time to put all this monumental work into effect to

8   get this case going and on trial day, as scheduled.  And we have

9   already seen today where we know that it's going to go way

10   beyond what was anticipated.

11        I am not going to continue this trial.  That would be a

12   typical kind of thing to do.  It's virtually impossible in this

13   case to do that.

14        And I suppose there is another aspect, too, that has

15   convinced me more and more that we ought to abolish depositions

16   entirely, but that's a matter for speculation over a fifth of

17   brandy, I think, but at any rate, I have got to be arbitrary, I

18   guess is what I am telling you, and I am going to permit the

19   depositions of newly-endorsed witnesses, and they will have to

20   be taken by September 28, unless counsel agree to another fixed

21   definite time after September 28th.

22        With regard to witnesses already deposed, I am not

23   going to permit additional depositions of them, but those

24   witnesses will be limited to the testimony in their depositions,

25    and if any additional testimony on direct is intended, then the

98

1   calling party must provide a sworn statement of that witness to

2   the opposing party not later than September 28th.

3        A sworn statement is to what that additional testimony

4   is.  An affidavit.  I hereby declare this is my testimony.

5   That's the best thing I can do to avoid surprise.

6        As to the opposing party, as Mr. Bernick pointed out,

7   he has learned some information he wants to go into at

greater

8   length and he seeks additional information, and this applies to

9   both sides, if either side expects or wants additional

10   information from a witness already deposed, that party seeking

11   that information on new matters, matters not contained in the

12   previous deposition, may serve a maximum of five interrogatories

13   to the other side to be answered, and that has to be served

14   by -- I hate to do this -- but Monday, September 26th, and it

15   has to be answered by Friday, September 30th.

16      MR. DAVIDOFF:  Can I make a comment, your Honor?  The

17   depositions of the witnesses that we are calling were, by and

18   large, taken by the defendants.  They were not limited.

19      I can't control what they did or did not ask in a

20   deposition.  Um, so I assume -- I shouldn't assume -- I am

21   asking, I guess, for some guidance here.  If the facts were

22   within the witness's knowledge and could have been asked about

23   in the deposition --

24      THE COURT:  Yeah.  This is not to plow over fields that

25   have already been gone over.  This is new matters.  If the

99

1    Bartletts have sold their property since their depositions were

2    taken, and he wants the details on that, he is entitled to that.

3        MR. DAVIDOFF:  Right.  I agree with that.

4        THE COURT:  If you are going to ask one of these

5    witnesses for information that came up after their deposition

6    was taken, at any time from that date forward, new information,

7    then you must provide sworn statements.

8        MR. DAVIDOFF:  I understand that.  I am not quarreling

9    with that at all.

10       THE COURT:  I am just trying to avoid ambush.

11       MR. DAVIDOFF:  I completely understand, and I think

12   that's fair.  Okay.  So if it was available at the time of the

13   deposition, whether they asked about it or not, it's fair game.

14   I don't want to have to go back and figure out between now --

15   let me finish, David, because I had a second point too.

16       MR. BERNICK:  I will sit down.

17       MR. DAVIDOFF:  Thank you.  All right.

18       Part one is, if they could have asked about it at the

19   deposition because the facts had occurred prior to the

20   deposition, what I am requesting is that we not have to go back

21   and do the work of determining whether Kirkland & Ellis asked

22   about a witness -- asked the witness that we are going to call

23   about something at his deposition that they could have asked

24   about, but didn't, that we then have to supplement.

25       As I understand it, we don't have to do that.

100

1       THE COURT:  Depends.  Are they going to testify to it

2   or not?  If they are going to testify to it, then you will.

3       MR. DAVIDOFF:  Okay.

4       THE COURT:  It's hard to figure out, but I don't know

5   what else I can do.

6       MR. DAVIDOFF:  Then I have -- that's a daunting task

7   because if they could have asked the question that they didn't

8   ask, and if I have to figure out whether they asked the question

9   that they didn't ask, September 28th is a -- not a realistic

10   deadline.

11        The other part of the clarification I was seeking, I am

12   respectfully suggesting it's not realistic.  I would suggest

13   maybe five days before the witness's testimony would be more

14   appropriate.

15        THE COURT:  I need to get it done before trial.  I

16   really do.

17        MR. DAVIDOFF:  All right.  The other clarification is

18   you said you want a sworn statement.  I may not be able to get

19   sworn statements from every witness.

