# Exhibit B

Westlaw.

999 F.2d 1430                                                                                                     Page 1
999 F.2d 1430, 37 Fed. R. Evid. Serv. 997, Prod.Liab.Rep. (CCH) P 13,606
(Cite as: 999 F.2d 1430)

▷

**Briefs and Other Related Documents**

United States Court of Appeals,
Eleventh Circuit.
Brenda Griffin **TOOLE** and J. Michael **Toole**,
Plaintiffs-Appellees, Cross-
Appellants,
v.
Richmond C. McCLINTOCK, Jr., M.D.; Richmond
C. McClintock, Jr., a Professional
Association; Heyer-Schulte, an unincorporated
wholly owned subsidiary of
American Hospital Supply Corporation, a
Corporation; American Hospital Supply
Corporation, a Corporation; **Baxter** Travenol
Laboratories, Inc., a
Corporation; Travenol Laboratories, Inc., a
Corporation, Defendants,
**Baxter Healthcare** Corporation, a Corporation,
Defendant-Appellant, Cross-
Appellee.
No. 91-7997.

Sept. 2, 1993.

Patient and spouse brought action against successor silicone gel breast implant manufacturer to recover for injuries caused by rupture of implants. The United States District Court for the Middle District of Alabama, No. 90- H-195-S, Truman M. Hobbs, J., 778 F.Supp. 1543, entered judgment, after ordering remittitur of jury verdict, and successor appealed. The Court of Appeals, Edmondson, Circuit Judge, held that: (1) federal agency report should have been excluded, and (2) evidence did not support award of punitive damages.

Vacated and remanded.

West Headnotes

**[1] Products Liability** ⊸87.1
313Ak87.1 Most Cited Cases
Under Alabama law, existence of duty to warn and adequacy of warning are questions of fact for jury.

**[2] Products Liability** ⊸83
313Ak83 Most Cited Cases

Finding that silicone gel breast implant manufacturer's warnings were insufficient, thereby rendering it liable to patient whose implants ruptured, was supported by evidence; jury could reasonably have found that warning given doctor understated risks of implant rupture from closed capsulotomies.

**[3] Products Liability** ⊸46.1
313Ak46.1 Most Cited Cases
  (Formerly 313Ak46)
Under "learned intermediary doctrine," adequacy of silicone gel breast implant manufacturer's warning was measured by its effect on physicians, to whom it owed duty to warn, and not by its effect on patient.

**[4] Products Liability** ⊸81.1
313Ak81.1 Most Cited Cases
Federal agency's document, containing proposal to require premarket approval for silicone gel-filled breast prostheses, as well as proposed findings on risks posed by devices, was not admissible in patient's action to recover against manufacturer for injuries suffered when implants ruptured; document, containing findings proposed years after dates of patient's implants or rupture, were irrelevant and inadmissible as to what manufacturer knew or should have known about risks.

**[5] Evidence** ⊸366(1)
157k366(1) Most Cited Cases
Federal agency's document, containing proposal to require premarket approval for silicone gel-filled breast prostheses, as well as proposed findings on risk posed by devices, was not admissible in patient's action to recover against manufacturer for injuries suffered when implants ruptured; document, which contained only "proposed" findings inferred from articles in medical journals, lacked "trustworthiness" necessary to come within exception to hearsay rule for government investigative reports. Fed.Rules Evid.Rule 803(8)(C), 28 U.S.C.A.

**[6] Damages** ⊸91.5(4)
115k91.5(4) Most Cited Cases
  (Formerly 115k91(1))
Manufacturer of silicone gel breast implants could not be held liable for punitive damages to patient whose implants ruptured absent showing, as required under Alabama law, that its conduct made injury "likely" or probable; actual incidence of implant ruptures from closed capsulotomies, as occurred in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

instant case, was slightly less than one percent.

**[7] Damages** 208(8)
115k208(8) Most Cited Cases
Under Alabama law, issue of punitive damages should not go to jury when manufacturer took steps to warn products liability plaintiff of potential danger that injured him; those facts bar finding that defendant was "consciously indifferent."

