

103 F.3d 767                                                                                                                        Page 1
103 F.3d 767, 45 Fed. R. Evid. Serv. 913, 96 Cal. Daily Op. Serv. 9090, 96 Daily Journal D.A.R. 15,085
**(Cite as: 103 F.3d 767)**

▷

**Briefs and Other Related Documents**

United States Court of Appeals,
Ninth Circuit.
Maximo HILAO, Class Plaintiffs, Plaintiff-Appellee,
v.
ESTATE OF Ferdinand MARCOS, Defendant-Appellant.
**No. 95-15779.**

Argued and Submitted June 18, 1996.
Decided Dec. 17, 1996.

Philippine nationals brought human rights class action against estate of former president of the Philippines, seeking damages for human-rights abuses committed against them or their decedents. The United States District Court for the District of Hawai'i, Manuel L. Real, J., entered final judgment, awarding class $1.2 billion in exemplary damages and $766 million in compensatory-damages. Estate appealed. The Court of Appeals, Fletcher, Circuit Judge, held that: (1) district court had jurisdiction over class action; (2) tort claims against former president were tolled until he left office; (3) claims survived death of former president; (4) district court properly certified class as defined; (5) claims satisfied typicality requirement for class action; (6) statements made by members of Philippine military or paramilitary forces to victims and witnesses were not hearsay; (7) district court properly relied on military members' statements to victims and expert testimony in determining that agency relationship existed between former president and military members who tortured victims, for purposes of hearsay exception for statements of agents; (8) certain documents were admissible under public records exception to hearsay rule; (9) former president could be held liable for human rights abuses committed by military under his command; (10) jury instruction on proximate cause was not misleading or inadequate; (11) award of exemplary damages against estate was properly allowed under Philippine law; (12) district court's decision to hold exemplary-damage phase of trial before compensatory-damage phase did not violate estate's due process rights; (13) jury instructions on exemplary damages did not violate due process; (14) district court did not abuse its discretion by deciding to trifurcate trial; and (15) use of statistical sample of class claims in determining compensatory damages did not violate due process.

Affirmed.

Rymer, Circuit Judge, filed opinion concurring in part and dissenting in part.

West Headnotes

**[1] Federal Courts** ⚷776
170Bk776 Most Cited Cases
Existence of subject-matter jurisdiction is question of law reviewed de novo.

**[2] Courts** ⚷96(4)
106k96(4) Most Cited Cases

**[2] Federal Courts** ⚷917
170Bk917 Most Cited Cases
Previously published decisions of the Court of Appeals which held that district court had jurisdiction of human rights class action against estate of former president of Philippines under Alien Tort Claims Act were controlling law of the circuit and the law of the case, where estate presented no compelling arguments that the law had changed in interim or that previous decisions were clearly erroneous and would work manifest injustice. 28 U.S.C.A. § 1350.

**[3] Courts** ⚷96(4)
106k96(4) Most Cited Cases

**[3] Federal Courts** ⚷917
170Bk917 Most Cited Cases
In human rights class action against estate of former president of Philippines, Court of Appeals would not reconsider estate's argument that Alien Tort Claims Act did not apply to conduct that occurred abroad, where Court had rejected that argument when estate made in it prior appeal and estate had offered no arguments for why Court should not follow previous decision as law of the circuit and law of the case. 28 U.S.C.A. § 1350.

**[4] Federal Courts** ⚷776
170Bk776 Most Cited Cases
Question of the appropriate statute of limitations is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case No. 1:90-cv-00181-JLK   Document 1517-4   filed 10/18/05   USDC Colorado   pg 2 of 20

103 F.3d 767                                                                                                        Page 2
103 F.3d 767, 45 Fed. R. Evid. Serv. 913, 96 Cal. Daily Op. Serv. 9090, 96 Daily Journal D.A.R. 15,085
**(Cite as: 103 F.3d 767)**

question of law that Court of Appeals reviews de novo.

### [5] Limitation of Actions 🗝104.5
241k104.5 Most Cited Cases
Under Alien Tort Claims Act, claims against former president of Philippines for injury from torture, "disappearance," or summary execution were tolled until he left office. 28 U.S.C.A. § 1350.

### [6] Courts 🗝96(4)
106k96(4) Most Cited Cases

### [6] Federal Courts 🗝917
170Bk917 Most Cited Cases
Court of Appeals' decision that tort claims by families of victims of acts of torture, summary executions, and disappearances under regime of former President of Philippines survived death of former President was not clearly erroneous, and thus, decision was law of the circuit and of the case on issue of abatement. 28 U.S.C.A. § 1350.

### [7] Federal Courts 🗝817
170Bk817 Most Cited Cases
District court's decision to certify proposed class is reviewed for abuse of discretion. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

### [8] Federal Civil Procedure 🗝181
170Ak181 Most Cited Cases
Definition of class as those Philippine citizens who were or whose decedents were tortured, summarily executed, or "disappeared" while in military custody during 14-year period satisfied requirement that proposed class be made up of people to whom effective notice of pending action can be given and who will be bound by any judgment entered; at time the class was certified, it was estimated that size of class was 10,000 people, following trial on liability, total of 10,059 detailed and certified claim forms were received, and in the end, 9,539 of the claims were found valid and awarded damages. Fed.Rules Civ.Proc.Rule 23(a), 28 U.S.C.A.

### [9] Federal Civil Procedure 🗝181
170Ak181 Most Cited Cases
Tort claims brought by alleged victims of torture and their families against estate of former president of Philippines satisfied typicality requirement for certification of class action; there were no relevant individual statute-of-limitations issues, question as to whether any compensable injury existed for particular class member was virtually identical in each case, and question as to whether any particular injury was caused by former president's act or omission was resolved by finding that former president was liable for any act of torture, summary execution, or "disappearance" committed by military or paramilitary forces on his orders or with his knowledge. Fed.Rules Civ.Proc.Rule 23(a)(3), 28 U.S.C.A.

### [10] Federal Courts 🗝823
170Bk823 Most Cited Cases
Evidentiary rulings are reviewed only for abuse of discretion and should not be reversed absent some prejudice.

### [11] Evidence 🗝245
157k245 Most Cited Cases
In human rights class action against estate of former president of Philippines, statements made by members of Philippine military or paramilitary forces to victims and witnesses were nonhearsay admissions of party opponent; agency relationship existed between former president and torturers. Fed.Rules Evid.Rule 801(d)(2)(D), 28 U.S.C.A.

### [12] Evidence 🗝258(2)
157k258(2) Most Cited Cases

### [12] Evidence 🗝261
157k261 Most Cited Cases
Existence of agency relationship, for purposes of rule providing that statements of party's agent are admissible over hearsay objection, is question for judge and must be proved by substantial evidence but not by preponderance of evidence. Fed.Rules Evid.Rules 104(a), 801(d)(2)(C, D), 28 U.S.C.A.

### [13] Evidence 🗝258(1)
157k258(1) Most Cited Cases
In determining whether agency relationship existed between former president of Philippines and military members who tortured certain Philippine nationals, for purposes of hearsay exception for statements of agents, district court properly relied on military members' statements to victims; abrogating *United States v. Jones*, 766 F.2d 412. Fed.Rules Evid.Rules 104(a), 801(d)(2)(C, D), 28 U.S.C.A.

### [14] Evidence 🗝508
157k508 Most Cited Cases
In determining whether agency relationship existed between former president of Philippines and military members who tortured certain Philippine nationals, for purposes of hearsay exception for statement of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

103 F.3d 767                                                                                                           Page 3
103 F.3d 767, 45 Fed. R. Evid. Serv. 913, 96 Cal. Daily Op. Serv. 9090, 96 Daily Journal D.A.R. 15,085
**(Cite as: 103 F.3d 767)**

agents, district court properly relied on expert testimony concerning structure, organization, and control of Philippine military, security, and intelligence forces, former president's relationship thereto, and effect of former president's presidential decrees. Fed.Rules Evid.Rules 104(a), 801(d)(2)(C, D), 28 U.S.C.A.

**[15] Evidence** 🗝️333(1)
157k333(1) Most Cited Cases
In class action against estate of former president of Philippines arising out of human rights abuses committed by military under former president's command, various Presidential Commitment Orders (PCOs), Arrest, Search and Seizure Orders (ASSOs), and Preventive Detention Actions (PDAs) were admissible under public records exception to hearsay rule. Fed.Rules Evid.Rule 803(8), 28 U.S.C.A.

**[16] Federal Courts** 🗝️776
170Bk776 Most Cited Cases
Claim that trial court misstated the elements that must be proven at trial is question of law to be reviewed de novo.

**[17] International Law** 🗝️10.11
221k10.11 Most Cited Cases
Former president of Philippines could be held liable for human rights abuses committed by military under his command in suit under Torture Victim Protection Act (TVPA) and Alien Tort Claims Act, upon proof that president knew of such conduct by military and failed to use his power to prevent it; conduct involved violations of jus cogens norm of international law parallel to type of war crimes for which international law imposes "command responsibility." 28 U.S.C.A. § 1350.

**[18] Assault and Battery** 🗝️19
37k19 Most Cited Cases
Issue of exhaustion under Torture Victim Protection Act (TVPA) is for court, not for jury. 28 U.S.C.A. § 1350.

**[19] Limitation of Actions** 🗝️199(1)
241k199(1) Most Cited Cases
Application of statute of limitations is question of law for court, not for jury.

**[20] Federal Civil Procedure** 🗝️2183
170Ak2183 Most Cited Cases
In human rights class action against estate of former president of Philippines, jury instruction that "to determine estate is liable, you must determine whether injury alleged by victim has been shown by preponderance of evidence to have been caused by reason of person being taken into custody by order of former president or under his authority" was not misleading or inadequate when considered in context of instructions as a whole; challenged instruction came directly after district court's main instruction on liability, which required jury to find either that former president had "directed, ordered, conspired with, or aided" in torture, summary execution, and disappearance, or that he had knowledge of that conduct and failed to use his power to prevent it.

**[21] Federal Courts** 🗝️822
170Bk822 Most Cited Cases
Court of Appeals reviews formulation of jury instructions in civil trial for abuse of discretion.

