**Mark Nomellini/Chicago/Kirkland-Ellis**

10/19/2005 10:28 AM

To  Joan Oppenheimer/Chicago/Kirkland-Ellis@K&E

cc

bcc

Subject  Please print the attachment.   Thanks.

----- Forwarded by Mark Nomellini/Chicago/Kirkland-Ellis on 10/19/2005 11:28 AM -----



"Jenna MacNaughton-Wong" <jmacnaughton@bm.net>

10/12/2005 02:52 PM

To  "Mark Nomellini" <mnomellini@kirkland.com>

cc  "Peter Nordberg" <pnordberg@bm.net>

Subject  Draft PTO

Hello Mark,

Attached is our counter-proposal on the PTO.  A couple of changes:

1.  I have added back the list of facts to which defendants have stipulated, or have left open as to whether they will stipulate.  The ones that need a decision are highlighted.  Please make your final decision on these.

2.  I have removed defendants' "objection" language in your Fn. 8 and in the "Discovery" section.  Defendants' objections are on the record elsewhere.

3.  I corrected a typo in the section about defendants' dep designations.

4.  I have corrected the description of Ms. Roberson's testimony to correct a typo and to more accurately describe her position at Rocky Flats.

5.  I have updated the "Pending Motions" section.

6.  I have amended plaintiffs' statement on discovery in light of recent developments.

Jenna

PRIVILEGED ATTORNEY/CLIENT COMMUNICATION AND/OR ATTORNEY WORK PRODUCT. The information in this transmittal may be privileged and/or confidential. It is intended only for the recipient(s) listed above. If you are neither the intended recipient(s) nor a person responsible for the delivery of this transmittal to the intended recipient(s), you are hereby notified that any distribution or copying of this transmittal is prohibited. If you have received this transmittal in error, please notify Berger & Montague, P.C. immediately at (215) 875-3000 or by return e-mail. Pursuant to requirements related to practice before the U. S.Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for purposes of (i) avoiding penalties imposed under the U. S. Internal Revenue Code or (ii) promoting, marketing or recommending to another person

any tax-related matter.  Cook PTO joint draft 3.wpd

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 90-CV-181

---

MERILYN COOK, WILLIAM JR. and DELORES SCHIERKOLK,
RICHARD and SALLY BARTLETT, and LORREN and GERTRUDE BABB,

    Plaintiffs,

      v.

ROCKWELL INTERNATIONAL CORPORATION and
THE DOW CHEMICAL COMPANY,

    Defendants.

---

## [PROPOSED] STIPULATED PRETRIAL ORDER

### 1. DATE AND APPEARANCES

The final trial preparation conference took place on September 22, 2005.  Counsel present were Merrill Davidoff, Peter Nordberg, Louise Roselle, Gary Blum, and Holly Shook for plaintiffs; and Douglas Kurtenbach, David Bernick, Mark Nomellini, and Joseph Bronesky for defendants.

### 2. JURISDICTION

This Court has jurisdiction over these proceedings under the Price Anderson Act, 42 U.S.C. § 2210(n)(2), and under 28 U.S.C. § 1331.

1

### 3. CLAIMS AND DEFENSES[1]

**a.      Plaintiffs' Statement of Claims**

The representative plaintiffs in this civil action are Merilyn Cook, William Schierkolk, Jr., Delores Schierkolk, Richard and Sally Bartlett, and Lorren and Gertrude Babb.  They sue on their own behalf and also on behalf of a class of persons who (like the representative plaintiffs themselves) held ownership interests in land as of June 7, 1989, within a defined geographic area (the "Class Area") near the Rocky Flats Nuclear Weapons Plant ("Rocky Flats").  Rocky Flats is a government-owned, contractor-operated facility occupying about 6500 acres and situated sixteen miles northwest of downtown Denver, Colorado.  Before operations at Rocky Flats were halted in 1989, nuclear weapons components were manufactured there.  The components were fashioned from materials including plutonium, a man-made radioactive element and potent carcinogen.  Operations at the plant also involved the use, generation, storage, and disposal of large quantities of numerous other hazardous substances and wastes, both radioactive and nonradioactive.

Defendants are Dow Chemical Company ("Dow") and Rockwell International Corporation ("Rockwell").  Both Dow and Rockwell are corporations organized and existing under the laws of the State of Delaware.  Both also served under contract with the United States Department of Energy and its predecessor agencies ("DOE") as operators of Rocky Flats.  Dow operated the plant from its inception in the early 1950's through June 30, 1975; Rockwell, from the latter date to December 31, 1989.

The claims of plaintiffs and the class arise under the Price-Anderson Act, 42 U.S.C. § 2210

---

[1] The statements below reproduce the statements of the case filed by each party on August 8, 2005.

2

("Price-Anderson" or the "Act"), a federal statute providing for claims against the operating contractors of nuclear weapons facilities, such as Rocky Flats, in case of certain legal injuries, including property damages, caused by releases of radioactive substances from the facilities. Under the Act, the legal rules governing plaintiffs' claims are derived from the law of the state where the incidents occurred. 42 U.S.C. § 2014(hh). Each plaintiff and class member asserts two claims deriving from Colorado law: trespass, and nuisance. Both claims are asserted against both defendants. Plaintiffs seek compensatory and exemplary damages.

Plaintiffs' trespass claims arise from the release, and dispersal throughout the Class Area, of plutonium from the Rocky Flats site, under both Rockwell and Dow's management, resulting in the contamination of the land and properties within the Class Area. Plutonium is a silvery-gray radioactive metal that becomes yellowish when exposed to air. It is solid under ordinary conditions, and chemically reactive. It has at least fifteen different isotopes, all of which are radioactive. The most common ones are Pu-238, Pu-239, and Pu-240. Pu-238 has a half-life of 87.7 years. Plutonium-239 has a half-life of 24,100 years, and Pu-240 has a half-life of 6560 years. When inhaled, plutonium can remain in the lungs depending upon its particle size and how well the particular chemical form dissolves. However, the lungs may absorb some chemical forms and pass them into the bloodstream. Once in the bloodstream, plutonium moves throughout the body and into the bones, liver, or other bodily organs. According to the United States Environmental Protection Agency ("EPA"), internal exposure to plutonium is an extremely serious health hazard: it generally stays in the body for decades, exposing organs and tissues to radiation, and increasing the risk of cancer.

In addition to plutonium, the contaminants on which the trespass claim is founded include radioactive substances generated in the course of the natural radioactive decay of the plutonium –

3

the most important of these being radioactive americium and uranium.

At one time, Rocky Flats housed more than 14 tons of plutonium, then making it the second-largest repository of the element in the United States. Substantial amounts have been removed in the course of the Superfund cleanup, but significant amounts remain. Precise quantitative estimates are difficult, due to such uncertainties as poor documentation of waste storage and burial, incomplete information concerning the progress and efficacy of remedial measures, and unresolved issues involving 1191 kilograms (about 2600 pounds) of "material unaccounted for" at the site ("MUF") – i.e., missing plutonium. DOE, which indemnifies defendants and controls the defense of this litigation, has failed and refused to conduct a good-faith declassification review of many thousands of MUF documents that could shed light on discrepancies in plutonium inventory at the plant, warranting the inference that the data, if disclosed, would be adverse to defendants.

