# Exhibit C

Hunter + Geist          Denver, Colorado

1

<pre>
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2
     Civil Action No. 90-K-181
 3
     MERILYN COOK, et al.,
 4
         Plaintiffs,                        COPY
 5
     v.
 6
     ROCKWELL INTERNATIONAL CORPORATION and THE DOW CHEMICAL
 7   COMPANY,

 8       Defendants.

 9   _____

     DEPOSITION OF:   JON S. LIPSKY - October 16, 2005
10   _____

11           PURSUANT TO NOTICE, the deposition of JON S.
     LIPSKY was taken on behalf of the Defendants at 1801 York
12   Street, Denver, Colorado 80202, on October 16, 2005, at
     8:53 a.m., before Barbara Birger, Registered Merit
13   Reporter, Certified Realtime Reporter and Notary Public
     within Colorado.
14
                     A P P E A R A N C E S
15
     For the Plaintiffs:        PETER NORDBERG, ESQ.
16                              Berger & Montague, P.C.
                                1622 Locust Street
17                              Philadelphia, Pennsylvania 19103

18   For the Defendants:        ELLEN AHERN, ESQ.
                                Kirkland & Ellis LLP
19                              200 East Randolph Drive
                                Chicago, Illinois 60601
20

21

22

23

24

25
</pre>

**H+G**

Hunter + Geist, Inc.     **(303) 832-5966**     1900 Grant Street, Suite 800
                                                Denver, Colorado 80203
                         ■ www.huntergeist.com  Fax: (303) 832-9525
                         ■ depo@huntergeist.com Toll Free: 1-800-525-8490

JON STEPHAN LIPSKY

37

1    course of the seminar?

2         A.    Yes.

3         Q.    Some type of a panel discussion?

4         A.    Solo, and panel sometimes.

5         Q.    Do you recall specifically one way or another

6    whether you discussed the use of infrared technology in

7    this environmental crimes seminar in 1988?

8         A.    I would not have.

9         Q.    Do you know whether that was a topic that was

10   presented at that time?

11        A.    No.

12        Q.    You don't know or, no, it was not?

13        A.    I don't believe there was.

14        Q.    In the course of any of the certificate programs

15   or training that you had up to and including the 1989 time

16   period, did you have any formal training by the FBI on

17   infrared technology?

18        A.    No.

19        Q.    How about physics?

20        A.    Pardon me?

21        Q.    How about physics?

22        A.    Formal training on physics?

23        Q.    Yes.

24        A.    I took none in college.

25        Q.    I meant in terms of your FBI course work.

JON STEPHAN LIPSKY

38

1     A.   I'm going to get up and get a drink of water.

2  What I'm thinking about is, and I'm not sure if I'm going

3  to say this correctly, but I do know how to operate a

4  camera.  I do know what an F stop is.  I don't think I have

5  to -- I don't think I have to be able to build a camera or

6  necessarily grind the glass to make the optics, and

7  probably would kind of waddle through an explanation of the

8  physics involved in the optical and aperture portions of

9  the camera.  But the fact of the matter is that I can take

10  really good pictures, so . . .

11     Q.   Okay.

12     A.   I've taken course work involving photography, but

13  it's not necessarily getting down to the nitty-gritty

14  scientific portions of it.  It's mostly the user end of it,

15  how to work it, and in concert with a flash unit and

16  different types of film and why you would use those

17  different types of film.

18          So what I'm trying to say, ma'am, is I'm a very

19  good photographer, but I don't think I have to explain how

20  a camera works.

21     Q.   My question was directed in a slightly different

22  area.  Mr. Lipsky, over the course of your formal education

23  or any of the certificate programs or training that you

24  received from the FBI or through other agencies related to

25  your work, did you have any course work in nuclear physics?

JON STEPHAN LIPSKY

53

1    called Ambush Grand Jury, that I worked with the FBI, and

2    we discussed the possibility and probability of me working

3    for his firm as a PI.  Private investigator, I'm sorry.

