# EXHIBIT A

1

```
1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2
    Civil Action No. 90-K-181
3
    MERILYN COOK, et al.,
4
    Plaintiffs,
5
    v.
6
    ROCKWELL INTERNATIONAL CORPORATION and THE DOW
7   CHEMICAL COMPANY,

8   Defendants.
    _____
9
    DEPOSITION OF:  WESLEY PAUL McKINLEY - October 18, 2005
10  _____

11
               PURSUANT TO NOTICE, the deposition of
12  WESLEY PAUL McKINLEY was taken on behalf of the
    Defendants at 633 17th Street, Suite 3000, Denver,
13  Colorado 80202, on October 18, 2005, at 1:35 p.m.,
    before Sharon L. Szotak, Registered Professional
14  Reporter, Certified Realtime Reporter, and Notary
    Public within Colorado.
15

16                    A P P E A R A N C E S

17  For the Plaintiffs:      PETER NORDBERG, ESQ.
                             Berger & Montague, P.C.
18                           1622 Locust Street
                             Philadelphia, Pennsylvania 19103
19
    For the Defendants:      MARK NOMELLINI, ESQ.
20                           Kirkland & Ellis LLP
                             200 East Randolph Drive
21                           Chicago, Illinois 60601

22

23

24

25
```

2

1                          I N D E X

2    EXAMINATION OF WESLEY PAUL McKINLEY:              PAGE
     October 18, 2005
3
     By Mr. Nomellini                                    3
4
                                                   INITIAL
5    DEPOSITION EXHIBITS:                         REFERENCE

6    1    Plaintiffs' Responses and Objections to       5
          Defendants' Supplemental Interrogatories
7
     2    State Revised Fiscal Impact                    7
8
     3    Subpoena to Wes McKinley                       39
9
     4    Photocopy of book entitled, "The Ambushed      41
10        Grand Jury"

11   5    Motions, Pleadings and Filings In Re Grand     43
          Jury Proceedings
12
     6    Article in Boston Globe, 3/27/04               72
13
     7    Map entitled, "Class Boundary"                 82
14
     8    Article in Boulder Weekly, 3/11/04            102
15
     9    Plaintiff's Sentencing Memorandum            112
16
     10   Article in The New York Times                117
17
     11   House Committee of Reference Report          124
18
     12   Article in Los Angeles Times                 133
19
     13   Article in Daily Camera, 1/6/05              142
20
     14   Article in Rocky Mountain News, 1/6/05       146
21
     15   Bill Summary for HB05-1079                   148
22
          (Original and copy exhibits bound separately.
23         Original exhibits to be filed with original
           transcript.)
24

25

1            WHEREUPON, the following proceedings were taken

2    pursuant to the Federal Rules of Civil Procedure.

3                *      *      *      *      *

4                    WESLEY PAUL McKINLEY,

5    having been first duly sworn to state the whole truth,

6    testified as follows:

7                        EXAMINATION

8    BY MR. NOMELLINI:

9        Q.   Could you state your name for the record,

10   Mr. McKinley, spelling your last name.

11       A.   Wesley Paul McKinley, M-c-K-i-n-l-e-y.

12       Q.   And what is your current address?

13       A.   9635 County Road 44, Walsh, Colorado 81090.

14       Q.   What is your occupation?

15       A.   I'm a cowboy.  And I hold the position of state

16   representative, House District 64.

17       Q.   And how long have you been a state

18   representative?

19       A.   Since November of 2004.

20       Q.   And how long have you been a cowboy?

21       A.   60 years.

22       Q.   Could you describe generally your occupational

23   history starting when you got out of school, or is it

24   just covered by cowboy and state legislature?

25       A.   Well, I've done various things to survive.  The

4

1    basic requirement to be a cowboy is to get a wife with a

2    good job, and I did that, so I've been able to survive.

3        Q.    Any other jobs that you've held during that

4    period?

5        A.    Well, I was foreman of the grand jury.  I don't

6    know if that's a job.  It was Special Grand Jury 89-2.

7            I held a commercial truck driver's license,

8    drove a truck for a while.  I've been a custom harvester

9    and I've been a feedlot cowboy, and built fences, done

10   some contract work in the oil fields.  I've done some

11   contract welding work.  And taught school, substitute

12   taught.  But all legal and moral occupations till I got

13   to be a representative.

14       Q.    And you were a physics teacher?

15       A.    Physics and math.

16       Q.    And that was in high school?

17       A.    Yes, sir.

18       Q.    And where did you receive your bachelor's

19   degree from?

20       A.    Panhandle State University, Goodwell, Oklahoma,

21   1968.

22       Q.    And was your degree in physics?

23       A.    I had a minor in science.  Bachelor's of

24   mathematics.

25       Q.    So major in physics, minor in science?

5

1          A.    Major in mathematics with a minor in science.

2          Q.    And are you represented today by Mr. Nordberg?

3          A.    That's right.

4          Q.    When did you retain Mr. Nordberg to represent

5    you?

6          A.    This morning.

7                MR. NOMELLINI:  Let's mark this as McKinley

8    Deposition Exhibit 1.

9                (Deposition Exhibit 1 was marked.)

10         Q.    I've marked as McKinley Deposition Exhibit 1

11   plaintiffs' responses and objections to defendants'

12   supplemental interrogatories.  And I wanted to direct

13   your attention to page 8 of this document.

14               Take some time to read No. 1 under Mr. Wes

15   McKinley, which is plaintiffs' description of the

16   testimony that -- your trial testimony.

17         A.    (The deponent perused the exhibit.)

18         Q.    Have you seen that before, Mr. McKinley?

19         A.    No.

20         Q.    What's your understanding of what you will be

21   testifying about at trial in this case?

22         A.    I don't have a real clear understanding of

23   that.  The knowledge I have is the knowledge I heard

24   inside the grand jury room, and the knowledge that I

25   gained through work on my bill.

6

1        Q.    And what bill are you talking about?

2        A.    The bill pertaining to signage posted at the

3    entrance to Rocky Flats prior to being opened as a

4    wildlife refuge.

5        Q.    And you intend to testify about knowledge that

6    you gained in connection with that bill?

7        A.    Yes.

8        Q.    And over what period of time did you gather

9    that knowledge in connection with the bill?

10       A.    That came from about November, middle, latter

11   part of November, through April.

12       Q.    November 2004 through April 2005?

13       A.    Yes.

14       Q.    So with respect to the second part of your

15   testimony, that is, testimony in connection with the

16   bill, you're going to be testifying about knowledge you

17   gained from November 2004 through April 2005; is that

18   fair?

19       A.    That's fair, yes.

20       Q.    And that's knowledge that you gained in

21   connection with your efforts to see that that bill was

22   passed?

23       A.    Yes.

24       Q.    Was the bill passed?

25       A.    It made it through committee, then was killed

1    in appropriations.

2         Q.    What committee did it make it through?

3         A.    Judicial.

4         Q.    Are you --

5         A.    I'm not sure whether it's judicial or human

6    health.  Human health and welfare.

7         Q.    And do you have any understanding as to why the

8    bill did not make it through appropriations?

9         A.    Misinformation from the fiscal analysis.

10        Q.    When you say, "misinformation from the fiscal

11   analysis," what do you mean by that?

12        A.    Fiscal information was not accurate.

13        Q.    I think I may have that fiscal information

14   here, if you'll bear with me.

15             MR. NOMELLINI:  Let's mark this as McKinley

16   Exhibit 2.

17             (Deposition Exhibit 2 was marked.)

18        Q.    McKinley Exhibit 2 is entitled, "Colorado

19   Legislative Council Staff, State Revised Fiscal Impact

20   for House Bill 05-1079."

21             Is this the fiscal information you were

22   referring to, Mr. McKinley?

23        A.    Yes.

24        Q.    And what part of this fiscal information set

25   forth in Exhibit 2 is in error?

8

```
 1        A.    The $104,603.

 2        Q.    Okay.  And that's under fiscal year 2006-2007

 3   potential increase?

 4        A.    Yes.

 5        Q.    And who came up with that number?  Do you know?

 6        A.    Amy Larson.  It says here, "Fiscal Analysis,

 7   John Evermann."  Evermann quit before this was done, so

 8   the actual work was done by Amy Larson.

 9        Q.    Is that L-a-r-s-e-n?

10        A.    I'm not sure.  I think it's s-o-n, but I'm not

11   sure how you spell it.

12        Q.    And who does Amy Larson work for?

13        A.    The State of Colorado.

14        Q.    And do you have any knowledge as to the reason

15   for Amy Larson's error?

16        A.    No.

17        Q.    Do you believe that the error was intentional?

18        A.    I can't say.  I don't know.

19        Q.    And the nature of the error is that the

20   potential increase was higher than it should have been?

21        A.    Yes.

22        Q.    And what should have been the budgeted --

23   proposed budgeted amount for your bill?

24        A.    Zero.

25        Q.    Zero?
```

1        A.    (Deponent nodded head up and down.)

2        Q.    And why should the proposed budgeted amount

3   have been zero?  Is that because the idea was that the

4   Department of Energy would pay?

5        A.    No.  The bill said it would be prior to opening

6   as a -- before people were allowed on there.  And the

7   information that I received, it wouldn't be open till

8   2008, so there could be no fiscal note.

9        Q.    Right.  So there would be -- there would be no

10   fiscal note for 2006 or 2007 because the wildlife refuge

11   wouldn't even be open till 2008.

12       A.    That's correct.

13       Q.    Now, the second part of your testimony, you

14   mentioned, is knowledge that you've gained as a grand

15   juror?

16       A.    Second part.  I don't know what my second

17   part --

18       Q.    Sure.  I was going back to when I asked you

19   what you expected to testify about, and you said, one,

20   knowledge that you gained in connection with trying to

21   pass your bill between November 2004 and April 2005, and,

22   two, you mentioned the grand jury process.

23            MR. NORDBERG:  I don't remember the language

24   that was used, but just to be extremely clear, I have

25   advised Mr. McKinley not to testify concerning any matter

1    within the deliberations of the special grand jury that

2    might be barred either under Rule 6(e) or under the

3    judge's rulings on the parties' motions in limini in this

4    case as they relate to the criminal investigation.

5              I think Mr. McKinley said he had two sources of

6    knowledge about Rocky Flats.  One was from his work on

7    the special grand jury and one was in connection with the

8    legislation.  So just to be very clear, speaking as

9    counsel for plaintiffs, plaintiffs do not intend to offer

10   any testimony from Mr. McKinley on the deliberations of

11   the special grand jury or matters falling within the

12   Federal Rule of Criminal Procedure 6(e), or under the

13   judge's rulings on the motions in limini, so long as

14   those rulings remain unaltered.

15             And speaking as Mr. McKinley's attorney, I will

16   instruct him not to answer any questions trenching on

17   Rule 6(e).

18        Q.   (BY MR. NOMELLINI)  And you intend to follow

19   your counsel's instruction, Mr. McKinley?

20        A.   Yes, sir.

21        Q.   Now, I just want to try to understand the scope

22   of that.  Is there anything that you're going to be --

23   you expect to testify about that occurred prior to

24   November of 2004 when the efforts to pass your bill

25   started?

1       A.   Say that again.

2            MR. NOMELLINI:   Could you read that back.

3            (The last question was read back as follows:

4    "Now, I just want to try to understand the scope of that.

5    Is there anything that you're going to be -- you expect

6    to testify about that occurred prior to November of 2004

7    when the efforts to pass your bill started?")

8       A.   I'm really not conducting the questions or

9    testimony.  I'll be answering questions, so there's not

10   much I can anticipate as to what they'll ask.

11           And a lot of what could possibly be asked, just

12   like my counsel said, will be Rule 6(e) material if it's

13   about the grand jury.  So I'm very cautious.  But I have

14   no -- no way of knowing what I'll be testifying to.

15           I know a lot about horses and dogs, very little

16   about money, some about Rocky Flats.  So, you know, we

17   could cover any of those topics, but we have to be

18   careful.

19           MR. NORDBERG:  I'll note that Mr. McKinley is

20   the coauthor of a book that could be germane to the --

21           THE DEPONENT:  You read it, I see.

22           MR. NORDBERG:  -- the market perceptions in

23   this case, if someone contended that market perceptions

24   in the time in and around the publication of the book was

25   relevant.  So I'll just draw that to your attention.

1           MR. NOMELLINI:  Thank you.

2      Q.   (BY MR. NOMELLINI)  Incidentally, in the answer

3   to interrogatory No. 1, there's a reference to lobbying

4   efforts by DOE and/or affiliated entities.

5           You have to answer audibly or the court

6   reporter won't get it down.  You nodded your head, and

7   you have to say yes or no or she won't be able to record

8   it.

9      A.   Yeah.  Say that again.

10      Q.   Sure.  In response to interrogatory No. 1,

11   plaintiffs have indicated that you'll be testifying about

12   legislative measures relating to Rocky Flats and lobbying

13   efforts by DOE and/or affiliated entities.

14      A.   Yes.

15      Q.   And my question is, what do you expect to

16   testify about with respect to lobbying efforts by DOE

17   and/or affiliated entities in connection with your Rocky

18   Flats bill?

19      A.   Well, again, I'm not -- I'll have to answer the

20   questions.  So I don't know what the question will be.

21   If you could specifically ask me a question about that

22   lobbying effort, then I will try to answer that.

23      Q.   Did you have any discussions with plaintiffs'

24   counsel before this morning about this case?

25      A.   Yes.

1     Q.   And did those discussions include discussions

2  about what you might testify about as a witness at trial?

3     A.   Yes, they did.  But as far as specifically, it

4  was very, very general.

5     Q.   Well, tell me the substance of what you recall

6  about the discussions that you had with plaintiffs'

7  counsel before this morning about what you might testify

8  about in this case.

9     A.   Basically, the bill that I wrote, that was what

10  most of our discussion was about.

11     Q.   Did you discuss lobbying efforts by DOE and/or

12  affiliated entities?

13     A.   We might have.  But, see, I wouldn't have been

14  too close to the lobbying effort of DOE.  Whenever

15  they're lobbying to kill my bill, they don't come in and

16  say, here's what we're going to do to kill your bill.

17     Q.   Well, tell me what you know about any lobbying

18  efforts by DOE to defeat your bill.

19     A.   Okay.  I won't reveal the name.  If it's public

20  record, you can look at it.  A lobbyist whom I have a lot

21  of respect for come in and told me that he had been

22  retained to kill my bill.  It was very honorable of him.

23  And then he wanted to know if I wanted to meet with Nancy

24  Tour, the CEO of Kaiser Hill.  I said, sure, I'll meet

25  with anybody.  And that was about all that was said then.

14

1    And it was a very good lobbying job for him.

2           And then later, on a bill that he lobbied

3    against -- and I was against it also -- he came and told

4    me what side he was on.  So it was kind of unusual that

5    here this guy was against one of my bills and then for

6    the other.  But, you know, my feeling is still the same;

7    he was respected, and he respected me.

8           Then when the bill died in appropriations -- he

9    was there and told me later that DOE and Kaiser Hill

10   people were in appropriations.  And when it was over and

11   the bill had died by a vote of one, they were quite

12   happy.  And Nancy Tour was quite excited about the fact

13   that my bill had been killed.

14          And he said he told her that probably it wasn't

15   over.  So I told him that he could go to Nancy and

16   deliver a message to her from me, that the rodeo had just

17   started, and she better strap her tits down tight and

18   take a deep breath and get ready to ride, because it was

19   going to be a lot more fun next year.

20       Q.   How do you spell Nancy's last name?

21       A.   T-o-u-r.

22       Q.   And by whom is Nancy employed?

23       A.   She was one of the top people of Kaiser Hill.

24       Q.   You're not aware of any efforts by anyone from

25   Dow to defeat your bill, correct?

15

1      A.   No.

2      Q.   You're not aware of any efforts by anyone from

3   Rockwell to defeat your bill, correct?

4      A.   This lobbyist had been retained to defeat it.

5   I don't know who all was paying him.

6      Q.   And so you don't know of any efforts by anybody

7   from Rockwell?

8      A.   No.

9      Q.   Now, when did you begin your service as a grand

10   juror, Mr. McKinley?

11      A.   August of 1989.

12      Q.   And when you started as a grand juror, you had

13   never heard of Rocky Flats, correct?

14      A.   That's true.

15      Q.   And you'd never been to Rocky Flats.

16      A.   No.

17      Q.   How many times have you been to Rocky Flats?

18      A.   Twice.

19      Q.   And one of those times was during a tour that

20   you took in August of 1990 while you were a member of the

21   grand jury, correct?

22          MR. NORDBERG:   I'm going to object and instruct

23   the witness not to answer any questions relating to the

24   grand jury proceedings.

25      Q.   Are you going to follow your counsel's

1    instruction, Mr. McKinley?

2        A.   Yes.

3        Q.   Have you toured Rocky Flats outside of your

4    service as a grand juror?

5        A.   No.

6            MR. NORDBERG:  I'm sorry.  It is difficult to

7    anticipate these things sometimes, but had I been

8    conscious, the numbers would sum to two and that both

9    constituents or addends of the number two would be within

10   grand jury territory, I would have instructed the witness

11   not to answer the question given the total number of

12   visits.

13           MR. NOMELLINI:  Hard to keep all that straight.

14           MR. NORDBERG:  It is.

15       Q.   (BY MR. NOMELLINI)  So outside your service as

16   a grand jury member, you have not visited the plant?

17       A.   That's correct.

18       Q.   And outside your service as grand jury member,

19   have you seen the plant?

20           THE DEPONENT:  Let me talk to counsel.

21           (Mr. Nordberg conferred with the deponent off

22   the record.)

23       A.   The second visit that I did included when I

24   said the two.  The second one was standing outside the

25   gate to Rocky Flats; the television crew came out and I

17

1    did an interview outside the gate.  And that was on

2    public television.

3          Q.    And when did that interview occur?

4          A.    I think it was about a year ago.  It was, yeah,

5    close.  I think I'd just been elected, and we were

6    talking -- we did a press conference.  And that was the

7    visit.  And it wasn't a visit of the plant.  I stood

8    there at the gates.

9          Q.    And at that time, you did not go inside the

10   gates, correct?

11         A.    That's correct.

12         Q.    Outside your service as a grand juror, any

13   other time that you've seen the plant other than late

14   2004 in connection with the interview?

15         A.    No.

16         Q.    Have you ever seen Building 771 in the plant?

17              THE DEPONENT:  Are we getting close to the

18   Rule 6(e) stuff?

19              MR. NORDBERG:  If we could have a standing

20   agreement that none of the questions involve anything

21   that Mr. McKinley has learned during his stint on the

22   special grand jury panel or in the course of the grand

23   jury's deliberations, then we would have an understanding

24   that that was just carved out from his answers, and he'd

25   be able to give answers to --

18

1           MR. NOMELLINI:  Let's go off the record.

2               (Discussion off the record.)

3           MR. NOMELLINI:  Would you read back the

4      question.

5               (The last question was read back as follows:

6      "Have you ever seen Building 771 in the plant?")

7           MR. NORDBERG:  Mr. McKinley, I'm going to

8      instruct you not to answer that question to the extent

9      that an answer would involve any information you learned

10      or anything you did during the course of your membership

11      in Special Grand Jury 89-2.  If you're able to respond to

12      the question based on activities you conducted outside of

13      the context of the special grand jury, you can answer the

14      question.

15           Can you remember the question?

16      A.   I've seen the newspapers.  There was pictures

17      of it in the newspapers.  And it's already on record as

18      to how many times I visited.

19      Q.   (BY MR. NOMELLINI)  But have you personally

20      seen Building 771?

21           MR. NORDBERG:  Same objection, same

22      instruction.

23      A.   I've seen the newspapers that's had pictures of

24      it in the newspapers.

25      Q.   And other than seeing it in the newspapers, you

1    have not seen Building 771?

2            MR. NORDBERG:  Same objection, same

3    instruction.  You can answer.  We are forced, absent an

4    agreement on another way to conduct this deposition, to

5    leave time after each of Mr. Nomellini's questions so

6    that I may utter the phrase "same objection, same

7    instruction."

8            And just to reiterate, the instruction is that

9    you can answer the questions to the extent they don't

10   involve your service on the grand jury.  You can leave

11   that part out and answer the questions.  But I'm

12   instructing you not to answer anything you know from your

13   service on the grand jury.

14           THE DEPONENT:  Okay.

15       Q.  (BY MR. NOMELLINI)  Are you following your

16   attorney's instruction, Mr. McKinley?

17       A.  Repeat the question.

18       Q.  Other than what you've seen in the newspapers,

19   have you personally seen Building 771?

20           MR. NORDBERG:  Same objection, same

21   instruction.

22       Q.  Are you following your attorney's instruction?

23       A.  Yes.

24       Q.  Did you see Building 771 during -- in the

25   course of your service as a grand juror?

1          MR. NORDBERG:  Same objection -- different

2    objection.  I instruct the witness not to answer that

3    question, since that question is focused exclusively on

4    something that would have occurred during the

5    deliberations of the grand jury.

