# Exhibit A

1

```
 1                IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLORADO
 2
      Civil Action No. 90-K-181
 3
      MERILYN COOK, et al.,
 4
      Plaintiffs,
 5
      v.
 6
      ROCKWELL INTERNATIONAL CORPORATION and THE DOW CHEMICAL
 7    COMPANY,
 8    Defendants.
      _____
 9
      DEPOSITION OF:  JON S. LIPSKY - October 16, 2005
10    _____

11            PURSUANT TO NOTICE, the deposition of JON S.
      LIPSKY was taken on behalf of the Defendants at 1801 York
12    Street, Denver, Colorado 80202, on October 16, 2005, at
      8:53 a.m., before Barbara Birger, Registered Merit
13    Reporter, Certified Realtime Reporter and Notary Public
      within Colorado.
14
                       A P P E A R A N C E S
15
      For the Plaintiffs:      PETER NORDBERG, ESQ.
16                             Berger & Montague, P.C.
                               1622 Locust Street
17                             Philadelphia, Pennsylvania 19103

18    For the Defendants:      ELLEN AHERN, ESQ.
                               Kirkland & Ellis LLP
19                             200 East Randolph Drive
                               Chicago, Illinois 60601
20

21

22

23

24

25
```

2

1                              I N D E X

2      EXAMINATION OF JON S. LIPSKY:                      PAGE
       October 16, 2005

3      By Ms. Ahern                                        3

4

5                                                        INITIAL
       DEPOSITION EXHIBITS:                             REFERENCE

6

       1  Letter to Lipsky from Goffi, 10/13/05,          142
7         Re:  Cook, et al. v. Rockwell International
          Corp., et al., 90-K-181 (D. Colo.), with
8         attachment

9      2  Plea Agreement, 3/26/92                          185

10     3  Map of Rocky Flats, 1989                         203

11     4  Aerial Photograph of Rocky Flats, 1989           203

12        (Attached to original and copy transcript of Ms.
           Ahern.)
13
                                                        INITIAL
14     DEPOSITION EXHIBITS:  (Previously marked)        REFERENCE

15     2 (Hobbs)  Application and Affidavit for            129
         Search Warrant
16
       6 (Smith)  Plaintiff's Sentencing Memorandum        187
17

18

19

20

21

22

23

24

25

3

1          WHEREUPON, the following proceedings were taken

2     pursuant to the Federal Rules of Civil Procedure.

3                 *     *     *     *     *

4          MS. AHERN:  I think that counsel would like to

5     make a statement on the record.

6          MR. NORDBERG:  Yes.  I'm Peter Nordberg, attorney

7     for plaintiffs.  In connection with the FBI's

8     communications about Mr. Lipsky's availability to testify

9     today, questions about compliance with the Privacy Act were

10    mentioned, and from Steve Taylor, the Assistant U.S.

11    Attorney for the District of Colorado, on behalf of FBI,

12    I'm permitted to represent that FBI will consider the

13    requirements of the Privacy Act satisfied if the parties

14    agree, as plaintiffs do, and as I'm informed defendants

15    will, that any persons identified by Mr. Lipsky in the

16    course of his testimony, with information concerning the

17    identities of those persons, will be used for purposes of

18    this litigation only.

19         MS. AHERN:  I'm Ellen Ahern.  I'm counsel for

20    defendants in this litigation.  I would agree with

21    Mr. Nordberg that the defendants are willing to stipulate

22    on the record that this deposition and its contents will be

23    used for this litigation only, but I make no representation

24    about whether that agreement would satisfy any Privacy Act

25    concerns.  I think that's a matter for the FBI.

4

1                          EXAMINATION

2     BY MS. AHERN:

3          Q.   Could you state your full name for the record,

4     please.

5          A.   My first name is Jon, J-o-n.  Middle name is

6     Stephan, S-t-e-p-h-a-n.  Last name is Lipsky, L-i-p-s-k-y.

7          Q.   I introduced myself when we came in, but we've

8     never met before, have we, Mr. Lipsky, before this morning?

9          A.   No, ma'am.

10         Q.   Has Jon Lipsky always been your name?

11         A.   Yes.

12         Q.   Have you ever gone by any other name?

13         A.   I've been advised by the FBI that there are

14    certain things that I can't talk about regarding 28 Code of

15    Federal Regulations and also Title V Privacy Act.

16         Q.   Is that answer yes or no.

17         A.   My answer is constrained by 28 C.F.R.

18         Q.   Outside of the context of anything you may have

19    done for your employment, have you ever gone by any other

20    name than Jon Lipsky?

21         A.   No, ma'am.

22         Q.   Have you been deposed before?

23         A.   Yes, ma'am.

24         Q.   So you understand how we're going to proceed

25    here.  You're under oath, and I'm going to ask you

5

1    questions for the next several hours.  The answers to those

2    questions need to be verbal so the court reporter here can

3    take it down, and I would ask that you wait until I

4    completely finish my question before you respond so that

5    the court reporter doesn't have any problem with us talking

6    over each other.

7            Mr. Nordberg here may object to some questions.

8    He's not your counsel, is he?

9        A.   No, ma'am.

10       Q.   Nevertheless, despite his objections, unless

11   you're instructed not to answer -- and I can't imagine that

12   you would be because he's not your counsel -- despite the

13   objection you should go ahead and answer the question; do

14   you understand that?

15       A.   Yes, ma'am.  Thank you for the instructions.

16       Q.   If I ask you a question and you don't understand

17   it for any reason, whether I have spoken too quickly or

18   there is just some term or phrase that I use that you don't

19   understand, I would ask that you stop me and say,

20   Ms. Ahern, I don't understand your question, because if I

21   ask you a question and you answer it, I'm going to assume

22   that you understood the question, fair enough?

23       A.   Yes, ma'am.

24       Q.   Where do you live?

25       A.   I live in Mission Viejo, that's M-i-s-s-i-o-n,

6

1    second word is V-i-e-j-o, California.

2         Q.    And you are here voluntarily on this deposition

3    in Denver, Colorado?

4         A.    Yes.

5         Q.    Did you come at the express request of the

6    plaintiffs in this litigation?

7         A.    Yes.

8         Q.    I would like to explore your educational

9    background a little bit.  Where did you go to high school?

10        A.    My high school started in 9th grade at Servite,

11   S-e-r-v-i-t-e, High School in Anaheim -- it's a parochial

12   school -- for one year.  Then I finished my 10, 11, 12

13   grade and graduated from Loara, L-o-a-r-a, High School in

14   Anaheim.

15        Q.    I assume you went to college?

16        A.    I did.

17        Q.    Where did you go?

18        A.    I went to Fullerton College.  I received my

19   associate of arts at Santa Monica City College.  I did a

20   couple quarters at the University of California Los

21   Angeles, and I graduated with a bachelor of science, police

22   science, at the California State University Los Angeles.

23        Q.    What year was that?

24        A.    1977.

25        Q.    How old a man are you?

7

1           A.    Today I'm 51.

2           Q.    What year were you born?  Excuse me for not doing

3    the math.

4           A.    That's okay.  I was born in 1954.

5           Q.    Have you achieved any graduate degrees?

6           A.    No.

7           Q.    You said that your degree from undergraduate was

8    in political science?

9           A.    No, ma'am.

10          Q.    What was your degree in?

11          A.    Police science.

12          Q.    Police science.  I apologize.  I misspoke.

13                Could you explain a little bit for us what is

14   involved in the study of police science on the college

15   level.  What sort of course work did you take?

16          A.    In the undergraduate course work it was different

17   topics regarding police budget, policy, legal, both

18   criminal, juvenile, which involved welfare and institutions

19   code, some other course work in other disciplines that were

20   electives but required.  Like I didn't have an official

21   minor, but I took psychology.  I have an unofficial minor

22   in psychology, sociology.

23          Q.    Did you ever have any classes expressly dedicated

24   to environmental law?  I'm speaking about college courses

25   at this time.

8

1      A.   We're still talking about college, correct?

2      Q.   Yes.

3      A.   No.

4      Q.   Did you take any college course work in

5   chemistry?

6      A.   Yes.

7      Q.   What did you take?

8      A.   It would have been a class at Fullerton College

9   my first or second year.

10     Q.   What was the title of that class, as best you can

11   recall?

12     A.   It was -- I believe it was an organic chemistry

13   class.

14     Q.   Did you take any physics courses in college?

15     A.   No.

16     Q.   How about engineering, did you take any

17   engineering courses in college?

18     A.   No, I didn't.

19     Q.   Have you had any college-level course work in

20   infrared technology?

21     A.   No, ma'am.

22     Q.   How about any graduate school courses in any of

23   those subjects?

24     A.   As I answered earlier, I didn't pursue a graduate

25   degree.

9

1      Q.   So you haven't even taken any graduate course

2  work, let alone culminating in a degree?

3      A.   No.

4           MR. NORDBERG:  Asked and answered.

5      Q.   (BY MS. AHERN)  You can answer.  I missed when he

6  was speaking.  Was that, no, you haven't taken any graduate

7  course work?

8           MR. NORDBERG:  You can answer.

9      A.   Again, I did not initiate or pursue a graduate

10 course of work.

11     Q.   (BY MS. AHERN)  Just so the record is clear,

12 while Mr. Nordberg may object, that doesn't mean you don't

13 have to answer the question.  You should answer even after

14 the objection unless someone expressly instructs you not to

15 answer.

16     A.   Thanks for the instruction.  I was just following

17 your instruction earlier when you asked me not to step over

18 anybody and wait until everybody is done talking.

19     Q.   Understood.

20     A.   Thanks.

21     Q.   Have you taken any certificate programs or

22 technical education after you completed your undergraduate

23 degree?

24     A.   I'm not sure what you really mean by that.  In

25 regards to my work, particularly with the police department

10

 1    and the FBI, there was course work that was recognized by

 2    not only my agency but by the state or the federal

 3    government, and I'm not sure if we're going to be

 4    talking -- I want to make sure that we're talking about

 5    certificate work and what you mean by it.  But also there

 6    are certificates that were just handed to you that meant

 7    something in my work too, so I'm not sure exactly what

 8    you're trying to ask.

 9         Q.   What I'm trying to probe, Mr. Lipsky, is whether

10    you took any training courses or technical courses after

11    you completed undergraduate that resulted in the issuance

12    of some kind of certificate of completion of any kind?

13         A.   Okay.  Yes.

14         Q.   What such course work did you take?

15         A.   In September of -- 11, 1978, through January --

16    early January of 1979, I completed the Las Vegas

17    Metropolitan Police Academy and received a certificate.

18    Later I received a basic certificate from the Nevada State

19    Police Officers Standard and Training recognizing -- though

20    our academy was 17 weeks, the state requirement was only

21    six weeks.  And it might even be better if I used a

22    document to refresh myself, if that's all right.

23         Q.   What would you like to use?

24         A.   The document that was handed to you.

25         Q.   Okay.  That would be fine.

11

1          MR. NORDBERG:  We have a copy.

2     Q.   (BY MR. NORDBERG)  I'm still not going to mark it

3  as an exhibit, but you might use it to refresh yourself.

4     A.   Thank you very much.  I appreciate that.  As I

5  mentioned earlier, I had a certificate from the police

6  department for going through the academy, then the basic

7  certificate from the State of Nevada.  I received a

8  certificate in 1983 for motivation dynamics.

9     Q.   Can I stop you there?

10    A.   Yes, ma'am.

11    Q.   What is motivation dynamics?

12    A.   Actually, interpersonal skills from a supervisory

13 point of view dealing with subordinates, which actually

14 could be expanded to really just dealing with people on a

15 day-to-day basis.

16    Q.   You can go on.

17    A.   Thank you.

18    Q.   What other educational course work -- I'm sorry,

19 training and certificate programs did you complete?

20    A.   Again, in 1983 I completed advanced officer

21 training that encompassed about 40 hours worth of course

22 work.  In 1983 received a certificate recognized by the

23 department that I was an instructor for the Monandock PR-24

24 AL.  That's M-o-n-a-n-d-o-c-k, and then it's PR-24, and

25 then AL.  And Monandock PL-24 AL, AL is aluminum.  It's a

12

1    baton.  It's a baton that's 24 inches long and has a

2    perpendicular handle that has been on, you know, TV a

3    little bit.

4        Q.   So that was a certificate that allowed you to

5    instruct in the use of that baton?

6        A.   Yes.  Other officers.  To certify them for their

7    use to be able to use the baton.

8             In 1984 I attended a toxic waste seminar.  That's

9    an FBI certificate.  That really was environmental crimes.

10   In 1984 I also attended a class concurrently at Quantico,

11   Virginia -- Quantico is Q-u-a-n-t-i-c-o -- the FBI academy.

12   Received a certificate as a general police instructor,

13   which meant that I could go out and teach topics to other

14   agents or officers.  Go out to the public and make

15   speeches.

16            Then the laboratory matters certificate

17   encompasses a familiarity more than usual of the abilities

18   of the laboratory.  And I would characterize it as where

19   the rubber meets the road.  Being able to solve problems,

20   what can the lab do in a particular case, or how to contact

21   the lab about something forensically.

22            1984 I took a financial investigative techniques

23   1 course.  This course was very helpful since I'm not a CPA

24   or college accountant, whether by degree or a minor, and

25   recognized -- it gave me recognition that I could do

13

1    financial investigative cases.

2        Q.   Okay.

3        A.   Another financial crimes case in 1985.  The

4    second part of the financial investigative techniques 2

5    certificate I earned in 1986.  In fact, that was in

6    Phoenix.  I remember that because that's when the shuttle

7    blew up that day.

8        Q.   Okay.

9        A.   Another toxic waste seminar in 1986.  In 1988 I

10   received an environmental crimes seminar certificate.

11            In 1989 I received a computer-related crimes

12   certificate.  It was investigating crimes involving

13   computers.  It was a very comprehensive class.  It was

14   three weeks.  I remember it very well.  I didn't know much

15   about the disk operating system at the time, and went early

16   so I could learn computers from the ground up as far as

17   being a user and maneuvering on them.

18            1990 I received a certificate for troubleshooting

19   Novell netware.  One of the environmental cases that I had,

20   we had occasion to need a server, as we were using a LAN,

21   or local area network system, and I was administrator of

22   that system.  So it was handy to get that.

23            In 1992 I went back to Quantico again.  The FBI

24   had an assessment center called a management assessment

25   program, and went through a series of tests to be scored on

14

1    my aptitude for management.

2         In 1992 I also received a relief supervisor

3    seminar.  Since I was a relief supervisor, it was kind of a

4    requirement.  1993, this time I was assigned in Los

5    Angeles.  I was assigned to a street gang squad with the

6    Los Angeles Police Department South Bureau, CRASH,

7    C-R-A-S-H, which is defunct right now, but it stood for --

8         Q.   It doesn't matter.

9         A.   I'm drawing a blank.

10        And the main impetus of this was that we brought

11   locals with us, and then we shared our training together.

12   Usually we don't train together.  This is an opportunity to

13   do that from all over the country.

14        1993, electronic reference library was a class

15   that I took with the FBI.  1996 I took a regional death

16   investigations class from a couple FBI agents dealing with

17   just in particular homicide.

18        1997 I took management training for field

19   supervisors.  I had just gotten promoted in December of

20   1996, and it was a requirement to go to this course.  I

21   think it was less than a week at Quantico.

22        In 1997 I took a regional agent assessor training

23   seminar.  And what that was is part of the hiring process.

24   I became an oral interviewer.  And to do that the way that

25   all of the system was reworked, I had to do this before I

15

1    could go out and do interviews and interview candidates for

2    the FBI agent job.

3              1997, LAPD put on a homicide investigation

4    course.  That was a practical exercise as well as lecture.

5    1997 went to California Narcotic Officer Association

6    training seminar on narcotics matters.

7              In 1998 I went to Quantico with a lieutenant from

8    Los Angeles County Sheriff's Department, and he was

9    interested in exploring the Violent Crime Apprehension

10   Program, commonly known as VCAP.  It was a state

11   cooperative conference.  The impetus was to get more local

12   entities involved to support the VCAP program, which was a

13   database of crime scenes of murders and certain types of

14   rapes.

15             In 1998 I attended another homicide matters

16   conference.  This was with the California Homicide

17   Investigators Association, of which I was a member.

18             1999 I attended a regional forfeiture training

19   for managers.  And that forfeiture training dealt with

20   money laundering laws, criminal, civil, and administrative

21   forfeiture proceedings.

22             2002 attended a drug supervisory seminar.

23   Because of my assignment in the program that I was assigned

24   to at that time, it was a specialized seminar just for drug

25   supervisors.  And in 2004 I attended the conference on

16

1    Asian organized crime and terrorism.

2         Q.    Are there any additional training courses that

3    you received in the course of the time as a police officer

4    or as an FBI agent that are not reflected in the testimony

5    you just gave.

6         A.    Yes, ma'am.  Just thinking that when I -- in 2000

7    I was assigned to a high-intensity drug trafficking area

8    intelligence office with the Los Angeles high intensity

9    drug trafficking area.  And the HIDTA, H-I-D-T-A, works

10   under the auspices of ONDCP, or the Officers of National

11   Drug Control Policies, of which we were separately budgeted

12   for.  And every December there was a training conference,

13   annual conference, that's not reflected here.  And I

14   believe, I'm not sure, I need to also confirm, but I

15   believe there was a conference that the Department of

16   Justice put on in like 1987, June, July of '87, and it

17   involved environmental crimes.

18        Q.    Do you remember anything more about that

19   conference?

20        A.    It was an environmental crimes, and it was

21   regarding the prosecution, investigation of such crimes and

22   promulgation of roles.

23        Q.    Is that separate and apart from the 1988

24   environmental crimes seminar that you took?

25        A.    I'm thinking it is.

17

1        Q.    Do you remember with any specificity than that?

2   Do you remember the title of the course with any greater

3   specificity?

4        A.    Not offhand, no, ma'am.

5        Q.    Let me back up and ask you about some of these

6   programs that you participated in.

7        A.    Yes, ma'am.

8        Q.    With regard to the 1984 toxic waste training

9   course, how long did that last?

10        A.    I believe it was three days at Los Angeles,

11   California.

12        Q.    Do you remember what topics were discussed at

13   that seminar?

14        A.    I can even remember the instructor, Dave Wilma,

15   W-i-l-m-a, and he was assigned out in the California area.

16   The topics were in regards to techniques of investigations.

17        Q.    Would you be a little more specific than that?

18        A.    What I can specifically remember is that as

19   investigating environmental crimes that are occurring in a

20   locale, that not just the location is important, but the

21   proximity, particularly like a school or a pathway or

22   taking -- and the focus was taking pictures of the

23   surroundings just to give more depth and understanding

24   to -- in particular it was, you know, it might always be

25   just an industrial complex or an area, and everything is

18

1    industrial related.  But if an accident or an environmental

2    crime were to occur like near a school, like you said, or

3    more public area, then Dave was trying to get the word out

4    to make sure you took pictures of it.

5         Q.    Did any of that discussion or training in your

6    toxic waste course include materials on infrared

7    technology?

8         A.    No.

9         Q.    Did you discuss nuclear waste issues in any way

10   in that 1984 class?

11        A.    No.

12        Q.    Radiological safety issues?

13        A.    No.

14        Q.    Let's move on a little bit to the 1984 course you

15   took with regard to laboratory matters.

16        A.    Yes, ma'am.

17        Q.    Could you describe a little bit more fully for me

18   what was encompassed in that class?

19        A.    Yes, ma'am.  The FBI laboratory, and still is, is

20   a very comprehensive laboratory and services.  One of the

21   things that was discussed was that as field agents we're

22   involved with cooperation with other state or local

23   officers.  And in attempting to make a decision about a

24   forensic piece of evidence and the handling of it, the

25   first emphasis was to call the lab since it was manned 24

19

1    hours.

2            A booklet was provided with different topics of

3    different types of evidence, how it should be collected,

4    packaged, shipped, what it should be shipped with, and to

5    what particular unit in the lab.  For instance, I remember

6    one of the topics was that in a case involving a break-in

7    of a front door, the decision was to actually cut the

8    entire doorjamb out of the house and package it carefully

9    and send it back to the lab.  That's how they wanted it.

10           The point was, don't make that decision yourself,

11   talk to the lab person because even talking through it

12   could save time or a matter of being able to preserve

13   evidence or not.

14       Q.   Were any specific topics covered related to

15   environmental crimes in that seminar?

16       A.   No.

17       Q.   Moving -- how long did that lab matters course

18   work last?

19       A.   Well, actually, ma'am, that lab matters and the

20   general police instructor portion was combined for a

21   two-week course.  So it was like -- it was interchange --

22   not interchangeable.

23       Q.   They alternated?

24       A.   Pardon me?

25       Q.   They alternated between topics?

1          A.   Kind of, yeah.

2          Q.   Over a two-week period?

3          A.   Over a two-week period, right.

4          Q.   Moving on to the 1986 certificate program which

5     you attended with regard to toxic waste.   How was that

6     course different from the 1984 course that you took?

7          A.   Just a moment, please.   The way it was different

8     was in 1984 I was a brand-new agent, and I had worked a

9     case that involved my time away from Colorado.   And when I

10    returned back to the squad, the squad that I was on, I was

11    advised that I was going to be assigned to work with the

12    EPA.   And in so doing, I made my introductions with the

13    EPA, the National Enforcement Investigation Center Office

14    of Criminal Investigations, and I learned that a person was

15    coming on board -- or from another agency that worked for

16    them.   And it was highly recommended by the EPA officials

17    who I met with that I go to this training course in Los

18    Angeles that we talked about in 1984.   It was like

19    November.

20         Q.   Can I stop you there?

21         A.   Yes, ma'am.

22         Q.   Who was that other person from the other agency

23    you were advised was coming in?

24         A.   From my understanding, that's a Title V issue

25    that we've talked about.   There is an agreement that I can

21

```
1    go ahead and name names for purposes of litigation.  I

2    don't mean to repeat this all the time, but I want to

3    stress that that's my understanding that I can name those

4    names.  And that person was Bill Smith.  He came over from

5    the Department of Agriculture Office of Inspector General.

6    May I get up and get a drink of water, please?

7         Q.    Absolutely.  Let's go off the record for a

8    minute.

9              (Discussion off the record.)

10        A.    It was -- I recall that it was at a hotel.  It

11   might have even been at the Holiday Inn near UCLA campus.

12        Q.    I'm sorry.  You're still speaking of the 1984?

13        A.    Yes, ma'am.  And like I say, it was Dave Wilma

14   that put that on.

15             Now going to 1986, how it was different is that

16   the FBI hosted this one.  It was at -- I believe at the

17   xerox training center at Leesburg, L-e-e-s-b-u-r-g,

18   Virginia.  And Bill Smith and I team taught a segment

19   because of the work that we had already done.  So, ma'am,

20   if I could, I would say it was significantly different, not

21   just being a participant, but actually making an oral

22   presentation.

23        Q.    How long did the 1986 course last?

24        A.    I believe at least a week.  Have you ever been

25   there?
```

22

1        Q.   Leesburg?

2        A.   The xerox training center.

3        Q.   No, I haven't been to the xerox training center.

4        A.   Self-contained.  You board there and eat there,

5   and it's like an academy at Quantico.

6        Q.   Do you recall the topics that you covered in your

7   1986 course work on toxic waste, generally speaking?

8        A.   Specifically, no.

9        Q.   Did any of those topics involve nuclear waste

10   issues?

11        A.   No.

12        Q.   Did they involve radiological safety issues?

13        A.   No.

14        Q.   Did they involve infrared technology?

15        A.   No, ma'am.

16        Q.   So you didn't discuss at that time the potential

17   use of infrared technology for investigating toxic waste

18   issues?

19        A.   No, we didn't.

20        Q.   By the time you attended -- or you participated

21   in this course in 1986, had you been working with Bill

22   Smith directly for about two years?

23        A.   The -- if it's what I thought it was, and it was,

24   this letter was November of '86, so about two.  I don't

25   remember Bill coming on board until almost the end of the

23

1    year of '84, so about two.

2         Q.   I think we covered a little bit of this, but it

3    seems as good a time as any to do it.  So you first met

4    Mr. Smith in approximately 1984?

5         A.   Late 1984.

6         Q.   Based on your understanding, did Mr. Smith have

7    prior environmental enforcement experience at the time that

8    you met him?

9         A.   I wasn't aware of that.

10        Q.   Not one way or another?

11        A.   I was just thinking his education was, I believe,

12   computers, but he was with the Department of Agriculture

13   Office of Inspector General.  I don't know to what extent,

14   if he had any environmental crimes background.

15        Q.   So you don't know if he had any background from

16   the Department of Agriculture?

17        A.   That's correct.

18        Q.   How did you and Bill Smith get along?

19        A.   Great.

20        Q.   Did you respect him personally?

21        A.   Yes.

22        Q.   Did you respect his abilities to interpret and

23   understand facts and evidence?

24        A.   I would say that everyone has an opinion --

25   allowed to have an opinion, and I usually respected his

24

1    thoughts about doing things.   I also, if I disagreed,

2    whether it was my opinion or whether I felt it was going

3    against the law, I would tell him.

4         Q.   Did you find Mr. Smith to be a man of integrity?

5         A.   Pardon me?

6         Q.   Did you find Mr. Smith to be a man of integrity?

7         A.   Up to a point.

8         Q.   Why do you hesitate?

9         A.   Because there was the occasion on one case that I

10   felt that -- I questioned him on the way that he handled

11   himself.

12        Q.   Was that the Rocky Flats case?

13        A.   No.

14        Q.   It was another case?

15        A.   Yes.

16        Q.   Is that a case that had been before your

17   involvement in the Rocky Flats case?

18        A.   Yes.

19        Q.   What case was that?

20        A.   Protex.

21        Q.   Did you have any occasion to question Mr. Smith's

22   integrity about the way that he addressed issues in the

23   Rocky Flats case?

24             MR. NORDBERG:   Objection to the form.

25        Q.   (BY MS. AHERN)   Did you understand my question?

25

1       A.   No.

2       Q.   Let me try again.  Mr. Lipsky, you testified that

3   with regard to the Protex case there was at least one

4   occasion when you had some disagreement with Mr. Smith

5   about the way that he handled certain issues in that case?

6       A.   Yes.

7       Q.   My question was, did any similar occurrence arise

8   in the course of your work with Mr. Smith in the Rocky

9   Flats case?

10      A.   Yes.

11      Q.   Can you describe the circumstances?

12      A.   I'm thinking about it.  There was an occasion

13  when we were discussing what type of evidence we had seized

14  at the plant, and we were -- Bill and I were actually

15  meeting with other people, and Bill said it was one way,

16  which we didn't seize any classified material.  My opinion

17  was that we did.  And he told me how he felt about it, and

18  the discussion didn't matter until I went and got the

19  evidence and showed that it was toxic waste.

20      Q.   So this was a specific point where you had a

21  difference of agreement about whether certain materials

22  seized were classified?

23      A.   No.  Just a matter of his memory recall about the

24  events during the search at Rocky Flats, and he raised the

25  bar -- people have a right to have a different opinion.  He

26

1    raised the bar when he made a point to, I guess, make me

2    look like I didn't know what I was talking about.  And

3    until I went and got the evidence that showed that it was

4    what I said it was, then it was like I had to prove it.

5           I have not talked to him about his testimony here

6    or his discussions with the staff, with Congress, but I

7    have some disagreement with what he said based on personal

8    discussions that we had while we worked together.  I

9    remember that he got promoted in about 1990, 1991.  He went

10   to Boston before the plea in Rocky Flats.  So we worked

11   close together, we were in the same office.

12       Q.   Let me back up a little bit.  With regard to this

13   one occasion that you have described where you and

14   Mr. Smith had a difference of opinion about certain

15   evidence, you referred to certain classified evidence that

16   may have been seized during the raid.  After you brought to

17   Mr. Smith's attention that the evidence was not as he

18   recalled it, did you and he discuss that issue?

19       A.   Well, we were in a room with people that were

20   trying to get their job done, and I really thought that the

21   side show about the characterization of what kind of

22   evidence -- because I was asked a question about the

23   characterization of evidence, and Bill Smith had answered

24   that he -- not only answered to the opposite of me, but

25   then disagreed with me when I said that it was a certain

27

1   characterization.

2          And, quite frankly, I don't believe in impeding

3   too many people's jobs.  And there wasn't really a

4   discussion to be had.  So I excused myself and went and got

5   the evidence so that the controversy could end.

6      Q.   Did that clarify the issue?

7      A.   Absolutely.

8      Q.   And did Mr. Smith then acknowledge that he had

9   recalled it incorrectly?

10     A.   No.

11     Q.   Other than this one occasion when you and

12  Mr. Smith had some disagreement about how to characterize

13  evidence in the Rocky Flats case, do you remember any other

14  occasion where you and he had any conflict?

15     A.   Yes.

16     Q.   I'm going to try to go at this in a different

17  way.  In the course of your investigation in the Rocky

18  Flats case, you worked closely with Bill Smith?

19     A.   Yes.

20     Q.   He was a significant partner in the investigation

21  with you?

22     A.   Yes.

23     Q.   And it's your testimony, as I understand it, that

24  there were occasions throughout the course of that

25  investigation where you and he may have disagreed on some

28

1    aspects of some evidence?

2          A.    Of course.

3          Q.    But despite that disagreement, you and he

4    continued to work together; isn't that right?

5          A.    That's right.

6          Q.    While you may have disagreed on occasion with

7    regard to specific aspects of the investigation or

8    individual pieces of evidence, would you say that as a

9    whole you respected Mr. Smith's ability to understand the

10   facts and contribute to the investigation?

11         MR. NORDBERG:   Compound.

12         A.    I'm trying to think of my answer here.  Basically

13   I respected his training and knowledge and skills, as I did

14   a lot of people I work with, but there's different kinds of

15   respect.  I also respect a rattlesnake that's about 9 feet

16   away from me, but it's not the same kind of respect, but it

17   also is self-preservation.

18         Bill Smith had good ideas, he was a good

19   investigator, but I also had to make sure I wasn't -- we

20   weren't going to cut corners.  I wasn't going to allow that

21   if I knew about it.

22         We worked together as well a lot because we

23   shared the same interest, not because we shared the --

24   doing it the same way.  I don't believe I have to look like

25   the person I work with.  I don't think I have to have the

29

1     same background as that person.   But we had this common

2     interest in doing environmental crimes case, and there were

3     some difficulties along the way.

4            Bill Smith was extremely upset with me that he

5     wasn't the affiant on the affidavit.  I mean, it was a big

6     issue to him.  But on the other hand, I think we got around

7     that and worked -- I mean, we worked very closely.  Like I

8     said earlier, we were in the same office together at

9     commercial space, and we took on quite a bit at the time

10    technologically.

11           He also had a disagreement with me spending too

12    much time on the computer aspect of the investigation,

13    which was to support the data flow, and they had -- he had

14    brought over an EPA person to alleviate that.

15           But that didn't stop him from working with me

16    either.  We stopped working together because he got

17    promoted and he left town.  And --

18       Q.   Let me try to back up a little bit so I can

19    understand what you are saying.  Did you and Mr. Smith

20    actually share office space?

21       A.   Yes.

22       Q.   During the course of the Rocky Flats

23    investigation?

24       A.   Yes.

25       Q.   And otherwise?

30

1      A.   And what?

2      Q.   And before that?

3      A.   Oh, no.  No.  I worked over at 1921 Stout and had

4  my pod over there, Bill had his office in another

5  building -- or in the area, and we would usually meet quite

6  a bit.  But when we had the commercial space for the case,

7  for Rocky Flats, which was in this building -- or in the

8  Embassy Suites building, we actually shared a large office

9  together.  He was on one side; I was on the other.

10     Q.   And it's your testimony that you and Mr. Smith

11 sometimes approached issues of investigation in the case

12 from different routes; is that fair to say?

13     A.   We had different ideas, yes.

14     Q.   But you still managed to overcome those

15 differences and work together well; is that fair?

16     A.   Well, it almost sounds like we had different

17 approaches that maybe one was bad and one was questionable

18 or one was not as good.  We came from different

19 backgrounds.  And like Bill Smith actually had brought up

20 the idea about using the infrared.

21     Q.   I'll get to that later.  I'll get to specific

22 examples later.

23     A.   I'm just saying it was something that he was

24 aware of, and I wasn't.  So it wasn't bad, it wasn't

25 questionable or questionable tactic or anything else, it's

31

1    just we had different training, and he knew a lot more what

2    EPA could do than I did.  But that's what made us stronger,

3    I thought.

4        Q.    And that's where I was going exactly.  Despite

5    your different backgrounds, you and Mr. Smith were able to

6    work together effectively, and it made you a better

7    investigative team; would you say that?

8        A.    Up through about -- yeah, up through the Rocky

9    Flats case, yeah.

10       Q.    As far as you know, Mr. Lipsky, Bill Smith wasn't

11   politically motivated in any way to bring the Rocky Flats

12   case, was he?

13       A.    What do you mean politically motivated?

14       Q.    In your experience, did Mr. Smith's individual

15   politics impact any motivation that you were aware of for

16   his bringing the Rocky Flats investigation on line?

17       A.    As in are you asking me did he have personal

18   motivation to get promoted as a result of this case?

19       Q.    I wasn't necessarily thinking in terms of job or

20   career advancement.  I was thinking more in terms of

21   general political inclination or bent.  I guess I was just

22   trying to explore whether in your opinion you thought that

23   there was a political motivation for Mr. Smith's interest

24   in pursuing an investigation of Rocky Flats?

25       A.    With the exchanges that I had with Bill Smith,

32

1   and the way that it came to our attention, no.

2        Q.   As you're probably quite aware, the Rocky Flats

3   case ultimately became fairly politically charged --

4             MR. NORDBERG:  Form.  I'm sorry, I should have

5   waited until the end of the question.

6        Q.   (BY MS. AHERN)  I was just seeking to clarify my

7   question, and I'll try it again.

8             MR. NORDBERG:  My apologies.

9        Q.   (BY MS. AHERN)  Generally there were political

10  issues that seemed to grow with regard to the Rocky Flats

11  case, perhaps in the later aspects of it, and what I was

12  seeking to explore was whether you were aware of any

13  political motivation that may have impacted Mr. Smith's

14  initiation of the case.

15            I think, if I understand your testimony, you've

16  testified that you were not aware or did not perceive

17  Mr. Smith to be politically motivated in bringing the case;

18  is that fair?

19       A.   From my exchanges with Bill Smith, my personal

20  exchanges, and we're talking about a period of late 1984 to

21  June of 1987, I'm not aware that he was looking for some

22  kind of personal gain out of this, political gain.

23       Q.   I would like to go back to where we took this

24  detour.  We were talking about the 1986 toxic waste course

25  work that you had taken and that you team taught that

33

1    course work with Bill Smith.

2         A.    Yes.

3         Q.    That's where we went off on our background

4    discussion with Mr. Smith.  You recalled that that 1986

5    course work on toxic waste lasted about a week; is that

6    right?

7         A.    Yes, ma'am.

8         Q.    Was Bill Smith with you that whole week?

9         A.    I don't recall.

10        Q.    Did you team teach course work together?

11        A.    Yes.

12        Q.    Do you remember any of the specific courses that

13   you were offering at that time?

14        A.    No, ma'am.

15        Q.    You also said that you took some environmental

16   crime seminar in approximately 1988?

17        A.    Yes.

18        Q.    How long did that course work last?

19        A.    If I could refresh my memory.

20        Q.    Certainly.

21        A.    Thank you.  That was -- I forgot the question,

22   ma'am.  Sorry.

23             MS. AHERN:  Can you read the question back.

24             (The last question was read back as follows:

25   "How long did that course work last?")

34

 1       Q.   (BY MS. AHERN)   That was specifically with regard

 2   to the 1988 environmental crime course work that you had

 3   taken.

 4       A.   Ma'am, I'm looking at the accommodation letter

 5   from April 20, 1988, and it references the week of

 6   April 11, but I don't remember exactly how many days it

 7   was.

 8       Q.   From what you can see in this document, is it

 9   consistent with your recollection it may have lasted

10   approximately a week?

11       A.   Yes.

12       Q.   Do you have any reason to think it was longer

13   than that?

14       A.   No.

15       Q.   Do you remember any of the specific course

16   materials that you covered in that environmental crimes

17   course work?

18       A.   No.

19       Q.   Do you remember covering specific environmental

20   statutes?

21       A.   When you say specific, then I feel like I have to

22   answer exactly.  No.  Specifically, no.

23       Q.   I guess I'm looking -- do you recall covering

24   RCRA in that course work?

25       A.   More than likely, yes.

35

1          Q.    But you don't have a specific recollection of

2    that as you sit here today?

3          A.    I can give you a general idea.

4          Q.    Why don't you generalize about what you recall

5    covering in that course work.

6          A.    It would have been not only RCRA, R-C-R-A,

7    Resource Conservation Recovery Act, and the Clean Water

8    Act, and aspects of the Comprehensive Environmental

9    Response Compensation and Liability Act, CERCLA,

10    C-E-R-C-L-A, also commonly known, as I would like to call

11    it, Superfund.  And it would have encompassed cases that

12    Bill and I had worked on in regards to a couple cases

13    involving RCRA, as well as the Clean Water Act.

14          At this point we had received a couple

15    convictions.  I had also helped a Lakewood police officer

16    swash through a kind of thorny issue involving three

17    entities on a Superfund matter.  I also had developed an

18    opinion about criminal investigations and the benefits of

19    them.

