1

1  IN THE UNITED STATES DISTRICT COURT
   FOR THE DISTRICT OF COLORADO
2  CIVIL ACTION NO. 90-CV-181-JLK
3  ─────────────────────────────────────────────────
   VIDEOTAPED DEPOSITION OF CHARLES C. McKAY
4  EXAMINATION DATE:  SEPTEMBER 28, 2005
5  ─────────────────────────────────────────────────
   MERILYN COOK, et al.,
6
   Plaintiffs,                            COPY
7
   v.
8
   ROCKWELL INTERNATIONAL CORPORATION
9  and THE DOW CHEMICAL COMPANY,
10 Defendants.
11 ─────────────────────────────────────────────────
12         PURSUANT TO NOTICE, the videotaped deposition of
   CHARLES C. McKAY was taken at 9:04 a.m. on September 28,
13 2005, at 1801 York Street, Denver, Colorado, before
   Nathan Stormo, Registered Professional Reporter and
14 Notary Public in and for the State of Colorado, said
   videotaped deposition being taken pursuant to the
15 Federal Rules of Civil Procedure.
16
17
                    Nathan Stormo
18          Registered Professional Reporter
19
20
21
22
23
24
25

Stormo Reporting, Inc.   (303) 200-4792

47

1 Rocky Flats?
2     MR. DAVIDOFF: Objection to form.
3   A   Can you ask that question again?
4   Q   (By Mr. Nomellini) Do you have any concern
5 about any health risk due to plutonium contamination
6 from Rocky Flats?
7     MR. DAVIDOFF: Same objection, please.
8   A   Today, no.
9   Q   (By Mr. Nomellini) And why is it that you have
10 no concern today about a health risk due to plutonium
11 contamination from Rocky Flats?
12  A   Well, the -- I am told that this -- that Rocky
13 Flats has been cleaned up, and that the hot areas have
14 been covered up or picked up and removed. And that,
15 coupled with the various warranties that we've gotten
16 from Al Hazle and others, leads me to believe that we
17 today do not have health risks from plutonium at Rocky
18 Flats.
19  Q   Now, part of the plans for Cimarron Park is to
20 sell properties to families for residential development,
21 correct?
22  A   Correct.
23  Q   If you had any concern about health risks from
24 Rocky Flats, would you sell properties to families at
25 Cimarron Park?

48

1   A   No.
2   Q   And in the course of the development of
3 Cimarron Park, has anyone asked you whether there's any
4 health risks due to Rocky Flats?
5   A   Yes.
6   Q   Who has asked you that question?
7   A   Very -- that's a very common question. The
8 first thing that they say is, Next to Rocky Flats; what
9 about Rocky Flats?
10  Q   And a number of people have asked you that
11 question?
12  A   Uh-huh.
13      MR. DAVIDOFF: Is the answer to that yes?
14      THE DEPONENT: Yes, sorry.
15  Q   (By Mr. Nomellini) And when people ask you the
16 question, Is there a health risk due to Rocky Flats at
17 Cimarron Park, what have you told them?
18  A   I've told them --
19      MR. DAVIDOFF: Excuse me.
20      Objection; overbroad.
21      Go ahead and answer. Just give me like a split
22 second.
23      THE DEPONENT: I'm sorry, I'm going too fast.
24  A   I tell them that we had a Phase I study done on
25 the property. Don't take my word for it. We had a

49

1 Phase I done on the property. And the Phase I says that
2 there is no concerns on that property. We had
3 authorized the Phase I study group to even do a Phase II
4 if necessary, and that they said that the Phase II --
5 there is nothing to indicate it needed a Phase II.
6   Q   (By Mr. Nomellini) And do you believe that the
7 results of the Phase I are reliable?
8   A   Yes.
9   Q   Now, do you recall participating and being
10 interviewed for the Rocky Flats Cold War Museum oral
11 history project?
12  A   Yes.
13  Q   And do you recall during that conversation you
14 made some observations based on your personal experience
15 as to -- as to why there is no health risk from Rocky
16 Flats?
17  A   Yes.
18  Q   And in particular, you mentioned that your
19 family had raised cattle in and around Rocky Flats for
20 generations?
21  A   Correct.
22  Q   Could you explain how your experience with
23 cattle around Rocky Flats tells you, Mr. McKay, that
24 there is no health risk from Rocky Flats?
25      MR. DAVIDOFF: Objection; form, foundation,

50

1 improper opinion under Federal Rule of Evidence 701.
2   A   So I --
3   Q   (By Mr. Nomellini) Yes.
4   A   Well, with cattle, you -- if you're in the
5 cattle business, if you can raise your own replacement
6 heifers and not have to buy them from someone else, it's
7 a better deal; just kind of keep the second level of
8 profit for yourself, or at least not pay it out to
9 somebody else to buy. So you raise -- so the cow raises
10 the calf. 50 percent of her calves are steers; 50
11 percent are heifers, which are the girls. And 50
12 percent of 50 percent could be candidates for new cows,
13 because as the years go on, you have to lay off the old
14 cows. And so you have a generation, so you have the
15 cow's calf and the cow's calves, calves, calves, calves,
16 calves, so you have a number of generations. And in my
17 opinion, something would have showed up.
18  Q   Something would have showed up in the
19 generations of cattle if there was a health risk from
20 Rocky Flats?
21  A   In my opinion.
22      MR. DAVIDOFF: Excuse me, please.
23      Can I please have a continuing objection on the
24 grounds stated to the prior question to this line of
25 questioning about the health risks in the cattle?

