- 9 -

the concentration.  If the exit concentration is between level
A and level B routine procedures should be used to reduce the
concentrations to below level A.

_____

... ... types of calculations ... ... perform... for setting
control levels for stacks from uranium areas.  The basis for
the uranium calculations is an $(MPC)_a$ for continuous, non-
occupational exposure of $2 \times 10^{-12}$ uc/cc.  This is the most
restrictive value listed in NBS Handbook 69 for any of the
... isotopes of concern at Rocky Flats plant.  Table V
lists the results of the uranium calculations.

Beryllium Area

The beryllium area is based on an AEC-recommended non-
occupational level of 0.01 ugm/m³.  For beryllium emission
from the Building 44 stack the results listed in Table VI
are obtained.

R. A. Kirchner
Health Physics
Building 76

RAK:mb

EGG2008974

COOK   APRIL 11 1994   ITEM 19   91145

EGG2008975

TABLE VI

Stack Control ...

| Building | h (meters) | $V_{exit}$ (m³/sec) | Equation 2 | | | Control Level |  |
|---|---|---|---|---|---|---|---|
| | | | | | | A. ($\mu g/m^3$) | C. $\mu_C$ |
| | 22 | 270 | 0.153 | 9.73 | 20.7 | 0.1 | 10 |

EGG2008976

COOK   APRIL  11  1994    ITEM  19    91147

- 12 -

Bibliography

1. L. B. J. Turner et al., An Index Handbook, U.S. Government Printing Office, 1949.

2. W. Henderson and Hassle Therm, U.S. Government Printing Office, 1956.

3. J. M. Bryant, "Derivation of Working Limits," Health Physics 10, 249-257 (1964).

4. A. P. Hull and H. E. Smith, "An Evaluation of the Environmental Significance of a Postulated Fuel Element Failure Incident at the Brookhaven Graphite Research Reactor," USAEC Report BNL-50J(T-313), [unclassified].

5. O. G. Sutton, "The Problem of Diffusion in the Lower Atmosphere," Quart. J. Roy. Meteorol. Soc. 73, -24-36 (1947).

6. F. A. Gifford, Jr., "Use of Routine Meteorological Observations for Estimating Atmospheric Dispersion," Nuclear Safety 2, - (June, 1961).

7. D. B. Turner, "Atmospheric Diffusion Computations," manuscript of the U.S. Weather Bureau, March, 1963.

EGG2008977

COOK   APRIL 11 1994   ITEM 19   91148

be very instructional to people who have not had such experiences in the past. I think this can be said for other investigative reports. With some prudence in the way they are handled, they should be required reading for supervisors and managers who are involved with any related operation. The same can be said for response and support groups.

Fire in Aero-Tech Unit, Beryllium Shop - February 1964

The main reason for discussing this particular incident at all is that there have been a lot of questions over the years whether or not beryllium will burn. In this particular instance, there was a fire in the ventilation-filtration-type unit called Aero-Tech in Building 444. Since there was a buildup of beryllium chips and oily residues in the Aero-Tech unit, it is questionable that the beryllium had anything to do with the fire or that the beryllium actually burned. Rather, it is suggested in the investigation report, which is in the Industrial Safety file, that perhaps the fire was organic in nature because of the oil and there was some beryllium oxidation which occurred from the fire. I think what is interesting in the file on this report is some of the other literature which relates to metallic beryllium fire hazards, and it would be well, I think, for those in responsible positions in beryllium to review this folder.

Contained within the folder is a bulletin that was put out by the AEC dated January 10, 1963 which discusses five fires involving metallic beryllium and it does suggest that beryllium can burn under various conditions, especially very fine powdered beryllium. So it would be my suggestion that responsible people do indeed read this file for instructional purposes. Also contained in that folder is an internal letter written in 1962 which suggests that using $CO_2$ on beryllium fires can cause the fires to become much more violent.

Degreasing Explosion, Building 776 - June 12, 1964

This incident, which was very serious, was investigated as a Type B incident and a very thorough report exists in the Industrial Safety file. I think anyone who needs to refer back to that incident will find information very complete either in that file or in an accompanying file located adjacent to it. The second folder is specific to the individual who was injured.

In the TECHNICAL part of this dissertation, I alluded to some of the problems in the Medical department that came about as a result of not knowing the individual involved in this incident was contaminated. I will not go into that again at this point. There are a few other things that may be well to highlight--lessons learned if you will--from this incident. Certainly the incompatibility of burning plutonium in carbon tetrachloride could not have been better demonstrated. When I get into discussions of another incident which occurred in 1965, I am of the opinion that similar reactions took place there. Information of this sort of incompatibility and serious consequences that can take

51

EGG2008978

CODE: DEPII 11 1994   ITEM 19   91149

place, again, I think should be used as a strong point in any kind of a training program for employees that may be up against this kind of potential. This should not be limited to operations people. With crafts people, situations can arise where there could be potential for serious occurrences when these kinds of materials are involved. The occurrence of 1965 that I will discuss later will bear this out as well as discuss some other potential parallel-type problems.

The other problems which were associated with this occurrence and probably require some reemphasis relate to contamination control. There is probably a fine dividing line between concern and curiosity on the part of closeby people when something occurs. But I believe it has to be made clear in training and indoctrination that curiosity can lead to trouble. One will find in this situation as well as in other occurrences which we have had that employees becoming aware something has happened have decided that they needed to find out for themselves more about it. Certainly, we should not discourage any kind of aid to an individual who is hurt. On the other hand, whatever kind of response might be involved here needs to be done keeping in mind the jeopardy an employee responding may put himself into. Some of this occurred at the time of the 1964 incident. Also, part of the contamination control is that service groups such as security guards need to be fully aware that when anything happens in a processing building, contamination can be involved and until the right kinds of surveys are made to determine otherwise, it is well to assume that contamination does, in fact, exist.

Another thing that was borne out at the time of this occurrence was the relationship and responsibility of the prime contractor; i.e. us, to other contractors on the plantsite. One can read in the report an accounting of one of the outside contractor employees leaving the area only to go home in a contaminated state and some of the concerns that came about because of this and the followup which luckily did not show any contamination. Such a thing happening today, of course, would be headlines in the newspapers. It is, therefore, imperative that when occurrences in buildings happen, an immediate accounting of all personnel, Rockwell and others, in the area be taken and, if there is contamination involved, egress from such areas be stopped or at least controlled until there is a clear indication that things can progress without any further problems.

There exists in the literature some writings with respect to the individual who was seriously exposed at the time of this occurrence. The first paper that was presented on this occurrence was at a meeting in Hollywood, California, an AEC-wide health-safety meeting, in which our medical doctor and Clayton Lagerquist and I participated, each with a portion of a paper giving an accounting of the occurrence and treatment of the individual. The AEC suggested at the time also that a paper on this incident be prepared for a meeting sponsored by the International Atomic Energy Agency in Vienna. The meeting in Vienna was to cover various kinds of emergencies and accidents. I was asked to prepare that paper, and I presented it in Vienna in the Spring of 1965.

EGG2008979

COOK   APP11  11 1994   ITEM 19                    91150

There was also some data that was accumulated at Oak Ridge National Laboratory on the amputated fingers and thumb of the individual involved. Correspondence on the data from Oak Ridge exists in the individual's health physics file.

If I were to offer a lay opinion on the medical actions that took place at the time, in retrospect, it would seem to me that it would have been prudent to have done the amputations immediately rather than delay for several weeks. I am of the opinion that a significant part of the body burden, since a large fraction of the plutonium was converted to chloride, occurred because of the time in which the material remained in the injured hand. I also believe the Wound Counter information would bear out the fact that there was some mobility further up into the hand toward the wrist that may have not occurred had the material been removed immediately. One can hardly fault the medical people on this, however, since I am sure their initial reaction was to save the thumb and as much of the capability of the hand as they possible could.

## Americium Explosion, Building 771 - September 25, 1964

This particular occurrence also is written up in an investigative format on file in the Industrial Safety office. This is one of a couple that relates to other contractors shipping material to us and the contents have caused problems. It involved shipping of americium back and forth to Lawrence Livermore Laboratory (LLL). Americium had been supplied to them in solution form back in 1958. In 1964, LLL decided to return to Rocky Flats that americium along with some other americium they had which was in oxide form for some kind of processing. The americium was then to be returned to LLL for whatever use intended.

Luckily, there was no employee involvement in this incident which was termed an americium explosion. This was probably fortuitous in that, under slightly different circumstances, exposures could have resulted. The americium container when received had been located in a small room (Room 180-A). It had been the intention of the operating group to open up the part of the container that had the solution in it on the day the occurrence took place. The occurrence took place at the beginning of the day shift on September 25 before anybody had actually occupied the room. The employees in the next room became aware of it because of the noise which was heard and an observation made through a window by a couple of Maintenance employees. The building was evacuated and reentered very shortly and it was determined that the adjacent larger room (Room 180) was somewhat contaminated, but basically the material was contained in Room 180-A.

The full account of this occurrence can be read from the report in the file; however, the investigation points out a couple of things that may be worthy of highlighting; e.g. the need for venting of any solutions and probably even more important the need for converting materials

53

EGG2008980

COOK   APRIL 11, 1994   ITEM 19   91151

to solid forms such as oxide for any kind of a shipment. It was never completely determined what the real cause of the explosion was, but it is well known that there can be radiolytic decomposition in aqueous solutions which by itself can build up considerable pressure, and it is also well known that static charges do occur with plastics and further that products of radiolytic decomposition, i.e. hydrogen and oxygen, associated with any kind of an ignition source can cause an explosion. So these are some of the factors that were considered as sources of the explosion, and again, at least for instructional information the details from this kind of incident could be valuable for people who are involved with handling solutions, packaging solutions, storing solutions, etc.

## Oil Leak from Wastebox - May 4, 1965

There is an internal investigation report on this particular occurrence in the Industrial Safety Office. I think a couple of things should be highlighted. This occurrence showed that when a piece of equipment, in this case a glovebox, is to be discarded as waste and boxed, that all places where oil can be trapped are thoroughly dry. With Size Reduction today, this may not ever occur again. But in any case, even moving gloveboxes around within buildings or to Size Reduction or wherever, there can be oil trapped in corners, voids, etc. that could cause a problem.

In this case, the oil did not show up until the box was transported to an outside area in preparation for loading and shipping to Idaho. The box leaked and contaminated a narrow path of road some 400 feet long. The contaminated asphalt was put in drums and was buried at a sludge pit near Building 995. The box also leaked at the storage area immediately east of Building 444 and there was an area of soil contamination at that location that was picked up and committed to contaminated waste and sent off to Idaho.

One other highlight of this incident was that once the trapped oil in the box had been assayed and plutonium content determined, there was a significant amount of plutonium, on the order of 45 grams, that would have gone off in this waste box had it not leaked, been brought back, and the material cleaned up.

## Fire in Lathe Coolant System, Building 776-777 - October 15, 1965

Again, this occurrence is well documented in the Industrial Safety files and anyone who has the need can read it.

This occurrence was very serious and probably unique in nature. It resulted from a rather simple type of maintenance job; at least from all appearances it did not seem complicated. It wound up as probably the most serious incident in terms of numbers of people affected that Rocky Flats has had. There are some of the things associated with the incident that again ought to be used for instructional purposes.

