the added skills and inconveniences associated with the kind of work that one has to do to get the job done in a plutonium facility.

At the very next negotiations, however, somehow or other the fact the Chemical Operator differential pay grade was already there for skill reasons got lost in the shuffle and they went in and asked the Company for the same thing as the Maintenance folks had received and it was allowed. Probably it was at the same time but at least by 1956 chemical operators not only in Building 771 but also in Building 881 had a progression program and they all progressed to the same top base rate.

Area allowance was set up in Building 771 which at the time was the only plutonium facility. Those on the first floor who went through the airlock to work in the production and laboratory areas received 10 cents/hr administered as follows: in order to get 1 hr they had to be there a least 1 hr; in order to get 4 hr they had to be there at least 4 hr; and in order to get 8 hr they had to be there the full day. The determination of hours of area allowance for an employee was managed by supervision. The area allowance did not figure into a person's vacation pay or other nonproductive pay until some years later.

The first situation that developed that related the area allowance to the notion of hazard or pay for work with radioactive materials occurred after the Building 771 fire of September 11, 1957. Our Industrial Relations manager, without consultation with anybody in Health Physics, immediately announced that area allowance would be paid to any hourly worker who went through the outer security guard post to do any work associated with the fire or the cleanup, and the boundaries for area allowance would revert back to where they were previous to the fire, i.e., inner guardpost and excluding the second floor, at such time as it was deemed by Health Physics that the remaining areas, such as the second floor, were decontaminated and no health physics restrictions would have to be put on any kind of a job that might occur outside those original area allowance boundaries. This implied then that the reason for the area allowance was not so much for skill but related to the protection required for the potential hazard associated with plutonium. So, in effect, since we could never guarantee a job on the second floor not to require some sort of protection or at least minimum health physics surveillance, area allowance continued indefinitely and from then on the building itself became the boundary for area allowance.

By 1957, Building 776-777 had already been built and was under partial production and area allowance was being paid in those areas as well. There did not seem to be any question about the fact that area allowance would be and was paid in plutonium facilities per se for quite a few years.

While addressed in the Union Labor Agreement, there was little if any question over its administration and then in the Agreement with the Union in 1968 there was formed an Area Allowance Committee composed of

EGG2009025

two Company and two Union representatives who were chartered to investi-gate and make recommendations to the Company and Union committees as to which areas should receive area allowance. There was also a statement that the removal of area allowance from any area would be done only by joint Company-Union agreement. Prior to that the contract had stated that area allowance would be paid by agreement of Company and Union but there was no committee who worked on any of the problems. Some of the things that had occurred, such as the transfer of contaminated oil and working with contaminated oil transfer at the 903 Area, and the transfer of plutonium-contaminated uranium parts to Building 883 and also to Building 881, were of a nature that the protection required for plutonium was really no different from that required within the plutonium production and laboratory areas themselves. Hence, area allowance was paid and area allowance terminated at such time as such jobs terminated. So the Company and Union agreed that there should be a committee to make the determinations where area allowance should be paid and when it should be removed. Thus started the Area Allowance Committee.

The Area Allowance Committee established a criteria which was a very short statement written in the form of a letter that said, in effect, that area allowance would be paid for any job in which full protective clothing was required and a respirator had to be at least carried because of the potential of working with plutonium or material of similar or higher specific activity. This opened up the situation to an awful lot of interpretation and eventually a lot of bickering and disagreement between Company and Union and it certainly did not make the health physicist's job any easier. From the health physics standpoint, we prefer to be very conservative. ALARA must be considered. Even though there is not much of a chance of exposure, we prefer to require a respirator just in case. So area allowance was paid for an awful lot of jobs in which the risk to plutonium was very minimal. Area allowance was paid for jobs such as sludge removal at the sanitary treatment plant, removal of contaminated soils from various places on plantsite, and things of that nature. Because it tended to become quite liberal and also was equated back in the earlier days to plutonium as a risk factor, there was more and more pressure as time went on that the area allowance should be paid for other things because of risk as well as for plutonium, more specifically such things as beryllium. There were a number of other kinds of potential hazards that were brought up from time to time.

I was on the Area Allowance Committee from sometime in 1973 or 1974 up until about a year-and-a-half ago. There were numerous times that our management, and I am talking both Dow and Rockwell, wanted to consider negotiating area allowance out completely. I went through several exercises in the early 1970's that suggested, at least at the time, that the vast majority of production and maintenance people were getting it anyway so why not prorate it over the entire plantsite and negotiate it out. This, of course, was never done. When Rockwell came on board I suggested the same thing and it was never done; but, because of some of the problems relating to starting up Building 374, I heard

81

EGG2009026

comments by some of our Rockwell management that implied they also would
like to get rid of it.

I think, in retrospect, a golden opportunity was missed in the last
negotiations. The area allowance pay was increased substantially over
what it was previously. The explanation which we had after the closing
of the Agreement was that the plutonium operations management were
having difficulty getting people to sign into jobs in that area and were
having problems retaining people in that area and the increase was to
try to alleviate that situation. When I say we missed a golden oppor-
tunity, I think the increase that was negotiated could have been done in
a way that says, "OK, we will eliminate the concept of area allowance on
a plantwide basis but we will pay these additional monies for those who
bid into and work in our plutonium production buildings, laboratories,
and research areas and the boundaries will be those buildings, security
fence, or whatever." Also, the Committee could have been eliminated
along with all the headaches and time-consuming meetings associated with
it.

A related pay situation from the standpoint of skill, inconve-
nience, or whatever, is the notion of pressure suit pay. This has been
with us since about the mid-1950's or thereabouts. Again, the Union
questioned whether or not a premium should be paid for work in supplied
air suit's. (The term "pressure suit" was a carryover from Los Alamos.)
Our plant manager observed such jobs going on in Building 771 and came
away and said, in effect, "Yes, it does look rather inconvenient and
perhaps these folks should get additional pay." So at the time of the
1956 agreement (I am not so sure about before that time), 50-percent
premium of the employee's straight-time base rate was applied when
working in pressure suits.

We kept very close bookkeeping in those days relative to that pay.
Health Physics was told by management that they would be the book-
keeper. We logged in the time a person actually started to work in the
fully dressed suit and logged him out at the time when he left the
workplace after he had been undressed. I am quite sure that adminis-
tration of pressure suit pay is considerably more liberal today than it
was at the time that we were keeping the books. Eventually supervisors
were given the responsibility and authority to log in on timecards
whether their employee should receive supplied air pay.

Since we in Health Physics had to make the decision as to whether a
job should require supplied air or not require it, we were frequently
challenged on whether we were being too liberal in our requirements to
avoid paying an employee the 50 percent. Then too there were times when
employees would say, "Well I'd rather wear the supplied air suit because
it is much more comfortable for doing the particular job than wearing
some other respiratory protection that might be required, such as a
full facemask with an all-purpose canister." So there were times when
employees wore suits and were not paid because they were wearing them
strictly for their own comfort and at their own request. Sometimes this

82

EGG2009027

did not stop them from coming to us later and saying it should have been required and, therefore, now we have worn it you will pay it.

Another part of the supplied air problem is that in the earlier days the pay was only for plutonium. How equitable this was was a very legitimate question. As time went on, if supplied air protection was required by Health Physics or Industrial Hygiene, the people involved were paid. The supervisor made the final determination, however, because it was he who signed off on the pay card as to how the employee should be paid. There was also a provision in the contract that did not allow supplied air pay if a suit was used to protect the product from the man.

We had some jobs which were deemed equivalent to so-called supplied air for pay purposes. A specific job I can remember as an example relates back to the cleanup of Room 180 in Building 771 after the 1957 fire. Room 180 was the origin of the fire and after the fire it was sealed up and sat in a rather static condition for some time and there were even questions raised should it ever be cleaned up. I recall the Production manager saying it would be a black eye if we did not get it cleaned up, so plans were made and Room 180 was eventually decontaminated and ready for further use in April 1960. Some of the cleanup in the ceiling area was deemed to be extremely difficult to do in supplied air and there was much innovation that went on relative to various kinds of protection people were given to do the job. As to whether it was a good idea, a bad idea, or what (and I know it would not be allowed today), the Health Physics supervisor in the building came up with a full facemask configuration that had two high-efficiency filters in series and we went ahead and put people in those masks when working at these higher elevations. We felt it was unsafe to have someone up there with a supplied air hose that he had to maneuver around various pipes, ceiling struts, etc. I expect this was not all that out of line when you consider other places that have done some rather high-level work using such things as assault masks. In any case, these individuals had to be totally protected with what we called sheik hoods, extra gloves, extra booties, extra coveralls, etc., and, except for the air hood and air line, they were in effect dressed the same as the person in the supplied air suit. The Company did not question it at all but decided that these people should also be paid the 50-percent supplied air suit pay while working in that cleanup situation. After the 1969 fire, I am sure similar situations may have occurred. Use of such substitutes caused some new language to be put into the labor agreement in 1960 which I quote:

Section 18.  PRESSURE SUIT WORK

(a) All work requiring pressure suits or equivalent equipment used in place of pressure suits when required by Supervision and Health Physics shall be paid a premium of fifty percent (50%) of the employee's straight time hourly base rate. This

83

EGG2009028

COOK  APRIL 11 1994   ITEM 19        91199

shall be in addition to any other applicable premium.

(b) Equivalent equipment is considered to be a respiratory device listed below when used in conjunction with the standard pressure suit.

    1.   An air line supply of air, or

    2.   A self contained generator for oxygen or air or a tank of air, or

    3.   At least two ultra or super dust filters in series, or a respiratory device developed to be used in lieu of two (2) ultra or super dust filters in series.

