| Date of Correspondence | Item of Interest |
|---|---|
| May 9, 1951 | Condemnation proceedings only if negotiations not successful. |
| May 9, 1951 | Division of Security does not recommend establishment of airspace reservation over site (copy to DMA - no reply). |
| May 15, 1951 | Suggested 200 foot right-of-way along south border of Section 9 to connect plant to Highway No. 93. |
| May 24, 1951 | Site review committee inspected proposed sites on March 15, 1951. |
| May 28, 1951 | Mr. Goodall gave surface rights appraisal at $26.00 per acre average or $65,800, road easement at $2000, and mineral rights at $10 per acre or $5500 for a total of $96,000. |
| June 8, 1951 | D. W. Persons sets up office at 1300 Glenarm, Denver, Colorado. |
| June 13, 1951 | Rodgers talks $75 per acre for all rights.<br>Church talks $50 per acre surface rights plus $400 for coal.<br>Lindsay talks $50 per acre.  Government figures |

| | | | |
|---|---|---|---|
| Rodgers | 400 acres at | $25/acre | $ 9,000 |
| Church | 1236 acres at ~ $27/acre | | 32,250 |
| UPRR Coal | | | 1,200 |
| Lindsay | 960 acres at ~ $35/acre | | 33,600 |
| Other Interests Subsurface | | | 1,500 |
| | 2596 acres at ~ $29.60/acre | | $76,550 |

| | |
|---|---|
| June 1?, 1951 | Austin Company contractor for technical buildings. |
| June 18, 1951 | G. W. Lindsay writes letter to Senator Johnson, Colorado, about government land acquisition tactics. |
| June 22, 1951 | Letter to Gordon Dean, USAEC Chairman, from Senators Johnson and Millikin asking study of four tracts held by G. W. Lindsay. |
| July 2, 1951 | Commission authorized acquisition of privately owned land by condemnation. |
| July 9, 1951 | Austin renting house from Lindsay for field office. Mr. Church grazing land heavily.  Mr. C. C. Chitty, Assistant U.S. Attorney for District of Colorado, to ask court for immediate possession of Church property to allow start of project. |

EGG2009062

| Date of Correspondence | Item of Interest |
|---|---|
| July 10, 1951 | AEC possession of land granted by court. |
| July 11, 1951 | Court order granting AEC immediate possession of site July 10, 1951 with papers to be served as soon as possible. |
| July 12, 1951 | Papers have been served on Mr. Church by the Marshall to give U.S. immediate possession. Others will be served in day or two. |
| July 23, 1951 | Rent payment to Lindsay for use of house by Austin steps as of July 10, 1951. |
| July 23, 1951 | Plan to acquire access road as easement in lieu of fee simple accepted by R. E. Cole of Corps of Engineering. |
| August 2, 1951 | Water line right-of-way includes "blow off manholes" and "air release manholes". Blow off manholes must be equipped with 6-inch discharge line - 25 feet to 100 feet long terminating in a small concrete structure. |
| August 2, 1951 | South Boulder Diversion Canal is an integral part of the Denver Municipal Water System. |
| August 9, 1951 | Corps of Engineers will accomplish acquisition. |
| August 13, 1951 | Note that some spring waters near Boulder contain the highest radioactivity content reported in the U.S. |
| August 23, 1951 | Corps of Engineers recommends fee title to surface and subsurface rights to 1960 acres and perpetual easement for access right of way to 27.56 acres. |
| September, 1951 | Corps of Engineers drawing 15-05-01 Rocky Flats "Property Boundary Survey" (Omaha District). |
| September 11, 1951 | Public Service Company will procure their own right-of-way to plantsite. |
| September 11, 1951 | Church takes cattle off Section 11 and S½ of Section 15. Church allowed to watch drilling and examine log of core samples. |
| September 14, 1951 | Landowners write to Senators complaining about threats(?) and Mr. Goodall, Chief of the Real Estate Division, Missouri River Division, Corps of Engineers, Omaha to come to Denver September 20, 1951 to visit landowners personally. |
| September 14, 1951 | Allocation of space for Public Service Company's 110 kilovolt line across project site. |

EGG2009063

COORS  RGGU  11  1994    ITEM  19                    91234

| Date of Correspondence | Item of Interest |
|---|---|
| October 2, 1951 | At a meeting with Goodall from U.S. Attorney's Office, Church requested elimination of the SE 40 acres from the land taken so he might have access to his cattle corrals and shipping point from the other portions of his land. He also claims minerals worth more than appraisal because of clay and coal. |
| October 2, 1951 | Note - Mr. Church has leased about 39,000 acres from U.S. in Buckley Field Bombing Range for grazing since 1946. |
| October 2, 1951 | Lindsay said he offered neighbor $40 per acre and was refused. |
| October 2, 1951 | Appraisal values based on eleven actual sales $6 to $27., was $23 per acre including minerals. Owners want $50 to $125 plus value for minerals ranging from $9.15 per ton estimated coal to $50 acre (????). |
| October 2, 1951 | Conclusion that value in each case will have to be determined in court (Goodall). |
| October 2, 1951 | G. W. Lindsay 960 acres (includes mineral rights on 173 acres and all minerals on 160 acres) $57,075 proposal. Katherine M. Church 1225.9 acres (includes all minerals on 400 acres and 1 on 500 acres). Frank M. Sellers and ... Other mineral rights owners A. Sealst Pattison et al, Samuel Eberhardt and Co. - Company. |
| October 2, 1951 | Original site 8 miles south of Boulder and 2 miles east of Highway No. 93 on the east was changed since ... said workable coal and fire clay deposits in that area. Final site 9 miles south of Boulder and 1 mile east of Highway No. 93. |
| October 3, 1951 | Church said he had two irrigation ditches from ... Ditch and three from ... and that the rights of each of these run from Baseline State Lake. He also ... modifying S/2 of ... of Section 11 to eliminate attempts ditch access problems. |
| October 3, 1951 | Church recently entered into leases for sand and gravel deposits. |
| October 12, 1951 | Robinson says Church placed a new ditch on Rock Creek on SE ¼ of SE ¼ of Section 11 after he knew property would be taken. |

EGG2009064

| Date of Correspondence | Item of Interest |
|---|---|
| October 16, 1951 | Suggested McKay Ditch be moved to follow Church Ditch and drop into first draw north of Walnut Creek (because of disposition of industrial waste). |
| November 6, 1951 | Act of Congress approved September 6, 1950 (Public Law 799-81st Congress) appropriated funds to acquire lands. |
| December 14, 1951 | Church says he has headgate in SE½ of NW¼ of Section 14 where he diverts water to ditch used for irrigation and for reservoir filling. Also that land would connect Church's land to east and south of project site. |
| November 19, 1951 | Check deposited in Registry of U.S. District Court for District of Colorado on December 15, 1951 and Decree on Declaration of Taking entered in Condemnation Proceeding on the same date. |
| December 20, 1951 | Last Chance Ditch fills Smart Reservoir (Croke Ditch take from Coal Creek under priority of Nov 1, 1870 and is second to court decree dated June 2, 1952 through a direct flow decreed, etc. (letter Fairfield and Woods to Croke). Letter asks for clarification on U.S. position on water rights. |
| January 3, 1952 | Declaration of Taking filed December 15, 1951, No. 3624. |
| January 7, 1952 | Filing of Declaration of Taking No. 2, Civil Action No. 3624, on January 2, 1952 (Tracts 1, 2, 3, 4, and 5), $76,511 deposited with court. |
| January, 1952 | C. W. Robinsons appraisal for acquisition of right-of-way for railroad. |
| | C. F. & L. Nilsen          5.51 acres      $ ?  |
| | Katherine E. Church        5.55 acres        ?  |
| | State of Colorado         17.26 acres      ?  |
| January 11, 1952 | Easement for access road vested in U.S.A. |
| January 25, 1952 | Church agrees to waiver for railroad crossing over Last Chance Ditch. |
| January 25, 1952 | License requested from Union Rural Electric Association to build track under power line. |
| January 29, 1952 | Mineral appraisers of landowners inspect site, logs, and drilling cores. |
| January 31, 1952 | Church says he will not sign railroad right-of-way waiver on land owned by Katherine E. Church in Section 14. |

