IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| MERILYN COOK, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 90-cv-00181-JLK |
| | ) | |
| ROCKWELL INTERNATIONAL CORP., | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF THE UNITED STATES'
STATEMENT OF INTEREST AND MOTION FOR PROTECTIVE ORDER**

<u>Introduction</u>

Pursuant to 28 U.S.C. § 517,[1] the United States hereby files this Statement of Interest and

moves for a protective order to ensure that certain classified or privileged information is not

revealed during the testimony of current and former federal officials during the trial of this case.

The United States is not a party to this litigation.  Rather, the Department of Energy (DOE) has

been involved in this litigation merely as a third party subpoena respondent and record holder.

Nevertheless, it has come to the government's attention that at least two (and possibly more)

present or former federal officials will be called to testify at trial.  The government does not

object to producing these witnesses for trial and allowing them to discuss a wide scope of

information.  But given the nature of the allegations made by the parties as well as prior

testimony by these and other individuals, it is critical that some minimally intrusive parameters

---

[1]  "The Solicitor General, or any officer of the Department of Justice, may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."  28 U.S.C. § 517.

be established to prevent the disclosure of classified or privileged information.  Such disclosures, if they were to occur, would be detrimental to the national security interests of the United States.

Plaintiffs already have issued trial subpoenas to Rodney Mr. Hoffman, the classification officer for DOE at the Rocky Flats Project Office (Rocky Flats), and Richard Mr. Kaufman, a former Assistant U.S. Attorney with the Department of Justice (DOJ).[2]  For the reasons set forth below, the government seeks the implementation of narrow measures to permit the testimony of these individuals to proceed without interruption while simultaneously protecting important governmental interests.

Mr. Hoffman testified during discovery proceedings in this litigation,[3] as did Bryan Siebert, a former DOE employee who was the Director of the (then) Office of Declassification.[4]  In the context of DOE's production of documents containing information relating to inventory difference or "Material Unaccounted For" (MUF), both officials were asked questions relating to DOE's classification policies and procedures, the mechanics of performing a declassification

_____

[2]  In addition, the government has been informed that defendants wish to depose a current DOE official in the Office of Classification, with the expectation that the official may be subpoenaed to testify at trial.  We understand that the defendants also are considering whether to subpoena additional former employees from the United States Attorney's Office in Denver, Colorado, including former United States Attorney Michael Norton.  For purposes of this memorandum, a reference to Mr. Hoffman includes any other DOE official who may be called to testify, *inter alia,* about DOE's classification policies and procedures.  Likewise, a reference to Mr. Kaufman includes any other DOJ official who may be called to testify, *inter alia,* about his representation of the government in connection with a particular case or proceeding.

[3]  Mr. Hoffman testified for DOE on July 21, 1995, in the course of the hearing relating to plaintiffs' motion to hold the agency in contempt.  Mr. Mr. Hoffman also was deposed during the period from June 16-18, 1997.

[4]  Mr. Siebert is retired and no longer works for the government.  Mr. Siebert was deposed on April 15-16, 1996 and plaintiffs have indicated their intent to introdue portions of his deposition into the record as part of their case in chief.

review of documents, and the bases for determining that that information is classified.   For the most part, Mr. Hoffman and Mr. Siebert, with the assistance of a classification officer who was present during their testimony, were able to answer the questions posed to them without revealing classified information.  There were some instances, however, when these officials were unable to respond to a question because the answer would have resulted in the disclosure of classified information.

To avoid such a situation from occurring during trial testimony, the government moves for a protective order, pursuant to which a classification officer would be present in the courtroom during Mr. Hoffman's testimony in order to monitor his responses to questions for the sole purpose of identifying the answers that would require the disclosure of classified information.  Such a safeguard is designed to prevent the inadvertent disclosure of classified information by the witness.  Further, the government moves to preclude questions in two narrow areas: (1) specifics concerning the manufacturing processes at Rocky Flats, the use and amounts of special nuclear materials in weapons, design of pits or other nuclear weapons components, and the stockpile of U.S. nuclear weapons; and (2) details regarding DOE's determination of why certain information is or is not classified.  Questions asking for specific information pertaining to these two areas were those which, during the course of Mr. Hoffman's and Mr. Siebert's prior testimony, resulted in an instruction not to answer in order to avoid the disclosure of classified information.  If such questions are not asked during Mr. Hoffman's trial testimony, he should be able to testify without interruption.

