**MEMORANDUM IN SUPPORT OF MOTION FOR PROTECTIVE ORDER**

**EXHIBIT 4**

## Page 1

```
 1  CONFIDENTIAL: SUBJECT TO THE ORDER CONCERNING DOE
    CLASSIFICATION GUIDES, ENTERED JANUARY 7, 1997; AND
 2  THE STIPULATION, ENTERED APRIL 11, 1997, RELATING TO
    GUIDE MATERIAL.
 3
 4            IN THE UNITED STATES DISTRICT COURT
 5              FOR THE DISTRICT OF COLORADO
 6
    Civil Action No. 90-K-181
 7
 8  MERILYN COOK, et al.,
 9  Plaintiffs.
10  vs.
11  ROCKWELL INTERNATIONAL CORPORATION,
    et al.,
12
    Defendants.
13
    --------------------------------------------------
14
    DEPOSITION OF RODNEY HOFFMAN - VOLUME I
15  June 16, 1997
16  --------------------------------------------------
17              Deposition location:
                1801 York Street
18              Denver, Colorado
19  APPEARANCES:
20
         DAVID F. SORENSEN, Esq.,
21       BERGER & MONTAGUE, P.C.
         1622 Locust Street
22       Philadelphia, Pennsylvania  19103
              For the Plaintiffs.
23
24
25
```

## Page 2

```
 1       BRETT BAKKE, Esq.,
         KIRKLAND & ELLIS
 2       200 East Randolph Drive
         Chicago, Illinois  60601
 3
         For the Defendant
 4       ROCKWELL INTERNATIONAL CORPORATION
         and THE DOW CHEMICAL COMPANY.
 5
 6       CARLOTTA WELLS, Esq.,
         U.S. Department of Justice
 7       Civil Division
         Federal Programs Branch
 8       901 E Street, N.W.
         Room 1058
 9       Washington, D.C.  20530-1621
10       and
         CHARLES J. KALL, Esq.,
11       Office of the United States Attorney
         1100 Federal Office Building
12       1961 Stout Street
         Drawer 3615
13       Denver, Colorado  80294
14       For the DEPARTMENT OF ENERGY.
15
         JAMES LONG, Esq.,
16       Office of Chief Counsel
         United States Department of
17          Energy/Rocky Flats Field Office
         P.O. Box 928
18       Golden, Colorado  80402-0928
19       For ROCKY FLATS.
20
    ALSO PRESENT:  Janet A. Nesheim.
21
22
23
24
25
```

## Page 3

```
 1            The deposition of RODNEY HOFFMAN,
 2  VOLUME I, called for examination by the Plaintiffs,
 3  was taken in the offices of SILVER & DeBOSKEY, P.C.,
 4  1801 York Street, Denver, Colorado, commencing at
 5  1:10 p.m., on June 16, 1997, before Curtis J. Slettum
 6  of Avery/Woods Reporting Service, Inc., 1000 Speer
 7  Boulevard, Denver, Colorado 80204, a Registered
 8  Professional Reporter and a Notary Public in and for
 9  the State of Colorado, pursuant to the Federal Rules
10  of Civil Procedure.
                    ****************
11
12
...
25
```

## Page 4

```
                INDEX OF EXAMINATION
                                                PAGE
    EXAMINATION BY MR. SORENSEN                   5


                 INDEX OF EXHIBITS

    EXHIBIT NO.                                 PAGE NO.

       1     (letter 12/13/95 w/attached List
              of Classified Document Titles)      23

       2     (letter 3/1/96)                      25

       3     (letter 3/12/96)                     30

       4     (letter 4/18/96)                     38

       5     (Section Two)                        84

       6     (MUF document 3/4/96)                85

       7     (MUF document 3/14/96)               90

       8     (MUF document 3/18/96)               91

       9     (MUF document 3/19/96)               91

      10     (MUF document 3/21/96)               92

      11     (memorandum 5/14/96)                 97
```

Page 5

RODNEY HOFFMAN, being first duly sworn to state the truth, the whole truth and nothing but the truth, testified on oath as follows:

EXAMINATION

Q. (By MR. SORENSEN) Good afternoon, Mr. Hoffman. We have met but I'll introduce myself.

My name is David Sorensen, I'm one of the plaintiffs' counsel in the Cook versus Rockwell litigation, and I'm here to take your deposition today.

Have you been deposed before, sir?

A. I've never been deposed.

Q. Well, your counsel may or may not have gone over some of these ground rules, but I'm just going to quickly go through a couple.

I will ask you a whole series of questions, perhaps show you some documents. I'd ask that you wait until I continue my question before you begin answering it. That way the reporter can take down what we're saying and it ensures that you are answering the question I've actually asked.

I'd ask if you don't understand a question, whether because I mumble or because you don't understand what I'm saying, you say so, I'll

Page 6

rephrase it, withdraw it, whatever I think appropriate, so that you understand what I'm trying to get at.

If you need a comfort break at any time, just speak up, we'll stop, that's fine.

There is obviously a classification officer here and obviously you are free to consult with her if you deem it appropriate.

I'd like to make clear who is in the room, other than the witness.

MS. NESHEIM: Janet Nesheim. I'm the contractor classification officer at Rocky Flats and I'm here as classification advisor to Mr. Hoffman.

MS. WELLS: Carlotta Wells. I'm attorney with the United States Department of Justice. I'm representing the Department of Energy.

MR. KALL: Charles Kall. I'm with the local U.S. Attorney's Office here on behalf of the Department of Energy.

MR. LONG: James Long, Rocky Flats, and the DOE attorney.

MR. BAKKE: Fred Bakke, Kirkland & Ellis, here representing Dow and Rockwell.

Q. (By MR. SORENSEN) Mr. Hoffman, is

Page 7

there any reason why you cannot give complete and truthful testimony today?

