**MEMORANDUM IN SUPPORT OF MOTION FOR PROTECTIVE ORDER**

**EXHIBIT 6**

Page 1

```
 1   IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF COLORADO
 2   CIVIL ACTION NO. 90-K-181

 3   _____

 4   DEPOSITION OF RICHARD C. KAUFMAN
     EXAMINATION DATE:  OCTOBER 18, 2005
 5
     _____
 6
     MERILYN COOK, WILLIAM JR. and DELORES SCHIERKOLK,RICHARD
 7   and SALLY BARTLETT, and LORREN and GERTRUDE BABB,

 8   Plaintiffs,

 9   v.

10   ROCKWELL INTERNATIONAL CORPORATION and THE DOW CHEMICAL
     COMPANY,
11
     Defendants.
12
     _____
13

14          PURSUANT TO NOTICE, the deposition of RICHARD
     C. KAUFMAN was taken at 9:00 a.m., October 18, 2005, at
15   633 17th Street, Suite 3000, Denver, Colorado, before
     Kimberley W. Gauthier, Registered Professional Reporter
16   and Notary Public in and for the State of Colorado, said
     deposition being taken pursuant to the Colorado Rules of
17   Civil Procedure.

18

19               Kimberley W. Gauthier
               Registered Professional Reporter
20

21

22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2   For the Plaintiffs:

 3       DAVID F. SORENSEN, ESQ.
         Berger & Montague, P.C.
 4       1622 Locust Street
         Philadelphia, PA  19103-6305
 5       (215) 875-3000

 6   For the Defendants:

 7       JANE S. PARK, ESQ.
         Kirkland & Ellis LLP
 8       200 East Randolph Drive
         Chicago, IL  60601
 9       (312) 861-3057

10   For the Deponent:

11       STEPHEN D. TAYLOR, ESQ.
         Assistant U.S. Attorney
12       U.S. Attorney's Office
         U.S. Department of Justice
13       1225 17th Street, Suite 700
         Denver, Colorado  80202
14       (303) 454-0100

15   Also Present:  None

16

17
                            I N D E X
18   EXAMINATION BY:                                    PAGE

19
     Ms. Park . . . . . . . . . . . . . . . . . . 5, 210, 234
20   Mr. Sorensen . . . . . . . . . . . . . . . .140, 231, 235

21

22

23

24

25
```

1   DOE from compliance from any provision of this order

2   shall constitute a basis for contempt of court.  Do you

3   see that?

4       A.   Right, I see it.

5       Q.   Why did DOE agree to this provision?

6            MR. TAYLOR:  Objection; attorney-client

7   privilege.

8       Q.   (By Ms. Park)  At the time that the stipulated

9   order was negotiated with plaintiffs -- I'm sorry, let

10  me go back.  Just to clear the record, are you going to

11  follow your counsel's instruction?

12      A.   Yes, I'll follow my counsel's advise.

13           MR. SORENSEN:  Can we take a short break at

14  some point soon?

15           MS. PARK:  Sure, we can take a break now.

16           (Break taken from 10:45 a.m. to 10:55 a.m.)

17      Q.   (By Ms. Park)  Back on the record.  At the time

18  that the plaintiffs and the DOE negotiated the

19  stipulated order, was the volume of documents the

20  plaintiff had requested submitted for classification

21  review small, do you remember?

22           MR. SORENSEN:  Objection; vague.

23      A.   Oh, at that point, yes, compared to what it

24  became.

