# FINAL REPORT

# LAMM·WIRTH

# TASK FORCE

# ON ROCKY

# FLATS

PLAINTIFFS'
EXHIBIT
P-338
90-CV-181

~3 007974

US3086810

**OCTOBER 1, 1975**

## TABLE OF CONTENTS

                                                                    Page

Lamm-Wirth Task Force Members . . . . . . . . . . . . . . . . . . . .    1

Abbreviations Used  . . . . . . . . . . . . . . . . . . . . . . . .    2

Introduction  . . . . . . . . . . . . . . . . . . . . . . . . . . .    4

Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . .    8

Documentary Report

    Author's Preface to Documentary Report . . . . . . . . . . . . .   28

Chapter I - Introduction

    Introduction  . . . . . . . . . . . . . . . . . . . . . . . . .   30
    Aids to the Reader . . . . . . . . . . . . . . . . . . . . . . .   30

Chapter II - History and Brief Description of the Rocky Flats Plant

    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . .   32
        A. Site Selection . . . . . . . . . . . . . . . . . . . . .   32
        B. RFP Operation  . . . . . . . . . . . . . . . . . . . . .   35
        C. Physical Layout of the RFP Site  . . . . . . . . . . . .   42

Chapter III - Hazards Associated with the Rocky Flats Plant

    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . .   44
        A. High Level Contamination . . . . . . . . . . . . . . . .   45
            (a) Previous Contamination . . . . . . . . . . . . . . .   45
            (b) Possible Contamination Resulting from Natural
                Castrophe . . . . . . . . . . . . . . . . . . . . .   48

                Gross Plant Terrain   . . . . . . . . . . . . . . .   48
                Geology . . . . . . . . . . . . . . . . . . . . . .   48
                Hydrology . . . . . . . . . . . . . . . . . . . . .   49
                Meteorology . . . . . . . . . . . . . . . . . . . .   49
                Tornadoes . . . . . . . . . . . . . . . . . . . . .   50
                Earthquakes . . . . . . . . . . . . . . . . . . . .   50
            (c) Possible Contamination Resulting from Accidents  . .   51
        B. Low Level Contamination  . . . . . . . . . . . . . . . .   53

3.007975

US3086811

Chapter IV - Control of Hazards at the Rocky Flats Plant

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . 54
    A. Radioactivity Standards . . . . . . . . . . . . . . . . . 54
    B. Industrial Safety . . . . . . . . . . . . . . . . . . . . 62
    C. Security and Safeguards . . . . . . . . . . . . . . . . . 62
    D. Emergency Response . . . . . . . . . . . . . . . . . . . . 63
    E. Removal of Lip Contamination . . . . . . . . . . . . . . . 64
    F. Purchase of Surrounding Land . . . . . . . . . . . . . . . 64
    G. Monitoring of Dangerous Materials . . . . . . . . . . . . 65
    H. Other Safety Measures at the RFP . . . . . . . . . . . . . 67
        (a) Building Design . . . . . . . . . . . . . . . . . . 67
        (b) Safety Features in the Buildings . . . . . . . . . . 68
        (c) Waste Handling . . . . . . . . . . . . . . . . . . . 70

Chapter V - Biological and Medical Aspects of Plutonium

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
    A. Further Information on Plutonium . . . . . . . . . . . . . 73
        (a) Alpha Radiation . . . . . . . . . . . . . . . . . . 73
        (b) Isotopes of Plutonium . . . . . . . . . . . . . . . 74
        (c) Important Plutonium Materials at the RFP . . . . . . 74
        (d) Plutonium Particle Sizes . . . . . . . . . . . . . . 75
        (e) The Hot Particle Theory . . . . . . . . . . . . . . 75
        (f) Threshold Limits to Radiation Danger . . . . . . . . 76
    B. Environmental Pathways of Plutonium to Man . . . . . . . . 76
    C. Animal Studies with Plutonium . . . . . . . . . . . . . . 79
        (a) Types of Animals . . . . . . . . . . . . . . . . . . 79
        (b) Administration of Doses and Dose Size . . . . . . . 79
        (c) Distribution of Plutonium Material in Animal Studies . 80
        (d) Pathology in Animals . . . . . . . . . . . . . . . . 82
             Blood . . . . . . . . . . . . . . . . . . . . . . 83
             Bone . . . . . . . . . . . . . . . . . . . . . . . 83
             Liver . . . . . . . . . . . . . . . . . . . . . . 83
             Lung . . . . . . . . . . . . . . . . . . . . . . . 84
             Lymph Nodes . . . . . . . . . . . . . . . . . . . 84
             Gonads . . . . . . . . . . . . . . . . . . . . . . 85
    D. Human Studies with Plutonium . . . . . . . . . . . . . . . 85
        (a) Subjects . . . . . . . . . . . . . . . . . . . . . . 85
        (b) Distribution of Plutonium Materials in Humans . . . . 86
        (c) Pathology in Humans . . . . . . . . . . . . . . . . 88
        (d) Risk Estimates in Humans . . . . . . . . . . . . . . 88
        (e) Medical Treatment for Plutonium Contamination . . . . 89

3 007976

US3086812

Page

Chapter VI — Impact of the RFP on Its Workers and the Residents of Colorado

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . .   91
   A. The Rockwell-AEC Contract . . . . . . . . . . . . . . . . .   91
   B. Dow Chemical Company-United Steelworkers Agreement . . . . . .   92
   C. Price-Anderson Amendments (1954) to the Atomic Energy Act . .   93
   D. Colorado Radiation Control Act, Colorado Revised
      Statute (CRS) (1973), 25-11 . . . . . . . . . . . . . . . . . . . .   94
   E. Colorado Occupational Disease Act, Colorado Revised Statute
      (1973), 8-60-111. . . . . . . . . . . . . . . . . . . . . . . . .   94
   F. Colorado Disaster Emergency Services Act, Colorado Revised
      Statute (1973), 28-2-101 to 405 . . . . . . . . . . . . . . . .   94
   G. Land Use, Zoning, and Building Requirements . . . . . . . . .   95
   H. Further Medical Considerations . . . . . . . . . . . . . . . .   96
   I. The Transuranium Registry . . . . . . . . . . . . . . . . . .   96
   J. Environmental Impact Statements (EIS) . . . . . . . . . . . .   97
   K. Nuclear Facilities Liability Act . . . . . . . . . . . . . . .   97


REFERENCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   98

Appendix A — List of Participants in Task Force's Public Hearings. . . . .   102

Appendix B — Letter to Task Force from Dr. Robert E. Yoder . . . . . . .   106

Appendix C — Nuclear Facilities Act . . . . . . . . . . . . . . . . . .   119

3007977

US3086813

## Lamm-Wirth Task Force Membership

|  | Affiliation |
|---|---|
| Robert D. Siek, Chairman | Colorado Department of Health |
| Wesley Brittin | University of Colorado |
| Patricia Burrows | State Representative |
| William Cohen | Attorney at Law |
| John Cobb | University of Colorado Medical Center |
| Patrick Kelly | United Steel Workers of America |
| George Lucas | Colorado School of Mines |
| Margaret Markey | Boulder County Commissioner |
| James Monaghan | Governor Lamm's Office |
| Joanne Paterson | Jefferson County Commissioner |
| Arthur Robinson | National Jewish Hospital |
| Robert Damrauer | Technical Staff Member, University of Colorado |

- 1 -

3 0079780

US3086814

## Abbreviations Used

| | |
|---|---|
| AEC | Atomic Energy Commission |
| ALO | Albuquerque Operations |
| ALOO | Albuquerque Operations Office |
| ATMX | Army Transport Model Special |
| BEIR | Biological Effects of Ionizing Radiation |
| CDH | Colorado Department of Health |
| CRS | Colorado Revised Statutes |
| DMA | Department of Military Affairs (Colorado) |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| ERDA | Energy Research and Development Administration |
| HEPA | High Efficiency Particulate Air |
| ICRP | International Commission on Radiological Protection |
| LASL | Los Alamos Scientific Laboratory |
| LEM | Lunar Excursion Module |
| MPBB | Maximum Permissible Body Burden |
| MPLB | Maximum Permissible Lung Burden |
| NCRP | National Council on Radiation Protection and Measurement |
| NRC | Nuclear Regulatory Commission |
| NRPB | National Radiation Protection Board (England) |
| QF | Quality Factor |
| Rad | Radiation Absorbed Dose |

- 2 -

3007979

US3086815

| | |
|---|---|
| RF | Rocky Flats |
| RFP | Rocky Flats Plant |
| RMA | Rocky Mountain Arsenal |
| USAEC | United States Atomic Energy Commission |
| USGS | United States Geological Survey |

US3086816

3097930

## Introduction

The Lamm-Wirth Task Force on Rocky Flats nuclear facility was appointed by Governor Richard Lamm and U.S. Representative Timothy Wirth in December, 1974 and was charged with developing options, alternatives, and recommendations to enable the Governor and Congressman to fully understand and deal with the RF (Rocky Flats) operation.  The Task Force commenced its work shortly thereafter, studying the operation of the Rocky Flats Plant (RFP), the hazards associated with it, its impact on the environment, and the legal and occupational problems associated with the facility.  The Preliminary Report, issued by the Task Force in February, 1975, was intended to serve as a basis for public hearings held in Denver and Broomfield on April 14 and 15, respectively.  Transcripts of the public hearings (see Appendix A for list of participants) are available for public perusal at the Colorado Department of Health (CDH).  This final Task Force report consists of two parts:  (1) recommendations to Governor Lamm and Congressman Wirth and (2) a Documentary Report of the RF operation and the most important technological information associated with understanding the operation.

