TABLE 6

CDH[29] and NCRP[26] Standards for Radiation Dose[*]

| | CDH (rem/year) | NCRP (rem/year) |
|---|---|---|
| Whole Body (Occupational Exposure) | 5 | 5 |
| Whole Body (general Population) | 0.17 | 0.17 |
| Skin (Occupational Exposure) | 30 | 15 |
| Hand (Occupational Exposure) | ** | 75 |
| Forearms (Occupational Exposure) | ** | 30 |
| All other tissues, organs, and organ systems (Occupationally Exposed) | - - | 15 |
| All other tissues, organs, and organ systems (General Population) | 0.17 | 0.17 |

[*] A number of more specific standards apply to workers who have large doses, are pregnant, or are younger than 18 years of age. Consult Reference 26 and/or 29.

[**] CDH combines hands, forearms, feet, and ankles together with a limit of 75 rem/year. The CDH regulations are patterned after those suggested by the Nuclear Regulatory Commission (NRC).

US3086875

3008039

TABLE 7

Derived Standards Pertinent to the RFP

| | $CDH^{29}$ | ERDA | (Units) |
|---|---|---|---|
| **Water** | | | |
| Plutonium-239 + 240 (General Population) | 1600 | 1667 | (times $10^{-9}$ microcuries per milliliter) |
| Tritium (General Population) | 1,000,000 | 1,000,000 | (times $10^{-9}$ microcuries per milliliter) |
| **Air** | | | |
| Plutonium 239 + 240 (MPBB) (Whole Body) | 0.04 | 0.04 | (microcuries) |
| Plutonium 239 + 240 (MPLB) (Lung) | 0.016 | 0.016 | (microcuries) |
| Plutonium 239 + 240 (Occupational Exposure) | 2 | 2 | (times $10^{-12}$ microcuries per milliliter) |
| Plutonium 239 + 240 (General Population) | 0.02 | 0.02 | (times $10^{-12}$ microcuries per milliliter) |
| **Soil** | | | |
| Plutonium | 2* | - - - | (disintegrations per minute per gram) |

* See discussion in Chapter VI, Section G.

- 61 -

3008040

US3086876

and other radioactive materials derivation of such standards requires a know-
ledge as yet incomplete.  The standards listed in Table 7 are, as a result, very
crudely derived.

One last comment on standards.  It is clear that allowed levels of ex-
posure for occupationally exposed workers are greater than for the public.
This is considered to be justified because of the careful monitoring control
of such workers and the required nature of their medical regimen.  Further,
many workers, ERDA, and the standard recommending groups feel that a slightly
increased risk is outweighed by the importance of the tasks occupationally ex-
posed workers are engaged in.  (See Recommendation 11 A)

## B. Industrial Safety[*]

The RFP has had an excellent record in industrial safety[*] despite its
size, complexity, and the danger of some of its operations.  The personal safety
record of the RFP employees "ranks first among major industries in Colorado."[2]

## C. Security and Safeguards

The RFP is secured by two main gates as well as complete security fencing.
Armed guards man the gates and patrol the Plant site.  An intricate security
system is evident within the site allowing only cleared people into various
areas.  A tag worn by every person onsite designates what area(s) he or she is
allowed in[12].

The Task Force, nevertheless, registers its concerns about security.
Recognizing that a great deal of publicity has recently been given to security

---

* We are distinguishing here between industrial and radiation safety.

3008041

US3086877

in various nuclear facilities and that some measures have been taken to alleviate problems, we tend to believe that anyone wanting to gain access to the RFP could.

Safeguards are perhaps best described as the measures necessary for complete inventory and protection of nuclear materials. Elaborate and, we believe, safe measures are taken for both the shipment of incoming radioactive "raw materials" and outgoing processed material. Such materials are transported in specially designed courier-attended trucks. Details about both the trucks and the actual movements of materials are difficult to obtain because of their necessarily secret nature. We are assured that every possible precaution is being taken.

On the other hand, inventory of nuclear materials within the RFP is difficult for the Task Force to assess. Extensive measures are taken to monitor work areas, waste process materials, and outgoing processed materials, yet the Task Force has no indication or expertise to determine how closely the material balance of radioactive materials is or can be kept. Again, we are concerned, largely for two reasons: (1) that various amounts of such materials might be stolen, or (2) that amounts might be accidentally dispersed. (See Recommendation 3 B)

D. Emergency Response

A system of emergency responses exists allowing reaction to numerous conceivable emergencies both on- and offsite."These include radiological, operational, natural, civil, and National disasters or emergencies."[2] Listed below are some of the local responses looked into by the Task Force:

(1) RFP Medical Department ) These both appear to the Task Force to
                                 ) be adequate in response to many emergencies.
(2) RFP Fire Department     ) We find it impossible to assess their adequacy in responding to a major accident.

US3086878

3008042

(3) St. Lukes Hospital - an agreement between the RFP and St. Lukes

provides RF with trained medical personnel

and the facilities to respond to a radiation

accident--a mock accident recently was staged

at St. Lukes.

(4) Colorado General Hospital - an agreement similar to that with

St. Lukes is pending.

There are both written and informal plans covering all types of emergencies; these have been considered in detail in the ERDA Draft Assessment[2]. Included within the response system is the Colorado Emergency Response Plan coordinated and controlled by the Colorado Department of Military Affairs with the coopera- tion of the CDH. Without detailing the cooperative efforts leading to these plans, we assert that the coordination and planning are reassuring to the Task Force. We, however, worry about the continued readiness of all the components in the system believing that extensive mock disaster training is a necessity. We hope it will be faithfully and routinely carried out. (See Recommendations 10 A-D)(14 A-D). (See Chapter VI, Section F).

E. Removal of Lip Contamination

Discussed in Chapter III, Section A

F. Purchase of Surrounding Land

The RFP is buffered from its neighbors by large expanses of Government owned land. Recently this buffer zone has been increased (see Figure 1) by the acquisition of 4,000 acres of land. This newly-acquired land will serve only as a buffer; there are no plans to expand the plant into this area[2]. (See Recommendation 9 A)

- 64 -

US3086879

G. Monitoring of Dangerous Materials

Both the RFP and the CDH extensively monitor both radioactive and non-radioactive materials.  RF monitors ambient and effluent stack air, ambient and effluent water, soil, and its workers on the Plant site; the CDH not only carries out onsite data acquisition, but has an extensive offsite program.  Table 8 lists some of the routine analyses carried out by the RFP and/or CDH.

Figures 3 and 4 indicate where air sampling is conducted.  To avoid a long discussion of the actual monitoring data, we would indicate that the CDH serves as an important watchdog of the data.  Actual values are almost always far below accepted standards.  Even at below standard levels, the CDH views any increasing trends with alarm.  The Task Force commends not only this attitude, but the harmony with which the CDH and the RFP interact.

Finally, let us consider the monitoring of the RFP workers.  Every employee wears a radiation sensitive badge capable of detecting external radiation. These badges are sensitive to all radiation types except alpha.  Radiation results are reported in rem units; no RF worker has ever exceeded his or her standard limit by any external exposure according to the RFP[2].  The Task Force has voiced concern[12] that these radiation exposures are not vigorously and meaningfully disseminated to the workers; we have been assured[31] that the new Rockwell management will vigorously pursue a radiation safety awareness program.  We are further concerned about the sensitivity of the badges and the procedures used to test the badges.

Internal exposures of workers are routinely monitored for plutonium by urine bioassay and by lung counting procedures. These analyses are somewhat complementary, the former allowing analysis from a known single occurrence and the

- 65 -

3098044

## TABLE 8

### Routine Analyses on RF Materials[2,30]

Ambient monitoring of water:

(a) Nonradioactive

dissolved oxygen
residual chlorine
fecal coliform bacteria
sulfates
chloride
cyanide
fluoride
arsenic
beryllium
chromium
selenium
zinc
nitrate
phosphate
pH
phenolics

(b) Radioactive

plutonium
uranium
americium
total alpha radiation
total beta radiation
gamma radiation
tritium
strontium

Ambient monitoring of air:

(a) Nonradioactive

beryllium

(b) Radioactive

tritium
uranium
plutonium
americium
total long-lived alpha and beta radiation

Ambient monitoring of soil:

plutonium
americium
uranium
beryllium

Effluent monitoring of water:

(a) Nonradioactive

ammonia
bacteria
chromium
beryllium
pH
phosphate
nitrate
BOD (biological oxygen demand)

(b) Radioactive

total alpha and beta radiation
tritium
strontium
plutonium
gamma radiation

Effluent monitoring of air:

(a) Nonradioactive

beryllium

(b) Radioactive

tritium
plutonium
long-lived alpha radiation
uranium

1130080415

- 66 -



HASL — Health and Safety Laboratory
D   — Colorado State Department of Health
J   — Jefferson County Department of Health

Air Samplers Operated by Independent Agencies.

FIGURE 3.



On-Site Air Sampling Stations.

FIGURE 4.
PAGE 66 A

latter from a long internal exposure. Current employees working with plutonium are on a mandatory monitoring program while former employees who have accumulated large body burdens are able to return to RF for periodic checks. Only a few former workers have returned for checks. The Task Force believes a more vigorous effort should be made to insure that such former employees are encouraged to return for checkups.

The lung counting instrumentation at RF is quite sophisticated. The Health Physics Department at RF seems to be vigorously attempting to obtain the best counters available. They are hoping shortly to have on-line a system as good as any now existing in the world--one having detection limits that are one-tenth (0.1) the maximum permissible lung burden of plutonium[12,31]. Various authorities[32] disagree strongly stating that with present technology reaching 0.25 of the MPLB would even be extremely difficult. Present instrumentation at the RFP cannot detect lung burdens of less than one maximum permissible lung burden. (See Recommendation 7 A, 7 I, and 7 J).

H. Other Safety Measures at the RFP

(a) Building Design

All buildings where plutonium materials are handled are of special design. The most important design criterion calls for containment and control of radioactive materials[2,12]. Most plutonium manipulations (all the hazardous ones) are carried out in glove boxes (containers in which dangerous materials can be manipulated under an inert atmosphere) and attached to an extensive filter system (see below). Containment is made possible by controlling the relative pressures in the corridors, the work areas, and the glove boxes: the highest pressure is in the corridors, next highest in the work areas, and the lowest in the glove boxes.

