THE DOW CHEMICAL COMPANY
Rocky Flats Plant

H000014

October 4, 1957

J. G. Epp
   Chairman, Investigating Committee

ACTION OF THE EMERGENCY MONITORING TEAM
IN CONNECTION WITH THE INCIDENT OF
SEPTEMBER 11, 1957

Upon arrival, I found that E. A. Putzier had relieved J. B. Owen at Building 71. The Emergency Monitoring Team cases containing instruments, protective clothing, etc. had been delivered to Building 71 and were in use. J. B. Owen had a hi-vol sampler in the EMT truck operated from the portable generator. He was obtaining instantaneous air samples and monitoring surfaces on the site proper. I called in the EMT and also a cable fabricator. Probes and cables were being expended at an accelerated rate and our chief supply of these had been in Building 71.

I established a check-out station at Building 23 for the second shift of Plant Protection which was being relieved. When the EMT arrived, this check-out station was transferred to the decontamination room of Building 22 where Dr. Guzak and Mr. Newton were already on duty. After the shift change, J. E. Hill of the EMT relieved Owen to return to Building 71. Hi-vol sampling stations were established at Building 23 and at Clockroom 2. With a third hi-vol sampler Hill patrolled Highway 72 which was perpendicular to the smoke plume.

Owen found positive activity in his preliminary survey between Buildings 81 and 91 which eventually turned out to contain plutonium at half tolerance level. Hill found barely detectable an unidentifiable activity due south of the Plant on Highway 72. A 10-mph wind from the north arose at 11:30 and blew consistently until 5:00 a.m., simplifying the problem of search for downwind activity. As soon as the sun rose the inversion lifted and a lapsed condition was established, thus frustrating attempts to make measurements directly in the plume when it became visible.

With the change of meteorological conditions, there was a drastic change in the radiation situation. The airborne activity at the base of the stack began to increase tremendously. As a gentle breeze arose from the east, this activity drifted toward the administrative area. The activity appeared to be completely airborne with no particles dropping out. As time elapsed for a second count of samples, the activity was observed to contain a large component of short-lived activity which relieved the anxiety somewhat.

-76-

PLAINTIFFS' EXHIBIT P-408 90-CV-181

002175

J. G. Epp .2. October 4, 1957

This short-lived activity behaved in a very peculiar manner. Samples taken every 15 minutes increased in succession until the middle of the afternoon. By noon, it had been determined that practically all of the airborne activity collected during the night was dependent upon the radon daughter chain. If this material had been contained on the filter bank, it should have disappeared, for all practical purposes, four hours after the blowers stopped. Nevertheless, the observed instantaneous activity with the air was increasing to alarming values. The diurnal tide in airborne natural activity also recedes after daybreak. The Colorado Public Health Service in Denver reported no abnormal concentration of radioactivity at this time. Consequently, this prolonged increase in activity was very alarming. Occupants of Buildings 76 and 77 were placed in respirators and arrangements were made for them to eat at Building 12. At noon Swinerton & Walberg was advised to release their employees who were not equipped with respirators and protective clothing, and who were not subject to urinalysis procedure. Consideration was given to evacuating the lump sum area when the airborne activity level, interpreted as plutonium, indicated the employees were receiving a week's tolerance exposure in a single day, but it was decided that the psychic damage would be greater than the real harm. Recount of samples on the following day showed that this airborne activity was, in fact, all attributable to the radon decay chain. The EMT collected the filter papers from the permanent air sampling station and a few incidental water, vegetation and soil samples along the route. With the help of the ladder truck, the tops of all buildings were surveyed for contamination which might indicate the advisability of evacuation or decontamination measures. None was detected. By special arrangement, samples were collected on the Church property contiguous on the south and directly in the path of the smoke plume.

Eighty-eight nose and throat swipes taken on people involved in the incident showed positive indications of plutonium. Three fecal samples and two blood samples, likewise, were positive. Only one urinalysis showed positive results. Three off-site locations are suspected of possible plutonium contamination. These are: four miles south of the Plant, five miles southeast of the Plant, and nine miles east southeast of the Plant. Identification is poor and the degree is small. Trivial amounts of plutonium were detected in the air at Gate 2 during the fire and at Building 23 on the following day. Water samples from Walnut Creek and Woman Creek contained no detectable activity derived from plutonium. For all practical purposes, the plutonium contamination resulting from the fire is negligible.

T. S. Chapman

T. S. Chapman, Director
Health Physics and
Medical Section

TSC:ab

-77-

002176

H000015

## FIRE REPORT -- JOHN EPP, ASSISTANT TECHNICAL DIRECTOR

On September 20, 12:30 p.m., a series of experiments were conducted at the Fire Barn by Mr. Langell; Mr. Ed Brock, the Fire Chief; and various others in attendance. The first attempts to start a sizeable Plexiglas fire using excelsior as a source of ignition proved that Plexiglas is moderately difficult to ignite. Pouring Shell Vitrea onto such a fire (Plexiglas) demonstrated that the Shell Vitrea is also difficult to ignite. In fact, the oil lying in the bottom of a metal tray did not ignite from the burning Plexiglas. It was possible to put out a fire in some ten to fifteen pounds of Plexiglas with a single short blast from a portable $CO_2$ extinguisher. Subsequent experiments proved that Plexiglas extinguished by a blast from the $CO_2$ extinguisher could be reignited by the ignition of the smoke coming off the Plexiglas.

Another experiment showed that magnesium chips partially immersed in oil (when ignited) could ignite the Shell Vitrea which gave forth a yellow smoky flame and that this fire could ignite Plexiglas if it were suspended above the Shell Vitrea fire.

Another demonstration indicated that Plexiglas fires could also be easily extinguished with fine spray from an ordinary garden hose and that reignition was difficult after the use of water.

A later demonstration showed that a fire among a sizeable quantity of magnesium chips could, with proper procedure, be extinguished by a spray of water, although this entailed the danger of the spread of the fire due to the violent reaction between the burning magnesium and the water.

John Epp
John Epp / Assistant Technical Director

002177