IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CIVIL ACTION NO. 90-K-181

---

DEPOSITION OF RICHARD C. KAUFMAN
EXAMINATION DATE: OCTOBER 18, 2005

---

MERILYN COOK, WILLIAM JR. and DELORES SCHIERKOLK,RICHARD and SALLY BARTLETT, and LORREN and GERTRUDE BABB,
Plaintiffs,
v.
ROCKWELL INTERNATIONAL CORPORATION and THE DOW CHEMICAL COMPANY,

Defendants.




---

PURSUANT TO NOTICE, the deposition of RICHARD C. KAUFMAN was taken at 9:00 a.m., October 18, 2005, at 633 17th Street, Suite 3000, Denver, Colorado, before Kimberley W. Gauthier, Registered Professional Reporter and Notary Public in and for the State of Colorado, said deposition being taken pursuant to the Colorado Rules of Civil Procedure.

Kimberley W. Gauthier
Registered Professional Reporter

Q. Do you recall being asked about that paragraph earlier?
A. Yes.
Q. I believe you were asked whether -- something to the effect that whether you felt that the release MUF data would be embarrassing, or hurt the posture of DOE, Rockwell and Dow. I believe you said something like you didn't feel that way; do you recall that?
MS. PARK: Objection, to the extent that mischaracterizes the Q and A, which we could go back to.
Q. (By Mr. Sorensen) I'm just asking if you recall it?
MS. PARK: Same objection.
Q. (By Mr. Sorensen) Do you recall the general back anD forth?
A. Yes.
Q. Then you were asked if anyone else felt that way, and I believe you lodged a privilege objection to that.
MR. TAYLOR: Correct.
Q. (By Mr. Sorensen) Let me ask you this: can you identify who -- just the name -- at DOE internal counsel that you had a conversation with about the subject that was discussed in Paragraph 8; that is, whether they or DOE feels that release of MUF



information is embarrassing to the DOE and its former contractors, or damaging to the posture. Can you identify the names of any such DOE counsel?
MS. PARK: Objection to form, and it assumes facts not in evidence.
MR. TAYLOR: Are you asking for the name of an individual that he discussed Paragraph 8 with?
MR. SORENSEN: Or the subject of Paragraph 8.
Q. (By Mr. Sorensen) Let me start again. This is not a good question. He said that he didn't feel that release of MUF information would be damaging, but it was asked if anyone else felt that way, and you asserted the privilege. What I'm trying to find out is if there are any such discussions Mr. Kaufman had with anyone that are in fact privileged. Is there some privileged conversation that's being protected here.
MR. TAYLOR: Okay. You're trying to find out if he did have a conversation, so the answer would be yes or no?
MR. SORENSEN: Yes or no, correct.
Q. (By Mr. Sorensen) Do you follow what I'm getting at?
MS. PARK: I'm going to object to the form, because I've totally lost what the original question was that was put to him, and that's now being misphrased.



Q. (By Mr. Sorensen) This is a yes or no question. And for the sake of this question, I'll assume it's privileged. Did you have any privileged conversations, yes or no, the subject of which was DOE's views about whether the release of additional MUF data would be embarrassing to DOE or its contractors, or hurt the posture of DOE or its contractors; just yes or no..
MS. PARK: Same objection.
MR. SORENSEN: Is that a question he can answer, or you'd permit him to answer?
MR. TAYLOR: The problem I have is if he answers in reference to the subject, I don't want to waive the privilege as to what the conversation were, and we're very close to the line.
MR. SORENSEN: I will stipulate it's not a waiver, if that helps. You know, yes or no. If you allow him to do that, I'll move on.
MR. TAYLOR: If the stipulation is that it's no waiver as to the content of the conversations, then I think he can answer that.
A. Yes.
Q. (By Mr. Sorensen) Well, for the record, I'm going to continue, can you please describe the content of any of those conversations?
MR. TAYLOR: I'll assert the privilege.



