**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 90-cv-181-JLK

MERILYN COOK, *et al.*,

   Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION
and THE DOW CHEMICAL COMPANY,

   Defendants.

___

**DEFENDANTS' MOTION TO STRIKE AND EXCLUDE TESTIMONY OF
DR. RICHARD CLAPP AND RELATED EXHIBITS**
___

  Defendants move to strike the entire testimony of Dr. Richard Clapp, to exclude any further testimony, and to strike and exclude any exhibits relating to such testimony. Dr. Clapp's testimony establishes that the study of cancer rates near Rocky Flats on which his testimony is based is unreliable and inadmissible under Tenth Circuit law.

  To test whether the results of a study reliably indicate a claimed association (such as a higher incidence of cancer in a certain population due to exposure to particular substances), scientists typically analyze whether the results are ***statistically significant***. Reference Manual on Scientific Evidence 356–57 (2d ed. 2000) (admitted as DX-323) (Tab A). A test for statistical significance generates a value referred to as a *p*-value, which represents the probability that the results of the study could have been the result of random chance (a p-value of .1 represents a 10 percent chance that the results could have been the product of chance). *Id.* at 357. The possibility that the association or effect shown by the study is in fact not present, and that the

results of the study are due to random chance, is referred to as the *null hypothesis*. *Id.* at 122. For most studies, including epidemiological studies such as Dr. Clapp's, the statistically significant threshold of interest is a p-value of .05; in other words, a study must show that the chance that the null hypothesis is true is less than 5 percent to be statistically significant. *Id.* at 357–58. Another way to demonstrate the statistical significance of a study is to calculate the confidence intervals associated with the p-value of .05 (a confidence level of 95 percent). *Id.* at 360–61. If the range encompassed by the confidence intervals includes 1.0 (the value of no association), then the results are not statistically significant. *Id.* at 361.

The acceptance of the scientific community of 95 percent as the critical level of statistical significance is best illustrated by the fact that each of plaintiffs' experts who have presented a statistical study so far in this trial have applied this level to their own work. Dr. John Radke testified:

> Q.  Would you agree traditionally scientists adopt the 95 percent level of confidence?
>
> A.  I agree earlier that traditionally they do.
>
> Q.  And, in fact, in your own report you actually used the 95 percent confidence level . . . to calculate or talk about a standard rate of error, correct?
>
> A.  Correct. Because the standard error is reported at that level.

(Tr. at 2778–79.) (Tab B)  Dr. Robert Goble also applied confidence intervals to the results of his study to demonstrate their inherent uncertainty. (Tr. at 3698–99, 3704–3705.) (Tab C)  Drs. Flynn and Slovic likewise reported the results of their survey subject to 95 percent confidence levels. (*See* Tr. at 4315 ("Q.  You specifically call out in this chart through asterisks the results that are statistically significant. At 95 percent and higher you put an asterisk. . . . A.  That's correct."). (Tab D))

Along with other plaintiffs' experts and most other epidemiologists, Dr. Clapp calculated the confidence intervals at the 95 percent level for the final results of his study. Dr. Clapp's discussion of these confidence intervals demonstrate that the results of his study are not statistically significant. All of the confidence intervals that he presented regarding purported increases in cancer incidence included the value of 1.0, meaning that ***none*** of his results met the 95-percent confidence threshold for statistical significance.

Dr. Clapp attempted to evade the fact that his study is not statistically significant in two ways. First, he misrepresented the meaning of the confidence intervals he calculated. For example, in testifying about the meaning behind a result of 1.29 with confidence intervals ranging from 0.99 to 1.67, Dr. Clapp testified:

> That's what I think the real relationship, that there is a 29 percent excess, and then the 95 percent confidence limit means or interval means that if you did this same study 100 times, it would fall within the range of .99 to 1.67 95 times out of a hundred, so it could be as low as .99 or as high as 1.67, but I think what it really is is 1.29.

