1

1  IN THE UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF COLORADO
3  MERILYN COOK, et al,
4           Plaintiffs,
5  vs.                        NO:  90-K-181
6  ROCKWELL INTERNATIONAL CORPORATION, et al.,
7           Defendants.
8
9           DEPOSITION OF HERB BOWMAN
              July 22, 2004
10              8:00 a.m.
       4081 High Resort Boulevard, Southeast
11             Rio Rancho, New Mexico
12
       PURSUANT TO THE FEDERAL RULES OF CIVIL
13  PROCEDURE, this deposition was:
14  TAKEN BY:  MS. ELLEN T. NOTEWARE
              Attorney for the Plaintiffs
15
16
17
18
19
20
21  REPORTED BY:   Beverly Ann Schleimer, RDR, CCR #66
                  Bean & Associates, Inc.
22                Professional Court Reporting Service
                  500 Marquette, Northwest, Suite 280
23                Albuquerque, New Mexico  87102
24  (5162R) BEV
25

154

1   A. No. That was in Cleveland, Ohio. It was
2   where the office was.
3   Q. How long did you do that?
4   A. I did that for about two years. And then I
5   took on further operations responsibilities for nine
6   plants around the eastern part of United States.
7   Q. Was that the job you retired from?
8   A. Yes.
9   Q. Now, let's turn back to that first
10  document, which is Exhibit Number 2, which is a
11  letter to you, dated February 20th, 1970, from C.M.
12  Love in fabrication. Do you recognize this document?
13  Take a chance to review it, and let me know when you
14  are ready.
15  A. I will have to read it.
16  Q. Yes.
17  A. Okay. The question is?
18  Q. The question is: Do you recognize this
19  document?
20  A. Obviously, I've seen it. It's addressed to
21  me.
22  Q. Do you recall seeing it before I handed it
23  to you? Is it something you remember seeing?
24  A. Yes.
25  Q. Is it something you reviewed more recently?

155

1   A. I don't recall.
2   Q. Who is C.M. Love?
3   A. He was production manager.
4   Q. Was he reporting to you in 1970?
5   A. Probably. I am sure he was. That's why
6   it's addressed to me.
7   Q. Now, I apologize that the article isn't
8   attached. It wasn't attached when I pulled the
9   document. Do you have a recollection of the article
10  that is at issue in this letter?
11  A. Not at all. I assume something in the
12  Denver Post, obviously. I do not.
13  Q. And do you have any recollection of what
14  you did after you received this letter?
15  A. Not at all.
16  Q. Do you have any memory of any discussions
17  with Mr. Love about a credibility gap on the part of
18  Dow in the community concerning Rocky Flats?
19  A. No. You would have to ask him what he
20  meant by that.
21  Q. That's not a term you heard at all? It's
22  not something familiar to you?
23  A. Not familiar to me. I don't know on what
24  basis he made that.
25  Q. Do you have a general understanding of what

156

1   the word "credibility gap" means?
2   A. Yes.
3   Q. Would you define for me in your own words
4   what you believe it means?
5   A. There's a difference between reality and
6   perception or something, or what face you put
7   forward. I don't know. There is a question about
8   your credibility is what you say exactly what you are
9   doing or something.
10  Q. In 1970, or thereabouts, do you believe
11  that there were questions about -- in the public mind
12  about credibility of statements issued by Rocky Flats
13  plant officials?
14      MR. POLAND: Object to the form of the
15  question.
16  A. I couldn't possibly answer that, because
17  you are asking me what other people thought. I don't
18  know.
19  Q. Was a credibility gap, or something of that
20  nature, discussed among senior plant officials in
21  that time frame?
22  A. I don't recall. I do recall a number of
23  discussions that centered around the philosophy that
24  said, we are the only people that have to tell the
25  truth. You can make any kind of charge that you want

157

1   to make, and there were a number of the charges by
2   certain detractors from the Rocky Flats operation,
3   for whatever reason, and were simply not true. But
4   they didn't have to defend them. We had -- we were
5   put in a position of having to defend what they said.
6   And so, it was our -- I don't know, absolute policy
7   that we gave the absolute -- I keep saying
8   "absolute." I am tying to explain how critical we
9   thought this was. We had to tell the truth. You
10  don't have to tell the truth about me, but I've got
11  to tell you the truth about me.
12  Q. I want to direct your attention to the
13  bottom part of first paragraph. The sentence that
14  says, "I understand the AEC release was largely
15  authored by Dow." The first clause in the last
16  sentence of the first paragraph.
17  A. Uh-huh, I see.
18  Q. Do you know whether Dow drafted any AEC
19  releases? Was that a common practice?
20  A. No, not a common practice.
21  Q. Did it ever occur, to your knowledge?
22  A. There were joint releases drafted.
23  Q. If something wasn't a joint release, would
24  Dow -- did Dow have any input into AEC releases
25  concerning the Rocky Flats plant?