# Exhibit B

**A Critical Review of the United States Department of Energy Efforts to Investigate the
Human Health Effects of Plutonium**

by:

Steve Wing
Associate Professor
Department of Epidemiology
School of Public Health
University of North Carolina
Chapel Hill, NC 27599-7400

prepared for:

Berger and Montague, P.C.
1622 Locust Street
Philadelphia, PA 19103-6365

November 21, 1996

fluoride, chlorine, or carbonate ions the solubility and gastric absorption of plutonium rises from very poor to near 100% absorption. In the Denver area drinking water is chlorinated, and contains fluoride as well as considerable carbonate ions. Plutonium is absorbed much more by children and nursing animals; these effects can not be assessed in occupational cohort studies which only consider adults. Through the food chain, plutonium may be incorporated and uptake increased as well. Finally, Johnson noted that workers are monitored, have health care, and wear protective masks, while the general public has neither the same exposure or health care experience. We have not found that these criticisms have been addressed by DOE researchers.

*Summary.*        Despite poor exposure measures and migration effects that lead to an inability to separate populations with lower from those with higher plutonium exposures, geographical incidence studies around Rocky Flats have found evidence of higher cancer incidence in areas with higher estimated plutonium deposition. DOE-funded critiques of the published work have emphasized the potential for confounding factors to lead to observing associations due to differences in other cancer risk factors. Crump's re-analysis used a highly unorthodox measure of urbanization that was not supported by any quantitative data in order to control for confounders. DOE critiques have not noted that confounding, in addition to migration and errors in dose estimates, could also lead to masking or underestimation of exposure effects.

**B        Evidence regarding role of DOE**

Plutonium is not a substance that is in general use. Therefore, DOE and agencies of other governments that have been responsible for nuclear weapons and nuclear research programs have had the ability and unique responsibility for conducting adequate investigation of potential effects of plutonium on workers in facilities that have used plutonium as well as on members of the general public who have been exposed through off-site releases from DOE facilities and nuclear weapons tests. As noted by Nussbaum and Kohnlein, "practically all epidemiologicad studies of nuclear worker populations in the industrialized world have been funded by government agencies."[102] This section of our report considers the DOE's historical role 'in research on human health effects of plutonium exposure by drawing on evaluations of DOE's research program made by its own researchers and advisory committees as well as critical reviews conducted by independent researchers.

Although there have been historical concerns about the potential conflict of interest between DOE's roles in both promoting nuclear technology and evaluating its health effects, we assume that most researchers have honorable motives and are committed to goals of protecting public health. Nonetheless, a traditional model of discovery through scientific discourse relies on the ability for prevailing opinions to be challenged, and opposing positions to be voiced and evaluated. Access to data relevant to assessing health effects has been and continues to be restricted. The history of DOE research shows that contesting voices, even at the highest levels of the organization, were silenced. Examples of leading DOE researchers who were silenced include Dr. Thomas Mancuso, who was the original director of the epidemiological studies of DOE workers, and whose research funding was terminated after reporting positive associations between cancer mortality and radiation exposure. This silencing also includes Dr. John Gofman, who was head of the biomedical research division at Lawrence Livermore National Laboratory

21

and one of LLNL's Associate Directors. Dr. Gofman's funding was cut after he published dissenting opinions about the human health effects of plutonium. Dr. Gregg Wilkinson, one of the lead epidemiologists at Los Alamos National Laboratory, lost his funding and position after reporting positive associations between radiation at Rocky Flats and cancer mortality. Dr. Brandom's funding for his highly praised work on chromosome aberrations following plutonium exposure was cut following his report of positive associations. By its treatment of well-known researchers who have exerted their independence, DOE sets an example for others of what will happen to them if they do not conform to expectations.

1.      **Views of DOE Advisory Committees**

        *The Advisory Committee for Biology and Medicine*

        Another element influencing DOE research on the health effects of plutonium is the evidence that researchers were influenced by concerns other than the protection of public health in planning, conducting and interpreting studies of plutonium health effects.

        The Advisory Committee for Biology and Medicine (ACBM) was established in 1947 as an external committee by the Division of Biology and Medicine (DBM) of the US Atomic Energy Commission (AEC) to formulate basic policies related to medical, biological and physics problems. The activities of the committee included the review of proposed research and the allocation of funds for research at US AEC facilities, universities and research institutions. Following each meeting, the chairman of the ACBM provided recommendations of the Committee in a letter to the chairman of the AEC.

