# Exhibit D

*new file —*
*all three [signed]*

# MOUNTAIN SHADOWS

## PURCHASE AND SALE OF VACANT LAND

### (PROJECTS BY REMINGTON HOMES, INC.)



DEPOSITION EXHIBIT 17
Griffin 8/19/04
CONFIDENTIAL
FOG 00001

# MOUNTAIN SHADOWS
# PURCHASE AND SALE OF VACANT LAND

## TABLE OF CONTENTS
(For Convenience Only -- Not a Part of Contract)

| | | Page |
|---|---|---|
| 1. | GENERAL. | 1 |
| 1.1 | The Property. | 1 |
| 2. | PURCHASE AND SALE PROVISIONS. | 1 |
| 2.1 | Purchase of Property. | 1 |
| 2.2 | Purchase Price and Take-Down Obligations. | 1 |
| 2.3 | Deposit | 2 |
| 3. | PRE-CLOSING CONDITIONS. | 2 |
| 3.1 | Buyer's Conditions. | 2 |
| 4. | PRE-CLOSING MATTERS. | 3 |
| 4.1 | Survey. | 3 |
| 4.2 | Additional Information Received by Buyer. | 3 |
| 5. | TITLE, CONVEYANCE, WARRANTIES. | 4 |
| 5.1 | Title Insurance. | 4 |
| 5.2 | Title Defects. | 4 |
| 5.3 | Conveyance. | 5 |
| 5.4 | Seller's Warranties and Representations. | 5 |
| 6. | CLOSING. | 5 |
| 6.1 | Definitions. | 5 |
| 6.2 | Documents at Closing. | 5 |
| 6.3 | License Agreement | 6 |
| 6.4 | Closing Statement Adjustments and Prorations. | 6 |
| 6.5 | Possession. | 6 |
| 7. | SELLER'S OBLIGATIONS FOLLOWING CLOSING. | 6 |
| 8. | BUYER OBLIGATIONS. | 6 |
| 9. | DEFAULTS. | 7 |
| 9.1 | Defaults by Seller prior to the Closing. | 7 |
| 9.2 | Defaults by Buyer Prior to the Closing. | 7 |
| 9.3 | Defaults After Closing. | 8 |
| 10. | SPECIAL DISTRICT DISCLOSURE; SYSTEM DEVELOPMENT FEES; SCHOOL FUNDING ASSESSMENTS. | 8 |

CONFIDENTIAL
FOG 00002

| | | |
|---|---|---:|
| 11. | MISCELLANEOUS. | 8 |
| 11.1 | Taking Prior to Closing. | 8 |
| 11.2 | Contract Not to be Recorded. | 9 |
| 11.3 | As-Is Condition, No Representations. | 9 |
| 11.4 | Indemnification; No Mechanic's Liens. | 9 |
| 11.5 | Notices. | 10 |
| 11.6 | No Oral Amendment or Modifications. | 11 |
| 11.7 | Severability. | 11 |
| 11.8 | Assignability. | 11 |
| 11.9 | Binding Effect. | 11 |
| 11.10 | Captions and Convenience. | 11 |
| 11.11 | Applicable Law. | 12 |
| 11.12 | Exhibits Incorporated. | 12 |
| 11.13 | Time of the Essence. | 12 |
| 11.14 | Brokers. | 12 |
| 11.15 | Counterparts. | 12 |
| 11.16 | Costs of Legal Proceedings. | 12 |
| 11.17 | Survival of Provisions. | 12 |
| 11.18 | General Cooperation. | 12 |
| 11.19 | Computation of Time. | 12 |
| 11.20 | Negotiated Provisions. | 12 |
| 11.21 | No Implied Waiver. | 12 |
| 11.22 | Entire Contract; Artistic Renderings. | 13 |

## EXHIBITS

| | |
|---|---|
| Exhibit A | Legal Description of the Property |
| Exhibit B | Map Showing Order of Take-Downs |
| Exhibit C | Form of Special Warranty Deed |
| Exhibit D | Description of Infrastructure |
| Exhibit E | License Agreement |

CONFIDENTIAL
FOG 00003

## MOUNTAIN SHADOWS
## PURCHASE AND SALE OF VACANT LAND

This Purchase Contract ("Contract") is made as of the 23 day of October, 2003, between ALKIRE INVESTMENTS, INC., a Colorado corporation ("Seller") and PROJECTS BY REMINGTON HOMES, INC., a Colorado corporation ("Buyer").

1.  GENERAL.

    1.1  The Property. The "Property" as the term is used herein shall (subject to the provisions of Section 2 below) mean the real property set forth on **Exhibit A** hereof, together with all rights-of-way, easements, privileges and appurtenances pertaining thereto and necessary to obtain access, consisting of those certain tracts of unimproved real property containing approximately 205 acres, located in the City of Arvada, Colorado, (the "Governmental Authority") along with any water and water rights, coal, oil, gas, minerals and mineral rights, if any, owned by Seller. The precise legal description for the Property will be shown on the Survey obtained pursuant to Section 4.1 hereof. The Property will be a part of a subdivision known as "Mountain Shadows."

