Exhibit A

```
4278
1              IN THE UNITED STATES DISTRICT COURT
1                FOR THE DISTRICT OF COLORADO
2
2    Civil Action No. 90-CV-00181(JLK)
3
3    MERILYN COOK, et al.,
4
4        Plaintiffs,
5
5    vs.
6
6    ROCKWELL INTERNATIONAL CORPORATION and
7    THE DOW CHEMICAL COMPANY,
8
8        Defendants.
9    _____
9
10                   REPORTER'S TRANSCRIPT
10                      Trial to Jury
11                        VOLUME 30
12   _____
12
13           Proceedings before the HONORABLE JOHN L. KANE, JR.,
14   Judge, United States District Court for the District of
15   Colorado, commencing at 1:05 p.m., on the 7th day of November,
16   2005, in Courtroom A802, United States Courthouse, Denver,
17   Colorado.
18
19
20
21
22
23
24   Proceeding Recorded by Mechanical Stenography, Transcription
24   Produced via Computer by Janet M. Coppock, 901 19th Street,
25       Room A-257, Denver, Colorado, 80294, (303) 893-2835
     4279
1                       APPEARANCES
2           MERRILL GENE DAVIDOFF,  DAVID F. SORENSEN, ELLEN T.
3    NOTEWARE and PETER NORDBERG, Attorneys at Law, Berger &
4    Montague, P.C., 1622 Locust Street, Philadelphia, Pennsylvania,
5    19103-6365; GARY BLUM, Attorney at Law, Silver & DeBoskey, 1801
6    York Street, Denver, Colorado 80206, appearing for the
7    Plaintiffs.
8           DAVID M. BERNICK, DOUGLAS KURTENBACH, MARK J.
9    NOMELLINI, STEPHANIE A. BRENNAN and ELLEN T. AHERN, Attorneys
10   at Law, Kirkland & Ellis, L.L.P., 200 East Randolph Drive,
11   Chicago, Illinois, 60601, appearing for the Defendants.
12                      *   *   *   *   *
13                      PROCEEDINGS
14       (1:05 p.m. reconvened.)
15       (Jury present.)
16           MR. BERNICK:  Good afternoon, ladies and gentlemen.
```

```
17        (Paul Slovic was previously sworn.)
18                       CROSS-EXAMINATION
19   BY MR. BERNICK:
20   Q.  Good afternoon, Dr. Slovic.  I would like to start out and
21   kind of do a little bit of a road map for what it is you can
22   speak to as an expert.  As I take it from your direct
23   examination, you are an expert -- you are a psychologist by
24   training, correct?
25   A.  That's correct.
  4280
1    Q.  Have you been a practicing psychologist at any point in
2    time?
3    A.  You mean like a clinical psychologist?
4    Q.  Yes.
5    A.  No, I haven't.
6    Q.  As a psychologist, you are focused on, I think you said,
7    perception, perceptions and attitudes, right?
8    A.  Well, I study judgment and decision-making in a very broad
9    way which includes how people process information when they
10   make judgments and decisions and how they process it when they
11   judge about risk, so it includes perceptions and attitudes, but
12   it's much broader than that.
13   Q.  I didn't ask you whether it was broader.  I just simply
14   said, is your focus in your work, are you an expert on
15   perceptions and attitudes?
16   A.  Particularly perceptions.
17   Q.  Okay.  And I think in particular, the focus, the kind of
18   perceptions that you have been talking about today and that you
19   have analyzed in connection with your work on Rocky Flats are
20   perceptions of risk, right?
21   A.  Yes.
22   Q.  And the attitudes that you are focused on are attitudes
23   relating to risk, fair?
24   A.  Yes.
25   Q.  And you -- and I don't think there is any dispute about
  4281
1    this in this case, these are two areas in which you are an
2    expert, right?
3    A.  Yes.
4    Q.  Okay.  Now, I want to go from the world of perception and
5    attitude to the world of reality.  I want to ask you some
6    questions about real risk.  In particular, I heard you say --
7    and Donnie, if I can have the overhead projector here for just
8    a moment.
9            You said, Risk does not exist out there.  Is that one
10   of the things that you believe in?
11   A.  That's only part of the statement.  I think it's incomplete
12   without the rest of the statement.
13   Q.  Well, it's there in front of the jury.
14   A.  I said that, yes.
15   Q.  You also said that there is no such thing as real risk or
16   objective risk.  Is that also one of your expert views?
17   A.  Yes, it is.
18   Q.  And you also said that defining risk is an exercise of
19   power.
20   A.  Have I said that, yes.
21   Q.  With an exclamation mark, correct?
```

22  A.  Yes.
23  Q.  I am particularly focused on this because the jury, as they
24  have probably -- not had the opportunity at this time to get
25  particularly focused on this difficulty, I am going to show you
  4282
1   the word "risk," increased risk of health problems, increment
2   of increased health risk, demonstrable risk.  This jury in this
3   courtroom in this case has to decide whether or not there is
4   risk resulting from the defendants' activities.  Are you with
5   me?
6   A.  Yes.
7   Q.  So when they are focused on the question of following the
8   Court's instructions, would it be fair to say that in your view
9   they have to consider the impact of politics?
10  A.  They should appreciate that when experts put forth
11  statistics and pronouncements about risk, that this is from a
12  certain perspective that has a lot of elements of subjectivity
13  and judgment.  And by politics, really here is the case that
14  the expert, if they are in a position of authority, they are
15  wielding some power in how you define risk.
16  Q.  The question I asked you, wouldn't it be fair to say in
17  your view they have to consider the impact of politics, yes or
18  no?
19  A.  Well, what do you mean by "politics"?
20  Q.  Just what you said when you showed the chart that said
21  "politics."  You said "politics."  I simply asked you, should
22  the jury be considering the impact of politics on risk?
23  A.  They should be considering the fact that risk is
24  subjective, that people in authority who are making
25  pronouncements, that this is sort of a form of politics as
  4283
1   opposed to having kind of a more inclusive group of people who
2   are evaluating risk.
3   Q.  You said that politics relates to risk assessment and risk
4   management, right?
5   A.  Yes.  And politics is defined in that slide as by politics
6   I mean risk perception, values, issues of who is making the
7   decision, power, questions and trust, that's what I meant by
8   politics here.
9   Q.  So in part they should be considering who is in power and
10  is defining how risk should be decided?
11  A.  What this points to is that people who control the
12  definition of risk in a situation have a great deal of control
13  over what then is decided to be safe or risky, because if you
14  define risk one way, then say, you know, if you just define
15  risk, say, by the -- let's say the nuclear power plant, if you
16  define it as a probability of an accident and the expected
17  consequence, it might appear as very safe and the consequences
18  are very safe.  If you include in the definition the risk of a
19  nuclear power plant, the fact the risk can affect future
20  generations, that contamination can be long lasting, you know,
21  and carcinogenic, if that's part of your definition, nuclear
22  power suddenly looks more risky.  So whoever controls the
23  definition controls in the end whether nuclear power comes out
24  looking safe or risky.  That's what I mean by this power
25  aspect.
  4284

