# Exhibit B

1

* ROUGH DRAFT *

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF COLORADO

3     Case No. 90-K-181

4     MERILYN COOK, et al.,

5          Plaintiff,

6     vs.

7     ROCKWELL INTERNATIONAL CORPORATION and THE DOW CHEMICAL
      COMPANY,
8
          Defendants.
9

10        VIDEOTAPED DEPOSITION OF JOHN E. TILL, Ph.D.
                  December 1, 2005
11

12    APPEARANCES:

13    FOR THE PLAINTIFFS:     LOUISE ROSELLE, ESQ.
                              Waite, Schneider, Bayless
14                             & Chesley, LPA
                              1513 Fourth and Vine Tower
15                            One West 4th Street
                              Cincinnati, OH  45202
16                                   and
                              DAVID F. SORENSEN, ESQ.
17                            Berger & Montague, P.C.
                              1722 Locust Street
18                            Philadelphia, PA  19103-6305

19    FOR THE DEFENDANTS:     DOUGLAS M. POLAND, ESQ.
                              Lafollette, Godfrey &
20                                 Kahn
                              One East Main Street
21                            P.O. Box 2719
                              Madison, WI  53701-2719
22
      ALSO PRESENT:           Helen Grogan, Ph.D.
23                            Kathleen R. Meyer, Ph.D.
                              Timothy L. Ortmeier, CLVS
24

25

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

2

* ROUGH DRAFT *

1        PURSUANT TO WRITTEN NOTICE, the videotaped

2   deposition of JOHN E. TILL, Ph.D., called for

3   examination by the Plaintiffs, was taken in the

4   conference room at Sherman & Howard, L.L.C., 633

5   Seventeenth Street, Suite 3000, Denver, Colorado, on

6   the 1st day of December, 2005, at the hour of 11:02

7   a.m., before Bonnie Carpenter, a Notary Public and

8   Certified Shorthand Reporter in and for the State of

9   Colorado and a Registered Professional Reporter.

10        **********

11            I N D E X

12   Index of Examination            Page

13   Ms. Roselle

14   Index of Exhibits               Page

15   1  Notice of Deposition

16   2  Report

17

18

19

20

21

22

23

24

25

CARPENTER REPORTING, INC.
(303) 752-1200

3

* ROUGH DRAFT *

1                        *********

2                        (Marked for identification were

3       Deposition Exhibit Nos. 1 and 2.)

4                        THE VIDEO OPERATOR:  We are on the

5       record at approximately 11:02.  Today is

6       December 1st, 2005.  This is the beginning of Tape

7       No. 1 of the video testimony of John E. Till, taken in

8       the matter of Merilyn Cook, et al., versus Rockwell

9       International Corporation, et al., Case No. 90-K-181,

10      in the United States District Court for the District of

11      Colorado.

12                       Today, we are located at 633 Seventeenth

13      Street, Suite 3000, in Denver.

14                       I am Timothy L. Ortmeier, a Certified

15      Legal Video Specialist of Ortmeier Video Services.  The

16      court reporter is Bonnie Carpenter of Carpenter

17      Reporting.

18                       Will all attorneys present please

19      introduce themselves.

20                       MS. ROSELLE:  Louise Roselle for the

21      plaintiffs.

22                       MR. SORENSEN:  David Sorensen for the

23      plaintiffs.

24                       MR. POLAND:  Doug Poland on behalf of

25      Dow Chemical Company and Rockwell International

CARPENTER REPORTING, INC.
(303) 752-1200

4

* ROUGH DRAFT *

```
 1    Corporation.
 2                    THE VIDEO OPERATOR:  Will the court
 3    reporter please swear in the deponent.
 4                      JOHN E. TILL, Ph.D.,
 5    called as a witness for examination under the Rules,
 6    having been first duly sworn according to law, was
 7    examined and testified on his oath as follows:
 8                           EXAMINATION
 9    BY MS. ROSELLE:
10              Q    Good morning, Dr. Till.  How are you
11    today?
12              A    Good morning.
13              Q    You received the notice of deposition
14    for today?
15              A    I don't know that I've received a
16    personal notice of deposition.  I guess my attorneys
17    have.  I don't recall seeing it.
18              Q    Okay.  And -- and you were asked to
19    bring a list -- a number of documents.  Did you bring
20    them with you?
21                    MR. POLAND:  For the record, Louise, we
22    did not get a copy of the notice of deposition.
23                    MS. ROSELLE:  For the record, it was
24    hand-delivered to David Bernick.
25                    MR. POLAND:  Well, I did not get a copy
```

CARPENTER REPORTING, INC.
(303) 752-1200

5

* ROUGH DRAFT *

1    of the notice of deposition.

2              MS. ROSELLE:  Well, we'll go through

3    what you were supposed to bring.  Perhaps you can get

4    them to us today at some time.

5              Q    (BY MS. ROSELLE)  Okay.  Documents

6    created or received by you either at home or at work

7    sufficient to, one -- to identify, one, the total

8    amount paid to Dr. Till by RAC, CDH, DOE, and/or K&E in

9    connection with this case and in connection with any

10   work relating to Rocky Flats.  Two, the total amount

11   paid to Dr. Till by RAC, DOE, and/or K&E in connection

12   with dose reconstruction studies or work relating to

13   sites other than Rocky Flats.

14             Do you have those records?

15        A    No.

16        Q    Okay.  Do those records exist?

17        A    I would assume they exist.  I could dig

18   them up.

19        Q    Okay.  Where are they?

20        A    Probably in my office.

21        Q    And where is your office?

22        A    South Carolina.

23        Q    Can you tell me how much money you have

24   been paid -- how much money RAC has been paid for the

25   work that it's done at Rocky Flats?

CARPENTER REPORTING, INC.
(303) 752-1200

6

* ROUGH DRAFT *

1        A    I can give you an estimate.

2          Q     And how much is the estimate?

3          A     I would estimate that it's about

4     $5 million.

5          Q     And can you tell me the years over which

6     that money was paid?

7          A     That would be between about 1992 and

8     1999.  That does not include -- there was another

9     study, the soil action level study related to Rocky

10    Flats for about $400,000 over a period of about 18

11    months, and I believe that was around 2000 to 2002.

12         Q     Okay.  The $5 million that was paid to

13    RAC, who did the money come from?

14         A     The Colorado Department of Public Health

15    and Environment.

16         Q     Where did they get the money?

17               MR. POLAND:  Object to the form of the

18    question.

19         A     I believe that their money came from the

20    Department of Energy.

21         Q     (BY MS. ROSELLE)  And was it a straight

22    pass-through, or did they get some overhead or

23    something from the DOE money?

24               MR. POLAND:  Object to the form of the

25    question.  Foundation.

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                        7
                        * ROUGH DRAFT *

1          A     I assume that they got some overhead,

2    but, really, I don't have knowledge of how much or if

3    they did or not.

4            Q    (BY MS. ROSELLE)  Do you -- do you have

5    knowledge that all of the $5 million that was paid to

6    RAC came from the Department of Energy?

7                 MR. POLAND:  Object to the form of the

8    question.  Mischaracterizes his testimony.

9            A    I believe that's the case.

10           Q    (BY MS. ROSELLE)  Now, at the time that

11   this money was received by RAC between 1992 and 1999,

12   can you tell me what your interest in RAC was?

13           A    I was president of RAC.  I was president

14   of Risk Assessment Corporation.

15           Q    Okay.  Were you also a shareholder?

16                MR. POLAND:  Object to the form of the

17   question.

18           A    I'm the sole owner of RAC.

19           Q    (BY MS. ROSELLE)  Is RAC a corporation?

20           A    Yes.

21           Q    Okay.  Where is it incorporated?

22           A    In the state of South Carolina.

23           Q    What year was it incorporated?

24           A    It was incorporated, I believe, in 1978

25   or '79 as Radiological Assessments Corporation.  And at

CARPENTER REPORTING, INC.
(303) 752-1200

8

* ROUGH DRAFT *

1    some point -- and I don't recall exactly when -- the

2    name was changed to Risk Assessment Corporation.

3          Q     Okay.  Since the time that RAC was

4     incorporated in 1978 or '79, have you been the sole

5     shareholder?

6          A     Yes.

7          Q     Is it a Subchapter S corporation?

8          A     Yes.

9          Q     Has it always been a Subchapter S

10    corporation?

11         A     Yes.

12         Q     Of the $5 million that was paid by the

13    Department of Energy to the Colorado Department of

14    Health and then to RAC, can you tell me how much of

15    that money went to John Till?

16              MR. POLAND:  Object to the form of the

17    question.

18         A     I cannot tell you precisely.  I'd have

19    to check the records to -- to sort that out.  But most

20    of the money that came into Risk Assessment Corporation

21    for that work went to other team members in my

22    corporation and to cover travel expenses, to cover

23    office overhead, and those kinds of things.

24         Q     (BY MS. ROSELLE)  How much money went to

25    you?

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                        9
                         * ROUGH DRAFT *

1               MR. POLAND:  Objection.  Asked and

2     answered.

3              MS. ROSELLE:  It was asked, but not

4     answered.

5              A    In the seven years from '92 -- and I'm

6     just going to have to guess -- take a guess at this, I

7     would guess 200-, $250,000.

8              Q    (BY MS. ROSELLE)  And would that include

9     both what you received as the sole shareholder of RAC,

10    as well as any salary that you received?

11             A    Yes.

12             Q    Okay.  Did you receive a salary from RAC

13    between 1992 and 1999?

14             A    Yes.

15             Q    Okay.  And what was your salary?

16             A    I don't believe it ever changed.  It was

17    $180,000 a year.

18             Q    Okay.  The 200- to $250,000, is that per

19    year that you received --

20             A    No.

21             Q    Okay.  So if -- so you're saying that

22    most of the salary that you received from RAC between

23    1992 and 1999 was unrelated to the Rocky Flats work?

24             A    Whether it's most or not, as I said, I'm

25    taking a guess at this.  But I had other sources of

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                         10
                      * ROUGH DRAFT *

1     income, that's correct.  And it certainly could have

2     been that Rocky Flats certainly was -- I think that

3     Rocky Flats was not the major source of income.

4          Q     For RAC?

5          A     For me personally or for RAC.  And for

6     RAC, I'd have to check the figures.

7          Q     All right.  I just want to make sure I

8     understand it.  Between 1992 and 1999, you got an

9     annual salary from RAC of 180,000 per year?

10         A     Correct.

11         Q     Okay.  However, for the entire time,

12    your estimate is that the total amount that you

13    received from the work at Rocky Flats was between 200-

14    and 250,000?

15         A     You know, without checking these

16    records, I'm guessing at figures.  And yes, that is

17    what I said, but I'd have to check the figures.

18         Q     Well, that's why we served a deposition

19    notice with the request that you bring the documents

20    with you.

21               Did you receive dividends or other money

22    from RAC between 1992 and 1999?

23         A     In an S corporation, you really don't

24    receive dividends.  If there's cash flow left over at

25    the end of the year, then that -- those funds would

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                    11
                        * ROUGH DRAFT *

1     come to you, and that's -- if that was the case, then,

2     yes, I received those funds.

3          Q     Okay.  Do you remember how much fund or

4    funds you received between 1992 and 1999 from RAC?

5         A    I really don't.

6         Q    Okay.  Do you recall how much you

7    reported to the IRS that you received from RAC?

8         A    No, I don't.

9         Q    Do you have your tax returns?

10        A    Yes.

11        Q    And where are your tax returns?

12        A    They would either be in my accountant's

13   office or in my office.

14        Q    Both of those are in South Carolina?

15        A    That's correct.

16        Q    During the same period, 1992 to 1999,

17   can you tell me what other work involving DOE nuclear

18   weapons sites you were working on at RAC?

19             MR. POLAND:  I'm sorry, Louise.  What

20   was the period?

21             MS. ROSELLE:  1992 to 1999.

22        A    I would have been working on the Hanford

23   facility and the Fernald facility and the Savannah

24   River site.

25        Q    (BY MS. ROSELLE)  Okay.  What years did

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                     12
                         * ROUGH DRAFT *

1    you do work at the Idaho national lab?

2             MR. POLAND:  Object to the form of the

3    question.

4         A    That may have been at the end of the

5      1990s.  I don't recall specifically when we started

6      that work, and I don't recall specifically when it

7      ended.  It was a several-year period.  Whether it

8      overlapped prior to 1999 or not, I'm not sure.

9              Q    (BY MS. ROSELLE)  And what years did you

10     do work at Los Alamos?

11             A    Well, let's see.  That would have been

12     the first thing I did, and that was -- are you talking

13     about work -- any work related to DOE sites?

14             Q    Yes, sir.

15             A    Is that the question?  That's the same

16     case withs Los Alamos.  That could have been started

17     prior to 1999, the audit that we conducted there for

18     the Department of Justice.

19             Q    And what about the Cerro Grande fire?

20     What years did you do that work?

21             A    I believe that was about 2000 to 2002,

22     but I'd have to check that to be sure.

23             Q    And did you also do work at Oakridge?

24             A    No.

25             Q    So the -- okay.  Let's start with

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                    13
                    * ROUGH DRAFT *

1      Hanford.  Who retained you to do work at Hanford?

2              A    The work that -- that I did first at

3      Hanford was funded by the CDC and the -- we were

4      actually under contract with the State of Washington

5    Department of Ecology, and that was for the Hanford

6    environmental dose reconstruction project.

7              RAC, as a team, worked for CDC on

8    Hanford, the Centers for Disease Control and Prevention

9    in Atlanta.

10             Q    How much money were you paid for the

11   dose reconstruction at Hanford?  And by "you," I mean

12   RAC.

13             A    Well, as I said, there were two pieces

14   to this.  There was a period of time when the dose

15   reconstruction -- there were no other members of RAC

16   involved in that.  It was me personally working for the

17   Department of Ecology.  How much was I paid for that?

18   Over the six-year period of time that I worked,

19   including all of my expenses and travel -- I just have

20   to take a guess -- it was probably on the order of

21   $400,000, perhaps.  500,000.  I'm just guessing.

22             Q    And then RAC became involved after that?

23             A    RAC did a study related to Hanford as a

24   part of a task order contract we had for the Centers

25   for Disease Control and Prevention, and the amount of

CARPENTER REPORTING, INC.
(303) 752-1200

14

* ROUGH DRAFT *

1    money we were paid -- this was being paid by CDC --

2    again, for all of our expenses and travel -- there were

3    two studies.  One related to hot particle emissions and

4    one related to the Columbia River.  I have to -- again,

5    I'm just guessing at these figures.  Maybe on the order

6      of $400,000 over a period of four years or so.

7              Q    For each, or total?

8              A    Total.

9              Q    Okay.  So your -- your best guess is

10     that the total amount that either you or RAC received

11     with regard to Hanford was about 900,000?

12                 MR. POLAND:  Object to the form of the

13     question.

14             A    Over -- over a period -- period -- an

15     entire period of about ten years or so, that may be

16     correct, but, again, I'm just guessing at these

17     figures, so ...

18             Q    (BY MS. ROSELLE)  Do you have records in

19     your office as to how much both you and RAC received

20     from -- with regard to Hanford?

21             A    I should have those records, yes.

22             Q    Okay.  With regard to Fernald, how much

23     was RAC paid at Fernald?

24             A    Well, the Fernald study occurred over

25     about a nine-year period of time, and, again, I'm just

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                    15
                    * ROUGH DRAFT *

1      guessing at these figures.  I believe it might have

2      been something on the order of $2 million.

3              Q    And who paid you at Fernald?

4              A    We were under contract with the Centers

5      for Disease Control and Prevention.

6              Q    And what years did you do the work at

7     Fernald?

8              A    I believe that was between about 1991

9     and 1999.  Something like that.

10             Q    And how much of the money from Fernald

11    went directly to you, either as the sole shareholder of

12    RAC or other income to you?

13             MR. POLAND:  Object to the form of the

14    question.

15             A    Again, I'm just guessing.  Maybe

16    $200,000.  Maybe 250.  I don't know.  I'm guessing at

17    these figures.

18             Q    (BY MS. ROSELLE)  And how much of the

19    money from Hanford went directly to you, either because

20    you were the sole person doing the work or as an

21    employee of RAC or as a shareholder of RAC?

22             A    Well, for me personally, the work I did

23    on the header project -- and I've forgotten what figure

24    I gave you -- but that would have all gone to -- you're

25    talking about coming now back to me personally --

CARPENTER REPORTING, INC.
(303) 752-1200

                                              16
* ROUGH DRAFT *

1         Q    Yes.

2         A    -- not including expenses?  I've

3     forgotten what figure I gave you.  Could you tell me

4     what I gave you?

5         Q    400- to 500,000.

6         A    I would say half of that or thereabouts

7      was -- came back to me personally.

8              Q     So about 200 to 250, again?

9              A     Perhaps, yeah.

10             Q     Okay.  And what about the study for the

11     CDC at Hanford on the -- the two studies.  The one on

12     hot -- hot particles and the one on emissions?  How

13     much of that money eventually made its way to you,

14     either as salary or as the sole shareholder?

15             A     So, again, could you tell me the figure

16     that I gave you, because I'm having difficulties --

17             Q     400,000.

18             A     -- pulling these out of my head.

19     Probably something on the order of about 50,000 over

20     the four years or so.

21             Q     Okay.  Now, does RAC file tax returns,

22     Federal income tax returns?

23             A     Yes.

24             Q     Okay.  And do you have all of those tax

25     returns for the last 15 years?

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    17
                        * ROUGH DRAFT *

1              A     Yes.

2              Q     Okay.  And where are they?

3              A     For the last 15 years, well, I'm

4      assuming I have them or my accountant has them.  I'm,

5      quite honestly, not sure.

6              Q     Okay.  Now, going on, then, to Savannah

7    River, what years did you do work -- either you

8    personally or RAC -- at Savannah River?

9         A    I believe we did the first phase of the

10   dose reconstruction there beginning in about 1995 or

11   1996 for a period of about -- of about two years.  And

12   I'm guessing at the figure.  The contract amount,

13   perhaps about $1.8 million.

14        Q    And was that money to RAC?

15        A    Yes.

16        Q    And then did you do other work at

17   Savannah River?  Either you or RAC?

18        A    We did a second phase of the dose

19   reconstruction work there.  I'm at a total loss as to

20   know how much.  I would -- I believe it was on the

21   order of about a million and a half or $2 million, but

22   I'm still not -- I don't have the records with me,

23   so ...

24        Q    And what years was -- did you do that

25   study?

CARPENTER REPORTING, INC.
(303) 752-1200

18

* ROUGH DRAFT *

1         A    I think that came right after the Phase

2    I work, so it would have been in the late 1990s, early

3    2000, that time period.

4         Q    And how much of the money that was paid

5    for the work at Savannah River came to you personally,

6    either as an employee or as the sole shareholder of

7    RAC?

8          A     Again, I don't have figures with me, so

9     I'm just guessing at what these amounts might be.  So

10    probably on the Phase I work, over a period of two

11    years, maybe $100,000.  Something like that.

12         Q     And the Phase --

13         A     On the Phase II work, I would guess

14    about the same amount.

15         Q     And who paid the money for the Savannah

16    River work?

17         A     That work was supported by the Centers

18    for Disease Control and Prevention in Atlanta.

19         Q     Okay.  Now, what work have you done at

20    the Idaho national lab?

21         A     The work we did in Idaho was a -- one of

22    the task orders under a task order contract that we had

23    with CDC in Atlanta, and it was CDC that paid us for

24    that work.

25         Q     And how much were you paid?

CARPENTER REPORTING, INC.
(303) 752-1200

19

* ROUGH DRAFT *

1          A     There were actually a couple of task

2     orders that we performed, if I remember correctly, and

3     I'm really guessing on these figures because I

4     certainly don't remember what they were.  I -- it seems

5     to me that the -- we did a document search at the INEEL

6     for CDC, and that might have been something on the

7     order of about a half a million dollars.

8                There was a second piece of work where

9        we calculated some preliminary source terms at the

10       INEEL, and again, I'm just guessing at these figures

11       and these contract amounts, but I would -- I'm guessing

12       around $300,000 for that.

13             Q    And how much of the work at the Idaho

14       national lab eventually came to you, John Till, either

15       as a shareholder or an employee of RAC?

16             A    Over the period -- probably over a

17       period of about five years, maybe 100,000, $125,000,

18       maybe.

19             Q    And what was the five-year period that

20       that spanned?

21             A    I believe that was somewhere around 1995

22       to the year 2000.  Somewhere in there.

23             Q    Now, the work at Los Alamos, first, the

24       Cerro Grande fire, when did you do that work?

25             A    I think I said earlier that was between

                        CARPENTER REPORTING, INC.
                            (303) 752-1200

                                                        20
                            * ROUGH DRAFT *

1        2000 and 2002.  Somewhere in there.  It was an 18-month

2        period.

3             Q    And who paid for that work?

4             A    That was paid for by the New Mexico

5        Environment Department.

6             Q    And how much was -- was that RAC that

7        received that money?

8             A    Yes.

9          Q    And how much did RAC receive?

10         A    I believe that contract was for about

11   $450,000.

12         Q    And how much of that money came to you,

13   John Till, personally, either as salary or as the sole

14   shareholder of RAC?

15         A    Probably 50,000 to $75,000.

16         Q    Okay.  Now, you said you were also doing

17   some of the audit work at Los Alamos?

18         A    We performed an audit.  The work was for

19   the Department of Justice at the Los Alamos National

20   Laboratory that went over a period of time of about

21   five years.  We performed a series of three audits.

22   Each audit was supported differently in terms of the

23   amount of money.  I believe the first audit was about

24   $300,000, I believe the second audit was about

25   $150,000, and the third audit was something on the

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                    21
                         * ROUGH DRAFT *

1    order of $100,000.

2          Q    And that was all paid to RAC?

3          A    Yes.  All of these, of course, include

4    all expenses, contract expenses in these amounts of

5    money.

6          Q    And what were the five years that the

7    three audits spanned?

8          A    I believe the first audit was about 1997

9       and till about 2003.  2002.

10              Q    And of the approximate $550,000 that was

11      paid for the five -- for the three audits over five

12      years, how much of that money went to you, John Till

13      personally, either as salary or as sole shareholder of

14      RAC?

15              A    Probably something on the order of

16      $75,000.

17              Q    The money that you received from the CDC

18      for these various studies that you've discussed, did

19      the CDC get the money for those studies from the DOE

20      budget?

21              MR. POLAND:  Objection.  Foundation.

22              A    No.  Not in all cases.  In -- some of

23      the money that CDC spent to conduct these studies came

24      directly from Congress.  Some of the money came from

25      DOE.

CARPENTER REPORTING, INC.
(303) 752-1200

22

* ROUGH DRAFT *

1               Q    (BY MS. ROSELLE)  And the money for the

2       audits at Los Alamos from DOJ, did DOJ get the money

3       for those audits from the DOE budget?

4               MR. POLAND:  Objection.  Foundation.

5               A    I believe that's correct because it was

6       a result of a settlement of a -- of a lawsuit.  But I'm

7       not certain about that.

8               Q    (BY MS. ROSELLE)  You said that -- I

9       believe you said in answer to my last question that

10      some of the money for these various CDC studies came

11      from -- directly from DOE.  Is that what you said?

12              A    I said that some of -- yes.  That's

13      correct.  I said some of the money for these studies

14      also came directly from Congress, as an appropriation

15      from Congress to CDC.

16              Q    All right.  But some of it came as an

17      appropriation from Congress to DOE?

18              A    Well, I assume that's the case.  There

19      was -- DOE has funded CDC for some of these studies,

20      and then Congress has written line item budget items to

21      support some of these studies.

22              Q    But, either way, it all comes out of the

23      Government's budget; right?

24              A    That's right.

25              Q    Have you ever done any study at any of

                        CARPENTER REPORTING, INC.
                            (303) 752-1200

                                                        23
                            * ROUGH DRAFT *

1       these plants where the money did not originate in some

2       form from the Federal Government?

3               MR. POLAND:  Object to the form of the

4       question.

5               A    Well, I really can't recall any off the

6       top of my head at the moment, no.  I'd have to think

7       about that a bit.

8               Q    (BY MS. ROSELLE)  Now, is it correct

9       that you received more than twice as much for the work

10      you did at Rocky Flats than for any other facility

11      owned by the DOE that you did work at?

12              A    I don't think that's correct, because,

13      if you look at the figures, Savannah River was similar,

14      if I recall.  The figures that I'm having to guess.

15              Q    Oh, okay.  Savannah River, you said, was

16      about 3.3 to 3.8.  Okay.

17              All right.  Other than Savannah River,

18      the amount that you received at Han -- at Rocky Flats

19      was more than twice what you received anywhere else?

20              A    Probably about correct.

21              Q    Now, when you began your work at Rocky

22      Flats, you held a number of public meetings; correct?

23              A    I personally didn't hold the public

24      meetings, no.  The Health Advisory Panel held public

25      meetings in which we participated.

                                                      24
                        * ROUGH DRAFT *

1               Q    And you spoke to the public at those

2       meetings; is that correct?

3               A    I'm sure I -- I'm sure I did.  If we

4       were present and we were a contractor -- I may have,

5       but I didn't in all cases.

6               Q    Okay.  And when you spoke to the public,

7       you held yourself out as being an independent

8       organization that was going to evaluate the historic

9       public exposures; is that correct?

10                   MR. POLAND:  Object to the form of the

11    question.

12              A    I don't know what I said at those

13    meetings.

14              Q    (BY MS. ROSELLE)  But that's the

15    impression you were conveying to the public, isn't it?

16                   MR. POLAND:  Object to the form of the

17    question.  Foundation.

18              A    I don't recall what I said at those

19    public meetings and whether I was conveying that

20    specifically, no.  I don't know that.

21              Q    (BY MS. ROSELLE)  Wasn't it your

22    intention, at Rocky Flats, to get the public to believe

23    that you were an independent entity that was going to

24    look at historic public exposures?

25              A    I believe that in the case in Rocky

                     CARPENTER REPORTING, INC.
                          (303) 752-1200

                                                        25
                          * ROUGH DRAFT *

1    Flats, we were independent, and I believe our

2    independence was provided by the Colorado Department --

3    Department of Public Health and Environment.  And yes,

4    I would consider myself as an independent scientist.

5                   And furthermore, because of the way

6    these studies are set up and with the openness and so

7    forth of all of these studies, yes, I would consider

8    them independent.

9              Q    And that's what you told the public;

10   right?

11                    MR. POLAND:  Object to the form of the

12      question.

13            A     Well, I've already said that I don't

14      remember saying that, no.

15            Q     (BY MS. ROSELLE)  Specifically.  You

16      don't remember specifically saying that?

17                    MR. POLAND:  Objection.

18      Mischaracterizes his testimony.

19            A     No, I don't remember specifically saying

20      that.

21            Q     (BY MS. ROSELLE)  Did you talk to

22      citizens on a one-on-one basis from time to time?

23            A     Yes.

24            Q     Okay.  Did you tell citizens that they

25      could call you from time to time if they had questions?

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                        26
                        * ROUGH DRAFT *

1             A     I probably would have, yes.  I don't

2       know that I did, but I probably would have.

3             Q     And did you -- did you tell people that

4       you would try to answer their questions because -- as

5       an independent person looking at this situation?

6                     MR. POLAND:  Object to the form of the

7       question.

8             A     I don't know that I would have

9       characterized it like that, no.  I mean, I'm a

10      scientist.

11            Q     (BY MS. ROSELLE)  How would --

12          A    And I would characterize it as -- if

13   somebody asked me a question, I'm going to give them an

14   honest answer.  It's not because of my independence.

15   That has nothing to do with it.  I'm going to give them

16   whatever honest answer I can as a scientist.

17          Q    But you -- you came to these meetings

18   and you told the public, directly or indirectly, that

19   you were there as their friend to try to help them

20   assess what their public -- what their exposures were

21   from the operations at Rocky Flats; correct?

22              MR. POLAND:  Object to the form of the

23   question.

24          A    I don't know that I would have told

25   anybody I'm there as their friend, trust me.  Because

CARPENTER REPORTING, INC.
(303) 752-1200

27

* ROUGH DRAFT *

1    I'm an independent scientist.  I have -- I don't know

2    that I've ever said that.  I have always tried to build

3    credibility with people.  Always.  And it's up to the

4    individual whether or not they trust me.  And I would

5    not go in and say to someone, Trust me because I'm an

6    independent scientist.  I'm here because I'm your

7    friend.  If I said that, I'd be surprised, but that's

8    not my character.

9          Q    (BY MS. ROSELLE)  Okay.  But you -- you

10   would tell them that you were here to help assess what

11   their exposures had been and that you were independent

12      in doing this assessment; correct?

13              MR. POLAND:  Object to the form of the

14      question.  Compound.

15          A    That's not correct.  I don't -- I don't

16      think I would have tied this independence.  What I

17      would have told people, just as I said before, is that

18      I'm here.  My goal is to open the books on this

19      facility, to lay all the facts on the table, and to

20      help you understand what went on.  Don't trust me

21      because I'm independent.  The information is there.

22      I'll help you get the information.  I'll help you

23      understand it to the best that I can.  I'll help you

24      get information if you'll tell me what you'd like to

25      see.  That's the way we've approached all of these

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                          28
                        * ROUGH DRAFT *

1      studies.

2          Q    (BY MS. ROSELLE)  And you tried to build

3      the -- the -- your rapport with the public, didn't you?

4          A    I believe in building credibility with

5      the public, but that is something that the public has

6      to attain in me as a scientist.  I didn't come in and

7      I'll never go into a study and say, Trust me, I'm a

8      scientist, you can come to me with your problems.

9      That's not the way I work.

10              Over a period of time, what I hope is

11      that people will build some trust, not only in me, but

12      the work, because all the facts are laid on the table.

13    It's not me as an individual.  It's the way that we do

14    the work as scientists and the open process and the

15    responsiveness that we take in these studies.

16           Q    I was at one of your early meetings at

17    Fernald.  I have a distinct recollection of your

18    sitting in the front of that room and your telling the

19    public at Fernald that you were going to give them

20    honest answers about what their exposures were -- had

21    been and that you were going to be independent and that

22    people such as Lisa Crawford and others could call you

23    and you would try to answer their questions.  Do you

24    deny that that's what you did at Fernald?

25           MR. POLAND:  Object to the form of the

CARPENTER REPORTING, INC.
(303) 752-1200

29

* ROUGH DRAFT *

1    question.  Completely irrelevant.  We're talking about

2    this study and this case; not what he said in other

3    cases.  And counsel is testifying.

4           A    What you just said is not out of my

5    character that I would not stand up and tell people,

6    I'm going to give you an honest answer, but we're going

7    to do it so that the books are open so you can see what

8    happened.

9           Whether I -- first of all, I don't

10   recall this meeting.  I don't recall your

11   interpretation of it.  I don't know whether I said

12   those things or not.  I would not go in and tell

13    someone to trust me because I'm here, I'm independent,

14    and I'm going to give you all the answers that you

15    want.

16              But some of the other things that you

17    said about if people wanted to call me if they had a

18    question, I would do the best that I could to answer

19    that question.  I've always done that.

20         Q    (BY MS. ROSELLE)  Did you ever tell the

21    public that you or RAC were not independent?

22              MR. POLAND:  Object to the form of the

23    question.  Vague.

24         A    I don't know.

25         Q    (BY MS. ROSELLE)  Do you remember ever

CARPENTER REPORTING, INC.
(303) 752-1200

30
* ROUGH DRAFT *

1    telling the public that you weren't independent?

2              MR. POLAND:  Objection.  Asked and

3    answered.

4         A    I don't know.

5         Q    (BY MS. ROSELLE)  Do you consider,

6    during the period of 1992 to the present, that you've

7    been a full-time employee of RAC?

