# COOK V. ROCKWELL INTERNATIONAL  WAYNE HUNSPERGER vol. 1    4/24/97

## DEL CASALE, CASEY, MARTIN & MANCHELLO

Page 1 to Page 279

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

*DEL CASALE, CASEY, MARTIN & MANCHELLO*
*Ten Penn Center, Suite 636*
*1801 Market Street*
*Philadelphia, PA    19103*
*Phone:   215-568-2211*
*FAX:   215-568-2622*

## Page 19

(1) Q. Are there any other documents that fall
(2) into the category that you just described, those
(3) being additional documents that you've come into
(4) possession of?
(5) A. Yes.
(6) Q. What are they?
(7) A. I don't recall the exact title, but it's
(8) an application for Enterprize Zone Status of a
(9) portion of the lands south and east of the Rocky
(10) Flats plant.
(11) Q. When did you get that document?
(12) A. Probably about a month ago.
(13) Q. Do you have that document with you here
(14) today?
(15) MR. DAVIDOFF: I'm going to endeavor
(16) to get a copy. I am endeavoring to get it
(17) copied now, Mr. Lillie, so that we can
(18) furnish it to you.
(19) BY MR. LILLIE:
(20) Q. Any other documents that fall into this
(21) category?
(22) A. Not at the moment.
(23) Q. None that you can recall, or none that you
(24) have?

## Page 20

(1) A. None that I have at the moment.
(2) Q. Does that imply in any way that you have
(3) them back in Denver, but don't have them here in
(4) Philadelphia?
(5) A. No. It only implies that if something
(6) relevant should come to the front, I would reserve
(7) to the right to consider it.
(8) Q. Now, have the two documents that you just
(9) identified been used, relied upon by you in any way
(10) with respect to the opinions you intend to express
(11) here today?
(12) A. I may refer to these documents in opinions
(13) that I tend to express today. But as I indicated,
(14) they tend to bolster my position and won't cause me
(15) to alter it.
(16) Q. All right. With respect to the report,
(17) Exhibit 1A, did you have any assistance in preparing
(18) the report from people within your firm?
(19) A. Yes.
(20) Q. Who was your team, so to speak, with
(21) respect to the preparation of this report?
(22) A. I don't know if we had a team, per se, but
(23) Mr. David Clayton and I signed the report. And at
(24) one time or another, various of my employees did

## Page 21

(1) research for the project.
(2) Q. Are you the principal author of the
(3) report?
(4) A. Yes, I am.
(5) Q. Is there any portion of the report that
(6) was written principally by Mr. Clayton or anyone
(7) else in your office?
(8) A. Mr. Clayton wrote a portion of the report
(9) under my direction.
(10) Q. Which portion of the report did he write?
(11) A. He wrote a portion of section Roman
(12) Numeral III, Market Sales Information.
(13) And now that I think about it, I believe
(14) he wrote a portion of Roman Numeral I, Real Estate
(15) Market Research.
(16) Q. Which portion of Section III, the Market
(17) Sales portion, did Mr. Clayton write?
(18) A. The section having to do with aggregate
(19) land values and residential property comparisons.
(20) Q. And by the latter, do you refer to the MLS
(21) section of that report?
(22) A. That's correct.
(23) Q. And can you describe for me or divide for
(24) me who bore principal responsibility for the various

## Page 22

(1) sections of the real estate research section?
(2) MR. DAVIDOFF: That's objected to as
(3) asked and answered.
(4) THE WITNESS: I bear principal
(5) responsibility for all the sections,
(6) although Mr. Clayton did conduct a number
(7) of the interviews and -- and wrote
(8) portions of the report that were
(9) particularly applicable to his portion of
(10) the assignment.
(11) BY MR. LILLIE:
(12) Q. What is the evaluation date of your
(13) report?
(14) A. The date is, in effect, the time continuum
(15) from around 1989 through present. In other words,
(16) we look at -- we looked at effects over a period of
(17) time as opposed to what appraisers typically do
(18) on -- in a given day.
(19) Q. In that regard, I take it, then, that your
(20) work is not typical of work appraisers do every day;
(21) is that correct?
(22) A. That's correct.
(23) Q. Is there any specific date, one date, that
(24) you can identify for me as the effective date of

