1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
CIVIL ACTION NO. 90-K-181-JLK

---

DEPOSITION OF JOEL SELBIN, Ph.D.
EXAMINATION DATE: NOVEMBER 9, 2005          COPY

---

MERILYN COOK, et al.,

Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION
and THE DOW CHEMICAL COMPANY,

Defendants.

---

**PURSUANT TO NOTICE**, the deposition of JOEL SELBIN, Ph.D., was taken at 10:09 a.m. on November 9, 2005, at 1801 York Street, Denver, Colorado, before Nathan Stormo, Registered Professional Reporter and Notary Public in and for the State of Colorado, said deposition being taken pursuant to the Federal Rules of Civil Procedure.

Nathan Stormo
Registered Professional Reporter

Stormo Reporting, Inc.   (303) 200-4792

40

1  Q  Okay. So those are the two people you came to
2  know that got you involved in the RSAL committee; is
3  that correct?
4  A  Yes, that's correct.
5  Q  And how did the process work that you actually
6  joined the committee?
7  A  Well, I was invited to submit information about
8  myself, a bio, to one of the people. I think he was a
9  council member from Broomfield who was on the committee
10 who was sort of chair of the committee, I guess. I'm
11 not sure exactly what title he had, because this wasn't
12 a very formalized, formal committee. Hank -- Hank
13 somebody.
14 Q  Would that be Hank Stovall?
15 A  Hank Stovall. So anyway, I basically had, as I
16 recall, an interview with Hank Stovall, told him of my
17 background in nuclear issues such as I've laid out to
18 you. I told him of my interest in being involved with
19 what they were doing, the cleanup process at Rocky
20 Flats, and was invited to join the committee.
21 Q  I'm going to back up just one minute to the
22 formation of the committee itself before the time that
23 you joined the committee. Do you know the circumstances
24 under which the committee came to be formed?
25 A  Well, there was great citizen concern with the

41

1  soil action level which had been put forth by these
2  three agencies; the Department of Energy, the EPA, the
3  Colorado Department of Public Health & Environment. In
4  1996, without any public input, they came up with a soil
5  action level of 651 picocuries per gram, which could be
6  left undisturbed at Rocky Flats and which was a figure
7  far higher than any other figure for soil action levels
8  elsewhere in the country.
9       And so citizens were concerned, and so there
10 was citizen concern about doing something about that
11 soil action level. And so I don't know the exact
12 circumstances or who specifically said, We need to have
13 a soil action level committee, but it grew out of
14 citizen concern. And I'm talking about citizens from
15 all the communities around Rocky Flats.
16 Q  The original action level that you mentioned,
17 the 651 picocuries per gram, let's talk about that for a
18 second. That number was set, you said, by the -- if I
19 say the CDPHE, the acronym, you know what I'm talking
20 about?
21 A  Yes.
22 Q  And the DOE, the Department of Energy, and the
23 EPA, correct?
24 A  Yes.
25 Q  And that was set pursuant to the Rocky Flats

42

1  Cleanup Agreement; is that correct?
2       MS. GEOPPINGER: I'm going to object.
3       To the extent it calls for speculation, I'm
4  going to instruct you not to speculate. But if you know
5  the answer, go ahead and answer.
6  A  That was part of the cleanup agreement, was
7  that the 651 arose in the --
8  Q  (By Mr. Poland) In the cleanup agreement
9  itself?
10 A  In the cleanup agreement, yes.
11 Q  If I use the acronym RFCA, or R-F-C-A, will you
12 understand I mean the Rocky Flats Cleanup Agreement?
13 A  Yes.
14 Q  So the original action level of 651 picocuries
15 per gram of plutonium 239 in the soil was set by the
16 RFCA, correct?
17 A  Correct.
18 Q  And that was the document that you said set the
19 level without input from the people in the community?
20 A  From the citizens, yes.
21 Q  And that was a level that was going to --
22 residual contamination that was going to be left in the
23 soil at the Rocky Flats plant at the site, correct?
24 A  Correct.
25 Q  Now, after the RFCA came out, what actions

43

1  or -- strike that question.
2       In response to the RFCA, what occurred that led
3  to the creation of the committee that you eventually
4  served on?
5       MS. GEOPPINGER: Objection; asked and answered.
6  He said he didn't know.
7  A  I don't know.
8  Q  (By Mr. Poland) Is your first knowledge of
9  anything having to do with the committee the time that
10 you actually joined the committee?
11 A  Yes.
12 Q  All right. Let's start there, then. The first
13 knowledge that you had of the committee would have been
14 at the time you interviewed with Mr. Stovall to serve on
15 the committee?
16 A  Yes.
17 Q  And you said you were invited to join shortly
18 thereafter, correct?
19 A  Correct.
20 Q  Who else was on the committee?
21 A  Well, there were representatives of
22 Kaiser-Hill, representatives of -- Joe Legare from the
23 Department of Energy, and Tim Rehder from the
24 Environmental Protection Agency, and Steve Gunderson
25 from Colorado Department of Public Health & Environment,

```
                                           48
 1  the people who were on the panel, as best you can
 2  recall?
 3     A   Yes. The people under the "Technical Support
 4  Contractor" were not members of the committee. They
 5  were the people from the group that was hired; the
 6  expert group that was hired to work on soil action
 7  level, the Risk Assessment Corporation.
 8     Q   Okay. We'll get to that in just a second.
 9         Once you were invited to join the panel and you
10  did join, do you recall exactly when that was; the date
11  that was?
12     A   No, I don't. It was roughly, I think, in the
13  summer of '98, but it could have been early fall. I'm
14  just not sure. I know the committee had already been
15  operating before I joined.
16     Q   Do you know who appointed the members of the
17  committee before the time that you joined?
18     A   No. I can only presume it was Harlow and
19  Stovall.
20         MS. GEOPPINGER: Don't guess.
21     A   I don't know.
22     Q   (By Mr. Poland) Do you know where the
23  committee received its funding?
24     A   From the Department of Energy.
25     Q   Do you know how much funding the Department of
```

```
                                           49
 1  Energy gave to the committee?
 2     A   I only know how much they came up with for the
 3  RAC corporation. I think that was half a million
 4  dollars, but I'm not positive of the exact amount.
 5         THE DEPONENT: Thanks.
 6         MS. GEOPPINGER: You're welcome.
 7     Q   (By Mr. Poland) Were there any other sources
 8  of funding for the work that the RSALOP did, other than
 9  the money that came from DOE?
10     A   Not that I know of. I'm unaware.
11     Q   What was the first thing the committee did
12  after the time you joined?
13         MS. GEOPPINGER: Had a meeting. Just kidding.
14         MR. POLAND: Could be.
15     A   I've spent over 300 hours in meetings with this
16  group. I have no idea exactly what took place the first
17  meeting I was there. I was introduced. We each
18  introduced ourselves so that I would know the other
19  members. When a new member came, everyone sort of
20  introduced themselves. That I can remember, but what
21  transpired, it's probably in the minutes in the library
22  somewhere. I mean, I did not keep minutes. Minutes
23  were taken, I believe every time. Minutes were handed
24  out. We were asked, Were there any corrections or
25  additions to the minutes. I always discarded the
```

```
                                           50
 1  minutes, but they are available I'm sure in the document
 2  part of the library somewhere.
 3     Q   (By Mr. Poland) Let's make it a little bit
 4  more general as opposed to a specific meeting. What was
 5  the task or what was the -- or what were the tasks that
 6  the committee was dealing with at the time that you
 7  joined it?
 8     A   The primary task was to consider the proper,
 9  appropriate, necessary cleanup of Rocky Flats, and what
10  scientific/technical studies needed to be done to
11  establish what an appropriate cleanup would be and
12  represent. But also what scenarios did we envision for
13  Rocky Flats in the future.
14     Q   At the time that you joined the committee in
15  the summer -- roughly the summer of 1998, had a
16  contractor already been retained by the RSALOP to do
17  that kind of scientific investigation?
18     A   No.
19     Q   You just mentioned scenarios that the committee
20  would envision for Rocky Flats. Could you explain that
21  for me?
22     A   Well, cleanup must be concerned with who the
23  cleanup is for. Is the cleanup for a person who is
24  going to be spending most of the year there, or for
25  someone who just occasionally comes there and so forth.
```

```
                                           51
 1  In other words, the cleanup must be done for whatever
 2  human beings are going to be involved with that site and
 3  for how much time they're going to be involved with it.
 4  Because clearly the longer they are involved with the
 5  site in a given year, the cleaner it better be.
 6     Q   Under the DOE's original cleanup level -- or
 7  action level, I guess I should say -- that was the 650
 8  picocuries that you had mentioned.
 9         MS. GEOPPINGER: Objection. It's actually 651.
10     Q   (By Mr. Poland) Do you know what the scenarios
11  were that were envisioned by the DOE, CDPHE, and EPA in
12  coming up with that action level?
13         MS. GEOPPINGER: Objection; form.
14     A   No, I don't.
15     Q   (By Mr. Poland) Did the RSALOP come up with
16  their own scenarios that they believed ought to apply to
17  accomplish an action level or a cleanup level at Rocky
18  Flats?
19     A   I'm not certain whether the committee members
20  specifically did this or whether it was the RAC, the
21  independent study group that we hired, that came up with
22  the different scenarios. But those are laid out in
23  their final report, and we considered a most restrictive
24  scenario to be a resident rancher -- that, I can say --
25  who would spend most of the year there, grow things
```

52

1 there, get water from wells there, raise children there.
2 Q   This was in 1998 that these scenarios were
3 determined?
4 A   No.
5 Q   When were --
6 A   They came after, I guess -- RAC came in, I
7 guess, in '99 and completed its work in 2000; February
8 or March of 2000. And, again, in the documents that I
9 have the scenarios are laid out. I can't recall exactly
10 what they were, because my greatest concern was for our
11 going for the most conservative, restrictive scenario of
12 a resident rancher.
13 Q   Do you recall whether the resident rancher
14 scenario, the most restrictive scenario, was decided on
15 before the legislation was passed that created the
16 wildlife refuge?
17 A   The RAC corporation recommendation was to use a
18 soil action level that was for the most restrictive
19 resident rancher scenario. That was the 35 picocuries
20 per gram which they came up with. That came before the
21 legislation creating a wildlife refuge.
22 Q   Were you involved with the determination that
23 the rancher -- the resident rancher ought to be the
24 scenario by which the action level would be determined?
25 A   I made that case as often as I could.

