ProTEXT Transcript Condensing for Windows

SHEET 1   PAGE 1

1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF COLORADO

3     Case No. 90-K-181

4     MERILYN COOK, et al.,

5             Plaintiffs,

6     vs.

7     ROCKWELL INTERNATIONAL CORPORATION and THE DOW CHEMICAL
      COMPANY,
8
              Defendants.
9

10          DEPOSITION OF JOHN R. FRAZIER, Ph.D.
                 December 5, 2005
11

12    APPEARANCES:

13    FOR THE PLAINTIFFS:       DAVID F. SORENSEN, ESQ.
                                Berger & Montague, P.C.
14                              1722 Locust Street
                                Philadelphia, PA  19103-6305
15
      FOR THE DEFENDANTS:       W. ALLEN WOOLLEY, ESQ.
16                              Kirkland & Ellis
                                717 Seventeenth Street
17                              13th Floor
                                Denver, CO  80202
18

19

20

21

22

23

24

25

              CARPENTER REPORTING, INC.
                 (303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

2

```
 1              PURSUANT TO WRITTEN NOTICE, the deposition of

 2    JOHN R. FRAZIER, Ph.D., called for examination by the

 3    Plaintiffs, was taken in the conference room at

 4    Sherman & Howard, L.L.C., 633 Seventeenth Street, Suite

 5    3000, Denver, Colorado, on the 5th day of December,

 6    2005, at the hour of 9:04 a.m., before Bonnie

 7    Carpenter, a Notary Public and Certified Shorthand

 8    Reporter in and for the State of Colorado and a

 9    Registered Professional Reporter.

10                       * * * * * * * * * *

11                          I N D E X

12    Index of Examination              Page

13    Mr. Sorensen                      3

14    Index of Exhibits                 Page

15    1  Notice of Deposition           3,4,8

16    2  Frazier Invoices              3,4,7,8,10,12

17    3  "Litigation in which Dr.
      John R. Frazier has Given
18    Testimony since August 2000"  28,36,40,44,48,52

19    4  Affidavit of Dr. John A.      86,89,91,234,238,240
      Auxier and Dr. John R. Frazier 242
20
      5  Expert Report of John A. Auxier,
21    Ph.D., CHP, Regarding
      Environmental Releases at the
22    Rocky Flats Plant              104,242

23    6  Attachment 2, AEC DBM letter  172,177,178

24    7  Supplemental Expert Report
      Regarding Enviromental Releases
25    at the Rocky Flats Plant       190,195
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

3

```
 1                        * * * * * * * *

 2               (Marked for identification was

 3   Deposition Exhibit No. 1.)

 4                JOHN R. FRAZIER, Ph.D.,

 5   called as a witness for examination under the Rules,

 6   having been first duly sworn according to law, was

 7   examined and testified on his oath as follows:

 8               MR. WOOLLEY:  Before we get started, I

 9   would like to just tender documents that have been

10   marked JF0001 through 12.  And these are in response to

11   the document request attached to the notice of

12   deposition.

13               MR. SORENSEN:  Why don't we mark that

14   Exhibit 2.

15               (Marked for identification was

16   Deposition Exhibit No. 2.)

17               MR. SORENSEN:  Thank you.

18                       EXAMINATION

19   BY MR. SORENSEN:

20         Q    Good morning.

21         A    Good morning.

22         Q    My name is David Sorensen.  I'm one of

23   the attorneys for the plaintiffs in the matter that we

24   are about today.

25               Could you state your full name for the
```

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

4

1    record, please.

2             A    John Ronald Frazier, F-r-a-z-i-e-r.

3             Q    And what is your date of birth, sir?

4             A    October 12th, 1948.

5             Q    My son is 10-10.

6                  Could you please take a look at what's

7    been marked as Exhibit 1 for me, sir.  My question is:

8    Have you seen that before?

9             A    No, I have not.

10            Q    Okay.  And could you have Exhibit 2 next

11   to you?  Do you have a copy for him --

12                 MR. WOOLLEY:  Yeah.

13                 MR. SORENSEN:  I'll take that.  He can

14   have the exhibit.

15            Q    (BY MR. SORENSEN)  And what is Exhibit

16   2?

17            A    Exhibit 2 is -- is the set of invoices

18   that I have sent to Auxier & Associates -- that's

19   A-u-x-i-e-r, & Associates -- since I have been

20   self-employed.  My self-employment began on

21   November 1st, 2004.  These are monthly invoices for

22   my labor on this project.

23            Q    And these invoices go from December 1,

24   '04, through November 1, '05; is that correct?

25            A    Yes.

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

5

```
 1                Q    And the totals are simply the monthly
 2      totals; is that correct?
 3                A    Yes.
 4                Q    So to get the total of all the invoices,
 5      I would just add these up; is that correct?
 6                A    Yes.
 7                Q    Have you been paid for these invoices?
 8                A    Yes, except for the last two.  That
 9      would be JF00011, and JF0012.  I have not been paid for
10      those two.
11                Q    And who has been paying these invoices?
12                A    Auxier & Associates.  That's who I get a
13      check from.
14                Q    I see.  So these invoices to  Auxier &
15      Associates for your time are at a rate of $175 an hour;
16      is that correct?
17                A    Yes.
18                Q    And then they pay you; is that correct?
19                A    Yes.
20                Q    All right.  Now, are you charging
21      Auxier & Associates $175 an hour for today's time?
22                A    Yes.
23                Q    Would that also be true for your time
24      testifying in court?
25                A    Yes.
```

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

6

```
 1          Q    Okay.  Now, you said you became
 2   self-employed in November of '04; is that correct?
 3          A    November the 1st.
 4          Q    '04.  Have you formed some kind of a
 5   corporation, or --
 6          A    No.  No.
 7          Q    -- just --
 8          A    Sole proprietorship as a consultant.
 9          Q    So there's no particular legal form?
10          A    No.
11          Q    And why did you leave Auxier &
12   Associates?
13          A    I just wanted to work on my own.
14          Q    Do you do any other work with Auxier &
15   Associates besides this case?
16          A    Not since the end of 2004.  No direct
17   work for them.  I work with them in a parallel capacity
18   on a few projects, but my pay is not through them.
19          Q    Okay.  These other projects, when you
20   say "a parallel capacity," what do you mean by that?
21          A    I work as a health physicist, like a
22   senior consultant, and they may do field work.
23          Q    Is this for purposes of litigation?
24          A    Some is; some is not.
25          Q    And -- okay.  We'll get to that.
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

7

1                    Now, do you know how much Auxier &

2      Associates is billing Kirkland & Ellis for your time?

3            A    I think -- I'm reasonably certain that

4      it's $205 an hour.

5            Q    So to find out how much Auxier &

6      Associates has been paid by Kirkland & Ellis for the

7      time depicted in Exhibit 2, I would just take the hours

8      and multiply by 205; is that correct?

9            A    Yes.  For my time.

10           Q    Okay.  How about your expenses?  Are

11     they listed in Exhibit 2?  Oh, yeah.  There are some

12     expenses here.

13           A    There are a few expenses.  I believe all

14     of those were associated either with copying documents

15     or FedEx overnight shipments.

16           Q    Okay.  Are your expenses -- they are

17     billed directly to Auxier & Associates; correct?

18           A    Yes.

19           Q    And does Auxier then get the exact

20     amount from Kirkland & Ellis, or is there any increase?

21           A    I don't believe there's any markup on my

22     expenses through Auxier & Associates to Kirkland &

23     Ellis.

24           Q    Have you seen the invoices that Auxier &

25     Associates sends to Kirkland & Ellis for your time?

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

8

1          A     Not since November 1st, 2005 -- 4.  I

2     saw the invoices prior to that date.

3          Q     So do you have any formal engagement

4     directly with Kirkland & Ellis?

5          A     No.  That engagement is Auxier &

6     Associates' -- engagement between Auxier & Associates

7     and Kirkland & Ellis.

8          Q     I see.  Is that memorialized in some

9     kind of contract or letter?

10          A     I don't know.  I don't recall.  Auxier &

11     Associates would have that information.  I don't

12     recall.

13          Q     Do you know how much Auxier & Associates

14     has been paid in total to date for work on this case?

15          A     No.  I have no idea.

16          Q     Could you take a look at the notice,

17     Exhibit 1.  Do you have it in front of you?

18          A     Yes.

19          Q     Could you turn to Attachment A, the

20     document request, please.  Now, the invoices you

21     produced as Exhibit 2, are they sufficient to identify

22     the total amount paid to you by CDH, COE, Kirkland &

23     Ellis, and/or Auxier & Associates in connection with

24     this case?

25          A     Since November 1st, 2004, yes.  Prior

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

9

1    to that time, I was -- I was an employee of Auxier &

2    Associates, where I -- whereby I received my regular

3    salary from them with no additional revenue associated

4    with any specific project.  It was just my regular

5    salary.

6              Q    And what was your regular salary?

7              A    I think the last three or four years, it

8    was $144,000 a year.

9              Q    When did you first start working on this

10   case?

11             A    I believe it was 1995.  Perhaps 1996.

12   But I believe certainly -- in that time frame.  '95,

13   '96.

14             Q    And from 1995 to November '04, were you

15   paid by Auxier & Associates for your work on this case,

16   or were you simply paid a salary and this was part of

17   it?

18             A    I was paid a salary, and there was no

19   additional monies associated with any particular case.

20             Q    Did you keep track of your hours spent

21   on this case?

22             A    Those are a part of the Auxier &

23   Associates records.  I don't have those.  I have some,

24   but I don't have a complete set of those records.

25             Q    So the answer is yes, you did keep track

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

10

1    of your time; is that correct?

2           A    I kept track -- during the time -- every

3    month, I completed a time sheet and submitted that to

4    Auxier & Associates.  They maintained those time sheets

5    in support of their invoices on all projects.  They

6    would have those time sheets and those invoices.  I

7    don't have copies of the invoices and I don't have

8    some -- I only have some of my time sheets which would

9    indicate how many hours I spent.  I don't have all of

10   them.

11          Q    You didn't produce any of those time

12   sheets here today; correct?

13          A    No, I did not.

14          Q    Why not?

15          A    I didn't -- didn't know I was to do

16   that.

17          Q    Okay.  Can you give me any estimate of

18   the amount of time you spent working on this case

19   between '95 and the beginning of the invoices depicted

20   in Exhibit 2?

21          A    I could give a rough estimate, but I

22   couldn't give -- it's just going to be very rough.

23          Q    Okay.

24          A    In the '95-'96 time frame, my time was

25   associated with the preparation of the standards for

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

11

 1    radionuclides in environmental media, DOE standards

 2    applicable for various time periods.  And the hours

 3    associated with that for -- for that total of that, I

 4    would say, would be less than 100 hours.  It might be

 5    much less than 100.

 6              I -- I also had a few hours in reviewing

 7    the reports by Auxier & Associates personnel associated

 8    with this litigation.  And those hours, I would

 9    imagine, would be less than 80 hours.

10              I reviewed large amounts of data and

11    documents in the 2004, 2005 time frame.  The -- up

12    until -- you have the hours for up until

13    November 1st -- excuse me -- from November 1st,

14    2004, on.  Prior to that, I -- I really don't have a

15    good estimate of those hours.  I just can't come up

16    with that.  That would be in the 2004 time frame,

17    perhaps some in 2003.

18              But there was a long period when there

19    was no activity at all on the project, and that would

20    have been from sometime in 1997 up until about 2003.

21    About a six- or seven-year span there.

22         Q    Okay.  So in the '95 to '96 time period,

23    there are two sets of hours you spent on this case --

24    let me make sure I understand what you were saying --

25    one, something less than 100, possibly much less having

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

12

1    to do with standards of radionuclides; is that correct?

2         A    Yes.

3         Q    Okay.  And then you described a second

4    set of time also in the '95 to '96 time period of

5    something under 80 hours reviewing reports prepared by

6    Auxier & Associates; is that correct?

7         A    Yes.  And aspects of plutonium physics,

8    plutonium health physics, plutonium metabolism, air

9    monitoring data, information that would have been in

10   the 1996 report and in the 1997 affidavit, and I think

11   there was a supplement there somewhere.

12        Q    Okay.  And then you -- if I'm

13   understanding you correctly, there was a lengthy period

14   where you weren't working on this case from '97 to

15   sometime into '03?

16        A    That's the best of my recollection, yes.

17   A six- or seven-year time frame where there's

18   essentially nothing done.

19        Q    Then you picked up again either in late

20   '03 or into '04, and you did some work that is in that

21   time frame that is not reflected in Exhibit 2; correct?

22        A    Yes.  That would be the work from when

23   it picked back up until the end of October 2004.

24        Q    Can you estimate that -- the number of

25   hours that are not reflected in Exhibit 2?

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

13

1              A    No.  I really can't.  If I pulled a

2      number, it would -- it would likely be off, so I can't.

3              Q    Okay.  Do you know what rate Auxier was

4      billing your time to Kirkland & Ellis back in 1995?

5              A    In '95, my best recollection would have

6      been about 180 or $185 an hour.  Maybe less, '95 to

7      '96.

8              Q    And did that -- when did that change?

9              A    It went to $195 an hour, I think, about

10     2000 or '99.  2000.  Something like that.

11             Q    And then it made a change again?

12             A    Then it changed to 205 an hour, I think,

13     in 2000 -- 2001.  Maybe 2000, I guess, maybe.  And it

14     stayed at the 205 until currently.

15             Q    Until currently.  Okay.  Now, when did

16     you join Auxier & Associates?

17             A    I joined in 1993.

18             Q    And were you ever a part-owner of

19     Auxier & Associates?

20             A    I owned about -- up to about 3 percent

21     of the shares.

22             Q    Do you still own 3 percent of the

23     shares?

24             A    No.  You have to be an employee -- an

25     employee to own shares, and when I ceased employment in

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

14

1   the end of October of 2004, I had to turn over my

2   shares.  I've been reimbursed for a fourth of those.

3   The value of the shares -- I think the total of that

4   3 percent is probably 10- to $12,000 total.

5           Q    That's the value of the 3 percent?

6           A    That's the best of my recollection, yes.

7           Q    So when you say you've been reimbursed

8   for it, it's some portion of that value?

9           A    A fourth.  I think it's about less than

10  $2,000 or 2,500.  Something like that.

11          Q    That 3 percent ownership of shares,

12  while you were working at Auxier & Associates, did that

13  entitle you to some share of the profits in addition to

14  your salary?

15          A    No.  There was no profit sharing.  There

16  were a couple of instances of a bonus, but there was no

17  profit sharing.

18          Q    So did the ownership of the shares have

19  any financial effect on your income?

20          A    No.  In fact, there was a -- the

21  provision is that you -- when you buy shares, when you

22  sold them back to the company, that you would get no

23  less than what you paid for them, so I did not incur

24  any loss, other than the fact that I paid some taxes at

25  the time I bought the shares.  So I don't have -- I

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

15

```
 1    haven't gone through all the numbers yet on how much I

 2    lost on that.

 3              Q    Is Dr. Auxier still alive?

 4              A    Yes.  He's up in his years.  He's --

 5    let's see.  He's -- I'm not sure if -- he's getting

 6    close to 80 years old, 79 or 80.

 7              Q    Has he retired?

 8              A    He's -- I would say partly.  He's still

 9    president of the company.  But -- he still works on a

10    few projects, but not very many.  I would say partially

11    retired.

12              Q    Do you know why defendants apparently

13    intend not to call him in this case?

14              A    I would -- I would say having to do with

15    his age and, also, my familiarity with the subject

16    matter and especially the data, the standards, and the

17    plutonium metabolism.  Those subjects.

18              Q    What -- when was the last time you saw

19    Dr. Auxier?

20              A    About three weeks ago.

21              Q    About this case?

22              A    No.  No.  Just -- just in passing.  It

23    was a totally separate matter -- nonlitigation

24    matter -- and I was at his office.

25              Q    Are you familiar with his general state
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

16

1      of health?

2              A     Generally, very good.  Very good, I

3      think.

4              Q     Do you know how much Dr. Auxier bills

5      Kirkland & Ellis for his time?

6              A     I believe his billing rate is $250 an

7      hour.

8              Q     Now, do you know, for his time on this

9      case, did he bill for his time directly, or does he

10     also formally get paid by Auxier & Associates?

11             A     I think all of his work on this case, at

12     least since the time I joined the company, would have

13     been a straight salary and nothing extra associated

14     with that.  It would have been straight salary that he

15     would have drawn.  His revenues associated with his

16     billing on the case would have gone into the company's

17     general revenues and he would have drawn his straight

18     salary, I think.

19             Q     What was his straight salary?

20             A     I don't know.

21             Q     Have you known at any time?

22             A     No.  Not that I recall.

23             Q     Okay.  Is that confidential and not

24     shared inside Auxier & Associates?

25             A     I think yes, that would be -- he is the

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

17

1    principal owner of it.  That would be true.  Yeah.

2         Q    Okay.  Other than you, do you know if

3    there's anyone else at Auxier & Associates who is

4    currently working on this case?

5         A    Yes.  A health physicist by the name of

6    Jason Faddis, J-a-s-o-n, F-a-d-d-i-s.  There is a data

7    technician -- Terri is her first name -- and I don't

8    recall her last name.  She joined them after I left.

9    There are others at Auxier & Associates who may have

10   worked on this project recently.  I don't know.

11             Since November 1st of 2004, I haven't

12   seen any of the invoices, so I don't know who has --

13   other than Jason and Terri, who has worked on the

14   project.

15        Q    So before -- before you left Auxier &

16   Associates, did you have occasion to see the invoices

17   that they were sending Kirkland & Ellis?

18        A    Yes.  Yes.  I generally reviewed all the

19   invoices that were sent out on all the projects.

20        Q    And how much has Auxier & Associates

21   billed Kirkland & Ellis for this case?

22        A    I don't know.  That would be part of the

23   records.  I saw the invoices.  I didn't maintain the

24   total in my mind.

25        Q    Do you have any sense of what the

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

18

1     numbers were?

2              A     No.  I have no idea.

3              Q     When you say you have no idea, you did

4     look at the invoices, did you not?

5              A     Yes.  Not so much for the total dollars,

6     but for verifying that the hours for each person was

7     reflected in their detailed sheets and explained what

8     work they did.  That the invoices themselves were

9     accurate in terms of the totals; in terms of total

10    hours, the dollars for those hours and any -- making

11    sure that any expenses had the associated receipts and

12    that those -- those types of things were correct.

13              In fact, I think I probably signed a lot

14    of the invoices that went out on this project, but I

15    did not maintain a -- separate from Auxier &

16    Associates, their records, of the billings on the

17    project.

18              Q     I see.  You signed the invoices, you

19    looked at them, but you have no idea of what they add

20    up to?

21              A     I do not.

22              Q     Not even a ballpark?  Order of

23    magnitude?  10,000, 100,000, a million?

24              A     I don't.  It would be speculation, and I

25    don't have enough information.  It would span multiple

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

19

```
 1    years.

 2            Q    What is Dr. Auxier's percentage

 3    ownership of Auxier & Associates?

 4            A    Well, since I left, I would imagine it

 5    would be about 94 percent is my best guess.  That may

 6    have changed, but that's my best guess.

 7            Q    You say when you left.  In other words,

 8    did your shares go back to him?

 9            A    They go back to the company, but that

10    would change the percent -- percentage of outstanding

11    shares.  So his ownership would be the percentage of

12    the outstanding shares.

13            Q    And what is his percentage ownership of

14    the outstanding shares?

15            A    My guess is 94 percent.

16            Q    I guess I don't quite understand.  How

17    does that percent fluctuate as people come and go who

18    also have shares?

19            A    The denominator changes in the formula.

20            Q    Okay.  That's the one that's at the --

21            A    The bottom.

22            Q    The bottom.  Yeah.  I remember that.  So

23    the denominator is the number of outstanding shares?

24            A    Yes.

25            Q    And what's the numerator?
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

20

1              A    In the calculation you just asked, it

2    would be the number of shares that he owns.

3              Q    So the number of shares he owns stays

4    fixed, but the denominator changes?

5              A    For the purposes of the calculation you

6    just asked, yes.

7              Q    Do you know how many shares he owns?

8              A    No.  I used to, but I don't recall.

9              Q    Okay.  Now, you said you're doing some

10   work in parallel with Auxier & Associates currently.

11   You mentioned some of it has to do with litigation.

12   Can you tell me what those cases are?

13             A    There is a lawsuit in New Orleans

14   against oil companies for environmental claims of

15   contamination from oilfield naturally occurring

16   radioactive materials.  NORM, N-O-R-M.  I believe

17   that's the only one I'm working in parallel with them.

18             Q    And are you working for the oil

19   companies?

20             A    I'm assisting the oil companies in the

21   defense of the claims, yes.

22             Q    And what law firm are you working with?

23             A    Assisting the law firm of Miller &

24   Keffer (phonetic).

25             Q    Are there any other litigation matters

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

```
 1    you're working on besides this case and the case you

 2    just mentioned?

 3              A    With Auxier & Associates?

 4              Q    Uh-huh.

 5              A    No.

 6              Q    How about --

 7              A    Not that I recall.

 8              Q    Okay.  How about just in general?

 9              A    Me?

10              Q    Yes.

11              A    Yes.

12              Q    And what are they?

13              A    I have a -- there's litigation that's

14    pending claims in south Florida.  The case is Finestone

15    versus Florida Power and Light.  I'm assisting the

16    defense on that.

17              Q    What kind of case is that?

18              A    It's the claim of causation of cancer

19    from radiation exposure.

20              Q    So it's a personal injury claim?

21              A    I'm sorry?

22              Q    It's a personal injury claim?

23              A    Yes.

24              Q    Personal injury?

25              A    Yes.
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

22

1          Q    Is this a fatality, or someone that is
2     still alive that has cancer?
3          A    They're deceased.
4          Q    One person?
5          A    Two.
6          Q    Okay.  Have you testified in that case?
7          A    In a deposition.  Not at trial.  No
8     trial yet.
9          Q    When were you deposed?
10         A    Last Wednesday.
11         Q    You've been busy.  Any other litigation
12    matters?
13         A    Yes.  There's a case pending in
14    Virginia.  The case is Ward, W-a-r-d -- or Ward,
15    however you pronounce it -- Ward vs. VEPCO, Virginia
16    Electric Power Company.
17         Q    VEPCO?
18         A    VEPCO.  V-E-P-C-O.
19         Q    That's a power company?
20         A    Yes.
21         Q    And what is that case about?
22         A    That's a claim of personal injury from
23    radiation exposure.
24         Q    Is it a fatality or sicknesses?
25         A    It was a temporary illness.  No

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

23

```
 1    fatality.

 2            Q     What was the illnesses?

 3            A     What was the what?

 4            Q     What was the illness?  I'm sorry.  I'll

 5    speak up.

 6            A     Skin rash.  I'm sorry.  I've had a cold

 7    and my hearing is not great.

 8            Q     I sometimes need to speak up.

 9                  In that case, is it just one -- one

10    plaintiff?

11            A     I believe so.

12            Q     And have you testified in that case?

13            A     No.

14            Q     Have you formed an opinion in that case?

15            A     Not yet.

16            Q     But you're testifying for the defense;

17    correct?

18            A     I've been asked to review the data by

19    the defense, yes.

20            Q     If you testify, you would be called by

21    the defense?

22            A     That's correct.

23            Q     Any other litigation currently?

24            A     Yes.  In Louisiana, south Louisiana,

25    southwest, I guess, there's an oilfield, NORM, N-O-R-M,
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

24

1      case of Weeks, W-e-e-k-s, versus Shell.

2                Q     What kind of case is that?

3                A     It's a property contamination claim.

4                Q     Is that an individual case, or a class

5      action?

6                A     It's an individual.

7                Q     How many plaintiffs; do you know?

8                A     I don't know.  It's a family, I think.

9                Q     And the claim is contamination with --

10               A     Radium 226, radium 228 associated with

11     oilfield NORM.

12               Q     What is NORM again?

13               A     Naturally occurring radioactive material

14     that has been enhanced in its concentration as a

15     consequence of oil production activities.

16               Q     So when you say "naturally occurring,"

17     you're talking about what I've seen in Auxier's report

18     as primordial radionuclides?  Is that what you're

19     talking about?

20               A     Yes.  These would be radionuclides

21     within the uranium and thorium decay series, natural

22     decay series, which are primordial radionuclides.

23               Q     Meaning they have been present since the

24     earth's creation?

25               A     Yes.  The concentrations are enhanced

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

25

1    inadvertently -- not deliberately -- during oil

2    production activities.

3              Q    I see.  So this case, Weeks versus

4    Shell, is a family alleging that their -- their home --

5              A    No.  Property.

6              Q    Oh, the property.  Commercial property

7    or some vacant land, or do you know?

8              A    Swampland.

9              Q    Swampland --

10              A    Yes.

11              Q    -- that has been contaminated with, as

12    you put it, NORM?

13              A    That's the claim.

14              Q    Have you testified in that case?

15              A    Yes.  It was the shortest deposition

16    that I've ever had.  There was one question of

17    substance.  That was the totality of the deposition.

18    There has been no trial yet.

19              Q    When was that deposition?

20              MR. WOOLLEY:  Something to aspire to,

21    Dave.

22              A    Earlier this year.

23              MR. SORENSEN:  Not happening.

24              Q    (BY MR. SORENSEN)  I'm sorry.  Go ahead.

25              A    Earlier this year.  I don't remember the

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

26

```
 1    exact date.

 2              Q    And what's your opinion in that case?

 3              A    Multiple opinions.  There is oilfield

 4    NORM disposed in a deep well -- fairly deep well on

 5    that property.  There is no evidence of any oilfield

 6    NORM that would present any exposure pathway to anyone

 7    at the ground surface -- or water surface.  It's

 8    swampland.

 9              Q    And that's what you were asked to look

10    at?

11              A    I was asked to review the data

12    associated with the NORM production and the data

13    associated with the disposal of the NORM-impacted pipe

14    down into that well.

15              Q    You're not a property valuation or

16    valuation expert; correct?

17              A    No.  I'm a health physicist.

18              Q    Okay.  And just to be clear, in the

19    Weeks case, you testified for the defense; correct?

20              A    Been called to testify on behalf of the

21    defense, yes.

22              Q    And just before I forget, the last case,

23    the Virginia case, what law firm are you working with?

24              A    Smeltzer, Aptaker & Shepard.

25              Q    Okay.  And how about in the Weeks case?
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

27

1       What law firm?

2                A     Liskow & Lewis, I'm pretty sure.

3                Q     Okay.  Any other litigation matters?

4                A     I think attached to my report was the

5       list of testimony in the last four years.  Is it not?

6                Q     Which report are you talking about?

7                A     I thought the August --

8                Q     The August '04?

9                A     Yeah.  I thought it was in there, but

10      maybe not.

11               Q     I don't recall seeing it.  Or perhaps I

12      don't have a complete copy.  That doesn't have it.

13      Either it wasn't included or that's not complete.  I

14      don't know which it is.

15               A     It probably was not included.  I thought

16      that that was requested, but it must not have been

17      requested.

18               MR. WOOLLEY:  There is an August 2004

19      list of litigation matters.

20               MR. SORENSEN:  Is there?  You don't have

21      one handy, do you?

22               MR. WOOLLEY:  I think I have a copy in

23      here.

24               MR. SORENSEN:  All right.  Could we get

25      a copy?  Does it have your notes on it?

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

28

```
 1                    MR. WOOLLEY:  Let's see what I've got

 2    here.  It's a one-page list.

 3                    MR. SORENSEN:  Could we take a copy?

 4                    MR. WOOLLEY:  I don't mind if you make a

 5    copy.

 6                    MR. SORENSEN:  Okay.  Thank you.

 7                    MR. WOOLLEY:  It's that page.

 8                    MR. SORENSEN:  All right.  I'll be right

 9    back.  Just off the record for a second.

10                    (There was a brief delay in the

11    proceedings.)

12                    (Marked for identification was

13    Deposition Exhibit No. 3.)

14              Q    (BY MR. SORENSEN)  Take a look at

15    Exhibit 3, sir.  Is this a complete list of litigation

16    in which you've given testimony since August 2000?

17              A    No.

18              Q    What is missing?  The cases you've just

19    mentioned?

20              A    Yes.  And any others since March 18th

21    of 2004.

22              Q    All right.  Let's -- let's complete the

23    list and then we'll go back to Exhibit 3.  What other

24    litigation matters have there been since March 18th,

25    2004, that you have not yet discussed?
```

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

29

 1              A     Well, I mentioned the case in Louisiana.

 2     The -- near New Orleans, the NORM case.  I gave a

 3     deposition in that earlier this year.

 4              There was a case, a worker's

 5     compensation case in which I testified from my home,

 6     from the office, with the Alaska worker's compensation

 7     board.

 8              Q     You didn't want to go to Alaska?  Just

 9     kidding.  Go ahead.

10              A     I went up in March of 2004, but this

11     year, the testimony in that hearing was -- I don't

12     remember the date.  It was sometime earlier this year.

13              Q     And what is that case about?

14              A     That case has already been completed.

15     It was a -- was a case of a claim of health effects

16     from radiation exposure.

17              Q     Is this on behalf of one plaintiff?

18              A     Yes.  I believe it was.  Actually, the

19     claim was one claimant.  My testimony was requested by

20     the insurance company that -- the worker's compensation

21     insurance company.  The defendant.

22              Q     But it involved a claim of one person;

23     is that correct?

24              A     Yes.

25              Q     Was that a man or woman?

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

30

```
 1              A    It was a man.

 2              Q    And what was the health effect claimed?

 3              A    I don't recall.

 4              Q    Well, he was still alive; is that

 5     correct?  Or had he passed away?

 6              A    I don't recall, because I sometimes in

 7     my mind, get it mixed up with the Carlson case that was

 8     on March 18th, 2004, so I apologize for not

 9     recalling.

10              Q    That's okay.

11              A    I -- my work was mostly in terms of

12     calculating the -- the radiation dose that he most

13     likely received.  The opinions regarding potential

14     causation and the health effects were given by a

15     medical doctor.

16              Q    And what happened in that claim?

17              A    The compensation board ruled in favor of

18     the defendant.

19              Q    What was the radiation exposure to?

20     What form of radiation or radionuclide?  Do you

21     remember?

22              A    The only one that I could find any

23     source of exposure potential was tritium.

24              Q    What exposure was claimed?

25              A    I think the claim was an unknown --
```

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

31

1    unknown sources.  They did not do a dose assessment.

2           Q    So your opinion in that case had to do

3    with what?  The exposure and health risk?

4           A    No.  Just the exposure to that -- what

5    the potential radiation dose was at that location for

6    the time period that the claimant was there, and also,

7    what the radiation doses would have been to that

8    individual from natural background sources.  Sort of

9    putting radiation doses in perspective.

10           Q    And then did you offer any other opinion

11    about whether the person's illness had been caused by

12    the radiation exposure claimed?

13           A    No, I did not.  A medical doctor offered

14    that opinion.

15           Q    Based on your work?

16           A    Partly based on my work and partly based

17    upon the upper bound of what the dose is it could have

18    been.

19           Q    And based on your work and anything

20    else, the medical doctor concluded what?

21           A    That the -- I don't know the total

22    conclusions of the medical doctor.  I know that one of

23    the conclusions were that the dose was so low as not to

24    produce any adverse health effects, but there may have

25    been -- and likely were opinions regarding the

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

32

1    particular illness -- and I don't recall what it was --

2    as to the lack of radiogenicity or cause by radiation

3    dose of that particular illness.

4         Q    Now, this case has been completed.  You

5    testified by deposition?  You gave a deposition?

6         A    The case in Alaska?

7         Q    The workers comp case.

8         A    I actually testified before the Board

9    from my home by phone.  That's a unique experience.

10   The reason I say that is because you don't know who is

11   asking the questions so you give the answer as you

12   should, as though anyone were asking the question, as

13   the expert should do.

14        Q    Any other pieces of litigation since

15   March 18th of '04?

16        A    Yes.  I testified by deposition in a

17   case where Schlumberger, S-c-h-l-u-m-b-e-r-g-e-r, was

18   the defendant.  There were multiple plaintiffs.  The

19   complaint was not a health effect, but a claim of

20   overexposure.

21        Q    Overexposure to what?

22        A    Radiation.  A single radiation source.

23        Q    What kind of radiation?

24        A    A well logging source.  The event

25   occurred in Montana.

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

33

```
 1              Q    Before we continue, in the Alaska case,

 2    your -- you were billing your time to who?  Who was

 3    your client?

