Siebert- 04-15-96

1

```
1              UNITED STATES DISTRICT COURT
2              FOR THE DISTRICT OF COLORADO
3
4    MERILYN COOK, et al            *
5           Plaintiffs              *
6       vs.                         *   C.A. No. 90-K-181
7    ROCKWELL INTERNATIONAL         *
     CORPORATION, et al
8           Defendants              *
9    *    *    *    *    *    *    *
                                    Monday, April 15, 1996
10                                  Washington, D.C.
11   Deposition of                       VOLUME ONE
12                    A. BRYAN SIEBERT,
13   The Witness, was called for examination by counsel for
14   the Plaintiffs, pursuant to notice, taken at the law
15   offices of Connerton, Ray & Simon, 1920 L Street,
16   N.W., beginning at 11:55 a.m., before Leslie L.
17   Schneider, a Notary Public in and for the District of
18   Columbia, when were present on behalf of the
19   respective parties:
20
                   FRIEDLI, WOLFF & PASTORE, INC.
21                 1900 L STREET, N.W., SUITE 303
                   WASHINGTON, D.C.  20036
22                      (202) 331-1981
```

4

7    Q   Good morning.

8    A   Good morning.

9    Q   I'm a little hoarse, I'm getting over a

10   cold.  My name is David Sorensen, I'm one of the

11   plaintiffs' counsel in the Cook vs. Rockwell action.

12        Could your please state your name for the

13   record.

14   A   Arlie Bryan Siebert.

6

11   Q   Are you repesented by counsel today?

12   A   Yes, I am.

13   Q   Who would that be?

14   A   Ms. Wells from the Department of Justice.

15   Q   Just Ms. Wells?

16   A   From the Department of Justice, right.

17   Q   Mr. Siebert, can you please tell me what

18   your job, title, position is?

19    A  My job title is Director, Office of

20  Declassification.

21    Q  And how long have you been the director?

22    A  Oh, six, seven years, something like that.

7

1    Q  And before that, did you work in the office

2  --

3    A  Office of Declassification.

4    Q  Before you were director, right.

5    A  Before that, it was -- no, I didn't work in

6  that office before that.

7    Q  Where did you work?

8    A  Before that, I was the Director of the

9  Office of International Security Affairs.

10    Q  For the Department of Energy?

11    A  Right, for the Department of Energy.

12    Q  And how many people work under you in the

13   Office of Declassification?

14        A   We have approximately 40 Federal employees

15   and perhaps twice that many contractors.

16        Q   What exactly is your job description, what

17   do you do as Director of Declassification?

18        A   The United States passed a law called the

19   Atomic Energy Act, and sections 11-Y and 141 and 142

20   define restricted data.  It falls upon my office's

21   responsibility to manage the restricted data

22   responsibilities of the Department of Energy as well

8

1   as the Executive Orders.

2            The Executive Order signed by presidents

3   over time, the current one is 12958, signed by

4   President Clinton more than a year ago, and that

5   concerns national security information.  We're also

6   responsible for national security information.

7        Q    Is it only for the Department of Energy or

8    for other Federal agencies as well?

9        A    The department -- the Atomic Energy Act

10   provides a joint responsibility for certain kinds of

11   restricted data between the Department of Energy and

12   the Department of Defense so we have shared

13   responsibility in that regard.  We also have

14   responsibility for restricted data policies as

15   concerns other agencies.

16            National security information is only the

17   responsibility of each agency to whom the order

18   applies and there's no responsibility outside the

19   Department of Energy for DOE's national security

20   information.

21       Q    Is your office formally part of the

22   Department of Energy?

9

1        A    Yes, it is.

287

8     Q   You say General Counsel, are you referring

9   to who specifically?

10    A   Any members of the General Counsel's office,

11   here or anywhere else.  At DOE or anywhere else.  We

12   don't talk to counsel about declassification

13   decisions.  As a general rule, I can recall not once

14   myself consulting with counsel about declassification

15   actions.  I can't recall that happening on this or any

16   other issue related to declassifications.

17        The issue is whether or not under the Atomic

18   Energy Act or the national security Executive Order,

19   we can legitimately protect the national security by

20   declassifying information.  That's not a legal

21   determination, it's one that involves an estimation of

22  the impact on national security and that alone.

307

7        It took four years to turn that

8   recommendation into a study.  And beginning in 1995,

9   in the spring of '95, March or April, we had

10   commissioned a highly respected senior manager named

11   Al Narath, who was at that time the president of

12   Sandia Laboratories, to do a fundamental review of

13   classification.

14        And he organized a group of 60 to 80 skilled

15   individuals, principally contractors, very few Feds,

16   along with some Department of Defense personnel, and

17   they set about to divide restricted data into a series

18   of categories, not to be confused with categories in

19   this particular deposition, such as weapons design,

20   weapons manufacturing.

322

21   Q   Mr. Siebert, if the recommendations as they

22   currently stand of the panel led by Mr. Narath were

323

1   adopted, okay, assume that they're adopted as they

2   stand, would any of those changes affect the

3   information -- would it have any effect on the

4   information that's currently being redacted from the

5   MUF documents being produced to plaintiffs?

6      A   To the best of my knowledge, I'll answer

7   that no.  We have declassified, prior to the

8   fundamental review, a large amount of MUF and ID

9   information, however those terms are used.  As you've

10   noted in your pleadings and I've noted in my own

11   affidavits, gross information per site and per types

12   of special nuclear material have been declassified.

13          I do recall Al Narath at the press

14   conference on February 6 indicating that he did never

15   expect in response to the Wald, Matt Wald, New York

16   Times article that was also quoted in one of your

17  pleadings, incorrectly by the way -- that he never

18  expected that design information would be

19  declassified.

20      And insofar as MUF and ID can provide that

21  type of information, my recollection of his report is

22  that it is not being declassified because of all the

324

1  work that's been done on it to this point.  That's not

2  necessarily a totally definitive answer.  It's a big

3  report.

4      To the best of my knowledge, MUF and ID are

5  not being further affected by that report in terms of

6  specific recommendations that would affect it in the

7  way that counsel just stated.

417

21    Q   Mr. Siebert, could you turn to exhibit ABS

22  18, it's the draft, the last exhibit, fundamental

418

1  classification policy review draft.  Could you please

2  turn to page 21.

3      A   Okay.

4      Q   I direct your attention to the second full

5  paragraph after the heading modifying the Atomic

6  Energy Act.  Could you please read the sentence

7  beginning unlike.

8      A   I'm sorry, page 21?

9      Q   Page 21, this paragraph beginning right

10  here.

11      A   Beginning there.  Okay.

12      Q   Please read those two sentences into the

13  record for me.

14      A   Unlike national security information, those

15  decisions by an individual -- excuse me, by an

16  official is needed to render information falling

17  within the Atomic Energy Act definition of

18  classified.  The very nature of this approach leads to

19   an environment fostering overclassification.

20      Q   Do you agree with that statement?

420

2      A   My answer is this, this is not a matter I

3   agree with or not, it's a matter of statutory

4   language.

5      Q   Well, do you agree with the statement,

6   quote, the very nature of this approach leads to an

7   environment fostering overclassification, close quote,

8   do you agree with that or not?

10      A   The concept of being classified as expressed

11   in the Atomic Energy Act, 11-Y in particular, is

12   likely to lead to overclassification.