# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 90-cv-181-JLK

MERILYN COOK, *et al.*,

      Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION
and THE DOW CHEMICAL COMPANY,

      Defendants.

---

## DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW

---

David M. Bernick
Douglas J. Kurtenbach
Ellen Therese Ahern
Mark J. Nomellini
John E. Tangren
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601-6636
Phone:  312-861-2000
Fax:      312-861-2200

Joseph J. Bronesky
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, Colorado 80202
Phone: 303-297-2900
Fax:      303-298-0940

Attorneys for ROCKWELL
INTERNATIONAL CORPORATION and
THE DOW CHEMICAL COMPANY

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF CONTENTS...........................................................................................I

INTRODUCTION ................................................................................................1

LEGAL STANDARD............................................................................................8

ARGUMENT ......................................................................................................9

I.    DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' TRESPASS CLAIMS.........................................................9

    A.    Plaintiffs Have Not Shown That Plutonium is Present on Each of the Class Properties. ...............................................................................9

    B.    Plaintiffs Have Failed to Prove a Trespass by Rockwell.......................16

    C.    Plaintiffs Have Not Shown That Any Trespass Was Continuing, or That Any Trespass Occurred While All Class Members Owned Their Class Properties. ...............................................................................18

    D.    Plaintiffs Have Not Introduced Sufficient Evidence That Defendants Intentionally Caused a Trespass.............................................................20

    E.    The Evidence Shows That Any Trespass Was Not Caused by Defendants. .........21

II.    TRESPASS ARGUMENTS THAT THE COURT HAS RULED ON AND THAT DEFENDANTS INCLUDE FOR PURPOSES OF PRESERVING THEIR RIGHTS. ...................................................................................24

    A.    Plaintiffs Have Not Demonstrated That Any Trespass Was Either Tangible or Caused Serious and Substantial Physical Damage............................24

    B.    Plaintiffs Have Failed to Present Evidence Showing That Defendants Did Not Comply with the Applicable Federal Standards for Offsite Plutonium Releases...............................................................................27

C.      Plaintiffs Have Not Shown That Plutonium Levels on Class Properties
        Exceeded the Applicable State Standards. ............................................................28

III.    DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW
        ON PLAINTIFFS' NUISANCE CLAIMS. .......................................................................30

        A.      Plaintiffs Have Not Shown a Class-Wide Health Risk. .........................................30

                1.      Plaintiffs Have Failed to Introduce Evidence That All Class
                        Members Experienced an Unreasonable Increased Health Risk as a
                        Result of Plutonium Exposure. ...................................................................30

                2.      Plaintiffs Have Failed to Introduce Evidence That All Class
                        Members Experienced an Unreasonable Health Risk as a Result of
                        Exposure to Plutonium Released by Rockwell. ..........................................35

        B.      Plaintiffs Have Failed to Introduce Evidence That All Class Members Are
                at an Increased Risk as a Result of Future Releases from Rocky Flats. ................36

        C.      Plaintiffs Have Not Shown That The Harm Associated With Any Health
                Risk Outweighs the Utility Associated With the Operation of Rocky Flats..........38

        D.      Plaintiffs Have Not Shown That Any Health Risk Is Substantial. ........................39

        E.      Plaintiffs' Acquisition of Land After Any Purported Nuisance Came Into
                Existence Establishes That Any Interference Was Not Substantial and
                Unreasonable. ........................................................................................................42

        F.      Plaintiffs Have Not Shown That Defendants Intentionally or Negligently
                Caused Any Health Risk. .......................................................................................44

        G.      The Evidence Shows That Any Health Risk Resulted From an Intervening
                Cause. .....................................................................................................................46

IV.     NUISANCE ARGUMENTS THAT THE COURT HAS RULED ON, AND
        THAT DEFENDANTS INCLUDE FOR PURPOSES OF PRESERVING THEIR
        RIGHTS. .........................................................................................................................46

        A.      Plaintiffs Have Not Shown a Violation of State Standards. ..................................46

        B.      Plaintiffs Have Not Shown That Any Health Risk Was Created by
                Releases Which Did Not Comply with Federal Standards. ...................................48

V.      THE RECORD CONFIRMS THE ABSENCE OF REMAINING FACTUAL
        DISPUTES REGARDING DEFENDANTS' AFFIRMATIVE DEFENSES OF
        STATUTE OF LIMITATIONS AND PRESCRIPTIVE EASEMENT. ...........................48

        A.      The Evidence Shows That Plaintiffs' Trespass Claims Are Barred by the
                Statute of Limitations...........................................................................................48

        B.      The Evidence Shows That Plaintiffs' Nuisance Claims Are Also Barred by
                the Statute of Limitations......................................................................................51

        C.      The Evidence Shows That Plaintiffs' Trespass Claims Are Barred by a
                Prescriptive Easement...........................................................................................52

        D.      The Evidence Shows That Plaintiffs' Nuisance Claims Are Barred by a
                Prescriptive Easement...........................................................................................54

VI.     DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW
        ON THE QUESTION OF WHETHER THEIR CONDUCT WAS CAPABLE
        GENERICALLY OF CAUSING FEAR, ANXIETY, OR MENTAL
        DISCOMFORT IN CLASS MEMBERS. .........................................................................54

        A.      The Generic Question of Emotional Distress Cannot Support a Judgment
                on Plaintiffs' Nuisance Claims. ..............................................................................54

        B.      Plaintiffs Have Not Introduced Any Evidence That Defendants' Conduct
                Was Capable of Causing Emotional Distress. ........................................................56

        C.      Plaintiffs Cannot Recover for Emotional Distress Without Demonstrating
                That Their Fears Were Grounded in Science..........................................................57

VII.    DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW
        ON PLAINTIFFS' CLAIMS BECAUSE PLAINTIFFS HAVE NOT
        EXPERIENCED RECOVERABLE DAMAGES. ..........................................................59

        A.      Plaintiffs Have Not Shown Damages Attributable to Defendants'
                Actionable Conduct:  First Principles....................................................................59

        B.      Plaintiffs' Damages Evidence is Insufficient Because It Relates to Losses
                Suffered as a Result of Non-Actionable Proximity. ...............................................61

        C.      Plaintiffs Cannot Recover Stigma Damages Where the Stigma Does Not
                Result From a Proven Trespass or Nuisance. ........................................................63

        D.      Plaintiffs Have Not Shown Damages Suffered by the Class. ...............................65

E.      Plaintiffs Have Not Shown Damages Attributable to the Prospect of the Continuance of Any Tortious Invasions. ...............................................................70

F.      Plaintiffs Have Not Demonstrated That Any "Injurious Situation" Became Complete and Comparatively Enduring Between 1989 and 1992.........................73

G.      Plaintiffs Have Failed to Limit Evidence of Damages to the Back-Calculated Statute of Limitations Window (January 30, 1988 - January 30, 1990). ...................................................................................................................75

VIII.   DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' DEMAND FOR PUNITIVE DAMAGES..........................................78

A.      Plaintiffs Have Not Shown That Defendants Engaged in Willful and Wanton Conduct. ..................................................................................................78

B.      Plaintiffs Have Not Shown Any Nuclear Occurrences Before August 1988.......................................................................................................................79

C.      The Price-Anderson Act Bars Plaintiffs from Receiving Punitive Damages....................................................................................................................80

D.      Plaintiffs Have Not Shown That the Punitive Damages They Seek Are in Any Way Linked to Defendants' Actionable Conduct. .........................................81

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Adams-Arapahoe School Dist. No. 28 v.*
  *GAF Corp.*,
  959 F.2d 868 (10th Cir. 1992) ........................................................................ 36

*Alfred v. Caterpillar, Inc.*,
  262 F.3d 1083 (10th Cir. 2001) ...................................................................... 8

*American Stevedores v. Porello*,
  330 U.S. 446 (1947)........................................................................................ 74

*Bennett v. Greeley Gas Co.*,
  969 P.2d 754 ................................................................................................... 81

*Blades v. Monsanto Co.*,
  400 F.3d 562 (8th Cir. 2005) .......................................................................... 10

*Boggs v. Divested Atomic Corp.*,
  No. C-2-90-840, 1997 WL 33377790
  (S.D. Ohio Mar. 24, 1997) .............................................................................. 27

*Bohrmann v. Maine Yankee Atomic*
  *Power Co.*,
  926 F. Supp. 211 (D. Me. 1996) ..................................................................... 27

*Boughton v. Cotter Corp.*,
  65 F.3d 823 (10th Cir. 1995) ......................................................... 57, 58, 60, 69

*Bower v. Weisman*,
  639 F. Supp. 532 (S.D.N.Y. 1986).................................................................. 41

*Bradley v. Am. Smelting and Ref. Co.*,
  709 P.2d 782 (Wash. 1985)............................................................................. 52

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
  155 F.3d 331 (4th Cir. 1998) .......................................................................... 10

*Buckley Powder Co. v. State*,
  70 P.3d 547 (Colo. App. 2002) ....................................................................... 67

v

*City of North Vernon v. Voegle,*
    2 N.E. 821 (1885) ............................................................................................ 74

*City of Vernon v. S. Cal. Edison Co.,*
    955 F.2d 1361 (9th Cir. 1992) ........................................................................ 61

*Cook v. Rockwell Int'l Corp.,*
    181 F.R.D. 473 (D. Colo. 1998) .............................................................. 31, 65

*Cook v. Rockwell Int'l Corp.,*
    273 F. Supp. 2d 1175 (D. Colo. 2003) ..................................................... passim

*Cook v. Rockwell Int'l Corp.,*
    358 F. Supp. 2d 1003 (D. Colo. 2004) .................................................... 48, 49

*Cook v. Rockwell Int'l Corp.,*
    755 F. Supp. 1479 (D. Colo. 1991) ........................................................ 79, 80

*Corcoran v. New York Power Auth.,*
    935 F. Supp. 376 (S.D.N.Y. 1996) ................................................................ 27

*Cox v. Cambridge Square Towne Houses, Inc.,*
    236 S.E.2d 73 (Ga. 1977) ............................................................................. 76

*Gassie v. SMH Swiss Corp. for Microelec. and Watchmaking Indus., Ltd.,*
    No. Civ. A. 97-3557, 1998 WL 158737
    (E.D. La. Mar. 26, 1998) .............................................................................. 27

*Good v. Fluor Daniel Corp.,*
    222 F. Supp. 2d 1236 (E.D. Wash. 2002) ..................................................... 27

*Goodyear v. Discala,*
    849 A.2d 791 (Conn. 2004) .......................................................................... 74

*Henry v. Dow Chemical Co.,*
    701 N.W.2d 684, (Mich. 2005) .................................................................... 74

*Hensley v. Tri-QSI Denver Corp.,*
    98 P.3d 965 (Colo. Ct. App. Aug. 12, 2004) ............................................... 79

*Holmes v. Securities Invest. Protection Corp.,* 503 U.S. 258 (1992) .......................... 60

*Hugunin v. McCunniff,*
    2 Colo. 367 (1874) ................................................................................. 19, 20

*In re Hanford Nuclear Reservation Litig.*,
    780 F. Supp. 1551 (E.D. Wash. 1991) .......................................................................... 80

*In re Hoery v. United States*,
    64 P.3d 214 (Colo. 2003) ...................................................................................... passim

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*,
    209 F.R.D. 323 (S.D.N.Y. 2002) ................................................................................ 55

*In re Rhone-Poulenc-Rorer Inc.*,
    51 F.3d 1293 (7th Cir. 1995) ...................................................................................... 55

*In re TMI Litigation Cases Consol. II*,
    940 F.2d 832 (3d Cir. 1991) ....................................................................................... 27

*Lamb v. Martin Marietta Energy Sys.*,
    835 F. Supp. 959 (W.D. Ky. 1993) ............................................................................. 27

*Lobato v. Taylor*,
    71 P.3d 938 (Colo. 2002) ........................................................................................... 52

*Mangini v. Aerojet-General Corp.*,
    912 P.2d 1220, 1221 (Cal. 1996) ............................................................................... 19

*McLandrich v. S. California Edison Co.*,
    942 F. Supp. 457 (S.D. Cal. 1996) ............................................................................. 27

*Middelkamp v. Bessemer Irrigating Ditch Co.*,
    103 P. 280 (1909) ........................................................................................................ 18

*Morsey v. Chevron, USA, Inc.*,
    94 F.3d 1470 (10th Cir. 1996) ...................................................................................... 1

*Nieman v. NLO, Inc.*,
    108 F.3d 1546 .............................................................................................................. 76

*O'Conner v. Commonwealth Edison Co.*,
    13 F.3d 1090 (7th Cir. 1994) ...................................................................................... 27

*O'Connor v. Boeing N. Am., Inc.*,
    No. CV 97-1554, slip op. at 77–87
    (C.D. Cal. Aug. 18, 2005) ........................................................................................... 27

*Oklahoma City v. Hopcus*,
    50 P.2d 216 (1935) ...................................................................................................... 74

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999)........................................................................................ 2

*Platte & Denver Ditch Co. v. Anderson*,
    6 P. 515 (Colo. 1885)............................................................................... 43, 44

*Pub. Serv. Co. of Colorado v. Van Wyk*,
    27 P.3d 377 (Colo. 2001)........................................................................ passim

*Renaud v. Martin Marietta Corp.*,
    749 F. Supp. 1545 (D. Colo. 1990)............................................................ 69

*Roberts v. Fla. Power & Light Co.*,
    146 F.3d 1305 (11th Cir. 1998) .................................................................. 27

*Roberts v. TXU Energy Retail Co.*,
    171 S.W.3d 901 (Tex. App. 2005).............................................................. 60

*Sanjuan v. IBP, Inc.*,
    160 F.3d 1291 (10th Cir. 1998) .................................................................. 8

*Saunders v. Hilperthauser*,
    1988 WL 42146 (S.D.N.Y. 1988)............................................................... 41

*Schmidt & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410 (7th Cir. 1992)................................... 61

*Smith v. State Compensation Ins. Fund*,
    749 P.2d 462 (Colo. Ct. App. 1987) ......................................................... 22

*Spanbauer v. J.R. Simplot Co.*,
    685 P.2d 271 (Idaho 1984)......................................................................... 76

*Sprague v. General Motors Corp.*,
    133 F.3d 388 (6th Cir. 1998) ..................................................................... 10

*Staley v. Sagel*,
    841 P.2d 379 (Colo. Ct. App. 1992) ......................................................... 60

*Taco Cabana v. Exxon Corp.*,
    5 S.W.3d 773 (Tex. App. 1999)................................................................. 29

*United States v. Hess*,
    194 F.3d 1164 (10th Cir. 1999) ................................................................. 76

*Walker Drug Co. v. La Sal Oil Co.*,
    972 P.2d 1238 (Utah 1998)........................................................................ 76

*Weisfeld v. Sun Chem. Corp.*,
210 F.R.D. 136 (D.N.J. 2002),
*aff'd* 84 Fed. Appx. 257 (3d Cir. 2004) .......................................................... 10

*Weisgram v. Marley Co.*,
528 U.S. 440, (2000)........................................................................................ 8

*Weisiger v. Harbour*,
62 P.3d 1069, 1071 (Colo. App. 2002) .......................................................... 52

*Westric Battery Co. v. Standard Elec. Co.*, 482 F.2d 1307 (10th Cir. 1973).......................... 59, 60

*Wilcox v. Homestake Mining Co.*,
No. CIV-04-534, slip op. at 6–7 (D.N.M. Nov. 15, 2005)................................ 27

*Wolfgang v. Mid-America Motorsports, Inc.*, 111 F.3d 1515 (10th Cir. 1997)............................. 8

## **Statutes**

28 U.S.C. § 2072 ..................................................................................................... 2

42 U.S.C. § 2014........................................................................................... 36, 79, 80

42 U.S.C. § 2210.................................................................................................... 79

Colo. Rev. Stat. § 13-21-102 ............................................................................ 78, 81

Colo. Rev. Stat. § 13-80-102 ............................................................................ 49, 76

## **Other Authorities**

9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2524 .................. 9

CJI-Civ. 4th 18:1 (May 2004)................................................................................... 19

*Prosser and Keeton on Torts*,
(5th ed. 1984) ............................................................................................ 18, 42

Pub.L. 100-104, § 20(a), Historical and Statutory Notes to 42 U.S.C.A. § 2014
(West Supp.1990) .......................................................................................... 81

Reference Manual on Scientific Evidence (2d ed. 2000) ............................................ 7

Restatement (Second) of Torts § 840.............................................................. passim

Sen. Rep. No. 296, 85th Cong.,
　　　1st Sess. at 16 (1957) ............................................................................................... 60

*The Law of Torts*, § 57
　　　(West Group 2001) ................................................................................................. 18

Wright & Miller, 5 Fed. Prac. & Proc. Civ.3d............................................................... 68

## **<u>Rules</u>**

Federal Rule of  Civil Procedure 32 ............................................................................... 15

Federal Rule of Civil Procedure 50 ................................................................................. 8

## **<u>Regulations</u>**

6 Colo. Code Regs. 1007-1, RH 4.60.1 ..................................................................... 29, 47

**<u>INTRODUCTION</u>**

Plaintiffs have attempted to construct a class-wide trespass and nuisance case within the contours of an artificial timeframe driven by the 1989 FBI raid.  However, throughout plaintiffs' case-in-chief, the incurable tension between the legal parameters governing trespass and nuisance class-wide liability and the scientific facts of this case became manifest as witness after witness — including the class representatives and plaintiffs' experts — conceded away the most basic elements of these claims.  In the wake of this failure of proof, plaintiffs' case has devolved into a patchwork quilt of "evidence" that simply does not fit the issues before this Court and cannot provide a basis for a finding of liability under any theory.  Consequently, as plaintiffs' case closes, defendants respectfully request this Court to enter judgment as a matter of law in favor of defendants on all claims because "there is no legally sufficient evidentiary basis for a reasonable jury" to find for plaintiffs on any issue.  *Morsey v. Chevron, USA, Inc.*, 94 F.3d 1470, 1476 (10th Cir. 1996).

**<u>Trespass:</u>**  Plaintiffs have failed to provide sufficient evidence allowing a reasonable juror to find that (i) defendants intentionally released "plutonium" (ii) onto each of "the Class Properties," and that (iii) "it appears that plutonium will continue to be present on the Class Properties indefinitely."  (Instruction No. 3.3, 3.4); *Pub. Serv. Co. of Colorado v. Van Wyk*, 27 P.3d 377, 387, 390 (Colo. 2001).  Instead, plaintiffs attempted to extrapolate *releases*[1] of plutonium from the Rocky Flats plant to "prove" that plutonium was deposited upon the class properties.  These extrapolations — culled from the so-called "Krey and Hardy" and "Poet and

---

[1] Even this release evidence relates only to releases by Dow, an issue addressed below.

Martell" contours — suffer from at least two fundamental deficiencies that render them insufficient as a matter of law.

*First*, neither set of researchers sampled all of the class properties.  Nor did they sample most of the class properties, or even one percent of the class properties.  Rather, Krey & Hardy sampled only 33 locations (equivalent to less than 1% of the 13,000 class properties), while Poet & Martell used even fewer samples.  (Budnitz testimony, Tr. 3342; DX 1167)  Many of these samples were not even in the class area.  (*See* DX 1167; Budnitz testimony, Tr. 3342-43 (Krey & Hardy had 33 monitoring stations, but Budnitz does not know how many were in the class area; Poet & Martell took fewer samples); Cochran testimony, Tr. 3573 (Poet & Martell only went out 2-4 miles east of the plant))

As Dr. Budnitz testified, Krey & Hardy and Poet & Martell used a process of "interpolation" or "extrapolation" to turn sampling points into a "contour."  (Budnitz testimony, Tr. 3338-39)  But plaintiffs' evidence is insufficient to prove that plutonium was deposited on each class member's property (or even most class members' properties).  For example, there was no evidence that the properties of class members who testified (*e.g.*, Mr. Ozaki, Ms. Robb, and Ms. Whalen) were contaminated.  In an individual trial, this process of "interpolation" or "extrapolation" from ***other properties*** would not be sufficient evidence to demonstrate that plutonium was present.  Nor is such evidence sufficient in a class trial, because the class device cannot be used to expand individual rights.  *See* 28 U.S.C. § 2072 (class action device cannot be used to "abridge, enlarge or modify any substantive right" of any litigant); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845 (1999).

