1

```
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLORADO
 2                        - - -

 3   MERILYN COOK, ET AL      : CASE NO. 90-K-181
            VS.               :
 4   ROCKWELL INTERNATIONAL   :
     CORPORATION, A DELAWARE   :
 5   CORPORATION; AND THE     :
     DOW CHEMICAL COMPANY,     :
 6   A DELAWARE CORPORATION    :
                        - - -

 7

 8            Oral deposition of JAMES FLYNN, Ph.D.,

 9   taken at the law offices of Berger & Montague,

10   P.C., 1622 Locust Street, Philadelphia,

11   Pennsylvania, 19103, on Thursday, March 27, 1997,

12   beginning at approximately 8:15 a.m., before Kim

13   Casey, Court Reporter, Notary Public.

14

15                        - - -

16

17   APPEARANCES:

18            BERGER & MONTAGUE, P.C.
              BY: Jonathan Auerbach, Esquire
19            Peter Nordberg, Esquire
              1622 Locust Street
20            Philadelphia, Pennsylvania  19103
              Counsel for Plaintiffs
21                        - - -

22            DelCASALE, CASEY, MARTIN & MANCHELLO
                  Ten Penn Center Plaza
23            Suite 636 - 1801 Market Street
              Philadelphia, Pennsylvania 19103
24                  (215) 568-2211
```

4

12   Q.      Will you state your name for the record,

13   please?

14   A.      James Flynn.

19   Q.      And what is your occupation?

20   A.      I'm senior research associate at

21   Decision Research.  Decision Research is an

22   independent non-profit research institute.

7

3   Q.      How long have you worked for Decision

4   Research?

5   A.      Since about 1990.

6   Q.      Before you worked for Decision Research,

7   who did you work for?

10   A.      Okay.  Prior to coming to Decision

11   Research, I worked for Mountain West Research.

22   Q.      What did you do for Mountain West

23   Research?

24   A.      I was the -- I did basic studies for

8

1   them and social impact assessment in the area of

2   social impact assessment.

3            I was a project manager for most

4   of that time.  My primary duties were, as a

5   project manager on this contract that Mountain

6   West had with the state of Nevada, to do the

7   studies on the social economic impacts of the

8   high-level nuclear waste repository at Yucca

9   Mountain, Nevada.

9

2   Q.      What is your education background?

3   A.      You mean like where I went to grad

4   school?

5   Q.      No.  Your qualifications as an expert

6   witness.

7   A.      I have a Ph.D. in English from the

8   University of Washington.

9   Q.      What is your undergraduate degree in?

10   A.      English.

11   Q.      Where did you get that degree?

12   A.      Washington State College it was at that

13   time.  It's now a state University.

14   Q.      Do you have any training in economics?

15   A.      No.

16   Q.      Do you have any training in psychology?

17   A.      No.

18   Q.      Do you have any training in any other

19   social science?

20   A.      No.

21   Q.      Do you have any training in statistics?

22   A.      No.

23   Q.      What about mathematics?

24   A.      No.

10

1  Q.    Do you have any training in real estate

2  valuation?

3  A.    Any formal training you mean?

4  Q.    Yes.

5  A.    No.

6  Q.    Are you an appraiser?

7  A.    No, I'm not.

8  Q.    Have you ever done an appraisal?

9  A.    No.

10  Q.    You don't have any accreditations with

11  any of the appraisal societies?

12  A.    No, I do not.

23  Q.    Did you ever conduct any hedonic

24  property value studies while you were at Mountain

11

1  West?

2  A.    No.

3  Q.      Did you ever review other hedonic

4  property studies while you were at Mountain West?

5  A.      No, I did not.

14

18  Q.      You began working with Mountain West

19  Research in 1978.  What did you do before that?

20  A.      Well, during that time, I was a research

21  associate at the Institute for Social and

22  Environmental Studies at the University of

23  Kansas.

16

5  Q.      When did you begin your job as a

6  research associate for the Institute For Social

7  and Environmental Studies at the University of

8  Kansas?

9  A.      That would be 1976.

10  Q.      During your time there, did you do any

11   research involving property values?

12   A.      No.

13   Q.      Did you do any research involving the

14   impact of environmental hazards on property

15   values?

16   A.      No.

17   Q.      Did you do any research on the impact of

18   environmental hazards on people's perception of

19   risk?

20   A.      No.

21   Q.      Prior to becoming a research associate

22   at the University of Kansas, what did you do?

23   A.      I taught English and communications at a

24   few different colleges, universities.

17

1   Q.      And before that?

2   A.      Went to school.

3   Q.      Have I covered your entire work history?

4   A.      No.  I had other jobs before I went to

5   school.

