```
0001
 1                UNITED STATES DISTRICT COURT

                 FOR THE DISTRICT OF COLORADO
 2

 3

 4   MERILYN COOK, ET AL.        )

                                 )

 5             Plaintiffs,       )

                                 )

 6         -v-                   ) CAUSE NO.

                                 ) 90-CV-181-JLK

 7   ROCKWELL INTERNATIONAL      )

     CORPORATION AND THE DOW     )

 8   CHEMICAL COMPANY,           )

                                 )

 9             Defendants.       )

10

11

12          The deposition upon oral examination of

13   SHIRLEY FRY, a witness produced and sworn before me,

14   Sally Cekander, RPR, Notary Public in and for the

15   County of Boone, State of Indiana, taken on behalf of

16   the Plaintiffs at the offices of Cohen & Malad, One

17   Indiana Square, Suite 1400, Indianapolis, Indiana, on

18   December 7, 2005, at 10:15 a.m., pursuant to the

19   Federal Rules of Civil Procedure.
```

```
    0020

     1   Q   After the November 7 visit, what was your next
     2       contact with Mr. Poland or anyone from Kirkland &
     3       Ellis?
     4   A   I believe Mr. Poland called and said or talked
     5       about arranging for testimony, this testimony, to
     6       see what my free dates were, when I was available.
     7       And I gave him my availability within the time
     8       frame that he had said, which was mid December.
     9       And so he said he would get back to me when he can
    10       try and fix that up.
    11   Q   Can you tell me approximately when that phone call
    12       was?
    13   A   It was certainly before Thanksgiving, I think.
    14   Q   Do you remember the dates that you told Mr. Poland
    15       that you were available?
    16   A   What's today, the 7th?  Sixth and 7th of December.
    17       And I think 13th and 14th or 12th and 13th next
    18       week.
    19   Q   But you did tell Mr. Poland that you were available
    20       yesterday to have this deposition taken?
    21           MR. POLAND:  Object to the form of the
    22       question.
    23   Q   Did you tell Mr. Poland that you were --
    24           MR. POLAND:  It mischaracterizes the
    25       testimony.
```

```
0022
 1       communication between the two at that stage as to
 2       when I would be available.  So I gave him the same
 3       information.
 4   Q   Fair enough.  So going back then to the call where
 5       Mr. Poland called about your availability for
 6       testimony, did you have any other substantive
 7       conversation during that telephone call other than
 8       about your dates of availability?
 9   A   I think not.  I don't believe so, any more than
10       just saying at that stage the trial was -- had
11       resumed and I think he said -- told me that
12       Dr. Wing was going to testify again and maybe other
13       people.
14   Q   Do you know what other people?
15   A   He mentioned Dr. Clapp at that stage.
16   Q   Are you familiar with Dr. Clapp?
17   A   No.
18   Q   Have you ever met Dr. Clapp?
19   A   No.
20   Q   But I trust you've met Dr. Wing?
21   A   Yes.
22   Q   And are you familiar with Dr. Wing?
23   A   We were colleagues, yes.  We are colleagues, I
24       guess.  We were coworkers.
25   Q   After your conversation with Mr. Poland, I then
```

```
0031

 1      reasonable.
 2   Q  Anything else?
 3   A  I think I did say that he tended to --
 4   Q  Can I interrupt you for a minute?  When you say he,
 5      do you mean Dr. Wing?
 6   A  Yes.
 7   Q  Sorry.
 8   A  Tended to ramble into areas that were largely
 9      opinion rather than fact.
10   Q  What areas would those be?
11   A  Well, specifically without referring to the
12      testimony, I can't reel them off, but just --
