1

1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF NEW MEXICO

3

4   MERILYN COOK, et al.,

5             Plaintiffs,          No.  CIV-90-K-181

6   vs.

7   ROCKWELL INTERNATIONAL CORPORATION
    and THE DOW CHEMICAL COMPANY,
8
              Defendants.
9

10

11             DEPOSITION OF GENERAL HAROLD DONNELLY

12

13                  Thursday, March 14, 1996
                          9:00 a.m.
14                  20 First Plaza, Suite 700
                    Albuquerque, New Mexico
15

16        PURSUANT TO THE NEW MEXICO RULES OF CIVIL
    PROCEDURE, this deposition was:
17

18  TAKEN BY:  Eric L. Cramer, Esq.
              Attorney for Plaintiff
19

20  REPORTED BY:  Julianne LaBadia, CRR, RMR, RPR, CCR #83
                  JOE JAMESON COURT REPORTERS
21                320 Gold, SW, Suite 801
                  Albuquerque, New Mexico  87102
22

23

24

25

2

```
 1                         APPEARANCES

 2

 3  FOR THE PLAINTIFFS:

 4          BERGER & MONTAGUE
            1622 Locust Street
 5          Philadelphia, Pennsylvania  19103
            BY:  ERIC L. CRAMER, ESQ.
 6
    FOR THE DEFENDANT DOW CHEMICAL:
 7
            KIRKLAND & ELLIS
 8          200 East Randolph Drive
            Chicago, Illinois  60601
 9          BY:   MARTIN T. TULLY, ESQ.

10  FOR THE DEPARTMENT OF ENERGY:

11          LINDA SURBAUGH, ESQ.
            Assistant United States Attorney
12          1961 Stout Street
            Drawer 3608
13          Denver, Colorado  80202

14          ALLEN WOOD RIGSBY, JR., ESQ.
            United States Department of Energy
15          P.O. Box 928
            Golden, Colorado  80402
16
            JAKE J. CHAVEZ, ESQ.
17          United States Department of Energy
            P.O. Box 5400
18          Albuquerque, New Mexico  87185-5400

19
    Also Present:  Ms. Margaret Donnelly Hino
20

21

22                   ****************

23

24

25
```

3

```
 1                          INDEX

 2                                             Page

 3   EXAMINATION OF GENERAL HAROLD DONNELLY

 4         BY Mr. Cramer                          5

 5         BY Mr. Tully                         132

 6         BY Mr. Cramer                        149

 7   Certificate of Completion of Deposition   151

 8   Signature/Correction Page                 153

 9                        EXHIBITS

10                                             Page
```

```
11   938.   Letter, Bean to Thompson            --
     942.   5/74 letter, Colston to Donnelly    --
12   1212.  12/5/73 notes                       --

13   1447.  Subpoena                            11
     1448.  Documents subpoena                  11
14   1449.  5/14/69 telex                       33
     1450.  5/14/69 telex, Donnelly to Giller   41
15
     1451.  5/69 telex, Donnelly to Woodruff    43
16   1452.  5/26/69 memo for record             46
     1453.  7/69 telex, Woodruff to Donnelly    47
17   1454.  Undated memo, Donnelly to Dunning   49

18   1455.  7/69 telex, Donnelly to Woofruff    51
     1456.  7/69 letter, Donnelly to Hollingsworth  52
19   1457.  Report on 7/69 fire                 53
     1458.  9/69 letter, Donnelly to Woodruff   54
20
     1459.  9/69 memo, Donnelly to Woodruff     56
21   1460.  9/69 telex, Donnelly to Woodruff    57
     1461.  Undated letter, Donnelly to Erlewine  58
22   1462.  10/69 letter, Donnelly to Erlewine  59

23   1463.  11/69 telex, Abbott to Donnelly     63
     1464.  12/69 letter, Donnelly to Giller    64
24   1465.  1/70 telex, Donnelly to Giller      64
     1466.  2/70 telex, Abbott to Tesche        66
25
```

4

```
 1   1467.   1/70 TWX, Giller to Donnelly              69
     1468.   2/70 letter, Abbott to Donnelly           70
 2   1469.   2/70 telex, Donnelly to Giller            70
     1470.   3/70 letter, Donnelly to Abbott           74
 3
     1471.   8/70 letter, Donnelly to Giller           75
 4   1472.   11/70 letter, Donnelly to Biles           75
     1473.   12/70 letter to area managers             77
 5   1474.   3/71 letter, Donnelly to Giller           80

 6   1475.   4/71 letter, Donnelly to Joshel           82
     1476.   6/71 telex, Donnelly to Ginkel            85
 7   1477.   7/67 to 12/70 appraisal report            86
     1478.   9/71 memo, Donnelly to Giller             86
 8
     1479.   10/71 letter, Donnelly to Joshel          88
 9   1480.   10/71 letter, Donnelly to Hollingsworth   93
     1481.   10/71 letter, Biles to Bloch              99
10   1482.   11/71 memo, Erlewine to Ryan             101

11   1483.   1/72 telex, Facer to Donnelly            102
     1484.   2/72 telex, Donnelly to Biles            103
12   1485.    3/71 to 2/72 performance appraisal      104
     1486.   2/72 to 4/73 performance appraisal       107
13
     1487.   10/73 letter, Donnelly to Hollingsworth  107
14   1488.   10/73 telex, Donnelly to Jones           109
     1489.   11/73 letter, Donnelly to Biles          110
15   1490.   1/74 letter, Donnelly to Biles           111

16   1491.   12/73 telex, Donnelly to Harley          113
     1492.   8/74 letter, Donnelly to Harley          118
17   1493.   4/74 letter, Donnelly to Liverman        121
     1494.   9/74 telex, Donnelly to Biles            122
18
     1495.   11/74 letter, Donnelly to Lamb           123
19   1496.   1/75 telex, Donnelly to Bradley          125
     1497.   1/75 letter, Donnelly to Lamb            125
20   1498.   4/75 telex, Donnelly to Liverman         126

21   1499.   5/75 letter, Donnelly to Lamb            127
     1500.   5/75 letter, Graves to Donnelly          127
22   1501.   Undated letter, Liverman to Donnelly     130
                     DEFENDANT DOW EXHIBITS
23                                                   Page
     A.   6/69 letter, Condon to Donnelly            144
24   B.   3/71 letter, Donnelly to Giller            144
     C.   11/69 letter, Donnelly to Giller           144
25   D.   12/69 letter, Donnelly to Biles            144
```

5

```
 1                    GENERAL HAROLD DONNELLY

 2   After having been first duly sworn under oath, was

 3   questioned and testified as follows:

 4                         EXAMINATION

 5   BY Mr. Cramer:

 6         Q.   Good morning, General Donnelly.

 7         A.   Good morning.

 8         Q.   As I introduced myself earlier, my name is

 9   Eric Cramer, with the law firm of Berger and Montague.

10   I'm with one of the firms that is representing the

11   plaintiffs in a lawsuit known as Cook versus -- Cook, et

12   al., versus Rockwell and Dow.

13              And just to summarize, give you an idea of

14   what this suit is about, the plaintiffs are individuals

15   who are property owners and others who are living around

16   the plant -- Rocky Flats plant, within a certain radius

17   around the plant.  And they are suing for property

18   damages and for medical monitoring.

19              And just to -- have you ever been deposed

20   before, General Donnelly?

21         A.   No.

22         Q.   So, let me set down some of the ground rules,

23   just so we understand each other here.  You're not a

24   defendant here.  You're not subject to any potential

25   individual liability here.  You're here simply as a
```

6

1   witness, and simply to testify to what you know about

2   the facts that are relevant to this lawsuit.

3             Could you please state your full name for

4   the record?

5        A.   My full name is Harold Cooper Donnelly.

6        Q.   And let me just go through some of the ground

7   rules.  The court reporter is here in blue, and she'll

8   take down everything that's been said here today.  So

9   that means that you have to answer verbally.  "Uh-huhs"

10  or nods of the head won't do it.

11            You also need to wait for my question to

12  finish before you answer.  Do you understand that?

13       A.   I understand.

14       Q.   Okay.  Also, and importantly, if you don't

15  understand my questions, or any words in the question or

16  the way I phrase it, just say so and stop me.  This is

17  important.

18            What we want to get is your honest

19  testimony, but if you don't understand my question,

20  we're going to be talking not to each other, but back

21  and forth, and it won't give us the testimony we need.

22            And if you don't tell me, I'm just going to

23  assume that you understand the question.  Is that

24  clear?

25       A.   That's clear, but sometimes it might be a

7

1  false assumption, because that all depends how bright I

2  am to understand your brilliant questions.

3      Q.   Well, just please stop me at any time if you

4  don't understand something.

5      A.   Don't worry.  I will.

6      Q.   Great.  Also, if you need to take a break at

7  any time, for any reason, just let me know and we'll

8  stop.  This is an informal proceeding, and we'll

9  accommodate anything that you need.

10          Your job here is to answer questions fully

11  and honestly.  If at any time during the deposition you

12  need to amend an earlier answer, you can do so.  In

13  fact, you're obligated to do so, so I'd ask that you do

14  that.  Is that clear?

15      A.   That's clear.

16      Q.   Now, are you represented by an attorney

17  today?

18      A.   No.  Not unless you consider the people here

19  from AEC and people as attorneys, but they're not

20  representing me, as I know of.  I mean they're here with

21  me.

22      Q.   But they're not representing you?

23      A.   No.  I don't have an attorney.

24      Q.   Okay.  That's fine.  During the course of the

25  deposition, these attorneys here who aren't representing

8

1   you may raise objections, and those objections are all

2   for the record, and those will be adjudicated later

3   before a judge.

4          So when I ask a question, an attorney may

5   raise an objection.  Let the attorney finish the

6   objection, and then you can answer the question.  The

7   objection is simply for the record.

8          MS. SURBAUGH:  Well, we need to clarify one

9   thing there.  With regard to some questions, if they're

10  outside the ambit of the Twohee regulations, you may be

11  instructed not to answer the question.

12     Q.  So unless you are specifically instructed not

13  to answer a question, then you are to answer the

14  question.

15          I need to ask you, do you have a medical

16  condition that might affect your ability to remember or

17  to testify truthfully?

18     A.  I don't have a medical condition, but I have a

19  condition of old age.  I'm 86 years old, and if you

20  expect me to remember something that happened 27 years

21  ago, that might be expecting a little bit too much.

22     Q.  Okay.  You can only testify to what you

23  remember and what you know.

24     A.  That's what I intend to do.

25     Q.  That's all you need.  Now, did you talk to

9

1    anyone at all about this deposition today?

2        A.   What do you mean, did I talk to them?

3        Q.   Have you spoken to anybody?  Have you had

4    conversations about this deposition with anyone?

5        A.   Well, I don't understand.  What do you mean

6    "conversations"?  About what -- the deposition itself,

7    or the -- what it wants, or what?

8        Q.   Either one.  Either.

9        A.   Well, I have talked with these people around

10   the table.

11       Q.   Okay.

12       A.   Are the only people I've talked with.  I told

13   my daughter over there I'm being deposed today.

14       Q.   Okay.

15       A.   I showed her the papers.  The reason she's

16   here is she has my power of attorney.

17       Q.   Okay.

18       A.   She's looking out for the old man.

19       Q.   And when did you have a meeting with the

20   people around the table?

21       A.   Yesterday.

22       Q.   And how long did that meeting last,

23   approximately?

24       A.   I can't remember.

25       Q.   And were you shown any documents at that

1  meeting?

2      A.   No.  Not that I remember.  I don't remember

3  any documents.  Hell, no.  Pardon me if I use words like

4  that, but it just comes out naturally.

5      Q.   That's quite all right.  Speak naturally.

6  Now, you're here pursuant to a subpoena; is that

7  correct?

8      A.   That is correct.

9      Q.   I'd like to --

10     A.   Sent by you, in a letter to me.

11     Q.   Yes.  And I'd like to show you copies of what

12  are apparently the two subpoenas that were sent to you,

13  one requesting your appearance and one requesting you to

14  produce documents.

15          So, I'll hand those to you, and if you'll

16  take a moment to look at them, just verify that those

17  are the subpoenas that were sent to you, and then we can

18  mark them as exhibits.

19     A.   This is a letter here of February 29, signed

20  by Eric Cramer, to me, and enclosed are two subpoenas

21  that are just like the things you showed me here.

22     Q.   Okay.

23     A.   Except my copies are better copies than these

24  things of yours.

25     Q.   Yeah.  You have the originals.  Mine were

1   faxed to me.

2       A.   Okay.  That's it.

3       Q.   Okay.  So I'd like to mark these two documents

4   as 1447 and 1448.

5   (Exhibits 1447 and 1448 marked for identification)

6       Q.   We'll mark the appearance subpoena as 1447 and

7   the documents subpoena as 1448.

8                Now, if you take a look at the documents

9   subpoena, which is 1448, there's an attachment which

10  refers to the documents that we asked you to search for

11  and produce today.

12      A.   Okay.

13      Q.   When you read that, what was the first thing

14  that you did?

15      A.   The first thing I did myself?  I said I don't

16  have any documents.

17      Q.   You don't have any file at home of any

18  documents related to Rocky Flats?

19      A.   No.  I'd like you to clearly understand,

20  through my experience in the military and with AEC, that

21  I worked in very high classified areas.  I never took a

22  document home in all my life, because I was worried

23  about safeguarding them, in case I got in a wreck and

24  somebody hit me and I flew out the door, I didn't want

25  to have a briefcase of documents, top secret documents,

12

1   going all over the place.

2       Q.   That's fair.  While you were working in any

3   capacity in association with the Rocky Flats plant, did

4   you keep a personal log or journal?

5       A.   No.  I'd like you to know, I don't keep

6   diaries or logs period.

7       Q.   Okay.  When did you first set foot on the

8   Rocky Flats plant site?

9       A.   I don't remember exactly, but I would say it's

10   shortly after I took over as manager of the Albuquerque

11   operations office.  Sometime after the 1st of July,

12   1968.

13       Q.   Okay.  I'd like to go back before that, just

14   to back up, to get a sense of your educational

15   background.  What did you study in college?

16       A.   I went to the military academy.  I got a

17   Bachelor's of Science in military engineering.  I

18   studied physics, studied electricity, I studied history,

19   I studied descriptive geometry, I studied analytic

20   geometry, I studied algebra, I did mechanical drawing,

21   did all those sorts of things.

22       Q.   And do you have an advanced degree, past

23   college?

24       A.   No.

25       Q.   Did you take, at any time, either in college

1  or thereafter, any courses in environmental science?

2       A.   I don't understand what you mean by

3  "environmental science."

4       Q.   Well, any course that focused on the effects

5  of -- strike that.  Did you take any courses relating to

6  health physics?

7       A.   No.

8       Q.   Have you taken any courses related to

9  radiation monitoring?

10      A.   No.

11      Q.   Have you taken any courses related to

12  epidemiology?

13      A.   Please give me a definition of "epidemiology."

14      Q.   Layman's terms, I would think epidemiology is

15  the study of -- the study of disease in human

16  populations.

17      A.   No.

18      Q.   Have you taken any courses in public health?

19      A.   No.

20      Q.   Have you taken any courses in nuclear

21  physics?

22      A.   No.  The only courses I've taken in physics, I

23  was at West Point, and I do not remember that we had

24  nuclear physics back then.  That was back in the old

25  days.  That was back in the 1929 to 1933 period.

14

1    Q.   And you graduated West Point in 1933; is that

2  correct?

3    A.   Absolutely.   June 13th, 1933.

4    Q.   That's right when Hitler came to power.

5    A.   I well know.

6    Q.   And what was your first job outside of -- when

7  you graduated from West Point?

8    A.   My first job was a Second Lieutenant.

9    Q.   And where?   Where were you stationed?

10    A.   The artillery, Coast Artillery down in Fort

11  Monroe, Virginia.

12    Q.   And what did you do in that position?

13    A.   I was in the battery, a battery officer.

14    Q.   And what were your responsibilities?   Briefly.

15    A.   My responsibility was training men on railroad

16  guns and firing target practices, and taking care of my

17  men.

18    Q.   And for how long were you in that position?

19    A.   I was in that position for one year.

20    Q.   And then what did you do after that?

21    A.   I went to Panama for two years.

22    Q.   And what were your responsibilities there,

23  briefly?

24    A.   I was still a battery officer.

25    Q.   And after Panama?

15

1    A.    I went to the Philippines from '36 to '38.

2    Q.    As a battery officer?

3    A.    No.  As an aide to a General.

4    Q.    Which General?

5    A.    General Bishop, who commanded Corregidor, and

6    then he commanded the Philippine division as a Major

7    General.  He went over there as a BG.  He was my

8    father-in-law.

9    Q.    And after the Philippines what did you do?

10   A.    Came back to Presidio, San Francisco.  Fort

11   Scott, California.

12   Q.    And how long were you there?

13   A.    I was a battery officer there for -- from '38

14   to 1940.

15   Q.    And then in 1940 what did you do?

16   A.    Went to Camp Hahn, Riverside, right near March

17   Field.  I was in the anti-aircraft artillery then.

18   Q.    What state is that in?

19   A.    California.  Camp Hahn, California, Riverside,

20   California, March Air Force Base, is right where it

21   was.  We were right across from the big field there.

22   Q.    And how long were you there?

23   A.    I was there until Pearl Harbor, and then we

24   set up the air defenses of San Francisco -- of Los

25   Angeles and San Diego.

16

1    Q.   And what were your responsibilities?

2    A.   I was commanding a battery, a gun battery.

3    Q.   Just for the record, what is a battery?

4    A.   A battery is like an infantry company.  A

5    battery consists of anywhere from 100 to 150 people,

6    back in those days, and you usually had a number of

7    firing guns and ammunition, and everything else that

8    goes with it.  You were self-supporting.  You had your

9    own cooks, your own supply, your own transportation,

10   your own everything.

11   Q.   And for how long were you in this position?

12   A.   Until Pearl Harbor.

13   Q.   And then after Pearl Harbor, what did you do?

14   A.   Pearl Harbor, I came back -- I was sent back

15   to Washington, to the Pentagon, to the Office of the

16   Chief of Coast Artillery, Anti-aircraft.

17   Q.   And for how long were you there?

18   A.   I was there about six months, and then I went

19   to Richmond, Virginia.

20   Q.   And what were your responsibilities in

21   Richmond?

22   A.   I was on the staff there.

23   Q.   And what was your position?

24   A.   I was on the plan section of the staff, as a

25   captain.

17

```
 1        Q.   Plan section?

 2        A.   Plans, yes.  Plans.  Plans and operations.

 3        Q.   And what did you do there?  What were your

 4   responsibilities?

 5        A.   Making plans and seeing that they were carried

 6   out.  Making plans for all the anti-aircraft people in

 7   the country.

 8        Q.   And for how long --

 9        A.   And I was a Captain, but I was low down on the

10   totem pole.

11        Q.   And for how long were you there?

12        A.   Oh, let's see.  God Almighty.  That was 1941.

13   Well, I was there, I guess, about a year or so, and then

14   I went to various schools.

15        Q.   What kind of schools?

16        A.   I went to command and journal staff school,

17   Leavenworth.

18        Q.   I'll stop you there.  I'm sorry.

19        A.   Yeah.

20        Q.   What did you study in the command school in

21   Leavenworth?

22        A.   Command and journal school.  You study

23   strategy and tactics, and how to make war plans, and how

24   to operate campaigns.

25        Q.   And then, after Leavenworth?
```

18

1      A.   I went back to the headquarters in Richmond

2   for a while, and then I went to the Armed Forces -- the

3   Army Navy Staff College.

4      Q.   And what --

5      A.   That included Army, Air Force, Air Corps,  was

6   all together in the Army then, and the Navy officers,

7   and we went to various places to learn how the services

8   operated.

9      Q.   Did you get any degrees from any of these

10   schools?

11      A.   Not that I know of, no.  And they didn't give

12   degrees.  They give you a diploma, but no degree.

13      Q.   And when did you leave the last school that

14   you were at?

15      A.   Oh --

16      Q.   Approximately.

17      A.   I think -- I was trying to think when I left

18   the last school.  I left the last school, it must have

19   been in '44, because I went to Chinaburm, India Theater

20   then.

