```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF COLORADO

 3    Case No. 90-K-181

 4    MERILYN COOK, et al.,

 5              Plaintiffs,

 6    vs.

 7    ROCKWELL INTERNATIONAL CORPORATION and THE DOW CHEMICAL
      COMPANY,
 8
                Defendants.
 9    _____

10              DEPOSITION OF HELEN GROGAN, Ph.D.
                       December 2, 2005
11    _____

12    APPEARANCES:

13    FOR THE PLAINTIFFS:       LOUISE ROSELLE, ESQ.
                                Waite, Schneider, Bayless
14                                & Chesley, LPA
                                1513 Fourth and Vine Tower
15                              One West 4th Street
                                Cincinnati, OH  45202
16                                    and
                                DAVID F. SORENSEN, ESQ.
17                              Berger & Montague, P.C.
                                1722 Locust Street
18                              Philadelphia, PA  19103-6305

19    FOR THE DEFENDANTS:       DOUG KURTENBACH, ESQ.
                                Kirkland & Ellis
20                              717 Seventeenth Street
                                13th Floor
21                              Denver, CO  80202

22    ALSO PRESENT:             Kathleen R. Meyer, Ph.D.

23

24

25
```

Page 33

1  Q  And what's the name of that
2  organization?
3  A  Enviros and Intera.
4  Q  Any other contracts that Cascade
5  Scientific has had?
6  A  With -- oh, yeah.  A contract with CH2M
7  Hill.
8  Q  Does that involve Hanford?
9  A  That involved Hanford.
10  Q  What did you do for them there?
11  A  In that case, I was on a panel of
12  experts to review the performance assessment for
13  closure of the high-level waste tanks.
14  Q  Any other contracts that Cascade
15  Scientific has had?
16  A  There may have been a couple, but I
17  do -- I can't -- I don't remember any more at the
18  moment.
19  Q  Okay.  Now, Dr. Till testified yesterday
20  that RAC has had and does have three contracts with
21  Kirkland & Ellis:  One for Rocky Flats litigation, one
22  for Hanford litigation, and one for some other
23  litigation.  Can you tell me which of those three
24  litigations you have worked on on behalf of RAC?
25  MR. KURTENBACH:  Object to the form of

Page 34

1  the question.  Foundation.  Could I have it read back,
2  please.
3  (The referred-to question was read by
4  the reporter.)
5  A  I have worked on all three of those
6  litigations, although I wasn't -- I'm not sure that
7  they were all contracts with Kirkland & Ellis.
8  Q  (BY MS. ROSELLE)  Okay.  What did you do
9  with regard to the Hanford litigation?
10  A  For the Hanford litigation, I helped in
11  preparing an expert report that presented doses for
12  defendants.  No.  For -- for individuals who were the
13  plaintiffs, I assume.
14  Q  And did you also help in preparing
15  Dr. Till for his testimony in court?
16  A  I was present with Dr. Till before he
17  gave his testimony in court and helped in the sense of
18  going over the calculations and the methods that we had
19  used.
20  Q  Were you present when Dr. Till met with
21  lawyers from Kirkland & Ellis to prepare his testimony?
22  MR. KURTENBACH:  Form and foundation.
23  A  I was present some of the time that
24  Dr. Till was there, preparing for his testimony.
25  Q  (BY MS. ROSELLE)  And how much money

Page 35

1  have you received from RAC for the work you did in the
2  Hanford litigation?
3  A  I do not know exactly how much I
4  received.  I have not looked at those numbers.
5  Q  Can you give me an estimate?
6  A  I can give you an estimate, but it would
7  have a large uncertainty about it, but I would say --
8  hmm -- possibly $15,000.  I really am not sure.
9  Q  Okay.  Now, in the litigation -- the
10  litigation for Kirkland & Ellis that I don't have the
11  name for --
12  A  Uh-huh.
13  Q  -- can you tell me how much work you've
14  done in that case?
15  A  I have not done much work in that case.
16  Q  Do you know how much you've been paid in
17  that case?
18  A  I believe it's a few thousand dollars.
19  Q  Okay.  And can you tell me how much
20  money you've received to date in the Rocky Flats
21  litigation?
22  A  I don't -- I have invoiced, I believe --
23  I don't believe I've actually received any payment.
24  Q  How much have you invoiced?
25  A  I don't know exactly, but I would

