1

1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLORADO

3     Case No. 90-K-181

4     MERILYN COOK, et al.,

5              Plaintiffs,

6     vs.

7     ROCKWELL INTERNATIONAL CORPORATION and THE DOW CHEMICAL
      COMPANY,
8
               Defendants.
9

10             DEPOSITION OF WILLIAM F. WESTON, Ph.D.
                       December 9, 2005
11                        Volume I

12

13    APPEARANCES:

14    FOR THE PLAINTIFFS:      DAVID F. SORENSEN, ESQ.
                               ELLEN T. NOTEWARE, ESQ.
15                             Berger & Montague, P.C.
                               1722 Locust Street
16                             Philadelphia, PA  19103-6305

17    FOR THE DEFENDANTS:      ELLEN T. AHERN, ESQ.
                               Kirkland & Ellis
18                             717 Seventeenth Street
                               13th Floor
19                             Denver, CO  80202

20

21

22

23

24

25

                     CARPENTER REPORTING, INC.
                        (303) 752-1200

2

1          PURSUANT TO WRITTEN NOTICE, the deposition of

2     WILLIAM F. WESTON, Ph.D., called for examination by the

3     Plaintiffs, was taken in a conference room at Sherman &

4     Howard, L.L.C., 633 Seventeenth Street, Suite 3000,

5     Denver, Colorado, on the 9th day of December, 2005, at

6     the hour of 2:21 p.m., before Bonnie Carpenter, a

7     Notary Public and Certified Shorthand Reporter in and

8     for the State of Colorado and a Registered Professional

9     Reporter.

10                    **********

11                    I N D E X

12    Index of Examination              Page

13    Mr. Sorensen                      3

14    Index of Exhibits                 Page

15    1  Notice of Deposition           3,4

16    2  12-8-05 and 12-9-05 e-mail
         thread                         3,6
17
      3  9-19-05 letter from Ellen      5,10,11,12,19,22,23
18       Ahern to William Weston       24

19    4  Plaintiff's Supplemental
         Sentencing Memorandum          140
20

21

22

23

24

25

                    CARPENTER REPORTING, INC.
                      (303) 752-1200

                                                        3

```
 1                        *********

 2                        (Marked for identification were

 3   Deposition Exhibit Nos. 1 and 2.)

 4                        WILLIAM F. WESTON, Ph.D.,

 5   called as a witness for examination under the Rules,

 6   having been first duly sworn according to law, was

 7   examined and testified on his oath as follows:

 8                        EXAMINATION

 9   BY MR. SORENSEN:

10             Q     Good afternoon, Mr. Weston.

11             A     Good afternoon.

12             Q     My name is David Sorensen.  I'm one of

13   the lawyers representing the plaintiffs in this case.

14   Could you state your full name for the record again,

15   please?

16             A     William Francis Weston.  W-e-s-t-o-n.

17             Q     And do you have a Ph.D.?

18             A     Yes, I do.

19             Q     So would you prefer to be called

20   Dr. Weston?

21             A     Whatever you prefer.

22             Q     I'll go by anything you prefer.

23   Mr. Weston or Dr. Weston.  Whatever is your preference.

24             A     I have no preference.

25             Q     Okay.  All right.  What was your date of
```

1   birth, sir?

2           A     May 31st, 1946.

3           Q     Okay.  Can you please take a look at

4   Exhibit 1, which is the notice of deposition in this

5   case.  And please tell me if you've ever seen that

6   before.

7           A     I don't believe I've seen this.

8           Q     Could you please take a complete look at

9   it so you can confirm that?

10          A     I'm just -- I'm not sure about the

11  document page, about the request to produce.

12          Q     You're referring to the attachment to

13  deposition subpoena?

14          A     Yes.  Uh-huh.

15          Q     You're not sure that you've seen this

16  before?

17          A     I'm not sure if I did.

18          MS. AHERN:  I'd like to just make an

19  objection for the record to this document in that it is

20  not a subpoena; it's a notice of deposition, even

21  though the attachment is miscaptioned.

22          MR. SORENSEN:  Okay.

23          Q     (BY MR. SORENSEN)  Have you ever seen

24  this attachment A to deposition subpoena?

25          A     I'm not sure if I saw this document.

1          Q    Okay.  Well, let me ask you this:  Have

2    you brought any documents today to produce?

3          A    No, I have not.

4          MS. AHERN:  I did bring one document.

5    This is from our files, but I believe Mr. Weston said

6    it's the only document that he had that was responsive

7    to your requests.

8          (Marked for identification was

9    Deposition Exhibit No. 3.)

10         Q    (BY MR. SORENSEN)  The document that

11   you -- that counsel just handed me, do you know how

12   that came to be produced?

13         A    Could I see it?  Yes.  When I was

14   contacted in September of this year about testifying at

15   this case, I agreed to do so.

16         Q    I think you're answering a different

17   question.  Let me interrupt.  I mean, how it came to be

18   produced today to us.

19         A    Oh.

20         Q    I don't mean its -- its original

21   creation, which we'll get to.

22         A    No.

23         Q    Okay.  So other than that document

24   marked as Exhibit 3, there are no other documents that

25   you're aware of to be produced today; is that correct?

CARPENTER REPORTING, INC.
(303) 752-1200

6

1          A    That is correct.

2          Q    Okay.  Can you look at Exhibit 2.  I

3    only have one copy, but you can certainly -- it's very

4    short.  Have you seen that before?

5          A    No, I have not.

6          Q    Okay.  Am I correct that you have been

7    in court in this case for a number of different days?

8    Is that correct?

9          A    Yes.

10          Q    Am I also correct that you've been

11    taking notes while you've been in court?

12          A    Yes, I have taken notes.

13          Q    And where are those notes?

14          A    Those notes are currently in my office

15    across the street.

16          Q    Okay.  And is there some reason why you

17    did not produce those notes today?

18          MS. AHERN:  We're asserting privilege as

19    to those notes.  Those notes are either conversations

20    with counsel -- we are representing Mr. Weston here at

21    this deposition -- or they are notes that he took at

22    the direction of counsel for reporting of -- reporting

23    to in-house counsel for Rockwell.

24          MR. SORENSEN:  Okay.  Can you read that

25    statement back again, please.

                  CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                        7

1               (The referred-to statement was read by

2      the reporter.)

3                  MR. SORENSEN:  Okay.  And the privilege

4      as to the first, conversations with counsel, what

5      privilege are you asserting?

6                  MS. AHERN:  Attorney-client.

7                  MR. SORENSEN:  Is that all?

8                  MS. AHERN:  Yes.

9                  MR. SORENSEN:  And with notes taken at

10     the direction of counsel, what privilege are you

11     asserting?

12                 MS. AHERN:  I think that would be

13     attorney-client and probably work product.

14                 Q    (BY MR. SORENSEN)  Mr. Weston, how

15     voluminous are these notes?

16                 A    Not very.  I would estimate that there

17     may -- in my steno pad, there may be 15 handwritten

18     pages, one side.

19                 Q    And is that the complete extent of the

20     notes you've taken while you've been in court?

21                 A    Yes.

22                 Q    After you've left court, have you

23     done -- created more notes?

24                 A    No.

25                 Q    Have you done anything with the notes

CARPENTER REPORTING, INC.
(303) 752-1200

8

1      you took in court?  In other words, to convert them

2      into something else, another document, either typed or

3      computer-generated --

4            A     No.

5            Q     -- or anything like that?

6            A     No.

7            Q     These notes that you've taken, they were

8      relating to which witnesses?

9            A     I -- my first day in court was

10     October 31st, I believe.  I can't remember what

11     witness that was.

12           Q     Okay.  What other days?

13           A     The other days?

14           Q     Uh-huh.

15           A     I have been in court most of the days

16     since, missing a few this week, so I'd have to --

17     that's as good as I can tell you without having them in

18     front of me right now.

19           Q     So your testimony is that your first day

20     in the court was October 31st?  Is that what you

21     recall?

22           A     If that's a Monday, I'm pretty sure that

23     was my first day in court, yes.

24           Q     Your testimony is that you've been in

25     court pretty much every day since; is that correct?

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                      9

1            A     With missing a few days this week, yes.

2            Q     And were you in court at the direction

3      of Kirkland & Ellis?

4             A    I was -- I was asked by -- through

5      Kirkland & Ellis by Rockwell counsel, the company that

6      I did work for, to represent Rockwell.  I agreed to do

7      so by attending as much of the trial as I could.

8             MR. SORENSEN:  So can you -- can you

9      read that back again?

10            (The referred-to question was read by

11     the reporter.)

12            Q    (BY MR. SORENSEN)  Which Rockwell

13     counsel are you referring to?

14            A    John Stocker.

15            Q    And what firm is he with?

16            A    I believe John has retired from

17     Rockwell.

18            Q    Was he --

19            A    I believe.

20            Q    Was he an in-house counsel?

21            A    He was in-house counsel.

22            MS. AHERN:  I can assert for the record

23     that John is in-house counsel for Rockwell, charged

24     with the oversight of this litigation.  I imagine

25     you've come across his name before, but ...

CARPENTER REPORTING, INC.
(303) 752-1200

10

1             Q    (BY MR. SORENSEN)  So is it your

2      understanding that you're working for Dow, also?

3             A    No.

4          Q    You have no understanding, or you're not

5     working for Dow?

6          A    I don't -- I am not working for Dow.

7          Q    So do you plan to testify about anything

8     concerning Dow's conduct?

9          A    I -- I started work on the last day of

10    Dow's operations at Rocky Flats.  I am aware of some of

11    what -- what occurred in the Dow era.  In as far as

12    that may overlap with my time at Rocky Flats, I would

13    testify about it.

14         Q    So is it your understanding that you'll

15    be testifying, at most, about one day of Dow's conduct?

16         A    Not necessarily.  There are areas I was

17    involved with that clearly operated through the Dow

18    era, as well.  If those questions come up, I will

19    answer them to the best of my ability.

20         Q    I'm sure you will, but do you have an

21    understanding today about whether you intend to testify

22    to this jury about Dow's conduct?

23         A    I have no understanding about that, no.

24              MR. SORENSEN:  Okay.  Let's take a look

25    at this Exhibit 3.  I think I may take a break and get

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                        11

1     a quick copy made.  You don't have any other copies of

2     that, do you?

3              MS. AHERN:  I don't have another copy.

4                    (There was a brief delay in the

5        proceedings.)

6                    Q    (BY MR. SORENSEN)  Okay.  Exhibit 3, the

7        document that counsel produced to me, are -- or us this

8        morning, at your dep, states -- well, first, it's

9        signed by Ellen Ahern, and it's addressed to you.  And

10       the first sentence states you've agreed to act as

11       consulting expert for the defense of Rockwell

12       International Corporation and Dow Chemical Company,

13       paren, the defendants, paren, in the above captioned

14       litigation.  Do you see that?

15                   A    Yes, I do.

16                   Q    I read that correctly; is that correct?

17                   A    Yes, you did.

18                   Q    That states you've agreed to act as a

19       consulting expert.  What is your understanding of what

20       that means?

21                   A    My understanding is that I'm

22       representing Rockwell.  That -- as my period at Rocky

23       Flats, I have some expertise about Rocky Flats'

24       operations at various areas, and that's the way I would

25       interpret that.

                                                       12

1                    Q    But you've prepared no written expert

2        report in this case; correct?

3                    A    That is correct.

4                    Q    And is it your understanding that you'll

5    be testifying as an expert in court?

6                    MS. AHERN:  We are only proffering him

7    as a fact witness.

8            Q    (BY MR. SORENSEN)  Is that consistent

9    with your understanding?

10           A    Yes.

11           Q    So if you're testifying as a fact

12   witness, do you know why this Exhibit 3 refers to you

13   as a consulting expert?

14           A    No.

15           Q    Are you -- withdraw the question.

16                    Do you have an attorney-client

17   relationship with Kirkland & Ellis?

18           A    Yes, I believe I do.

19           Q    And when did that relationship start?

20           A    My first -- at my first meeting with a

21   representative of Kirkland & Ellis.

22           Q    Which was when?

23           A    I believe it was late September of this

24   year.

25           Q    Who contacted who?

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                        13

1            A    I was contacted by Kirkland & Ellis.

2            Q    Who at Kirkland & Ellis?

3            A    Ms. Ahern.

4            Q    Had you had any prior attorney-client

5       relationship with anyone at Kirkland & Ellis?

6               A    No.  Not to my knowledge.

7               Q    Did Ms. Ahern suggest that you enter

8       into an attorney-client relationship with Kirkland &

9       Ellis?

10              A    I don't remember the full discussion.

11      She asked me to testify.  If I would be willing to

12      testify at the -- at this trial.

13              Q    What did you tell her?

14              A    I told her I would based on the time --

15      my availability.

16              Q    And was that your first understanding

17      that you might be called as a witness --

18              A    Yes.

19              Q    I'm sorry.  Just let me finish my

20      question.  Was that your first understanding, September

21      of '05 -- of when?  '04 or '05?

22              A    '05.  This year.

23              Q    September of '05 was your first

24      understanding that you might be called by the

25      defendants as a witness in this case; is that correct?

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    14

1               A    Yes, it is.

2               Q    So Ms. Ahern calls you in September '05,

3       and asks you whether you'd be willing to testify in

4       this case.  And I take it -- did you say yes?

5               A    I did say yes.

6          Q     So when did the subject of entering into

7     an attorney-client relationship come up?

8          A     Ms. -- Ms. Ahern scheduled a meeting

9     with me at my residence, and in the course of that

10    discussion, the attorney-client privilege was

11    discussed.

12         Q     When was this meeting?

13         A     Again, late September.

14         Q     Of '05?

15         A     Yes.  '05.

16         Q     Who was at this meeting?

17         A     Ms. Ahern and I.

18         Q     Anyone else?

19         A     No.

20         Q     How long did it last?

21         A     Four to five hours, including lunch.

22         Q     What was the subject of the discussion?

23              MS. AHERN:  I would caution you not to

24    reveal any attorney-client communications.  You can

25    give him a very general answer, but, beyond that, I

CARPENTER REPORTING, INC.
(303) 752-1200

15

1     would instruct you not to answer.

2          A     I was told to some extent about the --

3     what the case was about and some of the areas I -- it

4     might be anticipated that I would testify about.

5          Q     (BY MR. SORENSEN)  And who suggested

6      that you enter into an attorney-client relationship

7      with Kirkland & Ellis at that meeting?

8              A    I don't recall.

9              Q    Did you suggest it?

10             A    I'm not certain.

11             Q    Do you understand why -- what the

12     purpose is of entering into such a relationship with

13     Kirkland & Ellis?

14             A    To some extent, yes, I do.

15             Q    And what is that purpose?

16             A    I have had prior -- prior experience

17     with testifying and attorney-client privilege

18     relationships.

19             Q    Are you finished?

20             A    Yes.

21             Q    I guess I'm trying to understand why it

22     is you've entered into an attorney-client relationship

23     with Kirkland & Ellis.  Why?  I mean, you're not

24     seeking legal advice about some matter, are you?

25             A    No, I'm not.

                      CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                          16

1              Q    Okay.  So then why have you entered into

2      such a relationship?

3              A    I -- my understanding is that what we

4      discuss in those -- in those discussions about my

5      testimony and areas I may testify about are privileged.

6                   MS. AHERN:  I'll assert for the record

7    that Rockwell is providing counsel to Mr. Weston as a

8    former Rockwell employee and a former ranking officer

9    of Rockwell.  He -- he's afforded counsel in any

10   contact with any litigation involving Rocky Flats.

11              MR. SORENSEN:  Well, I object to the

12   statements of counsel.  Let me explore this a little

13   bit more.

14          Q    (BY MR. SORENSEN)  Is it your

15   understanding that Ms. Ahern -- let me start again.

16              So your understanding of the reason you

17   entered into an attorney-client privileged

18   relationship -- start again.  I'm sorry.

19              Am I correct that you entered into an

20   attorney-client relationship with Kirkland & Ellis in

21   this matter so that conversations you had with

22   Kirkland & Ellis about your testimony could be shielded

23   from discovery; is that correct?

24              MS. AHERN:  Objection to foundation.

25   Objection.  Calls for a legal conclusion.

CARPENTER REPORTING, INC.
(303) 752-1200

17

1          A    I think that's at least a part of it.

2          Q    (BY MR. SORENSEN)  And the same answer

3    would be as to any notes you've taken?  In other words,

4    the reason you entered into an attorney-client

5    relationship with Kirkland & Ellis is so that any notes

6    you've taken such as the ones you've described could,

7      at least in theory, be shielded or potentially shielded

8      from discovery; is that correct?

9                  MS. AHERN:  Objection.  Foundation.

10     Calls for a legal conclusion.

11                 Q    (BY MR. SORENSEN)  Go ahead.

12                 A    As I -- when I started to take notes at

13     the trial, I did so with the idea that I would be

14     providing Mr. Stocker updates on the status.  I had not

15     anticipated at that point that anyone would care to

16     look at my notes.

17                 Q    Before you started taking notes, did you

18     have some understanding of whether they would be

19     discoverable to plaintiffs?  I mean --

20                 A    I did not even consider it.

21                 Q    That wasn't quite my question.  Did you

22     have any understanding one way or the other whether

23     they would be discoverable?

24                 MS. AHERN:  Objection.  Vague.

25     Objection.  Foundation.

CARPENTER REPORTING, INC.
(303) 752-1200

18

1                  A    Could you --

2                  Q    (BY MR. SORENSEN)  Sure.

3                  A    Yeah.

4                  Q    Did anyone tell you, before you started

5      taking notes, these are notes that, if the plaintiffs

6      ask for them, we're going to object and not produce

7      them --

8          A     No.

9          Q     -- or anything like that?

10         A     No, sir.  I'm not sure that anyone knew

11    I was even taking notes.

12         Q     Is it your testimony that no one at

13    Kirkland & Ellis, until you just started testifying

14    today, knew you were taking notes at the trial?

15         A     I never discussed my note taking with

16    anyone at Kirkland & Ellis.

17         Q     But just as -- I will just tell you just

18    as I saw you in the courtroom taking notes --

19         A     Uh-huh.

20         Q     -- you have no reason to dispute that

21    someone from Kirkland & Ellis likely saw you in court

22    taking notes?

23         A     Very likely.

24         Q     I mean, they --

25         A     Yeah.

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    19


1          Q     Okay.  Now, it says in the second

2     sentence of Exhibit 3 that you'll be compensated at a

3     rate of $200 per hour for your work.  Do you see that?

4          A     Yes, I do.

5          Q     And how many hours have you billed at

6     $200 an hour?

7          A     I don't know without reviewing my

8    records.  I'd have to look back, but I've been here

9    quite a few days.

10              Q    Okay.  Can you give me an estimate?   10

11   hours?  20?  100?

12              A    Well, it'll probably -- 10-hour days

13   times the number of days I've been here.

14              Q    And how many is that?

15              A    Let's see.  A couple of weeks the first

16   trip, plus four before Thanksgiving, and then this

17   period after, so I must be approaching 20 days.

18              Q    So that's $2,000 times a day -- a day

19   times 20 is $40,000?  Is that about right?

20                   MS. AHERN:  I don't know if that math is

21   right.

22              Q    (BY MR. SORENSEN)  Did I get that wrong?

23   $200 times 10 hours is $2,000?

24              A    I -- again, I'd like -- I'd like to

25   check that, but it's probably at least that, yes.

                     CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                          20

1               Q    So at least $40,000?

2               A    I think so.

3               Q    Okay.  And have you been paid for this,

4    or have you just invoiced it?

5               A    I have received a couple of checks to

6    date.

7               Q    What do those checks total?

8               A    Maybe 10- or $11,000.

9         Q      And the --

10        A      Including some of it was for expenses.

11        Q      Okay.  And you're being paid for your

12   time today; correct?

13        A      I certainly hope so.

14        Q      Well, you intend to invoice --

15        A      Yes, I do.

16        Q      -- Kirkland & Ellis for your time today;

17   correct?

18        A      Uh-huh.

19        Q      Is that right?

20        A      Yes, I do.

21        Q      When you testify at trial, do you expect

22   to invoice Kirkland & Ellis for your time on the stand?

23        A      Yes.

24        Q      And all this time will be at, also, $200

25   an hour?

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    21


1         A      Yes.

2         Q      And how did you establish that rate?

3         A      I have -- since I retired from the

4    Boeing Company, I have been consulting, primarily at

5    the Los Alamos lab -- laboratory.  When I found out

6    that I was going to be representing Rockwell, I asked

7    my brother, who is an attorney, what I should ask for

8    as far as a rate, and he recommended that I ask for

9        this amount.

10                Q     Your brother who is an attorney, does he

11       have any connection with Rockwell or Dow?

12                A     Not to my knowledge.

13                Q     Do you know whether he's ever

14       represented Rockwell or Dow?

15                A     I'm pretty certain that he never has.

16                Q     Okay.  Do you know if he -- he does now

17       or has ever worked for any of the law firms

18       representing either of the defendants?

19                A     My brother has his -- he's a partner in

20       his own law firm in Los Angeles.  To my knowledge, he

21       has not worked with any of these firms.

22                Q     Okay.  What is your brother's name?

23                A     Steven --

24                Q     With a p-h or V?

25                A     A V -- Warren Weston.

                          CARPENTER REPORTING, INC.
                               (303) 752-1200

                                                              22

1                 Q     Before -- when did this conversation

2        take place?

3                 A     Shortly after my meeting with -- no.

4        Shortly after Ms. Ahern asked me if I would be willing

5        to represent Rockwell and attend the trial.

6                 Q     And that was in -- sometime in early

7        September '05; is that correct?

8                 A     Probably late September of '05.

9                 Q     Late September.  Let me go back to this

```
10    chronology.  There was a -- a phone call; right?

11              A    Yes.  I believe so.

12              Q    Between Ms. Ahern and yourself?

13              A    Uh-huh.

14              Q    She called you; is that correct?

15              A    Uh-huh.

16              Q    Is that yes?

17              A    Yes.

18              Q    Okay.  How long was that phone call?

19              A    Probably the first one, short.  Five or

20    ten minutes.  And then probably another phone call to

21    arrange a meeting.

22              Q    And then the meeting?

23              A    And then the meeting.

24              Q    And what's your best sense -- why don't

25    you take a look at Exhibit 3.  Did the meeting occur
```

                        CARPENTER REPORTING, INC.
                            (303) 752-1200

                                                            23

```
 1    before or after September 19th?

 2              A    It may have been -- my recollection is

 3    that Ms. Ahern may have brought this to the meeting,

 4    but I'm not certain.

 5              Q    So if she brought it to the meeting, you

 6    had a discussion before the meeting about your rate;

 7    correct?

 8              A    I believe so.

 9              Q    And was that in the first phone call or
```

10    the second phone call?

11         A    I -- it seems -- it must be the second

12    because I wasn't at all certain I was going to be

13    putting in much time until she asked me to represent

14    Rockwell.

15         Q    Okay.  So there's a first call that's

16    short, about whether you're willing to testify or

17    represent Rockwell.  Let me stop there for a moment.

18    Were you asked to also testify on behalf of Dow?

19         A    I was asked to testify at this trial.  I

20    don't remember any -- the exact discussion of what --

21    at that point what I would even be testifying about.

22         Q    Okay.  But the first sentence of Exhibit

23    3 mentions Rockwell and Dow.  Do you see that?

24         A    Yes.

25         Q    But you have, a number of times today,

CARPENTER REPORTING, INC.
(303) 752-1200

24

1     already said that your understanding is you're

2     representing Rockwell.

3          A    Yes.

4          Q    Why does the first sentence of Exhibit 3

5     also include Dow, then?

6          A    I'm not certain.

7          Q    Since you received a copy of this

8     letter, which I assume was on or about September 19,

9     2005; is that correct --

10         A    Yes.

11          Q       -- have you communicated to Kirkland &

12    Ellis in any way -- over the phone, e-mail, writing, in

13    person, in any fashion -- that the first sentence of

14    Exhibit 3 is inaccurate?

15          A       No.  I have not.

16          Q       Okay.  So you have this phone call that

17    lasts five or ten minutes, asking whether you'll

18    testify or represent Rockwell or Dow or some

19    combination thereof.  Then your understanding -- or

20    your memory is that, in the second phone call, there

21    was a discussion of your hourly rate; is that correct?

22          A       I -- I think so, yes.

23          Q       So did that -- your conversation with

24    your brother occur in between these two phone calls?

25          A       It -- it must have.

                    CARPENTER REPORTING, INC.
                      (303) 752-1200

                                                        25

1           Q       Well, during the first phone call, did

2     the subject of you being paid come up?

3           A       I don't remember.

4           Q       Well, it must have; right?  Because,

5     otherwise, why would you have contacted your brother

6     about what you'd charge; isn't that right?

7                   MS. AHERN:  Objection.  Argumentative.

8           Q       (BY MR. SORENSEN)  I'm just trying to

9     figure out what the sequence is.

10          A       When I found -- when I was asked if I

11      would represent Rockwell at the trial and I knew I

12      would be putting in more time, then I did talk to my

13      brother about a rate.

14            Q     When you -- when you say you knew you'd

15      be putting in more time, what does that mean?

16            A     That I would actually be in Denver for

17      an extended period of time, attending the trial.

18            Q     Well, did that understanding come about

19      in the first phone call or later?

20            A     I think later, but I don't remember.

21            Q     Okay.  And is it your memory that there

22      was a -- this first call, then a second call, and then

23      the meeting that you mentioned earlier?

24            A     I think so, because we had to arrange

25      the meeting time and place.

CARPENTER REPORTING, INC.
(303) 752-1200

26

 1            Q     But you don't recall any other

 2      conversations with Ms. Ahern or other Kirkland & Ellis

 3      attorneys during that time fame?

 4            A     No.  No other attorneys.  We -- it's

 5      possible we could have exchanged e-mails, but I'm not

 6      certain of that.

 7            Q     Okay.  Have you ever -- withdraw the

 8      question.

 9                  Before September 19, 2005, had you ever

10      charged and received $200 an hour for your time from

11      any other client?

12          A     As a consultant?

13          Q     Yes.

14          A     No.

15          Q     When did you become a consultant?

16          A     I started doing some consulting prior to

17    my -- prior to retirement, in about the year 2000.

18          Q     So when did you retire?

19          A     In 2003.

20          Q     And you were working for Boeing, you

21    said, at the time?

22          A     The Boeing Company, yes.

23          Q     Now, since you -- withdraw the question.

24                You work as a consultant.  Do you work

25    as an individual or as part of some kind of consulting

CARPENTER REPORTING, INC.
(303) 752-1200

27

1    firm or which?

2          A     I work as an individual.

3          Q     And other than working for Kirkland &

4    Ellis, what other clients have you had in the last

5    couple years?

6          A     University of California as the operator

7    of the Los Alamos National Laboratory.

8          Q     That's a DOE laboratory?

9          A     That is a Department of Energy national

10    laboratory, yes.

11          Q     And how much are you being paid per hour

12      for that work?

13              A       My -- I have two contracts.  My contract

14      with -- directly with UC to serve as an affiliate on

15      some committees is about $100 an hour.  My contract for

16      management consulting through -- where I'm affiliated

17      with another small company down there is -- I think my

18      time is billed out at around $150 an hour.

19              Q       You said you're affiliated with some

20      small company.  What company is that?

21              A       It's Alion, A-l-i-o-n, Science and

22      Technology.

23              Q       What kind of company is that?

24              A       I don't know a lot about the company.

25      It's a -- they have a number of Government contracts,

CARPENTER REPORTING, INC.
(303) 752-1200

28

1       one of which is with the Los Alamos National

2       Laboratory, and they -- when I was ready to retire, a

3       company in Albuquerque approached me about working at

4       Los Alamos through their company.  That was a company

5       that was later bought out by Alion.  I agreed to do so.

6               Q       What is your relationship with Alion?

7               A       I'm considered an affiliated employee.

8       I -- I have my own contracts with the laboratory, and

9       they do the billing and reimbursement of my expenses.

10              Q       So your understanding is that Alion is

11      billing your time to -- ultimately, DOE is paying this;

12      is that correct?

13          A    Yes.

14          Q    Your understanding is that Alion is

15   billing your time out at $150 an hour; is that correct?

16          A    I think that is right.

17          Q    And how many hours --

18          A    Yes.

19          Q    I'm sorry.

20          A    I think that is right.

21          Q    And how many hours of your time has been

22   billed to DOE at that rate?

23          A    I -- for the last couple of years, since

24   I've retired, I've been spending about one five-day

25   week a month at the laboratory, billing approximately

CARPENTER REPORTING, INC.
(303) 752-1200

29

1    40 to 45 hours per week.

2          Q    So that's from -- you said you retired

3    in 2003?

4          A    In -- at the end of May in 2003.

5          Q    May '03 retired.  And when did your work

6    start up that you've just been discussing through

7    Alion?

8          A    It was actually the predecessor company

9    to Alion, but yes.

10          Q    When did that start?

11          A    It actually started in -- about April of

12   2003.

13          Q      Just before you retired?

14          A      Yes.  Before I formally retired.

15          Q      Okay.  And what is -- what is the

16     predecessor company to Alion?

17          A      It's Integrated Technology Services

18     Corporation, I think.  ITSC.

19          Q      And what happened to that company?

20          A      It -- Alion bought it.

21          Q      Do you know if your time when you were

22     working through Integrated Technologies was also billed

23     out at $150 an hour?

24          A      Approximately the same.  I think I've

25     received an increase in between.  Somewhere in that

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    30

1      period.

2           Q      So from April '03 till when have you

3      been doing this work for Alion or through Alion today?

4           A      Current.

5           Q      Current?

6           A      Uh-huh.

7           Q      And so to figure out how much DOE has

8      been billed at $150 for your time, I would go from

9      April of '03 to today, take one five-day week per month

10     for average and multiply it for 40 to 45 hours for each

11     of those weeks.  Is that fair?

12          A      I think that would be reasonable.

13          Q      Okay.  All right.  So start again.  The

14    contract that Alion has where Alion is billing DOE at

15    $150 an hour, how much are you getting paid for each of

16    those hours?

17            A    I don't know exactly.  I think it's in

18    the order of 120, maybe.  Something like that.

19            Q    Per hour?

20            A    Yeah.

21            Q    And the rest, Alion keeps; is that

22    correct?

23            A    Excuse me?

24            Q    The rest -- the difference, Alion keeps?

25            A    I assume so.

CARPENTER REPORTING, INC.
(303) 752-1200

31

1            Q    Okay.  And you also get reimbursed for

2    your direct expenses?

3            A    Yes.

4            Q    And are they reimbursed by DOE on a one-

5    to-one basis, or is there any --

6            A    On expenses?

7            Q    -- markup?  Yeah.  On expenses.

8            A    I have no idea.

9            Q    Okay.  And is there an end point to this

10    contract, or is it just open-ended?

11            A    My contracts are renewed on a regular

12    basis, typically annually.  So far, they have been

13    renewed.

14          Q    And when does it come up for renewal

15    again?

16          A    I think at the end of March of 2006.

17          Q    So it was just renewed last -- in March

18    of '05?

19          A    I think so.

20          Q    Okay.  You mentioned you also have a

21    contract at $100 an hour.  Could you ex -- describe

22    that a little bit more.

23          A    Yes.  Part of the work I do is to serve

24    on external review committees for some of the larger

25    organizations at Los Alamos.  That contract is directly

                CARPENTER REPORTING, INC.
                    (303) 752-1200

                                                    32

1     through -- directly to the University of California.

2           Q    And so is DOE contributing the funds for

3     that in any way; do you know?

4           A    I believe they reimburse that.

5           Q    You believe that DOE reimburses the

6     University of California; is that correct?

7           A    Yes.

8           Q    On a one-to-one basis?

9           A    I don't know.

10          Q    Now, this $100 an hour, that's how much

11    you receive?

12          A    Yes.

13          Q    Okay.  And when did that begin?

14          A    I started that -- that was the first

15    contract I started in the year 2000, I believe.

16              Q    And that's been ongoing?

17              A    Yes.

18              Q    And it's current?

19              A    Yes.

20              Q    And how much time do you spend on that

21    work at $100 an hour?

22              A    That -- when I mentioned that I go to

23    Los Alamos about one week a month, about 30 percent of

24    that time is on that contract.

25              Q    So going back to my earlier questions

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                    33

1    about trying to figure out how much money DOE has paid

2    you for the other work at $150 an hour, is it now

3    correct that of the 40 to 45 hours in those weeks you

4    were mentioning, that I should now multiply some

5    30 percent of it by $100 an hour?

6              A    I would say --

7              Q    Is that right?

8              A    Yeah.  Of the 12 weeks a year,

9    approximately eight are on the Alion contract and four

10    on the other contract.  Close.

11              Q    Okay.  Now, other than those two

12    contracts and your current work for Kirkland & Ellis or

13    through Kirkland & Ellis, do you have any other

14    consulting contracts currently?

15          A     No, I do not.

16          Q     Do you have any other sources of income?

17          A     Retirement.

18          Q     And that retirement income comes from

19   who?

20          A     The Boeing Company.

21          Q     Which bought Rockwell; is that correct?

22          A     Yes.  Bought Rockwell Aerospace.

23          Q     And -- okay.  And how much is your

24   retirement income?

25          A     Let's see.  Maybe $8,000 a month.

CARPENTER REPORTING, INC.
(303) 752-1200

34

1          Q     Is that for life?

2          A     Yes.  I'm trying to think.  Is that

3   right?  I think that's about right.  7- or $8,000 a

4   month.

5          Q     Okay.  Are you married?

6          A     Yes, I am.

7          Q     Do you have children?

8          A     I have one natural daughter and three

9   stepchildren.

10          Q     Do any of them still live with you at

11   home?

12          A     No.

13          Q     So they are all out of the house; is

14   that right?

15          A     They are all grown.

16          Q     Grown.  Okay.  Do you have any other

17     paid consulting arrangements or any other paid

18     arrangements with Kirkland & Ellis, other than in

19     connection with this case?

20          A     No, I do not.

21          Q     All right.  Do you know why -- start

22     again.

23              I want to be clear about the sequence.

24     In September '05, Ms. Ahern calls.  Do you have any

25     understanding why your name would have appeared on a

CARPENTER REPORTING, INC.
(303) 752-1200

35

1     defendant's witness list before that date?

2          A     I didn't even know the trial was ongoing

3     or pending, if that's your question.

4          Q     Well, no.  Here is my question:  Had you

5     been contacted before September '05 by anyone

6     representing Dow or Rockwell, either, you know, an

7     in-house counsel, outside counsel, or anyone else on

8     their behalf?  Had you been contacted before September

9     of '05 about possibly appearing as a witness in this

10     case?

11          A     No.

12          Q     Okay.  When you set your rate at $200 an

13     hour in this case, did Kirkland & Ellis simply accept

14     that rate, or was there any negotiation about it?

15          A     It was accepted.

16          Q     Did they ask you whether you had been

17     charging that for any other client?

18          A     No, they did not.

19          Q     And I take it you didn't volunteer that

20     you had not; correct?

21          A     No, I did not.

22          Q     Okay.  Now, I want to get the sequence

23     down.  You have this call in '05 that's short.  Another

24     call to set up a meeting.  Both these calls were just

25     between you and Ms. Ahern; is that correct?

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    36

1           A     Yes.

2           Q     Did you take any notes of these calls?

3           A     I don't think so.

4           Q     Okay.  Then you have a meeting at your

5      house on or about September 19th; is that correct?

6           A     Yes.

7           Q     And is it correct that your

8      understanding of whether you entered into an

9      attorney-client relationship with Kirkland & Ellis is

10     that it begins on September 19th?

11          A     Yes.  I think that's fair.

12          Q     Now, after that meeting -- go back for a

13     second.  That meeting was just between you and

14     Ms. Ahern; is that correct?

15          A     Yes.

16          Q     Was there anyone participating by phone?

17          A     No.

18          Q     Okay.  What was your next meeting with

19     Kirkland & Ellis attorneys?

20          A     Not until I arrived in Denver.

21          Q     Which was when again?

22          A     I actually got to Denver the evening of

23     October 30th.

24          Q     And you've been here since?

25          A     I've been home a few times.

37

1          Q     Okay.  Have you done other work since

2     October 30th?  I mean for other clients.

3          A     One day, which was yesterday.

4          Q     Who was that for?

5          A     Los Alamos.  A meeting that I had to go

6     down for.  I didn't have to.  I went down to attend.

7          Q     I see.  So, between September 19th and

8     when you arrived October 30th, did you have any phone

9     calls with Kirkland & Ellis?

10          A     E-mails, I think.

11          Q     Do you recall any phone calls during

12     that time frame?

13          A     I don't recall.

14          Q     These e-mails, who were they between?

15          A     Ms. Ahern and I.

16          Q     How many such e-mails have there been?

17    Let's stick with this time frame first, between

18    September 19th and October 30.  How many?

19          A    I -- half a dozen.  I was out of the

20    country for much of October.

21          Q    Were these substantive e-mails?

22          A    No.  More of where I would be staying,

23    how I would meet up with them.  That sort of thing.

24          MR. SORENSEN:  Counsel, I assume if we

25    ask for production of these, you'll assert some kind of

CARPENTER REPORTING, INC.
(303) 752-1200

38

1    privilege objection and not produce them; is that

2    correct?

3          MS. AHERN:  I have to review them, but,

4    generally speaking, communications between me and

5    Mr. Weston are privileged.

6          MR. SORENSEN:  That's why I'm asking.

7    We are asking for them.

8          MS. AHERN:  My recollection is that

9    the -- that the communications that he's referencing

10    are merely scheduling, but I'll review them.  I imagine

11    we will assert a privilege as to them.

12          Q    (BY MR. SORENSEN)  Okay.  During this

13    meeting at your house, I believe you said the general

14    subject was possible areas of your testimony; is that

15    correct?

16          A    I think so.

17          Q    All right.

18          MS. AHERN:  I instruct the witness not

19   to answer in any greater substance of communications

20   between he and myself as counsel.

21          Q   (BY MR. SORENSEN)  Since you've been

22   in -- let me start again.

23          Have you had meetings with Mr. Stocker?

24          A   No.  I have not.

25          Q   Have you had conversations with

CARPENTER REPORTING, INC.
(303) 752-1200

39

1   Mr. Stocker about your testimony in this case?

2          A   No, I have not.

3          Q   So is it true that your only contact

4   with counsel for the defendants in this case about your

5   testimony has been Ms. Ahern; is that correct?

6          A   Say that again.

7          Q   I'll ask a different question.  Since

8   September 19th, have you had communications with

9   Kirkland & Ellis attorneys other than Ms. Ahern about

10   this case?

11          A   Since September --

12          Q   19th?

13          A   -- 19th, have I had --

14          Q   Uh-huh.

15          A   I have -- how to answer that.  Yes.

16          Q   Which attorneys?

17          A   I don't know if I know their full names.

18        Jane.

19                Q    Park?

20                A    I think that's right.  I'm not -- I'm

21        not recalling the names.

22                Q    Let's start with females and then males.

23        Any other females besides Ms. Park?

24                A    Yes.

25                Q    Stephanie Brennan?

CARPENTER REPORTING, INC.
(303) 752-1200

40

1                 A    I think it is Stephanie, yes.

2                 Q    Anyone else?  Females before I go to

3        males?

4                 A    Yes.

5                 Q    Do you know their names?  Females.  Do

6        you have any other names to provide?

7                      MS. AHERN:  I'm not sure who he's talked

8        to, so I can't help you.

9                 Q    (BY MR. SORENSEN)  That's all right.

10                A    I know there's a male.

11                Q    Doug Kurtenbach?

12                A    No. not --

13                Q    Poland?  There's so many of them.

14                A    First names, I might get.

15                Q    John?  Mark?

16                A    Maybe Mark.  Would it be Mark?

17                      MS. NOTEWARE:  David?

18                A    Okay.

19          Q    (BY MR. SORENSEN)  Tall guy?  Mark

20    Nomellini?

21               MS. AHERN:  I think I can help here.

22    Scott.

23          A    Scott.

24               MS. AHERN:  Scott McMillan.

25          A    That's the one.

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                        41


1                MS. NOTEWARE:  Thanks for your help.

2           Q    (BY MR. SORENSEN)  Okay.  So Jane Park,

3     Stephanie Brennan, Scott McMillan.

4           A    Yeah.

5           Q    Not Mark?

6           A    No.  Mark was more -- his office is next

7     to mine, so ... I think.

8           Q    Okay.  Any meetings with Doug

9     Kurtenbach?

10          A    No.

11          Q    Any meetings with David Bernick?

12          A    No.

13          Q    These meetings, have they all occurred

14    since you got into Denver?

15          A    Yes.

16          Q    And the general subject of these

17    meetings has been your expected testimony; is that

18    correct?

19          A    Yes.

20          Q    Did Boeing -- Boeing take over the

21   Rockwell division that was in charge of Rocky Flats?

22          A    No.

23               MS. AHERN:  Objection.  Foundation.

24          Q    (BY MR. SORENSEN)  I'll start again.

25   Boeing -- what is the relationship between Boeing and

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                          42

 1   Rockwell, as you understand it?

 2          A    Boeing bought the Rockwell Aerospace

 3   divisions in around 1996.

 4               MS. AHERN:  I just want to assert a

 5   foundation objection to this entire line of

 6   questioning.

 7               MR. SORENSEN:  Okay.

 8          Q    (BY MR. SORENSEN)  And is -- as you

 9   understand it, does Rockwell still exist as an

10   independent company?

11          A    I believe it does.

12          Q    Do you have any understanding of whether

13   the divisions or parts of Rockwell that were running

14   Rocky Flats have been purchased by Boeing?

15               MS. AHERN:  Objection.  Foundation.

16          Q    (BY MR. SORENSEN)  Do you have any

17   knowledge about that?

18          A    Rockwell Aerospace was the part of

19   Rockwell that ran Rocky Flats.

20          Q    And that's the part that Boeing bought?

21          A    And that's the part that Boeing bought.

22          Q    Okay.  Now, these conversations with

23   Kirkland & Ellis attorneys, has it just been you and

24   one or more of these lawyers present; is that correct?

25          A    Yes.

CARPENTER REPORTING, INC.
(303) 752-1200

43

1          Q    Have you had any meetings with any other

2    witness for the defendants since you've been here?

3          A    No.  There's an individual, Frank Blaha,

4    who used to work for me, who I have seen and talked

5    with in the offices, but it's been personal

6    conversation as opposed to discussions of areas we

7    would be testifying in.

8          Q    When you say you've seen and talked to

9    him in the offices, you're talking about the law

10   offices that Kirkland & Ellis are using here in Denver;

11   is that correct?

12          A    Yes.  Yes.

13          Q    Okay.  And these conversations with

14   Mr. Blaha, is it your testimony that they have been

15   completely nonsubstantive, meaning not having to do

16   with anything to do with this case?  Is that your

17   testimony?

18          A    No.  I can't -- I can't say that.  In

19   our conversations, I know that there has been -- that

20      he has mentioned his areas of expertise and some of the

21      things he may be talking about.

22              Q    What did he say?

23              A    Well, primarily -- am I allowed to

24      answer this?

25                   MS. AHERN:   I'm letting you answer this.

CARPENTER REPORTING, INC.
(303) 752-1200

44

1               Q    (BY MR. SORENSEN)  Go ahead.

2               A    He's been much more knowledgeable in

3       things like spray irrigation, water sampling.

4               Q    Anything else?

5               A    Those are the primary areas that I

6       remember.

7               Q    Did you mean to -- describe this as two

8       different areas -- spray irrigation and water

9       sampling -- or one area?

10              A    General -- general areas.

11              Q    Two areas?  Sampling and spray

12      irrigation?

13              A    Uh-huh.  Uh-huh.  Yes.

14              Q    Have you had any other conversations,

15      whether in person or over the phone, with any other

16      witness that you understand is going to testify for the

17      defendants?

18              A    No, I have not.

19              Q    Do you expect to between now and the

20      date of your testimony?

21          A    No.

22          Q    Have you been shown an outline of your

23   testimony?

24          A    No.

25          Q    Have you created an outline for your

CARPENTER REPORTING, INC.
(303) 752-1200

45

1    testimony?

2          A    No.

3          Q    Have you been shown any potential

4    graphics or demonstrative slides that may be used with

5    your testimony?

6                MS. AHERN:  I object and instruct the

7    witness not to answer.

8          Q    (BY MR. SORENSEN)  Are you going to

9    follow your counsel's instruction?

10                THE DEPONENT:  You've instructed me not

11   to answer?

12                MS. AHERN:  I've instructed you not to

13   answer.

14          A    Yes.  I will follow my counsel's

15   instructions.

16          Q    (BY MR. SORENSEN)  I would assume that

17   you would.  I just want to clarify that.

18          A    Uh-huh.

19          Q    Besides being in the courtroom yourself

20   and taking notes of testimony, have you been shown any

21      transcripts of any of the testimony given in this case?

22             A    Yes.

23             Q    Transcripts for which witnesses?

24                  MS. AHERN:  I object and instruct the

25      witness not to answer.

                        CARPENTER REPORTING, INC.
                             (303) 752-1200

                                                              46

1                   MR. SORENSEN:  On the basis of ...

2                   MS. AHERN:  Privilege.

3                   MR. SORENSEN:  And --

4                   MS. AHERN:  What I have selected for him

5       is privileged.

6              Q    (BY MR. SORENSEN)  And you're going to

7       follow your counsel's instruction?

8              A    Yes, I am.

9              Q    Could you tell me how many witnesses'

10      testimony you've been shown in transcript form?

11                  MS. AHERN:  I object and --

12             Q    (BY MR. SORENSEN)  The number?

13                  MS. AHERN:  I object and instruct the

14      witness not to answer.

15             Q    (BY MR. SORENSEN)  And you're going to

16      follow your counsel's instruction?

17             A    Yes, I am.

18             Q    Do you recall who you've -- I may have

19      asked this, but I apologize.  Do you recall by name who

20      of the witnesses you've heard testify live while you

21      were in court?  Just their names?

22          A    I've -- I can name some of the names.   I

23   have them basically -- I've been there since

24   October 30th for -- I don't think I missed anybody

25   except perhaps this week --

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    47

1          Q    Okay.

2          A    -- while I was out of town.

3          Q    So who do you recall?

4          A    Cochran, Flynn, Smallwood.  I saw the

5    Watkins depo -- deposition.  I can't remember the

6    gentleman's name this week.  There are others.  I can't

7    remember the names.

8          Q    Sellman?  Did you listen to Sellman's

9    testimony?

10         A    I think I missed that.

11         Q    Hunsperger?

12         A    Yes.  Part of it.

13         Q    Now, is it your understanding that,

14   after listening to all these witnesses in court, you've

15   taken a sum total of 15 pages of notes in your

16   stenographic pad?  Is that your testimony?

17         A    I think that's about right.  Yes, it is.

18   That's about the right number.

19         Q    Now, after reading the transcripts that

20   you've been asked to read, did you prepare any other

21   writings of any kind, memos to Kirkland & Ellis, memos

22      to yourself?  Any kind of writing that relates to your

23      expected testimony in this case?

24              A    No, I did not.

25              Q    After reading the transcripts that

CARPENTER REPORTING, INC.
(303) 752-1200

48

1       you've been asked to read, did you have conversations

2       with Kirkland & Ellis lawyers about your reactions to

3       these transcripts?

4                    MS. AHERN:  Object.  Instruct the

5       witness not to answer.

6              Q    (BY MR. SORENSEN)  Are you going to

7       follow your counsel's instruction?

8              A    Yes, I am.

9              Q    Do you expect that your attorney-client

10      relationship with Kirkland & Ellis will end after this

11      trial?

12             A    I hadn't thought about it.

13             Q    Well, is there any legal matter that you

14      have that you expect to be asking for help with from

15      Kirkland & Ellis that will go on past this trial?

16             A    I don't think so.

17             Q    Okay.  Is Kirkland & Ellis charging you

18      for their time?

19             A    No.  They are not.

20             Q    And was that your understanding -- when

21      was that understanding?

22             A    I never thought about it.

23        Q    This first conversation with Ms. Ahern

24    back in September, I believe you're a little unclear

25    about exactly -- well, I'll start again.

                        CARPENTER REPORTING, INC.
                            (303) 752-1200

                                                            49


1              When did you first understand that

2    Kirkland & Ellis would be representing you?

3        A    In my first face-to-face meeting with

4    Ms. Ahern.  It was my understanding that we entered

5    into an attorney-client privilege.  I didn't, myself,

6    think of the term of being represented.

7        Q    So do you consider yourself represented

8    by Kirkland & Ellis?

9        A    Now that that term has come up, I --

10    yes, I think I am represented by Kirkland & Ellis.

11        Q    Okay.  And in this face-to-face meeting,

12    that's the meeting at your house --

13        A    Yes.

14        Q    -- did you ask Ms. Ahern whether

15    Kirkland & Ellis would be charging for their time?

16        A    No.

17        Q    Did she say anything about the subject

18    to you?

19        A    No.

20        Q    Was it just assumed that whatever work

21    they were doing for you, it was going to be done for

22    free?

23              MS. AHERN:  Objection.  Foundation.

24         Q    (BY MR. SORENSEN)  Did you just assume

25    that -- that they would not be billing you?

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                    50

1              A    I absolutely assumed that.

2              Q    What was that assumption based on?

3              A    I didn't even consider that I would be

4    charged for my participation and representation in this

5    matter.

6              Q    Right.  In fact, you understood that

7    you'd be paid; correct?

8              A    Yes.

9              Q    Okay.  Do you know what Ms. Ahern

10   charges or Kirkland & Ellis charges for Ms. Ahern's

11   time for private clients?

12             A    I have no idea.

13             Q    I take it you don't know the billing

14   rates of any of the Kirkland & Ellis attorneys that

15   you've met with; correct?

16             A    I do not know any of them.

17             Q    Okay.  I just want to go through and get

18   your background straightened out.

19             A    Can we stretch for a couple minutes?

20             Q    Certainly.  We can take a break for that

21   anytime you want.

22             A    All I want to do is get some more water

23   and stretch for a moment.

24          (There was a recess taken from 3:19 p.m.

25     to 3:24 p.m.)

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    51

1          Q    (BY MR. SORENSEN)  Your background.  Why

2     don't we start with post-high school, so we don't go

3     too far back.  Where did you go to college?

4          A    I went to the University of California

5     at Berkeley, 1964 to 1968.

6          Q    And what was your degree in?

7          A    A Bachelor of Arts in physics.

8          Q    And then what did you do after that?

9          A    Then I went to the University of

10     Illinois in Champaign-Urbana, to graduate school and

11     received a Master's degree in 1971 in physics, and a

12     Ph.D. in physics in 1973.

13          Q    And what about after that?

14          A    Say again?

15          Q    After that, after '73, what did you do?

16          A    I -- I was awarded a National Research

17     Council post-doctorate appointment at the National

18     Bureau of Standards in Boulder, Colorado.  It was a

19     two-year appointment.

20               And --

21          Q    What did you do there?

22          A    I did research in cryogenic properties

23     of solids.

24          Q       What does "cryogenic" mean?

25          A       Cold temperature.

CARPENTER REPORTING, INC.
(303) 752-1200

52

1          Q       Okay.

2          A       And then in 19 -- June 30th, 1975, I

3    began work at -- for Rockwell at the Rocky Flats plant.

4          Q       Now, you said you worked for a day when

5    Dow was still there; is that correct?

6          A       June 30th.

7          Q       So did -- were you technically hired by

8    Dow?

9          A       You know, I can't remember on the

10   paperwork.  My interviews were with people who were

11   there at the plant, so they were Dow employees when I

12   was interviewing.  I was aware the contract was

13   changing.  I don't recall what the paperwork looked

14   like that I -- whether it said Rockwell or Dow.

15          Q       Was it your understanding that it was

16   Rockwell that was deciding to actually hire you?

17          A       Yes.

18          Q       And what were you hired to do?

19          A       I was hired as a research physicist.

20          Q       Doing what specifically?

21          A       I was doing -- it was called thin film

22   coatings work.  It had some weapons applications.

23          Q       Is it fair to characterize your work as

24   relating to weapons design?

25          A    Weapons manufacturing would be a better

CARPENTER REPORTING, INC.
(303) 752-1200

53

1    characterization.

2          Q    And did you work in a particular

3    department?

4          A    It was the research and development

5    division, I think it was called.

6          Q    Who was the head of that division at the

7    time?

8          A    I believe it was a man named Don

9    Wiederecht.

10          Q    Can you spell his last name?

11          A    W-i-e-d-e-r-e-c-h-t, I think.

12          Q    Okay.  And how long did you work in that

13    division, doing that work?

14          A    I think I was in that division

15    approximately two years.

16          Q    To '77?

17          A    Yes.

18          Q    And then what did you do?

19          A    Then I was given a -- a -- I was give --

20    promoted to a program manager for advanced weapons

21    systems.

22          Q    Was that in the same department, or a

23    different department?

24          A    A different department.

25          Q     What department was that in?

CARPENTER REPORTING, INC.
(303) 752-1200

54

1           A     I believe it was called product

2    engineering.

3           Q     Who was the head of that department?

4           A     A man named Jack Dorr, D-o-r-r.

5           Q     And what did you do in this capacity?

6           A     In that capacity, my responsibility was

7    as a liaison with the national laboratories, Livermore

8    in Los Alamos, looking at their future designs and what

9    the impacts would be on us for production.

10          Q     Future designs for weapons; is that

11   right?

12          A     Weapons design, yes.

13          Q     Could you give me a little more detail

14   about that.  In other words, when the designs were

15   changed, did they come in to Rockwell from the national

16   labs?

17          A     Yes.

18          Q     And when you said "liaison," you were

19   working with them to help Rockwell understand what

20   impact these new changes were going to have on

21   Rockwell?

22          A     On our ability to produce them, and

23   also, we would build some early test units, and I was

24   responsible for that activity.

25          Q     Like prototypes?

CARPENTER REPORTING, INC.
(303) 752-1200

55

1          A     Prototypes.

2          Q     Okay.  And how long were you in this --

3          A     I believe around three years.

4          Q     -- position?  So to about 1980?

5          A     I think so.

6          Q     And then what was your job?

7          A     Somewhere in there, I was asked to get

8     an MBA, and I was given some time off to do that on a

9     part-time basis.  It was an executive MBA program.  And

10    I received that MBA in 1981.

11         Q     From where?

12         A     University of Denver.

13         Q     Now, when you were asked to get an MBA,

14    who asked you?

15         A     The plant manager.

16         Q     Who was the plant manager at the time?

17         A     I believe at that time, it was R.O.

18    Williams.

19         Q     Why were you asked to get an MBA?

20               MS. AHERN:  Objection.  Foundation.  Go

21    ahead.  You can answer.

22         A     I was considered a -- a fast-track

23    manager with potential.

24         Q     (BY MR. SORENSEN)  And were you told --

25    let me start again.  Was there some agreement that you

CARPENTER REPORTING, INC.
(303) 752-1200

56

1    reached with Rockwell that they would pay for your MBA

2    and in return, you would do something for them?

3          A    I would -- they certainly paid for the

4    MBA and gave me some time off to do it, and there was

5    no expectation on my part other than they hoped I would

6    stay when I did get the MBA.

7          Q    And how much did they pay for your MBA;

8    do you know?

9          A    I don't remember.  Whatever the tuition

10   going rates were then.  I really don't remember.

11         Q    And were you going to school full-time?

12         A    No.  It was an executive program where I

13   went one day a week, where it alternated a Friday and

14   Saturday, so they gave me the Friday off every other

15   week and I put in Saturday.

16         Q    So they paid for your tuition; is that

17   correct?

18         A    Uh-huh.

19         Q    Is that yes?

20         A    Yes.

21         Q    Just want to make sure it gets recorded.

22   And were you also paid for your work time that you

23   missed when you were going to school?

24         A    Yes.

25         Q    Okay.  And that lasted about a year,

CARPENTER REPORTING, INC.

(303) 752-1200

57

1    year and a half, or how long did it last?

2             A    It was a year and a half to two years,

3    yeah.

4             Q    So there was no agreement -- excuse

5    me -- there was no agreement that after you got your

6    MBA, you would return to Rockwell or continue to work

7    for them; is that correct?

8             A    No.

9             Q    No, there was no agreement?

10            A    There was no agreement.

11            Q    Did you feel you had some moral or

12   ethical obligation, though, to continue working for

13   Rockwell?

14            MS. AHERN:  Objection.  Vague.

15            Q    (BY MR. SORENSEN)  Did you feel you had

16   any obligation of some kind to continue working for

17   Rockwell after they had paid for your MBA?

18            A    I felt that were Rockwell to continue to

19   advance me, I would be obligated to stay for some

20   period.

21            Q    Okay.  So, in about 1980, they asked you

22   to get this MBA and you got that in '81?

23            A    Uh-huh.  Yes.

24            Q    Is that a yes?  But in terms of your

25   working title, that continued to be program manager; is

CARPENTER REPORTING, INC.
(303) 752-1200

58

1    that correct?  Yeah.  Program manager; right?

2             A    Yes.  Yes.

3             Q    Okay.  And when did your job title

4    change, if it did?

5             A    Shortly after or right around the time

6    that I formally received the MBA, I was asked to run

7    manufacturing -- pit manufacturing in Building 707.

8             Q    And did you do that?

9             A    I did that for about one year.

10            Q    And what was your title at that time?

11            A    I -- I don't remember.  It was a manager

12   title, like a production manager for something like

13   that.

14            Q    And you did that approximately from '81

15   to '82?

16            A    Yes.

17            Q    And then what happened in '82?

18            A    At some point, then, they asked me to

19   get some experience in the finance side, and they asked

20   me to run the finance department.  And that was for a

21   relatively short period of time.  I think around six

22   months.

23            Q    Okay.  And then --

24            A    And then in about 1983 or '84, I was --

25   I was asked to take over responsibility for a -- a new

CARPENTER REPORTING, INC.
(303) 752-1200

1    organization at the general staff level.  And this

2    would include nuclear materials safeguards and

3    production control.  At that time, my title was

4    director.

5              Q    Director.  Just director?

6              A    Director of -- of -- I'm trying to

7    remember the organization's name.  It was something

8    like safeguards and material management, I think, was

9    the formal name of the organization.

10             Q    Okay.  So in around '83, '84, you were

11   asked to take over responsibility for a new

12   organization.  Do you mean a new structure inside

13   Rockwell?

14             A    It was a new structure.  The

15   organization -- the pieces of it existed, but they had

16   been pulled together, and they asked me to take them

17   on.

18             Q    And so your title became something like

19   director of safeguards and material management?  Is

20   that --

21             A    Yes.

22             Q    And how many people reported to you?

23             A    Several hundred at that point.

24             Q    And what were your responsibilities in

25   that title?

CARPENTER REPORTING, INC.
(303) 752-1200

1            A    I had -- the production control side, I

2    had responsibility for control for production for the

3    entire plant, including all the internal scheduling and

4    material movement and prioritization of work, I guess,

5    is a good way to put it.

6            On the other half of the job --

7            Q    Let me start -- one-half is -- how --

8    what are you calling this one-half?

9            A    Production control.

10           Q    Production control.  And what's the

11   other half?

12           A    Safeguards, which was -- is basically

13   material control and accountability for the special

14   nuclear material at the plant site.

15           Q    All right.  In the first half,

16   production control, you said you had control of

17   material movement?

18           A    Yes.

19           Q    You're talking about movement of nuclear

20   materials; is that correct?

21           A    And non-nuclear.  In other words, the

22   non-nuclear parts that were produced that would go

23   into, for example, pits.  I had the responsibility for

24   the control of that production and then making sure

25   that those parts were available for pit manufacturing,

CARPENTER REPORTING, INC.
(303) 752-1200

1    as well.  And I also had responsibility, then, for

2    scheduling plutonium work.

3         Q    And then you prioritized work; is that

4    correct?

5         A    That's -- that's one way to put it.  A

6    part of what production control is is telling the

7    production departments what to work on on what days so

8    that all schedules could be met.

9         Q    Okay.  And then you also said scheduling

10   was part of what you did?

11        A    Yes.

12        Q    That's -- you already described that?

13        A    Yes.

14        Q    Okay.  Then safeguards.  This is

15   material control and accountability for special nuclear

16   material; is that correct?

17        A    Yes.

18        Q    So did you have involvement in analyzing

19   any problems or issues relating to MUF or material

20   unaccounted for?

21        A    Yes.

22        Q    And what was your involvement in that?

23        A    I ran the -- the organization that was

24   responsible for the movement of all nuclear material

25   and the inventory process and the -- and, also, the

1    assay or -- the determination of plutonium content in

2    various forms so that we could do the -- the

3    inventories.

4            Q    Okay.  Anything else?

5            A    That's the -- that's the job in a

6    condensed form.

7            Q    Okay.  At this point, did you directly

8    report to Mr. Sanchini?

9            A    It was Mr. Jack Dorr at that time.  He

10   was Sanchini's predecessor.

11           Q    Okay.  Have you read Dr. Cochran's

12   expert report on MUF?

13           A    I don't think I've read Dr. Cochran's

14   report.

15           Q    Have you reviewed any other expert

16   report filed by the plaintiffs in this case?

17                MS. AHERN:  Objection.  Foundation.

18           Q    (BY MR. SORENSEN)  That you know of?

19           A    I have reviewed, yes.

20           Q    Which ones?

21           A    Let's see.  I have -- one of them is

22   the -- is it Roberts' report?

23           Q    That is not an expert report of the

24   plaintiffs, but that's all right.

25                MS. AHERN:  That's my foundation

CARPENTER REPORTING, INC.
(303) 752-1200

63

1    objection.

2          Q    (BY MR. SORENSEN)  Just for your

3    information, that's -- if I'm thinking of the same

4    thing you're thinking of, that's an EG&G document; not

5    an expert report of the plaintiffs.  Just for your

6    information.

7          A    Okay.  I -- then I don't --

8          Q    I'll name some of our experts.  Budnitz,

9    have you read any of his reports?

10         A    No, I don't think so.

11         Q    Werner North?

12         A    No.

13         Q    Well, I already asked about Cochran.

14    Hunsperger?

15         A    No.

16         Q    Flynn, Slovic?

17         A    No.

18         Q    Wing?

19         A    No.

20         Q    Who am I missing?  Some of the experts

21    in this case.  If more come to me, I'll ask you.

22              Okay.  Do you expect to testify about

23    MUF at this trial?

24         A    It's a possibility.

25         Q    And what will you tell the jury about

CARPENTER REPORTING, INC.
(303) 752-1200

64

1    it?

2                    MS. AHERN:  Objection.  Vague.

3           A    I have, I think, a reasonably good

4    understanding of inventory differences and the process.

5    I have some expertise in the equipment that's used to

6    do it and how the process is done.  And I have -- I had

7    briefings and I had work done for me to understand

8    inventory differences at Rocky Flats.

9           Q    (BY MR. SORENSEN)  Do you have a Q

10   clearance?

11          A    Yes, I do.

12          Q    When did you first get that?

13          A    I got that Q clearance in the summer of

14   1968.

15          Q    And is it still active?

16          A    There have been periods where it was

17   inactive, but it is active now.

18          Q    Was it active during the entire time

19   that you were working at Rocky Flats?

20          A    I think the answer is yes.  I'm trying

21   to remember if I had to get it reinstated when I first

22   started, but I think the answer is yes, it was -- it

23   was active.

24          Q    Have you reviewed any classified

25   documents in their classified form in connection with

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                        65

1    preparing to testify in this case?

2           A    Preparing to testify in this case?

3          Q     Yes.

4          A     No.

5          Q     Have you ever participated in the

6     process of reviewing a classified document for the

7     purpose of declassifying it?

8          A     No.

9          Q     Do you have any expertise whatsoever in

10    looking at a classified document and determining what

11    material, if any, needs to come out before it's

12    released to the public?

13              MS. AHERN:  Objection.  Vague.

14    Ambiguous.

15          A     When I was at Rocky Flats, I was an

16    authorized derivative classifier.  I was able to

17    classify -- determine classification of documents that

18    my departments produced.  I don't recall being involved

19    in any declassification efforts.

20          Q     (BY MR. SORENSEN)  Okay.  So, as you sit

21    here, is it correct that you have never in your life

22    participated in the process of taking a classified

23    document and reviewing it for the purposes of releasing

24    it in either its complete form or in some redacted form

25    to the public?  Is that correct?

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    66

1              MS. AHERN:  Objection.

2          Q     (BY MR. SORENSEN)  You've never done

3      that?

4                    MS. AHERN:  Objection.  Vague.

5      Ambiguous.  Compound.

6            A    To the best of my knowledge, I can't

7      recall ever being involved in that process.

8            Q    (BY MR. SORENSEN)  Okay.  Now, do you

9      recall that DOE, in 1994, released the total amount of

10     MUF relating to plutonium and uranium at Rocky Flats?

11     Do you recall that?

12                   MS. AHERN:  Objection.  Foundation.

13           Q    (BY MR. SORENSEN)  Do you understand

14     that, in 1994, the DOE released the total amount of

15     plutonium MUF at Rocky Flats?  Do you understand that?

16           A    I did not know about that or see any of

17     that until I got involved with this effort.

18           Q    I see.  You mean this case?

19           A    Yes.

20           Q    You mean since September of '05?

21           A    Yes.

22           Q    Well, when you -- let me go back to your

23     experience, and I'll come back to this.

24                   We were up to '83, '84.

25           A    Uh-huh.

                      CARPENTER REPORTING, INC.
                          (303) 752-1200

                                                           67

1            Q    You were asked to assume this different

2      position that you've been describing.  How long were

3      you in that position?

4          A    A year.  A year to two years in -- in --

5    I know in December of 1985, I moved into the job of

6    director of plutonium operations.

7          Q    Director of plutonium operations?

8          A    Yes.

9          Q    And at that point, did your

10   responsibility for accountability control and so forth

11   end?

12         A    It ended in the sense that I no longer

13   ran the department that -- that had the responsibility

14   for -- how do I say this?  Determining the --

15   officially running the inventories.  I now had the

16   departments that actually performed the work in -- for

17   inventories, so I still stayed very close to that

18   activity, but I was now running the operations

19   themselves.

20         Q    Okay.  And who did you report to in that

21   job?

22         A    Starting, Mr. Jack Dorr.  Mr. Sanchini

23   assumed presidency of Rocky Flats in about June of '86,

24   I think.

25         Q    And Mr. Sanchini died of cancer; is that

68

1    correct?

2          A    Yes, he did.

3          Q    Do you know what kind of cancer he died

4      of?

5              A      I believe it was bladder cancer.

6              Q      And in this new job, director of

7      plutonium operations, how many people reported to you?

8              A      Approximately 1,000.  Perhaps 1,500.

9              Q      And how long did you hold this position?

10             A      Until around September of 1989, and at

11     that point, when Mr. Sanchini was -- was being treated

12     for his cancer, I -- I was given the title of assistant

13     plant manager and acted as the plant manager in his

14     absence.

15             Q      Until when?

16             A      Until I left Rocky Flats at the end of

17     1989, when Rockwell gave the contract over to EG&G.

18             Q      And then what did you do after you left?

19             A      I went to Rockwell Aerospace, to the

20     Rocketdyne division, R-o-c-k-e-t-d-y-n-e, division, in

21     Conoga Park, California.  And the first year there, I

22     ran -- I think it was production operations.  And then

23     I became program manager for the space shuttle main

24     engine program.

25             Q      When?

                        CARPENTER REPORTING, INC.
                            (303) 752-1200

                                                            69

1              A      About the beginning of 1991.  And ran

2      that program in various aspects until around -- I'm

3      going to say 1996 when I became program manager for the

4      International Space Station power system.

5          Then in around the year 2000, I took a

6    special assignment at corporate headquarters in Seal

7    Beach to work on the consolidation of the engineering

8    organizations for Boeing with -- with their -- their

9    acquisitions of Rockwell Aerospace and McDonnell

10   Douglas.  I did that for around 15 months.  And then

11   returned to Rocketdyne to complete my career as --

12   it'll come to me -- division director of energy

13   systems, which was a commercial endeavor that

14   Rocketdyne was getting into.

15          Q     You returned to them in mid-'01?

16          A     Let me think.  This is '05.  Yes.  Yes.

17   I think that's right.  I think it was in the spring of

18   '01.

19          Q     And then what?

20          A     Then I retired in -- effective the end

21   of May of 2003.

22          Q     Why did you retire?

23          A     A number of reasons.  I was 57.  I could

24   then retire.  I had -- without any penalty.  I had

25   begun to do some consulting and wanted to expand that.

CARPENTER REPORTING, INC.
(303) 752-1200

70

1    And the most important reason was I wanted more time to

2    myself for travel and golf.

3          Q     Was your -- was your retirement

4    voluntary?

5          A    Yes.

6          Q    Did you retire pursuant to any kind of

7     attempt by Rockwell to reduce its work force by

8     offering buyouts or anything like that?

9          A    No.

10         Q    Were you approached about retiring, or

11    was that your idea?

12         A    It was my idea.

13         Q    All right.  I want to return to MUF and

14    safeguards for a moment.  As you sit here, do you know

15    how much plutonium is unaccounted for at Rocky Flats?

16              MS. AHERN:  Objection.  Foundation.

17         A    I have seen the MUF documents to total

18    that.  I know approximately what that number is.

19         Q    (BY MR. SORENSEN)  And what is that?

20         A    At least what it was as of the early

21    nineties, I guess.

22         Q    And what's your understanding of what

23    that amount is?

24         A    Around 1,100 kilograms.

25         Q    Now, until you saw some documents in

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                        71

1     connection with this case recently, did you know that

2     number?

3          A    I have seen -- I have seen the numbers

4     through the 1980s periods, starting when I assumed that

5     position, so it has changed a lot in that period, so

6      yes.

7             Q     In other words, when you assumed this

8      job having to do with accountability, you saw the total

9      MUF to that date?  Is that what you're saying?

10            A     Yes.  And then I -- then, of course, I

11     watched inventory differences from there on out.

12            Q     Okay.  And were you told that part of

13     your job was to keep that MUF from changing by a

14     certain amount from year to year?

15                  MS. AHERN:  Objection.  Foundation.

16     Vague and ambiguous.

17            Q     (BY MR. SORENSEN)  Do you follow what

18     I'm asking?

19            A     Yes.  I think so.  My -- in that job,

20     my -- part of my responsibility was to control

21     material -- special nuclear material in such a fashion

22     that we were -- all our inventories were successfully

23     conducted with no stoppage -- unplanned stoppage of

24     production.  That is, that we kept the inventory

25     difference within control.

1             Q     When you say "within control," within

2      some specified percentage or some amount?  Is that what

3      you're referring to?

4             A     Statistical control.

5             Q     What does that mean?

6          A     What that means is when comparing book

7    inventory to what you can measure, that you can do the

8    statistical analysis and show that, statistically, it

9    is in control and you had -- with a high confidence

10   level, you are not -- you have a high confidence level

11   that you are not missing plutonium.

12          Q     Was there some limit set on that?   In

13   other words, let's say you start with 100 pounds --

14          A     Uh-huh.

15          Q     -- and you end up with 99 pounds.

16   There's a difference.

17          A     Uh-huh.

18          MS. AHERN:   Object to --

19          Q     (BY MR. SORENSEN)  I'm just trying to

20   set a -- get to my question.  Was there some limit that

21   you had to try to shoot for?  In other words, as long

22   as you're -- if you start with 100 pounds, as long as

23   you're above 99 pounds, that's close enough?  If you

24   fall below some number -- do you follow what I'm

25   asking?

CARPENTER REPORTING, INC.
(303) 752-1200

73

1          MS. AHERN:   Objection.  Vague.

2    Ambiguous.  Speculative.  Compound.

3          MR. SORENSEN:   Besides that, it's a fine

4    question?

5          A     Yes.  But it's considerably more complex

6    than that.  You take -- in determining statistical

7    control, you take into account the precision and

8    accuracy of the equipment you're using to measure it,

9    the types of forms you have of plutonium, and the

10   anticipated holdup you would get.  And using all that

11   information, then, you say do we have a high level of

12   confidence that all the plutonium is accounted for.

13   Okay.  You may have, versus book inventory, a gain or a

14   loss in any particular period.

15          Q    (BY MR. SORENSEN)  And was there some

16   limit, whether in absolute amounts of ounces or pounds

17   or kilograms --

18          A    No.

19          Q    -- or some percentage beginning versus

20   end that you were operating under that triggered -- you

21   know, some trigger point that, below this amount, we

22   consider that we have control of all of it and above

23   this amount, that's something we have to investigate?

24   Anything like that?

25                  MS. AHERN:  Vague.  Ambiguous.

                  CARPENTER REPORTING, INC.
                     (303) 752-1200

                                                74


1    Compound.  Let him ask the whole question and give me

2    an opportunity to object.

3          A    Okay.

4          Q    (BY MR. SORENSEN)  Do you understand

5    what I'm getting at?

6          A    Again, it isn't based on a specific

7    number or percentage.  It's -- it's -- it's more

8    complicated.  The first part -- and maybe most

9    important -- is you must account for all of what's

10   considered category 1 material.  That is the most

11   attractive metal and oxide.  That has to be basically

12   100 percent accounted for so that you can assure you're

13   not missing any parts, any pits.  There's been no

14   diversion.

15          Q    That's plutonium we're talking about?

16          A    Plutonium in particular.

17          Q    So if there were some plutonium MUF,

18   whatever the amount, would that cause a work stoppage?

19               MS. AHERN:  Objection.  Vague.

20          A    No.

21          Q    (BY MR. SORENSEN)  No, it would not?

22          A    Not necessarily.  One of the first

23   things you do in an inventory after you've cleaned up

24   is you have to make sure, count that all the -- what's

25   considered category 1, most attractive material, is

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                   75

1    fully accounted for.  It's primarily metal, which is

2    easy to assay and get an accounting.  You can weigh it.

3    You put it on a scale.  That has to be all accounted

4    for.

5               Then, you move on to the measurements of

6    residues and waste and other forms of plutonium that

7    are considerably more difficult to -- to ascertain

8    exact values on.

9           Q    And how often was this process done?

10   Weekly?  Monthly?  Did it have any regular schedule?

11          A    We did have a regular schedule,

12   depending upon the types of material and the

13   quantities.  Some areas were inventoried on a monthly

14   basis.  Some on a bimonthly.  Some every six months.

15   Then the entire plant had what we called a wall-to-wall

16   inventory every six months.

17          Q    And you were responsible for this

18   process for about a year; is that right?

19          A    Maybe a year and a half.

20          Q    Okay.

21          A    I don't remember the exact dates.

22          Q    Okay.  But about 1985?  In that period;

23   right?

24          A    I know when I ended.  I can't remember

25   exactly when I started.

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                              76

1           Q    You ended when?

2           A    I took over plutonium operations in

3    December of 1985.

4           Q    So that's when your responsibility for

5    this accounting stuff that you were describing ended;

6    is that right?

7           A    My -- yes.

8          Q     When you took over this accounting or

9    MUF type position, did you learn about the total amount

10   of missing or unaccounted-for plutonium that existed at

11   Rocky Flats at that time?

12              MS. AHERN:  Objection.  Vague.

13          Q     (BY MR. SORENSEN)  I'll ask a new

14   question.  When did you first learn about the total

15   cumulative plutonium MUF at Rocky Flats?

16          A     Shortly after I took over this position,

17   I asked for a review of the total inventory difference

18   at the plant and wanted a full explanation of -- of how

19   that had -- how those numbers had been determined and

20   our best feel for where, indeed, that material was.

21          Q     And who did you ask to do this?

22          A     My organization at the time.

23          Q     And did they create some kind of report

24   about this?

25          A     I received several briefings on it.  I

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                      77

1    don't believe a formal report was prepared, but I

2    received several briefings on it.

3          Q     From who?

4          A     I can remember a few names.  Gary

5    Carnival.

6          Q     Carnival?

7          A     Carnival.  I think spelled just like

8    Carnival.

9           Q     The ship?  Just like the ship line?

10   Carnival Cruise?

11           A     Yes.  Yes.  I believe at that time,

12   Mr. R.D. Sherrill, S-h-e-r-r-i-l-l, I think, was also

13   in that organization.  Those are two names I remember.

14           Q     Did you have any briefings from Ronnie

15   Hoffman?

16           A     No.

17           Q     Do you know who Ronnie Hoffman is?

18           A     I know who he is.

19           Q     Okay.  And in these briefings, what did

20   they tell you?

21                 MS. AHERN:  Objection.  Vague.

22           A     They explained to me the buildup of the

23   inventory difference over the years and the evidence we

24   had to support where that material was.

25           Q     (BY MR. SORENSEN)  Did they tell you

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                              78

1    that they could account for all of the missing

2    plutonium?

3           A     I felt --

4                 MS. AHERN:  Objection.  Vague.

5           A     I felt, at the end of the discussion,

6    that I had high confidence that, indeed, all the

7    plutonium -- the inventory difference could be fully

8    explained.  That I had no concern that there was any

9    theft, diversion, or unexplained losses.

10        Q    (BY MR. SORENSEN)  Did they discuss with

11   you during these briefings how much, if any, of the MUF

12   may have been accounted for by releases to the

13   environment?

14              MS. AHERN:  Objection.  Ambiguous.

15        A    The evidence I saw, their opinions, and

16   certainly mine is that losses to the environment were

17   so negligible as to be no part of -- of inventory

18   difference.

19        Q    (BY MR. SORENSEN)  But after these

20   briefings, whatever the amount of MUF was stayed the

21   same; correct?

22              MS. AHERN:  Objection.  Vague.

23        Q    (BY MR. SORENSEN)  Let me start again.

24   When you had these briefings, do you recall how much

25   the MUF was?  If it was 1,191 kilograms in '94, do you

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                            79

1    recall what it was when you had these briefings you've

2    been discussing?

3         A    It was -- this would have been about ten

4    years prior to that.  It was about the same number.

5         Q    Okay.

6         A    I mean, approximately.

7         Q    Right.  Well, there's a chart that

8    Dr. Cochran prepared in his report.  There's also some

9    information in DOE -- I'll start again.

10                DOE issued an openness -- they called an

11     openness fact sheet in 1994.   June '94.  Do you

12     understand that?

13                MS. AHERN:  Objection.  Foundation.

14          Q    (BY MR. SORENSEN)  Does that ring any

15     bells?

16          A    I didn't know when that information was

17     released.  Okay.

18          Q    Okay.  So when I say DOE June '94

19     openness, press conference, fact sheet, does that --

20          A    No.

21          Q    Okay.  No bells.  So when you got

22     this -- these briefings, let's assume the amount of MUF

23     was approximately 1,100 kilograms just for purposes of

24     my question.  Okay?

25          A    Okay.

CARPENTER REPORTING, INC.
(303) 752-1200

80

1          Q    After these briefings were completed,

2     did you say to them, okay, we should now reduce the MUF

3     to zero or some other number --

4          A    No.

5          Q    -- because we know where it is?

6          A    No.  That's not the way it's done.

7          Q    First, you did not do that?

8          A    Did not do that.

9          Q    So, after these briefings, the MUF

10    number -- whatever it was before these briefings --

11    stayed the same; is that correct?

12         A    Yes.

13         Q    Okay.  And in fact, by the time you left

14    this job and moved on to your next position at -- at

15    Rockwell, the MUF number had not changed or it had not

16    gone down; is that correct?

17         A    That is correct.

18         Q    Okay.  Do you know how much of the 1,191

19    kilograms, if any, was recovered in the decommissioning

20    of Rocky Flats?

21              MS. AHERN:  Objection.  Foundation.

22         A    I've never seen any of that data.

23         Q    (BY MR. SORENSEN)  So, as far as you

24    know, the 1,191 figure remains the figure today --

25              MS. AHERN:  Object --

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                         81

1          Q    (BY MR. SORENSEN)  -- as far as you

2    know?

3               MS. AHERN:  Objection.  Calls for

4    speculation.

5          Q    (BY MR. SORENSEN)  Let me ask you a

6    different way.  Do you have any basis to say the amount

7    of material unaccounted for, MUF, of plutonium is

8    something other than 1,191 kilograms?

9          A    No.

10         Q    Now, you said that -- I think you said

11    one of your goals in these measurement procedures was

12    to avoid work stoppage?  Did you say something like

13    that?

14              MS. AHERN:  Objection.  Misstates the

15    prior testimony.

16              Q    (BY MR. SORENSEN)  When you did these

17    accounting --

18              A    Yes.  That -- from time to time, there

19    had been periods in inventories where we could not

20    resume operations in a timely fashion, and it was

21    certainly a part of my responsibility to run the

22    inventory process in such a fashion that we could

23    minimize those.

24              Q    Well, what triggered a work stoppage?

25              MS. AHERN:  Objection.  Vague.

CARPENTER REPORTING, INC.
(303) 752-1200

82

1              A    An example would be around material

2    balance areas, such as, say, the foundry, where you

3    have category 1 material, metal, that if their

4    inventory difference had something unexplained in it,

5    it -- that had to be immediately addressed.

6              An example would be if a transaction --

7    a movement of material had been improperly accounted

8    for, such that when you did the books in the foundry,

9    they had some -- some amount of metal that had

10   improperly been accounted for, those had to be resolved

11    very quickly.

12          Q    (BY MR. SORENSEN)  Okay.  And if -- if

13    there was some missing category 1 metal material, that

14    would cause work to stop until it was figured out; is

15    that what you're saying?

16          A    Yes.

17          Q    These MBA or material balance areas, how

18    many were there at Rocky Flats?

19          A    The number changed, but, as I recall, in

20    my time frame, around 100.

21          Q    Now, somewhere -- what was the smallest

22    one?

23          A    Oh, boy.  It would be something like the

24    analytical lab, where you handled gram quantity --

25    quantities of plutonium.

CARPENTER REPORTING, INC.
(303) 752-1200

83

1           Q    And it could be as large as what?

2           A    The largest would be the fabrication

3     areas, probably, such as the foundry machining or

4     assembly, where you would have hundreds of kilograms.

5           Q    But would that encompass an entire

6     building?

7           A    Parts of a building.

8           Q    Parts of a building.  The smallest might

9     be a lab.  The largest would be part of a building; is

10    that correct?

11          A    Yes.  When I say "largest," I'm talking

12    about quantity of material as opposed to physical size.

13         Q    Oh, I see.  Okay.  I was talking more

14    about physical size.

15         A    Yeah.

16         Q    You're talking quantity.  Okay.  In

17    terms of physical size, what would the smallest be?

18         A    Probably an R&D laboratory.

19         Q    Okay.  And in terms of physical area,

20    what would the largest be?

21         A    A -- an area like the foundry, which

22    would be a -- say, one-third of Building 707.

23         Q    And when you were director of

24    safeguards, were you in charge of all the MBA's?

25         A    Yes.

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                    84

1          Q    Now, you said that --

2          A    In --

3          Q    Go ahead.

4          A    In charge of an MBA from the standpoint

5     of having responsibility for any material moving in or

6     out.

7          Q    Okay.

8          A    Not the processing that occurs within

9     that MBA.

10         Q    Now, you said with respect to category 1

11    material, that if there was some amount missing, that

12    would cause a work stoppage.  Did that ever occur while

13    you were in this position of director?

14         A    I don't remember.  I know that it

15    occurred prior to my assuming the position.

16         Q    How many times?

17         A    I don't recall.

18              MS. AHERN:  Objection.  Foundation.

19         Q    (BY MR. SORENSEN)  Who was your

20    predecessor in that position?

21         A    The nuclear material accountability

22    group, prior to my getting that new position, reported

23    into the security director.

24         Q    Who was the security director at the

25    time?

CARPENTER REPORTING, INC.
(303) 752-1200

85

1         A    I believe it was Ed Young at that time.

2         Q    Okay.  Now, you were talking about

3    category 1 material metal.  I believe you also talked

4    about two other categories:  Residues and waste; is

5    that correct?

6         A    Yes.

7         Q    Now, let's talk about them for a moment.

8    You said those were a little more difficult.  What did

9    you mean by that?

10         A    Typically, residues, as they're

11    collected, or waste as they are removed from a glovebox

12    line, they are double bagged in sealed plastic bags and

13      then deposited in a 55-gallon stainless steel drum.  We

14      had many different types of residues and waste.  And

15      their -- the ability to assay those drums was

16      considerably more difficult than weighing a piece of

17      metal.

18              Q    Let me stop you for a minute.  When you

19      say "assay," what does mean?  Does that mean weigh?

20              A    Determining the amount of plutonium in a

21      55-gallon drum, and, also, assay is more properly used

22      to determine the -- the -- the makeup of that

23      plutonium.  For example, whether it was pure plutonium

24      or had been alloyed with something.

25              Q    So you're saying it was difficult to

CARPENTER REPORTING, INC.
(303) 752-1200

86

1       measure the amount of plutonium and residues and waste?

2       Is that what you're saying?

3               A    Much more difficult.

4               Q    Well, was there an attempt made to

5       measure the amount of plutonium in these residues and

6       waste before they were put in the drums, or that only

7       occurred after they were put in drums?

8                    MS. AHERN:  Objection.  Vague.

9       Compound.

10              A    Where we could, it was done prior to

11      putting it in.  If we had a good method for doing it.

12              Q    (BY MR. SORENSEN)  What, typically,

13    happened?

14          A    It depends on the type of -- of residue

15    or waste form.  If we were collecting something in cans

16    that could be measured more accurately with, say, a

17    calorimeter or a can counter, we would do that.  But if

18    it was a waste form that you were collecting, for

19    example, leaded -- lead-impregnated gloves, we had no

20    mechanism for doing those on a smaller basis, so we

21    would put them into a 55-gallon drum in plastic bags

22    and then count the drum itself.

23          Q    All right.  So let's take like a one-

24    month period.  That's one of the periods that these --

25    these accounting measurements were sometimes made;

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                        87

1    right?  A month?

2          A    In some areas.

3          Q    Let's take one of those.  One month.  So

4    what -- take me through it.  You have some numbers

5    about what the beginning inventory is; is that correct?

6          A    Yes.

7          Q    Let's call that 10 pounds, just for the

8    ease of math for this example.  And that was assumed to

9    be an accurate number when you did this?

10          MS. AHERN:  Objection.  Vague.

11    Ambiguous.  Incomplete hypothetical.

12          Q    (BY MR. SORENSEN)  Let me ask you this:

13    What I mean is when you were doing this, you know,

14    comparing the beginning to the end, did you assume that

15    the beginning number was accurate, or did you go back

16    and double-check it for some reason?

17          A    Again, it depends on the area.   If

18    you're talking like a foundry where you weighed

19    everything, most of the material is metal and could be

20    easily weighed, you have a very accurate beginning

21    number.   Some of it goes off as waste out of the

22    foundry.   Some of it is converted to oxide, but you

23    could get a pretty good number.

24          Q    Let's take that kind of example.

25          A    Okay.

CARPENTER REPORTING, INC.
(303) 752-1200

88

1          Q    So foundry.   Some metal comes in, and

2    you consider the beginning number accurate; is that

3    right?

4          A    Yes.   Because you have -- when you

5    complete an inventory, let's say you have -- say

6    there's 100 kilograms of plutonium in the foundry at

7    that period.   You've shipped off any of the oxide that

8    you've generated.   You've shipped off all the waste.

9    That's been counted as best you could.   So you have --

10   you now say in the foundry, we have to a -- to a pretty

11   high degree, 100 kilograms of plutonium.   Okay.

12   Probably, in this case all, in metal form.   Okay.   So

13   it's a good number.   Very accurate.

14          Q     Okay.

15          A     During the course of the month's

16   operation, you have had more plutonium come in in metal

17   form, primarily, a lot go out, mostly in metal form,

18   but you've also generated scrap, some of which has been

19   converted to oxide and shipped to 771 for processing.

20   You've also generated waste.  You've got gloves that

21   are waste, you've got rags that are waste, you've got

22   oils that are containing plutonium.  Quite a few

23   others.  Those are collected and as best we can,

24   determine the amount of plutonium in each of those.

25          Q     And what's the margin of error?

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                        89

1               MS. AHERN:  Objection.  Vague.

2          A     It depends on the --

3               MS. AHERN:  Go ahead.

4          A     It depends on the equipment we use, but,

5    typically, in measuring with -- with segmented drum

6    counters or neutron coincidence counters, helix

7    counters, can counters, you could have as accuracies --

8    inaccuracies of from 30 to 50 percent.

9          Q     (BY MR. SORENSEN)  So beginning

10   inventory period -- let's start with 100 kilograms.  I

11   was using 10 pounds.  I'll use your number.  You're

12   pretty confident about that number as you described it?

13         A     Yes.

14         Q     A month goes by.  A fair amount of this

15      plutonium has been, what, turned into pits?

16              A    Yes.

17              Q    And that's also in solid form?

18              A    Yes.

19              Q    And those are weighed pretty accurately?

20              A    Pretty good, uh-huh.

21              Q    That accounts for, at the end of this

22      period, how much of that 100 kilograms?

23              A    Maybe, in the foundry, it might be

24      80 percent.

25              Q    So --

                         CARPENTER REPORTING, INC.
                              (303) 752-1200

                                                        90

1               A    And I'm stretching my memory here.

2               Q    I'm just -- whatever you can tell me.

3                    MS. AHERN:   I'd actually like to object

4       to this whole line of hypotheticals as calling for

5       speculation to some extent.

6               Q    (BY MR. SORENSEN)   80 percent is pits

7       out.  So 80 kilograms.   Is that fair?

8               A    Yes.

9               Q    And that's pretty accurate?   Highly

10      accurate?  Is that what you said?

11              A    Measured to the gram.

12              Q    Because it's metal?

13              A    Measured to the gram, yeah.

14              Q    This other 20 percent or 20 kilograms,

15   is that what is distributed among waste, scrap,

16   residues?

17              A    And oxide.

18              Q    And oxide.  And the measurement of that

19   can be off, you said, by 30 to 50 percent; is that

20   right?

21              A    Oxide, you can measure more accurately.

22              Q    Okay.

23              A    So the next biggest quantity would be

24   plutonium oxide.

25              Q    So plutonium oxide.  All right.  So how

                     CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                        91

1    much of that -- of that 20 pounds -- start again.  How

2    much of the 20 kilograms --

3              A    12 --

4              MS. AHERN:  Let him finish his question

5    and give me a chance to object.

6              Q    (BY MR. SORENSEN)  Okay.  It's more fun

7    that way.  How much of the other 20 kilograms would be

8    accounted for in plutonium oxide?

9              MS. AHERN:  Objection.  Vague.  Calls

10   for speculation.

11             A    Stretching my memory here for the

12   foundry, but let's say that -- that 10 -- 10 kilograms

13   of it would go out as oxide.

14             Q    (BY MR. SORENSEN)  When you say "go out

15   as oxide," go out where?  Where is it going?

16          A    It goes down to 771 for processing back

17     to metal.  Okay?

18          Q    Because you're trying to recover it

19     back; is that right?

20          A    Yes.

21          Q    Okay.  So 10 goes out to -- as plutonium

22     oxide.  Now we're down to 10?

23          A    The oxide --

24               MS. AHERN:  There's no question pending.

25          Q    (BY MR. SORENSEN)  There isn't.  Is

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                        92

1      There something you wanted to add about the oxide?  Go

2      ahead.

3               MS. AHERN:  Why don't you ask a

4      question?

5          Q    (BY MR. SORENSEN)  Is there some

6      additional explanation about the plutonium oxide --

7          A    Oxide can be determined to the -- not as

8      accurate as metal but better than residue or waste.

9          Q    When you say metal is highly accurate,

10     plutonium oxide is somewhat below, can you quantify

11     that for me?  Metal is accurate to within X, oxide, so

12     forth?

13               MS. AHERN:  Objection.  Foundation.

14     Calls for speculation.

15          A    We weighed metal to the gram accuracy.

16    So a percent or less type accuracy for metal.  Oxide, I

17    don't remember the number, but -- but I -- I just can't

18    remember, but better than residue or waste.

19         Q    (BY MR. SORENSEN)  Okay.  Now, this is

20    occurring inside a building that has vents or some

21    filter system that goes out to the outside environment;

22    correct?

23         A    Yes.

24         Q    So some amount of plutonium is going up

25    these stacks and out into the environment; correct?

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                         93

1              MS. AHERN:  Objection.  Calls for

2    speculation.

3         Q    (BY MR. SORENSEN)  In the building that

4    we're talking about; correct?

5              MS. AHERN:  Same objections.

6         A    We had stack monitors.

7         Q    (BY MR. SORENSEN)  I wasn't -- I'll get

8    to that.

9         A    Yeah.

10        Q    You can talk about it.  I'm just trying

11    to get a yes or no.  The building that we've been

12    discussing in this hypothetical is a building that has

13    vents, goes through filters, but, eventually, it goes

14    into the outside environment?

15        A    Yes, it does.

16        Q    Some amount -- I'm not asking you how

17    much.  Some amount of plutonium is going out and into

18    the air; correct?

19              MS. AHERN:  Objection.  Foundation.

20    Calls for speculation.

21         Q    (BY MR. SORENSEN)  I'm really just

22    asking you a yes-or-no question.

23         A    Yes.

24         Q    Okay.  Getting to this 10 kilograms that

25    we're now left with, is that accounted for with residue

                CARPENTER REPORTING, INC.
                    (303) 752-1200

                                                    94

1     and waste and scrap?

2          A    Yes.

3          Q    And these are the three categories that

4     you said can be measured, but only to an accuracy of 30

5     to 50 percent; is that correct?

6          A    In general, yes.

7          Q    Okay.  So does that mean that, when you

8     measured this, you thought you were going to get

9     10 kilograms, but you could get 5?  Is that right?  Is

10    that what you mean?

11         A    Yes.

12         Q    And when you got 5, let's say, that's

13    50 percent off.  Did you say, Well, that's just as best

14    we can do and let's keep moving, or did you go look for

15    it, or did you do anything?

16              MS. AHERN:  Objection.  Argumentative.

17   Calls for speculation.  Repeat my ongoing objection to

18   this entire line of hypotheticals as calling for

19   speculation.

20          A    For each MBA, you have a process history

21   that tells -- gives you a pretty good indication of any

22   process holdup you might get, what you would anticipate

23   as underestimated in residues and waste, and that's a

24   part of what is used, then, in the statistical

25   determination of the accuracy of the overall inventory.

CARPENTER REPORTING, INC.
(303) 752-1200

95

1          If the number fits in based on the

2   throughput -- fits in the family of history we have for

3   that area, we say that area is in control and that

4   material is accounted for.

5          Q    (BY MR. SORENSEN)  All right.  So let's

6   say you think you -- you're going to find 10 kilograms

7   left in waste and residue and scrap, but you find

8   5 kilograms.  Did that mean that 5 kilograms was added

9   to the amount of plutonium MUF?  Did that happen?

10          MS. AHERN:  Objection.  Foundation.

11   Calls for speculation.

12          A    Yes.

13          Q    (BY MR. SORENSEN)  So if the number of

14   amount of total cumulative MUF before this month

15   process started was 1,000 kilograms in this

16   hypothetical we've been going through, at the end of

17   the month, the number would now be 1,005; is that

18    correct?

19          A    Yes.

20          Q    Okay.

21               MR. SORENSEN:  Let's take a quick break.

22               MS. AHERN:  Okay.

23               MR. SORENSEN:  Thanks.

24               (There was a recess taken from 4:22

25    p.m. to 4:28 p.m.)

CARPENTER REPORTING, INC.
(303) 752-1200

96

1          Q    (BY MR. SORENSEN)  Okay.  You were this

2     director of safeguards for about a year and a half.

3     After that period, did you have any continuing

4     involvement in MUF or accounting issues?

5               MS. AHERN:  Objection.  Vague.

6          A    Yes.

7          Q    (BY MR. SORENSEN)  And what was your

8     involvement after that period?

9          A    As director of plutonium operations, I

10    had responsibility for actually performing the

11    inventories.  Doing the cleanup, et cetera.

12         Q    I'm sorry.  You now have responsibility

13    for actually performing the inventories you've been

14    describing?

15         A    Yes.  From -- from the standpoint that

16    my people are the ones now who are doing the work,

17    cleaning up the boxes and getting everything set so

18   that the group -- the other group can then do the

19   measurements and calculations.

20          Q    So was there a period when you were

21   doing the measurements and the calculations?

22          A    When my -- when I had the group that

23   ran -- it had the MC&A group, they're the ones who

24   actually take all the numbers and put it all together

25   to determine inventory differences.

1          Q    MC&A group stands for what?

2          A    Material control and accountability.

3          Q    So I'm just trying to get this straight.

4   When you were the director of safeguards --

5          A    Uh-huh.

6          Q    -- did you personally participate in

7   this process of figuring out the beginning and ending

8   inventory?

9          MS. AHERN:  Objection.  Vague.

10          A    My group -- my -- whatever number of

11   people I had in that group -- were responsible for all

12   nuclear material transactions.  That is movement of

13   material.  Making sure that everything -- that all the

14   paperwork was in order, that we had properly run the

15   counting equipment, and that they are the ones that

16   pulled all the numbers together, did the statistical

17   analysis and said yes, the inventory is complete.  We

18   can resume operations.

19          Q     (BY MR. SORENSEN)  Okay.  You did that

20     in what period of time again?

21          A     That was, again, the 18 months or so

22     that I ran that nuclear material safeguards group.

23          Q     Until about 1985 or '86?

24          A     Until late '85, yes.

25          Q     Then, after that, you became director of

CARPENTER REPORTING, INC.
(303) 752-1200

98

1     plutonium operations?

2          A     Uh-huh.

3          Q     Is that yes?  Yes?

4          A     Yes.

5          Q     But you said you, in that position, were

6     now responsible for performing these inventories;

7     correct?

8          A     Yes.

9          Q     In that capacity, were you involved or

10     did you participate in actually doing these beginning

11     and ending measurements that you described earlier?

12          A     It was my group's responsibility to have

13     all the material properly packaged and ready.

14          Q     For someone else to do these

15     measurements?

16          A     For someone else to do the accounting.

17          Q     Okay.  And when you say packaged and

18     ready, do you mean what you were describing earlier,

19    putting some things in cans, some things in drums,

20    however you are dealing with it?

21          A    Cleaning out the gloveboxes entirely,

22    emptying our tanks as much as we could.

23          Q    But in this capacity as director of

24    plutonium operations, you and your group were not the

25    ones charged with doing the measurements; is that

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                        99

1    correct?

2          A    That is correct.

3          Q    Okay.  Now, in the earlier example that

4    we were talking about where it ended up with

5    5 kilograms of MUF, was there some limit on that number

6    with respect to waste and scrap and residues above

7    which work would have to stop?  You'd have to do some

8    investigation, whether in terms of an absolute amount

9    or percentage?  Do you follow what I'm asking?

10          A    To some extent.  You know, we've been

11    speculating on the foundry and I've been making up

12    numbers, so I don't remember them precisely.

13                One of the points that I was trying to

14    make is that it's not necessarily a percentage.

15    It's -- it's a statistical analysis based on the

16    history of that operation that determines whether or

17    not you feel that you're fully accounting for all the

18    material.

19          Q    But as long as the amount of MUF was

20     within, let's say, the counting accuracy of the

21     measurement tools you were using to measure plutonium

22     in the waste residues and scraps -- as long as the

23     number you got was within the counting accuracy, did

24     you consider that you had accounted for it?

25          A     Again, I believe that was a -- an

CARPENTER REPORTING, INC.
(303) 752-1200

100

1      important factor, but I can't remember all the details

2      of it at this point.

3          Q     Okay.  Now, you said earlier you had a

4      briefing about MUF from these various other

5      individuals.

6          A     Yes.

7          Q     Do you recall that?

8          A     Yes.

9          Q     And you said that, to your recollection

10     that was an oral briefing, but not through any kind of

11     written report; is that correct?

12          A     I saw a -- there were paper briefings

13     prepared for me that we worked through so, in that

14     sense, there was documentation, but no formal report

15     was issued to the Department of Energy.

16          Q     Okay.  And I believe you said something

17     about your confidence that you had at the end of those

18     briefings.  Do you recall that?

19          A     Yes.

20        Q     And what was that confidence based on?

21              MS. AHERN:  Objection.  Vague.

22        A     Based on the briefings that were shown

23   me, the investigations that had been done, I had good

24   confidence that we had a very capable inventory system

25   and could very well explain the inventory difference

CARPENTER REPORTING, INC.
(303) 752-1200

101

1    for the plant site.

2         Q     (BY MR. SORENSEN)  But, again, this --

3    these good explanations didn't result in any decrease

4    in the amount of MUF; correct?

5              MS. AHERN:  Objection.  Calls for

6    speculation.  Vague.

7         A     And that wasn't the intent.  The -- to

8    change that number, what -- you would actually have to

9    go and -- for example, to Idaho and remeasure drums.

10        Q     (BY MR. SORENSEN)  And that wasn't done;

11   correct?

12        A     It was -- it was sampled to give us some

13   confidence that, indeed, the drums in Idaho had been

14   understated as far as the amount of plutonium.  But

15   only a sampling.

16        Q     Okay.  So whatever confidence you say

17   you came away with, it wasn't enough of a confidence to

18   reduce that MUF number; correct?

19              MS. AHERN:  Objection.  Vague.

20   Foundation.

21          Q     (BY MR. SORENSEN)  Is that correct?

22          A     You can't reduce the MUF number without

23     actually recapturing that plutonium.

24          Q     Okay.  Now, before you took this earlier

25     job as director of safeguards and accounting, what

CARPENTER REPORTING, INC.
(303) 752-1200

102

1      training did you have in that area with respect to, you

2      know, the job duties you were about to start

3      performing?

4           A     In my period in running pit

5      manufacturing, I was heavily involved in the inventory

6      processes in that building.  The manufacturing

7      buildings.  I had gone through several of the wall-to-

8      wall inventories, I had some background in the types of

9      equipment that is used to measure nuclear materials,

10     and had come to a -- a pretty good understanding of

11     plutonium movement and control within manufacturing

12     buildings.

13          Q     Okay.  Did you have any more formal

14     training by Rockwell in terms of a course, anything

15     like that?

16          A     That --

17                MS. AHERN:  Objection.  Vague.

18          A     There were experts at the plant site who

19     provided training to people like me, new management

20     into those areas.  I don't recall if they were formal

21      courses or not.

22              Q    (BY MR. SORENSEN)  Who were these

23      experts?

24              A    One name that comes to mind is Yvonne

25      Ferris, F-e-r-r-i-s.  She had been at Rocky Flats for a

CARPENTER REPORTING, INC.
(303) 752-1200

103

1       number of years.  She had also served a term at the

2       International Atomic Energy Agency at Vienna, and she

3       was considered one of our resident experts in material

4       control and accountability.

5               Q    Okay.  Anyone else?

6               A    There were others, including some of the

7       names I mentioned before:  Gary Carnival, Dee Sherrill,

8       and others.  They had been in that area for many years.

9               Q    At this meeting with Ms. Ahern back in

10      September, did she show you any documents?

11              A    Yes.

12              Q    Do you recall what they were?

13              A    Not specifically.

14              MS. AHERN:  Go ahead.

15              Q    (BY MR. SORENSEN)  Can you describe them

16      generally?

17              MS. AHERN:  You know, I object and I

18      instruct the witness not to answer.  The substance of

19      our conversations is privileged.

20              MR. SORENSEN:  I'm not asking for the

21      substance of a conversation.  I'm asking about the

22    general description of the documents he was shown.

23              MS. AHERN:  You're asking what documents

24    I did show him, and I believe that reflects attorney

25    work product, attorney-client communications.

CARPENTER REPORTING, INC.
(303) 752-1200

104

1              Q    (BY MR. SORENSEN)  Can you tell me the

2    volume of documents you were shown?

3              A    A handful.  Five, six.

4              Q    And have you been shown documents since

5    then?

6              A    Yes.

7              Q    And what's the volume of documents

8    you've been shown since then, other than the

9    transcripts we've already discussed?

10             A    Again, I don't know the exact number.

11             Q    Well, is it an inch stack?  Is it a box?

12    Is it ten boxes?  I'm just trying to get a sense.

13             A    A box, maybe.  Maybe a box.

14             Q    And what is the general subject of these

15    documents you've been shown?

16             A    They cover a variety of areas.

17             Q    Such as?

18             A    Some were reports.

19             Q    I'm sorry?

20             A    Some were reports.

21             Q    What kind of reports?

22          MS. AHERN:  I object on privilege

23    grounds, and I instruct the witness not to answer.

24    He's given you plenty.  If you go much further into

25    invading the privilege, I have to object.

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                      105


1           MR. SORENSEN:  Go ahead.  Are you

2    finished?

3           MS. AHERN:  I'm finished.

4           MR. SORENSEN:  He hasn't named one

5    specific area of these documents yet.

6           Q    (BY MR. SORENSEN)  Can you name any of

7    these areas of these documents you've been shown?  The

8    subjects of them?  I mean, did it have to do with RCRA,

9    the grand jury investigation, the raid, MUF,

10    monitoring?  Can you name any areas?

11           MS. AHERN:  I object, and I instruct the

12    witness not to answer.

13           Q    (BY MR. SORENSEN)  Okay.  Are you going

14    to follow your counsel's instruction?

15           A    Yes, I am.

16           Q    Okay.  Have you had any conversations

17    with Mr. Norton in connection with this case?

18           A    No.

19           Q    Have you met Mr. Norton?

20           A    I don't believe I ever met Mr. Norton.

21           Q    Okay.  You were interviewed for the --

22    by the FBI in connection with their investigation of

```
23    Rocky Flats; correct?

24              A     Yes.  At Rocky Flats.

25              Q     And other than your interview by the
```

```
 1    FBI, were you interviewed by any other investigators?

 2              A     Yes.

 3              Q     Who?  From -- you know, what agency?

 4              A     A Rockwell team.

 5              Q     Who at Rockwell interviewed you?

 6              A     I'm not sure who they were.  I don't

 7    think they were Rockwell.  It was a Rockwell-sponsored

 8    team.

 9              Q     Who were they?

10              A     Who were they?  It may have been Lee

11    Foreman.

12              MS. AHERN:  I would caution you not to

13    reveal privileged communications that you may have had

14    with counsel for Rockwell.  The substance of those

15    communications would remain privileged.

16              Q     (BY MR. SORENSEN)  Do you know who

17    Mr. Foreman is?

18              A     There was -- there is a law firm here in

19    Denver that Rockwell retained, and some of those people

20    were people I talked to.

21              Q     Did you testify before the grand jury?

22              A     No, I did not.
```

23        Q    Were you ever issued a target letter?

24        A    Yes, I was.

25        Q    When was that?

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    107

 1              A    The early nineties, but I don't remember

 2    exactly when.

 3              Q    What became of that?

 4              A    Nothing.  I turned it over to my

 5    attorney and --

 6              Q    Were you ever informed by the Government

 7    that they were not going to indict you, or did you ever

 8    get any official communication?

 9              A    I don't -- I don't think I ever got any

10    official communication from the Government.

11              Q    So it just kind of faded away?  I don't

12    mean to be facetious.  I'm just trying to understand

13    what happened to it.

14              A    My understanding was that a part of the

15    plea agreement was that no individuals would be --

16    would be targeted.

17              Q    I'm sorry.  Your understanding of the

18    plea agreement was that no individuals would be

19    indicted?  Is that your understanding?

20              A    Yes.

21              Q    Where did you get that understanding

22    from?  An attorney?

23              A    Yes.

24          Q    Okay.  Which -- what's the name of the

25     attorney you're talking about?

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    108

1          A    I had my personal attorney.

2          Q    Who was your -- who was your personal

3     attorney?

4          A    His name is Vince Maurella.  I think

5     it's M-a-u-r-e-l-l-a.

6          Q    Now, did you hire him specifically as a

7     result of the FBI raid?

8          A    As a -- in the aftermath of that, yes.

9          Q    You hired him personally; is that right?

10         A    Yes.

11         Q    Did you pay his fee?

12         A    No.

13         Q    Who paid it?

14         A    I assume Rockwell.

15         Q    You don't know?

16         A    I never was involved in that part of it.

17         Q    Well, when you say you hired

18     Mr. Maurella, was there some discussion of paying him?

19         A    There was.  And I believe that

20     discussion was that after his conversations with

21     Rockwell counsel, that they would be handling any of

22     his fees.

23         Q    So do you know what his fees were?

24          A    I have no idea.

25          Q    You have -- all right.  Do you know, for

                 CARPENTER REPORTING, INC.
                      (303) 752-1200

                                                    109

1    instance, what he charged by the hour at this time?

2          A    I never asked.

3          Q    Do you know if he was representing other

4    Rockwell employees other than yourself?

5          A    I believe it was just me.

6          Q    In connection with your preparation to

7    testify in this case, have you reviewed the notes of

8    your FBI interview?

9          A    No.

10         Q    Have you reviewed the notes of your

11   interview by lawyers, Rockwell lawyers?

12         A    No.

13         Q    Other than your interview by the FBI and

14   your interview by Mr. Foreman or in connection with

15   lawyers interviewing you, were you interviewed by, for

16   instance, DOJ investigators?

17         A    No.

18         Q    Were you interviewed just once by the

19   FBI?

20         A    I don't remember.  They were at the

21   plant site for some three weeks.  I don't remember.

22         Q    Did they interview you on site?

23         A    Yes.

24         Q    How soon after the raid; do you

25    remember?

CARPENTER REPORTING, INC.
(303) 752-1200

110

1              A    No, I don't.

2              Q    Do you know when you got your target

3    letter in relation to the date of the raid?

4              A    Only that it was in the early nineties.

5              Q    Do you remember more specifically

6    whether it was 1990 versus 1991?

7              A    I don't.

8              Q    Do you know who else got target letters?

9              MS. AHERN:  Objection.  Foundation.

10   Calls for speculation.

11             MR. SORENSEN:  I'm just asking if he

12   knows.

13             A    I -- at one time, I knew.  I never knew

14   how many were issued and exactly who was issued them.

15   I thought I knew at one point a couple of other people

16   who had gotten them.

17             Q    (BY MR. SORENSEN)  Who?

18             A    I -- again, this is -- this is

19   information that I think I remember receiving, and I

20   believe one was Ed Naimon and I believe one was Chris

21   Bader.

22             Q    Do you know anyone else who got one?

23             A    I don't think so.  I can't recall that I

24   knew any others.

25          Q     Where did you get this information from?

CARPENTER REPORTING, INC.
(303) 752-1200

111

1          A     I can't -- I'm not sure.

2          Q     Do you know whether Mr. Blaha got one?

3          A     No, I don't.

4          Q     You don't know one way or the other?

5          A     I don't know.

6          Q     Okay.  After you received -- let me

7     start again.  When you received this target letter, I

8     take it you were no longer working at Rocky Flats;

9     correct?

10          A     That is correct.

11          Q     Okay.  I was asking you earlier about

12    these briefings you received having to do with MUF, and

13    I was a little unclear as to the -- whether some of

14    these briefings were in written form.  Were they?

15                MS. AHERN:  Objection.  Vague.

16          Q     (BY MR. SORENSEN)  Go ahead.

17          A     I received overhead briefings where I

18    believe I had a hard copy of that briefing.

19          Q     Do you know whether these briefings

20    still exist?

21          A     Excuse me?

22          Q     Do you know whether these briefings

23    still exist?  These --

24          A     I do not know.

25          Q     Have you seen them in connection with

CARPENTER REPORTING, INC.
(303) 752-1200

112

1    preparing to testify in this case?

2           A    No, I have not.

3           Q    Okay.  Have you read articles about the

4    grand jury in this case and who, if any, they -- who

5    they wanted to indict?  Have you read about it?

6               MS. AHERN:  Objection.  Relevance.

7               MR. SORENSEN:  Just asking him.

8           A    I know that at some point in the past --

9    in the nineties, I saw newspaper articles about the

10   grand jury, but I don't remember the content.

11          Q    (BY MR. SORENSEN)  Okay.  Now, there was

12   some kind of a grand jury report that came out.  Do you

13   recall anything about that?

14          A    No, I don't.

15          Q    Okay.  Now, you said, I believe, that

16   your understanding was that, as part of Rockwell's plea

17   agreement, that no individuals would be indicted; is

18   that correct?

19          A    Yes.

20          Q    Did you have any personal participation

21   in the plea negotiations?

22          A    No.

23          Q    When did you -- let me start again.

24               Before Rockwell pled guilty, how long

25   before they pled guilty did you understand that, as

CARPENTER REPORTING, INC.
(303) 752-1200

113

1    part of them pleading guilty, you would not be

2    indicted?

3                    MS. AHERN:   Objection.   Foundation.

4            A    The only information I got about that

5    was through my attorney.

6            Q    (BY MR. SORENSEN)   Okay.   I'm just

7    asking when.

8            A    And I don't -- I don't remember.

9            Q    Okay.   Well, let me ask you this:   Did

10   it occur before Rockwell pled guilty?   In other words,

11   were you told at some point before Rockwell pled guilty

12   that as part of this plea that they were about to enter

13   into, you would not be indicted?   Is that the sequence

14   of events?

15           A    I was -- I was told that, if an

16   agreement was reached, Rockwell would insist on -- on

17   the fact that no individuals would be pursued.

18           Q    Okay.   But in terms of -- of -- was that

19   as much assurance as you got before they actually

20   literally pled guilty?

21           A    Yes.

22           Q    Okay.   And then, once they pled guilty,

23   were you then informed that, in fact, that's what had

24   occurred?

25           A    Only -- only through my attorney.

                    CARPENTER REPORTING, INC.

(303) 752-1200

114

1           Q      Okay.  Did you see the plea agreement

2      that Rockwell entered into before they signed it?

3           A      No.

4           Q      Did you have any training with respect

5      to RCRA while you were working at Rocky Flats?

6           A      Yes.

7           Q      What training did you receive?

8           A      As DOE was instructing us that RCRA

9      would be -- begin to be applied to -- to the plant, we

10     began to get -- solicit experts to begin to train us on

11     what that would entail.  There were a number of people

12     who were brought in -- and I can't name them -- to

13     begin to indoctrinate us in RCRA and its application,

14     and that was ongoing.

15          Q      When did this training start?

16          A      Oh, boy.  I'm going to say around 1985,

17     but I'm not certain.

18          Q      And do you remember any of the people

19     who did this training?

20          A      I do not.

21          Q      And do you remember how much training

22     you got?

23                 MS. AHERN:  Objection.  Vague.

24          Q      (BY MR. SORENSEN)  In terms of you spent

25     a day, you spent a week?  You were in a course for a

115

1    month?  Any way of characterizing it?

2         A    I don't -- I don't remember the details

3    of it.  It was -- there were several time periods in

4    which various levels of training were provided, an

5    indoctrination.  I attended all of them, but I don't --

6    I don't remember the duration of it or the -- how many

7    there were.

8         Q    Can you estimate it at all for me?

9         A    I -- I just can't.

10        Q    Okay.  Did you have any responsibilities

11   for compliance with RCRA?

12        A    Yes, I did.

13        Q    And when did those responsibilities

14   start, in your mind?

15        A    As soon as DOE informed us that RCRA

16   would be applied to the Rocky Flats plant.  As a part

17   of my operation in waste -- in plutonium ops, plutonium

18   operations, I had the waste management organization,

19   so, from that point on, my organization was going to be

20   heavily involved in the -- in bringing the plant into

21   compliance.

22        Q    So about when did this --

23        A    Again, that would -- since I took the

24   organization over in late '85, it was after that, but I

25   don't remember specifically when.

116

1           Q     Okay.  At the time you -- that you took

2    over this responsibility, did you have an understanding

3    that Rockwell was in violation of RCRA and that it had

4    to be brought into compliance, or did you have any

5    understanding?

6           A     Not -- not at that point.

7           Q     When, if any -- start again.

8                 When, if at any date, did you have some

9    understanding that Rockwell was in violation of RCRA?

10                MS. AHERN:  Objection.  Argumentative.

11   Vague.

12          A     At some time in 1986, shortly after I --

13   I had taken over that operation, as we began to

14   understand what the application of RCRA would mean to

15   our facility, we began to lay out what needed to be

16   done to bring the plant into compliance.

17          Q     (BY MR. SORENSEN)  When you say that,

18   bring it into compliance, does that mean that at that

19   time, before these steps had been taken, it was your

20   view that Rockwell was out of compliance with RCRA?

21                MS. AHERN:  Objection.  Vague.

22          A     We were operating the plant to the DOE

23   regulations and felt we were in full compliance with

24   those.  We were now faced with a different set of

25   compliance orders, and we had to ascertain what the

                   CARPENTER REPORTING, INC.
                        (303) 752-1200

1    differences were, what we needed to do differently to

2    bring the plant into compliance under RCRA.

3           Q    (BY MR. SORENSEN)  Was there something

4    that you thought you had to do to bring Rockwell into

5    compliance with RCRA?

6           A    Yes.

7           Q    What do you think had to be done?

8           A    The -- RCRA involves a different way of

9    managing waste than the DOE regulations.  And as DOE

10   informed us, that various waste forms would now be also

11   regulated per the RCRA regulations.  We had to begin to

12   set up our buildings to properly handle and store those

13   waste forms under the RCRA regulations.

14          Q    So, before these steps were taken, it

15   was your view that Rockwell was not in compliance with

16   RCRA; correct?

17              MS. AHERN:  Objection.  Calls for a

18   legal conclusion.  Vague.

19          A    It would -- it was my view that -- that

20   Rockwell had not been told to handle its waste forms

21   under the RCRA regulations, but under the DOE AEC

22   regulations.

23          Q    (BY MR. SORENSEN)  I understand that,

24   but you obviously thought that these steps were

25   required, did you not, in order to bring Rockwell into

1    compliance?

2              A    Yes.

3              Q    And that if these steps were not taken,

4    Rockwell would not be in compliance with RCRA; correct?

5              A    Yes.

6              Q    Okay.  Now, when you say a different way

7    of managing waste -- RCRA required a different way of

8    managing waste, what did you mean by that?

9              A    There are a lot of aspects to it,

10   including the labeling that is placed on waste

11   containers, the formality of temporary storage of waste

12   containers, and -- and more permanent storage.  There

13   are a lot of aspects to it.

14             Q    Let me ask you this:  Were there any

15   waste practices that Rockwell was engaging in, such as

16   spray irrigation, use of solar ponds, or anything

17   else -- were there any waste management practices that

18   Rockwell was engaging in that, in your view, would need

19   to be changed if Rockwell was to come into compliance

20   with RCRA?

21             MS. AHERN:  Objection.  Vague.

22             A    The -- the compliance agreement that was

23   entered into by the Department of Energy with the EPA

24   and the Colorado Department of Health provided us

25   guidelines for performing certain actions, including

CARPENTER REPORTING, INC.
(303) 752-1200

119

1   the permit preparation and to begin to bring the plant

2   into full compliance with RCRA.  The -- for most of our

3   waste forms -- almost all -- that was the first time

4   that we received definitive guidance from the

5   Department of Energy on what was expected of us as the

6   operating contractor and, indeed, what waste forms

7   would be considered under that.

8           Q    (BY MR. SORENSEN)  Okay.  But getting

9   back to my specific question, was there some specific

10   waste management practice that, when you looked at

11   RCRA, you came to the conclusion that we have to change

12   this?  We have to stop spray irrigating, we have to

13   stop using the solar ponds, we have to do something

14   else with the way we're managing waste in order to come

15   into compliance with RCRA?  Was there anything like

16   that?

17           MS. AHERN:  Objection.  Vague.  Calls

18   for a legal conclusion.

19           A    As a part of the compliance agreement,

20   we were giving -- given specific guidance and

21   instruction on what to do with the solar ponds in

22   particular.  And part of that was that, except in some

23   circumstances, they would not be used anymore as a part

24   of our waste management.  And in fact, they would be

25   remediated.

CARPENTER REPORTING, INC.
(303) 752-1200

120

1           Q    (BY MR. SORENSEN)  Why?  Because they

2      were leaking into the groundwater?

3                    MS. AHERN:  Objection.  Foundation.

4           Q    (BY MR. SORENSEN)  Was that why?

5                    MS. AHERN:  Objection.  Calls for

6      speculation.  Foundation.

7           Q    (BY MR. SORENSEN)  Go ahead.

8           A    I don't know why the Department of

9      Energy decided with the regulators that the solar ponds

10     would be one of the areas of -- of priority.

11          Q    Well, at the time you were working at

12     Rocky Flats, you were aware, were you not, that the

13     solar ponds were leaking contaminants into the

14     groundwater?

15                    MS. AHERN:  Objection.  Foundation.

16     States facts not in evidence.

17          Q    (BY MR. SORENSEN)  Did you know that?

18          A    I knew it at some time.  I'm not exactly

19     sure when I became aware of -- of the leaking solar

20     pond.

21          Q    Okay.  I'm sorry.  Were you finished?

22     All right.  So your understanding is that the

23     consequence of this agreement you mentioned, which was

24     in the 1986 -- is that right?

25          A    I believe so.

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    121

1           Q    -- is that the solar ponds had to be

2    closed; is that right?

3           A    I -- I believe that's the way it was

4    called out.

5           Q    Okay.  Again, getting back to my

6    question, was there some particular waste management

7    practice, whatever it might be, that you, in your view,

8    when you got yourself familiar with RCRA, you came to

9    the conclusion we have to make some change, stop doing

10   this, change the way we're doing this in order to come

11   into compliance with RCRA?  Is there any such example?

12              MS. AHERN:  Objection.  Compound.  Calls

13   for a legal conclusion.

14          A    The solar ponds are an area that comes

15   to mind.

16          Q    (BY MR. SORENSEN)  Okay.

17          A    That's -- because it was specifically

18   spelled out, I began to get more knowledgeable about

19   the solar ponds and our use of them.  I had just

20   recently taken over the organization, so, in that time

21   frame, yes.

22          Q    But that was spelled out in the

23   agreement --

24          A    Yes.

25          Q    -- correct?  I'm talking about something

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                        122

1    that you separately came to a conclusion about, if

2    there is anything.  If there's nothing, just tell me

3      that.  I'm just trying to find out, other than solar

4      ponds, which were specified in that 1986-ish agreement,

5      was there something that you, in your role that you had

6      at Rocky Flats, came to your own conclusion about with

7      respect to some change that had to be made with some

8      waste management practice as a result of RCRA?  Is

9      there anything?

10             A    I -- I think I've mentioned labeling,

11     our waste storage practices, our collection practices.

12     There were changes we had to make there.

13             Q    Waste storage practices.  What do you

14     mean by that?  What, specifically, are you talking

15     about?

16             A    RCRA has specific requirements for how

17     long waste can be accumulated at various points, how

18     the labeling must be done, how often it must be

19     inspected, and at -- how long they can be held before

20     they must be moved to a -- for example, a permitted

21     storage site.  So there were a lot of things we had to

22     do in our buildings to -- to bring them into compliance

23     with the RCRA practices and regulations.

24             Q    Okay.  And then you said collection.

25     What do you mean by "collection"?  You said labeling,

123

1      waste storage practices, and then you said something

2      about collection.

3          A    Well, I meant by that collection of the

4    waste containers at various points throughout the

5    buildings.

6          Q    Where are you staying while you're here?

7          A    At the Marriott.

8          Q    And you said you had some conflict

9    tonight about going past 6; is that right?

10         A    My wife is in town.

11         Q    Understood.

12         A    The biggest conflict you can imagine.

13         Q    Say no more.

14         A    Yes.

15              MS. AHERN:  We also can't stay in this

16    building past 6.  They will kick us out for security

17    reasons.

18              MR. SORENSEN:  That's another conflict.

19    You people are obviously slackers.

20              MS. AHERN:  You tell me.

21         Q    (BY MR. SORENSEN)  Tomorrow, I

22    understand you have a conflict past noon; is that

23    right?

24         A    Yes.  We had planned to spend the

25    weekend with our children.

CARPENTER REPORTING, INC.
(303) 752-1200

124

1              MS. NOTEWARE:  Want to go off the

2    record?

3         Q    (BY MR. SORENSEN)  I want to know what

4      it is.

5                A    We planned to spend the weekend with our

6      children and grandchildren.  Since my wife came out for

7      this visit, we were going to do an early Christmas with

8      the grandkids.  That's the conflict.

9                Q    Okay.  All right.  You understand that

10     you're going to be called to the stand to testify in

11     front of a jury in just a few days?  Is that your

12     understanding?

13               A    Yes.

14               Q    All right.  Can you give me a list of

15     the areas -- the subject areas that you believe you are

16     going to testify about?

17               A    Oh, boy.  I'm not sure I can.  I have

18     been --

19               Q    Just do your best.

20               A    Hmm?

21               Q    Just do your best.

22               A    Okay.

23               MS. AHERN:  I object on foundation

24     grounds.  I'm not sure he knows.

25               Q    (BY MR. SORENSEN)  That's what I'm

                        CARPENTER REPORTING, INC.
                           (303) 752-1200

                                                              125

1      asking.

2                A    I -- I've not been told what it -- the

3      areas that they will ask me to testify in.  I have been

4    prepared in a number of areas from the standpoint of

5    being shown information, but I have not -- I don't know

6    how they are going to narrow that down to what they're

7    going to cover.

8           Q    You say you've been prepared in a number

9    of areas.  What are these areas?

10          MS. AHERN:  Object.  Attorney-client

11   privilege, and I'll instruct the witness not to answer.

12          Q    (BY MR. SORENSEN)  Are you going to

13   follow your counsel's instruction?

14          A    Yes, I am.

15          Q    Do you expect to testify about MUF?

16          MS. AHERN:  Asked and answered.

17          Q    (BY MR. SORENSEN)  Go ahead.  You can

18   answer.

19          A    I don't know.

20          Q    Did you have any involvement in the

21   measurement of the amounts of plutonium leaving the

22   Rocky Flats plant site and going off into the off-site

23   environment?  Did you have any role in that while you

24   were working at Rocky Flats?

25          A    I had no responsibility in that area.  I

                CARPENTER REPORTING, INC.
                    (303) 752-1200

                                                126

1    had some knowledge.

2           Q    So it was never part of your direct job

3    responsibility to be responsible for the measurement of

4    plutonium leaving the Rocky Flats plant site into the

5    off-site environment; is that correct?

6                    MS. AHERN:  Objection.  Vague.

7          A    It was never a part of my organization's

8    responsibility, with the caveat that once I became the

9    assistant plant manager, I think everything becomes a

10   part of my responsibility.

11         Q    (BY MR. SORENSEN)  Do you have any

12   training in the measurement of plutonium in the

13   off-site environment near Rocky Flats?

14         A    No formal training.

15         Q    What was the part of Rocky Flats that

16   was in charge of on- and off-site monitoring of

17   plutonium in the air?

18         A    Health, safety, and environment.

19         Q    Were you ever -- were you ever a part of

20   that department?

21         A    No.

22         Q    Do you believe that you're going to

23   testify to this jury about the subject of the accuracy

24   of the on- or off-site monitoring for plutonium in the

25   air?

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                    127

1          A    I don't know.

2          Q    Well, have you ever examined that

3    question?  The accuracy of the monitors?

4          A    I had some knowledge about them, but not

5    extensive.

6            Q    My specific question was:  Have you ever

7    examined, analyzed the accuracy of any of the on- or

8    off-site plutonium and air monitors run by Rockwell,

9    Dow, CDH, or anyone else in and around Rocky Flats?

10   Have you ever done that?

11           A    Personally, no.

12           Q    Have you ever personally been involved

13   in analyzing the health risks to people off-site from

14   Rocky Flats presented by exposures to plutonium or

15   other substances released from Rocky Flats?

16               MS. AHERN:  Objection.  Vague.

17           A    I would -- I have never been involved in

18   the analysis.

19           Q    (BY MR. SORENSEN)  Do you expect to

20   testify about that subject to this jury?

21           A    I -- I would be surprised if I were

22   asked to testify in that area.

23           Q    Have you looked at the transcript of the

24   testimony of Mr. Lipsky?

25           A    I did read Mr. Lipsky's transcript.

                 CARPENTER REPORTING, INC.
                      (303) 752-1200

                                                     128

1            Q    Do you expect to testify to this jury

2    concerning your views of Mr. Lipsky's testimony?

3                MS. AHERN:  Objection.  Vague.

4    Ambiguous.

5            Q    (BY MR. SORENSEN)  I'll ask a different

6    question.  Have you formed any views about Mr. Lipsky's

7    testimony?

8          A    I did review Mr. Lipsky's transcript and

9    I saw him on the stand when he came back to testify.  I

10    have not really formed any views about it, other than

11    it was very hard to get any answer out of Mr. Lipsky.

12          Q    Is that the only view that you have

13    formed as you sit here of Mr. Lipsky's testimony in

14    this case?  Is that your testimony?

15          MS. AHERN:  Objection.  Vague.

16    Ambiguous.

17          A    I -- I'm not sure what to -- what to add

18    to that.

19          Q    (BY MR. SORENSEN)  Okay.  I'll ask you

20    more specific questions.  Were you in court when the

21    overfly video or tape was shown?  Do you know what I'm

22    talking about?

23          A    Yeah.  Yeah.  I'm trying to remember.  I

24    think I did see that.  Okay.

25          Q    Did you have any reactions or views when

CARPENTER REPORTING, INC.
(303) 752-1200

129

1    you saw that?

2          A    No.  I think, after all these years,

3    that's the first time I ever saw it.  Okay?

4          Q    Had you heard about it?  I didn't mean

5    to cut you off.

6          A    No.

7          Q    Okay.  Had you heard about it before

8     then?

9          A    Oh, yes.

10         Q    Okay.  Have you formed any views about

11    it that you plan to share with this jury?

12              MS. AHERN:  Objection.  Vague.

13         A    I -- not really.  I'm -- I'm not an

14    expert in that area.

15         Q    (BY MR. SORENSEN)  That's an overflight

16    of -- at least as described in court -- of operations

17    at -- at an incinerator at Rocky Flats; is that

18    correct?

19              MS. AHERN:  Objection.  Vague.

20    Misstates the record.

21         A    That was certainly part of it.

22         Q    (BY MR. SORENSEN)  Part of -- part of

23    what the video was --

24         A    Uh-huh.

25         Q    -- described as showing; is that right?

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                    130

1          A    Yes.

2          Q    Okay.  Which incinerator was that?

3          A    That was the plutonium recovery

4     incinerator in 771 building.

5          Q    771 building.  Do you have any knowledge

6     of -- of whether that incinerator was run illegally or

7    not?  Do you have any personal knowledge?

8                   MS. AHERN:  Objection.  Vague and

9    ambiguous.  Calls for a legal conclusion.  You can

10   answer.

11          A    It was my building and my

12   responsibility, my people.  Certainly, very involved in

13   the investigations that were done.  I talked to all my

14   people, all my management staff, so yes, I did form an

15   opinion about whether or not that incinerator had been

16   run.

17          Q    (BY MR. SORENSEN)  And what was your

18   opinion?

19          A    I'm convinced that it did not run in

20   that time period.

21          Q    What time period are you talking about?

22          A    I believe the -- the time periods in

23   question were December of '88.  I think I have the

24   dates right.

25          Q    Do you plan to testify to that effect to

                   CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                   131

1    this jury?

2          A    I don't know.

3          Q    Okay.  Do you have an understanding on

4    whether you'll be asked to testify on that particular

5    subject to this jury?

6          A    I don't know.

7          Q    You have no idea?

8          A    I -- it's an area that I would expect

9     my -- I might be asked about, but I don't know for sure

10    that I will be.

11         Q    Now, when you say you spoke with your

12    people -- before I get to that, were you present at the

13    building in the time period that it was alleged to have

14    been run illegally --

15              MS. AHERN:  Objection.  Vague and

16    ambiguous.

17         Q    (BY MR. SORENSEN)  -- in December of

18    '88?

19         A    I can't remember.  I visited those

20    buildings frequently, but I can't remember those dates.

21         Q    Are you going to tell this jury that you

22    don't remember?  Are you going to tell this jury that

23    you -- is that what you're going to tell the jury that

24    you just don't remember whether you were there or not?

25         A    That's --

CARPENTER REPORTING, INC.
(303) 752-1200

132

1              MS. AHERN:  Dates, times?  The question

2     is vague and ambiguous.  You need to be more specific.

3          Q    (BY MR. SORENSEN)  In December of '88.

4     Okay.

5              MS. AHERN:  That's still insufficiently

6     vague.

7          Q    (BY MR. SORENSEN)  During the shutdown

8    of Building 771, with the able assistance of my

9    colleague.  Do you know what time period I'm talking

10    about now?

11          MS. AHERN:  There's a lot of days.

12    You're asking him if he was physically present at the

13    plant site during what must have been a course of

14    several months?  Do you want to know if he was at the

15    plant site every single day or every single waking

16    moment of the day?

17          Q   (BY MR. SORENSEN)  Did you read

18    Mr. Avery's testimony in this case?

19          A   I was there for Mr. Avery's testimony.

20          Q   All right.  And didn't he testify that

21    he personally was present when the incinerator was

22    running when it should not have been running?

23          A   Yes, he did.

24          Q   Were you present physically at the

25    building at the time that he was talking about?

CARPENTER REPORTING, INC.
(303) 752-1200

133

1          A   The -- I believe the time frame he was

2    talking about was -- was a Friday, Saturday, and

3    Sunday.  It's very likely, but I have -- I can't

4    recall -- that I might have been there on a Friday.  I

5    probably wasn't there on a Saturday or Sunday.

6          Q   Okay.

7          A   Okay.

8        Q      So did you form any opinion about

9   Mr. Avery's testimony?

10       A      Yes.

11       Q      And what was your opinion?

12       A      That he's mistaken.

13       Q      And that's based on what?

14       A      All the investigations and data that has

15   been collected that I had reviewed in that time period.

16       Q      But, as you just said, you were not

17   physically present for at least two of the three days

18   that Mr. Avery was -- was personally present and

19   testified about; correct?

20              MS. AHERN:  I object.  Vague and

21   ambiguous.  You didn't specify the specific days.  We

22   still haven't.

23       A    I -- I certainly don't recall being

24   present on that weekend in particular.  It's not out of

25   the question, but I -- I can't remember.

CARPENTER REPORTING, INC.
(303) 752-1200

134

1        Q      (BY MR. SORENSEN)  And you can't swear

2   to the jury that you were present; correct?

3        A      Absolutely.  I cannot swear that I was.

4        Q      Okay.  Then you said that you spoke with

5   your people about that incinerator issue.  Are you

6   talking about in connection with preparation to testify

7   in this case or back during the FBI investigation?

8        A      During the FBI investigation.

9          Q     All right.   When you say you spoke with

10    your people, who are you talking about?

11          A     Talking about the management staff

12    responsible for those operations, including the foremen

13    involved.

14          Q     Who are these people?  Do you remember

15    any of their names?

16          A     Well, at that time, I believe the

17    manager of plutonium recovery operations was -- was Dee

18    Sherrill.  The building manager, I believe, was John

19    Bretzke.

20          Q     What's the last name?

21          A     Bretzke.

22          Q     Bretzke.

23          A     B-r-e-t-z-k-e.  I don't remember the --

24    the management levels, necessarily, below that with the

25    exception of a few of the foremen.  And -- but there --

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                             135

1     there was an extensive investigation done.

2          Q     Well, besides speaking with these

3     managers, did you speak with any of the lower level

4     employees personally?

5          A     Yes.

6          Q     Who?

7          A     I don't recall.

8          Q     Did you speak with Mr. Avery?

9          A     Probably, but I don't recall.  No.

10    Wait.  I don't know.  I don't know if I did.

11          Q     All right.  So you can't swear to this

12    jury that you did; correct?

13          A     I cannot, yes.  That's right.

14          Q     Okay.  How many employees were there

15    below management level at that time in 1988 in Building

16    771?

17          A     771 could have had -- did have several

18    hundred employees.  May have had as many as 4- or 500.

19          Q     And how many of those did you speak with

20    personally as part of this investigation that you've

21    been talking about?

22          A     Principally, the management chain.

23          Q     So how many people is that?

24          A     Half a dozen, perhaps.  But there was a

25    formal investigation being pursued from a number of

CARPENTER REPORTING, INC.
(303) 752-1200

136

1    avenues and I was not a member of that investigation

2    team, so I didn't pursue my personal investigation.  I

3    waited for the results to be presented.

4          Q     Who was in charge of that formal

5    investigation team?

6          A     I don't know.  I can't remember.  There

7    was a Rockwell investigation team.  I believe there was

8    a Department of Energy investigation team.  And I don't

9    remember who headed those up.

10          Q     And did these different teams -- the

11     Rockwell team, the DOE team, did they produce written

12     reports?

13          A     Yes, they did.  To my recollection, they

14     did.

15          Q     And have you looked at those written

16     reports recently, meaning --

17          A     I don't think so.

18          Q     Okay.  Have you been shown any documents

19     that you understand will be used as exhibits in your

20     direct testimony in this case?

21          A     I have shown -- I have been shown

22     some -- some potential exhibits.  I'm not sure it was

23     ever said they would be used for my testimony.

24          Q     Okay.  What are these potential

25     exhibits?

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                    137


1          A     Time lines.

2                MS. AHERN:  Mr. Weston, I would counsel

3     you not to reveal attorney-client communications with

4     counsel.

5          A     Then I don't feel comfortable going any

6     further than that.

7                MR. SORENSEN:  Ms. Ahern, are you

8     instructing him not to answer?

9                MS. AHERN:  I don't have an objection

10    with what he said thus far, but if we go any further

11    than that, I think you are improperly probing into the

12    attorney-client communications between he and

13    Kirkland & Ellis, attorneys for Rockwell and for

14    Mr. Weston.  Yes, if you continue to ask questions, I

15    will probably instruct him not to answer.

16              MR. SORENSEN:  Okay.  Let's keep going.

17         Q    (BY MR. SORENSEN)  You said you have

18    been shown some time lines.  Let's stick with that.

19    Are these time lines prepared by Kirkland & Ellis or

20    ones prepared by the plaintiffs; do you know?

21         A    I -- I think they are Kirkland & Ellis

22    time lines.

23              MS. AHERN:  To the extent that you

24    testify about the content of those documents, I would

25    object.

CARPENTER REPORTING, INC.
(303) 752-1200

138

1         Q    (BY MR. SORENSEN)  All right.  Can you

2    tell me what these time lines show?

3              MS. AHERN:  I object, and I instruct the

4    witness not to answer.

5         Q    (BY MR. SORENSEN)  Are you going to

6    follow your counsel's advice?

7         A    Yes, I am.

8         Q    All right.  Other than these time lines,

9    what other potential exhibits have you been shown?

10         A    Building layouts.

11          Q     What buildings?

12          A     I'm uncomfortable with -- with pursuing

13    this, but 771 building.

14          Q     What else?

15          A     Specific areas within the building.

16          Q     What areas?

17          A     The process areas.

18          Q     Any other buildings besides 771?

19          A     I don't think so.

20          Q     Do you know -- go ahead.  Are you done?

21          A     Yes.

22          Q     Do you know what the purpose is of -- of

23    the 771 building and process area layout?

24              MS. AHERN:  I object, and I instruct the

25    witness not to answer with regard to the content of any

CARPENTER REPORTING, INC.
(303) 752-1200

139

1    communications with counsel.

2          Q     (BY MR. SORENSEN)  Are you going to

3    follow your counsel's instructions?

4          A     Yes, I am.

5          Q     Do you believe that you will be

6    testifying about the off-site impact of any of the

7    conduct to which Rockwell pled guilty?

8          A     Would you repeat that?

9              MR. SORENSEN:  Sure.  Can you read that

10    back to him, please.

11          (The referred-to question was read by

12   the reporter.)

13          A    I don't know.

14          Q    (BY MR. SORENSEN)  You have no idea as

15   you sit here a few days before your testimony; is that

16   what you're saying?

17          A    Yes.  I have no idea.

18          Q    Okay.  Have you ever investigated that

19   question?

20          A    The off-site impact?

21          Q    Of any of the conduct to which Rockwell

22   pled guilty.  Let me back up.

23          You're aware of the conduct to which

24   Rockwell pled guilty?

25          A    Yes, I am.

CARPENTER REPORTING, INC.
(303) 752-1200

140

1          Q    Okay.  Have you ever conducted an

2    investigation, yourself, of the off-site impact of any

3    of that conduct?

4          A    No, I have not.

5          MR. SORENSEN:  Okay.  I'm going to take

6    a short break and chat with my colleague.

7          (There was a recess taken from 5:24 p.m.

8    to 5:26 p.m.)

9          (Marked for identification was

10   Deposition Exhibit No. 4.)

11          Q    (BY MR. SORENSEN)  This is marked as 4.

12      Mr. Weston, what has been marked as Exhibit 4 is titled

13      Plaintiff's Supplemental Sentencing Memorandum.  Do you

14      see that?

15              A    Yes, I do.

16              Q    Have you seen this before?

17              A    I believe so.

18              Q    When was the first time you saw it?

19              A    I'm not certain.

20              Q    When was the last time you saw it?

21              A    In the last few weeks.

22              Q    Okay.  And in preparation for your

23      testimony in this case?

24              A    I believe so.

25              Q    Okay.  Could you turn to page 2,

1       footnote 1, please.  Do you see the first sentence that

2       states, "The crimes charged bear a substantial

3       similarity to the violations and types of violations

4       alleged in the search warrant, even though the warrant

5       was based on preliminary evidence"?  Do you see that

6       sentence?

7               A    Yes, I do.

8               Q    Do you have any basis to dispute that

9       sentence?

10              A    No.

11              Q    Do you plan to dispute it in front of

12    this jury?

13              MS. AHERN:  Objection.  Foundation.

14         Q    (BY MR. SORENSEN)  I take it, since you

15    have no basis to dispute it, you won't dispute it if

16    asked about it in front of a jury; correct?

17         A    I'm trying to -- give me a second to

18    read this.

19         Q    Sure.

20         A    I knew what -- I -- I had some idea of

21    what was in the affidavit for the search warrant, and I

22    have some idea of what was in the plea agreement.  To

23    me, there are differences, but I'm not certain I can go

24    much farther than that.

25         Q    Okay.  Can you turn to page 3, please.

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                        142

1          A    Yes.

2          Q    At the bottom of the page, it states,

3     "For many months, for example, Rockwell witnesses

4     denied any knowledge of a pondcrete problem before the

5     May 1988 spill.  Improper use of the solar ponds was

6     also denied.  The true facts were only learned after

7     persistent investigation."  Do you see that?

8          A    Yes, I do.

9          Q    Do you have any basis to dispute any of

10    those sentences?

11              MS. AHERN:  Do you understand what he's

12    asking you?

13          A    I'm reading this sentence again.

14          Q    (BY MR. SORENSEN)  Sure.  Take your

15   time.

16          A    I'm just not certain what is meant by "a

17   pondcrete problem."

18          Q    You don't think Rockwell had a pondcrete

19   problem?

20               MS. AHERN:  Objection.  Vague and

21   ambiguous.

22          A    We had a substantial packaging problem

23   with pondcrete.

24          Q    (BY MR. SORENSEN)  Okay.

25          A    Substantial problem.  I'm not -- we

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                              143

1    never denied -- the events of May 1988 with the spill

2    and some of the processing issues was new to us after

3    the spill, so I'm not sure what this "problem" means.

4          Q    If asked in front of this jury whether

5    you considered the crimes to which Rockwell pled guilty

6    to be technical violations, what would you say?

7          A    I'm not certain I'm qualified to answer

8    that.

9          Q    Is that what you'd say if you were

10   asked?

11         A    Yes.

12         Q    Now, could you turn to page 5 of this

13     document, please.

14              A     Yes.

15              Q     First full paragraph at the top,

16     second -- third sentence states, quote --

17                    MS. AHERN:  I'm sorry.  What page?

18              Q     (BY MR. SORENSEN)  Page 5, first full

19     paragraph at the top.  Simply put, Rockwell has pled

20     guilty to serious crimes involving 330 instances of,

21     underscore, knowing, felonious conduct, end underscore,

22     80 instances of, underscore, criminal negligence, end

23     underscore, from 1987 to 1989.  Do you see that?

24              A     Yes, I do.

25              Q     Do you have any basis to dispute that

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                144

1      sentence?

2                    MS. AHERN:  Objection.  Vague.

3      Ambiguous.

4              A     I don't know the details behind the

5      numbers, the 330 and the 80.  Criminal negligence,

6      felonious conduct, I'm just not, I don't think --

7                    MS. AHERN:  Let me interject a

8      foundation objection, as well.

9              Q     (BY MR. SORENSEN)  So you're not

10     qualified to dispute or comment on that sentence in any

11     way; is that correct?

12             A     I --

13                   MS. AHERN:  Objection.  Vague,

14   ambiguous.  Foundation.

15                  Q    (BY MR. SORENSEN)  Go ahead.

16                  A    I believe I understand the -- the

17   charges that Rockwell pled to.  I have no reason to

18   disagree with those charges.

19                  Q    Do you have any basis to disagree with

20   the specific sentence I just read to you?

21                  MS. AHERN:  Objection.  Foundation.

22                  A    I don't believe so.

23                  Q    (BY MR. SORENSEN)  Could you turn to

24   page 6, please.

25                  A    Yes.

CARPENTER REPORTING, INC.
(303) 752-1200

145

1                  Q    It talks in the first full paragraph

2   about the production and surveillance budget.  Do you

3   see that?

4                  A    Yes, I do.

5                  Q    Did you have any involvement, while you

6   were working for Rockwell, in the -- in that budget?

7                  A    Yes, I did.

8                  Q    What was your involvement?

9                  A    I had involvement in the -- particularly

10   in my years as a general staff member in preparation of

11   our budget requests, the production and surveillance

12   budget.  I certainly had responsibility for using that

13   budget when it was granted to us by the Department of

14    Energy.

15            Q    Can you please read that paragraph to

16    yourself, that paragraph that starts "The vast

17    majority" and runs to "regulations" on page 6 and tell

18    me when you're finished.

19            A    (Deponent reviewing exhibit).

20            MS. AHERN:  Bill, if, in the course of

21    any of these questions, you need to read any portion of

22    this document or you feel more comfortable if you read

23    more of this document, please feel free to do so.

24            THE DEPONENT:  Thank you.

25            Q    (BY MR. SORENSEN)  You can continue

CARPENTER REPORTING, INC.
(303) 752-1200

146

1    reading, Mr. Weston.  I want to focus you on the

2    question, if you need to, but the paragraph on page

3    6 -- you have read that paragraph; correct?

4            A    Yes, I have.

5            Q    My question:  Is that an accurate

6    description of what it's describing with respect to the

7    budget?

8            MS. AHERN:  If you need to read more of

9    this document to put the question in context, please

10    feel free to do so.

11            Q    (BY MR. SORENSEN)  Certainly, read

12    whatever you want to, but that's my question.

13            A    I don't -- if the question is -- would

14    you repeat the question?  I've read the paragraph.

15        Q    Sure.  Does that paragraph accurately

16   describe this production surveillance budget?

17             MS. AHERN:  Objection.  Foundation.

18        A    It -- it describes a part of the

19   process.

20        Q    (BY MR. SORENSEN)  Okay.  For the part

21   that it describes, does it describe it accurately?

22             MS. AHERN:  Objection.  Vague.

23        A    The Department of Energy certainly

24   provided us the production schedule and they certainly

25   provided us targets for our budgets and personnel

CARPENTER REPORTING, INC.
(303) 752-1200

147

1    levels.  And we did prepare requirements budgets,

2    trying to fit within those guidelines.  There was -- it

3    was an iterative process with -- with quite a bit of

4    back and forth before we reached final agreement.

5         Q    (BY MR. SORENSEN)  Well, is it -- I'm

6    sorry.  Go ahead.

7         A    But -- but I -- I agree with the

8    paragraph as far as it goes, yes.

9         Q    Okay.  The last sentence of this

10   paragraph that states, Based on this information,

11   Rockwell was told to prepare a, quote, requirements

12   budget, close quote, for operating Rocky Flats and

13   producing that many weapons or weapons components in

14   accordance with all laws and regulations, close quote.

15        Is that accurate?

16                    MS. AHERN:  Objection.  Vague and

17        ambiguous.

18            A     Requirements budget in quotes is a

19        little unfamiliar to me, but it -- in general, that

20        sentence, yes, is accurate.

21            Q     (BY MR. SORENSEN)  Okay.  Can you turn

22        to page 7, please.

23            A     Yes.

24            Q     The middle paragraph that begins, "Both

25        DOE and Rockwell."  Do you see that?

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                    148

1            A     Yes.

2            Q     Could you please read that to yourself

3        and tell me when you're finished.

4            A     (Deponent reviewing exhibit.)

5                    I have read it.

6            Q     Is there anything inaccurate about that

7        paragraph?

8            A     I believe it to be a little misleading.

9            Q     How so?

10           A     In that well -- well, the budget -- the

11       P&S budget was considered, quote, a lump sum that were,

12       in actuality, requirements that we work with the

13       Department of Energy before and get their agreement

14       before we would move substantial amounts of money

15       around within that budget.

16          Q    Was that a fixed requirement, or was

17    that simply a practice that had developed?

18               MS. AHERN:  Objection.  Foundation.

19          A    I believe that was --

20               MS. AHERN:  Go ahead.

21          A    I believe that was a requirement.

22          Q    (BY MR. SORENSEN)  What is that belief

23    based on?

24          A    My years of practicing and managing

25    within this budget system.

                CARPENTER REPORTING, INC.
                    (303) 752-1200

                                                    149

1          Q    Well, is there some written regulation

2    or contract provision or other written -- writing that

3    confirms what you just said?

4          A    I -- I can't recall that.  I'm not

5    familiar with the details of the contract that we have

6    with the Department of Energy, but I do know that, in

7    our efforts to move money around and -- and people,

8    that we -- it was required that we get DOE approval

9    before we made substantial changes.

10          Q    And what do you mean by "substantial"?

11    Is there some dollar limit that were considered to be

12    substantial?

13          A    I don't remember the limits, but if I

14    wanted to move people from, say, waste management to

15    plutonium recovery or R&D, I had to get their approval

16    to do that.  I could move a few, ones and twos, but, to

17    make any substantial change, particularly that -- that

18    might put at risk our ability to -- to meet the

19    schedules within that -- that area would require the

20    Department of Energy to concur.

21          Q    Can you turn to page 8, please.  And the

22    first full paragraph at the top of the page that starts

23    "In comparison to," do you see that?

24          A    Yes.

25          Q    Could you please read that paragraph to

                     CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                     150

1    yourself.

2          A    (Deponent reviewing exhibit.)

3              Okay.

4          Q    Do you have any --

5              MS. AHERN:  Hang on just a moment.

6          Q    (BY MR. SORENSEN)  Your counsel would

7    also like to read it.

8              MS. AHERN:  I read slower than you,

9    apparently.  Okay.

10          Q    (BY MR. SORENSEN)  Mr. Weston, do you

11    have any basis to say that any portion of this

12    paragraph is inaccurate?

13              MS. AHERN:  Objection.  Foundation.

14          A    I'm just uncomfortable with the

15    paragraph.  The -- the idea that the expenses

16    concerning many of the operations involving Rockwell's

17    crimes were quite small, I -- I'm just not certain I

18    agree with that.  And the given examples, I have no

19    reason to dispute.  There's just an awful lot more to

20    the areas that were involved in the plea agreement

21    than -- than what are mentioned here.

22            Q    (BY MR. SORENSEN)  Well, do you have any

23    specific basis -- and if so, please tell me what it

24    is -- to dispute anything that's contained in that

25    paragraph?

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                        151

1             MS. AHERN:  Objection.  Foundation.

2             A    The general statement, the first -- the

3     first sentence, I just feel that the expenses that we

4     had with the repackaging and -- and ultimately

5     reprocessing of much of the pondcrete was not an

6     insignificant number.

7             Q    (BY MR. SORENSEN)  What was the number?

8             A    I can't remember, but it was not small.

9     There were 17,000 blocks or whatever that needed to be

10    looked at and handled and -- and that was a daunting

11    task.

12            Q    Were you ever engaged in any

13    investigation of what those costs were?

14            MS. AHERN:  Objection.  Vague and

15    ambiguous.

16            A    Certainly, while I was at Rocky Flats,

17      we did several analyses and calculations of what it

18      would cost to -- to repackage, in particular, the

19      pondcrete.

20              Q    (BY MR. SORENSEN)  What did you come up

21      with?

22              A    I don't remember the numbers.

23              Q    The sentence at the end of the

24      paragraph, the 904 pad was built in August to

25      September 1987 for only $185,156, do you see that?

CARPENTER REPORTING, INC.
(303) 752-1200

152

1               A    Yes, I do.

2               Q    Do you have any basis to dispute that?

3                    MS. AHERN:  Objection.  Foundation.

4               Q    (BY MR. SORENSEN)  Your answer is no,

5       you don't?

6               A    I've never seen the number, that I can

7       recall.

8               Q    All right.  So you have no basis to

9       dispute it; correct?

10                   MS. AHERN:  Objection.  Foundation.

11      Argumentative.  Calls for speculation.

12              Q    (BY MR. SORENSEN)  Go ahead.

13              A    I -- I have no reason to dispute it.

14              Q    Okay.  Now, at the top of that

15      paragraph, it gives a figure of $408,236,000 for the

16      Rocky Flats total budget in fiscal year 1988.  Do you

17      see that?

18          A     Yes, I do.

19          Q     Do you have any basis to dispute that

20     figure?

21               MS. AHERN:  Objection.  Foundation.  We

22     haven't established any foundation that he has any

23     basis for any of these numbers one way or the other.

24          Q     (BY MR. SORENSEN)  Do you know anything

25     about that number, its accuracy one way or the other?

CARPENTER REPORTING, INC.
(303) 752-1200

153

1          A     I'm just not sure what "total budget"

2     means.  Is that the P&S budget?  Does it include the

3     capital budget?  I don't know what that means.

4          Q     In 1988, what was your position at Rocky

5     Flats?

6          A     I was the director of plutonium

7     operations.

8          Q     Okay.  Did you have any familiarity with

9     the budget of Rocky Flats at that time?

10          A     Yes, I did.

11          Q     What did you know about it?

12          A     At that time, I knew what the budgets

13     were.

14          Q     What were they?

15          A     I don't recall.

16          Q     Do you plan on testifying about the

17     budgets in front of this jury?

18                    MS. AHERN:  Objection.  Vague.

19    Foundation.

20            A    I have no idea.

21            Q    (BY MR. SORENSEN)  Okay.  Can you please

22    turn to page 9.

23            A    Yes.

24            Q    The bottom of page 9, and carrying over

25    to page 10, there are two paragraphs that are talking

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                    154

1     about budget surpluses.  Could you please read those to

2     yourself, please.

3             A    (Deponent reviewing exhibit.)

4                    MS. AHERN:  Mr. Weston, please feel free

5     to read as much as you like of the document in order to

6     become comfortable to answer the question.

7                    MR. SORENSEN:  I haven't asked a

8     question yet.

9                    MS. AHERN:  I understand that.

10            A    I've -- did you want me to read two

11    paragraphs?

12            Q    (BY MR. SORENSEN)  Yes.  The paragraph

13    that starts at the bottom of page 9, "Although Rockwell

14    complains," and running over to the end of the first

15    full paragraph on page 10 that ends, "Rockwell's

16    general budget.

17            A    Yes.  I've read those paragraphs.

18            Q    Okay.  Do you have any basis to dispute

19    what is contained in these two paragraphs about the

20    fact of budget surpluses?

21              MS. AHERN:  Objection.  Vague.

22    Ambiguous.  Foundation.

23         Q    (BY MR. SORENSEN)  You can answer.

24         A    I consider the paragraphs incomplete.

25         Q    Well, before we get to why they are

CARPENTER REPORTING, INC.
(303) 752-1200

155

1     incomplete, is there something that is factually wrong

2     with them?

3              MS. AHERN:  Objection.

4         Q    (BY MR. SORENSEN)  If so, please tell me

5     what it is.

6              MS. AHERN:  Objection.  Foundation.

7     Vague.  Ambiguous.

8         A    I -- I have -- I do not remember the

9     numbers.

10        Q    (BY MR. SORENSEN)  Okay.

11        A    I don't know if we ran budget deficits

12    or surpluses in that period, particularly for these --

13    these organizations.

14        Q    So how were they incomplete?

15        A    It's incomplete from the standpoint

16    that, oftentimes, we purposely try to run budget

17    surpluses in organizations so we can spend that money

18    in another organization.  Or, indeed, there was work

19    that was deferred into the next fiscal year, and we

20    would try and, with DOE's approval, have some

21    carryover, and so there were reasons why we may have

22    run surpluses.  And -- and those are my concerns.

23         Q    Okay.  Can you turn to page 11, please.

24    The top of the page, paragraph that starts, "The

25    investigation asked."  Do you see that?

CARPENTER REPORTING, INC.
(303) 752-1200

156

1         A    Yes, I do.

2         Q    Could you please read that paragraph to

3    yourself.

4         A    (Deponent reviewing document.)

5              I've read the paragraph, sir.

6         Q    Is there anything about it that you can

7    testify is inaccurate?

8              MS. AHERN:  Objection.  Foundation.

9    Vague and ambiguous.

10        A    My concern with the paragraph is I

11    remember instances where we alerted the Department of

12    Energy that it would be very difficult for us to

13    continue to operate within the regulations.  In Such

14    cases where no further money was forthcoming, we still

15    expected and planned to be able to comply.  Otherwise,

16    we would have ceased operations.  But that is my

17    concern with the paragraph.

18        Q    (BY MR. SORENSEN)  Let's take it one

19    step at a time.  The first sentence in this paragraph

20    states, "The investigation asks both DOE and Rockwell

21    budget and program managers to identify any instance

22    from 1987 to 1989 in which DOE had denied Rockwell

23    funding in a situation where Rockwell had explained to

24    DOE that a lack of funding would cause the plant to

25    break the law."  Do you see that sentence?

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                    157

1              A    Yes, I do.

2              Q    Can you identify any such instance

3    between 1987 and 1989?

4              MS. AHERN:  Vague and ambiguous.  I have

5    a foundation objection.  The -- the question is

6    ambiguous in terms of what is being referred to in that

7    sentence.  We don't know the underlying basis for the

8    sentence.  And from a foundation point of view, we

9    don't know the scope of the questions that the

10   investigation asked of these budgets and programmers

11   during that time period or what any caveats were on the

12   investigation at the time.  I don't know how you can

13   ask this witness to comment on that sentence and expect

14   him to be able to give you an accurate and complete

15   answer.

16             MR. SORENSEN:  It's -- it's -- well, go

17   ahead.  You can answer.

18             A    Again, one of the areas that I had

19   responsibility for in this time frame -- I'll come back

20    to pondcrete -- we had certainly alerted the Department

21    of Energy that we needed additional funding for the

22    repackaging and, in some cases, reprocessing of -- of

23    pondcrete that was stored on the pads.  That money was

24    not forthcoming.  While we weren't certain that we

25    would be in violation of any regulations, we were

CARPENTER REPORTING, INC.
(303) 752-1200

158

1    concerned about it.  And so -- so, again, that's my

2    concern and there were other instances.  You know, it

3    was our best effort to run that plant in full

4    compliance with all regulations.

5                 I believe, overall, we did a very good

6    job with it, but -- but it wasn't always easy and so

7    this -- this paragraph, I believe, is incomplete.

8                 Q     (BY MR. SORENSEN)  Was there any

9    instance in which you either personally or you

10    participated in -- was there any instance from '87 to

11    '89 in which you explained to DOE that a lack of

12    funding would cause the plant to break the law and yet,

13    DOE denied Rockwell the funding?  Is there any such

14    instance you can point me to?

15                 A     No.  I alerted DOE in several cases of

16    areas that we were at risk, but I did not tell them we

17    would absolutely break the law if the money wasn't

18    forthcoming.

19                 Q     Okay.  Now, this supplemental sentencing

20    memorandum, I believe, was responding to a filing by

21    Rockwell, which I do not have handy, but I was

22    wondering if you knew or had any participation in

23    Rockwell's filing.

24          A    Would you repeat that for me?  I'm not

25    sure I got it.

CARPENTER REPORTING, INC.
(303) 752-1200

159

1          Q    Sure.  I'll start again.  The Government

2    filed a sentencing memorandum.  Are you aware of that?

3          A    Yes.

4               MS. AHERN:  In March of '92?  Is that

5    what you're referencing?

6               MR. SORENSEN:  Yes.  March of '92.

7          Q    (BY MR. SORENSEN)  This document is

8    dated May '92.  May 28th.  Do you see that?  It's on

9    page 21.

10          A    Yes.

11          Q    I believe, in between here, Rockwell

12    filed something.  And my question is:  Did you have any

13    role in the preparation of what Rockwell filed?

14          A    No, I did not.

15          Q    Okay.  Can you turn to page 13, please.

16    Were you aware at some point when you were working at

17    Rocky Flats of the history of the 903 pad under Dow?

18               MS. AHERN:  Objection.  Foundation.

19    Vague and ambiguous.

20          Q    (BY MR. SORENSEN)  When I say "903 pad,"

21    do you know what I'm talking about?

22         A    Yes, I do.

23         Q    And during the time that you worked at

24    Rocky Flats, did you become knowledgeable in any way

25    about the history of Dow's operation of the 903 pad?

1         MS. AHERN:  Objection.  Vague.

2         A    Particularly as a member of the general

3    staff in the last several years I was at Rocky Flats, I

4    did -- I did get information on the history of that

5    pad, along with other sites at the plant site.

6         Q    (BY MR. SORENSEN)  And was this before

7    or after the problems with pondcrete developed?

8         MS. AHERN:  Objection.  Vague.

9    Ambiguous.  Both as to the word "problems" and the time

10   period.

11        A    Some of it could be coincident.  I mean,

12   we were beginning to learn about the sites that would

13   require remediation at the same time we were producing

14   pondcrete.  So a lot of this was going on at the same

15   time.

16        Q    (BY MR. SORENSEN)  When did you start

17   producing the pondcrete?  About '85?

18        A    We had actually produced some prior to

19   that, but the compliance agreement required us to

20   greatly step up production, and shortly after that, we

21   began to store pondcrete, which was new to us, so those

22      issues were ongoing.  About the same time I was coming

23      up to speed on some of these sites.

24              Q    Okay.  So is it your testimony that,

25      until 1985, you had no knowledge of the 903 pad?

CARPENTER REPORTING, INC.
(303) 752-1200

161

1               A    No, it is not.

2               Q    That's not your testimony?

3               A    It is not.

4               Q    All right.  So, before 1985, you had

5       some understanding that Dow had stored thousands of

6       drums of waste outside at the 903 pad; correct?

7                    MS. AHERN:  Objection.  Misstates the

8       record.

9               Q    (BY MR. SORENSEN)  I'm just asking him a

10      question.

11              A    Without knowing the details, I knew

12      that -- that plutonium-contaminated waste had been

13      stored outside.  I didn't know a lot of the details of

14      it.

15              Q    Okay.  But you knew that that had

16      resulted in some problems, such as leakage of plutonium

17      waste into the ground; correct?

18                   MS. AHERN:  Objection.  Vague and

19      ambiguous.  Misstates the record.

20              Q    (BY MR. SORENSEN)  Did you know that

21      before 1985?

22          A    I believe so.

23          Q    Okay.  Now, the -- the pondcrete blocks,

24     they were stored outside for a while; isn't that

25     correct?

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                    162

1          A    Yes, they were.

2          Q    Okay.  When -- when, if ever, were they

3     put inside a structure so that you could characterize

4     them as now being inside?

5          A    I believe that was late 1989.

6          Q    Okay.  And how long were they sitting

7     outside?

8               MS. AHERN:  Objection.  Vague and

9     ambiguous.

10              MR. SORENSEN:  As to what?  "Outside"?

11              MS. AHERN:  As to how long any

12     individual blocks were outside.  They were outside for

13     different lengths of time.

14              MR. SORENSEN:  That was a rhetorical

15     question.  I didn't really want to know.

16          Q    (BY MR. SORENSEN)  But go ahead.

17          A    I'm trying to get my dates right.  But I

18     believe starting in -- in the fall of '86 -- am I right

19     on that?  I'm trying to get my dates right when the

20     compliance agreements were.  We picked up production.

21     It was shortly after that that shipments were stopped

22     in Nevada and we began to store outside.  I believe

23        that was late '86.

24                 Q      By when would you say the total number

25        of blocks went into the thousands?

                            CARPENTER REPORTING, INC.
                                (303) 752-1200

                                                                163

1                 A      Let me -- in early -- we -- we began to

2        produce within a few months after that at a rate of

3        around 250 a week, so --

4                 Q      So, within just a couple of months,

5        you're into the thousands; correct?

6                 A      With some start-up time, but, certainly,

7        by early the next year, we -- we began to have large

8        numbers of blocks out there.

9                 Q      In the thousands; correct?

10                A      Building up to that, yes.

11                Q      Okay.

12                A      Uh-huh.

13                Q      Now, we've used the word -- I've used

14        the word, you've used the word "problems" with respect

15        to pondcrete.  Isn't it correct that one of the

16        problems that was experienced is that these pondcrete

17        blocks -- some number of them -- were not hard like

18        concrete, but were in various states of being soft?

19        They have been described as putty, for example.  Isn't

20        that correct?  That was one of the problems?

21                A      Well, a part of that is not a problem.

22        Is not a problem.

23        Q    Part of that is not a problem?

24        A    Yes.

25        Q    I see.  But is it correct that a number

CARPENTER REPORTING, INC.
(303) 752-1200

164

1    of these blocks were not hard like concrete, but were

2    much softer than that?

3        A    That is true.  It's also true that

4    that -- that that was -- may have been acceptable

5    pondcrete.

6        Q    May have been acceptable to who?

7        A    To Nevada and to the Department of

8    Transportation for shipping.

9        Q    Didn't Nevada reject a shipment of soft

10   or putty-like blocks?

11            MS. AHERN:  Objection.  Vague and

12   ambiguous.

13       A    The pondcrete -- the key point was that

14   it -- that it not have free liquids.  It would harden

15   to a putty -- hard putty-type consistency.  Very rarely

16   harden to a concrete consistency.  Those could be very

17   acceptable blocks.  We -- we could not have free

18   liquids in those blocks.

19       Q    (BY MR. SORENSEN)  How many -- I'm

20   sorry.  How many pondcrete blocks did Nevada accept?

21       A    I -- I don't know that number.  They --

22   we had been shipping pondcrete in a limited fashion for

23   a number of years before I took over plutonium

24     operations and before the compliance agreement.

25     Ultimately, once we were stopped from shipping,

165

1      ultimately, starting in -- '89 sometime, we began to

2      ship again, I believe.  A number of -- most of the

3      boxes had to be repackaged.  There were some that were

4      unacceptable as far as the waste form itself.  I don't

5      remember that number.

6              Q     When were you stopped from shipping to

7      Nevada?

8              A     I believe it was around September of

9      '86.

10             Q     Who stopped you?

11             A     We received word from the Department of

12     Energy that Nevada was not properly permitted to

13     receive our waste.

14             Q     Okay.  So, at that point, the waste was

15     not being shipped to Nevada anymore; correct?

16             A     That's right.

17             Q     When you say not properly permitted, is

18     that -- did that have any connection to the form of the

19     pondcrete itself being -- let me start again.

20                   Do you know why it is that Nevada's

21     permit wouldn't allow it to accept pondcrete?

22             A     I believe I do.

23             Q     Why?

24          A      They were not properly permitted to

25    receive a hazardous mixed waste.  They had to get a

CARPENTER REPORTING, INC.
(303) 752-1200

166

1    RCRA permit for that.

2          Q      And they didn't have one?

3          A      They did not have one.

4          Q      Okay.  The pondcrete that we've been

5    talking about contains some amount of plutonium; is

6    that correct?

7          A      Yes.

8          Q      Okay.

9                 MS. AHERN:  Off the record.

10                (There was a discussion off the record.)

11                MR. SORENSEN:  We can stop.

12                (The deposition was adjourned at

13    5:59 p.m., to be reconvened on December 10, 2005, at

14    8:00 a.m.)

15

16

17

18

19

20

21

22

23

24

25

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                        167

 1                  CARPENTER REPORTING, INC.
                  Certified Shorthand Reporters
 2              Registered Professional Reporters
                   12510 East Iliff, Suite 120
 3                     Aurora, CO  80014
                        (303) 752-1200
 4

 5   DAVID F. SORENSEN, ESQ.
     Berger & Montague, P.C.
 6   1722 Locust Street
     Philadelphia, PA  19103-6305
 7
     Re:  Cook v. Rockwell, et al.
 8        Case No. 90-K-181
          United States District Court
 9        District of Colorado

10   Dear Mr. Sorensen:

11          Attached is the original deposition of
     WILLIAM F. WESTON, Ph.D., Volume I, taken in the above
12   cause.

13      Deposition not signed                  _____
        Deposition signed by the deponent
14        No corrections                       _____
        Deposition signed by the deponent
15        correction sheet(s) included therein,
          and copy(ies) of same forwarded to
16        interested counsel                   _____
        Signature waived                       _____
17

18          Please retain the original copy of the
     deposition UNOPENED in your possession until such time
     as it is required by any party in a hearing or trial of
19   the above cause.

20   Yours truly,

21

22   Bonnie Carpenter, CSR, RPR

23   cc:  Ellen Ahern, Esq.
     Trial Date:  Present
24   RECEIVED BY _____DATE_____

25

CARPENTER REPORTING, INC.
(303) 752-1200

168

1                    C E R T I F I C A T E
STATE OF COLORADO          )
2                          ) ss
COUNTY OF ARAPAHOE         )
3
                    I, Bonnie Carpenter, Notary Public of
4    the State of Colorado, duly appointed to take the
     deposition of the above-named Deponent, do hereby
5    certify that previous to the commencement of the
     examination of the said above-named Deponent, he was
6    first by me duly sworn to testify the truth, the
     whole truth and nothing but the truth touching and
7    concerning the matters in controversy between the
     parties hereto, so far as he should be interrogated
8    concerning the same;

9                    That said deposition was
     stenographically reported by me at the time and place
10   heretofore set forth, and was reduced to typewritten
     form under my supervision as per the foregoing;
11
                    That the foregoing is a true and
12   correct transcript of my shorthand notes then and
     there taken;
13
                    That after the deposition was
14   transcribed, the same was submitted by letter to the
     Deponent for reading and signing, a copy of which is
15   hereto annexed;

16                   That I am not kin or in anywise
     associated with any of the parties to said cause of
17   action or their counsel and that I am not interested
     in the event thereof;
18
                    IN WITNESS WHEREOF, I have hereunto
19   set my hand and seal this _____ day of _____,
     2005.
20
                    My Commission Expires:  9-22-2007.
21

22          _____
                    Bonnie Carpenter
23                  Notary Public
                    12510 East Iliff
24                  Suite 120
                    Aurora, CO  80014
25

CARPENTER REPORTING, INC.
(303) 752-1200

169

```
 1               IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF COLORADO

 3    Case No. 90-K-181

 4    MERILYN COOK, et al.,

 5           Plaintiffs,

 6    vs.

 7    ROCKWELL INTERNATIONAL CORPORATION and THE DOW CHEMICAL
      COMPANY,
 8
             Defendants.
 9

10            DEPOSITION OF WILLIAM F. WESTON, Ph.D.
                      December 10, 2005
11                       Volume II

12

13    APPEARANCES:

14    FOR THE PLAINTIFFS:       ELLEN T. NOTEWARE, ESQ.
                                Berger & Montague, P.C.
15                              1722 Locust Street
                                Philadelphia, PA  19103-6305
16
      FOR THE DEFENDANTS:       ELLEN T. AHERN, ESQ.
17                              Kirkland & Ellis
                                717 Seventeenth Street
18                              13th Floor
                                Denver, CO  80202
19

20

21

22

23

24

25
```

170

1           PURSUANT TO WRITTEN NOTICE, the deposition of

2     WILLIAM F. WESTON, Ph.D., called for examination by the

3     Plaintiffs, was taken in a conference room at Sherman &

4     Howard, L.L.C., 633 Seventeenth Street, Suite 3000,

5     Denver, Colorado, on the 10th day of December, 2005, at

6     the hour of 8:02 a.m., before Bonnie Carpenter, a

7     Notary Public and Certified Shorthand Reporter in and

8     for the State of Colorado and a Registered Professional

9     Reporter.

10                    **********

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CARPENTER REPORTING, INC.
(303) 752-1200

1                          I N D E X

2     Index of Examination              Page

3     Ms. Noteware

4     Index of Exhibits                 Page

5     5  Notes                         177,178

6     6  Affidavit of William F. Weston 228

7     7  6-20-89 FBI interview summary  235,236,237,238,243

8     8  Contract between USA and
         Rockwell                      276
9
      9  Application and Affidavit
10        for Search Warrant           278,283,287

11    10 Plea Agreement and Statement
         of Factual Basis              278
12
      11 "Assessment of Environmental
13        Conditions at the Rocky
          Flats Plant"                 314
14
      Exhibits referred to, not marked herein:
15
      3                                280
16
      4                                175
17

18

19

20

21

22

23

24

25

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

```
1                      *********

2               WILLIAM F. WESTON, Ph.D.,

3    called as a witness for examination under the Rules,

4    having been previously duly sworn according to law, was

5    examined and testified on his oath as follows:

6                           EXAMINATION

7    BY MS. NOTEWARE:

8               Q    Good morning --

9               A    Good morning.

10              Q    -- Mr. Weston.  My name is Ellen

11   Noteware.  We met yesterday and, I guess, in court

12   before.  I'm going to be asking you questions today.

13   You're still under oath.  Do you understand that?

14              A    Yes.

15              MS. AHERN:  If I could, I'd like to

16   state something on the record this morning.  Yesterday,

17   as we left the deposition, Mr. Weston had mentioned to

18   me that there were a couple of areas of his testimony

19   that he felt might be potentially incomplete or

20   misleading.  This morning, I offered him a copy of the

21   rough transcript, which I think he skimmed.  He didn't

22   have it for very long.

23              MS. NOTEWARE:  Okay.

24              MS. AHERN:  But -- I don't know for

25   sure, but I think that he may have some things that
```

1    he'd like to state on the record this morning just

2    before we get started.

3              MS. NOTEWARE:  Go ahead.

4         A    I do.  I wrote myself a few notes.  I

5    just reviewed a few of the areas that I was thinking

6    about last night.

7              I want to emphasize in the MUF area,

8    when we talked about that, that I was uncomfortable

9    thinking about it with the example I gave.  The numbers

10   are totally made up when we were talking about the

11   foundry and possible numbers and accuracies and stuff.

12   I don't remember the details enough to know specifics.

13             If I'd had a chance in general to look

14   at a lot more documents and -- and read some of the

15   reports and study a little bit more, I could be more

16   complete.  I'd remember more.  But I just wanted to add

17   that.  I'm uncomfortable using numbers, making up the

18   examples.

19             I thought it was -- I was incomplete --

20   just briefly, we mentioned about the -- I was asked

21   about --

22        Q    (BY MS. NOTEWARE)  Hold on.

23             (There was a discussion off the record.)

24        A    I was -- just briefly, we -- I was

25   questioned a little bit about whether MUF had any

CARPENTER REPORTING, INC.
(303) 752-1200

174

1    relation -- I think it was something like that -- on

2     what could be vented out through the filter systems and

3     the stacks, and everything I knew at the time and still

4     knew and reviewed is that that was a -- just a nonissue

5     as far as MUF was concerned.  The numbers were so small

6     that it had nothing to do with our inventory

7     differences.  And it was just a totally different issue

8     for us.  So I wanted to clarify that.

9                 When I looked at some of the things I'd

10    said about the RCRA areas, I was asked about bringing

11    the plant into compliance.  I'm not sure I explained it

12    as well.  The emphasis in the DOE regulations had been

13    on control of the nuclear content of our waste forms.

14    RCRA now required -- their focus was on the hazardous

15    content.  And a number of things changed for us with

16    our -- our nuclear waste, the major detection you would

17    do for like leak detection with nuclear content is you

18    have air monitoring or sampling that you can do,

19    swiping the drum and then measuring for any -- any

20    leakage.

21                When you're looking for hazardous

22    component leakage, RCRA requires more of a visual

23    inspection where you have access to all the drums and

24    you can visually inspect.  That required a totally

25    different placement of drums for us.  All of a sudden,

CARPENTER REPORTING, INC.
(303) 752-1200

175

1     instead of pushing them all close together, as you

2      would do with -- to minimize the nuclear radiation

3      coming out, now you want to put them in some form where

4      you actually physically inspect them.

5                  So there were a bunch of differences.

6      And I wanted to emphasize, we were going from an

7      emphasis on nuclear content to now hazardous waste

8      content, and it was different for us.

9                  Finally, on the -- on the plea, when

10     we -- I was looking at a document on the plea, and

11     asked if I'd seen it.  I've seen several documents on

12     the plea.  I may have seen that one.  I'm not certain.

13     But I've seen the content.

14          Q    You're referring to Deposition Exhibit

15     4, which was the supplemental sentencing memorandum?

16          A    Yeah.  I've seen information on that.  I

17     don't know about that particular document.  There was a

18     statement in there about whether I was a -- something

19     about off-site impact of any of these.  I thought about

20     that and I thought, well, everything I'd ever known and

21     seen was that there was no off-site impact from any of

22     those plea violations.

23                 I made a -- a statement in there,

24     something about whether I was tech -- technical

25     violations.  And I -- my -- and I said something about

CARPENTER REPORTING, INC.
(303) 752-1200

176

1      whether I was qualified or not.  My concern was there I

2      don't know the definition of "technical," and that's

3   what I should have clarified.  I -- I understand the

4   violations.  I understand the plea to a certain level.

5   I'm not certain I know what "technical" means from a

6   legal standpoint.

7            And as far as the details, then, in --

8   in some of the statements I was reviewing, numbers,

9   number of days in violation, et cetera, I just don't

10   have any familiarity with that and so I really -- it's

11   not a matter of whether I disagree or agree with them.

12   I just don't know them.  So he was asking me if I had

13   any reason to disagree, I think.  I don't have any

14   reason to agree or disagree.  I just don't know the

15   numbers enough to be able to do that.

16            Q    The numbers -- I'm sorry.  That one, I

17   don't understand.  Don't know the numbers of days of

18   violation in --

19            A    Things like that.  Any of the specifics

20   in here that were -- that were mentioned.  I just

21   don't -- don't remember that information.  I'm not sure

22   I ever knew it, since I wasn't involved in any of the

23   preparation of the plea.

24            And this is a -- the final point, which

25   is kind of a small one, something about the -- in the

CARPENTER REPORTING, INC.
(303) 752-1200

177

1   budgeting process, if I remembered the contract or --

2   with DOE.  In -- the point I want to make is I knew it

3    at one time.  I just don't -- I'm no longer familiar

4    enough to know about the details of whether or not, you

5    know -- how specifically -- when we had to notify DOE

6    we're making budget changes or moving people around.  I

7    knew that at one time when I was there very well, but I

8    don't -- I have not reviewed that contract in 16 years,

9    so I just don't remember it.

10              Those are the key points I wanted to

11   make.

12              Q    Okay.  And I just want to for the

13   record -- you're looking at something.  Could we mark

14   that as an exhibit, please?  Could you mark that as

15   Weston Exhibit 5, and can I take a look at that.

16              (Marked for identification was

17   Deposition Exhibit No. 5.)

18              MS. NOTEWARE:  It's a sheet of yellow

19   paper with some handwriting on it.

20              Q    (BY MS. NOTEWARE)  How did you come to

21   create Deposition Exhibit 5?  When did you write this?

22              A    This morning, I was given a -- a

23   transcript of my testimony yesterday, and --

24              MS. AHERN:  Let the record reflect that

25   it was the rough transcript that the court reporter

CARPENTER REPORTING, INC.
(303) 752-1200

178

1    circulated.

2              Q    (BY MS. NOTEWARE)  Here in this room or

3    somewhere else?

```
 4          A    No.

 5          Q    Okay.

 6          A    Somewhere else.  And I -- I spent about

 7    20 minutes skimming it.  And particularly focused on --

 8    on some of the areas I've been thinking about last

 9    night.

10          Q    So Ms. Ahern gave that to you this

11    morning?

12          A    Yes, she did.

13          Q    And she asked you to review it?

14          A    She told me last night that I might be

15    given an opportunity to review it and I could if I

16    wanted to, and I did want to.

17          Q    Okay.  There are headings sort of in

18    your notes on Exhibit 5:  MUF, RCRA, and plea.

19          A    Uh-huh.

20          Q    Were those areas that you were asked to

21    focus on when you looked at the transcript?

22          A    No.  Those were areas I wanted to look

23    at.  I'm not even sure I labeled them properly, but, in

24    my mind, that's how I was breaking out some of my -- my

25    testimony yesterday.
```

CARPENTER REPORTING, INC.
(303) 752-1200

179

```
 1          Q    Uh-huh.  What time did you get to your

 2    office this morning at Kirkland & Ellis's offices?

 3          A    I got there shortly after 6:30.  I -- I
```

4    did not get a transcript, probably, until maybe a

5    quarter after 7.

6            Q    And was Ms. Ahern there at 6:30 with

7    you?

8            A    No.

9            Q    What time did she arrive?

10           A    I don't know what time Ellen came in,

11   but it was after me.

12           Q    Okay.  When did you get -- you said at

13   7:00.  Who gave it to you?

14           A    Probably more like 7:15 that I got that.

15           Q    Who gave you the transcript?

16           A    Ellen.  Ms. Ahern.

17           Q    Did you have a conversation with her

18   when she gave you the transcript?

19           A    Only that I could review it if I wanted

20   to.

21           Q    And you said you wanted to?

22           A    I said I wanted to.

23           Q    Did you have any further discussions

24   with her about your testimony?

25           A    No.  Other than, as we broke last night,

CARPENTER REPORTING, INC.
(303) 752-1200

180

1    she told me that I could think about what I'd said.

2    I'd have an opportunity to make any corrections or

3    additions if I wanted, and the transcript would

4    probably be available for me to look at in the morning.

5          Q    Did you speak with any other Kirkland &

6     Ellis attorneys between your deposition last night and

7     this morning, other than Ms. Ahern?

8          A    I don't believe so.  If I did, it was

9     social, but I don't believe I talked to anyone.  I was

10    in a hurry to get out last night.  In fact, we didn't

11    even go back up to the office.

12         Q    What about this morning?  Did you speak

13    with anybody this morning?

14         A    There wasn't anyone else there when I

15    came in.

16         Q    Okay.  Now, one of the corrections that

17    you made in the MUF area is you said that it was a

18    nonissue, that the numbers were so small from

19    everything that you saw that it had nothing to do with

20    your inventory difference.  Did I state what you said

21    correctly --

22         A    That was for --

23         Q    -- on the MUF issue?

24         A    And in particular, stack?  Stack

25    emissions?

181

1          Q    Okay.  Is that -- that your testimony?

2          A    Yes.  Yes.

3          Q    Okay.  When you say -- you said this

4     yesterday, as well.  All the evidence that you saw

5    indicated that it was a nonissue.  It was negligible.

6    So small.  What are you talking about?  What did you

7    see that led you to that belief?

8              A    Well, I saw all the stack emission data

9    at Rocky Flats.  I knew -- I saw the data on when the

10   filters were replaced and we would recover plutonium

11   from them or at least count the amount of plutonium on

12   them.  And it was very apparent to me, based on my

13   understanding -- scientific understanding of the

14   process, that numbers -- the amount of plutonium that

15   was going through the ventilation system was so small

16   as to have no factor at all in our -- in our inventory

17   difference analysis and reconciliations.

18             Q    Okay.  But you're relying on the fact

19   that the data concerning the ventilation system was

20   accurate in determining that this amount was

21   negligible; correct?

22             A    The -- that and the fact that we were

23   physically measuring plutonium that was captured on

24   the -- on the filter planes.

25             Q    Okay.  Let me break this down for a

                   CARPENTER REPORTING, INC.
                      (303) 752-1200

                                                  182

1    second.  You were looking -- the first thing you said,

2    you looked at the stack emission data.  Is that

3    something different than what you just mentioned, the

4    actual physical measurement of the plutonium that was

5    in the filter?  There are two things?  There is stack

6   emission data, and then there's the measurement of the

7   actual plutonium on the filter?

8           A    Yes.

9           Q    Okay.  So there's the stack emission

10  data, which is like a printout of what's been being

11  released into the environment?

12          A    I believe it was in that format, yes.

13          Q    Okay.  And then when you're talking

14  about measurement of plutonium in the filter,

15  physically, how did that occur?

16          A    Well, we replaced our plenum filters and

17  our prefilters in the gloveboxes on a regular scheduled

18  basis, and they would be then measured for plutonium

19  content.

20          Q    Which division did this?

21          A    I believe the -- the prefilters and the

22  gloveboxes would be replaced by the operators in each

23  of the buildings.  The plenum filters in the main

24  ventilation system would be replaced -- I think they

25  were by maintenance personnel.  The measurements were

CARPENTER REPORTING, INC.
(303) 752-1200

183

1   done by the nuclear material control group.

2           Q    Were -- was --

3           A    Do you mind if I get a cup of coffee?

4           Q    I wouldn't, either.

5                MS. AHERN:  Let's take just a little

6      break and --

7                     (There was a discussion off the record.)

8          Q     (BY MS. NOTEWARE)   Okay.   So you talked

9      about the stack emission data, which you believe was a

10     printout, and then the physical measurement of

11     plutonium, which was a multi-stage process.   When they

12     were changing the filters, workers would measure the

13     plutonium and then it would be analyzed by the control

14     group; is that right?

15         A     The workers would replace the filters.

16     The filters would be what we call size-reduced and

17     packaged so that we could measure the -- the plutonium

18     content on them.   "Size-reduced" means just squash them

19     down so you can get them in a container.

20         Q     And the workers would do that?

21         A     Well, it was done in the facility.   But

22     they were packaged.   A better way to say it is they

23     were packaged for measurement and disposal.

24         Q     Let me understand.   The worker takes out

25     the filter.

                     CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                184

1          A     Uh-huh.

2          Q     And does what with it?

3          A     At that point, then, they're bagged into

4      plastic bags, sealed.

5          Q     Okay.

6          A     Then they're taken -- the bigger ones

7     and some of these filters are big -- they are taken to

8     a -- to a size reduction facility and basically cut

9     into pieces or physically compressed so that you could

10    place them in, say, a 55-gallon drum.  Again, they

11    would be sealed in plastic and then put inside the

12    drum.  And then the drum would be measured for

13    plutonium content.

14         Q    Okay.  I'm still a little fuzzy on the

15    process.  They changed the filter.  They take it out,

16    they put it in the room that they're in, and then some

17    other people come in and resize it and package it and

18    take it to another facility?

19         A    On the bigger ones, I think that was the

20    process.

21         Q    Okay.

22         A    In any case, they -- ultimately, they

23    ended up in a 55-gallon drum, I believe.

24         Q    Okay.  So you're talking about stack

25    emission data, this physical measurement of plutonium

CARPENTER REPORTING, INC.
(303) 752-1200

185

1     when the filters were -- plenum filters were changed.

2     Was there any other data that you relied on to

3     determine that the off-site releases were negligible?

4          A    Well, I saw -- I saw the data that

5     health, safety, and environment collected on the an --

6     I think they were called ambient air samplers around

7       the plant site and around the perimeter of the site.

8       Those would have alerted us if there were any -- any

9       issues to see.

10              Q    Okay.  Anything else?

11              A    No.

12              Q    Okay.  What month did you leave Rocky

13      Flats?

14              A    December of 1989.

15              Q    Okay.  So you were present when the

16      Tiger Team, the special assignment team came through

17      Rocky Flats --

18              A    Yes.

19              Q    -- in 1989?

20              A    The ones I remember were in 1989.  There

21      may have been several.

22              Q    Okay.  Are you familiar with the

23      conclusions in their report of August of 1989?

24              A    I was at the time.

25              Q    Okay.  And I'll ask you again, that --

                        CARPENTER REPORTING, INC.
                          (303) 752-1200

                                                            186

1       the conclusion that you just said about the -- the

2       numbers were so small, they were negligible, it had

3       nothing to do with inventory differences?  What you

4       were relying on was the stack emission data, the

5       physical measurement of plutonium, and the data you

6       received from health, safety, and environment to form

7       that conclusion; correct?

8          A     And my understanding of the entire

9     process.

10          Q     And what do you mean by that?

11          A     The -- the -- the science of the

12     plutonium itself and where it -- the waste forms and

13     residues we were collecting.  The -- that -- that's the

14     basis of it that I -- that I understood the process

15     very well and all the data we had was very conclusive.

16          Q     Okay.  And just because I haven't been

17     getting an answer -- I keep going on to other things.

18     I just want to understand.  The data that you looked at

19     to determine that the plutonium released into the

20     environment was negligible was the stack emission

21     printouts, the physical measurement of plutonium, and

22     the ambient air monitors that were cited by the health,

23     safety, and environment department; is that correct?

24          MS. AHERN:  Objection.  Asked and

25     answered.  Misstates the witness's statement.

CARPENTER REPORTING, INC.
(303) 752-1200

187

1          Q     (BY MS. NOTEWARE)  I'm not trying to

2     misstate your testimony at all.  I'll rephrase because

3     all I want -- I just want the answer to the question

4     and not anything additional.

5          A     Those -- those are certainly the ones I

6     remember.

7          Q     Okay.

8              A    Okay.

9              Q    And you don't remember any others?

10             A    Not without reviewing some more

11  documents and reports.

12             Q    Okay.  Now, I mentioned the Tiger Team

13  report.  Do you know what I'm referring to when I say

14  "the Tiger Team"?

15             A    I believe so.

16             Q    Okay.  Did you review that report?

17             A    I certainly did.

18             Q    Okay.  When you were at the plant in

19  1989?

20             A    When I was at the plant.

21             Q    Have you looked at it since then?

22             A    I -- I may have.

23             Q    Do you recall that the Tiger Team noted

24  that there were deficiencies in the Rocky Flats plant

25  effluent air monitoring program?  Are you aware of

                CARPENTER REPORTING, INC.
                    (303) 752-1200

                                            188

1   that?

2              A    When I read the report, I focused on my

3   areas in particular.  So I -- I probably recall those

4   better, but -- but -- so without reading it or seeing

5   it in front of me, I'm not sure I can comment on that.

6              Q    Okay.  I have it.  We can go through it

7   in a second.

8                   You talked about you focused on your

9    areas that you were involved with.  What areas were

10   those?

11           A    Well, at that time, I was still -- if

12   it's around the summer of 1989, I was still the

13   director of plutonium operations, so I would have

14   focused on the -- anything with plutonium operations

15   recovery, plutonium recovery, waste management in

16   particular.  Those areas.

17           Q    Not the filtering and monitoring?

18           A    Not -- not the air monitoring as much.

19           Q    Okay.  You weren't assisting --

20   assistant plant manager at that time?

21           A    Around September --

22           Q    It was around that time?

23           A    -- I became assistant plant manager.

24           Q    Okay.  The Tiger Team report also noted

25   deficiencies in the ambient air monitoring program at

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    189

1    Rocky Flats; is that correct?

2            A    I don't remember.

3            Q    Okay.  Certainly, the Tiger Team found

4    deficiencies in waste management, which was an area

5    that you were familiar with; correct?

6            A    While I don't remember the details, I

7    know there were findings in that area.

8            Q    And you would have reviewed those?

9          A    I would have reviewed those.

10         Q    In greater detail?

11         A    Yes.

12         Q    Okay.  Would you have reviewed the

13   radiation -- the criticisms of radiation monitoring

14   that were in the Tiger Team --

15         A    I would have read them.  I don't

16   remember them now.

17         Q    Okay.  Do you know if there were

18   criticisms by the Tiger Team about the assessments that

19   Rocky Flats plant was doing concerning public radiation

20   doses?  Do you recall if --

21         A    I don't remember that.

22         Q    Okay.  Do you recall generally whether

23   there have been criticisms of the way in which Rocky

24   Flats plant assessed public radiation doses during the

25   time that you were there?

CARPENTER REPORTING, INC.
(303) 752-1200

190

1          A    No.  I don't -- I don't remember that.

2          Q    Okay.  What is a site environmental

3    report?  Do you know what that is?

4          A    I'm not sure I remember specifically

5    what a site environmental report is.

6          Q    Okay.  We'll come -- we'll come back to

7    that in a second.  I want to get back to what you were

8    talking about, the physical measurement of plutonium.

9    Okay?  Because I'm still not sure I have the process

10    down exactly right.

11              How often were the filters that were

12    physically scraped -- how often were those changed?

13         A    Oh, I don't --

14              MS. AHERN:  Objection.  Vague and

15    ambiguous as to time.

16         A    I don't -- I don't remember.  There were

17    different -- there were different periods, depending

18    upon which filter bank it was.  For example, what we

19    called the prefilters right at the top of the glovebox

20    would be replaced most frequently since it would be

21    anticipated they would have -- they would have most of

22    the -- any of the airborne plutonium they would be

23    capturing.  Filters farther downstream, I don't know

24    the changeout frequency of those filters.

25         Q    (BY MS. NOTEWARE)  Okay.  Let's take a

CARPENTER REPORTING, INC.
(303) 752-1200

191

1     further step back.  You were at Rocky Flats from 1975

2     through 1990, basically.  Late 1989.

3          A    Yes.

4          Q    Okay.  Ms. Ahern makes a good point.

5     There were different time periods where filters might

6     have been changed in different -- at different times.

7     So let's go back.

8               In 1975, were you involved in -- you

9     weren't involved in plutonium recovery or anything like

10    that; right?

11            A    No, I was not.

12            Q    Okay.  Did you know how the filters

13    worked at that point in time?

14            A    Only -- only briefly from the training I

15    had received on the -- in my safety training and

16    radiation training.

17            Q    When did you first become placed in a

18    position where you were involved in -- in any way in

19    filter maintenance, knowing the filter maintenance

20    schedule?

21            A    Probably when I was running the pit

22    manufacturing in Building 707, I would have become more

23    familiar with filter changeout schedules.

24            Q    And that was what year?

25            A    Around 1980.  Okay.  Maybe '81.  But in

1    that time frame.

2            Q    Okay.  Early eighties?

3            A    Yeah.

4            Q    Okay.  And then what -- your next

5    position after that was in '83 when you became head of

6    the nuclear monitoring safety --

7            A    Yes.

8            Q    Something --

9            A    A brief trip into finance and then --

10    and then my next major position was what -- I think it

11    was -- I think it was safeguards and materials

12    management.

13         Q    Okay.  And were you involved in the

14    filter changeout schedule in any way?

15         A    Only -- no.  Only that I was -- all my

16    people were employed in the nuclear buildings and were

17    aware of the filter changeout, and my group now had the

18    responsibility for the measurements of the waste drums,

19    some of which would contain filters and prefilters.

20         Q    Okay.  And then you became director of

21    plutonium operations after that; right?

22         A    Yes, I did.

23         Q    Okay.  And that was in '85-ish?

24         A    Late '85.

25         Q    Okay.  And obviously, as director of

CARPENTER REPORTING, INC.
(303) 752-1200

193

1    plutonium operations, you were involved in some way in

2    the filter changeout schedules?

3         A    I was much more aware of them because --

4    because I was now running operations in the buildings,

5    and a part of the operations would be the changeout of

6    filters.  So yes.

7         Q    Okay.  And then as assistant plant

8    manager, as well, you would have oversight over filter

9    changeout?

10        A    I would have oversight.

11          Q    To your knowledge, between 1980, when

12    you first had some involvement in the filter changeout

13    schedules, through 1989, did there come a point in time

14    where the filter changeout schedule changed?

15          A    I don't remember.

16          Q    Okay.  So, as far as you know, it was

17    the same the -- from the --

18               MS. AHERN:  Objection.  Misstates his

19    testimony.

20          A    I don't remember --

21               MS. AHERN:  I'm sorry.

22          A    I just don't remember one way or the

23    other.

24          Q    (BY MS. NOTEWARE)  Okay.  You have no

25    knowledge that there was a change in the amount of

CARPENTER REPORTING, INC.
(303) 752-1200

194

1    filter changes?

2          A    Not --

3               MS. AHERN:  Objection.  Misstates his

4    testimony.

5          Q    (BY MS. NOTEWARE)  Is that fair to say?

6          A    Without -- without reviewing some other

7    documentation, I just can't be more clear on that.

8          Q    Okay.  Do you recall how often filters

9    were changed as you sit here now?

10               MS. AHERN:  Objection.  Vague and

11    ambiguous.

12          A    For any of the different types, I just

13   can't recall now.

14          Q    (BY MS. NOTEWARE)  What -- what are the

15   different types?  And you talked about prefilters and

16   the larger filters, and I want to focus my question on

17   the filters that were used when you physically measured

18   the amount of plutonium in your earlier answer.  Do you

19   know what I'm talking about?

20          A    I'll try to answer that.

21          Q    Okay.

22          A    Again, I -- I can't be complete without

23   taking a look at a whole plenum system and -- and

24   looking back and trying to refresh it, but there were

25   filters on every glovebox.  At least one.

CARPENTER REPORTING, INC.
(303) 752-1200

195

1           Q    Uh-huh.

2           A    I'm calling them prefilters.  I think

3    that was the term, but I could be mistaken.  Those were

4    changed out on a regular basis, depending upon the

5    types of operations and the boxes.  The boxes that

6    would generate more plutonium dust would be changed out

7    more frequently.  The filters.

8           Q    How often were those changed?  I'm

9    sorry.

10          A    I just don't remember.

11          Q    Okay.  Okay.

12          A    And then the filters upstream, where you

13   get into the plenum system -- and there may be several

14   banks of these -- there was -- I don't remember the

15   changeout schedules on those.

16          Q    And how many filters are you talking

17   about in the plenum system?  Do you remember offhand

18   how many there were?

19          A    Several banks of them, but I don't

20   remember the -- the -- the numbers.

21          Q    Okay.  And which filters were -- were

22   scraped and squashed and measured in the drums?

23          A    Well --

24          MS. AHERN:  Object to the question.  I

25   don't believe the witness ever used the term "scraped"

CARPENTER REPORTING, INC.
(303) 752-1200

196

1   and you've used it repeatedly, and so the question is

2   vague, ambiguous as to that.

3          Q    (BY MS. NOTEWARE)  Okay.  Do you know

4   what I'm talking about?

5          A    Yeah.  And scraped is -- we didn't --

6   they weren't scraped.  These are -- these filters are

7   like a -- a paper material.

8          Q    I want to know exactly what you're

9   talking about.

10          A    Yeah.

11          Q    How many -- my question -- I'll restate

12   it.  How many filters went into the analysis of the

13   physical measurement of plutonium from the filters that

14   you talked about earlier?

15          A    Anytime a filter was taken out of

16   service, taken out of the line, it would be measured

17   for plutonium content.  To do that, it would end up

18   being put in a container.

19          Q    Okay.

20          A    Okay.  It might be a drum.  Okay.

21          Q    So if a filter was taken out for either

22   routine maintenance or for some other reason, the

23   amount of plutonium would be measured; is that fair to

24   say?

25          A    Yes.  It was considered waste --

CARPENTER REPORTING, INC.
(303) 752-1200

197

1    plutonium waste -- and so it had to be measured and

2    handled like that.

3          Q    Okay.  And there were -- you talked

4    about prefilters and filters in the plenum system.

5          A    Yes.

6          Q    Right?  Okay?

7          A    Uh-huh.

8          Q    Are there any other types of filters

9    that would be measured that you can recall?

10          A    I'm not sure I'm using the right

11   terminology anymore, 16 years removed, but there --

12   there may have been different names for the different

13     banks of filters all the way along the line.  I

14     remember the term "prefilter."  I remember plenum

15     filters.  There may be others, but all of them would be

16     treated in that fashion.

17            Q     Okay.  And I want to understand the

18     process.  If you took a prefilter out from the

19     glovebox --

20            A     Yeah.

21            Q     -- and it was being replaced for

22     maintenance or for routine maintenance or because there

23     was a problem with the filter, the worker would take

24     out that prefilter; is that fair to say?

25            A     Yes.

1             Q     And then where would it go?  Describe

2      for me, from cradle to grave, what happens to that

3      filter in order for it to get measured for the amount

4      of plutonium that was on it.

5             A     It would be -- it would be removed

6      inside the glovebox and replaced with a new one.  The

7      old filter, the used one, would be then bagged out of

8      the glovebox.

9             Q     By the worker?

10            A     Several workers, including radiation

11     monitoring that had to be present for any operation

12     where you were putting in or removing stuff from a

13     glovebox.  They would be there.  It would come out in a

14    double plastic bag, sealed.  Okay.  It would be assured

15    that there was no leakage from that bag.  That it was

16    tight and -- and not contaminated on the outside.  Then

17    the filter would be placed in a container.  It could be

18    various types of containers, depending upon its size.

19    It would then be measured in some of our detection

20    equipment for plutonium content and determined whether

21    it was a residue or a waste, depending on how much

22    plutonium was in it.

23            Q    Okay.  Was that the entire process?

24            A    As I -- as I can recall.  Now, there

25    were lots of different operations, lots of different

CARPENTER REPORTING, INC.
(303) 752-1200

199

1    gloveboxes, lots of different filters.

2            Q    So those weren't sized or cut into

3    pieces, or they were?

4            A    On the small ones, which -- which I'm

5    remembering are like a foot square --

6            Q    Uh-huh.

7            A    -- I think not.  But I can't be sure on

8    that anymore.

9            Q    Okay.  And then you said there were

10   these larger ones.  Those are the ones from the plenum

11   system?

12           A    Yes.

13           Q    Can you describe the process for me of

14    how they were -- the amount of plutonium was measured

15    off of the larger filters?

16             A    Only briefly because that was not my

17    department that replaced those filters.  That was done

18    by the maintenance operations.  But those operations

19    would be performed -- because you're basically in the

20    big plenum system -- you're walking into maybe an 8- or

21    10-foot square duct, if you will.  I can't remember the

22    size, so I'm -- these -- don't hold me to these

23    numbers, but they are actually going in in supplied

24    air -- they are wearing a supplied air suit -- and

25    they're replacing the filter.

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                           200

1             The filter is then bagged as I've

2    mentioned it, made sure it's not contaminated on the

3    outside of the plastic, and then processed in some

4    fashion to get it to a size where you could count the

5    amount of plutonium on it.

6             Q    Okay.  You said earlier it was cut into

7    pieces; is that correct?

8             A    It could have been.

9             Q    Okay.

10            A    It may have been squashed.  I can't

11    remember how they handled them.

12            Q    How would it be squashed?

13            A    Well, they had -- in size reduction,

14    they had devices that could take some -- some stuff and

15 actually squeeze it down into a -- a smaller size.  I

16 don't know if these were handled that way.

17    Q Was size reduction a department at Rocky

18 Flats?

19    A Yes, it was.

20    Q Size reduction was a department where

21 they would take big things and make them smaller?

22    A For example --

23    Q Not people?

24    A Like tear a glovebox apart.  When they

25 were going to get rid of a glovebox, tear it apart, cut

CARPENTER REPORTING, INC.<br>(303) 752-1200

201

1 it up so that it could be packaged.

2    Q Okay.  Was that in the plutonium

3 operations department?

4    A Yes.

5    Q Size reduction?

6    A It was.

7    Q So that was a hot area, size reduction?

8    A Yes, it was.  Oh, yes.

9    Q The plenum filters, though, they weren't

10 in a hot area, so to speak?  I mean, they were out in

11 the open?  You didn't have to --

12    A If they --

13    MS. AHERN:  Objection.  Vague and

14 ambiguous.

15          Q     (BY MS. NOTEWARE)  If they what?

16          A     If the plenum filter came from a

17    ventilation system in a nuclear building, it was

18    considered potentially contaminated and would be

19    handled in that fashion until it was determined

20    otherwise.  So we were -- we always handled it as

21    potentially contaminated.

22          Q     And you handled the plenums as

23    potentially contaminated because they were receiving

24    airflow from the plutonium building; right?

25          A     As I remember, yes.

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                        202


1          Q     Okay.  And those air flows could have

2     been contaminated when they were going into the filter;

3     right?

4                 MS. AHERN:  Objection.  Speculative.

5          A     And again, I didn't run that department,

6     but that -- that was my understanding.

7          Q     (BY MS. NOTEWARE)  You didn't run the

8     plutonium operations department?

9          A     I didn't run the department that changed

10    the filters out and how they handled it.

11         Q     Okay.

12         A     I --

13         Q     But as director of plutonium operations,

14    you were in charge of the entire hot area, so to speak;

15    right?

16          A    Yes.  And relied on a lot of other

17   organizations to help me do that.

18          Q    I would hope.  It's a big job.

19          A    Yeah.

20          Q    Okay.  But the plenums and the stacks in

21   the plutonium buildings were under your supervision

22   when you were director of plutonium operations;

23   correct?

24          A    Yes.  They -- inside the plutonium

25   buildings that I was responsible for, I had -- I had,

1    basically, oversight for the entire building.

2          Q    Okay.  And you treated the plenums in

3    the plutonium buildings as potentially contaminated?

4          A    That's my understanding.  Now, caveat

5    that in there that are -- there were several banks of

6    filters.  I could be wrong.  Maybe only the first bank

7    closest to the gloveboxes was considered contaminated

8    and the last ones weren't.  Okay.  I don't -- I don't

9    remember.

10          Q    But all of the filters were scraped and

11   tested for plutonium when they were replaced; correct?

12          MS. AHERN:  Object to the --

13          MS. NOTEWARE:  The term "scraped."

14          MS. AHERN:  Scraped.

15          A    There's no scraping.

16          Q    (BY MS. NOTEWARE)  Squashed.  I guess

17     squashed and scraped.

18          A    I could be wrong in that.  They were

19     handled in some way where you could measure them, I

20     think.  Now, it -- again, it could be the last filters,

21     the ones closest to the stack itself, were not handled

22     that way because they were never considered

23     contaminated.  I just don't remember on that without --

24     without seeing some more documentation.

25          Q    Okay.  So is it fair to say, then, that

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                         204

1      you don't remember, as you sit here today, exactly how

2      the physical measurement of plutonium was accomplished?

3      You know generally how it was done, but you can't tell

4      me whether the last filter was size-reduced in the

5      plenum and -- and measured?

6               MS. AHERN:  Object to the question.

7      Misstates the witness's testimony.

8          Q    (BY MS. NOTEWARE)  Is that fair to say?

9          A    I -- I remember that any filter that was

10     considered potentially contaminated, how it would be

11     handled and measured.  I can't tell you today if every

12     filter in the system was considered potentially

13     contaminated and handled that way.

14          Q    Okay.  But -- and you don't remember

15     whether the final filter from the plutonium operations

16     buildings was considered potentially contaminated; is

17      that fair to say?

18                A      Yes, it is.

19                Q      So then you don't know whether -- when

20      they were doing the physical measurement of plutonium,

21      whether that last filter was measured for plutonium?

22                      MS. AHERN:  Object.  Misstates the

23      witness's testimony.

24                Q      (BY MS. NOTEWARE)  Is that fair to say?

25                      MS. AHERN:  I think he said if he

CARPENTER REPORTING, INC.
(303) 752-1200

205

1      reviewed more documents, he would be able to address

2      that issue.

3                A      And that's exactly -- without -- without

4      going back and looking, I just can't be clear, 16 years

5      later, on how that was done.

6                Q      (BY MS. NOTEWARE)  So you don't know it

7      now as you sit here?

8                A      I can't remember.

9                Q      And then what happened was after they

10      were size-reduced, the plenum filters, they were put

11      into drums; is that right?

12                A      I'm -- I think so.  But we also would --

13      with some of them, maybe big enough that they might be

14      put into the metal boxes.  The bigger boxes.

15                Q      Uh-huh.

16                A      And then we had different counting --

17    plutonium counting devices for those, so I don't want

18    to -- I can't say they were all squashed and put into

19    drums.  They may have been put in metal containers, as

20    well.

21          Q    Okay.  Switch gears here for a minute.

22    We'll probably come back to that a little later.  I

23    don't want to get yesterday and today confused.

24          A    May I get some more coffee?

25          Q    Yes.

CARPENTER REPORTING, INC.
(303) 752-1200

206

1          (There was a discussion off the record.)

2          Q    (BY MS. NOTEWARE)  Okay.  Going back to

3    your educational and work background, am I correct that

4    your educational experience was in physics and not in

5    environmental management or regulatory issues?

6          A    Yes.

7          Q    Okay.  And whatever training you

8    received in environmental or regulatory issues was from

9    Rockwell; is that right?

10          A    I received in my MBA -- I took -- I

11    believe I took a course on environmental management.  I

12    wrote a paper, I know, on Love Canal and RCRA.  And --

13          Q    Do you still have that paper?

14          A    No.  I wish I did.  And I wrote -- I

15    took business law courses that had some aspects of

16    that, but -- so I had some -- some background and

17    training there.

18          Q    Okay.  So you took a -- a course in --

19   in environmental contamination?

20          A    It was -- it was something -- I'd have

21   to go back and look, but I did have -- have some

22   understanding of -- of the RCRA regulations.  In fact,

23   that was the first I'd learned of that.  And I wrote a

24   paper on RCRA and -- and so that would have been about

25   1980-81.  So I -- I had a little there, yes.

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                          207


1           Q    Okay.  And you received training from

2    Rockwell and -- in addition to your MBA course that you

3    took?

4           A    Yes, I did.

5           Q    Okay.  And you had no other outside

6    training, other than the MBA course and the Rockwell

7    training?

8           A    The Rockwell training was basically done

9    by outside experts.

10          Q    Okay.

11          A    Okay.

12          Q    And let me just caution you.  I think

13   we're talking over each other from time to time.  And

14   I'm sure our able court reporter is sorting it all out,

15   but we should probably just watch that.

16              MS. AHERN:  You should wait until the

17   question is fully ended.

18            A    I'm sorry.

19            MS. AHERN:  Pause a little bit to give

20    me an opportunity to object, so I don't have to talk

21    over you, and then answer.  I know it's kind of

22    cumbersome.

23            Q    (BY MS. NOTEWARE)  Okay.  Who were the

24    outside experts who provided the training for -- let's

25    talk about regulatory issues.  Was it attorneys?

CARPENTER REPORTING, INC.
(303) 752-1200

208

1            A    I -- I don't remember.  We had a number

2    of them came into the plant site.  I believe some of

3    our people went to off-site courses, but I -- I just

4    don't remember the details now.

5            Q    Okay.  But you didn't participate in any

6    outside courses?

7            A    I don't remember doing that.  No.

8            Q    And what were your responsibilities as

9    far as RCRA from between 19 -- 1980 and 1989?

10            A    Starting around the time I became

11    director of plutonium operations in late '85, I began

12    to become more familiar with our initial RCRA permit

13    applications, I think.  I'm trying to remember the time

14    frame.

15            Certainly, by the time of the compliance

16    agreement, which I think was mid -- mid-'86, we began

17    to -- to come up to speed fairly quickly.  My

18    responsibility evolved.  I had an -- in plutonium ops,

19    the waste management group, so we were going to be

20    major players in -- in bringing the plant into

21    compliance.

22              The -- the -- as we got -- sometime in

23    that first year or so, I was asked to form a new

24    organization within my group for compliance, RCRA

25    compliance.  And I began --

CARPENTER REPORTING, INC.
(303) 752-1200

209

1              Q     When you say your "group," you mean

2     plutonium operations?

3              A     In plutonium ops.  I began to recruit

4     people, knowledgeable people to be in that

5     organization.  I don't remember exactly when that was,

6     but it was, I believe, post-compliance agreement.

7              Q     Okay.  When you talked about earlier --

8     in your clarification of the testimony that you did

9     yesterday -- you talked about that the emphasis changed

10    from nuclear content to hazardous content of materials.

11    That was what you understood the difference was between

12    the pre-RCRA and post-RCRA environment.

13             A     If -- yeah.  If I can clarify that.

14    The -- the AEC regulations for our nuclear waste

15    management clearly focused on the nuclear content.  The

16    RCRA regulations, as we began to understand them,

17    focused on the -- the hazardous content.  So we now had

18    both sets of -- of regulations to comply with.

19          Q    So when you're talking about the AEC

20     nuclear regulations, those were DOE orders, things like

21     that that you had to comply with?

22          A    Yes.

23          Q    Okay.  And if there -- there wasn't a

24     group, then, that focused on the environmental aspect

25     in plutonium operations prior to 1986 when you created

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                        210


1      this new group?  Is that fair to say?

2                    MS. AHERN:  Objection.  Misstates the

3      witness's testimony.

4          A    Could you restate that?

5          Q    (BY MS. NOTEWARE)  I'll rephrase.  You

6      said, in 1986, you formed a new group in plutonium

7      operations for regulatory compliance; is that right?

8          A    For RCRA compliance.

9          Q    Okay.  And that was a group that didn't

10     exist before?

11         A    Right.

12         Q    Okay.  Was there a group for AEC nuclear

13     compliance?

14                   MS. AHERN:  Objection --

15         Q    (BY MS. NOTEWARE)  I'll restate.

16                   MS. AHERN:  Objection to the question.

17         Q    (BY MS. NOTEWARE)  Was there a group

18     that was formed in plutonium operations for compliance

19     with the AEC nuclear standards?

20              MS. AHERN:  Objection.  Vague and

21    ambiguous.  Foundation.

22           A    In -- in my area, it -- we ran the --

23    the entire plant based on the DOE regulations that had

24    been given to us by the Department of Energy.  In my

25    area, in waste management, we had specific regulations

211

1    on how to manage the waste.  DOE orders.

2           Q    (BY MS. NOTEWARE)  Okay.

3           A    Okay.

4           Q    And was there a group in waste

5    management that was formed to -- to make sure that

6    waste complied with DOE orders?

7              MS. AHERN:  Objection.  Ambiguous.

8    Object to the form of the question.

9           A    I don't remember the internal

10    organization of waste management, but there were

11    experts in the group on our -- on the DOE orders and

12    compliance.

13           Q    (BY MS. NOTEWARE)  Okay.

14           A    I can't remember if there was a specific

15    subgroup that was broken out in that.

16           Q    Okay.  In 1983, when you became

17    safeguards and materials manager -- management

18    director, who did you replace?

19              MS. AHERN:  Objection.  Asked and

20      answered.

21              A      Pardon me?

22              Q      (BY MS. NOTEWARE)   Who did you replace?

23      You can answer.

24              A      Replace.   That was a -- it was a new

25      organization.   These -- these -- the two main subsets

CARPENTER REPORTING, INC.
(303) 752-1200

                                                      212

1       of that existed on the plant site.   They were pulled

2       together and -- and I -- and this was a new

3       directorate, a new organization now at the top within

4       Rockwell.

5               Q      Okay.   Why was that formed?

6                      MS. AHERN:   Objection.   Foundation.

7               Q      (BY MS. NOTEWARE)   Let me take a step

8       back.   Were you told why that division was formed?

9               A      I had some idea of what the expectations

10      were for me with that.

11              Q      Who appointed you to that position?

12              A      Jack Dorr.

13              Q      Who was the plant manager at the time?

14              A      The plant manager.

15              Q      Okay.   Did you have a conversation with

16      Mr. Dorr when he appointed you to that position?

17              A      Yes, I did.

18              Q      Is that where your expectations were

19      formed from?

20              A      Several conversations with him, yes.

21          Q    And what were the -- what was the

22    subject of these conversations?

23          A    The subjects were that -- two-fold.  On

24    the -- on the production control side, that we needed

25    to strengthen the production control organization,

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                      213

1     which we believed to be critical to helping the plant

2     better maintain and recover production schedules.

3                On the nuclear material control and

4     accountability side, that organization had previously

5     resided within security operations.  I think that was

6     the title.  Security was becoming such a -- a big area

7     by itself that it was felt that it would be hard for

8     the director of that organization to spend enough time

9     now on safeguards, and they wanted me to take it over

10    and manage that.

11          Q    And what is production control?  That's

12    producing plutonium?  Is that --

13               MS. AHERN:  Objection.  Asked and

14    answered.

15          A    Production control is the organization

16    that -- for all production at Rocky Flats, nuclear and

17    non-nuclear, does the scheduling, movement of parts,

18    and prioritization of work for the production

19    organizations.

20          Q    (BY MS. NOTEWARE)  Why did you only stay

21    in the position as director of safeguards and materials

22    management for about a year?

23              MS. AHERN:  Objection.  Foundation.

24    A     My --

25              MS. AHERN:  Calls for speculation, too.

CARPENTER REPORTING, INC.
(303) 752-1200

214

1              Q     (BY MS. NOTEWARE)  If you know.

2              A     As I remember, my predecessor in

3    plutonium operations was going to retire.  And that was

4    a -- a large multi-faceted organization, and Jack Dorr,

5    the plant manager, decided that I should be the one

6    to -- to move into that.

7              Q     When you became director of safeguards

8    and materials management, did you understand that there

9    were criticisms of the way in which nuclear material

10    control had been accomplished by the security

11    department?

12              A     There -- I was aware that there had been

13    issues that had surfaced.

14              Q     What issues were those?

15              A     I -- I don't remember the details of

16    them, but there had been issues with some inventories,

17    but I don't remember the timing on that.  But I want to

18    emphasize again, the key reason for it, I believe, was

19    the fact that Ed Young, the head of security, was just

20    going to be overwhelmed with the security side of it

21    and couldn't give enough time to the safeguards side.

22          Q    Did you discuss the issues with Mr. Dorr

23     when he appointed you?  How you would resolve the

24     issues?

25          A    Yes, I did.

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                        215


1          Q    And you conducted a survey of the entire

2     plant MUF when you became director of safeguards and

3     material management; is that correct?

4               MS. AHERN:  Object to the form of the

5     question.

6          A    I -- I wanted to understand the plant

7     inventory difference and asked my organization to

8     educate me on that, yes.

9          Q    (BY MS. NOTEWARE)  Okay.  So you

10    conducted a plant-wide survey?

11          A    I wouldn't call it a survey.  I asked

12    my -- my people -- the most knowledgeable ones -- to

13    bring together all the information they had and show me

14    how the inventory difference had developed and how

15    it -- how it was being explained.

16          Q    Okay.  And that wasn't your mandate from

17    Mr. Dorr to do that?

18          A    He never asked me to look at that.

19          Q    When you were appointed to director of

20    plutonium operations, had there been criticisms of the

21    waste management functions of plutonium operations

22      before you took charge?

23                  MS. AHERN:  Objection.  Foundation.

24      Vague and ambiguous as to time.

25              A    I don't remember that at all.  I -- I

CARPENTER REPORTING, INC.
(303) 752-1200

216

1       think, as I was going into that, I was initially more

2       focused on the recovery operations than -- than the

3       waste management side.

4               Q    (BY MS. NOTEWARE)  Now, in -- in 1985,

5       that was the first time that you had involvement in the

6       RCRA permitting process; is that fair to say?

7               A    I think in the '85 time period, I began

8       to be -- get my first familiarity with the permitting

9       process, but I don't -- I don't remember that until --

10      I remember more specifically after the compliance

11      agreement, getting very involved in that.

12              Q    Okay.  Now, RCRA had been effective

13      prior to 1985; right?

14              A    It's my understanding that it had, yes.

15              Q    And there were other people at the plant

16      who were responsible for following RCRA prior to the

17      time that you became involved in 1985?

18                  MS. AHERN:  Objection.  Foundation.

19              A    It -- the RCRA activity prior to the

20      compliance agreement that I remember was mostly handled

21      out of the health, safety, and environment

22      organization, but I am really unclear on that at this

23    point.

24           Q    (BY MS. NOTEWARE)  Okay.  Now, you

25    didn't have a RCRA compliance organization within

217

 1    plutonium operations until after the compliance

 2    agreement?  Is that your testimony?

 3               MS. AHERN:  Objection.  Misstates the

 4    witness's testimony.

 5           Q    (BY MS. NOTEWARE)  I don't want to

 6    misstate your testimony.  Is something inaccurate in

 7    what I said?

 8           A    As far as breaking it out specifically,

 9    that was post-compliance agreement.  We had some people

10    in waste management who were very familiar with the

11    RCRA regulations at that time.

12           Q    Okay.  But you took the position that

13    RCRA didn't apply to plutonium operations; correct --

14               MS. AHERN:  Object to the form of the

15    question.

16           Q    (BY MS. NOTEWARE)  -- until the

17    compliance agreement; is that right?

18               MS. AHERN:  I'm sorry.  I thought you

19    were finished.  I object to the form of the question as

20    vague and ambiguous as to who "you" was.

21           Q    (BY MS. NOTEWARE)  You personally.

22           A    I received my direction from the

23     Department of Energy on which regulations applied, and

24     those are the ones that we followed.  We may have had

25     feelings about whether or not RCRA was going to be

                          CARPENTER REPORTING, INC.
                             (303) 752-1200

                                                              218

1      applied to the plant, but the DOE gave us explicit

2      instructions on -- on what it did apply to.

3              Q     Okay.  How -- how did DOE give you those

4      instructions?  Is it Mr. Whiteman who personally --

5              A     Through the area office, starting with

6      Mr. Whiteman.

7              Q     And the area office and Mr. Whiteman

8      specifically told you that RCRA did not apply to

9      plutonium operations at Rocky Flats?

10             A     As I remember, in the '85 time frame --

11     '86 time frame, the -- already, RCRA was being applied

12     to pure hazardous waste streams at Rocky Flats, which

13     was a small number, but waste -- plutonium operations

14     had some of those.  So there was some application, but

15     all that was in flux as DOE was deciding where to go

16     with allowing RCRA to be applied to the weapons -- the

17     nuclear weapons complex.

18             Q     Did you personally ever weigh in on

19     whether RCRA applied to plutonium operations?

20                   MS. AHERN:  Object to the form of the

21     question as vague.

22             A     There were internal discussions within

23     Rockwell management about the application of RCRA

24     and -- and when and where we thought it would apply,

25     but DOE, at that point, was not asking Rockwell's

                       CARPENTER REPORTING, INC.
                            (303) 752-1200

                                                              219

1      opinion and was conducting whatever negotiations they

2      wanted to conduct without Rockwell's participation.

3                 Q    (BY MS. NOTEWARE)  The internal

4      discussions within Rockwell that you referenced, was

5      the conclusion within Rockwell that you were referring

6      to different than what the DOE's conclusion was about

7      the application of RCRA to Rocky Flats operations?

8                       MS. AHERN:  Objection.  Foundation.

9      Also, vague and ambiguous.

10                A    We had a fairly open-ended discussion.

11     My personal opinion was that RCRA would become -- would

12     apply to more and more waste forms at Rocky Flats over

13     time.

14                Q    (BY MS. NOTEWARE)  You referenced in a

15     prior answer to internal discussions within Rockwell.

16     Can you identify what internal discussions those were?

17                A    At the general staff level, which would

18     be at -- at that time, either Jack Dorr and shortly

19     after that Dominic Sanchini and his staff, our counsel

20     was telling us about the ongoing lawsuits that DOE

21     had --

22                Q    Uh-huh.

23                A    -- and how -- and what he believed would

24          be the likely outcome.

25                    Q     And those are the internal discussions

                        CARPENTER REPORTING, INC.
                           (303) 752-1200

                                                        220

1          that you were referencing?

2                    A     Yes.

3                    Q     Okay.  Did you ever personally take a

4          position as to whether RCRA applied to low-level waste

5          streams at Rocky Flats?

6                    MS. AHERN:  Object to the form of the

7          question as vague.

8                    A     I was -- I was aware -- we felt our

9          waste streams were -- were well-regulated under the DOE

10         regulations, the AEC regulations.  I was becoming more

11         familiar with what differences that would occur if we

12         were to be regulated under RCRA.  I did not know how

13         the -- how the -- the DOE and the EPA would work out

14         that situation.

15                   Q     (BY MS. NOTEWARE)  Okay.  Were you ever

16         involved in discussions with people at Rockwell or

17         outside that having plutonium operations at Rocky Flats

18         comply with RCRA would be cost-prohibitive?

19                   MS. AHERN:  Object to the form of that

20         question as vague.  The term "prohibitive."

21                   A     We -- we knew it would be -- it would

22         take some amount of resources.  We had to study it

23         quite a bit to understand the full cost.  We knew it

24         would be difficult and take some time.  I don't think

25    any of us felt it would be prohibitive in the sense

CARPENTER REPORTING, INC.
(303) 752-1200

221

1    that we couldn't get there or do it.

2              Q    (BY MS. NOTEWARE)  Did you ever advocate

3    to representatives of the State of Colorado that RCRA

4    shouldn't apply to low-level waste because of the cost

5    issue, personally?

6                        MS. AHERN:  Object to the term

7    "advocate" as vague.

8              A    I don't remember having any dealings

9    with the EPA or Colorado Department of Health until

10   after the compliance agreement.

11             Q    (BY MS. NOTEWARE)  But that wasn't my

12   question.  Did you ever advocate that RCRA didn't apply

13   to low-level waste because of cost issues?

14                       MS. AHERN:  Object to the form of the

15   question.

16             A    No.

17             Q    (BY MS. NOTEWARE)  Do you have any

18   relation to Roy Weston?

19             A    No, I do not.  And that has been a

20   source of confusion over the years.

21             Q    Just wondered.  I had to ask.  What

22   about Weston Consulting that did the WSC study?  Do you

23   have any relatives at Weston Consulting?

24             A    No.  I'm smiling because my consulting

25      company, I call Weston Consulting.

CARPENTER REPORTING, INC.
(303) 752-1200

222

1           Q     I'm talking about the one that did WSC.

2           A     No.

3           Q     And no -- no relationship to the Weston

4    of Hunsperger & Weston?

5           A     No.  Not that I'm aware of.

6                 MS. AHERN:  If I can interject, probably

7    no relation to Weston Court Reporting, either.

8           Q     (BY MS. NOTEWARE)  Or Westin Hotels,

9    which is with an I

10          A     And that's spelled differently.

11          Q     Out of all those, that would be the one

12   you would pick, I would imagine.

13                How did you originally come to work at

14   Rocky Flats?

15          A     I had worked at Lawrence Livermore

16   laboratory when I was a student for two summers in the

17   summer of 1968 and 1969.  I had a Q clearance that was

18   granted to me then.  It was still active, although I

19   wasn't using it.  I had taken a post-doc in Boulder,

20   Colorado.  At the end of that, my wife and I decided

21   that we wanted to stay in Boulder.

22                I had some other job offers, but I also

23   had one from Rocky Flats, and I decided that -- we

24   decided that we would stay in Boulder and I would go to

25   Rocky Flats.

CARPENTER REPORTING, INC.
(303) 752-1200

223

1          Q     So you applied to Rockwell or Dow?

2          A     I can't remember.

3          Q     Okay.  Okay.  Now, yesterday and

4     today -- this isn't the first deposition that you've

5     been involved in, is it, sadly enough?

6          A     No.

7          Q     Okay.  And if you testify next week in

8     court, that wouldn't be the first time that you

9     testified in court, either, is it?

10         A     No.

11         Q     Okay.  How many depositions have you

12    taken?  And I'm asking generally; not just involving

13    Rocky Flats.

14         A     Half a dozen.  Almost all Rocky Flats.

15         Q     Okay.  So you think about half a dozen

16    depositions involving Rocky Flats issues?

17         A     I think so.

18         Q     Okay.  Half a dozen depositions or half

19    a dozen cases that you were involved in?

20         A     Depositions.

21         Q     Okay.  And how many times have you

22    testified in court involving Rocky Flats issues?

23         A     I think once.

24         Q     Okay.  Which case was that?

25         A     Stone.

CARPENTER REPORTING, INC.
(303) 752-1200

224

1          Q    Okay.  Actually, let's go through the

2     other litigation involving Rockwell and Rocky Flats

3     that you've been involved with.  Are you familiar with

4     a -- the Church lawsuit that was filed against Rocky

5     Flats?  Marcus Church?

6          A    I remember it.

7          Q    Did you have any involvement with that?

8          A    I don't think so.

9          Q    What about the Sierra Club lawsuit?  You

10    had some involvement in that; right?

11         A    I remember it.  This -- if it's the one

12    I'm thinking of --

13         Q    Uh-huh.

14         A    -- that was late '89 and into '90.

15         Q    Do you remember what your involvement

16    was in that?

17              MS. AHERN:  If any.

18         Q    (BY MS. NOTEWARE)  If any.

19         A    If it's the one I'm thinking of, I don't

20    remember the details of my involvement, but I -- if

21    that's the one that was the second half of '89 and then

22    continued on after I left the plant site -- that's the

23    only one I can think of with Sierra Club.

24         Q    Okay.  And do you remember what that

25    one -- what that suit involved?

CARPENTER REPORTING, INC.

225

1          A    The one I'm thinking of is involving the

2    plutonium recovery incinerator in Building 771.

3          Q    Okay.  And do you recall if you

4    submitted an affidavit in that case?

5          A    I think I did.

6          Q    Okay.  Do you remember who counsel was

7    in the Sierra Club lawsuit?

8          A    No, I don't.  Not without reviewing some

9    documentation.

10         Q    The incinerator that was involved in the

11   Sierra Club lawsuit, was that the SNM recovery

12   incinerator?

13              MS. AHERN:  Objection.  Vague as to the

14   term.

15         Q    (BY MS. NOTEWARE)  Do you know what the

16   SNM recovery incinerator is?

17         A    I believe that is a title for the

18   special nuclear material recovery.  I remember it as

19   the plutonium recovery incinerator, but ...

20         Q    And what building was the SNM or

21   plutonium recovery incinerator?

22         A    Building 771.

23         Q    Okay.  Is it accurate to say that the

24   primary purpose of the SNM recovery incinerator is the

25   ongoing processing and recovery of plutonium rather

1    than disposal or discard of wastes?  Is that accurate?

2              MS. AHERN:  Object to the question.

3    Vague as to time.

4         A    Would you read that again for me.

5         Q    (BY MS. NOTEWARE)  The primary purpose

6    of the SNM recovery incinerator is the ongoing

7    processing and recovery of plutonium rather than

8    disposal or discard of wastes?  Is that an accurate

9    statement?

10             MS. AHERN:  My objection is vague as to

11   time.  The question is posed in present tense.

12        A    In -- in my time frame as -- as director

13   of plutonium operations, the plutonium recovery

14   incinerator was used for the recovery of plutonium.

15        Q    (BY MS. NOTEWARE)  What does

16   "processing" mean?

17        A    Part of preparing the plutonium for

18   re -- recovery to plutonium metal.  It's a process.

19        Q    Okay.  Was the SNM recovery incinerator

20   being used in December of 1989?

21        A    December of 1989.  I -- I can't recall.

22        Q    Was it ever used after March 1989?  You

23   don't remember the dates?

24        A    I don't remember the dates.

25        Q    The SNM recovery incinerator is the one

227

1    that was the subject of Mr. Lipsky's testimony; is that

2    correct?

3                MS. AHERN:  Objection.  There were

4    multiple incinerators that were the subject of

5    Mr. Lipsky's testimony.

6         Q    (BY MS. NOTEWARE)  The one that was in

7    Building 771 that was supposedly operated during the

8    December 1988 plant shutdown.  Is that correct?

9         A    I believe so --

10        Q    Is that the same thing?

11        A    I believe so, yes.

12        Q    Were there other incinerators other than

13   the SNM incinerator in Building 771 in the 1988-89 time

14   frame?

15        A    My memory is no.

16        Q    So the HSA and LSA incinerators were not

17   in operation at that time?

18                MS. AHERN:  Objection.  Vague and

19   ambiguous.

20        Q    (BY MS. NOTEWARE)  High specific

21   activity incinerators and low specific activity

22   incinerators?

23        A    I -- I vaguely remember those, and if

24   they are the ones I'm thinking of, they were in

25   Building 371 and were not in operation, but, boy, I'd

CARPENTER REPORTING, INC.
(303) 752-1200

1    have to look at the documentation to be clear on that.

2           Q    (BY MS. NOTEWARE)  Actually, I'm going

3    to show you this and, unfortunately, I don't have a

4    copy because our copy machine broke last night and I

5    didn't get a chance to copy this.  What I'm going to

6    show you and have it marked as Exhibit 6 --

7                (Marked for identification was

8    Deposition Exhibit No. 6.)

9           Q    (BY MS. NOTEWARE)  I'm showing you --

10               MS. AHERN:  Can we go off the record for

11   a second?

12               (There was a discussion off the record.)

13          Q    (BY MS. NOTEWARE)  Okay.  I'm showing

14   you what's been marked as Deposition Exhibit 6, and

15   it's an affidavit that appears to have been signed by

16   you in December of 1989 and the caption on it is the

17   Sierra Club v. Rockwell and DOE lawsuit in the District

18   of Colorado.  I'll ask you to take a look at that.

19   There is some highlighting on it because it was my copy

20   that I couldn't manage to copy.  If you want to take a

21   second to review it --

22          A    Please.

23          Q    -- and let me know if everything is

24   accurate.  It's about a six- or seven-page document.

25          A    (Deponent reviewing exhibit.)

```
 1                Okay.

 2         Q    Okay.  And my question is is everything

 3    accurate, as far as you recall, in that affidavit?

 4         A    At this point, to the best of my

 5    knowledge, 16 years later, yes, it is accurate.

 6         Q    Okay.  And did you prepare that

 7    affidavit, or did an attorney prepare it and -- and

 8    have you sign it?

 9         A    I -- I don't remember.

10         Q    Okay.  And you don't remember what

11    lawyers it was that -- that were in -- contacted you?

12         A    I really don't.

13         Q    Do you remember -- it wasn't Kirkland &

14    Ellis, though?  This is the first time you've dealt

15    with Kirkland & Ellis?

16         A    I'm pretty certain it was not Kirkland &

17    Ellis.

18                MS. AHERN:  I can state for the record

19    that Kirkland & Ellis wasn't involved in the Sierra

20    Club lawsuit.

21         Q    (BY MS. NOTEWARE)  It was different

22    lawyers.  Okay.  Beyond the affidavit that you

23    submitted in the Sierra Club lawsuit, can you recall

24    any other involvement that you had in that suit?  Were

25    you deposed; do you know?
```

1          A     If I was -- I don't remember being

2     any -- any other involvement after this.

3          Q     Do you remember that involvement?  Do

4     you remember --

5          A     Barely.  Barely.  This was my last month

6     on the plant site.

7          Q     Okay.  Were you involved in the Sierra

8     Club lawsuit prior to submitting that affidavit?

9          A     I really can't remember.

10          Q     There was another lawsuit filed by Jim

11     Stone.  Are you familiar with that lawsuit?  Obviously,

12     you testified in the case; right?

13          A     I am somewhat familiar with that

14     lawsuit.

15          Q     Okay.  Do you know who Mr. Stone is?

16          A     I knew who he was, yes.

17          Q     Did he report to you?

18          A     I don't think he was ever in any of my

19     organizations.

20          Q     Okay.  How did you become involved in

21     that case?

22          A     I -- I don't remember exactly how.  I

23     began to give depositions in the nineties and at some

24     point, was asked to testify in the -- in the Stone

25     trial.

1          Q     Yesterday, you mentioned John Stocker

2  from Rockwell's legal group.  Do you remember that?

3         A    Yes, I do.

4         Q    Okay.  Was Mr. Stocker involved in the

5  Jim Stone suit?

6         MS. AHERN:  Objection.  Foundation.

7         A    I don't remember.

8         Q    (BY MS. NOTEWARE)  Was he the one who

9  contacted you about the Jim Stone lawsuit?

10        A    I don't remember.

11        Q    Okay.  Your involvement with this Jim

12  Stone lawsuit took place after you left Rocky Flats?

13        A    Yes.

14        Q    Did you -- what law firm were you

15  involved with with regard to the Stone lawsuit?

16        A    I don't remember the full name.  I

17  remember dealing with Mike Williams, among others.  I

18  can't remember the name of the -- the law firm.

19        Q    Okay.  But it was a different law firm

20  from the Sierra lawsuit and a different law firm from

21  Kirkland & Ellis?

22        A    I don't remember the Sierra Club law

23  firm, but I do remember Mike Williams.

24        Q    From the Stone lawsuit?  That was the

25  person who prepared you for your trial testimony?

CARPENTER REPORTING, INC.
(303) 752-1200

232

1        A    Yes.

2          Q    Okay.  And you also gave depositions in

3    that case?

4          A    I gave depositions.  I -- I can't

5    remember now if they were for that case specifically,

6    but I gave depositions.

7          Q    Okay.  And a lot of the subjects of the

8    depositions that you gave in the Stone lawsuit and

9    other litigation involved the production of pondcrete;

10   is that correct?

11         A    Yes, it is.

12         Q    Have you reviewed that testimony

13   recently?

14         A    I -- I did reread those depositions or

15   at least some of them.

16         Q    Okay.  Is there anything inaccurate

17   in -- in your testimony in those --

18         A    There were an awful lot of pages.

19         Q    I hear you.

20         A    Yes.  Without going through them in

21   great detail -- nothing sticks out that -- at this

22   point.

23         Q    Is the same true of your trial testimony

24   in Jim Stone -- let me clear that up.

25              First of all, did you review your trial

CARPENTER REPORTING, INC.
(303) 752-1200

233

1    testimony in the Stone case?

2          A    I think.

3          Q     It was much shorter?

4          A     I think so.  I think so.  And again, I

5    don't remember anything in detail without going through

6    it again in detail, but I don't remember anything I

7    disagree with at this point.

8          Q     Now, another -- another case that you

9    were involved with was the criminal investigation of

10   Rockwell by the U.S. Attorney's office here in

11   Colorado; correct?

12         A     Yes.

13               MS. AHERN:  Object to the term

14   "involved" as vague.

15         Q     (BY MS. NOTEWARE)  Well, you received a

16   target letter from that investigation; correct?

17         A     I did, yes.

18         Q     And you spoke with the FBI on at least

19   one occasion; correct?

20         A     At Rocky Flats during their period on

21   site, yes.

22         Q     Okay.  And let me go back a second.  The

23   Sierra Club lawsuit, as far as you recall, you weren't

24   represented individually by counsel, were you?

25         A     I certainly don't think so.  I can't

                CARPENTER REPORTING, INC.
                     (303) 752-1200

1    remember, but I don't think so.

2          Q     Was the same true in the Stone suit?

3          A    I'm -- I'm un -- I'm unclear how to

4    answer that.  I remember working with Mike Williams.  I

5    don't know if that entails being represented or not.  I

6    was a witness at that -- at that case.

7          Q    Okay.  But in the criminal investigation

8    of Rockwell, you were represented by Brian Morgan of

9    the Haddon Morgan law firm; is that correct?

10              MS. AHERN:  Object.  Misstates the

11   witness's testimony.

12         Q    (BY MS. NOTEWARE)  I'm not -- I don't

13   want to talk about your testimony.  I just want to know

14   who represented you in the --

15              MS. AHERN:  Like I said, that's what

16   misstates his testimony.  He identified his counsel

17   yesterday.

18         Q    (BY MS. NOTEWARE)  Okay.  I'm not -- I'm

19   not referring to your testimony from yesterday.  Were

20   you represented by any attorney in the criminal

21   investigation?

22         A    I did retain counsel, as I mentioned

23   yesterday, that represented me during -- during that --

24   in that period of that investigation.

25         Q    And that's Vince --

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                         235

1          A    Maurella, I believe, was his last name.

2          Q    So it's your testimony here that you

3    weren't ever represented by Brian Morgan?

4            A    I remember Brian Morgan.  I remember

5    that law firm.  I remember having interactions with

6    them while I was at Rocky Flats.  I don't remember any

7    interaction with them once I left Rocky Flats, but I

8    can't be certain.

9            Q    Okay.

10           A    I just don't remember at this point.

11                MS. NOTEWARE:  Let's mark this as No. 7,

12   please.

13                (Marked for identification was

14   Deposition Exhibit No. 7.)

15                THE DEPONENT:  Do you mind if I get

16   another cup of coffee?

17                MS. NOTEWARE:  Sure.  Let me find

18   another copy.  I think I have another copy of this.

19                (There was a brief delay in the

20   proceedings.)

21                MS. AHERN:  Can we go off the record?

22                (There was a discussion off the record.)

23           Q    (BY MS. NOTEWARE)  It's -- you can

24   review this in greater detail, but I want to focus on

25   the first paragraph because it's a 12-page document.

CARPENTER REPORTING, INC.
(303) 752-1200

                                                    236

1    Plaintiffs' Exhibit 7, the first sentence says,

2    "William F. Weston was interviewed in his office, room

3    109 of Building 11.  Present was an attorney Brian

4      Morgan, representing Mr. Weston."

5                  Is that -- do you have any reason to

6      believe that that's inaccurate?  That was while you

7      were still at Rockwell.

8            A    Yes.  And I do remember Brian Morgan.  I

9      have no reason to disagree with this.

10           Q    And he was representing you in your

11     capacity as an employee of Rockwell?

12           A    I -- based on what I'm reading here, he

13     was, yes.

14           Q    Okay.  Now, do you remember -- do you

15     remember your conversation with the FBI agent in 1989

16     at the plant site?

17           A    I -- I don't remember the details of

18     them.  Their -- there was at least one, probably more

19     than one conversation, but I don't remember the details

20     of them.

21           Q    Okay.  Do you know -- can you recall a

22     conversation with the FBI where counsel for Rockwell

23     was not present?

24           A    I -- I don't remember.

25           Q    Okay.  Have you reviewed your FBI

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                   237

1      interview transcript -- they call it a 302 -- in

2      preparing for this case?

3                  MS. AHERN:  Object to the form of the

4      question.  Object to the characterization of the

5    document as a transcript of the interview.  It is not.

6              Q    (BY MS. NOTEWARE)  Okay.  I'll rephrase.

7    Have you seen Plaintiffs' Exhibit 7 before?

8              A    I -- if I have, I don't remember it.  I

9    mean -- and I've only just glanced at it.  But I --

10   I -- I don't remember this.

11             Q    Okay.  I want to ask -- it's a

12   multi-page document, and I'm not going to ask you to

13   review the entire thing, but if you -- if you want to,

14   I'm perfectly willing to go off the record and let you

15   do that.

16             MS. AHERN:  I would urge you to review

17   the whole thing.

18             MS. NOTEWARE:  Why don't we go off the

19   record for a few minutes.

20             THE DEPONENT:  Thank you.

21             (There was a recess taken from 9:27 a.m.

22   to 9:35 a.m.)

23             Q    (BY MS. NOTEWARE)  As you sit here

24   today, is there anything that's inaccurate about the

25   document that's been marked as Plaintiffs' Exhibit 7?

CARPENTER REPORTING, INC.
(303) 752-1200

238

1              MS. AHERN:  Object to the form of the

2    question as vague.

3              A    In -- in reviewing the document briefly,

4    but I hope somewhat thoroughly, I didn't see anything

5    at this point that I would disagree with.

6         Q    (BY MS. NOTEWARE)  Okay.  Before we turn

7    to that, I want to ask you a question -- a couple

8    background questions.  You received the target letter

9    before or after this interview took place in June of

10   1989?  It was much later; right?

11        A    I think it was much later, yes.

12        Q    And the target letter meant that you

13   were a subject of an investigation and could have been

14   indicted; correct?

15        A    That was the way it was explained to me,

16   yes.

17        Q    And did you retain your separate

18   counsel, Mr. Maurella, before or after you received the

19   target letter?

20        A    I believe it was before.

21        Q    Now, turning back to this document,

22   Plaintiffs' Exhibit 7, the second paragraph -- well, in

23   the first paragraph of the document, you were asked

24   whether the Building 771 incinerator -- that's the same

25   thing as the SNM incinerator that was the subject of

CARPENTER REPORTING, INC.
(303) 752-1200

239

1    the Sierra Club lawsuit in Building 771 -- whether that

2    had been operated during the public shut -- publicly

3    stated shutdown which was between October 7th and

4    January -- October 7th, 1988, and January 20th,

5    1989.  At that time, June 20th, 1989, you advised

6       that you did not know -- to the best of your knowledge,

7       the -- the incinerator was not operated during that

8       period; is that correct?

9             A    Yes, it is.

10            Q    Okay.  On June 20th, 1989, what had

11      you done -- this is two weeks after the FBI raid --

12      what had you done to determine that the incinerator

13      hadn't been run during that public shutdown -- or

14      publicly disclosed shutdown?

15            A    Once we learned that the -- the details

16      in the affidavit which was several days after the --

17      the FBI came to the plant site -- and I can't remember

18      exactly when -- it was -- the incinerator was one of

19      the key issues to be investigated.  While I did talk to

20      my management team in that chain, very quickly --

21      because I was surprised by the allegation, the formal

22      investigations were -- were quickly taken over by

23      different organizations, different groups, including

24      outside people.

25                  So at that point, I did not pursue

1       personally any further investigations.  I awaited the

2       results of the investigation teams.

3             Q    Okay.  So two weeks later, after the FBI

4       raid and maybe ten days or so after you had -- Rockwell

5       had determined that the incinerator -- the operation of

6        the incinerator was one of the things that the FBI was

7        focusing on, you had not reviewed any documentation

8        about the incinerator; correct?

9                 MS. AHERN:  Objection to the form of the

10       question as to the timing issues.  I don't think he's

11       testified that he understands -- recalls any of those

12       timing issues.

13                 A     Could you --

14                 Q     (BY MS. NOTEWARE)  My question is:

15       Whether before this FBI interview in -- June 20th,

16       1989, whether you had reviewed any documentation

17       concerning the incinerator to determine that it had not

18       been operated.

19                 MS. AHERN:  I object to the form of the

20       question.  I just don't think that this witness has

21       established that he recalls the specifics of that

22       date -- those dates and timing.  That's my concern.

23                 Q     (BY MS. NOTEWARE)  And that's why I was

24       helping you out.  The raid was two weeks earlier.  A

25       few days after that, you just testified that Rockwell

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                        241

1        determined what the allegations in the -- in the

2        affidavit were.

3                 A     And I'm just unclear in the timing.

4        I -- it was -- it was three or four days, I remember,

5        after the FBI came on the plant site that we saw the

6        affidavit.  I don't remember exactly when.

7           Q      Right.

8           A      And -- and so I would have had some

9    window in there prior to June 20th to -- to do some

10   personal review besides talking to people.  I just

11   don't remember if I did.

12          Q      Okay.  So you don't remember whether you

13   had reviewed documentation prior to this interview?

14          A      I just -- without looking at something

15   else, I just -- I just don't remember.

16          Q      But, at some point, you remember

17   personally reviewing the documentation?

18          A      I do remember looking at the various

19   pieces of documentation that had been used by the

20   various investigation teams to determine their

21   conclusions.

22          Q      Okay.  And you were present during Ron

23   Avery's testimony in court?

24          A      I was, yes.

25          Q      Okay.  And what documentation did you

CARPENTER REPORTING, INC.
(303) 752-1200

242

1    personally review about the incinerator operation

2    during the shutdown?

3           A      I don't recall at this point, but I -- I

4    do remember that -- as the investigations concluded,

5    reviewing all the documentation that they had collected

6    to -- in their determination.

7        Q    Okay.  Now, you had several meetings

8    with employees following the FBI raid to discuss the

9    FBI raid; is that correct?

10        A    I did, yes.

11        Q    Okay.  Were you directed to do that, or

12    is that something that you decided to do as director of

13    plutonium operations?

14        A    No.  I was not directed.  I -- my

15    approach as a -- as a manager had always been to be

16    open with my people and give them the best information

17    I could.  This was such a -- a huge topic on the plant

18    site.  There was so much consternation of employees

19    that I felt obligated to tell them what I knew, which

20    wasn't much, but at least to go down and talk with them

21    and allow them a chance to ask me questions.

22        Q    Okay.  Were you aware that some

23    employees felt intimidated by the company during the

24    investigation?

25             MS. AHERN:  Objection.

CARPENTER REPORTING, INC.
(303) 752-1200

243

1        Q    (BY MS. NOTEWARE)  Had you ever heard

2    reports about that?

3             MS. AHERN:  Objection to the term

4    "intimidated" as vague.

5        Q    (BY MS. NOTEWARE)  Do you know what

6    "intimidated" means?

7             MS. AHERN:  Also, object to the

8     predicate as not in evidence -- or not established on

9     the record.

10            A     Would you repeat that again for me?

11            Q     (BY MS. NOTEWARE)  I'll ask a new

12    question.

13            A     Okay.

14            Q     Have you ever heard that employees at

15    Rocky Flats felt intimidated by Rockwell during the

16    course of the FBI investigation?

17            A     I don't remember hearing that, no.

18            Q     Okay.  Later on in -- in Plaintiffs'

19    Exhibit 7, you were asked whether -- or you say that

20    you did not say this is on -- this is on page 3 -- "he

21    did not say that whistle-blowers will be dealt with at

22    any of the meetings."  Do you see that?  It's the third

23    paragraph of page 3.

24                    MS. AHERN:  Let me get there.

25            Q     (BY MS. NOTEWARE)  It's in the middle of

                        CARPENTER REPORTING, INC.
                              (303) 752-1200

                                                        244

1     the third paragraph.

2             A     I do see this, yes.

3             Q     Okay.

4             A     And what's the question?

5             Q     Do you recall discussing that with the

6     FBI?  My question was just:  Did you see that?  I was

7     trying to get you there.

8           A    I sort of remember discussing it.  I

9   remember being asked about that comment --

10          Q    Okay.

11          A    -- or alleged comment --

12          Q    Okay.

13          A    -- which I absolutely did not make.

14          Q    Okay.  You didn't make.  But did you

15  hear anyone concerned about -- concerned about being a

16  whistle-blower?  You weren't aware of any concerns

17  about anyone cooperating with the FBI?

18          A    In my meetings, I told all my employees

19  that we would fully cooperate with the investigation

20  and the FBI.  I did not -- I don't remember anyone

21  coming back with any counter to that and saying that

22  they wouldn't or they would deal with whistle-blowers.

23  I don't remember anything.

24          Q    You would be surprised if a witness came

25  into court and said that there was some atmosphere of

CARPENTER REPORTING, INC.
(303) 752-1200

245

1   intimidation among the workers at Rocky Flats during

2   the FBI investigation?

3           A    I knew there was -- that the employees

4   had felt very intimidated by the FBI.

5           Q    Who was intimidated by the FBI?

6           A    My understanding is many of the -- many

7   of the people there were concerned about the FBI

8   presence and felt intimidated, but I didn't know of

9      anyone who said they were intimidated by Rockwell.

10              Q    Okay.  Do you know who Zimmie Fay

11     Williams is?  Zimmie Fay Williams.  Is that a name of

12     an employee at Rocky Flats that you were --

13              A    Zimmie Fay --

14              Q    Zimmie, Z-i-m-m-i-e.  She was in the

15     plutonium operations.

16                   MS. AHERN:  I think she had a different

17     name.

18              Q    (BY MS. NOTEWARE)  Zimmie Smith.

19              A    I just don't recall.

20              Q    A black woman?

21              A    I just don't remember.

22              Q    Okay.  So, as far as you know, during

23     the FBI investigation and when Haddon Morgan was the

24     counsel of record for Rockwell, no employee felt

25     intimidated by anything that Rockwell did; right?

1      That's your testimony?

2               A    I don't remember anyone telling me they

3      were intimidated by Rockwell or hearing that.

4               Q    You didn't hear any -- anyone -- but you

5      did hear that they were intimidated by the FBI, but not

6      by Rockwell?

7               A    That's what I remember at this point.

8               Q    Okay.  Now, you testified before the

9        grand jury; right?

10               A     No, I did not.

11               Q     And you talked about the team of -- but

12       many people did testify before the grand jury; correct?

13               A     That's my understanding, but I don't

14       have any -- any idea of the total number or who at this

15       point.

16               Q     Okay.  What was your involvement in the

17       investigation?  And let me ask a more specific

18       question.  Mr. McNett, what was his position at

19       Rockwell?

20               A     He was the chief counsel for Rockwell at

21       Rocky Flats.

22               Q     Okay.  And you've had conversations with

23       him over the years about the criminal investigation;

24       correct?  I don't want to know the subject of those

25       discussions.

                   CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    247

1                A     Once I left Rocky Flats?

2                Q     During your time at Rocky Flats and

3        after.

4                A     During my time at Rocky Flats, I had

5        conversations with Mr. McNett.  I'm not sure that after

6        I left Rocky Flats that I had any conversations with

7        him.

8                Q     Okay.  Did you have meetings with

9        Mr. McNett and other people, or just individual

10    discussions with Mr. McNett?

11             A    Probably both.

12             Q    From October 1989 through December 1989,

13    you were essentially the plant manager; correct?

14             A    From --

15             Q    October of -- September, October 1989

16    through --

17             A    Yes.  And no.  Let me explain that,

18    please.  Dom Sanchini had left to be treated for his

19    cancer.

20             Q    Right.

21             A    Once he recovered sufficiently from the

22    surgery, even though he was still undergoing

23    chemotherapy, he still, when he could, came back to the

24    plant site for a few days a week.

25             Q    Uh-huh.

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                        248

1              A    During those periods, Dom was in charge.

2     When he was not there, I was in charge.

3              Q    Okay.  After Haddon Morgan -- the Haddon

4     Morgan firm was retained, which was in mid-1989 at some

5     point -- I don't know the exact date -- did you have

6     meetings with attorneys from that firm and Mr. McNett

7     concerning the FBI investigation?

8              A    I don't remember them specifically, but

9     probably.  But I don't remember at this point.

10          Q    Okay.  Do you remember how Brian Morgan

11    came to be present with you at the June 20th, 1989,

12    interview with the FBI?

13          A    At this point, I don't.  I -- I -- I

14    sort of remember that I would have counsel there.  I'm

15    not sure I knew who it was going to be.

16          Q    Did -- did interviews of Rockwell

17    employees by the grand jury begin before you left the

18    plant?

19          A    I don't --

20               MS. AHERN:  Object to the form of the

21    question as vague.

22          Q    (BY MS. NOTEWARE)  I can rephrase it.

23    Do you -- was the grand jury impaneled before you left

24    the plant?

25          A    I -- I can't remember the exact dates.

CARPENTER REPORTING, INC.
(303) 752-1200

249

1    I'm sort of thinking it was, but I just don't remember

2    the dates when that happened.

3          Q    Are you aware that attorneys from the

4    firm of Haddon Morgan or other investigators or

5    attorneys interviewed the employees of Rockwell who

6    testified before the grand jury?  Are you aware of

7    that?

8          A    I don't remember.

9          Q    So you didn't know that the attorney --

10    the attorneys or investigators debriefed Rockwell

11    employees following their -- their testimony before the

12    grand jury?

13             MS. AHERN:  I object to the form of the

14    question.  It misstates his testimony.

15             MS. NOTEWARE:  I'm not misstating your

16    testimony.  I'm asking.

17             MS. AHERN:  He stated he didn't

18    remember.

19        A    What I can remember is that our -- that

20    employees were offered counsel if they wanted it.

21        Q    (BY MS. NOTEWARE)  Uh-huh.

22        A    I wasn't aware of debriefings or any of

23    that until much later in the -- in the investigation.

24    And I don't remember exactly when that was.  But well

25    after I left Rocky Flats.

CARPENTER REPORTING, INC.
(303) 752-1200

250

1         Q    You are aware that after Rockwell

2    employees testified to the grand jury, they were

3    debriefed --

4         A    I --

5         Q    -- about what their testimony was?

6         A    I had thought that that -- that some of

7    them were, if they permitted it, but I didn't know how

8    many or -- or -- or any of that.

9         Q    Okay.  Did you offer counsel to Rockwell

10    employees at these meetings that you had before you

11    left the plant?

12              A    Did I?

13                   MS. AHERN:  You're asking him

14    personally?

15              Q    (BY MS. NOTEWARE)  Yeah.  Did you

16    personally?  I mean that Rockwell would retain counsel

17    for you.

18              A    No.  That was not my -- I had no

19    authority to do that.

20              Q    Okay.  Do you recall anything that you

21    said at the meetings with employees in the June 1989

22    time frame?

23              A    The details of --

24              Q    Uh-huh.

25              A    No.  I remember telling them -- let me

CARPENTER REPORTING, INC.
(303) 752-1200

251

1    rephrase that.

2                   There had been a lot of information --

3    information -- a lot of things on the television.  I

4    remember telling them that -- that we had just gotten

5    the affidavit.  That we did not believe we had

6    committed any of those allegations.

7              Q    Uh-huh.

8              A    That we were going to do a thorough

9    investigation and that we would fully cooperate.  And

10   that's about all I could tell them at that point.

11             Q    All right.  And is that something that

12    you had cleared with Mr. McNett before you told the

13    attorneys -- the employees?

14              A    That I had to --

15              Q    Did you clear your message with anyone

16    at Rockwell, not even specifically Mr. McNett?

17              A    I did not clear that message with anyone

18    at Rockwell.

19              Q    Okay.  Now, you said -- if I understood

20    your testimony, you told the employees that, basically,

21    the FBI allegations were baseless, as far as you knew;

22    right?

23              A    As I recall, 16 years later, in our

24    first review of those allegations, we were astonished

25    and -- that the more we looked at it, the more we felt

CARPENTER REPORTING, INC.
(303) 752-1200

252

1    we had not done any of that.  And that is, I believe,

2    what I told the employees.

3              Q    That you were astonished?

4              A    I'm not sure I used the word

5    "astonished."  Personally, I was astonished, but I'm

6    not sure I used that word.  I did tell them they were

7    going to be fully investigated and that we felt

8    initially that we had not done any of those

9    allegations, but we were going to find out.

10             Q    Okay.  When you say "we," who are you

11    referring to?

12          A     The investigation teams that Rockwell

13     had, that DOE had.

14          Q     Okay.  Who were on the investigation

15     teams?  What investigation team were you on?

16          A     I was not on any investigation team.

17          Q     Okay.  Did you review the FBI affidavit?

18          A     I review -- I read the -- when it was

19     made available, I did -- I think I did read it.

20          Q     Okay.  I'm trying to understand your

21     testimony here.  You met with these employees that you

22     said we're astonished, we didn't do any of this stuff?

23     Is that -- is that accurate?

24               MS. AHERN:  I object.  Misstates his

25     testimony.  He says he doesn't recall if he ever said

CARPENTER REPORTING, INC.
(303) 752-1200

253

1     he was astonished.

2          A     I did meet -- I did meet with as many of

3     the employees --

4          Q     (BY MS. NOTEWARE)  When I ask you a

5     question, I'm not using quotes.  I was using your word.

6          A     Yeah.

7          Q     You did say "astonished."  It's not

8     squashed or scraped or whatever I was saying before.

9               MS. AHERN:  He also expressly said he

10     didn't remember he said that.

11          Q     (BY MS. NOTEWARE)  Not that exact word.

12     It wasn't astonished in quotes.

13          A    I don't remember my exact words.

14          Q    I'm not asking you about your exact

15   words.  Okay?

16          A    I think I did try to tell them that we

17   felt, after reading them and a quick review, that we

18   did not do any of those allegations, but they were

19   going to be fully investigated and we would -- we would

20   find out.

21          Q    But now, this was your personal message

22   that you were giving to the employees that you just

23   didn't clear with anyone at Rockwell; right?

24          A    That's right.

25          Q    And when you're saying "we," you mean

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                         254

1    you personally read the FBI affidavit before you talked

2    to the employees?

3           A    I'm pretty sure I did.

4           Q    Okay.  And you said if -- and this isn't

5    verbatim, but if I understood your testimony, you said,

6    you know, as we were looking through the affidavit, we

7    were astonished.  I have read it, and couldn't believe

8    that these things were being alleged; is that right?

9           A    That was my personal feeling.

10          Q    Okay.  So you read it, and that was your

11   feeling as you read it?

12          A    Yes.

13          Q     So when you said "we," you really meant

14    "I"?

15          A     I knew there were others at -- at Rocky

16    Flats in management who felt as I did.  I don't know

17    that they would use the term "astonished."

18          Q     Who were the others that you spoke with

19    about the affidavit before you spoke to the attorneys?

20          A     Boy, I -- I just don't remember.

21    There -- I don't remember how that all came out.  When

22    it was -- when it was finally made available to us,

23    I -- I don't remember whether or not Dom Sanchini got

24    us all together to talk about it or whether we just

25    looked at it individually or whether McNett talked to

CARPENTER REPORTING, INC.
(303) 752-1200

255

1     us.  I don't remember how we did that.

2           Q     Okay.  Leave this aside for a second.  I

3     have a question about the way things worked at Rocky

4     Flats.  Were you ever given backgrounders about what

5     information should be given to the public or media that

6     were approved by Rockwell and DOE?  Do you remember

7     that?

8                 MS. AHERN:  Object to the form of the

9     question.

10          Q     (BY MS. NOTEWARE)  Do you know what I

11    mean by "backgrounder"?

12          A     I'm not sure.  Go ahead.

13          Q     Do you recall ever getting guidelines

14    from -- that were approved by Rockwell and the DOE

15    about what you should say to the media or the public

16    when responding to questions from them?  Were there

17    approved messages from Rockwell and the DOE?

18              MS. AHERN:  Object to the form of the

19    question.  Vague as to time.

20          Q    (BY MS. NOTEWARE)  During your tenure at

21    Rocky Flats?

22              MS. AHERN:  Still vague as to time.

23          A    I don't remember.  The -- I just can't

24    recall at this point.  And so I'm not sure what else to

25    say.

CARPENTER REPORTING, INC.
(303) 752-1200

256

1          Q    (BY MS. NOTEWARE)  Okay.  So there

2    weren't approved messages that you can recall from DOE

3    and Rocky Flats about what you should be telling

4    people?

5          A    I just don't remember.

6              MS. AHERN:  Object to the question as

7    argumentative.  Object to the form.

8          Q    (BY MS. NOTEWARE)  Okay.  And you don't

9    recall ever being given instructions on what to say to

10    employees about the affidavit from other managers at

11    Rockwell; correct?

12          A    No.

13          Q    Okay.  You were told by Doug Smith that

14      he had been told by employees that the incinerator --

15      I'm looking at the first page of the document, third

16      paragraph.

17              A    I see it.

18              Q    "Doug Smith informed him privately that

19      he believed the incinerator may have been operated in

20      December."  Do you see that?

21              A    Yes.

22              Q    Okay.  Do you recall that conversation?

23              A    I -- in reading this, I begin to recall

24      it.  I -- but I had forgotten how some of that

25      information came to me after my meetings.

CARPENTER REPORTING, INC.
(303) 752-1200

257

1               Q    Now, Mr. Smith told you privately that

2       he thought the incinerator was operated in December;

3       correct?  You have no reason to dispute this?

4               A    I'm reading this now.  I can't remember

5       the conversation and the details of it, so, in reading

6       this, I have no reason to either agree or disagree,

7       but, in some fashion, Mr. Smith did tell me that he had

8       gotten information that might be contrary to -- to my

9       opinion that the incinerator had not run.

10              Q    And why didn't you believe Mr. Smith's

11      information?

12              A    It's not -- I didn't either disbelieve

13      it or believe it.  We -- I knew we were investigating

14      it and we were going to find out.  It -- it made me

15    nervous in that some people felt that it had run.  That

16    surprised me.  And I hoped they were wrong, but I

17    didn't have any way to know at that point.

18              Q    Okay.  Now, on June 13th, assuming this

19    is accurate, Mr. Smith told you that he thought the

20    incinerator had run; correct?

21              A    I'm reading it now.

22              MS. AHERN:  I object to the

23    characterization of the question as representing

24    Mr. Smith's own opinion.

25              Q    (BY MS. NOTEWARE)  Is that what it says?

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                        258

1               MS. AHERN:  I don't think it says that.

2               Q    (BY MS. NOTEWARE)  Is that what it says?

3               A    That is what it says.  I just can't

4     remember how that conversation went down.

5               Q    Okay.  But you remember that there was a

6     conversation with Mr. Smith?  That's not just the FBI

7     making that up?

8               A    In reading this, it begins to come back

9     to me that, as I was walking out of the building after

10    the meeting, Doug came to me, but I can't remember much

11    more than that.

12              Q    But you don't recall, after Mr. Smith

13    came to you, saying -- calling the FBI and saying, I

14    have some information that the incinerator ran;

15   correct?  That wasn't what you did, as far as you can

16   recall; right?

17          A    No.  I can't recall that.

18          Q    Okay.  And if this is correct and you

19   have no reason to dispute it -- you said you asked Dee

20   Sherrill to look into it.  Is that correct?  Is that

21   what it says here?

22          A    Yes.  That is what it says there.  I --

23   in remembering back, I know that, at some point, Dee

24   Sherrill -- as my manager of plutonium recovery and my

25   direct report, I asked him almost immediately to look

CARPENTER REPORTING, INC.
(303) 752-1200

259

1    into the incinerator --

2           Q    Okay.  And after you determined --

3           A    -- allegation.

4           Q    -- that there had been people who said

5    they were working the weekend of December 18th, you

6    contacted Mr. McNett with Mr. Sherrill; is that

7    correct?

8                MS. AHERN:  I think that you just

9    misstated the document.  You said December 18th.  Is

10   that what you intended to say?

11               Q    (BY MS. NOTEWARE)  If I did, I meant

12   December 11th, but that's not really important.  My

13   question is:  As far as you can recall -- and if this

14   refreshes your recollection -- did you speak with

15   Mr. McNett after being informed that the incinerator

16    may have been operated during the publicly disclosed

17    shutdown?

18         A    Again, in my reading this, I -- I have

19    no reason to agree or disagree.  I do think that after

20    I heard that, that I did go to Jack.  I can't remember

21    if Dee Sherrill was with me or not.  I'll accept that

22    he was in reading this.  But I did go right to our

23    counsel with that information.

24         Q    Okay.  Did you -- did you -- do you

25    recall a conversation with Mr. McNett about the

CARPENTER REPORTING, INC.
(303) 752-1200

260

1    incinerator?

2         A    I just don't.

3         Q    Okay.  You don't have any memory about

4    what you said to Mr. McNett?

5         A    No, I don't.

6         Q    Okay.

7         A    I mean, other than I would have told

8    him, you know, I think what Doug Smith had told me

9    and -- but I don't remember how we talked about it and

10    what was said.

11         Q    But you have no reason to disagree with

12    what's written here from your memory?  Your memory

13    isn't different from what's written in this FBI

14    interview notes?

15         A    You know, without look -- I can't agree

16    or disagree.  This went down in some fashion and -- and

17    I have no reason to -- to think it was other than this.

18    I just don't remember.

19         Q    Okay.  And you have no reason to

20    disagree that your counsel at this interview,

21    Mr. Morgan, directed you not to disclose information

22    that was privileged concerning your meeting with

23    Mr. McNett about the incinerator; correct?

24         A    While I can't remember Mr. Morgan being

25    my -- being -- representing me then, I will accept that

CARPENTER REPORTING, INC.
(303) 752-1200

261

1     he was.  I do know that whatever attorney was sitting

2     with me at the time at that point did intervene and --

3     and basically state what's mentioned here.

4          Q    Okay.  And so that was a privileged

5     conversation?  Your conversation with Mr. McNett about

6     the incinerator that you wouldn't disclose outside --

7     to people other than attorneys; correct?

8               MS. AHERN:  I object to the

9     characterization of the question.  I think the document

10    only indicates that he had a privileged conversation

11    with Mr. McNett, who was counsel -- inside counsel for

12    Rockwell at the time.

13         A    I don't know how to answer it any more

14    than that.  Once I had talked with Mr. McNett, you

15    know, we -- it was explained that, at that point, it

16    was -- it had become privileged, and that was the way

17    it would be handled.

18            Q    (BY MS. NOTEWARE)  Okay.  And you

19    wouldn't disclose anything that was a privileged

20    communication between you and Mr. McNett at your

21    attorney's direction; correct?

22            A    I was advised not to, and I did not.

23            Q    Okay.  After this time frame, June of

24    1989, did you continue to review the investigation of

25    whether the incinerator operated illegally during the

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                        262

1    shutdown?

2            MS. AHERN:  Object to the term

3    "illegally."  I don't think that there's any record

4    that the operation of the incinerator would have been

5    illegal.  Simply contrary to shutdown representations.

6            A    I did not -- because other

7    investigations were ongoing, I did not personally

8    review -- personally initiate a separate investigation.

9    I waited for these formal investigation teams to bring

10    forth their investigation.

11            Q    (BY MS. NOTEWARE)  Did you review the

12    formal investigation team's report concerning their

13    investigation of whether the incinerator operated in

14    December 1988?

15            A    Well --

16            MS. AHERN:  Objection.  Asked and

17       answered.

18                A     While I don't recall the details of

19       that, I'm sure I did.  I would have been very

20       interested.

21                Q     (BY MS. NOTEWARE)  Okay.  You don't

22       recall the details now?  That's not something you could

23       testify about on Tuesday without reviewing --

24                     MS. AHERN:  Without refreshing --

25                Q     (BY MS. NOTEWARE)  -- further documents?

                     CARPENTER REPORTING, INC.
                          (303) 752-1200

                                                           263

1                A     I -- I can remember some of the

2        substantiation that was used, the types of documents --

3        I haven't seen them in quite a while -- other than I

4        think what I saw in Mr. Avery's testimony, but I can

5        remember the types of documents that we used to -- to

6        reach a conclusion.

7                Q     And what types of documents were those?

8                A     Again, I'm relying, to some extent, on

9        what was shown in Mr. Avery's testimony, but time

10       sheets, material movements, foreman's logs, fluid

11       transfers to 774, oxygen consumption.  I remember those

12       types of things that were all looked at.  I think there

13       were others.

14               Q     Okay.

15                    MS. AHERN:  Can we take a break for just

16       a moment?

17                    (There was a discussion off the record.)

18                    (There was a recess taken from 10:04

19        a.m. to 10:09 a.m.)

20               Q    (BY MS. NOTEWARE)  Okay.  We're back on

21        the record.  You were mentioning Mr. Avery's testimony,

22        and he was shown some documents that showed a lot of

23        drums of raffinate waste being shipped out of Building

24        771 during the publicly disclosed shutdown.  Do you

25        recall that testimony?

                        CARPENTER REPORTING, INC.
                            (303) 752-1200

                                                                264

1               A    I recall it somewhat, yes.

2               Q    Okay.

3                    MS. AHERN:  Objection to the form of the

4        question characterizing the transfers as drums.

5                    MS. NOTEWARE:  So noted.

6               Q    (BY MS. NOTEWARE)  You know the

7        raffinate wastes.  Do you know why there would have

8        been documentation showing raffinate wastes being

9        shipped off out of Building 771 during the publicly

10       disclosed shutdown?

11              A    I think I do.

12              Q    Why is that?

13              A    We were in the process of performing our

14       semiannual inventory.  And as -- as a part of that, we

15       would have been shipping as much liquid out of 771 to

16       774, and a part of that would have been the ion

17       exchange raffinate, so it doesn't surprise me that we

18   were shipping in that period.  That's exactly what we

19   would do.

20          Q    And what about liquid oxygen?  The use

21   of liquid oxygen?  Was that also for inventory

22   purposes?

23               MS. AHERN:  Object to the form of the

24   question.

25          Q   (BY MS. NOTEWARE)  I'll rephrase.  Do

CARPENTER REPORTING, INC.
(303) 752-1200

265

1   you recall, during Mr. Avery's testimony, that there

2   was documentation that showed the use of liquid oxygen

3   in Building 771 during December of 1988?  Do you recall

4   that testimony?

5               MS. AHERN:  Object to the form of the

6   question.  I don't think that that testimony was ever

7   that oxygen was being used; simply that there were

8   changes in the tanks.

9          A    I don't remember that specifically.  I

10   remember looking at -- and seeing some oxygen

11   consumption logs at some point.

12          Q   (BY MS. NOTEWARE)  Right.

13          A    But I'm -- other than that, I don't have

14   anything to add.  I remember seeing them.  And I

15   remember, as a part of the incinerator investigations,

16   seeing oxygen consumption logs.  But --

17          Q    How do you explain the changes in the

18   oxygen consumption logs that seem to indicate that the

19    incinerator was operated during that period of time?

20              MS. AHERN:   I object to the predicate.

21    I don't believe anyone has said those oxygen

22    consumption logs indicate that.

23         A    In what I saw just briefly, I didn't

24    think they indicated that at all.  So I thought the

25    oxygen consumption logs showed exactly the opposite.

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                      266

1         Q    (BY MS. NOTEWARE)  You think the oxygen

2    consumption logs didn't show that liquid oxygen was

3    being used in Building 771 during December 1988?

4         A    I didn't think the oxygen consumption

5    logs showed that there was a change in the usage that

6    would indicate the incinerator was operating.  We

7    always used some liquid oxygen in 771 building.

8         Q    Even when it was shut down?

9         A    A plutonium building never really shuts

10    down.  You never turn the lights off and turn the

11    ventilation system off.  You are always, you know, open

12    from the standpoint that you are -- you have special

13    nuclear material in the building and you must maintain

14    it in a safe and secure condition.  So when we say

15    "shutdown," we mean we are not making plutonium metal

16    in the recovery operations at that point.  We were

17    still running a lot of operations.

18         Q    Would it be contrary to the public

19   statement that -- that the Building 771 was shut down

20   to incinerate wastes, as you understood the public

21   statement?

22              MS. AHERN:  I'm sorry.  Could you

23   rephrase that question?  Can you restate it?  I'm not

24   sure I got it.

25              A    And I was going to ask the same thing.

CARPENTER REPORTING, INC.
(303) 752-1200

267

1   I'm not sure I got it.

2              Q    (BY MS. NOTEWARE)  Okay.  Would it have

3   been consistent with the public statement that the

4   building was shut down to incinerate wastes in a

5   building, a plutonium building?

6              A    First, we didn't incinerate wastes in

7   the building.  We processed residues.  And in -- in the

8   building shutdown condition, we would not operate any

9   of the major processing equipment, including the

10   recovery incinerator.

11              Q    Would processing residues violate the

12   public statement -- be contrary to the public statement

13   that a building was shut down?  A plutonium operations

14   building was shut down?

15              MS. AHERN:  Object to the form of the

16   question as being hypothetical and vague.  If you're

17   asking specifically about the specific public shutdown

18   statements in the fall of '88, then I'd ask you to be

19   more specific in the question.

20          Q    (BY MS. NOTEWARE)  You stated earlier

21     that a plutonium processing building is never -- not

22     shut down.  It just means that -- the term "shutdown"

23     means that you're not manufacturing plutonium.  Is that

24     fair to say?

25                    MS. AHERN:  Object to the term

CARPENTER REPORTING, INC.
(303) 752-1200

268

1     "manufacturing" as vague in that usage.

2          A    In a very crude fashion.  I was trying

3     to show that when you shut down a nuclear building, you

4     don't turn the lights off and send everybody home.  You

5     are still managing the special nuclear material in a

6     safe and secure condition.  The shutdown does what

7     we -- what we did in a shutdown is we stopped the

8     processing operations, and a part of that would have

9     been not running the process recovery incinerator.

10          Q    (BY MS. NOTEWARE)  You testified

11     yesterday you saw that videotape in court that Special

12     Agent Lipsky was testifying about.  How do you explain

13     the heat signatures on that videotape?

14                    MS. AHERN:  Object to the form of the

15     question as vague and compound.

16          A    I can't -- I'm no expert in the infrared

17     oversights.  The -- the building, 771, was still being

18     managed in a safe and secure fashion and would still

19     eject heated air, room temperature air through that

20    incinerator.

21              MS. AHERN:  I'm sorry.

22              A    Excuse me.  Through that stack.  And so

23    I -- when I looked at -- at the thing -- at the video,

24    what I saw was warm air coming out of the stack.  I

25    don't know how to -- how it would be interpreted in any

CARPENTER REPORTING, INC.
(303) 752-1200

269

1    other fashion.

2              Q    (BY MS. NOTEWARE)  You said yesterday

3    that you were aware of some newspaper reports about the

4    grand jury, but that you didn't really follow those

5    newspaper reports?  Is that fair to say?  That was

6    after you left Rocky Flats.

7              A    After I left Rocky Flats, I tried to not

8    review anything I didn't have to about Rocky Flats.

9              Q    Did you ever become aware that,

10   according to Westword magazine and the grand jury

11   report that they released, that the grand jury had

12   intended to indict you if you -- you personally,

13   Mr. Weston, if the case hadn't been settled through

14   plea negotiation?

15             MS. AHERN:  Can we stop here for a

16   moment?  I want to object to any question with regard

17   to that grand jury report as being violative of the

18   Court's --

19             MS. NOTEWARE:  Right.  But he can still

20   answer the question at this deposition.

21          MS. AHERN:  I'm just saying for the

22   purpose of discovery, it's fine.  I object to the

23   substance of it ever being introduced at trial.

24          MS. NOTEWARE:  I can't rule on that,

25   so ...

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    270

1          MS. AHERN:  I know.

2          MS. NOTEWARE:  Thanks for noting it.

3          MS. AHERN:  I also want to object to any

4    specific question with regard to the prospect of

5    indicting Mr. Weston as being personally harassing, but

6    we can go forward.

7          Q    (BY MS. NOTEWARE)  Okay.  Just answer

8    the question.

9          A    I -- while I was aware that there

10   were -- there came information -- information came out

11   of the grand jury in some fashion or another, I never

12   looked at it.  I didn't want to look at it.  If my name

13   was in it, I didn't know.

14         Q    So you didn't know?

15         A    I didn't know.  I didn't want to know.

16         Q    If I showed you the article, you'd say,

17   Boy, I've never seen this before?

18         A    I would be amazed if I had read it.  I

19   knew there were articles out there.

20         Q    Is today the first time you heard that

21    the Westword article had said that the grand jury had

22    intended to indict you?

23         A    I don't know.  If I heard it, I don't

24    remember it, but it doesn't necessarily surprise me.  I

25    just -- I know I didn't read that stuff.

CARPENTER REPORTING, INC.
(303) 752-1200

271

1              Q    Okay.  When did you first learn that

2    this class action, the Cook case, was filed?  It wasn't

3    just when Ellen -- Ms. Ahern called you in 2004; right?

4         A    It seemed to me -- I remember from my

5    time in the late eighties at Rocky Flats that there

6    were landowners who had a lawsuit about Rocky Flats.  I

7    didn't know the details.  I didn't know it was a class

8    action suit.

9              Q    Uh-huh.

10         A    I had no idea it was still ongoing and

11    quite frankly --

12              MS. AHERN:  Didn't know that was the

13    suit.

14         A    And quite frankly was amazed when I was

15    contacted, but ...

16              Q    (BY MS. NOTEWARE)  Now, after you left

17    Rockwell, you also were involved in an action that

18    Rockwell filed against the United States Government.

19    Do you recall that action?

20              MS. AHERN:  Object to the form of the

21    question as -- as to the term "involved."

22          A    I -- as I remember -- I'm vague on

23    this -- I had thought that Rockwell --

24               MS. AHERN:  I'm sorry.  Can we go off

25    the record for just a moment?

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                      272

1                (There was a brief delay in the

2     proceedings.)

3          Q    (BY MS. NOTEWARE)  You had started that

4     you thought that Rockwell --

5          A    I had thought that Rockwell did have a

6     lawsuit against the Government.  I -- I didn't know the

7     details about it and I'm unclear at this point, as I

8     was deposed several times during the nineties, of what

9     case they were exactly for.

10         Q    So you know about this case and you were

11    contacted by Ms. Ahern, you know about the criminal

12    investigation, you know about the Sierra Club lawsuit,

13    and you know you were deposed in some case in the

14    1990s, but you don't know what case or cases that was?

15         A    Not without going back and -- and

16    looking at it more.  I had several depositions.  I'm --

17    I know that at some point, as we talked about, I

18    testified at the Stone trial, but I -- I can't put them

19    all together right now without going back and looking

20    at them.

21         Q    Do you know if it was just more than one

22      case that you testified at deposition on behalf of

23      Rockwell during the 1990s?

24              A    You know, I'm just not -- I'm just not

25      clear.  It wouldn't surprise me.  I'm just not clear.

273

1               Q    Do you remember the lawyers who were

2       involved in the cases -- case or cases?

3               A    I remember some names.  I couldn't match

4       them with the depositions or the cases without going

5       back and looking at them.

6               Q    Now, one of the things that Kirkland &

7       Ellis has said that you were going to discuss was

8       environmental regulatory issues.  And I want to

9       understand, as director -- as director of plutonium

10      operations, were you involved in groundwater

11      management?  Was that an area of your expertise?

12              A    I was not -- my organization did not

13      have responsibility for groundwater management.  I was

14      in attendance at a lot of meetings where groundwater

15      sampling and management was discussed.  I knew the

16      general approach and results of that groundwater

17      monitoring, and that's -- that's what I can talk about.

18              Q    What about the NPDES permit applications

19      and -- and monitoring for compliance with the NPDES

20      permits?  Is that something that -- in your capacity as

21      director of plutonium operations that you had

22      responsibility for?

23        A    I did not have direct responsibility for

24    the NPDES permit, and -- but, again, I was in

25    attendance at meetings where it was discussed and the

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                        274

1    issues were discussed with Rockwell and with the

2    Department of Energy and so I had that familiarity.

3    And -- and the general application to our overall RCRA

4    compliance and efforts, I was aware of those

5    connections.

6        Q    But you didn't have day-to-day

7    responsibility for either the groundwater sampling or

8    NPDES monitoring?

9        A    No.  I did not.

10        Q    Is that something that you feel

11    qualified to testify about, based on your attendance at

12    meetings where those areas were discussed?

13            MS. AHERN:  Object to the term

14    "qualified" as vague.  Undefined.

15        A    As I've tried to explain, I have some

16    information and as -- as asked, I will comment on that.

17        Q    (BY MS. NOTEWARE)  Okay.  The

18    information that you have concerning groundwater

19    sampling and NPDES, was it all information that was

20    told to you by other people?

21        A    That was presented to me in briefings

22    and in reports, I reviewed reports, and in my

23    discussions with people and with regulators and the

24    Department of Energy.

25              Q    So anything that you would testify would

275

1    not be from your own personal knowledge?  It would be

2    from things that regulators had written or told you

3    about?

4              MS. AHERN:  Object to the form of the

5    question as vague.

6              A    I'm not sure what you mean by "personal

7    knowledge."  I was shown and presented with an awful

8    lot of data and information over those years, and I'm

9    comfortable that I could -- that I could review some of

10    that and discuss it.  I did -- my organization, as you

11    said, did not have responsibility for the collection

12    and analysis of those data.

13              Q    (BY MS. NOTEWARE)  Okay.  And you had no

14    direct responsibility for collecting the data on

15    groundwater sampling or the NPDES permit; correct?

16              A    With -- with the qualification that, in

17    the last three months, when I was acting plant manager,

18    that would be, of course, under me, as well.

19              Q    But the last three months when you were

20    acting plant manager, you kind of weren't acting plant

21    manager, because Mr. Sanchini would come back in and

22    the days that he was there, you weren't really plant

23    manager?  Do I have that right?

24          A    Well, Dom was in and out, but, because

25     his schedule was so intermittent, I had to be prepared

CARPENTER REPORTING, INC.
(303) 752-1200

276

1      and responsible for all the activities.  I would, of

2      course, acquiesce to Dom when he was on plant site and

3      try and bring him up to speed with everything that had

4      gone on, but it was incumbent on me to be on top of all

5      of it at that point.

6          Q    Okay.

7               (Marked for identification was

8      Deposition Exhibit No. 8.)

9               (There was a discussion off the record.)

10         Q    (BY MS. NOTEWARE)  Okay.  I'm showing

11     you what's been marked as Plaintiffs' Exhibit 8, which

12     is a -- also marked as Trial Exhibit 606.  Do you

13     recognize what this document is?

14              MS. AHERN:  It's a lengthy document.

15     Take a little bit of time, especially since there are

16     things that make it unclear on the face.  It might take

17     a little bit to get you familiar.

18         Q    (BY MS. NOTEWARE)  I'll represent to you

19     that it's a version of the -- the Rockwell contract

20     with the United States Government concerning Rocky

21     Flats.

22              MS. AHERN:  I'll also represent that

23     there are multiple contracting-related documents.  This

24        is one of many.

25                  A    (Deponent reviewing exhibit.)

                        CARPENTER REPORTING, INC.
                           (303) 752-1200

                                                    277

 1                  MS. AHERN:  You can unclip it, if it's

 2        easier to look at it.

 3                  Q    (BY MS. NOTEWARE)  I'm not going to have

 4        many questions about this document.

 5                  A    I'm trying to get a feel for it.  I --

 6        okay.  I have -- I've very quickly scanned it.

 7                  Q    Okay.

 8                  A    And mainly, the -- the table of

 9        contents.

10                  MS. AHERN:  I want to represent that

11        this is a 140-some-odd page document and he's only

12        glanced at it.  If it requires a detailed review --

13                  Q    (BY MS. NOTEWARE)  I'm not going to ask

14        a detailed review.  Did you understand that there was a

15        contract between Rockwell and the United States

16        Government concerning the operation of Rocky Flats?

17                  A    Yes, I did.

18                  Q    And did you understand that Rockwell was

19        required to act in compliance with that contract in

20        operating Rocky Flats?

21                  A    That was my understanding, yes.

22                  Q    I'll ask you to turn to page 8.

23        Paragraph 3 on that page.  It states, "In carrying out

24        the work under this contract, the contractor shall be

25    responsible for the employment of all professional,

CARPENTER REPORTING, INC.
(303) 752-1200

278

1    technical, skilled, and unskilled personnel engaged and

2    to be engaged by the contractor in the work hereunder."

3                Wait a second.  I'm reading the wrong

4    part.  I'm sorry.  Strike that.  I turned to the wrong

5    page.

6                I'm sorry.  Okay.  I'm sorry.  Turn to

7    page 4.  No.  I'm sorry.  Give me a second here.

8                MS. AHERN:  Sure.  It's a long document.

9    It's hard to find the right part.

10                MS. NOTEWARE:  Yeah.

11                (There was a brief delay in the

12    proceedings.)

13                MS. NOTEWARE:  We're going to come back

14    to this.  I've got other fish to fry.

15                (Marked for identification were

16    Deposition Exhibit Nos. 9 and 10.)

17                MS. AHERN:  It's one of the documents

18    that constitute the plea agreement.  There are several

19    documents.  This is one of them.

20                Q   (BY MS. NOTEWARE)  And are you aware

21    that counsel in this case has represented repeatedly to

22    the jury that there were items in the affidavit that

23    was filed by the FBI that turned out not to be true?

24    Are you familiar with that argument that's been made by

25      defense counsel while you've been sitting in court for

CARPENTER REPORTING, INC.
(303) 752-1200

279

1       the last few weeks?

2               A    I've seen some of that, yes.

3               Q    Okay.  To your mind, which allegations

4       within the plea agreement -- I've given -- which

5       allegations within the FBI affidavit turned out not to

6       be true?

7               MS. AHERN:  Just let us note for the

8       record that we're talking about --

9               MS. NOTEWARE:  You don't have -- let me

10      say, before you note it for the record, I'm not asking

11      you to look at the document.  I've given it to you so

12      you can reference it if you need to.  I'm asking for

13      you to tell me, to your mind, what items within the

14      FBI's affidavit were not true.

15              MS. AHERN:  And I need to state my

16      objection for the record.

17              MS. NOTEWARE:  That's fine.

18              MS. AHERN:  My objection is that we're

19      talking about an affidavit that is in excess of 115

20      pages, and while not asking him to review the affidavit

21      itself, you want to know what, in 115 pages, this

22      witness believes is not true, I think that's an onerous

23      task for the witness and there's no way he can offer

24      complete testimony without reviewing every single line

25      of every page.

CARPENTER REPORTING, INC.
(303) 752-1200

280

```
1              Q    (BY MS. NOTEWARE)  We will review every

2        single line of every single page here today for the

3        next hour and if we have time, we'll review another

4        document or two, every single line of every single page

5        if that's what we're asked to do.

6                   Before you answer, yesterday, it was

7        established you're a consulting expert for Kirkland &

8        Ellis; correct?  In this case?

9              A    Yes.

10             Q    You've been retained as a consulting

11       expert?

12                  MS. AHERN:  At least he's been retained

13       as one.

14             A    I've been retained to represent Rockwell

15       at the -- at this trial and also to testify.

16             Q    (BY MS. NOTEWARE)  Wait.  Weston Exhibit

17       3 -- and I quote -- says, You have agreed to act as a

18       consulting expert for the defense of Rockwell

19       International Corporation and the Dow Chemical

20       Corporation in the above-captioned litigation; correct?

21             A    That is the way that document reads,

22       yes.

23             Q    But you don't believe you're a

24       consulting expert for Rockwell and Dow?

25             A    I'm not agreeing or disagreeing.  I'm
```

CARPENTER REPORTING, INC.
(303) 752-1200

281

1    just saying that's the way it reads, and my

2    understanding, as I told you, is I represent Rockwell

3    and will be a witness in this case.

4         Q    Okay.  Have you reviewed this -- the FBI

5    affidavit that was the basis for the raid since you've

6    been retained?

7         A    I have reviewed the -- the -- in some

8    fashion the allegations in the affidavit.  I'm not sure

9    I reviewed this entire document.

10        Q    Okay.  Do you have an opinion -- and

11   not -- as to what allegations in the affidavit were

12   untrue?

13        A    Without other documentation, I can't --

14   I don't recall all of the allegations in the affidavit.

15   I recall some of them.  The ones I recall, I have an

16   opinion on.  I remember the allegations about running

17   the incinerator.  I -- I disagree that we ran the

18   incinerator in that time frame.

19             MS. AHERN:  You're speaking about the

20   771 incinerator?

21             THE DEPONENT:  Pardon me?

22             MS. AHERN:  You're speaking about the

23   771 incinerator?

24        A    The 771 recovery incinerator.

25             I believe there was something in there

CARPENTER REPORTING, INC.

(303) 752-1200

282

1     about the fluidized bed incinerator, but I can't -- I

2     don't remember the details of it.

3                   There were -- there were some

4     allegations about the solar ponds, but I don't remember

5     the specifics on them.

6                   There were allegations about dumping of

7     hazardous waste or something like that.  I don't

8     remember the -- the specifics.

9                   In general, as I recall the -- these

10    allegations, without knowing -- without going back

11    through them in great detail, I can't remember any that

12    I agree with at this point.

13          Q    (BY MS. NOTEWARE) So, as far as you're

14    concerned, every allegation that was contained in the

15    affidavit was incorrect?

16                   MS. AHERN:  That's not what he

17    testified.

18          A    I can't even remember all of them.

19    Without going through them in detail and -- and you

20    certainly can if you'd like to -- I don't remember any

21    that I agreed with, and I think there aren't any, but

22    I -- I'd have to go through them.

23          Q    (BY MS. NOTEWARE) But, eventually,

24    Rockwell pled guilty to 10 criminal violations;

25    correct?  As far as you know?

CARPENTER REPORTING, INC.
(303) 752-1200

283

1            A    As far as I know, yes.

2            Q    Okay.  Now, when you formed a basis that

3    certain allegations were, quote, untrue, okay, was that

4    because they weren't part of the plea agreement in the

5    case eventually?  Is that what -- how you determined

6    that something was untrue?

7                 MS. AHERN:  Object to the form of the

8    question.

9            A    No, ma'am.  There -- there were

10   investigations done of -- around all the allegations.

11                As I remember it, before I left Rocky

12   Flats at the end of 1989, I had seen the results of

13   those investigations in sufficient detail to convince

14   me that none of those allegations were true.  But,

15   again, without reviewing other documents, I can't

16   remember the details of that.  But I left Rocky Flats

17   with the feeling that we had not done what was in those

18   allegations.

19           Q    (BY MS. NOTEWARE)  Okay.  I'll ask you

20   to turn to Plaintiffs' Exhibit 9.  9 was the Plea

21   Agreement and Statement of Factual Basis.  Is that 9 or

22   10?

23                MS. AHERN:  The Plea Agreement and

24   Statement of Factual Basis was 10.

25                MS. NOTEWARE:  Okay.

CARPENTER REPORTING, INC.
(303) 752-1200

284

```
 1              MS. AHERN:  We have to look at this
 2    together, though.
 3              Q    (BY MS. NOTEWARE)  I'll ask you to turn
 4    to the second page of that document.  And there's a
 5    listing on page 2 and 3.  There's a listing of 10
 6    counts.  Do you see that?
 7              A    Yes, I do.
 8              Q    There's 2 and 3.  Are those the counts
 9    that Rockwell pled guilty to, as far as you know?
10              A    To the best of my knowledge, they are.
11              Q    Okay.  And let's look at the first one,
12    count 1.  It says, "Knowing storage of mixed hazardous
13    waste pondcrete and saltcrete in violation of RCRA
14    requirements 42 USC Section 6928(d)(2)(C)."  Do you see
15    that?
16              A    Yes, I do.
17              Q    And it says penalty. "NMT $50,000 per
18    day of violation, 42 USC Section 6928(d)," and then
19    under that, it says 140 days times 50 equals a 7
20    million dollar fine.  Do you see that?
21              A    Yes, I do.
22              Q    Okay.  I'll ask you to turn to page 9,
23    paragraph 12.
24              MS. AHERN:  If you need to read anything
25    on either side -- actually, on page 9 -- okay.  If you
```

1    need to read anything further on this portion, feel

2    free to go right ahead.  It's not a long document.

3              Q    (BY MS. NOTEWARE)  Okay.  On paragraph

4    12, it states, "On or about June 15th to 24th,

5    September 11th through 30th and December 7 through

6    16th, 1987, February 15th through 24th, May 6th

7    through 25th, July 18th through 27th,

8    September 14th through 23rd, 1988, and"

9    September -- "and February 6th through 15th, 1989,

10   Rockwell knowingly stored approximately 12,000

11   pondcrete and saltcrete blocks on an outdoor pad known

12   as the 750 pad."  Do you see that?

13             A    I do see that.

14             Q    Do you have any reason to disagree with

15   that statement?

16             A    I -- I have no idea what those dates --

17   why those dates were selected, you know, so I can't

18   comment on that, agree or disagree.  I do know that,

19   you know, in that -- in general, in that time period,

20   we were storing some number of -- of pondcrete and

21   saltcrete blocks on the 750 pad.

22             Q    Okay.  So if the pondcrete was there

23   June 15th through the 24th, it's not as if on the

24   25th of 1987 -- June 25th, 1987, 12,000 boxes of

25   pondcrete and saltcrete were removed from the 750 pad

1    just because that's what it states in the plea

2    document; correct?

3         A    I have no idea why those dates were

4    selected and singled out, so I don't know what else to

5    say.  I mean, the -- we were using that 750 pad for

6    some number of blocks.  These dates are all in 1989.

7              MS. AHERN:  No.  They're not.

8         A    Okay.

9         Q    (BY MS. NOTEWARE)  '87 --

10        A    1987.

11        Q    -- '88, and '89.

12        A    I don't know what the numbers were

13   without seeing some other documentation, so I'm not

14   sure I can agree or disagree.  We were storing

15   pondcrete on the 750 pad and saltcrete, I think.

16        Q    And that was in violation of RCRA;

17   correct?

18        A    I don't -- again, without some more

19   data, I can't remember what that first count means.

20        Q    Okay.

21        A    We pled to it, we were in violation of

22   RCRA requirements, but without more documentation, I

23   can't tell you exactly what those specifics are.

24        Q    Do you believe today that Rockwell was

25   in violation of RCRA in its storage of pondcrete and

1    saltcrete?

2              A    I have no reason to disagree with that

3    plea.  I know we were storing it on the pad.  I'm not

4    exactly sure why those dates were singled out and what

5    the specific violations are.

6                   In some cases, in some of the other

7    allegations, where it's permit issues, I have a little

8    bit more knowledge, but I have no reason to disagree or

9    agree with it.  I understand we pled guilty, and I have

10   no reason to disagree with that.

11             Q    Okay.  But is it your belief that the

12   storage of pondcrete wasn't in violation of RCRA?

13             A    I didn't say that, ma'am, and I don't

14   mean to imply that.

15             Q    Okay.

16             A    In my time there, I thought we were

17   storing pondcrete in compliance with the regulations.

18   All of them.  This indicates we weren't.  And I don't

19   know the details with it.  I didn't help prepare this

20   plea, but I have no reason to -- to disagree with it.

21             Q    If you could turn to page 72 of Exhibit

22   9.  We'll just go through.

23             A    This one?

24                  MS. AHERN:  Yeah.  That's yours.

25             A    72.

                     CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    288


1              Q    (BY MS. NOTEWARE)  Okay.  So it begins

2    paragraph 7 -- or section 7.   RCRA incineration

3    violations.   Actually, turn to page 73.   It states in

4    paragraph 7.1, "First, by the terms" -- this is the

5    second sentence -- "terms of the WSC document, an old

6    incinerator in Building 771 has been incinerating at

7    least small quantities of hazardous waste and a

8    substantial quantity of mixed waste, without a RCRA

9    permit or interim status."   Do you see that allegation?

10        A     I do see that.

11        Q     Is that untrue at that time?

12              MS. AHERN:   There isn't a time frame

13   identified.

14        Q     (BY MS. NOTEWARE)   In June 1989.

15        A     I -- I disagree with the statement in

16   that we were processing recoverable residues; not

17   waste.

18        Q     Okay.   So the reason why that's

19   inaccurate is because of the terminology?

20              MS. AHERN:   I would object to

21   characterizing it as terminology.

22        A     I think it's just a -- a complete

23   misstatement.   This was a piece of processing

24   equipment; not a waste -- waste equipment.   We were not

25   processing waste in that -- in that plutonium recovery

CARPENTER REPORTING, INC.
(303) 752-1200

289

1    incinerator.

2          Q    (BY MS. NOTEWARE)  Okay.  Processing of

3    nuclear materials means taking solid wastes that had

4    been contaminated and putting it through the

5    incinerator and having it come out in another form?  Is

6    that fair to say?  Is that what "processing" means?

7               MS. AHERN:  I object to the form of the

8    question.  The term "solid" and the term "waste" are

9    defined terms of art in this industry.  They are vague

10   and ambiguous in their usage.

11              MS. NOTEWARE:  He can explain.

12              MS. AHERN:  I also object to the form of

13   the question generally.

14          A    Again, no waste was processed in that

15   recovery incinerator.  Residues and -- and residues

16   that would have economically recoverable plutonium in

17   it was what was processed.

18          Q    (BY MS. NOTEWARE)  What does the term

19   "residue" mean?

20          A    Residue means that there's enough

21   plutonium in the -- in the residue form that the DOE

22   will not and cannot allow that material to be discarded

23   as waste.  It must be kept and ultimately recovered for

24   the valuable plutonium inside.

25          Q    Okay.  So, for example, if a kimwipe

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                      290

1    that was contaminated with some plutonium -- that would

2    be an example of something that would be put through an

3   incinerator?

4          A    If it had -- if it was deemed that it

5   had come from a glovebox line where it was likely it

6   would have enough plutonium on it to be treated as a --

7   a recoverable residue.

8          Q    Okay.  So when you say "processed," that

9   would include taking a contaminated kimwipe, putting it

10  in the incinerator, and having it come out in another

11  form; correct?

12         A    Yes.

13         Q    But that isn't incineration, as far as

14  you're concerned?

15         A    It's incineration.  It's not

16  incineration of waste.  You're using the incineration

17  technique for some volume reduction and stabilization

18  of the waste form -- of the residue form.

19         Q    Confusing.

20         A    Confusing myself.

21         Q    Okay.  So your quarrel with the

22  terminology is that a kimwipe isn't waste; it's a

23  residue?

24              MS. AHERN:  Object to the form of the

25  question.

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    291

1          A    It's -- it's a residue if it has

2   recoverable amounts of plutonium on it.  And -- and

3    that -- that's -- that's my concern here.  The

4    statement is indicating we're processing waste in this.

5    It's not waste.

6              Q    (BY MS. NOTEWARE)  Okay.

7              A    Not waste at all.

8              Q    Because the term of art is -- isn't

9    waste under -- under your reading of it, the term of

10   art in the nuclear facility is a kimwipe isn't waste,

11   so --

12              MS. AHERN:  Object to the

13   characterization.  Misstates his testimony.

14              A    Again, these are the regulations and

15   the -- that have been given to us by the Department of

16   Energy that -- that combustible waste, combustible

17   residues from a glovebox line must be kept as -- and

18   the plutonium recovered.  You have no option.  You have

19   to keep it.  The incineration technique allowed us to

20   store it in a reduced volume and more stable form of

21   residue.  And that's what we did.

22              Q    (BY MS. NOTEWARE)  Okay.  Can you turn

23   to page 74, please.  Is that your same quarrel with the

24   terminology on this page, illegal incineration of

25   wastes in Building 771?  It's not wastes; it's

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                  292

1    residues?  Is that the issue?

2              MS. AHERN:  I object to the form of the

3    question.

4          A      Which paragraph are you reading from?

5          Q      (BY MS. NOTEWARE)   I'm actually looking

6     at the top of page 74 where it states "illegal

7     incineration of waste in Building 771."

8          A      Yes.  I see that.  And -- and yes, my

9     comments apply to that, as well.  We were not

10    processing, through the plutonium recovery incinerator,

11    waste at Building 771.  We were processing residues.

12         Q      Okay.  In paragraph 7.2 in the middle of

13    the page, it states, "The building houses approximately

14    48 processes, including what has been designated as a

15    special nuclear materials recovery incinerator."  Did I

16    read that correctly?

17         A      I'm reading that, yes.

18         Q      Okay.  Is that -- is that a true

19    statement?

20         A      I -- I don't remember the 40 -- whether

21    it was 48 processes, so I can't agree or disagree with

22    that.  I can't remember the number.  We did -- that did

23    include what was called the special nuclear recovery --

24    special nuclear materials recovery incinerator or I've

25    been saying the residue processing incinerator.

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                       293


1          Q      And that's the same incinerator that I

2     showed you in that affidavit earlier from the Sierra

3     Club lawsuit?  That's all the same incinerator;

4      correct?

5                      MS. AHERN:  I think there were three

6      incinerators in that affidavit.

7              Q    (BY MS. NOTEWARE)  The SNM lawsuit that

8      we fixed on.

9              A    As I recall, from the Sierra Club and

10     the documentation you've shown me, we are talking about

11     this incinerator.  I can't remember if there were more

12     than that in there.

13             Q    But the statements in your affidavit

14     that I showed you that you reviewed in total at the

15     start of this deposition about the 771 SNM incinerator

16     were accurate in that affidavit?

17             A    As I can recall, yes, they were

18     accurate.

19             Q    And it's the same incinerator --

20             A    Yes, ma'am.

21             Q    -- as the one in the -- in the FBI

22     affidavit; correct?

23                      MS. AHERN:  There are lots of

24     incinerators.

25             Q    (BY MS. NOTEWARE)  The page that we're

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                        294

1      looking at in front of you on page 74 of the affidavit

2      in paragraph 7.2 that we've just been discussing for

3      the last minute and a half.

4                      MS. AHERN:  Thank you.

5          A    I certainly believe so, yes.

6          Q    (BY MS. NOTEWARE)  Okay.  Do you have

7    any reason to disbelieve the conclusion in paragraph

8    7.2 that Building 771 is the final on-site disposal

9    location for 58 waste streams from other Rocky Flats

10   buildings?  That doesn't strike you as incorrect, does

11   it?

12         A    I have no reason to agree or disagree.

13   I can't recall the number of waste streams that we had

14   in that building, so I just -- without seeing more

15   documentation, I don't know how I can be more precise.

16   I can't agree or disagree with that.

17         Q    7.3 states that, "The Building 771

18   incinerator did not have a RCRA permit or interim

19   status to treat hazardous or mixed waste."  Is that

20   inaccurate?

21         A    Since we weren't treating hazardous or

22   mixed wastes in that incinerator, it's my understanding

23   we did not have a RCRA permit.  We did have a Clean Air

24   Act permit.

25         Q    Okay.  Could you turn to page 77,

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                    295

1    please.  This is entitled "Illegal Incineration of

2    Waste Designated for Incinerators in Building 776."

3          A    Yes.

4          Q    Is the Building 776 incinerator also

5      known as the fluidized bed incinerator?

6              A    Yes.  As I recall, the only incinerator

7      that was in 776 was the fluidized bed incinerator.

8              Q    Were there two fluidized bed

9      incinerators in Building 776?

10             A    It seems to me -- I'd have to see more

11     documentation to be precise on this -- that we had a

12     small version in R&D, but I don't remember if it was in

13     the same building and then the -- the one that we

14     intended to use in the production basis that we never

15     got to operate.

16             Q    Do you believe that the allegations --

17     and we can review them seriatim -- concerning the

18     fluidized bed incinerator that are contained in this

19     FBI affidavit are incorrect?

20                 MS. AHERN:  He would have to review

21     them.  Please take the time to review the allegations

22     with regard to the 776 incinerator to answer that

23     question.

24             Q    (BY MS. NOTEWARE)  It goes from page 77

25     to 81.

                  CARPENTER REPORTING, INC.
                      (303) 752-1200

                                                    296

1              A    Allow me a minute here.

2              Q    Okay.  Sure.  Go ahead.  If you can

3      point me to the inaccuracies, that will be my next

4      question.

5              A    (Deponent reviewing exhibit.)

6                  I read these pages.

7           Q    Okay.  And can you point me to what was

8    inaccurate about the Building 776 incinerator?

9           A    At this point, I have -- without other

10   documentation, I can't agree or disagree with any of

11   the numbers shown in these pages of hours of operation

12   or the amounts of waste to be processed, et cetera.

13          Q    Uh-huh.

14          A    I just don't -- don't remember that and

15   don't have any other documentation.

16               The -- the -- I guess the word is

17   "conclusion" they have reached that we must be -- have

18   operated it illegally to dispose of waste is just

19   wrong.  We did not operate that incinerator.

20          Q    And what do you base that conclusion on

21   that you did not operate the incinerator?

22          A    Personal knowledge.  I was very involved

23   in the testing of that incinerator and then,

24   ultimately, its shutdown.  I know that that -- that

25   facility was closed and that after we had shut it down,

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                    297

1    we never operated it again.

2           Q    Okay.  So the test burn was when the

3    incinerator caught fire in July of 1988?  Is that what

4    you're referring to as the test burn?

5           A    Well, I don't remember the dates without

6      some other documentation.  We -- we were testing the

7      incinerator.  We were not processing any waste forms in

8      it.  We were testing it.  And we did have a fire.  And

9      at that point, after much discussion, it was decided

10     that we would not operate that incinerator.  Not

11     attempt to get it permitted and not -- not process

12     any -- any of our waste forms through it.

13             Q    Okay.  Now you talked about there was a

14     small and a large incinerator, fluidized bed

15     incinerator; correct?

16             A    Without other documentation, I can't be

17     sure.  I think, from the best of my of knowledge, we

18     had a small R&D version.  I can't remember it.  I can't

19     even remember where it was, but I thought we had one.

20             Q    Okay.

21             A    Okay.

22             Q    Was that ever used, the R&D version?

23     You don't recall?

24             A    I don't recall.  I -- I remember some

25     discussion of it.  There may have been a -- a pilot

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                        298

1      burn in one of -- in that one, but I don't remember the

2      details of it.

3              Q    Uh-huh.  Was that -- was either

4      permitted, RCRA permitted?

5              A    I can't remember.

6              Q    Okay.  And you don't recall whether the

7    smaller fluidized bed incinerator was located in

8    Building 776?

9        A    Ma'am, I can't even be sure at this

10   point there was one, but -- without -- without other

11   documentation.  So I'm not sure where it was.

12        Q    Okay.  But you're quite sure of the

13   conclusion that no fluidized bed incinerator ever

14   operated other than the test burn in Building 776?

15        A    The -- the incinerator in question, the

16   one in 776, the one intended to be a production waste

17   incinerator, I'm confident we never operated that to

18   process waste.

19        Q    What about residues?  Did you ever

20   process residues in there?

21        A    I -- that incinerator was never intended

22   for residue processing and without -- I'm fairly

23   certain we never processed anything like that.  I'd

24   like to see more documentation to be sure, but -- and

25   that -- that's all I can say at this point without more

1    documentation to review.

2        Q    What documentation would show you

3    whether the fluidized bed incinerator in Building 776

4    was operated?

5        A    The only --

6        Q    It's really the absence of

7    documentation; right?

8         A    While --

9              MS. AHERN:  I object to the form of the

10   question.  Both of the last two questions.

11        A    I'm being cautious here because I

12   remember at some point -- I think prior to my even

13   getting involved with the fluidized bed incinerator

14   that, at some point, we had a -- a small demonstration

15   test of -- of destroying PCB.  I don't remember what

16   incinerator that was in, whether it was this one or

17   the -- the small R&D one.  I'm thinking if we did it at

18   all, it was the small R&D, but without other

19   documentation, I can't be clear on that.  But I sort of

20   remember it.

21        Q    (BY MS. NOTEWARE)  Okay.  Can you turn

22   to page 89.

23        A    Okay.

24        Q    Okay.

25             MS. AHERN:  Just give me one second

                     CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                        300

1    here.

2         Q    (BY MS. NOTEWARE)  Page 89 through --

3    page 89 through 100.  Sorry.  89 through 91.  The

4    Section 8.11 through 8.16 concerns the closed 207 solar

5    evaporation ponds.  Do you see that?

6         A    Yes, ma'am.

7         Q    Okay.  Was that something that you had

8    responsibility for, working with the solar evaporation

9    ponds?

10          A    Yes.  I had some responsibility.

11          Q    In which capacity?

12          A    I know that we were -- it was my

13   responsibility to -- to take the main effort in the

14   remediation of 207A and we were producing pondcrete

15   from it.

16              I can't recall if I had overall

17   responsibility for the solar ponds at this point.  I --

18   but I know that at some point in my management of

19   plutonium operations, we had made transfers from

20   Building 374 to one of the solar ponds.  I don't

21   remember the time frames.

22              But, in that sense, yes, I had some

23   responsibility for the solar ponds and some knowledge

24   of -- of them.

25          Q    Can you read page 89 through the top of

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                        301

1    90 -- the start of Section 9 and tell me what is

2    inaccurate in that section.

3              MS. AHERN:  91, I think you meant to

4    say.

5              MS. NOTEWARE:  91.

6          A    (Deponent reviewing exhibit.)

7              I've read those pages.  Again, on the --

8    on the specific dates and the numbers involved, I

9    really just don't have -- don't recall the -- whether

10   or not -- them well enough to agree or disagree.  I was

11   made aware after the fact that there was an FBI

12   overflight.  I'm not even sure at this point what they

13   thought they were seeing.  And so I'm not -- I'm not

14   sure, at this point, I could comment any more than that

15   on this one.

16        Q    (BY MS. NOTEWARE)  Okay.  Do you have

17   reason to believe that the allegations in -- concerning

18   the solar ponds are inaccurate?

19        A    I'm not even sure at this point what the

20   allegations really mean so I'm not sure I can comment a

21   lot more than that.  This is December of 1988.  Again,

22   I'm not sure what they were alleging here --

23        Q    Okay.

24        A    -- so I don't know how to comment more

25   than that.

CARPENTER REPORTING, INC.
(303) 752-1200

302

1         Q    Okay.  The next section, the Clean Water

2    Act violations, Section 9 goes from page 91 to 100.

3    Were you responsible for Clean Water regulations?

4         A    In my capacity as the director of

5    plutonium operations, I didn't have direct

6    responsibility for the areas that I believe are -- are

7    involved in this -- this allegation.

8         Q    Okay.  If you can turn your attention to

9    page 96.  Paragraph 9.16.  It states, "During the

10    period from March 1987 through May 1988, DOE area

11    manager Albert E. Whiteman reported several violations

12    of Rocky Flats' NPDES permit.  With the exception of

13    the March 1987 violation, all of these Clean Water

14    violations were reported in the plant's discharge

15    monitoring reports as summarized below," and then it

16    gives dates of violation there.  Do you have any reason

17    to believe that that's inaccurate?

18         A    I -- I just -- while I -- while I -- I

19    received information in meetings on these areas and saw

20    data, I certainly can't recall at this point that

21    the -- the dates or the specific allegations -- I just

22    don't remember.  So I -- I don't have enough

23    information without other documentation to really agree

24    or disagree.

25         Q    This wasn't one of the ones you were

CARPENTER REPORTING, INC.
(303) 752-1200

303

1    astonished about that it was an inaccurate --

2         A    I -- I've only read a paragraph or two,

3    so I'm not even sure what the allegation is without

4    going more into it, but I -- I can't -- I'm looking at

5    some of the information on the reported Clean Water

6    violations.  I just don't have enough information to

7    agree or disagree that those are correct.

8         Q    Okay.  Paragraph 9.17 states that on or

9      about November 11, 1988 -- I'm skipping here -- remote

10     water monitoring devices were installed on properties

11     adjacent to but separate from Rocky Flats to monitor

12     the plant's discharges into Walnut and Woman Creeks.

13     Do you see that?

14          A    Yes, I do.

15          Q    Do you have any reason to believe that's

16     a false statement or inaccurate statement?

17               MS. AHERN:  Object to foundation.

18          A    I have no idea whether they -- whether

19     they installed water monitoring devices.

20          Q    (BY MS. NOTEWARE)  And paragraph 9.18

21     that talks about what the water monitoring devices

22     showed, you have no reason -- you have no knowledge or

23     foundation or ability to dispute that, do you?

24               MS. AHERN:  Object to the form of the

25     question about his ability to dispute it.  I don't

                    CARPENTER REPORTING, INC.
                       (303) 752-1200

                                                    304

1      think he has -- that's my objection.

2          A    In this particular allegation, I -- I

3      remember enough of the discussions and the

4      investigations that were done --

5          Q    (BY MS. NOTEWARE)  Uh-huh.

6          A    -- after we saw the affidavit -- and if

7      this is the one I'm thinking of, from what I remember,

8      we did not -- we did not feel that if they were seeing

9      these chemicals, these chemicals led to the allegation

10    they were inferring.

11             Q    What does that mean?

12             A    I'm not sure I can explain it more

13    without reading the whole thing.

14             MS. AHERN:  If you want to read the next

15    page or so, if that helps you put it in context.  It

16    may not --

17             A    I'm reading paragraph 9.20, and I'm

18    trying to see if that's the one I remember -- and I

19    think it is.  The one with medical waste originating

20    from a research laboratory or pharmacy.  While I wasn't

21    directly involved in that -- in that area and that

22    investigation, as I recall, the information that came

23    back was -- from our investigations were we did not

24    have a medical research laboratory on that plant site

25    and -- and whatever they were seeing in their water

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    305

1    monitoring was not coming from that type of facility.

2             Q    (BY MS. NOTEWARE)  And you're saying you

3    saw documentation that -- that showed that there was no

4    discharges from the medical department of Rocky Flats?

5             MS. AHERN:  Object to the form of the

6    question.

7             A    I -- I saw and was -- and received

8    briefings, along with the rest of the general staff,

9    that -- that strongly concluded -- of course, we did

10     not have a research -- medical research laboratory, for

11     example, or pharmacy.  I can't be more precise on

12     whether or not there were any discharges of chemicals

13     from the -- from the medical department.

14          Q     (BY MS. NOTEWARE)  There was a medical

15     department?

16          A     There was a medical department at Rocky

17     Flats.

18          Q     And you don't recall there ever being

19     a -- a determination that the medical staff improperly

20     disposed of chemicals from the medical department?

21          A     I did not have direct responsibility for

22     that area.  I may have heard discussions about whether

23     or not the medical staff was disposing of chemicals.

24          Q     And they were, in fact?  That was

25     determined by Mr. Goldberg after he became acting area

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                        306

1      manager in 1989?  Do you recall that determination?

2               MS. AHERN:  Objection.  Foundation.

3          Q     (BY MS. NOTEWARE)  You don't recall

4      that?

5          A     I -- I recall some discussion there.

6      I'd have to look at documents to be -- to know when or

7      whatever.  My recollection is that they may have been.

8      I don't know that it was.  But, whatever it was, they

9      were going to not do it anymore if they were doing it.

10     But I can't remember if there was a final determination

11    about that.  But it was made very clear, I think at

12    that point, if they had been doing it, they weren't

13    going to do it anymore.

14          Q     So getting to the bottom of that,

15    there's nothing that you know of that would say that

16    the allegations in this Section 9 were inaccurate?

17              MS. AHERN:  I object to the form of the

18    question.  I think he did say that he believed that

19    the -- that the allegations in Section 9 were

20    inaccurate, and I think your discussion was otherwise.

21          Q     (BY MS. NOTEWARE)  Okay.  And that's

22    because you believe -- but I thought what you just said

23    was that you thought that there was -- there wasn't any

24    evidence of medical waste being improperly disposed of,

25    but then you heard discussions that there were and they

CARPENTER REPORTING, INC.
(303) 752-1200

307

1     weren't going to do it anymore.  Did I misstate your

2     testimony?

3           A     What I'm -- I think so.

4           Q     I thought you kind of changed from the

5     beginning to the end.

6           A     What I was trying to say is that part of

7     the allegations, as I remember it and as I look here,

8     was that we had some sort of medical research lab there

9     doing medical experiments.  Okay.  And -- and they were

10    seeing chemicals that would only come from that.  As I

11    recall, that was totally disproved.

12          Q    Uh-huh.

13          A    They may have seen chemicals.

14          Q    From the medical department?

15          A    I can't dispute that.  I don't even know

16    that they came from the medical department.  I mean --

17    but they may have seen chemicals.  But their conclusion

18    that it had to come from a research lab -- medical

19    research lab was just false.  It was erroneous.

20          Q    So looking at paragraph 9.2, which talks

21    about -- there's a quotation, strongly suggests that

22    the contamination is medical waste originating from a

23    research laboratory or pharmacy, you don't have a --

24    any reason to disbelieve this -- this is on page 98 --

25    that it's contamination or medical waste?  The quarrel

1    that you have is that it was from a research laboratory

2    or pharmacy?

3                MS. AHERN:  I think that misstates his

4    testimony.

5          Q    (BY MS. NOTEWARE)  I'm asking you.

6          A    I'm sorry, ma'am.  Which paragraph

7    again?

8          Q    Paragraph 9.20.

9          A    9.20.  Okay.  Again, my -- my

10    understanding is that the inference that the -- that

11    whatever chemicals they were seeing comes from a

12    medical waste research laboratory or pharmacy was just

13    totally disproved.  And -- and that is --

14         Q    Totally disproved that it was a research

15    laboratory or pharmacy that it came from, or totally

16    disproved that there was medical waste?

17         A    I can't -- I don't have enough

18    information to comment a lot more than that.  They may

19    have seen those chemicals that they say they came from.

20         Q    Okay.

21         A    I don't know, based on what I've seen

22    without seeing more data, that I could say it was

23    medical waste at all.

24         Q    Okay.

25         A    The inference that it came from a

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                   309

1    medical research lab is wrong.

2         Q    Okay.  The next section on page 100 --

3    beginning on 101 talks about groundwater violations.

4    And that goes to page -- all the way to the end -- 116.

5    Now, you didn't have direct responsibility for

6    groundwater violations; correct?  Or for groundwater

7    monitoring; correct?

8         A    I did not have direct responsibility for

9    groundwater monitoring.

10        Q    And like the NPDES allegations, you

11    would have to look at -- you were relying -- you heard

12   some reports about whether these allegations were true

13   or not; is that correct?

14          A    I was in -- in my tenure at Rocky Flats,

15   I was in regular briefings on groundwater analysis and

16   sampling and our techniques.  I was not responsible for

17   that area.  That was health, safety, and environment.

18          Q    Uh-huh.

19          A    Have I answered your question?  I'm not

20   sure.

21          Q    Do you know whether Rocky Flats was

22   complying with RCRA groundwater monitoring regulations

23   during the time that you were director of plutonium

24   operations?

25                   MS. AHERN:  Object to the form of the

                  CARPENTER REPORTING, INC.
                     (303) 752-1200

                                                         310

1    question as to time.  Vague, ambiguous, imprecise.

2          A    In the -- in the briefings I was in and

3    the regular discussions with Rockwell management and

4    with the Department of Energy, groundwater sampling and

5    wells was discussed a lot.

6          Q    (BY MS. NOTEWARE)  Uh-huh.

7          A    I know there were efforts to add wells

8    and -- but I'm not sure if that was a requirement to

9    come into compliance with RCRA or just additional

10   protection.  But I do know that more wells were being

11   put in all the time in the last several years I was

12   there and that the results were being monitored on a

13    regular basis.

14          Q    But you have no reason to -- you have no

15    personal knowledge that the groundwater violations

16    alleged in Mr. Lipsky's affidavit were incorrect?

17          MS. AHERN:  Object to the form of the

18    question.

19          A    I --

20          MS. AHERN:  Foundation, as well.  I'm

21    sorry.

22          A    My -- my knowledge in this, without

23    looking at more documents, is going to be limited.

24          Q    (BY MS. NOTEWARE)  Okay.

25          A    I did have some familiarity and I can

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    311

1    make some general comments on it, but -- if I saw more

2    data, I could probably make more and I'd remember more.

3    Without reading this whole thing, I'm not sure what the

4    allegations are at this point.

5          Q    Okay.  The -- we're done with that

6    document for now.

7          A    Done?

8          Q    Yeah.

9          A    Okay.

10         Q    After the Tripartite Agreement was

11    signed in about July 1986 and you were -- you were

12    director of plutonium operations, were you concerned

13    about the amount of storage space for mixed waste at

14    Rocky Flats?

15              MS. AHERN:  I object to the term

16    Tripartite Agreement.  Just for clarity's sake, that's

17    sometimes referred to as the compliance agreement.  Is

18    that the document you're referring to?

19              MS. NOTEWARE:  That's fine.

20         A    When we were shown the compliance

21    agreement by the Department of Energy and began to

22    understand the implications of it, what we would need

23    to do, I think, as I mentioned yesterday, part of what

24    we had to do was -- was -- you know, our handling of

25    mixed and hazardous waste was going to change --

CARPENTER REPORTING, INC.
(303) 752-1200

312

1         Q    (BY MS. NOTEWARE)  Uh-huh.

2         A    -- and storage.  We were beginning to

3    understand all that.

4         Q    Uh-huh.

5         A    We -- we did have some concerns about

6    whether or not we could manage it in our existing

7    facilities and set up enough space.  And over and above

8    that, we were also beginning to produce substantial

9    quantities of pondcrete, which at some point later in

10    that year, we ended up having to store as opposed to

11    ship.  So we did have some concerns about whether or

12    not we had appropriate facilities.

13         Q    Okay.  Who was Mr. C.P. Bader?

14          A    Chris Bader was the director of support

15     operations, which included maintenance and other

16     support functions at Rocky Flats.

17          Q    Did you inform Mr. Bader, after the

18     compliance agreement went into effect, that there was

19     extremely limited capacity on the plant for storage of

20     mixed waste?

21          A    I don't recall exact discussions with

22     Chris Bader.  I know that we met a lot and not just by

23     ourselves, but with the rest of the general staff and

24     discussed what our approach would be.  Chris Bader,

25     since he had responsibility for the facilities in

CARPENTER REPORTING, INC.
(303) 752-1200

313

1      general, was an important player in that, and I had

2      many discussions with Mr. Bader.

3          Q    And what was Mr. Bader's response to the

4      problem?

5          A    I really would have to see some

6      documentation to be clear.  Chris was, in general, very

7      supportive of the efforts we needed to do and gave us,

8      when we asked for it -- gave us a number of options we

9      could look at, up to and including new facilities.  If

10     we decided we might need a facility, he would

11     prepare -- his organization would prepare all the

12     necessary paperwork to apply to the DOE for it.

13               So Chris was very responsive, but I

14    can't, without more document -- I can't be more

15    specific than that.

16             Q    But after the compliance agreement was

17    the first time that you had these discussions with him

18    about the critical need for more storage space for

19    mixed waste; right?

20                 MS. AHERN:  Objection.  Foundation.

21             Q    (BY MS. NOTEWARE)  I'm asking about your

22    discussions.  I think you would know about that.

23             A    As we became more clear what was going

24    to be covered -- what waste forms would be covered

25    under the RCRA requirements, yeah, we began to be more

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                        314

1     specific about how we would handle it.  I had lots of

2     discussions before and after the compliance agreement.

3              Q    (BY MS. NOTEWARE)  Okay.

4                  MS. NOTEWARE:  For -- I could have

5     double-sided it, but that always gets screwed up.  Is

6     that okay?

7                  MS. AHERN:  I just --

8                  MS. NOTEWARE:  I could -- we could take

9     it out, but I think it's better to leave it in here.

10    Actually, just mark the face of the page.  But I

11    thought that was the best way of not getting it all

12    screwed up.

13                 MS. AHERN:  The record should reflect

14    this exhibit is an extremely voluminous document.

15                    (Marked for identification was

16     Deposition Exhibit No. 11.)

17            Q     (BY MS. NOTEWARE)   Okay.   I'm showing

18     you what's been marked as Deposition Exhibit 11.   I'll

19     represent to you that this is the last thing we're

20     going to do today.   We're running out of time.

21                    MS. AHERN:   There's only one copy of

22     this, so we're looking at it together.

23            Q     (BY MS. NOTEWARE)   You're looking at it

24     together.   Can you just first identify what that is,

25     just from the title page and -- yes, I -- it is a very

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                      315


1     voluminous document.   Is that the Tiger Team report

2     that I referenced to you earlier?

3            A     I don't know, first.   I'm going to take

4     a look at the executive summary.

5            Q     That's what I want to turn to first, and

6     that may be all we have time for.

7                    MS. AHERN:   Just give me a second.

8            A     I'm looking for a signature or name or

9     something to tell me exactly what this is.   I -- I

10     mean, the timing makes me think it could be the Tiger

11     Team report, but I'm looking for something that gives

12     me more evidence of that.

13            Q     (BY MS. NOTEWARE)   I don't know that

14     it's a signed --

15                  MS. AHERN:  I just don't recall, either.

16          Q    (BY MS. NOTEWARE)  I know the title page

17    says --

18                  MS. AHERN:  I'm sorry.

19          A    That's all right.

20                  MS. AHERN:  Yeah.

21          A    Okay.  The special assignment team,

22    which is probably the Tiger Team.

23          Q    (BY MS. NOTEWARE)  It doesn't --

24          A    Okay.

25          Q    Do you recognize the document?

                       CARPENTER REPORTING, INC.
                           (303) 752-1200

                                                        316

1          A    I -- I think I recognize the document.

2          Q    Okay.  You were at the Rocky Flats plant

3    as --

4          A    Yeah.

5          Q    -- plutonium -- director of plutonium

6    operations in August 1989; correct?

7          A    I was, yes.

8          Q    Okay.  And the document titled here says

9    "Assessment of Environmental Conditions at the Rocky

10   Flats Plant, Golden, Colorado, August 1989," and it

11   appears to have the seal of the Department of Energy,

12   United States of America on the cover.  And it says

13   "U.S. Department of Energy Special Assignment

14   Environmental Team."

15                  Okay.  Does that refresh your

16   recollection as to what -- do you know what the special

17   assignment environmental team was and what it did

18   during 1989, August 1989, following the FBI raid while

19   you were almost the plant manager -- the assistant

20   plant manager of the plant because Dom Sanchini was

21   gone?  Do you know what this is?

22            MS. AHERN:  I object to the form of the

23   question as argumentative.  The title of the team could

24   be somewhat vague.  It could be helpful if he takes

25   some time to familiarize himself with the document.

                CARPENTER REPORTING, INC.
                    (303) 752-1200

                                              317

1            Q    (BY MS. NOTEWARE)  I know we want to get

2    out of --

3            A    I don't remember the name of the team.

4            Q    I don't care if it's called Tiger Team.

5    That's not relevant.

6            MS. AHERN:  Can we go off the record for

7    just a couple of minutes and let him familiarize

8    himself with the document?  I don't expect to belabor

9    this.  I think it's an awfully large document.  I know

10   time is short.

11            (There was a recess taken from 11:32

12   a.m. to 11:35 a.m.)

13            Q    (BY MS. NOTEWARE)  Let's go back on the

14   record and finish this up.  Okay.  Moving aside from

15   the document for a second, you were present in the

16    courtroom during Admiral Watkins' videotape when it was

17    played?

18            A    Yes, I was.

19            Q    Do you recall he talked about the Tiger

20    Team coming in and assessing the conditions at Rocky

21    Flats; correct?

22            A    I remember him discussing the Tiger

23    Team, yes.

24            Q    Okay.  And you were present at Rocky

25    Flats as director of plutonium operations and then

CARPENTER REPORTING, INC.
(303) 752-1200

318

1     eventually assistant acting plant manager during the

2     time that the Tiger Team was at the plant; correct?

3             A    Yes, I was.

4             Q    Okay.  So you recall that that occurred?

5             A    Yes, I do.

6             Q    Okay.  Now, you've had a few minutes to

7     familiarize yourself with this exhibit.  Is this -- do

8     you understand this to be the report of that Tiger Team

9     that Admiral Watkins discussed?

10            A    I believe it to be the Tiger Team

11    report, yes.

12            Q    Okay.  And did you just look at the

13    executive summary of this document?

14            A    Primarily, yes.  I -- I didn't remember

15    it as being so voluminous, so I have glanced through

16    it, but I did look at the executive summary.

17          Q     Before we look at the executive summary

18     together for a minute, let me ask you if you have --

19     after you received the -- you did receive this report,

20     the Tiger Team report, when you were working at Rocky

21     Flats; correct?

22          A     Yes, I did.

23          Q     Okay.  You received the results of the

24     Tiger Team?

25          A     I --

CARPENTER REPORTING, INC.
(303) 752-1200

319

1          Q     What was your reaction?

2          A     My reaction, as I recall, was that it

3     was thorough.  That there were an awful lot of actions

4     in it, things we had to do.  And we began to prepare

5     corrective action plans to meet all their findings.

6          Q     Okay.  Now, when you saw Agent Lipsky's

7     affidavit, you were surprised by the allegations in

8     there and thought they were inaccurate; correct?  Is

9     that an accurate statement of your --

10          A     In general, yes.

11          Q     Okay.  And when you saw the Tiger Team

12     report, were you also shocked and did you believe that

13     those allegations were -- those findings to be

14     inaccurate?

15               MS. AHERN:  I object to the form of the

16     question.

17          A    As I recall, with the Tiger Team, that

18    we had received fairly regular briefings on their

19    status, so when I reviewed the final report, while I

20    may have disagreed with some of the findings, in

21    general, I have no disagreement with the report.

22          Q    (BY MS. NOTEWARE)  Okay.  Okay.  If you

23    turn to page ES-1 under the section that talks about

24    observations.  The second bullet point says,

25    "Implementation of the environmental programs lacks

CARPENTER REPORTING, INC.
(303) 752-1200

320

1    coordination and is hindered by poor communication.

2    The lines of authority and responsibility are

3    fragmented and not clearly defined.  A strategy that

4    that integrates the existing management and information

5    systems needs to be developed and implemented."  Do you

6    see that?

7          A    I do see that.

8          Q    Do you disagree with that observation?

9          A    Again, to fully comment on that, I'd

10    have to look at the individual findings because there

11    were a lot of findings --

12          Q    Okay.

13          A    -- and observations and even some best

14    practices, as I recall.

15          Q    Uh-huh.

16          A    But, as I look at that statement, I

17    understand the conclusion they drew.  I can't say right

18    now if my reaction back in 1989 was full agreement or

19    not.

20                Q     Uh-huh.

21                A     But I knew that there were things we

22    could do to improve in that area.

23                Q     The third bullet point, the next one,

24    says, "Environmental monitoring programs require

25    improvements to more accurately characterize and

CARPENTER REPORTING, INC.
(303) 752-1200

321

1    monitor plant-related emissions, discharges, and

2    ambient conditions."  Do you see that?

3                A     I do see that.

4                Q     We were talking -- at the start of

5    today's deposition, you were talking about that was the

6    data that you relied on to determine that there were no

7    off-site releases of plutonium; correct?

8                A     Certainly, some of the data, yes.

9                Q     Turning to the next page.  The top

10    bullet point there says, "Effective implementation of

11    the site remediation program has been adversely

12    impacted by poor communications, coordination,

13    planning, and scheduling."  Did you find that

14    conclusion to be inaccurate?

15                A     Again, I'd have -- I'd need time to

16    review the individual findings, observations, and best

17    practices.  I knew there were things we could do in the

18    area site remediation to improve.  I'm willing to

19    accept that part of that involved the communications,

20    coordination, planning, and scheduling.

21         Q    Okay.  The next bullet point says,

22    "Implementation of an effective waste management

23    program has been severely hindered by site waste

24    storage constraints, conservative waste classification

25    practices, and a lack of options for treatment and

1    final disposal of waste."  Do you see that?

2         A    I do see that.

3         Q    First, what does "conservative waste

4    classification practices" mean?

5              MS. AHERN:  Object to the form of the

6    question.  That wasn't his term.

7         Q    (BY MS. NOTEWARE)  Do you know what that

8    means?  Do you know what that means?

9         A    I have some -- some understanding of it.

10    Again, I would have to go into the depths of the report

11    to -- to make sure I'm right, but I do have some feel

12    for what that means.

13         Q    What do you think that means?

14         A    I think it meant that, in many cases, we

15    were over -- overly conservative in the way we

16    classified waste.  We could have, I think, grouped some

17    waste forms together that, in fact, some of what we

18    were calling waste may have been able to be handled in

19      a different fashion.  But we were -- we were being

20      overly cautious in our classification of wastes.

21                  MS. AHERN:  Can I take a moment?  I'm

22      sorry.  Okay.

23                  Q     (BY MS. NOTEWARE)  Okay.  Then skipping

24      a bullet point there -- wait.  Actually, the next one,

25      the next bullet point.  Wait.  Going back to the one we

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                    323

 1      were looking at, the second bullet point on page ES-2,

 2      do you have reason to disagree with their conclusions

 3      about the waste management program conclusions?

 4                  A     Since waste management was under my

 5      purview --

 6                  Q     Right.

 7                  A     -- and I had a little bit more knowledge

 8      in that area than some of these others, I don't

 9      disagree with the conclusions they've drawn here.

10                  Q     Okay.  The next bullet point says, "The

11      quality and reliability of sample collection laboratory

12      analysis and other information generated in support of

13      the environmental monitoring and restoration programs

14      are not adequate to achieve program goals."  Do you

15      have any reason to disagree with that statement?

16                  A     Again, in this area, to answer that

17      really well, I'd have to go look at the individual

18      findings, observations, and best practices.  That was

19      not my -- my area of responsibility.

20            Q     Okay.  What about the next bullet point,

21      "Management and maintenance of the sewage treatment

22      plant has received low priority, resulting in

23      inefficient operation which could create problems in

24      meeting future permit requirements"?

25            A     Again, it's not my area of

                    CARPENTER REPORTING, INC.
                         (303) 752-1200

                                                            324

1       responsibility.  I have some knowledge of the sewer

2       treatment plant, some knowledge of planned

3       improvements, but I'd have to review the findings and

4       best practices and observations to be more conclusive

5       on that.

6             Q     Okay.  If you could turn -- actually, to

7       page 1.7, which is best management practice findings.

8             A     1-7.

9             Q     1-7.

10            MS. AHERN:  I just want to state for the

11      record that the witness hasn't had an opportunity to

12      review any of this in detail.

13            MS. NOTEWARE:  I understand.

14            Q     (BY MS. NOTEWARE)  You were talking

15      about best management practices.  There was a section

16      of this report that -- just one page that talks about

17      best management practices findings.  Do you want to

18      take a second to review that?

19            A     Please.

20                    (Deponent reviewing exhibit.)

21                    I've reviewed that page.

22           Q     Best management practices are not

23     regulatory standards; correct?

24                    MS. AHERN:  Object to the form.

25           Q     (BY MS. NOTEWARE)  As you understand?

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                        325

1                     MS. AHERN:  Object to the form of the

2      question.  Also, foundation.

3            Q     (BY MS. NOTEWARE)  Actually, I'll change

4      that to regulatory requirements.  Best management

5      practices are something different than regulatory

6      requirements; correct?

7                     MS. AHERN:  My objection remains.

8            A     My understanding of best management

9      practices were that based on their -- the Tiger Team's

10     review of other sites within the department of weapons

11     complex and, in some cases, outside of it, they had to

12     form some opinions about the best way to do some

13     things, which didn't necessarily involve reg --

14     achieving regulatory compliance.  And they would

15     recommend to us some best management practices in areas

16     that could help us.

17           Q     (BY MS. NOTEWARE)  And they did find

18     some areas where best management practices were not

19     being used by Rockwell; correct?

20          A    In fact, they found some areas where we

21    were the best management practice.  I think those were

22    spelled out in the report.  And they found some areas

23    where we could learn from others on a better way to --

24    to do something.

25          Q    Okay.  Can you turn to page 2-7, please.

CARPENTER REPORTING, INC.
(303) 752-1200

326

1    Page 2-7 states -- do you have that page?  The first

2    full paragraph --

3          A    I'm reading it.

4          Q    -- "Deficiencies in Rocky Flats plant

5    effluent air monitoring program may adversely affect

6    determination of radioactive materials released to the

7    atmosphere."  And then it lists a bunch of

8    deficiencies.  Do you recall -- do you recall that

9    finding from the Tiger Team report?

10          A    Again, without reading the details that

11    go into it, I -- I somewhat recall it.  I'd have to

12    look at all the findings and practices and noteworthy

13    practices to -- to fully comment on it, but I do have

14    some -- some remembrance of it.

15          Q    Okay.  The first one there talks about

16    uncertainty about the volumetric flow rate of effluent

17    air in the exhaust ducts.  Is that something that you

18    have any knowledge about from your time at the Rocky

19    Flats plant?

20                    MS. AHERN:  Object to the form of the

21     question.  Object to the phrase "any knowledge" as

22     vague and ambiguous.

23             A     In -- in my -- in reviews of these --

24     these audit findings, there was some discussion of each

25     of those areas, and I did gain some knowledge about

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                        327

1      what the -- what their finding was based on.

2              Q     (BY MS. NOTEWARE)  Uh-huh.

3              A     And I -- at that time, I had some

4      knowledge.  I'd have to really go back through this in

5      more detail to -- to comment much.

6              Q     Okay.  But that wasn't really one of the

7      focuses of your areas in plutonium operations?  You

8      didn't have responsibility for the effluent air

9      monitoring program and problems with calibration of

10     flowmeters and things of that nature?  That wasn't part

11     of your responsibilities?

12             A     No.  It was not part of my

13     responsibility.

14             Q     Okay.  But that's something that you --

15     you have no knowledge to refute the Tiger Team's

16     finding in this area; correct?

17             MS. AHERN:  Object to the form of the

18     question about -- the phrase "knowledge to refute."

19             Q     (BY MS. NOTEWARE)  Is this one of those

20     areas that, if you looked at more documents, you might

21      be able to come up with some reason why the Tiger Team

22      was inaccurate in their findings?

23             A    I -- I'm not even going to attempt to

24      argue they were inaccurate.  I don't have that type of

25      knowledge.  I do know they were careful to say this

CARPENTER REPORTING, INC.
(303) 752-1200

328

1       wasn't an off-site issue.  It was a better way to do

2       it.  But we did not have any off-site issues that we

3       had to deal with and --

4              Q    Do you dispute their finding that the

5       deficiencies in the Rocky Flats plant effluent air

6       monitoring program may have adversely affected

7       determining whether radioactive materials were released

8       to the atmosphere?  You dispute that?

9              MS. AHERN:  I don't think that's what

10      the witness testified.

11             A    And -- and certainly, that's not what

12      I -- what I really wanted to say.  What I wanted to say

13      is while we could have been doing this better, we still

14      weren't doing it in a fashion that -- that led to any

15      off-site health concerns or hazards.

16             Q    (BY MS. NOTEWARE)  Well, since you bring

17      that up, on what do you base your conclusion that there

18      were no off-site releases or hazards?  What information

19      is that based on?

20             A    Well, I believe, at the beginning of

21      this report, they make a statement to that effect.

22          Q     Uh-huh.

23          A     Okay.  And of course, I had seen --

24     continually seen off-site monitoring data and on-site

25     monitoring data, and I hadn't seen anything that said

CARPENTER REPORTING, INC.
(303) 752-1200

329

1      that we had an off-site concern.  And I thought and

2      still think that their report says that.

3          Q     Okay.  So you were relying on the Tiger

4      Team report when you say that there was no off-site --

5               MS. AHERN:  I believe the witness

6      identified a variety of things he was relying upon.

7      This misstates his testimony.

8          Q     (BY MS. NOTEWARE)  Perhaps I missed it.

9      Other than -- other than the Tiger Team report, what

10     else were you relying on?

11          A     Well, I had continually seen the data

12     that had been --

13          Q     Okay.  Right.  The data we talked about

14     at the beginning, those three -- right.

15          A     Yes.  From the off-site sampling program

16     and I felt --

17          Q     Okay.

18          A     -- this report just reiterated that --

19          Q     Okay.  Let's go to --

20          A     -- you don't have an off-site health

21     concern.

22          Q     Page 2-11.

23          A     2-11.

24          Q     Uh-huh.  This one talks about

25   deficiencies in the ambient air monitoring program.  Do

CARPENTER REPORTING, INC.
(303) 752-1200

330

1   you have any reason to dispute their finding that there

2   were deficiencies in the ambient air monitoring program

3   for radionuclides?

4          A     Again, without looking at the particular

5   audit findings, best practices, observations,

6   noteworthy practices, I don't have any reason to agree

7   or disagree with all this detail.

8          Q     And the Tiger Team concluded that, "The

9   accuracies of measured concentrations of plutonium in

10   ambient air are questionable.  These data are reported

11   monthly and annually and are used in calculating an

12   annual radiation dose to the public to confirm dose

13   calculations that are made based on radioactive

14   effluent emission data."  Is that the health -- what

15   was it -- help me here -- health, safety, and

16   environment --

17                MS. AHERN:  Health, safety, and

18   environment.

19          Q     (BY MS. NOTEWARE)  -- samples that you

20   were talking about at the start of this deposition?

21          A     I believe so.  Yes.

22          Q     And the Tiger Team found those

23    deficient?

24            A    Again, I'd have to look at the details,

25    because this was not my area of responsibility.

331

1            Q    Okay.

2            A    My understanding --

3            Q    But you relied on that data in

4    determining that there weren't off-site releases or

5    that they were negligible?

6            A    In -- in -- certainly, in part.  And my

7    understanding was that the Tiger Team, while they found

8    areas we could improve, also said it's not an area

9    where you've got a concern to off-site health.

10           Q    Based on that first statement at the

11   start -- okay.  If you could show me in the section on

12   ambient air monitoring where the Tiger Team says that

13   that isn't an off-site concern, because my reading of

14   it is that -- that they are questioning the amount of

15   radiation dose to the public because of the

16   deficiencies in the ambient air monitoring program.

17   But if you see something different in there, please

18   point it out to me.  And take a moment to review.

19           MS. AHERN:  You can take more than a

20   moment to review it.

21           A    I would have to analyze or -- or read

22   through not just this summary, but all the audit

23    findings.  What I'm relying on is my remembrance of the

24    audit -- the audit team's outbriefing to us and our

25    further discussions and in part, it's -- the first

332

1    observation that they made that no situation which

2    posed an imminent threat to public health or the

3    environment were observed and and as I recall, in each of

4    these areas, they said, Look, you've got areas you can

5    improve in, but we're not talking about an off-site

6    health concern here.

7         Q    (BY MS. NOTEWARE)  Okay.  So let me

8    understand.  The Tiger Team was commissioned by Admiral

9    Watkins and they came in and they did their independent

10    review -- I mean -- by DOE of -- of the facility;

11    correct?

12         A    That's my understanding, yes.

13         Q    Okay.  And then they had briefings with

14    you before they issued this report?

15         A    As I recall -- and again, I'd have to go

16    back and look, but I thought we had a -- an -- on a

17    routine basis -- and I can't remember the frequency --

18    they would say, Here's some of our preliminary

19    findings.

20         Q    Who did they give those to?

21         A    Do you have any comments you want to

22    make?  Not that we could necessarily change their

23    minds, but we might provide them more data.

24          Q     For example, you might have told them

25     that you -- you might want to talk about what the --

CARPENTER REPORTING, INC.
(303) 752-1200

333

1      whether there was any imminent threat to public health

2      or the environment?  That might have been a comment

3      that someone from your team made to the Tiger Team?

4                    MS. AHERN:  Object to the form of the

5      question as argumentative.  Vague.  Ambiguous.

6          A     Specifically in that area, I can't --

7      I'm not certain that we ever made comments about that.

8      That was a conclusion they needed to draw.  Okay.  What

9      we would do --

10         Q     (BY MS. NOTEWARE)  You just said --

11         A     -- is provide them more data in certain

12     areas.  They may or may not ask for our opinions.

13     Okay.  But we would provide them more data and -- so

14     they could -- they could reach a better conclusion.

15         Q     Who met with the Tiger Team from

16     Rockwell?

17         A     There were -- as I -- if I'm remembering

18     correctly, there were regular briefings.  I can't

19     remember if they were daily or less frequently than

20     that -- in the late afternoon, early evening, and they

21     would present, Here is what we found this day.  Do

22     you -- is there stuff you would like to add?  There

23     were people from all these areas, including health,

24    safety, and environment, my areas, support operations,

25    Department of Energy's office people at these daily or

CARPENTER REPORTING, INC.
(303) 752-1200

334

1    weekly briefings -- whatever they were -- and that we

2    would respond to it.  Sometimes they would request more

3    information from us.

4         Q    Uh-huh.  But you don't remember who was

5    there, other than yourself and possibly Mr. Sanchini?

6         A    I can name some names of people I'm

7    fairly certain were there, but I can't remember -- I

8    can't picture those meetings in my mind right now.

9         Q    Okay.  Who can you name that was there?

10         A    I know there were health, safety, and

11    environment people there, including people like George

12    Setlock and Gary Potter and their people.  There were

13    other directors at my level there.  And I know there

14    were Department of Energy people there from the area

15    office.  I was there, if not at every one, at least

16    some.  My people and particularly waste management and

17    RCRA compliance people were there.  But, again, I'm

18    going back 16 years, so I can't give -- be more

19    definitive than that.

20         Q    Was Dom Sanchini there?

21         A    I don't recall.  Dom was --

22         Q    In and out?

23         A    In this time period, Dom was still at

24    the plant.  He could have been there, probably was for

25      some, but maybe not all of them.

CARPENTER REPORTING, INC.
(303) 752-1200

335

1           Q    Okay.  Can you turn to 3-5.  This

2      deficiency talks about discharge monitoring report

3      deficiencies.  Is that something that you -- you didn't

4      have responsibility over that area; correct?

5           A    No.  Again, while I saw -- routinely saw

6      data in this area and they were discussed in our

7      meetings with Rockwell and DOE, I didn't have the

8      direct responsibility for this.

9           Q    Okay.

10          A    Certainly, not as a director of

11     plutonium operations.

12          Q    If you could turn to 3-13, which talks

13     about sewage treatment plant deficiencies.  You have no

14     personal knowledge or basis to refute the findings of

15     the Tiger Team on -- on that, do you?

16               MS. AHERN:  Object to the form of the

17     question.

18          A    This was not my area of responsibility,

19     and without further review of this document, I can't

20     really agree or disagree with these particular

21     statements.

22          Q    (BY MS. NOTEWARE)  Okay.  Turn to 3-17,

23     deficiencies at the spray irrigation site.  Was that an

24     area that you had direct responsibility for?

25          A    Not as director of plutonium operations.

CARPENTER REPORTING, INC.
(303) 752-1200

336

1          Q    Okay.  And did you have any -- any

2    reason -- or basis to refute the Tiger Team's findings

3    about deficiencies at the spray irrigation site?

4               MS. AHERN:  Object to the form of the

5    question.  I also object that this witness hasn't

6    reviewed those conclusions even as we're sitting here

7    right now.  We just turned to this page.

8          A    Again, without -- without reviewing in

9    some detail this document and perhaps other documents,

10   I can't really comment as to whether I agree or

11   disagree at this point.  This was not my area of

12   responsibility.

13         Q    (BY MS. NOTEWARE)  Turning to 4-5, this

14   one talks about findings concerning groundwater

15   contamination at inactive waste sites.  Was this an

16   area of your responsibility?

17         A    Again, groundwater monitoring and

18   sampling was not in my direct area of responsibility as

19   the director of plutonium operations.

20         Q    Okay.  And it talks about high, low, and

21   medium priority sites in this document.  It talks

22   about, under the high-priority sites, the 881 hillside.

23   Is that an area that you had responsibility for any

24   cleanup or involvement in that area?

25               MS. AHERN:  Object to the form of the

CARPENTER REPORTING, INC.
(303) 752-1200

337

1    question.

2            A    While I had knowledge of -- of these

3    sites and some of the remediation activities and was in

4    briefings -- regular briefings about them, I was not

5    responsible directly for these areas.

6            Q    (BY MS. NOTEWARE)  Okay.  And 4-7 talks

7    about the lack of upgradient background monitoring

8    wells.  Again, that wasn't an area that you had

9    responsibility for directly?

10           A    No.  It was not in my comments from

11   previous areas.

12           Q    And 4-13 -- I'm doing this quickly

13   because we're running out of time here, but

14   deficiencies in groundwater sampling procedures in

15   4-13, that -- again, the same comment that you've made

16   before, that you were in briefings about groundwater

17   monitoring sampling, but you didn't have --

18           A    You're talking about 4-15?

19                MS. AHERN:  4-13.

20           A    4-13.  No.  Again, my comments stand.

21   This was not my direct area of responsibility.

22           Q    (BY MS. NOTEWARE)  Let's go to 5-5,

23   which is a waste management finding.  It talks about

24   storage of containers of hazardous waste at Building

25   334 do not conform with RCRA regulations limiting

CARPENTER REPORTING, INC.
(303) 752-1200

338

1   quantities of waste at satellite accumulation areas to

2   55-gallon drums.  Was this an area of your direct

3   responsibility?

4           A    This would have been an area of my

5   direct responsibility.

6           Q    What does that mean?

7           A    Yes.

8           Q    What does that mean?  It was -- what do

9   you mean, would have been?

10          A    This was an area --

11          Q    That was an area --

12          A    -- that as a director of plutonium ops,

13  that was my responsibility.

14          Q    So the findings that say audit

15  discipline waste management -- and there are several of

16  them that follow -- if you turn to 5-7, it talks about

17  the 750 drum pad, land band storage and the next one is

18  5-9, a container labeling, 5-11, Building 884 aisle

19  space, 5-13, mixed waste subject to disposal,

20  recommendations.  These are all areas of your --

21  everything that's audit discipline waste management,

22  that would have been under your purview as director of

23  plutonium operations?

24          A    I'd have to go through each one and the

25  backup, but, in general, yes, the waste management area

CARPENTER REPORTING, INC.

(303) 752-1200

339

1    was under my direction.

2            Q    Okay.  Was the -- if you will turn to

3    page 5-31, it talks about deficiencies in the waste

4    stream characterization, WSC study.  Was that done

5    under your watch?

6                 MS. AHERN:  The criticisms or the --

7            Q    (BY MS. NOTEWARE)  1986 was when the

8    study was.  Were you in charge of that?

9            A    As I remember, the waste stream

10   characterization was contracted out of the HS&E

11   department when it was initially done.

12           Q    Okay.

13           A    I had some knowledge of it and some

14   involvement.  I can't remember, but I don't believe, at

15   this point, it was directly under my purview, but I

16   really would have to look at a lot of other documents

17   or at least some of them to be certain on that.

18           Q    Okay.  Did that change between 1986 and

19   1989 when you left the plant?  Did the waste -- I mean,

20   the deficiencies that they are talking about on page

21   5-31 talks about deficiencies in the waste stream

22   characterization study was that then -- in 1989, was

23   that under your area of responsibilities?

24                MS. AHERN:  Object to the form of the

25   question as vague and confusing.

340

1          A     I would really have to see some more

2    documentation.  I know when we initially started our

3    waste stream characterization, primarily, it was out of

4    HS&E because they were handling a lot of the initially

5    RCRA activities.  More and more of that was

6    transitioning to my organization.  This may have, but I

7    just can't tell without looking at other documentation.

8    I just don't remember.

9          Q     (BY MS. NOTEWARE)  I'd ask you to turn

10   to 7-5, and this will be the last one that we look at.

11   Okay.  It says "Audit discipline radiation.  Audit

12   finding title, calculation and reporting of radiation

13   dose assessments."  Do you see that?

14         A     Yes, I do.

15         Q     The first paragraph says, "The

16   assessment of the Rocky Flats plant's contribution to

17   the public radiation dose as reported in the site

18   environmental report for 1987 rad-1 does not fully

19   address all potential exposure pathways and

20   radionuclides."  Do you see that?

21         A     I do see that.

22         Q     Do you recall a discussion about that

23   finding?

24         A     No, I don't.  Not without really

25   reviewing this document and perhaps others.  I just

CARPENTER REPORTING, INC.
(303) 752-1200

341

1    don't remember this topic.

2         Q    You don't remember?

3         A    I just don't.

4         Q    Okay.  Before the Tiger Team's finding,

5    do you remember having discussions about calculating

6    public radiation doses with anyone at Rockwell?

7         A    I remember seeing reports and perhaps

8    briefings on this.  I don't remember the specifics of

9    calculations and how they were done.

10        Q    Okay.  Was that -- whose department was

11    that responsibility?

12        A    Again, I think, but I'm not certain, it

13    was under health, safety, and environment.

14        Q    So that's not something you have

15    particular knowledge about, how the radiation dose

16    assessments were calculated; correct?

17        A    I had some exposure to it, to -- perhaps

18    using the wrong term there -- but I -- I saw some

19    briefings and reports, but it was not my area of

20    responsibility.

21        Q    Okay.  But you provided data to the

22    radiation department or the health safety department so

23    that they could calculate and report radiation dose

24    assessments?  That was something you did and you

25    provided them data for; correct?

1            A    I'm not sure what data I would have

2      provided at this point without looking at -- at other

3      documents.

4            Q    Okay.  That's all I have for this

5      document right now.

6                 Were you involved in the decision of

7      whether to accept the plea bargain that was entered by

8      Rockwell?  Were you consulted?

9                 MS. AHERN:  Objection.  Asked and

10     answered.

11           A    No, I was not.

12           Q    (BY MS. NOTEWARE)  Did you understand

13     that Rockwell would not agree to plead guilty to any

14     criminal activity that impacted off-site releases?

15                MS. AHERN:  Objection.  Foundation.

16           Q    (BY MS. NOTEWARE)  Do you know?

17           A    Would you state that again?

18           Q    I'll rephrase it.  I'll ask a different

19     question.  Were you aware that Rockwell would not agree

20     to plead guilty to any criminal violation that involved

21     the potential off-site release of nuclear

22     contamination?

23           A    I don't remember any -- I was not

24     involved in any of those discussions and I can't

25     remember that particular topic.

```
1                    MS. NOTEWARE:  Okay.  I have no further

2       questions.

3                    ... WHEREUPON, the deposition was

4       concluded at 12:05 p.m.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CARPENTER REPORTING, INC.
(303) 752-1200

```
 1                    SIGNATURE OF DEPONENT

 2              I, WILLIAM F. WESTON, Ph.D., the

 3    deponent in the above named deposition, have read the

 4    above and foregoing deposition, and the same is a true

 5    and accurate transcript of my testimony, save and

 6    except for changes and/or corrections, if any, as

 7    indicated by me on the amendment sheet(s) attached

 8    hereto as indicated.

 9    Amendment sheet(s) attached (    )

10    No changes and no amendment sheets attached (   )

11

12                    _____
                      WILLIAM F. WESTON, Ph.D.
13

14              The signature of WILLIAM F. WESTON,

15    Ph.D. was subscribed and sworn to before me this _____

16    day of _____, 2005.

17              My Commission expires:

18                    _____
                      Notary Public
19

20

21

22

23

24

25

                  CARPENTER REPORTING, INC.
                     (303) 752-1200

                                              345


 1                 CARPENTER REPORTING, INC.
```

```
                     Certified Shorthand Reporters
 2                  Registered Professional Reporters
                       12510 East Iliff, Suite 120
 3                       Aurora, CO  80014

 4     December 12, 2005

 5
       ELLEN T. AHERN, ESQ.
 6     Kirkland & Ellis
       717 Seventeenth Street
 7     13th Floor
       Denver, CO  80202

 8

 9     RE:  Cook v. Rockwell, et al.

10
       Dear Ms. Ahern:
11
                    Enclosed please find your copy of the
12     deposition of WILLIAM F. WESTON, Ph.D., along with the
       original signature page and correction sheets for his
13     use.  Would you please have him read your copy of the
       deposition and if he finds any changes necessary, have
14     him make them on the correction sheets provided.  Be
       sure that he signs each correction sheet that he may
15     use.  Then have him sign the original signature page
       before a notary public and file the signature page and
16     correction sheets with the Court at the time of trial,
       providing copies to opposing counsel.
17
                    Thank you for your assistance and
18     cooperation and if you have any questions concerning
       the above, please feel free to contact me.
19
       Yours truly,
20

21
       Bonnie Carpenter, CSR, RPR
22     cc:  Ellen Noteware, Esq.

23     Trial Date:  Present

24

25
                     CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                          346

 1                   CARPENTER REPORTING, INC.
                   Certified Shorthand Reporters
```

```
2                    Registered Professional Reporters
                       12510 East Iliff, Suite 120
3                         Aurora, CO  80014
                          (303) 752-1200
4
     DAVID F. SORENSEN, ESQ.
5    Berger & Montague, P.C.
     1722 Locust Street
6    Philadelphia, PA  19103-6305

7    Re:  Cook v. Rockwell, et al.
          Case No. 90-K-181
8         United States District Court
          District of Colorado
9
     Dear Mr. Sorensen:
10
             Attached is the original deposition of
11   WILLIAM F. WESTON, Ph.D., Volume II, taken in the above
     cause.
12
         Deposition not signed            _____
13       Deposition signed by the deponent
            No corrections                _____
14       Deposition signed by the deponent
            correction sheet(s) included therein,
15          and copy(ies) of same forwarded to
            interested counsel            _____
16       Signature waived                 _____

17          Please retain the original copy of the
     deposition UNOPENED in your possession until such time
18   as it is required by any party in a hearing or trial of
     the above cause.
19
     Yours truly,
20

21

     Bonnie Carpenter, CSR, RPR
22
     cc:  Ellen Ahern, Esq.
23   Trial Date:  Present

24   RECEIVED BY _____DATE_____

25

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

                                                 347

1                  C E R T I F I C A T E
     STATE OF COLORADO        )
2                             ) ss
```

COUNTY OF ARAPAHOE        )

3

I, Bonnie Carpenter, Notary Public of
4   the State of Colorado, duly appointed to take the
deposition of the above-named Deponent, do hereby
5   certify that previous to the commencement of the
examination of the said above-named Deponent, he was
6   first by me duly sworn to testify the truth, the
whole truth and nothing but the truth touching and
7   concerning the matters in controversy between the
parties hereto, so far as he should be interrogated
8   concerning the same;

9                   That said deposition was
stenographically reported by me at the time and place
10   heretofore set forth, and was reduced to typewritten
form under my supervision as per the foregoing;

11

That the foregoing is a true and
12   correct transcript of my shorthand notes then and
there taken;

13

That after the deposition was
14   transcribed, the same was submitted by letter to the
Deponent for reading and signing, a copy of which is
15   hereto annexed;

16                   That I am not kin or in anywise
associated with any of the parties to said cause of
17   action or their counsel and that I am not interested
in the event thereof;

18

IN WITNESS WHEREOF, I have hereunto
19   set my hand and seal this _____ day of _____,
2005.
20

My Commission Expires:  9-22-2007.
21

22                               _____

Bonnie Carpenter
23                               Notary Public
12510 East Iliff
24                               Suite 120
Aurora, CO  80014
25

CARPENTER REPORTING, INC.
(303) 752-1200