# Exhibit A

1

1              ** ROUGH DRAFT ** ROUGH DRAFT **

2

3        The material contained in this file has not been

4    reviewed by the court reporter.  Any reference to page

5    and line number will not be accurate.  Please do not

6    quote from this draft as this is not certified by the

7    reporter.  It is for review only.

8

9        Q    Good morning, Mr. Norton.

10       A    Good morning.

11       Q    Could you please state your name for the

12   record.

13       A    Michael Jeffrey Norton.

14       Q    To state the obvious, you are an attorney?

15       A    That's correct.

16       Q    So I don't need to go over with you what a

17   deposition is or what the ground rules are?

18       A    You can if you wish.

19       Q    I prefer that we assume that you know the

20   ground rules.  Is that fair enough?

21       A    Yes.

22       Q    I have multiple copies of all of my deposition

23   exhibits except the letter of December 6, 2005 to you.

24            MR. TAYLOR:  I happen to have additional copies

25   if you want.

2

1    Q    (By Ms. Nordberg)  From David M. --

2         MR. AHERN:  Gaouette.

3         I have copies too.

4         MR. NORDBERG:  G-a-o-u-e-t-t-e.  We can mark

5    mine.

6         MS. AHERN:  One for the witness, one for

7    counsel, one for me, you have your own.

8         MR. NORDBERG:  I have my own.

9         MS. AHERN:  I can't say that I can do this with

10   all your exhibits, Peter.

11        MR. NORDBERG:  I appreciate your anticipating

12   the one in which I would like copies.

13        (Deposition Exhibit 1 was marked.)

14   Q    (By Ms. Nordberg)  You are her under subpoena

15   here today, are you not, Mr. Norton?

16   A    Yes.

17   Q    And that subpoena is from defendants?

18   A    I'm not sure.

19   Q    And you've been subpoenaed to testify at the

20   trial of Cook versus Rockwell as well?

21   A    Yes.

22        MR. NORDBERG:  By the way, I don't think we

23   have been served, Counsel, with a copy of the subpoena.

24        MS. AHERN:  I apologize.  I thought you had

25   been.

1        MR. NORDBERG:  No trouble.  We looked, and it

2   is possible it came to us.  If it did, we've mislaid it,

3   and another copy would be appreciated.

4        MS. AHERN:  I will just state for the record

5   that we originally subpoenaed Mr. Norton for the 12th,

6   and with then we reissued the subpoena for the 14th.

7   I'm quite sure you got the one for the 12th, but I will

8   look for the one for the 14th.

9        MR. NORDBERG:  I appreciate it.

10   Q    (By Ms. Nordberg)  Mr. Norton, I will ask you

11   to look at what is called Norton Exhibit 1 and ask you

12   to take a moment to review it.

13   A    I've seen this letter.

14   Q    After you were subpoenaed, you contacted the

15   US Attorney's office here in Denver and notified them

16   that you had been asked to provide testimony in this

17   proceeding; is that correct?

18   A    That's correct.

19   Q    And the scope of the testimony that the

20   defendants, who are calling you as a witness,

21   anticipated for your trial testimony is described in an

22   attachment to this letter entitled "Disclosure of

23   Subject Matter of Anticipated Testimony," correct?

24   A    I assume so.  I've seen the pleading that you

25   refer to.

4

1     Q     Okay.  And you then received this letter from

2   the US Attorney's office outlining the scope of your

3   permissible testimony in this matter under Touhy and

4   under various federal statutes, regulations, and other

5   provisions; is that correct?

6     A     Yes.

7     Q     Are you represented by counsel here today, sir?

8     A     The Department of Justice has made available

9   Stephen Taylor.  I don't exactly know if he is my

10   counsel or counsel for the Department of Justice, but I

11   assume he'll be covering the deposition in anticipation

12   of any objectionable questions or issues that may arise

13   under this letter.

14          MR. NORDBERG:  I wonder if I might ask

15   Mr. Taylor in what capacity he is here today.

16          MR. TAYLOR:  Well, I'm in the capacity to

17   represent Mr. Norton as a former employee of the

18   Department of Justice.

19          MR. NORDBERG:  And are you also representing

20   the Department of Justice's interests here today?

21          MR. TAYLOR:  Yes.

22          MR. NORDBERG:  Are you representing DOE here

23   today?

24          MR. TAYLOR:  No.

25          MR. NORDBERG:  Thank you.

5

1      Q     (By Ms. Nordberg)  Among the restrictions of

2    your testimony outlined in the letter, Mr. Norton, if I

3    could refer you to Page 2, Item 4B is a restriction

4    on -- I'm going to read from Item 4B, a restriction on

5    "The deliberative process related to or involved in the

6    prosecution decisions arising from the grand jury that

7    investigated the functioning and operation of the Rocky

8    Flats Nuclear Plant."

9           Do you see that?

10     A     I do.

11     Q     I want to try to get some understanding from

12   you and/or your counsel of what you understand this

13   restriction is to include?

14     A     Since this letter is from the Department of

15   Justice, I think it's most appropriate that you address

16   that question to Mr. Taylor.

17          MR. TAYLOR:  This states that he's not

18   authorized to discuss the deliberative process involving

19   the grand jury.  And that means the prosecutorial

20   decision made, how the grand jury was impaneled, what it

21   was to investigate, and the decisions that arose during

22   and in relation to the prosecutions that resulted from

23   that grand jury.

24          MR. NORDBERG:  Okay.  Well, that's a

25   potentially broad restriction, and I guess we'll just

6

1   find out how broad it is in practice.  I take it,

2   Mr. Taylor, that if the Department of Justice, or you as

3   Mr. Norton's attorney, feel that that restriction is

4   implicated, you will raise an objection to the question?

5         MR. TAYLOR:  I will.

6         MR. NORDBERG:  And is that also true of the

7   other restrictions itemized in this letter that's been

8   marked as Norton Exhibit 1?

9         MR. TAYLOR:  That's correct.

10        MR. NORDBERG:  Thank you.

11   Q   (By Ms. Nordberg)  Mr. Norton, you're aware --

12   I think we covered this -- the defendants have listed

13   you as a witness in Cook versus Rockwell?

14   A   I was not aware of that.

15   Q   And are you aware that they've listed you to

16   testify for about an hour?

17   A   No, I was not aware of that.  I have been

18   advised that I will be called as a witness, and my

19   testimony may last as much as two hours.  But I am not

20   aware of who listed me as a witness or for what length

21   of time or for what purpose beyond what may be reflected

22   in this exhibit you've just presented to me.

23   Q   Okay.  When were you first told that you would

24   be called as a witness in Cook versus Rockwell?

25   A   I received an informal communication from an

7

```
 1    attorney about a month and a half ago indicating there

 2    was some discussion of the possibility that I may be

 3    called as a witness in this case.  And actually I was in

 4    trial in Judge Nottingham's courtroom, and the court

 5    reporter had apparently been in a hearing reporting for

 6    Judge Kane and heard that same potential being

 7    discussed.  I'm not exactly sure how or why or when, but

 8    she mentioned it to me as well.

 9        Q    Okay.  Do you remember the name of that

10    attorney?

11        A    Yes.  It was Lee Foreman.

12        Q    What law firm is Lee Foreman associated with?

13        A    Lee Foreman is with Haddon, Morgan, Foreman,

14    and a series of other names that I don't recall.

15        Q    Here in Denver?

16        A    Here in Denver.

17        Q    Was that the firm involved in the criminal

18    defense of Rockwell in --

19        A    Yes.

20        Q    -- in the criminal proceedings?

21             Is that law firm or Lee Foreman involved, to

22    your knowledge, in this litigation?

23        A    I do not know.

24        Q    Did Lee Foreman tell you how it was that he was

25    relaying this news to you?
```

8

1      A     I do not know how he learned that he may be

2    called.  I think he called me simply as a courtesy to

3    let me know I may be contacted.

4      Q     Did there come a time when you spoke to any

5    attorneys from the firm of Kirkland & Ellis?

6      A     No, not to my recollection, at least about this

7    particular area.

8      Q     And so between the time Lee Foreman called you

9    and told you that you might be a witness in this case

10   and today when you walked into this law firm at Sherman

11   and Howard, you have had no contact with attorneys, to

12   your knowledge, from Kirkland & Ellis?

13     A     None whatsoever.

14     Q     How about Sherman & Howard?

15     A     None.

16     Q     How about an attorney named Doug Poland?

17     A     Don't know the name.  The answer is no; no

18   contact.

19     Q     Did you have any communications with any other

20   counsel other than Lee Foreman between the time Lee

21   Foreman called you about this deposition and your

22   testimony at trial or this deposition?

23     A     After Mr. Foreman informed me of this

24   potential, I contacted acting United States attorney

25   bill Lee owe knee and let him know that I had heard I

9

1    might be called as a witness, and I wanted simply the

2    Justice Department to be aware of that for whatever

3    position it felt appropriate to take with regard to that

4    possibility.

5        Q    Any other communications?

6        A    I then ultimately heard from Mr. Taylor, seated

7    to me right, and I can't recall if that was before or

8    after the subpoena, but Mr. Taylor is the only attorney

9    that I have spoken to, other than Mr. Lee owe knee, the

10   brief communication with Mr. Lee owe knee.

11       Q    Has Mr. Taylor told you anything habit the

12   subject matter of your testimony, other than what may be

13   described in the disclosure attached to Norton Exhibit

14   1?

15       A    No.  I think that would be an attorney/client

16   communication, and I would decline to answer it on that

17   grounds.

18       Q    Let me try to rephrase this question.  Has

19   anyone told you what the anticipated subject matter of

20   your testimony is, other than insofar as you've gleaned

21   it from the attachment in Norton Exhibit 1?

22       A    Separate and apart from attorney/client

23   communications that may have occurred, no.

24       Q    And any attorney/client attorney communications

25   would be between you and Mr. Taylor, correct?

10

1      A    That would be correct, or the Department of

2   Justice, I suppose, in a global macro sense could also

3   be considered my attorney.  But I have had no

4   communications with anyone other than Mr. Taylor.

5      Q    Thank you.  I think I know the answers to these

6   questions, Mr. Norton, but it is my job to ask them.

7      A    Ask away.

8      Q    Is anyone compensating or reimbursing you for

9   your time associated, either in attending this

10  deposition or testifying at trial?

11     A    I received a witness fee which will just about

12  cover gas and parking; that's it.

13     Q    The statutory witness fee, I assume

14     A    I don't know whether it's statutory or not.  It

15  seems awfully low.

16     Q    The usual trifling amount.

17     A    I'll assume you calculated it correctly, or

18  whoever subpoenaed me.

19          MR. NORDBERG:  Could we mark this.

20          (Deposition Exhibit 2 was marked.)

21     Q    (By Ms. Nordberg)  Mr. Norton, you have taken a

22  look, I guess, at what's been marked as Exhibit 2?

23     A    Yes.

24     Q    Does that item look familiar to you?

25     A    I think it's my curriculum vitae from our firm

11

1   web site.  I'm assuming it is.

2        Q    I'm going to represent to you that it is.  I

3   would like to take a very brisk walk through is your

4   vitae, if we can, so that we can get to more interesting

5   matters, not that your vitae isn't interesting, but I

6   would assume you prefer not to spend seven hours

7   testifying at a deposition about.

8        A    That would be a good assumption.

9        Q    Is the information in that vitae true and

10  correct to the best of your knowledge?

11       A    Well, it was at the time it was prepared.  I do

12  not know how old this is, and I have not reviewed it for

13  probably six months, so it may have changed in some

14  respects.

15       Q    There might be some additional information, in

16  other words?

17       A    Yes.

18       Q    Is the information that was prepared, correct?

19       A    At the time it was, yes.

20       Q    You went so college?

21       A    Correct.

22       Q    You graduated from what university?

23       A    Colgate University, Hamilton, New York.

24       Q    With a bachelor's degree?

25       A    Yes, in economics.

12

1    Q    And you went to law school in American

2  University in Washington, D.C.?

3    A    Correct.

4    Q    Graduated from there?

5    A    Correct.

6    Q    What year was that?

7    A    1968.

8    Q    Could you briefly take me through your legal

9  career from 1968 to the present?

10    A    At the time I attended law school, I was

11  employed with a dairy farmer cooperative trade

12  association, and really attended law school at night.

13  After graduating from law school and passing the

14  Virginia bar, I was named associated or assistant

15  general counsel of the dairy farmer cooperative

16  organization called the national milk producers

17  federation.  I served in that capacity until -- I've

18  been with this milk producer group since about 1963, and

19  I served until sometime until early 1969 and went to

20  work briefly for the US Department of Agriculture in the

21  congressional affairs office, and then was transferred

22  over to and made the head of the congressional affairs

23  office for an agency called the US General Services

24  Administration.

25             In 1972 I was asked to come to Denver to be the

13

1   regional administrator of the US General Services

2   Administration.  And from '72 to roughly April of 1977,

3   I served in that capacity.  In April of 1977, I resigned

4   from US General Services Administration and entered the

5   private practice of law and was with a variety of law

6   firms from 1977 until about March of 1988 when I was

7   designated -- or maybe it was a little later, I'm not

8   quite sure, but sometime mid-1988 when I was named by

9   President Bush to be -- when I was nominated by

10  President Bush to be the United States Attorney for the

11  District of Colorado.  I served as US Attorney for the

12  District of Colorado from that point in time in 1988

13  until about April of 1993 when I, again, resigned from

14  that position and reentered the private practice of law.

15          I've been in the private practice of law with

16  the firms that are listed here.  The first firm then

17  called Friedlob Sanderson Raskin Paulson and Tourtillot.

18  It went through some name changes over the period of

19  time.  Then my own firm called Norton and Lidstone, and

20  then that firm merged in March of 2002 with Burns, Figa

21  & Will, which is where I am now and have been since

22  March of 2002.

23      Q    Can you quickly run down for me, to the best of

24  your recollection, the law firms you were with between

25  1977 and 1988?

14

1      A      When I first entered the private practice of

2   law I joined a Lakewood firm then called Henry & Henry.

3   It became known as Henry and Norton when I joined it.

4   We added a partner, and it became known as Henry, Norton

5   & Pickens, and we were operating in the Lakewood area.

6   In about 1983 I left that firm and set up my own firm in

7   Golden, Colorado and was known under various names,

8   including my name, for a period of time until I became

9   the US Attorney in 1988.  It was Norton & Miller, Norton

10   Miller & O'Toole and something else maybe, but that's

11   basically it.

12      Q      Okay.  Thank you.  When you were at the US

13   General Services Administration, what, briefly, were

14   your duties there?

15      A      I was the regional administrator as the manager

16   of the six state region of Colorado, Wyoming, North and

17   South Dakota, Montana, and Utah, I believe, and managed

18   the operations of GSA within that six-state region; 1600

19   employees.  And it involved sort of the support

20   facilities and supply support system for the civilian

21   branch of the federal government.  That would be federal

22   buildings, federal supply service, motor pool, data

23   communication facilities, telecommunication facilities

24   and surplus property, real and personal property

25   disposal.  Those were the core functions.

15

1      Q      Primarily in an administrative position?

2      A      Yes.

3      Q      Has most of your legal career been -- other

4   than working in GSA, since then, been devoted to

5   litigation; is that fair to say?

6      A      Probably at least half of my professional

7   activities have been civil litigation.  I currently am

8   engaged in two other areas, wills, trusts, estate

9   planning, probate, and criminal defense.  Those would

10   make up the bulk of my personal practice.

11      Q      Okay.  And as a civil litigator -- I don't know

12   what different terms mean to different people -- and I

13   had meant to sweep in criminal defense, or criminal

14   prosecution, for that matter, within the domain of

15   litigation.  But you've done a lot of trial work.  Is

16   that fair to say?

17      A      That's correct.

18      Q      You were US Attorney for at least most of the

19   time that the criminal investigation and criminal

20   proceedings against Rockwell International were pending;

21   is that right?

22      A      I think that's correct.

23      Q      And, in fact, lad the investigation even begun

24   by the time you took office?

25      A      I've been told that there had been some

1    preliminary steps taken before I became the US Attorney,

2    but the case was first presented to me in about August

3    of 1988 or September of 1988; the idea of the case was

4    first presented to me.

5        Q    And who presented it to you?

6        A    It was presented to me by assistant US Attorney

7    Ken Fimberg who recollects has since been known as Ken

8    Scott.  He took his paternal father's name sometime

9    actually after this investigation was concluded.

10       Q    And was that a meeting in which your approval

11   or authorization was sought to open a formal

12   investigation?

13       A    Yes.

14       Q    And was that permission granted?

15       A    Yes.

16       Q    Between the time that you authorized that

17   investigation and the time of the service of the search

18   warrant -- I'm sorry, the execution of the search

19   warrant on Rocky Flats in June 1989, about how much of

20   your time did you devote to overseeing or supervising or

21   participating in the investigation?

22       A    I didn't participate in the investigation to

23   any significant degree at any stage of the

24   investigation.  I was, as US Attorney, responsible for

25   the investigations, initiation as well as periodically

1   being briefed mostly by Mr. Fimberg as to developments

2   that he felt were significant.  I can't honestly give

3   you an estimate of the amount of time that it took.  It

4   would have been less than 10 percent of my time, less

5   than 5 percent of my time probably, but somewhere in

6   that lower range.

7       Q    And how many attorneys were under your

8   supervision in the US Attorney's office?

9       A    Initially when I became US Attorney, my

10  recollection hoe-and this is pure recollection -- that

11  there were somewhere in the area of 27, 28 attorneys

12  both in the criminal and civil division.  By the time I

13  left there were 53 or 54 attorneys in the criminal and

14  civil division.

15      Q    About how many criminal cases a year would the

16  US Attorney's office handle?

17      A    I have no recollection of that.

18      Q    Nor any recollection offhand the number of how

19  many civil case?

20      A    I have no recollection of that.

21      Q    If I suggested to you that you had previously

22  testified that the amount of criminal cases might be in

23  the neighborhood of 500 a year, would you have any

24  reason to disagree with me?

25      A    I would have no reason to disagree whether I

18

1   said that.  Whether or not it is correct is another

2   issue.  I honestly do not know the number of criminal

3   case.  I'm assuming I knew at the time, and I wouldn't

4   have said it at the time, but I don't know today as we

5   sit here.

6       Q    Your memory might have been fresher when you

7   testified before congress than it is today?

8       A    That was approximately 15 years ago, so it well

9   could have been.

10      Q    And if I suggested to you that you had

11  testified before Congress that there might be as many as

12  1,000 civil cases pending at any give time in the US

13  Attorney's office, would you have any reason to disagree

14  with me?

15      A    I, again, would have the same answer.  I would

16  have no reason to disagree with you or agree.

17      Q    This was an important case, though; is that

18  correct?

19      A    Oh, yes.

20      Q    So you devoted a little more attention to it

21  than you might to routine matters; is that fair to say?

22      A    I had great interest in the case because of the

23  inflammatory nature of the allegations that were being

24  discussed, and great concern.

25      Q    And when you talk about the allegations being

19

1    discussed -- let me rephrase that question.

2          You said it was primarily Ken Fimberg who had

3    briefed you in the progress of the investigation?

4    A    Yes.

5    Q    Did you have any meetings with Mr. Lipsky?

6    A    Occasionally, but not frequent.

7    Q    To your understanding, was it primarily

8    Mr. Lipsky and -- well, there was also a Mr. Smith

9    working on the investigation, wasn't there?

10   A    Well, the agencies that were assigned to the

11   investigation were the Federal Bureau of Investigation

12   and the Environmental Protection Agency Criminal

13   Investigation Division.  Within those two agencies, the

14   two lead investigators were, for the FBI, Mr. Lipsky,

15   and for EPA criminal investigation, Mr. Smith.  However

16   many other people in those two agencies were assigned,

17   either supervisory above those two or parallel to or

18   subordinate to, I couldn't tell you at the time at this

19   time.  But at the time of the execution of the search

20   warrant, there were plus or minus 120 federal agents

21   involved in that.  So clearly there were more than

22   Lipsky and Smith involved in the investigation at

23   varying points.

24   Q    And you understood the factual investigation

25   leading up to the execution of the search warrant, the

20

1    gathering of evidence, the review of documents and

2    whatnot was happening through Mr. Lipsky and Mr. Smith

3    and other people at those agencies primarily.

4         A    Well, and including the involvement of

5    Mr. Fimberg, and I believe by that point of time

6    Mr. Peter Murtha at the Environment and Natural

7    Resources Division, formerly Lands Division of the

8    Department of Justice.

9         Q    Was he from Main Justice?

10        A    He was from Main Justice, yes.

11        Q    And that's the phrase we use to talk about the

12   Justice Department personnel and officers in Washington,

13   D.C.

14        A    And there may have been other attorneys that

15   were involved in Main Justice.  I do not think, at least

16   at that point in time, there were other attorneys

17   involved in the District of Colorado.

18        Q    But I think you said you weren't personally

19   involved in the factual investigation leading up to the

20   rate; is that correct?

21        A    That's correct.

22             (Deposition Exhibit 3 was marked.)

23             MS. AHERN:  Off the record.

24             (Discussion off the record.)

25        Q    (By Ms. Nordberg)  Mr. Norton, I've handed you

21

1    a copy of what's I believe has been marked as Norton

2    Exhibit 3.  I'll tell you it's been marked, although I

3    don't believe it's yet been admitted into evidence in

4    Cook versus rock women as Plaintiff's Exhibit P-244.

5         A    I see both stickers or labels on the exhibit.

6         Q    What does this document appear to be?

7         A    It appears to be the application and affidavit

8    for the search warrant, for the search of the Rocky

9    Flats facility.  I don't see the date on it, but it

10   seems to me it was May or something of 1989.  There may

11   be a date on it here somewhere, but I don't see that.

12   It's not legible.

13        Q    Okay.  But this appears to include the

14   affidavit executed by Agent Lipsky in support of the

15   search warrant?

16        A    It does.

17        Q    Did you review that affidavit before it was

18   submitted?

19        A    Yes.

20        Q    You personally reviewed it?

21        A    Yes.

22        Q    I think you said this was an important case,

23   inflammatory allegation, political implication maybe,

24   and -- well, a major case.  Did you devote more care

25   than you usually might to previewing the application of

22

1    the search warrant?

2        A    Yes.

3        Q    In fact, is it matter of routine for the US

4    Attorney himself or herself to review an application for

5    a search warrant in a criminal matter?

6        A    Only -- well, let me back up and say in my

7    case -- and I can only speak for me hoe-I was actively

8    involved in the investigation and prosecution and trial

9    of criminal case.  And so for those cases for which I

10   was actively involved, I would have devoted whatever

11   attention was required to process the case from start to

12   finish.

13       Q    Sure S.?

14       A    With regard to other cases, it would be correct

15   to say that it would not have been my normal practice at

16   least to have been as involved in the details of the

17   case as I was in this case.

18       Q    This is not a document that you, yourself,

19   signed?

20       A    Correct, I don't think.  I mean, I could be --

21       Q    I don't think so either.  Did you meet with

22   anyone in order to satisfy yourself that there was

23   support for the allegations in the search warrant before

24   you authorized its submission?

25       A    I met with Mr. Fimberg to have him brief me on

23

1    what was contained in this document.  Mr. Murtha may

2    have been involved in that matter, but I don't recall if

3    he was, nor do I recall if anyone else was involved in

4    probably more than one meeting.  This took some time to

5    put together.

6          There were also meetings with representatives

7    of the Department of Justice, main justice, about the

8    overarching goals and objectives of the investigation

9    and the concept of executing a search warrant on a

10   federal facility, which was somewhat novel.

11   Q    And we'll come back to that in a minute.

12         Did you personally review any of the underlying

13   documentations or evidence on which the allegations in

14   the search warrant were founded?

15   A    No, nor do I believe I ever did during the

16   course of the investigation look at underlying data,

17   evidence.  It simply was far too bulky for me to be able

18   to focus on.

19   Q    I think it's been suggested that at some point

20   that approximately 3.5 million documents were collected?

21   A    That's my recollection.

22   Q    And perhaps as many as 800 witnesses

23   interviewed?

24   A    That's my recollection.

25   Q    You relied on other attorneys in the US

24

1    Attorney's office and other people from the FBI and EPA

2    to review and distill and analyze that evidence.   Is

3    that fair?

4        A    Yes.   Primarily it was Mr. Fimberg, I had

5    greatest level of trust and confidence in Mr. Fimberg

6    and didn't really know what level of trust to place in,

7    for example, the investigators.

8        Q    Had you ever worked with Mr. Lipsky before this

9    case?

10       A    I don't recall that I did.   I don't believe,

11   but I don't recall.

12       Q    Have you ever worked with Mr. Lipsky on any

13   case other than one?

14       A    Mr. Lipsky may have been involved in an

15   environmental case involving the dumping of TCE in

16   Elbert County, Colorado, but I don't recall if he was or

17   was not.   And I was involved in that case as well

18   because I had -- I had a special interest in

19   environmental cases, and so I would have made myself

20   more familiar with environmental cases, environmental

21   criminal prosecutions than some other cases.

22       Q    And --

23       A    But I can't say that I ever worked with Lipsky

24   on any case.

25       Q    And if you did --

25

1      A     Including this one.

2      Q     And if you did work with him at all in that

3  other case, it didn't make a deep and lasting

4  impression?

5      A     That's correct.

6      Q     You said you had an interest in environmental

7  cases.  Can you tell me where that interest may have

8  sprung from?

9      A     I think that simply comes from being a

10  Coloradan; an interest that many Coloradans have to the

11  environment that we live in, the value of the mountains,

12  the plains area, and simply a desire to elevate the

13  investigation and prosecution of more complex crimes

14  including environmental crimes to a higher level than

15  had been the case -- than I think had been the case in

16  at least the Colorado US Attorney's office prior to my

17  arrival.

18      Q     Have you been involved in environmental

19  litigation prior to your arrival in the United States

20  attorney's office?

21      A     No.

22      Q     Do you know whether the department of justice

23  was taking a more active interest in the prosecution of

24  environmental crimes more generally across the country

25  at this time?

1        A     Well, I think the answer is probably yes.

2   There was a feeling among the line prosecutors, Fimberg

3   would be a line prosecutor, that the environmental

4   crimes section and the environment and natural resources

5   division was a bit bureaucratic in the way in which it

6   would view authorities for the investigation and

7   progression cushion of environmental crimes.  I didn't

8   actually find that to be the case particularly in this

9   case.  There was a great degree of agreement and support

10  for us.  But as a result of that, mind set, I suppose,

11  within the line prosecutors and within the US Attorney's

12  offices in general, I took a greater interest in this

13  case to be sure that we didn't get sidetracked by that

14  bureaucracy.

15       Q     Okay.

16       A     I don't know if I answered your question or

17  not, but I'm delving back 15 years.  I'm trying to

18  figure out what the answer was.

19       Q     That was more than responsive.  That was

20  helpful, thank you.

21            While you were US Attorney, what percentage of

22  your time, how many cases, any way you can express it,

23  if you can remember, about how much of your time of your

24  work was devoted to environmental prosecutions?

25       A     Probably -- I mean, it would change over time,

27

1  frankly.  So I can't tell you as a uniform, during the

2  entire five years period of time that I was there what

3  the percentage would have been.  During this period of

4  time, during the original -- from the initiation of the

5  case to the execution of the search warrant, I would say

6  10 to 15 percent of my time was focused on this

7  particular case.

8         At other periods of time, less than 1 percent

9  of my time would be focused on environmental cases.

10     Q    Okay.  Was this the largest environmental case

11  that was prosecuted during your tenure as US Attorney?

