1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF COLORADO

 3    Case No. 90-K-181

 4    MERILYN COOK, et al.,

 5            Plaintiffs,

 6    vs.

 7    ROCKWELL INTERNATIONAL CORPORATION and THE DOW CHEMICAL
      COMPANY,
 8
              Defendants.
 9

10          DEPOSITION OF PAUL G. VOILLEQUE
                 December 16, 2005
11

12    APPEARANCES:

13    FOR THE PLAINTIFFS:      DAVID F. SORENSEN, ESQ.
                               Berger & Montague, P.C.
14                             1722 Locust Street
                               Philadelphia, PA  19103-6305
15
      FOR THE DEFENDANTS:      JANE S. PARK, ESQ.
16                             Kirkland & Ellis
                               717 Seventeenth Street
17                             13th Floor
                               Denver, CO  80202
18                                and
                               DOUGLAS M. POLAND, ESQ.
19                             Lafollette, Godfrey &
                                  Kahn
20                             One East Main Street
                               P.O. Box 2719
21                             Madison, WI  53701-2719

22

23

24

25
```

2

1             PURSUANT TO WRITTEN NOTICE, the deposition of

2       PAUL G. VOILLEQUE, called for examination by the

3       Plaintiffs, was taken in a conference room at Sherman &

4       Howard, L.L.C., 633 Seventeenth Street, Suite 3000,

5       Denver, Colorado, on the 16th day of December, 2005, at

6       the hour of 8:08 a.m., before Bonnie Carpenter, a

7       Notary Public and Certified Shorthand Reporter in and

8       for the State of Colorado and a Registered Professional

9       Reporter.

10                      * * * * * * * * * *

11                         I N D E X

12      Index of Examination              Page

13      Mr. Sorensen                      3

14      Ms. Park

15      Index of Exhibits                 Page

16      1   Report of September 8, 1997
            Workshop                      200,201,204,206
17

18      2   "Examination of Mass Balance
            Accounting as a Means for
            Estimating Plutonium          265,266,267,268,271
19          Releases"                     273,275,276

20      3   "Tracking Toxic Substances
            at Industrial Facilities"     265,266,271,272,325
21

22      4   Withdrawn by Mr. Sorensen     277,278,279

23

24

25

                        CARPENTER REPORTING, INC.
                            (303) 752-1200

3

```
 1    1                        *  *  *  *  *  *  *  *  *
 2    2                        PAUL G. VOILLEQUE,
 3    3    called as a witness for examination under the Rules,
 4    4    having been first duly sworn according to law, was
 5    5    examined and testified on his oath as follows:
 6    6                            EXAMINATION
 7    7    BY MR. SORENSEN:
 8    8               Q    Good morning.
 9    9               A    Good morning.
10   10               Q    Could you please state your full name
11   11    for the record.
12   12               A    It's Paul, middle initial G, last name
13   13    spelled V as in Victor, o-i-l-l-e-q-u-e.
14   14               Q    Is that Voilleque?
15   15               A    Voilleque.
16   16               Q    Okay.  I'll apologize in advance for
17   17    every time that I mispronounce it.
18   18               A    That's fine.  It's a common occurrence.
19   19               Q    My name is David Sorensen.  I'm one of
20   20    the lawyers for the plaintiffs in this case that we're
21   21    here about today.
22   22                    Could you please tell me your date of
23   23    birth, sir?
24   24               A    November 23rd, 1939.
25   25               Q    And where do you work?  A company name.
```

26                        CARPENTER REPORTING, INC.
27                            (303) 752-1200

4

1    1              A      Company name, it's MJP -- that's all

2    2       caps, all together -- Risk Assessment, Incorporated.

3    3              Q      Where is that located?

4    4              A      In Denver.  Street address?

5    5              Q      No.  That's all right.  I want to just

6    6       go a little bit through some of your background,

7    7       starting with post-high school education.  Could you

8    8       please -- I mean, I'll ask you questions, but that's,

9    9       essentially, what I'd like to get out first.  So could

10   10      you tell me where you went to college?

11   11              A      At the University of Colorado.

12   12              Q      And what was your degree in?

13   13              A      Physics.  My Bachelor's degree is in

14   14      physics.

15   15              Q      Could you speak up just a little bit?

16   16              A      I'm sorry.  I have kind of a sore

17   17      throat.

18   18              Q      Just do the best you can.  Okay.  And

19   19      when did you get that B.S. degree?

20   20              A      1961.

21   21              Q      And after that, what did you do?

22   22              A      I went to graduate school at the

23   23      University of Colorado.

24   24              Q      Did you get an advanced degree?

25   25              A      Yes, I did.

5

| | | |
|---|---|---|
| 1 | 1 | Q    What was your degree? |
| 2 | 2 | A    It was what was called a Master of Basic |
| 3 | 3 | Science, which is comprised of basic sciences: |
| 4 | 4 | Physics, chemistry, biology. |
| 5 | 5 | Q    Is that a one-year, two-year degree? |
| 6 | 6 | How long did that take? |
| 7 | 7 | A    Actually, I was there for four years.  I |
| 8 | 8 | wasn't going to school full-time throughout that |
| 9 | 9 | period. |
| 10 | 10 | Q    Do you have any other advanced degrees? |
| 11 | 11 | A    Yes.  I have a Master's Degree in |
| 12 | 12 | radiological health from the University of Michigan. |
| 13 | 13 | Q    When did you get that degree? |
| 14 | 14 | A    1966. |
| 15 | 15 | Q    Do you have any other advanced degrees? |
| 16 | 16 | A    No. |
| 17 | 17 | Q    So you do not have a Ph.D.; is that |
| 18 | 18 | correct? |
| 19 | 19 | A    That's correct. |
| 20 | 20 | Q    But after you got your Master's of |
| 21 | 21 | Science -- first, what year was that? |
| 22 | 22 | A    1965. |
| 23 | 23 | Q    What did you do after that? |
| 24 | 24 | A    Oh, which -- I'm sorry. |
| 25 | 25 | Q    The one -- the Master's of Basic |

6

```
1   1        Science.
2   2              A      Was 1965.
3   3              Q      What did you do after that?
4   4              A      That's when I went to the University of
5   5   Michigan.
6   6              Q      And when did you get that other degree?
7   7              A      In 1966, I believe I said.
8   8              Q      And what did you do after that?
9   9              A      Oh, then I went to work for the Atomic
10  10  Energy Commission at what was then called the National
11  11  Reactor Testing Station.
12  12             Q      Where?
13  13             A      That's in Idaho.
14  14             Q      What was your job there?
15  15             A      I was a health physicist initially.
16  16             Q      And how long were you working for the
17  17  AEC there?
18  18             A      I worked there until 1975.
19  19             Q      Did you have other positions with the
20  20  AEC during that time period?
21  21             A      Yes.  Subsequently, I was chief of the
22  22  environmental study section.
23  23             Q      Okay.  And then any other positions?
24  24             A      No.  I don't think so.
25  25             Q      So you were first a health physicist; is
```

7

1  1    that correct?

2  2              A    Right.

3  3              Q    What did you do in that position?

4  4              A    Actually, I was in the -- excuse me -- I

5  5    was in the environmental studies section, and we did

6  6    research on the behavior of radioactivity in the

7  7    environment, particularly radioactive iodine.

8  8              Q    That was after you were a health

9  9    physicist?

10  10             A    Well, both -- in both cases.

11  11             Q    Okay.

12  12             A    In one case, I was a member of the

13  13    section, and then, subsequently, I was chief of the

14  14    section.

15  15             Q    So before you became chief of the

16  16    section, you were a health physicist and also one in

17  17    the environmental study section; is that correct?

18  18             A    That's correct.

19  19             Q    Could you just generally describe what

20  20    your duties were in that position.

21  21             A    I did several things.  The main focus

22  22    was the experimental work related to the transfer of

23  23    radioactive iodine from air to milk -- cow's milk in

24  24    the environment.  I also was involved in internal

25  25    dosimetry calculations, reviews of technical documents,

8

1   1   safety analysis reports, things like that.

2   2               Q   Okay.

3   3               A   And I -- to clarify one thing, I was a

4   4   health physicist throughout this period.  I suspect if

5   5   I went back and knew what the job title -- job

6   6   description was -- I suspect it was probably a health

7   7   physicist all the time.

8   8               Q   Okay.  Before we get to your next

9   9   position, the national reactor test station in Idaho --

10  10   does that go by some other common name?

11  11               A   Now, it's known, I believe, as the Idaho

12  12   National Laboratory, but at the time I first -- it's

13  13   gone through a whole sequence of names, actually, and I

14  14   don't know that I can repeat them all.

15  15               Q   Okay.  And where in Idaho is it located?

16  16               A   It's located east of Idaho Falls.  It's

17  17   sometimes -- well, it's between -- it's -- excuse me.

18  18   West of Idaho Falls between Idaho Falls and Arco.

19  19   That's A-r-c-o.

20  20               Q   During the time you were there, was it

21  21   always completely owned and run by the AEC?

22  22               MS. PARK:  Objection.  Foundation.

23  23               Q   (BY MR. SORENSEN)  I'll back up.  Was

24  24   this national reactor test station owned by the AEC

25  25   when you were there?

26               CARPENTER REPORTING, INC.
27                  (303) 752-1200

9

1  1          A    Yes.  I -- well, it was owned by the

2  2  Government.  I don't know that AEC particularly owned

3  3  it.  It was a Government reservation.  I don't know

4  4  anything about ownership.

5  5          Q    Here's what I'm trying to get at.  Was

6  6  it run directly by the AEC, or through a contractor?

7  7          MS. PARK:  Objection.  Foundation.  He

8  8  said he doesn't know anything about ownership.

9  9          Q    (BY MR. SORENSEN)  That wasn't what I

10 10  was asking.

11 11          A    It was a combination.  The AEC -- there

12 12  was a local AEC office, and the laboratory that I

13 13  worked in was part of the -- the AEC.  The facilities

14 14  at the site were run by a variety of different

15 15  contractors.  There was a -- there was a section of the

16 16  site that was run by Argon National Laboratory.  There

17 17  was another section that was run at the time when I

18 18  first got there by Idaho Nuclear Corporation.  At

19 19  various times, I think General Electric and Allied

20 20  Chemical ran the chemical processing plant at the time

21 21  I was there.  When I first -- when I first began to

22 22  work there.

23 23          So there were a number of -- there were

24 24  a number of contractor organizations and then there was

25 25  the Atomic Energy Commission group.  And we -- it was

10

1   1   an unusual site in the sense that the Atomic Energy

2   2   Commission had a laboratory and our laboratory did

3   3   environmental monitoring for the whole site and it did

4   4   radiochemical analyses related to environmental

5   5   monitoring and, also, to internal dosimetry for the

6   6   whole site.  That is, in general, it provided common

7   7   services to -- to all the contractors.

8   8          Q    Your employer was the AEC; is that

9   9   correct?

10  10         A    That's correct.

11  11         Q    Okay.  And about how many AEC employees

12  12   were there at the time you were there?

13  13              MS. PARK:  Objection.  Foundation.

14  14         A    I don't know that I know the number.  I

15  15   don't think I know the number.

16  16         Q    (BY MR. SORENSEN)  Let's start more

17  17   broadly.  Do you know, as a general matter, how many

18  18   people were working there at the time you were there?

19  19              MS. PARK:  Same objection.

20  20              MR. SORENSEN:  There can't be a

21  21   foundation objection to that question.

22  22              MS. PARK:  I'm not stopping him from

23  23   answering.

24  24              MR. SORENSEN:  No.  But those kind of

25  25   objections are silly.

26
27                   CARPENTER REPORTING, INC.
                     (303) 752-1200

11

1   1                        MS. PARK:  I don't think so.

2   2                        Q    (BY MR. SORENSEN)  Go ahead.

3   3                        A    At the time, maybe a few thousand people

4   4   when I started working there.  Like 3,000, perhaps.

5   5   That's -- that's a very uncertain estimate.

6   6                        Q    All right.  Let's start with that

7   7   estimate of 3,000.  Could you estimate by percentage

8   8   what percentage would be AEC employees?

9   9                        MS. PARK:  Objection.  Speculation.

10  10   Foundation.

11  11                        A    I -- I really don't know how many AEC

12  12   employees there were.

13  13                        Q    (BY MR. SORENSEN)  Okay.  So you worked

14  14   there from '66 to '75; is that correct?

15  15                        A    '67 to '75.

16  16                        Q    '67 to '75.

17  17                        A    Yes.  I was at the University of

18  18   Michigan a year -- an additional year after getting my

19  19   Master's.

20  20                        Q    Did you ever work for one of the

21  21   contractors that you mentioned?

22  22                        A    No.

23  23                        Q    Okay.  You were always an employee of

24  24   the AEC while you were at the Idaho facility; is that

25  25   correct?

26                        CARPENTER REPORTING, INC.
27                             (303) 752-1200

12

1  A    That's correct.

2  Q    Okay.  Now, I believe you said,
eventually, you became chief of the environmental study
section; is that correct?

5  A    Yes.

6  Q    When did you assume that position?

7  A    Perhaps in 1969.  I'm not positive,
exactly.

9  Q    In that position, how many people
reported to you?

11  A    Oh, maybe eight or nine.

12  Q    What were your responsibilities in that
position?

14  A    Very similar to a -- aside from the
general management and report writing sorts of things
associated with it, they were very much the same as
they had been before.

18  Q    Okay --

19  A    I had more of a role in planning and
directing the research than I did initially.

21  Q    And during this position at the AEC, did
you have occasion to visit other AEC facilities around
the country as part of your job?

24  A    Not on any sort of routine basis.  I may
have gone to -- I may have gone to a meeting at some

13

1    1    other AEC facility.  I don't recall -- I don't recall

2    2    ever going to a particular facility offhand at this

3    3    time.

4    4                  Q    Did you ever visit Rocky Flats during

5    5    that time?

6    6                  A    No.

7    7                  Q    Do you recall any personnel from Rocky

8    8    Flats visiting you during that time?

9    9                  A    No.

10   10                 Q    Okay.  You said you left this position

11   11   in 1975; is that correct?

12   12                 A    That's correct.

13   13                 Q    And what did you do then?

14   14                 A    I went to work for Science

15   15   Applications -- what was then called Science

16   16   Applications, Incorporated.

17   17                 Q    Where?

18   18                 A    In Idaho Falls.

19   19                 Q    What kind of company was that?

20   20                 A    It's -- I call it a research -- diverse

21   21   research and consulting company.

22   22                 Q    How long were you there?

23   23                 A    From 1975 until 1990.

24   24                 Q    And what kind of stuff did you do there?

25   25                 A    I sort of changed focus from looking at

26                               CARPENTER REPORTING, INC.
27                                  (303) 752-1200

14

1   1   radioactivity in the environment to looking at

2   2   radioactivity inside nuclear facilities, particularly

3   3   nuclear powerplants.

4   4           Q    How big a company was this?

5   5           A    At -- at the time, probably a couple

6   6   thousand people.

7   7           Q    What was your job title?

8   8           A    Health physicist.

9   9           Q    Did it remain that the whole time you

10  10   were there?

11  11           A    I believe so, yes.

12  12           Q    How many people reported to you?

13  13           A    None.

14  14           Q    And what kind of clients did you work

15  15   for?

16  16           A    We worked for the Electrical Power

17  17   Research Institute.

18  18           Q    Is that a trade organization?

19  19           A    It's a research organization that's

20  20   funded by -- or at least at that time was funded by

21  21   utilities involved in electrical energy production.

22  22           Q    Funded by utilities that ran nuclear

23  23   powerplants?

24  24           A    Not exclusively, I don't believe.

25  25           Q    But included such utilities?

26
27                       CARPENTER REPORTING, INC.
                             (303) 752-1200

15

1    1              A    Yes.  I believe so.

2    2              Q    Any other types of clients you can

3    3    recall?

4    4              A    Individual utility companies.  The

5    5    Nuclear Regulatory Commission.  The Department of

6    6    Energy.  I think that generally covers it.

7    7              Q    Okay.  In working for individual utility

8    8    companies, what kind of stuff did you do for them?

9    9              A    It was similar -- initially similar to

10   10   what I had mentioned, looking -- looking at the

11   11   behavior of radioactivity in their facilities

12   12   initially.  And then we subsequently did work related

13   13   to effluent monitoring systems for those facilities.

14   14              Q    What does "effluent" mean?

15   15              A    We were concerned with releases to the

16   16   atmosphere of airborne effluents.

17   17              Q    That's what "effluent" means?  Release?

18   18              A    Yes.

19   19              Q    Just asking.

20   20              A    Sorry.

21   21              Q    No.  That's all right.  I'm just trying

22   22   to simplify.  Did you ever work during this time from

23   23   '75 to '90 for any of these clients in connection with

24   24   litigation?

25   25              MS. PARK:  Objection to form.

16

1   1              A    Actually, there was some work that we

2   2    did in connection with litigation.  It was for a

3   3    utility that had an unexpected release to the

4   4    environment, and we made, as I recall, a number of

5   5    environmental measurements around the facility and --

6   6    and did a variety of calculations related to this -- to

7   7    this incident.

8   8              Q    (BY MR. SORENSEN)  When did this happen?

9   9              A    Oh, that's a good question.  Around

10  10   1981, 1982.  When was the Challenger disaster?

11  11             Q    '84?

12  12                  MR. POLAND:  January 1986.

13  13             A    Challenger?

14  14                  MR. POLAND:  January 1986.

15  15             A    Okay.  Well, I was -- I was the -- I was

16  16   at that facility when that occurred.

17  17             Q    (BY MR. SORENSEN)  All right.  So about

18  18   1986.

19  19             A    So, you know -- and that was after some

20  20   work had been done, so maybe 1985 or 1984.

21  21             Q    And what was -- I'm sorry.  Were you

22  22   finished?

23  23             A    Yes.

24  24             Q    What facility was this?

25  25             A    It was called the Robert E. Ginna,

17

1   1   G-i-n-n-a, I think, powerplant.

2   2           Q    Where?

3   3           A    In Vermont.  No.  No.  No.  It was in

4   4   upstate New York.  Sorry.

5   5           Q    And did you testify in that case?

6   6           A    No.  No.  We were only -- we only

7   7   gathered information, environmental information.

8   8           Q    On behalf of the powerplant?

9   9           A    On behalf of the utility; right.

10  10          Q    And do you know what kind of case it

11  11  was?  Property contamination?  Personal injury?

12  12  Something else?  Do you know?

13  13          MS. PARK:  Objection.  Form.

14  14          A    No.  Actually, I don't.  And it's

15  15  possible that I may have misanswered your question.  I

16  16  know that the reason I said that -- that we were

17  17  involved in a -- in a -- some sort of litigation, we

18  18  may not have been, but we -- we -- I can remember

19  19  marking materials as -- as being privileged and

20  20  confidential, so, you know, I don't know in legal

21  21  terms, you know -- we were outside expert consultants

22  22  to them, but we -- to my knowledge, no one in our

23  23  company testified on their behalf.  And I don't think

24  24  we submitted any sort of expert report.  We did

25  25  technical analyses, but I don't think there was any

26                  CARPENTER REPORTING, INC.
27                     (303) 752-1200

18

1   1   sort of expert report.  So given that information, you

2   2   can decide if I've answered the question you asked.

3   3                  MS. PARK:  Just answer the question

4   4   asked.

5   5                  Q   (BY MR. SORENSEN)  Do you know what

6   6   happened in that case?

7   7                  A   No.

8   8                  Q   All right.  Are there any other

9   9   litigation matters that you can recall participating in

10  10  between '75 and '90?

11  11                 A   No.

12  12                 Q   What kind of work did you do for the NRC

13  13  during that time period?

14  14                 A   It was also related to radioactive

15  15  behavior in nuclear powerplants.  They were changing

16  16  their regulations and so there was a need to know where

17  17  in the plant the radioactivity was coming from and what

18  18  you could best do to clean it up.  That sort of thing.

19  19  That was the general focus of all these studies.

20  20                 Q   During this time, were you studying the

21  21  behavior of radioactivity inside human beings?

22  22                 A   No.

23  23                 Q   And what kind of work did you do for the

24  24  DOE during this time period?

25  25                 MS. PARK:  Specify the time period for

19

1    me.

2              Q    (BY MR. SORENSEN)   The time period we've

3    been discussing, '75 to '90.

4              A    '75 to '90.  Most of the work that was

5    done for DOE was -- was after the Three Mile Island

6    accident.  We were involved in a number of studies of

7    potential releases in the facility and -- and the

8    releases that could be associated with the -- with the

9    cleanup of the facility.

10             Q    Was that in connection with any

11   litigation?

12             A    No.  Not to the best of my knowledge.

13             Q    And how long did that work for DOE last?

14   From when to when?

15             A    Well, the accident occurred in --

16             Q    '78?

17             A    '78.  Yeah.  '79.

18             Q    Okay.

19             A    And this work would have been in the --

20   we also worked at Three Mile Island for the Electric

21   Power Research Institute.  That was right after the

22   accident.  The work for DOE was later, perhaps in '81

23   to '84 or something like that.  Maybe '85.

24             Q    I just want to clarify.  So your -- your

25   work for the DOE began in 1981?

20

1   1              A     Yes.  I think that's right.  Around that

2   2     time period.  Possibly 1980, but it was definitely

3   3     after the -- after the things had settled down.

4   4              Q     Okay.  And the work you did for DOE,

5   5     what did that consist of more specifically?

6   6              A     Well, one study was related to what

7   7     would happen when you -- the feasibility of removing

8   8     damaged fuel from the reactor and the -- you know, we

9   9     also did a study of -- of the venting of the

10  10    containment building and of the behavior of radioactive

11  11    iodine in the containment building, iodine 129,

12  12    long-lived iodine.

13  13              Q     Did you do any study of the amount of

14  14    radioactive materials released into the environment?

15  15              A     Yes, we did.

16  16              Q     And did that work result in some kind of

17  17    a report that you prepared?

18  18              A     There are a number of reports, yes.

19  19              Q     That you prepared or participated in

20  20    preparing?

21  21              A     Yes.

22  22              Q     Okay.  Do you know whether any of these

23  23    reports were used in litigation?

24  24              A     No.

25  25              Q     You don't know, or they weren't?

26
27

21

| | | | |
|---|---|---|---|
| 1 | 1 | A | I don't know. |
| 2 | 2 | Q | Okay.  So your work for DOE went from |

'81 to '85; is that correct?

          A     Roughly.  Perhaps 1980 to 1985.  I don't
remember exactly.

          Q     During this period from '75 to '90, did
you do any other work for the DOE besides what you just
described?

          A     I don't recall any at this time.

          Q     And in 1990, you left to form MJP Risk
Assessment; is that correct?

          A     That's correct.

          Q     Where is that incorporated?

          A     In Idaho.

          Q     How many employees does it have?

          A     One.

          Q     Is that you?

          A     Yes.

          Q     What -- are you the sole shareholder?

          A     Yes.

          Q     Have you always been the sole
shareholder?

          A     Yes.

          Q     Have you always been the only employee?

          A     Yes.

22

1    1              Q     And when did you get involved with RAC?

2    2                    MS. PARK:  Objection.  Form.

3    3              A     Either in late 1990 or early 1991.

4    4              Q     (BY MR. SORENSEN)  How did you become

5    5    involved with RAC?

6    6              A     I was asked to assist in the Fernald

7    7    project, Fernald dose reconstruction project.

8    8              Q     Who asked you?

9    9              A     John Till.

10   10             Q     Did you know John Till previously?

11   11             A     Yes.  I had met him previously.

12   12             Q     Where did you meet him?

13   13             A     Actually, I believe I met him at

14   14    Oakridge in about 1975, when we were doing work

15   15    around -- in and around nuclear powerplants.  He was at

16   16    Oakridge at the time, and we went to Oakridge and made

17   17    a presentation at a meeting.

18   18             Q     Was that when you were at this prior

19   19    company?

20   20             A     Right.

21   21             Q     So John Till asked you to assist in a

22   22    dose reconstruction at Fernald in connection with

23   23    litigation; is that right?

24   24                   MS. PARK:  Objection.  Assumes facts not

25   25    in evidence.

26
27                       CARPENTER REPORTING, INC.
                          (303) 752-1200

23

1   1              A    No.

2   2              Q    (BY MR. SORENSEN)  So there was

3   3    litigation involving Fernald.  You do realize that;

4   4    right?

5   5              A    Yes.

6   6              Q    All right.

7   7              A    But --

8   8              Q    Go ahead.  Go ahead.

9   9              A    Our dose reconstruction project was not

10  10   associated with the litigation.

11  11              Q    Okay.  Did you prepare any reports, give

12  12   any testimony in connection with the litigation

13  13   involving Fernald?

14  14              A    No.

15  15              Q    Okay.

16  16              A    Sorry.

17  17              Q    That's all right.  Was this a dose

18  18   reconstruction for workers or --

19  19              A    No.  For the public.  Exposure to

20  20   members of the public.

21  21              Q    Okay.  To what?  Uranium?

22  22              A    Yes.

23  23              Q    The principal --

24  24              A    Principally uranium.  Natural uranium.

25  25              Q    Okay.  So you worked with Dr. Till and

24

1    RAC beginning in late '90, early '91; is that correct?

2         A    That's correct.  I don't remember which

3    of those times is more correct.

4         Q    And after that work at Fernald, what was

5    the next project with RAC that you were involved in?

6         A    It was, I believe, a similar study where

7    the -- the beginning of a similar study at the Savannah

8    River site.

9         Q    Fernald is a DOE facility; correct?

10        A    It was, yes.

11        Q    It was.  A DOE weapons facility;

12   correct?

13        A    Yes.

14        Q    All right.  And Savannah River, what is

15   that?

16        A    It's called, I think, formally the

17   Savannah River site.  It was a source of production of

18   plutonium.  It was also a DOE facility.

19        Q    And then after -- I'm sorry.  With

20   respect to the Savannah River site, what kind of work

21   did you do?

22        A    We did the initial phase of -- of a dose

23   reconstruction project at Savannah River to look at the

24   historical releases and the potential exposure to

25   people off-site.

25

1    1            Q    And who was that work done for?

2    2            A    Centers for Disease Control and

3    3    Prevention.

4    4            Q    And who provided the funding?

5    5            A    I believe the funding ultimately came

6    6    from the Department of Energy.

7    7            Q    Now, with respect to the Fernald study,

8    8    who provided the funding for that?

9    9            MS. PARK:  Objection.  Foundation for

10   10   all of these.  If you know, you can answer.

11   11           Q    (BY MR. SORENSEN)  That goes without

12   12   saying.  Go ahead

13   13           A    I don't know for sure, but I believe

14   14   it's the same answer; that it came from the Department

15   15   of Energy.

16   16           Q    With respect to the Savannah River site,

17   17   did you do any work in connection with litigation?

18   18           A    No.

19   19           Q    And other than Fernald and Savannah

20   20   River, have you had any other projects with RAC other

21   21   than this case, which we'll get to?

22   22           MS. PARK:  Objection.  Form.

23   23           Q    (BY MR. SORENSEN)  Go ahead.

24   24           A    We did a dose reconstruction for the --

25   25   the second phase of the health studies of -- of Rocky

26

1       Flats.

2                       Q       Right.  Okay.  Other than Rocky Flats,

3       Savannah River, and Fernald, were there any other dose

4       reconstruction studies that you've been involved in

5       with RAC?

6                       A       Dose reconstruction, no.

7                       Q       Any other work involving RAC?

8                       A       Yes.

9                       Q       What?

10                      A       We did audits of the environmental

11      releases at Los Alamos National Laboratory, or the

12      effluent monitoring program and environmental program

13      at Los Alamos National Laboratory.

14                      Q       When did you do that work?

15                      A       It was -- it was over a period of time.

16      I think beginning in 1997.  There was -- there was an

17      initial audit.  Then there was a second audit, which

18      might have been in 2000.  The third in 2002, I think.

19      I'm not positive of those dates.

20                      Q       Were these audits in connection with

21      litigation?

22                      A       They came as the result of a settlement

23      of litigation between the laboratory and one or more

24      citizens groups.  And the -- the settlement was that

25      the -- the agreement was that both sides would agree

27

1    1    for -- for RAC to address -- actually, I should have

2    2    been a little more specific.  These deal with

3    3    compliance with the Clean Air Act, so the settlement

4    4    was that -- that both parties agreed that -- that we

5    5    would do an independent audit of their compliance with

6    6    the Clean Air Act --

7    7                Q    Okay.

8    8                A    -- related to radioactive --

9    9    radioactivity releases, primarily.

10   10               Q    And who was paying you?

11   11               A    The Department of Justice.

12   12               Q    Were they getting their funds from the

13   13   DOE?

14   14               MS. PARK:  Objection.  Foundation.

15   15               A    I don't know that.  I don't know for

16   16   sure what the answer to that is.

17   17               Q    (BY MR. SORENSEN)  Okay.  Okay.  Other

18   18   than what you've just mentioned, have you done any

19   19   other work with RAC?

20   20               A    I've been involved in work -- slightly

21   21   involved in a study for Colorado State University that

22   22   deals with -- with risk assessment communication and

23   23   analysis of -- of waste locations at Los Alamos.

24   24               Q    I'm sorry.  Is RAC involved in that

25   25   work?

26                        CARPENTER REPORTING, INC.
27                            (303) 752-1200

28

1    1              A    RAC is -- yes.

2    2              Q    And is this a research project?

3    3              A    Yes.

4    4              Q    Okay.  Any other work involving RAC?

5    5              A    RAC did an analysis of the Cerro Grande

6    6    fire at Los Alamos.

7    7              Q    When was that fire?

8    8              A    1990, perhaps.  No.  Excuse me.  2000.

9    9              Q    How do you spell Cerro --

10   10             A    C-e-r-r-o, G-r-a-n-d-e.  It was a -- it

11   11   was a forest fire that burned part of the -- burned

12   12   vegetation on the LANL site.

13   13             Q    Was there a concern that the fire

14   14   resulted in releases of radioactivity?

15   15             A    Right.

16   16             Q    That was the concern?

17   17             A    That was the concern.

18   18             Q    Why?  Did it burn some fuel or --

19   19             A    No.

20   20             Q    Why was there a concern?

21   21                  MS. PARK:  If you know, I guess.

22   22   Foundation.  Calls for speculation.

23   23             A    Well, it was a -- there was public

24   24   concern, I believe, is the answer.

25   25             Q    (BY MR. SORENSEN)  Was there concern the

26                            CARPENTER REPORTING, INC.
27                              (303) 752-1200

29

1    1    vegetation or things that were burned were themselves

2    2    contaminated --

3    3              MS. PARK:  Same --

4    4              Q    (BY MR. SORENSEN)  -- with

5    5    radioactivity?

6    6              MS. PARK:  Same objection.

7    7              Q    (BY MR. SORENSEN)  I guess I'm not

8    8    clear.

9    9              A    Well, I don't know that it was

10   10   vegetation explicitly.  I mean, it was -- it was a -- I

11   11   believe broader than that.  My involvement -- I should

12   12   have said at the beginning -- was only peripheral in

13   13   this -- in this project, but their -- you know, the

14   14   basis for the -- well, I think there were several

15   15   bases.  There were also high winds at the time.

16   16             Q    I'm trying to understand the basis for

17   17   the concern for the release of radioactivity.  Let's

18   18   start again.  What burned?

19   19             A    Vegetation.

20   20             Q    Okay.  Was there concern that the

21   21   vegetation was itself contaminated with radioactivity?

22   22             MS. PARK:  Objection.  Foundation.

23   23             A    The vegetation does contain

24   24   radioactivity.

25   25             Q    (BY MR. SORENSEN)  From --

26
27                      CARPENTER REPORTING, INC.
                             (303) 752-1200

30

1    1              A     All vegetation contains radioactivity.

2    2               Q     I mean, above natural levels.

3    3               A     People were also concerned about cesium

4    4   131 in the vegetation that would have come from

5    5   radioactive fallout, and they were concerned with the

6    6   possibility of radionuclides released from the

7    7   laboratory being in the vegetation.

8    8              Q     Okay.

9    9               A     It's a complex --

10   10            Q     So what did you do in connection with

11   11   that work?

12   12            A     I attended a couple of meetings.  As I

13   13   said, I was only peripherally involved.  I probably

14   14   reviewed some draft material, discussed various aspects

15   15   of the study with other members of the team.

16   16            Q     Okay.  Any other work involving RAC?

17   17            A     Not that I can think of at the moment.

18   18            Q     Okay.  How did you get involved in RAC's

19   19   work in connection with -- let me start again.

20   20               How did you become involved in RAC's

21   21   work relating to Rocky Flats?

22   22             MS. PARK:  Objection.  Form.

23   23            A     I participated in writing the proposal

24   24   to the -- to the Health Advisory Panel.

25   25            Q     (BY MR. SORENSEN)  When?

31

1    1              A     I think that would have been in 1991 or

2    2     1992.

3    3              Q     This proposal, was this a -- can you

4    4     describe it, please.

5    5              A     Well, there was a request for proposal

6    6     that was submitted to do the second phase of the study

7    7     related to health risks from Rocky Flats that was being

8    8     conducted by the Colorado Department of Health.  And --

9    9              Q     Who did the request for proposal come

10   10    from?  What agency; do you know?

11   11             A     I was just thinking of that, actually.

12   12    I believe it came from the Colorado Department of

13   13    Health.

14   14             Q     So you participated in writing it?

15   15             A     Yes.

16   16             Q     Who else participated in writing the

17   17    proposal?

18   18             A     Oh, many people on the team.  John Till,

19   19    Helen Grogan, Kathleen Meyer, probably Art Rood.  That

20   20    may be an incomplete list.

21   21             Q     And after this request for proposal was

22   22    accepted, then you just continued to work on the Rocky

23   23    Flats matter; is that correct?

24   24             A     Well, it was a competition, and the --

25   25    we -- we won the competition.  So we -- we -- our

26         CARPENTER REPORTING, INC.
27         (303) 752-1200

32

1   1   proposal was selected as the best of -- I don't know

2   2   how many that were submitted.

3   3            Q    How many were submitted?

4   4            A    I don't -- that's what I said.  I don't

5   5   know how many were submitted.  There were two

6   6   finalists.  I know that.

7   7            Q    Who was the other finalist?

8   8            A    I can't remember exactly what they were

9   9   called.  I think it was somehow related to -- it was

10  10   another environmental consulting firm.  I don't

11  11   remember for sure.  I couldn't say what their name was.

12  12   And so ...

13  13            Q    You're married; correct, sir?

14  14            A    That's correct.

15  15            Q    And your wife's name is Norma; is that

16  16   correct?

17  17            A    Yes.

18  18            Q    When did you meet her?

19  19            A    About 1989.

20  20            Q    Where was she working when you met her?

21  21            A    At the Colorado Department of Health.

22  22            Q    And what role did she have in deciding

23  23   to give the contract to RAC?

24  24            A    She didn't have a role.

25  25            Q    What role did she have after RAC was

26            CARPENTER REPORTING, INC.
27                 (303) 752-1200

33

1   1   chosen in connection with CDH's monitoring of RAC's

2   2   work?

3   3           A    Our -- our work was monitored by the

4   4   Health Advisory Panel.

5   5           Q    Well, what was her position at CDH

6   6   during the period '89 through the present?

7   7           A    She was manager -- or I guess -- she was

8   8   in charge of the Rocky Flats health studies group for

9   9   the Department of Health.

10  10          Q    When you say in charge of the Rocky

11  11  Flats health studies group, what does that mean?

12  12          A    That's just my general description.  I

13  13  don't know her official title.

14  14          Q    Well, RAC was chosen by CDH; correct?

15  15          A    No.  RAC was chosen by a subcommittee of

16  16  the Health Advisory Panel.

17  17          Q    Okay.  What -- after RAC was chosen and

18  18  it started doing its work, what did CDH do with respect

19  19  to RAC?  Did it receive reports?  Did it have meetings

20  20  with RAC?  I mean, what -- what was CDH doing during

21  21  this time period?

22  22          MS. PARK:  Objection to form.  There

23  23  were a number of questions.  Which one?

24  24          Q    (BY MR. SORENSEN)  I'm trying to

25  25  understand what CDH's role was once RAC was chosen with

34

1   respect to RAC.

2                   MS. PARK:  So what's the question?

3                   MR. SORENSEN:  That's the question.

4                   Q    (BY MR. SORENSEN)  What was CDH doing?

5   What was its role?

6                   A    Well, I didn't work at CDH, so I can't

7   answer that completely.  They did -- they did

8   facilitate the work of the Health Advisory Panel, which

9   was in charge of our work.  RAC's work.

10                  Q    Did CDH have something to do with the

11  funding for this study?

12                  A    Yes.

13                  Q    What was CDH's role with respect to

14  funding; do you know?

15                  A    The -- I believe that RAC -- well, RAC's

16  contract was, I believe, with the Colorado Department

17  of Health.

18                  Q    Was this a -- an annual renewable

19  contract, or did it have an open-ended term, or do you

20  know?

21                  A    I don't know the contractual

22  arrangements.

23                  Q    And who at CDH managed or supervised the

24  contract for CDH; do you know?

25                  MS. PARK:  Objection to form.

35

1    1                 A    I think the person who was most heavily

2    2    involved in the contractual matters was -- her name has

3    3    gone out of my head, but I'll try to remember.

4    4                 Q    (BY MR. SORENSEN)  I want to go --

5    5                 A    To go back to your previous question, I

6    6    think the contract -- RAC's contract was for the -- for

7    7    the period of Phase II.  It wasn't -- it wasn't --

8    8    well, I'll retract that.  I don't know for sure.

9    9                 Q    Okay.  Your wife, I believe you said she

10   10   was manager in charge of Rocky Flats health studies

11   11   group at CDH; is that correct?

12   12                 A    I don't know the official name of

13   13   that -- of that -- I don't know if it's called a group

14   14   or a section or whatever.

15   15                 Q    During what period of time did she have

16   16   this position?

17   17                 A    I think from 1989 to 1999, probably.

18   18                 Q    When did you get married?

19   19                 A    2001.

20   20                 Q    When would you say your relationship

21   21   with her began, if you met her in 1989?

22   22                 MS. PARK:  Objection to form.  And I

23   23   just fail to see the relevancy of this entire line of

24   24   questioning.

25   25                 Q    (BY MR. SORENSEN)  Go ahead.

26        CARPENTER REPORTING, INC.
27        (303) 752-1200

36

1    1              A    Sometime in the -- sometime after 1993.

2    2    Sometime -- perhaps in 1993.

3    3              Q    Is she still with the CDH?

4    4              A    Yes.

5    5              Q    Before you were married, did you have

6    6    any conversations with her about whether your

7    7    relationship presented a conflict of interest?

8    8              MS. PARK:  Objection to form.

9    9              A    Yes.

10   10             Q    (BY MR. SORENSEN)  And what -- what did

11   11   you discuss before you were married?  I'm not asking

12   12   any questions about once you were married.  How -- I

13   13   mean, you had some -- let me start again.

14   14             You said you had a conversation -- more

15   15   than one -- with your future wife before you were

16   16   married about the issue of whether your relationship

17   17   posed a conflict of interest.  I'm just asking you to

18   18   describe what those conversations were about.  How did

19   19   you -- what kind of conflict of interest did either of

20   20   you see?

21   21             A    She wasn't my future wife at the time.

22   22             Q    Right.  I mean, you had a relationship.

23   23   At some point, you got married.  I understand that.

24   24             A    Right.

25   25             Q    You had a conversation about the subject

26                            CARPENTER REPORTING, INC.
27                               (303) 752-1200

37

1    of conflict of interest; correct?

2                A    That's correct.

3                Q    Could you please describe the conflict?

4                A    Well, we didn't see that there was a

5    conflict, actually.

6                Q    What potential conflict did you discuss?

7                A    We discussed the fact that there could

8    be an appearance of a conflict.

9                Q    What conflict?

10               A    That people might not recognize that the

11   Health Advisory Panel was, in fact, in charge of RAC's

12   work, rather than her being in charge of RAC's work.

13               Q    So the conflict that you discussed was

14   that your -- that Ms. Mahler -- her last name was

15   Mahler?

16               A    Sorry?

17               Q    Her last name was Mahler at the time?

18               A    Morin.

19               Q    What was it?

20               A    Morin.

21               Q    How do you spell it?

22               A    M-o-r-i-n.

23               Q    Was the potential conflict you discussed

24   the fact that in her position at CDH and your position

25   at RAC, it may appear that RAC was being favored

1    1    because of her position at CDH?  Is that the conflict

2    2    you were talking about?

3    3                   MS. PARK:  Objection.  Mischaracterizes

4    4    his testimony.

5    5             Q    (BY MR. SORENSEN)  I'm asking a

6    6    question.

7    7             A    The -- well, could you repeat it?

8    8             Q    Sure.  I'm trying to understand what

9    9    this conflict or potential conflict was.

10   10            A    I -- I just told you what the potential

11   11   conflict was.

12   12            Q    Was it the fact that you -- your future

13   13   wife had a position in CDH, you worked for RAC, and

14   14   that it might appear that RAC was being favored?  Is

15   15   that the conflict that you were talking about?

16   16                   MS. PARK:  Objection.  Form and

17   17   mischaracterizes.

18   18                   MR. SORENSEN:  I'm not characterizing

19   19   anything.  I'm just asking him a question.

20   20                   MS. PARK:  Let me just get my objections

21   21   on the record, please, without interrupting.

22   22   Objection.  Form.  And mischaracterizes his testimony.

23   23            Q    (BY MR. SORENSEN)  Okay.  Go ahead.

24   24                   MS. PARK:  And I'll put asked and

25   25   answered.

26
27                        CARPENTER REPORTING, INC.
                           (303) 752-1200

39

1   1              Q    (BY MR. SORENSEN)  Go ahead.

2   2              A    Could you read it back, please.

3   3                   (The referred-to question was read by

4   4       the reporter.)

5   5              A    Yes.

6   6              Q    (BY MR. SORENSEN)  Okay.  Did you have

7   7       conversations with -- you personally have any

8   8       conversations with anyone else at RAC about this

9   9       potential appearance of conflict?

10  10             A    Yes, I did.

11  11             Q    Who did you talk to?

12  12             A    I recall talking to John Till.

13  13             Q    Did you talk to anyone else at RAC about

14  14       this subject?

15  15             A    I don't believe so.

16  16             Q    And what did John Till tell you?

17  17             A    I don't recall our discussion

18  18       explicitly.

19  19             Q    Okay.

20  20             A    But that -- I don't recall our

21  21       discussion explicitly.

22  22             Q    When did you have these discussions with

23  23       your future wife?

24  24                  MS. PARK:  Objection.  Form.

25  25             A    I don't know.

26                      CARPENTER REPORTING, INC.
27                         (303) 752-1200

40

1   1              Q    (BY MR. SORENSEN)  When did you have

2   2   this discussion with John Till?

3   3              A    I can't give you an exact date in either

4   4   case.

5   5              Q    Can you give me a rough date?

6   6              A    Not -- it's not clear in my mind.

7   7              Q    Well, let's try and refresh your memory.

8   8   You met your future wife in '89.  You said you began a

9   9   relationship with her in '93.  RAC obtained the

10  10  contract with CDH in '92?

11  11             A    Yes.

12  12             Q    Okay.  So --

13  13             A    I think it's '92.  Maybe early '93.

14  14             Q    Okay.  So did you have these discussions

15  15  with John Till about a potential conflict sometime in

16  16  '93 or before '93?

17  17             A    No.  I don't -- I don't think so.

18  18             Q    Later?

19  19             A    It was -- it would have been later.

20  20             Q    Okay.  '95, '96?  I'm just seeing if we

21  21  can --

22  22             A    As I said, I can't give you an exact

23  23  date.

24  24             Q    Okay.  I take it it's correct that John

25  25  Till didn't tell you to end the relationship; correct?

26          CARPENTER REPORTING, INC.
27             (303) 752-1200

1    1              A     That's correct.

2    2              Q     Okay.  Did you have any discussions with

3    3    anyone at CDH about this potential conflict, other than

4    4    your future wife?

5    5              A     No.  But I believe she did.

6    6              Q     Who did she have conversations with; do

7    7    you know?

8    8              A     Her supervisor, I believe.

9    9              Q     Who was her supervisor?

10   10             A     Ellen Mangione.

11   11             Q     I'm sorry.  What was her name?

12   12             A     Ellen Mangione.

13   13             Q     And what was Ms. Mangione's title at

14   14    CDH; do you know?

15   15             A     No.  She was the -- she was the

16   16    supervisor of the group in which Norma worked.

17   17             Q     Do you know when this conversation took

18   18    place?

19   19             A     At about the same time as my

20   20    conversation with John Till.

21   21             Q     Well, what prompted your conversation

22   22    with John Till and your wife's -- your future wife's

23   23    conversation with Ms. Mangione?

24   24             A     We decided that would be the best thing

25   25    to do.

42

1   1            Q    Okay.  Any other conversations that you

2   2    can recall that you or your future wife had about this

3   3    potential conflict with other people?

4   4            A    I can't speak for her, but I don't

5   5    recall.

6   6            Q    Any of the --

7   7            A    For me.

8   8            Q    For you.  Okay.  You attended a number

9   9    of HAP meetings; correct?

10  10           A    Yes.

11  11           Q    How many?  Do you recall?

12  12           A    Well, they were quarterly meetings,

13  13    so --

14  14           Q    Which took place from when to when?

15  15           A    Well, from whenever it was the contract

16  16    started, which would have been perhaps in 19 -- either

17  17    1992 or 1993.  I guess it probably was early '93, so

18  18    there were probably 25 quarterly meetings that I might

19  19    have attended --

20  20           Q    At any of these meetings --

21  21           A    -- assuming that there were four per

22  22    year.

23  23           Q    Okay.  These were all public meetings?

24  24           A    Yes.

25  25           Q    All right.  At any of these public

26                          CARPENTER REPORTING, INC.
27                             (303) 752-1200

43

1  1    meetings, did you disclose this potential conflict that

2  2    you've just been discussing?

3  3            A    No.

4  4            Q    Okay.  When were you first contacted

5  5    about being a potential witness in this case?

6  6            A    Fairly recently.

7  7            Q    When?

8  8            A    I can't say exactly.  Within the last --

9  9    I'd say within the last two months.  Perhaps three.

10 10            Q    Who contacted you?

11 11            A    Doug Poland.

12 12            Q    Did he call you?

13 13            A    Yes.

14 14            Q    And what did he say?

15 15            A    He said would I -- I can't remember

16 16    exactly his words, but, basically, the question was

17 17    would I be willing to be called as a witness.

18 18            Q    Had you heard of this case before he

19 19    called you?

20 20            A    Yes.

21 21            Q    When did you first hear of this case,

22 22    talking about the case we're here about today, Cook v.

23 23    Rockwell?

24 24            A    I'm not sure when I first heard about

25 25    it.  When I first heard about RAC's being involved in

44

1    1    it was probably in 2004.

2    2              Q    Okay.  How did you hear that?

3    3              A    At a meeting with -- with Doug Poland

4    4    and other people on the RAC team.

5    5              Q    When was this meeting?

6    6              A    In 2004, I think I said.

7    7              Q    Where was this meeting?

8    8              A    Maybe in Austin, Texas.  I don't know

9    9    for sure.  I don't recall exactly.

10   10             Q    Who was at this meeting?

11   11             A    Doug was at the meeting.  John Till was

12   12   at the meeting.  I was at the meeting.  Probably Helen

13   13   Grogan and Kathleen Meyer.  But I don't know.

14   14             Q    What was the purpose of the meeting?

15   15             A    As I think was stated just a minute ago,

16   16   that's where I first learned of the possibility of

17   17   RAC's being involved in this incident as a witness.

18   18             Q    But that wasn't the purpose of the

19   19   meeting, was it?  To inform you about this case?

20   20             A    No --

21   21             MS. PARK:  I'm sorry.  Could you just go

22   22   back and read the last Q and A and his answer?

23   23             (The referred-to question and answer

24   24   were read by the reporter.)

25   25             Q    (BY MR. SORENSEN)  What was the purpose

26        CARPENTER REPORTING, INC.
27             (303) 752-1200

45

1   1   of the meeting?

2   2          A     To --

3   3                 MS. PARK:  Objection.  Asked and

4   4   answered.

5   5                 MR. SORENSEN:  There was not an answer.

6   6          Q     (BY MR. SORENSEN)  Go ahead.

7   7          A     To discuss the possibility of RAC's

8   8   being involved in -- in this case.

9   9          Q     Who called the meeting?

10  10          A     I don't know.

11  11          Q     How long did it last?

12  12          A     Perhaps an hour.  Perhaps less.  I'm not

13  13   sure.

14  14          Q     Who asked you to be there?

15  15          A     John Till.

16  16          Q     And during this meeting, did the subject

17  17   of a potential conflict come up?  That is, RAC's having

18  18   done work for the State of Colorado and then, also,

19  19   being a witness in a -- in a lawsuit on behalf of

20  20   defendants?

21  21                 MS. PARK:  Objection.  Form.  And it's

22  22   misleading.

23  23          A     Sorry.  Would you --

24  24          Q     (BY MR. SORENSEN)  It's just a question.

25  25   I'll start again.

26
27                 CARPENTER REPORTING, INC.
                    (303) 752-1200

46

1    1                    MS. PARK:  It's a loaded question.

2    2                    Q    (BY MR. SORENSEN)  During this meeting,

3    3    did the subject of conflict of interest come up at all;

4    4    that is, the potential conflict that RAC had done work

5    5    through CDH and now might participate in litigation on

6    6    behalf of Rockwell and Dow?

7    7                    MS. PARK:  Same objection.

8    8                    A    The purpose of RAC's participation, as I

9    9    understood it then and as I understand it now, is to

10   10   present the results of work that was done for -- for --

11   11   as part of the -- the Rocky Flats health studies

12   12   project.

13   13                    Q    (BY MR. SORENSEN)  You understand

14   14   Dr. Till is testifying as we speak?

15   15                    A    Yes.  I guess that's true.

16   16                    Q    And you understand he's being paid by

17   17   Kirkland & Ellis?

18   18                    MS. PARK:  Objection.  Form.

19   19                    A    No.  I don't understand that.

20   20                    Q    (BY MR. SORENSEN)  You don't know that.

21   21   Okay.  You still haven't answered my question.  Did the

22   22   subject of a potential conflict come up during this

23   23   meeting?

24   24                    MS. PARK:  Same objection.

25   25                    Q    (BY MR. SORENSEN)  Yes or no?

26
27                        CARPENTER REPORTING, INC.
                              (303) 752-1200

47

1   1                    MS. PARK:  Objection to form.

2   2              A    I believe I just said that the purpose

3   3   of -- of the proposed testimony was to explain the --

4   4   our project for the Colorado Department of Health and

5   5   the results of our project --

6   6              Q    (BY MR. SORENSEN)  So is the answer

7   7   no --

8   8              A    -- to the extent that they relate to the

9   9   issues associated with this litigation.

10  10             Q    At this meeting you've been describing,

11  11   did anyone in the room at any time utter the words,

12  12   "This may be a conflict"?  Anything like that?

13  13                   MS. PARK:  Objection.  Form.

14  14             A    Not that I recall, for the reason that I

15  15   gave you.

16  16             Q    (BY MR. SORENSEN)  If it didn't come up

17  17   for the reason you gave me, doesn't that imply that you

18  18   or someone thought that there was a potential conflict

19  19   and then decided there was not?

20  20                   MS. PARK:  Objection.  Form.

21  21   Foundation.  Calls for speculation.  Misleading.

22  22                   MR. SORENSEN:  I'm just asking him.

23  23                   MS. PARK:  And I'm putting my objections

24  24   on the record.

25  25             Q    (BY MR. SORENSEN)  Do you follow what

26                      CARPENTER REPORTING, INC.
27                        (303) 752-1200

48

1    1    I'm asking?

2    2            A    No.  Actually, I don't.  I believe I've

3    3    answered your question.

4    4            Q    Okay.  After -- when was this meeting in

5    5    2004?  Can you narrow it down?

6    6            A    I believe it was in the spring.

7    7            Q    The spring?

8    8            A    Possibly March.

9    9            Q    When was your next meeting or

10   10   conversation about this case?

11   11            MS. PARK:  Objection.  Form.

12   12            A    I think it probably would have been in

13   13   2005.

14   14            Q    (BY MR. SORENSEN)  And who was that

15   15   conversation with?

16   16            A    With -- with Doug Poland, I think.

17   17            Q    The one you mentioned just a little

18   18   while ago?  A few months ago?

19   19            A    Well, we talked about -- there was

20   20   another physical meeting or a meeting where -- that

21   21   people attended.

22   22            Q    When was that?

23   23            A    My recollection is that it would have

24   24   been in July.

25   25            Q    July of --

26
27                     CARPENTER REPORTING, INC.
                       (303) 752-1200

49

1    1         A     2005.

2    2         Q     Where was that meeting?

3    3         A     In Wyoming.

4    4         Q     Who was at that meeting?

5    5         A     As I recall, Doug Poland and I and John

6    6    Till, Helen Grogan.  There may have been others, but I

7    7    don't recall explicitly.

8    8         Q     What was the subject of that meeting?

9    9         A     There were some discussions about the

10   10   case.

11   11        Q     What specifically?

12   12        A     Just -- just the general state of

13   13   affairs, I think.

14   14        Q     How long did that meeting last?

15   15        A     I believe an hour or less.  As I recall,

16   16   it was at -- at lunchtime, so I think it was short.

17   17        Q     During this meeting, did the subject of

18   18   the potential conflict come up at all?

19   19            MS. PARK:  Objection.  Form.

20   20        A     Potential --

21   21        Q     (BY MR. SORENSEN)  Conflict of interest.

22   22   Did the subject of a potential conflict of interest

23   23   come up during this meeting at all?

24   24            MS. PARK:  Same objection.

25   25        A     No.  And again, I believe the reason is

50

1    1    the same as I stated previously.

2    2              Q    (BY MR. SORENSEN)   Before or after

3    3    either of these meetings that we've just been

4    4    discussing, did it occur to you that there might be a

5    5    potential conflict of any kind?

6    6              A    As I said, I -- no.

7    7              Q    Okay.  For the reasons you've discussed?

8    8              A    For the reasons I gave you.

9    9              Q    Did you have any discussions before or

10   10   after these two meetings with John Till about the

11   11   subject of a potential conflict?

12   12             A    No.

13   13             Q    After this meeting in July '05, when was

14   14   your next discussion with someone either at RAC or with

15   15   anyone representing either Rockwell or Dow about this

16   16   case?

17   17             A    I think, as I said before, the phone

18   18   conversation with Doug Poland -- and I quite frankly

19   19   don't recall exactly when it was.  Within the last two

20   20   or three months.

21   21             Q    Did Mr. Poland tell you what he wanted

22   22   you to testify about?

23   23             A    No.  He asked me if I was willing to

24   24   testify.

25   25             Q    What did you tell him?

51

1    1              A    I said that I didn't feel that I had any

2    2    choice but to testify, considering that -- that when

3    3    what we're asked to testify about is the work that we

4    4    did for the Department of Health and my role in that

5    5    work.

6    6              Q    And when was your next conversation with

7    7    anyone representing the defendants?

8    8              A    I guess it was -- it was probably in

9    9    early -- early December or late November.

10   10             Q    You're talking about early December

11   11   of --

12   12             A    Right.

13   13             Q    This month?

14   14             A    Right.  It would -- it was just prior to

15   15   the time that I was leaving for the former Soviet

16   16   Union, and so there was a question of scheduling.

17   17             Q    So between Doug Poland's call to you a

18   18   few months ago and just a week or two ago, you had no

19   19   contact with counsel for the defendants?

20   20             A    I don't believe so.

21   21             Q    Okay.  And where do you live?

22   22             A    Denver.

23   23             Q    So you had a call from Doug Poland and

24   24   then another call fairly recently about scheduling; is

25   25   that right?

26                            CARPENTER REPORTING, INC.
27                               (303) 752-1200

52

1    1        A     Right.

2    2        Q     Who called you about scheduling?

3    3        A     Doug did.

4    4        Q     And other than scheduling, did anything

5    5   else come up during that call?

6    6        A     Not that I recall.  The problem was that

7    7   I was going to be out of the country.

8    8        Q     Okay.  And did you meet with counsel

9    9   before this deposition?

10   10        A     Yes.

11   11        Q     When?

12   12        A     Wednesday.  Primarily, Wednesday and

13   13   yesterday.  Late Wednesday and yesterday.

14   14        Q     On Wednesday, who did you meet with?

15   15        A     I met with Jane Park.

16   16        Q     Anyone else?

17   17        A     No.

18   18        Q     How long was that meeting?

19   19        A     It was about an hour, I guess.

20   20        Q     And on Thursday -- that is yesterday --

21   21   who did you meet with?

22   22        A     I met with both Jane Park and Doug

23   23   Poland.

24   24        Q     How long was that meeting?

25   25        A     Off and on throughout the day.

SHEET 53   PAGE 53

53

1   Q     So when did it start?

2   A     9:00.

3   Q     And when did you leave?

4   A     Shortly after 5, as I recall.  I don't

5   remember the exact time.

6   Q     And what was the subject of these

7   meetings?

8   A     Discussion about the deposition

9   procedure.  Discussions about work that I had done,

10  explaining particularly to Jane how we got the results

11  that we got.

12              MS. PARK:  That's because I was the more

13  clueless one.  I'll put that on the record.

14  Q     (BY MR. SORENSEN)  And what is your

15  understanding of what you're going to be testifying

16  about in this case?

17  A     I don't --

18              MS. PARK:  Objection.  Form.

19  A     I don't know what specific topics I'll

20  be testifying about.  My understanding is that I'll be

21  testifying about work that I did as part of the dose

22  reconstruction for Rocky Flats.  Phase II dose

23  reconstruction for Rocky Flats.

24  Q     (BY MR. SORENSEN)  Are you testifying

25  pursuant to subpoena?

54

1    1              A    No.  I don't think so.  I haven't

2    2    received a subpoena.

3    3              Q    You realize you're being called to the

4    4    stand for the defendants?

5    5              A    Yes.

6    6              Q    And you know that the defendants are

7    7    Rockwell and Dow, who ran Rocky Flats; correct?  You

8    8    know that?

9    9              A    Well, perhaps I misspoke.  I guess I've

10   10   been called by Kirkland & Ellis, who are representing

11   11   those people.

12   12              Q    You understand that you're being called

13   13   to the stand to testify on behalf of Rockwell and Dow,

14   14   the defendants in this case; correct?  You understand

15   15   that?

16   16              A    No.  I'm not testifying on behalf of

17   17   Rockwell and Dow.  Maybe I don't understand the legal

18   18   term here, but I understand that I'm testifying about

19   19   what we did in our dose reconstruction project.

20   20              Q    I understand.  But do you understand

21   21   that the party that is calling you to testify, the

22   22   parties, are the defendants?

23   23              A    Yes.  But whether that means on behalf

24   24   of, I don't know.

25   25              Q    I understand.  I understand.  Got it.

26                        CARPENTER REPORTING, INC.
27                           (303) 752-1200

55

1   1   And you understand that the defendants are Rockwell and

2   2   Dow?

3   3          A    If you say so.

4   4          Q    Do you have any knowledge who the

5   5   defendants are in this case?

6   6          A    Well, presumably, the people who ran the

7   7   plant, so, certainly, Dow and, I guess, Rockwell.  And

8   8   it's to 1989.  You're right.

9   9          Q    Okay.

10  10          A    That's not been the focus of my life.

11  11          Q    I --

12  12          MS. PARK:  Unlike David's.

13  13          MR. SORENSEN:  That's fine.

14  14          Q    (BY MR. SORENSEN)  Do you understand

15  15   you're being asked to testify about the various RAC

16  16   reports that you contributed to?

17  17          A    I presume that's right, yes.

18  18          Q    Well, is it fair for me to presume that

19  19   the RAC reports that you contributed to bear your name,

20  20   and the ones that don't bear your name, you did not

21  21   contribute to?  Is that true?

22  22          A    Not necessarily.

23  23          Q    Okay.  Why don't -- why don't we start

24  24   this process.  I'd like to show you a series of RAC

25  25   reports and ask you whether you contributed to them and

56

1    1    whether you believe you'll be testifying about them.

2    2    Okay?

3    3              A    Okay.

4    4              Q    There's a lot of them, so we'll just do

5    5    it one by one.

6    6              MS. PARK:  Because you've got one set

7    7    and we've got one, you're going to have to give us a

8    8    second.

9    9              MR. SORENSEN:  Yes.

10   10             MS. PARK:  I think you mentioned

11   11   yesterday, you have a set for the witness.

12   12             MR. SORENSEN:  No.  This is the only set

13   13   I have.  I'm not going to mark them as exhibits.  I'll

14   14   show them to the witness.

15   15             MR. POLAND:  That's fine.  You work with

16   16   yours with Paul and we'll get these ones out.  Let's

17   17   make sure we're on the same page as far as dates of

18   18   reports.

19   19             MR. SORENSEN:  Sure.  No.  I'll identify

20   20   them.

21   21             Q    (BY MR. SORENSEN)  The first one is

22   22   P1062.  It's dated March 1997.  The title is Final

23   23   Report, Task 4, Evaluation of Historical Environmental

24   24   Data.  And while the defense counsel are trying to find

25   25   that, I'd like you to look at that and tell me the

57

1    1    answers to at least two questions:  One, did you

2    2    contribute to that, and two, do you understand that

3    3    you'll be testifying about any of that report at trial?

4    4                    MR. POLAND:  I just want to see what the

5    5    title is.

6    6                    THE DEPONENT:  It's Task 4,

7    7    environmental monitoring data.

8    8                    MR. POLAND:  All right.

9    9                    MR. SORENSEN:  Let me see if I have a

10   10   cross-index.  I do not have a DX number for that.

11   11            A    Well, to answer your second question

12   12   first, I don't know whether I'll be testifying about

13   13   this report first.

14   14            To answer your first question, I'm not

15   15   listed as an author of the report, but I did make some

16   16   contributions to the report.  I probably have reviewed

17   17   parts of this report, I believe, and collected some

18   18   information related to it.

19   19            Q    (BY MR. SORENSEN)  Would you be

20   20   qualified to discuss that report at trial?

21   21                    MS. PARK:  Objection to form.

22   22            Q    (BY MR. SORENSEN)  Do you feel qualified

23   23   to talk about that report at trial?

24   24                    MS. PARK:  Same objection.

25   25            A    I'm knowledgeable about environmental

26
27                    CARPENTER REPORTING, INC.
                       (303) 752-1200

58

1  1   radioactivity.

2  2        Q    (BY MR. SORENSEN)   That really isn't my

3  3   question.

4  4        A    Okay.

5  5        Q    The report you're looking at, you said

6  6   you contributed to portions of it; correct?

7  7        A    I believe, yes, that's right.

8  8        Q    Would you feel capable of testifying

9  9   about it knowledgeably in front of a jury in this case?

10 10            MS. PARK:  Objection.  Form.

11 11        A    I guess that would depend on what aspect

12 12   of the report I was asked to testify about.

13 13        Q    (BY MR. SORENSEN)   What aspect of the

14 14   report could you testify about knowledgeably?

15 15            MS. PARK:  Objection to form.

16 16        A    I know about plutonium in soil.  I know

17 17   about airborne -- air sampling in the environment,

18 18   ambient air monitoring.  That's basically the same

19 19   thing.  I know about air sampling that was conducted

20 20   around the plant.  I know about some of the special

21 21   studies that were performed, particularly related to

22 22   resuspension of plutonium and particle size of

23 23   plutonium.  I did look into the -- the releases of

24 24   beryllium at one point.  This deals more with the

25 25   monitoring of the beryllium.  And I probably

59

1   contributed to the -- to the part on deposition

2   measurements using gum paper.

3        Q   (BY MR. SORENSEN)  During your meetings

4   in preparation for your deposition, did you go over the

5   various RAC reports that you were a coauthor of or

6   contributed to?

7        A   To the extent that I discussed and

8   explained to Jane what we did, we -- I -- most of my

9   explanations were related to the -- to the reports for

10  which either -- either that I authored alone or -- the

11  principal reports were the -- were the release reports,

12  the fire report -- 1957 fire, 1969 fire, routine

13  plutonium releases, plutonium risk report, but then,

14  also, as part of that, many of those results are used

15  in other reports like the technical summary report,

16  the -- the risk reports for the set of releases.  The

17  plutonium -- '57 fire risk report, the '69 fire risk

18  report, the routine release risk report, and then the

19  overall summary report.  Those -- my work is reflected

20  in all those reports.

21        Q   And is it fair to say that the reports

22  that you've just described and your work in them

23  required you to apply your specialized knowledge and

24  expertise in preparing these reports?  Is that correct?

25        A   Yes.

60

1   1              Q    Is that yes?

2   2              A    Yes.  Sorry.

3   3              Q    Is it your testimony that you have no

4   4   idea as you sit here what, specifically, you're going

5   5   to be asked to testify about at trial?

6   6              A    I explained to you already that it's my

7   7   understanding that I'm going to be asked to testify

8   8   about parts of the work in the -- in the dose

9   9   reconstruction that -- that I either performed or

10  10  participated in.

11  11             Q    Is that as specific as you can get?

12  12             A    Well, that's a general -- that's a

13  13  general picture.  Yes.  I -- I have not been told what

14  14  it is I'm asked -- going to be asked to testify about.

15  15             Q    Okay.  Have you been asked to review the

16  16  testimony of any other witnesses in this case?

17  17             A    I have received testimony of -- trial

18  18  testimony of a list of witnesses.  Steve Wing.  I

19  19  probably can't recite all the names to you.  Wing,

20  20  Clapp, Biggs.  I'm spacing the name of the guy from

21  21  NRDC.  Cochran.  Tom Cochran.  And then there was a

22  22  person with a complex name.  I can't think --

23  23             Q    Budnitz?

24  24             A    Yeah.  Budnitz's testimony is on that

25  25  CD.  There's a -- there's a person -- there's a

61

1   1   burrowing animal person.

2   2           Q    Smallwood?

3   3           A    Smallwood.  That's the complex name I

4   4   was trying to think of.

5   5           Q    Did you get his video, also?  I'm just

6   6   kidding.

7   7           A    Did he have a flashlight?

8   8           Q    What's that?

9   9           A    Did he have a flashlight?

10  10          Q    Anyone else that you can recall?

11  11          A    No.  In fact, I was failing at the end

12  12  myself.

13  13          Q    When did you get this testimony?

14  14          A    Before I left for the former Soviet

15  15  Union, so it would have been in either late November or

16  16  very early December.

17  17          Q    And who sent it to you?

18  18          A    Kirkland & Ellis.

19  19          Q    Who at Kirkland & Ellis?

20  20          A    I'm not sure.  I assume that -- that --

21  21  I didn't look at the -- at the name on the -- on the

22  22  envelope.  I can't recall whose name is on the

23  23  envelope.

24  24          Q    And were you given any instructions,

25  25  what to do with this testimony?

26          CARPENTER REPORTING, INC.
27             (303) 752-1200

62

1    1              A    That it was provided for review.

2    2              Q    Have you reviewed it?

3    3              A    I reviewed parts of it, yes.

4    4              Q    Were you asked to review it in

5    5    preparation for your testimony?

6    6              A    No.  Not specifically.  It was more, you

7    7    know, this is what -- this is what these people have

8    8    said in their testimony.

9    9              Q    You understand these were witnesses

10   10   called by the plaintiffs in this case?  You understand

11   11   that?

12   12              A    I believe all of them were called by the

13   13   plaintiffs.

14   14              Q    Okay.  Do you know the plaintiffs in

15   15   this case are a class of 12,000 citizens of Colorado?

16   16   Do you understand that?

17   17              A    I've heard that number before, yes.

18   18              Q    Okay.  Have you been asked to formulate

19   19   any specific opinions about any of the testimony -- let

20   20   me start again.  Bad question.

21   21              Do you have any understanding of whether

22   22   you'll be asked to testify in front of this jury about

23   23   any specific opinions you have about the testimony of

24   24   any of the witnesses whose testimony you've been asked

25   25   to review?

26                          CARPENTER REPORTING, INC.
27                            (303) 752-1200

63

1   1                MS. PARK:  Objection.  Form.  When you

2   2   say "opinions," do you mean expert opinions?

3   3                MR. SORENSEN:  Just opinions.

4   4                MS. PARK:  Same objection.

5   5        A    I don't -- I don't know that -- I

6   6   don't -- as I said before, I don't know what I'm asked

7   7   to testify -- going to be asked to testify about.

8   8        Q    (BY MR. SORENSEN)  Well, if you don't

9   9   know, I don't know, either.

10  10        A    Well, that's probably lucky for some

11  11   people.

12  12        Q    After this deposition, do you have any

13  13   other scheduled meetings with counsel for defendants?

14  14        A    Well, I -- I'm keeping the first week in

15  15   January free on my calendar, so it's -- but there's no

16  16   meetings scheduled that I'm aware of.

17  17        Q    Are you being paid for your time?

18  18        A    I believe I will be compensated for my

19  19   time.

20  20        Q    At what rate?

21  21        A    I believe it will be $125 an hour.

22  22        Q    What is that belief based on?

23  23        A    Based on a conversation with John Till.

24  24        Q    When was this conversation?

25  25        A    Oh, probably late -- late November,

64

1  1    early December.

2  2              Q    Who's paying you?

3  3              A    Risk Assessment Corporation.

4  4              Q    So RAC is going to pay you $125 an hour

5  5    for your time.  And do you know if RAC is going to bill

6  6    that time back to Kirkland & Ellis?

7  7              A    No, I don't.

8  8              Q    You have no idea?

9  9              A    I don't know who -- who -- I don't know

10  10   who's RAC -- whose arrangement RAC is with -- who -- I

11  11   don't know whom RAC's arrangement is with.

12  12             Q    Okay.

13  13             A    Whether -- whether he will bill

14  14   Kirkland & Ellis or whether he'll bill someone else.

15  15             MS. PARK:  If you're moving on to a new

16  16   topic, can we take a break now?

17  17             MR. SORENSEN:  Yes.  We can take a break

18  18   any time.

19  19             (There was a recess taken from 9:28 a.m.

20  20   to 9:35 a.m.)

21  21             Q    (BY MR. SORENSEN)  I'm showing you

22  22   Exhibit P1065.  It also bears No. DX510.  Final Task 2

23  23   Report dated September 1994 of RAC.  If you would take

24  24   a look at that.

25  25             MR. POLAND:  What's the title of it?

26                    CARPENTER REPORTING, INC.
27                      (303) 752-1200

65

1    1              A     Verification of Phase I Source Term and

2    2    Uncertainty Estimate.  Okay.

3    3              Q     (BY MR. SORENSEN)  Did you have any role

4    4    in the preparation of that document?

5    5              A     Yes, I believe I did.

6    6              Q     What was your role?

7    7              A     Well, it was -- the task was to

8    8    review -- I haven't seen this document in quite a long

9    9    time, and it was published in 1994, but my recollection

10   10   is that -- that we reviewed the ChemRisk Phase I

11   11   reports and made some recommendations.  And that seems

12   12   to be consistent with what I see here.

13   13              Q     And more specifically, what was your

14   14   role in the creation of that document?  Did you write

15   15   any portion of it, for example?

16   16              A     I frankly don't remember explicitly

17   17   whether I wrote a particular part of this.  I

18   18   haven't -- I haven't looked at every word that's in

19   19   here, so I -- I don't know the answer to that for sure.

20   20              Q     Do you have any understanding that

21   21   you'll be testifying about any portion of that report

22   22   at trial?

23   23              A     I have said more than once that I do not

24   24   know what it is that I'm going to be asked to testify

25   25   about.

SHEET 66  PAGE 66

66

1   1              Q    Well, then forgive me in advance because

2   2    I'm going to ask that question on every report I show

3   3    you.

4   4              A    Okay.  Well, forgive me for being

5   5    redundant.

6   6              Q    That's fine.  I just don't want you to

7   7    be surprised.

8   8                   Okay.  I'm showing you Exhibit P1067,

9   9    also bears No. DX511.  The title is Final Report, Rocky

10  10   Flats Plant 903 Area Characterization, dated

11  11   December 1996, which does, in fact, bear your name as

12  12   one of the authors.

13  13              MR. POLAND:  This is the '96 version?

14  14              MR. SORENSEN:  '96.

15  15              Q    (BY MR. SORENSEN)  You are, in fact, a

16  16   coauthor of that document?

17  17              A    That's true.

18  18              Q    In your work in coauthoring P1067, the

19  19   RAC report in front of you -- in doing that, you drew

20  20   on your expertise in the areas of health physics, among

21  21   other areas; is that correct?

22  22              A    Yes.  Health physics and environmental

23  23   radioactivity, I would say.

24  24              Q    And you drew on those areas of expertise

25  25   to express whatever opinions are expressed in that

26
27                        CARPENTER REPORTING, INC.
                            (303) 752-1200

67

1      1      document; correct?

2      2                  A     Well, it undoubtedly contributed to some

3      3      of the conclusions that are reached here.

4      4                  Q     And your contribution --

5      5                  A     It's a very big document.

6      6                  Q     It is.  Your contribution drew on your

7      7      expertise in the areas of health physics and

8      8      environmental -- what did you say --

9      9                  A     Environmental -- well, environmental

10     10     radioactivity transport as part of health physics.

11     11                 Q     So that your contribution to that report

12     12     drew on your areas of expertise; correct?

13     13                 A     Yes.  I believe it would have.

14     14                 Q     Okay.  Are you going to testify about

15     15     that report or the subject of it at trial?

16     16                 A     I do not know.

17     17                 Q     Okay.  Go to P1068, which also bears

18     18     No. -- designation DX514.  It's dated August 1999.  The

19     19     title is Final Report, Estimated Airborne Releases of

20     20     Plutonium During the 1957 Fire in Building 71, and you

21     21     are listed as the sole author of that document.

22     22                 A     Right.

23     23                 Q     Could you please take a look at it.

24     24                 MR. POLAND:  This is August '99?

25     25                 MR. SORENSEN:  Yes.

26
27                              CARPENTER REPORTING, INC.
                                     (303) 752-1200

68

1   1              A    Yes.  I recognize this document.

2   2              Q    (BY MR. SORENSEN)  You are the sole

3   3   author of that document?

4   4              A    That's true.

5   5              Q    And what areas of your expertise did you

6   6   draw on to prepare that document?

7   7              A    My health physics expertise, my previous

8   8   experience in estimating or measuring -- both measuring

9   9   and calculating releases from facilities.

10  10             Q    Calculating releases of radionuclides?

11  11             A    Yes.

12  12             Q    Anything else?  Any other areas?

13  13             A    I'd say those are -- those general areas

14  14   are broad enough.

15  15             Q    Okay.  What areas do you hold yourself

16  16   out to be an expert in?

17  17             MS. PARK:  Objection to form.  He's not

18  18   being called as an expert in this case.

19  19             MR. SORENSEN:  I understand your

20  20   position.  I'm just asking a question.

21  21             MS. PARK:  Then I'm going to repeat my

22  22   objection to form that it's vague and ambiguous.

23  23             A    I'm a certified health physicist.

24  24             Q    (BY MR. SORENSEN)  But, within that

25  25   title, health physicist, what areas in your

1    1    professional life do you hold yourself out to others to

2    2    be an expert in?

3    3            A    Areas in which -- in which I'm

4    4    experienced, which include internal dosimetry,

5    5    environmental transport of radioactivity, behavior of

6    6    radioactivity in the environment, releases of

7    7    radioactivity from facility -- nuclear facilities.  I

8    8    don't know that that's an exclusive list, but it's a

9    9    start.

10   10           Q    Okay.  Are these all under the umbrella

11   11   of health physics?

12   12           A    Yes.  Health physics is a very diverse

13   13   discipline.  I mean, for -- there are parts of health

14   14   physics, for example, that I certainly wouldn't

15   15   consider myself an expert; with regard, for example, to

16   16   nuclear medicine.  That's a subset of health physics.

17   17   I have no experience in nuclear medicine.

18   18           Q    Drawing your attention to the document

19   19   in front of you, P1068, and then going to this list of

20   20   areas of expertise as you just described it, I'd like

21   21   you to identify which of these areas you drew on in

22   22   preparing that document.

23   23           A    I think I mentioned experience in

24   24   measuring and calculating releases from facilities.

25   25   Isn't that on that list?

70

1    1                Q    Releases of radioactivity.  Right.  Is

2    2    that the only area that you drew on in preparation of

3    3    that report, releases of radioactivity from facilities?

4    4                     MS. PARK:  Objection.  Form.  And

5    5    objection to the use of the word "expertise" throughout

6    6    these questions to the extent they suggest he's an

7    7    expert witness, which he's not being offered as in this

8    8    case.

9    9                     MR. SORENSEN:  You've already said that.

10   10   Stop coaching.

11   11                     MS. PARK:  I'm not coaching.  I'm

12   12   putting my objection on the record.  Stop interrupting.

13   13                Q    (BY MR. SORENSEN)  Go ahead.

14   14                A    Can we go back to that again, please?

15   15                Q    Sure.  I'm trying to match things up.

16   16   You've listed four areas of expertise that you have:

17   17   Internal dosimetry, environmental transport, behavior

18   18   of radionuclides in the environment, releases of

19   19   radioactivity from nuclear facilities; correct?

20   20                A    Right.

21   21                Q    Under the umbrella of your expertise in

22   22   health physics?

23   23                     MS. PARK:  Object to form.

24   24                A    I said it was not an all-inclusive list,

25   25   probably.

26
27                     CARPENTER REPORTING, INC.
                            (303) 752-1200

71

1   1                    Q    (BY MR. SORENSEN)  Right.  And if --

2   2                    A    Another -- another aspect of that is

3   3   experience with -- on the behavior of radionuclides in

4   4   facilities, which was a significant focus of my work in

5   5   science applications.

6   6                    Q    Okay.  So now we have five areas.  And

7   7   I'm trying to match those up with which of those five

8   8   you drew on in --

9   9                    A    For the --

10  10                   Q    -- the preparation of P1068.

11  11                   A    Right.

12  12                   Q    And I have releases of radionuclides

13  13   from facilities.

14  14                   A    Right.

15  15                   Q    How about behavior of radionuclides in

16  16   the environment?

17  17                   A    I don't believe there's anything in this

18  18   report about behavior of radionuclides in the

19  19   environment.

20  20                   Q    Okay.  How about environmental

21  21   transport?

22  22                   A    In this particular report, there's

23  23   nothing about environmental transport.  That's in the

24  24   second report.

25  25                   Q    Okay.  Is it fair that each of these

26                            CARPENTER REPORTING, INC.
27                               (303) 752-1200

72

1   1   areas of expertise you've listed are fairly specialized

2   2   areas?

3   3             MS. PARK:  Objection.  Form.

4   4       Q   (BY MR. SORENSEN)  Is that correct?

5   5             MS. PARK:  And also the objection to the

6   6   word "expertise."

7   7       Q   (BY MR. SORENSEN)  I'll ask you --

8   8       A   What do you mean by "specialized"?

9   9       Q   I'll go through them.  Internal

10  10  dosimetry, that's an area of expertise that's outside

11  11  the common understanding of most people; isn't that

12  12  correct?

13  13            MS. PARK:  Same objection.

14  14      A   The common understanding of members of

15  15  the public or --

16  16      Q   (BY MR. SORENSEN)  Yes.  Members of the

17  17  public.

18  18      A   Yes.  It's outside the common

19  19  understanding, I expect, of most members of the public.

20  20      Q   Would that be true of these other areas

21  21  of expertise you've listed:  Environmental transport,

22  22  behavior of a radionuclides in the environment, release

23  23  of radionuclides from facilities, and behavior of

24  24  radionuclides in facilities?  The same would be true of

25  25  those areas, too?

73

1    1                    MS. PARK:  Objection to form.

2    2                    Q    (BY MR. SORENSEN)  That is, these are

3    3    all areas outside the general understanding of most

4    4    members of the public?

5    5                    A    I think that's generally true, yes.

6    6                    Q    Okay.  I'm going to show you 1069 --

7    7    P1069, which is dated August 1999 -- it also bears No.

8    8    DX515 -- titled Final Report, Estimated Airborne

9    9    Releases of Plutonium During the 1969 Fire in Buildings

10   10   776-777.  You're listed as the sole author of this

11   11   document.

12   12                    MR. POLAND:  I'm sorry.  What's the

13   13   title?

14   14                    THE DEPONENT:  '69 fire.

15   15                    MR. POLAND:  That's the source term or

16   16   the risk?

17   17                    THE DEPONENT:  Source term.

18   18                    MR. POLAND:  Thank you.

19   19                    Q    (BY MR. SORENSEN)  You are, in fact, the

20   20   sole author of that document --

21   21                    A    That's true.

22   22                    Q    -- P1069; is that correct?

23   23                    A    Yes.  Maybe we should go back to the

24   24   previous document, actually.  My name was the only

25   25   name --

74

1   1            Q    It was, in fact --

2   2            A    -- listed on here --

3   3            Q    Yes.

4   4            A    -- but there were contributions from

5   5   other people, just to make that clear.

6   6            Q    Okay.  Did you have some kind of policy

7   7   or protocol that you followed with RAC as to whether a

8   8   person's name would actually appear as a coauthor or

9   9   not on these reports?

10  10            A    Well, in -- I don't know that there was

11  11   a particular policy.  I don't recall a policy.  But, in

12  12   particular, there was a -- there was a consultant to

13  13   RAC that was involved in the preparation of the 1969 --

14  14   actually, he's a consultant to MJP Risk Assessment who

15  15   was involved in aspects of the 1957 fire report.

16  16            Q    MJP Risk Assessment?

17  17            A    That's my company.

18  18            Q    That's just another way of saying you,

19  19   isn't it?

20  20            A    No.  No.  I engaged -- I engaged a fire

21  21   expert to assist with the 1957 fire report.

22  22            Q    Who was the fire expert?

23  23            A    Michael Delibergo (sic) was his name.

24  24            Q    I saw that name.  We will get to that.

25  25            A    Okay.  I just --

1   1          Q     Thank you.

2   2                MS. PARK:  Could you spell his name?

3   3          A     I think it's D-i-l-i-b-e-r-g-o, as I

4   4     recall.

5   5          Q     (BY MR. SORENSEN)  Looking at P1069,

6   6     could you please tell me which of the areas of your

7   7     expertise as you described you drew on in the

8   8     preparation of that document?

9   9                MS. PARK:  Objection to form.  Vague.

10  10     Ambiguous.

11  11          Q     (BY MR. SORENSEN)  Well, I can -- I'll

12  12     make it a little bit easier.  I'll go through the

13  13     areas.  Internal dosimetry?

14  14          A     No.

15  15          Q     Environmental transport?

16  16          A     Yes.

17  17          Q     Behavior of radionuclides in the

18  18     environment?

19  19          A     Partially.

20  20          Q     Release of radionuclides from

21  21     facilities?

22  22          A     Yes.

23  23          Q     Behavior of radionuclides in facilities?

24  24          A     Yes.

25  25          Q     Is that yes?

1    1              A    Yes.  Sorry.

2    2                   Q    I'm sorry.  And if there are any other

3    3    areas of expertise other than these five that occur to

4    4    you as we're going through theses questions, feel free

5    5    to just tell me.  Okay?

6    6                   MS. PARK:  Objection.

7    7                   Q    (BY MR. SORENSEN)  Follow what I'm

8    8    asking?

9    9                   MS. PARK:  I'm going to object to the

10   10   characterization --

11   11                   Q    (BY MR. SORENSEN)  Yes?

12   12                   MS. PARK:  -- and to form.

13   13              A    Yes.

14   14                   Q    (BY MR. SORENSEN)  Okay.  Do you have

15   15   any understanding of whether you'll be asked to testify

16   16   to this jury about the conclusions reached in P1069 or

17   17   any other portion of P1069?

18   18              A    If -- if the conclusions in this report

19   19   are in issue, then I expect that I would be asked to

20   20   testify about this.

21   21                   Q    That's not quite my question.  You've

22   22   had, in preparation for this deposition, two meetings

23   23   with counsel for the defendants.  You've had other

24   24   conversations with counsel for the defendants.  At any

25   25   time, have they told you what they are going to ask you

1   1   to testify about?

2   2           A    I have said probably three or four times

3   3   that no, they have not told me what I'm going to be

4   4   testifying about.

5   5           Q    When do you expect that they will tell

6   6   you?

7   7           A    During preparation for my testimony, I

8   8   expect, which may be -- most likely will be in January.

9   9           Q    I see.  Okay.

10  10           A    Actually, I don't -- in fact, I should

11  11   mention that I don't know that I'm going to testify at

12  12   all.

13  13           Q    I agree with that.

14  14           MR. POLAND:  We would disagree with

15  15   that.

16  16           Q    (BY MR. SORENSEN)  Let's go to P1070,

17  17   which is dated August 1999, titled Final Report, Review

18  18   of Routine Releases of Plutonium in Airborne Effluents

19  19   at Rocky Flats.  It also bears the designation DX513.

20  20   You are listed as the author of this document, as well.

21  21           MR. POLAND:  For the record, that's

22  22   the -- that's the routine release source term report,

23  23   August '99; is that correct?

24  24           THE DEPONENT:  That's correct.

25  25           MR. SORENSEN:  Yeah.

26
27                  CARPENTER REPORTING, INC.
                    (303) 752-1200

78

1   1              Q    (BY MR. SORENSEN)  You are, in fact, the

2   2    author of that report?

3   3              A    Yes.

4   4              Q    And I'll go again through your areas of

5   5    expertise.  I'm trying to find out which of these areas

6   6    you drew on in the preparation of P1070.  Internal

7   7    dosimetry?

8   8              MS. PARK:  I'm just going to repeat my

9   9    objection throughout all of these that -- objection to

10  10   form and to the extent you're characterizing all of

11  11   this as if he's an expert witness in this case, which

12  12   he's not.

13  13              Q    (BY MR. SORENSEN)  Internal dosimetry?

14  14              A    No.

15  15              Q    Environmental transport?

16  16              A    I think not.

17  17              Q    Behavior of radionuclides in the

18  18   environment?

19  19              A    No.

20  20              Q    Releases of radioactivity from

21  21   facilities?

22  22              A    Yes.

23  23              Q    Was that a yes?

24  24              A    Yes.  It's a yes.  It's an obvious yes.

25  25              Q    Okay.

SHEET 79  PAGE 79

79

1  1                    MS. PARK:  Do you need to flip through

2  2      the report to answer these questions?  Do you want to

3  3      take the time to do it, or not?

4  4                    THE DEPONENT:  No.  I know about this

5  5      report.

6  6                    MS. PARK:  Okay.

7  7            Q    (BY MR. SORENSEN)  The next one,

8  8      behavior of radionuclides in facilities?

9  9            A    Yes.

10  10           Q    Okay.  Are you going to testify about

11  11     the conclusions of P1070 at trial?

12  12           A    I do not know.

13  13           Q    I'm going to show you P1073, which also

14  14     bears the designation DX519.  It is titled Final

15  15     Report, Estimated Exposure and Lifetime Cancer

16  16     Incidence Risk from Beryllium Released to the Air From

17  17     the Rocky Flats Plant dated August 1999.  Please take a

18  18     look at that.  You are not listed as an author of that

19  19     document, but did you contribute to it?

20  20           A    I can recall examining the effluent

21  21     monitoring data for beryllium, but whether what I did

22  22     is reflected in this report, I'm not sure.

23  23           Q    So your review, did that contribute to

24  24     that report?

25  25                    MS. PARK:  Objection to form.

26                         CARPENTER REPORTING, INC.
27                           (303) 752-1200

Case No. 1:90-cv-00181-JLK   Document 1882-1   filed 12/21/05   USDC Colorado   pg 80 of 329

SHEET 80  PAGE 80

80

1   1              A    I don't know for sure.

2   2              Q    (BY MR. SORENSEN)  Okay.  You said you

3   3    reviewed some -- I'm sorry.

4   4              A    I reviewed effluent monitoring data

5   5    related to beryllium.

6   6              Q    And that review drew on your expertise

7   7    on the release of radionuclides from facilities; is

8   8    that correct?

9   9              A    Yes.  Actually, actually, it's broader

10  10   than radionuclides.

11  11              Q    Your expertise is broader?

12  12              A    Yeah.  I have -- I drew on releases of

13  13   materials other than radioactive materials from -- from

14  14   facilities.

15  15              Q    Okay.  So --

16  16              A    So the characterization of -- of -- or

17  17   the specification of radioactivity is probably not

18  18   accurate.

19  19              Q    So we should go back and amend that list

20  20   to say release of radionuclides and other materials

21  21   from facilities?  I'm just asking you.

22  22              A    Yeah.  That's probably better.  Yeah.

23  23              Q    Okay.  All right.

24  24              A    Most of my experience is with

25  25   radionuclides.

26                  CARPENTER REPORTING, INC.
27                     (303) 752-1200

81

1    1                Q    Will you be -- will you be testifying

2    2    about your review of -- of beryllium monitoring data at

3    3    trial in this case?

4    4                A    I don't know.

5    5                Q    Next, we're going to P1074, which is

6    6    dated August 1999.  It also bears designation DX520.

7    7    Its title is Final Report, Estimated Exposure and

8    8    Lifetime Cancer Incidence Risk from Carbon

9    9    Tetrachloride Released to the Air from the Rocky Flats

10   10   Plant.  You are not listed as an author of this

11   11   document.

12   12                A    Right.

13   13                Q    Did you contribute at all to P1074?

14   14                A    I don't recall that I did.

15   15                Q    Okay.  Now, the documents we looked at

16   16   previously that you have either authored or contributed

17   17   to, let's focus on the ones you authored.  You express

18   18   conclusions and opinions in those documents; correct?

19   19                MS. PARK:  Objection to form.

20   20                A    There are definitely conclusions in

21   21   there, yes.

22   22                Q    (BY MR. SORENSEN)  That are your

23   23   conclusions based on the data and analysis you

24   24   performed; correct?

25   25                A    Right.  Those -- I believe that's

26                         CARPENTER REPORTING, INC.
27                            (303) 752-1200

82

1  correct, yes.

2            Q    Okay.  Let's go to P1075.  P1075 also

3  bears designation DX521.  It's dated August 1999.  The

4  title is Final Report, Estimated Exposure and Lifetime

5  Cancer Incidence Risk from Routine Plutonium Releases

6  at the Rocky Flats Plant.  You are not listed as an

7  author.  I'd like you to take a look at it, please,

8  sir.

9            Did you contribute to that document at

10  all, P1075?

11           A    The report utilizes some of my work, so

12  I don't know that -- what you're -- exactly what you

13  mean by "contribute," but the answer is yes, that my

14  work is -- is reflected in this report.

15           Q    What of your work is reflected in that

16  report?

17           A    The radioactivity of releases.  Work

18  related to the risk coefficients, as well as -- I'm

19  sure that -- that I probably participated in review of

20  various aspects of this report, as well.

21           Q    So your contribution to P1075 drew on

22  your expertise in internal dosimetry; is that correct?

23           MS. PARK:  Same objection to form and

24  the word "expertise."

25           Q    (BY MR. SORENSEN)  Go ahead.

A Yes.
Q And your expertise in environmental transport?
A Yes. To a lesser degree.
Q And your expertise in behavior of radionuclides in the environment?
A (Deponent indicating.)
Q Is that yes?
A Yes. Sorry. Excuse me.
Q That's okay. And your expertise in releases of radionuclides and other materials from facilities?
A Yes.
Q And your expertise in behavior of radionuclides in facilities?
A Yes. Because it -- it reflects the ANSI report.
Q So your contributions to P1075 drew on all your areas of expertise; correct?
MS. PARK: Objection to form and repeating my objection to the fact that he's not an expert witness.
Q (BY MR. SORENSEN) Go ahead.
A If --
Q I have a yes down --

84

1   1          A     If you marked them all, I guess they are

2   2    all marked.

3   3          Q     I want to confirm that that's accurate.

4   4          A     Yes.  I believe it is.

5   5          Q     Okay.  Do you believe you'll be

6   6    testifying about some portion of P1075 at trial?

7   7          A     I don't know.

8   8          Q     Let's go to P1076.  It also bears

9   9    designation DX525, dated August 1999, titled Final

10  10   Report, Estimated Exposure and Lifetime Cancer

11  11   Incidence Risk from Plutonium Released from the 1969

12  12   Fire at the Rocky Flats Plant.  You are not listed as

13  13   an author.  Please take a look at that, sir.

14  14                MR. POLAND:  Which one is it?

15  15                THE DEPONENT:  It's the --

16  16                MR. POLAND:  '69 fire.

17  17                THE DEPONENT:  -- risk report.

18  18                MR. POLAND:  Risk report.

19  19          A     This report -- this report on -- on risk

20  20   also relies on -- on the risk coefficient work in which

21  21   I participated and the -- the release estimates which I

22  22   developed for that event.

23  23          Q     (BY MR. SORENSEN)  So does your -- the

24  24   event being the '69 fire?

25  25          A     Right.

85

1    1              Q    So your contribution to P1076 draws on

2    2    each of your five areas of expertise as you've

3    3    described them; is that correct?

4    4              MS. PARK:  Same objection to form and to

5    5    the suggestion he's an expert witness for this and the

6    6    following questions.

7    7              Q    (BY MR. SORENSEN)  Go ahead.

8    8              A    Yes.  It's similar to the previous one.

9    9              Q    So just so the record is clear, your

10   10   contribution to P1076 draws on your expertise in

11   11   internal dosimetry; is that correct?

12   12             A    Excuse me.  Yes.

13   13             Q    And it -- and your contribution to P1076

14   14   draws on your expertise in environmental transport; is

15   15   that correct?

16   16             A    Yes.

17   17             Q    And your contribution to P1076 draws on

18   18   your expertise in the behavior of radionuclides in the

19   19   environment; is that correct?

20   20             A    Yes.  As a -- yes.  From the point of

21   21   view of -- from the point of view of review, yes,

22   22   that's correct.

23   23             Q    Your contribution to P1076 draws on and

24   24   is based on your expertise in the release of

25   25   radionuclides and other materials from facilities; is

1    1    that correct?

2    2              A    That's correct.

3    3              Q    And in my previous questions where I've

4    4    asked you whether your contributions or work draws on

5    5    your expertise, you understand that that would include

6    6    that your contributions or work is based on your

7    7    expertise?

8    8              MS. PARK:  Objection to form.

9    9              Q    (BY MR. SORENSEN)  Do you understand

10   10   that's what I was also asking?

11   11              MS. PARK:  Objection.  Form.

12   12              A    In the -- the distinction you're trying

13   13   to make here is -- draws on and based on?

14   14              Q    (BY MR. SORENSEN)  To me, it's just a

15   15   synonym.  I just -- do you see a distinction between

16   16   that?

17   17              A    I guess I'm not clear why you're saying

18   18   what you're saying.

19   19              Q    Okay.  I'll just continue.  And your

20   20   contribution to P1076 draws on and is based on your

21   21   expertise of the behavior of radionuclides in

22   22   facilities; is that correct?

23   23              MS. PARK:  Objection to form.

24   24              A    Yes.

25   25              Q    (BY MR. SORENSEN)  Go to P1077.  It also

26
27                    CARPENTER REPORTING, INC.
                          (303) 752-1200

87

1    bears designation DX524.  It's dated August 1999.  It's

2    titled Final Report, Estimated Exposure and Lifetime

3    Cancer Incidence Risk from Plutonium Released from the

4    1957 Fire at the Rocky Flats Plant.  You are not listed

5    as a coauthor.

6              Before I get to that, I want to make

7    sure I asked about 1076.  Do you have an understanding

8    of what you'll be asked to testify about at trial --

9         A    I do not.

10        Q    -- with respect to that report?

11        A    No.

12        Q    Okay.  Now, with 1077, did you

13   contribute to P1077?

14        A    This is a risk report related to the

15   1957 fire.  It uses the -- the dose -- dose to --

16   dose -- intake to dose, dose to risk coefficients that

17   were developed.  It utilizes the source term that I

18   developed in the same way that the other two risk

19   reports we've just talked about.

20        Q    So your contribution to P1077 draws on

21   and is based on your expertise in internal dosimetry;

22   is that correct?

23        A    Yes.

24             MS. PARK:  Same objection to the form

25   and to the suggestion about the expertise to the extent

88

1    1    he's not being offered as an expert witness.

2    2         Q    (BY MR. SORENSEN)  And your contribution

3    3    to P1077 draws on and is based on your expertise in

4    4    environmental transport; is that correct?

5    5         A    That's correct, as a reviewer, yes.

6    6         Q    That's correct as what --

7    7         A    As I mentioned before, I have reviewed

8    8    these reports and -- and my expertise in environmental

9    9    radioactivity and behavior is related to that review.

10    10    Because this is a broad scope report.

11    11         Q    Okay.  And your contribution to P1077

12    12    draws on and is based on your expertise in the behavior

13    13    of radionuclides in the environment; is that correct?

14    14         MS. PARK:  Objection to form.

15    15         Q    (BY MR. SORENSEN)  Go ahead.

16    16         A    Yes.  I was waiting for her.

17    17         Q    Perfectly appropriate.

18    18         MS. PARK:  You've got to make sure I get

19    19    my objection in.

20    20         Q    (BY MR. SORENSEN)  Your contribution to

21    21    P1077 is -- draws on and is based on your expertise in

22    22    the release of radionuclides and other materials from

23    23    facilities; correct?

24    24         MS. PARK:  Same objection.

25    25         Q    (BY MR. SORENSEN)  Go ahead.

1   A    Yes.

2   Q    And your contribution to P1077 draws on

3   and is based on your expertise in the behavior of

4   radionuclides in facilities; is that correct?

5        MS. PARK:  Objection to form.

6   Q    (BY MR. SORENSEN)  Go ahead.

7   A    Yes.

8   Q    So do you know what portion, if any, of

9   P1077 you'll be testifying about at trial?

10  A    No, I don't.

11  Q    Okay.  Now we're going to go to P1078,

12  which also bears designation DX523.  It is dated

13  August 1999.  It is titled Final Report, Estimated

14  Exposure and Lifetime Cancer Incidence Risk from 903

15  Area Plutonium Releases at the Rocky Flats Plant.  You

16  are not listed as an author.  Would you please take a

17  look at that, sir.  I'm sorry.  Did I catch your

18  finger?

19  A    No.  No.  I did it myself.

20  Q    Did you contribute to P1078?

21  A    This report relies on the risk

22  coefficients that we developed, yes.

23  Q    So, now, in a pattern of questions that

24  should be familiar to you by now, first, did your

25  contribution to P1078 draw on and was it based on your

90

1    1    expertise in internal dosimetry?

2    2                    MS. PARK:  Objection.  Form.

3    3           A    Yes.

4    4                    MS. PARK:  And to the extent it suggests

5    5    he's an expert witness in this case.

6    6           Q    (BY MR. SORENSEN)  Is it correct that

7    7    your contribution to P1078 drew on and was based on

8    8    your expertise in environmental transport?

9    9           A    In the review sense, yes.

10   10                    MS. PARK:  I have an objection to form

11   11    and the objection to the suggestion he's an expert, I'm

12   12    just going to apply to the following questions.

13   13                    MR. SORENSEN:  I follow.

14   14           Q    (BY MR. SORENSEN)  Your contribution to

15   15    P1078 drew on and was based on your expertise in the

16   16    behavior of radionuclides in the environment; correct?

17   17           A    Right.  In -- yes.

18   18           Q    Okay.  Your contribution to P1078 drew

19   19    on and was based on your expertise in the release of

20   20    radionuclides and other materials from facilities;

21   21    correct?

22   22           A    No.

23   23           Q    "No" meaning --

24   24           A    No.

25   25           Q    What does that mean?  No?

91

1   1              A    Isn't there a badge that says what am

2   2    I -- what part of no didn't you understand?

3   3              Q    I'm sorry.  You're -- the -- you upset

4   4    my expectations.  I'm sorry.

5   5                   Did you contribute to P1078 in the area

6   6    of release of radionuclides of other materials from

7   7    other facilities?

8   8              A    These releases were not from a facility.

9   9                   MS. PARK:  Objection to form.

10  10             A    They were environmental releases

11  11   resulting from environmental contamination.

12  12             Q    (BY MR. SORENSEN) I see.  Because we're

13  13   talking about the 903 area --

14  14             A    Yes.

15  15             Q    -- which was outside?

16  16             A    Outside, right.

17  17             Q    You don't have expertise in that

18  18   particular area, releases of radionuclides from outside

19  19   areas?

20  20             A    It doesn't fall into the category you

21  21   were referring to.  It falls into the environmental

22  22   behavior of radionuclides.

23  23             Q    It falls into transport?

24  24             A    Transport and behavior, I think they are

25  25   both listed there under your list of categories.

26
27                    CARPENTER REPORTING, INC.
                         (303) 752-1200

92

1    1              Q    I see.  Now I understand your "no."

2    2    Thank you.

3    3                   And your contribution to P1078, did it

4    4    draw on and was it based on your expertise in the

5    5    behavior of radionuclides in facilities?

6    6              A    That's another no.

7    7              Q    Because we're talking about an outside

8    8    area, the 903 area?

9    9              A    That's correct.

10   10             Q    Okay.  And do you have any understanding

11   11   of whether you're going to testify about some portion

12   12   of P1078 at trial?

13   13             A    No.

14   14             Q    You have no idea?

15   15             A    No.

16   16             Q    That's no, you have no idea?

17   17             A    That's five in a row.

18   18             Q    Okay.  A lot of nos.  Okay.  And I'm

19   19   going to show you P1079, which also bears designation

20   20   DX533.  It's dated August 1999.  It's titled Final

21   21   Report, RAC Responses to Public Questions and Concerns.

22   22   You are not listed as a coauthor.  Please take a look

23   23   at that, sir.

24   24             A    Okay.

25   25             Q    Did you contribute to some portion of

26                       CARPENTER REPORTING, INC.
27                         (303) 752-1200

93

1   1       P1079?

2   2                A     Yes.

3   3                Q     And what did you contribute?

4   4                A     There are some -- some elements of this

5   5     report that specifically reference my contributions.

6   6     There are some generic references to -- to RAC team,

7   7     for example, that I recognize as -- that I -- that I

8   8     believe I also participated in, as well.  But I

9   9     can't -- without reading the specific details, I can't

10  10    say which ones of those are -- there are --

11  11                Q     Okay.

12  12                A     -- but there are several that bear my

13  13    name --

14  14                Q     Okay.

15  15                A     -- explicitly and then there are --

16  16    there are some that say RAC team, so ...

17  17                Q     Did your contributions to P1079 -- start

18  18    again.

19  19                Your contributions to P1079, did they --

20  20    were they based on and were they drawn from your

21  21    expertise in internal dosimetry?

22  22                MS. PARK:  Same objection to form and

23  23    the continuing objection to this line of questioning to

24  24    the extent it suggests he's an expert witness in this

25  25    case.

26        CARPENTER REPORTING, INC.
27             (303) 752-1200

SHEET 94  PAGE 94

94

1    1              Q    (BY MR. SORENSEN)  Go ahead.

2    2              A    Looking at -- looking at the ones in

3    3    which I'm specifically identified, it does not -- they

4    4    do not seem to relate to external -- to internal

5    5    dosimetry.

6    6              Q    And your contributions to P1079, did

7    7    they draw on your expertise in environmental transport?

8    8    Were they based on your expertise in environmental

9    9    transport?

10   10             A    I think they are more like the behavior

11   11   of radioactivity in the environment, I guess, is

12   12   what -- that seems to be a more relevant category.

13   13             Q    All right.  So your contributions to

14   14   P1079 drew on and were based on your expertise in the

15   15   behavior of radionuclides in the environment; is that

16   16   correct?

17   17             A    Yes.  And the measurement of the

18   18   monitoring of such behavior, yes.

19   19             Q    The monitoring.  Does that fall within

20   20   the ambit of behavior of radionuclides in the

21   21   environment, in your mind?

22   22             A    Yes.  I think so.  Because some of these

23   23   deal with -- with measurements of particle size in the

24   24   environment or in -- the measurement of the size of

25   25   particles found in the environment.

26                       CARPENTER REPORTING, INC.
27                         (303) 752-1200

95

1    1              Q     Okay.  Did your contributions to

2    2     P1079 -- were they drawn from or were they based on

3    3     your expertise in the release of radionuclides and

4    4     other materials from facilities?

5    5              A     Yes.

6    6              Q     And it's correct that your contribution

7    7     to P1079 drew on and was based on your expertise in the

8    8     behavior of radionuclides in facilities?

9    9              A     Yes.  I think that's in -- in here, as

10   10    well.

11   11             Q     Okay.  Move on to P1080, which also

12   12    bears designation DX517.  It's dated August 1999.  It's

13   13    titled Final Report, Characterization of Releases to

14   14    Surface Water from the Rocky Flats Plant.  You are not

15   15    listed as coauthor.

16   16                   MR. POLAND:  Which version is it?

17   17                   MR. SORENSEN:  August '99.

18   18                   MR. POLAND:  Is that Revision 1?

19   19                   MR. SORENSEN:  Revision 1.

20   20             A     I think you forgot your final question.

21   21             Q     (BY MR. SORENSEN) Yes, I did.  Going --

22   22    thank you.  Going back to P1079, do you intend or do

23   23    you have any understanding of whether you are going to

24   24    testify about any portion of P1079?

25   25             A     No.

96

1    1              Q    You don't know?

2    2              A    I don't know.

3    3              Q    Okay.

4    4                   MS. PARK:  And I'd just like to ask my

5    5    witness not to pose questions for himself to answer.

6    6              Q    (BY MR. SORENSEN)  But I do appreciate

7    7    it.

8    8                   MS. PARK:  Plaintiffs' counsel

9    9    appreciates it, I'm sure.

10   10             A    I'm sorry.

11   11             Q    (BY MR. SORENSEN)  Did you contribute to

12   12   any portion of P1080?

13   13             A    I may have reviewed parts of it.  That

14   14   would have been my only contribution.

15   15             Q    What parts would you have reviewed?

16   16             A    I cannot recall.

17   17             Q    Okay.  Can you recall which of your

18   18   areas of expertise you drew on in your review of P1080?

19   19                  MS. PARK:  Objection to form and to the

20   20   extent it suggests he's an expert, and objection that

21   21   he also says he can't recall whether he reviewed it.

22   22             Q    (BY MR. SORENSEN)  Go ahead.  Can you

23   23   answer that question?

24   24             A    If I -- if I did review sections, it

25   25   would be related to releases from the -- from the

97

1  1  facility, I believe.

2  2           Q    So if, in fact, you did review P1080,

3  3  your review drew from and was based on your expertise

4  4  in the release of radionuclides and other materials

5  5  from facilities; is that correct?

6  6           A    That's correct.

7  7           Q    I'm going to show you P1081.  It also

8  8  bears designation DX530.  It's dated August 1999,

9  9  titled Final Report, Evaluation of Environmental Data

10 10  for Historical Public Exposure Studies on Rocky Flats.

11 11  You are not listed as a coauthor.

12 12           A    Isn't this the report that we started

13 13  with?

14 14           Q    This is another version of that same

15 15  report, yes.

16 16                MR. POLAND:  For the record --

17 17           Q    (BY MR. SORENSEN)  It's a later dated

18 18  version.

19 19                MR. POLAND:  For the record, the

20 20  document says it's Revision 1, dated August 1999.

21 21                MR. SORENSEN:  I can show you the

22 22  earlier one if you'd like to have it for comparison.

23 23           A    No.  I don't think I'll go through

24 24  all -- all the pages here.

25 25           Q    (BY MR. SORENSEN)  Did you contribute to

26                      CARPENTER REPORTING, INC.
27                        (303) 752-1200

1   1   any portion of P1081?

2   2           A   Yes.  I'm sure that I reviewed parts of

3   3   this report.

4   4           Q   What parts did you review?

5   5           A   Well, actually, I'm -- I contributed to

6   6   the predecessor report.  I shouldn't say that I

7   7   reviewed this report.  So my contributions would be as

8   8   I stated them previously.

9   9           Q   When you say "the predecessor report,"

10  10  you're talking about P1062; is that correct?  Which I'm

11  11  showing you now?

12  12          A   Yes.

13  13          Q   And just to be clear, your contributions

14  14  to P1062, did they -- did your contributions -- were

15  15  they drawn from and based on your expertise in internal

16  16  dosimetry?

17  17          A   No.

18  18          Q   Your contributions to P1062 were drawn

19  19  from and were they based on expertise in environmental

20  20  transport?

21  21              MS. PARK:  I'm going to object to form

22  22  and to the line of questioning to the extent it

23  23  suggests he's an expert witness in this case.

24  24          Q   (BY MR. SORENSEN)  Go ahead.

25  25          A   Environmental transport, I believe you

99

1    said?

2              Q    Yes.

3              A    Yes.

4              Q    Your answer is yes?

5              A    Yes.  I believe that's true.

6              Q    Your contribution to P1062 -- your

7    contributions to P1062, they were drawn from and were

8    based on your expertise in the behavior of

9    radionuclides in the environment; is that correct?

10             A    Yes.

11             Q    Your contributions to P1062 were drawn

12   from and based on your expertise in the release of

13   radionuclides and other materials from facilities; is

14   that correct?

15             A    No.  I don't believe so.  And when

16   you're finished, I'd like to go back and review the two

17   sets of answers to be sure that I haven't misspoken in

18   either case.

19             Q    Okay.  Your contribution to P1062 was

20   drawn from and based on your expertise in the behavior

21   of radionuclides in facilities; is that correct?

22             A    No.  This is an environmental data

23   report.

24             Q    Okay.  Okay.  So because of the subject

25   of the report, it only drew on your expertise in

100

1   1   environmental transport and the behavior of

2   2   radionuclides in the environment; is that correct?

3   3          A    I believe that's correct.  Yes.

4   4          Q    Okay.  Now, with respect to -- we've

5   5   been discussing P1062, but I'd also shown you P1081.

6   6          A    Right.

7   7          Q    Were all your answers for P1062 -- would

8   8   they apply to P1081?

9   9          A    Since it's -- since it's a revision of

10  10   the original report, yes.  And that's what I just

11  11   wanted to clarify, to be sure that I hadn't misspoken

12  12   in either case --

13  13          Q    Okay.

14  14          A    -- that the answers are consistent.

15  15          Q    Okay.  So of the areas -- the five areas

16  16   of expertise that you have listed for me that you

17  17   possess, you drew on your expertise in environmental

18  18   transport and behavior of radionuclides in the

19  19   environment to make your contributions to P1081; is

20  20   that correct?

21  21          A    Right.  Those are the two areas

22  22   identified for P1062.

23  23          Q    So the answer is yes; is that correct?

24  24          A    Yes.

25  25          Q    Okay.  And do you have any understanding

26                        CARPENTER REPORTING, INC.
27                          (303) 752-1200

101

1    1    of whether you're going to be asked to testify about

2    2    any portion of P1081?

3    3             A    No.

4    4             Q    You have no understanding?

5    5             A    No.

6    6             Q    Because you don't know?

7    7             A    I don't know.

8    8             Q    Okay.  We're going to go to P1082, which

9    9    also bears designation DX516.  It is dated August 1999.

10   10   Its title is Final Report, Development of the Rocky

11   11   Flats Plant 903 Area Plutonium Source Term.  You are

12   12   not listed as an author of this document.

13   13             MR. POLAND:  What's the date of this

14   14   report?  This is August of '99?

15   15             THE DEPONENT:  August '99.

16   16             MR. POLAND:  This is Revision 1?

17   17             THE DEPONENT:  This is Revision 1.

18   18             MR. POLAND:  Thank you.

19   19             A    And is another case of looking at a

20   20   document whose original version we've previously

21   21   discussed?

22   22             Q    (BY MR. SORENSEN)  Well, you know, I

23   23   don't know the answer to that.  I can show you an

24   24   earlier document.  Do you recognize 1082?  P1082?

25   25             A    Yeah.  It's the 903 pad source term.

26
27

102

1   1              Q    Now, earlier --

2   2              A    It's Revision 1 of the 903 pad source

3   3    term.

4   4              Q    Let me look and show you -- were you

5   5    referring to P1067 as the earlier one?

6   6              A    No.  No.

7   7              Q    No?

8   8              A    No.  So maybe we haven't looked at it

9   9    before.  I remembered seeing a 903 pad report.

10  10             Q    We had looked at P1078, exposure and

11  11   lifetime cancer incidence risk from the 903 area.

12  12             A    Okay.

13  13             Q    Do you recall looking at that?

14  14             A    Yes.

15  15             Q    Is that what you were thinking of?

16  16             A    Possibly.  I'm just not able to track

17  17   these in my mind as quickly as you can pass them out.

18  18             Q    Okay.  Well, looking at P1082, did you

19  19   contribute to some portion of P1082?

20  20             A    I -- I reviewed parts of it, I -- I do

21  21   believe, and discussed parts of it with the authors.

22  22             Q    And what parts did you contribute to?

23  23             A    I don't recall the specific sections at

24  24   this moment.

25  25             Q    If you could take a look --

26       CARPENTER REPORTING, INC.
27            (303) 752-1200

103

1    1              A    In the beginning, we were all looking

2    2    at -- we were all looking at releases from this area.

3    3              Q    Let me put 1067 back in front of you,

4    4    P1067.  Sorry.  Your name is listed on P1067.

5    5              A    Right.

6    6              Q    Do you know why your name is listed on

7    7    P1067, but not on P1082?

8    8              A    Well, no.  I don't know that for sure.

9    9              Q    Okay.  And your contribution to P1067 --

10   10   because I don't see it in my notes -- just for

11   11   completeness, P1067 drew -- let me start again.

12   12              Your work with respect to P1067 was

13   13   based on and drew on your expertise in internal

14   14   dosimetry; is that correct?

15   15              MS. PARK:  I'm going to interpose my

16   16   objections to form and my continuing objections to

17   17   these -- this line of questioning to the extent it

18   18   suggests he's being called as an expert witness in this

19   19   case.

20   20              Q    (BY MR. SORENSEN)  Go ahead.

21   21              A    Internal dosimetry, no.

22   22              Q    How about environmental transport?

23   23              A    Yes.

24   24              Q    So your contribution or your work,

25   25   authorship of P1067 drew on and was based on your

104

1    1    expertise in environmental transport; is that correct?

2    2              A    Actually, I believe I just misspoke.

3    3    Environmental behavior would be the more correct

4    4    category.

5    5              Q    So that's the behavior of radionuclides

6    6    in the environment; is that correct?

7    7              A    Right.  Right.

8    8              Q    So, just for the record, your work on --

9    9    with respect to P1067 was based on and drew on your

10   10   expertise in the behavior of radionuclides in the

11   11   environment; correct?

12   12             A    Correct.

13   13             MS. PARK:  I'm going to object to this

14   14   line of questioning on 1067 because we went through the

15   15   document already.  This is all asked and answered.

16   16             MR. SORENSEN:  I'm just -- I said at the

17   17   beginning, just confirming.

18   18             MS. PARK:  Well, then I repeat my

19   19   objection.  Asked and answered.

20   20             Q    (BY MR. SORENSEN)  Okay.  And your work

21   21   in P1067, did that -- let me start again.

22   22             Is it correct that your work with

23   23   respect to P1067 was based on and drew on your

24   24   expertise in the release of radionuclides and other

25   25   materials from facilities?

26
27                    CARPENTER REPORTING, INC.
                         (303) 752-1200

105

1    1              A    No.

2    2              Q    Because it had to do with the 903 area;

3    3    is that correct?

4    4              A    Yes.

5    5              Q    Okay.  And the same answer for your

6    6    expertise with respect to behavior of radionuclides in

7    7    facilities?  You didn't draw on that because, again,

8    8    the 903 area was outside; correct?

9    9              A    Right.

10   10              Q    Okay.  Now -- so for 1082, I'm trying to

11   11    be clear.  You're not listed as a coauthor, although it

12   12    also has to do with the 903 area.  Do you recall which

13   13    areas of your expertise you drew on to make your

14   14    contribution to P1082?

15   15              MS. PARK:  Objection.  Form.  Asked and

16   16    answered.  He said he doesn't recall specific sections.

17   17              A    I don't have a specific recollection

18   18    of -- of particular sections, but I recall reviewing

19   19    portions of this and -- but I can't -- I can't say any

20   20    more than that.

21   21              Q    (BY MR. SORENSEN)  What specific

22   22    portions did you review?  Do you know that?

23   23              A    I believe I just said I don't recall

24   24    which specific portions.

25   25              Q    Okay.  All right.  If we could go to

106

1   1   P1083, which also bears designation DX526.  It is dated

2   2   August 1999.  It's titled Final Report, Results of

3   3   Screening Calculations to Assess the Relative

4   4   Importance of Rocky Flats Uranium Releases, and this

5   5   bears your name.  Take a look at that, please.

6   6           A    Okay.

7   7           Q    In fact, you are the author of P1083; is

8   8   that correct?

9   9           A    That's true.

10  10          Q    Okay.  Now, in writing P1083 -- start

11  11  again.

12  12               Your work in -- relating to P1083, did

13  13  that draw on and was that based on your expertise in

14  14  internal dosimetry?

15  15               MS. PARK:  A continuing objection to

16  16  form and to this entire line of questioning to the

17  17  extent it suggests he's being offered as an expert

18  18  witness in this case.

19  19          Q    (BY MR. SORENSEN)  Go ahead.

20  20          A    Yes.

21  21          Q    And your work relating to P1083, that

22  22  drew on and was based on your expertise in

23  23  environmental transport; is that correct?

24  24          A    Yes.

25  25          Q    And your work relating to P1083, that

107

1   1   drew on and was based on your expertise in the behavior

2   2   of radionuclides in the environment; is that correct?

3   3           A    Yes.

4   4           Q    And your work relating to P1083, that

5   5   drew on and was based on your expertise in the release

6   6   of radionuclides and other materials from facilities;

7   7   is that correct?

8   8           A    Yes.

9   9           Q    And your work relating to P1083, that

10  10  drew on and was based on your expertise in the behavior

11  11  of radionuclides in facilities; is that correct?

12  12          A    Yes.  And I should make a couple of --

13  13  make a couple of other points.  With regard -- with

14  14  regard to uranium, there's always been a question of

15  15  whether the radioactivity in uranium is -- is worse as

16  16  a source of exposure than the -- than the chemical

17  17  toxicity of uranium.  So this has been a long-term

18  18  issue in internal dosimetry of uranium.

19  19          Q    Do you have expertise in the toxicity of

20  20  uranium?

21  21          A    We actually, at Fernald, had looked at

22  22  that issue very closely.  Helen Grogan, Warren

23  23  Sinclair, and I.

24  24          Q    When you say the "toxicity of uranium,"

25  25  you're talking about --

26

27

108

1    1              A    Chemical toxicity.

2    2              Q    As opposed to any effect it has on a

3    3    human being from its radioactive characteristics?  Is

4    4    that what you're saying?

5    5              A    That's correct.

6    6              Q    Your work in P1083, did you also draw on

7    7    your expertise in the toxicity of the chemical aspects

8    8    of uranium?

9    9              A    I drew on my knowledge of the chemical

10   10   toxicity of uranium, yes.

11   11             Q    Do you hold yourself out as an expert in

12   12   the toxicity -- the chemical toxicity of uranium in

13   13   your professional work?

14   14             A    I have some experience in the chemical

15   15   toxicity of uranium based on our work at Fernald and

16   16   review of the literature, yes.

17   17             Q    Well --

18   18             A    I'm not sure what you mean when you say

19   19   hold yourself out.  You're bringing this up again, and

20   20   I'm sure she's going to object.

21   21                  MR. SORENSEN:  She keeps objecting to

22   22   that.

23   23                  MS. PARK:  I have a standing objection

24   24   to that, so as a courtesy --

25   25                  MR. SORENSEN:  You say it's standing,

109

1  1  but you keep repeating it.

2  2                 MS. PARK:  For every time you hit that

3  3  line of questioning.

4  4                 Q   (BY MR. SORENSEN)  Well, in your

5  5  interactions with your professional colleagues and

6  6  peers, do you --

7  7                 A   I do not go around with a sign that says

8  8  I am an expert.

9  9                 Q   I understand that, but would you -- if

10 10  someone asked you, do you have expertise in the

11 11  chemical toxicity of uranium, would you say yes or no?

12 12                 MS. PARK:  Object to form.

13 13                 A   I would say that I have experience in

14 14  assessing the chemical toxicity of uranium.  As I said,

15 15  I don't go around holding a sign proclaiming that I'm

16 16  an expert in X, Y, Z, and D, and I wouldn't respond

17 17  that way to a question.

18 18                 Q   (BY MR. SORENSEN)  Okay.  Okay.  And do

19 19  you have any understanding of whether you're going to

20 20  be testifying about any portion of P1083?

21 21                 A   No, I don't.

22 22                 Q   You don't know; is that right?

23 23                 A   I don't know.

24 24                 Q   Okay.  Let's go to P1084, which also

25 25  bears designation DX522.  It's dated August 1999.  It

26
27                 CARPENTER REPORTING, INC.
                      (303) 752-1200

1   1   bears the title Final Report, Performance Evaluation of

2   2   Atmospheric Transport Models.  It does not bear your

3   3   name.  Please take a look at that, sir.

4   4              Did you contribute to any portion of

5   5   P1084?

6   6              MS. PARK:  Are you done reviewing it?

7   7              THE DEPONENT:  I'm sorry.

8   8              MS. PARK:  Are you done reviewing it?

9   9              THE DEPONENT:  Well, I know what it's --

10  10   I know what it's about.

11  11        A    Other than -- other than discussions

12  12   with the author, I don't believe I had any substantial

13  13   contribution.

14  14        Q    (BY MR. SORENSEN)  Okay.  Is it fair to

15  15   say that you will not be testifying about any portion

16  16   of P1084 at trial?

17  17        A    I don't know the answer to that.

18  18        Q    Okay.  Let's go to P1085.  It also bears

19  19   designation DX527.  It is dated September 1999.  It's

20  20   titled Final Report, Comprehensive Assessment of

21  21   Exposure and Lifetime Cancer Incidence Risk from --

22  22   from Plutonium Released from the Rocky Flats Plant,

23  23   1953 to 1989.  You are not listed -- I'm sorry.  You

24  24   are not listed as a coauthor of that document.

25  25              Did you contribute to some portion of

111

1   1   P1085?

2   2              A    Yes.

3   3              Q    What portions did you contribute to?

4   4              A    The -- the risk coefficient work that we

5   5   did is utilized in this report.  And the release

6   6   estimates that were made are utilized in this report.

7   7              Q    So your contributions to P1085 drew on

8   8   and were based on your expertise in internal dosimetry;

9   9   is that correct?

10  10             MS. PARK:  Same objections to form and

11  11   the standing objection to this line of questioning to

12  12   the extent it suggests that he's an expert witness or

13  13   being offered as an expert witness in this case.

14  14             Q    (BY MR. SORENSEN)  You said yes?

15  15             A    Internal dosimetry is part of the

16  16   source -- part of the risk coefficients, yes.

17  17             Q    And your contributions to P1085 drew on

18  18   and were based on your expertise in environmental

19  19   transport; is that correct?

20  20             A    To a lesser extent, yes.

21  21             Q    You say "lesser."  Is that because of

22  22   the subject of P1085?

23  23             A    Well, it's not -- it's not -- it's not

24  24   as directly --

25  25             Q    Linked?

26
27                    CARPENTER REPORTING, INC.
                          (303) 752-1200

112

1    1              A    It's not as directly linked as the -- as

2    2    the risk coefficients.

3    3              Q    When you say "risk coefficients," that

4    4    has to do with internal dosimetry; correct?

5    5              A    The risk coefficients, yes, involved.

6    6    Yes.  That's the internal dosimetry connection.

7    7              Q    Your contributions to P1085, they were

8    8    based on and drew from your expertise?  The

9    9    radionuclides in the environment?

10   10             A    In the sense of reviewing, yes, as I've

11   11   said.

12   12             Q    And your contributions to P1085 drew on

13   13   and were based on your expertise in the release of

14   14   radionuclides and other materials from facilities; is

15   15   that correct?

16   16             A    Yes.

17   17             Q    Is that yes?

18   18             A    Yes.

19   19             Q    And your contributions to P1085 drew on

20   20   and were based on your expertise in the behavior of

21   21   radionuclides in facilities; is that correct?

22   22             A    Yes.

23   23             Q    Do you have any idea what, if any,

24   24   portions of 1085 you'll be testifying about at trial?

25   25             A    No.

26                           CARPENTER REPORTING, INC.
27                              (303) 752-1200

113

1  1             Q     You have no idea?  Is that correct?  You

2  2      have no idea?

3  3             A     That's correct.

4  4             Q     Okay.  One more in this binder.

5  5             A     Oh, I'm sorry.

6  6             Q     We'll go to P1086.  It also bears

7  7      designation DX534.  It's dated September 1999.  It's

8  8      titled Final Report, Technical Summary Report for the

9  9      Historical Public Exposure Studies for Rocky Flats,

10 10     Phase II.  You are listed as a coauthor.

11 11             You are, in fact, a coauthor of P1086?

12 12             A     Yes.

13 13             Q     And did your work relating to -- let me

14 14     start again.

15 15             Did your work relating to P1086 -- was

16 16     that drawn from or was that based on your expertise in

17 17     internal dosimetry?

18 18             MS. PARK:  Objection to form.  And a

19 19     continuing objection to this line of questioning to the

20 20     extent it suggests he is being offered as an expert

21 21     witness as opposed to a fact witness in this case.

22 22             Q     (BY MR. SORENSEN)  Go ahead.

23 23             A     I have to --

24 24             Q     Take your time.

25 25             A     Yes.  I see there are risks in here.

26        CARPENTER REPORTING, INC.
27              (303) 752-1200

114

1    1              Q    So just to be clear, your coauthorship

2    2    of P1086 drew on and was based on your expertise in

3    3    internal dosimetry; is that correct?

4    4              A    Yes.  Although that seems to be a small

5    5    part of this particular report.

6    6              Q    Okay.  Did your work relating to

7    7    P1086 -- did that draw on and was that based on your

8    8    expertise in environmental transport?

9    9              A    Yes.  This is a summary of the whole

10   10   study, actually.

11   11             Q    So your work relating to P1086 drew on

12   12   and was based on your expertise in the behavior of

13   13   radionuclides in the environment; is that correct?

14   14             A    Yes.

15   15             Q    And your contribution to work relating

16   16   to P1086 drew on and was based on your expertise in

17   17   release of radionuclides and other materials from

18   18   nuclear facilities; is that correct?

19   19             A    Yes.

20   20             Q    And your work and contribution relating

21   21   to P1086 drew on and was based on your expertise in the

22   22   behavior of radionuclides in facilities; is that

23   23   correct?

24   24             A    Yes.

25   25             Q    Is that a yes?

1    1          A    Yes.  Sorry.

2    2          Q    I'm sorry -- that's all right.  And do

3    3    you have any idea what portions, if any, of P1086

4    4    you'll be testifying about at trial?

5    5          A    No, I do not.

6    6          Q    Okay.

7    7          MR. SORENSEN:  Almost done.  We'll take

8    8    a break after this line.

9    9          Q    (BY MR. SORENSEN)  Okay, sir, I'm going

10   10   to show you P1087, which also bears designation DX529.

11   11   It's dated February 2000.  It's titled Final Report,

12   12   Assessing Risks of Exposure to Plutonium.

13   13          And because I don't think I've stated,

14   14   these are all RAC reports.  I haven't repeated that

15   15   with each one.  But if you could take a look at P1087,

16   16   sir, you are listed as a coauthor.

17   17          MR. POLAND:  Can you tell me the date of

18   18   that exhibit, please?

19   19          MR. SORENSEN:  February 2000.

20   20          MR. POLAND:  It says Revision 2; is that

21   21   correct?

22   22          THE DEPONENT:  Right.

23   23          Q    (BY MR. SORENSEN)  Are you, in fact, a

24   24   coauthor of P1087?

25   25          A    Yes.

116

1    1              Q    And did your work relating to P1087 and

2    2    your coauthorship of that report -- did that draw on

3    3    your -- let me start again.

4    4              Is it correct that your coauthorship of

5    5    P1087 and your work relating to P1087 drew on and was

6    6    based on your expertise in internal dosimetry?

7    7              MS. PARK:  And a continuing objection to

8    8    form and to this line of questioning and also a

9    9    continuing objection to this line of questioning to the

10   10    extent it suggests he's being offered as an expert

11   11    witness in this case as opposed to a fact witness on

12   12    what he did.

13   13              Q    (BY MR. SORENSEN)  Is that correct, sir?

14   14              A    It -- this work draws on an expertise in

15   15    internal dosimetry, yes.

16   16              Q    Your expertise; correct?

17   17              A    Yes.  Well, others' expertise, as well.

18   18              Q    Right.  But including yours?

19   19              A    Right.

20   20              Q    Okay.  And your work and coauthorship of

21   21    P1087 drew on and was based on your expertise in

22   22    environmental transport; is that correct?

23   23              A    No.

24   24              Q    I'm sorry.  No?

25   25              A    No.

26         CARPENTER REPORTING, INC.
27              (303) 752-1200

117

1   1           Q    Because environmental transport is not

2   2   related to the subject of P1087; is that correct?   Is

3   3   that why?  Why is it that you answered no to that

4   4   question?  Because of the subject of P1087?  Because of

5   5   your role with respect to P1087?

6   6           A    That would have -- the topic of the

7   7   report.

8   8           Q    The topic being --

9   9           A    Risks of exposure to plutonium.

10  10          Q    I see -- so --

11  11          A    Assessing risks from exposure to

12  12   plutonium.

13  13          Q    I see.  So the area of environmental

14  14   transport, that did --

15  15          A    Did not enter into this report.

16  16          Q    I see.  Okay.  Would that same answer

17  17   apply to your expertise in behavior of radionuclides in

18  18   the environment?

19  19          MS. PARK:  Objection to form.

20  20          A    No.  Actually, there are some

21  21   environmental aspects to this report.  Behavior of

22  22   radionuclides in the environment, yes.

23  23          Q    (BY MR. SORENSEN)  So your work and

24  24   coauthorship of P1087, that drew on and was based on

25  25   your expertise in the behavior of radionuclides in the

26          CARPENTER REPORTING, INC.
27              (303) 752-1200

118

1   1   environment; is that correct?

2   2            A    Right.  My -- my knowledge, at least,

3   3   of -- and I would use that word every time.

4   4            Q    How about environmental transport?

5   5            A    No.

6   6            Q    No.  So your answer to environmental

7   7   transport stays no, but you've given a different answer

8   8   for behavior of radionuclides in the environment?

9   9            A    Right.

10  10           Q    Okay.  Now, your coauthorship and work

11  11   relating to P1087, that drew on and was based on your

12  12   expertise in the release of radionuclides and other

13  13   materials from facilities; is that correct?

14  14           A    No.

15  15           Q    Again, is that because of the subject of

16  16   P1087?

17  17           A    That's correct.

18  18           Q    Okay.  And your work and the

19  19   coauthorship of P1087, did that draw on your expertise

20  20   in the behavior of radionuclides in facilities?

21  21           A    To the extent -- yes.  To the extent

22  22   similarly to the environmental monitoring.  It's based

23  23   on knowledge of -- of aerosols in nuclear facilities.

24  24           Q    So just to make sure the record is

25  25   clear, your coauthorship and work relating to P1087,

119

1    1    that drew on and was based on your expertise in the

2    2    behavior of radionuclides in facilities; correct?

3    3              A    That's correct.

4    4              Q    Okay.  All right.  Let's go to P1088.

5    5    Let me -- my last question.  Before we go to P1088,

6    6    with respect to P1087, do you have any idea what

7    7    portions, if any, of P1087 you'll be testifying about

8    8    at trial?

9    9              A    No.

10   10             Q    Okay.  Now, go to P1088.  I don't have a

11   11   counterpart defendants' designation for this listed.

12   12   It's dated March 2002.  It's titled Final Report,

13   13   Comprehensive Assessment of Exposure and Lifetime

14   14   Cancer Incidence Risk from Plutonium Released from the

15   15   Rocky Flats Plant, 1953 to 1989.  You are not listed as

16   16   a coauthor.

17   17             A    Do you need --

18   18             MS. PARK:  That's okay.

19   19             Have you had a -- had a chance to look

20   20   at P1088?

21   21             A    Yes.

22   22             Q    (BY MR. SORENSEN)  Did you contribute to

23   23   some portion of P1088?

24   24             A    Like the other risk and summary reports,

25   25   this relies on source terms and -- and risk

1   1   coefficients that I -- that I developed or participated

2   2   in the development of.

3   3            Q    Okay.  So your contribution to P1088

4   4   relied on and was based on your expertise in internal

5   5   dosimetry; is that correct?

6   6            MS. PARK:  I'm going to repeat my

7   7   continuing objection to the form and to the extent this

8   8   line of questioning suggests that he's being called as

9   9   an expert witness in this case as opposed to a fact

10  10   witness.

11  11            Q    (BY MR. SORENSEN)  Go ahead.  You can

12  12   answer.

13  13            A    Yes.

14  14            Q    And your work and contribution relating

15  15   to P1088, that drew on and was based on your expertise

16  16   in environmental transport; is that correct?

17  17            A    To a lesser degree, yes.

18  18            Q    Lesser because that's a lesser subject

19  19   of P1088?

20  20            A    No.  Because my contribution was less.

21  21            Q    Well, with respect to the subject of

22  22   environmental transport, insofar as it relates to

23  23   P1088, who contributed more on that particular subject?

24  24            MS. PARK:  Object to form.

25  25            Q    (BY MR. SORENSEN)  Do you know?

26       CARPENTER REPORTING, INC.
27            (303) 752-1200

121

1   1                    MS. PARK:  Objection to form.

2   2                    Q    (BY MR. SORENSEN)  I'm asking, looking

3   3    at P1088 and the subject of environmental transport,

4   4    does someone other than you contribute more to that

5   5    area in P1088?

6   6                    A    Yes.  As I think I indicated previously,

7   7    my -- my contribution in that area are -- are due to my

8   8    reviews and -- and discussions about -- about the

9   9    transport.  I'm knowledgeable about transport, but I

10  10   didn't do the transport calculations.

11  11                   Q    Who did?

12  12                   A    Art Rood.

13  13                   Q    Art Rood.  Have you had conversations

14  14   with Art Rood in connection with this case?

15  15                   A    In connection with this case?

16  16                   Q    Yeah.  Is he around in Denver?

17  17                   A    He -- no.

18  18                   Q    Okay.  Have you had conversations with

19  19   him over the phone about this case?

20  20                   A    No.  I don't believe so.

21  21                   Q    Okay.  Now, your work and contribution

22  22   relating to P1088, that drew on and was based on your

23  23   expertise in the behavior of radionuclides in the

24  24   environment; is that correct?

25  25                   A    That, like transport, is a small

26
27                         CARPENTER REPORTING, INC.
                              (303) 752-1200

122

1  1  component here.  And again, I would use the word

2  2  "knowledge" rather than your term.

3  3          Q    Your knowledge of behavior of

4  4  radionuclides in the environment?

5  5          A    Yes.

6  6          Q    And your contribution relating to P1088

7  7  drew on and was based on your expertise in the release

8  8  of radionuclides and other materials from facilities;

9  9  is that correct?

10  10          A    That's correct.  The releases.

11  11          Q    And your contributions to P1088 drew on

12  12  and were based on your expertise in the behavior of

13  13  radionuclides in facilities; is that correct?

14  14          A    That's correct.

15  15          Q    Do you have any idea what portions, if

16  16  any, of P1088 you'll be testifying about at trial?

17  17          A    No.

18  18          Q    Do you have expertise in material

19  19  balance analysis?

20  20              MS. PARK:  Objection.  Form.

21  21          Q    (BY MR. SORENSEN)  Go ahead.

22  22          A    Actually, that was -- that was in my --

23  23  in my mind, that was included in the last category that

24  24  we've talked about.

25  25          Q    Behavior of radionuclides in facilities?

26      CARPENTER REPORTING, INC.
27          (303) 752-1200

123

1  1            A    Right.

2  2                 Q    So within that area that you've

3  3   described, you include material balance analysis?

4  4            A    Yes.

5  5                 MS. PARK:  David, can we take a break

6  6   soon?

7  7                 MR. SORENSEN:  I have one more to go.

8  8                 MS. PARK:  Okay.

9  9                 Q    (BY MR. SORENSEN)  So when you've been

10 10  answering my questions up to this point, when we've

11 11  gotten to the area of behavior of radionuclides at

12 12  facilities, in your mind, you were answering those

13 13  questions including in that category material balance

14 14  analysis; is that correct?  That was part of your

15 15  thinking?

16 16            A    Right.

17 17            Q    Okay.

18 18            A    And again, I would -- I would use the

19 19  term "knowledge" rather than "expertise" as you've

20 20  heard.

21 21            Q    Right.  I've asked you --

22 22            A    Knowledge and experience.

23 23            Q    Right.

24 24                 MS. PARK:  Can we take a break now,

25 25  please?

124

1  1                    MR. SORENSEN:  I have one more to go.

2  2                    Q    (BY MR. SORENSEN) We have P1089.  I

3  3   don't have a counterpart defendants' designation.  It's

4  4   dated March 2002.  It's titled Final Report, Estimated

5  5   Exposure and Lifetime Cancer Incidence Risk from

6  6   Plutonium Released from the 1957 Fire at the Rocky

7  7   Flats Plant.  You are not listed as a coauthor.

8  8                    I want to make sure the record is clear.

9  9   Do you have any idea what portions, if any, of P1088

10  10  you'll be testifying about at trial?

11  11                   MS. PARK:  1089.

12  12                   Q    (BY MR. SORENSEN) I want P1088.

13  13                   A    No.

14  14                   Q    You have no idea?

15  15                   A    I think you asked that question.

16  16                   Q    Before we get to 1089, do you have any

17  17  idea if you'll be testifying at trial about the subject

18  18  of material balance analysis?

19  19                   A    No.

20  20                   Q    Okay.  You have no idea?

21  21                   A    I don't know.  I've said several times,

22  22  I do not know what I'm going to be asked to testify

23  23  about.

24  24                   Q    Okay.  Take a look at P1089, please.

25  25                   A    I see that this is Revision 1.  Didn't

26                           CARPENTER REPORTING, INC.
27                             (303) 752-1200

125

1   1   we discuss the antecedent report?

2   2              Q    I believe we did.  Let me take a quick

3   3   look and help you out on that.

4   4              A    It would have probably been dated 1999.

5   5              Q    Yes.  I believe 1077, which I can pull

6   6   out for your reference.  Is that what you're talking

7   7   about?

8   8              A    Yes, I think so.

9   9              Q    All right.

10  10             A    Right.

11  11             Q    So did you contribute to some portion of

12  12  P1089?

13  13             A    Yes.

14  14             Q    What portion would that be?

15  15             A    Well, there are source term portions,

16  16  there are risk coefficient portions, and there are

17  17  environmental transport portions --

18  18             Q    Okay.  So did you --

19  19             A    -- and there are environmental

20  20  radionuclide behavior portions.

21  21             Q    Okay.  So your contributions to P1089

22  22  and your work relating to P1089, that drew on and was

23  23  based on your expertise in internal dosimetry; is that

24  24  correct?

25  25             MS. PARK:  Again, I'm interposing my

26      CARPENTER REPORTING, INC.
27          (303) 752-1200

126

1  continuing objection to form and to the extent this

2  line of questioning suggests that he's being called as

3  an expert witness in this case every time he uses the

4  word "expertise" as opposed to being a fact witness

5  who's testifying about what he's done.

6      Q   (BY MR. SORENSEN)  Okay.  Go ahead, sir.

7      A   We were on internal dosimetry, I guess;

8  right?

9      Q   Yes.

10      A   Yes.

11      Q   The answer is yes.  Okay.  And your work

12  and contributions to P1089, those drew on or were based

13  on your expertise in environmental transport; is that

14  correct?

15      A   To a limited extent, yes.

16      Q   Limited because of the subject matter of

17  P1089 or because someone else contributed more in that

18  particular area?

19      A   The latter.

20      Q   The latter.  Who contributed more?  Art

21  Rood?

22      A   That's correct.

23      Q   Okay.  And your contributions and work

24  relating to P1089 drew on or were based on your

25  expertise in the behavior of radionuclides in the

127

1   1   environment; is that correct?

2   2           A    That's correct.

3   3           Q    And your contributions and work relating

4   4   to P1089 drew on or were based on your expertise in the

5   5   release of radionuclides and other materials from

6   6   facilities; is that correct?

7   7           A    That's correct.

8   8           Q    Your contributions to and work relating

9   9   to P1089 drew on and were based on your expertise in

10  10  the behavior of radionuclides in facilities; is that

11  11  correct?

12  12          A    Yes.

13  13          Q    And do you have any idea of what

14  14  portions, if any, of P1089 you'll be testifying about

15  15  at trial?

16  16          A    No.

17  17          Q    Now, you've used the word "knowledge" a

18  18  couple times, I gather in relation to these various

19  19  areas, internal dosimetry, environmental transport and

20  20  so forth; is that correct?  That's what you were

21  21  referring to when you said "knowledge"?

22  22              MS. PARK:  Objection to form.

23  23          A    I was -- I was referring to my

24  24  background and experience in general.  As I said

25  25  before, I do not -- I do not carry a sign or a badge

26          CARPENTER REPORTING, INC.
27              (303) 752-1200

128

1   1   that says I'm an -- you know, I'm an expert in X, Y,

2   2   and Z.

3   3           Q    (BY MR. SORENSEN)  All of these areas --

4   4           A    But I have knowledge and experience in

5   5   all of those areas.

6   6           Q    These areas being internal dosimetry,

7   7   environmental transport, behavior of radionuclides in

8   8   the environment, release of radionuclides and other

9   9   materials from facilities, and behavior of

10  10  radionuclides in facilities: correct?

11  11          A    That's correct.

12  12          Q    These are all specialized areas of

13  13  knowledge outside the understanding of most people; is

14  14  that correct?

15  15              MS. PARK:  Objection to form.

16  16          Q    (BY MR. SORENSEN)  Is that correct?

17  17              MS. PARK:  Same objection.

18  18          A    I believe it's correct, yes.

19  19              MR. SORENSEN:  All right.  We can take a

20  20  break.

21  21              MS. PARK:  Thank you.

22  22              (There was a recess taken from 11:12

23  23  a.m. to 11:21 a.m.)

24  24          Q    (BY MR. SORENSEN)  Okay.  Are you ready?

25  25          A    Yes.  Sorry.

129

1    1              Q     No problem.

2    2              A     I thought you were talking to her.   I

3    3    was looking out the window.

4    4              Q     Just a general ready.

5    5                    MS. PARK:   Focus on his questions.

6    6    Listen to the man.

7    7              Q     (BY MR. SORENSEN)   For your work

8    8    relating to Rocky Flats, how much has MJP Risk

9    9    Assessment been paid in total?

10   10                   MS. PARK:   Objection.   Form.

11   11              A     I don't know.

12   12              Q     (BY MR. SORENSEN)   Do you have some

13   13    idea?

14   14              A     I don't have an offhand number to give

15   15    you.   I mean, if I chose a number, it would be pulling

16   16    it out of the air, so ... I'm not going to do that.

17   17              Q     You have no idea how much you've been

18   18    paid?

19   19              A     I really don't know the number, no.

20   20              Q     Do you have records of how much you've

21   21    been paid?

22   22              A     Yes.

23   23              Q     Where are those records?

24   24              A     In my office.

25   25              Q     In your office here in Denver?

26
27                        CARPENTER REPORTING, INC.
                          (303) 752-1200

130

1   1            A    Yes.

2   2            Q    Would that show both how much MJP has

3   3    been paid for work relating to Rocky Flats and how much

4   4    you personally have been paid?

5   5            A    That would have to be separated, because

6   6    the invoices typically include travel expenses and that

7   7    sort of thing, so it would be a matter of sorting out

8   8    what part was labor and what part was expenses.

9   9            Q    Okay.  Do you have a -- a rate, an

10  10   hourly rate that MJP billed RAC for its work relating

11  11   to Rocky Flats?

12  12           A    Yes.  And that also changed with time.

13  13           Q    What -- what was the rate at different

14  14   times?

15  15           A    I can't give you the sequence.  I think

16  16   the final rate was on the order of $100 per hour.

17  17           Q    And what was it before that; do you

18  18   recall?

19  19           A    Lower.

20  20           Q    Do you know what it was?

21  21           A    It changed with time.  I don't remember

22  22   what it was at the beginning.

23  23           Q    What -- what -- what contracts, if any,

24  24   does MJP currently have?

25  25                MS. PARK:  Objection.  Form.  Very

26                   CARPENTER REPORTING, INC.
27                       (303) 752-1200

131

1    1    vague.

2    2              Q    (BY MR. SORENSEN)  Does MJP -- I keep

3    3    messing up on those initials.  Does MJP Risk

4    4    Assessment, Inc., have any current contracts for work?

5    5              A    Yes.

6    6              Q    How many?

7    7              A    Three.

8    8              Q    Who are the contracts with?

9    9              A    Fred Hutchinson Cancer Research Center.

10   10             Q    That has to do with Hanford?

11   11             A    No.

12   12             Q    Releases from Hanford?

13   13             A    No.

14   14             Q    What does it have to do with?

15   15             A    Children exposed to the radioactivity in

16   16   the former Soviet Union as a result of the Chernobyl

17   17   accident.

18   18             Q    What are your other contracts?

19   19             A    National Cancer Institute.

20   20             Q    What does that contract have to do with?

21   21             A    The same topic.  Chernobyl-related

22   22   exposures.

23   23             Q    And your third contract?

24   24             A    It's with RAC.

25   25             Q    And what is that contract about?

26
27                       CARPENTER REPORTING, INC.
                              (303) 752-1200

132

1   1            A    Actually, there may be -- the third one

2   2    that I had in mind was a contract with RAC that deals

3   3    with a dose reconstruction.

4   4            Q    Where?

5   5            MS. PARK:  Do you have a litigation

6   6    question involved in --

7   7            A    Yes.  It is a litigation question.

8   8    We're undisclosed experts.

9   9            MS. PARK:  I just want to point that

10  10   out, that he is an undisclosed expert in one of those

11  11   cases, which is why he's not going to identify the

12  12   client or the case.

13  13            Q    (BY MR. SORENSEN)  In that case, is RAC

14  14   working with Kirkland & Ellis?

15  15            A    Yes.  I don't --

16  16            Q    Do you know if it's the same matter that

17  17   Dr. Till mentioned at his deposition?  Do you happen to

18  18   know?

19  19            MS. PARK:  Objection.  Form.  If you

20  20   know what Dr. Till mentioned.

21  21            A    No.  I don't know.

22  22            Q    (BY MR. SORENSEN)  Okay.  Have you read

23  23   Dr. Till's deposition in this case taken a couple weeks

24  24   ago?

25  25            A    Yes.  I did read it quickly.

133

1    1          Q     When?

2    2          A     After I returned, so sometime during --

3    3    sometime during this week, I guess, or -- or -- yes, I

4    4    guess sometime during this week or last weekend.  The

5    5    first of the -- first part of the week.

6    6          Q     Has it been the case that whenever RAC

7    7    is retained or works in connection with litigation, if

8    8    you are also working on the same matter, RAC bills its

9    9    time to, let's say, a law firm, but you bill your time

10   10   to RAC?  Is that the way it's always worked?

11   11          MS. PARK:  Objection to form.

12   12   Speculation.

13   13          A     I bill my time to RAC.  I don't know

14   14   what RAC's specific arrangement is in this -- in this

15   15   particular case or in -- in other cases.

16   16          Q     (BY MR. SORENSEN)  Do you have an

17   17   understanding that, when you're working in connection

18   18   with litigation, the time you bill to RAC gets passed

19   19   on to whoever RAC is working for?

20   20          MS. PARK:  Objection.  Form.  Calls for

21   21   speculation and foundation -- lack of foundation.

22   22          A     It's only logical that -- that RAC isn't

23   23   paying me out of RAC funds exclusively.  I guess they

24   24   are RAC funds.

25   25          Q     (BY MR. SORENSEN)  You say it's only

26                     CARPENTER REPORTING, INC.
27                       (303) 752-1200

134

1   1   logical that RAC is passing on your billable time on to

2   2   whoever is paying RAC; correct?

3   3          A    I don't know the details of that.  But

4   4   that's my general impression.

5   5          Q    Okay.  Any other current contracts?

6   6          A    I have a current contract with -- with

7   7   RAC, but I have -- I have a -- another contract with

8   8   RAC, but I think it's not currently active.

9   9          Q    What is that?

10  10         A    It's the contract related to CS -- the

11  11   work done for CSU with respect to environmental

12  12   questions at Los Alamos.  But, to my knowledge,

13  13   there's -- there's -- the new fiscal year contracting

14  14   still hasn't been sorted out.

15  15         Q    Okay.  Any other contracts currently?

16  16         A    Not that I can think of at the moment.

17  17         Q    Did you review any of Dr. Till's trial

18  18   testimony given yesterday?

19  19         A    No.

20  20         Q    Did you discuss with counsel for

21  21   defendants in your meeting yesterday or this morning

22  22   any of Dr. Till's trial testimony?

23  23         A    No.

24  24         Q    Okay.  I'd like you to -- let me show

25  25   you P1068.  I'd like to ask you a few questions about

135

1    1    it.  And that is DX514.  It's dated August '99.  Put

2    2    that in front of you.

3    3                  MS. PARK:  Give me a minute.

4    4                  MR. SORENSEN:  Sure.

5    5                  MS. PARK:  Okay.  Got it.

6    6                  MR. SORENSEN:  What was that PX number?

7    7    1068?

8    8                  THE DEPONENT:  1068.

9    9                  MS. PARK:  I've got it.

10   10              Q    (BY MR. SORENSEN)  Now, I'd like you to

11   11   turn to the appendix, please, of P1068.  Appendix A.

12   12   Are you there, sir?

13   13              A    Yes.

14   14              Q    Okay.  I'm looking for something here.

15   15   Okay.  Appendix A, page A-3 of P1068 has a Table A-1.

16   16   Do you see that?

17   17              A    Yes.

18   18              Q    Now, that table is drawn from a Zodtner

19   19   and Rogers 1964 study; correct?

20   20              A    Right.

21   21              Q    I want to show you what's been

22   22   previously admitted as Exhibit P10 in this case and ask

23   23   you to confirm that P10 is, in fact, the Zodtner and

24   24   Rogers study that is referenced on page A-3 of P1068.

25   25                  MS. PARK:  It seems to be missing some

26
27                  CARPENTER REPORTING, INC.
                    (303) 752-1200

136

1   1   pages.

2   2                    MR. SORENSEN:  Which one?

3   3                    MS. PARK:  It jumps from 16, 17, 19, and

4   4   then it goes to 21, then it goes to 23, then it goes to

5   5   25.

6   6                    MR. SORENSEN:  You know, that is a pain.

7   7   Yes.  Yes.  You're right.  The part that I'm going to

8   8   ask about doesn't have to do with that, but I will get

9   9   a better one for after lunch.

10  10                    Q    (BY MR. SORENSEN)  Okay.  What I'm going

11  11   to ask you about doesn't get into those pages.  I will

12  12   endeavor to get you a more complete copy.

13  13                    A    Yes.  It's one of those every other --

14  14                    Q    Copying glitch.  Putting that aside --

15  15   is P10 -- it's a previously admitted exhibit so the

16  16   admitted exhibit is complete, but is P10 the same

17  17   Zodtner and Rogers study that is referred to on page

18  18   A-3 of P1068?

19  19                    A    According to this stamp, this is P170.

20  20                    Q    Right.  P170 is an earlier designation.

21  21                    A    I'm sorry.  I didn't see the other

22  22   stamp.

23  23                    Q    Just trying to add to the confusion.  Is

24  24   it the same -- same thing?

25  25                    A    Yes.  This is the Zodtner and Rogers

26                         CARPENTER REPORTING, INC.
27                              (303) 752-1200

137

1   1   report.

2   2           Q   Okay.  When you say "this," P10?

3   3           A   Okay.  P10.

4   4           Q   P10 is what --

5   5           A   I see.  This is '95.  Excuse me.

6   6           Q   P10 is what's being referred to on page

7   7   A-3 of P1068; correct?

8   8           A   That's correct.

9   9           Q   Okay.  Could you please turn to page 8

10  10  of P10, which is included.

11  11          A   Yes.

12  12          Q   Do you see the table at the top or the

13  13  information at the top under Section 2.5?

14  14          A   Yes.

15  15          Q   That -- those numbers and that

16  16  information is reproduced in Table A-1 of Exhibit

17  17  P1068; correct?

18  18          A   Yes.

19  19          Q   Okay.  Do you have a Q clearance?

20  20          A   No.

21  21          Q   Have you ever had a Q clearance?

22  22          A   Yes.

23  23          Q   When did you have a Q clearance?

24  24          A   From 1966 or '67 until approximately

25  25  2000.  I believe those are the correct dates.

138

1    1              Q    Why do you no longer have one?

2    2              A    Q clearances are granted on a need-to-

3    3    know basis.  And I -- the -- the DOE didn't --

4    4    terminated the Q clearance that I had because I no

5    5    longer had a need to know.

6    6              Q    In other words, because your work with

7    7    RAC ended?  Is that why?

8    8              A    No.  Because I no longer had a need to

9    9    have access to classified data.

10   10             Q    Okay.

11   11             A    Classified information.

12   12             Q    In connection with your work relating to

13   13   P1068 or your work generally with respect to RAC, did

14   14   you speak with either Mr. Zodtner or Mr. Rogers?

15   15             A    No.

16   16             Q    Do you know whether either gentleman is

17   17   alive?

18   18             A    No, I don't.

19   19             Q    Okay.  Did you find out what specific

20   20   documents, if any, Mr. Rottner or Mr. -- Mr. Zodtner or

21   21   Mr. Rogers reviewed or relied upon in preparation of

22   22   their report, P10?  Do you follow my question?

23   23             A    Yes, I think so.  I don't --

24   24             Q    I'll restate it.  Do you know what, if

25   25   any, documents Mr. Zodtner and/or Mr. Rogers reviewed

1  1    in the preparation of their report marked P10?

2  2            A    I was just looking to see if there was a

3  3    reference list in their document, and that would be

4  4    where the pages are missing, so I don't actually know

5  5    that.  But I -- I don't recall offhand whether --

6  6    whether there was a reference list.

7  7            Q    Well, other than whatever was contained

8  8    in P10, if any such reference list was contained in

9  9    P10, would you have any other knowledge of any of the

10 10   documents, if any, that Mr. Zodtner or Mr. Rogers

11 11   reviewed in preparation of their report?

12 12            MS. PARK:  Objection to form.

13 13            Q   (BY MR. SORENSEN)  In other words, did

14 14   you ask anyone else at the plant?  Did you come upon

15 15   any lists of documents they reviewed or anything like

16 16   that?

17 17            MS. PARK:  Object to form.  And that's

18 18   confusing.  Can you pick one particular question for

19 19   Mr. Voilleque?

20 20            Q   (BY MR. SORENSEN)  I'm trying to find

21 21   out, other than what may have been listed in P10

22 22   itself, is there any other source of information that

23 23   you reviewed or obtained that tells you what documents

24 24   Mr. Zodtner and Mr. Rogers reviewed in the preparation

25 25   of P10?

140

1   1           A    Well, I know that they re -- reviewed

2   2    accountability documents, and we also have reviewed

3   3    accountability documents for Rocky Flats.

4   4           Q    Do you have any basis to say whether the

5   5    ones you reviewed are the same ones they reviewed?

6   6           A    Not identically, no.

7   7           Q    So you don't know whether there's any

8   8    overlap; correct?

9   9           A    I -- I believe there's overlap in this

10  10   case because we have looked at the accountability

11  11   documents related to the 1957 fire.

12  12           Q    Right.  What I'm trying to find out --

13  13           A    This table in Zodtner and Rogers is from

14  14   the section on the fire loss in Building 71 in 1957.

15  15           Q    In other words, it's your testimony that

16  16   the section on page 8 of P10 is a verbatim excerpt from

17  17   another accountability document?  Is that what you're

18  18   saying?

19  19           A    No.

20  20           Q    Okay.  Again, can you testify with

21  21   personal knowledge that any particular accountability

22  22   document that you reviewed is the same document that

23  23   Zodtner and Rogers reviewed?  Can you say that from

24  24   personal knowledge?

25  25           MS. PARK:  Objection to form.  And as he

26       CARPENTER REPORTING, INC.
27           (303) 752-1200

141

1    1    said before, he doesn't have a list of references and

2    2    list of publications in order to answer your question.

3    3              Q    (BY MR. SORENSEN)  Go ahead.

4    4              A    No.

5    5              Q    You can't say?  Is that right?

6    6              A    I think the question was phrased in the

7    7    other direction.

8    8              Q    Right.  Right.  That's right.  Okay.

9    9    Okay.  Let's go through -- you can either look at P10

10   10   and Table 2.5 or your Table A-1 in P1068.  You can go

11   11   back and forth.  It really doesn't matter.  The first

12   12   line, "inventory in room 180 before fire" is given as

13   13   62,515 grams.  Do you see that?

14   14             A    Yes.

15   15             Q    Or 62.5 kilograms.  Correct?

16   16             A    Yes.

17   17             Q    All right.  Then it says "undamaged

18   18   items removed."  I'm looking at P10 as it's reproduced

19   19   in the other document.  "Undamaged items removed,"

20   20   29,857 grams.  Do you see that?

21   21             A    Yes.

22   22             Q    Then "recovery through processing," in

23   23   P10, it says 24,356 grams.  Do you see that?

24   24             A    Yes.

25   25             Q    And then it -- underneath, it has

142

1   "measured discard," 2,315 grams.  Do you see that?

2             A    Yes.

3             Q    This is all on P10.  Then it says "total

4   recovered" 56,528 grams.  Do you see that?

5             A    Yes.

6             Q    Underneath, it says "fire loss,"

7   5,987 grams.  Do you see that?

8             A    Yes.

9             Q    Then the last line of this section, 2.5

10  of P10 states, "This gives a contribution to MUF of

11  6.0 kilograms."  Do you see that?

12            A    Yes.

13            Q    And what does MUF stand for?

14            A    Material unaccounted for.

15            Q    Now, do you have some basis to dispute

16  the first number given in P10; that is, 62,515 grams of

17  inventory in Room 180 before the fire?

18            MS. PARK:  Objection to form.

19            Q    (BY MR. SORENSEN)  Do you have any basis

20  to dispute that number?

21            MS. PARK:  Same objection.

22            A    There are -- in Table A-2 --

23            Q    (BY MR. SORENSEN)  You're looking at

24  Table A-2 of P1068?

25            A    Right.

143

1  1              Q     Okay.

2  2              A     The inventories in October and November

3  3   are -- are different.  The same -- the same 62-1/2

4  4   kilograms in November was described in the October

5  5   report as being 56.4.

6  6              Q     The October report that's referenced in

7  7   Table A-2, that's a document you reviewed personally;

8  8   is that correct?

9  9              A     Yes.

10  10              Q     And you reviewed it in its classified

11  11   form?

12  12              A     Yes.

13  13              Q     And you took notes while you were

14  14   looking at it in its classified form?

15  15              A     Yes.

16  16              Q     And those notes were reviewed for

17  17   declassification purposes?

18  18              A     Yes.

19  19              Q     And given to you?

20  20              A     Yes.

21  21              Q     And where are those notes now?

22  22              A     I believe that they're part of the

23  23   public record related to our -- our work on the 1957

24  24   fire.

25  25              Q     So where would they be located; do you

144

1   know?

2           A    They could be at Front Range Community

3   College or they could be at Norlin Library.  A

4   collection of documents was sent to Norlin Library, and

5   there, presumably, is a copy in my office.

6           Q    Do you know for a fact whether there's a

7   copy in your office?

8           A    No, I don't.

9           Q    Okay.  The 62,515 figure in P10, do you

10  know for a fact from personal knowledge where it's

11  drawn from?

12          MS. PARK:  Objection to form.

13          A    Well, it's the same number that we found

14  in the November 1957 accountability report for that

15  room.  So -- whether they drew it from that report or

16  not, I cannot say.

17          Q    (BY MR. SORENSEN)  Okay.  Then their

18  next figure in P10, "undamaged items removed," 29,857,

19  do you see that?

20          A    Yes.

21          Q    Do you have any basis to dispute that

22  figure?

23          MS. PARK:  Objection.  Form.  Basis to

24  dispute it's correct or basis to dispute that's what

25  they found?

145

1   1              Q    (BY MR. SORENSEN)  Basis to dispute that

2   2   it's correct.  I presume you have no basis to dispute

3   3   that the numbers in 2.5 of P10 are, in fact, the

4   4   numbers that Zodtner and Rogers found.  That's what

5   5   they reported in P10; correct?  They weren't lying

6   6   about it?

7   7              A    That's what -- that's what they

8   8   reported, but --

9   9              Q    Okay.

10  10             A    -- as we spoke before, it's -- it's not

11  11   clear what Table A-2 attempts -- you know, what this

12  12   shows is the different reports gave different numbers.

13  13   And so ...

14  14             Q    Okay.  So my question is:  The undamaged

15  15   items removed number in P10 on page 8 of 29,857 grams,

16  16   do you have any basis to dispute the accuracy of that

17  17   number?

18  18             A    It's consistent with the number in the

19  19   October report.  Yes.

20  20             Q    So the answer is no, you have no basis

21  21   to dispute its accuracy?

22  22             A    Right.

23  23             Q    Is that correct?

24  24             A    That's correct.

25  25             Q    Okay.  Let's go to the next item.  On

26                         CARPENTER REPORTING, INC.
27                           (303) 752-1200

146

1   page 8 of P10 under Section 2.5, "recovery through

2   processing," it states 24,356 grams.  This is all

3   plutonium, obviously.  Do you have any basis to dispute

4   the accuracy of that number?

5                    MS. PARK:  Objection.  Form.

6            A    No.

7            Q    (BY MR. SORENSEN)  Let's go to the next

8   line.  In -- on page 8 again of P10, under "measured

9   discard," it gives a figure of 2,315 grams.  Do you see

10  that, sir?

11           A    Yes.

12           Q    Do you have any basis to dispute the

13  accuracy of that number?

14                    MS. PARK:  I'm going to object to form.

15  It's vague and ambiguous.

16           Q    (BY MR. SORENSEN)  Go ahead.

17           A    No.

18           Q    And then the next number, under "total

19  recovered," on P10 on page 8 is 56,528, and that's

20  simply the arithmetic sum of the three previous numbers

21  just discussed:  29,857, 24,356, and 2,315; correct?

22           A    Yes.  That's the sum.

23           Q    Okay.  And then the next line, "fire

24  loss," 5,987 is simply the arithmetic result of

25  subtracting 56,528 from 62,515; correct?

147

1   1              A     Yes.

2   2              Q     And you have no reason to question the

3   3    arithmetic that they performed; correct?

4   4              A     No.  The arithmetic is correct.

5   5              Q     Okay.  So I am trying to understand if

6   6    you could please explain for me, sir, what basis, if

7   7    any, you have to dispute the results given on page 8 of

8   8    P10 that there was 6 kilograms, approximately, of

9   9    plutonium unaccounted for after the September 11th,

10  10   1957 fire as depicted on -- on page 8.

11  11             A     Well, we, in fact, quote that table in

12  12   our report.

13  13             Q     Yes.  I understand that.

14  14             A     In the report.  And so --

15  15             Q     I understand that.

16  16             A     Maybe I missed your question.  I'm

17  17   sorry.

18  18             Q     Well, in other words, the inventory

19  19   given (sic) is given.  I've asked you whether you have

20  20   basis to dispute these figures.  If the inventory is

21  21   what it is, undamaged items removed, recovery through

22  22   processing, measured discard, all those numbers are

23  23   accurate, then the rest is math.  I'm trying to

24  24   understand how you dispute that on the basis of the

25  25   Zodtner and Rogers analysis there were 6 kilograms of

148

1   1   plutonium after the fire -- there were 6 kilograms

2   2   before the fire that went missing after the fire.

3   3                    MS. PARK:  Objection.  Form.

4   4          A    That's -- that's -- that's their

5   5   conclusion.  That's correct.

6   6          Q    (BY MR. SORENSEN)  Do you dispute that

7   7   conclusion?  Do you disagree with it?

8   8          A    Well, we looked at -- we looked at

9   9   additional data at the time that the -- after the

10  10   building was cleaned up -- or the area of the building

11  11   was cleaned up.  And that's discussed in -- in the

12  12   report.

13  13          Q    In P1068?

14  14          A    Right.

15  15          Q    When was the building cleaned up?

16  16          A    The room was cleaned up in 1960 and

17  17   1961.

18  18          Q    Well, that was three years or so before

19  19   the Zodtner and Rogers study; correct?

20  20          A    Right.

21  21          Q    Okay.  Do you have any basis to conclude

22  22   that Zodtner and Rogers didn't have access to that same

23  23   information?

24  24          A    No.

25  25          Q    Okay.

149

1    1              A    I mean, I have no basis -- presumably,

2    2    they had access to it.

3    3              Q    Okay.  Do you have some basis to believe

4    4    that you have access to some information that they did

5    5    not have access to that's relevant to this?

6    6              MS. PARK:  Objection to form.  What do

7    7    you mean by "this"?

8    8              Q    (BY MR. SORENSEN)  Go ahead.

9    9              A    Could you read that --

10   10              Q    I'll ask it again.  We're talking about

11   11    this analysis or -- this MUF analysis of the 1957 fire.

12   12    My question is:  Do you have any reason to believe that

13   13    you had access to some information relevant or

14   14    pertinent to that analysis that Zodtner and Rogers did

15   15    not have access to?

16   16              A    In terms of access, no.

17   17              Q    I'm sorry?

18   18              A    I say in terms of access, no.

19   19              Q    In some other terms?

20   20              A    Well, whether they used the same

21   21    information is another question.

22   22              Q    Okay.  But you don't know the answer to

23   23    that?

24   24              A    Right.

25   25              Q    Okay.  Now, if you could explain to me,

26                        CARPENTER REPORTING, INC.
27                          (303) 752-1200

150

1    sir, why is it that you have some reason to believe

2    that, in fact, 6 kilograms as depicted on page 8 of P10

3    were not burned up in the '57 fire?

4            A    Were not --

5            Q    Were not burned up as a result of the

6    '57 fire and that's why they went missing after the '57

7    fire.

8                 MS. PARK:  Objection to form.

9            Q    (BY MR. SORENSEN)  In other words, if,

10   before the fire, there's this amount of plutonium and

11   after the fire, there's 6 kilograms less, what basis do

12   you have to believe that 6 kilograms didn't burn up as

13   a result of the fire?

14           A    There are a number of -- number of

15   different answers to inventory difference or material

16   unaccounted for besides -- besides burning up.

17           Q    I'm not -- I'm -- you can answer because

18   I do want an answer, but I just want to focus you.  I'm

19   talking about the '57 fire.

20           A    So am I.

21           Q    All right.  We can get to the broader

22   issues, which we will, but, with that caveat, go ahead.

23   Go ahead.

24           A    Well, if you look, actually, in our

25   report, we went through --

1   1              MR. SORENSEN:  While you're looking, I

2   2   want to make a quick call and get this process going.

3   3          A    Okay.  To get back to your question --

4   4          Q    (BY MR. SORENSEN)  Sure.

5   5          A    -- part of the material in -- in that

6   6   building and in any building can be in nooks and

7   7   crannies and corners of the gloveboxes and various

8   8   places that are very difficult to measure and very

9   9   difficult to assess what the quantity is there and what

10  10  quantities are held up in various parts of the system,

11  11  in equipment, for example, and lathe turnings and

12  12  things like that that aren't -- aren't completely

13  13  collected.

14  14              You'll see in our Table A-2 --

15  15          Q    Hold on one second.

16  16          A    Sorry.

17  17          Q    Yeah.  Go ahead.

18  18          A    Okay.  There's -- there's material

19  19  believed to be present, but not located.  So the

20  20  fact -- the fact that there's material unaccounted for

21  21  after the fire does -- does not imply that that

22  22  material was -- was burned up during the fire.

23  23          Q    Now, you're looking at the line

24  24  "believed present but not located" in Table A-2;

25  25  correct?

152

1   1              A    That's correct.

2   2              Q    And do you know what relationship these

3   3    two numbers, 6.3 and 4.9, have, if any, to Section 2.5

4   4    on page 8 of P10?

5   5              A    These --

6   6              Q    In other words, there is no line on

7   7    Section 2.5, comparable to "believed present but not

8   8    located"?

9   9              A    That's correct.

10  10             Q    So what relationship, if any, do the two

11  11   have?

12  12                  MS. PARK:  Objection.  Form.

13  13             A    I don't know because I don't know

14  14   whether Zodtner and Rogers took their information

15  15   from -- from these accountability reports or not.

16  16             Q    (BY MR. SORENSEN)  Okay.

17  17             A    I don't -- I don't know that.  All I'm

18  18   trying to point out is that the fact that material is

19  19   unaccounted for doesn't mean that it was burned up,

20  20   which was really what your question was.

21  21             Q    Right.  What I'm -- yes.  All right.

22  22   I'm trying to understand -- maybe you've begun to

23  23   answer -- let me start again.

24  24                  The table in 2.5 has a figure for

25  25   "inventory in Room 180 before the fire."  That's where

153

1    the fire occurred, Room 180; correct?

2              MS. PARK:  For clarity, could you say

3    2.5 and PX10?

4              Q    (BY MR. SORENSEN)  Yeah.  2.5 and P10.

5    There's a number, 62,515 grams.  And I think you've

6    agreed that you have no basis, as you sit here, to

7    dispute the accuracy of that number; correct?

8              A    Yes.

9              Q    All right.  And then they subtract three

10   line items.  We've gone through them.  You testified

11   you have no basis to dispute the accuracy of any of

12   those three numbers.  The rest is math; correct?  "The

13   rest" meaning you add up those three numbers, then you

14   subtract it from 62,000, and you get 5,987; correct?

15             A    That's correct.

16             Q    Okay.  So they, in this report --

17   Zodtner and Rogers are stating this gives a

18   contribution to MUF of 6 kilograms.  "This" being the

19   fire loss; correct?

20             A    Right.

21             Q    So what basis do you have to dispute

22   this conclusion or this statement in P10 that before

23   the fire versus after the fire, there was 6 kilograms

24   less after the fire than there was before the fire?

25             A    We went through that and -- and I agreed

154

1  1    that that was their conclusion.  That it was -- there

2  2    was 6 kilograms difference.

3  3              Q    Okay.  And what do you attribute -- and

4  4    do you attribute that 6 kilograms to something else

5  5    other than the fire?

6  6              MS. PARK:  Asked and answered.

7  7              Q    (BY MR. SORENSEN)  And if so, what's

8  8    your basis for doing that?

9  9              A    Do I attribute it to --

10  10             Q    Do you, in your mind, say that the

11  11   6 kilograms that's in Zodtner and Rogers, that's

12  12   because of waste shipped to Idaho or plutonium, you

13  13   know, in the nooks and crannies?  Have you reached some

14  14   kind of conclusion of that nature?

15  15             A    Your question -- your previous question

16  16   about whether the fact that the 6-kilogram difference

17  17   meant that that 6 kilograms was burned up, my answer to

18  18   that is no.

19  19             Q    Okay.

20  20             A    And that's because of material and other

21  21   information in other accountability reports that refers

22  22   to material that -- that isn't specifically identified.

23  23   "Believed present but not located," for example.

24  24             Q    So do you believe or have you reached

25  25   some opinion that the 6.3 kilograms under the October

155

1  1   '57 report in Table A-2 of P1068 next to "believed

2  2   present but not located" -- have you reached some

3  3   opinion that that 6.3 is, in fact, the 6 kilograms to

4  4   MUF that Zodtner and Rogers are talking about?

5  5              MS. PARK:  Objection.  Form.  And in

6  6   particular to the extent when you use the word

7  7   "opinion," you're suggesting that he formulates an

8  8   opinion as an expert in this case as opposed to a

9  9   finding.

10  10             Q   (BY MR. SORENSEN)  All right.  Well,

11  11  semantics aside --

12  12             MS. PARK:  Well --

13  13             Q   (BY MR. SORENSEN)  -- go ahead.

14  14             MS. PARK:  -- you're the one who's using

15  15  these terms.

16  16             A   No.  I don't associate that -- that 6.3

17  17  with their 6.0.  What I was trying to point out is that

18  18  the fact that there's material unaccounted for after

19  19  the fire doesn't mean that that material was all burned

20  20  during -- during the fire.

21  21             Q   (BY MR. SORENSEN)  Do you see anywhere

22  22  in P10 that Zodtner and Rogers are giving the opinion

23  23  that that 6.0 is attributable to something other than

24  24  the fire?

25  25             A   This is a fire loss in Building 71.

156

1   1   That's the title of that section.  And so they are

2   2   associating that 6 kilograms with the fire.  That's a

3   3   different thing from saying that that -- all that

4   4   material was burned.

5   5            Q    Do you see anywhere in P10 any basis to

6   6   think that Zodtner and Rogers concluded that any

7   7   portion of that 6.0 fire loss is attributable to

8   8   something other than the plutonium burning up?

9   9            A    In their general discussion of reasons

10  10   for the difference -- for inventory difference or

11  11   material unaccounted for, they, in fact, cite a number

12  12   of such reasons, and under-accounting of waste

13  13   materials is highest among their list.

14  14            Q    But do they relate that at all

15  15   specifically to the -- to the fire?

16  16            A    It's a general statement about -- about

17  17   the reasons for material unaccounted for.  And this is

18  18   material unaccounted for from the 1957 fire and so

19  19   it's -- it's addressed by the general statement that

20  20   they make.  In their conclusions, you'll see a whole

21  21   list of reasons why there is material unaccounted

22  22   for -- it exists and that's -- if I recall, that was

23  23   reason No. 1 in terms of magnitude.

24  24            Q    But do you think you'll find in P10 --

25  25   and please tell me if you see anything in P10 that

157

1    1    specifically relates the general discussion you just

2    2    mentioned to the 6.0 fire loss that we've been

3    3    discussing --

4    4                    MS. PARK:  Objection.  Form.

5    5             Q    (BY MR. SORENSEN)  -- connects the two?

6    6                    MS. PARK:  Objection.  Form and asked

7    7    and answered.

8    8             A    The 6.0 is part of the material

9    9    unaccounted for.  The underestimation of waste

10   10   transported to Idaho is the principal reason for

11   11   material unaccounted for.  There is nothing in this

12   12   report that says that the principal reason for this

13   13   6.0 kilograms was that it was burned during the fire.

14   14            Q    (BY MR. SORENSEN)  Okay.  Why don't we

15   15   go through this a little more carefully.  Are you

16   16   familiar with the term MBA, material balance area?

17   17            A    Yes.

18   18            Q    Okay.  We have a statement on Section

19   19   2.5 of P10 that inventory in Room 180 before the '57

20   20   fire occurred was 62.515 kilograms of plutonium;

21   21   correct?

22   22            A    Yes.

23   23                    MS. PARK:  Objection to form.  It says

24   24   "grams."

25   25            A    Oh, pardon me.

26
27                    CARPENTER REPORTING, INC.
                      (303) 752-1200

158

1  1           Q    (BY MR. SORENSEN)  I said 62.15

2  2   kilograms.  62,515 grams.  They are the same thing;

3  3   correct?  They are the same thing; correct?

4  4           A    That's correct.

5  5           Q    Okay.  So we have a statement in P10

6  6   that that's how much plutonium was in Room 180 -- not

7  7   all over the plant -- in Room 180 before the '57 fire

8  8   occurred; correct?

9  9           A    Correct.

10 10           Q    Okay.  Do you have some reason to

11 11   believe that they were missing something in that

12 12   number?  That there was more plutonium or less

13 13   plutonium in that room before the fire?

14 14           A    This is their report.

15 15           Q    Do you have some reason to believe they

16 16   are wrong about that number?

17 17           A    No.  Although other numbers are given in

18 18   other reports.

19 19           Q    Okay.

20 20           A    I mean, their number agrees with the

21 21   November 1967 report of prefire inventory.

22 22           Q    Okay.

23 23           A    It doesn't agree with the October 1957

24 24   report, but it agrees with one out of two.

25 25           Q    Okay.  You don't know which one they

26                   CARPENTER REPORTING, INC.
27                     (303) 752-1200

159

1   1   were relying on?  You don't know their basis for

2   2   relying on a particular document?

3   3            A    I think --

4   4                 MS. PARK:  Wait.

5   5            Q    (BY MR. SORENSEN)  You don't know;

6   6   correct?

7   7                 MS. PARK:  Wait.  Just -- I'm going to

8   8   object.

9   9                 MR. SORENSEN:  I'll withdraw the

10  10  question.

11  11                 MS. PARK:  Good.  Pick one question.

12  12            Q    (BY MR. SORENSEN)  I'll withdraw the

13  13  question.  You don't know specifically what documents

14  14  and information they relied on, Zodtner and Rogers;

15  15  correct?  You don't know?

16  16                 MS. PARK:  I'm going to object to form

17  17  and also it was asked and answered given the fact that

18  18  we also have pages missing.  And give me a chance to

19  19  object.

20  20                 THE DEPONENT:  I'm sorry.  I was --

21  21            Q    (BY MR. SORENSEN)  The next line item,

22  22  "undamaged items removed."  "Undamaged," what does that

23  23  mean to you?

24  24                 MS. PARK:  Objection.  Foundation.

25  25            Q    (BY MR. SORENSEN)  Does it have any

26
27                 CARPENTER REPORTING, INC.
                      (303) 752-1200

1   1    meaning to you?

2   2                    MS. PARK:  Same objection.

3   3             A    It -- to me, it means that it's -- it's

4   4    material that either was in metallic form or some other

5   5    form and was found undamaged in its original state.

6   6             Q    (BY MR. SORENSEN)  So these -- this is

7   7    undamaged plutonium that they're talking about;

8   8    correct?

9   9             A    Yes.

10  10            Q    All right.  And whatever the number of

11  11    items, they're saying that they add up in weight to

12  12    29,857 grams; correct?  That's what is being reported

13  13    here?

14  14            A    That's correct.

15  15            Q    Okay.  The next item, "recovery through

16  16    processing."  Do you know what that means?

17  17            A    Yes.

18  18            Q    What does it mean?

19  19            A    It means that they had collected some

20  20    material -- presumably, damaged material -- and -- and

21  21    that might have been spread around and recovered the

22  22    plutonium from it.

23  23            Q    Okay.

24  24            A    That they did some sort of processing

25  25    of -- of this material --

26                    CARPENTER REPORTING, INC.
27                       (303) 752-1200

161

1    1                    Q    Okay.  This is all --

2    2                    A    -- to recover the plutonium.

3    3                    Q    Okay.  And that adds up to 24,356 grams.

4    4    You've already said you have no reason to dispute the

5    5    accuracy of that number; correct?

6    6                    MS. PARK:  Objection to form.

7    7                    Q    (BY MR. SORENSEN)  Correct?

8    8                    A    Yes.

9    9                    Q    Okay.  Yes, you have no basis; correct?

10   10                   A    Yes.

11   11                   Q    Okay.  The next line item, "measured

12   12   discard," what does that mean to you, if anything?

13   13                   A    That's a term that's typically used to

14   14   refer to material that's been -- been disposed of as

15   15   waste material.

16   16                   Q    Okay.  And that is representing that

17   17   that added up to 2,315 grams of plutonium --

18   18                   A    Right.

19   19                   Q    -- correct?  That's what that means?

20   20                   A    That's what it says.

21   21                   Q    Okay.  And -- all right.  So, now, we

22   22   have a total recovered number.  Do you have any basis

23   23   to believe that they left something out in their three

24   24   line items?

25   25                   MS. PARK:  Objection.  Form.

26                        CARPENTER REPORTING, INC.
27                           (303) 752-1200

162

1    1              Q    (BY MR. SORENSEN)  Do you follow what

2    2    I'm asking?

3    3              A    Yes.  Yes, I do.  And this goes back to

4    4    my previous point.  The measured discard is waste.

5    5              Q    Okay.

6    6              A    And waste is the principal un --

7    7    underestimated quantities in waste is the principal

8    8    reason for material unaccounted for at Rocky Flats.

9    9    And that's a conclusion of your Exhibit P10.  And

10   10   that's the reason I was attempting to explain to you

11   11   that the fact that there's a 6-kilogram difference

12   12   doesn't mean that the 6 kilograms was burned during the

13   13   fire.

14   14             Q    Okay.  Let me follow what you're

15   15   asking -- ask you some questions.  Is it your opinion,

16   16   view, conclusion -- however you want to term it -- that

17   17   this number, 2,315, that's given on page 8 of P10 is

18   18   off and inaccurate and really could be as high as

19   19   8,315?  Is that your -- what you're saying?

20   20             MS. PARK:  Objection.  Form.

21   21             A    I'm saying that to quote that number to

22   22   four significant figures, even though there may be four

23   23   significant figures in a report that they looked at, is

24   24   an inaccurate representation of that number.

25   25             Q    (BY MR. SORENSEN)  And what's your basis

26

27

163

1  1  for saying that?

2  2          A    Because the measurement capabilities

3  3  that were available at the time did not permit reliable

4  4  quantification of the materials that were -- that were

5  5  packed up in drums and sent off as solid waste to

6  6  Idaho.

7  7          Q    Well, where does it say in P10 that the

8  8  measured discard was packed up in drums?

9  9          A    Measured discard as a -- is a term that

10  10  refers, generally speaking, to waste.  Waste materials.

11  11          Q    But --

12  12          A    It's discarded material.

13  13          Q    But do you have any personal knowledge,

14  14  as you sit here, of what, specifically, this measured

15  15  discard line on page 8 of P10 was specifically

16  16  referring to?  Do you have any personal knowledge of

17  17  that?

18  18          A    I just expressed to you my understanding

19  19  of that term.

20  20          Q    And that's as much of a basis as you

21  21  have, what you've already expressed?

22  22              MS. PARK:  Objection to form.

23  23          Q    (BY MR. SORENSEN)  If you have anything

24  24  to add, I'm happy to hear it.

25  25              MS. PARK:  He's already said it to you.

26              CARPENTER REPORTING, INC.
27                 (303) 752-1200

164

1   1              Q     (BY MR. SORENSEN)  Do you have anything

2   2       else to add?

3   3              A     I think I've explained my understanding.

4   4              Q     Okay.  Do you see anywhere in P10 --

5   5       please point out to me, if you do -- where Zodtner and

6   6       Rogers indicate that this 2,315 figure, in fact, could

7   7       be off by as much as 6 kilograms?

8   8              MS. PARK:  Objection.  Form.  I don't

9   9       think that the question of whether it's off by -- by

10  10      6 kilograms is -- is the relevant question.  The

11  11      question is --

12  12              Q     (BY MR. SORENSEN)  Well, that's my

13  13      question.

14  14              A     Okay.  Sorry.  I apologize.  Could you

15  15      read it back to me again.

16  16              Q     I'll ask it again.  Can you identify any

17  17      portion of P10 where Zodtner and Rogers state or

18  18      suggest that the figure of 2,315 grams, given next to

19  19      measured discard on page 8, is, in fact, off or could

20  20      be off, wrong, by as much as 6 kilograms?

21  21              A     There's no specific statement -- to my

22  22      knowledge, there's no specific statement to that effect

23  23      in this document.

24  24              Q     Let's move from specific statements to

25  25      suggestions.  Do you interpret some portion of P10 to

26          CARPENTER REPORTING, INC.
27              (303) 752-1200

165

1   be suggesting that the figure of 2,315 grams is or

2   could be off by as much as 6 kilograms?  And if you

3   believe that, please point out that section.

4           A    No, I don't.

5           Q    No, there's no such section?

6           A    To -- to my knowledge, yes.

7           Q    Okay.  I want to take a step back.

8   We're going to get back into the '57 fire report.  Take

9   a step back for a moment.  Could you please describe

10  for me your personal review of classified documents in

11  connection with this case -- in connection with your --

12  your work for RAC in connection with Rocky Flats is

13  what I meant to say.  Sorry.

14               MS. PARK:  I'm going to object to form.

15          Q    (BY MR. SORENSEN)  That was a messed-up

16  question.  You reviewed some classified documents in

17  connection with your work for RAC relating to Rocky

18  Flats; correct?

19          A    Yes.

20          Q    What volume of classified documents did

21  you personally look at?

22          A    That's -- it was a -- stating a

23  particular volume is difficult.  We reviewed -- the

24  group with Q clearances reviewed all the classified

25  documents at Rocky Flats and my own reviews were of two

166

1    1    types.  One, part of the general review, particularly

2    2    in Building 881 where there were more than 2,000

3    3    classified documents -- boxes of classified documents.

4    4    I participated in review of -- of -- of many documents

5    5    in many boxes in that -- in that facility.

6    6              I also participated -- or I also

7    7    reviewed in particular -- well, let me -- let me

8    8    continue with that a bit.  There was also a large

9    9    volume of classified documents in Building 706, and I

10   10   participated in the review of this -- also, this large

11   11   volume of documents.

12   12             And in addition to those sort of -- what

13   13   I would describe as general reviews, I reviewed

14   14   materials -- or documents that were related to material

15   15   unaccounted for.

16   16        Q    So what is the volume of documents

17   17   relating to MUF that you personally reviewed in their

18   18   classified form?

19   19        A    Numbers of documents.  I guess I would

20   20   say -- there were probably hundreds, I suppose.

21   21        Q    Hundreds of documents; is that correct?

22   22        A    Yes.  I believe that would be it.

23   23   That's, you know -- that's an estimate based on memory

24   24   of things that occurred a long time ago.

25   25        Q    Do you know what volume of classified

26        CARPENTER REPORTING, INC.
27             (303) 752-1200

167

1   1   documents DOE identified as relating to MUF?  What the

2   2   volume is?

3   3                 MS. PARK:  Objection to form.

4   4          A    I'm sure that it's very large.

5   5          Q    (BY MR. SORENSEN)  Okay.  How much time

6   6   did you spend in a classified setting, reviewing

7   7   classified MUF or MUF-related documents?

8   8          A    I don't have any specific time

9   9   recollection of that because it was intermixed with

10  10   general document review.

11  11          Q    But when you review classified documents

12  12   in a classified setting, you had to go to a particular

13  13   secure location; correct?

14  14                 (There was a discussion off the record.)

15  15                 MS. PARK:  Why don't we finish this

16  16   question and take a break for lunch.

17  17          Q    (BY MR. SORENSEN)  Okay.  When you

18  18   reviewed classified documents in their classified form,

19  19   you had to go to a different location that was more

20  20   secure than just doing a general document review;

21  21   correct?

22  22          A    Well, actually, I wasn't talking about

23  23   general document review.  I was talking about the

24  24   general review -- the broad picture review of

25  25   classified documents.

26                       CARPENTER REPORTING, INC.
27                          (303) 752-1200

168

1  1              Q    I see.

2  2              A    And that was -- those two locations that

3  3    I named were repositories of classified documents, so

4  4    when we were in those locations, we were in a

5  5    classified area.

6  6              Q    Building 881 and where else?

7  7              A    706.

8  8              Q    706.  I see.  So what you can't separate

9  9    in your mind -- correct me if I'm wrong -- is the

10  10   portion of the time -- of the overall time spent

11  11   reviewing classified documents, that portion spent

12  12   reviewing classified documents that related to MUF.  Is

13  13   that what you're saying?

14  14             A    That's correct.

15  15             MR. SORENSEN:  We can stop here.

16  16             (There was a luncheon recess taken from

17  17   12:16 p.m. to 12:54 p.m.)

18  18             Q    (BY MR. SORENSEN)  I had given you a

19  19   substitute copy of P10 to correct copying problems.  I

20  20   will tell you this has every page except, apparently,

21  21   even this one is missing page 26.  I will point that

22  22   out to you.  This document is clearly cursed.  I don't

23  23   think 26 -- it appears from the context that 26 is

24  24   another table.

25  25             A    Yes.

26                     CARPENTER REPORTING, INC.
27                       (303) 752-1200

169

1    1              Q    And I think if you could confirm for me

2    2    that this document in front of you, P10, has no

3    3    reference list.  I believe it does not.

4    4              A    I'll look a little bit further.

5    5              Q    Sure.  Go ahead.

6    6              A    As near as I can see, it doesn't have a

7    7    reference list, and it's unlikely that the reference

8    8    list would be on the missing page.

9    9              Q    Okay.  Do you recall whether you saw the

10   10   classified version of P10 in connection with your work

11   11   for RAC relating to Rocky Flats?

12   12             A    Yes.  I recall that.

13   13             Q    You do.  In this setting, can you say

14   14   anything about that classified document; if you

15   15   remember anything about it that's material to your

16   16   analysis that you performed in connection with your

17   17   work?

18   18             A    Classified portions of the document

19   19   cannot be discussed outside of a classified area --

20   20             Q    So there's --

21   21             A    -- with anybody who doesn't have a Q

22   22   clearance.

23   23             Q    I have a Q clearance.  I gather the

24   24   other two people in this room do not.  This is not a

25   25   classified setting, in any event.

26                        CARPENTER REPORTING, INC.
27                            (303) 752-1200

170

1   1              A     Right.  Even if I still had my Q

2   2      clearance, we couldn't talk about it.

3   3              Q     Right.  There's nothing -- is it correct

4   4      that you believe there's nothing that you would be

5   5      comfortable discussing about the classified version of

6   6      P10?

7   7              A     That's correct.

8   8              Q     Okay.  All right.  I want to go back to

9   9      this general discussion you were having about

10  10     classified documents.  I believe you said you reviewed

11  11     hundreds of classified documents in classified form

12  12     relating to MUF amongst a greater review of -- a

13  13     greater volume of classified documents.  Is that true?

14  14             A     Yes.

15  15             Q     Okay.  Do you know how many classified

16  16     MUF or MUF-related documents other members of your team

17  17     reviewed in their classified form?

18  18             A     No.

19  19             Q     Okay.  While you were in a classified

20  20     setting, looking at classified MUF or MUF-related

21  21     documents, did you attempt to analyze the MUF,

22  22     MUF-related documents on a material balance area level

23  23     in any way?

24  24                   MS. PARK:  Objection.  Form.

25  25             Q     (BY MR. SORENSEN)  In other words, you

26                      CARPENTER REPORTING, INC.
27                        (303) 752-1200

171

1    1    understand material balance areas are particular

2    2    physical areas at the plant?

3    3          A    Right.

4    4          Q    You understand that?

5    5          A    Right.

6    6          Q    Okay.  And there's, I understand, over

7    7    100 such material balance areas.  Does that comport

8    8    with your understanding?

9    9          A    Yes.

10   10         Q    Okay.  Did you make some attempt to

11   11    identify a particular material balance area or areas

12   12    and while you were looking at classified MUF and

13   13    MUF-related documents in a classified setting, attempt

14   14    to gather those documents about a particular material

15   15    balance area to see if you could make some kind of

16   16    calculation about that material balance area?

17   17               MS. PARK:  Objection.  Form.

18   18         Q    (BY MR. SORENSEN)  Did you make that --

19   19    any such effort?

20   20         A    It's a complicated question, but, as I

21   21    understand it, you're asking whether I did any

22   22    calculations for a particular material balance area

23   23    when I was in a classified area?

24   24         Q    Yes.  I'll start with that question.

25   25         A    Okay.  The answer to that is no.

26
27               CARPENTER REPORTING, INC.
                  (303) 752-1200

172

1   1              Q    Okay.  Did any members of your team do

2   2   such a calculation?

3   3              A    I don't know.

4   4              Q    Well, if they did, wouldn't you know?

5   5                   MS. PARK:  Objection.  Form.

6   6              Q    (BY MR. SORENSEN)  I'll start again.

7   7   Who was the head of this review team of classified

8   8   documents?  Who was in charge of it?

9   9              A    Well, John was generally in charge, but,

10  10  on any given day, you know, various people could be

11  11  reviewing classified documents in various areas at any

12  12  given time.  So I wasn't necessarily with all the

13  13  people on the team when they reviewed classified

14  14  documents.  They were there at times other than the

15  15  time that I was there and I was there when they weren't

16  16  there.

17  17             Q    And did you have discussions amongst

18  18  your team in a classified setting about the documents

19  19  you were looking at?

20  20             A    When we were there together, yes.

21  21             Q    And did you also have discussions

22  22  outside of that review in classified or secure rooms?

23  23  You know, away from Rocky Flats?

24  24                  MS. PARK:  Objection.  Form.

25  25  Discussions about the contents of classified

173

1    1    materials --

2    2                       MR. SORENSEN:  Yes.

3    3                       MS. PARK:  -- outside of the secure

4    4    area?

5    5                       MR. SORENSEN:  Yeah.

6    6              Q    (BY MR. SORENSEN)  In other secure areas

7    7    you could get permission for.

8    8              A    He said in other secure areas.  No.

9    9              Q    You did not?

10   10             A    No.

11   11             Q    When you were having discussions about

12   12   classified documents in a classified secure setting,

13   13   did you -- did you and your members of your team

14   14   discuss the making of calculations about specific

15   15   material balance areas?

16   16             A    I don't recall that we discussed that

17   17   in -- in either -- in those repositories because those

18   18   calculations weren't ongoing, as I said before.

19   19             Q    Were not ongoing?

20   20             A    Right.

21   21             Q    Okay.

22   22             A    We weren't doing the calculations while

23   23   we were there, and I don't recall any discussions of

24   24   those calculations.

25   25             Q    Okay.  Did you do such calculations

26                       CARPENTER REPORTING, INC.
27                          (303) 752-1200

174

1    1    after you were outside of the classified setting?

2    2            A    Yes.

3    3            Q    What kind of calculations?  Let me start

4    4    again.

5    5                 Did you do such calculations, other than

6    6    relating to the '57 fire?

7    7            A    No.  Not that I can recall.

8    8            Q    Okay.  Did you make any attempt to

9    9    correlate or associate other events, other potential or

10   10   actual release events at Rocky Flats; that is, the

11   11   release of plutonium either definitely into the

12   12   atmosphere or potentially?  Did you make any attempt to

13   13   correlate such events with particular material balance

14   14   areas or with particular sets of classified MUF or

15   15   MUF-related documents?

16   16                 MS. PARK:  Objection to form.

17   17           Q    (BY MR. SORENSEN)  Other than the '57

18   18   fire?

19   19           A    Such a -- such a correlation attempt

20   20   doesn't really make any sense in the context -- let's

21   21   take Building 71 because many -- many sources within

22   22   the plant, many locations within the plant are carried

23   23   by feeder ducts into a big ventilation system where

24   24   there's a big set of plenum filters, and the effluent

25   25   measurements are made downstream of those plenum

175

1    1    filters, so the likelihood that you could associate

2    2    something that some -- some activity or some material

3    3    unaccounted for in a particular area in the plant with

4    4    a -- with an effluent reading is -- is not -- is not a

5    5    productive activity to do that.  To try to do that.

6    6              Q    Did you do it?

7    7              A    No.

8    8              Q    Okay.

9    9              A    I was explaining why we didn't do it.

10   10             Q    All right.  You say you did not do it.

11   11   And did you attempt to do it?

12   12             A    No.  For the reason I just gave.

13   13             Q    Okay.  Are you, in that explanation,

14   14   assuming that all releases would have been monitored --

15   15   let me start again.

16   16                  Did you consider the possibility of

17   17   unmonitored releases?

18   18                  MS. PARK:  Objection to form.

19   19             A    From the building, the most significant

20   20   unmonitored release was the 1957 fire, and so we did,

21   21   in fact, address that specifically.

22   22             Q    (BY MR. SORENSEN)  Okay.

23   23             A    Unmonitored releases at other times

24   24   could have occurred briefly, and -- because -- during

25   25   filter changes or something like that.  We didn't --

176

1    1    the number -- the duration of unmonitored releases was

2    2    not significant enough to consider that as an option

3    3    with regard to the kind of activity that you're

4    4    suggesting.

5    5            Q    But do you believe, then, in -- in that

6    6    answer, that you were able to track down and account

7    7    for every single unmonitored release of plutonium from

8    8    Rocky Flats in its entire 37-year history?

9    9                 MS. PARK:  Objection.  Form.

10   10           A    The conclusion you draw from what I just

11   11   said is not valid.

12   12           Q    (BY MR. SORENSEN)  Okay.

13   13           A    I -- I was talking specifically about

14   14   Building 71.

15   15           Q    So I'll ask a general question.  Do you

16   16   believe that you and RAC, in their work, have accounted

17   17   for and been able to essentially list every single

18   18   unmonitored release of plutonium from every building at

19   19   Rocky Flats from 1952 to 1989?

20   20                 MS. PARK:  Objection to form.

21   21           A    No.  But we believe we've -- we have --

22   22   we have identified and that, in fact, others have

23   23   identified the major releases from Rocky Flats.

24   24           Q    (BY MR. SORENSEN)  Okay.  Did you make

25   25   any attempt to analyze classified MUF and MUF-related

177

1   1   documents in the classified form at the MBA level and

2   2   at the smallest time frame level that the documents

3   3   permitted, whether it was a week, a month, whatever it

4   4   was?  You know, a particular interval.  Did you make

5   5   any attempt to analyze that data to see if you could

6   6   spot or identify potential unmonitored releases that

7   7   you had not previously learned of?

8   8                 MS. PARK:  I'm going to object to form.

9   9                 Q    (BY MR. SORENSEN)  Do you follow my

10  10  question?

11  11                 MS. PARK:  I don't.  I'm going to object

12  12  to form.

13  13                 Q    (BY MR. SORENSEN)  I'll start again.

14  14  I'll start again.  We already talked about MBA's and

15  15  there are over 100 of them.  Some of them are small

16  16  portions of buildings.  Is that your understanding?

17  17                 A    Excuse me.  Yes.

18  18                 Q    And that inventories are taken on

19  19  different intervals, whether it's a week, two weeks,

20  20  every month, whatever it is.  Do you understand that,

21  21  also?

22  22                 A    Yes.

23  23                 Q    Okay.  Did you make any effort, and if

24  24  so, please describe it -- did you or your team make any

25  25  effort to analyze classified MUF and MUF-related

26
27                 CARPENTER REPORTING, INC.
                   (303) 752-1200

1    1    documents in their classified form at the narrowest

2    2    level possible -- that is the smallest MBA and the

3    3    smallest time frame the data permitted to see if you

4    4    could identify any unmonitored or potentially

5    5    unmonitored releases of plutonium into the environment?

6    6              MS. PARK:  Objection.  Form.  And --

7    7    classified in their classified form?

8    8              Q   (BY MR. SORENSEN)  Yes.  Did you make

9    9    any such effort?

10   10          A    No.  Because the amount of material

11   11   unaccounted for is unrelated to atmospheric releases to

12   12   the environment.

13   13          Q    Okay.  But the answer to my specific

14   14   question is no, you made no such effort; correct?

15   15          MS. PARK:  Objection.  Asked and

16   16   answered.

17   17          Q   (BY MR. SORENSEN)  Correct?

18   18          A    Yes.

19   19          Q    I understand you gave me an explanation.

20   20   I'm just trying to get clear.  The answer to my

21   21   specific question is no; correct?

22   22          MS. PARK:  He answered your question.

23   23   Same objection.

24   24          Q   (BY MR. SORENSEN)  Is that correct?

25   25          A    Yes.

179

1    1              Q    The answer is no?

2    2              MS. PARK:  Well, same objection.  He

3    3    answered it no with the explanation he felt he needed,

4    4    and now, you're trying to pull out of context --

5    5              A    I think I already answered.

6    6              Q    (BY MR. SORENSEN)  I say the answer is

7    7    no and you say yes.  Your answer is no; is that

8    8    correct?

9    9              A    Yes.

10   10             Q    All right.  All right.  That's fair

11   11   enough.  I think that's clear.

12   12             Did anyone -- either you or any member

13   13   of your team -- perform any scoping calculation or kind

14   14   of testing calculation that -- of the same sort I just

15   15   outlined to see whether, in fact, doing that kind of

16   16   calculation -- that is, looking at an MBA at a smallest

17   17   geographic physical level over the smallest period of

18   18   time -- could, in fact, be useful in identifying

19   19   previously unidentified releases to the environment?

20   20             MS. PARK:  Object.

21   21             Q    (BY MR. SORENSEN)  Did you do that kind

22   22   of scoping calculation?

23   23             MS. PARK:  Objection.  Form.  Vague and

24   24   ambiguous.  Scoping calculation?  Testing calculation?

25   25   Undefined.  And I think you made up those terms,

180

1   1   frankly.

2   2                   MR. SORENSEN:  No, I didn't.

3   3                   Q   (BY MR. SORENSEN)  Go ahead.

4   4                   A   One -- she threw me off.  One doesn't

5   5   need to make such a scoping calculation because it's

6   6   clear from the arrangement of the facility that such a

7   7   calculation would -- would not be useful and, for that

8   8   reason, we did not make such calculations.

9   9                   Q   So the answer is you made no such

10  10  calculations; correct?

11  11                  A   For that reason.

12  12                  MS. PARK:  Objection.  Asked and

13  13  answered.  He has answered your question, and you're

14  14  trying to pull it out of context.

15  15                  Q   (BY MR. SORENSEN)  You keep adding a

16  16  reason, which you're free to do, and you'll have the

17  17  opportunity and you take the opportunity to add the

18  18  reason.  Fine.  I'm just trying to get a clear answer

19  19  to my question, which is whether it happened or not.

20  20  No such scoping calculation was made; correct?

21  21                  A   To the best of my knowledge, and for

22  22  that reason.

23  23                  Q   Okay.  Correct?

24  24                  A   Correct.

25  25                  Q   Okay.  All right.

26
27                        CARPENTER REPORTING, INC.
                               (303) 752-1200

1  1              MR. POLAND:  We do expect that when that

2  2    appears in a brief, it'll appear in context with the

3  3    previous answer.

4  4              MR. SORENSEN:  Why would you expect

5  5    that?  Just kidding for the record.  I always put

6  6    things in context.

7  7          Q    (BY MR. SORENSEN)  Okay.  I was asking

8  8    you about potentially unmonitored releases.  I want to

9  9    turn to known identified releases of plutonium to the

10  10   atmosphere.  Okay.  Other than the '57 fire -- do you

11  11   have that in mind?

12  12         A    Yes.

13  13         Q    Okay.  That universe of releases --

14  14   whatever you thought and RAC thought it was of releases

15  15   of plutonium into the atmosphere from Rocky Flats other

16  16   than the '57 fire, did you or any members of your team

17  17   reviewing classified MUF or MUF-related documents

18  18   attempt to correlate any MUF documents to any

19  19   particular release to determine or make a calculation

20  20   of whether those MUF documents would assist you or shed

21  21   light in your analysis of the release?  Was any such

22  22   effort made?

23  23             MS. PARK:  Objection.  Form.

24  24         A    For the reason I've already explained to

25  25   you and for the further reason that the -- that the

26       CARPENTER REPORTING, INC.
27           (303) 752-1200

182

1   1   second biggest release is from the 903 area, no such

2   2   scoping calculation was made, that I know of, for areas

3   3   outside any material balance area.

4   4           Q    (BY MR. SORENSEN)  So to not just limit

5   5   it to the 903 area, no such scoping calculation was

6   6   made; correct?  At all?

7   7           A    That's correct.

8   8           MS. PARK:  Objection to form.

9   9           Q    (BY MR. SORENSEN)  Okay.

10  10          A    For the reasons that I've stated.

11  11          Q    Okay.

12  12          MS. PARK:  And just give me a little bit

13  13  more time to get in.

14  14          THE DEPONENT:  I'm sorry.  I'm sorry.

15  15          MS. PARK:  That's okay.  You're doing

16  16  great.  I just need a little more time.

17  17          Q    (BY MR. SORENSEN)  Do you know what the

18  18  smallest geographic area inside Rocky Flats -- start

19  19  again.

20  20          Do you know what the smallest MBA or

21  21  material balance area is at Rocky Flats on a geographic

22  22  or square footage area?  Do you know what it is?

23  23          A    The smallest one, no, I couldn't tell

24  24  you that.

25  25          Q    Could you estimate the size in terms of

26          CARPENTER REPORTING, INC.
27               (303) 752-1200

183

1    1    numbers of rooms, square footage, or in any fashion?

2    2              MS. PARK:  Objection.  Form.  Calls for

3    3    speculation.

4    4              Q    (BY MR. SORENSEN)  Go ahead.  If you

5    5    don't know, you can just say you don't know.

6    6              A    I don't know what the smallest area is.

7    7              Q    Do you know what the largest one is?

8    8              A    No.

9    9              Q    Do you know what the size of any of them

10   10   were?  That is -- my question is:  Do you know the

11   11   size, even approximately, of any MBA, material balance

12   12   area, at Rocky Flats?

13   13              MS. PARK:  Without the aid of documents?

14   14              Q    (BY MR. SORENSEN)  You can look at

15   15   anything you want.  If there's a particular report you

16   16   want to look at, I'll pull it for you.

17   17              A    I don't -- I don't believe that the --

18   18   that there's a dimensional diagram of Room 180 in our

19   19   report, but I -- I did have the dimensions of that.  I,

20   20   unfortunately, don't recall what they were.

21   21              Q    Okay.  And so you have no other answer?

22   22              A    That was -- that was a balance area.

23   23              Q    Okay.  And you've answered my question

24   24   to the best of your ability?

25   25              A    I do not have a -- cannot make a square

184

1    1    footage area for that room at this time.

2    2            Q    Or for any other material balance area;

3    3    correct?

4    4            A    That's correct.

5    5            Q    Okay.  Do you know what the time

6    6    interval was for material balance accounting at Rocky

7    7    Flats for any particular material balance area?  Like a

8    8    weekly basis?  Monthly?  Do you know how frequently

9    9    they were done?

10   10            MS. PARK:  Objection to form.

11   11            A    Room 180 was done on a monthly basis.

12   12            Q    (BY MR. SORENSEN)  Okay.  Do you know

13   13    the time period for any other material balance area?

14   14            A    I have seen monthly intervals for a

15   15    variety of areas, but I can't specify exactly what

16   16    areas those were.  I mean, in reviewing the documents,

17   17    I've seen other areas with monthly intervals.

18   18            Q    Okay.  So, other than monthly, did you

19   19    see anything else that would indicate any other

20   20    interval for any other material balance area?

21   21            MS. PARK:  Objection.  Form.

22   22            A    Excuse me.  I don't -- I don't recall

23   23    the details of the times for other areas.

24   24            Q    (BY MR. SORENSEN)  Now, at a -- let me

25   25    back up.

26                      CARPENTER REPORTING, INC.
27                       (303) 752-1200

185

1    1              Is it correct that everything you did in

2    2    connection with your work for RAC relating to Rocky

3    3    Flats -- everything you did related to or drew on or

4    4    was based on one or more of the five areas of expertise

5    5    that you listed earlier:  Internal dosimetry,

6    6    environmental transport, behavior of radionuclides in

7    7    the environment, release of radionuclides and other

8    8    materials from facilities, and the behavior of

9    9    radionuclides in facilities; is that correct?

10   10             MS. PARK:  I'm going to object to form,

11   11   and I'm also going to object to the extent it suggests

12   12   he is being offered as an expert witness.  I'm going to

13   13   object to the extent he's already explained how he

14   14   interprets the word "expertise."

15   15             A    Those were the -- those were the five

16   16   general topics that I could think of as we were going

17   17   through that discussion.  I -- I know -- I know about

18   18   other things, too, but ... those were -- those were the

19   19   areas that came up.

20   20             Q    (BY MR. SORENSEN)  But if we have the

21   21   five listed areas of expertise on -- or knowledge,

22   22   whatever words you'd like to attach to it --

23   23             MS. PARK:  Let's use "knowledge."

24   24             Q    (BY MR. SORENSEN)  I'll use "expertise."

25   25   The five areas on the one hand and the work you did for

186

1   RAC relating to Rocky Flats on the other -- do you have

2   those two hands in your mind?  Do you follow me so far?

3          A    Yeah.

4          Q    Okay.  Is there anything you did for RAC

5   relating to the work relating to Rocky Flats that did

6   not draw on or was not based on one of these five areas

7   of expertise or knowledge?  Was there any -- is there

8   anything?

9               MS. PARK:  Same objection.

10         A    Yeah.  I'll object, too.  I have --

11         Q    (BY MR. SORENSEN)  You can't object.  Go

12   ahead.

13         A    I have a broad knowledge of a lot of

14   things related to nuclear facilities, and so I would

15   not be willing to say that some arcane aspect that I

16   happen to know something about didn't ever enter into

17   the discussions related to Rocky Flats, even though

18   someone might allege it's not included in those five

19   areas.

20         Q    Okay.  Other than that, is there

21   anything else -- any other way you'd answer my

22   question?

23         A    That's the best way I can think of to

24   answer your question.

25         Q    Okay.  I mean, it's correct that you

1    1    have no personal knowledge of the particular releases

2    2    at Rocky Flats; right?  You weren't present at the '57

3    3    or '69 fire or you weren't present at any other

4    4    release; correct?

5    5              MS. PARK:  Wait a second.  There were

6    6    three questions there.

7    7              Q    (BY MR. SORENSEN)  Do you have personal,

8    8    firsthand knowledge of any release of plutonium from

9    9    Rocky Flats?

10   10             MS. PARK:  And by that, you mean was he

11   11   present at the time of the release?

12   12             MR. SORENSEN:  Was he present?  Yes.

13   13             A    In general, no.  But I was present in

14   14   the environment at the time of the 1967 -- '57 fire.

15   15             Q    (BY MR. SORENSEN)  You could be a member

16   16   of our class.

17   17             A    I wasn't -- I wasn't -- no.  I'm sorry.

18   18   I was in Boulder.

19   19             Q    Okay.  Other than that --

20   20             A    No.  I was not at the plant when those

21   21   releases occurred.

22   22             Q    Okay.  Do you have personal firsthand

23   23   knowledge of any events at Rocky Flats from '52 to '89?

24   24   That is, you were present when they occurred or you

25   25   participated in them?

188

1   1              A    Any --

2   2              Q    Any events of any kind.  I'll take a

3   3    step back.  You never worked at Rocky Flats; correct?

4   4              A    Except during the -- our dose

5   5    reconstruction study.  I worked there temporarily from

6   6    time to time.

7   7              Q    From '52 to '89, you never worked at

8   8    Rocky Flats?

9   9              A    I was never employed by Dow or Rockwell

10  10   at Rocky Flats.

11  11              Q    Did you ever do any work at Rocky Flats

12  12   from '52 to '89?  Physically present at Rocky Flats?

13  13              A    No.  Not that I can recall.

14  14              Q    Okay.  So your knowledge of what

15  15   occurred at Rocky Flats is derived from your view of,

16  16   in part, documents; correct?

17  17              A    Yes.

18  18              Q    And did you do any interviews?

19  19              A    Yes.

20  20              Q    Of employees?

21  21              A    Yes.

22  22              Q    And how many interviews did you conduct?

23  23              A    The interviews I did were -- were for

24  24   people in -- generally in the -- in the health physics

25  25   area or in the industrial hygiene area.  I can recall

189

1   1   going to -- going to California and interviewing --

2   2   what's his name?  I can't recall his first name.  His

3   3   initials are W.D., as I recall -- Kittinger, who was on

4   4   the health and safety staff.  I and some other people

5   5   interviewed Putzier.

6   6         Q    I think it's Putzier.

7   7         A    And I never have known -- he's got a

8   8   name like I do -- exactly how to pronounce it.

9   9   Although I'm sure he told me, I don't recall.

10  10         Q    Okay.

11  11         A    We -- I also have interviewed some other

12  12   people in health and safety at Rocky Flats, but I

13  13   don't -- no other names come to me.  We went on a

14  14   detailed tour of Building 71 with -- with a long-time

15  15   employee.  His name was Weaver and we were able to ask

16  16   him a lot of questions about -- about the building

17  17   and -- and the history of the building and the changes

18  18   that had been made to the building over time, because

19  19   when we did -- when we did our tour, the building was

20  20   very -- very different; in particular, the effluent

21  21   systems were very different than they had been in 1957.

22  22   We tried -- well, that doesn't add, I guess.

23  23         MS. PARK:  I believe the question was

24  24   just how many; right?

25  25         MR. SORENSEN:  Yeah.  I'm happy to just

190

1  1    listen.

2  2                    MS. PARK:  Okay.

3  3                    THE DEPONENT:  Oh, I'm sorry.

4  4                    MS. PARK:  Just focus on his question.

5  5                    THE DEPONENT:  I'm sorry.  I was trying

6  6    to go through the --

7  7                    MS. PARK:  I understand.

8  8                    THE DEPONENT:  -- list in my mind.

9  9    You're telling me I should have kept my mouth shut

10 10   while I was going through this list.

11 11                   MS. PARK:  Not at all.  I'm just saying

12 12   focus on his question so we can move more expeditiously

13 13   through this extremely long deposition.

14 14            Q    (BY MR. SORENSEN)  I can ask more

15 15   questions.

16 16            A    There are probably three or four more

17 17   whose names I don't explicitly recall at the moment.

18 18            Q    Okay.

19 19            A    So that -- may add up to seven or eight

20 20   or six or nine or something like that.

21 21            Q    When did these interviews take place?

22 22            A    Primarily, in the early stages of our

23 23   work, so I would say from probably 1992 to 1995.  There

24 24   may have been some even at later times, I guess.  I

25 25   can't say specifically for each one.

191

1    1              Q    But they all occurred after 1989;

2    2    correct?

3    3              A    Yes.  That's true.

4    4              Q    Or in the nineties; correct?

5    5              A    Right.

6    6              Q    Okay.

7    7                   MR. POLAND:  Sounds just like Dr. Biggs.

8    8                   MR. SORENSEN:  Object to the commentary.

9    9                   MR. POLAND:  Withdrawn.

10   10             Q    (BY MR. SORENSEN)  Weaver.  Who is

11   11   Weaver?

12   12             A    He was a foreman of Building 71 at some

13   13   time, and it seems to me his name was -- I'm starting

14   14   to say Ken, but there's a person at the Colorado

15   15   Department of -- a health physicist at the Health

16   16   Department who also has -- whose name, I think, is Ken

17   17   Weaver, so I don't think it's Ken.

18   18             Q    When did this tour of Building 71 occur?

19   19             A    Probably in 1993 or 1994.

20   20             Q    Okay.  Did you -- strike that.

21   21                  You did not personally take any of the

22   22   on-site measurements of plutonium in air at Rocky

23   23   Flats; correct?

24   24             A    That's correct.

25   25             Q    At any time; correct?

26
27                       CARPENTER REPORTING, INC.
                              (303) 752-1200

192

1    1              A    That's correct.

2    2              Q    And is the same true for off-site

3    3    measurements of plutonium in air?  You did not take

4    4    any -- you have not taken a single measurement of

5    5    plutonium in air off-site of Rocky Flats ever; correct?

6    6              A    That's correct.

7    7              Q    It's correct that you have never at any

8    8    time taken a single measurement of plutonium in soil on

9    9    site at Rocky Flats; is that correct?

10   10              A    Yes.

11   11              Q    Is it also correct that you have never

12   12    at any time taken a sample of plutonium from the soil

13   13    off-site of Rocky Flats?  Is that correct?

14   14              A    Yes.

15   15              Q    Is it correct that you have never at any

16   16    time taken a sample of plutonium in water on-site at

17   17    Rocky Flats?  Is that correct?

18   18              A    Yes.

19   19              Q    And is the same true for off-site?  You

20   20    have never taken a sample of plutonium in water

21   21    off-site of Rocky Flats; correct?

22   22              A    Yes.

23   23              Q    Okay.  That is yes, you've never done

24   24    any of those things; correct?

25   25              A    The question was correct.  The answer

26
27                    CARPENTER REPORTING, INC.
                         (303) 752-1200

193

1  1   was yes.

2  2              Q    Yes.  Okay.  I'm sorry.  A fault of my

3  3   question.

4  4              Did you or have you ever measured the

5  5   off-site concentrations of any hazardous substance

6  6   released from Rocky Flats?

7  7              MS. PARK:  Objection.  Form.

8  8              A    No.

9  9              Q    (BY MR. SORENSEN)  In any medium?  Air,

10  10  water, or soil?

11  11             MS. PARK:  Same objection.

12  12             A    No, I don't believe so.

13  13             Q    (BY MR. SORENSEN)  Okay.  Now, in a HAP

14  14  meeting of June '95, the discussion was about the

15  15  6 kilograms of MUF discussed in P10, and I'll show this

16  16  to you.  It's my only copy, but I want to just read it

17  17  and then I'll show it to you.  It's quoting you.

18  18             "What I would say is that based on

19  19  looking at the records, it's my opinion that most of

20  20  that 6 kilograms is in the ground.  Not the ground near

21  21  Rocky Flats, but the ground in the desert of

22  22  southeastern Idaho."

23  23             It's the highlighted portion at the

24  24  bottom.

25  25             MS. PARK:  I'm looking over the

26
27                      CARPENTER REPORTING, INC.
                         (303) 752-1200

194

 1   1   witness's shoulder because I don't have a copy.

 2   2              Q   (BY MR. SORENSEN)  Go ahead.  Go ahead.

 3   3              A   No.  I see it.

 4   4              Q   Do you see that?

 5   5              A   Uh-huh.

 6   6              Q   Do you recall making that statement, now

 7   7   that you're looking at it?  The back page gives you the

 8   8   date.  The very last page.

 9   9              A   It says something about June -- some --

10  10   the 6th of June.

11  11              Q   Yeah.

12  12              MS. PARK:  And you don't -- this

13  13   document doesn't reflect the context of the discussion

14  14   other than what your representation is on the record,

15  15   David.  Do you know anywhere else where it describes --

16  16              MR. SORENSEN:  If you look around where

17  17   that discussion is occurring, it's all about that.

18  18              A   Yes, I recall, you know, talking about

19  19   this and that's -- I mean, this is a verbatim

20  20   recording.  I'm sure I must have made that statement.

21  21              Q   (BY MR. SORENSEN)  Okay.  Do you intend

22  22   to offer that opinion at trial?

23  23              A   That --

24  24              MS. PARK:  Objection.  Form.

25  25              Q   (BY MR. SORENSEN)  The opinion I just

26
27                    CARPENTER REPORTING, INC.
                         (303) 752-1200

195

1  1   identified in the transcript.  That I just read into

2  2   the record.

3  3              MS. PARK:  Same objection.

4  4         A    I don't know whether I'm going to

5  5   testify at the trial or what I'm going to be asked to

6  6   testify about.

7  7         Q    (BY MR. SORENSEN)  Okay.  Now, the

8  8   opinion that I just recounted back to you that you

9  9   offered at this meeting, do you have some basis for

10 10   that opinion, other than what you've already discussed

11 11   here today in response to my earlier questions?

12 12              MS. PARK:  Objection.  Form.  And I'm

13 13   also going to object that we're taking really all of

14 14   this on your word that --

15 15              MR. SORENSEN:  He can read as much of it

16 16   as he wants.

17 17              MS. PARK:  That's fine.  Take a look and

18 18   read through it.

19 19              MR. SORENSEN:  Do you want to -- well,

20 20   strike that.

21 21              MS. PARK:  David, this is a fairly large

22 22   transcript.  The witness and I have just finished

23 23   skimming to page 51.  We're willing to work with you to

24 24   sort of focus on what the --

25 25              MR. SORENSEN:  Well, I've already showed

196

1  1   you the page that I was showing him.  You can read as

2  2   much of that as you want.  The discussion is about the

3  3   6 kilograms missing.  The whole discussion is about the

4  4   '57 fire, and then he makes the statement he made.

5  5          Q   (BY MR. SORENSEN)  Is there something

6  6   else you need to look at to answer the question I've

7  7   asked?

8  8              MS. PARK:  What was the question you

9  9   had?

10  10             MR. SORENSEN:  Well, that's a good

11  11   question.  What was my last question?

12  12         Q   (BY MR. SORENSEN)  The portion that I

13  13   read to you, quote, What I would say is based on

14  14   looking at the records, it's my opinion that most of

15  15   that 6 kilograms is in the ground.  Not the ground near

16  16   Rocky Flats, but the ground in the desert of

17  17   southeastern Idaho, close quote -- you recall saying

18  18   that?

19  19         A   Not explicitly, but it's recorded.

20  20         Q   Okay.  Do you have any basis for that

21  21   opinion, other than what you've already described in

22  22   this deposition in response to my earlier questions

23  23   about this Zodtner and Rogers study and about the RAC

24  24   report, P1068 dealing with the '57 fire?

25  25         A   Well, I don't think we discussed -- I

197

1   believe the answer is yes.

2                   Q    Okay.  And what is that?

3                   A    Well, we didn't discuss, for example,

4   previously the comparison of 1994 estimates of waste

5   shipped to Idaho.  It's page A-5.

6                   Q    We're looking at page A-5 of P1068?

7                   A    Right.

8                   Q    All right.  What -- what should I be

9   looking at?

10                  A    Okay.  There's a Table A-3.

11                  Q    Right.

12                  A    And there is plutonium in waste shipped

13  to Idaho, two categories there.

14                  Q    Right.

15                  A    And after the years, there are amounts

16  originally reported as having been sent to Idaho, and

17  there are amounts that were subsequently estimated in

18  1994 to -- to have been received in Idaho or revised

19  estimates of the amounts shipped.

20                  Q    Right.

21                  A    And you can see that if you look at the

22  first five years of operation, that there's roughly ten

23  times more in -- in the total of the revised estimates

24  than there was in the original ones.  And the same is

25  true if you extend that to 1961.

198

1    1              Q    When you say "ten times more," you're

2    2    comparing, for example, 3.4 for 1957 to 23.3?  That's a

3    3    little bit less than ten times.  But that's the

4    4    comparison?

5    5              A    I was comparing the sum of '54 to '59 to

6    6    this -- to the two categories.  17 --

7    7              Q    I see.

8    8              A    -- compared to 162 and for '54 to '61,

9    9    the comparison is 27 in round numbers to 297.

10   10             Q    All right.  And do you have any basis to

11   11   say that -- I'm sorry.  Were you finished?  I didn't

12   12   mean to cut you off.

13   13             A    I mean, you could look at -- you could

14   14   look at 1957 specifically.  That's about a factor of 7.

15   15             Q    Right.  And do you have any basis to say

16   16   that any portion of that increased estimate that is

17   17   from 3.4 to 23.3 in the 1957 line of Table A-3 of

18   18   Exhibit P1028 -- do you have any basis to believe that

19   19   any portion of that captures some portion of the

20   20   6 kilograms of fire loss discussed in the Zodtner and

21   21   Rogers study, P10?

22   22                  MS. PARK:  Objection.

23   23             Q    (BY MR. SORENSEN)  And if you have any

24   24   such basis, please tell me what it is.

25   25                  MS. PARK:  Well, I'm going to object to

26
27                       CARPENTER REPORTING, INC.
                              (303) 752-1200

199

1   1   form because those are two questions.  So let's just

2   2   start with the first question.

3   3            Q    (BY MR. SORENSEN)  Okay.  I'll start

4   4   again.

5   5                      Earlier in the deposition, you discussed

6   6   the 6.0, approximately, kilograms of material

7   7   unaccounted for labeled fire loss in the Zodtner and

8   8   Rogers study.  Do you recall those questions?

9   9            A    Yes.

10   10           Q    Okay.  Now, in the HAP transcript I

11   11   showed you, you were expressing an opinion that

12   12   6 kilograms -- some or all of it or most of it -- is

13   13   buried in the ground somewhere in Idaho.  Do you see

14   14   that?  That's still in front of you.  Do you see that?

15   15           A    Yes.

16   16           Q    I'm trying to understand what your basis

17   17   for that opinion is, other than what you've discussed

18   18   already.  You pointed me to Table A-3 of Exhibit P1028;

19   19   correct?

20   20           A    Correct.

21   21           Q    All right.  And what you pointed out is

22   22   that the 1994 estimates of plutonium shipped to Idaho

23   23   in waste are larger than the contemporaneous estimates?

24   24   You pointed that out.

25   25           A    That's correct.

200

1    1              Q    Okay.  Do you have any basis -- and if

2    2    so, please explain exactly what it is -- to offer the

3    3    opinion that any portion of the 6 kilograms of fire

4    4    loss MUF identified in Zodtner and Rogers Exhibit

5    5    P10 -- all right -- any portion of that is captured by

6    6    the increased estimates of plutonium waste shipped to

7    7    Idaho reflected in Table A-3 of Exhibit P1068?

8    8              MS. PARK:  Objection.  Form.  Asked and

9    9    answered.

10   10             Q    (BY MR. SORENSEN)  Go ahead.

11   11             A    Generically, yes.

12   12             Q    How about specifically?

13   13             A    There is no way to link waste that came

14   14   from Room 180 to waste that came from Rocky Flats in

15   15   general, to the best of my knowledge.

16   16             Q    Okay.  Any other basis for the opinion

17   17   expressed in the HAP transcript I showed you?

18   18             MS. PARK:  Objection to form.

19   19             MR. SORENSEN:  Excuse me.  No.  I'm

20   20   going to mark this as Exhibit 1, please.

21   21             (Marked for identification was

22   22   Deposition Exhibit No. 1.)

23   23             Q    (BY MR. SORENSEN)  It's actually the

24   24   only copy I have for you guys.  Exhibit 1 bears the

25   25   heading "Report of September 8th, 1997 Workshop."

1    1    And you were mentioned a number of times in this

2    2    document.  It says in the first paragraph -- it says,

3    3    "On September 8th, 1997, the Health Advisory Panel

4    4    source term subcommittee" --

5    5                    MS. PARK:  I'm sorry, David.  Can he

6    6    actually take a minute to look through the document,

7    7    please?

8    8                    MR. SORENSEN:  Oh, yeah.  Go ahead.

9    9    I'll be right back.

10   10                   MS. PARK:  We're still on the record;

11   11   right?  I didn't hear anybody say to go off the record,

12   12   so my understanding is we're still on the record.

13   13                   (There was a brief delay in the

14   14   proceedings.)

15   15                   Q    (BY MR. SORENSEN)  Have you had a chance

16   16   to look through Exhibit 1?

17   17                   A    Uh-huh.  Yes.

18   18                   Q    Okay.  I'd like to turn your attention

19   19   to page 3 of Exhibit 1.  Are you there, sir?

20   20                   A    Yes.

21   21                   Q    Okay.  There's a heading that says,

22   22   "comments on the reanalysis."  Do you see that?

23   23                   A    Yes.

24   24                   Q    And your name is mentioned several times

25   25   in the paragraphs below.  Do you see that?

26
27                        CARPENTER REPORTING, INC.
                              (303) 752-1200

202

1    1              A    Yes.

2    2              Q    That is you this document is talking

3    3    about; right?  There isn't another Voilleque they might

4    4    be talking about; correct?

5    5              A    I don't believe so.

6    6              Q    Okay.  Now, it says here in the fourth

7    7    paragraph below the subheading, "Another participant

8    8    argued that the analysis did not take into

9    9    consideration that operations in Building 71 were

10   10   resumed after the fire was out and before the main

11   11   filter plenum and booster system were repaired.  These

12   12   releases might be very high, given the lack of

13   13   filtering."  Do you see that?

14   14             A    Yes.

15   15             Q    Now, the paragraph that follows after

16   16   that states, "Voilleque agreed that he had not taken

17   17   these releases into account.  He and another

18   18   participant suggested, however, that actual production

19   19   in the building following the fire may have been

20   20   extremely limited and may not have involved operations

21   21   normally associated with large releases.  Voilleque

22   22   said that he did not think that these releases would

23   23   significantly contribute to the total release."  And

24   24   then it continues.  Do you see that?

25   25             A    Yes.

26        CARPENTER REPORTING, INC.
27             (303) 752-1200

203

1    1              Q    Other than what's stated here, do you

2    2    recall doing any further analysis of -- of this issue?

3    3              A    Yes.

4    4              Q    And what analysis did you do?

5    5              A    When it's described here as -- as the --

6    6    they weren't taken into account -- they weren't taken

7    7    into account as part of the release from the fire

8    8    itself.  From the event.  But they were subsequently

9    9    taken into account in the -- in the releases -- routine

10   10   effluent plutonium releases from Building 71.

11   11             Q    How so?  How were they taken into

12   12   account?

13   13             A    Well, part of -- part of the time, there

14   14   were measurements during the week -- actually, I think

15   15   if we go on to the next page, I believe I saw some

16   16   discussion there about -- okay.  The next air sample

17   17   was taken a week after the fire.

18   18             Q    So the next air sample after the fire

19   19   occurred was a week after --

20   20             A    Right.

21   21             Q    -- the fire; correct?

22   22             A    That's correct.

23   23             Q    And when did any activities start back

24   24   up in that building after the fire?

25   25             A    Specific -- the specific times of

204

1  1  activities were not entirely clear, but it is --

2  2  that's -- they weren't -- the specific times at which

3  3  various activities occurred after the fire and before

4  4  the next effluent sample were not clear.

5  5        Q   Okay.  So is it possible that production

6  6  activities resumed during that interval when there were

7  7  no effluent samples?

8  8            MS. PARK:  Objection.  Calls for

9  9  speculation.

10  10        A   I don't know whether it did or not.

11  11        Q   (BY MR. SORENSEN)  Okay.  Well, the

12  12  statement here that's attributed to you and another

13  13  participant, do you know who the other participant is

14  14  that this is talking about?  The last full paragraph on

15  15  page 3 of Exhibit 1 refers to "he" and I think that

16  16  refers to you and another participant.  Do you know who

17  17  the other participant is?

18  18            MS. PARK:  Objection.  Foundation.

19  19        A   I don't see where you are.  I'm sorry.

20  20        Q   (BY MR. SORENSEN)  I'm sorry.  Page 3,

21  21  the last full paragraph that says, "Voilleque agreed

22  22  that he had not taken these releases into account."  Do

23  23  you see that?

24  24        A   Right.

25  25        Q   Then it says "he and another participant

26
27  CARPENTER REPORTING, INC.
        (303) 752-1200

205

 1   1   suggested."  The "he" grammatically seems to be

 2   2   referring to you.

 3   3              A    Right.

 4   4              Q    "And another participant."  Do you know

 5   5   who the other participant is?

 6   6              MS. PARK:  Objection.  Foundation.

 7   7              A    I can't say for sure at this time.

 8   8              Q    (BY MR. SORENSEN)  Okay.  Well, then it

 9   9   says, "he" -- that's you -- "and another participant

10  10   suggested that actual production" dot, dot, dot, "may

11  11   have been extremely limited."

12  12              Do you have any basis to say that

13  13   production following the fire before sampling was taken

14  14   again may have been extremely limited?

15  15              A    Yes.

16  16              MS. PARK:  Objection.  Foundation.

17  17              A    Excuse me.

18  18              Q    (BY MR. SORENSEN)  Go ahead.  What's

19  19   your basis?

20  20              A    Yes.  When you have an event like this,

21  21   there is immediately an investigation committee that's

22  22   convened, and there's a substantial amount of

23  23   interference with normal operations of any facility

24  24   involved in such a -- such an event.  I believe that's

25  25   largely the reason that I was referring to.

206

1    1         Q    But Rocky Flats also had pressure to

2    2    continue production, didn't it?  Or resume production?

3    3              MS. PARK:  Objection.  Foundation and

4    4    form and calls for speculation.

5    5         A    I don't know about -- just as I don't

6    6    know when -- when production resumed, I don't know what

7    7    the level of pressure on Rocky Flats was at that time.

8    8         Q    (BY MR. SORENSEN)  All right.  So when

9    9    you say and it's reflected in Exhibit 1 that you

10   10   believe that production following the fire during the

11   11   week or so there was no sampling was fairly limited,

12   12   you're making an inference or deduction based on what

13   13   you consider to be reasons that you've articulated, but

14   14   you have no direct firsthand information that supports

15   15   that; is that correct?

16   16              MS. PARK:  Objection.  Form.

17   17         A    That's correct.

18   18         Q    (BY MR. SORENSEN)  Okay.  Now, RAC's

19   19   work relating to Rocky Flats started in approximately

20   20   '92 and ended when?

21   21         A    Basically, in '99.

22   22         Q    Okay.

23   23         A    Early 2000.  With regard to the -- to

24   24   Phase II of the health studies for Rocky Flats.

25   25         Q    So that's seven years and the

207

1  1    expenditure of about 5 million-plus in funds to RAC;

2  2    correct?

3  3                  MS. PARK:  Objection.  Foundation.

4  4           A    I -- I can subtract one year from

5  5    another and get -- get a number that isn't too far off

6  6    from the seven, but I don't have any knowledge of the

7  7    total amount of money.

8  8           Q    (BY MR. SORENSEN)  Okay.  And part of

9  9    what you did is to reconstruct releases from the plant;

10  10   correct?  That's part of what RAC did --

11  11          A    Yes.

12  12          Q    -- correct?

13  13          A    Yes.

14  14          Q    And part of what RAC did is to attempt

15  15   to reconstruct exposures and then doses and then risks

16  16   to people off-site; correct?

17  17          A    Yes.

18  18          Q    Now, it's correct this entire

19  19   reconstruction effort that lasted seven years or so --

20  20   that was done because there was no place one could just

21  21   go look up reliable answers and get reliable answers to

22  22   these same questions?  That is, the releases, the

23  23   exposures, the doses, and the risks?  Otherwise, you

24  24   just would have done that; correct?

25  25          A    No.  I don't think that is correct.

26        CARPENTER REPORTING, INC.
27             (303) 752-1200

1   1   Following the -- the 1969 fire, there was a lot of

2   2   information that was released about these previous

3   3   events at Rocky Flats, particularly the events that --

4   4   that resulted in the largest releases; namely, the 1957

5   5   fire and the 903 pad releases.

6   6           Q   And as of '69, what was the highest

7   7   official estimate of the release from the '57 fire?  Do

8   8   you know what it was?  If you want to look in P1068.

9   9           MS. PARK:  Objection.  Form.  What do

10  10  you mean by "official"?

11  11          Q   (BY MR. SORENSEN)  Well, let's look in

12  12  P1068.  There's a handy table in here.

13  13          MR. POLAND:  Which report is that?

14  14          A   That's the '57 fire report.  So it's on

15  15  page 52.

16  16          Q   (BY MR. SORENSEN)  52.  Yes, it is.

17  17  Thank you.  Page 52.  Did you have a hand in preparing

18  18  this Table 6.1 on page 52 of Exhibit P1068?

19  19          A   Yes.

20  20          Q   Did you, in fact, prepare it?

21  21          A   Yes.

22  22          Q   Okay.  So let's see.  As of 1969 --

23  23          A   No.  I said after the 1969 fire, so --

24  24          Q   1970?

25  25          A   Yes.

209

1    1              Q    Okay.  Okay.  Let's go down to 1970.  As

2    2    of 1970, this table that you prepared lists the 19 --

3    3    the 1957, the AEC says there was, quote, an

4    4    insignificant amount of plutonium released from the '57

5    5    fire.  Do you see that?

6    6              A    Yes.

7    7              Q    From '52 to '62, you list Dow internal

8    8    reports reporting .2 to .3 grams.  Do you see that?

9    9              A    Yes.

10   10             Q    And then, in 1970, you have Dow saying,

11   11   quote, at least -- what does the M-C-I stand for?

12   12             A    Millicurie.

13   13             Q    And that's what portion of a curie?

14   14             A    A thousandth of a curie.

15   15             Q    So that's a lot less than a gram;

16   16   correct?

17   17             A    Right.

18   18             Q    At least millicurie amounts.  Do you see

19   19   that?

20   20             A    Right.

21   21             Q    Okay.  So, as of 1970, there were no

22   22   reports from the AEC or Dow that even come close to the

23   23   RAC final range estimate of 40 to 500 grams; correct?

24   24             MS. PARK:  Objection.  Form.

25   25             A    Yes.

26                       CARPENTER REPORTING, INC.
27                          (303) 752-1200

210

1   1            Q    (BY MR. SORENSEN)  Okay.  Okay.  So

2   2   going back to my general question, the reason RAC took

3   3   seven years to do its dose reconstruction and looking

4   4   at -- and reconstructing releases, exposure, dose, and

5   5   risk is because there was no place one could reliably

6   6   just look up the answers to how much was released, what

7   7   the exposures were, what the doses were, and what the

8   8   risks were; correct?  That's why RAC did what it did?

9   9            MS. PARK:  Objection.  Form and

10  10   foundation.

11  11            A    I guess I've -- excuse me -- at the time

12  12   we began, the ChemRisk release estimate was -- was

13  13   available --

14  14            Q    (BY MR. SORENSEN)  Okay.

15  15            A    -- and several other release estimates

16  16   were available in periods before 1994.  So what we were

17  17   asked to do was to do an independent analysis of the

18  18   releases from the 1957 fire, independent from what had

19  19   been done in Phase I of the health studies.

20  20            Q    All right.  But not just for the '57

21  21   fire, but the '69 fire?

22  22            A    Other things, as well.

23  23            Q    903 pad, routine releases, uranium,

24  24   carbon tet, beryllium, water.  The whole shebang;

25  25   right?

26              CARPENTER REPORTING, INC.
27                 (303) 752-1200

211

1   1              A     No.   That's not true.   We were asked to

2   2     focus particularly on plutonium and particularly on

3   3     carbon tetrachloride, and that's as a result of the

4   4     screening effort that was done in Phase I of the

5   5     studies.

6   6              Q     But RAC produced its own report on

7   7     water; correct?   And beryllium?

8   8              A     That's correct.   And we ended up -- it's

9   9     true that we ended up looking at more things that were

10  10    in -- than were in the specific direction that we were

11  11    initially given by the Health Advisory Panel because

12  12    these were areas of interest to citizens and -- and

13  13    people who made comments on our work.

14  14             Q     Okay.   But if there was agreement that

15  15    there were already -- before ChemRisk even started its

16  16    work, there were already reliable estimates of the

17  17    releases of plutonium and other substances from Rocky

18  18    Flats and reliable estimates of dose exposure and risk,

19  19    there would be no need for ChemRisk and RAC; correct?

20  20             MS. PARK:   Objection.   Calls for

21  21    speculation and foundation.

22  22             Q     (BY MR. SORENSEN)   Otherwise, ChemRisk

23  23    and RAC is just a waste of time; right?

24  24             MS. PARK:   Same objection.

25  25             A     The State of Colorado has certainly felt

26
27                      CARPENTER REPORTING, INC.
                        (303) 752-1200

212

1   1   a need for additional investigations.

2   2          Q   (BY MR. SORENSEN)  Okay.  And in doing

3   3   your analysis, for example, of the '57 fire, you didn't

4   4   just look at the 1970 Dow statements that you quote

5   5   here on Table 6.1 of at least mi -- millicurie amounts

6   6   and stop there in your analysis; right?  You didn't do

7   7   that; correct?

8   8          A   No.  That wouldn't have been an

9   9   independent analysis.

10  10          Q   Right.  Nor did you say to yourself,

11  11  well, DOE, in '75 to '77, estimated .3 to .4 grams.  I

12  12  could stop right there.  You didn't do that, either,

13  13  did you?

14  14          A   No.

15  15          Q   Okay.  Did you do any analysis yourself

16  16  of where the plutonium that was released from the '57

17  17  fire was deposited on soil off-site?

18  18          A   Yes.  We did -- we did analysis of -- of

19  19  that, taking -- taking the source term and the

20  20  atmospheric dispersion and estimating deposition within

21  21  the domain.  There's a -- a result of that analysis is

22  22  in the -- in the technical summary document, I believe.

23  23          Q   Is that something that -- that analysis

24  24  you just described, is that something you did?

25  25          A   I participated.

213

1    1                Q    The technical summary, that -- I'll show

2    2    it to you.  You tell me if it's the right one.  I'm

3    3    going to show you 1086.  Also marked as DX534.  Tell me

4    4    if that's the one you're talking about, please.

5    5                A    Yes.  I believe it is.

6    6                MR. POLAND:  Which report is it?

7    7                A    Technical summary report, September '99.

8    8                Q    (BY MR. SORENSEN) Yeah.  September '99.

9    9                MR. POLAND:  Was there a page that

10   10   was -- no.  No.  I'm just asking whether that was the

11   11   report he was referring to.  Got it.

12   12                A    Yes, it is.

13   13                Q    (BY MR. SORENSEN)  Okay.  What portion

14   14   of that report?

15   15                A    I just believe I found it here.

16   16                MS. PARK:  I'm sorry, David?  What was

17   17   the question?  What portion of that report what?

18   18                Q    (BY MR. SORENSEN)  Reflects an analysis

19   19   of where the plutonium released from the '57 fire was

20   20   deposited on soil.

21   21                A    Was that the original question?

22   22                Q    Yeah.  Did you understand I was asking

23   23   something else?

24   24                A    Yeah.  I thought you were -- well, I

25   25   guess --

26                      CARPENTER REPORTING, INC.
27                        (303) 752-1200

214

1    1              Q    Go ahead.  What did you -- what were you

2    2    answering?  What question were you answering?

3    3              A    They're correlated -- correlated

4    4    questions.  I thought you were talking about amounts of

5    5    material that were deposited on soil in the

6    6    environment.

7    7              Q    No.  I'm -- my question was more

8    8    specific.  Is there someplace in one of these RAC

9    9    reports where you or RAC analyze where the plutonium

10   10   specifically that came out of the '57 fire was

11   11   deposited on soil off-site?

12   12             A    Well, I'm looking at -- at Figure 6.

13   13             Q    What page are you on?

14   14             A    24.

15   15             Q    You're on page 24 of Exhibit P1086.

16   16             A    1086.  And I think the answer to your

17   17   question is implicit in this figure, although it's not

18   18   an estimate of soil deposition.  It's an estimate of

19   19   average plutonium concentration in air.

20   20             Q    Okay.  Is there anywhere in this report

21   21   or any other report where soil deposition is actually

22   22   analyzed and discussed as it relates to the '57 fire?

23   23             A    This relates to the '57 fire.  I think

24   24   there's -- there's another -- there's another report

25   25   that -- that may contain such information.  I'm not

26                    CARPENTER REPORTING, INC.
27                       (303) 752-1200

215

1    1    sure.  I know the air concentrations were compared and

2    2    plume trajectories were compared in the -- using a

3    3    different -- using a CALPUFF transport model.  I guess

4    4    if you're looking for a figure, at least based on this

5    5    report, the answer seems to be no.  But if you look at

6    6    Figure 14 on page 41 --

7    7           Q     Okay.

8    8           A     -- over at the far right is "model

9    9    predicted" and that's the model predicted plutonium

10   10    inventory in soil in both the upper and lower parts of

11   11    that figure.  The lower one is the inventory in the

12   12    entire area affected by Rocky Flats releases.  And the

13   13    upper one relates to a study that was done by Webb in

14   14    1996.  Now, the model-predicted values cannot be

15   15    obtained unless you know the deposition on soil all

16   16    over the domain.  So there clearly -- there clearly is

17   17    a file that contains the amounts deposited on soil

18   18    throughout the domain of interest, which is illustrated

19   19    in Figure 6 that we were just looking at.  The figure

20   20    for the air concentrations.

21   21           Q     So is it your testimony that if we're

22   22    looking at page 41 of Exhibit P1086, these two graphics

23   23    where it states model predicted -- is it your testimony

24   24    that that reflects RAC's estimate of how much was

25   25    deposited into soil just from the 1957 fire?  Is that

216

1    1    your testimony?

2    2              A    Oh, no.  I'm sorry.  You said just the

3    3    1957 fire?

4    4              Q    Yes.  That's what I'm trying to focus

5    5    on.

6    6              A    Okay.  I'm sorry.  This is --

7    7              Q    I keep trying to focus just on that.

8    8              A    This is -- this is the total.

9    9              Q    Okay.

10   10             A    But the -- and whether this file to

11   11   which I refer -- whether there are multiple files or

12   12   just a single file, I'm not, frankly, quite sure.  I

13   13   don't know for sure the answer to that question.

14   14             Q    When it says it's "model predicted,"

15   15   what is this model?  Does it have a name?

16   16             A    In this --

17   17             Q    Yes.

18   18             A    -- report, the model that was used is

19   19   called RATCHET.

20   20             Q    You mentioned CALPUFF before.  That's a

21   21   different model?

22   22             A    Yes, it is.

23   23             Q    Have you ever seen a comparison of the

24   24   expected results from RATCHET as compared to CALPUFF?

25   25             A    Yes.  I've seen two pictures side by

217

1   1   side.

2   2          Q    And how do they compare?  Is one higher

3   3   than the other?

4   4          A    The highest con -- highest predicted

5   5   concentrations using the two models are comparable, but

6   6   the path of the -- of the plume is different in the --

7   7   in the two sets of calculations.

8   8          Q    Do you know why RAC chose RATCHET

9   9   instead of CALPUFF?

10  10          A    CALPUFF didn't exist at the time that

11  11   decision was made.

12  12          Q    When did CALPUFF exist?

13  13          A    Late nineties, I believe.

14  14          Q    Did you participate in an analysis

15  15   comparing the RATCHET results to CALPUFF?

16  16          A    Not in the details of that comparison.

17  17          Q    Okay.  Do you understand that Joseph

18  18   Bronesky is an attorney who has represented Rockwell

19  19   and Dow?  Do you understand that?

20  20          A    I don't know Joseph Bronesky.

21  21          Q    You've never heard that name before?

22  22          A    It rings a vague bell.

23  23          Q    Okay.

24  24          A    Yes.  Actually.  I believe it's -- he

25  25   wrote something about the 903 pad, I believe.

26
27

218

1    1              Q    Yes, he did.  Which is cited in the 903

2    2    RAC report.  Have you had any discussions about this

3    3    Bronesky document recently with counsel for defendants?

4    4              A    No.  I did -- I was in a room when it

5    5    was being discussed.  Actually, I can't say whether the

6    6    counsel -- whether -- whether Doug, for example, was in

7    7    the room at the same time, but I recall Kathleen Meyer

8    8    and Helen Grogan talking about the memo and how it --

9    9    how it came -- how it came to be cited in one of our

10   10   documents as a reference.

11   11             Q    And what did -- what did they say?

12   12             A    It wasn't clear why that mistake

13   13   occurred.

14   14             Q    Why do you think it was a mistake?

15   15             A    Well, as I understood it, the memo may

16   16   have been considered to be a privileged document, and

17   17   if it was a privileged document, then, as I understand

18   18   your business, we ought not to be citing it as a

19   19   reference in our report.

20   20             MS. PARK:  I would agree with that.

21   21             Q    (BY MR. SORENSEN)  And when was this

22   22   discussion?

23   23             A    On Monday or Tuesday of this week.

24   24             Q    So the people in attendance were you,

25   25   Kathleen Meyer, Helen Grogan?

26
27                    CARPENTER REPORTING, INC.
                        (303) 752-1200

219

1    1              A    Yes.

2    2              Q    And who else?

3    3              A    I don't know whether there was anyone

4    4    else there at the time.

5    5              Q    Where was this meeting?  Where did it

6    6    take place?

7    7              A    In the Kirkland & Ellis offices.  Across

8    8    the street, whichever direction.

9    9              Q    Right.  During that meeting, were you

10   10   looking at a copy of the Bronesky-authored document?

11   11             A    No.

12   12             Q    Okay.  Have you had any discussions,

13   13   telephone, or in-person meetings with any other

14   14   witnesses that have already been called to the stand by

15   15   the defendants?  There aren't that many.  It's Raabe,

16   16   Frazier, Till.

17   17             A    Well, I've talked to John Till,

18   18   obviously.

19   19             Q    Right.  But since he -- since he started

20   20   testifying yesterday?

21   21             A    No.

22   22             Q    Okay.  How about Drs. Frazier or Raabe?

23   23             A    I did see Frazier after he had finished

24   24   testifying.  He came in.  He was on his -- on his way

25   25   back to Tennessee, I assume, and just came in and

26
27                     CARPENTER REPORTING, INC.
                          (303) 752-1200

220

1   1   said -- in the room that we were in and came in and

2   2   said hello, goodbye, sort of thing.  We didn't have any

3   3   discussions.

4   4           Q    Have you -- so no other discussions with

5   5   Dr. Frazier?

6   6           A    No.

7   7           Q    Did you have any discussions with

8   8   Dr. Raabe?

9   9           A    No.  I haven't seen him.

10  10           Q    Have you had any discussions with any

11  11   individuals who you believe are going to be called by

12  12   the defendants to testify in this case?

13  13           A    Not that I know of.

14  14           Q    Okay.

15  15           A    I don't -- I don't have the list of

16  16   people that are going to be called.  I haven't really

17  17   seen anybody but, briefly, John Frazier and members of

18  18   our team.

19  19           Q    Okay.  Well, how about -- I think I

20  20   asked about Mr. Rood.  Have you had any discussions

21  21   with him?

22  22           A    No.

23  23           Q    Okay.  Okay.  You're not an

24  24   epidemiologist; correct?

25  25           A    That's correct.

26
27                          CARPENTER REPORTING, INC.
                             (303) 752-1200

221

1    1              Q    Did you have any role of any kind in the

2    2    preparation of estimated doses for the 12,000 or so

3    3    members of the plaintiff class?

4    4              MS. PARK:  Objection.  Form.

5    5              Q    (BY MR. SORENSEN)  Do you know what I'm

6    6    talking about?

7    7              A    Only vaguely.

8    8              Q    Okay.

9    9              A    So the answer to your question is no.

10   10             MS. PARK:  Well -- oh, the answer to

11   11   your question -- you know what I'm talking about?  I

12   12   would agree with that.  It's confusing.

13   13             Q    (BY MR. SORENSEN)  Well, the defendants'

14   14   counsel notified us recently of calculations --

15   15   estimated doses for 12,000-plus people and delivered us

16   16   a -- you know, paper that high and a disk.

17   17   (Indicating.)

18   18             Now, did you have any role in the

19   19   creation of that data?

20   20             MS. PARK:  I'm going to object to the

21   21   characterization.

22   22             Q    (BY MR. SORENSEN)  Maybe it's that high.

23   23   (Indicating.)  Go ahead.

24   24             MS. PARK:  I still object.

25   25             MR. POLAND:  You obviously didn't look

26
27                   CARPENTER REPORTING, INC.
                        (303) 752-1200

222

1   1    at the computer disk, which is only that high.

2   2    (Indicating.)

3   3              Q    (BY MR. SORENSEN)  Go ahead.

4   4              MR. POLAND:  Excel spreadsheets, when

5   5    you print them out, are big.

6   6              MS. PARK:  Do you have the question in

7   7    mind?

8   8              A    The question -- the question is whether

9   9    I participated in the calculation of the doses to the

10  10   12,000 plaintiffs --

11  11             Q    (BY MR. SORENSEN)  Yes.

12  12             A    -- that you were given on a disk

13  13   recently.

14  14             Q    Yes.  Yes.

15  15             A    No, I did not.

16  16             Q    Okay.  Now, I think you said, in

17  17   connection with the '57 fire analysis you did, that you

18  18   engaged a fire expert, Diliberto & Associates.

19  19             A    Yes.

20  20             Q    All right.  If you could turn to page 7

21  21   of Exhibit P1068, please.  And in the middle of that

22  22   page, under Section 2.2 -- just barely hanging in

23  23   there.  Second full paragraph, it mentions Diliberto &

24  24   Associates.  Do you see that?

25  25             A    Not yet.  I'm -- I was --

26       CARPENTER REPORTING, INC.
27            (303) 752-1200

223

1   1                    Q     Page 7?

2   2                    A     Right.  I was thinking they were double-

3   3    sided pages, so I wasn't actually on page 6.

4   4                    Q     Second full paragraph under Section 2.2.

5   5                    A     2.2.  Diliberto & Associates.  Right.

6   6                    Q     That's the fire expert you were talking

7   7    about?

8   8                    A     Yes, it is.  Well, that's his company.

9   9                    Q     Okay.  Did they prepare some kind of

10  10   separate report?

11  11                   A     Yes.

12  12                   Q     And is that separate report available

13  13   publicly?

14  14                   A     Yes.  I believe it is.

15  15                   Q     Okay.  Do you know where -- where it can

16  16   be located?

17  17                   A     I assume it's at the Front Range

18  18   Community College and probably in the Norlin Library

19  19   with the collection of documents.

20  20                   MR. POLAND:  I'm sorry.  I didn't hear

21  21   the end of that.

22  22                   THE DEPONENT:  Norlin Library.

23  23                   MS. PARK:  Could you spell that?

24  24                   THE DEPONENT:  N-o-r-l-i-n.

25  25                   MS. PARK:  Thank you.

26
27                        CARPENTER REPORTING, INC.
                              (303) 752-1200

224

1   1              Q    (BY MR. SORENSEN)  And what role did

2   2    this Diliberto & Associates report or analysis play in

3   3    your analysis as set forth in P1068?

4   4              A    It played -- well, there are several --

5   5    there are several aspects, I guess.  One was with

6   6    regard to the timing of the combustion of the various

7   7    sets of filters.  Actually, that -- the chronology of

8   8    the fire was a key aspect, and, also, the -- the

9   9    flammability.

10  10              He reviewed information about

11  11    experiments dealing with the flammability of the CWS

12  12    filters that were conducted at Rocky Flats and other

13  13    places after -- after the fire occurred and looked very

14  14    closely at the -- at the timing of -- of the burning of

15  15    such -- such filters.  Those are the filters that were

16  16    used in Building 57 at the time of the fire.

17  17              Q    Who made the decision to engage them?

18  18              A    I did -- or we did.

19  19              Q    Well, if you did, did you need approval

20  20    from Dr. Till?

21  21              A    Yes, I think we agreed at a -- at a

22  22    meeting that we should do that.  And I con -- I found

23  23    him as a -- as an expert.

24  24              Q    Okay.  Is that because Diliberto had

25  25    expertise in fire issues that was not possessed by you

26              CARPENTER REPORTING, INC.
27                 (303) 752-1200

225

1    1    or other members of RAC?  Is that why?

2    2          A    He had more experience in fire issues,

3    3    yes.

4    4          Q    Does anyone at RAC have expertise in

5    5    fire issues or fire standards?

6    6          A    I had done a lot of reading about fire

7    7    propagation and -- and deflagration and so on, but my

8    8    expertise wasn't nearly as good as his.

9    9          Q    Okay.  So is it fair to say that, once

10   10   you got Dilibergo's report, you relied on it in the

11   11   preparation of this P1068?

12   12         A    Yes, we did.

13   13         Q    Okay.  Could you turn to page 37 of

14   14   P1068, please.

15   15                MR. POLAND:  Again, which document is

16   16   P1068?

17   17                THE DEPONENT:  The '57 fire.

18   18                MS. PARK:  '57 fire.

19   19         Q    (BY MR. SORENSEN)  Do you see that

20   20   table, 3.6?

21   21         A    Yes.

22   22         Q    It's titled "Estimated Amounts of

23   23   Plutonium Involved in the Fire."  And I want to -- if

24   24   you could have, also, next to you P10 that I gave you

25   25   earlier, the Zodtner and Rogers study, and if you could

26                CARPENTER REPORTING, INC.
27                    (303) 752-1200

226

1   1   look at page 8 again.  Just tell me when you have those

2   2   side by side --

3   3           A    Yes, I do.

4   4           Q    -- please.  Do you have it?

5   5           A    Uh-huh.

6   6           Q    Okay.  Now, in the Zodtner and Rogers

7   7   study, P10, it states, as we've discussed before,

8   8   inventory in Room 180 is listed at 62,515 grams of

9   9   plutonium.  Do you see that?

10  10           A    Yes.

11  11           Q    Okay.  Now, in Table 3.6 of Exhibit

12  12   P1068, Estimated Amounts of Plutonium Involved in the

13  13   Fire, if I add up the amounts -- nominal amount of

14  14   kilograms, Room 180, that column, it adds up to about

15  15   17 kilograms; correct?

16  16           A    I'm --

17  17           Q    I'm just adding 1.7, 12, 2.6, and then

18  18   the other -- the others add up to a small amount.

19  19           A    Right.

20  20           Q    It adds up to about 17; correct?

21  21           A    Right.

22  22           Q    Okay.  I don't understand the difference

23  23   between 16 or 17 kilograms in Table 3.6 and the

24  24   62 kilograms -- 62.5 kilograms identified in Zodtner

25  25   and Rogers as being in the room -- or being in Room

227

1   1   180.   Can you explain that to me?

2   2              A    Well, as you see from Table 3.6, the

3   3   title is "estimated amounts of plutonium involved in

4   4   the fire."

5   5              Q    Okay.

6   6              A    And if you look back to Table 3.1, which

7   7   is on page 20 --

8   8              Q    Page 20 --

9   9              A    Right.

10  10             Q    -- of P1068?

11  11             A    Right.

12  12             Q    Okay.  I'm looking at it.

13  13             A    There are -- there are -- well -- well,

14  14   there's a figure up above, which, unfortunately, for

15  15   some reason, didn't -- didn't come through properly in

16  16   this version of the document.  But there's a -- if you

17  17   look at the -- at the top of that figure where it says

18  18   lathe --

19  19             Q    Yes.

20  20             A    -- and air lock and work area --

21  21             Q    Yes.

22  22             A    -- inspection and, I think, conveyor,

23  23   and off to the side, you can see -- maybe not conveyor.

24  24   I think conveyor is included.  Off to the side, you can

25  25   see areas affected by the fire are marked.

26                      CARPENTER REPORTING, INC.
27                        (303) 752-1200

228

1    1          Q    Yes.

2    2          A    There is supposed to be crosshatching

3    3    inside those boxes.

4    4          Q    Where the arrows are pointing to?

5    5          A    Where the arrows are pointing, and I

6    6    think the conveyor was also crosshatched, if I recall

7    7    the document.

8    8          Q    Okay.

9    9          A    Okay.  So that's -- that's the affected

10   10   area.

11   11         Q    Okay.

12   12         A    So now you go -- excuse me.  The --

13   13   that's in the table.  It's described as area burned by

14   14   fire.  Or area -- maybe it should say -- to be

15   15   consistent with the note up there, maybe it should say

16   16   "affected by fire."  The center line is -- is the area

17   17   that's adjacent to the burned area, and the

18   18   right-hand -- excuse me -- center line and the

19   19   right-hand column is in the unaffected area.

20   20         Q    All right.  Now, you were just talking

21   21   about the three columns in Table 3.1; correct?

22   22         A    Right.

23   23         Q    On page 20 of P1068; correct?

24   24         A    Yes.  And that --

25   25         Q    Is that correct?  Correct?  Page -- on

26        CARPENTER REPORTING, INC.
27           (303) 752-1200

229

1   page 20 of 1068?

2            A    And the title of the table is "Locations

3   of Plutonium in the Glovebox Line in Room 180 Before

4   the Fire."

5            Q    Now, just the first column "area burned

6   by fire" -- do you see that --

7            A    Yes.

8            Q    -- does that correspond just to the

9   arrows up above in Figure 3.1?

10            A    From my recollection of the document --

11   this figure has the crosshatching -- it includes the

12   lathe, the air lock, the work area, the inspection

13   area, and the conveyor that's right next to the

14   inspection area.

15            Q    And the -- the next column over labeled

16   "Adjacent to Burned Area" -- do you see that?

17            A    Yes.

18            Q    What would that consist of?

19            A    I think that consists of the air lock,

20   storage.  That row that goes across there.

21            Q    So the air lock, storage, balance, air

22   lock?

23            A    Right.

24            Q    And then the unaffected area, as labeled

25   in Table 3.1, would correspond to the remaining boxes

230

1   1      in Figure 3.1?

2   2                 A    Right.

3   3                 Q    That is mill, welding box, air lock, and

4   4      B box; is that correct?

5   5                 A    Right.  That's my recollection.

6   6                 Q    Okay.  And did you find exact records of

7   7      where plutonium was distributed in Room 180 at the time

8   8      of the fire?

9   9                 A    This is described in the accident

10  10     report.  The investigation of the accident.

11  11                Q    Prepared shortly after the fire?

12  12                A    Prepared shortly after the fire.

13  13     Actually, there were two reports.  There was -- there

14  14     was a report --

15  15                Q    There was an Epp report?

16  16                A    An Epp report or the accident

17  17     investigation committee.  Then there was a complement

18  18     to this.

19  19                Q    All right.  I'm showing you the Epp

20  20     report, Plaintiffs' 1290 previously marked.  Is that

21  21     the report you were just referring to?  At least one of

22  22     them?

23  23                A    Yes.

24  24                Q    Okay.

25  25                A    Well, yes.  I see this is the 7th of

26                         CARPENTER REPORTING, INC.
27                             (303) 752-1200

231

1   1   October.

2   2              Q    Is it your testimony that the locations

3   3   of the various plutonium items in Room 180 at the time

4   4   of the fire are specified in the Epp report, P1290, in

5   5   its unclassified form or only in its classified form?

6   6              MS. PARK:  I'm sorry.  Could you

7   7   repeat --

8   8              Q   (BY MR. SORENSEN)  I'll back up.  Why

9   9   don't you take a look at 1290, and if you could

10  10  identify for me where it is in this report, you know,

11  11  it specifies where the plutonium was at the time of the

12  12  fire.

13  13              MR. POLAND:  Give us a second to look at

14  14  it here.

15  15              MS. PARK:  Did you say you had the

16  16  supplemental report?

17  17              MR. SORENSEN:  I don't have it with me,

18  18  no.

19  19              MR. POLAND:  In some versions of the

20  20  document, it's attached to the end.  I don't know if

21  21  that's the case on this one.

22  22              MR. SORENSEN:  Not on this one.

23  23              MR. POLAND:  Who was it that marked this

24  24  one as an exhibit in Ackland?

25  25              Q   (BY MR. SORENSEN)  Take a look at page

26
27              CARPENTER REPORTING, INC.
              (303) 752-1200

232

```
1    1    73 and then page 75.  That area.  That may -- I'll just
2    2    point you to those pages.
3    3                    MS. PARK:  One thing I just want to note
4    4    for the record, it says Ackland 00230.  Does that
5    5    reflect that this was a document that was produced by
6    6    Mr. Ackland?
7    7                    MR. SORENSEN:  I don't know.
8    8                    MS. PARK:  So it may have been a
9    9    document that he had available at the time of his -- in
10   10   his possession.
11   11                    MR. SORENSEN:  I do not know.
12   12           A    Okay.  So we're on page 73?
13   13           Q    (BY MR. SORENSEN)  Yes.  Is that where
14   14   the information that appears on page 20 of P1068 is
15   15   drawn from?  That is, page 73 of Exhibit P1290.
16   16           A    Here's the real diagram, too.
17   17           Q    The diagram on page 75?
18   18           A    Right.  I was looking for the
19   19   dimensions.
20   20           Q    Okay.  Sure.
21   21           A    Yes.  It -- it says in -- in our Table
22   22   3.1 that this -- that -- these numbers are based on
23   23   this reference.  And I haven't looked through all the
24   24   pages of this reference again, but this Table 1 was
25   25   certainly relevant to the construction of this table.
```

233

1  1                Q    Okay.  All right.

2  2                     MS. PARK:  David, is now a good time to

3  3      take a short break?

4  4                     MR. SORENSEN:  Yeah.  Sure.

5  5                     (There was a recess taken from 2:26 p.m.

6  6      to 2:34 p.m.)

7  7                Q    (BY MR. SORENSEN)  Okay.  I want to make

8  8      sure something is clear.  Mr. Voilleque, is there

9  9      anything specific -- specific that you can identify

10  10     that you did in connection with your work for RAC

11  11     relating to Rocky Flats that did not depend on or rely

12  12     on one or more of the five areas of expertise or

13  13     knowledge that you identified earlier?  That is,

14  14     internal dosimetry, environmental transport, behavior

15  15     of radionuclides in the environment, release of

16  16     radionuclides and other materials from Rocky Flats, and

17  17     behavior of radionuclides in facilities?  Is there

18  18     anything specific that you can identify for me?

19  19                    MS. PARK:  I'm going to object that this

20  20     is asked and answered.  I'm going to object to form.

21  21     I'm going to object to the extent it again suggests

22  22     Mr. Voilleque is being offered as an expert witness

23  23     rather than as a fact witness to testify about the

24  24     historical study that RAC conducted.

25  25                Q    (BY MR. SORENSEN)  Okay.  Go ahead, sir.

26
27                    CARPENTER REPORTING, INC.
                         (303) 752-1200

SHEET 234  PAGE 234

234

1   1        A    Well, I believe that -- the short answer

2   2   to your question is no, although I previously stated

3   3   that I had -- that I have fairly broad knowledge of --

4   4   of a variety of areas, and whether some other aspect of

5   5   my knowledge entered into it, I cannot say.

6   6        Q    Okay.  But you can't, as you sit here,

7   7   identify any specific things for me; correct?

8   8        A    That's correct.

9   9             MS. PARK:  Same objections.

10  10       Q    (BY MR. SORENSEN)  Okay.  Could you look

11  11   at page 21 of Exhibit P1068.  This is, again, the RAC

12  12   report about the '57 fire.

13  13       A    Yes.

14  14       Q    Now, in the middle of the page, roughly

15  15   the fourth paragraph down, it states about the middle

16  16   of that paragraph, "Before 1967, reliable measurements

17  17   of the amounts of plutonium in solid waste shipments

18  18   were not performed."  Do you see that?

19  19       A    Yes.

20  20       Q    All right.  Is it your understanding

21  21   that, after 1967, reliable measurements were performed?

22  22       A    The -- the measurements performed after

23  23   that time were more reliable than the measurements that

24  24   had been performed before.  But those measurements,

25  25   even -- even at the time we were doing the study, still

26          CARPENTER REPORTING, INC.
27            (303) 752-1200

235

1   1   carried substantial uncertainties associated with them.

2   2            Q    That is the measurement of plutonium?

3   3   Is that what you're talking about?

4   4            A    The measurement of -- of the amounts of

5   5   plutonium in waste, which are typically -- which is

6   6   typically a barrel of material of some sort.

7   7            Q    Now, if you could turn to -- do this a

8   8   little more systematically.  Could you turn to page --

9   9   start at the beginning and work through this.  Could

10  10  you turn to page Roman numeral 4.  The fourth --

11  11           A    Right.

12  12           Q    The fourth little page in from the --

13  13  from the beginning.  Are you there, sir?

14  14           A    Not quite.

15  15           Q    Okay.

16  16           A    Yes.

17  17           Q    Now, in the first full paragraph, it

18  18  states about in the middle of the paragraph, "The

19  19  15-minute interval was chosen to match the available

20  20  meteorological data."  Do you see that?

21  21           A    Yes.

22  22           Q    Now, is it correct that there was no

23  23  actual meteorological data specifically for Rocky

24  24  Flats, specifically at the time of the '57 fire;

25  25  correct?

26
27                    CARPENTER REPORTING, INC.
                        (303) 752-1200

236

1    1              A    No.

2    2              Q    That's not correct, or there was no such

3    3    data?

4    4              A    Your statement was not correct.

5    5              Q    Okay.  Was there data about the

6    6    meteorological conditions at Rocky Flats available at

7    7    the time of the '57 fire that you reviewed?

8    8              A    Yes.

9    9              Q    Is that correct?

10   10             A    Yes.  There was data.

11   11             Q    And where did that data come from?

12   12    Where was it taken?  At Rocky Flats or someplace

13   13    nearby?

14   14             A    No.  It was taken at Rocky Flats,

15   15    actually.

16   16             Q    Okay.  If you could turn to the first

17   17    regular page of this same document, footnote A.  Are

18   18    you there, sir?

19   19             A    Yes.

20   20             Q    The last sentence of that footnote

21   21    states, "The contribution of americium 241 to the doses

22   22    received by persons exposed during the 1957 fire was

23   23    small."  Do you see that?

24   24             A    Yes.  It's page 1.

25   25             Q    Page 1.  Other than stating that it was,

237

1    quote, small, did you or RAC otherwise attempt to

2    quantify that dose of americium?

3                A    Yes.  We have calculated the buildup of

4    americium from plutonium 241 as a function of time.

5    And it's -- as a function of time after a separation,

6    the americium builds -- builds in, and the peak

7    concentration of americium is achieved at about 72 or

8    73 years, as I recall, after separation.

9                Q    And so what does that mean?  That the --

10               A    That means --

11               Q    Does it -- let me ask you this:  Does it

12   mean that the amount of americium in the soils off-site

13   would peak sometime down the road in the future?

14               A    The amount of -- let's see.  Where are

15   we?  We're in 2005.  So we could go back to 1957.  I

16   just was trying to be sure that it hadn't peaked.

17               Q    Okay.  Go ahead.

18               A    The -- the concentration of americium

19   results from the -- 241 results from the decay of

20   plutonium 241.

21               Q    Right.

22               A    And the -- and plutonium 241 consists --

23   or comprises about .5 percent, if I remember

24   correctly -- that number ought to be here -- I don't

25   see it.  Anyway, the -- there it is.  Yeah.

238

1    .36 percent is given here as the amount of plutonium

2    241 weapons grade plutonium.  So of the total

3    plutonium, there is that fraction that's plutonium 241

4    and that plutonium 241 decays with a -- like 14-year

5    half-life and at the time -- and the americium grows as

6    a result of this decay, and at about 72, 73 years was

7    the number I believe I calculated, the -- the -- that's

8    the time of the peak americium concentration.

9                    So if you looked at the plutonium 241 --

10   plutonium 241 deposited in 1957, it would increase over

11   a period of 70 years to a peak americium 241

12   concentration in whatever -- let's say 73, so you can

13   add 57 and 73 and get 2030.

14            Q    Peak americium concentration?

15            A    Right.

16            Q    So is it correct that the peak americium

17   concentrations -- americium 241 will peak -- let me

18   start again.

19                    Is it correct that the amount of

20   americium 241 in off-site soils -- that is off-site

21   from Rocky Flats -- that results from the decay of

22   plutonium 241 that was also deposited off-site from

23   Rocky Flats, all as a result of the 1957 fire -- that

24   the amount of americium 241 will peak in approximately

25   the year 2030?  Is that correct?

239

1    1                    MS. PARK:  Objection to form.

2    2           A    On the assumption that the --

3    3                    MS. PARK:  Speculation.

4    4           A    Excuse me.  On the assumption that the

5    5    time of separation of the plutonium was not many years

6    6    before 1957 because this calculation starts at the time

7    7    that plutonium is separated from the americium

8    8    initially.  You know, when the plutonium is purified,

9    9    that's when the clock starts.

10   10           Q    (BY MR. SORENSEN)  Okay.  Now, in doing

11   11    this 1957 fire source term analysis that's reflected in

12   12    P1068, you needed to make a number of assumptions and

13   13    estimates; correct?

14   14                    MS. PARK:  Objection.  Form.

15   15           A    We needed to make a number of

16   16    calculations.

17   17           Q    (BY MR. SORENSEN)  You used the word

18   18    "estimates" a number of times in your report.

19   19           A    Estimates are the result of

20   20    calculations.

21   21           Q    Okay.  But when you say "estimates,"

22   22    it's because you don't have specific data you can just

23   23    look at and say, That's the number, we don't need to

24   24    make an estimate?  That's why you need to make the

25   25    estimate; correct?

26                    CARPENTER REPORTING, INC.
27                     (303) 752-1200

240

1   1                    MS. PARK:  Objection to form.

2   2           Q    (BY MR. SORENSEN)  For example, you

3   3   don't know the actual temperature inside the '57 fire

4   4   when it was burning; correct?  There were no

5   5   measurements made; correct?

6   6           A    That's correct.

7   7           Q    So you had to, after the fact -- that is

8   8   in 1999 or thereabouts -- attempt to estimate what it

9   9   was back in 1957; correct?

10  10           A    In doing our analysis, we considered a

11  11   broad range of possible temperatures and incorporated

12  12   that into our uncertainty analysis of the amount

13  13   released.

14  14           Q    My point is that you needed to do that

15  15   estimate because there was no temperature reading that

16  16   you could just look at and use; correct?

17  17           A    That's correct.

18  18           Q    Okay.  And that's true of a number of

19  19   parameters and factors that you needed to examine to do

20  20   your analysis; correct?  You needed to make estimates

21  21   after the fact because there was no contemporaneous

22  22   data at the time that you could reliably use; correct?

23  23                    MS. PARK:  Objection to form.  And that

24  24   really is two questions.

25  25           Q    (BY MR. SORENSEN)  Go ahead.

26
27                    CARPENTER REPORTING, INC.
                        (303) 752-1200

241

1    1              MS. PARK:  Answer the -- you can just

2    2    make clear which question you're answering.

3    3         A    I guess I didn't hear the "and."  Can

4    4    you tell me what it was?

5    5         Q    (BY MR. SORENSEN) I'll start again.  I

6    6    just gave you the example of temperature.

7    7         A    Right.

8    8         Q    But there are other parameters or

9    9    factors that you needed to examine to do your analysis

10   10   reflected in P1068 that you were required to make

11   11   after-the-fact estimates of because there was no

12   12   reliable contemporaneous data that you could simply

13   13   take off the shelf; correct?

14   14              MS. PARK:  Objection to form.

15   15         A    Our charge was to make a best estimate

16   16   of the amount of plutonium released, and in doing this

17   17   for every parameter -- not just the temperature -- we

18   18   considered a range of estimates of that parameter,

19   19   as -- in most cases as a central value for that

20   20   parameter.  And that distribution of possibilities was

21   21   included in the uncertainty analysis of our

22   22   calculations.  And it's the source -- the uncertainties

23   23   in all those individual parameters are reflected in the

24   24   uncertainty in the total release estimate.

25   25              So not being able to just grab one value

242

1    wasn't -- that wasn't the kind of calculation we were

2    doing.  We were doing a best estimate calculation with

3    an uncertainty analysis.

4                    Q    (BY MR. SORENSEN)  Isn't it true that if

5    you -- if there did exist reliable contemporaneous data

6    that you could just take off the shelf, you wouldn't be

7    required to do any kind of estimation or uncertainty

8    analysis; correct?  Isn't that -- doesn't that

9    logically follow?

10                   MS. PARK:  Objection.  Speculation.

11                   A    Are you saying that if -- if the

12   effluents from the building stack in Building 71 in

13   1957 on the 11th and 12th of September had been

14   measured, we wouldn't have to do this?  Is that what

15   you're saying?

16                   Q    (BY MR. SORENSEN)  Well, that's a

17   shorthand way of perhaps saying it.  If it had been

18   measured and measured accurately, you wouldn't have to

19   do this; correct?

20                   A    That's right.

21                   Q    Okay.  So, for example, look at page 22

22   of P1068.  Are you there, sir?

23                   A    Yes.

24                   Q    It states towards the top of the page,

25   the second full paragraph towards the end, "The

243

1  1   conditions of oxidation of plutonium metal are very

2  2   important for estimating the appropriate release

3  3   fraction, Section 4.  Because these conditions are not

4  4   known, a range of possibilities is considered in

5  5   Section 5."  Do you see that?  Second full paragraph --

6  6           A    Second --

7  7           Q    The second full paragraph on page 22,

8  8   last two sentences.

9  9           A    Oh, okay.  I wasn't far enough down.

10 10           Q    That's all right.  It begins, "The

11 11   conditions of oxidation."

12 12           A    Right.

13 13           Q    Do you see those two sentences?

14 14           A    Yes.

15 15           Q    Okay.  These are -- this is -- start

16 16   again.

17 17                You say, "The conditions of oxidation of

18 18   plutonium metal are very important."  Do you see that?

19 19           A    Yes.

20 20           Q    Okay.  I take it there were no reliable

21 21   contemporaneous records you could turn to to figure out

22 22   the answer to this particular question.  That is, the

23 23   conditions of oxidation at the time; is that right?

24 24           A    That's correct.

25 25                MS. PARK:  Objection.  Form.

26                       CARPENTER REPORTING, INC.
27                          (303) 752-1200

244

1   1           A     Sorry.

2   2                 MS. PARK:  That's okay.

3   3           Q    (BY MR. SORENSEN)  Can you turn to page

4   4     24.  Bottom of the page, the first sentence states,

5   5     "Original records of the exhaust flow rates during

6   6     early years of operation of Building 71 are no longer

7   7     available for review."  Do you see that?

8   8           A    Yes.

9   9           Q     Is it your understanding that those have

10  10    been destroyed?

11  11                MS. PARK:  Objection.  Foundation.

12  12          A     I don't know whether they've been

13  13    destroyed or not, but I think you should also read the

14  14    next sentence.

15  15          Q    (BY MR. SORENSEN)  Right.  I see the

16  16    next sentence.  I'm just asking you about the first

17  17    sentence.

18  18          A     I don't know whether they have been

19  19    destroyed.

20  20          Q     Okay.  Can you turn to page 25, please.

21  21    The last paragraph on page 25 begins, "The amount of

22  22    contamination present on the filters is needed to

23  23    estimate the release of plutonium from filters that

24  24    burned."  Do you see that?

25  25          A     Yes.

245

1    1            Q    Here again, there were no

2    2    contemporaneous reliable records that you could use;

3    3    correct?  Of the amount of contamination present on the

4    4    filters at the time of the fire; correct?

5    5            A    No.  That's not correct.

6    6            Q    There were such records?

7    7            A    Yes.  In fact, we used the records to --

8    8    to calculate the amount of plutonium that was present

9    9    on the filters.

10   10           Q    And what -- where -- where do you

11   11   discuss these records?

12   12           A    Well, it might have been starting back

13   13   on the previous page.  No.  It's not.  I guess, then,

14   14   it's probably on the next page.  Well, the next --

15   15   actually, the next several pages.  You see in Table

16   16   3.3, and there's discussion of this as we go along --

17   17   but I'll try and summarize that.  Do you see in Table

18   18   3.3, there are a number of ducts?  The areas where

19   19   they -- from which they drew air --

20   20           Q    Uh-huh.  Yes.

21   21           A    -- and the activities in those areas?

22   22           Q    Right.

23   23           A    And the -- these ducts were sampled on a

24   24   routine basis and the values were reported in monthly

25   25   reports of the radiation protection staff.

26       CARPENTER REPORTING, INC.
27          (303) 752-1200

246

1    1              Q     Okay.

2    2              A     And that, I think, is the same Putzier

3    3    reference that I -- that I pointed out back on page --

4    4    the next line after the line you had the question

5    5    about.  Monthly health physics reports.  They contain

6    6    also the discharge air volume.  That was for the stack.

7    7    Excuse me.  Okay.  So we took those concentration

8    8    measurements that were reported in the monthly reports

9    9    and information about the flow rates through the

10   10   ventilation system and calculated the amount of

11   11   material that had been transported to the -- to the

12   12   filter.  And there's a summary of -- of the initial

13   13   estimates there on page 27.

14   14              Q     So you -- meaning RAC -- using the data

15   15   you just described -- you calculated or estimated the

16   16   amount of contamination present on the filters;

17   17   correct?

18   18              A     Right.

19   19              Q     That number wasn't just sitting

20   20   someplace in a record that you just read off; correct?

21   21              A     That's correct.  But what you had said

22   22   was that there were no contemporaneous -- there was no

23   23   contemporaneous information.

24   24              Q     I understand.  I understand.  Well --

25   25              A     I don't remember exactly what you said.

247

1    1              Q    Whatever I asked, I asked.  I'm just

2    2    trying to be clear about what -- what your testimony

3    3    is.  So you took the information and you estimated the

4    4    amount of contamination present on the filters.  And

5    5    you also had to make an estimate, did you not, of the

6    6    efficiency of the filters?  How much plutonium they

7    7    were collecting; correct?

8    8              A    No.  Because the measurements of

9    9    concentration in the ducts were upstream of the

10   10   filters.  So -- okay.  So we've got ducts coming in and

11   11   then -- my watch is the filters.

12   12             Q    Right.

13   13             A    Okay.  So we've got these ducts coming

14   14   in and the air is going this way.  (Deponent

15   15   indicating.)

16   16             Q    Okay.

17   17             A    We've got a measurement here, a

18   18   measurement here, measurement here, measurement here.

19   19   (Deponent indicating.)

20   20             Q    Okay.  I see.

21   21             A    Okay.

22   22             Q    Based on these measurements, then you're

23   23   calculating how much gets trapped in the filter?

24   24             A    Gets to the filter.

25   25             Q    Gets to the filter?

26
27                      CARPENTER REPORTING, INC.
                        (303) 752-1200

248

1  1              A     Right.

2  2              Q     And then did you make some estimate of

3  3  how much stays in the filter, or you just took the 100

4  4  percent that hit the filter?

5  5              A     I, frankly, don't know whether we took

6  6  the entire 100 percent or whether we took a count of

7  7  what was measured downstream of the filter in the

8  8  effluent sample.

9  9              Q     Downstream means after the filter,

10 10  upstream --

11 11              A     After the filter.

12 12              Q     -- in front of the filter in the way

13 13  you're using these words?

14 14              A     Right.

15 15              Q     Okay.  Okay.  But if you did not assume

16 16  that 100 percent of the plutonium that you calculated

17 17  was trapped in the filter, you would have had to make

18 18  some estimate of the filter efficiency; correct?

19 19              A     Yes.

20 20              Q     Doesn't that follow?

21 21              A     Yes.  That's true.

22 22              Q     Okay.

23 23              A     And -- well -- and in fact, there

24 24  were -- there were data -- there were measurements of

25 25  filter efficiencies that were made at Rocky Flats using

26
27                    CARPENTER REPORTING, INC.
                         (303) 752-1200

249

1   1   the -- the filter -- filters in the filter bank.

2   2           Q    Okay.  If you would turn to page 29,

3   3   please --

4   4           A    Okay.

5   5           Q    -- second full paragraph, it says in the

6   6   middle, "Analysis of the data showed that the single

7   7   probe did not provide representative sampling of the

8   8   building effluent."  Do you see that sentence?

9   9           A    Yes.

10  10          Q    We're talking about building effluent

11  11  from where?

12  12          A    From Building 71.

13  13          Q    Where the fire occurred; correct?

14  14          A    Right.  That's what this refers to is --

15  15  this is -- this is the '57 fire report; right?  Have I

16  16  lost track?

17  17          Q    No.  This is all the '57 fire report.

18  18          A    Okay.

19  19          Q    Let me see if I understand what you're

20  20  saying.  So imagine the exhaust is a square.  Is what

21  21  you're saying that there's only one point that's being

22  22  sampled and that's --

23  23          A    In the center.

24  24          Q    -- potentially not representative

25  25  because other places around that one point could have

1   higher or lower concentrations?  Is that what you're

2   saying?

3           A    Yes.

4           Q    Is that yes?

5           A    Excuse me.  Yes.  I had my mouth full.

6   Yes.

7           Q    Do you know what the size was of these

8   exhaust -- exhausts?

9           A    The exhaust duct was large.

10          Q    About how large?

11          A    There was a dimensional drawing of it in

12  the routine release report.

13          Q    Okay.  Did you do any study of how many

14  probes would be needed to get a statistically

15  representative sample out of that exhaust from Building

16  71?

17          A    We didn't do any explicit study, but I

18  can tell you, based on my own experience with that sort

19  of thing, that it was definitely more than one and it

20  was definitely more than three.

21          Q    Well, can you give me a range?  Is it

22  10?  Is it 1,000?

23          A    No.  It's not --

24          Q    What is it?

25          A    It's not 1,000.  I'd have to look at the

251

1  1   dimensions and the rules.  I can't -- I can't, sitting

2  2   here right now, give you that number.

3  3              Q    If you looked at the diagram you just

4  4   mentioned --

5  5              A    The diagram would give the dimension,

6  6   but it doesn't give the -- it doesn't explain -- it

7  7   doesn't contain the rules for doing this calculation.

8  8              Q    Okay.  Is it -- is the number more than

9  9   ten?  That you need more than ten probes?

10 10             A    I said a moment ago, I can't tell you

11 11   what the number is sitting right here right now.

12 12             Q    At some point, did you calculate that

13 13   number?

14 14             A    No.  And the result of that calculation

15 15   isn't relevant to what we were doing.  We had to work

16 16   with what we had.

17 17             Q    Okay.  Is it -- and the number that

18 18   would be required to produce an actual representative

19 19   sampling is not relevant to any uncertainty analysis

20 20   you did?  Is that what you're saying?

21 21             MS. PARK:  Objection.  Mischaracterizes

22 22   his testimony.

23 23             MR. SORENSEN:  It's just a question.

24 24             Q    (BY MR. SORENSEN)  Go ahead.

25 25             A    It could have some effect on the

26
27                    CARPENTER REPORTING, INC.
                       (303) 752-1200

252

```
1   1   uncertainty associated with the amounts of material,
2   2   particularly those -- particularly for the routine
3   3   releases.  And it could -- it could slightly affect the
4   4   uncertainty associated with the amount of plutonium
5   5   estimated to be on the filter.
6   6            Q    So it could have an effect on the
7   7   uncertainty for the routine releases.  And so do you
8   8   recall, as you sit here, anyone at RAC doing the
9   9   analysis that I just described; that is, figuring out
10  10   how many probe points you would need to get a
11  11   representative sample --
12  12            MS. PARK:  Objection.
13  13            Q   (BY MR. SORENSEN)  -- in the exhausts?
14  14            MS. PARK:  Form.
15  15            A    I do not recall that being done.
16  16            Q   (BY MR. SORENSEN)  Okay.  So if it
17  17   wasn't done, then, by definition, it wasn't factored
18  18   into any uncertainty analysis that RAC did; correct?
19  19            MS. PARK:  Objection.  Lack of
20  20   foundation.
21  21            Q   (BY MR. SORENSEN)  Isn't that a
22  22   tautology?
23  23            A    Yes.
24  24            Q    If it wasn't done, it wasn't factored
25  25   in; correct?
```

253

1   1                    A      That's correct.

2   2                    Q      Okay.

3   3                    A      We have ...

4   4                    Q      Can you turn to page 38, please.  The

5   5    second full paragraph states, "The fractional release

6   6    of plutonium into the air depends upon the chemical and

7   7    physical form of the material and the forces that are

8   8    applied.  Estimates of airborne release fractions for

9   9    various situations are based upon experimental studies.

10  10   These tests employ plutonium that was heated, oxidized,

11  11   or subjected to other stresses under controlled

12  12   conditions."  Do you see that?

13  13                   A      Yes.

14  14                   Q      When it refers to experimental studies,

15  15   what does that mean?  Are these studies that this

16  16   consultant did or that you did or RAC did, or what does

17  17   it mean?

18  18                   A      No.  They are studies that were done

19  19   in -- under controlled conditions in -- in controlled

20  20   environments.

21  21                   Q      By who?

22  22                   A      We're talking about measurements of

23  23   plutonium made airborne during -- during these -- under

24  24   the conditions described.

25  25                   Q      But who did these experiments?  What

254

1   1   experiments are we talking about?  By Rockwell, Dow,

2   2   DOE?

3   3           A    No.  Neither Rockwell nor Dow, to the

4   4   best of my knowledge, did any such studies.  The --

5   5   there were a number of different locations where --

6   6   where such studies were performed.  Battelle-Columbus

7   7   sticks in my mind.  I believe there were some at -- at

8   8   Hanford.

9   9                In order -- in order to do these

10  10  studies, you need -- you need a substantial -- you need

11  11  a substantial facility.  You need a hot cell.  You need

12  12  a -- a filtered exhaust system and so on and so forth.

13  13  So it's not the sort of experimental work that can be

14  14  done in any -- you know -- in many --

15  15           Q    In a garage?

16  16           A    -- in many places.  Right.  Don't try

17  17  this at home.

18  18           Q    Okay.  Now, these experiments, you said,

19  19  were under controlled conditions.  The -- the '57 fire,

20  20  by definition, was not a controlled event; correct?

21  21           A    That's correct.

22  22           Q    Okay.  So you looked at the results of

23  23  some of these experimental studies and made a judgment

24  24  about how they would apply to the uncontrolled

25  25  conditions present at the '57 fire; correct?

26      CARPENTER REPORTING, INC.
27           (303) 752-1200

255

1   1                    MS. PARK:  Objection.  Form.

2   2                    Q    (BY MR. SORENSEN)  Is that what you did?

3   3                    MS. PARK:  Same objection.

4   4                    A    As I understand your question, I think

5   5      the answer is yes.

6   6                    Q    (BY MR. SORENSEN)  Okay.  Let's turn to

7   7      page 39, next page.

8   8                    A    Yes.

9   9                    Q    Do you see that?  Under Section 4.1, it

10  10     states, "Airborne release fractions for oxidation of

11  11     plutonium metal depend upon several factors.  The

12  12     metallurgical type and temperature of the metal are

13  13     quite important.  Under some conditions, the surface

14  14     area of the metal, the humidity of the air, and the air

15  15     velocity have also been shown to be important

16  16     considerations when estimating release fractions."

17  17                    Do you see that?

18  18                    A    Yes.

19  19                    Q    Now, there were -- were there

20  20     contemporaneous reliable records of the metallurgical

21  21     type of the plutonium present in the '57 fire?

22  22                    MS. PARK:  Objection.  Form.

23  23                    A    I believe Epp's group gives the

24  24     plutonium form.  Most of it was alpha plutonium.

25  25                    Q    (BY MR. SORENSEN)  Okay.  We already

26                    CARPENTER REPORTING, INC.
27                       (303) 752-1200

1    discussed temperature.  How about the surface area of

2    the metal?  Were there contemporaneous records that you

3    could rely on for that, or did you have to make

4    estimates?

5              A    For the --

6                   MS. PARK:  Objection.  Form.

7              A    For the metal hemispheres, we made -- we

8    made estimates.  These -- and whenever we did this, of

9    course, we took into account the band of uncertainty

10   associated with -- with the release fraction.  As we go

11   on, there's -- if you -- maybe you're going to stop at

12   it.  There's a table that shows the estimates of

13   uncertainty, the release fractions, and the estimates

14   of uncertainty associated with them.

15             Q    (BY MR. SORENSEN)  But you were

16   estimating the uncertainty bounds; correct?

17             A    Based on the measurement data.

18             Q    Well, right.  Well, based on whatever

19   data you had, you were then creating an estimate of

20   what the uncertainty bounds are; correct?  You don't

21   take those off the shelf, either; right?

22                  MS. PARK:  Objection.  Form.

23             A    The uncertainty bounds are based on the

24   measurement data in the literature.  Measurements that

25   were made under controlled conditions.

257

1    1              Q    (BY MR. SORENSEN)  Well, the surface

2    2    area of the metal?

3    3              A    Oh, I'm sorry.  I thought you were

4    4    talking about the release fractions.

5    5              Q    No.  Well, talking about different

6    6    things.  I mean, I gather, for some uncertainty bounds,

7    7    you're taking it from the literature and for others,

8    8    you, yourself, have to estimate the uncertainty;

9    9    correct?

10   10             MS. PARK:  Objection.  Form.

11   11             Q    (BY MR. SORENSEN)  Isn't that right?

12   12             A    Well, all these things relate to the

13   13   release fractions.

14   14             Q    Right.  Okay.

15   15             A    And so we are estimating, when we --

16   16   when we take an estimate for a release fraction for a

17   17   particular form, the uncertainty bounds are dependent

18   18   on the measured release fractions under those

19   19   conditions for -- for the forms that we're talking

20   20   about, looking -- considering the -- the surface area

21   21   and so on.  And -- and I'm not -- I can't at this

22   22   moment recall a specific case to -- to describe to you.

23   23             Q    Well, did you have to or did you come up

24   24   with your own estimate of the uncertainty range to use

25   25   for the surface area of the plutonium metal present at

258

1    the '57 fire?

2             A    I don't recall.

3             Q    Okay.  How about the humidity of the

4    air?  There were no contemporaneous records of that;

5    correct?

6             A    That's correct.

7             Q    So did you come up with an estimate and

8    an uncertainty range to use for that?

9             A    I can't say absolutely sitting here

10   right here, right now, but it seems to me that -- that

11   the situation, when -- when humidity was important, was

12   at very high humidities and we could be quite confident

13   that we weren't at very high humidities.

14            Q    Okay.  Is that just because of the

15   general climate here?

16            A    Well, it's because of the general

17   climate and the fact that there was a fire going on.

18            Q    Well, fires can occur in humid

19   conditions, can't they?

20            A    Not if you start with dry air to start

21   with.

22            Q    But fires can burn in humid conditions

23   when it's not raining; correct?

24            A    That's true.

25            Q    You also list the air velocity.  I take

259

1   1      it it's correct that there were no reliable

2   2      contemporaneous measurements of the air velocity at the

3   3      time of the '57 fire; correct?

4   4              A    Actually, we had information about the

5   5      air velocity through the gloveboxes based on the flow

6   6      rate and the size of the gloveboxes.

7   7              Q    During the actual fire itself?

8   8              A    Certainly, at the -- at the start of the

9   9      fire, and then we also had estimates of the air

10  10     velocity in the room, as I recall.

11  11             Q    During the fire?

12  12             A    During the fire.  After -- that becomes

13  13     important after the gloveboxes have been breached.  But

14  14     the most -- the most important time period is -- is

15  15     when the material -- when the glovebox filter is being

16  16     burned out.  The air velocity for that is calculable

17  17     from the flow rate through the system and the -- and

18  18     the physical size of the box.

19  19             Q    So this most important flow rate, is

20  20     that something you had to calculate, or is that

21  21     something you just read off a contemporaneous

22  22     measurement?

23  23             A    It's a contemporaneous measurement in

24  24     the sense that the air velocity through the duct is

25  25     contemporaneous and the size of the duct is

260

1  1  contemporaneous.  It's -- it's two -- it's two

2  2  quantities based on conditions at the time.  It's

3  3  not -- it wasn't charted on the wall or anything like

4  4  that.

5  5          Q    All right.  But then you had to

6  6  calculate the rest; is that right?

7  7          A    We had to calculate the ratio of those

8  8  two numbers, yes.

9  9          Q    Okay.  Turn to page 48, please.

10  10          MS. PARK:  48?

11  11          MR. SORENSEN:   48.

12  12          Q    (BY MR. SORENSEN)  Are you there, sir?

13  13          A    Yes.

14  14          Q    Do you see the last full paragraph, it

15  15  states, "The actual conditions of plutonium oxidation

16  16  during the fire are not known."  Do you see that?

17  17          A    Yes.

18  18          Q    Because they were not known, that's why

19  19  you had to make all these estimates with uncertainty

20  20  ranges; correct?

21  21          A    Well, because the -- the conditions were

22  22  not known, we effectively assumed a uniform

23  23  distribution of conditions for the four categories.

24  24          Q    But that assumption could be wrong;

25  25  correct?

26
27                    CARPENTER REPORTING, INC.
                        (303) 752-1200

261

1   1                          MS. PARK:  Objection.  Form.

2   2                          Q    (BY MR. SORENSEN)  Go ahead.

3   3                          A    It's likely to be an overestimate of --

4   4   of the actual conditions.

5   5                          Q    The question is the assumption could be

6   6   wrong?  The answer to that is yes; correct?

7   7                          MS. PARK:  Same objection.

8   8                          A    When you don't have any information, you

9   9   use a uniform distribution to reflect that lack of

10  10  knowledge.  Okay?  And that's -- that's your best

11  11  estimate of the result.  And it includes the

12  12  uncertainty of the result.  We don't -- we don't know

13  13  what the right answer is.  We're trying to calculate a

14  14  best estimate with an uncertainty range.

15  15                          Q    (BY MR. SORENSEN)  Can you turn to page

16  16  51, please.  The first full paragraph, about the

17  17  middle, states, "The calculated releases are most

18  18  sensitive to the amount of metal assumed to have been

19  19  subject to very high-temperature (vigorous) oxidation."

20  20  Do you see that?

21  21                          A    Yes.

22  22                          Q    Now, that is, in turn, sensitive to the

23  23  amount of metal assumed to have been present in the

24  24  first place; correct?  First, you start with the amount

25  25  of metal present; isn't that right?

26
27                          CARPENTER REPORTING, INC.
                            (303) 752-1200

1    1                    MS. PARK:  Objection to form.

2    2              Q    (BY MR. SORENSEN)  Before the fire even

3    3    starts, you have to figure out how much plutonium was

4    4    present; correct?

5    5              A    Right.  But we did a sensitivity -- what

6    6    the sentence says is that we did a sensitivity analysis

7    7    that showed that the -- that the fraction of the metal

8    8    in that category, regardless of how big the total

9    9    quantity was -- the fraction of the metal in that

10   10   category was -- was a primary source of uncertainty in

11   11   the answer that we received.

12   12             Q    Okay.  But the -- ultimately, the amount

13   13   of plutonium that burned and got released, if it's

14   14   sensitive to this percentage, it's also then sensitive

15   15   to the amount of -- the absolute amount of plutonium

16   16   present in the first place; isn't that right?

17   17             A    That's not what I'm saying.

18   18             Q    Okay.

19   19             A    What I'm saying is we have four

20   20   categories and we have material distributed uniformly

21   21   among the four categories.

22   22             Q    Okay.

23   23             A    And we do this calculation and we've got

24   24   an answer out here with uncertainty.  And what I

25   25   said -- what this says is that this answer is very

```
1   1   sensitive to whether we use -- use a uniform
2   2   distribution of metal in those four categories,
3   3   regardless of what the total amount is, whether we use
4   4   a uniform distribution and put 25 percent in the
5   5   vigorous oxidation category or whether we use a more
6   6   realistic distribution and put less than 25 percent in
7   7   that category and more in the other categories.  And
8   8   it's not dependent on the total -- it's not dependent
9   9   on the same of A plus B, plus C, plus D where those are
10  10  the amounts of metal in the four categories.
11  11          Q     Maybe this is too simplistic, but
12  12  whatever percentage of metal subject to high-
13  13  temperature oxidation -- whatever that percentage is,
14  14  5 percent, 25 percent, it's some percentage of an
15  15  absolute amount of metal; correct?
16  16          A     Right.  But it -- this statement is
17  17  talking about the sensitivity of the result to the
18  18  oxidation categories.
19  19          Q     Got it.  And I take it it's correct that
20  20  there were no reliable contemporaneous measurements you
21  21  could use that told you the percentage of plutonium
22  22  subject to very high-temperature oxidation at the time
23  23  of the '57 fire; correct?
24  24               MS. PARK:  Objection.  Form.
25  25          A     It's impossible to make such
26          CARPENTER REPORTING, INC.
27               (303) 752-1200
```

264

1  1   measurements in the middle of a fire.

2  2             Q    (BY MR. SORENSEN)  The answer to my

3  3   question is no, there were no such measurements?

4  4             A    That's correct.

5  5             Q    Okay.  Could you turn to page 52, this

6  6   table we looked at before, please.

7  7             A    Uh-huh.

8  8             Q    Now, if you look at the ChemRisk number,

9  9   there's a range of .03 to 33 grams.  Do you see that?

10  10            A    Yes.

11  11            Q    That's their 5 percent and 95 percent

12  12   distribution range; correct?  Is that right?

13  13            A    Yes.  Sorry.

14  14            Q    And they were presenting that publicly

15  15   to say, you know, our best estimate is 1 gram, but

16  16   we'll give you a range from .03 to 33.  It could be as

17  17   high as 33.  Isn't that what that meant in lay terms?

18  18            A    I -- yeah.  I don't -- I don't have the

19  19   1 gram in this -- in this table.  So if you're

20  20   saying --

21  21            Q    I'm looking right at it.

22  22            A    I know it's .03 to 33.  I don't -- there

23  23   it is.  1 gram.  I'm sorry.  Pardon me.

24  24            Q    That's all right.

25  25            A    I looked at this table the other day and

26
27                    CARPENTER REPORTING, INC.
                       (303) 752-1200

265

1   in response to a question, I said I don't see what

2   their mean estimate was, but it's there.  Thank you.

3        Q    So am I correct that, in lay terms, what

4   ChemRisk was saying to the public was our best or

5   median estimate was 1 gram, but it could be as high as

6   33?

7        A    Right.

8        Q    Then when you came along, your range is

9   40 to 500; correct?

10       A    That's correct.

11       Q    So your low end, your 5 percent

12  likelihood of distribution, is higher than ChemRisk's

13  95 percent --

14       A    That's correct.

15       Q    -- figure?

16       A    Right.

17       Q    Okay.  And you're also now telling the

18  public, in effect, it could be as low as 40, but it's

19  no higher than 500; correct?  That's, in effect, what

20  you're trying to tell the public?

21            MS. PARK:  Objection.  Form.  Do you

22  mean RAC when you say "you"?

23            MR. SORENSEN:  Yes.  RAC.

24       A    Those are our estimates of the lower and

25  upper bounds of the fire release.

26            CARPENTER REPORTING, INC.
27                 (303) 752-1200

266

1    1              Q    (BY MR. SORENSEN)  Okay.

2    2                   (Marked for identification were

3    3    Deposition Exhibit Nos. 2 and 3.)

4    4              Q    (BY MR. SORENSEN)  Sir, what I've marked

5    5    as Exhibit 2 is entitled Technical Memorandum,

6    6    Examination of Mass Balance Accounting as a Means of

7    7    Estimating Plutonium Releases by Paul Voilleque dated

8    8    May 1995.  Do you see that, sir?

9    9              A    Yes.

10   10             Q    And what I've marked as Exhibit 3 is

11   11   titled Tracking Toxic Substances at Industrial

12   12   Facilities, National Academy Press, 1990.  Do you see

13   13   that?

14   14             A    Yes.

15   15             Q    Okay.  Can you first confirm for me that

16   16   you wrote Exhibit 2?

17   17             A    Yes.

18   18             Q    Okay.  And Exhibit 2 --

19   19             A    Well, just a minute.

20   20             Q    Yeah.  Go ahead.  Attached to Exhibit 2

21   21   is a portion of a transcript from May 25, 1995.

22   22             A    Is Exhibit 2 complete?

23   23                  MS. PARK:  Exhibit 2 isn't page

24   24   numbered, so it's difficult to determine.

25   25             A    There's no set of references here.

26                       CARPENTER REPORTING, INC.
27                          (303) 752-1200

267

1   1              Q    (BY MR. SORENSEN)  Are you telling me

2   2      that Exhibit 2 is not complete?

3   3              A    I'm not sure that -- no.  I'm saying --

4   4      I'm asking a question, which was is it complete,

5   5      because I'm surprised to look at the back and not see

6   6      this National Academy report in a reference list.

7   7              Q    Okay.  This was attached to another RAC

8   8      report, was it not?

9   9              MS. PARK:  When you say "this," are you

10  10     referring to --

11  11              MR. SORENSEN:  Exhibit 2.

12  12              MS. PARK:  -- the entirety of it,

13  13     including the HAP transcript?

14  14              MR. SORENSEN:  Exhibit 2.  Just the memo

15  15     itself.

16  16              MS. PARK:  The reason why we're confused

17  17     is because my Exhibit 2 has a technical memoranda and

18  18     the HAP transcript.

19  19              MR. SORENSEN:  Right.  I understand

20  20     that.

21  21              Q    (BY MR. SORENSEN)  Do you recall whether

22  22     this was attached to -- the technical memo was attached

23  23     to a longer RAC report?

24  24              A    I'm just looking to see if I can answer

25  25     that question for you.  If you look, actually, at the

26                        CARPENTER REPORTING, INC.
27                          (303) 752-1200

268

1    1    report we were just looking at, which is the '57 fire

2    2    report --

3    3                    MS. PARK:  PX1068.

4    4            A    -- yeah, 1068 -- Appendix B has the same

5    5    title.

6    6            Q    (BY MR. SORENSEN)  Can I see?

7    7            A    Yeah.  This is the fire report we were

8    8    just talking about.

9    9            Q    Yeah.  Because I'll show you where I got

10   10   Exhibit 2 from in a moment.  I'm just going to compare

11   11   them.  Right.  Well, Appendix B in Exhibit 1068 is not

12   12   the same thing as Exhibit B of this deposition; right?

13   13   They are two different things?

14   14                    MS. PARK:  Do you mean they are not

15   15   identical?

16   16                    MR. SORENSEN:  They don't have the same

17   17   title, for example.

18   18           A    I thought the title was the same,

19   19   actually.

20   20           Q    (BY MR. SORENSEN)  Well, Appendix --

21   21           A    Examination of Mass Balance Accounting

22   22   as a Means for Estimating Mass Plutonium Releases.

23   23           Q    Right.  The differences show up pretty

24   24   quickly in terms of the text.  I mean, you wrote both

25   25   documents; correct?  Exhibit 2 to the deposition and

26                        CARPENTER REPORTING, INC.
27                           (303) 752-1200

269

1  1    Appendix B to Exhibit P1068?

2  2              MS. PARK:  I have to keep insisting when

3  3    you say "Exhibit 2," you're referring to the technical

4  4    memoranda.

5  5              MR. SORENSEN:  Yes.

6  6              MS. PARK:  I mean, we can take the

7  7    transcript and mark it as a separate exhibit if it'll

8  8    make it less confusing.

9  9              MR. SORENSEN:  I will get to that in

10 10   just one second.

11 11             A    Well, I am the author of this, but I'm

12 12   surprised that there's not a list of references there.

13 13             Q    (BY MR. SORENSEN)  Well, I will show you

14 14   P1079, which is August '99 RAC Responses to Public

15 15   Questions and Concerns, and attached to that is this

16 16   technical memorandum and right after that technical

17 17   memorandum follows this excerpt from the HAP meeting.

18 18             A    What's the date of the HAP meeting?

19 19             Q    May 25, 1995.  I will show you this,

20 20   sir.  Why don't you tell me, looking at this, whether

21 21   the HAP meeting should have been part of this or, you

22 22   know, that was something we copied that was in error.

23 23   That's 1068, DX514.

24 24             A    Right.  Well, that --

25 25             MS. PARK:  You're looking through 1079.

270

1    Q    (BY MR. SORENSEN)  I'm sorry.  Yeah.

2  1079.  The -- let the record reflect what I showed the

3  witness and he is looking through is 1079.  P1079.

4    A    Okay.  I think we've got two things

5  here.  One is -- one is this memorandum that I wrote,

6  or at least the first version of this memorandum.  And

7  then this is probably some discussion about that

8  memorandum, I would assume, from its title.

9    Q    Okay.  When you say the first --

10    A    Discussion of mass balance during my '57

11  fire presentation.

12         MS. PARK:  I don't want you to guess.

13  The question is whether you know.  No one wants you to

14  guess.

15    Q    (BY MR. SORENSEN)  When you say the

16  first version, is the later version of the document you

17  pointed me to in P1068?

18    A    That's obviously a more complete version

19  because it has the references and so on.  It has more

20  details about how the calculation might be made on that

21  first page there.

22    Q    Right.  Right.  Okay.

23         MS. PARK:  So you're referring to

24  Appendix B in PX1068, David?

25         MR. SORENSEN:  I just was, yes.  Okay.

271

1    1            Q    (BY MR. SORENSEN)  Now --

2    2            A    I mean, I'm sure that some of the

3    3    material is the same, but that's definitely a more

4    4    complete version there.

5    5            Q    When you say "that," can you tell me

6    6    what you're referring to?

7    7                 MS. PARK:  Exhibit B in 1068.

8    8            A    Exhibit B in P1068 is obviously a more

9    9    complete version than what was discussed at this -- at

10   10    this meeting.

11   11            Q    (BY MR. SORENSEN)  Okay.  Got you.  Both

12   12    versions, that is the text portion that you wrote of

13   13    Exhibit 2 to the deposition and Appendix B to P1068 --

14   14    for both, one of your references and one of the

15   15    materials you relied on is Exhibit 3 to your

16   16    deposition; correct?  Take a look at Exhibit 3.

17   17            A    Yeah.  That's what got me started in the

18   18    first place was looking for the reference.

19   19            Q    Got it.  The reference is not there?

20   20            A    It's not there.

21   21            Q    It's there for Appendix B.

22   22            A    But it's not here, but this does refer

23   23    to this document.

24   24            Q    When you say "this document," you're

25   25    talking about now Exhibit 3 to the deposition?

272

1    1                A    Right.

2    2                Q    Okay.

3    3                A    I should look at Exhibit 2, I suppose.

4    4    And Exhibit 2 does refer to Exhibit 3.

5    5                Q    Okay.  Now, let's focus on Exhibit 3 to

6    6    the deposition for a moment, this Tracking Toxic

7    7    Substances in Industrial Facilities.  This study

8    8    nowhere mentions any nuclear facility; correct?

9    9                MS. PARK:  Well, David, this study is a

10   10   1,000-plus -- I take that back.  A 200-plus-page

11   11   document.

12   12                Q    (BY MR. SORENSEN)  You relied on this

13   13   study; correct?

14   14                MS. PARK:  Can he have a minute to take

15   15   a look at it?

16   16                MR. SORENSEN:  Sure.  He can look at it.

17   17                MS. PARK:  I think that question is very

18   18   broad.  I don't know how he can answer it without

19   19   looking through 200 pages.

20   20                Q    (BY MR. SORENSEN)  Let me ask you this:

21   21   If this study, Exhibit 3, had specifically discussed

22   22   plutonium in a nuclear facility, isn't it fair to

23   23   assume that you would have mentioned it --

24   24                MS. PARK:  Objection to form.

25   25                Q    (BY MR. SORENSEN)  -- in something you

26                        CARPENTER REPORTING, INC.
27                           (303) 752-1200

273

1   wrote?

2              MS. PARK:  Objection to form.

3         A    Well, you could -- you could make

4    whatever assumption you want, but let me look at the

5    introduction --

6         Q    (BY MR. SORENSEN)  Sure.

7         A    -- to this, and I think that would

8    probably answer your question.  So the potential

9    usefulness of mass balance information surfaces an

10   issue in the reauthorization of the CERCLA 1980

11   legislation, which was the -- the SARA legislation.

12   And the --

13             MS. PARK:  Paul, are you just reading

14   from the document out loud or answering the question?

15             THE DEPONENT:  I am trying to answer his

16   question.

17             MS. PARK:  Okay.  I just wanted to make

18   sure.

19        A    And that legislation deals with releases

20   of chemicals from various types of facilities.  And it

21   does not, therefore, consider releases of radioactivity

22   from various types of facilities.

23        Q    (BY MR. SORENSEN)  Okay.  In the first

24   version of this technical memorandum that's at least

25   part of Deposition Exhibit 2, you state on the first

274

1    1    page, "However, it was thought that plutonium

2    2    accountability data would prove to be more reliable

3    3    because of the much higher value of plutonium.

4    4    Citizens have expressed the same idea, because

5    5    plutonium was more valuable than gold, you would expect

6    6    that those responsible would know where every last bit

7    7    was."

8    8              Do you know, in fact, how valuable

9    9    plutonium is monetarily in relation to gold?

10   10             MS. PARK:  Objection to form.  Vague and

11   11   ambiguous.

12   12        A    That -- that -- that statement reflects

13   13   a statement of one or more citizens who commented on

14   14   this idea of using a mass balance approach.  That

15   15   was -- I'm trying to reflect their statement there.

16   16        Q    (BY MR. SORENSEN)  Well, the first

17   17   sentence, however, "It was thought that plutonium

18   18   accountability data" -- "it was thought."  Is that

19   19   something you thought?  You were writing this.

20   20        A    Maybe we should go back to the

21   21   beginning.  The -- we were asked by members of the

22   22   Health Advisory Panel and by citizens to consider a

23   23   mass balance approach for estimating the releases.  And

24   24   we had -- we had looked at uranium accountability

25   25   previously at Fernald.  And we had -- we had talked --

1    as I recall, we had talked to them -- the people on the

2    HAP about this approach and about what we had seen at

3    Fernald, but the -- the -- the sentence -- this refers

4    to the higher value of plutonium relative to uranium.

5    Right?

6         Q    Right.

7         A    That's what -- that's what that sentence

8    is talking about.

9         Q    Well, the construction "it was thought,"

10   that refers to something you thought?

11             MS. PARK:  Objection.  Asked and

12   answered.

13        A    Not necessarily.  I was trying to --

14   that's what I was trying to get to.  I'm sorry.  I got

15   off track there.  The "it was thought" is -- is, I

16   believe, the result -- I don't remember the exact

17   discussions that took place explicitly, but I think

18   it's a result of discussions among the people who

19   were -- who were pushing the idea or who were

20   requesting that -- that we perform a mass balance

21   accounting process, procedure, employ a mass balance

22   accounting procedure.

23        Q    (BY MR. SORENSEN)  Okay.  And when I

24   earlier asked about the MUF and MUF-related classified

25   documents you and your team looked at, did you do that

276

1   review before or after writing this May 1995 technical

2   memorandum marked as Exhibit 2 to the deposition?

3          A    I think most of that review was done

4   before, but I wouldn't preclude that part of it was

5   done afterward.

6          Q    Okay.  And after you did -- you wrote

7   this May '95 technical memorandum, Exhibit 2 to the

8   dep, did you do any further review of classified MUF

9   and MUF-related documents?

10          A    I think I just said that most of the

11   re -- maybe I misunderstood your previous question.  I

12   think I just answered that I thought most of the review

13   of -- of MUF-related documents was done before this

14   time, but that -- that I wouldn't exclude MUF-related

15   document review after this time.

16          Q    I'll ask this then:  After you wrote

17   this May '95 technical memorandum, did you go back into

18   a classified setting, looking at classified MUF

19   documents, to do some kind of a reanalysis of any kind

20   to try to figure out whether MUF data could be used?

21              MS. PARK:  Objection.  Form.

22          A    I think -- I think the -- the MUF review

23   that -- that was done after this time was more focused

24   on -- on Building 71 and the fire situation.

25          Q    (BY MR. SORENSEN)  The '57 fire?

277

1  1              A     Right.

2  2                    MS. PARK:  David, by my count, you've

3  3     got about a half hour left and I have some questions to

4  4     ask him, as well.  Are you almost done?

5  5                    MR. SORENSEN:  Well, I obviously have to

6  6     be almost done.

7  7                    MS. PARK:  I would agree with that.  Can

8  8     you give me a sense of how much time?

9  9                    MR. SORENSEN:  I can't.  I'm -- you

10  10    know, I have a lot that I want to ask.

11  11                   (Marked for identification was

12  12    Deposition Exhibit No. 4.)

13  13              A     Oh, no.

14  14              Q     (BY MR. SORENSEN)  What's that?  Oh, no?

15  15                    MS. PARK:  It's just a random comment.

16  16    If you'll have in front of you -- I'll put a new book

17  17    in front of you.

18  18              A     I'm sorry.  I should have gotten this

19  19    out of the way.

20  20              Q     (BY MR. SORENSEN)  No.  That's all

21  21    right.

22  22                    MS. PARK:  David, I'm going to object to

23  23    your marking of Voilleque Deposition Exhibit No. 4,

24  24    which is a 1978 Bronesky memo to the extent the Court

25  25    has made it clear that this document cannot be shown to

278

1  1   witnesses at trial.  I think you're showing it to

2  2   Voilleque.  It's a document that we obviously believe

3  3   was -- is privileged, and we object to you showing it

4  4   to additional witnesses in this case.

5  5              MR. SORENSEN:  Well, first, I'm not --

6  6              MS. PARK:  Particularly since you know

7  7   Mr. Voilleque's -- there is a strong likelihood that he

8  8   will be a witness in this case.

9  9              MR. SORENSEN:  Well, first, I'm not

10  10  aware of any ruling that prohibits me showing it to a

11  11  witness at deposition.

12  12             MS. PARK:  Well, that's my

13  13  understanding, at least.

14  14             MR. SORENSEN:  Doug, is that your

15  15  understanding?

16  16             MR. POLAND:  My understanding was that

17  17  the Court precluded Louise from using the document in

18  18  trial the other day.  She was not allowed to use the --

19  19  was not allowed to use this -- this memo at trial.

20  20             MR. SORENSEN:  You mean with -- can we

21  21  go off the record for a second?

22  22             (There was a discussion off the record.)

23  23             THE DEPONENT:  I just want to say for

24  24  the record, I turned this upside-down.

25  25             MR. SORENSEN:  Why don't you give it

26         CARPENTER REPORTING, INC.
27            (303) 752-1200

279

1   1   back to me.  Why don't we start up again.

2   2                 Okay.  Back on.  For the record, what I

3   3   marked as Exhibit 4, I've retrieved from the witness.

4   4   I don't believe that there's any Court-ordered bar to

5   5   me showing it to the witness.  However, in light of

6   6   defendants' objection, for now, I will not do so.

7   7                 MS. PARK:  And I would like to just sort

8   8   of clarify what our objection is.

9   9                 MR. POLAND:  Well, the objection -- my

10  10  understanding is that the Court had precluded the use

11  11  of what was going to be marked as Exhibit No. 4 at

12  12  trial.  And to the extent that that accurately reflects

13  13  the ruling, we'd object to the use of the document here

14  14  at deposition as well in light of the fact

15  15  Mr. Voilleque is intended to be called as a trial

16  16  witness.

17  17                 MR. SORENSEN:  Okay.

18  18          Q    (BY MR. SORENSEN)  Could you turn to

19  19  Exhibit P1067, which I've put in front of you.

20  20          A    Yes.

21  21          Q    All right.  Could you turn to page 12.

22  22          A    Okay.

23  23          Q    Are you there?

24  24          A    Yes.

25  25          Q    Now, the second full paragraph has a

280

1   1   sentence that states, Freeberg noted the odor of carbon

2   2   tetrachloride in the area, and the cite is to Bronesky,

3   3   1977.  Do you see that?

4   4           MS. PARK:  Could you wait just one

5   5   second?

6   6           A    It's the 903 pad -- it's the

7   7   characterization report.

8   8           MR. POLAND:  It's the characterization

9   9   report.  Give us just a second here.

10  10          MR. SORENSEN:  Are we all set?

11  11          MS. PARK:  What was the question again?

12  12          Q    (BY MR. SORENSEN)  On page 12, do you

13  13  see the reference to the Bronesky 1977 document, sir?

14  14          A    I see --

15  15          Q    Second --

16  16          A    Second paragraph, and it says Freeberg

17  17  noted the odor of carbon tetrachloride in the area,

18  18  Bronesky, 1977.

19  19          Q    Yes.  And I asked you earlier about

20  20  Mr. Bronesky, and I believe you recall or eventually

21  21  recalled that he is an attorney.  Do you recall that?

22  22          A    Yes.

23  23          Q    Okay.  Do you have any knowledge one way

24  24  or the other of how it is that a document written by

25  25  Mr. Bronesky wound up being cited by RAC in this

26          CARPENTER REPORTING, INC.
27              (303) 752-1200

281

1   1   report?

2   2               A    No, I don't.  The citation, as I recall,

3   3   says something to the effect that it was a draft

4   4   document that was reviewed by H.R. Meyer.  Yes.

5   5               Q    If you look in the notes --

6   6               A    It even says -- it's astonishing.  It

7   7   says "proprietary document" and --

8   8               Q    Did you have a conversation -- I think

9   9   you said earlier you had a conversation or meeting

10  10  about this document?

11  11              A    No.  I said that I heard Kathleen Meyer

12  12  and Helen Grogan discussing this document earlier this

13  13  week.

14  14              Q    And Kathleen Meyer is married to H.R.

15  15  Meyer; is that correct?

16  16              A    That's true, yes.

17  17              Q    The H.R. Meyer that's listed as having

18  18  reviewed this -- or a draft version of the Bronesky

19  19  '97 memo; correct?

20  20              A    Yes.

21  21              Q    Okay.  Did she shed any light on the

22  22  circumstances under which her husband reviewed this

23  23  document?

24  24              MS. PARK:  Objection.  Asked and

25  25  answered.

26
27                  CARPENTER REPORTING, INC.
                        (303) 752-1200

282

1    1              A    My understanding is that it's -- that

2    2    it's very unclear how this occurred.

3    3              Q    (BY MR. SORENSEN)  All right.  Now, I

4    4    want to show you P1082, which is dated August '99.

5    5    There's also a cite DX516.  I'm going to bring it over

6    6    to you, sir.

7    7              MR. POLAND:  David, which report is

8    8    that?

9    9              MR. SORENSEN:  Hold on a second.  Let me

10   10   just put it down.  It is Development of the Rocky Flats

11   11   903 Area Plutonium Source Term, Revision 1.  Got it?

12   12              MS. PARK:  Is this it?

13   13              MR. SORENSEN:  Revision 1, August '99.

14   14              A    That's it.

15   15              Q    (BY MR. SORENSEN)  Sir, just standing

16   16   over you for a moment, page 2-7, I'm pointing you.  You

17   17   see in the second paragraph under the heading of "The

18   18   Development of the 903 Barrel Storage Area," there's

19   19   again a reference to Bronesky 1977.  Do you see that,

20   20   sir?

21   21              A    Yeah.

22   22              Q    Do you see that?

23   23              A    Yes.

24   24              Q    Do you know why the reference to

25   25   Bronesky '77 continues in that 1999 document if that

283

1   1   is -- and I'll represent to you -- several years after

2   2   both RAC and Mr. Bronesky were notified that RAC had

3   3   obtained the document written by Bronesky?  Do you know

4   4   why it's still in there?

5   5        A    No.

6   6        Q    Okay.

7   7        A    Actually, I didn't even know about this

8   8   until very recently.

9   9        Q    Okay.

10  10        MS. PARK:  When you say "this," you mean

11  11   the Bronesky memo?

12  12        A    That's my recollection.  I don't recall

13  13   any historic discussions of that memo.

14  14        Q    (BY MR. SORENSEN)  But, again, going

15  15   back to P1067, in this one -- P1067 bears your name,

16  16   among others, as an author; correct?

17  17        A    That's correct.

18  18        Q    Okay.  So you would have read this

19  19   report before it was finalized; correct?

20  20        A    Yes.

21  21        Q    So you would have read its reference to

22  22   Bronesky '77; correct?

23  23        A    Yes.

24  24        Q    Okay.

25  25        A    In principle, at least.

26
27                CARPENTER REPORTING, INC.
                     (303) 752-1200

284

1   1          Q    Okay.

2   2          A    I don't know that I looked at every

3   3   reference that was on every page.

4   4          Q    Do you know what ALARA means?

5   5          A    Yes.

6   6          Q    All right.  Did you do any kind of ALARA

7   7   analysis in connection with this case?

8   8               MS. PARK:  Objection.  Form.

9   9          A    ALARA means as low as reasonably

10  10   achievable.

11  11          Q    (BY MR. SORENSEN)  Yes, it does.  Did

12  12   you do any kind of analysis to determine whether

13  13   Rockwell or Dow complied with ALARA in any way?

14  14               MS. PARK:  Objection.  Form.

15  15          A    No.

16  16          Q    (BY MR. SORENSEN)  Could you turn to

17  17   Exhibit 1067.  You still have it in front of you?

18  18          A    Right.

19  19          Q    Page 58, please.

20  20               MR. POLAND:  That's the source term

21  21   report?

22  22               MR. SORENSEN:  Yes.  The December '96.

23  23          A    Yes.

24  24          Q    (BY MR. SORENSEN)  Now, there's a -- a

25  25   figure there, Figure 22.  Do you see that?

26
27               CARPENTER REPORTING, INC.
                    (303) 752-1200

1   1              A    Uh-huh.

2   2                   MS. PARK:  I'm sorry.  I'm not on page

3   3    58 yet.

4   4              Q    (BY MR. SORENSEN)  Okay.

5   5                   MR. POLAND:  This is the 1996 version,

6   6    you said?

7   7                   THE DEPONENT:  Yeah.  It's the

8   8    characterization.

9   9                   MR. POLAND:  The characterization as

10  10   opposed to the source term.

11  11                  MS. PARK:  Okay.  I'm there.  Thank you.

12  12             Q    (BY MR. SORENSEN)  Okay.  Do you see

13  13   Figure 22, sir?

14  14             A    Yes.

15  15             Q    It states the air sampling method used

16  16   by Dow in the 1960s was not adequate to measure natural

17  17   or fallout long-lived alpha activity.  Therefore,

18  18   levels among the minimum detectable activity can be

19  19   attributed to Rocky Flats materials."  Do you see that?

20  20             A    Yes.

21  21             Q    I'm trying to understand what that means

22  22   in relation to this graph.  You have the third one

23  23   down, minimal detectable activity, alpha, the number is

24  24   5.5.  Do you see that?

25  25             A    Right.  And that's a bigger number than

286

1   1   natural alpha or fallout plutonium in 1966, which was a

2   2   very -- these are -- these are concentrations.  I don't

3   3   see the units.  Yeah.  Femtocuries per cubic meter.  So

4   4   fallout was .1 femtocuries; natural alpha activity was

5   5   1.4, and the minimal detectable activity was 5.5.

6   6           Q   And what does "minimal detectable

7   7   activity" mean in this context?

8   8           A   It means that that is the activity that

9   9   would have to be present in air for you to detect it

10  10   positively.

11  11           Q   Meaning Dow's instruments at the time?

12  12   Is that what you're saying?

13  13           A   Yes.  Pardon me.  For the measurement

14  14   technique, to detect it -- to detect that activity.

15  15           Q   Okay.

16  16           A   That concentration.  Excuse me.

17  17           Q   When you say the sixties, can you be

18  18   more specific?  Is it from 1960 to '69?  Can you give

19  19   me more of a specific range?

20  20           A   Well, the fallout number is identified

21  21   in 1966.  And I haven't read the text that's associated

22  22   with Figure 22, so let me look at that.

23  23           Q   Go ahead, because I would like to

24  24   understand what this means.  I think some of the text

25  25   on page 57, for example.

287

1    1              A    Yeah.  I'm just looking there and I was

2    2    trying to see the citation to the figure.  Okay.  Okay.

3    3    It just refers to the 1960s in general.

4    4              Q    So, as you sit here, can you be any more

5    5    specific?

6    6              A    No.

7    7              Q    Okay.  So going back to Figure 22, the

8    8    bottom bar, am I correct in reading that as annual

9    9    average alpha at S8 monitor in '69?

10   10             A    That's my understanding of it, yes.

11   11             Q    Okay.  So taking that bar with the text,

12   12   I take it means that all of that alpha activity above

13   13   5.5, at a minimum, is all attributable to Rocky Flats?

14   14   Is that what this means?

15   15                  MS. PARK:  Objection.  Form.

16   16             A    All of the activity above 5.5?

17   17             Q    (BY MR. SORENSEN)  Yes.

18   18             A    Well, if we consider that the total

19   19   alpha measured consisted of -- of plutonium coming from

20   20   the pad area as well as natural and fallout -- natural

21   21   alpha activity and fallout plutonium activity, then

22   22   the -- the 185 is attributable to the -- to the 903

23   23   area except for the 1-1/2 in those first two

24   24   categories.

25   25             Q    I --

288

1    1            A    So it doesn't -- the background doesn't

2    2    change the measurement very much in that particular --

3    3    in 1969.

4    4            Q    I see.  Go ahead.

5    5                 MS. PARK:  Do you have more?

6    6            Q    (BY MR. SORENSEN)  Okay.  So since you

7    7    give a figure of fallout plutonium in this Figure 22 of

8    8    .1 and natural alpha of 1.4, to figure out how much of

9    9    the annual average alpha at the S8 monitor in '69 which

10   10   is listed as 185 -- to figure out how much of that 185

11   11   is attributable to Rocky Flats plutonium, you subtract

12   12   1.4 plus .1, which adds up to 1.5 from 185; correct?

13   13           A    That's a good approximation.

14   14           Q    Okay.

15   15           A    Yes.  The fallout plutonium wouldn't --

16   16   in 1969 wouldn't have been higher than it was in 1966,

17   17   I don't believe --

18   18           Q    Okay.

19   19           A    -- because it was declining by then.

20   20           Q    Okay.  And this natural alpha that's

21   21   depicted in Figure 22, where is that coming from?

22   22           A    That's coming from radionuclides that

23   23   are produced by the decay of radon, and radon is a gas

24   24   that's produced by the decay of radium 226, which is

25   25   produced ultimately by the decay of -- of uranium 238

289

1  1    and 234.  So there's a whole chain of natural

2  2    radioactivity radionuclides starting with the uranium

3  3    radionuclides, one of which is -- well, there are two

4  4    uranium nuclides.  Then there is also radium 226 which

5  5    decays into radon.  And the radon can diffuse out of

6  6    the ground and then it decays to other alpha-emitting

7  7    radionuclides.

8  8              Q     Like what?

9  9              A     Like --

10  10             Q     Polonium?

11  11             A     -- polonium 210.  There's a whole chain.

12  12   Most of them are short-lived.

13  13             Q     Where does thorium show up in that?

14  14   Thorium?

15  15             A     Thorium is -- thorium 230 is in the

16  16   uranium decay scheme, but natural thorium is thorium

17  17   232 and that's a different chain and it produces a

18  18   radon -- it produces a radon isotope that's much

19  19   shorter lived.  Sometimes it's called thoron because it

20  20   comes from the thorium chain and it has a much shorter

21  21   half-life.  So the amount of that that diffuses out of

22  22   the ground is -- is less than -- you know, much less

23  23   than the amount of radon 222 that diffuses out of the

24  24   ground and produces these -- these alpha-emitting

25  25   radionuclides.

290

1    1              Q    So the natural alpha number of 1.4 takes

2    2    into account all these various naturally alpha-emitting

3    3    radionuclides you've just been listing; is that

4    4    correct?

5    5              A    Right.

6    6              Q    Okay.  Now, ChemRisk made estimates of

7    7    source term releases for routine releases, the 903 pad,

8    8    '57, and the '69 fires; correct?  Of plutonium, at

9    9    least; correct?

10   10              MS. PARK:  Could you repeat that?

11   11              Q    (BY MR. SORENSEN)  I'll start again.

12   12    Isn't it correct that ChemRisk -- before RAC, that

13   13    ChemRisk made its own estimates of the amount of

14   14    plutonium released from Rocky Flats due to the routine

15   15    releases, the '57 fire, '69 fire, and the 903 pad;

16   16    isn't that correct?

17   17              A    I don't recall -- I don't recall their

18   18    specific -- their specific number for the 1969 fire,

19   19    but I would agree that -- that the routine releases,

20   20    the '57 fire and the 903 area were all estimated by

21   21    ChemRisk, as well.

22   22              Q    And isn't it correct that for each of

23   23    those source terms, RAC's estimates were higher than

24   24    ChemRisk's?  Isn't that correct?

25   25              MS. PARK:  Objection.  Form.

26
27              CARPENTER REPORTING, INC.
                    (303) 752-1200

291

1   1              A    No.  That isn't correct, actually.  For

2   2    the -- for the -- for the routine releases, our -- our

3   3    estimate was about three times higher than theirs.

4   4    We've already talked about the '57 fire.  And actually,

5   5    they -- now that I'm saying this, I'm remembering that

6   6    they did have a release estimate for the '69 fire.  And

7   7    I think, in that case, our release estimates, the

8   8    uncertainty bounds overlapped, as I recall, for the '69

9   9    fire.

10  10             Q    (BY MR. SORENSEN)  The top end of RAC's

11  11    uncertainty bound was higher than the top end of

12  12    ChemRisk's?

13  13             A    Right.

14  14             Q    Okay.

15  15             A    But what you look for is the overlap

16  16    when you come at this from different ways.

17  17             Q    Okay.  How about for the 903 area?

18  18             A    I don't have a firm recollection of the

19  19    numbers, but maybe the answer is -- it wouldn't be

20  20    here.  I don't recall the relative numbers for the 903.

21  21             Q    Looking again at P1067, could you please

22  22    turn to page 16.

23  23             A    16?

24  24             Q    Yes.

25  25             A    Okay.

26                      CARPENTER REPORTING, INC.
27                        (303) 752-1200

292

1  1          Q      Under the heading Leveling of the 903

2  2   Area, second full sentence -- third, actually, states,

3  3   "Mr. Mel DeLorenzo, interviewed by RAC in the summer of

4  4   1994, described dust rolling from under the grader's

5  5   tires and being carried by the breeze to the southeast,

6  6   visible as far as a half mile past the perimeter

7  7   security fence.  Do you see that?

8  8          A      Yes.

9  9          Q      When it says "the perimeter security

10  10  fence," is that the border of Rocky Flats at that time?

11  11  Is that what that means; do you know?

12  12         A      Perimeter security fence.  No.  I don't

13  13  believe it was the border of Rocky Flats at that time.

14  14  My recollection is that the border of Rocky Flats at

15  15  that time went clear down to Highway 93 and the

16  16  perimeter -- perimeter's security fence is -- is a

17  17  much -- defines a much smaller area.  If we had a --

18  18  there's several reports that show -- you know, show the

19  19  map.

20  20         Q     Okay.

21  21         A      And I think that's the fence around the

22  22  facility -- the buildings themselves; not -- not the

23  23  additional property to the south that was obtained

24  24  after the '69 fire.

25  25         Q      Okay.  Do you know how far from the

293

1   boundary of Rocky Flats a half mile past the security

2   fence is?  In other words, how far is it from half mile

3   past the security fence -- the reference we just looked

4   at -- to the actual border of Rocky Flats; do you know?

5       A    Not off the top of my head, no.

6       Q    Have you done any study of whether

7   large -- start again.

8            Have you done any study of whether

9   plutonium particles of 15 microns and larger or

10   plutonium particles attached to other particles --

11   start again.  I'm sorry.

12            Have you done any study of whether

13   plutonium particles 15 microns and larger can or cannot

14   break up into smaller particles once dispersed into the

15   atmosphere?  Have you done any study of that question?

16            MS. PARK:  Objection.  Form.

17       A    I can recall looking at particle sizes

18   of plutonium in the environment that were measured by

19   alpha track techniques, and I think, at some point, I

20   prepared -- I prepared a memo about the results of

21   those measurements or a letter.  Maybe it was a letter

22   to Gale Biggs because he had raised a question about --

23   about large -- large plutonium particles and -- and

24   also, small plutonium particles, as I recall, so I

25   looked into the measurement data that were available

294

1    1    from plant studies and other studies and I -- I -- I

2    2    wrote a letter to him about that information.

3    3              Q    (BY MR. SORENSEN)   Okay.

4    4              A    I think that's referenced in that --

5    5    the -- the document that we looked at earlier dealing

6    6    with RAC responses to public questions.   That's not the

7    7    exact title, but I believe it's referenced in there.

8    8              Q    And you believe you wrote something

9    9    dealing with this issue of larger particles breaking up

10   10   into smaller ones?

11   11             A    No.   The memo was about measurements of

12   12   particle sizes observed around Rocky Flats.

13   13             Q    I see.

14   14             A    So it -- it relates to the large -- the

15   15   possibility of larger particles breaking up into small

16   16   ones, but not the process of larger particles breaking

17   17   up into smaller ones.

18   18             Q    Have you done any study yourself of what

19   19   percentage, if any, of plutonium particles 15 microns

20   20   and larger released into the atmosphere break up into

21   21   smaller particles while in the atmosphere?   Have you

22   22   done any study of that question?

23   23             A    Break up while in the atmosphere?

24   24             Q    Right.   Before a person can breathe

25   25   them.

295

1   1                  MS. PARK:  Objection.  Form.

2   2                  Q   (BY MR. SORENSEN)  You know, while

3   3   they're traveling.

4   4                  MS. PARK:  Objection.  Form.

5   5                  A   Right.

6   6                  MR. SORENSEN:  To my hand?

7   7                  MS. PARK:  I was going to say objection

8   8   to the way your fingers are twinkling across the sky,

9   9   too.

10  10                  A   I recall that we heard about an idea and

11  11   maybe it was from -- maybe it was from Gale Biggs

12  12   again.  I'm not positive of that.  But there was some

13  13   thought that -- that very -- that a few atoms of

14  14   plutonium might be coming off the particles or

15  15   something like that as a result of -- of -- of

16  16   radioactive decay of the plutonium.

17  17                  It seemed -- it seemed to me at the

18  18   time, as I recall it, that the -- that the probability

19  19   of -- of an alpha decay was during the time the

20  20   particle left the stack or the vent and the time it got

21  21   to, you know, downtown or something.  The probability

22  22   of plutonium decay in that time was -- was relatively

23  23   small, but I can't say for sure that I actually

24  24   calculated what that probability was.

25  25                  I frankly, sitting here, can't tell you

26
27                  CARPENTER REPORTING, INC.
                     (303) 752-1200

296

1   1   for sure that I did.

2   2          Q   (BY MR. SORENSEN)  Okay.  Do you adhere

3   3   to, in your professional work, the linear -- no

4   4   threshold linear dose response?

5   5          A   Linear no threshold hypothesis?  Is that

6   6   what you're trying to say?

7   7          Q   Yes.  Better said.  Do you support

8   8   and -- and follow that in your work?

9   9          A   Well, I -- I wouldn't say it's a

10   10   question of supporting it.  It's an assumption that's

11   11   commonly made for public health protection reasons when

12   12   doing calculations of potential doses to people exposed

13   13   to radioactivity.

14   14          Q   And in your professional opinion, do you

15   15   believe there's any safe dose of radiation --

16   16              MS. PARK:  Objection.  Form.

17   17          Q   (BY MR. SORENSEN)  -- to human beings?

18   18              MS. PARK:  Objection.  Form.

19   19          A   That has to do with this hypothesis.

20   20   And as I said, it's commonly assumed that the -- that

21   21   the risk is proportional to the dose, even to very

22   22   small dose levels.

23   23          Q   (BY MR. SORENSEN)  Is that what you

24   24   think?

25   25          A   It's a -- it's a hypothesis that I use

297

1   1   routinely, but I also know that it's -- that it's --

2   2   that there are alternative hypotheses about this whole

3   3   process.  And I don't -- I don't have a favorite.  I

4   4   use the -- typically would use the linear.  In our risk

5   5   report, we used the linear no -- I mean, the report on

6   6   plutonium risk --

7   7           Q   Uh-huh.

8   8           A   -- that I did with Helen Grogan and

9   9   Warren Sinclair, we used the linear no threshold

10  10  hypothesis in calculating our risk coefficients.

11  11          Q   So have you ever used or supported the

12  12  notion that there is some safe level of radiation

13  13  exposure to human beings?

14  14              MS. PARK:  Objection.  Form.

15  15          A   I, frankly, don't go around advocating

16  16  which of these hypotheses about low-level radiation

17  17  exposure is correct.  I certainly am aware of other

18  18  hypotheses and I have looked at data upon which some of

19  19  these conclusions are based and analyzed the data upon

20  20  which they're based.

21  21          Q   (BY MR. SORENSEN)  Well, as a

22  22  professional health physicist, is it your opinion that

23  23  there is some safe level of radiation exposure?

24  24              MS. PARK:  Objection to form.

25  25          A   Would you like to say what you mean by

26          CARPENTER REPORTING, INC.
27              (303) 752-1200

298

1   1   "safe level"?

2   2           Q   (BY MR. SORENSEN)  Zero risk.  Zero

3   3   risk.

4   4           A   Observable or theoretical?

5   5           Q   Does the word "safe" have any meaning to

6   6   you?

7   7           A   Yes.

8   8               MS. PARK:  Objection.  Form.

9   9           Q   (BY MR. SORENSEN)  Okay.

10  10              MS. PARK:  And at this late stage of the

11  11  deposition, I think that's harassing the witness.

12  12          Q   (BY MR. SORENSEN)  Do you have children?

13  13          A   Yes.

14  14          Q   All right.  If one of your children

15  15  asked you about a radiation exposure, What's safe, Dad,

16  16  what would you tell them?

17  17              MS. PARK:  Objection.  Improper

18  18  question.

19  19          Q   (BY MR. SORENSEN)  Go ahead.

20  20          A   I would -- it would depend on what

21  21  radiation exposure they were talking about.  For

22  22  example, if they said is it safe -- if my daughter

23  23  asked me is it safe for me to move from California to

24  24  Colorado because of the background radiation and

25  25  exposure in Colorado is -- is two or three times higher

26          CARPENTER REPORTING, INC.
27              (303) 752-1200

299

1    1    than it is in California where I live now, would that

2    2    be an okay thing for me to do?

3    3              Q    I'll be more specific.  If she came home

4    4    to you --

5    5              MS. PARK:  Are you done with your

6    6    answer?

7    7              A    No.

8    8              Q    (BY MR. SORENSEN)  Go ahead.

9    9              MS. PARK:  Please continue.

10   10             A    If she asked me that question, I

11   11   would -- I would tell her that I doubt that the

12   12   radiation exposure difference between background in

13   13   California and background in Denver was going to be a

14   14   serious problem for her health --

15   15             Q    (BY MR. SORENSEN)  Okay.

16   16             A    -- or her children's health.

17   17             Q    If she went on a field trip to a nuclear

18   18   facility, came home, and told you that the teachers

19   19   told them that they had all been exposed to some

20   20   plutonium in the air, would you tell her, Oh, as long

21   21   as it's below X, that's fine, it's safe, and would you

22   22   then supply her a number?

23   23             MS. PARK:  I'm going to object to the

24   24   form of the question, which is incredibly ambiguous and

25   25   filled with all sorts of unknowns in this hypothetical.

26
27                   CARPENTER REPORTING, INC.
                        (303) 752-1200

300

1   1   I'm also going to object that it's an improper

2   2   question.  You're bringing in the man's daughter as a

3   3   subject of your questioning.  It's improper.

4   4             MR. SORENSEN:  No, it isn't.

5   5             Q   (BY MR. SORENSEN)  But go ahead.

6   6             MS. PARK:  He's also a fact witness, so

7   7   I object to the hypotheticals.  If you understand the

8   8   hypothetical and you can answer it, that's fine, but if

9   9   you don't understand the hypothetical or you feel you

10  10  need more information, then you can simply let

11  11  Mr. Sorensen know that.

12  12            A   If I understood your question, it was

13  13  that if -- if, for example, this child, whoever it is,

14  14  whether it's my granddaughter or whoever -- went to --

15  15  went to whatever Rocky Flats is called now, this --

16  16            Q   (BY MR. SORENSEN)  It doesn't have to be

17  17  Rocky Flats.

18  18            A   Okay.  We were talking about plutonium

19  19  exposure.  Okay.

20  20            Q   There are other places where plutonium

21  21  is?

22  22            A   Yes.  There's plutonium at a great many

23  23  places.  All over the world from fallout.

24  24            Q   I'm not talking about fallout.  I'm

25  25  talking about nuclear facilities that have above

301

1   1   fallout levels.

2   2            A    Okay.  Plutonium is plutonium.  So,

3   3   anyway, this person goes out and -- and this child goes

4   4   out and plays in the dirt and her mother or her teacher

5   5   sees her playing in the dirt and the mother or teacher

6   6   knows about fallout plutonium.

7   7            Q    No.  You see, I'm going to stop you

8   8   because you completely changed my question.

9   9            MS. PARK:  Not at all.  He's trying to

10  10   answer your question.

11  11            A    Your question was --

12  12            MS. PARK:  Let me ask the court reporter

13  13   how much time we have left in this deposition because,

14  14   in my calculation, we don't have any more time left in

15  15   terms of your questioning.  What's the time?

16  16            THE COURT REPORTER:  Two more minutes.

17  17            MR. SORENSEN:  I just -- whatever time

18  18   it takes, I want --

19  19            MS. PARK:  Two more minutes.

20  20            MR. SORENSEN:  I want an answer to this

21  21   question.

22  22            MS. PARK:  It's an improper question.

23  23            Q    (BY MR. SORENSEN)  Is there some

24  24   level -- I'm not talking about dirt.  Your daughter or

25  25   someone that you care about, a child goes to a nuclear

302

1   1   facility -- it doesn't have to be Rocky Flats -- is

2   2   told they were exposed to plutonium in air above

3   3   fallout levels.  Okay?  Is there some concentration in

4   4   air or -- or some other numerical expression you want

5   5   to offer me where you would say to this child, That's

6   6   fine, that's safe?

7   7              MS. PARK:  Objection.

8   8        Q    (BY MR. SORENSEN)  Is there any such

9   9   number you can tell me?

10  10             MS. PARK:  Objection.  Form.

11  11   Hypothetical.

12  12        A    Pardon me.  What I would do is -- would

13  13   be to attempt to ascertain the -- the concentration of

14  14   plutonium in the air that the person was exposed to and

15  15   then do an estimate of what their radiation dose was.

16  16   And then I could use our plutonium risk coefficients to

17  17   make an estimate of -- of the risk to that person and I

18  18   would tell them what -- what I thought the risk was.

19  19        Q    (BY MR. SORENSEN)  Would you use the

20  20   word "safe"?

21  21             MS. PARK:  Objection.  Form.

22  22        A    No.

23  23             MR. SORENSEN:  No.  Okay.

24  24             MS. PARK:  I have some questions for the

25  25   witness.  You kindly left me no time, despite my

26
27                  CARPENTER REPORTING, INC.
                         (303) 752-1200

303

1   1   repeated request.

2   2              MR. SORENSEN:  Wait a second.  I'm going

3   3   to say on the record this is your witness.  Our --

4   4              MS. PARK:  I have --

5   5              MR. SORENSEN:  This is your witness.

6   6   This is our deposition of your witness.  As far as I'm

7   7   concerned, you're not entitled to any time to depose

8   8   your own witness because you're going to put him on the

9   9   stand.  I've taken the time that's allotted to me, and

10  10  it's, in my view, completely proper.

11  11             MS. PARK:  Well, I have some additional

12  12  questions for the witness, so I'd like to take maybe a

13  13  two- or three-minute break to get my notes together.

14  14             MR. SORENSEN:  I object to you asking

15  15  any questions of a witness that you're going to call to

16  16  the stand at a deposition.

17  17             MS. PARK:  Come on.  We're going on a

18  18  break.

19  19             MR. SORENSEN:  You say, "Come on."  I

20  20  object.  This is your witness.  You're going to put him

21  21  on the stand.  I object to you asking him any questions

22  22  at a deposition I have noticed.

23  23             MS. PARK:  I understand.  Your objection

24  24  is on the record.

25  25             (There was a recess taken from 4:09 p.m.

26                 CARPENTER REPORTING, INC.
27                     (303) 752-1200

304

1    to 4:14 p.m.)

2                    MR. SORENSEN:  I -- besides objecting to

3    defense counsel asking any questions of their witness,

4    I may and will likely have some questions based on

5    whatever questions they ask.  And I reserve that right.

6                    MS. PARK:  And I'm going to object to

7    that, David, because you took seven full hours to ask

8    all the questions that you needed and you ended up by

9    asking questions about his grandchildren and his

10   daughter, so I think if you had no more appropriate

11   questions than that, you should have ended it earlier.

12                   Both our objections are noted for the

13   record.  Let's move on since we're back on the record.

14                           EXAMINATION

15   BY MS. PARK:

16        Q    Mr. Voilleque, I have some questions for

17   you.  You testified earlier in response to questioning

18   by Mr. Sorensen when he went through a number of

19   reports and asked you questions about your expertise

20   and whether you drew on areas of your expertise --

21   which was his word -- to author or contribute to

22   various RAC reports.  Do you remember that whole line

23   of questioning?

24        A    Yes.

25        Q    Okay.  In each of the reports that he

305

1    1    went through with you, those reports also set forth

2    2    what you actually did as a historical matter in

3    3    conducting RAC's investigation as part of the

4    4    historical public exposure studies; correct?

5    5              MR. SORENSEN:  Objection.  Leading.

6    6         Q    (BY MS. PARK)  Correct?  Do you need me

7    7    to repeat my question?  Why don't I do that?

8    8         A    Well --

9    9         Q    Okay.

10   10         A    Go ahead.  I was -- I don't know what

11   11    the rules are at this point in the game.

12   12         Q    Okay.

13   13         A    If he objects, I don't know whether I'm

14   14    supposed to answer.

15   15              MR. SORENSEN:  No.  You can answer.

16   16         Q    (BY MS. PARK)  The rules --

17   17         A    I need to be polite and give him time to

18   18    object.  I understand that.

19   19              MR. SORENSEN:  I appreciate it.

20   20         A    The rest of it, I don't know.

21   21         Q    (BY MS. PARK)  The rules are basically

22   22    the same.  I ask you questions, he'll put his objection

23   23    on the record and you still have an obligation to

24   24    respond to the question.

25   25         A    All right.

26
27                   CARPENTER REPORTING, INC.
                        (303) 752-1200

1    1            Q    Okay.  So, going back, you went through

2    2    a number of reports with Mr. Sorensen -- RAC reports --

3    3    in which he asked you questions about your, quote,

4    4    unquote, expertise -- those are words that he used --

5    5    and whether or not you had drawn on areas of your

6    6    expertise -- his words -- to author or contribute to

7    7    these various RAC reports.  You remember that line of

8    8    testimony; right?

9    9            MR. SORENSEN:  Object to that question,

10   10   too, as misleading, misstating the record.  Go ahead.

11   11            MS. PARK:  David, can you please wait

12   12   until I finish my question before you interpose your

13   13   objection?  I'd appreciate it.

14   14            MR. SORENSEN:  Sure.

15   15            Q   (BY MS. PARK)  In those reports that you

16   16   reviewed with Mr. Sorensen, they also set forth what

17   17   you did as a historical matter in conducting RAC's

18   18   investigation as part of the historical public exposure

19   19   studies; right?

20   20            MR. SORENSEN:  Objection.  Leading.

21   21            A   The reports reflect what -- what we did.

22   22   Not just I did.  What we did in Phase II of -- of

23   23   the -- of the Rocky Flats health studies project.

24   24            Q   (BY MS. PARK)  And that includes what

25   25   you personally did, as well; correct?

307

1   1                   MR. SORENSEN:  Objection.  Leading.

2   2              A    Yes.

3   3              Q    (BY MS. PARK)  Okay.  And you have

4   4   personal knowledge, obviously, of the efforts that you

5   5   undertook to investigate certain issues in connection

6   6   with the historical public exposure studies; right?

7   7                   MR. SORENSEN:  Objection.  Leading.

8   8              A    Yes.

9   9                   MR. SORENSEN:  This is your witness.

10  10  You're not allowed to lead your witness.

11  11                  MS. PARK:  Your objection is noted for

12  12  the record.

13  13             A    Yes.  I know what I did.

14  14             Q    (BY MS. PARK)  Okay.  And these reports

15  15  set forth the steps that you undertook to evaluate

16  16  certain issues, such as the source terms for the

17  17  various release events that you were involved in;

18  18  right?

19  19                  MR. SORENSEN:  Objection.  Leading.

20  20             A    Yes.

21  21             Q    (BY MS. PARK)  Okay.  And these reports

22  22  also set forth the documents and the categories of

23  23  documents that you reviewed at the time as part of your

24  24  historical investigation into this Phase II project;

25  25  correct?

26              CARPENTER REPORTING, INC.
27                  (303) 752-1200

1   1            MR. SORENSEN:  Objection.  Leading.

2   2      A    Yes.

3   3      Q    (BY MS. PARK)  Okay.  And the various

4   4   RAC reports that you reviewed also reflect your

5   5   investigation of the historical events surrounding your

6   6   work in connection with the Phase II project; right?

7   7            MR. SORENSEN:  Objection.  Leading.

8   8      A    I wouldn't characterize it as the

9   9   historical events surrounding our work.  The historical

10  10   events are events that we analyzed in the course of our

11  11   work, if that's what you mean.

12  12       Q    (BY MS. PARK)  That is what I mean.  In

13  13   the sense that you went back and you looked at, for

14  14   example, the Rogers and Zodtner report to look at the

15  15   events at that point in time; correct?

16  16           MR. SORENSEN:  Objection.  Leading.

17  17      A    Okay.  I'm beginning to get a little bit

18  18   confused here.  I thought you were talking about

19  19   historical events.  And now your example is a

20  20   historical report.

21  21       Q    (BY MS. PARK)  And in that historical

22  22   report, it investigated a particular historical event,

23  23   the 1957 fire; right?

24  24           MR. SORENSEN:  Objection.  Leading.

25  25      A    I understand what you're saying now.

309

1    1      Yes.

2    2                  Q    (BY MS. PARK)  Okay.  And now that you

3    3      understand what I'm -- what I'm asking, in that sense,

4    4      did your work, which involved you going back and

5    5      looking at logbooks and other reports such as the '57

6    6      fire report and the Zodtner report, did your work

7    7      involve examining the historical events that took place

8    8      at Rocky Flats?

9    9                  MR. SORENSEN:  Objection.  Leading.

10   10             A    Yes.  That was the purpose of our work

11   11      was to examine historical events at Rocky Flats.

12   12                  Q    (BY MS. PARK)  Was part of the purpose

13   13      of your work to investigate the historical facts that

14   14      were associated at Rocky Flats?

15   15                  MR. SORENSEN:  Objection.  Form.  Vague.

16   16             A    As -- as part of our work, we always

17   17      look at documents that are contemporaneous to the

18   18      situations that we're trying to analyze.

19   19                  Q    (BY MS. PARK)  So you have personal

20   20      knowledge of your review of the historical documents

21   21      that you reviewed as part of this Phase II study;

22   22      correct?

23   23                  MR. SORENSEN:  Objection.  Leading.

24   24             A    Yes.

25   25                  Q    (BY MS. PARK)  Okay.  And you also have

26
27                       CARPENTER REPORTING, INC.
                            (303) 752-1200

310

1  1   personal knowledge of the procedures that you and RAC

2  2   followed to review various documents as part of your

3  3   effort to review as much of the source material as

4  4   possible; right?

5  5                    MR. SORENSEN:  Objection.  Leading.

6  6            A    I'm not quite sure what you mean by

7  7   "procedures," but we did do a thorough document review.

8  8            Q    (BY MS. PARK)  And you have knowledge

9  9   about --

10  10           A    And I know about that, yes.

11  11           Q    Okay.  And none of the reports that you

12  12   reviewed this morning with Mr. Sorensen and, indeed,

13  13   throughout the day were reports that you prepared as a

14  14   part of this litigation, Cook v. Rockwell; correct?

15  15           A    That's correct.

16  16           Q    In fact, all of the reports that you

17  17   reviewed with Mr. Sorensen today are reports that were

18  18   prepared in advance of any time that you knew about any

19  19   potential involvement you may have with this

20  20   litigation; correct?

21  21                    MR. SORENSEN:  Objection.  Assumes facts

22  22   not in evidence.  Foundation.  And leading.

23  23           A    I believe what you said is correct.

24  24           Q    (BY MS. PARK)  Okay.  So --

25  25           A    And I might add, I suppose, that it's

1   1   clear from -- from some of the -- from the HAP

2   2   transcript that he showed me that if I had known I was

3   3   going to be involved in this litigation, I would never

4   4   have made some of the statements that I made.

5   5          Q    Well, what statement in particular are

6   6   you thinking of?

7   7          A    I can't quote a particular one at this

8   8   point, but it's clear that there were some -- there

9   9   were some statements that were more categorical than

10  10  they should have been.

11  11         Q    And are they statements that we reviewed

12  12  today?

13  13         A    Yes.  Well, I can think of it now.

14  14  The -- the statement that all 6 kilograms of the --

15  15  that I knew that -- that I believed that all of the --

16  16  of the 6 kilograms of material unaccounted for was in

17  17  the ground in Idaho.  It's -- it's clear, as I listened

18  18  to him question me about that, that, in fact, that

19  19  was -- that was an overstatement, or a poorly expressed

20  20  opinion.

21  21         Q    In what way was it an overstatement?

22  22         A    The -- the -- there's no explicit

23  23  connection between, as I think came out before --

24  24  there's no explicit connection between the material

25  25  unaccounted for that is presently in Idaho and any

312

1  1   particular component of material unaccounted for from

2  2   any particular year -- well, or for any particular set

3  3   of waste drums that left Rocky Flats in 1957.

4  4          Q    But, as a general matter, is it your

5  5   understanding that the amount of -- that material

6  6   unaccounted for has uncertainty within it because some

7  7   of that MUF is material that may be in Idaho as a

8  8   general matter?

9  9          MR. SORENSEN:  Objection.  Leading.

10 10         A    Well, it's the conclusion of the Zodtner

11 11  and Rogers report that underestimated quantities of

12 12  solid waste shipped off-site is a significant

13 13  contributor to the material unaccounted for and the --

14 14  the data of the reevaluation in 1994 of the amounts of

15 15  plutonium in the -- in the -- I think all that time

16 16  period considered there was buried waste -- that the

17 17  plutonium in buried waste was underestimated.

18 18         Q    (BY MS. PARK)  Are there any other

19 19  overstatements that you can think about?

20 20         MR. SORENSEN:  Objection.  Vague.

21 21         A    I don't recall that -- that's one

22 22  example from a -- from an off-the-cuff discussion at a

23 23  meeting that, had I known I was going to be in this

24 24  situation, I would not have made.

25 25         Q    (BY MS. PARK)  Turning to the issue of

26     CARPENTER REPORTING, INC.
27          (303) 752-1200

313

1    1    the calculation of doses, you helped to calculate the

2    2    dose conversion factors; correct?

3    3              A    That's correct.

4    4              MR. SORENSEN:  Objection.  Leading.

5    5              A    Excuse me.

6    6              MR. SORENSEN:  Go ahead.

7    7              Q    (BY MS. PARK)  Your answer was "that's

8    8    correct"; right?  I missed your answer over his

9    9    objection, which was -- which interrupted you.  Why

10   10   don't I ask the question again?

11   11              MR. SORENSEN:  I didn't interrupt him.

12   12   I need --

13   13              A    I interrupted him.

14   14              MR. SORENSEN:  Exactly.

15   15              A    But I would like to hear your question

16   16   again.

17   17              Q    (BY MS. PARK)  That's fine.  You helped

18   18   to calculate the dose conversion factors; right?

19   19              MR. SORENSEN:  Same objection.  Go

20   20   ahead.

21   21              A    Yes.  I did.

22   22              Q    (BY MS. PARK)  And --

23   23              A    Dose and -- I assume you mean dose and

24   24   risk conversion factors?

25   25              Q    Yes.

26
27                   CARPENTER REPORTING, INC.
                        (303) 752-1200

314

1   1          A    Yes.

2   2               Q    And those dose conversion -- dose

3   3    conversion factors were used to calculate -- were used

4   4    to convert air concentrations to dose; correct?

5   5               MR. SORENSEN:  Objection.  Leading.

6   6          A    To dose.  Some were used to convert air

7   7    concentrations to dose and to risk.  We're talking

8   8    about two different sets of coefficients.

9   9               Q    (BY MS. PARK)  Okay.  So those dose and

10  10   risk conversion factors were used to convert air

11  11   concentrations to dose and risks; correct?

12  12          A    That's correct.

13  13               MR. SORENSEN:  Objection.  Leading.

14  14   Just give me a moment in between.

15  15               THE DEPONENT:  I'm sorry.

16  16               MR. SORENSEN:  If you could just think

17  17   to pause.  Thank you.

18  18          A    Excuse me.

19  19               Q    (BY MS. PARK)  To the extent that RAC

20  20   used air concentrations to convert to dose and used

21  21   your dose conversion factors in that process, isn't it

22  22   correct that you did help to calculate dose because you

23  23   were part of that effort?

24  24               MR. SORENSEN:  Objection.  Leading.

25  25          A    So as I understand your question, it's

26               CARPENTER REPORTING, INC.
27                    (303) 752-1200

315

1    1    because -- because I helped to develop the -- the dose

2    2    and risk coefficients and their uncertainties in our --

3    3    in our plutonium risk report and those -- the dose

4    4    coefficients were used to calculate a set of doses, I

5    5    assume this refers to the 12,000 doses that were talked

6    6    about before?  Is that what we're talking about?

7    7            Q    (BY MS. PARK)  Yes.

8    8            A    And then you're -- so your question

9    9    is --

10   10           Q    Given your --

11   11           A    Given my involvement, doesn't that mean

12   12   that I was also involved in the -- yes.  I see what you

13   13   mean.

14   14           Q    And is the answer yes?

15   15           A    Yes.

16   16           Q    Now, if we can turn to PX1068.  Would

17   17   you mind grabbing that?  If you could turn to page 52

18   18   of -- of PX1068.  Table 6.1.  Now, during your

19   19   examination by Mr. Sorensen, he went through a number

20   20   of these years in categories with you.  Do you recall

21   21   that in Table 6.1?

22   22           A    Yes.

23   23           Q    Okay.  If you look, he never talked to

24   24   you about the year 1978, so let's focus on that.  If

25   25   you look at the year 1978, it reflects, in terms of the

316

1   1   source of release estimate, plaintiffs' pretrial

2   2   statement.  Do you see that?

3   3            A    Yes.

4   4            Q    And you see that that pretrial statement

5   5   is actually the pretrial statement in the Church

6   6   lawsuit?

7   7            A    Yes.

8   8            Q    Okay.  And isn't it correct that, as of

9   9   1978, the comment that was being made publicly is that

10  10  the release estimate was, quote, a large amount, end

11  11  quote?

12  12            MR. SORENSEN:  Objection.  Foundation.

13  13  He's not testified he has any knowledge of whether

14  14  anything that was said in Church was public.

15  15            Q    (BY MS. PARK)  Isn't that correct as

16  16  you've written in your report on page 52?

17  17            MR. SORENSEN:  And leading and misstates

18  18  his testimony.  But go ahead.

19  19            A    Well, I -- the -- the -- as far as I'm

20  20  aware, the pretrial statement was, in fact, available.

21  21  I -- I have a copy of that document.  And -- and their

22  22  release amount based on the words "large amount" must

23  23  be in that document.  Otherwise, I don't believe they

24  24  would be there in -- in parentheses or in quotation

25  25  marks.

26
27

1   1          Q   (BY MS. PARK)  And that release amount,

2   2   large amount, was based on their estimates of 10 to

3   3   250 kilograms of plutonium on plenum filters; correct?

4   4          MR. SORENSEN:  Objection.  Leading.

5   5   Foundation.

6   6          A   That was part of -- that was part of it,

7   7   yes.

8   8          Q   (BY MS. PARK)  Now, going back to this

9   9   notion of what it is you're going to testify about or

10   10   not testify about at trial, if you're permitted to

11   11   testify at trial, it's never been your understanding

12   12   that you're going to testify at trial as an expert

13   13   witness; right?

14   14          MR. SORENSEN:  Objection.  Leading.

15   15          A   That's correct.

16   16          Q   (BY MS. PARK)  In fact, it's been your

17   17   understanding that you're going to go up and testify as

18   18   a fact witness; correct?

19   19          MR. SORENSEN:  Objection.  Leading.

20   20          A   Well, I don't -- I don't know that I

21   21   know the legal definitions of these terms accurately,

22   22   but it's my expectation that I will be asked to testify

23   23   about if I'm -- if I -- if I am going to testify, it

24   24   will be about my work and RAC's work during the course

25   25   of the dose reconstruction.

318

1   1                    MS. PARK:  David, you said you had some

2   2    additional questions for Mr. Voilleque.  I'm going to

3   3    object to that since you're out of time.

4   4                    MR. SORENSEN:  I just have a few

5   5    questions.

6   6                    MS. PARK:  I'll let you go ahead and ask

7   7    two.  You said you had a few questions.

8   8                    MR. SORENSEN:  "A few" is not two.

9   9                        RE-EXAMINATION

10  10   BY MR. SORENSEN:

11  11           Q    Sir, you were asked by defense counsel

12  12   about the HAP meeting transcript that I asked you about

13  13   of June 6th, 1995.  Do you recall that?

14  14           A    Yes.

15  15           Q    All right.  You state on page 96 there's

16  16   this exchange:

17  17                "Mr. Moore:  Or admit that there are

18  18   just great, great gaps in knowledge.

19  19                "Mr. Voilleque:  I think that's very

20  20   definitely the case."

21  21           A    Mr. Who said that?

22  22           Q    Mr. Voilleque.

23  23           A    The previous one.

24  24           Q    Mr. Moore.

25  25           A    LeRoy Moore.  Yes.

26                        CARPENTER REPORTING, INC.
27                            (303) 752-1200

1    1              Q    My question is to you, sir:  Is that

2    2    just another one of your off-the-cuff comments that you

3    3    wouldn't have made had you known you weren't going to

4    4    testify in this case?

5    5              MS. PARK:  I need to object to the form

6    6    of this.  Also, we need to take a look at this because

7    7    you're just offering him a snippet of an overall

8    8    transcript.

9    9              MR. SORENSEN:  Understood.

10   10             A    You look while I get some water.  And

11   11   then I'll come and look.

12   12             MR. POLAND:  Let's go off the record for

13   13   just a minute if we could.

14   14             (There was a discussion off the record.)

15   15             MS. PARK:  Do you want to reask -- I'm

16   16   sorry.  Are you ready?

17   17             A    I think we were at the point where you

18   18   said --

19   19             MS. PARK:  I need the --

20   20             A    The question and answer here.

21   21             Q    (BY MR. SORENSEN)  Sure.  I've pointed

22   22   you to something you said at a HAP meeting.  And my

23   23   question is:  Is that just another one of those off-

24   24   the-cuff comments that you wouldn't have made had you

25   25   known you were going to testify in front of a jury in

26                   CARPENTER REPORTING, INC.
27                      (303) 752-1200

320

1    1    this case?

2    2                    MS. PARK:  I'm objecting to form and

3    3    also, was the question the off-the-cuff comment the

4    4    quote, I think that's very definitely the case?

5    5                    MR. SORENSEN:  Yes.

6    6            A    In response to a question about gaps in

7    7    knowledge.

8    8            Q    (BY MR. SORENSEN)  Yes.

9    9            A    That's -- that's not a -- that's not a

10   10   statement, I don't think I would -- I would be

11   11   concerned about.

12   12           Q    Okay.  So you -- you'd reaffirm that

13   13   statement again?

14   14                    MS. PARK:  Objection.  Form.

15   15           Q    (BY MR. SORENSEN)  Is that correct?

16   16                    MS. PARK:  It's a different question.

17   17           A    Yes.  I don't -- the statement that I

18   18   referred to was a specific date -- statement about what

19   19   happened to that 6 kilograms of plutonium.

20   20           Q    (BY MR. SORENSEN)  I understand.  But

21   21   the statement that's reflected on the page that I just

22   22   referred you to, page 96 where Mr. Moore says, "Or

23   23   admit that there are just great, great gaps in

24   24   knowledge" and you say, "I think that's very definitely

25   25   the case," you would stand by that statement today;

26        CARPENTER REPORTING, INC.
27             (303) 752-1200

321

1   1    correct?

2   2               MS. PARK:  Objection to form.

3   3         A    There are gaps in knowledge about

4   4    material unaccounted for; that is correct.

5   5         Q    (BY MR. SORENSEN)  Okay.  Do you have

6   6    any actual personal knowledge of what was and what

7   7    wasn't public from the Church lawsuit at the time the

8   8    Church lawsuit was active back in the seventies?  Do

9   9    you have any knowledge of that?

10  10        A    At the time the Church lawsuit was

11  11   active in the seventies?

12  12        Q    Yes.  Well, you were pointed by defense

13  13   counsel back to Table 6.1 and the year 1978.  Do you

14  14   have any knowledge as you sit here, sir, of what was

15  15   and wasn't public from the Church lawsuit in terms of

16  16   filings or documents in 1978?

17  17        A    I am confused.

18  18        Q    Table 6.1 of P1068, you were referred to

19  19   that by defense counsel.

20  20        A    Okay.  Okay.  That's the list of

21  21   previous estimates of releases.

22  22        Q    Yes.

23  23        A    On page 59, probably.  58.  Something

24  24   like that.

25  25        Q    Page 52.

26              CARPENTER REPORTING, INC.
27                 (303) 752-1200

322

| | | | |
|---|---|---|---|
| 1 | 1 | A | I'm on the wrong report.  1068; right? |
| 2 | 2 | Q | Yes.  Page 52. |
| 3 | 3 | A | Okay. |
| 4 | 4 | Q | Are you there, sir? |
| 5 | 5 | A | Almost. |
| 6 | 6 | Q | Okay. |
| 7 | 7 | A | Yes.  Now, what's your question? |
| 8 | 8 | Q | Now, you were directed to 1978 and the |

9    9    Church lawsuit --

| 10 | 10 | A | Right. |

11   11         Q    -- pretrial statement.  Do you recall

12   12   that?

| 13 | 13 | A | Yes. |

14   14         Q    Do you have any knowledge, as you sit

15   15   here, of whether the Church pretrial statement was

16   16   public -- publicly available in 1978?

| 17 | 17 | A | No. |
| 18 | 18 | Q | Okay.  You don't know? |
| 19 | 19 | A | I know that it was -- I don't know. |
| 20 | 20 | Q | Okay. |
| 21 | 21 | A | You're right.  It was publicly available |

22   22   to me, but that was later.

| 23 | 23 | Q | That was in the 1990s; correct? |
| 24 | 24 | A | Right. |
| 25 | 25 | Q | Okay.  And after -- two lines down from |

26
27                    CARPENTER REPORTING, INC.
                         (303) 752-1200

323

1   1   that, there's Barick, 1981.  Barick worked for Rockwell

2   2   at the time; correct?

3   3           A   That's correct.

4   4           Q   And his estimate of 9.5 to 18, his top-

5   5   end estimate is less than half RAC's low-end estimate;

6   6   correct?

7   7                   MS. PARK:  Objection.  Form.

8   8           A   Right.

9   9                   MR. SORENSEN:  Okay.  I think that's it.

10  10                  MS. PARK:  I've got one question for

11  11   you, Mr. --

12  12                  MR. SORENSEN:  See, you just can't

13  13   resist.  I object to you going on any further.  Go

14  14   ahead.

15  15                  MS. PARK:  We seem to be objecting to

16  16   each other throughout this deposition.

17  17                       RE-EXAMINATION

18  18   BY MS. PARK:

19  19           Q   Mr. Voilleque, I have one question for

20  20   you based on a question that plaintiffs' counsel just

21  21   put to you.  With respect to the portion of the HAP

22  22   transcript where you were responding to a comment by

23  23   Mr. LeRoy Moore, you testified just now that -- that

24  24   you believe that there are gaps in knowledge about MUF.

25  25   Do you recall that testimony?

1   A   Yes.

2   Q   Okay.  Is it your understanding that,

3   therefore, MUF data is unreliable?

4           MR. SORENSEN:  Objection.  Leading.

5   A   Is it my understanding --

6           MR. SORENSEN:  And vague.

7   A   -- MUF data is unreliable?

8   Q   (BY MS. PARK)  To estimate off-site

9   releases.

10          MR. SORENSEN:  Objection.  Leading.

11  Vague.

12  A   Oh, well --

13          MR. SORENSEN:  Goes beyond the scope of

14  anything, but go ahead.

15  A   There's no question about that.  That

16  was the conclusion of our evaluation of the -- using

17  mass balance approach to estimate releases.

18  Q   (BY MS. PARK)  Which is that the MUF

19  data is --

20  A   We said and the National Academy of

21  Science said that -- that you could not use a mass

22  accounting approach -- mass balance approach to

23  reliably estimate releases and the mass balance and --

24  or accounting approach includes assessments of material

25  unaccounted for.  So if -- I hope that I have, with my

1   1   answer, brought your question and my answer into

2   2   coincidence.

3   3            MS. PARK:  I believe you have.  Thank

4   4   you, Mr. Voilleque.

5   5            MR. SORENSEN:  It's been a long day.

6   6                    RE-EXAMINATION

7   7   BY MR. SORENSEN:

8   8        Q    That National Academy study you just

9   9   referred to, that's the study I showed you earlier,

10  10   Exhibit 3 to your deposition; correct?

11  11        A    Right.

12  12            MR. SORENSEN:  Okay.

13  13            ... WHEREUPON, the deposition was

14  14   concluded at 4:40 p.m.

15  15

16  16

17  17

18  18

19  19

20  20

21  21

22  22

23  23

24  24

25  25

326

1    1                    SIGNATURE OF DEPONENT

2    2                 I, PAUL G. VOILLEQUE, the deponent

3    3    in the above named deposition, have read the above and

4    4    foregoing deposition, and the same is a true and

5    5    accurate transcript of my testimony, save and except

6    6    for changes and/or corrections, if any, as indicated

7    7    by me on the amendment sheet(s) attached hereto as

8    8    indicated.

9    9    Amendment sheet(s) attached (   )

10   10   No changes and no amendment sheets attached (   )

11   11

12   12                 _____
13                      PAUL G. VOILLEQUE
14   13

15   14                 The signature of PAUL G. VOILLEQUE was

16   15   subscribed and sworn to before me this _____ day of

17   16   _____, 2005/2006.

18   17                 My Commission expires:

19   18                 _____
20                      Notary Public
21   19

22   20

23   21

24   22

25   23

26   24

27   25

28                    CARPENTER REPORTING, INC.
29                       (303) 752-1200

327

CARPENTER REPORTING, INC.
Certified Shorthand Reporters
Registered Professional Reporters
12510 East Iliff, Suite 120
Aurora, CO  80014

December 20, 2005

Jane S. Park, Esq.
Kirkland & Ellis
717 Seventeenth Street
13th Floor
Denver, CO  80202

RE:  Collins v. Rockwell, et al.

Dear Ms. Park:

        Enclosed please find your copy of the
deposition of PAUL G. VOILLEQUE, along with the
original signature page and correction sheets for his
use.  Would you please have him read your copy of the
deposition and if he finds any changes necessary, have
him make them on the correction sheets provided.  Be
sure that he signs each correction sheet that he may
use.  Then have him sign the original signature page
before a notary public and file the signature page and
correction sheets with the Court at the time of trial,
providing copies to opposing counsel.

        Thank you for your assistance and
cooperation and if you have any questions concerning
the above, please feel free to contact me.

Yours truly,


Bonnie Carpenter, CSR, RPR

cc:  David F. Sorensen, Esq.

Trial Date:  Present

SHEET 328  PAGE 328

328

                         CARPENTER REPORTING, INC.
                         Certified Shorthand Reporters
                         Registered Professional Reporters
                         12510 East Iliff, Suite 120
                              Aurora, CO  80014
                              (303) 752-1200

          DAVID F. SORENSEN, ESQ.
          Berger & Montague, P.C.
          1722 Locust Street
          Philadelphia, PA  19103-6305

          Re:  Cook v. Rockwell, et al.
               Case No. 90-K-181
               United States District Court
               District of Colorado

          Dear Mr. Sorensen:

                    Attached is the original deposition of
          PAUL G. VOILLEQUE, taken in the above cause.

                  Deposition not signed           _____
                  Deposition signed by the deponent
                    No corrections                _____
                  Deposition signed by the deponent
                    correction sheet(s) included therein,
                    and copy(ies) of same forwarded to
                    interested counsel            _____
                  Signature waived                _____

                    Please retain the original copy of the
          deposition UNOPENED in your possession until such time
          as it is required by any party in a hearing or trial of
          the above cause.

          Yours truly,


          Bonnie Carpenter, CSR, RPR

          cc:  Jane S. Park, Esq.
          Trial Date:  Present
          RECEIVED BY _____DATE_____


                         CARPENTER REPORTING, INC.
                              (303) 752-1200

329

```
1   1                    C E R T I F I C A T E
2       STATE OF COLORADO          )
3   2                              ) ss
4       COUNTY OF ARAPAHOE         )
5   3
6                       I, Bonnie Carpenter, Notary Public of
7   4   the State of Colorado, duly appointed to take the
8       deposition of the above-named Deponent, do hereby
9   5   certify that previous to the commencement of the
10      examination of the said above-named Deponent, he was
11  6   first by me duly sworn to testify the truth, the
12      whole truth and nothing but the truth touching and
13  7   concerning the matters in controversy between the
14      parties hereto, so far as he should be interrogated
15  8   concerning the same;
16
17  9                   That said deposition was
18      stenographically reported by me at the time and place
19 10   heretofore set forth, and was reduced to typewritten
20      form under my supervision as per the foregoing;
21 11
22 12                   That the foregoing is a true and
23      correct transcript of my shorthand notes then and
24 13   there taken;
25
26 14                   That after the deposition was
27      transcribed, the same was submitted by letter to the
28 15   Deponent for reading and signing, a copy of which is
29      hereto annexed;
30 16
31 17                   That I am not kin or in anywise
32      associated with any of the parties to said cause of
33 18   action or their counsel and that I am not interested
34      in the event thereof;
35 19
36 20                   IN WITNESS WHEREOF, I have hereunto
37      set my hand and seal this _____ day of _____,
38 21   2005.
39
40 22                   My Commission Expires:  9-22-2007.
41
42 23                   _____
43                      Bonnie Carpenter
44 24                   Notary Public
45                      12510 East Iliff
46 25                   Suite 120
47                      Aurora, CO  80014
48
                        CARPENTER REPORTING, INC.
                             (303) 752-1200
```