# Exhibit D

4187

1          IN THE UNITED STATES DISTRICT COURT
2             FOR THE DISTRICT OF COLORADO

3  Civil Action No. 90-CV-00181(JLK)

   MERILYN COOK, et al.,
4
        Plaintiffs,
5
   vs.
6
   ROCKWELL INTERNATIONAL CORPORATION and
7  THE DOW CHEMICAL COMPANY,

8
        Defendants.
9  _____

10              **REPORTER'S TRANSCRIPT**
                  Trial to Jury
11                  VOLUME 29

12  _____

13       Proceedings before the HONORABLE JOHN L. KANE, JR.,

14  Judge, United States District Court for the District of

15  Colorado, commencing at 9:00 a.m., on the 7th day of November,

16  2005, in Courtroom A802, United States Courthouse, Denver,

17  Colorado.

18

19

20

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
    Produced via Computer by Janet M. Coppock, 901 19th Street,
25     Room A-257, Denver, Colorado, 80294, (303) 893-2835

1    we are going to be in recess from December 16 until January 3rd

2    and we are going every day after that until the trial is

3    completed, however long it takes.

4          Now, this is my ruling on Biggs.  Dr. Biggs is a

5    meteorologist who reportedly participated in several groups and

6    projects addressing environmental issues in Rocky Flats,

7    including the Rocky Flats scientific monitoring panel later

8    known as the citizens advisory board, appointed by Governor

9    Romer in 1989.

10          Plaintiffs report that Dr. Biggs will testify about

11    the historical events surrounding his work including the fact

12    that the governor's panel found Rocky Flats environmental

13    monitoring systems inadequate in various ways.  I find no merit

14    in defendants' contention that Dr. Biggs lacks personal

15    knowledge regarding matters such as Rocky Flats monitoring

16    system because he acquired his knowledge after the fact and

17    through his participation in the governor's panel and similar

18    vehicles.

19          To the extent his testimony reports the historical

20    facts associated with his work on Rocky Flats issues, his

21    testimony is admissible without reference to Rule 701 or Rule

22    702.  If Dr. Biggs offers any opinions in the course of his

23    testimony, I will determine whether they are admissible lay

24    opinions based upon the following principles.

25          As a general rule, the opinion testimony is admissible

4490

1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLORADO
2

Civil Action No. 90-CV-00181(JLK)
3

MERILYN COOK, et al.,
4

5        Plaintiffs,

vs.
6

ROCKWELL INTERNATIONAL CORPORATION and
7   THE DOW CHEMICAL COMPANY,

8

9        Defendants.
   _____

10                       REPORTER'S TRANSCRIPT
                            Trial to Jury
11                            VOLUME 32

12 _____

13           Proceedings before the HONORABLE JOHN L. KANE, JR.,

14   Judge, United States District Court for the District of

15   Colorado, commencing at 1:05 p.m., on the 8th day of November,

16   2005, in Courtroom A802, United States Courthouse, Denver,

17   Colorado.

18

19

20

21

22

23

24   Proceeding Recorded by Mechanical Stenography, Transcription
     Produced via Computer by Janet M. Coppock, 901 19th Street,
25       Room A-257, Denver, Colorado, 80294, (303) 893-2835

Gale Biggs - Direct

1    area, killed all the grapes and killed a lot of the vegetable

2    farming and some of the animals, and so I -- I was called over

3    there to -- basically because a citizen says, we hear you are

4    going to start the oil shale again, no, we remember the last

5    time, so I was taken over to try to see that they did it right.

6    Q.   Why did you get involved with Rocky Flats activities or

7    issues regarding Rocky Flats?

8    A.   In terms of what's going on in this trial?

9    Q.   Yes.

10   A.   Yes, let me back up.  I did, as a consultant, went out and

11   marketed Rocky Flats to try to get them to put up a

12   meteorological tower, and we never got any work out of that

13   with the company I was with, but it was in the mid to upper --

14   or mid 1980s I was approached by an individual who wanted me to

15   review one of the technical documents that had come out of

16   Rocky Flats.  And I was quite resistant to doing that, and

17   after all, this was our Federal Government.  And I believed in

18   them.

