Exhibit A

SHEET 1   PAGE 1

1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLORADO

3     Case No. 90-K-181

4     MERILYN COOK, et al.,

5              Plaintiffs,

6     vs.

7     ROCKWELL INTERNATIONAL CORPORATION and THE DOW CHEMICAL
      COMPANY,
8
               Defendants.
9

10            DEPOSITION OF PAUL G. VOILLEQUE
                  December 16, 2005
11

12    APPEARANCES:

13    FOR THE PLAINTIFFS:      DAVID F. SORENSEN, ESQ.
                               Berger & Montague, P.C.
14                             1722 Locust Street
                               Philadelphia, PA  19103-6305
15
      FOR THE DEFENDANTS:      JANE S. PARK, ESQ.
16                             Kirkland & Ellis
                               717 Seventeenth Street
17                             13th Floor
                               Denver, CO  80202
18                                  and
                               DOUGLAS M. POLAND, ESQ.
19                             Lafollette, Godfrey &
                                    Kahn
20                             One East Main Street
                               P.O. Box 2719
21                             Madison, WI  53701-2719

22

23

24

25

                    CARPENTER REPORTING, INC.
                        (303) 752-1200

53

1   1              Q     So when did it start?

2   2              A     9:00.

3   3              Q     And when did you leave?

4   4              A     Shortly after 5, as I recall.  I don't

5   5     remember the exact time.

6   6              Q     And what was the subject of these

7   7     meetings?

8   8              A     Discussion about the deposition

9   9     procedure.  Discussions about work that I had done,

10  10    explaining particularly to Jane how we got the results

11  11    that we got.

12  12              MS. PARK:  That's because I was the more

13  13    clueless one.  I'll put that on the record.

14  14              Q     (BY MR. SORENSEN)  And what is your

15  15    understanding of what you're going to be testifying

16  16    about in this case?

17  17              A     I don't --

18  18              MS. PARK:  Objection.  Form.

19  19              A     I don't know what specific topics I'll

20  20    be testifying about.  My understanding is that I'll be

21  21    testifying about work that I did as part of the dose

22  22    reconstruction for Rocky Flats.  Phase II dose

23  23    reconstruction for Rocky Flats.

24  24              Q     (BY MR. SORENSEN)  Are you testifying

25  25    pursuant to subpoena?

26
27              CARPENTER REPORTING, INC.
                     (303) 752-1200

59

 1    1    contributed to the -- to the part on deposition

 2    2    measurements using gum paper.

 3    3              Q    (BY MR. SORENSEN)   During your meetings

 4    4    in preparation for your deposition, did you go over the

 5    5    various RAC reports that you were a coauthor of or

 6    6    contributed to?

 7    7              A    To the extent that I discussed and

 8    8    explained to Jane what we did, we -- I -- most of my

 9    9    explanations were related to the -- to the reports for

10   10    which either -- either that I authored alone or -- the

11   11    principal reports were the -- were the release reports,

12   12    the fire report -- 1957 fire, 1969 fire, routine

13   13    plutonium releases, plutonium risk report, but then,

14   14    also, as part of that, many of those results are used

15   15    in other reports like the technical summary report,

16   16    the -- the risk reports for the set of releases.   The

17   17    plutonium -- '57 fire risk report, the '69 fire risk

18   18    report, the routine release risk report, and then the

19   19    overall summary report.   Those -- my work is reflected

20   20    in all those reports.

21   21              Q    And is it fair to say that the reports

22   22    that you've just described and your work in them

23   23    required you to apply your specialized knowledge and

24   24    expertise in preparing these reports?   Is that correct?

25   25              A    Yes.

26
27                        CARPENTER REPORTING, INC.
                             (303) 752-1200

60

1    1              Q      Is that yes?

2    2              A      Yes.  Sorry.

3    3              Q      Is it your testimony that you have no

4    4    idea as you sit here what, specifically, you're going

5    5    to be asked to testify about at trial?

6    6              A      I explained to you already that it's my

7    7    understanding that I'm going to be asked to testify

8    8    about parts of the work in the -- in the dose

9    9    reconstruction that -- that I either performed or

10   10   participated in.

11   11             Q      Is that as specific as you can get?

12   12             A      Well, that's a general -- that's a

13   13   general picture.  Yes.  I -- I have not been told what

14   14   it is I'm asked -- going to be asked to testify about.

15   15             Q      Okay.  Have you been asked to review the

16   16   testimony of any other witnesses in this case?

17   17             A      I have received testimony of -- trial

18   18   testimony of a list of witnesses.  Steve Wing.  I

19   19   probably can't recite all the names to you.  Wing,

20   20   Clapp, Biggs.  I'm spacing the name of the guy from

21   21   NRDC.  Cochran.  Tom Cochran.  And then there was a

22   22   person with a complex name.  I can't think --

23   23             Q      Budnitz?

24   24             A      Yeah.  Budnitz's testimony is on that

25   25   CD.  There's a -- there's a person -- there's a

26
27

1   1      document; correct?

2   2              A    Well, it undoubtedly contributed to some

3   3      of the conclusions that are reached here.

4   4              Q    And your contribution --

5   5              A    It's a very big document.

6   6              Q    It is.  Your contribution drew on your

7   7      expertise in the areas of health physics and

8   8      environmental -- what did you say --

9   9              A    Environmental -- well, environmental

10  10     radioactivity transport as part of health physics.

11  11             Q    So that your contribution to that report

12  12     drew on your areas of expertise; correct?

13  13             A    Yes.  I believe it would have.

14  14             Q    Okay.  Are you going to testify about

15  15     that report or the subject of it at trial?

16  16             A    I do not know.

17  17             Q    Okay.  Go to P1068, which also bears

18  18     No. -- designation DX514.  It's dated August 1999.  The

19  19     title is Final Report, Estimated Airborne Releases of

20  20     Plutonium During the 1957 Fire in Building 71, and you

21  21     are listed as the sole author of that document.

22  22             A    Right.

23  23             Q    Could you please take a look at it.

24  24                  MR. POLAND:  This is August '99?

25  25                  MR. SORENSEN:  Yes.

26
27                  CARPENTER REPORTING, INC.
                         (303) 752-1200

68

1      A    Yes.  I recognize this document.

2      Q    (BY MR. SORENSEN)  You are the sole

3    author of that document?

4      A    That's true.

5      Q    And what areas of your expertise did you

6    draw on to prepare that document?

7      A    My health physics expertise, my previous

8    experience in estimating or measuring -- both measuring

9    and calculating releases from facilities.

10      Q    Calculating releases of radionuclides?

11      A    Yes.

12      Q    Anything else?  Any other areas?

13      A    I'd say those are -- those general areas

14    are broad enough.

15      Q    Okay.  What areas do you hold yourself

16    out to be an expert in?

17            MS. PARK:  Objection to form.  He's not

18    being called as an expert in this case.

19            MR. SORENSEN:  I understand your

20    position.  I'm just asking a question.

21            MS. PARK:  Then I'm going to repeat my

22    objection to form that it's vague and ambiguous.

23      A    I'm a certified health physicist.

24      Q    (BY MR. SORENSEN)  But, within that

25    title, health physicist, what areas in your

86

1  1    that correct?

