171

1    1    understand material balance areas are particular

2    2    physical areas at the plant?

3    3              A    Right.

4    4              Q    You understand that?

5    5              A    Right.

6    6              Q    Okay.  And there's, I understand, over

7    7    100 such material balance areas.  Does that comport

8    8    with your understanding?

9    9              A    Yes.

10   10              Q    Okay.  Did you make some attempt to

11   11    identify a particular material balance area or areas

12   12    and while you were looking at classified MUF and

13   13    MUF-related documents in a classified setting, attempt

14   14    to gather those documents about a particular material

15   15    balance area to see if you could make some kind of

16   16    calculation about that material balance area?

17   17                   MS. PARK:  Objection.  Form.

18   18              Q    (BY MR. SORENSEN)  Did you make that --

19   19    any such effort?

20   20              A    It's a complicated question, but, as I

21   21    understand it, you're asking whether I did any

22   22    calculations for a particular material balance area

23   23    when I was in a classified area?

24   24              Q    Yes.  I'll start with that question.

25   25              A    Okay.  The answer to that is no.

26                          CARPENTER REPORTING, INC.
27                             (303) 752-1200

172

1    1              Q    Okay.  Did any members of your team do

2    2    such a calculation?

3    3              A    I don't know.

4    4              Q    Well, if they did, wouldn't you know?

5    5              MS. PARK:  Objection.  Form.

6    6              Q    (BY MR. SORENSEN)  I'll start again.

7    7    Who was the head of this review team of classified

8    8    documents?  Who was in charge of it?

9    9              A    Well, John was generally in charge, but,

10   10   on any given day, you know, various people could be

11   11   reviewing classified documents in various areas at any

12   12   given time.  So I wasn't necessarily with all the

13   13   people on the team when they reviewed classified

14   14   documents.  They were there at times other than the

15   15   time that I was there and I was there when they weren't

16   16   there.

17   17             Q    And did you have discussions amongst

18   18   your team in a classified setting about the documents

19   19   you were looking at?

20   20             A    When we were there together, yes.

21   21             Q    And did you also have discussions

22   22   outside of that review in classified or secure rooms?

23   23   You know, away from Rocky Flats?

24   24             MS. PARK:  Objection.  Form.

25   25   Discussions about the contents of classified

173

```
 1    1    materials --
 2    2                        MR. SORENSEN:  Yes.
 3    3                        MS. PARK:  -- outside of the secure
 4    4    area?
 5    5                        MR. SORENSEN:  Yeah.
 6    6             Q    (BY MR. SORENSEN)  In other secure areas
 7    7    you could get permission for.
 8    8             A    He said in other secure areas.  No.
 9    9             Q    You did not?
10   10             A    No.
11   11             Q    When you were having discussions about
12   12    classified documents in a classified secure setting,
13   13    did you -- did you and your members of your team
14   14    discuss the making of calculations about specific
15   15    material balance areas?
16   16             A    I don't recall that we discussed that
17   17    in -- in either -- in those repositories because those
18   18    calculations weren't ongoing, as I said before.
19   19             Q    Were not ongoing?
20   20             A    Right.
21   21             Q    Okay.
22   22             A    We weren't doing the calculations while
23   23    we were there, and I don't recall any discussions of
24   24    those calculations.
25   25             Q    Okay.  Did you do such calculations
```

174

1    1    after you were outside of the classified setting?

2    2              A    Yes.

3    3              Q    What kind of calculations?  Let me start

4    4    again.

5    5              Did you do such calculations, other than

6    6    relating to the '57 fire?

7    7              A    No.  Not that I can recall.

8    8              Q    Okay.  Did you make any attempt to

9    9    correlate or associate other events, other potential or

10   10   actual release events at Rocky Flats; that is, the

11   11   release of plutonium either definitely into the

12   12   atmosphere or potentially?  Did you make any attempt to

13   13   correlate such events with particular material balance

14   14   areas or with particular sets of classified MUF or

15   15   MUF-related documents?

16   16              MS. PARK:  Objection to form.

17   17              Q    (BY MR. SORENSEN)  Other than the '57

18   18   fire?

19   19              A    Such a -- such a correlation attempt

20   20   doesn't really make any sense in the context -- let's

21   21   take Building 71 because many -- many sources within

22   22   the plant, many locations within the plant are carried

23   23   by feeder ducts into a big ventilation system where

24   24   there's a big set of plenum filters, and the effluent

25   25   measurements are made downstream of those plenum

1    1    filters, so the likelihood that you could associate

2    2    something that some -- some activity or some material

3    3    unaccounted for in a particular area in the plant with

4    4    a -- with an effluent reading is -- is not -- is not a

5    5    productive activity to do that.  To try to do that.

6    6              Q    Did you do it?

7    7              A    No.

8    8              Q    Okay.

9    9              A    I was explaining why we didn't do it.

10   10             Q    All right.  You say you did not do it.

11   11   And did you attempt to do it?

12   12             A    No.  For the reason I just gave.

13   13             Q    Okay.  Are you, in that explanation,

14   14   assuming that all releases would have been monitored --

15   15   let me start again.

16   16             Did you consider the possibility of

17   17   unmonitored releases?

18   18             MS. PARK:  Objection to form.

19   19             A    From the building, the most significant

20   20   unmonitored release was the 1957 fire, and so we did,

21   21   in fact, address that specifically.

22   22             Q    (BY MR. SORENSEN)  Okay.

23   23             A    Unmonitored releases at other times

24   24   could have occurred briefly, and -- because -- during

25   25   filter changes or something like that.  We didn't --

176

1   1   the number -- the duration of unmonitored releases was

2   2   not significant enough to consider that as an option

3   3   with regard to the kind of activity that you're

4   4   suggesting.

5   5            Q    But do you believe, then, in -- in that

6   6   answer, that you were able to track down and account

7   7   for every single unmonitored release of plutonium from

8   8   Rocky Flats in its entire 37-year history?

9   9            MS. PARK:  Objection.  Form.

10  10            A    The conclusion you draw from what I just

11  11   said is not valid.

12  12            Q    (BY MR. SORENSEN)  Okay.

13  13            A    I -- I was talking specifically about

14  14   Building 71.

15  15            Q    So I'll ask a general question.  Do you

16  16   believe that you and RAC, in their work, have accounted

17  17   for and been able to essentially list every single

18  18   unmonitored release of plutonium from every building at

19  19   Rocky Flats from 1952 to 1989?

20  20            MS. PARK:  Objection to form.

21  21            A    No.  But we believe we've -- we have --

22  22   we have identified and that, in fact, others have

23  23   identified the major releases from Rocky Flats.

24  24            Q    (BY MR. SORENSEN)  Okay.  Did you make

25  25   any attempt to analyze classified MUF and MUF-related

26
27               CARPENTER REPORTING, INC.
                    (303) 752-1200

1  1  documents in the classified form at the MBA level and

2  2  at the smallest time frame level that the documents

3  3  permitted, whether it was a week, a month, whatever it

4  4  was?  You know, a particular interval.  Did you make

5  5  any attempt to analyze that data to see if you could

6  6  spot or identify potential unmonitored releases that

7  7  you had not previously learned of?

8  8                  MS. PARK:  I'm going to object to form.

9  9          Q    (BY MR. SORENSEN)  Do you follow my

10  10  question?

11  11                  MS. PARK:  I don't.  I'm going to object

12  12  to form.

13  13          Q    (BY MR. SORENSEN)  I'll start again.

14  14  I'll start again.  We already talked about MBA's and

15  15  there are over 100 of them.  Some of them are small

16  16  portions of buildings.  Is that your understanding?

17  17          A    Excuse me.  Yes.

18  18          Q    And that inventories are taken on

19  19  different intervals, whether it's a week, two weeks,

20  20  every month, whatever it is.  Do you understand that,

21  21  also?

22  22          A    Yes.

23  23          Q    Okay.  Did you make any effort, and if

24  24  so, please describe it -- did you or your team make any

25  25  effort to analyze classified MUF and MUF-related

1    1    documents in their classified form at the narrowest

2    2    level possible -- that is the smallest MBA and the

3    3    smallest time frame the data permitted to see if you

4    4    could identify any unmonitored or potentially

5    5    unmonitored releases of plutonium into the environment?

6    6                 MS. PARK:  Objection.  Form.  And --

7    7    classified in their classified form?

8    8                 Q    (BY MR. SORENSEN)  Yes.  Did you make

9    9    any such effort?

10   10                A    No.  Because the amount of material

11   11    unaccounted for is unrelated to atmospheric releases to

12   12    the environment.

13   13                Q    Okay.  But the answer to my specific

14   14    question is no, you made no such effort; correct?

15   15                 MS. PARK:  Objection.  Asked and

16   16    answered.

17   17                Q    (BY MR. SORENSEN)  Correct?

18   18                A    Yes.

19   19                Q    I understand you gave me an explanation.

20   20    I'm just trying to get clear.  The answer to my

21   21    specific question is no; correct?

22   22                 MS. PARK:  He answered your question.

23   23    Same objection.

24   24                Q    (BY MR. SORENSEN)  Is that correct?

25   25                A    Yes.

1    1              Q     The answer is no?

2    2              MS. PARK:  Well, same objection.  He

3    3    answered it no with the explanation he felt he needed,

4    4    and now, you're trying to pull out of context --

5    5              A     I think I already answered.

6    6              Q     (BY MR. SORENSEN)  I say the answer is

7    7    no and you say yes.  Your answer is no; is that

8    8    correct?

