Exhibit D

4187

1           IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLORADO
2
Civil Action No. 90-CV-00181(JLK)
3
MERILYN COOK, et al.,
4
      Plaintiffs,
5
vs.
6
ROCKWELL INTERNATIONAL CORPORATION and
7  THE DOW CHEMICAL COMPANY,
8
      Defendants.
9  ─────────────────────────────────────────────────

10                    REPORTER'S TRANSCRIPT
                        Trial to Jury
11                        VOLUME 29

12  ─────────────────────────────────────────────────

13           Proceedings before the HONORABLE JOHN L. KANE, JR.,

14  Judge, United States District Court for the District of

15  Colorado, commencing at 9:00 a.m., on the 7th day of November,

16  2005, in Courtroom A802, United States Courthouse, Denver,

17  Colorado.

18

19

20

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
    Produced via Computer by Janet M. Coppock, 901 19th Street,
25       Room A-257, Denver, Colorado, 80294, (303) 893-2835

4207

1   we are going to be in recess from December 16 until January 3rd

2   and we are going every day after that until the trial is

3   completed, however long it takes.

4         Now, this is my ruling on Biggs.  Dr. Biggs is a

5   meteorologist who reportedly participated in several groups and

6   projects addressing environmental issues in Rocky Flats,

7   including the Rocky Flats scientific monitoring panel later

8   known as the citizens advisory board, appointed by Governor

9   Romer in 1989.

10        Plaintiffs report that Dr. Biggs will testify about

11  the historical events surrounding his work including the fact

12  that the governor's panel found Rocky Flats environmental

13  monitoring systems inadequate in various ways.  I find no merit

14  in defendants' contention that Dr. Biggs lacks personal

15  knowledge regarding matters such as Rocky Flats monitoring

16  system because he acquired his knowledge after the fact and

17  through his participation in the governor's panel and similar

18  vehicles.

19        To the extent his testimony reports the historical

20  facts associated with his work on Rocky Flats issues, his

21  testimony is admissible without reference to Rule 701 or Rule

22  702.  If Dr. Biggs offers any opinions in the course of his

23  testimony, I will determine whether they are admissible lay

24  opinions based upon the following principles.

25        As a general rule, the opinion testimony is admissible

4208

1    only to help the jury or the Court to understand the facts

2    about which the witness is testifying and not to provide

3    specialized explanations or interpretations that an untrained

4    layman could not make if perceiving the same acts or events.

5    Lay opinion testimony is admissible so long as the opinions or

6    inferences being expressed do not require any specialized

7    knowledge and could be reached by any ordinary person.

8         I will be guided by this general rule in determining

9    whether any opinions Dr. Biggs might offer as part of his

10   testimony are admissible under Rule 701.

11        The essence of the distinction, as I see it, is

12   whether the testimony is based on facts, extrinsic or intrinsic

13   to his work in this investigation, by the committee or the

14   panel on which he serves.

15        MR. BERNICK:  I just -- I didn't understand the

16   extrinsic versus intrinsic.

17        THE COURT:  If the knowledge he has he gives an

18   opinion about is contained within the work of the panel, the

19   things that they did, and he is simply giving an opinion about

20   that, it's fine.  If it requires some kind of specialized

21   knowledge, research or other data that experts use, it isn't

22   admissible.

23        MR. BERNICK:  What if it is intrinsic in the sense it

24   was part of the panel's work?  Presumably it is an expert panel

25   and, therefore, all of its work involves expert opinions.

4490

```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
2
   Civil Action No. 90-CV-00181(JLK)
3
   MERILYN COOK, et al.,
4
        Plaintiffs,
5
   vs.
6
   ROCKWELL INTERNATIONAL CORPORATION and
7  THE DOW CHEMICAL COMPANY,
8
        Defendants.
9  _____

10                   REPORTER'S TRANSCRIPT
                        Trial to Jury
11                        VOLUME 32

12 _____

13       Proceedings before the HONORABLE JOHN L. KANE, JR.,

14 Judge, United States District Court for the District of

15 Colorado, commencing at 1:05 p.m., on the 8th day of November,

16 2005, in Courtroom A802, United States Courthouse, Denver,

17 Colorado.

18

19

20

21

22

23

24 Proceeding Recorded by Mechanical Stenography, Transcription
   Produced via Computer by Janet M. Coppock, 901 19th Street,
25    Room A-257, Denver, Colorado, 80294, (303) 893-2835
```

Gale Biggs - Direct

1    says?

2    A.   Yes, ma'am.

3    Q.   Then it goes down further under the now therefore.  Can you

4    highlight -- and number one?

