Exhibit B

418

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO

Civil Action No. 90-cv-00181 (JLK)

MERILYN COOK, et al,

Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION and THE DOW CHEMICAL COMPANY,

Defendants.

---

### REPORTER'S TRANSCRIPT
### (Jury Trial -- Volume IV-A)

---

Proceedings before the HONORABLE JOHN L. KANE, JR., Judge, United States District Court, for the District of Colorado, commencing at 9:14 a.m. on the 11th day of October, 2005, Alfred A. Arraj United States Courthouse, Denver, Colorado.

492

1    the two checks.  There was another check for $2,000,000,

2    but Rockwell paid at that time the first or second largest

3    environmental fine in U.S. history.

4         There are three major issues during the 37 years

5    that Rocky Flats operated, that you will see from the

6    evidence, over and over.  Sloppy operations with no

7    respect for the dangers of plutonium, awful waste storage,

8    they were extremely reckless in handling nuclear waste,

9    they piled and buried it everywhere, and lying to the

10   neighbors and the public.

11        And, finally, after the 37 years, the FBI raid and

12   the plant shut down, you will see that the Department of

13   Energy, which is on the hook for Dow and Rockwell's

14   damages, continued the pattern.  The DOE, instead of

15   coming clean about Rocky Flats, promised the United States

16   public that it would come clean, but then it did the

17   following:

18        It continued to deceive the public as to what its

19   contractors had done.  It used its national security, top

20   secret rights, to conceal from you and from this court

21   massive amounts of evidence.  Why?  To spare itself public

22   embarrassment and to defeat the damages in this and other

23   cases.  Why?  The logical conclusion, we will argue to you

24   from the evidence, is because the DOE, under its account

25   with Dow and Rockwell is probably responsible to pay the

1    damages to the plaintiffs and the class members.

2         This case is the civil case.  13 years after the

3    criminal case, for the neighbors, this is the lawsuit to

4    compensate the innocent neighbors for damages caused by

5    plutonium in their backyards.  This is the only

6    opportunity for them to get compensation for that.

7    Compensation for their inability to get full value for

8    their properties and to get full use and enjoyment of

9    their properties.

10        The evidence will show these individuals were

11   harmed by reckless and intentional activities of Dow and

12   Rockwell.  This is their only day in court.  We will be

13   asking you to restore at least some of these neighbors'

14   rights that Dow and Rockwell stole from them.

15        Ladies and gentlemen, we have a complicated case to

16   show you in the weeks ahead.  We have many witnesses who

17   are going to be testifying.  They are going to have to

18   testify, in some cases, out of order or by depositions

19   where their testimony is read or shown by videotape.  And

20   because that's going to be a little disjointed since we

21   don't control most of the witnesses, we are going to try

22   to make a lengthy presentation, and if we start to bore

23   you, we may cut it down a bit.

24        Ms. Roselle and I will be dividing this

25   presentation and outline of what the evidence will show,

597

1    Hazel O'Leary was the secretary of energy.  And both

2    secretaries of energy promised there would be a new dawn

3    of openness and honesty.

4         You will see media coverage about this during the

5    course of this trial.  And they made these problems of

6    openness and honesty, but the DOE broke these promises

7    too.  Watkins left, O'Leary left, the DOE bureaucracy

8    stayed.

9         This is from a 1994 press conference.  This is five

10   years after the plant was raided, DOE called the openness

11   press conference.  This is DOE's fact sheets.  I hope you

12   don't have to read them all.  We will call your attention

13   to them during the trial.  This is how they were going to

14   become open and honest and tell the people of Denver, as

15   well as the people of the United States --

16        MR. BERNICK:  I object.  This is political speech

17   we specifically sought to avoid.

18        THE COURT:  Sustained.

19        MR. DAVIDOFF:  How did MUF remain a secret for all

20   these years?  Why are most of the MUF documents and

21   information still secret?  The defendants and the DOE used

22   the national security power to keep them secret.  The

23   evidence will show a few documents were declassified

24   during the so-called period of openness in 1994.

25        We press that in this case, because the MUF was the

600

1        National security is supposed to prevent terrorist

2    or enemies of the United States from getting information

3    about how to build a bomb.  That is not what these

4    documents contained.  You saw the document from 1947 that

5    showed their motives.  They wanted to keep claims from

6    being made against the Atomic Energy Commission.

7        What is missing from these documents is the truth

8    about missing plutonium.  The truth about MUF.  The truth

9    has been White ed out by the misuse of the classification

10   power of the DOE and the United States Government to

11   prevent all of us in this courtroom from knowing the full

12   truth about missing plutonium at Rocky Flats.

13       It has never been revealed to this day, 55 years

14   after the plant was in construction.  It is a misuse of

15   power that has been going on for 50 years.  The evidence

16   in this case, unfortunately, in part, will be that they

17   don't want you to have the evidence.

