*RAC Report No. 10-CDPHE-RFP-1999-FINAL*

# FINAL REPORT

## Estimated Airborne Releases of Plutonium during the 1957 Fire in Building 71

### Task 2: Verification and Analysis of Source Terms

**August 1999**

***Submitted to the Colorado Department of Public Health and Environment, Disease Control and Environmental Epidemiology Division, Rocky Flats Health Studies in Partial Fulfillment of Contract No. 100APPRCODE 391***

"Setting the standard in environmental health"

RAC

Radiological Assessments Corporation
417 Till Road Neeses, South Carolina 29107
phone 803.536.4883 fax 803.534.1995

PLAINTIFFS'
EXHIBIT
P-1068
90-CV-181

*RAC Report No. 10-CDPHE-RFP-1999-FINAL*

# FINAL REPORT

## Estimated Airborne Releases of Plutonium during the 1957 Fire in Building 71

### Task 2: Verification and Analysis of Source Terms

**August 1999**

**Author**
**Paul G. Voillequé, MJP Risk Assessment, Inc.**

**Principal Investigator**
**John E Till, Ph.D., *Radiological Assessments Corporation***

## SUMMARY

This investigation into the atmospheric releases during the 11–12 September 1957 fire in Building 71 (now called Building 771) is a part of Phase II of the Historical Public Exposures Studies on Rocky Flats. The study was performed by *Radiological Assessments Corporation* for the Colorado Department of Public Health and Environment. The release estimates are based upon information about the amount of plutonium involved in the fire, conditions before and during the fire, and release fractions for plutonium under various oxidation conditions. Estimates of the amount of plutonium released to the atmosphere are needed because stack effluent sampling capability was lost during the fire. No measurements of the amounts of airborne plutonium in gaseous effluents were made.

The fire, which began at about 10 p.m., was initiated by spontaneous combustion of impure plutonium in a metal casting residue (called a skull) stored in a glovebox line in Room 180. Portions of the gloveboxes were constructed of Plexiglas[a], which caught fire and burned as did rubber gloves attached to gloveboxes. Before the fire broke through the glovebox containment, heat and contaminated air were carried into the glovebox exhaust filter system. Small, combustible chemical warfare system (CWS) filters were installed in the glovebox outlet lines to remove plutonium from the glovebox exhausts. The fire burned through these filters quickly and spread to eight larger (2-feet square) combustible CWS filters that were part of the glovebox exhaust or booster system. The booster system filters also burned through and the fire then spread to the main filter bank, which contained more than 600 large CWS filters. Exhaust fans, located on the downstream side of the filters, discharged into a large duct that connected at the wall of the building with an underground duct that carried the contaminated exhaust air to the stack and to the environment.

The fire in Room 180 was discovered at 10:10 p.m. and was extinguished using water about 30 minutes later. The most affected work area was Room 180 and adjoining rooms, but all parts of the building were contaminated when an explosion or deflagration occurred in the ventilation system. This occurred shortly after the fire on the first floor was put out. A power failure terminated operation of the exhaust fans and the effluent sampler at about the same time. Firemen began to fight the fire in the main filter plenum at 11:15 p.m. That fire was declared "knocked down" at 2 a.m. Smoldering of filters and further application of water continued for several more hours. The fire was formally declared "out" at 11:28 a.m.

Figure S-1 is a schematic drawing that shows the atmospheric release pathways for plutonium during the fire. Plutonium was carried to the main filter plenum in two ways: (1) from the gloveboxes through the glovebox exhaust (booster) filtration system and (2) via the Room 180 ventilation system. Fire damage to the main plenum filters permitted large discharges to the environment via the stack.

Estimated releases from the 1957 fire and the associated uncertainties have been computed for 15-minute time intervals between 10 p.m. on 11 September and 2 a.m. on 12 September, when the plenum filter fire was declared to be knocked down. By 2 a.m., water had been applied to the plenum filter fire for more than 2 hours. By that time, releases from the plenum filter fire were small compared to those that occurred earlier. The sum of all releases after 2 a.m. was a small fraction of the total release.

[a] Plexiglas is a trade name of Rohm and Haas for several types of clear polymethylmethacrylate.



**Figure S-1**. Pathways for release of plutonium during the 1957 fire.

Analysis, based upon post-fire experimental evidence, indicates that the combustible CWS filters used in various effluent treatment systems burned rapidly. Data from tests, in which filters and Plexiglas were ignited and burned, were used to estimate the progress of the fire and to define times of filter failures. The largest releases occurred after the main filter bank was compromised. The period of highest release was estimated to be between 10:15 p.m. (before the primary fire was extinguished) and 10:45 p.m. (before water was applied to the plenum filter fire). This period is shown clearly in Figure S-2, which contains the estimated 15-minute average releases during the entire period from 10 p.m. to 2 a.m. The 15-minute interval was chosen to match the available meteorological data and, thereby, facilitate the calculations of environmental transport and risk. The central or median estimate (50th percentile value) and the 5th and 95th percentiles of the distribution of estimates for each time period are all shown in the plot. After 10:45 p.m., the primary fire was out, the exhaust fans were off, and releases were much lower. After that time, the principal contribution to the releases was from the burning of the main plenum filters.

Figure S-3 shows the estimated releases during the first 45 minutes in more detail. As in Figure S-2, the median estimate and the 5th and 95th percentiles of the distribution of estimates are indicated. The time sequence of 1-minute average releases shown in this figure is uncertain but serves to illustrate the sequence of events. The period during which the plenum filters had caught fire and were burning through is highlighted. The estimated releases increase rapidly during that period. By the end of that time, the plenum filters were no longer effective in reducing the release from the fire in Room 180. The estimated releases continued at a high rate until the fire in Room 180 was extinguished (shortly before the exhaust fans stopped operating).

The explosion or deflagration also occurred just before the power to the fans was lost. The pressure pulse, which occurred after many plenum filters had already been severely damaged by fire, is not estimated to have had a significant effect on the plutonium release.

**Figure S-2.** Estimated releases of plutonium during consecutive 15-minute periods during the 1957 fire.

**Figure S-3.** Estimated releases of plutonium to the atmosphere during consecutive 1-minute periods during the first 45 minutes of the 1957 fire.

The uncertainties in the release estimates shown in Figures S-2 and S-3 reflect variations in parameters used in the calculations, including variations in release fractions for various conditions and uncertainties in the amounts of plutonium available in various forms. Also contributing are uncertainties in the amounts of plutonium previously deposited on the booster system filters, main plenum filters, glovebox exhaust filters, and room air prefilters. Those quantities involve estimates of the collection efficiencies of the various filtration systems and the historic measurements of activity in plant exhaust systems.

The release estimates discussed above reflect an assumption that the plutonium metal was evenly distributed among four categories of oxidation conditions that may have occurred during the fire. The estimated total release under those conditions was ~300 g with 5th to 95th percentile confidence bounds of 160–490 g. However, it is not certain that "vigorous" oxidation at high temperatures (>1500°C) occurred during the fire. The release estimate is most sensitive to the amount of plutonium assumed to have been in that category. Consideration of other scenarios led to the conclusion that a better estimate of the uncertainty associated with the total release is 40–500 g. The upper bound was rounded to one significant figure.

The size distributions of plutonium particles that were released at various times during the 1957 fire are not known. No measurements of the particle size of the airborne activity were performed. Experiments in which plutonium was oxidized and contaminated materials were burned have yielded a broad range of aerosol sizes. Particles with aerodynamic diameters that exceed 10 µm cannot penetrate into the pulmonary region of the lung and are not considered respirable. That diameter represents the upper bound for the sizes of particles that contribute most to dose from inhalation. For the types of plutonium oxidation and combustion of contaminated materials that occurred during the 1957 fire, consideration of a range of activity median aerodynamic diameters between 1 µm and 10 µm is recommended.

