IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| MERILYN COOK, et al. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Civ. No. 90-K-181 |
| v. ) | |
| ) | Judge Kane |
| ROCKWELL INTERNATIONAL ) | |
| CORPORATION, and ) | |
| THE DOW CHEMICAL ) | |
| COMPANY, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## AFFIDAVIT OF FRANK J. BLAHA

Frank J. Blaha, being first duly sworn on oath, duly states as follows:

### I.    Education and Work Experience

1.    I am currently a project manager for the American Water Works Association

Research Foundation.  During the past fourteen years, I have worked as an environmental

engineer on projects ranging from simple water quality assessments to the creation and

implementation of regulation-driven compliance programs for a major industrial facility.

2.    My areas of expertise include:

- Environmental Monitoring
- RCRA Part B Permits
- Radioactive Materials Management
- Groundwater Monitoring
- Unsaturated Zone Monitoring
- Water Chemistry
- Water Monitoring and Treatment
- RCRA Closure Plans
- Drinking Water Related Research
- Groundwater Regulatory Analysis

3. I received a Bachelor of Science degree in Environmental Health Engineering from Northwestern University in 1982, and a Masters of Science in Civil and Environmental Engineering from the University of Wisconsin in 1984. I have also attended numerous seminars, conferences, and other educational programs relating to environmental consulting and engineering issues since 1984.

4. As an environmental engineer, I have been involved in and managed numerous projects evaluating groundwater and surface water quality, groundwater and surface water monitoring programs, groundwater and surface water flow patterns, contaminant migration pathways, contaminant flow rates, and groundwater and surface water remediation. Below are brief descriptions of a few representative projects with which I have been involved.

- Investigation of source and contaminant flow-path of organic solvents impacting a drinking water source at an industrial facility.

- Investigation of nature and extent of groundwater contamination at a former oil refinery.

- Installation of a groundwater monitoring program and initial groundwater characterization for RCRA-required groundwater monitoring at land disposal units.

- Characterization of subsurface contamination and initial remediation of underground storage tank caused groundwater contamination.

- Initial characterization plan for identification of source of organic solvents at a municipal landfill.

- Subsurface characterization and creation of subsurface monitoring plan for an industrial waste land disposal unit.

- Groundwater characterization and monitoring plan preparation and implementation for RCRA-required monitoring at a former foundry.

- Subsurface characterization and groundwater monitoring plan implementation for RCRA-required closure plan and RCRA-required monitoring at an industrial facility.

2

- Implementation of groundwater monitoring plan and groundwater characterization at a municipal solid waste landfill.

5.    During my career as an environmental engineer, I have worked extensively at the

Rocky Flats Plant ("RFP"). At RFP, I have been involved in numerous projects evaluating the

extent of groundwater and surface water contamination, the groundwater and surface water

monitoring programs, contaminant flow pathways, and potential surface and groundwater

remediation plans. Below are brief descriptions of some of the projects at RFP with which I have

been involved.

- One of a team involved in the initial RCRA groundwater characterization and well installation activities (1986).

- Preparation of landfill groundwater and leachate collection characterization program as well as evaluation of initial data (1987).

- Preparation of solar pond characterization plan for soil and groundwater as well as evaluation of initial data (1987).

- Involved in general groundwater site-wide characterization work (1987).

- Involved in High Priority Sites initial RI/FS characterization work (1987).

- Involved in initial Medium Priority Sites RI/FS characterization work (1987).

- Managed preparation of initial Annual RCRA Groundwater Monitoring Report (1988).

- Managed preparation of the solar pond subsurface characterization for interim status closure plan (1988).

- Managed preparation of the present landfill subsurface characterization for interim status closure plan (1988).

- Managed preparation of overall RCRA groundwater monitoring plan for post-closure care permit application (1988).

3

- Involved in preparation of the groundwater quality assessment plan to address State of Colorado June 1989 comments on groundwater monitoring (1989).

- Evaluation of the quality of the interceptor trench system groundwater collection system relative to the zero offsite water discharge studies (1990/1991).

- Evaluation of the quantity and quality of the leachate generated by the present landfill relative to the zero offsite water discharge studies (1990/1991).

- Involved in preparation of the groundwater protection monitoring and program plan to address DOE orders (1989 - 1992).