20        THE COURT:  You can fax it, but they can sign it sworn

21   wherever they like, and if you can't get it because they are not

22   your clients or something of that nature, then notify

23   Mr. Bernick, and we will figure out what to do.

24        MR. DAVIDOFF:  Well, many of our witnesses do fall in

25   that category.

101

1        THE COURT:  You can ask them, can't you, to go ask them

2    to file a sworn statement.  It seems to me, it isn't going to

3    hurt to ask them.  If they say no, I suppose I can issue a

4    subpoena to have their deposition taken.  We are trying to save

5    them time too.

6         MR. DAVIDOFF:  All right.

7         MR. BERNICK:  I think I understand we have these

8    categories.  We have the named plaintiffs, who have been deposed

9    before.  It's easy to understand your Honor's determination with

10    respect to them.

11         We have new witnesses, who have not been deposed as

12    plaintiffs' new witnesses, and I don't know that your Honor's

13    direction just now addresses the new witnesses not previously

14    disclosed.

15         THE COURT:  I said you can take their depositions.

16         MR. BERNICK:  Take their depositions.  And the same

17    thing would apply to our people.

18         THE COURT:  Right.

19         MR. BERNICK:  And with respect to the people who are

20    old that were designated before, one of them was deposed, which

21    is Mr. McKay, and would fall well within the guidance that your

22    Honor offered.  We then have three people, Lipski, Lacy and

23    Williams who were never deposed, and may I make a suggestion,

24    which is that if we could just get a statement -- doesn't have

25    to even be a sworn statement.

102

1         THE COURT:  I said, you can send them interrogatories.

2         MR. BERNICK:  Send them interrogatories.

3         THE COURT:  Yes.

4         MR. BERNICK:  Okay.  And that would be fine.

5         THE COURT:  Okay.  All right.

6         MR. NORDBERG:  Your Honor, can I just get clarification

7    on one point?

8         THE COURT:  Yes, sir.

9         MR. NORDBERG:  This has all come up, your Honor, in the

10    context of a motion filed by defendants about twelve witnesses.

11         Do we have to go back through the entire corpus of all

12    the witnesses on our list?

13         THE COURT:  No.

14         MR. NORDBERG:  Just the twelve, correct.

15      THE COURT:  Yes.

16      MR. NORDBERG:  I just want to be clear, your Honor.

17      MR. BERNICK:  With respect to, and again by way of

18   saving timing, suggestion.  With respect to Kaufman, the AUSA,

19   and McKinley and Lipski.  Lipski again is FBI.

20      THE COURT:  Why can't you people get them on the phone

21   and talk to them?  Why don't we do that?  Is it possible?  A

22   retired FBI agent isn't going to be that difficult to talk to.

23      MR. BERNICK:  But what I am focused on -- I don't know,

24   for example, McKinley is the grand jury foreman.  What is the --

25   instead of hunting in the dark about what he is being proffered


103

1   for, why don't we find out what he is being proffered for.

2      THE COURT:  That's what I expect you to do, to find out

3   what he is being proffered for.  It seems to me you can get on

4   the phone.  There are people in lawsuits who can't afford

5   depositions, and that's what they do, so it's worth a try.

6          MR. BERNICK:  Certainly even if they are not willing to

7     talk, what I am raising about those people in particular, is

8     they fall within this area where your Honor has been very clear

9     about what it is that is going to be permitted or not.  And if

10    there is any ambiguity if it's something else that we haven't

11    foreseen, let's put it out in the open.  I don't know what a

12    grand jury foreman could testify to now other than how was the

13    grand jury foreman we met.

14         THE COURT:  That may well.  They might be deciding not

15    to call him after they heard what I have to say.  But I think if

16    you talk to one another, you can work it out.  You have seen

17    what the parameters are.  And I am just trying to cut to the

18    chase.  Okay?

19         Is there anything else we need to do today?  Anything

20    else?  Okay.  Thank you, gentlemen.  And ladies.

21         (Proceedings concluded at 2:35 p.m.)

22

23

24

25

104

1                    REPORTER'S CERTIFICATE

2          I certify that the foregoing is a correct transcript

3       from the record of proceedings in the above-entitled matter.

4          Dated at Denver, Colorado, this 23rd day of September,

5    2005.

6

7

8

_____

9                         Suzanne M. Claar, CSR, RPR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25