*1431 Patrick J. Lamb, Amy E. Smith, Katten Muchin & Zavis, Chicago, IL, C.C. Torbert, Jr., Maibeth J. Porter, Maynard, Cooper, Frierson & Gale, P.C., Montgomery, AL, Hall R. Marston, Dickson, Carlson & Campillo, Santa Monica, CA, for defendant-appellant.

Ralph I. Knowles, Jr., Everette L. Doffermyre, K. Christine Harrelson, Doffermyre, Shields, Canfield & Knowles, Atlanta, GA, Rufus R. Smith, Jr., Ernest H. Hornsby, Farmer, Price, Smith, Hornsby & Weatherford, Dothan, AL, K. Christine Harrelson, Federal, Goetz & Cronkright, Atlanta, GA, for plaintiffs-appellees.

Appeals from the United States District Court for the Middle District of Alabama.

Before ANDERSON and EDMONDSON, Circuit Judges, and YOUNG [FN*], Senior District Judge.

> FN* Honorable George C. Young, Senior U.S. District Judge for the Middle District of Florida, sitting by designation.

EDMONDSON, Circuit Judge:

In this products liability case, the jury returned a general verdict against appellant **Baxter Healthcare Corporation** and awarded compensatory and punitive damages to plaintiffs **Brenda** and Michael **Toole**. On the condition that the **Tooles** agreed to remit part of the jury award, the district court denied **Baxter's** motions for JNOV and a new trial and entered final judgment for plaintiffs. 778 F.Supp. 1543. Looking at the law of Alabama, we reverse and remand the case for a new trial.

*1. Background*

Brenda Toole had breast augmentation surgery in 1981. In that operation, Dr. Richmond McClintock, an Alabama surgeon implanted two silicone elastomer gel-filled mammary prostheses manufactured by Heyer-Schulte Corporation [FN1]. In 1987, Ms. Toole suffered from "capsular contracture," a condition in which a capsule of scar tissue forms around the implant and gradually contracts, deforming or hardening the breast. Toole returned to Dr. McClintock in February 1988 for treatment of this condition.

> FN1. **Baxter Healthcare** Corporation acquired the assets and liabilities of American Hospital Supply Corporation, the parent of the implant manufacturer, Heyer-Schulte Corporation, in November 1985.

Dr. McClintock treated **Toole's** capsular contracture by performing a "closed capsulotomy." In this technique, physicians compress the affected breast to rupture the scar tissue, which ideally restores suppleness. [FN2] When Dr. McClintock did this to Ms. **Toole,** the procedure ruptured her implants, causing silicone gel to escape into the surrounding tissue. Brenda Toole has since had several operations to replace her implants and to remove granulomas, which are basically lumps that form in response to a foreign particle in the body. **Toole** may require more treatment for granulomas in the future.

> FN2. Each of the five surgeons who testified at trial (Drs. McClintock, Robinson, Hamner, Windham and Zaworski), including Ms. **Toole's** expert witness and treating physician, Dr. Zaworski, testified that the closed capsulotomy is often the best way to treat capsular contracture and that they perform the procedure on their patients many times each year.

When Ms. **Toole** first got her implants, Heyer-Schulte provided in its product literature written warnings, including these: (1) *1432 that "Heyer-Schulte Corporation cannot guarantee the structural integrity of its implant should the surgeon elect to treat capsule firmness by forceful external stress;" (2) that "the patient should be made aware that any abnormal stress or trauma to the breasts could result in rupture of the prosthesis;" and (3) that "should the silicone envelope be ruptured, Heyer-Schulte Corporation cannot guarantee reliable gel containment and the prosthesis should be replaced." [FN3]

> FN3. The warnings in Heyer-Schulte's product insert read in full as follows:
> Warnings
> The silicone elastomer envelope of these products has a low tear strength and is thin to achieve desired prosthesis softness and

999 F.2d 1430                                                                                                           Page 3
999 F.2d 1430, 37 Fed. R. Evid. Serv. 997, Prod.Liab.Rep. (CCH) P 13,606
**(Cite as: 999 F.2d 1430)**

mobility. For these reasons, the envelope may be easily cut by a scalpel or ruptured by excessive stresses, manipulation with blunt instruments or penetration by a needle.