**[22] Federal Courts** 🗝️776
170Bk776 Most Cited Cases
Question of whether exemplary damages are available against an estate is question of law and therefore subject to de novo review.

**[23] Damages** 🗝️93
115k93 Most Cited Cases
Award of exemplary damages was properly allowed under Philippine law against estate of former president of Philippines in suit brought against estate by class of Philippine nationals seeking damages for human rights abuses.

**[24] Constitutional Law** 🗝️314
92k314 Most Cited Cases

**[24] Federal Civil Procedure** 🗝️1961
170Ak1961 Most Cited Cases
In human rights class action against estate of former president of Philippines, district court's decision to hold exemplary-damage phase of trial before compensatory-damage phase did not violate estate's due process rights. U.S.C.A. Const.Amend. 5.

**[25] Federal Courts** 🗝️776
170Bk776 Most Cited Cases
Court of Appeals reviews de novo a claim of violation of due process clause. U.S.C.A. Const.Amend. 5.

**[26] Constitutional Law** 🗝️303
92k303 Most Cited Cases

**[26] Damages** 🗝️215(1)

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case No. 1:90-cv-00181-JLK   Document 1517-4   filed 10/18/05   USDC Colorado   pg 4 of 20

103 F.3d 767                                                                Page 4
103 F.3d 767, 45 Fed. R. Evid. Serv. 913, 96 Cal. Daily Op. Serv. 9090, 96 Daily Journal D.A.R. 15,085
**(Cite as: 103 F.3d 767)**

115k215(1) Most Cited Cases

Although instructions on exemplary damages, in human rights class action against estate of former president of Philippines, gave jury significant discretion in its determination of punitive damages, instructions did not violate due process; jury's discretion was not unlimited, and instructions enlightened jury as to punitive damages' nature and purpose, identified damages as punishment for civil wrongdoing of kind involved, and explained that their imposition was not compulsory. U.S.C.A. Const.Amend. 5.

**[27] Federal Courts 🔑822**
170Bk822 Most Cited Cases
Trial court's decision to bifurcate or trifurcate trial is reviewed for abuse of discretion.

**[28] Federal Civil Procedure 🔑1961**
170Ak1961 Most Cited Cases
In human rights class action against estate of former president of Philippines, district court did not abuse its discretion by deciding to trifurcate trial, or in holding exemplary-damage phase prior to compensatory-damage phase; compensatory-damage phase presented much more complex questions, requiring presentation of testimony taken in Philippines before special master, than did exemplary-damage phase, which was closely related to evidence in liability phase, and district court retained authority, until entry of judgment, to review and require remittitur of exemplary-damage award if award was, in its view, excessive.

**[29] Constitutional Law 🔑314**
92k314 Most Cited Cases

**[29] Damages 🔑226**
115k226 Most Cited Cases
In human rights class action against estate of former president of Philippines, use of statistical sample of class claims in determining compensatory damages did not violate due process clause; although statistical method presented somewhat greater risk of error in comparison to adversarial adjudication of each claim, interest of the class in use of statistical method was enormous, since adversarial resolution of each class member's claim would pose insurmountable practical hurdles, and "ancillary" interest of judiciary in procedure was substantial, since 9,541 individual adversarial determinations of claim validity would clog docket of district court for years. U.S.C.A. Const.Amend. 5.

**\*770** Mark Lane, Washington, D.C., for defendant-appellant.

Robert A. Swift, Kohn, Swift & Graf, P.C., Philadelphia, Pennsylvania; Jon M. Van Dyke, Honolulu, Hawai'i, for plaintiff-appellee.

Appeal from the United States District Court for the District of Hawai'i; **\*771**Manuel L. Real, District Judge, Presiding. D.C. No. MDL-00840.

Before: FLETCHER, PREGERSON, and RYMER, Circuit Judges.

## OPINION

FLETCHER, Circuit Judge:

The Estate of Ferdinand E. Marcos appeals from a final judgment entered against it in a class-action suit after a trifurcated jury trial on the damage claims brought by a class of Philippine nationals (hereinafter collectively referred to as "Hilao") who were victims of torture, "disappearance", or summary execution under the regime of Ferdinand E. Marcos. We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1291 and we affirm.

## FACTUAL BACKGROUND

This case arises from human-rights abuses--specifically, torture, summary execution, and "disappearance"--committed by the Philippine military and paramilitary forces under the command of Ferdinand E. Marcos during his nearly 14-year rule of the Philippines. The details of Marcos' regime and the human-rights abuses have been set forth by the district court at 910 F.Supp. 1460, 1462-63 (D.Haw.1995).

## PROCEDURAL HISTORY

Shortly after Marcos arrived in the United States in 1986 after fleeing the Philippines, he was served with complaints by a number of parties seeking damages for human-rights abuses committed against them or their decedents. District courts in Hawai'i and California dismissed the complaints on the grounds that the "act of state" doctrine rendered the cases nonjusticiable. This court reversed in consolidated appeals. *Trajano v. Marcos,* 878 F.2d 1439 (9th Cir.1989). The Judicial Panel on Multidistrict Litigation consolidated the various actions in the District of Hawai'i.

In 1991, the district court certified the Hilao case as a class action, defining the class as all civilian citizens of the Philippines who, between 1972 and

Case No. 1:90-cv-00181-JLK   Document 1517-4   filed 10/18/05   USDC Colorado   pg 5 of 20

103 F.3d 767                                                                                                                        Page 5
103 F.3d 767, 45 Fed. R. Evid. Serv. 913, 96 Cal. Daily Op. Serv. 9090, 96 Daily Journal D.A.R. 15,085
**(Cite as: 103 F.3d 767)**

1986, were tortured, summarily executed, or "disappeared" by Philippine military or paramilitary groups; the class also included the survivors of deceased class members. Certain plaintiffs opted out of the class and continued, alongside the class action, to pursue their cases directly.

A default judgment was entered in 1991 against Marcos' daughter, Imee Marcos-Manotoc, upon one of the direct plaintiffs' complaints. That judgment was appealed to this court, which affirmed the district court in 1992, rejecting arguments that Marcos-Manotoc was entitled to foreign sovereign immunity and that the district court lacked jurisdiction under the Alien Tort Claims Act, 28 U.S.C. § 1350, and under Article III of the U.S. Constitution. *Trajano v. Marcos (In re Estate of Ferdinand E. Marcos Human Rights Litigation),* 978 F.2d 493 (9th Cir.1992) ("*Estate I* "), *cert. denied,* 508 U.S. 972, 113 S.Ct. 2960, 125 L.Ed.2d 661 (1993).

Marcos died during the pendency of the actions, and his wife Imelda Marcos and son Ferdinand R. Marcos, as his legal representatives, were substituted as defendants.

In November 1991, the district court issued a preliminary injunction that prohibited the Estate from transferring, dissipating, or encumbering any of its assets. The Estate appealed from the preliminary injunction, and this court affirmed, rejecting arguments on foreign sovereign immunity, on abatement of the action upon the death of Marcos, on the district court's lack of authority to enter the injunction, and on subject-matter jurisdiction and cause of action under the Alien Tort Claims Act. *Hilao v. Marcos (In re Estate of Ferdinand E. Marcos Human Rights Litigation),* 25 F.3d 1467 (9th Cir.1994) ("*Estate II* "), *cert. denied,* 513 U.S. 1126, 115 S.Ct. 934, 130 L.Ed.2d 879 (1995). [FN1]

> FN1. In August 1994, Hilao moved to modify the preliminary injunction to identify the Republic of the Philippines as an agent, representative, aider, or abettor of the Estate; the Republic argued that the court lacked jurisdiction over it under the Foreign Sovereign Immunities Act. In September 1994, the district court granted Hilao's motion. On appeal, this court found that the Republic was entitled to foreign sovereign immunity and vacated the district court's order. *See Hilao v. Estate of Ferdinand Marcos (In re Estate of Ferdinand Marcos Human Rights Litigation),* 94 F.3d 539 (9th Cir.1996).

**\*772** The district court ordered issues of liability and damages tried separately. In September 1992, a jury trial was held on liability; after three days of deliberation, the jury reached verdicts against the Estate and for the class and for 22 direct plaintiffs and a verdict for the Estate and against one direct plaintiff. Judgment was entered and the preliminary injunction modified to take account of the verdict.

The district court then ordered the damage trial bifurcated into one trial on exemplary damages and one on compensatory damages. The court ordered that notice be given to the class members that they must file a proof-of-claim form in order to opt into the class. Notice was provided by mail to known claimants and by publication in the Philippines and the U.S.; over 10,000 forms were filed.

In February 1994, the same jury that had heard the liability phase of the trial considered whether to award exemplary damages. After two days of evidence and deliberations, the jury returned a verdict against the Estate in the amount of $1.2 billion.

The court appointed a special master to supervise proceedings related to the compensatory-damage phase of the trial in connection with the class. In January 1995, the jury reconvened a third time to consider compensatory damages. The compensatory-damage phase of the trial is explained in greater detail below. After seven days of trial and deliberation, the jury returned a compensatory-damage award for the class of over $766 million; after two further days of trial and deliberation, the jury returned compensatory-damage awards in favor of the direct plaintiffs.

On February 3, 1995, the district court entered final judgment in the class action suit. The Estate appeals from this judgment.

**JURISDICTION**

[1] The district court exercised jurisdiction under the Alien Tort Claims Act, 28 U.S.C. § 1350. The existence of subject-matter jurisdiction is a question of law reviewed *de novo. Valdez v. United States,* 56 F.3d 1177, 1179 (9th Cir.1995).

[2] The Estate argues that this case does not "arise under" federal law for Article III purposes and therefore the federal courts cannot constitutionally exercise jurisdiction. This court has twice rejected these arguments in *Estate I* and *Estate II. See* 978

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

F.2d at 501-503, 25 F.3d at 1472-74. The published decisions in those cases are both the controlling law of the circuit and the law of this case. The Estate has presented no compelling arguments that the law has changed in the interim or that the two previous decisions of this court were "clearly erroneous and would work a manifest injustice". *Leslie Salt Co. v. United States,* 55 F.3d 1388, 1393 (9th Cir.), *cert. denied,* 516 U.S. 955, 116 S.Ct. 407, 133 L.Ed.2d 325 (1995). We therefore decline to reconsider the Estate's arguments and instead follow the court's prior decisions as the law of the circuit and of the case.