In addition to routine releases through the stacks and in unmonitored emissions, documented events believed to have caused past plutonium releases from Rocky Flats include major fires in 1957 and 1969, and releases from a plutonium-contaminated waste storage area at the site known as the "903 Pad." More generally, releases have occurred largely from the environmental transport, by natural forces and processes, of plutonium deposited in onsite soil and disposal areas. The releases and contamination began under Dow, continued under Rockwell, persist to the present, and will continue into the indefinite future, as the result of operational and waste-storage practices that Dow and Rockwell conducted intentionally, and which have led and will lead to offsite release of plutonium and the contamination of area properties in the usual course. Evidence of the releases and contamination is voluminous, and includes internal plant documents, reports and analyses by DOE and other governmental bodies, investigation of offsite contamination by DOE scientists and others,

4

testimony from fact witnesses and experts, and an official dose reconstruction commissioned and conducted after this litigation commenced.

Plaintiffs' nuisance claims are based not only on actual contamination by plutonium of the land and properties in the Class Area, but also on threatened future releases of plutonium and other hazardous substances. The nuisance claim is predicated on defendants' intentional, reckless, and negligent operational and waste storage practices, as documented by evidence including internal plant documents, reports and analyses by DOE and other governmental bodies, investigation of offsite contamination by DOE scientists and others, and testimony from fact witnesses and experts. A criminal investigation by the United States Department of Justice also resulted in Rockwell's guilty plea to ten counts of felony environmental violations involving the improper handling and storage of mixed radioactive waste, in addition to other environmental malfeasance that did not result in criminal charges and to which Rockwell did not plead guilty.

Defendants' releases and threatened releases have interfered with the use and enjoyment of class properties in various ways, including: health risks posed by plutonium contamination caused by past and ongoing releases into the area where class members reside; the threat of future releases of plutonium and other hazardous substances into the Class Area from the site, as the result of natural forces, cleanup activity, third-party conduct, and/or accidental events; and the fear, anxiety, and emotional distress that reasonable members of the community can (and do) suffer[2] by virtue of concerns and apprehensions over past and future releases, and the dangers to human health and well-

_____

[2] In the class trial, under the Court's rulings, the issue of actual emotional distress suffered by each individual class member will not be presented to the jury. The jury will be asked to decide, however, the generic question of whether the facts at issue were capable of causing such distress.

being they pose.  The disclosure of events and conditions at Rocky Flats attributable to defendants' misconduct, and the uncertainties associated with those events and conditions, have also had the effect of stigmatizing properties in the Class Area, resulting in a diminution of their relative market value, and evidencing the substantial character of defendants' interference with the quiet enjoyment of plaintiffs' and class members' properties.

In the class trial, plaintiffs seek compensatory damages, under *Restatement (Second) of Torts* § 930, measured by the diminution in market value of their properties, by comparison to what the value of the properties would have been, but for defendants' invasions.  Those damages are sought for residential properties and vacant land within the Class Area, expressed as total class-wide damages, in 2005 dollars, and as a percentage diminution for properties in both categories.  Those damages are measured by reference to the time period during which the injurious situation became complete and comparatively enduring.  The jury will be asked to determine when that occurred. Plaintiffs contend it occurred during the period between June 6, 1989, when the Federal Bureau of Investigation and EPA conducted a raid of the plant in furtherance of investigations into Rockwell's misconduct, and 1992, when Rockwell entered its guilty plea, and when the permanent closure of the plant was announced.  Plaintiffs also seek an award of exemplary damages against both Dow and Rockwell.

b.      **Defendants' Theories of the Case**

*Introduction*

The mission of Rocky Flats was to manufacture parts for nuclear weapons for the defense of the United States during the Cold War. The manufacture of nuclear weapons required the use of plutonium and other potentially hazardous substances. Defendants contend that the precautions taken

during their operation of the Rocky Flats plant worked and that the class members were not placed at any actionable risk as a result of either defendant's conduct.

*Trespass*

      In the Court's December 17, 2004 Order, the Court stated that, "in order for the Plaintiffs and the other class members to recover from either Dow or Rockwell or both of them on their claim of trespass, [the jury] must find Plaintiffs have proved the following by a preponderance of the evidence: Dow or Rockwell or both of them intentionally undertook an activity or activities that in the usual course of events caused plutonium to be deposited on the Class Properties." (12/17/04 Order re Proposed Trespass Instructions, Instruction No. 3.11, at 2). The class members' trespass claims have nothing to do with invasions by any substance other than plutonium. (*See* 12/17/04 Order at 7–8 (holding that "plutonium [is] the only substance at issue for trespass claims" and relying on "statements of Plaintiffs' counsel at hearing on September 8, 2004").) Neither do the class members' trespass claims have anything to do with any activity or event that did not "cause[] plutonium to be deposited" on each of "the Class Properties." (12/17/04 Order, Instruction No. 3.11, at 2).

      The precautionary procedures that Dow and Rockwell followed prevented any actionable releases of plutonium and, as has been confirmed by numerous independent experts including Colorado's health department, no historical releases of plutonium from Rocky Flats have posed any significant health risk to any class member.

      Any invasions resulting from releases of plutonium from Rocky Flats are not actionable for various reasons, including that any plutonium deposited onto class members' properties was not tangible (*i.e.*, palpable) and did not cause significant and substantial physical damage to class

members' properties.[3]   Any releases of plutonium onto class members' properties also are not actionable because they were attributable to intervening causes, such as the 1969 windstorms that caused the 903 pad release. (12/17/04 Order, Tentative Instruction No. 3.14, at 6) ("A defendant's conduct is not the cause of the claimed effect if, in order to bring about such an effect, it was necessary that the defendant's conduct combine or join with an intervening cause that also contributed to cause the claimed effect."). In addition, the releases from the 903 pad did not result from conduct in which the defendants "intentionally undertook an activity or activities that in the usual course of events caused plutonium to be deposited on the Class Properties." (12/17/04 Order, Instruction No. 3.11, at 2).