4         Q.   Did you subsequently come to work for

5    Mr. Nordberg's firm as a private investigator related to

6    this case?

7         A.   Yes.  And contractually, not as an employee of

8    the firm.

9         Q.   When did you commence that work?

10        A.   In January of 2005.

11        Q.   Were you paid for your work?

12        A.   Yes, ma'am.

13        Q.   What were you paid?

14        A.   $85 an hour.

15        Q.   And do you have a sense of how many hours of work

16   you have performed for Mr. Nordberg's firm -- for the

17   plaintiffs' counsel's firm since January of 2005?

18        A.   I have a figure in mind, but not an hourly.  But

19   I can certainly do the calculator thing and let you know.

20        Q.   Either way, why don't you give me the figure.

21        A.   It's about $35,000 worth of work.

22        Q.   So if we divided that by 85, we could estimate

23   the rough number of hours?

24        A.   That's what I was going to do, exactly.

25        Q.   Fair enough.  You don't need to do that

59

1    regarding the Rocky Flats case in June of 1989, the 6th.   I

2    also reviewed the Plaintiff's Sentencing Memo of 1992.

3         Q.    Anything else?

4         A.    And also -- I met with Peter yesterday for a

5    couple hours.

6         Q.    Was anyone else present in your meeting with

7    Mr. Nordberg yesterday?

8         A.    Well, we were in a larger room with other people

9    doing their own work, but they weren't party to what we

10   were talking about.

11        Q.    So there weren't other people participating in

12   your conversation with Mr. Nordberg?

13        A.    No.

14        Q.    But there were other people physically present in

15   the space?

16        A.    Yes.   And I mentioned my testimony and my -- not

17   really discussed it, but I talked about it with

18   Mr. Davidoff.

19        Q.    When did you talk about it with Mr. Davidoff?

20        A.    Friday night and last night.

21        Q.    How long a time did you discuss your potential

22   testimony with Mr. Davidoff?

23        A.    Just a few minutes.

24        Q.    What did you discuss?

25        A.    Much of what I discussed with Mr. Nordberg.

JON STEPHAN LIPSKY

60

1    Q.   And what did you discuss with Mr. Nordberg?

2    A.   I wanted a clarification of what this deposition

3    was.  And I didn't have an understanding of what it was and

4    what it was for.  And those answers were provided to me.  I

5    was asked to answer honestly.  It was emphasized that I be

6    truthful.

7         We also discussed the letter that I received last

8    week from the FBI.  The dialogue concerning receiving that

9    letter from the FBI agent who I spoke with.  Subsequent

10   conversations that Mr. Nordberg had with Mr. Taylor

11   regarding the admonishments that I had been given.  The

12   apparent agreement between the government and, I guess, me,

13   that Title V has been relaxed, so I can actually identify

14   people's names, otherwise I would have been prohibited from

15   doing that for the purposes of this litigation only.

16   And -- I'm trying to think.  Oh, that -- to expect to be

17   videotaped today.

18   Q.   I didn't notice it as a video deposition.  Did

19   they not tell you that?

20   A.   But you asked me what we talked about.  And that

21   we were going to be doing it here on Sunday.  That was fine

22   with me.

23        Also I understand there is a court order, among

24   other things, that this deposition was required before I

25   could actually testify in a trial -- or be allowed to, I

JON STEPHAN LIPSKY

65

1      A.    Oh, yes.

2      Q.    What specifically do you recall discussing?

3      A.    In the declaration under Title 28 Code of Federal

4   Regulations, in particular I reviewed this with

5   Ms. Noteware, the areas I needed to be sensitive to, and

6   what I was admonished or not authorized to talk about.  And

7   those are pretty much enumerated in that declaration.

8           And then also discussed the Privacy Act of Title

9   V, US Code.  And though they are not enumerated, we

10  discussed, I guess, the attributes or the operating words

11  like identifying people by number, simple number, contact

12  information, medical history, all of those types of issues

13  that are protected by the Privacy Act.