6          Q.   And you're following your attorney's

7    instruction

8          A.   Yes.

9          Q.   Outside of your service as a grand juror, have

10   you seen Building 771 personally?

11         A.   No.

12         Q.   Have you seen the incinerator in Building 771?

13         MR. NORDBERG:  Same instruction.  To the

14   extent that you can answer based on experience outside

15   your role in the deliberations of the special grand jury,

16   you can go ahead.  To the extent an answer would require

17   you to draw on knowledge gleaned from deliberations of

18   the special grand jury, you are instructed not to

19   answer.

20         Q.   You're following your attorney's instruction?

21         A.   Yes.

22         Q.   So outside your service as a grand juror, you

23   have not seen the incinerator in Building 771, correct?

24         A.   That is correct.  With the exception of the

25   newspaper pictures of it.

1        Q.    Are you aware of any wrongdoing by Dow in

2    connection with Dow's work at Rocky Flats?

3            MR. NORDBERG:  Same instruction.

4        Q.    Are you going to follow your attorney's

5    instruction?

6        A.    Yes.

7        Q.    Outside of your work as a grand juror, are you

8    aware of any wrongdoing by Dow in connection with Dow's

9    work at Rocky Flats?

10       A.    It has a 50-some-odd-year history, and there's

11   been lots of stuff published in the newspapers about

12   everybody that operated out there.

13       Q.    About everybody that --

14       A.    All the operators.

15       Q.    Other than what you've seen in the newspapers,

16   are you aware from non-grand jury experiences of any

17   wrongdoing by Dow during the time Dow operated the Rocky

18   Flats plant?

19       A.    Well, in addition to the newspapers, there is

20   lots of publications out there.  And I've read quite a

21   few of them.  So if you would phrase that question to say

22   other than newspapers or anything that is already printed

23   or reported, then I could say no.

24       Q.    So outside of your service as a grand juror,

25   your only knowledge of any wrongdoing by Dow in

1   connection with Dow's work at Rocky Flats comes from

2   newspapers, publications, or TV; is that correct?

3       A.   Reports.  Not much from TV, because I don't

4   have TV.

5       Q.   Good for you.  I don't have a TV, either.

6            What kind of reports and publications are we

7   talking about?

8       A.   There was Courtney papers done quite an

9   extensive study.  Dr. Courtney, Dr. Carl Johnson, Rocky

10  Mountain Peace and Justice Center, Concerned Citizens for

11  Nuclear Safety, Loretta Heights, the Nuns for Nuclear

12  Disarmament, Sierra Club.  There's a whole list of them.

13  I've seen quite a bit of their materials.

14      Q.   And that's what you mean by publications and

15  reports?

16      A.   Yes.  There's a lot of reports out there.

17      Q.   And these are written publications and reports?

18      A.   Yes.

19      Q.   So outside of your service as a grand juror,

20  your only knowledge of wrongdoing by Dow during the time

21  Dow operated the Rocky Flats plant comes from newspapers

22  and written publications and reports; is that correct?

23      A.   You said any wrongdoing by Dow.  Has Dow ever

24  done any wrong out there?  What wrongdoings do you refer

25  to?

1          Q.    Any wrongdoing.

2          A.    Well, I've read factual information.   I don't

3     know as we would call it -- till you're accused of doing

4     something wrong, you haven't done anything wrong.   That's

5     a strange way to ask a question.

6               I'm aware of a lot of stuff that happened

7     there.

8          Q.    Are you aware of anything that you considered

9     to be wrongdoing by Dow in connection with Dow's work at

10    the Rocky Flats plant, other than what you learned as a

11    grand juror and other than what you learned from

12    newspapers and written reports and publications?

13         A.    I don't think that's a judgment I'd like to

14    make.

15         Q.    And my question is a little bit different,

16    Mr. McKinley.   It's not whether or not you'd like to make

17    a judgment, but what I'm asking you to do is to tell the

18    jury whether you are aware of any wrongdoing by Dow

19    during its work at the Rocky Flats plant other than what

20    you learned as a grand juror and other than what you

21    learned from newspapers and written reports are and

22    publications.

23         A.    No.

24         Q.    Are you aware of any wrongdoing by Rockwell in

25    connection with the work that Rockwell did at the Rocky

24

1    Flats plant?

2         MR. NORDBERG:   Same instruction.   You can

3    answer to the extent your answer is based on knowledge

4    obtained outside the process of your membership in

5    Special Grand Jury 89-2.

6         Q.   And you're going to follow your attorney's

7    instruction?

8         A.   Yes.

9         Q.   Outside of your service as a grand juror, are

10   you aware of any wrongdoing by Rockwell in connection

11   with Rockwell's work at the Rocky Flats plant?

12        A.   I can't differentiate between before and after,

13   because if you heard it before and then you heard it

14   after, does that mean you've not heard it before or

15   you've not heard it after?   110 witnesses and a million

16   pages of documents.

17        MR. NOMELLINI:   Counsel, are you instructing

18   the witness not to answer when it's something that he

19   heard before and heard again after?

20        MR. NORDBERG:   I'm not going to issue a general

21   instruction on that subject, because I think we need to

22   deal with it case by case.

23        I realize, as I'm sure you do, that it can be

24   difficult to segregate when you have an opinion or

25   judgment about something or knowledge of something, and

1    that based on knowledge you learned before, during, and

2    after school, so to speak, it can be hard to keep track

3    of how much of what you know came from where.

4              So all I'm going to ask that you do is you make

5    a good faith effort, when you're reporting your

6    knowledge, to report what you know -- what you would know

7    even if you'd never been a special member of the grand

8    jury.  And just do your best, and I'll be satisfied with

9    that.

10             But I'd like to instruct you to try to avoid

11   disclosing what you learned as a member of the grand

12   jury, because Rule 6(e) doesn't permit the compulsion of

13   your testimony about the deliberative processes of that

14   body.

15             So as best you can, what you think you would

16   have known if you'd never sat on the grand jury is

17   permissible.  That's fine.

18        A.   Ask that again, Mark.

19        Q.   (BY MR. NOMELLINI)  Are you going to follow

20   your counsel's instruction?

21        A.   Yes.

22        Q.   Are you aware of any wrongdoing by Rockwell in

23   connection with Rockwell's work at the Rocky Flats plant

24   other than what you learned as grand juror?

25        A.   Yes.

1     Q.   And what are your sources of information

2  regarding wrongdoing by Rockwell during the time that

3  Rockwell worked at the Rocky Flats plant other than your

4  work as a grand juror?

5     A.   Ray Guyer.

6     Q.   How do you spell Mr. Guyer's last name?

7     A.   G-u-y-e-r.

8     Q.   Who does Mr. Guyer work for?  Who is he

9  affiliated with?

10     A.   Rockwell.

11     Q.   What is his job at Rockwell?

12     A.   He was an engineer.

13     Q.   Is he still employed by Rockwell?

14     A.   No.

15     Q.   Do you know where he lives today?

16     A.   I know where the body parts are.  He died, and

17  the men in black came to get the body.  And his wife was

18  able to keep the outside for burial, and the government

19  took the insides.

20     Q.   And over what period of time did you know

21  Mr. Guyer?

22     A.   From about April, May of '92, June '92, till he

23  died last Christmas.

24     Q.   Any other sources of information about any

25  wrongdoing by Rockwell during the time Rockwell worked at

1    the Rocky Flats plant that you learned outside of your

2    work as a grand juror, other than Mr. Guyer?

3         A.    Yes.  Jim Stone.

4         Q.    Mr. Stone was a Rockwell employee?

5         A.    Yes.

6         Q.    Any other sources?

7         A.    There was probably a couple that I pledged

8    confidentiality to because of fears they had.

9         Q.    And you will not name those sources, correct?

10        A.    No.

11        Q.    Any other sources other than Mr. Guyer,

12   Mr. Stone, and the sources you will not name, as to

13   information about wrongdoing by Rockwell during the time

14   that Rockwell operated the Rocky Flats plant?

15        A.    There -- and those are all in the footnotes in

16   the book.  There's several people listed there, and I

17   don't recall all of them.  They're in the book.  It would

18   be John Till, who's contributed to it.  Leroy Moore.

19   There's a whole list of them in the book.  You can get

20   the complete list from that in the footnotes.

21        Q.    Any others you can think of as you sit here

22   today?

23        A.    No.

24        Q.    John Till, who does he work for?

25        A.    I'm not sure.

28

1      Q.    Leroy Moore, who does he work for?

2      A.    Rocky Mountain Peace and Justice Center.

3      Q.    Is John Till a standup guy?

4      A.    Yes.

5      Q.    Is it your understanding that John Till's work

6    is reliable?

7      A.    Sure.

8            MR. NORDBERG:  Foundation.

9      Q.    What's the basis of your understanding that

10   John Till's work is reliable?

11     A.    My attorney, Caron Balkany, worked with him.

12     Q.    And what about Caron Balkany working with John

13   Till leads you to believe that Dr. Till's work is

14   reliable?

15     A.    Well, when my friends endorse someone, then I

16   go along with that.

17     Q.    Did Caron Balkany tell you why she endorsed

18   John Till?

19     A.    She didn't have to.

20     Q.    Have you had any interaction with Dr. Till

21   yourself?

22     A.    No.

23     Q.    Did Caron Balkany tell you anything about John

24   Till's work?

25     A.    Oh, we've had several discussions.

1          Q.   And what was the substance of your discussions

2     with Caron about John Till's work?

3               MR. NORDBERG:   I have to issue a new

4     instruction.   You can talk about any conversation you had

5     with Caron Balkany you want, so long as it's not

6     protected by the attorney-client privilege in your

7     attorney-client relationship with Ms. Balkany.

8          A.   I'm following his instructions.

9          Q.   (BY MR. NOMELLINI)   Any other sources of

10    information concerning wrongdoing by Rockwell during the

11    time that Rockwell operated the plant, other than Ray

12    Guyer, Jim Stone, John Till, Leroy Moore, others named in

13    the footnotes of your Ambushed Grand Jury book, and

14    confidential sources that you will not reveal?

15         A.   That about covers it.

16         Q.   Caron Balkany is the coauthor of your book,

17    Ambushed Grand Jury, correct?

18         A.   That's correct.

19         Q.   You and Caron Balkany are the co-authors?

20         A.   Yes.

21         Q.   Who wrote the book?

22         A.   Caron Balkany and myself.

23         Q.   And did you review what was contained in the

24    Ambushed Grand Jury book to ensure that what was

25    contained in the book was true?

1     A.    Yes.

2     Q.    And do you believe that what is contained in

3   the Ambushed Grand Jury book is true?

4     A.    Yes.

5          MR. NORDBERG:  And those were singular you's,

6   not plural.  In other words, they were about you, Wes

7   McKinley, as opposed to the duo of Mr. McKinley and

8   Ms. Balkany.

9          MR. NOMELLINI:  Yes.  Those questions were

10   about Wes McKinley.  And he understood that.

11          MR. NORDBERG:  And your answers were about Wes

12   McKinley, correct?

13          THE DEPONENT:  Yes.

14          MR. NORDBERG:  Thank you.

15     Q.    (BY MR. NOMELLINI)  Okay.  What did you learn

16   from Ray Guyer about wrongdoing by Rockwell during the

17   time that Rockwell operated the Rocky Flats plant?

18     A.    I learned from Ray Guyer that it ceased being a

19   weapons production plant and become a money-making

20   facility.

21     Q.    Do you know over what period of time Mr. Guyer

22   worked at the plant?

23     A.    No, I'm not sure.

24     Q.    Do you know if he began before 1989?

25     A.    Oh, yes.

1     Q.   Do you know if he began before 1980?

2     A.   I'm sure he did.

3     Q.   But you don't know how far back he worked

4     there?

5     A.   I really don't.  Long-term employee.  Retired

6     in about '91, '92 maybe.

7     Q.   You're not aware of any conduct by Rockwell

8     during the time Rockwell operated the Rocky Flats plant

9     that resulted in off-site releases, correct?

10          MR. NORDBERG:  I'm sorry.  May I have that

11    question read back.

12          (The last question was read back as follows:

13    "You're not aware of any conduct by Rockwell during the

14    time Rockwell operated the Rocky Flats plant that

15    resulted in off-site releases, correct?")

16          MR. NORDBERG:  Same instruction as earlier.

17    You can answer based on your non-grand jury knowledge.

18    Q.   (BY MR. NOMELLINI)  To make things move along,

19    I will assume, Mr. McKinley, that unless you tell me

20    you're not following your attorney's instruction, that

21    you are.  Is that fair?

22    A.   That's correct.

23    Q.   Outside of what you learned as a grand juror,

24    are you aware of any conduct by Rockwell that resulted in

25    releases off-site the plant?

1          A.    Yes.

2          Q.    What releases are you aware of resulting from

3     Rockwell's conduct that you learned of outside of your

4     service as a grand juror?

5          A.    During the cleanup.  The newspapers reported

6     25 million gallons plutonium-laced water.

7          Q.    When you say, "during the cleanup," do you mean

8     the newspapers reported it during the cleanup, or the

9     release happened during the cleanup?

10         A.    The newspapers reported it.

11         Q.    Do you know approximately when the newspapers

12    reported that?

13         A.    I'm saying 2006, about March, April.

14         Q.    2005?

15         A.    Yeah, 2005.  I'm sorry.

16         Q.    So in March or April of 2005, the newspapers

17    reported that there had been releases of 25 million

18    gallons --

19         A.    Yes.

20         Q.    -- as a result of Rockwell's conduct, correct?

21         A.    25 million gallons of water was found out

22    there.  And it was running down a hillside.

23         Q.    Other than what you read in the newspapers in

24    2005, are you aware of any other conduct by Rockwell that

25    resulted in off-site releases?  Other than what you

33

1     learned as a grand juror.

2         A.   No.  And we probably better clarify that,

3     because Rockwell quit operating the plant, didn't they,

4     in about '91 or '92?  So I guess that wouldn't pertain to

5     them, then, would it?  But they would have been there to

6     have created it.

7         Q.   And when you say, "created it," you're talking

8     about the 25 million gallons?

9         A.   Yeah.

10        Q.   And that's 25 million gallons of plutonium?

11        A.   Yes.

12        Q.   So just to make sure we're clear, other than

13    what you read in the newspaper in 2005, you're not aware

14    of any conduct by Rockwell that resulted in off-site

15    releases, correct?

16             MR. NORDBERG:  Subject to the grand jury

17    exception.

18        A.   Yes, I'm aware.

19        Q.   You are aware of other conduct by Rockwell that

20    resulted in off-site releases?

21        A.   Uh-huh.

22        Q.   What other releases are you aware of, outside

23    of the scope of what you learned as a grand juror?

24        A.   Contamination from the dust that blew off

25    during the cleanup.

1      Q.   And what is your source of the information

2  concerning the dust that blew off during the cleanup?

3      A.   That's the workers that were out there, that I

4  won't reveal their names.

5      Q.   And those workers are workers for EGG?

6      A.   I'm not sure who their contractors were.  There

7  was 2,045 different subcontractors.

8      Q.   Anyone from Dow or Rockwell -- Dow or Rockwell

9  weren't involved in the cleanup, right?

10     A.   That's correct.

11     Q.   So you learned from workers who didn't work for

12 Dow or Rockwell on the cleanup that dust from Rocky Flats

13 had blown off-site during the cleanup; is that correct?

14     A.   Yes.

15     Q.   And these are the workers whose names you will

16 not reveal, correct?

17     A.   That's correct.

18     Q.   Can you reveal how many workers?

19     A.   No.

20     Q.   Other than what you read in the newspaper in

21 2005 and what you learned from non-Dow and non-Rockwell

22 workers who worked on the cleanup about dust blowing

23 off-site, are you aware of any other Rockwell conduct

24 that resulted in off-site releases?

25     A.   No.

1    Q.   Are you aware of -- strike that.

2         Outside of what you learned as a grand juror,

3    are you aware of any Dow conduct that resulted in

4    off-site releases?

5    A.   Well, I could give you the reports that I know

6    about.

7    Q.   Other than what you learned in written reports

8    and publications and newspapers, are you aware of any Dow

9    conduct that resulted in off-site releases?

10   A.   No.

11        MR. NORDBERG:  Subject to that same grand jury

12   exception, correct?

13        MR. NOMELLINI:  Correct.

14        MR. NORDBERG:  Thank you.

15        MR. NOMELLINI:  Were you asking me or --

16        MR. NORDBERG:  The deponent, I guess.  I'm

17   trying not to interpolate that after every question that

18   doesn't include the magic phrase, but --

19        MR. NOMELLINI:  No.  I understand.

20        MR. NORDBERG:  If I grow lax, I fear confusion

21   will erupt, so --

22   Q.   (BY MR. NOMELLINI)  Now, the workers who told

23   you that dust had blown off-site during the cleanup, did

24   they tell you how much dust?

25   A.   It would be impossible to measure.

36

 1         Q.   Did they tell you what direction the dust had

 2    blown?

 3         A.   No.  It usually goes with the wind.

 4         Q.   Did they tell you what direction the wind was

 5    blowing?

 6         A.   No.

 7         Q.   Did they tell you how they became aware of dust

 8    blowing off-site during the cleanup?

 9         A.   Yes.

10         Q.   And can you reveal that?

11         A.   It was the monitors.

12         Q.   So workers for contractors, not Dow and not

13    Rockwell, told you that monitors had indicated that dust

14    was blowing off-site during the cleanup, correct?

15         A.   That's right.

16         Q.   And were those monitors on-site or off-site?

17         A.   They would monitor the ground, and the dust

18    would be blowing.  And they would find the hot spots.

19         Q.   Do you know if those monitors were on-site or

20    off-site the plant?

21         A.   They'd be right there with them.  The dirt was

22    blowing, so they assumed -- that's when they started

23    spraying a lot of water.

24         Q.   And so those monitors would be on-site?

25         A.   Yes.

37

1        Q.    Do you know if those were Colorado Department

2    of Health monitors?

3        A.    No.

4        Q.    You don't know one way or the other?

5        A.    No, I don't.

6        Q.    Have you ever seen any monitors at the Rocky

7    Flats plant?

8        A.    We've discussed my visits out there.

9        Q.    Apart from what you learned as a grand juror,

10   which I understand that you're not answering, have you

11   seen any air monitors at the Rocky Flats plant?

12       A.    No.   I wouldn't go that close.

13             MR. NOMELLINI:   Let's take a short break.

14             (Recess taken from 2:36 p.m. to 2:56 p.m.)

15             MR. NORDBERG:   If I could just say for the

16   record that in response to a subpoena for documents

17   served on Mr. McKinley from defendants, which may be

18   entered into the record at some point in this deposition,

19   we have -- Mr. McKinley has brought documents in his

20   possession, custody, or control.   Some of these documents

21   are material in the public domain but which may not be

22   readily accessible to defendants.

23             He has not combed his -- every bookshelf for

24   published material already well known to both parties in

25   this litigation about Rocky Flats reports and whatnot,

1    but material relating to Mr. McKinley, what he knows

2    about this case, as Mr. McKinley and documents relating

3    to it are in that production.

4           We would object to the production of any

5    material with content protected by the work product

6    privilege, the attorney-client privilege, or governed by

7    Federal Rule of Criminal Procedure 6(e).

8           Moreover, because Mr. McKinley does not own

9    property within the class area, he is not a member of the

10   class, and plaintiffs do not intend to elicit any

11   testimony from Mr. McKinley regarding property in the

12   class area.  And because he is not known to plaintiffs to

13   have any opinions concerning property in the class area,

14   plaintiffs object to the subpoena insofar as it calls for

15   the production of material that may be in Mr. McKinley's

16   possession concerning properties in the class area.

17          Plaintiffs moreover object, along with

18   Mr. McKinley, to the request to the extent they call for

19   production of all material relating to Rockwell, Dow, the

20   United States Department of Energy, or dose

21   reconstruction studies as overbroad.

22          What Mr. McKinley has done is made a good faith

23   effort to supply responsive material on subjects within

24   his personal knowledge that is not already available and

25   known to defendants.

1          MR. NOMELLINI:  Let me ask you, Peter, have --

2    does this pile that you've brought to the deposition in

3    response to the subpoena contain all of the documents in

4    Mr. McKinley's possession that plaintiffs may use during

5    his direct examination?

6          MR. NORDBERG:  I believe they include all

7    documents in Mr. McKinley's possession that plaintiffs

8    may use during his examination, with the possible -- if

9    we add the book to the pile.  I don't think you need to

10   copy the book, and I suspect you already have the book.

11   But otherwise, yes, this represents every document in

12   Mr. McKinley's possession that plaintiffs may use in

13   connection with Mr. McKinley's direct examination,

14   insofar as plaintiffs now know in good faith.

15         MR. NOMELLINI:  Well, I think we'll agree to

16   disagree on plaintiffs' objections to the subpoena.