20          Q.    This 1988 course work that we're talking about,

21    is this something that you attended, or something that you

22    taught?

23          A.    Both.

24          Q.    Both.  Was Mr. Smith involved in that course work

25    as well?

36

1          A.    More than likely.

2          Q.    Do you recall one way or another?

3          A.    With certainty, no.

4          Q.    As you sit here today, could you distinguish what

5     the subject matters were that were presented to you in this

6     environmental crimes seminar as opposed to the topics that

7     you were presenting them on?

8          A.    These seminars usually involve legal classes as

9     well, and that would be much different than what I would

10    do.  I'm not a lawyer, and I wasn't authorized to really

11    discuss any legal matters without being in concert with a

12    lawyer who could address the issues at hand.

13         Q.    Do you recall whether the presentations that were

14    made to you at this environmental crimes seminar were made

15    by lawyers?

16         A.    As I said, they usually did have a legal portion

17    to the seminar.

18         Q.    But beyond that generalization, you just don't

19    recall the course with enough specificity to say?

20         A.    That's correct.

21         Q.    Just a couple minutes ago when you were

22    discussing your testimony, certain experiences you had had

23    with regard to investigation of environmental-related

24    crimes, is it your testimony, Mr. Lipsky, that those would

25    have been subjects that you would have discussed in the

37

1   course of the seminar?

2        A.   Yes.

3        Q.   Some type of a panel discussion?

4        A.   Solo, and panel sometimes.

5        Q.   Do you recall specifically one way or another

6   whether you discussed the use of infrared technology in

7   this environmental crimes seminar in 1988?

8        A.   I would not have.

9        Q.   Do you know whether that was a topic that was

10  presented at that time?

11       A.   No.

12       Q.   You don't know or, no, it was not?

13       A.   I don't believe there was.

14       Q.   In the course of any of the certificate programs

15  or training that you had up to and including the 1989 time

16  period, did you have any formal training by the FBI on

17  infrared technology?

18       A.   No.

19       Q.   How about physics?

20       A.   Pardon me?

21       Q.   How about physics?

22       A.   Formal training on physics?

23       Q.   Yes.

24       A.   I took none in college.

25       Q.   I meant in terms of your FBI course work.

38

1          A.    I'm going to get up and get a drink of water.

2     What I'm thinking about is, and I'm not sure if I'm going

3     to say this correctly, but I do know how to operate a

4     camera.   I do know what an F stop is.   I don't think I have

5     to -- I don't think I have to be able to build a camera or

6     necessarily grind the glass to make the optics, and

7     probably would kind of waddle through an explanation of the

8     physics involved in the optical and aperture portions of

9     the camera.   But the fact of the matter is that I can take

10    really good pictures, so . . .

11         Q.    Okay.

12         A.    I've taken course work involving photography, but

13    it's not necessarily getting down to the nitty-gritty

14    scientific portions of it.   It's mostly the user end of it,

15    how to work it, and in concert with a flash unit and

16    different types of film and why you would use those

17    different types of film.

18         So what I'm trying to say, ma'am, is I'm a very

19    good photographer, but I don't think I have to explain how

20    a camera works.

21         Q.    My question was directed in a slightly different

22    area.   Mr. Lipsky, over the course of your formal education

23    or any of the certificate programs or training that you

24    received from the FBI or through other agencies related to

25    your work, did you have any course work in nuclear physics?

39

1       A.   No.

2       Q.   How about radiological safety?

3       A.   No.

4       Q.   Epidemiology or toxicology related to nuclear

5   issues?

6       A.   No.

7       Q.   I think we covered it a little bit, but could you

8   just very briefly state your employment history before you

9   came to the FBI?

10      A.   Certainly.  When I was 15 I worked in a

11   restaurant --

12      Q.   You don't need to go back that far.  Let's start

13   with your graduation from college.

14      A.   Okay.  When I graduated from college in 1977 I

15   also was a full-time employee as a clerical support

16   employed by the FBI in Los Angeles.  I remained at that

17   position until August of 1978.  And on 9/11, 1978, I was

18   hired by the Las Vegas Metropolitan Police Department.  I

19   became a police officer candidate then.  I graduated from

20   the academy in January of '79.

21         In the early part of 1980 I became a field

22   training officer.  Usually it took two years to reach that

23   point, but I got the position six months early.

24         In October of 1982 I was reassigned as a

25   detective trainee in the intelligence bureau.  The

40

1   intelligence bureau was organized crime.

2          In January of 1983 I was reassigned to patrol as

3   a field training officer.  And in October -- or excuse me,

4   August or September of 1983 I became a training academy

5   officer.  And I resigned my police officer position in

6   February of 1984.

7          I started with the FBI as a special agent in

8   February of 1984.  Graduated from the academy in June of

9   1984.  I was extended to stay in Las Vegas, Nevada, for a

10  few weeks because of the birth of my oldest daughter.  That

11  occurred while I was at the academy, two days before.

12         In July of 1984 I moved -- our family moved to

13  Denver.  That's where my first office was, actually.

14  Q.    Your first office with the FBI?

15  A.    Was Denver.  I have to qualify it because I was

16  in Las Vegas for six weeks.  And I was assigned to the

17  white collar squad.  I worked just about every program and

18  subprogram in the white collar program, including the

19  emerging environmental crimes program.

20         I was a relief supervisor in Denver.  I received

21  my transfer notice in January of 1993 to go to Los Angeles.

22  I began working in Los Angeles in April of 1993.  I was

23  assigned to a street gang squad.  I was co-located with the

24  Los Angeles Police Department South Bureau CRASH,

25  C-R-A-S-H.  I was assigned at an office about 2 miles from

41

1   ground zero of the Rodney King riots at 103 and Avalon.

2   About a year later I was assigned to south bureau homicide,

3   and began working with them on a particular gang member.

4           I stayed in that position until December of 1996

5   when I was promoted as a supervisor of that squad that I

6   worked.  I had an office in Westwood, I had an office at

7   the south bureau homicide in Crenshaw Mall.  I also had an

8   office at the 77th division of LAPD on 77th and Broadway.

9           Then in about October of 1998 I was reassigned as

10  an administrative supervisor -- it was an attempt to

11  centralize all of the intelligence aspects of the office --

12  and I stayed in that position until May of 2000.

13          May of 2000 I was reassigned as a supervisor over

14  the Los Angeles Joint Drug Intelligence Group, LAJD.  And

15  it was a multiagency task force, so my other hat with that

16  task force was to be the project manager, and I ran the

17  day-to-day operations until the retirement of my boss

18  October of 2003.

19          And I became the acting director of the LAJD and

20  responsible for over a $1 million budget, executive

21  meetings and greetings.  And I retired on December 31,

22  2004, from the FBI.

23      Q.  When was the first time you started to work on

24  investigation of any environmental-related crimes?

25      A.  Actually, that's an interesting story, and I hope

42

1    you enjoy the levity.  But when my boss, Bill Gentry, asked

2    me to be the liaison with the EPA and work with the EPA in

3    the latter part of 1984, I told him, I said, it will only

4    make sense because I used to write littering tickets as a

5    cop.

6         Q.   So prior to the latter part of 1984, the closest

7    you could come to environmental crimes was littering?

8         A.   Littering and wasting fuel in the state of

9    Nevada, which was at that time, I think, a $5 ticket.  They

10   were against speeding tickets for going too fast, so they

11   called it wasting fuel.

12        Q.   Very briefly could you identify for me the

13   environmental crime matters that you worked on prior to the

14   beginning of your investigation of Rocky Flats.  And I

15   don't need you to go into detail on each matter, I'm just

16   looking to identify the universe of sort of topics that you

17   covered.

18        A.   Bill Smith and I worked Frankel, F-r-a-n-k-e-l,

19   Manufacturing in, I believe, like -- I want to say February

20   of 1985.  Did a search warrant.  It involved issues of the

21   Resource Conservation Recovery Act.

22             We also initiated investigation on Protex,

23   P-r-o-t-e-x, Industries, Inc. in 1985.  We also -- I have

24   to back up.  I believe in 1984 we initiated an

25   investigation on Denver Sanitary Company.  I'm thinking

43

1     about the admonishments right now.

2          Q.   I'm not asking for any level of detail.

3          A.   No, ma'am, I don't feel that you're pressing me

4     on anything, I'm just trying to answer your question

5     completely.

6          Q.   You don't have to give names of cases.  You can

7     describe the matters generally, if you need to.

8          A.   I wrote an undercover operation.  It was an

9     analytical project to take the universe of data that was

10    contained at the Region 8 EPA office which encompassed, of

11    course, several states, and it would be Colorado,

12    Wyoming -- it went all the way to Minnesota, if I recall

13    correctly, or in the Dakotas.

14              It was based on data that was supplied by

15    companies that either applied as small-quantity generators

16    or large-quantity generators, and comparatively to other

17    aspects of EPA regulation, in particular CERCLA, which we

18    talked about earlier, and SARA, S-A-R-A, Title III, Roman

19    numeral 3.

20         Q.   You should probably define what SARA is.

21         A.   I can't remember what it stands for.

22         Q.   Can you describe it generally?

23         A.   Yes.  SARA Title III were regulations that placed

24    the onus on companies on what kind of hazardous materials

25    or waste that they had on inventory and what they used over

44

1   the course of the year.

2        Q.   When did that project commence?

3        A.   I don't remember.  I wrote it in '85 or '86.  It

4   was before Rocky Flats.

5        Q.   Was it ongoing at the time of Rocky Flats?

6        A.   I believe so.

7        Q.   Just so we have a benchmark as a point of

8   reference, when would you say, Mr. Lipsky, that you began

9   the investigation of Rocky Flats?  I'm just looking for a

10  time period.

11       A.   If I could finish up with the other question was

12  that with Rocky Flats, the file number was the 43rd case in

13  Denver, to give an idea how many cases I had worked before

14  Rocky Flats.

15       Q.   So -- I'm sorry to interrupt.  Was that your 43rd

16  environmental case, or the 43rd case since you came to

17  Denver, or both?

18       A.   The cases were all sequentially numbered, and of

19  course other people could have worked them as well.  I

20  was -- if I could go back to the other question about other

21  cases.

22       Q.   Certainly.

23       A.   I have to think about it a little bit.  Rocky

24  Flats was the 43rd numerical designation in the office, but

25  there were other people that worked other environmental

45

1   cases, though I had a hand in them.

2           So I also worked NIBCO, N-I-B-C-O, La Junta,

3   Colorado, that's Northern Indiana Brass Company, NIBCO, in

4   La Junta, L-a, space, J-u-n-t-a.  And worked with an agent

5   out in Grand Junction regarding a recycler that was -- the

6   name I can't remember.

7           Also worked a case with a Wyoming agent up in

8   Casper, Wyoming.  Also another agent in Thermopolis,

9   Wyoming.  I want to say there was a second one out in

10  La Junta, but I can't remember.

11          I mentioned just very briefly that I worked with

12  the Lakewood police officer.  He had an issue of

13  contamination in a storm drain from what they identified

14  was three different companies.  One was a Firestone tire

15  store, one was an auto car wash, and the other was a

16  mom-and-dad transmission shop.

17          Also I had sent letters to state and local law

18  enforcement that the bureau was interested in working with

19  them on environmental matters.  So I received calls for

20  advice.  One anecdote in particular, I got a call from the

21  Highway Patrol that Weld County had found six drums of MIC,

22  methyl iso cyanite, and when I looked it up, I called them

23  back and told them to call the EPA, they were the

24  responsible people, and not to touch them or open them or

25  breathe near them and get as far away as possible.  So that

46

1    kind of stuff.  It was a very active program.

2         Q.   Can you think of any other specific cases that

3    you worked on prior to beginning your work on Rocky Flats?

4    Any other environmental cases that you haven't listed here?

5         A.   Right now I can't think of anymore.  I'm sure

6    there are more.

7         Q.   Did any of these prior cases -- these prior

8    environmental cases that you worked on involve any nuclear

9    material?

10        A.   No.  Well, actually, if I could ask you what you

11   mean by nuclear material?

12        Q.   I guess I was just looking to generalize whether

13   any of these prior cases involved the sorts of nuclear or

14   radiological topics that arose in the course of the Rocky

15   Flats investigation.  If I can get a sense of your prior

16   experience with such matters.

17        A.   No.

18        Q.   Prior to the work that you did on the Rocky Flats

19   case, did you have occasion to do any professional work

20   with the Department of Energy?

21        A.   Not that I can recall.  Ma'am, can I correct

22   something that I thought of earlier?

23        Q.   Absolutely.

24        A.   Earlier you asked me if there was any training

25   involving radiological safety.

47

1        Q.   Yes.

2        A.   And, actually, on June 5, 1989, I attended like

3    an eight-hour course involving radiological safety that was

4    put on by the EPA's radiological unit out of Arkansas.

5        Q.   Was it immediately preceding the raid?

6        A.   The day before.

7        Q.   Other than that one eight-hour course, do you

8    recall any other training that you had prior to the time of

9    the Rocky Flats case, or even in the course of the Rocky

10   Flats case on radiological safety?

11       A.   Right now, that's the only one I can think of.

12   Thank you.

13       Q.   If at any time in the course of this deposition

14   it occurs to you that some piece of testimony that you have

15   given is incorrect or misleadingly incomplete, would you

16   let me know?

17       A.   Yes, ma'am.   Thank you.

18       Q.   I want to ask you a couple very brief questions

19   with regard to occasions where you have given testimony in

20   the past.   Originally when we began this deposition you

21   noted that you had given depositions before; is that right?

22       A.   Yes.

23       Q.   How many times, roughly, would you say you have

24   been deposed?

25       A.   Maybe twice.

48

1      Q.   Were they both civil matters?

2      A.   Yes, ma'am.

3      Q.   Did they both pertain to work you had done as an

4  FBI agent?

5      A.   No.

6      Q.   What were the civil matters?

7      A.   They were regarding the police department.

8      Q.   The Las Vegas Police Department?

9      A.   Yes, ma'am.

10     Q.   I imagine that you have testified in court on

11 many occasions?

12     A.   A lot.

13     Q.   If you had to offer a ballpark number of how many

14 times you've testified in court, what would that be?

15     A.   As a police officer, I've tried to sit down and

16 figure out how many arrests I made.  It was in the

17 thousands.  And I testified probably hundreds of times not

18 only on -- and I probably should qualify this, that in the

19 state of Nevada there were three types of crimes.  There

20 was felony, gross misdemeanor punishable in county jail,

21 and misdemeanor punishable in county jail.  Felony was the

22 only one that was state prison.  And everything was either

23 one of those things.  We didn't have infractions.

24          We had -- the police department was both the City

25 of Las Vegas and the County of Clark.  So I also testified

49

1    in the city municipal court.  In the county it was justice

2    of the peace level.  Then it went to, I believe, district

3    court from there, trial courts.  And I testified in all

4    three, I would say safely, hundreds of times.

5        Q.    Did you also testify in court as an FBI agent?

6        A.    Yes.

7        Q.    Again, I'm just looking for a ballpark number.

8    How many times?

9        A.    Maybe ten times in trial.

10       Q.    How about proceedings other than trial?

11             MR. NORDBERG:  I'm not going to object to the

12   form of the question, I'm going to express no view on

13   whether the question trenches on Federal Rule of Criminal

14   Procedure 6(e).  I just want to draw that issue to everyone

15   else's respective attention.

16       Q.    (BY MS. AHERN)  Why don't you answer the

17   question, and I'll ask a clarifying question, and I think

18   it will take care of Mr. Nordberg's concern.  I'm not sure

19   just a ballpark number impinges 6(e), but I'll clarify it

20   after.

21       A.    When you said other federal, I'm thinking about

22   my congressional testimony, my state court testimony, my

23   grand jury testimony, my probation -- or parole hearing

24   testimony.  There is a lot of things.

25       Q.    There is a lot of different court proceedings --

50

1      A.   Yes, ma'am.

2      Q.   -- that you have testified in those contexts?

3      A.   Some more than usual.  And -- but, gosh, I know

4  you're not holding me to a figure, but it's probably a lot

5  more than what I've testified at trial.

6      Q.   More than 100 times?

7      A.   I don't think so.

8      Q.   More than 50?

9      A.   Maybe.

10      Q.   Now I'm mindful of your 6(e) obligations, but I

11  want to ask you generally, as a ballpark number, how many

12  different grand juries have you testified before?  I think

13  that's probably still fair.

14      A.   Gosh, I don't know.

15      Q.   More than ten?

16      A.   Oh, yes.

17      Q.   More than 50?

18      A.   I think so.

19      Q.   More than 100?

20      A.   I don't think so.

21      Q.   Somewhere between 50 and 75?

22      A.   It's certainly -- that's where it gets fuzzy, if

23  it goes more than 75.  Certainly more than the others, than

24  state court and parole hearings, it wasn't that much.  So

25  the majority is the grand jury.

51

1      Q.   How many occasions -- and I'm not looking for

2   specifically the number of days, I'm looking for general

3   proceedings -- how many different matters have you

4   testified before Congress on?

5      A.   Just the one.

6      Q.   Just the one.  How many times would you say in a

7   ballpark number you testified in state court?

8      A.   Less than five.

9      Q.   How about probation hearings?

10     A.   One.

11     Q.   Federal court?

12     A.   Somewhere between five and ten times.  And I'm

13  thinking not only Los Angeles, Denver and New Orleans,

14  those locales.

15     Q.   When was the first time you met any

16  representative of the plaintiffs or plaintiffs' counsel in

17  this case?

18     A.   I met Mr. Nordberg in January of this year.

19     Q.   Prior to January of this year, had you ever

20  talked to any attorney for the plaintiffs in the Cook

21  matter?

22     A.   No.

23     Q.   Have you ever spoken to any of the named

24  plaintiffs in the Cook matter themselves?

25     A.   No.  I don't believe -- well, let me put it this

52

1    way:  I know the one plaintiff is Merilyn Cook, and I've

2    never met her, but I don't know how large the class is.

3    And just thinking about that, I mean -- but I didn't know

4    that they were a class member.

5         Q.    Leaving aside the class members as a whole, let

6    me ask you questions about the specific named plaintiffs.

7    Have you ever met the Bartletts?

8         A.    No.

9         Q.    Have you ever met Ms. Babb?

10        A.    No.

11        Q.    The Schierkolks, William and Delores

12   Schierkolk?

13        A.    No.

14        Q.    You testified you never spoke to Merilyn Cook

15   either?

16        A.    That's correct.

17        Q.    How did you come to speak with Mr. Nordberg in

18   January of this year?

19        A.    I met Mr. Nordberg through Caron, C-a-r-o-n,

20   Balkany, B-a-l-k-a-n-y.

21        Q.    How long did you spend with Mr. Nordberg in

22   January?

23        A.    Maybe a half hour.

24        Q.    What did you discuss?

25        A.    We discussed that Mr. Nordberg had read a book

53

1    called Ambush Grand Jury, that I worked with the FBI, and

2    we discussed the possibility and probability of me working

3    for his firm as a PI.  Private investigator, I'm sorry.

4         Q.   Did you subsequently come to work for

5    Mr. Nordberg's firm as a private investigator related to

6    this case?

7         A.   Yes.  And contractually, not as an employee of

8    the firm.

9         Q.   When did you commence that work?

10        A.   In January of 2005.

11        Q.   Were you paid for your work?

12        A.   Yes, ma'am.

13        Q.   What were you paid?

14        A.   $85 an hour.

15        Q.   And do you have a sense of how many hours of work

16   you have performed for Mr. Nordberg's firm -- for the

17   plaintiffs' counsel's firm since January of 2005?

18        A.   I have a figure in mind, but not an hourly.  But

19   I can certainly do the calculator thing and let you know.

20        Q.   Either way, why don't you give me the figure.

21        A.   It's about $35,000 worth of work.

22        Q.   So if we divided that by 85, we could estimate

23   the rough number of hours?

24        A.   That's what I was going to do, exactly.

25        Q.   Fair enough.  You don't need to do that

54

1    calculation here.

2            What was the nature of the investigative work you

3    did for Mr. Nordberg's firm?

4            MR. NORDBERG:  Objection, work product, instruct

5    the witness not to answer.

6        Q.    (BY MS. AHERN)  Have you met other members of

7    Mr. Nordberg's firm?

8        A.    I have.

9        Q.    Who have you spoken with?

10       A.    I've met Jenna, J-e-n-n-a, McNaughton,

11   M-c-N-a-u-g-h-t-o-n-W-o-n-g.  Ellen, E-l-l-e-n, Noteware,

12   N-o-t-e-w-a-r-e.  I've met Karen -- the last name starts

13   with an M.

14       Q.    Markert.

15           MR. NORDBERG:  M-a-r-k-e-r-t, a paralegal.

16       A.    Thank you.  I've met Merrill Davidoff,

17   D-a-v-i-d-o-f-f, I believe.  David Sorensen, I believe.

18           MR. NORDBERG:  S-o-r-e-n-s-e-n.

19       A.    Anna Louise --

20           MR. NORDBERG:  Roselle, R-o-s-e-l-l-e.

21       Q.    (BY MS. AHERN)  Are you aware Ms. Roselle does

22   not work for the same law firm as Mr. Nordberg?

23       A.    No.

24       Q.    Did you meet anyone else from Ms. Roselle's firm?

25       A.    I'm not sure where to go from there.

55

1      Q.   Any other attorneys that you have had contact --

2  any other attorneys for plaintiffs in this Cook matter that

3  you have had contact with in this case?

4      A.   That I'm aware are attorneys, no.

5      Q.   How about any other employees of plaintiffs'

6  counsel's firms?

7      A.   I've had phone contact with Ann Eppesen.

8           MR. NORDBERG:   E-p-p-e-s-e-n.

9      A.   And Gemma, G-e-m-m-a, George, Edward, Mary, Mary,

10  Adam, Cruz, C-r-u-z, that I'm certain of.

11      Q.   (BY MS. AHERN)  Anyone else that you can recall?

12      A.   No.

13      Q.   How many occasions would you say that you have

14  spoken to Ms. McNaughton-Wong?

15      A.   Less than five.

16      Q.   How about Ms. Noteware?

17      A.   Less than five.

18      Q.   Karen Markert?

19      A.   Less than five.

20      Q.   Merrill Davidoff?

21      A.   A couple times.   Two.   I'm sorry, two times.

22      Q.   David Sorensen?

23      A.   Less than five times.

24      Q.   Louise Roselle?

25      A.   Once.

56

1      Q.   And how many occasions would you say you have had

2   contact with or spoken to Mr. Nordberg?

3      A.   Maybe 20 to 30 times.

4      Q.   Other than work as a private investigator for

5   this case, have you had other communications with

6   plaintiffs' counsel?

7           MR. NORDBERG:   I don't want to be perceived as

8   suggesting an answer to that question on Mr. Lipsky's part.

9   Your previous questions, as I understood them, didn't

10  segregate contacts relating to work that Mr. Lipsky did as

11  a private investigator for the firm versus contacts

12  associated with testifying in the case, and your most

13  recent question seems to presuppose that all of the

14  contacts fell in the category of work performed as a

15  private investigator.   I'm not sure that that's correct.

16          MS. AHERN:   I certainly didn't mean to presuppose

17  that his prior contacts related solely to work as a private

18  investigator.

19          MR. NORDBERG:   I just wanted to clarify that.

20     Q.   (BY MS. AHERN)  I'm seeking to explore,

21  Mr. Lipsky, those occasions where you spoke with

22  plaintiffs' counsel with regard to potential testimony in

23  this case.

24     A.   Okay.

25     Q.   When was the first time you had a conversation on

57

1    that subject?

2         A.   Well, my recollection was maybe a week or so ago.

3         Q.   Were you aware, Mr. Lipsky, that you had been

4    disclosed as a potential witness in this case sometime in

5    2004?

6         A.   And I also had been subpoenaed by your firm, as

7    well as Berger & Montague.

8         Q.   So you were aware that you were disclosed as a

9    potential witness in this case sometime in 2004?

10        A.   Yes, ma'am.

11        Q.   At the time of the subpoena from Berger &

12   Montague in 2004, did you speak to any attorneys at Berger

13   & Montague?

14        A.   No, ma'am.

15        Q.   And you and I have never spoken before?

16        A.   That's correct.  We talked about that.

17        Q.   You've never spoken with any representative of my

18   law firm, Kirkland & Ellis?

19        A.   That's correct.

20        Q.   We talked a great deal about Berger & Montague

21   attorneys.  Have you ever had occasion to meet, speak to

22   Silver & Deboskey attorneys?

23             MR. NORDBERG:  Have you ever met Gary Blum?  He

24   doesn't know who Silver & Deboskey is.

25             MS. AHERN:  I'll go through them individually.

58

1          A.   I'm thinking back because, actually, Ken Fimberg

2    worked with one of the attorneys in this case on Protex.

3    So when you asked me that kind of a question without a time

4    frame, and I'm clicking all the way back.

5          Q.   (BY MS. AHERN)   That's fair.

6          A.   So Deboskey -- Mr. Deboskey's name is familiar to

7    me.

8          Q.   You think you may have had some contact with him

9    with regard to prior work?

10         A.   Incidental, yes, I believe.   And, of course, it

11   gets mixed up with all of the litigation that he was

12   involved with Rocky Flats workers, and I'm just trying to

13   be honest.

14         Q.   Have you ever had contact with Gary Blum?

15         A.   Gary --

16         Q.   Blum, B-l-u-m?

17         A.   I don't think so.

18         Q.   Holly Shook?

19              MR. NORDBERG:   Who opened the door here today.

20         A.   I met her the other day.

21         Q.   (BY MS. AHERN)   When did you meet her?   In the

22   past week?

23         A.   This weekend.

24         Q.   What did you do to prepare for this deposition?

25         A.   I reviewed my affidavit, the one that I signed

59

1    regarding the Rocky Flats case in June of 1989, the 6th.  I

2    also reviewed the Plaintiff's Sentencing Memo of 1992.

3           Q.    Anything else?

4           A.    And also -- I met with Peter yesterday for a

5    couple hours.

6           Q.    Was anyone else present in your meeting with

7    Mr. Nordberg yesterday?

8           A.    Well, we were in a larger room with other people

9    doing their own work, but they weren't party to what we

10   were talking about.

11          Q.    So there weren't other people participating in

12   your conversation with Mr. Nordberg?

13          A.    No.

14          Q.    But there were other people physically present in

15   the space?

16          A.    Yes.  And I mentioned my testimony and my -- not

17   really discussed it, but I talked about it with

18   Mr. Davidoff.

19          Q.    When did you talk about it with Mr. Davidoff?

20          A.    Friday night and last night.

21          Q.    How long a time did you discuss your potential

22   testimony with Mr. Davidoff?

23          A.    Just a few minutes.

24          Q.    What did you discuss?

25          A.    Much of what I discussed with Mr. Nordberg.

60

1        Q.   And what did you discuss with Mr. Nordberg?

2        A.   I wanted a clarification of what this deposition

3    was.  And I didn't have an understanding of what it was and

4    what it was for.  And those answers were provided to me.  I

5    was asked to answer honestly.  It was emphasized that I be

6    truthful.

7             We also discussed the letter that I received last

8    week from the FBI.  The dialogue concerning receiving that

9    letter from the FBI agent who I spoke with.  Subsequent

10   conversations that Mr. Nordberg had with Mr. Taylor

11   regarding the admonishments that I had been given.  The

12   apparent agreement between the government and, I guess, me,

13   that Title V has been relaxed, so I can actually identify

14   people's names, otherwise I would have been prohibited from

15   doing that for the purposes of this litigation only.

16   And -- I'm trying to think.  Oh, that -- to expect to be

17   videotaped today.

18       Q.   I didn't notice it as a video deposition.  Did

19   they not tell you that?

20       A.   But you asked me what we talked about.  And that

21   we were going to be doing it here on Sunday.  That was fine

22   with me.

23            Also I understand there is a court order, among

24   other things, that this deposition was required before I

25   could actually testify in a trial -- or be allowed to, I

61

1    should say.

2         Q.   Were there any other subjects you discussed with

3    Mr. Nordberg or plaintiffs' counsel about this deposition?

4         A.   Just questions I had about where this deposition

5    was going to go and any suggestions on material to prepare

6    with.

7         Q.   Did Mr. Nordberg or any other plaintiffs' counsel

8    suggest specific materials that you might want to review to

9    prepare for this deposition?

10        A.   Just that they agreed that the review -- just

11   that Mr. Nordberg and Mr. Davidoff agreed that the

12   affidavit was well timed -- or time well spent as well as

13   the sentencing memo to help me gather my thoughts.

14             Mr. Davidoff asked me if I had notes regarding my

15   investigation, and where were they, and if I had access to

16   them.  I also met with Ellen Noteware on Friday.  I was

17   advised that a declaration of sorts had to be generated,

18   crafted, and I worked with Ms. Noteware on that.  Also met

19   with Noteware and Mr. Nordberg Friday night and signed that

20   affidavit -- or declaration, I should say.

21        Q.   Did you discuss the substance of the testimony

22   that you will give in this case with Mr. Nordberg or any

23   other plaintiffs' counsel?

24             MR. NORDBERG:  Form.  Vague.

25        A.   Do you mind if I take a break?

62

1      Q.   (BY MS. AHERN)  I need for you to answer the

2   pending question first, but then you can take a break.

3      A.   Thanks.  I didn't hear what you said.

4           MR. NORDBERG:  I objected to the form of the

5   question.  And I don't remember what the question is at

6   this point.

7      Q.   (BY MS. AHERN)  I asked you, Mr. Lipsky, if you

8   had discussed the substance of your anticipated testimony

9   with Mr. Nordberg or any other plaintiffs' counsel in

10  preparation for this deposition?

11          MR. NORDBERG:  You can answer.

12     A.   Well, my question was -- the substance of this

13  deposition was I wasn't sure who was calling me, so that

14  had to be explained.  And my understanding is you were

15  going to be asking a lot of the questions, and that was

16  explained to me.

17          And the other substance was what I mentioned

18  earlier, that I asked probably, you know, from what angle

19  these questions were going to be asked so I knew what to

20  prepare for.

21     Q.   (BY MS. AHERN)  From what angle did Mr. Nordberg

22  or other plaintiffs' counsel tell you my questions would be

23  asked?

24     A.   No, I asked that question, from what angle.  And

25  it was agreed I should review my affidavit.  I got a copy

63

1    of that, as well as the Plaintiff's Sentencing memo.  Those

2    are my words.

3         Q.    Were those documents provided to you by

4    plaintiffs' counsel?

5         A.    No.

6         Q.    Where did you obtain those documents from?

7         A.    I got them from the Congressional Record, and I

8    also got them from the courthouse.  So I have different

9    copies of it.

10        Q.    If you would like to take a break, you mentioned

11   that you wanted to take one, this is a fine time for that.

12        A.    Thank you.

13             (Recess taken from 10:36 a.m. to 10:48 a.m.)

14        Q.    (BY MS. AHERN)  Before we took our break,

15   Mr. Lipsky, we were talking about your prior communications

16   with plaintiffs' counsel with regard to the testimony you

17   will give in this case, and I had asked you if you had

18   discussed the substance of that testimony with plaintiffs'

19   counsel.  Let me see if I can ask a slightly better

20   question.

21             Did you discuss with Mr. Nordberg, or any other

22   plaintiffs' counsel, the topics that were likely to be

23   covered in either your deposition or your trial testimony?

24        A.    Actually, I haven't really been thinking about

25   the trial and testimony.  And as far as I was concerned, we

64

1    were talking about the deposition today.  The topics

2    were -- I guess we got -- Mr. Nordberg and I got through a

3    lot of the affidavit yesterday, the topics out of there.

4         Q.   The affidavit being the declaration that you

5    submitted in this case, or the affidavit in conjunction

6    with the search warrant?

7         A.   Thank you for distinguishing that.  It's actually

8    the affidavit of June of 1989.

9         Q.   Beyond the June 1989 affidavit and the topics

10   therein, did you discuss any other subject matter of your

11   testimony today?

12        A.   Before I forget, the court -- there are some

13   court rulings, and we discussed the time frame in my

14   declaration that was signed on Friday, the 14th of October,

15   of this year, and I'll just call that the declaration.  And

16   the affidavit refers to the June '89 for the search

17   warrant, if that's okay.  In that declaration I had to be

18   sensitive to the court's rulings, so that's why the March

19   of 1992 time frame was placed in there.

20        Q.   Did you discuss any other specific topics of your

21   anticipated testimony beyond that which was in the June

22   1989 affidavit?  I think that was my question.  And you had

23   mentioned that you discussed generally the contents of your

24   declaration in terms of time frame, but did you discuss the

25   subject matters that are covered in your declaration?

65

1       A.   Oh, yes.

2       Q.   What specifically do you recall discussing?

3       A.   In the declaration under Title 28 Code of Federal

4   Regulations, in particular I reviewed this with

5   Ms. Noteware, the areas I needed to be sensitive to, and

6   what I was admonished or not authorized to talk about.  And

7   those are pretty much enumerated in that declaration.

8            And then also discussed the Privacy Act of Title

9   V, US Code.  And though they are not enumerated, we

10  discussed, I guess, the attributes or the operating words

11  like identifying people by number, simple number, contact

12  information, medical history, all of those types of issues

13  that are protected by the Privacy Act.

14      Q.   Other than the restrictions or limitations on

15  your testimony as advocated by the letter you received from

16  the FBI, did you discuss other subjects of your testimony

17  with Ms. Noteware or any other plaintiffs' counsel in

18  preparation for this deposition?

19      A.   The thrust of my testimony was also identified in

20  my declaration with those other topic areas that I dealt

21  with Ms. Noteware.  And then Mr. Nordberg and I talked

22  about those generally, as well as, as I mentioned earlier,

23  we got through some of the search warrant affidavit in

24  1989.

25      Q.   So it's your testimony, Mr. Lipsky, that you

66

1    discussed each of these subject matters that are identified

2    in your declaration with either Ms. Noteware or

3    Mr. Nordberg or both in preparation for this deposition?

4         A.   Yes.

5         Q.   Do you recall anything in particular that

6    Ms. Noteware had to say about any of those subjects?

7              MR. NORDBERG:  Could you give me a moment while

8    I'm deciding whether to object.

9              Objection, vague.  You can go ahead and answer.

10        A.   All right.  Do you mind reading it back?

11        Q.   (BY MS. AHERN)  My question to you was, what do

12   you recall Ms. Noteware saying to you with regard to any of

13   the subject matters that are included within your

14   declaration, leaving aside the issues related to the

15   limitations on your testimony as advocated by the FBI?  I'm

16   looking for the substantive subject matters.

17        A.   Just that we also discussed the court's rulings.

18   I guess I should have turned it off.  The cell phone is

19   vibrating.  Sorry.

20             The court's rulings, and also rules of court

21   itself.  You know, what I can testify to, you know, like

22   the hearsay rule.  Just a general -- I would call it

23   characterized as a general discussion, a limited amount of

24   time to somebody like me who has very limited experience in

25   civil court.  And to understand kind of the boundaries of

67

1    what I can do in this deposition.

2        Q.   Mr. Lipsky, do you recall Ms. Noteware or

3    Mr. Nordberg discussing with you or making any comments to

4    you with regard to the subject matter of the criminal

5    investigation of Rocky Flats itself?

6             MR. NORDBERG:   Objection, vague.   You can answer.

7        A.   I'm not sure what you mean.

8        Q.   (BY MS. AHERN)   Well, obviously your declaration

9    covers a variety of topics and subject matters related to

10   the criminal investigation of Rocky Flats in the late '80s

11   and early '90s.

12       A.   Yes.

13       Q.   What I'm seeking to explore with you here,

14   Mr. Lipsky, is what comments and what information

15   Mr. Nordberg or Ms. Noteware or any other plaintiffs'

16   attorneys conveyed to you with regard to the subject

17   matters that are covered in your declaration.

18            So my question for you was, what did Mr. Nordberg

19   or Ms. Noteware or any other plaintiffs' counsel

20   communicate to you with regard to the criminal

21   investigation of Rocky Flats?

22            MR. NORDBERG:   Same objection.

23       A.   Well, if I understand you correctly, those topics

24   were discussed with Ms. Noteware as possible discussion

25   topics or testimonial topics that might be explored.   As

68

1   far as specificity, I can only tell you that Mr. Nordberg

2   and I sat down for a couple -- I guess a few hours

3   yesterday and reviewed the affidavit, just going through

4   the affidavit, that I had been reviewing that, as well as

5   the sentencing memo.  But as far as information, I don't

6   know what you mean, other than what I know.

7          Q.   What did Ms. Noteware or Mr. Nordberg say to you

8   on those subjects?  That's what I'm looking for.

9          A.   Just generally that these are possible topics of

10  testimony that you will be asked about.

11         Q.   Beyond that which is contained in your June 1989

12  affidavit or the sentencing memo, did you discuss any other

13  subjects of the criminal investigation with Ms. Noteware or

14  Mr. Nordberg or any other plaintiffs' counsel?

15              MR. NORDBERG:  Form.  You can answer.

16         A.   I'm missing the question, I'm sorry.

17         Q.   (BY MS. AHERN)  You have indicated, Mr. Lipsky,

18  that your conversations with Mr. Nordberg and Ms. Noteware

19  with regard to the topic of the criminal investigation of

20  Rocky Flats keyed in mostly on your June '89 affidavit and

21  the Plaintiff's Sentencing Memo in this case.