14 (Pages 47 to 50)

75

1 might affect his rights is an unfair question.
2 I can't tell you not to answer, Mr. McKay, but
3 my suggestion to you is you should seek your own legal
4 counsel before you answer a question like that.
5 THE DEPONENT: I will take his recommendation.
6 MR. DAVIDOFF: As I mentioned off the record, I
7 have two minutes, but I would like to put it on the same
8 tape, and I see that the tape is nearly out, and our two
9 hours is nearly up.
10 MR. NOMELLINI: Right. Well, we have
11 previously stated before in this deposition that we
12 disagree with the two-hour time limit, and we reserve
13 our right to ask for additional time. I think that the
14 record has already been made clear on that.
15 Q (By Mr. Nomellini) Mr. McKay, let me ask you,
16 with respect to the Cimarron Park development, your web
17 site characterizes that as a world class development?
18 A World class site, I believe.
19 Q Is the Cimarron Park site a world class site?
20 A I believe it is with the views.
21 Q Why do you believe the Cimarron Park site is a
22 world class site?
23 A Just that it's on the edge of town, but close
24 enough to -- to things like the airport, to the
25 mountains, to Standley Lake, to downtown. And it has

76

1 great views of Standley Lake, the mountains, the
2 downtown; the mountains, both north and south.
3 Q Do you believe that it will be a successful --
4 THE VIDEOGRAPHER: Pardon me. I'm sorry,
5 Counsel. We've got to change tapes now.
6 MR. NOMELLINI: Okay.
7 THE VIDEOGRAPHER: This is the end of Tape
8 No. 1. We are going off record. The time is 11:07.
9 (A recess was taken from 11:07 to 11:10.)
10 THE VIDEOGRAPHER: This is the beginning of
11 Tape No. 2 in the deposition of Charles C. McKay. We're
12 back on record. The time is 11:10.
13 MR. NOMELLINI: This is Mark Nomellini,
14 attorney for defendants. Plaintiffs and defendants have
15 previously discussed the time period for Mr. McKay's
16 deposition. Plaintiffs' position is that it should be
17 limited to two hours. Defendants disagree with that
18 position. Moreover, Mr. Davidoff --
19 MR. DAVIDOFF: Why don't we do this after he
20 leaves? He has to leave. We can have our argument
21 after he leaves.
22 MR. NOMELLINI: Let me just finish.
23 Mr. Davidoff has indicated that he believes he is
24 entitled to ask questions in the middle of my
25 examination of the witness. We disagree with that, but

77

1 Mr. Davidoff is now going to proceed with those
2 questions.
3 MR. DAVIDOFF: Okay. Thank you. And if we
4 have any other colloquy, we can do it after he leaves,
5 since he has to leave.
6 E X A M I N A T I O N
7 BY MR. DAVIDOFF:
8 Q Mr. McKay, I'm going to be very brief.
9 You talked about a drinking water well. I just
10 want to make sure the reporter accurately got one thing
11 you said. Did you say that was a 800-foot deep well?
12 A 800-foot deep well, yes.
13 Q 800 feet, okay.
14 I want to ask you some questions about your
15 producing documents to the Kirkland & Ellis law firm
16 from which Mr. Nomellini and Mr. Tangren are
17 representatives and who represent Dow and Rockwell in
18 this litigation. Did they subpoena and did you produce
19 to them thousands of pages of documents a year or two
20 ago?
21 A Yes.
22 Q Did a number of attorneys from Kirkland & Ellis
23 come to your office?
24 A Yes.
25 Q And did they spend hours with you asking you

78

1 questions?
2 A Yes.
3 Q Were you as open with them in giving them
4 information and answering their questions as you have
5 been at any time with me?
6 A Yes.
7 Q Did you hide any information from them?
8 A No.
9 Q And is it fair to say that you were as freely
10 accessible to them for interview as you were to us, the
11 plaintiffs' counsel?
12 A Yes, yes, I would say that.
13 MR. DAVIDOFF: Nothing further.
14 E X A M I N A T I O N
15 BY MR. NOMELLINI:
16 Q Mr. McKay, let me just ask you, when you were
17 talking to the Kirkland & Ellis attorneys, was that at
18 the same time that they were in the process of reviewing
19 documents?
20 A Yes.
21 Q Okay. So no documents had yet been sent to
22 Kirkland & Ellis at the time that you were having your
23 discussions with them, correct?
24 A They were in my conference room with boxes like
25 this. They had gone through documents. They were