54

The fire that occurred was triggered by the pyrophoricity of plutonium but beyond that was again a demonstration of the incompatibility of burning or sparking plutonium and carbon tetrachloride. The employees who were involved with the actual job of trying to clean out the coolant line were very well aware of the fact that there could be plutonium chips in the so-called leg of the coolant line and should have been aware of the fact that the ever-present carbon tetrachloride in coolant was in the line. As a mater of fact, they were aware that carbon tetrachloride had been used in trying to flush out whatever was impeding the circulation of the coolant. Even so, the Maintenance people, with the knowledge of some of their supervision, were attempting to dislodge whatever the impediment was in the line by using mechanical force. They had some warning ahead of time from some of the feeble attempts they had made with a brass rod. They actually did see some sparking. This did not impede their further attempts, however, and they went into the line with a center punch creating more force in the line, more friction, and once they had created enough energy to start the plutonium chips on fire that were in the line, the carbon tetrachloride exothermic reaction took over and, in my estimation, vaporized plutonium that got out into the room. The reason I feel that the plutonium was vaporized is because of all the evidence of extremely small particle size. The Alpha-Met's on glove boxes, for example, were reported as flashing. Just from being in the area, the employees were picking up contamination on the upper portions of their bodies. Also, the surface contamination in the direction of room airflow was not very great compared to the airborne problem observed, thereby suggesting that indeed the plutonium dust particles were small and were suspended and being carried along with air currents without falling out. One of our Health Physicists made some measurements following the fire and estimated the mass median diameter at 0.32 micron.

Many of the capabilities we have today would have prevented the occurrence from becoming so serious relative to employee exposure. The cause of the particular occurrence and the nature of the maintenance operation is not something different from a job which may be necessary to be performed today. I would hope such a job would be better planned. The continuous air monitors we have today would presumably warn people to put on respirators. However, if a similar release were to occur, the people in close proximity, such as some of the folks were at the time of the incident without any protection whatsoever, could conceivably pick up lung burdens before they would be aware and before alarms possibly could warn them.

The physical layout at the time also was not conducive to control of contamination and could be a lesson to anyone who would come up with any notions of having large-scale rooms and office desks within the area such as we had at the time. Out of the earlier plenum fire of 1957, there had been much discussion on the need for partitioning and modularizing future buildings. There were discussions about that with respect to the wide-open spaces of the Building 776-777 area. As a matter of fact, within the investigation report folder there exists a

55

EGG2008982

CODK  APRIL 11 1994   ITEM 19                91153

letter from the Manufacturing manager which had been sent to the head of Engineering more than a year before this occurrence asking for partitions to be put in Building 776 to do just exactly what they should do, that is, to prevent spread away from or to confine spread to a more localized situation. The argument that this was never done relates to (1) the expense that would have been involved, and (2) someone expressing concern over employees getting trapped within some of these areas and not getting out. The design, of course, would have been such that it would have been a consideration. In retrospect, I think it was a rather lame excuse at the time that compartmentalization was not accomplished. Even the partitions between 777 and 776 had been removed for convenience of space. This in itself would have prevented the majority of the spread.

There is no doubt at all and I think this incident again demonstrated the need for good engineering of ventilation relative to the control of contamination in any processing building.

Relating to this occurrence, and I was on the investigation committee for it, the contamination drifted the full length of the building because the ventilation pattern generally caused it to do that. This is in contrast to having strong localized ventilation and compartmentalization which would have contained the contamination in the immediate area. Many of the positive inhalation cases which resulted from this occurrence involved people that were some distance from the location of the occurrence itself.

The group of people who were involved in this incident and showed up with positive lung burdens still would be an interesting group of people to study since the parameters I think are much different as compared to any of the other exposures that have occurred at Rocky Flats. There is no doubt that the particle sizes were extremely small; this in effect caused retention in the lungs more so than you would expect from other kinds of airborne releases. The DTPA treatments given them at the time had little or no effect which implied that practically none got into the bloodstream, and if my theory is correct that we volatilized the plutonium at the source and it condensed into these very fine oxide particles, we did have a pure high-fired source of plutonium oxide as contrasted to air-oxidized plutonium.

Another interesting observation, I think, is that even though the plutonium that was analyzed from the coolant pipe itself showed plutonium oxychloride and probably other kinds of plutonium chlorides, it appears that the exposures to the people probably because of the high temperatures involved resulted from oxides. One would have expected the chloride to be somewhat soluble and, if inhaled, to get into the bloodstream and show up in urine with some enhanced response to DTPA treatment. The fact that none did suggests the airborne material had to be oxide and was formed from the vaporized state.

56

EGG2008983

COOK   APRIL 11 1994   ITEM 19   91154

Breathing Air Occurrences - November 28, 1966 and February 2, 1973

In reviewing these two occurrences which are closely related in nature, I was a little surprised that the investigation report for the early one in 1966 had not been officially a Type B investigation, nor did there appear to be any evidence in the file that the investigation report had ever been transmitted to the AEC. Since the situation in 1966 involved an employee who did become unconscious, I would be of the opinion that this would have automatically made it a Type B occurrence. In that particular incident which occurred in Building 444, two employees were in supplied air working in an exhaust filter plenum cleaning the structure in preparation for installation of filters. The supplied air in Building 444 was supplied by Joy compressors. The Joy compressors were a part of the Utilities system and were a source of compressed air for a number of operations. The supplied air was taken off of them as another part of their function. The Joy compressors were oil-lubricated and the air which came off them for supplied-air purposes passed through the recommended types of filters for removing oil vapors, particulates, and that sort of thing. Something occurred which elevated temperatures at one of the compressors to a degree which caused the filters, which were a combination synthetic and natural fiber, to catch on fire. The products of this combustion then found its way through the supplied air lines and into the hoods of the two individuals working in the plenum. The two individuals were working on ladders and scaffold and were being observed from the outside by a radiation monitor. They had begun to smell smoke and thought that some truck had possibly backed up to or had come sufficiently close to the building to release some of its exhaust fumes into the intake of the compressors. However, the odor became worse and reached a point where the two individuals, independent of each other, decided they were getting a little woozy and should get out of the area. The one employee got down off the ladder and headed for the exit. When he got off the ladder, he put the ladder up against the scaffold for the other person to use. The other person started down the ladder, but discovered that his supplied-air line was tangled on the scaffold and he then had to go back up and release it. The first employee got to the exit and made some signs to the radiation monitor who had difficulty in interpreting them. By the time the second man got to the exit he had collapsed and the monitor knew there was a problem. The monitor yelled for help and the suits were removed from both men. The second man was unconscious but eventually came out of it and was treated at Medical. The first one was given some oxygen and was also treated at Medical. Neither of them had any lasting effects.

One of the recommendations that appears to never have been heeded after that particular investigation was to have gas monitoring in the supplied-air line. One of the other aspects of all of this that is a little confusing is that in the investigation of the later incident there are no references made whatsoever to the first incident--at least I could not find any.

EGG2008984

COOK   APRIL 11 1994   ITEM 19   91155

The second incident occurred when the so-called after-filter burned in the supplied air system in the Building 776 second floor area and 11 people in three different locations were affected. One individual who had collapsed and fell wound up with a relatively serious skull fracture. That incident was investigated thoroughly by a team which consisted mostly of AEC employees both local and from Albuquerque as well as one or two of our own employees. The one thing that the second incident brought to light mostly was the fact that the installation of the equipment for supplying the air had not been installed at all in line with the recommendations of the manufacturer. One can say, with considerable confidence, that the fact that the after-filters were located only 5 ft from the dryers when the manufacturer's recommendation was that they should be located at least with 75 ft of line separation was probably the direct cause of the fire which took place in those after-filters. The other part of it was that this whole system apparently had not been reviewed by anyone other than the people who were going to run it and the people who installed it. Relative to its safety, it had not been under any review in the 2-1/2 years or so that it had been used. In those 2-1/2 years, it had not been serviced according to manufacturer's specifications. The cycling of the dryers, which was to be an automatic system, was either not set properly or had malfunctioned and was never put back in shape. All of these factors led to a problem such that an accident was really waiting to happen. I think, again, the conclusion I would reach on all of this is that with the turnover in people at Rocky Flats, it is so important that the newer responsible people be acquainted with these things that have gone wrong in the past. Secondly, with the reorganizations, etc. that have taken place, I am not sure that there is a responsibility today for the periodic review that should occur with this type of equipment in order to ensure that it is being maintained and operated according to specifications.

Incidents Involving Lithium - October 13, 1966 and September 11, 1967

In the mid-1960's, there apparently was a fair amount of work done by R&D folks and also a group of the Manufacturing people with lithium. The material was cast in Building 444 in an operation which basically was out in free space. The material was heated up to molten state in a crucible and poured into a mold sitting on a cooling block. The two incidents that are on file as investigation reports in Industrial Safety relate both to the casting operation and to the disposal of lithium scrap. I think it is important to anyone who may get involved in similar operations or are involved in similar operations to review these particular occurrences and see what can go wrong, perhaps very innocently, in handling such material.

Relative to the first case, after many successful castings, a slight deviation in the operation involving melting some scrap metal to be saved for future use resulted in an extremely serious accident, burning an employee over a good portion of his body with second-degree burns, resulting in a lost-time injury. The original procedures,

58

EGG2008985

COOK   APRIL 11 1994   ITEM 19   91156

accepted by the Manufacturing people, could have probably prevented the individual from getting hurt had they been followed without deviation.

The other occurrence involved getting rid of the scrap. The Fire Department had for some time taken the scrap metal and gotten rid of it in a burning pit north of the Fire Barn. Apparently they had done this with some success for some period of time. The cause of the fire and explosion which occurred at this burning pit was never fully determined by the investigating committee. The procedures that were followed by the fireman, however, resulted in a fire and explosion with injuries to his face and eyes. Also at the time, the fire caused oil and grass fires in the same vicinity. I am sure that this same type of operation today would require some comprehensive review from the safety standpoint and I think the two documented investigation reports would be excellent resource material for any such review.

## Fire, Building 776-777 - May 11, 1969

This fire was investigated very thoroughly and the investigation reports, which apparently are classified, can be read by the reader if necessary.

I want to discuss some other things that I think relate to (1) possible indirect causes of the fire, and (2) the things that were done in previous years to correct other problems which I believe had a significant impact on the seriousness of the fire.

We had during the late 1950's and on into the middle 1960's a general increasing trend in external radiation exposure levels. This, one might say, was climaxed in 1967 when we had something like 14 Type C exposures, i.e. greater than 3 rem/qtr, 6 of which occurred in the ZPPR Program which I described before, and 8 within the Chemistry and Foundry operations. As a result of these over-exposures, the Plant manager, the local AEC manager, the Manufacturing manager, and Bruce Owen, and I were summoned back to Headquarters between Christmas and New Year's 1967 to discuss these with officials of the AEC. The attitude toward such exposures up to this point in time by the Manufacturing people seemed to be that this was part of the business and part of the business was that once in a while we would have to write reports for over-exposures and, secondly, that there were sufficient safety factors built into the radiation standards so that we were not jeopardizing anybody's health by occasional over-exposure. The Washington people had begun to become much more sensitive to publicity and the antinuclear, antiestablishment movement was gaining momentum. There had been some criticism already in terms of exposure and exposure potential at the various AEC installations including concern for the general public. As I recall, the concerns over the fallout in Utah, over people who had been involved with the Nevada Tests, and with the island people in the South Pacific, etc., were all beginning to come forth and create problems for AEC. The AEC did not want additional publicity such as lack of control of exposures within the Complex. At the same time, our

EGG2008986

COOK   APRIL 11 1994   ITEM 19   91157

Manufacturing people were faced with considerable demands in the Manu-
facturing area. We were doing a large volume of work, especially in the
Foundry and Fabrication areas. It was felt that in order to get the
work done expeditiously, a minimum amount of time should be allotted to
transport of material into the actual workstations. Because of this,
there had been put in place a very elaborate conveyor system (Chain-
veyor) within the gloveboxes. On this conveyor system would be such
things as ingots from the Foundry operation, buttons to charge the
Foundry operation, various parts in the various stages of manufacturing,
etc. In effect, in a fully loaded state, the conveyor was running on an
almost continuous basis and the material comprised a large number of
sources of radiation contributing to the overall ambient radiation
levels. This was the major source of the exposures to Foundry and
Fabrication personnel.