    4.   When respiratory devices in (2) or (3) above are used, a "sniek"-type hood will be required.

Another kind of pay that has come up (and this has come up since Rockwell came on board) which completely befuddles the health physicist is the notion of full facemask pay. I do not see it in the latest Agreement so I assume that probably with the increase in area allowance it has disappeared, but the rationale that must have gone into allowing this in the first place is beyond comprehension. Certainly with all the alleged inequities associated with area allowance and supplied air pay that have been alleged by the Union and the difficulties many of us have had to sort them out, I cannot see how anyone could be convinced that to wear a full facemask in Building 771 was any different from wearing one in other plutonium areas. The extra pay for full facemask wear which was proposed, as I understand, by the Union certainly was an inequitable kind of thing. There are no differences in requirements in Building 771 as compared with other buildings with respect to when a full facemask should be used or for what reason. The frequency of use I'll grant you is greater.

Over all the many years going way back to the early days, we in Health Physics have had many frustrations when management have made decisions that relate to potential risk or protective equipment requirements or things of that nature and have initiated action to put them in place without any consultation with the Health Physics department or without any previous agreement with health and safety people. After it is all in place, we get telephone calls to help administer the action and make decisions and judgements. The full facemask pay is a prime example. I had hourly people in Building 771 who perhaps would not put a full facemask on more than once a year, if at all. The fact that they may have to someday allowed them to be paid full facemask pay 100 percent of the time. The ruling was laid on us by Labor Relations after the employees complained they were not getting the premium. This

EGG2009029

COOK   APRIL 11 1994   ITEM 19   91200

is something that has to be defended on the basis of risk and when you do not have any input into it, it certainly makes it difficult.

Another administrative area in which I was heavily involved in the earlier years and on up to probably 1970 or so was the initiation and administration of the Monitor Progression Program. I have already mentioned that at the beginning the monitors in Building 771 were Grade V and monitors elsewhere were Grade IV. We in Health Physics made several attempts in the earlier years to convince our management that the monitors should be used wherever we needed them and that we should have the flexibility of rotation. In the event of an emergency, we would want our monitors to be able to function anywhere on the plantsite where the need might arise. We accomplished getting them all to Grade V in 1954. Perhaps it was not until the Building 771 fire in 1957 and the total response of the Health Physics monitoring group that our management really understood what we were talking about. In any case, we did in those early years manage to get somewhat of a unified program to treat all monitors alike. The two industrial engineers who had looked at area allowance also looked at the monitor's job and did come up with an overall rate on the presumption that monitors could be utilized anywhere on the plantsite. We began a program of moving monitors around and giving them training such that they could function wherever we had a need.

With my becoming group leader in August 1955, my job became easier from the standpoint of assuring that all monitors were trained for all parts of the Plant. We eventually began a rather formal rotation and training program. I think one of the big advantages we had in those days, which today would not be allowed, was that we required a monitor to have high school mathematics, physics, and chemistry as demonstrated by taking examinations. Because of that we did have a rather select group in those early years and a group highly motivated and, more or less, scientifically oriented. They were willing and eager to learn more about radioactivity; they took pride in their work; and in general were a delight to work with. We also had a scheme whereby any monitor who had the desire to learn beyond that which was really required for his job pretty much had the opportunity to do so mostly on his own but by allowing some time for tutoring by his supervision. In addition to the academic prerequisites we had some rather strong requirements on adaptability, working with others, attitude, etc. I can remember at least two monitors released because of deficiencies other than the academic requirements.

The Union became much more active in the area of what their desires were and to utilize the requirements and qualifications we had put upon them as bargaining points with the Company. By 1962 we were pretty much forced into developing a formalized program which was included in the collective bargaining contract. This program had a 3-year progression as far as wage was concerned and had testing and evaluation to go along with it, including a final examination, in order to reach the top grade. In 1965, a monitor could go to Senior Radiation Monitor in 4 years with a pay increase as well.

85

EGG2009030

We had the provision in the program to remove a person and return him to the Employment department if he should not meet the qualifications during the progression period. Usually if a person was unable to perform satisfactorily as a monitor, it would show up in the early months of his training and in the period of 1962 to 1972, we removed about 10 people from the radiation monitor program because of inability to satisfactorily perform. With the passing of time, the Union became more and more active in approving such things as examinations, examination questions, etc. and became more active from the standpoint of evaluation of performance of employees in general.

After the 1969 fire in which we had to hire a tremendous number of monitors, we began to have further headaches because we were squeezed from the standpoint of having sufficient time to adequately train monitors. Within a short period of time, if we had anyone who did not seem to perform up to the capabilities expected, the Union seemed to take the stand that the person had not been adequately trained. So for 2 or 3 years we had some problems and there were monitors maintained on the staff that under different circumstances might not have been allowed to continue had we been able to maintain standards in the way the original program was set up.

When the various Equal Employment Opportunity requirements came along, it was necessary to validate examinations which were used to qualify people in the program. Examination content was required to relate to the actual job and could not be of a general knowledge nature. To help us validate such examinations, we were assisted by consultants out of Colorado State University.

With the increasing numbers of monitors and additional areas of assignment, the monitor rotation-progression program was not without other problems. The overtime situation as far as maintaining an equitable distribution seemed to always be a cause for controversy and we had a number of problems that seemed insurmountable. This led up to negotiations in 1973 at which time our Negotiation Committee in attempting to try to help us both helped and hurt our situation. Unfortunately, during actual negotiations there comes a time when the doors are essentially closed and you do not know what is going on behind them. Some of the misconceptions that were used at the negotiating table apparently got us into the problems we had to live with for several years. The recent negotiations may have alleviated some of those problems.

The problem that came up in the 1973 negotiations related back to the fact that we had a plantwide overtime distribution list that had to be maintained within the hour spread requirements of the Company-Union Agreement. Because of the fire and the general Plant expansion with a larger number of employees hired, the existing requirements in the Agreement had become increasingly difficult to administer. Some of the problems we had, for example, required making telephone calls to five or six different places on Friday afternoons to try to line up personnel for overtime in a given building or buildings. Because of the sequence of first calling the person with the lowest accumulated overtime hours

86

EGG2009031

and then working up to the higher accumulations, there were situations where an individual who normally would work in Building 771 would be asked to work in Building 707 and later on in the day maybe a Building 771 job would open up and the next person on the list to fill it would come from another building. This got to be somewhat of a mess. It required a tremendous amount of time on the part of the foremen. On Fridays, they could not devote their time to supervising but had to sit at a phone and try to complete the overtime requirements for the weekend.

Other problems included transportation associated with getting an employee who had his personal belongings and personal locker in one building and had to work in another, and most of the monitors were inclined to want to take their own pet instrument with them. All these complications resulted in maybe a half-hour to an hour of lost time by the time the monitor would get to his job and, of course, for that we were paying time-and-a-half or double time, whatever the case might be. What we tried to do in 1973 was to put forth all those arguments to our Company Negotiating Committee with the idea in mind that they should negotiate an arrangement whereby we could have separate overtime lists in the four major areas and if we did rotate assignments of people around, there would be provisions to alter the lists appropriately to balance out whatever the hours should be balanced to. This was not new in concept since in earlier years this very kind of thing had occurred. One of the philosophical problems one gets into is that overtime pay is negotiated as a penalty to the Company but when it comes time to administer it, it becomes a privilege to the employee that he is allowed to work for the added premium pay. So it is a sort of a Catch-22 from the standpoint of arguing whether the person who works in an area of low overtime is better off or the person who works in an area of high overtime is better off. What happened in the 1973 negotiations was that the Company went ahead and negotiated in not only the kind of thing that gave us four or more overtime lists, but negotiated in such a restriction on area assignment of monitors that, in effect, a person working in Building 707 could not work at all in Building 776 on any occasion. This especially put us in a real turmoil with respect to assignment of work to our surveillance monitors which I will describe later from the standpoint of trying to have them pick up the slack from one area to another in the event one has to go home ill or is absent for any other reason. So, what our Negotiating Committee did in 1973 was to put too much of a restriction on the personnel movement around the plantsite. We solved one problem but created another just as bad if not worse.

The concept for surveillance monitors, to which I alluded previously, came about after the 1969 fire. The notion at the time was that we wanted to assure ourselves that there were adequate personnel on plantsite at all times to observe and walk through areas to make sure that the various alarm systems and conditions in general in the Plant on off-hours would not cause a problem or, if a problem existed, it would be caught early enough to eliminate any serious consequences from it. Of course, there already was an arrangement where there were patrols by

87

EGG2009032

Plant Protection and probably the Fire Department.  The idea of the
surveillance monitor was that we would assign a person to a major
building with a minimum of tasks to do to assure that continuous air
monitors were functioning properly in the event of an accident, to
assure that various self-monitoring devices were functioning properly
such that if anybody were going in and out of areas, they would be
properly monitored, and in general, to be the eyes and ears for the
Plant in terms of assuring safety in off-hours in these various major
buildings.  In order to adequately cover those areas, we had one monitor
in the Building 771-774 complex, one monitor in the Building 707-779
complex, and one monitor in the Building 776-777-559 complex.  These
monitors would make their rounds on the off-shifts and were required to
make entries in logbooks as to conditions found.  Now as time went on,
the various safety improvements which came along reduced the risk asso-
ciated with potential spills, etc.  These were improvements in fire
detection, fire prevention, sprinkler systems, some of the air
monitoring systems, etc.