EGG2009065

| Date of Correspondence | Item of Interest |
| --- | --- |
| January 31, 1952 | License granted for railroad under Public Service Company power line. |
| February 1, 1952 | Apply for authority to construct railroad crossings of Highways 72 and 93. |
| February 1, 1952 | David Persons, Project Engineer, has land fenced on diagonal in southeast corner so that the land lying south of northeast/southwest diagonal of S/2 of the N1 4 of Section 14 Church's Snart ditch is thereby excluded. Also a 14-foot strip is left so Church can get from SE/4 to SW/4 of Section 14. |
| February 4, 1952 | License for railroad track under power line granted by Arvada Electric Company. |
| February 4, 1952 | License granted for railroad track under power line by Union Rural Electric Association, Inc. |
| February 5, 1952 | Colorado State Board of Land Commissioners accepts [illegible] for 17.36 acres for railroad deeded right-of-way, [illegible] T2s, Range 70W. |
| February 7, 1952 | Maximum speed of train on spur 10 miles per hour [illegible] three trains per month after construction condition. Public Utilities Commission application hearing [illegible] |
| February 7, 1952 | Credvill serves Persons federal action in southeast corner as in the best interests of the U.S. |
| February 7, 1952 | Austin Company rents Wilson land for $30 for units and temporary storage of materials from Feb. [illegible] to July 1, 1952. |
| February 8, 1952 | Last appeal to Church for railroad right-of-way to avail. Papers on taking to be expedited. |
| February 8, 1952 | Final papers for Option to Purchase right-of-way railroad across land of G. H. Wilson to be signed February 11, 1952. |
| February 11, 1952 | Fifty foot deep vertical faces exposed on both north and south side of project. Church's and government appraisers will be allowed to examine the cuts. |
| February 12, 1952 | Wilson and Colorado State right-of-way for railroad agreements confirmed. |
| February 12, 1952 | Public Service Company waiver for railroad crossing under power line. |

EGG2009066

COORS    RSCLL  11  1994    ITEM 19                    91237

| Date of Correspondence | Item of Interest |
|---|---|
| February 14, 1952 | Successful negotiations of agreements with exception of Church property reported. |
| February 15, 1952 | License granted by Board of Water Commissioners of City and County of Denver for right-of-way for railroad across South Boulder Diversion Canal in Section 16, T2s, Range 70w. |
| February 19, 1952 | License from City and County of Denver to government for railroad right-of-way within South Boulder Diversion Canal right-of-way. |
| February 20, 1952 | Recommend Corps of Engineers obtain raw water line right-of-way from Ralston Reservoir to Rocky Flats. |
| February 20, 1952 | Colorado State Board of Land Commissioner grants right for 90 days to haul ballast for railroad across state land for fee of $40. |
| February 21, 1952 | License to cross the Kinnear Ditch with the railroad spur and the raw water line obtained from Farmers Reservoir and Irrigation Company with stipulation that a 100 cubic feet per second culvert be constructed for Kinnear Ditch under the railroad. |
| February 22, 1952 | Letter to Chief Appraiser, Corps of Engineers, U.S. Army, from C. N. Robinson with water information. In order to determine rights for decreed ditches in area, John made search at State Engineers office and Justice Department for the area. Such Creek carries no decreed rights. Upper Church Ditch will carry 10 second feet under Priority No. 2, a decree dated September 2nd, 1884 for 18.11 second feet out of Coal Creek used on land in vicinity of Broomfield.

McKay Ditch has capacity of 25 to 30 second feet and carries water to Great Western Reservoir under a right dated April 21, 1905 for 500 acre feet.

Decree dated May 20, 1872 to Kinnear Ditch and Church for 26.45 second feet and a reservoir right dated out of Coal Creek and Kinnear Creek to Standley Lake for 2,155,857,642 cubic feet of water is approximately 50,000 acre feet. The 1872 Kinnear Ditch and Reservoir decree puts about 1000 acre feet per year into Standley Lake for a total of $2,000 acre feet. Kinnear Ditch diverts water into Kinnear Creek at a point in Section 17 from whence it runs in Kinnear Creek to Standley Lake. |
| February 25, 1952 | Recommend railway right-of-way include raw water line right-of-way in Church land condemnation. |

EGG2009067

| Date of Correspondence | Item of Interest |
|---|---|
| February 26, 1952 | Right-of-way for crossing Highways No. 93 and No. 72 executed by Board of Jefferson County Commissioners. |
| February 26, 1952 | Austin Company to procure pipe and get bid from C. L. Palmer Company (railroad contractor) to put pipe under Highways 72 and 93. |
| February 26, 1952 | Application No. 11604 presented on January 30, 1952 to Public Utilities Commission for construction of railroad crossings across State Highways No. 72 and No. 93 granted by Decision No. 38198 dated February 21, 1952. |
| February 28, 1952 | Railroad spur to be 2.6 miles to access road property line and 1.6 miles within site for total length of 4.2 miles. |
| February 29, 1952 | Government appraisers visit plantsite cuts. |
| February 29, 1952 | Railroad requests Public Utilities Commission to raise power and telephone lines over railroad right-of-way. Railroad will pay costs. |
| March 7, 1952 | Condemnation of Church land for railroad in hands of AEC Real Estate Section and has yet to be approved by AEC Commission. Railroad contractor would be ready with grading up to Church lands by March 22, 1952. |
| March 12, 1952 | Commission authorized condemnation on March 12, 1952. |
| March 17, 1952 | Letter to Attorney General from General Manager asking for condemnation. |
| March 20, 1952 | Recommend raw water line go under water courses with fill and paved invert of the course. |
| March 20, 1952 | U.S. District Attorney in Denver obtains right of entry to Church land for the railroad right-of-way. Contractor to proceed with grading. |
| March 24, 1952 | U.S. granted possession of land by Civil Action No. 3973 as a perpetual easement and right-of-way for water pipe line and railroad spur. |
| April 3, 1952 | Recommend amending original "Declaration of Taking" to omit southeast triangular part of southeast corner and to provide for easement or "right to transport water" through Upper Church Ditch, McKay Ditch (Walnut Creek), Woman Creek, and Smart Ditch through the Rocky Flats site. |

EGG2009068

| Date of Correspondence | Item of Interest |
|---|---|
| May 1, 1952 | Compare costs of both original and shift site. |
| May 1, 1952 | DLRGW agrees to permit water line installation under railroad track. |
| May 14, 1952 | Drawing of water line right-of-way to Board of Water Commissioners of Denver. |
| May 15, 1952 | Wilson's sign right-of-way easement for water line and railroad spur for $250. |
| May 15, 1952 | License for water line to go under and along spur railroad spur in Section 21, T2s, Range 70w, 6 P.M. |
| May 20, 1952 | Right-of-way easement for water line in Sections 29, 32, and 33 signed by C. W. and F. H. Johnson. |
| May 21, 1952 | Suggest amendment to condemnation proceedings on access road to include water line, railroad spur, power line, telephone lines, etc. |
| May 21, 1952 | Filed Civil Action 3673 on March 29, 1952 against 6.11 acres for perpetual easement and right-of-way for application and subdivision of storm line and railroad spur e . . . . Katherine C. Church, et al. U.S. District . . . . . . order for immediate possession on March 29, 1952. |
| June 11, 1952 | License for right-of-way for water line and . . . owners on City and County of Denver land. |
| June 25, 1952 | State of Colorado gives right-of-way for railroad spur and water line across Section 16, T1s, Range 70w. |
| July 10, 1952 | Amendment filed to change taking of access road right-of-way to include railroad spur, power line, telephone line, water pipes, guard house, wells and other . . . . . . . |
| July 18, 1952 | Temporary spur built on C. F. Wilson's property is . . . . . |
| July 21, 1952 | Decree granted on Civil Action 3673 Declaration of T . . . for water line and railroad track on Section 21, T2s, Range 70w. |
| July 26, 1952 | Draft of new water contract sent to New and United Board of Water Commissioner by Austin. |
| August 18, 1952 | U.S. has vested rights in 2,583.9 acres of land including right-of-way for access road, railroad spur, power line, telephone line, etc. in Section 9. |
| October 27, 1952 | Determined that the three property owners in Civil Action 3624 would have separate court hearings. |