Similarly, during his deposition, Mr. Kaufman was asked questions relating to communications he had with DOE relating to the agency's responses to plaintiffs' discovery

requests and to the agency's compliance with the Court's orders, including the November 13,

1995 contempt order.  The government does not object to Mr. Kaufman's testimony pertaining to

the time and place of such communications, the participants in such meetings or telephone calls,

and a general description of the subject matter of the discussions.  The specific nature and

contents of such discussions,  however, implicates confidential communications between DOE

and its attorneys and, thus, is protected by the attorney-client privilege.  For this reason, the

government moves for a protective order to prevent questions about the specific nature and

content of discussions between Mr. Kaufman and DOE relating to DOE's discovery compliance

efforts.  Such a narrow limitation on the scope of Mr. Kaufman's testimony will not preclude him

from providing ample testimony at trial but will prevent the occasion to interrupt such testimony.

The government also moves the Court to permit the presence of a DOJ attorney during Mr.

Kaufman's testimony in case it becomes necessary to interpose an objcetion based on the

attorney-client privilege.

<u>Background</u>

1.      **<u>MUF-related Documents</u>**

Plaintiffs in the underlying litigation allege that information relating to the release of

plutonium is relevant to their claims of trespass and nuisance.  As a source of this information,

during the discovery phase of this case, plaintiffs requested documents containing information

relating to inventory differences in the amount of weapon grade fission materials at Rocky Flats,

or "material unaccounted for" (MUF).  The MUF or MUF-related information, however,

provides details about the design and construction of the pits of nuclear weapons[5] and the

military utilization of nuclear weapons, including the size and nature of the U.S. stockpile.  *See*

Declaration of Andrew Weston-Dawkes, dated November 2, 2005 (hereinafter referred as

"Weston-Dawkes Dec."), ¶ 11 (attached hereto as Exhibit 1).  As set forth below, if disclosed,

the classified information (known as "Restricted Data," see *infra*) contained in the MUF-related

documents could provide potential adversaries, proliferants, or terrorists with the ability to

deduce U.S. nuclear weapons design information and capabilities.  *Id.*, ¶ 12.

### a.    Restricted Data in General

Congress enacted the Atomic Energy Act of 1946, Pub. L. 79-585, 60 Stat. 755, in part

because "certain facts relating to atomic energy including all technical data on the design and

production of the atomic bomb itself ought to be kept secret."  *See* S. Rep. No. 1211, 79th Cong.,

2d Sess. 5 (1946).  The AEA created the category of classified information denoted "Restricted

Data" and established a host of criminal penalties for the unauthorized dissemination of such

classified information.  60 Stat. 755, 766 (1946).

Congress reaffirmed that the control of Restricted Data was "of vital importance to the

Nation's security," see S. Rep. at 23, in the Atomic Energy Act of 1954, 42 U.S.C. §§ 2011, et

seq. (the "AEA"), which defined Restricted Data as: "[A]ll data concerning (1) design,

manufacture or utilization of atomic weapons; (2) the production of special nuclear material; or

(3) the use of special nuclear material in the production of energy."  42 U.S.C. § 2014(y).  The

---

[5]  A pit is the source of all of the nuclear energy released in a single stage weapon or the source of nuclear energy that drives the secondary in every thermonuclear weapon.  The pit contains the tamper and the fission fuel (*i.e.,* plutonium and/or highly enriched uranium). Declaration of Andrew Weston-Dawkes, dated November 2, 2005, ¶ 10.

AEA requires DOE to control the dissemination and declassification of Restricted Data "in such a manner as to assure the common defense and security." *Id.* § 2161. The statute further provides that only DOE may declassify Restricted Data. *Id.* § 2162(a).

Because Restricted Data is highly sensitive classified information, its unauthorized distribution is subject to severe criminal penalties. The communication of Restricted Data to any individual with the intent to injure the United States or secure an advantage to a foreign nation is punishable by a term of life imprisonment. 42 U.S.C. § 2274. A court may also impose a life sentence upon persons convicted of receiving, or tampering with, Restricted Data with the intent to injure the government. *Id.* §§ 2275-2276. Even the mere disclosure of Restricted Data to unauthorized persons is punishable by a $2,500 fine. *Id*. § 2277.