A. None.

Q. In connection with today's deposition, did you consult or have discussions with a physician of any kind with respect to the stress the deposition would place on you or how many hours may be advisable for you to testify at one time?

A. Not recently.

Q. When you say not recently, did you have such consultations in the past?

A. Yes, I did.

Q. And when was that?

A. Last summer, I believe. Last summer or early fall.

Q. But that was not in connection with today's deposition, correct?

A. That's correct.

Q. I'm asking just a yes or no question now:

Did you have any consultations with any lawyers concerning today's deposition with respect to the number of hours that you could testify at one time?

A. No.

Page 8

Q. What is your current job title, sir?

A. I'm the classification officer, called scientist/engineer, for Rocky Flats Field Office, Department of Energy.

Q. So you work for the Department of Energy, correct?

A. Yes, I do.

Q. And you are stationed at the Rocky Flats plant?

A. Yes, I am.

Q. And do you work full time?

A. Yes.

Q. And how many hours a week is that?

A. I work eighty hours every two weeks.

Q. And since January 1 of 1996, have you worked full time?

A. I've put in that number of hours, yes.

Q. Was there any period beginning with January 1, 1996, to the present, where you worked less than full time or did not work at all other than for reasons of vacation?

A. I spread the hours out. I didn't come seven in the morning and leave at four-thirty, I worked some Saturdays, I worked late some days. I usually came in late for several months.

Page 65

```
 1  headquarters send you out types of information that
 2  they considered classified and you turned that into a
 3  guide? How did that work?
 4          MS. WELLS: Objection to the form of
 5  the question. If you are going to ask him how it
 6  works, just ask him how it works.
 7          Q. (By MR. SORENSEN) Go ahead,
 8  Mr. Hoffman.
 9          A. Headquarters writes what they call a
10  weapons guide and they call it CG-W-5, and that's in
11  a series, one, two, three, four, this is the fifth
12  one, and send it to us, and it's not particularly
13  useful to our classifier that's trying to keep the
14  information identified.
15          So we have to take that and adapt it to
16  our own language and our own understanding, our own
17  manufacturing processes, which we do, and then we
18  take this guide that tells you what is classified and
19  we try to reduce it or expand it, you could go either
20  way depending on how you look at it, to the person
21  who is making the decision who needs a quick answer
22  so that he doesn't have to research it.
23          We do the research on the topics and
24  then we have it so that the person on the floor, so
25  to speak, would have the guide there at his disposal
```

Page 66

```
 1  or her disposal and then they would be able to use it
 2  for the particular application-- particular question
 3  that they get.
 4          Q. So that the guide that comes-- withdraw
 5  the question.
 6          The guide that came from headquarters
 7  when you were working on the predecessor to the
 8  RFP-3900 guide, do you recall which guide that was,
 9  CG-W-1, 2, 3, 4?
10          A. It's either-- let's see-- at that
11  time-- it was probably W-5, CG-W-5.
12          Q. And there is also CG-W-5 that--
13          A. I'm sorry. On the previous--
14          Q. Before the 3900.
15          A. It probably was W-4.
16          Q. And in developing RFP-3900, you used
17  CG-W-5?
18          A. Yes.
19          Q. In developing RFP-3900, who
20  participated in that other than yourself?
21          MR. KALL: David, I mean is the history
22  of this important? Because if it is--
23          MR. SORENSEN: Are you making an
24  objection?
25          MR. KALL: Yes, because the man is
```

Page 67

```
 1  staring at the ceiling and I want to make sure that
 2  the record is accurate.
 3          MR. SORENSEN: What's your objection?
 4          MR. KALL: I'm not sure.
 5          MR. SORENSEN: Is it relevance? Just
 6  state an objection.
 7          MR. KALL: I'd like to have you ask him
 8  if he really remembers this I guess is what I'm
 9  saying.
10          MR. SORENSEN: Thank you for your
11  advice.
12          Q. (By MR. SORENSEN) Now Mr. Hoffman,
13  other than yourself, who else participated in
14  developing the RFP-3900 guide?
15          A. Basically my whole staff.
16          Q. Who would that be, specifically?
17          A. John Hargreaves, Janet Nesheim, Roberta
18  Thomas, Cathy Delaney, Steven Cunningham, and that's
19  probably about it.
20          Q. Okay, and after you and your staff
21  developed 3900, did it go back to headquarters for
22  approval? When I say headquarters, I'm talking about
23  DOE headquarters.
24          A. It went to-- the process was to send it
25  to Albuquerque operations, because Albuquerque
```

Page 68

```
 1  operations coordinated all the guides having to do
 2  with what we called the weapon complex, so it was
 3  sent to Albuquerque operations.
 4          Q. And who at Albuquerque operations would
 5  have been in charge of that review, do you know?
 6          A. It would have been either Richard
 7  Fredland or Charles Demos, and I don't remember who
 8  was in charge at that time, Richard Fredland or
 9  Charles Demos.
10          Q. In using the CG-W-5 guide in developing
11  the RFP-3900, did you have to make subjective
12  decisions or judgment calls about whether the CG-W-5
13  guide did or did not mandate that certain types of
14  information at Rocky Flats was or was not
15  classified?
16          MS. WELLS: Object to the form of that
17  question.
18          Q. (By MR. SORENSEN) Go ahead.
19          MS. WELLS: You can answer it if you
20  follow it.
21          A. Please read the question.
22          Q. (By MR. SORENSEN) I'll ask another
23  question. It's withdrawn.
24          I believe you said that the CG-W-5
25  guide that came from headquarters isn't specifically
```

Page 69

adapted to Rocky Flats and that in order to adapt it to Rocky Flats, the conditions that prevail there, the processes that go on there, the documents that exist there, you and your staff took CG-W-5 and adapted it and created RFP-3900, is that right?