25      Q.   (By Ms. Park)  At the time the DOE entered into

Page 68

1   the stipulated order, was there any concern that it
2   could not meet the strict timelines set forth in the
3   stipulated order itself?
4           MR. TAYLOR: Objection; I think we are going to
5   assert attorney-client privilege on that answer.
6       Q.  (By Ms. Park) Are you going to follow your
7   counsel's recommendation?
8       A.  Sure.
9       Q.  Earlier when you said that the amount of
10  documents that plaintiff had requested for
11  declassification review, at the time that the stipulated
12  order was initiated, was small compared to what it
13  became, are you able to put a percentage on it at all?
14      A.  Then and later?
15      Q.  Correct.
16      A.  I wouldn't have a precise percentage. But when
17  you kick in the MUF documents that came to light after
18  the contempt order, it would have gone up exponentially
19  in numbers. That's why the provision was in the
20  stipulated order that, you know, if it was going to take
21  longer than was in the stipulation, we would then
22  negotiate. And of course it was going to take a lot
23  longer, once all those other documents came to light.
24          MS. PARK: Can you please mark this as an
25  exhibit?

Page 94

1  I just don't know.

2      Q.   We're almost on lunch break soon, so you can
3  probably take a look at it during lunch.  I'll move on
4  at this point.

5           Do you recall whether there were instances
6  where items were declassified; documents were
7  declassified when they should not have been?

8           MR. SORENSEN:  Objection; foundation.

9      A.   I don't have any recollection of that.

10     Q.   (By Ms. Park)  After the Court found DOE to be
11 in contempt on November 13th, 1995, did DOE then make
12 efforts to comply -- stronger efforts to comply with
13 plaintiffs' discovery requests?

14     A.   I'll look to my counsel.

15          MR. TAYLOR:  We'll assert the attorney-client
16 privilege.

17     Q.   (By Ms. Park)  Okay.  And you're going to
18 follow your counsel's instruction?

19     A.   Yep.

20     Q.   Well, let me ask it to you this way:  After the
21 Court's contempt order, did DOE appoint someone to be
22 responsible for document production and compliance with
23 the Court's order?

24     A.   Yes.

25     Q.   Who was that individual?

Page 100

1    A.   No.

2    Q.   Further down, it says December 17th, 1995,
3  meeting between RRFO chief counsel, plaintiffs'
4  attorneys and AUSA. Do you see that?

5    A.   Uh-huh.

6    Q.   When it says AUSA, do you know if -- well,
7  strike that.

8         Do you recall whether there was a meeting
9  between you, RFFO chief counsel and plaintiffs'
10 attorneys on or around December 7th, 1995?

11   A.   I met for several weeks, every week, with Dana
12 Lindsay, and it was specifically for -- you know, to
13 comply with the contempt order. Whether plaintiffs'
14 counsel was there at any of those meetings, I just don't
15 recall. They may have been.

16   Q.   What was the purpose of your meeting, weekly
17 meetings with Ms. Lindsay?

18        MR. TAYLOR:  We'll assert attorney-client
19 privilege.

20   Q.   (By Ms. Park)  Are you following your counsel's
21 instruction?

22   A.   Yes.

23   Q.   Okay. If you look farther down on the -- Page
24 5 still of the same exhibit.

25   A.   Okay.

Page 103

1           MR. SORENSEN:  Objection; leading.
2      A.   Sure, yes.
3      Q.   (By Ms. Park)  Was it your understanding at
4  that time that it was a detailed plan?
5           MR. SORENSEN:  Objection; leading.
6      A.   I'm not quite sure what you mean by "detailed."
7      Q.   (By Ms. Park)  What was your understanding --
8      A.   But they knew which document collections they
9  had been held in contempt for, and it was Dana Lindsay's
10 job to produce those documents.  And that's what I would
11 discuss with her, was how to get all that done.
12     Q.   And in your communications with Ms. Lindsay
13 about how to get that done, was it your understanding
14 that she was at all times serious about getting it done?
15          MR. TAYLOR:  We'll assert the attorney-client
16 privilege.
17     Q.   (By Ms. Park)  Are you following your counsel's
18 instructions?
19     A.   Yes.
20     Q.   Do you recall being consulted at all in terms
21 of the DOE's plan about complying with the Court's
22 contempt order?
23     A.   Well, not Exhibit 19 specifically, but I mean
24 there were conversations every day about complying with
25 the contempt order.