The Task Force reflected on many facts and impressions during its nine month existence.  Some of these made profound impressions.  Public testimony on April 14 and 15 made it clear not only that many people had only rudimentary knowlege of the operations at RF, but also that there were grave misgivings about the Plant's safety and the potential for a cataclysmic accident.  Our Documentary Report is intended as an educational statement prepared to place the Rocky Flats Plant (RFP) into an objective and proper perspective.  Although we believe that such a plant can under ideal conditions be operated safely, we have become

- 4 -

3 007981

US3086817

aware of a number of specific occurrences which cause deviations from the ideal. These are noted as follows:

(1) It is our impression that the most serious environmental off-site release from the RFP (see discussion of the lip area in Chapter III, Section A*) occurred with the full knowledge of the RFP. The release occurred over a long period (1958-1969); it was discovered by RF people in 1959, but no action was taken to stop the leakage until 1966.

(2) A recent action carried out with all good intentions by the RFP served to illustrate to the Task Force that potentially serious incidents can still occur. The Governor's office, the CDH, and the Energy Research and Development Administration (ERDA) Headquarters had determined that any action taken to alter the lip area would have to be agreed upon by these concerned parties. Despite this agreement Dow Chemical, some time in the early summer, sprayed defoliant on the lip area vegetation. This action could have seriously upset the stabilization of the plutonium that had been established in the soil if a soil retention blanket had not been added to the area. The Task Force has evaluated this action with the help of the RFP and the CDH; the defoliant did not work particularly well and the plutonium in the soil appears stable (Chapter III, Section A).

(3) Another serious accident, the release of tritium into the Broomfield water supply (Chapter III, Section A), occurred in 1973. Although we believe the RFP did not know that tritium was present in the material to be reprocessed, we find it deplorable that no procedures existed to insure that the RFP was properly apprised of the constitution of the material it received.

---

* Parenthetical references are to chapters and sections in the Documentary Report.

- 5 -

US3086818

(4) Finally, the recent accidents (July 30 and 31, 1975) in which two
workers were contaminated in the plutonium recovery area (Chapter IV, Section H)
point out again that potential hazards often convert to real ones. The Task
Force has only limited information on these recent accidents since, as of this
writing, neither they nor the CDH were given official notification of the oc-
currences.

We believe it an inescapable conclusion that there is risk associated
with the RFP. Since the Task Force is unable to authoritatively assess many
of these risks, we have asked in our recommendations that independent agencies
investigate into many of the areas where we felt lacking.

It seems certain that if the criteria (Chapter II, Section A) evaluated
for the original siting of the RFP were applied for siting today, the RFP would
not be located near a densely populated area. We recognize that it is beyond
our charge to evaluate the benefits associated with the continued operation of
facilities like the RFP and expect that such evaluations are ongoing in the upper
echelons of the U.S. Government. The certainty that such a plant would not today
be located at Rocky Flats, as well as our feeling that accidents will continue
to occur even under the best circumstances, dictate our belief that such a
plant should not be located at Rocky Flats. Recognizing the potential hazards
associated with the location of the plant, the Task Force believes any burden
of proof rests with ERDA and Rockwell to guarantee the health and safety of the
workers as well as the population surrounding the RFP.

We have addressed ourselves to constructive recommendations regarding
both the optimal operation and final fate of the RFP. We believe that as the
present mission is phased out, a less hazardous one should be assigned to the
RFP while the economic integrity of the Plant, its employees, and surrounding

- 6 -

US3086819

communities are carefully preserved.

We believe that the health and safety of all workers at the RFP and citizens of Colorado is paramount. We have assumed, when technological knowledge was insufficient for us to make a good judgment, that we should err on the conservative side. The Task Force fully realizes that this approach may not be met with total acceptance by ERDA and Rockwell International, but feel safe that this philosophy will best protect those who might be directly affected.

3007934

US3086820

# R E C O M M E N D A T I O N S

007935

- 8 -

US3086821

## Recommendations

1.   A permanent <u>Monitoring Committee</u> should be established to continue
the work of this Task Force. Its makeup should include a balanced represen-
tation of the public. This Committee should be provided with paid staff with
appointments being made by the Governor and the District Congressman. Ultimate
responsibility for funding the Committee should rest with the Federal government.

   The Committee's duties should include but not be limited to:
   (1) Regularly reporting to the Governor, the District Congressman,
       and the public.
   (2) Developing procedures to assure that the Committee, the Governor,
       the District Congressman, and the public will be given adequate
       advance notice of any proposal to substantively change the mission,
       level or nature of activities at the Plant. Furthermore these
       procedures should assure that no such changes be implemented
       without publication of adequate environmental impact statements,
       study and publication of recommendations by the Monitoring Committee,
       public hearings, and Congressional and State approval.
   (3) Advising the Governor of the State of such proposed changes and
       their effect, and also of the Committee's recommendation for action
       by the State of Colorado.
   (4) Evaluating all aspects of plant management with respect to health,
       safety, and the environment. In carrying out this responsibility

- 9 -

3007936

US3086822

the Monitoring Committee will have provided to it data and
information by the CDH and various other State agencies with
statutory responsibilities in these areas.

(5) Arranging an agreement so that ERDA and its contractors provide
frequent progress reports on the status of the implementation
of the various safety programs. The first proposed programs
are outlined in a letter from Rockwell International on
August 1, 1975, signed by Dr. R. E. Yoder, Director of Health,
Safety, and Environment. (See Appendix B). The outline of a
"Total Safety Award Program" is contained in Appendix A of that
letter. All safety program information should be provided to
the Governor, the District Congressman, the CDH, the Monitoring
Committee, the Plant population in general, and the public.


2. Regarding the <u>Broomfield Water Supply</u> the Task Force investigation has
revealed the following facts with respect to the Broomfield Water Supply from
the Great Western Reservoir: Operation of the Federal facility at the Rocky
Flats Plant has resulted in radioactive and toxic material contamination of the
Great Western Reservoir. However, studies by the Colorado Department of Health
and the EPA have determined that the present level of contamination does not
pose a threat to the people in Broomfield. Notwithstanding plans by the Rocky
Flats Plant to install a sophisticated water treatment and recycling plant, the
Task Force believes no static water supply should be used for human consumption
while it is still subject to potential contamination from the Rocky Flats Plant.

THEREFORE, we recommend that Governor Lamm and Congressman Wirth request

3 007987

US3086823

that the Federal government, in cooperation with the City of Broomfield and all
appropriate County and State officials, provide the City of Broomfield with an
alternate source of water to replace the water which Broomfield receives from
the Great Western Reservoir. (Chapter III, Section A (a)).*

3. The Task Force recommends that Governor Lamm and Congressman Wirth request:

   A. Congress and the President of the United States should reassess
      the Rocky Flats Plant as a nuclear weapons component parts
      manufacturing facility. In reassessing the Plant as a weapons
      manufacturing facility, consideration should be given to a pro-
      gram of gradually phasing out its present operation, possibly
      transferring those operations to a more suitable site, and de-
      contaminating and converting the Plant's facilities to a less
      hazardous energy-related industry, such as solar energy research
      and development. In evaluating these alternatives, strong considera-
      tion should be given to maintaining the economic integrity of the
      Plant, its employees, and the surrounding communities. (Chapter II,
      Section A).

   B. Congress and the President of the United States conduct a thorough
      investigation of the Rocky Flats Plant to determine whether security
      at the Rocky Flats Plant is adequate to prevent (i) sabotage and
      terrorism of the Plant and (ii) surreptitious removal of radioactive
      material. (Chapter IV, Section C).

---

* Parenthetical references in the recommendations are to chapters and sections
in the Documentary Report.

US3086824

6707807988

C.  The Federal government advise the State of Colorado on a regular
basis of its short and long-range planning in all nuclear programs
which will have impact on both the nature of the mission and the
level of production at the Rocky Flats Plant.

4. The Task Force recommends that Governor Lamm and Congressman Wirth seek to
obtain the gradual introduction at the Rocky Flats Plant of research and
development operations related to less hazardous uses of energy.  We believe
that operations such as those currently carried out at RFP should be located
in areas remote from any population center.

5. Regarding Medical Studies and Occupational Health we recommend that:

A.  Governor Lamm and Congressman Wirth recommend to the Federal
government that it fund a comprehensive and independent epi-
demiological study of short and long-range effects of exposure
to various levels of both external and internal radiation from
transuranics elements in all past, present, and future trans-
uranic workers.  The study should be directed by experts of the
highest qualifications.  Funds should be committed for a minimum
period of twenty years so that the study can not be terminated
before enough reliable data have been collected and analyzed.

All epidemiological studies presently in progress or being
planned should be coordinated to assure maximum value of results
of any of these studies.  Similar studies should be carried out

- 12 -

3007989

US3086825

on an appropriate animal model.

Similar studies should include all past, present, and future RFP plutonium workers, but certainly not be limited to them. A nation-wide study including all plutonium workers is necessary to most efficiently study these problems. (Chapter V, especially Sections C and D), (Chapter VI, Section I).

B. An organized and concerted effort should be made to register all past, present, and future Rocky Flats employees with the Transuranium Registry authorizing release to the Registry of these individuals' exposure and medical records during their lifetime and of autopsy data after their death. This effort should be coordinated between ERDA, past, present, and future contractors, and labor organizations at the Plant. (Chapter VI, Section I).