- 67 -

3008047

All pressures in these structures are less than the outside pressure. Should any of these areas suffer a breach to the environment, the natural flow of dangerous materials would be toward the glove box system. As a result the outside atmosphere should remain clean unless the filter systems fail. In two recent accidents, July 30 and 31, 1975, gloves in the plutonium recovery area glove boxes were broken. One worker in each accident received both skin and inhalation contamination. The cause of these accidents has yet to be made public. The Task Force registers its concern that even with the sophisticated design in these areas, workers still could become contaminated.

Newly planned facilities are designed to withstand major catastrophies without the possibility of dangerous releases to the atmosphere[2]. For example, the plutonium recovery facility now under construction will be able to withstand 300 mph tangential winds without damage[2]. The Task Force, however, is skeptical that the roof of such a facility could withstand a major aircraft crash. (See Recommendation 6 A, 8 B, 10 D, 11 B).

(b) Safety Features in the Buildings

The glove box areas have been fitted with water sprinkler systems to deal with the potential from spontaneous ignition of plutonium materials. In the past there has been some reluctance to fight plutonium fires with water because of the danger of a criticality accident. Experience with the 1969 fire has indicated that water is a very effective firefighter and that a critical accident is a remote possibility[33]. Also as a result of the 1969 fire smaller quantities of plutonium are allowed in production lines[33].

Very large numbers of special filters are used at RF both in individual respirators and as effluent filters in areas potentially releasing dangerous

- 68 -

US3086884      8008048

materials to the atmosphere. An extensive program at RF checks every filter to be used to determine whether it meets specifications. Banks of high efficiency particulate air (HEPA) filters are placed at the extremity of the glove box systems reducing significantly any atmospheric release. The Task Force has studied the recent literature on HEPA filters concerned about just how efficient they might be. In particular, one recent study[34] subjects HEPA filters to the flow of plutonium particles. The plutonium particle size was varied as were flow rates, numbers of HEPA filters, and types of HEPA filters. The study was somewhat limited because of technological problems; particles of very small size are at present impossible to produce although these are believed to be the extremely dangerous ones when retained in the lungs[35]. Every variation performed on the HEPA systems[34] resulted in efficiencies greater than 99.97% thus satisfying the minimum efficiency criterion imposed on HEPA filters of the types used at RF. Efforts are being made to study smaller particle sizes. The Task Force recognizes the technical problems at hand, but voices its concern that no such data are yet available. We urge that greater resources be made available to examine this problem as well as its relationship to lung burdens and disease. We further urge that studies be instituted to ascertain the nature and characteristics of the effluents which do get through the HEPA banks. (See Recommendations 11 B, D, and E).

The RFP takes great care in the storage of fissionable (usually called fissile) materials. Two concerns are important: (1) elimination of the possibility of a critical accident, and (2) elimination of the possibility of the material being stolen. "Most storage facilities are walk-in vaults in which fissile material is stored in shipping containers or in fixed positions on

- 69 -

shelves or racks."[2]  A program at RF has been initiated to store all fissile materials in storage inerted vaults and to move the material by remote control devices.  A great deal of care is evident on the part of the RFP to avoid the potential problems of storage of large quantities of fissile materials.

(c) Waste Handling

A plant the size of the RFP produces large quantities of waste of several types: (1)sanitary--liquid and solid, (2) process--liquid and solid, and (3) miscellaneous wastes.  From 1952-69 a number of sites at RF were used for disposal[2].  In these, massive quantities of depleted uranium have been buried in drums and covered with fill dirt.  Also, other large quantities of depleted uranium and small amounts of plutonium have been buried onsite.  Since 1968 approximately 0.001-0.002 curies of alpha radioactivity have been buried as sanitary sewage sludge[2].  There are at present no plans to disturb any of these sites, but the Rockwell management indicates[31] that they will review the sub-ject.  The present uncertainties with respect to subsurface water flow on the RF site suggests to the Task Force that the review should be expeditiously carried out and the decision re-evaluated through a separate EIS.  Rockwell plans no burial of wastes on the RFP site.  (See Recommendation 12 B)

Liquid wastes at the RFP are handled in several ways.  Liquids contamin-ated with plutonium are treated in a process waste treatment plant.  Here plu-tonium and "other chemical contaminants"[2] are reduced in volume and converted to solid waste for shipment to ERDA approved offsite storage areas.  Other liquids with large amounts of chemical contaminants, but low levels of radio-activity, are reduced in volume in solar evaporation ponds[2].  Salts produced on

- 70 -

US3086886

evaporation are packaged in drums and removed offsite. Since December, 1973
there has been no release of process wastewater. It is being retained in a
large holding pond awaiting completion of the new waste treatment facility.

A few words about the present transportation of solids offsite[36] are
necessary. All radioactive materials removed from the RFP are either packaged
in heavy gauge drums or large polyester-coated wooden containers. The material
to be shipped in drums is: (1) packaged in a plastic bag, (2) surrounded by a
polyethylene liner, (3) sealed within a molded polyethylene container in the
heavy gauge 55 gallon drum, (4) placed in a cargo carrier container, and (5)
loaded on a ATMX railroad car*. The wooden containers are as carefully shipped
as are wastes containing lower level radioactive wastes. All shipments of ha-
zardous materials both in and out of the Plant are controlled by regulations of
the U.S. Department of Transportation. The Plant indicates that these regulations
are strictly** adherred to and the Task Force has been impressed by the care
taken in packaging and transportation of waste materials. A note of concern,
however, is that massive quantities of waste materials leave the RFP (and other
locations) and are shipped to a temporary storage facility in Arco, Idaho. We
urge that ERDA find a permanent site of requisite size and safety. (See Recom-
mendation 8 C)

---

* The letters, if said fast enough, come out atomics (Army Transport Model Special).
  These are specially designed railroad cars for shipping explosives or radioactive
  materials.

** We have recently investigated[37] what measures the U.S. Department of Transportation
   takes to be assured that its regulations are being met. We found that at present
   these were essentially nonexistent although new legislation has been enacted to
   give the Department both more authority and resources to carry out this function.
   It was stated[37] that facilities like the RFP are in general extremely good about
   meeting the regulations.

3 008051           - 71 -

US3086887

Sanitary wastes at the RFP are of very low radioactivity and are treated completely separate from process or industrial wastes. At present sanitary wastes are treated at a sewage treatment plant, sent through a series of waste holding ponds, and finally released to Walnut Creek and the Great Western Reservoir. Plans have been made for an addition to the present sanitary waste treatment plant. Expectations are[36] that contstruction of the addition will begin in 1977 with completion toward the end of 1978. Upon completion RFP will have a completely closed wastewater system (both process and sanitary); the only loses to the environment should be through evaporation.

- 72 -

3008052

US3086888

## CHAPTER V

## Biological and Medical Aspects of Plutonium

Introduction:

The potential hazards of plutonium and its compounds have been indicated repeatedly. In this chapter we try to assess these by highlighting some of the biological research carried out with plutonium materials. As expected in such a new field, although the desire to understand the biological effects of plu- tonium materials is great, our fundamental understanding is still rudimentary. In this chapter we will be almost exclusively concerned with those plutonium materials used at RF. These include plutonium metal, plutonium oxide, and solutions of plutonium nitrate. It is essential to emphasize both that very little experimental work with plutonium materials has been carried out on human subjects and that there is always a question about the application of the results of animal studies to humans. Further we will consider almost exclusively somatic effects (changes to the body caused in the present generation) since virtually nothing is known about the genetic effects of plutonium exposure.

A. Further Information on Plutonium

(a) Alpha Radiation

We have indicated that plutonium-239 is an alpha emitter. Alpha emission radiates over a short range. Physiological effects can only occur in the im- mediate vicinity of alpha emitters. Thus only "intimate and prolonged contact with human tissues"[7] represents a hazard to health. The dangers associated with various quantities of material in such contacts is still in question though the

3008053

US3086889

raditoxicity of alpha emitters, plutonium in particular[38], is not[7,8].

### (b) Isotopes of Plutonium

Plutonium-239 is the most abundant isotope in weapons grade plutonium (about 92% by weight) and represents to the locale of RF a major potential danger*. Other isotopes, particularly plutonium-238, are also commonly in use (See Table 2 in Chapter II). Although the 238 and 239 isotopes behave very differently in biological studies, we will focus our attention on 239 studies because of their direct bearing on the RFP.

### (c) Important Plutonium Materials at the RFP

Plutonium metal, plutonium oxide, and plutonium nitrate are the most likely materials to affect the environment around the RFP. Plutonium metal, handled in large quantities at the RFP, is readily converted to plutonium oxide both by spontaneous ignition and by controlled oxidation. While the metal is perhaps best characterized by its high chemical reactivity, plutonium oxide is quite inert. Its insolubility and inertness are extremely important in bio-logical experiments as we will see. Solutions of plutonium in nitric acid give rise to what are presumed to be plutonium nitrate solutions. In this chapter we will consider experiments in which plutonium nitrate is administered because (1) large quantities of plutonium are handled in nitric acid solutions at the RFP and (2) there is a fairly high potential risk to workers exposed to such solutions.

---

* In Chapter 2, Section B, we briefly indicated that americium-241 is also a major potential danger. Although for simplicity we have not included very much information about americium in this report, again we emphasize that no one should underestimate its potential hazard.

3008054

US3086890

### (d) Plutonium Particle Sizes

Solid plutonium materials come in all sizes and shapes. It is important to understand that the sizes of plutonium materials are operationally defined with monomeric particles considered to be "very small" and polymeric considered to be "intermediate"[*] in size. Monomeric and polymeric plutonium materials entering the body are believed to be distributed differently with the monomeric particles being more evenly dispersed[39]. There is consensus that one of the potential dangers to health comes from particles of respirable size[40]. Respirable particles are quite small although their exact size remains a matter of some controversy.

### (e) The Hot Particle Theory

Not only is there controversy over what respirable particle sizes do the greatest potential damage, but also by what mode of distribution within lungs the greatest potential damage can occur. Basically there are those[23] who are concerned that hot particles lodge in lung tissue and irradiate surrounding tissue at a greater rate causing a more serious potential for damage. On the other hand there are those who believe that inhaled plutonium particles can be thought to be fairly evenly distributed in lung tissues averaging out the potential for damage by lowering the rate of irradiation at any point[39]. These researchers state[39] that particles are surely not evenly distributed, but that the assumption of uniform distribution allows a better estimate of allowable lung burden standards then does the hot particle notion. Finally, it has been suggested[41] that the hot particle notion may be altogether misleading and that

---

[*] Particles of diameters less than 0.01 micrometer (millionth of a meter) are sometimes called monomeric; polymeric refers to particles between 0.01 and 1 micrometer.[40]

3008955                    - 75 -

US3086891

a more even distribution of particles in lung tissue may represent the greatest potential danger. The Task Force feels it is important that the public understand how controversial this area of study is; we feel a great deal of study will be required (1) to fully understand the distribution of plutonium materials in the lungs and tissues of exposed people, and (2) to with certainty set radiation standards for lung burdens.