Q. (By Mr. Sorensen) If you could look at Paragraph 10.
A. Let me get back there.
Q. Let me go back to the earlier one.
A. No. 8?
Q. Yeah. There were conversations -- maybe I didn't make this clear. Can you tell me what those conversations were with DOE internal counsel, yes or no? I guess they'd have to be if you're asserting the privilege.
MR. TAYLOR: Correct.
MS. PARK: Not necessarily. I'm going to object to form.
MR. TAYLOR: I agree with Ms. Park. Not necessarily have to be with counsel.
Q. (By Mr. Sorensen) Can you identify -- by title, not name, generic title -- the names of the individuals with whom you've had these privileged conversations; like lawyer, classification officer, cafeteria person, whatever? Whoever it might be.
MS. PARK: Objection; form
MR. TAYLOR: Well again, I think we're getting close. If you want to stipulate this isn't any kind of a waiver again, then I think he can answer as to the type of people.

205

MR. SORENSEN: I will not argue there's a waiver.
MR. TAYLOR: He can answer as to the type -- not specifically the title, but the type of person.
A. In-house counsel.
**Q. (By Mr. Sorensen) For DOE?**
A. Right.
**Q. Any other type of person?**
A. Not that I recall, no.
**Q. Now, if you take a look at Paragraph 10 of Exhibit 9 -- and you've read this paragraph before. Did you have any conversations -- this is a yes or no question. Did you have any conversations with any DOE in-house counsel, the subject of which was whether release of additional MUF information in this litigation would potentially harm the interests of DOE and/or the defendants in this litigation?**
MR. TAYLOR: I'll assert the privilege.
**Q. (By Mr. Sorensen) Was there any evidence at the DOE contempt hearing that you wanted to introduce, and for some reason you were unable to introduce.**
MR. TAYLOR: I'll assert the privilege on that.
**Q. (By Mr. Sorensen) I'll withdraw the question.**
**During the time that Mr. Hoffman was working as a classification officer working for Dow or Rockwell, do you have any understanding of what his authority was to clarify a particular document; do you have any knowledge of that?**

206

A. No, none.
**Q. I just want to get clear in my head on this disclosure of the different volume, kind of the chain of command. You first learned it from who, the difference between the 11,000 and the 500-, 600,000, the subject of the February '96 disclosure.**
A. From Dana Lindsay.
**Q. Who did you understand she learned it from?**
A. The whole discussion was she and somebody else came back to your officers in Philadelphia to discuss what needed to be produced, and it's my understanding that your definition of MUF broadened I guess what she had assumed. So they came back and started looking around, based on your definition. That's when they took -- called me and said, Look, there's 400-, 500,000 more documents, or pages of documents involved in this. That's what precipitated all this. And then she called and told me.
**Q. And do you know how Mr. Kurtenbach found out about this.**
MS. PARK: Asked and answered.
A. Well, as I said earlier, I don't know for sure. I may have mentioned it to him. She may have mentioned it to him. I don't know.

207

**Q. (By Mr. Sorensen) You haven't got a specific recollection?**
A. You know, it was not unusual to share this kind of information with defense counsel, as to what document collections we had, how many pages of documents, et cetera.
**Q. After -- or even before I think you left this case, did you write any memorandums to the file of any nature about the various discovery problems and issues that came up in the case?**
A. Have I ever written memorandums?
**Q. Specifically about the events leading up to the contempt order, the aftermath, any involvement of Kirkland & Ellis?**
A. I have written memos to the file.
**Q. More than one?**
A. I'm sure more than one.
**Q. That fits the description I've given?**
MR. TAYLOR: It's pretty broad.
A. I don't remember the specifics anymore, but I know I've written memos to the file, discussing the issues involved in this case; no question about it.
**Q. (By Mr. Sorensen) Do you know if those memos still exist?**

208

A. It would have to be in the DOJ -- US Attorney's archives.
**Q. Did you take any copies of such memos to the file with you when you left?**
A. I told Mr. Taylor, when all this started to heat up and I was going to be a witness -- I went back the other night and looked for anything I had retained from my nine years, and I had three red wells full of personnel -- you know, leave slips, and pay raises, or whatever, that kind of stuff. I did find two red wells that I have notes and stuff on this case.
**Q. Are those your personal notes?**
A. Yes. I have not gone through them and read them. I didn't have time. I've got too many other things going on in my practice. But I have two red wells that have notes, memos, whatever, but I haven't gone back and reviewed them.
MR. TAYLOR: For the record, those notes were made while he was an assistant, and therefore, they're not his personal notes. They're notes --
MR. SORENSEN: Well, we haven't asked for them yet, but I understand what you're saying.
THE DEPONENT: Right. They were all made while I was an assistant.