(Tr. at 4838–39.) (Tab E) This testimony rests on a misconception about the meaning of confidence intervals. The confidence intervals of a study do not delineate the range in which the results of 95 out of 100 studies would fall; rather, based on the results of ***one*** study, they show the range within which one can be 95-percent confident that the true association will fall. Thus, because the confidence interval of Dr. Clapp's example includes the value of 1.0, one cannot assert with at least 95-percent confidence that the result indicates a link between cancer incidence and exposure to substances from Rocky Flats. *See* Reference Manual on Scientific Evidence 361 ("Because the boundaries of the confidence interval with alpha set at .05 encompass a relative risk of 1.0, the study is not statistically significant at that level.") (Tab A).

Dr. Clapp's second strategy for dealing with the lack of statistical significance in his work is to claim that statistical significance is irrelevant to the validity of his study. He testified:

3

> Q. Do you in your work generally outside of this case place particular weight or rely on this particular test of statistical significance that you just described?
>
> A. I calculate it. I don't use it in a way of, you know—it doesn't contribute to my conclusion. It doesn't lead me to a conclusion. . . .
>
> Q. And does the fact that the ranges for some of these numbers dip below one, does that detract in any way from the results that you found?
>
> A. No. The results are what they are, and these are the ratios that represent these results, and the confidence interval or the P value is simply more things to consider.

(Tr. at 4838–39.) (Tab E)

Dr. Clapp's blasé attitude towards statistical significance has already been rejected by the Tenth Circuit, which has adopted statistical significance at the 95-percent confidence level as a evidentiary threshold for epidemiological studies. In *Renaud v. Martin Marietta Corp.*, 749 F. Supp. 1545 (D. Colo. 1990) (Tab F), Dr. Clapp, who testified as an expert on behalf of the plaintiffs, opined that the finding of a heightened cancer rate "significant" even though "a statistician would not conclude it is significant." *Id.* at 1551. Judge Weinschienk rejected Dr. Clapp's argument and held the study to be insufficient evidence of causation, *id.* at 1555; this decision was affirmed by the Tenth Circuit, 972 F.2d 304 (10th Cir. 1992). Later, in *Boughton v. Cotter Corp.*, 65 F.3d 823 (10th Cir. 1995) (Tab G), the Tenth Circuit affirmed the exclusion of another cancer study on the grounds that "none of the observed levels of cancer were elevated to a statistically significant level." *Id.* at 835 & n.20 ("In every table for every kind of cancer for which there were observed cases the confidence interval included the value of 1.00."); *see also Brock v. Merrell Dow Pharms., Inc.*, 874 F.2d 307, 313 (5th Cir. 1989) (finding epidemiological study to be insufficient evidence of causation "due to the fact that the confidence intervals include 1.0"), *cited in Renaud*, 749 F. Supp. at 1554.

Because Dr. Clapp's study fails to meet the test for statistical significance, as discussed above, Defendants request that this Court strike Dr. Clapp's testimony, and any related exhibits, and preclude Dr. Clapp from testifying further.

Dated:  November 10, 2005                                  Respectfully submitted,


/s/ John E. Tangren_____
One of the Attorneys for the Defendants
David M. Bernick
Douglas J. Kurtenbach
Ellen Therese Ahern
Mark J. Nomellini
John E. Tangren
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601-6636
Phone:  312-861-2000
Fax:     312-861-2200

Joseph J. Bronesky
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, Colorado 80202
Phone:  303-297-2900
Fax:     303-298-0940

Attorneys for ROCKWELL INTERNATIONAL CORPORATION and THE DOW CHEMICAL COMPANY

## CERTIFICATE OF SERVICE

  I hereby certify that on November 10, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses for the following:

Peter B. Nordberg, Esq.
c/o Karen M. Markert
Apartments at Denver Place, Apt. 2812
1880 Arapahoe Street
Denver, CO 80202
pnordberg@bm.net
kmarkert@bm.net

Gary B. Blum, Esq.
SILVER & DEBOSKEY
The Smith Mansion
1801 York Street
Denver, Colorado 80206
blumg@s-d.com

              /s/ Kari Knudsen_____
              Kari Knudsen (legal assistant)