        The early meetings of the ACBM were full of conflicting positions regarding protection of health and safety vs. concerns over cost and bad publicity. At their seventh meeting, in March, 1948, "The committee thoroughly discussed the medical aspects of hazard pay and recommended that exposure to permissible dosage of radiation and exposure to toxic material under satisfactory safeguards be regarded as not hazardous to health." It is noteworthy that the committee on biology and medicine decided to discuss wages as an issue at all. Decisions about research as well as about worker protection were affected by such considerations. At their thirteenth meeting in December, 1948, the committee rejected a proposal to study morbidity and mortality of workers to determine special hazards, noting that the cost of the study would include "insurance problems and labor relations." Recommendations were considered that terminated employees be informed about radiation exposures exceeding permissible standards and that they be given records that could be used by new employers to make a more complete exposure history. These recommendations were rejected in favor of telling a terminated employee about "the care that the A.E.C. utilizes in protecting each employee."

        The ACBM also took apparently contradictory positions regarding the open conduct of scientific inquiry. At its seventeenth meeting in September of 1948, the ACBM unanimously approved a statement that,

22

> Science will not long thrive in secret because intellectual restraints and taboos
> hamper the type of probing and wide-ranging thought essential to scientific
> discovery. Political restrictions do two dangerous things to scientists: alienate
> them by reason of lack of freedom of inquiry, which will merely retard progress;
> or distort their thought processes by orienting them about political points of
> reference, a process of substituting dogma for truth, deadly both to science and
> to polity.

Later at the same meeting it was noted that training of scientists was a national need in light of the
successful atomic explosion in the U.S. S.R. and that the Atomic Energy Commission was the best
agency to direct a fellowship program to train scientists, who must be "both loyal and discrete."
Despite the lofty proclamation of commitment to scientific ideals, the ACBM spent much time at
subsequent meetings discussing problems with dissemination of information that would have
serious repercussions from a public relations standpoint" (23rd meeting).  It was important
to "get the general scientific groups to avoid contradictory statements by competent scientists . . .
[especially] those associated with the AEC" (60th meeting).  The sixty-third meeting in April,
1957, was dominated by discussion of public relations problems, including those attributed to
independent scientists such as Drs. Pauhng and Schweitzer.

Excerpts of minutes from the ACBM's fortieth meeting on October 9-10, 1953, at Los
Alamos, suggest concerns of the committee for the cost of radiation protection and public
relations issues that could affect the scientific evaluation of health effects and public education
about radiation and health.  In considering proposed AEC safety regulations, one committee
member noted,

> the need for establishing a policy arose from the fact that there has been
> exaggerated use of additional safety factors by the contractor.  On general
> principles the contractor wants to be on the safe side, so the expense to the
> AEC is quite appreciable. According to this policy, the contractor should not
> have to take so many precautions ... if this information or policy should be
> released to the public it would create a rather bad impression if the AEC
> requires the contractors to assume the attitude that they must not take so many
> precautions for health protection.

The minutes further quote the Advisory Committee member directly,

> from the public relations point of view that is a bad situation especially at this
> time when, with the bomb tests in Nevada there is considerable amount of
> radioactivity there, and if the newspapers got hold of that--and this new policy
> too---they may say there has been a relative change in the attitude of the AEC.

Another committee member, again referring to the new safety regulations,

> brought out that the language could be changed somewhat to make it a little
> less mandatory and a little more permissive with which the Committee

23

concurred. He stated, however, that one of the reasons for making the policy mandatory was the fact that at the recent hearings before the Bureau of the Budget the question was asked as to what was being done by the AEC to reduce the cost of health protection.

It is noteworthy that these statements are excerpted from what was released from minutes for this meeting, which were heavily censored. In the portion of the minutes available to us, no member of the committee expressed discomfort with these statements, although one member, "following the meeting . . . urged great caution in reaching a waste disposal policy" due to the potential for genetic effects in future generations.