2.  PURCHASE AND SALE PROVISIONS.

    2.1  Purchase of Property. Seller hereby agrees to sell and Buyer shall have the option and right to purchase the Property, upon and subject to the terms and conditions set forth in this Contract.

    2.2  Purchase Price and Take-Down Obligations. The "Purchase Price" of the Property shall be approximately $17,000,000. The Purchase Price shall be adjusted at Closing to be the product of $57,095 per Estate Lot, $38,065 per Suburban Residential Lot and $33,305 per Lifestyle Lot, that are platted pursuant to the preliminary and final plat. As used herein, the terms "Estate Lot" shall mean a lot of approximately 13,000 square feet, "Suburban Residential Lot" shall mean a lot of approximately 8,000 square feet and "Lifestyle Lot" shall mean a lot of approximately 5,000 square feet. The parties anticipate that there will be approximately 78 Estate Lots, 103 Suburban Residential Lots and 259 Lifestyle Lots. Any of the foregoing may be referred to hereinafter as a "Lot" or "Lots". If following acceptance by the Governmental Authority of the Development Plan as defined in Section 3.1.2, no more than 405 Lots in the aggregate may be obtained, either party may terminate this Agreement, and the Deposit shall be returned to Buyer.

    Buyer shall acquire that portion of the Property shown on **Exhibit B** at the Initial Closing (as defined in Section 6.1 hereafter). Buyer shall acquire that portion of the Property shown on **Exhibit B** at the Second Closing (as defined in Section 6.1 hereafter). Buyer's right to acquire any portion of the Property hereunder shall expire and automatically terminate upon 365 days following the Initial Closing (the "Term"), except if Buyer's failure to close earlier is a result of a default by Seller.

    From and after the Initial Closing, the unpaid portion of the Purchase Price shall increase by 5% per annum calculated on a per diem basis.

1

CONFIDENTIAL
FOG 00004

The Purchase Price shall be paid by Federal wire transfer funds ("Good Funds").

2.3 Deposit. Buyer shall pay to the Title Company as a deposit $300,000 ("Deposit"). The Deposit shall be paid within three (3) days following execution of this Contract. The Deposit shall be invested by the Title Company at the highest available federally insured money market rate, and any interest earned thereon shall be included in the Deposit. The Deposit shall be credited against the Purchase Price at the Second Closing. The Deposit is not refundable to Buyer unless Buyer elects to terminate this Contract as may be allowed in Sections 3, 5.2, 8.1, 9.1(a), 11.1, or any other specific provision of this Contract.

3. PRE-CLOSING CONDITIONS.

3.1 Buyer's Conditions. In the event that any of the conditions set forth below are not satisfied, Buyer may as its sole remedy hereunder terminate this Contract automatically by giving written notice to Seller on or before the last day of the specified period of time set forth in this Section 3.1 to the effect that Buyer elects to terminate the Contract. Upon any such termination, the Deposit shall be returned to Buyer.

3.1.1 Investigations, Tests, Plans and Surveys. Buyer's obligations under this Contract are contingent upon Buyer's satisfaction, in its sole discretion, on or before the expiration of the Inspection Period, with the results of any investigations, tests and surveys, as Buyer, in its sole discretion, determines to make during the Inspection Period. The "Inspection Period" shall mean the period commencing on the date of mutual execution of this Contract and terminating at 5:00 p.m. (mountain time) on the 90th day following such date of execution. Within three business days following mutual execution hereof, Seller shall make available to Buyer all reasonably material information relating to the Property and its development, including without limitation, District service plans, facilities plans, engineering studies and governmental submissions, budgets for off-site improvements and off-site backbone infrastructure, and plans for common area amenities and common area landscaping.

Buyer, its authorized agents, employees and independent contractors shall have the right, for its benefit, to enter upon the Property for the purpose of making investigations, tests and surveys, both during and after the expiration of the Inspection Period. Any entry by or on behalf of Buyer shall be subject to such reasonable rules, regulations, standards and conditions as Seller may impose, including but not limited to the condition that Buyer maintain insurance coverage in a form and amount reasonably satisfactory to Seller. All such investigations, tests and surveys shall be at the sole cost and expense of Buyer and shall not damage, destroy or harm the Property or any improvements thereon. Buyer shall promptly repair and substantially restore the Property to its original condition at Buyer's sole cost and expense, and such obligation shall survive termination of this Contract. Buyer shall, if at all, elect its option to terminate under this Section 3.1.1 on or before expiration of the Inspection Period.