1   Q.  So the jury should consider politics, should consider
2   power, should consider emotion, should consider psychology,
3   should consider law, perception, culture, media and reason all
4   when they determine whether there is an increased risk?
5   A.  No.  I am not saying that the jury should be taking all
6   this into account.  I am saying that the global picture of risk
7   assessment involves not just science, but it involves many
8   factors.  Now, whether one wants to or can include these other
9   factors, you know, is another matter, but I am just saying that
10   risk assessment is not simply a scientific matter.  That's
11   really what I am saying.
12   Q.  Fair enough.  But you showed this chart, and the message of
13   this chart is that perception is reality.  Risk is complex.
14   And all of these different factors, power, emotion, politics,
15   reason, psychology, all these different factors relate to risk
16   assessment, correct?
17   A.  Yes.
18   Q.  In fact, even when it comes to science, which we all hope
19   will be sacrosanct, your chart says even the science is
20   subjected to politics, to media, to perception, to emotion,
21   right?
22   A.  Yes, it is.
23   Q.  Well, I want to talk to you about a couple examples of real
24   risk so maybe we can see if we can get on to a simpler kind of
25   page and just begin there and get to the more complex stuff.
    4285
1   Let's say, god forbid, someone were to pull out a gun because
2   he or she is thinking of ending their life and they put one
3   bullet in the chamber where there is six chambers and they spin
4   it.  And they are thinking about what the chances are that when
5   they pull the trigger they will die.
6           Now, when they go ahead and do that, they pull the
7   trigger, is that risk real?
8   A.  It depends how -- what your definition of risk is there.
9   If you are talking about is there a threat -- certainly there
10   is a danger.
11   Q.  I am sorry.  Just whatever meaning of the word "risk" you
12   give, the person that pulls that trigger, are they taking a
13   real risk?
14   A.  Well, they are taking a risk, yes.
15   Q.  And in fact, we can calculate that the chances that the
16   first time they pull the trigger that they will die are one in
17   six, right?
18   A.  That's one -- it depends upon the situation, but it could
19   be calculated that way.
20   Q.  Is there another way to calculate it?  Put it in, spin it,
21   pull the trigger, it's a one-in-six chance, right?
22   A.  If the spin is random.
23   Q.  Yeah, yeah, random, well lubricated gun.  So they pull the
24   trigger and nothing happens.  And then they are thinking about
25   pulling it again.  Chances are now one in five, right?
    4286
1   A.  Yeah.  You are defining here risk as the probability.
2   Q.  Yes, there are probability, the chance they will die, the
3   risk of their dying.
4   A.  Probability that they will die.
5   Q.  It's calculable down to one in four, one in three, one in

6  two and then 100 percent.  No doubt about those numbers, is
7  there?
8  A.  If you -- if, in fact, that the bullet is, you know, a real
9  bullet and everything else, then those probabilities are
10  meaningful, yes.
11  Q.  Yes.  That is a real risk that is also a calculable risk,
12  right?
13  A.  Yes.
14  Q.  Now, let's say that somebody is diagnosed, again, god
15  forbid, with having cancer.  The cancer is in remission.  They
16  go into the doctor and they say, Doctor, what are the chances
17  that the cancer will come back?  And he says, well, based upon
18  science and somebody your age and the kind of cancer and how
19  healthy you are, my judgment is based on the signs that you
20  have a 30 percent chance of recurrence.  Now, is that a real
21  risk or just a perceived risk?
22  A.  He is giving the judgment that in his opinion there is a
23  30 percent chance of recurrence.
24  Q.  Yeah, that's right.
25  A.  That's what it is, it's a 30 percent chance.  Now --
  4287
1  Q.  I am sorry.  Just focus on the question.  Is that a real
2  risk or not?
3  A.  What is -- there probably is a threat to this person.  The
4  doctor is saying that you have -- there is a chance you will
5  get cancer again.  But as soon as the doctor quantifies it,
6  30 percent, you know, you have to ask, well, what's the
7  information?  Is the 30 real?
8  Q.  Okay.  I understand.  Maybe it's accurate, maybe it's not.
9  A.  It may not be.
10  Q.  It may not be accurate.  It may not be the real risk.
11  A.  Yeah.
12  Q.  But there is a real risk for recurrence of cancer, right?
13  A.  Yes.  You are using risk as to mean likelihood.
14  Q.  Yeah, likelihood.  And it's real.  It's not just some
15  perception; it's a biological process that's underway, right?
16  A.  There is -- a he is saying there is a likelihood it can
17  recur.  There is a real likelihood it can occur.
18  Q.  In a layperson's view -- they then prescribe a medication
19  to treat the cancer.  They say, Doctor, what are the chances
20  that it will work?  He says, again, with your cancer, one in
21  five, a 50 percent chance that it will work.  There is a real
22  risk that it will work; real risk that it won't work, right?
23  They may have a biology such that that drug won't work.  That's
24  real, isn't it?
25  A.  Well, you know, if --
  4288
1  Q.  Can we just focus on the question?  Do they have a biology
2  such that if the drug works or not it isn't just a question of
3  perception, it's reality?
4  A.  That's why I say danger is real.
5  Q.  Danger is real.
6  A.  There is a danger there.
7  Q.  You would prefer to say it's not real risk, but it's real
8  danger?
9  A.  Yes, because risk is a sloppy construct.
10  Q.  Sloppy construct?

```
11   A.  Because it means different things.
12   Q.  Go ahead.
13   A.  Yeah, it's got variable definitions as I tried to indicate.
14   Q.  It's a sloppy construct that doctors all over the world use
15   every day in advising individuals what's going to happen to
16   their lives?
17   A.  Yes, it's a convenient way to talk about danger.
18   Q.  It's a sloppy construct that you acknowledge that doctors
19   all over the world use every day to tell people about their
20   lives?
21   A.  Yes.
22   Q.  It's a sloppy construct that agencies of the Federal
23   Government who are totally devoted to the cause of the nation's
24   health, it's a sloppy construct that they use, right?
25   A.  Yes, it would be better -- if you want to communicate to a
  4289
1   person what their chances are of getting a disease or getting
2   cancer, you should tell them --
3   Q.  Dr. Slovic, if you could focus on my question.  Risk is
4   used by the United States Department of Health, is used by the
5   surgeon general, is used by ATSDR, used by the Colorado
6   Department of Health, used by doctors, used by drug companies,
7   is used by everyday people who want to get advice on things
8   that make the greatest difference to them, correct?
9   A.  Yes, it is.
10   Q.  Would you acknowledge to me just in a very layperson's
11   sense that there is such a thing as real risk, real risk?  Does
12   it exist or not?  Just tell us.
13   A.  There are real dangers.  And if you want to use the word
14   "risk" to refer to a real danger, then in that sense I would
15   say there are real risks, yes.
16   Q.  Would you also agree that those real risks are in some
17   instances calculable like the example of the gun?
18   A.  You can always put numbers on risks --
19   Q.  I didn't say that.
20   A.  -- so they are calculable.  Isn't that what you mean, that
21   you can calculate numbers?
22   Q.  You said you can always put numbers on kind of saying you
23   can put anything on there you want.  I mean, by calculable in
24   the sense that the risk in some cases is capable of being
25   calculated in a meaningful fashion.  How about that?
  4290
1   A.  What do you mean by meaningful there?
2   Q.  Okay.  Would you agree with me that it's important to
3   define risks scientifically, that is that science is the best
4   means of calculating real risks?
5        MS. ROSELLE:  Objection.  That was two questions.  It
6   was compound.
7        THE COURT:  Sustained.
8   BY MR. BERNICK:
9   Q.  Would you agree with me that science is the best means of
10   calculating real risks?
11   A.  I think if you are looking at a simple system like a gun, a
12   bullet in a chamber, that science which involves a bit of
13   elementary probability theory is, you know, is an excellent way
14   to do it for the gun, for the Russian roulette example.
15   Q.  Is science the best way of calculating risk in the field of
```