8         A    Yes.

9         Q    And you're a full-time employee today?

10        A    Yes.

11        Q    And can you tell me what contracts RAC

12    has today for work?

13        A    Well, we recently completed a contract

14    with Colorado State University and are in the process

15    of getting that contract renewed related to Los Alamos.

16    We are working on this litigation for Kirkland & Ellis.

17    And we have another project we are doing with

18    Kirkland & Ellis.

19             Q    Is the other project Hanford?

20             A    No.

21             Q    Okay.  So you're working on another

22    lawsuit with Kirkland & Ellis that's neither Rocky

23    Flats nor Hanford?

24             A    Yes.

25             Q    Have you filed an expert report in that

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                      31
                      * ROUGH DRAFT *

1    case?

2             A    No.

3             Q    Okay.  What attorneys at Kirkland &

4    Ellis are you working with on that case?

5             A    Mr. Poland.

6             Q    You understand he does not work for the

7    law firm of Kirkland & Ellis?

8             A    That's correct.  Yes.  I know that.

9             Q    So what attorneys at Kirkland & Ellis

10    are you working with on that case?

11             A    I actually don't know the name.

12             Q    Does that case involve a DOE facility?

13             A    No.

14          Q    Okay.  When did you stop working on

15    litigation for Kirkland & Ellis on Hanford?

16          A    I believe the last work we did was about

17    August of this year.

18          Q    Okay.  So at the present time, as you

19    sit here today, on December 1st, 2005, you have three

20    contracts at RAC:  One with the Colorado State

21    University relating to Los Alamos, one with Kirkland &

22    Ellis relating to Rocky Flats, and one with Kirkland &

23    Ellis relating to another case; is that correct?

24               MR. POLAND:  Object to the form of the

25    question.  Mischaracterizes his testimony.

CARPENTER REPORTING, INC.
(303) 752-1200

32

* ROUGH DRAFT *

1          A    No.  Because I don't have a contract

2    with Colorado State at the moment.

3          Q    (BY MS. ROSELLE)  Okay.  So, at the

4    present time, is the only work that RAC has with the

5    law firm Kirkland & Ellis?

6          A    At the moment, yes.

7          Q    And how many employees does RAC have?

8          A    One.

9          Q    You?

10          A    Me.

11          Q    So the rest of the employees that are

12    people that appear on your website are no longer with

13    RAC?

14          A    All the individuals who work with my

15    team are independent contractors who work with my team

16    as independent contractors.  They're not employees.

17         Q    Has RAC ever had any full-time employees

18    other than you?

19         A    No.

20         Q    So, as we sit here today -- I just want

21    to make sure I've got this right -- the only contract

22    RAC has is with Kirkland & Ellis, and that's for two

23    different cases?

24              MR. POLAND:  Object to the form of the

25    question.  Mischaracterizes his testimony.

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                          33
                        * ROUGH DRAFT *

1              MS. ROSELLE:  I'll rephrase it.  I'll

2    rephrase it.

3         Q    (BY MS. ROSELLE)  As we sit here today

4    on December 1st, 2005, the only client that RAC has

5    is Kirkland & Ellis?

6         A    That's correct, unless I'm forgetting

7    something that we're doing, but I think that's about

8    right.  We're in the process, of course, of renewing

9    the contract with Colorado State.

10         Q    Okay.  Let's -- let's talk about

11    Kirkland & Ellis.  When did RAC first begin doing work

12    with Kirkland & Ellis?

13         A    About two years ago.

14         Q    And was the -- and what was the first

15    case involving Kirkland & Ellis that RAC had a contract

16    for?

17                    MR. POLAND:  Object to the form of the

18    question.

19            A    Hanford.

20            Q    (BY MS. ROSELLE)  And who retained you

21    to work on Hanford?

22            A    Do you mean --

23            Q    What lawyer?

24            A    Kevin VanWard, I assume.

25            Q    And how much was RAC paid by Kirkland &

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    34
                        * ROUGH DRAFT *

1    Ellis for work that you've done at Hanford in the last

2    two years?

3            A    About $400,000, I think.

4            Q    Okay.  And of that $400,000, how much of

5    that money came to you, John Till, as either salary or

6    as the sole shareholder of RAC?

7            A    Maybe $100,000.

8            Q    And what were you retained by Kevin

9    VanWard of Kirkland & Ellis to do at Hanford?

10           A    I was retained to explain the historical

11   dose reconstruction that took place at Hanford and my

12   role as the chairman of the technical steering panel

13   for that study.  And, also, to make dose calculations

14   using the Hanford -- the header methodology.

15           Q    You also appeared in trial in May of

16    this year as a witness for the defendants; is that

17    correct?

18              MR. POLAND:  Object to the form of the

19    question.

20         A    Yes.

21         Q    (BY MS. ROSELLE)  And prior to being

22    retained by the law firm of Kirkland & Ellis at Hanford

23    approximately two years ago, you had received money

24    from the State of Washington Department of Ecology and

25    the CDC to do work at Hanford; is that correct?

CARPENTER REPORTING, INC.
(303) 752-1200

                                             35
                  * ROUGH DRAFT *

1          A    Yes.

2          Q    Okay.  And you don't view that you had a

3     conflict of interest when you went from being a

4     scientist who had taken money from public agencies to

5     do work at Hanford and then you appeared as an expert

6     on behalf of the defendants in litigation?

7               MR. POLAND:  Object to the form of the

8     question.

9          A    No.  Not at all.  I was explaining the

10    Hanford study and the results of that study --

11         Q    (BY MS. ROSELLE)  And you didn't see any

12    conflict at all?

13         A    -- using -- no.  None.

14         Q    Did you discuss with Mr. VanWard or

15    anyone else at Kirkland & Ellis whether or not you had

16     a conflict of interest?

17              MR. POLAND:  Object to the form of the

18     question.

19          A    I really don't remember if we had that

20     discussion.

21          Q    (BY MS. ROSELLE)  How much were you paid

22     per hour for the work you did in Hanford by Kirkland &

23     Ellis?  And I don't mean you personally.  I mean RAC.

24          A    Could you rephrase that, please?

25          Q    How much money was RAC paid per hour for

CARPENTER REPORTING, INC.
(303) 752-1200

36
* ROUGH DRAFT *

1     the work that it did for Kirkland & Ellis at Hanford?

2          A    I really don't have any idea.  Other

3     people on my team were involved in that work, so to

4     give you an estimate of how much RAC was paid per hour,

5     I don't know.

6          Q    Well, let me try it a different way.

7     How much do you, John Till, as an employee of RAC, bill

8     your time at to Kirkland & Ellis?

9          A    I believe that was $160 an hour.

10         Q    For your time?

11         A    Yes.

12         Q    Okay.  When were you retained by

13    Kirkland & Ellis as an expert at Rocky Flats?

14              MR. POLAND:  Object to the form of the

15    question.

16         A    I think at the end of 2003.

17          Q    (BY MS. ROSELLE)  And who contacted you?

18          A    Mr. Poland.

19          Q    And how much are you being paid for your

20     time per hour at Rocky Flats?

21          A    $160 an hour.

22          Q    And how much has RAC received for the

23     work that you've done at Rocky Flats on behalf of

24     Kirkland & Ellis?

25          A    About $25,000.

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                        37
                         * ROUGH DRAFT *

1          Q    You're telling me that for this big

2     report, you have only been paid $25,000?

3          A    It's much less for that report.  That's

4     correct.

5          Q    You're swearing under oath that the

6     total amount that RAC has received from Kirkland &

7     Ellis over the last two years for your work at Rocky

8     Flats -- by "you," I mean RAC's work at Rocky Flats --

9     is $25,000?

10              MR. POLAND:  Object to the form of the

11     question.

12          A    I'm telling you that's about right, yes.

13     I mean, it's not much more than that.

14          Q    (BY MS. ROSELLE)  How much money were

15     you paid to prepare this report?

16          A    I'm really guessing.  I think it was

17      about $6,000.

18              Q    And when you were contacted by

19      Mr. Poland to work for the law firm of Kirkland & Ellis

20      in the Rocky Flats case, did you have any discussions

21      with Mr. Poland about whether or not you had a conflict

22      of interest?

23              MR. POLAND:  Object to the form of the

24      question.

25              A    I don't recall any discussions about

CARPENTER REPORTING, INC.
(303) 752-1200

38

* ROUGH DRAFT *

1      that.

2              Q    (BY MS. ROSELLE)  Did you have any

3      consideration in your own mind whether you had a

4      conflict of interest?

5              A    No.  Not at all.

6              Q    As you sit here today, you don't believe

7      you have any conflict of interest in testifying on

8      behalf of Dow and Rockwell at Rocky Flats?

9              MR. POLAND:  Object to the form of the

10      question.

11              A    No.  Not at all.

12              Q    (BY MS. ROSELLE)  The fact that you've

13      been paid $5 million by public agencies to do a dose

14      reconstruction, you don't think is a conflict with your

15      now coming into a court of law and testifying against

16      citizens of the State of Colorado; is that correct?

17              MR. POLAND:  Object to the form of the

18    question.

19             A    That's correct.  I don't.

20             Q    (BY MS. ROSELLE)  And why is that?

21             A    Because I'm a scientist.  Because what I

22    do is public information.  If someone asked me to come

23    in and talk about the work that I do, I have an

24    obligation to do that.  A responsibility to explain the

25    work that we do.

CARPENTER REPORTING, INC.
(303) 752-1200

39
* ROUGH DRAFT *

1             Q    And that's all you're coming to court to

2    do?

3             A    That's correct.

4             Q    How many meetings have you had with

5    Mr. Poland over the last year -- two years?

6             MR. POLAND:  Are you talking about in

7    this case, Louise?

8             MS. ROSELLE:  Yes.

9             A    Perhaps four or five.

10             Q    (BY MS. ROSELLE)  Tell me when the first

11    one was.

12             A    I'm really guessing, but I believe it

13    would have been in early 2004, perhaps.

14             Q    How long was the meeting?

15             A    Probably a couple hours.

16             Q    Who was there?

17             A    Probably myself and a few other members

18    of my team were present.

19         Q    Who was there for the defendants?

20         A    I believe that Mr. Poland was there and

21    Mr. Kurtenbach was there.

22         Q    Did anyone take any notes at that

23    meeting?

24         A    I have no idea if they took notes.

25         Q    Do you have any notes from that meeting?

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                          40
                          * ROUGH DRAFT *

1         A    I don't think I have any notes, no.

2         Q    Does RAC have any notes?

3         A    I have no idea.

4         Q    If RAC has any notes, where would they

5    be?

6         A    If there are any notes, I guess they

7    would be in individual offices of the team members who

8    were present.

9         Q    And who were those team members?

10        A    I'm just guessing now.  Mr. Voilleque

11   was probably there.  Dr. Grogan.  Mr. Rood may have

12   been there.  I don't know if Dr. Meyer was there or

13   not.  Those are probably the individuals who were

14   there.

15        Q    And what did you discuss at that

16   meeting?

17        A    I think -- I don't remember what we

18   discussed at that meeting.  It was probably just an

19     information briefing for us to hear what this case was

20     about, but I really -- I really don't recall any more

21     than that.

22              Q    Is there a written contract between RAC

23     and Kirkland & Ellis for Rocky Flats?

24              A    I believe there is something written, a

25     retainer written for my services, yes.

                                               41
                          * ROUGH DRAFT *

1              Q    And are you differentiating your

2     services from RAC?

3              A    Yes, I am, because I'm not sure there is

4     anything written for RAC.

5              Q    So the only entity that's been retained

6     with regard to this lawsuit is John Till?

7              A    I'm just -- that's not the case.  I'm

8     just saying I don't know that I have anything written

9     with other people's names in it.  It's written with my

10    name in it for my services and soon to be the services

11    of RAC, as well.

12             Q    Is there any written contract for the

13    services of others?

14             A    I don't know that there is.  I don't

15    know that there is -- I mean, I have a -- I don't know.

16             Q    All right.

17             A    Okay?

18             Q    When was the second meeting?

19          A    Probably the summer of 2004.

20          Q    And who was that meeting with?

21          A    Mr. Poland.

22          Q    Anybody else from Kirkland & Ellis

23     there?

24          A    I don't believe there was anyone else

25     there, no.

CARPENTER REPORTING, INC.
(303) 752-1200

42
* ROUGH DRAFT *

1           Q    Anyone else there with you?

2           A    Yes, there would have been some other

3      team members present.

4           Q    And who were they?

5           A    Probably the same individuals.

6           Q    Voilleque, Grogan, Rood, and Meyer?

7           A    To tell you the truth -- I'm sorry.  I

8      do not believe at that time, in the summer of 2004,

9      Rocky Flats was discussed.  It may have been discussed

10     between Mr. Poland and myself alone and no other team

11     members involved.

12          Q    So that was a meeting to talk about

13     Hanford?

14          A    No.  That wouldn't have been Hanford.

15     It would be the other --

16          Q    The third case?

17          A    Yes.

18          Q    Okay.  So when was the second meeting to

19     discuss Rocky Flats?

20          A     I'm saying there -- there was probably a

21   meeting between Mr. Poland and I at that same time, and

22   we discussed Rocky Flats, but I don't believe any other

23   individuals were involved in it.

24          Q     Do you have any notes from that meeting?

25          A     I don't have any notes, no.

CARPENTER REPORTING, INC.
(303) 752-1200

43

* ROUGH DRAFT *

1          Q     Do you remember anything that was

2    discussed?

3          A     I believe at that time, we talked about

4    my expert report and the schedule for the expert

5    report.

6          Q     Had you written your report at that

7    time?

8          A     I don't believe so, no.

9          Q     So was there a discussion of what should

10   be in your report?

11         A     I don't -- I don't remember whether or

12   not there was that discussion.

13         Q     Do you remember how long the meeting

14   was?

15         A     No, I don't.  It was --

16         Q     Do you remember where --

17         A     I remember it was at Couer d'Alene, and

18   it would have been very brief.

19         Q     What was the third meeting?

20              A    I believe it was probably in the fall of

21     2004.

22              Q    And who was at that meeting?

23              A    Actually, and quite honestly, I think

24     I'm getting meetings mixed up, because -- I'm just

25     trying to convey the truth.  I believe the meeting in

CARPENTER REPORTING, INC.
(303) 752-1200

44

* ROUGH DRAFT *

1     the fall of 2004 had nothing to do with Rocky Flats,

2     either.  In fact, if you'll just let me think a

3     minute --

4              Q    Sure.

5              A    -- there have been very few meetings

6     that I've had with Mr. Poland that focused on -- on

7     Rocky Flats.  It -- it may have been that we had a very

8     brief discussion about Rocky Flats, again, in the fall

9     of -- of 2004.  But that, again, would have been

10    extremely short, if at all.  If that occurred.

11             Q    And who would that discussion have been

12    with?

13             A    Mr. Poland.

14             Q    Do you have any notes from that meeting?

15             A    No, I don't.  No.

16             Q    Did you send a draft of your expert

17    report to Mr. Poland or anyone at Kirkland & Ellis

18    before it was finalized?

19             A    No.

20             Q    Did you discuss the contents of your

21    expert report with anyone at Kirkland & Ellis before it

22    was finalized?

23            A    No, I don't believe I did.  I mean, I

24    think the report I just tried to put together is a

25    comprehensive summary of the work, and -- and sent it

CARPENTER REPORTING, INC.
(303) 752-1200

45
* ROUGH DRAFT *

 1    in.

 2            Q    When was your next meeting with anyone

 3    from Kirkland & Ellis with regard to Rocky Flats?

 4            A    I -- it seems like about a month ago or

 5    so when we first came out here.

 6            Q    Who first came out here?

 7            A    Pardon?

 8            Q    Who came out here?

 9            A    I came out and Dr. Grogan came out.

10            Q    And when was that?

11            A    About a month and a half ago, I think.

12            Q    So October?

13            A    I believe that's correct, yes.

14            Q    And who did you meet with at that time?

15            A    I met with Mr. Poland.  I believe he was

16    the only one.  I met a couple of other people, but not

17    met with them.

18            Q    And how long did the meeting about a

19    month and a half ago last?

20            A    About a day.

21        Q    And what did you discuss at that

22   meeting?

23        A    We just discussed issues related to

24   the -- the trial and the -- and the historical dose

25   reconstruction, the work that we did.

CARPENTER REPORTING, INC.
(303) 752-1200

46
* ROUGH DRAFT *

1         Q    What kind of issues related to the

2    trials did you discuss?

3         A    Just trying to clarify the work and to

4    understand the work since it had been a number of years

5    since we had finished the project.  Those kinds of

6    things.

7         Q    Okay.  At the meeting a month and a half

8    ago, was there talk about who was going to testify in

9    court?

10        A    I don't remember if there was.  I don't

11   remember if there was talk about who all was going to

12   be testifying now.

13        Q    When was the first time that you had an

14   understanding that either Helen Grogan or Paul

15   Voilleque might testify in this case?

16        A    Well, I think it was my understanding

17   from the beginning that any of my team who participated

18   in this study could have been called to testify in this

19   case.  And exactly who was going to be called wasn't my

20   decision, and I don't know who made that decision.  So

21   it's always been my understanding that other members of

22    my team could have been called to testify.

23           Q    So it's your understanding since the

24    time you were first retained approximately two years

25    ago that any of the members of your team, as well as

CARPENTER REPORTING, INC.
(303) 752-1200

47
* ROUGH DRAFT *

1    yourself, could be listed as a witness in the Rocky

2    Flats litigation?

3           A    Yes.

4           Q    And was it your understanding that

5    whoever would testify would be coming into court as an

6    expert in their area?

7           A    Yes.

8           Q    And was that your understanding before

9    you signed your expert report on August 6th of 2004?

10          A    Yes.  I mean, I would expect that any of

11    my team might be called, yes.

12          Q    And you had had discussions with

13    Mr. Poland and/or others at Kirkland & Ellis about the

14    possibility of calling other members of your team to

15    testify; is that correct?

16                MR. POLAND:  Object to the form of the

17    question.  Mischaracterizes his testimony.

18          A    I don't know that I had discussions with

19    them about it or not.

20          Q    (BY MS. ROSELLE)  But it certainly was

21    your understanding from the first that -- when you

22      dealt with Kirkland & Ellis that any of the members of

23      your team could be called as an expert witness?

24              A    Yes.  That's correct.

25              Q    When were you first told that, in fact,

                        CARPENTER REPORTING, INC.
                            (303) 752-1200

                                                            48
                            * ROUGH DRAFT *

1       the defendants had listed Helen Grogan and Paul

2       Voilleque on their witness list?

3               A    I think last Wednesday.

4               Q    And who told you then?

5               A    Mr. Poland.

6               Q    What did he say?

7               A    Just the fact that the witness list was

8       submitted and they had been included as witnesses.

9               Q    I hand you what's been marked as

10      Plaintiffs' Exhibit 2, and ask you if that's the only

11      expert report that you've submitted in the case of Cook

12      versus Rockwell.

13                   (Helen Grogan exits the conference

14      room.)

15              A    Yes.

16              Q    (BY MS. ROSELLE)  Okay.  Will you turn,

17      please, to the third page of this document.

18                   MR. POLAND:  Louise, is there an extra

19      one?  An extra copy?

20                   MS. ROSELLE:  Yeah.  You can have this

21      one.

22              Q    (BY MS. ROSELLE)  The third page -- no.

23    The third page from the front.

24                    MR. POLAND:  Does that include the blank

25    one?

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    49
                        * ROUGH DRAFT *

1                     MS. ROSELLE:  Yes.

2            Q     (BY MS. ROSELLE)  Is that your

3    signature?

4            A     Yes.

5            Q     Okay.  Did you sign the original, or is

6    that a stamp?

7            A     I probably signed it.

8            Q     Okay.  Do you see on that report the

9    signature of Helen Grogan or Paul Voilleque?

10           A     No.

11           Q     So this was your report?

12           A     That's correct, yes.

13           Q     Okay.  And if you turn to the back,

14    you'll see a C.V., and a statement of professional

15    services.  Do you see those?

16           A     Yes.

17           Q     Those are your -- that's your C.V. and

18    your statement of professional services; correct?

19           A     Yes.

20           Q     Okay.  Did you submit, as part of this

21    report, the C.V. of Helen Grogan or Paul Voilleque?

22           A     No.

23          Q    Did you submit, as part of this report,

24     a statement of professional services and signature for

25     either Helen Grogan or Paul Voilleque?

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                          50
                        * ROUGH DRAFT *

1           A    No.

2           Q    Okay.  Did you understand that you had

3      to list all of your testimony within four years prior

4      to the date of this report at the time you submitted

5      this report?

6           A    I'm sorry.  Say that again.

7           Q    Did you understand that the Federal

8      Rules require you to submit, as part of your report, a

9      statement of all testimony given within four years

10     prior to the date of the report?

11               MR. POLAND:  Object to the form of the

12     question.

13          A    No.  I was not aware of that.

14          Q    (BY MS. ROSELLE)  Did you ever submit a

15     statement of all testimony, either for Helen Grogan or

16     Paul Voilleque?

17          A    No.

18          Q    Okay.  This report that's been marked as

19     Exhibit 2, that is the report of John Till, the expert

20     witness; is that correct?

21          A    That is my report summarizing the

22     historical public exposures study on Rocky Flats, yes.

23     It was done -- the work being done by my entire team,

```
24    yes.

25              Q    But you're the expert?
```

CARPENTER REPORTING, INC.
(303) 752-1200

51

\* ROUGH DRAFT \*

```
 1              MR. POLAND:  Object to the form of the

 2    question.

 3              A    I am the expert who submitted this

 4    report, yes.

 5              Q    (BY MS. ROSELLE)  And the other --

 6    Dr. Grogan and Dr. Voilleque, they never submitted a

 7    report to Kirkland & Ellis as part of this litigation,

 8    did they?

 9              A    No.

10              Q    Okay.  Now, when -- you had a meeting

11    about a month and a half ago with Mr. Poland and Helen

12    Grogan in Denver; correct?

13              A    Yes.

14              Q    Okay.  When was the next meeting that

15    you had with anyone from Kirkland & Ellis or Mr. Poland

16    about this lawsuit?

17              A    Tuesday of this week.

18              Q    Okay.  And how long was the meeting

19    Tuesday?

20              A    All day.

21              Q    And who did you meet with?

22              A    Mr. Poland, Mr. Kurtenbach.

23              Q    Anyone else?
```

```
24              A    I don't think so, no.

25              Q    Was anyone from your team there besides
```

52
* ROUGH DRAFT *

```
1    you?

2              A    Yes.  Ms. Grogan was there and Dr. Meyer

3    was there.

4              Q    Okay.  And what was the purpose of this

5    meeting?

6              A    Preparation for deposition, reviewing

7    reports and so forth.

8              Q    Did you also talk about your trial

9    testimony?

10             A    Some, yes.

11             Q    Were you shown an outline of your direct

12   testimony at -- for trial?

13             A    No.

14             Q    Okay.  After the meeting Tuesday, did

15   you have a meeting yesterday?

16             A    Yes.

17             Q    And who did you meet with yesterday?

18             A    Mr. Poland, Mr. Kurtenbach.

19             Q    And did that meeting last all day?

20             A    I'm -- sorry.  I hadn't finished.

21             Q    Oh.  Excuse me.

22             A    Ms. Parks.  I'm trying to think.  I

23   think that was it.

24             Q    Did that meeting last all day?
```

```
25          A    Yes.

                 CARPENTER REPORTING, INC.
                     (303) 752-1200

                                              53
                    * ROUGH DRAFT *

1           Q    And who was there for your team?

2           A    Dr. Grogan and Dr. Meyer.

3           Q    And what did you discuss at the meeting

4    yesterday?

5           A    Just the same matters.  Preparation for

6    deposition, primarily.

7           Q    Did you also talk about your trial

8    testimony?

9           A    Some, yes.

10          Q    Were you shown an outline of your

11   testimony?

12          A    No.

13          Q    Were you shown Powerpoint or other

14   graphics for your testimony?

15          A    No.

16          Q    Are you preparing any graphics for your

17   testimony?

18          A    Well, I have not prepared any graphics

19   yet, no.

20          Q    Were you asked to?

21          A    No.

22          Q    Have you been given any of the trial

23   testimony to review?

24          A    Trial testimony up to this point?
```

25          Q    Yes.

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    54
                        * ROUGH DRAFT *

1           A    Yes.

2           Q    What trial testimony have you been given

3    to review?

4           A    Dr. Cochran, Dr. Goble, Dr. Biggs.  I

5    may have been given some others, but I don't know.  I

6    haven't reviewed them.

7           Q    Dr. Wing?

8           A    I haven't reviewed it.  I may have been

9    given it, but I don't know.

10          Q    Have you reviewed any of this trial

11   testimony yet?

12          A    Of whose?

13          Q    Have you reviewed Dr. Cochran,

14   Dr. Goble, or Dr. Biggs' trial testimony yet?

15          A    Yes.  I've reviewed Dr. Cochran's

16   testimony and Dr. Biggs' testimony.

17          Q    Did you ask other members of your team

18   to look at any of this testimony?

19          A    Yes.

20          Q    Okay.  What members of your team are

21   looking at this testimony?

22          A    Mr. Voilleque, Dr. Grogan, Dr. Meyer,

23   and Mr. Rood.

24          Q    They're all going to look at all of the

25   testimony, or they're going to look at bits and pieces?

CARPENTER REPORTING, INC.
(303) 752-1200

55
* ROUGH DRAFT *

1          MR. POLAND:  Object to the form of the

2    question.

3          A    I did not ask them specifically to look

4    at all of the testimony.  I did, I think, ask them in

5    particular to look through Dr. Cochran's testimony,

6    and, if they had time, to look through the others.

7          Q    (BY MS. ROSELLE)  Why did you single out

8    Cochran?

9          A    Well, because I thought his testimony --

10   I would appreciate their opinion on what he said,

11   basically.  That's all.

12         Q    In what way?  Let's do it one by one.

13   What did you ask Mr. Voilleque?  What about

14   Dr. Cochran's testimony did you want Mr. Voilleque to

15   look at?

16         A    Actually, I didn't specify anything.  I

17   didn't specify anything in particular.  I just asked

18   him if he would take a look at it and tell me what he

19   thought about what he saw.

20         Q    Is that what you told the other three,

21   also?

22         A    That's correct.

23         Q    When's your next meeting with Kirkland &

24   Ellis attorneys?

25              MR. POLAND:  When was?

CARPENTER REPORTING, INC.
(303) 752-1200

56

* ROUGH DRAFT *

1           MS. ROSELLE:  When is.

2           MR. POLAND:  When is.

3           A    Well, I'm assuming it will be before the

4    trial, but I haven't specified a time.  It would be

5    during the week before the trial.

6           Q    (BY MS. ROSELLE)  Did you meet with

7    anyone this morning before your deposition?

8           A    I met with Mr. Poland this morning, yes.

9           Q    For how long?

10          A    Hour and a half.

11          Q    And what did you discuss this morning?

12          A    The same kind of issues related to the

13   work we did and deposition preparation, those kinds of

14   things.

15          Q    In the two and a half days -- or two

16   days and 1.5 hours that you've spent with the lawyers

17   at Kirkland & Ellis preparing for this deposition

18   today, did they tell you anything about the attorneys

19   for the plaintiffs?

20          A    No.  Not at all.

21          Q    No discussion of the lawyers at all?

22          A    Of the lawyers?  No.

23          MR. POLAND:  When you're at a convenient

24   spot, could we take a bathroom break?

25          MS. ROSELLE:  Sure.  We can take one

CARPENTER REPORTING, INC.

(303) 752-1200

57

* ROUGH DRAFT *

1    now.

2                    THE VIDEO OPERATOR:  We are going off

3    the record at 12:28.

4                    (There was a recess taken from 12:28

5    p.m. to 12:40 p.m.)

6                    THE VIDEO OPERATOR:  We are back on the

7    record at 12:40.  This is the beginning of videotape

8    No. 2.

9            Q    (BY MS. ROSELLE)  After this deposition,

10   are you returning to South Carolina?

11           A    Yes.

12           Q    And then are you coming back at some

13   point to testify in this case?

14           A    Yes.

15           Q    Okay.  When are you returning to

16   Colorado to testify in this case?

17           A    I'm not sure.  I -- probably a couple of

18   days before my testimony is scheduled.

19           Q    Okay.  But no meetings have been set up

20   as of now?

21           A    No.

22           Q    Okay.  Was there any reason that either

23   Paul Voilleque or Helen Grogan could not have signed

24   the expert report that you submitted on August 6th,

25   2004?

58
* ROUGH DRAFT *

1                MR. POLAND:   Object to the form of the

2       question.

3                A     No.   There was no reason why they could

4       not.  No.

5                Q     (BY MS. ROSELLE)   Okay.   Why did they

6       not?

7                MR. POLAND:   Objection.   Foundation.

8                A     Well, I didn't ask them to sign the

9       report because I assembled the report using all of our

10      information with the expectation that my entire team is

11      available to testify if necessary.   So it was on behalf

12      of my team.

13               Q     (BY MS. ROSELLE)   You told me earlier

14      that this is your expert report.

15               A     Yes.

16               Q     This is your -- John Till's -- expert

17      report that's marked as Exhibit 2; correct?

18               A     Yes.

19               Q     Okay.   Turning back to Exhibit 1, do you

20      have documents that relate to material unaccounted for

21      at Rocky Flats?

22               A     I'm sorry.   I don't know what Exhibit 1

23      is.

24               Q     This is Exhibit 1, your notice of the

25      deposition.   One of the things you were asked to bring

59

* ROUGH DRAFT *

1    today, which you have not brought, were documents

2    created or received by you relating to material

3    unaccounted for or MUF at Rocky Flats, and I'm asking

4    you, do you have such documents?

5                 MR. POLAND:  Object to the form of the

6    question.

7          A    I don't have them with me, no.

8          Q    (BY MS. ROSELLE)  Do you have them?

9    Does RAC have documents relating to MUF at Rocky Flats?

10         A    Really, I don't know that we do.  I

11   think our materials have been turned over to CDPHE.

12   The study was completed and everything was turned over

13   to CDPHE.  Everything that we had, I believe, was put

14   in the reading room of the community college in

15   Westminster.

16         Q    Okay.  Did you, in preparing your expert

17   report, have access to unredacted copies of MUF

18   records?

19         A    Would I have had access to?  I certainly

20   would have had access to those records, yes.

21         Q    Did you use them in any way in the

22   historic public exposures that RAC calculated?

23         A    Yes.

24         Q    Could you tell me every way in which you

25   used MUF in the historic public exposures that RAC

* ROUGH DRAFT *

1    calculated.

2              A    We looked very carefully at this issue

3    of material unaccounted for.  It was not only of

4    interest to us as scientists as a possible way to

5    derive a source term, but it was also of great interest

6    to a lot of members of the public and the Health

7    Advisory Panel.  And we looked at it very, very

8    thoroughly.

9              In particular, Mr. Voilleque, on our

10   team, led this effort and put together a report on the

11   potential use of material unaccounted for on a mass

12   balance approach, in a memo that was discussed at a HAP

13   meeting, I think in May of 1996.  And that document is

14   available in a report we put together which summarizes

15   all of our responses to questions from members of the

16   public and so forth, so it's available there.

17             Q    Did you include any MUF in the source

18   term that you used for the doses that you calculated

19   for the public?

20             MR. POLAND:  Object to the form of the

21   question.

22             A    What we did was to take into account and

23   look very carefully whether or not MUF could be used.

24   That's the first thing that we did was to look whether

25   or not this issue of material unaccounted for could be

CARPENTER REPORTING, INC.
(303) 752-1200

* ROUGH DRAFT *

1    used.  Our conclusion was that it could not be used.

2              Q    (BY MS. ROSELLE)  So the answer to my

3    question is you did not use any MUF as part of the

4    source term for the public exposures?