## Page 23

(1) value for purposes of your report?
(2) A. I wouldn't even characterize the report as
(3) an effective date of value. But beyond that, I
(4) wouldn't characterize the report as effective on any
(5) one date. It represents a study over a time
(6) continuum.
(7) Q. I take it, then, that there is no
(8) effective date of value for your report; is that
(9) correct?
(10) A. That's correct.
(11) Q. Have you ever before prepared a report
(12) that was called a property impact study?
(13) MR. DAVIDOFF: That title, is that
(14) your question, sir?
(15) MR. LILLIE: That's my --
(16) MR. DAVIDOFF: Objection to the
(17) form.
(18) THE WITNESS: I can't think of
(19) anything we've done that was titled with
(20) exactly those words.
(21) BY MR. LILLIE:
(22) Q. Have you ever prepared a report that was
(23) even slightly similar in its characterization as a
(24) property impact study?

## Page 24

(1) A. I don't know what you mean by "slightly
(2) similar", but we have prepared a number of
(3) consulting reports over the years dealing with
(4) different aspects of real estate.
(5) Q. But I take it that none of those reports
(6) has been titled a Property Impact Study; is that
(7) correct?
(8) A. That's the best of my recollection at the
(9) moment.
(10) Q. Are you aware of any particular standard
(11) or code within your business which recognizes or
(12) identifies the term "property impact study"?
(13) A. In effect, yes.
(14) Q. Which standard, please?
(15) A. I think your question was do you recognize
(16) any standard, or some other word. I'm not aware of
(17) a standard that uses the word "property impact
(18) study", but I am aware of materials within the text
(19) that recognize the concept of a property impact
(20) study.
(21) Q. That's not quite my question, though. My
(22) question is very specific. And I want to know, is
(23) there a standard, for instance, is there a USPAP
(24) standard which identifies or defines a property

Page 61

(1) Q. Who drew that on here?
(2) A. I don't recall who put this together.
(3) Q. Who did the graphics work for your report?
(4) A. As best I recall, Dr. Radke may have
(5) provided us some maps, and Ms. Benoit may have
(6) provided us some exhibits.
(7) Q. All right. Did you have people in your
(8) office that are equipped to do a graphic like this
(9) Page 203?
(10) A. No.
(11) Q. All right. Now, the class contour area
(12) actually spans three different MLS reporting
(13) districts; correct?
(14) MR. DAVIDOFF: Objection to the
(15) form. Objection to the word "spans".
(16) THE WITNESS: If you're asking me if
(17) three of the reporting districts touch or
(18) encroach into the class area, the answer
(19) is yes.
(20) BY MR. LILLIE:
(21) Q. Okay. That's what I was asking.
(22) Now, putting those areas aside, is it your
(23) view that there is some area outside of the contour
(24) area which you found to be most similar to the

Page 62

(1) contour area for purposes of comparing the MLS data?
(2) A. No, I didn't look at it in that context.
(3) Q. Was it your view that the Jefferson South
(4) area was the reporting district that was most
(5) closely comparable to the Rocky Flats contour area?
(6) A. As I indicated, I didn't look at it in the
(7) context of most comparable. At least I don't recall
(8) that I did.
(9) Q. Was it your view that the area most
(10) similar to the class area in your opinion was
(11) Jefferson County South, referring now to Page 215 of
(12) your report?
(13) MR. DAVIDOFF: 215?
(14) MR. LILLIE: Yes.
(15) THE WITNESS: I stand corrected. We
(16) did – we did identify Jefferson County
(17) South as being the most similar.
(18) BY MR. LILLIE:
(19) Q. All right. And why?
(20) A. Because of its physical characteristics,
(21) its relationship to core Denver to the south,
(22) approximates the same relationship that Rocky Flats
(23) area had to the north.
(24) Topographically it sits in the foothills