53

1 Q   Was there any -- strike that question.
2     Do you know whether the wildlife refuge bill --
3 or I guess now it's an act -- permits resident ranching
4 on the area that's covered by the soil action level?
5 A   I don't know. I have a copy of the bill, but I
6 have not read it in detail. I just skimmed it.
7 Q   How did RAC come to be selected as the group
8 that would come up with the action level for the RSALOP?
9 A   Actually, RAC, as I recall, had a reputation --
10 a good reputation for being involved in this type of
11 work and was actually involved in some other work at
12 Rocky Flats at the time. It was doing some other
13 studies at Rocky Flats, so it was not unusual for them
14 to be picked to do this also because they were very
15 familiar with Rocky Flats. But I don't know the details
16 of how they exactly were picked. I don't recall that
17 now.
18 Q   Were there other groups that bid on the
19 contract to do the work for RSALOP?
20 A   I'm not sure. It seems to me there may have
21 been, but I'm not sure.
22 Q   Were you involved with the selection process
23 that ultimately ended up having a contract with RAC?
24 A   I don't even recall that, whether there was a
25 formal vote that we pick them. I just don't recall

54

1 exactly. It just seemed as though it was kind of a
2 consensus thing that was done without any formality.
3 Q   Was the committee satisfied with the work that
4 RAC did?
5     MS. GEOPPINGER: I'm going to object to the
6 extent that he's asked about the committee as a whole.
7     To the extent you can answer, go ahead.
8     He can't speak for what other people thought.
9 But in the general proposition, I understand the
10 question.
11     If you can answer, go ahead.
12 A   I was personally satisfied with the work that
13 they did. And, again, just speculating, I think most of
14 the committee were also.
15 Q   (By Mr. Poland) I want to ask you a question
16 about that, because counsel raised an objection about my
17 question because I asked for the committee's view on
18 something.
19     Are you able to give me the committee view on
20 that issue? Can you tell me what the committee as a
21 whole thought?
22 A   No.
23 Q   Were you satisfied -- strike that question.
24     Did anyone else on the committee voice to you
25 their opinions or conclusions about the quality of the

55

1 work that RAC did?
2 A   To the extent that I remember, as I say, most
3 people seemed satisfied with the kind of work they were
4 doing, the kind of questions they raised, and with their
5 conclusion that the most restrictive scenario should be
6 the one on which the RSAL would be based.
7 Q   Did you feel the work RAC did was good science?
8 A   Absolutely.
9 Q   Did the committee express an opinion whether
10 they felt the work RAC did was good science?
11 A   Did the committee express an opinion?
12 That's --
13 Q   Let me withdraw the question.
14     Did the committee reach any kind of a
15 conclusion about whether the work that RAC did for the
16 RSALOP was good science?
17 A   There was a tacit exception of the work of RAC.
18 Q   I'm sorry, exception or acceptance?
19 A   I'm sorry. A tacit acceptance that the work
20 they did was good and sound and that was never, as far
21 as I recall -- you must also understand I was not at
22 every meeting for every last moment. I missed a couple
23 of meetings. But as far as I know, there was no
24 objection raised, but I also don't recall that we ever
25 formally said, We're pleased, we accept this, you did a

56

1  great job.
2      Everyone seemed very happy with John Till, who
3  ran the whole thing, and his presentation at the end and
4  with the report that he came out with.
5      Q  Do you believe that John Till is a good
6  scientist, at least insofar as the work he did for the
7  RSALOP?
8      A  Yes.
9      Q  What involvement did the RSALOP have with
10 the -- if any, with the work that RAC was doing while it
11 was engaged in the study itself?
12     A  We asked questions. We -- the involvement
13 basically was to hear reports, progress reports; to hear
14 technical discussion of what was being studied; how it
15 was being studied; what the results were. There were
16 these technical reports, so our involvement was to
17 listen, and when we didn't understand, to ask questions.
18 I can't remember all of those details. I mean, they are
19 just voluminous.
20     Q  Was it an iterative process between RSALOP and
21 RAC?
22     A  There was interaction on a regular basis. And
23 the interaction, as I say, involved RAC sort of
24 reporting to us what's going on and our responding with
25 questions. And, again, the details are probably

57

1  available in the minutes of these meetings.
2      Q  When did RAC complete its work for the RSALOP?
3      A  It was either February or March of 2000, I
4  believe.
5      Q  Would that have been with delivery of a final
6  report?
7      A  Yes.
8      Q  Was that the Task 5 report?
9      A  Yes. They gave these interim reports, Tasks 1,
10 2, 3, 4, 5, and we had a look at those along the way.
11 But the final report, I believe, came in in March
12 probably.
13     MR. POLAND: Mark this is Exhibit 2.
14     (Deposition Exhibit 2 was marked.)
15     MS. GEOPPINGER: I will accumulate them down
16 here.
17     COURT REPORTER: Okay.
18     Q  (By Mr. Poland) I'm handing you a copy of what
19 I've marked as Deposition Exhibit 2.
20     A  Okay. It was February of 2000.
21     Q  You will notice that this copy does not have
22 any numbers on it -- what we call Bates numbers or
23 production numbers -- indicating that it came from your
24 file. That means it did not come from your file.
25     A  This did not come from my file?

58

1      Q  No. I did not find one in your file, a Task 5
2  report.
3      MS. GEOPPINGER: Let me put this on the record
4  so Dr. Selbin understands. The documents that were
5  produced -- "we," plaintiffs' counsel -- put Bates
6  numbers on them. They are identified with a series of
7  numbers that start with JS for Joel Selbin and then have
8  a numeric after it to identify the documents that came
9  from your file, okay?
10     THE DEPONENT: Okay.
11     Q  (By Mr. Poland) Obviously, it's a very thick
12 document, so you're not going to flip through the whole
13 thing, and I'm not going to ask you to flip through the
14 whole thing. You're welcome to do it if you want, or
15 you can do it over the lunch hour perhaps. I wanted to
16 mark it and ask you if it appears to be a true and
17 correct copy of the Task 5 report.
18     Maybe we ought to hold off until you get a
19 chance to flip through it over the lunch break and see
20 what you think. I only wanted to mark it at this time
21 so we could look at the date and ground you as far as
22 the date is concerned.
23     Looking at Exhibit 2, does that refresh your
24 memory of when RAC issued their Task 5 report?
25     A  Yes.

59

1      Q  And when did they issue the report?
2      A  As I say, I thought it was February or March.
3  I don't know what else to say.
4      Q  That's okay. The document reflects that it was
5  February of 2000; is that correct?
6      A  Yes.
7      Q  So that's when they issued the final report and
8  their recommendation?
9      A  Yes. I may not have seen it until February,
10 but -- I mean until March, but that's why -- it's not
11 clear in my mind which of those months it came out.
12     What I remember reading and what I have in my
13 documents is the summary; is the executive, basically --
14 I don't know whether they called it an executive
15 summary, but the guts of the report; the general
16 summary.
17     Q  What we'll do, then, is over the lunch hour
18 I'll pull that document out, and we can take a look at
19 that if you're more comfortable looking at that.
20     Based on the report that the RSALOP received
21 from RAC, did they take any action with respect to the
22 levels that had been proposed by the CDPHE, DOE, and
23 EPA?
24     A  Well, the committee could not assign an RSAL.
25 That has to be done by the agencies involved. But as I

60

1  recall, the committee was satisfied by this 35
2  picocuries per gram and was accepted -- was accepting of
3  this report in the sense that that was the bottom line.
4      In other words, the bottom line concern of this
5  group all along was a final, acceptable RSAL. And since
6  this represented a far superior number compared to the
7  651 from 1996, the group was very pleased. I certainly
8  was very pleased.
9   Q  You mentioned it was a far superior number.
10 Why do you believe it was a far superior number to the
11 651 picocuries per gram number that was in the original
12 RFCA?
13  A  Well, because it represented a protective
14 cleanup for the most restrictive scenario that we had.
15 And those scenarios are laid out here now on Page
16 Roman V of this document.
17  Q  And you're referring to Exhibit No. 2, correct?
18  A  Yes.
19  Q  And so if we turn to Roman Page V of
20 Exhibit No. 2, there is a table GS-1 there?
21  A  Yes.
22  Q  Is that what you were just referring to --
23  A  Yes, I was.
24  Q  -- when you mentioned the scenarios?
25  A  Yes. Those are mentioned -- the scenarios --

61

1  this does not have to do with RSAL. This has to do with
2  dose rather than soil action level. But the scenarios
3  that are mentioned there are the ones we concerned
4  ourselves with, and the most restrictive one, of course,
5  is the resident.
6   Q  And if we take a look at the Table GS-1, the
7  title is "Plutonium Soil Concentrations," and then in
8  parens there, you see the notation pCi g minus 1. Do
9  you see that?
10  A  Yes.
11  Q  And that means picocuries per gram, correct?
12  A  That's correct.
13  Q  And then it says "at 5 to 10 percent
14 probability level." Do you see that?
15  A  Yes.
16  Q  Do you know what the 5 to 10 percent
17 probability level means?
18  A  Yes. It means that the rancher, the child of a
19 rancher, the infant of a rancher -- or the child of a
20 rancher at 35 picocuries per gram will protect them to
21 90 to 95 percent of getting a dose of 15 millirem per
22 year. So, in other words, their risk level is 5 to 10
23 percent. Their protection level is 90 to 95 percent, is
24 what that probability level means.
25  Q  Okay. I guess I don't quite understand what

62

1  you mean by "protection level."
2   A  Well, whenever you deal with a risk, there is a
3  probability involved. And the probability of getting
4  cancer in a certain number of people, say 1 in 10,000 to
5  1 in a million, your probability of being a cancer
6  victim, 1 in 10,000, is 5 percent to 10 percent. Your
7  probability of not being a victim in the 1 in 10,000 is
8  90 to 95 percent. In other words, there is not a way of
9  saying that one ever has 100 percent probability of not
10 developing a cancer from this particular soil action
11 level.
12  Q  So if I go to the DOE-1 resident -- let's go
13 down to the most restrictive one, I guess, the RAC-1,
14 the rancher, at 35 picocuries per gram.
15  A  Yes.
16  Q  That means that it's 90 percent probable that
17 you won't get a cancer?
18  A  Exactly; exactly. And maybe 95 percent. These
19 things are uncertain, these calculations, and they have
20 an error limit, as many scientific results, particularly
21 involving human beings. We can't be certain. We don't
22 have certainty with such studies.
23  Q  And then based on the 35 picocuries per gram
24 number, did the RSALOP take any further action to make
25 that number known to CDPHE, EPA, and DOE?