 4              A    A law firm -- a very small law firm --

 5    one person, I believe -- by the name of Constance

 6    Livsey, L-i-v-s-e-y.

 7              Q    And the radiation exposure in that case,

 8    where was this person working when they said they were

 9    exposed?  What kind of company?

10              A    They were working in Amchitka Island,

11    Alaska, in the -- oh, man.  1980s, perhaps.  1970 --

12    eighties, I think.

13              Q    What kind of company?

14              A    They worked for, I think, Raytheon

15    Corporation, installing radar units on Amchitka Island.

16    The claim was exposure to radioactive materials on

17    Amchitka Island.

18              Q    Okay.  Now, this next case you're

19    talking about, I can't pronounce the name of this

20    company?  What's it again?

21              A    Schlumberger.

22              Q    What kind of company is that?

23              A    That's an oil exploration and support

24    company, as best I know.

25              Q    And where is this case pending?
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

34

1          A    It's been -- I guess the -- the judge

2     ruled.  Gave a summary judgment.  Maybe -- either that

3     or it was dismissed without prejudice.  I don't know

4     the legal terms.

5          Q    That's okay.  Where?  Where is this

6     case?

7          A    It was in Montana.

8          Q    Oh, in Montana.  Okay.

9          A    I -- I think Billings, Montana.  I did

10    not go there.  I testified by -- in deposition by

11    phone.

12         Q    And was this a claim of personal injury?

13         A    No.  I expressed what the claim was.

14         Q    Overexposure.  But what was the -- were

15    they claiming they were sick, they weren't sick, they

16    needed medical monitoring, or something else?

17         A    None of those.

18         Q    What was the claim?

19         A    Overexposure.

20         Q    And as you understand it, they simply

21    said, We've been exposed to too much and therefore, we

22    want money?  Is that your understanding?

23         A    My opinion was, yes, you received a dose

24    above the dose to members of the public.  I agree.  My

25    other opinion was this material was cesium 137, which

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

35

1    is under the Atomic Energy Commission Act.  It's a

2    material that's produced by fission of radioactive

3    materials, of special nuclear material and hence it

4    falls under the Price-Anderson Act.  I'm not an

5    attorney, but it's my understanding that under Price-

6    Anderson, you have to have an illness to file a claim

7    under -- of overexposure or you have to have some

8    consequence there.

9                The judge's ruling was that such that

10   you don't have an illness yet.  If you ever get an

11   illness, you can refile the claim.

12        Q    Do you know whether they made a claim

13   for medical monitoring?

14        A    I don't know that they did.

15        Q    Do you know what medical monitoring

16   claim -- what that means?

17        A    Yes.

18        Q    Okay.  How many plaintiffs were involved

19   in that case?

20        A    I don't know the exact number, but I

21   think it was between eight and ten.

22        Q    And again, in that case, you testified

23   on behalf of the defense; is that correct?

24        A    Yes.  Certainly, my opinion affirmed the

25   plaintiffs' claim of an exposure that exceeded the

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

36

1    standards for a member of the public.

2              Q    Are there any other litigation matters?

3              A    Pending?  Completed?

4              Q    Yes.  Pending or completed.  I'm trying

5    to get a complete list, and then we're going to go back

6    to Exhibit 3.

7              A    There is a case pending in Louisiana a

8    few miles east of Baton Rouge, and it is a claim of

9    property damage, contamination from cesium 137 and I

10   believe, also, a claim of overexposure to that

11   radiation source.

12             Q    Who is the defendant?

13             A    I'm not sure.  It is one of the oil

14   companies.

15             Q    You're testifying on behalf of the

16   defendant; correct?

17             A    Yes.

18             Q    How many plaintiffs are there?

19             A    I believe there's just one.  Other cases

20   associated with that have been settled.  This is the

21   only remaining one.

22             Q    "Other cases associated."  How many

23   other plaintiffs were there?

24             A    There were three other cases, I think,

25   but they were separate complaints.

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

37

1          Q     Did you testify in those cases, also?

2          A     No.  And I have not testified in this

3     one, either.

4          Q     Have you given -- all right.  Have you

5     issued a report?

6          A     No.

7          Q     The property damage claim, is that to

8     residential land, commercial?  Something else?

9          A     It's residential land.

10          Q     Is that the person's home?

11          A     Yes.

12          Q     And the over --

13          A     You said "is."  Either is or was.

14          Q     Okay.  And the overexposure, again, is

15     that a personal injury, current sickness, medical

16     monitoring claim, or something else?

17          A     I don't know that there's any of those

18     claims.  I don't think there's a claim of personal

19     injury, a claim of medical monitoring or a claim of

20     sickness of any type.  It's -- it's sort of an open-

21     ended overexposure claim to this material.

22          Q     All right.  Any other cases?

23          A     Yes.  There's a case west of New Orleans

24     in a swamp -- in swampland associated with a brine --

25     that's sodium chloride -- brine transmission line with

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

38

1    a complaint that the brine produced NORM contamination

2    of swampland at an area where the brine line broke.

3            Q    Now, this NORM designation, is that

4    something you came up with?

5            A    No.

6            Q    Is that a preexisting designation?

7            A    Yes.

8            Q    Who came up with that?

9            A    I don't know.

10           Q    Okay.  So this -- this case involving

11   this brine line, what's the claim?  Is it property?

12           A    Yes.  It's a strange complaint.  The

13   brine has essentially no oilfield NORM or NORM in it.

14   It is essentially free of natural radioactive

15   materials.  The complaint is that the brine comes in

16   contact with the dirt in the swampland and causes the

17   radium to be released from the dirt into the water.

18   The strangeness about it is once the salinity drops,

19   the radium goes back into the soil.  So it's a strange

20   complaint.

21           Q    And you're testifying on behalf of the

22   defendant in that case; correct?

23           A    Yes.

24           Q    Who is the defendant in that case?

25           A    I believe it's Oxidental Chemical or

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

39

1    OxiChemical.

2            Q    They're a chemical company?

3            A    Yes.  In Taft, Louisiana.

4            Q    And have -- okay.  Maybe I've asked you

5    this:  There's one plaintiff in that case; is that

6    right?

7            A    I don't know how many plaintiffs.  There

8    is a particular parcel.  There may be -- I think there

9    are more than one heirs -- owners of that parcel of

10   land.

11           Q    But it's not a class action?

12           A    No.

13           Q    Okay.  Okay.  Any other cases?

14           A    There is a case in an area south -- an

15   oilfield area south of Baton Rouge near Napoleonville,

16   with a claim of NORM contamination of groundwater and

17   surface soil.

18           Q    Is that a property claim or personal

19   injury or something else?

20           A    Property.

21           Q    And how many plaintiffs?

22           A    I don't know.  It's not a class action

23   suit.  There are very few plaintiffs.  Perhaps only

24   one.  But, again, it's land that has -- may have more

25   than one owner.

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

40

1          Q    And who is the defendant in that case?

2          A    I don't recall.

3          Q    But you're testifying on behalf of the

4    defendants; correct?

5          A    Yes.  I'm reviewing the materials.  I

6    haven't testified at all.  I'm reviewing materials.

7          Q    You've been retained --

8          A    By counsel representing the defendants.

9          Q    Right.  Okay.  And what law firm?

10         A    Keene Miller.

11         Q    Other than this case, do you have any

12   current work, directly or indirectly, with Kirkland &

13   Ellis?

14         A    No.

15         Q    Okay.  All right.  So in this Baton

16   Rouge property contamination case, you have not yet

17   testified; correct?

18         A    That's correct.

19         Q    Have you issued a report?

20         A    No.

21         Q    Okay.  Any other litigation matters?

22         A    None that I can recall.

23         Q    Before we get to Exhibit 3, I just want

24   to make sure.  The brine case -- forgive me if I asked

25   some of these already; I just want to make sure -- you

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

41

```
 1    have not testified in that case yet; correct?

 2              A    Have not; that's correct.

 3              Q    And you've not issued a report yet;

 4    correct?

 5              A    That's correct.  I have not issued a

 6    report.

 7              Q    And what law firm are you working with?

 8              A    Curry, C-u-r-r-y, & Friend, F-r-i-e-n-d.

 9              Q    And the one in Louisiana involving

10    cesium where some of the cases settled and one has not,

11    have you testified in that case?

12              A    No.

13              Q    Have you issued a report?

14              A    No.

15              Q    And what law firm do you work with?

16              A    Keene Miller.

17              Q    The same one you just mentioned?

18              A    Yes.

19              Q    The oil company -- the oil case in

20    Montana, the overexposure case to cesium 137, you

21    testified in that by deposition; correct?

22              A    Yes.

23              Q    And what was your opinion?

24              A    As I stated previously today, my opinion

25    was that the individuals had received an exposure
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

42

1    exceeding the standard for members of the public.  At

2    least many of the defendants had.

3            Q    Many of the --

4            A    Defendants.  Plaintiffs.  Thank you.

5    Many of the plaintiffs had.

6            Q    And that was the extent of your opinion?

7            A    The second part that I mentioned earlier

8    in the deposition was that the source of that exposure

9    was cesium 137, a material that is produced as a

10   consequence of fissioning of --

11           Q    I'm sorry.  I guess what I mean other

12   than your opinion there was exposure and this is a

13   material, did you offer anything else like this is the

14   risk from that exposure or anything else?

15           A    I don't recall that I did.

16           Q    Okay.  Currently, do you work on any

17   matters that don't involve litigation?

18           A    Yes.

19           Q    What percentage of your income comes

20   from litigation-related matters?

21           A    Slightly over 50 percent on an annual

22   basis.

23           Q    And the other portion of your income

24   comes from what?

25           A    Health physics consulting.  It's pretty

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

43

1    close to 50 percent.  A little bit less than

2    50 percent.  Nonlitigation.

3              Q    Who do you do consulting for?

4              A    Environmental remediation, one project

5    is in Malaysia.  A remediation of a chemical plant and

6    the residues from that chemical plant.  Not litigation,

7    but just straight cleanup.

8              Q    All right.  So cleanup.  What other

9    types of work do you do?

10             A    Nonlitigation?

11             Q    Nonlitigation.

12             A    Interfacing, interacting with

13   regulatory -- between clients and regulatory agencies.

14   One of those is in the state of Kentucky.  Ashland,

15   Kentucky.  Nonlitigation.

16             Q    But is that to avoid litigation?

17             A    No.  It's to explain the technical

18   aspects of an environmental cleanup project.

19             Q    Okay.

20             A    Another one is in the state of Ohio, to

21   interact with the Army Corps of Engineers, the Ohio

22   Department of Health, and the Ohio Environmental

23   Protection Agency, and the client, a chemical company,

24   nonlitigation, to assist the client in their technical

25   aspects of their negotiations with primarily the Corps

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

44

1    of Engineers for an environmental cleanup.

2            Q    Okay.  You probably are not done, but I

3    want to move back to Exhibit 3.

4            A    That's correct.

5            Q    Is there any other type -- let me ask

6    you this:  Is there any other kind of category of

7    nonlitigation work you do that you haven't touched on?

8    Not necessarily a particular project, but kind of a

9    category.

10           A    Yes.  Reviewing data -- environmental

11   data, especially -- associated with characterizing

12   sites, with demonstrating cleanup of sites, with

13   assessing potential doses from environmental pathways

14   from environmental materials.  Nonlitigation.  I do

15   that fairly often, reviewing data associated with that.

16           Q    For companies that are concerned about

17   being sued?

18           A    No.  No.  Just individuals.  I'm -- I

19   sometimes laugh and say I'm a data nerd.  I'm --

20           Q    That's okay.

21           A    I'm very -- very experienced and

22   qualified in the review -- the generation and review of

23   environmental radiation data.

24           Q    Well, what I'm saying is when you say

25   you review potential exposures, do you do this on

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

45

1      behalf of companies?

2            A     Sometimes companies, sometimes

3      individuals.  It's not uncommon, and, typically, during

4      a year, I'll receive a couple of calls from individuals

5      saying what does this -- what do these data mean?  This

6      is in my groundwater.  What does this mean with respect

7      to me and my family in terms of a dose?

8                  I've also provided such responses

9      through the Health Physics Society, "ask the expert"

10     columns on these same types of questions.  Nothing to

11     do with litigation or even potential litigation, but an

12     understanding of what environmental amounts of

13     radioactive materials mean.

14            Q     You say "ask the expert" columns.  Where

15     do these columns appear?

16            A     It's in the Health Physics Society's

17     website, www.HPS.org.

18            Q     Have you ever in your life testified on

19     behalf of a plaintiff claiming personal injury from

20     radiation exposure?

21            A     No.  I have advised plaintiffs and

22     potential plaintiffs about data, but all the cases that

23     I recall on that was pro bono, and in all the cases I

24     recall, the doses were very low.  Not as -- high enough

25     to present any likelihood of radiation being a

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

46

1    causative factor.

2              Q    And that's what you told these

3    plaintiffs in these pro bono matters; is that correct?

4              A    Yes.  I put the doses in perspective,

5    usually, with respect to a natural background dose or

6    medical dose.

7              Q    Have you -- I'm sorry.  Have you ever in

8    your life testified on behalf of a plaintiff in a

9    property damage case in which the property damage

10   related to contamination with radionuclides?

11             A    I'm not sure.  I say that because there

12   was a case in Ohio, southwestern Ohio, where I

13   testified on behalf of the Department of Energy in a

14   groundwater contamination claim where the Department of

15   Energy wanted access to that groundwater for the

16   purposes of remediation of that groundwater and the

17   landowner was the defendant, who was trying to prevent

18   that cleanup.

19             Q    Did you testify for -- you testified for

20   DOE?

21             A    I -- I was called by DOE.  I believe I

22   testified in a deposition, I think.

23             Q    That's not a plaintiff seeking damages

24   for property contamination?

25             A    No.  That's why I said I'm not sure the

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

47

1     way you worded your question.

2                    MR. WOOLLEY:  Did you say DOE or DOD?

3                    MR. SORENSEN:  I said DOE.

4                    MR. WOOLLEY:  Why don't we get that

5     clarified?  Did you say DOE?

6          A    Yes.  I was called by DOE.  That's the

7     only time I think I was called by them.

8          Q    (BY MR. SORENSEN)  Other than that,

9     which we've taken care of, do you recall any other time

10    in your life you've testified on behalf of a plaintiff

11    in a property damage case relating to radioactive

12    contamination?

13         A    I don't recall any.

14         Q    In your life, have you ever testified

15    for a plaintiff in any kind of a claim where the

16    plaintiff is making a claim relating to exposure or

17    contamination from radionuclides?

18         A    No.  I did assist a plaintiff in a case

19    where the defense was claiming radio -- high radiation

20    dose.  The plaintiffs were claiming exposure to

21    asbestos.  I assisted the plaintiff in saying that the

22    radiation dose was more likely than not so low as not

23    to be the causative factor of this ...

24         Q    And in that case, the defendant was

25    trying to defend the claim, correct, by saying it's not

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

48

1    asbestos that got you sick, it's radiation; correct?

2         A    That's right.

3         Q    All right.  So you were saying no, the

4    radiation didn't make you sick; correct?  In effect?

5         A    I was saying that the radiation dose was

6    so -- more likely not so low as to not be the causative

7    factor.

8         Q    All right.  Okay.  Let's take a look at

9    Exhibit 3.  Is this a complete list of litigation

10   matters between the dates indicated, February 16th,

11   '01, to March 18th, '04?

12        A    To the best of my knowledge, it is.

13        Q    Okay.  And in each of these cases, you

14   testified on behalf of the defense; correct?

15        A    Yes.

16        Q    Why don't we go through them.  The first

17   one, Carolyn Mull versus Duke Power, what kind of case

18   was that?

19        A    Worker's compensation claim.

20        Q    And the plaintiff was Carolyn Mull?

21        A    The claimant was Carolyn Mull.

22        Q    And what was her claim?

23        A    That her husband's illness had been

24   caused by an overexposure to radiation.

25        Q    What was the illness?

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

49

1           A     I don't recall.

2           Q     Was he alive or dead?

3           A     He was dead.

4           Q     So the claim was a claim that his death

5      was caused by overexposure to radiation?

6           A     Yes.

7           Q     Was it a cancer claim?

8           A     I don't recall that it was cancer.  I

9      don't recall the illness.

10          Q     And you testified that -- what?  What

11     did you testify?

12          A     I testified as to the -- the amount of

13     the dose that he more likely than not received during

14     his work time at the Duke Power facilities.

15          Q     And that was on behalf of Duke Power?

16          A     Yes.

17          Q     And the exposure was to what form of

18     radiation claimed?

19          A     Primarily -- well, fission products and

20     activation products, the radiations you encounter --

21     radioactive materials you encounter at a nuclear

22     powerplant.

23          Q     What specific radionuclides; do you

24     recall?

25          A     I don't know that they had a specific

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

50

1    claim of radionuclides.  The doses would have been from

2    the activation product cobalt 60 and the fission

3    product, cesium 137, and other potential activation and

4    fission products.

5              Q    And you testified about dose.  Anything

6    else?  Risk?

7              A    I compared the radiation doses to the

8    natural background doses and the medical doses that

9    Mr. Mull would have received in his lifetime based upon

10   the -- his age, his location, and the medical

11   procedures that he had undergone.

12             Q    And what happened in that case?  Who

13   won?

14             A    The worker's compensation board ruled in

15   favor of the defendant after about three or four years.

16             Q    So Mrs. Mull received nothing; is that

17   correct?

18             A    I don't know what she received.

19             Q    But her claim was -- well, you said that

20   the defendants won.

21             So you testified about dose.  You

22   compared the dose.  Did you make an explicit opinion

23   about risk?  Do you know what I'm saying when I say

24   that?  In other words, his risk of getting cancer was 1

25   in 400 million or something like that?  Do you

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

51

1    understand -- when I've been saying "risk," you

2    understand what --

3              A    The risk as I would have in my

4    profession is health risk.  I am familiar with risk

5    assessments.  I do risk assessments and risk

6    calculations and also, probabilities of causation for

7    particular illnesses.

8              Q    So, in this case, what did you do?

9              A    I don't recall that I calculated the

10   probability of causation, although I may have.  I don't

11   recall that.  I calculated the dose, more likely than

12   not, Mr. Mull received in the course of his

13   occupational exposure.  The opinions regarding the

14   likelihood in this case -- likelihood of that dose

15   causing his particular illness was given by a medical

16   doctor.

17             Q    Relying, at least in part, on your work;

18   correct?

19             A    Relying in large part on my dose

20   assessment.

21             Q    And the medical doctor's opinion was

22   what; do you recall?

23             A    I don't recall.

24             Q    Well, given that he was testifying on

25   behalf of the defendants, I take it it's fair to assume

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

1   that it was that the illness or death was not caused by

2   the radiation; correct?

3               MR. WOOLLEY:  Objection to the form.

4          A    I don't recall.

5          Q    (BY MR. SORENSEN)  Well, the doctor who

6   relied on you was also testifying for the defense;

7   correct?

8          A    Yes.  Yes.

9          Q    Okay.  Let's go to the next one.

10              MR. WOOLLEY:  Could we take a short

11  break?  I need to run down the hall.

12              MR. SORENSEN:  Certainly.  By the way,

13  anytime you want a break, just ask for one.

14              (There was a discussion off the record.)

15              (There was a recess taken from 10:16

16  a.m. to 10:20 a.m.)

17          Q    (BY MR. SORENSEN)  Okay.  Before we get

18  to the next case, the last case involving Carolyn Mull,

19  did she have any children?

20         A    I don't recall.

21         Q    All right.  The next case on Exhibit 3,

22  Owens versus Chevron, what kind of case was that?

23         A    Property contamination claim to oilfield

24  NORM.

25         Q    And was that an individual plaintiff or

ProTEXT Transcript Condensing for Windows

53

1    multiple plaintiffs?

2            A    Multiple plaintiffs.

3            Q    How many; do you remember?

4            A    I think in this particular case, there

5    were four to six.

6            Q    And was this a claim of contamination of

7    residential property, vacant land, commercial property?

8    All the above?

9            A    Land on which there were some

10   residences, but not all the land had residences on it.

11           Q    And there was a claim of property

12   devaluation?

13           A    I really don't know all the details of

14   the claim.  It was claims of NORM impact.

15           Q    Okay.  And you testified on behalf of

16   Chevron?

17           A    Yes.

18           Q    The defendant?

19           A    The defendant, yes.

20           Q    Okay.  And what was the result of that

21   case?

22           A    Well, the first testimony was a

23   deposition.  And then the November of 2001 testimony

24   was at a trial, and I believe the -- there were four

25   plaintiffs.  And each received an average -- was

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

54

1    awarded an average of like $20,000 for -- in addition

2    to the cleanup of their property.  I think the total

3    award was about $88,000 to the four plaintiffs.  This

4    was in Mississippi.

5             Q    This was a jury trial?

6             A    Yes.

7             Q    So you're talking about the award that

8    the jury made; is that correct?

9             A    Yes.

10            Q    Okay.  The next case, Compton -- well,

11   that's the firm.  Smith versus AJ&K --

12            A    Yes.

13            Q    -- what kind of case was that?

14            A    It was a claim of oilfield NORM

15   contamination of property.  Some of the property was

16   near a residence, and other property was remote.

17            Q    And how many plaintiffs were involved in

18   that?

19            A    I don't know.

20            Q    And what kind of company is AJ&K

21   Operating Company?

22            A    It's a local -- fairly small oil

23   production company in El Dorado, Arkansas.

24            Q    So you testified on behalf of the

25   defendant; correct?

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

55

```
 1              A    Yes.

 2              Q    And what were the results of that case?

 3              A    I don't know.

 4              Q    Is it still pending?

 5              A    I don't know.

 6              Q    You testified by deposition, at trial,

 7    or --

 8              A    Deposition.

 9              Q    Deposition only?

10              A    Yes.

11              Q    Okay.  So you don't know whether it was

12    settled, for example?

13              A    I have no idea.

14              Q    Okay.  And in the last two cases, the

15    Chevron defendant, AJ&K, what was your opinion in these

16    cases?

17              A    That there was oilfield NORM on the

18    properties at some locations, specific locations.  I

19    gave opinions regarding the amounts and locations of

20    that NORM.  I did not -- was not asked to do any dose

21    assessment on these.  It was mostly to provide

22    information regarding the -- the nature and extent of

23    oilfield NORM-impacted equipment and soil.

24              Q    And then, in these opinions, did you

25    offer any other opinion about whether the contamination
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

56

 1    should be remediated or any opinion of that nature?

 2            A    Yes.

 3            Q    And what was your opinion?

 4            A    My opinion was that it should be

 5    removed.

 6            Q    In both of these cases?

 7            A    Yes.

 8            Q    Okay.

 9            A    And that it would normally be removed as

10    a normal part of their operations.

11            Q    So that nothing additional or special

12    needed to be done; is that correct?

13            A    Basically, the opinion is that -- that

14    each of these defendants should remove that material.

15            Q    I guess I'm a little confused.  You were

16    testifying on behalf of the defendants in these cases;

17    correct?

18            A    Yes.

19            Q    So what were they putting your testimony

20    on for?

21            A    The nature and extent of the NORM-

22    impacted soil.

23            Q    And the nature and extent that you

24    testified, was it less than what the plaintiffs were

25    claiming?

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

57

1          A    Yes.

2          Q    Okay.  Do you know how much less?

3          A    I don't recall the numbers.

4          Q    Do you recall roughly --

5          A    I --

6          Q    -- 10 percent of what they were claiming

7    or --

8          A    The plaintiffs did not -- in both of

9    these cases did not specify the extent of the NORM-

10   impacted equipment and soil on either of these

11   properties.

12         Q    I see.  But then you did?

13         A    I did.

14         Q    I see.  The next one, also involving

15   Chevron, Owens -- it's the same case?

16         A    Yes.  That's the trial.

17         Q    I see.  Okay.  So the fourth one is the

18   same case as the second one; correct?

19         A    Yes.  Both of those are Chevron.  The

20   first is October 15th, 2001.  The other is

21   November 19th and 20th, 2001.

22         Q    Okay.  We can take care of that.

23              Then the next three are all the same

24   case.  Woody Cantrell versus Ashland Oil?

25         A    Yes.

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

58

1          Q    And what kind of case is that?

2          A    Claims of property contamination from

3    oilfield NORM.

4          Q    And you testified on behalf of the

5    defendant, Ashland Oil; is that correct?

6          A    Yes.

7          Q    And how many plaintiffs were involved in

8    that case; do you know?

9          A    I believe this particular case was four

10   initially, and it dropped to three.  Four -- four

11   landowners.  Four parcels of land.

12         Q    And -- were you finished?

13         A    I'm trying to -- you asked about the

14   number of plaintiffs.  I don't know the exact number of

15   plaintiffs.

16         Q    Okay.  And what's become of that case;

17   do you know?

18         A    The trial that I -- which I testified in

19   was -- I testified on July 16th, 2003.  The case was

20   won by the defense.  Plaintiffs received zero

21   additional compensation.  Ashland had already agreed to

22   clean up their property, which they intend to do and

23   intended to do.

24         Q    So they were seeking something in

25   addition to cleanup?

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

59

```
 1              A     Yes.

 2              Q     What were they seeking?   Property

 3    devaluation?

 4              A     Yes.  And other compensation.

 5              Q     Was any of the other compensation having

 6    to do with any kind of a personal injury or medical

 7    monitoring claim?

 8              A     No.

 9              Q     Okay.  And you testified about what?

10    The extent of NORM contamination?

11              A     Nature and extent of NORM-impacted

12    equipment and soil -- and/or soil on the properties.

13              Q     Okay.  And the next one, Hawthorne Land

14    Company versus Oxidental, what kind of case was that?

15              A     This is a brine case.

16              Q     Similar to the one you discussed

17    earlier?

18              A     Yes.  This one, I believe, was settled.

19              Q     But you testified on behalf of the

20    defendant; correct?

21              A     Yes.  By -- at deposition.

22              Q     Deposition.  And it was settled sometime

23    after your deposition; is that correct?

24              A     Yes.

25              Q     And was this a property contamination
```

ProTEXT Transcript Condensing for Windows

60

1    case?

2             A    Yes.  It's the same nature of the one I

3    mentioned earlier.  Very strange.

4             Q    Was it connected to that earlier case?

5             A    It's nearby land.

6             Q    I see.  Same defendant?

7             A    Yes.

8             Q    Same incident or same conduct alleged?

9             A    Same conduct alleged.  Different time

10   frame.

11            Q    Different time frame.  Okay.  And the

12   claim was for property devaluation?  Do you remember?

13            A    I don't know.  I really don't know that

14   part of the claim.

15            Q    Okay.

16            A    It was swampland.

17            Q    Okay.  And the last one, Carlson and

18   Carlson versus Kiewit Centennial?

19            A    Yes.

20            Q    What kind of case is that?

21            A    Worker's compensation case in Anchorage,

22   Alaska.

23            Q    You testified on behalf of the

24   defendant; correct?

25            A    Yes.  At the hearing on March 18th,

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

61

1    2004.

2          Q    And what was the outcome of that case?

3          A    The opinion of the Board was in favor of

4    the defendant.

5          Q    And what was the claim?

6          A    A radiation dose caused a particular

7    illness -- cancer and, subsequently, his death.

8          Q    This is a death of a -- of a male

9    worker?

10         A    Yes.

11         Q    So the claim was being brought on

12   behalf -- by his widow?

13         A    Yes.

14         Q    Did they have children?

15         A    No.

16         Q    And what was your opinion in that case?

17         A    That he had received a radiation dose

18   more likely than not, but the magnitude of the

19   radiation dose was so low as to be less than his

20   natural -- his radiation dose from natural background

21   sources.

22         Q    And did some medical doctor rely on your

23   opinion to give a separate medical opinion?

24         A    Yes.

25         Q    And what was that separate medical

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

62

1    opinion?

2           A    That the radiation dose that I had

3    calculated and the radiation dose that plaintiff's

4    expert had calculated were both so low as not to have

5    been the causative dose of the cancer.

6           Q    What was the claimed radionuclide that

7    was ex -- what radionuclide did this person say they

8    were exposed to?

9           A    They did not specify the radionuclides

10   in their claim that I recall.  The radiation sources

11   that I determined to which he could have been

12   exposed -- most likely was exposed was cesium 137.  I

13   believe there were four sources that were in a position

14   that he would have been exposed during each transit in

15   an elevator up and down into -- or down and up into

16   a -- the blast cavity, and, also, tritium in water that

17   may have been present in the areas where he worked.

18          Q    What kind of -- were you finished?  I'm

19   sorry.

20          A    And that there were no other sources of

21   potential exposure to him during the time he was there.

22          Q    And what kind of company is Kiewit

23   Centennial?

24          A    It is a construction company.

25          Q    So what kind of work did this deceased

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

63

```
1    worker do?

2              A     He was an underground miner at the time

3    of his exposure -- or his work on -- Amchitka Island.

4              Q     Mining what?

5              A     Rock.  Excavating a hole.

6              Q     And so the claim was that, in the course

7    of that excavation, he had been exposed to various

8    radionuclides?  Is that essentially it?

9              A     The claim was also -- also included the

10   claim of exposure to other radioactive sources on

11   Amchitka Island while he was there.

12             Q     Okay.  These pieces of litigation that

13   you have been involved in before you left Auxier &

14   Associates were all -- you worked on them while you

15   were at Auxier; is that correct?

16             A     Yes.

17             Q     Since you left Auxier, for the cases

18   that you work on by yourself, your hourly rate is 205?

19             A     On some of the cases.  On this case, the

20   Rocky Flats case, it's 175.  And on -- my recent rate

21   is 225 on two cases.

22             Q     Okay.  When -- when did you arrive in

23   Denver for this deposition?

24             A     Yesterday, just before noon Denver time.

25             Q     And did you meet with counsel yesterday?
```

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

64

```
 1              A    Yes.

 2              Q    Which lawyers?

 3              A    The gentleman that's with me here.

 4              Q    Mr. Woolley?

 5                   MR. WOOLLEY:  Yes.

 6              A    Yes.

 7              Q    (BY MR. SORENSEN)  Anyone else?

 8              A    Mr. Kurtenbach, briefly.

 9              Q    Anyone else?

10              A    The -- I don't know if he's an attorney.

11    Mr. Woolley?

12                   MR. WOOLLEY:  I'm Mr. Woolley.

13              A    You're Woolley.  Snow.  I'm sorry.

14    Snow.  I get the name mixed up.  Allen Woolley, Rob

15    Snow, Doug Kurtenbach, and that's it.

16              Q    (BY MR. SORENSEN)  That's all right.

17    How long did this meeting last?

18              A    The meeting with Mr. Woolley and

19    Mr. Snow was from about lunchtime yesterday until, I

20    think, about 9:30 last night.

21              Q    What did you talk about?

22              A    The information that I had reviewed to

23    date, and the -- you know, what time the deposition

24    would be.  Whether or not I'd reviewed the reports and

25    other documents.  And sort of a summary of what I'd
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

65

1    reviewed since -- over the last few weeks.

2             Q    Did -- were you advised when you -- the

3    defense expected to call you to the stand?

4             A    Yes.

5             Q    What did they tell you?

6             A    They told me it would be Thursday.  They

7    didn't know what time.

8             Q    Have they told you to expect that you

9    would be finished Thursday, or that you might go over

10   to Friday?  Did they say anything about that?

11            A    Mr. Kurtenbach told me that I could be

12   finished by Friday morning, but he didn't know for

13   sure.

14            Q    Are you planning to stay here through

15   the week?

16            A    I have scheduled a return flight on

17   Saturday.

18            Q    So that's a yes, you are planning to

19   stay here?

20            A    Yes.

21            Q    That's all right.  I just wanted to be

22   clear.

23            Prior to yesterday's meeting, have you

24   had any meetings with counsel for the defendants since

25   this case went to trial in October?

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

66

```
 1            A     No.