***Second***, the Krey & Hardy and Poet & Martell contours were drawn in 1970, not as of June 7, 1989 (the date that defines the class).  (*See* P 149, Plutonium in Soil Around the Rocky Flats Plant, Aug. 1, 1970; P 533, Report on the Dow Rocky Flats Fire: Implications of Plutonium Releases to the Public Health and Safety, Jan. 13, 1970)  Thus, even for the smattering of properties tested in the Krey & Hardy and Poet & Martell studies, plaintiffs have introduced no evidence that plutonium remained on those properties as of 1989, and continues on those properties today.  Rather, the evidence has shown that virtually all of the class area development occurred between 1970 and 1989.  (DX 454, ATSDR 5/13/05 Report, at 1-2 ("Though Rocky Flats released plutonium to the air throughout its history, the overwhelming majority (> 99.9%) of plutonium emissions occurred between 1953 and 1969."); *see also* Smallwood testimony, Tr. 4083)  Plaintiffs have made no showing that notwithstanding the massive amount of soil bulldozing that accompanied that development, even the small number of properties tested remained contaminated.  All that Dr. Smallwood could say is that he "did not know" whether any class properties remained contaminated:

Q.  You couldn't — when it comes to the developed part of the class area, you can't simply say that because the Krey and Hardy and/or Poet and Martell contours show there may have been plutonium there back in 1970, that is certainly not very good evidence that there is still plutonium there today, fair?

A.  Where you have houses on top of the soil or warehouses or shopping mall or parking lot, I don't know, it depends on how deeply they scraped away the soil for the foundation of these structures.

Q.  Do you know of anybody today who has actually determined whether there is, in fact, plutonium on the class properties?

A.  I don't know.

(Smallwood testimony, Tr. 4083)

Plaintiffs' own experts' admissions, coupled with several class representatives' testimony, confirms plaintiffs' failure to prove ongoing **contamination** and dispenses with plaintiffs' trespass claims against both Dow and Rockwell.  *See* Sections I.A-D, *infra*.  And, as detailed in Sections I.E & F, *infra*, plaintiffs' inability to provide sufficient evidence of intent and causation provide additional reasons to grant judgment as a matter of law on the trespass claims.  Plaintiffs' claims against ***Rockwell*** are deficient for a further reason:  plaintiffs have failed to prove even a single ***release*** of plutonium from Rocky Flats during Rockwell's management beginning in 1975.  Because the Krey & Hardy and Poet & Martell contours relied upon sampling from 1970, they cannot be used to prove contamination caused by Rockwell.  Moreover, ***none*** of plaintiffs' experts testified that Rockwell had ***ever*** released ***any*** plutonium offsite, much less onto each of the class properties.

Nor can the plaintiffs rely on the FBI raid to prove trespass against Rockwell.  None of Rockwell's conduct relating to the raid, or to Rockwell's 1992 guilty plea, caused any offsite contamination, let alone plutonium contamination offsite.  (*See* Holeman testimony, Tr. 1333-34; Watkins testimony, Dep. Design. at 159-60, 167-69)  Nor did any of plaintiffs' witnesses testify that Rockwell's conduct caused offsite contamination of any of the class properties.  *See* Section I.B, *infra*.

**<u>Nuisance:</u>**  Plaintiffs fare no better with their nuisance claims.  To prove a nuisance under the Court's instructions, plaintiffs must demonstrate either that: (a) "all class members were exposed to plutonium in some way as a result of one or both Defendants' activities and that all incurred some increment of increased health risk as a result;" or (b) that "Defendants' activities at Rocky Flats interfered with Class members' use and enjoyment of their properties by

4

creating objective conditions that pose a demonstrable risk of future harm to the Class Area."

(Instruction No. 3.7)  Any such health risk must be "unreasonable," meaning that the common

harm to the class from the health risk is outweighed by the benefit to society as a whole from the

operation of the Rocky Flats plant.  (Instruction Nos. 3.8, 3.10-3.12)  Plaintiffs failed to

introduce evidence of an increased health risk to "all class members."  Although plaintiffs

attempted to introduce health risk evidence through Dr. Goble, Goble could only testify that

there was great "uncertainty" — he could not quantify a health risk to any member of the class.

(Goble testimony, Tr. 3660-61)  Indeed, Dr. Goble admitted that he could not even say what the

class was, much less quantify a health risk for all class members.  (*Id.* ("the definition of the

class is something that I don't actually truly know about, okay"))  *See* Section III.A.1, *infra*.

Dr. Goble's testimony also precludes any claim by plaintiffs that class members suffered

an "unreasonable" health risk.  Dr. Goble opined that, for those class members with the lowest

exposures,[2] exposures from Rocky Flats would have been so "very, very small" that "regulatory

agencies would not have been concerned about such exposures."  (Goble testimony, Tr. 3660-61)

Exposures that are so "very, very small" that "regulatory agencies would not have been

concerned" about them cannot give rise to a nuisance.  As the Colorado Supreme Court held in

*Van Wyk*, "what regulatory agencies would have been concerned about" (in terms of the

regulatory standards that they establish) provides the test for reasonableness under Colorado

---

[2] The Court's jury instructions require that, in determining reasonableness for purposes of assessing plaintiffs' nuisance claim, "you must also consider only harm that is common to the class as a whole, and not any more severe harm that may have been suffered by some Class members but not by others."  (Instruction No. 3.11)

nuisance law.  27 P.3d at 393.  In short, plaintiffs cannot prove a nuisance based on exposures that plaintiffs' own expert concedes are not of regulatory significance.  *See* Section III.A.1, *infra*.

Plaintiffs' evidence of a health-risk based nuisance claim against Rockwell suffers from further deficiencies.  In particular, as discussed above, plaintiffs have introduced no evidence of any offsite contamination caused by Rockwell.  Because plaintiffs have not introduced evidence of contamination by Rockwell, plaintiffs cannot show that Rockwell's actions created any health risk to the class.  *See* Section III.A.2, *infra*.

**Damages:**  Finally, as discussed in Part VII, plaintiffs have failed to introduce sufficient evidence to withstand judgment as a matter of law on the issue of damages.  Plaintiffs' proffered regression expert[3], Dr. Radke, conceded that he did not measure damages caused by either defendant's conduct.  (Radke testimony, Tr. 2752)  In fact, Dr. Radke testified that the "loss" he measured could have occurred ***regardless of how well the plant was run by the defendants***:

> Q.    In fact, there could be a lot of reasons why proximity would affect value that would have nothing whatever to do with who was running the plant, right?
>
> A.    Correct.  In fact — I really don't have any opinion.  I don't know who was running the plant, I don't know what was going on.  I was looking at the impact of it being ***located near Rocky Flats***.
>
> Q.    Right.  Well, for example, ***if people just didn't like the idea of living near a weapons plant***, whatever — whatever — whether people were running the plant well or poorly, if they didn't like working — living near a weapons plant, and there were a significant number of those people, that would lead to a negative relationship between proximity and the value of the property, right?
>
> A.    ***I measured proximity***.  I wouldn't know if the people had an opinion or not, but I measured the phenomena.

---

[3] Defendants incorporate by reference herein their *Daubert* motions to exclude the testimony of plaintiffs' experts.

Q.      Right.  There could be many reasons why proximity is a negative that's got nothing to do with how the plant was being run, right?

A.      *Correct*.

(*Id*. 2753-54) (emphasis added)  The failure of plaintiffs' experts to tie any diminution in value to defendants' allegedly actionable conduct is fatal to plaintiffs' damages claims.  *See*, *e.g.*, Reference Manual on Scientific Evidence 307, 308 (2d ed. 2000) ("If a damages analysis includes the effects not caused by the defendant, it is a defective analysis.").

Nor can plaintiffs recover for "stigma" attributable to the FBI raid.  First, the FBI raid cannot be used to prove damages against *Dow* because the raid did not involve any Dow conduct.  Furthermore, as discussed earlier, the raid related to onsite conduct that had nothing to do with offsite contamination (trespass) or health risk (nuisance).  (Holeman testimony, Tr. 1333-34; *see also* Watkins testimony, Dep. Design. at 159-60, 167-69)  Moreover, the FBI raid allegations were ultimately shown to be false (with the exception of onsite conduct relating to permitting processes). (*E.g.*, Holeman testimony, Tr. 1292-96 (Holeman was "dubious" of claims FBI was making when they went in because some could not be true); Watkins testimony, Dep. Design. at 155-57 & 161 (FBI went in for the wrong reason) P 604; P 736)

Finally, plaintiffs have failed to prove class members suffered any damages.  Plaintiffs purport to show that, in each year between 1988 and 1995, there was a difference between the class property value and the property value in the Denver metro area generally.  But plaintiffs fail to show that any such "difference" increased between the time any class member purchased his property and the time any class member sold his property.  For example, for class members who purchased in 1988 and sold in 1995, the alleged "difference" between class area and metro area properties actually decreased, from 7.68% to 5.45%.  In short, while plaintiffs have

introduced evidence relating to the value of class properties, plaintiffs have not shown that any class members actually lost money as a result of conduct by Dow or Rockwell.  This failure is independently dispositive of plaintiffs' damage claims.

Below, defendants set forth these and other arguments as bases for why plaintiffs' claims should be dismissed.  ***Some of these arguments have previously been rejected by the Court (e.g., arguments defendants raised in motions for summary judgment), but defendants re-raise the arguments here in order to preserve their rights.***  *See, e.g.*, *Wolfgang v. Mid-America Motorsports, Inc.*, 111 F.3d 1515, 1521 (10th Cir. 1997) ("Failure to renew a summary judgment argument — when denial was based on factual disputes — in a motion for judgment as a matter of law under Fed. R. Civ. P. 50(a)(1) at the close of all the evidence is considered a waiver of the issue on appeal.").

## LEGAL STANDARD

Federal Rule of Civil Procedure 50(a) provides:

> "If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue."

"Rule 50 allows the trial court to remove cases or issues from the jury's consideration when the facts are sufficiently clear that the law requires a particular result."  *Alfred v. Caterpillar, Inc.*, 262 F.3d 1083, 1089 (10th Cir. 2001) (quoting *Weisgram v. Marley Co.*, 528 U.S. 440, 448, (2000)) (internal quotations omitted).  Under this standard, a "mere scintilla of evidence is not sufficient to submit a case to a jury."  *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1298 (10th Cir. 1998); *see also* 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §

2524 ("The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury properly could find a verdict for that party.")

**ARGUMENT**

I.      **DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' TRESPASS CLAIMS.**

The trial evidence underlying plaintiffs' trespass claims suffers from several fatal deficiencies.  Each of these deficiencies is an independent and sufficient ground for judgment as a matter of law in defendants' favor on plaintiffs' trespass claims.

A.      **Plaintiffs Have Not Shown That Plutonium is Present on Each of the Class Properties.**

To prevail on their trespass claim, plaintiffs must show (among other things) that "Dow or Rockwell or both of them intentionally undertook an activity or activities that in the usual course of events caused plutonium from Rocky Flats to be present on the Class Properties," and that "it appears that plutonium will continue to be present on the Class Properties indefinitely." (Instruction No. 3.3, 3.4)  Plaintiffs' trespass claims here are limited to plutonium; contamination involving other substances cannot give rise to a trespass claim.  (*Id.*)  Thus, to prove a trespass as to a particular defendant, plaintiffs must show: (1) that the defendant in question released plutonium from Rocky Flats; (2) that the plutonium traveled onto the class members' properties; and (3) that the plutonium remains in the soil of the class members' properties today.

It is undisputed that, as a consequence of worldwide fallout, there is plutonium everywhere on earth, including (for example) in New York.  (Budnitz testimony, Tr. 3337)  Thus, to prevail on their trespass claims, plaintiffs must prove (among other things) that

9

defendants' releases caused contamination of plaintiffs' properties in an amount greater than that which could be attributable to plutonium from worldwide fallout or otherwise identify it as coming from Rocky Flats.

As summarized below, plaintiffs have introduced no evidence that releases resulted in contamination of all (or even most)[4] of the class properties or that any contamination remains on any class properties today. Plaintiffs have not even introduced any evidence of releases by Rockwell, much less evidence of contamination caused by Rockwell. Plaintiffs trespass case is largely based on two 1970 soil sampling studies that were done by (1) Krey & Hardy (P 149A) and (2) Poet & Martell (P 939). But those studies fail to address the relevant question of whether plutonium was present on the class properties as of 1989, and whether such plutonium continues to exist on these properties to this day.

*First*, the studies' limited sample size renders them wholly insufficient to show the existence of class-wide plutonium contamination. After taking a relatively small number of samples (*e.g.*, DX 1167 (Poet & Martell data points) & Budnitz testimony, Tr. 3342-43 (DX 1167 reflects Poet & Martell samples; Krey & Hardy had 33 sampling stations)), these researchers basically connected the dots to create theoretical contours through a process of

---

[4] *See Blades v. Monsanto Co.*, 400 F.3d 562, 571 (8th Cir. 2005) ("every member of the proposed classes" must "prove with common evidence that they suffered impact from the alleged conspiracy"); *Weisfeld v. Sun Chem. Corp.*, 210 F.R.D. 136, 144 (D.N.J. 2002), *aff'd* 84 Fed. Appx. 257 (3d Cir. 2004) ("Plaintiff must establish that each class member has, in fact, been injured by the alleged conduct."); *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 340-42 (4th Cir. 1998); *Sprague v. General Motors Corp.*, 133 F.3d 388, 398-99 (6th Cir. 1998) (class relief not available where "[a] named plaintiff who proved his own claim would not necessarily have proved anybody else's claim").

"interpolation or sometimes extrapolation."  (Budnitz testimony, Tr. 3338; *see also id.* at 3339-

41)  As plaintiffs' expert Dr. Budnitz testified:

> Q.  And was it your understanding that the way that Krey and Hardy were drawing these contours was to simply look at their data points and take a pencil —
>
> A.  Yes, they were trying —
>
> Q.  And get the best line?
>
> A.  Yes, and I thought that that was how Martell did his too. That is, they were trying to use their judgment to draw contours that were approximately accurate, but could not be very precise.

(*Id.* at 3341)

**Second**, the contours drawn do not show plutonium ***throughout the class area*** (which

was not the specific area of focus for these studies).  To the contrary, these researchers took very

few samples ***in the class area***.  (*See* DX 1167; Budnitz testimony, Tr. 3342-43 (Krey & Hardy

had 33 monitoring stations, but Budnitz does not know how many were in the class area; Poet &

Martell took fewer samples); Cochran testimony, Tr. 3573 (Poet and Martell only went out 2-4

miles east of the plant))  And even after extrapolation and interpolation, "much of the class area

is not touched by th[e] Poet and Martell contours."  (Budnitz testimony, Tr. 3332)

**Third**, the contours drawn by Krey & Hardy and Poet & Martell do not isolate plutonium

released from Rocky Flats — let alone releases caused by defendants.  Many of their

measurements are indistinguishable from worldwide fallout.  (Budnitz testimony, Tr. 3335-37

(some plutonium levels found by Poet & Martell indistinguishable from background; some found

by Krey & Hardy indistinguishable from that found from worldwide fallout in places like New

York))  Dr. Budnitz testified:  "It's most likely that those are worldwide fallout numbers, which

vary, you know, from place to place, that's most likely."  (*Id.* 3337; *see also id.* 3117 ("as they

got further out, [Krey & Hardy] found it increasingly difficult to separate plutonium they

measured from plutonium that might have occurred — excuse me, that did occur from fallout")

Consequently, the studies inability to demonstrate the presence of classwide plutonium

contamination occurring as a result of the activities of either or both defendants is yet another

deficiency that precludes reliance on these studies to prove the trespass claim.

     ***Fourth***, both of these studies were done nearly twenty years before the class definition

date (June 7, 1989, the date that all class members owned property in the class).  Plaintiffs have

presented no evidence that any plutonium found by these researchers remained as of that date

and would remain continuing into the future, especially in light of evidence of substantial

development in the class area during the intervening years.[5]  Plaintiffs' own expert Dr.

Smallwood concedes that there is no evidence that plutonium on the class properties today:

> Q.  You couldn't — when it comes to the developed part of the class area, you
> can't simply say that because the Krey and Hardy and/or Poet and Martell
> contours show there may have been plutonium there back in 1970, that is certainly
> not very good evidence that there is still plutonium there today, fair?

---

[5] The vast majority of the development in the class area took place after 1970 — by which time
99.9% of any Rocky Flats releases had already occurred.  (DX 1137, Graphic Showing Low
Number of 13,000 Class Members Living in Class Area as of 1969; Ex. 1, McKay Dep. at 118
("Q. And that press coverage in the late 1960s and early 1970s took place at a time when the
class area shown in McKay Deposition Exhibit 8 still had not been developed; is that correct?  A.
Yes.  Q. And so it was really subsequent to the press coverage of the fires and the 903 Pad that
the class area started to become developed with subdivisions, correct? A. Correct."); DX 454,
ATSDR 5/13/05 report, at 1-2) ("Though Rocky Flats released plutonium to the air throughout
its history, the overwhelming majority (> 99.9%) of plutonium emissions occurred between 1953
and 1969."))  In addition, the undisputed evidence has shown that class area development
involved removal of several feet of soil on class properties in connection with the construction of
houses.  (See Smallwood testimony, Tr. 4083)  And plaintiffs' experts have all conceded that
they "did not know" of evidence that any plutonium deposited on the parcels studied by Krey &
Hardy and Poet & Martell had not been removed by subsequent development.  (Smallwood
testimony, Tr. 4083-84; Budnitz testimony, Tr. 3346-47; *see also* Clapp testimony, Tr. 4915)

A.  Where you have houses on top of the soil or warehouses or shopping mall or parking lot, I don't know, it depends on how deeply they scraped away the soil for the foundation of these structures.

*       *       *

Q.  If we go back to 1989, are you aware of anybody who has data showing that even in 1989 there was plutonium on the soil throughout the class area from Rocky Flats?  Are you aware of anybody who has been able to show that data?

A.  Outside of Rocky Flats plant?

Q.  Yes.

A.  I don't know.

(Smallwood testimony, Tr. at 4083-84)  Dr. Budnitz similarly testified:

Q.  And so, in fact, if you had to — if you came in and took your samples 19 years later or 20 years after the release, then the plutonium by that time may have gone someplace else?

A.  Well, in fact, the measurements in that later time tell you what's there then. That's what they tell you, what's there then.  And they don't tell you anything else except what is there then . . .

Q.  But certainly one mechanism for that material not even being there anymore would be that it could become resuspended again, right?

A.  Well — I don't know what you mean by "anymore," just went somewhere else, perhaps, new or far.

Q.  Okay.

A.  That's what the new pattern would reveal.

Q.  Another method for it not being there anymore, if somebody dug up the soil in the interim and carted it all off, right?

A.  Yes, of course, removing it would remove it.

Q.  One mechanism for removing it and carting it all off would be, for example, if developers came in, built huge subdivisions in that area, after the time the original measurements were taken, correct?

> A.  That would be one of any number of ways that soil containing plutonium might have been removed.

(Budnitz testimony, Tr. 3346-47; *see also* Clapp testimony, Tr. 4915 (has not "seen any evidence that after this development took place and after these homes were built and after whatever disturbance of the soil took place that was associated with the building of those homes, that after that happened, then a soil sample was taken on such property and tested to determine whether there was plutonium in it."))  Thus, there has been no evidence presented to the jury that any plutonium that was on the class properties in 1970 is still there and will remain there indefinitely.[6]

*In short, plaintiffs have failed to introduce evidence of a single sample showing that there was any plutonium contamination on any class property as of 1989, much less today.* Indeed, as described below, class members called by plaintiffs as witnesses repeatedly testified that they did not know whether there was Rocky Flats plutonium on their properties:

**Charles McKay:**  Charles McKay is a class member with extensive property holdings in the class area.  During his deposition, McKay admitted that, following testing (by entities other

---

[6] Instead of introducing evidence that plutonium deposited on the class properties has remained on those properties, plaintiffs have repeated their mantra that "the half-life of plutonium is 24,000 years."  (*E.g.*, Goble testimony, Tr. 3633-34)  But the half-life of plutonium is beside the point.  Even if plaintiffs had demonstrated that plutonium was deposited in class properties' soil (which they have not), plaintiffs would still be required to demonstrate that the soil in which the plutonium was deposited ***remained on those properties***.  That is to say, even if plutonium has a half-life of 24,000 years, when the soil in which the plutonium is present on particular class properties was moved outside of the class area, then the plutonium-in-the-soil did not remain on the class properties "indefinitely," as required for plaintiffs to prove their trespass claims. (Instruction No. 3.3, 3.4)

than Dow, Rockwell, and the DOE), it had been determined that none of McKay's properties

were contaminated with plutonium.[7]  (Ex. 1, McKay Dep. at 153)  For example:

- McKay testified that sampling conducted in the 1980s by the Colorado Department of Health proved that his "Cimarron Park" property — located immediately south of the plant — was not contaminated.  (*Id.* at 147-49)

- McKay testified that plutonium sampling conducted in the 1990s by a private company known as Environmental Assessment Remediation Corporation (which McKay testified was not affiliated with Dow, Rockwell, or the DOE) proved that his "Great Western" property was not contaminated with plutonium.  (*Id.* at 153)

- McKay also testified to separate analyses performed by the Environmental Assessment Remediation Corporation which certified that three of his properties — Church Ranch, Great Western, and Cimarron Park — were not contaminated.  (*Id.* at 153-54)

- In fact, in at least one instance, McKay dug up his own samples, which McKay sent to Eberline Corporation (not affiliated with Dow or Rockwell), which in turn confirmed that the soil was not contaminated with plutonium.  (*Id.* at 149)

Thus, McKay used sophisticated methods to test of all his class area properties (including

testing by the Colorado Department of Health, the Environmental Assessment Remediation

Corporation, the Eberline Corporation, and samples dug by McKay himself).  All of that testing

showed that McKay's properties (which constitute a very significant portion of the class area)

were ***not*** contaminated with plutonium.