6   Q.      What type of jobs did you have before

7   you went to school?

8   A.      I was in the Army for two years.  I

9   worked at a number of manual labor jobs, clerical

10   jobs, those sort of things.

11   Q.      While you were at Mountain West

12   Research, did you conduct any research or studies

13   concerning the impact or potential impact on

14   property values from an environmental hazard?

19   A.      No, I don't think so

19.

24   Q.      How many reports did you do while you

20

1   were at Mountain West Research that related to

2   the potential impact on property values where you

3   yourself actually did research?

4   A.      I don't recall that I did any under

5   those conditions.

6   Q.      During your work at Decision Research,

7   have you ever done any studies on the impact of

8   an environmental siting or environmental hazard

9   on property values?

10  A.      Yes.

                         22

16  Q.      Can you identify those studies for me?

17  A.      One of them was a study that we did a

18  couple of years ago in Las Vegas on the affects

19  of a high-pressure gas pipeline on property

20  values in a residential development area.

21          One of them was a project to look

22  at the issues of lead contamination on property

23  in Southwestern Missouri.

24          One of them was a case of

23

1  chemical contamination in Georgia.

2         And, of course, we looked at the

3  issue of people's response and attitudes about

4  property values at Rocky Flats.

29

19  Q.    What training did you have in designing

20  surveys?

30

8  A.    I have never taken a course in survey.

34

13  Q.    Do you consider yourself an expert in

14  designing surveys, Mr. Flynn?

15  A.    If I consider that -- I think that I

16  have a great deal of experience in designing

17  surveys of a certain type.

18  Q.    What type is that?

19   A.      Surveys that ask people about their

20   attitudes and opinions in regard to technological

21 hazards and, in particular, nuclear hazards.

35

10   Q.      Have you ever authored any such work on

11   the methods that are necessary to insure a

12   reliable survey?

13   A.      Yes.

24   Q.      Can you point out for me from your C.V.,

36

1   Mr. Flynn, the article that you have written

2   describing proper methods to conduct reliable

3   surveys?

4   A.      Yes.  The article is Flynn 1996,

5   Constructing and Reconstructing Respondent

6   Attitudes During a Telephone Survey Interview.

7   This is in the joint proceedings of the American

8   Association for Public Opinion Research and the

9  American Statistical Association to be in the

10 current issue.

23          THE WITNESS:  The other

24  publication listed right above that that I wrote

37

1  with Robin Gregory and Steve Johnson and Terry

2  Satterfield and Paul Slovic and Bob Wagner, I

3  believe it's been published.  It's on a similar

4  methodological method.

5  Q.      What is that title?

6  A.      Decision Pathway Surveys, A New Tool for

7  Research Managers.  And it's in Land Economics.

47

4  Q.      So is it your testimony today, Mr.

5  Flynn, that you can't tell me whether or not

6  there are any principal distinctions between the

7  methods that are used by socioeconomic impact

8   surveyors like yourself and economists in

9   contingent valuation surveys?

12          THE WITNESS:  In contingent -- I

13   don't think that we did contingent valuation

14   surveys.

16   Q.     I'm not talking about the type of

17   survey.  I'm talking about the methods used and

18   I'm asking you whether there are any principal

19   distinctions in your mind between the methods

20   that are used in the social science surveys that

21   you conduct and in the surveys that economists

22   conduct in contingent valuation?

48

1          THE WITNESS:  I believe that

2   there are differences, but I'm not an expert on

3   contingent valuation surveys, and I don't feel

4   that I know enough to make a comparison on those

5 bases.

49

21  Q.      Is it correct for me to believe, Dr.

22  Flynn, that in preparing your survey that

23  Decision Research did in this case, that Decision

24  Research did not draw upon any of the substantial

50

1  amount of research that economists have done in

2  the field of contingent valuation surveys?

5          THE WITNESS:  I personally did

6  not consult the contingent valuation for my

7  participation in the design of the survey.

9  Q.      Do you know if anyone did?

10  A.      Not to my knowledge.

54

23  Q.      Am I correct in assuming, Dr. Flynn,

24  that the bases upon which you have formed your

55

1   opinions in this case are also set forth in the

2   two reports that you assisted in preparing?

3   A.      That's the primary basis, yes.

4   Q.      And other than your education and

5   background and experience, are there any other

6   bases upon which your opinions are formed that

7   are not identified in the two reports that you

8   helped prepare for this case?

9   A.      I'm sorry, I can't think of any other

10   condition that would apply besides those

11   categories that you listed.

12   Q.      My basic question is whether or not

13   there's any basis for your opinions that's not

14   set forth in those two reports.