13   Q  Just generally.
14   A  Generally in how his experiences as an investigator
15      on the studies, on that particular study.
16   Q  When you say that particular study, you're
17      referring to the one that was published in JAMA?
18   A  Yes, 1991.
19   Q  Anything else?
20   A  No, I think that's about it.
21   Q  In your conversation on Sunday with Mr. Poland,
22      what did you discuss with regard to Dr. Clapp?
23   A  We just generally discussed his testimony.
24   Q  What about his testimony?
25   A  The topic of his testimony and his background
```

```
     0032

 1           because I wasn't familiar with him until --
 2     Q     So Mr. Poland gave you his background?
 3     A     No.  It was in the testimony.
 4     Q     Okay.
 5     A     And at that stage I had no -- I had not read his
 6           report that he had provided when he had been asked
 7           to look at the Chinn and Crump studies as follow-up
 8           from Carl Johnson's study.
 9     Q     When you previously identified documents for me
10           that had been provided to you relating to this
11           litigation, you said that you had received papers
12           regarding Crump and Chinn.  Could you describe
13           those more fully for me?
14     A     And I received those yesterday, not prior to that.
15           There was a Chinn report that dealt with the review
16           of cancer incidence around the -- in the residents
17           around the Rocky Flats plant.
18     Q     Okay.
19     A     And that was prepared in 1981, and it was later
20           published.  No, it was not published.
21     Q     The reason I ask is, you just referenced
22           Dr. Clapp's report?
23     A     Uh-huh.
24     Q     Did you receive a copy of Dr. Clapp's report?
25     A     Yesterday, yes.
```

```
0033

 1    Q   You had not previously listed that as a document
 2        that you had received.  That's why I was asking.
 3    A   I'm sorry.  I was thinking about things I got
 4        before yesterday, but I got that yesterday.
 5    Q   What else did you receive yesterday?
 6    A   I think that was all, the three.
 7    Q   Did you receive a copy of Dr. Wing's report at any
 8        point in time?
 9    A   Yes, I think I told you that earlier.  The 1996
10        one.
11    Q   Right.
12    A   I received previously.
13    Q   Is that what you refer to as the prior testimony of
14        Dr. Wing?
15    A   No.  It was a separate document.
16    Q   Okay.  Let me --
17    A   I'm sorry if I confused you.
18    Q   That's okay.  We're just trying to get it straight.
19        That's all.  Let me list for you what I understand
20        you to have told me that you received and then
21        we'll make a full list of everything that you've
22        had, okay?
23    A   Okay.
24    Q   I understand that you had received copies of the
25        trial transcript testimony of Dr. Wing, the trial
```

```
0035
 1   A   But can I go off the record?
 2           MS. GEOPPINGER:  Yes.
 3           (A discussion was held off the record.)
 4   BY MS. GEOPPINGER:
 5   Q   Let me start over with the list of items that I
 6       understand you to have received, and please make
 7       corrections as we go along.  I understand that you
 8       received a copy of Dr. Wing's report that he
 9       prepared in 1996?
10   A   Yes.
11   Q   I also understand that you received a copy of his
12       deposition transcript or the copy of the transcript
13       of the deposition that was then taken in 1996 or
14       1997?
15   A   Yes.
16   Q   Okay.  And then you also received a copy of
17       Dr. Wing's trial testimony, correct?
18   A   Yes.
19   Q   Okay.  With respect to Dr. Clapp you received a