21      Q.   And how long were you in Chinaburm, India?

22      A.   26 months.

23      Q.   And then what did you do after that?

24      A.   Well, I was in the plans section out there, in

25   New Delhi at first, India, and then I went over the hump

19

1    and I was in the plan section at Chungking, China, and I

2    went from Chungking, China, down to Candy Salon, where I

3    worked for Lord Louie Montauban, in his headquarters.

4                    And then I came back from there to New

5    Delhi, and became Deputy Chief of Staff of the India

6    Burma Theater, and I became Chief of Staff of the India

7    Burma Theater, and stayed there and helped the general

8    close it out.

9                    We closed out the theater, and I came home

10   in 1946.

11        Q.   Chief of Staff, does that mean you were a

12   General or you were working under a General?

13        A.   No, no.  I wasn't a General.  I was working

14   under the General -- Vinegar Joe Stillwell was the

15   commander.

16        Q.   Stillwell?

17        A.   Stillwell, Vinegar Joe.  Four stars.  Vinegar

18   Joe Stillwell.  He had a deputy running the place down

19   in New Delhi, and I worked as a Colonel for him.

20        Q.   And then, after that, in '46 where did you

21   go?

22        A.   '46, '47, I came back to the United States and

23   I went to the Pentagon.

24        Q.   And what did you do in the Pentagon?

25        A.   I worked in the section called OPD, operation

1   plan department, that ran the whole war, and General

2   Eisenhower was then Chief of Staff.  And I had known

3   General Eisenhower in the Philippines as a Lieutenant

4   Colonel when he worked for MacArthur.  And I had known

5   MacArthur in the Philippines, who gave my graduation at

6   West Point, and MacArthur graduated 30 years ahead of me

7   out of West Point.  He was the class of 1903.

8              And then I worked -- I briefed General

9   Eisenhower when I was OPD.

10      Q.   What was your formal title at OPD?

11      A.   OPD?  I was plans -- one of the plans officers

12   in the planning section.

13      Q.   And then, after that, after being a plans

14   officer, what did you do?

15      A.   Well, I transferred to the Air Force on the

16   1st of September, 1947, Colonel Norstad, a three-star

17   General who was my boss, wanted me to go up there with

18   him and set up his office for him, which I did.

19      Q.   And how long were you there setting up the

20   office?

21      A.   I was there one year, and then I went to

22   Montgomery, Alabama, to Maxwell Air Force Base, to go to

23   the Air War College.

24      Q.   And what did you study at the Air War College?

25      A.   Air warfare.  All kinds of strategy and

1  warfare.  How to use airplanes.

2        Q.   Are you a pilot yourself?

3        A.   No.

4        Q.   And after the air college, what did you do?

5        A.   I came back to the Pentagon.

6        Q.   And what was your position?

7        A.   Oh, let's see.  I'm trying to think.  I guess

8  I worked in the Office of the Assistant for Atomic

9  Energy there.  The Air Force was just getting into a new

10  office, going to handle atomic energy matters.

11        Q.   And how did you come to work with the AEC?

12        A.   How did I come to work with the AEC?  Well,

13  when I retired from the Air Force, the AEC wanted to

14  know if I wanted to come out and be manager of AEC

15  Albuquerque operations office, and I said yes.  But I

16  had worked with the AEC a lot during my service.

17        Q.   In the late '40s, when you left this air

18  college and went to the Pentagon, was that your first

19  contact with the AEC?

20        A.   I didn't have any contact with the AEC then,

21  because I was too low down the totem pole, and my office

22   -- the General running the office had contact with it,

23  the Air Force General.

24        Q.   What was your position when you were in the

25  Pentagon in this period, after you left the air

22

1   college?

2        A.   Well, I was a Colonel, and I was working on

3   all kinds of plans and working on things for -- how we

4   got the Air Force in the atomic business.

5        Q.   And for how long were you in this position?

6        A.   Oh, I don't know.  I think about a year.

7        Q.   But you didn't personally deal with anybody

8   from the AEC at this point?

9        A.   I can't remember.

10       Q.   Okay.  And then, after that, what did you do?

11       A.   I became Chief of Staff of the Armed Forces

12   Special Weapons Project, which was the descendent from

13   the Manhattan engineer district.

14       Q.   Who was your supervisor at that point?

15       A.   My supervisor was Major General H.B. Loper,

16   who is now dead.

17       Q.   And what were your responsibilities, briefly?

18       A.   As Chief of Staff, my responsibilities were to

19   run the whole staff.

20       Q.   And what -- go ahead.

21       A.   Run all the divisions of the staff and see

22   that the old man got the proper papers, and proper

23   things were brought to his attention.  And that's when I

24   started having contact with the Atomic Energy

25   Commission.

23

1      Q.    Who did you have contact with at the AEC?

2      A.    The director of the Division of Military

3   Applications.

4      Q.    Who was that at the time?

5      A.    If I remember correctly, I think that was

6   General Fields, a classmate of mine, or General

7   Starboard.  General Fields -- Starboard relieved him.

8   I'm not exactly sure, but it was one of those guys.

9      Q.    Okay.  And for how long were you Chief of

10  Staff of the Armed Forces Special Weapons Project?

11  Approximately.

12     A.    About two years.

13     Q.    And what did you do after that?

14     A.    I went to Allied Ship Headquarters, Allied

15  Command, Europe, in Paris, France.

16     Q.    Approximately what year was that?

17     A.    That was 1954.

18     Q.    What what did you do at Allied Command

19  Europe?

20     A.    Made a Brigadier General while I was over

21  there.  I worked for General Grunther, who was the

22  supreme command, Allied SAC Europe, they called him, and

23  I was to set up the atomic plan for all Allied Command

24  Europe, for NATO.  And I had personnel of all the NATO

25  nations working for me.  I was a young Brigadier

1   General.

2       Q.   Up until this point, had you had any

3   involvement with the making of the bombs, the atomic

4   bombs?

5       A.   No.  Oh, well, wait a minute.  Hell, I didn't

6   make the bombs or anything, but I went and visited the

7   plants, various places.

8       Q.   Did you go to Rocky Flats?

9       A.   No.

10      Q.   Did you go to Hanford?

11      A.   Did I go to Hanford?  No.  The only place I

12  remember coming is maybe Sandia out here, to Sandia

13  Labs, because we had field command out here, but I

14  didn't get down to the nitty-gritty.  And I knew people

15  at Los Alamos, I went to Los Alamos and went to

16  Livermore.  That's about all I remember from those days.

17      Q.   And what did you do when you visited these

18  plants?

19      A.   Talked to people.  Asked them questions.

20      Q.   And what did those questions focus upon?

21      A.   I don't remember what I asked them.  Just like

22  I'd ask you a question.  Say, "How you doing, how's your

23  work?  Please tell me what you do here, will you?"

24      Q.   Why did you -- what was the point of going

25  there?  How did that help you do your job back in

25

1  Washington?

2       A.   The reason I went there was to increase my

3  education, to make contact with people I might be

4  working with later on, to see what they did, how they

5  fitted into my business, how I fitted into theirs, where

6  they could be helpful to me and where I could be helpful

7  to them.

8       Q.   Did your office, either as the Brigadier

9  General and --

10      A.   This is all NATO.  I didn't go there until

11  NATO.

12      Q.   I see.  So we're talking about while you were

13  Chief of Staff of the Armed Forces Special Weapons

14  Project?

15      A.   Yeah.  And sometimes afterwards.  When I was

16  in NATO I stayed over there, and the only place I came

17  from Paris was back to the Pentagon to talk to the three

18  services about war plans for NATO and their people.

19  That's what I did, why I came back, but I didn't go

20  running around to all the atomic plants in the country.

21      Q.   Right.  As Chief of Staff of the Armed Forces

22  Special Weapons Project, did you have any role in

23  setting production of --

24      A.   No.

25      Q.   For how long were you in Europe as a Brigadier

1    General?

2        A.   '54 to '57.

3        Q.   And then, after '57, what did you do?

4        A.   I came back to the United States.

5        Q.   And in what position?

6        A.   As a Major General in the Air Force staff.

7        Q.   Where were you located?

8        A.   Pentagon, plans and programs.

9        Q.   And what were your responsibilities?

10        A.   I mean do you -- all right.  I'll tell you

11   what they were.  I had a boss who was a three star

12   General, a General Gerhardt, who was a fighter pilot,

13   and I was his deputy.  And we made the plans and

14   programs for the whole Air Force.  How many units we

15   would need, how many men we would need, how many --

16   practically everything that had to do with the Air

17   Force.  We were the spark plug for the Air Force.

18        Q.   In or around 1957, did you learn that there

19   was a fire that occurred at Rocky Flats?

20        A.   No.

21        Q.   And after --

22        A.   I'd like to point out, when I had that job, I

23   didn't have anything to do with AEC or any atomic

24   business.  I was concentrating on the Air Force, and

25   what the Air Force had to do.

27

```
1        Q.   Right.  And after that, what did you do?

2        A.   Well, let me see.  Get back to --

3        Q.   After '57.

4        A.   Oh.  I became the Commander of the Field

5   Command, the Armed Forces Special Weapons Project out

6   here at Sandia Base.

7        Q.   And for how long were you in this position?

8        A.   From 1960 to '63.

9        Q.   And after that?

10       A.   After that, I went back to the Pentagon, and I

11   went to the Air Force headquarters and the offices of

12   the Deputy Chief of Staff, research and development.

13       Q.   Who was your supervisor?

14       A.   General Ferguson.

15       Q.   And what were your responsibilities?

16       A.   Well, we were looking to the Air Force

17   laboratories, we were looking at research and

18   development of new things for the Air Force, new

19   airplanes, new weapons, all kinds of new things.

20       Q.   And how long were you there?

21       A.   I was there about a year.

22       Q.   I never asked you, what were your

23   responsibilities at Sandia from '60 to '63?

24       A.   Well, my responsibilities at Sandia were

25   supervising the storage sites of the -- for the Field
```

28

1   Command, supervising the training of officers and men in

2   the atomic business, atomic weapons.  That was it.

3        Q.   Did you have any involvement with the making

4   of the bomb or bomb and atomic weapons in this position

5   from '60 to '63?

6        A.   Not that I remember.

7        Q.   And then --

8        A.   I was only operating on the use of them,

9   training of them.

10        Q.   How long were you at the Pentagon after '63?

11        A.   '60 -- what did I say?

12        Q.   '63?

13        A.   '63?

14        Q.   Well, you said you were at Sandia from '60 to

15   '63.

16        A.   That's right.  '63 I went back to the

17   Pentagon.  I spent one year up in DC, SR&D, and '64 I

18   became a three star General, became Director of the

19   Atomic Support Agency, with offices in the Pentagon.

20        Q.   And what were your responsibilities?

21        A.   My responsibilities were running the whole

22   Defense Atomic Support Agency, and seeing that the

23   services got the training they needed, got the -- got

24   the support they needed from -- just the same thing, the

25   Atomic Support Agency-- they got the support they needed

1   from the atomic field from my outfit.

2        Q.   And when you say that they got the support,

3   who is "they"?

4        A.   The Armed Forces.  Army, Navy, Air Force,

5   Marine Corps.

6        Q.   And then, after that, what did you do?

7        A.   I retired, in 1968.

8        Q.   And why did you retire?

9        A.   Why did I retire?  Well, I had put 35 years

10  in.  It was time for me to retire.

11       Q.   And after that what did you do?

12       A.   I came out here as the head of the AEC

13  operations office.

14       Q.   And who asked you to come out here?  If you

15  remember.

16       A.   Yes, I remember very well.  Mr. Robert

17  Hollingsworth.  The manager of AEC, general manager, and

18  his deputy, John Erlewine.

19       Q.   And had you had contact with Hollingsworth and

20  Erlewine prior to this point?

21       A.   Yes.

22       Q.   When?

23       A.   Through my career in the Atomic Support

24  Agency.

25       Q.   And what were -- what was Hollingsworth's

30

1  position at the time?

2       A.   General manager, as I said before, of the AEC.

3       Q.   And Erlewine?

4       A.   Assistant general manager.

5       Q.   And in your position at the Albuquerque

6  operations office, what were your responsibilities,

7  initially?

8       A.   My responsibilities were to supervise a

9  weapons production complex.

10      Q.   And were you responsible for all the different

11  plants around the country?

12      A.   No.  Not all of them.

13      Q.   Which ones?

14      A.   I can remember a few, but not all of them.

15  Rocky Flats was one.  PanTex at Amarillo was one.  The

16  lab at Sandia was one.  Los Alamos.  There were some

17  others, but I don't remember what they were.

18      Q.   Now, when you first came out to the

19  Albuquerque operations office, were you given a briefing

20  at all by Hollingsworth and Erlewine?  A briefing about

21  what your position -- what your responsibilities were,

22  what you were supposed to be doing?

23      A.   No.  I didn't need a briefing.  I had been in

24  contact with them so much and been in the business so

25  much -- I mean they didn't need to teach me a hell of a

31

1   lot.

2         Q.   Approximately how much -- what percent of your

3   time in the late '60s was spent dealing with Rocky

4   Flats, as opposed to the other plants and your other

5   responsibilities?  Just rough estimate.  What percentage

6   of time?

7         A.   What percent of my time was dealing with Rocky

8   Flats, compared to Amarillo and Sandia and the rest of

9   them?

10        Q.   Right.

11        A.   I don't remember.

12        Q.   Okay.  Do you remember if it was more than the

13   others, or do you --

14        A.   I said I don't remember.

15        Q.   Okay.  And how long were you in this position

16   at the operations office?

17        A.   From '68 to '75.

18        Q.   And why did you leave -- did you leave there

19   in '75?

20        A.   Yes, I did.

21        Q.   Why?

22        A.   Because I felt I had spent seven years there,

23   I was used to the service and moving every two or three

24   years.  I thought I had done my duty for the country,

25   and it was time for me to leave and give example to

32

1   other people to leave.

2        Q.   And who took over after you?

3        A.   Herm Roser.

4        Q.   Did he work under you while you were --

5        A.   Yes.  He was my deputy manager.  For a while.

6   John -- John McCraw was the first one, as I remember.  I

7   think that was the name.  He's dead.  So is Roser.  He's

8   dead.

9        Q.   And have you been retired since '75?

10       A.   Well, I retired in 1968, I told you, from the

11   Air Force.

12       Q.   Oh, well, retired --

13       A.   And retired since '75.  I've worked on and

14   off, but not a hell of a lot, as a consultant.

15       Q.   And what did you do as a consultant?  For

16   what?

17       A.   Well, people would ask me to give my ideas on

18   things.  I consulted on military affairs, I consulted on

19   atomic affairs.  I can't remember.  If you were willing

20   to pay me, I could come to you and work for you.

21       Q.   Did you do work for the AEC?

22       A.   No.  Not that I remember.  I don't remember

23   doing any work for them.

24       Q.   Okay.

25       A.   I split from the AEC in 1975, and didn't go

33

1    back working for them.

2         Q.    Have you had contact with anyone at the Rocky

3    Flats plant since 1975?

4         A.    No.

5         Q.    I'm going to be showing you some documents

6    during the course of the deposition and pointing you to

7    specific parts of the documents, but if you at any time

8    feel you need to review the entire document to get an

9    understanding of the context, please tell me, and we'll

10   take the time to do so.

11                     I'd like to have this marked as Exhibit

12   1449.

13   (Exhibit 1449 marked for identification)

14        Q.    Now, this appears to be a telex of some kind,

15   dated May 14th, 1969, and it appears to be from

16   yourself; is that correct?

17        A.    That's my name.

18        Q.    And would you call this a telex?  Is that what

19   this is called, this form?

20        A.    I'd call it a message.

21        Q.    A message?  Okay.  And do you recognize this

22   particular message?

23        A.    No, I do not.  But I can read it and I'll tell

24   you what I -- I want to read it and have time to read

25   it.

34

```
1        Q.   Go right ahead.  Please do.

2        A.   Okay.

3        Q.   Does this appear to be a document that you

4   authored, that you wrote?

5        A.   Yes.

6        Q.   And this was written to Major General Giller?

7        A.   Yes.

8        Q.   Who is Major General Giller?

9        A.   Major General Ed Giller was DMA, Director of

10  Military Applications, headquarters AEC.

11       Q.   Was he your supervisor?

12       A.   Was he what?

13       Q.   Was he one of your supervisors?

14       A.   Well, he was a supervisor.  He was my chief

15  contact.  I guess you could say he was the guy I went to

16  at headquarters.  He was my chief contact at

17  headquarters.  I worked for the general manager.

18       Q.   Right.

19       A.   But the general manager was my boss.  Ed

20  Giller was one of the staff officers there for him.

21       Q.   So Giller was in Albuquerque or in

22  Washington?

23       A.   No.  In Washington, headquarters AEC, where

24  the commission was.  Those days, they had five

25  commissioners on AEC.
```

35

1       Q.   Who was Giller's boss?

2       A.   Well, at that time, I don't know if it was

3   Seborg, or whoever it was.  Whoever was chairman of the

4   submission.  I think it was Seborg.

5       Q.   Now, do you remember some of the facts

6   discussed in the document?

7       A.   No.

8       Q.   Do you recall the fire that occurred in May of

9   1969 at Rocky Flats?

10       A.   What do you mean by "recall"?

11       Q.   Well, do you recall that there was a fire in

12   May of 1969 at Rocky Flats, a large fire?

13       A.   Do you mean do I know that there was a fire,

14   and remember what --

15       Q.   Yes.

16       A.   Yes.  I know that much.

17       Q.   When did you first learn about the fire?

18       A.   Well, I think I learned it by -- probably a

19   telephone conversation.

20       Q.   With whom?

21       A.   Probably area manager from up there.  I don't

22   remember.

23       Q.   And what were your responsibilities -- did you

24   have specific responsibilities with respect to dealing

25   with the aftermath of the fire at Rocky Flats?

36

1      A.   Well, I'll tell you to the best of my memory

2   what my reaction was.

3      Q.   Please do.

4      A.   When I was notified there was a fire, my first

5   reaction was, was anybody hurt.  My first reaction is

6   always safety.

7            When I learned that no one was injured,

8   that was good news to me.  Then I asked how important or

9   how bad it was.  And they said it was not -- it was not

10  real, real serious.

11           And my next thing that I did --

12     Q.   Let me just stop you for one second.

13     A.   What?

14     Q.   I just need to interrupt you for one second.

15     A.   Okay.  I can't hear very well, so speak up.

16     Q.   That's okay.  You said they told you "it was

17  not real, real serious."  I just want to know who the

18  "they" was.  Was it Dow?

19     A.   The people at Rocky Flats.

20     Q.   Was it AEC?

21     A.   No.  No, sir.  Dow.  My area officer up there,

22  manager.

23     Q.   And who was that?

24     A.   I do not remember.

25     Q.   Okay.  Okay.  Continue, please.  I just need

37

1    to clarify things for the record.  That's the only

2    reason I interrupt you, just so it's clear.

3         A.   Well, you interrupted my story, what I was

4    going to tell you.  Now I got to think things all over

5    again.

6         Q.   I'm sorry.  I apologize.

7         A.   I don't really appreciate it, to tell you the

8    truth.

9         Q.   I will refrain from doing it, because I don't

10   want to interrupt you.

11        A.   And the next action I took -- I can't remember

12   if it happened one day or two days -- I immediately went

13   up there.  That was always my reaction when I was in the

14   service, anyplace -- to go to the scene and see whatever

15   happened.  So I went up there.

16        Q.   And did you meet with -- who did you meet with

17   there?  Do you recall?

18        A.   I met with the area officer.  I met with Lloyd

19   Joshel, the manager.

20        Q.   And Joshel was the -- he worked for Dow?

21        A.   Yes.

22        Q.   And --

23        A.   And I took my safety people with me.

24        Q.   And who were your safety people?

25        A.   People that worked for me, safety people.  I

1  don't remember their names from 27 years ago.

2       Q.   Okay.  And did you tour the area of the fire?

3       A.   Yes.

4       Q.   Do you recall what it looked like?

5       A.   To the best of my memory, it was a long

6  building, and there were glove boxes in there.  And I

7  didn't worry about walking around there, because -- I

8  mean I don't remember whether I had any protective gear

9  on or not, but I sure went in the building.  The

10 radiation was practically nothing at all, and I wasn't

11 worried about it.  And I'm still alive.