Page 36

1  estimate it might be about $5,000.
2  Q  And what work did you do for that money?
3  A  Actually, I'd like to -- oh.  Yeah.
4  Perhaps that is the right amount.  The work that I did
5  for that is -- was I came out to Denver about a month
6  or so ago.  I did some work in my office reviewing dose
7  calculations that we had made.  And the time -- I will
8  invoice for the time I've been here.
9  Q  When you came to Denver about a month
10  ago, who did you meet with?
11  A  As I recall, I met with Doug Poland and
12  Doug Kurtenbach.
13  Q  And how long was that meeting?
14  A  I think it was a day and a half, but I'm
15  not absolutely sure.  I don't recall exactly.
16  Q  Okay.  Who else was present?
17  A  John Till was present.
18  Q  Was Kathleen Meyer here?
19  A  No.  Kathleen Meyer was not present.
20  Q  Was Paul Voilleque here?
21  A  No.  Paul Voilleque was not present.
22  Q  What did you discuss with -- during that
23  day and a half?
24  A  I do not recall exactly what all the
25  topics were that we discussed, but, in general, we

Page 37

1  discussed the findings of our study, we discussed the
2  dose calculations that we were making for this case.
3      Q  You mean these dose calculations for
4  real people as opposed to hypothetical people?
5      A  We did not --
6         MR. KURTENBACH: Object to the form and
7  foundation. Go ahead.
8      A  Sorry. The dose calculations that we
9  made were not specific to any individual.
10     Q  (BY MS. ROSELLE) Were these new dose
11 calculations as opposed to what appear in your 1999 RAC
12 report?
13        MR. KURTENBACH: Form and foundation.
14     A  The dose calculations that we made took
15 the calculations that we had made in 1996 for the
16 concentrations in air and soil in locations throughout
17 the model domain and calculated, then, the doses for
18 those.
19     Q  (BY MS. ROSELLE) Okay. So these were
20 new calculations that had not been done prior to about
21 a month and a half ago?
22        MR. KURTENBACH: I object to the form
23 and to the foundation. Mischaracterizes her prior
24 testimony. Could I have the question read back,
25 please.

Page 38

1         (The referred-to question was read by
2  the reporter.)
3         MR. KURTENBACH: I'm sorry. I asked the
4  wrong thing. Can I have the previous answer read back?
5         MS. ROSELLE: If you continue to burn up
6  my time, then I'm going to ask the judge for more than
7  seven hours.
8         MR. KURTENBACH: That's fine. I think
9  you just got an answer to your question and now you
10 asked her the same question again.
11        MS. ROSELLE: No. I didn't get an
12 answer to my question.
13        MR. KURTENBACH: I wrote down your
14 previous question and she just reread the question.
15 It's exactly the same question.
16     Q  (BY MS. ROSELLE) Were these new
17 calculations that were done for the first time within
18 the last few months?
19        MR. KURTENBACH: Same objection.
20     A  The doses that were calculated had not
21 been presented before.
22     Q  (BY MS. ROSELLE) And have they been
23 presented anywhere now?
24     A  I have seen a histogram that presents
25 them.

Page 39

1      Q  And where did you see that histogram?
2      A  On a slide projector over in the offices
3  of Kirkland & Ellis here in Denver.
4      Q  And do you have an understanding of when
5  that histogram is going to be used in court?
6      A  I have no understanding of that.
7      Q  Did you have any discussion with anyone
8  about why those dose calculations were done?
9      A  It was my understanding the dose
10 calculations were done to provide an example of the
11 types of doses that would be represented by members in
12 the class area.
13     Q  Do you know what assumptions were made
14 in those dose calculations as far as when people lived
15 there?
16     A  I believe the assumptions that were made
17 in the calculations reflected the time the -- the time
18 a person moved in to the class area, up through 1989.
19     Q  Well, what assumptions were made about
20 when people moved into the class area?
21     A  That it reflected the time when the
22 property was purchased.
23     Q  And what assumptions were made as to
24 when the property was purchased?
25     A  As I understand it, the assumptions --

Page 40

1  the assumptions that were made was that a database of
2  the class of property owners from the plaintiffs was
3  used, and the assumption was that that database
4  accurately reflects the time the -- the purchase time
5  of the individuals in the property class.
6      Q  Well, how many dose calculations were
7  made?
8      A  I believe it is approximately 12,000
9  dose calculations.
10     Q  And who made 12,000 dose calculations?
11     A  Risk Assessment Corporation.
12     Q  And who at Risk Assessment Corporation
13 made 12,000 dose calculations?
14     A  Art Rood.
15     Q  It's your understanding he made all of
16 those within the last couple months?
17        MR. KURTENBACH: Object to the form of
18 that, and foundation.
19     A  Yes. It's my understanding that the
20 doses for those -- for representative individuals who
21 purchased property and were class members for a
22 representative individual for those was made in the
23 last couple of months.
24     Q  (BY MS. ROSELLE) Were all 12,000 dose
25 calculations made in the last couple of months?