12     A    I believe so.  I think it was actually the

13  largest in the country.

14     Q    Now, you said, I think, that you had a meeting

15  maybe with DOE representatives about the difficult

16  problem of executing a search warrant at a secure

17  federal nuclear weapons facility; is that right?

18     A    That's true.  We actually had several meetings.

19  I don't recall the number, nor do I actually remember

20  the participants, but they would have been made up of

21  representatives of the criminal division and the -- I

22  can't recall the time that the Lands Division changed to

23  the Environment and Natural Resources, but those two

24  divisions, both of which had concurrent authority over

25  criminal investigation and prosecutions.

28

1    Q    And the purpose of that meeting was to make it

2    possible -- one purpose of that meeting was to arrange

3    or come to some way to execute the search warrant

4    without having security forces at the plant repel the

5    investigators; is that correct?

6    A    That was a concern, as a matter of fact.

7    Q    You didn't want to be shot at.

8    A    It was of great concern to me that the guards

9    at Rocky Flats had defeated the FBI in the pistol

10   shooting contest.  I did not want the FBI, and frankly

11   those people were trained, we were told, to repel the

12   kinds of things we were thinking of dog.  Show up at the

13   gate and execute a criminal search warrant, and if guns

14   started blazing, that was a great concern.  So that was

15   an issue.

16   Q    So what understanding did you come to as a

17   result of these meetings about that problem?

18   A    The understanding was that on the morning the

19   search warrant was executed, the deputy secretary of

20   energy, hen sen Moore, arrived in Denver probably the

21   day or so before, and arranged to meet with

22   representatives of Rockwell and the Department of Energy

23   at Rocky Flats.  I don't recall exactly the time he did

24   this, but probably about 8:00 in the morning, 8 or 8:30

25   in the morning, at which point in time he nuanced that a

29

1    search warrant was about to be executed, and that the

2    management, Rockwell and DOE management and contract

3    guards, I think they were contract guards as opposed to

4    federal employees were to stand down and allow the

5    search warrant team to enter and go wherever it wanted

6    to go.

7        Q    And that's your understanding about how it was

8    going to work as a result of what you agreed to at these

9    meetings, right?

10       A    That was my understanding of both, how it was

11   going to work and it did work.

12       Q    And that was my next question.  So that

13   basically unfolded as arranged.  Is that fair?

14       A    That's correct.

15       Q    The search warrant was unsealed while still

16   being executed.  Do you remember that?

17       A    I do not know when it was unsealed.  I actually

18   would have thought otherwise.  I would have thought that

19   it remained under seal for a period of time after the

20   execution of the search.  So I don't frankly recall when

21   it was unsealed.  It would be matter of record when it

22   was unsealed, but I don't recall the date.

23       Q    So it follows, I suppose, you don't remember

24   participating in the discussion or decision about

25   whether it should be unsealed during the pendency of the

30

1   search?

2       A     I don't recall that.  I have in mind that it

3   remained under seal for a period of time, and that's why

4   I must have thought that there was some investigative

5   reason to keep it under seal for some period of time,

6   but I can't recall.

7              (Deposition Exhibit 4 was marked.)

8       Q     (By Ms. Nordberg)  I'm showing you what's been

9   marked as Norton Exhibit 4 and also marked as

10  plaintiff's Exhibit 1195 in the Cook v. Rockwell

11  litigation.  Take a moment to look at it.

12             Have you had a chance to review it?

13      A     I've paged through it.

14      Q     What does this appear to be?

15      A     It appears to be the plea agreement and

16  statement of factual basis for the pleas of guilty that

17  Rockwell entered in connection with the Rocky Flats

18  investigation.

19      Q     I'm going ask you to turn to Page 27 of this

20  document.

21             MS. AHERN:  I would like to state for the

22  record on the copy -- well, I don't have the copy that

23  he gave you.  But there appear to be two documents here.

24      A     I'm not quite sure what the document attached

25  is.  I don't remember exactly what it is.

1      Q    Okay.  I will hold out to you -- and I think

2   you can see from the Bates numbers -- that this was

3   produced to plaintiffs at least in consecutively

4   paginated form, but it may be that it's two documents.

5      A    I think it might be two separate documents.

6      Q    Let's explore that.

7      A    Most assuredly the signature on what is

8   Page 04156 is mine.  I don't know who Charles H. Harff

9   is at this moment.  And most assuredly the signature on

10   Page 04151 is mine, along with several other signatures.

11      Q    Okay.  This first document from Pages 1 through

12   27 ending in Bates Stamp No. 04151 appears to be --

13   well, its bears the caption plea agreement and statement

14   of factual basis, does it not?

15      A    Uh-huh, yes, it does.

16      Q    And on Page 27 again, the signature -- or

17   purports to be a signature from Harold A. Haddon.  Is

18   that from the Haddon Morgan law firm?

19      A    The three signatures on the right are from -- I

20   believe are the signatures of the lawyers with the firm

21   that represented Rockwell.

22      Q    Including Lee Foreman?

23      A    Lee Foreman, Bryan Morgan, Harold A. Haddon.

24      Q    Including Lee Foreman who informed you about

25   your testimony in this trial?

32

1       A       Correct.  By the way, he did not tell me I was

2   going to testify.  He told me he heard I might be called

3   as a witness just to be correct, precise in that regard.

4       Q       Were you personally received with a subpoena by

5   a process server?

6       A       Yes, two times, as a matter of fact.

7       Q       Then there appears to be a second document, or

8   at least a second part of the same document.  But a

9   discreet collection of pages with discrete captions from

10  Bates Nos. 04152 through 04156.  What does this document

11  appears to be?

12      A       I can't tell you.  I can't recall what this

13  document -- what purpose this document served.  I just

14  don't really recall it, frankly.

15      Q       Okay.  Turning --

16      A       It appears to be a summary of the plea

17  agreement, but for what purpose -- I mean, again, this

18  is strictly speculation, but it may have related to the

19  potential of civil personalities or sanctions against

20  Rockwell for the pleas of guilty.  But I don't know.

21      Q       Okay.  Could you turn to Page 5 of that

22  document?

23      A       Uh-huh.

24      Q       Is that your signature there?

25      A       It is.

33

1    Q    I would like you to take a moment to review

2  there document to see if that can refresh your

3  recollection what about it is?

4    A    Which one.

5    Q    If second document captioned plea agreement.

6    A    Okay.

7    Q    Are you able, having reviewed this document, to

8  comment on further on what you might understand it to

9  be?

10    A    Well, it appears the major thrust of this

11  document has to do with the agreement which we required

12  of Rockwell that it not seek reimbursement for

13  indemnification of either the criminal find or the

14  attorneys' fees or costs related to the criminal

15  prosecution with some exceptions.  I think, as I recall,

16  that was a major issue with Rockwell because of the

17  historic ability of government contractors to be able to

18  seek reimbursement for views of criminal fines that were

19  assessed against them for whatever matter, environmental

20  or otherwise.  We wanted to make sure Rockwell did not

21  have the ability to seek reimbursement by way of

22  criminal findings.  I think that appears to be a major

23  thrust.  I know that was a big issue.

24    Q    You can't send a corporation to jail, right?

25    A    Right.

34

1    Q    The only thing you can impose on a corporation

2    is a fine, right?

3    A    Economic, that's correct.

4    Q    And you felt it would be pointless to prosecute

5    Rockwell and secure a fine only to have that fine be

6    indemnified by the United States Department of Energy?

7    A    Yes.

8    Q    But this document covers other topics, doesn't

9    it?

10   A    It covers -- yes.

11   Q    And it's headed "Plea Agreement"?

12   A    Yes.

13   Q    And in Paragraph 1, for example, it states that

14   Rockwell will plead guilty to certain criminal charges,

15   and in return the United States will not bring other

16   charges.  Is that fair to say?

17   A    Based on known environmental or environmental

18   related matters presently known to the Department of

19   Justice; then presently known.

20   Q    And Paragraph 3 represents an agreement to a

21   total criminal fine of $18.5 million, correct?

22   A    Yes.

23   Q    And Paragraph 4 discusses a contemporaneous

24   settlement with the state of Colorado involving the

25   payment to Colorado of $2 million that would be applied

35

1    against the $18.5 million fine?

2        A    Yes.

3        Q    And Paragraph 5 involves agreement by the

4    United States not to sue or take administrative action

5    against Rockwell on certain subjects?

6        A    Yes.

7        Q    Paragraph 6 addresses the indemnity issue you

8    were just discussing?

9        A    Yes.

10       Q    And you said that was a big issue at the time?

11       A    Yes.

12       Q    Paragraph 8 covers what Rockwell may and may

13   not seek to recover from DOE by way of attorneys' fees

14   in defending the criminal litigation and related

15   matters, correct?

16       A    Yes.

17       Q    And to your memory, was the basic agreement

18   that Rockwell could not recover fees from DOE for

19   defending the corporation Rockwell after January 1, 1990

20   for the charged conduct?

21       A    I have no independent recollection beyond this

22   document, which seems to say that.

23       Q    As you look at the Paragraph 8; is that what --

24       A    It seems to say that.

25       Q    By the way, do you recall estimating what

36

1    amount of attorneys' fees might or might not be

2    recoverable by Rockwell from DOE under this agreement

3    when the agreement was entered into?

4        A    Someone may have been told me what the

5    estimated fees were, but I did not make any independent

6    estimate.

7        Q    Okay.  Paragraph 10 represents an agreement by

8    the Department of Justice to make -- well, I won't

9    characterize it.  It says what it says -- certain

10   statements at an appropriate time.  First of all, do you

11   remember Rockwell's -- do you remember whether it was

12   important to Rockwell in the plea negotiations to have a

13   statement made either in the plea or sentencing

14   memorandum or otherwise that its charged conduct had not

15   resulted in substantial physiological harm?

16       A    Yes.

17            MS. AHERN:  I'm going to object to that

18   question as vague and ambiguous, and --

19            THE DEPONENT:  I'm sorry, speak up a little

20   bit.

21            MS. AHERN:  I would like to object to that

22   question as vague and ambiguous, and also a foundation

23   objection.

24       Q    (By Ms. Nordberg)  Is it common when -- was it

25   common during your tenure as US Attorney for plea

37

1    bargains or plea agreements to include the promise by

2    the Department of Justice to make public statements that

3    the defendants had not engaged in certain conduct or

4    caused certain harms?

5        A    I don't know if it was common or not.  I felt,

6    as did those who were involved from the Department of

7    Justice's perspective, felt that it was very important

8    in a case of this magnitude with the great public focus

9    that had been on Rocky Flats for 30 years, as well as

10   still is to this day, to be sure to do all we could to

11   put the public's mind at ease about what environmental

12   harm had been found as a result of the investigation.

13            I think a similar approach and policy would be

14   and was probably implemented, would be appropriate and

15   was probably implemented with respect to other

16   environmental investigation as well, simply because

17   environmental investigations do have the potential for

18   creating great public concern, at least in and around

19   the facility that's at risk.

20       Q    Can you think of another environmental case in

21   which you participated as US Attorney in which a similar

22   provision was inserted in the plea agreement?

23       A    I do not know of one.  There may have been one,

24   but I do not know of one.

25       Q    As you sit here, you don't remember one?

38

1     A    No.

2     Q    Can you think of any criminal case in which you

3   were involved while you were with the US Attorney's

4   office in which a similar plea was inserted in a plea

5   agreement?

6     A    I don't have any knowledge of that, but I can't

7   think of any.

8     Q    Rockwell was also conditioning its acceptance

9   of a plea on the issuance of some statement such as

10  this, wasn't it?

11    A    I don't think it was a condition of the

12  acceptance.  It was a request that was made, and I think

13  an appropriate request under the facts of the

14  investigation as it was at least developed and conveyed

15  to me by those involved.

16    Q    In fact, from the first time that a plea was

17  discussed with Rockwell, Rockwell is was requesting that

18  such a statement be part of any plea agreement, wasn't

19  it?

20    A    Well, I can't answer that.  I don't know when

21  the plea was first discussed with Rockwell or what was

22  said during the period of time when the plea was first

23  discussed with Rockwell.  It was a fair amount of

24  concern with Rockwell.

25    Q    Throughout the negotiations, as far as you

39

1   know?

2       A    At least at some time in the plea negotiations,

3   it became a matter of concern.  And as I said, I think

4   an appropriate matter of concern under the

5   circumstances.

6       Q    We'll come back to that.

7            If you as the United States Attorney, and your

8   office and the people advising you, felt it was

9   appropriate to issue such a calming piece of advice to

10  the public, can you explain to me why Rockwell would

11  feel it necessary to enter into a binding agreement with

12  the Department of Justice that this statement would, in

13  fact, be issued?

14      A    You will have to ask Rockwell that.  I don't

15  know.

16      Q    Do you know if this plea agreement was ever

17  filed with the Court?

18      A    I can't tell you.

19      Q    I would ask you to look at Page 5, Paragraph

20  12.

21      A    Page 5, Paragraph 12.

22      Q    Bates No. 04156.

23      A    Uh-huh.

24      Q    That's basically an integration clause, isn't

25  it?

40

1      A     It seems to be.

2      Q     It says it states the parties entire agreement,

3   there are no other agreements, terms or conditions,

4   express or implied?

5      A     Yes, that's what it says.

6      Q     And in entering into this agreement for the

7   Department of Justice or Rockwell have the reviewed

8   terms, promises or conditions not expressly stated here

9   in.  Is that correct?

10      A     That's what it said.

11      Q     Were there any side agreements to the plea

12   agreement?

13         MS. AHERN:  Objection vague as to the term side

14   agreement.

15      A     I don't know the answer to that.  I'm assuming

16   that you would consider this a side agreement, so I

17   suppose the answer is, if this is a side agreement, yes.

18   I'm not aware of anything beyond what you have given me

19   here.

20      Q     When you say that, are you referring the

21   document bearing the caption United States of America v

22   Rockwell and the heading of the plea agreement and

23   statement of factual basis?

24      A     Yes.

25      Q     But that's not an agreement, is it?

1      A    No, it's an agreement.  It is an agreement that

2  is, I believe, largely duplicative of what's in the

3  document that is attached to -- I don't know.  You could

4  compare it and tell me.  You probably have.

5      Q    The document without the caption just simply

6  headed plea agreement is dated March 22, 1992; is that

7  correct?  The first paragraph.

8      A    It says in the first paragraph March 26, 1992.

9      Q    My mistake.  And that has the same date as the

10 other document marked as Haddon 4, correct?

11     A    Correct.

12          MS. AHERN:  Do you mean Norton 4?

13          MR. NORDBERG:  Sorry, Norton 4.

14     Q    (By Mr. Nordberg)  I apologize, Mr. Norton, but

15 I get for some reason very dyslexic about your name.

16     A    Not a problem.  Hopefully you'll forget me real

17 soon.

18     Q    If I do that, I hope you will correct me and

19 not take offense.

20          I'm standing up to get another cup of coffee

21 here, not to tower over you.

22          By the way, isn't one of the reasons that

23 Rockwell was asking for a statement negating substantial

24 off site physiological harm was that they were concerned

25 about civil liability?

42

1        A    I don't know.

2             MS. AHERN:  Objection; foundation.

3        Q    (By Ms. Nordberg)  Your answer was you don't

4   know?

5        A    I don't know.

6        Q    You don't recall --

7        A    You will have to ask Rockwell that.  I don't

8   really know what might have motivated Rockwell to do

9   anything that it did.

10       Q    Did you have an understanding that Rockwell was

11   concerned about civil liability in connection with the

12   plea agreement?

13       A    At some point in time it became clear that

14   there were civil lawsuits, and I would assume from that

15   time forward Rockwell became concerned about civil

16   liability.  Whether or not they were at this time of

17   this document, I can't tell you.

18       Q    One of those civil lawsuits was a lawsuit known

19   as stone; is that correct?

20       A    I don't know.  I recall the name stone, but I

21   don't have any independent recollection of what the

22   stone lawsuit was about.

23       Q    Do you recall a Qui Tam action going by the

24   name of Stone?

25       A     No.  I don't recall the substance of the stone

43

1   lawsuit.  Whether it was Qui Tam or individual, I

2   couldn't tell you.

3       Q    One of those lawsuits were Cook versus Rockwell

4   International, wasn't it?

5            MS. AHERN:  Object to foundation.

6       A    Well, I understand that's what I'm here to

7   testify about, but I have no knowledge of the Cook

8   lawsuit.  I don't know what the lawsuit is about.

9       Q    It was mentioned in the plaintiff's original

10  sentencing memorandum, wasn't it?

11      A    It very possibly was.

12      Q    Did the Department of Energy contact you at

13  some point expressing preference that any plea bargain

14  be arranged through a nolo claim?

15      A    It seems to me --

16           MR. TAYLOR:  Wait a minute.  Are you asking if

17  there was contact?  Could you repeat the question?

18           MS. NORDBERG:  I can rephrase the question,

19  especially if you alert me to what problem I'm about to

20  encounter.

21           MR. TAYLOR:  If you're going to get into the

22  deliberative process --

23           THE DEPONENT:  Did the Department of Energy

24  contact me?  Maybe.  I don't recall.

25           MR. TAYLOR:  If you're going to talk about what

44

1    was discussed and deliberated, then I think that goes

2    under the deliberative process.

3         MR. NORDBERG:  I don't think I'm going ask any

4    questions about internal Department of Justice meetings,

5    confabs, etc.  I'm going to ask a couple questions about

6    communications to and from DOE with both DOE and the

7    Department of Justice as being black boxes from the

8    point of view of my question.

9         MR. TAYLOR:  Okay.

10        Q    (By Ms. Nordberg)  Do you remember whether you

11   or your office, anyone associated with the prosecution

12   of Rockwell, received communication from any

13   representative of the Department of Energy expressing a

14   preference that any plea arrangement be worked out

15   through know low pleas as opposed to guilty pleas?

16        A    I don't have an independent recollection of

17   that at this time.  I don't remember.

18        Q    So I suppose you can't tell me from your

19   independent recollection what your response or reaction

20   to that request would have been?

21        A    I have no present recollection of that

22   situation.

23        Q    As you sit here today, would you consider such

24   a request to be proper?

25        A    Probably not.

45

```
 1      Q     This plea agreement was not the result of an

 2   indictment returned by the special grand jury, was it?

 3      A     No, it was not.

 4      Q     I want to talk for a little bit about the

 5   different functions of different people or bodies in the

 6   criminal law process so that we and the people reading

 7   the transcript can all be straight about that, as you

 8   understand them.

 9            By the way, you or your office requested that a

10   special grand jury be impaneled in this case; is that

11   correct?

12      A     That's correct.

13      Q     Can you tell me different between a special

14   grand jury and other grand juries?

15      A     Regular grand juries are regularly impaneled in

16   districts, generally recall the concept must be up and

17   first approved by the Department of Justice and then

18   submitted to, I think T chief judge.  I don't really

19   know.  I don't really recall that.  And regular grand

20   juries are designed to hear evidence on all criminal --

21   any and all criminal case within the authority of the

22   Department of Justice in a given district or area to

23   which the grand jury applies.

24            A special grand jury can similar ly hear

25   evidence on criminal matters including the matters that
```

1    the grand jury might be specially called for, but in

2    addition has the ability to write a report at the

3    conclusion of the grand jury's tenure or tour of duty.

4    That's my recollection of the distinction.

5        Q    And based on your recollection of that

6    distinction, are there any conditions that have to be

7    satisfied before the special grand jury has the pow tore

8    write a report?

9        A    That's a matter of some uncertainty I think.

10   The Justice Department's view I believe was, and may

11   still be, I do not know, was that a special grand jury

12   or a regular grand jury for that matter did not have

13   independent authority to act on any matter, whether it

14   be an indictment or the writing of a report without with

15   the involvement, concurrence, and approval of the

16   Justice Department, in this case the university

17   attorney's office for the District of Colorado.

18       Q    Okay.  Was the capacity to write a report one

19   of the reasons that you requested the special grand jury

20   be impaneled?

21       A    Yes.

22       Q    And unless the defendant waives his rights or

23   consents, you can't indict someone as a prosecutor for a

24   felony without getting a grand jury indictment.  Isn't

25   that true?

47

1      A    That's correct, at least as I understand it.

2      Q    And I have never practiced criminal law for one

3  moment, so you're going to have to forgive my ignorance.

4  So basically unless the defendant agrees, in order to

5  indict someone for a felony, you need the grand jury to

6  return a bill?

7      A    That's correct.

8      Q    But if the grand jury returns a bill, are you

9  required to prosecute the case?

10     A    Well, again, that would be a matter of some

11 dispute.  My answer would be no, you're not required to

12 prosecute a case.  And an indictment is not an

13 indictment unless or until the Justice Department

14 approves the indictment.  Simply because a grand jury

15 takes some action, as has happened on occasion

16 throughout the grand jury system, by what I refer to as

17 frequently, quote, rogue grand juries, closed quote.  If

18 the Justice Department does not approve of the action

19 there, is no indictment, and therefore there is no

20 prosecution that flows from whatever it is that the

21 grand jury has done.

22          That said, if -- even if an indictment is

23 returned which is approved by the grand jury, it would

24 be my position that the Justice Department could decide

25 as a matter of policy not to prosecute a returned and

48

1    properly authorized bill of indictment.

2         Q    And would that involve what is sometimes called

3    the exercise of prosecutorial discretion that?

4         A    Would be correct.

5         Q    Tell me what your understanding is or was --

6    I'm sorry for the vagueness of the question -- it may

7    not make a difference because your understanding may not

8    have changed over time.  Can you just provide me your

9    understanding of what prosecutorial discretion; what it

10   means?

11        A    Oh, I think it's best summed up by the quote

12   from -- I believe it's the Sutherland case by

13   Mr. Justice Burger which sets forth some aspirational

14   goals of a prosecutor in the federal system, which is

15   not to prosecute people, not to seek convictions, not to

16   seek statistics, but to do justice to make -- to be fair

17   and not to strike foul or low blows, but in weighing all

18   of the facts and circumstances in a given case,

19   basically, to do the right thing.  To make valid and

20   appropriate decisions to do the right thing.

21        Q    Does prosecutorial discretion come into play at

22   every stage in criminal proceedings?

23        A    Does it come into play in every state?

24        Q    Stage.

25        A    Stage, of what, again?

49

1    Q    Of the criminal proceeding.

2    A    I think so.

3    Q    So when you make a determination to approve or

4  not approve a launching of an investigation, that

5  involves the exercise of discretion?

6    A    That involves some discretion.

7    Q    And when you make a decision about whether to

8  charge or not to charge one or more criminal defendants,

9  that too involves the exercise of discretion?

10    A    As well as what to charge.

11    Q    As well as what to charge.  And in negotiating

12  of a plea agreement or a plea bargain, fairly common

13  practice by the way in federal criminal proceedings?

14    A    It's a common practice throughout the criminal

15  justice process.  Without the plea bargain process, the

16  system would collapse simply from the weight of the

17  case, either that or fewer cases would be charged.

18    Q    Do you have an estimate of the number of cases

19  during your tenure as US attorney on the criminal end --

20    A    I don't really know.  I've heard the estimate

21  somewhere in the 80 to 90 percent range, and that sounds

22  correct.  But I honestly do not know it's correct or

23  not.

24    Q    Would it be fair to say it's well more than

25  half?

50

1      A      It's a fairly high percentage of cases that

2    wind up being plea bargained.  What percentage it is in

3    actuality, I do not know.

4      Q      And as a prosecutor when you're negotiating a

5    plea bargain, the question of what you will charge, who

6    you will charge, what sentence you will seek, all of

7    those involve the process of prosecutorial discussion;

8    is that right?

9      A      Yes.

10     Q      Let's talk for a moment about a case in which

11   there isn't a plea agreement, a hypothetical case in

12   which there isn't a plea agreement.  I take it then the

13   grand jury's function is not to determine guilt or

14   innocence; is that fair?

15     A      That's correct.

16     Q      How would you characterize or express what it

17   is that a grand jury determines when it indicts someone?

18     A      Based upon the recommendations of the

19   prosecutor that is involved with the case, the grand

20   jury's role is to determine whether or not there is

21   probable cause to believe that a crime has been

22   committed, and that a particular defendant has committed

23   that crime.

24     Q      And it's not the role of the prosecutors to

25   determine whether someone charged with a crime is guilty

51

1   or innocent; is that correct?

2       A    I think that in the US Justice Department

3   system, a prosecutor must be convinced, and I've

4   forgotten what the phrase is in the US Attorney's

5   manual, but it's by a fair probability that a conviction

6   will result from a prosecution before a prosecutor is --

7   before a prosecutor should, using the discretion that

8   you've talked about before, seek an indictment from a

9   grand jury.

10      Q    But prosecutors don't return verdicts of guilty

11  or investigate not guilty?

12      A    This would be true.

13      Q    Nor does defense trial?

14      A    This would be true.

15      Q    Nor in a trial does the judge?

16      A    That is true, except in a limited circumstance

17  the judge could direct a verdict in favor of the

18  defendant, which would be essentially determining

19  innocence.

20      Q    Other than in that situation, it would be the

21  jury that would make a determination of guilty?

22      A    That would be the usual scenario.

23      Q    And, again -- and I know that some of this may

24  be obvious, but just so it's clear to the people

25  reviewing this testimony or transcript, none of these

52

1   phases in a criminal proceeding that weave been talking

2   about, the investigation, the indictments, the exercise

3   of the prosecutorial discretion about whether to

4   prosecute and what to prosecute, for the issuance or not

5   of a directed verdict or a jury's verdict of guilty or

6   not guilty, none of that is designed to resolve tort

7   claims for trespass and nuisance, is it?

8       A    Not to my knowledge.  I think there are some

9   limited occasion when assets may be forfeited in and as

10  a result of criminal prosecution, but I don't know of

11  any criminal cases designed to resolve guilt or

12  innocence of conduct and given the facts and

13  circumstances as may be applied to a specific statute.

14      Q    In fact, when a criminal proceeding is

15  resolved, leaving aside res judicata, leaving aside

16  issues a claim preclusion for a moment, leaving those

17  issues aside, when a criminal proceeding is resolved,

18  that carries no automatic implications for how related

19  civil proceeding should or should not be resolved, does

20  it?

21      A    It may bear on how those proceedings proceed.

22  But in the abstract as you've asked the question, the

23  answer is no, it should have no bearing.

24      Q    It would normally be the jury in the civil

25  proceedings that determines civil liability and any

53

1    damages, correct?

2        A    The jury and the judge.

3            MR. NORDBERG:   This a good time perhaps for a

4    10-minute break.

5            (A recess was taken from 10:43 to 10:58 a.m.)

6            (Mr. Blum was not present in the proceedings.)

7        Q    (By Ms. Nordberg)   Mr. Norton, just to tidy up

8    on a couple points I inadvertently skipped over before.

9    Have you reviewed any material in preparation for this

10   deposition?

11       A    I scanned the testimony that I gave before the

12   Wolpe committee, but I can't tell you I reviewed it very

13   thoroughly.

14       Q    Sure.  Did you look at anything else?

15       A    I believe it was given some newspaper articles

16   to look at as well.  They were -- process accounts of

17   the time around the plea agreement.  That's all.

18       Q    Anything else?

19       A    And I think the documents you previously gave

20   to me, the so-called Touhy disclosure.

21       Q    Any transcripts of any trial testimony from

22   Cook versus Rockwell?

23       A    No.

24       Q    Has anyone told you about any of the trial

25   testimony from Cook versus Rockwell?

54

1     A     No.

2     Q     When is the last time you talked with

3  Mr. Lipsky that you can remember?

4     A     I don't recall talking to Mr. Lipsky at any

5  time after about 1991, although I may have.  I don't

6  recall that.