19        But she was very persistent, and finally after a few

20   months I gave up and looked at the documents and came away very

21   concerned at what I thought was very poor science.

22        They were using a document that was generated in the

23   early 1940s.

24        MR. KURTENBACH:  At this point I am going to object.

25   We are already getting into expert testimony or testifying from

Gale Biggs - Direct

1   Department of Health expressing our concerns, because in order

2   for them to emit the exhaust of this incinerator into the

3   atmosphere, they had to get a permit from the pollution control

4   division of the Colorado Department of Health.

5   Q.   And I want to draw your attention, Doctor, to the second

6   full paragraph.   And it says, We find abundant reasons to urge

7   that you deny the application for a trial burn.   It is our

8   belief that the equipment, the plan, the monitoring, and the

9   documentation are so flawed and deficient, so threatening to

10  public safety that the application is beyond expectation of

11  remedy.   In the event that you do not dismiss the application

12  outright, we ask that the following questions be answered

13  before you permit the proposed trials.

14        Is that what your feelings of you and the other

15  scientists were at the time?

16  A.   Yes, ma'am, they sure were.

17  Q.   And did the Colorado Department of Health then permit the

18  proposed trial?

19  A.   I believe they did, yes.

20  Q.   And is this the incinerator that never became fully

21  operational?

22        MR. KURTENBACH:   I object, Your Honor.   Calls for

23  expert testimony.   There has been no foundation laid he has

24  personal knowledge of this issue.

25        THE COURT:   Sustained.

Gale Biggs - Direct

1   about the impacts of the workers as to what would happen to

2   them at the facility if indeed the facility were to either cut

3   back or slow down or even be closed.   And so I was involved

4   with this because there were a lot of questions relating to

5   what was the technical capabilities of some of these workers

6   and how do we transfer this technical capability into the

7   non-Government regions.

8   Q.   What is the Citizens' Advisory Board, 1991 to

9   December 1994?

10   A.   This was a board that was set up by the Department of

11   Energy and funded by the Department of Energy to give them

12   advice directly on the issues that we saw at Rocky Flats and to

13   provide some kind of guidance to them on how they might want to

14   be able to change it.

15   Q.   And what was the TRAC Model, 1991 to 1993?

16   A.   This was in their quality model that was developed by the

17   personnel at Rocky Flats as an emergency model so that if there

18   were any emergency releases from the facility, they would have

19   a model running full-time that would tell them where that plume

20   might be going and how concentrated it might be, so if indeed

21   there was any need for evacuation, they would be able to direct

22   enforcement agencies into areas that would need to be evacuated

23   and how far and how wide these areas would be.   It was a model

24   that ran full-time, was updated every 15 minutes and was part

25   of the emergency response system at Rocky Flats.

Gale Biggs - Direct

1   A.   Yes, ma'am, it was.

2   Q.   And which committee was this?

3   A.   This was the governor's panel, the air committee.

4   Q.   And could you tell the jury what you observed when you were

5   on this tour in building 707 that your group, your committee

6   later incorporated into the report?

7   A.   We were concerned that with all of the bends and bows in

8   this part of the ducting, they were not really sampling very

9   well.  If you look up towards the top of the picture in this

10  area, you can see some ducting that looks like it's connected

11  into the plenum.  I don't recall exactly which ones these were.

12  There was one duct that we looked at specifically which we

13  thought was a classic example.

14       Basically the ductwork was going along, and then it

15  would narrow down in order to get an air flow measurement with

16  a pitot tube, and then it would open back up.  And then just

17  after the opening, the ductwork would turn the 45-degree angle,

18  and we were questioning the last time the pitot tube had been

19  calibrated in terms of air flow.  We were told that --

20       MR. KURTENBACH:  I object to that, Your Honor.  I

21  think he is about to get into some hearsay without any

22  foundation laid.