2  2              A    That's correct.

3  3              Q    And in my previous questions where I've

4  4    asked you whether your contributions or work draws on

5  5    your expertise, you understand that that would include

6  6    that your contributions or work is based on your

7  7    expertise?

8  8                   MS. PARK:  Objection to form.

9  9              Q    (BY MR. SORENSEN)  Do you understand

10 10   that's what I was also asking?

11 11                  MS. PARK:  Objection.  Form.

12 12             A    In the -- the distinction you're trying

13 13   to make here is -- draws on and based on?

14 14             Q    (BY MR. SORENSEN)  To me, it's just a

15 15   synonym.  I just -- do you see a distinction between

16 16   that?

17 17             A    I guess I'm not clear why you're saying

18 18   what you're saying.

19 19             Q    Okay.  I'll just continue.  And your

20 20   contribution to P1076 draws on and is based on your

21 21   expertise of the behavior of radionuclides in

22 22   facilities; is that correct?

23 23                  MS. PARK:  Objection to form.

24 24             A    Yes.

25 25             Q    (BY MR. SORENSEN)  Go to P1077.  It also

26
27                        CARPENTER REPORTING, INC.
                              (303) 752-1200

87

1    1    bears designation DX524.  It's dated August 1999.  It's

2    2    titled Final Report, Estimated Exposure and Lifetime

3    3    Cancer Incidence Risk from Plutonium Released from the

4    4    1957 Fire at the Rocky Flats Plant.  You are not listed

5    5    as a coauthor.

6    6                 Before I get to that, I want to make

7    7    sure I asked about 1076.  Do you have an understanding

8    8    of what you'll be asked to testify about at trial --

9    9         A    I do not.

10   10         Q    -- with respect to that report?

11   11         A    No.

12   12         Q    Okay.  Now, with 1077, did you

13   13    contribute to P1077?

14   14         A    This is a risk report related to the

15   15    1957 fire.  It uses the -- the dose -- dose to --

16   16    dose -- intake to dose, dose to risk coefficients that

17   17    were developed.  It utilizes the source term that I

18   18    developed in the same way that the other two risk

19   19    reports we've just talked about.

20   20         Q    So your contribution to P1077 draws on

21   21    and is based on your expertise in internal dosimetry;

22   22    is that correct?

23   23         A    Yes.

24   24              MS. PARK:  Same objection to the form

25   25    and to the suggestion about the expertise to the extent

88

1   1   he's not being offered as an expert witness.

2   2            Q    (BY MR. SORENSEN)  And your contribution

3   3   to P1077 draws on and is based on your expertise in

4   4   environmental transport; is that correct?

5   5            A    That's correct, as a reviewer, yes.

6   6            Q    That's correct as what --

7   7            A    As I mentioned before, I have reviewed

8   8   these reports and -- and my expertise in environmental

9   9   radioactivity and behavior is related to that review.

10  10  Because this is a broad scope report.

11  11            Q    Okay.  And your contribution to P1077

12  12  draws on and is based on your expertise in the behavior

13  13  of radionuclides in the environment; is that correct?

14  14            MS. PARK:  Objection to form.

15  15            Q    (BY MR. SORENSEN)  Go ahead.

16  16            A    Yes.  I was waiting for her.

17  17            Q    Perfectly appropriate.

18  18            MS. PARK:  You've got to make sure I get

19  19  my objection in.

20  20            Q    (BY MR. SORENSEN)  Your contribution to

21  21  P1077 is -- draws on and is based on your expertise in

22  22  the release of radionuclides and other materials from

23  23  facilities; correct?

24  24            MS. PARK:  Same objection.

25  25            Q    (BY MR. SORENSEN)  Go ahead.

26
27            CARPENTER REPORTING, INC.
              (303) 752-1200

89

1      A    Yes.

2      Q    And your contribution to P1077 draws on

3    and is based on your expertise in the behavior of

4    radionuclides in facilities; is that correct?

5           MS. PARK:  Objection to form.

6      Q    (BY MR. SORENSEN)  Go ahead.

7      A    Yes.

8      Q    So do you know what portion, if any, of

9    P1077 you'll be testifying about at trial?

10     A    No, I don't.

11     Q    Okay.  Now we're going to go to P1078,

12   which also bears designation DX523.  It is dated

13   August 1999.  It is titled Final Report, Estimated

14   Exposure and Lifetime Cancer Incidence Risk from 903

15   Area Plutonium Releases at the Rocky Flats Plant.  You

16   are not listed as an author.  Would you please take a

17   look at that, sir.  I'm sorry.  Did I catch your

18   finger?

19     A    No.  No.  I did it myself.

20     Q    Did you contribute to P1078?

21     A    This report relies on the risk

22   coefficients that we developed, yes.

23     Q    So, now, in a pattern of questions that

24   should be familiar to you by now, first, did your

25   contribution to P1078 draw on and was it based on your

109

1   1   but you keep repeating it.

2   2                   MS. PARK:  For every time you hit that

3   3   line of questioning.

4   4           Q    (BY MR. SORENSEN)  Well, in your

5   5   interactions with your professional colleagues and

6   6   peers, do you --

7   7           A    I do not go around with a sign that says

8   8   I am an expert.

9   9           Q    I understand that, but would you -- if

10  10  someone asked you, do you have expertise in the

11  11  chemical toxicity of uranium, would you say yes or no?

12  12                  MS. PARK:  Object to form.

13  13          A    I would say that I have experience in

14  14  assessing the chemical toxicity of uranium.  As I said,

15  15  I don't go around holding a sign proclaiming that I'm

16  16  an expert in X, Y, Z, and D, and I wouldn't respond

17  17  that way to a question.

18  18          Q    (BY MR. SORENSEN)  Okay.  Okay.  And do

19  19  you have any understanding of whether you're going to

20  20  be testifying about any portion of P1083?

21  21          A    No, I don't.

22  22          Q    You don't know; is that right?

23  23          A    I don't know.

24  24          Q    Okay.  Let's go to P1084, which also

25  25  bears designation DX522.  It's dated August 1999.  It

26                  CARPENTER REPORTING, INC.
27                    (303) 752-1200

122

1    1    component here.  And again, I would use the word

2    2    "knowledge" rather than your term.

3    3              Q    Your knowledge of behavior of

4    4    radionuclides in the environment?

5    5              A    Yes.

6    6              Q    And your contribution relating to P1088

7    7    drew on and was based on your expertise in the release

8    8    of radionuclides and other materials from facilities;

9    9    is that correct?

10   10             A    That's correct.  The releases.

11   11             Q    And your contributions to P1088 drew on

12   12    and were based on your expertise in the behavior of

13   13    radionuclides in facilities; is that correct?

14   14             A    That's correct.

15   15             Q    Do you have any idea what portions, if

16   16    any, of P1088 you'll be testifying about at trial?

17   17             A    No.

18   18             Q    Do you have expertise in material

19   19    balance analysis?

20   20                  MS. PARK:  Objection.  Form.

21   21             Q    (BY MR. SORENSEN)  Go ahead.