9    9              A     Yes.

10   10             Q     All right.  All right.  That's fair

11   11   enough.  I think that's clear.

12   12             Did anyone -- either you or any member

13   13   of your team -- perform any scoping calculation or kind

14   14   of testing calculation that -- of the same sort I just

15   15   outlined to see whether, in fact, doing that kind of

16   16   calculation -- that is, looking at an MBA at a smallest

17   17   geographic physical level over the smallest period of

18   18   time -- could, in fact, be useful in identifying

19   19   previously unidentified releases to the environment?

20   20             MS. PARK:  Object.

21   21             Q     (BY MR. SORENSEN)  Did you do that kind

22   22   of scoping calculation?

23   23             MS. PARK:  Objection.  Form.  Vague and

24   24   ambiguous.  Scoping calculation?  Testing calculation?

25   25   Undefined.  And I think you made up those terms,

180

1    1    frankly.

2    2               MR. SORENSEN:  No, I didn't.

3    3          Q    (BY MR. SORENSEN)  Go ahead.

4    4          A    One -- she threw me off.  One doesn't

5    5    need to make such a scoping calculation because it's

6    6    clear from the arrangement of the facility that such a

7    7    calculation would -- would not be useful and, for that

8    8    reason, we did not make such calculations.

9    9          Q    So the answer is you made no such

10   10   calculations; correct?

11   11          A    For that reason.

12   12               MS. PARK:  Objection.  Asked and

13   13   answered.  He has answered your question, and you're

14   14   trying to pull it out of context.

15   15          Q    (BY MR. SORENSEN)  You keep adding a

16   16   reason, which you're free to do, and you'll have the

17   17   opportunity and you take the opportunity to add the

18   18   reason.  Fine.  I'm just trying to get a clear answer

19   19   to my question, which is whether it happened or not.

20   20   No such scoping calculation was made; correct?

21   21          A    To the best of my knowledge, and for

22   22   that reason.

23   23          Q    Okay.  Correct?

24   24          A    Correct.

25   25          Q    Okay.  All right.

26
27                    CARPENTER REPORTING, INC.
                        (303) 752-1200

1   1                     MR. POLAND:   We do expect that when that

2   2     appears in a brief, it'll appear in context with the

3   3     previous answer.

4   4                     MR. SORENSEN:   Why would you expect

5   5     that?   Just kidding for the record.   I always put

6   6     things in context.

7   7                     Q     (BY MR. SORENSEN)   Okay.   I was asking

8   8     you about potentially unmonitored releases.   I want to

9   9     turn to known identified releases of plutonium to the

10  10    atmosphere.   Okay.   Other than the '57 fire -- do you

11  11    have that in mind?

12  12                    A     Yes.

13  13                    Q     Okay.   That universe of releases --

14  14    whatever you thought and RAC thought it was of releases

15  15    of plutonium into the atmosphere from Rocky Flats other

16  16    than the '57 fire, did you or any members of your team

17  17    reviewing classified MUF or MUF-related documents

18  18    attempt to correlate any MUF documents to any

19  19    particular release to determine or make a calculation

20  20    of whether those MUF documents would assist you or shed

21  21    light in your analysis of the release?   Was any such

22  22    effort made?

23  23                    MS. PARK:   Objection.   Form.

24  24                    A     For the reason I've already explained to

25  25    you and for the further reason that the -- that the

26
27                       CARPENTER REPORTING, INC.
                           (303) 752-1200

182

1    1    second biggest release is from the 903 area, no such

2    2    scoping calculation was made, that I know of, for areas

3    3    outside any material balance area.

4    4         Q    (BY MR. SORENSEN)  So to not just limit

5    5    it to the 903 area, no such scoping calculation was

6    6    made; correct?  At all?

7    7         A    That's correct.

8    8              MS. PARK:  Objection to form.

9    9         Q    (BY MR. SORENSEN)  Okay.

10   10        A    For the reasons that I've stated.

11   11        Q    Okay.

12   12             MS. PARK:  And just give me a little bit

13   13   more time to get in.

14   14             THE DEPONENT:  I'm sorry.  I'm sorry.

15   15             MS. PARK:  That's okay.  You're doing

16   16   great.  I just need a little more time.

17   17        Q    (BY MR. SORENSEN)  Do you know what the

18   18   smallest geographic area inside Rocky Flats -- start

19   19   again.

20   20             Do you know what the smallest MBA or

21   21   material balance area is at Rocky Flats on a geographic

22   22   or square footage area?  Do you know what it is?

23   23        A    The smallest one, no, I couldn't tell

24   24   you that.

25   25        Q    Could you estimate the size in terms of

26        CARPENTER REPORTING, INC.
27        (303) 752-1200

183

1   1   numbers of rooms, square footage, or in any fashion?

2   2                   MS. PARK:  Objection.  Form.  Calls for

3   3   speculation.

4   4           Q   (BY MR. SORENSEN)  Go ahead.  If you

5   5   don't know, you can just say you don't know.

6   6           A   I don't know what the smallest area is.

7   7           Q   Do you know what the largest one is?

8   8           A   No.

9   9           Q   Do you know what the size of any of them

10  10  were?  That is -- my question is:  Do you know the

11  11  size, even approximately, of any MBA, material balance

12  12  area, at Rocky Flats?

13  13                   MS. PARK:  Without the aid of documents?

14  14          Q   (BY MR. SORENSEN)  You can look at

15  15  anything you want.  If there's a particular report you

16  16  want to look at, I'll pull it for you.

17  17          A   I don't -- I don't believe that the --

18  18  that there's a dimensional diagram of Room 180 in our

19  19  report, but I -- I did have the dimensions of that.  I,

20  20  unfortunately, don't recall what they were.

21  21          Q   Okay.  And so you have no other answer?

22  22          A   That was -- that was a balance area.

23  23          Q   Okay.  And you've answered my question

24  24  to the best of your ability?

25  25          A   I do not have a -- cannot make a square

1  1    footage area for that room at this time.

2  2           Q    Or for any other material balance area;

3  3    correct?

4  4           A    That's correct.

5  5           Q    Okay.  Do you know what the time

6  6    interval was for material balance accounting at Rocky

7  7    Flats for any particular material balance area?  Like a

8  8    weekly basis?  Monthly?  Do you know how frequently

9  9    they were done?

10 10           MS. PARK:  Objection to form.

11 11           A    Room 180 was done on a monthly basis.

12 12           Q    (BY MR. SORENSEN)  Okay.  Do you know

13 13    the time period for any other material balance area?

14 14           A    I have seen monthly intervals for a

15 15    variety of areas, but I can't specify exactly what

16 16    areas those were.  I mean, in reviewing the documents,

17 17    I've seen other areas with monthly intervals.

18 18           Q    Okay.  So, other than monthly, did you

19 19    see anything else that would indicate any other

20 20    interval for any other material balance area?

21 21           MS. PARK:  Objection.  Form.

22 22           A    Excuse me.  I don't -- I don't recall

23 23    the details of the times for other areas.

24 24           Q    (BY MR. SORENSEN)  Now, at a -- let me

25 25    back up.

1   1           A     Any --

2   2           Q     Any events of any kind.  I'll take a

3   3   step back.  You never worked at Rocky Flats; correct?

4   4           A     Except during the -- our dose

5   5   reconstruction study.  I worked there temporarily from

6   6   time to time.

7   7           Q     From '52 to '89, you never worked at

8   8   Rocky Flats?

9   9           A     I was never employed by Dow or Rockwell

10  10   at Rocky Flats.

11  11           Q     Did you ever do any work at Rocky Flats

12  12   from '52 to '89?  Physically present at Rocky Flats?

13  13           A     No.  Not that I can recall.

14  14           Q     Okay.  So your knowledge of what

15  15   occurred at Rocky Flats is derived from your view of,

16  16   in part, documents; correct?

17  17           A     Yes.

18  18           Q     And did you do any interviews?

19  19           A     Yes.

20  20           Q     Of employees?

21  21           A     Yes.

22  22           Q     And how many interviews did you conduct?

23  23           A     The interviews I did were -- were for

24  24   people in -- generally in the -- in the health physics

25  25   area or in the industrial hygiene area.  I can recall

1    1    going to -- going to California and interviewing --

2    2    what's his name?  I can't recall his first name.  His

3    3    initials are W.D., as I recall -- Kittinger, who was on

4    4    the health and safety staff.  I and some other people

5    5    interviewed Putzier.

6    6              Q    I think it's Putzier.

7    7              A    And I never have known -- he's got a

8    8    name like I do -- exactly how to pronounce it.

9    9    Although I'm sure he told me, I don't recall.

10   10             Q    Okay.

11   11             A    We -- I also have interviewed some other

12   12   people in health and safety at Rocky Flats, but I

13   13   don't -- no other names come to me.  We went on a

14   14   detailed tour of Building 71 with -- with a long-time

15   15   employee.  His name was Weaver and we were able to ask

16   16   him a lot of questions about -- about the building

17   17   and -- and the history of the building and the changes

18   18   that had been made to the building over time, because

19   19   when we did -- when we did our tour, the building was

20   20   very -- very different; in particular, the effluent

21   21   systems were very different than they had been in 1957.

22   22   We tried -- well, that doesn't add, I guess.

23   23             MS. PARK:  I believe the question was

24   24   just how many; right?

25   25             MR. SORENSEN:  Yeah.  I'm happy to just

1    1    was yes.

2    2                Q    Yes.  Okay.  I'm sorry.  A fault of my

3    3    question.