5         Now, therefore, I, Roy Romer, governor of Colorado by

6    virtue of the authority invested in me under the laws of

7    Colorado, do hereby order that, one, the Governor's Rocky Flats

8    Scientific Panel on Monitoring Systems is created, which will

9    consist of no more than 20 members representing independent

10   science, research and private industry specialists.  All

11   members shall be appointed by the governor to serve at his

12   pleasure.  The governor shall appoint the chair.

13        And you were one of the 20 members appointed by the

14   governor?

15   A.   I was one of the members.  I don't know that we ever got as

16   many as 20 appointed.

17   Q.   And if you would look at P1328.

18   A.   Yes.

19   Q.   Can you identify that?

20   A.   This is a July 7, 1989, document which was a press release

21   released by the governor's office announcing the appointment.

22        MR. KURTENBACH:  Before we get into the substance of

23   the document, we object on the grounds it's hearsay.  We don't

24   know of any exception that applies.  It's a -- one page of a

25   press release.

4744

1      IN THE UNITED STATES DISTRICT COURT
2           FOR THE DISTRICT OF COLORADO

Civil Action No. 90-CV-00181(JLK)
3
MERILYN COOK, et al.,
4
       Plaintiffs,
5
vs.
6
ROCKWELL INTERNATIONAL CORPORATION and
7  THE DOW CHEMICAL COMPANY,
8
       Defendants.
9  _____

10                 **REPORTER'S TRANSCRIPT**
                      Trial to Jury
11                      VOLUME 34

12  _____

13      Proceedings before the HONORABLE JOHN L. KANE, JR.,

14  Judge, United States District Court for the District of

15  Colorado, commencing at 1:15 p.m., on the 9th day of November,

16  2005, in Courtroom A802, United States Courthouse, Denver,

17  Colorado.

18

19

20

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
    Produced via Computer by Janet M. Coppock, 901 19th Street,
25      Room A-257, Denver, Colorado, 80294, (303) 893-2835

4773

Gale Biggs - Redirect

1   in the panel's report.

2          Now, there was on cross-examination, the examination

3   went beyond the fact of that report because there was nobody

4   else to cross-examine, otherwise we are basically accepting the

5   report at face value, which we obviously could not afford to

6   do.  We timely objected to his being used for that purpose.

7   When you go beyond that, they attest to the accuracy of the

8   report that they even after having been cross-examined with

9   respect to reports that were issued in late 1990s, that was

10  very improper, and we would move to strike it, and we would

11  further ask the Court to tell the jury to disregard his

12  testimony to the extent it is offered as an opinion based upon

13  the science today because it isn't.

14         We further need to know from the Court what procedures

15  we should follow to supplement our witness list because, as

16  these witnesses proceed, we now have to add to our list.  We

17  have to call people to respond to this both factually and this

18  expert matter.  We are prepared to do that.  We are prepared to

19  do it in a timely basis, but we are waiting for instructions

20  from the Court how we should let the other side know who we

21  should be adding witnesses to our list.

22         MR. DAVIDOFF:  Can I respond briefly?

23         THE COURT:  Sure.

24         MR. DAVIDOFF:  On September 22nd or August 22nd, I

25  can't remember which, when they filed a timely motion in limine

4774

Gale Biggs - Redirect

1   by the motion in limine deadline to strike -- to preclude

2   Dr. Biggs' testimony, that was denied.  That motion was renewed

3   a few days ago.  Again, the Court denied the motion.  Dr. Biggs

4   testified within the confines of what he actually did at Rocky

5   Flats and the confines of his report, and counsel opened

6   numerous doors on cross-examination, and the redirect -- and

7   was basically specifically rifle shot targeted to the exact

8   documents and the exact points that were opened up on

9   cross-examination.  I think the motion that counsel are making

10  is wholly improper.

11          THE COURT:  It's not an improper motion.  He has the

12  right to make it.  The motion is denied, and if you want to add

13  to your list, you have to file a motion that sets forth the

14  grounds for it.

15          (In open court.)

16      (**Richard Clapp** was sworn.)

17          THE WITNESS:  I do.

18          THE COURT DEPUTY:  Please state your full name for the

19  record, spelling your first and last names.

20          THE WITNESS:  Richard W. Clapp, it's R-I-C-H-A-R-D,

21  last name is C-L-A-P-P.

22          MR. SORENSEN:  Good afternoon, Dr. Clapp.

23          THE WITNESS:  Good afternoon.

24                    **DIRECT EXAMINATION**

25  BY MR. SORENSEN:

5176

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 90-cv-00181-JLK

MERILYN COOK, et al.,

    Plaintiffs,

vs.