18       Now, MUF is also important for the future risk of

19   this plant.  Remember that in 1990, this plant was going

20   to be up for another 15 years before the buildings were

21   torn down.  And if we could show N-193 and N-194.  N-193

22   is an aerial photo taken in 1997, more than 8 years after

23   the FBI raid and after the plant was closed.

24       What N-193 shows is that 8 years later, more than 8

25   years later, all these buildings, with the ducts, with

2959

1            IN THE UNITED STATES DISTRICT COURT

2               FOR THE DISTRICT OF COLORADO

3   Civil Action No. 90-cv-00181(JLK)

4   MERILYN COOK, et al.,

5        Plaintiffs,

6   vs.

7   ROCKWELL INTERNATIONAL CORPORATION and THE DOW CHEMICAL
    COMPANY,

8

        Defendants.

9   _____

10

                        **REPORTER'S TRANSCRIPT**
11                         TRIAL TO JURY
                             VOLUME 19
12  _____

13        Proceedings before the HONORABLE JOHN L. KANE, JR.,

14  Senior Judge, United States District Court for the District of

15  Colorado, commencing at 1:24 p.m., on the 27th day of October,

16  2005, in Courtroom A802, United States Courthouse, Denver,

17  Colorado.

18

19

20

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
        Produced via Computer by Gwen Daniel, 901 19th Street,
25       Room A259, Denver, Colorado, 80294, (303) 629-9285

3002

Robert Budnitz - Direct

1   issue in this case is beside the point.  The issue here is that

2   he's not being called as a percipient witness.  He hasn't

3   offered any expert opinions on MUF.  He hasn't given us notice

4   of any such expert opinions.  And to get into the concept of

5   MUF with this witness would not be permissible.  If they want

6   to call him back as a percipient witness, then they're free to

7   do so.

8        In addition, the notion that an expert can just get up

9   and talk about anything that he knows about is directly

10  contrary to the rules.  That's why we have evidence, reports,

11  depositions and we go through the whole procedure.

12       MR. DAVIDOFF:  He was asked about this in his

13  deposition.  This is stuff that he did in this case, things

14  that he did as a consultant in this case.

15       MR. KURTENBACH:  Any opinions on this subject --

16       THE COURT:  I'm going to overrule your objection.

17       (In open court.)

18  BY MR. DAVIDOFF:

19  Q.  Now I just want to ask you what you did, and I want you

20  to -- I'm going to ask you to describe the process for the

21  jury.  You accompanied two attorneys from my firm who also had

22  gotten Q clearances, one of whom is Mr. Sorensen over here, to

23  look at documents on the subject of MUF; is that correct?

24  A.  Yes.

25  Q.  And they were classified documents; is that correct?

Robert Budnitz - Direct

1   A.   Yes.

2   Q.   And still are today for the most part; is that correct?

3   A.   I have no idea, actually.

4   Q.   When you go to inspect these MUF documents, were you

5   escorted into a cubicle or a room?

6   A.   Yes.

7        MR. KURTENBACH:   Your Honor, can I have a continuing

8   objection?

9        THE COURT:   Yes.

10  BY MR. DAVIDOFF:

11  Q.   Could you describe the room for the jury, please.

12  A.   Well, there was at the time at Rocky Flats entire areas of

13  the plant that could not be accessed by individuals except

14  those with a proper clearance, and the reason was because

15  documents, or in some cases even physical objects were

16  sensitive information that we wouldn't want our enemies to get

17  ahold of, for example, terrorists or in those days the Soviets,

18  or even today the Soviets, Russians.   And in order to have

19  access to those areas one needs a proper security clearance.

20        The area to which I was granted access with these --

21  the first visit was with one attorney, Jonathan Auerbach, and

22  the second visit was with two, Auerbach plus David Sorensen who

23  is sitting in front of you.   We had access to what I would call

24  a library room, it was actually several rooms, but the

25  conception of it is a library, in which were stored numerous,

Robert Budnitz - Direct

3006

1    something else and maybe, you know, 1200 grams of something

2    else, and sometimes they would say what those parts were,

3    including even little drawings of what they were.   That's

4    sensitive information.

5    Q.   We weren't interested in that type --

6    A.   Of course, but -- of course, but that's what it was, was a

7    lot of it was numerical work in which people were weighing

8    material to try to figure out how much they had, let's say,

9    Wednesday afternoon.   Then they come back Thursday afternoon

10   and try to determine what they have then to make sure they

11   haven't lost any because, of course, if you lose something --

12   Q.   What I am trying to develop first is the process.   The

13   process is you can talk about it in the room; is that right?

14   A.   Yes.

15   Q.   If you go outside the room with this other person with the

16   Q clearance, are you allowed to talk about it outside the room?

17   A.   No.   I've learned from early on that you can't have

18   conversations about that stuff outside of the cleared area,

19   even if the other person is also cleared.