## CONTENTS

SUMMARY ..... iii

ACRONYMS ..... xi

1. INTRODUCTION ..... 1

2. INVESTIGATIONS OF THE FIRE ..... 5
   2.1 The 1957 Investigation Reports ..... 5
   2.2 The Dose Reconstruction Project Fire Protection Investigation ..... 7
      2.2.1 Burning of Chemical Warfare System Filters ..... 7
      2.2.2 Combustibility of Other Materials ..... 9
      2.2.3 Supplemented Chronology for the 1957 Fire ..... 9
      2.2.4 The Explosion or Deflagration that Occurred during the 1957 Fire ..... 13
   2.3 Summary of the Fire Investigations ..... 16

3. SOURCES OF RELEASED PLUTONIUM ..... 19
   3.1 Plutonium in the Fire Area ..... 19
   3.2 Plutonium Previously Retained by Filter Systems ..... 22
      3.2.1 Exhaust System Air Flow Rates ..... 22
      3.2.2 Plutonium Collected on the Main Plenum Filters ..... 25
      3.2.3 Plutonium Collected on the Booster System Filters ..... 32
      3.2.4 Plutonium Collected on the Glovebox Outlet Filters and Room Air Prefilters ..... 35
   3.3 Plutonium Deposited in the Ventilation System ..... 35
   3.4 Summary of Amounts of Plutonium Involved in the Fire ..... 36

4. FRACTIONS OF PLUTONIUM RELEASED INTO AIR DURING FIRES ..... 38
   4.1 Airborne Release Fractions for Metal Oxidation ..... 39
      4.1.1 Oxidation Temperatures Below the Melting Point of Plutonium ..... 39
      4.1.2 Oxidation Temperatures Above the Melting Point of Plutonium ..... 41
   4.2 Airborne Release Fractions for Plutonium in Organic Liquids That Burn ..... 41
   4.3 Airborne Release Fractions Burning of Plutonium Contaminated Solids ..... 42
   4.4 Airborne Release Fractions for Plutonium Oxide Powder ..... 43
   4.5 Resuspension of Plutonium Deposited in Glovebox Exhaust Lines ..... 43
   4.6 Airborne Release Fractions for Plutonium on HEPA Filters Subjected to Blast Effects ..... 43
   4.7 Summary of Airborne Release Fractions for Plutonium Involved in the Fire ..... 44

5. PLUTONIUM RELEASE CALCULATIONS ..... 46

6. RESULTS ..... 50

7. REFERENCES ..... 54

## APPENDICES

APPENDIX A—Accountability Data Related to the 1957 Fire and to Early Operations in Building 71 ........ A-1

APPENDIX B—Examination of Mass Balance Accounting as a Means for Estimating Plutonium Releases ........ B-1

APPENDIX C—Reported Effluent and Duct Air Sampling Results for Building 71 during the Years 1953–1957 ........ C-1

APPENDIX D—Building 71 Hallway and Room Air Sampling Data Reported during the Years 1953–1957 ........ D-1

## FIGURES

1.1. Very simplified plan view of Building 71 .......... 2
1.2. Pathways for release of plutonium during the 1957 fire .......... 3
2.1. Schematic diagram of the main exhaust plenum in Building 71 .......... 11
2.2. Estimated spread of the fire in the main filter plenum, 11–12 September 1957 .......... 12
2.3 Estimated rate at which the fire burned through filters in the main plenum of Building 71 the night of 11–12 September 1957 .......... 13
3.1. Diagram of glovebox line in Room 180 where the fire began .......... 20
3.2. Reported or calculated monthly exhaust airflows for Building 71 .......... 25
3.3 Estimated buildup of $^{239,240}Pu$ activity on Building 71 main filter bank from startup until 11 September 1957 .......... 28
3.4 Initial estimates of the amounts of $^{239,240}Pu$ that passed through the booster system filters and were carried to the main filter bank .......... 33
3.5. Changes in Rocky Flats operations with time after startup .......... 34
5.1. Estimated fractional penetration of particles through booster system exhaust filters .......... 47
5.2. Estimated fractional penetration of particles through the filters in the main exhaust plenum of Building 71 .......... 47
6.1 Estimated releases of plutonium to the atmosphere during consecutive 15-minute periods during the 1957 fire .......... 50
6.2 Estimated releases of plutonium to the atmosphere during consecutive 1-minute periods during the first 45 minutes of the 1957 fire .......... 51

## TABLES

2.1. Elements of chronology of Building 71 fire .......... 6
2.2. Supplemented chronology of Building 71 fire .......... 10
3.1. Locations of plutonium in glovebox line in Room 180 before the fire .......... 20
3.2. Flow rates for ventilation exhaust ducts in Building 71 .......... 24
3.3. Ducts in Building 71 that were sampled routinely .......... 26
3.4 Initial estimates of inputs to the main filter bank before the fire in Building 71 on 11 September 1957 .......... 27
3.5. Average pre-fire air concentrations measured in rooms in Bldg. 71 .......... 31
3.6. Estimated amounts of plutonium involved in the fire .......... 37
4.1. Estimated release fractions for plutonium involved in the fire .......... 45
5.1. Largest estimated amounts of plutonium that became airborne in Room 180 .......... 48
6.1. History of estimates of plutonium releases from the 1957 fire .......... 52

Estimated Airborne Releases of Plutonium during the 1957 Fire in Building 71 Page xi

## ACRONYMS

| | |
|---|---|
| AEC | U.S. Atomic Energy Commission |
| ANS | American Nuclear Society |
| ARF | airborne release fraction |
| CWS | chemical warfare system (filter) |
| DOE | U.S. Department of Energy |
| HEPA | high-efficiency particulate air (filter) |
| MPL | maximum permissible level |
| MUF | material unaccounted for |
| NRC | U.S. Nuclear Regulatory Commission |
| TBP | tributyl phosphate |

***Radiological Assessments Corporation***
***"Setting the standard in environmental health"***

# ESTIMATED AIRBORNE RELEASES OF PLUTONIUM DURING THE 1957 FIRE IN BUILDING 71

## 1. INTRODUCTION

This investigation is a part of Phase II of the Historical Public Exposures Studies on Rocky Flats, performed by *Radiological Assessments Corporation* for the Colorado Department of Public Health and Environment. The Health Advisory Panel for the Project recommended that an independent investigation of the plutonium[a] releases from the 1957 fire be conducted as part of Task 2, Verification and Analysis of Source Terms. In Phase I, releases from the fire were estimated on the basis of environmental contamination measurements made at the time and the predicted atmospheric dispersion during the period of release. We have taken the alternative approach of using information about the material involved in the fire and the conditions before and during the fire in Building 71 (now called Building 771) to develop estimates of the amount of plutonium released to the atmosphere.

Figure 1.1 is a simple schematic diagram of portions of Building 71. The figure is not to scale and makes no attempt to show the large number of rooms and work areas in the building. Its purpose is to illustrate the primary relationships between equipment and air handling systems. These systems are important for analysis of releases from the fire that occurred in Building 71 on 11–12 September 1957. Only an overview of events is given here. A detailed chronology is provided in Section 2.

The fire started at about 10 p.m. in Room 180. The sequence of interconnected gloveboxes that housed a lathe, press, and other equipment used to form plutonium parts in that room is shown symbolically in Figure 1.1. Portions of the gloveboxes were constructed of Plexiglas.[b] The fire was initiated by spontaneous combustion of impure plutonium in a metal casting residue (called a skull) stored in the glovebox line. Subsequently, the Plexiglas ignited and burned as did the rubber gloves attached to gloveboxes.

Before the fire broke through the glovebox containment, contaminated air was carried through the glovebox exhaust lines to the glovebox exhaust filters (the so-called booster system). This system employed eight large (24 x 24 x 11.5 in.) combustible chemical warfare system (CWS) filters in two stages to remove plutonium from the glovebox exhausts. The figure shows symbolically 4 of the 12 exhausts from gloveboxes in the fire area. Although not shown in the figure, smaller CWS filters were also used at the glovebox air outlets. The fire burned through these filters and spread to the larger glovebox exhaust filters by way of the booster system exhaust lines.

---

[a] In this report, the word plutonium, or its symbol (Pu), means weapons grade plutonium, which consists primarily of $^{239}$Pu (~93.8%), $^{240}$Pu (~5.8%), and $^{241}$Pu (~0.36%). Both $^{239}$Pu and $^{240}$Pu emit alpha particles with average energies of 5.15 MeV and cannot be identified separately by alpha spectrometry. Releases of these two isotopes were the most important sources of radiation exposure that resulted from the 1957 fire. The beta decay of $^{241}$Pu forms $^{241}$Am, also an alpha-emitter, that can (after many years) account for as much as 18% of the total alpha activity. The contribution of $^{241}$Am to the doses received by persons exposed during the 1957 fire was small.

[b] Plexiglas is a trade name of Rohm and Haas for several types of clear polymethylmethacrylate.