- Involved in the Interceptor Trench System, Solar Ponds Area evaluation plan creation and implementation (1992).

- Evaluation of solar pond interceptor trench system (1993 - 1994).

- Pond water management IM/IRA to address RCRA requirements relative to surface water, State of Colorado water quality control criteria, changing NPDES permit status, identification and treatment of leachate from multiple sources, all relative to impact on surface water discharges from the Rocky Flats Plant (1993 - 1994).

6.     As a result of this work, I have detailed knowledge of surface and groundwater

quality at RFP, surface and groundwater flow pathways at RFP, the surface and groundwater

monitoring programs at RFP, and the extent and migratory potential of contaminants in surface

and groundwater at RFP.

7.     Through my education and work experience, I also have extensive knowledge of

the proper methods for designing and implementing groundwater and surface water

investigations and for determining the potential for contaminant migration through groundwater

and surface water.

## II.     Proper Methods For Analyzing Threat To Offsite Populations

4

8.    In order to demonstrate that contaminants in surface or groundwater pose a threat to offsite populations, an environmental investigation must demonstrate: (1) that a source of contamination exists, (2) that a pathway for exposure exists, and (3) that an exposed population exists.

9.    I have reviewed the report prepared by Linda Lehman entitled Report on Groundwater at the Rocky Flats Plant ("Lehman report"), and the report prepared by Warner North and Robert Budnitz entitled Management of Wastes, Residues and Risks by Rockwell International at the Rocky Flats Plant ("North report"). Both of these reports are flawed because they fail to demonstrate that plaintiffs have been impacted by RFP activities.

## A.    Warner North's Flawed Surface Water Analysis

10.    The North report is critical of various Rockwell waste management practices, including the storage of pondcrete and saltcrete, sewage treatment plant operations, the chromic acid spill, spray irrigation and other practices. Despite the criticisms in the North report, the report fails to demonstrate that these management practices resulted in any offsite releases of contaminants from RFP or in any plaintiffs being exposed to such contaminants. The North report completely fails to explain how class property has been impacted or how plaintiffs have been put at any increased risk from the storage of pondcrete and saltcrete, sewage treatment plant operations, the chromic acid spill, or spray irrigation. North did not review and does not address the potential pathway, if any, by which these management practices could have caused offsite contamination.

11.    The only potential pathway for offsite exposure from these waste management practices is through surface water. Surface water drains RFP through three main streams, North Walnut Creek, South Walnut Creek, and Woman Creek. A series of eleven surface water control

5

ponds have been engineered on these streams to allow for surface water bypass or detention, as well as surface water monitoring. The terminal ponds on each of the three main drainages were designed and constructed to provide additional surface water control, including stormwater control, and were keyed into bedrock in order to better control all water movement. Discharges from the terminal ponds, ponds A-4, B-5, and C-2 have consistently been monitored for environmental contamination.

12.    The only potential pathway for contaminants from pondcrete and saltcrete to reach plaintiffs is through surface water. Pondcrete was created in building 788 by combining portland cement with sludge from solar pond 207A. Similarly, saltcrete was created in building 374 by combining evaporator salts with portland cement. These cemented waste forms were deposited into plastic-lined triwall boxes, and once cured, were stored on the 750 and 904 pads, which were onsite, outdoor concrete slabs. The potential concern regarding pondcrete and saltcrete stems from outdoor conditions that may have caused the waste forms to deteriorate and leak while stored on the pads, potentially contaminating storm and surface water runoff from the pads. There is no evidence that any runoff from the 750 and 904 pads ever migrated offsite. This runoff drained down-gradient into onsite holding ponds. The 750 and 904 pad runoff itself, as well as the onsite holding ponds, were monitored by the plant to ensure that no contamination from pondcrete or saltcrete was discharged offsite in plant surface water.