Gel prostheses may be easily ruptured when still hot from the autoclave. Care must be exercised during handling to prevent such damage.

Each prosthesis should be checked for patency prior to implantation. A prosthesis which has been damaged, or on which repairs have been attempted, should not be implanted. A standby prosthesis should be available at the time of operation.

After autoclaving, it is recommended that the implant be completely cooled prior to insertion to avoid possible tissue damage from residual heat release.

Sepsis, hemorrhage or thrombosis may result from the placement of any foreign object in the body.

Dacron velour, when used as an internal fixation patch, will eventually deteriorate and may result in separation and/or migration of fragments into the surrounding tissues.

Heyer-Schulte Corporation cannot guarantee the structural integrity of its implant should the surgeon elect to treat capsule firmness by forceful external stress.

The patient should be made aware that any abnormal stress or trauma to the breasts could result in rupture of the prostheses.

The gel interior of these products is vulcanized to retard the migration of gel should a rupture occur in the silicone envelope. However, should the silicone envelope be ruptured, Heyer-Schulte Corporation cannot guarantee reliable gel containment and the prosthesis should be replaced.

Breast implants may interfere with postoperative xeromammography. It has been reported that silicone implants can interfere with ECG measurements.

The tab on the posterior side of the oval prostheses (Styles 6000 and 8000) is for orientation only and cannot be relied upon to provide permanent fixation.

Lint, fingerprints, talc and other surface contaminants can cause foreign body reactions. Utmost caution should be taken to avoid contaminants.

Pl. Exhibit 50.

Ms. **Toole** testified that she recalled Dr. McClintock warning her during their initial appointment in 1981 of certain risks, including implant rupture. [FN4] The testimony at trial was conflicting about what Dr. McClintock said to Ms. **Toole** before performing the closed capsulotomy in 1988. Ms. **Toole** testified that Dr. McClintock did not warn her that performing the closed capsulotomy risked rupturing her implants. Dr. McClintock testified that he warned Ms. **Toole** of certain risks of closed capsulotomies, including bleeding, rupture of the implant, and distortion of the breast. The evidence was plain that **Brenda Toole's** implants ruptured during the closed capsulotomy and that she has suffered from the consequences.

> FN4. Ms. **Toole** recalled that Dr. McClintock had told her that "it would take like the force of an automobile accident" to rupture the implants. R.Vol. 7 at 70. Dr. McClintock testified that, in 1981, he told Ms. **Toole** of "the complications that were generally accepted by the medical profession" and that his records showed he gave her an information sheet about implants. R.Vol. 7 at 150-51.

**Brenda Toole** and her husband brought this products liability action against appellant **Baxter Healthcare** Corporation ("**Baxter**") and a malpractice claim against Dr. McClintock. Two of the **Tooles'** claims against **Baxter** were tried to the jury: a claim that the implants were unreasonably dangerous and a claim that Heyer-Schulte failed adequately to warn doctors of risks associated with the product.

The jury found **Baxter** liable and awarded $350,000 in compensatory damages to **Brenda Toole** and $50,000 to her husband. The jury also awarded plaintiffs $5,000,000 in punitive damages. **Baxter** moved for JNOV or a new trial. The district court found the award excessive in the light of the evidence and conditionally granted **Baxter's** motion for a new trial unless the **Tooles** agreed to a remittitur reducing the award of compensatory *1433 damages to $275,000 and the award of punitive damages to $2 million, for a total award of $2,275,000. The **Tooles** agreed to the remittitur "under protest."

The district court denied **Baxter's** motions for JNOV and for a new trial, and entered final judgment for the **Tooles**. In this appeal **Baxter** attacks the district court's denials of **Baxter's** motions for a directed verdict, for JNOV and for a new trial. **Baxter** also asserts error in the admission of certain evidence and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the award of punitive damages. The Tooles' cross-appeal challenges the district court's order of remittitur.