[3] The Estate also argues that the Alien Tort Claims Act does not apply to conduct that occurs abroad and that all of the acts on which Hilao's judgment is based occurred within the Philippines. Again, however, this court rejected the argument when the Estate made it in a prior appeal. *See Estate I,* 978 F.2d at 499-501 ("[S]ubject-matter jurisdiction was not inappropriately exercised under § 1350 even though the actions of Marcos-Manotoc which caused a fellow citizen to be the victim of official torture and murder occurred outside of the United States."). The Estate has offered no arguments for why we should not follow that decision as the law of the circuit and of the case, and we therefore decline to reconsider that decision.

## DISCUSSION
### I. Statute of Limitations

[4][5] The Estate argues that the district court erred in not subjecting Hilao's claims **\*773** to a two-year statute of limitations. The question of the appropriate statute of limitations is a question of law that we review *de novo*. *Mendez v. Ishikawajima-Harima Heavy Indus. Co.,* 52 F.3d 799, 800 (9th Cir.1995).

The Alien Tort Claims Act does not contain a statute of limitations. The Estate argues, therefore, that the courts should follow the general practice of adopting an analogous state statute of limitations if such adoption would not be inconsistent with federal law or policy. Because the Alien Tort Claims Act involves, as its title suggests, torts, and because the case was heard in the District of Hawai'i, the Estate argues that Hawai'i's two-year statute of limitations for tort claims should apply. The Estate argues alternatively that the appropriate statute of limitations might be that imposed by Philippine law, which appears to require that claims for personal injury arising out the exercise by a public officer of authority arising from martial law be brought within one year. Philippine Civil Code, Art. 1146. Hilao argues that the ten-year statute of limitations in the Torture Victim Protection Act, 28 U.S.C. § 1350 (note, § 2(c)) (the TVPA), is the most closely analogous federal statue of limitations, and cites to a recent district court case applying that limit to claims under both the Alien Tort Claims Act and the TVPA. *See Xuncax v. Gramajo,* 886 F.Supp. 162, 192 (D.Mass.1995). Alternatively, Hilao points to the conclusion in *Estate II* that a claim under the Alien Tort Claims Act is closely analogous to a violation of 42 U.S.C. § 1983, 25 F.3d at 1476 (citing *Forti v. Suarez-Mason,* 672 F.Supp. 1531, 1548-50 (N.D.Cal.1987)), and argues that the jurisprudence on statutes of limitations under § 1983 should govern.

We need not decide which statute of limitations applies because Hilao's suit was timely under any of the proposed statutes when equitable tolling principles are applied. The Senate Report on the TVPA states that the ten-year statute is subject to equitable tolling, including for periods in which the defendant is absent from the jurisdiction or immune from lawsuits and for periods in which the plaintiff is imprisoned or incapacitated. S.Rep. No. 249, 102d Cong., 1st Sess., at 11 (1991). Section 1983 generally borrows its statute of limitations from state laws, *Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295 (1975), and incorporates equitable-tolling principles of either state or federal law in cases where a defendant's wrongful conduct, or extraordinary circumstances outside a plaintiff's control, prevented a plaintiff from timely asserting a claim. *See, e.g., Hardin v. Straub,* 490 U.S. 536, 109 S.Ct. 1998, 104 L.Ed.2d 582 (1989); *Bianchi v. Bellingham Police Dept.,* 909 F.2d 1316 (9th Cir.1990); *Williams v. Walsh,* 558 F.2d 667 (2d Cir.1977). Hawai'i courts have allowed equitable tolling in similar situations. *See, e.g., Cleghorn v. Bishop,* 3 Haw. 483, 483-84 (1873) (statute of limitations tolled during lifetime of King Kamehameha V because he was immune from suit; after his death, claim could be brought against estate).

Any action against Marcos for torture, "disappearance", or summary execution was tolled during the time Marcos was president. A Philippine attorney who testified as an expert witness at trial stated that in 1981 Marcos engineered the passage of a constitutional amendment granting him, and others acting at his direction, immunity from suit during his tenure in office. Another expert witness testified that many victims of torture in the Philippines did not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

103 F.3d 767                                                                                                                    Page 7
103 F.3d 767, 45 Fed. R. Evid. Serv. 913, 96 Cal. Daily Op. Serv. 9090, 96 Daily Journal D.A.R. 15,085
**(Cite as: 103 F.3d 767)**

report the human-rights abuses they suffered out of intimidation and fear of reprisals; this fear seems particularly understandable in light of testimony on the suspension of habeas corpus between 1972 and 1981, and on the effective dependence of the judiciary on Marcos. Given these extraordinary conditions, any claims against Marcos for injury from torture, "disappearance", or summary execution were tolled until he left office in February 1986. The Estate appears to concede that the claims in this suit were asserted in March 1986. Thus, the filing of this action was timely under any of the asserted statutes of limitations.

**II. Abatement**

[6] The Estate argues that Hilao's cause of action abated upon the death of Marcos **\*774** because the federal common-law rule is that an action for an intentional tort abates upon the death of either party. *See* Heikkila v. Barber, 308 F.2d 558, 560-61 (9th Cir.1962). This court has previously rejected this argument in *Estate II,* analogizing Hilao's cause of action to claims for violation of the Eighth Amendment right to freedom from cruel and unusual punishment or of 42 U.S.C. § 1983, neither of which abates upon the death of the defendant. 25 F.3d at 1476. We reject the Estate's argument that that decision was clearly erroneous and simply follow *Estate II* as the law of the circuit and of the case on the issue of abatement.

**III. Class Certification**

[7] A district court's decision to certify a proposed class is reviewed for an abuse of discretion. *Barber v. Hawaii,* 42 F.3d 1185, 1197 (9th Cir.1994).

*A. Definition of the Class*

[8] The Estate challenges the certification of the class because, it argues, the class does not meet the requirement of Rule 23 that a proposed class be made up of people to whom effective notice of the pending action can be given and who will be bound by any judgment entered.

The district court defined the class as:
   All current civilian citizens of the Republic of the Philippines, their heirs and beneficiaries, who between 1972 and 1986 were tortured, summarily executed or disappeared while in the custody of military or paramilitary groups.
The Estate does not allege that the certified class fails to meet any of the express prerequisites specified in Federal Rule of Civil Procedure 23(a); its only objection appears to be that the class "refers to the citizens of an *entire nation* ". The court's definition of the class, however, refers only to those Philippines citizens who were (or whose decedents were) tortured, summarily executed or "disappeared" while in military custody during a 14-year period. This is not a class, as the Estate contends, the size of which is almost unlimited. Indeed, as Hilao points out, at the time the class was certified it was estimated, on the basis of documentation maintained by human-rights organizations, that the size of the class was 10,000 people, and following the trial on liability a total of 10,059 detailed and verified claim forms were received. In the end, 9,539 of the claims were found valid and awarded damages in the subsequent stages of the trial. The district court did not abuse its discretion in certifying the class as defined.

*B. Representatives' Typicality of the Class*

[9] The Estate argues that the claims of the Hilao representatives are not typical of the claims of the class as required by Rule 23(a)(3) because there are significant individual questions in each case related to (1) the statute of limitations, (2) whether any compensable injury exists, (3) whether any injury was caused by Marcos' acts or omissions or was justifiable.

As to the statute of limitations, as discussed above, any applicable statute was tolled during the period that Marcos was in office in the Philippines, so there are no relevant individual statute-of-limitations issues: the applicable statute began to run at the earliest not when human-rights abuses were inflicted on each particular class member but in February 1986 when Marcos fled to Hawai'i. As to whether any compensable injury exists for a particular class member, that question is virtually identical in each case. Did the victim experience pain and suffering from the torture, summary execution, or "disappearance"? In the case of those who were executed or "disappeared", did their survivors suffer from the loss of the victim's earnings? As to whether any particular injury was caused by Marcos' act or omission, this question was resolved by the liability finding, discussed below, that Marcos was liable for any act of torture, summary execution, or "disappearance" committed by the military or paramilitary forces on his orders or with his knowledge. The district court's decision to certify the class was not an abuse of discretion. [FN2]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

103 F.3d 767                                                                                                                        Page 8
103 F.3d 767, 45 Fed. R. Evid. Serv. 913, 96 Cal. Daily Op. Serv. 9090, 96 Daily Journal D.A.R. 15,085
**(Cite as: 103 F.3d 767)**

FN2. As to the question of "justification", the Estate has offered no support for its suggestion that torture, summary execution, or "disappearance" could be found justified under international law.

**\*775 IV. Evidentiary Challenges**

[10] The Estate challenges the district court's admission of statements made by torturers to their victims and of various documents. Evidentiary rulings are reviewed only for an abuse of discretion and should not be reversed absent some prejudice. *City of Long Beach v. Standard Oil Co.,* 46 F.3d 929, 936 (9th Cir.1995).

*A. Hearsay Statements*

*1. Rule 801(d)(2)(D)*

[11] The Estate challenges the district court's admission under Federal Rule of Evidence 801(d)(2)(D) of statements made by members of the Philippine military or paramilitary forces to the plaintiffs or witnesses in this case. This evidence was used to show that those who committed the abuses were in the military and that Marcos either ordered specific acts taken by the military/paramilitary forces or knew of them yet failed to take effective measures to prevent them. [FN3]

> FN3. Examples of the challenged statements include:
> "I found out they were elements of the Intelligence Security Group of the Western Police District of Manila."
> "They were members of the GT-205, 2d MIG, and the 231st PC company and the Fifth CSU."
> "[T]he officers who were there were Lieutenant Joseph Mililay, Colonel Gallido, Captain Sebastian and Captain Calaunan and Major Escarcha."
> "Colonel Aure ... said ... Don't you worry, the President would know about this ... and by eight o'clock he will get the report in front of him."
> "Who arrested you?"   "MISG military personnel, sir."
> "What does MISG stand for?"   "Military Intelligence Security Group, sir."
> "... Lieutenant Pedro Tangco [who showed me the search warrant] belongs to the MISG, or the Metrocom Intelligence Security Group."
> "... Colonel Antonia Uy ... informed my husband that his release was being countermanded by the President and from that time he will be placed under house arrest ..."