In order to establish trespass liability and damages, the class members must prove "that the tortious invasion 'will probably continue indefinitely' because 'there is no reason to expect its termination at any definite time in the future.'" (12/17/04 Mem. Op. and Order at 20, *citing* Restatement (Second) of Torts § 930 cmt. b; *see also* 5/17/05 Order at 16 (class members must prove date when "injurious situation caused by Defendants became complete and comparatively enduring")). "Defendants may defeat this showing . . . by demonstrating that they or others have abated or remedied the trespass . . . " (12/17/04 Mem. Op. and Order at 20). As a result of development and other factors, all plutonium has been removed from the properties of certain class

---

[3] Defendants do not wish to reargue any issues that have been decided by the Court, but do wish to preserve their position on this and any other issues on which the Court has ruled. Moreover, as counsel for the defendants discussed at the July 28, 2005 hearing, the jury should be provided with guidance as to what magnitude of an invasion is required in order for a trespass to be actionable. (*See, e.g.*, 7/28/05 H'rg Tr. (Rough Transcript) at 37 ("Is the jury going to say you can find for the class if there's even one particle that came from Rocky Flats? Or is the jury going to be — is the jury going to be told that there has to be some magnitude to the invasion before it becomes actionable?")).

members, and, as a result, there is no continuing, class-wide trespass.[4]

Defendants' position with respect to alleged damages resulting from trespass is set forth in the Compensatory Damages section below, following the discussion of the class members' nuisance claims.

### Nuisance

Under Colorado law, "the elements of a claim of nuisance are [1] an intentional, negligent, or unreasonably dangerous activity [2] resulting in [3] the unreasonable and substantial interference [4] with a plaintiff's use and enjoyment of her property." *See Pub. Serv. Co. of Colo. v. Van Wyk*, 27 P.3d 377, 391 (Colo. 2001).

### Nuisance - Evidence Regarding Continuing or Recurring Invasions

Under the Court's May 17, 2005 Order, the class members may only recover for "the prospect of the alleged . . . nuisance (if proved by the plaintiffs) *continuing into the future*." (5/17/05 Order at 15-16) (emphasis added). There is no evidence of any "nuisance" that "continu[es] into the future." (*Id.*) There is no ongoing health risk, fear, or threat of releases from the Rocky Flats plant. The plant has not been in operation for well over a decade, and all fissile materials have been removed.

### Nuisance - Negligence

The only type of activity upon which the class members may predicate their nuisance claims is an allegedly negligent activity — not an "intentional" or "abnormally dangerous" activity. (*See*

---

[4] If the class members cannot prove that their claims are "continuing," then they cannot establish damages or liability, because the class members' non-continuing trespass claims are then barred by the statute of limitations. The Court has ruled that the statute of limitations does not apply to the extent the trespass is continuing. (12/17/04 Mem. Op. and Order at 2).

*id.* ("[T]he elements of a claim of nuisance are [1] an intentional, negligent, or unreasonably dangerous activity . . . .")). The class members have waived any nuisance claim based upon intentional activity. (*See* Plaintiffs' 12/10/03 Status Rep. at 2). Moreover, the Court has ruled that defendants may not be held strictly liable for engaging in an "abnormally dangerous" activity. (5/17/05 Order at 14).

With respect to plaintiffs' negligent-nuisance claims, there is no evidence that defendants' operation of Rocky Flats did not comply with applicable standards of care; although defendants do not bear the burden or proof, defendants' evidence will demonstrate that defendants did comply with applicable standards of care.

### Nuisance - Types of Interference With Use and Enjoyment

The Court has ruled that the class members may recover for the following two types of alleged class-wide interferences with the use and enjoyment of their properties: (1) "[c]urrent human health risk arising from past or on-going exposure to plutonium [or 'Rocky Flats contaminants other than plutonium'] released from Rocky Flats as a result of one or both of the Defendants' activities there," provided that the jury "must find all Class members were exposed . . . and incurred some increased health risk from this exposure," and provided that the jury "may only consider the magnitude of the common, class-wide health risk in determining whether this and any interference(s) they find are substantial and unreasonable" (5/17/05 Order at 5); and (2) "an objectively demonstrable risk of future harm . . . such as existing contamination on-site and off-site that may be released or remobilized in some fashion that would result in human exposure and increased health risk, that ha[s] the potential to affect all of the Class Area," provided that the threat of future harm is "real" and "verifiable" (*id.* at 6). The Court has also ruled that "[t]he generic causation question

10

of whether Defendants' activities and the conditions resulting from them were capable of causing Class members to suffer fear, anxiety or other mental or emotional discomfort is . . . common to the Class and may be decided by the jury in the class trial." (*Id.* at 7). However, the Court also ruled that whether "Class members' enjoyment of their properties is impaired because of an emotional reaction to the real or perceived risk of future harm, cannot be *fully* resolved on a class-wide basis," because "whether Defendants' activities caused Class members to suffer fear or other emotional disturbance raises individual causation questions and thus is not capable of class-wide determination." (*Id.* at 6-7) (emphasis added). These categories of "interference" are addressed in turn below.

### *Nuisance - Health Risk*

As has been confirmed by numerous independent experts including Colorado's health department, there is no "common, class-wide health risk" resulting from "exposure" to releases of plutonium from the Rocky Flats plant. Nor is there any "prospect" of any alleged common, class-wide health risk "continuing into the future," as plaintiffs must demonstrate in order to recover for a nuisance under this Court's May 17, 2005 Order. (5/17/05 Order at 16). Furthermore, the class members have abandoned their intention to present evidence of any health risk from exposure to substances other than plutonium. (Pls.' Response to Defs.' *Daubert* Motion at 54).

### *Nuisance - Objectively Demonstrable Risk of Future Harm*

There is no "objectively demonstrable risk of future harm" that would "result in human exposure and increased health risk," and that "ha[s] the potential to affect all of the Class Area." (5/17/05 Order at 6). There is no evidence of any future health risk resulting from any substance used at Rocky Flats, including plutonium. Moreover, the plant has not been in operation for well over a decade, and all fissile material has been removed.

***Nuisance - Generic Fear, Anxiety, or Other Mental or Emotional Discomfort***

The Court has ruled that the "generic causation question of whether Defendants' activities and the conditions resulting from them were capable of causing Class members to suffer fear, anxiety or other mental or emotional discomfort" presents a class-wide issue. (5/17/05 Order at 7). However, the Court has also ruled that whether "Class members' enjoyment of their properties is impaired because of an emotional reaction to the real or perceived risk of future harm, cannot be fully resolved on a class-wide basis," because "whether Defendants' activities caused Class members to suffer fear or other emotional disturbance raises individual causation questions and thus is not capable of class-wide determination." (*Id.* at 6-7). Accordingly, under the Court's May 17, 2005 Order, the jury may not consider generic fear, anxiety, or other mental or emotional discomfort either in determining nuisance liability or in determining damages.[5] (*Id.* at 7)

In any event, if the issue of "generic fear" is included in the class trial, there is no evidence that "defendants activities and the conditions resulting from them" were capable of causing all class members to suffer fear, because there is no past, ongoing, or future health risk from defendants' operation of Rocky Flats.

***Nuisance - Substantial and Unreasonable***

In addition to establishing the existence of such an interference on a class-wide basis, the class members must also prove that such interference was "substantial" and "unreasonable." (5/17/05 Order at 2).

---

[5] It follows that the issue of "generic fear" cannot be part of a class-wide trial. As a practical matter, it would be impossible for the jury to identify what evidence relates to the issue of "generic fear," much less to disregard those items of evidence when determining nuisance liability and nuisance damages.