14     Q.    Other than the restrictions or limitations on

15  your testimony as advocated by the letter you received from

16  the FBI, did you discuss other subjects of your testimony

17  with Ms. Noteware or any other plaintiffs' counsel in

18  preparation for this deposition?

19     A.    The thrust of my testimony was also identified in

20  my declaration with those other topic areas that I dealt

21  with Ms. Noteware.  And then Mr. Nordberg and I talked

22  about those generally, as well as, as I mentioned earlier,

23  we got through some of the search warrant affidavit in

24  1989.

25     Q.    So it's your testimony, Mr. Lipsky, that you

1    or strategies of counsel or delve so deeply into the

2    details as to divulge those.

3         A.    I can't find it.  The only thing I could find on

4    this public document was that on page 2 of the actual

5    affidavit, past the attachments 1 and 2, so attachment

6    No. 3, page 2, I would like a quote at the bottom of the

7    page, the beginning of the sentence that says, "The

8    following statements are also based on page 3, based upon

9    my physical observations and those of others, as well as

10   interviews conducted with various people."  I believe

11   that's as far as I feel I can go.

12        Q.    (BY MS. AHERN)  Let me see if I understand you,

13   Mr. Lipsky.  Is it your testimony that you believe under

14   the obligations that have been placed on you pursuant to

15   statutes as cited in that, communications you have had with

16   the FBI, you do not believe you can identify for me anyone

17   you interviewed in the course of your efforts to prepare

18   this affidavit and application for search warrant unless

19   and so far as that material is contained in a public

20   document?

21        A.    I'm not even sure if I can even restate it even

22   if it is in a public document.  I'm saying that I've been

23   constrained, and I'm not -- I've been told, it's written

24   that I'm not authorized to talk about any matter involving

25   Title 28 Code of Federal Regulations.  There is a specific

UON STEFHAN LIFSKI

1          My understanding is based on a couple of phone

2     calls I had with assistant divisional counsel Steven

3     Kramer, K-r-a-m-e-r, and chief divisional counsel Bob

4     Goffi, G-o-f-f-i.  Mr. Kramer works in the Los Angeles FBI

5     office, Mr. Goffi works in the Denver FBI office.  This

6     letter research I conducted myself regarding these

7     regulations and statutes and the U.S. Department of Justice

8     executive office of the U.S. Attorney's Office manual

9     that's on the Internet.

10          Item No. 1 is 28 C.F.R., section 16.26, paren,

11    lower class -- lower class -- small B, unparen, paren 1,

12    paren, dash, paren 6, unparen.  In consulting the U.S.

13    Department of Justice executive office of U.S. Attorney's

14    Office manual, it's my understanding that this regulation

15    was further promulgated by the Department of Justice and

16    that there are two courses of action.

17          Number one, I think a deputy attorney general is

18    delegated the authority by the U.S. attorney general to

19    make decisions in this matter, and that the deputy attorney

20    general has further delegated other matters regarding this,

21    but probably at a lower priority to the U.S. Attorney's

22    Office or to the U.S. attorney in the district where the

23    demand has been made.

24          It also says that upon a demand, that this

25    regulation kicks in, or is initiated.  My understanding is

JON STEPHAN LIPSKY

147

1   as cited and Title V, then I can freely discuss it, except

2   based on conversation with Mr. Nordberg, Mr. Taylor from

3   the U.S. Attorney's Office has agreed to relax Title V in

4   regards to identifying people only for the purposes of this

5   litigation.  It's not confusing to me, it's just a filter

6   process that I need to be sensitive to.

7        MR. NORDBERG:  I want to state for the record,

8   too, that that communication from Mr. Taylor, to which I

9   will attest, was not made directly to Mr. Lipsky.