17         MR. NORDBERG:  I was just hoping you would

18   accept that statement of objections from Mr. McKinley and

19   plaintiffs respectively on the record in lieu of a letter

20   being supplied today for the defendants stating --

21         MR. NOMELLINI:  That's fine.

22         Let's mark the subpoena as McKinley Exhibit 3,

23   as long as we've been talking about it.

24         (Deposition Exhibit 3 was marked.)

25         Q.   (BY MR. NOMELLINI)  Mr. McKinley, I'm going to

1    hand you what has been marked as McKinley Exhibit 3.

2    Have you seen that before?

3         A.   Yes.

4         Q.   And as far as you know, does the pile that

5    Mr. Nordberg has been pointing to on the table contain

6    all the documents that you have responsive to that

7    subpoena?

8              MR. NORDBERG:  I won't instruct the witness not

9    to answer that question, provided that it's understood

10   that his answer is subject to the objections that I just

11   mentioned.

12             MR. NOMELLINI:  I'm just asking him for his

13   understanding.

14        A.   Understanding of what?

15        Q.   (BY MR. NOMELLINI)  This pile of documents that

16   Mr. Nordberg placed on the table, which we're now going

17   to have copied, represents the documents in your

18   possession that are responsive to that subpoena, McKinley

19   Deposition Exhibit 3; is that correct?

20        A.   Yes.

21             MR. NOMELLINI:  Off the record.

22             (Discussion off the record.)

23        Q.   (BY MR. NOMELLINI)  Mr. McKinley, you were

24   foreman of the Special Grand Jury 89-2; is that correct?

25        A.   Yes.

41

1       Q.    And when you began your service as a grand

2    juror, you took an oath to follow the law; is that

3    correct?

4       A.    We took an oath to follow the judge's

5    instructions, to see to it that no one was above the law.

6       Q.    Let's look at your Ambushed Grand Jury book.

7    I'll mark -- I've made a copy of it, which we'll mark as

8    McKinley Deposition Exhibit 4.  But feel free to refer to

9    your copy if it's easier.

10           (Deposition Exhibit 4 was marked.)

11       Q.    Looking at McKinley Deposition Exhibit 4,

12    that's The Ambushed Grand Jury book?

13       A.    Sure.  You're not violating any copyright laws

14    now, are you, Mark?

15       Q.    No.

16       A.    Okay.  Good man.

17       Q.    And, actually, feel free to use this version if

18    it's easier for you to handle.

19       A.    Okay.  I want to make sure you get it right

20    here.

21       Q.    All right.  Turn to page 85 of your Ambushed

22    Grand Jury book, bottom paragraph.

23       A.    Uh-huh.

24       Q.    You see it says you became the foreman of

25    Special Grand Jury 89-2?

1       A.    Uh-huh.

2       Q.    And you swore an oath to uphold the laws of the

3    country.  Is that true?

4       A.    Correct.  To not be manipulated by the

5    government lawyers.  Read the rest of it.

6       Q.    Right.

7       A.    And to ensure no one is above the law, and to

8    see to it that justice was done.

9       Q.    And, Mr. McKinley, after I'm done with my

10   questions, you can have confidence that Mr. Nordberg will

11   ask questions and bring out anything that I've left out.

12      A.    Okay.

13      Q.    But I appreciate you adding that information.

14            And the judge who you were working with in

15   connection with the Special Grand Jury 89-2 was Judge

16   Finesilver, correct?

17      A.    He was the presiding judge, yes.

18      Q.    Correct.  And Judge Finesilver administered the

19   oath?

20      A.    Yes.

21      Q.    And when Judge -- after Judge Finesilver

22   administered the oath, you took the oath to uphold the

23   law, correct?

24      A.    Yes.

25            MR. NOMELLINI:  Let me mark as McKinley

1    Deposition Exhibit 5 one of Judge Finesilver's opinions

2    in connection with Special Grand Jury 89-2.

3         (Deposition Exhibit 5 was marked.)

4    Q.    (BY MR. NOMELLINI)  Now, after the grand jury

5    completed its work, it issued a report to Judge

6    Finesilver; is that correct?

7    A.    We handed in our findings.

8         MR. NORDBERG:  One second, please.  May I have

9    the question read back.

10        (The last question was read back as follows:

11   "Now, after the grand jury completed its work, it issued

12   a report to Judge Finesilver; is that correct?")

13        MR. NORDBERG:  I'm going to instruct the

14   witness not to answer that question insofar as his answer

15   would depend on knowledge gathered in the course of

16   the -- of his participation in the special grand jury.

17   Q.    (BY MR. NOMELLINI)  Are you following your

18   attorney's instruction not to answer?

19   A.    Yes.

20   Q.    Okay.  And Judge Finesilver ordered that the

21   grand jury's findings would be sealed and not made

22   public; is that correct?

23        MR. NORDBERG:  Same instruction.

24   Q.    Are you following your attorney's instruction?

25   A.    Yes.

44

1          MR. NOMELLINI:  Peter, the order sealing the

2     findings of the grand jury is a matter of public record.

3     It's the opinion which we're looking at right now.

4          MR. NORDBERG:  If you'd like to lay a

5     foundation based on matters in the public record, that's

6     fine.

7          MR. NOMELLINI:  Okay.

8          Q.   (BY MR. NOMELLINI)  Judge Finesilver issued an

9     order sealing the grand jury's findings, correct?

10         A.   Yes.

11         Q.   I've handed you what's been marked as McKinley

12    Deposition Exhibit 5, which is Judge Finesilver's order.

13    And I want to direct your attention in particular to

14    page 6 of Judge Finesilver's December 3rd, 1992, order as

15    clarified January 29, 1993.  Do you see that there's a

16    section entitled, "The Grand Juror's Duties and Oath"?

17         A.   Uh-huh.

18         Q.   And do you see where Judge Finesilver states,

19    "On August 1, 1989, in keeping with the long and

20    venerable history of the grand jury, this court charged

21    Special Grand Jury 89-2 with, among other things, the

22    following solemn duties and responsibilities"?  Do you

23    see that?

24         A.   Yes.

25         Q.   And then it lists the duties and

45

1    responsibilities that Judge Finesilver charged the grand

2    jury with, correct?

3            MR. NORDBERG:  Objection to the question.

4    Instruct the witness not to answer to the extent his

5    knowledge is based on information learned during his

6    participation in the special grand jury.  You can ask him

7    what this opinion says.

8        Q.   (BY MR. NOMELLINI)  As a grand juror,

9    Mr. McKinley, you took an oath of secrecy; is that

10   correct?

11           MR. NORDBERG:  Same instruction.

12       Q.   Are you following your attorney's instruction?

13       A.   Yes.

14       Q.   Among the duties and responsibilities that

15   you, as a member of Special Grand Jury 89-2 were charged

16   with, as set forth in Judge Finesilver's opinion dated

17   December 3rd, 1992, is the following, quote --

18       A.   Now, where are we at?  December 3rd, 1992?

19   Page 6?

20       Q.   Page 6.

21       A.   On the left-hand side?

22       Q.   Right-hand column.

23       A.   Okay.

24       Q.   Judge Finesilver instructed you -- if you look

25   at the bottom of page 6 -- quote, Your proceedings are

46

1    secret and must remain secret permanently unless and

2    until the court determines that the proceedings or a

3    portion of them should be revealed in the interests of

4    justice.

5            MR. NORDBERG:  Same instruction.  Your question

6    changed.  It started out as a question about what he

7    recited in the opinion and changed to a question about

8    what Judge Finesilver instructed the special grand

9    jurors.

10            I'm instructing the witness not to answer any

11   questions based on his knowledge from participation in

12   Special Grand Jury 89-2.

13   Q.    (BY MR. NOMELLINI)  Judge Finesilver's opinion,

14   dated December 3rd, 1992, McKinley Exhibit 5, states at

15   the bottom of page 6, quote, Your proceedings are secret

16   and must remain secret permanently unless and until the

17   court determines that the proceedings or a portion of

18   them should be revealed in the interests of justice.  Is

19   that correct?

20   A.    Could you start at the paragraph above -- read

21   that whole paragraph?

22   Q.    Sure.

23   A.    Start up there where it says, "You."

24   Q.    Sure.  Judge Finesilver's opinion, dated

25   December 3rd, 1992, recounting what he instructed you as

47

1    a member of the special grand jury, states, "You are free

2    to exercise your own judgment without fear or favor and

3    shall not be deterred or influenced by the criticism of

4    the public.  You are the defenders of the innocent as

5    well as the accusers of guilty, and in both respects you

6    vindicate the integrity of the law.  Your proceedings are

7    secret and must remain secret permanently unless and

8    until the court determines that the proceedings or a

9    portion of them should be revealed in the interests of

10   justice."  Correct?

11        A.   That's what it says.

12        Q.   And that is what you were instructed -- is that

13   correct? -- as a member of Special Grand Jury 89-2?

14             MR. NORDBERG:  Instruct the witness not to

15   answer.

16        Q.   Are you following your attorney's instruction?

17        A.   Yes.

18        Q.   Does McKinley Deposition Exhibit 5, as far as

19   you can tell, accurately set forth the duties and

20   responsibilities that you were charged with as a grand

21   juror?

22             MR. NORDBERG:  Instruct the witness not to

23   answer.

24        Q.   Okay.  Are you familiar with Rule 6(e),

25   Mr. McKinley?

1       A.   Yes.

2       Q.   What is Rule 6(e)?

3       A.   Rule 6(e) pertains to the part of the grand

4   jury which was instigated back in the days of King

5   Arthur.  And the reason they come up with 6(e) is, the

6   king would go out and have his way.  And so these knights

7   were all sitting around the table discussing the king and

8   the -- you know, the things that knights discuss, the

9   things that we discuss:  women loved, races won, battles

10  fought.

11          And one of them said, you know, Sir Edward is

12  no longer with us.  And another said, yes, and the king

13  has his fine stable of white chargers.  Another one said,

14  yes, and Sir James is gone.  The king beheaded him, and

15  now his beautiful wife belongs to the king.

16          And a couple others said that but for the fact

17  that my horses are old and splaven and my wife

18  sharp-tongued, there I could go, too, my head rolling

19  through the dust, my blood squirting through my veins.

20  And it was a serious situation.

21          So they said, we're going to get together in

22  body, go to the king, and say, well, King, no more of

23  this until there's probable cause.  But when we do that,

24  we must swear secret, because if the king finds out that

25  I was the one that stopped him from invading the man with

49

1    the beautiful horses, lovely woman, then he could behead

2    me.  So we're going to keep it secret.  So to protect

3    themselves, they did the secrecy rule.

4         Q.   And you consider yourself a student of

5    Rule 6(e); is that right?

6         A.   I've never been much of a student of anything,

7    Mark.

8         Q.   I didn't get it quite right.  In your book, you

9    indicate that you're a student of grand jury secrecy

10   laws.  Is that correct?

11        A.   I studied grand jury proceedings quite

12   extensively.

13        Q.   And if you look at page 85 of your Ambushed

14   Grand Jury book, the second paragraph from the bottom,

15   you indicate in the second sentence, "The thought of

16   doing jail time has been a real motivating factor in

17   making me a student of the grand jury secrecy laws."

18        A.   Uh-huh.

19        Q.   Is that correct?

20        A.   Yes.

21        Q.   And so you've done some studying up on the

22   grand jury secrecy laws?

23        A.   Yes.  Grand juries as a whole, and that was a

24   part of it.

25        Q.   So the grand jury secrecy laws have been around

1   since the 14th Century?

2        A.   Yes.  It came over from England with us.

3        Q.   Dow had nothing to do with the adoption of

4   Rule 6(e), correct?

5        A.   Dow?

6        Q.   Dow Chemical.

7        A.   Had nothing to do with the adoption of

8   Rule 6(e).

9        Q.   Correct?

10       A.   Rule 6(e) was here before Dow.

11       Q.   Rule 6(e) was here before Dow or Rockwell was,

12   correct?

13       A.   Yes.

14       Q.   Rule 6(e) was here before the Department of

15   Energy, correct?

16       A.   Yes.

17       Q.   Now, you -- if you'll look at page 79 of your

18   book, you indicate in the -- in the fourth paragraph,

19   quote, They used us.  The U.S. government manipulated the

20   whole grand jury system.  They made us part of their

21   coverup, part of a lie.  Is that correct?

22       A.   Yes.

23       Q.   And you believe that the United States

24   government manipulated Rule 6(e) in connection with

25   Special Grand Jury 89-2 to keep the findings of the

1    Special Grand Jury 89-2 from becoming public; is that

2    correct?

3         A.   No.  It says, "They used us.  The U.S.

4    government manipulated the whole grand jury system.  They

5    made us part of a coverup, part of a lie."  And it's a

6    lie that could expose people to hidden radioactive

7    dangers.  It doesn't say they manipulated Rule 6(e).  It

8    says they manipulated the grand jury system.

9         Q.   And how did the government manipulate the grand

10   jury system to keep the public from becoming aware of the

11   findings of Special Grand Jury 89-2?

12              MR. NORDBERG:  You can answer to the extent

13   your answer doesn't depend on knowledge you learned in

14   the course of your participation in Grand Jury 89-2.

15        A.   I cannot differentiate those.

16        Q.   And you're following your attorney's

17   instruction?

18        A.   Yes.

19        Q.   If you look at the bottom paragraph on page 79

20   of your book, The Ambushed Grand Jury, you indicate in

21   the second sentence that, "The Justice Department used

22   the FBI raid and the grand jury investigation to cover up

23   the contamination at Rocky Flats and the surrounding

24   neighborhoods."  Do you see that?

25        A.   Yes.

52

1        Q.   How did the Justice Department use the FBI raid

2   and the grand jury investigation to cover up the

3   contamination at Rocky Flats and the surrounding

4   neighborhoods?

5             MR. NORDBERG:  You can answer so long as your

6   answer doesn't divulge information that you learned based

7   on your participation in the Special Grand Jury 89-2.

8        A.   Have you read the Wolpe report?

9        Q.   I'm familiar with it.

10       A.   Most of that's all outlined in the Wolpe

11  report.  That gets into testimony from Murtha, Fimberg

12  and Norton.

13       Q.   What I'm asking you, though, is not what's

14  contained in the Wolpe report, although it may overlap

15  with your personal knowledge.  I'm asking you for your

16  personal knowledge as to the basis for your statement

17  that the Justice Department used the FBI raid and the

18  grand jury investigation to cover up the contamination at

19  Rocky Flats and the surrounding neighborhood.

20       A.   Then I can't separate that from the grand jury

21  proceedings.

22       Q.   And you're following your attorney's

23  instruction?

24       A.   Yes.

25            MR. NORDBERG:  Just to be clear, the

53

1    instruction is, if you can answer without divulging

2    information you learned in the grand jury proceedings,

3    you can go ahead.

4              THE DEPONENT:  I can't.

5              MR. NORDBERG:  That's fine.  I just wanted to

6    be clear about the instruction.  Thank you.

7         Q.  (BY MR. NOMELLINI)  Take a look at page 85 of

8    your Ambushed Grand Jury book.  In the fifth full

9    paragraph of that page that begins with the words, "Do

10   you really think."  Do you see that?

11        A.  Uh-huh.

12        Q.  And on page 85 of your grand jury -- Ambushed

13   Grand Jury book, you indicate, "Do you really think the

14   grand jury secrecy rules should stop me from saying that

15   in the United States of America?"  Do you see that?

16        A.  Yes.

17        Q.  And what is your view as to whether the grand

18   jury secrecy rules should stop you from talking about

19   matters that you learned as a grand juror?

20        A.   Grand jury secrecy rules talk about

21   deliberations, voting record, and testimony.  And at no

22   time have I ever revealed voting record, testimony, or

23   deliberations.

24        Q.   Have you revealed the contents of documents

25   that you learned about as a grand juror?

54

1          MR. NORDBERG:  Excuse me.  May I have that

2     question read back.

3          (The last question was read back as follows:

4     "Have you revealed the contents of documents that you

5     learned about as a grand juror?")

6          MR. NORDBERG:  Acting as Mr. McKinley's

7     attorney, I am going to instruct him not to answer that

8     question.  This deposition will not be used as an

9     investigation into the proceedings of the grand jury

10     unless Judge Kane overrules that instruction and

11     authorizes this deposition to be used in such a way.

12          Q.   (BY MR. NOMELLINI)  You're following your

13     attorney's instructions, Mr. McKinley?

14          A.   Yes.

15          Q.   The grand jury -- turn to page 74 of your book.

16     Looking at the bottom of that page, it refers to a

17     discussion between you and your attorney, Caron.  Do you

18     see that?

19          A.   Yes.

20          Q.   And you would agree that the grand jury secrecy

21     rule, Criminal Rule 6(e), prohibits you from talking

22     about what went on in the Rocky Flats grand jury room,

23     correct?

24          A.   No.

25          Q.   You don't believe that Criminal Rule 6(e)

1    prohibits you from talking about what went on in the

2    Rocky Flats grand jury room, correct?

3         A.    That's correct.

4         Q.    And why is it that you do not believe that

5    Rule 6(e) prohibits you from talking about what happened

6    in the grand jury room?

7         A.    Because the secrecy rule covers deliberation,

8    voting record, and testimony.

9         Q.    Okay.  And what things that went on in the

10   Rocky Flats grand jury room that are not deliberation,

11   voting records, and testimony do you believe that you're

12   allowed to talk about under Criminal Rule 6(e)?

13              MR. NORDBERG:  I'll instruct the witness not to

14   answer if the question is a reference to events actually

15   happening in the course of deliberations of Special Grand

16   Jury 89-2.

17              MR. NOMELLINI:  There's two parts to it.  The

18   first part is what he believes, which is all I asked for.

19              MR. NORDBERG:  If you're asking a general

20   question to outline his understanding of Rule 6(e), I

21   have no problem with that.

22              MR. NOMELLINI:  And that's what that particular

23   question was.

24              MR. NORDBERG:  So that question doesn't call

25   for him to itemize the different things that would have

1    happened in front of the Special Grand Jury 89-2 that do

2    and do not fall under Rule 6(e).  That's a general

3    question about the operation of Rule 6(e) in general,

4    right?

5         MR. NOMELLINI:  Correct.

6         MR. NORDBERG:  No problem with that question.

7    Q.  (BY MR. NOMELLINI)  What is your understanding

8    of things that occur in the grand jury room -- well, what

9    are the three categories that you mentioned?  Testimony,

10   voting record, and --

11   A.   Deliberations.

12        I think what you're wanting to know is how I

13   wrote the story about the last supper inside the grand

14   jury room.

15        MR. NORDBERG:  Sir, I'm going to ask you not to

16   speculate about what Mr. Nomellini wants to know.  The

17   way this deposition works is that he will ask you

18   questions.  You answer his questions if there's not an

19   objection and instruction not to answer.  I may have some

20   questions when it's concluded.  And then, as you know, it

21   is in some respects a free country, and so you're free to

22   make any statements that you wish.

23        But the way these depositions are set up to

24   work, the attorneys ask the questions and the witnesses

25   answer them.

1      Q.   (BY MR. NOMELLINI)  What is your understanding

2  of the things that go on in the grand jury room other

3  than testimony, voting records, and investigation that

4  Criminal Rule 6(e) does not prohibit a grand juror from

5  talking about?

6      A.   Not much.

7      Q.   And what falls in the category of not much?  Do

8  documents fall --

9      A.   Very little can you say.

10     Q.   How about documents that a grand juror reviews

11  in connection with the grand jury proceeding?  Are those

12  covered by Criminal Rule 6(e)?

13     A.   Yes.

14     Q.   So a grand juror is prohibited, under Rule

15  6(e), from talking about documents that he or she learned

16  about in the course of the grand jury investigation,

17  correct?

18     A.   It would depend on where those came from.

19     Q.   Okay.  And how does it depend?

20         MR. NORDBERG:  I'm taking these to be questions

21  addressed to Mr. McKinley's understanding as a layperson

22  and based on whatever research or reading he's done about

23  the rules, about Rule 6(e) and grand jury secrecy.  And

24  on that basis I'm not objecting.  I do note that he's not

25  an attorney.

1            MR. NOMELLINI:  I'm asking Mr. McKinley in

2    general, not with respect to the Rocky Flats proceedings

3    specifically, but in general, as a student of grand jury

4    secrecy laws, what is his understanding about what

5    documents that a grand juror learns about in the course

6    of his duties are covered by Rule 6(e) and what documents

7    are not covered.

8            A.    Any proceedings from the courts.

9            Q.    (BY MR. NOMELLINI)  Proceedings from the

10   courts --

11           A.    Or prosecutor.

12           Q.    Okay.  And so documents that are proceedings

13   from the courts are covered by Rule 6(e)?

14           A.    Yes.

15           Q.    Are there any documents that, as a general

16   matter, under your understanding of Rule 6(e), that if a

17   grand juror learns about in the course of his duties, he

18   can talk about and not violate Rule 6(e)?