22              My question for you was, beyond the materials

23  contained in those two documents, do you recall any other

24  subject matters related to the criminal investigation that

25  you discussed with Mr. Nordberg or Ms. Noteware or any

69

 1   other plaintiffs' counsel in preparation for this

 2   deposition?

 3        A.   Well, really it was the affidavit and the

 4   sentencing memorandum were -- it was just ratified by

 5   Ms. Noteware and Mr. Nordberg that reviewing it was a good

 6   idea to help refresh my memory about the criminal

 7   investigation.

 8        Q.   You met with Mr. Nordberg for several hours?

 9             MR. NORDBERG:  Objection, asked and answered.

10   Objection to form.  Objection, mischaracterizes the

11   witness' testimony.  You can go ahead and answer.

12             THE DEPONENT:  I can what?

13             MR. NORDBERG:  You can answer.

14        Q.   (BY MS. AHERN)  You can answer.

15        A.   I met for a few hours with Mr. Nordberg

16   yesterday.

17        Q.   I'm trying to understand what you talked about

18   for those hours.

19        A.   Just a reiteration of what I spent time with

20   Ms. Noteware about this declaration, those topics, and it

21   was really the first chance that I had with Mr. Nordberg to

22   better understand what was going to happen today.  You

23   know, what the deposition was about.  That mostly you would

24   be asking the questions.

25             I was interested in his spin on what he would ask

1   me if he was in your shoes.  And we also went over what his

2   policies were when we first met, and reiterated that I know

3   that Mr. Nordberg is not my attorney.  Mr. Nordberg wants

4   me to be honest with my answers, but he also wants me to be

5   careful because I have a little bit more constraints than

6   the normal person testifying in a manner like this.

7        Q.   What did Mr. Nordberg tell you about what his

8   spin was with regard to what he would ask if he were in my

9   shoes?

10            MR. NORDBERG:  Objection to form.

11       Q.   (BY MS. AHERN)  You may answer.

12       A.   Actually, we didn't reach a decision because I

13   couldn't either.  And when I'm saying a spin, I was looking

14   for, you know, the curveball, so to speak.  Just if he had

15   any thoughts.

16            And we both agreed that there is an obscene

17   amount of public material about my investigation, as well

18   as my involvement in the Rocky Flats case.  So it's not

19   like you or your firm don't really have an idea of how I

20   feel about things or the methodology that was conducted

21   during the investigation.  It's been extremely scrutinized

22   and rehashed several times.

23            So it was just understanding that it was the

24   court's order that I needed to be deposed before I could

25   testify, and it was just trying to understand all of that.

71

1    Just, you know . . .

2        Q.    Did you discuss in detail the contents of that

3    June 1989 affidavit with Mr. Nordberg and Ms. Noteware?

4        A.    Mr. Nordberg and I yesterday started to go

5    through it, and maybe got through about a third of it.

6        Q.    Do you recall anything in particular that

7    Mr. Nordberg said to you with regard to the contents of

8    that affidavit?

9        A.    We discussed particular topics like my

10   declaration in that affidavit about my training, knowledge,

11   and skills.

12       Q.    Other than training and knowledge, what other

13   topics did you discuss?

14       A.    One of the items was about how RCRA applied out

15   at Rocky Flats and what we were looking at.  That in

16   particular the Atomic Energy Act had exclusive domain over

17   special nuclear material and source material.  And we

18   discussed -- he would review it, and then when we came to

19   that point he asked me if I understood that -- what part of

20   RCRA covered a mixed waste.  And I told him, well, it did,

21   and why we didn't go after just radioactive waste.  Just

22   kind of like that.

23       Q.    Other than the subject of RCRA, the applicability

24   at Rocky Flats, did you also discuss the topic of RCRA

25   applicability with regard to other DOE facilities where

72

1    special nuclear materials may be handled?

2    A.   No.

3    Q.   So your conversation about RCRA applicability was

4    limited to the context of Rocky Flats?

5    A.   Yes.  Well, like --

6    Q.   Go ahead.  I didn't mean to cut you off.

7    A.   Are you intimating I'm going to be asked

8    questions about other facilities?

9    Q.   No.  I was just curious about whether the scope

10    of your discussion with Mr. Nordberg yesterday included any

11    general background you might have or you might know with

12    regard to the position DOE had taken with regard to RCRA

13    applicability at nuclear facilities generally.

14    A.   We didn't have the time -- I don't know that I

15    had the time to even really get a comfortable feeling about

16    being here today with the time that we had, let alone talk

17    about something like that.  And Mr. Nordberg has always

18    been real sensitive to time management so, no.  The answer

19    is, no, we were discussing Rocky Flats.

20    Q.   Other than the issue of regulatory applicability

21    at Rocky Flats, do you remember any other specific topic

22    that may have covered your June 1989 affidavit that you

23    discussed with Mr. Nordberg in preparation for this

24    deposition?

25    A.   Well, the booklet that he gave -- Mr. Nordberg

73

1   gave to you before we started this deposition regarding my

2   credentials and that, we went through that booklet as well.

3       Q.   I think you already mentioned that you had

4   discussed your background, education, and training?

5       A.   But I didn't tell you that we went through the

6   book kind of like what we did in this deposition with you.

7       Q.   Were there other subject matters that are

8   contained within your June 1989 affidavit that you

9   specifically recall discussing with Mr. Nordberg in

10  preparation for your deposition?

11      A.   Topics related to the sentencing memorandum of

12  1992.

13      Q.   What --

14      A.   But just generally that that would be a good

15  resource to review.

16      Q.   Did you discuss the contents of the sentencing

17  memo in any particularity with Mr. Nordberg in preparation

18  for this deposition?

19      A.   That does remind me of something.  Yes, we did

20  discuss the contents, and he asked me if I had reviewed the

21  documentation that was in the sentencing memorandum.  And I

22  had told him, yes, I had.  It wasn't really Mr. Fimberg,

23  who was the author of that document, his second reader, but

24  I was the one that was verifying -- authenticating, I

25  guess, the veracity of the source documentation that was

74

1   utilized.  And Mr. Nordberg asked me if I was involved in

2   crafting any of the statements in there other than that.  I

3   said, no, that was all Mr. Fimberg that had put that

4   together.

5          And then in reviewing the affidavit, he also

6   asked me when I swore to that affidavit.  And it mentions

7   like source documentation or discussions with people.  Did

8   I personally verify those things?  And I said, yes, any

9   time I was the affiant, then I would have done that.  And

10  the only time I can think of when I didn't do that, and I'm

11  sorry I did, was the time when Fimberg asked me to present

12  a court order for a -- like a pen register on a phone

13  involving a case with a squad member, a squad mate of mine.

14      Q.   That wasn't the Rocky Flats case?

15      A.   Not at all.  What made me uncomfortable, ma'am,

16  as I never thought I -- I always wanted to know and be

17  familiar -- I guess grossly familiar with the documentation

18  that I'm presenting before the court.  And if I'm before

19  the court, whether ex parte or in open court, that I had a

20  reason to be there just because of my training about

21  innocent bystanders.

22          There was a Supreme Court case where an FBI agent

23  was asked to go with some state people to a judge's house

24  and get a search warrant, and he became part of the

25  package, and it was disastrous.  So I always wanted to be

75

1    grossly familiar with what I was doing when I was before

2    the court.

3            One time I went in for Mr. Fimberg and signed off

4    on a court -- you know, a request -- an application for a

5    court order, and when we walked out Mr. Fimberg says, What

6    if the judge had asked you if you read it?  And I said, I

7    would have told him the truth.  And Mr. Fimberg says,

8    uh-huh, that figures.  I said, You know what?  That's the

9    risk you take when you ask me to do something that you know

10   is a little questionable.

11       Q.    Based on what you just said to me, let me ask you

12   this:  Is it your testimony that you agree with the factual

13   underplannings of the materials that are contained in the

14   Plaintiff's Sentencing Memo?

15           MR. NORDBERG:  May I have that question read back

16   so I can determine whether to object to it.

17           (The last question was read back as follows:

18   "Based on what you just said to me, let me ask you this:

19   Is it your testimony that you agree with the factual

20   underplannings of the materials that are contained in the

21   Plaintiff's Sentencing Memo?")

22           MR. NORDBERG:  Objection, vague.  You can answer.

23       A.    No.  What I told you, ma'am, is that there are

24   source document references in that sentencing memoranda

25   which I verified.  I think it could become a very, very

76

1    long argument about what is factual in that document.

2    And -- but there are subjective statements made in there by

3    Mr. Fimberg, and there are references to actual documents

4    that exist independently of this document, and it's those

5    documents that I was talking about.

6              I wasn't trying to mislead you that I was

7    involved in it and authoring of this document.  It's

8    Mr. Fimberg that authored that document.

9              The affidavit, on the other hand, I swore to.

10   Did I write the whole thing?  No.  But I did verify

11   everything and made sure that all of those things that were

12   referenced to or -- which reminds me, Mr. Nordberg pointed

13   out one of the footnotes on the affidavit, on the Church

14   litigation, if I had gone down and reviewed the

15   documentation on the Church litigation and knew enough to

16   put some kind of quote in the affidavit.

17             I said, No, I wasn't able to get the Church

18   documentation when I went to the clerk's office, and

19   Mr. Fimberg said he would handle it, and he did, and he's

20   the one that provided me the information.

21             Then the legal aspects of the affidavit, legal

22   arguments are not mine either.

23        Q.   The legal arguments in the affidavit -- and we're

24   talking about the June '89 affidavit in support of the

25   search warrant?

1      A.   Yes.

2      Q.   Mr. Fimberg provided the material that is

3  contained in the legal arguments in that affidavit; is that

4  right?

5      A.   He wrote it.

6      Q.   He wrote it?

7      A.   Yes.

8      Q.   Do you remember any other specific subject that

9  was contained in the June '89 affidavit that you discussed

10  with Mr. Nordberg in preparation for this deposition in the

11  meetings yesterday or on Friday?

12      A.   Are you asking me if there were any other things

13  that we talked about?

14      Q.   I'm asking for the other subject matters that you

15  talked about as you recall beyond those which we've

16  discussed already this morning.

17      A.   I need to ask him a question about something.

18      Q.   You can't consult with him until you answer my

19  question.

20      MR. NORDBERG:  There may be a work product issue,

21  and your question is vague.  So may I suggest that instead

22  of having Mr. Lipsky consult with me, I will object to the

23  question as vague.

24      THE DEPONENT:  Okay.

25      MS. AHERN:  You don't represent Mr. Lipsky here.

1          MR. NORDBERG:  That's quite correct.

2          MS. AHERN:  So the contents of your communication

3    with him about anticipating any testimony in this

4    deposition are not covered by any kind of attorney-client

5    privilege.

6          MR. NORDBERG:  Are we deposing me?  Plaintiffs

7    have not asserted attorney-client privilege with respect to

8    any question in this deposition.

9          MS. AHERN:  I'm simply making a statement.  I

10   would prefer that Mr. Lipsky answer my question before

11   consulting with you.

12         MR. NORDBERG:  I haven't asked to consult with

13   him, I've merely objected to the question as vague.

14         MS. AHERN:  Can you read the original question I

15   asked back for Mr. Lipsky.

16         (The last question was read back as follows:

17   "I'm asking for the other subject matters that you talked

18   about as you recall beyond those which we've discussed

19   already this morning.")

20         A.   We talked about the evolution of the RCRA

21   permitting process at Rocky Flats.  Specifically there is a

22   document that -- and the reason why I wanted to talk to

23   Mr. Nordberg was it may impact 28 C.F.R. in regards to

24   classified information.  I'll characterize it this way:

25   That there is a document that's referenced in the affidavit

79

1    about waste streams and characterizations.  And

2    Mr. Nordberg was asking me if I had personally reviewed

3    those things, as well as the permit paperwork documentation

4    from not only the region's RCRA programs office but also

5    the clean water programs office.

6         Q.   And your response was?

7         A.   My response was that I did obtain and I did read

8    them personally, but they weren't characterized to me by

9    other people.

10        Q.   Do you recall if those documents were authored by

11   the Department of Energy?

12        A.   I'm sorry?

13        Q.   Do you recall whether the documents you just

14   referenced were authored by the Department of Energy?

15        A.   Well, yes and no.

16        Q.   Some were and some weren't?

17        A.   Correct.

18        Q.   Which of those documents that you just

19   specifically referenced do you recall being authored by the

20   Department of Energy?

21        A.   Well, particularly groundwater monitoring

22   certification of 1985 was coauthored by the Department of

23   Energy and Rockwell.  The initial 1980 small quantity

24   generator permit or exemption, I believe, was signed by a

25   Rockwell person, but I'm not sure if it was signed off by a

80

1    DOE person.  And there was a litany of documentation

2    involving not only permits and applications, but

3    communications with the EPA and the Colorado Department of

4    Health, as it was known then, CDH.

5            The document that I'm thinking about that follows

6    the waste stream identification and characterization I

7    believe was submitted by Rockwell through a contractor, a

8    contractor had done this thing.  And I think specifically

9    it was like March '86.  It was part of the 1985 compliance

10   agreement with the health department that these waste

11   streams be identified.  And I believe the document -- the

12   volumes -- quite a few volumes that were submitted to the

13   health department, EPA, in '86.

14       Q.   Did you review any of that underlying

15   documentation -- regulatory documentation in conjunction

16   with preparing for your testimony here?

17       A.   No.

18       Q.   Do you have copies of that underlying

19   documentation?

20       A.   No.

21       Q.   Did Mr. Nordberg show you any copies of that

22   documentation?

23       A.   No.

24       Q.   How about Ms. Noteware?

25       A.   No.

81

1        Q.    Any other plaintiffs' counsel --

2        A.    No.

3        Q.    -- show you those documents in connection with

4   this deposition?

5        A.    No.

6        Q.    When was the last time you saw any of the

7   regulatory documentation that is specifically referenced in

8   your June 1989 affidavit?

9        A.    Certainly not after 1992.

10       Q.    Do you recall any other specific topic that may

11  be referenced in your June 1989 affidavit or the March '92

12  sentencing memo that you discussed with Mr. Nordberg or any

13  other plaintiffs' counsel in preparation for your testimony

14  here?

15       A.    Ms. Noteware and I were talking about

16  incinerators, and she made a comment that she thought there

17  were like five or six of them.  And I felt like, no, there

18  was only like three or four that were mentioned by Rockwell

19  in their permitting process.  And in reviewing my

20  affidavit, I think there actually were five in three

21  different buildings.  So I would have to stand corrected

22  with Ms. Noteware.  We did talk about that, and I mentioned

23  that to Mr. Nordberg.

24       Q.    Did you have any further discussion with either

25  Mr. Nordberg or Ms. Noteware with regard to the

82

1    incinerators at Rocky Flats in preparation for this

2    deposition?

3         A.   That Ms. Noteware wanted me to distinguish

4    between the fluidized bed incinerator and the other

5    incinerator if there was a difference.  I discussed that

6    with her.

7         Q.   Anything else related to incinerators that you

8    discussed with either Ms. Noteware or Mr. Nordberg or any

9    other plaintiffs' counsel in preparation for this

10   deposition?

11        A.   That the -- I talked to Ms. Noteware about

12   Building 376.

13        Q.   What do you recall discussing with Ms. Noteware

14   about Building 371.  Maybe 371?

15        A.   376.

16        Q.   What did you discuss with Ms. Noteware with

17   regard to Building 376?

18        A.   That it was the building that never got

19   functional.

20        Q.   And you said that was 376.  Beyond that did you

21   discuss anything further about that building with

22   Ms. Noteware or any other plaintiffs' counsel in

23   preparation for this deposition?

24        A.   No.

25        Q.   Are there any other subject matters that are

1    discussed in your June 1989 affidavit or the March 1992

2    sentencing memo or any other topic related to the criminal

3    investigation of Rocky Flats that you discussed with either

4    Mr. Nordberg or Ms. Noteware or any other plaintiffs'

5    counsel in preparation for this deposition?

6         A.   Mr. Nordberg asked me if I knew what alpha

7    hydrolysis was.

8         Q.   And do you?

9         A.   I refreshed my memory off the affidavit, and then

10   I recalled it.

11        Q.   Is there any other subject matter that you

12   discussed with either Mr. Nordberg or Ms. Noteware in

13   preparation for this deposition beyond those which we've

14   already discussed this morning?

15        A.   And we also looked at Mr. -- Mr. Nordberg and I

16   also looked at the area of discussion about the National

17   Priority List, or NPL, and I made a comment that I've seen

18   some news articles about the scenario at Rocky Flats, kind

19   of like a chronology.  And I noticed that the news media

20   was reporting that the national priority list that Rocky

21   Flats was placed on was in 1989, and I noted that it was

22   incorrect, it was 1984.

23        Q.   Do you know the difference between being proposed

24   for listing on the NPL as opposed to actually being listed?

25   Do you make that distinction?

84

1      A.    No.

2      Q.    Do you remember any other subject matter that you

3   discussed with Mr. Nordberg or Ms. Noteware or any other

4   plaintiffs' counsel in preparation for this deposition?

5      A.    Not offhand.

6      Q.    I want to go to the circumstances that gave rise

7   to the commencement of your investigation of Rocky Flats.

8   Mr. Lipsky, could you explain to me what it was that caused

9   you to take notice of Rocky Flats as a potential topic for

10  criminal investigation?

11          MR. NORDBERG:   Excuse me, I'm not going to object

12  to the question, but I am going to make note of the court's

13  rulings concerning the admissibility of testimony about

14  facts uncovered in the investigation versus the conduct of

15  the investigation itself.   As I said, I have no objection.

16     A.    It was in early June of 1987.   Bill Smith with

17  the EPA NEIC Office of Criminal Investigations asked to

18  meet with me and show me a document.

19     Q.    (BY MS. AHERN)   What document did he show you?

20     A.    The briefing memo of Mary L. Walker.

21     Q.    Do you know who authored that document?

22     A.    I did at one time.

23     Q.    Do you know today?

24     A.    I know that it's a male, an attorney that was

25  employed by the Department of Energy that was writing a --

85

1    kind of a synopsis of the state of condition of Rocky Flats

2    for undersecretary Mary L. Walker of the Department of

3    Energy -- or assistant secretary.  She was up there, pretty

4    high up.

5        Q.   Do you have firsthand knowledge of the

6    circumstances that gave rise to the authorship of that

7    document?

8             MR. NORDBERG:  Vague.

9        A.   No.

10       Q.   (BY MS. AHERN)  As of June of 1987 when you and

11   Mr. Smith first began to discuss the prospect of

12   investigating Rocky Flats, who was the contractor at the

13   plant?

14       A.   Oh, actually we didn't first discuss Rocky Flats

15   at that point.  You asked me at what point did I have --

16   could I actually meet the threshold of the attorney general

17   guidelines to initiate a criminal investigation.  So I just

18   want to distinguish that.

19       Q.   That's fine.  I'm jumping ahead, and you are

20   right to note that for me.

21       A.   I didn't want you to misunderstand that we

22   weren't -- you know, that I wasn't aware of Rocky Flats

23   before, or mislead you on that.  But I was constrained by

24   attorney general guidelines, and that was the trigger, so

25   to speak, that allowed me to -- I felt I had enough to go

86

1    talk to an attorney -- a prosecutor about it.

2        Q.   Your conversation with Mr. Smith regarding that

3    Mary Walker memo was the trigger?

4        A.   It was enough that I felt -- it was a subjective

5    opinion enough to go and talk to a prosecutor to determine

6    if either a full field or a preliminary inquiry was

7    available.

8        Q.   Okay.  My question is, at that time, then, who

9    was the contractor at Rocky Flats?

10       A.   Rockwell International North American Operations,

11   I believe.

12       Q.   At any period of time when you personally were

13   conducting investigation of the Rocky Flats plant, was Dow

14   Chemical Company the operator of the plant?

15       A.   No.

16       Q.   So your investigation of the plant commenced

17   after Dow Chemical Company had already left the plant?

18       A.   Yes.  Quite a bit.

19       Q.   Is it fair to say, then, Mr. Lipsky, that the

20   criminal investigation into the Rocky Flats plant that you

21   conducted had nothing to do with Dow's conduct?

22            MR. NORDBERG:  Objection, form.  You can answer.

23            THE DEPONENT:  Okay.  I wasn't sure.

24       A.   I think that would be -- I think a one-word

25   answer would be an unfair characterization, because it does

87

1    not consider CERCLA in this case, and CERCLA certainly

2    applied.  In my opinion, Dow cannot be ruled out, but in

3    regards to the -- what turned out to be the criminal

4    investigation, Dow was not a party to it.  Sorry about

5    that, counselor, but it's not a yes-or-no answer.

6         Q.   (BY MS. AHERN)  I want to just try to understand

7    what you are saying, then.

8         A.   Well, if you want me to elaborate on CERCLA --

9         Q.   No.  Let me see if I can formulate a question,

10   and it might clear up any confusion I might have.

11            Did you ever investigate Dow's conduct as part of

12   the criminal investigation of the Rocky Flats plant?

13            MR. NORDBERG:  Vague.  You can answer.

14        A.   Tangentially, yes.

15        Q.   (BY MS. AHERN)  How so?

16        A.   Well, for instance, the first Clean Water Act

17   NPDES, National Pollutant Discharge Elimination System,

18   NPDES permit that was obtained, I believe, was in 1974 by

19   Dow.  And that permit had a life span of five years until

20   renewal.  I can think of that Dow applied for this permit

21   and implemented it or initiated it before -- I believe it

22   was -- this is going way back, but I think June of '75 was

23   the end of the fiscal year at that time, I'm not sure.

24   Maybe July of '75 is when Rockwell took over.

25            So Rockwell had adopted this NPDES permit.  And

88

1    I'm not aware of any changes, I'm not aware that Rockwell

2    conducted any audits or contacted the EPA to reformulate

3    the permit and any of its requirements.  That would be one

4    reason.

5            Spray irrigation, I believe, was part of that

6    permit -- correction, it was not part of that permit yet,

7    but yet it was a waste treatment system that, I think, may

8    have existed at the time that Dow was the contractor out

9    there.

10   Q.   Do you know with any level of certainty whether

11   spray irrigation existed during the period of time when Dow

12   was the contractor of Rocky Flats?

13   A.   No.

14   Q.   And to the extent you were looking at the NPDES

15   permit that was in application at the time that Rockwell

16   took over the management of the plant, that was a

17   historical fact that you were reviewing in conjunction with

18   your investigation into Rockwell conduct at the plant?

19   A.   It was a historical document that was applied for

20   by Dow and then implemented, and then it was transferred

21   over -- or adopted by Rockwell.

22   Q.   Did any aspect of your investigation involve

23   investigation of conduct by Dow under that permit before

24   Rockwell took over the operation of the plant?

25   A.   No.

89

1    Q.   Can you think of any specific area where you, or

2  people acting at your direction, in the course of the

3  criminal investigation of the Rocky Flats plant

4  investigated conduct by Dow as part of your investigation

5  other than as historical facts?

6    A.   In regards to the criminal investigation?

7    Q.   Yes.

8    A.   No.

9    Q.   So it's your testimony that the criminal

10  investigation did not involve Dow's conduct?

11    MR. NORDBERG:  Vague.  You can answer,

12  Mr. Lipsky, notwithstanding any objections I may raise

13  unless you are instructed not to answer.

14    THE DEPONENT:  Thanks.

15    A.   The criminal investigation evolved over a period

16  of years to what turned out to be criminal sanctions.  Dow

17  had -- was not a party to any of those criminal sanctions

18  that Rockwell pled guilty to.  And the focus of -- to even

19  strengthen that, the focus of the investigation, though

20  some of the operations preexisted Rockwell's contract out

21  there at Rocky Flats, which would have been Dow, because

22  Dow was the contract operator, the focus was not at Dow.

23    Q.   (BY MS. AHERN)  The focus of your investigation

24  into the Rocky Flats plant, and that was an investigation

25  that commenced, is it fair to say, in 1987?

90

1          A.   It is, June.

2          Q.   The focus of that investigation was on the

3    current plant operator and owner; is that fair to say?

4          A.   The tact that was discussed between Bill Smith

5    and Ken Fimberg and I was that we were going to leave the

6    aspect of identifying any culpable parties open.  In other

7    words, my communications in regard to this case was unknown

8    subjects.  There were -- no one was identified

9    preliminarily, and it's the understanding that I had of not

10   only RCRA and the Clean Water Act, which had specific

11   statute of limitation issues, but I also was authorized to

12   do civil investigations, and with that CERCLA goes back

13   pretty far, I think as far as anybody can research, which

14   would have encompassed Dow and preowners.  But

15   realistically, when we did the search in June of 1989, Dow

16   was not a focus of the investigation.

17         Q.   So moving ahead a little bit.  With regard to the

18   execution of the search warrant and the actual raid on the

19   Rocky Flats plant site, the focus of your investigation at

20   that time was not Dow?

21         A.   Well, no, it was after the search.  Before the

22   search and until we did the search --

23         Q.   You had no preconceived notions who you were

24   investigating?

25         A.   We were leaving it open.  We wanted to keep an

91

1    open mind about it.  It really wasn't -- we discussed it

2    that we were going to leave it open.  What we really didn't

3    discuss was who might be culpable.  We didn't know.

4              And it goes to the fact that usually there has

5    been some kind of contact at a location where law

6    enforcement is planning -- or does execute a search

7    warrant.  I can name you a lot of different reasons why.

8    But in this case it was far removed from being able to go

9    on site.  And it was even onerous at best to get even

10   factual information about the plant that we felt was

11   reliable or material to this investigation.

12             So it was not until after we did the search that

13   things came into focus, this is what we're going to do, and

14   it evolved for several months, and probably even a little

15   bit longer.  It changed rapidly the first few months.

16        Q.   Well, what I'm trying to understand here,

17   Mr. Lipsky, is whether the criminal investigation that drew

18   out of the FBI's raid of the Rocky Flats plant in June of

19   '89 and culminated in the closure of that criminal

20   investigation in '92 involved investigation of Dow's

21   conduct?

22        A.   Culpable -- culpability, you mean, or just

23   conduct?

24        Q.   Either.

25        A.   Very little attention, I would say, was spent, if

92

1    any, on the culpability of Dow in our criminal

2    investigation.  But Dow's conduct was certainly of

3    historical interest.  Does that help?

4         Q.   Fair enough.  Absolutely.

5         A.   It took me awhile to figure those words out.

6         Q.   Did any aspect of the investigation that included

7    the June 1989 raid of the Rocky Flats plant and the ensuing

8    investigation that followed focus on off-site release of

9    plutonium by Dow Chemical Company?

10        A.   If I may, and just so we're crystal clear, the

11   investigation itself did not involve the Atomic Energy Act.

12   So we weren't really investigating anything to do with

13   source, special nuclear material, and by-product.  RCRA

14   covered -- through regulation, promulgated rule, and court

15   decision RCRA covered mixed waste, but only that portion

16   that was hazardous.  And then we were also limited by the

17   statute of limitations.

18             So after the focus of the investigation in June

19   of 1989, the aspect that Dow would have been part of that

20   investigation didn't exist, and that's because there was a

21   five-year statute of limitations.  And at best, 1989, we

22   could have only gone back to criminal conduct back to 1984.

23   That was nine years after Dow was the contract operator

24   there.

25        Q.   Let me see if I can get to some of that because I

93

1    think we are talking about the same thing.

2         A.    Okay.

3         Q.    The criminal investigation that you undertook

4    together with Bill Smith with regard to the Rocky Flats

5    plant did not involve materials regulated under the Atomic

6    Energy Act?

7         A.    That's correct.

8         Q.    And so the investigation -- the criminal

9    investigation that you and Bill Smith embarked upon

10   commencing in June of 1987 and culminating in the raid of

11   the plant site, the investigation that followed, did not

12   have anything to do with investigation of plutonium for a

13   specific example?

14        A.    Ma'am, I have a problem with, it did not have

15   anything to do, portion of it.

16        Q.    Except in so far as plutonium may have been

17   involved in mixed waste, and you were interested in the

18   hazardous aspect of that mixed waste?

19        A.    And also, too, Mr. Eddy Goldberg from Hanford was

20   the interim plant manager that replaced several other

21   people after Albert E. Whiteman in June of 1989 when I was

22   there doing the search.  And he ordered up an overflight,

23   multispectral scanning infrared audit of not only site but

24   the surrounding area.

25             And it wasn't our investigation to be privy to

94

1    all that data, but I was contacted about the data, and

2    there was mention of strontium-90 and cesium-137 and

3    elevated levels showing up not only south of the plant but

4    east of the plant on the east side of Indiana.  So that

5    would be by-product.

6         Q.   I understand.  And I understand what you are

7    saying.  And I actually have some very specific questions

8    for you with regard to any investigation into strontium-90

9    that you may have had any familiarity or involvement with;

10   but I'm leaving that aside for right now, and I'll come

11   back to that later.

12        I'm just trying to understand what you told me

13   about the scope of your investigation giving rise to the

14   FBI raid in terms of that not including source special

15   nuclear material -- source material or special nuclear

16   material.

17        A.   If it was independent of RCRA, then it would have

18   been reviewed and not investigated.

19        Q.   So is it your testimony, Mr. Lipsky, that your

20   criminal investigation that gave rise to the FBI raid was

21   not an investigation of plutonium insofar as plutonium is a

22   source material or special nuclear material independent of

23   RCRA?

24        MR. NORDBERG:  Form.

25        A.   In light of that question, I would say that I

95

1    don't believe that we really firmed up the discounting of

2    the Atomic Energy Act until after the search.  I certainly

3    had statutory authority to investigate it, and it's by

4    statute that the FBI does that, is the primary

5    investigative agency for the Atomic Energy Act.

6         But for purposes of this investigation, any

7    decisions, from my memory, really, about the content, the

8    scope, and the focus and the pursuit of the criminal

9    investigation really didn't take place until after the June

10   search.  It was wide open.  Like I said before, it was

11   really wide open up until after the search had been

12   conducted and, I guess, things had -- the information had

13   time to settle and the players were able to consider the

14   aspects of what we were about to embark on.

15        Q.   (BY MS. AHERN)  So it's your testimony the

16   content, the focus, and the scope of the criminal

17   investigation were ultimately determined not to include

18   plutonium except insofar as it may have been an element

19   contributing to something as a mixed waste under RCRA?

20        A.   The fact that if plutonium existed in the mixed

21   waste, it really didn't matter what it was because we

22   weren't investigating or having purview over that aspect of

23   it.  What mattered was that that mixed waste was RCRA

24   regulated, yes, ma'am.

25        Q.   So just -- it's been a very difficult discussion.

96

1      A.   It is.

2      Q.   So I'm trying to understand exactly what we're

3   saying here.  Apart from mixed waste, plutonium was not the

4   focus or within the scope of the criminal investigation

5   that ensued from the Rocky Flats plant?

6      A.   I'm just thinking of an answer that I can live

7   with because -- and, ma'am, what I'm thinking about in

8   particular that I'm getting hung up with, if I could, is

9   the RCRA permit that Rocky Flats submitted back in 1980,

10  actually, declaring that there was plutonium that was

11  recycled and what has -- and what I believe has turned into

12  the 771 Building incinerator that was used to burn kind of

13  like trash items that contained hazardous waste but also

14  was meant to recover the plutonium.  And it was also a

15  subject of the Sierra Club lawsuit, but it wasn't the

16  plutonium that was regulated.

17     Q.   I understand.

18     A.   I don't want to leave it so I can't talk about

19  plutonium at all; but on the other hand, there was other

20  things too -- there were other radioactive materials that

21  were in the low-level mixed waste that were part of the

22  investigation.

23     Q.   I understand what you are saying, and I'm going

24  to try to short-circuit it and see if we can get to the

25  point I was trying to establish.

97

1          The criminal investigation that you embarked upon

2    with Bill Smith that grew out of the FBI raid certainly,

3    you would agree, did not involve historical releases of

4    plutonium from the Rocky Flats plant site by Dow Chemical

5    Company prior to Rockwell coming on the site; is that fair?

6          A.   I'm thinking.  I'm not sure because of the

7    speculative -- I'm not sure because of the speculative

8    accumulation aspect of the 771 incinerator.  And I'm not

9    sure -- I'm not confident if it would have been part of

10   what was intended to be incinerated by the fluidized bed

11   incinerators.  So I'm reluctant to totally discount that

12   just because of that.

13         Q.   Okay.  I'm trying to make a historical --

14         A.   I don't know if you can with plutonium having a

15   half-life of 24,000 years.

16         Q.   Did you ever look at Building 771's stack

17   effluent from the Dow era of operations?

18         A.   From the Dow era?  I don't believe so.

19         Q.   Did you ever investigate as a topic plutonium

20   that may have gotten off site through Dow Chemical

21   Company's operations at the 903 pad?

22         A.   It may have been discussed but was not the

23   pertinent relevant subject matter.

24         Q.   Did you ever explore or pursue in the course of

25   the criminal investigation plutonium that may have gotten

98

1    off site of the Rocky Flats plant from either the 1957 fire

2    or the 1969 fire during the period of Dow's operations?

3         A.   That would not have been part of the ultimate

4    results of our investigation.  In fact, I would go so far

5    as to say that it was considered -- or was not considered

6    as part of the final results in March of 1992.

7         Q.   Certainly the final adjudication of the criminal

8    investigation in March of 1992 did not involve Dow?

9         A.   It was submitted in consideration of only the

10   party named, not Dow.

11        Q.   When was the first time you ever went on the

12   Rocky Flats plant site?

13        A.   Actually, the first time I impacted Rocky Flats

14   plant site was December 9, 1988.  And I say that because

15   the Atomic Energy Act has a provision about trespass, and

16   one of those provisions, besides the physical entry on the

17   property, is the fact that the law also protected that

18   facility from being photographed.  And I photographed it.

19   So I had a significant presence according to the law.  But

20   my physical entry on the plant was June 6, 1989.

21        Q.   So prior to June 6, 1989, you had not walked onto

22   the plant site before?

23        A.   Not to my knowledge.

24        Q.   And any photographs you may have taken in

25   December of 1988 were not taken from the ground on the

99

1   plant site?

2        A.   They sure were.

3        Q.   On the ground?  Not of the ground.  You were not

4   standing physically on the plant?

5        A.   Oh, no.  No.  It was from the air.

6        Q.   It was from the air?

7        A.   Or from the boundaries.

8        Q.   Or from the boundaries?

9        A.   Yes.

10        Q.   But you did not physically walk on to the ground

11   of the plant site in December of '88?

12        A.   Or before.

13        Q.   Or before?

14        A.   No.  No.  I need to amplify that I respected the

15   boundaries and the privacy of the Rocky Flats plant.

16        Q.   Were you physically present in the airplane that

17   conducted the overflights of the Rocky Flats plant site in

18   December of 1988?

19        A.   I was.

20        Q.   Were you there for all of those overflights?

21        A.   In reviewing the affidavit, it looks like I might

22   not have gone on one flight.  And honestly, ma'am, I can't

23   remember.

24        Q.   Do you ever recall how many overflights there

25   were in December of 1988?

100

1          A.   I thought there were four.   There was a daytime

2     run on the 9th and a nighttime run on the 9th.   Then I

3     believe the 10th, and then the 15th.

4          Q.   Which of these do you think you potentially did

5     not participate in insofar as being on the plane?

6          A.   Well, the one that is mentioned in the affidavit

7     that I recall reviewing looks like the one on the 10th I

8     may not have been there, but it's been a long time.

9          Q.   I think we got ahead of ourselves a little bit.

10    I want to get to the overflights, but I want to ask you a

11    couple general questions.   Who were the main prosecutors

12    who were involved in the criminal investigation of Rocky

13    Flats?

14         A.   I'm not sure I understand what you are asking.

15         Q.   I'm just trying to determine, based on your

16    experience and contacts and recollection, what prosecutors

17    were involved with you and Mr. Smith in terms of pursuing

18    the investigation and prosecution of conduct at the Rocky

19    Flats plant?

20         A.   Well, there's two lines of answers.   The first

21    line would be the actual approval process and reporting

22    process, the official part of it.   And then there were the

23    day-to-day contacts.

24         Q.   Let's start with the day-to-day contacts.

25         A.   My day-to-day attorney contact was initially Ken

101

1   Fimberg, that's F-i-m-b-e-r-g.

2        Q.   Anyone else?

3        A.   And then later, Peter J. Murtha, M-u-r-t-h-a,

4   became involved and he was assigned to the Department of

5   Justice Natural Resources Division.

6        Q.   Mr. Fimberg was an assistant U.S. attorney?

7        A.   Thank you, he was assistant U.S. attorney

8   assigned here in Denver, Colorado, for the District of

9   Colorado.

10       Q.   Anyone else in the day to day?

11       A.   Later in the investigation there was a gentleman

12   by the name of Bill Hassler, H-a-s-s-l-e-r.   And then after

13   that was another man by the name of Ken Buck, B-u-c-k.

14   And, of course, occasionally we met with Mr. Norton,

15   Michael J. Norton, he was the U.S. Attorney, District of

16   Colorado.

17            That was the extent of my -- I mean, I knew about

18   Neal, and I'm sorry, Carsciello, Italian name that I can't

19   spell twice correctly at the same time.

20       Q.   I'm not even sure I can pronounce it.

21       A.   It starts with a C, ma'am, C-a-r-s-c-i-e-l-l-o.

22   Because CI in Italian is ch.

23       Q.   You didn't have a great deal of contact with that

24   individual?