I am not sure whether one can pinpoint all of the contributions to
the problem associated in the Chemistry area, i.e. Building 771, but
there is no doubt that large volumes of recycle plutonium were handled
in the area and ambient levels were greatly affected by material storage
within operating areas. Because of the fluoride ion that is associated
with much of the process there was a large component of neutrons from
alpha-n's in the Chemistry area. In any case, the Manufacturing people
were reluctant to take the approach of minimizing the material in the
area. Rather they were more receptive to localized shielding in order
to maintain the availability of the material to the operating people.
Because of this, then, there was a great effort started to calculate the
amount of shielding that was going to be necessary to cut the radiation
levels down. We were experiencing radiation levels in 1967, for
example, in the Chemistry area at 1 ft from the gloveboxes of
1.6 mrad/hr x- and gamma radiations and 8.3 mrem/hour from fast
neutrons. In the Foundry area we were experiencing numbers like
7.9 mrad/hr of fast neutrons. The major shielding installation then was
to add on lead where it was feasible to do so, to install glove port
covers as shields in order to keep down the radiation coming from those
glove ports not in use, and to install massive amounts of Benelex
shielding to reduce the neutron field coming from the boxes. The
shielding program was expedited with our own Maintenance people doing
the work and by June 1968 it was reported that in the Chemistry area,
the average x- and gamma numbers were now 1 mrad/hr and the neutrons had
been reduced to 2.2 mrem/hr, resulting in an exposure rate value of
42 percent of that experienced in December 1967. Similarly, in the
Foundry area with the changes we made, the average for the x- and gamma
rays came down to 0.6 mrad/hr and the fast neutrons down to 1 mrem/hr--
an average of 17 percent of the December 1967 readings.

In 1967, employee exposure in the Chemistry area had averaged
something like 453 mrem/person/month, or an average of something in
excess of 5 rem/year. In 1968, for the first 7 months this had been
reduced down to 354 mrem/person/month. The Foundry area reduction was
much more dramatic in that we had averaged 645 mrem/person/month,
considerably above the 5-rem/year value, and we brought this down in the

60

first 7 months of 1968 to an average of 232 mrem/month, or an equivalent annual average on the order of 2.5 rem. Actually, in 1968 we were able, through rotation and these various schemes of shielding, to keep annual whole body exposures to all employees less than 5 rem. In addition to the shielding program, we put together a rather elaborate educational program for the employees to tell them how they, as individuals, could minimize exposures. There were numerous other things done such as emphasizing good housekeeping both inside and outside of the gloveboxes.

The part of this shielding program that I think probably contributed to the seriousness of the fire was within the Foundry glovebox. We had installed some shielded cabinets, again out of Benelex, and it was in one of these cabinets where a briquette was stored that the fire actually started. During the course of installation of the shielding, the shielding in effect insulated the heat detector from the briquette which spontaneously caught on fire. In the process of fighting the fire, the shielding that had been affixed permanently on the gloveboxes was an impediment to the firefighters. Even though it did not burn readily itself, it did cause lots of extra smoke. There were areas where Plexiglas was used that caused problems too and created extra smoke.

The elaborate shielding program was completed and I guess one could say the remedy for the radiation dose rate which seemed effective was done with blinders on from the standpoint of considering other potential things that could happen. And, of course, after the fire it was recognized that there was no reason why one could not have limited the amount of material within glovebox lines and have separate storage areas for the material. Of course this would have required dedicated space and one can argue whether it would have been authorized had we not had the fire.

Building 707 had already been built before the fire occurred but was not finished inside. Had the fire not occurred, it would have had massive shielding also. After the fire, Modules J and K were added onto the Building 707 project. This accomplished two things: (1) additional Foundry capability since we lost the north line in 776, and (2) shielded storage and computerized retriever capability. One of the main things that was done in Building 707 once it started operating was to establish upper limits of the amount of material that could be at any given workstation and this was published in a classified document and any changes that were proposed had to be approved by the Health Physics department. The limitations on material were based upon calculations made by Health Physics to maintain the exposure rate at workstations to less than 2.5 mrem/hr combined gamma and neutron radiation. Perhaps the biggest item in the Chemical operations area to bring down exposures was improvement in housekeeping, general cleanliness, and removal of all the drums of stored residues--the latter contributing to another problem, i.e. outside storage.

61

EGG2008988

Again, for the reader the availability of the investigation report is such that one should read it but I intend to say a few more words about my personal involvement that occurred at the time and after the fire itself.

On the Sunday afternoon of the 1969 fire I was called by Clarence Schuske who told me there was a "devastating" fire going on out at Rocky Flats. I left my home and came directly to the Plant. I arrived about 3:30 p.m. There already was a contingent of people down at the building supporting firefighting activities. One of the things I recall doing was going around and making some direct measurements on the various onsite air samplers we had knowing full well that the sensitivity of the instrument was not all that great. However, all air samplers should read about the same level, relative to natural radioactivity since they were sampling at equivalent rates. I found no differences from air sampler to air sampler and I repeated the check at 6:00 p.m. with the same kind of results. I am sure it is in the record but in general the counting which we did on the various samplers that we did have in place at the time, both onsite and offsite, did not show any pattern or deviation from what was normal. We did find measurable surface contamination levels on the roof of the building as well as on the roof of Building 778, the ground area between 776 and 778, and I believe a lesser amount on Building 707. We did not find measurable numbers on other flat surfaces located to the southeast and southwest of Building 776. Most everyone in the Health Physics organization who could be contacted on that Sunday responded and many of us were here well past midnight.

The lung counting that was done on the various people involved with fighting the fire showed one person with a significant lung burden which came down within a matter of days but remained above the maximum permissible. There was a lot of cleanup of people required, i.e. skin decontamination, performed in Buildings 559 and 778. I do not recall specifically whether it was on Monday or Tuesday following the fire but I was requested by our Public Relations Director to meet television people who were going to show up at the Customs House air sample station in Denver. This I did and that resulted in a discussion of the air sampler, what it did, how we handled it, and that sort of thing.

There was some concern over where the water runoff from the fire went and I remember we prepared an awful lot of quick answers for questions associated with concentrations in the water effluents leaving the plantsite. None of these were at any alarming level.

The next involvement that I recall I had relative to the fire was I was asked to accompany our General Manager and General Giller, who at the time was the head of DMA, to a meeting with the Colorado Committee for Environmental Information held at the National Center for Atmospheric Research. Dr. Martell, who was the chairman of the subcommittee of that group relating to Rocky Flats, had alleged that the fire had caused some environmental contamination as evidenced by a few samples

EGG2008989

COOK   APRIL 11 1994   ITEM 19   91160

which he had taken, one of which was on the order of 13.5 dcm/g of soil. I do not remember too many details of that meeting except that I assisted in giving them an overview of the Plant operations, of the kinds of sampling we had done and were doing, of some of the sampling results which we had, and in general to try to relate to them that all evidence seemed to suggest that the fire had not contributed significantly to contamination in the environment. As it was to turn out later, and a subject probably for a complete separate section in this report, the contamination in the environment was principally from the oilfield. I do not recall whether that was discussed at this meeting or not but we in Health Physics, after some discussion and reviewing some of our records, suggested to our management that that was probably the major source of environmental contamination.

This Committee remained quite active and corresponded considerably with Washington Headquarters, who asked many questions of the Plant to which we responded in the most honest way we could, questions not only associated with offsite release but questions associated with some of our onsite procedures as well, and in some cases they were very critical, for example, of the body counting capability. These people on this Committee were very well read and asked some very penetrating questions. The Committee was quite insistent with AEC that an enhanced environmental sampling program should be initiated. It lead up to another meeting, I believe in Februry 1970 in the Post Office Building in Denver, which included some of the top officials from Headquarters to discuss some of the outstanding questions this Committee had. Again, I am not too sure of all the kinds of things that resulted from that meeting except I believe it was after that meeting that the large sampling program was begun by the Health & Safety Laboratory of the U.S. Atomic Energy Commission, New York. This group came out and worked very closely with our laboratory manager. We actually supplied them with a couple of technicians from the laboratory. Their report which has been published and is fairly well known came out--at least the first draft did--on August 1, 1970.

As a sidelight piece of information relative to the original large shielding program, which I think had much to do with the final consequences and possibly even the cause of the fire, is to mention the high level of interest the AEC had in it and their expressed pleasure at the resulting decrease in exposure levels. The project at the time initiated a visit by Dr. Martin Biles, who was the head of Operational Safety Division; and one of his chief advisors, Dr. Gordon Dunning, who was later to become the chairman of the investigating committee for the fire. These gentlemen came out to review our progress and our plans on the shielding in the interest of ensuring that Rocky Flats would indeed bring its external radiation exposures into line with good practice and to as low as practicable levels.

The following pages show AEC correspondence relating to the Rocky Flats radiation exposure problems in the mid-1960's up through 1967, and which correspondence I find rather interesting. While we were solving

EGG2008990

COOK   APRIL 11 1994   ITEM 19   91161

OFFICIAL USE ONLY



May 8, 1968

SECRETARIAT

AEC 604/106

## INFORMATION MEETING ITEM

### PERSONNEL EXPOSURE AT ROCKY FLATS

#### Note by the Secretary

1. The General Manager has requested that the attached memorandum of May 7, 1968 from the Assistant General Manager for Operations, with attachment, be circulated for consideration by the Commission at an early Information Meeting.

2. At Information Meeting 765 on January 3, 1968, the General Manager reported on proposed interim measures with regard to the Rocky Flats, Colorado, radiation exposure problem. The Commission requested a staff report on alternative measures. Accordingly, a report was submitted by the Rocky Flats Division of the Dow Chemical Company and transmitted to the Commissioners by Mr. Erlewine's January 31, 1968 memorandum, commenting staff would submit an analysis of Dow's report at a later date. This paper presents staff's analysis of the Dow report.