     The surveillance monitors really had much less to do; however, we
continued to have them in the area and if one were ill or on vacation,
we felt that the slack could be taken up by one of the others, and we
tried to do this.  Also, if there were some rather minor jobs that were
assigned on shift that required a very minimum of monitor coverage or
monitor coverge which could be scheduled like a bag-out or something of
that nature, we felt the surveillance monitor had all the time in the
world to take care of those minor types of operations.  On the other
hand, if there was a fairly heavy load of shift work going on, we would
assign additional monitor coverage to assure someone was available close
by at all times and the responsibilities that we had given to the
surveillance monitor would still be carried out.  Because we expected
the surveillance monitor to cover the minor jobs and we did not assign
additional monitoring personnel on the shifts where they occurred, a
safety concern was filed by the Union.  It in effect stated that because
we were not assigning additional monitoring staff for some of these jobs
we were running an unsafe operation.  This safety concern eventually
went all the way through the management system that had been negotiated
into the Union contract and eventually was referred to General Donnelly,
Manager of AEC Operations Office in Albuquerque.  General Donnelly
reviewed the written material that was sent and also dispatched two of
his people to come up and review the situation with respect to the
allegations by the Union.  These AEC representatives spent time on
shifts where the alleged lack of monitor coverage occurred, talked to a
lot of people, made a lot of observations, and finally General Donnelly
responded to the safety concern.  In effect, he upheld management's
contention that the monitor coverage was indeed adequate, and perhaps
more important, that it was up to management to decide what staffing was
adequate.  His basic criticism was that if we assigned three people to
the three defined areas, if that was minimum staffing, we should not try
to get by with two.  However, if we decided two was minimum staffing,
then two should be it, etc.  So, in effect, we more or less got
ourselves locked into three people but we did continue then on the basis

88

EGG2009033

of General Donnelly's decision. We were able to continue to have the surveillance monitors take care of the minor jobs which came up on shifts. Of course, with the union negotiations of 1973 which I have already talked about in the terms of area assignments, we were to find ourselves locked in in such a way that we could not cross over from area to area anyway and even if we brought on additional monitors on shift, they were confined to the specified area as per the Company-Union Agreement.

With respect to some of the items that I have been talking about in this Labor Relations section, I did get involved in a couple of arbitration cases associated with topics I have discussed. One of these related to assignment of supplied air, more specifically a supplied air job which involved changing filters in a booster system in Building 776. Our usual practice in changing filters in such systems was that the individuals, who were within the plenum itself and were involved in the actual removal of filters that may contain a fair amount of plutonium, were in supplied air. The employees just outside the first door of the plenum, who accepted the filters into plastic bags and acted as sort of go-between from there to the cold area outside the plenum airlock, were dressed fully in protective clothing plus full facemasks; and, thirdly, the employees on the very outside, who put the filters that had been packaged in plastic into the original filter cartons, wore half-masks. The airborne contamination outside the plenum airlock was for all practical purposes near zero.

This case went to arbitration basically on the argument that the individual in the airlock with a full facemask should have been in supplied air and therefore should have received supplied-air pay. Our basic argument from the health physics standpoint was that the normal air flow was into the plenum past the various workers who were doing the work. In effect, the plenum itself acted like a hood relative to the people outside and the contamination would tend to flow in rather than out. In any case, the arbitrator (this was in 1964) did rule in favor of the Company and, in effect, that was in favor of the decision and determination which had been made by the Health Physics department relative to the degree of protection required by the filter change crew at that time.

The other arbitration case of which I was a part involved the removal of an employee from the Radiation Monitoring group. The final award of the arbitrator came on December 4, 1972, but the various kinds of things that occurred that led up to arbitration probably goes back 1-1/2 to 2 years previous to that. It involved an employee who had been hired at a time when we were necessarily hiring a large number of people. The employee in our estimation was relatively intelligent, probably his capabilities and abilities exceeded that which were required for the radiation monitor job. In any case, it became a sort of a combination of discipline problems and qualifying within the Monitor Progression Program itself. The events which led up to the

EGG2009034

COOK   DEPTL   11  1994   ITEM 19   91285

arbitration involved numerous accounts of Radition Monitoring Progression Committee meetings looking at performance of the individual, sometimes agreeing and sometimes disagreeing. To cloud the issue, the individual took a leave of absence along the way. He was also granted an extension above and beyond the 1-year qualification to try to straighten himself out. He had a number of run-ins with some of the foremen which were really more disciplinary in nature than in actual work performance as a monitor. The variety and content of evaluations by his various foremen along with the disciplinary problems resulted in the Progression Committee not agreeing on dismissal or retention of the employee. The Union wanted to protect this individual and continued to want to give him more and more chances, and the supervisors in the Health Physics group felt that he had had his chance and, therefore, should be sent back to the Employment department for some further assignment.

The procedure relative to the Monitor Progression Program called for referral to the joint Company-Union Committee for any unresolved issues. This was done and, in effect, the Company-Union Committee did not come to any final agreement acceptable to both sides so the problem was referred to an arbitrator. The arbitrator's decision upheld the right of the Company to remove an individual from the Program if he is not qualified. One of the learning things I think for all supervision, especially in groups that have progression programs, is the need to keep accurate records and to be consistent especially in situations such as this where the individual had worked for something like five or six different foremen during the course of all the controversy. Communication must be maintained among all supervisors as they are trying to qualify people in their program. This is especially important because if such cases come to arbitration, it is to the supervision's advantage to have a consistent story to show that they have uniformly made every attempt in the world to give the employee a chance to qualify and that they each have used the same standards in doing so. A lot of that was clouded in this particular arbitration case; however, the arbitrator did eventually find for the Company and the individual was removed from the progression program.

Management Organization

The Dow Chemical Company in the early years had what was called an Operating Board. This would be comparable to what we termed in later years General Staff and what under Rockwell has been the General Staff. It was somewhat different, however, in that in a couple of cases the members of the first Operating Board were not necessarily immediate subordinates of the General Manager. I remember specifically that the Services Manager or Superintendent, and the Maintenance Superintendent were members of the Operating Board and they reported to the General Services Superintendent who was an immediate subordinate to the General Manager. The Health Physics department was a part of a group called Health Physics and Medical headed by Dr. T. S. Chapman. The Health Physics department, in turn, was organized in such a way that we had an Operations group which was basically the health physics monitors and

EGG2009035

site survey function including environmental air sampling and other kinds of sampling which went on in those early years.

The Operations groups functioned in four major buildings which were called A, B, C, and D Plants. "A" Plant was Building 444 operations, in those days basically 100 percent fabrication of depleted uranium parts, possibly some normal uranium parts. "B" Plant, which was Building 881, contained a full chemistry capability for recovery of enriched uranium as well as fabrication capabilities to produce the enriched uranium component for the weapons complex. "C" Plant was Building 771 which had full capability for recovery of plutonium in residues as well as precipitation of plutonium that came in from the Hanford plant at Richland WA, and had the capabilities of fabricating and inspecting to the final plutonium parts used as weapons components. "D" Plant was Building 991 and it was an assembly building where the various components were sent for so-called pit assembly. These four Plants were very much isolated security-wise. Security was extremely tight and unless one had absolute official need to go into a building other than his assigned building, he just could not get there without high-level authorization. As I have mentioned before, there was an inner guard post and one who had need to get into the operating areas had to be authorized to exchange badges both at the outer gate and the inner guard post. Those who worked strictly in the office areas of these buildings and had no need to go to the operating areas could not have their badges coded for entry into such areas.

The superintendents of the A, B, and C Plants, as well as D Plant, were Operating Board members. But, the A, B, and C Plant Superintendents reported to a Production Manager who in turn reported to the General Manager of the Plant. The Operating Board met weekly and were, of course, a policy-making Board as would be expected. I think one of the major things that one observed in those years was the high visibility of the General Manager. He knew what was going on throughout the Plant. It was not uncommon to see him anywhere on the plantsite. He involved himself in many, many decisions that today would probably be handled by a manager or supervisor several levels below the General Manager; for example, the design of the steps leading down to Building 881. There had been a complaint that the spacing on the various steps and landings were such that they were a safety hazard. The General Manager at that time took so much interest in safety that he personally went down and reviewed that situation and brought in his top people until a decision was reached as to how these steps should be altered. He took a personal and active interest in all safety aspects of the Plant. A lost-time injury in those days was a near catastrophe for the supervisor of the employee involved. The General Manager would come out into the Plant, make his own investigation, and in effect, the entire line supervision were accountable to explain what happened and why and what they were going to do about it to keep it from happening again. These things were handled in such a way that I think most supervisors in those days had so much fear of having something happen within their group, where they would have to come forward and be the

91

EGG2009036

object of this kind of an investigation, that there was no question
about enforcing all the safety rules that we had. We had no problem
with safety glasses, for example. Now, while this gentleman ruled a lot
of us in a way that fear might have caused it to be effective, I think
out of his tactics developed a tremendous respect for safety of self and
safety of fellow employee. The employees did not hesitate to call on
their peers and correct their errors in not performing safely, not
wearing safety glasses, and things of that nature. There was a lot of
group pride installed in groups who managed to accumulate good safety
records. The Maintenance department had tremendous programs in which
there was a great amount of employee involvement. It gave opportunities
for an employee to come forth if he were so inclined and to be a leader
in safety no matter who he was or what he did. If he felt he wanted to
be an active person and run safety meetings or run safety programs, or
whatever, he was allowed to do so and all of these were very effective.
Perhaps the notion of having a safety program be successful because of
fear of doing wrong and being under the gun as far as the General
Manager is concerned is not acceptable today, but I think if there is a
lesson to be learned from it, safety performance is proportional to the
amount of effort within a supervisory chain from the top on down through
the first-line supervisor but perhaps askewed toward the top.

     The fundamental problem that we have had for the last several years
in physical safety I think stems from the fact that there has been a
general atmosphere whereby the amount of caring that has come from top
management has been minimal, nonevident, and not visible. I think as
the manager over the Industrial Safety group for the last several years
I can truthfully say that the amount of interest that any of the General
Staff members have had when they have had the equivalent of what we used
to call a lost-time injury has been little or none. It would seem to me
that one of the first things (and perhaps the new ESC might help) is to
try to turn that around because the first-line supervisor is not going
to be serious about these extra things that should be his responsibility
unless it comes all the way from the top. HS&E does not have a magic
wand strong enough to take the place of supervisory responsibility.
Another problem from my viewpoint is the extended amount of time it
seems like to resolve a problem and effect correction. By the time this
happens, many have either lost interest or do not care any more. To be
effective, in my mind, requires immediate and positive action.