EGG2009069

| Date of Correspondence | Item of Interest |
|---|---|
| November 14, 1952 | Church to be allowed to shift his herds from east side to west side of plant and vice versa, through plantsite but outside security fence, after making arrangements with Dow's Mr. Langell. Cattle guards and gates to be put in fences at the ends of the water line on the north side of Highway 72 and the south side of Rocky Flats access road. This would allow Church to drive cattle around plantsite to the south. |
| November 18, 1952 | Persons leaves for another assignment. Gilbert C. Hoover becomes Field Manager at Rocky Flats. |
| November 25, 1952 | Rodgers, Rodgers' attorneys, and U.S. land appraisers tour site and discuss conditions to be considered in appraisal of land. |
| December 16, 1952 | Stipulation for dismissal of tract in SW corner of taking (triangular section plus passageway). Filed in Civil Action 3624. |
| January, 1953 | Stipulations filed to Civil Action 3624 to recognize prior rights of the Farmers Reservoir and Irrigation Company to use Woman Creek to convey water and of the City and County of Denver in connection with the South Boulder Diversion Conduit. |
| January 7, 1953 | Approximately 86 tons of material removed from Erickson land, Rocky Flats site, for fill in and around tailings. |
| March 25, 1953 | Jury awarded Rodgers $125,219 for land and mineral rights plus $6,937 severance damage or about $125 per acre for 400 acres for a total of $39,156. Earlier jury verdict was based on $500 per acre for 90 acres irrigated meadow, $40 per acre on remaining 310 acres; $5,000 mineral rights; $5,000 severance damages on March 24, 1953. |
| April 3, 1953 | 7,328 cubic yards of pit run ballast with larger rocks screened out was taken from southwest corner of the site for use as railroad spur ballast. |
| April 23, 1953 | Amendment to Decree on Declaration of Taking, Civil Action 3624 for the southwest corner of NW¼ of Section 11, T2S, Range 70W, 6 PM (that 40 acres removed from taking). |
| May 20, 1953 | Mann Construction Company (water line contractor) gives Johnson $100 for damages to property in connection with water line installation. (Earlier they build trails a road for Johnson across a ravine on the right-of-way.) |
| May 29, 1953 | Reseeding of water line right-of-way through Johnson and Wilson property completed as of May 29, 1953. Seeding at 15 pounds/acre were seeded using 20% Buffalo, 20% Blue Grama, 40% Crested Wheat, and 20% Intermediate Wheat grasses. |

EGG2009070

| Date of Correspondence | Item of Interest |
|---|---|
| June 4, 1953 | Amendment to Decree of Declaration of Taking, Civil Action 3624, for access to and to flow water through Woman Creek on Rocky Flats plantsite by users. |
| June 4, 1953 | Amended Judgment on Civil Action 3624 notes 5% interest on $9,200 from July 10 to December 15, 1951 and an $10,316 from July 10, 1951 until paid and that all payment is subject to liens for taxes and for the amortization mortgage of the Federal Land Bank of Wichita. |
| July 26, 1953 | Corps of Engineers recommend acquisition of perpetual easement for water line and railroad spur track by condemnation because of title defects. |
| July 7, 1953 | Amendment to Decree on Declaration of Taking #2, Civil Action 3624 to recognize City and County of ____ of rights in South Boulder Diversion Conduit ____ ____ agreeing not to make changes to existing or add new structures on the 150-foot strip without City and County of ____ approval |
| July 17, 1953 | Drawings of "as built drawings" of railroad spur returned to AEC by Austin. |
| July 29, 1953 | Final agreed to Rodgers for 400 acres is $95,224 plus $4,879.97 interest for a total of $10,0_____ ___ $1156 per acre]. |
| September 1, 1953 | Suggested deletion of 541 acres of the timber ____ ___ from the original takingment to L____ ____ ___ __ of KFFO (to reduce estimated value by ____ __ _ __ |
| September 2, 1953 | Dow Security agrees 541 acres deletion ____. |
| September 3, 1953 | Dow Health Physics agrees 541 acre ____ ___ ___ suggest that only area needed outside chain ____ is the drainage area to the east. |
| September 9, 1953 | L. A. Matheson of Dow says probable ____ ___ than four square miles and defensible ____ ___ ___ below that without operating experience. ___ ___ Dr. Jette of Los Alamos suggestion that the ____ to 16 square miles with 4 square miles as the ____ minimum. |
| September 10, 1953 | Declaration of Taking No. 4502 by General ____ ___ ___, for right-of-way for railroad and water line ____ ___ ___ of Wilson and Johnson. |
| September 14, 1953 | Langell of Dow to Hoover of RFFO - Keep ____ ___ __ __ site unless price is unreasonable; at ____ ____ consider an acreage reduction. |

EGG2009071

COOK   APRIL 11 1994   ITEM 19   91242

| Date of Correspondence | Item of Interest |
|---|---|
| September 17, 1953 | Hoover to Tyler, SPOO - Keep 4 square mile site and if award too high, appeal. |
| October 20, 1953 | Tyler, Manager Santa Fe Operations, to General F. E. Fields, Director DMA - Should appeal Rodgers case as decision not to appeal evidently made solely by Attorney General's Office. |
| October 25, 1953 | Note by L. M. Grow says Attorney Chittom says Rodgers paid in full, case closed, and money probably already spent. |
| November 30, 1953 | USAEC, DMA, Jack Armstrong to C. P. Tyler, Manager Santa Fe Operations, time during which appeal could be lodged on Rodgers case is closed. Offered full cooperation to U.S. Attorney in preparation for the remaining cases. |
| December 1, 1953 | Current owner of Upper Church Ditch is a Mr. C──── of Broomfield. Water is from junior rights and according to record, flowed for about 18 days in 1949, 1 or 5 days in 1950, and 51 days in 1951. No flow recorded since 1951 to date. |
| December 4, 1953 | Persons suggests employment of U. S. ──── of ──── New Mexico as expert witness on ──── ──── subsurface values since Attorney Chittom feels ──── verdict in the Rodgers' case was mainly due to the lack of defense in this area. |
| December 10, 1953 | Pre-trial conference with Church, Linder, Church's attorneys, Knowles of USTC Company, representative of Martha Eberhalter, M. R. Chittom of U. S. Attorney's Office, D. W. Persons, and ──── of ──── ──── Knowles' court.  (Note:  One of witnesses stated ──── Church was representative of the interest held commonly on values of dairy ──── for use in ──── ──── aggregate products.  Use two witnesses ──── ──── retained by Church may be rendered useless for either cattle or residence due to use made of permits ──── probable refers to USE official saying that buildings around the security area would not be used for ──── grazing since it would be a buffer strip for ──── fallout from a facility stack - Building 771.) |
| December 22, 1953 | A. S. Walters says arrangements have been made for him to appear as an expert witness in Denver Federal Court on February 15, 1954. |
| January 8, 1954 | USAEC, Santa Fe Operations to General Counsel, ──── ──── D.C. - Church's postdialogment for damages to ──── ──── taken because of disclosure from USE station ──── ──── security and Public Relations problems. |