Pursuant to the responsibilities imposed by the AEA, the Secretary of Energy has developed policies on classification and declassification of Restricted Data. DOE classifies information primarily to prevent the efforts of nuclear proliferants and terrorist groups from gaining and using nuclear weapons. Weston-Dawkes Dec., ¶ 5. Essential to United States nonproliferation policy are procedures designed to limit access to Restricted Data that might either assist in the design of a weapon of mass destruction or identify costly or time consuming mistakes to be avoided in developing such a weapon. *Id.* For example, a major national security goal with respect to nuclear terrorists is to prevent terrorist groups from obtaining nuclear materials by strictly controlling the inventories of materials in the United States. *Id*. Further, to prevent potential malefactors from obtaining nuclear materials which could be used in nuclear weapons, the United States controls the technology and information used to produce such nuclear materials through classification and by export control regimes, seeking to limit the spread of this

type of information/technology through international agreements. *Id.* Finally, limiting the dissemination of nuclear weapon design information would make it difficult to design and produce a weapon that will produce a nuclear yield of significant proportion, even if a terrorist group were to obtain the basic nuclear materials. *Id.*

To effectuate the goal of preventing access to sensitive information by proliferants and terrorists, detailed information relating to the designs and characteristics of specific nuclear weapons and their military utilization, including the information about the size and nature of the stockpile of nuclear weapons, has remained classified under the provisions of the AEA. Weston-Dawkes Dec., ¶ 6. Some classified information relates to the designs of early nuclear weapons, which would be simpler to construct than later designs, thus making that task easier for a potential adversary, nuclear proliferant, or terrorist group. *Id.* Indeed, over the past few years, the United States Government has been especially concerned with simple and crude designs of nuclear weapons in relation to the terrorist threat and has sought to enhance the protection of such information. *Id.*

Because a great deal of information relating to nuclear weapons in general is unclassified and, as a result, available to the public in the national and international media and literature, as well as on the Internet, information regarding specific weapon designs or the exact amounts of special nuclear materials contained in a nuclear weapon component becomes even more sensitive. Weston-Dawkes Dec., ¶ 7. Some of this publicly available information is accurate; some is not. *Id.* Information contained in Government- released documents that may appear to be unclassified could be used in conjunction with already public information to either validate or invalidate such data. *Id.* In other words, although the basic physical principles used to design a

nuclear weapon are publicly known, DOE, through its classification guides that describe whether specific information is classified, continues to protect engineering design and manufacturing technology of such weapons in order to prevent and deter potential proliferants or terrorists from developing nuclear weapons.  *Id.*, ¶ 8.[6]

      **b.  Nature of the Restricted Data contained in the MUF-related documents**

Public release of classified information contained in the MUF-related documents would result in damage to the national security.  Weston-Dawkes Dec., ¶ 10.  Such harm derives from the fact that, for many years, Rocky Flats made the pits of nuclear weapons, as well as other components.  Some of the design parameters that are sensitive and, thus, classified are the masses of the fission fuel and its corresponding tamper.  *Id.*  The sensitive information redacted from the MUF-related documents, which are comprised largely of periodic reports generated during the years that Rocky Flats was in operation as a manufacturing facility, provides details relating to the design and construction of the pits of nuclear weapons and to the military utilization of nuclear weapons, including the size and nature of the stockpile.  As such, these categories continue to be among the most vital national security secrets that the United States government maintains.  *Id.*, ¶ 11.

---

[6]  The determination of whether information is classified is complicated by how the information might be associated or compiled with other information.  Weston-Dawkes Dec., ¶ 10.  In compilations and associations, DOE must take into account how the information is connected logically to other information.  *Id.*  Because a determination of whether a particular fact is classified could depend on its context, the possible harm to national security from the release of any one fact that remains classified must be evaluated in the context of all the other information that will be produced or may already be in the public domain.  *Id.*  For example, although the fact that DOE used a particular material may be unclassified, the association of that material with a certain function could reveal how or why the material is used in a nuclear weapon and would be classified.  *Id.*

Some of the MUF documents contain information relating to inventory quantities and throughput (*i.e.*, the movement through each stage of production) of special nuclear material relating to nuclear weapon stockpile data. Weston-Dawkes Dec., ¶ 12. Inventory difference data in relation to a specific mass material balance area (MBA) (*i.e.*, an identifiable physical area where the quantity of nuclear material is accountable and, therefore, measured) could reveal throughput or the mass of special nuclear material in a weapon component. *Id.* Because a great deal of information pertaining to weapons builds and retirements has been declassified, the additional information contained in some of the MUF-related documents could provide insight into quantities of nuclear materials in the nuclear weapons designs of the United States. *Id*.