A. That's correct.

Q. So is it correct that as it came to you from headquarters, CG-W-5 does not list every item or every type of information at Rocky Flats that headquarters wants classified, is that right?

A. No, that's not right.

Q. Well, it is correct that as a general matter-- withdraw the question.

Why don't you describe for me, if you can, how you went about adapting CG-W-5 in creating RFP-3900.

A. CG-W-5 would tell you what is and what isn't classified, and so we dealt with both things, but it would tell you that a certain concept is classified.

For the person down on the floor, turning the machine, or his supervisor, an overall idea needs to be reduced to what I'm doing today.

I'm operating a drill press and I want to know when I drill this hole in here, whether

Page 70

that's classified or not. That isn't covered-- it tells you that in CG-W-5 but it doesn't tell you in those words.

And so we then take that and reduce it or expand it, however you want to look at it, say we expand it to the classifier that's actually responsible for the document that comes on the floor, that talks about drilling that hole or making that weld, because CG-W-5 doesn't. It covers it, but it does not cover it in that kind of detail.

Q. Well, let's take the mass of plutonium in a pit, pits that were made at Rocky Flats.

Do I understand that the mass-- DOE considers the precise mass to be classified information, is that an example of a concept or is that an example of a specific-- well, let me stop it there.

Is that an example of a concept that would be contained in CG-W-5?

A. Masses are a concept in CG-W-5.

Q. And then in RFP-3900, you attempted to apply that to various situations that occur at Rocky Flats, is that right?

A. Yes.

Q. Now in doing that application of that

Page 71

concept to Rocky Flats, did you perform any analysis or calculation of a written nature to demonstrate to yourself that this concept requires this other information also to be classified?

A. I'm not sure--

Q. I'll try and clarify it.

Take the concept of mass of plutonium in a pit, you have the inventory difference or MUF for Rocky Flats for a given month in 1970, pick one month.

Now if in developing classification guides, the 3900, you determined that the concept mass in the pit requires that this MUF for January, 1970, also needs to be protected as part of that concept, in making that conclusion do you perform any kind of analysis, mathematical calculation, any kind of written analysis to support that conclusion?

MS. WELLS: We need to take a time out and go off the record.

MR. KALL: You are raising your hand, Janet.

MR. SORENSEN: Ms. Nesheim, would you like to confer with Mr. Hoffman? I'm not saying you can't. I'm just asking the question.

MS. NESHEIM: Actually, I think I would

Page 72

rather ask you a question.

MR. KALL: Let's take a break. Let's do this in an orderly way.

(Whereupon, a break was taken.)

MR. SORENSEN: Let the record reflect that Mr. Hoffman and some combination of Ms. Nesheim and counsel conferred for approximately fifteen minutes. I'm guessing on that, and that's all I have.

MS. WELLS: Okay. We would like to state an objection at this time. The question that you are asking involves specific information about what was going on at Rocky Flats.

To the extent that you are asking those specifics and treading into an area where the answers may possibly lead to the disclosure of classified information, this witness is not going to be able to answer those questions here today.

In addition, talking about thought processes and development guides and all that, we are getting into an area which the Government believes is covered by the privilege.

Having said this, however, if you want to ask Mr. Hoffman questions about the general

Case No. 1:90-cv-00181-JLK   Document 1603-5   filed 11/07/05   USDC Colorado   pg 6 of 14

BSA                    DEPOSITION OF RODNEY HOFFMAN - JUNE 16, 1997                    XHAX(19/19)

Page 73

```
 1  process of how the guides were developed using
 2  general concepts, he probably is going to be able to
 3  answer most questions although we'll have to hear
 4  them as you ask them.
 5           But again, the specifics are causing a
 6  real problem for us based mostly-- primarily on
 7  classification grounds.
 8           MR. SORENSEN: Okay. So there's a
 9  question pending. Are you instructing him not to
10  answer that question?
11           MS. WELLS: I am absolutely instructing
12  him not to answer that question.
13           MR. SORENSEN: And the grounds being
14  what?
15           MS. WELLS: The answer could possibly
16  lead to the disclosure of classified information.
17           MR. SORENSEN: Okay.
18      Q.   (By MR. SORENSEN) Mr. Hoffman, do you
19  believe that your answer to the pending question
20  might reveal classified information? Do you believe
21  that?
22           MR. KALL: Why don't you read it back.
23      A.   It could.
24      Q.   (By MR. SORENSEN) Well, do you believe
25  that you could respond to that question in a way that
```

Page 74

```
 1  would not reveal classified information?
 2           MS. WELLS: That's not the issue here.
 3           MR. SORENSEN: I'm asking him a
 4  question. I'm not asking you a question. I'm asking
 5  him a question.
 6           MS. WELLS: The ground rule is--
 7           MR. SORENSEN: Are you objecting to the
 8  question I just asked?
 9           MS. WELLS: Yes, I'm objecting to the
10  question.
11           MR. SORENSEN: The one I just asked?
12           MS. WELLS: Yes. I mean he's answered
13  that he thought it would get into classified
14  information. That's the only answer you can get.
15           MR. SORENSEN: No.
16      Q.   (By MR. SORENSEN) My question is,
17  Mr. Hoffman-- let me start again.
18           Prior to the break called by counsel--
19           MR. KALL: No, it was the
20  classification officer.
21      Q.   (By MR. SORENSEN) Prior to the break
22  initiated by the classification officer, I put a
23  question to you.
24           Do you recall that?
25      A.   Not exactly.
```