Page 139

1  February, a status conference before Judge Kane. That
2  was like in mid-February, probably, something like that.
3  I'd have to go look to see the exact date. But it was
4  sometime shortly thereafter in February. And after
5  that, from time to time, somebody would ask me a
6  question about something, but I was not working on the
7  case at all after sometime in late February.
8      Q.   Okay. Why did you stop working on the case in
9  mid-to-late February?
10          MR. TAYLOR: Attorney-client privilege.
11     A.   And I will follow that.
12     Q.   (By Ms. Park) Did Ms. Lindsay continue to work
13 on the Cook case after your departure from the case in
14 mid-to-late February, 1996?
15     A.   I believe she did.
16          MS. PARK: David, I have a few more exhibits
17 here, but I don't know if they're going to be
18 particularly relevant, given his timing. So do you have
19 questions for him?
20          MR. SORENSEN: I do.
21          MS. PARK: Why don't you go ahead with your
22 questions. I may have a few questions for you
23 afterwards.
24          MR. SORENSEN: Then let's break. I want to
25 switch places with you before I ask a few questions.

Page 151

1  A.  Because I would be on some of those
2  teleconference calls. There were meetings here in
3  Denver with Mr. Fingeret, myself and defense counsel.
4  They were always at Kirkland & Ellis' office. There
5  were a couple at Hall & Evans, which is where
6  Mr. Gallagher was an attorney at that time. You know,
7  he would tell me sometimes. But like I said this
8  morning, there were thousands of phone calls. I don't
9  have specifics recollections of those phone calls.
10  Q.  Well, do you recall anything that Mr. Fingeret
11  told you about anything that he had been told by
12  Kirkland & Ellis?
13       MS. PARK:  Objection; form, foundation.
14       MR. TAYLOR:  Assert the attorney-client
15  privilege.
16  A.  I don't have a specific recollection if
17  Kirkland & Ellis said anything to him about any of this.
18  Q.  (By Mr. Sorensen)  Why was Mr. Fingeret removed
19  from the case.
20       MR. TAYLOR:  Attorney-client privilege.
21  A.  Yeah.
22  Q.  (By Mr. Sorensen)  You said there were meetings
23  in Denver involving Kirkland & Ellis, Mr. Fingeret and
24  yourself. How many such meetings do you recall?
25  A.  Most of them took place at my beginning of the

Page 156

```
 1            MS. PARK:  Objection; form.
 2       A.   I would have to say that thought crossed my
 3  mine
 4       Q.   (By Mr. Sorensen)  Why did it cross your mind?
 5       A.   Well, I'll get into attorney-client privilege
 6  if I answer that.
 7       Q.   You know, my job is to ask.
 8            MR. TAYLOR:  We'll assert the privilege.
 9       Q.   (By Mr. Sorensen)  In your opinion, did
10  Mr. Fingeret act in good faith in attempting to comply
11  with plaintiffs' discovery requests?
12            MR. TAYLOR:  We'll assert the privilege.
13       Q.   (By Mr. Sorensen)  Did you have any discussions
14  directly with Mark Johnston about this case, just
15  generally, yes or no?
16       A.   Yes.
17       Q.   Do you know whether Mark Johnston had
18  conversations with Kirkland & Ellis about this case?
19            MS. PARK:  Objection; foundation and form.
20       A.   I don't know for sure.  I don't recollect him
21  ever telling me he did, or him being on the phone with
22  Kirkland & Ellis.  I don't recall.
23       Q.   (By Mr. Sorensen)  Do you have a belief, as you
24  sit here, one way or the other?
25            MR. TAYLOR:  I will assert the privilege on
```

1   that.