C. Since the stated primary purpose of the Transuranium Registry is ". . . . to protect the interests of workers, employees, and the public by serving as a National focal point for the acquisition and provision of the latest and most precise information about the effects of the transuranic elements on man," we recommend that the Advisory Committee and the management of the Transuranium Registry should be made up primarily of persons representing transuranium workers, employees in nuclear facilities, and the general public. (Chapter VI, Section I).

- 13 -

$\nabla$ 007990

US3086826

D.  To alleviate the severe problem of maintaining contact with all transuranic workers throughout their lives, all such workers should be given free lifetime health care similar to that provided to the military.

E.  A Federal nuclear workers health and compensation act should be enacted which could provide any plutonium worker or any other worker in a nuclear industry who is exposed to radioactivity and who contracts cancer, whether occurring during his period of employment or after he has left the employment or retired, with medical treatment and financial compensation if he is unable to work without the necessity of proving causation between the radiation exposure and cancer. (Chapter VI).

F.  The results of the above studies (Recommendation 5A.) should be used to revise the present State occupational disease acts with respect to illnesses in workers which may be caused by exposure to transuranic elements.  (Chapter VI, Section E).

6.  Regarding Public Information the Task Force recommends:

A.  An agreement should be obtained from ERDA and its contractor that they will provide speedy, accurate, and detailed information concerning all radiation accidents which occur at the Plant such as the two which occurred during the last week of July, 1975.  This information should be disclosed to the Governor, the Congressman, the CDH, the Monitoring Committee, and the media.  This agreement should provide for regular followup disclosures at specific intervals

- 14 -

3 007991

US3086827

concerning decontamination of any plant facilities, reduction of radiation levels, and health condition of any individuals affected. (Chapter IV, Section H(a)).

B. All information concerning radiation goals established in the Plant and progress reports on achieving those goals should be regularly made available to the public in an understandable form. Efforts should be made to encourage the local media to publish this information on a regular basis.

C. State universities, public schools, and State and local health departments should be charged with the responsibility and provided with the funds (by Rockwell, ERDA, HEW, and/or other Federal sources) to educate the workers at Rocky Flats and the public about the short and long-term effects of plutonium, americium, and other radionuclides on humans and other living things. These programs should present both the point of view of the environmentally concerned community and of the nuclear industry and the military.

7. Regarding Monitoring of Employees the Task Force recommends that:

A. Outside independent experts annually review all monitoring equipment and procedures to ensure that the best available equipment and measures are being appropriately used. (Chapter IV, Section G).

B. Accurate records of each employee's individual radiation exposures be compiled by ERDA's contractors and permanently preserved in cooperation with the Colorado Department of Health (CDH). (Chapter IV, Section G , Chapter VI, Section A).

- 15 -

US3086828

8.3087869
9007992

C.  That procedures be developed to provide access to this information,
    in a matter consistent with privacy of the individual involved, to
    the Colorado Department of Health and other appropriate agencies
    on a regular and frequent basis. (Chapter VI, Section A).

D.  That a program of radiation exposure goals should be developed and
    given top priority by the Rockwell management.  It should include
    publication of exposure levels in individuals by group and work
    areas throughout the Plant as well as exposure levels of that area
    of the Plant itself.  It should be combined with a system of re-
    wards and incentives for those who achieve and maintain the goals
    established.  The goals should be determined and periodically
    reviewed by management, employees, the CDH, and the independent
    Monitoring Committee.  (See Recommendation Number 1).

E.  Such information be required to be provided to each employee no
    less frequently than once per month in a readily understandable
    form with comparison of past levels of exposure and exposures of
    others in his work area and the Plant in general.

F.  High priority and allocation of resources should be devoted to
    developing and improving radiation protection systems for humans
    both in and outside of the Plant.

G.  A program should be developed to re-evaluate present and former
    Rocky Flats employees with new, more sophisticated detection
    systems.  The program should be designed to achieve maximum
    participation by these employees consistent with their right to

3007993

- 16 -

US3086829

privacy and psychological resistance to this type of information in the past. (Chapter VI, Section I).

H.  Federal impact funds should be provided to the State of Colorado to insure that programs are funded to provide the most up-to-date equipment and competently trained staff to regularly monitor the operation of the Plant and its impact on the environment.

I.  ERDA should provide funds to the State to acquire, operate, and maintain the most sophisticated monitoring instruments for determining plutonium lung burdens. This is necessary to assure the workers and citizens that the best available methods are currently being used at Rocky Flats and that workers are accurately informed of the extent of their plutonium lung burden. (Chapter IV, Section G).

J.  The Federal government should appropriate substantial research and development funds for continuing development of ultra-sophisticated bioassay techniques and monitoring equipment. (Chapter IV, Section G).

8. Regarding Safety the Task Force recommends:

A.  The Nuclear Regulatory Commission, Occupational Safety and Health Administration, and/or all other appropriate agencies, independent of the Operational Safety Division of ERDA, should be requested by Governor Lamm and Congressman Wirth to conduct routine comprehensive studies of all safety aspects at the Plant and should make proposals for improved safety in plant operations to prevent radiation and/or other accidents. Timely results of such inspection should be made public. (Chapter IV).

- 17 -

$x_{2}$007994

US3086830

B.  The Federal Aviation Administration should restrict the air space over and near the Plant by appropriate regulation and stringently enforce this regulation in cooperation with local law enforcement authorities and the administrator of the Jefferson County and other local and regional airports. We recommend that no expansion of the Jefferson County Airport occur until our recommendation of change of mission has been fully implemented. If the mission is not changed we believe airport expansion is incompatible with the close proximity of the airport to the RFP. (Chapter IV, Section H (a)).

C.  Transportation of all nuclear material both on and offsite of the Rocky Flats Plant and other nuclear facilities in Colorado should be monitored by the CDH. Regular reports consistent with National security should be made to the Monitoring Committee. (Chapter IV, Section H (c)).

D.  All appropriate Federal and State regulatory agencies should co-operate in developing guidelines for controlling air transpor-tation of plutonium and other transuranic elements.

9. Regarding Land Use the Task Force recommends:

A.  The Federal government should acquire land for an additional buffer zone around the Plant. This buffer zone (we suggest an additional one-to-two miles on each side) should provide additional protection from a possible nuclear disaster at the Plant and should include, but not be limited to, all land contaminated to or above the existing State soil guidelines. (Chapter IV, Section A and F), and(Chapter VI, Section G).

- 18 -

3007995

US3086831

B. The Board of County Commissioners and local governing bodies in Boulder and Jefferson Counties should be requested to declare a moratorium, if possible, on further development of any land in the vicinity of the Plant which exceeds the Board of Health's recommended soil standard as well as any land within the proposed additional buffer zone. This moratorium should remain in effect until the Federal government has an opportunity to acquire these lands or provide funds to State and local governments for their acquisition. (Chapter VI, Section G).

C. Colorado Land Use Statutes should be amended to give the State and local governments clear authority to restrict development on contaminated lands and land in the vicinity of hazardous facilities. (Chapter VI, Section G).

10. Regarding Emergency Response Plans the Task Force recommends:

A. That appropriate emergency response plans be prepared and implemented to provide responses to a wide variety of potential accidents at the Rocky Flats Plant. Such responses might affect small or large numbers of people both on- and offsite. These plans should consider evacuation and alternatives thereto. Frequent plan reviews, updates, and checks to assure their efficacy and the high state of readiness of involved personnel must be carried out. Frequent mock emergency drills of both on- and offsite responses should be conducted under supervision of the Department of Military Affairs, the Colorado Department of Health, and the Monitoring Committee. (Chapter IV, Section D).

- 19 -

VCRS007996

US3086832

B. Plans should be developed and implemented under agreements
with area hospitals to provide emergency treatment to small
or large numbers of contaminated individuals who might require
intensive care. Procedures should be instituted for updating
such agreements and for insuring that appropriate personnel
at these hospitals are familiar with and skilled in implemen-
tation. Plans should be reviewed regularly by the Colorado
Department of Health. (Chapter IV, Section D).

C. An independent study should be conducted to determine the ade-
quacy of the entire on- and offsite emergency response plans.

D. An independent study should be done of the maximum credible
accidents which might occur at the plant to include any incidents
of bombing, other acts of sabotage, or a major airplane crash into
a plutonium facility. This information should also be included in
the upcoming Environmental Impact Statement. (Chapter IV,
Section H (a)).

11. Regarding the Environment the Task Force recommends:

A. Federal law should be clarified to unequivocally grant authority to
the Environmental Protection Agency (EPA) to control and regulate
all discharges of radioactivity by contractors of Federally operated
nuclear facilities. EPA should establish standards for plutonium
and americium in soil under various conditions of climate, wind,
vegetation, soil chemistry, land use, degree of access to the

- 20 -

3 007997

US3086833

public, and proximity to residential areas. The Rocky Flats buffer zone and surrounding areas should be resurveyed at yearly intervals to monitor the spread of these elements. (Chapter IV, Section A).

B. A policy of striving toward zero discharge of any radioactive or highly toxic substance at the Rocky Flats Plant should be adopted and all necessary resources should be committed to achieving that goal. (Chapter IV, Section H (b)).

C. An independent study to assess the adequacy of all plutonium buildings (as well as the plutonium recycling and waste processing building presently under construction) to withstand all natural and human caused credible disasters should be performed. (Chapter IV, Section H (a)).

D. ERDA and Rockwell should carry out a complete particle size analysis of all stack effluents containing hazardous materials. (Chapter IV, Section H (b)).