(f) Threshold Limits to Radiation Danger

There has always been the question of whether with various types of radiation there is a threshold limit below which such radiation causes no damage[26]. The complications arising from any attempt to study the existence of a threshold limits are staggering to imagine and it has been assumed, for the sake of erring on the conservative, safe side, that no such limit exists. Basically those who develop radiation standards assume that any radiation, no matter how seemingly insignificant, is capable of causing damage. The standards produced assess the possible risks from radiation. In this chapter we will try to indicate some of the biological phenomena potentially causing damage.

B. Environmental Pathways of Plutonium to Man

There are several ways that plutonium materials can ultimately reach man:

Release of plutonium materials to air

(1) direct inhalation by man

(2) inhalation by animals who are food sources of man

(3) settling to soil, uptake by plants, and dispersal directly to man or to animals and then to man

- 76 -

3008056

W30860

US3086892

(4) settling to water, direct uptake by man or by animals and then to man

(5) settling to water, uptake by aquatic animals or plants and dispersal directly to man or to animals and then to man

Release of plutonium materials to water

(1) direct uptake by man or animals and then to man

(2) uptake by aquatic animals or plants and dispersal directly to man or to animals and then to man.

We will see in Section D that different routes of uptake by man (inhalation, ingestion, etc.) can lead to differing distributions of plutonium in the human body. There is a remarkable paucity of information on the various pathways of plutonium materials to man; we will indicate some of the information that is known with the admonition that most of what we say results from single studies of various subjects.

The concentrations of various radioactive materials (plutonium, uranium, tritium, strontium, and americium) have been measured in cattle grazing near the RFP[42]. Plutonium concentrations in both the lungs and the tracheo-bronchial lymph nodes of these cattle were elevated, comparable to the concentrations of cattle herds grazing near the Nevada Test Site. It was further determined[42] that some fraction of their exposure was attributable to inhalation of plutonium materials. We should note that the cattle grazed only half of the year on the land near the RFP and, as a result, levels in these cattle are not comparable to those on the Nevada Test Site. EPA figures[42] suggest that if a human were to ingest about a pound per day of these cattle for fifty years, his total radiation dose from this diet would be 0.02 rem. They imply that this is a very small fraction

-77-

2008957

US3086893

of the dose received over this period of time from other sources in the Denver area. Other animal studies[7] indicate that animal uptake from plutonium bearing plants is about 0.00001 percent of the amount of plutonium in the plant.

Studies[2] carried out in the laboratory to measure uptake by plants from plutonium containing soils indicate that an average of about 0.00001 percent of the radioactivity is taken up by the plants. There is some indication[2] that plants do not uniformly take up plutonium with time, but may have increased uptake after two years of exposure. Experiments at RF in which actual field measurements are to be made have only recently begun[2]. There are recent indications that uptake by plants may be great under some conditions[35]. Further study is certainly required.

One of the critical problems yet to be fully understood is how much plutonium which has settled into soil is resuspended in air in respirable form. The problem is a difficult one since many factors control resuspension. For example, newly deposited material is more readily resuspended than older material. The size of deposited material, the size of the soil particles, the composition of the deposited materials, the composition of the soil--all of these are important factors, yet ones that are difficult to study. Efforts[2] are being made by the RFP to study these factors at least with respect to the RF environs. The Task Force feels that such studies should proceed rapidly so that a more basic understanding of the potential threats to health can be made.

On a more global scale some very preliminary studies[7] of plutonium concentrations in marine environments suggest that plutonium concentrations may be high near shore. This is contrary to what one might have thought; namely, that plutonium would be widely distributed and diluted in oceans. Other indications

CImmmm3008058

US3086894

are[7] that plutonium materials in marine sediments may be resuspended and that marine plants and animals can concentrate plutonium materials.

Perhaps the most important question we can address in this section is how likely is it that significant quantities of radiation can reach man through the food chain. Some estimates[2] would allow 0.001 percent transfer of plant activity to an animal gastrointestinal tract and a 0.001 percent transfer of activity to the human gastrointestinal tract by ingestion of the animal. It is clear that the food chain route of plant to man just described represents an enormous dilution of radioactivity. If initial soil levels are low it seems that the dangers to man are minimal. Nevertheless, we reiterate that levels must be kept low and that any dose to man is biologically undesirable.

C. Animal Studies with Plutonium

(a) Types of Animals

A variety of animals have been used in the biological studies of plutonium materials. Among these are several types of rodents, rabbits, pigs, and dogs. The majority of studies have been carried out with either rodents or dogs, but for the purposes of this report, we will be concerned mainly with the dog experiments. This is because they more closely parallel what we know about human subjects than do the rodent studies[39].

(b) Administration of Doses* and Dose Size

There are several pathways by which plutonium materials can enter an

---

\* It should be clear that in this chapter the word dose is used in the medical sense. That is, it is the administration of a material not a radiation dose.


3008059

US3086895

experimental animal:

      (1) ingestion

      (2) inhalation

      (3) intravenous injection

      (4) introduction into surface wounds

To fully understand an experimental animal system, a complete analysis of the distribution of plutonium for each mode of entry is essential. As well, we must understand how rapidly plutonium material is translocated and eliminated from the animal. This requires a great deal of effort and is fraught with difficulties.

In general we can say that (1) plutonium materials that are soluble (e.g., plutonium nitrate) are more easily and rapidly translocated than highly insoluble compounds[39,41] (e.g., plutonium oxide) and (2) very small insoluble particles tend to behave like soluble ones in that they more rapidly move within the animal systems[41].

We also indicate that, in general, dose sizes in animal studies have been large[39,41] giving demonstrable effects, but ones which, perhaps, are not comparable to the effects to be expected from exposures at or near the RFP. Only recently have long-range experiments on beagles experiencing low level radiation doses been started[41].

(c) Distribution of Plutonium Material in Animal Studies

Only limited studies on the ingestion of plutonium materials in animals other than rats have been carried out. Nevertheless, it seems clear that only relatively small amounts are absorbed by the gastrointestinal tract; soluble



US3086896

materials are more readily absorbed than insoluble ones; young animals absorb more plutonium materials than mature ones. Materials absorbed by the gastro-intestinal tract are ultimately deposited primarily in bone and to a lesser extent in liver, endocrine glands, and gonads. [39] * Material not absorbed is largely excreted.

Studies on the inhalation of plutonium materials have been numerous undoubtedly because this is the most likely mode of entry into humans. In a very general way, we can say that inhaled plutonium materials can suffer either, or both, of two fates. [41] The first possibility is that the plutonium material will be deposited in the ciliated** portion of the respiratory system and relatively quickly brought up to the throat where it is swallowed and then distributed much as plutonium materials that have been ingested. Deep penetration into the non-ciliated portions of the lungs is the other fate of plutonium particles [41]. In such penetrations, there are several routes [41] by which plutonium materials can be cleared: (1) transport by specialized "engulfing cells" back through the lungs and throat where it is largely ingested (2) transport into the lymphatic drainage system of the lungs and ultimately to other organs, and (3) solubilization of plutonium materials and transfer to the blood.

The most significant point about the clearance routes discussed is that they are slow. Each ultimately transports plutonium materials to other organs with relatively small amounts being excreted. The actual details of the beagle lung studies [39,41] which have led to the above generalizations are beyond the

---

* A very recent review of gonad concentrations in man and animals has been published. C. R. Richmond and R. L. Thomas, Health Physics, 29, 241 (1975).

** Cilia are hairlike appendages on certain cell surfaces capable of a vibrating movement which tends to translocate materials past the cell surface.

scope of our report; it should be pointed out that many factors such as plutonium particle size and composition are important in the final distribution of material in the lung. It is clear that inhalation captures plutonium materials both efficiently and for a very long time. The dangers associated with this behavior are discussed in section (d).

Intravenous injection of plutonium nitrate solutions[39,41] indicates that about 90 percent of the plutonium becomes bound to a blood protein which transfers iron. Transfer of plutonium occurs largely to the bone or liver. Depending on the concentration of plutonium solutions (containing either mono- or polymeric plutonium), researchers have seen either very rapid or slow removal of plutonium from the blood. In either case, liver and bone and to a lesser extent spleen and bone marrow are the critical organs for deposition.

Plutonium nitrate deposited in wounds is readily absorbed and transported largely to bone with some liver deposition. Neither plutonium metal nor oxide are readily absorbed. Some experiments with beagles indicate that accumulations in the lymph system occur[39]. The studies of wounds have little relevance to the RFP simply because workers who have plutonium deposited in wounds are treated rapidly by decontamination procedures. Absorption and transport of material from the wound site are minimized (if not eliminated) by these procedures.

(d) Pathology in Animals

Pathology is the science concerned with the study of all aspects of disease. In this section we will attempt to indicate what manifestations of disease are caused by the various distributions of plutonium materials just described. We emphasize that these are what have been seen in animal studies and that, in most cases, we don't know yet whether similar manifestations

- 82 -

3008062

US3086898

occur in humans.

Blood[39,41]:

Rather large doses of plutonium materials (either by injection or inhalation) cause reduction of the numbers of white blood cells within a few weeks. No leukemias have been reported in dog experiments although in rat populations leukemias have been noted. There appear to be only minor effects in the blood because of the fairly rapid removal of plutonium materials.

Bone[39,41]:

Malignant tumors in the bones of dogs have been reported with a wide variety of plutonium materials administered by different methods. Extensive work with dogs over many years has produced risk estimates. These are estimates of the probability of tumor occurrence in animals which have received a certain dose. Because the doses these animals received are in excess of what humans might be exposed to, we feel these studies are of limited value. On the other hand, the value of animal studies rests in their use as warning devices for potential threats to human health. We expect that the low radiation level long-term dog studies now in progress will be more applicable to humans. Finally, we note that massive doses of plutonium compounds administered intravenously cause severe skeletal damages producing high incidence of bone fractures in dogs.