The ACBM routinely reviewed funding for studies at AEC facilities and universities as well as research being conducted on A-bomb survivors. One theme of committee discussions was the inadequacy of funding for biological research. However, committee chair Failla observed at the sixty-third meeting that, while more money was needed for the biology and medicine program, the weapons program needed the money to compete with the Russians. Furthermore, more funding for biological research "would not have prevented the present emotional reaction on the part of the public."

Discussions at ACBM meetings suggest that the conflict of interest of the AEC and its biomedical research program as both promoters of the nuclear industry and monitors of health and safety was acknowledged and of concern to some. At the ACBM's seventy-fourth meeting in April 1959, AEC Chair McCone questioned "to what extent an agency that contributed to a national (and also international) health hazard should be charged with monitoring and interpreting that hazard." Mr. WE. Johnson, Vice President of General Electric Co. and Manager of the Hanford Atomic Products Operation, said his concerns about the biomedical research program included "that the Hanford staff and the AEC were being placed in the position of judge, jury and offender with respect to its monitoring activities. It would be better for an outside organization to be the judge or jury."(78th meeting, January, 1960)

*The LANL Advisory Committee for Epidemiology*

In 1976 a protocol for an epidemiological study of all workers at major DOE facilities processing plutonium, the National Plutonium Workers Study, was reviewed and approved by a DOE Ad Hoc Advisory Committee (Document 00440616) The study was to be conducted at LANL, and it was to include past and present workers at LANL, Rocky Flats, Mound, and Savannah River. In the same year an external review committee for the epidemiology program at LANL was established. The purpose of the Committee was to provide an unbiased critique and review of epidemiology research of plutonium workers. At their first meeting the Committee reviewed proposed and ongoing studies of morbidity (including genetic effects) and mortality in plutonium workers. LANL staff described plans for the morbidity study of plutonium workers and requested input from the Committee regarding study design. The Committee recommended that LANL consult with genetic epidemiologists and develop a proposal to study genetic effects in plutonium workers. (Document 00463 5 78, 1976)

24

Beginning in 1977, Dr. Saxon Graham provided a written summary of the Committee's recommendations The Committee immediately raised questions about the usefulness of the mortality studies in identifying non-fatal cancers and the lack of exposure assessment for other types of radiation. The proposed morbidity study engendered enthusiasm on the par-t of the Committee, which provided detailed recommendations on study design issues. The Committee also recommended investigating potential genetic effects related to plutonium exposure as part of the proposed morbidity cohort study.(Document 00463554, 1977)

The Committee reiterated its support of the longitudinal study of morbidity, describing the proposed study as the "backbone" of research efforts of specific individuals exposed to various levels of irradiation by plutonium at the various work sites throughout the country. (Document 00463547, 1979) The Committee considered the mortality studies of Los Alamos County compared to other New Mexico counties, and related mortality studies being conducted by LANL, to be of limited use.

The Committee continued to advise LANL in 1981 regarding design of the morbidity study and urged LANL to begin data collection as soon as possible. The Committee reiterated the value of the morbidity study, including the opportunity to test a variety of hypotheses using cohort and case-control study designs. The Committee again expressed its concerns regarding the limitations of the mortality study,

> I think we made explicit our reservations about comparing mortality rates from
> various causes in the work forces with that to be expected in similar populations
> residing in the United States or the states or counties in which the locations are
> located. Ideally, mortality should not ordy be studied in the above fashion, but
> should be assessed in terms of the degree of exposure of worker. Certainly, state-
> county comparisons are necessary to assess the possibility that anyone working in
> the vicinity of plutonium may have experienced some effect whether or not
> exposure was measured. (Document 00463 523, 198 1)

In 1983, a DOE epidemiology site review committee disagreed with the program of research recommended by LANL researchers and the Advisory Committee for Epidemiology: "The proposed morbidity study should not be conducted as planned. A small pilot study may be warranted but should not be pursued until the protocol is reviewed and approved by the DOE Project Officer." In response, Dr. George Voetz from the LANL Health Division wrote to Dr. Charles W. Edington, Associate Director of Energy Research at the Office of Health & Environment Research, US Department of Energy, "We believe that the purpose of the plutonium workers study is to provide the most definitive answer possible to the concern about plutonium-related health effects and that a morbidity study is necessary to achieve this end. Total reliance on mortality studies would result in both scientific and public criticism for DOE and the eventual results of the plutonium workers study." (Document 00453348)