Buyer shall indemnify, defend and hold Seller harmless from and against any and all loss, cost, liability or expense whatsoever (including without limitation reasonable attorneys' fees) arising out of any damage to persons or property occurring on or about the Property arising from the acts or omissions of Buyer or Buyer's agents, employees or contractors except to the

2

extent caused by latent defects currently existing in the Property, and such obligation shall survive termination and Closing hereunder.

Seller makes no representations or warranties as to the accuracy, completeness or quality of any third party studies, reports, surveys, plans or other documents prepared for Seller or others and subsequently delivered to Buyer, except that Seller warrants that it has no knowledge of any inaccuracy therein. As used herein the term "knowledge" shall mean the current, actual (as opposed to constructive knowledge) of Seller without having made any investigation of facts or legal issues and without any duty to do so.

3.1.2   Other Conditions. Buyer's obligations under this Contract are contingent upon Seller obtaining the following within 360 days following the date of this Contract, the submittals for which shall each be subject to the prior written approval of Buyer: (i) approval by the Governmental Authority of the service plan of the metropolitan district that services the Property (the "District"); (ii) annexation and final zoning of the Property in conformance with the outline development plan (the "Development Plan"); (iii) the final plat for the Property which shall conform in all material respects with the Development Plan; and (iv) any submittals and documents prepared to govern the rights and obligations of homeowners, the rights and obligations of the District, or otherwise affecting maintenance and use of the Property, approval of environmental permits, an annexation agreement, a subdivision improvement agreement, "will-serve" letters from utility providers, access easements and other dedications. For each submittal, Seller shall provide written notice to Buyer and Buyer shall have seven (7) calendar days to approve or disapprove the submittal. If Buyer fails to give Seller written notice of its disapproval within such seven (7) day period, Buyer shall be deemed to have approved the submittal.

However, if any condition set forth in this Section 3.1.2 (not including (i) above) that is to be satisfied prior to the Initial Closing is not satisfied, either party may extend the Initial Closing for up to 180 days in order to obtain such satisfaction, and during said period, the Contract may not be terminated. If satisfaction is not obtained prior to expiration of the permitted extension of the Initial Closing, Buyer may terminate the Contract by written notice to Seller, and the Deposit shall be returned to Buyer.

Seller covenants that it shall use diligent efforts to satisfy each of the contingencies above in an expeditious manner.

4.   PRE-CLOSING MATTERS.

4.1   Survey. Within 30 days following the date hereof, Seller will provide to Buyer a current ALTA survey of the Property, showing the Property, locating any easements thereon and sufficient to obtain deletion of standard printed exceptions 1-5 of Schedule B of the Title Commitment, certified to Buyer, the Title Company, and any other party reasonably requested by Buyer.

4.2   Additional Information Received by Buyer. Buyer acknowledges that it has, or will have during the Inspection Period, received and read the provisions of the Colorado Geological Special Publication 43 entitled, A Guide to Swelling Soils for Colorado Homebuyers

3

CONFIDENTIAL
FOG 00006

and Homeowners. Buyer acknowledges that the Property contains soils that are expansive and Seller shall have no responsibility to take any action that may be necessary to remedy any condition resulting from the expansive nature of such soil.

5. TITLE, CONVEYANCE, WARRANTIES.

5.1 Title Insurance. Within five days after the date of this Contract, Seller shall deliver to Buyer an ALTA extended coverage owner's title insurance commitment with the creditor's rights exclusion deleted (the "Title Commitment") with respect to the Property, together with legible copies of the exceptions to title shown therein ("Title Documents"), issued by First American Heritage Title Company as agent (the "Title Company"), committing to insure title to the Property in Buyer in an amount equal to the Purchase Price, deleting standard printed exceptions 1-5 therefrom, and committing to give a 100.31 endorsement (at Seller's expense) following platting of the Property. If required by the Title Company to permit deletion of the standard printed exception regarding mechanics liens, each party shall execute an affidavit and indemnity agreement in favor of the Title Company regarding any mechanics lien claims resulting from work affecting the Property which may have been ordered by it. Buyer, at its expense, shall be entitled to obtain such endorsements to the Title Commitment as Buyer shall desire, and Seller shall reasonably cooperate in connection therewith. Promptly after Closing, Seller, at its expense, shall cause the Title Company to deliver to Buyer an owner's policy of title insurance consistent with the Title Commitment.