16  disease and medicine and treatment of diseases?
17  A.  Science is a very important -- obviously a very important
18  factor in understanding the risks of diseases.
19  Q.  Are you aware of any other better methodology for deciding
20  and calculating biological risks other than through science?
21  A.  For coming up with statistics about risk, sciences like
22  epidemiology and toxicology are essential, but they are only
23  part of the picture.
24  Q.  Only part of the picture.
25          Well, if you want to have advice from a doctor on what
  4291
1  is likely to happen to your body if you had cancer, wouldn't
2  you like to have him give you the answer scientifically?
3  A.  In that example, yes.
4  Q.  Wouldn't you want -- for example, if somebody has been
5  exposed to radiation, you go to the doctor or an expert to
6  learn about the risks from that radiation, wouldn't you want
7  him to give you a scientific answer?
8  A.  Yes, I would want that answer to be -- excuse me -- to
9  include obviously science, but also one might want it to
10  include information about how the patient will experience the
11  cancer, which is not a purely scientific matter.
12  Q.  Fair enough.  But if you don't have the science, you don't
13  have much of an answer, do you?
14  A.  Well, science is important.
15  Q.  It's critical.  You can't do without it?
16  A.  But it's not the only mechanism.
17  Q.  I understand we are going to get into this.  I know when it
18  comes to communicating with the public about science, it's not
19  necessarily sufficient to simply use scientific terminology.
20  There is no dispute about that in the case.  There is no
21  argument about that.  But would you agree with me that when you
22  communicate with the public about health risks, you can't do so
23  in a meaningful fashion unless you know the science?
24  A.  Yes.
25  Q.  Okay.  And when it comes to radiation risks in particular,
  4292
1  you can't communicate with anybody about radiation risks in a
2  meaningful and responsible fashion unless you get answers that
3  are based upon science, right?
4  A.  That's correct.
5  Q.  And when it comes to radiation science in particular, isn't
6  it true that an area of radiation is one of the areas of
7  science where the science is especially deep, extensive,
8  robust, correct?
9  A.  A lot is known about radiation.
10  Q.  In fact, the NCRP has been around for many years, but the
11  whole field of radiation science goes back to really before,
12  but particularly after World War II when the atomic bomb
13  survivors were studied at Hiroshima and Nagasaki, correct?
14  A.  The data from the atomic bomb survivors has been very
15  important.
16  Q.  And since that time, literally whole committees of people
17  have gathered together the evolving science in order to always
18  have a state-of-the-art view on radiation risk, correct?
19  A.  They have attempted to do that, yes.
20  Q.  And, in fact, the NCRP committee that you were a part of,

21  one of the whole purposes of the NCRP is to ensure that if you
22  were to pick up the phone or pick up a book today, you could
23  find out what science today says about radiation risk, what the
24  best scientists think, correct?
25  A.  Yes, you could.
 4293
1   Q.  We heard from Dr. Goble who talked about risk from the
2   plaintiffs' point of view.  He made a relatively short
3   appearance, and he never once even mentioned politics.  Do you
4   have any explanation for why he wouldn't mention politics?
5   A.  I presume because he was focusing on certain scientific
6   aspects of how radiation harms biological systems.
7   Q.  He also didn't think it was important to talk about emotion
8   or power or psychology.  He just talked about science.  How can
9   you reconcile that with your view that you can't talk about
10  science without talking about politics?
11  A.  He probably wasn't thinking about it in the broader sense
12  of how radiation is perceived by people and what the impacts of
13  these perceptions are.
14  Q.  Would you also agree with me that when it comes to talking
15  about real risk, there is a way to present neutral facts?
16  Would you agree with that?
17  A.  That there is a way to present neutral facts or that there
18  are neutral facts?
19  Q.  Well, that there is neutral facts.  Let's begin with that.
20  A.  Well, when it comes to presenting risk information, I am
21  not sure that there are neutral ways to present it.
22  Q.  Let's take your example here.  You say, Is coal mining
23  getting safer?  It depends on which measure you choose, and you
24  have got two different measures.  One says, Accidental deaths
25  per million tons of coal mined in the United States.  Then it
 4294
1   says things are getting better because there are fewer deaths.
2           On the other side you say, Accidental deaths per
3   thousand coal mine employees.  You say, gee, if you adopt the
4   perspective of the coal mining employee, things are not so much
5   better.  Do you remember that?
6   A.  Yes.
7   Q.  Now, it's pretty obvious that there is a third fact that
8   you have not presented there at all, right?
9   A.  What's that?
10  Q.  Well, the third fact is that you would have to determine
11  what's happened to the coal production in the United States,
12  right?
13  A.  You could bring that in, yes.
14  Q.  Before you presented this, did you find out what it was?
15  A.  Why should I find out what it was?
16  Q.  Because it's the key to reconciling these two perspectives,
17  isn't it?
18  A.  I was just using this as an example of two perspectives.
19  Q.  You chose two perspectives without filling in the third
20  fact, right?
21  A.  Probably not only a third fact, there is probably a dozen
22  other ways to examine this just as the following slide that I
23  presented after this shows that there are many different ways
24  and perspectives you can take on a particular risk.
25  Q.  But this suggests that there is no truth?  Did you mean to

4295

1   say there were no true facts about the existence of coal
2   mining?
3   A.  There are facts which can be more or less accurate.  Let's
4   assume that they are accurate.  But the facts, you know, you
5   have many different facts to choose from.  And what facts you
6   choose from influence how big or small the risk will look.
7   Q.  So it's hopeless to think about selecting a small number of
8   facts that everyone will agree are the right facts.  You just
9   can't do it?
10  A.  No, I think you gave a very good example with your gun
11  situation.  That's a situation where most people would agree
12  that the probability is one-sixth.
13          Once you get into things like the risk of, you know,
14  radiation exposure from certain contaminated areas, then you
15  get a lot less agreement and that's where these points which
16  may seem like kind of nitpicky points, that's where they become
17  critical, because not every situation is as simple as the
18  Russian roulette example.
19  Q.  In every situation that science investigates, the whole
20  effort in science is to try to find out what is real as opposed
21  to what is merely perceived, correct?
22  A.  Science is a search for knowledge.
23  Q.  Truth, right?
24  A.  Well, knowledge that is reliable, robust.
25  Q.  If the truth here is that coal production in the United

4296

1   States has actually stayed the same or increased and the number
2   of people who have died has gone down, that's pretty good news,
3   isn't it?  It says that while to mine the same amount of coal
4   used to cost X number of lives per year, it's now costing many
5   fewer lives per year because we don't need as many people to go
6   down into those mines.  That's a good news story, isn't it?
7   A.  Yes.
8   Q.  That means for all the people who didn't have to go down in
9   the mines to produce coal from the perspective of the employee
10   from the people down there, the people having to go down there
11  and take risks, correct, that's good news?
12  A.  That's good news, yes.
13  Q.  But didn't tell us what happened in coal production?
14  A.  Because it depends what you are interested in with regard
15  to the risk here.
16  Q.  You also said, gee, you know, these comparisons of risk
17  like the one in a million risks, you didn't present this one
18  but it was in your slides that we got produced to us.  There is
19  one in a million risks spending one hour in a coal mine,
20  traveling 10 miles by bike, a thousand miles by jet, one chest
21  x-ray, living within 5 miles of a nuclear power plant for 50
22  years.  And you suggested at least that those kinds of
23  comparisons have been called the kindergarten of risk like
24  nobody cares.  Is that what you meant to suggest, that nobody
25  cares what the real statistics are?