5              MR. POLAND:  Objection to the form of

6    the question.

7         A    I didn't get a chance to finish

8    answering my previous question.  Okay?

9         Q    (BY MS. ROSELLE)  I'm sorry.

10        A    Could I finish that?

11        Q    Yes.

12        A    Okay.  So I said what we did was we did

13   take into account whether or not MUF mass balance could

14   be used as an approach to derive a source term and

15   whether or not it could be taken into account at all.

16   And we concluded that it could not be.

17             What we did do, if you look at the 1957

18   report, is you'll see that 1957 fire report on the

19   source term, that we did take into account material

20   that was deposited on the sides of ventilation lines,

21   that was deposited on filters and so forth at the time.

22   And we did take that into account into our analysis of

23   the source term for the 1957 fire.

24        Q    Was that part of the 2600 pounds that's

25   missing?

1             MR. POLAND:  Object to the form of the

2     question.

3             A    I would say that, yes, it would be a

4     part of that.

5             Q    (BY MS. ROSELLE)  Isn't it your

6     understanding that if they know where the plutonium is,

7     it's not missing?

8             MR. POLAND:  Object to the form of the

9     question.

10            A    In the first place, I -- I don't like

11     the characterization of "missing."  I don't think

12     that's a correct characterization of it.  What I'm

13     telling you is that there were data -- there was

14     information available on what was on the sides of the

15     ventilation ducts and so forth and in the different

16     sets of filters, that if, instantaneously, you were

17     calculating material unaccounted for, it would be

18     within that calculation, and that that was taken into

19     account for analysis of the 1957 fire.

20            Q    (BY MS. ROSELLE)  How much did you take

21     into account for the 1957 fire?

22            A    I really don't -- I really don't

23     remember, myself, exactly the amounts that were

24     allocated to being on the ductwork or in the filters

25     and so forth, but that information is available in the

CARPENTER REPORTING, INC.
(303) 752-1200

63

* ROUGH DRAFT *

1     report.  I don't remember how much --

2          Q    Which report?

3          A    -- it was.  It would be in the report on

4    the source term for the 1957 fire that was prepared by

5    Mr. Voilleque.

6               MS. ROSELLE:  Do you have that?

7               MR. SORENSEN:  No.

8               MS. ROSELLE:  Do you want to go off the

9    record a minute?

10              THE VIDEO OPERATOR:  We're going off the

11   record at 12:49.

12              (There was a brief delay in the

13   proceedings.)

14              THE VIDEO OPERATOR:  We are back on the

15   record at 12:50.

16              Q    (BY MS. ROSELLE)  I hand you what's been

17   marked as Plaintiffs' Exhibit P-1068, and ask you if

18   that's the report you need to answer my question as to

19   how much MUF was included in your source term for the

20   1957 fire.

21              A    This may take me some time.

22              Q    That's okay.

23              A    Okay.

24              (Deponent reviewing document.)

25              I'm going to continue to look at this,

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                               64
                       * ROUGH DRAFT *

1    and if you're looking for one specific number, I doubt

2    that I'll find that one specific number, but there are

3    examples throughout this report of plutonium, plutonium

4    in oils, plutonium in plenum.  I'll continue to look to

5    see if there's some specific number for all that.  I'll

6    take into account I don't know where it is exactly.  %%

7              Q    Okay.  But that specific number, you

8    won't be able to tell from that number how much of that

9    was material unaccounted for and how much of that was

10   material that had otherwise been accounted for;

11   correct?

12             A    I don't know agree with that.  It would

13   seem to me that if we took into account plutonium that

14   at the time were in plenums, for example, in exhaust

15   ducts and plenums, that if you were making an

16   accounting of MUF at that particular time, that would

17   be a part of MUF.  And what I'm telling you is that

18   that material was taken into account, however much it

19   was, into our analysis of the source term for the '57

20   fire.

21             Q    Okay.  If we go to page 6 of Exhibit 2,

22   on the second full paragraph, you say the median

23   estimate of the total quantity of plutonium released --

24   and this is the 1957 fire -- was 290 grams.

25             A    Excuse me, Ms. Roselle.  Could I catch

CARPENTER REPORTING, INC.
(303) 752-1200

65

* ROUGH DRAFT *

1    up with you?  Just a minute.

2              Q    Sure.

3         A      And I'm sorry.  The page number?

4         Q      6.

5         A      I'm sorry.  Go ahead.

6         Q      On the second full paragraph, okay,

7    which if you turn to the page before relates to the

8    1957 fire, you say the median estimate of the total

9    quantity of plutonium released was 290 grams.  The 5th

10   and 95th percentiles of the distribution were 160 and

11   510 grams.  Do you see that that respectively?

12        A      Yes.

13        Q      Okay.  So in -- taking into account

14   everything, both material unaccounted for and things

15   that they knew about, the most that you think that the

16   95th percentile that was released during the 1957

17   fire was 510 grams; correct?

18        A      At the 95th percentile, yes.

19        Q      Okay.  And we can agree that that's a

20   little more than a pound?

21        A      Yes.

22        Q      Okay.  So that means that if there were

23   2600 pounds of material unaccounted for at Rocky Flats,

24   you took into account no more than a little more than a

25   pound of it?

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                        66
                         * ROUGH DRAFT *

1              MR. POLAND:  Object to the form of the

2    question.

3          A      Your question, Ms. Roselle, doesn't make

4     sense.  You're talking about how many pounds total of

5     MUF?

6          Q      (BY MS. ROSELLE)  2,600.

7          A      Right.  Which is a figure that one would

8     develop for the entire operation of the Rocky Flats

9     facility.  Is that correct?

10         Q      Yes.

11         A      Okay.  This is an analysis of the 1957

12    fire that occurred in 1957.

13         Q      That's correct.

14         A      Okay.

15         Q      And you told me that this was a place

16    where you had taken into account some of the MUF.  And

17    I was trying to quantify the amount of MUF that you

18    took into account in the 1957 fire.  I gave you the

19    report and you said it wasn't totaled in the report.

20    So then we looked at your expert report, and I said can

21    we agree that the most that you took into account with

22    regard to the '57 fire was a little more than a pound?

23         A      That's not correct.

24         Q      Okay.  Why is that not correct?

25         A      In the first place, we need to get a

CARPENTER REPORTING, INC.
(303) 752-1200

67

* ROUGH DRAFT *

1     couple of things straight.  I was looking through the

2     1957 fire report, and I haven't finished looking

3     through it, okay, so whether I could come up with that

4    figure in that report as I look through it, I don't

5    know, but I haven't finished.

6              Okay.  If you also look at page 6, the

7    second paragraph, the different sources of plutonium

8    that could have contributed to atmospheric releases

9    during the fire were identified.  These included the

10   plutonium present in the fire area, plutonium that had

11   accumulated in the booster system, filters, main

12   plenum, filters, glovebox, exhaust filters, and room

13   air prefilters before the fire and plutonium deposited

14   in the ductwork that may have been suspended during the

15   fire.

16             Those are all taken into account in that

17   estimate of the source term of 160 grams to 510 grams

18   at the 5th to the 95th percentile.

19        Q    So you're saying that -- that there may

20   have been more MUF in those -- the ductwork that wasn't

21   released?  Is that what you're saying?

22             MR. POLAND:  Object to the form of the

23   question.

24        A    That's probably possible.  You'd have to

25   talk to Mr. Voilleque about that, but I would think

                CARPENTER REPORTING, INC.
                    (303) 752-1200

                                                    68
                   * ROUGH DRAFT *

1    that's reasonable, yeah.

2         Q    (BY MS. ROSELLE)  No.  I'm just trying

3    to understand why what I told you before, you told me

4    was incorrect.

5         A    Well, then, perhaps I didn't understand

6    your question, but you were telling -- perhaps you

7    should repeat your question, then.

8         Q    Okay.

9         A    I didn't understand it.

10        Q    All right.  This line of questioning

11   began with my asking you how you took MUF into account

12   in your historic release estimates.  And you said to me

13   you used some MUF when you came up with your source

14   term for the 1957 fire.  And I asked you how much.  And

15   that's when you were reading the 1957 fire report, but

16   then I directed your attention to your expert report in

17   the hope that maybe we could shortcut this, because the

18   most that was released at the 95th percentile,

19   according to your report, is 510 grams, which is a

20   little more than a pound.

21            So I'm asking you, can we agree that the

22   most MUF you would have taken into account as having

23   been released during the 1957 fire, assuming everything

24   in your source term was MUF, would be 510 grams or a

25   little more than a pound?

69
* ROUGH DRAFT *

1            MR. POLAND:  Object to the form of the

2    question.  Mischaracterizes his testimony.

3         A    No.  But I still don't agree, and --

4         Q    (BY MS. ROSELLE)  Okay.  Why not?

5          A    Well, I didn't say that we used MUF in

6     the context of some fraction of the -- whatever you

7     think the MUF might be or whoever thinks it might be.

8     What I said was that MUF does -- part of MUF is what's

9     in the plenum ductwork and so forth and what I'm

10    telling you is that for this 1957 fire analysis, we

11    took that into account.  Yes.  I don't know the exact

12    amount of that.  It would be somewhere in the analysis

13    that Mr. Voilleque did for the 1957 fire.  How much it

14    is, I don't know.

15         Q    Okay.  Let me ask you the next question,

16    then.  Did you take MUF into account in any other

17    aspect of the source term that you calculated for the

18    historic public releases?

19         A    Well, again, I will say that if there

20    was material deposited on plenum pipes, in ductwork,

21    and filters, and so forth, that that material is taken

22    into account in an analysis of the, for example, the

23    '69 fire source term because what we did was to use the

24    data on what was being released from the stack and

25    within that material, there would be -- could be

CARPENTER REPORTING, INC.
(303) 752-1200

70

* ROUGH DRAFT *

1     plutonium that was deposited on this duct -- ductwork.

2          Q    Do you know what percentage of the

3     source term that you calculate for the historic

4     releases was MUF?

5                    MR. POLAND:  Can you repeat the

6       question?

7                    (The referred-to question was read by

8       the reporter.)

9                    MR. POLAND:  Object to the form of the

10      question.

11              A    No.

12              Q    (BY MS. ROSELLE)  Is there anywhere in

13      any of the reports that RAC prepared that would allow

14      one to figure out what percentage of the source term

15      that you calculated was from MUF?

16              A    I don't know that there is, no.

17              Q    Now, you've got a security clearance;

18      correct?

19              A    Yes.

20              Q    Okay.  Mr. Voilleque has a Q clearance?

21              A    He did at the time.  He does not now.

22              Q    Does Dr. Grogan have a Q clearance?

23              A    No.

24              Q    Were you the only member of the team who

25      had a Q clearance?

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                      71
                        * ROUGH DRAFT *

1               A    No.  There were about -- think my way

2       through who had a Q clearance.  Dr. Meyer.  Dr. Bob

3       Meyer.  Mr. Voilleque.  Dr. Schleien.  Dr. McGavran.

4       Ms. Case.  I think those are the only ones that had a Q

5       clearance on my team.

6          Q     Can you tell me, did they look at the

7     MUF documents in an unredacted form?

8          A     Some people on my team looked at all of

9     the classified documents.

10         Q     Including the MUF documents?

11         A     Including the MUF documents.

12         Q     Did you look at any of the classified

13    documents in an unredacted form?

14         A     Yes.

15         Q     Okay.  Did your team use information

16    that they learned in classified documents in the

17    unredacted form in the calculations of source term that

18    they made for the public historic releases?

19         A     No.  Because we couldn't use documents

20    that were classified for our work.  When we identified

21    documents in the document search and we requested the

22    documents to be declassified, they went through a

23    routine declassification process.  And after they're

24    declassified, then we can use the information for our

25    work.

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                        72
                       * ROUGH DRAFT *

1          Q     Well, isn't it true that had you wanted

2     to take notes of the classified documents, you could

3     have written things in your notes and then shown them

4     to a declassifier to determine whether or not the notes

5     you had taken from the classified documents were, in

6      fact, contained classified information?

7           A    I believe it's certainly true that you

8      could go in and take notes, but those notes would need

9      to be turned over to be declassified or to make certain

10     that they didn't contain any classified information.

11               That's a routine process when anyone is

12     going through a review of classified information.

13          Q    Did your team take any notes that you

14     asked DOE to declassify?

15          A    I -- I don't know that -- if we did or

16     not.  Generally, we don't take notes that have to be

17     reviewed.  You just identify records that you want

18     declassified, and have those records declassified

19     rather than take notes on records because it wouldn't

20     be appropriate to take notes from a document, not have

21     the document declassified and then use those notes in

22     scientific work.

23               Even if they were unclassified, all of

24     the documents that -- that we identified and requested

25     to be declassified that we used in this study, we

CARPENTER REPORTING, INC.
(303) 752-1200

73
* ROUGH DRAFT *

1      received, and we made all of these documents available

2      to the public or anybody else who wanted them as soon

3      as they were declassified.

4           Q    How many MUF documents did you review?

5           A    Well, I am not sure how many MUF

6      documents we reviewed.  We reviewed -- we went through

7    over a couple of thousand boxes of documents that were

8    classified in Building 881 in particular and then in

9    Building 706, I believe there were some additional

10   classified documents.  Some of these might have been

11   related to -- to MUF.  Most of them, certainly,

12   wouldn't have been, but over the course of probably a

13   couple of years, we went through all of the classified

14   boxes, looked through all of the boxes of the records

15   that were classified at Rocky Flats.  How many there

16   were, documents, I don't know.  There were thousands

17   and thousands of documents.

18          Q    Did you get any MUF documents

19   declassified?

20          A    I'm quite sure we did.  That's -- I'm

21   not sure -- I am quite sure we did.  I don't know how

22   many, yes.  At -- I should point out that at the time

23   that we were going through our review of the classified

24   records, Secretary O'Leary announced a massive

25   declassification of many of the records that had

CARPENTER REPORTING, INC.
(303) 752-1200

74

* ROUGH DRAFT *

1    previously been classified at Rocky Flats and at other

2    facilities.  And I think a number of the documents that

3    we found were in these -- in these -- this massive

4    declassification that had been done by DOE.

5          Q    Can you testify under oath that you got

6    any MUF documents declassified without redactions?

7            A    I don't know the answer to that question

8    and I wouldn't guess without talking to Mr. Voilleque

9    or looking through the -- looking through the records.

10    I believe that most of the documents that we requested

11    to be declassified didn't have significant redactions

12    in them.  I remember seeing some, and I think Paul

13    Voilleque showed some of these documents to the HAP.

14    Whether they had redactions in them or not, I don't

15    remember, but I don't remember many redactions of

16    records that he showed.

17            Q    Do you recall requesting that any MUF

18    document be declassified?

19            A    Not me personally, no.  I do recall that

20    we -- we requested some documents.  Either

21    Mr. Voilleque identified the documents or someone else

22    on my team did.  I feel pretty sure we did, but ...

23    that's the best answer I can give you.  I'm quite sure

24    I did.

25            Q    Where would I find the list of the MUF

                    CARPENTER REPORTING, INC.
                      (303) 752-1200

                                                        75
                    * ROUGH DRAFT *

1    documents that you requested be declassified?

2            A    You could probably find those in the

3    records of the historical exposure study, because all

4    of the documents were retained by CDPHE and made

5    available to the public, so I would assume they would

6    be there.

7            Q    Do you have any knowledge with regard to

8      MUF and how it was used in your study, the RAC historic

9      dose reconstruction, other than what you've described

10     here today?

11              MR. POLAND:  Could you read back that

12     question, please.

13              (The referred-to question was read by

14     the reporter.)

15          A    There is no question that material

16     unaccounted for and the use of a mass balance approach

17     to estimate a source term -- as a potential way to

18     estimate a source term was an issue raised by members

19     of the public and the Health Advisory Panel, and we

20     aggressively pursued that possibility to consider

21     whether or not that would be a viable way to estimate a

22     source term.

23              We concluded that it was not a viable

24     way to estimate a source term.  It's reported by

25     Mr. Voilleque, and was reported in the transcripts of a

CARPENTER REPORTING, INC.
(303) 752-1200

76

* ROUGH DRAFT *

1      meeting, the HAP meeting, which I'm sure are available,

2      explaining why this approach would not be a useful

3      approach.  So my point is that it's an issue that came

4      up frequently, particularly during the early part of

5      the work, and we addressed it thoroughly.

6          Q    (BY MS. ROSELLE)  I'm going to hand you

7      what's called the technical memorandum examination of

8    mass balance accounting as a means for estimating

9    plutonium releases dated May 1995, and ask you if this

10   is the report you're referring to.

11               MR. POLAND:  Louise, is that -- I want

12   to make sure we're clear on the record on this.  That's

13   part of what's been marked as a plaintiffs' exhibit; is

14   that correct?

15               MS. ROSELLE:  You mean in the case?

16               MR. POLAND:  Correct.

17               MS. ROSELLE:  I don't -- all of the RAC

18   reports are exhibits, but I thought they had defendant

19   case --

20               MR. POLAND:  I just --

21               MR. SORENSEN:  That one may have a

22   plaintiff's number on it, if you go to the front.

23               MR. POLAND:  I just wanted to see if you

24   go to the front.  Yeah.  It's P-1079.

25               MR. SORENSEN:  Right.  I don't know its

CARPENTER REPORTING, INC.
(303) 752-1200

77

* ROUGH DRAFT *

1    status in terms of its entry into the case.

2               MR. POLAND:  That's fine.

3               MR. SORENSEN:  But yes, that's part of

4    that.

5               MS. ROSELLE:  What was the question, if

6    that's the report; right.

7               MR. POLAND:  Why don't we read back the

8    last question.

9               (The referred-to question was read by

10      the reporter.)

11              A     Yes.

12              Q     (BY MS. ROSELLE)   Okay.   Is there any

13      other written document prepared by RAC with regard to

14      the material unaccounted for at Rocky Flats?

15              A     Not that I can recall, no.

16              Q     And once Dr. Voilleque made this

17      conclusion that you couldn't do a mass balance, then,

18      as I understand your testimony, with the exception of

19      the 1957 fire, you didn't include any material

20      unaccounted for in your source term?

21              A     Well, I guess we're going back to the

22      same point that I made before.   If there is material

23      deposited on the plenums, if you're including that as a

24      part of MUF, as we generated these source terms, that

25      material would have been taken into account.

CARPENTER REPORTING, INC.
(303) 752-1200

78

* ROUGH DRAFT *

1               Q     But, other than that, there was no

2       inclusion of any of the MUF as part of the source term?

3               A     As I said to begin with, we decided that

4       the strict use of a material balance approach or

5       material unaccounted for in the generation of the

6       source term was not a viable way to -- to estimate a

7       source term.

8               Q     Would you agree that it's certainly

9      possible that some of the material unaccounted for

10     ended up in the environment?

11            A    I would agree that it's certainly

12     possible, sure.

13            Q    Is it more likely than not that some of

14     the material unaccounted for ended up in the

15     environment?

16            A    Is it more likely than not that some

17     material that -- in this accounting of MUF could have

18     ended up in the environment?  Yes.

19            Q    Did you account for MUF in the

20     uncertainty analysis in the source term?

21            A    As I explained before, using the '57

22     fire for an example, that material that is on filters,

23     deposited on the plenums and so forth, that's all a

24     part of the uncertainty analysis, and the derivation of

25     the source term for the '57 fire.

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                        79
                         * ROUGH DRAFT *

1            Q    I've got the '57 fire.  I'm talking

2      other than the '57 fire.

3            A    The answer is yes.  It's the same

4      principle that --

5            Q    Okay.

6            A    -- is in the uncertainty --

7            Q    When you talk about how you did your

8      uncertainty analysis, can you point out to me where the

9      MUF is in that uncertainty analysis?  Okay?

10                    MR. POLAND:  Are you talking about for

11      the study as a whole now?

12                    MS. ROSELLE:  Yes.

13          Q    (BY MS. ROSELLE)  When we talk about

14      uncertainty, will you make sure you show me where the

15      MUF is in that analysis?

16          A    Yes.

17          Q    Okay.  Item 5 in our document request

18      was all previously classified documents released to RAC

19      after September 1, 1996, and all notes taken by RAC of

20      classified documents released to RAC after September 1,

21      1996.  Do you have any classified documents that meet

22      that criteria?

23          A    I have no classified documents.

24          Q    Or formerly classified documents?

25          A    I don't, no.

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                      80
                        * ROUGH DRAFT *

1           Q    So RAC has no records left whatsoever?

2           A    Quite honestly, I don't know that we

3       have any records left.  I mean, I certainly don't.  I

4       think most of the other members of my team turned their

5       documents over to CDPHE, and if they have them, I don't

6       know that they do, no.  These records would all be in

7       the public reading room and available to anybody who

8       wanted them.

9           Q    Okay.  I -- we also requested a copy

10  of -- and I quote -- the factual development of the

11  barrel incident, end quote, by Joseph Bernesky dated

12  December 1975, identified as a source document in final

13  report task 2.  And here is the final report task 2

14  that identifies the document, and I asked for a copy of

15  it.  We asked for a copy of it.

16          A    So I'm sorry.  What is the question

17  again?

18          Q    The -- one of the things we asked for

19  was a copy of that document --

20          A    Uh-huh.

21          Q    -- and I'm asking you:  Do you have that

22  document?

23          A    I don't have it, and I don't know that

24  any other members of my team have this document,

25  either, no.

                CARPENTER REPORTING, INC.
                    (303) 752-1200

                                               81
                    * ROUGH DRAFT *

1          Q    Okay.  Can you tell me why, in a

2  scientific report, you cited a document written by a

3  lawyer in litigation?

4          A    No, I don't know what this pertains to.

5          Q    You have no knowledge of it whatsoever?

6          A    No.

7          Q    Okay.  And here is Till Deposition

8  Exhibit 1, and will you just confirm you've never seen

9  that?

10          A    No.  I've not seen it.

11          Q     Okay.  During the period of 1992 to

12   2005, other than the law firm of Kirkland & Ellis, has

13   all of the work that RAC has done related to DOE

14   facilities?

15          A     I'm -- I think so, but I'm trying to

16   think if there was any others.  Certainly, the majority

17   of it was, yes.

18          Q     And with regard to the third case that

19   you're doing for the law firm of Kirkland & Ellis, is

20   that also a DOE facility?

21              MR. POLAND:  Objection.  Asked and

22   answered.

23          A     No.

24          Q     (BY MS. ROSELLE)  Has your name been

25   disclosed in that litigation as an expert?

                 CARPENTER REPORTING, INC.
                     (303) 752-1200

                                             82
                   * ROUGH DRAFT *

1          A     No.

2          Q     How many years was Mr. Voilleque at the

3    Idaho national lab?

4              MR. POLAND:  Objection to the form.

5          A     I really don't know.

6          Q     (BY MS. ROSELLE)  Before you agreed to

7    be an expert for the defendants in this lawsuit, did

8    you go back to the Colorado Department of Health to

9    tell them that you were going to work for the

10   defendants in this case?

11                    MR. POLAND:  Object to the form of the

12     question.

13            A     No, I did not.

14            Q     (BY MS. ROSELLE)  Have you ever

15     discussed with the Colorado Department of Health that

16     you're testifying in this lawsuit against the citizens

17     of Colorado?

18                    MR. POLAND:  Object to the form of the

19     question.

20            A     No.

21            Q     (BY MS. ROSELLE)  Did you send them a

22     letter or anything, telling the Colorado Department of

23     Health -- disclosing that after they paid you

24     $5 million, now you were going to testify in a court of

25     law on behalf of Dow and Rockwell?

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    83
                        * ROUGH DRAFT *

1                     MR. POLAND:  Object to the form of the

2      question.

3             A     No.

4             Q     (BY MS. ROSELLE)  Did you think that

5      they didn't have an interest?

6             A     I don't know if they had an interest or

7      not.

8             Q     You had no obligations to notify them

9      that you knew of?

10            A     No.

11            Q     Okay.  I'd like to turn to your expert

12      report in this case.  Okay.  Can you identify that

13      Exhibit 2 is, in fact, a true and complete copy of your

14      report in this case?

15              A    Yes.

16              Q    Okay.  I did not see anywhere in your

17      report the cumulative cancer risks to a member of the

18      public who lived in the area from the time Rocky Flats

19      opened until the time Rocky Flats closed for all

20      releases from Rocky Flats.  Is it in your report

21      somewhere?

22              A    (Deponent reviewing exhibit.)

23                   Okay.  So we need to be specific about

24      what we're talking about.  And you're asking me about

25      cumulative cancer risk at what location and at what

                        CARPENTER REPORTING, INC.
                           (303) 752-1200

                                                            84
                            * ROUGH DRAFT *

1       time?

2               Q    From an actually exposed person who was

3       there for the entire time.  I want to know, if you add

4       his beryllium -- well, that's not cancer.  If you add

5       his carbon tet exposure plus all his different decades

6       of exposure from plutonium, what is the total increased

7       risk of cancer to the maximally exposed person?

8                    MR. POLAND:  Object to the form of the

9       question.  The only substance at issue in the

10      litigation and the trial is plutonium.  And so

11      questions pertaining to other substances are improper

12          questions and aren't in front of the Court.

13                    MS. ROSELLE:  Are you going to instruct

14          the witness not to answer them in this deposition.

15                    MR. POLAND:  I'm not saying that I'm

16          going to instruct the witness not to answer the

17          question.  I'm saying it's an improper question because

18          plutonium is the only substance that is at issue in the

19          trial.

20                    Q    (BY MS. ROSELLE)  You may answer my

21          question.

22                    A    Well, there are a number of cancer risks

23          that we reported here in the first place.

24                    Q    Okay.

25                    A    You're talking about a cumulative risk

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                        85
                        * ROUGH DRAFT *

1          from carbon tet and plutonium, and I don't believe we

2          added those risks in anyplace, in any of the work that

3          we did.

4                    Q    Well, can you give me, then, the

5          cumulative plutonium increased risk for a person who

6          was there from '53 to '89?  I can't find that, either.

7                    A    Well, it would be -- let's see.  Well,

8          it is in our reports.  Whether it's in my expert report

9          or not, it is in my reports.

10                    Q    Tell me what report, and I'll show it to

11          you.

12                    A    Let's take a look at the report on the

13    comprehensive risk assessment.

14         Q    Do you want -- are you talking about

15    task 3, final report assessing risks of exposure to

16    plutonium?

17         A    I don't believe that's it.  No.  It's a

18    comprehensive assessment of risk from Rocky Flats.

19              MS. ROSELLE:  Have you got one called

20    that?

21              MR. SORENSEN:  I'm looking.

22         A    While you're looking for that, I'll look

23    through here for that figure, if you don't mind.

24         Q    (BY MS. ROSELLE)  I can tell you I -- I

25    haven't found it, but that doesn't mean anything.

                                                    86
                         * ROUGH DRAFT *

1          Q    We have now a report called Final

2    Report, Comprehensive Assessment of Exposure and

3    Lifetime Cancer Incidence Risk.  It's Plaintiffs'

4    Exhibit 1088.  If you'd rather look at this, be my

5    guest.

6          A    Well, the first reference in the expert

7    report is on page 26 where we talk about the highest

8    estimated incremental lifetime cancer incidence risk at

9    the 95th percentile or in the 10 to the minus 4

10   range.

11         Q    Okay.  But --

12         A    The fifth percentile, the highest cancer

13    risk was in the 10 to the minus 7th range.

14            Q    Right.  But --

15            A    On the second page --

16            Q    Right.  Excuse me.  Doesn't -- isn't

17    that just a ten -- a decade risk?

18            A    No, ma'am.  And then if you want the

19    total risk, what you could do is look at Figure 9, and

20    it takes a bit of mathematics, I guess, and try to find

21    the area where the highest risk occurred.  You can sum,

22    if you want, for the different decades.

23                 For example, if you're looking at

24    Leiden -- this is times 10 to the minus 6, it's a value

25    of about -- if you look at the median risk for the

CARPENTER REPORTING, INC.
(303) 752-1200

87

* ROUGH DRAFT *

1    range of 1953 to 1959, it's a value of about 2 times 10

2    to the minus 6.  And then you could add that to the

3    next decade, which is 10 -- 1960 to '69, yielding about

4    .2.  So you could go through a calculation like this.

5    So that's another place you could get it.

6                 You could also look at the graphic in

7    Figure 8.  It would be more difficult to discern

8    exactly where the maximum was looking by looking at

9    isopleths, of course; however, if you would like me to

10    look at this, I'll take a look at this, as well.

11            Q    You're saying on page 26, the sentence

12    that says, "Highest estimated incremental lifetime

13    cancer incidence risks at the 95th percentile level

14     were in the 10 to the minus 1 range, one chance in

15     10,000"?

16              A    Wait a minute.  I'm -- I'm not where you

17     are, Ms. Roselle.  Could you tell me where you are

18     again?

19              Q    I'm at page 26 of your report.

20              A    Okay.

21              Q    The sentence you pointed me to.

22              A    Okay.

23              Q    Okay.  And it's -- the sentence you

24     showed me was, "Highest estimated incremental lifetime

25     cancer incidence risks at the 95th percentile level

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                          88
                        * ROUGH DRAFT *

 1     were in the 10 to the minus 4 range, one chance in

 2     10,000, of developing cancer from Rocky Flats plutonium

 3     releases during a lifetime."  And it's your testimony

 4     that that is a cumulative risk for someone who was

 5     exposed every year from 1953 through 1969?

 6              MR. SORENSEN:  1989.

 7              Q    (BY MS. ROSELLE)  1989.

 8              A    No.  Not until I can check it in this

 9     report here.

10              Q    Oh, okay.

11              A    Okay.

12              (Deponent reviewing document.)

13              There is a single value in this report

14    that points out that however, for a single grid node

15    near the southwest corner of the Rocky Flats plant

16    boundary, there was a 95th percentile cancer risk

17    value of 1.1 times 10 to the minus 3 for the laborer

18    scenario.

19             And I believe that's the highest risk

20    value that we calculated at the 95th percentile.  And

21    I believe that's cumulative exposure for all releases.

22             Q    Okay.  Where do you see something that

23    says that that's cumulative exposure for all releases?

24             A    I don't see that.  It just says highest

25    estimated incremental lifetime cancer incidence risk.

CARPENTER REPORTING, INC.
(303) 752-1200

89

* ROUGH DRAFT *

1    Perhaps I could have been more clear to say this is for

2    all cumulative releases.

3             Q    But it's your testimony that that is

4    for -- a person -- that was for every year, and that's

5    not the highest of these decade calculations?

6             A    I believe that's correct.

7             Q    And can you point me to anywhere in any

8    of the reports that verify that?

9             A    That verify --

10            Q    That that's correct.

11            A    That this is the cumulative risk -- is

12   that what you're asking --

13            Q    Uh-huh.

14            A    -- or that the number is correct?

15          Q     The cumulative risk.

16          A     Well, let me look through this

17   comprehensive assessment report and see if it's -- it

18   appears at another place in the back and see if that's

19   any more clear.

20                (Deponent reviewing document.)

21          I don't see it explicitly.  It's

22   implicit in the description that we're giving because

23   in this particular report on the comprehensive risk

24   assessment, we talk about certain contributions being

25   greater from the 903 area than -- and so forth, but I

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                        90
                        * ROUGH DRAFT *

 1   mean, it's definitely the cumulative risk for the

 2   releases, and there may be some other reports that we

 3   have that say that more explicitly, that it's

 4   cumulative but it's inherit.  But when I talk about the

 5   highest estimated incremental lifetime cancer risk at

 6   the 95th percentile, I mean, that's -- that's

 7   highest.  Okay?