Page 63

(1) like the Rocky Flats area does. It's served by the
(2) same county government. It has some approximation
(3) to I-70 and transportation to the ski areas like the
(4) Rocky Flats area does.
(5) The school district is the same. There
(6) are probably other reasons that I can't think of at
(7) the moment.
(8) Q. All right. I'd like you to walk me
(9) through how you arrived at the numbers that are
(10) reported in your report, and compare them to Exhibit
(11) 3, which is their source.
(12) A. Before we do that, would this be a good
(13) time to take a break?
(14) Q. Sure.
(15) A. Thank you.
(16) (Brief recess.)
(17) MR. DAVIDOFF: Can I just put one
(18) thing on the record? Earlier Mr.
(19) Hunsperger identified a document that he
(20) had recently obtained. Is this part of it
(21) too?
(22) THE WITNESS: Yes.
(23) MR. DAVIDOFF: Which he had brought
(24) with him, and I said, I think I stated on

Page 64

(1) the record that I was having – had
(2) requested that it be copied. I have had
(3) it copied. It's a lengthy document. I've
(4) got two copies of it here.
(5) MR. LILLIE: Fine.
(6) MR. DAVIDOFF. If you're going to
(7) mark it, why don't I give you one and I'll
(8) hold one to look on with.
(9) There's a cover letter and the
(10) other – the one document is titled
(11) Jefferson County Enterprise Zone, Economic
(12) Development Plan Revision, September 1,
(13) 1996.
(14) I have now produced that to you.
(15) MR. LILLIE: Ready to get started?
(16) MR. DAVIDOFF: Yeah, sure.
(17) BY MR. LILLIE:
(18) Q. All right. We left off, Mr. Hunsperger,
(19) talking about Exhibit 3. If I can ask you, please,
(20) to show me just how you arrived at the numbers that
(21) you did in your report. And just a sample would be
(22) fine.
(23) Why don't we start with Jefferson North,
(24) which is on Page 204. And to speed things along, I

Page 65

(1) take it that what you did is you used the year-to-
(2) date sold statistics and took the numbers that
(3) appear on Exhibit 3 both for number of properties
(4) sold and average prices, and then set that forth in
(5) this chart which is in the middle of 204; is that
(6) correct?
(7) A. That's correct.
(8) Q. Okay. Now, I think the record is clear,
(9) but the only data that you're using in this section
(10) of your analysis is 1989 data and 1995 data and
(11) nothing in between –
(12) A. That's correct.
(13) Q. – is that true? Why did you do that?
(14) A. Because we wanted to calculate an average
(15) annual change rate over that period. And we could
(16) do that with '89 data and '95 data, and we didn't
(17) need to particularly look at it on an individual
(18) year basis. We were only looking for trends.
(19) Q. Is it fair to say that your analysis,
(20) then, would have missed all the transactions that
(21) took place in 1990, 1991, 1992, 1993 and 1994?
(22) MR. DAVIDOFF: That's objected to as
(23) misleading. Objected to as to form.
(24) THE WITNESS: Well, it does

Page 66

(1) mischaracterize what we did. And, in
(2) fact, the answer is, really, it
(3) wouldn't – our analysis would not have
(4) missed all those transactions because
(5) whatever happened in those years probably
(6) in some ways determines if it's 1995
(7) prices.
(8) So when we averaged over the years,
(9) I think we've taken all those ups and
(10) downs, if there are ups and downs, into
(11) account.
(12) BY MR. LILLIE:
(13) Q. Have you ever done MLS analysis before
(14) where you excluded the intervening years and used
(15) only an opening and closing year?
(16) A. Sure.
(17) MR. DAVIDOFF: That's objected to as
(18) to form. I note an objection as to form.
(19) BY MR. LILLIE:
(20) Q. All right. Back to where we were. Would
(21) you describe for me what the categories on this
(22) document Exhibit 3 mean, just walk me through what
(23) the document is.
(24) A. I will apologize first that the document