63

1   A  Well, they were part of this committee. They
2  knew this was being done. They probably learned it
3  before we did. Those three agencies were intimately
4  involved with this soil action level.
5   Q  I'm going to ask you to get Exhibit 1 out
6  again. Can you identify for me which panel members were
7  from the DOE, the EPA, and the CDPHE?
8   A  They are not listed here. They were not
9  considered, I guess, part of the oversight panel. They
10 were simply there to be involved with the oversight
11 panel and to -- that's a point that I guess I don't have
12 really clear in my head. I always considered them part
13 of the oversight panel, and I'm just wondering where in
14 here it mentions the fact that they were involved with
15 every meeting and everything that went on. And, in
16 fact, in a way almost ran things at many of the
17 meetings.
18     So from the point of view of this Exhibit 1,
19 this was just the oversight panel with mention on Page 1
20 of that document the Environmental Protection Agency and
21 the Colorado Department of Public Health & Environment.
22 But it doesn't -- nowhere on here does it claim that
23 they are members of this oversight panel. They were
24 just -- it doesn't also mention the contractor,
25 Kaiser-Hill. They were at every meeting. They had

**Page 64**

1 representatives at every meeting. So our meetings of
2 the oversight panel involved these four groups; the
3 three agencies, two federal, one state, and the
4 contractor for the cleanup.
5   Q  They were present at the meetings; that's your
6 testimony?
7   A  Yes.
8       MS. GEOPPINGER: Well, I'm going to object. I
9 think he described it as more than just presence at
10 the -- to the extent your question mischaracterizes his
11 testimony, because he testified specifically --
12      MR. POLAND: Legal objection only, please.
13      MS. GEOPPINGER: I beg your pardon?
14      MR. POLAND: Legal objection only.
15      MS. GEOPPINGER: I'm going to object to your
16 mischaracterization of his testimony.
17      MR. POLAND: Okay. That's fine.
18   Q  (By Mr. Poland) Is it your testimony that
19 representatives of the DOE, the EPA, the CDPHE, and
20 Kaiser-Hill attended the RSALOP meetings?
21   A  Yes.
22   Q  Were there times that the RSALOP took votes on
23 anything?
24   A  Not that I recall; not that I recall.
25   Q  When the RSALOP made decisions, for instance,

**Page 65**

1 retaining RAC, did the RSALOP do that on their own?
2       MS. GEOPPINGER: Objection; it's been answered.
3       You can answer if you can.
4   A  As far as I recall, there was no other input
5 called for. It was the RSALOP that agreed to hire RAC
6 once we knew that the Department of Energy was going to
7 supply the funding.
8   Q  (By Mr. Poland) Did the DOE, the CDPHE, or the
9 EPA force RAC on the RSALOP?
10  A  Not to my recollection, no.
11  Q  Did the DOE, EPA, or CDPHE somehow impede the
12 RSALOP in the work that it was doing?
13  A  I wouldn't use the word "impede." My own
14 opinion is that they may have misled the RSALOP in
15 regard to how much power and input we really had in the
16 cleanup.
17  Q  Is that your own opinion personally?
18  A  That's my opinion, and it's the opinion of
19 certain other people too.
20  Q  Okay. Let me ask you, did the committee -- can
21 you express an opinion that would be a committee
22 opinion; an opinion of the RSALOP that it felt that it
23 was misled by the DOE, CDPHE, EPA, and Kaiser-Hill?
24  A  It was never expressed openly, to my knowledge,
25 in the meetings I was at. But there certainly were

**Page 66**

1 members of the committee who agreed with me, and some
2 who were even ahead of me, in deciding that we were not
3 being dealt with above board with regard to how much
4 final input we would have in the cleanup process.
5   Q  And who were the other members of the committee
6 who felt that way?
7       MS. GEOPPINGER: I'm going to object to the
8 form of the question.
9       If you can answer, to the extent you know, go
10 ahead.
11  A  Well, I could name some names, but I would not
12 get them all, and I don't think I should fairly do that.
13  Q  (By Mr. Poland) Well, I do want to be clear.
14 I am going to ask you to name names, and I'm going to
15 ask you to identify all of them that felt that way.
16  A  Well, certainly LeRoy Moore, Tom Marshall,
17 Niels Schonbeck, Joe Goldfield. Not everybody is here.
18      MS. GEOPPINGER: For the record, Dr. Selbin is
19 referring to Exhibit 1.
20  A  I'm doing this to recall the names of some
21 folks who I have long forgotten, in terms of names; not
22 forgotten the people.
23      There may have been one or two others. I'm not
24 sure -- so I won't mention the ones I'm not sure of, but
25 the ones I mentioned, I'm sure of.

**Page 67**

1   Q  (By Mr. Poland) And did -- I'm sorry. Did you
2 have anything you wanted to finish?
3   A  No.
4   Q  How do you know that they felt as you did; that
5 you weren't being dealt with in an above-board way in
6 how much influence the RSALOP would have on the cleanup
7 level?
8       MS. GEOPPINGER: Object to the form of the
9 question. Who is "they"?
10  A  I guess I didn't quite understand. How did I
11 know?
12  Q  (By Mr. Poland) Correct. Did they express an
13 opinion to you? Did they tell you they felt the same
14 way you did?
15      MS. GEOPPINGER: Object to the form of the
16 question. Who is "they?"
17      MR. POLAND: The "they" are LeRoy Moore, Tom
18 Marshall, Niels Schonbeck, and Joe Goldfield.
19  A  Yes. In my discussions with them, we agreed
20 that we were not being dealt with above board. And, in
21 fact, one of the agency members a year after we started
22 this admitted that they were limited in the cleanup by
23 the funds that were appropriated. And that told us that
24 this whole cleanup was not being driven by safety and
25 concern for public safety, but was being driven by

```
                                                      68
1    money.
2       Q  (By Mr. Poland)  Who was the person who made
3    that admission that you just referred to?
4       A  I could find that in one of the documents that
5    I have. It was one of the members of -- it may have
6    been one of the members of the Colorado Department of
7    Public Health & Environment. It may have been Steve
8    Gunderson.
9       Q  What were the circumstances under which he made
10   that admission?
11      A  Well, several of us, myself often, asked the
12   question in the committee, why we did not go to the
13   Congress and ask for more money for a better cleanup;
14   for a more complete cleanup. And I guess we asked that
15   question enough times that we were finally told, That's
16   it. We can't get any more money.
17         And the money was incredibly small, like
18   7 percent of the total money for the cleanup. For the
19   over $7 billion of cleanup, only $470 million or
20   something was for the soil cleanup. And many of us felt
21   like for not very much more than that, the soil could
22   have been cleaned up better.
23      Q  So there was a statement made by a person. It
24   might have been Steve Gunderson, but you're not sure?
25      A  It might have. I'm not certain.

                                                      69
1       Q  And this was a statement that he made directly
2    to you and others as well?
3       A  No, in the committee; at the meeting.
4       Q  But it was a meeting where you were present?
5       A  Right.
6       Q  And so it was a statement that was made to you
7    and to other members of the committee?
8       A  Right. In fact, he made the comment, it was
9    like throwing a dead rat on the table.
10      Q  I don't follow. What did he mean by that?
11      A  I don't know what he meant by that.
12      Q  What was like throwing a dead rat on the table?
13      A  Sort of -- my interpretation was that he was
14   altering the whole scene of what we were trying to do.
15   He was basically saying that this cleanup is going to be
16   done with the amount of money we have as the driving
17   force, and not the concern for defending the safety of
18   the most vulnerable citizens. That was the
19   interpretation I put on it.
20      Q  He didn't actually make that particular
21   statement you've said?
22      A  No. That's my statement.
23      Q  And so he said that $470 million was going for
24   the cleanup of soil at the Rocky Flats plant?
25      A  I don't know if he said that at that time.

                                                      70
1    That is the factual information that I have read; that
2    of the 7-plus billion -- whatever was originally agreed
3    to by Congress -- that that was going to be not only the
4    total amount that was going to be given, there wasn't
5    going to be given anymore. But that of that, only about
6    7 percent of that was going to be for the soil cleanup.
7    The rest of it was going to be for tear down of
8    buildings, for safety, for transportation; for all the
9    other issues that require money. But the specific money
10   for the soil cleanup was going to be about that amount.
11         And by the way, that is an amount of money that
12   would only clean up to the 651 picocuries per gram and
13   not the 35 or the final 50 which this committee has --
14   which the agencies have come up with, which is why they
15   had to alter the whole cleanup procedure. They were not
16   going to clean up all the soil to 50 picocuries per
17   gram, but just the first -- top three feet. And then
18   from three feet to six feet, it was going to be a much,
19   much less cleanup. And below six feet there was going
20   to be no cleanup.
21         And the reason for that was there was a limited
22   amount of money, and no more was going to be available,
23   and they weren't going to ask for any more. And that
24   was my primary concern.
25         MS. GEOPPINGER: Could we take a break at some

                                                      71
1    point?
2          MR. POLAND: Sure.
3          MS. GEOPPINGER: We don't have to do it right
4    now. I just have to use the rest room when you get a
5    chance.
6          MR. POLAND: We'll just break now.
7          MS. GEOPPINGER: Okay.
8          (A recess was taken from 11:58 a.m. to
9    12:04 p.m.)
10      Q  (By Mr. Poland)  Mr. Selbin, when we broke I
11   was asking you about the work of the RSALOP itself. I'm
12   going to come back to that in just a minute. I'm going
13   to back up, though, and ask you a broader question.
14         Other than the RSALOP itself, are there any
15   other committees, boards, or groups that you have been
16   associated with or served on that deal with Rocky Flats
17   issues?
18      A  No.
19         MS. GEOPPINGER: Can we go off the record for
20   just a second?
21         MR. POLAND: Yes, we can go off the record.
22         (Discussion off the record.)
23      Q  (By Mr. Poland)  There was another group that
24   you were involved with other than the RSALOP itself; is
25   that correct?
```