 2            Q     Either over the phone or in person?

 3            A     Oh, I've talked over the phone.

 4            Q     Okay.  But no in-person meetings, other

 5     than yesterday?

 6            A     Not that I recall, no.

 7            Q     Okay.  How about phone calls?  How many?

 8            A     I don't know the number.  I'd say --

 9     including Mr. Woolley, Mr. Snow, Mr. Kurtenbach,

10     Mr. Poland, Doug Poland, I -- did the trial start --

11            Q     October 11th was the first day of

12     testimony.

13            A     Since October 11th, there were

14     probably two or three phone calls a week.  That's the

15     best of my recollection.

16            Q     And what were these calls about?

17            A     Specific information that had been

18     raised during the course of the trial.

19            Q     What kind of information?

20            A     Specific issues associated with the

21     claims and the testimony of the plaintiffs' expert

22     witnesses.

23            Q     Like what?

24            A     The criticisms of the air monitoring

25     program, the ambient air monitoring program, there were
```

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

67

1    several of those.

2              Q    Several calls?

3              A    Several calls and several criticisms.

4    Topics that I reviewed.

5              Q    Uh-huh.

6              A    Information -- and actually, identified

7    documents regarding that.  That's -- that's the best of

8    my recollection.

9              Q    Any other specific topics that you

10   recall during these calls?

11             A    Yes.

12             Q    What other topics?

13             A    The -- the history of the Department of

14   Energy funding for the epidemiological studies of

15   radiation workers at DOE facilities.

16             Q    You're not an epidemiologist; correct?

17             A    That's correct, I am not.

18             Q    Okay.  Any other topics?

19             A    No.  I think it just addresses the

20   issues raised by plaintiffs' experts during the

21   plaintiffs' case.

22             Q    Okay.  Have you been asked to review any

23   trial testimony?

24             A    Yes.

25             Q    Of -- of which witnesses?

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

68

1          A     I was sent the testimony of Dr. Budnitz,

2     Dr. Biggs, and Thomas Cochran.  I read the testimony

3     of -- portions of the testimony of Dr. Budnitz and Dr.

4     Biggs.  I didn't get through all of them.  I read the

5     direct examination and part of the cross-examination.

6          Q     How about Dr. Cochran?

7          A     I didn't read any of that.  I don't know

8     if it's Dr. or Mr. Cochran.

9          Q     You haven't read Dr. Cochran yet?

10         A     No.

11         Q     All right.  Do you plan to?

12         A     I may.  I haven't gotten to it.

13         Q     Well, have -- all right.  Let me

14    complete this.  Have you been asked to read the trial

15    testimony of any other witnesses?

16         A     Not that I recall.  That is true.

17         Q     Have lawyers for the defendants asked

18    you to focus on any of the particular witnesses you

19    just mentioned?

20         A     Well, to look at all -- all three, but I

21    haven't gotten to Cochran's.

22         Q     Have the defendants also sent you -- in

23    addition to the testimony, the exhibits that were used

24    during the testimony you just mentioned?

25         A     I -- I received some exhibits from --

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

69

1    regarding Dr. Biggs.  I don't know if those exhibits

2    were from deposition or trial, so I don't know.

3                Q    Okay.  How about exhibits used during

4    Dr. Budnitz' or Dr. Cochran's testimony in court?

5                A    I've seen some of those.  Some of those.

6    But I don't know if it's -- I don't know if it's all of

7    them or not.  I received some of those.

8                Q    Okay.  You mentioned the topic of the

9    history of DOE funding.  Did defense counsel send you

10   or ask you to look at the testimony of Dr. Wing?

11               A    I received like one page of testimony,

12   but it was attached at the back of someone else's and

13   so I didn't read it.  They didn't ask me to review

14   Wing's.  They didn't send me Wing's testimony

15   transcript.

16               Q    You're not an epidemiologist and you

17   haven't offered any testimony about this.  Why were

18   defense talking to you about DOE funding of

19   epidemiology?

20               A    I was employed from 1980 to 1986 at Oak

21   Ridge Associated Universities in Oak Ridge, Tennessee.

22   And during that time, I coordinated the health physics

23   training courses at Oak Ridge Associated Universities

24   and lectured in many of those courses.

25                    Some of the course instructors that --

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

70

1    invited speakers in those courses addressed

2    epidemiology and in light of that, I have sort of kept

3    up with the epidemiological studies that were performed

4    in health physics areas.

5              One of which was the MKS study,

6    called -- sometimes referred to as the Hanford study, I

7    guess.  Mancuso, Kneale & Stewart.  And I've -- I

8    recall the history of those studies from the lecturers

9    in those courses that I coordinated.  And I had

10   contacts in the Oak Ridge area who were very familiar

11   with that history of the funding of those studies.

12             Q    Okay.  Anything else?

13             A    With regard to that subject?

14             Q    Yeah.

15             A    Yes.  That's all.  No.  That's it.

16             Q    Now, you said that since the trial

17   started, you've had two or three conversations a week

18   with defense counsel.  How about in the months leading

19   up to trial?  Were you having contact with lawyers for

20   the defense?

21             A    Yes.

22             Q    When did it sort of begin?

23             A    I'd say after the first of the year is

24   the best of my recollection.  I -- I don't know that I

25   was advised when the trial would start.  I don't recall

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

71

1    that.  But I know there was a time when Mr. Kurtenbach

2    called and asked that we start going through the

3    materials that I would need to use as part of my

4    testimony, as exhibits.

5         Q    And what are those materials?

6         A    Oh, I can't recall all of them.  There

7    are certainly a large amount of materials regarding the

8    subject matter of the standards and the history of

9    those standards for radioactive materials in the

10   environment near AEC, ERDA -- E-R-D-A -- DOE facilities

11   also, the natural background radionuclide levels and

12   radiation dose levels in the U.S. and in Colorado and

13   in the Rocky Flats area, Denver area.

14              The information relating to global

15   fallout of plutonium and other radionuclides and the

16   time changing of that.

17              Information regarding the metabolism and

18   radiation dose from plutonium and other radionuclides.

19              The environmental measurement data for

20   Rocky Flats throughout the history of the operations of

21   the facility.

22              Reports that addressed the sources of

23   radioactive material from Rocky Flats.

24              The transport of those radioactive

25   materials.

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

72

1                    The dispersion of those radioactive

2       materials.

3                    And measurements of their concentrations

4       in the environment, such as the ChemRisk reports and

5       the RAC -- R-A-C -- reports.

6                    Those are the general areas that I can

7       recall.  There's some specific areas within those, of

8       course.

9                    As a health physicist, I would expect

10      that I would be asked questions regarding most any

11      aspect of health physics, including radiation sources,

12      radioactive material dispersion and transport,

13      radiation doses, and the environmental management of

14      radioactive materials, their concentrations in

15      environmental media.  I have not been asked to do any

16      radiation dose calculations.  Certainly, the RAC

17      reports present that in excellent fashion.

18                   Q    Have you been shown an outline of your

19      testimony?

20                   A    No.

21                   Q    Have you been shown any graphics that --

22      or demonstrative exhibits that defendants intend to use

23      with your testimony?

24                   A    None other than drafts that were -- I

25      was helped to develop throughout the year, but I have

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

73

1    not seen any that have been even prepared to submit.

2              Q    These drafts of demonstratives, what

3    do -- what are they about?  What are they depicting?

4              A    The standards for radioactive materials

5    in environmental media near DOE -- DOE facilities.

6    AEC, early DOE facilities.  The information, documents

7    associated with the environmental monitoring program,

8    and how those data were acquired, especially the air

9    monitoring data.  The locations of the air monitoring

10   equipment or air monitors for the different time

11   periods of operation of the facilities.  A graphical

12   depiction of radionuclides that are present in the air

13   from natural sources.  A graphical depiction of

14   radionuclides in the air from global fallout into the

15   Denver area.

16              I can't -- I mean, I'm sure there are

17   other areas.  I just can't recall what they are.  Those

18   are the general areas.

19              Doses in perspective is another one.

20   Where do we get our doses.  What doses we have from

21   various activities in our lives.  Radiation doses, of

22   course.

23              Q    So I want to be clear.  You have not

24   calculated any individual dose in this case?

25              A    I have not.

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

74

```
 1              Q    Have you calculated any individual risk,

 2     cancer risk in this case?

 3              A    I have not.

 4              Q    Have you been shown specific exhibits,

 5     document exhibits that defendants intend to use with

 6     your testimony?  In other words, not these

 7     demonstratives.  You understand the difference?

 8              A    I have not been shown any exhibits that

 9     were identified -- that were identified as exhibits

10     they would be using at trial.  No.  The only thing I

11     have knowledge of are the draft exhibits that were

12     discussed.

13              Q    Okay.  Did you have any meeting this

14     morning before the deposition?

15              A    Yes.

16              Q    With who?

17              A    Mr. Woolley.

18              Q    Anyone else?

19              A    Mr. Snow was present briefly.

20              Q    How long did that meeting last?

21              A    I'd say the total was less than an hour.

22              Q    And what was the subject of that

23     meeting?

24              A    Making sure that I had the documents I

25     wanted -- that I needed to bring with me to the
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

75

```
 1    deposition.

 2              Q    Were you shown any documents this

 3    morning?

 4              A    None that I didn't already have.

 5              Q    All right.  Were you told anything else

 6    this morning about your testimony or about anything

 7    else?

 8              A    No.  Except it's across the street in

 9    the building over there.  That's it.

10              Q    Okay.  Do you know why your name is

11    still listed in the Auxier & Associates website?

12              A    No.  I have no idea.  I have a -- an

13    idea.  The website manager is Mr. Michael Bollenbacher

14    and he's been very busy on several projects of -- not

15    litigation, but cleanup -- environmental cleanup

16    projects and in his role, he has probably not had time

17    to get back on there and remove it.  I'm certainly not

18    an employee of Auxier & Associates.

19              Q    Do you have your own website?

20              A    No.  No.

21              Q    Mr. Bollenbacher, that's M.K.

22    Bollenbacher?

23              A    Yes.

24              Q    Now, you do ALARA evaluations; is that

25    correct?
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

76

```
 1              A     Yes.  I have done them.

 2              Q     Okay.  And what is an ALARA evaluation?

 3              A     You must start with what A-L-A-R-A is an

 4     acronym for, as low as reasonably achievable.  And it's

 5     an -- a philosophy of excellence in the nuclear

 6     industry for operations regarding radioactive

 7     materials, radiation sources and potential radiation

 8     doses to workers and members of the public.

 9              The ALARA evaluations as we know them

10     now in this year of 2005 are quite different than they

11     were in past decades, past years.  There has been an

12     evolution of the understanding and application of ALARA

13     evaluations.

14              Currently, the ALARA evaluation consists

15     of a review of the operations records associated with

16     radiation doses, especially as it relates to dose

17     planning and control for individuals, individual

18     workers, and groups of workers and, indeed, workers at

19     a facility, and doses to off-site personnel.  That

20     would be one of the central aspects of an ALARA

21     evaluation.

22              Subparts of that is the methods and

23     evaluation of the methods by which a facility in

24     today's time frame of 2005 assesses the external

25     radiation doses and internal radiation doses to its
```

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

```
 1    workers and members of the public and how it implements

 2    engineered controls, administrative controls, and any

 3    other controls to maintain radiation doses to levels

 4    that are as low as reasonably achievable while still

 5    being able to perform the necessary work at hand.

 6    That, of course, is a summary of ALARA, anyway, as we

 7    currently know it.

 8              Q    How many ALARA evaluations have you

 9    done?

10              A    I participated in three or four in the

11    last ten years, I guess.

12              Q    And is that the total number you've

13    participated in?

14              A    They were specifically ALARA

15    evaluations.  There were -- aspects of my work over the

16    years, especially the last ten years, have been related

17    to components of an ALARA program, such as the

18    accuracy, precision, and reliability of external

19    radiation dose programs and internal radiation dose

20    programs at operating nuclear facilities.

21              Q    These ALARA evaluations, the three or

22    four that you spoke of, who were they done for?

23              A    I don't recall the -- the exact

24    programs.  I don't -- I don't recall.  Most of those

25    were -- actually, most of those were prior to the last
```

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

78

1    five years, I think.  And I think in all three or four

2    cases, they were part of an overall program evaluation.

3            Q    But were these for litigations purposes?

4            A    No.  They were nonlitigation purposes.

5            Q    And were these for oil companies, the

6    DOE, nuclear companies?  Who were they for?

7            A    DOE facilities, I think, in two or three

8    of those.  And commercial nuclear power was -- my

9    evaluation was part of an evaluation at one of those.

10   And that's the best I can recall.

11           Q    The DOE facilities that were involved in

12   two or three of them, what facilities were these?

13           A    They were aspects of evaluation and

14   oversight of the Oak Ridge facilities, to the best I

15   can recall.  The X10 advisory, the Y12 advisory, and

16   I'm not sure if the third one was K25 or Pantex.  I

17   don't recall.

18           Q    You said K25?

19           A    Yes.  Gaseous diffusion plant several

20   years ago.

21           Q    So you said Oak Ridge?

22           A    That actually might have been about 15

23   years ago.

24           Q    You said Oak Ridge X10.  Is that part of

25   Oak Ridge?

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

79

```
 1              A    Oak Ridge National Laboratory.  That's

 2    probably 12 years ago.

 3              Q    I'm sorry.  I just want to get clear on

 4    something.  Oak Ridge and then you said X10.  Is X10 --

 5              A    X10 is one of the Oak Ridge facilities.

 6    That's Oak Ridge National Laboratories.

 7              Q    All right.  Part of Oak Ridge.  And Y12,

 8    is that also part of Oak Ridge?

 9              A    Yes.  That's the -- one of the plants at

10    Oak Ridge.

11              Q    And then you said Pantex, possibly?

12              A    It's either Pantex or K12, the gaseous

13    diffusion plant.  That's been -- it might have been 12

14    or 15 years ago.  So I guess the ALARA things I did

15    were prior to the last ten years, I guess.

16              Q    Okay.

17              A    That's -- it's been a while.

18              Q    The K25 gas diffusion plant, where is

19    that?

20              A    In Oak Ridge.

21              Q    That's at Oak Ridge, also?

22              A    Uh-huh.

23              Q    Now, in these ALARA evaluations for

24    these DOE facilities, was DOE asking you to determine

25    whether these facilities were complying with ALARA?
```

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

80

1              A    No.  I don't think that was the specific

2       request.  I think it was a part of a review of

3       operations regarding health physics at these

4       facilities.

5              Q    But were you being asked to help these

6       facilities come into compliance with ALARA?

7              A    No.  I don't recall that we were.  It

8       was a part of the overall evaluations of health physics

9       operations.

10             Q    Well, did you reach a conclusion whether

11      they were complying with ALARA or not?

12             A    We weren't asked to.  We did review the

13      elements of the ALARA program.  I don't recall that we

14      were asked to give an opinion of whether they were in

15      compliance with ALARA.  But were the operations

16      consistent with the -- an ALARA program, I think in all

17      the cases, we said that they did have functioning

18      elements of an ALARA program that were providing dose

19      reductions, but I don't know that at any time we

20      attempted to do an item-by-item compliance with the

21      ALARA requirements.

22             Q    Well, in your mind, what is the

23      difference between doing an evaluation in which you

24      were determining whether there was -- whether the

25      operations were operating consistent with ALARA and

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

81

1    determining whether they were complying with ALARA?   Is

2    there a difference between those two things in your

3    mind?

4             A    Yes.   There is a -- more recent years,

5    I'd say -- it's certainly been probably 15 to 20

6    years -- probably in that time frame -- 15 years,

7    certainly, there have been ALARA requirements

8    associated with engineering design and construction.   I

9    have never been part of a review of those.   I have been

10   a part of review of the radiation dosimetry of

11   operating facilities as part of their health physics

12   programs to see if they are acquiring the data that

13   would be used for an ALARA evaluation, if they were

14   acquiring those properly and if they are using those

15   data in a fashion that would evaluate individual doses

16   over time and collective doses or doses of groups of

17   people -- of individuals, workers, over time.   And that

18   was -- is the extent of my ALARA evaluations.

19            Q    I see.   So I -- is it correct that

20   you've never been asked by a client or anyone else to

21   come in and help them determine whether their handling

22   of radioactive materials, their handling of radioactive

23   waste is complying with ALARA; is that correct?   You've

24   never done that?

25            A    Not specifically, because the ALARA is

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

82

1    not a -- a specific regulation or standard.  It is a

2    philosophy of excellence in terms of the radiation

3    protection program.

4            Q    Isn't it a DOE policy?

5            A    It's a policy that you will have an

6    ALARA program, I believe, and that you will operate

7    your facility in -- with this as an overriding

8    guideline, yes.  That's in recent years.  The concept

9    of ALARA is not a standard.

10            Q    Are you giving that as a legal opinion?

11            A    I'm giving it as an opinion as a health

12    physicist.  It's not a standard of care.

13            Q    Okay.  In your view as a health

14    physicist?

15            A    That's correct.

16            Q    Has it been a recognized philosophy

17    since the -- since at least the 1950s?

18            A    Yes.  I think there is a -- the

19    application of that is let's not get any doses unless

20    we really need to to do our job.

21            Q    Okay.  And these ALARA evaluations that

22    you've discussed, you charged the clients for your work

23    in doing them; correct?

24            A    Well, I --

25            Q    You or Auxier?

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

83

1          A     They were part of our health physics

2     program evaluations, yes.

3          Q     I mean, you were paid for it?  You or

4     Auxier & Associates?

5          A     The company and -- my salary -- I was

6     paid to perform those activities and it was not

7     strictly an ALARA evaluation, but, as I explained

8     already, it was an evaluation of the acquisition of

9     health physics data that would be used in an ALARA

10    program and whether or not they were using those data

11    in their program.

12         Q     Are you -- do you hold yourself out as

13    an expert in the handling of radioactive waste?

14         A     Only from the health physics aspects of

15    it.

16         Q     What does that mean?

17         A     The radioactive materials, waste, can

18    present potential external and internal doses to

19    workers and members of the public.  And I am

20    experienced and familiar with assessing the potential

21    radiation doses received by workers and members of the

22    public from radioactive waste and I'm experienced and,

23    I guess, qualified or whatever to assess past radiation

24    doses to workers and members of the public from

25    radioactive waste in terms of like dose reconstructions

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

84

1    from them.

2           Q    Do you have any expertise or do you hold

3    yourself out as an expert in opining, for example, on

4    whether a particular company's waste management

5    practices in handling radioactive waste, burying it,

6    storing it in barrels, spraying it on a field comports

7    with the standards -- applicable standards or was

8    negligent?  Do you have expertise in that area?

9           A    Only as it relates to the potential

10   radiation doses that might be received from each of

11   those scenarios.

12          Q    So, for example, if a company did

13   something that was negligent, you -- in terms of

14   handling radioactive waste, you wouldn't opine whether

15   it was negligent, but you might opine about whether it

16   resulted in doses of a certain --

17          A    Higher or lower radiation, yes.  The

18   latter.

19          Q    The latter?

20          A    I would give an opinion in whether it

21   could result in a higher or lower radiation dose.

22          Q    Not the doses --

23               MR. WOOLLEY:  Let's be clear on the

24   question.

25          Q    (BY MR. SORENSEN)  Sure.  I'll break it

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

85

1    down.  Let's say you have a practice of -- let's

2    assume -- well, start again.

3              I understand what you're saying.  If

4    there's a practice that occurred -- let's say burying

5    radioactive waste -- which resulted in some level of

6    off-site exposure -- let's put aside the level.  I take

7    it that you have expertise -- you say you have

8    expertise in testifying about the level of exposure.

9    Okay.  Is that right?

10              A    Yes.

11              Q    But not about whether the practice --

12   the under -- let me just finish.  But not about whether

13   the underlying practice was negligent or comported with

14   applicable standards for the -- for the handling or

15   disposal of that radioactive waste; is that correct?

16              A    Not totally.  Sort of the first part is

17   what I already answered.

18              The second part is that as a health

19   physicist, operate -- working in various facilities

20   over, I guess, nearly 30 years now, I have observed

21   standard practices, routine practices for waste storage

22   and management at various facilities, including DOE

23   facilities, and so I can give opinions about what was

24   a -- what has been accepted practices and -- and

25   followed practices at facilities, yes.

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

86

1                    But with regard to the engineering

2       evaluations of waste management programs, I have not

3       been asked to do the broad range evaluations of those.

4       I have been, over time, asked to give opinions

5       regarding the radiation doses associated with different

6       waste management programs.

7               Q     Okay.

8               A     But I have observed waste management

9       practices at a number of facilities over my working

10      life as a physicist.

11                   MR. SORENSEN:   Okay.  Let's take a short

12      bathroom break.

13                   (There was a recess taken from 11:11

14      a.m. to 11:16 a.m.)

15                   (Marked for identification was

16      Deposition Exhibit No. 4.)

17              Q     (BY MR. SORENSEN)  Dr. Frazier, could

18      you please confirm for me that Exhibit 4 is an

19      affidavit of Dr. Auxier and yourself submitted in this

20      case and dated February 3rd, 1999?

21              A     Yes.  I'll need to look at it.

22              Q     Sure.  Sure.  Sure.

23              A     The reason I was hesitating is that my

24      copy of this didn't look nearly this thick, but I

25      realize my copy did not have the attachments in this

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

87

1    format.  I mean, it's --

2              Q    Okay.

3              A    Yes.  This is the affidavit.

4              Q    Okay.  And your signature appears after

5    the end of the text?  It's not paginated.  It would be

6    page 27, if you were counting.

7              A    Right.  It's -- yes.  It would be page

8    27, and it's my signature on February 3rd of 1999.

9              Q    Okay.  All right.  Now, if you could

10   turn to paragraph 59, please.  Are you there, sir?

11             A    I'm trying to get there.

12             Q    That's okay.  Yes.  And that paragraph

13   refers to an Attachment 3.  Do you see that?

14             A    Yes.

15             Q    Now, could you -- what I've done is I

16   have paragraph 59 in front of me and Attachment 3 next

17   to it because I'd like to do some comparison, so if you

18   could -- I might be able to find Attachment 3 faster

19   than you can.

20             A    It's the last one.  I've got it.

21   Attachment 3.

22             Q    Attachment 3.

23             A    There.

24             Q    Okay.

25             A    I have it.

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

88

1          Q     You have it side by side?

2          A     Yes.

3          Q     Now, you say in this paragraph 59 that

4     there was a permissible dose to the public of .5 rem

5     per year whole body.  Do you see that?

6          A     Yes.

7          Q     And then 1.5 rem per year to most

8     organs.  Do you see that?

9          A     Yes.

10          Q     Now, that is coming from what?  These

11     numbers?

12          A     The -- I'm looking at the attachment.

13          Q     Which attachment?  3 or 4?

14          A     3.

15          Q     Okay.

16          A     0550.  It is -- comes from the -- the

17     enclosure -- the reference on page -- or in Section

18     0550-05.  The reference there to the basic -- it's a

19     051.  Basic standards of performance in the protection

20     of personnel from excessive exposure to ionizing

21     radiation are based on National Committee on Radiation

22     Protection and Measurement recommendations and

23     subparagraph C of that is the National Committee on

24     Radiation Protection and Measurement recommendations

25     for the maximum permissible radiation exposures to man

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

89

```
1     dated January 8th, 1957, appended to AEC manual

2     Chapter 0524, permissible levels.  Within that document

3     is the dose limit of 500 millirem for members of the

4     general public.  It had not been published, but it says

5     "to be published."  That 0524.

6              Q    Okay.  And then do you attach that

7     reference as Attachment 4 to this affidavit?

8              A    Yes.  That reference -- that item C

9     there, subparagraph C, is -- was published in

10    radiology, volume 68 in 1957 and it's dated

11    January 8th, 1957.  And that's the date that's cited

12    in subparagraph C.

13             Q    So when we go to Attachment 4 to this

14    affidavit, which is Exhibit 4, is that where we'll find

15    the .5 rem, 1.5 rem numbers?

16             A    That's where we find the recommendation

17    for a dose limit of one-tenth, it should be.

18             Q    This -- maybe I can help you.

19             A    I'd have to read this.

20             Q    That's okay.  If you look at Attachment

21    4, if you look at numbered paragraph 6, it says, "For

22    individuals outside of controlled areas, the maximum

23    permissible concentration should be one-tenth of those

24    for occupational exposure."  Is that what you're

25    talking about?
```

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

90

1          A    Yes.

2          Q    Okay.  If we go back to Attachment 3,

3    the second substantive page, Section 0550-01, Purpose

4    and Scope -- do you see that?

5          A    Yes.

6          Q    Purpose and Scope.  It says, "The

7    purpose of this chapter is to specify minimum codes and

8    standards that shall be used as basic guides for

9    protection of AEC and AEC contractor personnel from

10   excessive exposure to ionizing radiation for physical

11   aspects of health, safety, and fire protection and for

12   safe working practices."  Do you see that?

13         A    Yes.

14         Q    Where is there any indication in this

15   document, either where I pointed you to or anywhere

16   else in Attachment 3 that this has to do with off-site

17   exposures or, you know, exposures of the general

18   public?

19         A    (Deponent reviewing exhibit.)

20              I don't see a specific statement in this

21   that I found so far, but it certainly was the

22   understanding at AEC facilities that the one-tenth

23   factor in subparagraph C, the document referred to

24   there, was applicable to members of the public with the

25   issuance of this manual chapter 0550.

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

91

1          Q    Well, you say it's a basic

2    understanding.  But you can't cite me to anything in

3    this document that actually says that, can you?

4          A    The document says that basic standards

5    of performance -- well, in Section 05550-05.

6          Q    Right.  This is now just to be clear for

7    the record.  You're looking at Attachment 3 to Exhibit

8    4 to the deposition; correct?  Exhibit 4 is your

9    affidavit.

10          A    Yes.  Yes.

11          Q    So now we're looking at Attachment 3,

12    just to be clear?

13          A    0550-05, "Basic Standards, Guides, Codes

14    and Regulations for Radiation Protection.  The basic

15    standards, guides, codes, and regulations listed below

16    shall be considered minimum requirements.  The latest

17    edition including supplements, which, when such exist,

18    shall be followed.  Publications marked with" symbol

19    pound sign, it looked like, "are available from the

20    Superintendent of Documents, Government printing

21    office, Washington, 25, D.C."

22          Q    I can read it.  What do you want to

23    focus on?

24          A    The next paragraph of that says -- the

25    next section -- portion of that says, "Basic standards

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

92

1    of performance in the protection of personnel from

2    excessive exposure to ionizing radiation are based on

3    National Committee of Radiation Protection and

4    Measurement recommendations."

5              And then subparagraph C of that is this

6    recommendation that the maximum permissible radiation

7    exposures to man -- it doesn't say workers, it says

8    man -- dated August 28, 1957, and that's the basis of

9    my position and opinion that this document, Attachment

10   4, is applicable for the doses to members of the

11   public.

12             Q    Are you giving a legal opinion to that

13   effect?

14             A    I'm giving a health physics opinion.

15             Q    Okay.  Is there anything else you can

16   cite me to, whether it's in front of you or not, that

17   establishes that the standards for off-site exposure

18   that you state in paragraph 59 of this affidavit, in

19   fact, were applicable at that time for off-site

20   personnel?

21             A    I can't think of any right now, but that

22   doesn't mean that they don't exist.

23             Q    Okay.  Well, is it fair to assume that

24   in preparing this affidavit and the other things in

25   preparing this case, if you knew of other material, you

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

93

```
1    would have cited it?

2              A    I felt at the time I prepared this that

3    this was -- this narrative had the strength of

4    requiring the 500 millirem dose limit as of this date

5    of 0550, and that was the basis of my health physics

6    opinion.  I don't know whether or not I encountered any

7    other documents at the time I prepared this -- I don't

8    recall -- that would have -- such as a memorandum from

9    the Atomic Energy Commission stating this shall be

10   followed.  I interpreted this subparagraph to say that

11   this will be followed.

12             Q    Okay.  Now, if you can look again at

13   paragraph 59 of the affidavit, going from page 18 to

14   19, after discussing Attachment 3 and a --

15             A    Excuse me.  Just a second.

16             Q    Sure.

17             A    Let me put this back in order.

18             Q    Sure.  Sure.

19             A    Okay.  Pardon me.

20             Q    Are you with me?

21             A    Yes.

22             Q    Again, looking at paragraph 59 of the

23   affidavit, going from page 18 to 19, after discussing

24   Attachments 3 and 4 that we've just looked at, you

25   state on page 19, "This requirement changed the
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

94

```
 1    applicable concentration of plutonium 239 in air in

 2    uncontrolled areas to 0.2 picocuries per cubic meter

 3    effective August 29, 1957."

 4            Do you see that?

 5    A     Yes.

 6    Q     Where does that .2 picocuries per cubic

 7    meter come from?

 8    A     It comes from one-tenth of the level

 9    that was in place prior to August 29th, 1957.  The

10    concentration in place prior to August 29th, 1957,

11    was 2 picocuries per cubic meter and using the NCRP

12    statement there --

13    Q     You just divided by 10?

14    A     Divided by 10.

15    Q     Where did the 2 come from?

16    A     The 2 came from --

17    Q     I don't think it's discussed unless we

18    get to another document --

19    A     Do you have the --

20    Q     I have the Auxier affidavit.

21    A     -- original Auxier report?

22    Q     I do, which we'll get to.

23    A     It comes --

24    Q     I guess here's my question:  Did you

25    calculate the 2 --
```

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

95

1          A      No.

2          Q      -- or is the 2 stated someplace?

3          A      The 2 is stated in the Tripartite

4    conference of 1951 and in the subsequent adoption of

5    plutonium concentration limits for individuals in air

6    and water -- in air for the 2 here -- picocuries per

7    cubic meter.  And the documents that put those in

8    effect for DOE -- excuse me -- AEC facilities.  It's --

9    it's from the Tripartite conference and, also, ICRP

10   2 -- publication 2, statements of the concentration --

11   allowable concentration of plutonium in air.