The testimony of other class representatives similarly confirms the absence of proof of

class-wide, current plutonium contamination.

---

[7] Because Mr. McKay is a plaintiff/class member, his statements can be used at any time as party admissions.  Fed. R. Civ. P. 32(a)(1) ("Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of deponent as a witness, or for any other purpose permitted by the Federal Rules of Evidence.").

- **William Schierkolk:**  Mr. Schierkolk never had his soil sampled for radioactivity, and he is not aware of any evidence that his property was contaminated with radioactive materials from Rocky Flats.  (Schierkolk testimony, Tr. 1936-37)

- **Sally and Richard Bartlett:**  The Bartletts each testified that they had the soil on their property tested, and were told that the soil sampling results were "not above standards," the soil "was within normal limits", and it was "safe to build on."  (S. Bartlett testimony, Tr. 959-61; R. Bartlett testimony, Tr. 1060-61)

- **Gertrude Babb:**  Mrs. Babb never tested the soil on her class property.  (Babb testimony, Tr. 1971)

- **Merilyn Cook:**  During Ms. Cook's testimony, plaintiffs offered into evidence a letter indicating that samples that she collected with the assistance of the state health personnel were received by Rockwell and submitted to Accu-Labs Research, Inc., for analysis.  (Cook testimony, Tr. 2023-26; *see also* P 1230 & P 1231)  The letter further stated:  "[The samples] average 0.055 plus or minus 0.031 picocuries per gram.  The maximum value of 0.12 is 13 percent of the Colorado Department of Health guideline of two disintegrations per minute per gram."  (*Id.*)  This is well below background levels.

- **Gretchen Robb:**  Gretchen Robb testified that she had never had her property tested for plutonium, and that she had no way of knowing whether plutonium was present on her property or not.  (Robb testimony, Tr. 5028)

- **Karen Whalen:**  Karen Whalen testified that she never actually had her property tested, and so she did not know how much plutonium, *if any,* was actually on her class property.  (Whalen testimony, Tr. 5956, 5958) (emphasis added)

  **B.    Plaintiffs Have Failed to Prove a Trespass by Rockwell.**

Plaintiffs must have evidence that *each* defendant released plutonium onto all class members' properties.  (Instruction 1.10)  There is no evidence whatsoever that Rockwell released plutonium which was deposited upon the majority of the class members' properties, much less all of the class members' properties.

*First,* it almost goes without saying that the Krey & Hardy and Poet & Martell studies do not prove that *Rockwell* committed a trespass.  The Krey & Hardy and Poet & Martell studies

measured plutonium concentration in the soil around Rocky Flats in 1970; however, Rockwell did not begin as plant contractor until 1975.

**Second**, the only plutonium releases as to which plaintiffs have introduced any evidence occurred well before Rockwell began as plant contractor in 1975 (the 1957 fire, the 1969 fire, and the 903 pad).[8]

**Third**, plaintiffs' introduction of evidence of **onsite** Rockwell conduct, such as the conduct that gave rise to the 1992 guilty plea, cannot be used to support their offsite contamination elements of their trespass claim.  Plaintiffs have introduced no evidence that such onsite conduct by Rockwell resulted in offsite plutonium contamination.  Plaintiffs' own witness — Timothy Holeman — testified that Rockwell's conduct, including that which gave rise to the 1992 guilty plea, did not result in offsite contamination.  (Holeman testimony, Tr. 1333-34; *see also* Watkins Testimony, Dep. Design. at 159-60, 167-69)  In short, plaintiffs have failed to introduce evidence of any releases of plutonium from the Rocky Flats plant that occurred during Rockwell's tenure as contractor — much less evidence of releases during Rockwell's tenure as contractor that resulted in contamination of all (or even most) of the class properties.

For the foregoing reasons, the Court should grant judgment as a matter of law on plaintiffs' trespass claim against Rockwell.

---

[8] As discussed elsewhere, plaintiffs have not introduced evidence that these Dow releases have resulted in ongoing plutonium contamination of class properties.

**C.      Plaintiffs Have Not Shown That Any Trespass Was Continuing, or That Any Trespass Occurred While All Class Members Owned Their Class Properties.**

There are two types of trespasses:  continuing trespasses and permanent trespasses. Under this Court's rulings, to prove that a trespass is "continuing," plaintiffs must show that "it appears that plutonium will continue to be on the Class Properties indefinitely."[9]  (Instruction No. 3.4)

Here, plaintiffs have introduced no evidence that any plutonium on class properties will "continue indefinitely" (and thus is "continuing").  As discussed above, while plaintiffs have introduced evidence about the half-life of plutonium once it gets in the soil, plaintiffs have not introduced evidence that the ***soil itself*** has remained on class properties.  (Smallwood testimony,

---

[9] Defendants have previously argued that, in order for a trespass to be "continuing," plaintiffs also must prove that it is not reasonably abatable.  *See* Defendants' Response to Plaintiffs' Brief on the Statute of Limitations, State Regulatory Standards, Ultrahazardous Liability, Spoliation, and Negligent Trespass, filed Aug. 18, 2004; *see also* W. Keeton, *Prosser and Keeton on Torts* at § 89 (5th ed. 1984) (a "permanent" nuisance is one that is "unlikely to abate or to be avoided by any reasonable expenditure of money"); D. Dobbs, *The Law of Torts*, § 57 (West Group 2001), *cited in In re Hoery v. United States*, 64 P.3d 214, 223 (Colo. 2003) (listing first among the "most significant factors favoring a classification as temporary" that "(1) the invasion can in fact be terminated or abated" and "(2) the cost of termination is not wasteful or oppressive"); *Hoery*, 64 P.3d at 216, 222-23 ("the record at this stage of the litigation indicates that the contamination is not permanent — that is, it is remediable or abatable."); *Middelkamp v. Bessemer Irrigating Ditch Co.*, 103 P. 280, 283 (1909) (when nuisance or trespass "is not practicable to remedy" or could not "by a reasonable expenditure be checked," the nuisance is considered permanent).

Plaintiffs have introduced no evidence in this regard.  Defendants recognize that the Court has rejected defendants' position on this, but re-assert the argument here for the purpose of preserving it.

Tr. 4067, 4083-84)  Thus, plaintiffs have introduced no evidence that any trespass is "continuing."[10]

Because plaintiffs have failed to introduce evidence of a "continuing" trespass, their claims are subject to the rules applicable to "permanent" trespasses.  *See Hoery*, 64 P.3d at 217-23.  In the case of a ***permanent*** trespass, a plaintiff must prove that the contamination came onto the property ***during the time the plaintiff owned the property***.[11]  *See also Hugunin v. McCunniff*, 2 Colo. 367, 369-70 (1874) ("By the strict rule which anciently obtained in the English courts, trespass quare clausum fregit lay only by one having a possession, in fact, of the premises trespassed upon, at the time of the trespasses."); CJI-Civ. 4th 18:1 (May 2004) (requiring as element that "[w]hile Plaintiff was (the owner) . . . the Defendant intentionally (caused [the alleged contaminant] to come upon) that property); *Hoery*, 64 P.3d at 217-223 (holding that, where undisputed evidence showed that contamination was "not permanent — that is, it is remediable or abatable," then the cause of action does not accrue as long as "continuing property invasions remain[ed]" on plaintiff's property, regardless of whether "the United States continues to release toxic pollutants").  Here, plaintiffs have introduced no evidence that plutonium contamination of the class properties occurred after the date when all of the class members had acquired their properties — that is, after June 7, 1989.  To the contrary, the evidence at trial has

---

[10] Plaintiffs bear the burden of proving that their claim is "continuing."  *See, e.g.*, *Mangini v. Aerojet-General Corp.*, 912 P.2d 1220, 1221 (Cal. 1996) (holding that "because plaintiffs had failed to present ***any*** substantial evidence that the contamination of their land . . . was capable of being abated at a reasonable cost, the nuisance must be deemed permanent . . .  plaintiffs' nuisance and trespass claims were time barred").

[11] Defendants are uncertain as to whether the Court has ever ruled on this argument.  If the Court has ruled on this argument, defendants offer it here for the purpose of preserving their rights.

shown that 99.9% of all plutonium releases from Rocky Flats occurred before 1970, a time when only a small fraction of class members owned their properties.  (DX 454, ATSDR 5/13/05 Report, at 1-2; *see also* Goble testimony, Tr. 3678)

Accordingly, because plaintiffs have introduced no evidence that any trespass is "continuing" and have not proven that any trespass occurred after the class members acquired their properties, plaintiffs' claims should be dismissed.  *See Hugunin,* 2 Colo. at 369-70.

> **D.      Plaintiffs Have Not Introduced Sufficient Evidence That Defendants Intentionally Caused a Trespass.**

To prove a trespass, plaintiffs must also demonstrate that defendants' conduct was "intentional."  (Instruction No. 3.2) (plaintiffs must show that "Dow or Rockwell or both of them intentionally undertook an activity or activities that in the usual course of events caused plutonium from Rocky Flats to be present on the Class properties"); *see also Van Wyk*, 27 P.3d at 389 ("By ***intentionally*** entering the land possessed by someone else, or causing a thing or third person to enter the land, an individual becomes subject to liability for trespass, whether or not he caused harm to any legally protected interest of the landowner.") (emphasis added).

With respect to Dow, plaintiffs have introduced evidence of certain plant accidents (*e.g.*, the 903 pad incident, the 1957 fire, and the 1969 fire).  However, plaintiffs have introduced no evidence whatsoever that defendants' conduct in connection with any of these events was "intentional."   Rather, Dow took significant steps and precautions to avoid any such problems. (S*ee* Ray testimony, Tr. 1551-52 (Dow responded to union's complaints regarding the 903 pad to the point they didn't know what to do with the drums), 1658-60 (plant had not yet come up with a way to take care of oils in the drums but research and development efforts were ongoing to try and deal with these materials), 1671-1673 ("hundreds" and over "60 columns" of HEPA filters in

71 building, "floor to ceiling, side to side")).  After the 1957 fire, Dow took several of the recommendations from the 1957 fire report, and implemented them in buildings 776 and 777, where the 1969 fire occurred.  For example, Dow provided additional $CO_2$ fire extinguishers (Budnitz testimony, Tr. 3367-3368, 3272), installed additional standpipes and fire hoses (Budnitz testimony, Tr. 3385-3386), installed heat detectors in filter plenums and gloveboxes (Budnitz testimony, Tr. 3403-3405), provided a sprinkler system in the filter plenum (Budnitz testimony, Tr. 3375-3376, 3381-3382), added fire breaks in gloveboxes (Budnitz testimony, Tr. 3401-3402), and utilized fire resistant Plexiglas and other non-combustibles in the construction of gloveboxes (Budnitz testimony, Tr. 3396-3397).

Similarly, with respect to Rockwell, plaintiffs have failed to prove any "intentional" conduct resulting in offsite releases.  Indeed, plaintiffs have failed to prove any offsite releases (of plutonium or any other radioactive or hazardous substance or contaminant) during Rockwell's tenure, much less any releases resulting from "intentional conduct."  (Holeman testimony, Tr. 1333-34 (no offsite releases from plea conduct); P 604 ("We have operated the Rocky Flats plant with integrity and high ethical standards . . . we are committed to the welfare and safety of our Rocky Flats employees and the surrounding communities."); P 736 ("We have managed Rocky Flats with proper concern for public health, safety and the environment."))

**E.     The Evidence Shows That Any Trespass Was Not Caused by Defendants.**

Defendants are also entitled to judgment as a matter of law on the issue of causation. Under the Court's instructions, "the word 'cause' . . . means an act or failure to act that in natural or probable sequence produced the claimed effect.  It is a cause without which the claimed effect would not have happened."  (Instruction No. 3.18)

Defendants tendered an intervening cause instruction to the Court, which apparently has been rejected or at least was not addressed.[12]  Under the intervening cause instruction, "[a] defendant's conduct is not the cause of the claimed effect if, in order to bring about such an effect, it was necessary that the defendant's conduct combine or join with an intervening cause that also contributed to cause the claimed effect.  An intervening cause is a cause that would not have been reasonably foreseen by a reasonably careful person under the same or similar circumstances."  (Ex. 2, Defendants' Proposed Instruction No. 5); *see also Smith v. State Compensation Ins. Fund*, 749 P.2d 462, 464 (Colo. Ct. App. 1987).

Here, plaintiffs have failed to introduce sufficient evidence of causation to withstand a motion for judgment as a matter of law.  The uncontroverted evidence has shown that the plant (including the plutonium at the plant) was owned by the government, and that defendants acted in accordance with the government's instructions as plant contractors.  (*E.g.*, Tr. 5983-84 (expenditures require AEC approval); P 338 & Tr. 6205 (DOE must advise Colorado of its planning, which will impact "both the nature of the mission and the level of production at the Rocky Flats plant"); Ray testimony, Tr. 1659 (AEC determined whether waste could be shipped); Holeman testimony, Tr. 1383 (setting limits on waste affected production, which was controlled by the federal government and national security); Pls.' opening Tr. 524 ("The Atomic Energy Commission was both responsible for the production of nuclear weapons and for oversight of the facilities.")  The uncontroverted evidence also shows that there were at least two intervening causes of any trespass by defendants:  (1) the government's actions with respect to

---

[12] If it has been rejected, then defendants include this argument for the purpose of preserving their record.

the 903 pad incident (*see* Budnitz testimony, Tr. 3480-81; DX 359 (Dow 8/9/68 proposal for

concrete slab); DX 361 (1/24/69 denial from AEC)), which plaintiffs' witnesses have said is the

major release incident that could have resulted in contamination of plaintiffs' properties

(Cochran testimony, Tr. 5530, 5541; Budnitz testimony, Tr. 3081-82); and (2) abnormally high

100-plus mile-an-hour winds that were blowing at the time of the 903 pad incident (*see* Budnitz

testimony, Tr. 3493-99; DX 58, Historical Public Exposure Studies Summary of Findings

(describing windstorms))  Plaintiffs have introduced no evidence whatsoever that either of these

intervening causes were foreseeable by Dow.  To the contrary, there is no reasonable basis to

conclude that Dow could have foreseen either of these intervening causes.

       Likewise, with respect to Rockwell, the actions of the Federal Bureau of Investigation,

the Environmental Protection Agency and the Department of Justice in undertaking the FBI raid

constitute an intervening cause foreclosing liability for Rockwell.  Plaintiffs' witnesses have

repeatedly stressed that the basis of their claims is the FBI raid.  (*E.g.*, Whalen testimony, Tr.

5955 (the raid affected how she viewed her property) & 5938-39 (raid affected use and

enjoyment); Schierkolk testimony, Tr. 1902 (could not sell property after raid); Babb testimony,

Tr. 1961 (raid affected her ability to sell); Cook testimony, Tr. 2040-41 (FBI raid made her give

up on her property); 2055-56 (testified at her deposition that the only claim she was making was

based on the FBI raid); S. Bartlett testimony, Tr. 920 (raid had a tremendous impact on ability to

sell her home))  Plaintiffs have introduced no evidence that the actions of governmental agents in

the June 1989 FBI raid in making unsupportable allegations about Rocky Flats were reasonably

foreseeable by Rockwell.  Instead, the evidence that has been presented is to the contrary.  (*E.g.*,

Holeman testimony, Tr. 1292-96 (Holeman was "dubious" of claims FBI was making when they

went in because he knew some could not be true); Watkins testimony, Dep. Design. at 155-57, 161 (FBI went in for the wrong reason); *see also* P 604)

For the foregoing reasons, the Court should grant judgment as a matter of law on plaintiffs' trespass claims.

## II.     TRESPASS ARGUMENTS THAT THE COURT HAS RULED ON AND THAT DEFENDANTS INCLUDE FOR PURPOSES OF PRESERVING THEIR RIGHTS.

To preserve their rights, defendants also move for judgment as a matter of law on various trespass-related arguments that have already been rejected by this Court, as set forth in this Section.

### A.     Plaintiffs Have Not Demonstrated That Any Trespass Was Either Tangible or Caused Serious and Substantial Physical Damage.[13]

Another separate and independent reason why defendants should be granted a directed verdict on the issue of trespass is that, in addition to their failure to show that plutonium was deposited upon and remains on each of the class properties, plaintiffs have not demonstrated that any plutonium deposited on the class properties either (1) is "tangible"; or (2) has caused serious and substantial physical damage.  *See Van Wyk*, 27 P.3d at 387, 390.

In *Van Wyk*, the Colorado Supreme Court held:

An intangible intrusion onto property cannot result in a trespass unless the intrusion causes physical damage to the property. . . .  The meaning of the term 'intangible' is something that is impalpable, or incapable of being felt by touch. Webster's Ninth New Collegiate Dictionary 603, 628 (1988).  . . . [A]n intangible

---

[13] The Court has rejected defendants' argument that plutonium contamination is not tangible. *Cook v. Rockwell Int'l Corp.*, 273 F. Supp. 2d 1175, 1201 ("*Cook IX*") (D. Colo. 2003). Nevertheless, defendants believe that Dr. Smallwood's recent testimony that plutonium contamination is not "tangible" constitutes an intervening fact that merits reconsideration of this issue.  Defendants also re-assert this argument here for purposes of preserving their rights.

intrusion may give rise to claim for trespass, but only if an aggrieved party is able to prove physical damage to the property caused by such intangible intrusion. . . . Moreover, a property owner forced to prove damage will be further limited to seeking redress in cases of serious or substantial invasions.

*Id.* at 387, 390.  As this Court explained in *Cook IX*:

In *Public Service Co. of Colorado v. Van Wyk*, 27 P.3d 377 (Colo.2001), the Colorado Supreme Court joined the modern trend by recognizing that an intangible intrusion onto another's property may constitute a trespass, but only upon proof that the intangible intrusion caused physical damage to the property. *See id.* at 390. In so doing, it distinguished between trespass based on a "physical entry" and one based on an "intangible intrusion" *id.* at 389, which it defined as "something that is impalpable, or incapable of being felt by touch."  *Id.* at 387.

*Id.* at 1200.

Plaintiffs have introduced no evidence that any plutonium deposited onto class properties was "tangible" (which the *Van Wyk* court defined as "palpable," or "capable of being felt by touch").  27 P.3d. at 387.  To the contrary, plaintiffs' expert Shawn Smallwood testified that plutonium is **not** "tangible."  (Smallwood testimony, Tr. 4039-40 ("Q.  You would agree with that, by any stretch of the common sense word 'intangible', [plutonium particles a]re intangible, right?  A.  Yes."))  Plaintiffs and their counsel agree.  (*See* Pls.' opening, Tr. 497 ("You can't see it, you can't smell it, you can't taste it, you can't hear it, and you can't feel it . . . ."); Ex. 3, Representative Pls.' Joint Resps. to Dow's 2d Set of Interrogs. Directed to Each Class Representative Pl., dated 9/15/95, at 12 ("[T]he radionuclides and other hazardous substances released from Rocky Flats to which responding plaintiffs and members of the classes (and their properties) were exposed were not perceptible to the senses . . . ."))