15   A.      I think the total basis for my opinions

16   and for probably the way the reports are drafted

17   and written are contained in my education,

18   training, experience, the reading I do, the other

19   work that I work on.  I mean all of that has an

20   indirect effect on these reports, of course. But

21   the opinions that I would express, I think, are

22   the ones that are contained in the report.

23   Q.      And the factual basis, aside from your

24   experiential basis for those opinions, those are

56

1   all set forth in the report, as well, right?

2   A.      Yes.  The reports are complete in that

3   sense.  If you include, of course, the data bases

4   that accompanied the reports, which are not

5   actually shown in the reports.

57

15   Q.      With respect to the report on the

16   opinion survey that you conducted, when were you

17   retained to conduct that survey?

18   A.      I think sometime in early 1995, I

19   believe.

20   Q.      And who was it that contacted you to

21   conduct this survey for them?

22   A.      Wayne Hunsperger called me and wanted to

23   talk about a report of some type.

24   Q.      Had you worked with Wayne Hunsperger

                        58

1   before?

2   A.      No.

3   Q.      Had you met Wayne Hunsperger before?

4   A.      Yes, I had met Wayne Hunsperger once

5   before and we had talked about what sort of work

6   he did and what kind of work Decision Research

7   did.

12   Q.      How did Mr. Hunsperger explain your role

13   in helping him on this case?

14   A.      Well, he wanted to -- as I understood

15   it, he wanted to develop a multiple-strategy

16   approach, a strategy that had different ways,

17   different prospectives of looking at how people

18   viewed the areas around Rocky Flats and how these

19   different perspectives and different sources of

20   information might help formulate his evaluation.

21   Q.      So you knew from the beginning that Mr.

22   Hunsperger was going to use your survey in order

23 to elicit estimates of diminution of value?

59

2            THE WITNESS:  I actually never

3   believed that because he never expressed that as

4   his objective to me.  And I knew that some of the

5   other approaches that he was using couldn't

6   provide that type of data.

7            For instance, he was looking at

8   analogous cases which, obviously, couldn't supply

9   any precise estimate of diminution of value at

10   Rocky Flats but could supply an understanding of

11   how people more generally had responded to

12   analogous conditions, cases which might in some

13   way be similar and in some circumstances be

14   similar.

15            Since these analogies obviously

16   have limited compatibility, they can't be used to

17   valuate property at Rocky Flats.

18            I understood that he was taking a

19   very, I thought, interesting approach to try to

20   understand the community and people's response to

21   the community from outside.

22   Q.      When did you first meet with Mr.

23   Hunsperger with respect to this project?

24   A.      I think probably in the spring of 1995.

60

1  We talked quite a bit on the telephone and then

2  we went to Denver, Paul and I both went to Denver

3  and took -- and Wayne drove in his van around and

4  we looked at the area around Rocky Flats to get

5  some idea of what the distances and things were.

15  Q.    You conducted the survey around about

16  the early fall of 1995; is that right?

17  A.    Mostly -- yes.  We started design work,

18  I think, about June or July and actually

19  conducted most of the survey, I think, in August,

20  August 31st to October 1st, so it was mostly

21  during September.

61

3  Q.    During that time, did Mr. Hunsperger

4  send you any materials to orient you towards the

5  site or the issues involved in the case?

6  A.    I don't believe that he did.  Most of

7  the information that we got was from public

8   records.  In fact, I think that we probably sent

9   him some information that we had on potential

10   analogous cases because we, you know, keep a

11   library file.

12              I'm not sure that I understand

13   exactly what the nature of your question is, but

14   Wayne did not have any involvement in the design

15   of the survey.

16   Q.     None?

17   A.     No.

18   Q.     Did you send him any drafts of the

19   survey?

20   A.     I don't think so.  I don't think we ever

21   sent him a draft.

22   Q.     Well, when the survey was originally

23   designed, weren't you going to compare Arvada and

24   Westminster to Englewood and Longview or

62

1   something like that?

2   A.      We did ask Wayne to suggest some

3   communities that would be most appropriate as

4   comparative communities for Arvada and

5   Westminster.

6   Q.      When you say most appropriate as

7   comparative communities, what quality about a

8   comparative community would make a particular

9   community comparative to Arvada and Westminster?

10   A.      Ask them for something that had a

11   similar mix of land uses and housing.

12   Q.      And he selected Ken Caryl and Highlands

13   Ranch?

14   A.      Yes, he suggested them.

15   Q.      Did you go out and look at those

16   subdivisions in order to determine whether or not

17   they were anywhere close to Arvada and

18   Westminster?

19   A.      No, I did not do that.

                          68

8   Q.      In your opinion, did the results of the

9   survey indicate that people rated Ken Caryl and

10   Highlands Ranch at a similar level on the scale

11   as Arvada and Westminster?