20       copy of his report; is that correct, that he
21       prepared?
22   A   Yes.
23   Q   Okay.  Did you also receive a copy of his
24       deposition transcript?
25   A   Yes.
```

```
0036

 1   Q   And you received a copy of his trial testimony as
 2       well, correct?
 3   A   I received a copy of his trial transcript, not the
 4       deposition.
 5   Q   Okay.  And then in addition to the items pertaining
 6       to Dr. Wing and Dr. Clapp, you said that you had
 7       received a copy of the RAC final report?
 8   A   Uh-huh.
 9   Q   Then you said you received the papers from Crump
10       and Chinn?
11   A   Uh-huh.
12   Q   And those, I assume, are the study type papers; is
13       that correct?
14   A   Yes.
15   Q   And then you had Dr. Ruttenber's report on
16       mortality.  Was there anything else that you
17       received in connection with this litigation?
18   A   I don't believe so.
19   Q   Okay.  Have you reviewed all of those documents?
20   A   Yes.
21   Q   Okay.
22           MR. POLAND:  Can we take a real brief break?
23           MS. GEOPPINGER:  Sure.
24           MR. POLAND:  Five minutes?
25           MS. GEOPPINGER:  Sure, happy to.
```

```
     0043

     1          with respect to the analysis that he conducted for
     2          the mortality follow-up study and how that stood in
     3          the conclusions that he -- or his results rather,
     4          how those related to results of other epidemiologic
     5          studies of populations exposed to radiation, both
     6          from atomic bomb radiation as well as occupational
     7          studies.
     8     Q    Anything else that you will be specifically
     9          testifying to at trial with respect to Dr. Wing?
    10     A    My recollection as to the advisory committee
    11          meeting that he refers to.
    12     Q    Anything else?
    13     A    I think that's about it.
    14     Q    Okay.  With respect to Dr. Clapp, what is your
    15          understanding regarding what you will be testifying
    16          to at trial?
    17     A    Really my reactions to his report and the
    18          conclusions that he arrived at based on his study.
    19     Q    Anything else?
    20     A    No.
    21     Q    With regard to Dr. Clapp?
    22     A    No.
    23     Q    Okay.  Other than specific to Dr. Wing and
    24          Dr. Clapp, what is your understanding as to what
    25          you will be testifying to at trial?
```

```
0044

 1    A   My experience in occupational epidemiology,

 2        particularly with respect to the DOE worker

 3        studies, my expertise in the areas those studies

 4        involve, my training, former training, the findings

 5        of a number of the occupational epidemiologic

 6        studies and how they relate to each other and what

 7        their impact might be.

 8    Q   Anything else?

 9    A   At the risk of repeating it, I don't know whether

10        we have done this or not.

11    Q   I'd suggest that you don't look at my notes just

12        simply because I'm not the best notetaker.

13    A   I'm not looking at your notes.  I'm just trying to

14        focus myself.  In this context, I had said that the

15        culture of how the studies were conducted and the

16        culture that we had responsibilities that I had at

17        Oak Ridge Associated Universities in my time there.

18        That's about it.

19    Q   Anything else that you can think of that you're

20        going to be testifying to at trial that we've not

21        discussed or not listed?

22    A   I think some basic radiation health effects, basic

23        information about radiation health effects,

24        biological effects.

25    Q   Anything else?
```

```
0045
```