12      Q.   And how did you come to the conclusion that

13 the radiation was practically nothing at all, or low?

14      A.   Well, you read this message, did you?

15      Q.   I did.

16      A.   Well, it doesn't say the radiation was bad,

17 and -- it didn't say the radiation was great outside or

18 anything else, so why are you asking me the question?

19      Q.   I'm just asking you how you came to that

20 conclusion.  What data did you look at?

21      A.   I came to the conclusion from the people

22 there, from my own feeling and sense in looking at the

23 building, and common sense, and asking them.  And the

24 radiation monitors told me it wasn't bad, so I believed

25 in the experts.

39

1        Q.   Okay.

2             MS. SURBAUGH:   Why don't we take five

3    minutes.

4             MR. CRAMER:   Sure.

5    (Recess held)

6        Q.   I'd just like to state on the record, General,

7    that -- and I'm saying this sincerely.   I have the

8    utmost respect for what you did throughout your entire

9    career for the country, and I'm asking you questions

10   because you're a resource, because you're someone who

11   was there.

12            You were at the plant, you did the things

13   that you did, and you're an important resource for my

14   clients.   And so, that's the reason why I'm asking you

15   questions.

16            And I know it sounds -- it comes off as

17   questioning you, but I don't mean to question you.   I'm

18   just asking questions because myself and my clients just

19   want to know what you saw and what you know.

20            So, I'll try to move along a little

21   quicker, and I understand this is difficult and

22   awkward.

23            I just had one question about this

24   document.

25       A.   Okay.

40

1      Q.   The document, if you look in the first

2   paragraph, the document states, "What happened to the SS

3   material in the building?

4             "Answer.   The fire took place in building

5   776" -- I'm sorry.   "The fire took place in building

6   776, but the total inventory of buildings 776, 777

7   should be considered, inasmuch as there is no dividing

8   wall between the two buildings."

9             Do you recall what SS material is?

10     A.   Oh, wait a minute.   SS material, well, that's

11  nuclear material.   It's --

12            THE WITNESS:   Jake, do you remember what

13  the hell the name of that stuff was?

14     Q.   That's okay.

15            MS. SURBAUGH:   Sorry.   You can't do that.

16            THE WITNESS:   Oh, oh.

17     Q.   If you don't remember, that's okay.

18     A.   No.   SS material, it was just a pseudonym for

19  source material, or something like that.   I can't

20  remember back that far, no.

21     Q.   And do you recall why it's important to take

22  the total inventory of the material?   Why that was an

23  important thing to do?

24     A.   No, I don't.

25            MR. TULLY:   Off the record a second.

41

1  (Discussion off the record)

2      A.   The only thing I can say about the SS

3  material, why they wanted to know how much was there,

4  well, they just wanted to -- well, I don't really know.

5  I don't know.  I can't remember what it is.  I just

6  can't remember what it is.  I mean it's material, it's

7  nuclear material, is what SS material is.

8      Q.   Tell me if I'm wrong.  Was it they wanted to

9  measure how much was there after the fire?

10     A.   I don't know.

11     Q.   Because they knew how much was there before

12  the fire, so --

13     A.   No.  I don't know.  I don't know.

14     Q.   Okay.

15     A.   I wasn't at that meeting, so I don't know what

16  they wanted it for.

17     Q.   Okay.  You can put that document aside.

18  (Discussion off the record)

19     Q.   I'd like to have this document marked as

20  Plaintiff's Exhibit 1450.

21  (Exhibit 1450 marked for identification)

22     Q.   And I'd just like you to take a look at this

23  and tell me if this is a document you prepared.  You can

24  take your time.

25     A.   May I read the whole document?

1      Q.   Sure.  You can do whatever you need to do.

2      A.   I'd like to put in the record that I told you

3   previously I couldn't remember the name of the area

4   manager, but reading this message, it comes back to my

5   mind it was Seth Woodruff.  He was the area manager;

6   that he had been there for quite some time, long before

7   I ever came to AEC, and he was a very fine area

8   manager.  I admired him.

9      Q.   Okay.  And do you, after reading this, can you

10  verify that this is a document that you prepared?

11     A.   This is a document that was prepared by

12  Joshel, Seth Woodruff, and their staff, and my staff

13  worked with them.  And I signed the document and went

14  over the document and all that, but I personally did not

15  prepare it.  It was done by staff people.

16     Q.   If you turn to page 2, the bullet number 7.

17     A.   Yeah.

18     Q.   It reads, "Isolate burned-up part of building

19  776 and commence cleanup.  Major task is removing and

20  recovering plutonium.  In view of heavy contamination,

21  this will take three years before this part of building

22  is in the same condition as before the fire."

23           Does this in any way jog your recollection

24  about the extent of the devastation of the fire?

25     A.   (Witness shakes head)

1          MR. TULLY:  Objection as to form.  You can

2   answer, General.

3      Q.   No?

4      A.   No.

5      Q.   Okay.  Do you have reason to doubt any of the

6   facts in this document as we sit here today?

7      A.   Well, I cannot at this late date remember all

8   these facts and say they're bona fide, completely true,

9   but I don't doubt the document.

10     Q.   Okay.  But it was your practice at the time to

11  always check the facts while you were writing a

12  document, to ensure that everything that went into the

13  document was accurate and true, to the best of your

14  ability, given your constraints?

15     A.   Well, it was always my practice to check

16  anything that I was going to sign or send for its

17  accuracy in the spelling, language, and figures, yes.

18     Q.   Okay.  Good.  Okay.  We can put that document

19  aside.

20     A.   Okay.

21     Q.   Showing you another document, which I'd like

22  to have marked as Plaintiff's Exhibit 1451.

23  (Exhibit 1451 marked for identification)

24     Q.   Please take a moment to review it and attempt

25  to verify if this is a document that you prepared.

1      A.   If I may, I'd like to say something --

2      Q.   Please do.

3      A.   -- please, before I comment in detail on this

4   document.  Not that I'll be able to comment in detail.

5   When a thing says from me, from me to somebody, that

6   doesn't mean I personally wrote it or I personally saw

7   it.

8            Many documents, many things, messages went

9   out under my name, sent by my staff, that I never saw.

10   And so, that has to be figured in all these things.  I

11   couldn't see hundreds and hundreds of messages, or all

12   the papers.  I had to trust my staff to do so much

13   work.

14            So, when I see my name there, yes, that was

15   sent by me as the boss, and I was the boss.  I -- I know

16   I'm responsible for everything that happened with my

17   people, and I've always been that way, that the buck

18   stops with me and I'm the boss, and people do it with my

19   name.  If they don't do it right, why, then they answer

20   to me, but I'm the guy responsible.

21            So I don't know whether I ever saw this

22   message or not.  And probably these other messages.  I

23   just got thinking that I wanted to be clear with you,

24   you know.

25            And I hope that you understand that I

45

1    couldn't see all the messages, and there are only

2    certain ones that I saw, that people on my staff thought

3    I had to see, and for me to put my chop on it before

4    they went out.  You know what I mean?  Okay.

5          Q.   I understand.  I understand.  Does this appear

6    to be the form of a document that came from your

7    office?  And do you have reason to doubt that --

8          A.   Well, yeah.  This is the kind of message that

9    my staff would send, yes.

10         Q.   The document refers to the F. Braun Company.

11   Do you know what --

12         A.   C.F. Braun.  Yeah.  They were an architect

13   engineer firm.

14         Q.   Do you know why they were brought in, as

15   opposed to utilizing Dow for this process?

16         A.   I couldn't --

17         Q.   Well, do you know why C.F. Braun was brought

18   in as a contractor?

19         A.    Well, C.F. Braun did a lot of architect

20   engineering work for -- I mean they were -- I don't know

21   whether -- well, let's go back, now.  Woodruff was my

22   manager there, and he was told, he was told to be sure

23   that the Braun people, who worked as an architect

24   engineering firm at Dow, knew what the scope of the work

25   was going to be.  They're an architect -- engineering

46

1  firm that worked at Rocky Flats.

2        Q.    Okay.

3        A.    That's what they were.

4        Q.    And do you recall the addition to the building

5  707?

6        A.    No.

7        Q.    Do you recall that building 707 was a

8  plutonium building, or building that processed or

9  recycled plutonium?

10        A.    No.

11        Q.    You can put that document down over here.

12        A.    Okay.

13        Q.    And I'd like to have the next document marked

14  as Plaintiff's Exhibit 1452.

15  (Exhibit 1452 marked for identification)

16        Q.    And again, please take a moment to review it.

17        A.    Okay.

18        Q.    For the record, it's dated May 26, 1969.

19        A.    Okay.

20        Q.    Thank you.

21        A.    Yes.

22        Q.    Do you recall this document?

23        A.    No.

24        Q.    On the second page, it says H.C. Donnelly,

25  manager, original signed by H.C. Donnelly.

47

1        A.    Right.

2        Q.    Is that a stamp that your office used?

3        A.    I can't remember.

4        Q.    Do you have any reason to doubt that this is a

5    document that your office prepared?

6        A.    No.

7        Q.    And do you know who Dr. Gordon Dunning is?  Do

8    you recall?

9        A.    I don't remember.  I vaguely remember Dr.

10   Gordon Dunning.  I don't recall.

11       Q.    Do you recall if he was involved in a board --

12   AEC board that was investigating the 1969 fire?

13       A.    I know nothing about that.  I know nothing

14   about Dr. Gordon Dunning investigating the 1969 fire.  I

15   can't remember.  At least I can't remember now.  The

16   name is familiar, but I don't know -- I mean I can't

17   visualize Gordon Dunning.

18       Q.    Okay.  You can put that document aside.

19       A.    Okay.

20       Q.    I'd like to have the next document marked

21   Plaintiff's Exhibit 1453, please.

22   (Exhibit 1453 marked for identification)

23       Q.    And again, please take a moment to review it.

24   Attempt to verify that this is a document that you

25   authored, or came from your office.

48

1      A.    This document, to me, appears to be a status

2   report from Seth Woodruff.   This is not my document.

3   It's a report to me.

4      Q.    Okay.

5      A.    With information copied to Joshel.

6      Q.    Now, paragraph -- the document is dated July,

7   '69.

8      A.    July what?

9      Q.    July, '69.  Do you see that?

10     A.    It's stamped over here the 17th July.  Okay.

11     Q.    And if you'd just look at the first paragraph,

12   or paragraph numbered 1 --

13     A.    Yeah.

14     Q.    -- it reads, "The area west of building 776,

15   which was seal coated after the fire, remains to be

16   somewhat of a problem, as the contamination continues to

17   leak through.  Looking into the possibility of surface

18   removal and asphalting the area."

19            Do you remember the issue of the

20   contamination leaking from the --

21     A.    No, I don't.

22     Q.    -- 776 building?

23     A.    No.  I do not remember.

24     Q.    You can put that document aside.  I'd like to

25   have this document marked as Plaintiff's Exhibit Exhibit

49

1   1454.

2   (Exhibit 1454 marked for identification)

3        Q.   I apologize for the state of the copy, but do

4   your best to read it, and --

5        A.   Okay.

6        Q.   -- and again, verify if this is a document

7   that you authored or came from your office.

8        A.   Okay.  I'd like to point out that I did not

9   author the document.  I mean I'm not the author.  My

10  staff, the experts had to write all this stuff up.  It

11  was sent out in my name, though, but I did not author

12  it.  I want that to be clear, that I personally did not

13  author it.

14       Q.   Do you recall who the experts were on

15  plutonium fires, the subject of this memo?

16       A.   No, I do not.  You go -- I mean there are a

17  lot of these things that happened long before my time

18  there, back in '66, '67.  I have no knowledge of any of

19  those.

20       Q.   Right.  Do you recall the process of compiling

21  this data of all the past fires?

22       A.   No, I can't remember.  I can't remember.  That

23  was done by my staff.  I can't remember.  They're

24  responsible for getting the data about -- you know, I

25  didn't get the data up.

50

1      Q.    Approximately how many people were on your

2  staff at this time?

3      A.    I do not remember.  Headquarters, I would -- I

4  can't even make a ball park guess.

5      Q.    In the first sentence --

6      A.    Yeah.

7      Q.    -- I think it reads "Reference your telecon,

8  July 15, '69, to Burke and Holst"?

9      A.    Yeah.

10     Q.    Who are those people?  Who is Burke and

11  Holst?

12     A.    Jack Burke was on my staff.  He was -- the

13  best that I could remember, he was head of my safety

14  people.  He was a former naval officer, and he, if I can

15  remember correctly, was a graduate of the naval academy.

16     Q.    And Holst?

17     A.    Holst, I can't remember him.

18     Q.    Do you know if Burke is still alive?

19     A.    I haven't seen him in a long time, so I have

20  no idea whether he's alive.

21     Q.    This handwriting all over this document, is

22  that your handwriting?

23     A.    No.

24     Q.    Do you recognize the handwriting?

25     A.    No.

1      Q.   Okay.  You can put that document aside.  Well,

2  one last question.  Do you have any reason to doubt that

3  this is a document that was prepared by your office?

4      A.   No.

5      Q.   All right.  I'd like to mark the next exhibit

6  Plaintiff's Exhibit 1455.

7  (Exhibit 1455 marked for identification)

8      Q.   It's a short memo dated July, '69, from H.C.

9  Donnelly to S.R. Woodruff.

10      A.   Okay.

11      Q.   Now, this document references radioactive

12  waste disposal at Rocky Flats.  Do you remember what the

13  concerns were at this time regarding the waste disposal

14  at the plant?

15      A.   No.  I do not remember.

16      Q.   Do you recall if there were any problems

17  regarding waste disposal at the plant at this time?

18      A.   I do not remember.

19      Q.   Okay.

20      A.   I never saw this message.

21      Q.   Do you have any reason to doubt that this came

22  from your office?

23      A.   No.

24      Q.   I'd like to have this document marked as

25  Plaintiff's Exhibit 1456.

52

1  (Exhibit 1456 marked for identification)

2      Q.   Now, just for the record, this is dated July

3  11, 1969, and it appears to be a memo from General

4  Donnelly to R.E. Hollingsworth, and it attaches a report

5  about the fires in building 771 from 1966 through May,

6  1969, involving plutonium.

7      A.   Okay.

8      Q.   Is that your signature on the bottom of the

9  first page?

10     A.   Yes.

11     Q.   Do you recall the fact, as indicated in the

12  last sentence of the first paragraph, that there was

13  particular interest in the frequency of plutonium

14  fires?

15     A.   I do not remember that.

16     Q.   Do you know if this attachment to Plaintiff's

17  Exhibit 1456 is the same or similar report that was

18  prepared that we looked at that was Plaintiff's Exhibit

19  1454?

20     A.   To comment on that, I'd have to sit down and

21  check each -- each line against each line.

22     Q.   Okay.  No need.  You don't recall just from

23  looking at it?

24     A.   No, no.

25     Q.   Okay.

53

1       A.   And I'd like to point out that, as I said

2   before, I didn't take over until '68, and a lot of these

3   things were before that time.

4       Q.   Right.  Okay.  Now, I'd like to have this

5   document marked as Plaintiff's Exhibit 1457.

6   (Exhibit 1457 marked for identification)

7       Q.   I'll note that this document is not as short

8   as the other documents, so if you don't want to, you

9   don't have to read every word.  I'd just like you to --

10      A.   If I don't read any word, I don't see how I

11  can answer all your questions.

12      Q.   Well, I just want to --

13      A.   You can point out where you're going to ask me

14  questions.  I'd like to read that, if I may.

15      Q.   Yes.  I certainly am going to do that.  And if

16  you want to read the whole document, you can.  The

17  document is titled "Report of Investigation of Fire in

18  Building 771/776 Tunnel, Rocky Flats plant, July, 1969,"

19  and the date of the report is August 22, 1969.

20      A.   Okay.

21      Q.   Do you recall the tunnel fire that occurred in

22  or about July, '69, at the plant?

23      A.   The what?

24      Q.   The fire that occurred in the tunnel that's

25  referenced in the title, do you recall that?

54

1        A.   No, no.  No.

2        Q.   You don't have an independent recollection?

3        A.   No.  No.  In fact, I don't know anything about

4   a tunnel up there.

5        Q.   If you'll just flip through -- do you recall

6   ever seeing a report like this from the Dow people about

7   this -- about an incident at Rocky Flats?

8        A.   No.

9        Q.   Okay.  You can put that aside.  I'd like to

10  have this document marked as Plaintiff's Exhibit 1458.

11  (Exhibit 1458 marked for identification)

12       Q.   For the record, this is dated September 5,

13  1969.  It appears to be from General Donnelly to Seth

14  Woodruff.

15       A.   Okay.

16       Q.   I know the signature is blotted out on the

17  second page, but does this appear to be a document that

18  you authored?

19       A.   Yes.  I would like to -- when you use the word

20  "authored," I want to be precise.  I mean --

21       Q.   Please do.

22       A.   -- I didn't author it.  My staff probably

23  prepared it for me and I signed it.  I want to be sure

24  that's very crystal clear.

25       Q.   Okay.  But in general, it was your practice to

55

1   read the document?

2       A.   Oh, before I would sign anything like this I

3   would read it, yes.

4       Q.   Okay.

5       A.   Anything like this, I would read myself,

6   personally read it.

7       Q.   And to the best of your --

8       A.   Before I signed it.

9       Q.   And to the best of your ability, you would

10  attempt to verify if the facts were true?

11      A.   Well, I talked to my staff.  If I had

12  questions, I'd bring them in and talk to them, but on

13  messages, wire messages and stuff like that, that just

14  goes H.C. Donnelly on out, that could be sent by my

15  staff, unless they thought it was important for me to

16  see.  That makes a difference.  But if my own personal

17  signature was on it, I read the thing before I signed

18  it.

19      Q.   Okay.  The first paragraph of the document

20  references a report about a special fire protection

21  survey at building 771 conducted jointly by ALO and Dow

22  personnel.  Do you recall that survey or report?

23      A.   No.

24      Q.   Do you recall directing Dow to take certain

25  actions with regard to fire safety at the plant around

56

1  this time, the subject of this memo?

2       A.   No.  I do not clearly recall it, but I can --

3  no, I don't do that.  I don't recall it.  In fact, I

4  always told them to be careful up there.

5       Q.   Do you recall that the report cited any

6  deficiencies with Dow's safety?

7       A.   No.  I can't remember that.  I can't remember

8  those details.

9       Q.   Well, just one more second with the document.

10      A.   Yeah.

11      Q.   If you look at paragraph numbered 1, it reads,

12 "Take immediate action to correct or improve those

13 conditions identified in the report" --

14      A.   Right.

15      Q.   -- "which do not involve significant

16 expenditures of funds or manpower."

17      A.   Right.

18      Q.   Never mind.  I'll move on.  No question about

19 that.

20      A.   All right.

21      Q.   I'd like to have this document marked as

22 Plaintiff's Exhibit 1459.

23 (Exhibit 1459 marked for identification)

24      Q.   This is a document that appears to be signed

25 for General Donnelly, dated September 8th, 1969, to Seth

57

1  Woodruff, and it's attaching a message.  Do you know who

2  signed this document for you?

3      A.   Yeah.  Jim McCraw, who was my deputy manager,

4  who is now dead.

5      Q.   Now, if you turn to the attached memo, the

6  first paragraph reads, "This office has been requested

7  by letter of August 27 from the State of Colorado

8  Department of Health to provide a statement of policy as

9  to whether or not radioactive wastes from Rocky Flats

10  plant will be released to a commercial waste disposal

11  facility to be located in the State of Colorado."

12          Do you recall that issue?

13      A.   I do not remember anything about that.

14      Q.   Okay.  You can put that document aside.  I'd

15  like to have this document marked as Plaintiff's Exhibit

16  1460.

17  (Exhibit 1460 marked for identification)

18      Q.   And I'll note for the record it's dated

19  September, 1969, September 22, 1969.  And it reads that

20  it's from General Donnelly and directed to Seth

21  Woodruff.

22          Is this a document that appears to have

23  come from your office?

24      A.   Yes.

25      Q.   Do you recall the problem mentioned about four

58

1   lines down about glove box window cracking?

2        A.   No.

3        Q.   Do you recall -- strike that.  We can move

4   on.  I'd like to have this document marked as

5   Plaintiff's Exhibit 1461.

6   (Exhibit 1461 marked for identification)

7        Q.   I'll note for the record that this appears to

8   be a draft memo from General Donnelly on page 2 to John

9   Erlewine dated sometime in 1969, and it's referencing an

10  unclassified statement which is not attached to this

11  document.