Page 41

1  MR. KURTENBACH: Same objection. I
2  think it mischaracterizes her previous testimony with
3  respect to what was used to make them.
4      A  The -- the dose calculations that were
5  made took the calculations that had been made
6  through -- through 1999 when the dose reconstruction
7  was completed. It took the files with the results of
8  the concentrations in the environmental media
9  throughout the model domain, the study area that was
10 considered. It took those calculations and combined
11 that, then, with information about the class members to
12 generate doses for those -- for -- hypothetical
13 individuals for those -- that -- that reflect the class
14 members.
15     Q  (BY MS. ROSELLE) How many dose
16 calculations were made?
17         MR. KURTENBACH: Form and foundation.
18     A  As I said before, I believe 12,000 dose
19 calculations were made.
20     Q  (BY MS. ROSELLE) I hand you what's been
21 marked for identification purposes as Grogan Deposition
22 Exhibit 2, and ask you if that's a true and correct
23 copy of the information on the RAC team website about
24 you.
25     A  I believe this is not completely up to

Page 42

1  date.
2      Q  Okay. What --
3      A  But the --
4      Q  What is missing?
5      A  It doesn't seem to mention the work that
6  I've been involved with over the last 18 months in
7  relation to the Los Alamos site.
8      Q  And that's work that you've done for
9  RAC?
10     A  That is work that I've done for RAC.
11     Q  Okay. Other than that, is it up to
12 date?
13     A  I -- I have a feeling that, because it
14 says at the bottom, updated June 2003, that it probably
15 has some other things missing, too. Oh, I've just
16 thought of one. Recently, I have just started to work
17 on a National Academy of Sciences committee.
18     Q  And what committee is that?
19     A  It's -- it's reviewing -- it's -- it's a
20 review committee to look at the studies performed by
21 the CDC, NIOSH, and ATSDR, the worker studies and in
22 fact, also, the dose reconstruction studies that
23 resulted from the memorandum of understanding.
24     Q  Did you disclose, when you were named to
25 the NAS committee, that you're doing work on behalf of

Page 43

1  defendants in litigation?
2      MR. KURTENBACH: Form and foundation.
3      A  I believe I disclosed all of the work
4  that I've done.
5      Q  (BY MS. ROSELLE) Did you specifically
6  list that you were acting as a consult -- as a witness
7  in litigation?
8      MR. KURTENBACH: Same objections.
9      A  I think I did, yes.
10     Q  (BY MS. ROSELLE) Okay. And who did you
11 disclose this to? What was the name of the person?
12     A  It was Rick Jostes with the National
13 Academy of Sciences.
14     Q  Do you know how to spell Jostes?
15     A  J-o-s-t-e-s.
16     Q  Do you know where he's located?
17     A  Washington, D.C.
18     Q  Do you have a phone number for him?
19     A  I could find a phone number for him.
20     Q  Do you know the name of the department
21 he's in?
22     A  I don't recall the name. You probably
23 can find it on the website.
24     Q  And which website is that?
25     A  I believe it's -- there's two names that

Page 44

1  go together. National Academy of Sciences and
2  something else, and I can't bring it to mind right now.
3      Q  Well, if you bring it to mind while
4  we're here, will you tell me?
5      A  I will.
6      Q  Anything else that you recall that is
7  not on this Exhibit 2?
8      MR. KURTENBACH: Can -- did you get a
9  copy -- I sent over a copy of her C.V.
10     MS. ROSELLE: No, we did not.
11     MR. KURTENBACH: I sent it yesterday.
12     MS. ROSELLE: To whom?
13     MR. KURTENBACH: To you. And then to
14 the broader group, saying this may help you in your
15 deposition of Dr. Grogan.
16     MS. ROSELLE: Did you bring it with you?
17     MR. KURTENBACH: It was e-mailed with
18 two PDF's attached.
19     MS. ROSELLE: I didn't get it, but my
20 e-mail is not working right.
21     MR. SORENSEN: I didn't get it.
22     MR. KURTENBACH: Well, we can see what
23 we can do at a break. Actually, I have to take a break
24 pretty quickly here bathroom-wise, please.
25     MS. ROSELLE: We can take a break now,