7     Q     Okay.

8     A     Approximately the time of the plea agreement, I

9  believe, was the last time that I saw Mr. Lipsky.

10     Q     How about Mr. --

11     A     My recollection is that Mr. Lipsky was

12  transferred by the FBI to California office sometime

13  around that time, and I don't recall ever seeing him

14  really after the plea agreement.

15     Q     How about Mr. Fimberg?

16     A     I can't really tell you that I've seen

17  Mr. Fimberg since about 1992 or '93.  Again,

18  Mr. Fimberg, either I left the office of US Attorney,

19  which was in about April of 1993, and he was still

20  there, or he left before I did to take an assignment at

21  the hag in the Netherlands, and I'm not sure when that

22  happened.  But that's about the last time I saw him.

23     Q     Okay.  You don't happen to know where he is

24  today, as we sit here?

25     A     I don't.  I assume he's still in the

55

1   Netherlands.

2       Q    Have you attended any of the trial in Cook

3   versus Rockwell?

4       A    No.  I do know two of the plaintiffs that I saw

5   in the court going into and leaving the court during a

6   time that I was in another matter, and that's Mr. and

7   Mrs. Bartlett; Dick and Sally Bartlett.  I've known them

8   for quite a number of years.

9       Q    Your family and their family have been friends

10  for some time?

11      A    Yes, so I was aware that the case was at some

12  stage of the proceedings, just from what they were

13  saying?

14      Q    But you said you don't know a lot about the

15  case?

16      A    I know nothing habit the case.

17      Q    Have you read any press coverage about this

18  case over the last few weeks?

19      A    No.

20      Q    I want to go back now to the topic of

21  prosecutorial discretion and talk about some of the

22  different kinds of considerations or factors that you

23  and the Department of Justice considered in deciding to

24  agree to the terms of the plea bargain that was

25  ultimately adopted, if I may.

56

1        MR. TAYLOR:  Obviously, this is getting very

2    close to an area that he's not authorized to testify

3    about.

4        MR. NORDBERG:  Well, again, I'm not going to

5    ask him about meetings or communications in which these

6    consideration or factors were bantied about or what the

7    various people said about what which was assigned to

8    him.  I'm primarily going to list some fairly abstract

9    potential considerations and factors, and ask him if

10   they entered into the calculus in this case.

11       And you can object if I cross any lines that I

12   shouldn't be crossing.

13       MR. TAYLOR:  Okay.

14   Q    (By Ms. Nordberg)  By the way, Mr. Norton, am I

15   right to assume that if Mr. Taylor instructs you not to

16   answer a question on grounds outlined in the Touhy

17   letter, or any other ground for that matter, that you

18   will follow that instruction?

19   A    I think that would be likely to be the case,

20   although I guess I would have to say I would

21   independently weigh that instruction and perhaps consult

22   with him if I felt it was not appropriate.

23   Q    All right.  And if you need to consult with him

24   for any reason at any point in this deposition, just let

25   me know, and that's fine.

57

1          I'm hearing you say, though, that you will

2    make, in addition to any objections that Mr. Taylor may

3    or may not raise, an independent appraisal of whether

4    you may permissible testify in response to --

5        A    I certainly will talk to Mr. Taylor if I

6    disagree with anything he instructs me to do.

7        Q    Have you planned for how any objections based

8    on the restraints to which you are subject under the

9    Touhy letter, or any other ground for that matter, will

10   be handled at trial if they're not asserted by the

11   parties at trial?

12       A    No.

13       Q    If Judge Kane directs you to answer a question,

14   do you expect to follow that direction?

15       A    Subject to advice of counsel and any objection

16   counsel may make that would likewise weigh on some

17   instructions that we've discussed here.  The answer is I

18   don't know.  That's a speculative question, and I really

19   can't answer it until it's presented to me.

20       Q    Fair enough, it is a speculative question. ,

21   and the answer would still be more so.

22            When you testified before Congress, the

23   Department of Justice on that occasion as well, and you

24   invoked a deliberative process objection to the number

25   of the sub committees questions, didn't you?

58

1    A    I didn't myself.  My counsel at the time did,

2    who was David Margolis.

3    Q    Did the objections that he asserted on

4    deliberative process grounds basically conform to your

5    understandings of the scope of protection and privilege?

6    A    I think so.  I mean, the Department of Justice

7    may have a different view, and really Mr. Taylor is the

8    one that ought to address that.  But it seems to me the

9    objection is the same, or the position is the same.

10    Q    That's really what I was driving at.

11         Who made the decision to accept on behalf of

12    justice to accept the plea agreement in this case -- not

13    this case, Cook v Rockwell, but United States v

14    Rockwell?

15    A    Who, by individual name or --

16    Q    Who had authority to make that decision?

17    A    Who had authority to make that, the Attorney

18    General, the deputy Attorney General, the Assistant

19    Attorney General for the criminal division, the

20    Assistant Attorney General for the lands -- or

21    environment and natural resource division, various

22    personnel within those two divisions, and personnel in

23    the United States Attorney's office for the District of

24    Colorado, including myself, were all involved in the

25    making of the decision.

Case No. 1:90-cv-00181-JLK   Document 1834-1   filed 12/13/05   USDC Colorado   pg 60 of 214

1    Q    Who had the authority -- whose authority was

2    required in order to accept the plea agreement?

3    A    I believe the authority of the United States

4    Attorney for the District of Colorado and the Assistant

5    Attorney General for the environment and natural

6    resources division were, by the US Attorney's manual,

7    the two authorities for which were -- which were

8    required for environmental investigations, prosecution,

9    and conclusions.

10    Q    What would have happened if those two people

11    had disagreed?

12    A    Again, I never had that experience, so I don't

13    know.  But I would assume that it would work its way to

14    the Attorney General for resolution.

15    Q    In this case the plea agreement was approved, I

16    think you said, at the highest levels?

17    A    Well, I don't know how high the levels were.

18    Q    It doesn't get any higher in the Department of

19    Justice than the Attorney General, right?

20    A    Well, I don't know if the Attorney General was

21    involved in the approval of the plea agreement.

22    Certainly the Assistant Attorney Generals to some degree

23    were.

24    Q    You thought the plea agreement was an

25    appropriate disposition?

60

1      A    I did.

2      Q    And did aspects of prosecutorial discretion

3   come into play when you made that evaluation?

4      A    Yes.

5      Q    And among those aspects of prosecutorial

6   discretion, did you give any weight or consideration to

7   whether various claims against persons or entities could

8   be proved beyond a reasonable doubt?

9      A    Yes.

10     Q    Could you, again, for the benefit of the people

11   reading this transcript, just describe for me briefly

12   your understanding of any difference there may be

13   between the criminal standard of proof beyond a

14   reasonable doubt and the civil standard of a

15   preponderance of the evidence?

16     A    I don't know that there is any mathematical way

17   of describing the two burdens of proof.  Typically one

18   would characterize the civil burden of proof by a

19   preponderance as something more than 50 percent, where

20   as beyond a reasonable doubt is a substantially higher

21   and heavier burden, although again I don't think you can

22   attribute any mathematical formula to it.  But it's a

23   very heavy burden.  It's jury instructions -- a couple

24   jury instructions that are given with respect to

25   reasonable doubt, more accurately stated.  But it's a

1   higher burden than the civil burden.

2   Q    And, in fact, those jury instructions are

3   pretty standard, aren't they?

4   A    They are.

5   Q    Did you give any consideration to how charging

6   or not charge certain claims against certain persons or

7   entities might play in a Denver courtroom?

8   A    Not really.

9   Q    Did you give any consideration to is anything

10   that you might call a culture at either Rocky Flats or

11   within Rockwell or the Department of Energy?

12   MS. AHERN:  Object to the form of the question

13   as vague.

14   A    I think a plea agreement, at least as I recall

15   it, and public statements made during the time of the

16   plea agreement identified what the government -- or what

17   the prosecution, at least, team, characterized as a

18   culture or environment in which Rockwell and the

19   Department of Energy had functioned or operated for

20   quite a number of years.  That presented a difficult

21   scenario for prosecution because of the way in which

22   decisions were made or not made by the folks that were

23   involved in that.

24   Q    (By Ms. Nordberg)  What was it about the way in

25   which decisions were made or not made by the folks

                                                        62

1    involved in the --

2         A    Well, it seems to me as I recall it, there was

3    a management style called matrix management or known as

4    matrix management within the Rockwell Department of

5    Energy -- well, first of all, my recollection is the

6    Department of Energy staff at Rocky Flats was rather

7    small.  I don't recall the number, but for some reason

8    the number 60 sticks in my mind as the number of

9    employees associated with the Department of Energy.  It

10   may be far more, it may be far less, but that's a number

11   that pops into my mind.

12            And the contractor on the scene at the time,

13   Rockwell International, had several hundred, maybe over

14   1,000 employees, as a result of which it was generally

15   believed that Rockwell was sort of the tail wagging the

16   dog F you will, in terms of -- at least that was the

17   belief going into the investigation, that Rockwell was

18   the tail wagging the dog.  And the concept of matrix

19   management, as it was communicate to the me at least,

20   that decision were made by discrete units of Rockwell

21   and/or DOE, but not necessarily communicated to other

22   units.  So there was no clear line of authority to a

23   single manager or a single person that could be said to

24   have been responsible for decisions that were made.

25        Q    Was it a factor in your thinking in the

63

1    exercise of prosecutorial discretion that one or more of

2    actual or potential defendants might assert the advice

3    of counsel defense?

4        A    I don't recall that being an issue of concern.

5        Q    Was it --

6        A    Certainly the idea that the preeminent purpose,

7    goal, and objective of Rocky Flats was the production of

8    nuclear triggers, and all other issues were -- and those

9    were matters of national security and, therefore,

10   significant national importance that all other issues

11   including environmental concerns were secondary was a

12   factor.

13           Likewise, a factor was the conclusion of those

14   who had researched this issue -- that -- bless you.  Do

15   you need me to stop?

16           MR. NORDBERG:  Can we go off the record for a

17   second.

18           MR. TAYLOR:  Sure.

19           (Discussion off the record.)

20       Q    (By Ms. Nordberg)  I'm sorry I interrupted.  I

21   think you were in the middle of an answer.  Do you

22   remember where you were?

23       A    I do.  I was about to relate that there was a

24   belief consensus by the legal team, the prosecution team

25   both in my office -- my then office and the Department

64

1  of Justice that nuclear wastes were not capable of being

2  regulated under the nation's environmental laws; that

3  hazardous wastes were.  And then there was this sort of

4  never never land of mixed waste which were a combination

5  of hazardous waste and nuclear waste which remained

6  somewhat untested as to whether or not mixed waste could

7  be categorized under or regulated by environmental

8  hazardous waste laws.

9       Q    In other words, there were legal issues about

10  whether a conviction could be sustained under some

11  theories; is that right?

12      A    That's correct.

13      Q    Did it enter into your thinking that the

14  potential defendants had asserted or might assert that

15  they were acting under orders from the Department of

16  Energy?

17      A    I think that was a part of the management

18  culture issues that I spoke of before.  Yes.

19      Q    How about a defense that things were just as

20  bad at other DOE facilities?

21      A    I think that was another issue of general

22  concern.  That was not a great concern because the laws

23  had been violated, it didn't matter whether or not they

24  had been violated at other facilities.  But that was

25  certainly a topic of concern.

65

1      Q    Do you remember any issues about whether you

2    would be able to or would need to prove specific intent?

3      A    Yes, that was a concern under at least then,

4    and may still be called responsible corporate officer

5    doctrine.  There was some precedent in environmental

6    criminal prosecutions for holding a corporate officer

7    who was responsible for an area liable for violations of

8    criminal statutes.  The prosecutors, and I agreed, felt

9    that in the District of Colorado that was not a likely

10   theory of prosecution that would succeed, or should even

11   succeed; to try to hold somebody responsible without

12   specific intent or knowledge of the crimes.

13     Q    So that was another potential obstacle you

14   faced in the prosecution?

15     A    Yes.

16     Q    I suppose this is not a prosecutorial

17   discretion, but maybe it fits into the whole calculus of

18   evaluating the plea bargain.  You were limited in what

19   claims you would be able to prosecute by virtue of

20   statutes of limitations, weren't you?

21     A    Statute of limitation were certainly a factor,

22   although I think many people would have argued that the

23   offenses were of a continuing nature, so reach back

24   could have occurred in many cases.  I don't recall the

25   statute of limitations being a significant issue because

66

1   of the fairly recent nature of the offenses that were

2   ultimately focused on and charged in the information.

3       Q    Do you recall what the limitation period was

4   for the charges that were brought?

5       A    I am aware that the general criminal statute of

6   limitations is five years.  Whether or not there are

7   specific statutes within environmental crimes, I do not

8   know.  I do not recall knowing that.  I probably knew at

9   the time, but I don't know now.

10      Q    Do you know if anything in the plea bargain

11  involved charged conduct occurring more than five years

12  prior to --

13      A    I don't recall that there was anything in

14  there.

15      Q    You don't believe so?

16      A    I don't believe so.  It speaks for itself, but

17  I don't recall.

18      Q    What about the notion of -- I think it's

19  sometimes referred to as piling on.  Does that enter

20  into the --

21      A    I have no recollection of that concept being of

22  concern.  I'm not quite sure how it might be of concern,

23  but it doesn't -- I don't recall that being a matter of

24  concern.

25      Q    Do you recall whether it was ever publicly

67

1   offered as a reason, as one reason for the Department of

2   Justice to accept the plea agreement?

3       A    It may have been.  I don't know.  As I sit here

4   today, I don't know.

5       Q    This is going to be plaintiff's sentencing

6   memorandum?

7            (Deposition Exhibit 5 was marked.)

8       Q    (By Ms. Nordberg)  All right, Mr. Norton, I

9   think you've been shown as what's been marked in this

10  deposition as Exhibit 5, and which has been marked,

11  although not, I believe, introduced into evidence in the

12  Cook versus Rockwell trial as Plaintiffs' Exhibit 270.

13  Have you had a moment to look at that document?

14      A    Well, I can see that's what it appears to be.

15  It's over 100 pages long, so I haven't had a chance to

16  read it today.

17      Q    Obviously.

18      A    I haven't read it for, I would say, 13-1/2

19  years.

20           (Mr. Blum entered the deposition.)

21      A    I don't know if you want me to focus on a

22  specific section of it.  There will not be time for me

23  to read it today and conclude this deposition in a

24  timely fashion.

25      Q    Attorneys are reputed to have skills of speed

68

1   reading, but I didn't expect you to have read it in the

2   few seconds when it was handed to you.

3            If you could turn to Page 128, the last page.

4       A    Yes.

5       Q    Does that appear to be your signature on the

6   document?

7       A    Yes.

8       Q    What does the document appear to be?

9       A    It appears to be plaintiffs' sentencing

10  memorandum dated March 26, 1992 in the criminal

11  prosecution against Rockwell International Corporation.

12      Q    Did you give careful review to this document

13  before it was submitted to the Court?

14      A    Yes.  When it was presented to me, I carefully

15  reviewed it.

16      Q    Do you know whether you made any changes to it?

17      A    I don't have a recollection whether I did or

18  did not.

19      Q    But I assume a major document like this in the

20  case as substantial importance and attention, you would

21  give it careful attention just as you did the search

22  warrant, correct?

23      A    I reviewed it carefully at the time it was

24  presented to me.

25      Q    Now, in that careful review, would you have

69

1    reviewed the underlying evidentiary material on which

2    statements -- or some of the statements in the

3    sentencing memorandum are based?

4         A    No.

5         Q    You relied on other people in the prosecution

6    team and investigators to do that?

7         A    Yes.  Mainly the prosecution team.  I did not

8    have significant contact on a regular, ongoing basis

9    with the investigators.

10        Q    Okay.

11        A    And mainly in the prosecution team,

12   Mr. Fimberg.

13        Q    Since signing and submitting the plaintiffs'

14   sentencing memorandum, is there any specific portion of

15   it -- and we're going to go through it, but first I want

16   to ask you, if to your recollection is any specific

17   portion of it concerning what you've changed your views?

18        A    Concerning which I have since changed my views?

19        Q    That's right.

20        A    I haven't even thought about it since I've

21   signed it.

22        Q    So the only way we would know if you've changed

23   your views is to ask about what's in here?

24        A    That would be correct.

25        Q    Starting then on the first page, in the first

70

1    paragraph under the heading "Introduction," the

2    paragraph reads, "The United States Department of

3    Energy's Rocky Flats Nuclear Weapons Plant (Rocky Flats

4    or the Plant) is an old, generally antiquated facility.

5    During most of the 1980s, the Rocky Flats' owner, the

6    Department of Energy (DOE), and the Plant's operators,

7    Rockwell International Corporation (Rockwell), opposed

8    regulatory scrutiny and resisted the application of this

9    country's environmental laws to the Plant's activities.

10   Rocky Flats' prevailing culture, which DOE established

11   and continually fostered, was that nuclear weapons

12   production was the first and principal priority, and

13   environmental compliance was down the list.  DOE

14   oversight at Rocky Flats was generally poor, and

15   Rockwell, for all intents and purposes, ran the Plant."

16          You obviously agreed with the statements in

17   that paragraph at the time you signed this document?

18   A    Yes.

19   Q    Has anything happened since then to change your

20   views?

21   A    I'm not aware of anything that's happened that

22   has caused me to change my views, outside of the fact

23   that the facility has been shut down since that time.

24   Q    The next paragraph reads, "Rocky Flats has been

25   continually beset by environmental problems and safety

1   violations for many years.  Various reports, panels and

2   studies have confirmed Rocky Flats' poor performance in

3   these important areas, with limited, and often

4   inadequate, corrective action until mid-1989 and

5   thereafter, when DOE's Secretary Watkins personally

6   committed to changing how DOE does business.  DOE

7   sanctions or disciplinary actions were either minor or

8   nonexistent."

9        You obviously agreed with that paragraph at the

10  time you signed this document, correct?

11  A    Yes.

12  Q    Has anything changed since then to change your

13  views?

14  A    No.

15  Q    Turning to Page 4 -- and I'm looking at the

16  paragraph beginning with the word "Today," starting with

17  the second sentence, which I will read.  "The charges --

18  involving the illegal treatment and storage of hazardous

19  wastes and various Clean Water Act violations --

20  represent the most serious environmental violations for

21  which sufficient evidence exists to support a successful

22  prosecution and conviction, based upon criminal and

23  environmental law and the rules of evidence, beyond a

24  reasonable doubt.  The hazardous waste fines proposed by

25  the Justice Department -- if imposed -- will be the

72

1    largest hazardous waste fines ever imposed in this

2    country.  The Clean Water fines -- here in semi-arid,

3    landlocked Colorado -- will be the third largest Clean

4    Water fines in US history."

5          You obviously agreed with this when you signed

6    this document, correct?

7    A    I understood those to be correct, and I agreed

8    with them.

9    Q    I think maybe there had been a larger

10   environmental fine in the Exxon Valdez case?

11   A    Yes, but I don't think the Exxon Valdez was a

12   hazardous waste case.  I think it was -- I'm not even

13   sure what, but another environmental statute.

14   Q    A different set of statutes governing petroleum

15   spills?

16   A    Yes.

17   Q    Is there anything in here that you disagree

18   with now?

19   A    Not based on my information and understanding

20   at the time.

21   Q    The next paragraph reads, "The United States

22   wishes to publicly thank and commend the special grand

23   jury for its extraordinary attention, patience and

24   vigilance over many months of active service.  The

25   difficult investigation -- leading to these charges and

73

 1    this disposition -- would not have been possible without

 2    the grand jury.  It has rendered to the United States,

 3    and to the citizens of Colorado, and invaluable public

 4    service."

 5            Did you agree with that statement at the time

 6    it was made?

 7       A    Oh, it was a difficult statement to make under

 8    the circumstances of the grand jury, but I thought it

 9    was an appropriate statement to include.

10       Q    In other words, despite the controversies, and

11    is it fair to say friction sometimes between Justice and

12    the grand jury, you felt they had made some contribution

13    and provided some impetus that deserved --

14       A    Certainly they provided active service, and

15    certainly they made some contributions.

16       Q    The grand jury never returned indictments in

17    this case, correct?

18       A    Not that I'm aware of.  I think there were some

19    press or public reports of dissatisfaction by the grand

20    jury, but no indictment was ever returned, to my

21    knowledge.

22       Q    Is that because a plea bargain was reached

23    before they could return one?

24            MS. AHERN:  Objection; form.

25       A    I can't tell you that.

74

1     Q     (By Ms. Nordberg)  You can't tell me that

2  because it's privileged, or you can't tell me that

3  because --

4     A     I can't tell you that that's the way -- I can't

5  tell you that's a correct statement of fact.  There was

6  never a request by the Justice Department of the grand

7  jury to return an indictment that's any different than

8  what you have before you in the sentencing and plea

9  agreement and information.  Beyond that, I can't

10 speak -- I think anything else I would say would be

11 covered by Rule 6(e) of the Federal Rules of Criminal

12 Procedure, maybe even what I just told you would be.

13    Q     Did the grand jury return any indictment?

14    A     There was no indictment returned by the grand

15 jury, to my understanding of what an indictment is.

16    Q     Did they prepare a report?

17    A     Public reports suggest that the grand jury did

18 prepare a report.  I can't recall whether or not they

19 did, and I can't recall whether or not I've ever seen or

20 read the report, but there certainly were reports

21 published to that effect.

22    Q     Hadn't you pushed at one time for the grand

23 jury to issue a report as a vehicle for discussing

24 uncharged conduct?

25         MR. TAYLOR:  Objection.

1          MR. NORDBERG:  What are the grounds of the

2     objection?

3          MR. TAYLOR:  I think it goes to deliberative

4     process.

5          THE DEPONENT:  I think it also goes to

6     Rule 6(e).

7          MR. TAYLOR:  Yes, it also goes to Rule 6(e).

8     Q     (By Ms. Nordberg)  Haven't you testified under

9     oath that at one point you pushed for the grand jury to

10    issue a report as a vehicle for discussing uncharged

11    conduct?

12    A     I don't know.  If you show me the testimony, I

13    will be glad to --

14    Q     Okay.  We'll come back.

15    A     -- to tell you whether or not I said that.

16    Q     We'll come back.  We'll go document by

17    document, because I figure that's easier on everybody.

18          Turning now to Page 9.

19    A     Okay.

20    Q     The third full paragraph reads, "This DOE

21    culture was particularly evident concerning the

22    environment.  During most of the 1980s, DOE strenuously

23    resisted the application of federal and state laws at

24    its nuclear weapons facilities.  According to Rockwell,

25    DOE formed an institutional policy of active resistance

76

1    and to RCRA regulation, and expected its contractors to

2    support the same.  Regulation and oversight by EPA and

3    state environmental agencies was heavily contested and

4    grudgingly given."

5          Have you changed your views on that since you

6    signed this document?

7    A    I -- no.

8    Q    Turning to Page 11 -- by the way, this will be

9    a memory test.  We are about to read some pros that

10   contains a couple of acronyms.  Do you know or remember

11   what ALO stands for?

12   A    I was just trying to figure that out myself.  I

13   think it might be Albuquerque -- I don't really know.

14   It seems to me it was Albuquerque.  For some reason

15   there was a relationship that sticks in my mind to

16   Albuquerque.  But I don't see that in this document in

17   any preceding pages.  It's probably here somewhere.

18   Q    On Page 10, actually, I now see immediately

19   under the caption "DOE Oversight" what appears to be a

20   definition of ALO as referring to DOE's Albuquerque

21   Operations Office.  Do you see that?

22   A    No, not at the moment, but I'm sure if you see

23   it it's there -- oh, yes, I do.

24   Q    Where it says, "During the 1980s, DOE's

25   Albuquerque Operations Office (ALO).

77

1      A    Yes.

2      Q    And, actually, if we could go back and start on

3   Page 10 beginning with the paragraph reading "According

4   to."  It reads, "According to senior DOE management, it

5   was not DOE's role to micro-manage a particular plant,

6   but only to oversee the private company's performance.

7   DOE officials told the investigation that a principal

8   reason that generally large, sophisticated US

9   corporations were hired to run DOE's facilities was

10  their presumed operating expertise in operating complex

11  industrial facilities, and their ability to do so in

12  compliance with all laws and regulations, including

13  environmental laws.  According to DOE officials, 'that's

14  part of what they [the company] were being paid to do.'

15  As another DOE official stated, 'the management and

16  operating contractors that were chosen to run these

17  facilities were not chosen under the assumption that

18  their ability to run them in conformance with applicable

19  statues had to be demonstrated on a regular basis by

20  external oversight.'"

21       Have you changed your views since you signed

22  this document?

23      A    That was my information at the time, and they

24  have not changed.

25      Q    Has any information come to your attention that

78

1    would modify your views?

2        A    No.

3        Q    The next paragraph reads, "Until late 1989, the

4    ALO and Rocky Flats Area Office (RFAO) resources devoted

5    to environmental and waste management oversight were

6    sorely deficient.  According to RFAO management and

7    staff, ALO provide little day-to-day guidance or support

8    on environmental or waste management matters."

9             Has anything come to your attention since you

10    signed this document that would change your views on

11    that?

12        A    No.

13        Q    On Page 12 near the bottom, there is a

14    paragraph that reads, "The result of these severe

15    resource problems was almost no 'on the ground'

16    oversight of the Rocky Flats' actual day-to-day

17    environmental compliance, and the RFAO was dependent on

18    Rockwell for all Plant information, environmental or

19    otherwise.  The RFAO environmental workers were

20    essentially pinned to their desks, and spent very little

21    time out and about the Plant.  In short, the Rocky Flats

22    Area Office (RFAO) had no substantial ability to collect

23    its own, independent information or to verifying

24    Rockwell's information."

25             Anything since you've signed this document to

79

1    change your views about that?

2        A    No.

3        Q    The next section in this sentencing memorandum

4    is captioned "The RFAO" -- or Rocky Flats Area Office --

5    "was captured."  I won't read it aloud to you if you can

6    tell me what the gist of the assertion in this section

7    that the office was captured would be.

8        A    Well, I think, as I previously testified, it

9    was the general view of the prosecution team at least,

10   that the DOE components at Rocky Flats was so small as

11   to be, as previously read in one of the other sections,

12   as to be unable to act on an independent basis from the

13   operations at Rockwell as a result of which it was

14   characterized as being captured by Rockwell.

15       Q    And when you say that was the general overview

16   of the prosecution team, does that the United States

17   attorney Michael Norton?

18       A    Yes.  I have no disagreement with that language

19   now or then.

20            MR. NORDBERG:  Off the record.

21            (Discussion off the record.)

22       Q    (By Ms. Nordberg)  I think you testified a

23   minute or two ago that you remember some dispute or

24   controversy at various points in time about the

25   regulation of nonradioactive hazardous waste,

1    radioactive waste and various kinds of mixed waste.  Is

2    that a fair characterization of what you were saying?

3        A    Yes.

4        Q    And in particular, was there a time when it was

5    disputed whether, to your recollection, whether RCRA

6    even applied to mixed waste DOE sites or the Rocky Flats

7    site?

8        A    I don't really have a specific recollection of

9    this, at this time.  But it seems to me there was some

10   point in time when the regulation of mixed waste was

11   under the hazardous waste laws, including RCRA was

12   either conceded to by the Department of Energy or agreed

13   to by the Department of Energy, and therefore its

14   contractors.  I'm not confident of that, but it sticks

15   in my mind for some reason.