23       THE COURT:  Sustained.

24  BY MS. ROSELLE:

25  Q.   You can't tell the jury what other people told you.

Gale Biggs - Direct

1    A.   Okay.

2    Q.   You can tell the jury the findings of your committee.

3    A.   The findings of our committee were that the pitot tube had

4    never been calibrated since it had been put in in the 1950s,

5    that the monitors that were monitoring for radioactivity had

6    the opportunity of being in an eddy in the ductwork such that

7    the air would be actually potentially flowing backwards on to

8    these sampling tubes, so that we wouldn't really be getting a

9    flow into the sampler.

10        We also learned as part of the committee that they

11   were using millepore filters as a filtering device to capture

12   what might be in this last duct before it goes out into the

13   air.  We questioned as a committee whether or not the millepore

14   filter was sufficient to do this because if it wasn't more

15   efficient than the HEPA filter itself, then what would be

16   coming out of the HEPA filter would not be measured by the

17   millepore filter.  Since these were alarm systems and other

18   devices used for monitoring what was going out the stock, the

19   committee concluded it needed a total evaluation of the

20   monitoring system, the quality control as well as quality

21   assurance associated with all of the monitoring system in the

22   ductwork.

23   Q.   Would you look at P1326 in your book.  It's near the front.

24        THE COURT DEPUTY:  What's the number?

25        MS. ROSELLE:  1326.

4615

Gale Biggs - Direct

1    *BY MS. ROSELLE:*

2    *Q.* Can you identify P1326.

3    *A.* This was a sketch that was generated as part of our

4    committee work to try to understand what was going on, and it

5    basically shows in a pictorial form what I just presented to

6    you, verbal and hand forms.

7         *MS. ROSELLE:* We would offer P1326.

8         *MR. KURTENBACH:* It's being offered for demonstrative

9    purposes?

10        *MS. ROSELLE:* Yes.

11        *THE COURT:* Admitted.

12   *A.* This is a picture of a ductwork that we saw in the building

13   of 707. It shows the air flow coming down the duct. It then

14   shows a restriction in the duct for the purposes of measuring

15   air flow, and the little pitot tube is put into that location.

16   And then if you follow the aerodynamics of air through a duct,

17   you have a very narrow duct that is now coming out into a

18   larger duct. Usually for a little while that air comes through

19   as a jet out into the larger duct before it disperses out and

20   becomes part of the total air flow in the duct.

21        But what you see is there was about a 45-degree angle

22   in the ductwork just before -- just after it came through that

23   little restriction area, which then has the ability of creating

24   that duct, that jet going across, hitting the back side of the

25   panel and creating an eddy in this direction which would show

4616

Gale Biggs - Direct

1   that the monitors faced in the other direction are not picking

2   up the air flow or what was in that air flow as they were

3   mounted in the ductwork.

4            Then the air duct went out, turned vertical and came

5   out the stack exiting the roof of the building.

6   BY MS. ROSELLE:

7   Q.  And what did your committee in its report say about this

8   problem?

9   A.  We asked that they basically do some flow studies and

10  properly locate the monitors so that they would be measuring

11  whatever radioactivity might be in the air as it was coming out

12  the stack.

13  Q.  And would you go back, please, to Exhibit 1335 which are

14  the pictures that you had DOE or whoever was escorting you to

15  take during your tour of 707.  Would you turn to the next

16  picture.  And would you tell the jury what this is.

17  A.  This is another picture looking vertically up at the roof

18  showing the vents going out through the roof, and it doesn't

19  show the picture very well, but the vent is going vertically

20  and then bends over and then turns vertical again and goes out

21  the roof.  You are looking at it, I think, the roof going out

22  the roof is the bottom part of the picture.