22   22             A    Actually, that was -- that was in my --

23   23    in my mind, that was included in the last category that

24   24    we've talked about.

25   25             Q    Behavior of radionuclides in facilities?

123

1   1           A     Right.

2   2           Q     So within that area that you've

3   3   described, you include material balance analysis?

4   4           A     Yes.

5   5               MS. PARK:  David, can we take a break

6   6   soon?

7   7               MR. SORENSEN:  I have one more to go.

8   8               MS. PARK:  Okay.

9   9           Q     (BY MR. SORENSEN)  So when you've been

10  10   answering my questions up to this point, when we've

11  11   gotten to the area of behavior of radionuclides at

12  12   facilities, in your mind, you were answering those

13  13   questions including in that category material balance

14  14   analysis; is that correct?  That was part of your

15  15   thinking?

16  16           A     Right.

17  17           Q     Okay.

18  18           A     And again, I would -- I would use the

19  19   term "knowledge" rather than "expertise" as you've

20  20   heard.

21  21           Q     Right.  I've asked you --

22  22           A     Knowledge and experience.

23  23           Q     Right.

24  24               MS. PARK:  Can we take a break now,

25  25   please?

26
27                   CARPENTER REPORTING, INC.
                        (303) 752-1200

1   1   it.  And that is DX514.  It's dated August '99.  Put

2   2   that in front of you.

3   3                   MS. PARK:  Give me a minute.

4   4                   MR. SORENSEN:  Sure.

5   5                   MS. PARK:  Okay.  Got it.

6   6                   MR. SORENSEN:  What was that PX number?

7   7   1068?

8   8                   THE DEPONENT:  1068.

9   9                   MS. PARK:  I've got it.

10  10                  Q    (BY MR. SORENSEN)  Now, I'd like you to

11  11  turn to the appendix, please, of P1068.  Appendix A.

12  12  Are you there, sir?

13  13                  A    Yes.

14  14                  Q    Okay.  I'm looking for something here.

15  15  Okay.  Appendix A, page A-3 of P1068 has a Table A-1.

16  16  Do you see that?

17  17                  A    Yes.

18  18                  Q    Now, that table is drawn from a Zodtner

19  19  and Rogers 1964 study; correct?

20  20                  A    Right.

21  21                  Q    I want to show you what's been

22  22  previously admitted as Exhibit P10 in this case and ask

23  23  you to confirm that P10 is, in fact, the Zodtner and

24  24  Rogers study that is referenced on page A-3 of P1068.

25  25                  MS. PARK:  It seems to be missing some

1    pages.

2                    MR. SORENSEN:  Which one?

3                    MS. PARK:  It jumps from 16, 17, 19, and

4    then it goes to 21, then it goes to 23, then it goes to

5    25.

6                    MR. SORENSEN:  You know, that is a pain.

7    Yes.  Yes.  You're right.  The part that I'm going to

8    ask about doesn't have to do with that, but I will get

9    a better one for after lunch.

10               Q    (BY MR. SORENSEN)  Okay.  What I'm going

11   to ask you about doesn't get into those pages.  I will

12   endeavor to get you a more complete copy.

13               A    Yes.  It's one of those every other --

14               Q    Copying glitch.  Putting that aside --

15   is P10 -- it's a previously admitted exhibit so the

16   admitted exhibit is complete, but is P10 the same

17   Zodtner and Rogers study that is referred to on page

18   A-3 of P1068?

19               A    According to this stamp, this is P170.

20               Q    Right.  P170 is an earlier designation.

21               A    I'm sorry.  I didn't see the other

22   stamp.

23               Q    Just trying to add to the confusion.  Is

24   it the same -- same thing?

25               A    Yes.  This is the Zodtner and Rogers

137

1    1    report.

2    2              Q    Okay.  When you say "this," P10?

3    3              A    Okay.  P10.

4    4              Q    P10 is what --

5    5              A    I see.  This is '95.  Excuse me.

6    6              Q    P10 is what's being referred to on page

7    7    A-3 of P1068; correct?

8    8              A    That's correct.

9    9              Q    Okay.  Could you please turn to page 8

10   10   of P10, which is included.

11   11             A    Yes.

12   12             Q    Do you see the table at the top or the

13   13   information at the top under Section 2.5?

14   14             A    Yes.

15   15             Q    That -- those numbers and that

16   16   information is reproduced in Table A-1 of Exhibit

17   17   P1068; correct?

18   18             A    Yes.

19   19             Q    Okay.  Do you have a Q clearance?

20   20             A    No.

21   21             Q    Have you ever had a Q clearance?

22   22             A    Yes.

23   23             Q    When did you have a Q clearance?

24   24             A    From 1966 or '67 until approximately

25   25   2000.  I believe those are the correct dates.

26
27                       CARPENTER REPORTING, INC.
                              (303) 752-1200

138

1    Q    Why do you no longer have one?

2    A    Q clearances are granted on a need-to-

3 know basis.  And I -- the -- the DOE didn't --

4 terminated the Q clearance that I had because I no

5 longer had a need to know.

6    Q    In other words, because your work with

7 RAC ended?  Is that why?

8    A    No.  Because I no longer had a need to

9 have access to classified data.

10    Q    Okay.

11    A    Classified information.

12    Q    In connection with your work relating to

13 P1068 or your work generally with respect to RAC, did

14 you speak with either Mr. Zodtner or Mr. Rogers?

15    A    No.

16    Q    Do you know whether either gentleman is

17 alive?

18    A    No, I don't.

19    Q    Okay.  Did you find out what specific

20 documents, if any, Mr. Rottner or Mr. -- Mr. Zodtner or

21 Mr. Rogers reviewed or relied upon in preparation of

22 their report, P10?  Do you follow my question?

23    A    Yes, I think so.  I don't --

24    Q    I'll restate it.  Do you know what, if

25 any, documents Mr. Zodtner and/or Mr. Rogers reviewed

139

1    1    in the preparation of their report marked P10?

2    2            A    I was just looking to see if there was a

3    3    reference list in their document, and that would be

4    4    where the pages are missing, so I don't actually know

5    5    that.  But I -- I don't recall offhand whether --

6    6    whether there was a reference list.

7    7            Q    Well, other than whatever was contained

8    8    in P10, if any such reference list was contained in

9    9    P10, would you have any other knowledge of any of the

10   10   documents, if any, that Mr. Zodtner or Mr. Rogers

11   11   reviewed in preparation of their report?

12   12            MS. PARK:  Objection to form.

13   13            Q    (BY MR. SORENSEN)  In other words, did

14   14   you ask anyone else at the plant?  Did you come upon

15   15   any lists of documents they reviewed or anything like

16   16   that?

17   17            MS. PARK:  Object to form.  And that's

18   18   confusing.  Can you pick one particular question for

19   19   Mr. Voilleque?

20   20            Q    (BY MR. SORENSEN)  I'm trying to find

21   21   out, other than what may have been listed in P10

22   22   itself, is there any other source of information that

23   23   you reviewed or obtained that tells you what documents

24   24   Mr. Zodtner and Mr. Rogers reviewed in the preparation

25   25   of P10?