4    4                Did you or have you ever measured the

5    5    off-site concentrations of any hazardous substance

6    6    released from Rocky Flats?

7    7                MS. PARK:  Objection.  Form.

8    8          A    No.

9    9          Q    (BY MR. SORENSEN)  In any medium?  Air,

10   10   water, or soil?

11   11               MS. PARK:  Same objection.

12   12         A    No, I don't believe so.

13   13         Q    (BY MR. SORENSEN)  Okay.  Now, in a HAP

14   14   meeting of June '95, the discussion was about the

15   15   6 kilograms of MUF discussed in P10, and I'll show this

16   16   to you.  It's my only copy, but I want to just read it

17   17   and then I'll show it to you.  It's quoting you.

18   18               "What I would say is that based on

19   19   looking at the records, it's my opinion that most of

20   20   that 6 kilograms is in the ground.  Not the ground near

21   21   Rocky Flats, but the ground in the desert of

22   22   southeastern Idaho."

23   23               It's the highlighted portion at the

24   24   bottom.

25   25               MS. PARK:  I'm looking over the

26
27                        CARPENTER REPORTING, INC.
                             (303) 752-1200

1   1   witness's shoulder because I don't have a copy.

2   2   Q   (BY MR. SORENSEN)  Go ahead.  Go ahead.

3   3   A   No.  I see it.

4   4   Q   Do you see that?

5   5   A   Uh-huh.

6   6   Q   Do you recall making that statement, now

7   7   that you're looking at it?  The back page gives you the

8   8   date.  The very last page.

9   9   A   It says something about June -- some --

10   10   the 6th of June.

11   11   Q   Yeah.

12   12   MS. PARK:  And you don't -- this

13   13   document doesn't reflect the context of the discussion

14   14   other than what your representation is on the record,

15   15   David.  Do you know anywhere else where it describes --

16   16   MR. SORENSEN:  If you look around where

17   17   that discussion is occurring, it's all about that.

18   18   A   Yes, I recall, you know, talking about

19   19   this and that's -- I mean, this is a verbatim

20   20   recording.  I'm sure I must have made that statement.

21   21   Q   (BY MR. SORENSEN)  Okay.  Do you intend

22   22   to offer that opinion at trial?

23   23   A   That --

24   24   MS. PARK:  Objection.  Form.

25   25   Q   (BY MR. SORENSEN)  The opinion I just

26   CARPENTER REPORTING, INC.
27   (303) 752-1200

195

1  1    identified in the transcript.  That I just read into

2  2    the record.

3  3              MS. PARK:  Same objection.

4  4         A    I don't know whether I'm going to

5  5    testify at the trial or what I'm going to be asked to

6  6    testify about.

7  7         Q    (BY MR. SORENSEN)  Okay.  Now, the

8  8    opinion that I just recounted back to you that you

9  9    offered at this meeting, do you have some basis for

10 10   that opinion, other than what you've already discussed

11 11   here today in response to my earlier questions?

12 12             MS. PARK:  Objection.  Form.  And I'm

13 13   also going to object that we're taking really all of

14 14   this on your word that --

15 15             MR. SORENSEN:  He can read as much of it

16 16   as he wants.

17 17             MS. PARK:  That's fine.  Take a look and

18 18   read through it.

19 19             MR. SORENSEN:  Do you want to -- well,

20 20   strike that.

21 21             MS. PARK:  David, this is a fairly large

22 22   transcript.  The witness and I have just finished

23 23   skimming to page 51.  We're willing to work with you to

24 24   sort of focus on what the --

25 25             MR. SORENSEN:  Well, I've already showed

26
27                  CARPENTER REPORTING, INC.
                       (303) 752-1200

1    1    you the page that I was showing him.  You can read as

2    2    much of that as you want.  The discussion is about the

3    3    6 kilograms missing.  The whole discussion is about the

4    4    '57 fire, and then he makes the statement he made.

5    5            Q   (BY MR. SORENSEN)  Is there something

6    6    else you need to look at to answer the question I've

7    7    asked?

8    8                    MS. PARK:  What was the question you

9    9    had?

10   10                   MR. SORENSEN:  Well, that's a good

11   11   question.  What was my last question?

12   12           Q   (BY MR. SORENSEN)  The portion that I

13   13   read to you, quote, What I would say is based on

14   14   looking at the records, it's my opinion that most of

15   15   that 6 kilograms is in the ground.  Not the ground near

16   16   Rocky Flats, but the ground in the desert of

17   17   southeastern Idaho, close quote -- you recall saying

18   18   that?

19   19           A   Not explicitly, but it's recorded.

20   20           Q   Okay.  Do you have any basis for that

21   21   opinion, other than what you've already described in

22   22   this deposition in response to my earlier questions

23   23   about this Zodtner and Rogers study and about the RAC

24   24   report, P1068 dealing with the '57 fire?

25   25           A   Well, I don't think we discussed -- I

26
27                   CARPENTER REPORTING, INC.
                       (303) 752-1200

1    1    believe the answer is yes.

2    2                    Q    Okay.  And what is that?

3    3                    A    Well, we didn't discuss, for example,

4    4    previously the comparison of 1994 estimates of waste

5    5    shipped to Idaho.  It's page A-5.

6    6                    Q    We're looking at page A-5 of P1068?

7    7                    A    Right.

8    8                    Q    All right.  What -- what should I be

9    9    looking at?

10   10                   A    Okay.  There's a Table A-3.

11   11                   Q    Right.

12   12                   A    And there is plutonium in waste shipped

13   13   to Idaho, two categories there.

14   14                   Q    Right.

15   15                   A    And after the years, there are amounts

16   16   originally reported as having been sent to Idaho, and

17   17   there are amounts that were subsequently estimated in

18   18   1994 to -- to have been received in Idaho or revised

19   19   estimates of the amounts shipped.

20   20                   Q    Right.

21   21                   A    And you can see that if you look at the

22   22   first five years of operation, that there's roughly ten

23   23   times more in -- in the total of the revised estimates

24   24   than there was in the original ones.  And the same is

25   25   true if you extend that to 1961.

26
27                        CARPENTER REPORTING, INC.
                              (303) 752-1200

198

1    Q    When you say "ten times more," you're

2    comparing, for example, 3.4 for 1957 to 23.3?  That's a

3    little bit less than ten times.  But that's the

4    comparison?

5    A    I was comparing the sum of '54 to '59 to

6    this -- to the two categories.  17 --

7    Q    I see.

8    A    -- compared to 162 and for '54 to '61,

9    the comparison is 27 in round numbers to 297.

10    Q    All right.  And do you have any basis to

11    say that -- I'm sorry.  Were you finished?  I didn't

12    mean to cut you off.

13    A    I mean, you could look at -- you could

14    look at 1957 specifically.  That's about a factor of 7.

15    Q    Right.  And do you have any basis to say

16    that any portion of that increased estimate that is

17    from 3.4 to 23.3 in the 1957 line of Table A-3 of

18    Exhibit P1028 -- do you have any basis to believe that

19    any portion of that captures some portion of the

20    6 kilograms of fire loss discussed in the Zodtner and

21    Rogers study, P10?

22             MS. PARK:  Objection.

23    Q    (BY MR. SORENSEN)  And if you have any

24    such basis, please tell me what it is.

25             MS. PARK:  Well, I'm going to object to

199

1   1   form because those are two questions.  So let's just

2   2   start with the first question.

3   3          Q     (BY MR. SORENSEN)   Okay.   I'll start

4   4   again.

5   5                 Earlier in the deposition, you discussed

6   6   the 6.0, approximately, kilograms of material

7   7   unaccounted for labeled fire loss in the Zodtner and

8   8   Rogers study.  Do you recall those questions?

9   9          A     Yes.

10  10         Q     Okay.   Now, in the HAP transcript I

11  11  showed you, you were expressing an opinion that

12  12  6 kilograms -- some or all of it or most of it -- is

13  13  buried in the ground somewhere in Idaho.  Do you see

14  14  that?   That's still in front of you.  Do you see that?

15  15         A     Yes.

16  16         Q     I'm trying to understand what your basis

17  17  for that opinion is, other than what you've discussed

18  18  already.  You pointed me to Table A-3 of Exhibit P1028;

19  19  correct?

20  20         A     Correct.

21  21         Q     All right.  And what you pointed out is

22  22  that the 1994 estimates of plutonium shipped to Idaho

23  23  in waste are larger than the contemporaneous estimates?

24  24  You pointed that out.

25  25         A     That's correct.

26
27                     CARPENTER REPORTING, INC.
                        (303) 752-1200

1   Q   Okay.  Do you have any basis -- and if so, please explain exactly what it is -- to offer the opinion that any portion of the 6 kilograms of fire loss MUF identified in Zodtner and Rogers Exhibit P10 -- all right -- any portion of that is captured by the increased estimates of plutonium waste shipped to Idaho reflected in Table A-3 of Exhibit P1068?

8   MS. PARK:  Objection.  Form.  Asked and answered.

10   Q   (BY MR. SORENSEN)  Go ahead.

11   A   Generically, yes.

12   Q   How about specifically?

13   A   There is no way to link waste that came from Room 180 to waste that came from Rocky Flats in general, to the best of my knowledge.

16   Q   Okay.  Any other basis for the opinion expressed in the HAP transcript I showed you?

18   MS. PARK:  Objection to form.

19   MR. SORENSEN:  Excuse me.  No.  I'm going to mark this as Exhibit 1, please.

21   (Marked for identification was Deposition Exhibit No. 1.)