ROCKWELL INTERNATIONAL CORPORATION, and THE DOW CHEMICAL
COMPANY,

    Defendants.

_____

REPORTER'S TRANSCRIPT
Volume 38

_____

      Proceedings before the HONORABLE JOHN L. KANE, JR.,
Senior Judge, United States District Court for the District of
Colorado, commencing at 1:22 p.m., on the 14th day of November,
2005, in Courtroom A802, United States Courthouse, Denver,
Colorado.

Proceeding Reported by Mechanical Stenography, Transcription
Produced via Computer by Kara Spitler, RMR, CRR,
901 19th Street, Denver, CO, 80294, (303) 623-3080

Thomas Cochran - Direct                5294

1      MS. ROSELLE:  What about our problem with them?

2      THE COURT:  I haven't given it, but I will.

3      Yes.

4      MR. DAVIDOFF:  We attached an explanatory letter that

5  went to them as an exhibit to our filing when we filed our

6  final order of call.  And the only problem that I'm aware of

7  that has cropped up since then -- and we're following that

8  order of call, one of the issues was Mr. Lund, who is not

9  available until the -- L-U-N-D, who is not available until

10  December 5.  And we've been notifying them about that, and I

11  think I mentioned it to Your Honor before the trial even began.

12      The only other thing that I'm aware of right now that

13  would interfere with the orders of call is that Mr. McKay, if

14  we reach him on Wednesday, he's had some medical issues, he

15  just spent a week at the Mayo Clinic and he has a medical

16  appointment on Wednesday, but he would be available on

17  Thursday.  And his deposition is being completed, as I

18  understand it, tomorrow.

19      MR. BERNICK:  You don't want to hear, you don't want

20  to hear -- they're making other problems.

21      MR. DAVIDOFF:  Could I just -- could I just --

22      THE COURT:  Look, no, you can't.  I don't want to hear

23  any more of this tonight.  You people talk to each other and

24  act like human beings and talk to each other and work it out.

25  You got four days' notice.  I granted a motion from the defense

Thomas Cochran - Direct                                5295

1  to go ahead and add additional witnesses based upon testimony

2  you had as rebuttal witnesses, and I will do that if good cause

3  is shown.  But you have to proceed in good faith.  And that's a

4  term that I'm beginning to believe that none of you are

5  familiar with.  Now, stop it.

6       (Recess at 4:54 p.m.)

7                    REPORTER'S CERTIFICATE

8       I certify that the foregoing is a correct transcript

9  from the record of proceedings in the above-entitled matter.

10  Dated at Denver, Colorado, this 14th day of November, 2005.

11

12                                    _____
                                          Kara Spitler

13  WITNESSES

14      Richard Kaufman

15          Cross-Examination Continued By Mr. Bernick      5179

16          Redirect Examination By Mr. Sorensen            5203

17          Recross-examination By Mr. Bernick              5217

18      THOMAS COCHRAN

19          Direct Examination By Mr. Davidoff              5231

20          Voir Dire Examination By Mr. Bernick            5261

21          Direct Examination Continued By Mr. Davidoff    5266

22                    PLAINTIFFS' EXHIBITS

23  Exhibit      Offered  Received  Refused  Reserved  Withdrawn

24  635           5216

25  636           5216

6011

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 90-cv-00181-JLK

MERILYN COOK, et al.,

    Plaintiffs,

vs.

ROCKWELL INTERNATIONAL CORPORATION, and THE DOW CHEMICAL
COMPANY,

    Defendants.

_____

REPORTER'S TRANSCRIPT
Trial to Jury
Volume 46

_____

      Proceedings before the HONORABLE JOHN L. KANE, JR.,

Senior Judge, United States District Court for the District of

Colorado, commencing at 1:20 p.m., on the 21st day of November,

2005, in Courtroom A802, United States Courthouse, Denver,

Colorado.

Proceeding Reported by Mechanical Stenography, Transcription
Produced via Computer by Kara Spitler, RMR, CRR,
901 19th Street, Denver, CO, 80294, (303) 623-3080

6130

1  the same fashion that Dr. Biggs took the stand and talked about

2  what he concluded at the time, factually about matters that we

3  thought were fairly expert.  But he testified as to what the

4  report was that he put together.  That's exactly what

5  Mr. Voilleque is going to do.  He's going to talk about how the

6  RAC reports were put together in the area for which he is

7  responsible.  And there would be other witnesses that have to

8  do the other thing.  There are fact witnesses testifying about

9  the RAC report.