20   Q.   So in other words, if you and Mr. Sorensen after being in

21   the room talking about the documents were walking down 17th

22   Avenue or 17th Street here in Denver to a restaurant, you

23   couldn't talk about it?

24   A.   No.

25            MR. KURTENBACH:   Object to the form, your Honor.

4865

1           IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLORADO
2
    Civil Action No. 90-CV-00181(JLK)
3
    MERILYN COOK, et al.,
4
         Plaintiffs,
5
    vs.
6
    ROCKWELL INTERNATIONAL CORPORATION and
7   THE DOW CHEMICAL COMPANY,
8
         Defendants.
9   _____

10                    **REPORTER'S TRANSCRIPT**
                         Trial to Jury
11                        VOLUME 35

12  _____

13          Proceedings before the HONORABLE JOHN L. KANE, JR.,

14  Judge, United States District Court for the District of

15  Colorado, commencing at 8:35 a.m., on the 10th day of November,

16  2005, in Courtroom A802, United States Courthouse, Denver,

17  Colorado.

18

19

20

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
    Produced via Computer by Janet M. Coppock, 901 19th Street,
25     Room A-257, Denver, Colorado, 80294, (303) 893-2835

4886

1    now told you is we don't know these people were involved in

2    classification, but we want to be able to demonstrate to the

3    jury that the lawyers in this case, my firm, worked with the

4    Department of Energy to prepare this case.  That's what they

5    want to say, and then what are they going to do?  They are

6    going to ask the jury to draw the inference they are still

7    stonewalling to date.  That's just a lie.  It's slanderous.

8         THE COURT:  You are not going to go into that.  Those

9    are matters to take up before the Congress of the United

10   States, not in this trial, everything you said.  I want -- in

11   fairness, I want an offer of proof of what -- the testimony

12   from Mr. Hoffman before he is called to the stand and I am

13   going to review it.  I think, and my rulings have been based on

14   this and this alone, that a party litigant is entitled to

15   gather evidence and produce it.  And if they can't because of

16   operation of law or a bureaucratic decision, they have been

17   frustrated in the effort to bring forth all of the evidence

18   they want, I think they are entitled to show why the case is

19   weak in those spots and make that explanation.

20        It's what you are able to do and not able to do.  It

21   isn't what the defense does, how much they have paid, what the

22   Department of Energy does, how many people they have working on

23   this or not working on it, when they make their decision, none

24   of that matters.

25        If you have specific evidence that you have tried to

4887

1    bring forth and you have been frustrated in your effort by the
2    classification process, that is admissible, that and that
3    alone.   All the rest of this business is what's causing the
4    serious risk, the serious risk of either a mistrial or such
5    fundamental loss of fairness in the case that the case is
6    thrown out.

7                MR. DAVIDOFF:   That's why I am airing these concerns.
8                THE COURT:   I know you are.  I fully respect the fact
9    that you are an advocate, and you are representing your
10   clients, and I am concerned about that.  And I am equally
11   concerned about defense counsel and their obligations to their
12   clients.   I am tired of the acrimony, beyond tired.  I no
13   longer have a reservoir tolerance for it.  And I will just tell
14   you that right now.

15               MR. DAVIDOFF:   Well, Your Honor, respectfully, I don't
16   believe that I have been the source of the accusations.

17               THE COURT:   It doesn't matter.  The fact is that I can
18   go through years without having lawyers in court say, that's a
19   lie, that's a lie, that's a lie.  I just don't have that in my
20   court.   That's not what the purpose of a court is.

21               Now, what I want from you is an offer of proof as to
22   what you want to present by Mr. Hoffman and Mr. Kaufman before
23   they testify.

24           ,   MR. DAVIDOFF:   Can I make a suggestion, Your Honor?  I
25   think Mr. Hoffman, we'll probably reach him sometime this

4969

1    made on what will be done next about ID presently considered

2    RD.   That stands for restricted data.   Rod Hoffman repeated the

3    Rocky Flats recommendation that DOC study the significance of

4    all Rocky Flats nuclear materials accountability statistics

5    before making a decision about the release of Rocky Flats ID

6    data.   That's after the decision was made to release that for

7    every other weapons plant in the United States with the

8    exception of Oak Ridge and Rocky Flats plant.

9         He was an active participant in keeping this

10   information secret.

11        Here is one from 1983 during the Rockwell era when

12   Mr. Hoffman was a Rockwell employee.   This is Plaintiffs'

13   Exhibit P653.   Basically I am just going to characterize it,

14   Your Honor, to save time.   Unexplainable inventory differences

15   continue to be a major deficiency of plutonium production

16   processes at Rocky Flats, and that continues here, and they

17   explain that.

18        Of course, this document, too -- all of these

19   documents that I am showing Your Honor were basically not

20   declassified until the '94, '95, '96 era.   They were all secret

21   at that time.   Most of the documents that we attached, Your

22   Honor, we specify in the brief were admitted at the contempt

23   hearing that was held in 1995.