**Figure 1.1.** Very simplified plan view of Building 71. The glovebox exhaust system and the room air ventilation system provide air flow paths from the fire area (Room 180) to the main filter bank. The positions of exhaust fans are indicated by the letter F. The location of the effluent sampler in the exhaust duct is indicated by ES.

The glovebox exhaust filtration system discharged to the main filter plenum. The single-stage main filter bank was an array of more than 600 combustible CWS filters. These filters were the same type and size as those used in the booster system exhaust. The filter bank was also used to treat room ventilation exhaust air from many other areas in the building.

After the glovebox containment failed, contaminated air was carried to the main filter bank in the room air exhausted from the fire area. Prefilters, of the CWS type, were located at the front of the room ventilation exhaust registers. These were also burned. The fire spread to the filters in the main plenum through the glovebox and room ventilation exhausts. Exhaust fans, located on the downstream side of the main filter bank, discharged into a large metal duct that connected at the wall of the building with a concrete underground duct that carried the exhaust air to the stack.

Firefighters used water to extinguish the primary fire in Room 180 about 30 minutes after it was discovered. The fire damage on the first floor was mainly confined to that room, although connecting rooms were also heavily contaminated with plutonium. Shortly after the primary fire was extinguished, an explosion or deflagration occurred in the ventilation system. It blew contamination back through the ductwork into all parts of the building and into the atmosphere.

The exhaust fans stopped about 1 minute later because the power cable, located in the filter plenum, was burned.

Although it was subsequently necessary to attend to minor flare-ups in Room 180, the firefighters' primary focus shifted to the fire discovered in the main filter bank. That fire was declared "knocked down" at 2 a.m. The last of the smoldering filters was considered to have been extinguished by about 11:30 a.m.

The effluent sampler for Building 71 was located in the exhaust duct, near the point where it leaves the building en route to the stack. The power failure noted above precluded collecting an adequate sample of the effluent during the accident. Air sampling capability was not restored until 1 week after the fire. Failure of the effluent sampler during the accident is the reason that an alternative method is used to estimate plutonium releases from the fire.

Figure 1.2 illustrates the two pathways for plutonium release during the course of the fire. The first pathway begins at the top left of the figure. Some plutonium involved in the fire became airborne in the gloveboxes. That material was first carried to the glovebox outlet filters. When those small filters caught fire and burned through, airborne plutonium was carried to the filters of the booster system. Plutonium that had previously been deposited in the small, low-flow rate, booster system lines may have been resuspended during the fire and also carried along the same path. When the booster system filters burned and subsequently failed, plutonium was carried by the air stream directly from the gloveboxes to the main plenum filters. Part of the plutonium that had previously been deposited on the booster system filters became airborne when those filters burned. The main plenum filters had also previously been contaminated by airborne activity from various areas of Building 71.



**Figure 1.2.** Pathways for release of plutonium during the 1957 fire.

The second pathway begins at the lower left part of Figure 1.2. When the Plexiglas gloveboxes burned through, plutonium oxidized in the fire escaped into the air in Room 180. It was carried to the inlet registers of the room ventilation exhaust and then via the exhaust ductwork to the main filter plenum. The room air exhaust registers contained prefilters that burned. Initially the filters in the plenum were intact, but they also caught fire and burned. When the plenum filters burned through, there was a direct path from the fire in Room 180 to the stack and then to the atmosphere. In addition, part of the plutonium that had been deposited on filters that burned was also released to the stack and to the environment.

Figure 1.2 indicates that information about a number of quantities, times, and parameters is needed to estimate the release of plutonium to the atmosphere during the fire. The main items are summarized below. The list also includes two items related to the explosion or deflagration that occurred in the ventilation system.

- Amount of plutonium that was involved in the fire
- Amounts of plutonium that had been collected on the plenum filters, booster system filters, other filters, and in the booster system line before the fire
- Time at which the booster system filters failed because of combustion of the filters
- Time at which the plenum filters failed because of combustion of the filters
- Number of plenum filters that were burned through
- Fraction of the amount of plutonium in the fire area that became airborne during the fire
- Fractions of the amounts of plutonium in various filters that became airborne when those filters burned through
- Cause of the explosion or deflagration in the ventilation system
- Effects of the explosion or deflagration.

The remainder of this report is devoted to collecting information about the amounts of plutonium of interest, analyzing the critical times and release fractions, and estimating the plutonium release from the 1957 fire.

Section 2 contains results of the fire investigation performed by the U.S. Atomic Energy Commission (AEC) in 1957. That report provided the basic chronology of events. Recent investigations, performed as part of the Phase II work, are also discussed in Section 2. Section 2 also presents additions to the chronology and information related to the spread of the fire. Section 3 addresses the questions dealing with sources of plutonium that was released, including prior contamination of the filter systems. Section 4 discusses release fractions that have been recommended for a variety of plutonium fires. Section 5 brings together all of the information needed to estimate releases to the atmosphere during the course of the fire. The Monte Carlo analysis of fire releases is described in Section 5. That approach reflects the uncertainties in the answers to the many questions about the fire. Section 6 presents our results and a comparison of our estimates and those made previously. Section 7 contains references. Details related to plutonium accountability and historic data on plutonium in ventilation system exhausts and in room air are provided in the appendices.

## 2. INVESTIGATIONS OF THE FIRE

Two sets of investigations are discussed in this section. The first investigation was conducted soon after the fire by an AEC investigation team. Their main report (Epp et al. 1957) has been declassified, with deletions of information about the masses of weapons parts. A supplementary report for that investigation (Epp 1957) was prepared later in the year. Both those reports are summarized in Section 2.1. Section 2.2 contains results of a recent investigation of the fire protection aspects. That investigation (Diliberto 1999) was undertaken to try to define important times in the sequence of events.

### 2.1 The 1957 Investigation Reports

Following the 1957 fire, an investigation committee was formed by the AEC. The committee completed its *Report of Investigation of Serious Incident in Building 71 on September 11, 1957* in early October (Epp et al. 1957). That report presents the basic sequence of events that occurred during the fire; factors that contributed to the severity of the fire; an estimate of the economic loss caused by the fire; and recommendations for improvements in equipment, design, and operations.

Room 180, where the fire began, was called the Development Laboratory of Building 71. It adjoined Room 179 and some small offices. The part of the room where the fire occurred was used by the Special Products Group, which produced nuclear weapons components made from alpha-phase plutonium metal. Most of the operational experience in Building 71 was related to delta-phase plutonium, a less reactive (but still pyrophoric) metal. The reactivity of alpha-phase plutonium was considered a significant factor in starting the fire. New facilities for this activity had been constructed and installed in Room 180 earlier in 1957. Some of the gloveboxes involved in the fire were constructed almost entirely of Plexiglas.

Significant events in the chronology of the fire are listed in Table 2.1. The events listed are considered most important for the purposes of estimating releases from the fire. When the fire was discovered, flames from burning rubber gloves and Plexiglas were observed. The Fire Department was called and they arrived quickly (10:12 p.m.). The 12-minute delay before active firefighting began resulted from the need to don protective clothing and respiratory protection. The fans were turned on high speed to increase ventilation of the fire area and reduce the level of airborne contaminants to which those fighting the fire would be exposed. Water was not used to fight the fire initially because of concerns about nuclear criticality, but it was employed after it became clear that using carbon dioxide had little effect. The explosion, which did not occur in Room 180, knocked down personnel in that room and in the adjacent hallway. Kennedy and Kennedy (1990) indicates that a pressure of 1 lb in.$^{-2}$ is required to produce that result. Epp et al. (1957) suggested that the explosion was probably caused by ignition of unburned gases that accumulated in the ventilation system.

The fourth item in the chronology shown in Table 2.1 indicates that the plenum filters were burning before 10:28 p.m. None of the other elements of the chronology assembled by Epp et al. (1957) provides information about the filter failure times needed for the present investigation. The absence of information about the times when filters burned through was found to be a major source of uncertainty in initial estimates of the fire releases.