13.    Similarly, the only potential pathway for spray irrigation runoff to reach plaintiffs is through surface water. At Rocky Flats, spray irrigation was implemented to eliminate discharges of treated sanitary waste water per EPA's Zero Discharge Policy, a policy arising from the 1972 Clean Water Act (33 U.S.C. § 1323(b)). Spray irrigation --

6

which was allowed by RFP's National Pollution Discharge and Elimination System ("NPDES") Permit under the Clean Water Act -- allowed Rocky Flats to dispose of treated facility water through infiltration, evaporation, sublimation, and/or evapotranspiration. The plant treated sanitary sewage effluent and temporarily stored the treated effluent in onsite holding pond B3. A number of pipes led from this pond to sprinklers, which sprayed the pond water over various onsite spray fields. Spray irrigated water sometimes did not infiltrate into the ground or evaporate at a rate greater than that at which the plant was spraying the water. When this occurred, the spray irrigated water would runoff the land, and drain down-gradient into onsite holding ponds, including ponds B5 or C2. RFP voluntarily monitored surface water at these ponds and other areas. Moreover, under RFP's NPDES permit, the plant was required to monitor pond surface water whenever this water was discharged. Thus, there is no concern that contaminants, if any, in spray irrigated water were somehow leaving the plant, let alone flowing offsite, without being monitored.

14.     To the extent that there were any discharges of industrial wastes or other materials into RFP's sewage treatment plant ("STP"), such wastes or materials volatilized (or evaporated) at the plant or collected in the sludge and were removed by the sewage treatment process. Even if any of these materials remained in the treated STP effluent, these substances either settled out in Rocky Flats' holding ponds or were spray irrigated on site. Any materials contained in the surface water in the ponds or spray irrigation runoff were substantially treated or diluted before they crossed the Plant's boundaries. Moreover, RFP monitored the plant surface water before it was discharged offsite to ensure that it did not pose an offsite health risk.

7

15.    A chromic acid spill occurred in an onsite building on February 28, 1989.

Chromic acid from the spill was routed through the building's drainage system to the plant's

STP. This spill presented no offsite threat since the chromic acid remaining in the treated STP

effluent was spray irrigated and would have flowed to onsite holding ponds B5 and C2 prior to

offsite discharge. Neither pond was discharged offsite in February or March 1989. Indeed,

by March 16, 1989, chromium levels in all ponds were within Safe Drinking Water Act

standards. Moreover, rather than discharging the water in Pond B5 after the incident (despite

the fact that this water met Safe Drinking Water Act standards), the facility pumped the water

to Upper Church Ditch with the EPA's permission.

16.    Any contaminants from pondcrete or saltcrete runoff, spray irrigation, the

chromic acid spill or any other release of contaminants to the STP would have been detected

by RFP's surface water monitoring system. On-site, the plant monitored the STP effluent as it

left Building 995, and monitored plant surface water at Pond B3, Pond B5, Pond A4, Pond

C1, Pond C2, and Walnut Creek at the Indiana Street boundary. Off-site, the plant monitored

the water in Great Western Reservoir, and Standley Lake, as well as other offsite locations.

The plant also sampled Broomfield and Westminster tap water. The plant's monitoring system

is state of the art and would have detected any releases.

17.    Rocky Flats has monitored almost all of the materials of concern in surface

water, and has determined that water quality as discharged from RFP has typically met all

established drinking water standards, or has met background limits for analyzed compounds

without a drinking water standard.

18.    RFP was not the only one monitoring its surface water. The Colorado

Department of Public Health and the Environment, the U.S. Geological Survey and local

8

communities also sampled RFP's surface water as well as water in Great Western Reservoir, Standley Lake, community water treatment facilities and community tap water. Such studies indicate that RFP surface water presented no threat to the environment or public heath in surrounding communities.

19.     Moreover, with very little exception, surface water from RFP does not reach the plaintiffs. The vast majority of the plant's water flows into Walnut Creek which flows into Great Western Reservoir. None of the property class members receive household water from Great Western Reservoir. Only a small portion of the plant's water flows into Woman Creek which flows into Standley Lake. Westminster class members are the only people who would receive water from Standley Lake. However, only one tenth of one percent of the water in Standley Lake comes from the Rocky Flats Plant.

20.     Moreover, plaintiffs' dose expert -- Robert Goble -- does not even calculate any dose from water exposure pathways. Indeed, not one of the plaintiffs' experts has provided any evidence to suggest that water is a pathway by which the class members are exposed to significant health risks or by which class properties have been contaminated. Nor do plaintiffs' primary "Rockwell" experts -- Warner North or Robert Budnitz -- provide evidence that any possible RFP surface water contaminants had offsite consequences.