2. *Issues & Analysis* [FN5]

> FN5. The Tooles' cross-appeal challenging the remittitur does not persuade us. A federal plaintiff may not appeal a remittitur to which she has agreed, even if plaintiff agreed to it "under protest" to try to preserve appeal rights. *Donovan v. Penn Shipping, 429 U.S. 648, 649, 97 S.Ct. 835, 836, 51 L.Ed.2d 112 (1977)* (remittitur in lieu of new trial). Baxter's motion to dismiss the cross-appeal is granted.

A. *Denial of Directed Verdict/JNOV: Adequacy-of-Warning Issues*

Baxter contends that the district court erred in denying its motions for directed verdict and JNOV for three reasons. Baxter argues that its warning was clear that a closed capsulotomy could rupture the implant, that Ms. Toole admitted that, had the manufacturer's warnings been conveyed to *her*, she would not have consented to implant surgery, and that there is no evidence that a different warning from Baxter would have caused Dr. McClintock to behave differently. These arguments have insufficient merit.

[1][2] The jury in this case was instructed that it could find Baxter liable either because the Heyer-Schulte implant was an "unreasonably dangerous" product *or* for a negligent warning, and the jury returned a general verdict. Even assuming that the sole basis for the verdict was the warning, under Alabama law, "the existence of a duty to warn and the adequacy of a warning are questions of fact for the jury." *State Farm Fire & Casualty Co. v. J.B. Plastics, 505 So.2d 1223, 1227 (Ala.1987)*. The jury could reasonably have thought that Baxter's warning, as it was worded, understated the risks of implant rupture from closed capsulotomies.

[3] Under the "learned intermediary doctrine," the adequacy of Baxter's warning is measured by its effect on the *physician,* Dr. McClintock, to whom it owed a duty to warn, and not by its effect on Ms. Toole. *See Stone v. Smith, Kline & French Lab., 447 So.2d 1301, 1304-05 (Ala.1984),* adopting *Reyes v. Wyeth Laboratories, 498 F.2d 1264, 1276 (5th Cir.1974)*. The jury heard evidence from which it could reasonably conclude that a different warning would have caused Dr. McClintock to warn Ms. Toole before her augmentation surgery. [FN6] There was no error in denying Baxter's motions for directed verdict and JNOV on these grounds.

> FN6. Dr. McClintock's testified that "If I had known in 1981 that there was a--even a slightly significant instance of rupture of the implants, then I would have serial [sic] warned my patient. I'm not saying that I didn't know implants couldn't rupture. But in 1981 I think that was considered a very very unusual event." R.Vol. 7 at 150-51.

B. *Evidentiary Error* [FN7]

> FN7. Other evidentiary issues raised by Baxter lack merit.

Baxter contends that the district court abused its discretion when it admitted into evidence a document about implants prepared by the Food and Drug Administration. Baxter also contends that remittitur is insufficient to cure the error in admitting the FDA paper and that Baxter is entitled to a new trial. We agree.

Over Baxter's objection, the district court admitted into evidence, under Fed.R.Evid. 803(8)(C), a document published by the FDA in May 1990 about breast implants. The admitted document contained the agency's proposal to require pre-market approval for silicone-gel filled breast prostheses. The document also stated the agency's "proposed findings" on risks posed by the devices. *See *1434General and Plastic Surgery Devices; Effective Date of Requirement for Premarket Approval of Silicone Gel-filled Breast Prosthesis; Proposed Rule, 55 Fed.Reg. 20,568 (1990)* (to be codified at 21 C.F.R. § 878) (proposed May 17, 1990) ("the report"). [FN8]

> FN8. The FDA's proposed findings were based on a survey of 128 pieces of medical literature. The rule proposal said that "FDA now believes that the following are significant risks associated with the use of the silicone gel-filled breast prosthesis," and then described nine specific risks, including fibrous capsular contracture, silicone gel leakage and migration, infection, interference with early tumor detection, human carcinogenicity, and autoimmune disease. The FDA invited public comment on these proposed findings before issuance of a final rule. *See 55 Fed.Reg. at 20,568-*