[12] Section 801(d)(2)(D) provides that "A statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship". The existence of an agency relationship is a question for the judge under Rule 104(a) and must be proved by substantial evidence but not by a preponderance of the evidence. *United States v. Flores,* 679 F.2d 173, 178 (9th Cir.1982), *cert. denied,* 459 U.S. 1148, 103 S.Ct. 791, 74 L.Ed.2d 996 (1983).

[13] The Estate challenges the district court's determination that an agency relationship existed between Marcos and the torturers on two grounds. First, it argues that the statements made by members of the military forces to their victims cannot be used in determining whether an agency relationship existed between the person making the statement and Marcos. The Estate cites to *United States v. Jones,* 766 F.2d 412, 415 (9th Cir.1985), for the proposition that "[t]he fact of agency cannot be proven by the alleged agent's extrajudicial statements". After *Jones,* however, the Supreme Court decided in *Bourjaily v. United States,* 483 U.S. 171, 177-81, 107 S.Ct. 2775, 2779- 82, 97 L.Ed.2d 144 (1987), that a court may consider an out-of-court statement in making its Rule 104(a) determination of the admissibility of a statement under Rule 801(d)(2)(E). This court, relying on *Bourjaily,* has held that "out-of-court statements may themselves be considered in determining the preliminary question, under Rule 801(d)(2)(D), of the scope of [the agent's] employment duties". *Arizona v. Standard Oil Co. of California (In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation),* 906 F.2d 432, 458 (9th Cir.1990), *cert. denied,* 500 U.S. 959, 111 S.Ct. 2274, 114 L.Ed.2d 725 (1991). It therefore appears that *Jones* is no longer a correct statement of the law and the district court did not abuse its discretion in relying on the military members' statements to their victims in determining that an agency relationship existed between Marcos and the individuals who tortured the plaintiffs or their decedents.

[14] The Estate also challenges the district court's reliance, in deciding to admit the **\*776** evidence under Rule 801(d)(2)(D), on expert testimony,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case No. 1:90-cv-00181-JLK   Document 1517-4   filed 10/18/05   USDC Colorado   pg 9 of 20

103 F.3d 767                                                                                                   Page 9
103 F.3d 767, 45 Fed. R. Evid. Serv. 913, 96 Cal. Daily Op. Serv. 9090, 96 Daily Journal D.A.R. 15,085
**(Cite as: 103 F.3d 767)**

introduced by Hilao, concerning the structure, organization, and control of the Philippine military, security, and intelligence forces; Marcos' relationship thereto; and the effect of Marcos' presidential decrees. The Estate challenges this testimony because the experts did not testify as to the actual membership of particular individuals in those military or paramilitary organizations. The district court was clearly entitled, however, to rely on this testimony, in connection with the statements reported by the torture victims as to the unit affiliations of various perpetrators of torture, in determining whether an agency relationship existed in order to make the statements admissible.

The district court did not abuse its discretion in admitting the statements challenged by the Estate.

### 2. Rule 803(24)

The Estate challenges the admission of "many hearsay statements" on the basis of the residual exception contained in Rule 803(24). The only citation the Estate provides for the hearsay statements it is challenging is to the district court's ruling. In that ruling, the district court said

> All right. So you have in mind, the rulings made by the Court as to any conversations by military with any of the plaintiffs or witnesses, they are admitted pursuant to 801(d)(2)(D), since I think the evidence is clear at this point that Mr. Marcos was the commander in chief in absolute control of the military, and/or 803.24 deem to be--not 803.24 deem to be hearsay.

Thus, it is clear that the district court relied on Rule 803(24) only as an alternative ground for the admission of the statements of the torturers to their victims or witnesses. Because we have already determined that the district court did not abuse its discretion in admitting those statements under Rule 801(d)(2)(D), we decline to reach the Estate's Rule 803(24) challenge.

### B. Documents

[15] The Estate challenges the admission under Rule 803(8) of various Presidential Commitment Orders (PCOs); Arrest, Search and Seizure Orders (ASSOs); and Preventive Detention Actions (PDAs) signed by Marcos. Rule 803(8) allows the admission of "[r]ecords, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report ..., or (C) ... factual findings resulting from an investigation made pursuant to authority granted by law ...".

The Estate alleges that the challenged documents relate to various detainees, not to the activities of any office or agency within the Philippines. It is pellucidly clear, however, that the district court did not abuse its discretion in holding that letters from President Marcos to the Minister of National Defense approving requests for PCOs and PDAs are records "setting forth ... the activities of the office" of the President.

The Estate also challenges the admission of the documents under Rule 803(24). As it did with the hearsay statements discussed above, the district court admitted the documents on a number of alternative grounds, including Rule 803(8) and Rule 803(24). Because we affirm the admission of the documents on the basis of Rule 803(8), we decline to reach the Estate's 803(24) challenge.

### V. Instructions on Liability of the Estate

[16] A claim that the trial court misstated the elements that must be proven at trial is a question of law to be reviewed *de novo*. *Oglesby v. Southern Pacific Transportation Co.,* 6 F.3d 603, 606 (9th Cir.1993).

[17] The district court instructed the jury that it could find the Estate liable if it found either that (1) Marcos directed, ordered, conspired with, or aided the military in torture, summary execution, and "disappearance" or (2) if Marcos knew of such conduct by the military and failed to use his power to prevent it. The Estate challenges the latter basis for liability, arguing that liability is not imposed under such conditions in analogous U.S. law claims, that "no international law decision ... has ever imposed liability upon a foreign official" on those grounds, and that **\*777** the district court essentially made the Estate liable on a *respondeat superior* theory that is inapplicable in intentional torts.

The principle of "command responsibility" that holds a superior responsible for the actions of subordinates appears to be well accepted in U.S. and international law in connection with acts committed in wartime, as the Supreme Court's opinion in *In Re Yamashita* indicates:

> [T]he gist of the charge is an unlawful breach of duty by petitioner as an army commander to control the operations of the members of his command by 'permitting them to commit' the extensive and widespread atrocities specified....

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[T]he law of war presupposes that its violation is to be avoided through the control of the operations of war by commanders who are to some extent responsible for their subordinates.... [P]rovisions [of international law] plainly imposed on petitioner, who at the time specified was military governor of the Philippines, as well as commander of the Japanese forces, an affirmative duty to take such measures as were within his power and appropriate in the circumstances to protect prisoners of war and the civilian population. This duty of a commanding officer has heretofore been recognized, and its breach penalized[,] by our own military tribunals.

*In re Yamashita,* 327 U.S. 1, 14-16, 66 S.Ct. 340, 347-48, 90 L.Ed. 499 (1946). *See also* Art. 86(2), Protocol to the Geneva Conventions of August 12, 1949, *opened for signature* December 12, 1977, *reprinted in* 16 I.L.M. 1391, 1429 (1977) ("The fact that a breach of the Conventions or of this Protocol was committed by a subordinate does not absolve his superiors from penal [or] disciplinary responsibility ... if they knew, or had information which should have enabled them to conclude in the circumstances at the time, that he was committing or was going to commit such a breach and if they did not take all feasible measures within their power to prevent or repress the breach."); Art. 7(3), Statute of the International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia, 32 I.L.M. 1159, 1192-94 (1993) ( "The fact that any [act of genocide, crime against humanity, or violation of the Geneva Conventions or of the laws or customs of war] was committed by a subordinate does not relieve his superior of criminal responsibility if he knew or had reason to know that the subordinate was about to commit such acts or had done so and the superior failed to take the necessary and reasonable measures to prevent such acts or to punish the perpetrators thereof."); *see generally* Lt. Cmdr. Weston D. Burnett, *Command Responsibility and a Case Study of the Criminal Responsibility of Israeli Military Commanders for the Pogrom at Shatila and Sabra,* 107 Mil.L.J. 71 (1985).

The United States has moved toward recognizing similar "command responsibility" for torture that occurs in peacetime, perhaps because the goal of international law regarding the treatment of noncombatants in wartime--"to protect civilian populations and prisoners ... from brutality", *Yamashita,* 327 U.S. at 15, 66 S.Ct. at 347-48--is similar to the goal of international human-rights law. This move is evidenced in the legislative history of the TVPA:

[A] higher official need not have personally performed or ordered the abuses in order to be held liable. Under international law, responsibility for torture, summary execution, or disappearances extends beyond the person or persons who actually committed those acts--anyone with higher authority who authorized, tolerated or knowingly ignored those acts is liable for them.

S.Rep. No. 249, 102d Cong., 1st Sess. at 9 (1991) (footnote omitted) (citing *Forti* and *In re Yamashita* ). At least one district court has recognized such liability. *Xuncax,* 886 F.Supp. at 171-73, 174-75 ("Gramajo was aware of and supported widespread acts of brutality committed by personnel under his command resulting in thousands of civilian deaths.... Gramajo refused to act to prevent such atrocities." "... Gramajo may be held liable for the acts of members of the military forces under his command."). *See also Paul v. Avril,* 901 F.Supp. 330, 335 (S.D.Fla.1994) ("Defendant Avril [former military ruler of Haiti] bears personal responsibility **\*778** for a systematic pattern of egregious human rights abuses in Haiti during his military rule ... He also bears personal responsibility for the interrogation and torture of each of the plaintiffs ... All of the soldiers and officers in the Haitian military responsible for the arbitrary detention and torture of plaintiffs were employees, representatives, or agents of defendant Avril, acting under his instructions, authority, and control and acting within the scope of authority granted by him."). The conduct at issue in this case involved violations by members of military or paramilitary forces of a *jus cogens* norm of international law parallel to the types of war crimes for which international law imposes command responsibility. *Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 714-717 (9th Cir.1992) (prohibition against torture has attained status of *jus cogens* norm from which no derogation is permitted). In these circumstances, the district court's instruction on the second category of liability was proper under international law.