To prove that a nuisance is "unreasonable," the class members must demonstrate that the gravity of any injury that they have experienced outweighed the general public good from the operation of the Rocky Flats plant. *See* Restatement (Second) of Torts §§ 826, 828; *Cook v. Rockwell Int'l Corp.*, 273 F. Supp. 2d 1175, 1201 (D. Colo. 2003). The public good from the operation of the Rocky Flats plant — including both the economic benefits generated by the plant and the plant's contribution to national security — has far outweighed any harm to class members from the plant's operation, in part there is no evidence of any past, ongoing, or future health risk to class members from the operation of Rocky Flats.

In order to prove that a nuisance is substantial, the class members must demonstrate that the nuisance caused a class-wide diminution in value experienced by class members. *See Van Wyk*, 27 P.3d at 392 ("[T]he interference complained of by the Van Wyks must be a substantial invasion interfering with the use and enjoyment of the land, and reducing the value of the land."); Prosser & Keeton on Torts § 87, at 623 ("The substantial interference requirement is to satisfy the need for a showing that the land is reduced in value because of the defendant's conduct."). As discussed in the Compensatory Damages section below, there is no evidence of a diminution in value experienced by class members. This absence of any diminution in value independently prevents the class members not only from recovering damages, but also from establishing nuisance liability. *See Van Wyk*, 27 P.3d at 392; Prosser & Keeton on Torts § 87, at 623.

### *Compensatory Damages*

The Court stated in its May 17, 2005 Order that the class members will be required to prove damages "according to Restatement § 930(3)(b)." (5/17/05 Order at 14-20). The Court stated that "the current Class will be divided into two sub-classes for determination of compensatory damages."

(*Id.* at 15). The first sub-class "shall consist of all Class members who owned property within the Class Area on the later of: (i) January 30, 1990, the date this action was filed; or (ii) the date on which the jury, per Restatement § 930(1), finds it appeared the trespass and/or nuisance asserted by Plaintiffs would continue indefinitely." (*Id.*). The second sub-class will consist of everyone in the Property Class who is not in the first sub-class.[6] (*Id.* at 16).

With respect to the first sub-class, in order to prove Section 930 damages, the class members must establish: "(1) the date on which injurious situation caused by Defendants became complete and comparatively enduring ('CCE date'); (2) the average percentage diminution in property value that was caused by any trespass or nuisance found by the jury, as of the CCE date, for each property category [residential, commercial, vacant land]; (3) the value of the properties in the Damages sub-class, by property category, as of the CCE date; and (4) by multiplying the total value of each property category in the sub-class by the average percentage diminution in value for each property category as of the CCE date, and summing these amounts, the aggregate damages for the Damages sub-class." (5/17/05 Order at 16-17). The class members may only recover "damages for the decrease in the value of class properties caused by the ***prospect*** of the alleged trespass and/or nuisance ***continuing into the future***." (5/17/05 Order at 15-16) (emphasis added).

The class members have suffered no property damage as a result of any alleged trespass or nuisance. The class members have not even attempted to provide evidence of any change in market value attributable to the alleged trespass or nuisance, as opposed to a diminution allegedly attributable to non-actionable "proximity" to Rocky Flats. Nor have the class members provided

---

[6] With respect to the second sub-class, the Court stated that "the availability and means of determining any compensatory damages due this sub-class if Defendants are found liable in trespass will be decided after the class trial." (*Id.* at 16).

14

evidence of a diminution in value caused by "the prospect of the alleged trespass and/or nuisance continuing into the future." (5/17/05 Order at 15-16)

Even the class members' proof with respect to diminution in value allegedly caused by "proximity" to Rocky Flats is deficient in several respects. For example, the class members have provided no evidence that any alleged diminution in value of class properties attributable to "proximity" was experienced by class members. Rather, the class members' evidence relates to diminution in value allegedly experienced by class properties prior to when those class properties were owned by class members. The plutonium contour that is the basis of the class members' trespass claim was drawn in 1970, long before the vast majority of the class members purchased their properties. Moreover, looking as far back as the available data permits (*i.e.*, the early 1970s), the rate of appreciation of class members' properties has been at least as great as the rate of appreciation for non-class properties.

## 4. STIPULATIONS

**The parties stipulate to the following facts:**

1.      A portion of the Rocky Flats facility was built in 1951 and the plant began operations in 1952.

2.      The Rocky Flats facility produced plutonium "triggers" for nuclear weapons.

3.      Rocky Flats began processing plutonium for use in nuclear weapons in approximately July 1952.

4.      Dow Chemical Company operated Rocky Flats with the Department of Energy and/or its predecessor agencies from July 1952 to June 29, 1975.

5.      Rockwell International Corporation operated Rocky Flats under contract with the

15

Department of Energy and/or its predecessor agencies from June 30, 1975 to December 31, 1989.

6.      Plutonium and materials and substances containing plutonium were sent to Rocky Flats for extraction and purification of the plutonium.

7.      Operations at Rocky Flats involved the use of plutonium and uranium, and americium is and was present as a product of the natural decay of plutonium. Operations also involved the use of acids, nitrates, reactive metals, solvents, heavy metals, beryllium, carbon tetrachloride, ethanolamine, chromium compounds, dichloromethane, cholorform and other hazardous substances.

8.      Plutonium-239, the form of plutonium most prevalent at Rocky Flats, has a half-life of approximately 24,000 years.

9.      There were plutonium fires of varying magnitudes at Rocky Flats during the years 1957, 1964, 1965, 1969, 1971 and 1972.

10.      A major plutonium fire occurred at Rocky Flats on September 11, 1957, in Building 771, the main trigger manufacturing site at the plant.

11.      RAC's median estimate of the total quantity of plutonium released to the environment at the 71 stack in the 1957 fire was 290 grams; the 5th and 95th percentiles of RAC's distribution were 160 grams and 510 grams, respectively.

12.      There were no measurements of the size of plutonium particles released in the 1957 fire. RAC assumed that all activity released was respirable.

13.      A major plutonium fire occurred at Rocky Flats on May 11, 1969, in Buildings 776/777.

14.      RAC estimated total releases from the Building 776/777 exhaust system to the

16

environment resulting from the 1969 fire to be in the range of 140 to 900 mg.

15.     There were no measurements of the size of plutonium particles released in the 1969 fire.

16.     Between **1958 to at least 1966,** Dow stored drums containing waste oil contaminated with plutonium outdoors in an area known as the 903 pad.  Some of those barrels corroded and leaked.  In 1969, Dow covered the area where the drums had been stored with asphalt.

17.     RAC's median estimate of the total quantity of plutonium released from the 903 pad on particles <30 μm aerodynamic equivalent diameter was 43 grams; the 5th and 95th percentiles of RAC's distribution were 19 grams and 210 grams, respectively.

18.     On October 15, 1984, the United States Environmental Protection Agency published in the Federal Register a proposal to include Rocky Flats on the National Priorities List under CERCLA.