10  Mr. Lipsky, so far as I know, knows of it only from me.

11       A.   But I believe that Mr. Taylor is behind this

12  letter because on the phone call that I received from

13  Mr. Kramer advising me that at the time on Tuesday,

14  October 11, that a letter was in the mail to me, and I

15  asked to have it faxed.

16       Mr. Kramer told me he was going to call Mr. Goffi

17  in Denver and have him call me, which he did.  Mr. Goffi

18  explained to me that he couldn't fax the letter to me

19  because it wasn't written yet.  So in contrast, the

20  government was telling me that I had a letter in the mail,

21  but in reality the letter was actually being drafted.

22       When I asked him when he would finish with the

23  letter, he said he wasn't working on it, it was Mr. Taylor.

24  Mr. Taylor was working on the letter, and it was in his

25  computer and he didn't know when he would get to it.

JON STEPHAN LIPSKY

148

1        I received a phone call on Wednesday the 12th

2   from Mr. Goffi explaining to me that the letter was being

3   mailed, that he needed my address.  I gave him the

4   information.  I again asserted my request to have a copy

5   faxed to me, and I received just a two-page letter and a

6   fax cover sheet on Thursday the 13th of October.

7        Q.   (BY MS. AHERN)  I'm trying to understand,

8   Mr. Lipsky, the scope of what you can testify to here at

9   this deposition based on your understanding of your

10  obligations and consistent with this letter from Mr. Goffi.

11  Is it your understanding that you are permitted to testify

12  with regard to knowledge and information you obtained in

13  your employment as an FBI agent in the course of your

14  investigation of Rocky Flats if I asked you questions about

15  such topics at this deposition?

16       A.   Contrary to what Mr. Kramer said, I believe the

17  regulations allow me to testify about what I learned while

18  I was on the job about Rocky Flats except certain

19  categorical areas.

20       Q.   And what would be those categorical areas that

21  you would have to avoid based on your understanding of your

22  obligations under these regulations?

23       A.   Privilege, within the meaning of like an

24  attorney-client privilege.  Secondly, informants or

25  sources, protected sources.  Third, classified material.

JON STEPHAN LIPSKY

149

1    Fourth, trade secrets, proprietary information.  Fifth

2    would be Federal Rules of Criminal Procedure Rule 6(e).

3        Q.    Anything else?

4        A.    Off the top of my head, that's all I can

5    remember.

6        Q.    I asked you a question with regard to whether you

7    had interviewed any former Rocky Flats plant employees

8    before the time that the affidavit in support of the

9    application for a search warrant was submitted to the

10   court.  Is it your understanding that such a question would

11   implicate a category of information that you are obligated

12   to withhold under your understanding of these regulations?

13       A.    Yes.

14       Q.    That's because it would relate to a potential

15   source of information?

16       A.    I'm not sure which other categories, but

17   certainly that one.

18       Q.    So you can't tell me one way or another whether

19   you did conduct interviews of former employees, or simply

20   that you cannot provide me with the identities of those

21   sources?

22       A.    The answer to that question is that I'm

23   constrained from answering the question rather than I can't

24   answer it.  I just --

25       Q.    I didn't mean to suggest you weren't capable of

DON STEPHAN LIPSKY

160

1    are in the affidavit.  And you touched on these a little

2    bit this morning.

3           It's your testimony, Mr. Lipsky, that you

4    participated in several of those overflights; is that

5    correct?

6    A.    Like I said earlier this morning, I feel

7    comfortable with the December 9, 15, and February

8    overflights; but in reviewing the affidavit, I'm not sure

9    if I was on the 12th flight or not.

10   Q.    Let me ask you some background questions about

11   the flights themselves.  First, whose idea was it to pursue

12   infrared overflights as a possible means of investigating

13   the plant site?  It's fair to say you don't recall if

14   that's the case?

15   A.    No, I do.  I'm just -- you're asking a specific

16   question, so I'm trying to make sure I answer your question

17   the best I can, as I swore to do.  Bill Smith actually

18   mentioned that the infrared technology was available, and

19   through a service of the EPA.