19           A.    Are there any documents?  Yes.

20           Q.    What types of documents are those?

21           A.    Oh, notes passed back and forth between the

22   grand jurors that was invitations to birthday parties,

23   birth announcements.  The only grand jury in the history

24   that ever had a baby born during our tenure from one of

25   the grand jurors.  We wanted to name her Rocky.

1        Q.    How about notes -- how about notes taken by

2   grand jurors in the course of the proceedings?

3        A.    Sure.  They wouldn't be covered by Rule 6(e).

4        Q.    And what is the basis for your understanding

5   that notes taken by grand jurors in the course of the

6   grand jury proceedings are not covered by Rule 6(e)?

7        A.    Unless they pertain to testimony, voting

8   record, or deliberations.

9        Q.    How about notes pertaining to documents that

10  are shown to the grand jurors?  Are those covered by

11  Rule 6(e), to your understanding?

12       A.    Notes that are shown?

13       Q.    How about notes -- notes that relate to

14  documents that are shown to the grand jurors.

15       A.    No, that wouldn't be covered.

16       Q.    Okay.  And what is the basis for your

17  understanding that if grand jurors are shown documents in

18  the course of the grand jury proceedings, and take notes

19  based on those documents, that they can subsequently

20  disclose the contents of those notes and not violate

21  Rule 6(e)?

22       A.    If they don't pertain to voting record,

23  deliberations, or testimony.

24       Q.    And your understanding is that notes pertaining

25  to testimony taken by a grand juror may not be disclosed

1    under Rule 6(e), correct?

2        A.   Notes taken when?

3        Q.   Notes taken by a grand juror relating to a

4    witness' testimony.  Is it your understanding that notes

5    taken by a grand juror relating to a witness' testimony

6    may be disclosed under Rule 6(e)?

7        A.   Yes.

8        Q.   So notes relating to a witness' testimony may

9    be disclosed by a grand juror without violating Rule

10   6(e)?

11       A.   It depends on what it says.

12       Q.   And what are the factors that influence, in

13   your understanding, whether notes relating to testimony

14   of a witness taken by a grand juror may be disclosed

15   without violating Rule 6(e)?

16       A.   If it doesn't cover the three things we talked

17   about:  Deliberations, voting record, and testimony.

18       Q.   Okay.  But the question that I was asking you

19   is about testimony.  So in what circumstances would notes

20   relating to testimony not be covered by Rule 6(e), if

21   there are any circumstances?

22       A.   We would be getting into specifics to answer

23   that, and that would be covered.

24       Q.   But your testimony today is that there are some

25   circumstances in which notes taken by a grand juror

1    relating to a witness' testimony are not covered by

2    Rule 6(e), correct?

3         A.    Yes.

4         Q.    And can you tell me anything more about what

5    those circumstances are?

6         A.    No.

7         Q.    Can you tell me where I could look to find out

8    where -- what those circumstances are?

9         A.    Yes.

10        Q.    Where could I look to find those circumstances?

11        A.    The sealed vault where the grand jury material

12   is sealed.

13        Q.    Now, while you were a grand juror, you

14   maintained a journal, correct?

15             MR. NORDBERG:   Objection.  No objection.

16        A.    While I was a cowboy I maintain a journal.

17        Q.    And during the time that you were sitting as a

18   grand juror, you took down notes as witnesses presented

19   testimony, correct?

20        A.    Yes.

21        Q.    And while you were a grand juror on Special

22   Grand Jury 89-2, you took down notes based on documents

23   that were shown to you as a grand juror, correct?

24             MR. NORDBERG:   Mr. McKinley, I'm going to ask

25   you to give me a chance to object before you answer each

1    and every one of these questions in this line, because I

2    have to think about them.

3         That was a question about whether Mr. McKinley

4    took notes regarding documents offered as exhibits in the

5    grand jury proceedings?

6         MR. NOMELLINI:  I don't think I used the phrase

7    "offered as exhibits."  I think, "documents."

8         MR. NORDBERG:  No objection.

9         MR. NOMELLINI:  Could you read the question

10   back.

11        (The last question was read back as follows:

12   "And while you were a grand juror on Special Grand Jury

13   89-2, you took down notes based on documents that were

14   shown to you as a grand juror, correct?")

15        A.   Yes.

16        Q.   (BY MR. NOMELLINI)  Let's take a look at

17   pages 37 and 38 of your Ambushed Grand Jury book.

18        Page 37 contains excerpts from Wes' journal.

19   Do you see that?

20        A.   Yes.

21        Q.   And is that the journal that you maintained as

22   a grand juror as part of Special Grand Jury 89-2?

23        MR. NORDBERG:  Instruct the witness not to

24   answer.

25        Q.   Are you going to follow your attorney's

63

1    instruction?

2        A.    Yes.

3            MR. NOMELLINI:  What is the basis for that

4    instruction, Counselor?

5            MR. NORDBERG:  What you're attempting to do is

6    elicit testimony about Mr. McKinley's account of what

7    occurred during the proceedings before the grand jury.  I

8    am concerned to protect Mr. McKinley from potential

9    criminal prosecution, and I am, therefore, erring on the

10   side of caution in counseling him and instructing him not

11   to enter into testimony in this deposition that would

12   pose any such risk.

13           I will say, wearing now my hat as plaintiffs'

14   counsel, that the question, almost by definition, cannot

15   elicit admissible evidence and is not reasonably

16   calculated to lead to the discovery of admissible

17   evidence in light of Judge Kane's rulings on the parties'

18   motions in limini, including motions in limini filed by

19   defendants themselves in this litigation.

20           But just to be clear, and it might help speed

21   things along, since we've been at this for a little over

22   two hours now, I will instruct, as Mr. McKinley's

23   attorney -- I will instruct him to refuse to answer --

24   not to answer any question in this deposition if the

25   effect of an answer would be to disclose -- or if the

64

1    question is an attempt to elicit -- information about the

2    proceedings before Special Grand Jury 89-2.

3             MR. NOMELLINI:  Even if Mr. McKinley believes

4    that it's not a violation of Rule 6(e)?

5             MR. NORDBERG:  If you can warrant to me that

6    what Mr. McKinley believes, as a layperson, about the

7    operation of Rule 6(e) will be consistent with the

8    rulings of any courts having jurisdiction over the

9    matter, then perhaps we could talk.

10            But as an attorney, I suspect you know that

11   there is uncertainty and room for reasonable disagreement

12   about what falls within the scope of Rule 6(e).  And so,

13   in my view, Mr. McKinley's potential exposure is not

14   defined by his own personal understanding.

15            My job, as his counsel at this deposition, is

16   to prevent him from running afoul of the governing

17   authorities' interpretations, as those might emerge if

18   the matter were pursued, as opposed to his own

19   interpretations.  Because, for good or ill, Mr. McKinley

20   has not yet been appointed as an article 3 judge.

21            MR. NOMELLINI:  So you are instructing him not

22   to answer, regardless of whether he believes the answer

23   would violate Rule 6(e)?

24            MR. NORDBERG:  I don't think his personal

25   beliefs about what does and does not violate Rule 6(e)

1   are dispositive or even particularly material.  This is

2   not to say whether I would personally agree with him or

3   disagree with him, but my personal beliefs aren't

4   dispositive or material, either.

5          MR. NOMELLINI:  Well, let me ask you, then, if,

6   I mean, Mr. McKinley doesn't believe it would violate

7   Rule 6(e), do you believe that the answer would violate

8   Rule 6(e)?

9          MR. NORDBERG:  If you want to note my

10  deposition, we'll go into that.

11         MR. NOMELLINI:  Okay.  So what we have here is

12  a situation where the witness doesn't believe that the

13  answer would violate Rule 6(e).  The attorney is not

14  taking a position one way or the other on that.  And yet

15  there is an instruction not to answer.

16         MR. NORDBERG:  No, that's a mistaken

17  characterization of the situation.

18         Mr. McKinley has described in general terms --

19  because, if you'll remember, that's how the line of

20  questioning was defined -- what he believes to be the

21  general parameters governing grand jury secrecy under

22  Rule 6(e).

23         I am going to object to any question calculated

24  to elicit proceedings occurring before the special grand

25  jury or in the course of its deliberation, period.

1   Because whatever the fine points and gray area around the

2   margins may be, I think that that is a fair description

3   of the general zone of Rule 6's coverage.

4          If defendants wish, or if Mr. McKinley should

5   wish, and if defendants or Mr. McKinley should succeed in

6   obtaining a judicial order that insulates Mr. McKinley

7   from liability for testifying about proceedings occurring

8   before the grand jury, I will reevaluate the instruction.

9          It is possible that neither Mr. McKinley nor

10  plaintiffs would oppose such a request, were defendants

11  to file one.

12         MR. NOMELLINI:  But just on the issue of

13  whether plaintiffs have a position yes or no as to

14  whether this testimony would violate Rule 6(e), the

15  answer is that plaintiffs do not have a position that

16  falls into one of those two categories.

17         MR. NORDBERG:  If you want to note my

18  deposition on the interpretation of Rule 6(e), we can

19  talk about it.  I have stated the basis for my

20  instruction.

21     Q.  (BY MR. NOMELLINI)  Mr. McKinley, did you ever

22  violate Rule 6(e)?

23         MR. NORDBERG:  Instruct the witness not to

24  answer.  That's an abusive question.

25     Q.  Are you following your attorney's instruction?

1       A.   Yes.

2       Q.   Well, let's talk about the journal that you

3   took as a grand juror that contained notes relating to

4   documents that you were shown as a Rocky Flats grand

5   juror.

6           Is it your understanding that notes that you

7   took from documents -- not testimony, not voting records,

8   and not deliberations, but notes that you took from

9   documents as a Rocky Flats grand juror -- would lead to a

10   violation of Rule 6(e) if you disclosed them?

11           MR. NORDBERG:   I will instruct the witness not

12   to answer.  And I am about to adjourn this deposition for

13   the purposes of calling the court to determine whether

14   this line of questioning should be permitted.

15           There is nothing -- the reason that the court

16   has authorized depositions of witnesses in this case is

17   not so that defendants can appoint themselves a roving

18   commission to conduct an inquiry into violations that

19   they suspect or perceive grand juries have or have not

20   made under somebody's interpretation of Rule 6.

21           I'm at a total loss to perceive the relevance

22   of this line of questioning to any issue in the

23   litigation.  And its sole discernable purpose appears to

24   be to intimidate Mr. McKinley and discourage him from

25   participation in this lawsuit.

1           So unless we move on to a line of questioning

2     that involves issues of fact concerning which plaintiffs

3     have indicated they will offer his testimony or which are

4     relevant in some articulable way to some matter in

5     factual controversy in this lawsuit --

6           MR. NOMELLINI:  Well, let me ask you this,

7     Peter.

8           MR. NORDBERG:  -- I will adjourn the deposition

9     pending opportunity to seek judicial resolution to this

10    situation.

11          MR. NOMELLINI:  Do plaintiffs intend to elicit

12    testimony from Mr. McKinley that he can't tell the jury

13    what he learned about because of Rule 6(e)?

14          THE DEPONENT:  Correction here.  Could you read

15    just what he said.

16          (The record was read back as follows:  "Do

17    plaintiffs intend to elicit testimony from Mr. McKinley

18    that he can't tell the jury what he learned about because

19    of Rule 6(e)?")

20          THE DEPONENT:  Okay.  You got "jury."  I

21    thought he said, "grand jury."

22          MR. NORDBERG:  We may.

23          MR. NOMELLINI:  Okay.  Well, then, among other

24    things, I'm entitled to find out if that is a reason why

25    he can't tell the jury about what he learned about, and

69

1    that involves, among other things, finding out whether he

2    has any firsthand knowledge that he could testify about

3    that he learned as a grand juror.  Because, you know,

4    it's not clear to me that he does.

5            Now, I understand that you want to bar me from

6    learning that so that you can tell the jury that the

7    reason that he can't testify is not because he doesn't

8    have any firsthand knowledge but because of Rule 6(e).

9    But we believe that, among other reasons, that's the

10   reason why we're entitled to ask questions on this

11   subject.

12       Q.   (BY MR. NOMELLINI)  Let me ask you,

13   Mr. McKinley --

14           MR. NORDBERG:  Well, wait a second, because I'm

15   not sure that I'm not going to adjourn the deposition.

16   Not satisfied with that explanation.

17           So you want to ask him about any visits that he

18   may have played to the plant or firsthand knowledge that

19   he may have acquired by non-testimonial means during the

20   course of his service as a grand juror?

21           MR. NOMELLINI:  By any means.  I want to know

22   what knowledge he has.  Let me go about it differently,

23   Mr. McKinley.

24       Q.   (BY MR. NOMELLINI)  In the course of your

25   service as a grand juror, you learned about Rocky Flats

70

1    through what you were told by someone or through

2    documents that you saw; is that correct?

3         MR. NORDBERG:  Instruct the witness not to

4    answer.

5         Q.   Let's turn to page 139 of the Ambushed Grand

6    Jury book.  Chapter 9 is entitled, "Flashbacks From Wes'

7    Journals Inside the Grand Jury Chambers, 1989 to 1992."

8    Is that correct?

9         A.   Yes, that's what it says.

10        Q.   And in your Ambushed Grand Jury book, you state

11   in chapter 9, quote, I know some folks think I'm

12   violating my Rule 6(e) grand jury secrecy oath by doing

13   this, but we don't think the rule or the constitution or

14   the law was meant to protect illegal acts of the Justice

15   Department, so here's what happened inside the grand jury

16   chambers.  Is that correct?

17        A.   Yes.

18        MR. NORDBERG:  Point of clarification.  Is what

19   correct?

20        Q.   Is that what you wrote in your book Ambushed

21   Grand Jury, Mr. McKinley?

22        A.   That's what you read from page 139, chapter 9.

23        Q.   And in chapter 9, you set forth an account of

24   events that occurred in the grand jury chambers?

25        MR. NORDBERG:  One moment, please.  I instruct

71

1   the witness not to answer the question as framed.

2      Q.   And you're following your attorney's

3   instructions?

4      A.   Yes.

5      Q.   Have you ever been under investigation for

6   disclosing grand jury information?

7      A.   I read in the newspapers we were under

8   investigation.  I was never served any papers or

9   anything.

10      Q.   And approximately when did you read in the

11   newspapers that you were under investigation?

12      A.   It would have been summer '92.

13      Q.   And did you have any understanding as to why

14   you were under investigation with respect to the

15   disclosure of grand jury information?

16      MR. NORDBERG:  Based on his review of the

17   newspaper article?

18      MR. NOMELLINI:  In general.

19      Q.   Did you have any understanding at all?

20      MR. NORDBERG:  You can answer to the extent

21   that your answer doesn't involve information learned by

22   you in the course of your service on Special Grand Jury

23   89-2.

24      A.   There was a lot of information in the

25   newspapers about the grand jury.

1       Q.    And based on that information, do you have any

2   understanding as to why you were under investigation?

3       A.    I think it's pretty obvious the judge was

4   really pissed.

5       Q.    Judge Finesilver?

6       A.    Sherman Finesilver.

7       Q.    And do you have any understanding as to why

8   Judge Finesilver was upset?

9           MR. NORDBERG:  Based, again, on the newspaper

10  accounts?

11          MR. NOMELLINI:  In general.

12          MR. NORDBERG:  Same instruction.

13          MR. NOMELLINI:  Let's mark this as McKinley

14  Exhibit 6.

15          (Deposition Exhibit 6 was marked.)

16      Q.    (BY MR. NOMELLINI)  I'm handing you a copy of

17  what's been marked as McKinley Deposition Exhibit 6.

18  It's a Boston Globe article dated March 27, 2004,

19  entitled, "Book Accuses Justice Department of Nuclear

20  Plant Coverup.  Health Officials Say Claim's Under

21  Review."

22          And you see you're quoted in this article,

23  Mr. McKinley, in the fifth paragraph?  You state, "I am

24  doing my patriotic duty.  Mr. McKinley said these people

25  are criminals."  Did I read that correctly?

1        A.   Yes, you read it.

2        Q.   And the Boston Globe article states, "In

3   addition to interviews with former plant workers and

4   investigators, the author relied" -- "the authors relied

5   on a journal McKinley kept during the grand jury

6   sessions."  Is that a true statement?

7            MR. NORDBERG:  Excuse me.  You're asking

8   Mr. McKinley if it's a true statement that the authors

9   relied on a journal McKinley kept during the grand jury

10  sessions?

11           MR. NOMELLINI:  Yes.

12           MR. NORDBERG:  No objection.

13       A.   You just read the first sentence?

14       Q.   (BY MR. NOMELLINI)  Right.  And -- yes.  And

15  then I'll ask you about the second sentence.

16       A.   Yes.

17       Q.   So your book, The Ambushed Grand Jury, relies

18  on a journal you kept during the grand jury sessions; is

19  that correct?

20       A.   Yes.

21           MR. NORDBERG:  May I have that read back,

22  please.

23           (The last question was read back as follows:

24  "So your book, The Ambushed Grand Jury, relies on a

25  journal you kept during the grand jury sessions; is that

74

1    correct?")

2              MR. NORDBERG:  No objection.  And the answer, I

3    believe, was yes.

4              THE DEPONENT:  In part.

5        Q.   (BY MR. NOMELLINI)  And you told -- you told

6    the Boston Globe -- correct? -- that you had relied, in

7    part, for your book, The Ambushed Grand Jury, on a

8    journal that you had kept during the grand jury sessions,

9    correct?

10             MR. NORDBERG:  He, Mr. McKinley?

11             MR. NOMELLINI:  Yes.

12       A.   I'm not sure.  You could have gathered that

13   from reading the book.

14       Q.   So from The Ambushed Grand Jury book, one can

15   gather that the book relies, in part, on a journal you

16   kept during the grand jury sessions, correct?

17             MR. NORDBERG:  Objection to the form.  I think

18   we're up to authors, not book.  I'm not sure what it

19   would be for a book to rely on something, anyway.  But

20   what the Boston Globe article talks about, what I think

21   Mr. McKinley has testified to, and the word book may have

22   slipped into a previous question.  But I think the

23   quotation is about authors relying on things, not books

24   relying on things.

25             MR. NOMELLINI:  Are you instructing him not to

1    answer?

2            MR. NORDBERG:  No.

3            MR. NOMELLINI:  Okay.  Well, I'd appreciate you

4    restricting your objections to objections to the form of

5    the question.

6        Q.   (BY MR. NOMELLINI)  It's evident from the book

7    The Ambushed Grand Jury that the authors, in writing the

8    book, relied, in part, on a journal that you kept during

9    the grand jury sessions, correct?

10       A.   Let me -- if you'd rephrase that to say during

11   a journal I kept.  Because I've kept a journal for the

12   last 15 years.  And there's several things could be

13   written from that journal.  There's a lot of horse

14   stories in that journal.

15       Q.   But this book, The Ambushed Grand Jury -- in

16   writing this book with Caron Balkany, you relied in part

17   on a journal that you kept during the grand jury

18   sessions, correct?

19       A.   Yes.

20       Q.   And go on to the second sentence.  It says,

21   "They said they were able to independently confirm all of

22   the evidence discussed in the book."  Correct?

23       A.   That's what the article says, yes.

24       Q.   Have you produced your journal in response to

25   defendants' subpoena, McKinley Exhibit 4?

1      A.   No.

2           MR. NOMELLINI:   Defendants would request

3   production of that journal.

4           MR. NORDBERG:   Mr. McKinley will object to the

5   production of that journal on the grounds that the

6   journal contains material that would tend to disclose

7   proceedings before the Special Grand Jury 89-2.

8           MR. NOMELLINI:   Without waiving our prior

9   request, defendants would also request those portions of

10  the journal upon which the author -- authors relied in

11  writing the book The Ambushed Grand Jury.   That is, that

12  alternative request, without waiving the prior request,

13  would exclude anything that Mr. McKinley believes to

14  violate Rule 6(e).

15          MR. NORDBERG:   I understand the request.

16      Q.   (BY MR. NOMELLINI)   Now, as a grand juror, you

17  are not permitted to do your own investigation apart from

18  the rest of the grand jury, correct?

19          MR. NORDBERG:   Objection, foundation.

20      A.   I'll follow his instructions.

21      Q.   He's not instructing you on that one.

22          THE DEPONENT:   What were you doing?

23          MR. NORDBERG:   I just objected.   You can go

24  ahead and answer.

25      A.   Now, say that again.

1      Q.   (BY MR. NOMELLINI)  As a grand juror, you are

2   not permitted to do your own investigation of Rocky Flats

3   apart from the rest of the grand jury; is that correct?

4   During the time you were a grand juror.

5      A.   You haven't read the instructions.  You can

6   find that out from the judge's instructions to us.

7      Q.   Okay.  What do the judge's instructions say

8   about that?

9      A.   The source of information may come to us from

10   other sources other than the prosecutors.

11         MR. NORDBERG:  I assume this is all a

12   discussion of the instructions as printed in the

13   published opinion that's been marked as an exhibit at

14   this deposition

15         THE DEPONENT:  There was a complete set of

16   instructions at the time.