25       A.   Very rare.

102

1     Q.    On the day-to-day basis, the people with whom you

2  did have contact with were Mr. Fimberg, Mr. Murtha, later

3  Mr. Hassler, and Mr. Buck?

4     A.    Yes.

5     Q.    With occasional contact with Mr. Norton; is that

6  fair?

7     A.    Occasional.  Then sometimes I would meet with

8  Mr. Carsciello, and then there was a name, Berry Hartman,

9  H-a-r-t-m-a-n.

10     Q.    Did you have much personal contact with

11  Mr. Hartman?

12     A.    No.

13     Q.    How much contact did you have with Mr. Norton?

14     A.    Before the raid in June of '89, it seems like we

15  were meeting somewhere in D.C. at least once a month.

16     Q.    And Mr. Norton was at those Washington, D.C.,

17  meetings?

18     A.    Yes.

19     Q.    And Mr. Norton was physically located in

20  Colorado; is that right?

21     A.    Yes.

22     Q.    Did you work with any of these prosecutors prior

23  to the commencement of the investigation on Rocky Flats?

24     A.    I had worked with Ken Fimberg.

25     Q.    Anyone else?

103

1      A.    Actually, tangentially with Mr. Norton when he

2   was the acting U.S. attorney.

3      Q.    When Mr. Norton was the acting U.S. attorney?

4      A.    Yes.

5      Q.    So Mr. Norton and Mr. Fimberg worked together, as

6   far as you understand it?

7      A.    Did they work together?

8      Q.    Yes.

9      A.    No.   One is a subordinate.   Fimberg was a

10   subordinate.

11      Q.    So Norton was Fimberg's boss?

12      A.    Yes.

13      Q.    So people in between, but ultimately --

14      A.    There were people in between.

15      Q.    Did you have sufficient contact with the

16   prosecutors that we've named to have any personal opinions

17   about the roles that they played in the investigation?

18            MR. NORDBERG:   Vague.

19      A.    Go ahead and answer?

20      Q.    (BY MS. AHERN)   Go ahead and answer.

21      A.    You're asking if I had an opinion?

22      Q.    I'm asking if you had sufficient contact with

23   these individuals to formulate an opinion.

24      A.    Certainly with Mr. Fimberg.

25      Q.    How about any others?

104

1       A.    Mr. Murtha, Mr. Buck, Mr. Hassler.

2       Q.    How about Mr. Norton?

3       A.    Mr. Norton.  Mr. Carsciello and Mr. Hartman I

4   just -- I only met a couple three times.

5       Q.    Would you say that Mr. Fimberg was a

6   conscientious and skilled prosecutor?

7       A.    At what time frame?

8       Q.    During the time period of the investigation and

9   ultimate prosecution of the case regarding Rocky Flats.

10      A.    Well, I believe he thought he was being

11  conscientious.  He was certainly skilled.

12      Q.    How about Mr. Murtha?

13      A.    My opinion of Mr. Murtha was that the only thing

14  he was conscious of was his own personal desires.  And his

15  skill was lacking.  His interpersonal skills were almost

16  void.

17      Q.    How about Mr. Buck?

18      A.    Mr. Buck, based on what he was assigned to do and

19  what he actually did, he wasn't around enough to really

20  know that much about the case.

21      Q.    But the aspects of the case that Mr. Buck did

22  work on, did you have an opinion --

23      A.    Yes.

24      Q.    -- as to whether Mr. Buck was skilled and

25  conscientious in those aspects of the case?

105

1      A.   He was not conscientious, and he wasn't around

2   enough to show his skill.

3      Q.   So you don't have an opinion about his skill?

4      A.   I'm not sure that he could do what he was hired

5   to do, I could say that.

6      Q.   How about Mr. Hassler?

7      A.   Mr. Hassler certainly had the bona fides to be

8   skilled.  And though I didn't agree with some of his

9   research and presentations, he seemed to be skilled.

10  Because I wasn't really educated, or at least aware

11  completely, of what his contract or his -- the agreement

12  was for him to work on the Rocky Flats case.  He seemed to

13  be conscientious.  But, you know, I don't know what time

14  frame -- I don't know what his schedule was supposed to be.

15  But when he was there, he was conscientious.

16     Q.   How about Mr. Norton, in your experience would

17  you say that Mr. Norton was a conscientious and skilled

18  prosecutor?

19     A.   For most of the time that I knew Mr. Norton he

20  was conscientious, and he impressed me.  And it was

21  remarkable because Mr. Norton, as I recall, didn't come

22  from a criminal background as a lawyer.  He was mostly

23  civil.  And the first thing he did was argue the Protex

24  appeal for the circuit.  And we were all in awe of the way

25  he captured and grasped a situation that he had nothing to

106

1    do with because it happened before he came on board.  And

2    he wasn't a party or even involved in the case, and yet

3    he -- I sat through the entire oral argument, and I was

4    impressed with him.  I was impressed with him on the day he

5    made the oral argument before the Court of Appeals came

6    back with their opinion.

7          Q.   And that's the Protex case?

8          A.   They upheld the conviction, but it was great.

9    And then when we met with Mr. Norton about the -- what I

10   discussed earlier about my conversations with Bill Smith

11   and pressing forward on an investigative plan for the

12   investigation of Rocky Flats, he did all the right things.

13          He's a very good interpersonal -- was -- you

14   know, when I knew him, his interpersonal skills were good.

15   And he would ask the right questions.  As you know, trying

16   to present something to a higher up, it can be onerous.

17   And he didn't make it feel like it was a burden at all, and

18   very much elicited participation.

19          So up until about the time of the plea

20   agreement -- well, actually, I would say probably up until

21   the time about December of 1989, I felt like it was an open

22   door with him.

23          Q.   Now I understand that you may have had some

24   differences of opinions with some of the prosecutors about

25   the ultimate resolution of the case.  I'm not really

1  seeking so much to explore that right now, I'm just seeking

2  to explore your contact with them over the course of the

3  investigation.

4          Would you say that you respected Mr. Fimberg

5  personally?

6      A.   Well, you said in your question that I had a

7  difference of opinion with some of the prosecutors.

8      Q.   I don't know if you did or not.  I just assumed

9  you may.

10     A.   I just wanted to clarify that there may or may

11 not have been a difference of opinion.  But just so I could

12 clarify that.

13     Q.   Fair enough.  I'm seeking to elicit from you, did

14 you respect Mr. Fimberg personally?

15     A.   Up until the plea agreement, yes -- well, no.

16 Actually, I lost respect for him in April of '91.

17     Q.   How about Mr. Murtha, did you respect him

18 personally?

19     A.   Without proselytizing, I respected that he was a

20 human being, that I had to work with him, and I went out of

21 my way to make it so it was amenable and livable as best as

22 I could.  That's the kind of respect I had for him.

23     Q.   How about Mr. Hassler, did you respect

24 Mr. Hassler as a prosecutor?

25     A.   My understanding of Mr. Hassler's involvement in

108

1    the case was to support what Mr. Fimberg was doing, and I

2    respected that.  I would not have respected that if

3    Mr. Hassler had been the lead prosecutor.

4        Q.    How about Mr. Norton, did you respect Mr. Norton

5    personally?

6        A.    Yes, up until about, like you say, December of

7    '89.

8        Q.    December of '89?

9        A.    Yes, ma'am.

10       Q.    What happened in December of '89 to change your

11   opinion?

12       A.    Well, it was actually a continuum of things that

13   started once we initiated the search warrant at Rocky Flats

14   on June 6, and culminating in a meeting that Mr. Norton and

15   the attorneys attended in Washington, D.C.  And for the

16   first time Bill Smith and I were not involved.  So it was a

17   lot of things.  Would you like a litany?

18       Q.    No.  I'm just trying to get a sense of it.

19             Do you have any firsthand knowledge that -- let's

20   start with Mr. Fimberg.  Do you have any firsthand

21   knowledge that Mr. Fimberg did not act conscientiously with

22   respect to his work on this case?

23             MR. NORDBERG:  Vague.

24       A.    Yes.

25       Q.    (BY MS. AHERN)  Do you have any firsthand

109

1    knowledge that Mr. Fimberg did not act with integrity with

2    respect to his work in this case?

3         A.   Yes.

4         Q.   What is that firsthand knowledge?

5         A.   The first time was -- that I can recall is April

6    of 1991.  Mr. Fimberg had summoned me to his office and

7    asked me to hand deliver about 12 target letters.

8         Q.   And why is that reflective of any problem that

9    you perceived with Mr. Fimberg's integrity on the case?

10        A.   Because of some discussions that were made

11   previously, and directions and instructions from the

12   Department of Justice through Peter Murtha.  I was told

13   point-blank from Peter Murtha in March of 1991 that the

14   individuals -- any individual employed by Rockwell, the

15   contractor at Rocky Flats, would not be prosecuted in this

16   case.

17             And for Mr. Fimberg to ask me to issue target

18   letters when a decision had been made not to prosecute

19   amounted to extortion.  And I told him it was unethical for

20   us to do that.  Needless to say, I had an argument with

21   him.  And I didn't want to be a party to anything

22   unethical.

23        Q.   Did you have any firsthand knowledge that

24   Mr. Murtha did not act conscientiously with respect to his

25   work on this case?

110

1          MR. NORDBERG:  Vague.

2          A.   I just don't think this case really amounted --

3    that he was up to the kind of skill level of handling a

4    case like this.  And I say that because I know for a fact

5    that he let certain things fall through the cracks and

6    didn't follow up on it.  And I think a conscientious person

7    would have said, help, or I can't get this done, can we get

8    some help, or at least advise of a delay.  But for somebody

9    to say that they were handling it, and then find out that

10   they hadn't touched it, that's my example of whether or not

11   he was conscientious.

12         I mean, I don't know if he was capable of -- I

13   have to make certain assumptions of him being a member of

14   the bar and law degree and in a government job.  I thought

15   we hired more than just a pulse with a person.  I'm not

16   sure where -- how conscientious he was, but I know that he

17   didn't always follow up on things.

18         Q.   (BY MS. AHERN)  Is there a difference in the role

19   of the investigator versus the role of a prosecutor in a

20   criminal investigation such as that that was performed at

21   Rocky Flats?

22         A.   Actually, I believe Brady and its subsequent

23   cases, some prosecutors believe that they are actually the

24   lead investigator of a case.  And there's a -- I guess a

25   dichotomy there.  They are, you are going to do what I tell

111

1    to you do, which is not going to elicit a lot of

2    cooperation from many investigators, or there is the fact

3    that we'll work together on it.  So I'm not sure if it's

4    Gia, G-i-a, Supreme Court case, I think it's a Brady

5    derivative case.  And I'm getting afar from your question.

6        Q.   My question was, is there a difference in the

7    role that's played by the investigator in a case as opposed

8    to that which is played by the prosecutor?  Is there a

9    decision-making process for the prosecutor that are

10   different from those of the investigator based on your

11   experience?

12       A.   Well, certainly there is a difference in

13   decision-making process, but the decision-making process by

14   the investigator has to be in concert with the prosecutor

15   or it's not going to work.  It can't work.

16       Q.   Are there determinations in the case that are the

17   prosecutor's to make that go beyond the scope of that which

18   an investigator alone is capable of making?

19       A.   Mechanically, yes.

20       Q.   Such as?

21       A.   Whether to accept a case or deny it, and the

22   determination of the successful prosecution of a particular

23   crime.  Mechanically the prosecutor can -- for example, can

24   say, even though I accepted this case, I don't think a jury

25   will convict, and prosecutorial discretion, the prosecutor

112

1    can say, no, I'm not going to take it any further, or we're

2    going to do it this way, certainly, or this is what we're

3    going to charge.

4         Q.   So that's a level that the prosecutor would

5    contribute to the process that's above and beyond anything

6    that might come from the investigator?

7         A.   Sometimes there is input from the investigator,

8    sometimes there is not.  And it's along the lines of this

9    is what I've done, and the investigator doesn't really have

10   any input, yes.

11        Q.   So the prosecutor's decision in those matters

12   would be informed by the investigator, but it would be the

13   prosecutor's decision-making process to conduct such things

14   as to make a determination of what would be a

15   successful prosecutor -- let me try that again.

16             While the decision-making process of the

17   prosecutor is informed by information from the

18   investigator, there are decisions that the prosecutor then

19   is charged with making, such as prosecutorial discretionary

20   decisions --

21        A.   Yes.

22        Q.   -- that would go beyond the decision-making

23   process of the investigator alone?

24        A.   Both the prosecutor can make a decision without

25   the input of the investigator or with the input.  There are

113

1    certain decisions that can be made.

2        Q.    But either of those are decisions for the

3    prosecutor to make?

4        A.    Oh, yes.

5        Q.    They are not decisions that the investigator

6    makes alone?

7        A.    Yes.  That's correct.

8        Q.    I want to go back to where I was, here.  You

9    noted that there were some specific examples -- or that

10   there were areas of the case where you believed that

11   Mr. Murtha was not as conscientious in his follow-through

12   as you perceived to be appropriate to the task in terms of

13   his investigation?

14       A.    Yes.

15       Q.    Could those have been -- based on your

16   experience, Mr. Lipsky, could that have been reflective of

17   a difference in prioritization in terms of prosecutorial

18   issues by Mr. Murtha as opposed to yourself?

19       A.    Could that have been an opinion?

20       Q.    Could it have been a matter that was reflective

21   of a difference in prioritization by Mr. Murtha as opposed

22   to yourself?

23       A.    It's kind of a vague question because I was

24   basing my answer on the fact that we had caucused all the

25   priorities in particular to your question.  That there was

114

1    an agreement of what was a priority and what would be

2    handled.  And without raising his hand or notifying

3    anybody, some of those priorities were laid to the wayside

4    and went unattended.

5            It certainly is my opinion that that's

6    unacceptable in any type of setting, whether it's

7    government or private, but I don't really think it was

8    within his domain to change the priorities after the lead

9    prosecutor and Mr. Murtha and other investigators had

10   discussed and formulated what was going to be pursued.

11       Q.   Do you have any specific examples, based on your

12   firsthand knowledge, that you could offer of times when

13   Mr. Murtha did not act conscientiously with respect to his

14   work on this case?

15       A.   I do.

16       Q.   Can you give me one of those examples?

17       A.   One of those examples would be that he was

18   involved in following up with the Sierra Club lawsuit

19   regarding the speculative accumulation of the 771

20   incinerator plutonium issue, and that it never really got

21   done.  Mr. Fimberg and I discussed that probably over a

22   year later that the paperwork hadn't come in.

23       Q.   So your opinion is based on the lack of paperwork

24   coming in?

25       A.   Well, any information.

115

1    Q.   Do you know personally what Mr. Murtha did to

2  follow up on the Sierra Club issue?

3    A.   No.   I just know that what we agreed that he was

4  going to do, he didn't come through.

5    Q.   So you can't say from your personal knowledge how

6  diligently Mr. Murtha pursued that issue beyond the lack of

7  outcome that you saw?

8    A.   Correct.

9    Q.   From your personal knowledge, do you know the

10 efforts that Mr. Murtha did go to in that issue?

11   A.   Mr. Murtha was reticent about those types of

12 things.

13   Q.   Based on your personal knowledge, you don't know

14 what Mr. Murtha did or didn't do on that front?

15   A.   He wouldn't share it.

16   Q.   So I'm correct in saying he didn't communicate

17 that to you, and you don't have firsthand knowledge of what

18 he did do to pursue the Sierra Club issues?

19      MR. NORDBERG:   Objection, vague.   Objection,

20 asked and answered.

21   Q.   (BY MS. AHERN)   You can answer.

22   A.   I agree with counsel on the vague part of it

23 because when you say firsthand knowledge, when probably two

24 to three times a week Mr. Murtha was in town working the

25 same space as I did, and I had contact with him, and we had

116

1    meetings together formulating where this case was going to

2    go, and everyone was expected to, you know, either be

3    successful or ask for assistance or got promoted and left,

4    then I would expect them to explain that they needed to

5    transfer the request.  I had a lot of personal contact with

6    him.

7              But it's also Albert Einstein's definition of

8    insanity that doing the same thing, expecting to get

9    different results, is crazy.  And I saw him pretty much do

10   the same thing, and there were things that didn't get done.

11   So . . .

12        Q.   So your testimony with regard to the

13   conscientiousness with which Mr. Murtha pursued aspects of

14   the investigation are based on the fact that you did not

15   see progress or outcome with regard to those particular

16   aspects of the investigation that were charged to

17   Mr. Murtha?

18        A.   I don't know how I couldn't have seen the

19   outcomes.

20        Q.   I'm not saying whether they existed or not, I'm

21   just trying to understand the basis for your comments.

22   Mr. Lipsky, is it your testimony that your opinion of the

23   lack of conscientiousness of Mr. Murtha with regard to

24   certain aspects of the investigation is based on the fact

25   that you did not see progress made in those particular

117

1    aspects of the investigation?

2         A.   Well, I didn't -- if I need to, I need to correct

3    that.  I never said there was a lack of conscientiousness

4    with what he did.

5         Q.   That's what I understood you to say, and I'm

6    trying to pursue that.

7         A.   I need to correct that.  No, I didn't mean that

8    he didn't have any conscientiousness, I'm just saying that

9    on important topics that a number of us were carrying out,

10   I didn't see work product or outcomes or explanations.  And

11   I would have been involved in receiving that information

12   because I was also administering the databank, so to speak,

13   and the library.  And I was responsible for just about

14   every aspect of the investigation, being the case agent, as

15   my supervisor, part and parcel from what prosecutorial

16   discretion is --

17        Q.   I think I can clear this up, then.  It is not

18   your testimony, Mr. Lipsky, that Mr. Murtha was not

19   conscientious in his efforts in this case; is that right?

20             MR. NORDBERG:  Form.

21        Q.   (BY MS. AHERN)  Mr. Lipsky, was Mr. Murtha

22   conscientious in his efforts in this case to investigate

23   the Rocky Flats plant based on your personal knowledge?

24        A.   Mr. Murtha's efforts to be conscientious was --

25   Mr. Murtha's efforts to be consciousness in this case,

118

1    Rocky Flats, was inadequate.

2         Q.   Do you have any firsthand knowledge of Mr. Murtha

3    not doing his job in this case?

4              MR. NORDBERG:  Vague.

5              THE DEPONENT:  Go ahead and answer.

6              MR. NORDBERG:  You can go ahead and answer unless

7    you are instructed not to answer.

8         A.   Absent knowing what his job was, because I --

9    like I said earlier, he was a Department of Justice

10   employee, he was assigned to the land as a natural

11   resources division, he may have had -- maybe his job was to

12   not follow through on certain things.  I don't know that.

13        Q.   (BY MS. AHERN) So you don't know the focus of

14   the job that Mr. Murtha was tasked to in the prosecution of

15   this case?

16        A.   I know that he agreed to do certain things that

17   not all that was done or done timely.  But it presupposes

18   that I know what his job description and scope of

19   employment was.  I can only make some assumptions.

20        Q.   And with regard to that conscientiousness with

21   which Mr. Murtha pursued the tasks he undertook, your

22   comments on that relate solely to what you saw as progress

23   or output from that process?

24        A.   Yes.

25        Q.   But they don't necessarily reflect a knowledge of

119

1   the conscientiousness with which Mr. Murtha pursued it,

2   simply -- instead simply that the output wasn't what you

3   would have expected?

4        A.   That's correct.

5        Q.   I don't want to get bogged down on this by going

6   through some of these others because I'm not sure we're

7   communicating clearly here.

8            Do you have any firsthand knowledge that Michael

9   Norton didn't pursue his job in this case conscientiously?

10           MR. NORDBERG:  Vague.  May I have a standing

11  objection to questions using the expression "firsthand

12  knowledge"?

13           MS. AHERN:  Certainly.

14           MR. NORDBERG:  Thank you.

15       A.   The issue that I'm thinking about is I take great

16  umbrage with anybody that places me in peril and does not

17  consider my safety for myself or people I work with.  And

18  during the first week of the search warrant, June of 1989,

19  a decision was made, I don't know by whom, but I understand

20  it came from Attorney General Richard Thornburgh, that's

21  T-h-o-r-n-b-u-r-g, I believe.

22           MR. NORDBERG:  H, I believe.

23       A.   He is the governor of PA.  And after going

24  through the process of getting a seal on the affidavit, the

25  decision was made to not only unseal it, speed up the

120

1    process of making it public, all without consideration of

2    my safety, the safety of the other agents on the plant, and

3    that had to have gone through Mike Norton.

4            And for me to find out not before, not during the

5    discussion, but after the decision had been made, that was

6    a huge mistake.  And it actually personally devastates me

7    because this is unbelievable what was done in this case.

8    It's unconscionable for that to happen.  And he was a party

9    to it -- or should have been a party to it.  If he doesn't

10   know anything about it or remember it, then he should have

11   been a party to it.  He should have asked me how I felt

12   about it at the time.

13           MS. AHERN:  I move to strike as nonresponsive.

14           THE DEPONENT:  Pardon me?

15           MS. AHERN:  I'm just talking to the court

16   reporter.

17       A.   In finishing that answer, I'll go this far:

18   That's obstructing justice.  And from my point of view,

19   it's intimidating me.  And so that would be the first time

20   he did it.

21           Then the other --

22       Q.   (BY MS. AHERN)  Let me stop you for a minute.

23           MR. NORDBERG:  Wait a minute, I don't know that

24   the witness has finished answering the question.  You have

25   moved to strike part of the answer as nonresponsive.  Our

121

1    opinions on whether it was responsive may differ, I

2    understand that, but I'm not sure that the witness was

3    through answering the question that you asked.  So do you

4    want to withdraw the question, or let the witness finish?

5         Q.   (BY MS. AHERN)  Are you finished?

6         A.   You asked me what -- if Mr. Norton was not

7    conscientious about what he did, and you asked me when the

8    first incident up through December of '89, so I wasn't

9    finished yet.

10        Q.   Okay.  Fair enough.

11        A.   There are just two more things.  The agreement

12   that I had personally with Mr. Norton was that we were --

13   after the 18-day search, that we were going to allow things

14   to settle, get some space, actually use some commercial

15   space to house all of this evidence, and basically build an

16   infrastructure to handle it, and then actually start

17   reviewing it, and I was given three months.

18             Unbeknownst to me, the grand jury was empaneled

19   on August 1, 1989, and I was not a party to that.

20   Mr. Norton would have had to facilitate such a special

21   federal grand jury.  That was unconscionable.  And then not

22   including Bill Smith and I to the December 1989 meeting

23   involving the Department of Justice about the case,

24   certainly that was their prerogative.  Certainly it was not

25   friendly.

122

1      Q.    Let me ask you a couple questions to clarify the

2  things you've said.  With regard to the decision that was

3  made to unseal the affidavit that was submitted to the

4  court in support of the search warrant, do you have any

5  personal knowledge of the role, if any, that Michael Norton

6  played in that process?

7      A.    I have personal knowledge of the day-to-day

8  operations and the way the Department of Justice in concert

9  with the FBI and U.S. Attorney's Office operates, and I

10  think I can make certain assumptions based on that

11  experience.  Was I firsthand involved with Mr. Norton on

12  that decision?  No.  But I also know that Mr. Norton had to

13  have been involved with it.  It can't be discounted because

14  I know how it works.

15      Q.    But your testimony that Mr. Norton had to have

16  been involved with the decision to unseal the search

17  warrant affidavit is based on certain assumptions based on

18  how the --

19      A.    Certain knowledgeable --

20      Q.    I'm not questioning whether those are informed or

21  uninformed assumptions.

22      A.    Okay.

23      Q.    What I'm seeking to clarify here with you,

24  Mr. Lipsky, is your testimony that Mr. Norton was involved

25  with the decision to unseal the search warrant affidavit is

123

1    testimony based on your assumptions of how the U.S.

2    Attorney's Office would work in such a setting; is that

3    right?

4         A.   Yes.  I'm saying there is co-mission and no

5    mission aspects in this.  So if he wasn't involved in this,

6    he should have been.

7         Q.   That's your opinion?

8         A.   Yes.

9         Q.   With regard to the decision to facilitate and

10   empanel a federal grand jury in August of 1989, again, your

11   testimony that Mr. Norton was involved in that

12   decision-making process is again based on certain

13   assumptions; isn't that true?

14        A.   But also he told me.

15        Q.   He told you?

16        A.   Yes, a special federal grand jury was going to be

17   empaneled.

18        Q.   Did he tell you it was his decision to empanel

19   such a grand jury?

20        A.   In those words?  No.

21        Q.   Was your testimony, Mr. Lipsky, that one of the

22   factors that you considered in whether or not Mr. Norton

23   conscientiously executed his role in the criminal

24   investigation of Rocky Flats was Mr. Norton's participation

25   in the decision-making process that resulted in the

124

1    empaneling of the federal grand jury as of August of 1989?

2    But I believe it was also your testimony that you didn't

3    have firsthand knowledge that that was Mr. Norton's

4    decision, but it was simply something that he, quote, had

5    to be involved in, unquote?

6        A.   Are we talking about the unsealing, or are we

7    talking about the special federal grand jury?

8        Q.   We're talking about the special federal grand

9    jury.

10       A.   Mr. Norton told me first that -- first he asked

11   me right after the search how much time he thought we

12   needed.  And we personally agreed that he was going to give

13   me at least three months to acquire the space, the

14   infrastructure, set up the logistics.  It was not very long

15   after that that he came up to me and he says, We're

16   empaneling a grand jury.  I didn't know it was a special

17   one until I read it in the paper.

18       Q.   Do you know whether the decision to empanel the

19   federal grand jury was Mr. Norton's to make?

20       A.   Based on my qualified knowledge, other than that,

21   no.

22       Q.   So it would be an assumption on your part, based

23   on your familiarity with the U.S. Attorney's Office, that

24   you believe it was Mr. Norton's decision?

25       A.   It would be a qualified assumption.

125

1    Q.   But an assumption nonetheless?

2    A.   Well, ma'am, if I could, if I have a full tank of

3   gas and I have a range of 250 miles with that full tank of

4   gas and I need to drive to Philadelphia from Denver, I

5   think there is a substantial certainty that I'm not going

6   to make it on one tank of gas because I know it's thousands

7   of miles to Philadelphia from here.

8        All I'm getting at is the assumption part of it

9   has a meaning all of its own.  But the inner workings of

10   government, U.S. attorney is going to arrange for grand

11   juries, and does arrange for grand juries before the

12   judiciary branch of this government, and I also -- I'm not

13   one that has fantastic interpersonal skills.  I don't

14   profess to be that way with everybody.  We all have our

15   quirks.  But I also felt that he was the messenger on this,

16   and it was his way of letting me know if he had any

17   questions, I'm here to answer your questions.

18        But he's also the U.S. attorney, and it's kind of

19   like spilled milk.  It really didn't matter anymore.  It

20   was a matter of kicking it in and getting in high gear

21   because I knew that we were going to have to now make

22   presentations before that grand jury.  So for a lot of

23   reasons, more than just an assumption that I felt he was

24   involved with the process.

25    Q.   But you didn't personally know whose decision it

126

1    was to empanel the grand jury?

2         A.    Again, I did answer that I did not know that.

3         Q.    That's all I'm seeking to clarify.

4               (Noon recess taken from 12:34 p.m. to 1:15 p.m.)

5         Q.    (BY MS. AHERN)  Mr. Lipsky, I would like to ask

6    you -- actually, I would like to follow up on one thing

7    that we were touching on before we broke for lunch.

8               You had testified previously that one of the

9    grounds that -- one of the specific examples that caused

10   you to question Mr. Norton's role in this case was that you

11   and Mr. Smith were not included in a December 1989 meeting

12   in Washington, D.C.; do you recall that testimony?

13        A.    Yes, ma'am.

14        Q.    Do you know personally whose decision it was

15   whether to include you in the December 1989 Washington,

16   D.C., meeting on the case?

17        A.    No.

18        Q.    So you don't know one way or another whether

19   Mr. Norton contributed to that decision based on your own

20   personal knowledge?

21        A.    Well, again, my personal knowledge would be that

22   Mr. Norton being involved with the meeting and with the

23   position and title that he had could have contributed to

24   that decision.

25        Q.    But you don't know one way or another for sure

127

1   whether he did contribute to that decision?

2        A.   I can't tell you exactly what happened.

3        Q.   Fair enough.  I would like to move along a little

4   bit to the process that led to the development, drafting,

5   and submitting of the affidavit in support of the search

6   warrant.

7        A.   Can we first talk about the subpoena?

8        Q.   Sure.  Would you like to make a statement on the

9   record about the subpoena?  That's fine.  It's my

10  understanding that Mr. Lipsky would like to make a

11  statement on the record with regard to a subpoena that was

12  served upon him at the lunch break of this deposition with

13  regard to seeking documents that may be in his possession.

14       A.   I just wanted to confirm for you that I didn't

15  try to evade the process server.  That when you first

16  notified that someone might be out there waiting for me, I

17  saw a gentleman with sunglasses, tall, dark hair, thin,

18  with some papers rolled up in his hand, and later when we

19  went out for the break, he wasn't anywhere to be seen as

20  you were walking around with your one shoe off.

21           Then when Mr. Nordberg and I were walking out to

22  go walk at the park, I saw the same gentleman walk towards

23  the front of the building here, and I went up to him and I

24  asked him if he had something for me, and he confirmed my

25  name.  I confirmed it with him.

128

1          He gave me the subpoena duces tecum only, not

2     testimonial, and then he asked me for my ID.  And I told

3     him it wasn't a requirement that I positively identify

4     myself, but if he so inclined, to go on the Internet and

5     look at a picture of me if he wants.  But I was indeed in

6     fact Jon Lipsky, and he should be satisfied, as you should

7     be.

8          Q.   Anything else?

9          A.   That's it.

10         Q.   Fair enough.  Now, Mr. Lipsky, my question for

11    you had to do with the general subject matter about the

12    development, drafting, and submission of the affidavit in

13    support of the search warrant.  You testified that you

14    contributed factually to the development of that affidavit;

15    is that true?

16         A.   Yes.

17         Q.   Who else worked on that draft affidavit with you?

18         A.   Ken Fimberg.

19         Q.   Did Mr. Bill Smith also contribute to the

20    contents that were ultimately included within the

21    affidavit, based on your recollection?

22         A.   Absolutely he contributed.

23         Q.   And was your testimony earlier, I believe, that

24    the portions of the affidavit dealing with legal theories

25    and legal matters were primarily contributed by

129

1    Mr. Fimberg?

2         A.   And the facts regarding the Church-McKay

3    litigation.

4         Q.   So those were also provided by Mr. Fimberg?

5         A.   Yes.

6         Q.   How did a decision come to be reached about who

7    would actually sign that affidavit?

8         A.   The ultimate decision was decided by Ken Fimberg.

9         Q.   Do you know whether Mr. Fimberg consulted with

10   anyone else in reaching that decision?

11        A.   He consulted with me and Bill Smith together.  As

12   far as anybody else, no.

13        Q.   Just so we're all talking about the same thing, I

14   would actually like to mark a copy of the the application

15   and affidavit in support of the search warrant.  This has

16   been previously marked as an exhibit in this case.  You can

17   identify it as such.  I'm handing you, Mr. Lipsky, what has

18   been previously marked as Hobbs Exhibit 2.  I'll give you a

19   copy too, if you like.  Here is one for the court reporter.

20             Mr. Lipsky, is this the application and affidavit

21   for a search warrant that we've been discussing the

22   development of?  Take a couple minutes to look at it if you

23   like.  It's a fairly lengthy document.

24        A.   Thank you.  Knowing that there were two of them,

25   I want to make sure it's the first one.

130

1         Yes, I reviewed it, and it appears to be the

2    June 6, 1989, application and affidavit for search warrant

3    that we've been discussing.

4         Q.   Mr. Lipsky, before the submission of this

5    application and affidavit of search warrant to the court in

6    this matter, what process did you undertake to develop the

7    factual materials that are discussed in the affidavit?

8         Let me ask a little bit more specific question.

9    Did you review files at the Environmental Protection Agency

10   related to Rocky Flats and the development for the facts

11   for this affidavit?

12        A.   I did.

13        Q.   Were there materials in the possession of the

14   Environmental Protection Agency that had been submitted by

15   either Rockwell or the Department of Energy from the Rocky

16   Flats plant?

17        A.   Yes.

18        Q.   Did you also review files that were in the

19   possession of what was then the Colorado Department of

20   Health related to the Rocky Flats plant prior to the

21   submission of this affidavit?

22        A.   Just so I understand, did I review Colorado

23   Department of Health files?

24        Q.   Related to Rocky Flats prior to generating this

25   affidavit.

131

1      A.   I'm trying to distinguish between the files and

2  the information that the health department had provided to

3  the EPA.  And my answer would be inclined to say that the

4  communications that the Colorado Department of Health had

5  provided to the EPA.

6      Q.   So it's your recollection that you reviewed

7  regulatory files related to the Rocky Flats plant that were

8  in the possession of the Environmental Protection Agency

9  prior to submitting this application for search warrant?

10     A.   Yes.

11     Q.   But you're not sure if you actually reviewed

12 files that were in the possession of the Colorado

13 Department of Health prior to the time that you submitted

14 this application and affidavit for search warrant?

15          MR. NORDBERG:  Sorry.  Form.

16     A.   No.  Actually, it's the other way around.  I'm

17 pretty certain that I didn't go to the Colorado Department

18 of Health and ask to review their files about Rocky Flats.

19 Instead, I reviewed their communications to the Rocky Flats

20 plant that had also been sent to the EPA.

21     Q.   (BY MS. AHERN)  So you reviewed files that were

22 in possession of the EPA prior to the time you submitted

23 this affidavit, but it's your recollection that you likely

24 did not review files that were in the possession of the

25 Colorado Department of Health at that time?

132

1          A.    That's correct.

2          Q.    The materials that were in the possession of the

3    EPA and that you recall reviewing prior to the time of the

4    FBI raid included in them communications from the Colorado

5    Department of Health or between the Colorado Department of

6    Health and the plant; is that correct?

7          A.    Yes.

8          Q.    So those materials had been shared with the EPA

9    and were contained within the EPA's own files?

10         A.    Actually, the Colorado Department of Health

11   operated under the delegated authority of the EPA under the

12   RCRA program.  And because of that authority by the EPA,

13   rather than share, I believe it would have been incumbent

14   upon the Colorado Department of Health to keep the EPA

15   informed about their own program that they delegated to the

16   state.

17         Q.    Okay.  So it's your testimony that the CDH had in

18   fact provided materials to the Environmental Protection

19   Agency that CDH had received from or communications about

20   the Rocky Flats plant?

21         A.    Yes.

22         Q.    And those were available to you publicly at the

23   EPA?

24         A.    Not all of them.

25         Q.    What was available -- what wasn't available to

133

1    you or is the issue with the publicly part?

2       A.   Not that I don't want to answer your question,

3    but, again, I've not been authorized to discuss certain

4    areas of Title 28 Code of Federal Regulations pertaining to

5    classified material.  And I think there is a reason to

6    believe there is a controversy whether what specifically I

7    was looking at was classified or not at the time, but also

8    whether it's classified or not now.  And I would just

9    characterize it as the waste stream identification

10   characterization report.

11      Q.   Was there a copy of the waste stream

12   identification characterization report in your possession

13   at the EPA at the time you were conducting your review of

14   the EPA's files prior to the FBI raid in June 1989?

15      A.   Yes.

16      Q.   It's your testimony today you don't know one way

17   or another whether that document was classified either then

18   or now?

19         MR. NORDBERG:  Form.

20      A.   In the true meaning of the National Security

21   Information Act and what was promulgated by the executive

22   orders since that act, the level of classification for that

23   document didn't exist in that scheme, but instead it would

24   be more characterized as sensitive, but it was classified

25   in such a manner that it was not a public document per se.

134

1    But I'm not sure that -- I didn't do the research to see if

2    that characterization was proper and legal.  I respected

3    what had been -- how it had been characterized.

4         Q.    Let me ask you some background questions on that,

5    maybe that will help us here.  At the time that you began

6    your investigation of the Rocky Flats plant, did you have a

7    security clearance?

8         A.    At the time I began the Rocky Flats

9    investigation, did I have a security clearance?

10        Q.    Yes.

11        A.    Yes.

12        Q.    Was it sufficient to enable you to review

13   classified documents that may have been generated by the

14   Rocky Flats plant, if you know?

15        A.    I do know, I'm just trying to formulate the

16   answer.  National security information is based on the need

17   to know and right to know, and each agency formulates its

18   own rules on what levels and the method and manner that

19   somebody has given the national security clearance.  It's

20   not interchangeable necessarily, but it is held within the

21   possession of that agency.  And in this case it was in the

22   possession of the EPA.

23             The EPA maintained the documentation pursuant to

24   classification levels, and when I was asked, I responded in

25   a satisfactory manner that I would maintain that same type

135

1    of protection and continuity of the documentation.

2         Q.   So you were in fact, Mr. Lipsky, able to review

3    certain classified or sensitive materials that were in the

4    possession of the EPA prior to the time that you submitted

5    this application and affidavit for search warrant?

6         A.   Yes.

7         Q.   And it's also your testimony, then, that there

8    were classified or sensitive materials related to the

9    operations of the Rocky Flats plant that were in the

10   possession of the EPA at the time you reviewed the EPA's

11   files on Rocky Flats prior to June of '89?