W. B. McCool

Secretary

| DISTRIBUTION | NO. OF COPIES | DISTRIBUTION | NO. OF COPIES |
|---|---|---|---|
| Secretary | 7 | Asst. GM for Operations | 1 |
| Chairman Seaborg | 4 | Asst. GM for Plans & Prod. | 1 |
| Commissioner Ramey | 1 | Asst. GM for Reactors | 1 |
| Commissioner Tape | 1 | Asst. to.GM for Prog. Anal. | 1 |
| Commissioner Johnson | 1 | General Counsel | 1 |
| Commissioner | 1 | Congr. Relations | 1 |
| General Manager | 2 | Controller | 1 |
| Deputy Gen. Mgr. | 1 | Inspection | 1 |
| Asst. Gen. Mgr. | 1 | Operational Safety | 1 |
| Exec. Asst. to GM | 1 | Production | 1 |
| Asst. GM for Adm. | 1 | Public Information | 1 |
| Asst. GM for RA | 1 | Reactor Dev. & Tech. | 1 |

- 1 -

OFFICIAL USE ONLY

EGG2008991

COOK   APRIL 11 1994   ITEM 19   91162



**UNITED STATES**
**ATOMIC ENERGY COMMISSION**
WASHINGTON, D.C. 20545

MAY 7 1968

Chairman Seaborg
Commissioner Ramey
Commissioner Tape
Commissioner Johnson
ITEM: General Manager

PERSONNEL EXPOSURE AT ROCKY FLATS

As a follow-up to the meeting on December 29, 1967, with the AEC staff and the Rocky Flats contractor, Albuquerque Operations Office was asked to provide answers to nine specific questions concerning personnel exposure matters at Rocky Flats. The answers to these questions plus seven additional ones submitted by Albuquerque were returned to the Headquarters on February 1, 1968.

The conclusions drawn from the enclosed Staff Analysis are as follows:

    A.  The contractor has taken prompt and effective steps to reduce radiation exposure and the staff is satisfied that this situation is now under satisfactory control.

    B.  There has been a change in emphasis in the contractor's philosophy as a result of a better awareness of AEC's intention that radiation exposures be reduced to the lowest practicable levels and to accept the resulting reasonable increase in costs.

    C.  The contractor is fully aware of the possible restrictions due to the increasing hand exposures and has taken steps to reduce such exposures and improve monitoring techniques.

    D.  The contractor has nearly reached the limit of hand operations and, with the AEC, has begun studies for certain mechanized or remote operations. It should be noted that a remote operation will involve considerable new capital outlay.

    E.  Some breakdown in communication at Dow between certain process development groups and the operational departments (e.g., Health Physics) allowed the exposure potential of the ZPPR coating process to build up without appropriate countermeasures until several reportable exposures were experienced.

- 2 -

EGG2008992

COOK   APRIL 11 1994   ITEM 19   91163

Commissioners                    - 2 -

F.  NUMEC, the remaining ZPPR fuel element fabricator, should be and has been made completely aware of the problems (and their solutions) which Dow encountered in the fabrication cycle of the ZPPR fuel elements.

G.  The scrap and residue recovery operations have been brought under control and are essentially current.

The staff will continue to follow the progress of the changes in shielding and work habits and their effects on personnel exposures.  Another formal review of the Rocky Flats operations will be made at the end of September.  By that time the shielding in the foundry program and chemical area will have been completed and in use long enough to give significant results concerning personnel exposures.  The staff will report to you again, after that review.

J. A. Erlewine - for
Assistant General Manager
for Operations

Enclosure:
Staff Analysis

- 3 -

11 26, 1968

STAFF ANALYSIS
RADIATION PROBLEMS RELATED TO
PLUTONIUM FABRICATION OPERATIONS AT THE ROCKY
FLATS PLANT (JANUARY 1968)

I. Introduction

The external radiation exposures of workers at the Rocky Flats (RF) plant have increased markedly since CY 1965, culminating in 16 exposures slightly in excess of the quarterly whole body radiation limits in 1967. The problem of radiation exposure control has been more acute in some years than in others due to such changing conditions as: the amount of throughput; the isotopic composition of the plutonium feed; the age of the plutonium; the geometry of the parts produced; increases in batch size; and variation in opportunity for employee rotation resulting from changes in mission assignments.

Following a meeting on December 28 and 29 between AEC staff and Dow, the Rocky Flats contractor, the Albuquerque Operations Office (AL) was asked to provide answers to 9 specific questions concerning personnel exposure matters at Rocky Flats. These questions plus 7 additional ones from AL were directed to Dow on January 6, 1968, and the answers returned to AEC Headquarters on February 1.

Subsequent to this Chairman Seaborg, Commissioner Tape, the General Manager and the Assistant General Managers for Operations and Military Application visited Rocky Flats on February 13, and the Atomic Energy Commission Combined Operations Planning Group (AECOP) met there on February 19 and 20 with representatives from the Divisions of Operational Safety, Military Application, Production and the Albuquerque Operations Office. On March 25 and 26, AEC representatives from the Divisions of Operational Safety, Military Application, and the Albuquerque Operations Office met at Rocky Flats to review progress.

EGG2008994

- 2 -

## II.  Analysis of the Problem

### A.  Extent of Exposure

Based on the exposure summary table, (Attachment I) a steady
increase in the average annual whole body exposure (excluding those workers
with exposures below 1 rem/yr) from 2 rems in 1965 to 2.7 rems in 1966 and
3.1 rems in 1967 indicated that unless control of exposures was strength-
ened, there eventually would be trouble in meeting AEC limits.  In the pre-
vious 14 years, only 4 Dow employees had exceeded the AEC quarterly whole
body limit of 3 rems; in 1967, there were 14 such cases, 6 of which occurred
during the casting of ZPPR fuel elements.  The number of cases in the higher
exposure ranges indicated that if conditions remained unchanged there even-
tually would be trouble in meeting the cumulative limit.

Maximum hand exposures in various operating areas ranged from 20 to 50
roentgens gamma radiation during 1967.  Hand exposures to gamma radiation in
foundry operations averaged 41 roentgens.  When the additional hand exposure
to neutrons is considered, the maximum hand exposures in foundry operations
are at a level considered limiting, and in fabrication operations are at 80%
of limiting, relative to the AEC annual limit of 75 rems for exposure to ex-
tremities.  An important consideration is that when shielding proposed to
reduce whole body exposure is installed, potential hand exposures are already
a limiting factor for foundry operations and possibly would be for fabrica-
tion if the present radiation were increased as a result of material age or
changes in composition or increased in-line inventory.  Further increase in
radiation levels would require some remote and mechanical handling since in
present glovebox operations the load loading of the gloves is at a maximum
consistent with required dexterity.

- 5 -

EGG2008995

- 3 -

### B. Dow Operational Philosophy

Dow has been conscientious about working within the radiation exposure limits imposed by the Commission, namely, 3 rems/quarter and 5 (N-18) rems whole body total accumulated dose. However, it appears that the radiation exposure factor has not always been adequately weighed in determining if operations "were being conducted . . . in such manner as to assure that radiation exposure . . . (is) limited to the lowest practical levels." (AEC MC 0524). For example,

1. Dow's production activities permitted exposure up to the AEC numerical limits, leaving little margin for error and reducing resiliency for special tasks or process changes;

2. Until very recently, Dow had not adopted administrative guides to minimize the probability of individual exposures in excess of AEC limits;

3. Production activities frequently had proceeded on the basis of 1 rem/month exposure, the maximum average radiation exposure allowed under MC 0524 for those employees whose past radiation experience is below a 5 rems/year average.

With AEC's knowledge, Dow has operated with exposures very near AEC radiation exposure limits. If exposures are to be minimized to some lower practicable level, AEC guidance and Dow's operating philosophy and practices must stress the changes needed to reduce present exposure experience.

### C. Problems Associated with Feed Materials

At the present level of Pu-241 abundance, Pu-239 contributes about 40% and the daughters of Pu-241 (Am-241 and U-237) about 60% of the

- C -

EGG2008996

- 4 -

penetrating gamma radiation field.  Since the radiation intensities vary
markedly with the Pu-241 content and the age of the parent material, the
best condition from a radiation safety standpoint is to have freshly pro-
duced Pu of low Pu-241 content.

Pu with 1% Pu-241 30 days old (30 days after chemical processing),
will yield 143% of the penetrating radiation to be expected from Pu with
0.5% Pu-241 at the same age.  The radiation intensities for these same
materials at age 6 years (expected age) would be 323% of that for 1% Pu-241  r,
and 237% of that for 0.5% Pu-241.

Thus it is seen that the radiation problem for the operations at
Rocky Flats is closely related to:  (a) stockpile recycle of old Pu
(> 6 yrs.);  (b) new material with a high Pu-241 content;  (c) special ma-
terial such as that used in the EPRI fuel element fabrication which had a
high Pu-241 content and a relatively long age;  and (d) time lag between
purification and use as food material.  To continue operations with such
food materials, additional shielding is required to keep anticipated aver-
age exposures below 5 rems per year.  The cost of further reduction increases
very rapidly with reduction in target level.

On the short term basis, aged (> 6 years) recycle material is
approximately 1/3 of the process inventory.  However, RF no longer intro-
duces this metal directly into the process.  All of it is now chemically
processed prior to use.  A substantially reduced Pu-241 content of the
virgin material that constitutes the remaining 1/3 of the plant operating

- 7 -

EGG2008997

COOK   APRIL 11 1994   ITEM 19   91168

- 3 -

inventory would have a beneficial effect. However, due to production processing lag, the effect would be delayed 6 months or more. Substantial reduction in Pu-241 content could involve complex and expensive modifications in the production system. These will be evaluated in an AECOP study. For the long term situation, Rocky Flats must consider the likelihood that all Pu feed will be aged (> 6 years) stockpile recycle material. In this case, the removal of radioactivity by chemical processing is the only significantly productive approach.

Because of casting scheduling problems for a future program RF is chemically processing Pu, casting rolling ingots, and storing these ingots in anticipation of that temporary bottleneck. This material is presently scheduled to be stored for two or more years prior to use. Thus, the reduction in personnel exposure that could be gained by immediate use of Pu freshly processed for Am and U-237 removal is lost.

While Am-241 ingrowth is at a fairly constant rate over the first two years following purification, U-237 is for all practical purposes in equilibrium with Pu-241 in 30 to 40 days.

Further consideration must be given to the neutron exposure potential of the feed materials. In most cases the spontaneous fission neutrons do not constitute the major source of exposure. However, when plutonium is combined or mixed with light elements, neutron production is enhanced as a result of alpha,n reaction. This enhancement ranges from a factor of 2 for plutonium oxide to a factor of over 200 for plutonium fluoride. Consequently, in the production chemistry area, the neutron component may be as much as 60% of an individual's total penetrating radiation exposure.

- 8 -

EGG2008998

COOK   APRIL 11 1994   ITEM 19   91169

- 8 -

**D.  Problems Associated with Physical Layout**

The present physical layout at Rocky Flats is quite compact and crowded. It was originally designed for alpha particle containment only. With the currently higher background of penetrating radiation, it has not been possible to restrict exposure of an operator to radiation only from his work station. With the proposed additional shielding Dow believes that exposures can be held to acceptable levels provided present radiation levels do not increase. There is a physical limit to the amount of shielding that may be added to the existing equipment to reduce whole body and hand exposures. For example, added depth of shielding may render a work station essentially inoperable.

**E.  Problems Associated with Production Load**

If all other factors remained constant and only throughput increased as projected, the exposure to each workman would increase since he would spend more time at his primary work station and less time in areas of zero or very low exposure. If one adds other factors to the increased throughput, such as material of long shelf age, larger material batch size, greater overall inventory in the process areas, reduced down time for housekeeping and maintenance, and increased Pu-241 content, the radiation background will increase further.

**F.  Corrective Actions Taken by Dow**

In an effort to effect more stringent control of radiation exposures, the following actions were taken by the end of CY 1967:

- 9 -

EGG2008999

- 7 -

1. Adoption of a uniform administrative action level of 1250 mrem/quarter. When an employee receives this exposure, he is restricted from further significant exposure in that quarter.