     There has been a lot of discussion about the early days and what
some people like to term "the czars" of the various production facili-
ties. These were the four production superintendents of A, B, C, and
D Plants. I am going to try and discuss some of the advantages and
disadvantages as I see them of that management arrangement. I think the
effectiveness of such a system can be very good but it depends a great
deal upon the superintendent himself and his relations with the variety
of functions and people within his plant. I personally was indeed
fortunate to have started out in C Plant, the plutonium plant, under
Superintendent I. B. Venable. Mr. Venable was a man who ruled with a
firm hand but also with a sensitive hand. I think that I have never

92

EGG2009037

worked any closer with anybody or with anybody anymore responsive than ne was in those very early days. This is not to say that we did not have our differences.

One of the differences that occurred and for which I found I did not have much backup from my own management is when we started to produce bigger batches of plutonium and the neutron situation from the alpha-n reactions in fluoride became more and more evident as a source of significant exposure to the employees. We had our difficulties in measuring these on film as I have mentioned before. We did not have any difficulty, however, in measuring the neutron field with the instrumentation that was available at the time. One of the confrontations that I had in those early days was that the building management took the stand that as long as we could not report it or find it on the film, it did not exist. We had quite a battle going for a while that we were trying to get some control set up on the basis of instrument measurements and not seeing significant readings on film. With the batch process, the neutron fields were quite well defined and the total quantities were relatively small so I do not believe any serious exposures occurred. As the level of work increased, the nuclear track film did give us an indication of neutrons and Plant management took a softer stand on what was required. By the end of the 1950's, we had incorporated a considerable amount of shielding to take care of these increasing radiation fields brought on not only by the neutron production from fluorides, especially when the process went from batch to continuous fluorination, but also from additional neutrons which were generated because of the introduction of fluoride ion into the dissolution process, and the increase in the amount of americium that was showing up in the plutonium that was being recycled.

The disadvantage of the arrangement of a "production czar" was that it tended to make my own line supervision not as supportive as they probably should have been. Those at the Operating Board level, of course, had the opportunity to discuss various kinds of problems and the politicking there could work its way back such that we were more subordinate to the Production superintendent than we were to our own line supervision. If I were to balance the two together, however, at least for the first several years, I believe the overall effectiveness of the Plant superintendent being in command of everything in the building probably was the most effective way in getting a plant started, and certainly when we had our problems such as the chemical explosion and fire in 1957, there was no question who was in command and from that standpoint I think we did an excellent job in coping with those situations.

With respect to the "czars" in Plant A, and I only can relate back to recollection of conversations with my colleagues, the arrangement worked out about the same as it did in Plant C. Plant B, however, had a very strong-willed individual in charge and in effect he probably had too much of a command over all of the functions within that building such that the Health Physics portion was at a considerable disadvantage

93

EGG2009038

COOK  APRIL 11 1994  ITEM 19  91209

and it seemed that the line management in Health Physics had no ability to turn any of it around. Those folks in that area, I think, were not too happy with the situation. D Plant was so tight security-wise that I am not sure what happened there, but my recollection is from the people that I knew who worked there that things worked out fairly well. Of course, Building 991 had minor contamination problems compared to the other buildings. They did have some radiation problems. These Plant czar situations came to an end in the early 1960's with the change in General Manager and a reorganization to a more functional-type of management which I will get into later.

The Industrial Safety department originally was under the Personnel manager and when the plant first started up, the Safety department consisted of just one person. In about the second year Bill McKelvey, who had been working for the Austin Company in their safety function, came over and eventually became the head of the Safety group here at Rocky Flats. The emphasis on industrial safety I have already mentioned and I think their role down through the years was relatively simple because of the tremendous amount of management backing and also the backing they had all the way through the Corporation. Plant Management was in essence their staff. I do not believe that our top management in those early years felt that there was that much of a risk from radiation and never really put as much emphasis on it as we in Health Physics would have liked to have seen, until the 1967 exposures and our trip to Washington made believers out of them.

Nevertheless, we in Health Physics lived with the situation, and at least within our own group seemed to have an esprit-de-corps that I think was second to none. With Rockwell coming on board and the various Safety reorganizations that took place, it is easy to see why a lot of the Industrial Safety folks who were on board at the time felt that their influence was being eroded in favor of the influence that Rockwell management was trying to put across to put more emphasis on the total safety program. I guess in all fairness to The Dow Chemical Company, I think Dow, especially after the 1967 exposures and being called on the carpet for those back at the Washington level, had really turned itself around with respect to radiation safety. I think the difference was that the Dow organizational arrangement with its various separated safety disciplines allowed the Industrial Safety department to continue on with its own programs and its own emphasis independent of the others and with continuing direct top management emphasis.

The Fire Department in the early days and for quite a number of years after were part of the Security organization. The 1957 fire was their first big test and they did very well at controlling and stopping the fire at the time. It did point out, of course, the need for the backup from the guard force which was in existence.

The Health Physics department at the beginning, as I have already mentioned, contained the Radiation Monitoring group as well as the so-called Site Survey function. It also contained a laboratory which did

94

EGG2009039

COOK   APRIL 11 1994   ITEM 19   91210

all the analyses for the bioassay and environmental. There was also a Dosimetry group and Radiation Instrumentation group. The first year or so we had in effect three group leaders--one for Operations which included Radiation Monitoring and Site Survey; one for the Laboratory, Dosimetry, and Instrumentation function; and the third one for a very small Special Problems group which probably only included three or four people. That kind of arrangement continued until the summer of 1955 when the section head, Dr. Chapman, was given another job on a part-time basis, that of Technical Information Officer, for which he shared that along with his Health Physics and Medical function. When this came about, Dr. Chapman named C. W. Piltingsrud as Health Physics Superintendent for the total Health Physics function. Within a couple of months, several other changes occurred within the Health Physics organization. The Health Physics supervisor in A Plant, who had been there from the beginning and who was a graduate trained health physicist, terminated. The person in a comparable position at B Plant, who also was a graduate trained health physicist, moved over to work full-time in the Technical Information Office under Dr. Chapman. With the resignation of the group leader for Operations, I became group leader in August 1955 for that group which included all of the Monitoring functions as well as Site Survey. The Laboratory, Instrumentation, and Dosimetry functions remained under the newly named Health Physics Superintendent, and I also reported to him.

In the early 1960's when our first Plant Manager left and we had a new Plant Manager out of The Dow Chemical Company, Luther Evans, there was to come about a reorganization along functional lines. This eliminated the Plant "czars." We had a Manufacturing manager who oversaw manufacturing for the entire Plant and functional managers for other departments such as Maintenance. (There really was not much change in that except to change the fact that there was more direction now coming from the functional managers out into the Production and Laboratory buildings as compared with the previous arrangement in which a lot of the direction was coming from the Building or Production superintendent.) We became part of a Technical organization headed by John Epp; and Piltingsrud reported directly to him. Dr. Chapman moved full-time into the technical job which he had had as a part-time job before. Functionally speaking, the Plant reorganization did not have any other effect on Health Physics. We continued, however, to not have a person with any training whatsoever in health physics on the Operating Board. This turned out to be the beginning of reporting to a number of different General Staff or Operating Board members for several years, none of whom had any direct health physics training; and part of our job seemed to be to educate them in our needs and requirements and to enlist their support in the kinds of things we needed and required. In defense of the organization, I would say that almost all of them seemed very supportive and responsive but again it took the 1967 episode to enforce the importance of radiation control.

The new management that came about in the early 1960's had a much different attitude towards publishing and taking part in community

95

EGG2009040

activities and that sort of thing. It was the beginning of almost a decade of rather prolific generation of reports and these are listed in another section of this document. We had a very cooperative type of organization and, as I mentioned earlier, we worked as a team regardless of what our functional responsibilities were, and I think the end results were that we were very effective. I think that this is the kind of teamwork that led to our becoming leaders in several areas, e.g. Dosimetry, Body Counting, Wound Counting, and Alpha Instrumentation associated with contamination control. I think we played a major role in advances in continuous air monitoring for alpha. We also worked very closely with the Medical department. This all came about because we melded together all the technical and practical kinds of things that each of us had to offer and the results were all the various kinds of instrumentation and reports, etc. that were accomplished during that period of time. It also sets the stage for initiation of the U.S. Transuranium Registry and americium-plutonium translocation studies done at CSU for several years.

As a summary for this section, since it is sort of hit-and-miss as far as chronology of the Health Physics group, I will attempt to give a chronological account of the Health Physics organization and its position in the organizational scheme in the following table.