EGG2009072

COOK   APRIL 11 1994   ITEM 19   91243

| Date of Correspondence | Item of Interest |
|---|---|
| January 15, 1954 | Chapman presents information for expert testimony in Church case if damages to property-not-taken becomes a part of the trial. (Note: He agrees with Soddy Report of 1932 that on the average, the original land 1 square mile by 1 foot deep contains 6 tons of thorium, 5 tons of uranium, and 1 gram of radium and that a slight concentration of activity is found in the silt and mud of stream beds in the region. He also says it would take 25,000 years to reproduce, from stack effluent, the amount of radioactivity already in the ground.) |
| January 27, 1954 | Further information from Chapman of how to use in cross-examination if required (60 soil samples for national radioactivity average 30,000 dpm/kg) water and air sample information both on and off site in document of sodium is listed. |
| February 1, 1954 | Understand Denver Post carried story on January 31 referring to possible land contamination. RFD's suggested technical report, if declared declassified, to visit the Dev., RFD, and their attorneys in response to public questions. |
| February 2, 1954 | Photos of locations on Rocky Flats site sent to A. S. Waiter. |
| February 3, 1954 | Excessive expense being caused by Church's alleged future off site damages. |
| February 11, 1954 | Title defects in easement for railroad and water line right-of-way in Section 16. |
| February 12, 1954 | Landowner's lawyer makes charges to Denver Post who in turn asked G. C. Hoover for a statement. Hoover replied statement was being prepared. |
| February 12, 1954 | Corps of Engineers reserved necessary easements to obtained from State of Colorado by condemnation due to title defects. |
| February 15, 1954 | Hoover statement for public release detailing "low contamination" at Rocky Flats prepared, but not issued yet. Information Division says if statement is released it would be better for AG to release it. |
| February 25, 1954 | Hoover releases statement to Charlie Roos of Denver Post after talking to Richard G. Elliott, Director, Information Division, AEC. |

EGG2009073

COOK   APRIL 11 1994   ITEM 19   91244

| Date of Correspondence | Item of Interest |
|---|---|
| March 26, 1954 | Declaration of Taking, Civil Action 4670, of right-of-way for water line and railroad spur in Section 16 from State of Colorado signed by General Manager, AEC. |
| May 10, 1954 | Meeting between Church, Church's attorney, representative of U.S. Attorney's Office, and AEC on April 29, 1954 where discussed:  1)  Church wanted days to use Rocky Flats waste water - refused since AEC wants to retain control until it leaves plantsite, 2)  AEC does not have construction funds to build Church two railroad crossings, 3)  Denver says AEC cannot resell water to other users so request for Church tap denied, and 4)  Church wants to keep oil and gas rights. |
| May 11, 1954 | Hoover to Kelley, USBR - Could retain coal rights if mine from off site, not under Rocky Flats buildings, and give 30 days notice. |
| May 17, 1954 | Vogler of Galveston, Texas is part owner of Great Western Reservoir and 'Clay Ditch.  Dr. Church interested in filing for right on whatever Rocky Flats water is also his property. |
| May 21, 1954 | L. M. Gros., AEC Engineer, recommends government obtain all mineral rights. |
| | A. S. Walter appraisal: |
| | Church  $59,500 for 1152.17 acres = $52.50 per acre |
| | Lindsay  $06,550                    = $70   per acre |
| June 3, 1954 | Church talks to Cook about coverage of buildings with a cattle guard on railroad spur and when Church of Rocky est.  AEC didn't have construction money for this purpose.  Church became angry and said this right to it to it. |
| June 4, 1954 | Land appraisers say mineral rights of no value; therefore U.S. Attorney's Office said take them even though would not mining from inside coverage of properties, not under buildings, to give 30 days notice, and must not interfere with government surface rights. |
| June 21, 1954 | Church agrees to all stipulations except that it will build cattle guards or railroad right-of-way and will be able to plant waste water.  AEC position is that it does not grant these requests. |
| June 26, 1954 | Lindsay wants permission to graze cattle on AEC land and use corrals for vaccinating. |

EGG2009074

| Date of Correspondence | Item of Interest |
|---|---|
| June 30, 1954 | Johnson complains of damage to land when repairs were made on break in Ralston water line. Wants $225 damages. |
| July 9, 1954 | Lindsay requests for grazing denied, but he may use corrals for vaccination for this year only but to coordinate with Dow Security. |
| August 13, 1954 | Marcus Church signed stipulation agreeing to settle land condemnation suit for approximately $69,200: 1) mineral rights not included, 2) access right for purposes of inspection, operation, and maintenance of ditches, 3) license to build at Church's expense (a) two auto crossings of railroad spur, (b) a cattle guard, (c) two railroad spurs, (d) water pipe line under railroad spur, (e) a ditch from Ralston Creek southeast to a point in Section 15. Total $69,200 is inclusive of interest for land and easements in Civil Action 3624 and Civil Action 3873. Church has revocable right for access between E/2 of Section 14 and S/2 of SE/4 of Section 14. |
| September 15, 1954 | License for spur track under Public Service Company line in Section 16. |
| October 18, 1954 | Lands Division, Department of Justice, says Church settlement excessive. |
| November 15, 1954 | Offered Johnson $50 and Dow will reseed damaged area. |
| January 6, 1955 | Mathesen reports on old Capitol Coal Mine formations, type of coal, etc. |
| February 28, 1955 | Amendment to Taking No. 1, Civil Action 3624, allowing for rights for Great Western Reservoir and Canal Company, McKay Ditch, Tank Ditch to cross water across government property. Filed March 1, 1955 with Jefferson County Clerk. |
| April 21, 1955 | C. C. Chittim of U.S. Attorney's Office says Department of Justice says Church stipulation okay so he will start work on Lindsay case. |
| May 2, 1955 | Amendment to Taking, Civil Action 3873, allowing oil and gas rights to stay with Church but right-of-way for water line and railroad spur go to government. |
| May 2, 1955 | Amendment to Taking No. 2, Civil Action 3624, allowing oil and gas rights to stay with Church but government gets easement on access road. |

EGG2009075

| Date of Correspondence | Item of Interest |
|---|---|
| May 2, 1955 | Amendment to Taking No. 1, Civil Action 3624, allowing Church to use Worun Creek and ditches therefrom, coal in S/2, Section 10 and other areas and all oil and gas. |
| May 2, 1955 | Judgment okays stipulations on Civil Action 3624 and Civil Action 3873. |
| May 3, 1955 | County Clerk and Recorder of Jefferson County records amendments on:<br><br>Decree of Declaration of Taking #1, Civil 3624-Book 919, Pg 231<br>Decree of Declaration of Taking #2, Civil 3624-Book 919, Pg 31<br>Decree of Declaration of Taking ' Civil 3873-Book 919, Pg 347 |
| October 3, 1955 | U.S. Attorney's Office concludes Lindsay land fair value, ($78,000) including $10,000 interest. Lindsay counters with $95,000; after being told it was too high, Lindsay offered to take $85,000. |
| October 26, 1955 | Miller has applied for oil and gas leases on NW/4, Section 14 and NE/4, Section 15. |
| October 31, 1955 | General Counsel of STD, AEC feels preferable no leasing be granted for oil and gas on NW/4, Section 14 and NE/4, Section 15. |
| October 31, 1955 | Lindsay signs stipulation to accept $80,000 (inclusive of interest) for his 960 acres. |
| December 1, 1955 | Stipulation for Lindsay 960 acres received coal, oil and gas rights from the Taking except no on site operation. subsurface subordinate to government surface rights with 30 days notice to government for off site operations. Signed by Lindsay and supersedes earlier stipulation. (Note: A. Seaver Patten, Margaret D. Patten, and M. Patten held coal, oil and gas, and mineral rights on S/2 NE/4 of Section 10, SE/4 SW/4, E/2 NW/4, W/2 SE/4 and NE/4 SE/4 of Section 2 all in T3S, Range __.) |
| June 26, 1956 | Johnsons' given an extra $200 to make a total of $800 for right-of-way for water line across their land. This was an out of court settlement. |
| October 24, 1956 | Five-year lease beginning July 1, 1957 to T. C. Miller for oil and gas on NW/4, Section 14 and NE/4, Section 15 with stipulation for no on site drilling (320 acres). |