Some of the nuclear weapon design information that is reflected in a portion of the MUF-related documents includes information on the type of material chosen for a specific component, the amount of material for certain tampers (*i.e*., depleted uranium), and classified alloys used in combination with plutonium in some weapons. Weston-Dawkes Dec., ¶ 13. Such detailed information could provide insight into how much manufacturing tolerance is acceptable by examining variability in the amount of material across different designs for pits and the components used to produce pits. *Id.* Further, some of the information specifically relates to amounts of fissile material in nuclear weapon components. *Id.* Other portions of the MUF-related documents contain explicit details about the amounts of plutonium and/or highly enriched uranium in U.S. nuclear weapons components. *Id.*, ¶ 14. Such information could assist a proliferant or adversary in designing a nuclear weapon as well as provide information, in addition to that already in the public domain, relating to the nuclear weapon stockpile. *Id.*

More specifically, the MUF-related documents contain details relating, *inter alia*, to the

-9-

following: (a) the total mass of fission material in a pit; (b) the mass of each kind of fission material (i.e., plutonium and highly enriched uranium) in a pit; (c) the ratio of masses of kinds of fission material in a pit; (d) the mass of a tamper in a pit; (e) the material used as a tamper in a specific weapon; (f) material used for an alpha barrier or other safety materials in a specific weapon; (g) the alloying of plutonium that solved problems regarding the use of plutonium; (h) materials added for diagnostic purposes for tests of weapons; and (i) tritium quantities required for stockpiled weapons. Weston-Dawkes Dec., ¶ 15. If declassified or otherwise disclosed to the public, such information could enable a nuclear weapons state to improve its weapons, permit a proliferant to rapidly expand its knowledge base of nuclear technology, help validate the conceptual designs of potential proliferants, and reveal design capabilities and vulnerabilities of U.S. nuclear weapons. *Id.*

The Office of Classification within DOE recently completed a re-examination of the reasons provided by the agency in 1996 for determining that information in the MUF-related documents is classified. Weston-Dawkes Dec., ¶ 16. In tables attached to the March, 7, 1996, affidavit of Bryan Siebert, the agency identified 15 bases for classification that existed within the various categories of the MUF-related documents. *Id. See* Exhibit 2 (March 7, 1996 Affidavit of Bryan Siebert and attachments). During the period from 1996 to the present, DOE has changed its classification policy in only one of the areas identified by Mr. Siebert. Weston-Dawkes Dec., ¶ 16. Since 2000, it is now unclassified to reveal that a specified weapon's pit is composed of only plutonium (reason 8). *Id.* Because this declassification applies solely to the fact of use of only plutonium in a specified pit, this declassification would not likely provide any additional quantitative plutonium information within the fifteen categories of MUF documents. *Id.*

-10-

Indeed, based on the recent evaluation by DOE's Office of Classification staff, the vast majority

of information redacted from the MUF-related documents, during the declassification review that

occurred in the 1996 timeframe, remains classified at the present time for the reasons set forth in

the attachment to Mr. Siebert's February 14, 1996, affidavit.  *Id.  See also* Exhibit 3 (Siebert's

Feb. 14, 1996 Affidavit).

**c.      Testimony Relating to Classified Restricted Data**

Mr. Hoffman is the classification officer for DOE at Rocky Flats.  Among his duties and

responsibilities is the application of DOE's policies and procedures relating to classification and

the control of information and documents.  Mr. Hoffman oversaw the declassification review of

the MUF-related documents in 1996, helping to develop protocols for such review and

coordinating with DOE Headquarters to ensure that the risk of the inadvertent disclosure of

classified Restricted Data was minimized. He also has been involved in other efforts to respond

to plaintiffs' requests for classified information and to comply with the Court's orders.