Page 75

```
 1           MR. SORENSEN: Okay. Why don't we read
 2  back the question that was pending before the break.
 3           (Whereupon, the record was read back by
 4  the reporter as requested.)
 5      Q.   (By MR. SORENSEN) Do you recall I
 6  asked that question before the break?
 7      A.   Yes.
 8      Q.   This is the question now pending I'm
 9  about to ask you:
10           Do you think that you could answer that
11  question, the one that was just read back to you, in
12  a way that would not reveal classified information?
13           MS. WELLS: You've already stated--
14           MR. SORENSEN: Objection to coaching
15  this witness.
16           MS. WELLS: I've stated an objection
17  and I have told him he cannot answer that question.
18  You are now asking him the question again.
19           MR. SORENSEN: No, counsel, I have not
20  asked him to begin to respond to the question that
21  caused initially the break. The record shows that.
22  I know that. I'm not asking him to begin to respond
23  to that question. I understand the objection you've
24  made. This is a different question which I'm asking
25  for a yes or no answer.
```

Page 76

```
 1           MS. WELLS: It may not be possible for
 2  him to give.
 3           MR. SORENSEN: If he in response to
 4  that question feels that even answering that question
 5  is classified, he can obviously say so or confer with
 6  Janet Nesheim, but other than that, I'd like the
 7  answer to that question.
 8           MR. KALL: David, the whole purpose of
 9  this whole thing--
10           MR. SORENSEN: I'm not going to
11  tolerate speeches during this deposition.
12           MR. KALL: That's what you just made.
13           MR. SORENSEN: I'm conducting the
14  deposition. I'm attempting to get a simple question
15  answered, and you as well--
16           MR. KALL: The point is he should not
17  have to make that decision in the heat of battle at
18  this time.
19           MR. SORENSEN: Are you making an
20  objection?
21           MR. KALL: I'm making a speech, just
22  like you made.
23           MR. SORENSEN: Thank you. I'm glad the
24  record will now reflect that you said you made a
25  speech.
```

Page 77

Q. (By MR. SORENSEN) Mr. Hoffman, can you answer my question, please?

A. I think there are ways to illustrate what we're doing without using this-- I think your-- in the example you are using, I think it might be difficult-- would be difficult to use that as an example without getting into classified information.

Q. Okay.

A. I think there might be, and I don't have any-- I think there might be ways to-- if you want to say or show an example of what you might do, but it would have to be a different approach than the one you're using.

Q. Let me ask you a general question. I'm not asking you now about the mass in the pit and MUF. Put that aside.

As a general matter-- in applying the concepts that are contained in CG-W-5, in applying those concepts to specific situations at Rocky Flats, as a general matter do you and your staff rely on just gut instinct, your feelings, or some kind of objective, concrete analysis?

MS. WELLS: I'm going to object to the form of the question.

Q. (By MR. SORENSEN) Go ahead.

Page 78

A. Feeling is never a consideration. We have to take a rational approach, a thought-out approach to what the particular guidance is trying to do, and that's why the people that make-- that are in the office basically are people that are trained in scientific technical methods, engineering, they don't all have that, but the ones that don't generally have lots of experience out at the plant and so would have an in-depth understanding of the principles involved then are able to make an informed analysis.

Q. All right. Are you finished? I'm sorry.

A. Yes.

Q. When you said rational in that answer, what do you mean by rational?

A. I mean thought-out, learned, not intuitive but known, not subjective but objective.

Q. And if the results of that kind of rational or objective review informed you and your staff that the particular concept in CG-W-5 did not seem to warrant the classification of the particular information at Rocky Flats that you were reviewing, what would be the result of that conclusion?

MS. WELLS: Objection. Could you repeat that question? That was awfully vague.

Page 79

Q. (By MR. SORENSEN) Sure. I'll withdraw it.

I understand that CG-W-5 has concepts that you applied in developing the 3900, correct?

A. Yes.

Q. Now in applying a concept to a particular situation or at Rocky Flats, I believe you testified that you used a rational, objective approach, is that right?

A. Yes.

Q. Now if the results of that rational, objective approach did not show objectively that the particular information at Rocky Flats had to be classified based on that concept, would that particular information then remain unclassified?

MS. WELLS: Objection. That calls for speculation. There is no foundation that a situation like that would even arise.

Q. (By MR. SORENSEN) Okay. Go ahead.

A. Well, the Rocky Flats guidance, it must be in concert with the headquarters guidance.

Let me-- something we talked about a few minutes ago. Headquarters has concepts, yes, but they also have-- but they also have guidance. There are certain things that it would say this is

Page 80

classified and-- there is little doubt what that means, there is no doubt what that means.

When it can't be-- when that concept can't be broken down to maybe an engineering analysis, to an analysis of what's going on, when it doesn't break it down, then we break it down or we adapt it to that particular operation that we're performing.

The guide topic that we come to must reflect accurately what CG-W-5 says. If it's not, it's thrown out, we start again, we would not allow that guidance to go forth.

And then the person in charge-- or the people in charge of writing the guidance, the Rocky Flats guidance, the 3900, all of that is checked through the whole group, which is checked then through right now me, because the contractor has done it, and then that-- I say yes, that's good, and then it goes to Albuquerque operations, who is the overall coordinator for weapons guidance, and then they must pass on it too and say yes, what you have written absolutely reflects what W-5 says.