2      Q.   (By Mr. Sorensen)  Was Mr. Johnston ever
3   removed from that case, yes or no?

4      A.   I think he was, as far as I recall.

5      Q.   Do you know when?

6           MR. TAYLOR:  We'll assert the privilege on
7   that.

8           MR. SORENSEN:  So I assume if I ask why --

9           MR. TAYLOR:  I think you can anticipate my
10  response to that.

11          MR. SORENSEN:  I thought I'd slip that by you.
12  Just kidding.

13     Q.   (By Mr. Sorensen)  How about this:  under whose
14  authority was Mr. Johnston removed from the Cook case?

15          MS. PARK:  Objection; foundation.

16     Q.   (By MR. Sorensen)  Who was responsible for
17  removing him?

18          MS. PARK:  Objection; foundation, form and
19  beyond the scope of direct.

20     A.   I believe it was Nordhouse, general counsel.
21  But I'm not sure, to be honest with you.

22     Q.   (By Mr. Sorensen)  With respect to Mr.
23  Fingeret, do you know who removed him?

24          MS. PARK:  Same objection.

25     A.   It was Nordhouse.

Page 176

1      A.   Yeah, there was some deadline.  Because what I
2  remember is that of course right after this is when we
3  began to find out that there were hundreds of thousands
4  more pages.  And I remember one of the issues was based
5  on how long it takes to redact and classify documents.
6  I don't remember whether it was March 15th, but I
7  remember there was no way we were going to be able to
8  meet that deadline.  No way.
9      Q.   In this time period after you learned that
10 there were many more documents, MUF-related documents
11 responsive to the plaintiffs' December 1994 request than
12 you previously believed, during this approximately
13 two-week time period, did Dana Lindsay ever suggest to
14 you, or indicate to you that she believed that you
15 didn't have to disclose this, or shouldn't disclose
16 this.
17           MS. PARK:  Objection; form.
18           MR. TAYLOR:  We'll assert the attorney-client
19 privilege.
20      Q.   (By Mr. Sorensen)  You've mentioned a couple of
21 times this conversation with Mr. Kurtenbach about this
22 development.  I take it this conversation with
23 Mr. Kurtenbach occurred during this two-week-or-so
24 period?
25      A.   Oh, yes.

Page 177

1    Q.   After you learned about the difference in
2    volume and before you made the filing to the Court,
3    correct?
4    A.   Yes.
5    Q.   Did you have any conversations in the topic;
6    that is, the discrepancy of MUF volume estimates -- let
7    me start over.
8         Did you have any conversations with
9    Mr. Kurtenbach after DOE made its final -- announcing
10   the increased volume of the MUF documents, about that
11   same subject; that is, DOE's decision to reveal this?
12   A.   No, not that I recall.
13   Q.   Did you have any such conversations with any
14   lawyer for the defendants about the same subject after
15   DOE made its disclosure?
16   A.   No, I don't believe so.
17   Q.   Was Mr. Fingeret involved at all in discussions
18   about DOE's decision to make this disclosure?
19        MS. PARK:  Objection; form.
20        MR. TAYLOR:  I'll assert the privilege.
21   Q.   (By Mr. Sorensen)  After DOE made its
22   disclosure in the filing -- I think it's marked,
23   actually, as Exhibit 20.
24   A.   Let me look back here.  After that filing,
25   there was another hearing with the Court dated February

Page 181

1  hearing in front of Judge Kane in which he mentioned the
2  possibility of evidentiary sanctions, that DOE felt that
3  it was under a lot of time pressure to get these MUF
4  documents out the door?.
5         MS. PARK:  Objection; form.
6         MR. TAYLOR:  I'll assert the privilege.
7     Q.   (By Mr. Sorensen)  You testified earlier about
8  your general understanding of what MUF was.  You said
9  something about plutonium that comes in the door they
10 can't find later.  I mean, your testimony is what it is.
11 I'm just trying to refresh your recollection.
12    A.   Yeah.
13    Q.   Now, the universe of MUF and MUF-related
14 documents that the DOE ultimately identified was, in
15 fact, over 1.3 million pages.  Do you have any knowledge
16 that it actually went up that high?
17    A.   No.
18    Q.   We'll get to a document that talks about that.
19 My question is, do you have any personal knowledge or
20 basis to say what portion of those 1.3 million pages --
21 what portion of those documents would contain only
22 information about weapon parts, as to the more general
23 MUF information.  Do you have any knowledge, one way or
24 the other?
25    A.   No, not really.