E. High priority should be given to support the release prevention and detection systems with adequate manpower to maintain the existing systems and to change all filters according to a fail-safe schedule which is closely monitored by the CDH and the Monitoring Committee. (Chapter IV, Section H (b)).

F. Experts on aerodynamic sampling techniques should be commissioned to study the present system of ambient air sampling. This study



US3086834

should be conducted by an independent, highly qualified group mutually agreed upon by ERDA and the CDH.

12. Regarding <u>Formal Impact Statements</u> the Task Force recommends:

A. Before the Rockwell contract is renewed or bids are opened for other contractors to replace Rockwell, a current Environmental Impact Statement should be prepared. In addition, ERDA should not only conduct public hearings on the performance of Rockwell, but also seek input from the Monitoring Committee, the CDH, the Governor, the Congressman, and any and all interested citizens and groups. Periodic evaluations of the contractor by ERDA management on performance should be made public at regular intervals and provided to the Monitoring Committee, the CDH, the Governor, the Congressman, the public, and the media.

B. A separate EIS should be required immediately for the removal of all nuclear and non-nuclear toxic materials buried or otherwise contaminating the soil at or near the Plant site. (Chapter IV, Section H (c) and Chapter VI, Section J).

13. Regarding <u>Legislation</u> the Task Force recommends:

A. Congress should enact legislation subsidizing the State of Colorado and the county or local governments for impact costs incurred by any State governmental units because of the existence of Rocky Flats, including but not limited to: (a) health, safety, and environmental monitoring; (b) training of hospital and other emergency personnel; (c) maintenance of hospital and other emergency equipment;

3007999          - 22 -

US3086835

(d) establishment of the Monitoring Committee and proper staffing thereof; (e) environmental decontamination; and (f) cooperative public education program.

B. The Price-Anderson Act should be repealed and replaced with a nuclear industry liability act which requires contractors and licensees to bear the risk of doing business in the industry and to obtain and maintain their eligibility for adequate insurance without limits of liability. Strict liability on the part of the contractor or lisencees should be provided for by Federal law in the event of accidents which cause any injury or damage to persons or property not employed by or owned by the government or the contractor/licensee. A reasonable statute of limitations, not unrealistically short, should be provided. Waivers of all defenses including sovereign immunity must be the condition of all contracts and licensees in this field. All distinctions under existing legislation should be eliminated between different kinds of incidents and administrative discretion by Government agencies should be prohibited in determining the nature of an incident and scope of liability. (Chapter VI, Section C).

C. The Nuclear Facilities Act, passed by the Colorado House of Representatives during the 1975 Legislature but killed in the Colorado Senate, should be enacted into law. It should be put on the Governor's call for next year's legislative session and should be given high priority by the Governor's staff to assure its enactment. (Chapter VI, Section K).

- 23 -

$000000

US3086836

14. Regarding <u>Medical Facilities Related to Rocky Flats</u> the Task Force recommends:

    A. The head of the medical staff should be a physician with expertise both in the area of emergency service and in the special problems associated with injuries due to radioactive substances, particularly with regard to emergency surgery and decontamination procedures.[*] This should include knowledge of monitoring techniques and appropriate instrumentation. Such expertise should be documented by evidence of formal training in these areas. There should be a similarly trained alternate to the head of the medical staff. (Chapter IV, Section D).

    B. The nursing staff should receive training in the special problems nurses may face in handling patients at the RFP. (Chapter IV, Section D).

    C. The medical facility should include equipment necessary for minor surgery and for some major surgery (e.g., orthopedic or plastic) that could be accomplished more conveniently at Rocky Flats (perhaps by an outside consultant). This would require obtaining equipment for general anesthesia. (Chapter IV, Section D).

    D. All medical personnel at Rocky Flats including physicians, nurses, health physics personnel and any others involved in preventing and

---

[*] The person now in charge is presently undergoing this type of training.

3 002001

US3086837

treating radiation hazards should be required to receive a speci-
fied number of hours of continuing education courses each year.
Programs should be developed and coordinated between ERDA, ERDA
contractors, and the CDH.  Regular drills for treating various
radiation health emergencies not requiring offsite treatment
should be conducted under the review of the CDH.  (Chapter IV,
Section D).

15. Regarding Contract Provisions the Task Force recommends the following modi-
fications to the Rockwell contract:

A.  Provide for frequent unannounced inspections without notice to
the contractor by both ERDA and the appropriate agencies referred
to in Recommendation #8A.  The results of these inspections should
be made available to the public, the Monitoring Committee, the
district Congressman, and the Governor.

B.  Require the contractor to exercise the "utmost skill" to assure
safe operating conditions for employees as well as the public
particularly in view of the hazardous nature and potential danger
from the existence and operation of this Plant.

C.  Expressly add to the Rockwell contract as a separate provision
that Rockwell preserve individual occupational radiation exposure
records.  Such a provision was present in the Dow Chemical contract.

16.  In the past the AEC, now ERDA, has had the responsibility and the mandate
to monitor and regulate the contractor at the Rocky Flats Plant in the public
interest particularly with respect to public and employee health and safety.

- 25 -

800900
201 Pag
3 002002

Notwithstanding this responsibility, it appears to us that the AEC in the past operated under a policy of withholding and distorting information from the public with respect to the Plant's operations. We, therefore, recommend that Governor Lamm and Congressman Wirth request that Congress authorize the Government Accounting Office to conduct an investigation into the facts surrounding this apparent past policy and to impose any appropriate sanctions it determines are necessary to assure that such a policy will not be instituted again.

- 26 -

3 002003

US3086839

# DOCUMENTARY REPORT

3 002004

US3086840

## Author's Preface to Documentary Report

The author was engaged on May 29, 1975, by Governor Lamm's office, to serve both as a technical staff member to the Lamm-Wirth Task Force on Rocky Flats and as the author of the Task Force's Documentary Report. The Documentary Report has been prepared as an introduction to the Rocky Flats Plant. Every attempt has been made to keep it simple and nontechnical. It is, of course, impossible when dealing with a technical subject to be entirely successful in these objectives. Yet it is hoped that the attempt will make available to citizens of Colorado a readable account of the operations at Rocky Flats and their health and safety impact on both the workers of the Rocky Flats Plant and the citizens of Colorado.

Many individuals have helped in bringing the final report to completion. Some of those who have supplied technical information and to whom thanks are given are Professors Wesley Lemasurier and Clyde Zaidins, University of Colorado at Denver, Dr. Stuart Smith, University of Colorado Medical School; Bert Crist and Jim Montgomery of the Colorado Department of Health, and Robert Rich, Attorney at Law. In addition, the Task Force, many individuals at the Rocky Flats Plant, Barbara Radosevich of Governor Lamm's office, and the secretarial staff, in particular Mrs. Margaret Little, at the Colorado Department of Health, have been extremely helpful. Finally, Robert D. Siek, Chairman of the Task Force and Assistant Director of the Colorado Department of Health, and Albert J. Hazle, Director of the Occupational and Radiological Health Division of the Colorado Department of Health, have been instrumental in assisting the

3 002005

- 28 -

US3086841

author's education as the report was being written.  Their patience and friend-ship have made the process both rewarding and exciting.

August 15, 1975

Dr. Robert Damrauer
Department of Chemistry
University of Colorado at Denver

- 29 -

US3086842

## CHAPTER I

Introduction:

The Task Force Documentary Report was prepared as a summary of the factual material gathered from not only the public hearing participants and individuals who have corresponded with the Task Force, but also from our investigations of the literature relevant to the RFP. Most of the reference material used in preparing the final report is available at the CDH (Colorado Department of Health).

Because of the scope of the Task Force's undertaking, the Documentary Report will not discuss in detail information communicated in the Preliminary Report. Rather an attempt has been made to present an organized account of the Rocky Flats operation and its effect on the citizens of Colorado.

Aids to the Reader:

The reader should be aware of several limitations that may have influenced this final document. The most important is that the Task Force itself has taken on an enormous task and tried to come to its conclusions in a relatively short time span. Its members are not experts in all areas covered in this report and, although expert outside help has been sought, some areas are better treated than others. Further, many areas of concern to the Task Force have not been adequately studied either because such studies are as yet incomplete or because the issues involved have only recently been considered important enough to initiate studies.



US3086843

The Task Force has also had to face the problem of dealing with considerable amounts of data from studies generated within the United States Energy Research and Development Administration (ERDA) system.  Such data, although not necessarily questionable, is often generated and dispersed in a manner uncommon for scientific publications.  That is, oftentimes studies are carried out within the system and publications are dispersed without the benefit of review by anonymous peers.  This tendency is in some cases necessary because of the sensitive nature of the information gathered.  It should also be pointed out that the new agency, ERDA, seems more open and willing than its predecessor to subject its scientific work to outside scrutiny.

Finally, we would emphasize that in this report there is a good deal of discussion about radiation standards.  Many scientists and laymen are concerned that these standards are unsafe--that is, too high.  It is important to understand that standards are established on the basis of currently accepted hazards.  These are established as one might expect by experience.  Although the dangers may in the future prove to be graver than can now be identified, those recommending standards deal only with current knowledge.  Although the Task Force cannot set different standards it can point out that radiation standards have almost always been lowered as more information about radiation hazards have been accumulated.  Perhaps it is obvious to suggest that if we are to commit errors in establishing future radiation standards that they may be on the conservative, safe side always aware that such standards are established by risk-benefit analysis seeking levels that are both safe and economical.