Liver[39,41]:

Only quite limited information exists on liver tumors in dogs. These develop after long periods of time (longer than bone tumors) causing little life shortening in the dogs studied; again, the doses were high. Other changes in liver tissues were detected in shorter times when lower level doses were

- 83 -

US3086899

administered.

### Lung[39,41]:

Acute lung effects in dogs have been observed from single large doses. Severe inflammatory reactions, edema, hemorrhage, and usually death, occur within a few days. Lower doses cause fibrosis, the formation of a fibrous tissue in the lung, producing reduced lung function. Prolonged reduced lung function can cause lung insufficiency and associated heart failure in dogs. Long-term studies with beagles experiencing even lower doses* produced a high incidence of lung cancer. The types of cancer found in dogs are in the peripheral region of the lung in contrast with most lung cancers found in man which are frequently located in primary and segmented bronchi. Some concern has been voiced[39] that the levels at which some of these effects have been seen in beagles are only 100 fold higher than the human maximum permissible lung burden (MPLB). The most worrysome feature of this is that no data are yet reported on beagles at the MPLB levels.

### Lymph Nodes[39,41]:

Some dogs inhaling plutonium oxide sprays (aerosols) develop thoracic lymph node malignancies. These are secondary to lung tumors in each case studied. Although the lymph nodes have received a higher radiation dose than the lungs, the primary malignancies developed in lungs. Again, radiation levels are fairly high and expectations are that the low level studies in progress will complement the data already accumulated.

---

* The three respective doses indicated were: (1) greater than 0.5 microcuries per kilogram of lung, (2) 0.1 microcuries per kilogram of lung, and (3) less than 0.5 microcuries per kilogram of lung.

3008064

US3086900

Studies in which plutonium oxide is implanted in the forepaws of beagles show that the plutonium is transported to the cervical and auxilliary lymph nodes. No evidence exists, however, that such treatment is detrimental to the dogs.

Gonads[41,42]

All of the pathological effects just described are ones affecting the exposed subject (somatic effect). It is a matter of some concern to know what effect plutonium exposures will have on succeeding generations (genetic effect). Plutonium is deposited in the gonads of dogs, cattle, and humans. The Task Force believes too little definitive information is available and believes additional study is essential.

D. Human Studies with Plutonium

(a) Subjects[39,41]

Human subjects exposed to alpha radiation fall into several groups: (1) the general world population experiencing nuclear fallout (2) uranium miners experiencing radon and its decay products, and (3) occupationally exposed workers like those at the RFP.

Each of these groups is difficult to study. The world population not only experiences internal radiation from fallout, but receives other "background" radiation from sources like medical X-rays, cosmic radiation, and building materials. To sort out the effects of these sources and to attribute these to specific radiations would be exceedingly difficult. The best that can be done is to treat the population statistically and to estimate from other knowledge the risks to the general population. Uranium miners experience not only world-wide fallout, but exposure to alpha and gamma radiation from their mining environment. Studies

- 85 -

3008005

of the effect of alpha radiation on uranium workers are complicated because they inhale rock dust, diesel engine exhaust, and other materials as well. Occupationally exposed workers like those at the RFP experience fallout as well as the radiation exposures from their work. Such exposures are normally of fairly low levels although some individuals have experienced more serious exposures through accidents. In this section, we will deal mostly with occupationally exposed workers exposed above normal[*] levels. It is essential to recognize not only that thorough studies are lacking for workers exposed at normal[*] levels, but also that should such a study be started it will have to be of long duration and great expense to properly assess the dangers of exposure to the normal levels of alpha radiation experienced by radiation workers.

Only rarely[39] have humans been used in studies to assess the biological effects of plutonium. When such has been the practice, the subjects have been seriously ill patients. Attempts have been made to use occupationally exposed workers as study subjects, but these are often fraught with difficulties unless some good measure of the dose and its composition can be made.

(b) Distribution of Plutonium Materials in Humans[39,41]

While direct ingestion of plutonium materials is not a probable mode of entry in humans, the ingestion of contaminated food represents a potential hazard. Estimates of absorption in the gastrointestinal tract in humans derive from animal experiments and indicate very low absorptions.

---

* By normal we mean levels of radiation exposure experienced by workers in a well controlled working situation. Above normal levels are those associated with increased exposures resulting from accidents.

$S 002008

US3086902

Accidents involving workers can result in inhalation exposures. Some of these exposures have been to plutonium oxide and seem to suggest that humans can more rapidly clear plutonium from their lungs than dogs. This more rapid clearance should not disguise two important points: (1) lung retention times are still quite long, and (2) translocation of plutonium from the lungs leads to its deposition in other organs.

Plutonium nitrate and citrate, the latter a soluble compound, have been injected into humans. The nitrate was injected beneath the skin (simulating a wound) and relatively rapidly absorbed from the injection site. Within four hours, 3½ percent absorption had occurred.

Intravenous injection of the citrate results in rapid clearance of most of the plutonium from the blood. Yet, after as long as twenty days, there is still as much as one percent plutonium citrate circulating in the blood. The rapid clearance suggests that any therapy for that fraction of plutonium reaching the blood from an accidental exposure must be immediate to insure that deposition in various organs is minimized. Organ depositions from intravenous citrate injections are as follows: bone, 66 percent; liver, 23 percent; spleen, 0.4 percent; and kidney, 0.4 percent.

Little plutonium is absorbed through the skin in cases where there are no wounds. One accident occurring under conditions favorable to skin absorption resulted in only a 1/100 percent uptake.

Direct measurements of retention of plutonium in various organs have not been made, but estimates derived from excretion studies of terminally ill patients suggest that only half of injected plutonium would be excreted in two hundred years. Additional data beginning to accumulate from occupationally exposed autopsy specimens indicate large lung, liver, bone, and lymph node depositions.

- 87 -

US3086903

## (c) Pathology in Humans[39,41]

According to many groups "no cancers or detrimental biological effects"[41] have been found in humans as a result of plutonium exposures. Several important points need to be made in this regard. Most important is that experimentation must be accelerated. The various animal studies alert us to potentially serious problems. Further details on animals are essential as are long-range studies of occupationally exposed workers. Only a large study of long duration will be able to sort out the effects of long-term exposure to low level radiation. The Task Force feels that effects may be uncovered and takes seriously indeed its responsibility to urge that resources be quickly forthcoming to initiate studies of sufficient scope and design. (See Recommendation 5).

## (d) Risk Estimates in Humans[43,44,45,46]

The concern just expressed results from our examination of risk estimates to humans subjected to radiation. The BEIR report[43] and scientists including Gofman[44] and Cohen[45] have outlined in detail the estimated effects, both somatic and genetic, on populations exposed to low level radiation. The effects estimated by different groups[43,44,45] vary widely since there are at the present time many uncertainties in the data used for such estimates. Although it is impossible to decide which is the most accurate, each estimate indicates that there are risks to low level exposure to radiation. In addition to these more general estimates the Task Force sought[46] information which could be applied to the RFP. These estimates, supplied by A. J. Hazle of the CDH, are based on air and water monitoring data for areas in close proximity to the RFP. The air data measurements of plutonium resuspended from plutonium contaminated soil can be converted into risk estimates. The method used[46] is a reasonable conservative one and has been reviewed by both the EPA and ERDA. In essence risk estimates are provided

US3086904

- 88 -

≈008068

for a population living for 70 years on soil contaminated at the CDH soil standard. An excess of approximately 2 individuals per 1,000,000 persons are estimated to die from such exposure (this compares with about 500,000 people who would die from all causes and about 3,000 deaths from exposure to natural background radiation). Similarly estimates of genetic effects caused by such plutonium contamination in soil are less than those to be expected from background radiation. The Task Force also received estimates of the effects of known concentrations of plutonium in the Broomfield water supply (the tritium concentrations are too low to produce any significant risk). These indicate that less than 1 individual per 1,000,000 might die from such exposure. Although it may appear that the numbers resulting from the RFP emissions are insignificant, the Task Force takes the position that any excess above the already elevated Colorado background is undesirable. We commend the efforts at the RFP to reduce emissions to as close to zero as is technically and economically feasible. Yet we urge that every effort be made to advance technology as rapidly as possible indicating that economic factors be given less emphasis when the potential for health damage exists.

(e) Medical Treatment for Plutonium Contamination[39,41]

There are three main procedures for removal of plutonium contamination in humans. The first, excision, is effective with wound contamination. Injection or infusion of agents that complex plutonium has proven fairly effective when contamination is plasma-born and recent. Such treatments remove some newly deposited plutonium in bone and liver. The key to this treatment is speed; it proves to be largely ineffective for plutonium depositions of long standing. Finally, the technique of lung lavage (washing), although quite dangerous, has been used in one case of massive inhalation burden. Only 13 percent of the

- 89 -

US3086905

initial lung burden was removed even though experiments with dogs remove about 50 percent of inhaled plutonium oxide.

3008070

US3086906

## CHAPTER VI

### Impact of the RFP on Its Workers and the Residents of Colorado

Introduction:

In some respects this chapter is a catch-all gathering together certain
important aspects of the RFP either treated too superficially or not at all in
earlier chapters. The intention is to discuss various alternatives that both
workers and the citizens of Colorado have to react to any unfavorable impact
on them from the RFP. We will briefly review not only the contractual agree-
ments now in effect at RFP, but also legislation and other important information
about the RFP.

A. The Rockwell-AEC Contract

The contract for the operation of the RFP between the Rockwell Interna-
tional Corporation and the U.S. Government acting through the AEC (now ERDA)
became effective on June 30, 1975. Details have been discussed in our preliminary
report, so we will only highlight certain aspects here. The contract defines the
scope of Rockwell's work as well as its obligations with respect to the health
and safety of the RFP workers. The Task Force has raised the question of whether
Rockwell has any specifically designated obligations different from those of its
predecessor. The term of the contract is five and one-half years with a somewhat
flexible fee to be paid to Rockwell depending both upon the nature of the work
pursued and various impact costs. It seems important to point out that the RFP

3002071

- 91 -

US3086907

can hardly be viewed as a normal business--its product is not marketable and its costs are not within the realm we normally use when considering normal business ventures.    As a result, the Task Force has taken the approach (several times in this report) that expense is secondary to either the necessity of resolving a specific question or providing some special protection.  It is our view that this "extraordinary business" controls its own technology and that expenses are not measurable in ordinary economic terms.  Application of the "nuclear deterrent philosophy" incurs tremendous expense; the Task Force hopes the public understands this but in addition takes the position that extraordinary efforts can be made to solve problems associated with the health and safety of the RFP workers and the residents of Colorado.