Soon thereafter, Dr. Saxon Graham resigned as Chairman and member of the Advisory Committee, expressing disgust at the DOE site reviewers' conclusions about the morbidity study. Dr. Graham stated, "The DOE will never convince anyone that there are no untoward effects of

25

plutonium without carrying on the incidence study. Nested case-control studies cannot do the job." (Document 00442878, 1983)

The Epidemiology Advisory Committee continued to advise LANL on the design of the morbidity study in 1986. They noted that the morbidity study remained a high priority, but they recommended that the study should be pursued only if it can be done expeditiously and without draining resources from other important studies. The Committee also advised completion of mortality studies at LANL, Mound and Zia to confirm the results reported at Rocky Flats, but reiterated the limitations of mortality studies and the interpretation of the Rocky Flats study results.

In November 1989, the Secretarial Panel for the Evaluation of Epidemiologic Research Activities (SPEERA) recommended changes in the organization of epidemiological research activities at DOE facilities that would have significant impact on future plutonium research activities at LANL. Aware of the SPEEPA Committee recommendations, the Epidemiology Advisory Committee recommended that LANL significantly improve their health surveillance programs and records to provide opportunities for future epidemiological studies. The Committee continued to advise LANL on mortality study issues and recommended that special consideration be given to the study of excess bone tumors observed in the Zia cohort mortality study. The Committee continued to recommend that the morbidity study of plutonium workers as an important priority that has not been undertaken (Document 00423090, 1990).

The proposed incidence study was designed to interview 5000 workers with positive Pu body burdens and 20,000 workers without confirmed Pu exposure. (Database document 00424419,[72]) The study would collect information on confounders and track workers to detect incident cancers.
This protocol was repeatedly referred to in publications[73], suggested and approved by the LANL Advisory Committee for Epidemiology, yet rejected by DOE scientific advisory committee. To date, the study originally conceived in 1976 has not been initiated.

## 2.     The Scientific Culture at DOE

The conflict between the commitment of researchers to serving the public health and the interests of DOE in promoting nuclear technology has been noted by many scientists. Karl Z. Morgan, sometimes called the "father" of the discipline of health physics, who directed the radiation protection program at the Oak Ridge National Laboratory for many years, observed that "there were times when some of my associates were demoted or lost their jobs because they refused to yield to pressures to lower our standards or compromise for unsafe conditions."[103] He continued: "We were constantly resisting pressures of engineers and production supervisors to relax what they called our ridiculous conservatism. Sometimes we were forced to set exposure limits that were lower than our management wanted and perforce they were often little better than guesses because in some areas we had almost no experience or supporting experimental data. For example, one of the earliest papers showing how to calculate dose from internally deposited radionuclides and giving values of permissible body burden and permissible concentration of some 20 radionuclides was delayed for almost a year when I presented it for publication in 1945

26

because some of the permissible occupational exposure values I calculated were much lower than those in use in weapons production operations."[103]

Morgan's statement concerns standard setting, which depends on assumptions about the magnitude of health damage that results from a particular quantity of exposure, known as dose-response. As Greenberg noted, "The reduction of exposure to [radiation], whether by substitution, containment, or personal protection, of course, has important commercial, energy and defense policy considerations. Deliberations over dose-response relations have, in consequence, been hard fought over."[104] Greenberg goes on to point out that, "Data that are available for these exercises, both in terms of the gross epidemiological data and the finer information that deals with the biological effects of the agent and with the mechanisms by which disease processes proceed, are not all that good." In such a situation it is important "to appreciate all the considerations that went into the formation of the value judgments involved [in dose-response assumptions]."[104] Such a situation suggests why the views of advisory committees and the social context in which DOE researchers operate are so important.