5.2 Title Defects. Buyer shall have 20 days following receipt of the survey, Title Commitment and Title Documents (the "Title Inspection Period") in which to determine if any matters affect title that are objectionable to Buyer ("Defects"). Unless Buyer is willing to waive objection to the Defect, Buyer shall give written notice thereof ("Notice of Defect") to Seller within the Title Inspection Period, or if later within 10 days following notice of any new Defect not theretofore disclosed to Buyer. Buyer's failure to give Seller such Notice of Defect within the Title Inspection Period shall constitute Buyer's waiver of any objection to Defects. Within 10 days after receipt of Buyer's Notice of Defect, Seller may at its sole option elect to cure such Defect. If Seller elects to cure any Defect, Seller may, by written notice to Buyer, extend the date of Closing for a period of up to 30 days in order to attempt to do so. Seller shall give written notice to Buyer when the Defect is cured, and the Closing shall occur on the later of the date upon which Closing otherwise would have occurred had such Defect not existed or the 10th business day following the giving of such notice of cure. If Seller declines to cure any such Defect, or if Seller fails to cure the Defect within 30 days after the giving of the original Notice of Defect by Buyer to Seller (the "Cure Period"), Buyer may at its option and as its sole remedy hereunder, (a) waive objection to such Defect and close as provided in this Contract, or (b) terminate this Contract, in which case the Deposit shall be returned to Buyer. The failure of Buyer to give written notice to Seller that Buyer elects (a) or (b) above within three days following expiration of the Cure Period, shall be deemed to be a waiver of Buyer's objection to the Defect. Any Defects existing following compliance with the provisions of this Section are referred to hereinafter as "Permitted Exceptions".

The final subdivision plat shall be a Permitted Exception. Seller shall remove any other monetary liens and judgments arising prior to Closing.

4

CONFIDENTIAL
FOG 00007

5.3 **Conveyance**. Seller shall convey the Property to Buyer at Closing by special warranty deed in the form attached hereto as **Exhibit C** (the "Deed"), free and clear of all liens and encumbrances subject to the Permitted Exceptions.

5.4 **Seller's Warranties and Representations**. Seller hereby represents, warrants, and agrees that as of the date hereof, and on the date of a Closing, except to the extent disclosed or known to Buyer, and except as may be caused or created by Buyer:

    a. Seller has all requisite legal right, power, and authority to enter into this Contract and to transfer and convey the Property and otherwise perform its obligations hereunder, without the consent or approval of any third party.

    b. There is no litigation or condemnation action pending or to the best of Seller's knowledge, threatened which in any manner affects the Property.

    c. The execution and delivery of this Contract, and the performance of all obligations hereunder by Seller, do not and will not require any consent or approval of any person and do not and will not result in a breach of, or constitute a default under, any indenture, loan or credit agreement, mortgage, deed of trust or other agreement to which Seller is a party.

    d. Seller has not defaulted under any lease or contract affecting the Property, nor has Seller caused by its act or omission an event to occur which would with the passage of time constitute a breach or default under such lease or contract.

    e. Seller has received no written notice of any violation or claimed violation of any law, rule, or regulation relating to Hazardous Substances on or under the Property. As used herein, "Hazardous Substances" shall mean any substance or material which is regulated or controlled by any local, state or federal environmental law.

    f. Seller has received no notice of non-compliance with respect to any federal, state or local laws, codes, ordinances or regulations relating to the Property.

6. **CLOSING**.

6.1 **Definitions**. "Closing" shall mean payment of the Purchase Price for the Property and execution and delivery of the Deed and other documents to be delivered at Closing as hereinafter provided. "Closing Date" or "Date of Closing" shall mean the day on which Closing is accomplished. The initial Closing (the "Initial Closing") shall occur 30 business days following satisfaction of all of Buyer's conditions set forth in Section 3.1 above, but no later than October 7, 2004, subject to extension as described in Section 3.1.2 and Section 5.2, above. The next Closing (the "Second Closing") shall take place on the 10th business day following the election of Purchaser, but no later than expiration of the Term (as defined in Section 2.2). Closing shall take place at the offices of Seller's counsel, Brownstein Hyatt & Farber, P.C., 410 17th Street, 22nd Floor, Denver, Colorado, or at such other place as the parties may mutually agree.

6.2 **Documents at Closing**. At Closing, the following documents and materials shall be delivered by the parties: (a) a closing statement as hereinafter provided; (b) a duly executed and

5

CONFIDENTIAL
FOG 00008

acknowledged Deed in the form attached as **Exhibit C**; (c) the Purchase Price; (d) the License Agreement (as described in Section 6.3); (e) a special warranty bill of sale transferring all personal property belonging and appertaining to or affecting the Property; and (f) all other instruments and documents reasonably necessary to close the transaction contemplated by this Contract.

6.3  License Agreement. At Closing, Seller shall grant to Buyer a non-exclusive License Agreement in the form of **Exhibit E** granting Buyer the right to access the portion of Mountain Shadows to be retained by Seller for purposes of constructing the Infrastructure on the Property.