4297

1   A.  No.  They are a part of the story, but only a part, and
2   that the -- these comparisons tend to be put forth to convince
3   people that they should accept the risk; that is, if you ride
4   your bike and you accept those risks, can you go more than

5   10 miles on your bike regularly, then you certainly should have
6   no qualms about living within -- close to a nuclear power plant
7   for 50 years.  That's where the problem comes in.
8   Q.  But would you agree -- you say it's a problem precisely
9   because people are worried about nuclear power plants.  Isn't
10  it absolutely vital that whatever the form of the communication
11  is, that they should know that their risk living within 5 miles
12  is very low?  It's one in a million.  Don't you think that they
13  should know that?
14  A.  Besides the problems, this implying acceptability, you have
15  to ask --
16  Q.  Let me ask you about acceptability.
17  A.  How much of the risk story does this say?  How do you
18  arrive at this statement?  Again, underlying that simple
19  statement is a lot of assumptions about how you measure and
20  quantify risk of which that can be debated.
21  Q.  The best way to communicate with people living within
22  5 miles of the power plant is to say this is the best that
23  science can do; that is, you are not taking any real risk at
24  all.  It's one in a million, but we want to be sure you know
25  that all sciences, politics and is all based on assumption?
    4298
1   A.  No, it's because the use of the word "risk."  If you want
2   to communicate to people what science says the probability of
3   their getting cancer is from living near a nuclear power plant
4   for 50 years, then science uses the dose response, linear dose
5   response relationships that the NCRP says you should use.  You
6   say this is the probability.
7           If you want to use the word "risk," once you get into
8   risk, that broadens it.  I mean, because you are now talking
9   about -- you are saying that probability is everything.  You
10  are ignoring all those factors about whether the exposure is
11  voluntary or involuntary, whether -- if there is an accident.
12  This is with a normally operating reactor.  If there is an
13  accident, it's a completely different story.  It's all
14  boiled -- that statement is very limited and misleading.
15  That's what I am saying.
16  Q.  But would it be accurate, would you feel better if we said
17  one-in-a-million probability as opposed to one-in-a-million
18  risk?
19  A.  If you said one in a million, again, yes, that is more
20  accurate because you are not -- when you talk about
21  probability, you are implying that you need to consider whether
22  it's voluntary or involuntary.  You are talking about a
23  probability calculated from scientific data, of course, with a
24  lot of assumptions.
25  Q.  Well, we are stuck with the word "risk," Dr. Slovic.  It's
    4299
1   what the law says we should be focusing on.  So let's go back
2   to my chart here.  Would you agree with me that in the area of
3   radiation science, that when it comes to the real calculable
4   scientific risk associated with radiation, it's something which
5   is an area where you are not an expert?
6   A.  No, I have some expertise in those.  I have worked in the
7   area of risk analysis over 30 years.
8   Q.  I didn't ask you that.  I asked you whether you hold
9   yourself out as an expert in calculating the real scientific

10   risk associated with radiation exposure.
11   A.  Well, I know how that calculation is done.  I know what the
12   formulas are.  You know, I have -- you know, worked with people
13   who do those calculations, so I have some expertise.  You know,
14   that's not what I do.
15   Q.  You have never published a paper on it, have you?  You have
16   never published your own calculation of radiation risk, have
17   you?
18   A.  No, because that's not what my work focuses on.
19   Q.  You are not an expert in that, are you, Dr. Slovic?  You
20   are a psychologist?
21   A.  Well, I have enough expertise to be a member of that
22   National Council On Radiation Protection.
23   Q.  You just told us the reason you were there was to deal with
24   issues of communication, right?
25   A.  Yes, but I had to work with and get familiar with the
 4300
1   technical analysis.
2   Q.  In fact, apart from publishing papers, you have probably
3   never sat down to actually calculate a radiation risk
4   associated with any exposure, right?
5   A.  No, I haven't.
6   Q.  You have never testified to one, have you?
7   A.  No.
8   Q.  Now, there is also conduct.  Sometimes conduct gives rise
9   to a perception of risk, correct?
10   A.  Yes, it does.
11   Q.  In this case the conduct is operation of a weapons plant,
12   right?
13   A.  Yes.
14   Q.  Operations of a weapons plant is not an area where you are
15   an expert, correct?
16   A.  No, that's correct.
17   Q.  Let's talk about nuclear energy, that is the nuclear
18   activities you would have at such a plant.  That's not an area
19   where you are an expert either, is it?
20   A.  No.
21   Q.  Let's put a bracket around this and talk about
22   consequences, and in particular talking about market
23   transactions involving real estate.  That's not an area in
24   which you are an expert, is it?
25   A.  No, it's not.
 4301
1   Q.  Now, in the context of your work, you have focused on
2   attitudes relating to market values, have you not?
3   A.  Some of it, yes.
4   Q.  In fact, in this case the survey that you made reference to
5   is a survey that purports to find how perceptions of risk
6   affect attitudes relating to risk and particularly attitudes
7   concerning money that people would be prepared to make, right?
8   A.  That's correct.
9   Q.  But there is a critical difference.  You have expertise in
10   measuring attitudes relating to prices that people might be
11   willing to pay, but you don't have expertise in figuring out
12   what actually caused or affected the dollars that were paid,
13   right?
14   A.  Yes, I would leave that to other experts.

15  Q.  We are going to come back to this, very, very important.
16  You can ascertain what people's attitudes might be towards
17  payment, but you do no studies that tie those attitudes to what
18  ultimately is paid in the marketplace, correct?
19  A.  I haven't done such studies, no.
20  Q.  That's also not an area where you are expert, that is
21  analyzing market transactions to see what actually caused the
22  dollars to be spent.  That's not an area in which you have
23  published or you are an expert, correct?
24  A.  That's correct.
25  Q.  Now, I want to go -- use this structure here, the areas in
 4302
1  which you are expert, which is perceptions of risk and
2  attitudes relating to risk, and areas where you are not expert
3  and talk about the model that you have set out for the jury,
4  the social amplification of risk model.  And I will try to move
5  through this fairly promptly so we can get on and talk to
6  Dr. Flynn.
7           First of all, you have developed a model, a social
8  amplification model, and you have applied it to Rocky Flats,
9  right?
10  A.  Yes, we have said that it's relevant to Rocky Flats.
11  Q.  I am sorry?
12  A.  Yes.
13  Q.  Okay.  Now, as I understand it, you begin with an event.
14  In this case the event that you studied in this case was the
15  FBI raid, right?
16  A.  Yes.
17  Q.  I am sorry?
18  A.  Yes.
19  Q.  In particular, your focus in your model is to begin with
20  the FBI raid as an event and move from there to what kind of
21  risk perceptions it created and how it affected -- who it
22  affected and what their attitudes were, fair?
23  A.  Yes.
24  Q.  Okay.  Now, to begin with, it's pretty critical, the FBI
25  raid was a report by the FBI concerning Rockwell's conduct,
 4303
1  right?
2  A.  I don't -- I am not -- I don't quite know what you mean the
3  raid was a report.
4  Q.  Well, the raid itself was the FBI saying, here is what we
5  think is happening out at the plant, right?
6  A.  Yes.  I don't recall the specifics of the raid.
7  Q.  But they went into the plant as part of the investigation
8  and the newspapers carried the headlines, which is, FBI raids
9  the plant saying 771 incinerator may have been used in the dark
10  of night.  Do you recall that?
11  A.  Yes.
12  Q.  Now, with your theory of social amplification of risk, as
13  soon as that raid happens, the media takes over and that's
14  where we get the amplification?
15  A.  Yes.
16  Q.  It grows -- I will put a little horn here.  It gets very
17  loudly broadcast, and it creates, I think you have said, a
18  perception of risk, day one.  I am going to put another one
19  there which is why we are not twisting it the other way.  There