 8          Q     Right.  But that could be --

 9          A     Also --

10          Q     -- highest because for -- of any of the

11   ones you calculated for any given decade.  Because --

12                MR. POLAND:  Object to the form.

13          Q     (BY MS. ROSELLE)  When I go to the next

14   page and I look at that -- or the page with the chart,

15   there are some that go up that high.

16          A    I'm sorry.  But -- Ms. Roselle, when you

17   take the highest value, then, on a logarithmic scale

18   and you add the next value down and the next value

19   down, you're not going to be adding much to the top

20   number.

21          Q    But if you look at page 28, okay --

22          A    And again, could I ask you --

23          Q    -- of your report?

24          A    -- which document here.

25          Q    Of your report.

CARPENTER REPORTING, INC.
(303) 752-1200

91

* ROUGH DRAFT *

1          A    Which report?

2          Q    Your expert report.

3          A    Okay.

4          Q    Okay.  And you look at the Y axis, it

5    says incremental lifetime cancer incidence risk at 10

6    to the minus 6th.  But then when you look at it, it's

7    per decade.

8          A    Well, the way it's presented in this

9    graphic, it is per decade, yes.  It's presented in this

10   graphic broken down by decades just so that it would

11   give people an idea of what the risk would be to them

12   from the various scenarios by decade.

13          Q    Okay.  And --

14          A    But the --

15          Q    If you look at the 1953 to '59 Leiden,

16    that's where you get that -- that one times 10 to the

17    minus 4.  So that person got that -- that risk in

18    the -- the period of '53 to '59.

19                    MR. POLAND:  Object to the form of the

20    question.

21                    Q    (BY MS. ROSELLE)  That's not a

22    cumulative thing.

23                    A    For that particular bar, that's not

24    cumulative.  That is for that decade.  And if you want

25    the cumulative, you would -- you really can't add the

CARPENTER REPORTING, INC.
(303) 752-1200

92

* ROUGH DRAFT *

1    bars together, but it would be an approximation to take

2    the 5th percentile of each bar for each decade.

3                    Q    Okay.  But when I go back to page 26 and

4    look at the same sentence we've been looking at, all

5    right, and it uses the same language as the Y axis

6    chart, and it's got the same number, why would I assume

7    that that includes every decade and that's just not

8    this '53 to '59?

9                    A    You see on page 26 --

10                    Q    Yes.

11                    A    -- a sentence, highest estimated

12    incremental lifetime cancer incidence risk --

13                    Q    Right.

14                    A    -- at the 95th percentile level were

15    in the range.

16          Q    Right.

17          A    10 to the minus 4 range.

18          Q    And then you go to page 28 and you look

19    at the Y axis and those are the words and that's the

20    number.

21               MR. POLAND:  Objection.  You're

22    mischaracterizing the document and his testimony.

23          Q    (BY MS. ROSELLE)  In fact, if anything,

24    it looks like it's a little higher than 10 to the minus

25    4 at the Leiden location from '53 to '59.

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    93
                        * ROUGH DRAFT *

1          A    Well, looking at that graphic, that's

2    possible, but this sentence says that it was in the

3    range of 10 to the minus 4, and that's also not

4    explicitly pointing out the Leiden area.  This sentence

5    was made -- was referring in general to lifetime cancer

6    incidence risk.

7               (Helen Grogan enters the conference

8    room.)

9          Q    (BY MS. ROSELLE)  Okay.  Let's go to

10    Leiden.  Let's do it a different way.  Let's go to page

11    28 to Leiden.  You add up for me and tell me the total

12    incremental lifetime cancer incidence risk for the

13    maximally exposed person at that location from '5 3 to

14    '89.  Because, as I read this, I've got one that's 10

15    to the minus 4, I have one that's 10 to the minus 5, I

16    have another one that's 10 to the minus 6, and then I

17    have one that's 10 to the minus 8th.  Right?

18              A    Yes.

19              Q    Okay.  So how -- what's that add up to?

20              A    It's about 10 to the minus 4.

21              Q    Well, no, because one was 10 to the

22    minus 4 and one was 10 to the minus --

23              A    If you take 10 to the minus 4, which is

24    one times 10 to the minus 4 and you add one times 10 to

25    the minus 5, now you're at 1.1.

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                      94
                        * ROUGH DRAFT *

1               Q    Okay.

2               A    If you add one to 10 times minus 6, now

3     you're at 1.11.

4               Q    Yeah.

5               A    That's about 10 to the minus 4.

6               Q    I see.  So the fact that it's now 1.11,

7     that's still, you think, 1 chance in 10,000?

8               A    Correct.

9                    MR. POLAND:  Louise, when you're at a

10    convenient breaking point, I'd like to break for a

11    short lunch.

12                   MS. ROSELLE:  Sure.  That's fine.

13                   MR. POLAND:  Do it now?

14                   MR. SORENSEN:  Do you want to do it now?

15                   MS. ROSELLE:  Yeah.

16                   THE VIDEO OPERATOR:  We are going off

17      the record at 1:49.

18                  (There was a luncheon recess taken from

19      1:49 p.m. to 2:29 p.m.)

20                  THE VIDEO OPERATOR:  We are back on the

21      record at 2:29.

22            Q     (BY MS. ROSELLE)  Dr. Till, did RAC

23      author this book called Summary of Findings, Historic

24      Public Exposure Studies on Rocky Flats?

25            A     May I see that?

                        CARPENTER REPORTING, INC.
                          (303) 752-1200

                                                        95
                          * ROUGH DRAFT *

1             Q     (Tenders document.)

2             A     The book was published by the Colorado

3       Department of Public Health and Environment, and the

4       Health Advisory Panel actually put this on -- put this

5       together using the findings of -- of the study.

6             Q     RAC didn't author any of it?

7             A     Did we author it?

8             Q     Yes.

9             A     No.  I don't believe we did.  We may

10      have reviewed it.  I mean, it was based on work that we

11      did, but that was assembled by the Health Advisory

12      Panel.

13            Q     Okay.  And where did this logo on the

14      front of it come from?

15            A     I'm sorry.  I'm sorry.  I don't know.

16            Q     Because it also appears on a number of

17      other items.  But that's not something that RAC has

18      used, that logo for Rocky Flats?

19              A    No.  You see, the study was -- we were

20      working for the Health Advisory Panel who directed this

21      study or advised this study.  And it was the Health

22      Advisory Panel and the Colorado Department of Public

23      Health and Environment that put together that document,

24      and I assume that's where the logo that you showed me

25      came from.

                        CARPENTER REPORTING, INC.
                            (303) 752-1200

                                                        96
                            * ROUGH DRAFT *

1               Q    Okay.  I'd like to go through your

2       report now.  And I want to talk about the -- the

3       historic public exposure studies.  First of all, am I

4       correct that you made no calculations of the risk of

5       genetic effects?

6               A    I would -- I would have to check, but I

7       don't think that's correct.  I believe that genetic

8       effects would be included in the risk coefficient and

9       may be -- so I don't know the answer to that, but it's

10      possible we did take genetic effects into account into

11      the -- into the risk coefficients that we used.

12              Q    I was going to direct you to a page of

13      the report where that statement came from, but I may

14      have to wait till we get there.  So you believe that

15      you did look at genetic effects?

16                   MR. POLAND:  Object to the form of the

17      question.

18          A    I actually would have to look at the

19   risk coefficients to -- to know whether or not genetic

20   effects were taken into account.  I don't recall.

21          Q    (BY MS. ROSELLE)  At least you're not

22   opining in this trial as to the probability or

23   possibility of anyone having genetic effects from Rocky

24   Flats; is that correct?

25          A    The calculations that we made were for

                 CARPENTER REPORTING, INC.
                    (303) 752-1200

                                              97
                  * ROUGH DRAFT *

1    the incidence of cancer.

2          Q    Okay.  Yes.  So you're not looking at

3    genetic effects?

4               MR. POLAND:  Object to the form of the

5    question.

6          A    Well, again, whether or not genetic

7    effects were incorporated into that risk coefficient, I

8    don't -- I don't recall.  I know what we're reporting

9    as cancer incidence, so I suspect that that is strictly

10   a cancer incidence value.  I suspect we did consider

11   genetic effects, but --

12         Q    (BY MS. ROSELLE)  Okay.  In your expert

13   report, you have no opinions about whether or not

14   anyone off-site of Rocky Flats has or could have

15   genetic effects as a result of the emissions from Rocky

16   Flats; is that correct?

17         A    In our expert report -- and which report

18   are you referring to now?

19          Q     Exhibit 2.

20          A     In my expert report, I believe that's

21     strictly for incidence of cancer.

22          Q     Okay.  Now, tell me what you did with

23     the surface water.  Did you include a dose from surface

24     water in your dose calculations?

25          A     Excuse me.  Yes.  We looked at surface

CARPENTER REPORTING, INC.
(303) 752-1200

98

* ROUGH DRAFT *

1     water in our work very comprehensively and, in

2     particular, releases of tritium and some of the other

3     radioactive materials that may have gone off-site, and

4     we looked at the dose contribution from surface water,

5     that's correct.

6          Q     Okay.  I'm asking you, is the dose from

7     surface water in the dose calculations?  I mean, it's

8     one thing like you looked at MUF, too.  I'm asking

9     what's actually in the dose calculation.  Not things

10     that you considered and discarded.

11          A     Well, I need to look at my expert

12     report --

13          Q     Be my guest.

14          A     -- just to see if I included any

15     dosimetry from surface water.  It was a part of the

16     dose reconstruction study.  I believe that the risk

17     presented at the back of this study are strictly for

18     plutonium and from inhalation of plutonium.

19                We did look at surface water and

20      considered it very thoroughly and if I recall -- I'd

21      have to find the reports, but the dose and the

22      contribution of dose and risk from surface water would

23      have been quite small compared to the contribution from

24      inhalation of plutonium.  And it would have also been

25      in a very local area, either adjacent to the site or

CARPENTER REPORTING, INC.
(303) 752-1200

99
* ROUGH DRAFT *

1      very close to that.  And I'll just look through and see

2      if I reported anything in here about surface water.

3                (Deponent reviewing exhibit.)

4                Well, for example, I referenced the

5      characterization of releases to surface water from the

6      Rocky Flats plant as one of the reports that we

7      published and prepared as a part of this study.

8           Q    I'm -- I'm sorry.  That's not my

9      question.  My question is:  Did you include surface

10     water in the dose calculations that you reported in

11     your expert report?

12          A    I don't believe they're included in

13     these, no.

14          Q    Did you include any dose from

15     groundwater in your expert report?

16          A    No, we did not.

17          Q    Did you include any risk to the public

18     after the last date that Rockwell operated Rocky Flats?

19                MR. POLAND:  Object to the form of the

20      question.

21              A    No, we did not.

22              Q    (BY MS. ROSELLE)  Did you include any

23      risk caused by the cleanup at Rocky Flats after 1989?

24              A    I believe that is in my report, and if

25      you'll --

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                        100
                        * ROUGH DRAFT *

1               Q    No.  I'm asking about the doses.  I'm

2       not asking about things in the report.  I'm asking

3       specifically about what's in the dose calculation.

4               A    Well --

5                    MR. POLAND:  Are you talking about the

6       report or the study?

7                    MS. ROSELLE:  Either.

8               A    Ms. Roselle, there's a part of my report

9       where I discuss soil contamination at Rocky Flats and

10      the cleanup of soil at Rocky Flats.

11              Q    (BY MS. ROSELLE)  Right.  It starts at

12      page 30.

13              A    Correct.

14              Q    That's not my question.

15              A    Could you rephrase your question,

16      please?

17              Q    Okay.  I'll do that.  Did you include

18      any dose from releases of plutonium during the cleanup

19      of Rocky Flats after Rockwell left the plant in the

20   dose calculation?

21          A    In the dose calculation for the

22   historical exposures study.  Thank you.  No.

23          Q    Did you include in the dose calculation

24   for the historic releases study any dose which a member

25   of the public received as a result of the plutonium

CARPENTER REPORTING, INC.
(303) 752-1200

101

* ROUGH DRAFT *

1    that was off-site?

2           A    Yes.  That contribution to dose and risk

3    is taken into account in the calculation of dose

4    through material that would have been deposited and

5    then possibly resuspended, but that is taken into

6    account.

7           Q    I want to make sure we're clear on this.

8    You're telling me that if, say, there was plutonium in

9    the soil at, say, 96th and Indiana, you included in

10   the dose a source term for the plutonium that was in

11   the soil at 96th and Indiana?

12          MR. POLAND:  Objection.  It's a

13   different question.

14          A    Well, you know, quite honestly, I think

15   we did, but I'm not certain as to this accumulation of

16   deposited material off-site and whether that was

17   accounted for in the dose calculation, I really don't

18   know.  If it were to contribute to dose and risk, while

19   there were releases to air going on, any of these

20   contributions would have been significantly smaller

21      than the contribution of dose to risk from releases to

22      air.  Do you understand what I mean?

23                      Q     (BY MS. ROSELLE)  Uh-huh.   New

24      releases --

25                      A     So -- new releases.

CARPENTER REPORTING, INC.
(303) 752-1200

102
* ROUGH DRAFT *

1                       Q     -- as opposed to old releases.

2                       A     So the releases from any material that

3       would have been deposited may have been taken into

4       account.  I really don't know.  I'd have to check with

5       the modeling to see how that was addressed.  If it were

6       taken into account, that contribution would be quite

7       insignificant to the -- to the total risk.

8                       Q     Okay.  What report would you go to to

9       see if that was taken into account?

10                      A     I'm not sure.  I'll have to -- I'm not

11      sure which one it is.  I'm not sure.

12                      Q     Okay.  Did you --

13                      A     I'd have to --

14                      Q     -- include in the dose for the historic

15      dose reconstruction particles that were large -- 15

16      micrometers AMAD or larger?

17                      A     Yes.

18                      Q     In what way?

19                      A     It was a part of the particle size

20      distribution that was used as we calculated doses.

21          Q    Are you sure about that?

22          A    There were particles -- yes, ma'am.

23          Q    Can you show me where in your expert

24   report it says that?

25          A    Whether that's in my expert report or

CARPENTER REPORTING, INC.
(303) 752-1200

103

* ROUGH DRAFT *

1   not, I do not know.  It is in some of the other

2   material that we have, I'm sure.

3          Could I look at the comprehensive risk

4   report again --

5          Q    Is that this one?

6          A    -- that you had?  I'll start with that

7   one.

8          On page 5.

9          Q    Of what?  The comprehensive report?

10          A    This is the comprehensive assessment of

11   exposure, lifetime cancer incidence risk from Rocky

12   Flats.

13          Q    And what does it say?

14          A    This is page 5, discrete 903 area

15   releases were modeled for the six days in which high

16   suspension was suspected to have occurred.  Four

17   separate particle sizes were modeled for all 903 area

18   releases:  Less than 3 microns, 3 to 10 microns, 10 to

19   15 microns, and 15 to 30 microns aerodynamic equivalent

20   diameter.

21          Q    Okay.  And after they were modeled, how

22    were they used in the calculation of dose and risk?

23              A     Well, they were used in several ways.

24    In terms of suspension in the first case, which is the

25    original uplifting of material from the soil, particle

CARPENTER REPORTING, INC.
(303) 752-1200

104

* ROUGH DRAFT *

1     size makes a big difference in terms of the amount of

2     suspension into the air.

3               In the second case, once you have this

4     material suspended into the air, particle size makes a

5     big difference with regard to how far this material

6     might be transported downwind.  And larger particles,

7     particularly those greater than 30 microns are going to

8     deposit very close in to the source, the original

9     source.

10              In another case, in a third case,

11    particle size is very important in terms of the amount

12    of material inhaled by an individual.  And typically,

13    the upper range of inhalable material is about

14    15 microns.  Certainly, anything over 30 is not

15    considered respirable material.

16              But those are some of the ways that

17    particle size factored into the mathematical modeling

18    and the calculation of dose and risk.

19              Q     Would you go to your expert report,

20    please, Exhibit 2.  Would you turn to page 16, please.

21    Okay.  The last sentence on page 16, it says particles

22    greater than 15 micrometers AED were not considered

23    respirable because most do not penetrate beyond the

24    bronchial region of the respiratory tract and they are

25    eliminated from the body either by direct expulsion or

105

* ROUGH DRAFT *

1     via transfer to the gastrointestinal tract.

2               Okay.  When you calculated the doses,

3     did you include particles that were greater than 15

4     micrometers for the actual doses.

5           A    In terms of the dosimetry, the answer is

6     no.  15 microns is the upper bound of material for

7     which we calculated a -- a dose, but we certainly take

8     into account particles greater than 15 microns in the

9     transport and in the source term.

10          Q    Okay.  But for the doses themselves, if

11    the particle leaving the Rocky Flats plant was great --

12    was 15 microns or greater, it did not go into the dose

13    calculation; is that correct?

14          A    Well, I'll double-check that.  I believe

15    that's correct, but I'll double-check and just see if

16    that's stated in any other locations.

17               There's a report on the risk analysis

18    for the 903 area.

19          Q    Uh-huh.

20          A    I don't know the number of the report.

21          Q    It's Plaintiffs' 1078, I think.

22          A    Well, I don't see anything more specific

23     than that in here.  I know there's a discussion in one

24     of our reports somewhere about particle size

25     distribution.  I believe that 15-micron -- I believe --

CARPENTER REPORTING, INC.
(303) 752-1200

106

* ROUGH DRAFT *

1     and I would have to check this, but 15-micron would be

2     an upper range of respirable material.  And if that's

3     the case and we used that as an upper bound of dose and

4     risk in the analysis, what I'm not sure of is whether

5     we used a distribution that included values greater

6     than that, as well.  And I just don't know the answer.

7     I can't recall that right now.

8              Q    Okay.  But to the best of your

9     knowledge, as you sit here today, particles that were

10    greater -- were 15 microns or greater leaving the plant

11    site were not included in the doses; is that correct?

12             A    We need to be clear.  Are we talking

13    about inhalation doses?

14             Q    Those are the only --

15             A    Strictly inhalation doses?

16             Q    Those are the only doses that I believe

17    you're rendering a report on.

18             A    Okay.  Well, to the best of my

19    recollection, that is the case, but with the

20    qualification that we could have used an uncertainty

21    range that included particle size that's greater, but I

22    believe 15-micron is considered the upper bound of the

23      respirable particles.  And if that's the case, yes.

24             Q    Did you consider that particles leaving

25      the plant site might get broken up and become smaller

CARPENTER REPORTING, INC.
(303) 752-1200

107

* ROUGH DRAFT *

1      particles by the time they were inhaled by someone?

2             A    Yes.  We would have taken that into

3      account because we used a distribution of -- of

4      particle sizes in our calculation and particles -- and

5      this is -- and also the range of particle sizes and the

6      distribution that we used in the analysis was taken

7      from experimental data that would have taken into

8      account these kind of factors going on.

9             Q    Okay.  But you just told me that if it

10     was greater than 15 microns leaving the plant site, it

11     was not included in the dose.  And now I'm asking you,

12     did you take into account in calculating the dose that

13     some particles might have gotten broken up after they

14     left the plant site?

15            A    Well, Ms. Roselle, you're talking about

16     two separate things.  We've got a transport phenomenon

17     going on here with materials being transported downwind

18     and we've got an individual standing somewhere,

19     inhaling the material; right?

20            Q    That's right.

21            A    Okay.  In terms of the dose -- dose

22     itself that -- the particles that at that individual

23     when that individual breathes this material, I believe,

24     as I said, the upper bound of respirable particles

25     taking into account the dosimetry is 15 microns, we

CARPENTER REPORTING, INC.
(303) 752-1200

108

* ROUGH DRAFT *

1      know that there were particles greater than 15-micron

2      and greater than -- up to 30-micron, okay, that were

3      even larger than 30-micron -- that were released.  Now,

4      the way we come up with a particle size distribution is

5      by looking at what's actually in the air, which would

6      include particles that may have split as they get to

7      this point where these data are being taken.  So the

8      answer is yes, it would be taken into account.

9             Q    Where was the data taken that you used

10     for the particle size distribution?

11            A    Let me look at this report and I believe

12     one of the authors was Langer.

13            Q    Would you tell us what report you're

14     looking at, please?

15            A    Certainly.  I'm sorry.  Well, I'm

16     looking at the comprehensive assessment of exposure and

17     lifetime cancer incidence risk from plutonium released

18     from Rocky Flats and I really don't know that it's in

19     this paper but I'll look first.

20            The other one was the one I looked at a

21     few minutes ago about the risk assessment for the 903

22     area.  So I'll look at both of them.  I believe it's in

23     that publication.  If it's not in that one, the one I

24     would look in would be the characterization of the 903

25     area or the source term report for the 903 area.  But

CARPENTER REPORTING, INC.
(303) 752-1200

109

* ROUGH DRAFT *

1     that information --

2          Q    But you understand what I'm interested

3     in is doses, what went into the dose calculation?

4          A    Well, I've answered --

5          Q    Okay.

6          A    -- what went into the dose calculation

7     and to the best that I can recollect, it's up to

8     15-micron, okay, as being an upper bound, but then you

9     also asked me if I took into account whether or not

10    larger particles could have split as they get to the

11    individual, and that individual inhaled the material

12    and I'm saying yes, that would -- would have been taken

13    into account.  Okay?

14         Q    Right.  But my earlier question, I

15    specifically asked you 15 microns leaving the plant

16    site.

17         A    Well, I apologize if I didn't understand

18    the question.  Maybe we can get this clear if we

19    discuss it a bit more.

20         Q    Okay.  Okay.

21         A    It's up to you.

22         Q    Did you take into account in the dose

23    any particles that were 15 microns or larger leaving

24    the plant site?

25          A    Will you please define "dose" for me?

                CARPENTER REPORTING, INC.
                   (303) 752-1200

                                                    110
                    * ROUGH DRAFT *

 1          Q    Yeah.  The calculation of what the

 2    hypothetical person's dose was as reported in your RAC

 3    reports.

 4          A    Did we take into account -- would you

 5    read that question back to me?  I'm going to try to

 6    answer this to the best of my ability because it's a

 7    bit convoluted the way you've asked it a couple of

 8    times.  If you could ask that back again, please.

 9               MS. ROSELLE:  Can you read it back to

10    him, please.

11               (The referred-to question was read by

12    the reporter.)

13          A    I guess I would answer that question

14    yes, that we took these into account.  There could have

15    been particles larger than 15-micron or 30-micron

16    leaving the plant that it's possible.  I don't know the

17    probability of these particles splitting as they're

18    transported downwind, but it's possible they could

19    split.  And what I'm saying is that if that happened,

20    then that would be taken into account in the dose

21    calculation inherently because of the way we developed

22    the -- the distributions of particle sizes.

23          Q    (BY MS. ROSELLE)  Where do I find that,

24    whether or not you did that?

25              A    Well, I'll look.  As I said, that's

CARPENTER REPORTING, INC.
(303) 752-1200

111

* ROUGH DRAFT *

1    where we left off.  Okay?

2              Q    Okay.

3              A    (Deponent reviewing exhibit.)

4                   Page 13 of the Comprehensive Assessment

5    of Exposure and Plutonium and Lifetime Cancer Incidence

6    Risk from Plutonium Released from the Rocky Flats

7    Plant, 1953 to 1959.

8              Q    And what does it say?

9              A    This is one of the citations.  One -- in

10   one of the more exhaustive studies, Langer, 1986,

11   measured mass floating plutonium concentration in air

12   at plutonium activity concentration of resuspended dust

13   over a two-year period, 1982 to 1984, at three heights:

14   1, 3 and 10 meters, and three size fractions:  3, 3 to

15   15, and greater than 15.  This work provided the basis

16   for estimating activity particle size distributions

17   used to model Phase II 903 area suspension releases.

18             Q    Well, where did Langer do his work?  Was

19   it on the plant site or off the plant site or at the

20   boundary?

21             A    I really -- I don't know.  I'd have to

22   look at the paper to find out.

23             Q    Okay.  In your historic public exposure

24   calculations, you did not include doses from americium;

25   is that correct?

CARPENTER REPORTING, INC.
(303) 752-1200

112

* ROUGH DRAFT *

1           A    In the expert report doses that I

2     reported, that's correct.

3           Q    You did not include doses from tritium;

4     is that correct?

5           A    And I want to make this clear that

6     you're mentioning whether or not I included those doses

7     in my expert report or whether or not we took those

8     doses or risks into account in the study, because we

9     certainly did look at those risks in the study.

10          Q    I'm trying to make clear, when you tell

11    the jury what the people's increased health risks are,

12    what is in that calculation and what is not?  As I

13    understand your report, the only thing you're telling

14    the jury is an inhalation dose for hypothetical people

15    from plutonium between 1953 and the last day Rockwell

16    operated the plant in 1989.  Is that correct?

17               MR. POLAND:  Object to the form of the

18    question.  Are you asking him what's in the report?

19               MS. ROSELLE:  What he's going to tell

20    the jury.

21          A    Well, I will say that that's correct for

22    my expert report.

23          Q    (BY MS. ROSELLE)  Okay.  So there's no

24    calculation of a dose from tritium or a risk from

25    tritium; correct?

CARPENTER REPORTING, INC.
(303) 752-1200

113

* ROUGH DRAFT *

1          A      In my expert report.

2          Q      There's no calculation of a dose from

3    uranium; is that correct?

4          A      Again, Ms. Roselle, let me look at

5    whether or not I included a section because, as I said,

6    these analytes were certainly taken into account in the

7    study, and I may not have included them in the expert

8    report.

9                 (Deponent reviewing exhibit.)

10                I believe that's correct for the expert

11   report.

12         Q      And would you agree that a large amount

13   of uranium was processed at Rocky Flats?

14                MR. POLAND:  Object to the form of the

15   question.  Vague.

16         A      Yeah.  I think that defines how you --

17   what you call a large amount of uranium.

18         Q      (BY MS. ROSELLE)  Why don't you tell me

19   how much uranium was processed at Rocky Flats.

20         A      I don't know off the top of my head.

21   There again, I believe we have a report.  If you want

22   to hand it to me, I'll see if I can find it and see if

23   that number is in the report.  There's a report where

24   we looked at risks from uranium.  It's a separate

25   document.

CARPENTER REPORTING, INC.

(303) 752-1200

114

* ROUGH DRAFT *

1          Q     Did you calculate doses?

2          A     I don't remember.  I'd have to look at

3     this document to see.

4          Q     Do you have any recollection of how much

5     uranium was processed at Rocky Flats?

6          A     I don't.  No.

7          Q     Do you have any recollection that

8     uranium was released off-site from Rocky Flats into the

9     air and water?

10         A     I know we looked at that in the study.

11    I don't know how much and I don't know what might have

12    gone off-site, no.  I don't recall.

13         Q     Now, did -- in calculating doses, did

14    you take into account what people ate; for example,

15    from their home gardens?

16         A     We did that early on and ChemRisk also

17    did that early on to take into account the -- all the

18    different pathways of exposure in the presence of

19    inhalation.  And as a result of that analysis, those

20    pathways, when the inhalation pathway is present, are

21    so small that at the --

22              MR. SORENSEN:  Excuse me.  Sorry.

23         A     It was decided by the Health Advisory

24    Panel and -- that the Phase II work would focus

25    strictly on the inhalation pathway.

* ROUGH DRAFT *

1          Q    (BY MS. ROSELLE)  So you didn't take

2     into account what people ate from their home gardens;

3     is that correct?  The doses --

4               MR. POLAND:  Object to the form of the

5     question.

6          Q    (BY MS. ROSELLE)  -- and risk that

7     you're presenting in your expert report?

8          A    The risks that are presented in the

9     expert report are strictly for inhalation.  The

10    contribution from the other pathways were taken into

11    account and considered in the study as a whole, but

12    they're not included in the risk that I present in the

13    expert report.  That's correct.

14         Q    And you didn't take into account beef or

15    chicken or other animal products that people might have

16    eaten that had been raised in the area of Rocky Flats

17    as part of the dose; correct?

18              MR. POLAND:  Object to the form of the

19    question.  Based on facts not in evidence.

20         A    Well, let's -- let's break this down

21    because, in my expert report, there is a part of the

22    report that deals with a soil action level study.

23         Q    (BY MS. ROSELLE)  I'm talking about the

24    doses.

25         A    Okay.  So we're talking strictly about

CARPENTER REPORTING, INC.
(303) 752-1200

116
* ROUGH DRAFT *

1    doses and risk from plutonium in my expert report.

2           Q    So it does not include any dose from

3    ingestion of beef or chicken that was grown in the

4    area; is that correct?

5           A    That's correct.

6           Q    Okay.  By the way, according to this

7    report, the amount of -- here.  I'll give you your

8    final report on uranium releases, P-1083.  (Tenders

9    document.)

10          A    (Deponent reviewing document.)

11              There's a figure that's used in this

12   analysis and this is Mr. Voilleque's report, I believe.

13   Yes.  And it talks about during -- I'll just read a few

14   sentences here.  During peak production years there,

15   the throughput as measured by shipments was about

16   double the inventory of natural and low enriched

17   uranium.  We further assumed that on the average and

18   inventory of tens of thousands of kilograms can be

19   assigned the value of 50,000 kilograms, assuming that

20   the maximum inventory was about 600,000 kilograms,

21   maximum inventory, that's at any one time, I assume, so

22   it also points out that an estimate of the three put

23   during most of the time between 1955 and 1970 is about

24   600,000 kilograms per month.

25          Q    So can we agree there was a lot of

CARPENTER REPORTING, INC.
(303) 752-1200

* ROUGH DRAFT *

1    uranium processed at Rocky Flats?

2              A    I would say that's a lot, yes.

3              Q    And you calculated no doses in your

4    expert report for uranium to the off-site residents;

5    correct?

6              A    In my expert report, I did not present

7    doses from uranium, no.

8              Q    Okay.  Let's start with the source term.

9    The first step in a dose reconstruction is to calculate

10   a source term; is that right?

11             A    Well, not necessarily.

12             Q    Well, it's what you did; right?

13             A    If you're talking about the equation,

14   Ms. Roselle -- and I'm trying to be specific, okay, so

15   don't get frustrated with me.  If you're talking about

16   the equation that when used and the way that I explain

17   historical dose reconstruction, the source term, that's

18   correct, yes.

19                  MS. ROSELLE:  Okay.  Do you want to

20   change the tape now?  We can go off the record.

21                  THE VIDEO OPERATOR:  This is the end of

22   tape 2.  We're going off the record at 3:16.

23                  (There was a recess taken from 3:16 p.m.

24   to 3:17 p.m.)

25                  THE VIDEO OPERATOR:  We are back on the

CARPENTER REPORTING, INC.
(303) 752-1200

118

* ROUGH DRAFT *

1    record at approximately 3:17.  This is the beginning of

2    videotape No. 3.

3             Q    (BY MS. ROSELLE)  Okay.  I want to start

4    with the source term.  With regard to the source term

5    for routine operations, I want you to tell me what hard

6    data you had to calculate the source term, and what

7    assumptions you made in calculating the source term.

8             A    This work, of course, was done by

9    Mr. Voilleque, as well, for all the source term work.

10   And it's possible he could give you a more thorough

11   answer than I could.  And with regard to all of the

12   assumptions that were made versus what hard data we

13   had, to the -- to the best that I can recall, there

14   were quite a few data about releases from the key

15   stacks at Rocky Flats.

16             Measurements of plutonium or -- or other

17   materials that were released from the stacks.  There

18   was information about particle size, there was

19   information about chemical form.  There would have been

20   information about operations that were ongoing at the

21   plant at different times.  There was also a lot of

22   environmental data that were available that are used to

23   corroborate all of these source terms, whether it's the

24   routine releases or the '57 fire, the '69 fire.

25             All of these or just some -- I don't

1    have a clue that I've named all of the hard data that

2    we found that we used in this calculation, but those

3    are some examples of some.

4            Q    Okay.  And what were the assumptions you

5    made with regard to routine operations?