Page 72

1  A   Correct.
2  Q   And what was that group?
3  A   It was called -- we called it the focus group.
4  I think it had a longer title, perhaps the Rocky Flats
5  Citizens Focus Group, or something like that.
6  Q   And what was -- let's just call it the focus
7  group, if that's okay with you.
8  A   Okay.
9  Q   What was the focus group?
10 A   It was a continuation, in a sense, of the
11 RSALOP, because it was clear that the agencies involved
12 were not happy with the RAC report's bottom line, and
13 therefore there was need for further citizen input to
14 try to convince these groups to accept the RAC report
15 bottom line.
16     And I also felt, but don't know for sure, that
17 these organizations wanted to continue the discussion so
18 that they could bring the citizens around to agreeing
19 that things did not have to be done the way RAC ended up
20 recommending. In other words, they wanted to keep
21 citizens happy with what they had already decided, which
22 we didn't know for sure at the time. They had already
23 decided that they had to limit the cleanup based on the
24 money available and not based on the RAC 35 picocuries
25 per gram. In other words, the money they knew they had

Page 73

1  available would not be sufficient to meet the RAC
2  recommendation.
3  Q   Was that conclusion ever expressed to you
4  directly in those terms?
5  A   No. That was my own conclusion and the
6  conclusion of others; that things were not -- that they
7  could not meet, with the money they had, the RAC
8  recommendation. As I said earlier, the money they had
9  available was going to be able to meet the 651
10 picocuries per gram, but certainly not the 35 picocuries
11 per gram. And, therefore, they also wanted to continue
12 citizen input, hopefully to get the citizens group to
13 agree that the cleanup could be done with what they had
14 available. And I think this was just a sham, frankly.
15 I think it was -- it was just not reasonable.
16     What I have -- what I have learned, again, from
17 material that is in the documents that I have, is that
18 there had been a prior agreement -- prior to the
19 formation of the soil action level committee -- that
20 Congress would supply the $7 billion with three
21 restrictions: that the work be done on time; that the
22 work be done with the money supplied; and the final
23 restriction was that the community be kept satisfied.
24 That criticism would be kept to a minimum from the
25 community.

Page 74

1     And so my own interpretation of the focus group
2  is that was part of the reason for the focus group to
3  continue; was to try to satisfy the community that they
4  had input when they really didn't.
5  Q   Now. They --
6  A   That's my opinion.
7  Q   That's your opinion. And you mentioned there
8  were others on the committee that shared your opinion;
9  is that correct?
10 A   Yes.
11 Q   Who else on the committee shared your opinion?
12 A   Well, certainly LeRoy Moore who, in fact,
13 published that information in at least two different
14 places. One place is in the Bulletin of The Atomic
15 Scientists. Another place -- I'm trying to remember; a
16 science letter maybe. I'm not sure it's in his science
17 letter. It's certainly in his article in the Bulletin
18 of The Atomic Scientists, which has been published and
19 is also in my record.
20     And he has a specific reference in there to
21 where that information came from that I just gave you;
22 that there were these three -- I don't know whether I
23 would call them tacit understandings between the federal
24 government and the state that the state was going to get
25 so much money, it's going to be fixed, that it had to do

Page 75

1  the work, and the fixed amount -- in the time allotted,
2  and that it had to keep the public happy.
3     Keep the public happy is my words. Those
4  aren't the exact words in the thing, but keep the
5  criticism down, basically.
6  Q   In addition to LeRoy Moore, who else on the
7  committee shared your opinion that there had been a
8  prior agreement about what the cleanup focus would be?
9  A   I did not discuss this with people on the
10 committee. In fact, I was not really aware of this at
11 the time, so I couldn't discuss it.
12 Q   How did you --
13 A   I guess what I'm saying is that these are
14 feelings I had, and I didn't really discuss them with
15 anyone. And then I later found out that these feelings
16 were well-founded.
17 Q   How did you find -- what I'm trying to get at
18 is how did you discover that your feelings were
19 well-founded?
20 A   Well, when I -- when I first saw reference to
21 this information that, again, is published in a document
22 available -- the reference is available in the file that
23 you have from me; when I first saw reference to that.
24 And I don't remember exactly when that was because I did
25 have access to a preprint of LeRoy's article that

**Page 80**

1  there essentially every time because I was available to
2  be there at that time. So this looks to represent the
3  group I was serving with.
4  Q  Do you know from looking at the list -- and I
5  recognize it's a fairly long list of names. Do you know
6  if there is anybody that was absent from this particular
7  meeting?
8  A  Which particular meeting -- oh, the May 9th?
9  Q  Yes, any names that you don't see there.
10  A  I have no idea which people were there at any
11  given time. I certainly didn't look around and make a
12  note of who was there and who was not there.
13  Q  I guess what I meant was are there any names of
14  people who were on the focus group that don't appear on
15  Exhibit No. 3; people who might have been absent that
16  day?
17  A  Well, let me look.
18  No.
19  Q  Was Mr. Moore on the focus group?
20  A  He was.
21  Q  Okay. And I notice that his name --
22  A  Yes, his name is not on here at this time. He
23  was certainly on the focus group. And the reason I know
24  that for sure is we very often went in either his car or
25  my car, because this was in Broomfield, and we both live

**Page 81**

1  in Boulder.
2  Q  What about Mr. Marshall; was Tom Marshall on --
3  A  Marshall did not come every time, and I don't
4  recall now how often he did come. He certainly was
5  there many times, but I certainly didn't keep track of
6  people, except myself.
7  Q  What about Mr. Schonbeck; was Mr. Schonbeck
8  there?
9  A  He was not. By this time he had other -- I
10  think -- as I recall, there were personal problems that
11  took him off the committee, and I don't know what those
12  were. I just know he stopped serving on the committee.
13  Q  Were members of the public invited to attend
14  the Stakeholder Focus Group meetings?
15  A  Yes.
16  Q  Do you know, just from recollection, whether
17  people who were not on the focus group attended?
18  A  Yes, they did, and it was a variable number.
19  It was never very many, but there were always some.
20  Q  What was the purpose or the charge of the focus
21  group?
22  A  I don't know that I ever saw a charge written
23  out. The purpose of the focus group was to continue
24  discussions about appropriate cleanup of Rocky Flats.
25  There was not any particular charge to the focus group.

**Page 82**

1  In fact, the focus group was really not very well
2  organized. It didn't have a chairman; it didn't have
3  rules of order, Robert's Rules of Order or anything like
4  that. It was just a citizens group that was concerned
5  with ensuring that Rocky Flats was cleaned up properly.
6  That was basically the thrust of the group.
7  Q  Do you know when the focus group came into
8  being?
9  A  In the year 2000, and it lasted 22 months. I
10  don't know exactly what month it started in the year
11  2000, but the RSALOP ended in early 2000, and so this
12  group probably started not very much further along in
13  the year. I just don't know when it exactly started.
14  And, again, I don't know whether there were minutes
15  taken at this. There were minutes taken from the
16  RSALOP. This group was much more informal, and I don't
17  think anyone was taking minutes. And I certainly didn't
18  keep any if they did.
19  Q  Did the RSALOP end after the RAC Task 5 report
20  and recommended soil action level came out?
21  A  Basically, because what happened was a public
22  meeting was then scheduled to discuss that, and then
23  that seemed to be the last meeting that I was at, was a
24  public meeting held, I believe, in Broomfield. And a
25  fair number of people from the public were there, and

**Page 83**

1  questions -- and the three agencies involved were there
2  to respond to questions from the public. But that was
3  the last meeting, and my guess is that was in March of
4  2000. And that, I think, was the effective end of the
5  RSALOP.
6  Q  Do you recall, was there ever any kind of
7  formal action taken to end the RSALOP --
8  A  No.
9  Q  -- or did it just sort of end after that
10  committee?
11  A  It just sort of ended.
12  Q  Or after that meeting, I should say.
13  Was there ever any formal transmittal or formal
14  letter prepared by the RSALOP to the CDPHE, EPA, and EPA
15  saying 35 picocuries per gram is what we want, or words
16  to that effect?
17  A  They never said that.
18  Q  The RSALOP never said that?
19  A  No. Those agencies never said, We're going to
20  meet the RAC recommendations. They did not agree with
21  the RAC recommendations. And that's what I've indicated
22  was, I think, the primary reason the focus group had to
23  form; to continue to deal with the issue since the study
24  was not accepted for the conclusions it came to, and
25  therefore there was no resolution to the cleanup

84

1 question of how clean was Rocky Flats to be made.
2  Q  My question is slightly different. My question
3 is, was there a formal letter that was written --
4 regardless of whether EPA, CDPHE, and DOE already had
5 the RAC Task 5 report -- was there some kind of formal
6 communication or formal proposal or formal
7 recommendation on behalf of the RSALOP to the EPA,
8 CDPHE, and DOE saying --
9  A  Not that I recall, no.
10  Q  I just need to finish my question for the
11 record.
12  A  Sure, sorry.
13  Q  -- saying, This is the cleanup standard that we
14 would like to have?
15  A  No, I don't believe there was any such. We
16 certainly didn't vote on anything like that. I don't
17 see -- I don't remember anything like that being
18 prepared from the committee.
19  Q  Nevertheless, as you testified before, the
20 CDPHE, EPA, and DOE did have the RAC Task 5 report with
21 the recommendation?
22  A  They did.
23  Q  Do you know who started the Stakeholder Focus
24 Group?
25  A  Not really. I believe it was the people on the

85

1 RSALOP who were sort of officials in their communities.
2 I mean, each of the surrounding communities had an
3 official representative to be sure that all the
4 communities were included in the citizens input. I
5 would just have to guess that they decided that this
6 focus group should -- could form and continue the
7 discussion of the cleanup at Rocky Flats. That's all I
8 can recall.
9  Q  Do you remember the circumstances under which
10 you joined? And by that I mean, did somebody ask you to
11 be a part of the Stakeholder Focus Group?
12  A  Well, I don't remember someone specifically
13 asking me that. What I remember was being told that the
14 focus group was going to form, and the members of the
15 RSALOP were invited to continue on with the focus group.
16 Some could and some couldn't. It depended upon their
17 obligations. Many of these folks had other obligations
18 as well as -- I mean, full-time jobs. I had a very
19 part-time job then. I was teaching two courses on the
20 Boulder campus, and so I had -- because of the times of
21 my courses, I had afternoons open to meet.
22  Q  At the time the Stakeholder Focus Group formed
23 in approximately March or so of 2000, at that point in
24 time had there been some kind of a definitive statement
25 from the CDPHE, EPA, and DOE that they were not going to

86

1 follow the RAC recommended action level of 35 picocuries
2 per gram?
3  A  I don't recall anything being written to that
4 effect. I only recall that the agencies decided that
5 they needed more study, more input before they reached a
6 decision about cleanup, which is one of the things that
7 led me to suspect that they had already decided
8 something else, and that it was just to satisfy the
9 citizens that they still had input when, in my opinion,
10 we didn't have any further input at all possible. But
11 it was -- it was part of an effort to satisfy.
12  Q  What led you to believe that they had already
13 made up their minds at that point in time?
14  A  Because they didn't accept the bottom line of
15 the RAC report. They said that that was not final, not
16 definitive. They never -- they never explicitly, to my
17 knowledge, said, We can't do this because we don't have
18 enough money. If they had said that, I would have
19 understood it. They did not say that. They just said,
20 We would have to continue the study of the cleanup
21 problem at Rocky Flats.
22  Q  Now, you mentioned before we broke, you talked
23 about an article that Mr. Moore published in Bulletin of
24 the Atomic Scientists, correct?
25  A  Yes.