12         Q    We'll get to the Auxier affidavit in

13   order.  So in paragraph 59, you took the 2 that we've

14   just been discussing, you divided by 10 yourself, to

15   come up with .2, pursuant to your earlier explanation

16   of your interpretation or your -- your position on how

17   Attachment 3 and Attachment 4 fit together?

18         A    Yes.

19         Q    Is that right?

20         A    Yes.

21         Q    Okay.  Now --

22              MR. SORENSEN:  Off the record.

23              (There was a discussion off the record.)

24         Q    (BY MR. SORENSEN)  Now, if we go to

25   paragraph 60 of the affidavit, you start referring to

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

96

```
1    Attachment 5 and a change in plutonium in air numbers

2    from .2 picocuries per cubic meter to .33.  Do you see

3    that in paragraph 60 and 61?

4         A    Yes.

5         Q    All right.  Can we look at Attachment 5,

6    and have it side by side?

7              Are you with me?

8         A    Yes.

9         Q    Okay.  If we look at the first part of

10   this Attachment 5, Section 0524-01, Policies -- do you

11   see that?

12        A    Yes.

13        Q    And policy 012 states, quote, AEC

14   operations shall be conducted in such a manner as to

15   assure that radiation exposures to individuals and

16   population groups are limited to the lowest practical

17   levels, close quote.  Do you see that?

18        A    Yes.

19        Q    Is that a -- that's an ALARA policy;

20   correct?

21        A    ALAP is the acronym, as well, as low as

22   practical.  It's superseded later on to ALARA.

23   Generally, to the ALARA concept.

24        Q    Okay.  Now, I'm -- where in here is this

25   .33 number for off-site concentrations?
```

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

97

```
 1              A     On page 4 of AEC Appendix 0524.

 2              Q     Page 4.  Straight 4.

 3              A     Yes.

 4              Q     Okay.  I'm here.

 5              A     At the bottom of the page there, the 4

 6    is at the bottom of the page.  It's radioactivity --

 7    Section B, radioactivity in effluents released to

 8    uncontrolled areas.

 9              Q     Okay.

10              A     And under No. 2 -- well, under No. 1, it

11    says, "For the purpose of applying these standards,

12    radioactivity concentrations in effluents may be

13    averaged over periods up to one year."  And in item 2

14    or paragraph 2C -- well, actually, item 2B, it says,

15    "Individuals are not exposed in excess of Annex 1,

16    Table 2 standards."  And in subparagraph 2C, it says,

17    "The average exposure of a suitable sample of an

18    exposed population group is not in excess of one-third

19    of Annex 1, Table 2 standards.  Radioactivity

20    concentrations in the environment may be averaged over

21    periods up to one year."

22                    And that's the purpose of me using the

23    one-third is because we're talking about potential

24    exposures of population groups.  That's -- some people

25    use the one-third.  Some don't.  I tend to use the
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

98

1    one-third.

2           Q    I see.  Then if we go to Annex 1, Table

3    2 -- Annex 1, Table 2 and then we look for plutonium --

4    looking for it --

5           A    These are alphabetical, so it would be

6    on page 8.

7           Q    Page 8.  Plutonium.  Then 238?

8           A    239.

9           Q    239.  And then the S and I.  That's

10   soluble and insoluble?

11          A    Yes.  The terminology used at that time.

12          Q    Right.  Which is worse for people?

13          A    It depends on which pathway you're

14   talking about.

15          Q    Breathing it into your lungs, which is

16   worse?

17          A    You get a higher dose from the soluble

18   than you do from the insoluble.

19          Q    Okay.  So you were -- you're looking at

20   these numbers and you were looking at --

21          A    The insoluble plutonium of 1 times 10 to

22   the minus 12 microcuries per milliliter, which is 1

23   picocurie per cubic meter.

24          Q    Okay.  239.  And the numbers for --

25   that's for soluble?

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

99

 1              A    That's for insoluble.  1 times 10 to the

 2     minus 12.

 3              Q    Right.  I'm sorry.  Insoluble.  And then

 4     for soluble, right above it, it's -- if I'm reading

 5     this, 6 times 10 to the minus 14?

 6              A    That's correct.

 7              Q    And again, for breathing it into your

 8     lungs, soluble is worse?

 9              A    If, indeed, the plutonium is in a

10     soluble form when it is inhaled, it presents a higher

11     dose per unit amount in -- inhaled.

12              Q    All right.  So that means that this --

13     these numbers mean that, according to this table, the

14     plutonium in air concentration or plutonium 239 soluble

15     needs to be less than for insoluble; correct?

16              A    Yes.

17              Q    And then if you took one-third of that,

18     it would also again be -- it would be 2 times 10 to the

19     minus 14?

20              A    Yes.

21              Q    But you don't use 2 times 10 to the

22     minus 14 in your affidavit, do you?

23              A    No.

24              Q    Why not?

25              A    Because the form of plutonium in the

                        CARPENTER REPORTING, INC.
                            (303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

SHEET 100  PAGE 100

100

1     environment is in insoluble form because of the

2     environmental effects that take place from the time of

3     a release -- actually, the starting it is mostly

4     insoluble even, but during the transport and dispersion

5     process, especially from soil, it is -- it is an

6     insoluble form of plutonium 239.

7             Q    And you know that for a fact for the

8     plutonium that escaped from Rocky Flats?

9             A    Yes.

10            Q    Is that your testimony?

11            A    Yes.

12            Q    And that's based on what?

13            A    Review of numerous documents that have

14    evaluated the -- the solubility -- the chemical form of

15    the plutonium, the -- the plutonium released -- that is

16    in the -- present in the environment at the off-site

17    air locations, the publications that I've reviewed all

18    have indicated that this was a plutonium oxide,

19    plutonium oxide and that's -- that is an insoluble form

20    of plutonium.

21            Q    I see.  Okay.  Now, earlier -- let's

22    see.  Where is this?  Right.  On page 4 of Attachment

23    5, you pointed me to subparagraph B2C.  Do you see

24    that?

25            A    I'm sorry.  I have to get back there.

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

```
 1            Q    That's all right.

 2            A    Yes.

 3            Q    And it says, "The average exposure of

 4   the suitable sample of an exposed population group is

 5   not in excess of 1 of Annex 1 Table 2 standards."  Do

 6   you see that?

 7            A    Yes.

 8            Q    What does "a suitable sample of an

 9   exposed population group" mean?

10            A    To me, it's -- it means the individuals

11   in an off-site area.  That's the way I interpret it.

12   I'm not sure that that's -- that there is a definition

13   or that this is a term of art, "suitable sample," but

14   the way I interpret it is that when we're looking at a

15   population group such as off-site populations, perhaps

16   in the community, perhaps in a -- an area, that's --

17   that's the way I chose it.  Some people don't use the

18   one-third.  They just use the individual limit.

19            Q    Well, are there any other regulations --

20   written regulations or guidelines that further explain

21   what "suitable sample" means?

22            A    Not that I have found so far.  This

23   terminology is used in several of the standards that

24   I've listed here.  They tend to be repeated.  I did not

25   do, prior to this deposition, a -- or prior to my
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

102

1    affidavit, even, an exhaustive search of that term

2    because I couldn't find it as being a term of art,

3    suitable sample.  I just interpreted this as sort of

4    common-sense interpretation as we're talking about

5    people that might be in a community.  An area.  And I

6    would apply it to those people.

7                Many -- many health physicists do not

8    apply that one-third.  They just apply the actual

9    concentration limit for an individual in the -- in the

10   off-site environment.

11        Q    Well, you did apply the one-third.  What

12   I'm trying to get at is if there -- I think you've

13   answered this, if there's any written, official

14   definition of what "suitable sample" means that we --

15   that we can go to, you can point me to.

16        A    Not that I'm aware of, as I sit here

17   today.

18        Q    Okay.  Now, if you turn towards the back

19   of this affidavit, there's a C.V. for yourself.

20        A    Yes.

21        Q    Do you have a current C.V.?

22        A    Not with me.  I think the counsel may

23   have one that's fairly current.  Much more current than

24   this one, but ...

25        Q    One of my questions was in this C.V., if

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

103

1   you turn to the fourth page, it lists your

2   publications, but it only lists a few, and I'm

3   wondering whether there's a number of publications that

4   are missing.

5           A   No.   This is correct.   The statement

6   under "Publications" is that, "Dr. Frazier has prepared

7   or contributed to over 100 reports and publications in

8   the fields of health physics and environmental

9   science."

10          Q   Right.

11          A   Nearly all of those have not been peer

12  reviewed in journals.

13          Q   Uh-huh.

14          A   My type of work that I've done over the

15  years has not necessitated that I submit articles for

16  peer-review publications.   The ones that are listed are

17  all in peer-reviewed journals and I'm not -- there are

18  a few more that are in proceedings, several -- a few

19  more in proceedings that aren't really peer reviewed.

20  They're reviewed, but they are not through the normal

21  peer-review process.

22          So these ones listed on pages 3 and 4

23  are those that went through the peer-review process,

24  and the remainder of those -- some of which are, I

25  guess, confidential reports, publications,

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

104

```
 1    project-specific as part of projects, but, no, I don't

 2    have an exhaustive list of peer-reviewed publications.

 3            Q    Okay.  Okay.

 4                 (Marked for identification was

 5    Deposition Exhibit No. 5.)

 6            Q    (BY MR. SORENSEN)   Sir, I'm handing you

 7    Exhibit 5, which is a document entitled Expert Report

 8    of John A. Auxier, Ph.D., CHP, Regarding Environmental

 9    Releases at the Rocky Flats Plant dated November 25,

10    1996.  Do you see that?

11            A    Yes.

12            Q    Did you write any portion of this

13    document?

14            A    Yes.

15            Q    What portion did you write?

16            A    Chapter IV, I wrote the original draft

17    of this.

18            Q    Of Chapter IV?

19            A    Of Chapter IV.  And --

20            Q    That's called Standards for

21    Radionuclides in Air and Water --

22            A    Yes.

23            Q    -- correct?  Okay.

24            A    And I reviewed other chapters of the

25    report and made a few comments on them, but I did not
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

105

1       actually write the other chapters of the report.

2              Q     And when you say you drafted the

3       original draft of Chapter IV, I take it then you turned

4       that draft over to Dr. Auxier; is that right?

5              A     Actually, Dr. Pritchard.  Dr. Howard

6       Pritchard was the person who put together the various

7       sections of the report.  Dr. Auxier did the final

8       review and the signoff on it.  I don't know that he

9       actually made any changes in the sections.  He wrote

10      some of the sections himself.  Dr. Pritchard was the

11      coordinator of this document.

12             I -- the reason I say I authored the

13      draft of section -- of Chapter IV is that there might

14      be a choice of a word or something that's slightly

15      different than my original version.  I don't know that

16      there is and, in fact, this may be the same as my

17      initial draft.

18             Q     Did you draft any portion of any other

19      chapter of this -- of this report?

20             A     Not that I recall.  I did review them.

21             Q     Before it was finalized?

22             A     Yes.

23             Q     Did you review the entire thing before

24      it was finalized?

25             A     I don't recall reviewing the entire

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

1    report, especially the extensive portions on dose

2    calculations that they put in this report.  I did not

3    review the -- the list of documents, either.  I

4    contributed to documents that related to Chapter IV,

5    but not the others.

6                Q    Now, other than Chapter IV and other

7    than drafting other portions of -- let me start again.

8                You drafted Chapter IV, you reviewed

9    other portions of this exhibit before it was finalized.

10   Other than review them, did you make any other

11   substantive contribution to other portions of this

12   report?

13               A    I may have.  I don't recall.

14               Q    Okay.

15               A    I mean, I don't know what substantive

16   contribution --

17               Q    Well, review of a draft that someone

18   else wrote and suggest, you know, a fair number of

19   substantive nonstylistic changes based on your own

20   work.  Go back to look at, you know, source documents

21   they cited and go back to them and say, you know, you

22   got this wrong.  That's the kind of thing I'm talking

23   about.

24               A    Yes.  I did some of that regarding the

25   environmental monitoring program.  I reviewed that and

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

107

```
 1      I was already familiar with the environmental

 2      monitoring program.  That's Chapter V.

 3               Q    Who wrote Chapter V?

 4               A    It would be a collaboration.  The

 5      principal writing of Chapter V was a collaboration

 6      between Dr. Auxier and Dr. Pritchard.  I did contribute

 7      into that in terms of presenting the information,

 8      making sure that it was consistent with what I had

 9      information on at the time about the environmental

10      monitoring program around Rocky Flats.

11               Q    Well, Dr. -- who originally drafted

12      Chapter V?

13               A    I believe Dr. Pritchard did.  And I

14      commented on it and made suggestions on -- I reviewed

15      it.  I know that.

16               Q    Did you supply Dr. Pritchard with the

17      information he used?

18               A    No.  He got that from the -- the

19      reference documents that are contained therein.

20               Q    He did his own review of that.  I'm

21      sorry.  I didn't mean to cut you off.  I'm just trying

22      to understand.  Go ahead.  Go ahead.

23               A    I provided what I would consider useful

24      comments in review of Chapter V.

25               Q    Okay.
```

CARPENTER REPORTING, INC.
(303) 752-1200

1              A    I read the whole thing and there has

2    been a lot of information gained since then, especially

3    that information that was brought together by RAC

4    regarding the environmental monitoring program.

5              Q    Okay.  Any other contributions to other

6    chapters?

7              A    Yes.  I do a lot of internal dose

8    calculations, and I also do a lot of explanation,

9    putting doses in perspective.  So the Chapter I on

10   human exposure to radiation, that's a -- the

11   contribution there is what I felt needed to be the

12   content of it.

13                   I reviewed the content after

14   Dr. Pritchard drafted this and I gave comments on it.

15   But he -- he did a great job in putting it together.

16   It's consistent with the types of materials that I have

17   used in other reports.  And I did discuss this one with

18   him.  That's section -- or Chapter I.

19             Q    Did you draft any portion of Section 1?

20             A    I may have.  I don't recall.  Actually,

21   some of this text looks awful familiar.  He might have

22   done some block copying and pasting from other

23   documents -- other reports that I had prepared --

24             Q    Can you --

25             A    -- such as 1A1 on primordial

ProTEXT Transcript Condensing for Windows

109

1    radionuclides.

2             Q    As you sit here today, can you identify

3    any portion of Chapter I that you drafted?

4             A    I'd have to look through it.  I -- the

5    definition of terms.  I'm reasonably certain that --

6    that I wrote those from a glossary of terms that I

7    maintain, that I use in various -- and I even suggested

8    he include those in here.  So that would be one part.

9                 The background radiation sources --

10   certainly, the primordial radionuclides and their

11   explanation -- if I didn't write it, it's just like

12   I've written it in other reports.  I may have written

13   it.  I don't know for a fact.  And actually, most of

14   Chapter I is the same type of material I use routinely.

15   In fact, I've -- I don't know where -- I don't recall

16   where he got this.  It's quite a few years ago, so ...

17            Q    Okay.  Any other chapters?

18            A    Chapter II on the radionuclides at Rocky

19   Flats.  I did review the documents and I was familiar

20   with the sources there of radionuclides at Rocky Flats

21   from my knowledge of the site.  I did review it and

22   comment on it.  Dr. Pritchard wrote this section.  It's

23   only three pages.  And I reviewed it and affirmed,

24   basically, what he had there on Chapter II.

25                 Chapter III is one that I did review

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

110

1    and -- but he authored this.  I reviewed it with

2    respect to my knowledge of the plutonium metabolism --

3             Q    Who wrote --

4             A    -- in the human body.

5             Q    Who wrote it?

6             A    Dr. Pritchard.  And actually, probably

7    some of this was Dr. Auxier, too.  This one.  So

8    Chapter III was one that I reviewed, commented on, and

9    verified, affirmed the information that was contained

10   therein.

11                 And I already mentioned Chapter IV.

12                 And Chapter V.

13                 And after that, I'm not sure.  Oh,

14   environment -- Chapter VI, Environmental Monitoring

15   Data, yes, I did review that.

16             Q    Did you write any portion of it?

17             A    I may have.  I can't say one way or the

18   other.  At the time, it was primarily Dr. Pritchard's

19   and Dr. Auxier's activity, but I did review and comment

20   on the report as it being acquired -- prepared.

21   Certainly, the presentation of the graphical portions

22   of this on the comparison with standards, I did work

23   very closely with Dr. Pritchard to indicate how I felt

24   those needed to be presented --

25             Q    Uh-huh.

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

111

1           A     -- in Chapter VI on Environmental

2    Monitoring Data.

3                 The releases, I reviewed that, but I

4    didn't author any of that.  That's Chapter VIII -- or

5    VII.  Excuse me.

6           Q     That's VII?

7           A     Compliance with Standards -- standards

8    is the one I was referring to there.  And VI is the --

9    there is site data.  Yes.

10                VI and VII, the same sort of comments on

11   those.  Review and contributions on those.

12          Q     Who wrote VII?

13          A     Let's see.  Gosh, it's been a long time.

14   I -- I may have written part of this because it was in

15   line with the standards and the -- for the times.  It

16   was either Dr. Pritchard or myself.  The style is like

17   both of ours, so I can't base it on the style.  That's

18   Chapter VII and VI.

19                Then VIII, I didn't do anything but

20   review VIII.

21                IX, I looked over it, but I didn't make

22   any comments on IX.

23                Let's see.  X.  X, I reviewed it.  X is

24   Radiological Assessments Corporation Reports.  My

25   review of their reports was subsequent -- detailed

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

112

```
 1    review was subsequent to this Auxier report.

 2              XI -- actually, on X -- on X, I did

 3    review the last page of that.  I was familiar -- I'm

 4    a -- a person that tries to keep up with the aerial,

 5    a-e-r-i-a-l, radiological surveys, and I had some

 6    reports for Rocky Flats for those historical aerial

 7    surveys and so I commented on this.  I may have written

 8    this part, but I'm not sure.  I know I commented on

 9    that part.

10              And then the -- XI, I did review that,

11    and since then, I've read the Operable Unit 3 reports.

12         Q    At the time of this report, did you --

13         A    I didn't write this section --

14         Q    All right.

15         A    -- but I have reviewed the Operable Unit

16    3 reports since then.  I think there has been some

17    additional work on that.

18              And that was XI.

19         Q    That was XI.

20         A    XII.  No.  XII, I -- I didn't even

21    review all of that.  The dose reconstruction, looked

22    over some of it.  Discussed it somewhat with

23    Dr. Pritchard, but --

24         Q    Did you write any portion of it?

25         A    No.  Certainly, not XII.  And subsequent
```

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

113

```
 1    to this report, of course, is RAC's extensive dose

 2    reconstruction.

 3              Q    What about XIII?

 4              A    No.  Read through it, didn't write any

 5    of it.

 6              Q    Okay.  How about XIV?

 7              A    That's the -- the references is XIV.

 8              Q    Uh-huh.

 9              A    And I contributed the -- the references

10    associated with the standards and some of the

11    references associated with the aerial surveys and some

12    of the references associated with the environmental

13    monitoring program.  Dr. Pritchard had all the rest of

14    those, and Dr. Auxier.

15              Q    Okay.  Do you know why Dr. Pritchard is

16    not testifying in this case?

17              A    Yes.

18              Q    Why?

19              A    Dr. Pritchard died two years ago, this

20    week.  He was a good friend of mine.

21              Q    I'm sorry to hear that.

22                   Okay.  One more question before we

23    break.  What portions, if any, of this Auxier report by

24    chapter, if you could identify them, do you believe

25    you're going to be testifying about in this case?
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

114

```
 1            A    I don't really know.  They haven't
 2   advised me of what things -- I certainly could -- those
 3   portions that I -- that I just mentioned that I
 4   contributed to or reviewed, I would expect that either
 5   they or you or whoever might ask me questions about
 6   those and I'd give opinions on those, but I don't know
 7   what they would be.
 8            Q    So, as you sit here, you couldn't
 9   identify for me particular chapters of this --
10            A    Sure.  I didn't say that.
11            Q    No.  No.  That's what I'm trying to
12   understand.  In other words, do you have an
13   understanding, based on your discussions with
14   Kirkland & Ellis counsel, which particular portions, if
15   any, of this Auxier report they expect to put on in
16   front of the jury through you?
17            A    No.  They have not told me that.  I've
18   told them -- I've told them which portions of the
19   report that I not only am familiar with, but I'm, you
20   know, conversant and helped to write and review and
21   prepare, but they have not told me which ones they
22   would want me to use.
23            Q    All right.  And did -- did you tell them
24   what you just told me about your contributions?
25            A    Yes.  Yes.  Exactly.  It's the same ones
```

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

115

```
 1    that we just went through there.

 2             Q    You told them I drafted this, but I

 3    didn't draft that, I did this.

 4             A    Contributed to this one and didn't

 5    contribute to this one, and the same ones that we just

 6    went through.

 7             Q    Okay.  Okay.  Were you shown any motion

 8    that we filed with respect to your testimony?

 9             A    No.  No.

10             Q    Okay.  Are you aware of that at all?

11             A    No.

12             MR. SORENSEN:  Okay.  We can break for

13    lunch, if you want.

14             MR. WOOLLEY:  Okay.

15             (There was a luncheon recess taken from

16    12:06 p.m. to 12:57 p.m.)

17             Q    (BY MR. SORENSEN)  Okay.  Dr. Frazier,

18    did you look at any documents over lunch?

19             A    No.

20             Q    Okay.  Earlier in the deposition, I was

21    asking about the time you spent on this case, and you

22    talked about a period of time in '95-'96.  Is it fair

23    to say that others at Auxier & Associates spent more

24    time than you working on this case?

25             A    Yes.
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

116

```
 1              Q    Do you have any idea how many hours

 2    Dr. Pritchard spent on this case?

 3              A    No.  I really don't.

 4              Q    Well, if you spent something like less

 5    than 180 hours in '95 and '96, do you have any sense of

 6    how many hours --

 7              A    I didn't say I spent 180 hours in

 8    '95-'96.

 9              Q    Less than 180?

10              A    I didn't say that.  I think it was less

11    than 80.

12              Q    Let me clarify something.  My note says

13    '95-'96 standards, less than 100, then time spent

14    reviewing the Auxier report, less than 80.

15              A    That's probably about right.  I don't

16    know the exact number.  That's probably right.

17              Q    Okay.

18              A    I don't know how many they spent in that

19    same time period.

20              Q    Do you have any idea?  500?  1,000?

21              A    I do not know.  I really don't.

22              Q    Do you know what other cases, if any,

23    Auxier & Associates has worked on involving DOE-owned

24    nuclear facilities?

25              A    Hanford.  Fernald -- well, Fernald was
```

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

117

```
 1    not Auxier & Associates.  That was not appropriate.

 2    Hanford and Los Alamos, actually.  Lawrence Livermore,

 3    I believe some associated with waste that had been put

 4    in an off-site property.  I did not work on that.  But

 5    that's my recollection.

 6              Q    Any other facilities?

 7              A    Probably the Oak Ridge National -- Oak

 8    Ridge Reservation.  Portsmouth, Ohio.  Paducah,

 9    Kentucky.  That's all the ones I can recall.

10              Q    Did these all involve litigation of some

11    sort?

12              A    Yes.

13              Q    Are any of these still active?

14              A    I don't think so.

15              Q    Well, in Hanford, the case is still

16    active.  Do you know whether Auxier & Associates'

17    involvement in the case is still ongoing?

18              A    They're not involved, I don't think.

19              Q    What did they do at Hanford?

20              A    Reviewed the historical releases and

21    assessed doses to off-site individuals.

22              Q    Did you work on that matter?

23              A    Yes.  Part of it.  The river pathway.

24              Q    Did you testify in that case?

25              A    In deposition.
```

ProTEXT Transcript Condensing for Windows

118

```
 1              Q     Who else at Auxier worked on that

 2    matter?

 3              A     Drs. Pritchard and Auxier.

 4              Q     Do you know how much Auxier was paid for

 5    that work?

 6              A     No.

 7              Q     Do you know approximately?

 8              A     No.

 9              Q     Do you know if it was over a certain

10    figure or below a certain figure?

11              A     No.

12              Q     You have no idea?

13              A     No idea.  None.

14              Q     How much time did you spend on that

15    case?

16              A     Not very much.  I'd say less than --

17    less than 100 hours, including the time to prepare the

18    report, travel, deposition, return home, all that.

19              Q     And what period of time did you do this

20    work?

21              A     Well, I'm not sure.

22              Q     Approximately.  A year?

23              A     Approximately '95, '96.  That's --

24    that's very approximate.

25              Q     Do you know what Dr. Pritchard's billing
```

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

```
 1    rate was in that period of time?

 2              A    No.

 3              Q    Do you know what it was up to the time

 4    he passed away?  What knowledge do you have, if any, of

 5    Dr. Pritchard's billing rate?

 6              A    I used to know it, but I don't recall

 7    it.  I really don't know it.  It was less than mine, a

 8    little bit.

 9              Q    A little bit less than yours?

10              A    Yeah.

11              Q    Okay.  Fernald, what was Auxier &

12    Associates' involvement in Fernald?

13              A    The -- I don't know that there was any

14    involvement at Fernald under the company of Auxier &

15    Associates.  I think all that work, I believe, preceded

16    Auxier & Associates, the company.  I believe it was

17    while -- that we were with IT Corporation.

18              Q    Was IT a predecessor to Auxier &

19    Associates?

20              A    No.  No.  It was a separate company.  We

21    left IT Corporation and Auxier formed Auxier &

22    Associates.

23              Q    When you say "we," who is we?

24              A    Dr. Auxier and Dr. Pritchard left first.

25    Dr. Auxier left first, then Dr. Pritchard, and a year
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

120

1     later, I left.

2              Q    So the work at Fernald was done while

3     you were at IT?

4              A    Yes.

5              Q    The name of it was IT?

6              A    International Technology Corporation.

7              Q    I see.  And what work was done at

8     Fernald when you were --

9              A    It was the --

10             Q    -- there?

11             A    -- review of the -- well, actually, two

12    or three things.  There was a worker's claim.  I did

13    not work on that, that I recall.  That was Day, et

14    al. --

15             Q    Day versus NLO?

16             A    -- versus NLO.

17             Q    Class action?

18             A    I don't know if it was a class action or

19    not.  And then there was the off-site contamination and

20    I participated in that -- testified in that in

21    deposition.  That's where I met Ms. Roselle.  That was

22    about 1988, maybe.

23             Q    I think that's about right.

24                  Who else worked on the Fernald matter?

25    Did Dr. Auxier and Dr. Pritchard work on it?

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

121

1          A    On that part I was working on, I don't

2     think so.  They worked on the worker exposures.  I

3     don't know that -- I don't know that they worked on the

4     other.

5          Q    What did you work on again?  Your focus

6     was ...

7          A    Environmental, characterization of

8     radionuclides in soil off the property.

9          Q    About how many hours did you spend on

10    that matter?

11         A    Well, from 1986 to 19 -- well, for that

12    matter there, it was '86 to mostly -- I think they

13    settled that at the -- in '89.  Early '89 or something

14    like that.  I'm not quite sure about that.

15         Q    I don't know the exact date, but go

16    ahead.

17         A    The -- I spent a couple hundred --

18    couple hundred hours each year, at least, I think,

19    on -- those two, three years there.

20         Q    What was your billing rate back then?

21         A    It was about 1 -- 150, maybe.  That's to

22    the best of my recollection.

23         Q    Now, that rate is the rate that was

24    charged to the client?

25         A    Yes.  Right.  I didn't receive any over

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

                                                                122

```
 1    and above that.

 2              Q    You received whatever you received?

 3              A    Salary.

 4              Q    Is that how you were paid at IT was

 5    salary, also?

 6              A    Yeah.

 7              Q    At this time, do you recall what your

 8    salary was at IT in this period when you were working

 9    on Fernald?

10              A    It must have been about 90,000 a year.

11              Q    All right.  Now, do you have any idea

12    how many hours Dr. Pritchard and/or Dr. Auxier worked

13    on the Fernald matter?

14              A    No.  None.

15              Q    Do you know whether it was more or less

16    than you?

17              A    I don't know.  I don't know.

18              Q    Well, you were working with him at the

19    time; correct?

20              A    I was in the same organization, but I

21    don't know how many -- how many hours he spent on it

22    compared to mine or an absolute number.  I don't know.

23              Q    No?  Okay.  Then you mentioned Los

24    Alamos.  What was Auxier's involvement in that?

25              A    Reviewing the historical history --
```

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

123

```
 1    well, the history of operations of the plant, the

 2    releases from the site, and the assessments of any

 3    potential off-site doses.

 4              Q    Was there litigation you were talking

 5    about?

 6              A    Yes.  But I don't recall what

 7    specifically it was.  There was some type of

 8    litigation.  It was short-term and then it went away.

 9              Q    When was this?

10              A    1993 -- '93.

11              Q    So, as far as you know, that matter

12    has -- has ended?

13              A    Yes.  I think it ended in either '93 or

14    '94.

15              Q    Do you know how it ended?

16              A    I think it was dismissed without

17    prejudice.

18              Q    Okay.

19              A    That means they can refile it?  Is that

20    the way you do it?

21              Q    Usually.

22              A    Well --

23              Q    No.  I'm not -- yes.  Do you know what

24    kind of a claim it was?  Class action?

25              A    I don't know if it was a class action.
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

124

1    There were several plaintiffs.  Perhaps 15 or 20.

2         Q    What was your role in that case?

3         A    Review a large number of documents

4    regarding operations of the facility and releases of

5    radioactive materials.

6         Q    How many hours did you spend on that

7    matter?

8         A    I don't know.  I have no idea.

9         Q    100, 200?  More -- was it more than

10   Fernald or less than Fernald?

11        A    I don't know.  I mean, I really don't.

12   I don't recall.

13        Q    Okay.  Besides yourself, who else worked

14   on it at Auxier?

15        A    Dr. Pritchard and Dr. Auxier.  And -- I

16   think there was somebody else.  Yes.  Joe Bell,

17   B-e-l-l.

18        Q    And what was your billing rate at this

19   time?

20        A    Oh, '93.  I -- I'm not sure.  It's

21   around -- around 165.  150, 165.  Something like that.

22   An hour.  Of course, I was paid salary, so ...

23        Q    You mentioned Lawrence Livermore.

24        A    I did not work on that, so I don't

25   really know much about that one.  And I knew it was a

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

125

```
 1    very short-lived project.
 2              Q    Who worked on it at Auxier?
 3              A    Michael Bollenbacher and -- and
 4    Dr. Auxier.
 5              Q    And what did they do in that matter; do
 6    you know?
 7              A    They reviewed data associated with a
 8    sewage sludge disposal site.
 9              Q    Do you know whether that was an actual
10    lawsuit that had been filed?
11              A    I don't know.  I think there was, but I
12    don't know.  I think it was like the local folks wanted
13    to use the land for a subdivision and someone is
14    objecting.  I don't know if there was a lawsuit or not.
15              Q    Okay.  Do you know when this work was?
16              A    I would not -- I don't know exactly, but
17    I would say in the mid-nineties.  Maybe late nineties.
18    Very short duration project.
19              Q    And you mentioned Oak Ridge.  Did you
20    work on that matter?
21              A    I don't believe I did.
22              Q    Who worked on it?
23              A    Dr. Pritchard and Dr. Auxier.
24              Q    And what did they do on that matter; do
25    you know?
```

ProTEXT Transcript Condensing for Windows

126

```
 1              A    Reviewed data, releases, reviewed

 2    reports.  Environmental measurements off site, on site.

 3    And I don't know what happened to any of those Oak

 4    Ridge Reservations or the Paducah reports.  I don't

 5    know where those stood.

 6              Q    With respect to Oak Ridge, was there a

 7    piece of litigation that they were working on?