Because plaintiffs have introduced no evidence that plutonium is tangible, plaintiffs are required under *Van Wyk* to show that plutonium deposited on the class properties caused "serious or substantial" physical damage.  *See* 27 P.3d at 390 ("[A]n intangible intrusion may give rise to

claim for trespass, but only if an aggrieved party is able to prove physical damage to the property caused by such intangible intrusion. . . .  Moreover, a property owner forced to prove damage will be further limited to seeking redress in cases of serious or substantial invasions.").  But plaintiffs have not presented evidence that *any* class property — much less most class properties or all class properties — suffered serious or substantial physical damage from plutonium invasions.  (*See*, *e.g.*, R. Bartlett testimony, Tr. 1060-61 (plutonium sampling showed property safe to build on); *see also* Schierkolk testimony, Tr. 1932, 1934-35 (sampling showed well water safe); Watkins testimony, Dep. Design. at 159-60, 167-69 (no public health risk offsite))

**B.**   **Plaintiffs Have Failed to Present Evidence Showing That Defendants Did Not Comply with the Applicable Federal Standards for Offsite Plutonium Releases.[14]**

As defendants have previously argued, in order to prevail on their trespass claims, plaintiffs must demonstrate that defendants caused releases that violated the applicable federal standards.  These standards were as follows:

1.   2.0 picocuries per cubic meter for the period from 1953 through August 28, 1957.

2.   0.2 picocuries per cubic meter for the period from August 29, 1957 through August 11, 1963.

3.   0.33 picocuries per cubic meter for the period from August 12, 1963 through August 4, 1985.

4.   0.04 picocuries per cubic meter for the period from August 5, 1985 through June 7, 1989.

---

[14] Defendants acknowledge that the Court has already rejected defendants' position on this issue, *Cook IX*, 273 F. Supp. 2d at 1199, and re-assert this argument here for the purpose of preserving their rights.  Defendants note that, since this issue was last addressed by this Court in the *Cook IX* opinion, two more district courts — including one in the Tenth Circuit less than a month ago — have agreed with the vast majority that the Price-Anderson Amendments Act preempts state law to the extent that it creates a duty inconsistent with federal safety standards.  *See Wilcox v. Homestake Mining Co.*, No. CIV-04-534, slip op. at 6–7 (D.N.M. Nov. 15, 2005) (attached as Exhibit 4); *O'Connor v. Boeing N. Am., Inc.*, No. CV 97-1554, slip op. at 77–87 (C.D. Cal. Aug. 18, 2005) (attached as Exhibit 5).  The following decisions are in accord:  *Roberts v. Fla. Power & Light Co.*, 146 F.3d 1305, 1308 (11th Cir. 1998); *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1105 (7th Cir. 1994); *In re TMI Litigation Cases Consol. II*, 940 F.2d 832, 859 (3d Cir. 1991); *Good v. Fluor Daniel Corp.*, 222 F. Supp. 2d 1236, 1247 (E.D. Wash. 2002); *Gassie v. SMH Swiss Corp. for Microelec. and Watchmaking Indus., Ltd.*, No. Civ. A. 97-3557, 1998 WL 158737, at *4 (E.D. La. Mar. 26, 1998); *Boggs v. Divested Atomic Corp.*, No. C-2-90-840, 1997 WL 33377790, at *3 (S.D. Ohio Mar. 24, 1997); *Corcoran v. New York Power Auth.*, 935 F. Supp. 376, 386 (S.D.N.Y. 1996); *Bohrmann v. Maine Yankee Atomic Power Co.*, 926 F. Supp. 211, 220 (D. Me. 1996); *McLandrich v. S. California Edison Co.*, 942 F. Supp. 457, 465 (S.D. Cal. 1996); *Lamb v. Martin Marietta Energy Sys.*, 835 F. Supp. 959, 965 (W.D. Ky. 1993).

Plaintiffs have introduced no evidence that any of these standards were violated during either the Dow era or the Rockwell era.  Indeed, neither of plaintiffs' release experts (Goble and Smallwood) even discussed federal standards.  (*See* Goble testimony, Tr. 3618-88, 3692-3710; Smallwood testimony, Tr. 4064, 4067)

To the contrary, all of the evidence has shown that Rocky Flats plant releases (including water) have not been in excess of the federal standards.  This has been true both during the Dow era (*see* Budnitz testimony, Tr. 3335-36 (1970 contour below standards); *see also* S. Bartlett testimony, Tr. 959-60, 960 (test results below standards); DX 1252 (graphic depicting Krey & Hardy soil contours)), and during the Rockwell era (*see* Holeman testimony, Tr. 1363, 1370-71 (water met standards); *see also,* DX 34, Broomfield 2004 Water Quality Report (no violations of Safe Drinking Water Act standards)).

In sum, plaintiffs' failure to introduce any evidence that defendants violated federal standards constitutes another reason why defendants are entitled to judgment as a matter of law on plaintiffs' trespass claim.

### C.   Plaintiffs Have Not Shown That Plutonium Levels on Class Properties Exceeded the Applicable State Standards.[15]

In *Van Wyk*, the Colorado Supreme Court addressed the concern about over-extending trespass liability by establishing the prerequisites that, for an invasion to be significant enough to be actionable in trespass, the invasion must either be "tangible" (which the court defined as "[]capable of being felt by touch") or must cause "physical damage to the property" that is

---

[15] Defendants realize that the Court has ruled that plaintiffs need not prove a violation of these state standards to prevail on their trespass claims, *see* 12/17/04 Order re Proposed Trespass Instructions at 5, but assert this argument for the purpose of preserving their rights.

"serious or substantial."  27 P.3d at 387, 390.  Since *Van Wyk*, the only Colorado decision to allow a trespass claim on the ground that there was allegedly physical damage to the property was the Colorado Supreme Court's decision in *Hoery*.  In *Hoery*, the Court held that an ***above-state-standards*** TCE invasion constituted a continuing trespass based on the record in that case. *Hoery*, 64 P.3d at 222; *see also Taco Cabana v. Exxon Corp.*, 5 S.W.3d 773, 780 (Tex. App. 1999) ("Because the evidence presented at trial did not establish that Exxon failed to remove soil that contained contaminants above state action levels, Taco Cabana failed to establish its trespass theory of liability.")

In this case, plaintiffs seek to recover for an alleged trespass by a contaminant that:  (1) indisputably cannot be experienced by the senses; and (2) is not alleged to have caused any perceptible impact to the property (such as killing plants, causing paint to peel, *etc.*). (Smallwood testimony, Tr. 4039-40)  Accordingly, plaintiffs are required to show contamination in excess of the state plutonium standard before defendants can be found liable for a trespass. *Van Wyk,* 27 P.3d at 387, 390; *Hoery,* 64 P.3d at 222.

The Colorado plutonium standard is two disintegrations per minute of plutonium per dry gram of soil or square centimeter of surface area.  6 Colo. Code Regs. 1007-1, RH 4.60.1, Permissible Levels of Plutonium in Uncontrolled Areas.  Plaintiffs have introduced no evidence whatsoever that either defendant caused class properties to become contaminated with plutonium in excess of this standard.  To the contrary, the only evidence that was introduced at trial showed that any contamination of class properties was in an amount far less than the state standard.  (*See*, *e.g.*, Budnitz testimony, Tr. 3335-36; S. Bartlett testimony, Tr. 959-60, 961; Cook testimony, Tr. 2023-26)  Plaintiffs' failure to introduce any evidence that defendants' conduct resulted in

contamination of the class properties in excess of the state plutonium standard constitutes

sufficient grounds for judgment as a matter of law as to the trespass claims.

## III.  DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' NUISANCE CLAIMS.

As with trespass, the trial evidence underlying plaintiffs' nuisance claims suffers from

fatal deficiencies.  These deficiencies are independent and sufficient grounds for judgment as a

matter of law in defendants' favor on plaintiffs' nuisance claims.

### A.    Plaintiffs Have Not Shown a Class-Wide Health Risk.

Under the Court's jury instructions, to prove a nuisance, plaintiffs must demonstrate that

"Dow or Rockwell or both of them interfered with Class members' use and enjoyment of their

properties in the Class Area in one or both of the following ways:

> A.    By causing Class members to be exposed to plutonium and placing them at some increased risk of health problems as a result of this exposure (*see* Instruction Nos. 3.7, 3.18); and/or
> B.    By causing objective conditions that pose a demonstrable risk of future harm to the Class Area (*see* Instruction Nos. 3.7, 3.18)"

(Instruction No. 3.6)

Plaintiffs have proved neither of these interferences.  There is no evidence of *all* "*class*

*members*" experiencing "increased risk of health problems as a result" of "expos[ure] to

plutonium."  (Instruction No. 3.7)  Nor is there any evidence of any "objective conditions that

pose a demonstrable risk of future harm to the Class Area."  (Instruction No. 3.6)

### 1.    Plaintiffs Have Failed to Introduce Evidence That All Class Members Experienced an Unreasonable Increased Health Risk as a Result of Plutonium Exposure.

With respect to past health risk, the Court's jury instructions require plaintiffs to prove

that "*all Class members* were exposed to plutonium in some way as a result of one or both

Defendants' activities and that all incurred some increment of increased health risk as a result."

(Instruction 3.7) (emphasis added)  Any such "increment of health risk" must be

"unreasonable."[16]  (Instruction 3.8)

The property class is defined "with reference to geographical representations of the area

bounded by the plutonium contour and the complaint supplies the *operative date of ownership as*

*June 7, 1989*."  *See Cook v. Rockwell Int'l Corp.*, 181 F.R.D. 473, 476 n.3 ("*Cook VIII*") (D.

Colo. 1998) (emphasis added).  Plaintiffs have introduced no evidence that "all class members"

either (a) were exposed to plutonium; or (b) incurred an increased health risk as a result of that

exposure.

Indeed, plaintiffs' witness on this issue, Dr. Goble, could not quantify any exposures or

health risks to the class.[17]  Rather, he merely claimed that there was tremendous "uncertainty" in

---

[16] Under the Court's jury instructions, in determining "unreasonableness," is necessary to "consider both harm that has actually been incurred and the risk of future harm."  (Instruction No. 3.11)  The "risk of future harm" is addressed in Part III.B, *infra.*

[17] As an initial matter, the property class consists of individuals who *own property* in the class area – not individuals who *reside* in the class area.  Some class members, such as Mrs. Babb and Mr. Bowman, never lived on their class properties.  (Babb testimony, Tr. 1953; Bowman testimony, Tr. 6032)  As plaintiffs' own class notice list demonstrates, some class members reside in locations such as New York and Florida.  (Ex. 6, selected class notice list excerpts); *see also* Ex. 1, McKay Dep. at 21 (Charles McKay's brother is a class member, lives in Fort Lauderdale, Florida, and rarely visits Colorado:  "Q. . . . [D]uring the time period from 1960 to the present, as far as you know, approximately what percent of his time has your brother spent in Colorado? A. Percent of his time, 1 percent.")  Thus, the only way for plaintiffs to prove that "all class members" experienced some increased health risk as a result of exposure to Rocky Flats plutonium would be to show that Rocky Flats plutonium traveled to New York, Florida and any other such places where class members reside.  But plaintiffs have introduced no such evidence.

Nor did plaintiffs' experts support plaintiffs' allegation that "all class members" experienced an increased health risk as a result of Rocky Flats plutonium.  Plaintiffs' exposure/dose expert was Dr. Robert Goble.  Dr. Goble was unable to testify that he even knew what the class was – much

(Continued…)

such exposures and health risks.  (Goble testimony, Tr. 3660-61)  Moreover, Dr. Goble opined as

follows:

> Q.      Okay.  So when you say, in my judgment these exposures were significant
> and were sufficient to cause latent diseases among members of the exposed group,
> you're not talking about everyone that lived in the class area?  In other words, not
> everyone had a significant exposure?
>
> A.      Well, some of the exposures for people living in the class area were really
> small.  And significance, you might call sort of a policy to when you take it
> seriously.  But *some of these are very, very small exposures.  And, for instance,
> regulatory agencies would not have been concerned about such exposures.*

(Goble testimony, Tr. 3660-61) (emphasis added)

As a matter of law, exposures that are so "very, very small" that "regulatory agencies

would not have been concerned" about them cannot give rise to a nuisance.  Rather, to be

actionable as a nuisance, an interference must be "substantial and unreasonable."  (Instruction

No. 3.8)  In determining what is unreasonable, it is necessary to "balance the gravity of the harm

to Class members against the utility of Dow and Rockwell's conduct at Rocky Flats and

---

less that all class members have experienced an increased health risk as a result of exposures to
Rocky Flats plutonium:

> Q.      Were the risks to all of the members of this class significant?
>
> A.      Okay.  Now, I want to be sure I'm saying this right because what I didn't do was
> carefully figure — was — *the definition of the class is something that I don't actually
> truly know about, okay*.
>              *What I said was people living in the area*.  And the — and so let's talk about
> them.  Okay.  For people living in the area, the exposures and the risks could have been
> really different, depending on when people were there.

(Goble testimony, Tr. 3660-61) (emphasis added)  In short, Dr. Goble never expressed any
opinion relating to health risk for "all class members."  (Instruction 3.7)  Rather, he expressly
limited his opinions to "people living in the area" – which is *not* "all class members."

determine whether the gravity of this harm outweighs the utility of this conduct."  (Instruction No. 3.10)  Importantly, "[i]n assessing the extent of the harm, [the jury] must also consider only harm that is common to the class as a whole, ***and not any more severe harm that may have been suffered by some Class members but not by others***."  (Instruction No. 3.11) (emphasis added)  Thus, in weighing "the gravity of the harm" versus "the utility" of defendants conduct, the trier of fact may only consider the "lowest common exposure" and "lowest common risk" experienced by the class — namely, "very, very small exposures" that even "regulatory agencies would not have been concerned about."  (Goble testimony, Tr. 3661)

As a matter of law, such exposures are ***not*** an "unreasonable" exposure.  Indeed, the Colorado Supreme Court held in *Van Wyk* that regulatory standards establish the standard for reasonableness under Colorado nuisance law:

> Thus, because an allegation of unreasonableness is central to a nuisance claim, the ***[Colorado Public Utilities Commission] determination of reasonableness sets the standard*** for the balance between the social utility of the transmission of electricity and possible harm to property against which the Van Wyks must argue.

27 P.3d at 393 (emphasis added).  It follows that, because plaintiffs' own expert concedes that (even for people "living in the area") the lowest common denominator of exposure is so "very, very small" that "regulatory agencies would not have been concerned" (Goble testimony, Tr. 3661), there is no evidence that any interference is "unreasonable" (as required to prove a nuisance claim).  (*Id.*)

Plaintiffs' experts Drs. Cochran, Smallwood and Clapp also presented no evidence of increased health risk to class members.  Dr. Cochran did not calculate dispersion, dose or risk for anyone, including members of the class.  (Cochran testimony, Tr. 5527)  Dr. Smallwood, like Dr. Cochran, did not calculate the amount of plutonium that got offsite, let alone dose or risk to class

members. (Smallwood testimony, Tr. 4060-61, 4064, 4069)  And Dr. Clapp did not study the class itself, nor did he determine whether anyone he did study was actually exposed to any Rocky Flats releases.  (Clapp testimony, Tr. 4862-63, 4908-10, 4918-19)[18]

Although plaintiffs' failure to present evidence of an increased health risk to "all class members" is dispositive of plaintiffs' nuisance claim, the evidence affirmatively shows that no health risk exists.  For example, EPA's Operable Unit 3 ("OU3") study (which is comprised of all offsite areas around Rocky Flats) investigated the media for exposure to people in the offsite community, including soil, surface water, air, groundwater and sediment.  The EPA's Record of Decision ("ROD") for OU3 concluded "No hazardous substances, pollutants or contaminant will remain within the boundaries of OU3 above level that allow for unlimited use and unrestricted exposure."  (DX 36, OU3 ROD at 2)  The OU3 ROD further concluded that all sites within the OU3 study area "are already in a state protective of human health and the environment." (*Id.*; *see also* DX 454, ATSDR 5/13/05 report, at 56 ("Therefore, no past, current, or future public health hazard exists from exposure to offsite surface soils, even at the most contaminated locations."))

In addition, defendants presented a study by the ATSDR, the principal federal health agency involved with hazardous waste issues, that considered any possible health risks associated with Rocky Flats and found no health risks associated with exposure to Rocky Flats plutonium.  In evaluating Rocky Flats plutonium emissions, the ATSDR concluded that:

---

[18] Like plaintiffs' experts, plaintiffs' fact witnesses also fail to present any evidence of increased health risk to class members.  In fact, plaintiffs' fact witness testimony demonstrates that there is ***not*** an increased health risk.  (*E.g.,* Holeman testimony, Tr. 1337;  Watkins testimony, Dep. Design. at 159-60, 167-69; Ozaki testimony, Tr. 1804, 1808-09)

- "Exposures to plutonium were well below levels associated with adverse health effects." (DX 454, ATSDR 5/13/05 report, at 1-2)

- "[P]lutonium emissions from routine operations at Rocky Flats Plant (1953-1989) had minimal air quality impacts at offsite locations; these impacts were estimated to be comparable to the plutonium levels that have been attributed to fallout from past testing of nuclear weapons." (*Id*. at 45)

- "Overall, ATSDR finds past and current inhalation exposures to site-related air emissions to be no apparent public health hazard." (*Id.* at 78)

This study also found that "levels of offsite surface soil contamination are no apparent public health hazard for past, current and future exposures." (*Id.* at 76)

Consequently, plaintiffs have failed to introduce sufficient evidence of a past health risk to withstand judgment as a matter of law.

### 2. Plaintiffs Have Failed to Introduce Evidence That All Class Members Experienced an Unreasonable Health Risk as a Result of Exposure to Plutonium Released by Rockwell.

As discussed in the trespass section above, plaintiffs have failed to introduce evidence that Rockwell caused releases of plutonium to the class area. It follows that plaintiffs cannot show that "all [class members] incurred some increment of increased health risk" as a result of exposure to any "plutonium" released by Rockwell. (Instruction No. 3.7) This is an additional reason why defendants are entitled to judgment as a matter of law on plaintiffs' nuisance claims with respect to Rockwell.

Nor have plaintiffs' experts introduced any evidence of any exposures or health risk attributable to Rockwell's conduct. Rockwell operated the plant beginning in 1975. All of the exposure estimates created by plaintiffs' dose/risk expert, Dr. Goble, are derived from releases that occurred for the period from 1965-1969. (P 1124, Goble Report, at 35) To derive exposure estimates for 1970-1989, Dr. Goble applies a "multiplier" of .003 to his exposure estimates for

1965-1969.  But Goble's multiplier has nothing to with activities by Rockwell; rather, Goble's

multiplier relates, at best, to the continuing migration of plutonium released by Dow.  (*Id*. at 49)

(***Goble has made "no estimate" for contamination in or after 1990***).

Plaintiffs have no expert or other evidence of any exposures or health risk caused by

Rockwell's conduct.  Therefore, if the Court elects not to grant judgment as a matter of law on

all of plaintiffs' nuisance claims, the Court should nevertheless grant judgment as a matter of law

on plaintiffs' nuisance claims against Rockwell.

**B.      Plaintiffs Have Failed to Introduce Evidence That All Class Members Are at
an Increased Risk as a Result of Future Releases from Rocky Flats.**

Aside from past health risk, the only other possible interference that plaintiffs could

prove to sustain a nuisance claim is that "one or both of Defendants' activities at Rocky Flats

interfered with Class members' use and enjoyment of their properties by creating objective

conditions that pose a demonstrable risk of future harm to the Class Area."[19]  (Instruction No.

3.7)  Any such "future harm" must likewise be "unreasonable."  (Instruction No. 3.7, 3.11)

Plaintiffs have not introduced sufficient evidence to meet these standards.

---

[19] Defendants maintain their position that a threat of future harm may not form the basis of a
nuisance claim.  *See, e.g.*, 42 U.S.C. § 2014(w) (requiring that a public liability action assert
liability "arising out of or resulting from a nuclear incident," which is further defined as an
"occurrence"); *see also Adams-Arapahoe School Dist. No. 28 v. GAF Corp.*, 959 F.2d 868, 872
(10th Cir. 1992) ("find[ing] nothing . . . which supports the notion that tort liability may be
premised on the mere risk of future harm"); *Van Wyk*, 27 P.3d at 391 (defining theory of
nuisance predicated on invasion that is "unintentional and otherwise actionable under the rules
for negligent or reckless conduct").