12   A.      Overall, it depended to a certain extent

13   where the people resided how they rated those

14   things.  But the overall rating was higher for

15   Ken Caryl than it was for Arvada or Westminster

16   on the part of the Denver area respondents.  And

17   also higher for Ken Caryl than for Highlands

18   Ranch.  And Highlands Ranch, in turn, was overall

19   rated higher than Westminster and Arvada.

20              In looking at the rating for

21   Arvada, Westminster respondents, they rated quite

22  highly Arvada; somewhat less Westminster.  They

23  rated Ken Caryl as equal to Arvada, Westminster,

24  and somewhat less than Highlands Ranch.

69

1  Q.      Do you attach any significance to those

2  ratings in your opinions in this case?

3  A.      I think that this demonstrates that

4  people that we ask to respond to these rating

5  questions considered a list of the usual

6  characteristics that are considered important to

7  making a judgment about housing in a community

8  that -- could they distinguish between different

9  communities, and that they were oriented towards

10  thinking about property and its importance and

11  values.

21  Q.      Yes, but my question was, does this have

22  any significance or does this allow you to

23  infer -- I guess that's a better question -- does

24   this allow someone to infer that there has been a

70

1   diminution in value in the property class area in

2   this case as a result of Rocky Flats?

7   A.      These questions do not directly -- the

8   questions and ratings do not directly rate -- do

9   not directly apply to people's opinions about

10   property values, so in that sense, I do not think

11   that they directly are related to valuations of

12   property.

13   Q.      Were pretests done with respect to this

14   survey?

15   A.      Yes, the pretests were done at the

16   University of Maryland in the process of arriving

17   at a final version of the instrument.

18   Q.      What were the results of the pretests?

19   A.      The -- I believe they did 76 pretests

20  and these tests were primarily to see if the

21  instrument worked properly, if the interviewers

22  had any problems, and if respondents understood

23  the questions and could answer, and if the flow

24  of the questionnaire was efficient and workable.

71

1          So the judgment of the survey

2  research center at the University of Maryland was

3  that, with some minor adjustments in the final,

4  after the pretest, that the instrument was

5  suitable.

74

12  Q.     How much time did Decision Research

13  spend on preparing the survey questionnaire and

14  writing up the report on the survey?

15  A.     I think we worked on -- it was a project

16  that we worked on for about a year, a little over

17 a year.

84

17   Q.      You have in front of you now what has

18   been marked as Flynn Exhibit 1, which is the

19   report of William E. Wecker, dated March 19th,

20   1997.

21            I direct your attention to

22 paragraph 22 of that report on page 7.

87

1   Q.      The reported response rate of 63.9

2   percent, you reported that in your report, right?

3   A.      I don't believe that we reported that

4   rate.

5   Q.      Why didn't you report a response rate?

6   A.      We did report a response rate.  I just

7   don't believe we reported that one.

8            I think if you'll look on page 3

9   of our report, you will see that the sentence

10   says:  "A total of 604 persons were interviewed

11   during the period October 31st, 1995 to October

12   1st, 1995.  This total sample included 614

13   respondents from Denver metropolitan area

14   separate from Arvada, Westminster and 188

15   respondents from Arvada, Westminster.  The margin

16   of error for a total sample size of 604

17   respondents is 4.1 percent at the 95 percent

18   confidence level.  At the same 95 percent level

19   of confidence, the margin of error for the Denver

20   metropolitan area sample of 416 is 5 percent and

21   for the Arvada, Westminster sample of 188, it is

22   7.2 percent.  Several ways of calculating a

23   response rate were used resulting in a

24   conservative estimate of 54 percent and a more

88

1   realistic estimate of 63 percent.  A more

2   detailed description of the response rate

3   calculation is presented in the appendix."

4           This is not the same figure that

5   he uses at 63.9 percent.  It reports a range of

6   response rates depending on how response rates

7   are calculated.

8   Q.     It's the highest of the response rates

9   that were estimated?

10   A.     Actually higher.

11   Q.     Well, do you anywhere disclose in this

12   report the appendix that is referred to on page

13   3?

16   A.     This is the appendix that -- the

17   discussion -- the methodological appendix is from

18   the Survey Research Center at the University of

19   Maryland.  They report the disposition of numbers

20   from the two samples that they used and at the

21   bottom of page 8, they talk about the response

22   rate and the basis for calculating the response

23   rate.

24   Q.      Take a look at page 9, middle paragraph.

89

1   Is the estimated response rate based on the

2   calculation in that paragraph 63.9 percent?

8   A.      63.9 percent.

9   Q.      Is that the highest of several estimated

10   or several response rate estimates contained in

11   this report?

12   A.      Yes, this is the weighted total response

13   rate.