1  A  How those have been developed over time, the

2     scientific knowledge, the scientific basis for

3     those.

4  Q  Okay. Anything else?

5  A  I think that's it.

6  Q  Pretty comprehensive list. As a general question,

7     the testimony that you're going to be giving at

8     trial or your understanding of the testimony that

9     you're going to be giving at trial, is that similar

10    to the type of testimony that you gave in the Oak

11    Ridge case that you previously described for me?

12         MR. POLAND: Object to the form of the

13    question. Vague.

14 Q  You can answer.

15 A  Generally but in the Oak Ridge case it was more

16    focused on the studies of Oak Ridge workers.

17 Q  Okay. Same question with respect to the Australian

18    case. The topics that you described such as your

19    experience with occupational epidemiology with the

20    DOA workers studies, those type of things -- strike

21    that.

22         The general topics that you described for me

23    that you will be testifying to at trial in this

24    case, are those similar to the general topics that

25    you testified to in the Australian case?

```
0046

 1         MR. POLAND:  Object to the form of the
 2     question.
 3  Q  You can answer.
 4  A  Can I take time off the record?
 5         MR. POLAND:  No, let's stay on, Shirley.
 6  Q  I'm sorry, I need to you answer the question.
 7  A  I don't understand when you say I can answer when
 8     Mr. Poland has objected.
 9         MS. GEOPPINGER:  Okay.  Let's go off the
10     record.
11         (A discussion was held off the record.)
12         MS. GEOPPINGER:  Let's go ahead and reread the
13     question.
14         (The requested material was read back by the
15     reporter.)
16         MR. POLAND:  And I objected to the form of the
17     question.
18  A  Very generally because the Australian case was
19     focused on uranium and dealt with studies of
20     workers exposed to uranium, not so focused on
21     particularly Oak Ridge studies.
22  Q  Okay.
23  A  So it wasn't so concerned about the interaction
24     with Department of Energy.  That's what I was
25     trying to separate so that it was much more
```

```
0047
 1       scientific, totally scientific.
 2   Q   But the types of expertise that you're bringing to
 3       this case, was that the same type of expertise that
 4       you brought to those other two cases?
 5   A   Yes.
 6   Q   Okay.  Now we're going to get to what makes
 7       probably a little more sense.  We got ahead of
 8       ourselves.  I apologize.  Dr. Fry, I've given you
 9       what we've previously marked and identified as
10       Plaintiffs' Exhibit 2 and that is a copy of your
11       curriculum vitae, correct?
12   A   It is.
13   Q   Could you describe for me generally your
14       educational background?
15   A   I was educated in Britain, grew up and got my
16       education through high school in Britain.  And then
17       I took medical degree, medical training at the
18       University of Dublin, Trinity College, and at the
19       same time took a bachelor of arts degree which was
20       required, a requirement for obtaining a medical
21       degree at that university at that time.
22   Q   Okay.  And have you received any other degrees?
23   A   Yes.  Then I received a master of public health
24       with a focus in epidemiology from the School of
25       Public Health at University of North Carolina in
```

```
    0103

    1    A    That would be in the annual report of Oak Ridge

    2         Associated Universities.

    3    Q    And is that a public document?

    4    A    Yes.

    5    Q    Now, based on the employment chronology that we

    6         went through, my understanding is that your first

    7         contact at ORAU was 1978, correct?

    8    A    Uh-huh.

    9    Q    Do you have any personal knowledge of anything that

   10         was done at ORAU before 1978?

   11    A    Only what I've read and heard and been told.

   12    Q    Okay.  But you don't have any personal knowledge

   13         yourself of what occurred before 1978?

   14    A    I was not involved in anything there.

   15    Q    And can you give me a percentage at the time you

   16         were there, what percentage of ORAU's funding came

   17         from DOE?

   18    A    I think I addressed that earlier.

   19    Q    I think you may have, too.  But I don't remember so

   20         I thought I would ask again.

   21    A    I think we said it was varying amount.  Over time

   22         the DOE, the percentage of DOE funding declined of

   23         outside and non-DOE funding increased.  And I think

   24         I said that in the latter part of my time there, it

   25         would be about two-thirds DOE and one-third out,
```

```
0150

 1       related necessarily to the study that was being
 2       reported directly.
 3   Q   So it's fair to say that you agreed with the
 4       results of the study, if not the discussion,
 5       correct?
 6   A   Well, I agreed with most of the scientific -- the
 7       analytic discussion and the discussion as it
 8       related to the study itself, yes.
 9   Q   Okay.  How long did you work on the study with
10       Steve Wing?
11   A   Well, Checkoway published in '85 and Steve probably
12       began this in -- began this in '87.  So it would be
13       three -- roughly three years.
14   Q   Do you have any personal animosity towards Steve
15       Wing?
16   A   No, not at all.
17   Q   Have you had any disagreements with Dr. Wing about
18       anything else?
19   A   No.
20   Q   Did you ever make public your disagreement with
21       Steve Wing regarding the inclusion of these
22       comments?  Did you publish anything anywhere?
23   A   No, no.  I had a very high regard for Steve as an
24       epidemiologist.  It was just we had a difference of
25       opinion over those comments.
```