12             Is that your signature on the second page?

13       A.   Yes.

14       Q.   Do you sometimes go by Sam?

15       A.   My nickname is Sam.

16       Q.   Now, there's a stamped box at the top

17  right-hand corner of the first page, and under the --

18  next to the title folder, it says "Rocky Flats fire

19  press release, November 18, 1969."

20             Does that give you an idea or jog your

21  recollection about what this document is about?

22       A.   I can't remember.  I'd have to see this,

23  whatever this is, to say whatever it is, whatever the

24  press release was.  I can't remember.  I'd have to see

25  the whole thing to be able to give you a comment.

59

1      Q.   In general, did you generally review press

2   releases prior to them being released to the public or

3   to the press, about Rocky Flats issues?

4      A.   Well, in this case, this was the deputy

5   manager, and that was from his headquarters, and I

6   didn't release -- I didn't review all the press releases

7   from the AEC headquarters in Washington while I was

8   sitting in Albuquerque.

9      Q.   Did you review, specifically about the 1969

10   fire, did you generally review --

11      A.   I can't remember.  I can't remember that far

12   back.

13      Q.   Okay.  I'd like to have this document marked

14   as Plaintiff's Exhibit 1462.

15   (Exhibit 1462 marked for identification)

16      Q.   For the record, it's a two-page document, a

17   cover memo and attachment, dated October 8, 1969.  It

18   appears to be signed by General Donnelly and directed to

19   John Erlewine, entitled "Discussions with Dow Regarding

20   Inspection Report."

21           Is that your signature on the first page?

22      A.   Yes.  That's right.

23      Q.   Now, the second page is an attachment entitled

24   "Actions to be Recommended by ALO."  ALO is the

25   Albuquerque operations office?

60

1       A.   Yes.

2       Q.   Were these actions that you and your office

3  came up with?

4       A.   I can't remember.

5       Q.   Do you recall concerns about Dow's management

6  with respect to safety at this time?

7       A.   I can't remember that.

8       Q.   Now, these concerns, or these actions -- for

9  example, paragraph 1 states, "Centralize all safety

10  functions and elevate in the Dow RFD organization."

11  Number 7 says, "Establish a formal internal safety audit

12  program."

13            Is it safe to say that these corrective

14  actions were recommended because there were problems

15  that had occurred in the past?

16            MR. TULLY:  Objection to form.  You can

17  answer, sir.

18       Q.   You can answer.  Do you understand the

19  question?

20       A.   Yes.  I understand the question.  Please give

21  me the question again, will you?

22       Q.   Sure.

23       A.   I got diverted.  I can't --

24       Q.   Quite all right.  These are corrective actions

25  that your office is recommending, is that correct, to

61

1   Dow management?

2        A.   They appear to be.

3        Q.   Okay.  Now, is it fair to say that you

4   wouldn't be implementing corrective actions unless you,

5   meaning the Albuquerque operations office, saw that

6   there were problems or concerns?

7        A.   I can't remember whether corrective actions

8   were needed or not.  I just can't remember way back that

9   -- 27 years ago.

10       Q.   This document does reflect that there were

11   actions to be recommended by the Albuquerque operations

12   office, correct?

13       A.   Yes.  But I would like to say here that I

14   thought that Dow had a very -- a very good operation,

15   and they were very safety-conscious.

16       Q.   But is it fair to say that there were certain

17   concerns that you had, as the manager, about certain

18   aspects?

19            MR. TULLY:  Objection to form.  You can

20   answer if you can, sir.

21       A.   No.  I don't think it would be fair to say

22   that, because it was so long ago that I can't answer

23   that one a yes.  I'd have to say no.

24       Q.   Well, if you look at paragraph number 5, it

25   reads, "Provide for better coordination between

62

1   operating divisions."  Or paragraph number 4, "Provide

2   SOP for overall safety reviews and recommendations

3   regarding change in operation procedures, facility

4   modifications, equipment rearrangement, and new

5   construction."  These are all recommending changes;

6   isn't that correct?

7        A.   Not necessarily.  To me, to me a lot of those

8   things are just general statements that you make.

9             I mean you can always, probably, get better

10  coordination.  I mean I can always improve what I'm

11  doing, you know what I mean?  So, that's just

12  suggestions.  To me it doesn't mean that there's

13  something wrong.  I can always go to a guy and say,

14  "Hell, you can do a better job."

15       Q.   Okay.  And that's what this is doing?

16       A.   What?

17       Q.   And that's what this is doing?  Telling them

18  to do a better job, in those words?

19            MR. TULLY:  Objection as to form.

20       A.   No.

21       Q.   No?

22       A.   No.  It's just telling -- you know, just

23  general statements is what it is.  That's all I can say.

24       Q.   Okay.  I'd like this marked as Plaintiff's

25  Exhibit 1463.

1  (Exhibit 1463 marked for identification)

2      Q.   For the record, this is a document dated

3  November, 1969, November 14, 1969.  And it's a telex

4  that appears to have come from F.E. Abbott and directed

5  to General Donnelly and Lloyd Joshel.  Unless you want

6  to read the whole document, I only want to ask you a

7  question about the second page.

8      A.   Second page?

9      Q.   Under B, operational planning.

10     A.   Yeah.

11     Q.   Number 1.  It reads, "The activity in the 776

12 area stirs up the contaminants which are deposited on

13 the main filter plenum.  This is closely monitored by

14 health physics personnel, and they continually advise

15 the operation personnel of fluctuations in levels found

16 on the filters.  All readings have been well within the

17 control limits.  However, during one of the monitorings

18 it was found that some of the filters had holes in them

19 when installed.  Approximately 80 of these, of the over

20 900 in the plenum, have been temporarily blanked off

21 until they can be replaced."

22          Do you recall the problem of the filters

23 having holes in them?

24     A.   No.  That's a detail I don't recall.

25     Q.   Okay.  You can put that document aside.  I'd

64

1    like to have this document marked as Plaintiff's Exhibit

2    1464.

3    (Exhibit 1464 marked for identification)

4        Q.   I apologize for the state of the copy.  For

5    the record, it appears to be a document authored by or

6    signed by General Donnelly and directed to Major General

7    Giller dated December 31, 1969, I believe.  I'm not

8    going to ask you many questions about it.

9             If you can just verify on the second page

10   that this is a document that came from your office or

11   was originally signed by you?

12       A.   Yes.  I can verify that.

13       Q.   Okay.  And there is some handwriting on the

14   left-hand margin of the first page.  I think it reads

15   "Dow estimated they needed 6000" --

16       A.   Yeah.

17       Q.   -- something.  Is that your handwriting?

18       A.   No.

19       Q.   Do you recognize that handwriting?

20       A.   No.  I could never write that small.

21       Q.   Okay.  I'd like to have this document marked

22   as Plaintiff's Exhibit 1465.

23   (Exhibit 1465 marked for identification)

24       Q.   I need to take a two-minute break.

25   (Recess held)

1        Q.   Just take a moment to review this Plaintiff's

2   Exhibit 1465, which appears to be a memo dated January

3   22, 1970, from H.C. Donnelly, or his office, and to

4   Major General Giller, and also sent to F.E. Abbott.

5               Does this appear to be a document that came

6   from your office?

7        A.   Yes.

8        Q.   Do you remember the issues discussed in this

9   document?

10       A.   No.

11       Q.   Do you recall at all the issue of plutonium

12   being discovered off site of the Rocky Flats plant in or

13   around 1969 or 1970?

14       A.   No.

15       Q.   Do you recall the name Edward Martell?

16   Martell?  M-a-r-t-e-l-l.  He was a scientist,

17   independent.

18       A.   Yeah.  The name is familiar.

19       Q.   Do you recall if he was a person who had

20   raised some concern about plutonium being found off site

21   the Rocky Flats plant around this time?

22       A.   I don't remember.  All I know is the guy's

23   name, Martell.

24       Q.   Now, the document also specifically

25   references, about half of the way down, it reads,

1   "Additionally, Dow personnel have discussed soil

2   sampling with Dr. Harley at HASL," H-A-S-L, which I

3   believe to be the Health and Safety Laboratory.

4           It reads on, "Harley intends to obtain soil

5   samples in remote locations in Colorado in the near

6   future and will coordinate HASL efforts with Dow."  Do

7   you recall working with the Health and Safety Lab?

8       A.   I don't know those guys.

9       Q.   Do you recall the issue at all of plutonium

10  being found off site at the Rocky Flats plant, at any

11  time?

12      A.   No.  I'm not an expert on soil sampling.  No.

13  I don't recall.

14      Q.   Okay.  We can move on.  I'd like to mark a

15  document as Plaintiff's Exhibit 1466.

16  (Exhibit 1466 marked for identification)

17          MR. CRAMER:  Is there a problem with the --

18          MR. RIGSBY:  I have a loose page here.

19          MR. CRAMER:  Oh, okay.  I think that's an

20  extra.

21      Q.   Okay.  This appears to be a memo or a message

22  dated February -- in or around February, 1970, from F.E.

23  Abbott to a Mr. Tesche, T-e-s-c-h-e, with the Division

24  of Military Applications, and also a copy appears to

25  have been sent to General Donnelly.  Do you recall this

67

 1   document?

 2        A.   No.  Frank Abbott, F.E. Abbott, was the area

 3   manager up there.   He took Seth Woodruff's place.

 4        Q.   At Rocky Flats?

 5        A.   At Rocky Flats.   But I never saw this

 6   document.

 7        Q.   Do you know who Mr. Tesche is?

 8        A.   He was one of Ed Giller's deputies.

 9        Q.   At the Division of Military Applications in

10   DC?

11        A.   Yeah.   But I can't remember him, either.

12        Q.   The first paragraph reads, "In accordance with

13   your verbal request of February 16, the following is

14   Dow's estimate of the yearly buildup of plutonium in the

15   soil, assume no fires or drum storage incidents in the

16   future."

17             Do you recall the issue of having Dow

18   prepare this information?

19        A.   No.  This is from Abbott to Tesche.  I don't

20   know anything about it.

21        Q.   Okay.   You can put that aside.   I'd like to

22   show you a document that has been previously marked as

23   Plaintiff's Exhibit 1193.

24             THE WITNESS:  Do you want to stick

25   something on that?

 1                    THE COURT REPORTER:  It's already on there.

 2        Q.   It's from a prior deposition.  It appears that

 3   the copy I gave you is missing some pages.  Give me a

 4   moment and I'll figure it out.

 5                    Well, I'll try to fix this situation during

 6   a break, but this is not the entire Exhibit 1193.  I

 7   think some pages are missing, and we'll correct it

 8   later.  But let me just ask you some questions, since we

 9   have it in front of you.

10                    MR. TULLY:  Just if I can for a moment, Mr.

11   Cramer, Plaintiff's Exhibit 1193 is a one-page

12   document.  Attached to that is what was previously

13   marked as Plaintiff's Exhibit 941.  And I can just tell

14   you that 941 is missing five pages.

15                    MR. CRAMER:  Right.

16                    MS. SURBAUGH:  And I can further tell you

17   that I don't have a copy of 941.  My page 2 of my 1193

18   doesn't have an exhibit sticker on it.

19                    MR. CRAMER:  All right.  What I'll do is

20   we'll put this aside.

21                    MS. SURBAUGH:  So I think we need to deal

22   with it later.

23                    MR. CRAMER:  We'll put it aside for now and

24   we'll deal with it later.

25        Q.   I apologize for that.  I'd like to show you a

69

1   document dated January 12, 1970, and have it marked as

2   Plaintiff's Exhibit 1467.

3   (Exhibit 1467 marked for identification)

4        A.   I need to ask you a question.

5        Q.   Go right ahead.

6        A.   This looks just like the thing we had before

7   that you didn't have all the papers to.

8        Q.   That may be true.

9        A.   It looks like it to me.   Drafted by Tesche,

10   and so forth and so on.

11        Q.   Well, I think this is a little bit different.

12        A.   Oh, it is?

13        Q.   This is to yourself.

14        A.   I didn't have the other one right here in

15   front of me.   The guys' names are all the same and

16   everything.

17        Q.   Right.   Similar issues.   I think it's

18   something a little bit different.

19        A.   Okay.

20        Q.   But as you read it today, does this jog your

21   recollection about the issue of plutonium levels in the

22   soil outside of the Rocky Flats plant?

23        A.   No.

24        Q.   Okay.

25        A.   I do not know the names of any of the --

70

1    Harley or Richmond, and I do not know Harley or

2    Richmond.  So this --

3         Q.   Harley --

4         A.   No.  This doesn't do anything for me.

5         Q.   Okay.  Then we'll put it aside.  I'd like to

6    show you a document dated February 20, 1970, and have it

7    marked as Plaintiff's Exhibit 1468.

8    (Exhibit 1468 marked for identification)

9         Q.   It's a two-page document, appears to be from

10   F.E. Abbott, and directed to H.C. Donnelly, entitled

11   "Report on Waste Control Study for Rocky Flats Plant."

12   I'd like to direct your attention to the third

13   paragraph, where it reads, "The overall construction of

14   the vault is the most sophisticated construction yet

15   considered, but it would not, in our opinion, be

16   acceptable to geology and water control interests of the

17   State and consultants from the USGS and Colorado School

18   of Mines.

19             "In addition, any public rumors revealing

20   the possible construction of such a vault would, in all

21   probability, further damage our already poor public

22   image."

23             Do you recall the issue of constructing a

24   vault for storage of waste?

25        A.   No, no.

1        Q.   Do you recall any of the issues as you look at

2   this document?

3        A.   I haven't had an opportunity to read it all.

4   Please let me.  I'm a slow reader.

5        Q.   Go right ahead.

6        A.   Thank you very much.

7        Q.   You've just reviewed the document?

8        A.   Yes, I did.

9        Q.   Do you recall any of the issues discussed in

10   the document?

11        A.   No.  I don't remember this stuff.

12        Q.   Okay.  We can put it aside.

13        A.   Okay.

14        Q.   Thank you.  I'm showing you a document that I

15   think Mr. Tully stated was marked as Plaintiff's Exhibit

16   941.  I'd like to verify that.  We can mark it again,

17   but I just wanted to --

18                MR. TULLY:  Let me look at that.

19                MR. CRAMER:  Okay.  Go ahead.

20                MR. TULLY:  Off the record for a second.

21   (Discussion off the record)

22        Q.   Okay.  I'd like to have this document marked

23   as Plaintiff's Exhibit 1469.

24   (Exhibit 1469 marked for identification)

25        Q.   Please take a moment to review that.

1            MR. TULLY:  In response to your question,

2   Mr. Cramer, after comparing my copy of what was

3   previously marked as Plaintiff's Exhibit 941 with the

4   document you've just marked as Plaintiff's Exhibit 1469,

5   I can tell you that while they are not completely

6   identical, that in substance, they are and appear to be

7   the same document.

8            MR. CRAMER:  Thank you.

9        Q.   For the record, the document is dated February

10   18, 1970, and it comes from General Donnelly's office

11   and directed to Major General Giller, and copied to F.E.

12   Abbott.

13            Have you completed reading that document?

14        A.   Yes.

15        Q.   Does this appear to be a document that came

16   from your office?

17        A.   Yes.

18        Q.   The document states that it's a chronological

19   history regarding leakage in drum storage area.

20            MS. SURBAUGH:  Could you be more specific

21   with regard to where it states that?

22            MR. CRAMER:  I'm sorry.  Right at the top

23   it states, "In reply to E.B. Giller's TWX of February 3,

24   the following information is furnished."  And then it

25   says, "Chronological history regarding leakage in drum

1  storage area."  And it appears to be a chronology of

2  events regarding the drum storage area.

3       Q.   Do you know who prepared this chronology?

4       A.   I know nothing about it.

5       Q.   Do you know what the drum storage area is?

6       A.   I can't remember anything about it.

7       Q.   The 903 pad?  Does that jog your

8  recollection?

9       A.   903 doesn't mean anything to me.

10      Q.   Do you recall an issue of leaking drums at the

11  plant during this time?

12      A.   I can't remember anything about it.  Anything

13  I would say to you would be conjecture, and I don't want

14  to do that.

15      Q.   Okay.

16      A.   On 903, I think I might have heard there was

17  such a building, but I don't have any personal knowledge

18  of it.

19      Q.   Do you have any reason to doubt any of the

20  facts or issues set forth in this document?

21      A.   Well, I'd like to point out, this is a

22  chronological thing going back to 1958, so I don't know

23  anything about that stuff.  That's way before my time.

24      Q.   Right.

25      A.   But I don't doubt that whoever made it up

1    tried to do a good job.

2         Q.   Does it appear to have been made up by

3    somebody in your office?

4         A.   What do you mean by my office?

5         Q.   I mean your office in Albuquerque, the people

6    working for you.

7         A.   Well, I would think they had to get the dope

8    from Rocky Flats, and that if it went from my office, it

9    was probably made by somebody on my staff, yes.  I can't

10   remember who.

11        Q.   All right.  Thanks.  We can move on.

12        A.   Okay.

13        Q.   I'm showing you a document that I'd like to

14   have marked as Plaintiff's Exhibit 1470.

15   (Exhibit 1470 marked for identification)

16        Q.   And all I'd like you to do is verify that this

17   is your signature on the first page.

18        A.   That is correct.

19        Q.   And ask you to just look at this attachment,

20   which is entitled "Environmental Survey, Calendar Year

21   1969, The Dow Chemical Company," and tell me if you can

22   identify it or recognize it?

23        A.   I cannot at this point in time recognize the

24   document.

25        Q.   Okay.  We can move on.  We'll put that aside.

75

1   I'd like to mark this document Plaintiff's Exhibit

2   1471.

3   (Exhibit 1471 marked for identification)

4       Q.   It's a one-page memo, appears to be written by

5   H.C. Donnelly, or at least comes from his office, and

6   directed to Major General Giller.  I can't read the date

7   on it.

8           Does this appear to be a document that you

9   authored or was signed by you?

10      A.   It's my signature all right.

11      Q.   Okay.

12      A.   Signed by me, I mean.  It's a document that

13  says original signed by me.  I take it to be true.

14      Q.   Okay.  You can put it aside.  I'd like to mark

15  a document Plaintiff's Exhibit 1472, please.

16  (Exhibit 1472 marked for identification)

17      Q.   Take a moment to review it.  It's a one-page

18  letter or memo that appears to be authored by General

19  Donnelly and directed to Martin Biles, and I think the

20  date is November 20, 1969, though it's difficult to

21  read.

22          And then there's a one-page attachment

23  entitled "Solid Waste Disposal Summary."  Is that your

24  signature on the first page, or is that your stamp?

25      A.   Well, that's a -- it's not an actual

1  signature.  It's just says original signed by me, so I

2  take it that I signed it, yes.

3      Q.   Okay.  Do you recall the issue described in

4  this memo?

5      A.   No, I do not remember it.

6      Q.   If you look at the second paragraph, it reads,

7  "We share Dr. Joshel's concern that such an

8  unsubstantiated charge has become a matter of record."

9  And that refers to the charge that's described in the

10 first paragraph here.

11     A.   Yeah.

12     Q.   "As you know, there are no federal or state

13 regulations which relate to burial of radioactive waste

14 at government-owned sites.  Further, and most important,

15 there has been no burials of waste which have resulted

16 in a hazard to AEC or Dow employees or members of the

17 public."

18          Do you know how you came to that conclusion

19 about lack of hazard?  Do you recall?

20     A.   No.  I can't recall it.

21     Q.   Do you know what this attachment is?

22     A.   Well, all I can tell is from the heading on

23 it, Solid Waste Disposal Summary. I don't know what it

24 is.  I guess it's just numbers and figures, but I have

25 no specific knowledge of it.  Details like that, I'm not

77

1   acquainted with.

2        Q.   I'd like to mark a document Plaintiff's

3   Exhibit 1473.

4   (Exhibit 1473 marked for identification)

5        Q.   For the record, it's a two-page memo, appears

6   to be signed by General Donnelly, directed to area

7   managers, dated December 16, 1970, and it's entitled

8   "Release of Radioactive Effluents from ALO

9   Facilities."

10                  If I can direct you -- if you need to read

11  the whole document, you can, but I'll just direct you to

12  the first paragraph.