16       Q    Would it be consistent with your recollection

17   that if I held out to you that sometime in the mid 1980s

18   that there was a three party or try party or try parte

19   agreement between I think it was CDH, DOE, and Rockwell?

20           MS. AHERN:  I'll object to that

21   characterization.

22           MR. NORDBERG:  EPA, CDH, and DOE.

23       A    It's certainly possible.

24       Q    (By Mr. Nordberg)  And, in fact, if you could

25   look at Page 23 of your memorandum, the sentencing

81

1    memorandum that has been marked as Norton 5.

2            I direct your attention to a sentence that

3    reads, After a confrontation in late 1985 and early 1986

4    between EPA and the Colorado Department of Health (CDH),

5    on the one hand, and DOE and Rockwell on the other, EPA,

6    CDH and DOE signed a Compliance Agreement on July 31,

7    1986 (the '1986 Compliance Agreement'), which made it

8    clear that Rocky Flats' low-level mixed wastes were

9    RCRA-regulated, by EPA and CDH."

10           Do you see that?

11   A    I do.

12   Q    Does that refresh your recollection about the

13   understanding that those parties came to about the

14   status of mixed waste at lock Rocky Flats under RCRA?

15   A    No more than what I've said before.

16   Q    Okay.

17   A    Just a general recollection of that T but this

18   appears to be the specifics regarding that recollection.

19   Q    I'm going to talk for a while now --

20   A    By the way, I have a noon appointment, so I

21   don't know what your plans are, but I'm hoping we can

22   break right at or close to noon.

23   Q    Sure.  What time are we at now?

24           MR. BLUM:  About a quarter of.

25   Q    (By Ms. Nordberg)  Do you need some time to get

82

1   from here to there?

2        A    Real close by.

3        Q    Break at noon and reconvene when?

4        A    1:00 or 1:15.

5             (Discussion off the record.)

6             MR. NORDBERG:  I'm going to talk about the

7    Building 771 incinerator and what you recall about those

8    subject.

9        A    Okay.

10       Q    I'm going ask you, first of all, would it be

11   fair to say that there were two kinds of issues at stake

12   or potentially at stake here with the 771 incinerator?

13   I'm going to list them, and you can disagree with me if

14   I get them wrong or if I say something that isn't true.

15   Issue No. 1 was there was some form of publicly

16   announced shutdown, that DOE announced some form of

17   shutdown of Building 771 or the incinerator for some

18   period of time, and there was thought to be some

19   evidence possibility or allegation that the incinerator

20   had been operated during that period of time contrary to

21   DOE's public representations; is that right?

22       A    I believe that's correct.

23       Q    By the way, and I understand that there have

24   been and probably will be debates about the truth of the

25   matter of what I just described, whether the incinerator

83

1   was operating and during what times of that DOE

2   shutdown.  Would the fact that Rockwell had operated the

3   incinerator even though the public had been told

4   otherwise, would that be a crime?

5       A   Not necessarily.  That was certainly one of the

6   issues that was of concern in the potential of a

7   criminal prosecution, the thought was that it may be

8   possible or conceivable to charge Rockwell with the

9   making of false statements under criminal statutes.  But

10   typically such false statements would not have been

11   those made in a public setting such as what you've just

12   referred to.  They would rather be to a government

13   agency or some other government authority.  So that

14   was -- it was an up in the air question as to whether or

15   not the statement to the public that the incineration

16   system in Building 771 was shut down, when alternatively

17   it was suspected that it had been utilized during that

18   period of shutdown was, in fact, a crime, even if it had

19   been proved to the operated at that time.

20       Q   Did these uncertainties factor in your thinking

21   or the DOJ's thinking about whether to accept the

22   ultimate disposition and --

23       A   No, not at that point in time.  By that point

24   in time, the prosecution team had concluded, and I

25   agreed with this conclusion based on the reports that

84

1   were provided to me that, in fact, there was not

2   credible evidence that Building 771 had been operated

3   during the period of shutdown; the announced shutdown.

4        Q     Investigation into whether the 771 incinerator

5   was operated during that period halted by December of

6   1989; isn't that true?

7        A     I have no idea.

8        Q     Then there's a second aspect to Building 771,

9   which I'll try to summarize and you can correct me if I

10  get it wrong.  Forgetting for the moment about what DOE

11  may or may not have shut down or told the public it was

12  going to shut down, there was the issue of whether

13  operation of the 771 incinerator without the RCRA permit

14  would be lawful, correct?

15       A     The concern as I recall it was whether or not

16  the incinerator was being used to incinerate hazardous

17  wastes without a RCRA permit, yes, without the proper

18  permitting.

19       Q     And was there an issue involving a claim of

20  exempt shun from RCRA by DOE on the grounds or theory

21  that the Building 771 incinerator was used in plutonium

22  recovery operations; do you remember that?

23       A     I don't recall that, but that sounds like it's

24  certainly logical to the circumstances.  But I don't

25  have an independent recollection.  It may be in here

85

1   somewhere.

2       Q    I think we'll probably come to that.

3            When you say that the prosecution -- and I

4   don't want to get into deliberative process issues, soy

5   eel leave it at that, the prosecution came to the

6   conclusion that there wasn't sufficient credible

7   evidence to present this claim, or to charge this

8   charge.

9       A    Allegation, support the allegation.

10      Q    Well, you don't charge someone with an

11  allegation.  You charge someone with a crime?

12      A    Well, I believe the idea that Building 771 had

13  been use utilized during the period of the shutdown was

14  included in the search warrant affidavit.

15      Q    Right.  There was overflight for --

16      A    Yes, there were overflights by some kind of FBI

17  infrared or ultraviolet secret plane which were reported

18  to me as not having reached the conclusion that is at

19  least preliminarily were thought to be the case.  But

20  I'm reasonably sure that was one of the allegations that

21  was included in the search warrant affidavit, and it was

22  a matter of great concern because of the other

23  allegations that were included in the search warrant

24  affidavit of environmental-related problems.

25           I'm not sure what your question was, but maybe

86

1    I forgot it.

2        Q    You were responsive.  I'm pausing to reflect on

3    the following issues which is that you just told me a

4    little bit about what I'm going to call internal DOJ

5    communications within the broad prosecution team.

6        A    Well, I think Building 771 was fairly well pub

7    sized as to what was alleged and what was found.  So I

8    don't believe I have any constraints that discussing

9    Building 771.

10       Q    And is that because there has been a lot of

11   publicity and disclosure around those events already?

12       A    That's correct.

13       Q    So you wouldn't be divulging --

14       A    That's not already out there.

15       Q    I follow what you're saying.

16            There were a couple of witnesses that had been

17   interviewed in the investigation who said that the

18   incinerator had been operated, weren't there?

19       A    I believe that's the case.  I did not

20   participate in any of the grand jury sessions

21   regarding -- I may have been to one or perhaps two short

22   periods of time of testimony before grand jury of

23   witnesses, but I didn't participate in -- I wasn't

24   personally present for the grand jury.  But I believe

25   that's the case; that there were two witnesses who

87

1    alleged that the incineration had been used during the

2    period of the DOE announced shut down.

3        Q    Ms. Brever and Pitts?

4        A    I recall the name Brever, B-r-e-v-e-r, and I

5    don't recall the other person's name.

6        Q    But it could have been Karen Pitts?

7        A    Could have been who.

8        Q    The name of the other witness could have been

9    Karen Pitts?

10       A    It certainly could have been.

11       Q    And do you recall whether one of the issues

12   with those witnesses was whether they were able to

13   specify dates for the alleged operation of the

14   incinerator that fell within the period of the DOE

15   ordered shutdown?

16       A    I recall there was no ability to independently

17   corroborate the allegations they had made of the use of

18   the incinerator during the DOE announced shutdown.

19   Whether or not it was dates or simply something else, I

20   don't know.  There was no other corroboration that was

21   able to be developed in that regard.  Whether it was

22   from other witnesses, from documents, from, you know,

23   whatever it might have been.

24       Q    Did you evaluate what incentive Rockwell or DOE

25   employee might have to lie about whether the incinerator

88

1   had been operated?

2        MR. TAYLOR:  Object to the form.

3   A    Evaluate what again?

4   Q    (By Mr. Nordberg)  Did you evaluate what

5   incentive if any, they might have to lie about that?

6        MR. TAYLOR:  Objection; vague, argumentative.

7   A    We evaluated everything we possibly could to

8   determine the truth of the allegation, at least the

9   investigative prosecution team.  And I can't really give

10  you any different answer than there was no independent

11  corroboration developed.

12  Q    (By Ms. Nordberg)  Prosecutors normally prize

13  eyewitness testimony, don't they?

14  A    You're going to have to speak up a little bit.

15  Q    I'm sorry.  My voice tends to trail off,

16  especially when I haven't had enough coffee.

17       Prosecutors normally prize eyewitness

18  testimony, don't they?

19  A    They normally prize eyewitness testimony?

20  Q    Yes.  Eyewitness testimony is something that

21  prosecutors normally consider an effective and valuable

22  form of evidence?

23  A    It certainly can be.

24  Q    Did you ever interview Ron Avery, or do you

25  know if anyone in the prosecution team --

89

1       A    I didn't interview Ron Avery.  I don't know who

2    Ron Avery is.  Someone may have interviewed him, but it

3    wasn't me.

4            I have to just add here, just to make sure, and

5    possibly to short-circuit these questions.  I, myself,

6    was not involved as an investigator in this case.

7    Likewise, I, myself, was not involved in terms of

8    evaluating the evidence from the investigation in this

9    case.  I, myself, was involved in taking reports from

10    the lead prosecutor in the case, Mr. Fimberg, and

11    occasionally Mr. Murtha, who was colead prosecutor, at

12    times when decisions needed to be made by the United

13    States Attorney for the District of Colorado and making

14    decisions as best I could.

15       Q    That's helpful.  Thank you.

16            So in evaluating what I'm loosely going to call

17    the strength of the evidence -- or what I'm loosely

18    going to call this claim about Building 771 -- was

19    strong enough, you didn't yourself talk to the

20    witnesses?

21       A    That's correct.

22       Q    You relied on other people in the prosecution

23    team or the investigative team to describe their

24    statements or testimony to you?

25       A    That's correct.

90

1    Q    And you relied on their evaluations of the

2    strength and the credibility of these witnesses?

3    A    That is correct.  And, again, primarily on the

4    evaluations of Ken Fimberg and all of the members of the

5    team who you just sort of collectively identified.

6    Q    Do you know whether me interviewed either

7    Ms. Brever or Ms. Pitts?

8    A    I assume so, but I don't know.

9    Q    Is that something you might have asked him at

10    the time if he told you we have an opinion about their

11    testimony?

12    A    You know, if he did tell me that, then -- I

13    don't quite know how to answer that question, really.  I

14    can only tell you that the consensus of the opinion of

15    those involved in the investigation, as represented to

16    me by Mr. Fimberg, was that the incineration system had

17    not been used during the period of shutdown, so that's

18    basically all I can tell you about that.  Anything else

19    is sheer speculation on my part as to whether or not

20    anyone else knew or didn't know or interviewed or wasn't

21    interviewed.

22    MR. NORDBERG:  Thank you.  It's now noon.  Why

23    don't we break until 1:15.

24    THE DEPONENT:  Okay.

25    (A lunch recess was taken from 11:59 a.m. to

91

1          1:17 p.m.)

2     Q     (By Ms. Nordberg)  Hello again, Mr. Norton.

3     A     Hello.

4     Q     A couple of things to go back and clean up from

5     this morning.  I think you had said that you had been

6     acquainted with the Bartletts for some time; is that

7     correct?

8     A     That's correct.

9     Q     Have you ever spoken with them about the Cook

10    versus Rockwell lawsuit?

11    A     Not to my knowledge or recollection.  I'm

12    confident they've mentioned their concerns over the

13    value of their property in Arvada, which I believe they

14    no longer own, and the impact of the Rocky Flats

15    facility on their property, but I know nothing habit the

16    details or the facts.  It was just a concern that has

17    been expressed by them from time to time.

18    Q     So those conversations are friendly, but you

19    don't have an opinion --

20    A     I have no opinion whatsoever.

21    Q     -- about the value of their property or the

22    impact of Rocky Flats on them?

23    A     No.

24    Q     I think I know the answer to this question, but

25    I have to ask it anyway.  Do you have any opinion about

92

1   who should win the Cook versus Rockwell lawsuit?

2       A    No.  I don't even know who the parties are,

3   other than Mr. and Mrs. Bartlett.

4       Q    Class representatives, yes.  Do you have any

5   meetings scheduled with any representative of defendants

6   between now and Wednesday morning?

7       A    No.

8       Q    If representatives of defendants asked you to

9   attend a meeting with them, would you attend it?

10      A    Maybe.

11      Q    If plaintiffs asked you to attend a meeting

12  with plaintiffs, would you attend?

13      A    Maybe, but I assume that's what this is about.

14      Q    Are you curious about what subjects defendants

15  will ask you to testify about at trial?

16      A    No.

17      Q    You know what you know, and the answers are the

18  answers?

19      A    That would be correct.

20      Q    Okay.  I just need to confirm, too, that you're

21  not a class member?

22      A    No, I'm not a class member.  I'm not in any

23  way, shape, or form associated with any party, any class

24  on any side of the litigation or any attorney associated

25  with the litigation.

93

1    Q    Right.  Even if you weren't, but resided within

2  a certain area or owned property within that area on the

3  date of the raid, then that's going happen in class

4  actions.  You might find yourself a member of the class

5  without having initiated that status.

6    A    I never received any notice from anybody

7  regarding potential involvement or inclusion in any

8  class.

9    Q    Where do you live?

10   A    At this point in time I live in Arapahoe

11  County.  At that point in time I lived in Jefferson

12  County, near central Jefferson County; 32nd and

13  Youngfield; quite a way south of the Rocky Flats

14  facility.

15   Q    About how far south would you say?

16   A    Probably 16 miles.  That's my guess.

17   Q    I think it can be therefore stated with

18  authority that you are not a class member.

19        Did you own any other property in Jefferson

20  County, apart from the property where you lived, at that

21  time?

22   A    No.  Not at that time nor -- no, nor at any

23  time in between.

24   Q    I'm going ask you now to continue to go through

25  this first sentencing memorandum.  Do you have that in

94

1   front of you?

2        A    Uh-huh.

3        Q    If you could you turn to Page 25.

4        A    Okay.  I'm there.

5        Q    Beginning midway through the first paragraph

6   under the heading "Solid Mixed Wastes," the memorandum

7   reads, "Historically, the treatment and storage of

8   combustible residues involved their incineration in the

9   Building 771 'nuclear recovery' incinerator, where --

10  the theory went -- the scrap material was reduced to an

11  ash from which plutonium could allegedly be recovered.

12         "This practice raised the question however, in

13  one form or another, of whether the hazardous waste

14  constituents were not at the same time being treated or

15  disposed of.  Since the Building 771 incinerator did not

16  have, and has never had, a RCRA permit or interim status

17  to treat hazardous wastes, the next question was whether

18  the practice involved illegal RCRA treatment of

19  hazardous wastes.  It was Rockwell's and DOE's position,

20  in the 1980s, that the Building 771 incinerator involved

21  recycling activity which was beyond RCRA's reach."

22         Do you see that?

23       A    I do.

24       Q    Has anything happened since you signed this

25  document to change your beliefs on the subject of the

95

1    text I just read to you?

2       A    No.

3       Q    It goes on to say in the sentencing memorandum,

4    "While the investigation showed that hazardous wastes

5    were indeed treated in the Building 771 incinerator, as

6    part of the alleged plutonium recovery process, no

7    charges are being brought concerning this practice,

8    since it was endorsed and directed by DOE at a broad

9    institutional level.  In this particular circumstance,

10   criminal prosecution is not appropriate."

11           Do you see that?

12      A    I do.

13      Q    Anything happened since you signed this

14   document to change your views?

15      A    I'm not aware of anything, and my views haven't

16   changed.

17      Q    The concluding paragraph on Page 27 reads, "It

18   should nonetheless be noted that the United States

19   investigation showed that," underlined, "no incinerator

20   ash produced by the Building 771 incinerator since at

21   least 1980," begin underlining, "has ever been used to

22   recover plutonium," end underlining, "even though such

23   recovery was the alleged basis for the incinerator's

24   RCRA exemption."

25           Do you see that?

96

1      A     Yes.

2      Q     Any changes in your view since you signed this

3   document?

4      A     I know of no changes that would cause me to

5   change my view, and they haven't changed.

6      Q     Okay.  So at least in the case of the operation

7   of the Building 771 incinerator, it was part of the

8   basis of DOJ's decision not to bring charges that in

9   DOJ's view this process -- this practice had been

10   endorsed and directed by DOE at a broad institutional

11   level, correct?

12      A     That's what the sentencing memorandum says, and

13   I believe it to be correct based on my understanding of

14   the investigation and the history of the investigation.

15      Q     All right.  In other words, if it says in the

16   sentencing memorandum that you signed that this was the

17   reason for nonprosecution of any charge on Building 771

18   done, that was the reason for the nonprosecution of any

19   charge on Building 771, correct?

20      A     That's certainly a reason.  I'm not aware of

21   any other reasons, but there may have been other

22   reasons.

23      Q     Fair enough.  Before I go on, let me step back

24   for a second and ask you, under your view at the time of

25   the plea bargain, were the offenses or violations to

1    which Rockwell pleaded guilty minor, technical, trivial

2    violations?

3         MS. AHERN:  Objection; compound.

4    A    I don't think they would be characterized as

5    minor, technical or trivial, otherwise I don't believe

6    Rockwell would have pled guilty and/or agreed to pay an

7    $18.5 million fine.

8    Q    (By Mr. Nordberg)  Did regard them at the time

9    to be serious environmental violations?

10   A    Yes.

11   Q    The next thing in the sentencing memorandum is

12   a lengthy discussion of pondcrete and saltcrete, which

13   I'm not going to read into the record or ask you to read

14   into the record because of its sheer size.

15        Do you have a general recollection of the

16   issues involving pondcrete and saltcrete as they relate

17   to this plea agreement?

18   A    I think so.

19   Q    Can you describe for me from your own memory

20   and your own words what your understanding of the basic

21   basis for the charge relating to pondcrete and storage

22   would have been?

23   A    As it was reported to me and as I understand

24   it, the concept of pondcrete and saltcrete was designed

25   to solidify by mixing hazardous waste with a concrete or

98

1    concrete substitute to create solid blocks, if you will,

2    of concrete in which was captured in a hardened form the

3    hazardous wastes, which were then to be shipped to a

4    hazardous waste disposal facility.  I think -- my

5    recollection is someplace in Nevada was the destination

6    for much of this stuff.  However, due to inadequate

7    inclusion of concrete in the blocks, the substance never

8    solidified and leaked on to pads and off into the ground

9    and ground water in the area.

10          That's what I know about pondcrete and

11   saltcrete.  I don't know how many blocks there were or

12   what the hazardous wastes specifically in the blocks

13   were at this point in time.  But that's the concept.

14       Q    Okay.  And what was it about Rockwell's

15   handling or storage of the pondcrete or saltcrete that

16   constituted a RCRA violation?

17       A    I think, at least as I understood it at the

18   time -- and I'm not a RCRA expert; other involved in the

19   process were -- that essentially the leakage of the

20   hazardous wastes in the blocks that were not solidified

21   constituted hazardous waste disposal.  And since there

22   was no permit for the disposal of the hazardous waste,

23   that was a violation under RCRA.

24       Q    And I understand that you're not a specialist

25   in RCRA and I'm not either.  To your understanding, does

1    the RCRA application or permitting process trigger any

2    form of regulatory control or oversight?

3         A    I'm not sure I understand the question.

4         Q    In other words, is the RCRA application just so

5    much paperwork, or does something happen once the party

6    submits a RCRA application?  How does that work?

7         A    I don't really know that I know the answer to

8    that.  My surmise is that a regulatory agency, whether

9    it be federal or state, by delegation determines whether

10   or not disposal permits should be issued to permitees.

11   And absent the issuance of a permit, the disposal of a

12   hazardous waste -- whether in this case through neglect

13   or oversight, or however it might be characterized --

14   gives rise to regulatory, civil, or criminal fines and

15   penalties.

16        Q    Turning now to Page 51 of the first sentencing

17   memorandum.

18        A    Uh-huh, I'm there.

19             MS. AHERN:  I'm sorry, what page?

20             MR. NORDBERG:  51.

21        Q    (By Ms. Nordberg)  Under the heading Count 3,

22   "Illegal Treatment and Storage of Hazardous Wastes in

23   Solar Pond 207C," once again, there are several pages

24   here that I'm not going read into the record.  I'm

25   interested if you could just provide a summary of this

1   charge involved, to your understanding, and if you need

2   to look at the document quickly to refresh your

3   recollection.

4        A    Yes, I don't have a present recollection of

5   these charges, so if you wish for me to answer that, I

6   will have to read through the first few pages.

7        Q    I think there are about three or four pages.

8   Do you want to take a quick look, or I can point you to

9   excerpts if you would like?

10       A    Go ahead and point, if it would save time.

11       Q    It might.

12            Beginning on Page 51, then, this document

13   reads, "Count 3 charges Rockwell with illegal treatment

14   and storage of mixed hazardous wastes in Solar

15   Evaporation Pond 207C, without a RCRA permit or interim

16   status.

17            "As mentioned earlier, Rocky Flats has had five

18   solar evaporation ponds since the 1950s and '60s which

19   were used to treat and store hazardous and mixed wastes.

20   By the time Rockwell began operating Rocky Flats in

21   1975, it was well known that the ponds were leaking and

22   contaminating the surrounding ground water.  In 1971 and

23   thereafter, various french drains and underground

24   intercepter trenches were installed in an attempt to

25   collect and control the leakage.  Still, the solar ponds

1    continued to impact the surrounding groundwater, causing

2    substantially elevated nitrate, chemical and radioactive

3    contamination.

4          "Amendments to RCRA in 1984 required that

5    surface impoundments like Rocky Flats' solar ponds meet

6    minimum technological standards in order to be

7    RCRA-permitted, and included requirements that the waste

8    ponds be double-lined and have a leachate collection

9    system, to protect groundwater from contamination.

10    Since Rocky Flats' solar ponds did not meet these

11    requirements and it would have been very expensive to

12    fix them, the Plant decided to 'close' the ponds.

13    Accordingly, Rockwell did not list the solar ponds on

14    any RCRA Part A application after 1984, and the ponds

15    did not have a RCRA permit or interim status to treat or

16    store hazardous or mixed wastes.

17          "In February 1985 at the direction of

18    Rockwell's environmental management, five signs were

19    erected at the solar ponds informing Rocky Flats'

20    workers:  'These solar ponds are closed.  Contact

21    Building 774 management for disposable of discardable

22    liquids.'  As part of the 1986 Compliance Agreement, DOE

23    committed to EPA and CDH that the ponds would be closed

24    and their contents removed, in accordance with RCRA

25    procedure.

1          "Despite this commitment -- which Rockwell was

2     well aware of, Rockwell continued to use pond 207C to

3     treat and store a hazardous mixed waste knows as 'salt

4     brine' or 'concentrate,' which was produced by liquid

5     waste treatment processes in Building 374.  At all

6     material times, salt brine was a corrosive hazardous

7     waste (D002) by virtue of its high pH, which typically

8     raged from 12.5 to 14, and also contained listed

9     hazardous wastes, including methylene chloride (F002),

10    acetone (F003), benzene (F004), and toluene (F004).

11    Salt brine was ordinarily reduce by a 'spray dryer' to

12    evaporator salt.  This salt, when combined with Portland

13    cement and salt brine, became saltcrete."

14         Stop right there.  Anything in what I've read

15    so far under this heading that you've changed your views

16    about since you signed this document?

17    A    I have no knowledge of any changes that would

18    cause me to change my view.

19    Q    At the time that you signed this document, your

20    knowledge of the facts as they were related to you by

21    Mr. Fimberg was fresher.  Is that fair to say?

22    A    Yes.

23    Q    Turning to Page 53, the document continues,

24    "The investigation discovered that Rockwell, from 1985

25    to April 8, 1988 knowingly transferred hazardous mixed

1    wastes -- that is, salt brine -- from Building 374 to

2    Solar Pond 207C on at least 28 occasions, even though

3    the pond did not have a RCRA permit or interim status.

4    Each transfer usually ranged from 10,000 to 15,000

5    gallons, and was generally made by Rockwell supervisors

6    in Building 374 and 774, with authorization from the two

7    buildings' managers.  The Rockwell managers, in turn,

8    asked for and received permission from Rockwell's

9    Manager of Waste Operations.  The transfers stopped when

10   the two large tanks increased Building 374's storage

11   capacity to 1.2 million gallons."

12         I think I just inserted a spurious word in that

13   last sentence which, therefore, I'll read again.

14         "The transfer stopped when two large tanks

15   increased Building 374's storage capacity to 1.2 million

16   dollars (sic).

17         MS. AHERN:  Gallons?

18         MR. NORDBERG:  Gallons, thank you.

19   Q    (By Mr. Nordberg) "DOE was not informed of

20   these transfers and was not aware that new mixed wastes

21   were being treated and stored in Solar Pond 207C without

22   legal authority.  On August 22, 1988, a Rockwell RCRA

23   manager wrote to DOE that, except for intercepted

24   groundwater being returned to the ponds, 'no other waste

25   is accepted by the Solar Ponds, and has not been

104

1    accepted for over a year,' since at least the summer of

2    1987.  As recently as November 1991, DOE stated that

3    'Pond 207C has not received process wastes since 1986.

4    But, in fact, Rockwell had used Pond 207C to treat and

5    store hazardous mixed wastes."

6         Did I read that correctly as amended from time

7    to time?

8         A    Yes.

9         Q    And has anything changed since you signed this

10   document to change your views about its contents?

11        A    No.

12        Q    Do you remember anything about the vacuum

13   filter sludge?

14        A    I don't have any present recollection of that

15   issue again either at this time without, again, reading

16   this document, which I would be happy to do.

17        Q    Well, let's take a quick look, as I think we

18   may do, since vacuum filter sludge is not the core of

19   the Cook versus Rockwell litigation.

20        MS. AHERN:  I thought it was.

21        MR. NORDBERG:  Not the first time the

22   plaintiffs and defendants have failed to see eye to eye.

23        Q    (By Ms. Nordberg)  However that may be, on

24   Page 56 -- well, first let's go back to Page 54.  The

25   first paragraph under Count 4 reads, "Count 4 charges

1    Rockwell with illegal storage of a mixed hazardous waste

2    known as 'vacuum filter sludge' without a RCRA permit or

3    interim status," correct?

4         A    That's what it says.

5         Q    In the second paragraph under that heading,

6    there is a description of vacuum and filter sludge that

7    reads as follows:  "At all material times, vacuum filter

8    sludge was a low-level mixed hazardous waste which was

9    EP toxic for cadmium (D006) and chromium (D007), and

10   also contained listed hazardous wastes, including

11   1,1,1-trichloroethane (F001), carbon tetrachloride

12   (F001), methylene chloride (F002), xylene (F003) and

13   n-butyl-alcohol (F003)."

14        Did I read that correctly?

15        A    Yes.

16        Q    On Page 56, the documents reads, "On June 13

17   through 17, 1988, a CDH inspection found 868 drums of

18   vacuum filter sludge stored in Building 964.  On

19   July 25, 1988, CDH sent a report to Rocky Flats which

20   noted the violation.  On August 2, 1988, Rocky Flats

21   finally sought approval to store vacuum filter sludge in

22   Building 964."

23        Did I read that correctly?

24        A    Yes.

25        Q    Has anything happened since you signed that

1    document to change your view?