23  Q.  Oh, I see.  It's going towards the bottom?

24  A.  It's going out the roof, but the roof is depicted at the

25  bottom part of the picture, yes.

Gale Biggs - Direct

1   Q.  Is that better?  I don't think so.  Is that going up now?

2   A.  Yeah, I feel better now.

3   Q.  Okay.

4   A.  Us meteorologists, we have to get the air flowing in the

5   right direction here.

6       MR. BERNICK:  Could you explain which direction is up?

7   BY MS. ROSELLE:

8   Q.  Would you use your finger on the screen again and show the

9   jury where the air is flowing?

10  A.  The air is flowing along the duct here up to here, and then

11  it bends over and comes out this way, and this is where it goes

12  out the roof.

13      MS. ROSELLE:  I think, Your Honor, this is a good

14  place for the break.

15      THE COURT:  All right.  We will be in recess until

16  9:00 a.m. tomorrow morning.  We will be in recess.

17      (Jury out.)

18      MR. BERNICK:  I am just wondering about the schedule.

19  I am not going to ask when this witness is going to be done on

20  direct, but whenever they are done, I am assuming we will do

21  the cross-examination, and then my assumption would be we would

22  just go to the next witness.  Now, if Dr. Flynn is able to

23  appear, then our preference would be to have him be the next

24  witness so there is some semblance --

25      THE COURT:  I agree.  If he is able to appear, we will

4632

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 90-CV-00181(JLK)

MERILYN COOK, et al.,

        Plaintiffs,

vs.

ROCKWELL INTERNATIONAL CORPORATION and
THE DOW CHEMICAL COMPANY,

        Defendants.

_____

**REPORTER'S TRANSCRIPT**
Trial to Jury
VOLUME 33

_____

        Proceedings before the HONORABLE JOHN L. KANE, JR.,

Judge, United States District Court for the District of

Colorado, commencing at 8:50 a.m., on the 9th day of November,

2005, in Courtroom A802, United States Courthouse, Denver,

Colorado.

Proceeding Recorded by Mechanical Stenography, Transcription
Produced via Computer by Janet M. Coppock, 901 19th Street,
Room A-257, Denver, Colorado, 80294, (303) 893-2835

4658

Gale Biggs - Direct

1   committee evaluated two types of emissions from the Rocky Flats

2   plant.   One, routine stack in building emissions which we

3   talked about yesterday; two, fugitive emissions primarily from

4   resuspension of disturbed soil due to wind-blown and man-made

5   earth disturbances.

6           MR. KURTENBACH:   Fair enough.

7   BY MS. ROSELLE:

8   Q.   When we are talking about fugitive emissions, are we

9   talking about the soil, for example, that's being blown off the

10  903 pad?

11  A.   That would be one example.

12  Q.   Were there other fugitive emissions from Rocky Flats that

13  your committee found besides the 903 pad?

14  A.   There were other sources that we were told about, the 881

15  hillside.   There were trenches and other areas that we were

16  told, plus we were basically concerned about any of the soil on

17  the plant because of the plutonium getting into the soil simply

18  as it came out of the building and settled onto the ground

19  there.

20  Q.   Now, with regard to emissions from the stacks, what type of

21  monitoring do they do for stack emissions?

22  A.   That would have been the samplers that we saw in the

23  ductwork and especially that little handwritten diagram that I

24  made which showed the samples going into the ductwork.   And the

25  air is supposed to flow into the sample tube and then into the

Gale Biggs - Direct

1   analysis phase and because we questioned -- we didn't think the

2   air was even flowing into the tubes, so we were very concerned

3   about that.