26
27                  CARPENTER REPORTING, INC.
                       (303) 752-1200

1     A   Well, I know that they re -- reviewed

2   accountability documents, and we also have reviewed

3   accountability documents for Rocky Flats.

4     Q   Do you have any basis to say whether the

5   ones you reviewed are the same ones they reviewed?

6     A   Not identically, no.

7     Q   So you don't know whether there's any

8   overlap; correct?

9     A   I -- I believe there's overlap in this

10   case because we have looked at the accountability

11   documents related to the 1957 fire.

12     Q   Right.  What I'm trying to find out --

13     A   This table in Zodtner and Rogers is from

14   the section on the fire loss in Building 71 in 1957.

15     Q   In other words, it's your testimony that

16   the section on page 8 of P10 is a verbatim excerpt from

17   another accountability document?  Is that what you're

18   saying?

19     A   No.

20     Q   Okay.  Again, can you testify with

21   personal knowledge that any particular accountability

22   document that you reviewed is the same document that

23   Zodtner and Rogers reviewed?  Can you say that from

24   personal knowledge?

25     MS. PARK:  Objection to form.  And as he

141

1    1    said before, he doesn't have a list of references and

2    2    list of publications in order to answer your question.

3    3         Q    (BY MR. SORENSEN)  Go ahead.

4    4         A    No.

5    5         Q    You can't say?  Is that right?

6    6         A    I think the question was phrased in the

7    7    other direction.

8    8         Q    Right.  Right.  That's right.  Okay.

9    9    Okay.  Let's go through -- you can either look at P10

10   10   and Table 2.5 or your Table A-1 in P1068.  You can go

11   11   back and forth.  It really doesn't matter.  The first

12   12   line, "inventory in room 180 before fire" is given as

13   13   62,515 grams.  Do you see that?

14   14        A    Yes.

15   15        Q    Or 62.5 kilograms.  Correct?

16   16        A    Yes.

17   17        Q    All right.  Then it says "undamaged

18   18   items removed."  I'm looking at P10 as it's reproduced

19   19   in the other document.  "Undamaged items removed,"

20   20   29,857 grams.  Do you see that?

21   21        A    Yes.

22   22        Q    Then "recovery through processing," in

23   23   P10, it says 24,356 grams.  Do you see that?

24   24        A    Yes.

25   25        Q    And then it -- underneath, it has

142

1   1   "measured discard," 2,315 grams.  Do you see that?

2   2            A    Yes.

3   3            Q    This is all on P10.  Then it says "total

4   4   recovered" 56,528 grams.  Do you see that?

5   5            A    Yes.

6   6            Q    Underneath, it says "fire loss,"

7   7   5,987 grams.  Do you see that?

8   8            A    Yes.

9   9            Q    Then the last line of this section, 2.5

10  10   of P10 states, "This gives a contribution to MUF of

11  11   6.0 kilograms."  Do you see that?

12  12            A    Yes.

13  13            Q    And what does MUF stand for?

14  14            A    Material unaccounted for.

15  15            Q    Now, do you have some basis to dispute

16  16   the first number given in P10; that is, 62,515 grams of

17  17   inventory in Room 180 before the fire?

18  18            MS. PARK:  Objection to form.

19  19            Q    (BY MR. SORENSEN)  Do you have any basis

20  20   to dispute that number?

21  21            MS. PARK:  Same objection.

22  22            A    There are -- in Table A-2 --

23  23            Q    (BY MR. SORENSEN)  You're looking at

24  24   Table A-2 of P1068?

25  25            A    Right.

143

1   1            Q     Okay.

2   2            A     The inventories in October and November

3   3   are -- are different.  The same -- the same 62-1/2

4   4   kilograms in November was described in the October

5   5   report as being 56.4.

6   6            Q     The October report that's referenced in

7   7   Table A-2, that's a document you reviewed personally;

8   8   is that correct?

9   9            A     Yes.

10  10            Q     And you reviewed it in its classified

11  11   form?

12  12            A     Yes.

13  13            Q     And you took notes while you were

14  14   looking at it in its classified form?

15  15            A     Yes.

16  16            Q     And those notes were reviewed for

17  17   declassification purposes?

18  18            A     Yes.

19  19            Q     And given to you?

20  20            A     Yes.

21  21            Q     And where are those notes now?

22  22            A     I believe that they're part of the

23  23   public record related to our -- our work on the 1957

24  24   fire.

25  25            Q     So where would they be located; do you

26       CARPENTER REPORTING, INC.
27           (303) 752-1200

144

1  1    know?

2  2          A    They could be at Front Range Community

3  3    College or they could be at Norlin Library.  A

4  4    collection of documents was sent to Norlin Library, and

5  5    there, presumably, is a copy in my office.

6  6          Q    Do you know for a fact whether there's a

7  7    copy in your office?

8  8          A    No, I don't.

9  9          Q    Okay.  The 62,515 figure in P10, do you

10 10   know for a fact from personal knowledge where it's

11 11   drawn from?

12 12              MS. PARK:  Objection to form.

13 13          A    Well, it's the same number that we found

14 14   in the November 1957 accountability report for that

15 15   room.  So -- whether they drew it from that report or

16 16   not, I cannot say.

17 17          Q    (BY MR. SORENSEN)  Okay.  Then their

18 18   next figure in P10, "undamaged items removed," 29,857,

19 19   do you see that?

20 20          A    Yes.

21 21          Q    Do you have any basis to dispute that

22 22   figure?

23 23              MS. PARK:  Objection.  Form.  Basis to

24 24   dispute it's correct or basis to dispute that's what

25 25   they found?

145

1    1        Q    (BY MR. SORENSEN)   Basis to dispute that

2    2    it's correct.   I presume you have no basis to dispute

3    3    that the numbers in 2.5 of P10 are, in fact, the

4    4    numbers that Zodtner and Rogers found.   That's what

5    5    they reported in P10; correct?   They weren't lying

6    6    about it?

7    7        A    That's what -- that's what they

8    8    reported, but --

9    9        Q    Okay.

10   10       A    -- as we spoke before, it's -- it's not

11   11   clear what Table A-2 attempts -- you know, what this

12   12   shows is the different reports gave different numbers.

13   13   And so ...

14   14       Q    Okay.   So my question is:   The undamaged

15   15   items removed number in P10 on page 8 of 29,857 grams,

16   16   do you have any basis to dispute the accuracy of that

17   17   number?

18   18       A    It's consistent with the number in the

19   19   October report.   Yes.

20   20       Q    So the answer is no, you have no basis

21   21   to dispute its accuracy?

22   22       A    Right.

23   23       Q    Is that correct?

24   24       A    That's correct.

25   25       Q    Okay.   Let's go to the next item.   On

1    1    page 8 of P10 under Section 2.5, "recovery through

2    2    processing," it states 24,356 grams.  This is all

3    3    plutonium, obviously.  Do you have any basis to dispute

4    4    the accuracy of that number?

5    5                MS. PARK:  Objection.  Form.

6    6         A    No.

7    7         Q    (BY MR. SORENSEN)  Let's go to the next

8    8    line.  In -- on page 8 again of P10, under "measured

9    9    discard," it gives a figure of 2,315 grams.  Do you see

10   10   that, sir?