23   Q   (BY MR. SORENSEN)  It's actually the only copy I have for you guys.  Exhibit 1 bears the heading "Report of September 8th, 1997 Workshop."

222

1    at the computer disk, which is only that high.

2    (Indicating.)

3         Q    (BY MR. SORENSEN)   Go ahead.

4              MR. POLAND:   Excel spreadsheets, when

5    you print them out, are big.

6              MS. PARK:   Do you have the question in

7    mind?

8         A    The question -- the question is whether

9    I participated in the calculation of the doses to the

10   12,000 plaintiffs --

11        Q    (BY MR. SORENSEN)   Yes.

12        A    -- that you were given on a disk

13   recently.

14        Q    Yes.   Yes.

15        A    No, I did not.

16        Q    Okay.   Now, I think you said, in

17   connection with the '57 fire analysis you did, that you

18   engaged a fire expert, Diliberto & Associates.

19        A    Yes.

20        Q    All right.   If you could turn to page 7

21   of Exhibit P1068, please.   And in the middle of that

22   page, under Section 2.2 -- just barely hanging in

23   there.   Second full paragraph, it mentions Diliberto &

24   Associates.   Do you see that?

25        A    Not yet.   I'm -- I was --

CARPENTER REPORTING, INC.
(303) 752-1200

223

1    1             Q      Page 7?

2    2             A      Right.  I was thinking they were double-

3    3    sided pages, so I wasn't actually on page 6.

4    4             Q      Second full paragraph under Section 2.2.

5    5             A      2.2.  Diliberto & Associates.  Right.

6    6             Q      That's the fire expert you were talking

7    7    about?

8    8             A      Yes, it is.  Well, that's his company.

9    9             Q      Okay.  Did they prepare some kind of

10   10    separate report?

11   11             A      Yes.

12   12             Q      And is that separate report available

13   13    publicly?

14   14             A      Yes.  I believe it is.

15   15             Q      Okay.  Do you know where -- where it can

16   16    be located?

17   17             A      I assume it's at the Front Range

18   18    Community College and probably in the Norlin Library

19   19    with the collection of documents.

20   20                    MR. POLAND:  I'm sorry.  I didn't hear

21   21    the end of that.

22   22                    THE DEPONENT:  Norlin Library.

23   23                    MS. PARK:  Could you spell that?

24   24                    THE DEPONENT:  N-o-r-l-i-n.

25   25                    MS. PARK:  Thank you.

26                        CARPENTER REPORTING, INC.
27                            (303) 752-1200

224

1    1              Q      (BY MR. SORENSEN)   And what role did

2    2    this Diliberto & Associates report or analysis play in

3    3    your analysis as set forth in P1068?

4    4              A      It played -- well, there are several --

5    5    there are several aspects, I guess.   One was with

6    6    regard to the timing of the combustion of the various

7    7    sets of filters.   Actually, that -- the chronology of

8    8    the fire was a key aspect, and, also, the -- the

9    9    flammability.

10   10             He reviewed information about

11   11   experiments dealing with the flammability of the CWS

12   12   filters that were conducted at Rocky Flats and other

13   13   places after -- after the fire occurred and looked very

14   14   closely at the -- at the timing of -- of the burning of

15   15   such -- such filters.   Those are the filters that were

16   16   used in Building 57 at the time of the fire.

17   17             Q      Who made the decision to engage them?

18   18             A      I did -- or we did.

19   19             Q      Well, if you did, did you need approval

20   20   from Dr. Till?

21   21             A      Yes, I think we agreed at a -- at a

22   22   meeting that we should do that.   And I con -- I found

23   23   him as a -- as an expert.

24   24             Q      Okay.   Is that because Diliberto had

25   25   expertise in fire issues that was not possessed by you

26
27                       CARPENTER REPORTING, INC.
                             (303) 752-1200

1   1   or other members of RAC?  Is that why?

2   2          A    He had more experience in fire issues,

3   3   yes.

4   4          Q    Does anyone at RAC have expertise in

5   5   fire issues or fire standards?

6   6          A    I had done a lot of reading about fire

7   7   propagation and -- and deflagration and so on, but my

8   8   expertise wasn't nearly as good as his.

9   9          Q    Okay.  So is it fair to say that, once

10  10  you got Dilibergo's report, you relied on it in the

11  11  preparation of this P1068?

12  12          A    Yes, we did.

13  13          Q    Okay.  Could you turn to page 37 of

14  14  P1068, please.

15  15              MR. POLAND:  Again, which document is

16  16  P1068?

17  17              THE DEPONENT:  The '57 fire.

18  18              MS. PARK:  '57 fire.

19  19          Q    (BY MR. SORENSEN)  Do you see that

20  20  table, 3.6?

21  21          A    Yes.

22  22          Q    It's titled "Estimated Amounts of

23  23  Plutonium Involved in the Fire."  And I want to -- if

24  24  you could have, also, next to you P10 that I gave you

25  25  earlier, the Zodtner and Rogers study, and if you could

26          CARPENTER REPORTING, INC.
27                (303) 752-1200

239

1    1                    MS. PARK:  Objection to form.

2    2          A     On the assumption that the --

3    3                    MS. PARK:  Speculation.

4    4          A     Excuse me.  On the assumption that the

5    5    time of separation of the plutonium was not many years

6    6    before 1957 because this calculation starts at the time

7    7    that plutonium is separated from the americium

8    8    initially.  You know, when the plutonium is purified,

9    9    that's when the clock starts.

10   10          Q     (BY MR. SORENSEN)  Okay.  Now, in doing

11   11   this 1957 fire source term analysis that's reflected in

12   12   P1068, you needed to make a number of assumptions and

13   13   estimates; correct?

14   14                    MS. PARK:  Objection.  Form.

15   15          A     We needed to make a number of

16   16   calculations.

17   17          Q     (BY MR. SORENSEN)  You used the word

18   18   "estimates" a number of times in your report.

19   19          A     Estimates are the result of

20   20   calculations.

21   21          Q     Okay.  But when you say "estimates,"

22   22   it's because you don't have specific data you can just

23   23   look at and say, That's the number, we don't need to

24   24   make an estimate?  That's why you need to make the

25   25   estimate; correct?

240

1    1                    MS. PARK:   Objection to form.

2    2              Q     (BY MR. SORENSEN)   For example, you

3    3    don't know the actual temperature inside the '57 fire

4    4    when it was burning; correct?   There were no

5    5    measurements made; correct?

6    6              A     That's correct.

7    7              Q     So you had to, after the fact -- that is

8    8    in 1999 or thereabouts -- attempt to estimate what it

9    9    was back in 1957; correct?

10   10             A     In doing our analysis, we considered a

11   11   broad range of possible temperatures and incorporated

12   12   that into our uncertainty analysis of the amount

13   13   released.

14   14             Q     My point is that you needed to do that

15   15   estimate because there was no temperature reading that

16   16   you could just look at and use; correct?

17   17             A     That's correct.

18   18             Q     Okay.   And that's true of a number of

19   19   parameters and factors that you needed to examine to do

20   20   your analysis; correct?   You needed to make estimates

21   21   after the fact because there was no contemporaneous

22   22   data at the time that you could reliably use; correct?

23   23                   MS. PARK:   Objection to form.   And that

24   24   really is two questions.

25   25             Q     (BY MR. SORENSEN)   Go ahead.

1    1              MS. PARK:  Answer the -- you can just

2    2    make clear which question you're answering.

3    3              A    I guess I didn't hear the "and."  Can

4    4    you tell me what it was?

5    5              Q    (BY MR. SORENSEN)  I'll start again.  I

6    6    just gave you the example of temperature.

7    7              A    Right.

8    8              Q    But there are other parameters or

9    9    factors that you needed to examine to do your analysis

10   10   reflected in P1068 that you were required to make

11   11   after-the-fact estimates of because there was no

12   12   reliable contemporaneous data that you could simply

13   13   take off the shelf; correct?

14   14              MS. PARK:  Objection to form.

15   15              A    Our charge was to make a best estimate

16   16   of the amount of plutonium released, and in doing this

17   17   for every parameter -- not just the temperature -- we

18   18   considered a range of estimates of that parameter,

19   19   as -- in most cases as a central value for that

20   20   parameter.  And that distribution of possibilities was

21   21   included in the uncertainty analysis of our

22   22   calculations.  And it's the source -- the uncertainties

23   23   in all those individual parameters are reflected in the

24   24   uncertainty in the total release estimate.

25   25              So not being able to just grab one value

1    1    wasn't -- that wasn't the kind of calculation we were

2    2    doing.  We were doing a best estimate calculation with

3    3    an uncertainty analysis.

4    4         Q    (BY MR. SORENSEN)  Isn't it true that if

5    5    you -- if there did exist reliable contemporaneous data

6    6    that you could just take off the shelf, you wouldn't be

7    7    required to do any kind of estimation or uncertainty

8    8    analysis; correct?  Isn't that -- doesn't that

9    9    logically follow?

10   10             MS. PARK:  Objection.  Speculation.

11   11         A    Are you saying that if -- if the

12   12    effluents from the building stack in Building 71 in

13   13    1957 on the 11th and 12th of September had been

14   14    measured, we wouldn't have to do this?  Is that what

15   15    you're saying?

16   16         Q    (BY MR. SORENSEN)  Well, that's a

17   17    shorthand way of perhaps saying it.  If it had been

18   18    measured and measured accurately, you wouldn't have to

19   19    do this; correct?

20   20         A    That's right.