10           With respect to Mr. Fimberg/Scott, I don't think we're

11  going to call Mr. Fimberg/Scott.  If they want to worry about

12  it, they can.  But this is why we agreed last week under Your

13  Honor's instruction to turn out the list by Wednesday, not

14  tomorrow, but by Wednesday, so that we could give them a firm

15  commitment.

16           I can go through all these others --

17           THE COURT:  I don't want to listen to this.

18           MR. BERNICK:  Yeah.

19           THE COURT:  I am not and never have been a magistrate.

20  I do not schedule discovery matters for counsel.  I leave that

21  up to them.  And if you can't schedule the depositions that you

22  want to take and I have permitted them, I'll have to take

23  action when there's a motion in front of me for sanctions.

24  That's the only thing I can do.  I'm not going to sit around

25  here and order depositions to be taken when I don't even know

6953

1     IN THE UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF COLORADO
2
 Civil Action No. 90-cv-00181(JLK)
3
 MERILYN COOK, et al.,
4
   Plaintiffs,
5
 vs.
6
 ROCKWELL INTERNATIONAL CORPORATION and
7 THE DOW CHEMICAL COMPANY,
8
   Defendants.
9 _____

10       **REPORTER'S TRANSCRIPT**
        TRIAL TO JURY
11         Volume 55

12 _____

13    Proceedings before the HONORABLE JOHN L. KANE, JR.,

14 Senior Judge, United States District Court for the District of

15 Colorado, continuing at 8:53 a.m., on the 8th day of December,

16 2005, in Courtroom A802, United States Courthouse, Denver,

17 Colorado.

18

19

20

21

22

23

24 Proceeding Recorded by Mechanical Stenography, Transcription
  Produced via Computer by Therese Lindblom, 901 19th Street,
25   Room A259, Denver, Colorado, 80294, (303) 628-7877

7048

Joel Selbin - Direct

1   the panel and went to panel meetings, and a little bit of what

2   you learned in the first few months that you were going to the

3   monthly SALOP panel meetings.

4   A.   Well, the panel, I think, officially began with 13 members.

5   I'm not sure whether those are all -- the ones just listed

6   here.   I can -- let me count them -- I see only 11 names here.

7   But I think the idea of the panel, as I think I mentioned

8   already --

9   Q.   Sir, minor correction, two co-chairs makes 13.

10   A.   You're right.   Absolutely right.   Sorry.   I didn't count

11   the two co-chairs.   Sorry.

12          Anyway, the idea was to have representatives from the

13   surrounding communities, interested citizens concerned with the

14   property cleanup of Rocky Flats, proper remediation.

15          And I and a few others were invited to join as

16   technically trained people to help interpret some of the

17   technical discussions that we were going to have.   And the fact

18   of the matter is, we had a great many technical discussions

19   involving all kinds of things that go into arriving at a soil

20   action level.

21          Because, again, I would remind you that the purpose of

22   this committee forming was to question the 651 picocuries or

23   1,429, whichever you want to look at, that was promulgated by

24   the three agencies without citizen input.

25          That was the key.

7056

Joel Selbin - Direct

1   Q.   The concerns I wanted to ask about, first, was things like

2   natural events or natural phenomenon that might have an impact

3   on dispersion of plutonium.

4           Did the panel discuss such things?

5   A.   We did, indeed.

6   Q.   Could you tell the jury -- just let me ask the quick

7   follow-up question.

8   A.   Sure.

9   Q.   Could you tell the members of the jury the kinds of things,

10  the topics that the panel discussed.

11  A.   Well, the topics included resuspension as a very

12  important -- redistribution, spreading of plutonium, both on

13  the site and off the site.   Plutonium, of course, is not going

14  to arrive at the boundary of Rocky Flats and say, I can't go

15  any further.   Nature doesn't work that way.

16          Resuspended material occurs with tremendous winds.

17  And those of you who are familiar with the area, and in

18  particular who experienced 90-mile-an-hour winds in Boulder a

19  couple of days ago, know that I have experienced those kinds of

20  winds on Route 93 right by Rocky Flats.   So there is

21  resuspension that way.

22          Resuspension can occur with a fire --

23  Q.   Sir, can I --

24  A.   We discussed fires --

25  Q.   I'm going to bring you right back to fires, I promise.

7057

Joel Selbin - Direct

1   A.   Sure.

2   Q.   Highway 93, while we're on the topic, that actually runs

3   right from Boulder all the way past the old Rocky Flats site --

4   A.   West --

5   Q.   West of the Rocky Flats site, and right near the foothills;

6   is that a fair statement?