24        Then there is Plaintiffs' Exhibit P652 and also P548.

25   These are the same document that went through a classification

4970

1    review in the 1990s at two different times.  This one was

2    declassified on 7/12/95, and this one was declassified on

3    6/17/96.  Among other things, this document -- they white out

4    different portions of the same document.

5         This is a document where there is a comprehensive

6    study made after August of 1977 for four months on MUF, special

7    nuclear materials.  An extensive records search has been

8    conducted to assure DOE and Rockwell International that

9    unclassified data when associated with MUF did not exist that

10   could divulge classified production information or weapons

11   data.  During the past four months approximately 25

12   knowledgeable long-term employees have participated in a

13   records search to determine if any unclassified data existed.

14        This is -- this document goes on.  They reviewed

15   records at Dow Chemical.  They reviewed personal files.  Then

16   they consulted -- actually, if you look at page 3, Your Honor,

17   there is some whiteout still on this document in the form that

18   we have it.  Rockwell management and certain Dow Chemical

19   officials -- so even two and a half years or more after Dow has

20   been -- has relinquished the contractor responsibility, they

21   are still being consulted on keeping this stuff secret for

22   reasons that will soon emerge, feel that the declassification

23   and release of MUF including explanations for special nuclear

24   material at Rocky Flats could reveal production data, blank,

25   and possibly weapons information.  The following data is

4971

1    presented in support of this position.

2          One of the factors was more time and attention is

3    devoted to MUF by the news media and the private sector which

4    gives a higher visibility to data which as it becomes more

5    accurate may also become a good indicator in the future to

6    correlate MUF, the production rates.

7          Then on this page, page 7, If MUF is declassified --

8    we have to recognize that this is being written after the

9    decision to declassify MUF at all the other plants except for

10   one other plant had already been made -- a gate will be opened

11   to generate further questions from the public sector until a

12   point is reached where the answer could involve classified

13   information.  If a statement were made at this sensitive point

14   that the answer would reveal classified data, this in itself

15   may be classified.  It seems prudent not to place ourselves in

16   this vulnerable position.  The thrust of that is to avoid

17   embarrassing questions where we might have to decline to

18   answer.  We are just not even going to start down that road.

19         But the most telling parts of the document are

20   paragraphs 8 and 10.  Anti nuclear environmentalists and

21   pacifist groups, the declassification and possible release of

22   MUF in this unfriendly environment whether due to

23   misunderstanding, lack of knowledge or misinterpretation could

24   seriously damage the posture of the Department of Energy,

25   Rockwell International and former contractor, the Dow Chemical

4972

1    Company.

2           I mean, those purposes are flatly improper under the

3    national security statutes which enable them to classify in the

4    first place.

5           And then in No. 10, At the present time multimillion

6    dollar litigation action is being carried out against the

7    Department of Energy, Rockwell International and the Dow

8    Chemical Company.  Declassification of MUF and subsequent

9    release could have an adverse effect on the final court

10   decision or settlement which is also an improper purpose.  And

11   those -- that's not being introduced for proof of the

12   settlement in any other litigation; that's being introduced for

13   proof of the improper purpose.

14          There are two or three other documents in this set

15   that we submitted to the Court.  This is another one which was

16   declassified in 1996 but certain blanks were left in here.  And

17   it shows, for example, deuterium is this D for unclassified

18   purposes, and there is a blank there.  And there is a blank up

19   here.  This is to Mr. Hoffman, telex to Mr. Hoffman from

20   Germantown, Maryland, the headquarters, and they are still

21   blanking out information about a loss.

22          And one that I think is particularly significant, then

23   on the back of this document, it's the same thrust, is Church,

24   Church was the market, Church to be told what happened to the

25   term written off as NOL, non-operating loss.

4973

1        Again, you know, an improper purpose for keeping

2   things secret.

3        This is one that may not have made it into the motion,

4   Your Honor, but this is another tritium release, not the 1973

5   one about which we heard so much, but a January 6 and 7, 1981,

6   tritium release in building 777 to glove box exhaust plenum 205

7   and 206 and subsequently to the environment.  And then there is

8   some history there, and then there is a section called

9   "Findings," and in the section called "Findings," everything is

10  basically whited out there on those findings.

11       There is further text in this document as to how it

12  occurred, and there is an estimated quantity of tritium

13  released to the environment was a tenth of a curie which is

14  3.7 billion disintegrations per second.  It's not a trivial

15  amount, but, you know, the Environmental Analysis and Health

16  Physics findings are whited out.  At least the copy I have does

17  not have an exhibit number.

18       So these are examples -- we have other examples that

19  we intend to show during this examination to show that the

20  classification had a very broad ambit at the Rocky Flats plant,

21  considerably broader, we believe, than at the other plants.