**Table 2.1. Elements of Chronology of Building 71 Fire (from Epp et al. 1957)**

| Evening of 11 September 1957 | Event |
|---|---|
| 10:10 | Fire discovered in Room 180 by guards on a routine building tour |
| 10:25 | Building exhaust fans turned on high speed |
| 10:24-10:27 | Attempts to put fire out using carbon dioxide extinguishers failed |
| 10:28 | Smoke noticed coming from exhaust fan system |
| 10:37–10:38 | Water used to extinguish the fire in Room 180 |
| 10:39 | Explosion in ventilation exhaust system |
| 10:40 | Exhaust fans went off; power cable in plenum burned through |
| 10:47 | Plenum filter bank observed to be burning |
| 11:10 | Electrical power failure in entire building |
| 11:15 | Water applied to filter fire in main plenum |
| Morning of 12 September 1957 | |
| 2:00 | Fire in filter plenum declared "knocked down" |
| 11:28 | Filter plenum fire declared completely out |

Two key factors affected the severity of the fire: (1) the use of Plexiglas in glovebox construction and (2) the use of combustible CWS filters for filtration in several locations, including the glovebox exhaust (booster) system and main filter plenum. Delays in fighting the fire were also cited. Another factor was the earlier decision to disconnect a fire detection system in the plenum area because it was the source of false alarms and unnecessary shutdowns of the building ventilation system (Epp et al. 1957).

A supplementary report (Epp 1957) prepared in December discusses factors affecting the fire and considers alternative materials for glovebox construction. Epp (1957) indicates that the flammability of Plexiglas and its heat of combustion were not fully appreciated at the time the gloveboxes in Room 180 were built. The report also addresses plant protection and fire protection improvements that were either (a) already completed or planned or (b) being contemplated. It describes reorganization of the Fire Department and discusses alternative methods to extinguish pyrophoric metal fires, which were being examined at the time. An updated cost estimate for the fire, about $430,000, was included in the report. That estimate was about 10% higher than the initial estimate that had been made.

Epp (1957) also discussed possible causes of the explosion. He concluded that it occurred in the ventilation system and was not a direct result of extinguishing the fire in Room 180 (water reacts with metallic plutonium to produce hydrogen). He noted that ventilation exhaust ductwork in rooms was not distorted and that there was no evidence of flames reaching the rooms. Distortion of ducts was found near the main plenum, and it was concluded that gases distilled from the burning CWS filters were ignited. The event was described as a "puff" or "whoosh" (Epp 1957; Epp et al. 1957) rather than a "bang." This suggests that it was a deflagration rather than an explosion. The difference between the two types of events is primarily in the rate of burning of the flammable material and the magnitude of the pressure pulse produced (Noon 1995). A deflagration burns more slowly and produces a lower pressure pulse than an explosion,

but is not a trivial event. Persons standing in Room 180 at the time were knocked down by the resultant pressure pulse.

The fire was the subject of a serious accident bulletin (AEC 1957) in November. Building 71 was not identified and Rocky Flats was not mentioned, probably because processing of plutonium at Rocky Flats was not discussed publicly at that time. The complexities of fighting fires involving plutonium were emphasized in the bulletin, as were problems with flammable filter banks. The large economic loss sustained resulting from the spontaneous combustion of a small amount of plutonium was also noted (AEC 1957).

## 2.2  The Dose Reconstruction Project Fire Protection Investigation

The behavior of the CWS filters during the course of the accident is an important factor in the analysis of the plutonium releases to the atmosphere. The time required for the filters to burn through, affects the amount of time that a direct path was available for airborne plutonium to travel from Room 180 to the atmosphere. Combustion of the filters was also implicated as a source of flammable gases involved in the deflagration. How those gases could accumulate with the ventilation system operating at high speed was another puzzling question.

At the request of the Health Advisory Panel and the public, a fire protection review of information related to the 1957 fire was initiated to attempt to resolve some of these questions and to provide information needed for estimating plutonium releases to the atmosphere during the fire. The review, conducted by Diliberto + Associates, examined the original fire reports, standards and guides that were current at the time of construction and early operation of Building 71. They also reviewed publications that documented the behavior of CWS filters and other materials in fire tests.

The remainder of this section summarizes the findings of that investigation and other relevant information. Section 2.2.1 contains information about burning of CWS filters from experimental programs at Rocky Flats and elsewhere. Section 2.2.2 describes the results of testing of the flammability of other materials that were used at Rocky Flats. Section 2.2.3 provides a supplemental chronology of the fire that focuses on times that were important to estimating the plutonium release to the atmosphere. Section 2.2.4 discusses the explosion or deflagration.

### 2.2.1  Burning of Chemical Warfare System Filters

The combustible CWS filters were known to be a fire hazard before the fire at Rocky Flats in September 1957. The filter medium was 86% cellulose and 14% asbestos fibers, added to strengthen the paper and improve its filtration properties. The filter media and asbestos paper separators were enclosed in square plywood frames and attached to those frames using an adhesive.

In 1955, the AEC issued a serious accident bulletin (AEC 1955) that described a fire in a large bank of CWS filters in wooden frames in an Oak Ridge facility. Because water could react with the material (uranium) collected by the filters, carbon dioxide had been used to attempt to extinguish a fire in the filters. After it was believed to be out, the fire recurred on 2 successive days, again requiring large volumes of carbon dioxide for control. Subsequently, the combustible filter assemblies were replaced by a newer design that employed fiberglass filter media, metal

frames, and metal separators. The bulletin encouraged reappraisal of fire hazards at such facilities (AEC 1955).

Personnel at Rocky Flats were aware of the fire risks associated with use of the CWS filters. However, they were quite satisfied with the performance and economics of those filters. Little maintenance had been required; for example, most of the plenum filters in Building 71 had been used for 4 years. They were concerned about the possible shorter filter life and associated costs of noncombustible filters that were being designed and tested (Walker 1957). In fact, when new noncombustible filters were installed following the 1957 fire, there were a number of operational difficulties caused by poor quality assurance in filter production and short operating lifetimes (Walker 1959). An earlier presentation that described the ventilation and filtration systems in Rocky Flats facilities also suggests that cost was an important concern (Walker 1954).

Following the 1957 fire, tests of burning of the CWS filters were conducted at Rocky Flats (Erickson and Linck 1958). Earlier tests that employed the same filters had been conducted at Hanford (Keigher 1956), at the Naval War School in Virginia, and at Oak Ridge (Gilbert 1998). Diliberto (1999) reviewed the relevant tests and summarized the results. In the 1957 tests at Rocky Flats, the time required for filters to burn through was about 2.5 minutes for a single-filter flow rate of 480 $ft^3$ $min^{-1}$. That flow rate was comparable to the average flow rate through each plenum filter during the fire. The Hanford tests focused more on the temperature increase during burning. In tests with single filter flow rates of about 350 $ft^3$ $min^{-1}$, temperatures of 1100–1500°F were recorded (Keigher 1956).

A second set of tests was conducted at Rocky Flats using both CWS filters and the newer noncombustible filters. For the combustible CWS filters, single filter flow rates ranged from 224 to 525 $ft^3$ $min^{-1}$. Temperatures of about 1000°F were reached and the times required for the filters to burn through ranged from ~1 to 2 minutes (Erickson et al. 1961). The effect of flow rate was not clearly shown in the seven tests with CWS filters. Filter ignition temperatures for both the Hanford and Rocky Flats tests were in the range of 420–490°F. The adhesive used in filter construction appeared to be the first material to begin burning at a temperature of approximately 300°F.

Gilbert (1998) verbally reported his observations during CWS filter burning tests conducted in the 1950s at the Naval War School and at Oak Ridge. The following is a summary. When the filters are ignited, unburned carbon monoxide is drawn toward the back of the filter where it accumulates. When flames reach the pocket of combustible carbon monoxide, a minor explosion occurs. Gilbert observed tests that produced flame flashbacks up to 4 ft in length. Minor explosions and flashbacks were also observed in the Rocky Flats and Hanford filter burning tests (Diliberto 1999). The flashback phenomenon is important to the understanding of the postulated mechanism for the explosion, discussed later. Plugging of the filters by smoke was studied later by Gaskill et al. (1977). The filter plugging phenomenon that they observed could facilitate formation of "pockets" of carbon monoxide that are the source of flashbacks.

### 2.2.2 Combustibility of Other Materials

Following the 1969 fire in Buildings 776-777, Beltz et al. (1970) conducted additional tests of combustible materials used in gloveboxes and elsewhere at Rocky Flats. The tests of glovebox window material included tests of two types of Plexiglas. Gasket materials and various types of gloves were also tested. The study included combustion tests of various materials used for shielding against neutrons, a variety of paints, and components of the high-efficiency particulate air (HEPA) filters in use at the time.

Tests showed that Plexiglas began to decompose at about 390°F. The vapor that was produced was monomeric methylmethacrylate. It was quite flammable at about 540°F. Leaded gloves, composed of three layers (neoprene, lead, and neoprene), were found to be self-extinguishing at ambient temperature, but highly combustible above 390°F.