**B.     Lehman Fails To Demonstrate That Plaintiffs Have Been Impacted By Contaminants Found In Onsite Groundwater.**

21.     Linda Lehman's report suffers from several serious methodological and scientific flaws which render her conclusions unreliable and scientifically unsupportable.

**1.     Lehman Fails To Demonstrate A Groundwater Pathway For Contaminants to Get Offsite.**

9

22.     Although Linda Lehman opines that contaminants in onsite groundwater have migrated offsite, she has failed to demonstrate that there is any pathway for these contaminants to flow offsite. Proving that there is a pathway for contaminants to move offsite is a critical technical prerequisite to demonstrating any threat to plaintiffs, all of whom live offsite. EPA guidance on the issue of human health risk assessment describes an "exposure pathway analysis" as a critical step in assessing risk associated with a Superfund site. EPA defines an exposure pathway as "[t]he course a chemical or physical agent takes from a source to an exposed organism. An exposure pathway describes a unique mechanism by which an individual or population is exposed to chemical or physical agents at or originating from a site" (EPA, 1989, p. 6-2). The EPA guidance goes on to further establish the critical elements of an exposure pathway analysis: "An exposure pathway generally consists of four elements: (1) a source and mechanism of chemical release, (2) a retention or transport medium (or media in cases involving media transfer of chemical), (3) a point of potential human contact with the contaminated medium (referred to as the exposure point), and (4) an exposure route (e.g., ingestion) at the contact point" (EPA, 1989, p. 6-8).

23.     Specifically, Lehman has failed to demonstrate that the geologic units within which contaminated groundwater exists onsite are continuous to offsite areas. Onsite contamination exists within the Arapahoe sandstone and the Rocky Flats Alluvium. The contaminated portions of these units, however, do not extend offsite. Both units are completely truncated by Walnut Creek and/or Woman Creek which have eroded through these layers. Since there is no continuous geologic unit through which these contaminants can flow, it is impossible for contaminants in groundwater onsite to move offsite through these geologic units.

10

24.    Numerous studies performed at the Rocky Flats Plant have confirmed that there is no complete groundwater pathway for onsite contaminants to reach offsite populations. For instance, the Groundwater Conceptual Plan for the Rocky Flats Environmental Technology Site (RMRS, 1996) explains that groundwater in the Arapahoe sandstone and Rocky Flats Alluvium onsite does not flow offsite, but discharges to the stream drainages on site at seeps. The report concludes that "there is no known hydraulic connection between impacted groundwater at RFETS and offsite domestic wells." (RMRS, 1996, p. 2-5) The report also explains that there is no exposure pathway to humans from contaminated groundwater. (RMRS, 1996, p. 1-2) Significantly, the Groundwater Conceptual Plan was not developed solely by RFP personnel, but was a joint effort between the Department of Energy, the Colorado Department of Public Health and the Environment, the Environmental Protection Agency, and RFP personnel. (RMRS, 1996, p. 1-1) Similarly, the Geologic Characterization Report for the Rocky Flats Environmental Technology Site (EG&G 1995) also concludes that "[a]lthough Arapahoe Formation sandstones exhibit the highest hydraulic conductivity values for bedrock units, the formation is not a pathway for the offsite migration of contaminants because it is discontinuous, breached by modern streams along the edges of the pediment." (EG&G, 1995, p. ES-2) These reports had been published and were available to Linda Lehman when she wrote her report in November of 1996, however, she failed to review them. Finally, the Corrective Action Decision/Record of Decision, Operable Unit 3, The Offsite Areas (DOE, 1997), a document approved by CDPHE and EPA, states that "Extensive groundwater monitoring at RFETS, including alluvial wells at the site boundary, has shown that hazardous substances are not migrating off site via shallow groundwater. The Upper Laramie Formation, which underlies RFETS, is sufficiently impermeable and robust so as to provide protection for the regional Laramie-Fox Hills Aquifer.

11

Thus, no mechanism for the off site transport of hazardous substances via the regional aquifer exists." (DOE, 1997, p. 14)

25.     The only feasible pathway for contaminants in groundwater to move offsite is through discharge to surface water. The groundwater contained within the Arapahoe sandstone and the Rocky Flats Alluvium discharges to seeps where these units are truncated by the onsite stream drainages. The water from these seeps flows into the B series ponds along South Walnut Creek, and into the C series ponds along Woman Creek. If contaminants were getting to surface water in this manner, they would be detected by the surface water monitoring program at the retention ponds and along the creeks. As explained above, materials in surface water have generally been within safe drinking water standards.