Case No. 1:90-cv-00181-JLK   Document 1512-2   filed 10/16/05   USDC Colorado   pg 6 of 8

999 F.2d 1430                                                                                                                Page 5
999 F.2d 1430, 37 Fed. R. Evid. Serv. 997, Prod.Liab.Rep. (CCH) P 13,606
(Cite as: 999 F.2d 1430)

71. The district court ruled that the report was admissible under Fed.R.Evid. 803(8)(C) "because it was the product of a factual investigation conducted by the FDA pursuant to its statutory authority" and was "sufficiently reliable to be deemed admissible under Fed.R.Evid. 803(8)(c)."

The report said that FDA thought human carcinogenicity and autoimmune disease to be among the "significant risks" of implants. The Tooles relied on the report to corroborate testimony by their expert witness, Dr. Shanklin. On direct examination, plaintiff's counsel asked Dr. Shanklin to review the admitted FDA report. Shanklin testified that he agreed with the FDA report's assertions that implant recipients faced risks including cancer and autoimmune disease. [FN9] The Tooles argued to the jury that the report established what Baxter should have known about risks posed by its implants and also showed Ms. Toole's chances of suffering ailments, such as autoimmune disease, in the future.

FN9. We note that the district court, in granting Baxter's post-trial motion for remittitur, said that
"[T]he only evidence that Brenda Toole is at increased risk for cancer and immune system diseases is the testimony of Dr. Shanklin. Baxter, on the other hand, produced evidence which tended to show that the overwhelming majority of the medical establishment disagrees with Dr. Shanklin. It is clear that today, in 1991, the scientific basis for Dr. Shanklin's views is not generally accepted; in 1981, there was even less basis for a belief that a ruptured implant could cause cancer.
R.Vol. 5-135 at 16. That Dr. Shanklin's views were not the "only evidence" that purported to show risks of cancer and autoimmune disease is plain to us. The Tooles urged the jury to view the FDA report as independent evidence of cancer and autoimmune risks, corroborative of Dr. Shanklin's testimony. R.Vol. 12 at 15, 75 ("When Doctor Shanklin testified about what he believed Brenda was at risk for, he wasn't pulling this out of thin air ... You are going to have back there with you the Federal Register and the report of the FDA, Federal Food and Drug Administration [sic] of the United States government. Nobody can challenge this as being a biased report....").

Rule of Evidence 803(8)(C) excepts certain kinds of government investigative reports from the hearsay rule in civil actions. Under the rule, courts may admit reports containing "factual findings resulting from an investigation made pursuant to authority granted by law, unless the sources of information or other circumstances indicate lack of trustworthiness." Fed.R.Evid. 803(8)(C). We conclude that it was an abuse of discretion to admit the FDA report in this case because the report was irrelevant and failed to qualify for admission under Rule 803(8)(C).

[4] The FDA report contains no findings specifically about the Heyer-Schulte implants at issue in this case, but rather proposes findings about implants generally. The report contained findings proposed by the FDA in 1990, years *after* the dates of Ms. Toole's initial implant surgery or her later capsulotomy. As a simple matter of timeliness, those statements are irrelevant and inadmissible on what Heyer-Schulte knew or should have known about risks before 1988. *See* Fed.R.Evid. 401, 402. [FN10]

FN10. The Tooles' counsel urged the jury to look at the references listed in the FDA report's bibliography--the original sources from which the FDA inferred its proposed findings--and to compare the references' publication dates with the dates of Ms. Tooles' treatment. That some of those *references* pre-date Ms. Toole's treatment, however, makes none of the *FDA findings* relevant. Rule 803 makes admissible only the hearsay statements "of public offices or agencies," not the findings of others which the government investigator may have considered or cited. To view the rule otherwise is simply to let in the source material in addition to the agency's findings. No exception in Rule 803 exists for an agency's reference material.