**VI. Torture Victim Protection Act (TVPA)**

The Estate challenges three aspects of the district court's jury instructions on the basis of the TVPA. [FN4] The TVPA creates a cause of action against one who commits torture or extrajudicial killing and was intended to codify judicial decisions recognizing such a cause of action under the Alien Tort Claims Act. 28 U.S.C. § 1350, note; S.Rep. No. 249, 102d Cong., 1st Sess., at 3-5 (1991); H.R.Rep. No. 367, 102d Cong., 1st Sess., at 3-4 (1991).

103 F.3d 767                                                                                                Page 11
103 F.3d 767, 45 Fed. R. Evid. Serv. 913, 96 Cal. Daily Op. Serv. 9090, 96 Daily Journal D.A.R. 15,085
**(Cite as: 103 F.3d 767)**

FN4. The Estate suggests in a footnote in its opening brief that the district court erred by retroactively applying the TVPA, which was enacted on 12 March 1992. The summary mention of an issue in a footnote, without reasoning in support of the appellant's argument, is insufficient to raise the issue on appeal. See *Retlaw Broadcasting Co. v. N.L.R.B., 53 F.3d 1002, 1005 n. 1 (9th Cir.1995)*; *Acosta-Huerta v. Estelle, 7 F.3d 139, 144 (9th Cir.1992)*; *International Olympic Committee v. San Francisco Arts & Athletics, 781 F.2d 733, 738 n. 1 (9th Cir.1986)*. We therefore decline to consider this issue.

*A. Exhaustion*

[18] The Estate argues that the jury was not properly instructed because it was not required to find that each plaintiff had met the exhaustion requirement of the TVPA. The Act provides that "[a] court shall decline to hear a claim under this section if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred". 28 U.S.C. § 1350, note, § 2(b). The language of this provision, referring as it does to the court's authority to hear a claim, demonstrates that, contrary to the Estate's suggestion, the issue of exhaustion is one for the court, not for the jury. The Estate was therefore not entitled to the instruction it seeks. [FN5]

FN5. If the Estate is challenging the court's refusal to decline to hear Hilao's TVPA claim, that challenge fails. The legislature's intended operation of the exhaustion provision is set forth with remarkable clarity in the Senate Report:
[T]orture victims bring suits in the United States against their alleged torturers only as a last resort.... Therefore, as a general matter, the committee recognizes that in most instances the initiation of litigation under this legislation will be virtually prima facie evidence that the claimant has exhausted his or her remedies in the jurisdiction in which the torture occurred. The committee believes that courts should approach cases brought under the proposed legislation with this assumption.
More specifically, ... the interpretation of section 2(b) should be informed by general principles of international law. The procedural practice of international human rights tribunals generally holds that the respondent has the burden of raising the nonexhaustion of remedies as an affirmative defense and must show that domestic remedies exist that the claimant did not use. Once the defendant makes a showing of remedies abroad which have not been exhausted, the burden shifts to the plaintiff to rebut by showing that the local remedies were ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile. The ultimate burden of proof and persuasion on the issue of exhaustion of remedies, however, lies with the defendant.
S.Rep. No. 249 at 9-10. The Estate has pointed to *no* evidence that it put forth even to raise the issue that Hilao had unexhausted remedies available elsewhere, let alone evidence sufficient to carry its burden. The district court therefore did not err in not declining to hear Hilao's TVPA claim on exhaustion grounds.

*B. Direct v. Vicarious Liability*

The Estate next argues that the district court failed to instruct the jury that it could **\*779** only find the Estate liable for acts actually committed by Ferdinand Marcos. It points out that the Act imposes liability on any "individual who ... subjects an individual to torture ... or ... subjects an individual to extrajudicial killing". 28 U.S.C. § 1350, note, § § 2(a)(1), (2). Thus, the Estate concludes, the jury should have been instructed that it could not find liability under the TVPA for acts of torture or summary execution of which Marcos was aware and failed to prevent.

As discussed above, however, the Senate Report makes clear that in enacting the TVPA, Congress intended to impose exactly the type of liability that the jury instructions allowed in this case:
> [A] higher official need not have personally performed or ordered the abuses in order to be held liable. [R]esponsibility for torture, summary execution, or disappearances extends beyond the person who actually committed those acts-- anyone with higher authority who authorized, tolerated or knowingly ignored those acts is liable for them.

S.Rep. No. 249 at 9. Thus, the district court's instructions on liability were proper under the TVPA.

*C. Statute of Limitations*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[19] Finally, the Estate argues that the district court should have instructed the jury on the ten-year statute of limitations in the TVPA. The application of a statute of limitations, however, is a question of law for the court, not for the jury. Washington v. Garrett, 10 F.3d 1421, 1429 (9th Cir.1993). Thus, the Estate was not entitled to a jury instruction on the TVPA's statute of limitations. As discussed above, the district court did not err in allowing Hilao's action to proceed despite the TVPA's ten-year limit because the limitation is subject to equitable tolling.

**VII. Proximate Cause**

[20][21] The Estate challenges an instruction given by the district court in the liability stage of the trial:

> To determine the Estate of the late President Marcos is liable to any plaintiff for wrong alleged by the plaintiffs, you must determine whether the injury alleged by a plaintiff has been shown by a preponderance of the evidence to have been caused by reason of a person being taken into custody by an order of Ferdinand Marcos or under his authority.

We review the formulation of jury instructions in a civil trial for an abuse of discretion. Oglesby, 6 F.3d at 606. The Estate argues that under this instruction, the jury might have found it liable for a plaintiff's injuries only on the basis of the plaintiff being taken into custody on Marcos' authority, even if intervening causes were actually responsible for the injuries.

The instructions "considered as a whole" do not appear to be "misleading or inadequate". *Id.*. The challenged instruction came directly after the district court's main instruction on liability, which required the jury to find either that Marcos had "directed, ordered, conspired with, or aided" in torture, summary execution, and disappearance, or that he had knowledge of that conduct and failed to use his power to prevent it. Thus, it is clear that the jury was required to find not merely that the plaintiffs were taken into custody under Marcos' authority but that once in custody the plaintiffs were tortured, executed, or disappeared on Marcos' orders or with his knowledge. The district court did not abuse its discretion in giving the challenged instruction. Alternatively, if there was any error in the district court's instruction, it is more probable than not that the error was harmless and therefore reversal is not required. Oglesby, 6 F.3d at 606.

**VIII. Exemplary Damages**

*A. Exemplary Damages against an Estate*

[22] The question of whether exemplary damages are available against an estate is a question of law and therefore subject to *de novo* review. Twenty-Three Nineteen Creekside, Inc. v. Commissioner, 59 F.3d 130, 131 (9th Cir.1995).

[23] The Estate argues that the district court erred in awarding exemplary damages against it because federal courts have disallowed **\*780** punitive damages against estates. Hilao argues that the district court looked to Philippine law in determining the appropriate damage standards, that Philippine law allows exemplary damages "by way of example or correction for the public good" in order to deter the public from emulating the defendant's conduct, that such damages are therefore different from punitive damages (which Philippine law does not allow), and that Philippine law does not bar the award of exemplary damages against an estate.

Hilao appears to be correct that the district court followed Philippine law on the issue of damages. We have found no ruling by the district court expressly choosing Philippine law, but the district court's jury instruction on exemplary damages is virtually identical to the jury instruction proposed by Hilao, and that proposed jury instruction lists as two of its sources Philippine Civil Code Articles 2229 and 2231. [FN6] In addition to the jury instructions, Hilao submitted at least two memoranda on the question of damages to the district court between the verdict on liability and the trial on exemplary damages, and both memoranda base the request for exemplary damages on the same articles of the Philippine Civil Code. It therefore appears that the district court applied Philippine law to the question of exemplary damages. The Estate has not disputed Hilao's statement that Philippines law allows exemplary damages against an estate. We conclude that the district court did not err in allowing exemplary damages against the Estate.

> FN6. Article 2229 provides that "[e]xemplary or corrective damages are imposed, by way of example or correction for the public good, in addition to the moral, temperate, liquidated or compensatory damages". Article 2231 provides that "[i]n quasi-delicts, exemplary damages may be granted if the defendant acted with gross negligence".

*B. Instructions and Procedure*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

[24] The Estate argues that even if exemplary damages are available against a deceased's estate, the district court violated its rights under the Due Process Clause by holding the exemplary-damage phase of the trial before the compensatory-damage phase and by not instructing the jury that an exemplary-damage award must bear a relationship to compensatory damages.

*1. Due Process Claims*

[25] The Estate claims that the sequence in which the district court held the damage phases of the trial violated its right to due process. We review *de novo* a claim of a violation of the Due Process Clause. In its most recent discussion of punitive damages, the Supreme Court wrote that "[o]nly when an award can fairly be categorized as 'grossly excessive' in relation to [a State's legitimate] interests [in punishing unlawful conduct and deterring its repetition] does it enter the zone of arbitrariness that violates the Due Process Clause". *BMW of North America, Inc. v. Gore,* 517 U.S. 559, ----, 116 S.Ct. 1589, 1595, 134 L.Ed.2d 809 (1996). *See also TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 458, 113 S.Ct. 2711, 2720, 125 L.Ed.2d 366 (1993) (Stevens, J.). The *BMW* Court identified three "guideposts" for measuring gross excessiveness: "the degree of reprehensibility [of defendant's conduct]; the disparity between the harm or potential harm suffered by [the plaintiff] and his punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases". *BMW,* 517 U.S. at ---- - ----, 116 S.Ct. at 1598-99.