19.     In July 1986, the Department of Energy, Colorado Department of Health and EPA entered into a Compliance Agreement designed to establish agreements regarding disposal of hazardous wastes and regarding investigations and corrective actions by Rockwell.

20.     DOE filed revised applications for Part A and Part B RCRA permits for hazardous waste units at Rocky Flats in 1986.  In September 1989, CDH issued a Notice of Intent to Deny the Part B RCRA permit for **eleven low-level radioactive mixed waste management facilities** at Rocky Flats

21.     In June 1989, the Federal Bureau of Investigation filed in the United States District Court for the District of Colorado two separate applications and affidavits for search

17

warrants to search Rocky Flats (case numbers 89-730M and 89-753M).  The applications for search warrants were granted.

22.    The FBI raided Rocky Flats on June 7, 1989 on suspicion of criminal violations of environmental laws.

23.    Manufacturing operations at Rocky Flats ceased in October of 1989.

24.    On January 29, 1992, the DOE announced that plutonium operations would cease permanently and the plant would be shut down.

25.    On March 26, 1992, Rockwell entered a guilty plea in the criminal investigation against it, *United States v. Rockwell Int'l Corp.*, No. 92-CR-107 (D. Colo.).   Rockwell agreed to pay an $18.5 million fine.

26.    Rockwell committed the acts to which it pled guilty in *United States v. Rockwell Int'l Corp.*, No. 92-CR-107 (D. Colo.); specifically:

a.    Knowing storage of mixed hazardous wastes (pondcrete and saltcrete) in violation of RCRA requirements, 42 U.S.C. § 6928(d)(2)(C);

b.    Knowing storage of mixed hazardous wastes (pondcrete and saltcrete) without a permit or interim status, in violation of RCRA, 42 U.S.C. § 6928(d)(2)(A);

c.    Knowing treatment and storage of mixed hazardous wastes (concentrated salt brine) without a permit or interim status, in violation of RCRA, 42 U.S.C. § 6928(d)(2)(A);

d.    Knowing storage of mixed hazardous wastes (vacuum filter sludge) without a permit or interim status, in violation of RCRA, 42 U.S.C. § 6928(d)(2)(A);

e.    Negligent violation of Clean Water Act permit conditions (industrial wastes to the

18

sewage treatment plant), in violation of the Clean Water Act, 33 U.S.C.

§ 1319(c)(1)(A);

f.  Negligent violation of Clean Water Act permit conditions (BOD violations,

March 1988), in violation of the Clean Water Act, 33 U.S.C. § 1319(c)(1)(A);

g.  Negligent violation of Clean Water Act permit conditions (BOD/ fecal coliform

violations, April 1988) in violation of the Clean Water Act, 33 U.S.C.

§ 1319(c)(1)(A);

h.  Negligent violation of Clean Water Act permit conditions (BOD violations, May

1988), in violation of the Clean Water Act, 33 U.S.C. § 1319(c)(1)(A);

i.  Knowing violation of Clean Water Act conditions (spray irrigation), in violation

of the Clean Water Act, 33 U.S.C. § 1319(c)(1)(A); and

j.  Negligent violation of Clean Water Act permit conditions (chromic acid spill), in

violation of the Clean Water Act, 33 U.S.C. § 1319(c)(1)(A).

**[DEFENDANTS WILL ADDRESS THIS PROPOSED STIPULATION AFTER THE**

**COURT'S FINAL WRITTEN RULING ON THIS ISSUE.]**

27.  During the negotiations of its guilty plea, Rockwell and/or the Department of

Energy insisted that the statements in ¶ 10 of the plea agreement be included as a condition of

pleading guilty; specifically:

a.  Based on information presently known to the Department of Justice, the

conduct to which Rockwell has pleaded guilty did not and has not resulted

in substantial physiological harm, or the imminent threat of substantial

physiological harm, to members of the public residing and working outside

19

Rocky Flats' boundaries.

b.      The investigation has not revealed that hazardous or mixed wastes were

burned in the Building 771 incinerator during the period October 1988 to

January 1989, or, at any time, in the Building 776 fluidized bed

incinerator.

**[DEFENDANTS WILL ADDRESS THIS PROPOSED STIPULATION AFTER THE**

**COURT'S FINAL WRITTEN RULING ON THIS ISSUE.]**

28.     During the negotiations of the settlement in *McKay v. United States*, No. 75-M-

1162, Rockwell and/or the Department of Energy insisted that, as a condition of settlement, the

plaintiffs agree not to dispute Rockwell and/or the DOE's factual assertion that the

contamination from Rocky Flats posed no greater health risk to off-site populations than that

caused by background radiation.  This assertion was later incorporated into the Findings of Fact

and Conclusions of Law, *McKay v. United States* (No. 75-M-1162, D. Colo.), filed Jul. 3, 1985,

at 9.

**[DEFENDANTS WILL ADDRESS THIS PROPOSED STIPULATION AFTER THE**

**COURT'S FINAL WRITTEN RULING ON THIS ISSUE.]**

29.     Dow has not remediated the plutonium from the class properties.

30.     Rockwell has not remediated the plutonium from the class properties.

31.     Measurements of the amount of plutonium in soil are affected by a number of

uncertainties, such as prior history of the site where the measurement is made.  If the site is

disturbed in any way, such as through development or grading, after it is contaminated with

plutonium, but before any measurement is taken, the measurement may not reflect the amount of

plutonium deposited.

32.     Plutonium that is transported through the air and then deposited on the soil surface accumulates over time in undisturbed soil.

33.     Because of its long half-life and low mobility in the environment, plutonium that was transported off-site from Rocky Flats will tend to stay in place for a long time.

34.     Location is an important issue for consideration in any real estate analysis.


**The parties stipulate to the following legal propositions:**

1.     This action is governed by the Price-Anderson Act.


## 5.  PENDING MOTIONS

1.     Defendants' Objections to Identification of Stipulated Facts, filed 1/14/2005.
            Plaintiffs' Response filed 3/1/05
            Defendants' Reply filed 3/17/05

2.     Plaintiffs' Proposed Limiting Instruction:  Utility Versus Harm, filed 9/23/05
        Defendants' Objections, filed 9/29/05

3.     Defendants' Proposed Limiting Instructions, filed 9/23/05
        Plaintiffs' Objections, filed 9/29/05


## 6.  WITNESSES

Each side will provide the other with their order of witnesses by the end of the day on Friday for witnesses to be called during the following week.

**a.        Nonexpert Witnesses**

**For Plaintiffs**

21

This list does not include witnesses, *e.g.* "Librarian," needed to authenticate or qualify documents or summaries of documents, in the event that the issue of authentication or qualification cannot be resolved by stipulation or Court order.

Plaintiffs reserve the right to add new witnesses, and to call any witness on defendants' witness list.

**(1)     Witnesses who <u>will</u> be present at trial.**

**Avery, Ronald H.**                    Pueblo, CO
Mr. Avery is a former Rocky Flats employee who is expected to testify about Rockwell's illegal operation of the waste incinerator that was a subject of the FBI raid, as well as other wrongdoing at the plant.