20   Q.    Prior to the prospect of using infrared

21   technology to investigate the Rocky Flats plant came up in

22   the course of the investigation of that site, had you ever

23   had any contact or use with infrared technology as an

24   investigative tool before?  I'm talking about you

25   personally.

JON STEPHAN LIPSKY

161

1      A.    No.

2      Q.    So this was the first time you had ever used or

3    contemplated using that technology?

4      A.    That's a different question.  No, this isn't the

5    first time.  What triggered my thought process on it was

6    that I saw a trade magazine at an oil company, and on the

7    cover was a satellite with a corresponding article

8    discussing the ability of satellite technology to not only

9    read the surficial part of the earth, but go deep into the

10   earth, particularly if it was an oil company for oil

11   drilling.

12          And I talked to Mr. Greenberg about such

13   technology, and in doing some research there was a case

14   called Dow versus Michigan, I believe, and that case --

15   Supreme Court case ruling was that as long as the

16   equipment -- this type of technology was commercially

17   available, then it could be used in a criminal

18   investigation.  Then Bill Smith mentioned about the

19   infrared technology.

20     Q.    Do you recall the specific type of plane that was

21   used in order to conduct the infrared overflights of the

22   Rocky Flats plant?

23     A.    Do I recall specifically?

24     Q.    The type of plane.

25     A.    Again, because the FBI sent this letter on

JON STEPHAN LIPSKI

162

1    October 13, 2005, I think pursuant to their not allowing me

2    to talk about Title 28 Code of Federal Regulations.

3         Q.    So that's something you believe that falls within

4    the scope of limitations on which you can testify to here?

5         A.    Yes, ma'am.

6         Q.    Would you be able to tell me what the model

7    number or the serial number of any equipment that was used

8    to conduct those overflights was?

9              MR. NORDBERG:    Able or permitted?

10        Q.    (BY MS. AHERN)   Either.

11        A.    I'm not -- I believe I'm permitted to answer the

12   question.   I am not able to give you the model or serial

13   number of the plane.

14        Q.    Mr. Lipsky, do you recall if a camera on the

15   plane that conducted the overflights was attached to a

16   camera port actually on the outside of the airplane?

17        A.    I'm not sure I'm permitted to be able to answer

18   that question.

19        Q.    Are you able to answer the question?

20        A.    Yes.

21        Q.    Mr. Lipsky, could you tell me whether the camera,

22   if it was mounted on the airplane, whether it was covered

23   with any materials the way that it was physically attached

24   to the airplane?

25        A.    Again, I believe I'm not permitted, but I'm able

JON STEPHAN LIPSKY

163

1    to answer the question.

2         Q.    Would you know what kind of material that was,

3    whether it was plexiglass or something else?

4         A.    I'm not sure I'm permitted to answer the

5    question, and if allowed to I'm not able to answer the

6    question.

7         Q.    It's more than just you're not sure that you are

8    permitted to answer the question, it's your understanding

9    you are not permitted to answer that question?

10             MR. NORDBERG:  You know, I'm going to object to

11   the extent that these abstract questions about the scope of

12   what Mr. Lipsky is and is not permitted to testify are

13   asked outside the context of a specific factual question.

14   And I will tell you, frankly, that the place of concern is

15   Mr. Lipsky is not an attorney, that we do not know what

16   position the Department of Justice and the FBI will or will

17   not take, or the DOE for that matter, in the matter, and

18   I'm concerned that an abstract pronouncement on the legal

19   issues may not anticipate all of the factual particulars

20   that may emerge as we dealt with the specific question.

21             So it's not an instruction not to answer, it's a

22   registration of an objection and concern.