17         MR. NORDBERG:  Well, here's the thing,

18   Mr. McKinley.  I'm going to instruct you not to testify

19   in this deposition about instructions given to you during

20   the course of proceedings of Special Grand Jury 89-2,

21   because those are proceedings relating to the

22   investigations of Special Grand Jury 89-2.

23      Q.   (BY MR. NOMELLINI)  And will you follow your

24   attorney's instruction in that regard --

25      A.   Yes.

1      Q.    -- not to testify about any instructions that

2   you were given as a grand juror?

3      A.    Yes.

4         MR. NOMELLINI:  Off the record for a second.

5         (Discussion off the record.)

6      Q.   (BY MR. NOMELLINI)  As a general matter,

7   setting aside the Rocky Flats grand jury, do you have any

8   understanding as to whether a grand juror is permitted to

9   do his or her own investigation separate and apart from

10  the rest of the grand jury?

11     A.    Haven't we covered that?

12     Q.    I don't think so.

13        MR. NORDBERG:  I'm letting it go.  I'm not

14  objecting.  If you have an understanding about --

15     A.    Yes.

16     Q.    Your understanding is that a grand juror is

17  permitted to do his own investigation in general while

18  the grand jury is pending?

19     A.    Define investigation.

20     Q.    That is, could a grand juror, for example, make

21  his own trip to the scene of the events that the grand

22  jury is hearing about without the rest of the grand jury

23  in order to gather more information?

24     A.    Yes.

25     Q.    And what is the basis of that understanding?

1         MR. NORDBERG:  You can answer to the extent

2    that it does not involve material relating to the

3    investigations of Special Grand Jury 89-2.

4        A.   I can't differentiate between them.

5        Q.   Prosecutors are not required to present

6    exculpatory evidence to a grand jury, correct?

7        A.   Grand jury is a power within itself.  It can

8    subpoena witnesses; can ask any question they want.

9        Q.   And the prosecutor is not required to present

10    the defendants' side of the story, correct?

11        A.   I don't know that much about the prosecutors.

12    I never looked into that area.

13        Q.   You don't know one way or the other whether the

14    prosecutor is required to present the defendants' side of

15    the story to the grand jury?

16        A.   I don't know that much about prosecutors.  I

17    never read the attorneys manual.

18        Q.   Now, while you were a grand juror, no Rockwell

19    lawyers appeared before you to present Rockwell's side of

20    the case, correct?

21        MR. NORDBERG:  With respect, I instruct the

22    witness not to answer on the grounds that by definition,

23    an answer would require disclosing proceedings occurring

24    before Special Grand Jury 89-2.

25        Q.   As a general matter, do you have an

1    understanding as to whether a defendant gets to have his

2    lawyer present the defendants' case to a grand jury?

3         A.   I don't know anything about that.

4         Q.   Do you have any knowledge as to what

5    safeguards, if any, or what rights a defendant is

6    entitled to in connection with a grand jury

7    investigation?

8         A.   No.

9         Q.   Did you ever have any interest in determining

10   what rights a defendant had in connection with grand jury

11   investigation, as a general matter?

12        A.   Could you give me a definition of defendant?

13        Q.   That's a fair clarification.  Do you have any

14   knowledge as to what rights a person or corporation who

15   is the subject of a grand jury investigation has in

16   connection with the grand jury proceedings?

17        A.   No.

18        Q.   Did you ever have any interest in learning what

19   rights a person or corporation who was the subject of a

20   grand jury investigation has in connection with a grand

21   jury proceeding?

22        A.   Never thought about it.

23        Q.   Was Dow the subject of the investigation in

24   which Special Grand Jury 89-2 was involved?

25             MR. NORDBERG:  Objection, form.  Vague.  Again,

81

1    acting as Mr. McKinley's attorney -- and all of these

2    instructions are being made in any capacity as

3    Mr. McKinley's attorney unless otherwise specified -- I

4    don't believe, Mr. McKinley, that you can answer that

5    question without disclosing material from the proceedings

6    before Special Grand Jury 89-2.  And because I don't

7    perceive how you could answer it without disclosing such

8    material, I'm instructing you not to answer the question.

9         Q.   (BY MR. NOMELLINI)  You're following your

10   attorney's instruction?

11        A.   Yes.

12        Q.   Same question with respect to Rockwell.

13             MR. NORDBERG:  Same instruction.

14        Q.   And you're following your attorney's

15   instruction?

16        A.   Yes.

17        Q.   Can you disclose any person or corporation who

18   was the subject of Special Grand Jury 89-2's

19   investigation?

20             MR. NORDBERG:  Does he have the ability to?

21             MR. NOMELLINI:  No.

22        Q.   Who were the persons or corporations who were

23   the subject of Grand Jury 89-2's investigation?

24             MR. NORDBERG:  Same instruction.

25        Q.   Are you following your attorney's instruction?

82

1     A.   Yes.

2        MR. NOMELLINI:  Off the record.

3        (Discussion off the record.)

4     Q.  (BY MR. NOMELLINI)  What are the subject

5  matters that were at issue during Special Grand Jury

6  89-2's investigation?

7        MR. NORDBERG:  Same instruction.

8     Q.  Are you following your attorney's instruction?

9     A.   Yes.

10     Q.  You're familiar with the fact, Mr. McKinley,

11  that this action is a class action?

12     A.   Yes.

13        MR. NOMELLINI:  Let's mark this as McKinley

14  Deposition Exhibit 7.

15        (Deposition Exhibit 7 was marked.)

16     Q.  McKinley Deposition Exhibit 7 I will represent

17  to you is the -- is a depiction of the Rocky Flats plant

18  and the class boundary in this case.

19        And my question for you is, are you aware of

20  any actions by Dow that resulted in contamination of all

21  of the area contained in the class boundary?

22        MR. NORDBERG:  To the extent your knowledge

23  wouldn't disclose proceedings before Special Grand Jury

24  89-2.

25     A.   No.

1      Q.    Are you aware of any actions by Rockwell during

2    the time that it operated the Rocky Flats plant that

3    resulted in contamination of all of the area within the

4    class boundary?

5           MR. NORDBERG:   To the extent your answer would

6    not disclose information from the proceedings of Special

7    Grand Jury 89-2.

8      A.    Yes.

9      Q.    And what -- is that the same information that

10   you testified about earlier, the 25 million gallons

11   containing plutonium reported by the newspaper and the

12   information about the dust from the cleanup reported to

13   you by employees of contractors at the plant in 2004 and

14   2005?

15     A.    Yes.

16     Q.    Other than those two sources, that is, the

17   employees of plant contractors in 2004 and 2005 telling

18   you and the newspaper accounts that you read in 2005,

19   are you aware of any other actions by Rockwell that

20   resulted in contamination of the areas within the class

21   boundary?

22     A.    Excluding the newspapers and stuff we talked

23   about, that I can't differentiate between grand jury

24   and --

25     Q.    And when you say, "stuff we talked about," you

1    mean your discussions with the contractors --

2         A.   Right.

3         Q.   -- who were cleaning up in 2004 and 2005?

4         A.   Yes.

5         Q.   And you're following your attorney's

6    instruction not to answer with respect to anything you

7    learned as a grand juror?

8         A.   Yes.

9              MR. NOMELLINI:  Time for a short break?

10             THE DEPONENT:  Let's just go on and finish up.

11             MR. NOMELLINI:  All right.

12        Q.   (BY MR. NOMELLINI)  Let me ask you, with

13   respect to -- with respect to the dust issue, you

14   indicated that you were told by the current contractors,

15   or the contractors as of 2004 and 2005, that dust had

16   been released from the plant during the cleanup.

17             You don't know one way or the other whether

18   that dust spread to all of the areas within the class

19   boundary; isn't that right?

20        A.   No.

21        Q.   So what I just said was correct?

22        A.   Yes.

23        Q.   And with respect to the water issue reported in

24   the newspaper in 2005, you don't know whether that

25   allegedly contaminated water spread to the areas within

85

1    the class boundary, correct?

2        A.   That's correct.

3        Q.   So other than what you learned in the grand

4    jury room, which you've indicated that you're not going

5    to testify about, following your counsel's instructions,

6    you're not aware of any conduct by Dow or Rockwell that

7    resulted in a contamination spreading to the areas

8    within the class boundary marked as McKinley Deposition

9    Exhibit 7?

10       A.   I think there was, yes.

11       Q.   You think there was?

12       A.   Based on what I've heard since.  We covered

13   that.

14       Q.   Well, what sources are there other than the

15   workers --

16       A.   Well, I believe that there is, based on that.

17   But you said know, as far as going out and sampling that

18   area.  I haven't.

19       Q.   You haven't done any sampling, correct?

20       A.   No.

21       Q.   You haven't done any sampling either on-site or

22   off-site the plant, correct?

23       A.   We've discussed my visits to the plant.

24       Q.   And you didn't do any sampling during your

25   visit to the plant?

1        A.    It's Rule 6(e).  I'm not going there.

2              MR. NORDBERG:  I'm sorry.  I would have

3    interposed an objection had I noticed the issue in time.

4        Q.    Okay.  You testified you didn't do any

5    sampling -- you've never done any sampling off-site the

6    plant, correct?

7        A.    That's correct.

8        Q.    Now, you -- I just want to make sure we're on

9    the same page.  In terms of your sources of information

10   about off-site contamination, you pointed to the

11   newspaper article, 2005, and what was told to you by

12   contractors in 2004 and possibly 2005, correct?

13       A.    (Deponent nodded head up and down.)

14       Q.    And any other sources of information with

15   respect to releases from the plant that resulted in

16   contamination of the class area, McKinley Deposition

17   Exhibit 7, that is outside of what you learned as a grand

18   juror?

19       A.    That's the only sources.

20       Q.    And you testified that those two sources, as

21   far as you know, did not result in contamination of this

22   entire class area, McKinley Deposition Exhibit 7,

23   correct?

24       A.    I don't think I testified to that.

25       Q.    Okay.  Let's go back and let's take them one at

87

1    a time just to make sure we're on the same page.

2         Do you know that the dust that you testified

3    about, as reported to you by contractors, resulted in

4    contamination of the class area -- entire class area set

5    forth in McKinley Deposition Exhibit 7?

6    A.   I believe, based on what I heard, the dust

7    contaminated that.

8    Q.   You believe that the dust contaminated the

9    entire class area set forth in McKinley Deposition

10   Exhibit 7?

11   A.   Possibly.

12   Q.   But you don't know one way or the other; is

13   that correct?

14   A.   I believe it did.

15   Q.   And your belief is based solely on your

16   discussions with contractors who were working on the

17   cleanup in 2004 and 2005, correct?

18   A.   No.

19   Q.   What else is your belief based on?

20   A.   I spent three years in the grand jury room.

21   And that's where it gets so difficult.

22   Q.   So apart from what you learned as a grand juror

23   and you're not testifying about, your knowledge about

24   dust leaving the plant is based on what you learned from

25   contractors who were working at the plant in 2004 and

88

1    2005?

2        A.    Removing that part of the grand jury, yes.

3    That and the newspaper articles.

4        Q.    And how about the water issue that you learned

5    about in 2005?  Do you know one way or the other whether

6    that 25 million gallons of water issue reported by the

7    newspapers in 2005 resulted in contamination of the

8    entire class area?

9        A.    It may have.  I believe there was a possibility

10   of -- strong -- I believe it did.

11       Q.    And what is that belief based on?

12       A.    The fact that if there's 25 million they found,

13   there's a lot they didn't find.

14       Q.    Do you know what the drinking water source is

15   for people who live in Arvada?

16            MR. NORDBERG:  That's fine.  If you know.

17       A.    In Arvada?  Not right now, no.

18       Q.    Do you know if a person who lived in Arvada

19   within the class boundary would have had any contact with

20   the 25 million gallons of water that you testified you

21   learned from a newspaper -- strike that.

22            Do you know if people living in Arvada within

23   the class area would have any contact with water from

24   Rocky Flats?

25       A.    I have no idea about those people.  Don't know

89

1    where they went and what they did.

2         Q.   Do you know if people living in Westminster

3    within the class area would have had any contact with

4    water from Rocky Flats?

5              MR. NORDBERG:  Again, to the extent that your

6    knowledge is from sources other than information

7    disclosed in the proceedings of Special Grand Jury 89-2.

8         A.   If I knew where they went and what they did.  I

9    have no idea where they went or what they did.

10        Q.   But as you sit here today, you don't know

11   whether people living within Westminster within the class

12   boundary would have any contact with water from Rocky

13   Flats, correct?

14             MR. NORDBERG:  Same instruction.

15        A.   I'll follow my counsel's instruction.  I would

16   have to know when they lived there.

17        Q.   Do you know whether individuals living in

18   Arvada within the class boundary as of June 7th, 1989,

19   would have had any contact with water from the Rocky

20   Flats plant?

21        A.   It's Rule 6(e).

22        Q.   Other than what you learned as a grand juror,

23   do you know if people living in Arvada within the class

24   boundary would have had any contact with water from Rocky

25   Flats?

90

1        A.    And I can't separate them.

2        Q.    So other than what you learned as a grand

3    juror, you don't have any knowledge as to whether

4    individuals living in Arvada would have any contact with

5    water from the Rocky Flats plant, correct?

6        A.    I don't know, because I can't separate what I

7    learned and what I've understood before.

8        Q.    So following your counsel's instruction, as

9    you've indicated you're going to do, you can't testify

10   about any exposure that a person living in Arvada would

11   have had to water from the Rocky Flats plant, correct?

12       A.    I said I can't separate, because I can tell

13   you lots of stuff that it may get back into it's too

14   close.

15       Q.    Okay.  So if you're following your attorney's

16   instruction, you can't give me, sitting here today, any

17   information about whether or not people who live in the

18   class area came into contact with water from Rocky Flats,

19   correct?

20       A.    Without divulging Rule 6(e), I cannot tell you

21   whether they did or did not.

22       Q.    And sitting here today, you can't give me any

23   information as to whether people living within the class

24   area were exposed to dust from Rocky Flats, correct?

25       A.    I cannot give you that information.

1      Q.   And sitting here today, you can't tell me

2    whether people living within the class area were exposed

3    to any contaminants from Rocky Flats, correct?

4      A.   You're making that sound like I don't know.

5    But I would be violating Rule 6(e) if I told.

6      Q.   Sitting here today, you can't give me any

7    information about whether anyone living within the class

8    area was exposed to any contaminants from Rocky Flats,

9    because you believe you would be violating Rule 6(e) if

10   you told, correct?

11     A.   It would be a better question if you asked,

12   you will not give me any information.  Then I can say

13   yes.

14     Q.   Sitting here today, you will not give me any

15   information about whether anyone living within the class

16   area was exposed to any contaminant from Rocky Flats,

17   because you believe it would violate Rule 6(e); is that

18   correct?

19     A.   It's possible, yes.

20     Q.   Is that a yes?

21     A.   Yes.

22     Q.   So you're not going to be testifying before the

23   jury about anything that you learned as a grand juror,

24   correct?

25     A.   I can't anticipate what I'll be testifying

1    about.  I'm a cowboy, not a lawyer.

2         MR. NOMELLINI:  Is Mr. McKinley going to be

3    testifying about anything he learned as a grand juror?  I

4    believe we're entitled to know that, given that we've

5    been instructed -- he's been instructed not to answer any

6    question that relates to that subject.

7         MR. NORDBERG:  Well, he's been instructed not

8    to -- he's been given the instructions he has.  And I'm

9    hesitating, Mark, just because the question is vague.

10        I will repeat that plaintiffs do not intend to

11   call Mr. McKinley to elicit testimony about the grand

12   jury investigation or that would disclose material from

13   the grand jury proceedings.

14   Q.   (BY MR. NOMELLINI)  You mentioned in your

15   Ambushed Grand Jury book that you conducted a citizens

16   investigation of matters at Rocky Flats, correct?

17   A.   Yes.

18   Q.   And over what time period did that citizens

19   investigation take place?

20        MR. NORDBERG:  Do you have a page reference,

21   Mark?

22        MR. NOMELLINI:  I don't have one handy.

23        MR. NORDBERG:  Because it's a question about

24   what he indicated in his book, so -- is the question

25   about what the book indicated about the time period over

1   which the investigation took place, or --

2          MR. NOMELLINI:  No.  My question is over what

3   time period did the citizens investigation take place.

4          MR. NORDBERG:  Well, because I don't know the

5   answer to that question, and because --

6          MR. NOMELLINI:  Do you want to confer with

7   Mr. McKinley on this subject, to speed things along?

8          MR. NORDBERG:  Yes, if I may.

9          (Mr. Nordberg conferred with the deponent off

10  the record.)

11         (Recess taken from 4:33 p.m. to 4:45 p.m.)

12     Q.   (BY MR. NOMELLINI)  Mr. McKinley, you will not

13  provide me with information about anything you believe to

14  be wrongdoing by Dow or Rockwell, because you believe

15  that doing so would violate Rule 6(e); is that correct?

16     A.   On advice of my counsel, that's correct.

17     Q.   Okay.  Have you -- and your counsel is

18  Mr. Nordberg?

19     A.   (Deponent nodded head up and down.)

20     Q.   I understand it's your view that Rule 6(e)

21  covers some matters that occurred before the grand jury

22  and doesn't cover some other matters.

23     A.   That's correct.

24     Q.   Have you publicly disclosed anything that

25  occurred before Rocky Flats Special Grand Jury 89-2?

94

1          MR. NORDBERG:  I instruct the witness not to

2    answer.

3          Q.   You're following your attorney's instruction?

4          A.   Yes.

5          Q.   And you will not disclose to me anything that

6    occurred before Grand Jury 89-2, correct?

7          A.   That's right.

8          Q.   Do you know what the state standard is for

9    plutonium in soil in Colorado?

10          MR. NORDBERG:  Form.  Also, I instruct the

11    witness not to answer to the extent the knowledge would

12    reveal proceedings before Special Grand Jury 89-2.

13          A.   I'll follow my counsel, yes.

14          Q.   So other than the special grand jury

15    proceedings, you don't have any knowledge of what the

16    state contamination standard is, correct?

17          A.   That's not correct.

18          Q.   What is your knowledge, apart from the special

19    grand jury proceedings, as to what the state

20    contamination standard is?

21          A.   The contamination levels out at Rocky Flats by

22    the cleanup agreement is 50 pico curies per gram of soil

23    down to 3 feet.

24          Q.   And that's for plutonium on-site --

25          A.   Yes.

1        Q.   -- the Rocky Flats plant?

2        Do you know what the state's standard is for

3   plutonium off-site the plant in other areas of Colorado?

4        MR. NORDBERG:  Form.

5        THE DEPONENT:  Pardon?  What did you say?

6        MR. NORDBERG:  I raised an objection.  You can

7   go ahead and answer the question to the extent your

8   knowledge is based on information gathered outside the

9   context of Special Grand Jury 89-2.

10       A.   Standards for -- for what?

11       Q.   (BY MR. NOMELLINI)  For plutonium in soil.

12       Do you know what the standard is for plutonium

13  in soil for areas outside the Rocky Flats plant in

14  Colorado?

15       A.   Not at the current time, no.  I know it's been

16  raised a couple of times.  And if you had watched the

17  Frontline movie, they asked the Colorado Department of

18  Health people what they did when they got up to the

19  unsafe levels.  They said, "We raise it to a new safe

20  level."

21       Q.   And who said that, according to the movie that

22  you watched?

23       A.   It's Frontline.  Mike McCloud produced it.

24  Showed in about 1994, Colorado Department of Health.  I'm

25  not sure which one it was.

96

1       Q.    Somebody at the Colorado --

2       A.    It's on film.  It's on record.

3       Q.    Somebody at the Colorado Department of Health

4    said that they'd raise the standard?

5       A.    Yes.

6       Q.    Now, Dow in this case didn't have anything to

7    do with the application of Rule 6(e) to the Rocky Flats

8    special grand jury, correct?

9             MR. NORDBERG:  Form.

10      A.    Isn't that covered by Rule 6(e)?

11      Q.    Okay.  You're not answering --

12      A.    No.

13      Q.    -- because you believe it's covered by

14   Rule 6(e)?

15            And Rockwell -- same question with Rockwell.

16   Same answer?  You're not answering because --

17      A.    That's correct.

18            MR. NORDBERG:  Same objection.

19      Q.    So you will not tell me whether Dow or Rockwell

20   had anything to do with the application of Rule 6(e) to

21   the Rocky Flats grand jury, because you believe it's

22   covered by Rule 6(e)?

23      A.    On advice of counsel, yes.

24            MR. NORDBERG:  Form.

25      Q.    And you will not tell me whether you believe

1    that the Department of Energy had anything to do with the

2    application of Rule 6(e) to what you could say as a grand

3    juror, because --

4              MR. NORDBERG:  Form.  I'm sorry.

5        Q.    -- because you believe it's covered by Rule

6    6(e), correct?