12        A.   The characterization or the response from me

13   regarding classified information, again, is protected by

14   Title 28 Code of Federal Regulations.

15        Q.   I'm not -- go ahead.

16        A.   I'm sorry, you asked a mouthful.

17        Q.   I thought you were finished.

18        A.   The assumption that the documentation that we

19   were -- that I was looking at was classified, again I

20   stated earlier I'm not sure that it was.

21        Q.   Okay.

22        A.   And so with -- go ahead.

23        MR. NORDBERG:   Not to interrupt, but I believe

24   Ms. Ahern's question was, was it classified or sensitive.

25        Q.   (BY MS. AHERN)   My question was classified or

136

1    sensitive.

2         A.   Or sensitive.

3              MR. NORDBERG:   Right.   I don't know if that

4    helps.

5         Q.   (BY MS. AHERN)   I don't think we need to get

6    bogged down on this.   I'll come back to that if we need to

7    clarify anything.

8              At any time during the course of your

9    investigation into the Rocky Flats plant did you,

10   Mr. Lipsky, ever obtain a Q clearance that would enable you

11   to review classified documents and materials related to the

12   operation of the Rocky Flats plant?

13        A.   Yes.

14        Q.   When did you receive that Q clearance?

15        A.   In 1989.

16        Q.   Prior to the raid?

17        A.   I would say yes.

18        Q.   To the best of your recollection?

19        A.   Yes.

20        Q.   Based on the materials that you reviewed at the

21   EPA prior to the time of the raid, is it your understanding

22   that the EPA had sent various requests for information to

23   the Rocky Flats plant?

24        A.   I'm not sure what we're talking about.

25        Q.   I'm talking about the files that were located at

137

1    the Environmental Protection Agency prior to the time of

2    the Rocky Flats raid.  And my question for you was, given

3    what you found in the contents of the EPA's files with

4    regard to the Rocky Flats plant based on your own review of

5    those materials, is it your understanding that the

6    Environmental Protection Agency had sent in various forms

7    requests for information to the Rocky Flats plant seeking

8    information about the plant?

9         A.   Yes.

10        Q.   And that the Rocky Flats plant had responded to

11   those requests with various data and reports and other

12   materials?

13        A.   Yes.

14        Q.   Was it your understanding that most of those

15   responses had been sent or submitted by the Department of

16   Energy as opposed to the contractor?

17        A.   I'm not sure that I could quantify what was

18   most -- or what was joint or what was either DOE or

19   Rockwell.

20        Q.   Is it your testimony, Mr. Lipsky, that you recall

21   seeing materials that were submitted to the Environmental

22   Protection Agency by the Department of Energy with regard

23   to the Rocky Flats plant?

24        A.   Yes.

25        Q.   Is it also your testimony, Mr. Lipsky, that you

138

1    recall having seen some materials sent by the Rocky Flats

2    plant that were specifically submitted by the contractor

3    Rockwell?

4         A.   Yes.

5         Q.   And there were other materials that you recall

6    seeing in the possession of the Environmental Protection

7    Agency prior to the time of the raid that you believe were

8    jointly submitted by both the Department of Energy and the

9    contractor Rockwell?

10        A.   Yes.

11        Q.   Prior to June 6, 1989, did you subpoena the

12   Department of Energy for plant records?

13        A.   No.

14        Q.   Prior to June 6, 1989, did you ever obtain

15   records directly from the plant site with regard to the

16   Rocky Flats plant for your investigation?

17        A.   No.

18        Q.   Prior to June 6, 1989, did you interview any

19   current Rocky Flats plant employees in the conducting of

20   your investigation at the Rocky Flats plant?

21        A.   No.

22        Q.   Did you interview former employees prior to the

23   raid?  Former plant employees, that is.

24        A.   Again, I've been advised by the FBI that I'm not

25   authorized to talk about matters regarding Title 28 Code of

139

1    Federal Regulations involving certain matters.  But I

2    believe it would help me refresh my memory if I could skim

3    through this affidavit, I could ask -- answer it based on

4    the public record.

5        Q.    Sure.  I don't want to get bogged down in a

6    lengthy review of the document because it is a lengthy

7    document.  I was just questioning whether you recall

8    interviewing former employees?

9        A.    No.  I understand your question.

10       Q.    Your concern is the limitations --

11       A.    What you need to understand is that I have been

12   muzzled by the FBI and U.S. Attorney's Office, and I want

13   to note that Mr. Taylor is not here today, and he could

14   have expedited this quite a bit.  And I'm not refusing to

15   answer your question, ma'am --

16       Q.    If it would help your testimony, why don't you

17   take a couple minutes and glance through this affidavit,

18   then I'll ask my question again.

19       A.    I don't mind at all, but there is a reference in

20   here that I contacted certain people.

21       Q.    Certain former plant employees?

22       A.    And being that this is a 16-year-old document, I

23   know it's a lot better to go over the document.  I'm afraid

24   I'm going to have to leaf through every page to be

25   accurate.  I want you to know that might be what I need to

140

1   do.

2           MR. NORDBERG:  To economize on time, while

3   Mr. Lipsky is looking through the document I would like to

4   make a couple statements on the record that I plan to make.

5   Statement No. 1.  I think the record may already reflect

6   this, but I'm not sure, so I'm going to say it.  We

7   provided to defendants at the beginning of this deposition

8   a binder that Mr. Lipsky had provided to plaintiffs

9   assembling material relating to his vita in which I think

10  he has consulted from time to time in order to answer

11  Ms. Ahern's questions regarding his experience and

12  background.  That's statement No. 1.

13          Statement No. 2.  This morning, I believe, I

14  raised a work product objection and instructed the witness

15  not to answer any questions relating to his work as a

16  private investigator for Berger & Montague.  I'm not sure

17  what the question was to which I interposed the objection,

18  the record will show that.

19          But I want to adjust, modify, or relax that

20  objection as I believe people could differ over the scope

21  of the work product privilege, and saying that the

22  plaintiffs will not object if, during this deposition,

23  there are questions into the general nature, perhaps

24  general topics of work that Mr. Lipsky did in that capacity

25  so long as the questions do not focus on mental impressions

141

1    or strategies of counsel or delve so deeply into the

2    details as to divulge those.

3         A.   I can't find it.  The only thing I could find on

4    this public document was that on page 2 of the actual

5    affidavit, past the attachments 1 and 2, so attachment

6    No. 3, page 2, I would like a quote at the bottom of the

7    page, the beginning of the sentence that says, "The

8    following statements are also based on page 3, based upon

9    my physical observations and those of others, as well as

10   interviews conducted with various people."  I believe

11   that's as far as I feel I can go.

12        Q.   (BY MS. AHERN)  Let me see if I understand you,

13   Mr. Lipsky.  Is it your testimony that you believe under

14   the obligations that have been placed on you pursuant to

15   statutes as cited in that, communications you have had with

16   the FBI, you do not believe you can identify for me anyone

17   you interviewed in the course of your efforts to prepare

18   this affidavit and application for search warrant unless

19   and so far as that material is contained in a public

20   document?

21        A.   I'm not even sure if I can even restate it even

22   if it is in a public document.  I'm saying that I've been

23   constrained, and I'm not -- I've been told, it's written

24   that I'm not authorized to talk about any matter involving

25   Title 28 Code of Federal Regulations.  There is a specific

142

1    cite, in fact I believe you received a courtesy copy of

2    this letter, at least on my version you were a cc'd a copy

3    of the letter, the cite escapes me, and until the legal

4    authority removes that restriction, I'm not comfortable

5    answering the question.

6            MS. AHERN:  Let's mark this as an exhibit in the

7    case.

8            (Deposition Exhibit 1 was marked.)

9       Q.   (BY MS. AHERN)  Mr. Lipsky, you referenced a

10   letter that you had received from the Federal Bureau of

11   Investigation setting certain limitations on the testimony

12   you can provide in this case.  Is Exhibit 1 a copy of that

13   letter?

14      A.   Yes.

15      Q.   I'm going to ask you some questions about this

16   letter.  The FBI wrote to you with regard to the scope of

17   any testimony you might provide in this case; isn't that

18   right?

19      A.   I'm trying to formulate an answer.  I'm not sure,

20   ma'am, how to answer that regarding the scope.  The FBI did

21   indeed send me a letter dated October 13, 2005, of which

22   there are citations of what they were saying on what I'm

23   not authorized to testify, the scope of which is not

24   defined in this letter.

25      Q.   The letter you received, the October 13, 2005,

143

1    letter you received from the FBI with regard to your

2    testimony in this case, reminded you of your obligation to

3    comply with certain laws that were cited in the letter with

4    regard to any testimony you might give in this case; is

5    that right?

6            MR. NORDBERG:  Form.

7        Q.   (BY MS. AHERN)  You can answer.

8        A.   I'm not sure that the Code of Federal Regulations

9    is necessarily a law, and it's been further promulgated by

10   the U.S. Department of Justice.  Title V, however, does

11   have -- is more of a law, it has prescribed sanctions.

12       Q.   So it's your understanding that this letter

13   contains, if not laws, at least regulations that set forth

14   certain obligations that the FBI was bringing to your

15   attention in connection with testimony you might give in

16   this case?

17       A.   Yes.

18       Q.   How do you understand those obligations?  Let's

19   go through them one at a time.  What is your understanding

20   of the application of 28 C.F.R., section 16.21, et seq.?

21           MR. NORDBERG:  Foundation.  You can answer.

22       A.   My understanding is not based -- I should say

23   that my understanding on this is based on my own research,

24   not by any guidance either provided by this letter -- let

25   me rephrase that.

144

1            My understanding is based on a couple of phone

2    calls I had with assistant divisional counsel Steven

3    Kramer, K-r-a-m-e-r, and chief divisional counsel Bob

4    Goffi, G-o-f-f-i.  Mr. Kramer works in the Los Angeles FBI

5    office, Mr. Goffi works in the Denver FBI office.  This

6    letter research I conducted myself regarding these

7    regulations and statutes and the U.S. Department of Justice

8    executive office of the U.S. Attorney's Office manual

9    that's on the Internet.

10            Item No. 1 is 28 C.F.R., section 16.26, paren,

11    lower class -- lower class -- small B, unparen, paren 1,

12    paren, dash, paren 6, unparen.  In consulting the U.S.

13    Department of Justice executive office of U.S. Attorney's

14    Office manual, it's my understanding that this regulation

15    was further promulgated by the Department of Justice and

16    that there are two courses of action.

17            Number one, I think a deputy attorney general is

18    delegated the authority by the U.S. attorney general to

19    make decisions in this matter, and that the deputy attorney

20    general has further delegated other matters regarding this,

21    but probably at a lower priority to the U.S. Attorney's

22    Office or to the U.S. attorney in the district where the

23    demand has been made.

24            It also says that upon a demand, that this

25    regulation kicks in, or is initiated.  My understanding is

145

1    the demand has not been made.  I am not here because of the

2    demand.

3         Q.    Okay.

4         A.    And I'm not sure that the regulation kicks in.

5         Q.    So is it your testimony, Mr. Lipsky, then, that

6    you're not sure that the regulatory code section at 28

7    C.F.R. 16.26(b)(1) through (6) has been triggered in this

8    case?

9         A.    That's not what I said.  What I'm saying is that

10   for a decision to be made by the deputy attorney general or

11   his designee, which would be the U.S. attorney, for

12   alleviating this type of restriction would remain with

13   those two individuals, those two titles.

14         But further in my understanding and further

15   relating my presence here now in comparison to not only

16   what was told to me by Steve Kramer but what I've read from

17   the manual itself is that a decision by -- in this case

18   would have been the U.S. attorney, would have been

19   triggered by a demand, but the FBI is aware that I have not

20   been subpoenaed to be here.

21         With that said, it was explained to me by

22   Mr. Kramer that regardless of whether I'm subpoenaed or

23   not, there's two designations of basically what I can

24   testify to.  Number one would be what I learned on the job

25   is what he told me would be protected by this regulation.

146

1    And what I learned in this case, Rocky Flats, outside the

2    scope of my employment, I could talk about.

3              And so it's kind of confusing from his

4    explanation, and I think since we all have this letter

5    there is no doubt in my mind that the FBI is asserting that

6    I'm not authorized to talk about certain things, and that

7    includes former employees.

8        Q.   Okay.  Your understanding of the regulation

9    that's cited in this letter, then, has what impact on the

10   scope of what you can talk about here?  Let me ask you a

11   more specific question.

12             Is it your understanding that you are or are not

13   permitted to talk about information that you have learned

14   in the course of your investigation of Rocky Flats as an

15   FBI agent?

16       A.   I believe that a demand has not triggered the

17   regulation in that a decision has to be made by the deputy

18   attorney general or the U.S. attorney.  The way I take this

19   letter from the FBI is that I still have to be sensitive to

20   certain disclosures that are protected by the regulation,

21   or in the case of Title V by the law.

22       Q.   So what can you -- consistent with those

23   provisions, what is the scope of what you are permitted to

24   testify about here in this deposition and in this case?

25       A.   When I believe that I'm not impacting 28 C.F.R.

147

1    as cited and Title V, then I can freely discuss it, except

2    based on conversation with Mr. Nordberg, Mr. Taylor from

3    the U.S. Attorney's Office has agreed to relax Title V in

4    regards to identifying people only for the purposes of this

5    litigation.  It's not confusing to me, it's just a filter

6    process that I need to be sensitive to.

7            MR. NORDBERG:  I want to state for the record,

8    too, that that communication from Mr. Taylor, to which I

9    will attest, was not made directly to Mr. Lipsky.

10   Mr. Lipsky, so far as I know, knows of it only from me.

11       A.    But I believe that Mr. Taylor is behind this

12   letter because on the phone call that I received from

13   Mr. Kramer advising me that at the time on Tuesday,

14   October 11, that a letter was in the mail to me, and I

15   asked to have it faxed.

16           Mr. Kramer told me he was going to call Mr. Goffi

17   in Denver and have him call me, which he did.  Mr. Goffi

18   explained to me that he couldn't fax the letter to me

19   because it wasn't written yet.  So in contrast, the

20   government was telling me that I had a letter in the mail,

21   but in reality the letter was actually being drafted.

22           When I asked him when he would finish with the

23   letter, he said he wasn't working on it, it was Mr. Taylor.

24   Mr. Taylor was working on the letter, and it was in his

25   computer and he didn't know when he would get to it.

148

1           I received a phone call on Wednesday the 12th

2    from Mr. Goffi explaining to me that the letter was being

3    mailed, that he needed my address.  I gave him the

4    information.  I again asserted my request to have a copy

5    faxed to me, and I received just a two-page letter and a

6    fax cover sheet on Thursday the 13th of October.

7           Q.   (BY MS. AHERN)  I'm trying to understand,

8    Mr. Lipsky, the scope of what you can testify to here at

9    this deposition based on your understanding of your

10   obligations and consistent with this letter from Mr. Goffi.

11   Is it your understanding that you are permitted to testify

12   with regard to knowledge and information you obtained in

13   your employment as an FBI agent in the course of your

14   investigation of Rocky Flats if I asked you questions about

15   such topics at this deposition?

16          A.   Contrary to what Mr. Kramer said, I believe the

17   regulations allow me to testify about what I learned while

18   I was on the job about Rocky Flats except certain

19   categorical areas.

20          Q.   And what would be those categorical areas that

21   you would have to avoid based on your understanding of your

22   obligations under these regulations?

23          A.   Privilege, within the meaning of like an

24   attorney-client privilege.  Secondly, informants or

25   sources, protected sources.  Third, classified material.

149

1   Fourth, trade secrets, proprietary information.   Fifth

2   would be Federal Rules of Criminal Procedure Rule 6(e).

3        Q.   Anything else?

4        A.   Off the top of my head, that's all I can

5   remember.

6        Q.   I asked you a question with regard to whether you

7   had interviewed any former Rocky Flats plant employees

8   before the time that the affidavit in support of the

9   application for a search warrant was submitted to the

10   court.  Is it your understanding that such a question would

11   implicate a category of information that you are obligated

12   to withhold under your understanding of these regulations?

13        A.   Yes.

14        Q.   That's because it would relate to a potential

15   source of information?

16        A.   I'm not sure which other categories, but

17   certainly that one.

18        Q.   So you can't tell me one way or another whether

19   you did conduct interviews of former employees, or simply

20   that you cannot provide me with the identities of those

21   sources?

22        A.   The answer to that question is that I'm

23   constrained from answering the question rather than I can't

24   answer it.  I just --

25        Q.   I didn't mean to suggest you weren't capable of

150

 1    answering it, but is it your understanding that the

 2    obligations under this regulation prevent you from telling

 3    me whether or not you interviewed former plant employees or

 4    merely that you cannot reveal to me the identity of any

 5    such persons who you may have interviewed?

 6         A.   My first feeling is that answering that question

 7    would tend to obviate the regulation.

 8         Q.   So your understanding of the regulation is that

 9    you can't answer my question at all about whether you

10    interviewed someone or not?

11              MR. NORDBERG:  Objection --

12              MS. AHERN:  Leaving aside the question of who

13    that individual may have been.

14              MR. NORDBERG:  Objection, either asked or

15    answered or mischaracterizes his testimony.

16         A.   I'm not sure that I can go into any more detail

17    about something that's protected by the regulation.

18         Q.   (BY MS. AHERN)  Okay.  With regard to the

19    regulatory materials that are contained in the affidavit

20    that provided the basis for the application for search

21    warrant, would you agree, Mr. Lipsky, that there is a

22    fairly lengthy regulatory history and recital in this

23    affidavit?

24         A.   Yes.

25         Q.   Was the basis for that regulatory discussion in

151

1   the affidavit in support of the application for search

2   warrant based primarily upon review of regulatory records

3   and materials in the possession of the EPA?

4       A.   I would say that from the best of my memory, the

5   information that I reviewed was from the EPA.  But because

6   RCRA was delegated authority to the Colorado Department of

7   Health, they were also in possession of a lot of the RCRA

8   material.  But I don't recall going to the health

9   department to review it.  So I'm not sure if that answers

10   your question.

11       Q.   I think it does.

12       A.   Okay.

13       Q.   I think it does.  You do not recall drawing upon

14   materials that were in the possession of the Colorado

15   Department of Health in helping to piece together the

16   regulatory portion of the affidavit?

17       A.   I feel comfortable saying that I didn't.  I don't

18   know what Bill Smith did.

19       Q.   And you don't know what Ken Fimberg did either;

20   is that right?

21       A.   That's true.

22       Q.   Would that be a portion of the affidavit that was

23   drafted by or contributed to by Mr. Fimberg?

24       A.   Say that again.

25       Q.   The regulatory portion of this affidavit in

152

1   support of the application for search warrant --

2          MR. NORDBERG:  Vague.

3     Q.   (BY MS. AHERN) -- is that a portion of the

4   affidavit that would have been drafted by Mr. Fimberg, if

5   you recall?

6     A.   Well, there are several different portions of the

7   regulatory portion, meaning that there is an explanation of

8   what the environmental laws of the United States -- I guess

9   the history of them.  There is the actual permit -- there

10  is, I guess, a documentation of the actual permitting

11  process through the regulatory agencies as well.

12          The factual part, the portion where

13  communications between the plant and regulatory agencies is

14  what I reviewed.  Mr. Fimberg used his own license to

15  formulate, draft the way that it looks now.  And it wasn't

16  necessarily a way that -- this is not a usual affidavit,

17  and hence it's not a usual case, but normally I would have

18  drafted this a little bit differently.

19          Factually it would have been the same, but --

20    Q.   Style-wise?

21    A.   -- style-wise it's substantially different.

22    Q.   Style-wise you believe the affidavit was

23  formulated by Mr. Fimberg?

24    A.   The style was Mr. Fimberg, yes.

25    Q.   At the time that you contributed to the drafting

153

1    of this affidavit in support of the application for search

2    warrant, were you familiar with the monthly exchange

3    meetings between the Rocky Flats plant and the CDH and EPA

4    regulators?

5         A.   As I sit here today, based on having the

6    affidavit in front of me, no.

7         Q.   Do you recall reviewing materials related to the

8    monthly exchange meetings between Rocky Flats plant and CDH

9    and the EPA?

10        A.   I don't believe so.

11        Q.   At the time of the June 6, 1989, raid on the

12   Rocky Flats plant, were you familiar with the fact that

13   plant representatives and representatives of CDH and EPA

14   regulators met on a monthly basis to exchange various

15   information related to information requests from

16   regulators?

17        A.   I was not aware of it.

18        Q.   So you were also probably not aware that

19   representatives from municipalities also participated in

20   these exchange meetings from time to time?

21        A.   It was something that was not discussed with me,

22   no.

23        Q.   With regard to the actual raid at the Rocky Flats

24   plant, part of that raid was that documents on the plant

25   site were seized; isn't that right?

154

1          A.    Yes.

2          Q.    And the documents that were seized on the Rocky

3     Flats plant during the raid included materials that would

4     have been classified; isn't that right?

5          A.    Yes.

6          Q.    Was there a classification or declassification

7     review process that was triggered by the desire to seize

8     documents during the course of the raid?

9          A.    I'm not sure what you mean by triggered.

10         Q.    Let me ask a different question.   The documents

11    that the FBI and the EPA and other participants in the raid

12    desired to seize during the course of the raid, were those

13    documents subjected to a classification review before you

14    were able to take them off the plant site, if you recall?

15         A.    I remember -- I remember a few things about that.

16    Number one, the -- and I'm not up to date on the law as it

17    doesn't affect me -- but during this time frame there was

18    no requirement for law enforcement to provide a copy of the

19    seized documents to the -- back to the plant.

20              There is certainly a law now for business records

21    and stuff.   We went a step further.   Not only did we intend

22    to give a copy, and we did, but we also brought in -- or

23    the EPA brought in equipment to make it contemporaneous to

24    our search, and that was something that we didn't have to

25    do.

155

1        We also were asked to allow the declassifiers to

2   review certain documents that I'm aware of to ensure the

3   proper handling of the documentation, of course.  And,

4   again, I don't think we were obligated to allow those

5   requests to come to fruition.  But on the other hand, this

6   was -- you know, it was an air of cooperation, and we did.

7   We allowed this to happen, and I think it probably gave the

8   Department of Energy some solace that we were handling

9   these documents properly.

10       Also, too, there was documentation in one of the

11  manager's offices that were sent to yet another federal

12  agency for declassification, and we facilitated that as

13  well, but I don't know that there was a trigger or a

14  requirement.  I think we got through a lot of things

15  that -- you know, there were a lot of bad things that

16  happened over the years, and we certainly didn't want

17  Rockwell to not have access to their records to be able to

18  operate the plant.  And these machines were, as I recall,

19  going 24 hours a day.

20       Q.   I think you had a number of things that I was

21  intending to ask you that were a little beyond my question.

22  At the time you seized documents at the plant site, it's

23  your testimony that you allowed the plant to retain copies

24  of the materials that you seized; is that right?

25       A.   Yes.

156

1     Q.   And you allowed the plant to retain or make

2    copies of materials that the FBI and EPA intended to seize

3    contemporaneous with the EPA or the FBI seizure of those

4    materials?

5     A.   Yes.

6     Q.   And that was so as to enable the plant to

7    continue to operate and not be hampered by the fact that

8    the documents had been seized; is that right?

9     A.   Yes.

10     Q.   That's a courtesy you provided to the plant --

11     A.   Yes.

12     Q.   -- in the course of the raid and the seizures?

13     A.   Yes.

14     Q.   Is it also your testimony, Mr. Lipsky, that

15    Rockwell was cooperative with those efforts to obtain

16    documents from the plant site?

17     A.   Yes.

18     Q.   With regard to classified materials that -- with

19    regard to documents that the FBI or the EPA seized during

20    the course of the raid, is it also your testimony,

21    Mr. Lipsky, that those individuals involved in the raid

22    allowed classification officers from the Rocky Flats plant

23    to review the documents that you were intending to seize

24    for the purpose of identifying whether classified materials

25    were contained among them?

157

1      A.   Yes.

2      Q.   And that was so as to enable the investigators to

3  properly handle any such classified material that you were

4  desiring to seize; is that right?

5      A.   Yes.

6      Q.   In the course of this classification review of

7  documents that the investigators were in the process of

8  seizing during the course of the FBI raid, were materials

9  redacted or expunged from any documents according to

10  classification policy, as you recall?

11      MR. NORDBERG:  Foundation.

12      A.   I'm not aware of any redacting occurring, and I'm

13  not aware that anyone asked me if redacting should be

14  imposed.  In the spirit of the cooperation between Rockwell

15  and our task force, though it wasn't -- certainly it's an

16  impediment to the plant for its operations, but it's also

17  an impediment for the task force to be able to do its job

18  and get out, get out of the way of the operations.  It

19  slowed it down a few days.

20      But I'm not aware that we -- that anything was

21  redacted, and there was no controversy about it either,

22  that I'm aware of.  I would be surprised if there was

23  redacting.

24      Q.   So you don't have any personal knowledge of any

25  efforts by the Department of Energy to suppress the

158

1    contents of documents that you were seeking to seize during

2    the course of the raid?

3         A.   That's a pretty negative word.  The only thing I

4    can think of is that concurrently to our investigation

5    Admiral Watkins placed tiger teams at the facility, and the

6    tiger teams were working on their own agenda, writing their

7    own reports.  And though we received some of them, I'm not

8    sure we received all of them.

9              But that really was a separate issue from what we

10   were doing because they were doing an on-site audit, but on

11   the other hand the Department of Energy -- quite frankly,

12   there is basically three things that I have to produce for

13   the magistrate in order to get approval for this affidavit,

14   and one of those things is a list of places where I want to

15   search.  But always is the case, usually all appurtenances

16   are included.  But we were being very, very careful.  So

17   when it came to a point where a lead was developed at one

18   of these locations and another building was identified, we

19   went the extra step and I went to Mr. Goldberg and received

20   a written consent to search.

21             So, if anything, it took just a little bit extra

22   time, depending on his schedule, how quickly I could get

23   that consent before we could go in and get that

24   documentation.  So it was pretty good.

25        Q.   So it's your testimony, Mr. Lipsky, that not only

159

1    was Rockwell cooperative in the orderly providing of

2    documents to the investigators during the course of the

3    raid, the Department of Energy was also cooperative in that

4    process?

5        A.    Only a certain facet of it.  The tiger teams

6    identified that Rockwell employees were moving barrels from

7    one building to another.  That was an investigative

8    interest.  So separating those types of issues out, as far

9    as the document collection process we were receiving

10    cooperation from Rockwell, as well as pursuing further

11    investigation, we were receiving cooperation from the

12    Department of Energy.

13        Q.    My question was only limited to the document

14    production process.  It's your testimony that both Rockwell

15    and the Department of Energy were cooperative with

16    investigators in the course of the document production

17    process during the course of the raid and seizure of

18    documents at the plant?

19        A.    Yes.

20        Q.    I would like to talk a little bit about some of

21    the specific subjects of the affidavit in support of the

22    search warrant.  One of the topics I would like to talk

23    about is the infrared overflights that were conducted

24    during the course of your investigation of the Rocky Flats

25    plant I think that gave rise to some of the materials that

160

1    are in the affidavit.  And you touched on these a little

2    bit this morning.

3            It's your testimony, Mr. Lipsky, that you

4    participated in several of those overflights; is that

5    correct?

6        A.   Like I said earlier this morning, I feel

7    comfortable with the December 9, 15, and February

8    overflights; but in reviewing the affidavit, I'm not sure

9    if I was on the 12th flight or not.

10       Q.   Let me ask you some background questions about

11   the flights themselves.  First, whose idea was it to pursue

12   infrared overflights as a possible means of investigating

13   the plant site?  It's fair to say you don't recall if

14   that's the case?

15       A.   No, I do.  I'm just -- you're asking a specific

16   question, so I'm trying to make sure I answer your question

17   the best I can, as I swore to do.  Bill Smith actually

18   mentioned that the infrared technology was available, and

19   through a service of the EPA.

20       Q.   Prior to the prospect of using infrared

21   technology to investigate the Rocky Flats plant came up in

22   the course of the investigation of that site, had you ever

23   had any contact or use with infrared technology as an

24   investigative tool before?  I'm talking about you

25   personally.

161

1       A.   No.

2       Q.   So this was the first time you had ever used or

3  contemplated using that technology?

4       A.   That's a different question.   No, this isn't the

5  first time.   What triggered my thought process on it was

6  that I saw a trade magazine at an oil company, and on the

7  cover was a satellite with a corresponding article

8  discussing the ability of satellite technology to not only

9  read the surficial part of the earth, but go deep into the

10 earth, particularly if it was an oil company for oil

11 drilling.

12         And I talked to Mr. Greenberg about such

13 technology, and in doing some research there was a case

14 called Dow versus Michigan, I believe, and that case --

15 Supreme Court case ruling was that as long as the

16 equipment -- this type of technology was commercially

17 available, then it could be used in a criminal

18 investigation.   Then Bill Smith mentioned about the

19 infrared technology.

20      Q.   Do you recall the specific type of plane that was

21 used in order to conduct the infrared overflights of the

22 Rocky Flats plant?

23      A.   Do I recall specifically?

24      Q.   The type of plane.

25      A.   Again, because the FBI sent this letter on

1    October 13, 2005, I think pursuant to their not allowing me

2    to talk about Title 28 Code of Federal Regulations.

3         Q.    So that's something you believe that falls within

4    the scope of limitations on which you can testify to here?

5         A.    Yes, ma'am.

6         Q.    Would you be able to tell me what the model

7    number or the serial number of any equipment that was used

8    to conduct those overflights was?

9              MR. NORDBERG:   Able or permitted?

10        Q.    (BY MS. AHERN)   Either.

11        A.    I'm not -- I believe I'm permitted to answer the

12   question.   I am not able to give you the model or serial

13   number of the plane.

14        Q.    Mr. Lipsky, do you recall if a camera on the

15   plane that conducted the overflights was attached to a

16   camera port actually on the outside of the airplane?

17        A.    I'm not sure I'm permitted to be able to answer

18   that question.

19        Q.    Are you able to answer the question?

20        A.    Yes.

21        Q.    Mr. Lipsky, could you tell me whether the camera,

22   if it was mounted on the airplane, whether it was covered

23   with any materials the way that it was physically attached

24   to the airplane?

25        A.    Again, I believe I'm not permitted, but I'm able

163

1    to answer the question.

2         Q.   Would you know what kind of material that was,

3    whether it was plexiglass or something else?

4         A.   I'm not sure I'm permitted to answer the

5    question, and if allowed to I'm not able to answer the

6    question.

7         Q.   It's more than just you're not sure that you are

8    permitted to answer the question, it's your understanding

9    you are not permitted to answer that question?

10        MR. NORDBERG:  You know, I'm going to object to

11   the extent that these abstract questions about the scope of

12   what Mr. Lipsky is and is not permitted to testify are

13   asked outside the context of a specific factual question.

14   And I will tell you, frankly, that the place of concern is

15   Mr. Lipsky is not an attorney, that we do not know what

16   position the Department of Justice and the FBI will or will

17   not take, or the DOE for that matter, in the matter, and

18   I'm concerned that an abstract pronouncement on the legal

19   issues may not anticipate all of the factual particulars

20   that may emerge as we dealt with the specific question.

21             So it's not an instruction not to answer, it's a

22   registration of an objection and concern.

23        Q.   (BY MS. AHERN)  Mr. Lipsky, my questions for you

24   only involve your understanding of what you are permitted

25   to talk about with regard to the scope of your testimony

164

1    here.  And so if it is that I ask you a question and your

2    understanding of the scope of the limitations that have

3    been imposed upon you is that you are not permitted to so

4    testify, I just want to make sure I understand that your

5    testimony is that, as you understand your obligations, you

6    are not permitted to speak to that point, that's all I'm

7    seeking to ask here.

8         A.    I know.  I think I follow you, but you have to

9    understand that my answer not only encompasses this letter,

10   but also the fact that talking to Mr. Kramer on Tuesday the

11   12th somewhat is incongruous with what the regulations

12   state, and I'm not comfortable talking about something that

13   apparently -- I'm defaulting to the regulation itself.

14        Q.    Okay.

15        A.    Not to what Mr. Kramer said, but I -- certainly

16   when someone gets a call from the FBI it raises a little

17   bit of attention and concern, and I'm somewhat intimidated.

18   I would like to put that on the record.  That not only

19   being called about this, but getting somewhat conflicting

20   instructions from a legal adviser who is, I know, a lawyer,

21   and what these regulations state.

22             So I feel in my mind, with that said, that I feel

23   I'm not permitted until -- who I believe is really the one

24   that can change this is Mr. Taylor through the U.S.

25   attorney, can come back and say -- relaying a great

165

1   foundation for that because that's what we did in Congress

2   too, same scenario.  Permitted.  Can you.  And I believe

3   Mr. Taylor -- again, that's why I wish he was here.  I

4   think we could get that resolved a lot quicker.

5        Q.   Is it your intention, Mr. Lipsky, to attempt to

6   comply with the restrictions that have been placed on you

7   either through the letter you received from the FBI or

8   through your communications with Mr. Kramer and the FBI in

9   the course of this testimony in this case?

10       MR. NORDBERG:  Vague and compound.

11       A.   I'm complying with this letter that I received,

12  that's why I say I default to the letter.  Because it also

13  was -- if I could -- sorry to cut you off -- but just to

14  fully answer that question, Mr. Kramer also told me in that

15  phone call on the 12th that he was trying to give me some

16  anecdotal examples of what I may or may not say based on

17  what knowledge I had.  But he also said that he was going

18  to refer me to Mr. Goffi.  So the letter, I think, has

19  priority over what Mr. Kramer said.

20       Q.   Speaking a little bit further with regard to the

21  infrared overflight investigation and surveillance that was

22  done on the Rocky Flats plant in December of 1988 and

23  February of 1989, Mr. Lipsky, do you know the wavelength of

24  the infrared that was being employed in that surveillance

25  process?

166

1      A.   I don't believe I'm permitted to answer that

2   question.  And if allowed to, I don't believe -- I am not

3   able to answer that question.

4      Q.   Mr. Lipsky, do you know whether a thermal

5   calibration was conducted prior to -- or in conjunction

6   with the infrared overflight surveillance tapes that were

7   taken of the Rocky Flats plant in December of '88 or

8   February of '89?

9      A.   Can I ask you to further define what you mean by

10   thermal calibration?

11      Q.   I think it's a term of art with regard to

12   infrared camera or infrared photography processes whereby

13   one benchmarks and calibrates the materials in terms of the

14   air temperature, the ground temperature, and other such

15   parameters.

16      A.   I can -- my understanding of calibration, there

17   are several different types of calibration, but I did an

18   in-flight calibration, and that involved comparing two

19   different thermal signatures at two different locations.

20      Q.   Can you describe with particularity the

21   calibration that you performed?

22      A.   Yes.

23      Q.   Would you do so?

24      A.   Yes, ma'am.  I had prearranged with the Public

25   Service Company, which is the utility in the state of

167

1   Colorado, and they -- one of the power-generating stations

2   near Mile High Stadium, along I-25, around 17th or so, and

3   prearranged with an individual to take an infrared video of

4   the stack.  And in doing so I wanted to be able to get a

5   temperature reading from them at the time we did it.  So he

6   was aware of it.  It was coordinated is what I'm trying to

7   say.

8           So that when that first night on December 9 when

9   we flew over Rocky Flats, we had made a record of something

10  that we kind of knew as close as we can the temperature of

11  that image that we had, and then be able to compare it with

12  the Rocky Flats thermal signatures.

13      Q.   Do you recall providing testimony to Congress on

14  the same subject?

15      A.   Yes.

16      Q.   Mr. Lipsky, do you recall whether it was

17  possible, then, to generate comparative analysis between

18  the overflight of the Mile High Stadium and the overflight

19  images that were taken on the plant site?

20      A.   Well, we don't do a comparative analysis of Mile

21  High Stadium and the plant site.

22      Q.   Public Service Company.  Excuse me, I misspoke.

23      A.   That's all right.  It would help me to refresh my

24  memory what the discussion was on that with the

25  congressional testimony specifically.

168

1      Q.   As you sit here today, Mr. Lipsky, do you recall

2  whether it was possible to say that what you saw at Public

3  Service Company was the same or warmer or cooler than the

4  images that were taken in the overflight of the plant site

5  in December of '88?

6      A.   As I sit here right now?  No, I couldn't answer

7  that question with certainty.

8      Q.   Would your testimony at the time of the

9  congressional hearing be more accurate on that subject

10  because it was closer in time?

11      A.   Absolutely.

12      Q.   Mr. Lipsky, are you familiar with the term black

13  body calibration?

14      A.   No, ma'am.

15      Q.   So do you know one way or another whether a black

16  body calibration was done with regard to the overflights of

17  the Rocky Flats plant site in December of '88 or February

18  of '89?

19      A.   In regards to the overflights at Rocky Flats, I'm

20  not -- I don't believe I'm permitted to answer that

21  question.  And if allowed to answer that question, I

22  wouldn't know the answer.

23      Q.   Do you know what navigational aids were employed

24  during the course of the overflight of the Rocky Flats

25  plant in December of '88 or February of '89?

169

1    A.   I don't believe I'm permitted to answer that

2    question.  And if allowed to answer that question, I don't

3    believe I know the answer.

4    Q.   With regard to the overflights of the Rocky Flats

5    plant site in December of '88 or February of '89, can you

6    identify the direction or air speed that were the

7    circumstances on the individual occasions of the

8    overflights?

9    A.   I'm not able to tell you what the air speed was.

10   While looking at the video, I could tell you where the

11   direction was.