2. Emphasis on remedial action when radiation surveys indicate exposure levels exceeding 2.5 mrem/hour.

3. Start of an intensive training program to improve operator techniques in exposure reduction by stressing the proper use of shielding, utilization of distance, reduction of exposure time and control in glovebox housekeeping.

4. Placement of additional emphasis on housekeeping in glovebox lines to prevent the accumulation of aged material and associated Americium growth.

5. Temporary use of leaded aprons by personnel assigned to the foundry and the fast recycle area of chemical recovery operations.

6. Development of a "Neutrometer," an improved instrument for evaluating neutron exposures, and the start of an investigation using TLD in evaluating hand exposures.

7. Reduction of the inventories in the Chainsweyer system.

8. Allocation of funds for shielding.

9. Review of existing facilities to see if exposure potential can be reduced by relocation of equipment.

- 10 -

EGG2009000

COOK   APRIL 11 1994   ITEM 19   91171

- 8 -

These actions represent immediate means whereby radiation exposures can be reduced at Rocky Flats in the near future. Other possible actions that have been considered, such as building a remote type facility and deploying chemical processing to other sites, are long or medium-range ventures.

III. Present Status

By late March 1968, radiation exposures had been reduced to an important degree. The following comparisons apply to the two highest exposure areas:

Chemical Processing Area

| Date | Biweekly exposure - mrem | |
|------|---------|---------|
| | Average | Maximum |
| Sept. 1967 | 280 | 1253 |
| Jan. 1968 | 246 | 877 |
| Feb. 1968 | 142 | 931 |
| March (1st half) 1968 | 158 | 872 |

Foundry Area

| Date | Biweekly exposure - mrem | |
|------|---------|---------|
| | Average | Maximum |
| Sept. 1967 | 495 | 952 |
| Jan. 1968 | 197 | 367 |
| Feb. 1968 | 171 | 320 |
| March (1st half), 1968 | 77 | 251 |

- 11 -

EGG2009001

COOK   APRIL 11 1994   ITEM 19   91172

- 9 -

These exposure reductions can be attributed to the following factors:

a) Change in Dow management philosophy.

Largely as a result of a keener awareness of AEC's intention that
radiation exposures be reduced " . . . to the lowest practical levels" and
to accept reasonable consequent costs, Dow has more emphatically stated to
the supervisors the importance and necessity for closer control of expo-
sures. A uniform administrative exposure control level of 1 1/4 rem per
quarter has been adopted for the entire plant in an effort to eliminate
exposures in excess of 3 rems per quarter and to reduce exposures to 5 rems
per year or below. In general, of the many important factors (cost, man-
power, schedules, etc.) which must be considered in the operation of a
production plant, radiation exposure is receiving a higher priority at
Rocky Flats now than last year.

b) Completion of ZPPR project.

While this work was a significant source of radiation exposures in
mid-1967, the problem leading to these exposures was largely solved by
December 1967. Nevertheless, so that all factors will be more clearly
understood in the future, it is noted that the foundry work on the ZPPR
elements was completed by mid-February; the fabrication finished by March
1; and the assembly and packaging concluded by March 7. The chemical proc-
essing of ZPPR residues was terminated March 20 at the request of EDT.

c) Shielding of existing facilities.

On January 2, 1968, the Plant Manager issued instructions to ex-
pedite the installation of shielding in the chemistry and foundry areas.

- 12 -

EGG2009002

COOK  APRIL 11 1994  ITEM 19  91173

- 10 -

The shielding requirements in these two areas constitute an estimated 60,000 man-hours of work, will cost $700,000 and are scheduled for completion by July 1, 1968. Shielding of work stations in other existing areas is a $2,600,000 job and will be completed during FY 1969.

By March 18, 1966, 32% of the total man-days required to shield the chemistry area had been expended. This effort represents all of the shielding for X and gamma radiation and about 25% of the neutron shielding. By this same date, 80% of the X-ray and gamma shielding and 10% of the neutron shielding had been completed in the foundry area.

The rather drastic drop in the average March radiation exposure in the foundry area (noted above) can be attributed, in large part, to this addition of the gamma shielding.

d) Training.

A training program designed specifically to teach the effective use of time, distance and shielding in reducing radiation exposure has now involved 90% of all plutonium workers. The training is built around a series of slides depicting poor technique with lengthy discussion of appropriate corrective measures. Dow supervision considers that this program was the single most effective measure taken to reduce radiation exposures throughout the plant.

e) Reduction of inventories on the Chainsveyor system.

The time delay between the casting of an ingot and the first operation (rolling) has been reduced from 7 days to 3. In addition, the preprocessing of site returns has been expedited and measures taken to

- 11 -

EGG2009003

- 11 -

prevent inventory buildup when delays in processing occur. The total in-
ventory in the Chainsweyer system has been reduced by 4% between December
1967 and March 1968.

IV.  RECOMMENDATIONS

   A.  Endorse Dow's modified philosophy toward reducing radiation expo-
sure and the specific administrative controls which have been recently
instituted for this purpose.

   B.  Establish closer coordination by Division of Military Application
with other program divisions (Production, Reactor Development and Tech-
nology) and their respective operating contractors to assure that coordin-
ated efforts and resources can be made available on any particular problem.

   C.  Make a major effort to reduce radioactivity of the feed by optimum
use of chemical reprocessing for recycle Pu or other aged Pu, and immediate
reintroduction of this purified Pu feed stock into the metal fabrication
system.  (AL will investigate the possibility of utilizing available SRP-
Hanford capacity for purification, reduction, casting and rolling of pluton-
ium.)

   D.  Continue to work on reducing the in-process time of the Pu.

   E.  Continue the joint Division of Military Application/Division of
Production studies to determine what CI Program action can be taken to
assist in improving on the Rocky Flats situation.  The study approach has
two objectives:

      1.  Short term - An immediate definition and measure of the expo-
sure problem in order to evaluate alternatives available to the CI Program
Operation primarily to help the short term future.  Such alternatives

- 14 -

EGG2009004

COOK   APRIL 11 1994   ITEM 19        91175

- 12 -

considered are:  reducing reactor fuel exposure levels, and change of reactor modes of operation.

2.  Long term planning - A long term study which will consider both the short term and the long range planning of the Divisions of Military Application, and Production.  A meeting on February 19 and 20 between AEC Combined Operations Planning (AECOP) personnel and Rocky Flats personnel defined and scoped the problem.  The AECOP studies will include personnel exposure control cost factors in its production optimization studies.

F.  The Rocky Flats contractor should expand, from the present nominal effort, the  process improvement program with 1) development of additional remotely or mechanically operable chemical and mechanical systems, 2)  development and evaluation of metallurgical or other high temperature alternatives to chemical processing for Am control, 3) engineering studies to obtain reliable estimates of costs for additional shielding or remote operations for feed contaminant control.

V.  Conclusions

A.  The contractor has taken prompt and effective steps to reduce radiation exposure and the staff is satisfied that this situation is now under satisfactory control.

B.  There has been a change in emphasis in the contractor's philosophy as a result of a better awareness of AEC's intention that radiation exposures be reduced to the lowest practicable levels and to accept the resulting reasonable increase in costs.

- 15 -

EGG2009005

COOK  APRIL 11 1994   ITEM 19                91176

- 13 -

C. The contractor is fully aware of the possible restrictions due to the increasing hand exposures and has taken steps to reduce such exposures and improve monitoring techniques.

D. The contractor has nearly reached the limit of hand operations and, with the AEC, has begun studies for certain mechanized or remote operations. It should be noted that a remote operation will involve considerable new capital outlay.

E. Some breakdown in communication at Dow between certain process development groups and the operational departments (e.g., Health Physics) allowed the exposure potential of the ZPPR casting process to build up without appropriate countermeasures until several reportable exposures were experienced.

F. NUMEC, the remaining ZPPR fuel element fabricator, should be and has been made completely aware of the problems (and their solutions) which Dow encountered in the fabrication cycle for the ZPPR fuel elements.

G. The scrap and residue recovery operations have been brought under control and are essentially current.

VI. ATTACHMENTS

1. Summary of Personnel Exposures, 1958-1967.

2. Personnel Exposures for Plant Segments - CY 1967.

- 16 -

EGG2009006



SUMMARY OF WHOLE BODY PENETRATING RADIATION - DOSE
(1958-1966)
ROCKY FLATS PLANT

ATTACHMENT 1

- 17 -                    Attachment 2

EGG2009007

__ATTACHMENT II__

Personnel exposures for plant segments for CY-1967:

| Area | Average Mrem/Year | | |
|------|---------|---------|--------------|
| | __Gamma__ | __Neutron__ | __Penetrating__ |
| Production Chemistry | 3370 | 2048 | 5418 |
| Foundry | 6580 | 1561 | 8141 |
| Fabrication | 2668 | 696 | 3364 |
| Inspection | 1941 | 571 | 2512 |
| Assembly | 1891 | 509 | 2400 |

IPPR exposures are included in each of the above categories.  Separate data are not available.

Relative contribution to personnel exposures for inventory and work in progress:

| Area | Percent of Totals | |
|------|---------|----------------|
| | __Process__ | __Line Inventory__ |
| Production Chemistry | 95 | 5 |
| Foundry | 67 | 33 |
| Fabrication | 56 | 44 |
| Inspection | 62 | 38 |
| Assembly | 91 | 9 |

- 18 -                    Attachment II

EGG2009008

COOK   APRIL 11 1994   ITEM 19          91179

the one problem, little did we know the eventual problem that the massive shielding would give us as an impediment to both early fire detection and controlling the fire once it started.

Burials, Outside Storage, and Associated Problems

In 1970, I was asked by our General Staff members to put together a document that would attempt to piece together information about the burial sites, what was in them, etc. as well as the history of the 903 Area. This I did and the document in its entirety including appendices is located in the Environmental Master File and identified as No. 60-13350. That particular report was based primarily on material extracted from the Waste Disposal group's files which seemed to be quite complete at the time. In addition to the files, information was obtained by talking to members of other groups such as the Garage, et al, and testing memories with respect to some of the things that had happened. I know that there were some things missed that have since been identified and there are probably some inaccuracies in it not necessarily because of wrong information but wrong memories or wrong perspectives or just plain missing information. Included in the survey was an area which we referred to as the Mound located in the east part of the Plant on the north side of Central Avenue just short of the east guardpost area. The Mound contained a number of drums with a variety of contents that had been covered over with earth. Perhaps one of the pieces of information that I had put in my report that triggered manage- ment to want to go into the Mound and get rid of its contents was an indication about eighty-six 55-gal drums from Building 776 containing contaminated oil which were in the Mound. The historical information in the file had indicated such drums in the early days had been moved to the Mound area and Ed Ryan, who had been involved with the waste dispo- sal function right from the beginning of the Plant, told me that he had been given orders to move those drums into the Mound and he was certain they were there. When the Mound was dismantled, it was done very carefully under constant supervision of Bob Vogel from Health Physics and the contents were listed in a report that Bob prepared that also exists in the Environmental Master File under Bob's name. The job was done with the knowledge of the State Department of Health. There was constant air sampling performed and there was no contamination that was spread from the operation. When all of the drums had been removed and identified, the 86 drums of concern were not in the Mound. There were sixteen 30-gal drums that had originated in Building 771 in the Mound. Checking up on these drums, it turned out that for all practical purposes, the 30-gal drums contained no plutonium. As near as we could surmise, these were lubricating oils that had been taken out of machinery used in the production area in Building 771. At the time, as has always been the case, we were very strict in saying that anything that was used in a production area that was not monitorable had to be assumed to be contaminated relative to the method of disposal. So those were the only drums originating from a plutonium area that were in the Mound. The various oils, liquids, and numerous solids that were in drums in the Mound which originated from uranium areas were disposed of

64

through the Building 774 operation and all solid materials including the drained oil drums were committed to solid waste and shipped to Idaho.