EGG2009041

| Date | General Staff or Operating Board | Direct Report and Function (Hire or Termination Date if known) | Other |
|---|---|---|---|
| 7/51 to 3/52 | W.H. Beamer Dir., HP and Med | R.W. Peterson, Med Dir O.M. Wisdahl, HP Sup. 9/10/51 Ross Thackeray, HP Sup. | H.L. Miller, Physist W.O. Ursenbach, Chemist 9/51 - Term 10/52 W.D. Kittinger, HP Site Survey 11/51 W.J. Obrien, HP, 44 Bldg |
| 3/52 to 4/55 | T.S. Chapman Dir., HP and Med | R.W. Peterson, Med Dir, Term 3/54 O.M. Wisdal, HP Op. 9/51, Term 7/55 Ross Thackeray, Spec Prob, Term 10/54 C.M. Piltingsrud, Lab, Elect. Dos Sup; 1/1/53 S.V. Guzak, Med Dir, 4/54 | W.J. Obrien, HP 44-91, Term 7/55 W.E. Hammond, HP 81, 6/52-XFK4/55 E.A. Putzier, HP 71, 6/52 W.D. Kittinger, Site Survey S.E. Hammond, Labs, 3/52 R.G. Maras, Rad Inst, 6/52 |
| 4/55 to 11/61 | T.S. Chapman Dir HP and Med 50% Tech Info Officer 50% In 2/61 TSC began reporting to John Epp | C.M. Piltingsrud, HP Sup. S.V. Guzak, Med Dir | E.A. Putzier, HP Oper (Ind Hyg), 1955 S.E. Hammond, Labs & Dos, Term 9/60 R.G. Maras, Rad Inst, Term 1/60 V.P. Johnson, Rad Inst, as of 1/60 E.L. Ray, Labs & Dos, 9/60 |
| 11/61 to 9/64 | John Epp, Dir Also responsible for Gen Labs, Radiography (Others?) | C.M. Piltingsrud, HP Sup. | E.A. Putzier, HP Oper (Ind Hyg) V.P. Johnson, Rad Inst E.L. Ray, Labs, to end of 1961 J.K. Mann, Dos--Int and Ext S.E. Hammond, Labs & Ind Hyg (early 1962) |
| 9/64 to 5/66 | E. Walko (Plant Services) Also responsible for Garage, Gen Labs, Radiography | C.M. Piltingsrud, HP Sup. | E.A. Putzier, HP Oper & Waste Disp Admin V.P. Johnson, Rad Inst S.E. Hammond, Labs & Ind Hyg J.K. Mann, Dos |

97

EGG2009042

| Date | General Staff or Operating Board | Direct Report and Function (Hire or Termination Date if Known) | Other |
|---|---|---|---|
| 5/66 to 1/68 | H.K. Harrison, Also responsible for Ind Rel (Other?) | C.W. Piltingsrud, HP Sup. | E.A. Putzier, HP Oper & Waste Disp Admin; V.P. Johnson, Rad Inst.; S.E. Hammond, Labs & Ind Hyg; J.K. Mann, Dos |
| 1/68 to 2/70 | C.W. Love, Also responsible for Info, Emp Rel (Inc Ind Safety), Security, Labor Rel | C.W. Piltingsrud, HP Sup. | E.A. Putzier, HP Oper & Waste Disp; S.E. Hammond, Lab & Ind Hyg; J.K. Mann, Dos; V.P. Johnson, Rad Inst, Term 2/68; H.G. Maras, Rad Inst, 3/68 |
| 2/70 to 8/71 | W.H. Lee, Env. Control Mgr., also responsible for Shift Supts, Utilities, Safety & Loss Prev, Sec, Decon, Nuc Safety | C.W. Piltingsrud, HP Sup. | E.A. Putzier, HP Oper & Waste Disp; S.E. Hammond, Lab & Ind Hyg; J.K. Mann, Dos; H.G. Maras, Rad Inst, 3/68 |
| 8/71 to 1/74 | J.F. Willging, Dir of Research & Ecology | E.A. Putzier, HP Oper; J.K. Seed, Product & HP Res, Term 6/73 | W.D. Kittinger, Staff 5 Unit Leaders; H.G. Maras, Elect; J.K. Mann, Dos (Term); S.E. Hammond, Env Control & Labs (Deceased); H.W. Bistline, HP Res |
| | | M.A. Thompson 7-73 Products & HP Research | H.G. Maras - Elect; C.K. Lagerquist - Dos; G.J. Werkema - Env. Control & Labs; R.W. Bistline - H.P. Res. |

98

86

EGG2009043

| Date | General Staff or Operating Board | Direct Report and Function (Hire or Termination Date if Known) | Other |
|---|---|---|---|
| 1/74 to 7/75 | L.A. Putzier Health Science Dir | H.G. Maras, Rad Inst; C.R. Lagerquist, Dos; M.D. Kittinger, Rad Mon; J.E. Hill, Ind Hyg; K.S. Freiberg, Eng & Const Liaison | 4 Unit Leaders in Rad Mon Group |
| 1/74 to 7/75 continued | M.A. Thompson Env Sciences & Waste Control Mgr | G.J Werkema, Env Control; R.K. Gunning, Anal & Stack Sampling; M.A. Thompson, Env Studies; J.B. Owen, Waste Mgmt | M.E. Maas, Waste Treatment, reporting to J. B. Owen |
| 7/75 to Present | (Rockwell Org) | | |

99

EGG2009044

COOK   APRIL 11 1994   ITEM 19                 91215

## Safety Emphasis

I have already mentioned that right from the beginning there was tremendous emphasis on industrial safety and a very effective program was run. It gave us an excellent record up to the better-than-24-million accident-free hours which we enjoyed in the late 1950's to early 1960's.

Criticality safety was recognized as a requirement for such a plant as this way back in the early days and Clarence Schuske came on board in 1953 to head up that group. I do not think that the criticality safety potential was appreciated by our top management to the extent it should have been in the early days until the time of the Oak Ridge criticality accident which occurred in 1958. As a matter of fact, and I think I have mentioned it before, there were comments that the only criticality accident that this plant could possibly have would be during the experiments which the Nuclear Safety group was performing. The Nuclear Safety group performed a lot of very good experiments. Most of them in the early days, since they did not have their own facility, were done as in situ experiments in operating areas but a few of the more sensitive ones were done on off hours. The Nuclear Safety people actually used production materials in the production buildings to set up various kinds of arrays to make multiplication-type experiments and make predictions with respect to safe geometries for various kinds of production vessels, spacing parameters, shipping containers, and things of that nature. The accident in 1958 in Oak Ridge and then the accident just a short time later at Los Alamos, one in a uranium facility and one in a plutonium facility, made a lot of people sit up and take notice that indeed accidents were possible in production plants such as we had here at Rocky Flats. From then on, the Criticality safety group functioned with the kind of appreciation that it deserved. I have already mentioned the couple of near-misses that occurred in the early days, but with the aggressiveness the Criticality safety group has had over the years, I think they have minimized the potential as much as they possibly can; and, as was the case in both the Oak Ridge and the Los Alamos incidents, it is the human failure that causes such things to happen, and if Rocky Flats should ever have one, it would probably be someone not following procedures--someone just not being aware of the potential and doing something foolish because of lack of concern or lack of awareness.

There has been some controversy over the years about what kind of detail one should use in indoctrinating personnel in criticality safety. There are some very gory types of pictures that can be used to show what occurs when a person is overexposed and these kinds of things will bring home the message, I think, to the employees of what can happen. There have been, at times, management that did not want to use such things because they felt they would scare employees and employees will not want to work with fissile materials. I guess my own personal feeling is that a person has to be told the full story and if his decision is that he does not want to work with fissile materials after

100

EGG2009045

he has been told the full story, then that decision should be accepted and the employee should be removed from working with fissile materials. It really is not any different than the gory pictures used to make believers out of reckless drivers.

The philosophy of our Plant management in the early years relative to documentation, procedures, etc. was such that we had practically none for the first 8 or 10 years. It was frowned upon to reduce things to written procedures; it was frowned upon to write things up for publication that may lead to some kind of controversy relative to the Plant. (I have already mentioned my experience with writing up the Wound Counter.) We did not have a formal Health Physics document for the first 9 years or so of Plant operation. We did use as references and guides some publications that were put out by the U.S. Public Health Service, Cincinnati OH, and by the National Bureau of Standards. Los Alamos came up with the first edition of a Los Alamos Monitoring Handbook and there were others that had been published that we also used as guides. However, from the standpoint of Plant procedures relative to radiation and contamination control, we did not have much in the way of official documentation except possibly a few simpler things that might have been written for building rules.

In 1961, we were specifically requested by AEC to come up with some type of procedural document. As a matter of fact, the request was not limited to Health Physics procedures but the rest of the Plant as well. There was still a reluctance on the part of our management at the time to do this; however, we wound up writing our first issue of what we termed "Health Physics Guide" in 1961 and we continued with the Health Physics Guide, updating it on an annual basis over the years, up until the time that Rockwell came on board. I think the Health Physics Guide was very complete in the sense of the rules and requirements around the plantsite for radiation and contamination control as well as some of our internal procedures and requirements. The advance team of Rockwell Safety people who came here to review our programs in the spring of 1975 thought it was an outstanding document. In my opinion, the HS&E Manual which we have today, as far as the radiation safety portion of it is concerned, still does not come up to the completeness we had in the Health Physics Guide with respect to control of contamination and radiation. This is even more true since our Plant Rules and Building Rules were reduced back to considerably less than they had been. The recent Plant rules made references to the HS&E Manual and the HS&E Manual by that point in time had lost much of its material relating to Building Rules which originally had been in the Health Physics Guide.

With the problems we had in radiation exposures in 1967 and some of the recommendations that were made in 1968, it was deemed appropriate by our management that the Health Physics Guide be reworked and reissued into two parts. One of these parts related specifically to Plant operations and the requirements throughout the Plant in terms of radiation and contamination control. The second part dealt more with internal procedures of the Health Physics department. This was really a good

101

EGG2009046

improvement to the Guide and allowed the Plant operating people to be able to come up with requirements that they should be under without having to get into some of the portions that dealt also with the internal workings of the Health Physics department. While they are probably not all on file, the last several issues and revisions of the Health Physics Guide from 1967 through 1974 are still available at the Denver Federal Center.

As I mentioned previously, Building rules were developed by Building Committees. This came about probably on a more formal basis after 1961 (although evidence relating to some of the occurrences suggest local rules did exist in documented form in the 1950's) and after the reorganizations which took place than they had previously. I think under the production superintendent regimes of the A, B, C, and D Plants the building rules, while perhaps not so much evidenced in writing, were very effective. The building rules did rely heavily on the Health Physics Guide and they were put together by building committees which by that time had representatives from the various safety groups to influence their content.

Right from the very begining of the Plant, the Executive Safety Council (ESC) played a very influential role and for many, many years the ESC met weekly and were very evident to the entire Plant that they existed: Their proceedings were always dispersed throughout the Plant via the ESC Minutes. The ESC Minutes were a standard part of each mandatory safety meeting. Each supervisor was accountable to Industrial Safety in reporting to assure a 100-percent safety contact with his employees. Whenever anything occurred out in the Plant that had anything associated safety-wise (and I am talking mainly industrial safety), the ESC was very active in their review of such things. There was a lot of emphasis in those earlier days on what we called a "near-miss" and there was a lot of discussion in the ESC on near-misses. While the supervisors did not have quite the burden to stand up and defend themselves on a near-miss as they did if something actually happened, I think the emphasis that was placed on prevention of acci- dents, i.e. emphasis that was put on near-misses, probably played a very important role in the good safety record we had.