EGG2009076

segment type="boilerplate"COOK APRIL 11 1994 ITEM 19 91247

| Date of Correspondence | Item of Interest |
|---|---|
| November 28, 1956 | AEC "Commission" decided not to approve Mr. Miller's application for on site drilling but directional controlled drilling would be approved if revised application were submitted. |
| January 21, 1957 | Mineral rights of UTSR excluded from Judgment of October 12, 1956. Condemnation Proceeding, Civil Action 3624 - Declaration of Taking No. 1, Civil Action 3624 - executed November 6, 1951, filed January 2, 1952. |
| June 20, 1960 | 50-year license to Union Rural Electric Association, Inc. to cross railroad spur with electric power line. |
| May 4, 1964 | Appraisal of 19.41 acres for an east access road by T. C. Hitching is $8,120. Weighted one price per acre of land in vicinity as determined by eleven most significant sales from February 1959 through February 1963 was $525.75. The two most comparable sales were from $550 to $476 per acre without adjustments. |
| May 27, 1964 | Letter to Rodgers from L. J. Cotton, Jr., Chief Administration and Real Estate Branch of Engr. and Construction Div. ... offers to accept the $9,000 offer for a perpetual easement for 19.41 acres of land in the SW⅓ of Section 11, T2S, Range 70W, o 6th. |
| June 19, 1964 | Grant of perpetual easement on Rodger's land for east access road dated May 29, 1964 and recorded June 5, 1964 in Book 1716 of Deeds at page 45, File No. 3546-335. |
| July 2, 1964 | Church wishes to exercise his license to construct ... automobile crossing over the railroad spur in Section ? north of State Road 72 and 3) a water pipe line 12" ... under the railroad spur at a point 9 feet north of ... south line of the SW⅓ of NW¼ of Section 11. |
| July 7, 1964 | AEC concurs to Church's auto crossing and pipe line. |
| September 10, 1969 | New legal description of inner security fence obtained by using Diesel, Kurrell and Company of Boulder as the contracted surveyors. |

EGG2009077

COOK  APRIL 11 1994  ITEM 19       91248

| | |
|---|---|
| 1953 to ? | Periodically received $^{24}$Na sources from Idano by air at Jefferson County Airport. Used for quality check in Building 991 production. |

7/53 - Monthly summary of T. S. Chapman: "Messrs. Jacoe and Torrey of the State Department of Public Health discussed liaison with respect to contamination on July 1. They felt they should be prepared to assure the public that there was no contamination."

1954     All monitors classified to Grade V level.

1955     Appointed first Industrial Hygienist, Darrel Goodwin.

1956     First mention of availability of leaded gloves. First installation was actually in 1958.

1957     Logbook Entry - Policy - Did not want women working in production buildings.

5/57 - Drawing and prototype of dual beryllium sample head completed.

8/57 - Nuclear alarm tested at LASL by Maras.

9/57 - September 10-13, 1957 Wagner School sample showed 0.56% MPL of plutonium.

| | |
|---|---|
| Average onsite smears | 6.3 dpm |
| Maximum on roof of Building 91 | 51. |
| Average offsite | 3.5 dpm |
| Maximum offsite | 12. |

1958     Logbook Entry - Lots of personnel contamination problems in Building 881. Supervisors contaminating personal clothes.

Logbook Entry - Special uranium rolling project at Kokomo, Indiana. Kittinger on work crew.

9/58 - Indium foil placed in dosimetry and security badges.

Logbook Entry - A contaminated concrete floor from Building 883 was buried in a sludge trench. Also, concrete with 2000-6000 cpm from Room 266 in Building 881 buried in sludge trench.

Logbook Entry - Because of contaminated floors, a radiation monitor on shift posted signs and established bootie changes at Building 881 entry. This created great turmoil with Operations supervision.

EGG2009078

COOK   APRIL 11 1994   ITEM 19   91249

1959   (Feb.) Logbook Entry - Reference is made to special summaries made for Congressional Investigating Committee.

Note: There was considerable Union activity at this time over working conditions in Building 881 and Union representatives took their story to Washington. Health Physics was caught in between and Building 881 Production supervision accused us of supplying the Union with information which we had not.

Formal training of Radiological Assistance Team completed.

1960   Logbook Entry - Some bare thorium was rolled in Building 883. Also, some thorium was canned in Building 883.

4/60 - Room 180 decontamination completed.

1961   Logbook Entry - First WR parts went to Building 883 for final cleanup and breakup on press. Some plutonium contamination problems in that area.

Health Physics' involved with instrument for checking WR parts.

Logbook Entry - 10/23, WR parts now received in Building 881, Room 266.

3/61 - Started looking at Body Counter design parameters.

8/61 - Placed 55 Alpha Flashers in plutonium areas.

1962   Logbook Entry - March - Alluded to cleanup of Room 105, Building 881 (apparent beginning of conversion to offices).

Logbook Entry - July - Apparent start of decontamination of uranium lathes in Building 444.

Logbook Entry - August - Strike. Salaried people worked 10-hr days and ran much of the Plant.

Logbook Entry - October - Alpha Flasher (later to become Alpha-Met) was being used.

Logbook Entry - Some discussion of pipeline from 903 Area to Building 774 for transfer of oil. (Never occurred.)

1963   Logbook Entry - Relocated Sample Station S-8 from east of Building 881 to near Gate 6. Also, began using fallout trays for environmental sampling.

Logbook Entry - 6/17, Nickel carbonyl bottles removed from burial near Building 771 hatch and destroyed by explosion.

113

EGG2009079

COOK   APRIL 11 1994   ITEM 19   91250

Cylinders committed to hot waste. Contamination levels at 60 K cpm.

Logbook Entry - AEC-ALO inquired about potential fire problems with Benelex or polyethylene to be used for shielding (probably Room 114, Building 771 addition). Agreed it could be painted.

Logbook Entry - Hill and Owen set up respirator fitting in Building 771.

Logbook Entry - Obtained a PuF$_4$ source for dosimetry calibration.

Logbook Entry -Several filled out applications for courier cards. (In the early 1960's, we began escorting waste to Idano since containers did not meet DOT specs. Several of our salaried people rotated as escorts, with W. W. Bright coordinating the effort and making the trip each time.)

1964        Logbook Entry - Alluded to outside 6000-gal. americium storage tank. Concentration about 0.1 g/l. (This tank was located about where the Chemical Production manager's office in Building 771 is located now.)

Logbook Entry - Alluded to rolling oralloy foil in Building 331. (The northeast part of the Garage was for some time an R&D uranium area.)

Logbook Entry - 9/64, A $^{233}$U job was postponed for 6 months.

Logbook Entry - Planning for filter house at oil field (903 Area) discussed.

Logbook Entry - 10/64, Waste line break in Building 776 parking lot (now under Building 707). Soil at 4.7 x 10$^4$ dpm/kg, water at 10$^3$ to 2.4 x 10$^4$ dpm/l.

Logbook Entry - 11/64, 2400 gal of Building 444 lathe coolant, water, etc., dumped in sewage sludge trench, approximately 1.35 kg of $^{38}$U in liquid.

AEC Audit Report - Combination Dosimetry and Security badge to start April 1. Body Counter completion expected by March with half-time devoted to low-energy detection development.

1965        Logbook Entry - Alluded to moving Room 146 fluorinator to Room 148, Building 771. (This I believe is the fluorinator that was alluded to in a compensation case as a source of radiation to the claimant.)

114

EGG2009080

Logbook Entry - 5/1/65, 60 kg of $^{38}$D was mistakenly burned along with pallets at a waste-burning pit (I think south of the Building 881 parking lot). Plan was to drum material (what disposition of drums was I do not know).

Logbook Entry - 12-13-65, Employee reported beta burns from smearing $^{90}$Sr source in Building 779. (I have not included the identity of the person. C. R. Lagerquist knows of case. Local AEC decided it was not a reportable case. Under today's standards it certainly would be.)

Logbook Entry - Implies the last waste escort trip was 6/26/65.