After DOE completed its production of the reviewed and redacted MUF-related

documents and after DOE complied with the Court's January 7, 1997 order to produce

unclassified portions of the classification guides used to redact the MUF-related documents,

plaintiffs took Mr. Hoffman's deposition from June 16-18, 1997.  Plaintiffs asked Mr. Hoffman

questions relating to the declassification review of the documents, the basis for and application of

the classification guides, and the nature of the information that was determined to be classified

and redacted from the copies of the documents produced to plaintiffs.  A classification officer

was present during the deposition.

For the most part, Mr. Hoffman was able to respond to the questions posed by plaintiffs'

-11-

counsel with unclassified information.  In some instances, however, Mr. Hoffman, either on his own or with the concurring assessment of the classification officer, determined that he could not provide the information requested to prevent the disclosure of classified information.   The times when it became difficult, if not impossible, for Mr. Hoffman to respond to a question occurred when, following a general discussion, there was a request for more specific information.  *See* Exhibit 4 (Excerpts from the Deposition of Rodney A. Mr. Hoffman).   For example, Mr. Hoffman could not respond to a hypothetical question about the analysis performed to determine that specific information relating to the mass of special nuclear materials in a pit was classified. *Id.* at 69-73.  Further, in answering questions about redactions from particular MUF-related documents due to application of the classification guides, Mr. Hoffman could not provide more than a general description of the reasons why information was classified.  *Id.* at 146-47, 158, 187-88.

Similarly, during the April 1996 deposition of Bryan Siebert, the witness was unable to answer questions relating to why certain information was classified.  *See* Exhibit 5 (Excerpts from the Deposition of A. Bryan Siebert).    For example, Mr. Siebert could not answer a question relating to the specific information redacted from a MUF-related document, even though he did provide general testimony relating to that category of information.  *Id*. at 116-18. Mr. Siebert also could not answer questions asking for the reasons why certain information was classified.  *See, e.g., id.* at 126-28, 172-73 (throughput data); 127 (amount of plutonium in the first bomb); 169 (application of the mosaic principle to weapons design information); 183-84 (monthly inventory difference).

2.      **Attorney-client Privilege**

Richard Mr. Kaufman is a former Assistant U.S. Attorney who worked for DOJ from 1990 to 2000.  From September 1993 through February 1996, Mr. Kaufman represented DOE in connection with the agency's response to the subpoenas duces tecum plaintiffs served on the government.  In response to plaintiffs' identification of Richard Mr. Kaufman as a trial witness, defendants took Mr. Kaufman's deposition on October 18, 2005.   During the full-day deposition, Mr. Kaufman responded to general questions relating to the actions he took to represent the interests of his client.  He also provided testimony relating to basic interactions with the client agency with regard to DOE's response to plaintiffs' discovery requests.  However, Mr. Kaufman repeatedly was instructed not to answer questions relating to the specific nature of his communications with DOE officials on a broad range of issues.

For example, Mr. Kaufman did not respond to questions relating to why DOE agreed to certain provisions in the Stipulated Discovery Order (entered by the Court on September 13, 1994).  *See* Exhibit 6 (Excerpts from Mr. Kaufman Deposition) at 67-68.  In addition, Mr. Kaufman did not answer questions about specific communications relating to DOE's compliance with the subpoenas or the November 13, 1995 contempt order, see *id.* at 94, 100, 103, 181, 203; and the reasons for increased volume of MUF-related documents and the agency's response to the discovery of the increased volume, see *id.* at 176, 177, 198, 203, 209.  Mr. Kaufman also was instructed not to answer questions relating to why he, as well as employees in DOE's Office of General Counsel, ceased working on this case.  *Id.* at 139, 151, 156-57.

The privileged communications at issue involve legal advice sought by DOE officials from Mr. Kaufman or other DOJ attorneys for the purpose of formulating the agency's

-13-

compliance with its third-party discovery obligations in the *Cook* litigation. *See* Declaration of

Mell Roy, dated November 6, 2005 (hereinafter referred to as "Roy Dec.")(attached hereto as

Exhibit 7), ¶ 4. Such communications were conveyed with the agency's expectation that they

were in confidence. *Id.* DOE has not waived the privilege and, thus, seeks to have the

disclosures made to Mr. Kaufman remain confidential. *Id.*, ¶ 5.