Q. Well, in developing 3900, was there any-- withdraw the question.

In applying guide concepts from CG-W-5

COPY

119

```
 1  CONFIDENTIAL:  SUBJECT TO THE ORDER CONCERNING DOE
    CLASSIFICATION GUIDES, ENTERED JANUARY 7, 1997; AND
 2  THE STIPULATION, ENTERED APRIL 11, 1997, RELATING TO
    GUIDE MATERIAL.
 3

 4              IN THE UNITED STATES DISTRICT COURT

 5                 FOR THE DISTRICT OF COLORADO

 6
    Civil Action No. 90-K-181
 7

 8  MERILYN COOK, et al.,

 9  Plaintiffs.

10  vs.

11  ROCKWELL INTERNATIONAL CORPORATION,
    et al.,
12
    Defendants.
13
    ----------------------------------------------------
14
    DEPOSITION OF RODNEY HOFFMAN - VOLUME II
15  June 17, 1997

16  ----------------------------------------------------

17                              Deposition location:
                                1801 York Street
18                              Denver, Colorado

19  APPEARANCES:

20
              DAVID F. SORENSEN, Esq.,
21            BERGER & MONTAGUE, P.C.
              1622 Locust Street
22            Philadelphia, Pennsylvania  19103

23                For the Plaintiffs.

24

25
```



**AVERY WOODS REPORTING**

1000 Speer Boulevard • Denver, Colorado 80204
303-825-6119 • 1-800-962-3345 • FAX 303-893-8305

Page 143

```
 1  the reporter as requested.)
 2       A.   No information in this document is
 3  classified.
 4       Q.   That wasn't my question.  Do you
 5  understand my question?
 6       A.   I'm not sure that I do.
 7       Q.   Okay.  The same question I asked with
 8  respect to the previous guide.
 9            Is there any indication anywhere in the
10  guide that is in front of you, is there any
11  indication that any information is itself
12  classified?  In other words-- withdraw the question.
13            In other words, there is a series of
14  guide topics by number in this guide in front of you,
15  correct?
16       A.   Yes.
17       Q.   Now I understand that the words in
18  these topics are not themselves classified or else
19  DOE wouldn't have produced it to us, correct?
20       A.   Yes.
21       Q.   But these descriptions in these topics
22  describe types of information that DOE either
23  considers classified, unclassified, restricted data
24  or national security information, correct?
25       A.   Yes.
```

Page 144

```
 1       Q.   And that indication of the
 2  classification status of the-- the type of
 3  information described in the topic is given in the
 4  extreme right column, correct?
 5       A.   Yes.
 6       Q.   So for instance, on the second page of
 7  this guide-- no, look at the third page.
 8            Do you see topic 145?  Do you see that?
 9       A.   Yes.
10       Q.   In the extreme right column is a U.
11            Do you see that?
12       A.   Yes.
13       Q.   That means that the information
14  described in topic 145 is unclassified, correct?
15       A.   Yes.
16       Q.   Now is there any indication in this
17  guide that is in front of you that any information
18  and type of information is considered classified?
19  Yes or no.
20       A.   No.
21       Q.   Now who reviewed this particular guide,
22  TCG-WM-1, for the purposes of production to
23  plaintiffs, do you know?
24       A.   No.
25       Q.   Did you review it?
```

Page 145

```
 1       A.   I looked at it after it was done.
 2       Q.   It was done at headquarters?
 3       A.   It was done at headquarters.
 4       Q.   Did you make any suggestions for
 5  changes when you reviewed it?
 6       A.   They had asked me to review it to see
 7  if anything in there was classified, and I said no.
 8       Q.   If you can take a look at topic 143 of
 9  this particular guide.  I'm sorry, the second page,
10  towards the bottom.  143.
11            Do you see that?
12       A.   Yes.
13       Q.   There's a description of topic, and
14  then in the extreme right column, there is the word
15  deleted.
16            Do you see that?
17       A.   Yes.
18       Q.   Now to your knowledge, did anyone on
19  behalf of DOE review the information that exists in
20  the right column of Exhibit 143 in the guides in an
21  unredacted form and make a determination that that
22  information was itself classified?
23       A.   I don't know.
24       Q.   Did you make any such determination?
25       A.   No.
```

Page 146

```
 1       Q.   Is that type of information usually
 2  considered classified?  Yes or no.
 3            MS. WELLS:  Is it possible for you to
 4  answer that question?
 5       Q.   (By MR. SORENSEN) And I want to be
 6  very clear about what I'm asking.
 7            I'm not asking whether the topic words,
 8  the total mass, or mass of a single component, of
 9  tuballoy in a fission or staged weapon, weapon
10  specified or unspecified-- I've just read the words
11  that appear at the top of 143.  I'm not asking
12  whether that type of information is considered
13  classified or not.
14            It's not my question.
15            My question refers to the information
16  to the right of that that is missing from this
17  particular guide as produced to plaintiffs, the
18  information that states whether that type of
19  information is classified or not and what the
20  classification status is.
21            My question is, is that type of
22  information usually considered classified?  Yes or
23  no.
24       A.   I don't know-- as I said before, I
25  don't know what was in that column.
```

Page 147

Q. Assume that it had no notes and all it states was either U-- just for the purposes of my question, assuming it didn't have notes, just U standing for unclassified or NSI standing for national security information or RD, different abbreviations used.

Assuming that's the only type of information that appeared there, is that type of information itself usually considered classified?

MS. WELLS: Object. He has already stated he doesn't know, doesn't have the entire document in front of him, it's not possible for him to answer based on that.

Also, we are getting very close to an area which I imagine is very sensitive and could lead to the disclosure of classified information.

Q. (By MR. SORENSEN) In your judgment.

MS. WELLS: I don't know if he can answer the question, and-- I don't know if we can allow you to ask these questions if he perceives a problem.

Q. (By MR. SORENSEN) Go ahead.

A. As a general statement-- and I can't speak to the deletions, but as a general statement, the total mass, or single component in a weapon,

Page 148

staged weapon, specified or unspecified, generally is classified information.

Q. Okay, but the fact that that kind of information is considered classified, that fact, is that itself considered classified?

A. No.

Q. Do you have any idea why then the extreme right column of topic 143 was deleted?

A. No.

Q. Now if you take a look at the fourth page of this particular guide where it has topic number 271.

Do you see that?