Page 198

```
 1      Q.    The defendants were asking you to do just that,
 2   correct.
 3            MS. PARK:  Objection; form.
 4      A.    Yes.
 5      Q.    (By Mr. Sorensen)  Did you get the sense,
 6   either directly or something that you just concluded,
 7   that K&E was getting some support for these kinds of
 8   objections and phone calls to you from someone else at
 9   DOE; DOE internal counsel or someone else at DOE?  Do
10   you follow what I'm asking you?
11      A.    I understand the question.
12            MS. PARK:  My objections are to foundation,
13   form and foundation.
14            MR SORENSEN:  Anything else?
15            MR. TAYLOR:  I'll join in and assert the
16   privilege.
17      Q.    (By Mr. Sorensen)  So much for that.
18            And after telling the lawyers that you would
19   not join in the objections, did they say anything else
20   to you about it?
21      A.    No, they went ahead and filed the objection.
22      Q.    But removed your name?
23      A.    Yes, yes.
24      Q.    Let me ask you this, perhaps getting around an
25   objection:  during that phone call that you were just
```

Page 203

1    Q.   (By Mr. Sorensen)  This is a yes or no
2    question.  And for the sake of this question, I'll
3    assume it's privileged.  Did you have any privileged
4    conversations, yes or no, the subject of which was DOE's
5    views about whether the release of additional MUF data
6    would be embarrassing to DOE or its contractors, or hurt
7    the posture of DOE or its contractors; just yes or no..
8         MS. PARK:  Same objection.
9         MR. SORENSEN:  Is that a question he can
10   answer, or you'd permit him to answer?
11        MR. TAYLOR:  The problem I have is if he
12   answers in reference to the subject, I don't want to
13   waive the privilege as to what the conversation were,
14   and we're very close to the line.
15        MR. SORENSEN:  I will stipulate it's not a
16   waiver, if that helps.  You know, yes or no.  If you
17   allow him to do that, I'll move on.
18        MR. TAYLOR:  If the stipulation is that it's no
19   waiver as to the content of the conversations, then I
20   think he can answer that.
21   A.   Yes.
22   Q.   (By Mr. Sorensen)  Well, for the record, I'm
23   going to continue, can you please describe the content
24   of any of those conversations?
25        MR. TAYLOR:  I'll assert the privilege.

Page 209

1          MR. SORENSEN:  I can anticipate what the
2   response would be.
3          I think I'm just about done.  Let me just check
4   a couple of things.
5       Q.   (By Mr. Sorensen)  I asked you about Exhibit 9,
6   Paragraph 10, and any conversations you might have had
7   about the subject of Paragraph 10, with DOE counsel.
8   Whatever; it was series of objections.  That's just a
9   preface to get your mind back on that subject.
10          Did you have any conversations with any counsel
11   for defendants or conversations with counsel for defense
12   who participated, about the subject of Paragraph 10 of
13   Exhibit 9.  This is the impact of releasing MUF data on
14   this litigation.
15          MS. PARK:  Objection; asked and answered.
16       A.   None that I recall at the moment.
17       Q.   (By Mr. Sorensen)  Did any other DOE internal
18   counsel, such as Mr. Fingeret, Mr. Johnston, or
19   Mr. Nordhouse, or anyone else, ever tell you that they
20   had such conversations with any lawyers at Kirkland &
21   Ellis, the subject of which was the impact of releasing
22   additional MUF data on this litigation.
23          MR. TAYLOR:  I'll assert the privilege.
24          MR. SORENSEN:  That's it.  I pass the witness.
25          MS. PARK:  May I have a short break, please?