- 31 -

3002008

CROSON

US3086844

## CHAPTER II

## History and Brief Description of the Rocky Flats Plant

Introduction:

In this chapter we briefly review the history of the RFP including the selection of the RF site, an outline of the operations of the plant, and a description of the present site.

A. Site Selection:

Construction of the Rocky Flats Plant, located about seven miles west of Broomfield, was begun in 1951. Selection of the site was based on an engineering study by the Austin Company[1] designed to satisfy criteria established by the Santa Fe Operations Office* of the Atomic Energy Commission (AEC), and the Dow Chemical Company. Generally, the criteria involved (1) general Western location, (2) minimal site and plant sizes, (3) reasonable distance from a population center of 25,000 or more, (4) minimal displacement of homes and population for site construction, (5) dry, moderate climate, (6) proximity to main railroad line, (7) proximity to good main highway, (8) proximity to major airport, (9) dependable primary and alternate power sources, (10) adequate water supply, (11) adequate gas, oil, or coal fuel supply, (12) normal sewerage facilities, (13) drainage above possible flood levels, and (14) attractiveness of area to skilled personnel

---

* Later was relocated and became the Albuquerque Operations Office (ALOO)

- 32 -

008009

US3086845

moving to the region. The most important criteria were later determined to be (1) a dry, moderate climate, (2) adequate supporting population, (3) attractive environs, and (4) ready accessibility to Los Alamos, Chicago, and St. Louis. Examination of the criteria established only three suitable locations: Denver, Pueblo, and Colorado Springs, Colorado. These were each of suitable size and had dry, moderate climates. Pueblo was dismissed as being less attractive to workers, less accessible, and as having another vital industrial operation; Colorado Springs was considered to be only minimally suitable with respect to power resources. Having selected Denver as the best locality, seven alternate plant sites were examined. Again, the criteria were applied and finally Rocky Flats and a site adjacent to the Rocky Mountain Arsenal (RMA) were chosen. The main disadvantages of the RMA site were (1) dependency on both water and power lines already serving RMA, (2) likeliness of dusty site conditions resulting from sandy soil, and (3) undesirable public reaction to another secret project "close to the civilian installations northeast of Denver and in the South Platte Valley." Final recommendation of Rocky Flats was based on:

> "a) Its terrain provides a desirable combination of a mesa and ravines.
>
> b) Its deep beds of gravel provide good foundation conditions.
>
> c) The gravel surface, its altitude above the sandy farm land to the east, and the closeness of the foothills of the Rocky Mountains provide maximum protection from wide-spread or local dust storms which would disrupt the important ventilation system.
>
> d) Water from a reservoir of the City of Denver is reasonably accessible.
>
> e) It enjoys maximum reliability of electrical power from adjacent

- 33 -

US3086846

transmission lines with multiple generating sources.

f) It is within reasonable driving distance and time of Denver,
Boulder, and Golden, over good highways with very little com-
muting traffic.

g) It is about two miles from the Denver, Rio Grande and Western
Railroad's Moffat Tunnel mainline. It would be feasible to
extend a sidetrack to the site if this should be desirable.

h) The property is the least valuable of the seven Denver sites
considered and should be obtainable for the least cost.

i) The site has the least occupancy of the seven Denver sites; only
one homestead was apparent.

j) It is remote from any industrial installation or conceivable
military target.

k) It is easily adaptable to any desired degree of plant security
control.

l) It is ideal from the viewpoint of public relations: minimum
displacement of homes, land used only for minor grazing, and
well removed from any residential area."[1]

The engineering report[1] cites only one disadvantage for Rocky Flats; namely,
that it is far (27 miles) from Stapleton Airport.

Of the information reported in the Austin engineering report[1], the
data on wind directions proves the most interesting. The report states that
the site be located on the leeward side of any dense population and further
indicates that the prevailing winds in the Denver area are from the south.
This proves to be erroneous since winds at Rocky Flats are predominately from
the west[2]. Stapleton International Airport's wind stations, on the other

3002011          - 34 -

hand, record most frequent winds from the south and southwest.[2]  In general,
then, air passing over Rocky Flats merges with air that has passed over Denver
and is dispersed to the northeast.  The Task Force strongly would emphasize
not only that Denver's population has exploded since the RFP was located and
that certain siting criteria were poorly applied, but also that no public input
went into the original siting.  (See Recommendation 3A).

B. RFP Operation:

The Rocky Flats Plant began its operations in 1953 as part of the nuclear
weapons complex administered by the Albuquerque Operations Office (ALOO) of the
AEC.[3]  Santa Fe Operations were designated as the primary development and pro-
duction organization for nuclear weapons in 1943.  Its assignment has not notably
changed through the years, being largely concerned with "research, development,
production, testing, stockpile surveillance, and transportation" of nuclear
materials.[3]

Albuquerque Operations can be divided into three areas:[3]  (1) research
and development laboratories, (2) production, and (3) other operations.  Re-
search and development are largely carried out at the Los Alamos and Sandia
Laboratories.  The Los Alamos Scientific Laboratory's (LASL) "primary mission
is research and development of explosive systems of nuclear weapons."  In
addition, basic and special research have become increasingly important to LASL
to the point where about 50% of the Laboratory's efforts are now devoted to
nonweapons programs.  These projects include thermonuclear reactions for power,
plutonium fuels development, studies of the effects of nuclear radiation on
molecular and cellular levels, biophysical and biomedical research, as well as
others.  The Sandia Laboratories are located in Albuquerque, New Mexico and
Livermore, California.  In Albuquerque, Sandia's mission has been largely

- 35 -

connected with ordnance engineering, nuclear bomb assembly, and military training although a more basic nonweapons research program is now carried out. The Sandia Livermore Laboratory is responsible for ordnance systems engineering for weapons conceived at the Lawrence Livermore Laboratory.

There are Albuquerque Operations (ALO) production facilities in Amarillo, Texas; Kansas City, Missouri; and Pinellas, Florida. Table 1 lists some of the work carried out at these facilities.

Other ALO administered operations include biomedical research and university-ERDA laboratory cooperative projects.[3]

From Table 1 we see that Rocky Flats is the primary plutonium fabrication facility for ALO. The Plant's operations were contracted to Dow Chemical until recently when, on July 1, 1975, Rockwell International, Atomics International Division, became the prime contractor. Appendix B of the contract between ERDA and Atomics International defines the scope of work as: "(1) manufacturing design and development, fabrication, and assembly of nuclear weapons components and subassemblies, (2) reimbursable work as requested or approved by the Commission, (3) reimbursable work, including development support and fabrication and assembly of special components, as delineated in work orders issued by Design Agencies or other Commission (ERDA) contractors, provided that the undertaking of such work on any particular work order requires prior Commission approval if (a) it is not consistent with the Rocky Flats Plant's mission assignments, or (b) requires the expenditure of funds for capital plant and/or equipment in excess of $50,000, (4) development work on both product and process as required to carry out the production mission, including related manufacturing research carried out as a part of the continuing long-range effort to improve production performance, (5) other work related to the mission of the Rocky Flats Plant,

- 36 -

US3086849

## TABLE 1

## ALO PRODUCTION FACILITIES AND THEIR ASSIGNMENTS[3]

| Facility | Assignments |
|---|---|
| Amarillo-Pantex Plant | fabrication of chemical explosives<br>development work in support of design laboratories<br>nuclear weapons assembly<br>nuclear weapons disassembly<br>nuclear weapons component testing<br>nuclear weapons repair |
| Kansas City-Bendix Corporation | procurement of complex electrical, electromechanical, and mechanical weapons components |
| Miamisburg-Mound Laboratory | manufacture of detonators and other explosive components for weapons<br>process and distribution of gaseous isotopes (e.g., helium-3)<br>production of plutonium-238 |
| Rocky Flats-Rockwell Atomics International | "production facility, handling nuclear materials, where fabrication, manufacturing design and development, production engineering, and related activities are performed."[3] |
| Pinellas-General Electric | development and production of neutron gathering devices<br>electronic and high vacuum technology |

- 37 -

3008014

including recovery of certain radionuclides associated with test activities; extraction and purification of radioactive isotopes for Commission laboratory or private industrial use; and reclamation of specified weapons materials in support of the nuclear weapons retirement program."[4]

The principle materials handled at the RFP are elemental plutonium and its compounds. Other materials handled (both in the elemental and compound states) are americium, beryllium, and uranium as well as large quantities of chemicals like nitric acid and carbon tetrachloride. Elemental plutonium is man-made, produced by the neutron bombardment of uranium-238.[*] The chemistry of plutonium has been well studied. Its behavior is complex due not only to its chemical properties, but also because of its high radioactivity.[5] [**] The biological effects of plutonium intake are less well studied[5] although such effects as are known will be detailed in later sections.

Plutonium and its compounds exhibit a high radiotoxicity;[***] some materials are quite pyrophoric (ignite spontaneously). As a result plutonium materials must be assiduously excluded from environmental release and handled with extreme caution. The most abundant isotope in weapons grade plutonium is plutonium-239 characterized by a half life of about 24,000 years. This means that one-half of the plutonium-239 will still be present in 24,000 years. The rest will have spontaneously decayed mostly to other radioactive materials.

Americium-241 is a radioactive decay product of plutonium-241 and is recovered at the RFP and shipped to an isotope storage and distribution center

---

* Elements followed by a dash and a number indicate which isotope of that element we are considering. The same element may have more than one mass (weight)-- these different masses are called isotopes.