The Task Force in its preliminary report indicated that the Rockwell contract did not specifically provide for the preservation of individual worker's occupational radiation exposure records.  We have been assured by Rockwell[31] that (1) such records are and will continue to be preserved, (2) will be disseminated to the individual workers, and (3) will be available, altered only to preserve confidentiality, for research workers.  (See Recommendation 7 B, C).

B. Dow Chemical Company-United Steelworkers Agreement

Rockwell International and the United Steelworkers have very recently signed a new labor agreement.  Our comments on the labor contract are based on the last Dow-United Steelworkers Agreement[47] since the new agreement is not yet available.  There are, however, no substantial changes in the new contract in those areas we will comment on.[48]  The contract covers all "hourly-paid production and maintenance employees"[47] at the RFP.  Since a complete appraisal of the labor agreement is beyond the scope of the Task Force's duties, we will

- 92 -

3008072

US3086908

comment only on the health and safety aspects of the agreement. The contract provides that (1) the Company (Rockwell) must supply all the protective clothing and equipment necessary for the health and safety of employees, (2) medical examinations be mandatory for hiring purposes and upon termination and required during employment in those areas indicated by the Company, (3) upon written request an employee may receive his occupational radiation exposure record, (4) any employee who exceeds the radiation exposure limits will be immediately notified, (5) any terminated employee will receive a written summary of his radiation exposure upon his written request, and (6) that a Joint Safety Committee (Company and Union) supervise not only safety inspections and safety meetings, but also deal with grievance problems related to health and safety.

C. Price-Anderson Amendments (1954) to the Atomic Energy Act

Our preliminary report discusses the Price-Anderson amendments in detail. Only a few comments seem necessary. The amendments provide in part that the U.S. Government agrees to indemnify its contractors in the event of a nuclear accident (up to $500 million). Such provision applies only to offsite injuries or property damage. There is some question about defining nuclear accidents since at present the determination of whether to label an accident as a nuclear incident or an extraordinary nuclear occurrence rests with the AEC (presumably both ERDA and the Nuclear Regulatory Commission). The statute of limitation on a claim resulting from a nuclear accident is ten years. Although by the standards of most accident cases this is a very liberal limit, the Task Force notes that somatic effects of radiation exposure may not show up for twenty to thirty years or longer. (See Recommendation 13 B)

$2008073$

US3086909

D. Colorado Radiation Control Act, Colorado Revised Statute (CRS)(1973), 25-11

This statute defines the powers of the Governor and the Colorado Department of Health in dealing with the hazards of radiation. These are detailed in the preliminary report. Perhaps the most important point we should make is that the CDH in a 1975 amendment to this 1973 CRS is no longer specifically barred from entering Federal facilities. It is not clear whether this amendment really gives the CDH any power since it has yet to be used. Although the relationship between the RFP and the CDH is a harmonious one, the CDH still enters and leaves the RFP only with the approval of management. The Task Force voices concern believing that in the best interests of the citizens of Colorado, Rockwell should be required by ERDA through its contract to allow the CDH to carry out onsite inspections. Such inspections should be in those areas where the CDH has jurisdiction in non-Federal facilities. (See Recommendation 15 A).

E. Colorado Occupational Disease Act, Colorado Revised Statute (1973), 8-60-111

The Colorado Occupational Disease Act takes into account the possibility that effects of radiation exposure may not surface for many years. As a result, workers or their families are protected and may file claims up to three years after the commencement of disability or death. (See Recommendation 5 F).

F. Colorado Disaster Emergency Services Act, Colorado Revised Statute (1973), 28-2-101 to 405

Two of the expressed purposes of the Colorado Disaster Emergency Services Act are (1) reducing "vulnerability of people and communities of this State to damage, injury, and loss of life and property resulting from natural or manmade catastrophies, civil disturbance, or hostile military or paramilitary action," and (2) authorizing and providing for "cooperation in disaster prevention,

- 94 -

US3086910

3008074

preparedness, response, and recovery." The Act creates a Division of Disaster
Emergency Services within the Department of Military Affairs (DMA) responsible
for creating and coordinating disaster response. An agreement between the DMA
and the CDH concerning emergency response to radiation disasters is to be signed
shortly.[49]  The Governor, in 28-2-110, is given the power to "consider steps
that could be taken on a continuing basis to prevent or reduce the harmful
consequences of disasters." The Governor's powers to prevent a disaster con-
ceivably could be stretched to allow control of some operations at the RFP.

G. Land Use, Zoning, and Building Requirements

The RFP has purchased additional buffer land as earlier described. The
Task Force has examined the question of what other measures could be taken
(1) to further buffer the RFP from its environs and (2) protect any nearby
residents from potential health hazards.

The State regulation pertaining to radiation control was amended in 1973[50]
to include plutonium contamination in soil. The amendment indicates that plu-
tonium contaminations in excess of 2.0 disintegrations per minute per gram
(0.01 microcuries per square meter) present "a sufficient hazard to the public
health to require the utilization of special techniques of construction upon
property so contaminated." Upon request the CDH will evaluate proposed control
techniques.[50] This amendment points out the potential for danger without as-
signing any real regulatory power.  The CDH does not have to be notified when
someone builds on land contaminated above the 2.0 level. Luckily only small
portions of land in the RF area exceed this level; until now these have not been
particularly attractive to commercial enterprise. The Task Force urges that
this land be purchased by ERDA or somehow decontaminated.

- 95 -

3008975

US3086911

The potential for further soil contamination exists in the RF area. The Division of Disaster Emergency Services, in CRS 28-2-110(3), is authorized to recommend to the Governor any necessary changes in existing zoning, land use regulations, or building requirements.[51] Such recommendations must be based on evidence that a disaster of catastrophic proportions could occur without adequate warning. The Governor may not only recommend changes to the appropriate agencies or local governments, but also initiate legislative action. The Task Force has examined other measures that might control land use near the RFP (e.g., condemnation, rezoning, etc.) and has recommended that measures be taken to insure better control of land use surrounding the RFP. (See Recommendation 9 A-C).

## H. Further Medical Considerations

The Task Force has taken a strong position on the need for a comprehensive study of the effects of low level radiation. We wish to point out that not only the workers at the RFP, but also workers at other nuclear facilities, nearby residents, their animals, and the local ecology must be included in the study. (See Recommendation 5).

## I. The Transuranium Registry

The Transuranium Registry was established for the AEC to provide a central body for the accumulation and evaluation of data on the long-term uptake, distribution, and retention of plutonium (and other transuranic elements) in exposed workers. There has been poor cooperation between the Registry and workers; as a result only minimal autopsy data have been collected. The Task Force believes strongly that reorganization of the Registry is necessary to insure better participation in the program. (See Recommendation 5 A-C, 7 G).

US3086912

3008076

J. Environmental Impact Statements (EIS)

Rockwell and ERDA have assured[22,31] the Task Force that no major actions can be undertaken at the RFP without the submission of an Environmental Impact Statement. Such assurances resulted from the Task Force's concerns about (1) the removal of the contaminated lip area, (2) the possibility of reprocessing spent fuel from nuclear power reactors, and (3) the potential for new secret work at the RFP. We strongly endorse the requirement that an EIS be submitted for all contemplated changes at the RFP. We, in addition, urge both the public and those who can expertly comment on specific EIS statements to examine these carefully and comment accordingly. (See Recommendation 12 B).

K. Nuclear Facilities Liability Act

During the 50th General Assembly (1975) the State of Colorado Legislature, House Bill 1488, a nuclear facilities liability act, was introduced. This Bill (see Appendix C for reproduction of 1488) passed in the House and was defeated in the Senate. The intent of the Bill was to better define the liabilities of nuclear facilities with regard to the public. The Task Force has voiced its concern that various other laws defining the RFP's liability may not provide adequate protection to the public. It believes that a Bill like House Bill 1488 represents a start at rectifying this situation. (See Recommendation 13C).

- 97 -

3008077

US3086913

## References

1. "Engineering Survey and Report for Atomic Energy Commission on Location and Site for Project Apple," by the Austin Company, March 27, 1951.

2. "Draft Omnibus Environmental Assessment for the Rocky Flats Plant of the U.S. Energy Research and Development Administration," May, 1975.

3. "The Story of Albuquerque Operations," Information Division, U.S. Atomic Energy Commission, 1973.

4. Contract between United States Atomic Energy Commission and Rockwell International Corporation, Contract #AT(29-2)-3533, Effective Date June 30, 1975.

5. G. M. Matlack, "The Chemistry of Plutonium in Relation to its Behavior in Biological and Environmental Systems," from Plutonium Information Meeting, January 4-5, 1974, Los Alamos, New Mexico, Published by Technical Information Center, Office of Information Services, U.S. AEC, December, 1974.

6. Paul B. Smith, Region VIII Representative, Radiation Program, U.S. Environmental Protection Agency, Mr. Smith expressed his concerns about americium in "Review of the Lamm-Wirth Task Force Preliminary Report," submitted March 10, 1975.

7. "Plutonium: Statement of the Problem," Office of Radiation Programs, U.S. Environmental Protection Agency, December, 1974.

8. E. P. Hardy, Jr. in "Plutonium and Other Transuranium Elements: Sources, Environmental Distribution, and Biomedical Effects," U. S. AEC, December, 1974, Page 115.

9. M. E. Wrenn in "Plutonium and Other Transuranium Elements: Sources, Environmental Distribution, and Biomedical Effects," U.S. AEC, December, 1974, Page 89.

10. "Investigative Report of the 1973 Tritium Release at the Rocky Flats Plant in Golden, Colorado," Radiation/Noise Control Branch, Hazardous Materials Control Division, U.S. Environmental Protection Agency, July, 1975.

11. "Lamm-Wirth Task Force on Rocky Flats Preliminary Report," February, 1975, corrected August, 1975.

12. The Lamm-Wirth Rocky Flats Task Force toured the Rocky Flats Plant on July 8, 1975.

13. S. E. Poet and E. A. Martell, Health Physics, 23, 537 (1972)

14. Personal communication with Mr. D. D. Hornbacker, RFP, on or about July 21, 1975.

15. Letter to Dr. James Liverman, Division of Biological and Environmental Research, U.S. ERDA, from R. D. Siek, Assistant Director, CDH, and Chairman, Lamm-Wirth Task Force on Rocky Flats, August 20, 1975.