Sterling investigated the decision making at DOE involved in establishing the Health and Mortality Studies in the mid-1960's.5 He notes that DOE's decision to initiate these long term studies neglected the advice of scientific reviewers because the design of the study was anticipated to produce ambiguous findings that could be interpreted as evidence that there are no untoward effects of occupational radiation exposures. Marks, a DOE-funded researcher, said, "This study probably will not confirm or refute any important hypothesis but should permit a statement to the effect that a careful study of workers in the industry has disclosed no harmful effects of radiation." A study consultant from Harvard who served as the chair of the ad hoc advisory committee to the federal radiation council of the National Academy of Sciences wrote to the AEC, "In my opinion this study does not have, never did have, and never (in any practical sense) will have, any possibility of contributing to knowledge of radiation effects in man .... I recognize that much of the motivation for starting this study arose from the 'political' need for assurance that AEC employees are not suffering harmful effect." These assessments turned out to be wrong, as over the ensuing fifteen years numerous researchers reported evidence of radiation health effects among DOE workers. Nevertheless, it is an important indication of the scientific climate at DOE that studies were readily funded (although under-funded) even though they were thought to be scientifically useless when it was believed that their results would have political utility. As Sterling notes, the funding was cut when the investigators reported positive findings.

Pressure on DOE researchers to come up with the "right" answer is exemplified by the experience of Gregg Wilkinson, formerly epidemiology group leader at LANL and principal investigator of the plutonium workers study. Wilkinson, who described his experiences before the SPEERA committee, considered his "mission as a public health professional [was) to investigate whether or not there were health effects, ostensibly associated with exposure to internal radiation, primarily, but also external radiation."(page 211) After finding evidence of excess cancer at Rocky Flats, Wilkinson "decided to inform some of my superiors at the laboratory . . . [one of whom] was very upset and made the statement that, if these findings are true, this will shut the nuclear industry down." (page 21 1) He was "called to the Director's office at Los Alamos and be rated and accused of not having these results properly reviewed," and told that, "we should not

27

be publishing using or trying to please peer reviewers, but rather we should be publishing to please the Department of Energy because they were a customer of ours." He further stated that, "at that time, pressure was put on me to withdraw the paper and which I refused to do." (page 207) Pressure to withdraw the paper came not only from his superiors at LANL. "There was very definite pressure from several sources within the Department of Energy to withdraw the results of that study to change the findings or the interpretation."

The experience of a British epidemiologist suggests that the scientific climate at DOE is similar in other countries in which the government has a vested interest in promoting nuclear technology. According to Geoffrey Rose, a participant in an inquiry into the relationship of childhood cancer to environmental exposures from the Sheffield, United Kingdom, nuclear facility, "We were given information (which, it later transpired, was incorrect) of the total radioactive emissions from the plant, but the exposure levels of the children were a matter of speculation. The radiation experts on the committee calculated 'best estimates' and they concluded, on theoretical grounds, that these could not have caused any major excess risk: 'It couldn't have happened, so it didn't happen.'" 105 Rose went on to note that "From experience at Sheffield and elsewhere I have become aware that in investigating the environmental health impact of large industries (especially if they have military interests) we are confronting the seat of immense economic and political power."115 Rose's experience suggests that problems with governmental and industry influence on radiation health researchers is international.

### Advisory Committee on Human Radiation Experiments ( ACHRE)

The ACHRE was created by President Clinton to investigate experiments on individuals involving intentional exposure to ionizing radiation, and experiments involving intentional environmental releases of radiation. The Advisory Committee on Human Radiation Experiments Final Report (1995) and related documents describe Atomic Energy Commission (AEC) policies, procedures and activities 'in releasing information related to the human radiation experiments, occupational exposures, environmental emissions and nuclear fallout studies conducted by the Manhattan Engineering District and the AEC.

The AEC established a written policy of security classification which controlled access to information by the scientific community and the public. The written policy was adopted in 1947 following recommendations of the Advisory Committee on Declassification[106] and the AEC Medical Board of Review. The Medical Board of Review recommended that, "in so far as it is compatible with national security, secrecy in the field of biological and medical research be avoided."(Letter from David E. Lilienthal to Dr. Robert F. Loeb, Chairman, Atomic Energy Commission Medical Board of Review, June 27, 1947)

However, in practice the AEC consistently violated this policy. Instead, criteria other than national security were used to prevent release of information, creating classification categories of restricted and confidential, in addition to secret and top secret classifications, to control access to information. These criteria are described in several documents obtained by ACBRE. For example, documents were classified by the AEC as Confidential if, "while not endangering the National security, would be prejudicial to the interests or prestige of the Nation or any

28