6.4  Closing Statement Adjustments and Prorations. The closing statement shall reflect the Purchase Price adjusted by a credit for the Deposit at the Second Closing, and an adjustment as of the Closing Date for proration of real property taxes and the current installment of assessments. Seller shall pay the basic premium for the owner's extended coverage title insurance policy. Unless otherwise agreed to by Seller pursuant to Section 5.2 hereof, Buyer shall pay for such title insurance endorsements as it requires, documentary fees, and fees for recording the Deed. The parties shall share equally any closing fee payable to the Title Company. Proration for real property taxes and assessments shall be based upon the most recently available mill levy and tax assessments with respect to the Property, and said proration shall be final. In the event that the Property is assessed or taxed as a part of a larger parcel, the tax shall be determined by multiplying the assessment and tax for the land portion of said larger parcel by a fraction, the numerator of which shall be the land area of the Property and the denominator of which shall be the land area of said larger parcel.

6.5  Possession. Possession of the Property shall be delivered to Buyer on the Closing Date free and clear of all liens, leases, encumbrances, easements and restrictions, but subject to the Permitted Exceptions.

7.  SELLER'S OBLIGATIONS FOLLOWING CLOSING. Prior to and following Closing, Seller shall have no obligation to complete any improvements or perform any covenants on or with regard to the Property or Mountain Shadows, except as set forth herein.

8.  BUYER OBLIGATIONS. Following the Initial Closing, Buyer shall install and construct those items set forth on **Exhibit D** (the "Infrastructure") in a good and workmanlike manner and in accordance with all requirements of the Governmental Authority; provided, however, Seller and Buyer shall, prior to expiration of the Inspection Period, agree to an allocation of costs of the Infrastructure attributable to the portion of Mountain Shadows to be retained by Seller. If Seller and Buyer are unable to reach such agreement, either party shall have the right to terminate this Contract by written notice to the other on or before expiration of the Inspection Period, whereupon the Deposit shall be returned to Buyer. Following Buyer's completion of the Infrastructure, in connection with the preliminary acceptance by the Governmental Authority all of such improvements shall be transferred and conveyed to the District (as defined in Section 3.1.2 above) by warranty bill of sale free and clear of all liens and encumbrances. Subsequently, Buyer shall cooperate with Seller and the District with respect to the District's issuing directly to Seller the District's note payable to Seller (the "District Note") in exchange for the Infrastructure, including the execution of assignments to the District or other

6

documents reasonably requested by Seller to effectuate the intent of the parties that Seller receive any consideration from the District for such improvements. The parties hereby acknowledge that the District Note issued directly to Seller by the District is part of the consideration for the sale of any portion of the Property from Seller to Buyer. The issuance of the District Note shall not be a condition to Seller's obligations hereunder.

Prior to expiration of the Inspection Period, Seller and Buyer shall agree to a security arrangement in favor of Seller to secure Buyer's completion of the Infrastructure, whether by a declining balance letter of credit, cash deposit, or other security. If Seller and Buyer are unable to reach such arrangement, either party shall have the right to terminate this Contract by written notice to the other on or before expiration of the Inspection Period, whereupon the Deposit shall be returned to Buyer.

Buyer shall take all actions (not requiring the expenditure of funds) reasonably requested by Seller to obtain approval by the Governmental Authority of the provisions of the service plan, provided that the service plan is not modified in any material respect following Buyer's approval of such service plan. Furthermore, Buyer shall make no objection to performance by the District of its obligations under the service plan, so long as, in Buyer's determination, the District performs such obligations in accordance with the terms of the service plan.

Notwithstanding any of the foregoing, if there are any reimbursements of costs incurred in connection with the lift station and related facilities constructed by Buyer, whether such reimbursements are to be from the Jefferson Center Metropolitan District or any other person or entity, shall be payable exclusively and entirely to Buyer. Prior to expiration of the Inspection Period, Seller shall fully cooperate with Buyer to obtain reimbursement agreement in favor of Buyer relating to such costs. If Seller and Buyer are unable to reach such agreement, then Buyer shall have the right to terminate this Contract by written notice to the Seller on or before expiration of the Inspection Period, whereupon the Deposit shall be returned to Buyer.

8.2   Buyer's obligations under this Section 8 shall survive the Closing unless the Contract is terminated by Buyer pursuant to its rights hereunder.

9.   DEFAULTS.

9.1   Defaults by Seller prior to the Closing. Prior to the Closing, if there is any material default by Seller under this Contract, after giving Seller 10 days' notice and right to cure, Buyer may at its option and as its sole remedy, (a) declare this Contract terminated in which case the Deposit shall be returned to Buyer, or (b) bring an action against Seller for specific performance and damages; provided however, damages shall be limited to actual damages, and shall not include consequential or punitive damages.

9.2   Defaults by Buyer Prior to the Closing. Prior to a Closing, if there is any material default by Buyer under this Contract, after giving Buyer 10 days' notice and right to cure, then Seller may, as its sole remedy, except for those remedies set forth under Sections 3.1.1 and 8.1 hereof, declare this Contract terminated in which case the Deposit shall be paid to Seller as liquidated damages.