20   is a perceived risk that's associated with that amplification,
21   correct?
22   A.  Yes.
23   Q.  And what you try to do in this study is then take it to see
24   whether as a result of this event, which was broadcast and
25   created perceived risk, whether it generated a concern on the
   4304
1    part of people in the real estate market over the FBI raid,
2    right?
3    A.  Yes.
4    Q.  And the concern in particular that you ultimately came to
5    was to find out whether people who had heard about the raid
6    broadcast, whether those people insisted upon paying less
7    dollars.  So we will put fewer dollars.  Whether they had an
8    attitude as a result of the raid that they would need a
9    discount before they bought?
10   A.  Yes.
11   Q.  You didn't actually go and measure the market prices, but
12   you measured their attitudes to see whether their attitudes
13   were different depending upon whether they heard about the raid
14   or not, right?
15   A.  Yes.
16   Q.  Did I get so far or am I okay?
17   A.  Yes.
18   Q.  Let's flesh it out a little bit.  Is it true that in the
19   area of amplification of risk, the facts have a tendency to
20   change?  Things happen from day one coverage to later coverage.
21   A.  Yes.
22   Q.  In particular, there could be investigations, right?
23   A.  Yes.
24   Q.  There can be risk assessments that are done, right?
25   A.  Yes.
   4305
1    Q.  There could be a change in the conduct of the company or
2    the plant or whatever?
3    A.  Yes.
4    Q.  And there is the big other.  There can be other changes as
5    well that take place, right?
6    A.  Yes.
7    Q.  So it's very critical in measuring perceived risk to
8    understand the full context in which the risk is now being
9    perceived, right?
10   A.  It depends what your purpose of measuring it is and --
11   Q.  Well, if you want to find out whether there was an
12   amplification of risk and whether that perceived risk then
13   affected attitudes, you have got two variables.  You have got
14   perceived risk and you have got attitudes, and you have got to
15   make sure that you are defining each variable, right?
16   A.  I should be cognizant of factors that could influence the
17   perceived risk.
18   Q.  That's all I am saying.
19   A.  Sure.
20   Q.  Another thing we have to bear in mind is that in your
21   particular context, as I said, you were looking at the reported
22   conduct; you weren't looking at what actually was done by
23   Rockwell, fair?
24   A.  That's correct.

```
25   Q.  So we have -- the jury has already heard ad nauseam about
  4306
 1   the difference between the FBI raid and what Rockwell at least
 2   said it did.  So we have the real conduct of Rockwell down
 3   here.  Would it be fair to say that you never traced Rockwell's
 4   real conduct to any perception of risk, correct?
 5   A.  That's correct.
 6   Q.  You never traced Rockwell's real conduct to any attitudes
 7   about the raid, right?
 8   A.  Not specifically, no.
 9   Q.  Now, it might have been possible if you had done the study,
10   if you wanted to figure out what was Rockwell's real conduct
11   and did it create a concern about risk, you might have done a
12   study that sought to look for what Rockwell's real conduct was
13   and whether it caused attitudes about price, right?  You could
14   have done that.
15   A.  It's possible.
16   Q.  I am sorry?
17   A.  It's possible one could do --
18   Q.  But you didn't do that either?
19   A.  No.
20   Q.  Another thing is let's talk about the who had an attitude.
21   The who that you studied was a group of people, a survey group,
22   right?
23   A.  Yes.
24   Q.  And this group of survey people, and we will talk a little
25   bit more to Dr. Flynn, who I assume is back there, we will talk
  4307
 1   a little more with Dr. Flynn about the details of this.  But
 2   this was a group of people who were surveyed by telephone,
 3   correct?
 4   A.  Yes.
 5   Q.  And they included not just people in the Westminster/Arvada
 6   area; they included people from all over Denver, right?
 7   A.  I believe so, yes.
 8   Q.  And they also included as a result, I think, something like
 9   36 percent of the people who qualified had never even heard of
10   the raid.  Did you hear that?  36 people who qualified and were
11   polled or surveyed had never even heard of the FBI raid, right?
12   A.  I don't remember the specific percent, but certainly some
13   of the people had not heard of it, yes.
14   Q.  These were people -- and all you had to do to qualify to be
15   a person who was surveyed was to have been in the market for a
16   house sometime in the last five years, right?
17   A.  That's correct.
18   Q.  So in fact, you could have lived in Denver and looked for a
19   house in Philadelphia, and you would still qualify to be in
20   this survey group even though you had done nothing to look into
21   the area around Rocky Flats, correct?
22   A.  That's correct.
23   Q.  You could have bought a house in the prior five years.  You
24   could have bought a vacation home in Florida.  Not even ever
25   going to the neighborhood around Rocky Flats, you could have
  4308
 1   been included in this survey group, correct?
 2   A.  Yes.
 3   Q.  Now, we know that probably some people in this survey group
```

4  never heard of Rocky Flats.  We know that's true.  And some of
5  these people in the survey group could have heard about Rocky
6  Flats and simply didn't care, right?
7  A.  That's true.
8  Q.  You could have had some people in the survey group who
9  cared enough to do an investigation to find out what really
10  happened at Rocky Flats and whether there was risk.  There
11  could be people in the group that would fall into that
12  category, right?
13  A.  It's possible.
14  Q.  You never found out, did you?  You never found out who
15  within this group actually became knowledgeable about Rocky
16  Flats, correct?
17  A.  We didn't investigate that.
18  Q.  I am sorry?
19  A.  That's correct, yes.
20  Q.  So you never looked to anybody in the group to find out
21  whether they really knew what was going on and still had a
22  concern?
23  A.  That's correct.
24  Q.  So as we sit here today, on the basis of this survey, you
25  can't say whether what actually was done by Rockwell created
  4309
1  any concern, can you?
2  A.  You mean after the raid?
3  Q.  Yeah, you can't say that after the raid, whatever the
4  circumstances were, you can't say that anybody actually became
5  concerned about what Rockwell really did as opposed to what it
6  was reported to have done?
7  A.  We didn't study that.
8  Q.  You can't say whether there was any real concern that was
9  focused on Rockwell's actual conduct as opposed to the media,
10  correct?
11  A.  We didn't study that.
12  Q.  And let's talk about something else.  We do know that
13  people bought property in the class area after the raid, right?
14  A.  Yes.
15  Q.  Now, if you had a group of buyers as opposed to -- to be in
16  your survey group you didn't have to buy in the class area at
17  all, right?
18  A.  That's correct.
19  Q.  People, though, who actually bought in the class area,
20  those people would be making a very important personal
21  decision, right, buying a house?
22  A.  Yes.
23  Q.  People who buy a house tend to actually spend some time
24  looking a lot into the house and into the neighborhood, right?
25  A.  Some do.
  4310
1  Q.  Well, pretty safe to say that a lot of people do, correct?
2  A.  Well, to more or less extents, yes.
3  Q.  But certainly this group of people who actually bought into
4  the class area, just to be sure I will say class, these people
5  were far more likely to be knowledgeable about Rocky Flats than
6  people who were part of your survey group that lived in Denver
7  and never even went to Rocky Flats, correct?
8  A.  What do you mean by knowledgeable about Rocky Flats?