6            A    You know, I'm not sure I can -- I can

7    answer that question.  I really -- I don't know of what

8    assumptions that we made.  Are you interested in if

9    there were data missing or something like this?

10           Q    I want every assumption that went into

11   the source term.

12           A    Well, why don't you give me the report

13   on the routine release source term, and I'll take a

14   look.

15                (There was a discussion off the record.)

16           Q    (BY MS. ROSELLE)  This is Plaintiffs'

17   Exhibit 1080, final report, review of routine releases

18   of plutonium in airborne effluents.  Is this the report

19   you're looking for?

20           A    Yes.  I'll state from the beginning that

21   I'll look through this report, but the -- the idea of

22   every single assumption and for my even finding that in

23   this report during the day today, I'd say is highly

24   unlikely.  If there are assumptions made in the

25   calculation of the source term, they're included in the

* ROUGH DRAFT *

1    report.

2                    (Deponent reviewing document.)

3          Q    If you don't know what assumptions were

4    made in the calculation of the source term and you want

5    to rest with that answer, we'll move on.

6          A    I do not know, off the top of my head,

7    all of the assumptions that were made in this

8    calculation, no.  I don't know them.

9          Q    Is that the answer -- you want -- you

10   want to rest with that answer, or do you want to take a

11   look at that report?  It's your choice.

12         A    It seems to me it's your choice.  If you

13   want me to look at the report, I'm telling you that I

14   don't think I'll be able to pinpoint every single

15   assumption that we made, but I'll be happy to take the

16   time and try to identify them if you want me to go

17   through the report.

18         Q    Well, I mean, I can read the report.

19   I'm asking you what assumption -- but I -- I will also

20   tell you that a number of your reports, you can't

21   figure it out from reading.  Maybe you can, but I

22   can't.  I'd like to know all the assumptions that go

23   into your source term on the routine operations, if you

24   can tell me them.  If you can't tell me them, if all

25   you can do is read that report, maybe we should move

CARPENTER REPORTING, INC.
(303) 752-1200

121

* ROUGH DRAFT *

1    on.

2          A    I'd have to read the report and, you

3    know, point out that this is a document prepared by

4    Mr. Voilleque, reviewed by the Health Advisory Panel,

5    peer reviewed by outside peer reviewers as well, but

6    I'm happy to tell you that I don't recall what all the

7    assumptions were.

8          Q    Do you recall any of them?

9          A    I don't know that I recall any of them

10   for the 50 -- for the routine releases.  I'd be happy

11   to look at the report if you want me to.

12         Q    Okay.  Do you remember that your

13   calculation of the routine releases was orders of

14   magnitude higher than the previous calculation by

15   ChemRisk?  Do you remember that?

16         A    That's not correct, Ms. Roselle.

17         Q    That's not?

18         A    No.

19         Q    How much higher was your calculation of

20   routine releases than ChemRisk?

21         A    About a factor of 3, I believe.

22         Q    And what were the differences that

23   increased your source term by a factor of 3 for routine

24   releases?

25         A    I don't know the -- the reason for the

CARPENTER REPORTING, INC.
(303) 752-1200

122

* ROUGH DRAFT *

1    differences.  I do know that the methods that we used

2    were different from those of ChemRisk.  I believe that

3    in the case of the routine releases, a key difference

4    is how we addressed the uncertainty in the sampler in

5    the stack and taking that uncertainty plus several of

6    the other uncertainties associated with the sampling

7    data and taking that into account.  And to the best

8    that I can recall, that's the reason there were

9    differences.

10           Q    Okay.  What did you do with -- with

11   regard to the uncertainty in the sampler in the stack

12   that was different than what ChemRisk did?

13           A    Well, if I -- if I recall, it has to do

14   with the placement of the sampler as one example in the

15   stack and the fact that there are different

16   concentrations of material coming up through the stack

17   and the sampler may not always be in the exact place

18   where the highest or lowest concentration is located.

19   And you take that into account by assuming a

20   distribution and making the estimate of the source term

21   using a -- an uncertainty analysis, a Monte Carlo

22   analysis.  That's just one example of one parameter, if

23   I've recalled that correctly, that we took into

24   account, and would lead to a difference.

25           Q    How much did ChemRisk estimate the

CARPENTER REPORTING, INC.
(303) 752-1200

123
* ROUGH DRAFT *

1    routine releases to be?

2               A    I believe their number -- and what I'd

3      like to do is check my report, as well -- but was about

4      .05 millicurie as a median release, but I'd like to

5      look at the comprehensive risk --

6              Q      Which number is that?

7              A      Comprehensive risk report.  Do I have

8      that?

9                     MR. POLAND:  Yeah.  It is in there.

10     It's P-1088; right?

11                    MR. SORENSEN:  It's right here.

12                    MR. POLAND:  It's over here, Dr. Till.

13                    THE DEPONENT:  That's not it?  I think

14     that's it.

15                    MR. SORENSEN:  There are different

16     dates.

17                    THE DEPONENT:  This is the report.

18                    MR. SORENSEN:  There's this one dated

19     March '02.

20                    THE DEPONENT:  Okay.  Well, I don't know

21     the difference.

22                    MR. SORENSEN:  If you don't, I don't,

23     either.

24             A      (Deponent reviewing document.)

25                    There's another report.  I'd like to see

CARPENTER REPORTING, INC.
(303) 752-1200

124

* ROUGH DRAFT *

1      if you have it.  It's called a Technical Summary

2      Report.  I mean, I distinctly remember a sentence

3      talking about the source term and the difference

4      between the Phase I source term and the Phase II source

5      term for the routine releases as being about a factor

6      of 3.

7                     I'm trying to find that sentence and I'm

8      quite sure it exists.  In fact, I'm very sure it

9      exists.  You have to realize there's thousands of pages

10     of material here that we're dealing with.

11                    (There was a discussion off the record.)

12             Q     (BY MS. ROSELLE)  Okay.  Well, if you

13     can't find what you're looking for in that report,

14     Dr. Till, we'll move on.

15             A     Okay.  I am quite sure that that

16     sentence exists in our reports.

17             Q     Okay.

18             A     I'm quite sure that it's a factor of 3

19     that we reported.

20             Q     Okay.  And you're quite sure one of the

21     reasons was this uncertainty in the sampler in the

22     stack?

23             A     I believe that's one of the reasons.

24     There are probably many.

25             Q     Okay.  So let's go to your expert

                        CARPENTER REPORTING, INC.
                          (303) 752-1200

                                                        125
                        * ROUGH DRAFT *

1      report, Exhibit 2.  Okay.  Page 4.  Routine operations.

2      Okay.  At the end of the first paragraph, you write,

3      the total estimated release from routine operations is

4    estimated to be 4.4 G becquerel or about 1.7-gram

5    between 53 and 89.  Can you tell me what part of that

6    number is an estimate and what part of that number is

7    data from key stacks?

8               MR. POLAND:  Object to the form of the

9    question.

10          A    That number is based on calculations

11   using data.

12          Q    (BY MS. ROSELLE)  Okay.  What

13   calculations were done using data?

14          A    They would be explained very thoroughly

15   in this source term report for the 903 -- I'm sorry --

16   for the routine releases, and I've already told you I

17   don't know the assumptions -- assumptions that went

18   into that.

19          Q    So, therefore --

20          A    But a lot of hard data went into that

21   calculation, yes.

22          Q    And then a lot of assumptions went into

23   it?

24          A    I don't know that there were a lot of

25   assumptions.  I told you, I don't know I don't know how

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                      126
                        * ROUGH DRAFT *

1    many.  I said there may have been some.  I don't recall

2    what the assumptions were.

3               Q    Okay.  What part of calculation of the

4    source term for routine operations did you do?

5           A      I did not make the calculation.

6    Mr. Voilleque, working with Health Advisory Panel,

7    produced these calculations.

8           Q      Would that be true of all the source

9    term calculations?

10          A      That's true for the 1957 fire, the 1969

11   fire, and for the routine releases.

12          Q      So does that mean you did the

13   calculations for the 903 pad?

14          A      No.  Those calculations were made by

15   Mr. Art radioed, Dr. Bob Meyer, Ms. Jill Aanenson and

16   again working with the Health Advisory Panel throughout

17   the course of this and how those were derived.

18          Q      Did you, John Till, do any of the source

19   term calculations that you're going to testify about?

20          A      I didn't personally make the

21   calculations, no.  I reviewed the work.  I, throughout

22   the course of the -- the time that this work was going

23   on, I reviewed reports, draft reports, participated in

24   discussions related to parameters that were used,

25   looked at records that were used as a source of data.

CARPENTER REPORTING, INC.
(303) 752-1200

127

* ROUGH DRAFT *

1    I mean, all of that.

2           Q      But you didn't do the calculations

3    yourself?

4           A      I didn't personally do the calculations

5      myself, no.

6              Q    Okay.  Did you write this expert report

7      yourself?

8              A    Which expert report?

9              Q    Exhibit 2?

10             A    Ms. Roselle -- pardon?

11             Q    Exhibit 2.

12             A    Yes.

13             Q    The entire expert report, you wrote

14     yourself?

15             A    Using information from all of the work

16     in the study, yes.

17             Q    Okay.  So when you say here in your own

18     words on page 4 the total estimated release from

19     routine operations is estimated to be, and then you

20     give a number, can you tell me what part of that is the

21     estimate and what is from hard data?

22                  MR. POLAND:  Object to the form of the

23     question.  Mischaracterizes the document.

24             A    I think you're misunderstanding the word

25     "estimated" and the way it's being written here because

CARPENTER REPORTING, INC.
(303) 752-1200

128

* ROUGH DRAFT *

1      this is not a guess.  It is not scientific judgment.

2      These are calculations that we made during the project

3      based on real data and if there were any assumptions

4      that went into that calculation.  The fact that I say

5      estimated, perhaps calculated would have been a better

6    word to put there.  Because they were calculated.

7            Q    (BY MS. ROSELLE)  But in those

8    calculations went scientific judgment?  It wasn't a

9    straight mathematical calculation.  This were

10   assumptions that were made in order to do that math;

11   right?

12           A    I really don't agree with that.  I mean,

13   scientific judgment, these are hard calculations based

14   on data.  These are distributions that we derived from

15   historical records and measurements and -- and it's a

16   mathematical formulation and I wouldn't call it

17   scientific judgment at all.

18           Q    Okay.  That's a good difference then.

19   The second paragraph under routine releases, you wrote,

20   in the second-to-the-last sentence, "The greatest

21   uncertainties are for the years before 1964 and reflect

22   the correction for nonrepresentative sampling."

23               First of all, what do you mean by "the

24   greatest uncertainties"?

25           A    I need to find exactly where you're

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                      129
                        * ROUGH DRAFT *

1    reading.  You're on page 4?

2            Q    Yes.

3            A    And where are you reading?

4            Q    Second full paragraph under "Routine

5    Operations."

6          A     Okay.

7          Q     Second-to-the-last sentence.

8          A     Well, what that -- what that means is

9    that there were probably less data available prior to

10   1964, and if there are less data to work with, it's

11   quite natural that the uncertainties might be greater.

12         Q     And how much --

13         A     Okay.

14         Q     -- data did you have before 1964 that

15   you actually used?

16         A     Well, I don't -- I can't -- I can't

17   answer that question.  It's probably in this report on

18   the routine release source term.  In fact, I'm quite

19   sure it is.  And that calculation was made by

20   Mr. Voilleque, who I'm sure could answer it.

21         Q     And then you say and reflect the

22   correction for nonrepresentative sampling.  Do you know

23   what the correction was that was made for

24   nonrepresentative sampling?

25         A     I believe as an example --

CARPENTER REPORTING, INC.
(303) 752-1200

                                               130
* ROUGH DRAFT *

1          Q     No.  I want to know if you know what the

2    correction was in this calculation for

3    nonrepresentative sampling.

4          A     I'm trying to explain that.

5          Q     Okay.

6          A     As I mentioned to you before, if a

7    sampler is not in the right location in a stack, then

8    you may not be getting representative sampling for that

9    stack or the effluent coming out of that stack may be

10   going at a -- a high speed or a low speed, so you may

11   not be getting representative sampling.

12             When those biases occur, then what we do

13   is to make a correction for it.  And it's corrected

14   using uncertainty analysis.  In other words, you look

15   at how those biases could possibly affect what you're

16   actually seeing and what you're actually reading.  So

17   that's what's meant by the correction.

18             Is there a single number?  There

19   probably isn't a single value, if that's what you're

20   asking me.  It's probably the fact that we took this

21   distribution of possible answers into account so we

22   corrected for those biases.  That's -- that's the point

23   that's being made there.

24        Q    Okay.  And the last sentence -- last

25   paragraph on this page, it says, "When filter leakage

CARPENTER REPORTING, INC.
(303) 752-1200

131

* ROUGH DRAFT *

1    occurred, larger particles that were more typical of

2    the workplace aerosols would have been released."

3             Do you know what percentage of the time

4    filter leakage occurred?

5        A    No, I don't.  I don't know personally.

6    No.

7          Q    Did you look at any documents that

8     talked about the filters in the 771 building being

9     warped after the 1957 fire?

10         A    You know, I believe I did look at

11    documents of that type.  As I said, again,

12    Mr. Voilleque took the lead on our team, and I'm

13    certain that he looked at documents that took those

14    things into account.  But I believe during the process,

15    I also saw documents that took these into account.

16         Q    But you don't recall at this time?

17         A    No, I don't recall specifically.

18         Q    Okay.  Let's look at the 1957 fire.

19    Would you agree with me that your current estimate of

20    the releases from the 1957 fire are approximately 1,000

21    times higher than ChemRisk's estimates?

22         A    I think that's about right.  And there

23    again, I don't remember exactly, but I believe that's

24    probably a ballpark figure.

25         Q    Okay.  Can you tell me why your

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                    132
                      * ROUGH DRAFT *

1     estimates are now 1,000 times higher than ChemRisk's?

2          A    Well, there are probably a lot of

3     reasons why.  As I said before, in the first place,

4     ChemRisk derived their source term for the '57 fire

5     from what we call an outside-in approach, looking at

6     what was in the environment and trying to back out what

7     the source term might have been.

8          Our approach was called an inside-out

9     approach where you go into the facility, you look at

10    what was in the room in the way of plutonium, in

11    gloveboxes, exactly the location of this material, and

12    that's the approach that we followed.

13          And I would say that the approach that

14    we use was a far more methodical way to estimate the

15    source term for the '57 fire.  And this was done over a

16    very long period of time, several years working and I

17    know Paul Voilleque worked with in particular David

18    Albright on the Health Advisory Panel and also a number

19    of outside experts.  They looked at photographs, they

20    looked at information, reports on the fire, some of

21    course that were being released at that time as I

22    mentioned in Secretary O'Leary's release of documents.

23          So the -- the bottom line of what I'm

24    telling you is that there were two different methods

25    being used to estimate the source term.  In the first

133

* ROUGH DRAFT *

1     place, it's not unusual at all that -- that scientists

2     tackle an issue and come up with two different answers.

3     That's not unusual at all.  In the second place, we

4     went through a far more rigorous analysis of the fire

5     than ChemRisk did, and so what I would offer is that

6     it's just because of the methodological approaches that

7     are used.  That's the reason for the difference.

8          Q    Okay.  Now, you understand that ChemRisk

9     got a report published in Health Physics in 1996, it

10    appears, about the 1957 fire.  Do you remember that?

11         A    Yes.

12         Q    It was accepted in June 1st, 1996, and

13    in that, they say approximate upper bound on the

14    pollute -- total plutonium release from the fire is 1.9

15    G Becquerels, parens, 0.05 curies with an uncertainty

16    of about two orders of magnitude.  Is your estimate of

17    the releases from the 1957 fire within their upper

18    bound?

19         A    In the first place, I'd like to look at

20    that paper that you're reading from.

21         Q    Sure.

22              (Tenders document.)

23         A    (Deponent reviewing document.)

24              And then could you repeat your question,

25    please.

                CARPENTER REPORTING, INC.
                    (303) 752-1200

                                                    134
                    * ROUGH DRAFT *

1               MS. ROSELLE:  Could you read it back to

2     him, please.

3               (The referred-to question was read by

4     the reporter.)

5          A    I guess I'd say it was.  I need to look

6     at what our upper and lower bound was.  I think we had

7     24 curies for a median.  I don't recall my lower bound.

8     Upper bound, I believe, was about 33, so if they're

9   reporting -- I see.  And I may be incorrect here,

10   Ms. Roselle, because I'm misreading their statement.

11                    With an upper bound of .05 and then they

12   say with an uncertainty of about two orders of

13   magnitude.  And I assume that means a total

14   uncertainty.  If that's the case, then -- and that is

15   their uncertainty, then our source term would not be

16   within their range, no.

17          Q    And how much higher than their upper

18   bound is your source term?  It's -- your source term is

19   on page 10 of your expert report.

20          A    I believe it's on the order of about 400

21   or thereabouts.

22          Q    Times higher?

23          A    Correct.  I need to make the calculation

24   just to see because the units are different.  And I'm

25   trying to do this in my head, but that's probably a

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                      135
                    * ROUGH DRAFT *

1    rough estimate.

2           Q    Okay.  I'll take my article back.

3    What -- now, with regard to the 1957 fire, there was no

4    stack monitoring; correct?

5                    MR. POLAND:  Object to the form of the

6    question.

7           A    I believe that's correct, yes.

8           Q    (BY MS. ROSELLE)  In fact, there was no

9    stack monitoring for an entire week; correct?

10         A    I -- I don't remember how long there was

11    no monitoring.  I really don't recall.

12         Q    And all of the filters were burned out;

13    correct?

14         A    And again, I don't know that all of the

15    filters were burned out.  I'd be happy to look at the

16    report done by Mr. Voilleque on the '57 fire.

17         Q    So what hard data did you have to

18    calculate your source term for the '57 fire.

19              (Helen. Grogan exits the conference

20    room.)

21         A    That's all laid out very carefully in

22    that source term report.  Okay?  I'm going to just give

23    you some examples of what I can recall, but then I may

24    just look at the report, as well, if you'd like.

25              But I believe there were quite a bit of

CARPENTER REPORTING, INC.
(303) 752-1200

136
* ROUGH DRAFT *

1    data on amounts of plutonium that were in the various

2    gloveboxes and amounts of plutonium that were in

3    different plenums and filter banks and those kinds of

4    things.  There was quite a bit of information with

5    regard to which glove box -- gloveboxes burned and how

6    much they burned.

7              With the assistance of experts in fire

8    analysis who were brought in to assist with this work,

9    some determination was able to be made about the

10    temperatures that were involved in the fire.

11          Q    (BY MS. ROSELLE)  Well, now, are those

12    calculations?

13          A    They -- they were -- they were used

14    as -- they were calculations.  In other words, for --

15    they went into the calculation, yes.

16          Q    Okay.  What I want to know is what hard

17    data you had.  Not stuff you calculated, but stuff that

18    actually existed that you used.  I mean, I can

19    understand the amount of plutonium in the glovebox, but

20    you didn't know the actual temperatures.  There were no

21    records of the temperatures, were there?

22          A    I don't believe there were records of

23    the temperatures, but this is a part of the scientific

24    process, and I would say that is hard data.  When you

25    bring in an expert who understands the type of fire

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    137

                      * ROUGH DRAFT *

1     that occurred in these gloveboxes and can give you some

2     range of what the temperatures were, that's hard data.

3          Q    If you want to call it hard data, we'll

4     call it hard data.

5          A    I would also say that -- that there were

6     environmental data afterwards, after the fire, that

7     helped to put some reasonableness to the amounts of

8     plutonium that could have been released.  So -- but in

9     terms of the generation of the source term in the 90 --

10      in the -- in the 1957 fire report, those are some

11      examples of things.  There are many more that go into

12      this calculation.

13              Q    Okay.  And what amount of the plutonium

14      in the gloveboxes was assumed to go up into the

15      atmosphere?

16                  MR. POLAND:  Object to the form of the

17      question.

18              A    Well, that's called the release

19      fraction.  I don't know that number off the top of my

20      head.  That was certainly taken into account in the

21      report.  I don't know that.  It's in the document.

22              Q    (BY MS. ROSELLE)  And how was it

23      determined?

24              A    Again, it was determined using the

25      pieces of information that you have, such as

                    CARPENTER REPORTING, INC.
                      (303) 752-1200

                                                    138
                       * ROUGH DRAFT *

1       temperature, amount of material, looking at the

2       photographs that were taken after the fire.  All of

3       those were used to come up with a release fraction of

4       material.

5               Q    But that's -- that's an assumption.  The

6       release fraction is an assumption that was made by RAC;

7       correct?

8                   MR. POLAND:  Object to the form of the

9       question.  Mischaracterizes the testimony.

10              A    I don't agree.  I mean, it's -- you may

11        call it an assumption, but, to me, when you're bringing

12        in experts that are providing bounds and some kind of a

13        value, that's hard data.  Because you've got the

14        opinion of a number of different people and I think

15        that's just as good of data as -- as most any other

16        kind of data.

17                Q    (BY MS. ROSELLE)  How did you make the

18        decision to model every 15 minutes?

19                A    I'm not sure.  I don't -- I don't

20        remember why every 15 minutes.  Mr. Voilleque could

21        probably answer that question quite readily.  I suspect

22        part of it had to do with making sure that we were

23        working at a level of thoroughness because things were

24        happening so fast.

25                    I believe that the -- well, I think

                        CARPENTER REPORTING, INC.
                          (303) 752-1200

                                                        139
                        * ROUGH DRAFT *

1        that's probably one big reason was just to make sure

2        because things were so change -- changing so fast over

3        that period of time that you want to model it, in small

4        enough increments to make sure that you're taking into

5        account everything that's going on.

6                Q    What did you use for wind data for your

7        model?

8                    MR. POLAND:  Are you asking specifically

9        for the '57 fire?

10                    MS. ROSELLE:  Uh-huh.

11          A    For the 1957 fire, if I remember

12   correctly, we found some wind data and it's -- I

13   believe the gentleman's name was Clere, C-l-e-r-e.  I'm

14   not exactly sure who provided meteorological data that

15   applied to Rocky Flats for that period of time.  And it

16   would be in the -- in the risk assessment report for

17   the 1957 fire if you want me to look up that reference.

18          Q    (BY MS. ROSELLE)  Who is Mr. Clere?

19          A    I need to look up the reference and then

20   I can provide it to you.  I don't recall, and I don't

21   know who he is.

22          Q    Well, we can look it up.  We'll move on.

23               MR. POLAND:  Could we take five minutes,

24   please?

25               MS. ROSELLE:  Sure.

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                               140
                    * ROUGH DRAFT *

1                THE VIDEO OPERATOR:  We are going off

2   the record at 3:56.

3                (There was a recess taken from 3:56 p.m.

4   to 4:05 p.m.)

5                THE VIDEO OPERATOR:  We are back on the

6   record at 4:05.

7          Q    (BY MS. ROSELLE)  On page 6 of your

8   expert report, I'd like to direct your attention to the

9   last paragraph under the 1957 fire.  Okay.  You say,

10   "the size of the plutonium particles released during

11   the fire is not known.  It was assumed that all the

12   activity released was respirable and could have ranged

13   from some micron up to 10-micron AMAD.  For this

14   reason, particle size was treated as a distribution and

15   handled stochastically in the transport calculations."

16             Okay.  Can you tell me what assumptions

17   were made in use -- in handling the particle size

18   stochastically in the transport calculations?

19             A    Well, I believe -- and again, I'd have

20   to look at these reports -- that instead of assuming

21   that a particle is simply one size, you assume that it

22   has a distribution of possible sizes, and you sample

23   from that distribution of particle sizes as this

24   material is being transported through the environment.

25             Q    Well, for example, what percentage did

                                                    141
                    * ROUGH DRAFT *

1    you assume were less than 1 micron?

2              A    I don't know off the top of my head.

3    It's in our reports.  I'm certain that it would be.

4              Q    Somewhere?

5              A    I'm sorry?

6              Q    I said somewhere?

7              A    I feel quite sure it would be in the

8    report somewhere, yes, but specifically in either the

9    1957 fire risk analysis, possibly the comprehensive

10   risk assessment, in one of those, yes.

11             Q    Did you have a different calculation of

12    the source term from the 1957 fire in an earlier RAC

13    report?

14            A    I think that's correct.  I think we went

15    through and initially cut of the 1957 fire earlier on

16    in the study and we produced a draft report.  I believe

17    that's correct.

18            Q    And how much did your source term

19    increase between your draft report and your final

20    report for the 1957 fire?

21            A    I really don't remember how much it

22    increased.  I believe it increased quite a bit, yes.

23            Q    What were the differences in the

24    assumptions or calculations that you made in the draft

25    report compared to the final report?

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                        142
                        * ROUGH DRAFT *

1            A    Well, I'd have to look at the draft

2    report to see.  I -- I don't recall.  I'm going to -- I

3    believe that what we did was to just pursue this more

4    rigorously along with the Health Advisory Panel.  I

5    know that a special committee was put together on the

6    let advisory panel to help guide the -- in particular

7    the 1957 fire analysis.  Some outside experts were

8    brought in who specialized in fires of this type.

9            Those are the kinds of things that I

10   believe went into -- well, I know went into the final

11   report, and those may not have all been taken into

12   account in the earlier report.

13          The fact that an earlier report was

14     issued, I mean, this is normal science.  We were

15     probably investigating the 1957 fire and just one thing

16     led to another.  Perhaps we found more information.

17     I'm not sure why.  But, for whatever reason, the

18     analysis that we came up with and the methodology gave

19     a larger answer.  I don't know why.

20          Q    Okay.  On page 6 in the first full

21     paragraph, it says, "A number of factors and their

22     uncertainties were taken into account in RAC's analysis

23     of the fire."

24          Can you list for me what the factors

25     were and what their uncertainties were?  Or is it the

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                              143
                    * ROUGH DRAFT *

1      stuff that's listed in the rest of the paragraph?

2          A    Well, I think it certainly includes

3      what's listed in the rest of the paragraph, but there

4      are other uncertainties.  I mean, I don't know, again,

5      off the top of my head, what those factors were and

6      what their distributions were that we assumed.  I

7      mentioned release fraction being one.  Okay.  But

8      that's just an example, but a number of other ones were

9      included.  I don't know what they were off the top of

10     my head, no.

11          Q    Okay.  Now, I'm going to ask a question

12     that's not going to be very artful because I don't know

13    how to phrase this.  But every step of the way, from

14    the source term up to the risk, there are assumptions

15    and estimates that are made and each of those

16    assumptions has an uncertainty with it.  How were all

17    of those uncertainties at each step reconciled to come

18    to the final range of uncertainty that you used for the

19    risk calculation?

20              MR. POLAND:  I'm going to object to the

21    form of the question.  Assumes facts not in evidence.

22         A    Well, this is what comprehensive

23    uncertainty analysis is all about.  That you

24    investigate the source term, you report a source term

25    as a possible distribution that takes into account all

CARPENTER REPORTING, INC.
(303) 752-1200

144

* ROUGH DRAFT *

1    of these uncertainties.  You look at the transport of

2    that material.  Atmospheric dispersion of that

3    material, for example.  And take into account the

4    possible distribution of all of the parameters that go

5    into that calculation of dispersion.  And even if this

6    work, model uncertainty, which is another -- another

7    factor we incorporated into the atmospheric dispersion.

8    So what you do in the end, you go through and you

9    sample in a very methodical way from these

10   distributions to come up with your final distribution

11   of risk.

12              Q    (BY MS. ROSELLE)  But if you made a

13   mistake in the source term, say, such as ChemRisk did

14     or a different analysis, however you want to describe

15     what they did in their 1996 Health Physics article,

16     that's not going to accurately give the range of

17     uncertainty at the -- for the risk at the end because

18     they were so far off on their source term?

19             A     In the first place --

20                   MR. POLAND:  Object -- wait, John.  I'm

21     going to object to the form of the question.  You can

22     answer.

23             A     Your characterization of "far off," I

24     wouldn't agree with.  I mean, it certainly depends on

25     what we're talking about.  In some cases, their source

CARPENTER REPORTING, INC.
(303) 752-1200

145

* ROUGH DRAFT *

1      term was larger than our source term and in some cases,

2      they were pretty close, a factor of 3 I mentioned for

3      routine releases, so, to me, this is what uncertainty

4      is all about.

5             It is allowing for the fact that you can

6      be off, that you don't have every bit of data that you

7      need.  That there may be gaps in the data, and so what

8      you do when you are establishing your values and your

9      distribution is to take into account these unknowns.

10     So --

11             Q     (BY MS. ROSELLE)  Well, if we look at

12     page 28 of your report, can you tell me exactly how the

13     uncertainty bounds or the confidence interval for each

14    of these risks was determined?  Was it a -- was it a

15    mathematical model that you used, or was it something

16    that you did yourself where you evaluated the

17    uncertainty, or what?

18            A    These uncertainties are mathematical

19    calculations.  It's not judgment.  These are

20    calculations that are made all the way through the

21    course of from the source term to the estimate of risk,

22    taking into account the hundreds of parameters that go

23    into that calculation and the possible distributions of

24    those parameters.  These calculations were made the

25    same way.  These are mathematical uncertainties.

CARPENTER REPORTING, INC.
(303) 752-1200

146

* ROUGH DRAFT *

1             Q    Were these done using a computer

2    software program?

3             A    Yes.

4             Q    What program?

5             A    These were done using methods that were

6    developed throughout the course of the study, software

7    that was developed throughout the course of the study

8    by Mr. Rood, and the Health Advisory Panel and the

9    other members -- everybody who contributed to this

10    study.  But they were use -- using software developed

11    primarily for this study.

12            Q    So it was proprietary software?

13            A    No.  Absolutely not.  Every bit of this

14    information was available to anybody who wanted it.

15          Q     But is the software available?

16          A     There are -- yes.  The software is

17    available.  For example, the mathematical model that

18    was used for dispersion of material --

19          Q     Okay.  Wait.  I'm just talking about the

20    one that was used on page 28 for the risks.  That's all

21    I'm asking right now.  What software did you use on

22    page 28 to calculate the uncertainty bounds in the

23    risk?

24          A     This is -- there is no one software.

25    There are many pieces of software that go into this

CARPENTER REPORTING, INC.
(303) 752-1200

147

* ROUGH DRAFT *

1    calculation of risk that's put into the model of the

2    calculation.  None of the software is proprietary.

3    It's all available to anyone who wanted it.  I was

4    going to give you an example of the dispersion software

5    being RATCHET, which is available to anyone who wants

6    it, dispersion modeling.

7               The mathematical -- mathematical method

8    for uncertainty analysis, Monte Carlo, is simply a

9    computer simulation that you can buy it if you want it.

10   There's software called -- it's available from a

11   company here in Denver, but there are many other soft

12   wear packages that allow you to do Monte Carlo

13   calculations.  It's available to anyone who wants it.

14          Q     Okay.  So what did Mr. Rood do?  You

15    said he had -- he had developed some software here.

16              A    What Mr. Rood did was to assemble the

17    different pieces, okay, so that you go through this,

18    take this information on the source term and the

19    distributions from the source term, you take that

20    material and you transport it in the atmosphere, you

21    compute the uncertainties associated with this, you

22    take exposure factors for the different scenarios that

23    we -- for which we calculated risk, you take the dose

24    and risk coefficients and come up with an estimate of

25    risk.  He put that into the package.  And all of this

CARPENTER REPORTING, INC.
(303) 752-1200

148

* ROUGH DRAFT *

1    software was turned over to Colorado Department of

2    Public Health and Environment.

3              Q    With regard to the 1969 fire, what

4    assumptions did you make in doing your source term

5    calculations?

6              A    Well, again, all the information is in

7    the report, and I don't know how -- what kind of

8    assumptions were made.  We worked with a lot of data

9    that were available related to releases from the stack.