87

1     MR. POLAND: Why don't we mark this as
2 Deposition Exhibit No. 4.
3     MS. GEOPPINGER: Are you still going to need
4 this one?
5     MR. POLAND: We might. Why don't you keep it
6 out. Do you want a Post-It or something to put on the
7 conclusions?
8     (Deposition Exhibit 4 was marked.)
9  Q  (By Mr. Poland) Dr. Selbin, I'm handing you a
10 document that I've marked as Exhibit No. 4. I would
11 like you to take a look at that document, please.
12  A  Okay.
13     Okay. It looks like the document.
14  Q  Do you recognize what I've marked as Exhibit
15 No. 4?
16  A  Yes.
17  Q  And for the record, it is an article that has
18 Bates numbers JS 00005 through JS 00014.
19  A  Yes.
20  Q  Can you identify --
21  A  00014 is not part of the article. It's part of
22 the next article, but anyway.
23     MS. GEOPPINGER: Probably a copying issue.
24  Q  (By Mr. Poland) Okay. Fair enough.
25  A  Just to be accurate.

24 (Pages 84 to 87)

88

1  Go ahead.
2  Q  Good, good. I'm glad. Thank you.
3      Can you identify Exhibit No. 4 for the record,
4  please?
5  A  This is an article appearing in the Bulletin of
6  the Atomic Scientists by LeRoy Moore in the
7  January/February 2005 issue.
8  Q  Now, Dr. Selbin, you testified earlier that you
9  believe that the RSALOP committee was a sham because
10 there had been a prior agreement that the Rocky Flats
11 cleanup would be limited; is that correct?
12 A  That's correct.
13 Q  And when I asked you about your basis for that,
14 you referred me to the article that we've now marked as
15 Exhibit No. 4, correct?
16 A  Yes.
17 Q  Can you identify for me in Exhibit No. 4 the
18 portion of the article that led you to your beliefs?
19 A  Yes. This is on Page JS 00009, or Page 53 of
20 the bulletin; bottom, middle column paragraph. Shall I
21 read it?
22 Q  Yes, if you would, please.
23 A  "Another government official said that Congress
24 had agreed to provide full funding for Rocky Flats
25 cleanup via a series of roughly equal annual

89

1  appropriations, provided the work was completed on time,
2  no additional funds were sought, and conflict in the
3  community was curtailed, according to a report on public
4  participation at Rocky Flats," which then is in
5  Reference No. 4.
6      Reference No. 4 is on Page 13, the JS Page 13,
7  and Reference No. 4 actually refers to Reference 3.
8  It's Ibid. 3. Theresa Satterfield and Joshua Levin, the
9  article entitled "Risk Communication, Fugitive Values,
10 and the Problem of Tradeoffs: Diagnosing the Breakdown
11 of the Deliberative Processing," appearing in Decision
12 Research on Page 15 of 2002. That's where LeRoy Moore
13 got that information.
14 Q  And that's -- and that paragraph that you read
15 from Mr. Moore's article was the basis for your belief
16 that the level of cleanup had already been determined,
17 and that the RSALOP was a sham?
18     MS. GEOPPINGER: Object. I think it
19 mischaracterizes his earlier testimony.
20     But you can go ahead and answer.
21 A  Yes, I had that suspicion myself. I had that
22 feeling myself; that we were being led down a phony
23 path. The phony path being that we really had some
24 input into the cleanup and that decisions -- prior
25 decisions for the cleanup had not been made, but, in

90

1  fact, they had.
2  Q  (By Mr. Poland) What was it that led you to
3  have a suspicion that that was the case?
4  A  Well, because I asked many times whether there
5  was going to be additional money available should it be
6  necessary for the most rigorous, restrictive cleanup.
7  And I had been told by these representatives -- not
8  always the same ones -- that the money had already been
9  appropriated and there was only so much money. Those
10 were not the exact words, but that was the essence of
11 their message, was that the cleanup was being determined
12 by money and not by ultimate safety.
13 Q  Is it the case that only the most restrictive,
14 rigorous cleanup would do for Rocky Flats?
15     MS. GEOPPINGER: I'm going to object to the
16 form of the question.
17 Q  (By Mr. Poland) Do you understand my question?
18 A  Yes. For me and a great many others, yes. In
19 fact, a citizens group in Colorado had decided that the
20 cleanup ultimately should be to background radiation,
21 far lower than the 35 picocuries per gram. Ultimately
22 to background radiation with the full understanding that
23 the technology was probably not yet available to do
24 that, but ultimately that should be the goal of the
25 cleanup, background radiation. And that was agreed to

91

1  by any number of committees.
2      In fact, I believe that is mentioned in here
3  also.
4  Q  Can you identify for me who it was, the
5  citizens group that determined that background -- that
6  it should cleaned up to background?
7  A  On Page 8 of this Exhibit 4.
8      MS. GEOPPINGER: For the record, that's on
9  Page 52 from the --
10 A  Page 52 from the bulletin.
11     "In 1994" -- this is the first column, last
12 paragraph -- "the Rocky Flats Local Impact Initiative,
13 an Energy-funded advisory body" -- now, that's
14 Department of Energy funded advisory body -- "created
15 the broadly representative Rocky Flats Future Site Use
16 Working Group for the sole purpose of telling Energy
17 what the local community wanted at Rocky Flats. In June
18 1995, the group recommended, by consensus, that the site
19 be cleaned up so that only background levels of
20 radiation remain. Mindful that the technology to attain
21 this goal was not yet available, the group called for
22 ongoing research to develop the requisite technology and
23 for the creation of a trust fund to ensure coverage of
24 the cleanup costs. 'We are willing to wait as long as
25 is necessary,' the group said, 'but no longer than

### Page 104

1  had mentioned?
2  A   That is a higher number available to, I don't
3  know, workers or people who know they're taking the
4  risk, as opposed people who don't know they're taking a
5  risk. I'm not exactly sure how EPA defines those two
6  numbers. There is a definition from the EPA about those
7  two numbers.
8  Q   Now, the soil action level that had originally
9  been proposed in the RFCA, 651 picocuries per gram, do
10 you know what kind of annual dose that would impart?
11 A   I don't know. It obviously would be a lot
12 higher. There is a direct relationship there. The
13 higher the picocuries per gram, the higher the risk.
14 Q   In the view of the RSALOP committee, the
15 cleanup standard that RAC had recommended, 35 picocuries
16 per gram, was acceptable?
17 A   Yes.
18 Q   So the dose of 15 millirem per year was
19 acceptable?
20 A   Yes.
21     MR. POLAND: Let's mark this as Deposition
22 Exhibit No. 5.
23     (Deposition Exhibit 5 was marked.)
24 Q   (By Mr. Poland) Dr. Selbin, I'm handing you a
25 document that I've marked as Exhibit No. 5. Can you

### Page 105

1  take a moment to look at it, please.
2  A   Okay.
3  Q   Can you identify what the court reporter has
4  marked as Exhibit No. 5?
5  A   Well, this is a piece prepared for the Rocky
6  Mountain Peace and Justice Center by LeRoy Moore in May
7  of 2000. He made this available to members of the
8  panel, and I believe probably to members of the public
9  since the Rocky Mountain Peace and Justice Center was
10 perfectly happy to communicate with the public all the
11 time. This is basically to go over some of the kinds of
12 details that RSALOP was working on.
13 Q   And is Exhibit No. 5 a document that came from
14 your files?
15 A   Yes.
16 Q   And so you have seen this document before?
17 A   Yes, I have.
18 Q   If you look under the heading close to the
19 bottom of the page, it says, "Background: Controversy
20 over the 'RSALs'"?
21 A   Yes.
22 Q   Do you see that?
23     If you look at the second bullet point down, do
24 you see Mr. Moore's reference there, he says, "The
25 interim RSALs were problematic for several years

### Page 106

1  reasons"?
2  A   Yes.
3  Q   And the second reason he gives is, he says,
4  "They were calculated to provide protection at a dose
5  limit of 85 millirem per year, a level that probably
6  exceeds Superfund guidelines applicable at Rocky Flats."
7  Do you see that?
8  A   Yes.
9  Q   So Mr. Moore appears to be stating in this
10 document that the 651 picocuries per gram level proposed
11 in the original RFCA would relate to an 85 millirem
12 annual dose. Do you see that?
13     MS. GEOPPINGER: Go ahead.
14 A   Probably. I'm not sure it's entirely clear
15 from these bullets that are here that that's what he's
16 saying. He does have a footnote that says, "The RSALs
17 were calculated to provide protection at a 15 millirem
18 per year level. EPA says this conforms with federal
19 Superfund law applicable for cleanup at Rocky Flats.
20 This interpretation of the law may be subject to
21 challenge. Perhaps 15 millirem per year is not as
22 protective as the law requires."
23     But if you're asking -- what you asked about
24 was if the 85 millirem per year correlates with the 651
25 picocuries per gram. I'm not sure about that. I

### Page 107

1  wouldn't necessarily think so.
2  Q   (By Mr. Poland) All right. You can set that
3  document to the side.
4      Is a risk-based end point a legitimate way of
5  determining a cleanup level?
6  A   Yes and no. Yes in the sense if one does the
7  risk analysis for the most -- the people at the most
8  risk, if it is not done for that, if it's done for
9  average risk, it is not the way to decide.
10 Q   And --
11 A   So yes and no. It depends on how the risk
12 analysis is done.
13 Q   And do you know how the risk analysis was done
14 for the current soil action level of 50 picocuries per
15 gram?
16     MS. GEOPPINGER: 50?
17     THE DEPONENT: 50 is what is proposed now.
18 A   But 50 is proposed with modifications to the
19 original 35 and the original 651. 651 and 35 were both
20 all the way down. The 50 picocuries per gram is just
21 the top 3 feet of the soil. It's allowed to go to 1,000
22 picocuries per gram between 3 and 6 feet, and there can
23 even be small spots that go as high has 6,000 picocuries
24 per gram. And below 6 feet, unlimited picocuries per
25 gram.