 8              A    I don't know.

 9              Q    And when was this work done?

10              A    Late nineties.  Maybe even early 2000.

11              Q    The Portsmouth facility, what kind of

12    facility is that?

13              A    Gaseous diffusion plant.  Part of the

14    fuel enrichment.

15              Q    Did you work on that matter?

16              A    No.  Not that I recall.

17              Q    Who worked on it?

18              A    Dr. Pritchard and Auxier and -- I'm not

19    sure if anybody else did or not.  Since I wasn't

20    working on that, I only saw it from a distance.

21              Q    Do you know when that work was done?

22              A    Mid- to late nineties, I guess.

23              Q    Do you know whether that related to a

24    piece of litigation?

25              A    I think it was, but I don't know the
```

ProTEXT Transcript Condensing for Windows

127

```
 1    claim or anything about it.

 2              Q    Do you know if that case was resolved?

 3              A    I haven't heard about it in years, so I

 4    don't know.  I assume it was.

 5              Q    Okay.  But you don't know?

 6              A    I don't know.

 7              Q    Okay.  The Paducah --

 8              A    Similar situation as Portsmouth.

 9              Q    Did you work on that?

10              A    I don't recall that I did.  I did advise

11    some sampling methods that were used on some areas

12    there, but I don't think I billed for that.  I just

13    commented on the environmental measurements and the

14    approach to doing some sampling.

15              Q    Who worked on it, other than yourself,

16    then?

17              A    Come to think about it, that was -- that

18    was probably in the IT -- International Technology --

19    time frame.

20              Q    So this was a while ago?

21              A    Yeah.  A long time ago.  And it was --

22    persons working on it, Dr. Pritchard and one of our

23    women employees.  And I don't remember her name.  She's

24    no longer in health physics.

25              Q    So this was about when?  Can you place
```

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

128

```
 1      it in time?

 2             A     It must have been in the late eighties.

 3             Q     Now, is it correct that all these

 4      matters we've just gone through from Hanford to

 5      Paducah, you or your colleagues at Auxier and before

 6      that at IT were working on behalf of the defendants, if

 7      it was litigation, or the operators of the plant, if

 8      there was not litigation?  Is that correct?  That's who

 9      you were doing the work for?

10             A     Yes.  I believe so.

11             Q     Have you had any meetings with other

12      defense experts in this case in the last three months?

13             A     None other than in passing.  Mr. Blaha.

14      No discussion of the case.  Just how things are going.

15      I met him prior to the last three months, and I've seen

16      him since.

17             Q     Have you had any discussions with Otto

18      Raabe?

19             A     He's a friend -- Otto Raabe is a friend

20      of mine, but I've not discussed anything about this

21      case with him.

22             Q     Do you know if he's in town?

23             A     I don't know.

24             Q     Any other meetings or phone calls with

25      defense experts in the last several months?
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

129

         1              A    You say "several months."

         2              Q    Well, since -- let's say since

         3    September 1st.

         4              A    No.  Not that I recall.

         5              Q    Did you have any substantive discussions

         6    with Otto Raabe -- how do you pronounce his last name?

         7              A    Raabe.

         8              Q    Have you had any substantive discussions

         9    about this case with Otto Raabe at any time?

        10              A    As far as I know, I have never discussed

        11    this case with Otto Raabe.

        12              Q    Do you agree with the linear no

        13    threshold dose response -- what to call it -- way of

        14    looking at the risks of ionizing radiation to human

        15    beings?

        16              A    I agree that it's a hypothesis of

        17    relationship between risk and radiation dose.  I don't

        18    believe and I don't -- the data have not been shown

        19    to -- in my opinion, to show that it is valid for lower

        20    doses.  And that it is based on extrapolation from

        21    measurements at high doses.  I believe that it is a

        22    reasonable approach for planning operations of

        23    facilities.  And in fact, I have supported that for

        24    activities in operational health physics programs as

        25    far as planning purposes.

ProTEXT Transcript Condensing for Windows

130

1          Q    Do you intend to testify about that

2     subject at trial?

3          A    I don't know, but I may be asked to.  I

4     don't know.  I've not been told one way or the other.

5     Certainly, for me with my health physics background and

6     understanding of that --

7          Q    You've done no work on -- correct -- on

8     whether Rockwell or Dow violated any NPDES permits or

9     regulations; is that correct?

10         A    No.  I have not evaluated that.

11         Q    You've done no work evaluating whether

12    Dow or Rockwell violated RCRA, have you?

13         A    No.  I have not evaluated that.

14         Q    And you've done no evaluation of whether

15    Dow in this case -- whether Dow or Rockwell violated

16    the Clean Air Act, have you?

17         A    I have not evaluated that specifically,

18    no.

19         Q    And you've done no evaluation of whether

20    Dow or Rockwell violated the Clean Water Act, have you?

21         A    No.

22         Q    That's no, you have not?

23         A    I have not.

24         Q    I'm just -- sometimes my question,

25    you -- you know what I'm saying.  It has to be clear

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

131

1    for the record.

2              And you've done no evaluation, correct,

3    of whether Dow or Rockwell violated CERCLA, have you?

4         A    To me, CERCLA is SuperFund, but, no, I

5    have not evaluated.

6         Q    Okay.  And you've done no evaluation,

7    correct, of whether Dow or Rockwell violated AEC fire

8    standards, have you?

9         A    Have not.

10        Q    Okay.  And you've done no evaluation of

11   the conduct underlying Rockwell's guilty plea in

12   relation to its operation of Rocky Flats, have you?

13        A    That was --

14             MR. WOOLLEY:  I'm going to object to the

15   form.

16        Q    (BY MR. SORENSEN)  I'll --

17             MR. WOOLLEY:  It may not be clear to the

18   witness.

19        Q    (BY MR. SORENSEN)  You're familiar that

20   Rockwell pled guilty to 10 environmental crimes in

21   connection with its operation of Rocky Flats?  Are you

22   familiar with that?

23        A    In the 1988 time frame?

24        Q    No.  They pled guilty in '92.

25        A    I'm not -- I just have a vague knowledge

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

132

1   of that -- something like that went on.  I don't know

2   the specifics and I don't have any opinion about that.

3              Q    So you've done no evaluation of the

4   guilty plea, the conduct to which Rockwell pled

5   guilty -- or its impact one way or the other off-site;

6   is that correct?

7              A    I have not reviewed that with respect to

8   that, no.

9              Q    And you've done no evaluation of

10  material unaccounted for or known as MUF in connection

11  with this case; is that correct?

12             A    I've certainly reviewed the -- some of

13  the information and claims regarding that.  I have not

14  been asked to give opinions on that.  I'm familiar with

15  materials unaccounted for and the difficulties in

16  accounting for all the plutonium or other -- especially

17  nuclear material.

18             Q    You've formulated no opinion that's in

19  writing that's been disclosed to us about that subject?

20             A    Have not.

21             Q    How about with respect to VOC?  You know

22  what VOC refers to?

23             A    Volatile organic compounds.  I have not.

24  I'm not a chemist.

25             Q    You have no opinion about the VOC's at

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

133

1    Rocky Flats?

2           A    I've not been asked to and don't plan to

3    give opinions on that.

4           Q    You've done no work and authored no

5    report concerning bioturbation effects on- or off-site

6    at Rocky Flats; correct?

7           A    On what?

8           Q    Bioturbation.  The effects of animals

9    and insects on soil.

10          A    Oh, I'm familiar with the disturbance

11   of, especially, subsurface soil by various animals and

12   the extent of their -- the aerial and volume extent of

13   their impacts on sites.  Seen that for many years at

14   different sites.  I've not been asked to give an

15   opinion, but, certainly, I'm prepared to give opinions

16   in terms of the relative contribution that that might

17   make on airborne concentrations of radionuclides.

18          Q    But you've given no such opinion written

19   in any report that's been disclosed to plaintiffs;

20   correct?

21          A    I have not.

22          Q    All right.  You understand that you're

23   going to be testifying to this jury probably in a few

24   days; correct?

25          A    Yes.  As you asked me earlier.

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

134

1        Q    Can you please tell me, to the best of

2    your knowledge, what you intend to tell them?

3             MR. WOOLLEY:  Objection.  Asked and

4    answered.  And it will depend on what he's asked.

5             MR. SORENSEN:   Object to the coaching of

6    the witness.

7        Q    (BY MR. SORENSEN)  You can go ahead and

8    give me whatever understanding you have.

9        A    The areas that I -- I have prepared in

10   reports and I'm -- I have looked at regard the

11   standards of radiation -- radioactive materials in the

12   environment, both -- well, whatever environment and

13   environmental media.  I don't know what I'll be asked

14   about that, but that's an area that I've put in my

15   reports and I'm familiar with.

16            Another area is the radio --

17   radioactivity measurements in the environments on-site

18   and off-site Rocky Flats, especially air, over time,

19   both in terms of methods that were used, equipment

20   used, and the results of those measurements.  Airborne

21   concentrations, primarily.

22            I don't know what I'll be asked in those

23   areas, but I'm prepared to provide testimony in those

24   areas.

25            The natural background radiation doses

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

135

1    from various sources and various pathways for

2    individuals in the Rocky Flats and Denver area, I'm

3    familiar with those.  I'm prepared to testify, if

4    asked.  I don't know what I'll be asked in those areas,

5    but I'm prepared to testify on those.

6              Fallout of radioactive materials in air

7    and in soil.  I don't know that I'll be asked about --

8    anything about soil, but I'm certainly prepared to

9    answer about that.

10             I've not prepared work on soil, but a

11   lot of my work, historically, has been on soil.  Not

12   here, but I mean on other projects.

13             Metabolism and internal dose

14   calculations of plutonium in physical forms -- physical

15   and chemical forms.  Routes of exposure to plutonium

16   and other radionuclides.  Pathways of exposure.

17   Methods of dose calculation, dose assessment.  I don't

18   know if I'll be asked about these, but these are

19   certainly areas of my expertise.

20             That's -- that's the general areas that

21   I think I would be -- there are probably sub-areas

22   within each of those, but I don't know what they will

23   be asking.

24        Q    I want to go through each of these.

25   Standards of radionuclides in the environment.  The

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

```
 1    written report that reflects your work in this is the

 2    part of the Auxier report you identified earlier; is

 3    that correct?

 4            A    Part of the Auxier report, the --

 5            Q    The Auxier-Frazier affidavit, also?

 6            A    The Auxier-Frazier affidavit.  And I'm

 7    not sure that my supplemental report in 2004 had

 8    anything in it on that specifically.

 9            Q    We'll get to that.  It has a short

10    section of whether things changed.

11            A    Yes.

12            Q    So Chapter IV of the Auxier report to do

13    with standards, the Auxier-Frazier affidavit we

14    discussed earlier, and whatever is said in your

15    supplemental report; is that correct?

16            A    Yes.  And I didn't limit it to just

17    Chapter IV.  The information in the metabolism of

18    plutonium chapter is important as it relates to the

19    standards -- as it relates to the standards.

20            Q    Okay.  And that would be where?

21            A    Chapter II or something like that.

22            Q    I think -- well, IIIB, Metabolism in the

23    Body?

24            A    3, probably, yes.  That relates to the

25    standards.
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

137

1              Q    All right.  But you didn't write Chapter

2     III; correct?

3              A    I reviewed it and, as I said earlier, I

4     may have contributed portions of it, but most of it was

5     in a review role.  Check for consistency with my

6     previous knowledge and work in plutonium dosimetry.

7              Q    Now, the second subject, measurements in

8     the environment, in the air, among other places, over

9     time, methods and results, did you write a report about

10    that?

11             A    No.

12             Q    I'm sorry.  You did not or --

13             A    No.  I was -- contributed to the

14    sections in the Auxier report and -- regarding the

15    measurements of that.

16             Q    As you testified earlier?

17             A    Yes.

18             Q    Okay.  But is there any other place

19    where you authored something about this subject?

20             A    Not that I recall.

21             Q    All right.  Your name appears nowhere in

22    the Auxier report; correct?

23             A    I'd have to check the references.  I

24    don't know that it does or doesn't.

25             Q    I mean, you didn't sign it?

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

138

```
1            A     I did not sign the 1996 report.

2            Q     And your name doesn't appear on the

3    cover as a co-author?

4            A     Not as far as I know.

5            Q     Okay.  And then we get to natural

6    background radiation doses.  Where is there some

7    written report by you about that subject?

8            A     The sections in the Auxier '96 reports

9    on natural background doses.

10           Q     As you testified about earlier in terms

11   of whatever your contribution was to those sections?

12           A     Whatever my contribution was.

13           Q     Is there any other place where you wrote

14   something or contributed to something about that

15   subject?

16           A     Not that I am aware of, no.

17           Q     Okay.  Fallout, another subject in air

18   and soil.  Where did you write or contribute to

19   something about that subject?

20           A     I think the section in the Auxier &

21   Associates report.

22           Q     Again, however you described it earlier

23   when we were going through the chapters?

24           A     Yes.  Right.

25           Q     Is there any other place that we can go
```

ProTEXT Transcript Condensing for Windows

139

1      to?

2               A      Regarding --

3               Q      That subject?

4               A      -- this subject and this case?

5               Q      Yeah.

6               A      No.  Not that I can think of.

7               Q      You mentioned metabolism and internal

8      dose.  I'm just going by my notes.  You said whatever

9      you said.  I'm just trying to go down the subjects.

10     Metabolism and internal dose.  Where did you do

11     something on that subject?

12              A      The information in the Auxier -- '96

13     Auxier & Associates report.

14              Q      Oh, what portion of that report?

15              A      The section -- the chapter on metabolism

16     of plutonium.  I think it's II --

17              Q      IIIB?

18              A      III, I think.

19              Q      IIIB is metabolism in the body.

20              A      Yeah.

21              Q      Again --

22              A      As it relates to internal dosimetry,

23     yes.

24              Q      Well, did you calculate anyone's dose in

25     this case?  You didn't, correct?

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

140

```
 1              A    I did not.  Certainly, RAC's work is

 2      very comprehensive in that area.

 3              Q    You didn't participate in RAC, though;

 4      right?

 5              A    No.  I reviewed their data, their

 6      reports.

 7              Q    You had no participation directly

 8      yourself in any of RAC's work; is that correct?

 9              A    I did not.

10              Q    I just wanted to be clear about that.

11      Did you calculate anyone's risk in this case?

12              A    No, I have not.

13              Q    Did you take any soil measurements off

14      site for plutonium in this case?

15              A    No, I did not.

16              Q    And you mentioned pathways of exposures.

17      That's a separate topic or maybe it meant it to be part

18      of metabolism.  I wasn't sure.  But -- where did you

19      write or contribute to something about pathways of

20      exposure?

21              A    I think I reviewed and commented on the

22      exposure path -- potential exposure pathways to

23      off-site individuals from Rocky Flats in the 1996

24      Auxier report where they addressed potential pathways

25      there.  I don't remember the section, but the concept
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

141

1    of exposure pathways is a part of my expertise.  I

2    don't -- I did not prepare or submit any specific

3    reports on that.

4              Q    Okay.  Could you take a look at the

5    Auxier report and tell me what section you were just

6    referring to?  I think it's the one below.  Auxier.

7              A    No.  It would have only been associated

8    with the Section 12A3.  The pathways are discussed in

9    the RESRAD, R-E-S-R-A-D, code.  But no.  No.  There's

10   no separate report on it.

11             Q    So did you write some portion of Chapter

12   XII?

13             A    No.  I did look over portions of it, but

14   I did not write it.

15             Q    Okay.  And what is RESRAD?

16             A    It's a calculation software by which you

17   can calculate radiation doses from radioactive

18   materials in the environment, primarily in surface soil

19   or soil.  It is a pathway analysis program that -- to

20   which you can assign exposure parameters for each of

21   the pathways and each of the values in those pathways.

22   It's a -- they used it in a preliminary fashion here.

23   It's widely used software.

24             Q    Who created it?

25             A    Argon National Laboratory initiated that

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

142

1    code and has maintained the code over the years.

2            Q    Argon National Laboratory, is that a DOE

3    laboratory?

4            A    Yes.  It's near Chicago.  Argon,

5    Illinois.

6            Q    Okay.  You mentioned methods of dose --

7    I can't read my own handwriting.  Dose assessment?

8    That was another subject you mentioned.

9            A    Certainly, in terms of reviewing dose

10   assessment methodology, I'm experienced and qualified

11   to do that.  I have not been asked to give opinions on

12   that and I have not prepared any reports on that.

13           Q    Okay.  Now, you've done no work, formed

14   no opinions about potential synergistic effects of

15   exposures to more than one hazardous substance;

16   correct?  You've done no such work?

17           A    Have not.

18           Q    Okay.  Have you done any work in this

19   case concerning potential variability in effects of

20   radiation exposure with respect to young versus old,

21   sick versus healthy, children versus adults, fetuses

22   versus, you know, live -- live human beings, have you?

23           A    Not specifically in this case.  Although

24   I'm familiar with the -- the methods of dose assessment

25   for different age groups and also, the basic

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

143

1    information of radiosensitivity as a function of age.

2            Q    But you haven't authored a report about

3    this in this case; correct?

4            A    No, I have not.

5            Q    You've done no other work on the other

6    subjects I listed in my question; correct?

7                 MR. WOOLLEY:  Object to the form.

8            Q    (BY MR. SORENSEN)  I listed a -- a

9    series of different factors.  Age was one of them --

10   and then you commented on age.  Do you remember that?

11   This just happened.

12           A    None of the factors that you mentioned,

13   I have specific -- I have not performed -- prepared a

14   report on any -- for this case on any of those

15   subjects.

16           Q    Okay.

17           A    But for all of those subjects, I am

18   familiar with the dose assessment differences in

19   general --

20           Q    Okay.

21           A    -- associated with that.

22           Q    Have you done any work in this case

23   about the effects of radiation -- radiation exposure on

24   human beings that do not manifest themselves in

25   disease, such as cellular damage, genetic damage, other

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

1    types of biological damage?  Have you done any work on

2    that in this case?

3              A    I have not done any work specifically in

4    this case.  I am familiar with the body of literature,

5    I think, that's associated with attempts to find

6    genetic effects from radiation exposure in humans.  And

7    there have never been any genetic effects demonstrated

8    from radiation effect in humans.

9              Q    But you've authored no such report about

10   that subject in this case; correct?

11             A    Mine has strictly been a review of

12   documents pertaining to that.

13             Q    I just want to be clear.  You've

14   authored no report in this case on that subject;

15   correct?

16             A    That's correct.

17             Q    Okay.  Have you done any independent

18   analysis of the source term of release of

19   radioactivity, radionuclides from Rocky Flats in this

20   case?

21             A    No.

22             Q    Have you done any independent

23   investigation of the transport of plutonium or other

24   radionuclides off of Rocky Flats into the off-site

25   environment?

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

145

```
 1            A    No.

 2            Q    Have you done any independent assessment

 3    of the dose of radiation incurred by any person living

 4    off-site of Rocky Flats?

 5            A    As I answered earlier, I have not.

 6            Q    Okay.  And again, on -- just to finish

 7    this off, you've done no independent assessment of the

 8    risk, elevated risk, if any, suffered by any person

 9    off-site of Rocky Flats as a result of exposure to

10    radionuclides, plutonium, or other substances from

11    Rocky Flats; correct?

12            A    I have not prepared any reports.  I've

13    certainly reviewed the published doses in comparison

14    with natural background doses and the potential risks

15    of those doses, but I have not authored any reports.

16            Q    Did you talk with any former Rockwell or

17    Dow employees in connection with your work in this

18    case?

19            A    Yes.

20            Q    Who did you talk to?

21            A    I spoke with Ed Putzier.  Putzier.

22            Q    I think it's Putzier.

23            A    Putzier.  I also spoke with Joe

24    Aldridge.  I've read documents written by several, but

25    speaking with -- speaking --
```

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

146

1          Q    Take one step at a time.

2          A    In recent years -- in the years

3    associated with this case, those are the only two I

4    recall specifically discussing the case.  I know

5    several health physicists who work or have worked at

6    Rocky Flats, but I don't recall discussing specifics of

7    this case with anyone except those two.

8          Q    And when did you have these

9    conversations?

10          A    Mr. Aldridge, few weeks ago.  For

11    Mr. Putzier, I read the information that he had

12    provided in an interview with Auxier & Associates

13    employees back about '95 or '96 and then I spoke with

14    him yesterday.

15          Q    You spoke with --

16          A    Putzier.

17          Q    -- Putzier yesterday?

18          A    Yes.

19          Q    Where?

20          A    By phone.

21          Q    What did you talk about?

22          A    His recollection of the environmental

23    monitoring program for air from the fifties, sixties,

24    and up into the seventies.

25          Q    How long was this conversation?

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

147

```
 1              A    Less than an hour.

 2              Q    Was it just you and Ed Putzier on the

 3    phone?

 4              A    No.

 5              Q    Who else was on the phone?

 6              A    Mr. Woolley was in the room where I was

 7    on the phone.

 8              Q    You were on a speaker phone?

 9              A    Yes.

10              Q    Anyone else?

11              A    I did the bulk of the conversation with

12    Mr. Putzier.  Very interesting gentleman.  Mr. Jason

13    Faddis was in the room, also.

14              Q    Who is Jason Faddis?

15              A    He's an employee of Auxier & Associates.

16              Q    Anyone else?

17              A    Mr. Snow, Rob Snow.

18              Q    He's a lawyer for Kirkland & Ellis?

19              A    I don't know if he's an attorney or not.

20              Q    Okay.  But he works for Kirkland &

21    Ellis?

22              A    Yes.

23              Q    Anyone else present?

24              A    That's it.  That's all.

25              Q    Did you take any notes of this
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

```
 1    conversation?

 2            A     No.

 3            Q     Did anyone, to your knowledge, take any

 4    notes?

 5            A     I didn't see anybody else taking notes.

 6            Q     Okay.  Do you recall any specific things

 7    that Mr. Putzier told you?

 8            A     Yes.

 9            Q     What did he tell you?

10            A     He described the methods of collection

11    of air samples for gross alpha and beta counting.  He

12    described the methods of verifying and calibrating the

13    flow rates through the air samples that were collected

14    for gross alpha and beta counting.  He described the --

15    a little bit of the time line in terms of transition

16    from gross alpha-beta counting to isotopic plutonium

17    counting which occurred in the early seventies.  He

18    described -- I'm trying to remember some of the other

19    areas.  The counting room, how the counting equipment

20    was checked daily.  How the -- the efficiency was

21    measured daily.  How the self-absorption was determined

22    for the filters.  The sample media.

23                 That's all I recall right now.  There

24    may have been others, but I don't recall.  I have to

25    think longer on it.
```

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

149

```
 1              Q    How did this conversation come about?

 2    Did K&E suggest you have it?

 3              A    I suggested.

 4              Q    You suggested?

 5              A    Yes.  I read some of his materials

 6    before and -- and I didn't know he was still alive and

 7    so I asked, is it possible to talk with Mr. Putzier

 8    and ...

 9              Q    Have you had any other conversations

10    with him other than the call you just mentioned?

11              A    No.  But I read the -- I don't know if I

12    read it.  I think I may have read it.  There was -- I

13    spoke with Carol Berger, who was an Auxier & Associates

14    employee -- I think it was Carol Berger -- back in the

15    '9 -- no.  It wasn't Carol, either.  I'm not sure.  It

16    was -- there were some notes from Auxier & Associates'

17    input.

18              Q    Auxier did some kind of interview with

19    Mr. Putzier?

20              A    Yes.

21              Q    Is that your understanding?

22              A    That's my understanding.

23              Q    And were these notes you looked at --

24    was this a verbatim transcript, or just a summary of

25    what he said?
```

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

SHEET 150  PAGE 150

150

1           A    General notes.  General notes.

2           Q    Do you have possession of your notes?

3           A    No.

4           Q    Do you have a copy in your office?

5           A    No.  Actually, I saw those several years

6    ago, and I don't even know where they are.

7           Q    Mr. Aldridge, you spoke with him a

8    couple weeks ago?

9           A    Yes.

10          Q    Who was he?

11          A    A former employee of the Rocky Flats

12   site who worked in the health physics area associated

13   with the environmental monitoring and other activities

14   there.

15          Q    Did he work for Rockwell or Dow or both?

16          A    I'm not sure when he came.  I don't

17   think he worked for Dow.  He's not -- I don't think

18   he's old enough to have gone back that far.  I believe

19   it was Rockwell and then whoever followed Rockwell.

20   EG&G, I guess.

21          Q    Okay.  And what did -- what did he tell

22   you?

23          A    I asked him some questions about the

24   counting room and how they counted their samples and

25   what sort of checks they did on their counting room.

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

SHEET 151  PAGE 151

151

```
 1              Q    Who was -- who participated in this

 2    conversation?

 3              A    Just me.

 4              Q    Just you and Mr. Aldridge?

 5              A    Yes.

 6              Q    Was it a phone call?

 7              A    Yes.

 8              Q    There were no lawyers on the phone?

 9              A    No.

10              Q    Okay.  So have you had any other

11    conversations in person or over the phone with any

12    former plant employees in connection with your work in

13    this case?

14              A    I can't recall any conversations that

15    related to this case.  As I said, I've -- I know

16    several of the health physicists who used to work at

17    Rocky Flats and I've talked with them over the years,

18    but not specifically the issues related to this case

19    that I recall.

20              Q    Have you reviewed a study done by

21    Dr. Carl Johnson concerning cancer incidence near Rocky

22    Flats?

23              A    I've read that.  I believe I read the

24    report.

25              Q    In connection with your work in this
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

152

```
1    case?

2            A    No.  I'm not sure it was.

3            Q    Okay.

4            A    I think it was just reading the report.

5            Q    So you've formulated for this case no

6    opinion about that report; correct?

7            A    No.  Not been asked to.

8            Q    And is the same true of the study by

9    Steven Chin of cancer incidence near Rocky Flats?  Do

10   you know what I'm talking about?

11           A    I've heard of that one.  I'm not sure

12   I've read that one.  What's the last name?

13           Q    Chin.  C-h-i-n.  About '80, '81-ish time

14   frame.

15           A    I don't recall reading that.  I may

16   have, but I don't recall.

17           Q    Okay.  Have you looked at the report of

18   Dr. Richard Clapp in this case?

19           A    I have seen the Clapp report, I think,

20   and read parts of it.

21           Q    When?

22           A    Oh, I don't -- I've seen the report and

23   portions of it, but I don't remember when.  It's

24   sometime within the last few weeks or months.  I don't

25   know.
```

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

153

1          Q    Have -- has K&E or anyone else of the

2    defendants asked you to formulate some opinion about

3    Dr. Clapp's report?

4          A    No.

5          Q    You didn't participate in any direct

6    personal way in which of the ChemRisk work in

7    connection with your work at Rocky Flats -- let me

8    start again.

9               Is it correct that you did not

10   participate in ChemRisk's work that they did in

11   connection with Rocky Flats?

12         A    That's correct.  I did not participate

13   with their work.

14         Q    What are the nonprimordial radionuclides

15   that people are generally exposed to from fallout or

16   I -- I guess that would be the only way.

17         A    No.  There are radionuclides that are

18   produced continuously in the atmosphere referred to as

19   cosmogenic radionuclides.  Among these are beryllium 7

20   and carbon 14 and tritium at various amounts.  Those

21   are cosmogenic radionuclides that are not primordial

22   radionuclides.

23         Q    These are produced by the effects of the

24   sun and cosmic radiation on the atmosphere; is that

25   correct?

ProTEXT Transcript Condensing for Windows

154

1          A    The interactions of cosmic rays with the

2     atmosphere, yes.

3          Q    But that -- you're distinguishing that

4     from primordial, but these cosmic generated would have

5     been generated for as long as we've had an

6     atmosphere -- the earth has had an atmosphere; correct?

7          A    Yes.  But they are of short half-life --

8     relatively short half-life, so they have to be

9     constantly produced in the atmosphere.

10          Q    Apart from those, what are the

11     nonprimordial radionuclides that people are exposed to?

12          A    People in general?

13          Q    Yeah.  Not -- I'm not focusing on Rocky

14     Flats right now.

15          A    These are addressed in the National

16     Council on Radiation Protection and Measurements'

17     reports of background radiation doses.  There -- I'll

18     try to recall from memory some of those in those

19     reports.

20          Q    Before you get to the list, a clarifying

21     question.  Am I correct in thinking that this list

22     comes from fallout?  That's where this is coming from?

23     Nuclear weapons testing fallout?

24          A    Not all of it.  The --

25          Q    These are also -- go ahead.  I don't --

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

155

1    go ahead.

2              A    I've already mentioned the radiogenic

3    radionuclides that are constantly being produced and

4    have fairly short half-lives.

5              Q    Right.

6              A    There are radionuclides to which we're

7    all exposed from global fallout from atmospheric

8    weapons testing and among these are strontium 90,

9    cesium 137, plutonium 239, 240, I want to say neptunium

10   237 -- I'm pulling some of these from memory, so I'm

11   sorry if I'm not getting them all right -- and a few

12   other radionuclides that are present in the environment

13   with half -- from fallout that have half-lives that are

14   longer -- americium 241.  They have half-lives that are

15   long enough to still be around.

16              There are other radionuclides present in

17   the environment that are not primordial, that are not

18   from global fallout from atmospheric weapons testing.

19   Most prominent among them is tritium.  Tritium is

20   generated from a number of processes, especially the

21   processing of spent fuel worldwide and from some

22   reactor facilities that give rise to global tritium

23   inventories.

24              There are probably -- there are some --

25   a few other radionuclides that are produced through

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

156

```
 1    operations of accelerators and some other nuclear

 2    facilities, but the amounts and quantities of these

 3    radionuclides are typically, although potentially

 4    worldwide, are relatively low concentrations.

 5              And based upon my memory, those are the

 6    only ones I can think of.

 7         Q    Okay.  Is there some portion that you

 8    can point me to in the Auxier report or any other

 9    report that you had any involvement in this case where

10    you did some kind of an ALARA analysis of Dow or

11    Rockwell?

12         A    I did not produce a report in which I

13    did an ALARA analysis of Dow or Rockwell.

14         Q    Okay.  In the Auxier report, there's a

15    reference to a biokinetic model for plutonium.  If you

16    could turn to page 3-8.

17              (There was a discussion off the record.)

18              (There was a recess taken from 1:51 p.m.

19    to 1:55 p.m.)

20         Q    (BY MR. SORENSEN)  Okay.  Dr. Frazier, I

21    asked you whether you have calculated any person's dose

22    or risk in this case and you said no.  Have you

23    calculated any hypothetical dose or risk for any

24    hypothetical person in this case?

25         A    No.
```

ProTEXT Transcript Condensing for Windows

157

```
1              Q    Okay.  If you could turn to page 3-8 of
2    the Auxier report.  Do you have that in front of you?
3              A    Yes.
4              Q    There's a reference to a new biokinetic
5    model for plutonium.  Do you see that?
6              A    For plutonium, americium, and neptunium,
7    yes.
8              Q    Yes.  Could you describe that model?
9              A    Generally.  The key things about it is
10   the model addresses the recirculation of the
11   radionuclides that go back into the bloodstream once
12   they have gone into a compartment.  "Compartment" being
13   an organ or tissue.  And that -- it's my understanding
14   that that -- that's a refinement in the metabolic
15   model.  It was before that material went into the organ
16   and the return to the bloodstream for which you could
17   then have excretion, that this was refined based upon
18   some additional information.
19              That's, basically, the model, as I
20   understand it.  It's an improvement of the older model
21   based upon some specific steps in that -- in the
22   knowledge of metabolism of -- of plutonium, americium,
23   and neptunium.
24              Q    Do you know what assumptions are made or
25   go into the model?
```

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

1           A     No.  I'd have to look them up.  I

2    don't -- I'm not that familiar with that model.