***First***, plaintiffs have introduced no evidence of any "objective condition[] that pose[s] a demonstrable risk of future harm to the Class Area."[20]  (Instruction No. 3.7)  The Rocky Flats plant has been shut down for approximately 15 years, has been decommissioned, demolished, and remediated, and is being converted to a wildlife preserve.  (*See* Smallwood testimony, Tr. 4024; Holeman testimony, Tr. 1252)  Plaintiffs have introduced no evidence that, notwithstanding the cleanup, there continues to be any "plutonium or other hazardous substances present [at] . . . Rocky Flats" that could "cause harm to properties in the Class Area by increasing the health risk."  (Instruction No. 3.7; s*ee* Holeman testimony, Tr. 1392-1398; *see also* DX 69, EPA Superfund ROD; DX 43, Agreement in Principle; DX 454)  Instead, the record is to the contrary.  As the ATSDR concluded:  "[L]evels of offsite surface soil contamination are no apparent public health hazard for past, current and future exposures."  (DX 454, ATSDR 5/13/05 report, at 76; *id.* at 1-2, 45, 55, 57)

***Second***, plaintiffs have introduced no evidence of a future health risk ***to the class as a whole***, as distinct from a health risk to persons now living within the 1970 Krey & Hardy contour.  As an initial matter, some class members, such as Mrs. Babb and Mr. Bowman, never lived on their class properties.  (Babb testimony, Tr. 1954; Bowman testimony, Tr. 6032)  Many other class members no longer live in the class area.  (*See*, *e.g.*, R. Bartlett testimony, Tr. 1004; Robb testimony, Tr. 5015, 1521; Whalen testimony, Tr. 5932)  Accordingly, even if there were

---

[20] The example of such an "objective condition" set forth in the jury instructions is "if plutonium or other hazardous substance present on or in the vicinity of Rocky Flats is at risk of being released to the Class Area — through natural forces, cleanup activity, the conduct of others and/or accidences — and could cause harm to properties in the Class Area by increasing the health risk to residents or impairing the future use of their land in some way."  (Instruction No. 3.7)

an "objective condition" that "pose[d] a demonstrable risk of future harm" (*e.g.*, "plutonium or other hazardous substances present on or in the vicinity of Rocky Flats [that] is at risk of being released ***to the Class Area***") it would ***not*** be a "risk of future harm" ***to members of the class who do not live there***.

For these reasons, defendants should be granted judgment as a matter of law on plaintiffs' claim of future health risk.

**C.      Plaintiffs Have Not Shown That The Harm Associated With Any Health Risk Outweighs the Utility Associated With the Operation of Rocky Flats.**

Dr. Goble's testimony about the miniscule nature of the risks is dispositive for plaintiffs' nuisance claim.  However, there is also a second, independently sufficient, reason why the Court should grant judgment as a matter of law on the issue of the unreasonableness of the nuisance. Here, plaintiffs have failed to introduce any evidence as to the utility (or lack of utility) of defendants' conduct.  (*See* Instruction No. 3.10 (jury must weigh harm versus utility)) Defendants nevertheless have brought out evidence of the utility and benefit of their conduct. Mr. Holeman testified that "Rocky Flats was a plant that was built for and operated for national security purposes" and agreed that "Rocky Flats was important not only for national security, but it was also important economically to the area."  (Holeman testimony, Tr. 1378;  *see also* Cochran testimony, Tr. 5287 ("First is there's got to be a net benefit.  And I said, you know, that's a given at Rocky Flats.  It was cold war, and we were making warheads for national security purposes.");  P 394 (3/23/51 AEC Press Release, "About 2,000 construction workers will be employed at the site during the peak of building in early 1952."))

Because plaintiffs bear the burden of proof as to their nuisance claim, plaintiffs' failure to introduce any evidence on the balance between the utility and harm of defendants' conduct requires the grant of defendants' motion for judgment as a matter of law on that claim.

### D.    Plaintiffs Have Not Shown That Any Health Risk Is Substantial.

In order to prevail on their nuisance claim, plaintiffs must demonstrate not only that any health risk is "unreasonable," but also that it is "substantial."  (Instruction No. 3.8); *Van Wyk*, 27 P.3d at 391.  Plaintiffs' failure to demonstrate that any interference was "substantial" constitutes yet another ground for granting defendants' motion for judgment as a matter of law.

As set forth in the Court's jury instructions, "[a]n interference with a person's right to use and enjoy their land is 'substantial' if the interference is significant enough that a normal person in the community would find it offensive, annoying or inconvenient."  (Instruction No. 3.9)[21] Here, plaintiffs' own witnesses testified that any health risk that resulted from defendants' conduct was ***not*** "offensive, annoying or inconvenient" on a class-wide level.  (Instruction No. 3.7, 3.9)  For example, class member Charles Ozaki testified that, even as of the time of his trial testimony, he was not even "aware of any — anything, any possibility that there was plutonium on my property."  (Ozaki testimony, Tr. 1832)  Mr. Ozaki further testified that, following the FBI raid, "[i]t didn't cross my mind" to be "worried about my property from Rocky Flats."  (*Id.*) Similarly, Ms. Whalen testified that her sister, a class member, had not expressed any concern

---

[21] As set forth in *Cook IX*, the correct standard is that for an invasion to be substantial, it must be "definitely offensive, seriously annoying or intolerable."  273 F. Supp. 2d at 1204-05; *see also id.* ("Section 821F of the Restatement and its supporting commentary, relied upon by the Colorado Supreme Court in *Van Wyk*, states that a significant invasion of another's interest in the use and enjoyment of property exists '[i]f normal persons living in the community would regard the invasion in question as definitely offensive, seriously annoying or intolerable.'").

about living and owning property within the class area.  (Whalen testimony, Tr. 5954)  Ms. Whalen herself sold her house after the FBI raid to a couple who was from the area, knew about Rocky Flats, and wanted to move in.  (*Id.* 5966-67)  Mr. Schierkolk, a named plaintiff, testified that, despite what he knows about the plant, he likes his home and does not want to move. (Schierkolk testimony, Tr. 1944-45)  Ms. Bini Abbott, a neighbor of the named class members who has been a member of the Health Advisory Panel related to Rocky Flats, also has continued to live in the area and buy more property there, as has Mr. Coleman, one of the investors in the Alkire group.  (Holeman testimony, Tr. 1347; Bowman testimony, Tr. 6064-65, 6113)  In addition, Mr. Ozaki and Mr. Cassidy explained that Broomfield continued to annex land within the class area after the FBI raid.  (Ozaki testimony, Tr. 1793; Cassidy testimony, Tr. 4538)

Moreover, as discussed above, plaintiffs' own dose/exposure expert Dr. Goble admitted that the alleged health risk at issue resulted from exposures that were so small that regulatory agencies would not have been concerned about them.   (Goble testimony, Tr. 3661)   As a matter of law, an interference so small that regulatory agencies would not have been concerned cannot be "offensive, annoying or inconvenient" to a "normal person in the community."[22]

In addition to proving that the interference is "significant enough that a normal person in the community would find it offensive, annoying or inconvenient," in order to prove that the interference is "substantial," plaintiffs must prove that the interference has caused a reduction in

---

[22] *Van Wyk*, 27 P.3d at 393 (Colo. 2001) ("[T]o be unreasonable, an interference must be significant enough that a normal person in the community would find it offensive, annoying, or inconvenient."  However, "because an allegation of unreasonableness is central to a nuisance claim, the [regulatory agency's] determination of reasonableness sets the standard for the balance between the social utility of the transmission of electricity and possible harm to property against which the [plaintiffs] must argue.").

the value of the property.[23]  *See Van Wyk*, 27 P.3d at 392 ("[T]he interference complained of by the Van Wyks must be a substantial invasion interfering with the use and enjoyment of the land, and reducing the value of the land.") (citing *Prosser & Keeton on Torts* § 87, at 622-23); *Prosser & Keeton on Torts* § 87, at 623 ("The substantial interference requirement is to satisfy the need for a showing that the land is reduced in value because of the defendant's conduct."); *Saunders v. Hilperthauser*, 1988 WL 42146, at *6 (S.D.N.Y. 1988) ("Such interference must be substantial and unreasonable.  It exists only upon a showing of damages — that is, that the land is reduced in value because of the defendant's conduct.") (internal citations and quotations omitted); *Bower v. Weisman*, 639 F. Supp. 532, 542 (S.D.N.Y. 1986) ("[A]n action for private nuisance cannot be sustained without a showing of damages.").

As explained in Part VII, plaintiffs have failed to prove any classwide damages for several reasons:  (1) plaintiffs have failed to demonstrate any damages attributable to defendants' actionable conduct, as distinguished from damages attributable to proximity to Rocky Flats or from some "stigma" not arising from any trespass or nuisance by defendants; (2) while plaintiffs purport to measure a diminution in the value of class properties, plaintiffs have failed to measure any damages suffered by class members, because plaintiffs' experts have not determined whether class members bought or sold their properties at a pre-existing discount attributable to Rocky Flats;[24] (3) plaintiffs have not proved that any trespass or nuisance became complete and

---

[23] Defendants recognize that the Court has rejected this argument, and reassert it here in order to preserve defendants' position.

[24] Defendants recognize that the Court has ruled that defendants bear the burden of proof on this issue, and re-assert this argument for the purpose of preserving their rights.

comparatively enduring between 1989 and 1992; (4) plaintiffs have not demonstrated that any trespass or nuisance was continuing, as required to prove damages under Section 930 of the Restatement (Second) of Torts; and (5) plaintiffs have not proved damages attributable to the prospect of the continuance of any tortious invasions, as also required under Section 930.

Because a showing of a reduction in the value of the property is required to prove a nuisance claim,[25] and because plaintiffs have not made this showing of class-wide damages, plaintiffs cannot show that any interference was substantial, which is fatal to plaintiffs' nuisance claims.  *See Van Wyk*, 27 P.3d at 392; *Prosser & Keeton on Torts* § 87, at 623.

> **E.      Plaintiffs' Acquisition of Land After Any Purported Nuisance Came Into Existence Establishes That Any Interference Was Not Substantial and Unreasonable.**

In determining whether a plaintiff has proved that any interference to his or her use and enjoyment of property was substantial and unreasonable, it is necessary to consider whether the plaintiff acquired the land after the interference with the land had come into existence.[26]  *See* Restatement § 840D ("The fact that the plaintiff has acquired or improved the land after a nuisance interfering with it has come into existence is . . . a factor to be considered in determining whether the nuisance is actionable."); *see Prosser and Keeton on Torts* § 88, at 630, 635 ("Whether or not the plaintiff or the defendant should be required to bear the loss of

---

[25] The Court has apparently ruled that a showing of damages is not required in order to prevail on a nuisance claim.  (*See* Instruction No. 3.7)  Nevertheless, defendants re-assert that argument here for the purpose of preserving it.

[26] Although this Court has ruled that the "coming to the nuisance" defense is not an absolute bar to liability, this Court's May 28, 2004 Order left open the question of whether "the timing of class' members acquisition of class properties" is relevant to nuisance.  5/28/04 Order at 7.

substantial interference to plaintiff from defendant's reasonable conduct depends upon[, among other factors,] priority in time as to the respective activities of the plaintiff and the defendant . . . . If a plaintiff comes to a 'nuisance' in the sense that he comes to an area where the defendant has already been making a particular kind of use of his property, and then is allowed successfully to maintain a suit either for damages or for abatement of the nuisance, the court could frequently be in the position of giving the plaintiff a windfall capital gain . . . ."); *Platte & Denver Ditch Co. v. Anderson*, 6 P. 515, 521 (Colo. 1885) ("Where one buys a city lot bordering upon ground set apart or dedicated to any public use, he takes it subject to all the annoyances incident to the purposes of the dedication.").

Here, the undisputed evidence shows that following sequence of events:  (1) there was virtually no development of the class area in the 1950s or 1960s (*see* DX 1138 (graphic showing class members present in the class area in 1955); DX1137 (graphic showing class members present in the class area in 1969)); (2) 99.9% of all releases of plutonium from Rocky Flats occurred before 1970, in connection with the 1957 fire, 903 pad incident, and 1969 fire (*e.g.,* DX454, ATSDR Report, at 1-2); (3) these pre-1970 release events, and the associated health risks, were heavily publicized in the early 1970s (*see*, *e.g.*, DX 11 (2/11/70 Denver Post article, "Radioactive Soil Pollution Tied To Rocky Flats Plant"), DX 63 (8/7/73 Denver Post article, "Atom Wastes Buried in Tons at Rocky Flats"), and DX 568 (11/29/71 Denver Post article, "Plutonium Safety Doubted")); and (4) following the extensive publicity surrounding these release events, the class members moved into the class (DX 1137 (graphic showing class members present in the class area in 1969))  Indeed, over 99% of the class bought into the class area after 1969 — long after the release incidents at issue had been extensively publicized.  (*See*

DX 1137)  Similarly, class member Charles McKay testified at deposition that the development

of subdivisions in the class area came in the face of significant press coverage regarding the 1957

and 1969 fires and the 903-pad releases.[27]  Hence, the undisputed fact that over 99% of class

members had "acquired . . . [their] land after a nuisance interfering with it has come into

existence" is fatal to plaintiffs' nuisance claims here.  Restatement § 840D; *Platte & Denver*

*Ditch Co.*, 6 P. at 521.

> **F.     Plaintiffs Have Not Shown That Defendants Intentionally or Negligently**
> **Caused Any Health Risk.**

To prevail on their nuisance claim, plaintiffs must prove that "[t]he activity or activities

causing the unreasonable and substantial interference were either 'intentional' or 'negligent.'"

(Instruction No. 3.6)  Plaintiffs have failed to introduce sufficient evidence that Dow or

---

[27] Q.     Around this time — 1969, 1970 — there was a significant amount of press
           coverage of Rocky Flats.  Is that fair to say?
A.     Yes.
Q.     And in the late 1960s and early 1970s, there was a significant amount of press coverage
           about the '57 and '69 fire.  Is that fair?
A.     Yes.
Q.     And in the late '60s and early '70s, there was a significant amount of press coverage
           about the 903 Pad incident.  Is that fair to say?
A.     Yes.
Q.     And that press coverage in the late 1960s and early 1970s took place at a time when the
           class area shown in McKay Deposition Exhibit 8 still had not been developed; is that
           correct?
A.     Yes.
Q.     And so it was really subsequent to the press coverage of the fires and the 903 Pad that the
           class area started to become developed with subdivisions, correct?
A.     Correct.
(Ex. 1, McKay Dep. at 117-18)

Rockwell intentionally[28] or negligently caused a health risk to class members to withstand a motion for judgment as a matter of law.

First, as set forth in Part I, *supra*, plaintiffs have failed to introduce any evidence that Dow or Rockwell intentionally released plutonium to the class area.  Accordingly, plaintiffs have also failed to introduce evidence that Dow or Rockwell intentionally caused any health risk resulting from plutonium released to the class area.  Nor have plaintiffs introduced any evidence that Dow or Rockwell (1) "knew that [their] conduct would interfere with others' use and enjoyment of their property"; (2) "knew that it was substantially certain that [their] conduct would interfere with others' use and enjoyment of their property"; or (3) "learned that [their] conduct was interfering with or was substantially certain to interfere with others' and enjoyment of their property and yet continued this conduct."[29]  (Instruction No. 3.14)

In addition, plaintiffs have not introduced evidence sufficient to support a finding that Rockwell negligently created a nuisance.  Because there is no evidence that Rockwell caused **any releases** of plutonium to the class area, *see* Part I, *supra*, or **any health risk** to people living in the area, *see* Part II.A *supra*, there is no evidence that Rockwell negligently caused any interference with plaintiffs' use and enjoyment of their properties.

---

[28] Defendants recognize that the Court has rejected the argument that plaintiffs waived their claim of intentional nuisance by not including that claim in plaintiffs' December 2003 Status Report, but preserve that argument.

[29] To prove an intentional nuisance, plaintiffs must demonstrate that defendants knew that defendants' conduct was interfering with plaintiffs' use and enjoyment of their property, or was substantially certain to interfere with plaintiffs' use and enjoyment of their property.  *See Van Wyk*, 27 P.3d at 394.

Accordingly, there is no evidence that Dow or Rockwell intentionally or that Rockwell negligently caused a nuisance, and defendants should be granted judgment as a matter of law on that ground.

> **G.     The Evidence Shows That Any Health Risk Resulted From an Intervening Cause.[30]**

As discussed in Section II.D, *infra*, the evidence shows that any trespass resulted from an unforeseeable intervening cause.  Because any **contamination** of the class area resulted from a non-actionable intervening cause, any **health risk** attributable to that contamination also resulted from a non-actionable intervening cause.

**IV.     NUISANCE ARGUMENTS THAT THE COURT HAS RULED ON, AND THAT DEFENDANTS INCLUDE FOR PURPOSES OF PRESERVING THEIR RIGHTS.**

As in the case of nuisance, the Court has already ruled against defendants on certain arguments relating to plaintiffs' nuisance claims.  Defendants re-assert those arguments here for the purpose of preserving their rights.

> **A.     Plaintiffs Have Not Shown a Violation of State Standards.[31]**

To prove nuisance, plaintiffs must show, among other things, an "unreasonable and substantial interference with a plaintiff's use and enjoyment of her property."  *See Van Wyk*, 27 P.3d at 391.  In addressing the "unreasonable interference" element of a nuisance claim (as distinct from the "wrongful conduct" element), the *Van Wyk* court held that "an allegation of

---

[30] To the extent that the Court has already rejected defendants' intervening cause argument, defendants assert that argument here for the purpose of preserving their rights.

[31] Defendants acknowledge that the Court has ruled that plaintiffs need not establish a violation of state standards to prevail on their nuisance claim, and re-assert this argument for the purpose of preserving their rights.

unreasonableness is central to a nuisance claim," as well as that a regulatory entity's

"determination of reasonableness sets the standard for the balance between the social utility of

the [acts causing the nuisance] and possible harm to property." *Id.* at 393.  The *Van Wyk* court

further ruled that if the governmental entity has "quantified the [invasion] level it deemed to be

reasonable, then that [invasion] level would become the standard for the level at which [the

invasion] would not constitute an invasion interfering with [plaintiffs'] use and enjoyment of

their property." *Id.*

Here, the Colorado Department of Health ***has*** "quantified" the level of plutonium that it

considers reasonable on properties.  Accordingly, to recover on their nuisance claims, plaintiffs

must demonstrate that any plutonium released by defendants resulted in contamination of class

properties in excess of the Colorado plutonium standard (two disintegrations per minute of

plutonium per dry gram of soil or square centimeter of surface area).  6 Colo. Code Regs. 1007-

1, RH 4.60.1, Permissible Levels of Plutonium in Uncontrolled Areas.  Plaintiffs have introduced

no such evidence.  To the contrary, the evidence has shown that any contamination of class

properties was in an amount far less than the state standard.  (Budnitz testimony, Tr. 3335-36; S.

Bartlett testimony, Tr. 959-60, 961; Cook testimony, Tr. 2023-26; Holeman testimony, Tr. 1363,

1370-71; *see also* DX 34, Broomfield 2004 Water Quality Report (no exceedences of Safe

Drinking Water Act standards); DX 1245 (Poet & Martell soil contours); DX 1252 (Krey &

Hardy soil contours); DX 1265 (Jones & Zhang 1986 and 1989 soil contours))

Plaintiffs' failure to introduce any evidence that defendants violated state standards

constitutes an independently sufficient basis for dismissing plaintiffs' nuisance claims.

**B.    Plaintiffs Have Not Shown That Any Health Risk Was Created by Releases Which Did Not Comply with Federal Standards.**[32]

In order to prevail on their nuisance claims, plaintiffs must demonstrate that defendants caused releases which violated the applicable federal standards.  As discussed, plaintiffs have not done so (*see* Section II.B, *supra*), and the Court should thus grant judgment as a matter of law on plaintiffs' nuisance claims.

**V.    THE RECORD CONFIRMS THE ABSENCE OF REMAINING FACTUAL DISPUTES REGARDING DEFENDANTS' AFFIRMATIVE DEFENSES OF STATUTE OF LIMITATIONS AND PRESCRIPTIVE EASEMENT.**

The Court has already rejected defendants' argument of statute of limitations and prescriptive easement.  *Cook v. Rockwell Int'l Corp.*, 358 F. Supp. 2d 1003 ("*Cook X*")(D. Colo. 2004) (statute of limitations); 5/28/04 Order at 7-10.  Nonetheless, defendants reassert those arguments here for the purpose of preserving their rights.

**A.    The Evidence Shows That Plaintiffs' Trespass Claims Are Barred by the Statute of Limitations.**[33]

In *Cook X*, this Court ruled that, ***if plaintiffs prove a continuing trespass***, then the statute of limitations does not apply.  *See Cook X*, 358 F. Supp. 2d 1003, 1004 (D. Colo. 2004) ("the continuing presence of plutonium on the Class Properties, ***if proven***, would constitute a continuing trespass"; in such circumstances, "Defendants do not have a limitations defense to

---

[32] Defendants acknowledge that the Court has ruled that plaintiffs need not establish a violation of state standards to prevail on their nuisance claim, and re-assert this argument for the purpose of preserving their rights.