14   Q.      So Wecker is correct that the highest of

15   several response rate estimates contained in the

16   report is 63.9 percent, right?

17   A.      Yes, he is.

18   Q.      And you don't have any dispute with the

19   fact that the margin of error calculated based on

20   such a response rate is 21.1 percent from a

21  mathematical standpoint, do you?

90

1                THE WITNESS:  I don't -- I have

2   no idea of how he calculated a margin of error of

3   21.1 percent, because -- although I assume that

4   mathematicians and statisticians can calculate

5   such things.

6                I have never seen this done

7   before and I don't know how it was done.  And in

8   particular, I don't understand how it was done

9   because it makes assumptions about missing data.

100

12   Q.      You don't plan to express any opinions

13   in this case about the market value of properties

14   near the Rocky Flats facility, do you?

15   A.      No.  I think that we will report on the

16   findings of our survey and what our respondents

17   said their response to the properties were, but I

18   don't think that I'm going to make any appraisal

19   evaluation of our survey.

20   Q.      Are you going to express any opinions

21   about the diminution in market value that

22   allegedly occurred because of an FBI raid at

23   Rocky Flats?

24   A.      I think that I would be willing to

                           101

1   testify to this:  That the condition of Rocky

2   Flats and related to residential property in the

3   communities Arvada and Westminster, that the

4   results of our survey indicate that there's

5   resistance to housing associated with Rocky Flats

6   and that this will exert a downward pressure on

7   desirability and prices of homes.

8   Q.      Will in the future or has?

9   A.      I think that as long as this association

10   and its affects have existed that there have been

11   downward pressures.

12   Q.      Have been?

13   A.      Yes.

14   Q.      Are the downward pressures the result of

15   the FBI raid?

16   A.      I think that certainly it is my belief

17   that some of them are.

18   Q.      Are the downward pressures related

19   solely to the FBI raid?

20   A.      I think that Rocky Flats is a facility

21   that has a long history that it's developed its

22   ability to exert these downward pressures and

23   that the raid is one very significant incident in

24   that history and reputation.

102

10          THE WITNESS:  I think that the

11   FBI raid has a significant influence in the

12   reputation of Rocky Flats, and that along with

13   other conditions and information about Rocky

14   Flats and attitudes toward Rocky Flats would

15   exert a downward pressure on the desirability and

16   the prices of homes in the communities of Arvada

17 and Westminster.

19   Q.     Yes or no, Dr. Flynn, do you believe

20   that the downward pressures that you say have

21   occurred in the property class area are the

22   result of and solely the result of an FBI raid on

23   Rocky Flats?

103

4   A.     I guess -- I think that the FBI raid is

5   a significant influence in creating downward

6   pressures on the desirability and prices of

7    houses.  I don't know the exact proportion of

8    that, what is due to the raid and what is due to

9    other conditions at Rocky Flats.

107

11              … did Mr.

12   Hunsperger tell you that he was going to take the

13   average discount of Denver metropolitan area

14   residents as expressed in your survey, multiply

15   that times the number of properties in the Rocky

16   Flats class area and make an estimation of the

17   diminution in property value that had occurred

18   according to him.

23              THE WITNESS:  My answer to that

24   one is no.

108

2    Q.     Did you design your survey with the

3    intent that Mr. Hunsperger could use the express

4   average discounts of Denver metropolitan

5   residents, multiply that times the number of

6   properties in the Rocky Flats area and come up

7   with a number that was an estimation of the

8   diminution of value of the properties?

9   A.      That was not an objective or goal of our

10   design of the survey.

109

14   Q.      Do you think this is scientific

15   research?

16   A.      Yes.

17   Q.      Do you think that your research applies

18   scientific methods?

19   A.      I think it applies acceptable social

20   science methods, yes.

136

21   Q.      The survey that you did was done over

22   the telephone, correct, in this case?

23   A.      We are back to Rocky Flats?

24   Q.      Yes.

137

1   A.      Rocky Flats' survey was done by

2      telephone, yes.

138

3   Q.      Yesterday we talked about stigma.  Mr.

4   Slovic referred to stigma as an image and as

5   places become associated with an image, they

6   become stigmatized.

7              Do you agree with that?

8   A.      Yes.  I think that's an apt

9   characterization.

17   Q.      When you try to measure stigma, you ask

18   people about images?

19   A.      Sometimes we do, yes.

20   Q.      And you ask people, for instance, what's

21   the first thing that comes to mind when you hear

22   the term Love Canal, right?

23   A.      This methodology was developed by people

24   at Decision Research to ask about images and that

139

1   is the technique we use, although to my case we

2   never used it in the case of Love Canal.