13       A.   All right.

14       Q.   The second -- I'll read the entire paragraph

15  into the record.  "As I have emphasized in the past,

16  most recently during our meeting at Pinellas, immediate

17  steps must be taken to decrease the amounts of

18  radioactive effluents released to the environments.  I

19  well recognize that releases of radioactivity have

20  generally been small percentages of the maximum limits

21  sent by the AEC.  However, our policy requires that

22  quote, 'AEC and AEC contractors shall be conducted in

23  such a manner as to assure that radiation exposures to

24  individuals and population groups are limited to the

25  lowest levels technically and economically practical.'"

78

1          Do you recall, or do you have any reason to

2   doubt that that was the standard that you were enforcing

3   upon Dow at this time; that is, the standard set out in

4   the quotes there.

5          MR. TULLY:  Objection the form.  You can

6   answer if you can, General.

7     Q.   Do you understand the question?

8     A.   Yeah.  I understand the question.  This was --

9   this statement, the way it is, was my general policy to

10  all areas working under me, to go ahead and release the

11  least you can.  Do better.  Do better, and improve

12  things.

13     Q.   Right.

14     A.   Just exhorting them to do a better job.

15  That's all.

16     Q.   And specifically, to ensure, and quote, "That

17  radiation exposures to individuals and population groups

18  are limited to the lowest levels technically and

19  economically practical"; is that correct?  That was the

20  standard?

21          MR. TULLY:  Objection to form.  You can

22  answer, sir.

23          MS. SURBAUGH:  And you'll have to answer

24  verbally.

25          THE WITNESS:  What?

79

```
 1              MS. SURBAUGH:  You have to answer

 2   verbally.

 3              THE WITNESS:  Oh.  I know that.  I'm trying

 4   to think about it.

 5              MS. SURBAUGH:  All right.

 6       A.   Please say it over again, will you?

 7       Q.   Sure.  I'm just trying to specify that the

 8   standard that's in the quotes here about assuring that

 9   "Exposures to individuals and population groups are

10   limited to the lowest levels technically and

11   economically practical," is the standard that you

12   attempted to get all the contractors to adhere to.

13              MR. TULLY:  Objection to form.  Answer if

14   you can, sir.

15       A.   What I wanted to do was to have my people cut

16   down on any radiation they had.  I'd like them to reach

17   zero, if they could.  And I just want them to do a

18   better job.

19              And if you will read this thing here, you

20   will see that it says that "have generally been small

21   percentages of the maximum limits set by AEC."

22       Q.   Right.

23       A.   So to me, they're doing a hell of a good job.

24       Q.   But you wanted them --

25       A.   I wanted them to do better.  It was a pep talk
```

80

1   to them, if you know what I mean.  And I love to give

2   pep talks.

3        Q.   Now, in the first paragraph, there's a

4   reference to meetings at Pinellas.  What is Pinellas, do

5   you recall?

6        A.   Pinellas was a place down in Florida.

7   Pinellas was an area operation office out of there.

8   There is the operation officer I couldn't remember

9   before, but I forget what they did.

10       Q.   Do you recall the meetings?

11       A.   No.

12       Q.   There's a reference in the first paragraph to,

13   quote, "immediate steps must be taken."  Do you recall

14   why there was such urgency at this time?

15       A.   No.

16       Q.   Okay.  You can put that document aside.  I'd

17   like to show you a document dated March 30, 1971, and

18   have it marked as Plaintiff's Exhibit 1474.

19   (Exhibit 1474 marked for identification)

20       Q.   The document is a one-page letter or memo.  It

21   appears to be from General Donnelly to Major General

22   Giller, entitled "Environmental Surveillance Program of

23   the Rocky Flats Site."  The first sentence reads, "As we

24   discussed previously, it is important that radioactively

25   contaminated area within the Rocky Flats plant site be

81

1  identified and reported so as to preclude future

2  'surprises,'" and "surprises" is in quotes.

3          Do you know what you're referring to with

4  regard to the "surprises"?

5      A.  I can't remember that.

6      Q.  Do you recall any surprises during your role

7  in 1971 as area manager with regard to the Rocky Flats

8  plant?

9          MR. TULLY:  Objection to form.  Answer if

10  you can, sir.  Also objection on the grounds of

11  vagueness.

12      A.  I can't recall any.

13      Q.  Do you recall if there was a surprise

14  regarding plutonium being found off site of the plant?

15          MR. TULLY:  Objection; asked and answered.

16  Go ahead, sir.

17      A.  No.

18      Q.  Now, it appears from this document that the

19  surprises are related to the radioactively contaminated

20  areas; is that correct?

21          MR. TULLY:  Objection.  Answer if you can,

22  sir.

23      Q.  Is that correct?  Is that a correct reading of

24  the document, is basically what I'm asking you.

25          MS. SURBAUGH:  I'm going to object to

82

 1  that.  The document speaks for itself.

 2      A.   Do you -- I'm afraid you got to rephrase your

 3  question.

 4      Q.   Yeah.  I'm trying to understand --

 5      A.   Please, please.

 6      Q.   I certainly will.  I'm trying to understand

 7  the document that -- did you write this document, by the

 8  way?  Is this your signature or --

 9      A.   I personally?  No.

10      Q.   No.  But somebody on your staff?

11      A.   Yes.  Somebody did.

12      Q.   I'll move on.

13      A.   Okay.  Thank you.

14      Q.   Thank you.  I'd like to have a document marked

15  as Plaintiff's Exhibit 1475.

16  (Exhibit 1475 marked for identification)

17      Q.   This document appears to be a two-page memo

18  with an attachment dated April 23, 1971.  It appears to

19  be signed for General Donnelly, on the second page, and

20  directed to Mr. Joshel, and entitled "Ad Hoc Review,

21  Rocky Flats Waste Program -- Problems."  Is that your

22  signature on the second page?

23      A.   No.  That's the signature of my deputy manager

24  at the time, James McCraw.

25      Q.   Okay.  If you look at the attachment, do you

1   recall this document, the ad hoc review?  You may need

2   to read the whole thing, but if, in reading it, it jogs

3   your recollection.

4        A.   I just want to read the first part.

5        Q.   Go right ahead.

6        A.   See if I remember any of these guys' names

7   here.  No.  I don't.  No.  I don't recognize this

8   document.  In fact, it was sent out by my deputy

9   manager, and I probably never saw it.

10       Q.   If you'd turn to page 6, the section entitled

11   "903 Area."

12       A.   The pages are numbered at the top, huh?

13            MS. SURBAUGH:  Yeah.

14            MR. TULLY:  I'm sorry, Mr. Cramer.  Did you

15   say page 6 or section 6?

16            MR. CRAMER:  Page 6.  They're numbered at

17   the top.

18       A.   They're numbered at the top.  Okay.

19       Q.   The area marked "903 area."  There's a

20   reference in here to potential removal of

21   plutonium-contaminated soil, packaging and shipping that

22   elsewhere.  Do you recall that proposal?

23       A.   No.  As I said previously, I couldn't remember

24   anything much about the 903 area.

25       Q.   If you look at page 7, the middle paragraph,

1  it reads, "the Dow management at Rocky Flats" --

2       A.   Yeah.

3       Q.   Actually, start at the second sentence,

4  referring to Dow management.  "They admitted that their

5  failure to report plans to remove soil from the 771

6  outfall, which is a location conspicuous to employees,

7  was a serious error, although unintentional.  Dow

8  management has been made very conscious of the

9  importance of adherence to the policy mentioned,

10  particularly the importance of reporting promptly."

11            Do you recall the 771 outfall soil

12  removal?

13       A.   No.  I do not remember.

14       Q.   Do you recall a problem with Dow not reporting

15  promptly?

16       A.   No.  You can see this was a committee -- these

17  guys were there, and I wasn't there.  I don't know

18  anything about it.

19       Q.   Okay.  If you turn to -- at the end of the

20  first attachment, there's a document dated 1/15/71, in

21  the top left-hand corner, something that says "mound" on

22  it.  It's right after the page with the names.

23       A.   Okay.  Here.

24       Q.   Do you know what the mound is?

25       A.   Mound was a laboratory.

85

1        Q.   Do you recall if there was a burial site on

2   the plant that was called the mound?

3        A.   No, no.

4        Q.   Rocky Flats plant?

5        A.   Oh.   This is still relating to Rocky, isn't

6   it?

7        Q.   Yeah.

8        A.   Well, there was a Mound Laboratory, but I

9   don't know anything about a mound.

10       Q.   Okay.

11       A.   All I know is about a Mound Laboratory.

12       Q.   Okay.   You can put that document aside.   Thank

13   you.   I'd like to show you a document and mark it

14   Plaintiff's Exhibit 1476.

15   (Exhibit 1476 marked for identification)

16       Q.   It appears to be a two-page message from

17   General Donnelly's office to a Mr. W.L. Ginkel,

18   G-i-n-k-e-l, in Idaho Falls, and Major General Giller,

19   Germantown, among others.   Does this appear to be a

20   document that came from your office?

21       A.   Yes.

22       Q.   First paragraph of the document refers to an

23   incident that occurred on June 8, 1971, and states,

24   "Regarding disposition of five drums of Rocky Flats

25   waste suspected of containing over 200 grams of

86

1  plutonium."  Do you recall the incident?

2      A.   No.

3          MR. TULLY:  Objection to form.  I'm sorry,

4  sir.  I didn't mean to cut you off. Go ahead and

5  answer.

6          THE WITNESS:  No.  Go ahead.

7          MS. SURBAUGH:  He's done.  That's okay.

8          MR. TULLY:  I'm done.  I didn't mean to

9  interrupt you.

10     A.   No.

11     Q.   Okay.  You can put that document aside.  I'd

12 like to show you a document dated January 25, 1971, and

13 have it marked as Plaintiff's Exhibit 1477.

14 (Exhibit 1477 marked for identification)

15     Q.   The document is entitled "Prerenewal Appraisal

16 of Performance, The Dow Chemical, Contract AT

17 (29-1)-1106, Rocky Flats plant, for the period July 1,

18 '67, to December 1 -- December 31, 1970."

19          Does this appear to be one of the documents

20 that you prepared in appraising Dow's performance?

21     A.   Yes.  I signed it.  That's my signature.

22     Q.   Okay.  You can put that aside.  I'd like to

23 show you a document dated September 16, 1971, and have

24 it marked as Plaintiff's Exhibit 1478.

25 (Exhibit 1478 marked for identification)

87

```
 1       Q.   It appears to be a memorandum from General

 2   Donnelly, his name is on page 7, directed to Major

 3   General Giller, entitled "ALO Recommendation for Rocky

 4   Flats Plutonium Recovery and Waste Treatment

 5   Facilities."

 6            If you look specifically to paragraph

 7   letter A, on the bottom of page 1, there's a reference

 8   to a newly constructed plutonium recovery facility.  Do

 9   you recall the process of constructing the plutonium

10   recovery facility?

11       A.   No, I do not remember.

12       Q.   Right above paragraph letter A, there is a

13   sentence that refers to minimum -- a document entitled

14   "Minimum Criteria for New Plutonium Facilities."  Do

15   you recall that document?

16       A.   No, I do not.

17       Q.   If you look to page 5, the numbers are on the

18   top, in paragraph number 4, in the parentheses at the

19   end, it reads, "Demolition will include the removal,

20   destruction, and burial of contaminated equipment and

21   structures.

22            MS. SURBAUGH:  For the record, I believe

23   that's paragraph 5.

24            MR. CRAMER:  Oh, I'm sorry.  Thank you.

25       Q.   Paragraph 5.  Do you recall the issue of
```

88

1  demolishing and burying contaminated structures and

2  buildings?

3      A.   No, I do not remember.

4      Q.   Okay.  You can put that document aside.  I'd

5  like to show you a document dated October 6, 1971, and

6  have it marked as Plaintiff's Exhibit 1479.

7  (Exhibit 1479 marked for identification)

8      Q.   And and please review the entire document,

9  because I have several questions about it.

10     A.   Okay.

11     Q.   Just let me know when you're done.  The

12  document is entitled "Incidents at Rocky Flats."

13          Is that your signed-for signature on the

14  second page of the document?

15     A.   Yes.

16     Q.   Did you prepare this document, do you recall?

17     A.   No.

18     Q.   Did somebody on your staff prepare it?

19     A.   Yes.

20     Q.   Do you know who?

21     A.   No.

22     Q.   All right.  Do you have any reason to doubt

23  any of the facts or statements in the document, as we

24  sit here today?

25     A.   At this point in time, I can't remember these

89

1    things.

2         Q.   Is it fair to say that you knew around 1971,

3    when the document was written -- strike that.  I'll move

4    on.

5         A.   I'd like to go off the record with you a

6    minute, if I could, please.

7         Q.   Sure.  We can go off the record.

8    (Discussion off the record)

9         Q.   I just had one other question about

10   Plaintiff's Exhibit 1479.

11        A.   Wait a minute, now.  Are you through with this

12   guy, 79?

13        Q.   Yeah.  I have one more question about it.  You

14   said that someone on your staff prepared it, and you

15   just said off the record that -- and tell me if I'm

16   misstating -- that you often had people who worked under

17   you prepare things for you?

18        A.   That's right.

19        Q.   Is it fair to say that you had a certain

20   amount of trust and faith that the people who were

21   working under you were competent to do the job?

22        A.   Well, I don't like the word "fair."  I mean I

23   would say that anybody did work under me wasn't

24   competent, they didn't work under me very long.

25        Q.   So you had trust in the people who were

90

1   working under you at the time, in 1971, or specifically

2   in 1971?

3       A.   I trusted them, and I expected them to have

4   trust in me.

5       Q.   And if there were things that were written in

6   a memo or a document that was prepared by people on your

7   staff, but that was sent out under your signature, if

8   you later learned that something was amiss or awry or

9   wrong, would you have attempted to correct it?

10      A.   Well, normally, if I signed it, I would go

11  over it very, very carefully.  Many times I sent it back

12  for corrections, and so forth and so on.

13           I don't think I was perfect, and I don't

14  think that we -- that I didn't make mistakes.  And I was

15  always ready to admit when I made a mistake.

16      Q.   Okay.

17      A.   That's all I can say.

18      Q.   And is Plaintiff's Exhibit 1479 one of those

19  documents where someone on your staff prepared it, and

20  you read it and maybe sent it back?  Do you think --

21      A.   Well, I might have read it, sent it back, and

22  I might have signed it.  That period is so far back in

23  time, I can't remember.  That's the way I operated.

24      Q.   Okay.  We can move on.  Thank you.  I

25  appreciate that.  It's quarter to -- or about ten to 12

1  now.  Are you ready to break for lunch, or --

2      A.   Well, I would like to get a ball park estimate

3  how long you think this thing is going on, and how deep

4  that -- don't put this on the record, please.

5      Q.   Let's go off the record.

6  (Discussion off the record)

7  (The noon recess was held, 11:50 to 1:00)

8      Q.   Let me start out by asking you if you had

9  several or one or two key deputies that you looked to

10  for health, safety, and environmental issues?

11      A.   I had one deputy, one assistant manager for

12  safety -- for safety things.  That was Jack Burke.

13      Q.   That was Jack Burke?

14      A.   Yeah.

15      Q.   And he was the key person on that.  Was there

16  anybody else?

17      A.   Well, I mean just like, you know, when you go

18  down through a staff.  Jack had a section, he had people

19  working for him, but I dealt with Jack.  And if Jack

20  wanted to brief me on something and he didn't know all

21  about it, he would get one of his experts on that

22  certain subject to come in and tell me about it, but I

23  dealt with Jack.

24      Q.   What was Jack's title, do you remember?

25      A.   Oh, I think it was assistant manager for

1   safety, or something like that.  I can't remember back

2   in those days, but he was one of the top echelon people.

3        Q.   And what was his training, if you recall?

4        A.   He was a naval officer, and as I remember, I

5   think he had gone to Annapolis.

6        Q.   Do you know if he had a background in health

7   physics or --

8        A.   I can't remember.  I can't remember.

9        Q.   Okay.  We've looked at a lot of documents so

10  far in this deposition, many of them dealing with

11  health, safety, and environment, and you've indicated in

12  many cases that you didn't write the document, but that

13  somebody under you might have written it.

14             Is it fair to say that Jack Burke might

15  have written or helped to write many of these

16  documents?

17       A.   I don't know.  I mean you'd have to ask Jack

18  Burke that.  I would say that probably Jack had some of

19  his staff write them, maybe wrote some himself.  I just

20  don't know.

21       Q.   But given that most of these documents deal

22  with health, safety, and environment, would it be fair

23  to say that at least his group, Jack Burke's group,

24  wrote a lot of these documents?

25       A.   Yes.

93

1      Q.    I don't remember if I asked you, do you know

2   where he is today, Jack Burke?

3      A.    No.  I don't know where he is.  I could

4   probably find out from -- I don't know whether even AEC

5   would know.  I just don't know whether he's alive or

6   dead.  I just don't know.  We haven't kept up with each

7   other.

8      Q.    Okay.  One other question.  Do you receive a

9   pension from the Department of Energy?

10     A.    Well, I receive a pension from the Air Force,

11  and I receive a pension from the Department of Energy,

12  yes.  But I decided not to take -- you know, civil

13  service pension, because I didn't know how long they

14  were going to last, or anything else, and I was so fond

15  of the military, I decided I'd take both.

16     Q.    Okay.

17     A.    I'd have probably wound up making more money

18  if I had taken one from the civil service with my other

19  ones.

20     Q.    Okay.  We'll go back to the documents.  I'd

21  like to mark a document dated October 8, 1971, as

22  Plaintiff's Exhibit 1480.

23  (Exhibit 1480 marked for identification)

24     Q.    Take a moment to look over the document.

25  You'll notice on page -- well, the document has -- it's

94

1   a memo to R.E. Hollingsworth.

2              MR. RIGSBY:  Excuse me.  Is there a second

3   page to the memo?  I only have one.

4              MR. CRAMER:  Do you mean the cover memo?

5              MS. SURBAUGH:  Yeah.  You'll notice that

6   the cover memo ends with --

7              MR. CHAVEZ:  Well, I think it's on the last

8   page of the packet.

9              MS. SURBAUGH:  "I am," and the next page is

10  a newly titled page.

11             MR. CRAMER:  Yeah.  It is the last page of

12  the packet.  You'll notice that --

13             MS. SURBAUGH:  The letter is on the first

14  and the last.

15             MR. CRAMER:  The problem is, I think that

16  this is in the order that the Bates numbers are, and the

17  Bates numbers for some reason were stamped this way.

18             But anyway, page 1 is on the front page of

19  this Exhibit 1480, and page 2 of the memo is on the last

20  page of this Exhibit 1480.

21             MR. TULLY:  Just for the record, I'm not

22  sure that's correct.  If you'll look, the first page is

23  dated October 8, 1971, and the last page is dated

24  October 6, 1971.  I just point that out.

25             MR. CRAMER:  The date stamp would be wrong,

1  because it appears to read correctly, "I am involved."

2       A.   Well, my last page says September 7th, 1971.

3            MS. SURBAUGH:  There's one more.

4            MR. TULLY:  Also for the record, you'll

5  notice --

6            THE WITNESS:  Oh, October 6.  Okay.  Two

7  pages.  Yeah.  Okay.  The last one has to do with

8  another memo.

9            MR. CRAMER:  Okay.

10            MR. TULLY:  Let me just also point out that

11  the last page seems to be addressed to Mr. Joshel, where

12  the first page is addressed to Mr. Hollingsworth.

13            MR. CRAMER:  You are correct.  You are

14  correct.

15            MR. TULLY:  So I don't think they follow.

16  I think the last page of the exhibit follows the second

17  to last page of the exhibit, perhaps.

18            MS. SURBAUGH:  Yes.

19            MR. CRAMER:  You're right.

20       Q.   And actually, you're correct.  The last two

21  pages of this exhibit is a copy of what plaintiffs have

22  marked as PX 1479.  It was the last exhibit we looked at

23  today.  That was an attachment to this memo.

24            All right.  Why don't we just --

25       A.   Okay.

96

1     Q.   -- look at page -- the attachment to this

2  document is entitled "Action Relative to Rocky Flats

3  Incident of August 22, 1971."  And there's a description

4  of this incident.  If you take a moment to read the

5  first two pages of this actions relative to Rocky

6  Flats --

7     A.   All right.

8     Q.   -- I'd like to ask a couple questions about

9  it.