2        A    No.

3        Q    Do you have a general recollection -- now

4    turning to the Clean Water Act violations to which

5    Rockwell pleaded -- of what the factual issues were, so

6    to speak, as they surrounded the Clean Water Act

7    charges?  And I'm not asking for details here.  I'm

8    asking for --

9        A    I'm recalling that the Clean Water Act charges

10   related to the spray discharge of wastewater through a

11   sprinkling system that was designed to get rid of such

12   waters, but was sprayed at times when it was impossible

13   for the waters to percolate into the soil due to the

14   frozen condition of the soil.  I'm not sure if that is

15   correct or not, but that's my recollection.  Again,

16   without rereading this section, I couldn't tell you if

17   that's correct or not.

18       Q    Right.  And do you have a recollection of

19   whether the spray irrigation -- is that what it was

20   called?

21       A    That's what I recall it being termed as.

22       Q    Do you have a recollection of whether that

23   spray irrigation was resulting or was thought to have

24   resulted in runoff --

25       A    Yes.

107

1      Q      -- of surface water?

2      A      Surface runoff into nearby drinking water

3   reservoirs.  I believe Standley Lake and Woman Creek and

4   some other reservoir the name of which escapes me.

5      Q      Great Western Reservoir?

6      A      Yes, I think that's it.

7      Q      At the time did you consider that to be a minor

8   or trivial or technical violation?

9      A      No.

10     Q      If you could turn to Page 72 to 73 of this

11   document.

12     A      Okay.  I'm there.

13     Q      And you'll see a single-spaced block of

14   quotations spanning both those pages, right?

15     A      Yes.

16     Q      And then at the end of the block quotation

17   there is a footnote superscript, Footnote 65, correct?

18     A      Yes.

19     Q      But neither in the text of the document

20   immediately following the quote, nor in the footnote, is

21   the source document for the quote identified, is it?

22     A      I haven't read the entirety of either those two

23   pages or the section.  But if you say it isn't, I will

24   certainly accept that.

25     Q      Well, you don't see one immediately adjacent to

108

1    the quote here anyway, do you?

2        A    I don't, outside -- I mean, the quote is

3    contributed to a consultant from Colorado State

4    University who was hired by Rockwell.  I have no

5    knowledge beyond -- I don't even know who the consultant

6    was.

7        Q    And you're referring there to what's written on

8    Page 72?

9        A    Page 72, right.

10       Q    Right before the quote, right?

11       A    Correct.

12       Q    You relied on Mr. Fimberg and other members of

13   the prosecution and investigative team to make sure that

14   any facts alleged or documents quoted in this document

15   were accurate and correct to the best of their ability;

16   true?

17       A    Correct.  This document was largely prepared,

18   if not entirely prepared, by Mr. Fimberg.

19       Q    And do you know who he consulted in preparing

20   the document?

21       A    I have no knowledge.  I mean, I'm assuming he

22   did so with Mr. Murtha, with Mr. Hassler, with Mr. Buck,

23   with other members of the Department of Justice staff in

24   Washington, D.C. in the Environment and Natural

25   Resources Division, and presumably with those involved

1   with the investigation from the FBI or EPA.

2      Q     Well, you say you're assuming.  Do you know?

3      A     Pardon?

4      Q     Do you have --

5      A     I have no knowledge.  I'm just assuming that to

6   be the case.  That would have been his style, that would

7   have been my expectation, and probably my request.

8      Q     Okay.  And this quote that's attributed to the

9   consultant from Colorado State University hired by

10  Rockwell to look at Rocky Flats ponds, on Page 73

11  includes the following language, and I'll quote now:

12  "Monitoring of the wastewater system is inadequate.  The

13  information supplied to me was insufficient to formulate

14  definitive conclusions.  It is obvious that monitoring

15  is limited to those times when discharges are in

16  progress and only those parameters included for

17  licensing are monitored."

18         It goes on to read, "There is no accountability

19  for the release of toxicants into the wastewater

20  system."

21         Do you see that?

22     A     Yes.

23     Q     Has anything happened since you signed there

24  document to doubt the truth of those statements?

25     A     No.

110

1     Q     Going on with the sentencing memorandum's

2   discussion of Clean Water Act issues on Page 74, quoting

3   from the sentencing memorandum itself now and not some

4   underlying document, the sentencing memorandum reads in

5   part, "While there was more than sufficient information

6   to put Rockwell on clear notice that problems existed,

7   there were only sporadic, usually crisis-oriented,

8   efforts to address the situation.  Even by

9   November-December 1988, the Rockwell employees and

10  consultants who were most directly involved with Rocky

11  Flats' Clean Water Act compliance 'didn't know' what

12  went to the sewage treatment plant and reliable

13  information simply did not exist.  In order to fill out

14  the necessary renewal document (including the Form 2C),

15  they scrambled for whatever data they could find, most

16  of which didn't meet the application's requirements."

17          Do you see that?

18     A     I do.

19     Q     Has anything happened since you signed this

20  document to make you doubt the truth of those

21  statements?

22     A     Not that I'm aware of.

23     Q     If I could ask you to turn to Page 80.

24     A     80?

25     Q     Yes.

1       A    I am there.

2       Q    Under the heading "Count 9," the first

3   paragraph reads, "Count 9 charges Rockwell with

4   knowingly violating Rocky Flats' NPDES permit by

5   operating the East Spray Field contrary to good

6   engineering practices and bypassing facilities necessary

7   to maintain compliance with the terms and conditions of

8   a Rocky Flats' NPDES permit," and then it goes on to

9   cite certain statutory code sections.

10          Is this, to your recollection, the spray

11  irrigation issue that you were talking about earlier?

12      A    It certainly sounds like it, and that's what

13  it's captioned under Paragraph G, Count 9, "Spray

14  Irrigation in Knowing Violation of the NPDES Permit."

15      Q    And the next paragraph reads, "The principal

16  way in which Rockwell addressed the discharge violation

17  'problem' was the same way it had addressed problems

18  with the quality of Rocky Flats' STP effluent and

19  surface waters on other occasions -- by spray irrigating

20  the water instead of discharging it.  But in doing so,

21  Rockwell continued to violate, as it had for several

22  years, other terms and conditions of Rocky Flats' NPDES

23  permit," right?

24      A    That's what it says.

25      Q    Any information come to your attention since

112

1    you signed this document that would cause you to doubt

2    those statements?

3        A    No, not to my attention.

4        Q    In a moment I'm going to ask you a few

5    questions about the sections of the sentencing

6    memorandum beginning on Page 107.  To set up those

7    questions, I want to ask you a couple preliminary

8    questions.

9             In the course of your work on the criminal

10   proceedings, during the investigation and after the plea

11   bargain, did it come to your attention that Rockwell

12   contended that certain allegation in the search warrant

13   were unfounded?

14       A    Rockwell made its views well known from the

15   beginning of the investigation that the allegations or

16   certainly the allegations at least that were set forth

17   in the search warrant had not, in fact, occurred,

18   including the Building 771 incineration issue which we

19   already talked about.

20       Q    Right.  Do you recall reading such statements

21   from Rockwell representatives in the press?

22       A    Do I recall doing what?

23       Q    Reading statements along those lines from

24   Rockwell's representatives or spokespeople in the press?

25       A    I can't tell you if I recall or don't recall

113

1    that.  There very well could have been --

2       Q    Do you recall --

3       A    -- press statements, but I really know.

4       Q    I'm sorry, I didn't mean to interrupt your

5    answer.  I apologize.

6            Do you recall receiving correspondence from

7    Rockwell or its representatives on this subject?

8       A    I don't.  That's not to say I didn't.  I just

9    don't recall it.

10      Q    Do you remember how you knew Rockwell was

11   taking issue with some, at least, of the allegations in

12   the search warrant?

13      A    Well, the two ways you mentioned were certainly

14   two possible ways.  About the only other way would be

15   in-person meetings with Rockwell attorneys and/or

16   in-person meetings with members of the prosecution team.

17      Q    Who themselves might have met with

18   representatives of --

19      A    Who themselves might have met with or read or

20   heard of or otherwise somehow had knowledge of those

21   issues.

22      Q    Okay.  And this is not a question.  I'm going

23   to suggest to you that this section of the sentencing

24   memorandum discusses certain of the allegations in the

25   search warrant that Rockwell had contested, or

114

1    concerning which Rockwell was not charged when the plea

2    agreement was entered into.  And perhaps the simplest

3    thing is to read the paragraph summarizing the section

4    which begins -- Section 5 on Page 107 and reads,

5    Although the charges to which Rockwell has pled guilty

6    concern a number of significant allegations and related

7    areas covered in the search warrant affidavit, a number

8    of the search warrant allegations are not charged and

9    merit some discussion.  In particular, various

10   allegations were made concerning:  (1) the use of the

11   Building 771 'nuclear recovery' incinerator during a

12   DOE-imposed shutdown of the building; (2) the use of the

13   Building 776 fluidized-bed waste incinerator to treat

14   hazardous wastes, contrary to DEO public statements that

15   it would not be so used; (3) unreported discharges

16   (including so-called 'exotic' or laboratory chemicals)

17   Walnut and Woman Creeks; and (4) a false certification

18   that Rocky Flats was in compliance with RCRA groundwater

19   monitoring requirements."

20           Do you see that?

21   A    I do.

22   Q    And I read that correctly?

23   A    Yes.

24   Q    Let's focus now first on the Building 771

25   incinerator.  Under heading A, that is only a paragraph

1   long, and I ask you just to take a moment and read that

2   to yourself, if you could.

3        A    All right.

4        Q    To your recollection, did you personally review

5   evidence obtained by EPA on this subject?

6        A    Not at any time during the investigation did I

7   personally review evidence.

8        Q    Did you personally -- it follows, then, that

9   you did not personally review any evidence obtained by

10  the FBI on this subject?

11       A    That would be correct.

12       Q    Did you personally review information provided

13  by Rockwell on this subject?

14       A    No, I don't think so.  Let me say this by way

15  of explanation.  Whatever I knew of or learned about

16  this investigation and/or prosecution came predominantly

17  from Mr. Fimberg.  Now, if Mr. Fimberg in making that

18  review with me presented synopsize or summaries of

19  evidence, it would have been entirely possible that he

20  did so.  And in that event, I would have to say the

21  answer to your question is yes, I reviewed evidence.

22  But I was not involved in the day-to-day investigative

23  review or analysis of the evidence.  So that's the only

24  way I can answer the yes.

25       Q    I understand.  Just so you know where I'm

116

1    coming from, my predicament is the defendants have

2    listed you as a witness in this case.  And one of the

3    things I have to test is whether you possess personal

4    knowledge on some of these points.

5        A    I possess no personal knowledge about this

6    matter.  Whatever I have know is hearsay.

7        Q    Now, this paragraph concludes with a clause or

8    phrase, "the United States has concluded that the

9    Building 771 incinerator was not operated contrary to

10   the DOE ordered shutdown," correct?

11       A    That's correct.

12       Q    Footnote 93 to which that clause then refers

13   us, reads, "Although the evidence does not show that the

14   incinerator was operated during the shutdown, the

15   investigation established the allegation that the

16   Building 771 incinerator was used at various times, with

17   DOE's approval, to treat hazardous wastes, without a

18   RCRA permit or interim status to do so.  The grand jury

19   investigation also revealed that, from at least 1980

20   forward, none of the Building 771 incinerator ash was in

21   fact used to recover plutonium."

22            Did I read that correctly?

23       A    Yes.

24       Q    Have any facts come to your attention since

25   you've signed this document that would cause you to

117

1    doubt those statements?

2         A    No.

3         Q    Turning then to Section B on Page 108 -- and,

4    again, we're dealing with allegations from the search

5    warrant that weren't charged.  I would again just ask

6    you to read that short paragraph quickly to yourself,

7    and I will have a couple of questions.

8         A    All right.

9         Q    And the gist of this paragraph is that the

10   building 776 incinerator wasn't used to treat or dispose

11   of hazardous or mixed wastes, correct?

12        A    That's correct.

13        Q    Except maybe for some experimental or test

14   burns, right?

15        A    That's what it says.

16        Q    Do you remember whether evidence was developed

17   in the criminal investigation of waste streams

18   terminating and the storage of hazardous waste in

19   Building 776?

20        A    I don't really remember anything -- I'm not

21   even sure I remember what's written here, but I don't

22   remember what you just asked.

23        Q    Fair enough.  Turning to Section C, again, if

24   you could just take a moment to read those two

25   paragraphs quickly.

118

1    A    Okay.

2    Q    Okay?

3    A    Not quite.

4         All right.

5    Q    Now, this paragraph is about the discharge of

6    certain laboratory chemicals into Walnut Creek, right?

7    A    Yes.

8    Q    And the gist of it is that although the precise

9    source of those chemicals was not identified in the

10   investigation, the United States stood behind the

11   allegations in the search warrant, correct?

12   A    Yes.

13   Q    And also behind the proposition that the

14   presence of those chemicals was consistent with the

15   improper discharge of waste streams into Walnut Creek,

16   correct?

17   A    Yes.

18   Q    The section also goes on to say, "Based on

19   aerial infrared surveillance . . . that a direct

20   discharge had been observed in December 1988 from the

21   sewage treatment plant to Woman Creek," right?

22   A    Yes, it says that.

23   Q    And then it says, "Further investigation showed

24   that this and similar discharges were primarily runoff

25   from the spray irrigation fields (as charged in Count

119

1   9)," right?

2       A    Yes.

3       Q    Forgive me, I'm struggling to find a way to ask

4   this question.

5            If you can tell me, what is the relationship

6   between the first sentence -- I'm in the paragraph

7   beginning "Based on aerial infrared surveillance."  And

8   my question is, if you can tell me, what is the

9   relationship between the first sentence and the second

10  sentence?  Is the second one qualifying, explaining,

11  contradicting, or doing something else with respect to

12  the first sentence?

13           MS. AHERN:  Objection; foundation, calls for

14  speculation.

15      Q    (By Ms. Nordberg)  If you know.

16      A    I have no independent knowledge, other than

17  what's written here.  I can surmise what it says, but

18  beyond that, I can't give any further explanation.

19      Q    Fair enough.

20           The next section of the sentencing memorandum,

21  I believe, is about the fine.

22      A    What page are you on?

23      Q    More broadly maybe it's about the sentence.

24  I'm in the section beginning on Page 113, Roman Numeral

25  VII captioned "Factors to be Considered in Imposing a

1   Sentence."  And the first question I'm going ask about

2   this document is going to be on Page 118, but before I

3   ask that question, do you have a general memory of

4   how -- and I'm not talking about deliberative processes,

5   meetings, calls, memos.  I'm talking about the reasoning

6   that the Department of Justice engaged in to set a level

7   for the fine in the plea agreement that the DOJ thought

8   would be an appropriate disposition.

9        A    Once it was determined that there was not a

10  credible basis to proceed against individuals on any

11  criminal violations -- that there was no substantial

12  evidence on which to charge individuals -- the next

13  question was, was there a basis to charge the

14  corporation for criminal violations.  And as we've just

15  gone through with a variety of criminal violations that

16  you've outlined, we thought the answer to that was, yes,

17  there was a significant enough evidentiary basis to

18  pursue the charging of crimes against the individuals --

19  excuse me -- against the corporation.

20            Then we got to the discussion or the point

21  about deciding how to calculate a monetary fine, which

22  is all the corporation can do -- or perform by way of

23  criminal compliance with a criminal conviction.  And

24  that was an area of great debate and controversy within

25  the prosecution team, ranging from views that Rockwell

121

1    should be paid for the trouble it had been paid put to

2    by one prosecutor, to fines in the $50 million or more

3    range by another, to fines in the 4 to $6 million range

4    by a third, and a group of people associated with the

5    third view to dialogue about what we thought would be

6    fair under the circumstances to a dialogue of what we

7    thought would be sufficiently punitive to punish the

8    conduct on the one hand and deter like conduct from

9    others.

10           At some point in time a number between 15 and

11   $20 million was reached, although I think that the

12   initial opening demand was substantially higher than

13   that, and dialogue about how to come to closure with

14   simply collegial consensus, discussion within the group,

15   including input from the defendant at this point in time

16   who thought it ought to be paid for the trouble it had

17   been put to.

18       Q    Did the factors that you looked at in

19   evaluating the level of the fine include fines imposed

20   for comparable or other environmental violations in

21   other cases throughout the country?

22       A    Yes.

23       Q    And you wanted it to be a substantial fine?

24       A    Yes.

25       Q    And you wanted the fine to be imposed that DOE

122

1 would not indemnify?

2      A     Correct.

3      Q     And so after all of this discussion, in light

4 of that and other factors that you considered and that

5 you mentioned, you came to something in the 15 to

6 $20 million range.  Is that how the level of the fine

7 was arrived at?

8      A     Generally.  I think there were some analysis of

9 the -- these laws, as I recall, provide for daily fines,

10 and there was some analysis of what the daily fine

11 calculation would be for the period of time of the

12 violations.  There was some really simply professional

13 determination of what a likely fine would be that would

14 be imposed by a sentencing judge under the circumstances

15 of the nature of the offenses charged for which guilty

16 pleas were entered.  All those factors evolved to the

17 point where we ultimately settled on the $18.5 million

18 level.

19      Q     And when the deal was done, so to speak, those

20 dollar values for daily violations that were charged

21 corresponded to the figure in that 15 to $20 million

22 range, right?

23      A     I don't know if the daily violations on a

24 cumulated basis corresponded or not.  But the fine range

25 was deemed acceptable by at least the government.

123

1    Q    Okay.  We may need to take a look back -- if I

2    can find my own copy -- to the two documents that were

3    marked as one document, the first of those being the

4    plea agreement and statement of factual basis.

5    A    Okay.  I have it.

6    Q    If you would look at Page 2.

7    A    Okay.

8    Q    Spanning Pages 2 to 3 are two columns, the

9    first one headed "Charge" and the second headed

10   "Penalty," correct?

11   A    Yes, I see it.

12   Q    And then for each penalty do you see there is a

13   citation to a US Code provision for the number of

14   dollars per day of violation?

15   A    Yes.

16   Q    And then do you see that there is a number of

17   days of violation for each of these counts, a number of

18   days violation multiplied by that dollar value per day

19   of violation to give a total fine associated with that

20   count?

21   A    I see that.

22   Q    And then do you see at the bottom on Page 3

23   next to the words "Total Fines" the total of

24   $18,500,000?

25   A    Yes.

124

1       Q     So the statutory fines for the daily violations

2    with which Rockwell was charged equated to the total

3    fines for violations to which it pleaded, correct?

4       A     It appears as though that's the case.

5       Q     DOJ had evidence, didn't they, that Rockwell

6    had violated the relevant statutory provisions cited on

7    Pages 2 and 3 of the plea agreement and statement of

8    factual basis on days in addition to those for which

9    Rockwell was charged?

10      A     I think so.

11            MS. AHERN:  Object to foundation.

12      Q     (By Ms. Nordberg)  I'm sorry?

13      A     I think the answer is yes, but I don't know for

14   sure.

15      Q     But to your recollection, was the number of

16   days selected as part of calculus that would make the

17   total fine equate to $18,500,000?

18      A     Yes.

19      Q     Is it, therefore, fair to say to that extent --

20   and only to that extent -- that the fine amount on

21   which, I guess, the parties had settled drove the number

22   of daily violations with which Rockwell would be

23   charged?

24      A     I think that would be accurate.

25      Q     If I could ask you to turn now to the promised

125

1   Page 118 of the sentencing memo.

2       A    All right.  I'm there.

3       Q    I'm going to read to you from the last

4   paragraph in this subsection.  It reads, "The crimes

5   here were institutional crimes -- committed by one

6   institution call Rockwell" -- I suppose that should read

7   "called Rockwell."  -- "and fostered, in a significant

8   sense, by another institution called DOE.  They were not

9   crimes of a few 'rogue' individuals, but rather were the

10  result of a culture, substantially encouraged and

11  nurtured by DOE, where environmental compliance was a

12  much lower priority than the production or recovery of

13  plutonium and the manufacture of nuclear 'triggers.'

14  For these reasons, the United States believes that it is

15  more appropriate to charge Rockwell, as an organization,

16  with this collective, institutional conduct.  While DOE,

17  as a governmental entity, cannot be charged, this

18  document serves in part to make governmental officials

19  and the general public aware of the Energy Department's

20  serious environmental failures in most of the 1980s."

21          Do you see that?

22      A    I do.

23      Q    Has any information come to your attention

24  since you've signed this document that would alter your

25  views?

126

1     A     No.

2     Q     On Page 119 under the next heading, the

3  document reads, in the first sentence of that section,

4  "Criminal violations of environmental statutes have the

5  potential to, and often do, result in enormous injury.

6  Therefore, adequate deterrence is essential to future

7  avoidance."

8          Do you see that?

9     A     I do.

10     Q     And was that deterrent a factor in your

11 evaluation of the appropriate level for a fine?

12     A     Yes.

13     Q     On Page 124 under the heading of "Lack of

14 Substantial Off-Site Impacts."

15     A     I'm there.

16     Q     As you are probably aware, this section of the

17 sentencing memorandum has been the subject of some

18 public and private discussion and debate.  And I think

19 you may have been asked about it at the Wolpe

20 subcommittee hearings.

21          A little earlier we looked at -- whether or not

22 we looked at the document, I think I asked you whether

23 Rockwell had been interested, in the course of the plea

24 negotiations, in securing a statement from the

25 government or from DOJ to the effect that there had been

127

1   no substantial off-site physiological harm or the

2   imminent threat of off-site physiological harm.  Do you

3   remember that?

4       A    Yes.

5       Q    And, indeed, in the second document that was

6   marked as one document but was really two -- which I

7   happened to have mislaid --

8       A    Here you go.

9       Q    Thank you -- the Department of Justice had

10  agreed in Paragraph 10A that it would make such a

11  statement, correct?

12      A    Correct.

13      Q    And is it fair to say this sentencing

14  memorandum is the occasion on which that statement was

15  made?

16      A    It is certainly one of the occasions on which

17  that statement was made.

18      Q    Okay.  And in particular, in the first sentence

19  under heading "H, Lack of Substantial Off-Site Impacts"

20  on Page 124, the statement is made, "Based on the

21  evidence gathered in this investigation, and to the best

22  of the Justice Department's present knowledge and

23  information, the conduct to which Rockwell has pled

24  guilty did not result in substantial physiological harm,

25  or the imminent threat of substantial physiological

128

1    harm, to members of the public residing and working

2    outside Rocky Flats' boundaries," right?

3        A    Yes.

4        Q    I want to go over some of the limitations and

5    caveats in this statement.  The statement is made,

6    "Based on the evidence gathered in the investigation,"

7    correct?

8        A    Correct.

9        Q    It's made only to the best of the Justice

10   Department's then present information and information,

11   correct?

12       A    Correct.

13       Q    It covers only to the conduct to which Rockwell

14   pleaded guilty, right?

15       A    That's correct.

16       Q    The statement is limited to substantial

17   physiological harm, or the imminent threat of

18   substantial physiological harm, correct?

19       A    That's what it says.

20       Q    And insofar as it involves the threat of

21   physiological harm, it's limited to an imminent threat

22   of physiological harm, correct?

23       A    That's what it says.

24       Q    Do you know what the latency period is for

25   cancer?

129

```
 1      A    Do I know what?

 2      Q    The latency period for cancer?

 3      A    I have no knowledge of --

 4      Q    From exposure to symptoms.

 5      A    I have no understanding of that.

 6      Q    That paragraph concludes with a footnote,

 7  Superscript 106 which refers to a footnote on Page 125

 8  which reads as follows:  "It's important to note that

 9  the criminal" --

10      A    I'm sorry.  Where are we?

11      Q    We're on Page 125, Footnote 106 --

12      A    All right.

13      Q    -- which reads, It's important to note that the

14  criminal investigation involved various inquiries into

15  discrete instances of potential criminal conduct, and

16  was not (and was never intended to be) a broad-based

17  public health or environmental survey of Rocky Flats and

18  all of the problems or issues associated with the site.

19  To say that Rockwell's particular criminal conduct does

20  not appear to have caused substantial off-site

21  physiological harm is not to say that serious

22  environmental issues don't exist at the Plant which

23  demand substantial attention."

24           Did I read that correctly?

25      A    Yes.
```

130

1    Q   Obviously you agreed with that statement at the

2  time you signed this document?

3    A   I did.

4    Q   Has anything happened since you signed this

5  document to change your mind?

6    A   Not to my knowledge.

7    Q   To the extent that you know, what investigation

8  were conducted by the United States Department of

9  Justice or persons associated with the criminal

10  investigation, including people from EPA, to determine

11  whether the conduct with which Rockwell had been charged

12  resulted in substantial off-site physiological harm?

13    A   I don't know.

14    Q   So you don't know what that statement was based

15  on?

16    A   It's based on the representations and

17  assurances of the prosecutors to me; based upon the

18  evidence gathered that those facts were accurate.

19    Q   So you respected them?

20    A   Absolutely.

21    Q   And you trusted them?

22    A   I did.

23    Q   And you have no personal knowledge of what that

24  statement is based on?

25    A   No, not at this time.  I may have at the time,

131

1    but I don't at this time.

2        Q    Is there something that we could look at that

3    would help you remember whether you had personal

4    knowledge at the time?

5        A    I have no way of knowing what might exist that

6    you could look at.

7        Q    You can't even think --

8        A    In the 3.5 million pages of documents you

9    referred to before, there may be something, but I don't

10   know what it is.

11       Q    Do you think it's likely that you are going to

12   be looking at a document between now and, shall we say,

13   Wednesday, that would refresh your memory?

14       A    Not if I can help it.

15            MR. BLUM:  Be right back.

16            (Mr. Blum left the deposition.)

17            (Deposition Exhibit 6 was marked.)

18       Q    (By Ms. Nordberg)  Would you take a quick look

19   at Norton Exhibit 6, sir, and tell me if you are able to

20   identify it.

21       A    It bears my signature on Page 21, it's dated

22   May 28, 1992, and it's captioned "Plaintiff's

23   Supplemental Sentencing Memorandum," to which is

24   attached a series of attachments, exhibits, and charts,

25   I believe.

132

1    Q    Okay.  Do you have a memory of the

2  circumstances leading to the -- well, and it appears to

3  have been filed?

4    A    It appears to have been filed in the US

5  District Court in the District of Colorado in connection

6  with this case.

7    Q    And by "this case," you mean the US versus

8  Rockwell?

9    A    Correct.

10   Q    And do you have a memory of the circumstances

11  leading to its preparation or filing?

12   A    I don't.

13   Q    I am going to direct you to a few spots in this

14  memorandum starting on Page 2.

15   A    Okay.

16   Q    The first paragraph there under the caption II,

17  "Rockwell Has Pled Guilty to Serious Environmental

18  Crimes."  It reads "Rockwell devotes a great deal of its

19  Sentencing Memorandum to pointing out that the United

20  States' investigation failed to prove certain

21  'sensational allegations' against the company.  The

22  United States, in the interest of fair disclosure, and

23  following a careful investigation, has candidly

24  acknowledged that several publicized allegations at the

25  time of the June 1989 search warrant were not borne out.

133

1    But it was not the United States which classified

2    certain allegations as 'sensational,' and the

3    characterization is nothing more than a Rockwell

4    invention to divert attention to divert attention from

5    the serious crimes to which it has pled guilty.  Whether

6    or not a particular allegation was 'sensational' was

7    never a measure of whether serious crimes had occurred,

8    or were occurring."