4   Q.   And are those commonly called stack samplers?

5   A.   Yes.

6   Q.   And what kind of sampling do you do for fugitive emissions?

7   A.   You put out devices, and the tube they most commonly used

8   out there was called a high volume sampler and a low volume

9   sampler.   These are just little motors that suck air through a

10  filter, and the filter catches whatever particles there are in

11  the air.   The filters are removed periodically in terms of the

12  high volume sampler.   High volume means it's sucking a lot more

13  air through than a low volume sampler.   And since it's sucking

14  a lot more air through, the high volume sample filters are

15  usually -- or are changed every 24 hours.   The low volume

16  samplers are just changed weekly.

17  Q.   Okay.   Now, did your committee look at the stack samplers,

18  the high volume samplers and the low volume samplers?

19  A.   Yes, we did.

20  Q.   And what did your committee find with regard to the stack

21  samplers?

22  A.   We were very concerned that those samplers were either not

23  calibrated or improperly positioned in the ductwork, and,

24  therefore, we seriously questioned what they were measuring.

25  Q.   With regard to the -- well, the high volume samplers, were

4660

Gale Biggs - Direct

1    there high volume samplers both on the plant site and off the

2    plant site?

3    A.   We only looked as a committee at the ones that were on

4    site.

5    Q.   What about the low volume samplers?

6    A.   We only looked at the ones that were on site.

7    Q.   So you didn't look at any of the samplers off site?

8    A.   I don't recall that we did as part of the panel.  I was on

9    another committee that they asked me to site samplers for

10   community samplers, and we did make recommendations for siting

11   them.

12   Q.   Which committee was that?

13   A.   I don't know that we had a formal name.  It was a

14   scientist, I think he was from -- I think he was from the

15   National Oceanic and Atmospheric Administration, but he might

16   have been from NCAR.  There was a fellow from the Colorado

17   Department of Health and myself, and we looked at sites outside

18   of the plant site for siting of what they were calling

19   community monitors.

20   Q.   At this point I want to stick with what's in the governor's

21   panel report, okay?

22   A.   Yes, ma'am.

23   Q.   With regard to the high volume samplers, what problems did

24   your committee report on those?

25   A.   We had two major problems.  We had several minor ones, but

4661

Gale Biggs - Direct

1  the two major problems were that they were located too close to

2  the ground, and the second problem is that we were very

3  concerned that they were not sampling the plutonium that was

4  coming off the site.

5  Q.  Okay.  We will go to the too close to ground first.  Would

6  you look in your book, please, at Exhibit 1336?

7  A.  That's a Bates number?

8  Q.  That's the Exhibit number.  It's a different exhibit.

9  A.  I am sorry.

10  Q.  It's near the back.

11  A.  Yes, I have that.

12  Q.  Can you identify this exhibit?

13  A.  This is a photograph of the -- some of the panel members as

14  we were visiting the Rocky Flats facility.

15  Q.  And did you take these photographs?

16  A.  No, ma'am.  A representative from the facility took the

17  photographs and then presented them to me later.

18  Q.  Would you look at the three photographs and tell me if they

19  accurately depict what you saw during your tour of the plant?

20  A.  Yes, ma'am, they do.

21          MS. ROSELLE:  Your Honor, the plaintiffs offer P1336.

22          MR. KURTENBACH:  No objection.

23          THE COURT:  It's admitted.

24  BY MS. ROSELLE:

25  Q.  Let's please look at the first picture.  Will you tell the

7076

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
   Civil Action No. 90-cv-00181(JLK)
3
   MERILYN COOK, et al.,
4
        Plaintiffs,
5
   vs.
6
   ROCKWELL INTERNATIONAL CORPORATION and
7  THE DOW CHEMICAL COMPANY,
8
        Defendants.
9  _____

10                  **REPORTER'S TRANSCRIPT**
                      TRIAL TO JURY
11                      Volume 56

12  _____

13          Proceedings before the HONORABLE JOHN L. KANE, JR.,

14  Senior Judge, United States District Court for the District of

15  Colorado, continuing at 1:32 p.m., on the 8th day of December,

16  2005, in Courtroom A802, United States Courthouse, Denver,

17  Colorado.

18

19

20

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
       Produced via Computer by Therese Lindblom, 901 19th Street,
25       Room A259, Denver, Colorado, 80294, (303) 628-7877

7083

Joel Selbin - Direct

1   *Q.*   -- Dr. Till from risk assessment?