11   11        A    Yes.

12   12        Q    Do you have any basis to dispute the

13   13   accuracy of that number?

14   14            MS. PARK:  I'm going to object to form.

15   15   It's vague and ambiguous.

16   16        Q    (BY MR. SORENSEN)  Go ahead.

17   17        A    No.

18   18        Q    And then the next number, under "total

19   19   recovered," on P10 on page 8 is 56,528, and that's

20   20   simply the arithmetic sum of the three previous numbers

21   21   just discussed:  29,857, 24,356, and 2,315; correct?

22   22        A    Yes.  That's the sum.

23   23        Q    Okay.  And then the next line, "fire

24   24   loss," 5,987 is simply the arithmetic result of

25   25   subtracting 56,528 from 62,515; correct?

1        A     Yes.

2        Q     And you have no reason to question the

3    arithmetic that they performed; correct?

4        A     No.  The arithmetic is correct.

5        Q     Okay.  So I am trying to understand if

6    you could please explain for me, sir, what basis, if

7    any, you have to dispute the results given on page 8 of

8    P10 that there was 6 kilograms, approximately, of

9    plutonium unaccounted for after the September 11th,

10   1957 fire as depicted on -- on page 8.

11       A     Well, we, in fact, quote that table in

12   our report.

13       Q     Yes.  I understand that.

14       A     In the report.  And so --

15       Q     I understand that.

16       A     Maybe I missed your question.  I'm

17   sorry.

18       Q     Well, in other words, the inventory

19   given (sic) is given.  I've asked you whether you have

20   basis to dispute these figures.  If the inventory is

21   what it is, undamaged items removed, recovery through

22   processing, measured discard, all those numbers are

23   accurate, then the rest is math.  I'm trying to

24   understand how you dispute that on the basis of the

25   Zodtner and Rogers analysis there were 6 kilograms of

1  1   plutonium after the fire -- there were 6 kilograms

2  2   before the fire that went missing after the fire.

3  3              MS. PARK:   Objection.   Form.

4  4         A    That's -- that's -- that's their

5  5   conclusion.   That's correct.

6  6         Q    (BY MR. SORENSEN)   Do you dispute that

7  7   conclusion?   Do you disagree with it?

8  8         A    Well, we looked at -- we looked at

9  9   additional data at the time that the -- after the

10  10  building was cleaned up -- or the area of the building

11  11  was cleaned up.   And that's discussed in -- in the

12  12  report.

13  13        Q    In P1068?

14  14        A    Right.

15  15        Q    When was the building cleaned up?

16  16        A    The room was cleaned up in 1960 and

17  17  1961.

18  18        Q    Well, that was three years or so before

19  19  the Zodtner and Rogers study; correct?

20  20        A    Right.

21  21        Q    Okay.   Do you have any basis to conclude

22  22  that Zodtner and Rogers didn't have access to that same

23  23  information?

24  24        A    No.

25  25        Q    Okay.

1    1              A    I mean, I have no basis -- presumably,

2    2    they had access to it.

3    3              Q    Okay.  Do you have some basis to believe

4    4    that you have access to some information that they did

5    5    not have access to that's relevant to this?

6    6              MS. PARK:  Objection to form.  What do

7    7    you mean by "this"?

8    8              Q    (BY MR. SORENSEN)  Go ahead.

9    9              A    Could you read that --

10   10             Q    I'll ask it again.  We're talking about

11   11   this analysis or -- this MUF analysis of the 1957 fire.

12   12   My question is:  Do you have any reason to believe that

13   13   you had access to some information relevant or

14   14   pertinent to that analysis that Zodtner and Rogers did

15   15   not have access to?

16   16             A    In terms of access, no.

17   17             Q    I'm sorry?

18   18             A    I say in terms of access, no.

19   19             Q    In some other terms?

20   20             A    Well, whether they used the same

21   21   information is another question.

22   22             Q    Okay.  But you don't know the answer to

23   23   that?

24   24             A    Right.

25   25             Q    Okay.  Now, if you could explain to me,

150

1    1    sir, why is it that you have some reason to believe

2    2    that, in fact, 6 kilograms as depicted on page 8 of P10

3    3    were not burned up in the '57 fire?

4    4            A    Were not --

5    5            Q    Were not burned up as a result of the

6    6    '57 fire and that's why they went missing after the '57

7    7    fire.

8    8                 MS. PARK:  Objection to form.

9    9            Q    (BY MR. SORENSEN)  In other words, if,

10   10   before the fire, there's this amount of plutonium and

11   11   after the fire, there's 6 kilograms less, what basis do

12   12   you have to believe that 6 kilograms didn't burn up as

13   13   a result of the fire?

14   14           A    There are a number of -- number of

15   15   different answers to inventory difference or material

16   16   unaccounted for besides -- besides burning up.

17   17           Q    I'm not -- I'm -- you can answer because

18   18   I do want an answer, but I just want to focus you.  I'm

19   19   talking about the '57 fire.

20   20           A    So am I.

21   21           Q    All right.  We can get to the broader

22   22   issues, which we will, but, with that caveat, go ahead.

23   23   Go ahead.

24   24           A    Well, if you look, actually, in our

25   25   report, we went through --

26
27                    CARPENTER REPORTING, INC.
                         (303) 752-1200

151

1    1                    MR. SORENSEN:  While you're looking, I

2    2    want to make a quick call and get this process going.

3    3              A    Okay.  To get back to your question --

4    4              Q    (BY MR. SORENSEN)  Sure.

5    5              A    -- part of the material in -- in that

6    6    building and in any building can be in nooks and

7    7    crannies and corners of the gloveboxes and various

8    8    places that are very difficult to measure and very

9    9    difficult to assess what the quantity is there and what

10   10   quantities are held up in various parts of the system,

11   11   in equipment, for example, and lathe turnings and

12   12   things like that that aren't -- aren't completely

13   13   collected.

14   14                    You'll see in our Table A-2 --

15   15              Q    Hold on one second.

16   16              A    Sorry.

17   17              Q    Yeah.  Go ahead.

18   18              A    Okay.  There's -- there's material

19   19   believed to be present, but not located.  So the

20   20   fact -- the fact that there's material unaccounted for

21   21   after the fire does -- does not imply that that

22   22   material was -- was burned up during the fire.

23   23              Q    Now, you're looking at the line

24   24   "believed present but not located" in Table A-2;

25   25   correct?

26                   CARPENTER REPORTING, INC.
27                      (303) 752-1200

1    1                     A     That's correct.

2    2                     Q     And do you know what relationship these

3    3     two numbers, 6.3 and 4.9, have, if any, to Section 2.5

4    4     on page 8 of P10?

5    5                     A     These --

6    6                     Q     In other words, there is no line on

7    7     Section 2.5, comparable to "believed present but not

8    8     located"?

9    9                     A     That's correct.

10   10                    Q     So what relationship, if any, do the two

11   11    have?

12   12                         MS. PARK:   Objection.   Form.

13   13                    A     I don't know because I don't know

14   14    whether Zodtner and Rogers took their information

15   15    from -- from these accountability reports or not.

16   16                    Q     (BY MR. SORENSEN)   Okay.