21   21         Q    Okay.  So, for example, look at page 22

22   22    of P1068.  Are you there, sir?

23   23         A    Yes.

24   24         Q    It states towards the top of the page,

25   25    the second full paragraph towards the end, "The

1   1   conditions of oxidation of plutonium metal are very

2   2   important for estimating the appropriate release

3   3   fraction, Section 4.  Because these conditions are not

4   4   known, a range of possibilities is considered in

5   5   Section 5."  Do you see that?  Second full paragraph --

6   6          A    Second --

7   7          Q    The second full paragraph on page 22,

8   8   last two sentences.

9   9          A    Oh, okay.  I wasn't far enough down.

10  10         Q    That's all right.  It begins, "The

11  11   conditions of oxidation."

12  12         A    Right.

13  13         Q    Do you see those two sentences?

14  14         A    Yes.

15  15         Q    Okay.  These are -- this is -- start

16  16   again.

17  17              You say, "The conditions of oxidation of

18  18   plutonium metal are very important."  Do you see that?

19  19         A    Yes.

20  20         Q    Okay.  I take it there were no reliable

21  21   contemporaneous records you could turn to to figure out

22  22   the answer to this particular question.  That is, the

23  23   conditions of oxidation at the time; is that right?

24  24         A    That's correct.

25  25              MS. PARK:  Objection.  Form.

26
27              CARPENTER REPORTING, INC.
                 (303) 752-1200

244

1    1              A    Sorry.

2    2                   MS. PARK:  That's okay.

3    3              Q   (BY MR. SORENSEN)  Can you turn to page

4    4     24.  Bottom of the page, the first sentence states,

5    5     "Original records of the exhaust flow rates during

6    6     early years of operation of Building 71 are no longer

7    7     available for review."  Do you see that?

8    8              A    Yes.

9    9              Q    Is it your understanding that those have

10   10    been destroyed?

11   11                   MS. PARK:  Objection.  Foundation.

12   12              A    I don't know whether they've been

13   13    destroyed or not, but I think you should also read the

14   14    next sentence.

15   15              Q    (BY MR. SORENSEN)  Right.  I see the

16   16    next sentence.  I'm just asking you about the first

17   17    sentence.

18   18              A    I don't know whether they have been

19   19    destroyed.

20   20              Q    Okay.  Can you turn to page 25, please.

21   21    The last paragraph on page 25 begins, "The amount of

22   22    contamination present on the filters is needed to

23   23    estimate the release of plutonium from filters that

24   24    burned."  Do you see that?

25   25              A    Yes.

1   Q   Here again, there were no
2   contemporaneous reliable records that you could use;
3   correct?  Of the amount of contamination present on the
4   filters at the time of the fire; correct?

5   A   No.  That's not correct.

6   Q   There were such records?

7   A   Yes.  In fact, we used the records to --
8   to calculate the amount of plutonium that was present
9   on the filters.

10   Q   And what -- where -- where do you
11   discuss these records?

12   A   Well, it might have been starting back
13   on the previous page.  No.  It's not.  I guess, then,
14   it's probably on the next page.  Well, the next --
15   actually, the next several pages.  You see in Table
16   3.3, and there's discussion of this as we go along --
17   but I'll try and summarize that.  Do you see in Table
18   3.3, there are a number of ducts?  The areas where
19   they -- from which they drew air --

20   Q   Uh-huh.  Yes.

21   A   -- and the activities in those areas?

22   Q   Right.

23   A   And the -- these ducts were sampled on a
24   routine basis and the values were reported in monthly
25   reports of the radiation protection staff.

246

1   1          Q     Okay.

2   2          A     And that, I think, is the same Putzier

3   3   reference that I -- that I pointed out back on page --

4   4   the next line after the line you had the question

5   5   about.  Monthly health physics reports.  They contain

6   6   also the discharge air volume.  That was for the stack.

7   7   Excuse me.  Okay.  So we took those concentration

8   8   measurements that were reported in the monthly reports

9   9   and information about the flow rates through the

10  10  ventilation system and calculated the amount of

11  11  material that had been transported to the -- to the

12  12  filter.  And there's a summary of -- of the initial

13  13  estimates there on page 27.

14  14          Q     So you -- meaning RAC -- using the data

15  15  you just described -- you calculated or estimated the

16  16  amount of contamination present on the filters;

17  17  correct?

18  18          A     Right.

19  19          Q     That number wasn't just sitting

20  20  someplace in a record that you just read off; correct?

21  21          A     That's correct.  But what you had said

22  22  was that there were no contemporaneous -- there was no

23  23  contemporaneous information.

24  24          Q     I understand.  I understand.  Well --

25  25          A     I don't remember exactly what you said.

247

1    1                Q      Whatever I asked, I asked.  I'm just

2    2      trying to be clear about what -- what your testimony

3    3      is.  So you took the information and you estimated the

4    4      amount of contamination present on the filters.  And

5    5      you also had to make an estimate, did you not, of the

6    6      efficiency of the filters?  How much plutonium they

7    7      were collecting; correct?

8    8                A      No.  Because the measurements of

9    9      concentration in the ducts were upstream of the

10   10     filters.  So -- okay.  So we've got ducts coming in and

11   11     then -- my watch is the filters.

12   12                Q      Right.

13   13                A      Okay.  So we've got these ducts coming

14   14     in and the air is going this way.  (Deponent

15   15     indicating.)

16   16                Q      Okay.

17   17                A      We've got a measurement here, a

18   18     measurement here, measurement here, measurement here.

19   19     (Deponent indicating.)

20   20                Q      Okay.  I see.

21   21                A      Okay.

22   22                Q      Based on these measurements, then you're

23   23     calculating how much gets trapped in the filter?

24   24                A      Gets to the filter.

25   25                Q      Gets to the filter?

248

1    1              A    Right.

2    2              Q    And then did you make some estimate of

3    3    how much stays in the filter, or you just took the 100

4    4    percent that hit the filter?

5    5              A    I, frankly, don't know whether we took

6    6    the entire 100 percent or whether we took a count of

7    7    what was measured downstream of the filter in the

8    8    effluent sample.

9    9              Q    Downstream means after the filter,

10   10   upstream --

11   11             A    After the filter.

12   12             Q    -- in front of the filter in the way

13   13   you're using these words?

14   14             A    Right.

15   15             Q    Okay.  Okay.  But if you did not assume

16   16   that 100 percent of the plutonium that you calculated

17   17   was trapped in the filter, you would have had to make

18   18   some estimate of the filter efficiency; correct?

19   19             A    Yes.

20   20             Q    Doesn't that follow?

21   21             A    Yes.  That's true.

22   22             Q    Okay.

23   23             A    And -- well -- and in fact, there

24   24   were -- there were data -- there were measurements of

25   25   filter efficiencies that were made at Rocky Flats using

1    1    the -- the filter -- filters in the filter bank.

2    2              Q    Okay.  If you would turn to page 29,

3    3    please --

4    4              A    Okay.

5    5              Q    -- second full paragraph, it says in the

6    6    middle, "Analysis of the data showed that the single

7    7    probe did not provide representative sampling of the

8    8    building effluent."  Do you see that sentence?

9    9              A    Yes.

10   10             Q    We're talking about building effluent

11   11   from where?

12   12             A    From Building 71.

13   13             Q    Where the fire occurred; correct?

14   14             A    Right.  That's what this refers to is --

15   15   this is -- this is the '57 fire report; right?  Have I

16   16   lost track?

17   17             Q    No.  This is all the '57 fire report.

18   18             A    Okay.

19   19             Q    Let me see if I understand what you're

20   20   saying.  So imagine the exhaust is a square.  Is what

21   21   you're saying that there's only one point that's being

22   22   sampled and that's --

23   23             A    In the center.

24   24             Q    -- potentially not representative

25   25   because other places around that one point could have

256

1    1    discussed temperature.  How about the surface area of

2    2    the metal?  Were there contemporaneous records that you

3    3    could rely on for that, or did you have to make

4    4    estimates?

5    5              A    For the --

6    6              MS. PARK:  Objection.  Form.

7    7              A    For the metal hemispheres, we made -- we

8    8    made estimates.  These -- and whenever we did this, of

9    9    course, we took into account the band of uncertainty

10   10   associated with -- with the release fraction.  As we go

11   11   on, there's -- if you -- maybe you're going to stop at

12   12   it.  There's a table that shows the estimates of

13   13   uncertainty, the release fractions, and the estimates

14   14   of uncertainty associated with them.

15   15              Q    (BY MR. SORENSEN)  But you were

16   16   estimating the uncertainty bounds; correct?

17   17              A    Based on the measurement data.

18   18              Q    Well, right.  Well, based on whatever

19   19   data you had, you were then creating an estimate of

20   20   what the uncertainty bounds are; correct?  You don't

21   21   take those off the shelf, either; right?

22   22              MS. PARK:  Objection.  Form.

23   23              A    The uncertainty bounds are based on the

24   24   measurement data in the literature.  Measurements that

25   25   were made under controlled conditions.

257

1    1              Q    (BY MR. SORENSEN)  Well, the surface

2    2    area of the metal?

3    3              A    Oh, I'm sorry.  I thought you were

4    4    talking about the release fractions.

5    5              Q    No.  Well, talking about different

6    6    things.  I mean, I gather, for some uncertainty bounds,

7    7    you're taking it from the literature and for others,

8    8    you, yourself, have to estimate the uncertainty;

9    9    correct?

10   10             MS. PARK:  Objection.  Form.