7   A.   That's correct.

8   Q.   Go ahead, sir, I'm sorry.  You're on fires now.

9   A.   Well, actually, fires didn't come up right away.  But it

10  occurred to us in our discussions of the movement of

11  radioactive materials on the site that they were going to be in

12  the process of being resuspended from the topsoil, that they

13  would get onto plants.  And, of course, if plants burned, then

14  that would be another way of redistributing plutonium.

15         We -- in our discussion of the transport of plutonium

16  underground, we were led to believe that it would not move,

17  except in water, but that it would not move through the soil on

18  grounds that at the time I thought were quite reasonable,

19  because, as a chemist, I knew what we were told also by the

20  agencies, that the plutonium is in the form of a very insoluble

21  compound called plutonium oxide.  And plutonium oxide,

22  therefore, is not dissolved by water.  And so if it's in the

23  ground, it presumably should be retained in the soil and should

24  not move.

25         And this was why I discovered -- why I introduced to

7058

Joel Selbin - Direct

1   the panel two very important documents that I understand have

2   not been --

3   Q.   Well, sir, let's not go there yet.

4   A.   All right.

5   Q.   The -- we're on things, natural phenomenon or other

6   phenomenon that were discussed by the panel.   Underground

7   transport of plutonium, was that one of them too?

8   A.   Yes.

9   Q.   Either water or otherwise, right?

10   A.   Yes.

11   Q.   Were there other kinds of living organisms other than

12   plants that were discussed?

13   A.   Yes, animals, of course, will pick up plutonium, both from

14   eating plants, certainly from eating each other, and certainly

15   by digging into the ground.

16          Some of the animals, of course, are capable of digging

17   well into the ground and picking up radioactive material and

18   moving it around as they move around.   Of course, some of them

19   move off-site, so some of them actually carry some radioactive

20   material off-site.   And we did, indeed, discuss that.

21   Q.   How about water, either surface or groundwater, did you

22   discuss that?

23   A.   Yes, we did.   Surface water carries -- was carrying

24   plutonium and other radioactive materials through the site and

25   off-site.

7059

Joel Selbin - Direct

1    Q.  And groundwater as well?

2    A.  Groundwater as well.  It's --

3         MR. BERNICK:  Is the question whether groundwater was

4    carrying plutonium off --

5         MR. DAVIDOFF:  I'm going to rephrase that question,

6    Your Honor.

7    BY MR. DAVIDOFF:

8    Q.  You at least discussed whether or not groundwater could

9    carry plutonium off-site?

10   A.  Yes, we did, which is why I wanted to refer to one of

11   the --

12   Q.  Well, let's --

13   A.  Okay.

14   Q.  You're going to have an opportunity to discuss them, at

15   least, I think.

16   A.  Okay.

17   Q.  Let's talk about the final things.  Did you discuss

18   concentrations of plutonium in certain areas?

19   A.  We did.  We discussed in particular the fact that sampling

20   was necessary throughout the site, and that there had to be

21   some good regiment for sampling.  Sampling meaning, digging

22   holes and taking up a sample of material, sending it to a

23   laboratory and examining how much plutonium and other harmful

24   materials were there.

25   Q.  Okay.

7060

Joel Selbin - Direct

1   A.   What we were concerned about was that there was no way in

2   the world to physically sample the entire site.   There had to

3   be a certain distance between sampling holes; otherwise, we

4   could spend the national budget just digging holes and

5   sampling.

6            So our concern was that these radioactive materials

7   can concentrate in very small regions, which we call hot spots.

8   And so we discussed hot spots.

9            And what do we do if we miss a hot spot?   We know what

10  to do if we find a hot spot, we remediate.   And that's the

11  whole purpose of a soil action level.   A soil action level, if

12  it's set at a certain number, and you find a hot spot, and the

13  soil action level there is 10 times or 100 times that, you

14  remediate it.

15           But what if you don't find it?   And that was a great

16  concern of ours.   And there are a great many hot spots expected

17  to be present in Rocky Flats.   It has not been sampled nearly

18  adequately enough to know that we've gotten most of them.

19           MR. BERNICK:   Your Honor, great respect and due

20  respect for Dr. Selbin.   I think the last statement that the

21  witness made was pretty much an opinion on the state of Rocky

22  Flats --

23           THE COURT:   Yes.

24           MR. BERNICK:   -- today.   I don't think that's within

25  the scope of his appearance.

7061

Joel Selbin - Direct

1      THE COURT:  That's correct.  The objection is

2  sustained.

3      MR. DAVIDOFF:  Can I --

4      THE COURT:  Doctor, you're not called in as an expert,

5  and that requires an expert opinion.