22       And I'll briefly outline the other areas I want to get

23  into.  I want to make a suggestion as to what Your Honor said

24  earlier today.  Your Honor suggested that the fact that DOE

25  cooperated with defense counsel for a number of years or with

1   the repository of confidential or national security

2   information.  What outrageous hubris.  Who does he think he is?

3          Who does the plaintiffs' counsel think that they are

4   to make -- pass judgments on what is in the national security

5   interests of the United States?  He thinks he is so good about

6   them, he knows so much?  They got classified information in

7   their heads.  Let them go out and tell the jury.  Let them feel

8   the burden of the law instead of arguing to the jury that

9   somehow our clients field the burden of the law.  It is not up

10  to Mr. Davidoff, it's not up to this jury, not up to anybody

11  here to pass on the national security laws, and that is nakedly

12  what is taking place.

13         THE COURT:  Thank you.  I am ready it rule now.  I

14  don't need 104 or further examination.  The offer of proof has

15  failed to show that the plaintiffs were denied any information

16  needed in this case.  I am not concerned with philosophical

17  issues, political issues or foot dragging by the Department of

18  Energy which was handled as it should have been handled in

19  terms of the contempt power of the Court, but it has nothing to

20  do with the factual determinations to be made by the jury here.

21         How difficult that is is a matter for pretrial case

22  management.  The evidence of the amount of most MUF data is

23  declassified and it is admissible for two reasons, one, it

24  represents plutonium that could have spread to the plaintiff

25  class members' land; and two, it has an effect on class owners

5006

1   during a period of time with regard to the enjoyment of their

2   property and not knowing the extent of such pollution as there

3   was.

4        The evidence that some information that might be

5   admissible for plaintiffs was -- remains classified, is

6   admissible and that's it.   That's it.   I am not going to permit

7   any further testimony.   I am rejecting the offer of proof

8   that -- because there has been a failure to show plaintiffs

9   were denied any information dealing with this case.   You have

10  demonstrated quite clearly how difficult it was, and I am not

11  going to get into the wisdom of what's in the security

12  interests of the United States.   That's simply not a matter for

13  me to decide.

14        MR. DAVIDOFF:   Counsel for the defendants have

15  reargued many rulings, and I have tried to avoid that, but

16  there is one aspect of this, Your Honor, that I believe has to

17  at least -- I respectfully ask you to hear me out.   If Your

18  Honor wants to call the jury in so we don't detain them any

19  further, I am happy to do that after the jury is dismissed

20  after Ms. Robb's testimony, but I do want to be heard out on

21  some of the specific types of documents that we submitted with

22  our motion.   I think it is extremely prejudicial, Your Honor,

23  for those to be ruled out of bounds in this case.

24        And I think, you know --

25        THE COURT:   I will hear you later.   Let's get the jury

5049

1  If we can get these documents into evidence, we will try to do

2  this through Mr. Cochran who will be a witness next week,

3  Dr. Cochran.  But I do think that I respectfully ask Your Honor

4  to look at those documents again, and it doesn't matter whether

5  a document has a political overtone or a litigation overtone,

6  if it shows that the motives were improper and that they were

7  improper motives for keeping information classified.

8  Your Honor has not issued a spoliation instruction

9  even though Your Honor at one time was disposed to do so.  The

10  draft instruction in Your Honor's instructions is extremely

11  mild.  It allows either side to argue from the absence of a

12  piece of evidence, as I recall correctly.  It's extremely mild.

13  And I think that Your Honor should at least allow us

14  to put in these documents, so I am imploring Your Honor to look

15  at those documents with perhaps a less jaundiced eye over the

16  weekend, and I believe those documents are very, very probative

17  of the motives of not only the Department of Energy but of the

18  contractors in this case, and they are the ones that are

19  attached to our --

20  THE COURT:  Because you have asked me to, I will look

21  at them, but, frankly, I have yet to hear an argument as to why

22  the motives of anyone in this case are relevant.

23  MR. DAVIDOFF:  I am going to let Mr. Sorensen add

24  something.  I will tell you the argument, Your Honor.  The

25  documents belong to the Department of Energy.  They don't

5050

1   belong to the contractors anymore.  This isn't an ordinary case

2   where you take discovery from an adverse litigant and you get

3   information from their files.  It's been like pulling teeth out

4   of a hippopotamus, a young strong hippopotamus to get

5   information out of the Department of Energy for 15 years in

6   this case.

7          And we have a right to give some of the flavor of that

8   to the jury.

9          THE COURT:  Why?  What does it have to do with your

10  clients?  I know how frustrating it is for you.  I have been

11  there, and I have done that, not with the Department of Energy,

12  but with other government agencies.  And I understand that as a

13  recovering lawyer, I understand that, but what I don't

14  understand is how your argument relates to your clients and

15  their case.  If they have Darth Vader sitting back in

16  Germantown, Pennsylvania making, these decisions, what

17  difference does it make?  What makes a difference is how much

18  evidence you have and do you have it for the jury.