### 2.2.3 Supplemented Chronology for the 1957 Fire

Diliberto (1999) estimated the times of occurrence of various events important for the plutonium release calculations using information that was obtained in the burning tests described above. These times, shown in *italics*, have been incorporated into a supplemented chronology of the fire, which is provided in Table 2.2. Table 2.2 includes the elements of the chronology developed by Epp et al. (1957) that were presented in Table 2.1. A key feature of this chronology is the rapid spread of the fire from the gloveboxes in Room 180 to the booster filters and to the main filter plenum. Once ignited, both the Plexiglas glovebox material and the CWS filters burned rapidly.

The exhaust airflow in the booster system was about 4800 $ft^3\ min^{-1}$. The flow was distributed over a square array of four filters, meaning that the flow through each filter was about 1200 $ft^3\ min^{-1}$. Thus, the linear velocity of air through those filters was about 2.5 times higher that the air velocities employed in the filter burning tests described above. That higher air velocity is expected to have shortened the time required for the fire to burn through the two layers of booster system filters. It is estimated that at 10:12 p.m., soon after the fire was discovered, the booster system exhaust filters were compromised and provided little filtration of the air that was being carried through the booster system exhausts from Room 180.

The general arrangement of the main exhaust plenum on the second floor of Building 71 is shown schematically in Figure 2.1. This plan view is incomplete and not to scale. Its purpose is to illustrate the entry of air from various parts of the building through many (17) ducts that penetrate the concrete walls of the plenum room. The main filter bank is located in the middle of the space; air is drawn through the filters by the fans (indicated by F) and exhausted to the stack. The plenum area is very large, with an east-west dimension greater than 200 ft (north is toward the top of the figure). Ducts carrying air from the booster system exhaust and from room 180 are located on the western side of the plenum. The fire in the main plenum filters most likely started in the area where the booster system exhaust duct enters the plenum.

**Table 2.2. Supplemented Chronology[a] of Building 71 Fire (Diliberto 1999)**

| Evening of 11 September 1957 | Event |
|---|---|
| *10:06* | *Open flame in glovebox* |
| *10:07–10:09* | *Glovebox outlet filter burned; booster system filters catch fire* |
| 10:10 | Fire discovered in Room 180 by guards on a routine building tour |
| *10:12* | *Hole burned in booster exhaust system filters* |
| *10:17–10:19* | *Local ventilation system exhaust prefilters burning* |
| *10:18–10:24* | *Heat and smoke buildup in exhaust plenum* |
| *10:20* | *Main plenum filters begin to ignite (450°F)* |
| 10:25 | Building exhaust fans turned on high speed |
| 10:24-10:27 | Attempts to put fire out using carbon dioxide extinguishers failed |
| 10:28 | Smoke noticed coming from exhaust fan system |
| *10:29* | *Booster system filters consumed by the fire* |
| *10:30* | *Plenum filters burning* |
| 10:37–10:38 | Water used to extinguish the fire in Room 180 |
| 10:39 | Explosion in ventilation exhaust system |
| 10:40 | Exhaust fans went off; power cable in plenum burned through |
| 10:47 | Plenum filter bank observed to be burning |
| 11:10 | Electrical power failure in entire building |
| 11:15 | Water applied to filter fire in main plenum |
| Morning of 12 September 1957 | |
| 2:00 | Fire in filter plenum declared "knocked down" |
| 11:28 | Filter plenum fire declared completely out |

[a] Additions to the original chronology are shown in italics.

Figure 2.2 shows the estimated spread of the fire in the main exhaust plenum. Each of the squares is symbolic of a filter in the plenum. Six filters across from the booster system exhaust duct are believed to have been first to catch fire at 10:20 p.m. The entire filter bank, which contained more than 600 filters, cannot be shown legibly in the figure. Experimental results from large-scale filter burning experiments conducted at Rocky Flats indicate that the upward spread of the fire on the filter surface would be more rapid that either the downward or lateral spread (Erickson et al. 1961). Results from those tests underlie these estimates.

An average filter dust loading of 6–10 lb per filter in plants at Rocky Flats was reported by Walker (1957) less than 3 months before the Building 71 fire occurred. He also indicated that the dust loading both raised the amount of combustible material available and contributed to the potential for spread of a fire from filter to filter.

The filters adjacent to the six that are highlighted are also estimated to have caught fire within 5 minutes after the filter fire began. The lateral spread of the fire is indicated by the times in Figure 2.2 and is considered to be symmetric; spread to the right (east) is only partly shown. The growth of the fire shown in Figure 2.2 is consistent with observations of flames on the downstream side of the filters (the side nearest the fans in Figure 2.1) between 11:13 and 11:15 p.m. (Epp et al. 1957; Diliberto 1999). Expansion of the fire area is shown for a period of

about 2 hours, from the start of the main plenum filter fire until 1 hour after the application of water to the fire began.



**Figure 2.1**. Schematic diagram of the main exhaust plenum in Building 71. Air from all parts of the building entered the plenum through ducts at the top of the drawing. The air was pulled through the filter bank and discharged to the stack by the exhaust fans.

Figure 2.3 shows the number of filters estimated to have burned through as a function of time, in 5-minute intervals, after 10 p.m. The plot reflects the fire spread shown in Figure 2.2 and the fire propagation rates from experimental tests. The first filters to catch fire are estimated to have burned through in about 4 minutes because the exhaust airflow was lower before 10:25 p.m. The rapid increase in filter failure during the 15-minute period when the fans were on high speed, before power was lost, is shown in the figure. It is estimated that filters catching fire during this period would be penetrated by fire in about 2 minutes. Most of the plutonium release (discussed in Section 5) occurred during this part of the fire.

After electrical power to the exhaust fans was lost (10:40 p.m.), it is estimated that, initially, fire burned through filters in about 5 minutes. After water was applied to the fire at 11:15 p.m., the time required to burn through the filters was estimated to be about 10 minutes. That change causes the small jog in plot in Figure 2.3; there is a 5-minute period during which no filters are estimated to have burned through. The estimated lateral spread of the fire in the filter bank, illustrated in Figure 2.2, does not change greatly during this time. The rates of fire spreading and filter burning at times after power to the exhaust fans was lost are not significant factors in estimating the overall release of plutonium.

Page 12 Historical Public Exposures Studies on Rocky Flats, Phase II

Estimated Times When Individual Plenum Filters Began to Burn
(Same Progression to the East as to the West)
West End of Filter Bank
East
Six Plenum Filters Where
Filter Fire Began at 10:20 p.m.

**Figure 2.2.** Estimated spread of the fire in the main filter plenum, 11–12 September 1957. Estimated times when filters began to burn are shown. The eastward progression is the same as the westward spread, but can't be shown. View is from inlet side of plenum.



**Figure 2.3.** Estimated rate at which the fire burned through filters in the main plenum of Building 71 the night of 11–12 September 1957. Before 10:25 p.m., the exhaust fans operated at low speed.

### 2.2.4 The Explosion or Deflagration that Occurred during the 1957 Fire

Explosions (detonations) are distinguished from deflagrations by differences in rate of combustion and size of the pressure pulses produced. In a deflagration, the fuel burns more slowly and produces a lower overpressure. Most accidental explosions that occur within buildings are characterized as deflagrations. These include ignitions of flammable gases and airborne dust particles (Noon 1995). Detonations are explosions in which the rate of combustion is very fast and the overpressure produced is large. Examples of fuels for such events are dynamite, nitroglycerine, and trinitrotoluene.

The initial investigations of the fire in 1957 concluded that the fuel for the explosion was most probably unburned combustible gases that had collected in the ventilation system (Epp et al. 1957; Epp 1957). Deformations of ductwork were found near the exhaust plenum but not in the rooms, and this led to the conclusion that the explosion occurred in the plenum area (Epp 1957). There was also no mention in the 1957 reports (Epp et al. 1957; Epp 1957) of either (a) observations of a flash or (b) scorching of clothing worn by personnel who were in Room 180 when the event occurred.

Kennedy and Kennedy (1985, 1990), and Noon (1995) provide tables of the concentrations of various fuels in air that can produce deflagrations. The ranges of mixtures of fuels in air that can produce deflagrations are called the "explosive limits" for the fuels. The highest overpressure and highest flame temperature are usually achieved when the mixture is approximately chemically balanced (stoichiometric). An excess either of fuel or of oxygen can significantly reduce the overpressure and flame temperature.