26.     Lehman's assumptions that bedrock fractures or permeable sandstone channels within the bedrock may allow contaminated groundwater to migrate offsite are erroneous and based on a misconception of the nature of the bedrock underlying the RFP. In her report, Lehman suggests that contaminants may get offsite by migrating through sandstone channels within the bedrock. As the basis for this statement, Lehman cites a generalized diagram from the 1991 report entitled Final Groundwater Protection and Monitoring Plan (EG&G 1991). First, this report did not conclude that permeable sandstone channels exist which could carry groundwater contaminants offsite. Second, further studies were performed subsequent to the issuance of this report to determine whether, in fact, such channels existed. These studies have conclusively determined that no such continuous sandstone channels exist. The site Geologic Characterization Report concludes: "[d]ue to their discontinuous nature, very fine grain size, and high silt and clay content, these sandstone lenses are not potential pathways for offsite migration of contaminants." (EG&G, 1995, p. ES-2) Similarly, the Hydrogeologic Characterization Report

12

for the Rocky Flats Environmental Technology Site (EG&G 1995) concludes that "the geometry

of these LHSU sandstone units has been characterized as being laterally discontinuous in nature

and, therefore, these sandstone units are unlikely to represent pathways for offsite contaminant

migration." (EG&G, 1995, p 6-50)  Thus, these sandstone lenses cannot serve as channels to

transport materials offsite.

27.     Lehman also suggested that fractures or faults in the bedrock could serve as a

conduit for contaminated groundwater to migrate down to the Laramie Fox Hills Aquifer.  This

potential pathway has also been disproved by recent geologic investigation.  The Groundwater

Conceptual Plan determined that "available hydrogeologic and geochemical data suggest that

fractures and faults are not significant conduits for vertical groundwater flow at RFETS."

(RMRS, 1996, p. 2-5)  The report concluded that the Laramie formation "has sufficient

hydrologic integrity to provide long term protection of the Laramie-Fox Hills Aquifer from

shallow groundwater contamination."  (RMRS, 1996, p. 2-6)

## 2.     Lehman's Analysis Is Flawed Because She Ignored Contrary Groundwater Monitoring Data.

28.     Lehman's analysis is flawed because she failed to review available groundwater

monitoring data.  Rocky Flats has monitored its groundwater since the 1950s for environmental

protection purposes.  Beginning in 1986, this groundwater monitoring network was extensively

upgraded to better characterize groundwater conditions at the site and to support site

characterization and clean-up efforts as required by Superfund.  The ultimate purpose of this

extensive groundwater monitoring program is: "to protect human health and the environment

from current and potential threats posed by uncontrolled hazardous substance releases." (EPA,

1989, p. 1-1).  Thus, one of the prime concerns of this groundwater monitoring program has been

13

identification of any plumes of contaminated groundwater that might leave the plant site. This has been a concern not only of the plant personnel, but also of EPA and CDPHE who have been extensively involved in groundwater monitoring at the site since 1986.

29.     The current onsite monitoring well network includes wells around known areas of groundwater contamination, along with wells at the site boundary and at intermediate points between the contaminated areas and the site boundary. The current onsite groundwater monitoring system is state of the art and is capable of detecting contaminants should they migrate to the site boundary.

30.     The groundwater monitoring data for the past ten years demonstrates that the contaminant plumes in onsite groundwater are not moving offsite. The data sets for both the boundary wells and the intermediate stream valley wells show no evidence of contaminant plume migration towards the site boundary.

31.     Lehman failed to review this extensive database of onsite groundwater monitoring data. Had she reviewed this data, she would not have been able to reach the conclusion that she did -- that contaminants have migrated offsite in groundwater. By failing to review this primary source of data, she committed a fundamental error which renders her conclusions unreliable and scientifically unsupportable.

### 3.     Lehman's Analysis Is Flawed Because She Has No Evidence That Offsite Groundwater Is Contaminated.

32.     Lehman's analysis is flawed because she has presented no evidence that offsite groundwater is contaminated due to Rocky Flats activities. In her deposition, she admitted that she had not examined any groundwater data from offsite wells to determine whether or not

14

contamination was present. Moreover, although she presents some information concerning

contaminant levels at the site boundary, these levels do not exceed drinking water standards.