[5] In addition, the FDA report is not the kind of trustworthy report described in Rule 803. By its own terms, the FDA report contained only "proposed" findings. The report invited public comment and forecasted the issuance of a "final" document after more study. Rule 803 makes no exception for *1435 tentative or interim reports subject to revision and review. *See City of New York v. Pullman Inc., 662 F.2d 910, 914 (2nd Cir.1981); United Air Lines v. Austin Travel Corp., 867 F.2d 737, 742-43 & n. 3 (2nd Cir.1989).*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case No. 1:90-cv-00181-JLK   Document 1512-2   filed 10/16/05   USDC Colorado   pg 7 of 8

999 F.2d 1430                                                                    Page 6
999 F.2d 1430, 37 Fed. R. Evid. Serv. 997, Prod.Liab.Rep. (CCH) P 13,606
(Cite as: 999 F.2d 1430)

The FDA's proposed findings are inferred from articles in medical journals (documenting investigations made by others). The assumption "that a government agency's findings may be assumed to be trustworthy ... has substantially diminished force when extended to the sources outside the investigative agency from which the agency culls the information for its report." Brown v. Sierra Nevada Mem. Miners Hosp., 849 F.2d 1186, 1189-90 (9th Cir.1988). We doubt that the kind of academic exercise behind the FDA report produced findings deserving special presumptions about trustworthiness in a court of law. [FN11] The tentative and second-hand nature of the findings in the FDA report should have kept it out of evidence.

> FN11. We note that, after the trial in this case, the FDA released its final rule mandating premarket approval of breast implants. 56 Fed.Reg. 14620 (1991) (to be codified at 21 C.F.R. § 878). The differences between the final rule report and the proposed rule report points out the tentative nature of the earlier report. The final rule says that 29 of the references it cited in its proposed rule in support of its proposed findings were miscited, and the rule abandoned its earlier finding that human adjuvant disease was among the autoimmune diseases risked by implants. Unlike its proposed findings, which described cancer, autoimmune disease, and other conditions as "significant risks," the final rule is substantially more equivocal about these risks. The final report says that, "carcinogenesis is a putative risk secondary to implantation of any material" and that "carcinogenicity is a *potential* risk" that *must be assessed* in a premarket approval filing. As to autoimmune disease, the final report says that "it is not clear whether the incidence of these diseases in implanted women is the same as or greater than the incidence in the general population ... the uncertainty surrounding this risk *requires that it be investigated.*" *Id.* at 14,624. The final rule notes that, of 2,670 public comments received, over 2600 of the comments described the benefits of breast prostheses.

For these reasons, we think that the FDA report was inadmissible hearsay. Admitting the report, which contained highly and unfairly prejudicial assertions about the risks of cancer and autoimmune disease, was an abuse of discretion. Counsel was permitted to argue to the jury that the FDA evidence showed both Baxter's liability and the Tooles' damages, improperly influencing both issues. In these circumstances, remittitur alone is no cure for the error; a new trial is mandatory. See Edwards v. Sears, Roebuck & Co., 512 F.2d 276, 283 (5th Cir.1975).

C. *Punitive Damages*

[6] Baxter also argues that insufficient evidence supports the award of punitive damages in this case. [FN12] Under Alabama law, to award punitive damages, the jury must have found, by clear and convincing evidence, that Baxter "consciously or deliberately engaged in ... wantonness ... with regard to the plaintiff." Ala.Code § 6-11-20 (Supp.1990). "Wantonness" means "reckless or conscious disregard" of the plaintiffs' rights. *Id.* The district court ruled that the evidence in this case showed that "the company had knowledge that the implants were *likely* to rupture when closed capsulotomies were performed" and so justified an award of punitive damages. R.Vol. 5-136 at 14. We cannot agree.

> FN12. We need not reach Baxter's argument that Alabama's statutory punitive damages cap, Ala.Code § 6-11-30 (Supp.1990), should have been applied in this case.