The Estate's argument appears to challenge the district court's procedure and instructions as deficient with respect to the second *BMW* "guidepost". The Court's discussion of this issue, however, offers little support to the Estate's argument. The Court noted the "long pedigree" of "[t]he principle that exemplary damages must bear a 'reasonable relationship' to compensatory damages". *Id.* at ----, 116 S.Ct. at 1601. The Court also pointed out that it had "refined this analysis [in *TXO* ] by confirming that the proper inquiry is ' "whether there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred" ' ". *Id.* (quoting *TXO,* 509 U.S. at 460, 113 S.Ct. at 2721 (emphasis in original) (quoting **\*781***Pacific Mutual Life Insurance Co. v. Haslip,* 499 U.S. 1, 21, 111 S.Ct. 1032, 1045, 113 L.Ed.2d 1 (1991))). Finally, the Court reiterated its previous caution that a categorical approach to this question must be rejected: " '... "We ... cannot[ ] draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." ' " *Id.* at ----, 116 S.Ct. at 1602 (emendations in original) (quoting *TXO,* 509 U.S. at 458, 113 S.Ct. at 2720 (quoting *Haslip,* 499 U.S. at 18, 111 S.Ct. at 1043)).

Thus, the Court has not required, as the Estate would have it, that punitive damages be calculated on the basis of the amount of a previous award of compensatory damages. The fact that the excessiveness of a punitive-damage award is to be measured in part by the reasonableness of the relationship between the award and "*the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred" undercuts the Estate's argument that a punitive-damage award *must* in all cases be determined after an award of compensatory damages, since compensatory damages will not include any recovery for harm that was likely to have occurred but did not actually occur. The departure from the usual sequence in this case did not violate the Estate's due-process rights. Certainly the Estate has no persuasive argument that the actual amount of exemplary damages awarded, $1.2 billion, was grossly excessive, given the eventual award of over $750 million in compensatory damages for the human-rights abuses inflicted on the nearly 10,000 class members.

[26] The Estate also appears to argue that the district court's instructions on exemplary damages were erroneous because they granted the jury unrestrained discretion in arriving at its award. [FN7] While the Supreme Court has indeed suggested that "unlimited" jury discretion in the determination of punitive damages might violate the Due Process Clause, *Haslip,* 499 U.S. at 19, 111 S.Ct. at 1043-44, these instructions did not grant the jury unrestrained discretion in its exemplary-damage determination.

> FN7. The relevant portions of the instructions are as follows:
> Exemplary damages are damages that are awarded by way of example or correction for the public good. In other words, exemplary damages reflect an award to the plaintiffs which may serve as a warning or deterrence to others that they should not copy or emulate the conduct for which you found Ferdinand Marcos responsible ... Unlike compensatory damages, which are to reimburse plaintiffs for their injuries, exemplary damages are to make an example

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

103 F.3d 767                                                                                                                                    Page 14
103 F.3d 767, 45 Fed. R. Evid. Serv. 913, 96 Cal. Daily Op. Serv. 9090, 96 Daily Journal D.A.R. 15,085
**(Cite as: 103 F.3d 767)**

of a defendant's conduct so others will not engage in the same practices.

The law does not require you to award exemplary damages. [T]he amount of an award of exemplary damages must not reflect bias, prejudice or sympathy toward any party. Nor should any award be intended to punish a defendant. Exemplary damages may only be awarded if you determine ... that defendant's conduct ... was malicious, wanton or oppressive....

There is no exact standard for fixing the amount of exemplary damages. The amount [is] any amount you believe necessary to fulfill the objective of exemplary damages, which is to deter similar conduct in the future by others. Any award you make should be fair in light of the evidence. You may consider the financial resources of the Estate of Ferdinand Marcos in fixing the amount of exemplary damages as well as the nature of the conduct for which you found the defendant responsible, the period the conduct continued, the number of people affected by that conduct, and the severity of the injuries to the plaintiffs and the class.

The instructions in this case, like those in *Haslip,* "gave the jury significant discretion in its determination of punitive damages[, b]ut that discretion was not unlimited". *Id.* The *Haslip* Court found that the instructions given in that case "enlightened the jury as to the punitive damages' nature and purpose, identified the damages as punishment for civil wrongdoing of the kind involved, and explained that their imposition was not compulsory". *Id.* The district court's instructions here provided the same information to the jury. Indeed, while the Estate complains that its rights were violated because the jury was not instructed that a reasonable relationship must exist between the amounts of compensatory and exemplary damages, the actual instructions approved by the Supreme Court in *Haslip* contained no such explanation. *Id.* at 6, n. 1, 111 S.Ct. at 1037 n. 1. The district court's instructions did not leave **\*782** the jury with the unrestrained discretion that might violate the Due Process Clause.

*2. Trifurcation*

[27][28] A trial court's decision to bifurcate--or, in this case, trifurcate--a trial is reviewed for an abuse of discretion. *Exxon Co. v. Sofec, Inc.,* 54 F.3d 570, 575 (9th Cir.1995). In the absence of any constitutional problems with the district court's decision to hold the exemplary-damage phase of the trial prior to the compensatory-damage phase, the district court did not abuse its discretion by the sequence in which it conducted the proceedings below. The compensatory-damage phase presented much more complex questions, requiring the presentation of testimony taken in the Philippines before a special master, than did the exemplary-damage phase, which was closely related to the evidence in the liability phase. In addition, of course, the district court retained the authority, until the entry of judgment, to review and require a remittitur of the exemplary-damage award if the award was, in its view, excessive. Indeed, the procedure followed by the district court is not unprecedented in class-action suits. *See Jenkins v. Raymark Industries, Inc.,* 782 F.2d 468, 474-75 (5th Cir.1986) (affirming plan for trial on punitive damages before actual damages in class-action suit; noting that since punitive damages are intended to create deterrence and protect public interest, focus is on defendant's conduct, and while Texas law bars a punitive-damage award to a plaintiff who does not receive a compensatory award, "the allocation need not be made concurrently with an evaluation of the defendant's conduct" and "[t]he relative timing of these assessments is not critical"). Thus, the order in which the stages of the trial proceeded was not an abuse of the district court's discretion.

**IX. Methodology of Determining Compensatory Damages**

[29] The Estate challenges the method used by the district court in awarding compensatory damages to the class members.

*A. District Court Methodology*

The district court allowed the use of a statistical sample of the class claims in determining compensatory damages. In all, 10,059 claims were received. The district court ruled 518 of these claims to be facially invalid, leaving 9,541 claims. From these, a list of 137 claims was randomly selected by computer. This number of randomly selected claims was chosen on the basis of the testimony of James Dannemiller, an expert on statistics, who testified that the examination of a random sample of 137 claims would achieve "a 95 percent statistical probability that the same percentage determined to be valid among the examined claims would be applicable to the totality of claims filed". Of the claims selected, 67 were for torture, 52 were for summary execution, and 18 were for "disappearance".

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

103 F.3d 767 Page 15
103 F.3d 767, 45 Fed. R. Evid. Serv. 913, 96 Cal. Daily Op. Serv. 9090, 96 Daily Journal D.A.R. 15,085
**(Cite as: 103 F.3d 767)**

*1. Special Master's Recommendations*

The district court then appointed Sol Schreiber as a special master (and a court-appointed expert under Rule 706 of the Federal Rules of Evidence). Schreiber supervised the taking of depositions in the Philippines of the 137 randomly selected claimants (and their witnesses) in October and November 1994. These depositions were noticed and conducted in accordance with the Federal Rules of Civil Procedure; the Estate chose not to participate and did not appear at any of the depositions. (The Estate also did not depose any of the remaining class members.)

Schreiber then reviewed the claim forms (which had been completed under penalty of perjury) and depositions of the class members in the sample. On the instructions of the district court, he evaluated

(1) whether the abuse claimed came within one of the definitions, with which the Court charged the jury at the trial ..., of torture, summary execution, or disappearance; (2) whether the Philippine military or paramilitary was ... involved in such abuse; and (3) whether the abuse occurred during the period September 1972 through February 1986.

**\*783** He recommended that 6 claims of the 137 in the sample be found not valid. [FN8]

> FN8. Three torture claims and one summary-execution claim were recommended as invalid because the claimants presented insufficient proof that the abuses were committed by military or paramilitary forces. One summary-execution claim and one "disappearance" claim were recommended as invalid for insufficient evidence.

Schreiber then recommended the amount of damages to be awarded to the 131 claimants. Following the decision in *Filartiga v. Pena-Irala,* 577 F.Supp. 860, 863 (E.D.N.Y.1984), he applied Philippine, international, and American law on damages. In the cases of torture victims, Schreiber considered:

(1) physical torture, including what methods were used and/or abuses were suffered; (2) mental abuse, including fright and anguish; (3) amount of time torture lasted; (4) length of detention, if any; (5) physical and/or mental injuries; (6) victim's age; and (7) actual losses, including medical bills.

In the cases of summary execution and "disappearance", the master considered

(1) [the presence or absence of] torture prior to death or disappearance; (2) the actual killing or disappearance; ... (3) the victim's family's mental anguish[;] and (4) lost earnings [computed according to a formula established by the Philippine Supreme Court and converted into U.S. dollars].

The recommended damages for the 131 valid claims in the random sample totalled $3,310,000 for the 64 torture claims (an average of $51,719), $6,425,767 for the 50 summary-execution claims (an average of $128,515), and $1,833,515 for the 17 "disappearance" claims (an average of $107,853).