**Baca, Dr. Randall**                   Wheat Ridge, CO
Dr. Baca is expected to testify about an aborted property purchase from class representatives Richard and Sally Bartlett.

**Bannister, Karen**                    Brighton, CO
Ms. Bannister will testify about her experiences living in the class area on property owned by her parents, Richard and Sally Bartlett.

**Bartlett, Richard**                   Brighton, CO
Mr. Bartlett is a class representative who will testify about his experiences as a property owner in the class area and his representation of the class.

**Bartlett, Sally**                     Brighton, CO
Mrs. Bartlett is a class representative who will testify about her experiences as a property owner in the class area and her representation of the class.

**Biggs, W. Gale, Ph.D.**               Boulder, CO
Dr. Biggs is expected to testify about his experiences on several committees charged with the review of Rocky Flats' environmental management, including Governor Roemer's scientific monitoring panel, the Rocky Flats Cleanup Commission, and the Citizens' Advisory Board. Dr. Biggs will testify about the work of those committees and their findings and recommendations. He may also testify about his experience as a contractor to Rocky Flats in the 1970's.

**Bowman, Joseph**                      Denver, CO
Mr. Bowman will testify about his experiences as a property owner in the class

22

area as a partner in the Alkire Investment Group.

**Brever, Jacqueline**                    Pueblo, CO
Ms Brever is a former Rocky Flats employee who is expected to testify about
Rockwell's illegal operation of the waste incinerator that was a subject of the FBI
raid, as well as other wrongdoing at the plant.

**Cassidy, Sam**                    Denver, CO
Mr. Cassidy is expected to testify about his experiences as the president of the
Jefferson County Economic Council and the president and CEO of Colorado
Association of Commerce & Industry

**Cook, Merilyn**                    Arvada, CO
Ms. Cook is a class representative who will testify about her experiences as a
property owner in the class area and her representation of the class.

**Hoffman, Rodney**  (as on cross)        Wheat Ridge, CO
Mr. Hoffman is expected to testify about his work on this case as a Dow,
Rockwell, and later DOE classification officer; about "MUF" or "material
unaccounted for," and DOE's response to plaintiffs' request for MUF-related
documents, including his own statements and testimony about the volume of such
documents, and DOE's production of over 1 million redacted MUF documents.

**Holeman, Tim**                    Denver, CO
Mr. Holeman is expected to testify about his experiences as the governor's
assistant tasked with Rocky Flats issues and as a City of Broomfield employee.

**Kaufman, Richard**  (as on cross)        Denver, CO
Mr. Kaufman is a former Assistant U.S. Attorney who was in charge of MUF
compliance before the contempt finding against DOE.  He is expected to testify
about DOE's responses to plaintiffs' discovery requests, and possibly about
classification of MUF documents, leading up to DOE being held in contempt, and
DOE's response thereafter.

**Lipsky, Jon**                    Mission Viejo, CA
Mr. Lipsky is expected to testify about his experiences as the lead FBI agent
involved in the raid on Rocky Flats.

**Lund, L.B. Pete**                    Denver, CO
Mr. Lund is expected to testify about his experiences as a property owner in the
class area as a partner in the Alkire Investment Group.

**McDaniel, Cynthia**                    Brighton, CO

Mrs. McDaniel will testify about her experiences as a property owner in the class area.

**McKay, Charles**                              Westminster, CO
Mr. McKay is expected to testify about his experiences as a property owner and developer in the class area, the lawsuit his uncle Marcus Church filed against Dow and Rockwell that Mr. McKay eventually inherited, and the events which led the DOE to seize part of his family's property in the 1950's in order to build the Rocky Flats plant.

**McKinley, Wesley**                            Walsh, CO
Mr. McKinley is expected to testify about his experiences as a state legislator, including his efforts to pass a bill requiring full disclosure of the potential radiation risks to visitors of the future Rocky Flats wildlife refuge.  He was also the foreman of the special grand jury that investigated Rockwell, and limited testimony is expected to be elicited on this issue, consistent with the Court's rulings on the motions in limine.

**Minshall, David**                             Centennial, CO
Mr. Minshall is expected to testify about his experiences as a reporter covering Rocky Flats and about media coverage of events at Rocky Flats, and will authenticate videotapes of news coverage from the 1980's forward.

**Ozaki, Charles**                              Broomfield, CO
Mr. Ozaki is expected to testify about his experiences as an assistant city manager, especially pertaining to the City of Broomfield's water replacement project, when Broomfield was forced to replace its water supply due to Rocky Flats contamination of the Great Western Reservoir, and possibly other actions taken by the City of Broomfield in response to revelations about Rocky Flats after the FBI raid.

**Park, Donald**                                St. Petersburg, FL
Mr. Park will testify about his experiences as a property owner in the class area.

**Poet, Stuart**                                Longmont, CO
Mr. Poet is expected to testify about his participation in the Colorado Committee for Environmental Information soil sampling study that found plutonium in the class area.

**Ray, John A.**                                Louisville, CO
Mr. Ray is a former Rocky Flats employee who is expected to testify about Dow and Rockwell's environmental management and other wrongdoing.

24

**Robb, Gretchen**                     Broomfield, CO
Ms. Robb will testify about her experiences as a property owner in the class area.

**Selbin, Joel Ph.D.**                 Boulder, CO
Dr. Selbin is expected to testify about his experiences as a member of the Radionuclide Soil Action Levels oversight panel and other Rocky Flats citizens' committees funded by DOE. He is expected to testify that the committees were shams, and that DOE attempted to evade its responsibility to clean up the contamination left by Dow and Rockwell.

**Schierkolk, William**               Arvada, CO
Mr. Schierkolk is a class representative who will testify about his experiences as a property owner in the class area and his representation of the class.

**Schonbeck, Niels, Ph.D.**           Boulder, CO
Dr. Schonbeck is expected to testify about his experiences as a member of the Health Advisory Panel, the Radionuclide Soil Action Levels oversight panel, and other Rocky Flats citizens' committees funded by DOE. He is expected to testify that the committees were shams, and that DOE attempted to evade its responsibility to clean up the contamination left by Dow and Rockwell.

**Whalen, Karen**                     Broomfield, CO
Ms. Whalen will testify about her experiences as a property owner in the class area.

**Williams, Zimmie Faye**             Houston, TX
Ms. Williams is a former Rocky Flats employee who is expected to testify about Rockwell's illegal operation of the waste incinerator that was a subject of the FBI raid, as well as other wrongdoing at the plant.

(2)    **Witnesses who _may_ be present at trial if the need arises.**

**Ackland, Len**                      Boulder, Co
Mr. Ackland is a journalist, a professor of journalism, and the author of a book on Rocky Flats He is expected to testify about the media coverage of Rocky Flats in the wake of the FBI raid and later events, and about generally known historical information about the plant.

**Babb, Gertrude**                    Golden, CO
Ms. Babb is a class representative who will testify about her experiences as a property owner in the class area and her representation of the class. In light of the fact that she is elderly, she may not be able to testify.