23        Q.    (BY MS. AHERN)  Mr. Lipsky, my questions for you

24   only involve your understanding of what you are permitted

25   to talk about with regard to the scope of your testimony

JON STEPHAN LIPSKY

165

1   foundation for that because that's what we did in Congress

2   too, same scenario.  Permitted.  Can you.  And I believe

3   Mr. Taylor -- again, that's why I wish he was here.  I

4   think we could get that resolved a lot quicker.

5         Q.    Is it your intention, Mr. Lipsky, to attempt to

6   comply with the restrictions that have been placed on you

7   either through the letter you received from the FBI or

8   through your communications with Mr. Kramer and the FBI in

9   the course of this testimony in this case?

10          MR. NORDBERG:  Vague and compound.

11        A.    I'm complying with this letter that I received,

12   that's why I say I default to the letter.  Because it also

13   was -- if I could -- sorry to cut you off -- but just to

14   fully answer that question, Mr. Kramer also told me in that

15   phone call on the 12th that he was trying to give me some

16   anecdotal examples of what I may or may not say based on

17   what knowledge I had.  But he also said that he was going

18   to refer me to Mr. Goffi.  So the letter, I think, has

19   priority over what Mr. Kramer said.

20        Q.    Speaking a little bit further with regard to the

21   infrared overflight investigation and surveillance that was

22   done on the Rocky Flats plant in December of 1988 and

23   February of 1989, Mr. Lipsky, do you know the wavelength of

24   the infrared that was being employed in that surveillance

25   process?

JON STEPHAN LIPSKY

166

1    A.    I don't believe I'm permitted to answer that

2    question.  And if allowed to, I don't believe -- I am not

3    able to answer that question.

4    Q.    Mr. Lipsky, do you know whether a thermal

5    calibration was conducted prior to -- or in conjunction

6    with the infrared overflight surveillance tapes that were

7    taken of the Rocky Flats plant in December of '88 or

8    February of '89?

9    A.    Can I ask you to further define what you mean by

10   thermal calibration?

11   Q.    I think it's a term of art with regard to

12   infrared camera or infrared photography processes whereby

13   one benchmarks and calibrates the materials in terms of the

14   air temperature, the ground temperature, and other such

15   parameters.

16   A.    I can -- my understanding of calibration, there

17   are several different types of calibration, but I did an

18   in-flight calibration, and that involved comparing two

19   different thermal signatures at two different locations.

20   Q.    Can you describe with particularity the

21   calibration that you performed?

22   A.    Yes.

23   Q.    Would you do so?

24   A.    Yes, ma'am.  I had prearranged with the Public

25   Service Company, which is the utility in the state of

JON STEPHAN LIPSKY

167

1    Colorado, and they -- one of the power-generating stations
2    near Mile High Stadium, along I-25, around 17th or so, and
3    prearranged with an individual to take an infrared video of
4    the stack.  And in doing so I wanted to be able to get a
5    temperature reading from them at the time we did it.  So he
6    was aware of it.  It was coordinated is what I'm trying to
7    say.

8            So that when that first night on December 9 when
9    we flew over Rocky Flats, we had made a record of something
10   that we kind of knew as close as we can the temperature of
11   that image that we had, and then be able to compare it with
12   the Rocky Flats thermal signatures.

13       Q.    Do you recall providing testimony to Congress on
14   the same subject?

15       A.    Yes.

16       Q.    Mr. Lipsky, do you recall whether it was
17   possible, then, to generate comparative analysis between
18   the overflight of the Mile High Stadium and the overflight
19   images that were taken on the plant site?

20       A.    Well, we don't do a comparative analysis of Mile
21   High Stadium and the plant site.

22       Q.    Public Service Company.  Excuse me, I misspoke.

23       A.    That's all right.  It would help me to refresh my
24   memory what the discussion was on that with the
25   congressional testimony specifically.

JON STEPHAN LIPSKY

168

1    Q.    As you sit here today, Mr. Lipsky, do you recall
2    whether it was possible to say that what you saw at Public
3    Service Company was the same or warmer or cooler than the
4    images that were taken in the overflight of the plant site
5    in December of '88?