7              MR. NORDBERG:  Form.

8        A.    Yes.

9        Q.    And sitting here today, you will not tell me

10   whether the government had anything to do -- United

11   States government had anything to do with the application

12   of Rule 6(e) to what you could say about your grand jury

13   service, correct?

14             MR. NORDBERG:  Form with a capital F.

15             THE DEPONENT:  On advice of counsel, what?

16             MR. NORDBERG:  I'm not giving you any

17   instruction about whether you can answer or not.  I'm

18   simply preserving an objection to be raised later with

19   the court, if necessary.  And the objection is, form with

20   a capital F.

21             You can go ahead and answer to the extent you

22   understand the question.

23        Q.    (BY MR. NOMELLINI)  I think your answer was

24   yes.

25        A.    Yes.

98

1      Q.   So you will not testify about whether Dow or

2   Rockwell or the government, including the Department of

3   Energy, did anything to stop you from talking about what

4   you learned as a grand juror because of the advice of

5   counsel Mr. Nordberg has given you, correct?

6           MR. NORDBERG:  Excuse me.  There's a string of

7   questions going on here, the assumption of which seems to

8   be that I've instructed the witness not to answer on each

9   of the topics covered.  I'm not sure I've issued such an

10  instruction as regards that question.  I might have to

11  hear it again.

12          MR. NOMELLINI:  I'll withdraw the question.

13      Q.   (BY MR. NOMELLINI)  You will not testify about

14  anything that Dow or Rockwell or the government did to

15  prevent you from talking about what you learned as a

16  grand juror, correct?

17          MR. NORDBERG:  Objection to the form of the

18  question.

19          I wanted to say for the record that I have not

20  issued an instruction to the witness not to answer that

21  question.  The reason I haven't is that not everything

22  the government did to prevent the witness from talking

23  would be a proceeding occurring before the grand jury

24  necessarily.

25      A.   So you're asking did the men in black ever show

99

1    up at the front door with their blackjacks and say, don't

2    talk?  The answer is no, they never did.

3        Q.    (BY MR. NOMELLINI)  And my question is just a

4    little bit different.

5        A.    Okay.

6        Q.    You will not testify about anything that Dow or

7    Rockwell or the government did to prevent you from

8    talking about what happened before the grand jury,

9    because you believe it's covered by 6(e); is that

10   correct?

11           MR. NORDBERG:  Same objection, same remarks.

12       A.    Same thing.  They never showed up.  I mean, I

13   never got a call from Rockwell.

14           MR. NORDBERG:  Sounds like he will testify.

15       Q.    Did you have any information as to anything

16   that Dow did to prevent you from talking about what you

17   learned as a grand juror?

18       A.    They never showed up, either.

19       Q.    But apart from whether they showed up, you

20   don't have any information as to --

21       A.    No.

22       Q.    And apart from whether they showed up at your

23   door, and you don't have any information as to anything

24   that Rockwell did?

25       A.    No.

1     Q.   And apart from whether they showed up at your

2  door, you don't have any information as to anything the

3  Department of Energy did to prevent you from talking

4  about what you learned as a grand juror?

5     A.   No.

6     Q.   So sitting here today, you don't have any

7  information as to anything that Dow or Rockwell or the

8  Department of Energy did to prevent you from disclosing

9  what you learned as a grand juror, correct?

10     A.   That's correct.

11     Q.   Now, Dow left the plant in 1975; is that

12  correct?

13     A.   Yes.  You look like an honest man.  I'll

14  believe you.

15         MR. NOMELLINI:  Is that right, Peter?

16         MR. NORDBERG:  I will stipulate that they left

17  the plant in 1975.

18     Q.   (BY MR. NOMELLINI)  Now, you were involved in a

19  citizens investigation, correct?

20     A.   Yes.

21     Q.   Who were the other members of the citizens

22  investigation?

23     A.   There's been lots of people involved in it.  It

24  encompasses actually all of America that's read the book.

25  In the back of the book, there's a form.  Have you filled

1    your form out?  Well, fill it out and send it in, Mark.

2        Q.   Are there primary members of the citizens

3    investigation?

4        A.   Yes, yes.  I think it's outlined in the book.

5    We started -- Caron, myself.  Marvin the mule played a

6    part.  Caron's mother.  Jackie Brever.  John Lipsky.

7    Caron's mother.  Beth Harris.  I think Lee Lesing.  Lee's

8    husband, Jim, was a part of it.  There's several.

9        Q.   And will you explain to the jury who Marvin the

10   mule is?

11       A.   That's my mule that I run around over the

12   district.  Got more votes than I did in one of the

13   elections.

14       Q.   And over what period did the citizens

15   investigation take place?

16       A.   Caron and I met in about '96, I think, '95.

17   And that's when it started forming the -- I mean, as the

18   name itself, citizens investigation.

19       Q.   And how long did the investigation continue?

20   Or is it still ongoing today?

21       A.   Well, we're still working.

22       Q.   Now, at some point, the citizens investigation

23   presented some of its findings to Congress?

24       A.   No.  And I don't know how you would mean

25   Congress.  As far as a sitting committee for us to

102

1    testify before, no, we didn't do that.

2        Q.   Did the -- the citizens investigation was

3    investigating Rocky Flats, correct?

4        A.   And the Justice Department handling Rocky Flats

5    case, a lot of the nuclear stuff as a whole, the cleanup.

6        Q.   And did the citizens -- was The Ambushed Grand

7    Jury book one of the products of the citizens

8    investigation?

9        A.   I think the book probably was about the time it

10   started.  That's how it wound up.

11           MR. NOMELLINI:  Let's mark this article as

12   McKinley Deposition Exhibit 8.

13           (Deposition Exhibit 8 was marked.)

14       Q.   McKinley Deposition Exhibit 8 is an article

15   from the Boulder Weekly about Rocky Flats, dated

16   March 11th, 2004.

17       A.   Uh-huh.

18       Q.   And I want to first direct your attention to

19   page 2.

20       A.   Okay.

21       Q.   The paragraph that begins with, "While Lipsky

22   struck gold with Brever."  Do you see that?

23       A.   Uh-huh.

24           MR. NORDBERG:  One moment.  Thank you.  Go

25   ahead.

1     Q.   And the second sentence of that paragraph says,

2     "Lipsky had gone to great lengths to get the court to

3     seal the affidavit in support of the search warrant,

4     application for the raid, but three days after the sting,

5     U.S. Attorney General Dick Thornberg unsealed the

6     documents to assure the public that, quote, this

7     investigation does not signal any major new environmental

8     or safety concerns."  Do you see that?

9     A.   Yes.

10    Q.   And do you recall Attorney General Thornberg

11    saying that?

12         MR. NORDBERG:  You may answer to the extent

13    that your knowledge does not derive from proceedings in

14    front of Special Grand Jury 89-2.

15    A.   No.  I didn't find that out until after we were

16    dismissed.

17    Q.   Okay.  And, actually, if you look at page 14 of

18    your book --

19    A.   I have a lot of pages here.  Okay.  I'm there.

20    Q.   Page 14 of your book includes the same comments

21    from Attorney General Thornberg, correct?  The second to

22    last paragraph.

23    A.   Uh-huh.

24    Q.   And Attorney General Thornberg stated that the

25    investigation of Rocky Flats did not signal any major new

1    environmental or safety concerns, correct?

2         A.   Correct.

3              MR. NORDBERG:  Is that a question about what

4    the book says or about what Attorney General Thornberg

5    stated?

6              MR. NOMELLINI:   What he stated was the

7    question.

8              MR. NORDBERG:  Thank you.

9         Q.   (BY MR. NOMELLINI)  And that's reported in your

10   book, correct?

11        A.   Yes.

12        Q.   Okay.  Let's turn back to McKinley Deposition

13   Exhibit 8.

14        A.   Okay.

15        Q.   Page 4 of that article indicates that a copy of

16   the grand jury report was leaked to Westword.  Do you see

17   that?  The seventh paragraph down.

18        A.   Page 4.  Is that the one, "Facing a possible

19   sentence"?  Is that what starts at the top of the page?

20        Q.   I think it starts with, "In January," at the

21   top.

22        A.   Okay.  I've got it.

23        Q.   We're on page 4 of McKinley Deposition

24   Exhibit 8.

25        A.   Uh-huh.

1        Q.   Seventh paragraph down.

2        A.   Okay.

3        Q.   The article refers to a copy of the grand jury

4    report being leaked to Westword.  Do you see that?

5        A.   Yes.

6        Q.   Do you have any knowledge as to who leaked the

7    grand jury report to Westword?

8             MR. NORDBERG:  I instruct the witness not to

9    answer.

10        Q.   You're following your attorney's instruction?

11        A.   Yes.

12        Q.   Let's turn to the last page of McKinley

13    Deposition Exhibit 8.  Under "Strange Bedfellows," the

14    article states, "At the end of their investigation, the

15    four members of the citizens grand jury presented their

16    findings to members of Congress, hoping someone would

17    launch an official investigation into their claims."  Do

18    you see that?

19        A.   Yes.

20        Q.   And did you, as citizens grand jury, present

21    your members -- your findings to members of Congress?

22             MR. NORDBERG:  One second.  You can answer to

23    the extent your answer would not disclose material before

24    Special Grand Jury 89-2.

25        A.   Lipsky wrote an open letter to Congress.

1      Q.    Lipsky wrote an open letter to Congress

2  regarding the findings of the citizens grand jury?

3      A.    No.  His open letter is in the front of the

4  book.  And we give a lot of findings to Edith Holliman,

5  who was the investigator for the Wolpe committee.  And

6  there was a lot of stuff in there she was amazed at,

7  because she hadn't heard from the grand jury's side.

8      Q.    And the hope was that somebody in Congress

9  would launch an official investigation into the claims of

10 the citizens grand jury?  Is that fair?

11     A.    The hope was that justice would be served at

12 Rocky Flats, and the Wolpe committee would be vindicated

13 when they said that the Justice Department's handling has

14 proven there's no accountability in government.  That's

15 on the opening pages of the Wolpe report.

16     Q.    And did you hope to accomplish that --

17     A.    Yes.

18     Q.    -- by having somebody in Congress launch an

19 official investigation into the claims of the citizens

20 grand jury book -- citizens grand jury investigation?

21     A.    Into the facts that we'd found, yes.

22     Q.    And did any member of Congress offer to do

23 that?

24     A.    Not yet.

25     Q.    So the hope was that the citizens grand jury

1    findings would persuade a member of Congress to launch an

2    official investigation into the claims, but no member of

3    Congress has offered to do that yet, correct?

4         A.   Yes.  I'm not in Congress yet.

5         Q.   You're in the state legislature.

6         A.   Yes.

7         Q.   In the paragraph on this final page of McKinley

8    Deposition Exhibit 8 that begins with the words, "Each of

9    the four citizens grand jury members."  Do you see that?

10        A.   Yes.

11        Q.   That paragraph, second sentence, states,

12   "McKinley is still under FBI investigation."  Do you see

13   that?

14        A.   Yes.

15        Q.   Is that true?

16        A.   Don't know.

17        Q.   And it says, "If McKinley is found in contempt

18   of violating the grand jury's secrecy oath, he could go

19   to prison."  Do you know if that's true?

20             MR. NORDBERG:  Foundation.  You can go ahead

21   and answer.

22        A.   Yes.

23        Q.   Let's turn to page 124 of your Ambushed Grand

24   Jury book.

25        A.   Okay.

108

1      Q.   There's references to Mike Norton.  Do you see

2   that?

3      A.   On 100 --

4      Q.   Excuse me.  125.

5      A.   Okay.

6      Q.   Do you see that?

7      A.   Yes.

8      Q.   Who is Mike Norton?

9      A.   He was the government attorney.

10      Q.   With the Department of Justice?

11      A.   Yes.

12      Q.   Do you have any information as to anything that

13   the Department of Justice did to prevent you from talking

14   about what you learned as a grand juror on Rocky Flats

15   Special Grand Jury 89-2?

16           MR. NORDBERG:  You can answer to the extent the

17   answer does not disclose proceedings before Special Grand

18   Jury 89-2.

19      A.   Yes.

20      Q.   What information do you have as to anything

21   that the Justice Department or the U.S. Attorneys Office

22   did to prevent you from talking about what you learned as

23   a member of the grand jury?

24      A.   It's outlined in the Wolpe report.  Testimony

25   by Fimberg, Murtha, Lipsky, and Norton.

109

1      Q.    And do you believe that Mr. Norton was part of

2   an effort to cover up information about Rocky Flats?

3            MR. NORDBERG:  You can answer to the extent

4   your answer would not disclose --

5      A.    That's all in the Wolpe report.

6      Q.    And I'm asking you, based on your personal

7   knowledge, do you believe that Mr. Norton was part of an

8   effort to cover up information about Rocky Flats?

9      A.    All I know is what's in the Wolpe report.  I've

10  never had a discussion with Mr. Norton.  Never sat down

11  and drank beer, rode the rails.

12     Q.    So aside from what's in the Wolpe report, you

13  have no information as to anything that the Justice

14  Department did to cover up Rocky Flats?

15     A.    I said I never talked to him.  And I don't

16  speculate.

17     Q.    And is that a fair statement, then, that aside

18  from what's in the Wolpe report, you don't have any

19  information as to anything that the Justice Department

20  did to cover up anything that happened at Rocky Flats?

21     A.    Now, you were talking about Mike Norton, and

22  you changed gears on me a little bit.

23     Q.    Yes.

24     A.    Okay.  Mike Norton I've never had a discussion

25  with.  The Justice Department there has done things.  I

1  do believe, yes, for the Justice Department.

2     Q.   And what individuals at the Justice Department

3  do you believe were involved in the coverup?

4     A.   That would go under Rule 6(e).

5     Q.   So while following your counsel's instructions

6  not to violate Rule 6(e), you will not provide me with

7  any information as to anything that the Justice

8  Department did to cover up what happened at Rocky Flats,

9  correct?

10     A.   That's correct.

11        MR. NORDBERG:  I object to the form.

12     Q.   And following counsel's instructions not to

13  violate Rule 6(e), you will not tell me anything that the

14  Justice Department did to prevent you from talking about

15  what went on in front of the grand jury; is that correct?

16     A.   That's correct.

17        MR. NORDBERG:  Form.

18     Q.   And following your counsel's instruction not to

19  violate Rule 6(e), you will not provide me with any

20  information as to anything that Dow or Rockwell did to

21  cover up what happened at Rocky Flats, correct?

22        MR. NORDBERG:  Form.

23     A.   Yes.

24     Q.   And following your counsel's instruction not to

25  violate Rule 6(e), you will not provide me with any

1    information as to anything that the DOE did to cover up

2    what happened at Rocky Flats, correct?

3            MR. NORDBERG:  Form.

4        A.   Yes.

5        Q.   Let's look at -- now, you're aware that the

6    Justice Department stated in its sentencing memorandum --

7    well, strike that.

8            First let me ask you, have you reviewed the

9    Justice Department's sentencing memorandum?

10       A.   Yes.

11       Q.   And you're aware that the Justice Department

12   stated in its sentencing memorandum following the grand

13   jury's investigation that the conduct to which Rockwell

14   had pled guilty did not result in substantial

15   physiological harm or the imminent threat of substantial

16   physiological harm --

17           MR. NORDBERG:  Form.

18       Q.   -- to members of the public residing and

19   working outside Rocky Flats boundary?

20           MR. NORDBERG:  Form.

21       A.   That's what it says.

22       Q.   That's what the Justice Department said?

23           MR. NORDBERG:  Form.

24       A.   Yes.

25           MR. NOMELLINI:  What's wrong with the form,

1    Peter?

2            MR. NORDBERG:  I don't know, as I sit here,

3    whether that's a verbatim quote.  And I'm not sure

4    Justice Department is an accurate characterization.

5            A.   You got it.

6            Q.   (BY MR. NOMELLINI)  I have it.

7            A.   Good man.

8            MR. NORDBERG:  I'm unsurprised.

9            MR. NOMELLINI:  Mr. Nordberg has objected, and

10   so to clear up the record, I need to fix that.

11           Let's mark this as McKinley Exhibit 9.

12           (Deposition Exhibit 9 was marked.)

13           MR. NOMELLINI:  Off the record.

14           (Discussion off the record.)

15           Q.   (BY MR. NOMELLINI)  Let's look at McKinley

16   Exhibit 9, which is the plaintiff's sentencing memorandum

17   in United States versus Rockwell.  Do you see that?

18           A.   Yes.

19           Q.   And you've seen this document before?

20           A.   Yes.

21           Q.   And if you look at page 128, it's signed by

22   attorneys for plaintiff, United States of America.

23           A.   Yes.

24           Q.   Please look at page 124 of the sentencing

25   memorandum.

1      A.   Okay.

2      Q.   You see under, "Lack of substantial off-site

3   impacts"?

4      A.   Yes.

5      Q.   On page 124, the attorneys representing the

6   United States stated in the sentencing memorandum that

7   you reviewed, quote, Based on the evidence gathered in

8   this investigation and to the best of the Justice

9   Department's present knowledge and information, the

10   conduct to which Rockwell has pled guilty did not result

11   in substantial physiological harm or the imminent threat

12   of substantial physiological harm to members of the

13   public residing and working outside of Rocky Flats'

14   boundaries, correct?

15      A.   That's what it says.

16      Q.   Let's look at page 72 of your Ambushed Grand

17   Jury book.

18      A.   You did buy that book.  That's not a free one

19   they sent up, is it?

20      Q.   I did not personally buy it, but somebody must

21   have bought it.

22      A.   Okay.  Good.

23      Q.   Excuse me, Mr. McKinley.  Page 163.

24           Page -- at the bottom of page 162 of the

25   Ambushed Grand Jury book, it says, "Wes got up shaking

114

1     his head."  Do you see that?

2          A.    162?  Yes.

3          Q.    And then page 163 there's a quote from you.

4          A.    Uh-huh.

5          Q.    Correct?

6          A.    Uh-huh.

7          Q.    And in the second sentence on page 163, you

8     state, quote, it's not possible to make nuclear weapons

9     without creating tons of nuclear waste.  Do you see that?

10         A.    Yes.

11         Q.    And do you believe that it's true that it's not

12    possible to make nuclear weapons without creating tons of

13    nuclear waste?

14              MR. NORDBERG:  Foundation.

15         A.    Yes.

16         Q.    Do you believe that it's true that it's not

17    possible to make nuclear weapons without sacrificing the

18    health of the neighboring citizens and the workers?

19              MR. NORDBERG:  Foundation.

20         A.    Yes.

21         Q.    Do you believe that there's no safe way to make

22    nuclear bombs?

23              MR. NORDBERG:  Foundation.

24         A.    Yes.

25         Q.    Do you believe that there's no safe way to

115

1    dispose of nuclear waste?

2          MR. NORDBERG:  Foundation.

3    A.    Yes.

4    Q.    Do you believe that there's no safe way to

5    transport nuclear waste?

6          MR. NORDBERG:  Foundation.

7    A.    Yes.

8    Q.    Do you believe that there's no safe way to

9    store nuclear waste?

10         MR. NORDBERG:  Foundation.

11   A.    Yes.

12   Q.    Do you believe that there's no way to hide

13   nuclear waste from terrorists and other criminals?

14         MR. NORDBERG:  Foundation.

15   A.    Yes.

16   Q.    Do you believe that the United States does not

17   need any more nuclear weapons?

18   A.    Yes.

19   Q.    And do you believe that the United States

20   already has enough nuclear weapons to blow the planet up

21   20 times over?

22   A.    Yes.

23   Q.    What is the basis for the views about nuclear

24   weapons and nuclear waste set forth on page 163 of your

25   Ambushed Grand Jury book?

1          MR. NORDBERG:  Compound.

2          MR. NOMELLINI:  Let me fix that.

3     Q.   What is the basis for your views about nuclear

4     weapons as set forth on page 163 of your Ambushed Grand

5     Jury book?

6          MR. NORDBERG:  Compound.  You can answer.

7          THE DEPONENT:  I can answer?

8          MR. NORDBERG:  If you're able to answer, yes.

9     A.   What is the basis for that statement?

10    Discussions with Harvey Nichols.

11    Q.   Who --

12    A.   Harvey Nichols?

13    Q.   Who is Harvey Nichols?

14    A.   He's the professor out at CU.

15         Arjun Makhingy.  He's the nuclear physicist in

16    Washington, D.C.

17    Q.   Arjun Makhingy --

18    A.   Yes.

19    Q.   -- has an afterword in your book Ambushed Grand

20    Jury, correct?

21    A.   Yes.

22    Q.   And he is the president of the Institute for

23    Energy and Environmental Research?

24    A.   Uh-huh.

25    Q.   Now, the coauthor of your book The Ambushed

1    Grand Jury, Caron Balkany, is an anti-nuclear campaigner;

2    is that fair?

3         A.    That's your statement.  I don't know.

4               MR. NOMELLINI:  Let's mark this article as

5    McKinley Exhibit 10.

6               (Deposition Exhibit 10 was marked.)