12   Q.   Who was it who was actually flying the plane at

13   the time of the overflights?

14   A.   Pardon me?

15   Q.   Who was flying the plane at the time of the

16   overflights?  Who was the pilot employed by?

17   A.   Employed by?

18   Q.   Yes.

19   A.   The FBI.

20   Q.   The plane itself, was it equipment that was FBI

21   equipment or EPA equipment?

22   A.   FBI also.

23   Q.   Do you know the thermal sensitivity of the

24   equipment that was used for the infrared overflights --

25   A.   Say that again.

170

1    Q.   Do you know the thermal sensitivity of the

2   equipment that was used for the infrared overflights in the

3   surveillance of the Rocky Flats plant in December of '88 or

4   February of '89?

5    A.   I don't believe I'm permitted to answer that

6   question.  And if allowed to, I wouldn't be able to answer

7   it.

8    Q.   In the course of the infrared overflight

9   surveillance tapes that were taken at the Rocky Flats plant

10   in December of '88 and February of '89, do you know whether

11   a measurement cursor was used to highlight one particular

12   level of intensity or take a number reading that was

13   comparative of the difference between the levels of

14   intensity of the items taped?

15    A.   I don't believe I'm permitted to answer that

16   question; but if allowed, I wouldn't be able to answer that

17   question.

18    Q.   Also speaking with reference to the surveillance

19   and the infrared overflight tapes from December of '88 and

20   December -- February of '89 of the Rocky Flats plant that

21   were done in the course of your investigation, did you or

22   did the technician operating the infrared camera note the

23   Delta temperatures in differential terms?

24    A.   I don't believe I'm permitted to answer that

25   question, but if allowed I wouldn't be able to answer.

171

1          MR. NORDBERG:  Mr. Lipsky, can I make a request

2   because I want to make sure you're understood when you

3   answer this series of question.  I request that you not use

4   the contraction wouldn't, and I request you say would or

5   would not.

6          Q.   (BY MS. AHERN)  Sometimes it's difficult in the

7   record.

8          A.   I know.  I'll make it easy for her.  Sorry.

9          Q.   With regard to the infrared overflight

10  surveillance tapes that were taken at the Rocky Flats plant

11  as part of your investigation in December of 1988 or

12  February of 1989, do you know whether yourself or any of

13  the technicians who were involved in that infrared taping

14  recorded the specific stack or ground or roof temperatures

15  that were present on the occasion of any individual

16  overflight?

17         A.   I'm not sure I understand the question.

18         Q.   Do you know whether it was possible to discern

19  from the infrared overflight tapes that were taken at the

20  Rocky Flats plant site in December of '88 or February of

21  '89 the specific stack temperature underneath the buildings

22  recorded?

23         A.   My understanding was that a specific temperature

24  could not be discerned, but that's what I knew when I

25  arranged for the overflights.  I learned more later.

172

1      Q.   And what did you learn later?

2      A.   I learned later that there was a range of

3   temperature in each frame, and there was a ceiling and a

4   threshold of temperature readings that could be quantified

5   in that frame.

6      Q.   How did you come to that understanding?

7      A.   After talking to Al Divers with the Reynolds

8   Electric Company, a contractor with the EPA in Las Vegas,

9   Nevada.

10      Q.   Mr. Lipsky, do you know whether in conjunction

11   with the infrared overflight surveillance tapes flights

12   that were done at the Rocky Flats plant site in December of

13   '88 or February of '89, whether temperature readings were

14   taken of the air temperature or the ground temperature on

15   those occasions?

16      A.   What did I personally cause to happen or find

17   out?

18      Q.   Did you know whether those temperature readings

19   were in fact recorded on each occasion of an overflight?

20      A.   I know that the December 15, 1988 overflight, in

21   the affidavit that I reference that I contacted the

22   National Weather Service and obtained the ambient

23   temperature for that evening at a certain time frame.

24      Q.   Do you know whether ground temperature readings

25   were taken on any of the occasions of the overflights?

173

1      A.   It was a National Weather Service call that I

2   made.  I believe the plant -- later on I found out the

3   plant kept their own temperature readings, but I didn't

4   consult the plant what their temperature was.

5      Q.   Other than on December 15, did you obtain the

6   ambient air temperature readings with regard to the dates

7   of the overflights?

8      A.   Without access to my notes, I can't answer that

9   question.

10      Q.   Do you have your notes in your possession?

11      A.   I have no notes in my possession.

12      Q.   Are those notes left in the possession of the

13   Federal Bureau of Investigation at the point in time when

14   you concluded the investigation of the Rocky Flats plant?

15      A.   Yes, ma'am.

16      Q.   Those are not materials you took with you when

17   you relocated to Los Angeles?

18      A.   In fact, I would like to make a record that I

19   took nothing that was official documentation from the FBI.

20   I made sure before I retired, as per my exit separation

21   interview, the form that I signed, that I didn't keep

22   anything that didn't belong to me, which was very, very

23   limited.

24      Q.   At the time of the infrared overflights that were

25   taken at the Rocky Flats plant in December of 1988, did you

174

1    know, Mr. Lipsky, what operations within Building 771

2    contributed to or ventilated through the stack on that

3    building?

4        A.   If I understand your question, you're asking me

5    for my state of mind on those particular nights of the

6    overflights?

7        Q.   I'm asking for your knowledge on those particular

8    nights.

9        A.   My knowledge on the overflights?

10       Q.   About whether additional -- let me rephrase the

11   question.  Perhaps it was a bad question.

12            At the time of the overflights in December of

13   1988, did you know what functions within Building 771

14   vented to or contributed to the stack temperature on that

15   building?

16       A.   The information that I knew about the operations

17   in that building were limited to what was published by

18   Rocky Flats to the regulators.  The documentation that

19   earlier we talked about that I obtained from Bill Smith and

20   the EPA.  And because I don't have that in front of me

21   right now, I can't say for certainty what other

22   contributing factors were to the stack other than any one

23   particular production item.

24       Q.   At the time of the overflights, did you know

25   whether anything in addition to the incinerator contributed

175

1    to the heat that may have been seen in the Building 771

2    stack?

3         A.   Unless I can consult some notes, I don't feel

4    comfortable answering -- I don't know.

5         Q.   You just don't recall as you sit here today?

6         A.   I don't recall.

7         Q.   Your unrefreshed recollection is that you don't

8    recall?

9         A.   That's correct.

10        Q.   At the time of the congressional hearings, would

11   your recollection be fresher on that subject?

12        A.   Yes.

13        Q.   So would you defer to whatever the contents of

14   that testimony might be?

15        A.   Yes.  Because that was 13 years ago and more

16   contemporaneous around the investigation.

17        Q.   Mr. Lipsky, are you aware of statements that Bill

18   Smith has made to the effect that the technology that was

19   used in the infrared overflights at the Rocky Flats plant

20   site was ineffective in order to determine whether the

21   Building 771 incinerator had been operating on the nights

22   of those overflights?

23        A.   I'm not sure if I remember him saying that, but

24   he certainly didn't say it before the raid.

25        Q.   Are you aware of him saying that at any time?

176

1      A.   Sounds familiar, but I don't know if he said it

2    that way or when.  But I do recall that before the raid

3    itself and the overflights, that there was no objection to

4    pursuing it that way.

5      Q.   At any point in the investigation after the time

6    of the raid, do you recall Mr. Smith or any other

7    participant in the investigation of conduct at the Rocky

8    Flats plant stating that they believed the infrared

9    overflights had proven to be ineffective in order to

10   definitively tell whether the 771 incinerator was operating

11   on the nights in question?

12     A.   Are you saying after the raid am I aware of

13   anybody saying that?

14     Q.   Anyone on the prosecutorial or investigative

15   team?

16     A.   Yes.

17     Q.   Specifically who do you recall taking that

18   position?

19     A.   Well, in October of 1992 there was a Rocky

20   Mountain News article that was published that the

21   interpreter had recanted what he had wrote in the report

22   and compared to what he testified in the grand jury.  And

23   specifically Mr. Norton had called me to apologize that

24   such a disclosure had been made to the press, and that he

25   was going to look into it because, after all, it was a

177

1    contempt of court issue with the release of grand jury

2    material to the public that was unauthorized.

3        Q.   I think my question was a little bit more

4    specific than that.  My question was, do you recall there

5    being any individual on the investigative team or the

6    prosecutorial team?

7        A.   I'm sorry, that article quoted an anonymous

8    source from the prosecution table.

9        Q.   Other than an anonymous source, someone you can

10   name, do you recall any individual whose name that you

11   could identify ever stating that they found -- that they

12   had formulated the conclusion that the infrared overflights

13   were ineffective in order to be able to determine whether

14   the Building 771 incinerator had operated on the nights in

15   question?

16       A.   Well, Bill Smith and I had talked about the

17   preference of using a different type of technology.  And I

18   know that Peter Murtha was -- had told me that he wasn't

19   happy with the -- using the infrared in the affidavit.

20           There was a meeting in Washington, D.C., in

21   January of 1989, and it was a round table with the

22   associate attorney general, and it seems to me that there

23   was a departmental attorney that objected to the

24   sensationalization of the technology to use it as probable

25   cause.  But there was a caucus about it, and it was

178

1    pointedly for probable cause.  And Ken Fimberg also told me

2    that he had concerns about the infrared.

3        Q.    Do you recall with any greater specificity what

4    Ken Fimberg's concerns were about the infrared?

5        A.    I don't believe I'm permitted to talk about

6    matters involving 28 C.F.R., particularly Rule 6(e).

7        Q.    Leaving aside anything that might implicate

8    Rule 6(e), Mr. Lipsky, do you recall any statements from

9    Mr. Fimberg that would indicate concerns he may have had

10   regarding the effectiveness of the infrared technology in

11   determining whether the Building 771 incinerator had

12   operated on any of the evenings in question that were the

13   subject of the overflights?

14       A.    Mr. Fimberg told me that he had some doubts about

15   the infrared, and that -- I'm trying to remember exactly.

16   The gist of what he told me was that it became a question

17   of whether or not Al Divers' report that we got in 1989 was

18   accurate.  And then Ken Fimberg pulled me to the side and

19   told me that he wanted me to know that after I had called

20   Mr. Divers and got his preliminary findings, that he

21   separately called Mr. Divers to confirm what I had told

22   Mr. Fimberg -- or relayed to Mr. Fimberg.

23            So the point of it was -- and it seemed to me

24   that it was a meeting and there was a discussion about the

25   infrared, but Ken was trying to give me some solace in that

179

1    he had independently called Mr. Divers and had felt

2    comfortable with it, so . . .

3         Q.   Do you recall whether during the course of your

4    investigation anyone on the investigative team consulted

5    with a second infrared analyst or expert with regard to the

6    contents of Mr. Divers' report on the infrared overflights?

7         A.   I may have inquired about getting another reader.

8         Q.   As you sit here today, do you recall one way or

9    another whether you did obtain a second reader on that

10   report?

11        A.   I would need my notes to refresh my memory on

12   that.

13        Q.   In your congressional testimony you reference a

14   second expert who reviewed Mr. Divers' analysis but not

15   necessarily the tapes themselves.  Do you have any

16   recollection of that process as you sit here today?

17        A.   The most I can remember from that process was

18   when I was talking to Mr. Divers, he mentioned there was

19   some software available to be able to crunch the numbers

20   through, and it was very expensive.  And that's the most I

21   remember of it.  And that being -- if I said that in the

22   congressional testimony, it's a lot more reliable than my

23   memory today.

24        Q.   If you had said in your congressional testimony

25   that this second infrared consultant -- or expert had

1    reviewed Mr. Divers' report and concluded that Divers was

2    incorrect in using the information as it was presented,

3    would you have any reason to disagree with that

4    congressional testimony as you sit here today?

5         A.    No.

6         Q.    Do you recall whether the Building 771 had a

7    radon problem?

8         A.    Specifically, no.

9         Q.    Do you recall whether any efforts to address the

10   radon issues in Building 771 could have contributed to the

11   heat signature in the 771 incinerator stack?

12        A.    No.

13        Q.    Do you have any recollection from any materials

14   generated in the course of the investigation of the Rocky

15   Flats plant, and in particular with regard to the infrared

16   overflights, about what differential in temperature use of

17   the incinerator would have contributed to the overall heat

18   signature of the stack?

19        A.    During the course of the investigation?

20        Q.    Yes.

21        A.    I believe -- I hope I'm answering your question,

22   but I believe within the first week or so of the search

23   warrant in June of 1989, a Rockwell engineer presented, and

24   I read, a write-up about the contributing thermal signature

25   to the heat -- to the incinerator stack from the building

181

1    itself.

2         Q.   What do you recall that differential temperature

3    to be?

4         A.   I don't remember the exact temperature.  It

5    was -- what I do recall, I believe, was it had a negative

6    airflow in the building, and the actual heat was allowed to

7    escape through the stack, and that it was nothing more than

8    the inside building heat.  That's what I remember.  It's

9    been awhile.

10        Q.   Do you remember anything in the reports that you

11   reviewed in the course of your investigation of the issue

12   of the 771 incinerator burns that indicated what increase

13   in temperature in the heat of the material going up the

14   stack would have resulted had the incinerator been in use?

15        A.   No.

16        Q.   You don't recall one way or another what that

17   differential might have been?

18        A.   Not today.

19        Q.   Do you remember seeing materials on that issue at

20   the time?

21        A.   Yes.  Can we take a water break?

22        Q.   Sure.

23             (Recess taken from 2:54 p.m. to 3:06 p.m.)

24        Q.   (BY MS. AHERN)  Before the break we were talking

25   a little bit about the allegations in the affidavit related

182

1   to the search warrant with regard to use of the Building

2   771 incinerator.  In the course of your investigation of

3   the Rocky Flats plant, did you have occasion to review the

4   data from the on-site or the off-site air monitors related

5   to the Rocky Flats plant?

6          A.   Are you saying did I have -- did I review this

7   recently, or . . .

8          Q.   In the course of in your investigation.  At the

9   time of the criminal investigation of the Rocky Flats

10  plant.

11         A.   If I could look at the affidavit for a minute.

12         Q.   Certainly.

13         A.   Thanks.  To refresh my memory at the time of the

14  search.

15         Q.   My question is a little bit broader than the time

16  of the search, though.  My question was more whether in the

17  course of the entirety of the investigation -- the criminal

18  investigation of the Rocky Flats plant, whether among the

19  materials that were gathered and reviewed in the course of

20  that investigation, whether investigators reviewed data

21  from the on-site and off-site air monitors related to Rocky

22  Flats?

23         A.   Specifically I don't recall today whether we did

24  or not.

25         Q.   Do you know whether in the course of the

183

1   investigation yourself or any of the other investigators

2   reviewed data from the community air monitors that were off

3   site?

4        A.   I don't recall.

5        Q.   Do you know whether in the course of the

6   investigation of the Rocky Flats plant, and in particular

7   the allegations related to the 771 incinerator issues,

8   whether effluent records from the 771 stack were reviewed

9   by the investigative team?

10        A.   I believe they likely were.

11        Q.   Do you know one way or another as you sit here

12   today?

13        A.   With certainty, no.

14        Q.   If they had been reviewed, would you have been

15   the one who would have reviewed them?

16        A.   If I can separate the difference between

17   scrutinizing and being aware of it, but I'm still not sure.

18        Q.   In terms of division of responsibility and the

19   various issues that were germane to the criminal

20   investigation of the Rocky Flats plant, who bore

21   responsibility in the investigation for issues related to

22   the 771 incinerator conduct?  Who led up that portion of

23   the investigation?

24        A.   I'm not sure, but I believe Peter Murtha did.

25        Q.   And who would you say, Mr. Lipsky, took the lead

184

1    on the investigation into issues related to the conduct of

2    the 776 incinerator?

3         A.   I'm not sure.

4         Q.   Do you know whether any of the plant effluent

5    records related to the 776 stack were ever reviewed during

6    the course of the investigation at the Rocky Flats plant

7    back in '89 and proceeding through '92?

8         A.   I didn't know there was a 776 stack.

9         Q.   How about effluent records generally, not just

10   776?

11        A.   I'm just really not sure about the -- when you

12   say 776, are you talking about the fluidized bed

13   incinerators?

14        Q.   The fluidized bed incinerators were in building

15   776.

16        A.   Yes.  Based on that, I'm still not sure.

17        Q.   You just don't recall?

18        A.   Today I don't recall.

19        Q.   Did you have occasion to see the Building 771

20   incinerator during the course of your investigation?

21        A.   You mean the actual -- no.

22        Q.   You never saw the actual incinerator itself?

23        A.   No.

24        Q.   So you would be in no position to estimate the

25   size of that burn box?

185

1       A.    That's correct.

2       Q.    Do you have an understanding of what -- strike

3   that.

4             Mr. Lipsky, there are some statements in the plea

5   agreement that was one of the documents related to the

6   ultimate resolution of this case with regard to the

7   allegations about the Building 771 and Building 776

8   incinerators.  Are you familiar with those statements?

9       A.    Yes.

10            MS. AHERN:  Can we mark this as the next exhibit.

11            (Deposition Exhibit 2 was marked.)

12      Q.    (BY MS. AHERN)  Mr. Lipsky, do you recognize the

13  document that we've marked as Exhibit 2 to this deposition?

14      A.    Vaguely.  But I do recognize Mr. Norton's

15  signature.

16      Q.    Is this the plea agreement that was entered into

17  at the conclusion of the criminal investigation of the

18  Rocky Flats plant, or one of the documents that constitutes

19  the plea agreement?

20      A.    It's one of the documents that constitutes the

21  plea agreement.

22      Q.    Paragraph 10 of this document on page 4, there is

23  a statement at paragraph 10b that says -- this is a

24  document that's signed by Mr. Norton and a senior official

25  at Rockwell International, but it states at paragraph 10b,

186

1    "The investigation has not revealed that hazardous or mixed

2    waste were burned in the 771 incinerator during the period

3    of October 1988 to January 1989, or, at any time, in the

4    Building 776 fluidized bed incinerator."

5            Were you aware that that statement was part of

6    the plea agreement?

7        A.    Yes.

8        Q.    Were you consulted with, with regard to the

9    content of that statement prior to the signing of the plea

10   agreement?

11       A.    For purposes of making the plea agreement, no.

12       Q.    Were you aware that Mr. Norton intended to make

13   such a statement, or did make such a statement at a public

14   document?

15           MR. NORDBERG:  Vague as to time.

16       A.    There was a time that I learned that a statement

17   of this nature was going to be made and that it had already

18   been agreed to.  So I was being advised, not consulted.

19       Q.    (BY MS. AHERN)  When did you learn that this

20   statement was going to be made, or had been made?

21       A.    I would put it between the time frame of

22   December 1991 through March of 1992.

23       Q.    I would like to give you what's been previously

24   marked as Smith Deposition Exhibit 6.  Earlier in your

25   deposition, Mr. Lipsky, you noted that you had reviewed the

187

1    Plaintiff's Sentencing Memorandum as one of the documents

2    you reviewed for this deposition.  Is Smith Deposition

3    Exhibit 6 that sentencing memorandum?

4         A.   Yes, ma'am.

5         Q.   Can you turn to page 128, which is the signature

6    page at the back of Smith Exhibit 6.  Do you see that this

7    document is signed by Michael Norton?

8         A.   Yes.

9         Q.   It's also signed by Kenneth Fimberg?

10        A.   Yes.

11        Q.   Berry Hartman?

12        A.   Yes.

13        Q.   And Peter Murtha?

14        A.   Yes.

15        Q.   Can we turn to page 107.  I'm looking at the

16   sentence that begins at the bottom of 107 and carries over

17   to the top of 108.  The sentence that reads, "After

18   carefully reviewing evidence obtained by the EPA and the

19   FBI during and after the search (including information

20   provided by Rockwell) the United States has concluded that

21   the Building 771 incinerator was not operated contrary to

22   the DOE," shutdown order.  Do you see that sentence?

23        A.   I do.

24        Q.   Were you aware that in the spring of 1989

25   Mr. Norton, Mr. Fimberg, Mr. Murtha, and Mr. Hartman were

188

1   making such a statement in a public document?

2       A.   In the spring of 1989, we hadn't even done the

3   search yet.

4       Q.   I'm sorry, I misspoke.  I meant the spring of

5   1992.

6       A.   In the -- well, the plea was actually tendered,

7   Rule 11(c), in March of 1992 and, I believe, before spring

8   had come.  So we were in the winter when the plea agreement

9   was -- correct me if I'm wrong.

10      Q.   I think the plea agreement was signed at the end

11  of March of 1992.  In any event, were you aware at the time

12  that this document was signed and the end of March of 1992,

13  that Messrs. Norton, Fimberg, Murtha, and Hartman were

14  making the statement that I read that is the statement that

15  is contained on page 107 and carried over to the top of

16  page 108 of this agreement -- or this document?

17      A.   Yes.

18      Q.   Were you consulted with, with regard to the

19  content of that statement before it was made?

20      A.   Yes.

21      Q.   Do you agree with the statement that was made by

22  Mr. Norton, Fimberg, Murtha, and Hartman?

23      A.   Actually, the statement that was tendered to me

24  was not -- did not include the word "contrary."  And after

25  a great deal of discussion with Mr. Fimberg, I asked and

189

1    negotiated that we were going to -- that my discussion was

2    not going to materially change this statement, except he

3    acquiesced and allowed the input of contrary.  So that

4    statement with the word "contrary" was actually as a result

5    of me talking to Mr. Fimberg.

6        Q.   So you actually provided input on the content of

7    that particular sentence?

8        A.   But I was provided input on that sentence.  But

9    if you'll note, it's footnoted and somewhat diluted with

10   the footnote.

11       Q.   Mr. Lipsky, did you contribute to the contents of

12   footnote 93 as well?

13       A.   No, I didn't.

14       Q.   The sentence that I read, the carry-over sentence

15   from page 107 to page 108 regarding the fact that the

16   evidence in the FBI investigation did not show that the

17   Building 771 incinerator was operated contrary to the DOE

18   shutdown order, is that a statement you would agree with?

19            MR. NORDBERG:  I'm sorry, may I have that

20   question read back.

21            (The last question was read back as follows:

22   "The sentence that I read, the carry-over sentence from

23   page 107 to page 108 regarding the fact that the evidence

24   in the FBI investigation did not show that the Building 771

25   incinerator was operated contrary to the DOE shutdown

190

1    order, is that a statement you would agree with?")

2           MR. NORDBERG:  No objection.

3       A.    No, I wouldn't agree with it, but it was -- I was

4    happy that the contrary word was put in there.

5       Q.    (BY MS. AHERN)  So is it your testimony,

6    Mr. Lipsky, that you disagreed with Messrs. Norton,

7    Fimberg, Murtha, and Hartman on that statement?

8       A.    Well, I ratified the statement after negotiating

9    the input of the word "contrary."

10      Q.    So do you believe it to be a factually true

11   statement?

12          MR. NORDBERG:  Just for clarification, the thing

13   that would or would not be factually true is the sentence

14   written in the sentencing memorandum starting at the bottom

15   of 107 and continuing on to page 108?

16          MS. AHERN:  I'll note your objection.  I'll ask a

17   clearer question.

18      Q.    (BY MS. AHERN)  Mr. Lipsky, do you agree that

19   after careful review of the evidence obtained by the EPA

20   and the FBI during the search, including information

21   provided by Rockwell, the United States concluded that the

22   Building 771 incinerator was not operated contrary to the

23   DOE shutdown order?

24          MR. NORDBERG:  I'm sorry to do this, but I object

25   on the grounds that counsel has twice read this sentence

191

1    and inserted the word "the" between reviewing and evidence.

2         Q.    (BY MS. AHERN)  I'll do it again.  Mr. Lipsky,

3    would you agree, "After carefully reviewing evidence

4    obtained by EPA and the FBI during and after the search

5    (including information provided by Rockwell) the United

6    States has concluded that the Building 771 incinerator was

7    not operated contrary to the DOE," shutdown order?

8         A.    Well, I agree that those four gentlemen believe

9    that characterization of the Building 771 incinerator.

10        Q.    But you disagree?

11        A.    Yes.

12        Q.    With regard to the allegations in the application

13   for search warrant, the affidavit that was attached to the

14   application for search warrant, who was responsible for

15   generating the information contained in that affidavit with

16   regard to the conduct about the Building 776 incinerator

17   that was the fluidized bed incinerator?

18        A.    Just so I understand your question, you're asking

19   me who was assigned to do the search at 776?

20        Q.    I'm asking who on the investigative team took the

21   lead with regard to the investigation of that issue?

22        A.    As I sit here today, I don't recall.

23        Q.    What was the basis for the allegations that are

24   contained in the affidavit with regard to the Building 776

25   incinerator issues?

192

1      A.    That the -- I believe the 776 incinerator was

2   listed on the part A, and that there was indications of it

3   being operated at a time -- just because it was on the part

4   A didn't mean that it had interim status or RCRA permit.

5      Q.    But the part A, you're referring to the RCRA

6   application part A that was submitted by the DOE?

7      A.    The RCRA part A is the portion of the facility

8   informing the EPA what they intend to request.  And the

9   part B was the approval process.  And there was no part B.

10     Q.    So it is your recollection that the basis for the

11  allegations in the search warrant affidavit related to the

12  Building 776 incinerator was in large part drawn from

13  information about that incinerator included in the plant's

14  RCRA part A application -- permit application?

15     A.    Permit, and RCRA permit applications.

16     Q.    And that was information that you reviewed in the

17  files of the Environmental Protection Agency, you or other

18  investigators?

19     A.    It was information that was -- yes, that had been

20  filed with the EPA.

21     Q.    Do you recall any additional bases for the

22  Building 776 incinerator conduct allegations?

23     A.    No.

24     Q.    With regard to the Building 776 incinerator,

25  there are also statements related to that incinerator in

193

1    the sentencing memo; isn't that correct?

2         A.    There are also plans.

3         Q.    There are also statements with regard to the

4    investigation into issues in the Building 776 incinerator

5    that are contained within the Plaintiff's Sentencing Memo;

6    isn't that right?  I'm looking at another document now,

7    Mr. Lipsky.

8         A.    Okay.

9         Q.    Looking at the Plaintiff's Sentencing Memorandum,

10   if I could direct your specific attention to page 108.

11   Isn't it true, Mr. Lipsky, there are statements in the

12   Plaintiff's Sentencing Memo which is a document that was

13   signed by prosecutors Norton, Fimberg, Murtha, and Hartman

14   related to the investigation into Building 776 incinerator

15   issues?

16        A.    Yes.

17        Q.    Would you agree with the statements contained in

18   the Plaintiff's Sentencing Memorandum with regard to the

19   conclusions of the investigation related to the Building

20   776 incinerator?

21             MR. NORDBERG:  Is this a reference to the

22   paragraph under heading B on page 108?

23             MS. AHERN:  Yes, it is.

24        Q.    (BY MS. AHERN)  And that's specifically what I'm

25   referring to there.

194

1       A.   No, I wouldn't.

2       Q.   So you would disagree with the statement that,

3   "The ongoing investigation revealed that the Building 776

4   incinerator was not used to treat or dispose of hazardous

5   or mixed waste, although various experimental test 'burns,'

6   primarily utilizing diesel fluid and polyvinyl chloride

7   occurred in 1986 and 1987."  You would disagree with that

8   statement?

9       A.   I did, yes.

10       Q.   What is the basis of your disagreement?

11       A.   The inference here is that there was an ongoing

12   investigation when, in fact, there was anything but a

13   complete investigation to make that determination.  It was

14   an agreement in principle between the government and

15   Rockwell that this statement would be made.

16       Q.   So it's your testimony that you disagreed with

17   the fact that any investigation was ongoing at the time

18   this statement was made?

19       A.   I would -- correct.  I would disagree with the

20   characterization that there was an ongoing investigation

21   into the Building 776 incinerator.  And having been

22   involved with the investigation from start to finish, I'm

23   also adding that this issue was not fully investigated to

24   make that determination.  It may have been true, it may not

25   have, but this paragraph does not properly inform the

195

1    reader that this issue, as a result of a plea agreement

2    with Rockwell, was not going to be fully investigated.

3              In fact, issues like this involving false

4    statements was negotiated away very quickly right after the

5    search, and anything to do with a false statement was not

6    something that I was authorized to investigate early on.

7         Q.   Mr. Lipsky, do you know with any degree of

8    certainty whether the Building 776 incinerator was used to

9    treat or dispose of hazardous or mixed waste at the Rocky

10   Flats plant?

11        A.   Without rehashing the part A that Rockwell and

12   DOE submitted to the EPA and regarding the documentation

13   about the test burns, let's just set that aside, no, I

14   don't have any comfort to be able to make a statement like

15   that.  It was not fully investigated.

16        Q.   So you can't say one way or another?

17        A.   Absent the part A and the litany of RCRA

18   correspondence and permits and stuff, that's correct.

19        Q.   I'm not sure I understand your testimony,

20   Mr. Lipsky.  Is it the basis for the allegation related to

21   the 776 incinerator -- you said the basis for the

22   allegations contained in the affidavit related to the FBI

23   raid for the conduct involving the 776 incinerator was the

24   statements made by the plant in the RCRA part A permit

25   application; isn't that right?

196

1      A.   Yes.

2      Q.   And I believe that you then testified that you

3  believed that the investigation -- that a complete

4  investigation into this issue was not fully made in the

5  course of the criminal investigation of Rockwell?

6      A.   Oh, it's a lot more than a belief, ma'am, it's a

7  fact.

8      Q.   But certainly it's your position that a complete

9  investigation into the Building 776 incinerator was not

10 made at the time of the criminal investigation of Rockwell

11 that culminated in the plea agreement?

12     A.   Can you read it back, please.

13          (The last question was read back as follows:

14 "But certainly it's your position that a complete

15 investigation into the Building 776 incinerator was not

16 made at the time of the criminal investigation of Rockwell

17 that culminated in the plea agreement?")

18     A.   That's correct.

19     Q.   And so it's your testimony here today that in

20 your opinion it would be impossible to definitively state,

21 based on the level of completeness of the investigation at

22 the time of the raid, whether or not hazardous or mixed

23 waste had been burned in the Building 776 incinerator; is

24 that true?

25     A.   No.  I can't answer that question the way that

197

1    it's structured because when you raise the issue of

2    impossibility -- I didn't take any physics classes at

3    college, but I can show you that if I did say yes, then you

4    would know I was wrong because we're looking at the

5    document right now.  So there is a possibility it could be

6    said.

7            What I'm trying to say is that the notification

8    that there was any indication of an incinerator with 776

9    was because of Rockwell and DOE placing that information on

10   the part A with the EPA for a RCRA permit, and they went

11   into a litany of test burns and what their intentions were

12   to do, and it goes on and on and on.

13           All I'm saying is that -- I guess to cut to the

14   chase -- I'm pretty certain that after Rockwell had their

15   plea agreement accepted by the court, I don't think that

16   Rockwell took the time to write the letter to the EPA to

17   take the -- to correct that information with part A.  Maybe

18   they did, I don't know.

19           But I'm just saying that there is a logical

20   sequence and analytical result from reviewing these types

21   of documents, and for it to go away the way they want it

22   to, there should be a letter to the EPA and the health

23   department saying, never mind about this part A request for

24   this incinerator in this building.  And I haven't seen that

25   document.  So I have discomfort with agreeing with it.

198

1           Is there a document that's been filed?

2           MR. NORDBERG:  Ms. Ahern gets to ask the

3    questions.

4       Q.   (BY MS. AHERN)  I don't know how to answer that.

5       A.   Sorry.  I'm just getting into this.

6       Q.   With regard to the statement that is contained in

7    the Plaintiff's Sentencing Memorandum with regard to what

8    the investigation into the 776 incinerator revealed,

9    certainly that's a statement that prosecutors Hartman,

10   Murtha, Norton, and Fimberg were prepared to make as of the

11   end of March of 1992?

12      A.   What their state of mind was and what they

13   accepted as the truth, you'll have to ask them.  I don't --

14      Q.   Did you express disagreement with that statement

15   at the time that this document was generated?

16      A.   I'm not sure that I was -- I don't believe I was

17   consulted with this portion of the Plaintiff's Sentencing

18   Memorandum.  And when I found out, it was already ratified.

19   And to me, when an agreement is struck between two sides

20   involving the attorneys, I don't see the reason to waste

21   too much energy on it.

22      Q.   So you don't recall having raised any objection

23   to that statement?

24      A.   I don't -- I believe I wasn't in a position to be

25   able to raise an objection.

199

1    Q.    Did you ever see the fluidized bed incinerator?

2    A.    Are you asking me in picture form, or in person?

3    Q.    In person.

4    A.    No.

5    Q.    With regard to the allegations in the affidavit

6    in support of the search warrant, what agent or what

7    investigator took the lead in investigating the issue of

8    direct discharges from the sewage treatment plant into

9    Woman Creek?

10   A.    During the time of the search?

11   Q.    During the time of the search, the investigation

12   that led up to the raid.

13   A.    Well, the raid is the search.

14   Q.    Uh-huh.

15   A.    So on June 6 are you asking me who --

16   Q.    During the course of the investigation that led

17   up to and included the FBI raid, what investigator working

18   on the criminal investigator team took the lead in

19   investigating the issue of alleged direct discharge from

20   the sewage treatment plant into Woman Creek?

21   A.    Well, the -- when the affidavit -- in the

22   investigation from June of 1987 up until the affidavit of

23   June 6, 1989 was approved, it was me.  And I believe in the

24   affidavit, in reviewing it, there is a statement in here

25   that there was a discharge from the sewage treatment plant,

200

1     and it was from an infrared reading.

2          Q.    So the basis for that allegation regarding the

3     direct discharge from the sewage treatment plant into Woman

4     Creek was based on the infrared overflight tapes?

5          A.    To the best of my recollection, the basis of that

6     allegation was from the --

7          Q.    The underlying factual evidence that you were

8     drawing upon working infrared overflight tapes?

9          A.    And their review.

10         Q.    And their review?

11         A.    I believe.  And their review.

12         Q.    Can you explain to me what you recall having seen

13    on the infrared overflight materials related to the direct

14    discharge of the STP into Woman Creek?

15         A.    The video image is monocolor -- or monochrome, I

16    guess, black and white, and I believe that the preference

17    was to use white as hot.  And what I'm trying to describe

18    is that when viewing this video, a viewer would not be

19    seeing images as they normally would see them in their own

20    natural light, what we can see with our eyes, because it's

21    being filtered through an infrared device.

22              So depending on the heat emanating from each

23    source, the image would look differently.  For example, a

24    car going down the road, the hottest spot on it that's

25    visible, depending on the perspective, might be the exhaust

1    pipe.  It would be white with the heat from the engine, and

2    then the windows, and other parts of the car.  But you

3    wouldn't really see a car like you normally would, even in

4    a black-and-white photograph.

5            In this particular case that you are asking

6    about, what I recall is a thermally active area to the

7    south of the sewage treatment plant that connected to the

8    culvert that went underneath the road at Central Avenue,

9    that traversed down the -- from the bench southbound to the

10   interceptor ditch along Woman Creek.

11       Q.   Would it be possible, Mr. Lipsky -- can we mark

12   this as an exhibit.  Let me do this first, then I'll mark

13   it here.  It's simply a map of the Rocky Flats plant circa

14   1989.  Would it be possible for you, Mr. Lipsky, to draw

15   the pathway of the flow that you recall seeing from the

16   infrared tapes from the STP to Woman Creek?

17            MR. NORDBERG:  Give me a moment here.  I believe

18   that in the rules of civil procedure you are entitled to

19   ask the witness questions but not to require that he draw

20   things.  I'm not going to object on that basis except to

21   note that Mr. Lipsky would be being asked to do a drawing

22   on a map of the plant he's never seen before, and from

23   memory.

24       A.   I would like to note that there is no legend or

25   scale that's discernible.

202

1    Q.   (BY MS. AHERN)   There is a legend and scale

2    there.

3        A.   There is a scale, but there is not a legend.   I'm

4    not sure about a lot of things on this map.   And I'm not

5    even sure if Building 995 and 998 are represented here and

6    if they would be to scale and in proximity to the other

7    drawn areas.

8            You're also asking me to do this without any

9    contours to the land.   I don't see -- it's not discernible

10   where the culvert is.

11       Q.   Just a moment.   Would you prefer to try with this

12   map?   This is an aerial photograph.

13       A.   And I'm not sure, you know -- as you know, we had

14   infrared tapes that were made contemporaneous to our

15   overflights, and from what I understand, these tapes have

16   been copied and provided to Mr. Nordberg, which I also

17   understand happened yesterday.   And yesterday afternoon I

18   started to review them a little bit, but they are not

19   really great viewing.

20           And I seem to recall one of the images that may

21   have been the reason for the statement in the affidavit,

22   but I'm not sure.   So my memory has been cluttered with

23   something that I saw last night that I'm not sure if that's

24   what it was.   There was quite a thermal signature over in

25   the area of those two areas.

203

1        Q.   My question, Mr. Lipsky, was is it possible for

2    you with either one of these maps to draw the pathway of

3    flow that you recall seeing from the STP to Woman Creek?

4        A.   I'm not comfortable doing that right now is

5    what -- I was trying to explain to you why I'm not

6    comfortable.

7        Q.   Fair enough.

8        MS. AHERN:  Can we mark both of these as

9    exhibits?  Can we mark the first one that isn't the aerial

10   photograph as the next exhibit, and the aerial photograph

11   as the exhibit after that.