The 903 Area, now the black-topped area, where oil drums had been stored outside was started way back in the mid-1950's because of the problem of disposal of contaminated oils. There was at least one attempt made to dispose of drummed uranium oil at Idaho and this was unsuccessful and we got directions from Washington not to ship any oils from then on. There was concern about drums rusting out; there were inhibitors added to try to prevent rusting and, of course, there were efforts going on to try to find some means of disposal. Perhaps there would not have been as many drums out there had a proposed plan in 1963 been funded but it was cancelled because of lack of funds, and that plan would have been an operation in Building 774 that would have separated carbon tetrachloride from oil and at least this would have allowed for a direct transfer of oils from Building 776 to Building 774 in order to get rid of them and offer some further means of developing something to get rid of the oil from the field as well.

When the jelly factory in Building 774 was finally at a point of being able to take materials from the 903 Area, it was thought that it would be well to try to filter the oils at 903 Area, catch the solids in filters, and then ship the filtered oil to Building 774 for the solidi-fication process. So a building was built (I believe it was Building 904) in that area and there was an attempt made to transfer oils from drums through the filters and catch the remaining liquid and send it to Building 774 for the solidification process. The filtration attempt at the drum storage site was stopped after not too many drums had gone through because it turned out to be such an extremely slow process and the decision was made to go ahead and transfer the liquids out of the drums as they stood in the field into new drums, transport the new drums to Building 774 for processing, and put in some drying-type material into the residue in the bottom of the old drums, drum count them for content, and ship them off as solid waste without any further processing. This was in the spring of 1967 that this was all going on and then it continued on through the summer and winter months into the spring of 1968. Finally, the last plutonium had been trans-ferred early in 1968 and the final uranium oil drums were transferred in the first part of June 1968.

The last drums that were transferred created a problem. They were transferred on a forklift and the operator of the forklift was not aware that, as he was driving down the road on Central Avenue from 903 Area and made the turn at the Warehouse corner toward Building 771, a good portion of the way he was sloshing oil out on the street. This was taken care of not by taking the street up (since it was uranium, there was not much activity in it), but by giving the street a coat of gravel and sealcoat. However, to quote from a monthly report of July 1970, Piltingsrud to W. H. Lee: "A section of asphalt between Eighth and Tenth Streets on Central Avenue was replaced by the contractor. The old asphalt was monitored before and after removal with negative results.

65

EGG2009010

The section of roadway had been slightly contaminated in a leaking drum incident in June 1968."

Some of the earlier history of the 903 Area is a little vague and I am not sure if it is documented anywhere but up to about 1963 or 1964 the east end of the Plant was not all that visible to employees or to very many people because the only access road to the Plant was the west Plant access road. We do know that somewhere in the earlier 1960's, because we did have some surveillance among the drums that were stored there, we discovered definite leaks into the ground, and we discovered rabbits inhabiting the area and our management agreed to put up a rabbit-proof fence. To quote from an FY-1961 summary from myself to Piltingrund, "Leakage from barrels of contaminated coolants stored outside has been a problem. At year's end some small amount has been transferred to Building 771 for distillation." A report in October 1960 stated that one plutonium-contaminated oil drum had leaked empty, six with oralloy-contaminated oil had leaked empty, and three with depleted uranium-contaminated oil had leaked empty.

Another operation that I am quite vague about back in those earlier days (it might even have been in the late 1950's) is when Coors Porcelain Company got into some kind of a business in which they were handling uranium. (It certainly was not enriched to the extent ours was.) I believe it was supposed to be a ceramic that was to be used in reactors. They wound up with waste that they had to get rid of as well and I know there was some kind of an activity going on with our Waste Disposal people in accommodating Coors in bringing their materials out here and making some kind of a transfer down in the 903 Area to ship their waste.

Now to get back to the time when the drums had been totally removed. We in the Health Physics department were fully aware of the potential for materials to blow off plantsite. As a matter of fact, as a result of our routine surveys we had had cold soil brought in to cover up the ground which we found contaminated from leaky drums. Of course as long as the drums were intact, i.e. standing on the ground, they in themselves offered considerable barrier to the reentrainment of dust into the air in effect holding it down and preventing contamination from becoming airborne. So it was uppermost in our minds at the time that with some haste we should cover up this area to prevent the high winds that would come on as expected in the winter months of 1968 and 1969 from carrying the soils off plantsite. We discussed it with management and I think pretty much all the pressure we could bear was brought on them. Even so, it seemed like the Engineering head at the time was not excited enough about it to at least have some gravel brought in and put down. Instead, there was a lot of discussion between our Engineering folks and the Albuquerque AEC Engineering folks. As I understand it, they were in disagreement as to exactly how to engineer the cover and therefore the area went through the winter months without any protective cover and the job was not completed until the following summer and fall. I have witnessed one presentation of the Plant briefing for

EGG2009011

COOK   APRIL 11 1994   ITEM 19   91182

visitors in which the speaker implied we did not have as much concern for the environment in those days. As far as Health Physics is concerned, I would take issue with that but with respect to our management and the AEC the reader can draw his own conclusions.

I have been searching and have not been able to find a plot that was put together by Bob Vogel which shows over the years the gross alpha activity that was measured at the air sampling S-8 site, but my recollection of it is that it clearly showed that the airborne levels at that station were elevated more so during the period of time that the 903 Area was unprotected (i.e. after the drums were removed and before the pad was laid down). The area that was finally covered was defined on the basis of health physics surveys but I think the delay in getting the area covered, relative to those surveys, probably had a lot to do with the excessive amount of contamination that eventually had to be moved out from the so-called lip area. I do know that there was additional loose gravel or dirt cover put on the soils to the east of the pad after the pad had been installed because of the contamination levels that were measured there.

For anyone who may be interested, there also exists in the Environmental Master File under No. 60-13886 a letter which Ken Freiberg, who was a member of my group at the time, put together that shows the chronology of the drum removal from that area.

The summary document I put together and previously alluded to in this section also refers to the depleted uranium chips that were buried and are still in the ground across the road from the 903 Area. There are some letters in the Appendices of that document which show AEC approval for that kind of burial. My recollection is that, here again, we had a material about which there was considerable concern, i.e. fire safety in shipping. I do not know the details but I do know that there was at least one of these containers rooted out when an in-drive to that general area was being installed by the service organization--a blade hooked into the ground deep enough to pull one of those containers out. I do not, however, remember what happened to the container or its contents.

There was other outside storage in the 1960's. It seemed like there were volumes and volumes of materials that Building 771 was not equipped for or could not handle and that went into storage awaiting eventual recovery. There were drums stored out north of Building 771 on the ground for some period of time. Then there was the storage location for such drums we termed the Triangle Area in the northeast part of the Plant east of the evaporation ponds bounded by the perimeter road and the ponds. With the increased concern over the problem of soil contamination, we moved an awful lot of these drums into cargo containers. I recall numerous cargo containers being used north of Building 771 and also in the Triangle Area. As time went on, these drums were eventually worked off. There was no more outside storage.

67

One of the associated problems relates back to the disposal of sanitary sludge. Many of the so-called burial sites listed in the document I referred to earlier were used for disposal of sanitary sludge. There was a small amount of radioactivity in that sludge but it was primarily enriched uranium. The Building 774 operation, in the early days at least, processed the aqueous portion of the liquid waste down to an effluent liquid that had to be less than 1600 dpm/liter. In most cases, it was considerably less than that, probably in the hundreds. If, in addition to meeting the radiological standards, the aqueous solution was low in nitrates or basically chemically acceptable (the nitrate level being less than 45 ppm), it was transferred into the stream that took it into the four ponds down below Building 995. It did not go through the Building 995 processing but went on by in that general outfall. I would expect the buildup in those four ponds as well as whatever got into Great Western Reservoir principally came from that source.

One of our top management decisions, sometime after the fire, was that we could minimize the amount of plutonium that went down in that stream if we rerouted the Building 774 effluent into the sanitary system and made use of the sanitary process as a decontamination process for the liquid. It turns out that that particular process did do an excellent job and I do not remember the decontamination factor but it took out a very large fraction of the radioactivity that was in the water. However, this created another problem. The activity was then in the sludge which had to be handled and while in the earlier years we had been putting the sludge into the sanitary landfill, we now had a sludge that had to be shipped as contaminated waste. So we had to drum up the sludge after it was thoroughly dry. It was an outside operation, outside meaning the laborers who were doing the work (including a couple of summer students at one time) had to shovel the material from the drying beds into lined drums which were eventually shipped off as contaminated waste. This presented contamination control problems at that location. The sludge, when dry, is very dusty and special air samplers that were set up did indeed show that there was some amount of activity that became airborne and the powdery material was also easily tracked along ground surfaces. As I recall, there were a few times when we had contamination tracked onto the paved areas east of Building 995. I also recall that some of the equipment that was used for pumping sludge had been contracted from downtown and we had a further problem in that we had to decontaminate that equipment.

The aqueous solutions from Building 774 that did not meet the chemical standards in the earlier years were piped into the solar evaporation ponds built for that purpose. As time went on, plans developed to eliminate the ponds and use forced evaporation. This, as we all know, was not accomplished and even though we had evaporator capability, the ponds were still needed to accommodate the load. The solar evaporation ponds were probably good in concept; had they been constructed in a manner in which they would have been leakproof, they certainly would have done the job properly, but the problem we faced

68

EGG2009013

with those ponds over the years was they developed leaks and this resulted in saturating the hillside with nitrate-laden water. We did have a few windstorms that caused a problem or two from salts that were carried out of those ponds as aerosols and blown east. There was a time when we had a lot of construction people parking their cars over in the same Triangle Area I referred to earlier. When winds occurred, those cars were subjected to deposits of salt. It turned out, however, that the radioactivity in the salt was practically nondetectable and we never really had much of a problem.

Another interesting problem to include in this section relates further to nitrate disposal. I think, in general, over the years from the standpoint of release of nitrate-laden aqueous liquids, the Plant has done a fairly good job, save the problem I just related with respect to the solar ponds. We were very sensitive to the 45-ppm number which was a standard for many years. It was based upon the possibility of nitrate getting into milk from cows drinking high-nitrate water and the further potential of "blue" babies developing from drinking the milk. At one time, we were quite concerned (this was in the mid-1960's) about unexplained increased nitrate levels going out of Building 995. Our Waste Disposal folks did a lot of investigative work trying to find out where the nitrate originated. It seemed to be a chronic-type problem since the value had gone up and seemed to stay there. One of the areas suspected was Building 123 since a lot of nitric acid was used in the urinalysis assay work. There was no direct evidence that Building 123 was the problem area but at that time its effluents did go directly into the sanitary system. Since there was a process waste line fairly close by (because in the early days Building 441 was a laboratory), we tied into the process waste line in order to eliminate Building 123 as a source of the nitrate going into the sanitary system. The nitrate level stayed up, however, so obviously Building 123 was not the problem. No other obvious sources could be detected and eventually a consultant was hired to come in to look at our entire system because we began to wonder about the Building 995 area itself. The consultant who was from Coors went over all of the parameters that were used in the Building 995 operation and discovered that we were manufacturing nitrate in the sanitary process. This was happening because of the oxidation of ammonia and when the ammonia was oxidized, it went to the nitrate and showed up then in the effluent as the major contributor to the nitrate problem. Basically, what was happening, as I understand it, was the so-called digestion stage was being operated such that the material passing through it was there for too long a time period and the excess oxidation was allowed to occur. Corrections were made in the sanitary process and the nitrate level came down. However, this had been a problem for a long enough period of time that the level at Great Western Reservoir had risen significantly (I do not recall the number--it was less than 45 ppm), and I plotted for many months the level of nitrate in Great Western Reservoir in the interest of seeing how long it would take to drop down to essentially nothing or, if there is such a number, to a natural number. One of the problems one always runs into when there is a reorganization is that such papers get shuffled around and get lost.