I do not recall exactly when the Nuclear Safety Committee began but it went on for many, many years and it functioned as a separate commit- tee to assure nuclear safety of the Plant, and as I have mentioned before, the 1958 accidents at Oak Ridge and Los Alamos had a tremendous impact on the nuclear safety attitude of Rocky Flats. This Committee was taken very seriously with the same stature as ESC. Somewhere along the line the AEC promulgated their manual chapter requirement that required a review of activities associated with the Criticality group. Their experiments had to be approved by a high-level technical group and this, of course, added then to the emphasis placed on nuclear safety.

Even though the major emphasis in the earlier days seemed to be with industrial safety, when we did have internal radiation exposures as

102

a result of an accident, there was no question we had full support from top management with respect to the kinds of policies the Health Physics organization developed to take care of a situation with respect to the exposed personnel. The first time we were faced with this was after the 1957 chemical explosion in Building 771. In effect, a restriction policy was begun at that time and it was pretty much dictated by Dr. Chapman who was still the head of our organization. He felt strongly that since this Plant had very little opportunity for an exposed person to change jobs into something meaningful, employees in plutonium areas should be restricted at the 50-percent systemic burden level to allow "room" to work with uranium.

The two employees that had been exposed in the 1957 explosion, however, had exposures greater than 100 percent. In effect, then, his policy was that these folks should not work with anything further that involved radioactivity or radiation. The policy in effect said that a person between the 50-percent and 100-percent levels would be allowed to work with uranium on the presumption that there was some reservoir there for the potential for uranium exposure which was known to not stay in the body nearly as long as plutonium and there was some chance for eliminating the systemic burden one might receive from uranium. His policy, in effect, has prevailed up until recently when there have been some changes in the DOE Orders having to do with exposed people. Up until these recent DOE Orders, there has never been any precise guidance within any of the manual chapters over the years as to how to deal with the problem of employees who are exposed in excess of standards. When we had Body Counter capability, we decided to restrict at 100 percent on the presumption that the lung clearance took place in a finite period of time and a person would not be restricted forever if a normal lung clearance pattern prevailed. As has been observed, lung clearances vary greatly from individual to individual relative to the nature of the exposed material.

Another safety item which has impacted Rocky Flats, I think considerably, for the last 12 years has been the Company-Union Safety Committee. When I say "impacted," I am not sure if I mean impacted in the sense of improved safety or to what degree of improved safety; perhaps there has been some improved safety but it has impacted Rocky Flats a great deal from the standpoint of the amount of time spent by other than supervisors and management in looking at what are deemed to be safety problems by this particular group. The notion of a Company-Union Safety Committee came about back in about 1970. There was a considerable amount of push by the Union to do this and it was resisted by the Company from the standpoint of arguing that The Dow Chemical Company by its history was safety-oriented and management took their responsibility for safety in such a way that such a committee was probably unnecessary. However, the issue got all the way to the Washington level, probably Federal mediation or at least to the labor relations part of AEC, and in effect it was decided at that level that there would be such a committee. Such a committee was established and a method of bringing forth safety items was set up, still presumably

103

EGG2009048

CODE  ORRII  11  1994   ITEM 19   91219

allowing the first-line supervisor to solve a safety issue if at all possible. There seems to have been a sort of cyclic-type of pattern in that there have been periods of low numbers of safety concerns filed and then there have been periods of high. At times the cycle seemed to correlate with other issues.

There have been some changes in the language relating to the Company-Union Committee since this provision went into the Company-Union Agreement. These changes may be a little bit subtle but I think as time goes on they are a little more than subtle from the standpoint of where they may lead. The original words that I am referring to, in effect, authorized the Committee to deal with substantive safety problems at Rocky Flats. The definition of a "substantive safety problem" probably was open to question, but the word "substantive" does suggest that there is something about the problem that is serious in nature. That terminology existed for several years. The terminology today, however, is, "The Committee is authorized to deal with health and safety problems at Rocky Flats. The Committee will establish procedures to ensure the prompt consideration of health and safety problems brought to its attention." This is quite a turnaround from the original in that those very words imply that anyone can go directly to the Committee even though the following paragraph in the Agreement suggests that the health or safety problem will first be brought to the attention of the supervisor. The Agreement words are such that one could question whether or not it is really a requirement that an employee go to his supervisor first or that the Committee itself cannot initiate action on most anything it decides to act on.

I had several years of experience with this Committee under Dow management because of the procedure which involved the Health Physics manager: If a safety concern had not been resolved at the supervisory level and it had been passed on to the Company-Union Committee and they had not resolved it, it was sent on to me if it involved a Health Physics related concern. My perception of what occurred was that frequently the motive behind a safety concern was as much economic as it was safety in that part of the complaint was inadequate radiation monitor coverage, insufficient overtime, and various things of that nature that challenged management's ability to assign a proper number of radiation monitors to safely cover a job. So they were brought forth through the safety concern procedure rather than through the grievance procedure in an attempt to use the safety argument to have more people assigned to particular jobs. This was true not only from the standpoint of just straight monitor support but also related to jurisdiction, such as who has the right to handle what kind of instrument and things of that nature. I think the concern which went all the way to Albuquerque, which dealt with the surveillance monitors, has an answer that should not be forgotten and that pretty well upheld the fact that it is management's responsibility to decide the number of people necessary to cover a particular job. On the other side of the coin is that one must be consistent in the number of people one assigns under particular circumstances.

104

EGG2009049

Another area which comes under the Safety Emphasis part of this document deals with outside contractors. I am not so much speaking of our requirements as laid down in the old manual chapters or the more recent DOE Orders, but more from the standpoint of where these people are allowed to work relative to the level of safety requirements, and more specifically the health physics requirements that need to be put upon them to do their job safely. I have long felt it was a mistake, and I think it occurred back in 1967 or 1968, when the head of our Engineering and Maintenance organizations proposed to the General Manager that many of the renovations that we wanted to do in plutonium facilities be done utilizing outside contractor personnel. We protested at the time because we felt it was a mistake to bring in inexperienced people to work in potentially radioactive contaminated areas--people who had not had the experience of properly wearing protective equipment, had no experience with respect to radiation control, and to some degree people who may be here today and gone tomorrow. We could lose track of them and would not have a complete health physics record on such people. I think in the last few years some of the alleged health and illness compensation cases that have come up by some of these folks bear out the fact that it was impossible to maintain perfect records and this has hindered our defense of the allegations. Even though we protested at the time, our management went ahead and allowed for outside contractor people to do work in the production buildings. We did at a later time eliminate the possibility of such people going into supplied air and at most we would allow full facemask wear in jobs which they did. The other part of the problem was that we had to provide very, very close monitor surveillance over these people and we were always concerned with the ability to maintain a total record. Also, it increased the load on our body counter, our urinalysis program, our dosimetry badge program, etc., and created an extra set of records which had to be kept as well as our own and for which the other contractor was really responsible. Another part of the problem was that the outside contractors would sublet certain kinds of jobs so we would wind up with contractors once or twice removed from the major contractor. In any case, I think that there should be limitations put on what outside contractors are allowed to do because it is a large job to adequately maintain the records. I think one of the problems with the new organization in HS&E right now is the fact that the Records people as well as some of the Dosimetry Assessment people, etc. are getting further and further removed from any knowledge of what goes on out in the Plant to understand the relationship that has to exist in order to adequately cover the outside contractor.

## Radiological Assistance

It was back in about 1957 when Rocky Flats was requested to establish a capability for dispatching a team under what, at the time, would have been called "Operation Hotspot." This related to weapon transportation accidents. For this we were under the Albuquerque Operations Office; we would have been called by them had our capabilities ever been needed. We never have been requested to respond to such an

EGG2009050

accident, e.g. accidents such as occurred in Spain, Greenland, and in
tne southeast part of this country. It was not more than a year or two
after the establishment of the Hotspot team that it was recognized that
an assistance team would also fit into the picture in response to other
types of radiological accidents or emergencies that might come about in
any kind of a nuclear setting. For this we were under the jurisdiction
of tne AEC at Idaho Falls. I believe it was Region VI. So we nave
maintained a Radiological Assistance Team since 1957 that has had the
capability in one form or another of responding in the eventuality of a
nuclear problem associated with transportation or at another site where
they may require some kind of help.

The first team transportation capability for a response was a
schoolbus-type venicle which we fixed up with supplies, electronics
workbench, and that sort of thing, and we had the capability of pulling
an a.c. generator that could furnish us with 4 kilowatts (kW) of power.
We also had capability of hauling some smaller portable a.c. generator
units to operate air sample equipment in the event we should need them.
The bus was maintained by the Garage. It was given a dry-run every
montn or so to make sure it was in operation. I do not believe we ever
responded to any incident with the bus itself, at least not offsite.
Most of our responses required one or two men. For example, we were
called to the airport wnere some question came up with respect to a
radioactive shipment. A couple of times we responded to trucking
terminals in which snipments showed up with suspicious water on them or
there was suspicion of leakage or something of that nature. None of
these were ever serious. The bus, of course, was not considered all
tnat versatile and our two team leaders soon decided that a trailer
pulled by a heavy venicle from the Fire Department or Garage probably
would work better. We bought a Red Dale trailer and that has been the
major vehicle available for response for quite a number of years. As
mentioned, the few times we have been called we never had to respond as
a full team except for tne Fort St. Vrain exercise. We have been able
to do that witn some reasonable effort except there was some question
about the timeliness of the response which was made when one of our
low-level shipments slid off the road. Perhaps the greatest problem at
that time was the fact that the procedures were not followed and the
people who were called did not know where some of the things were.