1966    AEC Audit - 20 CAM's installed by April 1, 1966.

1967    Logbook Entries - Several allude to high-gamma-emitting drums stored in operating areas, lack of shielding, etc.

Logbook Entry - Implies we started classifying waste relative to DOT and the various drums originating from Building 774 were identified as follows:

    741 - 1st stage - Non-LSA.
    742 - 2nd stage - LSA unless > 0.5 mr/hr.
    743 - Grease plant - LSA unless > 0.5 mr/hr.
    744 - Incompatible waste - label on individual basis.
    745 - Evaporator salts - LSA unless > 0.5 mr/hr.
    746 - Empty contaminated drums - LSA.
    (Readings, I am sure, were at surface.)

1968    Logbook Entry - Pad from $^{241}$Am storage tank north of Building 771 removed and relocated "back" of Building 771. Tank also relocated to that point and used for nitric acid.

Logbook Entry - Plant Manager disbanded the Executive Safety Council with the Industrial Safety manager to report to the Plant Manager once per month and the Health Physics manager (Piltingsrud) to meet with Operating Board the first Wednesday of each month. (I do not know exactly when the ESC was reinstated with weekly meetings except I do know it was meeting on such a schedule in the fall of 1970.)

ALO issued S/RD report on RFP external exposure problem--excellent summary of exposure problems 1952 through 1967.

1969    Bruce Owen - transferred to Operations to be in charge of fire cleanup.

Hired on order of 53 summer students to assist in cleanup. (These people were used on 2nd floor or areas where only half-masks were deemed necessary.)

115

EGG2009081

COOK   APRIL 11 1994   ITEM 19        91252

1970          Logbook Entry - 5/26/70, Area Allowance started in
              Building 707.

                   Modules E, F, G, and H considered "hot" on 6/22/70.
                   Modules C considered "hot" on 8/12/70.
                   Modules A considered "hot" on 12/14/70.
                   Modules B considered "hot" on 12/16/70.

              Family Open House including Building 707 on May 2 and 3.
              Strike from 6/28 to 9/8.

1972          Logbook Entry - 4/27, Ref: AEC Manual Chapter 0545--exempt
              for fixed neutron dosimeters if personal badge contains
              elements.

              Logbook Entry - Harry Ettinger of LASL initiated particle size
              study of effluent from Building 771 Booster III and the
              Building 707 Glovebox systems.

From AEC appraisals in my file:

1955          Alludes to Plant liquid waste program.

1956          Mentions Plant may get into beryllium work.

1957          Average gross alpha level in liquid waste effluent is 19 dpm/l
              for period September 1, 1956 to April 30, 1957; 330 dpm/l was
              used as "tolerance."

              Sanitary sludge alpha level was less than that for fertilizer
              so disposal is unrestricted.

1959          Alludes to Industrial Hygiene function assignment to
              Industrial Safety, specifically E. (Tim) Hicks.

1960          Visitors to buildings given film badges.

              Indium in film badges and also laminated in all Security
              badges.

              Alludes to accumulation of CCl₄ and Shell Vitrea in 55-gal
              drums. No satisfactory disposal available and significant
              quantities accumulated.

              Discussed studies for recovery and processing of oil to solid
              (jelly).

1961          Test wells near evaporation ponds showed 800-1000 ppm nitrate.

              Reported 500 plutonium drums stored in open on pallets.

116

EGG2009082

COOK   APRIL 11 1994   ITEM 19                    91253

Contents of 300 uranium drums burned in pit.

Twenty-three nuclear accident dosimeters installed in Plant.

1962   No reports.  Ref. to classified report.

1963   Alludes to developing a respirator fitting plan.

Alludes to design of combination security and film badge.

Alpha Flashers in use.

Report shows table with contaminated wound summary for 1958-1962.

1964   Respirator fitting program going smoothly.  Thirteen hundred employees field-tested with smoke tubes and records maintained.

Combination security and film badge to start April 1.

Body Counter complete by March 15.  Half-time will be devoted to low energy detection.

1965   RFP cited as only ALO contractor with NAD capability which will be recommended in forthcoming manual chapter.

Health Physics initiated study designed to decontaminate valuable machine tools excessed from uranium processing.

Shielding installed in Building 777 in 1964 reduced exposures to one-third of that experienced in 1963.

Body Counter now used routinely.

Health Physics Guide and Health Physics Emergency Manual issued.

Bus outfitted for emergency service.

1966   Reported progress to eliminate solar evaporation ponds. Building 774 evaporator under construction.

Reported plutonium and $CCl_4$ to be reclaimed and oil residues incorporated with microcell to produce grease.  Construction of grease plant in early 1966.

Commended our (HP) Building 889 Operation.  Occupancy date September 1966.  (Decontamination of uranium machinery had been taking place starting in 1965 in Building 444 "pit.")

117

EGG2009083

Terminated waste escort to Idaho.

Personnel decontamination room added at Medical.

Mentioned 3500 to 4000, 55-gal drums of plutonium-contaminated coolant. Filter pump station under construction. Distillation and solidification to be accomplished in Building 774.

Twenty continuous air monitors installed and operational by April 1, 1966.

Sixteen reports in 1965 as RFPs.

1967   In March, thermal evaporation ready to undergo initial plant-scale operation. Predicted solar ponds to be abandoned.

Forty 55-gal oil drums processed per week, predicted 3 years to do backlog.

August AEC survey alluded to increasing radiation exposures.

    Additional education and training.
    Additional shielding in Building 771.
    Recognized $^{241}Am$ problem with ZPPR.
    Reported in 1966, 87 people > 5 rem.

1968   Alluded to Building 707 construction.

TLD being evaluated.

Second Body Counter being installed.

Shielding being expedited.

Oil transfer coming to end.

1969   (April) Project for added shielding nearing completion.

Decontamination started in open area formerly used for drum storage.

First recommendation - study half-mask with ultimate objective of eliminating.

TLD extensively evaluated - scheduled to replace gamma film.

Both Body Counters in operation.

First reference to ATMX cars - DOT permit, DOT regulations, and container problem.

118

EGG2009084

(Post-fire) Alluded to second stage of filters.

1970    (In my estimation this was the first really comprehensive survey. A team of five people came up with 21 recommendations, mostly relating to the fire.)

(Also, I feel it was the first really comprehensive HP review with 19 recommendations.)

Since 1970, the survey reports are quite comprehensive with numerous recommendations and I will not try to highlight them.

File MHS 3-6.6 - Internal Exposures

Summary furnished AEC on case-by-case basis for employees with > 25% MPSB and > 100% MPLB for 1957-1966.

File MHS 3-9 - Letter from Dr. Shipman of LASL, 1959

Observation - after 1 hr, measured 15 mr/hr from Kelley's body surface. Also, from whole body count extrapolated to time 0 and got 225 ug of $^{24}$Na.

This file also contains a letter from Dr. Guzak to Ed Walko on beta burns to employee's finger.

File MHS 3-1.11 - Incidents

Contains accounts of several Rad. Assistance Team responses offsite.

File MHS 5 - Tolerance Levels

Chronological history of stack levels and problems.

Incinerator started in November 1960.

File MHS 6-1 - Federal Regulations

Copy of original ERDA communication from ALO on instructions to women on NCRP 39.

Draft summary of Don Ross' (AEC Headquarters) review of our efforts to reduce exposures in 1968.

Contains copy of correspondence Woodruff to Vespe where it states 62 kg involved in general area of 1957 fire and probable ug released through ventilating stacks.

119

EGG2009085

File MHS 6-1 - Type B Incident Reports

Fourteen cases in 1967 of > 3 rem/qtr were categorized as Type B. Today they would be Type C.

Also shows that in those days no investigation required if facts were considered to be known.

File MHS 8 - Reports and Data

Dow Corporate Appraisals.  Contains much detail on 1967 exposures.

File MHS 9 - Meteorology

Contains several pieces of correspondence on meteorology back in 1951-52.

120

EGG2009086

(This page has been left blank intentionally.)

121

EGG2009087

COOK   APRIL 11 1994   ITEM 19   91258

Health, Safety & Environment -- 1975 to Present  (November 24, 1982)

I have pondered long and hard whether to write this section.  The easy way
is to leave the plant quietly and not comment at all on the past 7 years.
I leave behind a great number of people in the HS&E organization who have
contributed much to Rocky Flats over many years.  I have great respect,
compassion and concern for those people and therefore feel I would be
remiss if I did not make an attempt at evaluating the impact of the
many organizational occurrences over the past 7 years on the effective-
ness of those people and the organization in general.  I've spent many
a waking moment both at the plant and at home thinking about how best
to express myself without giving the impression of vindictiveness toward
anyone.