<u>Argument</u>

Before government officials testify in the trial of this case, entry of a modest protective

order is appropriate in order to protect the government's significant interest in preventing the

inadvertent disclosure of classified Restricted Data and privileged attorney-client

communications. The scope of the requested protective order is narrow. With respect to the

witnesses who could reveal classified information during their testimony, the government merely

requests the Court to allow the presence of a classification officer during the testimony and to

order the parties to refrain from asking questions, the answers to which would involve specific

details about nuclear weapons (*i.e.,* concerning the designs of nuclear weapons, the mass of a

particular special nuclear material in a weapon or weapon part, and the nature of the U.S.

stockpile) and specific reasons for why certain information is or is not classified. In regard to the

witnesses who served as employees of DOJ and represented DOE, the government simply

requests the Court to prevent the parties from asking questions designed to elicit more than a

general description of communications between the attorney and DOE officials. The government

also requests that a DOJ attorney be present to make objections during testimony in order to

protect attorney-client privileged communications. The minimal protections sought will be

sufficient to protect the government's interests while at the same time allowing the testimony of

-14-

the present and former government officials to proceed without interruption.

I.   **A PROTECTIVE ORDER IS NECESSARY TO PREVENT THE INADVERTENT DISCLOSURE OF CLASSIFIED INFORMATION DURING A PUBLIC TRIAL**

The authority "to classify and control access to information bearing on national security" is constitutionally vested in the Executive Branch.  *See* <u>Department of the Navy v. Egan</u>, 484 U.S. 518, 527 (1988).   As the court noted,

> The President, after all, is the 'Commander in Chief of the Army and Navy of the United States.'  U.S. Const., Art. II, 2.  His authority to classify and control access to information bearing on national security. . . flows primarily from this constitutional investment of power in the President and exists quite apart from any explicit congressional grant."

*Id.* at 527.  Further, with respect to "these areas of Art. II duties the courts have traditionally shown the utmost deference to Presidential responsibilities.' <u>United States v. Nixon</u>, 418 U.S. 683, 710  (1974).  Thus, unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs."  *Id.* at 529-30.  In connection with Restricted Data, Congress has delegated exclusive authority for its control and dissemination to DOE under the terms of the Atomic Energy Act.  42 U.S.C. § 2162.

The declaration of Andrew Weston-Dawkes, the acting Deputy Director of DOE's Office of Classification, explains the sensitivity of the classified information at issue, noting that even inadvertent disclosure of classified information contained in the MUF-related documents would facilitate the ability of a proliferant or nuclear terrorist to obtain necessary information relating not only to the design of nuclear weapons, but also to the strengths and weaknesses of the United States' stockpile of such weapons.  The risk that classified information may be inadvertently

disclosed stems from the complex nature of the information contained in the MUF-related documents.   Weston-Dawkes Dec., ¶¶ 11-15.  This risk is amplified by the fact that an association of the information at issue with information already in the public domain could provide a proliferant or nuclear terrorist with sensitive  information about weapons design or the United States' military vulnerabilities.  *Id.*, ¶ 10.  Indeed, often the context in which a specific fact or issue is disclosed can determine whether that information is classified.  *Id.*  Given these complications, it is not feasible that, during a trial, a Court or private litigants could properly safeguard against the disclosure of classified information that would harm national security interests.   Protecting against the risk of inadvertent disclosure of classified Restricted Data in the context of litigation is, as recognized by the Court of Appeals for the Tenth Circuit, an important governmental interest.  *See* <u>Ridenour v. Kaiser Hill Co.</u>, 397 F.3d 925, 936-38 (10th Cir. 2005)(court of appeals affirmed dismissal of case due to "theoretically minimal" risk of inadvertent disclosure of classified Restricted Data, rejecting argument that DOE misused classification policy to cover up security deficiencies at Rocky Flats and that government's motion to dismiss because of classified information was fraudulent or otherwise improper).