A. Yes.

Q. Do you see how it goes from topic 271 down to topic 456, I believe?

Do you see that?

A. Yes.

Q. Now am I correct in thinking that there are numerous topics in the unredacted guide between 271 and 456?

A. I don't know, but I'm sure that there are. I don't know-- I don't know for a fact, but yes, that's probably correct.

Q. So it's likely that in producing this

Page 149

particular page to the plaintiffs, someone on behalf of DOE essentially put these pages together to make it appear that they are all one page, where in fact they appear on separate pages in the actual guide, correct?

A. Yes, I'm not sure if they appear as one page. It was certainly cut and paste.

Q. In other words, they appear on one page in front of you?

A. That's correct.

Q. But in the actual guides, they are not on the same page, correct?

MS. WELLS: Asked and answered.

Q. (By MR. SORENSEN) Go ahead.

A. Yes.

Q. Yes, that's correct?

A. That's correct.

(Whereupon, Deposition Exhibit 15 was marked for identification.)

Q. Mr. Hoffman, the guide that you see in front of you, TCG-NAS-1, was this one of the guides used to review and redact the MUF documents produced to plaintiffs pursuant to the contempt order?

A. Yes, as I recall.

Q. Can you please review the guide that's

Page 150

in front of you and tell me if there is any indication anywhere in it that any particular type of information is considered classified?

Again I'm not asking you whether the information in the document itself is classified. I'm asking you whether any of the topics that are contained in it indicate that any particular type of information is itself considered classified.

A. Restate, please.

Q. Okay. Is there any indication anywhere in this guide, that you can locate and point out to me, that indicates that any particular type of information is considered to be classified?

A. No.

Q. Do you know who reviewed this particular guide for the purposes of production to plaintiffs?

A. No.

Q. Did anyone in your office-- well, withdraw the question.

Is it safe for me to assume that someone at DOE headquarters reviewed it?

A. Yes, they did.

Q. Was it shown to you after it was together?

Page 151

1  A. I was asked to comment whether there
2 was classified information-- to review it to see if
3 there was any classified information remaining in the
4 documents.
5  Q. Well, were you also asked to review it
6 for the purposes of determining whether any
7 information was improperly deleted from the
8 document?
9  MS. WELLS: Objection. Lack of
10 foundation. Argumentative.
11  Q. (By MR. SORENSEN) Go ahead.
12  A. What was the question?
13  Q. Did anyone ask you to review this guide
14 before its production to plaintiffs to determine
15 whether in your judgment any information was being
16 improperly deleted from it?
17  Did anyone ask you to do that?
18  MS. WELLS: Restate my objection.
19  Q. (By MR. SORENSEN) Go ahead.
20  A. I was asked to review for errors. I
21 don't recall that I was asked to do that.
22  Q. You don't recall being asked to look
23 for any deletions that were improper, is that right?
24  MS. WELLS: Objection. The question is
25 argumentative.

Page 152

1  Q. (By MR. SORENSEN) Go ahead.
2  A. No.
3  Q. No, you were not asked?
4  A. I don't recall being asked.
5  Q. Now again drawing your attention to the
6 extreme right column of the various topics, on the
7 second page of this guide, topic 209, it states a U,
8 and that stands for unclassified, correct?
9  A. Yes.
10  Q. That means the information under topic
11 209, designator, per se, and the fact it is a
12 designator, that type of information is considered by
13 DOE to be unclassified, right? That's what that
14 means?
15  A. Yes.
16  Q. Now right below it, we have topic 231,
17 do you see in the extreme right column, there's the
18 word deleted that appears?
19  A. Yes.
20  Q. Now to your knowledge, did anyone on
21 behalf of DOE make any attempt to determine whether
22 the information that is contained in that extreme
23 right column in the unredacted version of this guide
24 is itself classified?
25  A. Not to my knowledge.

Page 153

1  Q. Is there anything in this guide in
2 front of you that states that MUF information,
3 material information about amounts of unaccounted for
4 nuclear material at Rocky Flats, is considered
5 classified, and if there is any such indication in
6 this guide, could you show me?
7  A. I see no direct reference to MUF in
8 this guide.
9  Q. I believe I asked you a question about
10 Hoffman 13, but I don't think I did with Hoffman 14.
11 Could you go back to Exhibit 14 for a second,
12 please?
13  The same question with respect to
14 Hoffman 14. Is there any indication anywhere in this
15 particular guide, Hoffman Exhibit 14, that indicates
16 that actual unaccounted for information at Rocky
17 Flats is classified, and if so, please point it out.
18  A. I see no reference in Exhibit 14.
19  Could we have a little break?
20  MR. SORENSEN: Certainly.
21  (Whereupon, a break was taken.)
22
23  (Whereupon, Deposition Exhibit 16 was
24 marked for identification.)
25  Q. (By MR. SORENSEN) Mr. Hoffman, I'll

Page 154

1 show you what I've marked Exhibit 16, guide of
2 WNP-63.
3  Do you see that?
4  A. Yes.
5  Q. Is this in fact one of the guides used
6 by DOE to review and redact the MUF documents
7 produced to plaintiffs pursuant to the contempt
8 order?
9  A. I believe so.
10  Q. In its unredacted form, do you know how
11 long this particular guide is?
12  A. No. It's not very long, but I don't
13 know.
14  Q. Who reviewed this particular guide for
15 the purposes of its production to plaintiffs?
16  A. I don't know.
17  Q. Can you please look at the guide that's
18 in front of you, all three pages of it, and tell me
19 whether there is any indication anywhere in it that
20 any types of information are considered classified?
21  A. I don't see any. No is the answer.
22  Q. Do you see anything in the guide that
23 is in front of you that states that MUF actual
24 unaccounted for information at Rocky Flats is
25 considered classified?