** Radioactivity is the property of many chemical elements of spontaneously releasing radiant energy.

*** Radiotoxicity is the toxic property associated with the release of radiant energy.

- 38 -

US3086851

in Oak Ridge, Tennessee. Although it is present in low concentrations in RF plutonium, it is considered[6] to be a great potential hazard. We have not detailed its properties or its potential hazards in an effort to keep the report simple. In no way would we minimize the potential hazards associated with americium; we urge that every effort be made to expand our knowledge in these areas.

Plutonium, being man-made, was unknown in the environment before its invention in the early 1940's. Since then it has been produced in large quantities and released by a number of occurrences. The major incidents are indicated in Table 2.

In addition to the quantities of plutonium already released to the environment, it is to be anticipated that additional sources will surface. A number of consumer products are being or have been developed containing either plutonium or closely related materials. These include americium smoke detectors, plutonium-238 well-logging sources, plutonium-238 mineral analyzers, and plutonium-239 heart pacemakers. Finally, the burgeoning nuclear fuel industry estimates the production of at least a million pounds of plutonium by the year 2000.* The estimated annual plutonium discharges from nuclear fuel reprocessing plants in 2000 are less than 0.2 curie per year; this, of course, assumes that there are no accidental releases.[7]

Table 2 indicates that the RFP's contribution to world-wide plutonium levels is slight (3-5 curie release). We will discuss in a later section what effects such releases may have on the local environment. Table 3 outlines some of the events at RF leading to the 3-5 curie offsite release.

Details of the dispersal of the radioactivity from the RFP to the local environs have been given in our Preliminary Task Force Report.[11] To briefly

---

* Present uncertainties in the nuclear industry made this a very crude estimate.

US3086852

TABLE 2

## PLUTONIUM LEVELS FROM VARIOUS SOURCES[7,8,9]

| Source | Distribution | Amount (curies)* |
|---|---|---|
| Fallout from weapons testing | World-wide | 300,000-500,000** |
| Airborne from weapons testing | World-wide | Approx. 4,000 |
| Fallout from weapons testing | Over United States | Approx. 10,000-15,000 |
| Satellite burnup of Radioisotope Thermoelectric Generator (RTG)** | World-wide | 17,000** |
| Reentry of Apollo 13 LEM (RTG)** | Believed to be intact in ocean | 45,000 |
| Fallout from testing | Nevada Test Site | 1000 at least |
| Fallout from testing | Trinity Test Site, New Mexico | More than 1, less than 100 |
| Plutonium processing | Rocky Flats, Colorado-- offsite | 3-5 |
| Plutonium processing | Hanford, Washington-- offsite | 4 |
| Plutonium processing | Savannah River, South Carolina--offsite | 4 |
| Plutonium processing | Mound Laboratory, Ohio-- offsite | 4 |
| Strategic mission/nuclear weapons | Spain | Extensive cleanup carried out; amount is classified information |
| Strategic mission/nuclear weapons | Greenland | 25 left, after extensive cleanup |
| Purposeful waste release | by UK into the Irish Sea | 1500-2000 in sealed containers |

---

* CURIE: the basic unit of radioactivity defined as the quantity of radioactive
material giving $3.7 \times 10^{10}$ disintegrations per second. A millicurie
is $\frac{1}{1000}$ of a curie; a microcurie is $\frac{1}{1,000,000}$ of a curie.

** General weapons grade plutonium has the following approximate composition:
plutonium-238, 0.01%; plutonium-239, 93.6%; plutonium-240, 5.9%; plutonium-241,
0.4%; plutonium-242, 0.04%; americium-241, 0.02%; RTG plutonium is largely
plutonium-238.

- 40 -

3008017

US3086853

## TABLE 3

### NOTABLE EVENTS AT RF[2]

| Year(s) | Event | Radioactive Release*<br>(curie) |
|---------|-------|------------------------------|
| 1957 | Plutonium fire | 0.026 |
| 1969 | Plutonium fire | 0.00086 |
| 1959-69 | Plutonium leakage from drum storage area | 3.6 lost offsite |
| 1973 | Tritium incident | 500-2000[10] |
| 1974 | Accidental direct plutonium release of untreated air | 0.00093 |

TOTAL PLUTONIUM RELEASES 1953 to 1974 – – – – –    0.026 airborne
0.060 waterborne
0.026 fires
3-5 oil spill

* Prior to mid-1973 monitoring detected long-lived alpha emitters only. Since mid-1973 specific isotopes, such as plutonium-238, 239, and 240 have been monitored in environmental samples.

- 41 -

US3086854

review, "background" soil activities resulting largely from weapons testing (see
Table 2) range from 0.001-0.002 microcuries per square meter. Colorado's level
has been determined to be 0.0018. Accumulations in the RF area range from
0.002-200: (a) areas within the plant boundary range from 200 to 0.002 and
(b) some off-site areas (within one and one-half miles mostly due east) have
accumulations as high as 0.25 microcuries per square meter[2].*

C. Physical Layout of the RFP Site:

The area of the RF plant site is approximately 12 square miles and is
enclosed by a four-strand barbed wire stock fence.[2]

The production complex itself (security fenced area of 0.6 square mile)
is surrounded by a large buffer zone. The Omnibus Assessment claims[2] that the
buffer zone extends somewhat more to the east and southeast than in other direc-
tions thus offering "control of areas downstream and downwind of the Plant"[2]
(Figure 1). It seems clear from the figure that the Plant is not to any signifi-
cant degree better buffered to the east. Within the production complex (Figure 2)
are more than ninety structures housing the plutonium fabrication, beryllium fa-
brication**, and uranium alloy fabrication facilities as well as various waste
treatment, research, and administrative facilities.    Plutonium recovery and
process wastewater treatment facilities are under construction. A sanitary waste-
water recycle system is in the planning stages and is scheduled to be completed
in 1978. Completion of this system will give the RFP a completely self-contained
wastewater facility; except for evaporation, no wastewater should leave the
plant site.

---

* The setting and application of various standards will be discussed in
  Chapter IV, Section A.

** Beryllium is used as a neutron source in nuclear devices.

$\mathcal{Z}$008019

US3086855



Drainage Channels and Diversion Canals.

FIGURE 1.
Page 42 A

(08061)

8 008020

US3086856



ROCKY FLATS 'PLANT

Major Plant Structures. Numbers indicate building complexes. Utilities and Service facilities throughout the Plant have identification numbers in the 200 series.

700 – Plutonium Fabrication
Plutonium Assembly
Plutonium Recovery
Plutonium Waste Processing
Research and Development
Library
Administration

900 – Storage
Sewage Treatment
Holding Ponds for Treated Water
Laundry
Storm Drainage

– 800 –
Nonradioactive Metal Fabrication
Administration
Nuclear Safety
Equipment Con-tamination
Research and Development
Uranium Fabrication

600 – Warehouses
Storage
Waste Handling

400 – Administration
Steam Generator
Warehouse
Uranium Fabrication

500 – Warehouses
Storage
Loading

300 – Garage
Fire Station
Maintenance

100 – Administration
Water Treatment
Security
Medical
Health Physics

200 – Services (e.g., fences, telephone lines, evaporation ponds, parking)

(under construction) – Plutonium Recovery
(under construction) – Waste Treatment

3008021

Figure 2.
PAGE 42 B

US3086857

In this brief section we have tried to give the reader a sense of both the history and operation of the RFP, and its interrelation with other facilities. Many details will be supplied in subsequent sections as we explore the facility in more depth.

US3086858

CHAPTER III

## Hazards Associated with the Rocky Flats Plant

Introduction:

The various hazards associated with the RFP are both radioactive and
nonradioactive in nature.  In this chapter we consider these while in the
following chapter consideration is given to their control.  The radioactive
hazards are a result of the handling and fabrication of plutonium, americium,
uranium, and their compounds.  Nonradioactive hazards result from machining
and metallurigical operations on various materials including beryllium, stain-
less steel, aluminum, tantulum, titanium, tungsten, copper, cadmium, silver,
gold, lead, nickel, and graphite.  Further, large quantities of other chemicals
(e.g., nitric acid and carbon tetrachloride) are used routinely and represent
potential dangers.  We will comment almost exclusively on the radioactive hazards
at RF while indicating that the hazards resulting from the handling of other
materials have been minimized by the adoption of extensive control measures.
Our emphasis on the radioactive dangers issues from our belief that the public
has greater fear and less understanding of radioactive materials and radiation.
It should not, however, be inferred that the nonradioactive materials are less
dangerous.  A constant, thorough control operation for nonradioactive materials,
similar to that in any chemical manufacturing plant, is necessary to prevent
problems.

- 44 -

3 008023

US3086859

Much of the information reported in this and the following chapter is taken either from the Draft ERDA Omnibus Environmental Assessment of $RF^2$ or results from an extensive tour[12] of the RFP by the Task Force.

A. High Level Contamination.

(a) Previous Contamination

Table 3 in Chapter II indicates the levels of radioactive contamination caused by various events at the RFP. It is clear that during normal plant operations releases of radioactive materials to the environment are small. Several accidents have, however, resulted in larger insults to the environment. The two most serious of these are the long-term leakage of the barrel storage area resulting in about a 3.6 curie offsite plutonium waste release and an estimated 500-2000 curie tritium release in 1973. The latter resulted from tritium "mistakenly and unknowingly brought into the Plant during March, 1973 with a shipment of plutonium scrap destined for reprocessing"[2]. Both of these releases were initially reported by outside sources. Subsequently, programs were designed for either reduction or cessation of such releases.