C 3008078

US3086914

16. Review of the U.S. ERDA document entitled, "Environmental Assessment for the Removal of Contaminated Soil at the Rocky Flats Plant of the U.S. Energy Research and Development Administration - DRAFT," February 14, 1975, review by Bert Crist, CDH, supplied to Lamm-Wirth Task Force.

17. Letter to B. W. Colston, Area Manager, U.S. AEC, Rocky Flats Operation, from R. D. Siek, a letter describing the proper chronology of the tritium events, December 20, 1973.

18. Conclusions and Recommendations from, "An Engineering Study for Water Control and Recycle," by Engineering-Science, Inc., supplied to the Task Force by RFP on July 1, 1975.

19. Detailed comments have been submitted to the Task Force from Professor Vincent Matthews, University of Northern Colorado.

20. Dr. K. Medearis, "A Review of the Seismic Design Criteria for the Rocky Flats Plutonium Recovery and Waste Treatment Facility," June, 1974, contracted by U.S. AEC and supplied to the Task Force on August 4, 1975.

21. Dr. Carl Kisslinger, Director, Cooperative Institute for Research in Environmental Sciences, University of Colorado, reviewed the geology and earthquake sections of Reference #2, comments on July 23, 1975.

22. Task Force meeting at the CDH, June 9, 1975, attended by Mr. Earl Bean, Assistant Area Manager for Operations, RFP-ERDA.

23. A. R. Tamplin and T.B. Cochran, "A Report on the Inadequacy of Existing Radiation Protection Standards Related to Internal Exposure of Man to Insoluble Particles of Plutonium and Other Alpha-Emitting Hot Particles," Natural Resources Defense Council, February 14, 1974.

24. J. W. Healy, "Los Alamos Handbook of Radiation Monitoring," Los Alamos Scientific Laboratory, 1970.

25. "The Toxicity of Plutonium," Medical Research Council, London, 1975.

26. (a) "Basic Radiation Protection Criteria," NCRP Report #39, National Council on Radiation Protection and Measurements, January 15, 1971.
    (b) "Review of the Current State of Radiation Protection Philosophy," NCRP Report #43, January 15, 1975.

27. G. Friedlander, J.W. Kennedy, and J.M. Miller, "Nuclear and Radiochemistry," John Wiley and Sons, 1964.

28. D. T. Oakley, "Natural Radiation Exposure in the United States," U.S. Environmental Protection Agency, June, 1972.

29. "Rules and Regulations Pertaining to Radiation Control," Colorado Department of Health, 1970.

3008079

US3086915

30. Colorado Department of Health, "U.S. AEC Rocky Flats Plant Surveillance Report," December, 1974.

31. Lamm-Wirth Rocky Flats Task Force meeting with Rockwell and ERDA officials at C. U. Medical Center, July 17, 1975.

32. Personal communication of A. J. Hazle, CDH, with P. Dean and Dr. A. Anderson, both of Lawrence Livermore Laboratories, at the July 14-17, 1975 Health Physics Society meeting in Buffalo, New York.

33. Review of two fire protection surveys made by the Factory Insurance Association carried out by P. Kelly, Lamm-Wirth Task Force, and A. J. Hazle and J. Montgomery, CDH, January 3, 1975.

34. J. C. Elder, J.H. Ettinger, M. Gonzales, and M. Tillery, Los Alamos Scientific Laboratory Progress Report, LA-5784-PR, November, 1974.

35. E. A. Martell, National Center for Atmospheric Research Technical Note, NCAR-TN/STP-110, May, 1975.

36. Answer of one of 26 questions posed to ERDA by the Task Force on June 6, 1975, answered on July 1, 1975.

37. Phone call on August 28, 1975 to A. W. Grella, Office of Hazardous Materials Operations, U.S. Department of Transportation.

38. "Hot Spots or Hot Lungs," The Lancet, November 23, 1974.

39. W. J. Bair, "Toxicology of Plutonium," Advance in Radiation Biology, 4, 255 (1974)

40. "The Metabolism of Compounds of Plutonium and Other Actinides," ICRP Publication #19, 1972.

41. G. W. Dolphin et al, "Radiobiological Problems in the Protection of Persons Exposed to Plutonium," NRPB-R29, September, 1974.

42. D.D. Smith and S.C. Black, "Actinide Concentrations in Tissues from Cattle Grazing Near the Rocky Flats Plant," U.S. EPA, Draft Document, undated.

43. "The Effects on Populations of Exposure to Low Levels of Ionizing Radiation," Division of Medical Sciences, National Academy of Sciences, November, 1972.

44. (a) J. W. Gofman, "The Cancer Hazards from Inhaled Plutonium," Committee for Nuclear Responsibility, May 14, 1975.
    (b) J. W. Gofman, "Estimated Production of Human Lung Cancers by Plutonium from Worldwide Fallout," Committee for Nuclear Responsibility, July 10, 1975.

45. B. L. Cohen, "The Hazards in Plutonium Dispersal," July, 1975.

46. "Rocky Flats Transuranics and Risk Estimates," submitted by A. J. Hazle of the CDH to the Task Force, August, 1975. This document was reviewed by EPA and the RF Area Office of ERDA.

US3086916

47. "Agreement Between the Dow Chemical Company, Rocky Flats Division and United Steelworkers of America AFL-CIO-CLC, Local Union 8031," 1973-76.

48. A phone call to Labor Relations at the RFP indicated that the health and safety aspects of the new agreement (Article XIV, Sections 8-11) are not substantially different from the earlier Dow agreement, August 6, 1975.

49. "Agreement and Memorandum of Understanding," between the Department of Military Affairs and the CDH.  This has been signed by the CDH and we are informed will shortly be signed by the DMA.

50. Amendment to RH 4.21, April 19, 1973.

51. B. N. Pisanko, Law Clerk at Colorado Land Use Commission, prepared memo on Colorado Disaster Emergency Act for the Task Force, February 11, 1975.

- 101 -

3.008931

US3086917

LIST OF SPEAKERS AT LAMM-WIRTH    **APPENDIX A**

ROCKY FLATS TASK FORCE PUBLIC HEARINGS

Volume 1          April 14, 1975          Denver Public Library, Denver, Colorado

| SPEAKER | ADDRESS | AFFILIATION | PAGES |
|---------|---------|-------------|-------|
| | General Introduction by Robert D. Siek | | 1-5 |
| William M. Lamb | P.O. Box 928 Golden,Colorado | Area Manager, Rocky Flats Plant | 5-10 |
| Dr. Milton Thompson | Dow Chemical Co. Rocky Flats Div. | Manager of Environment Science & Waste Control Rocky Flats Plant | 11-19 |
| R. O. Williams, Jr. | Atomics Intern'l. Div. Rockwell Intern'l. | Vice Pres. Rockwell Intern'ls Atomics Intern'l. Div. | 19-31 |
| Paul B. Smith | 1800 Lincoln St. Region 8, Denver, Co. | Air & Hazardous Materials Div., EPA, #8 | 31-43 |
| Albert J. Hazle | Colo. Depart. of Health 4210 E. 11th Ave., Denver | Dir. of Occupational & Radiological Health Div., Depart. of Health | 43-62 |
| Dr. Carl Johnson | 42 Hillside Drive Wheatridge, Colo. | Jefferson County Health Department | 62-67 |
| Paul Shippee | 1945 Grow Street Boulder, Colo. | Prof. of Science & Solar Energy, CSU | 68-74 |
| David Mastbaum | | Colo. Public Interest Research Group & Concerned citizen | 74-81 |
| Dr. Frederick Thieme | 1006 JILA, Boulder Campus Univ. of Boulder | Univ. of Colorado | 81-88 & 92-99 |
| Dr. Robert Wilcox | | Dean, School of Public Affairs, CU | 89-92 and 99 |
| Dr. Edward Martell | 325 Norton St. Boulder, Colo. | concerned scientist | 100-115 |
| Tom Rauch | 935 Garfield St. Denver, Colo. | concerned citizen | 115-118 |
| Carl Lehrburger | 70 Adams St. Denver, Colo. | People for Rational Energy Resources | 119-127 |

US3086918

5008932

| SPEAKER | ADDRESS | AFFILIATION | PAGES |
|---------|---------|-------------|-------|
| Maury Travis | 901 Sherman St. Suite 523, Denver, Co. | Travis Research Intern'l. | 127-133 |
| Dr. Eric Eisenbud | 1619 Milwaukee | concerned citizen | 133-141 |
| Paul Wehr | Institute of Behavior Science, Room #1, Univ. of Colorado, Boulder, Co. | Sociologist, CU, Consortion on Peace Research, Education, & Development | 141-151 |
| Maury Wolfson | # 3, South Cook Denver, Colo.  80209 | Environmental action of Colo. & People for Rational Energy Sources | 152-158 |
| Bill Pace | 1639 E. 22nd Avenue Denver, Colo.  80205 | concerned citizen | 159-162 |
| Ms. Pam Solo for Prof. Elise Boulding | 2801 E. Colfax, Room 304 Denver, Colo.  80206 | Sociology Dept., CU | 162-174 |
| Bernard Meyer | 4044 17th Ave. Parkway Denver, Colo.  80220 | concerned citizen | 174-178 |
| Cris Crosby | 5060 E. Quincy Englewood, Colo. | concerned citizen | 178-181 |
| Kevin Markey | 1570 Emerson Denver, Colo.    80218 | Friends of the Earth | 182-195 |
| Mrs. Norma Hessler | | Public Interest in Education | 195-196 |