7

CONFIDENTIAL
FOG 00010

In the event this Contract is terminated due to the default of Buyer hereunder or for any other reason, Buyer shall deliver to Seller, at no cost to Seller, without warranty as to accuracy or quality, all right, title and interest in all plans and specifications regarding any construction which Buyer planned to complete on the Property (excluding plans and specifications of planned residential units), along with all reports regarding the Property, including, but not limited to inspections, soils, environmental and economic feasibility plans.

9.3 <u>Defaults After Closing</u>. Each of Seller and Buyer shall be entitled to pursue any and all legal and equitable remedies available to either in the event of a default by the other party after Closing, but in no event shall either party be liable for consequential or punitive damages.

10. <u>SPECIAL DISTRICT DISCLOSURE; SYSTEM DEVELOPMENT FEES; SCHOOL FUNDING ASSESSMENTS</u>.

Prior to Closing, the Property shall be located within the boundaries of the District. Buyer has previously, or will have during the Inspection Period, satisfied itself with regard to the services performed by, the rules and regulations of, the system development fees, and other fees charged by the District, all of which shall be paid by the Buyer. In the event that Buyer acquires the Property or any portion thereof, it shall comply with all requirements of the District, charges, assessments and other amounts payable to the District.

In addition, C.R.S. § 38-35.7-101 requires the following disclosure statement to be provided in every contract for the purchase and sale of residential real property.

> SPECIAL TAXING DISTRICTS MAY BE SUBJECT TO GENERAL OBLIGATION INDEBTEDNESS THAT IS PAID BY REVENUES PRODUCED FROM ANNUAL TAX LEVIES ON THE TAXABLE PROPERTY WITHIN SUCH DISTRICTS. PROPERTY OWNERS IN SUCH DISTRICTS MAY BE PLACED AT RISK FOR INCREASED MILL LEVIES AND EXCESSIVE TAX BURDENS TO SUPPORT THE SERVICING OF SUCH DEBT WHERE CIRCUMSTANCES ARISE RESULTING IN THE INABILITY OF SUCH A DISTRICTS TO DISCHARGE SUCH INDEBTEDNESS WITHOUT SUCH AN INCREASE IN MILL LEVIES. BUYERS SHOULD INVESTIGATE THE DEBT FINANCING REQUIREMENTS OF THE AUTHORIZED GENERAL OBLIGATION INDEBTEDNESS OF SUCH DISTRICT, EXISTING MILL LEVIES OF SUCH DISTRICT SERVICING SUCH INDEBTEDNESS, AND THE POTENTIAL FOR AN INCREASE IN SUCH MILL LEVIES.

11. <u>MISCELLANEOUS</u>.

11.1 <u>Taking Prior to Closing</u>. If any portion of the Property is taken by the right of, or is included in any pending action to exercise the right of, eminent domain, prior to the date of any Closing, at Buyer's option: (a) this Contract shall remain in effect, Closing shall nevertheless occur and Buyer shall thereupon become entitled to the entire award or proceeds received or receivable for the portion of the Property taken; or (b) if such taking reduces the

CONFIDENTIAL
FOG 00011

number of Lots that can be developed by Buyer by 10%, Buyer may terminate this Contract by written notice to Seller, in which case the Deposit shall be returned to Buyer.

11.2  Contract Not to be Recorded. Buyer shall not cause this Contract to be recorded, but may file a memorandum of record as notice of this Contract provided the form thereof is approved by Seller, which approval shall not unreasonably withheld. Upon termination of this Contract prior to acquisition of the entire Property, Buyer shall quit claim any interest in the remainder of the Property to Seller.

11.3  As-Is Condition, No Representations. Buyer acknowledges and agrees that, except as otherwise expressly provided for elsewhere in this Contract or as shall be provided in any instrument or document to be executed pursuant to this Contract (the "Related Documents"), Seller has made no representations, warranties, or agreements to or on behalf of Seller as to any matter concerning the Property, the present use thereof or the suitability for Buyer's intended use of the Property, including without limitation, any representations, warranties or agreements relating to topography, climate, air, water, water rights, utilities, present and future zoning, soil, subsoil, environmental conditions, the purposes to which the Property is suited, the use of adjoining or nearby properties, drainage, access to public roads, or proposed routes of roads, or extensions thereof, or the effect of any state or federal environmental protection laws or regulations.