9   Q.  Knowledgeable in the sense that they would have done
10  further inquiry, investigation.  There would have been more
11  people likely to investigate Rocky Flats who were thinking of
12  buying in the area or did buy in the area, correct?
13  A.  I really don't know.
14  Q.  You never looked into that?
15  A.  No, no.  Maybe they -- well, I don't know.
16  Q.  Well, in fact, it would have been very interesting to say,
17  well, look, let's find out the people who actually looked at
18  the class area properties, investigated what Rockwell really
19  did, and see if any of them, any of the people who really knew
20  the story, whether they were still concerned.  That
21  investigation could have been done, right?
22  A.  Well, I don't know enough about the specifics.  I don't
23  know what Rockwell was doing and what they were saying they
24  were doing.  We are assuming that what they said they were
25  doing was actually what they were doing.  And you know, perhaps
     4311
1   maybe they were trying to cover up their problems that were
2   going on, so I don't know -- I don't have that information so I
3   can't --
4   Q.  Is that what you believe?  You believe after the raid was
5   announced that Rockwell engaged in a cover-up scheme?
6   A.  I don't have specifics on that.
7   Q.  Then why do you speculate that's what happened?
8   A.  Because I believe that's a possibility.
9   Q.  Sure, lots of possibilities.  Another possibility is
10  Rockwell cooperated in the investigation, right?
11  A.  That's a possibility.
12  Q.  One possibility is the governor's office got involved and
13  specifically asked for quick information on whether there was
14  really incinerator burning or not?  Did you know that?
15  A.  I am not familiar with that, no.
16  Q.  Fact of the matter is there were many allegations of the
17  FBI complaint that were almost immediately dismissed as not
18  being well founded, correct?
19  A.  I don't know.
20  Q.  But in any event, you never got down to the level of
21  looking at Rockwell's real conduct, finding people who were
22  actually in the market for class properties and learned about
23  Rockwell's conduct, and then you never looked to see if they
24  had a concern, right?
25  A.  We didn't, no.
     4312
1   Q.  So in a sense we could have people who really were on top
2   of things, found the conduct, and it might have been that there
3   was real conduct that led people in the market to have real
4   concerns, and you never looked at that, correct?
5   A.  I did not look at that.
6   Q.  Now, in point of fact, the results of your -- of the survey
7   were published, were they not?
8   A.  Yes.
9   Q.  And the results of the survey were indicated.  And one of
10  the other things I wanted to bring out, and I omitted to just
11  now, is that while you could have looked to people who bought
12  in the class, when it came to measuring which people would pay
13  how much, that is whether they would need the discount or not,

```
14   isn't it true that you specifically carved out from the survey
15   group anybody who lived in Arvada or Westminster, that is
16   people who would be closest to being class members, just carved
17   them out?  You never looked at them, correct?
18   A.  I don't recall specifics.
19   Q.  Well, you don't remember that at all?
20   A.  No.  This was done eight or nine years ago.
21   Q.  It certainly would have been unjustifiable to carve out of
22   your study group the people likely to be most knowledgeable
23   about Rocky Flats, correct?  That wouldn't have been proper
24   technique.
25           MS. ROSELLE:  Your Honor, there was an agreement
```
4313
```
1   between counsel as to what the cross-examination would be and
2   that the specifics of the studies would be covered by
3   Dr. Flynn.
4           MR. BERNICK:  There is no such agreement.
5           THE COURT:  Objection is overruled.  The doctor can
6   answer the question.
7   BY MR. BERNICK:
8   Q.  It would have been improper --
9           THE COURT:  There is a question pending before the
10   doctor.
11           THE WITNESS:  Would you repeat the question.
12       (Question read.)
13   A.  If -- yeah, I don't recall.  The study was done eight years
14   ago, and I haven't -- you know, I haven't thought about that
15   aspect of it.  I will have to think about it.
16   BY MR. BERNICK:
17   Q.  When you testified on cross-examination, in fairness,
18   Dr. Slovic, you specifically were asked about whether three
19   reports were done, right?
20   A.  Yes.
21   Q.  You specifically said you were going to talk about one
22   report, right?
23   A.  That's right.
24   Q.  With respect to the other two, you specifically testified
25   under oath today that you concurred in the results of those
```
4314
```
1   reports, correct?
2   A.  Yes.
3   Q.  Yet before you said that, you never even went back to
4   review the reports to see whether that testimony was accurate?
5   A.  I looked over the reports briefly, yes, but I looked to see
6   if -- just the general findings from the report which were, you
7   know, the attitudes of people who had heard or not heard of
8   Rocky Flats and to see whether those were in general consistent
9   with the kind of psychological factors that I was presenting
10   this morning.  And I believe that they are.  I did not study
11   the methodology specifically because that's going to be
12   discussed in detail in future testimony.
13   Q.  Well, in point of fact, the data review specifically looked
14   to see whether people -- I think you have already -- we covered
15   this a little, but let's just bring it back to the forefront of
16   our minds.  You would look to see whether people who had heard
17   about the Rocky Flats FBI raid, whether those people were more
18   likely to insist upon discounts before they would buy the
```

19  property, right?
20  A.  Yes.
21  Q.  And you also looked to see whether people who were
22  concerned over past releases, whether those people too would be
23  more likely to insist upon a discount, right?
24  A.  Yes.
25  Q.  And the conclusion was, the hypothesis was that the FBI
　4315
1  raid resulted in social amplification of risk, heightened the
2  perception of risk at Rocky Flats among people in the survey
3  group such that they, if they had heard about the FBI raid,
4  would have paid less.  That was the hypothesis, correct?
5  A.  Yes.
6  Q.  And in fact, it turns out that there was no statistically
7  significant difference between people who had heard of the raid
8  and people who had not heard of the raid, no statistically
9  significant difference in terms of how they answered the
10  discount questions, correct?
11  A.  The 53 percent versus the 62 percent?  Is that what you are
12  referring to there?
13  Q.  Yeah.  You specifically call out in this chart through
14  asterisks the results that are statistically significant.  At
15  95 percent and higher you put an asterisk.  When it came to the
16  questions about value, price, how much would you pay, there was
17  no statistically significant difference between the people who
18  had heard about the raid and the people who had never even
19  heard about it, right?
20  A.  That's correct.
21  Q.  And as a result, your data did not support the proposition
22  that the FBI raid had had an impact on what the people were
23  willing to pay for property close to Rocky Flats, correct?
24  A.  In this particular comparison, no, there was not a
25  significant difference between the two groups.
　4316
1  Q.  And you certainly reached no conclusion that anything that
2  was actually done by Rockwell affected people's willingness to
3  pay, did you?
4  A.  We didn't look at that.
5  Q.  You seem to say, well, this particular comparison, this is
6  the comparison that was published in the peer review journal in
7  1998, correct?
8  A.  Yes.
9  Q.  Society for Risk Analysis, 1998.  You were one of the
10  authors?
11  A.  Yes.
12  Q.  You specifically, you and your colleagues, picked out this
13  comparison, and you found there simply was not a statistically
14  significant difference, right?
15  A.  That's what this shows here, yes.
16  Q.  Even when it came to concern over the releases, isn't it
17  true that whether people were knowledgeable about the prior
18  releases or not was not a statistically significant difference
19  in terms of their willingness to pay dollars, correct?
20  A.  Where is that data?
21  Q.  It's the data that's part of your study.  It wasn't even
22  reported.  Do you recall that being part of your study?
23  A.  I don't recall, no.

24   Q.  Now, if it turns out that the raid was not the explanation
25   and it turns out the contamination was not the explanation for
　4317
1   people's attitudes, there was still another possibility, wasn't
2   there, very obvious one?
3   A.  No.
4   Q.  Well, if you take a look at your article, your article
5   emphasizes that nuclear energy itself is a very, very powerful
6   stimulant of fear and concern.  Do you recall that?
7   A.  Yes.
8   Q.  And to the extent that people felt that Rocky Flats was --
9   involved nuclear energy, which it did, to the extent people
10   felt that Rocky Flats involved nuclear energy, you would expect
11   them to be very concerned about Rocky Flats regardless of the
12   FBI raid and regardless of any conduct by Rockwell and
13   regardless of whether there had been releases.  You would have
14   expected them to be just concerned about the fact of nuclear
15   energy, correct?
16   A.  People were concerned about nuclear energy, yes.
17   Q.  It was the number one subject of fear and loathing
18   according to the same article is nuclear power, nuclear energy,
19   right?
20   A.  Yes.
21   Q.  Therefore, it would be very understandable if people simply
22   didn't want to live near Rocky Flats or wanted to pay less
23   money because no matter how it was operated, it was a nuclear
24   facility.  You would expect that, right?
25   A.  You would expect some stigmatization.
　4318
1   Q.  One of the simple things you could have done was to measure
2   not the effect of the raid, not the effect of contamination,
3   not the effect of conduct.  You could have measured to see
4   whether people insisted on paying less because they had a
5   concern over any nuclear facility.  You could have looked for
6   nuclear energy plant generating concern.  You could have done
7   that, right?
8   A.  We could have, yes.
9   Q.  And you didn't do that, did you?
10   A.  No.
11   Q.  Isn't that the most obvious explanation for why people --
12   why some people might insist upon a discount for living around
13   Rocky Flats?  Isn't the most obvious explanation because Rocky
14   Flats is a nuclear weapons plant?  Isn't that the most obvious
15   explanation?
16   A.  No.  I think in light of the FBI raid and the publicity,
17   that that's an extraordinary event which generated a lot of
18   publicity specific to the plant.
19   Q.  Well, you say that.  But more than a third of the people in
20   your own study group hadn't even heard of it, hadn't even heard
21   of the raid?
22   A.  Well, people come and go.  They move into a community.
23   There is a lot of newcomers in the area.
24   Q.  But certainly having found there was no statistically
25   significant difference in buying attitudes for people who had
　4319
1   heard of the raid and had not heard of the raid, isn't the most
2   obvious explanation for people's buying attitudes the mere fact