10   The events of the fire.

11              In the case of the 1969 fire, there were

12   better data available on stack releases, actual

13   measurements that were available and information

14   available on measurements of plutonium in the

15   environment.  There was meteorological data available.

16      So there were a number of kinds of data that we had

17      that went into this calculation.

18              Q     And was the meteorologic data for that

19      day?

20              A     I want to look at that report, but I

21      believe that that's correct.  It was for the day.  And

22      I need to check the report to be sure.

23              Q     Do you have it there?

24              MR. POLAND:  Dave, do you know which

25      number it is?

* ROUGH DRAFT *

1               THE DEPONENT:  The best report would be

2       the report on the risk analysis from the 1969 fire.

3       I'm looking at the comprehensive risk report just to

4       see if it's here.

5               MS. ROSELLE:  We're on '69.

6               MR. SORENSEN:  I will look for it.

7               MR. POLAND:  Here.  I think this is it.

8       This is the '69 fire.  This is the estimated airborne

9       releases of plutonium during the 1969 fire.  That's the

10      source terms.

11              THE DEPONENT:  No.

12              MR. SORENSEN:  Look at 1076.

13              MR. POLAND:  That would be this one

14      right here.

15              MR. SORENSEN:  Is that it?  Is that the

16    right one?

17              THE DEPONENT:  I think so.

18              MR. SORENSEN:  That's 1076.

19         A    I'm looking on page 12 of the Final

20    Report, Estimated Exposure and Lifetime Cancer

21    Incidence Risk from Plutonium Released From the 1969

22    Fire at the Rocky Flats Plant.  And let's see.  This

23    is -- I saw something else a minute ago, but I'll read

24    this:  "Meteorological data from the RFP during the

25    fire were reported every 15 minutes."  It also talks

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                        150
                        * ROUGH DRAFT *

1    about there being data available at Stapleton airport,

2    which we recognize wouldn't be exactly the same.  But

3    it does say there were hourly release -- hourly

4    meteorological data that were used in the calculation.

5         Q    (BY MS. ROSELLE)  Do you know what

6    assumptions were made in the calculation with regard to

7    the source term for the 1969 fire?

8              MR. POLAND:  Object to the form of the

9    question.  And asked and answered.

10        A    As I said before, I don't know off --

11    offhand what assumptions went into this calculation, if

12    any.  I mean, we certainly had more data for the 1969

13    fire, as I mentioned earlier.  I don't know, without

14    going through the report -- the source term report

15    thoroughly what kind of assumptions, if any, were made.

16        Q    (BY MS. ROSELLE)  Let's go to the 903

17   pad.  Why did you only look at releases between '64

18   and -- I guess it was '68 or '69 for the 903 pad?

19              MR. POLAND:  Could you read the question

20   back, please.

21              (The referred-to question was read by

22   the reporter.)

23              MR. POLAND:  Objection.  Assumes facts

24   not in evidence.

25         A    I don't know that that's the case.  I'd

                CARPENTER REPORTING, INC.
                     (303) 752-1200

                                                    151
                   * ROUGH DRAFT *

1    need to look at the report.  What we may have

2    calculated and reported in that report were for a short

3    period of time, but -- can you show me where you're

4    reading.

5         Q    (BY MS. ROSELLE)  I have it -- if you

6    turn to page 8 of your report, for example.  You have a

7    Table 3 of the 903 area continuous release estimates

8    that goes from '64 to '69.  But it is true.  I don't

9    know.  Maybe you did some calculations for the years

10   before that that just aren't on that -- that weren't

11   continuous.  I don't know.

12             A    I don't recall.  There were -- there

13   was -- there were two -- two reports related to the

14   source term for the 903 area.  Very thorough reports.

15   One was a characterization of that facility, and I

16   don't recall how far back that report went.  Certainly,

17        if we only included the period between 1964 and 1969,

18        it would be -- be because that was the period that any

19        significant releases would have occurred.

20                Q     Well, what did you look at that told you

21        that?

22                A     It would be a report called the 903 area

23        characterization by Meyer and Aanenson, I believe.

24                MS. ROSELLE:  Do you have a number?

25                MR. SORENSEN:  Yeah.  1067, which should

CARPENTER REPORTING, INC.
(303) 752-1200

152
* ROUGH DRAFT *

1        be in here, but this is -- it's not in here.

2                MR. POLAND:  Is it in that one, John?

3                MR. SORENSEN:  It's a different date

4        than the other one.  I'm looking for the earlier

5        report.

6                A     There's another report -- if I don't

7        find it in here -- called the 903 area source term.

8                MS. ROSELLE:  You don't have it?

9                MR. SORENSEN:  It just looks like -- it

10       looks like it's 1067 or DX 511, the volume should have

11       1067 doesn't have it in it and I'm not sure why.

12               MS. ROSELLE:   Okay.

13               A     (Deponent reviewing document.)

14               Q     (BY MS. ROSELLE)  Why did you assume --

15               A     Excuse me, Ms. Roselle.  Do you want me

16       to look at this or not?

17               Q     Yeah.  If you have an answer.

18          A     Well, I'm trying to find one.

19          Q     Oh, okay.

20                MR. POLAND:  I've got a copy of the

21    source term report here.

22                MR. SORENSEN:  I think that's the same

23    as that one.

24                MR. POLAND:  This is the source term.

25    This isn't the characterization one.

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                              153
                        * ROUGH DRAFT *

1                 MR. SORENSEN:  Oh, I see.

2                 MR. POLAND:  Were you looking for the

3     characterization or the source term?  Because I've got

4     the characterization, but it's not an entire one.

5                 MR. SORENSEN:  Right.

6           A     Well, I found one -- one statement

7     that's probably not the answer to your question, but it

8     does point out --

9                 MR. SORENSEN:  See if I can find this.

10          A     -- that the median release estimate of

11    plutonium from the 903 area for high-wind periods

12    during which the source was open and available for

13    particle suspension activity, the reported source term

14    is 3.1 curies with 5th and 95th percentile values of

15    the distribution of 1.4 and 15 respectively.  These

16    results indicated -- I won't go on, but what this

17    points out, it says that the source was open and

18    available for particle suspension.

19               And I mean, I'll look through here if

20    you want, but these are -- it's just an incredibly

21    comprehensive analysis of that particular source area

22    from the beginning to the first barrels being put there

23    to the end.

24               Q    (BY MS. ROSELLE)  And all I asked is

25    what did you do with the -- the stuff before '64.  Did

CARPENTER REPORTING, INC.
(303) 752-1200

154

* ROUGH DRAFT *

1    you include it in your source term?

2               MR. SORENSEN:  Can I look very briefly

3    at the front of this page.  Yeah.  This is the same

4    thing.  It's the same thing.

5               MR. POLAND:  It's the same thing.

6               MR. SORENSEN:  Yeah.  There's an earlier

7    date that I can't find.  Thank you.

8               A    The answer is I don't believe it was

9    included in the source term, but we certainly

10   considered it --

11              Q    (BY MS. ROSELLE)  Okay.  Then tell me

12   why.

13              A    -- in the calculation of the source

14   term.

15              Q    Then tell me why.

16              A    I'm sorry.

17              Q    Why was it not included in the source

18   term, the years before '64?

19          A    Well, again, I mean, I'm just telling

20   you what I'm reading in this report, that it --

21          Q    If you don't know --

22          A    We made the statement that prior to that

23   period, that the source would not have been open and

24   available for suspended material, so, most likely, that

25   was our rationale for doing that, yes.

CARPENTER REPORTING, INC.
(303) 752-1200

155

* ROUGH DRAFT *

1          Q    Well, how open and available was it in

2    1964?

3          A    Well, I'll look at the report.  Okay?

4          Q    I guess what I'm trying to ask you is

5    what's the difference between '63 and '64?

6          A    Yes, ma'am, I understand the question.

7          Q    Okay.  As long as you understand.  Yeah.

8          A    And -- and I'm saying that evidently, we

9    went through some methodological thinking as to what

10   was going on prior to and after 1964, and we made some

11   calculations that showed us it was not worth putting

12   into the source term.  I assume that's in this report

13   and I'll take a look for it.

14               (Deponent reviewing document.)

15               If you look at the chronology of events,

16   I'm looking at page Roman numeral 2-4, this is just

17   placed as a chronology, 7-1964, first evidence of

18   large-scale deterioration of drums.  Drums were packed

19    tightly in the 903 area making inspection of the

20    interior drums impossible.  So I assume that based on

21    these data, there would have been less of a probability

22    of anything being released during that period of time.

23            Q    Where did you get the data of the high

24    winds during the winter of 1968-69?

25            A    One of the things we did in this study

CARPENTER REPORTING, INC.
(303) 752-1200

156

* ROUGH DRAFT *

1    was to vigorously look for information that might not

2    have been found or was not found at Rocky Flats or

3    especially meteorological data that I'm talking about

4    or someplace like Stapleton airport where the data

5    didn't fit exactly for Rocky Flats.  And so we found

6    information at several sources.  Of course, there was

7    information at Rocky Flats in the assayed sampler gave

8    some indication of high-wind events, but we went to the

9    Jefferson County Airport and we found data from there.

10   We went to NCAR, NCAR, which is National Center for

11   Atmospheric Research, which is close by, that we found

12   some tremendous information, meteorological data, very

13   specific, very detailed kind of information that we

14   needed for the reconstruction of the high-wind events.

15            Most of that data was available on -- I

16   believe it was all available on strip charts that we

17   took and digitized so that we could use in the analysis

18   so that we had specific numbers to put in the

19   calculation.  As I mentioned, Stapleton airport, I

20    think those were the key sources.

21             Q    Did you combine them, or did you use any

22    specific set of data?

23             MR. POLAND:  Excuse me.  Can we go off

24    the record for just a second?

25             MS. ROSELLE:  Uh-huh.

                   CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    157
                        * ROUGH DRAFT *

1             THE VIDEO OPERATOR:  We are going off

2     the record at 4:37.

3             (There was a recess taken from 4:37 p.m.

4     to 4:44 p.m.)

5             THE VIDEO OPERATOR:  We are back on the

6     record at 4:43.

7             Q    (BY MS. ROSELLE) Dr. Till, with regard

8     to the routine releases, do you agree that through the

9     end of Rockwell's tenure in 1989, there continued to be

10    routine releases from Rocky Flats?

11            A    I believe that there were routine

12    releases up until 1989, into the atmosphere.  And no

13    those releases decreased substantially over the period

14    of that last decade, yes.

15            Q    Were they larger during the 1980s?

16            MR. POLAND:  Object to the form of the

17    question.

18            Q    (BY MS. ROSELLE) I'm sorry.  During the

19    1970s.

20          A    Well, you know, I think that's the case,

21    but we've got this all laid out and I'll look at the

22    report if you want me to to quantify it.

23          Q    And which report would that be?

24          A    That would be the report on the routine

25    releases, I believe.  The source term report.

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    158
                        * ROUGH DRAFT *

 1          Q    Okay.

 2          A    Perhaps in the comprehensive risk

 3    assessment, if I still have that, it may be reported.

 4    There is a graphic, I believe.

 5          Q    Well, we can find it if we know which

 6    report to look in.

 7                MR. POLAND:  Did you want the

 8    comprehensive, or did you want a different one?

 9          A    I need the routine release report, most

10    likely.

11                MR. SORENSEN:  That's 1070.

12                MR. POLAND:  1071?

13                MR. SORENSEN:  Show him this one.  I

14    think it's this one, 1070.  Excuse me, sir.  Is that

15    what you're referring to?

16          A    Yes.

17                MR. SORENSEN:  That's 1070.

18          A    The fact is that they wouldn't have been

19    much larger during the 1970s.  About the same.

20          Q    (BY MS. ROSELLE)  But there continued to

21    be releases during both the seventies and the eighties;

22    correct?

23         A    Yes.

24         Q    Okay.  And there also were releases to

25    the surface water from Rocky Flats during the Rockwell

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                       159
                      * ROUGH DRAFT *

1    era?

2         A    Releases to surface water --

3              MR. POLAND:  Object --

4         Q    (BY MS. ROSELLE)  of radioactive

5    materials.

6              MR. POLAND:  Object to the form of the

7    question.

8         A    Quite honestly, I don't know that those

9    releases to surface water occurred all over -- over all

10   that time.  I don't know that that's correct.

11        Q    (BY MS. ROSELLE)  Okay.  Did you prepare

12   or -- I don't know what the right word would be -- an

13   individual risk calculator to determine individual

14   risks for people in Colorado?

15        A    Yes.

16        Q    Okay.  And tell me about that.  What

17   exactly was it?

18        A    The goal was to take the information

19   from the historical public exposures study and develop

20   some computer interfaces that could be used so that if

21     a person wanted to -- to get some idea, some idea of

22     risk, a sense of what risk might have been, that they

23     could use this risk calculator for -- for some estimate

24     of that type.

25              Q     Have you ever used it to calculate

                   CARPENTER REPORTING, INC.
                      (303) 752-1200

                                                    160
                        * ROUGH DRAFT *

1     anyone's risk?

2              A     Have I ever used it to calculate -- not

3     any person's risk, no.  Have I used the risk calculator

4     or did I use it at the time, yes.

5              Q     You never calculated a risk for a real

6     person using it?

7              A     I didn't, no.

8              Q     Okay.  Do you know what the State of

9     Colorado did with it after you gave it to them?

10             A     No, I don't.

11             Q     Okay.  How far away from Rocky Flats

12    would it calculate risks for?

13             A     It would calculate a risk -- I don't

14    know the distances without -- I'll look at the map in a

15    minute.  Anywhere in the model domain that was used for

16    the public exposures study.  Let me see if I can find a

17    distance for you.

18                   (Deponent reviewing document.)

19                   Out to about 25 or 30 kilometers.

20             Q     So about 14 miles?

21             A     Something like that.

22          Q    Does each inhalation of plutonium by an

23    off-site resident result in an increase in risk?

24              MR. POLAND:  Can you repeat that

25    question again?  Read it back.

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    161
                      * ROUGH DRAFT *

 1              (The referred-to question was read by

 2    the reporter.)

 3          A    I would say that one could calculate --

 4    one could calculate a hypothetical risk from any amount

 5    of plutonium.  Does that mean that this risk is

 6    manifested in this individual, of course not.  Because

 7    that's what risk is about.  You calculate a risk, for

 8    example, of one in a million.  It means in order for

 9    that to be manifested or for you -- for it to ever be

10    seen, you'd need a million people exposed at that level

11    of risk to have a chance for that incidence of cancer

12    to occur.

13          Q    (BY MS. ROSELLE)  But if one person

14    inhales plutonium, and that person develops lung

15    cancer, there's no way to tell whether that lung cancer

16    was caused by the plutonium they inhaled or not;

17    correct?

18          A    Correct.

19          Q    So one of the things that you can do is

20    look at epi studies; correct?

21          A    You can look at epi studies for -- are

22    you referring specifically to Rocky Flats or --

23          Q    To cancer.

24          A    Epidemiological studies can be used,

25    yes.

CARPENTER REPORTING, INC.
(303) 752-1200

162

* ROUGH DRAFT *

1          Q    And as part of your study a Rocky Flats,

2    you didn't do any epi study, did you?

3               MR. POLAND:  Object to the form.  Didn't

4    perform an epi study?

5               MS. ROSELLE:  Yes.

6          A    That's correct.  We didn't perform an

7    epidemiological study.  The work was -- the results of

8    the study were reviewed by the Health Advisory Panel

9    and the decision was made and the conclusion was made

10    because of the results that an epidemiological study

11    wasn't -- wasn't warranted, but, certainly, we did not

12    perform one.

13          Q    (BY MS. ROSELLE)  Okay.  And that's at

14    page 31 of your report, the very last sentence, based

15    on the estimated exposures and risks reported in these

16    findings, further epidemiologic studies of the exposed

17    population do not appear to be justified or

18    warranted -- justifiable or warranted.  Correct?

19    That's what you wrote?

20          A    That's correct.

21          Q    Okay.  What -- why did you use the word

22    "further"?  What past epidemiologic studies had been

23    done?

24         A    Well, it may be some poor English on my

25    part.  I don't know why I used the word "further."

CARPENTER REPORTING, INC.<br>(303) 752-1200

163

* ROUGH DRAFT *

1    Certainly, we weren't conducting an epidemiological

2    study, and that could certainly be misleading that

3    perhaps we were or we did conduct an epidemiological

4    study.

5         Q    Okay.  And the reason that you didn't

6    think it was warranted was because you would need such

7    a large population in order to see an increase in lung

8    cancer based on the risk estimates that you prepared;

9    is that right?

10         MR. POLAND:  Object to the form of the

11    question.

12         A    Well, I'll admit that I should have been

13    more clear in making that statement, that this

14    statement refers to a consensus and a decision by the

15    health advisory panel and not my own.  And I'm just

16    conveying that here.

17         Q   (BY MS. ROSELLE)  Okay.  What was the

18    reason that the Health Advisory Panel did not think

19    that epidemiologic studies were justifiable or

20    warranted?

21         A    Well, I think you need to ask the Health

22    Advisory Panel and look at the transcripts.  I would

23    assume that it's because of the level of risk that were

24    estimated in our study, but I think you need to look at

25    the transcripts of the Health Advisory Panel meetings

CARPENTER REPORTING, INC.
(303) 752-1200

164

* ROUGH DRAFT *

1     to see how they came to that decision.

2            Q    Okay.  But this still remains your

3     report?  Okay?  If the report's in error and it should

4     say based on this that the Health Advisory Panel

5     decided that epidemiologic studies do not appear

6     justifiable or warranted, just tell me and we'll make

7     the change to the report.  Or if this is your opinion

8     that you're stating, so tell me.

9            A    Well, it's both.  It was a decision made

10    by the Health Advisory Panel and I concur with that

11    decision, so I wouldn't have a problem with that

12    sentence being there.

13           Q    Okay.  And what is the basis of your

14    personal concurrence with that statement?

15           A    Because of the level of risk involved in

16    the results that we found.

17           Q    Is that because you would have to do a

18    study of so many people if you wanted to try to find if

19    there was an increased lung cancer incidence?

20           A    No.  That's not the reason.  It's the

21    level of risk.  It's not the number of people involved.

22    It's the level of risk.  Because you still wouldn't

23    see -- if you had 100 million people, I mean, it's --

24      it's -- it's not the --

25                  Q     Is it that the study wouldn't have

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    165

                        * ROUGH DRAFT *

1       adequate power?

2                   A     Well, I'll make it clear I'm not an

3       epidemiologist, okay, but with our work, we have

4       interacted with epidemiologists.  To say that I'm

5       qualified to make that decision on my own, as an

6       epidemiologist, I'm not but based on the experience

7       I've had and looking at levels of risk and based on the

8       discussions of the Health Advisory Panel, and I

9       concurred with those -- I put that statement in and I

10      still believe that's a solid statement.

11                  Q     But I just want to know -- I mean, I

12      understand you're saying it's based on the level of

13      risk.  But I'm asking you what about the level of risk

14      makes an epidemiologic study neither justifiable or

15      warranted?  Is it that you need so many people that the

16      increased number of diseases you'd find would be small,

17      or is it that your -- your study wouldn't have adequate

18      power?  Or is it all of those?

19                  A     It's really all of those.  I mean,

20      basically, having more people doesn't solve the problem

21      of the level of risk being so small -- excuse me --

22      that you couldn't discern disease at a level of one in

23      a million in a population.  You'd never see it.

24          Q    So that's --

25          A    All of the --

CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    166
                        * ROUGH DRAFT *

1           Q    -- the power?

2           A    I'm sorry.  With the other natural

3    incidence of cancer and other factors, environmental

4    factors and -- and environmental factors that might

5    cause cancer, you wouldn't see it.

6           Q    Did anyone do any statistical analyses

7    to see what the power of the study would be, or did you

8    guys just come to this conclusion and let it be?

9               MR. POLAND:  Object to the form of the

10   question.

11          A    Well, when you say you guys, you're

12   referring to the Health Advisory Panel.

13          Q    (BY MS. ROSELLE)  Yeah.

14          A    And not to --

15          Q    And you.

16          A    We did not make any calculations on my

17   team, no.  Did the Health Advisory Panel make

18   calculations, I really don't know if they did or not.

19          Q    What's the increased risk to the

20   American population from worldwide fallout?

21          A    I've never made that calculation.  I

22   don't know what it would be.

23          Q    Do you agree that worldwide fallout has

24   caused cases of cancer?

25          A    I'm not sure I agree that it has caused

                 CARPENTER REPORTING, INC.
                      (303) 752-1200

                                                    167
                      * ROUGH DRAFT *

1    cases of cancer.  I mean, I'll agree as I said before

2    that you can make this calculation which we do all the

3    way down to atom level and to zero and we make some

4    assumption that there is an incidence even down at

5    these very low levels.  Would I agree that worldwide

6    fallout makes a contribution to that?  Hypothetically,

7    you can make that calculation.  Yes.  You can make the

8    calculation.  It's a hypothetical calculation and I

9    don't know what that level of risk would be.

10          Q    And in the inhalation from plutonium

11   doses and risks at Rocky Flats, those were risks in

12   addition to whatever risks people would have from

13   background radiation and worldwide fallout; correct?

14          A    Yes.

15          Q    You never did a calculation taking

16   together -- taking all three of those -- worldwide

17   fallout, natural background radiation, and Rocky

18   Flats -- to see what the increased risk was to the

19   people around Rocky Flats; correct?

20               MR. POLAND:  Object to the form of the.

21          A    I don't know that we didn't.  I don't

22   recall what it would be.  But I don't recall making

23   that calculation.

24          Q    (BY MS. ROSELLE)  And can you tell me

25    for your risk calculations, did you assume a linear

CARPENTER REPORTING, INC.
(303) 752-1200

168

* ROUGH DRAFT *

 1    node dose threshold model?

 2            A    Yes, we did.

 3            Q    And that was your judgment that that was

 4    the best model to use in this case?

 5            A    Yes.  When we looked at the interaction

 6    of very low levels of dose and the different theories

 7    available, whether or not there might be a threshold of

 8    dose and not a threshold of dose.  And the Health

 9    Advisory Panel, working together with us, made the

10    decision that an LNT hypothesis was prudent,

11    conservative, and that's what we did.

12            Q    And you concurred with that?

13            A    Yes.  I did.

14            Q    Okay.  Let's go on to the dispersion

15    models.  You chose to use a RATCHET model; correct?

16            A    Yes.

17            Q    Okay.  And you would agree with me that

18    RATCHET is a model that was developed specifically for

19    Hanford?

20            A    No.  It wasn't developed specific had I

21    for Hanford.

22            Q    Well, what's --

23            A    RATCHET was a model that was developed

24    by personnel at Battelle Northwest.  But it's a model,

25    a wind field model that could be applied to any

CARPENTER REPORTING, INC.
(303) 752-1200

169

* ROUGH DRAFT *

1    location, if you have the information to use it.

2            Q    Okay.  What do -- what does the acronym

3    stand for?

4            A    Oh, you've -- I'm not sure I can

5    remember this without -- without looking at it.

6    Radioactive -- I'll look it up.  I would rather not

7    guess.  But I'll look.  It would be -- it might be in

8    this comprehensive risk report.

9                  (Deponent reviewing document.)

10                 The acronym stands for Regional

11   Atmospheric Transport Code for Hanford Emission

12   Tracking.

13           Q    Okay.  Now, can we agree that RATCHET

14   was a model developed specifically for Hanford?

15           A    No, ma'am.  I don't agree with that.

16   RATCHET was a model developed by individuals at Hanford

17   and a model is a mathematical structure -- because it

18   was named after the Hanford facility doesn't mean that

19   you cannot take RATCHET and apply it to any other

20   location.  If you have site-specific data to put into

21   that model.

22                 RATCHET is nothing more than a series of

23   algorithms, okay, that was originally developed

24   because -- to try to improve the meteorological

25   dispersion when you have wind field data, and we had

CARPENTER REPORTING, INC.
(303) 752-1200

170

* ROUGH DRAFT *

1    wind field data here at Rocky Flats.  Anyplace that you

2    have appropriate information that will go into the

3    model, it can be used at that site.

4            Q    But it was developed for Hanford, wasn't

5    it?

6                 MR. POLAND:  Objection.  Asked and

7    answered.

8            Q    (BY MS. ROSELLE)  I'm not saying you

9    can't use it other places, but that's what it was

10   developed for; right?

11                MR. POLAND:  Objection.  Asked and

12   answered.

13           A    You know, I don't know that it was

14   developed for Hanford specifically.  Certainly, it was

15   developed by scientists at Hanford and to apply at

16   Hanford.  But does that mean -- when you say for

17   Hanford, it does not infer that that's the only

18   location that model could be applied.  So ...

19           Q    (BY MS. ROSELLE)  Okay.  And you agree

20   that it's a flat terrain model?

21           A    This gets somewhat semantics.  I don't

22   agree.  It's laid out as a flat terrain model.  The

23   fact is that Hanford -- that RATCHET, if you have the

24   wind field takes into account terrain because what

25   you're doing is taking a domain and over this domain,

CARPENTER REPORTING, INC.

(303) 752-1200

* ROUGH DRAFT *

1    you've got wind field data at different heights.  If

2    there are mountain ranges in between then -- and you're

3    using those data, then the model is taking into account

4    terrain.

5              Q    So do you deny it's a flat terrain

6    model?

7              A    I say that it takes into account terrain

8    effects.  I -- I'm not a meteorologist and a developer

9    of atmospheric dispersion models, so whether -- I

10   would -- I'm not -- frankly, I don't know that I would

11   call it a flat terrain model.

12             Q    If someone else called it a flat terrain

13   model, would you disagree with them?

14             A    If someone else called it a flat terrain

15   model, I would try to explain to them that it would

16   take terrain effects into account if you have the

17   appropriate wind field data.

18             Q    And would you agree with me that the

19   location of Hanford is different from the location at

20   Rocky Flats?

21                  MR. POLAND:  Object to the form of the

22   question.

23             A    Yes.

24             Q    (BY MS. ROSELLE)  Okay.  In what ways is

25   the low -- the area around Hanford different from Rocky

CARPENTER REPORTING, INC.
(303) 752-1200

172
* ROUGH DRAFT *

1    Flats?

2           A    You asked the question previously, was

3    it at a different location than Rocky Flats, and I said

4    yes; correct?

5           Q    Yeah.

6           A    And then you asked a second question?

7           Q    I think I asked if the terrain around

8    Rocky Flats was different from Hanford.

9           A    The terrain around Rocky Flats as you go

10   in a westerly direction is certainly different from

11   Rocky Flats.  The terrain around Rocky Flats as you go

12   east ward, which is the predominant direction of wind

13   flow or to the north or to the south is not that much

14   different from Hanford.

15          MR. SORENSEN:  I think you misspoke

16   before when you -- if you go back before that last

17   sentence, I think you said Rocky Flats when you meant

18   Hanford.  Could you read it back.  I think just to

19   check.

20          (The referred-to answer was read by the

21   reporter.)

22          Q    (BY MS. ROSELLE)  I need to correct

23   myself and thank you very much.  It's certainly

24   different from Hanford as you go in a westerly

25   direction.

CARPENTER REPORTING, INC.
(303) 752-1200

173
* ROUGH DRAFT *

1        Q     Now, you did some calculations using

2    other dispersion models, didn't you, of risk at Rocky

3    Flats?

4        A     Yes, we did.  We did a model evaluation

5    analysis in trying to find what would be the best model

6    to apply for Rocky Flats, and took some validation data

7    that were available sulfur hexafluoride that was

8    released to the environment and I'll have to look in

9    the report to find out who did this, but the material,

10   whatever it was, inert material was released to the air

11   and then monitored at a number of locations downwind at

12   different directions from the source of the release.

13   We took those data and then we essentially ran four

14   different models to try to evaluate if one model is

15   clearly better than another model because we want to

16   use the best modeling that's available in our analysis.

17   We have a report on this.

18       Q     What's the name of that report?

19       A     It would be a model validation study.

20   Atmospheric transport model validation study.

21       Q     And who on your team did this validation

22   study?

23       A     That would have been Mr. Rood and

24   several members of the Health Advisory Panel, including

25   Frank Gifford, who's an internationally known

CARPENTER REPORTING, INC.
(303) 752-1200

* ROUGH DRAFT *

1    meteorologist, who reviewed and oversaw that work.  But

2    Mr. Rood on my team specifically was the individual.

3            Q    Okay.  And was one of the models that

4    you considered CALPUFF?

5                 MR. SORENSEN:  Excuse me.

6            A    I want to look at the report and I'll

7    get you the four models.  I don't recall.

8                 MR. SORENSEN:  Is that it?

9                 THE DEPONENT:  Yes.  Thank you.

10                MR. SORENSEN:  It's 1084.  CALPUFF was

11   not one of the four models that we evaluated.

12           Q    (BY MS. ROSELLE)  But at a different

13   time, you ransom risk studies using could you puff and

14   made a report to the State of Colorado; isn't that

15   correct?

16           A    I believe we did, yes.  That's correct.

17           Q    And when you use could you puff instead

18   of RATCHET, the risk to the people off-site went up

19   considerably, didn't it?

20           A    I don't know that that's true, and that

21   wouldn't be included in this, so I don't -- I don't

22   know the answer to that question.

23           Q    You remember doing the study, though?

24           A    I remember we made some calculations

25   with CALPUFF, but I do not recall what the results

* ROUGH DRAFT *

1    were, no.

2            Q     Where could we find a copy of your

3    CALPUFF results?

4            A     I suspect the State of Colorado would

5    have them.

6            Q     Why didn't you write a report on them?

7            A     Because that was not a part of this --

8    this work that you see here through 1999.

9            Q     Okay.  What was the CALPUFF work part

10   of?

11           A     The CALPUFF work was just some follow-on

12   work to items that were left over for this, but it's

13   not -- it was after the historical dose reconstruction

14   work was completed.

15           Q     When did you do it?

16           A     Probably around 2002 or 2001.

17           Q     Why did you do it?

18           A     I'm really not sure why we did it.  It

19   may have been at the request of the Health Advisory

20   Panel as being some follow-up issues.

21           Q     Did you issue a formal report to the

22   State of Colorado?

23           A     I believe it would be a report.

24           Q     And you don't remember anything about

25   the findings?

CARPENTER REPORTING, INC.
(303) 752-1200

176

* ROUGH DRAFT *

1          A    No, I don't.

2          Q    Do you have a copy of your report in

3    your office?

4          A    I really don't know if I do or not.

5          Q    Did you get paid by the State of

6    Colorado for the work?

7          A    Yes.

8          Q    Did you concur that it was worth running

9    the CALPUFF model?

10         A    As I said, I really don't remember the

11   context in which we ran the model, what the results

12   were, was it worthwhile doing.  I really don't know if

13   it was or not.

14         Q    Okay.  Do you remember how much you were

15   paid for the work?

16         A    No, I don't.  That was probably -- I

17   mean -- there were a couple of other items in the work

18   that we did, and it might have been on the order of 3

19   or $400,000.

20         Q    Okay.  Do you recall -- I know you told

21   me you don't, but I'll see if I can refresh your

22   recollection that some of the results using the CALPUFF

23   model showed risks as high as 1 in 1,000.

24         A    No, I don't.

25         Q    Okay.  Did you prepare progress reports

                 CARPENTER REPORTING, INC.
                      (303) 752-1200

                                                    177
                      * ROUGH DRAFT *

1    to the State of Colorado on that -- on that work?

2          A    I don't remember if we had progress

3    reports or not.  No, I don't know.