108

1   Q   (By Mr. Poland) How far down did the
2   35 picocuries per gram recommendation extend?
3   A   All the way.
4   Q   To where?
5   A   It was not specified how deep. The presumption
6   simply was that if you got deep enough, you wouldn't
7   find even 35 picocuries per gram.
8   Q   Now, plutonium is an alpha emitter, correct?
9   A   Correct.
10  Q   And the primary pathway of concern with alpha
11  emitters is inhalation, correct?
12  A   It depends. For adults, yes. I think there
13  are some questions about babies and children who eat
14  dirt. Then it can be ingestion. Besides, they don't
15  breathe as much as adults do. In other words, they
16  don't take in as much air. So there are lots of
17  variables that have to do with age relation in terms of
18  ingestion and inhalation.
19      Also, kids cut themselves more often and then
20  still play in the dirt. They can take in radiation
21  through a cut more than an adult, presumably. But -- in
22  other words, it's not an exact science in terms of how
23  the radioactive material gets into the body.
24  Q   Okay. The plutonium that is in the ground at
25  Rocky Flats that was produced at Rocky Flats -- strike

109

1   that question.
2       Is it your understanding that the ingestion
3   pathway is a potentially problematic pathway with
4   respect to ingestion of plutonium?
5       MS. GEOPPINGER: I'm going to object to the
6   form.
7       If you understand it, you can answer.
8   A   I don't quite -- you're asking me if ingestion
9   is a form of ingestion, I thought you said.
10  Q   (By Mr. Poland) Let me rephrase the question.
11      Is it your understanding that ingestion of
12  plutonium in dirt -- strike that question.
13      Is it your understanding that plutonium that is
14  in the soil at the Rocky Flats plant represents an
15  ingestion -- a health hazard from ingestion?
16  A   Partly, and partly from inhalation. And
17  perhaps in many cases more from inhalation because dust
18  is stirred up all the time by winds.
19  Q   What's the basis for your understanding that
20  ingestion of dirt that contains plutonium from Rocky
21  Flats is a health hazard?
22  A   Well, it's taken in in an insoluble form as
23  plutonium oxide, and the body has no way of dissolving
24  that -- it doesn't dissolve in water -- and yet it can
25  be picked up in the blood, distributed to various parts

110

1   of the body, and wreak havoc wherever it ends up in the
2   body. So these pathways into the body are all of a
3   variable nature depending upon the person and their
4   activity; what their activity is.
5   Q   If it's in an insoluble form, it passes through
6   the body, doesn't it?
7   A   Not necessarily. If it's in finely divided
8   particles, it can be taken in as particles into various
9   parts of the body.
10  Q   Do you know --
11  A   I don't know all of the biological details of
12  these -- of transport within the body. And it is
13  probably quite accurate to say that some material
14  ingested, depending on its particle size, could be
15  eliminated; might be eliminated from the body. But it's
16  definitely the case that particles that are ingested are
17  kept in the body.
18      What the relationship is, how, what the
19  particle size is, these studies have been done, I know,
20  because we had presentations by people dealing with such
21  matters before the committee -- before our committee.
22  So I know this is a potential danger to the body. I
23  don't know all the details of how this stuff gets
24  distributed.
25  Q   And if the NCRP or the ICRP had models or had

111

1   reports that show how plutonium is distributed into the
2   body, would you defer to those?
3   A   I certainly would; defer to those compared to
4   what I know.
5   Q   Yes, that was my question.
6   A   Look, I'm not an expert in this field. I just
7   know what I've read. I've certainly not done any
8   experiments myself.
9   Q   So if the ICRP or the NCRP said ingesting
10  insoluble forms of plutonium does not represent a health
11  hazard, would you defer to those conclusions?
12  A   If they said that, I would have to strongly
13  defer to them, I suppose. I would want to get as much
14  information as possible before I eliminated such a
15  thing, because I think that we -- we definitely
16  established in the RSALOP without objections, as far as
17  I can recall from any of the agencies, that there were
18  these three pathways that were hazardous to health; the
19  ingestion pathway, the inhalation pathway, and the skin
20  rupture, or whatever, pathway.
21  Q   Is it your understanding that the 35 picocuries
22  per gram cleanup standard that RAC recommended was
23  adequately protective of all three of those pathways of
24  exposure?
25  A   No, because there is another pathway which we

**Page 116**

1 the RSALOP and the Stakeholder Focus Group?
2  A   No, I would not say that.
3  Q   Nobody expressed that sentiment to you?
4  A   Nobody expressed that sentiment to me.
5  Q   Now, do you know for a fact whether the EPA,
6 CDPHE, and DOE did or did not consider the RSAL or soil
7 action level that RAC came up with of 35 picocuries per
8 gram?
9      MS. GEOPPINGER: Object to the form of the
10 question.
11  A   They looked at it, but they didn't accept it.
12 They couldn't accept it. As I've said before, they
13 couldn't accept it because it would have cost far more
14 money to clean up to that level, which they knew they
15 didn't have.
16  Q   (By Mr. Poland) That was your conclusion,
17 correct?
18  A   That's correct.
19  Q   But do you know -- you were not present at any
20 of the meetings -- strike that question.
21      Do you know whether there were any meetings
22 that the EPA, CDPHE, and DOE had where they discussed
23 the RAC Task 5 recommendation of 35 picocuries per gram?
24  A   I can only conjecture that they must have, but
25 I was not aware of them, and I certainly wasn't invited

**Page 117**

1 to any of those meetings.
2  Q   And did you see -- well, strike that question.
3      The three parties -- the CDPHE, EPA, and DOE --
4 ultimately did come out with a different action level,
5 did they not?
6  A   Correct.
7  Q   And what is that current action level?
8  A   50 picocuries per gram for the first 3 feet of
9 soil, and higher levels allowed for 3 to 6 feet, and
10 unlimited levels allowable below 6 feet.
11  Q   Did you look at the documents; have you seen
12 the documents that were released by the EPA, CDPHE, and
13 DOE in which they expressed or came up with a 50
14 picocuries per gram RSAL?
15  A   Yes, I think I have that.
16  Q   Let's just mark them as exhibits.
17  A   I'm trying to remember where I -- I think
18 that's in my --
19      MR. POLAND: Let's go off the record for a
20 minute.
21      (Discussion off the record.)
22      MR. POLAND: Can we mark this as Exhibit No. 6.
23      THE DEPONENT: I don't think I've seen that.
24      (Deposition Exhibit 6 was marked.)
25      MR. POLAND: I've got to justify having broken

**Page 118**

1 my back carrying it here.
2      THE DEPONENT: That's too many inches.
3  Q   (By Mr. Poland) Dr. Selbin, I am handing you
4 what has been marked as Exhibit No. 6.
5      MR. POLAND: And for the record, the document
6 says, "Task 3 Report and Appendices: Calculation of
7 Surface Radionuclide soil action levels for plutonium,
8 americium, and uranium, prepared by EPA, CDPHE, and DOE,
9 September 30, 2002."
10      I will also note for the record that it does
11 not have Bates numbers on it. It did not come from
12 Dr. Selbin's files.
13  Q   (By Mr. Poland) Dr. Selbin, I would like you
14 to take a moment just to flip through the document.
15 It's a very thick document. I understand you can't read
16 it with any thoroughness, but I just wanted to ask you
17 whether it's a document you have seen before.
18  A   No. That makes it easy.
19  Q   It does make it easy.
20      Were you aware that as of September 30th, 2002
21 there was a process that EPA, CDPHE, and DOE were going
22 through by which they were coming up with a revised soil
23 action level?
24  A   I was aware that they were going to do that. I
25 had not seen the product.

**Page 119**

1  Q   Was the Stakeholder Focus Group still meeting
2 in September of 2002?
3  A   I don't think so. We ran from 2000 to 2002,
4 but we didn't run as far as September, as far as I
5 recall. So this is probably a reason I didn't see this.
6      MR. POLAND: Let me now mark a document you
7 perhaps did see. Let's mark this as Exhibit No. 7.
8      (Deposition Exhibit 7 was marked.)
9  Q   (By Mr. Poland) Dr. Selbin, I'm handing you a
10 document the court reporter has just marked as Exhibit
11 No. 7. I would ask you to take a moment to look through
12 that document.
13  A   And your question is?
14  Q   Have you seen Exhibit No. 7 before?
15  A   No, I haven't.
16      MR. POLAND: And I will note again for the
17 record that there is no Bates number on the document.
18 It did not come from Dr. Selbin's files. This one is a
19 little bit thinner, a little bit more manageable.
20  Q   (By Mr. Poland) You will see the title of the
21 document is "Proposed Modifications and Additions to
22 Attachments to the Rocky Flats Cleanup Agreement"?
23  A   Uh-huh.
24  Q   And it says it's a document that's for public
25 review?

120

1  A  Uh-huh.
2  Q  And it's dated November 12, 2002?
3     MS. GEOPPINGER: You need to say yes or no.
4  A  Yes.
5     MR. POLAND: Thank you.
6     MS. GEOPPINGER: You're welcome.
7     THE DEPONENT: Sorry.
8     MS. GEOPPINGER: Uh-huh and huh-uh are very
9  hard to get down on the record.
10    THE DEPONENT: Right.
11 Q  (By Mr. Poland) If you look at Page 1 of
12 Exhibit No. 7, Section 1 it will say "Introduction and
13 Purpose" up at the top.
14    I'm sorry, it's not actually -- it's Page 1 at
15 the bottom of the page.
16 A  Yes.
17 Q  You will see, if you look at the second full
18 paragraph --
19 A  Yes.
20 Q  -- the last line it says, "The proposed RSAL
21 for plutonium 239/240 is 50 picocuries per gram." Do
22 you see that?
23 A  Yes.
24 Q  Do you know how the EPA, DOE, and CDPHE came up
25 with the 50 picocuries per gram RSAL?