3           Q     How about the model that it replaced?

4    Are you familiar with the model that it replaced?

5           A     Yes.  The ICRP 48 publication.

6    Actually, updated publication 19.  I have ICRP 48 and

7    ICRP 19.  In each case, the -- I won't say in each

8    case, but, generally, the number of compartments into

9    which plutonium is deposited, compartment being an

10   organ or a tissue, the number of compartments was

11   improved with more knowledge.  The transfer

12   coefficients from one compartment to another was

13   improved with knowledge over time.  And so that the

14   1972 ICRP publication 19 and the 1986 publication of

15   ICRP 48 and then again in the ICRP publication 67,

16   which was -- oh, man, that must have been in -- must

17   have been in the nineties.  '92, '93.

18           Q     What assumptions go into the ICRP 48

19   model?

20           A     I'd have to review it.  There are

21   several assumptions.  It has to do with the -- the

22   route of intake, uptake, and retention of the

23   radionuclides into the body.

24           Q     And what are these models based on?

25   Have scientists actually been able to watch plutonium

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

159

1    inside human beings' bodies and see where it goes and

2    see exactly what cells it interacts with and how it

3    interacts and what effects it has on those cells or

4    what?

5              A    No.  The best information, in my

6    opinion, comes from the autopsy results of individuals

7    who donate their bodies -- individuals who have had

8    plutonium, actinium -- I mean plutonium, americium, or

9    neptunium uptake and the analysis of the tissues to

10   determine where in the body the plutonium is located.

11             Additional information is gained from

12   excretion analysis of individuals who are exposed to

13   plutonium, which can occur from time to time.

14             Some of the historical data were based

15   upon measurements of plutonium from individuals who

16   voluntarily had intake of plutonium into their bodies.

17   Those are the best sources of human-specific

18   information.  And the refinement of those is an ongoing

19   process and from that refinement, the radiation dose

20   assessment or dose conversion factors are also

21   refined --

22             Q    So you --

23             A    -- and improved.

24             Q    You mentioned autopsy studies.  These

25   are people who have had some exposure to plutonium and

ProTEXT Transcript Condensing for Windows

160

1    then have donated their bodies and their bodies have

2    been examined; is that correct?

3         A    Yes.  And these are individuals who died

4    natural deaths not related to the plutonium intake, but

5    who have known levels -- who worked in plutonium

6    facilities and have known levels of -- or known or

7    suspected levels of plutonium in their bodies.

8         Q    And the autopsy is done to look at

9    whether the organs have been damaged or what exactly

10   are those in the autopsies?

11        A    I'm not an authority in all aspects of

12   it, but, certainly, one aspect of the autopsies is to

13   measure the amounts and concentrations of plutonium in

14   various tissues throughout the body.  Other

15   observations may be made regarding the condition of

16   those tissues, but I'm not familiar with those.

17        Q    Okay.  And you said there is -- these

18   are -- I'm sorry.  The excretion studies, this is what,

19   in your urine and feces?

20        A    Yes.

21        Q    And measurements thereof?

22        A    Yes.

23        Q    And then based on those measurements,

24   scientists try to make judgments or assumptions about

25   what -- what that means about where the plutonium is

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

161

1    going in the body?

2              A    They make -- they evaluate the intake,

3    uptake, and retention of those radionuclides in fair --

4    inferring that from the models they have before them

5    and the concentrations in the excreta as a function of

6    time.

7              Q    Okay.  Did you mention a third type of

8    human --

9              A    Third type of what?  Excuse me.

10             Q    I was asking about what underlies, you

11   know, these models.  You mentioned autopsy, excretion.

12   Was there a third category that you were referring to

13   about human health -- direct human health studies?

14             A    I mentioned -- well --

15             Q    Sorry.

16             A    I don't recall what -- certainly --

17             Q    I wrote down two.

18             A    There have been attempts -- there have

19   been attempts to use animal data.  In fact, many of the

20   studies of plutonium metabolism are related to animal

21   data and inferred from animal data.  I'm not an

22   authority on that.  I think Dr. Raabe would be your

23   authority on that area.

24             Q    Could you turn to 3-10, please, of this

25   Auxier report.

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

162

1                        You see 3.D, Plutonium in Perspective.

2       Do you see that section?

3                  A    Yes.

4                  Q    There's a sentence in the middle of the

5       first paragraph that says, "Many factors effect the

6       DCF," and DCF stands for dose conversion factor; is

7       that correct?

8                  A    Yes.

9                  Q    Okay.  "Many factors effect the DCF

10      including the chemical form of the nuclide, the nature

11      of the matrix in which the material is found, and the

12      particle size distribution."  Do you see that?

13                 A    Yes.

14                 Q    What does the matrix in which the

15      material is found mean?  What does that mean?

16                 A    The physical form of the material.  A

17      good example is if you have a -- a particle that would

18      be inhaled that's in a physical form that is like a

19      mineral, fractured mineral.  The solubility of that

20      material would be -- could be different than another

21      mineral form that may be found relating to the

22      material.

23                        Now, the obvious consideration there is

24      the dose conversion factor for inhalation is different

25      than the dose conversion factor for ingestion because

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

163

1    inhalation of the material would be in the air matrix

2    and in the ingestion, the dose conversion -- the

3    material would be in some solid or liquid material

4    that's ingested.  That may be what they mean with

5    respect to that.

6              Q    Could you turn to the next page, 3-11.

7    Do you see these charts?  These figures 3-4, 3-5, and

8    the next page, 3-6 and 3-7.

9              A    Yes.

10             Q    Did you have any participation in

11   creating these charts?

12             A    Yes.  I reviewed the values they were

13   using for that.

14             Q    Okay.  You reviewed the values?

15             A    And made sure that the plots were

16   generated correctly.

17             Q    Did you do these plots?

18             A    No.  Dr. Pritchard actually prepared the

19   plots.

20             Q    Did you provide the source material for

21   these things?  For these plots?

22             A    I'd have to look and see.  No.  This

23   source information from which this came would be the

24   ICRP publications 71 and 72.

25             Q    But did you look at these publications

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

164

1      and take data from them and turn them into these plots?

2             A    No.  But I verified that they were put

3      in there correctly.

4             Q    What did you do to verify that?

5             A    Took the values -- at the time, I took

6      the values and verified that they plotted them

7      correctly.

8             Q    When you say you took the values, did

9      you go to the underlying source documents?

10            A    Yes.  ICRP 71, 72.  I was a little

11     surprised at some of the numbers and I went back and

12     verified them.  These are straight out of ICRP 71 and

13     72.

14            Q    When you say these, let's -- 3 -- 3-4

15     cites ICRP 72?

16            A    Yes.  Going to ICRP 72, the effective

17     dose conversion factor, that's the effective dose

18     equivalent conversion factor for that whole body in

19     Sieverts per becquerel is the number that's listed here

20     for inhalation for the default absorption times.

21            Q    Okay.  And then 3-5 is for the same

22     radionuclides if all are known to be at least soluble

23     forms is that -- that's what it says.

24            A    Well, the least soluble form is type

25     S --

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

1          Q     Okay.

2          A     -- in that new model.  And that's --

3    that's what they're presenting here.  These -- if they

4    are least soluble, then they are retained in the lung

5    for longer periods of time.

6          Q     TH 228, that's thorium 228?

7          A     Yes.  It's one of the primordial

8    radionuclides.  Its half-life is about 1.9 years, but

9    it's continued being produced in the thorium 232

10   primordial decay series.

11         Q     And did you have any role in creating

12   Figure 3-5?

13         A     None other than what I've said about

14   3-4.

15         Q     You had the same role?

16         A     Yes.

17         Q     Did you go to the underlying publication

18   and confirm the numbers?

19         A     Publication 72.

20         Q     Yeah.  Did you --

21         A     Yes.  I was a little surprised by the

22   numbers there.

23         Q     Go to Figure 3-6, please.  The next

24   page.

25         A     Okay.

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

166

1          Q      That refers to ICRP 71.  Do you see

2      that?

3          A      Yes.

4          Q      Did you have any role in preparing this?

5          A      Similar thing.  Reviewing the numbers,

6      as I did for Figures 3-4 and 3-5.

7          Q      And same questions for 3-7.  Did you

8      have the same role?

9          A      Yes.

10          Q      If you turn to page 3-13, please.  This

11      Figure 3-8, did you have any role in preparing this

12      figure?

13          A      No.

14          Q      Who prepared it; do you know?

15          A      Dr. Pritchard.  I looked at it, reviewed

16      it.  I didn't have any role in preparing it.

17          Q      Could you turn to page 3-14, please.  Do

18      you see Figure 3-9?

19          A      Yes.

20          Q      Did you have any role in preparing that

21      figure?

22          A      No.

23          Q      Same question for Figure 3-10.  Did you

24      have any role in preparing that figure?

25          A      No.  Other than reviewing it.

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

167

1          Q    Okay.  Let's turn to Chapter IV.  The

2     4A, Basis for Plutonium Standards.  Do you see that?

3          A    Yes.

4          Q    All right.  This is a chapter that you

5     drafted; correct?

6          A    Yeah.  I wrote it.

7          Q    All right.  Okay.  Do you recall what,

8     if any, changes were made to your draft?

9          A    As I said earlier, I don't know that

10     there were any made, but they were certainly reviewed

11     before it went out.

12          Q    Okay.  Now, you say on page 4-2 at the

13     top of the page, quote, The permissible activity of

14     plutonium 239 in the body was derived by a direct

15     comparison with the maximum permissible activity of

16     radium 226 in the body incorporating differences in

17     physical and metabolic properties of plutonium 239 and

18     radium 226.  Do you see that?

19          A    Yes.

20          Q    Now, is radium a primordial

21     radionuclide?

22          A    Yes.

23          Q    And a comparison between plutonium and

24     radium, what radium information is being used?

25          A    The --

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

168

1          Q    Radium dial painters?

2          A    Data based upon the radium dial painters

3    and -- primarily, radium dial painters, but maybe some

4    others from the use of radium in medicine determined

5    that the safe level of radium in the body was -- I

6    don't remember the exact number -- like .6 micrograms

7    or something.  I don't remember the exact number, so

8    don't hold me to that, but a particular amount.

9               And then there was a discussion of the

10   appropriate level for other long-lived alpha-emitting

11   bone seekers, such as plutonium 239, and in that

12   discussion, it was agreed that there would be a ratio

13   and proportion calculated for other radionuclides that

14   were long-lived alpha-emitting bone seekers such as

15   plutonium 239 to the radium, and that's what they went

16   through for that.  It's in that Tripartite.  I don't

17   remember the exact terms or numbers.

18         Q    Have you reviewed Dr. Carl Morgan's

19   deposition in this case?

20         A    No.

21         Q    Do you know who Carl Morgan is?

22         A    Yes.  I knew him.

23         Q    You knew him?

24         A    Yes.  I met him and --

25         Q    Okay.  Would you agree that the

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

169

1   radionuclide radiation standards set by the AEC were

2   affected, in part, by economic considerations?

3           A    Not for plutonium -- not for plutonium

4   in air or water, no, I would not agree with that.

5           Q    Are there other standards that you're

6   aware of that the DOE or its predecessor said that were

7   influenced by economic considerations?

8           A    I'm not aware of any.  None of the

9   information I reviewed indicated that that was ever a

10  consideration for the permissible activities of

11  plutonium in air or water.

12          Q    And what work have you done to look at

13  that question?

14          A    I looked at the writings of -- not just

15  writings, but the collection of documents from --

16  certainly, the Tripartite conferences, Newell Stannard,

17  S-t-a-n-n-a-r-d, his -- the history of radioactivity.

18  And the collection of documents and articles by NCRP's

19  main guru.  I can't think of his name.  He's now

20  deceased.  And so is Newell Stannard.  Those documents.

21  Huge collection of documents.  I'm trying to remember

22  his name.  I can't remember it.  I'm sorry.

23          Q    Well, would you agree that the setting

24  of a standard for radioactivity emissions by the AEC or

25  its successor could have an economic impact?  Would you

ProTEXT Transcript Condensing for Windows

1    agree with that?

2              A    Yes.

3              Q    So is it your testimony that the people

4    at the AEC and its successors who set these standards

5    were simply indifferent to economic considerations?  Is

6    that your testimony?

7              A    No.  I didn't say that.

8              Q    Okay.

9              A    I said with respect to the plutonium

10   concentrations for air and water, I saw no information

11   that economic considerations were ever taken for the

12   recommendations that were made by the Tripartite

13   conference or that were accepted and used by the AEC,

14   Atomic Energy Commission.

15             Q    Have you ever worked for the NRC or the

16   AEC or DOE?

17             A    No.

18             Q    It says on part 4-2 of the Auxier

19   report, the same sentence I read to you, the latter

20   part where it says, "Incorporating differences in

21   physical and metabolic properties in plutonium 239 and

22   radium 226."  Do you see that?  Top of the page?  The

23   sentence I just read?

24             A    Yes.  Yes.

25             Q    Okay.  Are you there?  What are the

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

171

```
 1    differences between plutonium 239 and radium 226 that

 2    are referenced here?

 3             A    Well, I'd have to look them up.  They're

 4    in that document that I remember seeing them and how

 5    they were explained, but I don't have a copy with me.

 6             Q    So without looking at a copy, there's

 7    nothing you can tell me about the differences that

 8    are --

 9             A    Certainly --

10             Q    -- referred to here?

11             A    Certainly, the metabolism is slightly

12    different.  The alpha particle energies are slightly

13    different.  The alpha particle energies from plutonium

14    239 are slightly higher.  Well, slightly lower than

15    radium 226 energies.  I remember reading that -- they

16    are both long-lived alpha bone seekers.

17             But regarding the specific numbers, I

18    don't recall those.  That's in the documents in several

19    places, and that's in those references that I mentioned

20    here.

21             Q    And chemically, they're different;

22    correct?

23             A    Yes.  The radium tends to be a little

24    more soluble than the plutonium.  The compounds of

25    radium tend to be a little more soluble.
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

172

1          Q    Okay.  Now, you refer to -- back on page

2     4-1 of this report, there's a Footnote 2 referring to

3     an AEC letter.  Do you see that?  Shaw, January 3rd,

4     1951?

5          A    I don't recall.  I don't recall that

6     letter.

7          Q    Well, it's just the cite for the

8     sentence, "The standards for protection for internally

9     deposited plutonium 239 prescribed for personnel at AEC

10    facilities in 1951."  That's the last full sentence on

11    page 4-1.

12         A    Yes.

13         Q    There's a footnote to this letter?

14         A    Yes.

15         Q    Do you recall reviewing that letter?

16         A    I'm sure I did, but I don't recall it.

17         Q    Okay.

18              (Marked for identification was

19    Deposition Exhibit No. 6.)

20         Q    (BY MR. SORENSEN)  Show you what has

21    been marked as Exhibit 6.  The front page has an

22    Attachment 2 reference because this was attached to an

23    Auxier affidavit.  And I'm just giving you the

24    attachment.  Is that the letter that's referred to in

25    Footnote 2 of -- on page 4-1 of the Auxier 1996 report?

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

SHEET 173  PAGE 173

173

1              A     Yes.  It's a letter from David Shaw of

2      the US AEC to the General Electric Company at the

3      Hanford Works.

4              Q     Okay.  Now, you used this as part of

5      your discussion and opinion about what the standards

6      for plutonium in air were in the early fifties;

7      correct?

8              A     Yes.

9              Q     Could you please show me where in this

10     attachment there's anything said about off-site

11     plutonium in air concentrations?

12             A     It doesn't.

13             Q     Okay.

14             A     The document to which it refers and the

15     historical documents that relate to operations of AEC

16     facilities at the time were that -- and other nuclear

17     facilities at the time were that the protection of

18     workers was equally as important as protection of the

19     off-site personnel.  In fact, the workers -- we're just

20     protecting people, so the people, whether they are on-

21     site or off-site.  And there was no difference between

22     the concentrations on-site or off-site of a facility

23     during its operations.  Not just AEC facilities, but

24     any facilities.  That was the practice at the time.

25                    That changed in 1957-58 with the NCRP

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

174

1    recommendations of the factor of 10 decrease for

2    off-site personnel.

3              Q    Let me see if I understand what you're

4    saying.  Let's focus on this document that's in front

5    of you.  This has to do with on-site standards;

6    correct?  That's what this document is about?

7              A    This has to do with standards, period.

8    On-site or off-site.  They did not make any difference

9    between those.

10             Q    But there's no reference in this

11   document to off-site?

12             A    That's right.  There's no reference that

13   it's only on-site, either.

14             Q    Look at the letter, January 3rd, 1951.

15   Do you see it?

16             A    Yes.

17             Q    It says, "The attached statement

18   prepared by the Division of Biology and Medicine, AEC

19   Washington office, specified that maximum permissible

20   levels of external radiation and the maximum

21   permissible concentrations of certain radioactive

22   isotopes as applied to AEC and AEC installation

23   personnel."  Do you see that?

24             A    Yes.

25             Q    Okay.  So are you expressing some kind

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

175

1    of legal opinion about what standards were in place, if

2    any, for off-site plutonium in air at this time?

3              A    I'm expressing the opinion of a health

4    physicist with knowledge of the practice of health

5    physics and radiation protection for on-site and off-

6    site from this period up until 1957-58.  The same

7    levels were applicable on-site and off-site.

8              Q    That's your opinion?

9              A    That is referenced from the other

10   documents, too.  I don't have them before me, but

11   that's in other documents.  It came across as the same

12   information in looking at other sites, too, such as Los

13   Alamos National Laboratory.  This was the practice at

14   nuclear facilities; not just AEC facilities.

15             Q    In your opinion; correct?

16             A    That's what the documents show, and it's

17   certainly my opinion based upon those documents.

18             Q    But is there a document you can point me

19   to, whether it's in front of you and perhaps you cited

20   it somewhere, that states for the period 1951 till the

21   next change that we'll get to, this is the plutonium in

22   air off-site standard?  Is there any such document?

23             A    I'm going to have to review the

24   documents to which I referred to see if those are even

25   included already.

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

1          Q    Go ahead.  Take your time.

2               MR. WOOLLEY:  Are you going to give him

3     the documents to which he referred?

4          Q    (BY MR. SORENSEN)  I thought you were

5     saying you could look at your report.

6          A    I would like to.

7          Q    Your section of the Auxier report.

8     Let's start with that.  Why don't you look in that

9     section and see if there's some reference to some

10    document that states what you just said.

11              MR. WOOLLEY:  I think he said he has to

12    look at the documents to which he referred, which I

13    don't think are in the room.

14         Q    (BY MR. SORENSEN)  Why don't we start

15    with looking at the chapter you said you authored.

16         A    Chapter IV, that I did author.

17         Q    Right.

18         A    And the only potential thing here would

19    be on the top of 4-4.  I need to look at that.  And any

20    other documents between 1951 and 1954.  I don't have

21    those in my possession today here.  I'd have to look at

22    those.

23         Q    Okay.  Let me --

24         A    But, certainly, my opinion that I gave

25    earlier was based upon knowledge of what the practice

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

177

1    was for radiation protection of workers and the public

2    prior to 1957 and '58.

3             Q    You just referred to page 4-4 at the

4    top.  Were you talking about the top full paragraph?

5             A    Yes.  That particular document, I need

6    to look at closely and any other documents that might

7    fall in that time frame between 1951 and 1954 and 1957.

8    That time range there.

9             Q    Uh-huh.  Okay.

10            A    I don't have those documents with me.

11   I'm sorry.

12            Q    Turn back to Deposition Exhibit 6,

13   please.  Now, if you could turn to one of the

14   attachments.  I think it says Group 1.  It's a little

15   difficult to read.  Group 1, based on Harwell.

16            A    Harwell.  That's the British site --

17   research facility that -- at which there was a meeting

18   of the Tripartite group.  The Tripartite was Canada

19   meeting at Chalk River, the Britain meeting was at

20   Harwell, and AEC, I think that was in Washington.  I'm

21   not certain.

22            Q    The --

23            A    DOE.

24            Q    The -- the plutonium 239 permissible air

25   concentration number is 2 times 10 to the minus 12.

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

178

1    What's the rest of that mean?

2              A    Excuse me?

3              Q    It's hard for me to -- I'm sorry.  I'll

4    circle it.  I'm trying to understand that number.

5              A    Yes.  This is -- I think this is

6    Attachment B stated here.  It looks -- it says

7    plutonium 239, and then the permissible air

8    concentration is listed as 2 times 10 to the minus

9    12th microcuries per cc.  That is not the same symbol

10   for curie that's currently used.  That's a lower case

11   C, but it is microcuries.  If you convert that to

12   picocuries per cubic meter, that would be 2 picocuries

13   per cubic meter.

14             Q    I see.  And microcuries is -- is how

15   much of a curie?

16             A    It's a millionth of a curie.

17             Q    And the picocuries is a billionth?

18             A    A trillionth of a curie.

19             Q    And the cc, is that cubic centimeters?

20             A    Cubic centimeters.  And there are a

21   million cubic centimeters in a cubic meter.

22             Q    Right.  Because 1,000 by 1,000?

23             A    Right.

24             Q    So you took that number as expressed in

25   this chart of Exhibit 6 and in your -- and in the

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

179

1    Auxier report, Chapter IV, you converted that to 2

2    picocuries per cubic meter; correct?

3              A    Yes.

4              Q    Okay.

5              A    The footnote to this, I think, is

6    illustrative --

7              Q    Which footnote?

8              A    -- to this column that you referred me

9    to just now.

10             Q    Uh-huh.  Go ahead.

11             A    The footnote says, "Air concentrations

12   are calculated on the basis of 168 hours per week

13   exposure with breathing rates of 1.25 times 10 to the

14   6th cc per hour of working time and 0.63 times 10 to

15   the 6th cc's per hour off time.  If exposure is

16   during working time only, permissible concentrations

17   may be increased accordingly."

18             The footnote clearly shows to me, as a

19   health physicist, that they are talking about exposure

20   during work and exposure off-site away from the work

21   environment --

22             Q    Okay.

23             A    -- as 168 hours represents 24 hours per

24   day times 7 days per week.

25             Q    Now, on page 4-5 of the Auxier report,

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

180

1    if you could turn to that, please.  Are you there, sir?

2        A    Yes.

3        Q    All right.  Kind of the middle of the

4    page, it states at the end of that paragraph, "The

5    annual air consumption of 8,400 cubic meters became

6    approximately 0.04 picocuries per cubic meter."

7             Do you see that?

8        A    Yes.

9        Q    When you say "approximately," did you

10   calculate that from a table, or did you just take this

11   number off of a table?

12       A    I calculated it.

13       Q    From some kind of a table; is that

14   correct?

15       A    Calculated it using the methodology that

16   was described in the August 5th, 1985 memorandum by

17   Vaughn.  And in the information provided in the DOE

18   publication EH-0071, 1988, Internal Dose Conversion

19   Factors for Calculation of Dose to the Public.

20       Q    That attachment 9 -- sorry to do this to

21   you, but these things are located in different places.

22   If you could look at the Auxier-Frazier affidavit we

23   looked at earlier --

24       A    Yes.

25       Q    -- and if you could look at Attachment

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

181

1    9.   I believe that's the document you just referred to.

2              A     That's the Vaughn memorandum that I

3    referred to.

4              Q     Right.

5              A     It does not include the DOE EH-0071 that

6    I referred to.

7              Q     Okay.  Well, does this Vaughn memorandum

8    specify anything about a new air concentration?

9              A     Yes.  In the wording of application

10   of -- I'd have to read it.  This is the --

11             Q     Before you do --

12             A     -- driver --

13             Q     Before you do -- and I'm happy to give

14   you the time to read it.  I'm trying to understand, as

15   much as I can with whatever we have in front of us, how

16   you did your calculation to get to .04.  So feel free,

17   you know -- go ahead.  Take your time.

18             A     The first part of that process of

19   determining the allowable concentration that Vaughn is

20   referring to is in the first paragraph of his

21   August 5th, 1985 memorandum.  And in that paragraph,

22   he -- near the middle of that first paragraph, it says,

23   "In this document, the NCRP endorses the recommendation

24   of the ICRP to limit the continuous exposure of any

25   member of the public from other than medical sources

ProTEXT Transcript Condensing for Windows

182

1    and natural background to 100 millirem per year whole

2    body dose equivalent.  The previously recommended limit

3    of 500 millirem per year is retained for noncontinuous

4    exposures.  This recommendation" -- he's referring to

5    the NCRP recommendation -- "is now adopted as an

6    interim standard for DOE environmental activities for

7    all exposure pathways."

8              From 1951 until the date of this memo,

9    the plutonium standard was not calculated from a

10   radiation dose.  It was ratioed to radium content in

11   the body and derived from that.  At this time, he says

12   calculated from a radiation dose.  He goes on to say

13   how that calculation can be performed or should be

14   performed.  And it's the next-to-the-last paragraph of

15   the memorandum.

16             In concert with this action, EH --

17   that's environmental health, I guess, the group

18   within -- division within DOE -- is preparing to

19   publish tables of intake to dose conversion factors

20   based on ICRP publication 30 models and parameters to

21   be used by DOE environmental programs in calculating

22   dose to members of the public in calendar year 1985 and

23   future years.  A copy of the final draft of these

24   tables is attached for your information and use.

25             I did not have that attachment.  But I

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

183

1   do have -- I've never seen it attached to this

2   document.  I had this document in years past, but the

3   document to which he refers is the DOE EH0071.  That is

4   a document in which DOE published their dose conversion

5   factors for internally deposited radionuclides.

6                   Also, in that document was the parameter

7   inhalation rate -- 8,400 cubic meters per year -- that

8   would be used for the calculation.  So it is a simple

9   mathematical formula on the left side of which is 10

10  millirem -- left side of the equal sign.  On the right

11  side is concentration C in air, let's say, for that

12  purpose, times 8,400 cubic meters per year.  And of

13  course, on the left side of the equation, it was 100

14  millirem per year so you've got the right units.  The

15  dose conversion factor would be -- for example, would

16  be in picocuries -- I'm sorry -- the concentration

17  would be in picocuries per cubic meter and, hence, the

18  dose conversion factor would be in millirems per

19  picocuries, and that's the third term on the right side

20  of the equation.  So the equation has, on the left,

21  annual dose.  Then the equation -- then the equal

22  signs.

23              On the right side, you have

24  concentration times intake rate, which is 8,400 cubic

25  meters per year and a dose conversion factor which

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

184

1    would come from -- come from the DOE EH-0071.  I don't

2    recall that number, but if you look up the -- well,

3    first of all, you would rearrange the formula such that

4    your C is on one side and everything else on the other

5    side.

6            Q    Solving for C?

7            A    Solving for C algebraically, hence the

8    concentration C is equal to 100 millirem per year,

9    divided by the dose conversion factor for the specific

10   radionuclide that you're considering and inhaling, and

11   the 8,000 -- also divided by 8,400 cubic meters per

12   year.  The units all cancel out.

13               If the concentration in picocuries per

14   cubic meter and the dose conversion factors is in

15   millirem per picocurie, looking up the value in zero --

16   DOE EH-0071, the dose conversion factor, you would have

17   to convert that to millirem per picocurie.  It would be

18   in probably rem per microcurie or something.  Simple

19   conversion of units there.  But if you get the units

20   correct and divide that out for plutonium inhaled,

21   inhalation pathway, then you get approximately .04.

22           Q    Okay.  A couple questions.  This

23   document, DOE EH-0071 referred to on page 4-5 of the

24   Auxier report, did you have that at the time you

25   prepared this?

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

185

1           A    Yes.

2           Q    Okay.

3           A    It was not attached to my copy of the

4    DOE 1985 memorandum, but I received copies of -- of

5    that in 1988.  There were companion documents.  They

6    were in an orange-covered perfect bound document.  0070

7    is the external dose conversion factors, and 00171 are

8    the internal dose conversion factors.

9           Q    And these dose conversion factors were

10   developed by who?

11          A    I believe the principal investigator was

12   at Oak Ridge National Laboratory using the ICRP models

13   and I believe the individual's name is Dr. Keith

14   Eckerman.  He also was the principal investigator that

15   developed the corresponding dose conversion factors in

16   EPA's publication Federal guidance report No. 11, and

17   EPA's Federal guidance report No. 12, and EPA's Federal

18   guidance report No. 13.

19          Q    Is he still alive?

20          A    Yes, he is.

21          Q    Is he still at Oak Ridge?

22          A    Yes.  As far as I know.

23          Q    Now, this dose conversion -- before we

24   get to that, you say it's approximately .04.  Do you

25   recall more -- I mean, what is the precise number?  You

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

186

```
1    said approximately .04.   .04 and then a lot of zeros,

2    or do you recall?

3            A    The dose conversion factors that are

4    listed, I think, are rounded off to either 1 or 2

5    significant figures.  I think maybe even one

6    significant figure.  So the allocation, as I went

7    through it, came up with one significant figure as

8    being appropriate.  I believe that's the case on those

9    dose conversion factors.

10           Q    Do you recall that it's .04 and some

11   other numbers after it, or is it .039 and you rounded

12   up?

13           A    I don't recall.  It's -- it's very near

14   04.  It's somewhere very close to that.  A few percent

15   either way.

16           Q    The dose conversion factor -- is it

17   Dr. Eckerman --

18           A    Yeah.

19           Q    -- that he developed, when did he

20   develop them; do you know?

21           A    He used the ICRP models and his group

22   developed that cal -- they didn't develop it.  They

23   calculated it.  It's a straight calculation process

24   using the ICRP models.  Well, he did it -- the group

25   itself -- Dr. Eckerman came to Oak Ridge in about 1980.
```

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

187

1    He was formerly with the Nuclear Regulatory Commission

2    in Chicago prior to that.  He's a friend of mine.

3                   And even prior to him arriving at Oak

4    Ridge in 1980, the dose -- there was a group at Oak

5    Ridge National Laboratory that calculated dose

6    conversion factors based upon ICRP 2 methodology and

7    their publication -- portions of those numbers were in

8    NCRC's regulatory guide -- Nuclear Regulatory

9    Commission Regulatory Guide 1.109, I believe is the

10   number.

11                  There were also published, in other

12   documents, the dose conversion factors by that --

13   calculated by that group using the models at the time

14   that were then improved with the ICRP 30 methodology

15   that's presented by DOE here and also, for the Federal

16   guidance report No. 11, which is EPA's publication.

17   And subsequent to that, they -- as the models improved,

18   their dose conversion factors have been revised.

19            Q    This dose conversion factor, can you

20   tell me just in simple terms what that means, dose

21   conversion factor?

22            A    Yes.  It's a very useful, yet simplified

23   concept of having a number which really is a ratio, I

24   guess you could say, a number -- of what the radiation

25   dose would be to either the whole body as the effective

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

188

1    dose or to an organ of the body per unit intake of a

2    specific radionuclide.  The calculation with the dose

3    conversion factor -- to derive the dose conversion

4    factor takes into account the route of intake of the

5    material into the body, the known metabolic information

6    of the radionuclide, how it is taken up by various --

7    by the body into the bloodstream and how it is

8    deposited and retained in various tissues of the body,

9    and it is based upon the physical radiological

10   properties of the radionuclide such as the half-life,

11   the mode of decay, the energies of the emissions during

12   those decays, and the intensity or frequency of those

13   emissions during the decay.

14           The metabolic information is determined

15   by the chemical and physical form of the material and

16   the route -- of course, the route of intake.

17           What the dose conversion factors do is

18   provide a single multiplying factor that can be used to

19   multiply an intake by to calculate the radiation dose.

20   In the case of the dose conversion factors that I

21   presented here and the case of the dose conversion

22   factors that are in DOE EH-0071 and in Federal guidance

23   report No. 11, these are the internal doses that are

24   received from intake out to 50 years.  This is referred

25   to as the committed dose.  50 years following the

CARPENTER REPORTING, INC.
(303) 752-1200
You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

189

```
 1    intake.