[33] Although the Court has ruled that the statute of limitations does not apply if the jury determines that the trespass/nuisance is continuing, the Court has not ruled on whether, if the jury determines that the trespass/nuisance is not continuing, the jury should then apply the statute of limitations.

liability on the trespass claim because the statute of limitations has not yet begun to run on this claim").

Under this Court's rulings, to prove that a trespass is "continuing," plaintiffs must show that "it appears that plutonium will continue to be on the Class Properties indefinitely."[34] (Instruction No. 3.4)  As discussed above, plaintiffs have introduced no evidence of such a "continuing" trespass.  As discussed above, while plaintiffs have introduced evidence about the half-life of plutonium once it gets into the soil, plaintiffs have not introduced evidence that any plutonium-contaminated *soil itself* has remained on the class properties, notwithstanding the massive development that has  occurred on those lands during the last four decades.  (Smallwood testimony, Tr. 4067, 4083-84)

Because plaintiffs have failed to introduce evidence that any trespass was "continuing," the statute of limitations defense applies.  *See Cook X*, 358 F. Supp. 2d at 1004; *Hoery*, 64 P.3d at 216-17.  The statute of limitations for trespass actions is two years.  Colo. Rev. Stat. § 13-80-102 (tort actions for trespass "shall be commenced within two years after the cause of action accrues, and not thereafter").  Under Colorado statute of limitations rules, a claim "accrues the later of when the injury first occurs or when the plaintiff learned or should have learned of his injury and its cause."  *Hoery*, 64 P.3d at 216-17.  Thus, if plaintiffs' claims accrued on or before January 30, 1988 (two years before plaintiffs filed their Complaint), they are time-barred.

---

[34] As discussed above, defendants have previously argued that, in order for a trespass to be "continuing," plaintiffs also must prove that it is not reasonably abatable.  Plaintiffs have introduced no evidence in this regard.  Defendants recognize that the Court has rejected defendants' position, but re-assert this argument here for the purpose of preserving it.

Here, there is ample evidence that class plaintiffs "learned or should have learned of [their] injury [in the case of trespass, plutonium contamination on their properties] and its cause" well before January 30, 1988:

- **Bartlett:**  Sally Bartlett testified that she learned that people questioned the safety of Rocky Flats in the mid to late 1960s, and was fully aware of such claims before she moved to the property on Alkire.

- **Ozaki:**  Mr. Ozaki, another class member, testified that it was "common knowledge" in the 1970s that nuclear materials were handled at Rocky Flats, that such materials were dangerous, that there had been offsite releases from plant manufacturing processes, and that there were concerns about offsite impact.  (Ozaki testimony, Tr. 1826-27)

- **Schierkolk:**  William Schierkolk, a named plaintiff and class member, testified that he recalled reading newspaper articles in February 1970 discussing the release of radioactive materials from Rocky Flats offsite which stated:  "Radioactive plutonium from the Dow Chemical Company plant at Rocky Flats has polluted soils over a radius of several miles . . . ."  (Schierkolk testimony, Tr. 1944-45; *see also* DX 11)

- **Bowman:**  Joseph Bowman, an Alkire investor and a class member, testified that he knew about media relating to the 1969 Rocky Flats fire and protesting at the plant that followed the fire in the 1970s.  He further testified that he and his Alkire investment group partners learned of the Rocky Flats-related health concerns of Dr. Carl Johnson in the 1970s.  Mr. Bowman agreed that by about early 1970 it was the view of the Alkire Investment Company partners that Rocky Flats had begun to influence the Alkire property value.  (Bowman testimony, Tr. 6081-85)

- **McKay:**  Similarly, class member Charles McKay, who plaintiffs pulled from their witness list days before he was to testify, testified at his deposition as follows:

  Q:   Was contamination from Rocky Flats in Jefferson County widely publicized in the 1970's?

  A:   Yes.

  Q:   Were the 1957 and 1969 fires widely publicized in the 1970's?

  A:   Yes.

  Q:   Was the 903 pad incident widely publicized in the 1970's?

  A:   Yes.

(Ex. 1, McKay Dep. 69)

- **Trial Exhibits:**  In addition to witness testimony, several admitted newspaper articles show that plutonium contamination from Rocky Flats has been known at least since the early 1970s.  They include DX 11 (2/11/70 Denver Post article, "Radioactive Soil Pollution Tied To Rocky Flats"), DX 63 (8/7/73 Denver Post article, "Atom Wastes Buried in Tons at Rocky Flats"), and DX 568 (11/29/71 Denver Post article, "Plutonium Safety Doubted")

In short, the undisputed evidence shows not only that plaintiffs' claims were not continuing, but also that plaintiffs knew or should have known of their injuries — and the causes of those injuries — before January 30, 1988.  Accordingly, plaintiffs' claims are barred by the statute of limitations, and defendants are entitled to judgment as a matter of law.

### B.  The Evidence Shows That Plaintiffs' Nuisance Claims Are Also Barred by the Statute of Limitations.[35]

For the same reasons that support judgment as a matter of law on plaintiffs' trespass claims, *see* Part I, *supra*), the Court should also rule that plaintiffs' nuisance claims are time-barred.  Just as the alleged contamination that is the basis for plaintiffs' trespass claims was heavily publicized by the early 1970s, the alleged health risks that are the basis for plaintiffs' nuisance claims were also widely publicized during that period.  (*See, e.g.,* DX 11 (2/11/70 Denver Post article, "Radioactive Soil Pollution Tied To Rocky Flats Plant"), DX 63 (8/7/73 Denver Post article, "Atom Wastes Buried in Tons at Rocky Flats"), and DX 568 (11/29/71 Denver Post article, "Plutonium Safety Doubted"))  Moreover, plaintiffs' witnesses have consistently testified that they were aware of health risks from Rocky Flats before January 30, 1988, the date on which the statute of limitations began to run.  (Ozaki testimony, Tr. 1826-27;

---

[35] See the immediately preceding footnote.

Schierkolk testimony, Tr. 1899, 1929, 1944-45, 1995-96; S. Bartlett testimony, Tr. 949-50, 953;

Bowman testimony, Tr. 6081-85; Avery testimony, Tr. 3813-14)  Thus, like plaintiffs' trespass

claims, plaintiffs' nuisance claims are barred by the statute of limitations.

C.     **The Evidence Shows That Plaintiffs' Trespass Claims Are Barred by a Prescriptive Easement.**

Under Colorado law, "[a]n easement by prescription is established when the prescriptive

use is: 1) open or notorious, 2) continued without effective interruption for the prescriptive

period [eighteen years], and 3) the use was either a) adverse or b) pursuant to an attempted, but

ineffective grant."  *Lobato v. Taylor*, 71 P.3d 938, 950 (Colo. 2002); *see also Weisiger v.

Harbour*, 62 P.3d 1069, 1071, 1073 (Colo. App. 2002) ("An easement by prescription is acquired

when the use is open or notorious, continuous without effective interruption for the prescriptive

period and either adverse or pursuant to an attempted but ineffective grant. . . . To satisfy the

open and notorious element, the use must be sufficiently obvious to apprise the owner of the

servient estate, in the exercise of reasonable diligence, that another is making use of the

burdened land so that the owner may object.  However, actual knowledge by the owner need not

be proved."); *Bradley v. Am. Smelting and Ref. Co.*, 709 P.2d 782, 792-93 (Wash. 1985) (holding

that "[t]he defense of easement by prescription is available" where defendant deposited heavy

metal particles on plaintiffs' property); Restatement § 899 cmt. d ("In other cases when there is a

series of continuing harms, . . . the defendant may have acquired a right by prescription to

continue the tortious act."); Restatement § 161, cmt. d.

Here, the uncontroverted evidence establishes that: (1) the presence of any plutonium

released by defendants onto plaintiffs' property was open and notorious; and (2) the presence of

any plutonium released by defendants onto plaintiffs' property continued without interruption for

eighteen years before plaintiffs filed their claim on January 30, 1990 (that is, the presence of

plutonium continued at least during the eighteen years from January 30, 1972 through

January 30, 1990).[36]

The evidence introduced by plaintiffs shows that the releases from the 1957 fire, the 1969

fire, and the 903 pad incident all occurred before 1970.  ATSDR reports demonstrate that 99.9%

of any Rocky Flats releases had already occurred by 1970.   (DX454, ATSDR 5/13/05 report, at

1-2) ("Though Rocky Flats released plutonium to the air throughout its history, the

overwhelming majority (> 99.9%) of plutonium emissions occurred between 1953 and 1969.")

The uncontroverted evidence shows that the existence of these releases was "open and

notorious."  For example, class member William Schierkolk testified that, in early 1970, he read

Denver Post newspaper articles discussing the release of radioactive materials from Rocky Flats

offsite, including related offsite soil contamination.  He specifically recalled reading a February

1970 article entitled "Radioactive Soil Pollution Tied to Rocky Flats" that stated that

"radioactive plutonium from the Dow Chemical Company plant at Rocky Flats has polluted soils

over a radius of several miles . . . " (Schierkolk testimony, Tr. 1944-45; *see also* DX 11)

Likewise, class member Joseph Bowman testified that he knew about media relating to the 1969

Rocky Flats fire in the 1970s and agreed that, by about early 1970, he and his Alkire Investment

Company partners believed that Rocky Flats had influenced the Alkire property value.  (Bowman

testimony, Tr. 6081-85)  Former plant employee Ron Avery testified that he remembers

"publicity about plutonium discovered offsite of Rocky Flats, big bold headlines, people being

---

[36] Defendants respectfully disagree with this Court's finding that the defense of prescriptive easement has been waived and tender this instruction to preserve their objection.

worried about that" in 1970.  (Avery testimony, Tr. 3813-14); (Ex. 1, McKay Dep. at 24-25; s*ee*

*also* DX 11, 63 & 568 (Denver Post articles from early 1970s))

Accordingly, the uncontroverted evidence establishes that alleged plutonium

contamination from Rocky Flats had been "open and notorious" for over eighteen years, and that

plaintiffs' claims are therefore barred by the affirmative defense of prescriptive easement.

> **D.**     **The Evidence Shows That Plaintiffs' Nuisance Claims Are Barred by a Prescriptive Easement.**

Like plaintiffs' trespass claims, plaintiffs' nuisance claims are barred by the prescriptive

easement rule.[37]  Here, the uncontroverted evidence shows that the existence of any health risk

resulting from defendants' conduct was "open and notorious" by January 30, 1972.  (*See* DX 11

(2/11/70 Denver Post article, "Radioactive Soil Pollution Tied To Rocky Flats"); DX 568

(11/29/71 Denver Post article, "Plutonium Safety Doubted"); Schierkolk testimony, Tr. 1944-45;

S. Bartlett testimony, Tr. 949-50, 953; Bowman testimony, Tr. 6081-85; Avery testimony, Tr.

3813-14; Babb testimony, Tr. 1963)  Accordingly, like plaintiffs' trespass claims, plaintiffs'

nuisance claims are barred by the affirmative defense of prescriptive easement.

> **VI.**     **DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE QUESTION OF WHETHER THEIR CONDUCT WAS CAPABLE GENERICALLY OF CAUSING FEAR, ANXIETY, OR MENTAL DISCOMFORT IN CLASS MEMBERS.**

> **A.**     **The Generic Question of Emotional Distress Cannot Support a Judgment on Plaintiffs' Nuisance Claims.**

Pursuant to the Court's jury instructions, the jury is to answer the following question:

---

[37] Because plaintiffs filed their Complaint on January 30, 1990, plaintiffs' nuisance claims are time-barred if the prescriptive use was established on or before January 30, 1972.

Have plaintiffs proved by a preponderance of the evidence that the intentional or negligent conduct of Dow or Rockwell or both of them at Rocky Flats, and/or actual or threatened harms caused by such conduct, created a situation that is capable of causing fear, anxiety or mental discomfort in individual Class members?  (Instruction No. 3.28)

As this Court has recognized, regardless of what the jury determines with respect to this question, the jury is not to consider this issue in determining whether a trespass or nuisance has occurred.  (Instruction No. 3.28) ("Because this is a trial of claims by the whole Class, I earlier instructed you *not* to consider whether individual plaintiffs or Class members suffered this form of interference in deciding whether plaintiffs had proved their class-wide nuisance claim.")  Thus, regardless of how this issue is resolved, it does not help plaintiffs to escape a judgment as a matter of law on the trespass and nuisance claims.  Nevertheless, as defendants have made clear in the past, defendants object to any trial of this partial claim for several reasons, which defendants will not belabor here.[38]

---

[38] Defendants respectfully disagree with the Court's May 17, 2005 Order's holding that "[t]he generic causation question of whether Defendants' activities and the conditions resulting from them were capable of causing Class members to suffer fear, anxiety or other mental or emotional discomfort . . . may be decided by the jury in the class trial." 5/17/05 Order at 7, for a number of reasons, including but not limited to the four reasons set forth below.  *First*, trying the issue of emotional distress to two juries — first on a generic basis and second on an individual basis — violates defendants' Seventh Amendment rights.  *See*, *e.g., In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 352 (S.D.N.Y. 2002) ("[S]uch division must 'carve at the joint' between liability and damages.") (quoting *In re Rhone-Poulenc-Rorer Inc.*, 51 F.3d 1293, 1302 (7th Cir. 1995)).  *Second*, the Court has previously ruled that "whether defendants' activities caused Class members to suffer fear or other emotional disturbance raises individual causation questions and thus is not capable of class-wide determination."  5/17/05 Order at 7.  It follows that, in determining trespass and nuisance liability and damages, the jury may not consider evidence relating to "[t]he generic causation question of whether Defendants' activities and the conditions resulting from them were capable of causing Class members to suffer fear, anxiety or other mental or emotional discomfort."  *Id.*  There is no effective method of ensuring that the jury does not consider evidence relating to generic emotional distress in determining trespass and nuisance liability and damages. The instructions to the jury do not solve

(Continued…)

**B.    Plaintiffs Have Not Introduced Any Evidence That Defendants' Conduct Was Capable of Causing Emotional Distress.**

To prevail on their generic emotional distress claim, plaintiffs must demonstrate that ***defendants' actionable conduct***, or the "actual or threatened harm caused by such conduct," was "capable of causing fear, anxiety or emotional distress."  (Instruction No. 3.28)  However, while some of plaintiffs' own witnesses have testified that they had concerns (e.g., Whalen, Robb), none linked their emotional distress to any specific actionable conduct by defendants.  (*See, e.g.,* Whalen testimony, Tr. 5938 ("when I read the ***headlines in the paper about the FBI raid***, it really terrified me") (emphasis added); Robb testimony, Tr. 5019-20 (did not feel safe due to "[a]ll the information that was spreading about the high cancer risks in that area"; got information from ***newspaper articles*** and ***neighbors***) (emphasis added); *id.* 5022 (in response to a question about whether Rockwell's conduct caused her fear, answering "I think the biggest fear that I had and what I — really sticks in my mind was the raid, you know, that they weren't doing things the way they were supposed to be doing things out there."))  Accordingly, defendants are entitled to judgment as a matter of law on plaintiffs' partial claim that defendants' conduct was capable of causing emotional distress.

---

this problem, because such instructions, at the least, would have to identify all of the evidence (including testimony and exhibits) relating to the issue of generic emotional distress, as well as all of the argument relating to the issue of generic emotional distress.  Any such identification is doomed to failure, *inter alia*, by the sheer mass of evidence to which it would relate.  Moreover, it would be impossible for the jury to completely disregard such evidence in deciding trespass and nuisance liability and damages.  ***Third***, plaintiffs have pointed to no precedent for a class-wide trial on the issue of generic emotional distress.  ***Fourth***, plaintiffs have cited no Colorado authority for the proposition that generic emotional distress can give rise to a nuisance.

**C.      Plaintiffs Cannot Recover for Emotional Distress Without Demonstrating That Their Fears Were Grounded in Science.**

Even if the Court were to reject defendants' position that defendants are entitled to judgment as a matter of law on the generic emotional distress claim as the jury instructions are currently structured, the Court should reconsider its prior rulings and instructions on the generic emotional distress issue.[39]  In particular, the Court should reconsider the following instruction:

> In answering this question [pertaining to generic emotional distress], you should know that Plaintiffs do not need to show that any actual or threatened future contamination from Rocky Flats poses an actual or verifiable health risk.  An individual Class members' [sic] fear, anxiety or mental discomfort can also be based on concerns that may be without scientific foundation or other support in fact.  (Instruction 3.28)

This instruction is contrary to Colorado and Tenth Circuit law.  The Tenth Circuit has predicted that the Colorado Supreme Court would rule that unscientific fears cannot give rise to recovery under Colorado law, even if those fears are "normal" for the community.  *See Boughton v. Cotter Corp.*, 65 F.3d 823, 831-33 & 832 n.13 (10th Cir. 1995) (predicting that Colorado Supreme Court would ***not*** follow Section 821F, under which, "[i]n determining whether the harm would be suffered by a normal member of the community, fears and other mental reactions common to the community are to be taken into account, even though they may be without scientific foundation or other support in fact," and that Colorado Supreme Court would not allow "compensation for wholly unfounded fears")  Accordingly, defendants respectfully request that the Court reconsider its prior ruling, and hold that unscientific fears are not actionable.   Were

---

[39] Defendants recognize that the Court has previously rejected their position on this issue and, if the Court does not wish to reconsider this question, include this argument for the purpose of preserving it.

the Court to reconsider this decision, such a ruling would constitute yet another basis for judgment as a matter of law on the generic emotional distress issue, because plaintiffs have introduced no evidence whatsoever of any reasonable fears that are consistent with science.  (Nor **could** plaintiffs introduce such evidence, as plaintiffs' own exposure and risk expert, Dr. Goble, has testified that any class-wide exposures were so low that "regulatory agencies would not have been concerned" about them.  (Goble testimony, Tr. 3661))

The class representatives have admitted that their claims arise from the FBI raid. (Schierkolk testimony, Tr. 1902; Babb testimony, Tr. 1962; Cook testimony, Tr. 2040-41, 2055-56; S. Bartlett testimony, Tr. 920)  Yet plaintiffs cannot base a claim for nuisance on emotional distress arising from the FBI raid under the Tenth Circuit's ruling in *Boughton*.  As an initial matter, the FBI raid is unrelated to plaintiffs' trespass and nuisance claims, because it did not relate to offsite contamination or a health risk from that contamination.  (*E.g.,* Holeman testimony, Tr. 1288-89, 1296, 1333-34)  Moreover, the FBI raid allegations turned out to be false.  (Watkins testimony, Dep. Design. at 155-57, 161; Holeman testimony, Tr. 1294-95, 1325; P 604)  Defendants are not liable for emotional distress resulting from false allegations.  *See Boughton*, 65 F.3d at 831-33 & 832 n.13 (("unfounded fears" cannot give rise to recovery). Thus, defendants respectfully request that the Court grant judgment as a matter of law on plaintiffs' generic emotional distress "partial claims," because plaintiffs have failed to introduce any evidence of fears by class members that are grounded in scientific fact.

VII.   **DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' CLAIMS BECAUSE PLAINTIFFS HAVE NOT EXPERIENCED RECOVERABLE DAMAGES.**

Defendants should also be granted judgment as a matter of law on plaintiffs' claims for damages.  Furthermore, because plaintiffs must show damages in order to establish nuisance liability, *see* Section III.D, *supra*, plaintiffs' failure in this regard is also fatal to plaintiffs' nuisance claims.

A.   **Plaintiffs Have Not Shown Damages Attributable to Defendants' Actionable Conduct:  First Principles.**

In order to be actionable, any damages claimed by plaintiffs must be proximately caused by defendants' actionable conduct — that is, a trespass (contamination) or nuisance (health risk) committed by defendants.[40]  (Instruction No. 3.24) ("[Y]ou must follow my directions in Instruction No. 3.22 to award damages for diminution in value you find was caused by any trespass or nuisance you find Dow or Rockwell or both of them committed.")  While plaintiffs can recover damages proximately caused by a trespass or nuisance created by defendants, they cannot recover for:  (1) damages caused by proximity to Rocky Flats; or (2) damages caused by negative public perceptions that do not result from a trespass or nuisance that has been proved by plaintiffs.