10   Q.      And because of the stigma of Love Canal,

11   you believe that if you ask somebody, "What was

12   the first thing that comes to mind when you hear

13   the term Love Canal," they would think of

14   pollution?

15   A.      I think there's a very good probability

16   that they would.  In fact, the people of Love

17   Canal tried to change the name of Love Canal when

18   they wanted to market the houses after they had

19 done the reclamation.

140

19   Q.      Now, you ask a similar question in your

20   survey of respondents in the Rocky Flats case.

21   A.      Yes.

141

5   Q.      And you asked people in question 7,

6   "What is the first thing that comes to your mind

7   when you think about Arvada," right?

8   A.      Westminster, but they are basically the

9   same question, yes.

10   Q.      And you asked people after that, what is

11   the second thing that comes to their mind when

12   they think about Westminster or Arvada, right?

13   A.      Yes.

14   Q.      And then you ask people what's the third

15   thing that comes to their mind when they think

16   about Arvada and Westminster, right?

17   A.      Right.

18  Q.      And a very small percentage of people

19  mention Rocky Flats, correct?

20  A.      Yes.

147

23      Is stigma just another negative

24  externality that people take into account when

148

1  they make market decisions?

4              THE WITNESS:  I think that stigma

5   -- the images and responses to the conditions

6   that we call stigma are conditions that are taken

7   into account when people make market decisions, I

8  believe.

14  Q.      And when people make market decisions,

15  they take into account not only stigma, but a

16  vast number of other attributes or disammenities

17  or positive externalities or negative

18  externalities, correct?

21          THE WITNESS:  Correct.

171

16   Q.     Do you consider it unscientific to refer

17   to media coverage of an issue as evidence of the

18   perception of risk of a specific population

19   concerning the same issue?

20   A.     I would think that the media coverage

21   that the population is exposed to should be

22   considered as a factor in shaping people's

23   perceptions of risk or even stigma, if that's the

24   nature of the media coverage.  I think that the

172

1   media does have an influence on how people

2   understood conditions when they are exposed to

3   the media, yes.

177

3   Q.     The newspaper articles that you reviewed

4   for your newspaper study were coded as either

5   strongly negative, negative, neutral, positive,

6   or strongly positive; is that right?

7   A.     Yes.  There's a coding in sheet in the

8   back and I think maybe there's even an example of

9   one filled out here.  The coding sheet is

10  somewhat complex because of the nature of the

11  information that we wanted to code and

12  understand.

13           But the first thing that we did

14  was to ask people to identify what the main

15  points of the article were.  And the second thing

16  we did in question 6 was ask them for an overall

17  rating from plus three to minus three.

18  Q.     That was the scale, plus three to minus

19  three?

20  A.     Yes.

21  Q.     Minus three being strongly negative?

22  A.      Yes.

23  Q.      And plus three being strongly positive?

24  A.      Yes.  This is on the first page.

                        183

18  Q.      You cannot conclude from your study of

19  newspaper articles in 1989 that the increase in

20  media in response to this event, the FBI raid,

21  was different from the increase in media that may

22  have occurred in response to events in years

23  prior to 1989, can you?

24  A.      We never attempted to make that

                        184

 1  assertion.

 2  Q.      Wouldn't you want to be able to look at

 3  prior events or occurrences or accidents in order

 4  to determine whether the media's reaction to this

 5  particular event or occurrence was unusual or

6   different?

7   A.      Well, I think that -- I think that there

8   have been, as I understand it, historical

9   incidences at Rocky Flats which have been fairly

10   large media stories, but those were not included

11   in the scope of our study and we did not look at

12   them.

13   Q.      What is the significance, then, of this

14   study?

15   A.      Well, I think the significance of this

16   study is that it is related to the hypotheses we

17   developed from the social amplification of

18   risk.   And that the analysis of these articles

19   is consistent with the social amplification of

20   risk theory or model, and that we would expect

21   this to have some effect on people's perceptions

22   and understanding of what the nature of the

23   hazards at Rocky Flats might be.

24  Q.      And couldn't you have applied that same

185

1  analysis to events in prior years?

2  A.      I think that would be an interesting

3  thing to do.

4  Q.      And if you found an increase in

5  newspaper articles and a story that carried on

6  for a number of months, that would be a pretty

7  similar scenario, wouldn't it?

11  Q.      Wouldn't it?

12  A.      I think that there would certainly be

13  analogies in the scenario.  That's true.  But I

14  mean this was -- you know, what happened in, say,

15  1957 or 1963 or whenever one of these, you know,

16  large, noteworthy events took place was not

17  within the scope of our study.

24  Q.            Wouldn't you like to

186

1   see whether or not there was any impact from

2   prior events where this social amplification

3   process may have taken place?