10     A.   How much of this do you want me to read?

11     Q.   Just read through A1, on page --

12     A.   A1 on page 2?

13     Q.   Yes.  You can stop there, at the end of A1.

14     A.   Okay.

15     Q.   Does this appear to be a report that was

16  prepared by your office?

17     A.   Yes.

18     Q.   On the first page of this attachment 1A,

19  related -- actions relating to the investigation, the

20  first sentence says, "The day following the incident,

21  8/23/71, after determining that it was a type B

22  occurrence," and it goes on.  What's a type B

23  occurrence?

24     A.   Well, I don't remember anything of an incident

25  on August 22, 1971, and I don't remember what a type B

97

1  occurrence was.

2      Q.   Okay.   If you look to the second page, under

3  A1 status, do you have any knowledge of the issue of Dow

4  using carbon tetrachloride in building 707?

5      A.   No.

6      Q.   Turn to page 4, please.

7      A.   Okay.

8      Q.   Number 6 reads, "Reestablish, to the extent

9  feasible, the integrity of ventilation barriers such as

10  walls, ceilings, et cetera, in order to maximize

11  contamination control."  Do you recall that there was a

12  problem at the plant, Rocky Flats plant, with the

13  feasibility -- or I mean the integrity of barriers and

14  ceilings?

15          MR. TULLY:  I'm sorry.  But I don't know --

16  before you answer the question, could you refresh me

17  what page we're on and then repeat the question?

18          MR. CRAMER:  I'm sorry.  Page 4, number 6,

19  top.

20          MR. TULLY:  I'm sorry.  Could I rehear the

21  question?

22          MR. CRAMER:  Sure, I referred to number 6,

23  and I basically am asking General Donnelly if he recalls

24  the problem or problems with integrity of ventilation

25  barriers, walls, ceilings, in the Rocky Flats plant.

1               MR. TULLY:  Objection to form.  You can

2  answer, sir.

3       A.   That's a detail of which I have no memory at

4  this time.

5       Q.   Would it be a fair assumption that Jack Burke

6  and his group, working under you, prepared this

7  document, given that it's dealing with health, safety,

8  and environmental issues?

9       A.   I have trouble making fair assumptions of what

10  they did, because it was so long ago, I just have

11  trouble.  I can't -- just can't surmise what they did.

12      Q.   Okay.  If you turn to page 5, under "actions

13  taken," number 2, the document reads, "On October 6,

14  1971, I dispatched a memorandum to L.M. Joshel, general

15  manager, Dow Chemical Company, Rocky Flats division,

16  expressing my dissatisfaction with the adequacy of

17  management actions with regard to the prevention of

18  incidents."

19              Do you recall having feelings of

20  dissatisfaction with the Dow management during this

21  period?

22      A.   No, I don't remember.  We've discussed this

23  memo before attached back here.  I just don't remember.

24      Q.   Right.  That memo is Plaintiff's Exhibit 1479,

25  the document --

1       A.   The memo is back here, too.  The same thing.

2       Q.   Right.

3       A.   No.  But I just don't remember anything about

4   it.

5       Q.   Okay.  You can put that document aside.  Thank

6   you.

7       A.   All right.

8       Q.   I'd like to mark a document dated October 21,

9   1971, as Plaintiff's Exhibit 1481.

10  (Exhibit 1481 marked for identification)

11      Q.   Please take a moment to read the entire

12  document.  It's two pages.  It's a memo.  You know

13  what?  Don't read the entire document yet.  Let me ask

14  if you --

15      A.   Do you want me to read the whole thing?

16      Q.   No.  Don't read it yet.  I don't know that you

17  need to read it yet.

18      A.   Okay.

19      Q.   When this document, at the top of the

20  document, it says "ref," r-e-f, "H.C. Donnelly,

21  manager."  Does that mean that the document was sent to

22  you?

23      A.   No.  I think that makes it -- I think that

24  means reference.

25      Q.   Oh, okay.

1        A.   A letter that I wrote to the general manager.

2        Q.   Would you have received a copy of this

3   document, if it was referencing a letter that you

4   wrote?

5        A.   I can't remember whether I would or not.

6        Q.   This letter, on the page 2, appears to be

7   written or authored by Martin Biles, director of

8   Division of Operational Safety.

9        A.   Uh-huh.

10        Q.   Who was Martin Biles, if you recall?

11        A.   He worked at the AEC headquarters, and he was,

12   as I remember, I said here, Division of Operational

13   Safety.  Martin Biles.  I just knew Martin, that's all I

14   knew, and I knew he was working back in headquarters.

15        Q.   Now, this letter appears to reference your

16   letter to Joshel, the general manager, of 10/8/71.  Can

17   you verify that that -- the letter that's being referred

18   to in Plaintiff's Exhibit 1481, the one you have before

19   you, is the 1479, which is right here?

20             MS. SURBAUGH:  Counsel, for point of

21   clarification, are you referring to the paragraph in the

22   back memo containing the sentence "Mr. Donnelly's letter

23   of October 8, 1971?"

24             MR. CRAMER:  Yeah, I am.  And I just

25   realized that 1479 is October 6.

1          MS. SURBAUGH:  Is dated October 6.

2          MR. TULLY:  Yeah.  I'm going to also lodge

3   an objection on the grounds that you're asking the

4   witness whether a reference in a document he did not

5   author is made to another document, so the objection is

6   to foundation.

7          MR. CRAMER:  Okay.

8     Q.   All right.  You can put the document aside.

9     A.   Okay.  I mean I -- it was all Greek to me.

10    Q.   We'll move on, since I don't understand Greek,

11   either.  I'd like to have the next document marked as

12   Plaintiff's Exhibit 1482.

13   (Exhibit 1482 marked for identification)

14    Q.   Take a moment to read it, and let me know when

15   you're done.  For the record, it appears to be from John

16   A. Erlewine, E-r-l-e-w-i-n-e, to John Ryan, dated

17   November 2, 1971.  At the bottom it says, "ref memo,

18   10/8/71, Donnelly to GM, Rocky Flats, contamination

19   incident of 8/22/71."

20          Do you -- I'll read it into the record.

21   The document says, "In view of the record of the past

22   few years at Rocky Flats on safety incidents and the

23   sensitivity of that plant, I cannot concur with General

24   Donnelly that good judgment was exercised in permitting

25   Dow to chair the investigating committee."

1              Do you remember the issue of having Dow

2    chair the investigating committee of this incident?

3         A.   No, I don't, but this is Erlewine's -- this is

4    Erlewine's view, and as I remember -- I can't remember

5    him ever taking it up with me.  He just -- I had a

6    different view, and he had a view, but he never came to

7    me and said anything about it, as I remember.  If he

8    had, I would have had a discussion with him about it.  I

9    remember nothing about it.

10        Q.   Okay.

11        A.   And there's no carbon copy or anything coming

12   to me, that I see here.

13        Q.   So you don't recall seeing this document?

14        A.   No, no, no.  If I had, it would have made an

15   impression, because I would say -- because he was

16   disagreeing with me, and I'd have had it out with him.

17        Q.   All right.  I'd like to introduce a new

18   document and have it marked as Plaintiff's Exhibit

19   1483.

20   (Exhibit 1483 marked for identification)

21        Q.   Now, this is a message dated January 26, 1972,

22   from Gordon Facer to General Donnelly.

23        A.   Uh-huh.

24        Q.   Now, if you look to the first sentence of the

25   letter, it says, "Attached is the text of a letter from

1   Senator Muskie to chairman Schlesinger."  Do you recall

2   Senator Muskie writing a letter raising the issues

3   regarding the Rocky Flats plant?

4        A.   Please let me read this whole thing first,

5   will you?

6        Q.   Sure.  Go ahead.

7        A.   Thank you.  Gordon Facer, I remember his

8   name.  I do not remember this letter.  Muskie, I knew,

9   was a Senator from Maine, and Jim Schlesinger was a

10  friend of mine.  I worked for him as chairman for the

11  AEC and as Secretary of Defense.  But besides that, I

12  don't remember anything about it.

13       Q.   Okay.  You can put the document aside.  I'd

14  like to mark this document as Plaintiff's Exhibit 1484.

15  (Exhibit 1484 marked for identification)

16       Q.   It appears to be a three-page message from

17  General Donnelly to M. Biles, among others, dated

18  February 10, 1972.  If you'd just take a moment to read

19  the first page.  Do you recall the incident that's

20  discussed in this document?

21       A.   No.

22       Q.   Does this appear to be a memorandum or message

23  that emanated from your office?

24       A.   Yes.

25       Q.   Okay.  You can put that aside.  I'd like to

1    mark a document dated February 24, 1972, as Plaintiff's

2    Exhibit 1485.

3    (Exhibit 1485 marked for identification)

4        Q.    And I don't want you to read the whole thing,

5    since it's long, unless you feel you need to, but the

6    title is "Summary Fee and Scope Appraisal of

7    Performance, the Dow Chemical Company Contract."

8            MS. SURBAUGH:  Excuse me.  I think I have

9    the wrong --

10           MR. CRAMER:  Oh, here.  I'm sorry.  There

11   it is.

12           MS. SURBAUGH:  Thank you.

13       Q.    And it's for the period March 1, 1971, to

14   February 15, 1972, and it has your signature on the

15   first page.  Is that your signature?

16       A.    Correct.

17       Q.    And was it -- can you identify what this

18   document is?  Can you explain to me what --

19       A.    Do you want me to give you the title of it, or

20   what?

21       Q.    Well, explain to me more what the document is.

22       A.    Well, this document says it's a summary fee

23   and scope appraisal performance of Dow Chemical

24   Company.  Appraisals were made of Dow Chemical Company

25   and how they were doing the job from time to time.  It

1  appears that this is one of those reports.

2       Q.   And were you the person responsible for doing

3  those appraisals, or ensuring --

4       A.   My office was, yes.

5       Q.   And what was the purpose of the appraisals?

6       A.   Well, it was just like anything you do in

7  life.  You make an efficiency report on people.  In the

8  military, you make an appraisal of how you're running

9  any kind of a job.  If you got a garage, appraise the

10  mechanics in the garage.  I mean it's just a thing that

11  you do as an ordinary part of your job.

12       Q.   Now, the first page under the introduction,

13  second paragraph, it states that, "During the appraisal

14  period, James H. Hanes was appointed general manager of

15  the Rocky Flats plant."

16       A.   Well, wait a minute.  Where is that, now?  On

17  the cover sheet?  Yeah.  Yeah.  Hanes, yeah.

18       Q.   Do you recall working with James Hanes at

19  all?

20       A.   Yes.  I remember.  He took Joshel's place.

21       Q.   And do you know how long Hanes was in that

22  position?

23       A.   I can't remember.

24       Q.   If you look to the first -- the second page of

25  the document, entitled "Summary Evaluation, Current

106

1    Contract Period."  The second paragraph reads, "Most

2    significant among deficiencies noted are those relative

3    to the operational application of good criticality

4    safety practices.  In addition, there is a concern about

5    safety considerations associated with radioactive waste

6    management and the recurrence of

7    radioactive/contamination incidents, which ALO

8    attributes, in part, to inadequacies in the control of

9    operations at the first line supervisory levels and lack

10   of management-directed programs to minimize hazard

11   potentials."

12            Is that something that you or your office

13   wrote at the time?

14        A.   I can't remember.  It's my office paper, but I

15   can't remember this statement.

16        Q.   Okay.  Do you have any reason to doubt that

17   any of the statements or facts in this document are --

18   were true or correct at the time that you wrote them, or

19   your office wrote them?

20        A.   Well, at this time, in my memory of things, I

21   have to think these people -- I look at this thing, and

22   it came out of my office, and I assume they were

23   correct.  That's all I can say at this time period.

24        Q.   Okay.  We can move on.  Thank you.  I'd like

25   to mark another document Plaintiff's Exhibit 1486.

1  (Exhibit 1486 marked for identification)

2       Q.   Again, this is the Summary Fee and Scope

3  Appraisal of Performance for the period February 15,

4  1972, to April 30, 1973.  And it says, "Approved by," on

5  the front page, "H.C. Donnelly."  Is that your signature

6  on the front page?

7       A.   Yes.

8       Q.   And this is essentially the same type of

9  report, just one year later?

10      A.   Yes.  It's one year later.  And I signed it in

11  July.  I got it in April, but I guess my staff worked it

12  over or something.

13      Q.   Okay.  Please mark this as Plaintiff's Exhibit

14  1487.

15  (Exhibit 1487 marked for identification)

16      Q.   It's a one-page memo dated October 15, 1973,

17  from General Donnelly to Mr. Hollingsworth, entitled

18  "Potential Sources of Contamination, Rocky Flats."  Is

19  that your signature at the bottom of the page?

20      A.   Yes.

21      Q.   First paragraph references "locating the

22  source of tritium which has caused increased level of

23  tritium contaminant in the Rocky Flats environs."  Do

24  you recall, in general, the release of tritium to the

25  Rocky Flats environment from the Rocky Flats plant?

1    A.   No.  I can't remember anything about it.  I

2  can't remember that.  I regret I can't remember.

3    Q.  If you look at the second full paragraph,

4  second sentence, it reads, "To date, most leakage has

5  been found to be caused by mechanical failure, i.e.,

6  packed joint or valve leakage, rather than internal or

7  external corrosion of the lines.  A construction

8  program, part of the new plutonium recovery and waste

9  treatment facility project, is under way, which will

10  replace most of the existing waste piping network with a

11  new two-pipe system designed to be inspectable and

12  repairable and incorporating an alarm system to warn of

13  leakage."

14       Do you recall the creation of this new

15  waste treatment facility?

16    A.  Those details I can't recall at this time,

17  this period of time.  I just can't recall it.

18    Q.  Okay.  The last paragraph states, "Until

19  existing lines can be replaced, we believe it is prudent

20  to redouble our efforts to detect any latent source of

21  contamination."  Do you recall the efforts that were

22  made by your office to detect the sources of

23  contamination?

24    A.  No.

25    Q.  Okay.  I'd like to have this document marked

1   as Plaintiff's Exhibit 1488.

2   (Exhibit 1488 marked for identification)

3       Q.   This is a memo from General Donnelly's office

4   dated October 17, 1973.  It's three pages, and it

5   appears to have a duplicate of itself attached.  I don't

6   know if you all have that.  So there's three pages, and

7   then three pages of the same document.

8                 Now, this document states that the subject

9   is nuclide inventory data, and the first sentence reads,

10  "AEC headquarters has requested that each contractor

11  compile up-to-date inventories of the quantities of

12  radioactivity that have been released, disposed of, or

13  otherwise deposited in the on-site and off-site

14  environment as of December 31, 1972."

15                Do you recall sending a memo to the

16  contractors of the AEC facilities to have them prepare

17  inventories of radio nuclides released?

18      A.   No.

19      Q.   Is this a memo that emanated from your

20  office?

21      A.   Yes.  It appears it is.

22      Q.   If you'd just look to page 3 of the

23  document --

24      A.   Okay.

25      Q.   -- towards the middle of the page, it is noted

1  that formal reporting of this type of data has been in

2  effect since January, 1968, referring to environmental

3  sampling data.  "Although the 1968 through 1972 data

4  should be included in your estimated inventories, the

5  main purpose of this request is to determine

6  specifically that information may or may not be

7  available prior to 1968.  We are aware that the data

8  will be rough, but research for data during this early

9  period is requested."

10         Do you recall that it was difficult to find

11  data regarding environmental releases prior to 1968 at

12  the Rocky Flats plant?

13     A.  No.

14         MR. TULLY:  Objection to form.  You can

15  answer, sir.

16     A.  No.

17     Q.  Okay.  I'd like to mark the next document as

18  Plaintiff's Exhibit 1489.

19  (Exhibit 1489 marked for identification)

20     Q.  This appears, on the last page, page 6 of this

21  document, there's a signature, H.C. Donnelly.  Is that

22  your signature?

23     A.  Correct.

24     Q.  Okay.  And the document is dated November 1,

25  1973, entitled "Report of Investigation of tritium

1  Contamination Detected in Rocky Flats Environs."  Take a

2  moment to read the first page, and I'm just going to ask

3  if this jogs your recollection about the tritium

4  release.  If it doesn't, we can move on.

5        A.   I can't remember this.

6        Q.   One other thing.  If you'd look to page 3,

7  there's one other question I have.

8        A.   Yeah.  Page 3?

9        Q.   On page 3, letter E.  "Liquid recycle plans."

10  There's a reference to the completion of a new chemical

11  recovery building, building 371.  And then, further

12  down, I think the third sentence, "This will be

13  accomplished through the addition of a tertiary

14  treatment cycle to the sanitary sewage plant by the use

15  of reverse osmosis."  Do you recall if that ever came

16  into fruition?

17        A.   No, I cannot.

18        Q.   Okay.  Please mark the next document as

19  Plaintiff's Exhibit 1490.

20  (Exhibit 1490 marked for identification)

21        Q.   This is a one-page memo with an attachment.

22  The attachment is entitled "Rocky Flats Site Condition

23  Study Status Report."  Is that your name at the bottom

24  of the page?

25        A.   Yes.

1       Q.   The document references a site condition study

2   done at the Rocky Flats plant, and that's attached.  Do

3   you recall this study being done at all?

4       A.   No.

5       Q.   Just take a moment to look at the

6   attachments.  I just want to know if you recognize any

7   of them.  There are three attachments on the back.

8       A.   Which ones, please?  All of them, or --

9       Q.   It's attached as 1, 2, 3.  There's a map of

10  the plant site --

11      A.   This sheet, landfill -- oh, my goodness.

12      Q.   Do you recall, do these --

13      A.   That one?

14      Q.   Do you recall that?  Does that look familiar

15  to you?

16      A.   No.  I don't have in my mind any outline of

17  the plant, so I -- none whatsoever.

18      Q.   How often did you visit the plant site during

19  this period?

20      A.   I can't remember.

21      Q.   Was it once a month?  Once every six months?

22      A.   I can't remember, to tell you -- you know, to

23  keep a site like this in my mind, I can't -- I can't

24  imagine I'd keep a site like this in my mind.  In fact,

25  it's a -- it doesn't mean anything to me.

1        Q.    Okay.  Did your staff visit this plant site
2  often?
3        A.    Yes.
4        Q.    Specifically, did Jack Burke visit the plant
5  site?
6        A.    Yes.  His people, particularly, visited the
7  site.
8        Q.    Please mark this document Plaintiff's Exhibit
9  1491.
10  (Exhibit 1491 marked for identification)
11        Q.    It appears to be a message or memo from
12  General Donnelly to John Harley of the Health and Safety
13  Laboratory in New York, among others, regarding Fidler
14  readings at Rocky Flats, or a report entitled "Fidler
15  Readings at Rocky Flats."
16              And the first sentence reads, "You
17  indicated a desire to publish the referenced report in
18  your fallout program quarterly summary report and
19  requested our comments.  Jack Burke of my staff
20  discussed our views and concerns with Dr. Biles, who in
21  turn talked personally with you.
22              "Our comments are as follows:  We prefer
23  that HASL not publish the Fidler survey report,
24  especially the on-site data, in the quarterly report.
25  The report as written could be taken out of context with

114

1   other published data concerning contamination in the

2   Rocky Flats environs, and as such, could generate a

3   great deal of controversy.  Some of the comments in the

4   report are somewhat speculative, and not yet supported

5   by hard data."

6           Do you recall that being a conclusion

7   reached by Jack Burke or you or someone in your office?

8       A.   I can't remember who reached the conclusion.

9       Q.   Do you recall that the Health and Safety Lab

10  did a study with the Fidler instrument in and around

11  this time?

12      A.   No.  I don't remember those details.  In fact,

13  I don't know what a Fidler thing is.  Where is that, did

14  you say?  Where is that word, "Fidler"?

15      Q.   It's the second line, F-i-d-l-e-r.  I think it

16  stands for field instrument for the detection of --

17      A.   Oh, "Fidler."  I don't know what that is.

18      Q.   -- low-level radiation.

19      A.   That's a new one on me.  No.  I don't know

20  anything about Fidlers.

21      Q.   Is Jack Burke the person in your office who

22  would have dealt with the Health and Safety Lab?