9           Do you see that?

10    A    I do.

11    Q    I read it correctly?

12    A    Yes.

13    Q    And then there is a footnote.  Footnote 1 on

14    that same page reads, "The crimes charged bear a

15    substantial similarity to the violations and types of

16    violations alleged in the search warrant, even though

17    the warrant was based on preliminary evidence.  While

18    most of the allegations were borne out to varying

19    degrees, our Sentencing Memorandum acknowledges certain

20    allegations which were not established, and explains why

21    other allegations, although established in one respect

22    or another, were not in fact charged (such as the

23    incineration of mixed wastes in the Building 771

24    incinerator)."

25           Do you see that?

134

1     A     I do.

2     Q     Did I read it correctly?

3     A     Yes.

4     Q     Obviously you agreed with these statements at

5   the time you signed this document?

6     A     Yes.

7           (Mr. Blum entered the deposition.)

8     Q     (By Ms. Nordberg)  Is it customary, by the way,

9   to file supplemental sentencing memoranda in criminal

10  proceedings?

11    A     It depends on the case; I suppose.

12    Q     What are some of the reasons that might lead to

13  the filing of a supplemental sentencing memorandum, in

14  general?

15    A     For the reasons set forth in the paragraph you

16  just read; a disagreement or dispute with the analysis,

17  that in this case the defendant had provided to the

18  Court with respect to the crimes to which the defendant

19  had pled guilty.

20    Q     Were you generally aware that spokespersons for

21  Rockwell --

22    A     Was I generally aware of what?

23    Q     I'm sorry, let me start that question over.

24          At and around the time of the plea agreement,

25  were you generally aware that spokespeople for Rockwell

1   were citing the plea bargain for the proposition that

2   Rockwell had been pretty much exonerated of doing

3   anything seriously wrong?

4       A    No, not that I can recall anyway.  Certainly

5   it's possible at the time, but I don't recall that at

6   this point in time.

7       Q    Do you recall what Rockwell had said or done

8   that led to the government to want to file this

9   supplemental sentencing memorandum?

10      A    Only what's set forth here.

11      Q    Okay.  Going on to Paragraph 4.

12      A    Paragraph 4?

13      Q    I'm sorry, Page 4.  The document reads,

14  "Rockwell's crimes were hardly 'technical.'  The

15  company's violations were pervasive, and ran through

16  entire areas of Rocky Flats' waste operations and

17  environmental activities.  In the area of liquid mixed

18  wastes, for instance, illegalities affected virtually

19  every waste form involved in those processes -- from

20  salt brine and saltcrete to vacuum filter sludge.  Rocky

21  Flats' surface water system ---from the sewage treatment

22  plant to the holding ponds and spray irrigation -- was

23  out of control."

24          And then there's a citation to plaintiff's

25  original sentencing memorandum.

1          The document continues, "In short, Rockwell's

2     crimes speak for themselves.  They involved knowing,

3     potentially dangerous and concealed misconduct, and

4     little points served in calling them 'sensational' or

5     'nonsensational.'  Simply put, Rockwell has pled to

6     serious crimes involving 330 instances knowing felonious

7     conduct, and 80 instances of criminal negligence, from

8     1987 to 1989."

9          Do you see that?

10     A     I do.

11     Q     Did I read it correctly?

12     A     Yes.

13     Q     Has anything changed since you've signed this

14     document to alter your views?

15     A     Not to my knowledge.

16     Q     On that same page under the heading Roman

17     Numeral III which reads, "Rockwell had day-to-day

18     control over Rocky Flats, and played a substantial role

19     in making and spending its budget."

20          The document reads, "Plaintiff's Sentencing

21     Memorandum acknowledges DOE's substantial role in

22     causing or allowing Rocky Flats' environmental problems,

23     but Rockwell goes too far in absolving itself of

24     significant responsibility for those problems.  Contrary

25     to Rockwell's Memorandum, federal government control of

137

1    the Plant's day-to-day operations was not 'pervasive,'

2    and Rockwell's operations were not 'closely supervised.'

3    As we indicated in our original submission, 'Rockwell,

4    for all intents and purposes, ran [Rocky Flats].'  DOE's

5    environmental oversight was extremely thin, and EPA and

6    the Colorado Department of Health had only limited and

7    infrequent access to the plant."

8          Did I read that correctly?

9    A    Yes.

10   Q    Has anything happened since you've signed this

11   document to change your views?

12   A    Not to my knowledge.

13   Q    Turning to Page 11.

14   A    I'm there.

15   Q    The first paragraph at the top of the page

16   reads, "The investigation asked both DOE and Rockwell

17   budget and program managers to identify any instance,

18   from 1987 to 1989, in which DOE had denied Rockwell

19   funding in a situation where Rockwell had explained to

20   DOE that a lack of funding would cause the Plant to

21   break the law.  No witness, either from DOE or Rockwell,

22   identified such an instance.  According to DOE, the

23   first time Rockwell said that it couldn't meet

24   production and comply with the law was after the search

25   in June '89."

138

1          Did I read that correctly?

2     A    Yes.

3     Q    Has anything happened since you signed this

4    document to change your views?

5     A    No.

6     Q    Turning to Page 17, Footnote 13.

7     A    Page 17, I'm there.

8     Q    Footnote 13 reads, "In concluding this

9    investigation, the Justice Department has stated that,

10   to the best of its presence knowledge and information,

11   the conduct to which Rockwell has pled guilty did not

12   result in substantial physiological harm, or the

13   imminent threat of physiological harm, to members of the

14   public residing and working outside Rocky Flats'

15   boundaries.  We express no view on whether the Plant or

16   its proximity (or alleged contamination from the Plant)

17   has affected surrounding property values or caused

18   psychological or emotional distress."

19          Do you see that?

20    A    I do.

21    Q    I read it correctly?

22    A    Yes.

23    Q    Nothing happened since you signed this document

24   in 1992 to change your views?

25    A    No.

139

1          (Deposition Exhibit 7 was marked.)

2     Q    (By Ms. Nordberg)  Mr. Norton, I would ask you

3  to take a look at Exhibit 7.

4     A    Yes, I have.

5     Q    And tell me what it appears to be.

6     A    It appears to be a copy of a written statement

7  that I prepared and presented to the Wolpe subcommittee.

8  I've forgotten the specific subcommittee name.  It's

9  dated September 23, 1992.  I presume that's the date I

10  appeared before the subcommittee, but I'm not sure.

11          I don't think it's a complete copy.  I think

12  there were some attachments that were presented with the

13  statement itself which are not here.

14     Q    Do you know what those attachments would have

15  been?

16     A    I recall making reference to sort of his --

17  well, here they are.  On Page 3 in the second full

18  paragraph toward the end, it says, "I have attached a

19  list of numerous independent studies performed by GAO,

20  CDH, and EPA, among others."  There was a list of about,

21  I don't know, 50 independent studies that had been

22  conducted over the years of the Rocky Flats facility.

23     Q    It's been a well-studied facility?

24     A    It's been a well-studied facility; discussed

25  and cussed.

140

1          And just in reviewing my testimony, you were

2    asking me about earlier that I was provided by

3    Mr. Taylor.  I presented the statement and summarized it

4    for the committee at the opening of my testimony.  I

5    didn't read the entire thing.

6          Q    The subcommittee was -- is it fair to say there

7    was controversy surrounding aspects of the Rocky Flats

8    criminal proceedings?

9          A    I certainly didn't think so.

10         Q    Nevertheless, congressional --

11         A    Others apparently did.

12         Q    There was a fair amount of press attention

13   devoted to the outcome, correct?

14         A    That would be correct.

15         Q    Some political interest was taken in the

16   matter, correct?

17         A    According to press reports, there was some

18   political interest.

19         Q    And I think you've said you had read some

20   reports about the grand jurors' activities, both before

21   and maybe after the plea bargain.  Is that fair?

22         A    I think I have seen newspaper accounts of that

23   particular area of controversy.

24         Q    And when you testified before the Wolpe

25   subcommittee, did you have an understanding of what that

141

1    body was looking into?

2         A    The Wolpe subcommittee?

3         Q    I'm sorry, I say Wolpe.  Is it Wolpe?

4         A    W-o-l-p-e, Wolpe.

5         Q    Did you have an understanding?

6         A    Not really.  I mean, beyond my -- again, I have

7    no independent recollection of why I was called.  I'm

8    assuming it was because there was some belief by the

9    politicians -- or some of the politicians -- that the

10   plea agreement needed to be reviewed by the legislative

11   body.

12        Q    But you knew it was about the Rocky Flats

13   investigation --

14        A    Oh, most assuredly.

15        Q    -- and not, for example, about milk prices?

16        A    No.  It had nothing to do with drug

17   trafficking.

18        Q    Okay.  And Congress didn't have the power to

19   review the plea bargain in the sense of, for example,

20   setting it aside, did they?

21        A    Not certainly in my opinion, but they might

22   have different views of their power and authority.

23        Q    I suppose they might, but in any case they were

24   conducting some kind of investigation or hearing; fair?

25        A    Yes.

142

1     Q     Turning to Pages 5 and 6 --

2     A     All right.

3     Q     -- of your statement.  That statement or

4  testimony reads in part as follows, "Our investigation

5  was a criminal investigation.  In the public discussion

6  that has followed the disposition of the case, there has

7  been a frequent failure to recognize this important and

8  basic distinction.  The investigation was not, and was

9  never intended to be, an exhaustive environmental,

10  scientific, public health or technical survey of the

11  potential myriad of issues surrounding Rocky Flats' 40

12  years of operations.  Nor was it a vehicle for passing

13  judgment on public policy, evaluating the performance of

14  public officials or making political statements.  Those

15  are not accepted functions of a criminal

16  investigation -- which is focused instead on whether

17  crimes were committed and whether those crimes, if any,

18  could be successfully prosecuted to conviction,

19  consistent with the rules of law, evidence and

20  procedure, accepted ethical principles of prosecution

21  and fundamental fairness."

22         Did I read that correctly?

23     A     You did.

24     Q     I'm going to suppose that those still represent

25  your views today?

143

1      A     They do.

2      Q     In the course of this statement -- it's not a

3   question.  I think it's just fair to say by way of

4   setting up a couple of questions, you go into some of

5   the considerations that in your view made the

6   disposition justified, or at least some of the aspects

7   that had to be thought about when the disposition was

8   arrived at.

9            One of the things you mentioned -- and there

10  are two sets of page numbers on this document, and I'm

11  going to with the ones on the bottom.

12     A     Okay.

13     Q     One of the things you mentioned -- and I'm not

14  going to read it, but it's on Pages 11 and 12 -- is the

15  importance of obtaining a fine from Rockwell that was

16  not indemnified, correct?

17     A     Yes.

18     Q     On Page 17 there is --

19     A     By the way, here is my Berger quote that I was

20  talking to you about earlier.  Mr. Justice Sutherland in

21  Berger v. United States, not Mr. Justice Burger in

22  Sutherland v. United States.  You should have corrected

23  me on that.

24           MR. TAYLOR:  Well, I would have.  I didn't want

25  to be presumptuous.

1          MR. NORDBERG:  We'll have to retire to the

2    library to see if perhaps Justice Burger said the same

3    thing in Sutherland versus United States.

4          THE DEPONENT:  We'll have to do a LexisNexis

5    search.

6     A    I'm sorry, I digress.

7          Page 17?

8     Q    (By Mr. Nordberg)  Page 17, you say, "Our

9    decision not to charge individuals -- before I read the

10   rest of this quote, let me stop for a second.

11         Is it fair to say that some people had

12   questioned DOJ's decision not to charge individuals?

13    A    I believe that's accurate, as at least I

14   recall.

15    Q    That's probably why you were addressing the

16   matter in your sworn statement?

17    A    Probably.

18    Q    By the way, was this a sworn statement?

19    A    Was this a what?

20    Q    A sworn statement.

21    A    No.  I was placed under oath -- well, I drafted

22   this statement in anticipation of my testimony.

23    Q    Right.

24    A    I was placed under oath by the committee chair,

25   Mr. Wolpe, and everything I stated was thereafter under

145

1   oath.  This statement was not read, but summarized --

2       Q     I understand.

3       A     -- and submitted for the record.  I mean, I

4   would view it as a sworn statement in that regard.

5       Q     Okay.  In your mind, anyway, it was the

6   functional equivalent of one?

7       A     I think so.

8       Q     On Page 17 the document reads, "Our decision

9   not to charge individuals was based on a careful and

10  wide-ranging consideration of various appropriate

11  factors -- including the specific evidence, all manner

12  of governing law (including environmental law and

13  substantive criminal law, the rules of procedure, etc.),

14  the question of criminal intent, the high burden of

15  proof -- beyond a reasonable doubt -- that must be shown

16  in all criminal cases, potential defenses, overall

17  equities, and mitigating factors in each particular

18  circumstance."

19            Did I read that correctly?

20      A     You did.

21      Q     And then you go on to list some specific

22  reasons for DOJ's conclusions in a series of numbered

23  paragraphs.  I'm just going to go through those one by

24  one.  The first one reads:  "1.  It was clear from the

25  evidence that there was no single rogue employee or 'bad

1   actor' or group of 'bad actors' among the surviving

2   potential targets whose egregious criminal conduct

3   caused the criminality we charged.  Discrete

4   organizational components of a large corporate structure

5   each contributed to the resulting criminal conduct.  The

6   combined effect of Rockwell's fragmented management

7   style (called 'matrix management') and the

8   compartmentalization of many Rocky Flats' operations

9   made individual responsibility nearly impossible to

10  determine.  Prosecution of the entity could be factually

11  justified and was appropriate since these many discrete

12  acts and the knowledge of all individuals could be

13  collectively attributed to the organization."

14          Did I read that correctly?

15  A    Yes.

16  Q    Do you still agree with that?

17  A    I do.

18  Q    No. 2, "There was substantial regulatory

19  ambiguity in these complex environmental laws as applied

20  to the unique circumstances of a nuclear weapons plant.

21  For example, there has been a long and public history of

22  disagreement between EPA and DOE, a disagreement well

23  known to the Congress, about whether or not RCRA even

24  applied at Rocky Flats and, if it did apply, what it

25  covered.  Criminal prosecution under such ambiguous and

147

1   cloudy circumstances of mid- or low-level employees who

2   could not be fairly presumed to know of the actions they

3   needed to take to fully comply with environmental

4   requirements, would have been particularly untenable and

5   unfair."

6          I read that right?

7   A   You did.

8   Q   Was that regulatory ambiguity that you were

9   describing in this paragraph also a consideration in any

10  way in decisions about what disposition to accept with

11  respect to Rockwell International Corporation itself?

12  A   I think it was a factor in the overall analysis

13  of the case.

14  Q   Okay.  Is it fair to say, then, that it would

15  have been -- if I may use the word "a mitigating factor"

16  as opposed to an aggravating factor?

17  A   It would certainly have been something that

18  Rockwell, had we had to go to trial in the case, would

19  have used to its substantial advantage.

20  Q   So when you're entering into a plea bargain,

21  one of the things you think about is the potential

22  defenses or arguments that the defendant could assert at

23  trial?

24  A   Yes.

25  Q   And that was a factor, then, in your thinking?

148

1      A     Yes.

2      Q     Item 3, "Substantial 'jury nullification'

3    issues were present which probably would have reached a

4    jury had a trial taken place."

5            What is "jury nullification," by the way?

6      A     It essentially means to convince the jury, for

7    emotional reasons not related to the evidence or the

8    law, that the defendant ought not to be convicted.  An

9    example would be the OJ Simpson trial where the jury was

10   effectively nullified by the defense, at least as I

11   understand that case.  It's to convince the jury that it

12   should disregard the facts and the law and apply

13   emotions to the outcome.

14     Q     So the advocate tries to persuade the jury not

15   to pay attention to the instructions or the evidence in

16   the case --

17     A     Right.

18     Q     -- but to their own private or personal sense

19   of justice --

20     A     Correct.

21     Q     -- or emotions?

22           All right.  To resume the quote from scratch

23   because I interrupted myself, it reads, "Substantial

24   'jury nullification' issues were present which probably

25   would have reached a jury had a trial taken place.

149

1    Among these issues were (a) the charge that

2    environmental violations at Rocky Flats were no

3    different than like violations at every other DOE

4    facility, thus making it terribly unfair to punish on

5    contractor and not another; (b) DOE's former 'culture'

6    which promoted production to the near-exclusion of all

7    other considerations, including environment, would be

8    used to characterize the conduct as 'authorized'; (c)

9    some alleged violations arguably occurred for which

10   there was no known technological solution -- no

11   treatment, nor storage, or no disposal alternative -- an

12   obviously inequitable proposition; and (d) the

13   contractor's and DOE's congressionally approved

14   budget -- developed with many of these controversies as

15   a matter of public record -- arguably precluded complete

16   compliance by the contractor."

17         I read that correctly?

18   A    Yes.

19   Q    And, again, these involve some arguments that

20   you would have to face if, rather than accepting the

21   plea agreement disposition, you took the matter to trial

22   with Rockwell, correct?

23   A    Yes, that's correct.

24   Q    Item 4, "Finally, our courts require proof

25   beyond a reasonable doubt of the elements of federal

150

1    crimes, including the element of specific intent.  To

2    establish specific intent, the government must prove

3    beyond a reasonable doubt that the defendant knowingly

4    did an act which the law forbids, purposely intending to

5    violate the law.  Under the law, an act or a failure to

6    act is 'knowingly' done, if done voluntarily and

7    intentionally, and not because of mistake or accident or

8    other innocent reason."

9          By the way, to interrupt this quotation, once

10   again, you're talking in the context of criminal law

11   here, correct?

12        A    Yes.

13        Q    To continue with the quote, "While the Justice

14   Department takes the position that environmental crimes

15   are general intent crimes involving protection of the

16   public health, Colorado federal judges, in those in

17   environmental prosecutions we have successfully pursued

18   to date, have required proof of such specific intent

19   beyond a reasonable doubt by an individual under the

20   facts and circumstances here would have been nearly

21   impossible.  As you may be aware, the government is

22   unable to appeal an adverse jury instruction in a

23   criminal case.  Further there is no right or ability for

24   the government to appeal from a judgment of acquittal or

25   not guilty verdict."

151

1          Once again, those statements in this paragraph

2    represent procedural hurdles or hurdles involved with

3    proving specific intent or meeting burden of proof

4    beyond a reasonable doubt that applies in criminal cases

5    that Justice would have faced if it had taken this case

6    to trial, rather than settling it through a plea

7    bargain, correct?

8          A    Yes.

9          Q    On Page 22 -- also on Page 1044 -- in the

10   concluding paragraph of your statement you say, "Those

11   of us involved in this complex criminal investigation

12   and prosecution hope and believe that the 'culture'

13   which, in the past, gave only lip service to the

14   environmental laws of this country has, as a result of

15   the Justice Department's criminal investigation and

16   prosecution at Rocky Flats, been erased from the mindset

17   of those who operate under these environmental laws.  We

18   have done our job and we have done it well."

19          Do you still agree with that statement?

20         A    Yes.

21         Q    Are you proud of the outcome and the work you

22   did in this Rocky Flats case?

23         A    I don't think pride is exactly the right way to

24   characterize it.

25         Q    Let me ask the question another way.  Do you

152

1    think that it was a socially beneficial outcome?

2         A    I think it certainly has been.

3              MS. AHERN:   Object to the form; vague and

4    ambiguous.

5              I'm sorry.

6         Q    (By Ms. Nordberg)  Let me rephrase the question

7    since Ms. Ahern has objected.

8              Do you think it was a beneficial outcome?

9         A    Yes.

10        Q    Can you explain why?

11        A    It was the first time in history that there had

12   been an investigation and prosecution of a

13   government-owned, contractor-operated nuclear weapons

14   plant in this nation's history for environmental

15   violations.  There are and were, at least at that time,

16   15 or 16 other similar facilities around the country.

17   No one had had the, I'm going to call it intestinal

18   fortitude to take on any of those other facilities, even

19   though, as was alluded in one of those subparagraphs

20   that you just read, the problems -- the environmental

21   management problems were very similar at those other

22   facilities.

23             The threats at the beginning of the

24   investigation were quite serious, and as has been

25   characterized by some "sensational," at least as

153

1   portrayed in the press, that caused there to be great,

2   great concern and anxiety among the people of Colorado.

3   Not just those in and around Rocky Flats, but throughout

4   the state of Colorado.

5           It is what caused me to be especially concerned

6   about making sure that the investigation concluded that

7   there had not been any substantial off-site

8   physiological harm or threat of physiological harm.  Not

9   simply because that was a function of the criminal

10  investigation, but to put the minds of the people who

11  would be impacted by that concern as best at rest as

12  could be possible under the circumstances.

13          And I think that in truth, the investigation

14  and prosecution ultimately led to the conclusion to shut

15  down the facility and clean it up over the long haul.

16          There are probably others that I would think of

17  if I was given time, but those come to mind.

18      Q    You don't feel regret over taking the case on?

19      A    No, not at all.

20          MR. NORDBERG:  Off the record.

21          (Discussion off the record.)

22          (Deposition Exhibit 8 was marked.)

23          (A recess was taken from 2:52 to 3:09 p.m.)

24          (Mr. Blum was not present in the proceedings.)

25      Q    (By Ms. Nordberg)  We have marked Norton 8.

154

1   Can you take a look that the and tell me what it appears

2   to be?

3       A    It appears to be an extract of the testimony

4   before the Wolpe subcommittee.  Again, I don't recall

5   the formal title of the subcommittee.

6       Q    Of your testimony?

7       A    Of my testimony.  I was there on two separate

8   occasions, and I think this was the first of those two

9   occasions.

10      Q    There was a little bit of a controversy between

11  the committee and DOJ, wasn't there, about whether --

12      A    Yes, there was.

13      Q    -- about whether DOJ witnesses would testify

14  before that committee, but in the end DOJ agreed to make

15  you and other DOJ witnesses available, correct?

16      A    That's correct -- well, at least I was made

17  available.  I can't tell you who else was made

18  available.

19      Q    Well, DOJ is a big umbrella, and it includes,

20  for example, the FBI and, for example, Mr. Lipsky, I

21  suppose, who also testified, I believe.

22      A    I have not read anybody else's testimony, so I

23  am not entirely sure who all testified.

24      Q    Ever?

25      A    Ever.

1      Q     You will correct me if I'm wrong, but I think

2    you testified earlier today that when the time came to

3    make decisions, the people on the prosecution team with

4    whom you were in communication were in broad consensual

5    agreement that the plea was an appropriate disposition,

6    right?

7      A     I think that's correct.

8      Q     Do you remember offhand -- without looking at

9    the testimony right now -- whether you testified to that

10   same general effect in front of the Wolpe subcommittee?

11     A     I don't know.  You will have to point me to the

12   specific section you have in mind.  I think would have

13   because I don't believe my opinion has changed over the

14   years.

15     Q     Okay.

16     A     If I was asked a question, I think that's what

17   I would have said.

18     Q     Before I get to the specific parts of the

19   testimony, are you aware that Mr. Lipsky has testified

20   in Cook versus Rockwell?

21     A     I think I've been made aware of that, and I've

22   also been made aware that there are some -- simply, I

23   think, by reading in the paper that there are some

24   concern he has about the thrust of the investigation or

25   things he was instructed to do or not instructed to do.

156

1   But beyond that, I have no knowledge of what his

2   position.

3       Q    Okay.  Are you aware that when he was

4   cross-examined by counsel for defendants in Cook versus

5   Rockwell, Mr. Lipsky was asked whether or not your

6   characterization of the prosecution team's views about

7   the appropriateness of the disposition accurately

8   reflected Mr. Lipsky's own views at the time?

9       A    I'm not aware that he was asked that.

10      Q    I'm going suggest to you that he was, so if

11  you're not aware of what he was asked, you're not aware

12  of how he answered?

13      A    That's correct.

14      Q    I think you testified earlier today that you

15  met with Mr. Lipsky during the course of this

16  investigation relatively infrequently.  Is that fair?

17      A    I think at the beginning when the case was

18  first presented, I recall one or two or three occasions

19  when Mr. Lipsky was involved in such meetings.  But from

20  roughly the beginning of the investigation onward, my

21  meetings with Mr. Lipsky regarding the investigation --

22  I don't think I had a meeting with Mr. Lipsky.  I would

23  have had a meeting with Mr. Fimberg, and it's possible

24  that Mr. Lipsky was in that meeting.  But I don't really

25  recall him being in any such meetings.  He might have

157

1    been, but I just don't recall.

2        Q    Well, I'm going direct your attention now to

3    Page 1050 of your testimony --

4        A    Uh-huh.

5        Q    -- and the following question and answer:

6    "Mr. Wolpe:  Could you identify specifically the

7    individuals with whom you discussed this question of

8    whether or not to look for evidence against individuals?

9            "Mr. Norton:  Mr. Chairman, I can't honestly

10   recall each and every meeting that I have had over the

11   course of the last three and a half or almost four years

12   now with the investigative prosecutive team, but almost

13   always one of those members was Mr. Fimberg.  Usually

14   one of those members was Mr. Murtha.  Occasionally one

15   of those members was the lead case agent, Special Agent

16   Jon Lipsky of the Federal Bureau of Investigation, who I

17   believe has been before this subcommittee.  Again,

18   usually one of those members was Special Agent Bill

19   Smith of the Environmental Protection Agency, Criminal

20   Investigation Division.

21           "There may have from time to time been others

22   involved, but that usually was the nucleus of the

23   discussion team."

24           Did I read that correctly?

25       A    You did.

158

1    Q    To the best of your recollection, was that

2    testimony accurate?

3    A    I think the way I've characterized the nature

4    of meetings is perhaps more accurate.  And that is that

5    almost always, if there was a meeting involving the

6    Rocky Flats investigation and/or prosecution, it would

7    involve a meeting -- that I was a part of, it would

8    involve a meeting that Mr. Fimberg was present and, in

9    fact, took the lead in presenting whatever issue was on

10   the table.

11        Often, but not as frequent, Mr. Murtha was one

12   of those participants; was a participant in those

13   meetings.  Fimberg being in Colorado and Murtha being in

14   DV made it less likely that Murtha was at every meeting.

15   And occasionally Lipsky and Smith were a part of the

16   meeting.  I mean, that's the way I would characterize

17   it.  And I think that's what this says, but it's little

18   bit garbled toward the end, so --

19   Q    It sounds consistent to me with what you would

20   testify to.

21        Later --

22   A    By the way, I might also add, I don't really

23   recall any specialized discussion on, Let's look for

24   evidence against individuals.  The direction of the

25   investigation was, Let's look for evidence of crimes.

159

1    And in the looking for evidence of crimes, if that led

2    to the determination of charging individuals with

3    crimes, that's the direction the investigation was going

4    to take.

5          So it wasn't sort of a specialized, as this --

6    Wolpe kind of got off on the idea that there was some

7    differentiation between charging the corporation and

8    charging the individuals, and there really wasn't.  It

9    was just, Let's go with this investigation in whatever

10   direction it takes us.

11   Q    Right.  Subject, again, though, to the

12   considerations, some of which we were talking about

13   before that --

14   A    Those were conclusions toward the end of the

15   case, not at the beginning of the case.

16   Q    Right, I understand.  You're saying that you

17   didn't shut down investigations into individuals from

18   the get-go or anything like that, right?

19   A    Nor did we have any specialized focus on

20   individuals from the get-go.  Let's just see what we

21   find.

22   Q    Right.  Further on Page 1051, I'm going have to

23   read a fair snatch of this because the questioning is a

24   little garbled.

25          "Mr. Wolpe:  Did any of those

1    individuals recommend" -- this is immediately following

2    the testimony we just read.