2   *A.*   Yes.

3   *Q.*   Look in the general summary.  Again, I don't want to take

4   the time to put this up, but if you look at the bottom of page

5   2 and the top of page 3 -- maybe it would be faster to just

6   show it, very bottom of page 2, top of page 3.

7          Again, using the 10 percent probability that the 15

8   millirem per dose limit will be exceeded, i.e., in 90 percent

9   probability that it won't be -- I don't think you're in the

10  right place, Mark.  Down toward the bottom of page --

11         Let me try it again.  Again, it was same exact limit,

12  10 percent probability that the 15 millirem per year dose limit

13  will be exceeded, 90 percent probability that it will not be

14  exceeded.

15         And then at the top of the next page, Mark.

16         Using this approach, the technically -- just the top

17  paragraph there -- technically derived RSAL for plutonium in

18  soil at Rocky Flats would be 35 picocuries per gram.  And that

19  was in the final report, sir?

20  *A.*   That's correct.

21  *Q.*   And -- and I take it that the -- well, tell the jury, did

22  the SALOP committee accept RAC's recommendation that the

23  cleanup level should be 35 picocuries per gram?

24  *A.*   We did accept that bottom line.  There were various

25  concerns expressed, but overall, the committee -- the panel

7084

Joel Selbin - Direct

1    was, I would say, generally pleased with this result.

2    Q.   Sir, can I -- 35 picocuries per gram is how much the normal

3    background level, which you told us was .04 this morning?

4    A.   Well, it's 875 times the normal background level.

5    Q.   Okay.

6    A.   So it's still way above what some original citizens

7    committees were hoping for.

8    Q.   Right, and --

9    A.   But it was a great improvement over the 651 that had been

10   promulgated in 1996.

11   Q.   Okay.   What I'm -- just give me a chance to frame one

12   question, then I'll let you explain.

13   A.   Sure.

14   Q.   You told us this morning that the Rocky Flats citizens

15   oversight panel, Citizens Advisory Board had wanted the site

16   cleaned up to background, .04 picocuries per gram.

17   A.   Correct.

18   Q.   Now, the SALOP committee is recommending a level --

19   accepting a recommendation from RAC of a level which is 875

20   times as high.   I want you to explain to the members of the

21   jury why you went along with that, and if there were any

22   concerns, what the concerns were.

23   A.   Well, it was understood, first of all, by those citizens

24   groups back in '94 and '95 that wanted cleanup to background,

25   it was understood that that was probably not technically

7101

Joel Selbin - Direct

1   Q.   Then if we could turn to the -- if we could just look at

2   the next page and show the title of that to the jury, and the

3   next page, please.

4        There is even an acronym list if we go to the next

5   page.  We're not going to take the time to look at it.  That's

6   a list of acronyms.

7   A.   That's a very short list of the acronyms we dealt with.

8   Q.   I know you had lots of acronyms.

9        Could we go to page 11, please.  And this is where

10  they started to set forth the new standards; is that correct?

11       I'm sorry, page 13, would you look at page 13, please.

12  A.   Correct.

13  Q.   There is a chart there.  Can we just focus in, Mark, on the

14  boxed part of the exhibit.

15       This is confusing to me, I'm sure, as well as many

16  people.  But maybe you could explain what this chart purported

17  to show to the jury.

18  A.   Well, the original 651, which we talked about, promulgated

19  in 1996, was in terms of plutonium itself, 1,429, so that's

20  that 1,429 at the top of the left column.  And that refers to

21  the plutonium itself.

22       The new proposed number, which is the critical value

23  that they are presenting in this document, where it says new

24  proposed picocuries per gram is 50, so they were proposing 50

25  picocuries per gram in place of the RAC 35 picocuries per gram.