17   17                    A     I don't -- I don't know that.   All I'm

18   18    trying to point out is that the fact that material is

19   19    unaccounted for doesn't mean that it was burned up,

20   20    which was really what your question was.

21   21                    Q     Right.   What I'm -- yes.   All right.

22   22    I'm trying to understand -- maybe you've begun to

23   23    answer -- let me start again.

24   24                         The table in 2.5 has a figure for

25   25    "inventory in Room 180 before the fire."   That's where

153

1    the fire occurred, Room 180; correct?

2                MS. PARK:  For clarity, could you say

3    2.5 and PX10?

4                Q    (BY MR. SORENSEN)  Yeah.  2.5 and P10.

5    There's a number, 62,515 grams.  And I think you've

6    agreed that you have no basis, as you sit here, to

7    dispute the accuracy of that number; correct?

8                A    Yes.

9                Q    All right.  And then they subtract three

10   line items.  We've gone through them.  You testified

11   you have no basis to dispute the accuracy of any of

12   those three numbers.  The rest is math; correct?  "The

13   rest" meaning you add up those three numbers, then you

14   subtract it from 62,000, and you get 5,987; correct?

15               A    That's correct.

16               Q    Okay.  So they, in this report --

17   Zodtner and Rogers are stating this gives a

18   contribution to MUF of 6 kilograms.  "This" being the

19   fire loss; correct?

20               A    Right.

21               Q    So what basis do you have to dispute

22   this conclusion or this statement in P10 that before

23   the fire versus after the fire, there was 6 kilograms

24   less after the fire than there was before the fire?

25               A    We went through that and -- and I agreed

154

1       1      that that was their conclusion.  That it was -- there

2       2      was 6 kilograms difference.

3       3              Q    Okay.  And what do you attribute -- and

4       4      do you attribute that 6 kilograms to something else

5       5      other than the fire?

6       6              MS. PARK:  Asked and answered.

7       7              Q    (BY MR. SORENSEN)  And if so, what's

8       8      your basis for doing that?

9       9              A    Do I attribute it to --

10      10              Q    Do you, in your mind, say that the

11      11      6 kilograms that's in Zodtner and Rogers, that's

12      12      because of waste shipped to Idaho or plutonium, you

13      13      know, in the nooks and crannies?  Have you reached some

14      14      kind of conclusion of that nature?

15      15              A    Your question -- your previous question

16      16      about whether the fact that the 6-kilogram difference

17      17      meant that that 6 kilograms was burned up, my answer to

18      18      that is no.

19      19              Q    Okay.

20      20              A    And that's because of material and other

21      21      information in other accountability reports that refers

22      22      to material that -- that isn't specifically identified.

23      23      "Believed present but not located," for example.

24      24              Q    So do you believe or have you reached

25      25      some opinion that the 6.3 kilograms under the October

155

1    1    '57 report in Table A-2 of P1068 next to "believed

2    2    present but not located" -- have you reached some

3    3    opinion that that 6.3 is, in fact, the 6 kilograms to

4    4    MUF that Zodtner and Rogers are talking about?

5    5                    MS. PARK:  Objection.  Form.  And in

6    6    particular to the extent when you use the word

7    7    "opinion," you're suggesting that he formulates an

8    8    opinion as an expert in this case as opposed to a

9    9    finding.

10   10           Q    (BY MR. SORENSEN)  All right.  Well,

11   11   semantics aside --

12   12                    MS. PARK:  Well --

13   13           Q    (BY MR. SORENSEN)  -- go ahead.

14   14                    MS. PARK:  -- you're the one who's using

15   15   these terms.

16   16           A    No.  I don't associate that -- that 6.3

17   17   with their 6.0.  What I was trying to point out is that

18   18   the fact that there's material unaccounted for after

19   19   the fire doesn't mean that that material was all burned

20   20   during -- during the fire.

21   21           Q    (BY MR. SORENSEN)  Do you see anywhere

22   22   in P10 that Zodtner and Rogers are giving the opinion

23   23   that that 6.0 is attributable to something other than

24   24   the fire?

25   25           A    This is a fire loss in Building 71.

1    That's the title of that section.  And so they are

2    associating that 6 kilograms with the fire.  That's a

3    different thing from saying that that -- all that

4    material was burned.

5         Q    Do you see anywhere in P10 any basis to

6    think that Zodtner and Rogers concluded that any

7    portion of that 6.0 fire loss is attributable to

8    something other than the plutonium burning up?

9         A    In their general discussion of reasons

10   for the difference -- for inventory difference or

11   material unaccounted for, they, in fact, cite a number

12   of such reasons, and under-accounting of waste

13   materials is highest among their list.

14        Q    But do they relate that at all

15   specifically to the -- to the fire?

16        A    It's a general statement about -- about

17   the reasons for material unaccounted for.  And this is

18   material unaccounted for from the 1957 fire and so

19   it's -- it's addressed by the general statement that

20   they make.  In their conclusions, you'll see a whole

21   list of reasons why there is material unaccounted

22   for -- it exists and that's -- if I recall, that was

23   reason No. 1 in terms of magnitude.

24        Q    But do you think you'll find in P10 --

25   and please tell me if you see anything in P10 that

1   specifically relates the general discussion you just

2   mentioned to the 6.0 fire loss that we've been

3   discussing --

4                   MS. PARK:  Objection.  Form.

5          Q    (BY MR. SORENSEN)  -- connects the two?

6                   MS. PARK:  Objection.  Form and asked

7   and answered.

8          A    The 6.0 is part of the material

9   unaccounted for.  The underestimation of waste

10  transported to Idaho is the principal reason for

11  material unaccounted for.  There is nothing in this

12  report that says that the principal reason for this

13  6.0 kilograms was that it was burned during the fire.

14         Q    (BY MR. SORENSEN)  Okay.  Why don't we

15  go through this a little more carefully.  Are you

16  familiar with the term MBA, material balance area?

17         A    Yes.

18         Q    Okay.  We have a statement on Section

19  2.5 of P10 that inventory in Room 180 before the '57

20  fire occurred was 62.515 kilograms of plutonium;

21  correct?

22         A    Yes.

23                  MS. PARK:  Objection to form.  It says

24  "grams."

25         A    Oh, pardon me.

1    1                Q     (BY MR. SORENSEN)   I said 62.15

2    2    kilograms.   62,515 grams.   They are the same thing;

3    3    correct?   They are the same thing; correct?

4    4                A     That's correct.

5    5                Q     Okay.   So we have a statement in P10

6    6    that that's how much plutonium was in Room 180 -- not

7    7    all over the plant -- in Room 180 before the '57 fire

8    8    occurred; correct?

9    9                A     Correct.

10   10               Q     Okay.   Do you have some reason to

11   11   believe that they were missing something in that

12   12   number?   That there was more plutonium or less

13   13   plutonium in that room before the fire?

14   14               A     This is their report.

15   15               Q     Do you have some reason to believe they

16   16   are wrong about that number?

17   17               A     No.   Although other numbers are given in

18   18   other reports.

19   19               Q     Okay.

20   20               A     I mean, their number agrees with the

21   21   November 1967 report of prefire inventory.

22   22               Q     Okay.