11   11             Q    (BY MR. SORENSEN)  Isn't that right?

12   12             A    Well, all these things relate to the

13   13   release fractions.

14   14             Q    Right.  Okay.

15   15             A    And so we are estimating, when we --

16   16   when we take an estimate for a release fraction for a

17   17   particular form, the uncertainty bounds are dependent

18   18   on the measured release fractions under those

19   19   conditions for -- for the forms that we're talking

20   20   about, looking -- considering the -- the surface area

21   21   and so on.  And -- and I'm not -- I can't at this

22   22   moment recall a specific case to -- to describe to you.

23   23             Q    Well, did you have to or did you come up

24   24   with your own estimate of the uncertainty range to use

25   25   for the surface area of the plutonium metal present at

1  the '57 fire?

2       A    I don't recall.

3       Q    Okay.  How about the humidity of the

4  air?  There were no contemporaneous records of that;

5  correct?

6       A    That's correct.

7       Q    So did you come up with an estimate and

8  an uncertainty range to use for that?

9       A    I can't say absolutely sitting here

10  right here, right now, but it seems to me that -- that

11  the situation, when -- when humidity was important, was

12  at very high humidities and we could be quite confident

13  that we weren't at very high humidities.

14       Q    Okay.  Is that just because of the

15  general climate here?

16       A    Well, it's because of the general

17  climate and the fact that there was a fire going on.

18       Q    Well, fires can occur in humid

19  conditions, can't they?

20       A    Not if you start with dry air to start

21  with.

22       Q    But fires can burn in humid conditions

23  when it's not raining; correct?

24       A    That's true.

25       Q    You also list the air velocity.  I take

259

1    1    it it's correct that there were no reliable

2    2    contemporaneous measurements of the air velocity at the

3    3    time of the '57 fire; correct?

4    4         A    Actually, we had information about the

5    5    air velocity through the gloveboxes based on the flow

6    6    rate and the size of the gloveboxes.

7    7         Q    During the actual fire itself?

8    8         A    Certainly, at the -- at the start of the

9    9    fire, and then we also had estimates of the air

10   10   velocity in the room, as I recall.

11   11        Q    During the fire?

12   12        A    During the fire.  After -- that becomes

13   13   important after the gloveboxes have been breached.  But

14   14   the most -- the most important time period is -- is

15   15   when the material -- when the glovebox filter is being

16   16   burned out.  The air velocity for that is calculable

17   17   from the flow rate through the system and the -- and

18   18   the physical size of the box.

19   19        Q    So this most important flow rate, is

20   20   that something you had to calculate, or is that

21   21   something you just read off a contemporaneous

22   22   measurement?

23   23        A    It's a contemporaneous measurement in

24   24   the sense that the air velocity through the duct is

25   25   contemporaneous and the size of the duct is

26
27                  CARPENTER REPORTING, INC.
                       (303) 752-1200

1    1    contemporaneous.  It's -- it's two -- it's two

2    2    quantities based on conditions at the time.  It's

3    3    not -- it wasn't charted on the wall or anything like

4    4    that.

5    5         Q    All right.  But then you had to

6    6    calculate the rest; is that right?

7    7         A    We had to calculate the ratio of those

8    8    two numbers, yes.

9    9         Q    Okay.  Turn to page 48, please.

10   10             MS. PARK:  48?

11   11             MR. SORENSEN:  48.

12   12         Q    (BY MR. SORENSEN)  Are you there, sir?

13   13         A    Yes.

14   14         Q    Do you see the last full paragraph, it

15   15    states, "The actual conditions of plutonium oxidation

16   16    during the fire are not known."  Do you see that?

17   17         A    Yes.

18   18         Q    Because they were not known, that's why

19   19    you had to make all these estimates with uncertainty

20   20    ranges; correct?

21   21         A    Well, because the -- the conditions were

22   22    not known, we effectively assumed a uniform

23   23    distribution of conditions for the four categories.

24   24         Q    But that assumption could be wrong;

25   25    correct?

1   1                    MS. PARK:  Objection.  Form.

2   2              Q     (BY MR. SORENSEN)  Go ahead.

3   3              A     It's likely to be an overestimate of --

4   4     of the actual conditions.

5   5              Q     The question is the assumption could be

6   6     wrong?  The answer to that is yes; correct?

7   7                    MS. PARK:  Same objection.

8   8              A     When you don't have any information, you

9   9     use a uniform distribution to reflect that lack of

10  10    knowledge.  Okay?  And that's -- that's your best

11  11    estimate of the result.  And it includes the

12  12    uncertainty of the result.  We don't -- we don't know

13  13    what the right answer is.  We're trying to calculate a

14  14    best estimate with an uncertainty range.

15  15             Q     (BY MR. SORENSEN)  Can you turn to page

16  16    51, please.  The first full paragraph, about the

17  17    middle, states, "The calculated releases are most

18  18    sensitive to the amount of metal assumed to have been

19  19    subject to very high-temperature (vigorous) oxidation."

20  20    Do you see that?

21  21             A     Yes.

22  22             Q     Now, that is, in turn, sensitive to the

23  23    amount of metal assumed to have been present in the

24  24    first place; correct?  First, you start with the amount

25  25    of metal present; isn't that right?

26
27                    CARPENTER REPORTING, INC.
                          (303) 752-1200

1    MS. PARK:  Objection to form.

2    Q    (BY MR. SORENSEN)  Before the fire even
starts, you have to figure out how much plutonium was
present; correct?

5    A    Right.  But we did a sensitivity -- what
the sentence says is that we did a sensitivity analysis
that showed that the -- that the fraction of the metal
in that category, regardless of how big the total
quantity was -- the fraction of the metal in that
category was -- was a primary source of uncertainty in
the answer that we received.

12    Q    Okay.  But the -- ultimately, the amount
of plutonium that burned and got released, if it's
sensitive to this percentage, it's also then sensitive
to the amount of -- the absolute amount of plutonium
present in the first place; isn't that right?

17    A    That's not what I'm saying.

18    Q    Okay.

19    A    What I'm saying is we have four
categories and we have material distributed uniformly
among the four categories.

22    Q    Okay.

23    A    And we do this calculation and we've got
an answer out here with uncertainty.  And what I
said -- what this says is that this answer is very

SHEET 263   PAGE 263

263

1    sensitive to whether we use -- use a uniform

2    distribution of metal in those four categories,

3    regardless of what the total amount is, whether we use

4    a uniform distribution and put 25 percent in the

5    vigorous oxidation category or whether we use a more

6    realistic distribution and put less than 25 percent in

7    that category and more in the other categories.  And

8    it's not dependent on the total -- it's not dependent

9    on the same of A plus B, plus C, plus D where those are

10   the amounts of metal in the four categories.

11            Q    Maybe this is too simplistic, but

12   whatever percentage of metal subject to high-

13   temperature oxidation -- whatever that percentage is,

14   5 percent, 25 percent, it's some percentage of an

15   absolute amount of metal; correct?

16            A    Right.  But it -- this statement is

17   talking about the sensitivity of the result to the

18   oxidation categories.

19            Q    Got it.  And I take it it's correct that

20   there were no reliable contemporaneous measurements you

21   could use that told you the percentage of plutonium

22   subject to very high-temperature oxidation at the time

23   of the '57 fire; correct?

24            MS. PARK:  Objection.  Form.

25            A    It's impossible to make such

CARPENTER REPORTING, INC.
(303) 752-1200

264

1    1    measurements in the middle of a fire.

2    2              Q    (BY MR. SORENSEN)   The answer to my

3    3    question is no, there were no such measurements?

4    4              A    That's correct.

5    5              Q    Okay.  Could you turn to page 52, this

6    6    table we looked at before, please.

7    7              A    Uh-huh.

8    8              Q    Now, if you look at the ChemRisk number,

9    9    there's a range of .03 to 33 grams.  Do you see that?

10   10             A    Yes.

11   11             Q    That's their 5 percent and 95 percent

12   12   distribution range; correct?  Is that right?

13   13             A    Yes.  Sorry.

14   14             Q    And they were presenting that publicly

15   15   to say, you know, our best estimate is 1 gram, but

16   16   we'll give you a range from .03 to 33.  It could be as

17   17   high as 33.  Isn't that what that meant in lay terms?

18   18             A    I -- yeah.  I don't -- I don't have the

19   19   1 gram in this -- in this table.  So if you're

20   20   saying --

21   21             Q    I'm looking right at it.

22   22             A    I know it's .03 to 33.  I don't -- there

23   23   it is.  1 gram.  I'm sorry.  Pardon me.

24   24             Q    That's all right.

25   25             A    I looked at this table the other day and

26
27                      CARPENTER REPORTING, INC.
                            (303) 752-1200

1    1              Q    (BY MR. SORENSEN)  Okay.

2    2                   (Marked for identification were

3    3    Deposition Exhibit Nos. 2 and 3.)

4    4              Q    (BY MR. SORENSEN)  Sir, what I've marked

5    5    as Exhibit 2 is entitled Technical Memorandum,

6    6    Examination of Mass Balance Accounting as a Means of

7    7    Estimating Plutonium Releases by Paul Voilleque dated

8    8    May 1995.  Do you see that, sir?

9    9              A    Yes.

10   10             Q    And what I've marked as Exhibit 3 is

11   11   titled Tracking Toxic Substances at Industrial

12   12   Facilities, National Academy Press, 1990.  Do you see

13   13   that?

14   14             A    Yes.

15   15             Q    Okay.  Can you first confirm for me that

16   16   you wrote Exhibit 2?