6      THE WITNESS:  Thank you.

7      THE COURT:  That's what the objection is.

8      THE WITNESS:  I understand.

9  BY MR. DAVIDOFF:

10 Q.  Let me just ask you, focusing on the discussions of the

11 committee, where all the agencies were there, and the 13 --

12 however many of the 13 attended and members of the public, were

13 these hot spots discussed?

14 A.  Absolutely.

15 Q.  What was the consensus on the SALOP committee about whether

16 the hot spots could all be successfully remediated or not?

17 A.  Well, the general opinion -- and you must understand, we

18 never took a vote on anything.  This committee was not

19 organized with Roberts Rules of Order or anything like that.

20 But the consensus was that there were hot spots and that we

21 were probably not going to be able to know them all.

22      Now, that was -- that a consensus opinion of the

23 group.  We would like to know them all, but there was no

24 physical way to do that for sure.

25 Q.  Okay.  And that was with all the agency people and the

Joel Selbin - Direct

1   Kaiser-Hill people you identified before present; is that

2   right?

3   A.   That's correct.

4   Q.   Now, let's go into a little -- a little bit more about your

5   interest on the committee.

6       You mentioned that you saw a couple of articles.  And

7   without reading from the articles, could you tell -- tell us

8   what they were and what concern they animated in your mind and

9   what you did about it.

10  A.   Well, the reason these articles, I think, are incredibly

11  important, whether or not they get introduced, or could be

12  introduced --

13      MR. BERNICK:  Well, I'm not sure what difference it's

14  going to make after a certain point.

15      You know, I always want the jury to see absolutely

16  everything -- never make any objections whatsoever.  But -- so

17  the witness knows, and it sounds to me like the witness doesn't

18  really know, that I believe Your Honor's ruling is that the --

19  basically, the subjects may be admissible, but the fact of the

20  newspaper coverage or what a newspaper said --

21      THE COURT:  Or the learned articles.

22      Here is the problem, if we get into the matter of

23  expert testimony -- and I'm sure after having listened to you

24  that you could easily be qualified as an expert in chemistry,

25  but the fact is that you were not.  And that's not the purpose

Joel Selbin - Direct

1   for your being here.

2          In order to have learned articles and treatises and

3   that sort of thing to come in, we have to know the methodology

4   that's been used.  We have to be able to have the authors

5   either cross-examined or the expert cross-examined with regard

6   to a bunch of factors that nobody here is prepared to do,

7   because you weren't identified as an expert.

8          So the fact that you relied on some articles and you

9   gave them to the committee is fine, but we can't get into what

10  the articles say, the substance of them.  All right.

11         Does that make sense to you?  If it does, I want you

12  to go to law school now that you're --

13         MR. DAVIDOFF:  Now that he's taught college for 40

14  years.

15         THE COURT:  Yeah.

16         THE WITNESS:  I have two sons who are lawyers, and

17  both of their wives are lawyers, so I have four lawyers -- I

18  need engineers, I need plumbers, I need electricians, I -- I

19  need car mechanics, but I have four lawyers.

20         THE COURT:  Where did you fail in being a parent?

21         THE WITNESS:  And they all went to Harvard Law School.

22         THE COURT:  Okay.

23         THE WITNESS:  Anyway.

24         I understand -- I think what I would like to try,

25  again, to say is that one of the concerns of the committee and

7064

Joel Selbin - Direct

1  my concern was the movement of plutonium in the ground.  And

2  that's a very critical issue at Rocky Flats.

3          So when I learned -- I won't tell you where -- that

4  the Department of Energy and scientists at the Department of

5  Energy laboratories were totally surprised at new mechanisms of

6  movement of plutonium in the ground, I felt that this was

7  important for the committee to know, and so did they.

8  BY MR. DAVIDOFF:

9  Q.  Okay.  Did you bring -- did you bring this subject of

10  movement of plutonium through the ground by new mechanisms to

11  the attention of the committee?

12  A.  Exactly.  I did.

13  Q.  Did you bring it to the attention of the DOE,

14  Kaiser-Hill --

15  A.  They were there.  They were there.  And they -- and their

16  only response, which I can give is -- and it might coincide

17  with the feeling of the judge --

18          MR. BERNICK:  Wait.

19          THE WITNESS:  Sorry.

20          MR. BERNICK:  No apologies necessary.

21          I'd like to -- from our point of view, the fact that

22  the witness has now recited, which is this information came --

23  I think it's probably now important to say, came from

24  experience at other locations, not at Rocky Flats; is that

25  correct?

7065

Joel Selbin - Direct

1    *THE WITNESS:*  That's correct.