19         It's taken 15 years.  You don't need to tell me how

20  difficult this case has been, but what I am trying to separate,

21  and I think I am correct in my thinking on this, is that it's

22  the merits of the case, not the motivations of employees of the

23  Department of Energy.  And if you don't -- as I said before, if

24  you had evidence of a conspiracy, that's fine.  What you have

25  are comments that people are talking about it's bad for PR,

1  it's bad for pending litigation, bad for this, bad for that,

2  but you still have a classification decision that's made, and

3  the Congress says it's none of my business.

4      *MR. DAVIDOFF:*  Your Honor, I completely understand

5  that.  That has been explained to the jury and can be explained

6  to the jury.  But this is not an ordinary litigation.  And what

7  the relevance to our clients is is 2600 pounds of missing

8  plutonium.  Our class which is our clients, the class, not just

9  the class representatives, lived in that area, owned property

10  in that area.  There were tremendous revelations of misconduct.

11      They weren't fully investigated.  Your Honor has

12  already ruled a great deal of that out of bounds.

13      *THE COURT:*  I ruled a great deal of it in.

14      *MR. DAVIDOFF:*  For the defendants.

15      *THE COURT:*  No, for you.  I ruled a lot of it in.

16      *MR. DAVIDOFF:*  The fact of the matter is we have

17  missing 2600 pounds of plutonium, and that's the only fact we

18  have been able to pull out of these people in 15 years, and

19  there are documents that make it absolutely, starkly clear this

20  was done for improper purposes.  And this plant has been closed

21  for 16 years, 16 years.  They are not making weapons.  There is

22  no -- I think it would be evident in an examination that there

23  would be no legitimate national security purpose to hiding

24  information about production rates 30 or 40 or 50 years ago.

25      It's self-evident to you, perhaps, Your Honor, or to

1   the context of this.

2         THE COURT:  I think -- Mr. Sorensen, I thank you for

3   your comments, and I do value them, and I am not being flippant

4   when I tell you this, but it seems to me that what you have

5   just outlined is a proper remedy for coming back in the

6   pretrial stage with another motion for contempt and that didn't

7   happen.  And I didn't have that.  What we have now is

8   another -- is a jury, and the jury has to look at evidence.

9   And what I said was, and I continue to think that's correct,

10  that your witness must show that you attempted to get this

11  evidence and you didn't.  Whether or not they had bad faith

12  motivations or otherwise, whether it's political, philosophical

13  or religious doesn't matter.  What matters is the test that I

14  set out, and I am very confident in that test.

15        And that's -- the offer of proof was made on that

16  basis and that basis alone, but I think -- that's the kind of

17  thing when you have somebody dragging their feet, that that's

18  when you pursue a pretrial remedy of contempt.  And you did

19  once, and you got it.

20        MR. BERNICK:  If I could --

21        MR. DAVIDOFF:  One other thing.  I want to just answer

22  that one question, and I apologize, Mr. Bernick.

23        There wasn't any point in coming back to Your Honor

24  because Your Honor, this is a judicially unreviewable power.

25  It's a judicially unreviewable power.  We researched it.  We

5068

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 90-cv-00181-JLK

MERILYN COOK, et al.,

    Plaintiffs,

vs.

ROCKWELL INTERNATIONAL CORPORATION, and THE DOW CHEMICAL
COMPANY,

    Defendants.

_____

REPORTER'S TRANSCRIPT
Trial to Jury
Volume 37

_____

      Proceedings before the HONORABLE JOHN L. KANE, JR.,

Senior Judge, United States District Court for the District of

Colorado, commencing at 9:07 a.m., on the 14th day of November,

2005, in Courtroom A802, United States Courthouse, Denver,

Colorado.

Proceeding Reported by Mechanical Stenography, Transcription
Produced via Computer by Kara Spitler, RMR, CRR,
901 19th Street, Denver, CO, 80294, (303) 623-3080

5081

1       THE COURT:  No, wait a minute.  The idea of putting
2   somebody on the stand and then having them decline to answer
3   because of privilege is not permissible.

4       MR. SORENSEN:  Your Honor, we don't believe the
5   privilege objections are well-founded, at least some of them.

6       THE COURT:  If they're not, they should have been
7   raised before.  I can't do that in the middle of this trial.
8   If there was an objection because the privilege was not
9   properly asserted, if there's an objection about the work
10  product rule that wasn't properly done, I can't, I can't handle
11  that in the middle of trial.  But to set up a straw man and
12  then have him -- it's the same thing that happens when -- when
13  they put people in front of senate investigating committee or
14  in front of court and have them take the Fifth Amendment.  It's
15  not a permissible practice.  And I won't permit that.