The Building 71 ventilation system was reported by Epp et al. (1957) to have been operating at high speed before the event (see Table 2.1). It is, therefore, difficult to visualize a mechanism that would produce adequate concentrations of unburned gases for a deflagration to occur in the filter plenum. Although some filters may have been partially plugged by the smoke (shown in studies by Gaskill et al. [1977]), there were more than 600 filters in the plenum. Each was rated for an airflow of 1000 $ft^3$ $min^{-1}$, well above the average flow rate per filter that would occur when the fans were operated on high speed. With the fans set on high speed, the exhaust airflow was about 300,000 $ft^3$ $min^{-1}$ (Walker 1954). This corresponds to the individual filter flow rate test condition (480 $ft^3$ $min^{-1}$) used by Erickson and Linck (1958). Methane and carbon monoxide are combustible gases that were likely present in the air. They have lower and upper explosive limits (volume of fuel per volume of air, expressed as a percentage) of 5% and 15% and 12.5% and 74%, respectively (Noon 1995). The lower and upper explosive limits for hydrogen, which could have been produced by the reaction of water with plutonium metal, are 4% and 75% (Kennedy and Kennedy 1985). Continuous production of large amounts of flammable gases is required to achieve volumetric concentrations of 4% or more in an airstream flowing at 300,000 $ft^3$ $min^{-1}$.

Diliberto (1999) concluded that the fuel for the explosion or deflagration was provided by the combustible paper filter media and the combustible dust and lint reported by Walker (1957) to have accumulated on plenum filters at Rocky Flats. Smoldering of this material would produce carbon monoxide. Minor explosions of carbon monoxide of the type observed by Gilbert (1998) during CWS filter burn tests, would have caused vibrations of the plenum filters. The vibrations would have suspended lint and dust and made rapid burning of it possible. The burning plenum filters provided a ready ignition source. The mechanism of flame flashbacks identified by Diliberto (1999) is more convincing than the earlier conclusion (Epp et al. 1957; Epp 1957) that invoked a simple build-up of unidentified combustible gases in the plenum.

Kennedy and Kennedy (1985, 1990) give a minimum explosive concentration for cotton lint of 0.5 ounce per cubic foot (0.0005 g $cm^{-3}$). Maximum explosive limits for dusts are difficult to define (Kennedy and Kennedy 1990; Noon 1995). Cotton lint is considered a "weak" explosion hazard, according to criteria developed by the Bureau of Mines, and produces a maximum overpressure of 48 psi. The maximum rate of pressure rise is 150 psi $s^{-1}$. (For comparison, the maximum overpressures produced by wheat and corn cob dust explosions are 103 and 110 psi, respectively. The maximum rates of pressure rise for those fuels are 3600 and 5000 psi $s^{-1}$, respectively, and they are rated as "strong" and "severe" explosion hazards, respectively.) All the parameter values listed and the hazard rankings are from Kennedy and Kennedy (1985, 1990).

The mass of combustible lint and dust on the plenum filters is estimated using the filter dust loading information presented for Rocky Flats. Walker (1957) reported a typical range of 6–10 lb of combustible material per filter and a maximum of 13 lb collected on some filters. Using a central value of 8 lb per filter, the total mass of combustible lint and dust is estimated to be about 5000 lb (about $2.2 \times 10^6$ g). If this mass of lint and dust were uniformly distributed within the volume (about $9.0 \times 10^9$ $cm^3$) on the upstream side of the filters (see Figure 2.1), the average concentration would be about 0.002 g $cm^{-3}$, which is about 5 times the minimum explosive concentration cited above. However, it is more likely that dust suspended from filter surfaces as the result of fire flashback explosions (Gilbert 1998) entered a smaller volume close to the face of the filter bank and was ignited.

It is known that persons in Room 180 were knocked down by the pressure pulse that resulted from the explosion. An overpressure of 1 lb $in.^{-2}$ is required to achieve this effect (Noon 1995).

Diliberto (1999) has estimated the amount of fuel that would be needed to produce such a pressure in Room 180. The calculation is not exact, but the estimated amounts range, in round numbers, from 50–70 lb of cellulosic material. It is clear, from the calculation above, that there was an abundant fuel supply available in and on the filters. Suspension of 25% of the dust collected on 30 filters would provide 60 lb of fuel.

When it occurred, the explosion would have also consumed any combustible gases present in the filter plenum. Hydrogen gas, produced by the reaction of water with plutonium metal, may have contributed to the fuel supply. The maximum production of hydrogen gas is limited by the amount of plutonium metal available for oxidation in this manner near the end of the fire. The maximum amount of plutonium metal involved is estimated to be 18 kg (see Section 3). It is highly unlikely, considering the known course of events, that it was all oxidized by interaction with the water applied to the fire. The maximum amount of hydrogen that could have been produced is estimated to be about 142 moles, which corresponds to about 3200 L or about 112 $ft^3$ at standard temperature and pressure. If it were produced in 3 minutes, the ratio of the volume of hydrogen to the volume of air exhausted from Room 180 (>3500 $ft^3$ $min^{-1}$) would be less than 0.01. At the higher temperatures that occurred during the fire, the volumes of hydrogen and air would both increase, but the ratio, which is well below the lower explosive limit of 4%, would not be greatly different. The upper bound concentration of hydrogen in the plenum exhaust air would be substantially smaller, but some hydrogen may have been part of the fuel supply for the explosion.

Gilbert (1998) identified carbon monoxide produced by smoldering filters as the fuel for the filter flashback explosions. Diliberto (1999) has estimated that incomplete combustion of 1 lb of cellulose fuel would produce slightly more than 1 lb of carbon monoxide. The total cellulose content of a filter is about 25 lb. This includes 8 lb of lint and dust and 17 lb (86% of 20 lb) of filter material. If partial combustion of 80% of the cellulose occurred in 5 minutes, the average volumetric concentration in air drawn through the filter at the rate of 480 $ft^3$ $min^{-1}$ would be about 11%, just below the lower explosive limit for carbon monoxide. Buildup of the gas concentration because of localized plugging of the filter by smoke from the fire could produce concentration levels consistent with the flame flashbacks that were observed during filter testing. If the carbon monoxide production rate were lower, more efficient localized plugging of the filter must have occurred because flame flashbacks did occur in burning filters and were observed (Gilbert 1998).

At times after filters in the main plenum had burned through, more of the exhaust air would flow through the burned areas because that was the path of least resistance. During the period from 10:25 to 10:39 p.m., there would have been more smoldering of filters that had caught fire and, because the oxygen supply would be reduced, a greater production of carbon monoxide. It is estimated that about 60 filters had caught fire before the explosion at 10:39 p.m. It is not simple to estimate the effects of diverted airflow resulting from the burn through of some filters. The estimates of numbers of filters that had burned through, shown in Figure 2.3, assume that the rate of filter consumption by fire did not change appreciably even though the air flow rate through filters that were burning, but not burned through, had no doubt diminished. In any case, it is estimated that at least 10 filters were not burned through and were smoldering at 10:39 p.m. Thus, there were multiple opportunities for the minor explosions of the type observed by Gilbert to suspend lint and dust from the filters to fuel the deflagration that occurred. Carbon monoxide produced by smoldering filters could also have been a supplementary fuel source.

It has been suggested that a nuclear criticality may have occurred in the filter plenum and caused the pressure pulse that was experienced by those persons in Room 180. A criticality occurs when an adequate mass of fissionable material (plutonium in this case) is brought together so that a chain of nuclear fissions can occur. Each nuclear fission releases neutrons, some of which cause further fissions. The reaction continues until the energy released separates the mass of plutonium into a configuration that does not allow a chain reaction to occur. The energy produced by the fission reactions would also cause a pressure pulse. The amount of plutonium required to produce such a reaction is known as the critical mass. It is highly dependent upon the geometric array of the plutonium components. The lowest critical mass of metal, a few kilograms, is usually found for a spherical geometry. However, the critical mass depends on the form of the material and whether neutron reflectors are present.

In addition to producing a pressure pulse, a criticality would also have produced neutron and gamma ray fluxes and fission products that would have been blown back into the building and out into the environment. However, there are no reports of elevated external exposure rates that would have been produced by the fission products or of the presence of fission products on contamination smear samples or air samples collected within the building. There are also no reports of alarms from the criticality monitors located in the processing areas on the first floor of Building 71.