33.    Lehman's analysis is also flawed because she failed to review available offsite

groundwater monitoring data. The most comprehensive study of offsite contamination -- the

Operable Unit (OU) 3 Remedial Investigation -- concluded that there was no offsite groundwater

contamination. As a part of this study, wells were drilled downgradient of both Great Western

Reservoir and Standley Lake. These wells were designed to identify any plumes of contaminated

groundwater in the area. The OU3 report concluded: "Comparison of the results from these wells

with background values indicates that there are no contaminants present in the groundwater

downgradient of the reservoirs, and that there is no indication that contaminants are migrating

from the reservoirs via the groundwater. These results were expected because of the extremely

low solubility of plutonium and americium in groundwater. Groundwater wells at the site

boundary have not detected the presence of contaminants leaving the site via the groundwater

pathway." (EG&G, 1996) (emphasis added). The EPA issued a Record of Decision in 1997 for

the OU3 area which concluded that no further action was necessary because onsite contamination

poses no health threat to offsite areas.

34.    Further, in 1994, RFP installed two groundwater monitoring wells between the

eastern site boundary and Great Western Reservoir. Samples from these wells were analyzed for

two years and demonstrated that no contaminants were migrating offsite. Had Lehman reviewed

the database of offsite groundwater monitoring data, she would not have been able to conclude

that contaminated groundwater has gotten offsite. Her failure to review this primary source of

data renders her conclusions unreliable and scientifically unsupportable.

15

## 4.  Lehman Has Failed To Show That Any Plaintiffs Have Been Impacted By Groundwater Contamination.

35.    Lehman's analysis is flawed because even if we assume that contaminants have gotten offsite in groundwater, Lehman has not shown that plaintiffs are exposed to this groundwater or that class property is affected by this groundwater. Lehman has not analyzed whether any plaintiffs use offsite groundwater for drinking water, or if so, whether their wells draw water from units that are hydraulically connected to groundwater from the Rocky Flats Plant.

36.    Finally, Lehman's report is not relevant because neither she nor any other plaintiffs' expert allege that class members have been subjected to any quantifiable dose or health risk from groundwater contamination. At her deposition, Lehman testified that her report did not address any health concerns or health risks from the condition of drinking water or groundwater at RFP. Moreover, plaintiffs' dose expert, Robert Goble, does not calculate any dose from groundwater exposure pathways.

## C.  Warner North's Groundwater Analysis Fails To Demonstrate Any Impact To Plaintiffs.

37.    North's groundwater analysis is methodologically flawed because he fails to demonstrate that there is a pathway for contaminants in onsite groundwater to get offsite. As explained above, demonstrating a pathway for contaminants to flow offsite is a critical technical prerequisite to demonstrating any threat to plaintiffs. Like Lehman, North fails to demonstrate that the geologic units onsite which contain contaminated groundwater are continuous to offsite areas. North even admits that the "alluvium thins toward the east, in the direction where most of the nearby population is located." (North, 1996) In fact, the Rocky Flats alluvium is truncated by

16

stream valleys between the contaminated areas and the site boundary. Thus, no contaminated groundwater can reach offsite populations by flowing through the Rocky Flats alluvium.

38. North correctly recognizes that when the Rocky Flats alluvium is truncated by the stream valleys, the groundwater emerges as seeps along the sides of the stream valleys. These seeps may flow to surface water, however, as explained above, North has failed to demonstrate that any plaintiffs have been impacted by contaminants in surface water. In fact, surface water monitoring has shown that water discharged from RFP has typically met all established drinking water standards, or has met background limits for analyzed compounds without a drinking water standard.

39. North quotes the Historical Release Report for the Rocky Flats Plant (EG&G 1992) for the proposition that "in the past" contaminated groundwater from the Solar Ponds has seeped into North Walnut Creek and migrated offsite. (North, 1996) North takes this sentence out of context. The next sentence reads: "However, this migration of contamination is believed to have largely been corrected first by installation of the trenches and sumps and later by the installation of the ITPH system." (EG&G, 1992, p. 000-14) The trenches and sumps were installed between 1970 and 1974, well before any named plaintiffs moved to the area. (EG&G, 1992, p. 000-9) Moreover to the extent that any class members lived in the area at that time, North has failed to demonstrate that any of them were exposed to contaminants in surface water. As explained above, the water in Walnut Creek flows into Great Western Reservoir, and none of the class members get their water from Great Western Reservoir.