In a case about "wantonness" under Alabama law, we have stressed that "wantonness" must be distinguished from negligence. Salter v. Westra, 904 F.2d 1517, 1525-27 (11th Cir.1990). Wantonness means knowledge that an act or failure to act does not merely increase risk of injury, but that the act makes injury "likely" or "probable." *See id.;* see also Coca-Cola Bottling Co. United, Inc. v. Stripling, 622 So.2d 882 (Ala.1993). The evidence in this case showed that the *actual* incidence of implant ruptures from closed capsulotomies is probably slightly less than one percent. [FN13] Although the evidence showed that implant rupture can be serious when it occurs, rupture is no "likely" event, even for patients undergoing closed capsulotomies.

> FN13. At oral argument, counsel for Baxter stressed the evidence showing that less than one percent of closed capsulotomy patients suffer implant rupture. Counsel for the Tooles stressed the evidence showing that implants have an overall complication rate, encompassing ruptures and other problems, of about 10%.

Case No. 1:90-cv-00181-JLK Document 1512-2 filed 10/16/05 USDC Colorado pg 8 of 8

999 F.2d 1430 Page 7
999 F.2d 1430, 37 Fed. R. Evid. Serv. 997, Prod.Liab.Rep. (CCH) P 13,606
(Cite as: 999 F.2d 1430)

*1436 [7] And, we have held that the issue of punitive damages should not go to the jury when a manufacturer took steps to warn plaintiff of the potential danger that injured him; those facts bar a finding that defendant was "consciously indifferent." See Kritser v. Beech Aircraft Corp., 479 F.2d 1089, 1096-97 (5th Cir.1973) (applying Texas law similar to Alabama law). The Heyer-Schulte warning describes the main harms that Ms. Toole has actually suffered--capsular contracture, rupture, and granuloma--and the warning forecasted the way she came to suffer these harms--"treat[ment of] capsule firmness by forceful external stress." More could have been done or said, but Heyer-Schulte did not exhibit indifference toward safety. Baxter's conduct shows regard for recipients of its implants and cannot be viewed as "wanton." We conclude that there was insufficient evidence of wantonness in this case to permit the jury to award punitive damages.

3. *Conclusion*

The judgment below is VACATED and the case is REMANDED for further proceedings consistent with this opinion.

999 F.2d 1430, 37 Fed. R. Evid. Serv. 997, Prod.Liab.Rep. (CCH) P 13,606

**Briefs and Other Related Documents (Back to top)**

• 1992 WL 12019801 (Appellate Brief) Reply Brief of Appellees/Cross-Appellants Brenda Griffin Toole and J. Michael Toole (Dec. 18, 1992)Original Image of this Document (PDF)

• 1992 WL 12135103 (Appellate Brief) Reply Brief of Appellees/Cross-Appellants Brenda Griffin Toole and J. Michael Toole (Dec. 18, 1992)Original Image of this Document (PDF)

• 1992 WL 12135104 (Appellate Brief) Reply Brief of Appellant/Cross Appellee Baxter Healthcare Corporation (Nov. 27, 1992)Original Image of this Document with Appendix (PDF)

• 1992 WL 12019802 (Appellate Brief) Reply Brief of Appellees/Cross-Appellants Brenda Griffin Toole and J. Michael Toole (Oct. 06, 1992)Original Image of this Document (PDF)

• 1992 WL 12135102 (Appellate Brief) Brief of Appellees/Cross-Appellants Brenda Griffin Toole and J. Michael Toole (Oct. 06, 1992)Original Image of this Document (PDF)

• 1992 WL 12135105 (Appellate Brief) Brief of Appellant Baxter Healthcare Corporation (Aug. 20, 1992)Original Image of this Document with Appendix (PDF)

• 1992 WL 12019803 (Appellate Brief) Brief of Appellant Baxter Healthcare Corporation (Aug. 19, 1992)Original Image of this Document with Appendix (PDF)

• 1991 WL 11011170 (Appellate Brief) Reply Brief of Appellant/Cross Appellee Baxter Healthcare Corporation (1991)Original Image of this Document with Appendix (PDF)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.