Schreiber then made recommendations on damage awards to the remaining class members. Based on his recommendation that 6 of the 137 claims in the random sample (4.37%) be rejected as invalid, he recommended the application of a five-per-cent invalidity rate to the remaining claims. He then performed the following calculations to determine the number of valid class claims remaining:

|  | Torture | Summary Execution | Disappearance |
|---|---:|---:|---:|
| Claims Filed | 5,372 | 3,677 | 1,010 |
| Facially Invalid Claims | -179 | -273 | - 66 |
| Remaining Claims | 5,193 | 3,404 | 944 |
| Less 5% Invalidity Rate | -260 | -170 | - 47 |
| Valid Claims | 4,933 | 3,234 | 897 |
| Valid Sample Claims | - 64 | - 50 | - 17 |
| Valid Remaining Claims | 4,869 | 3,184 | 880 |

----------

He recommended that the award to the class be determined by multiplying the number of valid remaining claims in each subclass by the average award recommended for the randomly sampled claims in that subclass:

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

103 F.3d 767                                                                                      Page 16
103 F.3d 767, 45 Fed. R. Evid. Serv. 913, 96 Cal. Daily Op. Serv. 9090, 96 Daily Journal D.A.R. 15,085
**(Cite as: 103 F.3d 767)**

|  | Torture | Summary Execution | Disappearance |
|---|---|---|---|
| Valid Remaining Claims | 4,869 | 3,184 | 880 |
| x Average Awards | $51,719 | $128,515 | $107,853 |
| Class Awards | $251,819,811 | $409,191,760 | $94,910,640 |

----------

By adding the recommended awards in the randomly sampled cases, Schreiber arrived at a recommendation for a total compensatory damage award in each subclass:

|  | Torture | Summary Execution | Disappearance |
|---|---|---|---|
| Class Awards | $251,819,811 | $409,191,760 | $94,910,640 |
| Sample Awards | $ 3,310,000 | $ 6,425,767 | $ 1,833,515 |
| TOTALS | $255,129,811 | $415,617,527 | $96,744,155 |

**\*784** Adding together the subclass awards, Schreiber recommended a total compensatory damage award of $767,491,493.

*2. Jury Proceedings*

A jury trial on compensatory damages was held in January 1995. Dannemiller testified that the selection of the random sample met the standards of inferential statistics, that the successful efforts to locate and obtain testimony from the claimants in the random sample "were of the highest standards" in his profession, that the procedures followed conformed to the standards of inferential statistics, and that the injuries of the random-sample claimants were representative of the class as a whole. Testimony from the 137 random-sample claimants and their witnesses was introduced. Schreiber testified as to his recommendations, and his report was supplied to the jury. The jury was instructed that it could accept, modify or reject Schreiber's recommendations and that it could independently, on the basis of the evidence of the random-sample claimants, reach its own judgment as to the actual damages of those claimants and of the aggregate damages suffered by the class as a whole.

The jury deliberated for five days before reaching a verdict. Contrary to the master's recommendations, the jury found against only two of the 137 claimants in the random sample. As to the sample claims, the jury generally adopted the master's recommendations, although it did not follow his recommendations in 46 instances. [FN9] As to the claims of the remaining class members, the jury adopted the awards recommended by the master. The district court subsequently entered judgment for 135 of the 137 claimants in the sample in the amounts awarded by the jury, and for the remaining plaintiffs in each of the three subclasses in the amounts awarded by the jury, to be divided pro rata. [FN10]

> FN9. The jury awarded more than recommended to six torture claimants and less than recommended to five torture claimants; more than recommended for lost earnings to two execution claimants and less than recommended for lost earnings to nineteen execution claimants; more than recommended for pain and suffering to three execution claimants and less than recommended to one execution claimant; less than recommended for lost earnings to six "disappearance" claimants; and more than recommended for pain and suffering to one "disappearance" claimant and less than recommended for three "disappearance" claimants.

> FN10. Although never expressly explained by the district court, the mechanics of this division, as represented by Hilao, are as follows: The 135 random-sample claimants whose claims were found to be valid would receive the actual amount awarded by the jury; the two sample claimants whose claims were held invalid would receive nothing. All remaining 9,404 claimants with facially valid claims would be eligible to participate in the aggregate award, even though the aggregate award was calculated based on a 5% invalidity rate of those claims.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case No. 1:90-cv-00181-JLK   Document 1517-4   filed 10/18/05   USDC Colorado   pg 17 of 20

103 F.3d 767                                                                                                              Page 17
103 F.3d 767, 45 Fed. R. Evid. Serv. 913, 96 Cal. Daily Op. Serv. 9090, 96 Daily Journal D.A.R. 15,085
**(Cite as: 103 F.3d 767)**

*B. Estate's Challenge*

The Estate's challenge to the procedure used by the district court is very narrow. It challenges specifically only "the method by which [the district court] allowed the validity of the class claims to be determined": the master's use of a representative sample to determine what percentage of the total claims were invalid. [FN11]

> FN11. In its reply brief, the Estate for the first time "also questions the propriety of the methodology employed by the district court for determining the quantum of compensatory damages". Reply Brief at 13. Issues raised for the first time in a reply brief, however, are generally deemed waived, *Dilley v. Gunn,* 64 F.3d 1365, 1367 (9th Cir.1995), and we will not consider this issue.

The grounds on which the Estate challenges this method are unclear. It states that to its knowledge this method "has not previously been employed in a class action". This alone, of course, would not be grounds for reversal, and in any case the method has been used before in an asbestos class-action case, the opinion in which apparently helped persuade the district court to use this method. *See Cimino v. Raymark Indus., Inc.,* 751 F.Supp. 649, 659-667 (E.D.Tex.1990).

The Estate also argues that the method was "inappropriate" because the class consists of various members with numerous subsets of claims based on whether the plaintiff or his or her decedent was subjected to torture, "disappearance", or summary execution. The district court's methodology, however, **\*785** took account of those differences by grouping the class members' claims into three subclasses.

Finally, the Estate appears to assert that the method violated its rights to due process because "individual questions apply to each subset of claims, *i.e.,* whether the action was justified, the degree of injury, proximate cause, etc.". It does not, however, provide any argument or case citation to explain how the methodology violated its due-process rights. Indeed, the "individual questions" it identifies--justification, degree of injury, proximate cause--are irrelevant to the challenge it makes: the method of determining the validity of the class members' claims. [FN12] The jury had already determined that Philippine military or paramilitary forces on Marcos' orders--or with his conspiracy or assistance or with his knowledge and failure to act--had tortured, summarily executed, or "disappeared" untold numbers of victims and that the Estate was liable to them or their survivors. The only questions involved in determining the validity of the class members' claims were whether or not the human-rights abuses they claim to have suffered were proven by sufficient evidence.

> FN12. The degree of injury would, of course, be relevant to the computation of damages for each claim, but, as noted above, the Estate has waived any challenge to the computation of damages.

Although poorly presented, the Estate's due-process claim does raise serious questions. Indeed, at least one circuit court has expressed "profound disquiet" in somewhat similar circumstances. *In re Fibreboard Corp.,* 893 F.2d 706, 710 (5th Cir.1990). The *Fibreboard* court was reviewing a petition for a writ of mandamus to vacate trial procedures ordered in over 3,000 asbestos cases. The district court had consolidated the cases for certain purposes and certified a class for the issue of actual damages. The district court ordered a trial first on liability and punitive damages, and then a trial (Phase II) on actual damages. In the Phase II trial, the jury was "to determine actual damages in a lump sum for each [of 5] disease categor [ies] for all plaintiffs in the class" on the basis of "a full trial of liability and damages for 11 class representatives and such evidence as the parties wish to offer from 30 illustrative plaintiffs" (half chosen by each side), as well as "opinions of experts ... regarding the total damage award". 893 F.2d at 708-09. The Fifth Circuit noted that the parties agreed that "there will inevitably be individual class members whose recovery will be greater or lesser than it would have been if tried alone" and that "persons who would have had their claims rejected may recover". [FN13] *Id.* at 709. The court said that

> FN13. This suggests that the procedure used here may present a more difficult issue of violation of the due-process rights of particular class members. In *Cimino,* that issue was resolved by the fact that "[p]laintiffs ... agreed to the procedure, thereby waiving their rights to individual damage determinations". 751 F.Supp. at 653. That does not appear to be the case here. However, no plaintiff in this case is raising that issue in this or any related appeal.

[t]he inescapable fact is that the individual claims of 2,990 persons will not be presented. Rather, the claim of a unit of 2,990 persons will be presented. Given the unevenness of the individual claims, this Phase II process inevitably restates the dimensions of tort liability. Under the proposed procedure, manufacturers and suppliers are exposed to liability not only in 41 cases actually tried with success to the jury, but in 2,990 additional cases whose claims are indexed to

Case No. 1:90-cv-00181-JLK   Document 1517-4   filed 10/18/05   USDC Colorado   pg 18 of 20

103 F.3d 767                                                                                                    Page 18
103 F.3d 767, 45 Fed. R. Evid. Serv. 913, 96 Cal. Daily Op. Serv. 9090, 96 Daily Journal D.A.R. 15,085
**(Cite as: 103 F.3d 767)**

those tried. *Id.* at 711. The court granted the petitions for mandamus and vacated the trial court's order, but it did so not on due-process grounds but because the proposed procedure worked a change in the parties' substantive rights under Texas law that was barred by the *Erie* doctrine. [FN14]

> FN14. *Cimino,* the district court case upon which the district court appears to have relied in choosing the procedure it followed here, was decided after *Fibreboard* by the same district judge whose order had been vacated in *Fibreboard.* The main difference between the procedures disapproved in *Fibreboard* and those used in *Cimino* appears to be that while the *Fibreboard* process would have presented the 41 cases of the class representatives and allegedly "illustrative" class members to the jury and used those cases to determine an aggregate damage award for the class, the *Cimino* process presented to the jury a statistically significant random sample of class claims and awarded each of the non-sample claims the average of the damages awarded in the sample claims.
>
> After *Fibreboard,* the Fifth Circuit approved a trial court's proposal to determine punitive damages in a mass-tort class-action suit by fully trying 20 sample claims on *compensatory* damages to the jury and then asking the jury to "establish the ratio of punitive damages to compensatory damages for each class member". *Watson v. Shell Oil Co.,* 979 F.2d 1014, 1018 (5th Cir.1992). The court distinguished this procedure from the one disapproved in *Fibreboard* because of the fact that the punitive-damage inquiry focuses primarily on the defendant's conduct--"the degree of culpability underlying a single act"--and because the jury was not to "extrapolate" the amount of actual punitive damages but rather to "determine a basis for assessment of punitive damages in the form of a ratio". *Id.* at 1019.

**\*786** On the other hand, the time and judicial resources required to try the nearly 10,000 claims in this case would alone make resolution of Hilao's claims impossible. *See Cimino,* 751 F.Supp. at 652-53 ("If the Court could somehow close thirty cases a month, it would take six and one-half years to try these [2,298] cases ..."). The similarity in the injuries suffered by many of the class members would make such an effort, even if it could be undertaken, especially wasteful, as would the fact that the district court found early on that the damages suffered by the class members likely exceed the total known assets of the Estate.