25

**Bartlett, Richard Jr.**                    Overland Park, KS

Mr. Bartlett will testify about his experiences living in the class area on property owned by his parents, Richard and Sally Bartlett.

**Bartleson, Michael**                    Arvada, CO

Mr. Bartleson is expected to testify about his experiences as an assistant city manager, especially pertaining to the City of Broomfield's water replacement project, when Broomfield was forced to replace its water supply due to Rocky Flats contamination of the Great Western Reservoir, and possibly other actions taken by the City of Broomfield in response to revelations about Rocky Flats after the FBI raid.

**Lacey, Howard**                    Arizona

Mr. Lacey is expected to testify about his experiences as a developer who developed or attempted to develop property in the class area. Due to Mr. Lacey's advanced age and ill health, he may not be able to testify.

**Schnoor, Kathryn**                    Broomfield, CO

Ms. Schnoor is expected to testify about his experiences as an assistant city manager, especially pertaining to the City of Broomfield's water replacement project, when Broomfield was forced to replace its water supply due to Rocky Flats contamination of the Great Western Reservoir, and possibly other actions taken by the City of Broomfield in response to revelations about Rocky Flats after the FBI raid.

**Till, John Ph.D.** (as on cross)

Dr. Till is expected to testify about the RAC study.

(3)    **Witnesses whose testimony is expected to be presented by means of a deposition and, if not taken stenographically, a transcript of the pertinent portions of the deposition testimony.**

This list does not include designations of testimony needed to authenticate or qualify documents or summaries of documents, in the event that the issue of authentication or qualification cannot be resolved by stipulation or Court order.

Plaintiffs reserve the right to add additional deposition designations, and to call by deposition anyone whose deposition has been taken.

**Hardy, Edward Ph.D.**                    Pleasantville, NY

26

Dr. Hardy's deposition testimony will introduce the soil sampling study he conducted that found plutonium in the class area.

**Hazle, Albert**                                    (deceased)
Mr. Hazle's deposition will discuss his experiences as the head of the Colorado Department of Health.

**Krey, Phillip, Ph.D.**                            Hillsdale, NJ
Dr. Krey's deposition testimony will introduce the soil sampling study he conducted that found plutonium in the class area.

**Henderson, Judith**                              Melbourne, FL
Ms. Henderson is a former DOE employee at Rocky Flats whose deposition will discuss Rockwell's attempts to thwart DOE oversight, its environmental management, and other wrongdoing.

**Jierree, Candice**                               Carlsbad, NM
Ms. Jierree's deposition will discuss her work as a DOE employee involved in oversight of Rocky Flats' waste management and environmental practices.

**Lindsay, Dana**
Ms. Lindsay's deposition will discuss DOE's response to the contempt order, including the production of redacted MUF documents.

**Morgan, Dr. Karl**                               (deceased)
Dr. Morgan's deposition will discuss the evolution of the first plutonium exposure standards.

**Roberson, Jessie**
Ms. Roberson's deposition will discuss her experiences a manager at the Rocky Flats plant.

**Siebert, A. Bryan**
Mr. Siebert's deposition will discuss his work as a DOE classification official, including his discussions of legal strategy with DOE.

**Silverman, Mark**
Mr. Silverman's deposition will discuss his experiences as director of the Rocky Flats plant, and his views, as director, of DOE's production of redacted MUF documents.

**Watkins, Adm. James**
Adm. Watkins' deposition will discuss his experiences as the Secretary of Energy.

27

**For Defendants**

      **(1)**     **Witnesses who <u>will</u> be present at trial.**

Defendants' current, good-faith witness list is attached to this filing.  Pursuant to the agreement of the parties, the attached good-faith witness list is subject to amendment.

      **(2)**     **Witnesses who <u>may</u> be present at trial if the need arises.**

Defendants' current, good-faith witness list is attached to this filing.  Pursuant to the agreement of the parties, the attached good-faith witness list is subject to amendment.

      **(3)**     **Witnesses whose testimony is expected to be presented by means of a deposition and, if not taken stenographically, a transcript of the pertinent portions of the deposition testimony.**

Defendants' deposition designations are attached to this filing.

**b.**     **Expert Witnesses**

**For Plaintiffs**

      **(1)**     **Witnesses who <u>will</u> be present at trial**

**Budnitz, Dr. Robert**        Berkeley CA
Dr. Budnitz is a physicist and nuclear operations specialist. He is expected to testify about the operational history of Rocky Flats; environmental monitoring; waste management; releases of plutonium into the off-site environment, including through plutonium fires and the "903 Pad;" and other releases of hazardous substances; and risk assessment.

**Clapp, Dr. Richard W.**        Boston, MA
Dr. Clapp is an epidemiologist. He is expected to testify concerning epidemiology and risk assessment.

**Cochran, Dr. Thomas B.**        Arlington, VA
Dr. Cochran is a physicist and health physicist. He is expected to testify about the basics of plutonium and radiation and their hazards to human health, including related uncertainty; the "ALARA" standard or "As Low as Reasonably Achievable" as it applies to the exposure of human beings to radiation and radionuclides, including to plutonium; the history of Rocky Flats operations and

its manufacture of "pits" for nuclear weapons; defendants' management of plutonium and plutonium-contaminated waste and fire risks; and releases of plutonium from the plant into the off-site environment. He also is expected to testify about "MUF" or "material unaccounted for.

**Flynn, Dr. James A.**                Eugene, OR

Dr. Flynn is an expert in public opinion survey design and administration. He is expected to testify as to contingent valuation methodology and/or opinion survey; judgment; decision-making and risk assessment.

**Goble, Dr. Robert L.**                Brookline, MA

Dr. Goble is a physicist. His is expected to testify concerning characterization of on-site plutonium and radioactive materials unaccounted for; nature of exposure assessment methodology; dose reconstruction, including source term development, environmental transport, and dose/exposure conversion; risk assessment; and critical analysis of existing dose reconstruction studies.

**Hunsperger, Wayne L.**                Englewood, CO

Mr. Hunsperger is a real estate appraiser/Consultant. He is expected to testify concerning the diminution in value of real property located in the vicinity of Rocky Flats based on: contingent valuation methodology and or opinion survey; valuation by analogy; real estate appraisal; non-transactional market information; and quantitative analysis or analytical methods such as sampling, regression analysis, and geographic information systems.

**Radke, Dr. John D.**                Orlinda, CA

Dr. Radke is a quantitative analyst and geographic information systems specialist. He is expected to testify concerning quantitative analysis of current and historical data with respect to property, which may include the use of sampling, regression analysis, and/or geographic information systems.

**Slovic, Dr. Paul**                Eugene, OR

Dr. Slovic is a psychologist and risk assessment specialist. He is expected to testify as to contingent valuation methodology and/or opinion survey; judgment; decision-making and risk assessment.

**Smallwood, Dr. K. Shawn**                Davis, CA

Dr. Smallwood is an ecologist. He is expected to testify about soil turnover due to biological activity at Rocky Flats.