6    A.    As I sit here right now?  No, I couldn't answer
7    that question with certainty.

8    Q.    Would your testimony at the time of the
9    congressional hearing be more accurate on that subject
10   because it was closer in time?

11   A.    Absolutely.

12   Q.    Mr. Lipsky, are you familiar with the term black
13   body calibration?

14   A.    No, ma'am.

15   Q.    So do you know one way or another whether a black
16   body calibration was done with regard to the overflights of
17   the Rocky Flats plant site in December of '88 or February
18   of '89?

19   A.    In regards to the overflights at Rocky Flats, I'm
20   not -- I don't believe I'm permitted to answer that
21   question.  And if allowed to answer that question, I
22   wouldn't know the answer.

23   Q.    Do you know what navigational aids were employed
24   during the course of the overflight of the Rocky Flats
25   plant in December of '88 or February of '89?

JON STEPHAN LIPSKY

169

1     A.    I don't believe I'm permitted to answer that

2    question. And if allowed to answer that question, I don't

3    believe I know the answer.

4     Q.    With regard to the overflights of the Rocky Flats

5    plant site in December of '88 or February of '89, can you

6    identify the direction or air speed that were the

7    circumstances on the individual occasions of the

8    overflights?

9     A.    I'm not able to tell you what the air speed was.

10    While looking at the video, I could tell you where the

11    direction was.

12     Q.    Who was it who was actually flying the plane at

13    the time of the overflights?

14     A.    Pardon me?

15     Q.    Who was flying the plane at the time of the

16    overflights?  Who was the pilot employed by?

17     A.    Employed by?

18     Q.    Yes.

19     A.    The FBI.

20     Q.    The plane itself, was it equipment that was FBI

21    equipment or EPA equipment?

22     A.    FBI also.

23     Q.    Do you know the thermal sensitivity of the

24    equipment that was used for the infrared overflights --

25     A.    Say that again.

JON STEPHAN LIPSKI

1    Q.   Do you know the thermal sensitivity of the

2  equipment that was used for the infrared overflights in the

3  surveillance of the Rocky Flats plant in December of '88 or

4  February of '89?

5    A.   I don't believe I'm permitted to answer that

6  question.  And if allowed to, I wouldn't be able to answer

7  it.

8    Q.   In the course of the infrared overflight

9  surveillance tapes that were taken at the Rocky Flats plant

10  in December of '88 and February of '89, do you know whether

11  a measurement cursor was used to highlight one particular

12  level of intensity or take a number reading that was

13  comparative of the difference between the levels of

14  intensity of the items taped?

15    A.   I don't believe I'm permitted to answer that

16  question; but if allowed, I wouldn't be able to answer that

17  question.

18    Q.   Also speaking with reference to the surveillance

19  and the infrared overflight tapes from December of '88 and

20  December -- February of '89 of the Rocky Flats plant that

21  were done in the course of your investigation, did you or

22  did the technician operating the infrared camera note the

23  Delta temperatures in differential terms?

24    A.   I don't believe I'm permitted to answer that

25  question, but if allowed I wouldn't be able to answer.

JON STEPHAN LIPSKY

172

1    Q.   And what did you learn later?

2    A.   I learned later that there was a range of

3  temperature in each frame, and there was a ceiling and a

4  threshold of temperature readings that could be quantified

5  in that frame.

6    Q.   How did you come to that understanding?

7    A.   After talking to Al Divers with the Reynolds

8  Electric Company, a contractor with the EPA in Las Vegas,

9  Nevada.

10    Q.   Mr. Lipsky, do you know whether in conjunction

11  with the infrared overflight surveillance tapes flights

12  that were done at the Rocky Flats plant site in December of

13  '88 or February of '89, whether temperature readings were

14  taken of the air temperature or the ground temperature on

15  those occasions?

16    A.   What did I personally cause to happen or find

17  out?

18    Q.   Did you know whether those temperature readings

19  were in fact recorded on each occasion of an overflight?