7         Q.    McKinley Exhibit 10 is a New York Times article

8    published March 13th, 2004, entitled, "Book Says U.S.

9    Aides Lied in Nuclear Arms Plant Case."  Have you seen

10   this article before?

11        A.    Yes, I think I have.

12        Q.    And if you look at the second page of the

13   article, the first full sentence states, "The authors of

14   the book are Wes McKinley, the grand jury foreman, and

15   Caron Balkany, a lawyer and long-time anti-nuclear

16   campaigner."  Do you see that?

17        A.    Uh-huh.

18        Q.    And is that a true statement, that Caron

19   Balkany is a long-time anti-nuclear campaigner?

20              MR. NORDBERG:  Asked and answered.

21        A.    I really don't know.  I didn't write the

22   article.  Caron and I don't discuss politics.

23        Q.    Does Caron Balkany share your views as set

24   forth on page 163 of your book, that it's not possible to

25   make nuclear weapons without sacrificing the health of

118

1    the neighboring citizens and the workers?

2            MR. NORDBERG:   Foundation.

3       A.   I probably -- I'm sure she does.  I don't

4    really know.

5       Q.   Does Caron Balkany share your views that it's

6    not possible to make nuclear weapons without creating

7    tons of nuclear waste, as far as you know?

8       A.   Probably, yeah.

9       Q.   Does Caron Balkany share your views that

10   there's no safe way to make nuclear bombs, as far as you

11   know?

12      A.   As far as I know, uh-huh.  I think we're agreed

13   on that.  There's one thing in here she didn't agree to,

14   though.

15      Q.   Okay.  You're looking at another page in your

16   book?

17      A.   Yeah.  We didn't agree on everything.

18      Q.   What is it that she did not agree on?

19      A.   She didn't agree when I said that my granddad,

20   on page 84 -- start on page 83.  Caron -- I would start

21   off by telling people who I am and how ordinary a person.

22   "My grandfather homesteaded at this very place where I

23   now live.  He came here with a fine mule, a good milk cow

24   and a worn-out wagon.  The air was clear, the water was

25   pure, and a desirable woman soon joined him.  He was a

119

1   blessed man.  Women, mules, and milk cows are just as

2   good or better today than they were then, but the air and

3   water are killing us."

4        Caron put a note down there that said, "I have

5   to register an objection to the attitudes implicated in

6   this characterization."

7        Q.   She didn't agree on that one?

8        A.   She didn't agree.

9        MR. NORDBERG:  Let the record show that

10  according to the book Wes just read.

11       Q.   Is it your belief that the United States did

12  not need to make any more nuclear weapons?

13       A.   It's my belief that they could have properly

14  defended our country with more intelligent use of the

15  ones we have.

16       Q.   All right.  Well, we talked before about your

17  view that it's not possible to make nuclear weapons

18  without sacrificing the health of the neighboring

19  citizens and the workers, correct?

20       A.   Yes.

21       Q.   And was that one of your motivations in writing

22  this book, was to express your view that there's no safe

23  way to make nuclear weapons?

24       A.   Yes, one of them.  But it wasn't near the top.

25       Q.   And there were other motivations, too?

120

1  A. Yes. Children dying out at Rocky from exposure

2 to Rocky Flats on field trips, without being properly

3 informed as to the dangers there, was the prime

4 motivation.

5  Q. And when you're talking about children dying as

6 the result of exposure to Rocky Flats on field trips,

7 you're talking about exposure on-site the plant and not

8 off-site exposure, correct?

9  A. Yes. Because not all of the children that's

10 going to be visiting Rocky Flats live in that area. If

11 you live in that area, it would probably be all right to

12 visit. It's not going to make that much difference.

13  Q. Well, you testified before that you can't tell

14 me about any health effects that Rocky Flats has had on

15 people who live off-site --

16  A. No.

17  Q. -- the area, correct?

18  A. That's correct.

19  Q. Okay. And just for the record, relying on

20 that, I'm not going to probe further on that off-site

21 issue. But on the on-site issue -- well, before we get

22 to the on-site issue, let me ask you about the issue of a

23 coverup.

24   On page Roman Numeral VII of your book, you

25 refer to a coverup.

1      A.   Roman Numeral VII?  Where is that exactly?

2      Q.   Excuse me.  I think it's Roman Numeral XII.

3      A.   Is that in the front or back?

4      Q.   In the front of the book.

5      A.   I don't see Roman Numeral XII.

6      Q.   XII.

7           MR. NOMELLINI:  Peter, do you want to share?

8           MR. NORDBERG:  Yes.  It's in the note to

9  readers, Wes, beginning before part 1.  I don't know

10 where the coverup is, but --

11     A.   Okay.  Note to readers.  Maybe I'm not far

12 enough.  Okay.  Now I found it.

13     Q.   (BY MR. NOMELLINI)  If you'd look in Roman

14 Numeral XII, the reference to a government coverup.  Do

15 you see that?

16          MR. NORDBERG:  Second full paragraph on the

17 page.

18     A.   Uh-huh.

19     Q.   Okay.  Is it your belief that Judge Finesilver

20 was involved in the government coverup that you referred

21 to in Roman Numeral XII?

22          MR. NORDBERG:  May I confer with my client

23 before he responds to that question?

24          MR. NOMELLINI:  Yes.  As long as the time is

25 not counted against me.

1          MR. NORDBERG:  Well, we do have to leave at

2    6:00, so it's not a question of counting against you.

3    But it's understood that I requested the conference.

4          (Recess taken from 5:35 p.m. to 5:36 p.m.)

5          MR. NORDBERG:  May we have the question read

6    back.

7     Q.  (BY MR. NOMELLINI)  Was Judge Finesilver part

8    of the coverup?

9          MR. NORDBERG:  I will instruct the witness not

10   to answer on the grounds any answer would seemingly

11   implicate proceedings before the grand jury -- Special

12   Grand Jury 89-2.

13         MR. NOMELLINI:  And are you going to give the

14   same instruction if I ask if any individual was a part of

15   the coverup?

16         MR. NORDBERG:  Not necessarily.  Judge

17   Finesilver was a participant in the grand jury

18   proceedings.  If you asked about people who weren't

19   participants, I would not necessarily give that

20   instruction.

21    Q.  (BY MR. NOMELLINI)  Was Judge Maitsch a part of

22   the coverup?

23         MR. NORDBERG:  Same instruction.

24    Q.  Was the State of Colorado a part of the

25   coverup?

123

1     A.   Who is the State of Colorado?

2     Q.   Was the Colorado Department of Health a part of

3 the coverup?

4     A.   No.

5     Q.   Was the Rocky Flats Coalition of Local

6 Governments a part of the coverup of events at Rocky

7 Flats?

8     A.   I never knew them.

9     Q.   So you have no information that the Rocky Flats

10 Coalition of Local Governments was a part of any coverup?

11     A.   Not during -- no.

12     Q.   You have no information that Rocky Flats

13 Citizens Advisory Board was a part of any coverup?

14     A.   No.

15     Q.   You have no information that the Health

16 Advisory Panel was a part of any coverup?

17     A.   No.

18     Q.   How about Binny Abbott?  Do you know Binny?

19     A.   No.

20     Q.   You have no information that the Environmental

21 Protection Agency was a part of any coverup?

22     MR. NORDBERG:  I object to that question to the

23 extent it would involve or implicates proceedings before

24 Special Grand Jury 89-2.

25     A.   Yes, I'm following his lead.

124

1      Q.   Do you know what the ATSDR is?

2      A.   No.

3      Q.   Do you know whether the ATSDR issued a report

4  on Rocky Flats?

5      A.   I wouldn't know.

6      Q.   Now, you proposed a bill in the state

7  legislature regarding Rocky Flats in 2004, correct?

8      A.   Yes.

9      Q.   And can you tell me -- can you summarize for me

10  what that bill is about?

11      A.   We put signs at Rocky Flats.

12      Q.   And what were the signs to be about?

13      A.   History, the cleanup, the contamination, and

14  the dangers.

15      MR. NOMELLINI:  Let's mark this draft of

16  the -- Mr. McKinley's bill on Rocky Flats as McKinley

17  Exhibit 11.

18      (Deposition Exhibit 11 was marked.)

19      Q.   Is McKinley Exhibit 11 a draft of your bill on

20  Rocky Flats?

21      A.   Yes.

22      Q.   And is it the first draft or one of several

23  drafts?

24      A.   It's one of several.

25      Q.   Is it the most recent draft?

1        A.    Yes.   The last draft.

2        Q.    And this is one of the documents that you

3   brought with you today in response to the subpoena?

4        A.    Yes.

5        Q.    You are not an expert on plutonium, correct,

6   Mr. McKinley?

7        A.    That's correct.

8        Q.    You're not an expert on radiation?

9        A.    That's correct.

10        Q.    You're not an expert on how radiation impacts

11   children versus how it impacts adults?

12        A.    That's true.

13        Q.    You're not an expert on the cleanup of nuclear

14   weapons plants?

15        A.    That's true.

16        Q.    You're not an expert on sampling of nuclear

17   weapons plants?

18        A.    That's true.

19        Q.    Do you know whether samples have been taken at

20   Rocky Flats in connection with the cleanup?

21        A.    Yes.

22        Q.    And have samples been taken?

23        A.    Yes.

24        Q.    And one of the entities that's taken those

25   samples is the Colorado Department of Public Health and

1    Environment, correct?

2         A.   I think so.  Yeah.

3         Q.   And have you asked the Colorado Department of

4    Health -- Public Health and Environment to see any of the

5    samples that they've taken?

6         A.   No.

7         Q.   Do you have any reason to believe that the

8    samples taken by the Colorado Department of Health in

9    connection with the cleanup are not accurate?

10        A.   Yes.

11        Q.   And what's the basis for your testimony that

12   the samples taken by the Colorado Department of Public

13   Health and Environment in connection with the Rocky Flats

14   cleanup are not accurate?

15        A.   Can't talk about that.

16        Q.   Why can't you talk about the basis for your

17   view that the samples taken by the Colorado Department of

18   Public Health and Environment are not accurate?

19        A.   Because that may go into Rule 6(e).  I've been

20   advised by counsel not to go there.

21        Q.   Do you know who Steve Gunderson is?

22        A.   Yes, I've seen that.

23        Q.   He's the Rocky Flats cleanup agreement

24   coordinator for the Colorado Department of Public Health

25   and Environment, correct?

127

1        A.    Yes.

2        Q.    Have you had any discussions with Mr. Gunderson

3   about the cleanup?

4        A.    No.

5        Q.    Have you ever advised Mr. Gunderson that the

6   samples taken by the Colorado Department of Public Health

7   and Environment may not be reliable?

8        A.    No.

9        Q.    And you've never seen any of the sampling data

10  taken by the Colorado Department of Health and

11  environment?

12       A.    I can't answer that.

13       Q.    You've never seen any of the sampling data

14  taken by the Colorado Department of Health and

15  Environment from 1993 to the present?

16       A.    No.

17       Q.    You have not seen it, correct?

18       A.    That's correct.

19       Q.    Do you know how much sampling data the Colorado

20  Department of Health and Environment has taken from 1993

21  to the present?

22       A.    No.

23       Q.    Do you know what areas of the plant the

24  Colorado Department of Health and Environment has sampled

25  from 1993 to the present?

128

1        A.   No.

2        Q.   Do you know one way or the other whether the

3   Colorado Department of Health has taken into account

4   information -- the same information that you learned as a

5   grand juror in sampling from 1993 to the present?

6             MR. NORDBERG:   Instruct the witness not to

7   answer.

8             MR. NOMELLINI:   I'm just asking him if he

9   knows.   It's a yes or no question.

10            MR. NORDBERG:   Depending on the answer, and

11  plus it would disclose information from the proceedings

12  before the grand jury.   And as I've made very clear, I'm

13  going to instruct him not to answer any question that

14  would entail such a disclosure.

15       Q.   (BY MR. NOMELLINI)  Do you know if there is any

16  relevant information that the Colorado Department of

17  Health has not taken into account during the sampling

18  that the Colorado Department of Health has done from 1993

19  to the present?

20       A.   Yes.

21       Q.   And what information that the Colorado

22  Department of Health has not taken into account?

23       A.   There have been different sites disclosed to me

24  by people that worked out there on the cleanup.   And I

25  won't reveal who has told me this.

129

1      Q.   Do you know if the Colorado Department of

2   Health has sampled at those sites?

3      A.   No, I really don't.

4      Q.   Do you know how much the Colorado Department of

5   Health has sampled at those sites?

6      A.   No.

7      Q.   Do you know what the results were when the

8   Colorado Department of Health sampled at the sites that

9   you learned about as a grand juror but that you

10   weren't -- you won't disclose?

11      A.   I read in the newspapers.  Read in the

12   newspapers that they had found a lot of hot spots here

13   the other day.

14      Q.   But apart from what you've read in

15   newspapers --

16      A.   No.

17      Q.   -- do you have any knowledge as to what the

18   Colorado Department of Health found when they sampled at

19   sites in Rocky Flats that you learned about as a grand

20   juror?

21          MR. NORDBERG:   That you learned about as a

22   grand juror is surely the signal that the question

23   implicates proceedings before Special Grand Jury 89-2,

24   and, therefore, I'm instructing the witness not to

25   answer.

1        MR. NOMELLINI:  I'm just asking him yes or no

2  if -- if he can tell me whether he has personal knowledge

3  as to what results the Colorado Department of Health came

4  up with when it sampled at the sites on Rocky Flats that

5  he learned about as a grand juror.

6        MR. NORDBERG:  I'm going to instruct you not to

7  answer that question.

8      Q.  (BY MR. NOMELLINI)  So given your counsel's

9  instructions, you will not tell me whether you have

10  personal knowledge as to what the Colorado Department

11  of Health learned when it sampled at the sites in

12  Rocky Flats that you learned about as a grand juror,

13  correct?

14        MR. NORDBERG:  Objection, form.  Like several

15  previous questions of this same form, it misleadingly

16  suggests that Mr. McKinley has refused or been instructed

17  to refuse to testify to information from his personal

18  knowledge derived from sources other than the proceedings

19  before the special grand jury.  To that extent, the

20  question is ambiguous and misleading.

21        MR. NOMELLINI:  Let me fix it.

22      Q.  (BY MR. NOMELLINI)  Because of Rule 6(e), you

23  will not testify as to any personal knowledge that you

24  have as to what results the Colorado Department of

25  Health came up with when they sampled the areas at

1    Rocky Flats that you learned about as a grand juror,

2    correct?

3         A.   That's correct.

4         Q.   And because of Rule 6(e), you will not testify

5    about any personal knowledge that you have as to any

6    sampling that was done at any sites at Rocky Flats that

7    you learned about as a grand juror, correct?

8         A.   That's correct.

9         Q.   Now, you're familiar with the Rocky Flats

10   Coalition of Local Governments, correct?

11        A.   Yes.

12        Q.   And the Rocky Flats Coalition of Local

13   Governments has been involved in the cleanup efforts at

14   Rocky Flats, correct?

15        A.   I don't know.  They made a lot of racket, but I

16   don't know what their involvement in the cleanup was.

17        Q.   You've had conversations with David Abelson,

18   right?

19        A.   Conversations would be a stretch.

20        Q.   You've talked to Mr. Abelson?

21        A.   Yes.

22        Q.   And he's the head of the Rocky Flats Coalition

23   of Local Governments, right?

24        A.   I don't think anymore.  I think he was.

25        Q.   He was the head of the Rocky Flats Coalition of

1    Local Governments in the past?

2         A.    In the past.  Till DOE shut his funding off.

3         Q.    And what's your basis -- what's the basis of

4    your view that DOE shut off the funding of the Rocky

5    Flats coalition?

6         A.    I think I received that from the Rocky Mountain

7    Peace and Justice Center.

8         Q.    Somebody from the Rocky Flats Peace and Justice

9    Center told you that?

10        A.    I believe that.

11        Q.    And the Coalition of Local Governments

12   comprises Boulder County, Jefferson County, Arvada,

13   Boulder, City and County of Broomfield, Westminster and

14   Superior, correct?

15        A.    I don't really know who comprise them, but

16   probably close.

17        Q.    Have you asked -- you've talked to David

18   Abelson before, right?

19        A.    Uh-huh.

20        Q.    And did you ask him whether the Coalition of

21   Local Governments is involved in the Rocky Flats cleanup?

22        A.    No.

23             MR. NOMELLINI:  Let's mark as McKinley

24   Deposition Exhibit 12 an article from the Los Angeles

25   Times dated January 6, 2005.

```
 1                (Deposition Exhibit 12 was marked.)

 2        Q.   This article, dated January 6, 2005, is

 3   entitled, "A Nuclear Weapons Site Still Unsafe, Says

 4   Ex-FBI Agent."  And it's from the Los Angeles Times.

 5                And I want to ask you first -- I note that

 6   you're quoted in this article.  Have you seen it

 7   before?

 8        A.   No.

 9        Q.   If you look at the sixth paragraph down, you're

10   quoted as saying, "If you go horseback riding, you get a

11   warning."  Do you see that?

12        A.   Yes.

13        Q.   And look at the second to last paragraph down.

14        A.   Uh-huh.

15        Q.   McKinley Exhibit 12 says, "David Abelson, who

16   heads the Rocky Flats Coalition of Local Governments, a

17   group of communities near the site that monitors the

18   cleanup, said much of what Lipsky said might be true but

19   was old news."

20                And then he goes on to say, "The local

21   governments feel highly confident in the cleanup.  There

22   is no bit of information we have asked for that has been

23   turned down."  Do you see that?

24        A.   Where is that at?

25        Q.   It's at the bottom of Exhibit 12.
```

1     A.   Okay.

2     Q.   Okay.  Now, you're aware that the Rocky Flats

3 Coalition of Local Governments is a group of communities

4 near Rocky Flats that monitored the cleanup, right?

5     A.   Yes.

6     Q.   And --

7     A.   Well, representatives of those different places

8 monitored.  The county commissioners, not the communities

9 themselves.  Because I've heard from several community

10 members.

11     Q.   But the Rocky Flats Coalition of Local

12 Governments monitored the cleanup.

13     A.   Yes.

14     Q.   And Mr. Abelson says that there is no bit of

15 information that the Rocky Flats coalition of governments

16 has asked for that has been turned down.  Are you aware

17 that that was true?

18     A.   That's what he says.

19     Q.   And did you ever ask anybody from the Rocky

20 Flats Coalition of Local Governments whether they had

21 received all of the information that they sought in

22 connection with the cleanup?

23     A.   No.

24     Q.   Did you ever ask the Rocky Flats Coalition of

25 Local Governments for any information in connection with

1   the cleanup?

2       A.   I've gotten -- I've asked and gotten

3   information from them that would read that.  But -- yes,

4   I have.  And they did give it to me.

5       Q.   Do you believe the Rocky Flats Coalition of

6   Local Governments is involved in any coverup with respect

7   to sampling data?

8       A.   No.

9       Q.   Have you asked the Rocky Flats Coalition of

10  Local Governments for any sampling data?

11      A.   No.

12      Q.   Do you believe that David Abelson is

13  trustworthy?

14      A.   No.

15      Q.   No?  What's the basis -- now, David Abelson

16  is -- does not work for Dow or Rockwell, right?

17      A.   That's true.

18      Q.   He represents local governments, correct?

19      A.   It's funded by DOE.

20      Q.   What's the basis for your view that Rocky Flats

21  coalition of governments was funded by the DOE?

22      A.   What's the basis for that?

23      Q.   Yes.

24      A.   I've got several papers of that.  I can find

25  out and get back to you.

136

1     Q.   So the basis for your view that the Rocky Flats

2   Coalition of Local Governments is funded by the DOE is

3   papers that you've read?

4     A.   No.  I've got that somewhere.  It's not the --

5   yes, I'll find that.  I'll be more specific.  I'll

6   research that out, because I've got it.

7     Q.   But the basis of your view that the Rocky Flats

8   Coalition of Local Governments is funded by the DOE is

9   something that you've read, correct?

10    A.   Yes.

11    Q.   And as far as you know, is it anything that you

12  read that was written by Dow or Rockwell?

13    A.   No.

14    Q.   Look at page 3 of your bill.  This is McKinley

15  Deposition Exhibit 11, I believe.  Page 3 of McKinley

16  Deposition Exhibit 11, section E, states, "The EPA and

17  the State of Colorado, using mathematical modeling, have

18  determined that cleanup of what is now the Rocky Flats

19  National Wildlife Refuge has made the refuge safe for

20  visitors and wildlife refuge workers."  Do you see

21  that?

22    A.   Yes.

23    Q.   And do you believe that that's true?  First

24  that the State of Colorado has determined that the

25  cleanup of what is now the Rocky Flats National Wildlife

1    Refuge have made the refuge safe for visitors and

2    wildlife refuge workers?

3         A.   No.

4         Q.   You believe that the State of Colorado has not

5    determined that cleanup of what is now the Rocky Flats

6    National Wildlife Refuge has made the refuge safe for

7    visitors and wildlife refuge workers?