12       (Deposition Exhibits 3 and 4 were marked.)

13       Q.   (BY MS. AHERN)  Mr. Lipsky, you note that you

14   spent some time yesterday reviewing the infrared aerial

15   surveillance overflight tapes that were taken

16   contemporaneous with your investigation of the plant in

17   December of 1989.  In your review of those tapes -- first,

18   how long did you spend reviewing the tapes yesterday?

19       A.   Close to three hours.

20       Q.   When did you begin that review?

21       A.   About 3:15 in the afternoon.

22       Q.   Was anyone with you while you were reviewing the

23   tapes?

24       A.   No.

25       Q.   How did the quality of the tapes appear compared

204

1    to what you recall from the time of the actual criminal

2    investigation?

3        A.    There were four -- Mr. Nordberg gave me four

4    DVDs, and they were marked separately with the file number

5    from the case, which is DN, for Denver, 249-43, then there

6    was a 1B, as in boy, number afterwards, and I don't

7    remember what they were.  They were marked with the date of

8    each overflight, so they were separated.

9            The first one dated December 9, 1988, I rate it

10   as very poor quality -- or poor quality, I should say.  The

11   images were obscured by blue and red pixel squares.  They

12   were also -- there was lines -- noise lines.  I'm not sure

13   how to characterize this because I haven't seen any

14   literature on it, but there is almost like a fog that is in

15   between the screen and the image, and it greatly obscured

16   the heat signatures that were more subtle.

17           The brighter ones I could make out like in the

18   frames where the plenums were or where you knew there was

19   heat, but when it came to more of a gray scale, they were

20   obscured, especially with all these green and red dots

21   floating around.

22           The second one I reviewed was December 9, 1998 --

23   correction, December 10, 1988.  And the quality of that one

24   was also poor.  What I just described about the December 9

25   one, minus the red and blue pixels, still poor quality.

205

1          Then I looked at the December 15.  In this case

2     the menu indicated two different types of, you know, titles

3     to pick from.  The first one was the SVHS version, and the

4     second one was the regular VHS the way it was labeled.  It

5     lends itself to a lot of questions that I had, and I'm glad

6     to share some of them with you if you want.  But when I

7     reviewed the SVHS version, I rated it as fair quality.  It

8     was much, much better than before.  But I'm rating it

9     basically on what I recall what the original VHS tapes

10    were.

11         And there was -- again, the images were obscured

12    by this fog or cloud -- almost like a fog between the

13    screen and the images themselves.  A little bit of a

14    pixilation, there was a demarcation when I changed the

15    oblique angle.  So if you weren't -- when you were

16    looking -- when I was looking at it straight on, it was

17    much better than looking at it from a side angle when the

18    pixels started appearing.  And the regular VHS version was

19    less quality than the SVHS version, and it was okay.  It

20    was fair, but I think there were some problems with it.

21         And I couldn't even look at the February 1989

22    version, the fourth one.  I couldn't even get it to play in

23    my DVD player, so I couldn't make a comment about it.

24    Q.   Let me go back and ask you some questions related

25    to the allegation of direct discharge into Woman Creek.

206

1    During the course of the investigation of the Rocky Flats

2    plant at any time during or after the FBI raid, did you or

3    any other investigators that you are aware of physically go

4    out to the STP and attempt to trace the track of the flow

5    that you saw on the infrared videotape all the way down to

6    Woman Creek?

7        A.   What I'm thinking about, ma'am, is I've been out

8    to the sewage treatment plant, which is also known as

9    Building 995 at the end of Building 998.   With some

10   limitations I have viewed that area and the culvert, the

11   area of Central Avenue, and then down to Woman Creek.   Do I

12   recall specifically what that thermal heat was emanating

13   from?  No, I don't today.

14       Q.   Do you recall during the course of the

15   investigation going out to the actual physical locations on

16   the plant site that correspond to what you believe you saw

17   in the heat signature on the infrared tape and looking for

18   piping or some kind of conduit between the STP and Woman

19   Creek?

20       A.   For specifically that reason, no.

21       Q.   Do you recall whether you found any piping or

22   conduit connecting the STP to Woman Creek?

23       A.   No.

24       Q.   What, if anything, did you do to verify the

25   discharge that you saw in the infrared photography of the

207

1   discharge directly flowing from the STP to Woman Creek?

2       A.   As of today, I don't recall.

3       Q.   Did you personally speak to any plant employees

4   with regard to whether or not the STP was directly piped or

5   routed to Woman Creek?

6       A.   Without being able to refresh my memory with the

7   notes and reports that I had conducted, I'm not able to

8   recall right now.

9       Q.   Do you recall whether anyone in the course of the

10  investigation was able to confirm that there was a physical

11  pathway for discharge directly from the STP to Woman Creek?

12      A.   I'm not sure.  I don't recall.

13      Q.   Do you recall whether any conclusion was made as

14  to whether what you saw in the infrared overflight tapes

15  was spray field runoff as opposed to some kind of direct

16  piping or conduit connected to STP -- from the STP to Woman

17  Creek?

18           MR. NORDBERG:  Vague.  Conclusion made by whom?

19      Q.   (BY MS. AHERN) Let me restate the question.

20  Mr. Lipsky, during the course of the investigation, do you

21  recall whether any of the investigators formulated any kind

22  of opinion or conclusion whether the infrared overflight

23  tapes showed spray field runoff as opposed to any kind of

24  direct piping or conduit for discharge from the STP to

25  Woman Creek?

208

1      A.   I vaguely recall this part of it.  There was no

2  doubt what's on the video is a thermal image, but as we sit

3  here now I vaguely recall that it was possibly represented

4  as like a ponding of the runoff from north of the Central

5  Avenue.  I'm not sure.

6      Q.   Is it your recollection that any conclusion was

7  made one way or another in the course of the investigation

8  by any of the participants in the investigation about

9  whether that represented -- that ponding that you saw in

10  the infrared video represented spray field runoff as

11  opposed to something else?

12      A.   Well, the something else that it could have been

13  is that it needs to be understood that the infrared didn't

14  pick up heat signatures that were blocked by solid

15  materials; for instance, a culvert pipe or a road or a

16  building.  And I believe that the -- if I can refresh my

17  memory about the outfalls for the plant, it seemed to me

18  that operating under the assumption of limited knowledge,

19  but within the scope of probable cause, I believe 988 had

20  an outfall.  I want to confirm that.

21          So based on reasonable belief that if 988, which

22  is in the vicinity of this ponding, is a discharge outfall,

23  it's basically trying to explain a puzzle without having

24  all the pieces in place.  Ma'am, I found the EPA

25  designations for discharge locations for the permit that

209

1    was relevant at the time period of search on page 95.  But

2    I believe -- it was my belief that the -- one of the

3    discharge points was changed from Building 988 to another

4    location.

5         Q.    Mr. Lipsky, do you know how far apart the STP is

6    from Woman Creek in terms of distances?

7         A.    No.

8         Q.    Topographically, do you know what the terrain in

9    the topographical conditions are that separate the STP from

10   Woman Creek?

11        A.    Roughly.

12        Q.    Could you describe any vertical separation that

13   there might be between the STP and Woman Creek?

14        A.    The Central Avenue.

15        Q.    Other than Central Avenue, do you recall anything

16   with regard to the terrain between the STP and Woman Creek?

17        A.    I believe that in the vicinity of Central Avenue

18   there was a bench.

19        Q.    By bench, what do you mean?

20        A.    A bench in the land meaning a high point, and

21   then the terrain from -- going south went downhill, and

22   going north went downhill, but I think there was kind of

23   like another bench north of the STP.  It was hilly.

24        Q.    So any direct discharge from the STP to Woman

25   Creek would have to go up and then down a couple of hills

1   before it reached Woman Creek?

2        A.   Unless there was like a culvert.  But, yes.

3        Q.   Do you recall in the course of the investigation

4   of this issue during the course of the criminal

5   investigation of the Rocky Flats plant ever identifying or

6   locating a culvert that could have been the conduit for

7   this direct discharge that you saw in the infrared

8   overflight tapes?

9        A.    Again, the infrared tapes would not show a

10   reading if the heat signature was shielded by something

11   else.  So I really -- I don't know how I could answer that

12   question based on the infrared tapes.  The culvert could be

13   covered, and . . .

14        Q.   I'm asking whether any physical review of the

15   actual conditions on the ground that exist between the STP

16   and Woman Creek as of December of 1988 through June of 1989

17   were ever identified and located that could have

18   constituted a pathway for this direct discharge between the

19   STP and Woman Creek based on your understanding of what the

20   evidence and the investigation revealed?

21        A.   As I said, as I sit here today, no, I don't know.

22   I can't recall.

23        Q.   Would you look at the Plaintiff's Sentencing Memo

24   at page 209.  I'm looking at the first full paragraph at

25   the top of page 209.

211

1        A.   109?

2        Q.   I'm sorry, 109.  Do you see a statement in that

3    paragraph that reads, "Further investigation showed that

4    this and similar discharge --"

5             Let me start over.  The top of that paragraph

6    begins, "Based on aerial infrared surveillance, the

7    affidavit also alleged that a direct discharge had been

8    observed in December 1988 from the sewage treatment plant

9    to Woman Creek."

10            That's consistent with the allegation we've been

11   discussing just now; isn't that right?

12       A.   Yes, ma'am.

13       Q.   Do you see in this paragraph that it goes on to

14   say, "Further investigation showed that this and similar

15   discharges were primarily runoff from spray field -- from

16   spray irrigation fields," and it notes, "(as charged in

17   Count 9)," which is presumably via the plea.  Do you see

18   that as well?

19       A.   Yes, I do.

20       Q.   Would you disagree with this statement that the

21   discharge that was depicted in the aerial infrared

22   surveillance was primarily runoff from the spray irrigation

23   fields?

24       A.   Yes.

25       Q.   So you would disagree with the statement that's

212

1    being made by Norton, Fimberg, Hartman, and Murtha?

2        A.    I misunderstood your previous question.   You

3    asked me if I agreed with it.

4        Q.    I asked if you disagree.

5        A.    I misheard that.

6        Q.    So you would agree that the infrared surveillance

7    materials related to a direct discharge from a sewage

8    treatment plant to Woman Creek was primarily runoff from

9    the spray irrigation fields?

10       A.    I don't remember a controversy about this

11   statement.

12       Q.    And so as you sit here today, you don't have any

13   basis for disagreeing with that statement?

14       A.    Correct.

15       Q.    There are also allegations in the affidavit that

16   was submitted in support for the application for search

17   warrant with regard to use of solar pond 207A and transfers

18   between solar pond 207A and 207B.   Do you recall those

19   allegations?

20       A.    I remember that there are allegations regarding

21   the solar ponds.

22       Q.    Do you recall any of the specifics of those

23   allegations?

24       A.    I'm trying to head that way.   Do you have a page

25   number?

213

1      Q.   I can give you paragraph numbers.  I direct your

2  attention to paragraphs 8.13 through 8.16.

3      A.   Yes.

4      Q.   Do you recall what agent or investigator took the

5  lead on this area during the course of the investigation

6  leading up to and including the time of the FBI raid?

7      A.   I was principally responsible for writing the

8  affidavit, so it was me up until the raid, then it was

9  delegated after the raid.

10     Q.   To whom was it delegated to after the raid, do

11  you recall?

12     A.   As of today, I don't recall.

13     Q.   What was the basis for this allegation related to

14  solar pond use?

15     A.   Relying on and being able to refresh my memory

16  from this document, it was based on Rockwell hazardous

17  waste manager asking the EPA to be able to transfer liquid

18  hazardous waste from one pond to another.

19     Q.   It's your testimony that there was documentary

20  evidence in possession of the EPA that such a request had

21  been made?

22     A.   I'm not sure that I put a document -- documentary

23  comment in there.  It's just it's information that I

24  received that would have been documented had the Rockwell

25  manager asked the EPA person to authorize this transfer.

214

1    It doesn't say document here.

2         Q.   So you can't recall whether it was based on a

3    document or not, but it was information you received from

4    the EPA that an individual at the Rocky Flats plant had

5    made such a request to transfer materials between 207B and

6    207A?

7         A.   Yes.

8         Q.   Did you find any documentary evidence that such a

9    transfer had occurred, or was the allegation based on

10   infrared overflight again?

11            MR. NORDBERG:  Form.

12        A.   I'm looking.  I believe that -- I believe before

13   June 6 the only other information I had on it was from the

14   infrared.

15        Q.   (BY MS. AHERN)  What do you recall that the

16   infrared overflight material showed with regard to the

17   solar pond transfer issue?

18        A.   Well, as a precursor, I was aware that the ponds

19   were closed.  They did not have interim status to be

20   operated.  In fact, documentation indicated that -- I think

21   it was 207A was empty, and yet during the overflights I'm

22   basing it on the affidavit, what it says, there was a heat

23   signature on December 9, 10, and 15 of 1988.

24        Q.   Apart from the affidavit, do you have any

25   independent recollection of what the infrared overflight

215

1    materials showed?

2         A.   Say that again, please.

3         Q.   Apart from the affidavit itself, as you sit here

4    today, Mr. Lipsky, do you have any independent recollection

5    of what the infrared overflight surveillance tapes showed

6    with regard to the solar pond transfer issue?

7              MR. NORDBERG:  Form.

8         A.   Are you asking me before I actually looked at

9    this just now?

10        Q.   (BY MS. AHERN)  I'm saying without reference to

11   the affidavit, do you have a present recollection of what

12   the infrared overflight tapes related to the solar ponds

13   show?

14             MR. NORDBERG:  Objection.  I think the problem

15   may be that to the extent you are asking about a refreshed

16   recollection based on a reading of the affidavit, it's

17   refreshed now and probably can't be unrefreshed.  To the

18   extent whether you are asking whether the sole basis for

19   his answer is the statement in the affidavit as opposed to

20   a recollection refreshed by the affidavit, then the

21   question is not clear, and I think that's the source

22   ambiguity -- it is at least the ambiguity.

23        Q.   Mr. Lipsky, having reviewed the affidavit here,

24   did that refresh your recollection with regard to what the

25   infrared overflight tapes related to the solar pond issues

216

1    showed?

2         A.    Yes.

3         Q.    What do you recall the infrared overflight tapes

4    showing with regard to the specific issue of solar pond

5    transfer as alleged in the criminal investigation?

6         A.    You mean what does it mean?

7         Q.    What do you recall from the tapes?

8         A.    I can remember seeing a heat signature on some of

9    the ponds.

10        Q.    What did you do to follow up on that issue in the

11   course of the criminal investigation?

12        A.    Well, before the search warrant affidavit was

13   submitted to the court, the tapes were sent to Las Vegas to

14   Al Divers again, who did an interpretation of the tapes

15   that didn't necessarily verify an action that was occurring

16   but quantified the heat signature that was seen in the

17   tapes.

18        Q.    So it's your recollection of Mr. Divers' review

19   that the infrared overflight tapes could merely confirm

20   that there was a heat signature with regard to the ponds,

21   but it didn't necessarily indicate definitively one way or

22   another whether there had been transfers?

23        A.    I think that's a very fair statement.  But in

24   proximity to the requests for the transfers and then noting

25   the heat signatures, that's what's being presented.

217

1      Q.   In the course of the criminal investigation into

2   the solar pond transfer issue, do you recall whether

3   yourself or any other investigators talked to solar pond

4   operators about whether there, in fact, were any such

5   transfers?

6      A.   Not only solar pond operators, but managers as

7   well.

8      Q.   And what did they say that you recall?

9      A.   What I recall is that there were transfers from

10   Building 374 to, I believe, 207A.

11      Q.   My question was relating to transfers between the

12   ponds and the allegation that's in the application for

13   search warrant references transfers between solar pond 207A

14   and 207B.  And my question was, did any of your

15   communications with solar pond operators indicate that

16   there were transfers on the dates in question as recorded

17   by the infrared overflight tapes between ponds 207A and B?

18      A.   I just don't recall.

19      Q.   Do you recall whether the investigators in the

20   criminal investigation reviewed solar pond logs for that

21   purpose?

22      A.   Yes.

23      Q.   Do you recall what the conclusion or outcome of

24   that review process was?

25      A.   Not specifically.  I remember there were some

218

1    emergency situations, but I don't recall exactly what they

2    were.

3        Q.    Did yourself or any of the investigators looking

4    into the solar pond transfer issue look at records for

5    water levels in the solar ponds on the dates in question?

6        A.    I don't recall.

7        Q.    Do you know one way or another whether logs were

8    kept of the specific water levels in the solar ponds during

9    December 1988?

10       A.    I don't recall.

11       Q.    Assuming that there was a transfer between pond

12   207A and 207B, can you explain why infrared overflight

13   tapes would show transfer between two ponds which were

14   presumably the same temperature as thermal activity?

15       A.    The actual date in question is December 15, 1988.

16   It also needs to be understood that I believe that the

17   National Weather Service reported that, about the time that

18   these tapes were shot, the recorded temperature was

19   7 degrees Fahrenheit, which means it was below freezing.

20   It should also be known that these ponds were closed, that

21   meant no activity, and they were supposed to have been

22   drained.

23           But the thermal activity in the two ponds at the

24   time when it was below freezing and they were supposed to

25   be empty I think rises to an issue of suspicious activity

219

1   and probable causes, and that's all this document is, is

2   probable cause.  It's not the threshold of what I was

3   required to do in the trial and get beyond a reasonable

4   doubt.

5        Q.   Let me ask you a question, Mr. Lipsky.  Do you

6   know whether any of the solar ponds 207A, B, or C were

7   represented to have been empty as of December of 1988?

8        A.   I believe that there was a pond that was

9   supposedly emptied at one point after 1985.

10       Q.   Do you know which pond that was?

11       A.   And emptied, I mean by the liquid portion.  The

12  solid waste was still there.  It might have been 207A, but

13  I'm not sure, that the pondcrete came from.

14       Q.   You don't know which of the ponds --

15       A.   No.

16       Q.   You recall one of the ponds was reportedly empty

17  as of December 1988, but you don't know which of the three

18  ponds it was?

19       A.   After 1985 there was a pond that was emptied,

20  then I believe permission was granted to put liquid back in

21  it, but -- getting into a lot of detail.

22       Q.   I'm just trying to ascertain from you whether it

23  is your testimony that any one of these three solar ponds

24  were empty as of the timing of the infrared overflight, and

25  if so, which pond?

220

1      A.   Absolutely not.  The ones that had thermal

2   activity indicated there was something in them, so they

3   weren't empty.

4      Q.   Did you see thermal activity in all three ponds?

5      A.   I don't recall.

6      Q.   I guess the thing that's causing me difficulty

7   here is, is it your testimony, Mr. Lipsky, that any of

8   these ponds were represented to be empty as of December of

9   '88?  Do you know that one way or another?

10      A.   I don't recall if one of them was supposed to be

11   emptied.

12      Q.   Do you know why transferring water from one

13   outdoor pond to another outdoor pond would show up as a

14   heat signature on infrared overflight tape?

15      A.   On a night that the temperature was 7 degrees and

16   had been cold for a while, it would have to be -- if there

17   was a transfer occurring between those two ponds -- and I'm

18   not even sure which 207B pond we're talking about, there is

19   north, middle, and south, that's the pond that has the

20   three inner ponds -- and the liquid, if it was going

21   through like an internal combustion engine pump, then it

22   might be getting heated up.  But if you were to use a

23   vacuum siphon with no heat around the siphon itself and

24   transferring liquid from these two ponds on a night that

25   was as cold as it was, I don't think that there would have

221

1    been a thermal image that showed up.

2        Q.    But that's your own conjecture as you sit here

3    today?

4        A.    You asked me that question, yes.

5        Q.    With regard --

6        A.    But I think it's based on physics too.

7        Q.    With regard to the temperature in the days

8    preceding the overflight on December 15, do you have

9    weather service data indicating one way or another whether

10   the ambient air temperature had warmed up in those days?

11       A.    I'm not sure what would be over at the FBI office

12   in the file.

13       Q.    Do you recall --

14       A.    Do I have something now?  No.

15       Q.    Do you recall looking into this issue at the time

16   of the solar pond investigation?

17       A.    Yes.  When I was developing the affidavit, yes.

18       Q.    Do you know whether the sunshine and the

19   increased temperature melted any snow or ice that may have

20   been on the solar ponds in the days immediately preceding

21   the December 15 overflight?

22       A.    No, I don't recall.

23       Q.    Do you understand how the solar ponds operate?

24       A.    I understand that they were closed and they

25   weren't to be operated.

222

1          Q.    I believe that they were closed and they weren't

2     to be receiving waste.  But do you understand functionally

3     how a solar pond works?

4          A.    Transevaporate, you mean?

5          Q.    Yes.

6          A.    That process?  Yes.

7          Q.    Generally speaking, is it your understanding that

8     the heat of the sun warms the pond, and materials in the

9     pond then evaporate, consolidating the contents of the

10    pond?

11         A.    Well, in theory that's what would be acceptable.

12    But these ponds were leakers.  So we had leaking and

13    transevaporation occurring.

14         Q.    My question didn't have to do with what was

15    actually happening with regard to the ponds.  I'm trying to

16    understand whether you had a conceptual understanding of

17    how the solar ponds worked?

18         A.    Yes.

19         Q.    Do you know whether the sun in the days preceding

20    the infrared overflight warmed the pond?

21         A.    How deep -- how much liquid is in the pond?

22         Q.    I don't know.  I'm just asking whether this is an

23    issue that you investigated at the time of the criminal

24    investigation.

25         A.    I told you I didn't recall.  I thought we were

223

1    talking about the theoretical use of the solar pond because

2    it depends how deep the water or the liquid is, how hot the

3    sun got, how long the sun was out.  There are a lot of

4    factors.

5         Q.   Taking those factors into account, are those

6    issues that one could track vis-a-vis weather data?

7         A.   Yes.

8         Q.   And do you know whether that would be information

9    that would be recorded in the logs that were related to the

10   ponds in the 1988 time period?

11        A.   No, I don't.

12        Q.   You just don't know one way or another?

13        A.   I don't recall.

14        Q.   Speaking hypothetically, if the sun and the heat

15   in the days that preceded the overflight had warmed the

16   pond and melted any snow or ice on the pond, would that

17   explain a heat signature on the pond compared to the cold

18   night air if it was 7 degrees on the night of the

19   overflight on the December 15 tape?

20             MR. NORDBERG:  Calls for speculation.

21        Q.   (BY MS. AHERN)  Mr. Lipsky, I'm asking you to

22   answer my question based on the knowledge that you have

23   about how solar ponds operate, and the cold temperature on

24   the night of the overflight on December 15, if that would

25   be a reasonable assumption assuming in fact that the sun

224

1  had melted the snow and heated the ponds in the preceding

2  days?

3      A.   I'm just thinking.  I mean, I live here, and I

4  have seen the sun even below freezing melt the snow, and it

5  does.  But what we're talking about is two different

6  concepts here.  You're talking about the heat that would

7  have warmed up the water -- or melted snow, not necessarily

8  warmed up the water -- and technology that is seeking

9  thermal signatures.  So it had to emanate some heat, and I

10  don't know that melting snow is necessarily emanating heat.

11  One is a destructive force, and the other is kinetic, it's

12  giving off energy.

13      Q.   Do you know whether the sun operating upon the

14  pond would warm the pond in such a way that it might give

15  off a different heat signature compared to the cold night

16  air?

17      A.   There would be -- if there was enough of a

18  temperature degree difference there would be a subtle

19  difference between the dark, and there might be like a cast

20  of gray, but I'm not sure.

21      Q.   Do you recall investigating this issue at the

22  time of criminal investigation of the Rocky Flats plant in

23  the days that followed the FBI raid?

24      A.   The only thing I recall is that in regards to

25  this issue, what was fully -- or more fully investigated

225

1    was the transverse between the building and one of the

2    other ponds.

3         Q.   And those were, in fact, transfers that gave rise

4    to a plea count; isn't that right?

5         A.   Pardon me?

6         Q.   Those are, in fact, transfers of salt brine that

7    gave rise to a plea count?

8         A.   Yes.

9         Q.   Do you recall if you ever in the course of the

10   criminal investigation that preceded the FBI raid and that

11   is summarized in the affidavit that was part of the

12   application for search warrant regarding transfers between

13   ponds 207A and B, do you recall whether those allegations

14   were ever substantiated during the remainder of the

15   criminal investigation at the Rocky Flats plant?

16        A.   My recollection would be that they weren't

17   substantiated during the investigation because they weren't

18   charged.

19        Q.   I would like to ask you some questions with

20   regard to the allegations in the affidavit related to the

21   FBI raid regarding discharges to Walnut Creek.  I would

22   like to refer you to search warrant paragraphs 9.17 and

23   9.20.

24             Mr. Lipsky, do you recall what agent or

25   investigator took the lead on this area during the course

226

1    of the criminal investigation of the Rocky Flats plant?

2         A.    Bill Smith would have.

3         Q.    And that was both in the time period preceding

4    the raid and in the time after the raid?

5         A.    After the raid, I don't recall who got it.

6         Q.    This allegation was based on monitoring devices

7    that were placed on Walnut Creek off site at Indiana; is

8    that correct?

9         A.    And elsewhere.

10        Q.    Do you recall where the other monitoring sites

11   were?

12        A.    Woman Creek.

13        Q.    This specific allegation has to do with discharge

14   to Walnut Creek, and I was asking specifically about the

15   Walnut Creek issue.

16        A.    Okay.   I thought you were talking about the

17   effluent monitors, where they were.

18        Q.    I'm specifically asking with regard to any

19   monitors that were related to the allegations about

20   discharges to Walnut Creek.

21        A.    No, there was just the one.

22        Q.    And that one was at Indiana?

23        A.    Yes, ma'am.

24        Q.    Do you recall what the sampling data showed from

25   that off-site monitor that the investigators placed at

227

1   Walnut Creek and Indiana?

2       A.   Do I recall looking at the sampling data?

3       Q.   Do you recall what that sampling data showed?

4       A.   From what's in the next paragraph.

5       Q.   Specifically what is that?  I'm not asking you to

6   read me the paragraph, I'm just asking what you recall of

7   what that data revealed.

8       A.   The data was provided to Suzanne Wuerthele from

9   the EPA.  She's a toxicologist.  And they rendered a report

10  that basically talked about constituents consistent with

11  radiation -- kind of medical radiation testing.

12      Q.   Do you specifically recall what the component

13  constituents or elements were that she identified in Walnut

14  Creek at that location?

15      A.   I think it was characterized as experimental,

16  like reticent.  Seemed like there was some perfume or some

17  other constituents.

18      Q.   Do you recall the amounts of any of those

19  constituents that were identified in the Walnut Creek

20  testing?

21      A.   No.

22      Q.   Do you know whether they were extremely low or

23  trace amounts of any of those constituents?

24      A.   I don't know what you mean by extremely low.

25      Q.   Fair enough.  But it is your testimony that you

228

1    don't know the amounts of any of the components that were

2    at issue with regard to that allegation about discharges

3    into Walnut Creek?

4         A.    I think it's arguable that if it was in the

5    affidavit it wasn't on the NPDES permit.

6         Q.    That wasn't my question.  My question was, did

7    you know the amount one way or another about the

8    constituent elements that were identified as being at issue

9    in this allegation in the FBI raid affidavit about

10   discharges to Walnut Creek?

11        A.    Only if I could review the report or the

12   affidavit.

13        Q.    Only through review of the affidavit?

14        A.    Or the report.

15        Q.    Or Ms. Wuerthele's report?

16        A.    Yes, ma'am.

17        Q.    Do you know what sources, in addition to the

18   plant, contributed to the water flow in Walnut Creek at the

19   point where it was sampled by the remote samplers that were

20   placed by the criminal investigators?

21        A.    How much more time do we have, just so I know?

22        Q.    I would imagine we have somewhere between a half

23   hour and 45 minutes.  I'm not certain on that, that's a

24   rough ballpark.

25        A.    You are asking me what were -- the influent side

229

1    of Walnut Creek would be?

2         Q.   I'm asking what other sources or communities

3    contributed to the flow that was contained in Walnut Creek

4    at the point in time where you sampled, in addition to the

5    plant, if any?

6         A.   My understanding was that Walnut Creek was a

7    tributary from the Clear Creek to the east and to the north

8    there was a -- I'm not sure if it was the Church-McKay

9    Ditch or not, but there was another flow.  And, of course,

10   there is all natural springs flows that are on the

11   property.  Depending on snowmelt, that has to be taken into

12   consideration.

13        Q.   Do you know whether there were residential

14   communities that were upstream of the plant that

15   contributed to the flow of Walnut Creek at the point in

16   time where the samplers are -- the location and space where

17   the samplers were placed during the criminal investigation?

18        A.   Residential to the east?  Far to the east.

19        Q.   There were some?

20        A.   Up the hill, yes.

21        Q.   And do you know whether those communities or the

22   personal sewage treatment or sanitary use of those

23   communities in any way impacted Walnut Creek?

24        A.   Specifically, no, but I knew there was impacts.

25        Q.   Do you know whether the levels of any constituent

230

1    elements that were identified through the monitor off site

2    at Indiana and Walnut Creek that was placed during the

3    criminal investigation, do you know whether the levels of

4    any constituent elements were found through the course of

5    that monitoring suggested any health risk to people living

6    off site based on the contents of the water?

7         A.   Well, in regards to suggestion, I'm not qualified

8    to, and I don't have the expertise, and specifically I'm

9    not going to supplant what Ph.D. Dr. Suzanne Wuerthele, a

10   toxicologist, has said.

11            Secondly, from my perspective as an investigator

12   and some knowledge into the EPA regulations, those

13   constituents were not enumerated on the NPDES permit, they

14   were illegal, and they were off site.

15        Q.   But you can't say whether they posed a health

16   risk based on your own knowledge?

17        A.   That has to be someone in that field to be able

18   to make that determination.

19        Q.   So is it your testimony, Mr. Lipsky, that you are

20   not qualified, based on your educational background and

21   experience, to assess the health risk of any chemicals or

22   constituent elements that may have gotten off site of the

23   Rocky Flats plant in the Walnut Creek water?

24        A.   I'm not comfortable saying I'm not qualified

25   because I'm certainly qualified for myself to make a

231

1   determination of whether I'm going to drink something or

2   not.

3        Q.   You are entirely right.  Your personal comfort

4   level with regard to whether or not you would drink the

5   water is something that you are qualified to assess.  My

6   question for you is whether you considered yourself

7   qualified to objectively assess whether there was any

8   health risk from the constituent elements that were found

9   in the sampling at Walnut Creek during the course of the

10  criminal investigation of the Rocky Flats plant or if that

11  is a topic that would be better left to a toxicologist or

12  an epidemiologist or some person of such a discipline?

13       A.   And that's what I did.  We relied on the

14  toxicologist to make a determination of what she felt was

15  in there.  That's why you don't see my name attributed to

16  that paragraph.

17       Q.   My question was a slightly different one.  My

18  question was having to do with -- I guess my question was

19  two part.  The first part is you were not in a position to

20  make the determination of whether there was a health risk

21  based on the constituent elements in Walnut Creek based on

22  your educational background; is that true?

23       A.   I didn't feel comfortable making those remarks,

24  that's true.

25       Q.   And my next question was, do you know whether any

232

1  determination was made by a toxicologist or epidemiologist

2  that the constituent elements that were found in Walnut

3  Creek as based on the monitoring data that was generated

4  from the remote sampler at Walnut Creek at Indiana during

5  the course of the criminal investigation of Rockwell that

6  took place between the late '80s and early '90s indicated

7  the existence of any health risk from the materials and the

8  amounts that were identified in that water sampling?

9       A.  I'm not even sure that we asked that question.

10      Q.  So you don't know?

11      A.  Well, on the basis of the affidavit, I didn't

12  have to show a health risk.

13      Q.  I'm not asking if you had to, I'm asking whether

14  you know the answer to the question.  Was there a health

15  risk based on the constituent elements and the amounts that

16  were present according to the sampling data?

17      A.  I'm not aware that we even asked that question,

18  that's my answer.

19      Q.  Fair enough.  As of the point in time of the FBI

20  raid in February -- I'm sorry, in June of 1989 -- let me

21  start that again.

22          As of the time of the FBI raid in June of 1989,

23  do you know what communities' drinking water supplies

24  received any water from -- or any water that would be

25  impacted by the Rocky Flats plant?

233

1      A.   Yes.

2      Q.   What communities were they?

3      A.   To the north, Broomfield.  To the south,

4  Westminster, Thornton, and Northglenn.

5      Q.   Do you know whether these communities conducted

6  sampling to assess the compliance of any water with the

7  safe drinking water standards?

8      A.   What type of testing are you asking me about?

9      Q.   I'm asking whether you know if any of these

10  municipalities sampled and tested either at the plant site

11  or in the reservoir about whether or not the water was in

12  compliance with Safe Drinking Water Act standards?

13      A.   I didn't hear the last part.

14      Q.   Let me try again.  Do you know, Mr. Lipsky,

15  whether any of the municipalities that you named,

16  Broomfield, Westminster, Thornton, Northglenn, sampled and

17  tested the water that was coming off of the Rocky Flats

18  plant site to assess whether it complied with Safe Drinking

19  Water Act standards?

20      A.   My understanding of the Safe Drinking Water Act

21  is the onus is placed on the municipality that's going to

22  provide the water for drinking purposes.  And it's also the

23  onus is on that municipality to provide it within certain

24  standards.

25           I'm also aware, not because of the Safe Drinking

234

1    Water Act, but the City of Broomfield not only sampled the

2    water, and I met with people at the City that were aware of

3    high nitrates, but also they monitored the flow.  And we

4    looked at it earlier in March of 1987, it was reported by

5    Rockwell as a discharge.  But I'm also aware that it was

6    actually an unscheduled discharge that would raise the ire

7    of the City of Broomfield.

8            And the employee who I talked to was Dan Mayo,

9    M-a-y-o, and that he had called the plant and complained

10   about the unscheduled discharge coming off the plant.  So

11   they were -- so in addition to sampling, not for safe water

12   drinking, but they were also monitoring the flow.

13           MS. AHERN:  I move to strike as not responsive.

14       Q.   (BY MS. AHERN)  Mr. Lipsky, my question was a

15   little more focused than that.  My question for you was, do

16   you know whether any of the municipalities, including

17   Broomfield, Westminster, Thornton, or Northglenn, were

18   sampling the water that came off the plant site to assess

19   compliance with Safe Drinking Water Act standards?

20       A.   And my earlier answer was yes.

21       Q.   At least Broomfield?

22       A.   No, they all had to.

23       Q.   They all had to.  Do you know whether the

24   Colorado Department of Health was sampling the water that

25   came off the plant site at Indiana during the time period

235

1   of your investigation?

2       A.   No.

3       Q.   You don't know?

4       A.   I don't know.

5       Q.   Do you know whether there were any Safe Drinking

6   Water Act violations with regard to water that would have

7   been discharged from the Rocky Flats plant during the time

8   period of your investigation?

9       A.   That's a confusing question, and I am sorry, but

10  where I'm stuck, ma'am, is the Safe Drinking Water Act

11  applies to the municipality, it has nothing to do with the

12  plant.   And there is a space in between the plant and the

13  point where the water is produced to the residents.

14      Q.   My question for you, though, is do you know

15  whether there were any violations of the state Safe

16  Drinking Water Act recorded by any of the municipalities

17  who were receiving water impacted by the Rocky Flats plant

18  during the time period of your investigation?

19      A.   That's a very tough question to answer because

20  anything that happened from the plant to the point where

21  it, for instance, got to Great Western Reservoir is

22  separate and distinct from Broomfield reporting that they

23  had violated the Safe Drinking Water Act.

24          Now I'm aware that the City of Broomfield paid

25  like a $6 million upgrade in the mid-'80s to combat the

236

1    nitrate problem that Rocky Flats was contributing to the

2    Great Western Reservoir, and they told me it was in regards

3    to a blue baby syndrome.  Pregnant women drinking this

4    water with the nitrates, the way it was explained to me,

5    endangered the newborn.  And I was told that they paid the

6    $6 million to upgrade their equipment.  Whether it was a

7    violation or not, I don't know.

8        Q.   Who told you that?  What was the source of that

9    information?

10       A.   The manager of the drinking water supply in the

11   City of Broomfield.

12       Q.   Did you see any independent verification of

13   increased nitrates in the water coming off the plant site

14   as tested by the City of Broomfield?

15       A.   Just internal Rockwell information that testing

16   indicated that nitrate levels were high, particularly at

17   pond B3, and possibly the runoff.

18       Q.   Do you know whether the nitrate levels were -- do

19   you know -- let me try this again.

20            Did you personally see any data or information

21   indicating whether discharges of water at the plant

22   boundary contained increased nitrate levels during the

23   period of time of your investigation?

24       A.   Taking it through the numbers when we were

25   looking at this paragraph 9.17, I'm not sure that nitrates

237

1   was a constituent that was found in that particular sample,

2   but that was one of the very few samples that had been

3   tested.

4            My understanding of the NPDES permit was that

5   Rockwell was supposed to sample before they spray irrigated

6   or discharged, and I'm not sure that we found hardly any,

7   if any, sample reports.

8        Q.   That wasn't my question.  My question was whether

9   you knew whether there were increased nitrates in any

10  sampling that was done at the plant boundaries of water

11  coming off the plant site during the period of time of your

12  investigation?

13       A.   And what I said was that I recall seeing Rockwell

14  reports indicating that there was a nitrate problem from

15  pond B3 and spray irrigation that would have gone off site

16  in Walnut Creek, but I don't know what the quantity was.