69

EGG2009014

In the early 1970's, the Health Physics group was split up into two separate organizations with the Health Physics Laboratory being split off. Although the lab had never been under me, I lost my direct association with the group. I turned over all the data on the subject to Stan Hammond, who at the time was in charge of the Laboratories and Industrial Hygiene, and no one knows what happened to it. My recollection is that it probably took something in excess of a year or more to bring the nitrate level down to what was considered a normal level.

Another related area under this section regards "buried contaminated lines." Rocky Flats has always experienced a problem of soil shifting and this has contributed to broken lines, leaky joints, etc. There have been numerous underground lines over the years used for transfer of aqueous liquids containing varying levels of radioactivity. Obviously, soils around many of them became contaminated. The realization and concern for this led to a policy in the early 1970's that "all process lines shall be constructed in such a manner as to render them inspectable and reparable..." Extensive work in identification, testing, and planning is summarized in a report in the Industrial Safety file: Buried Contaminated Lines, 5-8-73.

## Some Internal Exposure Problems

Throughout this document under various subjects I have alluded to various kinds of occurrences, accidents, etc., that have resulted in internal exposure, and I will try not to get into any of those specifics again but I think there may be a few things more to be said in the area of internal exposure.

I believe the reason we have had a large number of employees who show something detectable in the urine, and therefore have measureable systemic burdens is probably something that should be expected in a Plant such as this. I believe that had we had the protective capabilities of fitted respiratory protection and had we had the concern that we have today for radiation exposure from Day 1 on, I believe that we would have less people with, and probably lower levels of, systemic burdens. I am not trying to criticize the operations from the early days because we were living in a different world. We and the AEC in general looked at radiation standards in a much different way. We looked at them in terms of doing our darndest to stay below them and this meant, as far as internal exposure was concerned, not to accumulate a maximum permissible body burden during the working lifetime of an employee. The way we did things and the way we learned things, from places like Los Alamos, did not suggest that our people would remain at ZERO exposure as time went on. I think, though, that with the means we had to work with at the time, we did try our darndest to keep things as much at a minimum as possible. I think a lot of our Maintenance people were very innovative and helpful in developing safe ways of doing specific jobs. While there has been a lot of criticism of the amount of supplied air work we have done, I think in retrospect, had we used the full-face masks that were available in the early years, such as the

70

EGG2009015

COOK   APRIL 11 1994   ITEM 19           91186

assault mask instead of the supplied air, we would have had a lot less protection and a lot more exposures. So I think I would be the first to defend the use of supplied air under the circumstances in which we were working during those years. Then, too, I have already mentioned the fact that we were working very closely with protective equipment people in improvements of respirators, and I think we played an important role in the improvements that were made and, of course, we were a pretty good customer of the respirator manufacturers.

There were some things that occurred that turned out to be problems. Prior to the time of the Wound Counter, we didn't feel that we really had a wound contamination problem. The nature of the Fabrication work was such that there was practically no potential for cut fingers, and I do not believe there is a case on record of anybody, who worked in Fabrication on the type of plutonium parts we had in the early days in Building 771, cutting a finger that might have been contaminated. We know that we had a couple of cases in the Chemistry and Development areas because I know of a couple of cases where nodules formed in fingers and after we had the Wound Counter and measurements were made, they did indeed show that plutonium was in the fingers of these people. The nodules were removed.

When Building 776 started operating, it presented new and different problems from the internal exposure standpoint compared with what we were up against in Building 771. Perhaps the worst problem we ever had in Building 776 was with the type of conveyor system conceived by the manager of the Fabrication group. It was nothing more than about a 2-inch-wide steel band that went along the bottom of the glovebox line and returned across the top of it. This steel band literally honed itself on the surface of the glovebox and developed razor-sharp edges. We had any number of contaminated wound cases coming out of Building 776 where employees just accidentally happened to touch this moving band. That is all it took, a touch, and they would have a cut finger that was contaminated. So, in those earlier years (more so in the 1960's) we had a large number of employees with wounds, many of whom came from the Building 776 Fabrication area.

Another contaminated wound hazard I remember that resulted in a number of wound cases were balances with pointers on them located inside gloveboxes. Very frequently someone would come to Medical with a contaminated wound received when they had been weighing something and accidentally had stuck their finger with the pointer of a balance. Other wounds which developed out of that type of operation were associated with the Foundry where fine needle-like pieces of plutonium would punch through the gloves and catch the employee unaware. The rolling mill and the shear each had some problems associated with fine needle-like pieces that were generated from those operations. I recall one employee who was stuck through the entire fleshy part of his thumb by a sliver of plutonium.

71

EGG2009016

COOK   APRIL  11  1994    ITEM  19              91187

I have mentioned nodule formation in a couple of these cases. There is documented and published by Dr. C. C. Lushbaugh, currently at Oak Ridge Associated Universities, a paper on an examination of the nodule which was taken from one of our employees. This created quite a stir at the time because the cell structure was described as precancerous.

I think a lot of our internal systemic burdens also came from the numerous wounds which we had over the period of time when we were in heavy production in Building 776 and were using some of the hazardous equipment I mentioned. In the past 10 years or so the number of wounds has been much, much lower and the nature of them has been such that in most cases the doctors have been successful in removing the plutonium.

In addition to the many people who carry fractions of a maximum permissible systemic burden, there are, of course, those few cases of people who carry in excess of the maximum permissible systemic burden or lung burden. With possibly an exception or two, these cases have all resulted from acute accidental exposures and, therefore, I think that the Plant needs to continuously emphasize programs designed to prevent accidents and/or mitigate their effects. Most accidents that occur in plutonium facilities do have a potential for contamination being involved and that usually means people being involved and most do not seem to realize how small an amount it takes to reach a maximum permissible systemic or lung burden. This perspective needs to be frequently emphasized.

### Plutonium Chip Can Explosion - August 22, 1971

This occurrence, which at the time received considerable publicity and with respect to the individuals involved excessive publicity, was investigated as a Type B occurrence and the investigation reports are on file.

There are probably a few aspects of this that might be worth discussion. This was yet another occurrence which demonstrated the incompatibility of carbon tetrachloride with plutonium when subjected to elevation in temperature or burning. The two previous occurrences which relate to this kind of reaction were in effect triggered by mechanical forces giving an energy surge, if you will, to start the highly energetic reaction. This one proved to be a relatively slow-starting reaction, one for which it is difficult to understand exactly what the triggering mechanism really was other than being strictly chemical in nature.

This was a sealed can of plutonium chips which had been measured in a calorimeter to determine and quantify its content. As I recall, the investigation very clearly indicates that a contributing factor to the cause was probably a slight change in procedure or technique by a person who was filling in on doing the particular job from which the can originated. The chips were canned with some carbon tetrachloride from the

72

EGG2009017

COOK   APRIL 11 1994   ITEM 19   91188

degreasing operation still remaining on them. The can had been measured in a different room from that where the occurrence took place. As a matter of convenience, it was stored on a shelf in the room where it exploded. In outward appearance, it was similar to other cans for which one would not think there would be a problem. In any case, in retrospect it seemed very inappropriate for the can to have been stored on a laboratory shelf, not even under the responsibility of Production to whom it was assigned.

This occurrence pointed out a couple of other things with respect to policy and procedure that I think needs to be reiterated. There were questions raised with respect to facial hair requirements of our employees, and even though the facial hair probably did not enter into the cause of the exposure, it did raise the level of concern from the standpoint of whether any kind of facial hair on the chin can impede the ability of a mask to give adequate protection either relative to the seal to the face itself or from interference with the respirator valves.

Another awareness this incident very clearly pointed out was the immediate need for laboratory analysis of materials which are involved to determine chemical form as early as possible as a guide for medical treatment, and further, that DTPA treatments probably should be initiated just in case there are chemical forms present which would allow the DTPA to be therapeutically effective. In this particular case, because of our experience with previous exposures to pure oxide and the ineffectiveness of DTPA for same, the decision was made at the Medical department, on the presumption that the exposures were from pure oxide (probably high-fired), that DTPA was not called for. It was only after an analysis, the results which came in several days later, showing a substantial fraction of chloride that the DTPA was started.

Finally, one other thing that can be said about the report of this incident is that there was some concern about the use of other similar solvents, i.e. chlorinated hydrocarbons, in other areas where metal fines are generated. It would be good for anybody who might be involved in such operations to read information on such materials collected at the time. If nothing more, it could instill an alertness to potential problems which might occur with such kinds of materials.

As a follow-on to the discussion of the August 22, 1971 incident, there is a very interesting report in another folder in the Industrial Safety occurrence file entitled "Reactive Chemicals Hazard Evaluation." A particular report in that file that I am referring to is entitled "Chemical Hazards Analysis, Building 776 Foundry" by W. E. Domning. This goes into a discussion of the potential hazards associated with carbon tetrachloride and various metals and oxides and points out that, for example, with aluminum somewhat finely divided, it may take only a temperature elevation of 75° C to initiate a high-level reaction. It talks about other metals as well and here again I think it would be good for employees who are involved with metal working, etc. and associated hydrocarbons and solvents to be aware of what is in this report.

73

EGG2009018

Tritium Occurrence - 1973

There are two rather extensive files in Industrial Safety relating to this occurrence. One is quite specific to the investigative report itself and the other is entitled "Tritium Release - Rocky Flats Area, 10/73." For the interested party, there is probably all the information one needs or wants to read relative to that particular incident. There are a couple of observations I might relate to from this extremely embarrassing occurrence for both The Dow Chemical Company and the AEC. The one situation that I think we can go back in retrospect and say we never should have done was to stop our own tritium sampling. The Health Physics Laboratory manager, Stan Hammond, had been sampling for tritium in the effluent waters of Rocky Flats. Stan had worked for the State of Colorado many years ago and, while possibly being a little bit cynical, he decided on sampling when he heard the State was doing it, with the idea that he did not want them to come up with something he did not know about. The State was sampling the waters, I understand, not so much in the interest of measuring what was coming from Rocky Flats but as a part of an overall waste sampling program to determine tritium in the waters of Colorado. This may very well have been linked to their environmental surveillance program associated with Rio Blanco.

With Stan's untimely death his reason for sampling apparently was abandoned and the equipment used was converted to other uses by his successor. In retrospect, it was unfortunate to have abandoned the capability.