Several of our people over the years nave received special training
in coping with outside radiological problems both at Nevada and at
Albuquerque. This is a program to which, as long as such training is
available, we should probably continue sending health physics
professionals.

## Compensation Cases

I have been involved to some degree or other in Workmen's
Compensation cases both from the standpoint of contested unemployment
compensation and contested health impairment or injury compensation.
Une case involved an employee who would not go back to his old job

106

EGG2009051

because he felt it was unsafe. This occurred after the 1969 fire when an inspector did not want to return to Building 777 to operate his equipment because he felt that area was unsafe. Since we had no other job for him, he was laid off; he left the plantsite and filed for Workmen's Compensation. There was correspondence that came to the Plant that indicated the referee from the State had allowed the compensation. Upon receiving this, the Company decided to contest since they had had no opportunity to offer evidence in their own behalf and took great pains and great preparation to establish their case. This occurred in the summer of 1970 and much of the hearing took place at the time the Union was on strike which had nothing to do with it except that some of the Union officers sat in on much of the hearing and one or two of them actually testified on behalf of the employee.

I was asked by our Plant Manager to work very closely with the attorneys in the preparation of their case and to work with them on through the hearing itself. The primary attorney I worked with was Bill Schoeberlein. We spent quite a few weeks in preparation for the hearing. The correspondence which I include shows why. The strategy was to be responsive to the claimant and present a complete picture of the radiological safety program at Rocky Flats.

The hearing was scheduled in August and was held before a 3-man commission. We took with us to the hearing numerous pieces of contamination and surveillence control equipment for demonstration purposes. I was put on the stand and questioned to the point where Mr. Schoeberlein made a motion that I be accepted as an expert witness in health physics. There was no objection by the other side and I was accepted. I spent probably as many as 2 days on the stand under questioning mostly by Mr. Schoeberlein on how all the various kinds of equipment worked, describing it all piece by piece, discussing the various controls that we had and, in general, the entire radiological health program. There was some cross-examination by the other attorney but as I recall there was no problem in answering his questions. My perception was that he was a little overwhelmed and had difficulty asking anything about what was presented.

We also had Dr. Roger McClelland from Inhalation Toxicology Research Institute as an expert witness in biological effects of radiation. It was probably this hearing that was the beginning of the query on cancer incidents from year-to-year which we have had from the press, the State, and others. Our Medical Doctor, Dr. Dale Hylton, was asked by the attorney to testify and relate the various kinds of cancer cases that he knew about that had occurred in Rocky Flats employees and how they related to the potential of plutonium as the cause. Much of the testimony that was given was along the lines that the nature of the cancers, which up to that point in time our doctor knew about, really did not relate to plutonium exposure for a couple of reasons: (1) Most of them occurred in employees who had not worked at all with plutonium and (2) in those who had worked with plutonium, the cancer sites were not in organs in which one would expect cancer to occur as a result of

107

EGG2009052

LAW OFFICES

DAWSON, NAGEL, SHERMAN & HOWARD

1600 FIRST NATIONAL BANK BUILDING

DENVER, COLORADO 80293

260-3491 AREA CODE 303

July 17, 1970

The Dow Chemical Company
Rocky Flats Division
P. O. Box 888
Golden, Colorado 80402

Attention:  Ed Putzier

Dear Ed:

   You will find enclosed a letter from Morgan Smith,
attorney for Joseph Sykes, to the Industrial Commission.  It is
obvious from this letter that Sykes' attorneys are seeking an
elaborate public display on the safety hazard issues.  This con-
firmation is no surprise.

   We will have word to you next week on a more detailed
plan of defense on this matter.

          Very truly yours,

WFS/aw
Enc.
cc:  Dr. Lloyd Joshel
   V. Fruehauf
   R. Nagel

EGG2009053

MORGAN SMITH
ATTORNEY AND COUNSELOR AT LAW

1701 WEST FORD AVENUE
DENVER, COLORADO 80223

July 15, 1970

RECEIVED
JUL 16 1970

Industrial Commission of Colorado
200 East 9th Avenue
Denver, Colorado 80203

Attention:  Kenneth C. Russell, Commissioner

Re:  JOSEPH SYKES vs. DOW CHEMICAL COMPANY

Gentlemen:

On behalf of Joseph Sykes, we would like to state our
position regarding Dow's Petition to Review.  We feel
that it will expedite matters to do so by way of letter
rather than any lengthy legal brief or memorandum.

We believe that the case should be re-opened for the
taking of additional evidence.  Although we strongly
disagree with the allegations in Dow's Petition and feel
that the Commissioner's decision was clearly correct, we,
nevertheless, recognize that this case involves issues of
substantial national importance.  As a matter of public
policy these issues should be fully discussed and examined.
Mr. Sykes has long felt this way, (see, for example, his
letter of February 28, 1970, to the Commission) and Dow,
after a casual start, now appears equally concerned.  These
issues should not be obscured by or resolved on the basis
of technical legal arguments at a time when there is dispute
over the sufficiency of the evidence.  We believe, therefore,
that issues such as the plutonium fire of May 11, 1969, the
working conditions in Building 776, the safety protections,
standards and training for Dow workers, the hazards of
plutonium processing, the past and future fire hazards, the

EGG2009054

COOK   APRIL 11 1994   ITEM 19                91225

Industrial Commission of Colorado          July 15, 1970
Page 2

carcinogenic effects and other relevant issues should be
tested and evaluated in an adversary proceeding and that
both parties should have the opportunity to present any
additional evidence deemed necessary.  It is our firm
belief that the Dow facility constitutes a menace to the
health and safety of its employees and we are prepared to
support that position.

Thank you for the opportunity to respond to Dow's Petition
and I hope that this letter clarifies our position.

                              Very truly yours,

                              MORGAN SMITH
                              ROBERT B. MILLER

                              By
                              Attorneys for Joseph Sykes

MS/ls
cc:  William F. Schoeberlein, Esq.

EGG2009055

radiation from plutonium. In any case, these were statistics that went into the record and that went into the newspaper that related to cancer in employees at Rocky Flats. Obviously our adversaries picked this up and very eloquently gave the press the details on how this could not possibly tell the story of the incidence of cancer at Rocky Flats since it was statistically unsound. We really could not argue with them. In retrospect, one wonders whether it was prudent to relate how safe it was to work at Rocky Flats by suggesting the cancer incidence was lower than the national average. On the other hand, with reference to the correspondence I have included, the claimant's attorney had it on his list and cancer incidence would have come up regardless. The hearing went on for a full 2 weeks and when the final decision came out, the compensation was denied and, in effect, the Company did win its point.

Another case of some interest involved the first female monitor we had in the department. She became pregnant and told her supervisor of her condition. At the time she was working in Buidling 771. This occurred back in the early 1970's after NCRP had put forth its recommendations on the fertile female in NCRP 39 but EPA and AEC had not come out with any specific standards, rules, or policies. We at Rocky Flats felt that what we should do was to go by the NCRP recommendations even though we had no formal guidance from AEC. I went to Building 771 and talked with this lady and told her about the NCRP recommendations. As a monitor she had not received radiation exposure anywhere near the NCRP 500-mrem exposure guide. I told her the choice would be hers if she wanted reassignment outside the plutonium area or whether she preferred to stay in the plutonium area where I was quite sure her assignments could be adjusted in such a manner that she would not receive in excess of the maximum of 500 mrem the NCRP had recommended during the period of gestation. She elected to be reassigned and we reassigned her to Site Survey, a place where she would not receive any radiation. On her own volition she shortly thereafter decided not to take a leave of absence but to terminate and she left the plantsite and later on had a healthy baby. Sometime after that a notice came to the Plant of a claim that had been put in for unemployment compensation for this lady because she had to terminate her employment. The allegation was that she was required to terminate her employment because of her pregnancy. The Employment manager, myself, and her former supervisor went down to the hearing and there was not very much argument at all whether she should or should not receive compensation. It turned out her main object was that she felt there should be some kind of compensation provided for anybody who leaves a job because of pregnancy. There was not anything in the State law that suggested this be allowed. In any case, it did not take the referee very long to advise the lady that she had no claim and nothing was allowed.

I have been involved to some extent in a number of other compensation cases as an advisor to an attorney during hearings and I have been involved in making myself available in the event testimony was asked for.

108

EGG2009056

## Professional and Management Development

Many of the people I have been associated with in the health physics, industrial hygiene, and the industrial safety areas have taken an interest in membership in professional organizations which relate to their profession. Since I was in health physics most of the years of my career, I was a charter member of the Health Physics Society and I also belonged to the American Industrial Hygiene Association (AIHA) up until a couple of years ago. In the early years, AIHA dealt fairly heavily with health physics matters and, of course, there has always been some crossover from the standpoint of methodology and who is responsible for what. We always did our best to encourage our people to join such organizations. Perhaps the most discouraging thing once they joined has been our inability each year to authorize attendance of very many of them to a meeting. The local chapter of the Health Physics Society essentially grew out of interest at Rocky Flats. There were not very many people in the Denver or eastern slope areas other than ourselves who were engaged in health physics work. This grew, however, as the years went by and today there is a large number of people other than those at Rocky Flats who deal with radiation-type problems and are members. When the Chapter first began, we not only had membership from our professionals, we had members from nondegreed foremen and several members from the radiation monitors, and some of these foremen and monitors played a very active role. Jim Kelly was one of the early secretary-treasurers of the local Health Physics Society chapter. We tried to encourage their interest in professional development. We tried to send as many people as we possibly could to local chapter meetings. We were very limited in the number we could send to national membership meetings. I think in the later years with the influx of more and more professional-level people the supporters from the lower ranks are losing out and, in effect, are being discouraged from professional development.