My concern relates to the people with whom I've been associated over
the 30-plus years at Rocky Flats and who will be continuing on for
years to come.  Each wants to make a meaningful contribution but in
doing so expects Rocky Flats to provide a satisfactory organizational
atmosphere in which to work.  With very few exceptions I've enjoyed a
very high level of mutual respect and loyalty from those who have worked
under my supervision and I owe those people a debt of gratitude for
contributing to my successes over the years.

To me, an organization's effectiveness and contributions are directly
proportional to its morale level.  Even the most capable people need to
feel a sense of security in their respective jobs;  they need to understand
what their role is with respect to the overall organization;  they need
to feel that role is respected and supported.  They must feel they are
being managed by motivation, not intimidation.

When organizational changes are made it needs to be made evident to
them that such changes are utilizing and building upon the strengths of
the past and indeed reflect reasonable objectives the changes are expected
to accomplish.  Perhaps most important is the need for assurance that the

122

EGG2009088

employee's position remains secure with continuing opportunity for growth. When changes are made, the new objectives, goals, roles, etc. for HS&E must be communicated so each employee understands and is able to re-establish his own role to meet those objectives.

From the previous paragraph, it is probably obvious to the reader what I feel to be the problem areas that have led to a very low state of morale in many of the groups within HS&E, not only today but to some degree for a large fraction of those 7 years. While some of the problem areas I've expressed in the previous paragraphs relate to everyday management of HS&E, the big "blows" have come about from some of the numerous reorganizations and the roles of technical groups of the past vs. what appears to be a new approach to the technical support of HS&E in the future. I will from here on attempt to elaborate in some detail on observations I've made that have led me to make the statements I've made up to this point.

Through the various reorganizations since July, 1975, many of the people I referred to above have been moved around and new jobs have been established, some of which confused a lot of us because the jobs weren't well defined and we weren't involved in any of the planning or developing objectives for them. With the reorganization of last April many people are even more confused and worried.

For both the reorganization of May, 1976 and April, 1982 my comments are based on what I feel has been a lack of sensitivity to the strengths, capabilities, and scope of existing functions as well as a lack of sensitivity to the people affected. Along with this has been a lack of communication to the people affected as to why changes were made.

Although there are other groups in HS&E and even outside of HS&E who are confused by the most recent reorganization, my discussion will be limited to those HS&E functions of which I'm the most familiar and which

123

EGG2009089

experienced the greatest impact from the two reorganizations alluded to
previously.

While there was some lateral movement of several HS&E functions in May, 1976,
much greater impact was felt by the Health Sciences group. From the
Health Sciences group, Radiation Monitoring was split off and the
Engineering & Construction Liaison group was dissolved. With McKelvey's
announced retirement, Industrial Safety joined what was left of
Health Sciences. A new group under Ed Sitzberger, called Health & Safety
Engineering, took over Radiation Monitoring with R.G. DelPizzo as manager,
the Fire Department under Ted Eckert, and established Engineering & Safety
Analysis under W.D. Kittinger. Dick DelPizzo had been the Group Leader
of Engineering & Construction Liaison and W.D. Kittinger had been
Radiation Monitoring Manager. The Unit Leader arrangement we had previously
in Radiation Monitoring was eliminated and the Area Representative concept
was begun under Kittinger.

I do not quarrel with Management's right to reorganize, but if at all
possible, in my view the new organization should build upon the strengths
of the old organization and those responsible have an obligation to fully
explain why the reorganization was necessary and convey what the newly
created functions are expected to accomplish.

Except for the OSA program which got off to a shaky start, what was to
be accomplished by the other affected groups was never very well explained.
The retrospective criticism I have is that there apparently wasn't a
sufficient enough understanding of the existing organization, which
could have been built upon and strengthened resulting in a positive
rather than negative influence on the people affected. The perception
many of those affected had was that their past work was unsatisfactory
and the new organization was to try to correct that incompetence.

EGG2009090

Two of our Unit Leaders, former supervisors of foremen and radiation monitors, were assigned to the new Area Representative position -- a staff job. A third area representative came from our Engineering & Construction Liaison group. All three had many years in Applied Health Physics as part of Radiation Monitoring and were also well versed in other safety problems and had a thorough knowledge of the physical plant as well as an excellent working relationship with operational people. The success of the present Area Representative group (with one exception, they all have such a background) I think is heavily influenced by their collective experience in Health Physics.

For the first 2 to 3 years, the area representatives struggled and were frustrated many times in trying to figure out what was expected of them, and what was the delineation of authority and responsibility within HS&E, etc. In general, the job was created with little definition and it had to find its place.

The area representative concept was obviously borrowed from LLL. There have been numerous comments from time to time by those familiar with the LLL system that the area representatives at LLL have monitors working for them and, in effect, function as supervisors in their areas of responsibility. It would have made so much sense in May, 1976 to expand the responsibilities of the existing Unit Leaders, who already had monitors working for them and had a thorough knowledge of the plant, to the role of area representatives and built upon that strength rather than remove it. Expansion of their function to the area representative concept utilizing the existing people should have been a natural and obvious thing to do. What an opportunity to have enriched those jobs and created an atmosphere of confidence by those affected, that top management in building a new team were building on the positive contributions of the old team -- a reiteration of what was heard by many of us prior to July 1, 1975.

In spite of continued redundancies, the area representatives of today do an excellent job. Perhaps the job could have been effectively established

125

EGG2009091

within a matter of months if it had grown out of the Unit Leader's job and there would have been very little problem defining it.

While there have been a few minor reorganizations since May, 1976 and up to April, 1982, it is the last one that continues to have many people confused, concerned, and worried. The morale of many seems to be at an all-time low. The non-degree people who have faithfully contributed so much hear the message that they're frozen in their tracks or they'll be replaced by degreed people as time goes by. I've even had the impression that the equivalent of the academic expression "Publish or perish" has been laid on some of our people.

I have always felt strongly that to be the most effective in providing service to the plant operations, such as we have at Rocky Flats, the Health Physics manager needs a mixture of various levels of people, both degree and non-degree. The non-degreed are assumed to have had much experience and have shown some technical ability while "growing up" with the plant operation. It's been the non-degree folks who have maintained some degree of stability in Area Health Physics over the past years while we've watched a parade of Master-level and Doctor-level people test the challenges, contribute a little bit, and move on to more technically challenging jobs. There is no substitute for the proper blending of professional and practical experience.

I would be the first to admit that I was taken aback when the April, 1982 reorganization was announced and couldn't believe what I was seeing. Be that as it may, I think the "blow" for everyone could have been softened greatly with a different approach to the way it was announced.

HS&E Direct Reports were called to a late afternoon staff meeting. The charts were shown to us one after another in a period of 20 minutes or less with no more explanation than who goes where. We were dismissed with the

125

EGG2009092

admonition to tell our respective subordinate managers concurrently at 8:00 a.m. the next morning. The impact was the greatest for my group who were splintered in several directions. At that morning meeting all I could say was "I don't understand, but here it is."

It would seem to me that it could have been anticipated that the changes would create a lot of concern and question since the changes, at least for my group, were indeed surprising and upsetting to say the least. The "blow" possibly could have been softened if the reorganization would have been announced by the Director getting all affected managers at all levels together. (Such an assembly occurs frequently for much less-important items.) Once assembled a clear, concise set of objectives should have been presented showing what the reorganization was intended to accomplish. Once the objectives were thoroughly discussed he then should have gone through the organization charts explaining how each change was expected to contribute to the stated objectives and how each was building on the strengths we already had. The most I ever heard was that they were needed to accomplish "changes in the 80's." What changes?