The government is aware that plaintiffs are alleging at trial that DOE has misapplied its classification policies and guidelines in order to bar plaintiffs from having access to pertinent information relating to inventory differences of plutonium at Rocky Flats.  Plaintiffs claim that DOE has "over classified" information, thus redacting more information from documents during a declassification review than is necessary to protect the national security. *See* Exhibit 8 (Excerpts from the opening statement of Merrill Davidoff, dated October 11, 2005).  Plaintiffs also allege that DOE has abused its classification policies in order to shield information that

-16-

would be harmful either to the government or to defendants.  *Id.*  The government vigourously

disputes these allegations.  The government does not object (nor has it objected throughout this

litigation) to allowing testimony with respect to the application of DOE's classification policies

and guidelines to the MUF-related documents.  Indeed, the government has strived to make the

declassification review process as transparent as possible.  But certain information contained in

the MUF-related documents is classified because it is provides details regarding the design and

construction of the pits of nuclear weapons and the military utilization of nuclear weapons,

including the size and nature of the stockpile.  Weston-Dawkes Dec., ¶ 11.  Because these are

"among the most vital national security secrets" the government maintains, *id.,* the government

must take steps to protect against the disclosure of such information.

    The protective order proposed by the government, see Exhibit 9, strikes a balance

between the need to protect classified information and the parties' interest in exploring the

reasons supporting DOE's redaction of information during the review of the MUF-related

documents and the production of an unclassified version of the classification guides.  Consistent

with the practice adopted during the depositions of Mr. Hoffman and Siebert, the proposed order

provides for the presence of a classification officer during Mr. Hoffman's testimony.   The role of

the classification officer will be limited to monitoring Mr. Hoffman's testimony for the sole

purpose of identifying questions to which the answers would require the disclosure of classified

information.  After reviewing Mr. Hoffman's prior testimony, we believe that he should be able

to provide an answer to most questions it is anticipated plaintiffs will ask.  But it is likely that

some questions will implicate classified Restricted Data.  The presence of a classification officer

will alleviate, although not wholly remove, the burden on Mr. Hoffman when, in answer to a

-17-

specific question, the disclosure of classified information is likely.[7]

In addition, the proposed protective order precludes questions to Mr. Hoffman regarding two narrow areas:   (1) specifics concerning the manufacturing processes at Rocky Flats, the use and amounts of special nuclear materials in weapons, design of pits or other nuclear weapons components, and the stockpile of U.S. nuclear weapons; and (2) details concerning DOE's determination that certain information is or is not classified.  Questions asking for specific information pertaining to these two areas were those which, during the course of Mr. Hoffman's and Siebert's prior testimony, resulted in an instruction not to answer in order to avoid the disclosure of classified information.  If such questions are not asked during Mr. Hoffman's trial testimony, he should be able to testify without interruption.

The proposed protective order permits Mr. Hoffman to testify at trial regarding DOE's classification policies and procedures while simultaneously protecting against the inadvertent disclosure of classified information.  With the order in place, Mr. Hoffman's testimony should proceed before the jury in a smooth and seamless manner.  The absence of such protections, however, could result in the risk of a revelation of critical information relating to the design of nuclear weapons or the nature of the United States stockpile, thus necessitating an interruption of government's motion for a protective order.

---

[7]   In such circumstances, the government contemplates that the classification officer would make a nonverbal signal to Mr. Hoffman.  At such time, Mr. Hoffman would note that the answer to the question involves classified information, but he would nevertheless respond to the extent he is able without revealing Restricted Data.  This procedure is merely a suggestion by the government.  Any procedure, including one that may be devised by the parties and the Court, would be acceptable to the government as long as the classification officer is permitted to communicate in some manner to Mr. Hoffman that he needs to proceed with caution so as not to reveal classified information.

## II.    A PROTECTIVE ORDER IS NECESSARY TO PROTECT PRIVILEGED ATTORNEY-CLIENT COMMUNICATIONS

In his deposition, Richard Mr. Kaufman, a former Assistant U.S. Attorney, testified about his representation of DOE during the period from September 1993 through February 1996.   Mr. Kaufman responded to questions relating to DOE's responses to and compliance with plaintiffs' requests for documents and the Court's discovery orders.  Mr. Kaufman provided a significant amount of information regarding these issues.  Some questions, however, asked for specific details concerning Mr. Kaufman's communications with DOE officials.  Because the answers to such questions are privileged (and Mr. Kaufman was directed in the deposition not to answer), a protective order is necessary to preclude the posing of such questions at trial and, thus, to allow Mr. Kaufman's testimony to proceed without interruption.