Page 155

1  A.  I see no reference to MUF in this
2  guide.
3  Q.  Well, by giving your answer in that
4  way, are you trying to state that there is perhaps
5  information in this particular guide that relates to
6  MUF?  I want to make sure that you are not-- that I
7  understand if you are attempting to carve out
8  something in your mind.
9  Do you understand what I'm asking you?
10  MR. KALL:  Rod, do you want him to
11  repeat the question?
12  A.  Yes, I do.
13  Q.  (By MR. SORENSEN)  Would you like me to
14  repeat it?
15  A.  Yes, please.
16  Q.  All right.  Withdrawn.  I'll rephrase
17  it.
18  Speaking more broadly about MUF, not
19  just MUF but MUF-related information, is there
20  anything in this guide that you see in front of you
21  that states that any MUF or MUF-related information
22  is considered classified?
23  A.  No.
24  Q.  Now do you see on page two of this
25  particular guide, Bates number 4291055, right under

Page 156

1  topic 411.3, do you see the word deleted?
2  A.  Yes.
3  Q.  To your knowledge, did anyone on behalf
4  of DOE make a determination that the information that
5  has been deleted from that particular location in
6  this guide is itself classified?
7  A.  I have no idea.  It may have been a
8  topic that was not used.  I don't know why it was
9  deleted.
10  (Whereupon, Deposition Exhibit 17 was
11  marked for identification.)
12  Q.  I show you what I've marked as
13  Hoffman 17.  For the record, what I've marked as
14  Hoffman 17 is a classification guide with the
15  designation TCG-WPMU-1.
16  Do you see that, Mr. Hoffman?
17  A.  Yes.
18  Q.  Was this in fact one of the
19  classification guides used by DOE to review and
20  redact the MUF documents produced to plaintiffs
21  pursuant to the contempt order?
22  A.  I believe it was.
23  Q.  Is there any indication anywhere in
24  this guide that appears in front of you that
25  indicates that any type of information is considered

Page 157

1  classified?
2  MR. KALL:  Could you read that question
3  back again for me?
4  (Whereupon, the record was read back by
5  the reporter as requested.)
6  A.  Okay, and the question was?
7  Q.  (By MR. SORENSEN)  I'll withdraw the
8  previous question and ask you this question:
9  Is there anyplace in the guide that
10  appears in front of you that states or indicates that
11  any type of information is considered classified?
12  A.  No.
13  Q.  Is there anything in Hoffman Exhibit 17
14  that indicates that MUF or MUF-related information at
15  Rocky Flats is considered classified?
16  A.  No.
17  Q.  If you turn to the second page of this
18  two-page document, do you see the right-hand column
19  has a whole series of words, they all say deleted?
20  Do you see that?
21  A.  Yes.
22  Q.  To your knowledge, did anyone on behalf
23  of DOE review the information that was deleted from
24  this column to determine whether the information is
25  itself classified?  In other words, the information

Page 158

1  that was deleted-- withdraw the question.  I'll start
2  again.
3  I presume that in the unredacted guide,
4  these words deleted appeared as actual information,
5  correct?
6  A.  Yes.
7  Q.  In replacing that information with the
8  word deleted, did anyone on behalf of DOE determine
9  that that information was itself classified?
10  A.  I don't know.
11  Q.  Is there anything that you can point to
12  me in this guide as it appears in front of you that
13  supports the deletion of any information from any of
14  the MUF documents produced to plaintiffs pursuant to
15  the contempt order?
16  A.  There are topics in here that relate to
17  MUF.
18  Q.  And which are those?
19  A.  I'm not going to answer that.
20  Q.  Is there any indication that any of
21  these topics relate to information that is considered
22  classified?  Withdraw that question.
23  There is nothing on this page that you
24  are looking at, is there, that would inform the
25  plaintiffs or the court that any particular type of

Page 183

```
 1  referred to earlier?
 2      A.  I don't know. I put it together.
 3      Q.  Do you know over what span of time it
 4  occurred?
 5      A.  Two, three days.
 6          (Whereupon, a break was taken.)
 7
 8          MR. SORENSEN: Let the record reflect
 9  that we're beginning again at one-ten.
10      Q.  (By MR. SORENSEN) Mr. Hoffman, did you
11  discuss your testimony, either yesterday or today,
12  with counsel at lunch today?
13      A.  No.
14      Q.  To your knowledge, sir, has DOE, in
15  connection with its response to the issuance of the
16  contempt order by Judge Kane, made any attempt of any
17  kind to determine whether MUF information at Rocky
18  Flats at the MBA level for any time period could be
19  released without threatening national security?
20          MS. WELLS: Object to the form of the
21  question.
22      Q.  (By MR. SORENSEN) Go ahead.
23      A.  Could you read that one back, please?
24          MS. WELLS: Yes. It's awfully long.
25      Q.  (By MR. SORENSEN) Sure. I'll state it
```

Page 184

```
 1  again.
 2          To your knowledge, Mr. Hoffman, has
 3  DOE, in connection with its response to the issuance
 4  of a contempt order by Judge Kane, made any effort of
 5  any kind to determine whether MUF information at
 6  Rocky Flats at the MBA level for any time interval
 7  could be released to the plaintiffs without
 8  threatening national security?
 9      A.  No, not that I know of.
10      Q.  Who is Joan Hawthorne?
11      A.  She's an employee of the office of
12  declassification in Germantown, Maryland.
13      Q.  And did you have contact with her in
14  the course of-- or in connection with DOE's
15  production of redacted classification guides for the
16  plaintiffs?
17      A.  Yes.
18          (Whereupon, Deposition Exhibit 22 was
19  marked for identification.)
20      Q.  What I've marked as Hoffman Exhibit 22
21  is titled Rocky Flats Security Classification Guide.
22  It also has a designation RFP-4790 at the top.
23          Do you see that, Mr. Hoffman?
24      A.  Yes.
25      Q.  This particular Exhibit 22 was one of
```