In the case of the storage area leakage, which was only publicized when a study conducted by Martell[13] turned it up, the highly-contaminated land has been stabilized by overlaying with an asphalt pad; immediately adjacent land, still quite contaminated, but not to extremely high levels, has been stabilized by both a plant ground cover and, more recently, a soil retention blanket*[14]. Final treatment of the area to reduce radiation levels significantly will occur only after comments have been received by ERDA on a separate Environmental

---

* The soil retention blanket was made necessary by the unfortunate and questionable use of defoliants in the early summer of 1975. For further information see the introduction to the report.

- 45 -

US3086860

Assessment being prepared for cleanup of the spill.[15] The area is carefully monitored by RF and the Colorado Department of Health (CDH); the delay in the final disposition of the problem has been agreed to by both the CDH and the Task Force. Both felt that the situation in the area is and has been quite stable and that the comments on the Environmental Assessment might bring forth a superior plan for removal of the contamination. In lieu of that, the area will probably be cleaned up by removal of the contaminated soil.[16] The Task Force strongly believes that this insult to the environment was a result of poor management and decision making. That the leakage was discovered shortly after the area was used for storage, but that nothing was done about it for eight years, we find deplorable.

The tritium release began in April, 1973, was detected by the CDH shortly thereafter, and was reported to AEC-Dow on May 4, 1973.[10,17] The report was substantially ignored since the RFP claimed not to use significant quantities of tritium in any of its operations. On July 31, 1973 high levels again were reported although the CDH had some question about the validity of its tests for tritium. At another meeting at RFP on September 5, 1973 (attended again by CDH, RFP, and EPA officials) concern was again raised by the CDH, but this time the EPA decided to cross-check the Health Department results.[10] By September 14, EPA had verified the CDH's results; EPA and CDH concluded that the RFP was the only credible source of the tritium release. On September 26, AEC officials at the RFP accepted responsibility for the tritium leak. An AEC investigative report released on November 26, 1973 pieces together some of the story of the contamination. On March 19, 500-2000 curies of tritium (unknown to the RFP) arrived at the Plant from the Lawrence Livermore Laboratory. The tritium was associated with some scrap plutonium to be reprocessed. Between April 9 and 25 this scrap was chemically

9008025

treated as if it contained only scrap plutonium. As a result, no steps were taken to capture the tritium and it was lost to the liquid waste system. It has been estimated[10] that between 50-100 curies of tritium were released to waters eventually flowing into the Great Western Reservoir. Another indication of the spill comes from the CDH determinations of the tritium levels in the Broomfield water supply (these data have been routinely collected by the CDH) which peaked twice--in April and May of 1973. Following the second peak, an elevated but decreasing level of tritium remained in the water supply; it will require several years before the decreasing levels reach the natural background[10].

In contrast to the storage area leakage of plutonium wastes where measures were taken to stabilize the contaminated area, only time will bring about decontamination of the Great Western Reservoir*. The natural process of dilution of the water supply has fortunately reduced tritium concentrations in drinking water minimizing the dangers to Broomfield residents. EPA has carried out extensive calculations and estimations of the public health danger to drinkers of the Broomfield water supply. They have concluded that "any public health impact of this event is, therefore, expected to be minimal"[10]. (See Recommendation 2)

Additional releases, those of nonradioactive materials, have occurred. They resulted from cracks in the solar evaporating ponds used to concentrate liquid salt wastes. High concentrations of materials like nitrates have been released to the subsurface of the Plant site. Other potentially dangerous releases may occur through other tanks, piping, and solid waste burial sites[18]. No estimates of the extent of groundwater contamination have yet been made (see section on hydrology), but the RFP has begun[2] to monitor potentially dangerous sites of release.

---

* Although we have indicated only the release of tritium to the Great Western Reservoir, it should be clear that other radioactive materials, particularly plutonium, have been released to the Reservoir in small quantities.

- 47 -

3008026

(b) Possible Contamination Resulting from Natural Catastrophe

The possibility that a natural disaster could release high level contamination has been studied in great detail since 1951. The original study[1] as well as subsequent studies conducted for the AEC (and ERDA) have indicated that the chances of a major natural catastrophe are remote. Some criticism of this conclusion has been leveled at RF and this will be discussed subsequently. In the brief sections below we will consider both the terrain, geology, hydrology, and meteorology of the RFP, as well as the potential for various types of natural disasters.

Gross Plant Site Terrain[2]:

The Plant is located on a level, rocky bench called Rocky Flats. At an elevation of about 6,000 feet, the plant rests on a stony soil consisting largely of "gravel and cobbles intermixed with sand, silt, and clay[2]". Some huge boulders break the monotony of this semi-arid bench.

Geology:

A detailed geologic study has been prepared for the RFP by J.A. Blume and Associates[2]. Most of the details of this study are of minor consequence for this report, but some controversy has arisen.[19] This results from an argument about when the last tectonic activity took place in this region. Tectonic activity (movements of the earth's crust) is closely associated with earthquake activity. The crux of the argument is that the Blume Study[2] would minimize the possibility of significant current earthquake activity while the critics[19] suggest that the possibility of severe activity in the RF region is not remote.

- 48 -

3008027

US3086863

A detailed geologic study of the Plant site has recently been made to evaluate the area for construction of the plutonium recovery facility[2,20] (now under construction). According to ERDA[2], this facility has been maximally designed as a result of this study.

Hydrology:

Water flow through the RFP is largely from west to east. Figure 1 in Chapter II indicates the natural and man-made surface drainage in relation to the RFP. A long-range subsurface study by the U.S. Geological Survey, Water Resources Division, is in progress and should be completed by September, 1975. It appears at present that, although some information about the subsurface waters of the RFP is available, further details are essential to completely define the possibility of subsurface contamination. The results of the USGS report will, hopefully, supply the necessary information; we urge that all necessary steps be taken by the RFP to eliminate possible subsurface contamination.

Meteorology:

One of the most important cirteria for the original siting of the RFP[1] was a climate that was moderate and dry. Such is indeed the case with mean January and July temperatures of 30° F and 72° F respectively, a yearly average precipitation of about 15 inches, and an average relative humidity of 46%. Various extremes and averages of common meteorological data are presented in Table 4.

Wind direction, which is a primary concern in the dispersal of particulate contamination from the RFP, is predominately toward the east (i.e., a westerly wind). Average (17 years between 1953-1970) wind directions indicate

- 49 -



# TABLE 4

## AVERAGE AND EXTREME METEOROLOGICAL DATA

|  | Average | Extreme |
|---|---|---|
| Precipitation | About 15 inches/year | about 25 inches in 1969 |
| Humidity | 46% | 60% in 1960 |
| Temperature | 77° F average maximum | 102° F, July 12, 1971 |
|  | 22° F average minimum | -26° F, January 12, 1963 |
|  | 50° F average mean |  |
| Wind | 8.1 mph average mean wind velocity | 105 mph on four occasions |

- 50 -

3008029

that "west winds occurred 25% of the time; over 50% of the winds had a westerly component."[2]

Tornadoes:

Tornadoes of dangerous magnitude occur rarely in central Colorado. In fact, as you proceed west from the Colorado border the frequency and severity of tornadoes decreases. These were important considerations in the original siting of the plant[1]. Further, the proximity of the RFP to the mountains tempers the severity of tornadoes. There are no reported cases of tornadoes just east of the Rocky Mountains having winds in excess of 200 mph. Such winds would be 100 mph less than those characterizing some midwestern tornadoes.[2]

Earthquakes:

As a result of the controversy surrounding the geologic studies of the RF region, it is not surprising to find dispute over the possibility of a major earthquake near RF. The Draft Omnibus Assessment[2] asserts that both the historic earthquake record and the lack of recent tectonic activity mitigate against the possibility of a major quake. Matthews[19], on the other hand, states that recent seismic activity is demonstrable and that such activity is more important as a warning for future earthquakes than the historic record. Several additional sources consulted by the Task Force[20,21] indicate that the potential for a major earthquake is remote.

(c) Possible Contamination Resulting from Accidents

Fires have plagued the RFP since its beginning largely because of the pyrophoric (igniting spontaneously) nature of plutonium and some of its compounds. Fire danger is minimized by handling plutonium materials under an

- 51 -

CGt&308030

inert atmosphere of nitrogen gas containing a few percent of oxygen. In-
creasing or decreasing the amount of oxygen increases the potential for
ignition. In both the 1975 and 1969 fires plutonium was released to the
atmosphere: the earlier fire was severe enough to breach the filter systems
to the environment; the 1969 fire although very costly[*] was less severe with
atmospheric release resulting from the breaching of a room air exhaust filter
and the tracking about of plutonium by the firemen. The danger of future fires
is real, but as we will discuss, the technological advances in prevention and
containment reduce the possibility of major contamination.

The dangers of a criticality accident ("sustained nuclear chain reaction"[2])
or a nuclear excursion ("sudden, rapid rise in the power level for a massed
fissile material"[2]) are real when large quantities of pure fissionable material
are handled. Such accidents can result from close packing of such materials
with the geometry and density of material being important controlling factors.
No criticallity accident or excursion has ever been reported at the RFP. Re-
search criticality studies have been carried out; these, we are told by the RFP[22],
are carried out under precisely controlled, safe conditions.