US3086919

# LIST OF SPEAKERS AT LAMM-WIRTH

## ROCKY FLATS TASK FORCE PUBLIC HEARINGS

Volume 2         April 15, 1975         Broomfield Public Library, Broomfield, Colorado

| SPEAKER | ADDRESS | AFFILIATION | PAGES |
|---|---|---|---|
| | General Introduction by Robert D. Siek | | 1-3 |
| Mayor Jack Elliot | | Mayor, Broomfield | 3-16 |
| George DeCiero | City Hall of Broomfield | City of Broomfield | 14-15 |
| Frank Anders | 1525 13th Ave. Greeley, Colo. | concerned citizen, UNC | 16-28 |
| James D. Kelly | Box 888, Rocky Flats Golden, Colo. | United Steelworkers of America | 28-34 |
| Doug Hunt | | Rocky Flats worker | 35-44 |
| Don Miller | | Boulder City & County Health Department | 44-54 |
| Dwight Filley | 1266 Lafayette | Colorado Open Space Council | 55-59 |
| Lloyd Mixon | 9501 N. Wadsworth Broomfield, Colo. | concerned area resident | 59-66 |
| Ms. Mary Taylor | 787 17th St. Boulder, Colo. | Indian Peaks Group of Sierra Club, Boulder County Sierra Club, Boulder Ecocenter & Boulder County Council on Environmental Quality | 68-74 |
| Miss Judy Danielson | 1652 Adams Denver, Colo.  80206 | American Friends Service Committee | 75-89 |
| Albert Nunez | Environmental Action of Colo., Univ. of Colo. 1100 14th St., Denver | Environmental Action of Colorado | 89-97 |
| Ms. Melody Martin | | concerned citizen | 94-96 |
| Ms. Ruth Correll | | City Council Member, Boulder | 97-104 |
| Ms. Maggie Markey | | County Commissioner, Boulder | 105-110 |
| Ms. Arlys Lafehr | | League of Women Voters of Metro Denver | 111-115 |



US3086920



-2-

| SPEAKER | ADDRESS | AFFILIATION | PAGES |
|---------|---------|-------------|-------|
| Jerry Martin | | Health Physics Laboratory, CU | 115-118 |
| Dr. Vincent Matthews | Greeley, Colo., UNC | Earth Science Dept. UNC | 119-136 |
| Robert Adams | | concerned citizen | 136-142 |
| Dr. Jack Silner | | State Medical Society | 142-150 |
| I. K. Roberts | Box 102, Dacono, Colo. 80514 | Dow Chemical RF Employee | 150-157 |
| Ms. Linda Blum | 880 College Ave. Boulder, Colo. 80302 | concerned citizen | 157-165 |
| Jeffrey Bauer | Div. of Health Admin. Dept. of Preventive Medic. Univ. of Colo. Med. Ctr. 4200 E. 9th Ave., Denver | concerned citizen | 165-171 |
| Steve Jackson | 1852 S. Humboldt Denver, Colo. 80210 | concerned citizen | 171-180 |
| Virgil Blackburn | IBM | concerned citizen | 180-193 |
| Tom Gottlieb | 11900 W. 75th Arvada, Colorado | concerned citizen | 194-200 |
| Lewis Tenebaum | | concerned citizen | 200-203 |
| Ms. Cathy Green | | concerned citizen | 204-206 |
| Mrs. Dorothy Chambers | | concerned citizen | 206-207 |
| William Schroer | Boulder Co. P.I.R.G. | Colorado Public Interest Research Group | 207-213 |
| Robert Evans | | concerned citizen | 213-214 |
| H. A. Stovalc | | concerned citizen | 214-222 |
| Anonymous Comments and Conclusion | | | 222-227 |

3008985

US3086921

Atomics International Division
Rocky Flats Plant
P.O. Box 464
Golden, Colorado 80401
(303) 494-3311
Contractor to
Energy Research and Development
Administration



**Rockwell
International**

**APPENDIX B**

August 1, 1975

75-RF-0240

Dr. Robert D. Siek, Chairman
Lamm-Wirth Task Force
Colorado Department of Health
4210 East 11th Avenue
Denver, Colorado 80220

Dear Dr. Siek:

Enclosed are five copies of Rockwell International response to
questions posed by the Lamm-Wirth Task Force at their
July 17, 1975 meeting.

Robert E. Yoder, Director
Health, Safety and Environment

REY:cmc
Enc.

cc:
W. M. Lamb      -  ERDA, RFAO
E. G. Kunz      -  AI, Rocky Flats
R. O. Williams  -  AI, Rocky Flats

- 106 -

3002006

RESPONSE TO QUESTIONS POSED
BY LAMM-WIRTH TASK FORCE

QUESTIONS:

"What has Rockwell International done in the safety area since they assumed operational responsibility of the Rocky Flats Plant and what items are under study or pending study?"

"What is being done regarding the size reduction area?"

Items Accomplished or Under Study

1. Rockwell International has reorganized the safety elements (i.e. Nuclear Safety, Health Sciences, Environmental Sciences and Waste Control, and Safety and Loss Prevention) into a single responsive unit reporting to the plant manager. This organizational approach should unify the several safety disciplines to provide a coordinate approach to problem solving, policy development and implementation, monitoring and audit.

2. A review of the safety program was conducted in the phase-in period to establish base line data for the delineation of problem areas requiring further review for potential corrective action.

3. The plant safety award program is being expanded to include more than industrial safety and lost time accidents. A study committee - representing several plant employee units presented their recommendations to the Executive Safety Committee on July 30, 1975. A summary of their program concept is attached as Appendix A. These objectives are plant wide in scope and multifaceted. The goals represent a 20-30% reduction in last years' experience. An interesting feature of the suggested program allows partial reward for partially meeting goals. Experience indicates that a reward-no reward situation may increase the accident rate rather than decrease it.

4. An announcement has been made that individual employee exposure summaries will be provided to each employee on an annual basis. We expect to do this by July 1, 1976. If the necessary analyses can be accomplished sooner we will move to accelerate that date.

3008997          - 107 -

US3086923

-2-

5.  We are reviewing the size reduction operation and at your request
    are including data relative to the radiation background in this area.
    (Appendix B)  It is our intent to initiate a program (which may
    require specific ERDA funding) to separate workers from the radio-
    active materials where possible through the use of remote or
    enclosed operations.  We hope in this manner to eliminate the
    routine use of air supplied suits.

6.  A review of the quality assurance requirements in personnel
    dosimetry (badge) is underway to determine how many and what
    type of blind badges are required as well as how the system can
    be automated.  Consideration is being given to using a commercial
    service for independent checks.

7.  The Health, Safety and Environment Director is now involved as a
    step in the resolution of safety concerns.  Several pending items
    have been presented to him for his resolution and suggested
    priorities have been established by the union safety committee.

8.  A generalized set of plant rules is under development to provide
    employees, in a single document, the basic requirements for safe,
    secure conduct.  Each major building will have a short addendum
    to the general rules which specify additional requirements specific
    to the functions conducted therein.

9.  An independent management audit function that reports to the
    General Manager has been established.  The four organizations
    within the Health, Safety and Environment are scheduled for audit
    within the next 12 months.  These audits are separate and inde-
    pendent of the ERDA annual audits by Health and Safety.

10. The worker classification lists are being reviewed to assure that
    each individual who has an assignment which involves a special
    material, e.g. beryllium, is included on the appropriate rosters
    and that each is notified of this inclusion in a roster.  Each
    employee will receive the results of his periodic or any special
    medical examination.

11. The "stepoff" lines which demark the several radiation contamination
    zones are being reviewed and relocated to provide better contami-
    nation control and to include human factors motivation to stimulate
    people to monitor themselves as a natural and convenient act.

3008058

US3086924

-3-

12. A revised schedule to develop complete ERDA Approved Safety
Analysis Reports has been developed and is being submitted to
ERDA for their approval.

13. The emergency preparedness program is under study to assure
the clear assignment of responsibilities, that proper external
mutual aid agreements are in force, and to provide coordinated
training.

14. The St. Lukes Hospital agreement for radiological support has
been transferred from Dow Chemical U.S.A. to Rockwell
International. A change in corporate assignment for the agree-
ment with the Medical Center, University of Colorado, Board
of Regents regarding radiological support has been transmitted
to the Regents and we are awaiting their action. The desirability
of additional agreements is under internal discussion and we may
augment this program if hospitals wish to participate.

15. A request for additional funds has been made to implement an
analysis of the major buildings for their resistance to earthquake
damage and to determine their integrity from a design basis
earthquake as well. Critical systems (ventilation system,
emergency power, fire suppression, etc.) will be evaluated
similarly.

16. A contract is pending with a consultant to establish the basis of
a maximum accident beyond that which is deemed credible. This
accident is analogous to a class nine accident hypothesized for
nuclear reactors (which we do not have).

Items Scheduled for Study or Those Whose Scope Is Being Defined

1. Procedures and methods to assure maximum analysis of environ-
mental and in-plant monitoring data to assure the detection of
anomolies or trends at the earliest possible time.

2. Review of the safety training provided to the several groups in
the Plant.

z008099

US3086925

-4-

3. Review and establish procedures and guidelines for formal review and sign off of all operations - such as production, research, maintenance, etc.

4. Review the health physics instrumentation resources, its maintenance and calibration.

5. Review the whole body (lung) counting program to assure proper dose assessment and assignment. This may include some independent personnel whole body counts by a commercial firm.

6. Initiate a review of safety manuals, guides, policies and rules to assure proper assignment of responsibility and to establish any needed new policies and procedures.

7. Conduct a review of the air sampling program both on and off site and in the work environment.

8. Initiate a disciplined approach to job safety analyses using "systems safety" techniques.

9. Pursue research program in air cleaning development to seek avenues for waste volume reduction.

10. Review the requirements for retention of monitoring records and provide an effective system to demonstrate the degree of cleanliness in work areas or support areas.

US3086926

3008090

## APPENDIX A

## TOTAL SAFETY AWARD PROGRAM

A new total safety award program has been developed that encompasses the Industrial Safety, Fire Protection, Nuclear Safety, Health Sciences and Environmental Sciences functions.

The objective of the program is to involve all plant employees in all facets of safety, to improve overall safety performance at the Rocky Flats Plant, thereby minimizing or eliminating any adverse effects to the surrounding area, community or general population.

Areas to be included in the goals are nuclear safety, disabling and serious injuries, ERDA reportable incidents, effluent control, radiation dose reduction, reduction in the already low gaseous emissions, reduction in property loss or damage, and reduction in preventable vehicle accidents.

Plant wide goals have been established with incentive awards based on accomplishments of these goals.  Progress or lack of progress in achieving these goals will be reviewed on a monthly basis by the Executive Safety Committee to insure continued emphasis on all goals and take corrective action if goals are not being met.

Point values have been assigned to each of the plant goals in order of their importance.  These point values will be used to judge plant performance and eligibility for an incentive award to all employees.

Plant performance will be evaluated on a quarterly basis for the incentive awards and a determination made as to the level of award each employee will receive.  Three levels of incentive awards have been suggested.