Buyer represents and warrants to Seller that except as otherwise expressly provided for elsewhere in this Contract, Buyer has made or will make its own independent inspection and investigation of the Property, is acquiring the Property in its "as is," "where is" condition, with all faults, and in entering into this Contract, Buyer intends, except as otherwise provided herein or in the Related Documents, to rely solely on its own inspection and investigation of the Property. No agreement, warranty or representation, unless expressly contained or provided for herein or in the Related Documents, shall bind Seller. Buyer expressly waives any right of rescission and all claims for damages by reason of any statement, representation, warranty, promise, or agreement, if any, unless contained in this Contract or in the Related Documents and releases Seller, its officers, directors, brokers, contractors and representatives from, and waives any and all causes of action or claims against any such persons for (i) any and all liability attributable to any physical conditions of or at the Property, without limitation, soil conditions, drainage and the presence on, under or about the Property of any hazardous materials whether regulated or not by any governmental authority, except and to the extent the same would constitute a breach by Seller of a representation, warranty or covenant contained herein or in the Related Documents; (ii) any and all liability resulting from the failure of the Property to comply with any applicable laws, including, without limitation, any environmental law, except and to the extent the same would constitute a breach by Seller of a representation or warranty contained herein or in the Related Documents; and (iii) any liabilities, damages, or injury arising from, connected with or otherwise caused by statements, opinions or information obtained from any such persons with respect to the Property.

11.4  Indemnification; No Mechanic's Liens. Buyer hereby acknowledges that the preparation and submission of any plans, and the making of investigations, tests and surveys prior to the Closing hereunder, is for the benefit of Buyer. Buyer expressly acknowledges that nothing in this Contract shall authorize Buyer, or any person dealing with, through or under

9

CONFIDENTIAL
FOG 00012

Buyer to subject the Property to mechanic's liens. Buyer agrees to indemnify, hold harmless and defend Seller from any claim, liability, loss, damage, cost or expense, including attorneys' fees, which Seller may incur or which may be asserted by reason of any entry on the Property or work performed through or under Buyer or the preparation of any plans, or the making of investigations, tests and surveys ordered or conducted by Buyer. Buyer agrees not to permit or suffer and, to the extent so permitted or suffered, to cause to be removed and released, any mechanic's, materialman's, or other lien on account of supplies, machinery, tools, equipment, labor or materials furnished or used in connection with the planning, design, inspection, construction, alteration, repair or surveying of the Property, or preparation of plans with respect thereto as aforesaid by, through or under Buyer.

Seller may at its option, at Buyer's cost and expense, with the assistance of attorneys of Seller's choosing, enter into, defend, prosecute or pursue any effort or action (whether or not litigation is involved) which Seller deems reasonably necessary to defend itself and the Property from and against all claims or liability arising by, through or under Buyer as set forth herein. Buyer acknowledges and agrees that Seller may, but shall not be required to, post or serve a notice that Seller's interest in the Property shall not be subject to any mechanics' liens pursuant to the provisions of C.R.S. § 38-22-105, and to take such other actions as Seller deems necessary to comply with the provisions of said statute.

11.5   <u>Notices</u>.   All notices, statements, demands, requirements, or other communications and documents ("<u>Communications</u>") required or permitted to be given, served, or delivered by or to either party or any intended recipient under this Contract shall be in writing and shall be either delivered by hand, sent by a nationally recognized overnight courier service, or prepaid certified or registered mail (airmail in the case of all international communications), return receipt requested, to the party or intended recipient at its address stated below, or sent by facsimile machine to the party or intended recipient at its facsimile number stated below or to such other address or facsimile number as either party may from time to time have notified the other party as being its address or facsimile number for purposes of this Contract to the exclusion of all previously applicable addresses and facsimile numbers. Such Communications shall be deemed to have been given, served, or delivered:

   (1)   if delivered by hand, upon delivery;

   (2)   if delivered by overnight courier, on the next business day following the date of delivery to the courier;

   (3)   if sent by mail, four days after the date of mailing; or

   (4)   if sent by facsimile machine, upon transmission.

The addresses and facsimile numbers of the parties are as follows:

   To Seller:   Alkire Investments, Inc.
   301 Junction Highway, Suite 320
   Kerrville, Texas  78028
   Attn: Neil Griffin
   Facsimile Number:  (830) 257-2986

10

CONFIDENTIAL
FOG 00013

|               |                                       |
|---------------|---------------------------------------|
| with copies to: | Mountain Shadows LLC<br>7353 South Alton Way, Suite 100<br>Englewood, Colorado  80112<br>Attn: Chris Elliott<br>Facsimile Number:  (303) 770-9424 |
|               | Brownstein Hyatt & Farber, P.C.<br>410 17th Street, 22nd Floor<br>Denver, Colorado  80202<br>Attn: Edward N. Barad, Esq.<br>Facsimile Number:  (303) 223-0908 |
| To Buyer:     | Projects by Remington Homes, Inc.<br>9468 W. 58th Avenue<br>Arvada, Colorado 80002<br>Attention: Nanci Kerr<br>Facsimile Number:  (303) 425-3004 |
| with copies to: | Thomas P. Kearns, Esq.<br>Fairfield & Woods, P. C.<br>1700 Lincoln Street, Suite 2400<br>Denver, Colorado 80203<br>Facsimile Number:  (303) 830-1033 |

11.6   No Oral Amendment or Modifications.   No amendments, waivers or modifications hereof shall be made or deemed to have been made unless in writing executed by the party to be bound thereby.