3   that the plant was a nuclear plant?  Isn't that now the most
4   obvious explanation?
5   A.  I don't know.  I would have to go back and study the --
6   think about the design and the data.
7   Q.  And you haven't done that since 1998 when the paper was
8   published?
9   A.  No, I haven't.
10  Q.  One last step and we will be done by 2:30.  I am sure there
11  will be time to take a break.  I don't know if this is going to
12  work out.
13          I want to shift gears here and put another flap out.
14  I now want to talk about the market.  We have gotten up to
15  attitudes, and having reached attitudes towards money, I think
16  you told us that this is the area, the line for your expertise,
17  right?
18  A.  Yes.
19  Q.  I want to pursue a little bit whether and to what extent it
20  would be permissible or appropriate to use your data to cross
21  the line and actually talk about market value itself.  Let me
22  get at it this way.  Just because there are people who don't
23  want to live near Rocky Flats, that doesn't necessarily mean
24  that their attitudes would be affecting market price, correct?
25  A.  Again, this is getting into the dynamics of what -- how
    4320
1   attitudes relate to market price.  That's really not what I am
2   testifying about.
3   Q.  Okay.  Let's just take it very simply.  I understand and
4   appreciate that candor.  But if there are people who have a
5   negative attitude to Rocky Flats, for it to actually affect the
6   market price, the market has to be such that there aren't
7   enough other people to buy who don't have that attitude, right?
8   A.  Yes.  Also factors that are relevant are whether a person
9   who has a negative attitude feels they have a choice not to
10  live there or maybe there is certain factors that are
11  offsetting, disconcern, real as it may be, there are a lot of
12  factors there, but I am really not prepared to go into the
13  dynamics of what affects the market prices.
14  Q.  Okay.  But are we agree -- let's do it this way.  I have
15  got some other magnets we can use here.  We did have testimony
16  from a Dr. Radke.  And Dr. Radke did look at market prices, the
17  value of class property.  That's what he looked at.  And the
18  reason I made like these puzzle pieces I hope to make evident
19  in a moment, but he talked about the value of class property.
20  And in particular, he expressed a view that the FBI, there was
21  an effect of the FBI raid on class property values during the
22  period 1998 to 1990.  I want you to assume that's what his
23  testimony was.  He is focused on value as determined by price.
24          Are we clear that your measurements of attitudes are
25  not the same as a measurement of price?
    4321
1   A.  Well, they are clearly different behaviors.
2   Q.  That's what I am saying.  Somebody who simply has an
3   attitude on the telephone survey hasn't actually gone out and
4   paid a price for the property, right?
5   A.  Not necessarily, no.
6   Q.  Okay.  So what you are saying, they are different
7   behaviors.  This is an attitude in response to a telephone

8   call; this is actually somebody who signs on the bottom line,
9   right?
10  A.  Yes.
11  Q.  Okay.  Now, Dr. Radke testified that there were many
12  variables that he looked at.  In fact, he told us he looked at
13  over 40 variables in proximity, whether there were schools in
14  the area, what do you call the amenities.  He looked at all of
15  them looking at multiple regression to see which ones actually
16  fit with and contributed to property values.  He looked for
17  that fit.  Are you with me?
18  A.  Yes.
19  Q.  Now, isn't it a fact that you did not look to see whether
20  the attitudes that you were measuring actually fit with what
21  was happening in the marketplace, fair?
22  A.  That's true.
23  Q.  Okay.  You, for example, didn't see how those attitudes
24  competed with other facts in the marketplace to determine
25  price, correct?
   4322
1   A.  No, we didn't.
2   Q.  And therefore, from your own point of view, you can't offer
3   any opinion to this jury that either the FBI raid or Rockwell's
4   actual conduct or contamination, you can't offer any expert
5   testimony based on your data that said that any of those things
6   actually affected the price of class property, correct?  You
7   can't make any such statement based upon your data, correct?
8   A.  I have to go back and study our data more carefully.
9   Q.  As you sit here today, is it a fact that you can't say
10  based upon your data today that either the FBI raid or
11  Rockwell's conduct or contamination actually affected prices
12  for class property?
13  A.  I can't say that today, no.
14  Q.  In fact, in order to figure out whether that was so, you
15  would have to run a similar multiple regression, one input of
16  which was attitude, other inputs of which would be these other
17  variables.  You would have to run your own regression to make
18  what constitutes, if any, those attitudes affected the price,
19  correct?
20  A.  Yes.
21  Q.  Dr. Radke hasn't run that regression, has he?
22  A.  I don't know what Dr. Radke did specifically.
23  Q.  There is another gentleman in this case called a
24  Mr. Hunsperger.  Do you know -- or Dr. Hunsperger.  Do you know
25  Dr. Hunsperger?
   4323
1   A.  Yes, I do.
2   Q.  Now, did Dr. Hunsperger run any analysis, run any analysis
3   to determine whether the attitudes that you found actually
4   affected price?  Did he do that?
5   A.  I don't know.  He is going to testify later.  He could
6   indicate that.  I don't know offhand whether he did.
7   Q.  You never looked -- you talked with Dr. Hunsperger about
8   his work on this case, did you not?
9   A.  Not in detail, no.
10  Q.  But you did talk with him, did you not?
11  A.  I have spoken with him, yes.
12  Q.  Did you talk with him about the work that you were going to