4          Q    Do you remember who did the work on the

5    CALPUFF part?

6          A    That would have been Mr. Rood.

7          Q    Did you do any of it?

8          A    No.  I would not have done that.

9          Q    What is the CALPUFF model?

10          A    Well, again, not being a meteorologist,

11    it's another model, very similar to the ones that --

12    that we used here, mathematical way of predicting the

13    transport dispersion of material.  I believe it's

14    probably a more -- it might address the effects of

15    terrain in a -- in a better way than some of the other

16    models.  But aside from that, I can't tell you much

17    about it.  It's another one of these meteorological

18    models that we've used.

19          Q    When you say a meteorological model,

20    you're referring to a dispersion model?

21          A    Yes.  Something similar to RATCHET that

22    we used in the study.

23          Q    Right.  Okay.  So let's look at page 13

24    of your expert report, which is Exhibit 2.  And I'd

25    like to focus your attention on the last sentence on

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                              178

                         * ROUGH DRAFT *

1    page 13.  And it says, a five-year meteorological data

2    set from 1989 to 1993 was used to estimate annual

3    average plutonium concentration from routine

4    operational releases and continuous 903 -- excuse me --

5    areas suspension releases.  Okay.  Can you explain that

6    to me?  Are you saying you didn't use any of the

7    historic data for those two projects?

8              A    Well, as you -- as you know, there were

9    no meteorological data available early on at rocky

10   flats specific to the site.  Eventually, the site put

11   up meteorological towers so that these data,

12   site-specific data could be obtained.  And what you can

13   do for releases that are occurring continuously over

14   long periods of time, if you don't have specific data,

15   it's a very valid surrogate to take a block of time and

16   in this case five years, and that's, I believe, sort of

17   a standard period of time recognized by meteorologists

18   to give you representative data so you can take those

19   data and apply them to earlier periods of time for

20   these continuous types of releases.  And that's exactly

21   what we did.  And that's very valid meteorological

22   practice.

23             Q    What year was the meteorologic tower put

24   in at Rocky Flats?

25             A    You know, I don't know, but I'll look it

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    179
                    * ROUGH DRAFT *

1    up in one of these reports.

2              Q    Was it sometime in the seventies?

3          A    I don't know, but I'll look it up in one

4     of the reports.

5          Q    Well, it was before 1989, wasn't it?

6          A    Ms. Roselle --

7          Q    You don't know?

8          A    I really don't know.

9          Q    Okay.

10         A    I honestly don't know.

11         Q    All right.  Look it up?

12         A    I will look it up for you.

13         Q    Okay.

14         A    I need to think which report this would

15    be in.

16              I don't know when the tower was put in

17    but the data set that we used was from 1989 to 1993.

18    That was the five-year period that we used.

19         Q    Okay.  So did you come to the conclusion

20    that there was no data before 1989 that was adequate

21    for you to use to do the continuous event modeling?

22         A    Well, there certainly were other data.

23    There were data from the Denver Stapleton airport, as I

24    mentioned.  There were data that we got from the Jeffco

25    area, the Jeffco airport, okay.  And for the routine

CARPENTER REPORTING, INC.
(303) 752-1200

180

* ROUGH DRAFT *

1     releases, I really don't know how far prior to 1989,

2     what -- how far prior to 1989 we could have gone, if we

3    have could have gone earlier than that or if the towers

4    were installed in 1988.  I don't know when they were

5    installed.  Okay?

6             We -- we looked at all of the data

7    available and we felt that this five-year set of data

8    was very comprehensive and very adequate for using as

9    our input to routine releases that were going on on an

10   annual basis and for the baseline releases, that's

11   important to distinguish from the 903 area.

12        Q    Okay.  I just want to make sure I

13   understand.  Is it your position that neither Dow nor

14   Rockwell had collected between 1953 and 1988 adequate

15   meteorologic data for you to do your modeling of

16   continuous events?

17             MR. POLAND:  Object to the form of the

18   question.

19        A    Well, without reviewing the report, I'm

20   not sure I can answer that.  I assume that that's the

21   case.  That there was not adequate on-site continuous

22   meteorological data that were being collected that gave

23   us all of the parameters that we needed for our model

24   calculation for the routine releases.

25        Q    (BY MS. ROSELLE)  Okay.  And the first

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                      181
                    * ROUGH DRAFT *

1    paragraph on page 13 of your report, under atmospheric

2    dispersion and transport, you say that the RATCHET

3    model was selected based on the results of a model

4    comparison study involving five models and results of a

5    site-specific tracer study conducted in 1991.  Okay.

6    And that site-specific tracer study is this thing that

7    you referred to involving the sulfur hexafluoride?

8          A    I believe that's correct.

9          Q    Okay.

10         A    What page are you on again, please?

11         Q    Page 13 of your report.

12         A    Okay.

13         Q    And the four different models that you

14    looked at are all set forth in the model validation

15    study?

16         A    That's correct, yes.

17         Q    Okay.  Now, you say in the next

18    paragraph, atmospheric transport simulations were

19    performed differently for discrete and continuously --

20    continuous events.  For discrete events, meteorologic

21    data for the specific days of the events were obtained.

22    And that's what you were describing to me earlier,

23    these three sets of data that you had that you used?

24    Like for the '69 fire?

25         A    I believe we were talking about the 903

CARPENTER REPORTING, INC.
(303) 752-1200

182

* ROUGH DRAFT *

1    area for those discrete areas from NCAR, for example.

2    But, yes, we had specific meteorological data for the

3    1957 fire, the 903 area, and the '69 fire.

4          Q    Now, was any of that data collected by

5    Dow?

6          A    I -- I don't know in the case of the

7    1969 fire.  We -- I found for you a few minutes ago

8    that we had hourly release data, but I didn't find the

9    source of those data.

10              MS. ROSELLE:  We have to go off the

11   record so that we --

12              THE VIDEO OPERATOR:  This is the end of

13   tape 3.  We're going off the record at 5:28.

14              (There was a recess taken from 5:28 p.m.

15   to 5:30 p.m.)

16              THE VIDEO OPERATOR:  We are back on the

17   record at 5:30.  This is the beginning of videotape No.

18   4.

19          Q    (BY MS. ROSELLE)  Would you -- do you

20   recall anything about the meteorologic data that was

21   collected by Dow or Rockwell, other than what you've

22   said so far?

23          A    No, I don't -- I don't recall anything

24   specific.  Mr. Rood would be the one who would have a

25   better answer to that than me, but, no, I don't recall

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                    183
                      * ROUGH DRAFT *

1    anything else specifically.

2          Q    Okay.  Could we go, then, to page 19 of

3    your expert report, Exhibit 2.  Okay.  You have never

4    calculated a dose for any member of this class; is that

5    correct?

6              A    No.  Actually, we have calculated some

7    doses for members of this class.

8              Q    Okay.  And which people are those?

9              A    I don't know the individuals.  These

10   would have been calculated by another firm, and I don't

11   know the name of the firm that basically used the --

12   the results of the historical dose reconstruction to

13   match up the concentrations and time integrated

14   concentrations in the environment with locations and

15   times that individuals would have moved into the class

16   area.

17             Q    When was this done?

18             A    In the last month or thereabouts.

19             Q    Who did it?

20             A    I'm not sure I can recall the

21   individual's name.  I think Mr. Ken Spitze, and I don't

22   know the name of the company.

23             Q    Okay.  Tell me exactly what your role

24   was in these calculations.

25             A    Well, our role was to provide output

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                      184
                    * ROUGH DRAFT *

1    from the historical dose study on a grid basis, exactly

2    as you see, using the exactly the same machinery, using

3    the source terms used in the report, and using a

4    typical breathing rate, EPA breathing rate, and then

5     those time integrated concentrations were matched -- or

6     from that information, the information on the class

7     specifically, doses could be calculated for individuals

8     based on their location and the time they moved into

9     the area.

10         Q    And were you paid for this work?

11         A    The part of this that we did, yes, we

12     would have been paid for.

13         Q    And that would have been by Kirkland &

14     Ellis?

15         A    That's correct.

16         Q    Do you remember how much you were paid?

17         A    Probably $10,000 or thereabouts.

18         Q    Is that 10,000 part of that 25,000 that

19     you told me you had been paid for Rocky Flats earlier

20     today?

21         A    Yes.

22         Q    Okay.  Who asked you to do this work?

23         A    Mr. Poland.

24         Q    Okay.  And once you gave your

25     information to Mr. Spitze, what did he do with it?

CARPENTER REPORTING, INC.
(303) 752-1200

185

* ROUGH DRAFT *

1         A    Well, as I said, he took the information

2     we provided him, matched it up with individuals in the

3     class, locations, time they moved into the area,

4     calculated -- and calculated doses with it.

5         Q    Have you seen any of those dose

6    calculations?

7            A    Yes.

8            Q    Yes?  When did you see them?

9            A    Just briefly, I saw some this week in a

10   graphic.

11           Q    What did the graphic look like?

12           A    Well, I'm not sure I recall.  What do

13   you mean, what did it look like?  It was a graphic

14   of -- I'm not sure what the ordinant and the axis were.

15   Probably dose versus a function of time moved back in

16   the area, but I'm -- I really don't recall specifically

17   what was on the graphic.

18           Q    Do you know the names of the people for

19   whom these doses were calculated?

20           A    No.

21           Q    Okay.  Were you told that you're going

22   to testify about these doses?

23           A    No.

24           Q    Do you know what's going to be done with

25   these doses?

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                    186
                       * ROUGH DRAFT *

1            A    No.  I'm not sure.

2            Q    Okay.  You certainly have never provided

3    to the plaintiffs any dose calculations for any real

4    person; is that correct?

5            A    That's correct.

6          Q    Were you told who was going to testify

7     about these dose calculations?

8          A    Not specifically, no.  The only person

9     I've talked to in relation to this is Mr. Ken Spitze

10    that I mentioned to you earlier.  Whether he's

11    testifying about them or not, I'm not sure.

12         Q    Well, what did he tell you?

13         A    What did he tell me about what?

14         Q    You said you specific -- you talked to

15    him specifically about these calculations and I'm

16    asking you, what did he tell you?

17         A    I really don't recall what he told me.

18    I mean --

19         Q    Okay.

20         A    No.

21         Q    Other than these calculations that you

22    believe were done within about the last month, have you

23    ever calculated yourself or has RAC ever calculated any

24    doses for real people?

25         A    This is specifically Rocky Flats?

CARPENTER REPORTING, INC.
(303) 752-1200

                                                    187
* ROUGH DRAFT *

1          Q    Yes.

2          A    No.  Not that I recall.

3          Q    Okay.  And you have in your report no

4     opinions that are specific to any member of this class;

5     correct?

6               MR. POLAND:  Object to the form of the

7    question.

8            A    Do I have an opinion -- I'd like you to

9    restate your question because, certainly, what's in my

10   report could give any individual who was a member of

11   the class some sense of what their level of risk might

12   have been.

13           Q    (BY MS. ROSELLE)   I understand that.

14           A    Okay.

15           Q    If they made all the same assumptions

16   you made and did their -- I mean, if you -- in other

17   words, your report gives people an idea of a level of

18   risk if they buy every assumption you've made in your

19   report.  In other words, that they are just looking at

20   an inhalation dose, just looking at plutonium, just

21   looking at up till late '89, and so forth and so on;

22   correct?

23           A    Yes.

24           Q    All right.  But with regard to the

25   individuals who actually lived in the area between 1953

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    188
                        * ROUGH DRAFT *

1    and 1989, you're not addressing any real individual in

2    any of the opinions that you're rendering; correct?

3            A    These calculations are for hypothetical

4    individuals, that's correct, but can real people take

5    the information and get some sense of what their risk

6    was?  Yes.  If they assume the same things that we

7    assumed in our study.

8            Q    That you assumed?

9            A    Yes.

10           Q    Right.  Okay.  But what I'm saying, when

11   you talk to the jury, you don't know anything, for

12   example, about the class representatives in this case;

13   right?

14           A    Do I know anything about the class

15   representatives --

16           Q    Uh-huh.

17           A    -- in this case?  I know general

18   information that many of the class didn't move in until

19   very late periods of time.  That kind of information.

20   Generally where members of this class would have

21   resided in a general sense.  The boundary of the class

22   area.  Yes.  Those are the kinds of things that I would

23   know.

24           Q    And where would you have learned that?

25           A    I've seen that in the graphics, an

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                              189
                        * ROUGH DRAFT *

1    example in the graphic I mentioned I saw on Monday.

2            Q    You you mean the one that Mr. Spitze

3    made?

4            A    No.  Mr. Radioed -- I'm not sure he did

5    any -- I guess that's correct.  Mr. Spitze made it,

6    yes.

7            Q    Okay.  When I go back to my notes from

8 this morning, you told me that you met with Mr. Poland

9 and Mr. Kurtenbach on Tuesday or Wednesday.  You didn't

10 tell me anything about a meeting on Monday.  Where did

11 you see that graphic on Monday?

12    A I'm mistaken.  I apologize.  It was

13 Tuesday.  I wasn't here on Monday.  I'm sorry.

14    Q That's okay.  Do you have any actual

15 knowledge of when any class representative moved into

16 the class area?

17    A I have some general knowledge about when

18 individuals moved in and in general that were -- there

19 were a small number of people who lived in the area in

20 1953.  Very, very small number.  But I have no specific

21 numbers now.

22    Q And you -- and you learned that general

23 information from Mr. Spitze?  From a lawyer?  From

24 whom?

25    A I -- I learned that information from

* ROUGH DRAFT *

1 Mr. Poland.

2    Q A lawyer.  Right?

3    A Well, to the best of my recollection,

4 either from Mr. Spitze or from Mr. Poland, yes.

5    Q But yourself, you've never gone to the

6 real property records in Jefferson County to see when

7 people moved into the area, did you?

8          A    No.

9          Q    And you're not rendering any opinions as

10   to when people moved into the area, are you?

11         A    No, I'm not.

12         Q    Okay.  Do you even know who the class

13   representatives are?

14         A    Your question is very vague.  Do I

15   know --

16         Q    Who they are?

17         A    Who these individuals are.

18         Q    Okay.  Well, let me back up a minute.

19   Do you know what a class representative is?

20         A    It's an individual -- and -- I may be

21   incorrect about this, but generally, it's an individual

22   that moved into the property area before the end of

23   1989 or about 1989.  Maybe --

24         Q    So you don't know what a class

25   representative is.  Has anyone told you that -- how a

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    191
                        * ROUGH DRAFT *

1    class action works?

2          A    No.

3          Q    And you don't know the names of the

4    class representatives in this case, do you?

5          A    No.

6          Q    So if I told you the name, for example,

7    of Richard Bartley, you've never heard that name

8    before; right?

9          A    That's correct.  I've never heard that

10    name before.

11          Q    And if I told you -- and if I asked you

12    what year he moved into the area, you wouldn't have any

13    idea, would you?

14          A    No.

15          Q    Okay.  Let's look at exposure factors on

16    page 19 of your report.  Okay.  You -- you did some

17    calculations and if we look at page 20, you decided

18    that the laborer, the male laborer was the most highly

19    exposed person; right?

20          A    And where are you reading this from?

21          Q    Page 20, table 6, exposure scenario

22    descriptions.

23          A    I see the table.  And so what is your

24    question?

25          Q    You determined that the male laborer was

CARPENTER REPORTING, INC.
(303) 752-1200

192

* ROUGH DRAFT *

1    the highest exposure scenario; correct?

2          A    That's what we used as an example of the

3    highest exposure scenario or an example of a higher

4    exposed scenario; that's correct.

5          Q    All right.

6          A    But that's not in that table.

7          Q    I understand that.

8          A    Oh, sorry.

9        Q    Okay.  I want you to tell me every

10   assumption you made about the laborer.  Let's start

11   with how many hours a week did he work in the area?

12        A    We're going to have to find that

13   information in the report.

14        Q    Well, good luck.  Because that, I

15   haven't been able to find.

16        A    I can assure you it's in here.

17        Q    It probably is.  I just don't know where

18   to look.

19        A    Let me look at another volume of this.

20             MR. SORENSEN:  If you tell me the title,

21   I might be able to find it more rapidly.

22        A    The problem is I'm not exactly sure of

23   the title of the report.  I need to look for the

24   exposure factor information.  It's in one of our

25   reports.

                CARPENTER REPORTING, INC.
                   (303) 752-1200

                                              193
                    * ROUGH DRAFT *

1             (Deponent reviewing documents.)

2             Well, I will tell you that there is a

3    discussion of this, and whether I can calculate out the

4    exact amount of time included in -- as an example, the

5    Estimated Exposure and Lifetime Cancer Incidence Risk

6    from Plutonium Released from the 1957 Fire at Rocky

7    Flats.  The same kinds of assumptions would be made.

8    There's a breakdown of the --

9         Q    (BY MS. ROSELLE)  Do you have an exhibit

10      number there?

11                      MR. POLAND:  On the front of it.  No.

12      P-1089.

13              Q    (BY MS. ROSELLE)   Okay.  And what page

14      are you on?

15              A    Page 37.

16              Q    Okay.

17              A    Breathing rates and time budgets.  And

18      this goes through a discussion of how, for example, a

19      breathing rate would have been broken down by a certain

20      number of hours per day based on the particular

21      activity the individual was going through.

22              Q    All I want to know is how many hours a

23      day was it assumed he worked?

24              A    I don't see it explicitly.  I would

25      assume that we assumed at least an eight-hour day that

                        CARPENTER REPORTING, INC.
                            (303) 752-1200

                                                        194
                            * ROUGH DRAFT *

1       an individual worked, but I don't see that written here

2       explicitly.  I know it's in the calculation.  I'm sure

3       it's in our report somewhere.

4               Q    Okay.  That, I need to know, where can I

5       find it?  Because I can tell you I've looked and I have

6       not found it.

7               A    Well, I'll read through this and see if

8       I can sort it out.  It has to be broken out in the

9       calculation.

10                    (Deponent reviewing document.)

11                    I mean, for example, each of the events

12     were handled specifically so that we were -- we were

13     trying to be prudent and conservative about our

14     estimate of dose, and in the case of the 1957 fire, we

15     assumed that the individual was working the -- the

16     night shift outdoors when the fire occurred.  That

17     helps with the timing.  It doesn't tell you how long.

18     I agree.

19                    If I may look at the routine risk report

20     and maybe that's broken down there, as well.

21          Q    Well, I've got some more questions about

22     the laborer, so if you can find more about him, I mean,

23     I want to know what you assumed for all kinds of

24     things, like where he lived when he wasn't working, how

25     much time he spent outside when he wasn't working, you

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                        195
                    * ROUGH DRAFT *

1      know, was he a runner when he wasn't working?  Was

2      he --

3          A    Right.

4          Q    -- a jogger when he wasn't working?

5          A    It's -- it's all here if I can find it

6      for her.

7          Q    Okay.

8          A    I guarantee you, it's in here.  Let's

9      look at the routine risk report because that might

10     be -- I don't have that one.

11          MS. ROSELLE:  What number that, David?

12          MR. SORENSEN:  I want to make sure it's

13  the right one first.  Is this the one you're talking

14  about?

15          THE DEPONENT:  No.  That's the source

16  term.  I need the risk report.  Routine Risk Report.

17          MR. SORENSEN:  Okay.

18      Q   (BY MS. ROSELLE)  Is this something that

19  you think Dr. Grogan knows?

20      A   It's possible, yes.

21      Q   (BY MS. ROSELLE)  Possible or probable?

22          MR. POLAND:  Do you want him to quantify

23  the uncertainty in that statement?

24          MS. ROSELLE:  Yes.

25      A   It's -- it's probable she could find it

                  CARPENTER REPORTING, INC.
                      (303) 752-1200

                                            196
                     * ROUGH DRAFT *

 1  faster than I could.

 2          MR. SORENSEN:  Let's look at 1075.

 3          MS. ROSELLE:  So we'll spend a little

 4  more time on it and then we'll save it for tomorrow, I

 5  guess.

 6          MR. POLAND:  If it helps, there is a

 7  discussion of exposure scenarios at page 35 of the risk

 8  report.  I don't know if that -- what "routine" means.

 9          MS. ROSELLE:  Is that --

10          MR. POLAND:  I don't know if that's what

11      he's referring to.  There is a discussion there on it.

12                      MR. SORENSEN:  That's 1075, he's looking

13      at, for the record.

14                      MR. POLAND:  Which one is that, David?

15                      MR. SORENSEN:  1075, Estimated Exposure

16      Lifetime Cancer Incidence Risk for Routine Plutonium

17      Releases, part of Task 3.

18              A       (Deponent reviewing document.)

19                      Well, on page 38, time budgets and

20      weighted breathing rates for the exposure scenarios,

21      for example, rancher, occupational, eight hours per day

22      workweek.

23              Q       (BY MS. ROSELLE)  Is a rancher the same

24      as a laborer?

25              A       No.  There is a laborer 1 and a laborer

                        CARPENTER REPORTING, INC.
                            (303) 752-1200

                                                        197
                        * ROUGH DRAFT *

1       2 --

2               Q       Which one --

3               A       -- in that same table.

4               Q       -- did you use?  Do you know which one

5       you used?

6               A       I don't know.  I'd have to look and see

7       if that's explicitly laid out and the reason for there

8       being two laborers, I don't recall.

9               Q       I'm just curious, it seems to me that

10      one of your goals when you did these reports was you

11      were trying to make this understandable to the public;

12    isn't that correct?

13            A    You know, I think we did a fantastic job

14    of trying to make this something that's incredibly

15    complicated understandable to the public.  If you'd

16    been there at the meetings where we talked about the

17    work, public meetings, HAP meetings, there were many

18    members of the public -- many -- some -- who came to

19    those meetings.  We spent a lot of time explaining what

20    this meant to the public.

21                There were also fact sheets.

22            Q    Right.

23            A    Monthly reports.  The summary.  There is

24    no question that it is a lot of very complicated

25    information that's been pulled together here and many

CARPENTER REPORTING, INC.
(303) 752-1200

198

* ROUGH DRAFT *

1    pages.  Okay?  Can any member of the public go into

2    these reports if you've not had some training in risk

3    analysis, it would be very difficult to do.

4                But we did prepare a summary report, and

5    I believe we had a --

6            Q    Are you referring to this?

7            A    No.  I'm not.

8            Q    You prepared a summary report?

9            A    We had a technical summary report, yes.

10                MS. ROSELLE:  Do we have that?

11            A    The report I'm talking about says

12      technical summary report.

13              Q    (BY MS. ROSELLE)   We looked for that

14      earlier this morning for something else.

15              MR. SORENSEN:   This is the only one that

16      I -- is that it?  1086.

17              THE DEPONENT:   I'm sorry.  This is not

18      it.

19              MR. SORENSEN:   No?

20              THE DEPONENT:   This is some -- this is

21      task 6.  You asked what we did for the public.  This is

22      an example of how -- yeah.  This is not -- this is the

23      technical summary report.  I'm sorry.  This is the one

24      I was thinking about.  Okay?

25              Q    (BY MS. ROSELLE)   Uh-huh.

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                    199
                         * ROUGH DRAFT *

1               A    So this is a technical summary report

2       for public involvement, and I mean, it is a technical

3       summary, yes.  In addition to that, we have a report

4       that documents and responds to the public on all of the

5       questions that we were asked during the course of this

6       study.

7               Q    That's Task 6.

8               A    I'm sorry?

9               Q    I said that's Task 6.

10              MR. POLAND:  For clarification, I think

11      they are both Task 6.  I think they --

12              MS. ROSELLE:  I give up.

13                    MR. POLAND:  You've got to read the

14    title.

15                    MR. SORENSEN:  This is 1079.  RAC

16    responses to public questions and concerns.

17          A    And in that document, we kept track of

18    all of the questions that we were asked during the

19    study.  We provided answers to members of the public,

20    trying to explain as clearly as we could what we did.

21    I think we went to extraordinary efforts to work with

22    people, to explain to them what all of this meant.  And

23    I don't know of any case in this project where we were

24    asked for something that we didn't try to explain it

25    and in a lot of situations, a lot of parts of this

CARPENTER REPORTING, INC.
(303) 752-1200

200
* ROUGH DRAFT *

1    work, the study was, indeed, changed because the public

2    had concerns and questions as we went through the

3    course of this.

4                    Frankly, I think -- I'm very proud of

5    that, in fact, what we did.  The fact --

6          Q    (BY MS. ROSELLE)  But if you were user

7    friendly, couldn't you find how long the laborer worked

8    outside?

9                    MR. POLAND:  Object to the form of the

10    question.

11          A    Ms. Roselle, part of this is just my own

12    memory and trying to recall explicitly where these data

13    are in a couple of thousand pages of reports.  Okay?

14    And I really apologize for that if it's taking me a

15    long time to do.

16         Q    (BY MS. ROSELLE)  No.  You haven't found

17    it.  It's not that it took you a long time.  It's that

18    you haven't found it

19              MR. POLAND:  Object to the form of the

20    question.

21              MS. ROSELLE:  It's not a question.  It's

22    a statement.

23              MR. POLAND:  Object to the statement.

24         Q    (BY MS. ROSELLE)  All I want to know is

25    what assumptions were made about the laborer that you

CARPENTER REPORTING, INC.
(303) 752-1200

201

* ROUGH DRAFT *

1     actually cite to in table 6 of your expert report which

2     is Exhibit 2 to this deposition.

3              A    Tell me again the page you're looking

4     at.

5              Q    Page 20.  Table 6.  Middle of the page.

6              A    This is an example for the routine

7     releases of the assumptions that we made about the

8     laborer.  I've shown that to you in the report.

9              Q    That's page -- that's report 1089?

10             A    Page 38.

11             Q    Page 38.  And those are all assumptions

12    that you made?

13             A    These are assumptions for the breathing

14    rates.

15            Q    So you have two pages --

16            A    Okay.

17            Q    -- just of assumptions on the breathing

18    rate?

19            A    That's correct.

20            Q    Okay.  Now, what about the length of

21    time he worked outside per day?  Where -- where are

22    those assumptions?

23            A    Well, I don't know if I can find it and

24    I'll try to keep it in mind -- or try to remember, but

25    I believe the laborer was assumed to work outside all

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                       202
                      * ROUGH DRAFT *

1    day and to live in the location where he worked, and to

2    be in that low indication for 50 weeks out of the year.

3    And I'm sure all of the specifics are in the reports at

4    places that my slow mind is not finding quickly enough

5    for you.

6            Q    What about the elderly who are ill?  Did

7    you make any assumptions as to the risks for the

8    elderly that were ill?

9            MR. POLAND:  Object to the form of the

10    question.  Assumes facts not in evidence.

11            A    I really don't recall if we did.

12    Certainly not reported in these reports, but it doesn't

13    suggest that we didn't have a discussion about this

14    with the Health Advisory Panel.  Whether or not

15    something like this should have been taken into account

16    specifically, these scenarios were decided upon and

17    actually developed using advice from members of the

18    public and the Health Advisory Panel.  Whether that

19    specific scenario came up for discussion, I really

20    don't remember.

21             Q    (BY MS. ROSELLE)  Okay.  Let's talk now

22    about the risk factors that you put in for cancer.  Are

23    these questions you can answer, or would I be best off

24    to wait until tomorrow and ask Dr. Grogan?

25             MR. POLAND:  You're on page 20 of his

CARPENTER REPORTING, INC.
(303) 752-1200

203

* ROUGH DRAFT *

1    report, Louise?

2             MS. ROSELLE:  Yes.

3             A    Well, Ms. Grogan certainly was one of

4    the authors of that work and could probably answer the

5    questions more thoroughly than I could, but I'll be

6    happy to answer, to the best of my ability, anything

7    you ask me about them.

8             Q    (BY MS. ROSELLE)  Okay.  How did you

9    blend the four types of studies that you listed at the

10   bottom of page 20.  The epi studies, the dose response

11   relationship observed in the atomic bomb survivors, the

12   human dose relationships for populations exposed to

13   alpha emitting radionuclides and the results of

14   controlled experiments to animals?  How did you take

15    all those together and come to get with your risk

16    coefficient?

17         A    I'm going to caution you -- I'll answer

18    your question.  If you want a better answer, you can

19    get that from Ms. Grogan.  Okay?  What Dr. Grogan and

20    Dr. Sinclair and Mr. Voilleque did really at the design

21    of Dr. Warn Sinclair, who's one of the world's

22    best-known biostatisticians, epidemiologist was to

23    be -- the objective was to try to develop a method for

24    estimating the uncertainty in risk and dose from a unit

25    intake of plutonium by inhalation.

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                    204
                      * ROUGH DRAFT *

 1         And their study looked at all of the

 2    information that has accumulated -- this huge body of

 3    information accumulated on dosimetry of plutonium and

 4    plutonium risk over decades of research.  What they did

 5    was to take that body of information and to divide it

 6    into categories.  Basic categories of methodological

 7    methods, for example, animal experiments, the A bomb

 8    survivors, alpha radiological epidemiological studies

 9    other than plutonium -- for example, radium -- and the

10    fourth category was --

11         Q    The A bomb survivors?

12         A    -- the epidemiological studies of

13    workers exposed to plutonium in Russia.  And what they

14    did -- and it's quite remarkable work and I'm very

15        proud to be associated with these individuals because

16        it's really established, in my opinion, some solid

17        methods for bounding uncertainties in dose and risk.

18        But what they did was to go through these categories of

19        data.

20                    Ms. Grogan can tell you more

21        specifically how the work was divided up and who took

22        what area.  They came up with a scheme for weighting

23        the different areas and looking at all of the data,

24        developed distributions for dose coefficient,

25        distributions for risk coefficients.  They solicited

CARPENTER REPORTING, INC.
(303) 752-1200

205

* ROUGH DRAFT *

1        expert review of this work as they went through it from

2        a number of well-known dosimetrists and

3        epidemiologists.  And then mathematically through this

4        weighting process and through the distributions that

5        were developed, used a Monte Carlo method to come up

6        with an overall distribution of uncertainty.  I've

7        explained this, I'm sure, very crudely, but it is a --

8        it's a mathematical process.

9                    It incorporated hundreds of data points

10        from the scientific literature.  It incorporated expert

11        review, advice, peer review on reports, checking of

12        data and those kinds of things.  And it's a short

13        explanation.  That's basically what they did.

14             Q    Doesn't either the ICRP or the NCRP have

15        risk coefficients?

16          A    The ICRP has -- I'm sorry.  Risk

17    coefficients did you ask?

18          Q    Yes.

19          A    ICRP and NCRP, I believe, have risk

20    coefficients.

21          Q    Okay.  Did they not use the ICRP and the

22    NCRP risk coefficients?

23          A    Well, the fact is that they did use the

24    ICRP and the NCRP extensively.  What -- what Dr. Grogan

25    and Dr. Sinclair and Mr. Voilleque were doing was to

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                        206
                    * ROUGH DRAFT *

1     try to come up with a method for putting some bounds on

2     the uncertainties for these values.  And what they

3     developed was a quantitative process for doing that for

4     plutonium exposure, specifically inhalation.

5           Q    Okay.  Did -- what did they do -- okay.

6     Let's start they started with an ICRP risk coefficient.

7     What did they do with that risk coefficient then?  If

8     you don't know, you can just tell me.

9           A    I don't know.  I think that's getting to

10    the level of detail that you could ask Dr. Grogan.  I'm

11    sure she'd provide you an answer.

12          Q    Okay.  Here on page 21 of your report,

13    which you told me you wrote, you write, "The

14    independent cancer risk coefficient distributions were

15    combined to develop an overall cancer incidence risk

16    coefficient distribution that accounted for both the

17    uncertainties associated with the estimate and an

18    assigned intrinsic merit of the approach".

19              Okay.  Is that what you just described

20    to me?

21         A    That's exactly what I described to you.

22         Q    Okay.  What is what you call this

23    assigned intrinsic merit of the approach?