121

1     MS. GEOPPINGER: Objection; asked and answered.
2     You can answer again.
3  A  No. I would have to -- I would have to read
4  these documents which I have not read. I just know that
5  that's what they came up with from information obtained
6  elsewhere. But I have no -- I mean, these are the kind
7  of documents that I would have been reading while I was
8  on these committees. But once I was off the committee,
9  I was not involved anymore. I didn't receive these
10 documents; nobody sent them to me. There was no way for
11 me to even know they had been produced. But I did learn
12 later about the 50 picocuries per gram and the revised
13 levels at which the cleanup was going to occur.
14 Q  (By Mr. Poland) When was the date -- and
15 approximate if you need to -- by which your service on
16 the second committee, the Stakeholder Focus Group,
17 ended?
18 A  Well, it lasted 22 months, and, again, I'm not
19 sure exactly when it started, but it was in the year
20 2000. So it ended in 2002 sometime, but before these
21 documents were produced.
22 Q  And by "these documents," you mean Exhibit 6
23 and Exhibit 7?
24 A  Exactly, but if I had been on the committee, I
25 would have received these.

122

1  Q  Do you know whether in either Exhibit 6 or
2  Exhibit 7 there is any consideration of the
3  recommendation that the RSALOP made of 35 picocuries per
4  gram?
5     MS. GEOPPINGER: I'm going to object. He said
6  he didn't see the documents.
7  A  I have no idea.
8  Q  (By Mr. Poland) And you don't know the basis
9  on which CDPHE, DOE, and EPA came up with the 50
10 picocuries per gram --
11    MS. GEOPPINGER: Objection; asked and answered.
12 Q  (By Mr. Poland) -- standard?
13    MS. GEOPPINGER: Sorry.
14 A  I will give my own personal answer, if I may.
15    MS. GEOPPINGER: Go ahead.
16 A  I think they came up with it because it fit the
17 amount of money they had.
18 Q  (By Mr. Poland) And, again, going back to the
19 article by Mr. Moore, that's your basis for that
20 statement, correct?
21 A  Yes, that and other statements by members of
22 the committee.
23    I'm going to add something. I got to know some
24 of these people better than others, and I got to know
25 one of the members from the Department of Energy. We

123

1  became friendly and actually saw each other occasionally
2  at parties of mutual friends. And he confided in me
3  something that I think I need to state. He said, You
4  know, Joel, you're absolutely right about the need for
5  better cleanup, but we can't do it because we don't have
6  the money, and we can't get the money. We can't get any
7  more money.
8     Now, that was a statement from somebody that
9  was part of the DOE team.
10 Q  And who was it in the DOE who made the
11 statement?
12 A  Jeremy Karpatkin.
13 Q  How do you spell Karpatkin?
14 A  K-a-r-p-a- -- he's on here.
15    MS. GEOPPINGER: Exhibit 3.
16 A  K-a-r-p-a-t-k-i-n; Jeremy Karpatkin.
17    Now, that was a personal statement to me. I
18 don't know what harm I might be doing to him or whether
19 that's fair game, but it was not unexpected by me.
20 Q  (By Mr. Poland) And when did Mr. Karpatkin
21 make that statement to you?
22 A  I have no exact recollection. It was at a
23 party; a party of mutual friends in Boulder. And we
24 were just talking about various and sundry things, and,
25 of course, he had been at most of the meetings that I

## 124

1  was at. He wasn't always there. DOE didn't always have
2  the same people there, anymore than the EPA or -- I
3  mean, they had the same leaders each time, but he was
4  not one of the lead people. Joe Legare was the lead of
5  the team on the Department of Energy.
6       Jeremy Karpatkin was there from time to time,
7  and he heard some of my expressions of concern about the
8  level of cleanup and how inadequate it was going to be
9  for the most restricted user of that site, and for the
10 long term. And so he was basically expressing to me
11 that he felt the same way, but their hands were tied.
12    Q  Would that have been around the same time
13 that -- again, I note that his name is on the
14 Stakeholder Focus Group attendance list at this May 2001
15 meeting.
16    A  Yes.
17    Q  And that's Exhibit 3.
18    A  It was probably in the year 2000. That's as
19 close as I can come. I have no idea. I certainly
20 wouldn't have marked that on a calendar.
21    Q  Do you know, is Mr. Karpatkin still in the
22 Denver area?
23    A  I have no idea.
24    Q  Have you spoken to him recently?
25    A  I have not.

## 125

1     Q  When was the last time that you saw
2  Mr. Karpatkin?
3     A  Probably toward the end or at the end of the
4  focus group meetings. I mean, we were not personal
5  friends that saw each other all the time. We just had
6  mutual friends, and I didn't see him all that often
7  socially. It was kind of rare.
8        MR. POLAND: Let's take five minutes.
9        (A recess was taken from 2:22 to 2:29 p.m.)
10    Q  (By Mr. Poland) Just before we broke, we were
11 talking about the soil action level and the proposed
12 modifications to the Rocky Flats Cleanup Agreement. I'm
13 going to mark one more document and ask you if you've
14 seen it.
15       MR. POLAND: Let's mark this as Deposition
16 Exhibit No. 7.
17       MS. GEOPPINGER: 8.
18       (Deposition Exhibit 8 was marked.)
19    Q  (By Mr. Poland) Let the record reflect that
20 I'm handing Dr. Selbin a document that is marked as
21 Exhibit No. 8. Please take a moment to look it over.
22    A  Okay.
23    Q  Now, is it your understanding, Dr. Selbin, that
24 the action levels that are currently proposed or
25 embodied in the RFCA of 50 picocuries per gram are

## 126

1  designed only to be protective of a wildlife refuge
2  worker?
3     A  That's my understanding.
4     Q  Do you know the basis for the determination
5  that 50 picocuries per gram -- a scientific basis for
6  the determination that 50 picocuries per gram is the
7  standard or is the action level?
8        MS. GEOPPINGER: You can answer the question.
9     Q  (By Mr. Poland) If you understand the
10 question, and if not, I can rephrase it.
11       MS. GEOPPINGER: If you know.
12    A  No. I mean, that's what's laid out,
13 presumably. How they got it, I could only guess that
14 they used RESRAD and the various inputs that go into
15 RESRAD. As I've indicated, there are over 70 of them,
16 and they can vary them in various ways.
17       My own opinion is that one of the inputs is how
18 many dollars we have. Now, that doesn't go into the
19 actual computer program of RESRAD, but that's one of the
20 limitations on the cleanup levels, to my understanding
21 of what they are doing; that they have got a limit of
22 money, and they are going to make the cleanup fit the
23 money rather than get the money to fit the appropriate
24 cleanup.
25    Q  (By Mr. Poland) Do you know the annual dose in

## 127

1  millirem that result to a wildlife refuge worker under
2  the current RSAL?
3     A  No, I don't. I'm sure it's available in
4  various documents. It's probably the 85 millirem, but I
5  don't know that for sure.
6     Q  If you take a look -- and I'm going to ask you
7  to take out again Exhibit No. 7, which is the proposal
8  modifications documents dated November 12th. I'm going
9  to ask you to take a look at Page 11.
10    A  There is no Page 11.
11    Q  There's not a Page 11 in yours?
12       MS. GEOPPINGER: No. It goes from 9 to 12.
13    A  No. It goes from 9 to 12.
14       MR. POLAND: Let's go off the record for a
15 second.
16       (Discussion off the record.)
17       (Deposition Exhibit 7A was marked.)
18    Q  (By Mr. Poland) Dr. Selbin, I'm handing you
19 two pages. The court reporter has marked them as 7A.
20 We were missing -- as we just discussed in Exhibit 7, we
21 were missing Pages 10 and 11, and I just handed those
22 two pages to you and marked them as Exhibit 7A.
23       If you would like to take a moment to look them
24 over, please do.
25    A  Okay.

**Page 160**

1  contain the names of everyone that was on RSALOP during
2  your tenure?
3      A   Absolutely not. There were other members of
4  the public, and then there were certainly members of
5  that committee who were there every time that
6  represented the three agencies; the two federal ones and
7  the state one.
8      Q   Let me break this down from your answer. With
9  respect to people who were actually members of the
10 panel, such as the individuals that are listed on
11 Pages 2 and 3, are there other individuals that you
12 recall who were actual members of the panel during your
13 tenure who are not listed on that list?
14     A   Oh, absolutely.
15     Q   And you said in addition to that that there
16 were individuals from the various agencies -- the EPA,
17 the Colorado Department of Health, and DOE -- who also
18 participated in the --
19     A   Absolutely, as well as members of Kaiser-Hill.
20     Q   Okay. With respect to individuals from the
21 EPA, DOE, Colorado Department of Health, and
22 Kaiser-Hill, did they attend those meetings?
23     A   They attended every meeting. Now, not every
24 member of those organizations attended. Generally the
25 lead member, the senior member of each of these

**Page 161**

1  organizations would be there, but not always. And there
2  would occasionally be other members from the DOE or
3  other members from the EPA or other members from the
4  Colorado Department of Public Health & Environment. But
5  the main one -- Steve Gunderson, Tim Rehder and Joe
6  Legare -- were there almost, I think, every time.
7      Q   Okay. Let me interrupt you there. Tell me
8  each of those individuals, what agency they were with.
9  Who was Mr. Gunderson with?
10     A   Colorado Department of Public Health &
11 Environment; Joe Legare, Department of Energy; and Tim
12 Rehder of the EPA.
13     Q   And you said other members of those agencies or
14 representatives of those agencies would periodically
15 attend the RSALOP meetings?
16     A   Absolutely.
17     Q   Did they participate actively in the meetings?
18         MR. POLAND: Object to the form of the
19 question.
20     Q   (By Ms. Geoppinger) Could you describe for me
21 their participation in the meetings?
22     A   They would often be asked questions about items
23 on the agenda, or they would be asked questions about
24 items that were actually being lectured to us on or
25 discussed at that particular meeting, and they would

**Page 162**

1  respond for their agencies. In other words, they would
2  kick in information that was not clear; that was -- I
3  don't know. They just took part in discussions almost
4  as though they were members.
5      Q   Okay.
6      A   But most often they would be there to respond
7  to questions from the members of the committee.
8      Q   Okay. Dr. Selbin, let me show you what's been
9  marked as Deposition Exhibit No. 3. You previously
10 testified, I believe, that these were members of the --
11 of what we were referring to as the focus group --
12     A   Yes.
13     Q   -- on May the 9th, 2001; is that correct?
14     A   Yes.
15     Q   The same questions I asked before with regard
16 to RSALOP; are there other individuals that you recall
17 who were on the focus group whose names may not appear
18 on that list?
19     A   Absolutely. They are not here.
20     Q   With respect to Mr. Karpatkin who appears on
21 that list, was Mr. Karpatkin a participant in the
22 RSALOP; do you recall?
23     A   Yes, he was.
24     Q   And who did he participate on behalf of?
25     A   The DOE.