 2                 There are other calculations, not

 3    presented in either of the documents to which I just

 4    referred, that also give the calculated radiation dose

 5    for the first year and other time periods following

 6    intake.

 7                 Some of that information and those dose

 8    factors are contained in more recent ICRP publications

 9    that followed our -- and my writing of this -- this

10    report.  I'm sorry for the long explanation.

11          Q    No.  No.  That's fine -- you know,

12    that's perfectly all right.  I asked the question.

13    Now, going back to page 4-5 of the Auxier report,

14    there's this table that summarizes the different

15    permissible plutonium 239 concentration in air numbers.

16    Do you see that?

17          A    4-4?

18          Q    Right.  Well, the page is 4-5.

19          A    4-5.

20          Q    The table is 4-1.  Do you see that

21    table?

22          A    Yes.

23          Q    I take it from your supplemental report

24    or your report dated 2004 that there's been no change

25    since December 31, 1989; is that correct?
```

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

190

1          A     No.

2          Q     That's not correct, or there has been no

3     change?

4          A     The Clean Air Act went into effect in

5     1989, and the concentration for plutonium in air was

6     lowered by approximately a factor of 10 because the

7     dose limit for the air pathway is 10 millirem instead

8     of 100 millirem.  That's my recollection.  I don't have

9     a copy of the Clean Air Act in front of me or with me.

10              (Marked for identification was

11    Deposition Exhibit No. 7.)

12         Q    (BY MR. SORENSEN)  Dr. Frazier, could

13    you confirm for me, please -- take your time -- that

14    Exhibit 7 is a copy of your report in this case dated

15    August 6th, 2004?

16         A     Yes.

17         Q     And your signature appears on page --

18    what would be page 4?  It's not paginated.

19         A     Yes.  Yes.

20         Q     Okay.  Now, do you mention anywhere in

21    this report what you just mentioned about the effect of

22    the Clean Air Act?

23         A     I'd have to read it.

24         Q    Sure.  Go ahead.

25              (There was a discussion off the record.)

ProTEXT Transcript Condensing for Windows

191

```
 1              A    I did not include the Clean Air Act.

 2    That is an omission on my part.  At the time I wrote

 3    this, I was not aware of the change in concentration or

 4    the ramifications of it.  I was aware that the Clean

 5    Air Act had come out, but I was not aware of the

 6    concentrations of it.  And I did not include it in my

 7    list of documents here.

 8              Q    (BY MR. SORENSEN)  And when did you

 9    become aware of this error or --

10              A    Within the last --

11              Q    -- omission, whatever you want to call

12    it?

13                   MR. WOOLLEY:  Object to the

14    characterization.

15              A    I became aware of this omission within

16    the last few months.  The original charge that I recall

17    for standards developments was up until the time that

18    the facility ceased operation in, I think, '89, and

19    that's as far as I went with my standard development.

20                   The question you asked earlier regarding

21    this Table 4-1, that was -- my charge for this was --

22    was what were the standards up until the time that the

23    plant ceased operation.  And that's the purpose of

24    putting it like that.

25              Q    (BY MR. SORENSEN)  Okay.  All right.  I
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

192

1    want to go back to the Clean Air Act.  You believe that

2    was passed in 1989?  Is that it?

3              A    I think it became effective somewhere

4    towards the end of 1989.  I don't know the exact date.

5              Q    Okay.  And can you explain to me how

6    that changed the permissible plutonium concentration in

7    air from .04 to, I gather it would be .004?  Is that

8    right?

9              A    It's approximately ten times lower.  I

10   don't recall the exact number.  It's -- there's a

11   number in that and it's 004 or 002 or something.  It is

12   calculated the same way as we did before, except

13   instead of using a -- 100 millirem on the left side of

14   the equation, you used 10 millirem for the pathway.

15             Q    So it shouldn't be .002; right?  Because

16   that would be 20 times --

17             A    No.  Because you also have to consider

18   who did the calculation and what generation of dose

19   conversion factor they used.

20             Q    I see.

21             A    That's also in the formula for

22   calculation there.

23             Q    So this number, do you believe that it's

24   actually specified in the statute?

25             A    I don't recall.  I did look through

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

193

1    that, and I honestly don't recall.

2            Q    And how did this official, as you put

3    it, come to your attention?

4            A    In discussion with Mr. Jason Faddis of

5    the data that we would be looking at and comparing,

6    what time frames we were asked to look at in terms of

7    measured air concentrations.  That was -- those time

8    frames were extended beyond 1989 up until the present

9    day.  And in looking at that, I said we ought to make

10   sure we've got the right standards for those latter

11   time periods and that's when I came across the Clean

12   Air Act and I was surprised by that, but then I

13   recalled that in the time of the '86 -- '96 -- 1996

14   report, we were up to go through the 1989 time frame,

15   and even at the time of my August 6th, 2004

16   supplement, I was still thinking in terms of standards

17   up through the close of the plant, ceasing of

18   operations of the plant in 1989.

19           Q    So is it your recollection that the new

20   standards in the Clean Air Act -- I know I asked you

21   this.  I'm just -- let me start again.

22               Do you recall whether the new plutonium

23   in air standards in the Clean Air Act are in the

24   statute itself or in some implementing regulations?

25           A    The dose limit is in the statute.

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

194

```
 1              Q    Okay.

 2              A    Well, that's a good -- I don't know.

 3              Q    Okay.

 4              A    I do know the difference between the law

 5      and the --

 6              Q    Regulations?

 7              A    -- regulation, so I don't really know.

 8      I know I saw the dose limit in the regulation.

 9              Q    The dose limit or the concentration

10      limit?

11              A    The dose limit is in 40 CFR Part 61.

12              Q    Okay.

13              A    That's the regulation.  There may be a

14      concentration limit, but I don't recall.

15              Q    So the dose limit, the 10 millirem, that

16      would be 40 CFR Part 61?

17              A    Yes.

18              Q    But the conversion of that to a

19      concentration number, which you think is either .004 or

20      .002 or something like that, that would be where?

21              A    The explanation of it would be in

22      40 CFR 61, I believe.

23              Q    Where would the number be?  Is there a

24      place I can see and say there's the number, or is that

25      a number you calculated?
```

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

195

1          A     If I used the same dose conversion

2    factor as I used for the DOE EH-0071 based upon ICRP 30

3    and if I used a dose limit of 10 millirem, then the air

4    concentration would be .004.

5          Q     Right.  Okay.

6          A     Somewhere, I have seen a .002.  I don't

7    know if it were -- was in the 40 CFR 61 or if it was in

8    the DOE tables of air concentrations, under

9    implementation of 40 CFR 61.  I don't remember.

10          Q     But you remember you saw a .002 number?

11          A     Somewhere.  Yes.

12          Q     So, as you sit here, you're -- your best

13    testimony is that the current off-site plutonium in air

14    permissible concentration is .002 picocuries per cubic

15    meter; is that correct?

16          A     From -- yes.  From releases from a

17    facility.  And AEC -- excuse me -- DOE has said we will

18    comply with the Clean Air Act, so it applied to

19    releases from a DOE facility.  Now, that's the best of

20    my recollection.

21          Q     Okay.  I -- okay.  Now, this August 6,

22    2004 report, Exhibit 7, that's your latest report in

23    this case?  You've issued nothing else in this case;

24    correct?

25          A     That is correct.

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

196

1          Q     Okay.  Have you prepared any other

2     writing for the defendants that has never been served

3     on us?

4          A     No, I have not.

5          Q     Okay.  Could you kind of put side by

6     side page 4-5 of the Auxier report with 4.7, please.

7     Tell me when you have them kind of side by side.  Are

8     you there?

9          A     Yes.

10         Q     Now, there's a Table 4-2 on page 4-7

11    entitled Permissible Plutonium 239 Concentration in

12    Water.  Do you see that?

13         A     Yes.

14         Q     You prepared this table?

15         A     Yes.

16         Q     Has there been any change since

17    December 31, 1989?

18         A     Not to the best of my knowledge.

19         Q     Have you checked to see whether there

20    were any statutes or regulations passed since

21    December 31, 1989, that could have changed that number?

22         A     Yes.  Safe Drinking Water Act.  I didn't

23    see that it was applicable to this or gave information

24    which it would change this.

25         Q     The Safe Drinking Water Act, when was

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

197

1    that passed; do you know?

2              A    No.

3              Q    When did you look at that in connection

4    with this chart?

5              A    Probably sometime shortly after the Safe

6    Drinking Water Act came out.  That would be 40 CFR 141.

7    The 30 may even be consistent with that.  I don't --

8    I'd have to look at this and see.

9              Q    Well, with the other chart for air, you

10   realized at some point as you described that the Clean

11   Air Act had an effect, and so there's this omission in

12   terms of the period after '89.  After you realized that

13   with respect to air, did you go back and check water,

14   or had you already satisfied yourself there was no

15   change?

16             A    It was my recollection that the Safe

17   Drinking Water Act preceded the Clean Air Act regarding

18   that.  That's my recollection.  And I didn't see any

19   change that would have occurred because of that.

20   Because they already used the -- the dose limit that

21   you see here.

22             Q    After you recognized the omission with

23   respect to the Clean Air Act, did you go back and check

24   whether there had been some change after '89 with

25   respect to water?

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

198

1          A    Not in that last few months, no.

2          Q    For the period January 3, 1951, through

3    December 31, 1989, were there any Federal standards for

4    plutonium concentrations in soil off site?

5          A    Not to the best of my knowledge.  The

6    only ones I'm aware of are the Colorado Department of

7    Health State standards for soil, and those were based

8    upon resuspension of plutonium compared to actually

9    fallout plutonium.

10          Q    All right.  I understand that.  But I

11    want to just stick with Federal standards for a moment.

12    I want to be very clear.  To your knowledge, there was

13    no Federal standard governing the amount of plutonium

14    in soil off-site between January 3rd, 1951, through

15    December 31, 1989; is that correct?

16          A    That's correct.

17          Q    Since December 31, 1989, has there been

18    any Federal plutonium in soil standard adopted?

19          A    Not to the best of my knowledge.  There

20    have been some site-specific derivations of plutonium

21    cleanup levels associated with application of

22    SuperFund, CERCLA sites, but those have all been

23    site-specific derivations of levels and not Federal

24    standards.

25          Q    Could you turn to Chapter V of the

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

199

```
 1    Auxier report, entitled Environmental Monitoring

 2    Program.  Do you see that?

 3            A    Yes.

 4            Q    Now, I believe you testified that

 5    Dr. Auxier and Pritchard wrote this; is that correct?

 6            A    That's what I said, and they did.

 7            Q    Okay.  Do you happen to know --

 8    withdrawn.

 9                 Looking at Chapter V, do you believe

10    that you'll be giving testimony in front of the jury

11    about this chapter?

12                 MR. WOOLLEY:  Objection to the form of

13    the question.

14            Q    (BY MR. SORENSEN)  Do you have any

15    understanding, one way or the other, whether you'll be

16    giving testimony to the jury in this case about Chapter

17    V?

18            A    I don't know specifically what I'll be

19    giving testimony regarding the environmental monitoring

20    program.  I certainly -- part of my work has been to

21    review the environmental monitoring program and the

22    data acquired as part of that program.  I don't know

23    if -- what questions I'll be asked.

24            Q    Do you know where the Wagner station is

25    located at?
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

1           A    Yes.  I believe it's approximately one

2    mile from the property boundary to the south-southeast

3    of the plant.  That's my best recollection.

4           Q    Did you do any analysis of what --

5    whatsoever of beryllium released from Rocky Flats to

6    the off-site environment?

7           A    No.

8           Q    Now, if you could turn to Chapter VII of

9    the Auxier report, please.

10          A    Yes.

11          Q    Are you there?  I believe you testified

12   that either Dr. Pritchard or yourself wrote this

13   chapter; is that correct?

14          A    I -- yes.  I don't know who.  I know

15   that I verified or reviewed or -- the values in the

16   standards listed here.

17          Q    Did you review or verify the standards

18   numbers or the concentration -- the measured

19   concentration numbers?

20          A    Both --

21          Q    Both.

22          A    -- at that time.  I've looked over the

23   data much more extensively since then.

24          Q    Who prepared these charts?  These graphs

25   in Chapter VII?

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

201

1          A    Actually constructed them would have

2    been Dr. Pritchard.

3          Q    Do you believe that you'll be testifying

4    in any way about health risks to people in the class

5    area from releases from Rocky Flats?

6          A    I don't know what I'll be asked about

7    that.  I've not been asked to write a report about it

8    to date, but I don't know -- I certainly am familiar

9    with the -- putting risks in perspective from radiation

10   doses.

11         Q    But there's no written report or -- that

12   you can point me to that you authored about that

13   subject; correct?

14              MR. WOOLLEY:  Object to the form.

15   Misstates the testimony.

16         Q    (BY MR. SORENSEN)  It's just a question.

17         A    I -- I don't have any written reports --

18   I've not prepared any written reports to that subject

19   for this case.

20              MR. WOOLLEY:  Can we clarify what you

21   mean by "that subject"?

22         A    Oh, the subject of off-site risk

23   assessment is what I was answering.  I'm sorry.

24         Q    (BY MR. SORENSEN)  Do you have a Q

25   clearance?

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

202

1          A    I had one from 19 -- approximately 1982

2     till approximately 1996, to the best of my knowledge.

3     Or maybe '97.

4          Q    So you don't have one now?

5          A    I do not have a current Q clearance.

6          Q    Did you review any classified documents

7     in connection with your work in this case?

8          A    No.  Not -- not to the best of my

9     knowledge.  With a Q clearance -- classified documents

10    would be highly protected and I would not have seen

11    those, so --

12         Q    Do you know whether anyone at Auxier &

13    Associates reviewed any classified documents in

14    connection with their work in this case?

15         A    I don't know.

16         Q    Who at Auxier has a Q clearance; do you

17    know?

18         A    Currently, Marcia Joseph has a Q

19    clearance.  I don't know if Auxier still has his.  But

20    he had his for many decades.  I don't know if any --

21    of any others who are employees there who have or have

22    had Q clearances.

23         Q    Did you prepare some kind of a report

24    that you can point me to concerning the health risks

25    from exposure to natural background radiation and

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

203

1    fallout radiation?

2                    MR. WOOLLEY:  If you need to take time

3    to look at your reports, please do.

4         A    I don't -- I didn't prepare any reports

5    for -- regarding health risks from fallout radiation or

6    natural background radiation for this project.

7         Q    (BY MR. SORENSEN)  Okay.  Is it your

8    understanding that you're going to be asked to testify

9    about the results of ChemRisk's investigations and

10   reports?

11        A    I don't know about any questions that

12   may arise regarding ChemRisk's work.  The release

13   information that they had from their work, quantities

14   released.  I don't know if I'll be asked or not.

15        Q    Did you write any report you can point

16   me to about your study of ChemRisk?

17        A    No.

18        Q    Have you done any kind of an uncertainty

19   analysis of any kind in this case on any subject?  Do

20   you know what I mean by "uncertainty analysis"?

21        A    I know what "uncertainty analysis" means

22   in general.

23        Q    Have you ever --

24        A    I don't know what you mean with your

25   question.

ProTEXT Transcript Condensing for Windows

204

```
 1              Q    Let's take it one step at a time.

 2    Outside of this case, have you done uncertainty

 3    analyses?

 4              A    Yes.

 5              Q    Okay.  Have you done any -- so it has

 6    some meaning to you when I say that?  Uncertainty

 7    analysis?  That has a meaning to you?

 8              A    I've done it in various disciplines in

 9    terms of the uncertainty of a -- of a laboratory

10    measurement, of a count result.  I've done uncertainty

11    analysis of the radiation dose from various pathways

12    before, but not specifically for this case.  I'm

13    familiar with the methodology by which one could

14    calculate the uncertainties of either a measurement or

15    the uncertainties of a calculation using various

16    parameters.

17              Q    But it's correct that, in this case,

18    you've performed no uncertainty analysis that you can

19    point me to; is that correct?

20              A    Not in a quantitative sense; right.

21              Q    Well, in a nonquantitative sense, do you

22    believe you performed some uncertainty analysis in this

23    case?

24              A    Certainly, as I reviewed the data, I

25    would look at the potential uncertainties of the
```

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

205

```
1    results, the range of uncertainties of the results, but

2    I have not quantified those or presented them in any

3    sort of a quantitative fashion in this case.

4           Q    What data are you referring to?

5           A    The range of concentrations of plutonium

6    in air as -- from a measurement.  What sort of

7    uncertainty there might be associated with that

8    measurement.  I've looked at those in a qualitative and

9    semi-quantitative sense, but I've not prepared a

10   rigorous quantitative determination of those.

11          Q    In terms of a qualitative -- withdraw

12   the question.

13               The data you're talking about is that

14   contractor data and also other party data such as CDH?

15   Is that the data you're talking about?

16          A    Yes.

17          Q    You say you've done some kind of

18   qualitative uncertainty analysis of that data; is that

19   correct?

20          A    I have looked at the parameter values

21   that go into the calculation and determination of the

22   concentrations of plutonium in air to see what -- what

23   are the variation and uncertainties of those parameter

24   values to see what overall impact they might have on

25   the final result.  I have not included that in a
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

206

1    quantitative fashion, but I'm prepared to discuss

2    those, if asked during my testimony.

3            Q    And where is there some writing that you

4    authored about that -- that subject, that qualitative

5    uncertainty analysis?

6            A    There is none here.

7            Q    Okay.  Have you prepared any written

8    report in this case analyzing the RAC reports?

9            A    No.

10           Q    Have you prepared any kind of report in

11   this case analyzing the results of plutonium in soil

12   sampling that has been done in areas in the -- in the

13   class area and in other surrounding areas off-site of

14   Rocky Flats?

15           A    I've not prepared any report regarding

16   an interpretation of the results of soil sampling.

17           Q    Have you prepared any report of any kind

18   about the results of soil sampling?

19           A    At the Rocky Flats area?

20           Q    Yeah.  In the area surrounding Rocky

21   Flats, including the class area.

22           A    No, I have not.

23           Q    Do you know what the class area is in

24   this case?

25           A    I've seen a figure, a map that showed an

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

207

1    approximate boundary, I think as drawn by the judge in

2    years past, to the east-southeast of the property.

3             Q    Do you know what that contour is based

4    on?

5             A    It's my understanding that the contour

6    is based upon some of the data that were acquired by

7    organizations that sample surface soil off the Rocky

8    Flats -- Flats property.

9             Q    Have you ever looked at -- withdraw the

10   question.

11            Could you turn to Chapter XII, please,

12   of this 1996 Auxier report.

13            Are you there?

14        A    Yes.

15        Q    Could you turn to page 12-11, please.

16   Are you there?

17        A    Yes.

18        Q    Now, on 11 and page 12 and, actually, on

19   page 13, there are numbers for a dose for particular

20   individuals.  Do you see that?

21        A    Yes.

22        Q    Did you -- who prepared these charts?

23        A    I had no involvement with this Chapter

24   XII, in preparation of it, certainly.  It's my

25   recollection that Dr. Howard Pritchard and Dr. John

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

1   Auxier prepared this.  I've not really reviewed this,

2   and I'm not prepared to give any testimony associated

3   with this.

4            Q    Okay.  Have you reviewed the Cobb tissue

5   data study?  Do you know what I'm talking about?

6            A    What kind of tissues?

7            Q    Well, does that have any -- does that

8   ring any bells to you?  The author is Cobb, C-o-b-b.

9            A    I've seen some articles by Cobb.  I

10  don't know if it's the same Cobb.  I don't recall any

11  articles on tissue studies.

12           Q    Or autopsy studies?

13           A    No.  I don't recall seeing any of that.

14           Q    Okay.  Do you expect to -- in front of

15  this jury to offer some testimony comparing the doses

16  that class members may have received to natural

17  background or fallout radiation?

18                MR. WOOLLEY:  Object to the form of the

19  question.

20           A    I don't know.  Certainly, I have

21  provided such information in reports and testimony in

22  other cases, but I don't know what I'll be asked in

23  this case.

24           Q    (BY MR. SORENSEN)  But you haven't

25  provided that kind of information in reports in this

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

209

1    case; correct?

2                   MR. WOOLLEY:   Object to the form.   The

3    reports speak for themselves.

4          Q    (BY MR. SORENSEN)   Go ahead.   You can

5    answer.

6          A    I provided the information and

7    contributed the information in the Auxier '96 report

8    regarding the natural background sources and doses.

9          Q    Right.

10         A    But I did not do any comparison of those

11   doses at that time.

12         Q    Okay.

13         A    Certainly, the RAC doses are the -- it's

14   a best dose calculation that have been performed and

15   those doses could be compared by me or someone else to

16   natural background doses.

17         Q    But there is no report that you can

18   point me to that you authored comparing doses from

19   background or fallout radiation to doses estimated by

20   RAC or anyone else of the off-site population; correct?

21         A    That's correct.

22         Q    Okay.   Now, is the same true of risk?

23   In other words, did you provide any written report -- I

24   may have asked you this question.   I apologize if it's

25   redundant.   Did you do any report looking at the risk

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

210

1    to human beings, the health risks posed by exposure to

2    natural background or fallout radiation?

3                A    No, I did not.

4                Q    So does it then follow that you prepared

5    no report you can point me to that compares the health

6    risk to human beings from exposure to natural

7    background or fallout radiation to any estimated dose

8    that people off-site of Rocky Flats received from Rocky

9    Flats emissions?  Is that correct?

10                MR. WOOLLEY:  Objection.  The reports

11   speak for themselves.

12                Q    (BY MR. SORENSEN)  You prepared no such

13   report; correct?

14                A    The question was -- I can't answer that

15   as asked.

16                Q    Okay. I'll start again.  It was a long

17   question.

18                A    In one place, you said risk; in one

19   place, you said dose.

20                Q    I'm sorry.  I didn't mean to -- that was

21   unintentional.

22                Is it correct that you've prepared no

23   report in this case that compares the health risk posed

24   by exposure to natural background or fallout radiation

25   to the risk posed by exposure to plutonium released

ProTEXT Transcript Condensing for Windows

211

1    from Rocky Flats?  You prepared no such report

2    comparing those two; correct?

3              MR. WOOLLEY:  Objection.  The reports

4    speak for themselves.

5         Q    (BY MR. SORENSEN)  Is that correct?

6         A    I prepared information regarding the

7    doses from -- from background.  I've certainly --

8    that's in the 1996 report.  But I have not prepared a

9    separate report for that.  Comparison of risks, I have

10   not.

11             MR. SORENSEN:  Why don't we take a short

12   break.  I may be pretty close to done and I may not be,

13   but I want to collect my thoughts here.

14             (There was a recess taken from 3:21 p.m.

15   to 3:32 p.m.)

16        Q    (BY MR. SORENSEN)  Dr. Frazier, am I

17   correct in thinking you'll be offering no testimony and

18   you formed no opinions about the contracts under which

19   Dow and Rockwell operated Rocky Flats?  Is that

20   correct?

21        A    That's correct.

22        Q    Okay.  Am I correct that you will be

23   offering no opinions or testimony in this case about

24   the decommissioning and cleanup of the Rocky Flats site

25   and its conversion to I believe what is called a

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

212

```
 1    wildlife refuge?

 2           A    That's correct.

 3           Q    Did you bring documents here today?

 4    I --

 5           A    Yes.  Yes, I --

 6           Q    Tell me what those are.

 7           A    I brought some documents that I reviewed

 8    as a consequence of reading the Budnitz and Biggs

 9    deposition.  Not deposition, but trial testimony.  I

10    asked specifically about some of those statements that

11    were made in there because I disagreed with -- with the

12    testimony, and I asked about some of the -- their

13    exhibits that supported their positions and so I

14    brought those documents along that had some

15    information.  I flagged the -- the high -- highlighted

16    these.  I did this to show the questions that I might

17    have about those.

18           Q    Okay.  Can I take a look at those?

19           A    Sure.  (Tenders documents.)

20           Q    Do you intend to -- let me start again.

21           Do you believe that you're going to

22    provide testimony to the jury criticizing the opinions

23    or testimony of any plaintiffs' witnesses?

24           A    Certainly --

25           Q    As of right now, it's yes or no.  Then
```

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

213

1    I'll get into it.

2            A    Yes.  I think the -- use of the word

3    criticizing --

4            Q    Responding?

5            A    Responding to, yes, would be a better

6    term.

7            Q    And which -- which of plaintiffs'

8    witnesses do you believe you'll be responding to

9    directly?

10           A    Directly, I think it would be Budnitz,

11   Biggs, and Cochran.

12           Q    Okay.  And you base -- your

13   understanding is that -- start again.

14               The defendants have -- have asked you to

15   be ready to provide such testimony in this case; is

16   that right?

17           A    They have asked me to review the -- the

18   testimony and to identify any areas that I had

19   evaluations of or response to.  And these documents

20   reflect many of those responses.  I don't think it

21   reflects all of them, but many of the subject matter.

22           Q    And these documents, who provided these

23   to you?

24           A    I requested some of those specifically,

25   and others were provided in response to my request for

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

214

1    what exhibits were used.  Some of the documents, I've

2    already had for some time and included in my list of

3    documents relied upon.

4           Q    I was going to ask, have you looked at

5    all these documents previously in connection with your

6    work in this case?

7           A    I'd have to look to see if all -- some

8    of them, I wasn't aware of until the testimony of

9    plaintiffs' experts.  Some of them, I did review

10   previously.  Many of them, I reviewed previously.

11              MR. SORENSEN:  I'm going to want a copy

12   of this.  The things he brought.

13              MR. WOOLLEY:  Do you want us to provide

14   you a copy?  We can do that back at our shop and send

15   you a copy or --

16              MR. SORENSEN:  Yeah.  He's highlighted

17   them, so I'd like the highlights to show up.

18              MR. WOOLLEY:  Okay.

19           Q    (BY MR. SORENSEN)  You did the

20   highlighting yourself?

21           A    Yes.  And I may not have -- in reviewing

22   things, you know, when you highlight, sometimes you

23   highlight everything you're commenting on, but I tried

24   to -- I may not have highlighted every little thing.

25           Q    Really, I was just wondering whether you

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

215

```
1     did the highlighting yourself as opposed to someone

2     else.

3              A    I did.  Yes, I did.

4              MR. SORENSEN:  I hesitate because of

5     speed.  He's going to be on the stand in a few days.

6     How fast can you get these to me?

7              MR. WOOLLEY:  We can get them to you

8     tomorrow.

9              MR. SORENSEN:  That's fine.  That's fast

10    enough.  Yeah.  Just a copy with the highlights.  That

11    would be good.

12             Q    (BY MR. SORENSEN)  I'm sorry, because,

13    you know, I'm looking at these while you're testifying.

14    That's my fault.  I want to be very clear.  How did

15    this set of documents come to be that I'm looking at in

16    front of me?

17             A    As I reviewed plaintiffs' experts' trial

18    testimony, I came across statements that they were

19    making and references to specific documents that I felt

20    were in error or wrong, and I requested those.  And

21    then I reviewed those, as well as some other documents

22    that relate that are there -- that relate to responses

23    to those.  Most of those related to criticisms of the

24    air monitoring program, although there were some other

25    areas that are distant.
```

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

216

1          Q    Okay.  So what statements of plaintiffs'

2     experts do you believe are wrong?

3          A    The statements pertaining -- I'm not

4     sure -- trying to give you -- I don't know if it would

5     be an exhaustive list, but the ones I can recall from

6     here.

7          Q    Just before you start, I just want to

8     ask one foundation question.  I assume that what you're

9     going to tell me appears in the written report you

10    prepared; correct?

11              MR. WOOLLEY:  Object to the form.  He

12    hasn't even testified yet.

13              MR. SORENSEN:  I understand that.

14         Q    (BY MR. SORENSEN)  In other words, you

15    understand the plaintiffs' experts prepared reports.

16    Do you understand that?

17         A    Yes.  Some of those were 1996.  Yes.

18         Q    Correct.  And plaintiffs' experts were

19    deposed by the defendants.  Do you understand that?

20         A    I assume they were.  I don't know.

21         Q    Okay.  The response or criticism --

22    whatever you want to call it -- to specific statements

23    of the plaintiffs' experts that -- that you think

24    you're going to give to the jury, that appears nowhere

25    in a report prepared by you; correct?

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

217

1           MR. WOOLLEY:  Objection.  He hasn't

2    testified what they even are yet.

3           A    I don't know that they will.  I know

4    that there was testimony in court of information that I

5    did not see in -- some of which I did not see in their

6    reports that came out as criticisms of the air

7    monitoring program and other aspects of the data that I

8    felt it's important to respond to or be prepared to

9    respond to.

10           Q    (BY MR. SORENSEN)  Okay

11           A    That's the information there.

12           Q    Okay.  Why don't you tell me what that

13    is.

14           A    If I could look at that list, I think I

15    could speed it up a little.

16           Defendants' Exhibit DX329, which is the

17    April 15th, 1971 report by Hazle -- Hazle and Siek,

18    environmental sampling from the Colorado Department of

19    Health in which they conclude that "Recent results

20    confirm the Department's instrument calibrations and

21    assumptions that total long-lived alpha concentrations

22    do, indeed, provide an adequate evaluation of potential

23    hazard related to plutonium."  And this is the -- I

24    think an excellent response and statement regarding the

25    appropriateness of using the total long-lived alpha

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

218

1    results from 1952 through the end of the time they did

2    the total long-lived alpha.

3              Q     Which was about 1970 or '69?

4              A     '70, '71.  It depends.  There was a

5    transition period there, yes.

6              The second document is the Defendants'

7    Exhibit 530 which is the RAC Task 4 report.  And with

8    respect to this one, on page Roman numeral 2-9 is the

9    statement that, "Two distinct data sets from the early

10   1970s suggest that an average of 40 percent of the

11   total long-lived alpha in air near the 903 area in the

12   late 1960s is plutonium."  This also affirms the

13   approach to using the total long-lived alpha for

14   compare -- comparing compliance with the plutonium

15   standard because plutonium 239 is a long-lived alpha

16   emitter and is a fraction of the total long-lived alpha

17   that would be on the sample.

18             Also, from this same defense Exhibit 530

19   are statements regarding air sampler height and the

20   appropriateness of that.

21             On page Roman numeral 3-72, RAC reports

22   that, "From 1970 to 1972, special air samplers were

23   taken about 250 feet east of the 903 pad for

24   determination of plutonium 239 concentration in air at

25   different heights above ground."

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

219

1          It goes on to say at the last paragraph,

2     "The concentrations in air measured" each -- "through

3     time at each height are presented in 3-44.  No trends

4     are obvious and the highest concentrations of plutonium

5     were seen at 5 feet above the ground, but an expected

6     systematic decrease with height was not clearly shown,"

7     which points out that the sampling height at the

8     breathing zone or 3 to 6 feet is the appropriate height

9     for demonstrating compliance.

10          Highlighted on the next page, 3-73, the

11     concentrations measured at the various heights.