*First*, as reflected in this Court's instructions, plaintiffs may not recover damages caused by the proximity of class members' properties to Rocky Flats.  (Instruction No. 3.24) ("In

---

[40] *See*, *e.g.*, *Westric Battery Co. v. Standard Elec. Co.*, 482 F.2d 1307, 1318 (10th Cir. 1973) (it is "only the damage flowing legally from the defendant's misdeeds which counts").

determining any actual damages to be awarded in this case, you should not consider or award any diminution in value caused solely by the proximity of the Class Area to Rocky Flats.")[41]

**Second**, plaintiffs cannot recover for damages caused by the public perception of Rocky Flats (*i.e.*, "stigma"), unless that public perception directly concerns the trespass (contamination) or nuisance (past or future health risk).  Moreover, any public perception of contamination or health risk must be based on what plaintiffs have proved about the contamination or health risk. For example, if a newspaper article stated that Rocky Flats was a health risk that regulatory agencies would be concerned about, but plaintiffs have not proved that Rocky Flats is a health risk that regulatory agencies would be concerned about (*see* Goble testimony, Tr. 3661), then any damages resulting from such an article **would not be actionable**.  *See, e.g.*, *Boughton*, 65 F.3d 823, 831-33 & 832 n.13 (predicting that Colorado Supreme Court would not adopt Restatement Section 821F, and would not allow "compensation for wholly unfounded fears").  Among other barriers to recovery, such damages would be too "remote" from the alleged conduct to permit recovery.  *See Holmes v. Sec. Invest. Prot. Corp.*, 503 U.S. 258, 271 (1992) (in civil RICO action, "the link is too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers."); *Roberts v. TXU Energy Retail Co.*, 171 S.W.3d 901, 903 (Tex. App. 2005) ("At some point in time in the

---

[41] *See also* Sen. Rep. No. 296, 85th Cong., 1st Sess. at 16 (1957) (Price Anderson Act legislative history) ("It is not the intention of the committee to have the damage to property which is included in the term 'nuclear incident' include the diminution in value or other similar causes of action which may occur, namely, from the location of an atomic energy activity at a particular site."); *Westric Battery*, 482 F.2d at 1318; *Staley v. Sagel*, 841 P.2d 379, 382 (Colo. Ct. App. 1992) ("[Plaintiffs] are not entitled to recover for any claimed diminution in their property's value caused by any of defendant's actions that do not constitute a nuisance or other actionable wrong.").

causal chain, the defendant's conduct may be too remotely connected with the plaintiff's injury to constitute legal causation.")

    **B.    Plaintiffs' Damages Evidence is Insufficient Because It Relates to Losses Suffered as a Result of Non-Actionable Proximity.**

Here, plaintiffs have not proved any damages attributable to any trespass (contamination) or nuisance (health risk).  Rather, plaintiffs' proffered regression expert,[42] Dr. Radke, admitted that he measured damages attributable to proximity to Rocky Flats.  (Radke testimony, Tr. 2753 ("I do proximity."))  Dr. Radke conceded that he did not measure damages caused by either defendant's conduct.  (*Id.* at 2752)  In fact, Dr. Radke testified that the "loss" he measured could have occurred ***regardless of how well the plant was run by the defendants***.  (*Id.* at 2752-53)  Dr. Radke's failure to segregate any diminution in value attributable to defendants' allegedly actionable conduct (trespass and nuisance) from any diminution in value attributable to non-actionable conduct (*e.g.*, "people just didn't like the idea of living near a weapons plant") is fatal to plaintiffs' damages claims.[43]

---

[42] Plaintiffs' incorporate by reference herein their *Daubert* motions to exclude the testimony of plaintiffs' experts.

[43] *See, e.g., Schmidt & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415 (7th Cir. 1992) ("For years we have been saying, without much visible effect, that people who want damages have to prove them, using methodologies that need not be intellectually sophisticated but must not insult the intelligence. . . . The expert should have tried to separate the damages that resulted from the lawful entry of a powerful competitor — Nordisco — from the damages that resulted from the particular forms of misconduct allegedly committed by that competitor."); *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1372 (9th Cir. 1992) ("[The expert] study failed to segregate the losses, if any, caused by acts which were not antitrust violations from those that were. . . . The question remaining is whether the district court was nevertheless required to allow Vernon to go the jury with its erroneous approach or to give it still another opportunity to refine a study that, according to Vernon, could not be refined.  We think not.").  (*See also* Defs.' Am. Br. in Supp.

(Continued…)

Like Dr. Radke, Drs. Flynn and Slovic have failed to segregate impact attributable to defendants' actionable conduct from impact attributable to non-actionable factors such as proximity.  In studying public attitudes about Rocky Flats, they did not attempt to distinguish between attitudes stemming from defendants' wrongful conduct and attitudes stemming from conduct that was reported but did not actually happen.  (Slovic testimony, Tr. 4305-06, 4308-09, 4311-12)  Neither did they attempt to discern between any impact resulting from the FBI raid and impact from other factors.  (Flynn testimony, Dep. Design. 102-03, 198)  They did not even attempt to identify and distinguish public concern over the mere fact that Rocky Flats is a nuclear facility.  (Slovic testimony, Tr. 4317-18)

Mr. Hunsperger likewise failed to measure damages caused by Defendants' conduct.  First, Mr. Hunsperger did not even attempt to discern whether the "stigma" purportedly attached to class properties was caused by Defendants.  Mr. Hunsperger testified at trial that Stigma caused by the FBI raid or just the influence of Rocky Flats was all "one ball of wax" and could not be distinguished.  (Hunsperger testimony, Tr. 6683); (*see also* Hunsperger testimony, Tr. 6788 (for MLS analysis, "we just looked at those that were closer to Rocky Flats for indications of stigma."))  Further, Mr. Hunsperger testified that he did not even know what Dow or Rockwell did when it was at the plant:

> Q.    Then it ought to be pretty simple to answer my question.  My question is very, very simple.  Do you know what Dow did during the period of time it was at the plant, yes or no?
>
> A.    Of course not.

of Their Mot. to Exclude Expert Witness Test. re Damages, filed 6/21/05, at 9–11 (citing additional authority).)

(Hunsperger testimony, Tr. 6687).

Likewise, Mr. Hunsperger testified that he did not "specifically" know what Rockwell did.  (Hunsperger testimony, Tr. 6687-88).  Indeed, Mr. Hunsperger testified that stigma could be associated based upon proximity to the plant, even without any evidence of contamination:

> Q.     What this stands for is the proposition that you can have stigma associated with proximity to the plant even without evidence of actual contamination, right?
>
> A.     Without my evidence of contamination, you can, sure.

Because Mr. Hunsperger focused solely on proximity, and made no attempt to tie his damages calculation to any actionable conduct by defendants, his analysis is not sufficient to withstand judgment as a matter of law.

### C.     Plaintiffs Cannot Recover Stigma Damages Where the Stigma Does Not Result From a Proven Trespass or Nuisance.

The concept of "stigma" has taken a prominent role in plaintiffs' case.  In their opening arguments, plaintiffs' counsel alleged that "Rocky Flats created a stigma" (Pls.' Opening, Tr. 490), and promised that "[w]e will talk all about stigma, and what it means, and what it has to do with this case" (*id.* at 707).  The jury has since heard extensive testimony on stigma from plaintiffs' expert Dr. Paul Slovic, who discussed the meaning and causes of stigma.  (Slovic testimony, Tr. 4244-46)  According to Dr. Slovic, "nuclear technologies are one of the types of technologies that are stigmatized."  (*Id.* at 4246)  Mr. Hunsperger defines "stigma" as a set of risks that are distinguished from "real or scientifically quantifiable risks," but rather are risks that are "perceived."  (*Id.*)

As defendants have previously argued, plaintiffs should not be permitted to recover any stigma-based damages.  *See* Defs.' Combined Mots. for Summ. J. and Decertification of the

Classes, filed December 9, 1996.  Although defendants renew that argument here, defendants

recognize that the Court has rejected defendants' position that stigma damages are not

recoverable.

However, even if stigma damages were recoverable in this action, any effort to prove

stigma damages must meet two tests:  (1) the stigma (negative public perception) must arise from

defendants' actionable conduct — either conduct that caused a trespass (contamination) or

conduct that caused a nuisance (past or future health risk); and (2) the stigma must arise from

facts that have been proved to be true by plaintiffs (*e.g.*, plaintiffs cannot seek damages from a

newspaper article reporting "X" if plaintiffs have not proved that "X" is true).

Here, plaintiffs have failed to show damages resulting from any stigma triggered by any

trespass (contamination) or nuisance (health risk).  Rather, plaintiffs claim that their losses stem

from the FBI raid.  (*E.g.,* Whalen testimony, Tr. 5955 (the raid affected how she viewed her

property) & 5938-39 (raid affected use and enjoyment); Schierkolk testimony, Tr. 1902 (could

not sell property after raid); Babb testimony, Tr. 1962 (raid affected her ability to sell); Cook

testimony, Tr. 2040-41 (FBI raid made her give up on her property); 2055-56 (testified at her

deposition that the only claim she was making was based on the FBI raid); S. Bartlett testimony,

Tr. 920 (raid had a tremendous impact on ability to sell her home); Radke testimony, Tr. 2676 ("I

wanted to measure—could I measure the impact of the raid and what it had—did it have any

impact at all on property value."))  But the FBI raid related to onsite conduct that has not been

proven to have anything to do with offsite contamination (trespass) or health risk (nuisance).

(Holeman testimony, Tr. 1333-34; *see also* Watkins testimony, Dep. Design. at 159-60, 167-69)

Except for allegations relating to onsite conduct about certain permitting processes, the FBI raid

allegations were ultimately shown to be false.  (*E.g.,* Holeman testimony, Tr. 1292-96 (Holeman was "dubious" of claims FBI was making when they went in because knew some could not be true); Watkins testimony, Dep. Design. at 155-57 & 161 (FBI went in for the wrong reason); P 604; P 736)  Because the FBI raid did not stem from any conduct proven by plaintiffs that could even conceivably have resulted in a trespass or nuisance, plaintiffs may not recover any stigma damages attributable to the FBI raid.

### D.      Plaintiffs Have Not Shown Damages Suffered by the Class.

Another fundamental flaw in plaintiffs' damages proof — which independently requires judgment as a matter of law on plaintiffs' damages claims — is that plaintiffs have failed to prove any damages experienced ***by the class***, which is defined as individuals who owned property in the class area as of June 7, 1989.  *See Cook VIII*, 181 F.R.D. at 475 n.3.

Plaintiffs' experts measure the value of ***properties*** within the class area within each year from 1988 to 1995.  (*See* DX 1085, Radke Chart)  However, plaintiffs' experts do not measure whether a diminution in value was experienced by any ***class members*** as a result of Rocky Flats. The class definition requires only that members own their properties as of June 7, 1989.  It does not impose any limits as to how far before June 7, 1989 class members bought their properties, or as to how long after June 7, 1989 class members sold their properties (if at all).  *See Cook VIII*, 181 F.R.D. at 475 n.3.  Accordingly, thousands of class members purchased their properties before 1988 (the first year analyzed by Radke/Hunsperger), and thousands more sold their properties after 1995 (the last year analyzed by Radke/Hunsperger).

Because Dr. Radke only studied the period from 1988-1995 — and found that there was a pre-existing difference before 1989 between class property values and Denver metro area

property values (*see* DX 1085, Radke Chart) — he admitted that he had not determined whether

anyone (much less anyone in the class) had lost money as a result of Rocky Flats:

> Q.     You've not actually determined whether anybody lost money in this
>        marketplace?
>
> A.     Correct, I haven't done that study.
>
> Q.     Right.  In order to do that study you would have to go back and find out
>        for the people that owned in '88, '89, '90, etc., you have to find out when
>        they bought, at what price they bought, and when they sold?
>
> A.     Correct.
>
> *  *  *
>
> Q.     Just to be clear, you haven't done that, right?
>
> A.     That wasn't possible.

(Radke Tr. 2812, 2814-15)

To illustrate this point, thousands of class members sold their properties after 1995 (or

still have not sold their properties).  Because plaintiffs' experts did not measure a diminution in

value after 1995, plaintiffs' experts cannot say whether the thousands of class members who sold

their properties after 1995 experienced a ***loss*** caused by Rocky Flats — that is, an ***increase*** in the

"Rocky Flats discount" between the date they purchased their property and the date they sold

their property.  In fact, Dr. Radke's own results show the "Rocky Flats discount" decreasing

between 1992 (when the discount was 9.18%) and 1995 (when the discount was 5.45%).

Hypothetically, even if the "Rocky Flats discount" were the same in 1996 as measured by Radke

and Hunsperger in 1995 (5.45%), then a class member who purchased in 1988 (a year for which

Radke and Hunsperger measure the "Rocky Flats discount" as 7.68%) and sold in 1996 would

have suffered no loss attributable to Rocky Flats (that is, the "Rocky Flats discount" would have

*decreased* over the time the class member owned the property).  In fact, because Radke and Hunsperger have not measured the "Rocky Flats discount" for 1996, they have no evidence of what loss (if any) was suffered by class members who sold in that year.

The same defect in plaintiffs' proof exists with respect to the thousands of class members who purchased their properties before 1988.  Because plaintiffs' experts did not measure a diminution in value before 1988, plaintiffs' experts cannot say whether the thousands of class members who purchased their properties before 1988 purchased at a price that already reflected a pre-existing "discount" attributable to Rocky Flats.  *See Ario v. Metro. Airports Comm'n*, 367 N.W.2d 509, 515 (Minn. 1985) ("If, for example, plaintiff buys a Zone 1 house in 1980, he presumably buys at a market price already discounted for aircraft noise existing at that time. Plaintiff has no diminution in market value of his property unless he shows that the noise level has increased since 1980 and such increase has measurably depressed the value of his property.").  Thus, plaintiffs' experts cannot say whether class members who purchased their properties before 1988 experienced a *loss* caused by Rocky Flats — that is, an *increase* in the "Rocky Flats discount" between the date they purchased their property and the date they sold their property.[44]

_____

[44] To the extent the Court has ruled that the "prior market discount" argument is an affirmative defense with respect to which defendants bear the burden of demonstrating a pre-existing discount, defendants preserve their disagreement with the Court's ruling.  The plaintiff — not the defendant — bears the burden of proving both the fact and the amount of damages.  *See Buckley Powder Co. v. State*, 70 P.3d 547, 563 (Colo. App. 2002).  Unless a plaintiff shows that the alleged "Rocky Flats discount" was greater when he or she sold the property than when he or she purchased the property, not even the fact of damages has been proved.  Nor is the so-called prior market discount defense an "affirmative defense."  Plaintiffs have cited no cases from any jurisdiction holding that evidence as to the price at which a plaintiff purchased his or her property is an affirmative defense.  According to Wright & Miller, an affirmative defense

(Continued…)

Because plaintiffs must prove their claims on a class-wide basis, the failure of plaintiffs' experts to measure a loss either for class members who purchased before 1988 or class members who sold after 1995 is independently fatal to plaintiffs' claims. Plaintiffs cannot plausibly claim that the experience of class members who both bought after 1988 and sold before 1995 is a fair representation of the gains or losses of the class as a whole. But plaintiffs' experts have also failed to prove a loss even for class members who happened to both purchase and sell within the period studied by Radke and Hunsperger (1988-1995). For example, a class member who purchased in 1988 and sold in 1995 would have experienced no net loss attributable to Rocky Flats (given that she purchased at a "Rocky Flats discount" of 7.68% and sold at a "Rocky Flats discount" of 5.45%). In fact, Radke and Hunsperger never determined a ***between-year*** statistically significant increase in the Rocky Flats discount for any period between 1988 and 1995.[45] The failure of plaintiffs' damages expert to determine a statistically significant increase in the alleged "Rocky Flats discount" for any class member (much less for most or all class

---

"encompasses two types of defensive allegations: those that admit the allegations of the complaint but suggest some other reason why there is no right of recovery, and those that concern allegations outside of the plaintiff's prima facie case that the defendant therefore cannot raise by a simple denial in the answer." Wright & Miller, 5 Fed. Prac. & Proc. Civ. 3d § 1271. Defendants do not "admit the allegations of the complaint" by arguing for a prior market discount – to the contrary, the existence of a prior market discount negates the allegations of the complaint because plaintiffs have not suffered any damages. For the same reason, a prior market discount does not concern "allegations outside of the plaintiff's prima facie case" because a plaintiff is required to plead and prove damages as part of his prima facie case.

[45] (Radke testimony, Tr. 2810 ("The only statistical significance that you analyzed was within the data set for each year, correct? A. It was of statistical significance for the entire multiple regression, and then each year had its own significant value, yes. Q. If you wanted to you could have looked for a trend from '88 to '89 to '90 to '91 statistically, couldn't you? A. You could if you wanted. That wasn't my goal."))

members) is dispositive of plaintiffs' claims that defendants' conduct caused damages to the

class.  *See Boughton*, 65 F.3d at 835 & n. 20 (study must establish statistical significance to

prove causation); *Renaud v. Martin Marietta Corp.*, 749 F. Supp. 1545, 1551 (D. Colo. 1990)

(same).

      Moreover, even if plaintiffs' experts had shown a statistically significant increase in the

alleged "Rocky Flats discount" (they have not), plaintiffs still have not shown that such an

increase could be attributable to the FBI raid, much less to Dow and Rockwell's actionable

conduct (especially with respect to Dow, whose last day at Rocky Flats preceded the FBI raid by

14 years).  Dr. Radke claimed that the diminution in value following the 1989 FBI raid was

2%.[46]  However, Dr. Radke could not say that the drop *following* the FBI raid was ***caused*** by the

FBI raid, much less caused by defendants' actionable conduct:

> Q.     The first question I am going to ask you, and put down here, is the two
> percent — can you say that, in fact, the two percent decline is caused by
> the F.B.I. raid?  Can you say that the two percent drop actually was caused
> by the F.B.I. raid?
>
> A.     No.  I can only say that these are the numbers that I got, there was a
> devaluation, and then something occurred that year, and it was the raid at
> the plant, that something occurred in the area to drop the values almost
> two percent that year.  And it had to be in the previous two years.
>
> Q.     Right.  All you can say is that something happened to drop the value, but
> you don't have the data to say that it was the F.B.I. raid, correct?
>
> A.     Correct.

(Radke testimony, Tr. 2786-87)

---

[46] Dr. Radke could not say that the 2% drop following the FBI raid was statistically significant.
(Radke testimony, Tr. 2810)

Because plaintiffs have failed to measure damages for the class, defendants are entitled to judgment as a matter of law on plaintiffs' damages claims.

### E.    Plaintiffs Have Not Shown Damages Attributable to the Prospect of the Continuance of Any Tortious Invasions.

As this Court has previously ruled, to recover damages in this class trial, plaintiffs must prove damages within the framework established by Section 930 of the Restatement (Second) of Torts.  *Cook IX*, 273 F. Supp. 2d at 1209-10; 5/17/05 Order at 15-16.  Under Section 930, a plaintiff may recover damages caused by "diminution in the value of the land caused by the prospect of the continuance of the invasion."  Restatement § 930.  Accordingly, the Court has ruled that plaintiffs may recover "the average percentage diminution in property value" that was "***caused by the prospect*** of the alleged trespass and/or nuisance (if proved by Plaintiffs) ***continuing into the future***, measured at the time when the injurious situation became complete and comparatively enduring."  5/17/05 Order at 15-16 (emphasis added).

Damages caused by the continuing effects of prior invasions — such as the continuing impact of past contamination — are not recoverable under Section 930.  Restatement § 930 cmt. d ("Manifestly, this element of depreciation is distinct from the loss in value brought by the ***actual effects of past invasions*** (see Comment on § 929) such as damage by floods to the soil's fertility.") (emphasis added)[47]  Only damages arising from the prospect of ***future invasions*** (*i.e.*, future contamination or a future health risk) is recoverable under this Section.  *Id.*

---

[47] To the extent that the Court has ruled that the continuing effects of past invasions are recoverable under Section 930, defendants disagree with that ruling as being contrary to Section 930.  *See* Restatement § 930 cmt. d.

Plaintiffs have failed to introduce sufficient evidence of damages attributable to "the prospect of the continuance of the invasions" to withstand a motion for judgment as a matter of law.  As an initial matter, plaintiffs have failed to produce evidence of "continuing invasions" on a classwide basis.[48]  As shown above, plaintiffs' failure of proof exists regardless of whether the "continuing invasions" are viewed as "continuing plutonium contamination or a "continuing health risk."