4   A.      It seems to me that some of the prior

5   events that may have some value as analogies took

6   place enough distance in time to not be

7   applicable in the same way that this one is to

8   current perceptions of Rocky Flats.  But some of

9   those prior events may have helped to establish a

10  reputation or public perception to some degree

11  about Rocky Flats.

12             But this is really a point of

13  extraordinary media coverage an extraordinary

14  example of the social amplification of risk.  In

15  fact, this point is so forceful that stories

16  about it carry up to today.

189

10   Q.      You completely ignored prior events that

11 may have resulted in similar media stories.

15   Q.      Didn't you?

16   A.      The scope -- I mean our story analysis

17   of these stories was focused on the period before

18   and after the raid during 1989.  We did not look

19   at the media coverage, the newspapers, or any

20   other way at earlier events or stories that came

21   from Rocky Flats.  Is that responsive, I hope?

22   Q.      Yes.  You don't know, sitting here

23   today, whether or not the process or the

24   framework that you describe as the social

190

1   amplification of risk had any actual economic

2   impact in the Rocky Flats class area; is that

3   correct?

4   A.      I think that this story and the way that

5   it was portrayed in the media provided

6   information, opinions, attitudes, perspectives on

7   Rocky Flats that are consistent with the social

8   amplification of risk theory, in that this theory

9   has the potential of affecting stigmatization

10   market performance behaviors.

11            Now, whether we can make a direct

12   causal link to that or not, I don't know.  This

13   is a conceptual theory.

14            What we are trying to do here is

15   to help people understand -- help people who

16   would look at this problem to understand how this

17   type of event and how this type of media coverage

18   could have influences on people's perceptions and

19   potentially on their behaviors.

20   Q.     Okay.  Now that you have given your

21   explanation, do you agree or disagree, sitting

22   here today, do you know, as a result of your

23   work, that there has been any economic impacts in

24   the Rocky Flats class?

191

3           THE WITNESS:  As the result of

4   this study of the media, I believe that the

5   conditions, as described in the social

6   amplification of risk, assisted in the Denver

7   metropolitan area as a result of this raid and

8   that they could produce the conditions to have an

9   affect on people's perceptions and economic

10   behaviors.

195

6 Q.     Can you say, with a reasonable degree of

7   scientific certainty, that an economic effect had

8   actually occurred?

9 A.     I think that -- I think I've made the

10   statement that answers that question in saying

11   that I believe that the negative downward effects

12   on the market, which is an economic effect,

13   exists because of this raid.

14          I mean if we want to argue about

15   what we mean about economic effect, then I

16   suppose we can do that.

17          But I think that the data from

18   the surveys show that effect and that this

19   newspaper analysis provides some explanation of

20   why that effect might have occurred.

21   Q.    Your survey was designed to measure an

22   economic effect; is that what you are saying?

23   A.    The survey was designed to measure

24   people's attitudes and opinions about Rocky Flats

196

1   and its relationship to housing values in Arvada,

2   Westminster.  And the results of that survey show

3   that people have some negative responses to that

4     association, to property in Arvada, Westminster.

5     That they say that they will not buy or they will

6     buy only under conditions of distance or

7     discounts for the large majority of the

8     population we interviewed, and that this is some

9     evidence that there is downward pressure.  There

10    could be downward pressure on the market because

11    of this resistance to buy properties associated

12    with Rocky Flats.  That's my opinion.

13    Q.     Have you measured at all whether the

14    potential for downward pressure has been

15    reflected in the prices that have been paid for

16    the hundreds of homes in the property class area

17    that have been bought and sold in the last six

18    years?

19    A.     The measurement of the actual sales data

20    is the responsibility of the market analysis that

21   is done by people like Wayne Hunsperger who is an

22   appraiser.  And I suspect that he has done this

23   analysis and will give you that answer.

24          But I'm not an appraiser and I

                              197

1  did not do that analysis so, therefore, I cannot

2  answer the question of whether or not our

3  research suggests or supports the idea, the

4  finding opinion that Rocky Flats has, because of

5  its reputation, a downward pressure effect on

6  property in Arvada, Westminster.  That is our

7  opinion that it does.

8  Q.      Rocky Flats or the FBI raid?

9  A.      Rocky flats.

10  Q.      Rocky Flats, per se?

11  A.      Per se.

12  Q.      You can't distinguish between the effect

13  of Rocky Flats before the raid and the effect of

14  Rocky Flats after the raid, can you?

15  A.      I think that this information on the

16  media reporting of the raid strongly suggests

17  that the raid contributed to the influence of

18  Rocky Flats on people's attitudes and

19  perceptions.  That this is consistent with this

20  theory of the social amplification of risk and

21  that it's consistent with the data that we got in

22  the survey when we asked people if they had heard

23  about the raid.  And those who answered yes were

24  more likely to have a negative opinion about

198

1  property in Arvada, Westminster.