23      A.   Yes.  Yes.  Jack was the guy.

24      Q.   I'd like to show you a document that was

25  previously marked as Plaintiff's Exhibit 1212, on

1  10/24/1995.  I only have two copies.  I'll represent to

2  you that this is the handwriting of Edward Harley of the

3  Health and Safety Lab.

4       A.   May I ask you a question, please?

5       Q.   Sure.

6       A.   What does "Plaintiff's Exhibit" mean?  Is that

7  you?

8       Q.   Yes.

9       A.   Or is that the guys you're being the lawyer

10  for, or what?

11       Q.   That is our clients, yes.

12       A.   Are these things -- but these things are just

13  ordinary exhibits down here, you're doing with me.

14       Q.   Right.  It's just a different form for the

15  sticker.

16       A.   Oh, oh.  I thought this was something

17  special.  No difference, huh?

18            MS. SURBAUGH:  No difference.  It has to do

19  with who offers the exhibit.

20            THE WITNESS:  Oh.  Who offers the exhibit.

21  I see.  Okay.

22       A.   Now, please.  I'm sorry I interrupted you.

23  Please go ahead.

24       Q.   I just wanted to point you down and ask if you

25   -- if this jogs your recollection.  Under December 11,

116

1   1973, it says --

2       A.   No.  It sure doesn't bring this thing -- the

3   guy doesn't even know how to spell my name.

4       Q.   -- Gordon Facer, Fidler, hold-up, the leak out

5   of January 1 quarterly.  Quite a reaction to HASL-235,

6   vulnerable to slightest public reaction."

7            And then, "Haven't heard from Donnelly

8   yet.  Things are so bad, State of Colorado."  Does this

9   jog your recollection about --

10      A.   No.  I told you I didn't know this guy, and he

11  sure didn't know me, if he didn't know how to spell my

12  name.

13      Q.   Okay.

14      A.   Where is this "Things are so bad in

15  Colorado."

16      Q.   Last line.  I think "Things are so bad, State

17  of Colorado."

18      A.   I don't even read that.  "I haven't heard from

19  Donnelly yet."  And what's this thing at the end of it?

20      Q.   "State of Colorado," I think.

21      A.   No.  I don't have that.

22      Q.   Oh.  It might have come off your copy.

23      A.   This just says -- I can't translate it.

24           MS. SURBAUGH:  I think that's what he's

25  referring to.  It's missing -- isn't it?

1      Q.   I think it says "State of Colo," C-o-l-o.

2      A.   Well, it doesn't make any difference because

3   -- oh, I see.  "State of C-o-l-l."  Something or

4   other.  That's pretty poor.  That's that guy writing in

5   that fine print.

6      Q.   Okay.  I'd like to show you a document that's

7   been previously marked as Exhibit 938.  It's dated

8   December 14, 1974.  And at the bottom -- well, the

9   letter is from Earl Bean to M. Thompson at Dow, entitled

10  "Assistance to Land Owners in the State-Declared 'Area

11  of Concern,'" and it discusses "an attached letter," but

12  the letter is not attached, "from H.C. Donnelly to W.M.

13  Lamb, provides guidance for establishing a program of

14  assistance to land owners with bona fide development

15  plans in the quote 'area of concern,' which had been

16  specified by the Colorado Department of Health."

17            Do you recall what the area of concern

18  was?

19     A.   No.  I have no -- no recollection of area of

20  concern.

21     Q.   Okay.

22     A.   This was just between these people, and I

23  don't even know about the meeting.

24     Q.   Okay.

25  (Discussion off the record)

118

1      Q.   Please mark this document as Plaintiff's

2 Exhibit 1492.

3 (Exhibit 1492 marked for identification)

4      Q.   And this is a two-page memo from General

5 Donnelly to J.H. Harley at the Health and Safety Lab in

6 New York, entitled "Remote Plutonium Contamination in

7 Total Inventories from Rocky Flats."

8           On the second page, is that your name?

9      A.   Yes.

10      Q.   If you had to guess as to who in your office

11 prepared this document, would it be Jack Burke?

12           MR. TULLY:  Objection to form.  You can

13 answer if you know.

14           MS. SURBAUGH:  And I'll insert an

15 objection, too.  It calls for speculation.

16      Q.   I'm going to rephrase the question.

17           MS. SURBAUGH:  But you can answer.

18      Q.   Did you write this document?

19      A.   No.

20      Q.   Who do you think wrote this document?

21           MR. TULLY:  Same objection.

22      A.   This was a document which originated in my

23 staff.  And as I said before, I do not remember knowing

24 of Harley, and that's all I can say.

25      Q.   The third -- well, the second and third

119

1  paragraphs refer to problems that you or your office had

2  with the paper.  For example, that plutonium was only

3  reliable -- I mean that the estimate of off-site

4  plutonium was only reliable within plus or minus 30

5  percent, and that there is a lack of adequate number of

6  data points.

7            Are those issues with which you personally

8  have expertise?

9       A.   No.

10      Q.   Okay.  Now, attached to this memo is a

11  two-page report entitled "Remote Plutonium Contamination

12  and Total Inventories from Rocky Flats, P.W. Kray, HASL,

13  and it appears to be comments on Mr. Kray's report from

14  the Health and Safety Lab.

15            Were these comments prepared by someone

16  from your office?

17      A.   I can't remember whether they were or not,

18  but --

19      Q.   If you look in the first paragraph of the

20  front page of the entire document --

21      A.   Yes.

22      Q.   -- it refers to --

23      A.   Yeah.

24      Q.   -- a review and comment on the subject paper.

25      A.   Yeah.  Comments.  Now, this, to me, is

1   comments between experts.  Kray who wrote a report,

2   supposedly an expert, and my experts.

3        Q.   Okay.

4        A.   On details that I would never get into.

5        Q.   All right.

6        A.   But I support my guys.

7        Q.   I'd like to go back just for one question to

8   Plaintiff's Exhibit 1490.

9        A.   Okay.

10            MR. TULLY:  I'm sorry.  What was the

11   exhibit number?

12            MR. CRAMER:  1490.

13       Q.   And if you'd turn to page 5 of the

14   attachment.  It's the last page before the exhibits.

15   There's a heading "Recommendations."

16       A.   Oh.  It's down at the bottom this page is

17   numbered.  Okay.

18       Q.   Do you see that?  The paragraph reads, "It is

19   proposed that an overview of the foregoing site studies

20   be furnished to appropriate State officials, together

21   with our general plans for studies to be undertaken to

22   establish appropriate action."

23            And it goes on to say, "This can be done in

24   connection with general plant orientation briefings by

25   RFAO which have been requested by the Governor and other

1   key officials of the State, and can be presented as a

2   low key compilation of the numerous news stories and AEC

3   releases on this subject over the past several years."

4            Do you recall an attempt to low key some of

5   the issues that were going on at the Rocky Flats plant

6   during this time?

7        A.   No.

8            MR. TULLY:   Objection to form.

9        A.   No.  I don't.

10       Q.   Okay.  You can put that aside.

11       A.   Do you want these things in order, or do you

12   care?

13       Q.   Yeah.  That would be good.  I'd like to have a

14   document marked as Plaintiff's Exhibit 1493.

15   (Exhibit 1493 marked for identification)

16       Q.   This is a letter that appears to be from

17   General Donnelly to James Liverman.  Is this a document

18   that emanated from your office?

19       A.   Yes.

20       Q.   And it's signed by Herman E. Roser, or the

21   original is signed by Herman E. Roser, for Donnelly?

22       A.   He was my deputy manager, and I must have been

23   away then, yes.

24       Q.   And he was authorized to sign documents on

25   your behalf?

122

1      A.   Yes.

2      Q.   I'd like to show you a document that has been

3  previously marked as Plaintiff's Exhibit 942.  And this

4  appears to be a document authored by B.W. Colston, area

5  manager, and directed to General Donnelly.

6      A.   Right.

7      Q.   Dated May 16, 1974, and entitled "Removal of

8  Contaminated Soil Southeast of Asphalt Pad 903 Area."

9           Does this jog your recollection about the

10  proposal or program to remove the soil at the Rocky

11  Flats plant?

12      A.   No.  I do not remember these details.

13      Q.   Please mark this as Plaintiff's Exhibit 1494.

14  (Exhibit 1494 marked for identification)

15      Q.   This appears to be a document dated September,

16  1974, from General Donnelly to M. Biles and Ernest

17  Graves and others.  It's three pages long.  And the

18  subject is "Elevated Levels of tritium in Rocky Flats'

19  Effluent Air."

20           It reads, "This message confirms telephonic

21  notification to DOS and DMA on September 5, 1974, of the

22  subject occurrence involving tritium in the effluent air

23  from the 205 plenum serving building 776/777, and

24  tritium in the rainwater collection samples."

25           Does this jog your recollection about

123

1 tritium emanating in the effluent from Rocky Flats?

2      A.   No.  This message is September, '74.  That's

3 22 years ago.  I do not remember.

4      Q.   Okay.  Do you have any doubt that this is a

5 document that was prepared by your office?

6      A.   No.

7      Q.   Okay.  Please mark this as Plaintiff's Exhibit

8 1495.

9 (Exhibit 1495 marked for identification)

10      Q.   Now, I think this would be a good time to take

11 a five-minute break.

12      A.   Break?  I agree.  Why not.  Five minutes is

13 long enough.

14 (Recess held)

15      Q.   We've just marked a document Plaintiff's

16 Exhibit 1495.

17      A.   Oh.  This one here?

18      Q.   Yeah.  It's dated November 29, 1974, and it

19 seems -- it appears to be signed by Herman Roser for

20 General Donnelly; is that correct?

21      A.   Yes.

22      Q.   And the title is "Special Survey of Material

23 Accumulations in Glove Box Exhaust Ducts in Building

24 771."

25               Do you recall the issue of a problem of

1  plutonium amassing in ducts at the Rocky Flats plant?

2           MR. TULLY:  Objection to form.

3      A.   No.  I can't remember anything about that.

4      Q.   There's an attachment to this memo entitled

5  "Special Survey of Material Accumulations in Glove Box

6  Exhaust Ducts in Building 771, November 4 to 5, 1974."

7               Does this appear to be a document that was

8  prepared by your office?

9      A.   Yes.

10      Q.   Actually, if you look on page 8, there are

11  names of the people who worked on the document.  Can you

12  identify any of those people?

13      A.   Well, let me see.  Page 8?

14      Q.   Yeah.

15      A.   Hmm.  Let's see what year this was.  I think

16  it was towards the end of my tour.

17      Q.   Late '74.

18      A.   Roser signed the paper.  The only name that I

19  recall is Cruickshank, Cruickshank.

20      Q.   Did he work for you?

21      A.   Well, he worked in the office, but I think --

22  these guys, I think, were -- some were chiefs, like

23  Cruickshank was a chief.  This guy was a chief of a

24  branch, and he would be under a division chief, so you

25  know, you have a division, a bigger guy, a

125

1    higher-ranking guy, and then you have these branch

2    chiefs.  But Cruickshank is the only name I recognize.

3         Q.   Please mark the next document as Plaintiff's

4    Exhibit 1496.

5    (Exhibit 1496 marked for identification)

6         Q.   This appears to be a message or memo from

7    General Donnelly to R.G. Bradley, Idaho Falls, F.K.

8    Pitman, Germantown, among others, and the subject is

9    potential hydrogen buildup in certain plutonium wastes,

10   and it references a telex or a TWX from Bradley to

11   Donnelly on the same subject dated January 13, 1975.

12             Do you recall the issue of hydrogen buildup

13   in plutonium wastes, in certain plutonium wastes?

14        A.   No.  Bradley didn't work under me.  He was a

15   different -- different place.  Idaho Falls, I didn't

16   have any jurisdiction over, and I don't remember

17   anything about it.

18        Q.   Do you have any doubt that this is a document

19   that was prepared by your office?

20        A.   No.

21        Q.   I'd like to mark the next document as

22   Plaintiff's Exhibit 1497.

23   (Exhibit 1497 marked for identification)

24        Q.   This is a memo or letter dated January 16,

25   1975, and it appears to be signed by General Donnelly.

126

1  Is that your signature?

2      A.   Yes.

3      Q.   And it's directed to William Lamb, and

4  entitled "Removal of Contaminated Soil at Rocky Flats

5  Plant."

6           It references an attached memo which I do

7  not have attached here.

8      A.   General Graves is the guy who took -- well, he

9  took General Camm's place and Camm took Giller's place.

10  He's an engineer with DMA.

11      Q.   The Division of Military Applications?

12      A.   Yeah.  His name is Ernie Graves.  I know him.

13      Q.   And you don't recall the issue of removing

14  soil from the 903 pad; is that correct?

15      A.   No.  I do not remember about it.

16      Q.   Okay.  I'd like to mark this document as

17  Plaintiff's Exhibit 1498.

18  (Exhibit 1498 marked for identification)

19      Q.   And this is a three-page message dated April,

20  1975.  I think it's April 22, from General Donnelly to

21  James Liverman, Ernest Graves, among others.  The

22  subject is removal of contaminated soil southeast of

23  asphalt pad.  Do you have any doubt that this is a

24  document that was prepared by your office?

25      A.   No.

1        Q.   Okay.  Please mark this next document as

2   Plaintiff's Exhibit 1499.

3   (Exhibit 1499 marked for identification)

4        Q.   It's a document dated May 2, 1975, entitled

5   "Soil Removal Project."  And it appears to be signed by

6   Mr. Herman Roser for General Donnelly; is that correct?

7        A.   Yes.

8        Q.   If you look at the last paragraph, it reads,

9   "I understand we will be receiving comments from

10  headquarters soon in connection with the environmental

11  assessment you prepared.  I share Dr. Liverman's hope

12  that an assessment can be developed to the satisfaction

13  of all parties which would preclude the need for an

14  environmental impact statement."

15           Do you know why your office would want to

16  preclude the need for an environmental impact

17  statement?

18       A.   No.  I don't know why.  Roser signed the

19  letter, and I wasn't there, so I wouldn't know why.

20       Q.   Okay.  Please mark the next document as

21  Plaintiff's Exhibit 1500.

22  (Exhibit 1500 marked for identification)

23       Q.   This is a one-page memo with an attachment

24  dated May 6, 1975, from General Donnelly to Major

25  General Ernest Graves, and it's signed "Sam."  Is that

128

1  your name?

2      A.   Right.   My nickname.

3      Q.   And the cover memo here is discussing a visit

4  of General Graves.  Do you recall that visit and meeting

5  with General Graves?

6      A.   No, I do not recall it.  I had so many visits

7  at so many different times, and that was way back, 21

8  years ago.  I do not recall it.

9      Q.   And the cover memo states that you asked that

10  we provide you with a, quote, "talking paper," close

11  quote, which would identify those issues or subjects

12  which might be raised in any such discussions, referring

13  to discussions with Colorado officials, regarding the

14  Rocky Flats plant.

15            And attached, I believe, is the talking

16  paper.  Can you verify that this appears to be the

17  talking paper that is mentioned in the cover letter?

18      A.   Yes.

19      Q.   And do you have any doubt that this was the

20  paper that -- a paper that was prepared by your office

21  and the people working under you?

22      A.   No.

23      Q.   If you turn to page 9 of this document --

24      A.   Do you mean the enclosure?

25      Q.   Yeah.   The enclosure.

1        A.   Right.

2        Q.   Under J, epidemiological studies.

3        A.   Yeah.   Remember I had asked you what that big

4   word meant?  Now, tell me again, what's that big word?

5   I didn't remember.  My memory is damn poor.  Go ahead.

6        Q.   My layman's understanding of it is, and this

7   is an oversimplification, but it's the study of diseases

8   in human populations.

9        A.   Oh, I see.  Okay.  I'm with you now.  Thank

10  you.

11        Q.   And the effects of certain toxins and

12  chemicals on those populations.

13             The position -- there's a discussion, and

14  then the position, and the position reads, "Considerably

15  more is known about the health effects of internal

16  exposures to plutonium than was indicated either in the

17  task force report or the associated hearings.  As a

18  matter of fact, the task force was provided additional

19  material from ERDA regarding biomedical effects in order

20  to provide a better perspective on the subject.

21  However, it is clear that considerably more research and

22  information is needed."

23             Do you know who came to that conclusion?

24        A.   No.  No.

25        Q.   Was that someone in your office, though?

130

1       A.   I have no idea.

2       Q.   Okay.  It's fair to say, though, that this

3   document was written by someone in your office, right?

4       A.   Written by somebody in the office, but maybe

5   they got this dope from somebody else, as far as I know.

6       Q.   Okay.  But they adopted this conclusion as

7   part of their own in this matter?

8       A.    Well, I don't know whether they adopted it or

9   not, but they included it as part of everything.

10  Whether they adopted it or not -- it's semantics, I'll

11  grant you, but you're used to semantics better than I

12  am.

13      Q.   Okay.  Please mark this document as

14  Plaintiff's Exhibit 1501.

15  (Exhibit 1501 marked for identification)

16      Q.   This is a three-page cover memo from James

17  Liverman to General Donnelly with attachments, and dated

18   -- it's actually undated, unfortunately, but it's

19  entitled "Removal of Contaminated Soils Southeast of

20  Asphalt Pad, Rocky Flats."

21          And it discusses this soil removal project

22  at the asphalt pad, and the attachments appear to be

23  comments on an environmental assessment that was

24  prepared by Dow, or others, about the soil removal.

25          Do you recall this incident?  I remember

1  you said you didn't, but --

2      A.   No, no.  Not at all.

3      Q.   Okay.  Do you have any doubt that this

4  document was authored by -- strike that.  Do you have

5  any doubt that your office received this document?

6      A.   I have no way of knowing.

7      Q.   That's your name on the top, isn't it?

8      A.   That's my name, but whether it got there or

9  not, or anything else -- besides, looking at the

10  enclosures, if I may so -- may I go off the record a

11  minute?

12      Q.   Sure.  We can go off the record.

13  (Discussion off the record)

14      Q.   I'm just going to take one minute to look with

15  my notes.  I'm done with the documents.

16      A.   Oh, sure, sure.  Take all the time you want.

17  (Discussion off the record)

18      Q.   Do you have any regrets?

19          MR. TULLY:  Objection.

20          MS. SURBAUGH:  Vague.

21      A.   Oh, I mean if I can go off the record -- may I

22  go off the record, please?

23          MR. TULLY:  If you wouldn't mind, General,

24  just answer his question.

25      A.   Not -- about Rocky Flats, or anything else?

132

1   Do I have any regrets?

2          Q.   About your work with Rocky Flats.

3          A.   Oh.  That's a different question.  I thought

4   you just said do I have any regrets.

5          Q.   I did.

6          A.   In my life, I got lots of regrets in my life.

7   I mean I did a lot of bad things in my life when I was a

8   young kid.

9          Q.   We don't need to hear about that.

10         A.   But now do you want me to -- I answered the

11  question about Rocky Flats as no, I have no regrets.

12         Q.   Okay.

13         A.   Okay.

14              MR. CRAMER:  All right.  I thank you very

15  much for your patience and for answering all of our

16  questions.

17              THE WITNESS:  Thank you.

18              MR. CRAMER:  And for sitting through and

19  reading all of these documents again.

20              THE WITNESS:  I'd like to go off the record

21  again, if I may.

22  (Discussion off the record)

23

24                    CROSS-EXAMINATION

25  BY Mr. Tully:

133

1       Q.   Good afternoon, General Donnelly.  My name is

2  Martin Tully and I represent one of the defendants who

3  have been sued in the litigation, Dow Chemical Company.

4  I'd like to ask you a few questions, mostly concerning

5  the testimony that you've given up until this point

6  today.

7              General Donnelly, you were the Albuquerque

8  operations office manager from approximately July of

9  1968 until approximately the spring of 1975?

10       A.   Correct.

11       Q.   During that point in time, Dow Chemical was

12  the contractor operating the Rocky Flats plant?

13       A.   Right.

14       Q.   Given your experience as the Albuquerque

15  operations office manager, General Donnelly, what are

16  your views as to Dow's abilities as a contractor in

17  connection with operating the Rocky Flats plant?

18       A.   Well, Dow -- I would -- I'll go back and

19  compare Dow with my other contractors.  I mean that's

20  the way I measured all my contractors.  And I thought

21  Dow was a very good contractor.  They were -- I mean I

22  considered them to be very fine, and in that type of

23  work, to be outstanding.