3        A     Okay.

4        Q     "Mr. Wolpe:  Did any of those individuals

5    recommend that evidence should be pursued against --

6              "Mr. Norton:  I am sorry, recommend what?

7              "Mr. Wolpe:  That evidence should be pursued,

8    that investigators should continue look for evidence

9    against individuals?

10             "Mr. Norton:  Well, as I said, Mr. Chairman, as

11   is the case in any investigation, the instructions,

12   directions, mode, method, was to look for the evidence

13   and let it take us wherever it would.

14             "Mr. Wolpe:  What was Mr. Lipsky's

15   recommendation that regard?

16             "Mr. Norton:  Mr. Chairman, upon advice of

17   Mr. Margolis, I cannot get into matters of internal

18   deliberation during the course of the investigation.

19             "Let me say again that there were wide ranging

20   and continuously evolving and developing and changing

21   and shifting views by member of the investigative team

22   during the course of the investigation.  However, at the

23   time that the plea agreement was entered into in

24   approximately March of 1992, I guess, there was you

25   unanimity that the plea agreement was the appropriate

161

1   disposition of the matter.  As you know, no individuals

2   were charged in that resulting matter."

3        Did I read that correctly?

4   A    You did.

5   Q    And then a little later, on the bottom of

6   Page 1052, "Mr. Wolpe:  Let us go back and ask -- go

7   back to the two questions related to Mr. Lipsky, would

8   you please?"

9        And the record was read as requested.

10       "Mr. Wolpe:  And that is the point at which

11  you --

12       "Mr. Norton:  I don't know, candidly, if he had

13  a recommendation that differs from what I have

14  expressed.  The recommendation of all, in any criminal

15  justice investigative matter, is to pursue the evidence

16  to the conclusion that it takes us.

17       "Mr. Wolpe:  Are you claiming deliberative

18  privilege here or not?

19       "Mr. Norton:  I think I have answered the

20  question, Mr. Chairman.  I don't think there is any part

21  of the question I have not answered."

22       Did I read that correctly?

23  A    You did.

24  Q    Further down on the same page, "Mr. Wolpe:  Let

25  me ask you this question.  Did Mr. Lipsky at any time

162

1    give you his advice or opinion or recommendation as to

2    whether or not evidence should be -- that there should

3    be a pursuit of evidence that would relate to the

4    conduct of individuals?  And if so, what was his opinion

5    or recommendation?

6              "Mr. Norton:  I don't recall any time when

7    Mr. Lipsky directly gave me such information.

8              "Mr. Wolpe:  How about indirectly?

9              "Mr. Norton:  I don't recall actually anybody

10   ever representing to me that Mr. Lipsky had an opinion

11   at any stage during the course of the investigation."

12             Was that your testimony?

13        A    That is, or was.

14        Q    So would it be fair to say, then, that when you

15   talked about the views of the prosecution team and its

16   consensus or unanimity on the appropriateness of the

17   disposition, you were only talking about the views of

18   team members that you knew about and not the views that

19   hadn't been expressed to you?

20        A    Well, I couldn't articulate views that hadn't

21   been expressed to me.  I wouldn't have had any way of

22   knowing them, No. 1.

23        Q    That stands to reason.

24        A    No. 2, the investigators' views on what should

25   or should not be prosecuted, while meriting

1   consideration, are not determinative factors.  It is

2   what the prosecutor decides to recommend that should be

3   prosecuted.

4       Q    So when you were talking about the consensus or

5   unanimity on the team, you were focused primarily on the

6   beliefs, recommendations, or ideas of the prosecutors?

7       A    That would be correct, although as this says, I

8   was never made aware of any disagreement within the

9   investigative/prosecutive team to the results that were

10  obtained.

11      Q    I guess my point is that if Mr. Lipsky didn't

12  feel that these statements accurately captured his own

13  views, that wouldn't necessarily imply that he was

14  accusing you of lying.  It might just imply that your

15  statement didn't capture his views.  Is that fair?

16          MS. AHERN:  Object to the form of the question

17  as vague.

18      A    I can't speak for Mr. Lipsky and what he thinks

19  then or now.  I can only tell you that there was at no

20  time any communication to me by anyone that Mr. Lipsky

21  disagreed with the outcome of this case at this time.

22      Q    (By Mr. Nordberg)  Well, let me put this

23  question to you another way.  If you didn't know

24  Mr. Lipsky 's views, it would be impossible to lie about

25  them except by saying something about them; true?

164

1    A   I guess so.  I mean, if I understand the

2   question, I don't know how a person could lie

3   about something that --

4    Q   That they didn't know.

5    A   -- was not known.

6    Q   Right.  Thank you.  I guess that's what I was

7   driving at.

8    A   I think I accept that.

9    Q   Okay.

10      THE DEPONENT:  Sorry, Steve.

11      MR. TAYLOR:  I'm not sure I understood the

12   question --

13      THE DEPONENT:  I'm not sure I do either.

14      MR. TAYLOR:  -- in a metaphysically sense.

15      THE DEPONENT:  Metaphorically speaking; what is

16   truth.

17    Q   (By Ms. Nordberg)  I understand that you can't

18   speculate about what was in Mr. Lipsky's mind.  Given

19   what you've testified to just now about the people on

20   whose views you were focusing when you made these

21   remarks in front of the Wolpe committee, it would be

22   possible for Mr. Lipsky to feel that you hadn't

23   accurately captured any dissenting views he might have

24   without also thinking that you were lying?

25      MS. AHERN:  Objection; vague, assumes facts not

165

1   in evidence.

2       A    I suppose so.  Anything is possible.  Anything

3   add is possible, and that certainly could be possible.

4       Q    (By Ms. Nordberg)  This is not a metaphysical

5   problem that I conjured up on a quiet day at the office.

6   It springs from other sources.

7            Do you know whether Mr. Lipsky ever received

8   instructions from within FBI not to pursue further

9   investigation into potential crimes or charges against

10  individuals?

11      A    I have read press accounts that he has said

12  that.  I have no personal knowledge that that occurred.

13      Q    You weren't party to any such communications?

14      A    I was not party to any such communications.

15      Q    Nor were any such communications reported to

16  you during the criminal investigation?

17      A    Nor were any such communications reported to me

18  during the course of the investigation, or any time

19  thereafter to this date, and I would quite surprised if

20  the FBI had instructed Mr. Lipsky to that effect --

21      Q    Why would that --

22      A    -- any of his supervisors, which were

23  undoubtedly numerous.

24           I don't know.  It just doesn't make any sense

25  to me that the FBI -- people in the FBI who would be

166

1    charged with the responsibility for investigating and

2    prosecuting criminal violations, in this case

3    environmental laws, would have instructed an

4    investigative agent not to look for evidence of those

5    crimes.  I would just be quite surprised if that

6    happened.  I read that he says that it has happened, but

7    I don't know that I believe that it did happen.

8        Q    It would probably surprise Mr. Lipsky if that

9    happened too?

10       A    Pardon me.

11       Q    It would probably surprise an FBI agent too,

12    correct?

13          MR. TAYLOR:  Objection; calls for speculation.

14       A    I don't know.

15       Q    (By Mr. Nordberg)  You don't know, though, if

16    it would surprise an FBI agent?

17       A    I don't know.  I don't know what would surprise

18    Mr. Lipsky.

19       Q    On Page 1072 --

20       A    All right, I'm there.

21       Q    -- about maybe three-fifths of the way down,

22    "Ms. Holleman" -- I don't know if I'm pronouncing her

23    name correctly.  I'm going to pronounce it Holleman --

24    "Is it your position then that every charge, not just

25    against individuals, but every charge, every count that

167

1    was not brought, you could not have proven?

2         "Mr. Norton:  No.  We could have proven perhaps

3    additional violations in the areas that we have charged,

4    for example, Pondcrete.  We could have proved

5    additional" -- maybe that should be "proved" --

6    "additional violation in the Pondcrete area."

7         "Irrespective of the nature of the prosecution,

8    there is a point at which you strategically decide to

9    cut off the potential further charges simply because the

10   burden of proving all of those charges in court, the

11   troublesome nature of presenting such accumulative and

12   burdensome evidence to a jury, and the appearance to a

13   jury and judge of piling on a defendant under such

14   circumstances.

15        "Here, as I said, we charged the most serious

16   environmental crimes for which we have readily provable

17   evidence, and we charged a significant number of events

18   of those readily provable crimes, and we charged a level

19   of fine that we thought was appropriate."

20        And the first question, did I read that

21   correctly?

22   A    You did.

23   Q    When you're saying you charged the most serious

24   environmental crimes, on what kind of scale or axis are

25   you measuring "seriousness"?

168

1          MS. AHERN:  Objection; vague.

2     Q    (By Ms. Nordberg)  How do you tell a serious

3    environmental crime from a less serious environmental

4    crime?

5     A    I'm not sure that's capable of being answered.

6    The plea agreement specified that the crimes charged to

7    which guilty pleas were entered were serious

8    environmental crimes.  The prosecution team, I included,

9    viewed the crimes charged as serious environmental

10   crimes.  As this says -- and I believe to be the case --

11   those crimes with which the defendant was charged were

12   the crimes for which there was readily provable

13   evidence.  There were no crimes for which there was

14   readily provable evidence, serious or unserious, that

15   were not charged, with I think one exception.

16    Q    What was the exception?

17    A    That was allegations that guards had urinated

18   on the grounds in violation of the Clean Water Act.

19         MR. NORDBERG:  Off the record.

20         (Discussion off the record.)

21    Q    (By Ms. Nordberg)  So as much as the

22   seriousness or the nonseriousness of the crimes, or

23   alleged crimes or allegations or claims, what affected

24   your decision to charge or not charge had to do with the

25   quality of the evidence, correct?

169

1       A     That's correct.

2       Q     On Page 1073 -- let me first just ask you

3    without referring to the testimony, because maybe you

4    remember.  Was the language in the sentencing memorandum

5    provided to Rockwell's attorneys to review?

6       A     I don't recall.  It may have been.

7       Q     I'm going to refer you --

8       A     It would have been not unique for it to have

9    been provided to them to review.  But I personally would

10   not have been done that.  It might have been done by

11   Mr. Fimberg or others on the prosecution team.

12      Q     I didn't mean to suggest there was anything

13   wrong with it.  I'm just trying to find out.

14          In the middle of Page 1073, let me refer you to

15   the following testimony, picking up in the middle of

16   Mr. Wolpe's paragraph-long question near the top.  "In

17   your correspondence with Rockwell, Rockwell insists

18   several times on controlling the language in the

19   sentencing memorandum.  Did Rockwell actually read and

20   approve the statements in that document?

21          "Mr. Norton:  Rockwell attorneys were given the

22   opportunity to review the sentencing memorandum.  They

23   were not given the right to control the language.

24          "Mr. Wolpe:  Did they make changes on the draft

25   they were initially presented?

170

1           "Mr. Norton:  I think it is fair a number of

2    suggested changes were made.  Some of those changes were

3    incorporated.  Specific changes I cannot identify.

4    Those negotiations really were carried on between

5    Mr. Fimberg and/or Mr. Murtha and the Rockwell counsel."

6           Do you have any reason to correct that

7    testimony that you gave to the congressional

8    subcommittee?

9       A    No.  I have no independent recollection that it

10   occurred or not occurred, but I'm assuming it did or I

11   would not have testified.

12      Q    And, again, your memory would have been

13   fresher, presumably, closer to the events --

14      A    Yes.

15      Q    -- back when you testified before the

16   committee?

17          Going now to 1079 near the bottom.

18      A    All right, I'm there.

19      Q    "Mr. Wolpe:  Is it your view that the Justice

20   Department knew the full extent of all pollution or

21   damage that might be coming off the Rocky Flats site?

22          "Mr. Norton:  Not at all.  We do not know of

23   any --

24          "Ms. Holleman:  You don't know of any, but

25   basically you are saying if you don't know you can make

171

1    a statement we didn't know of anything.  It doesn't

2    really go to your -- it doesn't mean you are the export"

3    -- and perhaps it should read "expert," but I speculate.

4             "Mr. Norton:  That is what I have said here.

5             "Mr. Wolpe:  Is that the way we should

6    interpret the plea agreement also, that --

7             "Mr. Norton:  No, you should interpret the plea

8    agreement with the language of the plea agreement in

9    mind.

10            "Mr. Wolpe:  That says that Justice, based on

11   knowledge available to its tests, doesn't know of any of

12   this?

13            "Mr. Norton:  Relating to the charged conduct.

14            "Mr. Wolpe:  What kind of environment

15   investigation did you do of the effects or potential

16   effects of the charged conduct?

17            "Mr. Norton:  You will have to ask those

18   specific questions of Mr. Fimberg and/or Mr. Murtha.  I

19   am assured that adequate environmental testing related

20   to the charged conduct was in fact done and when you

21   couple that with the water analysis by Broomfield or

22   Northglenn we felt we could with safety make that

23   statement.

24            "Mr. Wolpe:  But you can't remember now what

25   that investigation would have entailed?

172

1          "Mr. Norton:  I am not sure I ever knew

2     specifically the scientific technology that was used to

3     make that analyses."

4          Did I read that testimony correctly?

5     A     Yes.

6     Q     Was that testimony accurate?

7     A     Yes, I believe so.

8     Q     You said a minute ago that you thought that one

9     of the beneficial outcomes of the criminal investigation

10    was that DOJ or the US Attorney's office was in a

11    position to offer reassurance to the public.  Is that a

12    fair summary of what you said?

13    A     I don't think it thought that was one of the

14    benefits.  I thought that was one of the obligations.

15    And the obligations sprung from the initial allegations

16    which suggested, in the search warrant, the potential of

17    quite serious and as characterized sensational off-site

18    problems that had been suspected of having occurred:

19    exotic chemicals into the groundwater, surface water,

20    midnight burning of the Building 771 incineration;

21    similar such matters.

22    Q     This is the search warrant, correct, Exhibit 3?

23    A     I think so.

24    Q     Can you point me to some allegation of off-site

25    physiological impacts on the search warrant?

173

1      A      I don't know if I can or not.  I can tell you

2    in the early stages of the investigation leading up to

3    the application for the search warrant, monitoring

4    device were placed upstream and off site from the

5    facility and downstream and off site from the facility.

6    And the allegations of "exotic chemicals" in the surface

7    water arose as a result of those monitoring facilities.

8           Likewise, the allegations of the "midnight

9    burning" at Building 771 arose as a result of an

10   interpretation of infrared photography, or whatever it

11   might be called, by the FBI and its over-flight.  Beyond

12   that, if you want to take me through the search warrant

13   paragraph by paragraph, I will be glad to try to focus

14   on it.

15     Q      Well, it was you who just said that you thought

16   it was your responsibility to correct allegations in the

17   search warrant about off-site impact.  And I was just

18   asking which --

19     A      Those are the two that I'm most -- that most

20   stick in my mind as being matters of significant public

21   interest and concern that I thought it responsible to

22   assure the public be made aware of what we knew.

23           Ordinarily in a criminal investigation, there

24   is not the kind of public impact as there can be in an

25   environmental investigation, nor in this specific

174

1    investigation the huge interest in the facility by lots

2    of people from lots of different location, but

3    especially people in the area.

4        Q    Did the Department of Justice do anything to

5    measure off-site impacts associated with any operation

6    of the Building 771 incinerator during the DOE ordered

7    shutdown?

8            MS. AHERN:  Objection; foundation.

9        A    I cannot really answer to any greater degree

10   than I answered both in this testimony and here today,

11   and that is that you'll have to direct those questions

12   to either Fimberg or Murtha, who would have been the

13   ones that would have reported to me what various studies

14   showed or didn't show.

15       Q    (By Ms. Nordberg)  Did you ask, before you felt

16   impelled to offer this reassurance to the public,

17   whether anyone had done anything to measure off-site

18   impacts associated with the operation of the Building

19   771 incinerator during the DOE ordered shutdown?

20           MR. TAYLOR:  Objection; argumentative.

21       A    I'm sorry say that again.  Did I ask what.

22           MR. NORDBERG:  May I have the question read

23   back, please.

24           (Question read back.)

25       A    I think I testified that the evidence that was

175

1  gathered by the prosecutors and investigative team did

2  not support the allegation that the Building 771

3  incineration had been used during the shutdown period.

4  There would not have been any reason to even ask that

5  question, at least as I understand the question.

6       Q    (By Ms. Nordberg)  Okay.  So is it fair to say,

7  then, that any statement that operation of the Building

8  771 incinerator during the DOE ordered shut down did not

9  result in substantial off-site physiological harm, or

10  the imminent threat of it, would be based not on any

11  measurements taken, but rather on the conclusion reached

12  by DOJ prosecutors that there was not sufficient

13  evidence to support a criminal charge on that point?

14      A    There may have been other studies that were

15  known to the line prosecutors and not necessarily known

16  to, or at least at this point recalled by me.  But

17  certainly what you just said makes sense.

18      Q    Well, as you sit here today, can you recall any

19  such studies?

20      A    I couldn't recall them when I testified before

21  Mr. Wolpe 13 years ago.  I am in no better position to

22  recall them today.

23      Q    Fair enough.  I believe the other example you

24  mentioned just now of allegations in the search warrant

25  potentially involving off-site exposure involved the

176

1    release of exotic chemicals to -- was it Walnut Creek?

2        A    I can't recall the creek or creeks at which

3    these monitoring stations were set up, but it was into

4    one of the drainage areas or creeks that led essentially

5    east and downhill from the Rocky Flats facility.

6        Q    I have the same basic question about that

7    allegation.  I think we already covered it, but just to

8    be abundantly clear, as you sit here today, can you

9    think of any investigation, studies, or measurements

10   that supported DOE's conclusion that those incidents did

11   not result in substantial off-site physiological harm?

12       A    Well, I don't think it was a DOE conclusion.  I

13   think it was a DOJ prosecution team conclusion, No. 1.

14   And No. 2, whatever studies existed is not known to me,

15   or were made, it is not known to me today, and I'm sure

16   it was known to me then.

17       Q    To your recollection, did either of the

18   sentencing memoranda recite the basis for DOJ's

19   conclusion that no facts in the investigation had shown

20   substantial off-site physiological impact or the

21   imminent threat of it based on the charged conduct?

22       A    I don't know of anything beyond what we looked

23   at earlier in the sentencing memorandum.

24       Q    Okay.  I don't want to take the exhibit.

25            There was some fairly high-powered legal talent

1   working for the defendants in US v Rockwell, correct?

2   If you don't --

3        A    I don't know if I'm able to judge that.  They

4   were competently represented, I think.

5        Q    Highly reputed law firms?

6        A    I think so.

7        Q    Williams & Connolly?

8        A    I believe that is one of the firms that

9   represented Rockwell.

10       Q    Haddon Morgan & Foreman here in Denver?

11       A    That's another one of the other firms, perhaps

12   the lead firm, that represented Rockwell.

13            (Deposition Exhibit 9 was marked.)

14       Q    (By Ms. Nordberg)  I would like you to take a

15   look at the document that has been marked as Exhibit 9.

16            MS. AHERN:  Do you have a copy for me, by

17   chance?

18            MR. NORDBERG:  I'm sorry, I have two copies for

19   the three of you.

20            MR. TAYLOR:  We'll share.

21       Q    (By Ms. Nordberg)  Have you had a chance to

22   look at Exhibit 9?

23       A    I've scanned it, yes.

24       Q    All right.  Are you able to tell me what that

25   appears to be?

178

1     A    Am I able to do what?

2     Q    Tell what me Exhibit 9 appears to be.

3     A    It appears to be a letter dated September 7,

4  1989, hand delivered and addressed to me and Mr. Fimberg

5  from the law firm of Haddon, Morgan & Foreman.  It

6  appears to be 13 pages long signed by Bryan Morgan and

7  Harold A. Haddon.

8     Q    And those were lawyers representing Rockwell in

9  the criminal proceedings, correct?

10    A    That's what they purport to say.

11    Q    Well, you don't have an independent

12  recollection of whether Bryan Morgan and Mr. Haddon

13  represented Rockwell in the criminal proceeding?

14    A    I have an independent recollection that they

15  did, or they claimed that they did.

16    Q    Well, they are, to your knowledge, honorable

17  and well reputed gentlemen, correct?

18    A    This would be true, grudgingly.  I'm getting

19  punchy here; forgive me.

20    Q    Aren't we all.

21       And so from even a quick scan of this letter,

22  is it fair to say that it takes strenuous issue with the

23  allegations in the search warrant concerning the

24  operation of the incinerator?

25    A    Yes.

179

1    Q    As well as certain other allegations in the

2   search warrant, correct?

3    A   Yes.

4    Q    And one of the things it says on Pages 6 and 7

5   under the heading "Conclusion" is, "This allegation" --

6   referring to the Building 771 incinerator allegation --

7   "which received the largest amount of media attention

8   and which has dramatically generated public mistrust, is

9   flatly wrong.  We suspect you may have come to the same

10   conclusion we have.  The responsible course of action to

11   calm public fear and to correct the prejudice directed

12   against Rockwell and its employees would a public

13   statement by the United States Attorney's Office that

14   the allegation that the incinerator was secretly

15   operating was disproved after a full review of the

16   evidence," correct?

17    A   Yes, you read that correctly.

18    Q    That's basically what you eventually did,

19   right?

20    A   I believe that's correct.  I believe that's

21   what I've testified to today.

22    Q    Except you didn't testify really that it was

23   disproved.  You testified that the public statement was

24   that the evidence didn't support the allegation.  Is

25   that a fair statement?

180

1    A   That's correct.

2       (Deposition Exhibit 10 was marked.)

3    Q   (By Ms. Nordberg)  Let me show you Exhibit 10,

4 and if I'm correct that's going to be -- it appears to

5 be a letter dated September 20, 1989 to you, sir, from

6 someone purporting to be Harold A. Haddon; is that

7 correct?

8    A   That's correct.

9    Q   Do you remember receiving this letter?

10    A   No.  I have no reason to doubt that I didn't

11 receive it.  I just don't have any present recollection

12 that I did.

13    Q   Sure.  And from a quick scan, would it be fair

14 to characterize this letter as requesting certain

15 evidence involving the Building 771 incinerator that had

16 been gathered in the investigation?

17    A   It appears that that's at least one purpose of

18 the letter.

19       (Deposition Exhibit 11 was marked.)

20    Q   (By Ms. Nordberg)  Sir, can you take a quick

21 look at that document, Norton Exhibit 11, and tell me

22 what it appears to be.

23    A   It appears to be a December 21, 1990 letter

24 signed by me addressed to Lee D. Foreman regarding the

25 Rocky Flats investigation.

1      Q     And I've actually handed over one of my only

2   two copies of that letter, so I can't quote it to you.

3      A     There you go; take a look.

4      Q     The paragraph on the second page -- thank you

5   for handing me back the document -- beginning "By its

6   omission," could you just read that paragraph aloud into

7   the record?

8      A     I'm sorry, which one?

9      Q     The paragraph beginning "By its omission."

10     A     "By its omission from the foregoing list, you

11  and your client may privately consider that the

12  so-called 'midnight burning' is not being pursued."

13     Q     And is that your signature on the letter?

14     A     It is.

15     Q     So as early -- was that December 1990?

16     A     That's correct.

17     Q     So as early as December 1990, you've assured

18  defendants that the midnight burning allegations were

19  not being pursued, correct?

20     A     I think by December 21, 1990, it had been

21  concluded that there was no credible evidence upon which

22  to base or prove the allegation that had originally been

23  contained in the June 1989 search warrant affidavit

24  regarding midnight burning.

25     Q     But in any event, by December 1990 you had

182

1   advised Rockwell that those allegations were not being

2   pursued, correct?

3       A    That's correct, and that's what that letter

4   does.  It may have been communicated in other forms at

5   earlier times, but I couldn't tell you.

6            (Deposition Exhibit 12 was marked.)

7       Q    (By Ms. Nordberg)  Are you able to tell me,

8   sir, what Exhibit 12 appears to be?

9       A    A February 7, 1991 letter to Lee D. Foreman

10   signed by me.

11      Q    And that is, in fact, your signature on the

12   third page?

13      A    It is.

14      Q    Does this represent a settlement offer, so to

15   speak, of the criminal proceedings to Rockwell?

16      A    It appears to represent a settlement

17   counteroffer.  It appears that by a communication -- I

18   don't know whether it was letter or oral or otherwise --

19   dated January 17, 1991, Mr. Foreman and/or his firm had

20   communicated an offer of settlement, and this appears to

21   be in response to that.

22           (Deposition Exhibit 13 was marked.)

23      Q    (By Ms. Nordberg)  Are you able, sir, to take a

24   quick look at Exhibit 13 and tell me what it appears to

25   be.

1      A    It appears to be a March 29, 1991 letter to Lee

2    Foreman signed by Peter J. Murtha regarding the Rocky

3    Flats/motion to quash subpoena.

4      Q    Do you have any knowledge of why this letter

5    would have come from Peter Murtha and not from the

6    US Attorney's offers?

7      A    Mr. Murtha, along with Mr. Fimberg, was

8    essentially colead line prosecutor for Rocky Flats

9    investigation.  I think he had coequal authority with

10   Mr. Fimberg.  Beyond that, I don't know.  I don't recall

11   this letter nor what caused it.

12     Q    You're saying, to the best of your

13   understanding, routine communications might have come

14   from either source?

15     A    Either/or or both, and it appears Fimberg was

16   copied on this letter, so I would have to surmise that

17   he was aware of the letter at some point in time.

18          (Deposition Exhibit 14 was marked.)

19     Q    (By Ms. Nordberg)  Are you able to tell me,

20   sir, what Exhibit 13 appears to be?

21     A    A June 27, 1991 letter --

22          MS. AHERN:  Exhibit 14?

23          MR. NORDBERG:  I'm sorry.

24     A    Yes, it's Exhibit 14.  A June 27, 1991 letter

25   with some handwriting on it that may or may not have

184

1   been on the original that was addressed to me and was

2   signed by Mr. Haddon and Mr. Fuller regarding the Rocky

3   Flats grand jury investigation.

4       Q    (By Mr. Nordberg)  And does this appear to be

5   another offer or counteroffer or counter counteroffer in

6   connection with the plea negotiations?

7       A    It does.

8       Q    So by June 1991, negotiations were well

9   underway; is that fair to say?

10      A    They were continuing, it appears.  I don't

11  recall -- beyond the dates of these letters, I don't

12  recall the start date or the conclusion date, outside of

13  the fact the plea agreement itself.

14      Q    Fair enough.  If you could look, before you put

15  that down, at Paragraph 8 on Page 3.

16      A    Paragraph 8?

17      Q    No, my apologies; Paragraph 9 on Page 3.

18           My question is, that paragraph includes a

19  request or demand by Rockwell, does it not, for a rather

20  strong public statement that the investigation

21  determined that there was no threat to public health or

22  safety caused by Rockwell's operation of Rocky Flats,

23  and that further investigation determined that each of

24  several allegations contained in the search warrant were

25  not true, including surreptitious burning of wastes in

185

1   the Building 771 incinerator, prohibited water

2   transfers, direct discharges from the sewage treatment

3   plant into public waterways, the burning of huge

4   quantities of waste in Building 776 incinerator, the

5   discharge of exotic medical waste chemicals, and false

6   statements, including those alleged with respect to

7   groundwater monitoring compliance.

8           Is that a fair summary of the demands being

9   presented by Rockwell in --

10      A    That's what it says.

11      Q    -- Items A and B.

12          And would bit fair to characterize those

13  demands as going substantially further than the

14  statements actually made in the sentencing memorandum?