Joel Selbin - Cross

1    we're not going to get into, the government decided at some

2    point to clean up Rocky Flats.  And we're not here to debate

3    that.

4         All I am suggesting to you and asking you is a very

5    simple question, which is, if we want to put these numbers into

6    perspective, if we want to put these numbers into perspective,

7    we have to understand that given the fact that radiation is

8    everywhere, 15 millirem above background per year is a very,

9    very hard thing to avoid, even if you wanted to.  Would you

10   agree with that?

11   A.   Yes.  And every extra millirem of radiation causes the

12   potential for harm or the potential to a cancer.

13   Q.   Right.

14   A.   And so why should we accept extra radiation when it can be

15   cleaned up?  We cannot clean up the background.

16   Q.   Sure.

17   A.   The only thing we can do with background is move to a lower

18   background.

19   Q.   Sure.

20   A.   But if we have a mess that we have made, we have an

21   obligation to clean it up so that there is not even an extra 1

22   millirem per year that's going to do harm to health.

23   Q.   And, Dr. Selbin, I know that's your view, and those were

24   the policy decisions that were being discussed at the time.

25   And I'm not here to debate whether that's right or wrong, you

7160

Joel Selbin - Cross

1   had that opportunity before, somebody else made the decision.

2       But we all know that 15 millirem in the everyday

3   living context, whether it is in your view acceptable or not,

4   it is a very small amount of radiation; is that fair?

5   A.  The smallest amount of radiation can cause harm.  And

6   that's been established by all of the reputable radiation

7   institutions in the world, that -- that there is no lower level

8   to -- of radiation that does no harm.

9       So we're talking about a harm caused by additional

10  radiation, generated by contamination which can be cleaned up.

11      And when I said that we learned that if you make a

12  mess, you clean it up, I mean you clean it up properly to the

13  best of your ability.  That may not have been added in the

14  kindergarten, but I'm adding it here.

15      MR. BERNICK:  Your Honor, we would offer DX-1601,

16  DX-1596, DX-1599 --

17      MR. DAVIDOFF:  Could I have a moment, Your Honor?

18      THE COURT:  Yes.

19      MR. BERNICK:  DX-1600, DX-1607 and DX-1608.

20      MR. DAVIDOFF:  I'm probably not going to object to

21  most of those, Your Honor.  I do have an objection to the one

22  that says 50 picocuries per gram, because it's misleading.  It

23  doesn't -- I think it's 1600.  I don't have it.

24      MR. BERNICK:  50 picocuries per gram?

25      MR. DAVIDOFF:  The time line.

7161

Joel Selbin - Cross

1          MR. BERNICK:  This is the RSAL that was adopted was

2     50.

3          MR. DAVIDOFF:  Your Honor, can I redirect, please?

4          MR. BERNICK:  We would move those into evidence,

5     including the time line.

6          THE COURT:  Okay.

7                      **REDIRECT EXAMINATION**

8     BY MR. DAVIDOFF:

9     Q.  Since we just had a little side bar about this time line,

10    let me show it to you, Dr. Selbin.  This is Defendants' Exhibit

11    1600 that was shown to you.  And it has final RSAL of 50

12    picocuries per gram.  Do you see that?  I believe at a couple

13    of points in your cross-examination you started to say that

14    that was misleading, and I'd like to give you an opportunity to

15    explain that.

16    A.  The 50 picocuries per gram was misleading?  I said that

17    what was misleading about it, I believe I -- I'm repeating

18    myself several times, is that it applies only to the top 3 feet

19    of soil, and there are many ways in which plutonium and other

20    materials below 3 feet can be transported to the surface and

21    will be transported to the surface, and that that does not

22    apply to either the 651, which was originally promulgated in

23    '96, or to the 35 picocuries per gram, which was the bottom

24    line of the RAC study.

25               So the 50 picocuries per gram of soil is a very