23   23               A     It doesn't agree with the October 1957

24   24   report, but it agrees with one out of two.

25   25               Q     Okay.   You don't know which one they

1    1    were relying on?  You don't know their basis for

2    2    relying on a particular document?

3    3              A    I think --

4    4                   MS. PARK:  Wait.

5    5              Q    (BY MR. SORENSEN)  You don't know;

6    6    correct?

7    7                   MS. PARK:  Wait.  Just -- I'm going to

8    8    object.

9    9                   MR. SORENSEN:  I'll withdraw the

10   10   question.

11   11                  MS. PARK:  Good.  Pick one question.

12   12             Q    (BY MR. SORENSEN)  I'll withdraw the

13   13   question.  You don't know specifically what documents

14   14   and information they relied on, Zodtner and Rogers;

15   15   correct?  You don't know?

16   16                  MS. PARK:  I'm going to object to form

17   17   and also it was asked and answered given the fact that

18   18   we also have pages missing.  And give me a chance to

19   19   object.

20   20                  THE DEPONENT:  I'm sorry.  I was --

21   21             Q    (BY MR. SORENSEN)  The next line item,

22   22   "undamaged items removed."  "Undamaged," what does that

23   23   mean to you?

24   24                  MS. PARK:  Objection.  Foundation.

25   25             Q    (BY MR. SORENSEN)  Does it have any

26
27                   CARPENTER REPORTING, INC.
                          (303) 752-1200

160

1    1    meaning to you?

2    2                    MS. PARK:  Same objection.

3    3                    A    It -- to me, it means that it's -- it's

4    4    material that either was in metallic form or some other

5    5    form and was found undamaged in its original state.

6    6                    Q    (BY MR. SORENSEN)  So these -- this is

7    7    undamaged plutonium that they're talking about;

8    8    correct?

9    9                    A    Yes.

10   10                   Q    All right.  And whatever the number of

11   11   items, they're saying that they add up in weight to

12   12   29,857 grams; correct?  That's what is being reported

13   13   here?

14   14                   A    That's correct.

15   15                   Q    Okay.  The next item, "recovery through

16   16   processing."  Do you know what that means?

17   17                   A    Yes.

18   18                   Q    What does it mean?

19   19                   A    It means that they had collected some

20   20   material -- presumably, damaged material -- and -- and

21   21   that might have been spread around and recovered the

22   22   plutonium from it.

23   23                   Q    Okay.

24   24                   A    That they did some sort of processing

25   25   of -- of this material --

161

1    1              Q    Okay.  This is all --

2    2              A    -- to recover the plutonium.

3    3              Q    Okay.  And that adds up to 24,356 grams.

4    4    You've already said you have no reason to dispute the

5    5    accuracy of that number; correct?

6    6              MS. PARK:  Objection to form.

7    7              Q    (BY MR. SORENSEN)  Correct?

8    8              A    Yes.

9    9              Q    Okay.  Yes, you have no basis; correct?

10   10             A    Yes.

11   11             Q    Okay.  The next line item, "measured

12   12   discard," what does that mean to you, if anything?

13   13             A    That's a term that's typically used to

14   14   refer to material that's been -- been disposed of as

15   15   waste material.

16   16             Q    Okay.  And that is representing that

17   17   that added up to 2,315 grams of plutonium --

18   18             A    Right.

19   19             Q    -- correct?  That's what that means?

20   20             A    That's what it says.

21   21             Q    Okay.  And -- all right.  So, now, we

22   22   have a total recovered number.  Do you have any basis

23   23   to believe that they left something out in their three

24   24   line items?

25   25             MS. PARK:  Objection.  Form.

26
27              CARPENTER REPORTING, INC.
                   (303) 752-1200

1   1                Q    (BY MR. SORENSEN)   Do you follow what

2   2       I'm asking?

3   3                A    Yes.  Yes, I do.  And this goes back to

4   4       my previous point.  The measured discard is waste.

5   5                Q    Okay.

6   6                A    And waste is the principal un --

7   7       underestimated quantities in waste is the principal

8   8       reason for material unaccounted for at Rocky Flats.

9   9       And that's a conclusion of your Exhibit P10.  And

10  10      that's the reason I was attempting to explain to you

11  11      that the fact that there's a 6-kilogram difference

12  12      doesn't mean that the 6 kilograms was burned during the

13  13      fire.

14  14                Q    Okay.  Let me follow what you're

15  15      asking -- ask you some questions.  Is it your opinion,

16  16      view, conclusion -- however you want to term it -- that

17  17      this number, 2,315, that's given on page 8 of P10 is

18  18      off and inaccurate and really could be as high as

19  19      8,315?  Is that your -- what you're saying?

20  20                     MS. PARK:  Objection.  Form.

21  21                A    I'm saying that to quote that number to

22  22      four significant figures, even though there may be four

23  23      significant figures in a report that they looked at, is

24  24      an inaccurate representation of that number.

25  25                Q    (BY MR. SORENSEN)  And what's your basis

163

1    for saying that?

2            A    Because the measurement capabilities

3    that were available at the time did not permit reliable

4    quantification of the materials that were -- that were

5    packed up in drums and sent off as solid waste to

6    Idaho.

7            Q    Well, where does it say in P10 that the

8    measured discard was packed up in drums?

9            A    Measured discard as a -- is a term that

10   refers, generally speaking, to waste.  Waste materials.

11           Q    But --

12           A    It's discarded material.

13           Q    But do you have any personal knowledge,

14   as you sit here, of what, specifically, this measured

15   discard line on page 8 of P10 was specifically

16   referring to?  Do you have any personal knowledge of

17   that?

18           A    I just expressed to you my understanding

19   of that term.

20           Q    And that's as much of a basis as you

21   have, what you've already expressed?

22                MS. PARK:  Objection to form.

23           Q    (BY MR. SORENSEN)  If you have anything

24   to add, I'm happy to hear it.

25                MS. PARK:  He's already said it to you.

CARPENTER REPORTING, INC.
(303) 752-1200

1    1          Q     (BY MR. SORENSEN)  Do you have anything

2    2     else to add?

3    3          A     I think I've explained my understanding.

4    4          Q     Okay.  Do you see anywhere in P10 --

5    5     please point out to me, if you do -- where Zodtner and

6    6     Rogers indicate that this 2,315 figure, in fact, could

7    7     be off by as much as 6 kilograms?

8    8               MS. PARK:  Objection.  Form.  I don't

9    9     think that the question of whether it's off by -- by

10   10    6 kilograms is -- is the relevant question.  The

11   11    question is --

12   12          Q     (BY MR. SORENSEN)  Well, that's my

13   13    question.

14   14          A     Okay.  Sorry.  I apologize.  Could you

15   15    read it back to me again.

16   16          Q     I'll ask it again.  Can you identify any

17   17    portion of P10 where Zodtner and Rogers state or

18   18    suggest that the figure of 2,315 grams, given next to

19   19    measured discard on page 8, is, in fact, off or could

20   20    be off, wrong, by as much as 6 kilograms?

21   21          A     There's no specific statement -- to my

22   22    knowledge, there's no specific statement to that effect

23   23    in this document.