17   17             A    Yes.

18   18             Q    Okay.  And Exhibit 2 --

19   19             A    Well, just a minute.

20   20             Q    Yeah.  Go ahead.  Attached to Exhibit 2

21   21   is a portion of a transcript from May 25, 1995.

22   22             A    Is Exhibit 2 complete?

23   23                  MS. PARK:  Exhibit 2 isn't page

24   24   numbered, so it's difficult to determine.

25   25             A    There's no set of references here.

267

1    1              Q    (BY MR. SORENSEN)   Are you telling me

2    2     that Exhibit 2 is not complete?

3    3              A    I'm not sure that -- no.   I'm saying --

4    4     I'm asking a question, which was is it complete,

5    5     because I'm surprised to look at the back and not see

6    6     this National Academy report in a reference list.

7    7              Q    Okay.   This was attached to another RAC

8    8     report, was it not?

9    9              MS. PARK:   When you say "this," are you

10   10    referring to --

11   11              MR. SORENSEN:   Exhibit 2.

12   12              MS. PARK:   -- the entirety of it,

13   13    including the HAP transcript?

14   14              MR. SORENSEN:   Exhibit 2.   Just the memo

15   15    itself.

16   16              MS. PARK:   The reason why we're confused

17   17    is because my Exhibit 2 has a technical memoranda and

18   18    the HAP transcript.

19   19              MR. SORENSEN:   Right.   I understand

20   20    that.

21   21              Q    (BY MR. SORENSEN)   Do you recall whether

22   22    this was attached to -- the technical memo was attached

23   23    to a longer RAC report?

24   24              A    I'm just looking to see if I can answer

25   25    that question for you.   If you look, actually, at the

26
27                  CARPENTER REPORTING, INC.
                       (303) 752-1200

1    1    report we were just looking at, which is the '57 fire

2    2    report --

3    3                    MS. PARK:  PX1068.

4    4             A    -- yeah, 1068 -- Appendix B has the same

5    5    title.

6    6             Q    (BY MR. SORENSEN)  Can I see?

7    7             A    Yeah.  This is the fire report we were

8    8    just talking about.

9    9             Q    Yeah.  Because I'll show you where I got

10   10   Exhibit 2 from in a moment.  I'm just going to compare

11   11   them.  Right.  Well, Appendix B in Exhibit 1068 is not

12   12   the same thing as Exhibit B of this deposition; right?

13   13   They are two different things?

14   14                    MS. PARK:  Do you mean they are not

15   15   identical?

16   16                    MR. SORENSEN:  They don't have the same

17   17   title, for example.

18   18             A    I thought the title was the same,

19   19   actually.

20   20             Q    (BY MR. SORENSEN)  Well, Appendix --

21   21             A    Examination of Mass Balance Accounting

22   22   as a Means for Estimating Mass Plutonium Releases.

23   23             Q    Right.  The differences show up pretty

24   24   quickly in terms of the text.  I mean, you wrote both

25   25   documents; correct?  Exhibit 2 to the deposition and

269

1    1    Appendix B to Exhibit P1068?

2    2              MS. PARK:  I have to keep insisting when

3    3    you say "Exhibit 2," you're referring to the technical

4    4    memoranda.

5    5              MR. SORENSEN:  Yes.

6    6              MS. PARK:  I mean, we can take the

7    7    transcript and mark it as a separate exhibit if it'll

8    8    make it less confusing.

9    9              MR. SORENSEN:  I will get to that in

10   10   just one second.

11   11              A    Well, I am the author of this, but I'm

12   12   surprised that there's not a list of references there.

13   13              Q    (BY MR. SORENSEN)  Well, I will show you

14   14   P1079, which is August '99 RAC Responses to Public

15   15   Questions and Concerns, and attached to that is this

16   16   technical memorandum and right after that technical

17   17   memorandum follows this excerpt from the HAP meeting.

18   18              A    What's the date of the HAP meeting?

19   19              Q    May 25, 1995.  I will show you this,

20   20   sir.  Why don't you tell me, looking at this, whether

21   21   the HAP meeting should have been part of this or, you

22   22   know, that was something we copied that was in error.

23   23   That's 1068, DX514.

24   24              A    Right.  Well, that --

25   25              MS. PARK:  You're looking through 1079.

26
27                   CARPENTER REPORTING, INC.
                         (303) 752-1200

1    1          Q    (BY MR. SORENSEN)  I'm sorry.  Yeah.

2    2    1079.  The -- let the record reflect what I showed the

3    3    witness and he is looking through is 1079.  P1079.

4    4          A    Okay.  I think we've got two things

5    5    here.  One is -- one is this memorandum that I wrote,

6    6    or at least the first version of this memorandum.  And

7    7    then this is probably some discussion about that

8    8    memorandum, I would assume, from its title.

9    9          Q    Okay.  When you say the first --

10    10          A    Discussion of mass balance during my '57

11    11    fire presentation.

12    12          MS. PARK:  I don't want you to guess.

13    13    The question is whether you know.  No one wants you to

14    14    guess.

15    15          Q    (BY MR. SORENSEN)  When you say the

16    16    first version, is the later version of the document you

17    17    pointed me to in P1068?

18    18          A    That's obviously a more complete version

19    19    because it has the references and so on.  It has more

20    20    details about how the calculation might be made on that

21    21    first page there.

22    22          Q    Right.  Right.  Okay.

23    23          MS. PARK:  So you're referring to

24    24    Appendix B in PX1068, David?

25    25          MR. SORENSEN:  I just was, yes.  Okay.

271

1    1              Q    (BY MR. SORENSEN)  Now --

2    2              A    I mean, I'm sure that some of the

3    3    material is the same, but that's definitely a more

4    4    complete version there.

5    5              Q    When you say "that," can you tell me

6    6    what you're referring to?

7    7                   MS. PARK:  Exhibit B in 1068.

8    8              A    Exhibit B in P1068 is obviously a more

9    9    complete version than what was discussed at this -- at

10   10   this meeting.

11   11             Q    (BY MR. SORENSEN)  Okay.  Got you.  Both

12   12   versions, that is the text portion that you wrote of

13   13   Exhibit 2 to the deposition and Appendix B to P1068 --

14   14   for both, one of your references and one of the

15   15   materials you relied on is Exhibit 3 to your

16   16   deposition; correct?  Take a look at Exhibit 3.

17   17             A    Yeah.  That's what got me started in the

18   18   first place was looking for the reference.

19   19             Q    Got it.  The reference is not there?

20   20             A    It's not there.

21   21             Q    It's there for Appendix B.

22   22             A    But it's not here, but this does refer

23   23   to this document.

24   24             Q    When you say "this document," you're

25   25   talking about now Exhibit 3 to the deposition?

1   1                A    Right.

2   2                Q    Okay.

3   3                A    I should look at Exhibit 2, I suppose.

4   4       And Exhibit 2 does refer to Exhibit 3.

5   5                Q    Okay.  Now, let's focus on Exhibit 3 to

6   6       the deposition for a moment, this Tracking Toxic

7   7       Substances in Industrial Facilities.  This study

8   8       nowhere mentions any nuclear facility; correct?

9   9                     MS. PARK:  Well, David, this study is a

10  10      1,000-plus -- I take that back.  A 200-plus-page

11  11      document.

12  12                Q    (BY MR. SORENSEN)  You relied on this

13  13      study; correct?

14  14                     MS. PARK:  Can he have a minute to take

15  15      a look at it?

16  16                     MR. SORENSEN:  Sure.  He can look at it.

17  17                     MS. PARK:  I think that question is very

18  18      broad.  I don't know how he can answer it without

19  19      looking through 200 pages.

20  20                Q    (BY MR. SORENSEN)  Let me ask you this:

21  21      If this study, Exhibit 3, had specifically discussed

22  22      plutonium in a nuclear facility, isn't it fair to

23  23      assume that you would have mentioned it --

24  24                     MS. PARK:  Objection to form.

25  25                Q    (BY MR. SORENSEN)  -- in something you

26
27                    CARPENTER REPORTING, INC.
                         (303) 752-1200

1    1    wrote?

2    2                MS. PARK:  Objection to form.

3    3           A    Well, you could -- you could make

4    4    whatever assumption you want, but let me look at the

5    5    introduction --

6    6           Q    (BY MR. SORENSEN)  Sure.

7    7           A    -- to this, and I think that would

8    8    probably answer your question.  So the potential

9    9    usefulness of mass balance information surfaces an

10   10   issue in the reauthorization of the CERCLA 1980

11   11   legislation, which was the -- the SARA legislation.

12   12   And the --

13   13           MS. PARK:  Paul, are you just reading

14   14   from the document out loud or answering the question?

15   15           THE DEPONENT:  I am trying to answer his

16   16   question.

17   17           MS. PARK:  Okay.  I just wanted to make

18   18   sure.

19   19        A    And that legislation deals with releases

20   20   of chemicals from various types of facilities.  And it

21   21   does not, therefore, consider releases of radioactivity

22   22   from various types of facilities.

23   23           Q    (BY MR. SORENSEN)  Okay.  In the first

24   24   version of this technical memorandum that's at least

25   25   part of Deposition Exhibit 2, you state on the first

1  1  page, "However, it was thought that plutonium

2  2  accountability data would prove to be more reliable

3  3  because of the much higher value of plutonium.

4  4  Citizens have expressed the same idea, because

5  5  plutonium was more valuable than gold, you would expect

6  6  that those responsible would know where every last bit

7  7  was."