2    *MR. BERNICK:*  And --

3    *MR. DAVIDOFF:*  Your Honor, I'm happy to bring that

4    out, but I'd like to be able to conduct --

5    *MR. BERNICK:*  I think what is really important is that

6    to the extent we start to get into the peculiarities of form of

7    plutonium and the nature of the transport at other sites, we're

8    then into a world that we could pursue, and we're prepared to

9    pursue, but not now and not through this witness.  And that's

10    really -- I think it ought to be made clear, that's the problem

11    that we --

12    *THE COURT:*  Well, I think that's correct.  And so

13    we're not going to go into it.

14    But he brought this to the attention of the committee.

15    The committee considered it to be very serious, and the answer

16    was that representatives of the Department of Energy and the

17    contractor, RAC -- not these defendants, but the subsequent

18    contractor were present at the time, and then the question is,

19    what was their reaction -- without getting into the substance

20    of it, you can say what their reaction was.

21    BY MR. DAVIDOFF:

22    Q.  Did you --

23    A.  I'd be glad to give you their reaction.  Their reaction was

24    that Rocky Flats soil is not the same as these other soils.

25    And that was the end of that.

7066

Joel Selbin - Direct

1   Q.  And therefore, they were not concerned?

2   A.  And --

3       MR. BERNICK:  Well -- just hear what he has to say.

4   BY MR. DAVIDOFF:

5   Q.  Okay.  Go ahead.

6   A.  That's as far as they would go.  They -- they could not

7   really say that there was anything wrong with this information

8   from other sites.  They could only say that these were other

9   sites, and as the judge has pointed out, those sites are not

10  exactly the same as Rocky Flats, which is certainly the case.

11      But clearly, there were surprises of how plutonium

12  moves underground.  And so our concern was, are we going to be

13  surprised at Rocky Flats at how plutonium might move

14  underground?  That was our concern.

15  Q.  When they said that the Rocky Flats soil was different, did

16  that alleviate your concerns?

17  A.  No.

18  Q.  Did it alleviate the concerns of other members of the

19  panel?

20  A.  It did not, to my -- as far as I can tell.  I mean --

21  Q.  All right.

22  A.  I didn't question each individual member.  We certainly

23  didn't vote on anything.

24  Q.  Now, did there come a time -- the document that we put in

25  evidence earlier, 1468, indicated -- and I'm not going to go

7071
Joel Selbin - Direct

1    great many factors, almost all of which had some variability,

2    almost all of which had a probability range.  But out of this

3    RESRAD computer modeling was going to come a soil action level.

4    Q.  Were there any uncertainties associated with the factors

5    that were programmed into the RESRAD program?

6    A.  Absolutely.  Absolutely.  Factors including dose, what dose

7    should be allowed.  At the time, the Environmental Protection

8    Agency had promulgated an acceptable dose to an average

9    individual.  And, of course, I have two troubles with that, who

10   is accepting what, and what's the individual?  Every individual

11   is different from every other.  So that's a tremendous

12   variable.

13          A child is not as -- is different from an adult, in

14   terms of breathing, in terms of the amount of dirt they eat.

15   And the amount of dirt they eat, we talked about.  We actually

16   had a whole lecture on that, on how much dirt children eat

17   compared to how much dirt adults eat, if there is a child

18   on-site.

19          So the --

20   Q.  Most adults don't eat dirt; is that right?

21   A.  Not intentionally, but, in fact, we all eat a little bit.

22          THE COURT:  Depends on the restaurant, doesn't it?

23          MR. DAVIDOFF:  Right.

24          Your Honor, I think this would be -- on that note, I

25   think this would be a good time to break for lunch.

7076

1                   IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLORADO
2
Civil Action No. 90-cv-00181(JLK)
3
MERILYN COOK, et al.,
4
        Plaintiffs,
5
vs.
6
ROCKWELL INTERNATIONAL CORPORATION and
7   THE DOW CHEMICAL COMPANY,
8       Defendants.
9   _____
10                      REPORTER'S TRANSCRIPT
                          TRIAL TO JURY
11                          Volume 56
12  _____
13          Proceedings before the HONORABLE JOHN L. KANE, JR.,
14  Senior Judge, United States District Court for the District of
15  Colorado, continuing at 1:32 p.m., on the 8th day of December,
16  2005, in Courtroom A802, United States Courthouse, Denver,
17  Colorado.
18
19
20
21
22
23
24  Proceeding Recorded by Mechanical Stenography, Transcription
    Produced via Computer by Therese Lindblom, 901 19th Street,
25      Room A259, Denver, Colorado, 80294, (303) 628-7877

7126

Joel Selbin - Cross

1      MR. BERNICK: It's not an assault --

2      THE COURT:   The objection is overruled.   This is

3   germane to the jury's responsibility to assess the credibility

4   of witnesses.