16      MR. SORENSEN:  Okay, Your Honor.

17      THE COURT:  I think that the distinction I've made
18  already between Hoffman and Kaufman and the thing that you're
19  entitled to do in this case is to show that there were
20  discovery abuses by the Department of Energy, that you pursued
21  those, and that there were delays in getting the information
22  that you wanted, and if you can show that there was information
23  that you didn't get as a consequence of that, related to this
24  case, then it's admissible.  And that's my ruling.  But you
25  cannot go into the classification process itself as to whether

5082

1  it was done in good faith or not because that's beyond the

2  purview of this Court.

3          That's what I tried to say on Thursday is that they

4  can have a hundred motivations for what they do, as long as

5  they're saying that they did this as a matter of security in

6  their classification process.  Whatever other motivations they

7  have, I can't go into.  This is -- I don't sit as court of

8  review as to the -- as to how classifications are made.  If

9  they made classifications and you're denied information as a

10 consequence of that on this case, and you can identify with

11 some degree of probativity what those things are that you were

12 denied, then I think that's admissible.  I think the MUF

13 material is a matter of critical concern in this case.

14         Now, whether they -- whether they refused to give you

15 information, the Department of Energy did, they refused to

16 declassify MUF information on the grounds of national security,

17 is not something I'm going to go into.  It asks you for

18 material, and it was denied to you, and then there was an

19 agreement made to give you certain information, and the

20 Department of Energy was held in contempt for not complying

21 with that, that is going to be admissible in this case.

22         MR. BERNICK:  Your Honor, just so I'm clear.  I

23 understand where Your Honor is going, but respectfully

24 disagree, but just so the nature of my disagreement is clear.

25 Beyond the fact that we don't think that any of this has to do

Richard Kaufman - Direct                                    509

1   district court judges and handle matters such as discovery,

2   document production, scheduling the case, on behalf of the

3   district judge.  In this case, Magistrate Judge Borchers

4   handled this order, and he is the one who signed it and made it

5   an order of the court.

6   Q    All right.  And you came to understand that the Department

7   of Energy had possession of millions and millions of documents

8   potentially relevant or potentially related to this case,

9   correct?

10  A    Well, I don't know whether they were relevant, I don't

11  think most of them were, but there was a total universe of

12  65 million pages of documents, most of them irrelevant.

13  Q    But the volume was huge, correct?

14  A    Yes.

15  Q    Now, in this stipulated order that the Department of Energy

16  agreed to, it contains certain provisions with respect to

17  classified documents, correct?

18  A    I'm sure it does.  I would have to review those.  I

19  don't -- I remember that was part of the subject matter, but I

20  don't remember the specifics.

21  Q    Okay.  Could you turn to page 12, please, of P635.

22  A    Yes.

23  Q    Are you there, sir?

24  A    Yes.  Yes.

25  Q    It states, for classification.  Within seven days from the

Richard Kaufman - Direct                    5148

1          THE COURT:  Yes.

2      (At the bench:)

3          MR. DAVIDOFF:  Your Honor, at his deposition that was

4  taken by the defendants, he was asked, I believe by

5  Mr. Sorensen, why he was removed from the case in February of

6  1996.  He was instructed by Mr. Taylor, I believe, not to

7  answer that question.  And we would like to ask him that

8  question.  We think it's directly relevant.

9          MR. BERNICK:  If he was instructed not to answer, then

10  I don't know what the answer would have been.  Therefore, they

11  can't make any proffer of relevance.  It's beyond the stretch,

12  and even if it was true that the removal was for some matter

13  that related to the case, that removal would be hearsay.

14          THE COURT:  Yeah.  I don't think you should go into

15  that.

16          MR. DAVIDOFF:  I do have a request that he --

17          THE COURT:  I think would require me to have a hearing

18  outside the presence of the jury with his counsel there, and I

19  cannot see it coming in under any circumstance.

20          MR. DAVIDOFF:  Well, that was actually my alternative

21  request, Your Honor.  If Your Honor doesn't deem it appropriate

22  for the jury to hear, we would like the answer to the question

23  on the record.  It could be outside the presence of the jury.

24          THE COURT:  I don't think it even -- I don't think

25  it's appropriate with anything in the case.  I have no idea why

Richard Kaufman - Direct                    5149

1  he was taken off the case.

2          MR. DAVIDOFF:  Well, he was removed.  He was removed

3  from the case by the U.S. attorney, we believe, because he was

4  trying to cooperate with the plaintiffs in the orders of the

5  Court.

6          THE COURT:  Well, I mean, that's purely speculative.

7  I don't want to go there.

8          MR. SORENSEN:  I have another matter.

9          THE COURT:  What's that?

10         MR. SORENSEN:  There was a question I asked at his

11 deposition to which a privilege objection was not raised.  I

12 want to just be very clear.  I asked whether he had discussion,

13 Mr. Kaufman had discussions with other DOE counsel about

14 whether producing more MUF information would hurt the posture

15 of DOE and its contractors, and he said yes, he had such

16 conversations.  The answer is, yes, he did.

17         And am I permitted to ask that?

18         MR. BERNICK:  Your Honor has ruled on that three

19 different times now.