Nearly all of the plutonium (mean estimate of ~300 g) that was collected by the plenum filters before the fire came from Room 146 as a result of the peroxide explosion in June 1957 (see Section 3). That exhaust duct enters the plenum near the west end (see Figure 2.1). If the plutonium from that explosion were concentrated on a few filters, it would be at that end of the plenum. If it were spread over many filters, the amount per filter would be small. In either case, the planar distribution of material would not be conducive to producing a criticality when more plutonium was added during the September 1957 fire. The amount of plutonium carried to the filter plenum during the September fire is estimated to be less than 600 g (see Section 5). Not all of this plutonium was present at one time, and it is estimated that much of it was released through the damaged filter plenum. Plutonium that was collected on surfaces of several filters would not be in a geometry that was conducive to creating a critical mass. The amounts of plutonium on the plenum filters during the fire are too small to produce a criticality. The original classified investigation documents have been reviewed and found to contain no evidence or suggestion that a nuclear criticality was the source of the pressure pulse.

## 2.3  Summary of the Fire Investigations

This section has focused primarily on the aspects of the fire that are important to estimating the releases. The summary that follows identifies a number of the key elements, including some that are related to fire protection. Further discussion of the fire protection aspects of the investigations and recommendations that were made can be found in the investigation reports (Epp et al. 1957; Epp 1957; Diliberto 1999). Some of the same fire protection issues resurfaced in 1969 when a second major plutonium facility fire occurred at Rocky Flats in Buildings 776-777 (see Voillequé 1999a).

The investigations of the 1957 fire have revealed a number of important factors related to the fire and its spread. The initial investigation led to experimental investigations that have proved quite useful in defining a more detailed chronology of events. The following aspects are particularly noteworthy:

- The potential for spontaneous combustion of alpha-phase plutonium was not fully appreciated; protection against a fire initiated by that mechanism was not adequate
- The use of Plexiglas in glovebox construction contributed significantly to the spread and severity of the fire
- Use of combustible CWS filters in exhaust cleanup systems allowed the fire to spread to the filter plenum; burning of CWS filters created a direct path from the fire area to the atmosphere
- Operation of the exhaust fans at high speed provided some protection to firefighters but also provided oxygen to the fire, increased the rates of filter combustion, and led to larger releases of plutonium to the environment
- Evaluation of filter burning tests that simulated conditions present during the fire permitted definition of a more detailed chronology of events important to estimation of releases
- The pressure pulse that knocked down persons in Room 180 was most likely caused by a deflagration fueled by combustible dust and lint that had accumulated on the plenum filters and by carbon monoxide (CO)
- Production and pocketing of CO in smoldering filters led to flashbacks that likely initiated the deflagration that occurred in the ventilation system
- Accumulations of combustible dust and lint on filters facilitated the spread of the fire in the main filter plenum and provided fuel for the deflagration that occurred
- Hydrogen gas produced by the reaction of water with plutonium metal was at most a minor contributor to the deflagration
- There is no evidence that a nuclear criticality occurred during the 1957 fire.

# 3. SOURCES OF RELEASED PLUTONIUM

Figure 1.2 shows that there were several sources of plutonium that could contribute to airborne releases during the course of the fire. Those sources are discussed in this section. The first, and most important, is the plutonium in the fire area in Room 180 (Section 3.1). Section 3.2 discusses estimates of the amounts of plutonium that had accumulated on the main plenum filters, booster system filters, glovebox outlet filters, and room air exhaust prefilters before the fire. Taken together, the amounts of plutonium collected by various filters are the second most important source of plutonium releases. Section 3.3 considers the amounts of plutonium deposited in ductwork that may have been suspended during the course of the fire. Section 3.4 provides a summary of the various quantities identified.

## 3.1 Plutonium in the Fire Area

The first and most important source of released plutonium considered is material that was present in the fire area and was involved in the fire. Epp et al. (1957) and Epp (1957) reported the damage that occurred in the fire area in Room 180. That information is summarized here. Figure 3.1 shows the general layout of the glovebox line in Room 180. The fire was initiated by spontaneous combustion of plutonium stored on a shelf in the west conveyer box. A Plexiglas partition between the conveyer box and the "work area" was ignited and that Plexiglas box was totally burned. The box that contained the lathe was also severely damaged. The inspection box was also partly constructed of Plexiglas and it was burned. Portions of the glovebox line were not greatly affected by the fire. The storage box windows were only deformed by the heat but not burned. Unburned rubber gloves were found in parts of the glovebox line that were north and east of the cold storage box.

The 1957 investigation report (Epp et al. 1957) provided an initial estimate of the amounts of plutonium in various parts of the room. This inventory was based upon the 3 September accountability report and interviews with workers. Although the accountability data were incomplete at the time, the report provides information on the forms and physical locations of much of the plutonium present at the time of the fire. Table 3.1 summarizes the information on the amounts of plutonium by location relative to the fire in Room 180. The fire damage was described above. The north-south line that terminates with airlocks (see Figure 3.1) was adjacent to the burned area. The eastern end of the conveyer line and the line between the mill and the "B" box are the unaffected area.

At the time of the investigation report (7 October 1957) the amount of plutonium in the room at the time of the accident was given as 42.3 kg. However, the report identifies some additional material that had been identified but whose mass was not yet known. Not included in the stated inventory were the amount of plutonium in a large bottle of degreasing solvent, the mass of some miscellaneous metal and sweepings, and the masses of three casting residues. The sum of the identified masses is 26.5 kg. The masses of the hemispherical shells of plutonium metal, which were included in the inventory, were unspecified because they are classified. Assuming that indicated uncertainties in the amounts of plutonium chips in cans are small, the average mass of the nine metal hemispheres can be estimated to be <1.8 kg.



**Figure 3.1.** Diagram of glovebox line in Room 180 where the fire began. The shading indicates the approximate area burned by the fire.

**Table 3.1. Locations of Plutonium in Glovebox Line in Room 180 Before the Fire[a]**

| Description | Location, by section of glovebox line | | |
|---|---|---|---|
| | Area burned by fire | Adjacent to burned area | Unaffected area |
| | Amount of plutonium (kg) | | |
| Plutonium in organic liquids (lathe cutting oil sludge, $CCl_4$ degreasing solvent) | 1.2 | [b] | 2.1 |
| Plutonium metal pieces of various types | 0.5 | 1.6[c] | [d] |
| Plutonium metal casting residues | 0.8 | 1.2[c] | [d] |
| Plutonium chips in cans | [d] | 3.7[e] | 8.0[e] |
| Plutonium dioxide ($PuO_2$) in cans | 2.6 | 2.2 | 2.6 |
| Totals | 5.1 | 8.7 | 12.7 |
| | Number of hemispheres[f] | | |
| Plutonium metal hemispheres | 8 | [d] | 1 |

[a] Based upon the 7 October accident investigation report (Epp et al. 1957). At that time, the known amount of plutonium in the room was estimated to be 42.3 kg.
[b] A large plastic bottle containing 8 L of carbon tetrachloride degreasing solvent with an unknown amount of plutonium was identified in this area.
[c] In this area, additional materials (consisting of miscellaneous metal, three casting residues, and sweepings) were reported, but the masses of those materials were not given.
[d] No material of this type was present.
[e] These masses were indicated to be uncertain.
[f] Masses of hemispheres were not given; average is estimated to be <1.8 kg (see text).

Nearly all the metal items that were identified as having been in Room 180 before the fire were experimental alpha-phase plutonium, as opposed to the delta-phase plutonium handled in larger quantities elsewhere in Building 71. The work in Room 180, the special products area, was related to developing new nuclear weapons. Inexperience with alpha-phase plutonium was considered a contributing factor to the occurrence of the fire (Epp et al. 1957).

The amount of plutonium in the 8-L bottle of degreasing solvent is not expected to be large. If the plutonium concentration in $CCl_4$ were 100 times that found in waste solvent and if the bottle were full, then only about 8 g of plutonium would have been present. The amount of plutonium reported to have been present in lathe cutting oil and sludge has been rounded from 1170 g to 1.2 kg. Use of 1.2 kg with a substantial uncertainty (see below) accounts for the amount of plutonium that was in the 8-L bottle.

The plutonium accountability procedures were applied to the fire area until cleanup of Room 180 was completed in 1961. Those accountability data, which remain classified, have been reviewed and the elements useful for this analysis have been extracted. Our notes containing that information have been declassified. Appendix A discusses the accountability data related to the 1957 fire and the estimates of the amount of material unaccounted for (MUF) following the fire. The U.S. Department of Energy estimated loss of plutonium resulting from the fire to be 6 kg (DOE 1994a) based on analysis by Zodtner and Rogers (1964). Our analysis of the accountability reports indicates that the total amount of material that was unaccounted for following the fire was probably 8.3 kg (see Appendix A).