40. North also suggests that faults in the bedrock might allow contaminated groundwater to migrate vertically down to the deep Laramie Fox Hills aquifer. North's statement is nothing more than speculation. North has performed no study of the bedrock

17

geology at RFP to determine whether such faults exist. Further, as discussed above, the

Groundwater Conceptual Plan concluded that faults and fractures are not significant conduits for

vertical groundwater flow. (RMRS, 1996)

41.    Finally, North quotes from a 1988 GAO Report which was critical of RFP's pre-

1986 groundwater monitoring program. What North fails to explain is that starting in 1986, the

groundwater monitoring network at RFP was extensively upgraded to better characterize

groundwater conditions at the site and to support site characterization and cleanup efforts as

required by Superfund. The current groundwater monitoring system is state of the art and is

capable of detecting contaminants should they migrate to the site boundary. The groundwater

monitoring data for the past ten years demonstrate that the contaminant plumes in onsite

groundwater are not moving offsite.

/ / /

42.     If called to testify at trial, I would testify to the foregoing.

FURTHER THE AFFIANT SAYETH NOT.


Frank J. Blaha, P.E.

STATE OF COLORADO      )
                    JEFFERSON  ) ss.
COUNTY OF ARAPAHOE  )

The foregoing instrument was acknowledged before me this 30th day of January, 1999, by Frank J. Blaha, P.E.

Witness my hand and official seal.
My commission expires: 08/09/2000

WILLIAM HOFMANN
NOTARY PUBLIC
STATE OF COLORADO

Notary Public

19

## REFERENCES

DOE, 1997, "FINAL CORRECTIVE ACTION DECISION/RECORD OF DECISION, OPERABLE UNIT 3, THE OFFSITE AREAS," Final CAD/ROD, April 1997.

EPA, 1989, "RISK ASSESSMENT GUIDANCE FOR SUPERFUND, VOLUME I, HUMAN HEALTH EVALUATION MANUAL (PART A)," INTERIM FINAL, PA/540/1-89/002, December 1989, Office of Emergency and Remedial Response, Washington, DC.

EG&G, 1991, "FINAL GROUNDWATER PROTECTION AND MONITORING PLAN," Final Report, November 1991.

EG&G, 1992, "HISTORICAL RELEASE REPORT FOR THE ROCKY FLATS PLANT," Manual No. 21100-TR-12501.01, June 1992.

EG&G, 1995, "GEOLOGIC CHARACTERIZATION REPORT FOR THE ROCKY FLATS ENVIRONMENTAL TECHNOLOGY SITE," Volume I of the Sitewide Geoscience Characterization Study, Final Report, March 1995.

EG&G, 1995, "HYDROGEOLOGIC CHARACTERIZATION REPORT FOR THE ROCKY FLATS ENVIRONMENTAL TECHNOLOGY SITE," Volume II of the Sitewide Geoscience Characterization Study, Final Report, April 1995.

EG&G, 1996, "RESOURCE CONSERVATION AND RECOVERY ACT FACILITY INVESTIGATION/REMEDIAL INVESTIGATION REPORT, OPERABLE UNIT 3 (OFFSITE AREAS)," Final Report, June 1996.

LEHMAN, 1996, "REPORT ON GROUNDWATER AT THE ROCKY FLATS PLANT," November 1996.

NORTH, 1996, "MANAGEMENT OF WASTES, RESIDUES AND RISKS BY ROCKWELL INTERNATIONAL AT THE ROCKY FLATS PLANT," November 1996.

RFCA, 1996, "ROCKY FLATS CLEANUP AGREEMENT," Signed by Patti Shwayder of the Colorado Department of Public Health and Environment, Alvin Alm of the US Department of Energy, Jessie Roberson of the US Department of Energy, and Jack McGraw of the US Environmental Protection Agency, July 19, 1996.

RMRS, 1996, "GROUNDWATER CONCEPTUAL PLAN FOR THE ROCKY FLATS ENVIRONMENTAL TECHNOLOGY SITE," Final Revised Report, September 1996.