While the district court's methodology in determining valid claims is unorthodox, it can be justified by the extraordinarily unusual nature of this case. " 'Due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances". *Cafeteria and Restaurant Workers Union, Local 473 v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). In *Connecticut v. Doehr,* 501 U.S. 1, 10, 111 S.Ct. 2105, 2112, 115 L.Ed.2d 1 (1991), a case involving prejudgment attachment, the Supreme Court set forth a test, based on the test of *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), for determining whether a procedure by which a private party invokes state power to deprive another person of property satisfies due process:

> [F]irst, consideration of the private interest that will be affected by the [procedure]; second, an examination of the risk of erroneous deprivation through the procedures under attack and the probable value of additional or alternative safeguards; and third, ... principal attention to the interest of the party seeking the [procedure], with, nonetheless, due regard for any ancillary interest the government may have in providing the procedure or forgoing the added burden of providing greater protections.

501 U.S. at 11, 111 S.Ct. at 2112. The interest of the Estate that is affected is at best an interest in not paying damages for any invalid claims. If the Estate had a legitimate concern in the identities of those receiving damage awards, the district court's procedure could affect this interest. In fact, however, the Estate's interest is only in the total amount of damages for which it will be liable: if damages were awarded for invalid claims, the Estate would have to pay more. The statistical method used by the district court obviously presents a somewhat greater risk of error in comparison to an adversarial adjudication of each claim, since the former method requires a probabilistic *prediction* (albeit an extremely accurate one) of how many of the total claims are invalid. [FN15] The risk in this case was reduced, though, by the fact that the proof-of-claim form that the district court required each class member to submit in order to opt into the class required the claimant to certify under penalty of perjury that the information provided was true and correct. Hilao's interest in the use of the statistical method, on the other hand, is enormous, since adversarial resolution of each class member's claim would pose insurmountable practical hurdles. The "ancillary" interest of the judiciary in the procedure is obviously also substantial, since 9,541 individual adversarial determinations of claim validity would clog the docket of the district court for **\*787** years. Under the balancing test set forth in *Mathews* and *Doehr,* the procedure used by the district court did not violate due

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case No. 1:90-cv-00181-JLK   Document 1517-4   filed 10/18/05   USDC Colorado   pg 19 of 20

103 F.3d 767                                                                                                                    Page 19
103 F.3d 767, 45 Fed. R. Evid. Serv. 913, 96 Cal. Daily Op. Serv. 9090, 96 Daily Journal D.A.R. 15,085
**(Cite as: 103 F.3d 767)**

process.

> FN15. Hilao suggests that this risk is balanced in part by other benefits the Estate received from the district court's method, including the plaintiffs' decision to forego certain damages (*e.g.,* costs of medical treatment) that would not be "generic to the class members" and the special master's recommendation (followed by the jury) of a ceiling on damages for both lost wages and pain and suffering.

**CONCLUSION**

The district court had jurisdiction over Hilao's cause of action. Hilao's claims were neither barred by the statute of limitations nor abated by Marcos' death. The district court did not abuse its discretion in certifying the class. The challenged evidentiary rulings of the district court were not in error. The district court properly held Marcos liable for human rights abuses which occurred and which he knew about and failed to use his power to prevent. The jury instructions on the Torture Victim Protection Act and on proximate cause were not erroneous. The award of exemplary damages against the Estate was allowed under Philippine law and the Estate's due-process rights were not violated in either the determination of those damages or of compensatory damages. The judgment of the district court is therefore

**AFFIRMED.**

RYMER, Circuit Judge, concurring in part and dissenting in part:

Because I believe that determining causation as well as damages by inferential statistics instead of individualized proof raises more than "serious questions" of due process, I must dissent from Part IX of the majority opinion. Otherwise, I concur.

Here's what happened: Hilao's statistical expert, James Dannemiller, created a computer database of the abuse of each of the 10,059 victims based on what they said in a claim form that assumed the victim's torture. Although Dannemiller would have said that 384 claims should be examined to achieve generalizability to the larger population of 10,059 victims within 5 percentage points at a 95% confidence level, he decided that only 136 randomly selected claims would be required in light of the "anticipated validity" of the claim forms and testimony at the trial on liability that the number of abuses was about 10,000.

He selected three independent sample sets of 242 (by random selection but eliminating duplicates). Hilao's counsel then tried to contact and hold hearings or depositions with each of the claimants on the first list, but when attempts to contact a particular claimant proved fruitless, the same number in the next list was used. When the sample results for the first 137 victims proved insufficient to produce the level of sampling precision desired for the project, Hilao's counsel continued from case 138 to case 145. Eventually, 124 were completed from list A, 11 from list B, and 2 from list C.

The persons culled through this process went to Manilla to testify at a deposition (which Dannemiller thought was "remarkable"). Dannemiller Narrative Statement, p. 6. He opined that "this random selection method in determining the percentage of valid claims was fair to the Defendant" as "[a] random selection method of a group of 9541 individuals is more accurate than where each individual is contacted." *Id.* Further, the statistician observed that "[t]he cost and time required to do 9541 would be overwhelming and not justified when greater precision can and was achieved through sampling." *Id.* at 7. Finally, he concluded that "the procedures followed conformed to the standards of inferential statistics and therefore ... the injuries of the 137 claimants examined are representative of the 9541 victims." *Id.*

In accordance with the "computer-generated plan developed by James Dannemiller," the Special Master oversaw the taking of the 137 depositions in the Philippines. In accordance with the district court's order, the Special Master was to determine "(1) whether the abuse claimed came within one of the definitions, with which the Court charged the jury at the trial held in Hawaii, of torture, summary execution, or disappearance; (2) whether the Philippine military or para-military was or were involved in such abuse; and (3) whether the abuse occurred during the period September 1972 through February 1986." Special Master and Court Appointed Expert's Recommendations, p. 1. Based on a review of the deposition transcripts of the 137 randomly selected victim claims, and a review of the claims, the Special Master found that 131 were valid within the definitions which the court gave to the jury; the **\*788** Philippine military or para-military were involved in the abuse of the valid claims; and the abuse occurred during the period 1972 through February 1986. As a result, he recommended the amount of compensatory damages to be awarded to the valid 131 claimants, and for the entire class based on the average awards for torture, for summary execution (including lost earnings, which the Special Master determined should be capped at $120,000 per claimant, and which would be determined by the average for the occupation when a witness did not state the amount of income earned), and disappearance (including lost earnings similarly calculated). His report

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

103 F.3d 767                                                                                                    Page 20
103 F.3d 767, 45 Fed. R. Evid. Serv. 913, 96 Cal. Daily Op. Serv. 9090, 96 Daily Journal D.A.R. 15,085
**(Cite as: 103 F.3d 767)**

indicates that "for all three categories, moral damages as a proximate result of defendants' wrongful acts or omissions, Phil.Civ.Code § § 2216, 2217 were weighed into the compensation." *Id.* at 7.

Thus, causation and $766 million compensatory damages for nearly 10,000 claimants rested on the opinion of a statistical expert that the selection method in determining valid claims was fair to the Estate and more accurate than individual testimony; Hilao's counsel's contact with the randomly selected victims until they got 137 to be deposed; and the Special Master's review of transcripts and finding that the selected victims had been tortured, summarily executed or disappeared, that the Philippine military was "involved," that the abuse occurred during the relevant period, and that moral damages occurred as a proximate result of the Estate's wrongful acts.

This leaves me "with a profound disquiet," as Judge Higginbotham put it in *In re Fibreboard Corp.,* 893 F.2d 706, 710 (5th Cir.1990). Although I cannot point to any authority that says so, I cannot believe that a summary review of transcripts of a selected sample of victims who were able to be deposed for the purpose of inferring the type of abuse, by whom it was inflicted, and the amount of damages proximately caused thereby, comports with fundamental notions of due process.

Even in the context of a class action, individual causation and individual damages must still be proved individually. As my colleagues on the Sixth Circuit explained in contrasting generic causation--that the defendant was responsible for a tort which had the capacity to cause the harm alleged--with individual proximate cause and individual damage:

> Although such generic causation and individual causation may appear to be inextricably intertwined, the procedural device of the class action permitted the court initially to assess the defendant's potential liability for its conduct without regard to the individual components of each plaintiff's injuries. However, from this point forward, it became the responsibility of each individual plaintiff to show that his or her specific injuries or damages were proximately caused by [the defendant's conduct]. We cannot emphasize this point strongly enough because generalized proofs will not suffice to prove individual damages. The main problem on review stems from a failure to differentiate between the general and the particular. This is an understandably easy trap to fall into in mass tort litigation. Although many common issues of fact and law will be capable of resolution on a group basis, individual particularized damages still must be proved on an individual basis.

*Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188, 1200 (6th Cir.1988).

There is little question that Marcos caused tremendous harm to many people, but the question is which people, and how much. That, I think, is a question on which the defendant has a right to due process. If due process in the form of a real prove-up of causation and damages cannot be accomplished because the class is too big or to do so would take too long, then (as the Estate contends) the class is unmanageable and should not have been certified in the first place. As Judge Becker recently wrote for the Third Circuit in declining to certify a 250,000-member class in an asbestos action: "Every decade presents a few great cases that force the judicial system to choose between forging a solution to a major social problem on the one hand, and preserving its institutional values on the other. This is such a case." *Georgine v. Amchem Prod., Inc.,* 83 F.3d 610, 617 (3d Cir.1996).

**\*789** So is this. I think that due process dictates the choice: a real trial. I therefore dissent.

103 F.3d 767, 45 Fed. R. Evid. Serv. 913, 96 Cal. Daily Op. Serv. 9090, 96 Daily Journal D.A.R. 15,085

**Briefs and Other Related Documents (Back to top)**

• 1996 WL 33414428 (Appellate Brief) Reply Brief for Appellant (Feb. 07, 1996)

• 1996 WL 33414565 (Appellate Brief) Brief of Plaintiffs-Appellees (Jan. 25, 1996)Original Image of this Document with Appendix (PDF)

• 1995 WL 17014285 (Appellate Brief) Brief for Appellant Estate of Ferdinand Marcos (Oct. 31, 1995)Original Image of this Document with Appendix (PDF)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.