**Wing, Dr. Steven**                Chapel Hill, NC

Dr. Wing is an epidemiologist. He is expected to testify concerning the adequacy of the DOE's investigations into the health hazards of plutonium, including how

DOE has long controlled epidemiological research into the health effects of exposure to plutonium and other nuclear materials, and that DOE's self-interest in avoiding liability and promoting the nuclear industry has resulted in a distorted body of research concerning the dangers of low-level radiation exposure.

    (2)    **Witnesses who <u>may</u> be present at trial; and**

Not applicable.

    (3)    **Witnesses whose testimony is expected to be presented by means of a deposition and, if not taken stenographically, a transcript of the pertinent portions of the deposition testimony.**

Not applicable.

### For Defendants

    (1)    **Witnesses who <u>will </u>be present at trial.**

Defendants' current, good-faith witness list is attached to this filing.  Pursuant to the agreement of the parties, the attached good-faith witness list is subject to amendment. Defendants reserve the right to add new witnesses, and to call any witness on plaintiffs' witness list.

    (2)    **Witnesses who <u>may</u> be present at trial if the need arises.**

Defendants' current, good-faith witness list is attached to this filing.  Pursuant to the agreement of the parties, the attached good-faith witness list is subject to amendment. Defendants reserve the right to add new witnesses, and to call any witness on plaintiffs' witness list.

    (3)    **Witnesses whose testimony is expected to be presented by means of a deposition and, if not taken stenographically, a transcript of the pertinent portions of the deposition testimony. *[See Fed. R. Civ. P. 26(a)(3)(B)].***

Defendants' affirmative deposition designations were filed on September 30, 2005.  This

list did not include counter-designations and did not include designations of testimony needed to authenticate or qualify documents or summaries of documents, in the event that the issue of authentication or qualification cannot be resolved by stipulation or Court order.

Defendants reserve the right to add additional deposition designations, and to call by deposition anyone whose deposition has been taken.

## 7. EXHIBITS

a.      The parties have exchanged good-faith exhibit lists and copies of exhibits. The parties have agreed that these lists are subject to good-faith amendment.

b.      The parties have agreed that each side will provide the other via e-mail with identification of exhibits, and copies of those exhibits, to be used with each witness by 9 am on the day before each witness is called, such that objections to exhibits will be asserted by the opposing party and resolved by the Court following such identification.

## 8. DISCOVERY

**Plaintiffs' Statement:** Plaintiffs have completed discovery, with three exceptions. First, plaintiffs reserve the right to conduct preservation depositions of witnesses who will be unavailable at the time of trial. Second, plaintiffs reserve the right to take depositions of any of defendants' trial witnesses who plaintiffs have not yet deposed. Third, plaintiffs have served very limited requests on the Department of Justice and the Department of Energy seeking physical evidence to be used at trial.

**Defendants' Statement:** Defendants may need to conduct additional discovery as warranted by the events leading up to and during trial.

31

## 9. SPECIAL ISSUES

Defendants anticipate that they may request that the jury be given a tour of the class area and its environs. Plaintiffs object to such a tour as irrelevant, a waste of scarce trial time, and prejudicial. A visual inspection of the class area cannot inform the jury about whether plutonium is present there, whether property values are depressed, or any other aspect of the parties' claims or defenses.

## 10. SETTLEMENT

The case is not expected to settle prior to trial.

## 11. EFFECT OF PRETRIAL ORDER

This Pretrial Order incorporates the parties' current, good-faith witness lists, exhibit lists, and deposition designations; pursuant to the parties' agreement, amendments will be permitted. The pleadings are deemed merged herein. This Pretrial Order supersedes the Scheduling and Discovery Order. In the event of ambiguity in any provision of this Pretrial Order, reference may be made to the record of the Pretrial Conference to the extent reported by stenographic notes and to the pleadings.

## 12. TRIAL AND ESTIMATED TRIAL TIME/FURTHER TRIAL PREPARATION PROCEEDINGS

a.      This case shall be tried to a jury. Plaintiffs estimate that the plaintiffs' case in chief will last four weeks and that additional time will be needed for rebuttals. Defendants estimate that defendants' case will last four weeks. The trial shall take place at the United States District Court for the District of Colorado, Alfred A. Arraj United States Courthouse, Denver CO.

32

b.    Plaintiffs and defendants have met and conferred with respect to the necessary technology for trial.  Defendants understand the Court to be seeking specificity as to what equipment would be requested, and defendants respond as follows.  Defendants would use a presentation system that is similar to that available for use in Courtroom 11, including the following:  a multi-media projector; one monitor for each counsel table; an Elmo document presenter; the matrix control pad that allows switching between display devices; extra cables and audio cables; a light pen system; a cabinet that contains all the distribution amps and switches along with extra VGA cables, audio cables, and gender benders; two TV screens for the jurors and the court.  Defendants also would use notebook computers.  In addition, defendants understand that the Court has permitted parties to bring in a large projection screen to display materials to the jury, and defendants anticipate using such a projection screen at trial.

Plaintiffs will require the following equipment that may be shared by the parties:  one 8x4 VGA matrix switch (or comparable); one document camera a/k/a Elmo; a 3000 lumen (or greater) projector; projector screen (size appropriate for room); six 15" flat panel monitors; two 1x4 distribution amps; a minimum 24"x48" technician table; speaker system; and various necessary cables, hubs, power sources, etc.

In addition to the equipment listed above, plaintiffs will bring the following into the courtroom for their personal use:  two notebook computers, a color printer, and a flatbed scanner.

b.  Trial Date:  October 11, 2005.

c.  Final Trial Preparation Conference Date: September 22, 2005.

d.  Deadline for filing motions objecting to any testimony of an expert witness based

on the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,*

*509 U.S. 579 (1993), Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), and*

*their progeny*:  Motions were filed on June 16, 2005, and on September 16, 2005

(in the case of the motion to exclude Dr. Wing's testimony).

e.  Deadline for filing all other motions in *limine*, including objections to exhibits

and designated deposition testimony:  Motions in *limine* were filed on June 16,

2005.  The deadline for objections to exhibits and designated deposition testimony

is yet to be determined.


DATED this ____ day of _____, 2005.


BY THE COURT:


_____
JOHN L. KANE, Senior Judge
United States District Court


34

**PRETRIAL ORDER APPROVED:**

_____

Merrill G. Davidoff
Peter Nordberg
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
(215) 875-3000

Gary Blum
SILVER & DEBOSKEY, P.C.
1801 York Street
Denver, CO 80206
(303) 399-3000

Attorneys for Plaintiffs

_____

David M. Bernick
Douglas J. Kurtenbach
KIRKLAND & ELLIS
200 East Randolph Drive
Chicago, IL  60601
(312) 861-2000

Joseph J. Bronesky
SHERMAN & HOWARD
633 17th Street, Suite 3000
Denver, CO  80202
(303) 297-2900

Attorneys for Defendants