20    A.   I know that the December 15, 1988 overflight, in

21  the affidavit that I reference that I contacted the

22  National Weather Service and obtained the ambient

23  temperature for that evening at a certain time frame.

24    Q.   Do you know whether ground temperature readings

25  were taken on any of the occasions of the overflights?

JON STEPHAN LIPSKY

227

1    Walnut Creek and Indiana?

2         A.    Do I recall looking at the sampling data?

3         Q.    Do you recall what that sampling data showed?

4         A.    From what's in the next paragraph.

5         Q.    Specifically what is that?  I'm not asking you to

6    read me the paragraph, I'm just asking what you recall of

7    what that data revealed.

8         A.    The data was provided to Suzanne Wuerthele from

9    the EPA.  She's a toxicologist.  And they rendered a report

10   that basically talked about constituents consistent with

11   radiation -- kind of medical radiation testing.

12        Q.    Do you specifically recall what the component

13   constituents or elements were that she identified in Walnut

14   Creek at that location?

15        A.    I think it was characterized as experimental,

16   like reticent.  Seemed like there was some perfume or some

17   other constituents.

18        Q.    Do you recall the amounts of any of those

19   constituents that were identified in the Walnut Creek

20   testing?

21        A.    No.

22        Q.    Do you know whether they were extremely low or

23   trace amounts of any of those constituents?

24        A.    I don't know what you mean by extremely low.

25        Q.    Fair enough.  But it is your testimony that you

JON STEPHAN LIPSKY

260

1    happened at the sewage treatment plant?

2         MR. NORDBERG:   Form.

3         A.    There was a chromic acid spill in the spring of

4    1989 just right before the raid.

5         Q.    (BY MS. AHERN)   Other than the chromic acid

6    spill, do you know of any other occasion where materials

7    found their way to the sewage treatment plant and were not

8    resolved through treatment of the sewage treatment plant?

9         A.    That were not resolved?

10        Q.    Where the wastes were not removed through the

11   processes at the sewage treatment plant?

12        A.    Just anecdotal log entries and documentation from

13   the workers smelling formaldehyde and other things.

14        Q.    So it's only anecdotal information that you are

15   aware of, other than the actual conduct that's discussed in

16   the chromic acid spill plea count, in terms of other

17   industrial materials finding their way to the sewage

18   treatment plant and not being resolved through the sewage

19   treatment processes there --

20        MR. NORDBERG:   Form.

21        Q.    (BY MS. AHERN)   -- is that right?

22        A.    Not only anecdotal, it was documented anecdotal

23   by Rockwell.  And as best as I can recall right now, that's

24   the list.

25        Q.    That would be log entries, the documentation that

JON STEPHAN LIPSKY

261

1   you are referencing?

2        A.    I'm not permitted to talk about certain things

3   regarding Title 28 Code of Federal Regulations, in

4   particular classified documentation.

5        Q.    Would these be classified documents?

6        A.    Since I'm not permitted to answer that question,

7   if I was allowed to answer that question, I could.

8             MR. NORDBERG:   I'm also going to object to any

9   further questioning after five minutes from right now since

10  by my calculation we're past seven hours in this

11  deposition.

12       Q.    (BY MS. AHERN)   We were talking a little bit

13  about issues related to potential levels of strontium-90 in

14  the soil surrounding the Rocky Flats plant.  Do you have

15  any opinion or evidence regarding -- strike that.  Let me

16  try again.

17            Mr. Lipsky, with regard to the investigation into

18  elevated strontium-90 levels in soils on or around the

19  Rocky Flats plant site, do you have any evidence of what

20  may have caused any increase in strontium-90 levels in the

21  soils on or around the Rocky Flats plant?

22       A.    Absent my research, no.

23       Q.    And by your research, what do you mean?

24       A.    My research, because I really didn't know what

25  the -- what strontium-90 and cesium-137 really meant, and