8         A.   I believe that the EPA and the State of

9    Colorado, using mathematical modeling, have determined

10   that cleanup of what is now the Rocky Flats National

11   Wildlife Refuge has made the refuge safe for visitors.

12   They have determined through their mathematical

13   modelings.

14        Q.   And have you asked to see the results of the

15   mathematical modeling done by the EPA or the State of

16   Colorado regarding whether the cleanup is safe for

17   visitors and wildlife refuge workers?

18        A.   I don't need to.  It's the EPA and Colorado

19   have determined.

20        Q.   And have you asked to see the results of the

21   EPA -- what the EPA and the State of Colorado have

22   determined as a result of their testing?

23        A.   No.  But they determined that 50 pico curies

24   per gram of soil up to 3 feet is safe.  2,000 from 3 to

25   5 -- or 3 to 6.  And below 6,000.  That is what they have

1    determined.

2        Q.   And do you have a view as to whether the

3    standard of 50 pico curies per gram for the cleanup is

4    protective of human health?

5        A.   Yes.

6        Q.   And what is that view?

7        A.   No, it's not.

8        Q.   What is the basis of that view?

9        A.   Conversations with Dr. Harvey Nichols, Arjun

10   Makhingy, Carl Johnson reports, Courtney files, and

11   interviews of several of the old scientists that admitted

12   they had made a mistake.  And those are on the date line

13   of Westword -- or date line of Frontline.  And I don't

14   recall their names.  They're dead now.

15       Q.   And as far as you're aware, are any of the

16   people that have told you that the 50 pico curies per

17   gram standard is not safe employees of Dow or Rockwell?

18       A.   I don't know who they worked for.

19       Q.   So as you sit here today, you're not aware of

20   any employees of Dow or Rockwell who have told you that

21   the 50 pico curies per gram standard is not safe?

22       A.   No.

23       Q.   You've been told that by other people,

24   correct?

25       A.   Yes.

139

1          Q.   And that's the basis for your view that the

2     50 pico curies per gram standard is not safe, what

3     people other than Dow and Rockwell employees have told

4     you?

5               MR. NORDBERG:  Form.

6          Q.   Correct?

7          A.   Yes.

8          Q.   Now, you're not an expert as to what level of

9     pico curies per gram is protective of human health,

10    correct?

11         A.   Mark, about the only thing I'm an expert on

12    is horses and dogs.  But one spec of plutonium will kill.

13         Q.   And my question, Mr. McKinley, is --

14         A.   One atom.

15         Q.   And my question, Mr. McKinley, respectfully,

16    is, you're not an expert as to whether the 50 pico curies

17    per gram standard is protective of human health?

18         A.   There is no protective standards.

19         Q.   And my question is simply, you're not an expert

20    as to whether or not there is any standard that is

21    protective of human health, correct?

22         A.   I can quote the expert as saying there is no

23    standard.  But I can tell time, too.

24         Q.   And you, yourself, are not an expert?

25         A.   Only on horses and dogs.

140

1      Q.    You're aware of the Rocky Flats Citizens

2   Advisory Group?

3      A.    Yes.

4      Q.    And you know who Victor Holm is?

5      A.    I've heard the name.

6      Q.    And the Rocky Flats Citizens Advisory Group is

7   not affiliated with Dow or Rockwell, correct?

8      A.    No.   That's right.   I don't know.

9      Q.    And the Rocky Flats Citizens Advisory Group has

10  also monitored the cleanup, correct?

11     A.    I think so.   But I don't have proof or

12  anything.   But I'll accept that.

13     Q.    Well, the Rocky Flats Citizens Advisory Group

14  is not funded by the DOE, as far as you know, correct?

15     A.    That's right.

16     Q.    And you're aware that the Rocky Flats Citizens

17  Advisory Group has monitored the sampling data from the

18  cleanup of Rocky Flats?

19     A.    Uh-huh.

20     Q.    Yes?

21     A.    Yes.

22     Q.    And, in fact, Victor Holm of the Rocky Flats

23  Citizens Advisory Group has done his own sampling in

24  connection with the cleanup, correct?

25     A.    I don't know that.

1          Q.    In any event, you haven't asked the Rocky Flats

2    Citizens Advisory Council to share with you sampling data

3    regarding the cleanup of Rocky Flats, correct?

4          A.    No.

5          Q.    And you're not aware one way or the other as to

6    whether the Rocky Flats Citizens Advisory Council has

7    gotten all of the information that they've asked for in

8    terms of sampling data in connection with the Rocky Flats

9    cleanup?

10         A.    No.

11              MR. NORDBERG:  Mark, can I ask if, on the brink

12   of exhaustion, the question is the defendants' ambition

13   to ask?

14              MR. NOMELLINI:  The question that it is

15   defendants' ambition to ask?

16              MR. NORDBERG:  Are we near the end of this

17   deposition, from your point of view?

18              MR. NOMELLINI:  Here is what I would like to

19   do:  I would like to go to 6:30 and then to reserve my

20   right to go on.

21              MR. NORDBERG:  Can we go off the record for a

22   second?

23              MR. NOMELLINI:  Yes.

24              (Discussion off the record.)

25              (Recess taken from 6:04 p.m. to 6:11 p.m.)

1          MR. NOMELLINI:  Let's mark this as McKinley

2    Exhibit 13.

3          (Deposition Exhibit 13 was marked.)

4     Q.   (BY MR. NOMELLINI)  This is an article from the

5    Daily Camera dated January 6th, 2005, entitled, "FBI

6    Agent Alleges Federal Coverup at Site."

7          And this relates to claims by Agent Lipsky.

8    And you'll see, Mr. McKinley, in the fourth to last

9    paragraph, there's a statement that, "The authors of the

10   Ambushed Grand Jury, New Mexico lawyer Caron Balkany and

11   state representative Wes McKinley, made similar

12   allegations last spring."

13         First let me ask you, have you seen this

14   article before?

15    A.   I don't think I have.  I don't know.  I've seen

16   a lot of them.  Can't be sure.

17    Q.   If you look at the last paragraph of McKinley

18   Deposition Exhibit 13, it states, quote, Steve Gunderson,

19   the Rocky Flats cleanup coordinator for the Colorado

20   Department of Public Health and Environment, said there

21   was nothing new in Lipsky's allegations.  Further, he and

22   others said the cleanup was done based on environmental

23   sampling since the mid-1990s.

24         And my question for you is, do you know whether

25   that's true?  Whether the cleanup was done based on

1    environmental sampling done since the mid-1990s?

2         A.    No.

3         Q.    You don't know one way or the other, correct?

4         A.    Right.

5         Q.    That's correct?

6         A.    Yes.

7         Q.    And you don't know whether the sampling --

8    strike that.

9              You don't know what parts of the plant the

10   sampling done since the mid-1990s is covering, correct?

11        A.    No.

12        Q.    And Mr. Gunderson states that the sewage

13   sprayed fields Lipsky mentioned were, quote, extremely

14   well sampled and well characterized, correct?

15        A.    That's what it says.

16        Q.    And do you know whether, as a result of the

17   work done by the Colorado Department of Public Health and

18   Environment, the sewage sprayed fields were extremely

19   well sampled?

20        A.    No.

21        Q.    You don't know one way or the other?

22        A.    No.

23        Q.    In fact, you don't know what sampling was done

24   in connection with the cleanup?

25        A.    No.

144

1          Q.    And you've never asked anybody about that?

2          A.    No.

3          Q.    Now, did you ask the Rocky Flats Coalition of

4    Local Governments to support your bill?

5          A.    Yes.

6          Q.    And you're aware, I take it, that the Rocky

7    Flats Coalition of Local Governments decided not to

8    support your bill?

9          A.    Yes.

10          Q.    Did you ask the Rocky Flats Citizens Advisory

11    Group to support your bill?

12          A.    No.

13          Q.    And you're aware, Mr. McKinley, that one of the

14    reasons that the Rocky Flats Coalition of Local

15    Governments gave for not supporting your bill is that the

16    plant site has been extensively sampled in connection

17    with the cleanup?

18          A.    I'm not aware of that.  That's not why they

19    opposed it.

20          Q.    Did you ask Mr. Abelson why the Rocky Flats

21    Coalition of Local Governments opposed the bill?

22          A.    Yes.

23          Q.    What did Mr. Abelson tell you?

24          A.    They opposed it because I was going to do the

25    language on it.

145

 1          Q.    Because you were going to do the --

 2          A.    The language.

 3          Q.    Which language?

 4          A.    That says, on page 2, starting with line 9

 5     through line 36, page 3, lines 1 through 19.

 6          Q.    The Rocky Flats Coalition of Local Governments

 7     opposed that language?

 8          A.    Yes.  Did they tell you they opposed it because

 9     of other reasons?

10          Q.    They haven't told me anything.

11                But you didn't ask the Rocky Flats Coalition of

12     Local Governments what sampling results it had seen,

13     correct?

14          A.    Sampling had nothing to do with this bill.

15          Q.    Well, my question is just whether you asked the

16     Rocky Flats Coalition of Local Governments for any

17     sampling they had seen.

18          A.    We're talking about something other than the

19     bill.

20          Q.    Okay.  Let's shift now.

21          A.    Okay.

22          Q.    Did you ask the Rocky Flats Coalition of Local

23     Governments for any sampling results they had seen --

24          A.    No.

25          Q.    -- for the period 1993 to 2005?

1        A.   No.

2        Q.   And you've never seen any sampling results for

3   the period 1993 to 2005?

4        A.   No.

5        Q.   And because of Rule 6(e), you will not testify

6   as to any reasons why you believe that sampling results

7   from 1992 and prior are not reliable, correct?

8        A.   I will not testify to that.

9             MR. NOMELLINI:  Let's mark as McKinley

10  Deposition Exhibit 14 a January 6, 2005, article from the

11  Rocky Mountain News entitled, "Ex-agent Outlines Flats

12  Allegation."  And there's a fine picture of Mr. McKinley

13  in this article.

14             (Deposition Exhibit 14 was marked.)

15       Q.   Have you seen this before?

16       A.   Yes.

17       Q.   Okay.  You've read this article before?

18       A.   Uh-huh.

19       Q.   If you'd look at page 2.  Do you see where

20  it -- page 2 of the Rocky Mountain News article mentions

21  Victor Holm?

22       A.   Uh-huh.

23       Q.   And Exhibit 14 on page 2 says, "Victor Holm,

24  head of the Rocky Flats Citizens Advisory Board, is one

25  of those watchdogs.  He thinks that there are safeguards

1    today that didn't exist in 1989 that ensure that testing

2    is accurate, including independent labs, the state's

3    health department, and the Environmental Protection

4    Agency."  Did I read that correctly?

5         A.   Yes.

6         Q.   And Mr. Holm further states in the article that

7    you've read, "I've personally sampled, he said, and

8    personally taken the samples to the labs.  I get the same

9    result they do."  Do you see that?

10        A.   Uh-huh.

11        Q.   Now, when you read this article, McKinley

12   Exhibit 14, and Mr. Holm's comments, did you ask to see

13   his samples?

14        A.   No.  If you'd have read on, it says, "He said

15   test shows there are, in fact, tiny amounts of

16   radioactivity on the east side of the plant's buffer zone

17   and off-site into Westminster near Indiana and the former

18   town of Layton on the south."

19        Q.   And then he continues.  "But the levels are so

20   low that cleanup of the soil is not required," correct?

21        A.   Uh-huh.

22        Q.   Do you have any knowledge as to whether or not

23   the samples taken by Mr. Holm are reliable?

24        A.   I don't know about his samples.  I don't even

25   know his background, what it is.

148

```
 1        Q.   Do you have any reason to believe that any
 2   samples taken by Mr. Holm are not reliable?
 3        A.   No.
 4        Q.   Do you know what parts of the plant Mr. Holm
 5   sampled?
 6        A.   No.
 7        Q.   Did you ever ask him about any of his sampling
 8   work?
 9        A.   No.
10        Q.   And you've talked to Mr. Holm before.
11        A.   No, I don't think so.
12        Q.   Have you ever asked the Rocky Flats Coalition
13   of Local Governments or the Rocky Flats Citizens Advisory
14   Board to become involved in monitoring the Rocky Flats
15   cleanup?
16        A.   No.
17        Q.   Have you ever asked anyone to become involved
18   in the Rocky Flats cleanup?
19        A.   No.
20             MR. NOMELLINI:  Mark this as McKinley
21   Exhibit 15.
22             (Deposition Exhibit 15 was marked.)
23        Q.   McKinley Exhibit 15 is the bill summary for
24   your bill on Rocky Flats.  Do you see that?
25        A.   Uh-huh.
```

149

1        Q.    And have you seen that document before?

2        A.    No.

3        Q.    Now, Mr. McKinley, during debate on your bill

4    on Rocky Flats, Victor Holm indicated that he would be

5    opposing the bill.  Is that correct?

6        A.    Yes, I think so.

7        Q.    And Hank Stoval, he was a member of the

8    Broomfield city council for many years, right?

9        A.    Yeah.  I don't know.

10        Q.    Hank Stoval indicated that he would be opposing

11    your bill, correct?

12        A.    I don't know.  I'm not -- I don't know.  I know

13    they testified.  I see it here that they testified.

14        Q.    David Abelson spoke for the Rocky Flats

15    coalition of governments.  He indicated he would be

16    opposing your bill, correct?

17        A.    Yes, he has.

18        Q.    Lorraine Anderson is a member of the Arvada

19    city council, correct?

20        A.    I don't know.

21        Q.    She indicated that she would be opposing your

22    bill; is that correct?

23        A.    Yes.  It says here, "Stated the bill's warning

24    will create a stigma against the area."

25        Q.    Gerald DePoorter is a member of the Rocky Flats

150

1    Citizens Advisory Board, right?

2         A.   I don't know.  That's what it says.

3         Q.   Mr. DePoorter indicated that he would be

4    opposing your bill?

5         A.   I don't know.

6         Q.   Howard Roitman, he's a member of the Colorado

7    Department of Health, correct?

8         A.   Yeah.  Uh-huh.

9         Q.   Howard Roitman is director of environmental

10   programs at the Colorado Department of Health, right?

11        A.   Right.

12        Q.   And Mr. Roitman indicated that he would be

13   opposed to your bill.

14        A.   Uh-huh.

15        Q.   Doug Young is a representative of Mark Udall's

16   office, correct?

17        A.   Yes, that's correct.

18        Q.   And Mark Udall is a democratic representative

19   from Colorado?

20        A.   Yes.

21        Q.   And Mr. Young indicated that he and Mr. Udall's

22   office were opposed to your Rocky Flats bill, correct?

23        A.   Yes.  At one point, they said they were

24   supportive.  And we changed it, and then they opposed it.

25        Q.   So as of the last you heard, they were opposed

1    to the bill, right?

2         A.   Yes.

3         Q.   Now, plutonium is an unseen substance, right?

4              MR. NORDBERG:  Form.  I'm sorry.  You can go

5    ahead and answer.

6         A.   Till you start puking blood up from your lungs.

7    Now, you showed this, the bill summary.

8         Q.   Yes.

9         A.   House committee on Health and Human Services.

10   Can we put into the record that all -- with all the

11   opposition against it, it still passed this committee?

12        Q.   It may reflect that in the document.

13        A.   It says, "Passed without objection."

14        Q.   It passed by a vote of 7 to 6; is that fair?

15        A.   That's correct, yes.

16        Q.   And finally, let's look at page 79 of your

17   Ambushed Grand Jury book.  On page 79 of your Ambushed

18   Grand Jury book, there are quotes from you.  If you look

19   at the bottom of the page.  Correct?

20        A.   Uh-huh.

21        Q.   And if you look at the third -- the fourth to

22   last paragraph, you're quoted as saying, "They're going

23   to pretend like nothing bad was ever done there.

24   Property values are skyrocketing around Denver."  Do you

25   see that?

1        A.   Uh-huh.

2        Q.   And those were your statements?

3        A.   Yes.

4        Q.   What was the basis for your view as expressed

5    on page 79 of your Ambushed Grand Jury book that property

6    values are skyrocketing around Denver?

7        A.   From talking with the people that live here.

8    Housing rates have gone up.   That's how.

9        Q.   Does that include people in Arvada and

10   Westminster?

11       A.   Yes.

12       Q.   And does that include people in Broomfield?

13       A.   I think so, yes.

14       Q.   So the comments that have been made by people

15   in Arvada, Broomfield, and Westminster to you have

16   indicated to you that property values are skyrocketing

17   around Denver, correct?

18            MR. NORDBERG:   Mischaracterizes the testimony.

19       Q.   Is that fair?

20       A.   Yes.

21       Q.   Isn't it true, Mr. McKinley, that all you saw

22   during the grand jury process was what the prosecutors

23   wanted you to see?

24       A.   No.

25       Q.   What did you see in the grand jury process that

153

1   the prosecutors did not want you to see?

2          MR. NORDBERG:  I'll instruct the witness not to

3   answer.

4      Q.   And you're following your attorney's

5   instruction?

6      A.   Yes.

7          MR. NOMELLINI:  It's 7:29, so -- 6:29.  Excuse

8   me.  We are reserving the right to continue the

9   deposition.  And we will be in touch with --

10          THE DEPONENT:  Will these be sealed in the

11   vault?

12          MR. NOMELLINI:  These actually will not be

13   sealed.

14          THE DEPONENT:  Do you want them back, or what

15   do you want to do with this?

16          MR. NORDBERG:  You need to let Mark finish his

17   statement.

18          MR. NOMELLINI:  These actually will not be

19   sealed, just so there's no misunderstanding.  Do you have

20   any disagreement with that?

21          MR. NORDBERG:  I agree with you.  Unless

22   someone wants to seal them.

23          MR. NOMELLINI:  Right.  And so to get back to

24   my statement, we are accommodating plaintiffs' request to

25   terminate this -- not to terminate but to at least

1    postpone this deposition at 6:30.

2            MR. NORDBERG:  At least adjourn the deposition.

3            MR. NOMELLINI:  It is defendants' position that

4    Judge Kane has ordered the deposition should last for

5    seven hours, so that we're entitled to the remainder of

6    that time.  And Mr. Nordberg has not stated yet whether

7    plaintiffs will agree to reconvene the deposition and, if

8    so, at what time.

9            MR. NORDBERG:  That's a fair summary.

10           WHEREUPON, the within proceedings were recessed

11   at the approximate hour of 6:31 p.m. on the 18th day of

12   October, 2005.

13                   *     *     *     *     *

14

15

16

17

18

19

20

21

22

23

24

25

1          I, WESLEY PAUL McKINLEY, do hereby certify that

2     I have read the above and foregoing deposition and that

3     the same is a true and accurate transcription of my

4     testimony, except for attached amendments, if any.

5          Amendments attached    (  ) Yes    (  ) No

6                         _____

7                         WESLEY PAUL McKINLEY

8

9          The signature above of WESLEY PAUL McKINLEY was

10    subscribed and sworn to before me in the county of

11    _____, state of Colorado, this _____ day of

12    _____, 2005.

13                         _____

14                         Notary Public
                           My commission expires:

15

16

17

18

19

20

21

22

23

24    Merilyn Cook 10/18/05(sz)

25

156

REPORTER'S CERTIFICATE

STATE OF COLORADO          )
                           )  ss.
CITY AND COUNTY OF DENVER  )

        I, SHARON L. SZOTAK, Registered Professional

Reporter, Certified Realtime Reporter, and Notary Public,

State of Colorado, do hereby certify that previous to the

commencement of the examination, the said WESLEY PAUL

McKINLEY was duly sworn by me to testify to the truth in

relation to the matters in controversy between the

parties hereto; that the said deposition was taken in

machine shorthand by me at the time and place aforesaid

and was thereafter reduced to typewritten form; that the

foregoing is a true transcript of the questions asked,

testimony given, and proceedings had.  I further certify

that I am not employed by, related to, nor of counsel for

any of the parties herein, nor otherwise interested in

the outcome of this litigation.

        IN WITNESS WHEREOF, I have affixed my signature

this 19th day of October, 2005.

        My commission expires June 10, 2008.

October 19, 2005

Peter Nordberg, Esq.
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, Pennsylvania  19103

Re:  Merilyn Cook, et al. v Rockwell International
     Corporation, et al.
Deposition of:  Wesley Paul McKinley

Dear Mr. Nordberg:

Enclosed is the original signature page(s) of the
above-named deposition(s).  It was agreed that you would
arrange for signature of same by means of your copy
transcript(s) and the enclosed signature page(s).

Also enclosed are amendment sheets for changes if
necessary.  Please return the signature page(s) and
amendment sheets to court prior to trial, furnishing
copies of amendments to all counsel of record and our
office.

Thank you for your attention to this matter.

Sincerely,


Sharon L. Szotak, RPR, CRR
HUNTER + GEIST, INC.
Registered Professional Reporters

c:  Mark Nomellini, Esq.