17       Q.   Did you see sampling data that indicated that?

18       A.   Again?

19       Q.   Did you see sampling data that indicated that

20  there were elevated nitrate levels?

21       A.   No.  These are narrative reports.

22       Q.   So you never -- you do not recall ever having

23  seen or reviewed sampling data from the plant boundary

24  indicating elevated nitrate levels coming off the plant

25  site?

238

1          A.   And that's what I was also explaining was that

2    even though Rockwell was to have tested before the

3    discharge, we didn't find many instances where they did.

4    And I don't really remember seeing much, if any, data about

5    that.

6          Q.   So the answer to my question is, no, you don't

7    recall seeing sampling data indicating elevated nitrates --

8          A.   I don't remember seeing --

9          Q.   -- in the water being discharged at the plant

10   boundary?

11         A.   I don't remember seeing hardly any data

12   whatsoever.

13         Q.   I'm going to try it one more time.  I understand

14   that your comment is you recall there not being a quantity

15   of sampling data that you saw or reviewed in the course of

16   your investigation of the Rocky Flats plant.

17              My question to you is a yes-or-no question.  Do

18   you recall seeing sampling data that indicated elevated

19   levels of nitrate in the water that was discharged at the

20   plant boundary during any point in the course of your

21   criminal investigation of the Rocky Flats plant?

22         A.   I don't recall.

23         Q.   With regard to groundwater monitoring,

24   Mr. Lipsky, do you recall whether in the course of the

25   criminal investigation of Rockwell and other issues related

239

1    to the Rocky Flats plant, whether you looked at monitoring

2    data from the perimeter wells -- monitoring data related to

3    groundwater in the perimeter wells?

4        A.    I remember seeing reports attempting to obtain

5    data regarding the groundwater monitoring wells.

6        Q.    Do you recall seeing actual reports of that data?

7        A.    I recall there weren't any.

8        Q.    That's your recollection?

9        A.    Right now.

10       Q.    Do you recall seeing monitoring data of

11   groundwater from any off-site wells?

12       A.    I'm focused on the ones that were at the plant

13   that were of concern for the RCRA permit that were

14   characterized in the EPA and CDH documents.

15       Q.    I'm asking you about the actual analysis of the

16   groundwater in any off-site groundwater monitoring levels.

17   Do you recall reviewing that data in the course of the

18   criminal investigation of the Rocky Flats plant?

19       A.    It was an issue that was looked at or delegated

20   by another agent, and the issue itself didn't have much of

21   a life.

22       Q.    And why do you say that?

23            MR. NORDBERG:  Can we take a one-minute break?

24            (Recess taken from 4:49 p.m. to 4:52 p.m.)

25       Q.    (BY MS. AHERN)  Before we took our break,

240

1   Mr. Lipsky, we were talking about groundwater issues in the

2   criminal investigation as related to groundwater issues,

3   and you had commented that the investigation into

4   groundwater matters was delegated to another agent.  Where

5   did that -- how was that issue delegated?

6        A.   After the search and after getting some logistics

7   put into place, Mr. Fimberg and Mr. Murtha wanted to

8   identify what viable issues could be investigated and what

9   personnel would be available to do that investigation.  And

10  it was essentially a caucus of assignment, and there

11  were -- in the beginning there were quite a number, and

12  they were apportioned out.

13       Q.   Do you recall to whom the groundwater issue was

14  delegated to?  What agent?

15       A.   At this time, no, without refreshing my memory.

16       Q.   There was no plea count with regard to RCRA

17  groundwater or groundwater certification issues, was there?

18       A.   No.

19       Q.   Do you know whether the groundwater on the Rocky

20  Flats plant site is hydraulically connected with any

21  aquifer that might be used for off-site domestic water

22  supplies?

23       A.   I believe it is.

24       Q.   You believe it is.  And what is the basis of that

25  belief?

241

1        A.    U.S. Geological Survey information.

2        Q.    Did you personally ever review the Geological

3    Survey information?

4        A.    Yes.  But I'm not a geologist either.

5        Q.    Are you familiar with communications between the

6    EPA, the CDH, and plant representatives with regard to the

7    siting and construction of groundwater monitoring wells in

8    the late '80s?

9        A.    I believe there is some discussion of that in the

10   affidavit.  It doesn't, but I believe I've seen some

11   documentation regarding that.

12       Q.    Mr. Lipsky, can you confirm whether in the course

13   of 1986, 1987, and 1988, at the direction of the Colorado

14   Department of Health and the EPA, that the DOE and Rockwell

15   drilled additional groundwater monitoring wells throughout

16   the plant site?

17       A.    I'm not sure if I can recall right now.

18       Q.    Do you have any personal knowledge or information

19   regarding the amount and frequency of communications

20   between the CDH and the EPA and Rocky Flats plant

21   representatives, be they DOE or Rockwell, in the '86 to '88

22   time period with regard to the siting and construction of

23   groundwater monitoring wells?

24           Do you know whether state and federal officials

25   were advised of groundwater monitoring test results from

242

1    the Rocky Flats plant site in the time period of 1986

2    through '89?

3        A.   There is some in the affidavit.

4        Q.   Beyond what's in the affidavit, do you know

5    whether there were additional reports of groundwater

6    monitoring test results?

7        A.   If the -- I was relying on the EPA's system of

8    record -- central system of record in conformance with

9    Title V.  And if those documents were in that central

10   system of record, they would have been in this affidavit.

11   So I can't discount the fact that there were other

12   conversations or communications going between officials

13   that didn't make it to the official file.

14       Q.   And you've already testified, Mr. Lipsky, that

15   you were unfamiliar with the monthly monitoring exchange

16   meetings that were taking place between the CDH, the EPA,

17   and plant representatives as of the late '80s?

18       A.   Yes, I did.

19       Q.   Do you know whether by early 1987 the EPA had

20   formulated a conclusion with regard to the sufficiency of

21   groundwater monitoring systems at Rocky Flats in terms of

22   its compliance with any interim status groundwater

23   monitoring requirements?

24       A.   I got lost in that one, sorry.

25       Q.   Do you know one way or another whether the EPA

243

1    had taken a position as of early 1987 about the sufficiency

2    of Rocky Flats' groundwater monitoring systems with regard

3    to substantial compliance with EPA's interim status

4    groundwater monitoring requirements?

5         A.    Not any more than what's in the affidavit.   That

6    was -- there were problems in late 1987.

7         Q.    Beyond that which is contained in the affidavit

8    that was put together and submitted in support of the

9    application for search warrant, do you have any additional

10   knowledge of communications between regulators and the

11   Rocky Flats plant with regard to groundwater monitoring

12   well issues?

13        A.    Not without being able to refresh my memory with

14   the reports and records that we obtained from the plant.

15        Q.    Do you have possession of any of those reports

16   and records?

17        A.    As I stated earlier, no.

18        Q.    Have you reviewed any of the groundwater-related

19   regulatory reports from the late '80s in any time since the

20   conclusion of the criminal investigation?

21        A.    If you were to say from the time that I -- even

22   say from the time I left Denver in April of '93, no.   But

23   between the time of the conclusion of the investigation,

24   which was really arguably March of '92, we still had the

25   congressional inquiry, so I may have -- I don't want to

244

1    discount that I may have looked up something in response to

2    a congressional question about groundwater, but I don't

3    remember.

4         Q.   Did you ever personally assess off-site migration

5    of groundwater-related contamination from the Rocky Flats

6    plant?

7         A.   Can you ask that again.

8         Q.   Did you ever personally assess whether there was

9    off-site migration from contamination of groundwater at the

10   Rocky Flats plant?

11        A.   No.

12        Q.   Is it fair to say, Mr. Lipsky, that off-site

13   health risks from the Rocky Flats plant was not a primary

14   focus of the FBI's and EPA's criminal investigation into

15   the Rocky Flats plant?

16        A.   That off-site contamination from any source?

17        Q.   I said off-site health risk.

18        A.   Off-site health risks?

19        Q.   Was not a primary focus of the criminal

20   investigation of the FBI and EPA into the Rocky Flats plant

21   in the late '80s and early '90s?

22        A.   I wouldn't even give it that much priority.  It

23   wasn't part of our investigation.

24        Q.   Was it part of your investigation at all?

25        A.   No.  In fact, in the sentencing memoranda it

245

1    talks about on-site health risks, that there were no laws,

2    which isn't true.  That statement isn't true because under

3    Title 18, Section 7 and 13, the United States government

4    can adopt a state statute on a federal property, but the

5    problem was that the State of Colorado at the time only had

6    a $25 misdemeanor health and safety violation, and Ken

7    Fimberg and I talked about that.  So that was . . .

8         Q.   So is it fair to say, Mr. Lipsky, that the

9    criminal investigation into the Rocky Flats plant site

10   reached no conclusions with regard to the existence of

11   off-site health risks from any of the conduct that was the

12   subject of the investigation?

13        A.   I would say that --

14        Q.   Perhaps I can direct your attention to page 124

15   and 125 in the sentencing memo.  You appear to be looking

16   through the sentencing memo.

17        A.   How I was going to answer is that I really can't

18   answer your question the way that it's been formed.  That

19   there is a statement on page 124 under the heading of H,

20   Lack of Substantial Off-Site Impacts.  There is a statement

21   in here that starts with the paragraph, "Based on the

22   evidence gathered in this investigation, and to the best of

23   the Justice Department's present knowledge and information,

24   the conduct which Rockwell has pled guilty to not result in

25   substantial physiological harm, or the imminent threat of

246

1    substantial physiological harm, to members of the public

2    residing and working outside Rocky Flats' boundaries."

3              There is no basis for that statement to be made,

4    but the reason why it was made is because it was a

5    negotiated statement between Rockwell and the government.

6         Q.    That wasn't my question.  My question was whether

7    you personally knew of and whether it was fair to say

8    that -- let me break it down into two parts, Mr. Lipsky.

9    Did you personally know of the existence of off-site health

10   risks that resulted from the conduct that was the subject

11   of criminal investigation of Rockwell and the FBI raid?

12        A.    No.

13        Q.    You are aware of no such health risk?

14        A.    I didn't say that.  I'm not aware that there were

15   any health risks, right.

16        Q.    So it's your statement that you were not aware of

17   any health risks from that conduct?

18        A.    Right.  But I wasn't looking for them either.

19        Q.    The Plaintiff's Sentencing Memo also states on

20   page 124, the sentence goes on to page 125, that, "The RCRA

21   violations," and I suppose that they are speaking of the

22   RCRA violations that were involved in the plea, "involved

23   on-site treatment and storage of hazardous mixed wastes,

24   and the environmental impacts appear to have been

25   substantially limited to inside the plant's boundaries."

247

1          Would you agree with that statement, Mr. Lipsky?

2     A.   No.  I'm not sure I agree with the footnote

3     either.

4     Q.   Why would you disagree with that statement?

5     A.   Because the reader is being led to believe that

6     the RCRA violations involved in the on-site treatment and

7     storage of hazardous mixed waste from this investigation

8     and their environmental impacts, and it's saying,

9     ". . . appear to have been substantially limited to inside

10    the plant's boundaries."  The investigation was not allowed

11    to proceed to see how far the impact was.

12    Q.   Are you aware of any off-site health risk from

13    any of the conduct that is the subject of Rockwell's plea

14    based on in your investigation?

15         MR. NORDBERG:  Vague.

16    A.   What I'm thinking is that there are several

17    counts that Rockwell pled guilty to that involved at least

18    a threat of off-site impact.  And with regards to the 750

19    and the 904 pads that were leakers, as well as the 207C

20    pond that was a known leaker, the discharges from the

21    sewage treatment plant that was never regulated as an

22    industrial sewage plant, it was regulated as a sanitary

23    plant, and the investigation did not pursue any off-site

24    impact regarding the leaks from those places and the

25    discharges from the water portions off site.  And so I

248

1   can't say what I guess the impact was.  We didn't look into

2   it.

3       Q.   I understand that the investigation did not look

4   into that issue.  My question for you was a little bit

5   different.  My question for you was, Mr. Lipsky, do you

6   know of any off-site health risk that -- was the conclusion

7   of the investigation that there existed any off-site health

8   risk as a result of any of the conduct to which Rockwell

9   pled guilty?

10           MR. NORDBERG:  Objection.  Which question does

11   Mr. Lipsky know or did the investigation include, because I

12   think you have both of them in there?

13       Q.   (BY MS. AHERN)  Why don't you answer both

14   questions.

15           MR. NORDBERG:  Which question are we going to do

16   first, so I know whether to object to it?

17       Q.   (BY MS. AHERN)  I'll ask whether Mr. Lipsky knew

18   of the existence of any actual off-site health risk as a

19   result of any of the conduct to which Rockwell pled guilty?

20           MR. NORDBERG:  Foundation, vague.

21       A.   If I was aware of any off-site health risk?  You

22   mean threat?

23       Q.   (BY MS. AHERN)  No.  I mean any actual existing

24   health risk off site.

25       A.   I wasn't authorized to do that kind of

249

1    investigation, so I wouldn't have known.

2         Q.   Did the conclusion of the investigation identify

3    any off-site health risk as a result of any of the conduct

4    to which Rockwell pled guilty?

5         A.   We weren't authorized to look into that aspect of

6    it.

7         Q.   You did not look into it?

8         A.   No.

9         Q.   I'm going to move on to a different subject

10   matter area.

11        MR. NORDBERG:   I think we are moving into this

12   new subject matter into the eighth hour.

13        MS. AHERN:   We're going to conclude very shortly.

14   I think we have probably taken at least four ten-minute

15   breaks, so I have a bit longer, but not a lot longer.

16        MR. NORDBERG:   I'm not going to fight you.

17        MS. AHERN:   I'll try to wrap it up.

18        Q.   (BY MS. AHERN)   Mr. Lipsky, at various points in

19   the course of your testimony today you have referenced

20   investigation into an issue of potentially elevated

21   strontium-90 levels in soils around the plant site.   Can

22   you explain to me how this issue of potentially elevated

23   strontium-90 levels came to your attention?

24        A.   I believe it was in the summer, June, of 1990.

25   It was over in the 130 area, the trailers, the

250

1   environmental.  It was an EG&G person.  It was a white

2   male, I don't remember his name.  I was walking through the

3   offices, and he asked me to come over, he wanted to show me

4   something in some binders, and showed me some color

5   pictures of aerial overflights that he represented were

6   from the multispectral scanning that Mr. Goldberg had

7   ordered up in August of 1989.

8           At the same time, this was a time when I don't

9   think he felt very comfortable talking to me, and so it was

10  in a hurry, and he pointed out that the raw data, mind you,

11  raw, indicated the elevated strontium and that it was not

12  only on site but to the east off site.  It was above

13  background level.

14      Q.   Was this unidentified white male's representation

15  to you that the strontium levels in the soil were above

16  background levels?

17      A.   Yes.

18      Q.   Did you independently confirm that that was the

19  case?

20      A.   There was no way that I could.  I could never

21  pursue it much further after talking to Mr. Murtha.

22  Immediately went to him to tell him what I had been told,

23  and he -- his opinion was that there was no reason to spend

24  any time on it.  So I didn't pursue it.

25      Q.   Did you ever see any of the actual documents that

251

1   were referenced by the individual who approached you in the

2   130 area?

3         A.    Did I see ever again the reference document?

4         Q.    Did you ever see the reference documents?

5         A.    I saw what he was showing me in the binder, the

6   raw data.

7         Q.    After that occasion when that individual, whose

8   name you don't recall, approached you and showed you

9   certain documents, did you ever see any documents

10  supporting any issue related to elevated strontium levels

11  in the soil on or around the Rocky Flats plant thereafter?

12        A.    No, I didn't.  I didn't meet with him again that

13  I know of.

14        Q.    Do you know what the soil testing on the plant

15  site or in the area off site the plant shows with regard to

16  strontium-90 levels?

17        A.    I didn't really pursue it.

18        Q.    So you don't know one way or another what that

19  actual soil testing shows?

20        A.    The only thing I remember recently was probably

21  like about January of this year DOE was asked about the

22  strontium and cesium levels, and they acknowledged -- DOE

23  acknowledged that, yes, there were elevated levels about

24  that time frame, but over the past few years it dissipated.

25        Q.    Do you have any -- can you identify any concrete

252

1    occasion when the DOE indicated that there were elevated

2    strontium and cesium levels on the plant site?

3         A.   What do you mean by concrete?

4         Q.   I'm trying to pin down the specifics with regard

5    to the representation that you're recounting from the DOE

6    about potentially elevated strontium or cesium levels.  I

7    want to know the exact details of the circumstances when

8    you believe that statement was made?

9         A.   I just did.

10        Q.   When was that statement made?

11        A.   I believe in June of 1990.

12        Q.   June of 1990?

13        A.   Yes.

14        Q.   Do you know who made that statement?

15        A.   No, I don't recall his name.

16        Q.   Was it a representative of the Department of

17   Energy?

18        A.   No.

19        Q.   Who was it?

20        A.   EG&G.

21        Q.   No.  No.  No.  My question was your more recent

22   statement.

23        A.   Oh, the more recent statement.  It was in the, I

24   believe, the local newspaper.

25        Q.   So it's not an account that anyone at the

253

1    Department of Energy made to you personally?

2         A.    Oh, no, it was a public statement in the paper.

3         Q.    It was a statement reported in the newspaper

4    articles?

5         A.    Yes.

6         Q.    Do you know the basis for that statement?

7         A.    Yes.

8         Q.    And what is the basis for that statement?

9         A.    My press conference here in January of 2005.

10        Q.    Do you know the basis for the data that the DOE

11   was referencing in any statement it may have made to the

12   newspaper?

13        A.    No.

14        Q.    You never looked at any actual sampling data from

15   soils with regard to actual strontium or cesium levels on

16   the plant site or the area surrounding the plant?

17        A.    I --

18        Q.    Any more recent cleanup period on or around the

19   time period of your press conference in January of 2005?

20        A.    Go ahead.

21        Q.    What I'm trying to explore, Mr. Lipsky, is the

22   representation that you commented on about the DOE's

23   acknowledging the existence of elevated strontium or cesium

24   levels in soils.  Was that a statement that was in the

25   newspaper?

254

1        A.   As I recall, it was.

2        Q.   And you had no direct communication with the DOE

3    with regard to that statement?

4        A.   No.

5        Q.   Do you know or have you reviewed any of the

6    underlying data that provided the basis for any statement

7    the DOE may have made?

8        A.   No.  Well, let me qualify that.  I believe that

9    the raw data from -- that I saw in June of 1990 may have

10   been a contributing factor to that statement, but I don't

11   know that that nexus had occurred.

12       Q.   Do you know whether any of the studies that were

13   conducted in conjunction with risks at the Rocky Flats

14   plant or emanating from the Rocky Flats plant explored the

15   issue of elevated strontium-90 or cesium-137 levels in

16   soils?

17       A.   I got lost again.

18       Q.   Do you know whether any of the studies -- the

19   risk assessment studies that were conducted with regard to

20   the Rocky Flats plant looked at issues of elevated

21   strontium-90 or cesium-137 in soils on or around the plant

22   site?

23       A.   Am I aware of any study?

24       Q.   Any risk assessment study.

25       A.   I've been in contact -- I've been contacted,

255

1   unsolicited, by a woman who I would have to -- who I

2   probably will have to give you the documentation I got from

3   her so I can identify her compliant with the subpoena.   It

4   was just in the past few weeks.   Kathy Roberts, I believe,

5   was her name, and she works for Strategic Technology

6   something, Washington.

7           And she contacted me because she is doing some

8   NIOSH, and through the Center for Disease Control, studies

9   on what she was told was through interviews with

10  Rockwell -- former Rockwell employees who were having great

11  difficulty proving that they ever worked out at the plant.

12  I don't know if you are aware of this.

13          In any event, they have been interviewed, and

14  what I have been told by Kathy is that they are trying to

15  develop a radiation model for the plant, which they are

16  having great difficulty doing.   But specifically I was

17  contacted because workers that worked out in the buffer

18  zone said that they were spray irrigating

19  radiation-contaminated effluent, and so they were -- they

20  made those statements to her during the interviews.

21          So now she's trying to backtrack and see if they

22  can build some kind of model to show what the effluent

23  contained, and then satisfy the NIOSH requirements.   And

24  there's a term of art for it, and I forget it.   Anyway, so

25  I'm aware of that.

256

1       Q.    You're aware of the claims made by this woman who

2   approached you?

3       A.    Yes.

4       Q.    With regard to waters that may have been spray

5   irrigated at the plant site, is it your understanding that

6   that was treated water from the sewage treatment plant?

7       A.    Well, I wouldn't characterize my answer in that

8   fashion.

9       Q.    Do you have any evidence that any water that was

10  spray irrigated on the Rocky Flats plant site was anything

11  other than treated sewage treatment plant effluent?

12      A.    It's a real vague question.

13      Q.    Mr. Lipsky, do you have any personal knowledge of

14  the content of the spray irrigation water that was sprayed

15  at the plant site during any period of your criminal

16  investigation of the Rocky Flats plant?

17      A.    Did I sample any of the spray irrigated water?

18  No.

19      Q.    Did you review sampling results in the spray

20  irrigated water?

21      A.    Actually, I'm not sure that we found any.

22      Q.    Do you have any evidence that -- other than the

23  lack of documentation that you may have been able to

24  discern, that water that was spray irrigated was not

25  treated before it was spray irrigated?

257

1      A.    In the Plaintiff's Sentencing Memo there is a

2  litany of evidence that in particular during the winter

3  months the sewage treatment plant which, by the way, was

4  only permitted for sanitary waste but was treating

5  industrial waste, in particular had a nitrate problem, and

6  it was quite elevated.

7            Had they discharged there, the comments by the

8  Rockwell employees in that sentencing memorandum is that

9  they would have violated the NPDES permit, so the strategy

10 was to not discharge but to spray irrigate even in the cold

11 of winter with snow on the ground and ice on the ground.

12     Q.    Do you have any personal knowledge of the Rocky

13 Flats plant ever spray irrigating any water that was not

14 treated sanitary waste -- treated sanitary water?

15     A.    Say that again.

16     Q.    I'm trying to figure out if you have any personal

17 knowledge about whether any of the water that was spray

18 irrigated at the Rocky Flats plant was anything other than

19 water -- treated water from the sewage treatment plant?

20     A.    I think you're asking a couple different

21 questions.  The first question I think you're asking is did

22 the water that gets spray irrigated only come from the

23 sewage treatment plant?  And the answer is no.

24            The second question I think that you are asking

25 is, am I aware of any waste streams other than sanitary

258

1   waste that went to the sewage treatment plant for

2   treatment?  And the answer is yes.

3        Q.   I don't think either of those are my question.

4        A.   Then I'm confused.

5        Q.   Having put them out there, what evidence do you

6   have in your personal knowledge that water that was spray

7   irrigated at the Rocky Flats plant came from anywhere other

8   than the sewage treatment plant or the ponds that were fed

9   by the sewage treatment plant treated water?

10       A.   Well, the sewage treatment plant discharge flowed

11  into pond B3 of South Walnut Creek.  There was a

12  stand-alone pump that fed the effluent to the spray

13  irrigators.  It was known that the spray irrigation systems

14  caused runoff, and on some occasions the runoff went back

15  into the South Walnut Creek and the B series ponds.

16  Usually downstream would be 3, but I believe it could have

17  gone back into B3 itself.

18       Q.   Do you have evidence of any water that was used

19  for spray irrigation that came from any source other than

20  pond B3?

21       A.   I believe during the course of our investigation

22  that pond B3 was the primary source of the spray

23  irrigation.

24       Q.   Do you know of any other source, not just that it

25  was the primary source, but do you know of evidence of any

259

1    other source of the water for spray irrigation other than

2    pond B3?

3         A.   No.

4         Q.   Now I understand there is a plea count that

5    discusses some quantities of waste streams that found their

6    way to the sewage treatment plant other than sanitary

7    waste.  Other than the information that's contained in that

8    plea count, are you aware of any other sources --

9         A.   Yes.

10        Q.   -- of water that found its way to the sewage

11   treatment plant other than sanitary waste?

12        A.   Yes.

13        Q.   And what evidence do you personally know of of

14   materials reaching the sewage treatment plant other than

15   sanitary waste beyond that which is discussed in the plea

16   count?

17        A.   It's based on the waste stream identification and

18   characterization report document that Rockwell

19   submittedded.

20        Q.   Anything other than that document?

21        A.   Not that I can recall.

22        Q.   Do you know what happened to -- do you have any

23   personal knowledge of what happened to any quantity of

24   other waste streams that may have found their way to the

25   sewage treatment plant in the course of the treatment that

260

1   happened at the sewage treatment plant?

2           MR. NORDBERG:  Form.

3       A.   There was a chromic acid spill in the spring of

4   1989 just right before the raid.

5       Q.   (BY MS. AHERN)  Other than the chromic acid

6   spill, do you know of any other occasion where materials

7   found their way to the sewage treatment plant and were not

8   resolved through treatment of the sewage treatment plant?

9       A.   That were not resolved?

10      Q.   Where the wastes were not removed through the

11  processes at the sewage treatment plant?

12      A.   Just anecdotal log entries and documentation from

13  the workers smelling formaldehyde and other things.

14      Q.   So it's only anecdotal information that you are

15  aware of, other than the actual conduct that's discussed in

16  the chromic acid spill plea count, in terms of other

17  industrial materials finding their way to the sewage

18  treatment plant and not being resolved through the sewage

19  treatment processes there --

20          MR. NORDBERG:  Form.

21      Q.   (BY MS. AHERN)  -- is that right?

22      A.   Not only anecdotal, it was documented anecdotal

23  by Rockwell.  And as best as I can recall right now, that's

24  the list.

25      Q.   That would be log entries, the documentation that

261

1    you are referencing?

2        A.   I'm not permitted to talk about certain things

3    regarding Title 28 Code of Federal Regulations, in

4    particular classified documentation.

5        Q.   Would these be classified documents?

6        A.   Since I'm not permitted to answer that question,

7    if I was allowed to answer that question, I could.

8             MR. NORDBERG:  I'm also going to object to any

9    further questioning after five minutes from right now since

10   by my calculation we're past seven hours in this

11   deposition.

12       Q.   (BY MS. AHERN)  We were talking a little bit

13   about issues related to potential levels of strontium-90 in

14   the soil surrounding the Rocky Flats plant.  Do you have

15   any opinion or evidence regarding -- strike that.  Let me

16   try again.

17            Mr. Lipsky, with regard to the investigation into

18   elevated strontium-90 levels in soils on or around the

19   Rocky Flats plant site, do you have any evidence of what

20   may have caused any increase in strontium-90 levels in the

21   soils on or around the Rocky Flats plant?

22       A.   Absent my research, no.

23       Q.   And by your research, what do you mean?

24       A.   My research, because I really didn't know what

25   the -- what strontium-90 and cesium-137 really meant, and

262

1  being mentioned together, so in my research I consulted a

2  chemical dictionary.

3       Q.   Is it your understanding, Mr. Lipsky, that

4  strontium-90 and cesium-137 are fission products?

5       A.   Yes.

6       Q.   Do you have any evidence of criticality ever

7  occurring on the Rocky Flats plant site?

8       A.   That's the strontium-90 and cesium-137 is indicia

9  of criticality, as well as the large amount of tritium that

10  was documented at Rocky Flats.

11       Q.   Do you have any personal knowledge if criticality

12  ever occurred in the Rocky Flats plant site?

13       A.   No, ma'am.

14       Q.   Do you know whether it would have been possible

15  to cover up a criticality accident at the Rocky Flats plant

16  site?

17       A.   Of course.

18       Q.   And why do you say that?  How would one cover up

19  a criticality accident at a Rocky Flats plant?

20       A.   I would think that there is a multitude of ways

21  of doing that.  No different than, say, the Santa Sussana

22  operations out in California or the --

23            MS. AHERN:  Object and move strike any

24  reference to Santa Sussana.

25            MR. NORDBERG:  I object to most of the content of

263

1    this deposition, most of which has concerned matters not

2    admissible under the court's pretrial rulings.

3        Q.   (BY MS. AHERN)   Mr. Lipsky, other than the

4    documents that you saw in June of 1990 that suggested

5    elevated strontium-90 levels, do you have any other

6    evidence that you have ever seen in the course of the

7    criminal investigation of the Rocky Flats plant that

8    suggested a criticality accident occurred on the plant

9    site?

10       A.   No.

11       Q.   Do you know where the materials that you saw in

12   June of 1990 with regard to potentially elevated

13   strontium-90 levels are today?

14       A.   No.

15       Q.   Do you know whether the Rack or the Camerest

16   studies investigated strontium-90 and cesium-137 levels in

17   soils on or off the plant site?

18       A.   No.

19       Q.   Do you know how one would go about attempting to

20   cover up a criticality accident on the Rocky Flats plant

21   site?

22       A.   Well, I'm -- my method of operation is not to

23   cover up things, so I would have to think about it a little

24   bit.  But it's a pretty big facility.  Depending how big

25   the pile is.

264

1     Q.   What is your understanding of what a criticality

2  accident is?

3     A.   It's the result of fission material spontaneously

4  combusting at any degree.  And I had a brother-in-law who

5  worked at the Lawrence Livermore lab that worked with

6  materials that he really wasn't allowed to explain to me,

7  but from describing an incident that he had, he had a

8  spontaneous combustion that he was later told good thing he

9  moved out of the way because the gas would have probably

10  killed him.  So there is different levels.  And I don't

11  mean to characterize everything as the Chernobyl level or

12  Three Mile Island, for that fact, in this country.

13     Q.   Have you ever seen any report in connection with

14  the criminal investigation of the Rocky Flats plant that

15  indicated that a criticality accident had occurred on the

16  Rocky Flats plant site?

17     A.   Not in those terms, no.

18     Q.   Have you ever --

19     A.   I don't think that was apparent to me.

20     Q.   Have you ever seen reports that had stated that

21  no criticality -- there is no evidence that any criticality

22  has ever occurred on the Rocky Flats plant site?

23     A.   Maybe I'm not understanding your question.

24     Q.   I'm asking whether you have seen reports that

25  have said just the opposite; in other words, that no

265

1    criticality did occur in the Rocky Flats plant or there is

2    no evidence that criticality occurred at the Rocky Flats

3    plant.  Have you seen any such reports?

4        A.   The memory is fuzzy because even though our

5    criminal -- it's been awhile.  Secondly, our criminal

6    investigation resulted in a time frame of like, you know,

7    April of '87 through March of '92, a very limited scope.  I

8    also remember reviewing documentation going back to the '69

9    fire that way preceded Rockwell, and I think the '57 fire,

10    and there was a lot of conjecture that I read.  So I'm not

11    sure if it did or didn't.

12        Q.   Do you have any --

13        MR. NORDBERG:  Plaintiffs object to any further

14    questioning in this deposition.

15        MS. AHERN:  I'll just wrap it up.

16        Q.   (BY MS. AHERN)  Mr. Lipsky, do you know whether

17    criticality occurred during the course of the '57 fire or

18    the '69 fire?

19        A.   Do I know for certain?  No.

20        Q.   Are you familiar with the Scientech report of

21    1989?

22        A.   No.

23        Q.   Do you know what levels of either strontium-90 or

24    cesium-137 would be consistent with worldwide fallout from

25    nuclear testing?

266

1      A.   Do I know what those -- that value is?

2      Q.   Yes.

3      A.   For background level?  No.  I would have to look

4   it up.

5           MR. NORDBERG:  Plaintiff's again object to any

6   additional questioning of this witness at this point.

7   We're asking him for worldwide fallout levels of strontium

8   and cesium, and he's an FBI agent.

9      Q.   (BY MS. AHERN)  Mr. Lipsky, did you have any

10   direct participation in the cleanup process with regard to

11   the Rocky Flats plant site?

12      A.   Other than help shutting it down and making

13   production go somewhere else and causing eventual cleanup

14   of it, no.

15      Q.   My question was with regard to the remediation

16   efforts that have taken place in the Rocky Flats plant site

17   in recent years.  Were you directly involved in any of the

18   standards setting with regard to that cleanup action

19   levels?

20      A.   No.

21      Q.   Have you had any direct involvement with any of

22   the entities who have been conducting the cleanup at the

23   Rocky Flats plant?

24      A.   I collaborated with Jacque, J-a-c-q-u-e, Breber,

25   B-r-e-b-e-r, who wrote a paper that I believe was sent to

1    the Department of Energy questioning the methodology and

2    the places that were chosen and not chosen for sampling.

3        Q.   Have you reviewed any of the cleanup documents to

4    be able to determine with any specificity whether the

5    actual cleanup of the plant site addressed any of the

6    issues that were released in your January 2005 paper that

7    you submitted together with Jacque Breber?

8        A.   Jacque gave me some abstracts, and I forget the

9    names of them, and I reviewed them as well as just to

10   capture her thought process on it.

11       Q.   What was the basis for the January 2005 paper

12   that you coauthored together with Ms. Breber and

13   Mr. McKinley about the Rocky Flats plant cleanup?

14           MR. NORDBERG:   Plaintiffs object to any further

15   questioning of this witness, even assuming -- plaintiffs

16   again object to the continuation of this deposition past

17   the seven hours authorized, absent traditional approval by

18   the Federal Rules of Civil Procedure, even granting the

19   proposition, which I dispute, that there have been four

20   ten-minute breaks.

21           This deposition convened early, a truncated

22   lunch.  We are -- it is 5:45 p.m. on a Sunday afternoon.

23   We've 2685 assurances about an hour ago that the deposition

24   was going to continue for another half hour to 45 minutes.

25   It shows no sign of terminating or ending.

268

1          There is obviously an infinity of questions that

2     could be asked of Mr. Lipsky.  At the moment, despite the

3     announcement of intention to wrap up, this deposition shows

4     every indication of proceeding in that direction.  It has

5     not wrapped up, or moved toward wrapping up, and plaintiffs

6     object to any further questioning.

7          Q.   (BY MS. AHERN)  Mr. Lipsky, can you answer the

8     question that I posed?

9          MR. NORDBERG:  You can go ahead and answer.

10         A.   I'm trying to remember what the question was.

11         MS. AHERN:  Can you read the question back.

12         (The last question was read back as follows:

13    "What was the basis for the January 2005 paper that you

14    coauthored together with Ms. Breber and Mr. McKinley about

15    the Rocky Flats plant cleanup?")

16         MR. NORDBERG:  Form.

17         A.   First off, I didn't coauthor that paper with her.

18    I didn't help write it.

19         Q.   (BY MS. AHERN)  Okay.  You're identified as an

20    author on the face of the paper, that's why I asked.

21         A.   I'm just clarifying that.

22         Q.   Who did author that paper?

23         A.   Jacque did the research and worked with Caron

24    C-a-r-o-n, Balkany.

25         Q.   You did not write any portion of that paper; is

269

1    that your testimony, Mr. Lipsky?

2         A.    That's correct.

3              MS. AHERN:   I don't have any further questions at

4    this time.

5              MR. NORDBERG:   We have no questions.

6              WHEREUPON, the within proceedings were concluded

7    at the approximate hour of 5:43 p.m. on the 16th day of

8    October, 2005.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

270

```
 1            I, JON S. LIPSKY, do hereby certify that I have

 2     read the above and foregoing deposition and that the same

 3     is a true and accurate transcription of my testimony,

 4     except for attached amendments, if any.

 5            Amendments attached   (  ) Yes  (  ) No

 6

 7            _____

               JON S. LIPSKY
 8

 9            The signature above of JON S. LIPSKY was

10     subscribed and sworn to before me in the county of

11     _____, state of Colorado, this _____ day of

12     _____, 2005.

13

14            _____

               Notary Public
15            My commission expires

16     Merilyn Cook 10/16/05 (bb)

17

18

19

20

21

22

23

24

25
```

271

REPORTER'S CERTIFICATE

STATE OF COLORADO          )
                          ) ss.
CITY AND COUNTY OF DENVER  )

       I, BARBARA BIRGER, Registered Merit Reporter,

Certified Realtime Reporter, and Notary Public, State of

Colorado, do hereby certify that previous to the

commencement of the examination, the said JON S. LIPSKY was

duly sworn by me to testify to the truth in relation to the

matters in controversy between the parties hereto; that the

said deposition was taken in machine shorthand by me at the

time and place aforesaid and was thereafter reduced to

typewritten form; that the foregoing is a true transcript

of the questions asked, testimony given, and proceedings

had.

       I further certify that I am not employed by,

related to, nor counsel for any of the parties herein, nor

otherwise interested in the outcome of this litigation.

       IN WITNESS WHEREOF, I have affixed my signature

this 17th day of October, 2005.

       My commission expires November 26, 2006.

October 17, 2005


Peter Nordberg, Esq.
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103

Re:  Merilyn Cook, et al. v. Rockwell International
     Corporation, et al.
Deposition of:  Jon S. Lipsky

Dear Mr. Nordberg:

Enclosed is the original signature page of the
above-named deposition.  It was agreed that you would
arrange for signature of same by means of your copy
transcript and the enclosed signature page.

Also enclosed are amendment sheets for changes if
necessary.  Please return the signature page and
amendment sheets to court prior to trial, furnishing
copies of amendments to all counsel of record and our
office.

Thank you for your attention to this matter.


Sincerely,



Barbara Birger,
HUNTER + GEIST, INC.
Registered Professional Reporters

c:  Ellen Ahern, Esq.