From my perception, another part of the problem was that it seemed the reorganization which had taken place at an earlier time added to the confusion. The reorganization, in effect, separated the old Health Physics organization into two groups--establishing a separate Environmental function with a so-called Health Physics & Product Research group which later became Environmental Sciences. Even though we reported to the same director, the Environmental group went merrily on their way trying to find the source and we in Health Physics Operations were pretty much left out in the cold, sitting on the sidelines not really knowing what was going on. We in Health Physics Operations did have sampling equipment at the time with which I think, had we been brought into the know as we probably should have been, we could have made surveys within buildings that might have solved this problem a lot earlier than it was solved. Once the source of tritium had been determined, it became very apparent then that a lot of equipment in glovebox systems on the plantsite were in all likelihood contaminated with tritium. There were even some activities relating to the plutonium that had come into the Plant that involved Building 881 and Building 444 operations, so there was some surveillance and some cleanup activities that had to take place in those buildings. However, the massive amounts in gloveboxes were in that particular area of Building 779 where the hydriding had taken place as well as some of the associated gloveboxes extending into the Building 776 area. Considerable effort was made to clean up those boxes. Since we had had, for all practical purposes, no

74

COOK   APRIL 11 1994   ITEM 19   91190

experience in tritium decontamination, we turned for help to LLL for some standards and to Mound for some practical experience. Joe Garner from Mound came out and gave us some suggestions as to how to handle some of the materials, how to clean up, etc. Many of the people we talked to at other sites sort of scoffed at what we were doing from the standpoint that the levels we were talking about were so small that we were going overboard relative to any health hazard associated with those levels.

Related to this incident were several other problems. We had problems associated with containers that had been used to ship things back and forth from Rocky Flats to other places: We found tritium levels in some of those containers and cleanup was required. We estab-lished our own document relative to the standards which we were going to live by and there exists in my file a book entitled "Health Sciences - Radiation Monitoring Tritium Procedures" dated 3-12-75 which is a summa-tion of the standards and procedures which we used during the course of the cleanup of the tritium incident.

Another sidelight to this occurrence relates to ensuring that the Plant would not receive any other shipment that could "surprise" us. Ed Young, Ed Vejvoda, and I were assigned to an ad hoc committee to establish procedures and requirements to ensure that at least we would require shippers to certify that unusual materials were not in their shipments or, if there were, tell us what they were so we could make a decision as to whether or not we were willing to accept them. Paperwork on many of the actions of that committee as well as much of the other information I am relating here is in a file in my office--OM 7, Ad Hoc Committee, Monitoring Procedures.

While there were those who might have said we did not want any tritium at all in plutonium, we recognized from the onset that a ZERO number was not a practical number since, in all likelihood, there was some tritium background in the plutonium we were receiving. I was asked to come up with a standard for material coming into the Plant, which I did. The numbers were not pulled out of the air, rather I used a radia-tion concentration guide from Manual Chapter 0524 for tritium in oxide form--for an individual in the general population--and made the assump-tion that if that concentration were not exceeded in a stack that we would be so far below anything that got into the environment that there should be no concern over it. I proceeded to make calculations then relative to the amount of air that went through the various stacks. I also looked at the potential of tritium getting into the water effluents and what it would take to maintain water effluents less than 1000 pCi/liter. From these calculations I arrived at numbers that were transmitted to the AEC as official numbers. We allowed no more than 0.1 curie per shipment in 1 month's time, or not more than 0.01 curie per container or per kilogram of plutonium contained in the shipment. A further consideration that went into these numbers was what the poten-tial would be for exposed Plant people should such concentrations be allowed in plutonium. To assure everyone that these numbers were all

EGG2009020

COOK  APRIL 11 1994    ITEM 19                    91191

right from that standpoint, we related them back to the experience we had with exposures to those employees who handled the parts in the 1973 incident. The numbers allowed for future shipments were calculated then to result in something on the order of 3 to 4 orders of magnitude less than the actual personnel exposures at the time of the incident. None of those exposures were in excess of annual allowable standards as evidenced by urine analysis and extrapolations back to probable time of exposure.

We also came up with some Rocky Flats action guides for cleanup of boxes, effluent air, etc. We established for the inside surfaces of gloveboxes smear levels of 1 $\mu$Ci/100 cm$^2$, and for the process area in general, e.g. floor surfaces, equipment surfaces, etc., 0.005 $\mu$Ci/100 cm$^2$ on a smear. For unlimited transfer or going into storage, we allowed up to 0.001 $\mu$Ci/100 cm$^2$ on a smear. For effluent air as determined from bubbler samplers, we established 2 $\mu$Ci/m$^3$; and for room air as determined from bubbler samplers, 0.05 $\mu$Ci/m$^3$. For receiving containers, we established a number of 5 $\mu$Ci/m$^3$ on the Sniffer. We also at the time looked into the amount of tritium that may be related to deuterium containers which were to some degree used in Research & Development activities and came up with a number of 0.06 millicuries of tritium which could exist along with deuterium in those containers. The source of that tritium was felt to originate from the deuterium production process itself from the natural environment.

Because initially there had been concern that the source of the tritium may have come from the landfill, we initiated sometime during this crisis a routine surveillance of material taken to the landfill. This revealed a number of situations in which we were able to stop small quantities of radioactivity getting into the landfill. One of the interesting things that came up at that time was that discarded clothing, principally coveralls coming out of the plutonium laundry which theoretically contained no plutonium, gave positive readings on the Fidler-type survey equipment that was used. Apparently there was just enough contamination that would get into the various seams, etc., in coveralls or that was less than detectable by alpha surveillance, that we were able to detect when we had a large volume. From that point on, discarded coveralls were handled as LSA waste.

There were a few other situations which came up from time to time. Material that originated from uranium areas showed measurable radioactivity and was returned to be processed as solid waste. Also, radioactivity in waters suggested there may have been some strontium-90 in the landfill as well, the source of which no one ever seemed to be able to ascertain. All the numerous correspondence, dialogues, etc. that occurred between The Dow Chemical Company, AEC, State of Colorado Department of Health, various administrators of the cities of Broomfield et al., are fairly well documented in the file and I will not go into any of those details.

EGG2009021

COOK   APRIL 11 1994    ITEM 19           91192

A further related occurrence was in September 1974, at which time an unexplained increased room air level and increased stack level occurred and this resulted in a full-blown investigation by a committee consisting of AEC employees. The real reason for the release was never exactly known and was postulated to be related to some kind of a puff from residual tritium in lines and ventilation systems from the 1973 incident which may have been released because of changing humidity conditions or changing conditions within the ventilating system that changes humidity. In any event, this brought on some more recommendations, more enhancement of the sampling that we were doing, and the document which I referred to earlier on procedures, I believe, was a result of this. Also, there was reiterated in this investigation that we had a considerably large number of pressure cooker type of shipping containers that had been used to ship plutonium among the various sites that were indeed contaminated with tritium. As a matter of fact, the room air sampler that came up high could possibly have resulted from a container which had plutonium in it and was handled in that particular room. The container showed up with a fair amount of tritium contamination within it. As I recall, the container problem was resolved by a combination of cleanup or container disposal.

77

EGG2009022

## ADMINISTRATION

### Introduction

In this section I intend to discuss a number of administrative happenings over the years and I am doing this with a two-fold purpose: (1) To record as best I can a number of things that occurred; and (2) To take the liberty of philosophizing and commenting either positively or negatively on those various happenings. To me it is just as important to relate to administrative occurrences that have had great influence positively or negatively on Plant operations or people themselves as to relate to the numerous items covered in the first two sections. The final part of this section will be a kind of "potpourri" listing of things that happened where possible in chronological order. The listing represents things that I have run across that may be of interest that perhaps have not fit into any of the discussions thus far, or may more specifically date some of the things that already have been discussed in some detail.

### Labor Relations

We operated without a union until May 18, 1953. The first union to come in was under the AFL-CIO Affiliated Denver Metal Trades Council. This union was craft-oriented for the most part and had something like 21 or so local unions that it represented, i.e. the pipefitters had their own local, the machinists had their own local, electricians, etc. The Denver Metal Trades Council represented the production and maintenance workers for a number of years. In 1965, the first contract with District 50 of the United Mine Workers was negotiated. The Denver Metal Trades Council had been decertified.

This proved to be quite a turnaround from a highly craft-oriented union to one which from then on was to be dominated much more by the noncraft people. Under the Colorado Peace Act which required a three-fourths majority vote for union shop, District 50 for the first several years had to operate under an open shop. The crafts, in effect, were objecting to a noncraft union. District 50 then represented the workers until they became affiliated with the United Steelworkers in 1973. From my perspective, these changes which occurred in the three different union affiliations went from a highly locally controlled situation into a much, much more nationally/internationally structured type of organization with the Steelworkers.

The first pay grade structure under The Dow Chemical Company and continuing on for several years after the Union came in included 10 pay grades. (I am not sure exactly how long these specific 10 grades persisted but in any case it was what we started with.) There were some interesting things related to that particular pay grade structure and assignment location of people. In general, the journeyman-level pay was at Grade VII with Toolmaker at Grade X and some of the more highly

EGG2009023

COOK   APRIL 11 1994   ITEM 19        91194

skilled Inspectors also Grade X. There were some specialties, e.g., in Instrumentation that were at the VIII or IX level. The Chemical Operators group who worked with plutonium (in those days in Building 771) were at Grade VII, VI, or IV depending on where they fit into the job assignment structure. The plutonium area was the only place in which a Chemical Operator could progress to Grade VII. The operator in Building 771 was not limited to production chemistry as we know it today, but the Foundry folks, and actually those who worked on the fabrication, were also called operators and were also at the Grade VII level.

The uranium workers, on the other hand, were rated no higher than Grade VI. This was a carryover from Los Alamos. The differential was started because of the recognition by the superintendent of the plutonium plant of the added skills necessary to work through gloves in gloveboxes. Therefore, there was a nominal one-grade difference. At the pay grades in those days, that meant almost a 10-cent differential for plutonium workers. This differential also was true of the original structure that was set up for the Radiation Monitors. The Radiation Monitors who were not assigned to plutonium were Grade IV; those assigned to plutonium were Grade V. This was to cause us some problems as time went on since we needed the flexibility of being able to use monitors throughout the Plant. When I get into the next subject of skill allowance, area allowance, and things of that nature, it will be seen that this original notion of pay differential added to those overall problems.

The area allowance situation as we know it today is not the same as it was in concept when it first was started. Going back to the notion that in a plutonium area the chemical operator was from the very beginning given a grade differential because of the added recognized skill, it was not long before the Maintenance workers caught onto this fact. They were all at journeyman level with no added allowance for working in the plutonium areas, and for them and their work in plutonium areas there was indeed additional skills (in some cases more so than for the Chemical Operators) to do some of the jobs which they had to do. By the time the maintenance worker issue was raised, the Union had already come in and the Maintenance workers made a request through the Union that their jobs be studied. Our management brought out two gentlemen from Corporate in Midland MI, Ron Lowry and George Root, to do job evaluation studies and one of their first assignments was to study maintenance work in Building 771. These two gentlemen spent quite a bit of time observing the Maintenance folks and their final evaluation was such that, yes indeed, it did take more skill to do a job in Building 771 than a similar job in one of the other buildings and, therefore, the job should be worth more. (At that time I think the initial estimate was 5 cents/hr more.) However, by the time it all got worked through, it was determined that they should get an additional 10 cents/hr. Thus started the notion of a skill allowance or area allowance, whichever you want to call it. In any case, the origin of it was that it was based on

EGG2009024

COOK   APRIL 11 1994   ITEM 19      91195