One consideration that could regenerate professional interest in development here at Rocky Flats would be to try to establish formal instructional seminars, formal courses of instruction, even classes that relate to specific topics of health physics, industrial hygiene, and industrial safety with the idea in mind of improving professional development of these folks who, especially the nondegreed people, are doing an excellent job. These are people who cannot progress really any further unless they can really accomplish far beyond what is normally expected of a person with no degree. A lot of these people have a lot of capability and a lot of sound judgement and a very thorough knowledge of the Plant. With a little help by making available some formal seminars, they could go a long way in improving safety integrity of the Plant. At the same time, HS&E management has to create an atmosphere that recognizes the participant's contribution and allows for job enrichment and promotion to those who are deserving.

In the many years I have been here, I have been subjected to a lot of different management training, classes, seminars, etc. When I first started, there was very little professional management training. About

EGG2009057

COQK  APR11  11  1994    ITEM 19                    91228

all that happened was indoctrination or orientation into the methods of filling out timecards, making sure that correspondence was proper, making sure that security of the Plant was maintained, and things of that nature. There was not any real formal training in terms of human relations, personal skills, etc. We did have some review of Company-Union Agreements as they came along and how to administer some of the things associated with them. We relied heavily on the Labor Relations directors to help us out in tight places, but in general we had no real professional management development.

With the change in management in 1961, there was a change in attitude toward management training and there was considerable effort made to send people off for training. Sensitivity training came into vogue and I spent a week (along with a lot of other people) in sensitivity training. Since that time the notion of sensitivity training has been highly questioned as being effective or useful. I think the main influence on me, even though it was a very stressful experience, was that I really learned to know the people in the same room so well that I had no inhibitions to talk to them about anything. I think it also gave people confidence once back at the Plant in that it gave a person a much more positive feeling toward approaching and dealing with other people in business matters as the days went by. Some of the people in sensitivity training, however, were affected adversely by it and it probably was not a good experience for them at all.

We also had a session somewhere along the line in Kepner-Tregoe. Kepner-Tregoe was excellent; however, as has been the case in so many kinds of management courses, one gets all excited about what is learned and comes back to the Plant and your own management does not use it, your own department does not know what you are talking about, and it never really gets put into practice.

We went through a period of time training people in Work Simplification. This again went well for a couple of years and then people lost interest but it probably involved more people, more action, more activities, and more recognition of those who really figured how to do something in a simpler way. So it probably had its usefulness but, as the way with others, it gradually disappeared and was not very long-lasting.

With respect to the Kepner-Tregoe training and the various training that has occurred under Rockwell, I think it can be said for all of them--they are excellent in terms of the content; they sort-of rev a person up. The practical management course that has been taught in the last 2 or 3 years is the same way but to a great degree I think they are a waste of money because people come back to the Plant and it does not seem like one ever uses anything that was taught, it does not seem that the boss does much to utilize any of the material, and while you can get all excited at the time, through lack of application you eventually forget what you have learned.

110

EGG2009058

While I am not sure you could call it a real training course, the
session which I feel was as valuable as anything was run by The Dow
Chemical Company and it was dubbed "Charm School." This particular
course had two major things about it that I think rubbed off very, very
well, and anyone who participated probably would continue on using some
of the information to his advantage as time went on. A lot of people
have made fun of this particular school but I think it was probably one
of the better ones if not the best one from the standpoint of helping
the supervisor. Firstly, it was designed in a way to help each
supervisor get his job done by knowing what goes on throughout the rest
of the Plant, and learning directly from the people who are involved
with the rest of the Plant. From this comes an appreciation that you
are not the only fish in the pond and that it takes coordination,
cooperation, knowledge, etc. from a lot of people to get your job done
effectively and properly. The second part of this school that I think
was extremely valuable to everyone was the full half-day lecture by a
professor from the University of Colorado who, in effect, gave us all an
insight into why people respond and react the way they do relative to
when they grew up, where they grew up, etc. I think this, for a lot of
people, was a revelation as to why people are different one to the other
and why one has to deal with them differently one to another.

While we dwell on human relations these days and its importance to
manager-employee relationships, I point out an observation with respect
to the present Building 123 situation and the satellite trailers. We
are hiring lots and lots of professional people and day after day we see
all of these strange faces wandering around the hallways, going to the
copy machine, etc. Their supervisors do not take the time to introduce
them around the building or explain to them who other people are in the
building and what they are doing. I think if we are going to have a
teamwork approach, the first thing is that people have to know each
other and what their role is, where they came from, what they are doing,
etc.; that just is not happening today in the Building 123 setting.

## Potpourri

As a part of this section, I include in its entirety a set of
papers relating to siting criteria and land aquisition Chuck Bogard sent
me. After these papers, I will backtrack a bit and start over chrono-
logically. In several instances I will refer to documentation within a
specific file. Therefore, I assume such files will be preserved if the
specific information is to be preserved.

1951     File MHS 3.7.1 - Site          H.S. Office.
         This document contains a grid survey of gamma background with
         four different types of instruments. It also contains a
         discussion of underground waters and a discussion prior to
         putting in the evaporation ponds.

111

EGG2009059

CHRONOLOGY OF ROCKY FLATS PLANT

Some of Original Siting Criteria for Project Nickel

| | |
|---|---|
| General Location | Nebraska, Kansas, Oklahoma, Mississippi, Arkansas, Colorado, and Texas Panhandle |
| Area | Square - 2 miles by 2 miles |
| Supporting Population | No less than 5 miles or more than 25 miles from a community with at least 25,000 population |
| Isolation | Minimum displacement of homes and population |
| Climate | Dry, moderate |
| Railroad | Within 10 miles of railroad |
| Highway | Near good main highway |
| Airport | The nearby community served by major North-South and East-West airlanes, also Army airfield within 50 miles. |
| Electricity | 12,000 kilowatts available |
| Water | 1,000,000 gallon per day |

February 22, 1972

EGG2009060

| Date of Correspondence | Item of Interest |
|---|---|
| March 9, 1951 | Corps of Engineers alerted to procure land when site is chosen. |
| March 14, 1951 | C. L. Tyler, Santa Fe Operations Manager, will deal with Missouri River Division Engineer for necessary surveys of selected site. |
| March 22, 1951 | On March 21, 1951 Commission approved acquisition in fee of site at Rocky Flats. |
| March 22, 1951 | Original Selection   T1s, R 70W   S/2 Sec 33 & S/2 Sec 34 East of No. 93 |
| | T2s, R 70W   Sec 4 less portion N of No. 93 Sec 3 & N/2 of Sec 9 & 10 |
| March 22, 1951 | David W. Persons of Regional Operations Division acting on project as Project Engineer. (Located at Santa Fe Operations Office, Los Alamos, New Mexico.) |
| March 30, 1951 | Right of Entry for survey and subsurface exploration obtained. Last one signed March 28, 1951. |
| April 2, 1951 | Mineral resources of Rocky Flats site by Engineering & Minerals Branch, Geologic Division, USGS – note coal and clay. |
| April 18, 1951 | Site on Red Civil Airway No. 6 (Denver to Grand Junction). |
| April 23, 1951 | Southwest corner of Section 8, T2s, Range 69W coal up to 2918 feet, found coal at 651 to 655 feet and at depth of 800 feet. |
| April 24, 1951 | Shift in site to avoid expensive mineral rights (coal is as near surface on new site but not minable coal). New site about 1 mile south and 1 mile west of original site. |
| April 25, 1951 | "Coal in Rocky Flats Sites" by W. W. Ross of Bureau of Geological Survey, checked coal deposits on alternate site. |
| April 25, 1951 | Dow Chemical acknowledges and approves of shift in site. |
| May 2, 1951 | Compare costs of both original and shift site. |
| May 4, 1951 | C. W. Robinson, Appraiser for Corps of Engineers, to obtain expert help in determining subsurface appraisal. Mr. Whiteside of Denver and Dr. John Vanderwilt, President of Colorado School of Mines, contacted. |

EGG2009061

91232

| Date of Correspondence | Item of Interest |
|---|---|
| May 9, 1951 | Condemnation proceedings only if negotiations not successful. |
| May 9, 1951 | Division of Security does not recommend establishment of airspace reservation over site (copy to DMA - no reply). |
| May 15, 1951 | Suggested 200 foot right-of-way along south border of Section 9 to connect plant to Highway No. 93. |
| May 24, 1951 | Site review committee inspected proposed sites on March 15, 1951. |
| May 28, 1951 | Mr. Goodall gave surface rights appraisal at $26.80 per acre average or $68,800, road easement at $2000, and mineral rights at $10 per acre or $1500 for a total of 150,000. |
| June 8, 1951 | D. W. Persons sets up office at 1300 Glenarm, Denver, Colorado. |
| June 13, 1951 | Rodgers talks $75 per acre for all rights. Church talks $50 per acre surface rights plus $100 for coal. Lindsay talks $50 per acre.  Government figures. |

| | | |
|---|---|---|
| Rodgers | 400 acres at $25/acre | $ 9,000 |
| Church | 1276 acres at $27/acre | 32,253 |
| UMWA Coal | | 1,200 |
| Lindsay | 960 acres at $33/acre | 31,443 |
| Other Interests Subsurface | | 1,000 |
| | 2856 acres at $25.66/acre | $76,579 |

| June 14, 1951 | Austin Company contractor for technical buildings. |
|---|---|
| June 18, 1951 | G. W. Lindsay writes letter to Senator Johnson asking about government land acquisition tactics. |
| June 22, 1951 | Letter to Gordon Dean, USAEC Chairman, from Senators Johnson and Millikin asking study of four tracts and G. W. Lindsay. |
| July 2, 1951 | Commission authorized acquisition of privately owned land by condemnation. |
| July 9, 1951 | Austin routine hours from Lindsay for field office. Mr. Church grazing land heavily. Mr. C. C. Chets to Assistant U.S. Attorney for District of Colorado, to ask court for immediate possession of Church property to allow start of project. |

EGG2009062

COOK   APRIL  11  1994   ITEM  19            91233