It would be natural at this point for a reader to ask me what kind of reorganization I would have proposed. In January, 1982, when I confirmed my intent to retire, I did suggest a reorganization scheme for consideration. While only expressed orally, I did convey objectives I felt my proposal would have accomplished. While perhaps over-simplified for this writing, the primary problem from my observation which resulted in inefficiencies in HS&E was the interwoven, horizontal, interdependence that existed between some of the HS&E groups. The result was a lack of acceptance of responsi-bility among managers, a passing of the blame back and forth for delinquent data or information which depended on more than one group to generate, all leading to a lack of definition of accountability for the managers involved. Much of this sort of problem wound up unnecessarily at the Director's level for resolution. I could see a simple approach to correcting such problems and a reorganization of HS&E would have been an appropriate time to make the change. An added spin-off would have improved morale of affected groups and, in general, a better definition of job responsibility and

127

EGG2009093

accountability.  My approach was to suggest a more vertically oriented organization.  This would have maximized control of a given manager to accomplish the end result for which he is responsible and at the same time better define each manager's accountability to the HS&E organization as a whole and bring less items to the Director's staff meeting for resolution.  A copy of the functional chart I presented in January, 1982 is included herewith.

The HS&E organization of last April has created even more of a horizontal dependence within itself with an associated increased lack of defined responsibility and accountability at least in the eyes of many who are trying to adjust to it.  While there may be some very able people appointed as managers, many have had little or no plant or managerial experience which I feel is essential to doing an effective job especially in the various dosimetry and radiation instrumentation functions.  An effective and thorough job cannot be accomplished without a high degree of sensitivity to the everyday challenges of the operations people themselves.

The chart put together by the new HS&E Data Manager is probably a good example to show the spiderweb of interdependence the other managers have to relate to.  From what's depicted, the other managers must draw intelligence from and respond to outside agencies, compensation hearings, Transuranium Registry, chromosome study, epidemiological study, individual employee requests, annual reports, etc.  Another obvious question: Who is responsible for the data reporting, the scientific interpretation, action, and recognition of significance of data when such responses need to be made?

While perhaps already discussed to some extent, I will continue discussion of concerns relating to changes which have, are expected to, or are perceived to come about in the future as a result of the April reorganization. Most of these concerns relate to technical developments and functions and to the future security of people already involved in such functions.

128

EGG2009094



EGG2009095



EGG2009096

From my experiences of the first 23 years, I feel the May, 1976 reorganization had a negative influnce on the effectiveness of Applied Health Physics Support to Plant Operations.  This relates to the separation of the radiation monitoring function, organizationally, from the professional and technical Health Physics functions.  The recognition of special problems and technical needs in the operating areas was frequently a result of the everyday closeness of radiation monitoring personnel to the operations themselves.  We did all we could to nurture this attitude among the group.  The solution of such problems when they required professional assistance was accomplished by a team effort within the Radiation Monitoring group.  This approach had a positive influence on the entire group. It created a job satisfaction and enhancement atmosphere for all involved. (Isn't this the exact concept Jean Hilbig is trying to put forth in improving productivity?)  While one can argue that such can still be done even with the last reorganization, it just doesn't happen as easily as when all parties involved in effect "live" together as one group and are accountable to the same manager and dedicated to a specific operational improvement.  The emphasis of hiring more and more professional people and establishing a separate large (25 people) organization under George Campbell to do all the technically challenging work, including that within the capability of existing degree and non-degree people, is having a negative effect on morale, job security, and concern for future opportunity.

Many salaried people of today and of the past were picked from hourly ranks on the basis of demonstrated technical as well as practical ability from working with professional Health Physicists.  Some have been stimu- lated to self-study, continuing education, certification, etc.  These people proved themselves and were promoted because of demonstrated ability. Some of our greatest contributors to Rocky Flats over the years came up the ladder from such roots, e.g., Ken Freiberg, W.R. (Bob) Sheets, J.B. Owen, Jack Leigh, Ralph Hayne, Jerry Haynes, Dick DelPizzo, and many others.  This is not to slight the professionals who also contributed

129

EGG2009097

greatly, but from them it was expected.  Certainly our accomplishments
in the body counter, wound counter, dosimetry, laboratory, instrument
design, etc. could not have come about without the technical know-how
of professionals but most of the applied know-how and field equipment
needs have come about from a joint effort by all levels of people
collectively understanding and recognizing the needs of the plant.  The
four patents granted to people in the department attest to that.

The final observation I want to comment on is what I term "overkill"
in insisting on degreed people in certain jobs.  Many of the non-degreed
people who are in technical or managerial jobs right now feel very
insecure and, to a man, they are doing excellent work.  They need to
be reassured.  There appears to be some intimidation, whether intended
or implied, that is responsible for their concern.  To replace them with a
degreed person doesn't guarantee any better contribution than one gets
from a dedicated non-degree person unless, indeed, the added technical skills
that one can only get in graduate school or advanced courses leading to a
degree are required for the specific job.  Unfortunately in Area Health
Physics, the demand for that level of skill is the exception rather than
the rule and that is why the non-degree people have made most of the
contributions.

Another area that worries me is how a manager is going to keep the additional
professional specialists challenged by putting them on nights to wander
around.  A Radiation Monitoring foreman or top-performing radiation monitor
probably has a better trained eye for the gamut of safety problems by
virtue of their understanding of an operation.  Putting a professional
on nights will not only be boring to him or her after a short time but
could have the negative effect of removing the assumed responsibility
Radiation Monitoring has.

130

Finally, the existing non-degree jobs in Area Health Physics and Area Representative jobs offers a place for radiation monitors and Radiation Monitoring foremen to aspire. The perception that without a degree these folks can't progress to anything better is no incentive to even perform at their best in their existing job. That avenue for progression should be left open just as it is in other departments at Rocky Flats.

131

EGG2009099

**Internal Letter**  Rockwell International

Date

No.

TO   (Name, Organization, Internal Address)          FROM   (Name, Organization, Internal Address, Phone)

. Those listed                                        . A. Barris
                                                      . Rad. Dose Assess.
                                                      . Building 123
                                                      . Ext. 2455

Subject . DOCUMENT  ENTITLED  "MY EXPERIENCES FOR THE PAST
         30 YEARS AT ROCKY FLATS"  BY  E. A. PUTZIER

        At the request of Mr. Putzier I am transmitting separately
        the final 10 pages of the ADMINISTRATION section of the
        subject report.

        These enclosed pages 122 through 131 are the final pages
        of the report.  The major document will be forwarded to
        you in a few days.  It consists of 121 pages, plus various
        tabulations and record material of an explanatory nature
        interposed.

        A. Barris

        Enc.

        Distribution
        J. E. Dorr
        B. D. Wozniak
        R. E. Yoder

EGG2009100

Internal Letter

 Rockwell International

November 24, 1982

TO    R. E. Yoder

FROM   E. A. Putzier
Address  HS & E
         Building 123
Phone    Ext. 2454

Subject   MY EXPERIENCES FOR THE PAST
30 YEARS AT ROCKY FLATS

Within the ADMINISTRATION section of the document I've been writing are comments and appraisals on past organizations and organization changes, and where Health Physics functions fit into them or were affected by them. There's no doubt in my mind that organization structure and other administrative actions have had a great deal of influence on the effectiveness of Health and Safety programs. I have decided, however, that the part relating to the period of July, 1975 to the present should be handled separately from the document, with its distribution perhaps limited at least initially to the distribution of this letter.

There exists among many HS&E folks today a feeling of insecurity and concern that can very well influence the overall future effectiveness of the HS&E group. Because of them I felt it necessary to write the attached as an expression of my appraisal of why they are uneasy and somewhat confused. Because of my concern for a lot of people who have been loyal to and contributed much to this plant for many years, this letter is also an appeal for something to happen in the very near future to give these people the assurances they deserve. I respectfully submit the attached for these reasons.

E. A. Putzier
Health, Safety & Environment

cc:
J. E. Dorr    w/enclosure
B. D. Wozniak  w/enclosure

EGG2009101

COOK 4 APRIL 11 1994    ITEM 19