The attorney-client privilege is one of the oldest common law privileges for confidential communications.  See Swidler & Berlin v. United States, 524 U.S. 399, 403 (1998)(citing Upjohn Co. V. United States, 449 U.S. 383, 389 (1981)).  The privilege is meant to encourage "full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice."  Upjohn, 449 U.S. at 389.  The essential elements of a claim of attorney-client privilege are: (1) where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or the legal adviser, (8) except the protection may be waived.  See, e.g., United States v. Bisanti, 414 F.3d 168, 171 (1st Cir. 2005); In re Grand Jury Subpoena, 341 F.3d 331, 335 (4th Cir. 2003); United States v. Martin, 278 F.3d

-19-

988, 999 (9th Cir. 2002); In re Impounded, 241 F.3d 308, 316 (3d Cir. 2001).  *See also* Sprague v.

Thorn Americas, Inc., 129 F.3d 1355, 1370 (10th Cir. 1997)(attorney-client privilege protects not

only giving of professional advice to client but also giving information to attorney in order to

enable him to provide sound and informed advice).

      Based on Mr. Kaufman's deposition testimony, the communications covered by the

proposed protective order involved those in which DOE sought advice from the former DOJ

attorney (and also, in some circumstances, other DOJ attorneys as well) regarding the agency's

responses to plaintiffs' requests for documents and its compliance with the Court's orders.  Roy

Dec., ¶ 4.  The communications, both oral and written, were made in confidence by DOE.  *Id*.

The client agency has requested that such communications remain protected against disclosure.

*Id.*, ¶ 5.[8]

      The proposed protective order is designed to maintain the confidentiality of those

attorney-client communications while permitting Mr. Kaufman to provide testimony regarding

DOE's actions in responding to third-party discovery requests and complying with the Court's

orders.  The proposed order precludes specific questions about these communications, but will

not apply to questions seeking general descriptions of the nature of Mr. Kaufman's

communications with DOE officials.  For example, if asked to identify the subject matter of a

conversation on a certain date, Mr. Kaufman could respond that the discussion related to DOE's

compliance with the November 13, 1995 contempt order.  The protective order would preclude a

---

[8] Nothing in Mr. Kaufman's deposition indicates that DOE sought his legal advice for the purpose of committing a fraud or other illegal act.  Therefore, there can be no basis for establishing a prima facie case that the "crime-fraud" exception applies to the agency's assertion of the attorney-client privilege in this case.  *See, e.g.,* Clark v. United States, 289 U.S. 1, 14-15 (1933); In re Impounded, 241 F.3d at 316-17.

follow-up question, however, that pertains to the precise issue being discussed.  Similarly, Mr.

Kaufman could answer a question designed to elicit the fact that Mr. Kaufman and employees in

DOE's Office of General Counsel at some point ceased working on the *Cook* case.  The

protective order would preclude questions seeking the reasons why the government undertook

such staffing changes.   In addition, the protective order allows for the presence of government

counsel in the courtroom for the purpose of making objections, if necessary, based on the

attorney-client privilege.  Neither the witness nor counsel for the parties is in a position to

adequately protect against the disclosure of the privileged information.[9]  Because the proposed

order is narrowly tailored to prohibit only answers to those questions that would implicate

attorney-client protected communications, the government's motion should be granted.

Conclusion

For the foregoing reasons, the government's motion for a protective order relating to

classified information and attorney-client privileged communications should be granted.

Dated: November 7, 2005                         Respectfully submitted,

                                                PETER D. KEISLER
                                                Assistant Attorney General

                                                WILLIAM J. LEONE
                                                United States Attorney


                                                _____/s/_____
                                                STEPHEN D. TAYLOR
                                                Assistant U.S. Attorney

---

[9]  If permitted, the government will submit a proposed instruction to the jury explaining
the presence and limited role of the government attorney during Mr. Kaufman's testimony.

-21-

                          /s/
_____

ARTHUR R. GOLDBERG
CARLOTTA P. WELLS

U.S. Department of Justice
Civil Division
P.O. Box 883
Washington, D.C. 20044
(202) 514-4522 (telephone)
(202) 616-8470 (facsimile)

Counsel for the United States and the
Department of Energy