Page 185

```
 1  the classification guides used by DOE to redact the
 2  MUF documents produced to plaintiffs?
 3      A.  Yes.
 4      Q.  Is this a guide that you had a personal
 5  role in developing?
 6      A.  Yes.
 7      Q.  Did you develop it while you were an
 8  employee of Dow?
 9      A.  It was developed by the contractor or
10  by the Kaiser-Hill classification office, Worldwide
11  Security, and then discussed with me and I approved
12  the guide.
13      Q.  While you were working for Rockwell,
14  did you have any role in developing either this guide
15  or any predecessor guide to it?
16      A.  Yes.
17      Q.  Did you have a role while an employee
18  of Rockwell in developing this particular guide?
19      A.  No.
20      Q.  Or developing a predecessor guide?
21      A.  Yes.
22      Q.  And the predecessor guide, what's the
23  designation of that guide?
24      A.  RFP-3900.
25      Q.  The guide that you see in front of you,
```

Page 186

```
 1  is it currently in use?
 2      A.  Yes.
 3      Q.  Could you turn to page eighteen of the
 4  guide itself of the pagination in the lower left-hand
 5  of the page? Well, they seem to alternate. Sorry.
 6          Page eighteen, do you see that in the
 7  lower left corner, it says page eighteen?
 8      A.  97?
 9      Q.  Yes.
10      Q.  Do you see that?
11      A.  Yes.
12      Q.  In the extreme right column, there are
13  various abbreviations.
14          Do you see those?
15      A.  Yes.
16      Q.  The first one, CNSI, what does that
17  stand for?
18      A.  Confidential national security
19  information.
20      Q.  Now does that mean that topic 244-A is
21  considered confidential national security
22  information? Is that what that means?
23      A.  Yes.
24      Q.  Now if that information were also
25  considered restricted data, would this guide also
```

Page 187

1  state RD in addition to CNSI?
2       A.   Yes.
3       Q.   And the fact that no RD appears, does
4  that mean that this information, that is topic 224-A,
5  is not considered restricted data?
6       A.   Sometimes.
7       Q.   Okay. Do you see there's an asterisk
8  next to CNSI?
9       A.   Yes.
10      Q.   And at the bottom there's a paragraph
11 about that asterisk?
12      A.   Yes.
13      Q.   Now it states that such data, in
14 general, may be declassified by DOE operations
15 offices or HQ, and then it has an explanation.
16           Do you see that?
17      A.   Yes.
18      Q.   In connection with DOE's production of
19 MUF documents to plaintiffs pursuant to the court's
20 contempt order, to your knowledge did DOE make any
21 attempt of any kind to determine whether ID
22 information, as described in topic 224-A, could be
23 released to plaintiffs without harming national
24 security?
25      A.   Yes.

Page 188

1       Q.   They did make such an effort?
2       A.   Yes.
3       Q.   And who made such an effort?
4       A.   I did and the contractor classification
5  office did.
6       Q.   Who specifically?
7       A.   I don't remember.
8       Q.   Are you talking about someone who works
9  for Kaiser-Hill?
10      A.   Yes.
11      Q.   The effort that you made, could you
12 describe it, please?
13      A.   We looked at inventory differences and
14 determined that in the light of other guidance, the
15 inventory differences should not be declassified.
16      Q.   In light of other guidance, you are
17 talking about in light of other topics in other
18 classification guides?
19      A.   That's correct.
20      Q.   Other than looking at topics in
21 classification guides, did you perform any other
22 analysis?
23      A.   That's all we would do is look at the
24 other guides. I don't know what else we would do.
25           (Whereupon, Deposition Exhibit 23 was

Page 189

1  marked for identification.)
2       Q.   Mr. Hoffman, Hoffman 23 is dated
3  November 1, 1976, it has a cover page and then an
4  underlying document. The cover page has the name at
5  the bottom R.B. Hoffman. Is that you?
6       A.   Yes, it is.
7       Q.   And the signature that appears there,
8  is that your signature?
9       A.   Yes.
10      Q.   Am I right in thinking that the
11 attachment to this cover letter is some kind of study
12 that you participated in conducting concerning MUF
13 data at Rocky Flats? Is that right?
14           Mr. Hoffman, have you had a chance to
15 look at that document?
16      A.   I'm trying to resolve these numbers.
17      Q.   Well, my first question about that is
18 fairly simple. I'm just trying to establish that
19 this document reflects a study of MUF data that you
20 participated in.
21           That is what it reflects, doesn't it?
22      A.   Yes.
23      Q.   Do you see on the second page of the
24 document, next to Roman numeral II, it talks about
25 requests for information about whether MUF or an

Page 190

1  individual material balance area within the Rocky
2  Flats plant blah blah blah.
3           Do you see that?
4       A.   Yes.
5       Q.   The material balance area at Rocky
6  Flats is what?
7       A.   It's an individual account that's owned
8  by one group or one manager who is responsible for
9  the material in that particular account.
10      Q.   Do you see the page immediately
11 following it, the third paragraph, it states
12 statisticians with whom we have discussed results?
13           Do you see that paragraph?
14      A.   Yes.
15      Q.   Subsequent to this-- the date of that
16 document, November 1, 1976, did you participate in
17 any subsequent studies or subsequent consultations
18 with statisticians that would change in any way the
19 conclusion that is stated in that paragraph?
20           MR. KALL:  Is it clear that it's his
21 conclusion?
22      Q.   (By MR. SORENSEN) Mr. Hoffman, if you
23 will turn to the next page--
24           MR. KALL:  Okay.
25      Q.   (By MR. SORENSEN) -- that's your