The Task Force has worried a great deal about the possibility of a
contaminative release caused by mechanical failures or sabotage. Among the
accidents which we feel are credible are: (1) an airplane crash into the
plutonium facility at RF, (2) a transportation accident involving truck ship-
ment of weapons grade material or railway or truck shipments of various waste
materials, or, (3) various acts of terrorism or sabotage. It is impossible to
predict the probability of such accidents yet important to point out that they

---

* Approximately $26,000,000 was spent in the aftermath of the 1969 fire[2] to affect
repairs, study the causes of the fire, and institute necessary precautions
against future problems.

- 52 -

$C-3008031$

are possible and that every precaution be taken to avoid any insult to the
environment resulting from them.

## B. Low Level Contamination

The possible events just described in Section A are less likely to
release high levels of contamination than low levels and should be taken as
a signal to regard the possibility of low level contamination seriously. Low
level contamination is mysterious and subtle since, as we will soon point out,
its long-term effects on animals and man are unknown. The Task Force takes the
position that the limits to be placed on radioactive release should approach
zero as closely as can be attained at any given stage of technological advance-
ment. This is an evolutionary concept since as technology advances, releases
should more closely approach zero. The factors leading to this are basically
three: (1) that we know little or nothing about long-term radiation effects,
(2) that until we do, levels should be as low as possible, and (3) that virtu-
ally all standards set for radioactivity have had to be lowered as the effects
of the radioactivity have become better understood and as our techniques of
measurement have become more sophisticated. Our position differs from that of
ERDA who attach the proviso of economic feasibility to the lowest possible -
level at a given technological stage.

- 53 -

3008032

US3086868

## CHAPTER IV

### Control of Hazards at the Rocky Flats Plant

Introduction:

In this chapter we discuss the application of radioactive standards to the RFP and its environs as well as the measures taken at RF to secure the control of its potential hazards.

A. Radioactivity Standards:

Because of the potential danger resulting from release of radioactive materials from the RFP, an extensive monitoring program is carried out by the RFP and the CDH. Monitoring of air, water, and soil samples must be performed routinely to determine the radiation impact on the area.  Standards for air, water, and soil monitoring, as well as for occupationally exposed workers and the general public have been developed to minimize the occurrence of possibly harmful effects of exposure to radioactive materials.  Monthly meetings attended by the RFP, CDH, EPA, City of Broomfield, City and County of Boulder, Jefferson County, and interested observers are held to review monitoring data and discuss other aspects of the RFP operation.

Recommending standards for radioactive materials is a complicated task[23,24,25,26].  The greater our knowledge of the material, the better standard can be set.  Yet our knowledge is in only a rudimentary stage with respect to "correct" standards.  It is a matter of philosophical commitment[26] among the groups*

---

* The International Commission on Radiological Protection (ICRP) and the National Council on Radiation Protection and Measurements (NCRP) are the oldest and best known radiation standard recommending groups.  Both have maintained continuous studies of radiation protection problems since their inception.  In general both bodies have recommended similar radiation standards.

3008033

US3086869

who recommend standards that maximum protection be afforded those who contact radioactive substances. As a result such groups always attempt to overestimate the dangers known at the time. Nevertheless, virtually every standard recommended for radioactive materials has been reduced as more information accrued.

Standards can be divided into two classes:[23,24,25,26] (1) primary standards which are applicable to all radioactive substances and sources and (2) derived standards which refer to a specific radioactive material. One can further delineate not only between the effects of radioactive whole body and critical body organ exposure, but also between the exposure limits to the general population and to occupationally exposed workers.

Let us first consider definitions of the common basic radioactive units:

  (1) Rad: a rad (radiation absorbed dose) is a quantity of
      energy absorbed from a radioactive source; specifically,
      one rad is the amount of radiation required to cause absorp-
      tion of 100 ergs of energy per gram of absorbing target[24].

  (2) Rem: a rem is a quantity of equivalent dose; specifically,
      one rem is the quantity of any type of radiation which, when
      absorbed in man, produces an effect equivalent to the absorp-
      tion of a rad of X- or gamma radiation[23].

We must be clear on the difference between a rad and a rem. When two different types of radiation* deliver the same amount of energy to a target, different

---

\* Radioactive materials emit different types of radiation characterized by different energies and different penetrating powers. Alpha radiation, the type given off by most plutonium isotopes, is characterized by its poor penetration into targets. Beta, gamma, and X-rays penetrate deeper into targets than alpha radiation. Alpha radiation can present internal hazard to the body where the beta, gamma, and X-rays generally are considered a hazard external to the body.

3008034
CCC390
US3086870

amounts of damage may be done.  The rad allows us to express the amount of energy reaching the target; the rem gives us a way of estimating the damage done.  A dose of one rad of fast neutrons does ten times the damage of one rad of X-rays[27] (e.g., one rad of X-rays equals one rem, but one rad of fast neutrons delivers ten rems to the target.)  We can express this as follows realizing that the quality factor (QF) is the modifying factor accounting for different biological effects from equivalent energy quantities of different sources of radiation:

Dose Equivalent (in rems) = QF x Dose (in rads)

Since one of our purposes in this report is to assess the biological dangers associated with the RFP, we will be concerned only with equivalent (or rem) doses.  Also, we will primarily be concerned with alpha radiation from plutonium, americium, and/or uranium sources.  Alpha particles have QF's of ten relative to X- or gamma rays.  That is, alphas are ten times more damaging to target (biological) materials than X- or gamma rays.

A further important point is based on consideration of the target. Radiation doses can be expressed as whole body burdens or as critical organ burdens.  Various target or critical organs have different responses to alpha radiation; some are extremely sensitive while others appear practically unaffected.  To critically and properly assess burdens to various organs, a great deal of information must be known.  For instance, the quantity and distribution of the radiation must be ascertained.  In general, radiation impinging on the surface of a biological target will affect the skin while radiation reaching an internal target (either by inhalation, ingestion, or some other insult to the organism by a radiation releasing substance) will be distributed to the internal organs.  It is a prodigious task to study the distribution of radioactivity within a complex organism.  Not only are there numerous variables

- 56 -

3008935

to be studied (e.g., mode of entry of radiation, chemical form of radioactive
substance, isotopic distribution of radioactive material, etc.) but ultimately
the animal must be sacrificed and each of its organs assayed for radioactivity.
If this were accomplished with certain animals, its applicability to the human
animal would still have to be studied requiring comprehensive autopsy data on a
very large number of individuals.

With this brief discussion we hope it is clear that the recommendation
of radiation standards is exceedingly difficult. Because complete data does
not exist and since obtaining some of these data will be both difficult and
time consuming, we are faced with standards that are little more than crude
estimates of the hazard limits. This is not meant as a criticism of those who
recommend standards for they continually warn us:

> "all NCRP reports tend to contain pragmatic recommendations
> based on reasonable interpretations of available but usually in-
> complete scientific data"[26]

> "because the criteria involve value judgments on matters that
> potentially affect the welfare of future generations as well as
> of living individuals, ultimate acceptability of the criteria also
> rests with society as a whole, rather than with any member or group"[26]

To gain some perspective of the radiation doses discussed in this report,
let us consider the radiation sources that we commonly meet in everyday life.
The radiation doses arising from external sources such as cosmic radiation or
gamma and alpha rays from materials in the soil vary with location[26]. Cosmic
radiation doses are greater at higher elevations so that the Denver population
receives about 0.07 rem per year compared to a U.S. average of about 0.04 rem/year.

- 57 -

3008036

US3086872

The average terrestrial radiation dose (from naturally occurring radioactive
materials in soils and building materials) received in the U.S. is 0.06 rem
per year, but in Denver it is estimated to be 0.09 rem per year.[28]   Other
sources to be included in the total "everyday" dose are ingested food, water,
and air, and diagnostic and therapeutic medical sources.  Estimates of these
are presented in Table 5.  We estimate[26,28] that the total "everyday" exposure
received by a typical Denver resident is 0.25 rem per year compared with the
U.S. average of about 0.20 rem per year.  Thus an average Denver resident re-
ceives roughly 25% larger radiation dose than the average non-Coloradoan; in ad-
dition Colorado receives the highest external radiation dose of any state.

Primary standards of radiation dose to the whole body have been sug-
gested by NCRP[26] to not exceed 0.17 rem per year* for the general public and
5 rem per year* for occupationally exposed workers.  The Colorado Department of
Health has adopted[29] these standards; the ERDA regulations developed from ICRP
and NCRP recommendations differ only slightly from the CDH.  Other CDH and NCRP
standards are listed in Table 6.

The various critical organ burdens are estimated both from biological
models of radiation dispersal and from experiences with exposures of these
organs.  It is essential again to emphasize that the derivation of primary
standards is very crude indeed.  We assume, but are not sure, that primary
standards have been set at low enough levels.

Derived standards, those applicable to specific radioactive materials,
are even more elusive.  Table 7 lists some of the air, water, and soil standards
applicable to this report.  These standards are derived in such a way that ex-
posures of either workers or the general public to these specific radiation
sources will not exceed the primary standards listed in Table 6.  For plutonium

---

* These doses are in addition to the background ("everyday") dose.

3008037            - 58 -

US3086873

**TABLE 5**

"Everyday" Doses of Radiation[26,28]

| Source | Estimated Dose (in rem/year) |
|---|---|
| Cosmic rays | 0.04 average United States |
| | 0.075 Denver, Colorado |
| Terrestrial | 0.03 Dallas, Texas |
| | 0.09 Denver, Colorado |
| | 0.06 average United States |
| Uptake of food, air, and water | 0.025 average U.S. - Internal dose |
| Medical uses | 0.06 average United States |

- 59 -

3008038

US3086874