All goals are achievable but they will require a better than average performance on the part of all employees.

These plant goals will be reviewed annually and set higher if need be to continually improve the plant's overall safety performance.

3008091

US3086927

APPENDIX B

A review of the size reduction area has been initiated. The basic data regarding external radiation fields shows that significant improvement was achieved in the February 1975 dose reduction effort. The quarterly (April-June) and semiannual (January-June) dosimetry results are attached. No workers are accumulating exposure at a rate which would exceed an individual exposure in excess of the 5 rem/year whole body limit or 75 rem/year hand limit (ERDA and statutory limits). Our internal objective is to limit the annual exposure to 3.0 rem which should be accumulated at as near constant rate as possible. It should be mentioned that these workers receive a pay differential for work in air supplied suits so that to equalize this remuneration the personnel are rotated. Supervision appears to have exercised prudence in maintaining exposures within operational requirements.

To further reduce exposure the following actions are being taken:

1.  Conduct more frequent radiation surveys on a random basis (during operations) to determine dose extremes.

2.  Prohibit transfer to size reduction of any material or package of materials whose contamination produces a dose rate greater than 50 millirem/hour without prior discussion and scheduling. This will insure better decontamination before transfer and permit pre-job analysis to accomplish the task in a minimum of time as well as prevent the accidental accumulation of material awaiting processing.

3.  Review each routine task (e.g. waste water filter change) to provide improved shielding during the operation.

4.  Survey the walls of the facility and if necessary recoat for easier cleaning or cover with a suitable material to shield any nonremovable contamination. (this action will depend upon the possible dose reduction which we may anticipate.)

5.  Review the facilities and practices at other ERDA sites which have similar activities to glean information from their experience.

6.  Request Research and Development to direct more of their remote engineering work to assist us in the design of new facilities or equipment.

US3086928

- 112 -

3002092

-2-

7.  Include in the Waste Management funding request to ERDA sufficient
    funds to design and build a new or modified facility for this operation.
    The design criteria and objectives have not been delineated; however,
    they will include as a minimum a remote operation, contained
    cabinets for radioactivity control, and a design basis worker dose
    accumulation of 1 rem/year.

- 113 -

3002093

US3086929



SIZE REDUCTION AREA, GAMMA SURVEY RESULTS BY MONTH

US3086930

PAGE 114

YEAR 1975

WHOLE BODY EXTERNAL DOSE DISTRIBUTION
FOR PLUTONIUM AREA GROUPS (HREM)

PERIOD
QUARTER   SECOND ONLY

| | 0 To 125 | 126 To 250 | 251 To 375 | 376 To 500 | 501 To 625 | 626 To 750 | 751 To 875 | 876 To 1000 | 1001 To 1125 | 1126 To 1250 | 1251 To 1375 | 1376 To 1500 | 1501 To 1625 | 1626 To 1750 | More Than 1750 | Max. Body Dose |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MGMT. | | 4 | 2 | 2 | 2 | 3 | | 1 | 1 | | | | | | | 1045 |

QUARTERLY PRORATED LEVEL

3002095

US3086931

YEAR ___1975___

PERIOD QUARTER ___SECOND ONLY___

## HAND EXTERNAL DOSE DISTRIBUTION FOR PLUTONIUM AREA GROUPS (MREM)

| | 0 To 1000 | 1001 To 2000 | 2001 To 3000 | 3001 To 4000 | 4001 To 5000 | 5001 To 6000 | 6001 To 7000 | 7001 To 8000 | 8001 To 9000 | 9001 To 10000 | 10001 To 11000 | 11001 To 12000 | 12001 To 13000 | 13001 To 14000 | More Than 14000 | Max Hand Dose |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MGMT. | 5 | 5 | 4 | 1 | | | | | | | | | | | | 3034 |

10,000 mrem — QUARTERLY PRORATED LEVEL

US3086932

3002966

YEAR ____1975____

FIRST SIX MONTHS SUMMARY
WHOLE BODY EXTERNAL DOSE DISTRIBUTION
FOR PLUTONIUM AREA GROUPS (REM)

| | 0 To 0.499 | .5 To 0.999 | 1.0 To 1.499 | 1.5 To 1.999 | 2.0 To 2.499 | 2.5 To 2.999 | 3.0 To 3.499 | 3.5 To 3.999 | 4.0 To 4.499 | 4.5 To 4.999 | > 5.0 | Max. Body Dose |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WASTE MGNT. | 2 | 6 | 5 | 2 | | | | | | | | 1690 |

3008097

US3086933

FIRST SIX MONTHS SUMMARY
HAND EXTERNAL DOSE DISTRIBUTION
FOR PLUTONIUM AREA GROUPS (REM)

| | 0 To 4.999 | 5 To 9.999 | 10 To 14.999 | 15 To 19.999 | 20 To 24.999 | 25 To 29.999 | 30 To 34.999 | 35 To 39.999 | 40 To 44.999 | 45 To 49.999 | 50 > 50 | Max. Hand Dose |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| STE MGMT. | 13 | 2 | | | | | | | | | | 5231 |

US3086934

HOUSE BILL NO. 1488

# Appendix C

Fiftieth General Assembly

## STATE OF COLORADO

BY REPRESENTATIVE Burrows

### A BILL FOR AN ACT

CONCERNING NUCLEAR FACILITIES, AND ENACTING "THE NUCLEAR

FACILITIES LIABILITY ACT OF 1975".

---

### Bill Summary

(NOTE: This summary applies to this bill as introduced and does not necessarily reflect any amendments which may be subsequently adopted.)

Provides for definitions pertaining to nuclear facilities and for the liability of the operator of a nuclear facility.

---

Be it enacted by the General Assembly of the State of Colorado:

SECTION 1. Title 13, Colorado Revised Statutes 1973, as amended, is amended BY THE ADDITION OF A NEW ARTICLE to read:

### ARTICLE 21.5

#### The Nuclear Facilities Liability Act

13-21.5-101. Definitions. As used in this article unless the context otherwise requires:

(1) "Byproduct material" means any radioactive material (except special nuclear material) yielded in or made radioactive by exposure to radiation incident to the process of producing or utilizing special nuclear material.

(2) "Injury" means any harm to person or property for which damages may be recovered under the law of this state.

(3) "Nuclear facility" means:

(a) Any nuclear reactor;

(b) Any equipment or device designed or used for separating the isotopes of uranium or plutonium, processing or utilizing spent fuel, or handling, processing, or packaging waste;

(c) Any equipment or device used for processing, fabricating, or alloying special nuclear material if at any time the total amount of the material at the site where the equipment or device is located consists of or contains more than twenty-five grams of plutonium or uranium 233, or any combination thereof, or more than two hundred fifty grams of uranium 235;

3008099

- 119 -

US3086935

(d)  Any structure, basin, excavation, premise, or place prepared and used for the storage or disposal of waste, other than facilities utilized exclusively in connection with the transportation of the material; and

(e)  The site on which any of the above is located.

(4)  "Nuclear incident" means any occurrence:

(a)  Causing, other than at the nuclear facility, bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radio-active, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material;

(b)  Caused by any reason, other than an act of war;

(c)  Occurring either at the nuclear facility or in the course of transportation of source, special nuclear, or byproduct material to or from the facility; and

(d)  As to which an indemnification agreement exists between the United States atomic energy commission and the operator in accordance with section 170 of the "Atomic Energy Act of 1954", as amended, whether or not indemnification under the agreement may be necessary.

(5)  "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of special nuclear material.

(6)  "Operator" means the person with whom the United States atomic energy commission has executed an indemnification agreement in accordance with section 170 of the "Atomic Energy Act of 1954", as amended.

(7)  "Person" means an individual, corporation, partnership, firm, association, trust, estate, public or private institution, group, government agency, a state or any political subdivision thereof, or a political entity within a state, a foreign government or nation or a political subdivision of any such government or nation, or other entity or a legal successor, representative, agent, or agency of the foregoing;

(8)  "Source material" means uranium, thorium, or any other material which has been determined by the United States atomic energy commission to be source material or ores containing one or more of the foregoing materials, in any concentration as determined by regulation of the United States atomic energy commission.

(9)  "Special nuclear material" means:  plutonium, uranium enriched in the isotope 233 or in the isotope 235, and any other material which the United States atomic energy commission has determined to be special nuclear material or any material artificially enriched by any of the foregoing, but does not include source material.

(10)  "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in any nuclear reactor.

(11)  "Waste" means any waste material resulting from the operation of a nuclear facility or containing byproduct material.

US3086936

IC 8008100

- 120 -

13-21.5-102. **Liability - nuclear facilities.** The operator of a nuclear
facility is liable, without proof of fault, for an injury arising out of or
resulting from a nuclear incident, other than an injury, compensable under a
state or federal workmen's compensation act, of any employee employed at the site
of and in connection with the nuclear facility or an injury to the nuclear facil-
ity or to property located at the site of and used in connection with the nuclear
facility.

13-21.5-103. **Application of article.** This article applies to an injury suffered
in this state arising out of or resulting from a nuclear incident either within or
without this state or an injury suffered outside this state arising out of or result-
ing from a nuclear incident within this state.

13-21.5-104. **Exclusive liability.** If in any action an operator is liable with-
out proof of fault under section 13-21.5-102 or a substantially similar law, either
in this state or by application of controlling law rules, and if jurisdiction can be
obtained over the operator in that action, the operator is exclusively liable, and
no action may be brought against any other person with respect to the injury.

13-21.5-105. **Limitations.** No action may be brought under this article more
than three years after the person suffering or incurring the injury knows, or rea-
sonably could have knowledge of, the cause of the injury or more than ten years
after the date of the last occurrence to which the injury is attributed, whichever
first occurs.

13-21.5-106. **Effect of other laws.** (1) The provisions of this article do not
affect, amend, or repeal:
(a) Any other rule or provision of law governing immunity to suit, the
conditions and effect of a waiver of immunity, or the effect of the purchase
of insurance upon the insurer or the insured;
(b) Any other provisions of law governing liability for injuries not
covered by this article, limiting the amount of recovery for injuries covered
by this article, or governing the kinds of injuries for which damages may be
awarded; or
(c) Unless otherwise provided by this article, any other provisions of
law relating to establishing and proving legal liability.

SECTION 2. **Safety clause.** The general assembly hereby finds, determines, and
declares that this act is necessary for the immediate preservation of the public
peace, health, and safety.

3008101

US3086937