11.7   Severability.  If any other provision of this Contract shall be invalid, illegal or unenforceable, it shall not affect or impair the validity, legality or enforceability or any other provision of this Contract, and there shall be substituted for the affected provision a valid and enforceable provision as similar as possible to the affected provision.

11.8   Assignability.  Buyer may not assign its rights or obligations under this Contract without the prior written consent of Seller, except to an entity in which Buyer or its sole shareholder controls more than 50% of the interests in voting and capital.  Any attempted assignment, except as specifically provided for herein, shall be null and void.  Prior to considering consent to any assignment, Seller shall be entitled to receive and review such credit, financial and other information as is reasonably requested by Seller with respect to the proposed assignee. No assignment by either party shall release that party from its obligations hereunder.

11.9   Binding Effect.  Subject to Section 11.8, this Contract shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

11.10   Captions and Convenience.  All headings and captions used herein are for convenience only and are of no meaning in the interpretation or effect of this Contract.

11

CONFIDENTIAL
FOG 00014

11.11   Applicable Law. This Contract shall be interpreted and enforced according to the laws of the State of Colorado.

11.12   Exhibits Incorporated. All exhibits to this Contract are incorporated herein and made a part hereof as if fully set forth herein.

11.13   Time of the Essence. Time is of the essence with respect to performance required under this Contract.

11.14   Brokers. Each party warrants and certifies to the other party that such party has not engaged or utilized the services of any broker in connection with this transaction who shall be entitled to any commissions or fees of any kind as a result of this Contract or the transaction contemplated hereby. Each party agrees to defend, indemnify and hold harmless the other from and against any claims for broker's or finder's fees, commissions, or fees of any kind made by any party claiming to have dealt with it.

11.15   Counterparts. This Contract may be executed in counterparts, each of which shall constitute an original, but all of which, when taken together, shall constitute one agreement.

11.16   Costs of Legal Proceedings. In the event that either party institutes legal proceedings with respect to this Contract or the transaction contemplated hereby, the prevailing party shall be entitled to recover, in addition to any other relief to which it is entitled, its costs and expenses incurred in connection with such legal proceedings, including, without limitation, reasonable attorneys' fees.

11.17   Survival of Provisions. Any provisions of this Contract which require observance or performance subsequent to Closing shall continue in force and effect following Closing.

11.18   General Cooperation. Buyer and Seller shall take such other actions, as may be reasonably necessary or appropriate to fully carry out the intent and purposes of the parties as set forth in this Contract.

11.19   Computation of Time. In computing any period of time under this Contract, the date of the act or event from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included unless it is a Saturday, Sunday, or federal legal holiday, in which event the period shall run until the end of the next day which is not a Saturday, Sunday, or federal legal holiday.

11.20   Negotiated Provisions. This Contract shall not be construed more strictly against one party than against the other merely by virtue of the fact that it may have been prepared by counsel for one of the parties, it being recognized that both Seller and Buyer have contributed substantially and materially to the preparation of this Contract.

11.21   No Implied Waiver. Except as otherwise set forth herein, no failure by a party hereunder to insist upon the strict performance of any term, covenant or provision contained in this Contract, no failure by a party to exercise any right or remedy under this Contract, and no acceptance of full or partial payment owed to a party during the continuance of any default by

12

CONFIDENTIAL
FOG 00016

the other party, shall constitute a waiver of any such term, covenant or provision, or a waiver of any such right or remedy, or a waiver of any such default unless such waiver is made in writing by such party. Any waiver of a breach of a term or a condition of this Contract shall not prevent a subsequent act, which would have originally constituted a default under this Contract, from having all the force and effect of a default.

    11.22    <u>Entire Contract.</u> This Contract constitutes the entire understanding between the parties with respect to the subject matter hereof, and all prior agreements or understandings shall be deemed merged in this Contract.

13

CONFIDENTIAL
FOG 00016

IN WITNESS WHEREOF, the parties hereto have executed this Contract as of the day and year first-above written.

**SELLER:**

ALKIRE INVESTMENTS, INC., a Colorado corporation

By: _____
Name: F. O'NEIL GRIFFIN
Title: Pres.

**BUYER:**

PROJECTS BY REMINGTON HOMES, INC., a Colorado corporation

By: _____
Charles Reagan Hauptman, President

195964v2

14

CONFIDENTIAL
FOG 00017

**EXHIBIT A**
**to Purchase and Sale of Vacant Land**

**Legal Description**

Parcels C, D, E, F, G, and H as described in the attached descriptions.

CONFIDENTIAL
FOG 00018