13  do?
14  A.  Well, this was eight or nine years ago.
15  Q.  I know you may not remember.  You can simply say, I don't
16  remember.
17  A.  Yeah, I don't remember specifically.
18  Q.  Now, because the data that you gathered relates to
19  attitudes as opposed to prices, are you aware of any data, any
20  study that's been done, are you aware of any study that enables
21  the numbers that come from your study to be linked
22  scientifically to the value of class property?  Are you aware
23  of any such data that permits that linkage to be drawn?
24  A.  I have not examined any studies of that matter, of that
25  topic.
    4324
1  Q.  Are you familiar with something called contingent
2  valuation?
3  A.  Yes, I am.
4  Q.  What's contingent valuation?
5  A.  It's a survey methodology where you ask people how much
6  they would pay for some amenity that is not
7  marketed.  For example, when you despoil the coastline of
8  Alaska with oil, what's the cost of that or what would be the
9  benefit of preventing the next oil spill on the coast.  So you
10  ask people, how much would you pay, you know, contribute to
11  preventing the next oil spill?  If there were a market -- I
12  mean, there is no market for it, but assuming this is a market,
13  how much would you pay?  And so it's contingent.  The word
14  "contingent" means contingent upon there being a market, which
15  there is not.
16        MR. BERNICK:  Your Honor, if I could approach briefly
17  to the scratch pad.  I know I am getting a little close to the
18  witness.
19        THE COURT:  That's okay, go ahead.
20  BY MR. BERNICK:
21  Q.  So contingent valuation you do a survey, right?
22  A.  Uh-huh.
23  Q.  Respond audibly for the court reporter.
24  A.  Yes.
25  Q.  In the survey you ask people, you say, they are going to
    4325
1  buy a house and a particular -- I am going to ask some
2  questions about what you would pay, but roughly what's your
3  house worth today?  That's kind of how the questions begin,
4  right?
5  A.  No.
6  Q.  I won't try to put words in your mouth.  You tell me how
7  the question --
8  A.  Not a contingent valuation survey what you are describing.
9  You are describing a survey about, I am assuming, the person as
10  a potential buyer of a house or has bought a house.  There is a
11  market for houses, right?
12  Q.  Right.
13  A.  These are people who have participated in a real market for
14  houses.  There is nothing contingent about that.  Contingent
15  valuation is not relevant to this at all.
16  Q.  Okay.  Let me ask you this.  If you have a survey where you
17  ask somebody what their house is worth, what they would pay for

18  a house, and let's say they said $100,000, and then you asked
19  them, even though they are not in the marketplace at all, they
20  are not in the marketplace at all, you would say, how much
21  would you pay?  How much less would you pay if near Rocky
22  Flats?  They are not near Rocky Flats, never heard of Rocky
23  Flats.  How much would you pay less if your house were located
24  near a nuclear weapons plant?
25  A.  Yeah, so say, how much more would you pay or how much less
 4326
1  would you pay or would you pay the same?
2  Q.  Right.
3  A.  You would have all the different options.
4  Q.  Now, in that survey there is no market.  And the person is
5  not part of any market where they can look for an answer.  They
6  are just giving you their opinions based upon the questions,
7  right?
8  A.  But it is a market situation.  People can relate to that
9  because they have perhaps bought and sold houses.  They have --
10  they are familiar with the market.  The question is, do you
11  want to focus on this?  Do you really care about the word
12  "contingent value"?  The word "contingent valuation" is
13  irrelevant.
14  Q.  Take it out.  Let's assume you got the survey.  You are
15  asking the person about a house that they own.  Then you are
16  saying, see, though, there is nothing like this around you, I
17  want you to pretend that there is.  Tell me what the discount
18  should be.  That person has got no market point of reference,
19  correct?
20  A.  They -- to the extent that they are familiar with buying
21  and selling houses, I mean, it's a good -- you know, we buy --
22  we pay prices for things all the time.  We kind of know what's
23  the regular price, what kind of discount is a good discount.
24  You know, I am not -- I can't make that judgment.
25  Q.  That's my point is they have no experience base.  They have
 4327
1  nothing in their background that says, oh, gee, the house is
2  going near -- going on the market for -- in locations near a
3  nuclear weapons facilities.  Gee, that's a standard $10,000
4  discount.  There is no experience that they can go do that?
5  A.  But that's true of virtually any person that comes into the
6  area looking for a house and is told that Rocky Flats is there.
7  They have no experience background, but what they are coming to
8  it and --
9  Q.  Not all the people coming into the Rocky Flats market, not
10  people part of your survey but people coming into the market,
11  they can see what the houses sold for for the last 10, 20, 30
12  years, right?  I will withdraw the question and make it clear.
13        Somebody who actually is a buyer in this marketplace,
14  has got all kinds of market history to work with, somebody who
15  is actually coming into the Rocky Flats marketplace, right?
16  A.  I am not sure what they have available to them.
17  Q.  If you assume, like any other marketplace, there are all
18  kinds of transactions that will tell them what houses have been
19  bought and sold for, right?
20  A.  Yes.
21  Q.  But the people who are answering your survey who never had
22  even been there don't know anything about it, and you ask them

23  how much less would you pay?  Isn't it true that they are
24  pulling a number out of their heads, not out of the
25  marketplace, true or not?
　4328
1   A.  They are giving you a number.  That number is most likely
2   based on a feeling.  You know, feelings generate these numbers,
3   and to the extent that Rocky Flats, you know, produces a bad
4   feeling in them, that could affect the number that they give.
5   Q.  Then let's just bring this point home, and I am two minutes
6   away from my self-imposed deadline here.  This is survey person
7   and this is Rocky Flats area buyer.  You have acknowledged that
8   the survey person who doesn't know the Rocky Flats area will
9   be -- will answer the question based upon feelings, more
10  particularly fear and concern, right?
11  A.  To the extent that they, yeah, are aware of the
12  contamination.
13  Q.  Not even that.  If all they knew was it was a weapons
14  plant, nuclear energy, they are going to have dread.  Is it
15  D-R-E-A-D?
16  A.  Yes.
17  Q.  Right?  That's how they are going to answer the question is
18  based on dread, nothing to do with how Rocky Flats was operated
19  or anything.  People over in your group include people who
20  never heard of Rocky Flats.  So these are people who dread
21  nuclear power.  Odds are they dread nuclear power, and that's
22  what's going to lead to their answer to the question?
23  A.  Possibly.
24  Q.  Well, as to actually most likely based upon the data you
25  have presented here today, right?
　4329
1   A.  I don't know if it's most likely.  It's a possibility.
2   Q.  You showed us the data that said it's number one on the bad
3   guy's list?
4   A.  Yes.
5   Q.  Where people over here are actually working with market
6   data, right?  They know what the houses went for?
7   A.  Yes.  They are also working with feelings.
8   Q.  Sure.  But the feelings, if they had really bad feelings,
9   they wouldn't want to be there, right?  If they are there, they
10  are prepared to accept whatever feelings they have, and they
11  want to get the best price, right?
12  A.  Yes.
13  Q.  Now, do you know any way scientifically to use answers from
14  your personal survey that are driven by dread and feelings, to
15  use those answers numerically, to use the numbers to predict
16  loss of market value?  Do you know of any way to do that
17  scientifically?
18  A.  It's possible if you, you know, collected data from
19  different markets where this was going on.  You know, you could
20  do a study to correlate that.
21  Q.  You could do a multiple regression as an example, the input
22  of which is bad feelings and to see whether that correlates,
23  right?
24  A.  Yes.
25  Q.  And so far as you know, there is no expert in this case,
　4330
1   including Dr. Hunsperger, Dr. Flynn, Dr. Radke or yourself, who

```
2   have ever even tried to correlate bad feelings about nuclear
3   power with market prices at Rocky Flats, correct?
4   A.  That's correct.
5           MR. BERNICK:  I pass the witness, Your Honor.
6           THE COURT:  Redirect?
7                    REDIRECT EXAMINATION
8   BY MS. ROSELLE:
9   Q.  Good afternoon, Doctor.
10  A.  Good afternoon.
11  Q.  Dr. Slovic, at the beginning of your testimony Mr. Bernick
12  asked you some questions about risk, and he showed you a couple
13  of those slides that you put up.  And in answer to some of his
14  questions you said that if you changed the word from "risk" to
15  "probability," that -- like the probability of something
16  occurring was one in a million, you might be able to agree with
17  that statement, but if he asked you what the risk, whether the
18  risk was one in a million, then you had trouble with that.  Can
19  you explain in your -- to the jury the difference in your mind
20  between risk and probability?
21  A.  In my mind risk is most appropriate as a combination of how
22  likely something bad is to happen and how serious it is.  You
23  know, it's kind of, you know, the threat or the expected
24  outcome; whereas probability is likely -- probability is a much
25  more concept, is how likely is X to happen.  It doesn't take
```