24         A    As I mentioned going through the

25    admittedly crude explanation, I said that the different

CARPENTER REPORTING, INC.
(303) 752-1200

207

* ROUGH DRAFT *

1    categories of data were weighted, and that's what I was

2    referring to.

3         Q    What do the words "assigned intrinsic

4    merit" mean, as you've used them?

5         A    Assigned weighting.

6         Q    Well, what does the word "intrinsic"

7    add?

8         A    Well, perhaps that's some of my lousy

9    writing.  But it means -- it's very clear to me, it's a

10    merit to an approach that's assigned.  It's a

11    weighting.  A weighting factor, basically is what it

12    is.

13         Q    You refer to Grogan, et al., 2001.  What

14    specific report are you referring to?

15         A    That would be a report on plutonium risk

16    uncertainty by Grogan -- Sinclair, Grogan, and Rood.  I

17    don't know which of your reports that is.

18            Q    And Voilleque?

19            A    And Voilleque, yes.

20            Q    Is it part of Task 3, assessing risks of

21    exposure to plutonium, independent analysis of exposure

22    dose and risk -- health risks to off-site individuals?

23                 MR. POLAND:  Can we see a copy.

24                 MS. ROSELLE:  Yeah.

25                 THE DEPONENT:  I'm not sure that's the

                        CARPENTER REPORTING, INC.
                            (303) 752-1200

                                                          208
                            * ROUGH DRAFT *

1     right report.

2                  MR. SORENSEN:  1087.  1087.

3                  THE DEPONENT:  I think that's the

4     report, yes.

5                  MS. ROSELLE:  Okay.

6                  MR. POLAND:  There is a -- at the end of

7     Dr. Till's report, there is a biblio -- a reference.  A

8     bibliography.

9                  MS. ROSELLE:  Yeah.  For what that's

10    worth.  I'll take it back.

11                 MR. SORENSEN:  I think we actually have

12    a copy here somewhere.

13            Q    (BY MS. ROSELLE)  Okay.  Did Dr. Grogan

14    author or participate in any of the other RAC reports?

15            A    Yes.

16            Q    Okay.  What other RAC reports did she

17    participate in?

18         A    I don't know off the top of my head.

19         Q    Well, what are the subjects that you

20    understand she's going to testify at trial about?

21         A    Well, she participated in all of these

22    reports in one sense, as a part of a critical reviewer

23    and as a leader on my team that helps to oversee the

24    work that's being done, just like myself.  So, to some

25    extent, she's been involved in everything.

CARPENTER REPORTING, INC.
(303) 752-1200

209

* ROUGH DRAFT *

1          MS. ROSELLE:  What is it?

2          MR. SORENSEN:  It's 1087.  That's the

3     one; right?  Before.

4          THE DEPONENT:  Yeah.  That's correct.  I

5     mean --

6          Q    (BY MS. ROSELLE)  Have you had

7     discussions with the lawyers as to what Ms. --

8     Dr. Grogan is going to testify about?

9          A    I really don't know what Ms. Grogan is

10    going to testify about.  I've not had specific

11    discussions.  I would assume that she's available to

12    talk about any of these documents for which she was

13    involved.

14         Q    Well, then why don't you tell me one by

15    one which are the documents in which she was involved

16    that she may testify about.

17         A    Well, I can tell you which documents she

18    was involved, if I can get my list and take a look at

19    the authorship and -- please understand that Dr. Grogan

20    is one of the key authors on the open literature

21    publications, several open literature publications

22    related to this study.  She's an author of those, as

23    well, even though she may not be listed specifically as

24    an author on one of these reports.  So we'll just go

25    through them.

CARPENTER REPORTING, INC.
(303) 752-1200

210
* ROUGH DRAFT *

1              The Technical Responses to Public

2     Questions and Concerns.

3              Q     What did she write on that?

4              A     You know, I won't recall exactly what

5     she wrote on each of these reports, and so I will not

6     know that.

7              Q     Go on.

8              A     Assessing Risk of Exposure to Plutonium.

9              Q     Do you have an exhibit number?

10              MR. POLAND:  It will be right in -- it

11    will be right on the front of the document.  There's a

12    P number.

13              A     P-1087.

14              Q     (BY MS. ROSELLE)  Okay.

15              MR. SORENSEN:  If there's not enough

16    here, there's more.

17              A     P-1088, which is the comprehensive risk

18   report that covers the entire study.  Summary report.

19          Q    (BY MS. ROSELLE)  Is that 1089

20          A    P-1089, which is Estimated Exposure and

21   Lifetime Cancers Incidence Risk from Plutonium Released

22   From the 1957 Fire at the Rocky Flats Plant.

23               P-1085.

24          Q    Which one is that?

25          A    Comprehensive Assessment of Exposure and

                 CARPENTER REPORTING, INC.
                    (303) 752-1200

                                                211
                 * ROUGH DRAFT *

1    Lifetime Cancer Incidence --

2          Q    Okay.

3          A    Risk --

4          Q    No.  I got it.

5          A    P-1086, Technical Summary Report for the

6    Historical Exposure Studies for the Rocky Flats, Phase

7    II.

8               P-1076, Estimated Exposure and Lifetime

9    Cancer Incidence Risk from Plutonium Released from the

10   1969 Fire at the Rocky Flats Plant.

11              P-1077, Estimated Exposure and Lifetime

12   Cancer Incidence Risk from Plutonium Released from the

13   1957 Fire at the Rocky Flats Plant.

14              P-1078, Estimated Exposure and Lifetime

15   Cancer Incidence Risk from the 903 Area Plutonium

16   Releases at the Rocky Flats Plant.

17              MR. SORENSEN:  Yeah.  Ours are yellow.

18              MS. ROSELLE:  Okay.

19              A    P-1081, Evaluation of Environmental Data

20    of Four Historical Public Exposures Studies on Rocky

21    Flats.

22              P-1065, Verification of Phase I Source

23    Term and Uncertainty Estimates.

24              I'm on open literature publications now.

25         Q    (BY MS. ROSELLE)  Uh-huh.

CARPENTER REPORTING, INC.
(303) 752-1200

212

* ROUGH DRAFT *

1              A    Coauthor, Risk to the Public from

2    Historical Releases of Radionuclides and Chemicals at

3    the Rocky Flats Nuclear Weapons Plant in the Journal of

4    Exposure Analysis and Epidemiology.  That's 2002.

5              Coauthor, a Model for a Comprehensive

6    Assessment of Exposure and Lifetime Cancer Incidence

7    Risk from Plutonium Released from the Rocky Flats

8    Plant, Health Physics.

9              Well, I believe those are the key ones.

10         Q    Okay.  Could we turn, please, to page 23

11    of your expert report.  I'd like to look at the very

12    mid he will paragraph on the page, and there is a

13    sentence about two-thirds of the way down that says the

14    model underestimated concentrations at community

15    locations in the late 1970s and early 1980s.  Why did

16    you consider -- continue using the model if it

17    underestimated concentrations in community locations in

18    the late 1970s and early 1980s?

19          A    What you're seeing here is a summary of

20     the validation, and what we're discussing in the report

21     at this point is a comparison with what was measured

22     and what was calculated.  It's not uncommon at all that

23     a model is going to underestimate something in one

24     place, overestimate something in another place, and

25     what we're doing here is just explaining the validation

CARPENTER REPORTING, INC.
(303) 752-1200

213

* ROUGH DRAFT *

1      and the comparison between the measurement data and the

2      model calculations.

3          Q    Right.  But what your measurement data

4      told you was that your model was underestimating the

5      concentrations in the community during the late 1970s

6      and early 1980s, and I'm asking you why did you

7      continue to use that model?

8          A    Well, just because a model

9      underestimates doesn't mean you throw it out.

10         Q    Well --

11         A    I mean, what's good is that you have

12     some sense of -- of how far off it might be.  I mean,

13     it might be underestimating by a small amount at one

14     period of time and overestimating at another period of

15     time.  So this is not --

16         Q    Did you --

17         A    -- unusual at all.

18         Q    Did you do anything to correct for the

19     underestimation of your model?

20          A    I don't know that we did anything.  I

21     don't know that we felt we needed to do anything for a

22     correction to the model.  In the first place, that's

23     one location.  Maybe there are other locations where

24     the model is overpredicting.

25          Q    So.  There's an S.  It says community

CARPENTER REPORTING, INC.
(303) 752-1200

214

* ROUGH DRAFT *

1      locations with an S.

2               MR. POLAND:  Objection.  I'm going to

3      ask that you allow Dr. Till to finish his answer.

4               MS. ROSELLE:  Okay.

5          Q    (BY MS. ROSELLE)  It's more than one

6      location; wouldn't you agree?

7          A    I agree that it says locations, but what

8      does that mean?  I'm not sure.  But, again, I mean, the

9      fact that a model might underestimate in some cases,

10     overestimate in some cases, that's not unusual at all.

11         Q    Okay.  But you're coming into a court of

12     law and you're testifying under oath on behalf of Dow

13     and Rockwell that these were the risks that you

14     calculated, and one of the things that you say in your

15     report is that your model underestimated concentrations

16     at community locations in the late 1970s and early

17     1980s, and I'm asking you what, if anything, you did to

18     correct for that in your risks that you are going to

19     testify to a jury about?

20          MR. POLAND:  Object to the form of the

21   question.  Mischaracterizes his testimony.

22          A    Well, as I said, you can look at these

23   data and the fact that it might be underestimating

24   doesn't mean that you need to make any correction to

25   the model.  You have to look at the data as a whole, as

CARPENTER REPORTING, INC.
(303) 752-1200

215

* ROUGH DRAFT *

 1   a whole picture and the fact that it might overestimate

 2   somewhat at one location and that is making a

 3   comparison with certain data at a certain point of time

 4   in the model.  Perhaps the data are not correct.  The

 5   measurement data perhaps.

 6          Q    (BY MS. ROSELLE)  What did you do after

 7   you determined that the model underestimated

 8   concentrations at community locations in the late

 9   seventies and early eighties?  What steps did you take,

10   if any?

11          A    I think we certainly would have taken

12   steps.  That's what we did.  That's what we're trying

13   to do is to look at the performance of these models.

14          Q    So what steps did you take --

15          A    Okay.

16          Q    -- to correct for it?

17          MR. POLAND:  Object to the form of the

18   question.

19          A    I don't know that we took any steps to

20   make a correction for it.  Nor would I say that a

21    correction were needed based on these data.  It's very

22    common to see this underestimate or overestimate at

23    certain locations.  It's -- it's possible we went back

24    in to sort out in our own minds why it might

25    underestimate or overestimate.

CARPENTER REPORTING, INC.
(303) 752-1200

216
* ROUGH DRAFT *

1         Q    (BY MS. ROSELLE)  Do you remember doing

2    that?

3         A    I -- I don't remember for this specific

4    location, but we could have.

5         Q    No.  No.  It's more than one location.

6    It says locations with an S.

7         A    I don't remember for these locations

8    with an S.

9         Q    Thank you.

10              MR. POLAND:  Louise, can I ask you

11    something?  How much longer do we have?

12              MS. ROSELLE:  I don't know.  How much

13    longer do we have?

14              THE VIDEO OPERATOR:  22 minutes.

15              MS. ROSELLE:  Okay.

16              MR. POLAND:  Did you want to take a

17    break, Dr. Till?

18              THE DEPONENT:  Yes.  I think I do.

19              MR. SORENSEN:  I'm sorry.  What?

20              MS. ROSELLE:  You want a break?

21              THE VIDEO OPERATOR:  We are going off

22     the record at 6:39.

23              (There was a recess taken from 6:39 p.m.

24     to 6:45 p.m.)

25              THE VIDEO OPERATOR:  We are back on the

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    217
                        * ROUGH DRAFT *

1     record at 6:45.

2              Q    (BY MS. ROSELLE)  Dr. Till, the dose

3     assessment of historic public exposures does not

4     include any assessment whatsoever of what people may be

5     exposed to today and in the future from Rocky Flats;

6     correct?

7              A    Certainly, that's -- that information is

8     not included in the -- in the risk estimates that we've

9     got.  But the methods, the estimates could be helpful

10    to people at any point, I think.

11             Q    I'm just trying to confirm that you have

12    not calculated, as part of this study in this case,

13    future risks to the population around Rocky Flats; is

14    that correct?

15             A    I have not made the calculation, no.

16             Q    Okay.  Would you turn to page 30 of your

17    report.  Okay.  Do you have it?

18             A    Yes.

19             Q    Okay.  And page 31.  Okay.  You did a

20    study that was funded by the Colorado Department of

21    Health, looking at what the cleanup standards should be

22     at Rocky Flats; is that correct?

23              A    No.  That's not correct.  That work was

24     actually funded by the Rocky Flats Citizens Advisory

25     Board.

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                  218
                        * ROUGH DRAFT *

1              Q    And where did they get their money?

2              A    From the Department of Energy.

3              Q    Oh, so it was more DOE work?

4                   MR. POLAND:  Object to the form of the

5     question.

6              Q    (BY MS. ROSELLE)  Is that correct?

7                   MR. POLAND:  Same objection.

8              A    I strongly disagree with that.  The work

9     that we did in this study was for the Citizens Advisory

10    Board.  The work was overseen by an -- a group of

11    community members who were scientists, who were

12    citizens, and for a period of about 18 months working

13    together, we did this work to develop soil action

14    levels for cleanup at Rocky Flats.

15             Q    (BY MS. ROSELLE)  Okay.  And that study,

16    you told me this morning, you got paid -- or RAC got

17    paid $400,000; correct?

18             A    I think that's about right.  Yes.

19             Q    Okay.  And that money came from the

20    United States Government; correct?

21             A    Yes.

22          Q    Okay.  And your recommendation, when you

23    completed this study, was that the cleanup level should

24    be 35 picocuries per gram; is that right?

25          A    What we recommended, 35 picocuries per

CARPENTER REPORTING, INC.
(303) 752-1200

219

* ROUGH DRAFT *

1    gram was the median of a distribution that we

2    calculated.  That distribution ranged between about 25

3    picocuries per gram or 20 picocuries per gram up to,

4    say, 55 or 60 picocuries per gram.  And that's the way

5    we explained it to the soil action level.  The median

6    value was 35.

7          Q    Okay.  Would you turn to your report.

8    And this is just a question I don't understand.  Why

9    every time on page 31 that you say "gram," there's a

10   minus 1 superscript.

11         A    Could you show me, Ms. Roselle, where

12   you're looking at.

13         Q    Sure.  On page 31, for example?

14         A    Page 31.  I'm sorry.

15         Q    On the sixth line, 35 picocuries gram

16   and then there's a minus one superscript.

17         A    That's scientific notation for per gram.

18   In other words, that's 35 picocuries per gram, or 35

19   per gram.  However you want to call it.  That's

20   scientific notation.

21         Q    And this 35 picocuries per gram, what

22   depth was this standard supposed to be for?

23          A     Well, I don't believe that we were given

24     any -- we weren't prescribed a depth.  I believe that

25     we made our calculation for a depth of 15 inches or

CARPENTER REPORTING, INC.
(303) 752-1200

220

* ROUGH DRAFT *

1      there about.  I'm not sure.

2          Q     Did you, as part of your study, look at

3      how deep the contamination at Rocky Flats was?

4          A     That's something that was certainly

5      discussed with the panel.  But the fact is, when you

6      are trying to derive a level for cleanup, the

7      contribution to dose from -- to individuals, the

8      contribution to dose would come from any plutonium near

9      the surface of the soil, because the pathways that

10     would be available to people would be near the surface

11     of the soil.

12               And in working with a soil action level

13     panel, we described this as we went through, it really

14     wouldn't have changed the result if you'd have gone any

15     deeper.  What you want to do is to be sure that you're

16     going deep enough in your analysis to take over any --

17     take into account any turnover of soil or a child, for

18     example, eating soil near the surface.  If we'd have

19     gone to 30 centimeters, it really wouldn't have made

20     any difference in the analysis that we came up with.

21          Q     Well, you told me 15 inches.  Did you

22     mean centimeters?

23          A    I could look at the report and see.  I

24    suspect it was about a foot.  Okay?

25          Q    Uh-huh.  Did you take into account

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    221

                        * ROUGH DRAFT *

1    prairie dogs?

2          A    Could I ask you in what sense prairie

3    dogs?

4          Q    Prairie dogs burrow.

5          A    I really don't think that would come

6    into the calculation of an RSAL because what you're

7    trying to do is determine in this layer of soil is how

8    many picocuries per gram you could allow and not exceed

9    a dose limitation, which I believe was 15-milligram in

10    this case.  Would we have taken that into account?

11    Certainly.  That would be, in my opinion, a count of

12    the kind of mixing that we're talking about in this top

13    layer or so of soil.  That's the reason you would do

14    that.

15          Q    Okay.  So if you had, for example, much

16    more contamination down deeper that wasn't being

17    cleaned up, and the prairie dogs were bringing that to

18    the surface, is it your assumption that the

19    concentration at the surface after the prairie dogs

20    bring it up should have been at 35 picocuries per gram?

21          A    I guess what I'm saying is in our

22    calculation, the reason that you take into account some

23    volume of soil is in case you have perturbation of the

24    soil for whatever reason, so I'm not sure I've answered

25    your question completely.  I mean, in my opinion, that

CARPENTER REPORTING, INC.
(303) 752-1200

222

* ROUGH DRAFT *

1     would be taken into account.

2              Q     Do you know how -- how deep the prairie

3     dogs burrow?

4              A     I really don't know how deep they

5     burrow, no.

6              Q     Do you know how deep the harvester ants

7     go?

8              A     No, I don't.

9              Q     Have you ever heard of a harvester ant?

10             A     I never heard of a harvester ant.  I've

11    heard of fire ants.  I don't know if that's the same

12    thing or not.

13             Q     Did you, as part of your study, consult

14    with any experts on burrowing animals?

15             A     You know, I don't recall specifically if

16    we did.  I do know that a number of individuals on this

17    panel and who came to the meetings because it was such

18    an open public process, it's most likely that this was

19    brought up for discussion.  Whether there were experts

20    there who specifically -- who were specific experts on

21    burrowing animals, I -- I don't remember.  Certainly,

22    anybody who had had the knowledge and wanted to bring

23    it up to us could have done that.

24          Q    The -- the 35 picocuries per gram

25     standard was assuming a 10 percent probability that the

CARPENTER REPORTING, INC.
(303) 752-1200

223

* ROUGH DRAFT *

1     millirem per year dose limit would be exceeded; is that

2     correct?

3          A    The 10 percent probability level

4     essentially -- because we worked with the community

5     panel on this so hard, it was a value that they

6     selected, by the way.  They wanted to be 90 percent

7     certain that the dose limit would not be exceeded.

8     That was their level of certainty that they asked us to

9     use in the analysis.  So I'm answering your question

10     the backward way, but the 10 percent is correct.

11          Q    Okay.  Let me try it another way.  If

12     Rocky Flats had been cleaned up to a 35 picocurie per

13     gram soil level, based on your calculations, you would

14     still expect a 10 percent probability that the

15     15 millirem per year dose limit would be exceeded to

16     the off-site residents; is that correct?

17          A    Well, I'm still going to tell you it's

18     the other way around.  That the citizens wanted a

19     90 percent chance that the level would not be exceeded

20     and they accepted the fact that if 10 percent of the

21     time the level was exceeded, that was okay with them.

22          Q    Okay.  And what -- the 15 millirem

23     level, was that for someone on the Rocky Flats plant

24     site or someone off-site?

25          A    The soil action level was derived for an

CARPENTER REPORTING, INC.
(303) 752-1200

224

* ROUGH DRAFT *

1    individual living on site, in an area that had been

2    cleaned up to the 35 picocuries per gram.  The soil

3    action level, there were several scenarios that we

4    investigated, including, and I think that the rancher

5    scenario and the child scenario both in our

6    calculations intersected at about the same point on the

7    curve at the 10 percent probability level.  And that

8    was about 35 picocuries per gram.  But this was for an

9    individual residing on-site all of the time.

10          Q    Did you make any calculations of what

11   the risks were to the off-site residents?

12          A    You know, I don't recall.  It's -- it's

13   possible that we did, and it would be in one of our

14   reports.  And I don't recall whether we did or not.

15          Q    If there's plutonium in the soil on-site

16   and the winds come off the Front Range as they have

17   been known to do in the past, isn't there going to be

18   future risk to the people off-site?

19          A    It is certainly possible that that's the

20   case, but to qualify that, by saying there is going to

21   be risk, this would be, of course, hypothetical.  It's

22   certainly possible.

23          Q    But you didn't do any calculations as to

24   that risk?

25          A    As I said, I don't recall.  It's

CARPENTER REPORTING, INC.
(303) 752-1200

225
* ROUGH DRAFT *

1    possible that we did.  I'd have to look at the reports

2    to see.

3           Q    Okay.  Did you make any recommendations

4    in your report about whether they should remain --

5    remove the slabs in which the buildings had rested?

6           A    I don't believe we did, no.

7           Q    Okay.  Did you address the underground

8    piping at Rocky Flats in your report?

9           A    No, I don't think we did.

10          Q    Okay.  Did you address the groundwater

11    contamination in your report?

12          A    Yes, I believe we did address the

13    groundwater.  We did not include that in the

14    calculation.  And I believe the conclusion -- and this

15    is, again, based on the recommendations of the panel

16    that we worked with -- was that there were extensive

17    studies that were ongoing related to groundwater at

18    Rocky Flats, and I believe there's a place in our

19    reports that at the recommendation and advice of the

20    panel was that that work should continue and that we

21    wouldn't include that in our analysis.

22          Q    Okay.  I have -- are you being paid for

23    your time today?

24          A    Yes.

25          Q    And have you been paid for your time

CARPENTER REPORTING, INC.
(303) 752-1200

226

* ROUGH DRAFT *

1    while you've been out here this week, meeting with

2    Mr. Poland and Mr. Kurtenbach?

3            A    Have I been paid or am I being paid?

4    There's a difference between the two.

5            Q    Are you being paid.  Yes.  I understand.

6    Are you being paid?

7            A    Yes.

8            Q    Okay.  And are Dr. Meyer and Dr. Grogan

9    also being paid for their time here?

10           A    Yes.

11           Q    Okay.  And is it your understanding

12   you're being paid by Kirkland & Ellis and that they're

13   being reimbursed by the United States Government?

14               MR. POLAND:  Objection.  Foundation.

15           A    I'm not sure how Kirkland & Ellis is

16   being paid, no.

17           Q    (BY MS. ROSELLE)  But you know you're

18   getting paid by Kirkland & Ellis?

19           A    That's correct.

20           Q    Okay.  Now, many times today, we've been

21   talking about things and you've referred to the HAP

22   panel.  And I just want to be clear that the opinions

23   that you expressed in your expert report are John

24   Till's opinions and regardless of the impact -- input

25   that you got from the HAP panel, what you put in your

CARPENTER REPORTING, INC.
(303) 752-1200

227

* ROUGH DRAFT *

1    report are your opinions; correct?

2                    MR. POLAND:  Object to the form of the

3    question.

4              A    What I've done in this report is to

5    summarize what my team did for the Health Advisory

6    Panel, the Colorado Department of Public Health and

7    Environment, and all of this information was taken from

8    those reports.  Yes, I back those reports.  If there's

9    information in here, there is information in this that

10   comes directly from those reports that, yes, I back,

11   and yes, that's my opinion, but all of this is the

12   conclusion of seven years' worth of work and input from

13   many sources and peer review from many individuals,

14   including the Health Advisory Panel.  It's very

15   important.

16                    (Helen Grogan enters the conference

17   room.)

18              A    It's very important that that be stated.

19              Q    (BY MS. ROSELLE)  But the opinions in

20   these reports, the final decisions, regardless of the

21   input you received, you stand behind as your opinions;

22   is that correct?

23              A    The opinions in these reports, I stand

24   behind.  That's correct.

25              Q    Okay.  Now, would you turn, please, to

CARPENTER REPORTING, INC.

(303) 752-1200

* ROUGH DRAFT *

1    page 22 of your expert report.

2              A    I'm sorry.  Which page?

3              Q    22.  I'm looking at the last sentence in

4    the third full paragraph under uncertainty.  And it

5    says, "Other sources of uncertainty could not be

6    quantified and were not considered."  Okay.  First, I

7    want you to tell me what those sources of uncertainty

8    were, and then I want you to tell me when you say they

9    weren't considered, what you mean.

10             A    Well, certainly, as I -- as I mention,

11   the uncertainty and assuming low dose linearity, the

12   fact is that we don't know what happens at very low

13   doses.  And what we've done is to be prudent and assume

14   that there's a linear no-threshold effect, and so we've

15   just assumed that it's linear.  We've not tried to

16   apply any uncertainty at those low ranges, and that's

17   an example of what I mean.

18             Q    Any other uncertainties that could not

19   be quantified and were not considered?

20             A    I think the other two there, I can't

21   explain very well, but the uncertainty in extrapolating

22   from high dose animal studies to low dose human

23   studies.  The variability of cancer response among

24   animals and humans.

25             Q    In the work that you did in this case,

CARPENTER REPORTING, INC.
(303) 752-1200

229

* ROUGH DRAFT *

1    did you see any statements that would indicate that

2    there is a threshold for plutonium causing cancer of

3    1,000 rem?

4                MR. POLAND:  Could you read the question

5    back, please.

6                (The referred-to question was read by

7    the reporter.)

8         A    I certainly don't recall anything of

9    that type.

10        Q    (BY MS. ROSELLE)  And you reviewed all

11   the literature in -- that you could find that was

12   applicable to assessing risks to the people at Rocky

13   Flats?  The medical literature.

14        A    Well, as I explained earlier, I didn't

15   say I reviewed all the literature.  Certainly, I didn't

16   personally, but, also, the word "all," I don't believe

17   I used before.  I said I believe there were hundreds of

18   documents, there was a wealth of information that would

19   been accumulated over decades, if I remember what I

20   said correctly.

21               Dr. Grogan, Dr. Sinclair, Mr. Voilleque

22   were the three individuals that primarily looked at

23   that information and performed the analysis of

24   uncertainty.

25               MR. POLAND:  How much time do we have

230

* ROUGH DRAFT *

1   left?

2                    THE VIDEO OPERATOR:  Zero.

3                    MR. POLAND:  Okay.

4                    MS. ROSELLE:  I have nothing else.  He

5   said zero; right.

6                    MR. POLAND:  He did.

7                    MS. ROSELLE:  I must have nothing else.

8                    MR. POLAND:  We're done.

9                    THE VIDEO OPERATOR:  This is the end of

10   tape 4, we are going off the record at 7:08.

11                    ... WHEREUPON, the deposition was

12   concluded at 7:08 p.m.

13

14

15

16

17

18

19

20

21

22

23

24

25

CARPENTER REPORTING, INC.
(303) 752-1200

* ROUGH DRAFT *

1                    SIGNATURE OF DEPONENT

2                    I, JOHN E. TILL, the deponent

3    in the above named deposition, have read the above and

4    foregoing deposition, and the same is a true and

5    accurate transcript of my testimony, save and except

6    for changes and/or corrections, if any, as indicated

7    by me on the amendment sheet(s) attached hereto as

8    indicated.

9    Amendment sheet(s) attached (    )

10   No changes and no amendment sheets attached (   )

11

12                    _____
                      JOHN E. TILL
13

14                    The signature of JOHN E. TILL was

15   subscribed and sworn to before me this _____ day of

16   _____, 2005.

17                My Commission expires:

18                    _____
                      Notary Public
19

20

21

22

23

24

25

                    CARPENTER REPORTING, INC.
                       (303) 752-1200
                                                    232
                    * ROUGH DRAFT *

```
 1                CARPENTER REPORTING, INC.
                Certified Shorthand Reporters
 2             Registered Professional Reporters
                 12510 East Iliff, Suite 120
 3                  Aurora, CO  80014

 4   December 5, 2005


 5


 6   DOUGLAS M. POLAND, ESQ.

 7   Lafollette, Godfrey &
         Kahn
 8   One East Main Street
     P.O. Box 2719
 9   Madison, WI  53701-2719

10   RE:  Cook v. Rockwell, et al.


11

     Dear Mr. Poland:
12
                Enclosed please find your copy of the
13   deposition of JOHN E. TILL, Ph.D., along with the
     original signature page and correction sheets for his
14   use.  Would you please have him read your copy of the
     deposition and if he finds any changes necessary, have
15   him make them on the correction sheets provided.  Be
     sure that he signs each correction sheet that he may
16   use.  Then have him sign the original signature page
     before a notary public and file the signature page and
17   correction sheets with the Court at the time of trial,
     providing copies to opposing counsel.
18
                Thank you for your assistance and
19   cooperation and if you have any questions concerning
     the above, please feel free to contact me.
20
     Yours truly,
21


22
     Bonnie Carpenter, CSR, RPR
23   cc:  Louise Roselle, Esq.

24   Trial Date:  Present


25
                  CARPENTER REPORTING, INC.
                     (303) 752-1200

                                                      233
                    * ROUGH DRAFT *
```

```
 1                    CARPENTER REPORTING, INC.
                     Certified Shorthand Reporters
 2                  Registered Professional Reporters
                      12510 East Iliff, Suite 120
 3                       Aurora, CO  80014
                          (303) 752-1200
 4
         LOUISE ROSELLE, ESQ.
 5       Waite, Schneider, Bayless
             ^ Chesley Co., LPA
 6       1513 Fourth and Vine Tower
         One West 4th Street
 7       Cincinnati, OH  45202

 8       Re:  Cook v. Rockwell, et al.
              Case No. 90-K-181
 9            United States District Court

10            District of Colorado


11

         Dear Ms. Roselle:
12
                 Attached is the original deposition of
13       JOHN E. TILL, Ph.D., taken in the above cause.

14           Deposition not signed              _____
             Deposition signed by the deponent
15             No corrections                   _____
             Deposition signed by the deponent
16             correction sheet(s) included therein,
               and copy(ies) of same forwarded to
17             interested counsel               _____
             Signature waived                   _____
18
                 Please retain the original copy of the
19       deposition UNOPENED in your possession until such time
         as it is required by any party in a hearing or trial of
20       the above cause.

21       Yours truly,

22

23       Bonnie Carpenter, CSR, RPR

24       cc:  Douglas M. Poland, Esq.
         Trial Date:  Present
25       RECEIVED BY _____DATE_____
```

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                    234
                      * ROUGH DRAFT *

```
 1                    C E R T I F I C A T E
```

```
     STATE OF COLORADO        )
2                             ) ss
     COUNTY OF ARAPAHOE       )
3
                  I, Bonnie Carpenter, Notary Public of
4    the State of Colorado, duly appointed to take the
     deposition of the above-named Deponent, do hereby
5    certify that previous to the commencement of the
     examination of the said above-named Deponent, he was
6    first by me duly sworn to testify the truth, the
     whole truth and nothing but the truth touching and
7    concerning the matters in controversy between the
     parties hereto, so far as he should be interrogated
8    concerning the same;

9                 That said deposition was
     stenographically reported by me at the time and place
10   heretofore set forth, and was reduced to typewritten
     form under my supervision as per the foregoing;
11
                  That the foregoing is a true and
12   correct transcript of my shorthand notes then and
     there taken;
13
                  That after the deposition was
14   transcribed, the same was submitted by letter to the
     Deponent for reading and signing, a copy of which is
15   hereto annexed;

16                That I am not kin or in anywise
     associated with any of the parties to said cause of
17   action or their counsel and that I am not interested
     in the event thereof;
18
                  IN WITNESS WHEREOF, I have hereunto
19   set my hand and seal this _____ day of _____,
     2005.
20
                  My Commission Expires:  9-22-2007.
21

22                          _____
                            Bonnie Carpenter
23                          Notary Public
                            12510 East Iliff
24                          Suite 120
                            Aurora, CO  80014
25

                  CARPENTER REPORTING, INC.
                     (303) 752-1200
```