**Page 163**

1      Q   Mr. Poland asked you a number of questions
2  about the basis for your beliefs that the work that was
3  done by the -- strike that.
4          Mr. Poland asked you a number of questions
5  regarding your opinion that the RSALOP was, in your
6  word, a sham. And he asked you -- and one of the issues
7  that you discussed was the article that appeared in the
8  Bulletin of the Atomic Scientists?
9      A   Uh-huh.
10     Q   Was that the only basis for your opinion, or
11 were there other bases that you had for that opinion?
12         MR. POLAND: Object to the form of the
13 question.
14     Q   (By Ms. Geoppinger) Let me rephrase it.
15         Can you tell me what the bases for your
16 opinions were?
17     A   The basis for the opinion that the thrust of
18 what the agencies were involved in compared to the
19 thrust of what we as citizens thought we were involved
20 in was that I specifically, several times, raised the
21 question of why these agencies, particularly -- well,
22 not particularly -- all of these three agencies weren't
23 going to Congress to request appropriate funds for an
24 adequate, complete cleanup as we felt was required for
25 the safety of citizens.

Stormo Reporting, Inc.   (303) 200-4792

## Page 164

1  And the response was always that, This is the
2  amount of money that we have available, and we can do
3  the cleanup. We can do the cleanup properly, is what
4  they said. I mean, they didn't say, We can do the
5  cleanup improperly. They said, We can do the cleanup
6  properly with this money. And I knew that this was -- I
7  certainly felt, I don't know whether I knew with any
8  factual information -- that this was not going to do the
9  job, and that the concern was not for future
10 generations. The concern was for a less restrictive --
11    Q  When did you first have that feeling; do you
12 recall?
13    A  I think it was probably, but I'm not sure,
14 probably after RAC finished its work and came up with
15 the 35 picocuries per gram for the cleanup. And there
16 clearly was unease on the part of the agencies that this
17 was a nice thing to shoot for, but that it was not going
18 to be something that could necessarily be done.
19    Q  Okay. Did you hold that opinion prior to the
20 publication of Mr. LeRoy Moore's article in the Atomic
21 Scientists?
22    A  Oh, yes.
23       MR. POLAND: Object to the form of the
24 question.
25    A  Yes, I did.

## Page 165

1    Q  (By Ms. Geoppinger) Let me show you what has
2  been marked as Deposition Exhibit 7A. And I believe you
3  previously testified with regard to -- at some length
4  with regard to whether the numbers that are set forth on
5  Page 11 of that exhibit are acceptable risks in terms of
6  the 1 millirem and 2 millirem. Can you tell me, do you
7  know whether these 1 millirem or 2 millirem numbers that
8  are referenced on Page 11 --
9    A  Millirem per year.
10       MR. POLAND: Go ahead. I'm going to object to
11 your question on form, but finish it up.
12       MS. GEOPPINGER: On that note, let me try
13 again.
14    Q  (By Ms. Geoppinger) With respect to the
15 numbers that are set forth on Page 11, do you have any
16 understanding as to whether or not -- or to what areas
17 of the Rocky Flats site those applied?
18    A  Yes. It's my understanding that the wildlife
19 refuge will not include what was the industrial area,
20 but will include areas outside of that. And so
21 presumably since it says "The resultant calculated
22 annual dose to a wildlife refuge worker is about
23 1 millirem per year," 1 is dealing with the area of
24 Rocky Flats outside of the industrial area.
25    Q  Okay. If someone was -- or if a resident --

## Page 166

1  can I borrow it just a second?
2       Thank you.
3       Referencing Paragraph 2, if a rural resident
4  was exposed to the industrial area at Rocky Flats, do
5  you have an opinion as to whether or not it would be a
6  higher dosage than is set forth in this document?
7       MR. POLAND: Object to the form of the
8  question; speculative, leading, hypothetical.
9    Q  (By Ms. Geoppinger) You can answer the
10 question.
11   A  Yes, certainly.
12   Q  Why is that?
13   A  Well, because the industrial area has got a
14 great deal more plutonium in it down to greater depths,
15 which are not going to be cleaned up properly, than the
16 further out areas.
17   Q  Okay.
18   A  So, you know, I don't believe that a rural
19 resident is necessarily going to end up there except
20 maybe 1,000 years from now or 2,000 years from now or
21 10,000 years from now, because we don't have any idea
22 who is going to end up out there. And that's been my
23 primary concern with the cleanup at Rocky Flats, is that
24 we are imposing industrial -- we are imposing engineered
25 controls. That means stay off the industrial site;

## Page 167

1  that's an engineer control.
2       We are imposing institutional controls.
3  Institutional control is also going to keep people off
4  of there. But no one believes that institutional
5  controls and -- and -- institutional and the other term.
6    Q  May I; engineered?
7    A  -- engineered controls are going to last very
8  long. In fact, the National Academy of Sciences in
9  these United States has explicitly stated that; that
10 engineered controls and institutional controls do not
11 last very long. I could go on and elaborate on that.
12 The longest control I know about is the Catholic Church,
13 and that's only been 2,000 years, and it hasn't had that
14 good of control that long.
15       MS. GEOPPINGER: Being a practicing Catholic,
16 I'll stop asking questions there.
17            E X A M I N A T I O N
18 BY MR. POLAND:
19   Q  A couple of follow-up questions. You testified
20 just a couple of minutes ago that you got the feeling
21 after RAC finished their work that there was unease on
22 the parts of the agencies about RAC's soil action level
23 that it recommended, correct?
24   A  Uh-huh.
25   Q  What made you feel that there was unease on the

Page 168

1  part of the agencies?
2      MS. GEOPPINGER: Believe it or not, I'm going
3  to object and say asked and answered.
4      But go ahead.
5      A  Because they did not take this report as
6  something -- as a fait accompli. They wanted to
7  continue to study what was appropriate for cleanup, and
8  that was the reason for the formation of the focus
9  group.
10     Q  (By Mr. Poland) But you don't know, do you,
11 what, if any, consideration they actually gave the RAC
12 recommendation?
13     MS. GEOPPINGER: Objection; asked and answered.
14     A  No, I don't. I don't know. They presumably --
15 again, I'm just guessing -- they talked among themselves
16 and said, Hey, we can't do this with the money we have,
17 and therefore we better keep going.
18     Q  (By Mr. Poland) But that is a guess, correct?
19     A  Absolutely it's a guess.
20     Q  Ms. Geoppinger asked you just a minute ago
21 about your understanding of whether the industrial area
22 is included within the area that is going to be cleaned
23 to 50 picocuries per gram, correct?
24     MS. GEOPPINGER: Objection. You misstated my
25 question.

Page 169

1      A  That's not what she asked.
2      Q  (By Mr. Poland) Is it your understanding
3  that the industrial area is going to be remediated to
4  50 picocuries per gram; the same as the soil action
5  level on the rest of the Rocky Flats plant?
6      A  I haven't read either of those reports, which
7  are now official documents here, so I don't know whether
8  that 50 picocuries per gram is going to apply to the
9  entire 6,500 acres. I know that there will be things
10 left underground which are contaminated which are not
11 going to be removed. And how they're going to clean
12 those to 50 picocuries per gram is beyond me.
13     So I don't know what their plan is, but I know
14 that they are going to leave enough stuff there that can
15 continually supply plutonium to higher levels in the
16 soil, as well as the lower levels in the soil, because
17 they don't know exactly how it's going to move.
18     Q  Have you seen the result of a single soil
19 sample taken on site at the Rocky Flats plant?
20     A  Have I seen the results of a single soil
21 sample?
22     Q  Yes.
23     A  I've seen the results of a lot of soil samples.
24 There are maps that show where samples have been taken.
25     Q  And have you seen those maps?

Page 170

1      A  And the highest concentrations are in the
2  industrial area.
3      Q  And do you know, as the plant currently stands
4  today, November --
5      MS. GEOPPINGER: 9th.
6      Q  (By Mr. Poland) -- 9th, 2005, do you know
7  whether any of the soil -- the locations where those
8  soil samples that were taken that you saw, whether those
9  were remediated and contaminated soil removed?
10     A  No, I don't know.
11     Q  When is the last time you saw a map of any soil
12 samples that were taken?
13     A  Well, as a matter of fact, I have some maps in
14 my file, but those go back a couple years. So I don't
15 know of any November 9th sampling; I don't think anybody
16 else does. The point is that holes have been dug all
17 over the place and sampling has been done all over the
18 site, I know that, and these are represented on maps. I
19 can't reproduce the maps. I can tell you where you
20 might find them, but -- I'm not sure what you want me to
21 answer.
22     Q  As of today, is it fair to say that you do not
23 know exactly what levels of contamination there are on
24 the industrial -- in the industrial area, the former
25 industrial area, or other parts of the Rocky Flats plant

Page 171

1  because you have not seen any soil samples taken on
2  there any time recently?
3      A  That is correct, but it is also correct to say
4  that nobody knows what's on all of that soil because
5  sampling is done with a pretty good space in between.
6  So nobody knows what's there, and nobody knows how it's
7  moving and how fast it's moving. So a soil sample that
8  was taken ten years ago would not yield the same result
9  as a soil sample taken two years ago in the same spot.
10     Every different spot is going to have a
11 different sample, so I don't have to see those. I know
12 there's plutonium there, and I know it should be removed
13 to a certain level with the technology that we have now.
14 And I think that's all that can be said. I mean --
15     Q  You haven't seen a soil sample that's been
16 taken on site in the past four years; is that correct?
17     A  Four years is probably an exaggeration. I
18 probably saw something in 2002, so maybe three years.
19     Q  Can you identify for me what it was that you
20 would have seen in 2002?
21     A  Yes. As I said, in my documents somewhere I've
22 got -- that I supplied you with, there are some maps. I
23 could find them or you could find them. I have seen
24 those. But what I'm saying is there is not a great deal
25 of movement unless you go to a different hole. If you