12          And in the same defense Exhibit 530,

13     page Roman numeral 3-109, the section on filter

14     clogging, I've highlighted the portions that relate to

15     that.  "An RFP investigator suggested that measured

16     alpha activity in air from the low-volume samplers

17     might be biased low because of clogging of the filter

18     with particulates" -- that's Chapman 1960 -- "thereby

19     reducing collection efficiency, Mongan, et al., 1966B.

20     Particulate loading of an air" filter -- "air sampler

21     filter actually does not decrease the filter's

22     efficiency.  In fact, dust particle loading has been

23     shown to increase the filter efficiency of Whatman 41

24     cellulose filters."  That's Lindeken, et al, 1965.

25     "However, the effect of particle loading on the air

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

220

1    filter may be to decrease the actual airflow rate

2    through the filter.  In turn, this would result in an

3    overestimate of the volume of air sampled.  Recall that

4    in the early years, the volume sample was a fixed

5    average value preprinted on the data sheet and not

6    computed for each actual sample.  Sampling of air may

7    even stop from severe dust loading if the motor

8    overheats."

9                And then the next paragraph, there

10   was -- it describes the -- how this was addressed.  And

11   it concludes that, "Therefore, under typical dust

12   loading conditions with the Rocky Flats sampler, flow

13   might be decreased 8 percent over a day using HV70

14   paper and 20 -- 24 percent if Whatman 41 paper were

15   used."  It points out a response to the air sampler

16   clogging that was claimed.

17               The -- on the next page, 3-10, Roman

18   numeral 3-10.

19               Q    3-10 or 3-110?

20               A    110.  Thank you.  110.  About the middle

21   of the page, I've highlighted a quote that relates to

22   the counter-efficiency and alpha particle self-

23   absorption.  And this explains how the self-absorption

24   of the alpha particle emitters, plutonium and other

25   alpha particle emitters down into the sample -- filter

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

221

1    medium itself was corrected and it says, "In addition,

2    a 70 percent correction factor was applied for

3    self-absorption when counting air filters instead of

4    very thin standard sources.  This means that 70 percent

5    of the alpha particles would escape the filter matrix

6    and 30 percent would be absorbed.  These two subfactors

7    were combined to produce a total efficiency factor of

8    .21 count per minute per disintegration per minute,

9    parens, 0.7 times 0.3 equals 0.21 close parens, which

10   was used by" Rocky Flats -- "RFP personnel to convert

11   alpha count rates to activity concentrations."

12              And this points out, again, that they

13   were considering the self-absorption of the alpha

14   particles that might have been embedded in the filter

15   or that would have been embedded in the filter paper

16   itself.

17              Q    Okay.

18              A    The next article is -- doesn't have an

19   exhibit number on it.  It's --

20              Q    Can I see?  It doesn't have -- okay.

21   Let me just write down the title.

22              A    While you're writing, I'm going to get

23   something to drink.

24              Q    Sure.  Okay.  Go ahead.

25              A    This document is three pages from a --

CARPENTER REPORTING, INC.
(303) 752-1200

ProTEXT Transcript Condensing for Windows

222

```
 1    an article entitled Air Surveillance Network, Siting

 2    Study, Rocky Flats Plant Site, dated Final,

 3    December 20th, 1991.  And on page 30 of this

 4    document, there's a summary statement that all the

 5    references listed in 5-point -- Section 5.0 that

 6    commented on sampler height were in general agreement

 7    that the optimum height is that of the breathing zone,

 8    approximately 2 meters.

 9             And that is also consistent with other

10    documents that I located and identified during the

11    plaintiffs' presentation of their case, some of which I

12    was aware of; some I wasn't aware of prior to that.

13             The next document is entitled

14    Instrumentation for Environmental Monitoring-Air.

15        Q     There's no exhibit number on this?

16        A     There's no exhibit number that I saw on

17    it.

18        Q     Go ahead.

19        A     Air, Part 2, First Edition, July 1975.

20    First measured update, September 1979, by the

21    environmental instrumentation group of Lawrence

22    Berkeley Laboratory.  And in page 1.3.2-1 of this

23    document is the statement regarding particulate

24    monitoring systems.  The second paragraph.  "Most

25    particulate matter suspended in the atmosphere is in
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

223

```
 1     the size range of 0.1 microns to 10 microns.  Larger"

 2     particles -- excuse me -- "parens, larger particles

 3     settle out and smaller ones coagulate, close

 4     parentheses.  At these sizes, the particles can be

 5     trapped in the human and animal respiratory system."

 6                   That's all I've got highlighted on that

 7     one, but it does have some other useful information in

 8     it regarding appropriate air sampling methods.

 9                   The next document is Defense Exhibit

10     516.  This is the RAC Task 2 report, August 1999.  I

11     have three pages from this report.

12                   On page Roman numeral 4-11, I've

13     highlighted the statement that, "It is important to

14     emphasize the basic premise underlying these

15     calculations that submicron plutonium particles,

16     parens, Hayden 1974, close parentheses, in the cutting

17     oil were attached to larger soil particles and it was

18     those soil particles that were suspended, and not the

19     individual plutonium particles."  This relates to

20     particle size for resuspension from the releases, the

21     leaking drums at the 903 area.

22                   In the middle of that page, I've also

23     highlighted text regarding the activity particle size

24     distributions at Rocky Flats plant.  Quoting,

25     Measurements of activity, particle size distributions
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

224

1    at the RFP, parentheses, Nathans, et al., 1971, Langer,

2    1983, 1986, Sehmel and Lloyd, 1976, Volchok, et al.,

3    1972, are presented in table Roman numeral 4-2.  These

4    measurements were performed after the 903 area was

5    paved and they represent resuspension from the

6    contaminated field east of the 903 area.  Airborne

7    activity particle size distributions may have been

8    different from these during suspension events, but we

9    have no measurements to confirm this.

10            On down, "Measurements indicated that,

11    in general, most of the activity was associated with

12    larger particles, parentheses, greater than 15 microns

13    AED, close parentheses.  Particles less than 3 microns

14    AED represented about 1.7 to 14 percent of the total

15    airborne activity of the" particles -- "of the

16    samplers."  And further down in the text, "However,

17    only 1 percent of the airborne mass of 10-micron

18    particles actually gets into the deep lung region."

19            This relates to the particle sizes

20    released from the 903 area as measured and the

21    importance of the respirable fraction of those -- what

22    fraction was in that area.

23            Further down on page Roman numeral 4-11,

24    we used data at the 1-meter level because that was the

25    approximate height -- height of the assayed sampler

CARPENTER REPORTING, INC.
(303) 752-1200
You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

225

1   inlet and that relates to the appropriateness of the --

2   relates to the sampler height that was actually used at

3   the site.

4           Then on Roman numeral 4-12 -- that's

5   page Roman numeral 4-12 -- is the table to which we

6   referred previously and there is a footnote C that I

7   highlighted that said, "Only the respirable fraction

8   was reported, parentheses, less than 10 microns, AED,"

9   which is generally assumed -- it's a comment on my

10  part -- generally assumed to be the respirable sizes.

11          Footnote D highlighted percentages that

12  represent the fraction of activity less than 7 microns

13  that falls within less than 3 microns in the 3 to 7

14  category is what's listed in the Sehmel and Lloyd

15  portion of that article.

16          The next two articles relate to alpha

17  recoil fragmentation.  The first of these is an

18  article -- both of these were from my Health Physics

19  journal collection.  I copied these out -- I copied

20  these.

21          The first of these is an article by Ryan

22  and Poston in 1987, entitled The Impact of an Isotopic

23  Effect on the Interpretation of Bioassay Data for

24  Plutonium.  And I've highlighted the section that

25  points out on the first page, page 255, "It has been

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

226

1   suggested that the fragmentation of particles may occur

2   and the higher specific activity of plutonium 238 oxide

3   results in a higher production rate of particles than

4   plutonium 239 oxide.  This general process may account,

5   in part, for the higher translocation rates for

6   plutonium 238 oxide."

7                  And this supports the opinion that the

8   fragmentation, if indeed, it occurs in air or out in

9   the environment, may occur for plutonium 238 oxide, but

10  very unlikely for plutonium 239 oxide.

11                 The next article is the article from

12  Health Physics 1978, by Fleischer, F-l-e-i-s-c-h-e-r,

13  and Raabe, R-a-a-b-e.  In the abstract, I've

14  highlighted, "An experiment to understand subparticle

15  formation by alpha decay of plutonium 239 in plutonium

16  oxide particles shows that in a vacuum, at most, a

17  single plutonium 239 atom is ejected with a U235 recoil

18  nucleus and that, therefore, direct spraying out of

19  multi-atom fragments does not occur."

20                 Further down on that page -- that's page

21  545 -- I've highlighted the statement, "Plutonium 239

22  oxide particles appear to dissolve at a rate 1/200ths

23  times" -- 1 over 200 "times that for plutonium oxide

24  particles that were 80 percent enriched in plutonium

25  238."

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

227

1           This, again, supports the opinion and

2    the basis of fragmentation of plutonium in the

3    environment as may occur for plutonium 238 oxide, but

4    much, much less likely for plutonium 239 oxide.

5           The next article is Defense Exhibit 513.

6    This is the RAC Task 2 report and the page -- the first

7    page of the summary, I've highlighted, "A review of

8    effluent monitoring data indicated that concentrations

9    of plutonium were not constant over the cross-section

10   of the large ducts and that the single point sampling

11   system that was used before mid-1963 did not obtain a

12   representative sample of the effluents.  Detailed

13   analysis of two sets of data collected after multiple

14   point sampling was introduced at Rocky Flats led us to

15   develop correction factors for nonrepresentative

16   sampling.  We used these factors and the associated

17   uncertainties to make new estimates of plutonium

18   releases."

19          Continuing with my highlighting, "The

20   search for measurements of self-absorption of alpha

21   particles in filter samples uncovered several old

22   documents that contained relevant information.  We used

23   the data to estimate a central value and range of

24   possible values of a self-absorption correction factor.

25   Analysis showed that there was a small bias in the

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

228

1    point estimate of self-absorption correction factor

2    previously used at Rocky Flats.  In the present

3    analysis, we considered the full range of self-

4    absorption correction factors."

5                 I've also highlighted at the bottom of

6    the page, "The revised estimates of Rocky Flats routine

7    plutonium releases, which are based upon the correction

8    that RAC made of the stack effluent monitoring systems"

9    of the -- "or the duct monitoring systems."

10                On page 3 of the report, I highlighted

11   the statement that, "During the first ten years of

12   operation, release estimates were based upon single

13   point sampling labeled main 2 in the center of the

14   large 90-by-96-inch rectangular exhaust duct.  For the

15   next 20 years, release estimates were based upon three

16   samples of the exhaust air withdrawn at the three

17   locations indicated in the figure.  Nearly all the

18   routine releases from the Building 771 stack were

19   measured using a single or three-point sampling

20   procedure."

21                That's shown on the next page, page 4,

22   the locations of sampling points.

23                Then on page 26, "These differences were

24   considered in the calculations of revised annual

25   releases for the appropriate years."

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

229

1                    Further down on page 26, "Results of the

2       calculations of revised routine plutonium releases are

3       summarized in Tables 10-11 for the Building 771 stack

4       release and releases from the vents that discharged

5       near roof level of other buildings; primarily, Building

6       776 and 777."

7                    And then on -- further down on the page,

8       I highlighted, "The distribution of plutonium release

9       estimates for 1957 does not include releases during the

10      fire in September of that year."

11                   On page 27 is the Table 10 of the

12      distributions of revised release estimates with the

13      corrections that RAC made for the duct sampling.

14                   Also, on Table 11, they have the revised

15      building vent releases from 1957 to 1989.

16                   Then the last page I have in this

17      excerpt is page 29.  "Releases during the 1950s and

18      sixties were more than ten times greater than those

19      during the 1970s and releases during the 1980s were

20      even lower."

21                   And that's the last -- excuse me.  I've

22      got one more.

23                   This is Defense Exhibit 521.  This is

24      RAC -- part of Task 3 report.  And this is page Roman

25      numeral lower case IV or 4.

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

230

1           "Predicted concentrations.  Median value

2      predicted concentrations of plutonium in air east of

3      the plant along Indiana Avenue ranged from .1

4      femtocuries per cubic meters in 1957 to 5 times 10 to

5      the minus 5 femtocuries in 1978.  This can be compared

6      to weapons testing fallout concentrations of 0.15

7      femtocuries per cubic meter in 1957 and four times 10

8      to the minus 2 femtocuries per cubic meters in 1978

9      relating to the concentrations from fallout."

10          The next highlighted things at the

11     bottom of that page discusses RAC's exposure scenarios.

12     "Inhalation was the only pathway considered in this

13     evaluation.  This decision was based on the Phase I

14     results, ChemRisk 1994, C, that showed soil ingestion

15     and inhalation of resuspended plutonium to be minor

16     pathways when considered in the long-term exposure to

17     Rocky Flats effluent."

18          And then the pages 4 and 5 of this same

19     document, I've highlighted on page 4, "The median

20     particle size for HEPA filter effluent was reported to

21     be 0.3 microns, Voilleque 1999.  However, when filter

22     leakage occurred, larger particles, parentheses, more

23     typical of the workplace aerosols, close parentheses,

24     would have been released.  For this reason, routine

25     operational releases were assumed to be characterized

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

231

1    by plutonium aerosol with an AMAD of 1 micron and a

2    geometric standard deviation or GSD of 2.5, Voilleque

3    1999."

4              I also highlighted a statement down in

5    the last paragraph, "Prior to 1963, releases were

6    dominated by the Building 771 stack which goes to the

7    importance of the releases from that stack."

8              Page 5, I highlighted two sections.  "In

9    the 1950s, in particular 1955 to 1960, four-hour gross

10   alpha counts were made.  The count was made four hours

11   after collection and included large contributions from

12   natural alpha-emitting radionuclides like radon decay

13   products."

14             Later on in that page, near the bottom

15   of the page, I've highlighted, "The plutonium activity

16   concentration in ambient air resulting from weapons

17   fallout for the 1960 time frame is around 0.1

18   femtocuries per cubic meter and the long-term average

19   background from natural sources of long-lived alpha

20   activity is 1.4 picocuries per cubic meter, but can be

21   as high as 7 to 10 femtocuries per cubic meter on any

22   given day."

23        Q    Is it your understanding that you're

24   going to testify to the jury about the documents you've

25   just been discussing and what you've highlighted in

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

232

```
 1      them?

 2                  MR. WOOLLEY:  Object to the form.

 3          Q    (BY MR. SORENSEN)  Is that your

 4      understanding?

 5          A    I don't know what I'll be asked

 6      regarding those, but in terms of the responses to

 7      plaintiffs' experts' testimony, I think all of those

 8      are relevant to that response.

 9          Q    Is it your -- start again.

10               Have you cited and discussed all of

11      these documents in any written report you've prepared

12      in this case?

13          A    Several of those -- I'd have to look and

14      see.

15          Q    So either you have or you haven't,

16      but --

17          A    I have some of those.

18          Q    You have -- all right.

19          A    Yes.

20          Q    Okay.  Did you do some analysis of the

21      accuracy of the off-site plutonium air monitoring from

22      1950 to 1989, meaning that the numbers registered are,

23      in fact, accurate, give or take a particular amount?

24      Did you do some kind of analysis of that?

25          A    I reviewed the work of RAC in that
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

233

1    regard, and also, the parameters relating to those

2    measurements as data were being entered by Auxier &

3    Associates into their air monitoring database.  I did

4    not prepare a separate report of any analysis of that.

5            Q    So do you expect to offer any opinions

6    to the jury in this case about the accuracy of the

7    off-site air monitoring from 1950 to 1989?

8                 MR. WOOLLEY:  Object to the form of the

9    question.

10           Q    (BY MR. SORENSEN)  Go ahead.  You can

11   answer.

12           A    I don't know what I'll be asked on that,

13   but, certainly, I feel that the -- the overall

14   uncertainty of the off-site monitoring results is such

15   that they provide representative sampling of the air

16   concentrations for the periods for which the

17   measurements were made at the locations that they were

18   made.

19           Q    And the opinion you just offered, is

20   that set forth somewhere in some written report

21   prepared by you?

22                MR. WOOLLEY:  If you need to look at

23   your reports, please do.

24                MR. SORENSEN:  While you do that, I'm

25   going to see how fast they can copy this thing because,

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

234

```
 1    otherwise, we're pretty much done.

 2              (There was a recess taken from 4:08 p.m.

 3    to 4:16 p.m.)

 4         A    I made related statements in Deposition

 5    Exhibit 4.  That's the affidavit of Auxier and Frazier.

 6    I guess that's '97.

 7         Q    (BY MR. SORENSEN)  Yes.  Where are you

 8    looking at?

 9         A    Pages 5, 6, and 7.  The title of the

10    section is Reliable Air Monitoring Data are Available

11    to Test Goble's Model.  It points out -- these

12    paragraphs point out the opinions that we had and have

13    regarding the reliable nature of these measured

14    concentrations.

15         Q    Okay.  That's on page 5, 6, and 7?

16         A    Yes.

17         Q    Okay.  Anywhere else?

18         A    Well, that's the first ones I found.  I

19    didn't look through the rest of it for that.

20         Q    Okay.

21         A    I don't know of anywhere else right now.

22         Q    Do you expect to offer any testimony in

23    this case criticizing Goble, or any testimony that he's

24    offered in this case?

25         A    No.  I didn't review his testimony.
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

235

```
 1    Somewhere, I heard that he did not present the dose

 2    assessment that he presented previously to which the

 3    1996 Auxier report was in rebuttal.  So I -- no.  I've

 4    not been asked to review his testimony or give an

 5    opinion one way or the other about it.

 6            Q    Okay.  Paragraph 14 on page 5 of this

 7    affidavit you just referred me to, it says, "Over

 8    200,000 measurements of radioactivity in the off-site

 9    perimeter area have been made."  Do you see that?

10    Paragraph 14?

11            A    What page?

12            Q    Page 5, paragraph 14.

13            A    I don't know if that number is --

14            Q    I haven't asked a question yet.  I just

15    wanted you to look at it.  You're looking at it?

16            A    Yes.

17            Q    Where did that number come from?

18            A    I don't know.

19            Q    Okay.  Now, you pointed me to pages 5,

20    6, and 7.  7 goes through the end of paragraph 22 or --

21    stopping somewhere before that.

22            A    Actually, it continues to the last

23    sentence on the top of page 8.

24            Q    This is paragraphs 13 through 22?

25            A    22.
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

236

```
 1              Q    22.  Yeah.  Did you write these
 2    paragraphs?
 3              A    I don't recall.
 4              Q    Okay.
 5              A    I certainly reviewed them.
 6              Q    But you can't tell me that you wrote
 7    them; is that correct?  As you sit here?
 8              A    As I sit here today, I don't know that I
 9    actually wrote them, no.
10              Q    All right.
11              A    I may have, but I don't recall.
12              Q    Okay.  Okay.  Other than these
13    paragraphs you pointed me to -- withdraw that question.
14                   Besides the documents that you've just
15    been testifying about and identified, are there any
16    other documents that you have identified yourself or
17    have been identified for you that you believe you're
18    going to testify about to the jury concerning any
19    response or rebuttal to any of plaintiffs' experts?
20                   MR. WOOLLEY:  Objection to the question
21    about what he believes he's going to testify about for
22    the reasons we've talked about.
23              Q    (BY MR. SORENSEN)  Go ahead.
24              A    I don't know what I'll be asked to
25    testify on.  I have not gone through any line of
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

237

1    questions or any testimony on the line of -- areas for

2    my testimony.

3              Q     Did you do any analysis resulting in any

4    written report in this case concerning the quality

5    control or lack thereof of Dow with respect to its on-

6    or off-site monitoring?

7              A     I did a review of the quality control,

8    and that was discussed with Mr. Putzier the other

9    night.  Also discussed that with Mr. Aldridge, Joe

10   Aldridge a few weeks ago.  I'm also familiar with

11   quality control procedures used at numerous facilities

12   that count samples, and so I -- I certainly am prepared

13   to give -- I don't know if I'll be asked, but give

14   testimony regarding the appropriate equal control

15   measurements that would be made at different time

16   frames over time.

17             Q     My question, though, sir, more

18   specifically is:  Have you prepared any written report

19   in this case about the subject you were just

20   discussing?

21             A     No, I have not.

22             Q     Okay.  I just want to look at these

23   paragraphs for a second.

24                   Did you review the depositions of

25   Dr. Krey or Hardy in this case?  Do you know who they

ProTEXT Transcript Condensing for Windows

238

1      are?

2              A     I think I did review them, but I think

3      they were deposed in like 1997.

4              Q     Yeah.  They were.

5              A     It's been a long time ago, but I think I

6      did review those, yes.

7              Q     Okay.

8              A     Very good scientists, if it's the one

9      I'm thinking of.

10             Q     Yeah.  I don't think there are any

11     others.

12                   Could you look at paragraph 22 in this

13     Exhibit 4 that you've pointed me to, please?

14             A     Yes.

15             Q     It says in paragraph 22, second

16     sentence, "Off-site air monitors such as S39, S40, S41,

17     and S58 measured respirable plutonium in air with high

18     efficiency and sensitivity at the times and places for

19     which Goble has made indirect predictions via the use

20     of his multipliers."  Do you see that?

21             A     Yes.

22             Q     What's the basis of saying "high

23     efficiency and sensitivity"?

24             A     Well, the nature of the filter media

25     themselves for the air monitors and the large volumes

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

239

1    of air drawn through to allow for measurement of very

2    low levels or, in other words, high sensitivity of very

3    low concentrations of plutonium in air.

4           Q    Did you do any direct investigation of

5    the efficiency or sensitivity of these monitors?

6           A    Yes.  As it relates to the volume of air

7    collected, the filter efficiencies, the calculation

8    of -- the assay of the activity on the filter, yes.  I

9    did not do a written report of such, but I did evaluate

10   it.

11          Q    I see.  So that was going to be my next

12   question.  Whatever evaluation you did is not reflected

13   in any written report in this case; is that correct?

14               MR. WOOLLEY:  Other than the statement

15   he just read, I take it?

16               MR. SORENSEN:  You don't need to coach

17   him.

18               MR. WOOLLEY:  I'm not coaching.  I'm

19   objecting to an unfair question.

20               MR. SORENSEN:  You can object as to form

21   or whatever you want.  Let's stick with objections.

22          A    I think the statement is what it is.

23   And it has a basis upon what we reviewed, yes.

24          Q    (BY MR. SORENSEN)  All right.  Let me go

25   back.  I asked you whether you did an investigation of

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

240

1    the efficiency and sensitivity of these monitors and

2    you said something and then you said it was not

3    reflected in your report.  My question is:  To make

4    sure we're clear, other than what I'm looking at in

5    paragraph 22, did you prepare any report in this case

6    discussing the efficiency and sensitivity of air

7    monitors?

8         A    That -- there was no report that

9    specifically addressed that.  No specific report that

10    addressed only that.  It certainly is included in this

11    statement here.

12         Q    All right.  Now, you pointed me to

13    Exhibit 4 and the section you pointed me to.  Is there

14    anyplace else that you believe you prepared any kind of

15    written analysis of the air monitoring conducted on-

16    and off-site at Rocky Flats?

17              MR. WOOLLEY:  If you need to review your

18    reports in order to answer --

19              MR. SORENSEN:  Go ahead.

20              MR. WOOLLEY:  -- please do so thoroughly

21    so you're correct.

22         A    (Deponent reviewing exhibit.)

23              Page 10 of Deposition Exhibit 4.

24    Paragraph 29, second sentence, "Total long-lived alpha

25    includes natural background radioactivity in weapons

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

241

1    fallout as well as any contributions from RFP and

2    should be higher than reliable estimates of respirable

3    plutonium.  Exhibit 8 compares the annual measured

4    total long-lived alpha concentration with Goble's

5    prediction of annual mean respirable plutonium."

6              Q    (BY MR. SORENSEN)  Did you write that

7    paragraph?

8              A    I don't recall.

9              Q    Okay.

10             A    Page 30, last sentence of the 19 -- mid-

11    1970s onward, program --

12             Q    Hold on one second.  Page 30?

13             A    I'm sorry.

14             Q    Paragraph 30?

15             A    Paragraph 30.

16             Q    Okay.

17             A    Page 10.  Last sentence.  "From the

18    mid-1970s onward, parameter and community air

19    monitoring data did not differ significantly from

20    national averages for plutonium in air recording values

21    well below Goble's 50 percentile estimate at the time."

22             Q    Did you write that sentence?

23             A    I don't recall.  Your question regarding

24    this statement, I don't recall who wrote each

25    particular statement.  I certainly reviewed those and

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

242

1    affirmed them prior to signing the document.

2         Q    Okay.  So, generally, whatever

3    discussion is in here -- go ahead.  You can continue.

4              Let me ask you a general question:  Is

5    it your belief that you will be asked to testify about

6    any particular portions of this Exhibit 4 we're looking

7    at?

8         A    I don't know what I'll be asked to do.

9              I don't see any other statements in this

10   report, this affidavit pertaining to the sensitivity of

11   the -- other than the ones I've already mentioned.

12        Q    Okay.

13        A    I'd have to look in this Exhibit 5.

14             MR. SORENSEN:  While you're looking, I'm

15   just going to make a quick phone call.

16             (There was a discussion off the record.)

17        A    The text in Chapter V -- Roman numeral 5

18   of Exhibit 5 has statements relevant to the quality of

19   the air sampling data.

20        Q    (BY MR. SORENSEN)  But you didn't write

21   Chapter V; correct?

22             MR. WOOLLEY:  Object to the form.

23        A    I'd have to review -- my recollection

24   was that although I did not -- it's on the record today

25   that although I did not write Chapter V, I did review

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

243

1    it and concurred with the information therein.  I

2    believe that's on the record.

3              I don't see any other sections that

4    would have information relating to that -- to answer

5    that question.

6              Q    (BY MR. SORENSEN)  Okay.  Do you have an

7    understanding of whether you're going to give testimony

8    to this jury about Chapter V of Auxier's 1996 report?

9              A    I don't know whether I will be asked

10   specifically about that or not.

11             Q    Okay.  You were looking through your

12   reports to answer an earlier question.  Have you

13   finished that process?

14             A    Yes.

15             MR. SORENSEN:  Okay.  I have nothing

16   further.  I think those documents should be ready

17   shortly.

18             MR. WOOLLEY:  Okay.  I've got nothing.

19             ... WHEREUPON, the deposition was

20   concluded at 4:36 p.m.

21

22

23

24

25

ProTEXT Transcript Condensing for Windows

244

```
 1              SIGNATURE OF DEPONENT

 2              I, JOHN R. FRAZIER, Ph.D., the deponent

 3   in the above named deposition, have read the above and

 4   foregoing deposition, and the same is a true and

 5   accurate transcript of my testimony, save and except

 6   for changes and/or corrections, if any, as indicated

 7   by me on the amendment sheet(s) attached hereto as

 8   indicated.

 9   Amendment sheet(s) attached (    )

10   No changes and no amendment sheets attached (   )

11

12              _____
                JOHN R. FRAZIER, Ph.D.
13

14              The signature of JOHN R. FRAZIER, Ph.D.

15   was subscribed and sworn to before me this ____ day of

16   _____, 2005.

17              My Commission expires:

18              _____
                Notary Public
19

20

21

22

23

24

25
```

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

245

```
 1                 CARPENTER REPORTING, INC.
                   Certified Shorthand Reporters
 2               Registered Professional Reporters
                    12510 East Iliff, Suite 120
 3                      Aurora, CO  80014

 4       December 6, 2005

 5

         W. Allen Woolley, Esq.
 6       Kirkland & Ellis
         717 Seventeenth Street
 7       13th Floor
         Denver, CO  80202
 8

 9       RE:  Collins v. Rockwell, et al.

10       Dear Mr. Woolley:

11                 Enclosed please find your copy of the
         deposition of JOHN R. FRAZIER, Ph.D., along with the
12       original signature page and correction sheets for his
         use.  Would you please have him read your copy of the
13       deposition and if he finds any changes necessary, have
         him make them on the correction sheets provided.  Be
14       sure that he signs each correction sheet that he may
         use.  Then have him sign the original signature page
15       before a notary public and file the signature page and
         correction sheets with the Court at the time of trial,
16       providing copies to opposing counsel.

17                 Thank you for your assistance and
         cooperation and if you have any questions concerning
18       the above, please feel free to contact me.

19       Yours truly,

20

21       Bonnie Carpenter, CSR, RPR

22       cc:  David F. Sorensen, Esq.

23       Trial Date:  Present

24

25
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

SHEET 246  PAGE 246

246

1                    CARPENTER REPORTING, INC.
                   Certified Shorthand Reporters
2              Registered Professional Reporters
                    12510 East Iliff, Suite 120
3                       Aurora, CO  80014
                        (303) 752-1200
4
       DAVID F. SORENSEN, ESQ.
5      Berger & Montague, P.C.
       1722 Locust Street
6      Philadelphia, PA  19103-6305

7      Re:  Cook v. Rockwell, et al.
            Case No. 90-K-181
8           United States District Court
            District of Colorado
9
       Dear Mr. Sorensen:
10
               Attached is the original deposition of
11     JOHN R. FRAZIER, Ph.D., taken in the above cause.

12          Deposition not signed           _____
            Deposition signed by the deponent
13             No corrections                _____
            Deposition signed by the deponent
14             correction sheet(s) included therein,
               and copy(ies) of same forwarded to
15             interested counsel            _____
            Signature waived                 _____
16
               Please retain the original copy of the
17     deposition UNOPENED in your possession until such time
       as it is required by any party in a hearing or trial of
18     the above cause.

19     Yours truly,

20


21     Bonnie Carpenter, CSR, RPR

22     cc:  Douglas M. Poland, Esq.
       Trial Date:  Present
23     RECEIVED BY _____DATE_____

24


25


                    CARPENTER REPORTING, INC.
                        (303) 752-1200
You may have up to 3 Header and 3 Footer Lines

ProTEXT Transcript Condensing for Windows

```
 1                    C E R T I F I C A T E
          STATE OF COLORADO      )
 2                               ) ss
          COUNTY OF ARAPAHOE     )
 3
                    I, Bonnie Carpenter, Notary Public of
 4        the State of Colorado, duly appointed to take the
          deposition of the above-named Deponent, do hereby
 5        certify that previous to the commencement of the
          examination of the said above-named Deponent, he was
 6        first by me duly sworn to testify the truth, the
          whole truth and nothing but the truth touching and
 7        concerning the matters in controversy between the
          parties hereto, so far as he should be interrogated
 8        concerning the same;

 9                    That said deposition was
          stenographically reported by me at the time and place
10        heretofore set forth, and was reduced to typewritten
          form under my supervision as per the foregoing;
11
                    That the foregoing is a true and
12        correct transcript of my shorthand notes then and
          there taken;
13
                    That after the deposition was
14        transcribed, the same was submitted by letter to the
          Deponent for reading and signing, a copy of which is
15        hereto annexed;

16                    That I am not kin or in anywise
          associated with any of the parties to said cause of
17        action or their counsel and that I am not interested
          in the event thereof;
18
                    IN WITNESS WHEREOF, I have hereunto
19        set my hand and seal this _____ day of _____,
          2005.
20
                    My Commission Expires:  9-22-2007.
21

22                          _____
                            Bonnie Carpenter
23                          Notary Public
                            12510 East Iliff
24                          Suite 120
                            Aurora, CO  80014
25
```

CARPENTER REPORTING, INC.
(303) 752-1200

You may have up to 3 Header and 3 Footer Lines