With respect to "continuing contamination," the vast majority of the development in the class area took place after 1970 — by which time 99.9% of any Rocky Flats releases had already occurred.   (DX 454, ATSDR 5/13/05 report, at 1-2) ("Though Rocky Flats released plutonium to the air throughout its history, the overwhelming majority (> 99.9%) of plutonium emissions occurred between 1953 and 1969."); (DX 1137, Graphic Showing Class Members as of 1969) Plaintiffs have introduced no evidence that, given the development that took place following 1970, any contaminated soil that was present on each class property as of 1970 remained on class property.  Consequently, plaintiffs have introduced no evidence of a continuing, class-wide trespass.  Thus, from a trespass perspective, plaintiffs have failed to introduce class-wide evidence of a "continuance of the invasions" from which damages could be assessed under Section 930.  Nor, as described in Part III, *supra*, have plaintiffs demonstrated a "continuing

---

[48] Defendants recognize that the Court has ruled that the continued presence of plutonium on plaintiffs' properties would constitute a continuing invasion, but respectfully disagree with the Court's ruling in that regard.  Nor is the Colorado Supreme Court's decision in *Hoery* to the contrary.  In *Hoery*, the Supreme Court followed the long-established rule that contamination is continuing where it is abatable.  *See Hoery*, 64 P.3d at 218 n.6 (stating that "contamination is not permanent" where "it is remediable or abatable").  Where, as here, contamination is not abatable, it is not continuing solely by virtue of its continued presence.

nuisance" — that is, a "continuing health risk," or a "continuing threat of a future health risk." (DX 454, ATSDR 5/13/05 Report, at 56) ("[N]o past, current, or future public health hazard exists from exposure to offsite surface soils, even at the most contaminated locations.")

In short, because plaintiffs have failed to demonstrate "continuing invasions" (either in the form of a "continuing trespass" or a "continuing nuisance"), it follows that plaintiffs cannot prove damages "attributable to the prospect of the continuance of the invasions" under Section 930. Restatement § 930. Indeed, plaintiffs' failure to prove "continuing invasions" demonstrates that Section 930 is completely inapposite to this action. *See id.* (by its terms, applicable only if "[one] causes continuing or recurrent tortious invasions on the land of another").

In any event, even if plaintiffs could demonstrate "continuing invasions," in order to recover under Section 930, plaintiffs would still be required to demonstrate ***damages caused by*** "the prospect of the continuance of the invasion[s]." *Id.* In fact, plaintiffs have introduced no evidence of damages attributable to "invasions," much less damages attributable to "the prospect of the continuance of the invasions." Rather, plaintiffs have only introduced damages attributable to "proximity" to Rocky Flats. (*See, e.g.,* Radke testimony, Tr. 2753 (Dr. Radke: "I measured proximity."); Slovic testimony, Tr. 4317-18; *see also* Hunsperger testimony, Tr. 6788 ("we just looked at those that were closer to Rocky Flats for indications of stigma.")) Because plaintiffs have failed to introduce any evidence of damages attributable to the "prospect of the continuance of the invasions," defendants are entitled to judgment as a matter of law on the issue of damages.

**F.      Plaintiffs Have Not Demonstrated That Any "Injurious Situation" Became Complete and Comparatively Enduring Between 1989 and 1992.**

Under the Court's jury instructions, in order to recover damages, plaintiffs must prove that the injurious situation became complete and comparatively enduring between June 6, 1989 and March 26, 1992.  (Instruction No. 3.22) (plaintiffs must prove that the "injurious situation became 'complete' and 'comparatively enduring' (as defined in this instruction) between June 6, 1989 and March 26, 1992")  However, regardless of whether the "injurious situation" is viewed as a trespass (contamination) or nuisance (health risk), plaintiffs have failed to introduce any evidence that the injurious situation became complete and comparatively enduring in between these dates.

First, with respect to trespass, plaintiffs have introduced no evidence that the injurious situation (alleged plutonium contamination) became complete and comparatively enduring between June 6, 1989 and March 26, 1992.  According to plaintiffs' own evidence, the contamination occurred before 1970.  (*See* P 1150, Budnitz 903 Pad Report at 2 ("in the 1950s and 1960s it was the Dow Rocky Flats Plant's poor waste-management practices that led to the principal release of plutonium from the 903 Area to the nearby environment around the plant"); P 1151 Budnitz Fires Report at 2 (report discusses two major fires at Rocky Flats Plant in 1957 and 1969); P 149A & P 939 (Krey & Hardy and Poet & Martell studies measuring contamination as of 1970))  The ATSDR Report confirms that 99.9%[49] of all releases of plutonium from Rocky Flats occurred before 1970.  (DX 454, ATSDR 5/13/05 Report, at 1-2)  Given that it is

_____

[49] Plaintiffs have introduced no evidence that even the 0.1% of Rocky Flats releases that occurred after 1970 traveled in the direction of the class area.

undisputed that 99.9% of plutonium releases occurred before 1970, plaintiffs cannot show, in the case of plaintiffs' trespass claim, the "injurious situation"[50] became complete and comparatively enduring at any date after 1970, much less during the period from 1989 to 1992.  Because plaintiffs have failed to introduce any evidence that any trespass or contamination became complete and comparatively enduring between 1989 and 1992, the Court should grant judgment as a matter of law on plaintiffs' trespass claim.

Similarly, with respect to plaintiffs' nuisance claim, plaintiffs have introduced no evidence that the "injurious situation" (a past or future health risk) became complete and comparatively enduring between 1989 and 1992.  Even according to the report of plaintiffs' risk/exposure expert Dr. Goble, the amount of exposure to people living within the class contour after 1970 was only 0.003 times the amount of exposure to people living within the class contour

---

[50] The "injurious situation" is the trespass or nuisance itself, not damages allegedly flowing from the trespass or nuisance.  "Damages" are a separate concept from "injury."  Restatement § 902 ("The word 'damages' is used in this Restatement in the same sense in which it is used in the Restatement of Contracts. It has reference to an award made to a person by a competent judicial tribunal in a proceeding at law or in equity because of a legal wrong done to him by another. Damages flow from an injury. As stated in § 7, injury denotes the invasion of any legally protected interest."); *Henry v. Dow Chem. Co.*, 701 N.W.2d 684, 691 (Mich. 2005) ("plaintiffs attempt to blur the distinction between 'injury' and 'damages'"); *Goodyear v. Discala*, 849 A.2d 791, 799 (Conn. 2004) ("The concept of 'damages,' however, is distinct from the legal injury from which damages arise."); *Oklahoma City v. Hopcus*, 50 P.2d 216, 218 (Okla. 1935) ("[t]here is a clear distinction between injury and damages . . . '[t]he word 'injury' denotes the illegal act; the term 'damages' means the sum recoverable as amends for the wrong. The one is the legal wrong to be redressed, the other the scale or measure of recovery.'"); *City of North Vernon v. Voegle*, 2 N.E. 821, 824 (Ind. 1885) ("['Injury' and 'damages'] are ... words of widely different meaning .... [T]hey describe essentially different things."; *see also American Stevedores v. Porello*, 330 U.S. 446, 450, n. 6 (1947) (term "damages" connotes "a compensation in money for a loss or damage" [internal quotation marks omitted]).  Thus, whether media that appeared during the 1989-1992 period caused plaintiffs *damages* is irrelevant to the question of when the "*injurious* situation" became complete and comparatively enduring.

before 1970.[51]  (P 1124, Goble Report, at 49)  Thus, even according to plaintiffs' expert evidence, any health risk reached its maximum extent (and thus became "complete and comparatively enduring") by 1970, not during the period from 1989 to 1992.  Indeed, plaintiffs have introduced evidence of no post-1970 event, and no post-1970 conduct by either defendant, that increased the amount of actual or threatened health risk relative to the amount of health risk that existed as of 1970.  Accordingly, if any nuisance caused by defendants ever became complete and comparatively enduring, it became complete and comparatively enduring by 1970, not during the 1989-1992 period.  In short, plaintiffs' failure to introduce evidence that the injurious situation caused by any trespass or nuisance became complete and comparatively enduring constitutes yet another basis for granting defendants' motion for judgment as a matter of law as to plaintiffs' damages claim here.

> **G.    Plaintiffs Have Failed to Limit Evidence of Damages to the Back-Calculated Statute of Limitations Window (January 30, 1988 - January 30, 1990).**

As discussed above, plaintiffs have failed to introduce sufficient evidence of a "continuing" trespass or nuisance to withstand a motion for judgment as a matter of law. However, if the Court were to rule that plaintiffs had proved a continuing tort, then plaintiffs must prove that their damages are either (i) future damages; or (ii) past damages that occurred within the "statute of limitations period dating back from when plaintiff's complaint was filed" (that is, from January 30, 1988 to January 30, 1990).  *Hoery*, 64 P.3d at 217 ("For continuing torts, . . . plaintiff's recovery is limited to the statute of limitations period dating back from when

---

[51] Defendants preserve the argument that Dr. Goble's expert report, like plaintiffs' other expert reports, should not have been admitted into evidence.

plaintiff's complaint was filed.") (internal citations omitted); *United States v. Hess*, 194 F.3d 1164, 1177 (10th Cir. 1999) ("In trespass cases, where the statute of limitations has expired with respect to the original trespass, but the trespass is continuing, we and other courts have calculated the limitation period back from the time the complaint was filed, rather than forward from the date of the original trespass, or where applicable, back to the reasonable discovery date."); *Walker Drug Co. v. La Sal Oil Co.*, 972 P.2d 1238, 1246 n.8 (Utah 1998) ("To recover for trespass or nuisance, a plaintiff must draw a causal connection between contamination occurring within the limitations period and a decrease in value to the affected property."); *Spanbauer v. J.R. Simplot Co.*, 685 P.2d 271, 274 (Idaho 1984) ("To recover for his injury, Spanbauer was required to prove the value of the property at the beginning of the limitation period, before the damage done within that period occurred, so that a comparison could be made between the market value of the land before the compensable damage began and the value of the land after the compensable damage occurred.  Spanbauer totally failed to enter any proof into the record of the market value of his land at or near the beginning of the limitations period."); Colo. Rev. Stat. § 13-80-102 (2002) (tort actions for trespass or nuisance shall be commenced within two years after the cause of action accrues).

The rule limiting damages for continuing torts to either future damages or past damages that occurred within the back-calculated statute of limitations period is equally applicable in cases involving Restatement Section 930.  *See Nieman v. NLO, Inc.*, 108 F.3d 1546, 1557, 1559 ("[Plaintiff's] time frame for assessing damages is limited to the statute of limitations window, i.e., four years prior to the filing of the complaint in the instant action.") (citing Restatement § 930); *Cox v. Cambridge Square Towne Houses, Inc.*, 236 S.E.2d 73, 74 (Ga. 1977) ("Since it

clearly appears that this situation 'will continue indefinitely' (Restatement § 930(1)(a)), ***the appellant has the right to elect to treat the nuisance as temporary and sue for all those damages which have occurred within the past four years***, or he may elect to sue for all ***future damages*** as well and put an end to the matter.") (emphasis added).

Here, plaintiffs have not introduced sufficient evidence of damages resulting from defendants' actionable conduct that is isolated to the two years prior to the filing of their Complaint –- that is, between January 30, 1988 and January 30, 1990.[52] Indeed, plaintiffs' damages expert Dr. Radke conceded that he did not assess the statistical significance of any change in the value of class properties between 1988 and 1990. (Radke testimony, Tr. 2810) Nor could Dr. Radke say whether any change from 1988 to 1990 was attributable to the FBI raid, much less to conduct by Dow or Rockwell. (*Id.* 2786-87)

In sum, if the Court holds that defendants are not entitled to judgment as a matter of law on the ground that plaintiffs have failed to introduce evidence of a continuing tort, the Court should nonetheless grant judgment as a matter of law because plaintiffs have failed to prove damages within the back-calculated statute of limitations window applicable to continuing torts.

---

[52] Two years is the applicable statute of limitations period in Colorado. *See* Colo. Rev. Stat. § 13-80-102 (2002) (tort actions for trespass or nuisance shall be commenced within two years after the cause of action accrues).

## VIII.   DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' DEMAND FOR PUNITIVE DAMAGES.

### A.   Plaintiffs Have Not Shown That Defendants Engaged in Willful and Wanton Conduct.

To prove punitive damages, plaintiffs must show, among other things, that "the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct." Colo. Rev. Stat. § 13-21-102..  (*See also* Instruction No. 3.27) ("[Plaintiffs] must prove . . . that the conduct . . . was 'willful and wanton.'")

Here, plaintiffs have introduced no evidence that any injury was "attended by circumstances of fraud, malice, or willful and wanton conduct."  Colo. Rev. Stat. § 13-21-102. To the contrary, plaintiffs' witnesses testified that Rockwell and Dow took care to ensure against harm.  (Holeman testimony, Tr. 1333-34; Ray testimony, Tr. 1679-80 (Ray agreeing with statement that "a number of safety procedures [] were put in place at this plant, not only to ensure the safety of the workers but the environment and the residents offsite), 1683 (Dow's attitude was that "when [accidents] happened, we will do our best to clean them up"))

Plaintiffs' punitive damages claim is also defeated by defendants' compliance with standards.  *See* Part II.B, *supra*.  As the Court has ruled, whether defendants complied with standards is relevant to whether any injury claimed by plaintiffs was "attended by circumstances of fraud, malice, or willful and wanton conduct" sufficient to prove punitive damages.  (*See* 9/13/05 Hr'g Tr. at 6 ("Such evidence is relevant . . . to the issue of punitive damages."))

Because of plaintiffs' failure to introduce any evidence that any injury was attended by willful and wanton conduct, or that defendants violated federal or state standards, defendants are entitled to judgment as a matter of law on plaintiffs' punitive damages claim.

### B.     Plaintiffs Have Not Shown Any Nuclear Occurrences Before August 1988.

Any determination of punitive damages must be consistent with the Price Anderson Act. Under the Price Anderson Amendments Act of 1988, "[n]o court may award punitive damages in any action with respect to a nuclear incident . . . ."  42 U.S.C. § 2210(s).  Under this Court's interpretation of that provision,  the Act bars punitive damages only for "nuclear incidents occurring on or after" August 20, 1988.  *See Cook v. Rockwell Int'l Corp.*, 755 F. Supp. 1468, 1479-81 ("Cook I") (D. Colo. 1991).  A "nuclear incident" is defined as "any ***occurrence*** . . . ***causing*** . . . bodily injury, sickness, disease, or death, or ***loss of or damage to property, or loss of use of property***, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of [nuclear materials.]"  42 U.S.C. § 2014(q) (emphasis added)

Under the Amendments Act, to determine whether punitive damages can be awarded, the jury must first determine when the "nuclear incident" happened.  If the nuclear incident occurred after August 20, 1988, the jury may not award punitive damages.  *See Cook I*, 755 F. Supp. at 1479-81.  If a portion of the "nuclear incident" (or "nuclear incidents") occurred before August 20, 1988, and a portion of the "nuclear incident" (or "nuclear incidents") occurred after August 20, 1988, then the maximum amount of punitive damages that may be awarded is limited to the amount of damages attributable to the "nuclear incidents" occurring prior to August 20, 1988.[53] Thus, a nuclear incident could have "occurred" before August 20, 1988 only if class members

---

[53] *See Hensley v. Tri-QSI Denver Corp.*, 98 P.3d 965, 967-68 (Colo. Ct. App. 2004) (if punitive damages are not allowed for a particular claim, then compensatory damages awarded pursuant to that claim do not increased the amount of punitive damages may be awarded; *e.g.*, if $2,500 is awarded for a claim for which punitives are allowed, and $7,500 is awarded for a claim for which punitive damages are not allowed, then the maximum amount of punitive damages that may be awarded is $2,500).

experienced "loss of or damage to property, or loss of use of property" before August 20, 1988.

42 U.S.C. § 2014(q).

Here, plaintiffs cannot prove "loss of or damage to property, or loss of use of property"

before August 20, 1988 on a class-wide basis.  Some class members did not even purchase their

properties in the class area until after August 20, 1988, and thus could not possibly have suffered

any loss or damage before August 1988.  Also, plaintiffs claim that any "damage" to their

"property" occurred at the time of the FBI raid, which happened in 1989, after the effective date

of the Price Anderson Amendments Act.  (*E.g.,* Whalen testimony, Tr. 595, 5938-39; Schierkolk

testimony, Tr. 1902; Babb testimony, Tr. 1962; Cook testimony, Tr. 2040-41, 2055-56; S.

Bartlett testimony, Tr. 920; Radke testimony, Tr. 2676 ("I wanted to measure — could I measure

the impact of the raid and what it had — did it have any impact at all on property value."))  It

follows that plaintiffs' claim arises from a nuclear incident that occurred (at least in part, if not

wholly) on or after August 20, 1988, and that plaintiffs' claims for punitive damages are barred

by Price Anderson Amendments Act.  *See Cook I*, 755 F. Supp. at 1479-81 (D. Colo. 1991).

### C.     The Price-Anderson Act Bars Plaintiffs from Receiving Punitive Damages.

Defendants preserve the position -- which the Court has never addressed — that the Price

Anderson Act bars plaintiffs from pursuing punitive damages entirely.  *See In re Hanford*

*Nuclear Reservation Litig.*, 780 F. Supp. 1551, 1572 n.38 (E.D. Wash. 1991) (Section 2014(hh)

of the Act, which provides that state law does not apply in a Price Anderson Act case if that state

law is inconsistent with (among other things) the prohibition on punitive damages in Section

2210(h), *expressly* applies to nuclear incidents occurring "***before, on, or after*** the date of the

enactment of this Act," and thus is not covered by the "catch all" provision that restricts the

applicability of *other* provisions of the act to dates "on or after August 20, 1988); *see also* Pub.L.

100-104, § 20(a), Historical and Statutory Notes to 42 U.S.C.A. § 2014 (West Supp.1990) ("(a)

*Except as provided in subsection (b)*, the amendments made by this Act [enacting section 2282a

of this title, amending this section and sections 2210 and 2273 of this title, and enacting

provisions set out as notes under sections 2011 and 2210 of this title] shall become effective on

the date of the enactment of this Act [Aug. 20, 1988] and shall be applicable with respect to

nuclear incidents occurring on or after such date.  (b)(1) The amendments made by section 11

[*enacting subsec. (hh)* and (jj) of this section and section 2210(m)(3) of this title and amending

section 2210(m)(2) and (o) of this title] shall apply to nuclear incidents occurring *before, on, or*

*after* the date of the enactment of this Act [Aug. 20, 1988].") (emphasis added)

    **D.**    **Plaintiffs Have Not Shown That the Punitive Damages They Seek Are in Any Way Linked to Defendants' Actionable Conduct.**

To recover punitive damages, plaintiffs must demonstrate that any such damages are

linked to the same conduct that caused plaintiffs' injuries.  *See Bennett v. Greeley Gas Co.*, 969

P.2d 754, 761 ("[T]he conduct referred to is that causing the injuries.  It is the quality of that

tortious act, not the character of the wrongdoer, that justifies exemplary damages.")  Plaintiffs

have introduced no such evidence here.  Indeed, as discussed *supra*, plaintiffs have failed even to

introduce evidence of any *compensatory* damages resulting from defendants' allegedly

actionable conduct.  Because Colorado law limits the amount of punitive damages to the amount

of compensatory damages, *see* Colo. Rev. Stat. § 13-21-102 (jury's award of punitive damages is

limited to "the amount of the actual damages awarded to the injured party"), it follows that,

because plaintiffs have not introduced evidence of any compensatory damages, they may not

recover any punitive damages.

## <u>CONCLUSION</u>

For the foregoing reasons, defendants respectfully request that the Court grant judgment as a matter of law on plaintiffs' claims of trespass and nuisance, on plaintiffs' claim for damages, and on plaintiffs' partial claim of generic emotional distress.

Dated:  December 8, 2005                                    Respectfully submitted,

                                                            /s/ John E. Tangren_____
                                                            One of the Attorneys for the Defendants
                                                            David M. Bernick
                                                            Douglas J. Kurtenbach
                                                            Ellen Therese Ahern
                                                            Mark J. Nomellini
                                                            John E. Tangren
                                                            KIRKLAND & ELLIS LLP
                                                            200 East Randolph Drive
                                                            Chicago, Illinois 60601-6636
                                                            Phone:  312-861-2000
                                                            Fax:     312-861-2200

                                                            Joseph J. Bronesky
                                                            SHERMAN & HOWARD L.L.C.
                                                            633 Seventeenth Street, Suite 3000
                                                            Denver, Colorado 80202
                                                            Phone:  303-297-2900
                                                            Fax:     303-298-0940

                                                            Attorneys for ROCKWELL
                                                            INTERNATIONAL CORPORATION and
                                                            THE DOW CHEMICAL COMPANY

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 8, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses for the following:

Peter B. Nordberg, Esq.
c/o Karen M. Markert
Apartments at Denver Place, Apt. 2812
1880 Arapahoe Street
Denver, CO 80202
pnordberg@bm.net
kmarkert@bm.net

Gary B. Blum, Esq.
SILVER & DEBOSKEY
The Smith Mansion
1801 York Street
Denver, Colorado 80206
blumg@s-d.com

/s/ Kari Knudsen_____ _____
Kari Knudsen (legal assistant)