2  Q.      You can't say whether or not the

3  downward effect that you claim is attributable to

4  Rocky Flats is attributable to Rocky Flats before

5  the raid or after the raid?

7          THE WITNESS:  I think that part

8   of the effect, that it's our opinion that it is

8  due to the raid

11   Q.      You don't know how much of whatever

12   effect is due to the raid?

13   A.      I don't have a precise exact numerical

14   figure to apply to that, although there are

15   numerical figures on the difference in the

16   responses between the people who report they

17   heard of the raid then those who report that they

18   had not.

19   Q.      But that doesn't translate into a

20   percentage of downward effect before or after the

21   raid, does it, in your opinion?

22   A.      Probably not.  I certainly didn't

23   attempt to calculate it that way.

24   Q.      It would be incorrect to assume that all

199

1   of the negative downward pressures that you

2   observed in your survey were attributable to the

3   FBI raid?

4   A.      That would not -- in those categorical

4   terms, that would not be my opinion.

10   Q.      Who designed the economic value

11   questions concerning discounts in the opinion

12 survey?

14              THE WITNESS:  I think I was

15 primarily responsible for those.

17   Q.      You're not a trained economist, correct?

18   A.      That's correct.

201

4   Q.      Do you think that the discounts observed

5   for Denver metro residents would also be observed

6   for residents in the Arvada, Westminster area?

7   A.      I don't think that they would, no.

8  Q.      How were the value increments

9  determined?

12  A.      I determined the discount values.

202

12  Q.      You're not a real estate expert, are

13  you?

14  A.      No.

211

8  Q.      I have one brief redirect and that is

9  simply, Dr. Flynn, could you describe for me the

10  education, training or experience that permits

11  you to render the expert opinions that have been

12  expressed in the reports you prepared in

13  connection with this litigation and the testimony

14  that you've given here today?

18          THE WITNESS:  My primary

19  educational -- my terminal educational degree is

20   a Ph.D. in English from the University of

21   Washington.

22   BY MR. AUERBACH:

23   Q.      Aside from your testimony in response to

24   Mr. Dutton's questions earlier today about your

212

1   education and about, I think, formal training, is

2   there any other education, training or experience

3   that you rely on in rendering the opinions that

4   you have given here in testimony today and in the

5   reports you prepared in connection with this

6   case?

7   A.      Well, I think that in some ways my

8   background is not the usual one to achieve an

9   expertise in a particular field.

10              But the experience that I've had,

11   going back to 1976, is strong in the areas of

12   social impact assessment, community studies.

13   I've done community studies, in particular,

14   involving nuclear facilities and nuclear

15   technology.  I began working on these issues in

16   1978, when I participated in a four year study

17   for the Nuclear Regulatory Commission.

18          And the purpose of the study was

19   to develop the social and economic regulations

20   for permitting and licensing nuclear power

21   plants.  And we conducted 12 case studies and

22   provided a summary and report, which are

23   published as new regs.  And that was completed

24   about 1982.

213

1          And then subsequent to that, I

2   worked on the environmental impact statement for

3   Pudget Power Company.  They had proposed a

4   nuclear power plant.  It was called the

5    Skagit/Hanford plant, which is a fairly complex

6    history, but was probably the last nuclear power

7    plant that a license was attempted for.

8            Also worked on other EIS type of

9    work in a social impact assessment type of work

10   for oil shales for development in Colorado, for

11   landfills, for --

12           And then in 1985, I did some work

13   for the state of Mississippi on the proposed

14   high-level waste site in Mississippi at Richton

15   Dome.

16           And in 1986, began work on a

17   project that has lasted to the present day for

18   the state of Nevada on the high-level waste site

19   at Yucca Mountain, Nevada.

20           On that project, I served as the

21   project manager and project director.  I was

22   responsible for the conduct of the research.  It

23   produced in excess, I think, of 300 reports and

24   documents to the state of Nevada.  125 or 30,

214

1   maybe more by now, publications in the peer

2   review literature.  It covered the complete gamut

3   of socioeconomic studies.

4            Since coming to Decision Research

5   in 1990, '91, I've worked on a number of research

6   projects, including national surveys on nuclear

7   power, national surveys in Canada on health and

8   environmental hazards, surveys on the use of the

9   public responses to forest, vegetation

10   management.  And this work, some of it has been

11   completed recently and some of it continues.

12            So basically, that's -- I don't

13   know how many articles and chapters of books and

14   such things that I've completed, but I think

15   there's a couple pages in the C.V.