24       Q.   During your tenure as Albuquerque operations

25  office manager overseeing the Rocky Flats plant, did you

1   ever experience or perceive that Dow Chemical was

2   putting production over safety in connection with

3   operating the Rocky Flats plant?

4       A.   No.  In fact, I preached all the time safety

5   was the number one thing.  Safety, to me, has always

6   been number one, be it in the Air Force or -- in the

7   military, wherever I was or anything, I placed --

8   anything like production or anything else were

9   subservient to safety.  They came after safety was taken

10  care of.

11                   To me, that was the most important thing,

12  was taking care of my people and doing everything I

13  could possibly do to be sure they were in a safe

14  environment, be it military or AEC or anything.

15      Q.   I take it, then, sir, that safety was a

16  paramount consideration in your running of the

17  Albuquerque operations office?

18      A.   Safety was number one in my running anything I

19  did in my life.

20      Q.   Based on your experience with Dow Chemical,

21  would you say that that was true for Dow Chemical, as

22  the operator of the Rocky Flats plant?

23      A.   I can't speak for Dow Chemical.  I can speak

24  for myself.  It was my -- it was my policy.  I can't

25  speak for Dow Chemical, I mean how they'd word the reply

1   to that question.  I can't speak for them.

2       Q.   I understand, sir.  What I was actually asking

3   you is based on your observations of how Dow ran the

4   plant, was it your perception that safety was also more

5   important than production from Dow's perspective?

6             MR. CRAMER:  Objection; asked and answered.

7       A.   Based on my observation, from when I first

8   visited Dow in 1978, and in talking with the people up

9   there, the people I knew, I respected their views, and I

10  think they held the same regard for safety as I hold.

11      Q.   I just want to point something out, sir.  I

12  believe you said 1978.  Did you mean 1968?

13      A.   1968, yeah, yeah.

14      Q.   Earlier today the name Mr. Joshel, the plant

15  manager of Rocky Flats, came up.  What were your views

16  or opinions of Mr. Joshel as plant manager of Rocky

17  Flats while you were the Albuquerque operations office

18  manager?

19      A.   I considered Mr. Joshel to be a very

20  well-trained and well-educated scientist.  I considered

21  him to be a very loyal servant, you might say, servant

22  of the government, and a loyal worker for AEC.  I

23  considered that he was straightforward and truthful, and

24  I admired him as a man and a gentleman.

25      Q.   I believe earlier today it came out that Mr.

1  Joshel was succeeded by Mr. Hanes as plant manager of

2  Rocky Flats.

3        A.   Yes.

4        Q.   What were your views of Mr. Hanes as the plant

5  manager of the Rocky Flats?

6        A.   I thought he was a very fine -- fine manager,

7  and I didn't -- I don't remember how long I was with

8  him.  Not too long, I don't think.  I can't remember how

9  many years, but I thought he was a very fine manager.

10       Q.   You mentioned -- there's been some discussion

11  today, General Donnelly, concerning the staff that

12  reported to you as Albuquerque operations manager.  Do

13  you recall that, sir?

14       A.   Well, I'm not quite sure.  The staff that

15  reported to me?

16       Q.   Let me restate the question.

17       A.   I mean I had certain area officers report to

18  me, but I had members of my staff report to me, so I

19  don't know that -- I mean I've got to make a distinction

20  between, say, Rocky Flats and Kansas City and Pinellas

21  and those places, and Amarillo, compared to my own

22  staff, so I don't know which one you mean.

23       Q.   Okay.

24       A.   If you're talking about my staff or those guys

25  out in the field running the area offices.

137

1      Q.   I'm referring, sir, to the staff that reported

2 to you that were also out of the Albuquerque operations

3 office.

4      A.   That was my own personal staff, I called them,

5 yes.

6      Q.   Yes.

7      A.   What's the question?

8      Q.   The question, sir, is were there members of

9 your own personal staff who had expertise in fire

10 protection?

11      A.   Yes.

12      Q.   Were there members of your personal staff, as

13 Albuquerque operations office manager, who had expertise

14 in health protection?

15      A.   Well, it all depends what you mean by

16 "expertise."  I didn't have any doctors, MDs, but I had

17 people who were trained in that type of thing.

18      Q.   Similarly, sir, were there members of your

19 personal staff, as Albuquerque operations office

20 manager, who were trained in environmental protection

21 issues?

22      A.   Yes.

23      Q.   And were there members of your personal staff,

24 as Albuquerque operations office manager, who were

25 trained in nuclear criticality and safety?

138

1        A.   Well, I never asked them that question, but if

2     -- because they never trained in nuclear safety, but I

3     didn't get down to nits and bits things of criticality

4     or anything like that, or critical mass, or all that

5     stuff, and put them through a test and ask them.  You

6     know, an academic test of how many got this and that and

7     that before you got a critical mass, and all that

8     stuff.  I didn't do that, but they were trained in

9     nuclear weapons period.

10        Q.   And nuclear safety?

11        A.   Nuclear safety period.

12        Q.   During the time that you were Albuquerque

13     operations office manager, sir, was there ever a

14     critical event or a criticality experienced at the Rocky

15     Flats plant?

16        A.   I can't remember.

17        Q.   General Donnelly, during the time that you

18     were Albuquerque operations office manager, were there

19     any releases, off-site releases, of contamination from

20     the Rocky Flats plant in excess of applicable

21     standards?

22             MR. CRAMER:   Objection; foundation.

23        A.   I can't remember that.  That's a detail I

24     can't remember.  I can't remember even what the

25     standards were.

139

1     Q.   Okay.  General Donnelly, you'll recall that

2  Mr. Cramer asked you this morning a number of questions

3  concerning the courses that you took when you were at

4  West Point from 1929 until 1933.  Do you recall that,

5  sir?

6     A.   Right.  Right.

7     Q.   Between 1929 and 1933, was there -- were there

8  any courses even offered concerning health protection at

9  that time?

10    A.   You mean at West Point?

11    Q.   Anywhere.

12        MR. CRAMER:  Objection; foundation.

13        MS. SURBAUGH:  Yeah.

14    A.   I mean that, I can't understand.  All I know

15  is that the only thing we had was First Aid, when I was

16  a cadet, was First Aid.  If something happened to you,

17  how to bandage you up, and hope to hell you were going

18  to live.  That's all I can remember.

19    Q.   Would it be fair to say --

20    A.   We weren't that fancy back in those days.  We

21  didn't know all those things.

22    Q.   Would it be fair to say, General Donnelly,

23  that when you were at West Point, the Manhattan Project

24  hadn't even come to exist yet?

25    A.   Hell, I never heard about nuclear or atoms or

140

1 anything else.  Maybe I heard about atoms and physics,

2 and I passed it by and hoped to hell I wouldn't get it

3 on an examination, so that I could pass.

4     Q.   Would it be fair to say, General Donnelly,

5 that when you were at West Point from 1929 until 1933,

6 that there was no such thing as a weapons complex in the

7 United States, a nuclear weapons complex?

8     A.   Oh, yes.  Of course.  There was nothing

9 dreamed of at that time.  Well, we were lucky -- we were

10 firing rifles from World War I, Springfields.

11     Q.   Just a moment, sir.  I believe you indicated

12 earlier today, General, that Mr. Jack Burke was a member

13 of your personal staff?

14     A.   Right.

15     Q.   What were your views as to Mr. Burke's

16 competency?

17     A.   My views as to what?  Pardon?

18     Q.   As to Mr. Burke's competency.

19     A.   Oh, I think Jack was an outstanding guy.  I

20 think he was very competent in his work.  He had been a

21 fine Naval officer.  I would have -- to sum it up in a

22 few words, I would want to have Jack Burke work for me

23 any day at any time, and any place.  I can't give the

24 guy a better compliment than that.

25     Q.   General Donnelly, I have a few questions

141

1    regarding some of the documents that Mr. Cramer has

2    marked as exhibits today in the deposition.  Do you

3    still have Exhibit 1461 in front of you, sir?

4         A.   1461?  Okay.

5         Q.   Yes, sir.

6         A.   All right.  Here we are.

7         Q.   In particular, I'll draw your attention to the

8    paragraph on the first page that begins "page 3."

9         A.   Yeah.

10        Q.   And there's a sentence there that -- actually,

11   it's the third line, beginning of the third line on that

12   page which refers to -- I'm sorry.  It's actually the

13   second and third lines which refer to "plutonium

14   carried beyond the plant boundaries."  Do you see that,

15   sir?

16        A.   Yeah.

17        Q.   Do you recall whether "plant boundaries"

18   referred to the physical walls of the building, or

19   whether that referred to the fence line of the plant

20   property?

21        A.   I can't remember.  I have no idea what it

22   refers to.

23        Q.   Okay.  I'm finished with that document.  Thank

24   you, general.  Actually, if you could pull out what Mr.

25   Cramer marked as Plaintiff's Exhibit 1477, please.  I

142

1    have one quick question there.

2              MR. CRAMER:  Here you go.

3              THE WITNESS:  Thank you.

4        Q.   It's the appraisal.

5        A.   Okay.  All right.  Here we go.

6        Q.   If I could, sir, I'd like to draw your

7    attention to the third paragraph on -- well, for ease

8    here, it's the first page of the appraisal.  The number

9    in the lower right-hand corner is 076520.

10       A.   076520.  I got it.

11       Q.   Right. This is Exhibit 1477.

12       A.   Yeah.

13       Q.   Now, the third paragraph on that page, I

14   believe it's the second sentence in that paragraph,

15   which reads, "Dow's overall performance was outstanding

16   during the period covered in the last appraisal, March

17   1, 1969, through March 1, 1970."  And it goes on from

18   there.  Do you see that, sir?

19       A.   Yeah.

20       Q.   My question, General Donnelly, is, given that

21   in that same time period, the May 11, 1969 fire

22   occurred, do you have any recollection as to why Dow was

23   given an outstanding appraisal for this period?

24       A.   No.

25       Q.   Just to see if this jogs your memory, sir:

143

1    Later on in that same paragraph it refers to cleanup

2    operations and restoration of production capabilities

3    following the fire.

4                Does that refresh your recollection at all

5    as to part of the basis for the outstanding appraisal

6    given to Dow for this appraisal period?

7        A.   No.  I can't remember it.

8        Q.   You don't remember one way or the other, sir?

9                MR. CRAMER:  Objection; asked and answered.

10       A.   No.  I can't remember.  I mean I can't

11   remember.

12       Q.   That's fine, sir.

13       A.   I just can't remember what -- I mean I've been

14   saying all day long "I can't remember," because my

15   memory is not that good.  Not after 27 years, at the age

16   of -- 86, did I say I was?  Born 1910.  I guess that's

17   86.

18       Q.   Okay.  General Donnelly, all I have left is

19   I'd just like to show you a few documents, mostly for

20   purposes of authentication, so this should go very

21   quickly.

22                Bear with me one moment here.  I can

23   assemble these into one packet, and I think we can

24   handle them all at once.

25       A.   Okay.  All right.

1      Q.   In fact, you may want to get up and stretch

2   your legs a minute.

3            MR. CRAMER:  We're all anxious to go.

4      Q.   Okay.  Let me hand you, General Donnelly, what

5   I've already marked as Donnelly Exhibits A, B, C, and

6   D.  Let me just hand them to you, and I'll identify them

7   for the record while you just glance at them, and while

8   I pass out copies to everyone else.

9   (Exhibits A through D marked for identification)

10     Q.   For the record, Donnelly A is a document dated

11  June 18th, 1969, from Mr. Frank Abbott to H.C.

12  Donnelly.

13           Donnelly B is a document dated March 19,

14  1971, from H.C. Donnelly to General Giller.

15           Donnelly C is a document dated November

16  19th, 1969, from H.C. Donnelly to General Giller.

17           And Donnelly D, as in dog, is a document

18  also dated November 19, 1969, from H.C. Donnelly to

19  Martin Biles, B-i-l-e-s.

20           I'm not going to ask you to read these,

21  sir.  I'm just going to ask you to authenticate them,

22  and then I'll point out a couple of things and have a

23  couple of quick questions.

24     A.   Okay.

25     Q.   If you could look at what I've marked as

1 Donnelly Exhibit A please, sir.

2     A.   Right.  Got it.

3     Q.   This is the June 18, 1969 memo.  Does this

4 letter appear to be a document that was sent to you or

5 received by your office on or about June 18th, 1969?

6     A.   This is a document that was sent by Frank

7 Abbott.  It says it was signed by him, to me.  Yes, to

8 my office.

9     Q.   The document refers to a briefing of Governor

10 Love on June 17th, 1969.  Do you see that, sir?

11     A.   Well, yeah.  This one I've got here?

12     Q.   Yes.

13     A.   Yeah.  Briefing for Governor Love on March

14 16th, 1971, I got.  Not '79 -- or not '69, or whatever

15 it was.

16     Q.   I'm sorry, sir.  Are you looking at Donnelly

17 A?

18     A.   No.  I'm looking at Donnelly B.  Oh, you're

19 still on Donnelly A?  I thought you were through with

20 that one.

21     Q.   No.  I had one more question, sir.

22     A.   All right.  Where are we, now, please?

23     Q.   On Donnelly A, which is the June 18, 1969

24 letter --

25     A.   Okay.  Yeah.

1      Q.   The heading of the document, in the first

2  sentence, referring to a briefing --

3      A.   For Governor Love, right.

4      Q.   -- for Governor Love on June 17, 1969.  My

5  question is if you recall that briefing, sir?

6      A.   No.

7      Q.   I have no further questions on Donnelly A,

8  sir.

9      A.   Okay.

10      Q.   Now if you could please look at Donnelly B.

11      A.   Okay.

12      Q.   This is the March 19, 1971 letter from H.C.

13  Donnelly to General Giller, and my first question, sir,

14  is if that is your signature that appears on page 4 of

15  Donnelly B?

16      A.   Right.

17      Q.   And is this, to the best of your recollection,

18  a letter that you sent to General Giller on or about

19  March 17, 1971?

20      A.   Yes.

21      Q.   And, sir, just again, real quickly, do you

22  recall anything concerning the briefing for Governor

23  Love on March 16, 1971, that is referred to in this

24  document?

25      A.   No, I do not.

147

1     Q.   Okay.  I have nothing further --

2     A.   In fact --

3     Q.   I'm sorry.

4     A.   No, I do not.

5     Q.   I have nothing further on Donnelly Exhibit B,

6  sir.  If you could please look at Donnelly Exhibit C,

7  this is the November 19, 1969 letter from H.C. Donnelly

8  to General Giller.

9         My question here, sir, is if you recognize

10  Donnelly Exhibit C to be a document that was sent either

11  by you or by someone else in your office on your behalf

12  to General Giller on or about November 19, 1969?

13     A.   Yes.

14     Q.   I have nothing further on that document, sir.

15  Last is Donnelly Exhibit D, if you could please turn to

16  that, sir.

17     A.   Right.

18     Q.   This is the November 19th, 1969 letter from

19  H.C. Donnelly to Martin Biles.

20     A.   Right.

21     Q.   My question here is the same, sir.  Do you

22  recognize Donnelly Exhibit D to be a document that was

23  sent either by you or someone in your office on your

24  behalf to Martin Biles on or about November 19th, 1969?

25     A.   Yes.

1      Q.   Just give me one moment to check my notes.  I

2  believe I'm finished.  Two more questions, sir.

3           One, do you recall that earlier today, in

4  connection with a question that Mr. Cramer posed to you

5  about the May, 1969 fire at Rocky Flats, that you

6  indicated that to you, the fire wasn't that serious?  Do

7  you recall that, sir?

8      A.   Yes.

9      Q.   Could you explain to me what you mean by "not

10  that serious"?  Is that in terms of damage, or off-site

11  impact?

12      A.   To me, it wasn't that serious because there

13  were no serious injuries, there was no -- I was -- as I

14  was told on the phone, there was no rupturing of the

15  plant.  I mean it didn't blow the roof off or holes

16  through the walls or anything like that, something

17  serious.

18           That would have been something serious, to

19  me.  But to me, this was an accident.  It was an

20  accident that happened.

21      Q.   Last question, and I'm going to make good on

22  this promise.

23      A.   Okay.  I'll hold you to it.

24      Q.   During the time that you were Albuquerque

25  operations office manager, sir, can you give me an idea

1   of approximately how many times a year you would

2   personally visit the Rocky Flats plant?

3        A.   I can't remember.  Just like I told Mr.

4   Cramer, I can't remember.

5             MR. TULLY:  I have no further questions for

6   you, sir.  Thank you very much.

7             MS. SURBAUGH:  Do you have any?

8             MR. CRAMER:  I have one question.

9             MS. SURBAUGH:  Mr. Cramer has one more

10   question.

11             THE WITNESS:  Okay.  Sure.

12                  REDIRECT EXAMINATION

13   BY Mr. Cramer:

14        Q.   Is it fair to say -- and I know you don't like

15   that.

16        A.   You know I don't like that word.  I'll tell

17   you why.  Can we go off the record a minute?

18        Q.   Sure.  Off the record.

19   (Discussion off the record)

20        Q.   Is it fair to say that on issues in areas that

21   you didn't consider yourself an expert on, for example,

22   health, safety, and environmental issues, that you

23   deferred and referred to your deputies while you were in

24   Albuquerque?

25        A.   On issues that I wasn't an expert on, I always

1   sought the advice of my experts, and I would use my

2   common sense and my experience to see whether I would

3   agree with what they said, or I'd question them

4   further.

5            And then I would ask them, various times

6   they were working for me, to educate me, come in and

7   just sit down, and eyeball to eyeball with me, and brief

8   me on these things that I didn't understand.

9            And I was a very inquisitive person, like I

10  kept asking you what the -- what the one word meant, and

11  I'll remember it means disease, or something else, now,

12  the rest of my life.  But that's the way I learned.

13            MR. CRAMER:  That's all the questions I

14  have.  Thank you very much.

15            MR. TULLY:  I have nothing further.  Thank

16  you very much for your time, sir.

17            THE WITNESS:  Well, as I said, thank you

18  all.

19  (The deposition was concluded at 2:40 p.m.)

20

21

22

23

24

25

151

```
1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF NEW MEXICO

3

4  No. CIV-90-K-181

5

6  MERILYN COOK, et al.

7  Vs.

8  ROCKWELL INTERNATIONAL CORPORATION

9  and THE DOW CHEMICAL COMPANY

10

11        CERTIFICATION OF COMPLETION OF DEPOSITION

12        I, Julianne LaBadia, CRR, CMR, RPR, CCR, No. 83,

13  DO HEREBY CERTIFY that on March 14, 1996, the deposition

14  of GENERAL HAROLD DONNELLY was taken before me at the

15  request of, and the sealed original thereof retained by:

16                Eric L. Cramer
                  Attorney for Plf.
17                1622 Locust Street
                  Philadelphia, Pennsylvania  19103
18

19        I FURTHER CERTIFY that copies of this

20  certificate have been mailed or delivered to the

21  following counsel and parties not represented by counsel

22  appearing at the taking:

23

24

25
```

152

```
 1  Martin T. Tully            Linda Surbaugh
    Attorney for Dow           Attorney for DOE
 2  200 East Randolph Driv     1961 Stout Street
    Chicago, Illinois  60601   Denver, Colorado  80202
 3

 4         I FURTHER CERTIFY that examination of this and

 5  signature of the witness was required by the witness and

 6  all parties present.

 7         I FURTHER CERTIFY that the recoverable cost of

 8  the deposition is $      to the Plaintiff.

 9         I FURTHER CERTIFY that I did administer the oath

10  to the witness herein prior to the taking of this

11  deposition; that I did thereafter report in stenographic

12  shorthand the questions and answers set forth herein,

13  and the foregoing is a true and correct transcript of

14  the proceedings had upon the taking of this deposition.

15         I FURTHER CERTIFY that I am neither employed by

16  nor related to any of the parties or attorneys in this

17  case, and that I have no interest whatsoever in the

18  final disposition of this case in court.

19         WITNESS MY HAND AND SEAL this 21st day of March,

20  1996.

21
                           _____
22                         Julianne LaBadia, CRR, RMR, RPR
                           CCR No. 83
23                         License Expires:  12/31/96

24  My Notary Commission Expires:  7/23/99

25
```