15      A    I think so.

16          (Deposition Exhibit 15 was marked.)

17      Q    (By Ms. Nordberg)  Can you tell me what

18  Exhibit 15 appears to be?

19      A    A July 9, 1991 letter to Mr. Foreman signed by

20  me on Page 3.

21      Q    And is this a response to defendant's June 27,

22  1991 offer?

23      A    It says it is.  I assume it is.

24      Q    And if I could direct your attention to Page 3,

25  Item 9A, that reads, "In connection with this

1   disposition, the United States -- mind you, this is just

2   an offer at this stage.

3           "In connection with this disposition, the

4   United States will make the following statements:

5           "A.  Based on information presently known to

6   the Department of Justice, the conduct to which Rockwell

7   has pleaded guilty did not, and has not resulted in

8   imminent harm, or the threat of such imminent harm, to

9   members of the public residing near or working outside

10  of Rocky Flats' boundaries."

11          I read that correctly?

12      A   Yes.

13      Q   And that was the position that the DOJ was

14  prepared to offer on July 9, 1991 by way of a statement

15  about off-site harm, correct?

16      A   Yes.

17      Q   Had DOJ's investigations, if any, into off-site

18  harm resulting from Rockwell's conduct been concluded by

19  July 9 of 1991?

20      A   I assume so.

21      Q   You assume that because you were prepared to

22  make that offer?

23      A   That's correct.

24          (Deposition Exhibit 16 was marked.)

25          (Discussion off the record.)

1     Q    (By Ms. Nordberg)  Sir, what does Exhibit 16

2   appear to be?

3     A    A July 16, 1991 letter addressed to me on the

4   Rocky Flats grand jury investigation signed by

5   Mr. Haddon and Mr. Fuller.

6     Q    And on its face, it purports to be a response

7   to your settlement offer of July 9, correct?

8     A    Yes.

9     Q    If I could direct your attention to Page 3,

10   Item 9.

11     A    All right.

12     Q    That reads, "Rockwell continues to insist that

13   a grand jury report should not issue in this matter.

14   With respect to public statements, Rockwell continues to

15   believe that the proposal set forth in Paragraph 9 of

16   our June 27, 1991, letter is appropriate and necessary."

17          Is that correct?

18     A    You read that correctly.

19          (Deposition Exhibit 17 was marked.)

20     Q    (By Ms. Nordberg)  What does Exhibit 17 appear

21   to be, sir?

22     A    A July 17, 1991 letter to Mr. Haddon regarding

23   Rockwell International Corporation signed by Kenneth

24   Fimberg for me as US Attorney.

25     Q    If I could direct your attention to Page 3,

188

1   Item 9.

2       A    I'm there.

3       Q    "The United States anticipates," it reads,

4   "that the special grand jury may issue report.  The

5   report's principal focus will be on persons,

6   organizations, and governmental entities other than

7   Rockwell."

8           Do you see that?

9       A    I do.

10      Q    At the time that you sent this letter to

11  Rockwell about the report that you anticipated the grand

12  jury potentially issuing, and discussing its anticipated

13  focus, what persons, organizations, or governmental

14  entities did you believe the report would focus on?

15      A    I didn't send this letter.  Mr. Fimberg signed

16  this letter.

17      Q    I'm sorry.  Are you looking at the July 17th,

18  1991 letter?

19      A    July 17, 1991 on the last page shows

20  Mr. Fimberg signed the letter for me.

21      Q    All right.  Did Mr. Fimberg sign this letter

22  for you?

23      A    That's what it says.

24      Q    Would Mr. Fimberg do that without giving you an

25  opportunity to review the letter?

189

1    A    Possibly.  He certainly had the authority to do

2    so.

3    Q    Did Mr. Fimberg have the authority to make --

4    to send correspondence on your behalf in connection with

5    the Rocky Flats criminal investigation?

6    A    In general.

7    Q    Were you ever made aware that it had been

8    represented on your behalf by Mr. Fimberg to Rockwell

9    that a grand jury report was anticipated to cover the

10   conduct of persons or entities other than Rockwell?

11   A    I think there was some discussion during this

12   and at various other stages of the investigation to keep

13   the option open that I told you at the beginning, which

14   was I believed to be a valuable tool of the writing of a

15   report by a special grand jury; to have that option

16   available.  I'm not sure there was ever any specific

17   focus on the persons, organizations, or governmental

18   entities, other than Rockwell, who would have been the

19   subject of any such report.

20        And, in fact, the sentencing memorandum and

21   supplemental memorandum were in the nature and form of

22   the report that ultimately would have been submitted to

23   the grand jury had one been submitted by government to

24   the grand jury.

25   Q    What persons, corporations or entities, other

190

1    than Rockwell, find their conduct discussed in either of

2    the government's sentencing memoranda?

3        A    What persons?  I don't know.  The sentencing

4    memorandum, you will have to read.  It speaks for

5    itself.  Whether or not persons, organizations or

6    government entities other than Rockwell are mentioned in

7    the sentencing memorandum or supplement are matters that

8    I presently don't have any personal knowledge of --

9        Q    Okay.

10       A    -- without reading each and every page of both

11   documents.

12       Q    Right.  At the time -- you said a few minutes

13   ago, I think, that one of the reasons that you were

14   concerned to offer some public reassurance about the

15   results of the investigation as it affected imminent,

16   substantial off-site physiological impact was to --

17   that, I guess, the investigation had been the subject of

18   some public attention, and you wanted to allay concerns;

19   is that right?

20       A    That's correct.

21       Q    And, in fact, this investigation was the

22   subject of considerable attention, correct?

23       A    That's correct.

24       Q    So the issuance of a grand jury report

25   discussing conduct by persons at Rocky Flats -- by

191

1   persons, organizations, and governmental entities other

2   than Rockwell would have been a fairly big deal, right?

3       A    I don't know.

4       Q    It would be a step that would have been taken

5   only after major consideration.  Is that fair?

6       A    It certainly would not have been lightly

7   undertaken.

8       Q    I guess that's what I was driving at, and you

9   put it better than I did.

10      A    It would have been the intention, at least, to

11  be purposeful and responsible in the authoring of any

12  such report.

13      Q    So at the time of the discussions reflected in

14  this letter about the possibility of the issuance of a

15  special grand jury report on persons, organizations, and

16  governmental entities other than Rockwell, what persons,

17  organizations, or governmental entities other than

18  Rockwell were, in your mind, the potential subject of

19  such a report?

20          MR. TAYLOR:  Objection.

21          MS. AHERN:  Objection.

22          Go ahead.

23          MR. TAYLOR:  Objection.

24          MS. AHERN:  Asked and answered.

25          THE DEPONENT:  What is your objection?

192

1          MR. TAYLOR:  It calls for deliberative process.

2     It also involves a grand jury, and I instruct the

3     witness not to answer beyond what he has previously

4     answered.

5          MR. NORDBERG:  That's a Rule 6(e) invocation?

6          MR. TAYLOR:  It is.

7     Q    (By Ms. Nordberg)  I take it, sir, at least

8     Mr. Fimberg sending this letter on your behalf on

9     July 17, 1991 did not conceive it to be a rule 6(e)

10    violation to announce Rockwell International Corporation

11    the government's anticipation that the special grand

12    jury may issue a report, and the report's principal

13    focus will be on persons, organizations, and

14    governmental entities other than Rockwell; is that fair

15    to say?

16    A    I think the purpose of that statement was to

17    reserve the right and ability to issue such a statement.

18    Whether or not there was information existent at that

19    time is another issue.

20    Q    You didn't see this letter before it went out,

21    correct?

22    A    I don't know.  I may have.

23    Q    Did you approve this letter before it went out?

24    A    I don't know.  I may have.

25    Q    On what basis do you say that that was the

193

1    purpose of the statement in Paragraph 9?

2       A    It's my recollection that was a goal of the

3    reason to impanel a special grand jury to begin with; to

4    keep open the opportunity and option of writing a

5    report.  And it was simply a reiteration of that goal at

6    this point in time.

7       Q    Paragraph 9 doesn't say anything about

8    reserving rights, does it?

9            MS. AHERN:  Objection; argumentative.

10      A    It speaks for itself.

11      Q    (By Ms. Nordberg)  It speaks for itself and

12   does not include the expression of reserving rights,

13   correct?

14      A    I will accept whatever representation you wish

15   to make about it.

16      Q    Well, the document has been marked as an

17   exhibit, and you can look at it.  Does Paragraph 9

18   include the words "reserving rights"?

19      A    It doesn't state that, no.  You asked what its

20   purpose was.  I believe I've answered that to the best

21   of my ability.

22      Q    I think what I asked was a different question

23   than what the purpose was, but --

24      A    Well, ask it again, Counselor, if you wish.

25      Q    I think I got the answer that I'm going get.

194

1          (Deposition Exhibit 18 was marked.)

2     Q    (By Ms. Nordberg)  Does Exhibit 18 appear to be

3  a letter from Harold Haddon to Ken Fimberg dated

4  October 7, 1991 attaching some proposed revisions --

5  defendant's proposed revisions to some draft language in

6  connection with the plea negotiations?

7     A    It does.

8          (Deposition Exhibit 19 was marked.)

9     Q    (By Ms. Nordberg)  Sir, does Exhibit 19 appear

10  to be a letter to Ken Fimberg from Lee Foreman dated

11  November 14, 1991?  End of question.

12     A    It does.

13          MS. AHERN:  Wow.

14          (Deposition Exhibit 20 was marked.)

15     Q    (By Ms. Nordberg)  20 is a letter -- or

16  purports to be a letter from Lee Foreman to Ken Fimberg

17  dated November 21, 1991, correct?

18     A    It does.

19     Q    And it's general subject is what the plea

20  agreement would provide about indemnification.  Is that

21  fair to say from --

22     A    It appears to relate primarily to attorney's

23  fees, but it may also include the issue of

24  indemnification.

25     Q    I'm sorry, and I should have been clearer.  So

195

1    indemnification might have two components.  No. 1, there

2    might be an issue about whether DOE was going to

3    indemnify Rockwell for payment of the fine, correct?

4        A    Yes.

5        Q    And No. 2, there might be an issue of whether

6    Rockwell was going -- as part of its indemnity agreement

7    to compensate Rockwell for some or all of the legal

8    expenses, costs and fees associated with defending the

9    criminal case, correct?

10       A    Yes.

11       Q    And you're saying this letter primarily

12   concerns the second of those issues?

13       A    It appears to.

14       Q    Thank you.

15            (Deposition Exhibit 21 was marked.)

16       Q    (By Ms. Nordberg)  21 appears to be a letter

17   from Lee Foreman Ken Fimberg dated November 27, 1991,

18   correct?

19       A    I'm sorry.  What I've been given -- Deposition

20   Exhibit 21 is a December 13, 1991 letter addressed to me

21   signed by Lee D. Foreman.

22       Q    Well, that's bad.

23       A    Do you want to look at it?

24       Q    No.  That's fine.  You're quite correct.

25            This letter appears to be a letter to you from

1   Foreman dated December 13, 1991?

2       A    Yes.

3       Q    And is it fair to say that this discusses the

4   potential impact of a recent appellate court decision on

5   the criminal charges in the plea agreement?

6       A    Certain of those charges, yes.

7            (Deposition Exhibit 22 was marked.)

8       Q    (By Ms. Nordberg)  Exhibit 22 I certainly hope

9   is a letter dated November 27, 1991 from Foreman to

10  Fimberg, correct?

11      A    Yes, it appears to be.

12      Q    And, again, it relates to the ongoing attempts

13  to iron out an agreement on language, terms, and

14  conditions of the plea agreement, correct?

15      A    Correct.

16           MR. NORDBERG:  Off the record.

17           (Discussion off the record.)

18           (A recess was taken from 4:24 to 4:28 p.m.)

19      Q    (By Ms. Nordberg)  Sir, I have only a tiny

20  number of additional questions; moreover I'm fairly

21  confident that all of my the additional questions will

22  be objections and instructions not to answer.  However I

23  need to test that intuition, so I will attempt to do so

24  quickly.  I'm sure you will give your counsel an

25  opportunity to object before you launch in to an answer

197

1    to the question.

2           Did there come a time when you were instructed

3    by superiors at the Department of Justice to halt any

4    aspect of the criminal investigation in the Rocky Flats

5    matter?

6        A    No.

7           THE DEPONENT:  Did you have an objection to

8    that?

9           MR. TAYLOR:  Apparently not.

10          THE DEPONENT:  Sorry about that.  I'll take a

11   breath the next time.

12          That is such an offensive question.  To be

13   perfectly honest with you, that is such an offensive

14   question that I wasn't going to give him a chance to

15   object.

16          MR. TAYLOR:  Truthfully, I'm not sure I would

17   have objected on the same basis.

18       Q    (By Ms. Nordberg)  Did there come a time when

19   prosecution members of the prosecution team -- and I

20   understand that's a vaguely defined concept -- you,

21   Mr. Fimberg, and the people involved from Main Justice

22   reached the view that enough investigating had been

23   done?

24          MR. TAYLOR:  Is that the end of your question?

25          MR. NORDBERG:  Yes.

198

1          MR. TAYLOR:  We would object as to deliberative

2     process.

3          MR. NORDBERG:  And instruct the witness not to

4     answer?

5          MR. TAYLOR:  And instruct the witness not to

6     answer.

7          MR. NORDBERG:  And I assume that any

8     deliberative process object incorporates that

9     instruction.  Would that be fair?

10         MR. TAYLOR:  That would be fair.

11     Q   (By Ms. Nordberg)  Was there ever any

12     disagreement between that same group people, or among

13     that same group of people, about whether any aspect of

14     the allegation against Rockwell merited further

15     investigation?

16         MR. TAYLOR:  We would object to certain

17     deliberative process; objection and instruct the witness

18     not to answer.

19     Q   (By Ms. Nordberg)  Was there any disagreement

20     among that same group of people about whether it was

21     appropriate to prosecute individuals?

22         MR. TAYLOR:  Objection; assert the deliberative

23     process objection and instruct the witness not to

24     answer.

25         But could I talk to you in the hall?

199

1          THE DEPONENT:  Sure.

2          (A recess was taken from 4:32 to 4:33 p.m.)

3          MR. TAYLOR:  We will withdraw the objection of

4    that question.

5          MR. NORDBERG:  Can I have the question read

6    back, please.

7          (Question read back.)

8      A    During the course of any criminal

9    investigation, there are varying views of the strength

10   or weaknesses of the evidence that members of the

11   investigation/prosecution team may have.  At the point

12   in time of the plea agreement, however, the prosecutors,

13   and so far as I know, the investigators were all in

14   agreement that the crimes that were charged against the

15   corporation were the only credible, serious

16   environmental crimes that could be charged against any

17   entity or person and proved by readily approvable

18   evidence.

19     Q    (By Mr. Nordberg)  Were target letters ever

20   sent to individuals in the course of the investigation?

21     A    I think so, but I don't have a specific present

22   recollection of that or, if so, to whom.

23     Q    About 14 of them to --

24     A    I have no present -- I don't believe I signed

25   the target letters.  I think if anyone signed them, it

1   would have been either been Mr. Fimberg or Mr. Murtha.

2   But I could be wrong about that as well.

3       Q    And if Mr. Fimberg or Mr. Murtha signed target

4   letters to individuals, is that something you would

5   normally expect them to do in the absence of credible

6   evidence of potential commission for crime by those

7   individuals?

8       A    It was frequently utilized as a way of

9   attempting to gather evidence as opposed to identify

10  criminality in a specific case.  I think that's probably

11  how it was used here.

12      Q    What is a target letter?

13      A    Identifying to a person that that person is

14  the -- in the center of the proposed investigation as to

15  potential criminal conduct.

16      Q    It alerts the recipient that the recipient is

17  himself potentially subject to criminal charges,

18  correct?

19      A    In general I believe that's correct, although

20  the specific letter would speak for itself.

21      Q    Well, would it be appropriate to alert an

22  individual that he was potentially subject to criminal

23  charges absent credible evidence to support any such

24  criminal charges?

25      A    I don't know.

201

1       Q     Do you know whether there are any provisions in

2   the applicable canons of ethics or Justice Department

3   manuals relating to that issue?

4       A     I do not presently know that.  I'm not sure I

5   ever did know that, but --

6       Q     Did the Department of Energy exert any

7   political pressure of which you're aware in DC or

8   elsewhere to bring the criminal proceedings to a halt?

9       A     I don't know what you mean by "political

10  pressure."  The Department of Energy believed that it

11  had as one of its mission responsibilities the

12  production of nuclear weapons and, therefore, the kinds

13  of things that were produced at Rocky Flats, I'm

14  reasonably sure that that mission did not change during

15  the course of the investigation and, therefore, there

16  was some concern about that.

17      Q     How often, if at all, did representatives of

18  DOE communicate with you personally on matters relating

19  to the criminal investigation?

20      A     I don't really recall any communications from

21  the Department of Energy.  That is not to say that there

22  weren't one or more such communications, but I don't

23  really recall any.

24      Q     Do you recall hearing from anyone else in

25  justice that there had been such communications with

202

1   them from the Department of Energy?

2       A    No, not really.  I don't recall that.

3       Q    Did the grand jury request your assistance in

4   the preparation of the report?

5       A    They did not request assistance of me.

6       Q    Did the grand jury or any of its members

7   request assistance from any employee of the United

8   States Department of Justice in the preparation of a

9   report?

10      A    I do not know.

11           MR. AHERN:  Object to foundation.

12           I'm sorry.

13           THE DEPONENT:  No problem.  Forgive me for

14  answering too quickly.

15      A    I don't know.

16      Q    (By Mr. Nordberg)  Is it the normal practice to

17  provide assistance in the preparation of a report to a

18  grand jury if it requests such assistance?

19      A    This particular area of the law is somewhat

20  unclear, at least it was at that point in time.  It

21  still may be.  However, it was my view and the view of

22  the prosecution team, and I believe the view of the

23  Justice Department, that absent concurrence from or by

24  the prosecutor, any action by the grand jury was

25  inappropriate and not able to be accomplished.

1      Q    So in this case at the conclusion of the

2   investigation, you -- and by "you" I mean the Department

3   of Justice -- did not concur in the grand jury's -- in

4   any aspiration on the part of the grand jury or its

5   members to write a report?

6      A    It's my understanding that some of the members

7   of the grand jury prepared and issued some document

8   which I think they called a report.  So far as I know,

9   the report was not either -- well, in any way, shape, or

10  form prepared by or concurred in by the Justice

11  Department or any aspect of the Justice Department.

12     Q    Isn't it true that that happened only after the

13  Justice Department had refused to assist them in the

14  preparation of their report?

15     A    I'm sorry.  Isn't it true that what?

16     Q    That they prepared and released that report --

17  if any of them released it -- only after the Department

18  of Justice refused to assist them in the preparation of

19  that report?

20     A    I couldn't tell you.  I don't know.

21     Q    Isn't it true that Ken Fimberg informed you and

22  others in the Department of Justice that the grand jury

23  was going to write a report one way or the other, and it

24  was only a question of whether the Department of Justice

25  could participate or not?

204

1    A    That's possible.

2    Q    Do you have a recollection?

3    A    No.

4    Q    You don't?

5    A    No.

6         MR. NORDBERG:  I have nothing further at this

7    time.

8                    E X A M I N A T I O N

9    BY MS. AHERN:

10   Q    Okay.  I do have a few questions.  I do not

11   very many.

12   A    Okay.

13   Q    Mr. Norton, you testified that twice in the

14   fall of 1992 you testified before Congress with regard

15   to the criminal investigation into Rocky Flats; isn't

16   that right?

17   A    I believe that's correct, on two separate

18   occasion before the same subcommittee.

19   Q    Did you tell the truth in your testimony to

20   Congress?

21   A    So far as I knew it to be, yes.

22   Q    Did you endeavor to be accurate in the

23   testimony you gave before Congress on both of those

24   occasions?

25   A    Yes.

205

1      Q      Throughout the course of the criminal

2   investigation of Rocky Flats, there were occasions where

3   you made public statements or statements to the press

4   with regard to the investigation; isn't that light?

5      A      Probably.

6      Q      Did you endeavor to tell the truth when you

7   made those public statements?

8      A      Yes.

9      Q      And you endeavored to be accurate in the

10   statements you made to the press?

11      A      Yes.

12      Q      Mr. Norton, do you recall that Mr. Nordberg

13   asked you a question with regard to the basis for your

14   statements that there was no off-site risk associated

15   with the allegations in the search warrant related to

16   the release of exotic chemicals to Walnut Creek?

17      A      Yes.

18      Q      And do you also recall that Mr. Nordberg asked

19   whether you knew whether there was anything that you

20   could point to within the government sentencing memo

21   that would address the basis for that conclusion; isn't

22   that right?

23      A      I recall that question.

24           MR. NORDBERG:   I object to the form of the

25   question two questions back; that is, the question

206

1   involving risk -- in which the word risk was used.

2        Q    (By Ms. Ahern)  Could you take a look at

3   Exhibit 5 on Page 125, please.

4        A    125?

5        Q    125.

6        A    I'm there.

7        Q    I am looking in the middle of the paragraph

8   that begins "To the extent that."  And in particular I'm

9   looking at the sentence that begins, "In terms of

10  discharges."  Could you read from there all the way down

11  to where Footnote 108 is marked?

12       A    Sure.  "In terms of discharges" --

13       Q    You can read it to yourself.  You don't have to

14  read it into the record.

15       A    Okay.

16            Yes.

17       Q    Mr. Norton, does that -- those couple of

18  sentences refresh your recollection as to the basis upon

19  which the statements you related to off-site risks from

20  releases to Walnut Creek may have been based?

21            MR. NORDBERG:  Form.

22       A    Well, certainly it sets forth some of the

23  bases, which would be the studies performed by the City

24  of Broomfield, and as I recall the City of Northglenn as

25  well.

1    Q    (By Ms. Ahern)  And what were those studies?

2    A    Regular testing and measurement of the content

3    of water as it flowed into either Standley Reservoir or

4    the other reservoir, Great Western -- I think it was --

5    Reservoir.

6    Q    Could you also take a look at Page 109 of that

7    exhibit.

8    A    Yes.

9    Q    And in particular what I'm looking at is

10   Footnote 94.

11   A    Yes.

12   Q    Is it true, Mr. Norton, that another possible

13   basis underlying this statement related to off-site risk

14   from releases to Walnut Creek -- or alleged releases to

15   Walnut Creek -- was that specific chemicals noted in the

16   sampling were present in small amounts and were not

17   believed and are not now believed to have caused a

18   significant risk to the environment?

19         MR. NORDBERG:  Form; calls for speculation.

20   A    That's what it says.

21   Q    (By Ms. Ahern)  Do you have any recollection of

22   that being true?

23   A    I have no recollection of it not being true.

24   Q    Earlier in your testimony Mr. Nordberg raised

25   with you an issue that FBI Agent Jon Lipsky may have

208

1    formed the belief that he was instructed by the FBI not

2    to pursue further investigation of certain issues in the

3    criminal investigation of Rocky Flats.  Do you recall

4    that testimony?

5        A    I recall that exchange.

6        Q    Did you ever instruct Mr. Lipsky not to pursue

7    further investigation of any subject?

8        A    No.

9        Q    Do you know whether the Department of Justice

10   ever instructed Mr. Lipsky not to pursue further

11   investigation on any subject related to criminal --

12       A    No such instruction was communicated to or

13   through me, nor would it have been tolerated if it had.

14       Q    Mr. Norton, in your testimony earlier this

15   afternoon, you testified that there was a widely varying

16   set of views with regard to a potential value of the

17   claims that were at issue in the criminal investigation.

18   And if I took this quote down correctly, you represented

19   that the views varied from one extreme where certain

20   members of the prosecutorial team believed that Rockwell

21   should be paid for its trouble --

22       A    That's correct.

23       Q    -- in terms of the trouble it was put to in the

24   criminal investigation?

25            And that that varied at the other end to other

209

1    members of the prosecutorial team who thought that a

2    fine in excess of $50 million would be appropriate.  Is

3    that your testimony?

4         A    That's my recollection of the debate.

5         Q    As you sit here today, could you tell me whose

6    views panned out where?

7              MR. TAYLOR:  Wait a minute.

8              MR. NORDBERG:  First of all, form.

9         Q    (By Ms. Ahern)  Let me try that again.

10        A    I would have to say -- let me say it this way

11   just because I said it way this way before.  I take full

12   responsibility for the final result in this case, and

13   therefore I would have to state that the views -- that

14   the views that were most influential were therefore

15   mine.

16        Q    (By Ms. Ahern)  Fair enough.  But even with

17   taking that into account, the views on the team did

18   differ widely on that issue; is that right?

19        A    Yes.

20             I think you can see that actually in the

21   letters over the six- or eight-month period of time, the

22   numbers bouncing around.

23        Q    Now, earlier this afternoon also, Mr. Norton,

24   you gave some testimony with regard to the plea counts

25   involving spray irrigation.  And at the time those

210

1    questions were posed to you, I believe that Mr. Norton

2    asked you to summarize your assessment of what that

3    claim was about without refreshing yourself by any

4    documents.  Do you recall that?

5        A    I do.

6        Q    As you sit here today, do you have any present

7    recollection or knowledge of the content, the actual

8    hazardous or radioactive or nonhazardous or radioactive

9    contents of any water that was spray irrigated at the

10   Rocky Flats plant site?

11       A    No.

12       Q    So as you sit here today, you don't know what

13   was in the spray water one way or another?

14       A    Well, it could read the plea agreement and

15   sentencing memorandum and supplement to refresh my

16   recollection.  I was advised at the time what the

17   various components were, but I have no independent

18   recollection at this time of what they are, or were.

19       Q    So you would rely on documents that would

20   refresh your recollection as to the content of any

21   spray irrigation --

22       A    Virtually everything we've talked about today.

23       Q    Do you recall testimony that you gave earlier

24   this afternoon with regard to the topic of pondcrete?

25       A    I do.

211

1    Q   And do you recall testimony that you offered

2  suggesting that pondcrete had -- the pondcrete waste

3  form itself had leaked off the storage pads into the

4  environment?

5    A   I believe that's correct.

6    Q   Do you know, as you sit here to day, whether it

7  was an actual leak of the waste form itself, or a

8  potentially contaminated runoff from that waste form

9  that was at issue?

10       MR. NORDBERG:  Form.

11    A   I'm not sure I know the difference of the two

12  that you've just articulated.  It sounds like it's the

13  same to me, basically.

14    Q   (By Ms. Ahern)  Fair enough.

15       MS. AHERN:  If you will give me just a second

16  off the record, I may be done.

17       (Discussion off the record.)

18       MS. AHERN:  Okay.  I don't have anything more

19  right now.

20          E X A M I N A T I O N

21  BY MR. NORDBERG:

22    Q   Very quickly, Mr. Norton, you testified you

23  spoke to the press from time to time about the

24  investigation and were truthful to the best of your

25  ability when you did so, right?

212

1      A      Yes.   I can actually only recall two specific

2    occasion when that occurred.   One was on the occasion of

3    the execution of the search warrant, and the other was

4    on the occasion of the plea agreement itself.   There may

5    have been other times, but I don't frankly recall any

6    other times.

7      Q      Do you know whether the reporters who wrote any

8    statements that you may have made recounted them

9    accurately?

10      A      I have no knowledge of that, whether they did

11    or didn't.

12      Q      So to find out what you said, we would have to

13    ask you and not them?

14      A      That would be correct.

15            MR. NORDBERG:   Nothing further.

16            MS. AHERN:   I think we're done.

17            THE DEPONENT:   Okay.

18

19

20

21

22

23

24

25