24   24          Q     Let's move from specific statements to

25   25    suggestions.  Do you interpret some portion of P10 to

1   be suggesting that the figure of 2,315 grams is or

2   could be off by as much as 6 kilograms?  And if you

3   believe that, please point out that section.

4        A    No, I don't.

5        Q    No, there's no such section?

6        A    To -- to my knowledge, yes.

7        Q    Okay.  I want to take a step back.

8   We're going to get back into the '57 fire report.  Take

9   a step back for a moment.  Could you please describe

10  for me your personal review of classified documents in

11  connection with this case -- in connection with your --

12  your work for RAC in connection with Rocky Flats is

13  what I meant to say.  Sorry.

14            MS. PARK:  I'm going to object to form.

15       Q    (BY MR. SORENSEN)  That was a messed-up

16  question.  You reviewed some classified documents in

17  connection with your work for RAC relating to Rocky

18  Flats; correct?

19       A    Yes.

20       Q    What volume of classified documents did

21  you personally look at?

22       A    That's -- it was a -- stating a

23  particular volume is difficult.  We reviewed -- the

24  group with Q clearances reviewed all the classified

25  documents at Rocky Flats and my own reviews were of two

166

1    1    types.  One, part of the general review, particularly

2    2    in Building 881 where there were more than 2,000

3    3    classified documents -- boxes of classified documents.

4    4    I participated in review of -- of -- of many documents

5    5    in many boxes in that -- in that facility.

6    6              I also participated -- or I also

7    7    reviewed in particular -- well, let me -- let me

8    8    continue with that a bit.  There was also a large

9    9    volume of classified documents in Building 706, and I

10   10   participated in the review of this -- also, this large

11   11   volume of documents.

12   12              And in addition to those sort of -- what

13   13   I would describe as general reviews, I reviewed

14   14   materials -- or documents that were related to material

15   15   unaccounted for.

16   16        Q    So what is the volume of documents

17   17   relating to MUF that you personally reviewed in their

18   18   classified form?

19   19        A    Numbers of documents.  I guess I would

20   20   say -- there were probably hundreds, I suppose.

21   21        Q    Hundreds of documents; is that correct?

22   22        A    Yes.  I believe that would be it.

23   23   That's, you know -- that's an estimate based on memory

24   24   of things that occurred a long time ago.

25   25        Q    Do you know what volume of classified

26
27                 CARPENTER REPORTING, INC.
                      (303) 752-1200

167

1    1    documents DOE identified as relating to MUF?  What the

2    2    volume is?

3    3                    MS. PARK:  Objection to form.

4    4              A    I'm sure that it's very large.

5    5              Q    (BY MR. SORENSEN)  Okay.  How much time

6    6    did you spend in a classified setting, reviewing

7    7    classified MUF or MUF-related documents?

8    8              A    I don't have any specific time

9    9    recollection of that because it was intermixed with

10   10   general document review.

11   11             Q    But when you review classified documents

12   12   in a classified setting, you had to go to a particular

13   13   secure location; correct?

14   14                    (There was a discussion off the record.)

15   15                    MS. PARK:  Why don't we finish this

16   16   question and take a break for lunch.

17   17             Q    (BY MR. SORENSEN)  Okay.  When you

18   18   reviewed classified documents in their classified form,

19   19   you had to go to a different location that was more

20   20   secure than just doing a general document review;

21   21   correct?

22   22             A    Well, actually, I wasn't talking about

23   23   general document review.  I was talking about the

24   24   general review -- the broad picture review of

25   25   classified documents.

26
27                    CARPENTER REPORTING, INC.
                        (303) 752-1200

168

1    1              Q     I see.

2    2              A     And that was -- those two locations that

3    3    I named were repositories of classified documents, so

4    4    when we were in those locations, we were in a

5    5    classified area.

6    6              Q     Building 881 and where else?

7    7              A     706.

8    8              Q     706.  I see.  So what you can't separate

9    9    in your mind -- correct me if I'm wrong -- is the

10   10   portion of the time -- of the overall time spent

11   11   reviewing classified documents, that portion spent

12   12   reviewing classified documents that related to MUF.  Is

13   13   that what you're saying?

14   14              A     That's correct.

15   15              MR. SORENSEN:  We can stop here.

16   16              (There was a luncheon recess taken from

17   17   12:16 p.m. to 12:54 p.m.)

18   18              Q     (BY MR. SORENSEN)  I had given you a

19   19   substitute copy of P10 to correct copying problems.  I

20   20   will tell you this has every page except, apparently,

21   21   even this one is missing page 26.  I will point that

22   22   out to you.  This document is clearly cursed.  I don't

23   23   think 26 -- it appears from the context that 26 is

24   24   another table.

25   25              A     Yes.

26
27                     CARPENTER REPORTING, INC.
                          (303) 752-1200

169

1   1               Q      And I think if you could confirm for me

2   2       that this document in front of you, P10, has no

3   3       reference list.  I believe it does not.

4   4               A      I'll look a little bit further.

5   5               Q      Sure.  Go ahead.

6   6               A      As near as I can see, it doesn't have a

7   7       reference list, and it's unlikely that the reference

8   8       list would be on the missing page.

9   9               Q      Okay.  Do you recall whether you saw the

10  10      classified version of P10 in connection with your work

11  11      for RAC relating to Rocky Flats?

12  12              A      Yes.  I recall that.

13  13              Q      You do.  In this setting, can you say

14  14      anything about that classified document; if you

15  15      remember anything about it that's material to your

16  16      analysis that you performed in connection with your

17  17      work?

18  18              A      Classified portions of the document

19  19      cannot be discussed outside of a classified area --

20  20              Q      So there's --

21  21              A      -- with anybody who doesn't have a Q

22  22      clearance.

23  23              Q      I have a Q clearance.  I gather the

24  24      other two people in this room do not.  This is not a

25  25      classified setting, in any event.

26
27                      CARPENTER REPORTING, INC.
                           (303) 752-1200

170

1    1              A     Right.  Even if I still had my Q

2    2    clearance, we couldn't talk about it.

3    3              Q     Right.  There's nothing -- is it correct

4    4    that you believe there's nothing that you would be

5    5    comfortable discussing about the classified version of

6    6    P10?

7    7              A     That's correct.

8    8              Q     Okay.  All right.  I want to go back to

9    9    this general discussion you were having about

10   10   classified documents.  I believe you said you reviewed

11   11   hundreds of classified documents in classified form

12   12   relating to MUF amongst a greater review of -- a

13   13   greater volume of classified documents.  Is that true?

14   14             A     Yes.

15   15             Q     Okay.  Do you know how many classified

16   16   MUF or MUF-related documents other members of your team

17   17   reviewed in their classified form?

18   18             A     No.

19   19             Q     Okay.  While you were in a classified

20   20   setting, looking at classified MUF or MUF-related

21   21   documents, did you attempt to analyze the MUF,

22   22   MUF-related documents on a material balance area level

23   23   in any way?

24   24                   MS. PARK:  Objection.  Form.

25   25             Q     (BY MR. SORENSEN)  In other words, you

26
27                   CARPENTER REPORTING, INC.
                        (303) 752-1200