8  8                Do you know, in fact, how valuable

9  9  plutonium is monetarily in relation to gold?

10  10                MS. PARK:  Objection to form.  Vague and

11  11  ambiguous.

12  12        A    That -- that -- that statement reflects

13  13  a statement of one or more citizens who commented on

14  14  this idea of using a mass balance approach.  That

15  15  was -- I'm trying to reflect their statement there.

16  16        Q    (BY MR. SORENSEN)  Well, the first

17  17  sentence, however, "It was thought that plutonium

18  18  accountability data" -- "it was thought."  Is that

19  19  something you thought?  You were writing this.

20  20        A    Maybe we should go back to the

21  21  beginning.  The -- we were asked by members of the

22  22  Health Advisory Panel and by citizens to consider a

23  23  mass balance approach for estimating the releases.  And

24  24  we had -- we had looked at uranium accountability

25  25  previously at Fernald.  And we had -- we had talked --

1    1    as I recall, we had talked to them -- the people on the

2    2    HAP about this approach and about what we had seen at

3    3    Fernald, but the -- the -- the sentence -- this refers

4    4    to the higher value of plutonium relative to uranium.

5    5    Right?

6    6             Q    Right.

7    7             A    That's what -- that's what that sentence

8    8    is talking about.

9    9             Q    Well, the construction "it was thought,"

10   10   that refers to something you thought?

11   11             MS. PARK:   Objection.  Asked and

12   12   answered.

13   13             A    Not necessarily.  I was trying to --

14   14   that's what I was trying to get to.  I'm sorry.  I got

15   15   off track there.  The "it was thought" is -- is, I

16   16   believe, the result -- I don't remember the exact

17   17   discussions that took place explicitly, but I think

18   18   it's a result of discussions among the people who

19   19   were -- who were pushing the idea or who were

20   20   requesting that -- that we perform a mass balance

21   21   accounting process, procedure, employ a mass balance

22   22   accounting procedure.

23   23             Q    (BY MR. SORENSEN)  Okay.  And when I

24   24   earlier asked about the MUF and MUF-related classified

25   25   documents you and your team looked at, did you do that

26
27                    CARPENTER REPORTING, INC.
                         (303) 752-1200

1   1   review before or after writing this May 1995 technical

2   2   memorandum marked as Exhibit 2 to the deposition?

3   3         A   I think most of that review was done

4   4   before, but I wouldn't preclude that part of it was

5   5   done afterward.

6   6         Q   Okay.  And after you did -- you wrote

7   7   this May '95 technical memorandum, Exhibit 2 to the

8   8   dep, did you do any further review of classified MUF

9   9   and MUF-related documents?

10  10        A   I think I just said that most of the

11  11   re -- maybe I misunderstood your previous question.  I

12  12   think I just answered that I thought most of the review

13  13   of -- of MUF-related documents was done before this

14  14   time, but that -- that I wouldn't exclude MUF-related

15  15   document review after this time.

16  16        Q   I'll ask this then:  After you wrote

17  17   this May '95 technical memorandum, did you go back into

18  18   a classified setting, looking at classified MUF

19  19   documents, to do some kind of a reanalysis of any kind

20  20   to try to figure out whether MUF data could be used?

21  21        MS. PARK:  Objection.  Form.

22  22        A   I think -- I think the -- the MUF review

23  23   that -- that was done after this time was more focused

24  24   on -- on Building 71 and the fire situation.

25  25        Q   (BY MR. SORENSEN)  The '57 fire?

306

1    1              Q    Okay.  So, going back, you went through

2    2    a number of reports with Mr. Sorensen -- RAC reports --

3    3    in which he asked you questions about your, quote,

4    4    unquote, expertise -- those are words that he used --

5    5    and whether or not you had drawn on areas of your

6    6    expertise -- his words -- to author or contribute to

7    7    these various RAC reports.  You remember that line of

8    8    testimony; right?

9    9              MR. SORENSEN:  Object to that question,

10   10   too, as misleading, misstating the record.  Go ahead.

11   11              MS. PARK:  David, can you please wait

12   12   until I finish my question before you interpose your

13   13   objection?  I'd appreciate it.

14   14              MR. SORENSEN:  Sure.

15   15              Q    (BY MS. PARK)  In those reports that you

16   16   reviewed with Mr. Sorensen, they also set forth what

17   17   you did as a historical matter in conducting RAC's

18   18   investigation as part of the historical public exposure

19   19   studies; right?

20   20              MR. SORENSEN:  Objection.  Leading.

21   21              A    The reports reflect what -- what we did.

22   22   Not just I did.  What we did in Phase II of -- of

23   23   the -- of the Rocky Flats health studies project.

24   24              Q    (BY MS. PARK)  And that includes what

25   25   you personally did, as well; correct?

26
27                    CARPENTER REPORTING, INC.
                          (303) 752-1200

307

```
1    1                    MR. SORENSEN:  Objection.  Leading.

2    2            A    Yes.

3    3            Q    (BY MS. PARK)  Okay.  And you have

4    4    personal knowledge, obviously, of the efforts that you

5    5    undertook to investigate certain issues in connection

6    6    with the historical public exposure studies; right?

7    7                    MR. SORENSEN:  Objection.  Leading.

8    8            A    Yes.

9    9                    MR. SORENSEN:  This is your witness.

10   10   You're not allowed to lead your witness.

11   11                   MS. PARK:  Your objection is noted for

12   12   the record.

13   13           A    Yes.  I know what I did.

14   14           Q    (BY MS. PARK)  Okay.  And these reports

15   15   set forth the steps that you undertook to evaluate

16   16   certain issues, such as the source terms for the

17   17   various release events that you were involved in;

18   18   right?

19   19                   MR. SORENSEN:  Objection.  Leading.

20   20           A    Yes.

21   21           Q    (BY MS. PARK)  Okay.  And these reports

22   22   also set forth the documents and the categories of

23   23   documents that you reviewed at the time as part of your

24   24   historical investigation into this Phase II project;

25   25   correct?
```

1          MR. SORENSEN:  Objection.  Leading.

2     A    Yes.

3     Q    (BY MS. PARK)  Okay.  And the various

RAC reports that you reviewed also reflect your

investigation of the historical events surrounding your

work in connection with the Phase II project; right?

7          MR. SORENSEN:  Objection.  Leading.

8     A    I wouldn't characterize it as the

historical events surrounding our work.  The historical

events are events that we analyzed in the course of our

work, if that's what you mean.

12    Q    (BY MS. PARK)  That is what I mean.  In

the sense that you went back and you looked at, for

example, the Rogers and Zodtner report to look at the

events at that point in time; correct?

16         MR. SORENSEN:  Objection.  Leading.

17    A    Okay.  I'm beginning to get a little bit

confused here.  I thought you were talking about

historical events.  And now your example is a

historical report.

21    Q    (BY MS. PARK)  And in that historical

report, it investigated a particular historical event,

the 1957 fire; right?

24         MR. SORENSEN:  Objection.  Leading.

25    A    I understand what you're saying now.

309

1    1    Yes.

2    2              Q    (BY MS. PARK)   Okay.   And now that you

3    3    understand what I'm -- what I'm asking, in that sense,

4    4    did your work, which involved you going back and

5    5    looking at logbooks and other reports such as the '57

6    6    fire report and the Zodtner report, did your work

7    7    involve examining the historical events that took place

8    8    at Rocky Flats?

9    9              MR. SORENSEN:  Objection.  Leading.

10   10             A    Yes.  That was the purpose of our work

11   11   was to examine historical events at Rocky Flats.

12   12             Q    (BY MS. PARK)  Was part of the purpose

13   13   of your work to investigate the historical facts that

14   14   were associated at Rocky Flats?

15   15             MR. SORENSEN:  Objection.  Form.  Vague.

16   16             A    As -- as part of our work, we always

17   17   look at documents that are contemporaneous to the

18   18   situations that we're trying to analyze.

19   19             Q    (BY MS. PARK)  So you have personal

20   20   knowledge of your review of the historical documents

21   21   that you reviewed as part of this Phase II study;

22   22   correct?

23   23             MR. SORENSEN:  Objection.  Leading.

24   24             A    Yes.

25   25             Q    (BY MS. PARK)  Okay.  And you also have

310

1  1    personal knowledge of the procedures that you and RAC

2  2    followed to review various documents as part of your

3  3    effort to review as much of the source material as

4  4    possible; right?

5  5                    MR. SORENSEN:  Objection.  Leading.

6  6         A    I'm not quite sure what you mean by

7  7    "procedures," but we did do a thorough document review.

8  8         Q    (BY MS. PARK)  And you have knowledge

9  9    about --

10 10        A    And I know about that, yes.

11 11        Q    Okay.  And none of the reports that you

12 12   reviewed this morning with Mr. Sorensen and, indeed,

13 13   throughout the day were reports that you prepared as a

14 14   part of this litigation, Cook v. Rockwell; correct?

15 15        A    That's correct.

16 16        Q    In fact, all of the reports that you

17 17   reviewed with Mr. Sorensen today are reports that were

18 18   prepared in advance of any time that you knew about any

19 19   potential involvement you may have with this

20 20   litigation; correct?

21 21                    MR. SORENSEN:  Objection.  Assumes facts

22 22   not in evidence.  Foundation.  And leading.

23 23        A    I believe what you said is correct.

24 24        Q    (BY MS. PARK)  Okay.  So --

25 25        A    And I might add, I suppose, that it's

26
27                    CARPENTER REPORTING, INC.
                       (303) 752-1200