5      MR. BERNICK:   Your Honor, just a couple of questions,

6   and I'll move on, Your Honor.

7   BY MR. DAVIDOFF:

8   Q.   Isn't it a fact that you do know Mr. Moore's views because

9   you actually asked to have him come speak about Rocky Flats at

10   one of your classes?

11   A.   That's correct.

12   Q.   And isn't it true that Mr. Moore has been a long-term

13   anti-Rocky Flats activist, and he organized protests against

14   Rocky Flats in the 1980s, correct?

15   A.   I believe that's correct.

16   Q.   Okay.   Now, when it comes to your being put on this panel,

17   or this -- invited to be on this oversight committee, you've

18   been very impressive this afternoon in talking about a variety

19   of issues that that oversight committee took up.   But in fact,

20   you are not put or asked to be on that committee because you

21   had any particular expertise insofar as radiation issues were

22   concerned, correct?

23   A.   Well, that's not quite correct.   I certainly in my

24   course -- not only my nuclear age course, but in my chemistry

25   course, and as a chemist, I talked about radiation effects.

7127

Joel Selbin - Cross

1    And in fact, one of the textbooks I've used, Advanced Inorganic

2    Chemistry by Cotton and Wilkinson, specifically refers to the

3    potential dangers to human beings of plutonium.  And I taught

4    that in my chemistry classes.

5    Q.  Did that --

6    A.  So I have some expertise.  I am not a radiobiologist; I am

7    a chemist.  But that does not preclude me from having great

8    knowledge in an area that was of great interest to the

9    oversight panel.

10   Q.  Let me ask you, do you consider yourself an expert in

11   radiation health effects?

12   A.  If an expert is someone who has had --

13   Q.  This is Exhibit 1599.

14   A.  -- education and a degree in the area, I am not an expert.

15   But as an educated scientist who can read and perceive and

16   understand what I read, I am almost an expert.

17   Q.  Almost an expert.

18   A.  You bet.

19   Q.  Okay.  Would it be fair to say that a precise description

20   would be that you're not an expert, no, knowledgeable to a

21   degree, yes, from reading, but having done research or spent a

22   great deal of time with it, no?  Would that be an accurate

23   statement?

24        It's from your deposition at page 9, lines 1 through

25   3.

7129

Joel Selbin - Cross

1  an expert, really, in any field?  Do you understand that?

2  A.  I do understand that.  I hope that people understand I am

3  an expert in chemistry.

4  Q.  Well, we take that as a given and not contest it.  But

5  you're not even called here to testify as an expert in

6  chemistry.  Do you understand that?

7  A.  Yes, I do.

8  Q.  Okay.  You're here to talk about history.  I want to ask

9  you a few questions about history.  And some of them you've

10  covered a little bit, but I -- I had kind of my own gloss on a

11  few of them, so I'm going to put up a little time line here to

12  keep track of where we are.

13       This is DX-1600.  If there is anything in this time

14  line that as we go through it you find is not accurate, there

15  is no pride of authorship, I'll just change it.  It's designed

16  to kind of get things going here.

17       The very top line has to do with the RFCA agreement,

18  which is the agreement related to funding of cleaning up Rocky

19  Flats, right?

20  A.  Yes.

21  Q.  I have RFCA agreement being entered into in 1996; is that

22  correct?

23  A.  '96.

24  Q.  Is that correct?

25  A.  Yes.

7159

Joel Selbin - Cross

1   we're not going to get into, the government decided at some

2   point to clean up Rocky Flats.   And we're not here to debate

3   that.

4           All I am suggesting to you and asking you is a very

5   simple question, which is, if we want to put these numbers into

6   perspective, if we want to put these numbers into perspective,

7   we have to understand that given the fact that radiation is

8   everywhere, 15 millirem above background per year is a very,

9   very hard thing to avoid, even if you wanted to.   Would you

10  agree with that?

11  A.   Yes.   And every extra millirem of radiation causes the

12  potential for harm or the potential to a cancer.

13  Q.   Right.

14  A.   And so why should we accept extra radiation when it can be

15  cleaned up?   We cannot clean up the background.

16  Q.   Sure.

17  A.   The only thing we can do with background is move to a lower

18  background.

19  Q.   Sure.

20  A.   But if we have a mess that we have made, we have an

21  obligation to clean it up so that there is not even an extra 1

22  millirem per year that's going to do harm to health.

23  Q.   And, Dr. Selbin, I know that's your view, and those were

24  the policy decisions that were being discussed at the time.

25  And I'm not here to debate whether that's right or wrong, you