20         MR. SORENSEN:  Thank you.

21    (In open court:)

22 BY MR. SORENSEN:

23 Q   Just a couple of more questions, Mr. Kaufman.  You earlier

24 saw the Court's order holding DOE in contempt.  Do you recall

25 that?

1    Q    Just order of magnitude, what was, about, the volume of
2    that?
3    A    It was hundreds and hundreds of thousands of pages of
4    documents.  There were two components to that.  There were
5    documents that ended up in front of the grand jury and then
6    documents that were not used in front of the grand jury.  But
7    the total was hundreds and hundreds of thousands.
8    Q    Now, you've made mention of just eye-popping numbers like
9    45 million, 65 million pages.  Are you representing to this
10   jury that Mr. Davidoff and his team actually got copies of all
11   of those different documents?
12   A    No.  What They were primarily interested in were indexes to
13   those -- finding aids to those documents, and that's what we
14   gave them.  They would have had -- if they would have wanted to
15   see them, yes, they would have had access to them.
16   Q    All right.  In terms of hard copies that were actually
17   copied by the plaintiffs in this case from government
18   production, do you have any recollection of what the total
19   volume was of hard copies or electronic copies that were
20   furnished?
21   A    Well, it would have been in the millions.
22   Q    Let's pick up and talk about MUF, which is our last line
23   here.  And I want to begin on that where I think that counsel
24   for the plaintiffs began this morning, which is a letter that
25   was, I believe, received into evidence.  It's Plaintiffs' 650.

Richard Kaufman - Cross                    5182

1  declassification?

2  A    By that time, I was familiar.

3  Q    Now, if we went back to the stipulation that was entered

4  into in July of 1994, that stipulation did talk about

5  declassification, did it not?

6  A    Yes, sir.

7  Q    At the time that that stipulation was entered into, from at

8  least the DOE's point of view or I should say your point of

9  view, was there any anticipation that there would be a

10  substantial volume of documents that would have to be reviewed

11  for declassification purposes?

12  A    No.

13  Q    In fact, if we took a look at -- did you actually

14  articulate to the Court in connection with these proceedings

15  that there was no contemplation in some fashion the DOE and the

16  Department of Justice would have to go through the process of

17  declassifying literally hundreds of thousands of pages?

18  A    That's correct.

19  Q    Okay.  Now, in terms of what the process was like, I've got

20  a demonstrative here which is DX1382, Counsel?

21        MR. SORENSEN:  I object to it.

22        THE COURT:  Overruled.

23      (Exhibit 1382 admitted.)

24  BY MR. BERNICK:

25  Q    I've taken -- we've taken our best crack as kind of the

1    reasonable time?

2    A    Some of the plaintiffs' counsel had what were known as Q

3    clearances which are security clearances, so they would have

4    been able to look at the MUF documents.  And one of the things

5    we did at this meeting was we invited them to come to Rocky

6    Flats, look at the MUF documents.  And they could see for

7    themselves that most of the information had nothing to do with

8    the lawsuit that we're today on.  And, you know, then they

9    could focus their request based on that.

10   Q    Now, we all know that at the end of the day a contempt

11   order was issued.

12   A    Yeah.

13   Q    And because -- particularly because it was issued by the

14   Court in this case, it was correct in all respects.  We are not

15   going to be second-guessing any aspect of that here.  As I'm

16   sure you can appreciate, Mr. Kaufman, that's not a very

17   generous undertaking, but it really is, the defendants in this

18   case do not contest the contempt order and, for that matter,

19   the DOE do not contest the contempt order, either; is that

20   right?

21   A    That's fair.

22   Q    Would it be fair to say, kind of looking back, and maybe

23   even at that time, that some mistakes have been made by the

24   Department of Energy in connection with this process, and let

25   me suggest two.  One is that the Department of Energy did not

Richard Kaufman - Cross                              5190

1   A   Well, we -- I don't know what you mean by taken issue --

2   Q   You had not come to the Court for relief?

3   A   Right, correct.  Correct.

4   Q   So would it be fair to say that when the contempt process

5   began the DOE was in a tough situation?

6   A   Yes.

7   Q   Okay.  Now, it turns out that the failure to really even

8   begin to formally start -- by the time these hearings took

9   place, there had been dialogue with the plaintiffs, but the DOE

10  had not yet officially started at least in writing the

11  declassification process, right?

12  A   There had been a handful of documents -- are we talking MUF

13  documents?

14  Q   Yes.

15  A   No, there hadn't been on the MUF.  There had been on some

16  others.

17  Q   So the contempt order is issued, and one of the bases for

18  the contempt order was the failure to start the

19  declassification process earlier, correct?

20  A   Yes.

21  Q   Okay.  Was there any finding that was made in connection

22  with this contempt order that the materials that were in

23  question had been improperly classified or that classification

24  in some fashion was being used to conceal something?

25  A   No.