The following discussion digresses from the topic at hand, but it is closely related to the plutonium accountability information used in this section. Initially, it was thought that the accountability data could provide a basis for estimating the amount of plutonium released during the 1957 fire. The theoretical approach is described in Appendix B. Investigation showed that the mass balance approach could not be used to make an unbiased estimate of the release because of a serious flaw in the accounting system. Before 1967, reliable measurements of the amounts of plutonium in solid waste shipments were not performed. Appendix A provides information about the quantities of solid wastes shipped and discusses the measurement difficulties. This systematic inadequacy in the plutonium accounting process prevents an estimate of the amount of MUF from being a reliable guide to the amount of plutonium released to air or water. The amount of MUF does provide a grossly overestimated upper bound on the amount of material released. Such upper bounds are useful for some types of screening calculations, but they are not credible estimates of the amounts of plutonium actually released in airborne and liquid effluents. [c]

The October and November 1957 accountability reports (Appendix A) gave differing estimates of the quantities of plutonium present before and after the fire. These changed as more information was collected. Later estimates of possible losses of plutonium were consistent with the November report, and that report is consistent with the analysis by Zodtner and Rogers (1964). The final estimate of the pre-fire inventory was 62.5 kg of plutonium. In November 1957, about 37 kg of the plutonium had been recovered from the room. An additional 16 kg had been located in the room and another 5 kg was thought to be present but had not been located at that

[c] Appendix B also includes an example of the mass balance accounting system and its relationship to estimates of routine releases to air and water from a plutonium processing facility. For a facility much like Rocky Flats, our analysis shows that the mass balance approach has no potential for determining the amounts of material released routinely. This result is consistent with the findings of a committee of the National Academy of Sciences for releases from chemical facilities under similar conditions (NAS 1990).

time. From that report, it can be estimated that about 9 kg of plutonium, including the material that had not been located, was definitely involved in the fire.

Unfortunately, there is no way to correlate the amounts of plutonium in the accountability summaries with the listing of materials in particular forms (Table 3.1) given by Epp et al. (1957). The detailed compilations of information that were used to prepare the summaries have not been retained in the plant records system.

There are two categories of material that could have been oxidized during the fire: (1) the metal turnings contained in lathe oil and sludge and (2) the various types of plutonium metal (including unidentified pieces, residues, and hemispheres). The amount of plutonium in oils and sludges is estimated to be between 1.0 and 2.4 kg. This range reflects possible measurement uncertainties and also the fact that there were uncertainties about the amounts of plutonium in sludge that may have burned (Epp et al. 1957; Epp 1957). There were eight plutonium hemispheres in the area where fire damage was greatest. An upper bound on the mass of plutonium metal in these components is 14.4 kg. Considering the other metal forms that were present leads to an upper bound metal mass of about 16 kg. A lower bound for the amount of metal oxidized is taken to be 9 kg based upon the November accountability report. In the Monte Carlo calculations in Section 5, the ranges specified here are taken to be the bounds of uniform probability distributions. The conditions of oxidation of plutonium metal are very important for estimating the appropriate release fraction (Section 4). Because these conditions are not known, a range of possibilities is considered in Section 5.

## 3.2 Plutonium Previously Retained by Filter Systems

This section describes the estimates of plutonium that had accumulated on filters in the ventilation system before the fire. The filters of interest include the large main plenum filter bank, the booster system filters, the glovebox outlet filters in Room 180, and the room air prefilters in Room 180. The estimates are based upon in-plant measurements of plutonium concentrations in ventilation air. Thus, knowledge of the airflow in the various parts of the ventilation system is an essential component of the procedure. Section 3.2.1 presents information on the airflow rates in the building ventilation exhaust system. Subsections that follow discuss estimates of the amounts of plutonium in the locations of interest. Section 3.2.2 deals with the main filter plenum. Section 3.2.3 discusses the amounts of plutonium collected by the glovebox exhaust system (booster system) filters. Section 3.2.4 addresses the glovebox exhaust filters and the ventilation air duct prefilters in Room 180.

### 3.2.1 Exhaust System Air Flow Rates

There were many ducts that carried air to the main filter bank. The general airflow in the building was from office and hallways into rooms that contained processing lines and then into the contaminated gloveboxes, which were at the lowest pressure. Air entering the gloveboxes was filtered and local exhaust filters were also provided. The collected glovebox exhausts from the analytical and development areas were carried to the booster system filters. Glovebox exhausts from the chemical, fabrication, and recovery areas were collected and filtered by the recirculating air system (so-called because it was designed to be an inert atmosphere system to which only makeup nitrogen would be added). The filtered discharges from the recirculating and booster systems were combined with room air exhausts and transported to the inlet side of the

main filter bank. After filtration, all the ventilation air was discharged via the Building 71 stack. Figure 2.1 showed the discharge of the ducts into the main filter plenum, the plenum filters, and the exhaust system.

Routine monthly reports prepared by the radiation protection staff of Building 71 contain some information about building ventilation system flow rates as well as all the data from measurements of airborne plutonium (Putzier et al. 1953–1958). Data in the January 1954 report indicate that the flow rate during the day shift was 180,000 $ft^3$ $min^{-1}$. At night and over weekends, the flow rate out of the building was lowered to 130,000 and 100,000 $ft^3$ $min^{-1}$, respectively. Air supply fan operation was adjusted accordingly. The data on fan operation were apparently kept by building operations at the time, but no detailed records of the information have been found.

The January 1954 flow rates are generally supported by information contained in an Argonne National Laboratory trip report prepared following a visit to Rocky Flats (Shuck 1954). That report states that the fans could be operated at three different speeds, normally providing 20 air changes per hour, and reduced to 10 air changes per hour in off shift hours. It was stated that, at high speed, the fans could produce 30 air changes per hour. The rates of 20 and 10 air changes per hour are roughly consistent with the daytime flow rate of 180,000 $ft^3$ $min^{-1}$ and the weekend flow rate of 100,000 $ft^3$ $min^{-1}$. The higher air change rate reported by Shuck (1954) probably refers to the condition when all four fans are operated at full capacity. That interpretation is consistent with the flow rate of about 300,000 $ft^3$ $min^{-1}$ estimated for fan operation at high speed during the fire (Section 2.2.4) and with the drawings of the ventilation system for Building 71 (Austin 1952).

It is known that the daily average exhaust flow rate increased as multiple shift operations became more common. There were two reasons for the increase. First, the operational flow rate was used for a greater fraction of the day. Second, the normal operational flow rate was increased to 202,000 $ft^3$ $min^{-1}$. A sheet of air duct data dated December 1955 (Anonymous 1955) shows a daytime linear velocity for the main exhaust duct of 3360 ft $min^{-1}$, which corresponds to that higher flow rate. The measured night time air velocity in the duct was 1700 ft $min^{-1}$, implying a total discharge of about 102,000 $ft^3$ $min^{-1}$ under those fan operating conditions (Anonymous 1955).

Air velocity measurements were reported for four of the main exhaust ducts as well as for the main filter plenum (Anonymous 1955). Airflow rates for those ducts averaged 64% (range: 58–72%) of the flow rates shown on building drawings (Austin 1952) and are consistent with the flow rate of 202,000 $ft^3$ $min^{-1}$ derived from the air velocity measurement for the main exhaust duct. The sum of the flow rates shown in the drawings for all ducts entering the filter plenum is about 312,000 $ft^3$ $min^{-1}$. This corresponds to the maximum exhaust flow rate for the building discussed above. The ratio of the measured building flow rate to the total flow rate from the drawings is 0.65.

To calculate the amount of plutonium transported to the main filter plenum by an exhaust duct, it is necessary to know the flow rate of air in the duct and the concentration of plutonium in the air stream. The measurements made in December 1955 were used as a reference point for estimating airflow rates through the ventilation exhaust ducts. The maximum flow rate specified for an exhaust duct (Austin 1952) was multiplied by 0.65 to obtain the flow rate that corresponded to operation with a total exhaust flow rate of 202,000 $ft^3$ $min^{-1}$.

Table 3.2 lists the building ventilation exhaust ducts and contains the duct flow rates that correspond to a building exhaust rate of 202,000 $ft^3$ $min^{-1}$. There has been no attempt to provide