# Exhibit B

Cook, et al., v. Rockwell International Corp., et al.

No. 90-K-181

United States District Court, District of Colorado

Report of William E. Wecker

March 19, 1997

William E. Wecker, Ph.D., states as follows:

1. I make these representations on the basis of personal knowledge. I am over the age of 21 and competent to testify to the matters stated herein.

2. I am a statistician and applied mathematician. I received the Bachelor of Science degree (Basic Sciences) from the United States Air Force Academy and both the Master of Science degree (Operations Research) and Doctor of Philosophy degree (Statistics and Management Science) from the University of Michigan. I have served on the faculties of the University of Chicago, the University of California, Davis, and Stanford University where I taught statistics and applied mathematics at the graduate level and did research in statistical theory, statistical methods, and applied mathematics for seventeen years.

3. I am currently President of William E. Wecker Associates, Inc., a consulting firm located in Novato, California, which specializes in mathematical and statistical analysis, including analyses of large computer databases.

4. I have published numerous articles in peer-reviewed journals. I am a member of the American Statistical Association and have served as an associate editor of the Journal of the American Statistical Association and the Journal of Business and Economic Statistics. These qualifications and a list of my professional publications are in my curriculum vitae, which is appended to this report as Exhibit 1.

5. A list of all cases in which I have testified as an expert at trial or by deposition since January 1, 1993, is appended to this report as Exhibit 2.

6. I have been asked by attorneys for the defendants to assess Dr. Robert Goble's "uncertainty" analysis. In this connection I have reviewed the following materials produced by Dr. Goble: "Exposures from Releases of Plutonium and Other Toxic Substances at Rocky Flats," by Robert Goble, dated November 24, 1996; and a 3.5 inch floppy disk containing

- 2 -

materials requested from Dr. Goble, produced under a cover letter from Jonathan Auerbach dated February 11, 1997. Based on my review of these materials, it is my opinion that Dr. Goble's conclusions are not reliable. The basis for my opinion includes the following observations.

7. Dr. Goble's analysis of "uncertainty" and "variability" regarding the health risks associated with Rocky Flats begins with his subjective specification of probability distributions for several input variables. Dr. Goble then, based on additional assumptions, combines those inputs to derive the probability distributions of certain output variables. These output variables include, for example, estimates of air concentrations of plutonium (Table 4.4), estimates of plutonium uptake through inhalation (Table 4.6), radiation dose estimates (Table 4.7), and excess cancer risk estimates (Table 4.8).

8. Each output variable is defined by an equation that combines certain input variables in accordance with his assumptions about the distribution of those variables. For example, the air concentration of respirable plutonium is calculated using as inputs the amount of plutonium remaining in the soil, the respirable fraction, the deposition velocity of plutonium and the fraction of deposited plutonium remaining in the soil. If the true values of the inputs were known (and if the equation adopted by Dr. Goble correctly represents the deposition process), the true value of the air concentration could be calculated from the equation.

9. Dr. Goble does not know the true values of the input variables. Instead he makes assumptions about input variables in the form of subjective probability distributions. That is, for each variable he chooses a range of values that seems plausible to him and, within each such range, he assigns relative likelihoods to the different possible values based, again, on what seems plausible to him. The resulting probability distributions represent Dr. Goble's subjective judgment about the likely true (but unknown) values of the inputs.

10. For example, for the respirable fraction Dr. Goble specifies a triangular distribution with vertices at 0.05, 0.30, and 0.55 (pages 36-38). He cites various measurements

that suggest to him the plausibility of this range of values, but the precise, triangular functional form is solely his own, subjective assessment. It is a product of Dr. Goble's state of mind after reviewing the cited measurements, not the empirical relative frequencies of any observable phenomenon.

11. Dr. Goble combines his subjective probability distributions for the input variables using the assumed equations for the output variables to calculate probability distributions for the output variables. Because the inputs to this calculation are subjective assessments its output, derived from the inputs, is also a subjective assessment. Therefore Dr. Goble's results represent his own subjective probability distributions for the output variables.

12. For his plutonium risk calculations Dr. Goble uses the "Monte Carlo procedure," an approximate method for calculating the combined effect of the input distributions. Dr. Goble's use of Monte Carlo approximations does not per se lend validity to his conclusions. In fact, validity of his conclusions depends entirely on the validity of his assumptions about input variables and the assumed equations by which he combines the input variables.

13. The degree of uncertainty in Dr. Goble's input variables determines the degree of uncertainty in his output variables. The more uncertain the inputs (in terms of Dr. Goble's subjective probability assessments), the more uncertain are the outputs.

14. The result of Dr. Goble's uncertainty analysis is a complete subjective distribution of excess cancer risk. That distribution can be summarized using various descriptive measures including, for example, a range of values that more likely than not includes the "true" risk value (even under Dr. Goble's analysis). From this menu of descriptive measures Dr. Goble arbitrarily chose the 95 percent quantile of subjective excess risk. This choice produces a biased and misleading interpretation of his results. As discussed above, greater uncertainty in the distributions of the input variables in Dr. Goble's analysis leads to greater dispersion in the distribution of the output variable. Greater dispersion in the output variable is reflected by a higher

value for the 95th percent quantile. Thus, completely apart from the facts regarding the actual risk, Dr. Goble's formulation automatically produces higher risk assessments when he has greater uncertainty about the input variables. Under Dr. Goble's approach, the less information the plaintiff expert brings to the analysis, the higher the potential result.

15.     I have also been asked by attorneys for the defendants to evaluate the conclusions that Mr. Wayne Hunsperger has drawn from the sample survey conducted by Decision Research. In this connection I have reviewed the following materials produced by Mr. Hunsperger: the "Public Opinion Surveys" section of his expert report; a Decision Research report entitled "Rocky Flats Health and Housing Survey," by Flynn et al., dated July 5, 1996, and attached to the Hunsperger expert report as Appendix A; the interview script used in the Flynn survey; a 3.5 inch floppy disk containing the responses to the survey; and tabulations from the statistical analyses and underlying the Decision Research report. Based on my review of these materials, it is my opinion that Mr. Hunsperger's conclusions from the survey data are not reliable. The basis for my opinion includes the following observations.

16.     Upon finding that 192 survey respondents (46.2 percent of the respondents) would not buy a home within a four-mile radius of Rocky Flats at any discount, Mr. Hunsperger assumes that their reason for not buying near Rocky Flats is the presence of the plant. This assumption is not supported by the survey data, however. In many cases it is demonstrably false. Indeed, only 5.1% of the 192 respondents mentioned Rocky Flats as the "main disadvantage" or one of the "other disadvantages" of Arvada or Westminster.

17.     The survey responses to the open-ended questions reveal several potential reasons, other than the presence of the plant, for a preference not to buy a house near the Rocky Flats plant. Indeed, 53.7% of the 192 respondents mention other disadvantages of the area. For example, "transportation" and "growth/development" are listed as the "main disadvantages" of both Arvada and Westminster. In Mr. Hunsperger's interpretation of the survey data, discounts

Case No. 1:90-cv-00181-JLK    Document 1925-2    filed 01/04/06    USDC Colorado    pg 6 of 18

value for the 95th percent quantile. Thus, completely apart from the facts regarding the actual risk, Dr. Goble's formulation automatically produces higher risk assessments when he has greater uncertainty about the input variables. Under Dr. Goble's approach, the less information the plaintiff expert brings to the analysis, the higher the potential result.

15.     I have also been asked by attorneys for the defendants to evaluate the conclusions that Mr. Wayne Hunsperger has drawn from the sample survey conducted by Decision Research. In this connection I have reviewed the following materials produced by Mr. Hunsperger: the "Public Opinion Surveys" section of his expert report; a Decision Research report entitled "Rocky Flats Health and Housing Survey," by Flynn et al., dated July 5, 1996, and attached to the Hunsperger expert report as Appendix A; the interview script used in the Flynn survey; a 3.5 inch floppy disk containing the responses to the survey; and tabulations from the statistical analyses and underlying the Decision Research report. Based on my review of these materials, it is my opinion that Mr. Hunsperger's conclusions from the survey data are not reliable. The basis for my opinion includes the following observations.

16.     Upon finding that 192 survey respondents (46.2 percent of the respondents) would not buy a home within a four-mile radius of Rocky Flats at any discount, Mr. Hunsperger assumes that their reason for not buying near Rocky Flats is the presence of the plant. This assumption is not supported by the survey data, however. In many cases it is demonstrably false. Indeed, only 5.1% of the 192 respondents mentioned Rocky Flats as the "main disadvantage" or one of the "other disadvantages" of Arvada or Westminster.

17.     The survey responses to the open-ended questions reveal several potential reasons, other than the presence of the plant, for a preference not to buy a house near the Rocky Flats plant. Indeed, 53.7% of the 192 respondents mention other disadvantages of the area. For example, "transportation" and "growth/development" are listed as the "main disadvantages" of both Arvada and Westminster. In Mr. Hunsperger's interpretation of the survey data, discounts

demanded by potential buyers for any of these reasons are attributed to the presence of the Rocky Flats plant.

18.   For his damage calculation Mr. Hunsperger imputes a required discount of $30,000 to each potential buyer represented by the 46.2 percent of respondents who prefer not to buy houses near the Rocky Flats plant. Even if Mr. Hunsperger's calculation of the effect of this imputed discount on housing prices near Rocky Flats were correct, which it is not, it is wrong to attribute to the presence of Rocky Flats the effects of buyer preferences which depend on a variety of factors, as illustrated above, and not primarily on the presence of Rocky Flats.

19.   For his damage calculation Mr. Hunsperger attributes a required discount of $6,825 to each potential buyer represented by the other 53.8 percent of respondents, i.e., the complement of the 46.2 percent of respondents. He includes in this group respondents who reported that they had never heard of Rocky Flats, and others who were not asked the discount questions because they had indicated that "being near Rocky Flats" makes a house "somewhat more desirable" or "considerably more desirable". It is clearly wrong to attribute to Rocky Flats a decline in housing prices induced by such respondents. Furthermore, the preferences of those respondents who are correctly included in the 53.8 percent depend on a variety of factors, as illustrated above, and in several cases not primarily on the presence of Rocky Flats. Thus it is wrong to attribute their effect on housing prices near the plant solely to the presence of the Rocky Flats plant.

20.     Mr. Hunsperger's analysis of the survey data is based on several apparently arbitrary methodological choices. For example, for those subjects who reported a required discount in more than one zone near Rocky Flats, Mr. Hunsperger retains only one reported discount and discards the rest. For a different group of subjects a required discount of zero in the four-to-six mile zone can be inferred from their zero required discount in the two-to-four mile zone, but Mr. Hunsperger uses the zero discount in only the two-to-four mile zone.

21.     For his damage calculation involving potential buyers' required discounts, Mr. Hunsperger chose to analyze only the responses of residents of the Denver metropolitan area, <u>not</u> including Arvada/Westminster. This choice influences his results in a predictable direction. By choosing to live near the Rocky Flats plant the residents of Arvada/Westminster, who constituted over 30 percent of the survey respondents, revealed preferences different from those of the Denver metropolitan area residents. These differences are reflected, for example, in that 79 percent of Arvada/Westminster residents answered "no difference" when asked their "opinions about the influence of Rocky Flats on the desirability of homes in the Arvada/Westminster area," compared to 33 percent of the Denver metropolitan area residents.

22.     Mr. Hunsperger reports that "the margin of error for a total sample size of 604 respondents is 4.1% at the 95% confidence level" (page 234). This calculation falsely assumes a 100 percent response rate, however, while at a response rate of 63.9 percent — the highest of several response rate estimates contained in the report — the corresponding, corrected "margin of error" is 21.1 percent.

23.     I have also been asked by attorneys for the defendants to evaluate the conclusions that Mr. Hunsperger has drawn from data other than the sample survey. The data provided thus far by plaintiffs on these subjects is incomplete. My analysis cannot be completed until that data is turned over and has been reviewed. My review of Mr. Hunsperger's other

conclusions is continuing, and I may refine my evaluation of Mr. Hunsperger's conclusions from the sample survey in light of that review.

_____
William E. Wecker

_____
3/19/97
Date

**Exhibit 1**

**Curriculum Vitae** of William E. Wecker

January, 1997

# WILLIAM E. WECKER

505 San Marin Drive
Novato, California 94945

Telephone: (415) 898-2255
Fax: (415) 898-2260

### EDUCATION

| | | |
|---|---|---|
| B.S. | (Basic Science) (1963), USAF Academy | |
| M.S. | (Operations Research) (1970), University of Michigan | |
| Ph.D. | (Statistics and Management Science) (1972), University of Michigan | |

### EMPLOYMENT

| | |
|---|---|
| 1963-1967 | Fighter pilot, USAF |
| 1968-1969 | Chief of Protocol, USAF, Berlin, Germany |
| 1970-1972 | Graduate Student, University of Michigan |
| 1973-1976 | Assistant Professor, Graduate School of Business, University of Chicago |
| 1977-1983 | Associate Professor, Graduate School of Business, University of Chicago |
| 1984-1985 | Associate Professor, Graduate School of Management, University of California, Davis |
| 1985-1989 | Professor, Graduate School of Management, University of California, Davis |
| 1994-1995 | Consulting Professor of Law, School of Law, Stanford University |
| 1990- | President, William E. Wecker Associates, Inc. |

### ACTIVITIES

| | |
|---|---|
| 1977-1981 | Associate Editor (Theory and Methods), *Journal of the American Statistical Association*. |
| 1981- | Associate Editor, *Journal of Business and Economic Statistics*. |
| 1990-1992 | Management Committee, *Journal of Business and Economic Statistics*. |
| 1976-1994 | Seminar Leader, NSF/NBER Seminar on Time Series Analysis. |
| 1993-1994 | National Advisory Council on Environmental Policy and Technology (Lead Subcommittee). |

## PUBLICATIONS

"A Nonparametric Approach to the Construction of Prediction Intervals for Time Series Forecasts" (with W.A. Spivey), Proceedings of the Business and Economic Statistics Section-- American Statistical Association, 1972.

"Regional Economic Forecasting: Concepts and Methodology" (with W.A. Spivey), The Regional Science Association Papers, Vol. 28, 1972, pp. 257-276.

"On the Weighted Average Cost of Capital" (with R.R. Reilly), Journal of Financial and Quantitative Analysis, January 1973, Vol. VIII, pp. 123-126.

"On Random Walks with Absorbing Barriers" (with Thomas E. Morton), Proceedings of the Business and Economic Statistics Section-- American Statistical Association, 1973.

"Prediction Methods for Censored Time Series," Proceedings of the Business and Economic Statistics Section--American Statistical Association, 1974.

"More on the Weighted Average Cost of Capital: Reply" (with R.R. Reilly), Journal of Financial and Quantitative Method, June 1975.

"Predicting Mail Order Demand for Style Goods," Proceedings of the Business and Economic Statistics Section--American Statistical Association, 1975.

"The Prediction of Turning Points," Proceedings of the Business and Economic Statistics Section-- American Statistical Association, 1976.

"Bounds on Absorption Probabilities for the m-Dimensional Random Walk" (with T. Morton), Journal of the American Statistical Association, March 1977.

"Discounting, Ergodicity and Convergence of Markov Decision Processes" (with T. Morton), Management Science, April 1977.

"Comments on 'Forecasting with Econometric Methods: Folklore versus Fact'," Journal of Business, 1978, pp. 585-586.

"Comment on 'Seasonal Adjustment When Both Deterministic and Stochastic Seasonality Are Present'," Proceedings of the NBER-CENSUS Conference on "Seasonal Analysis of Economic Time Series," U.S. Government Printing Office, Washington, D.C., 1978, pp. 274-280.

"Predicting Demand from Sales Data in the Presence of Stockouts," Management Science, 1978, Vol. 34, No. 10, pp. 1043-1054.

"The Time Series Which Is the Product of Two Stationary Time Series," Stochastic Processes and Their Application, 1978, pp. 153-157.

"Predicting the Turning Points of a Time Series," Journal of Business, January 1979, Vol. 52, pp. 35-50.

"A New Approach to Seasonal Adjustment," *Proceedings of the Business and Economic Statistics Section--American Statistical Association*, 1979.

"Linear and Nonlinear Regression Viewed as a Signal Extraction Problem" (with C. Ansley), *Proceedings of the Business and Economic Statistics Section-- American Statistical Association*, 1980.

"Asymmetric Time Series," *Journal of the American Statistical Association*, March 1981.

"Predicting a Multitude of Time Series" (with R.A. Thisted), *Journal of the American Statistical Association*, September 1981.

"Applications of the Signal Extraction Approach to Regression" (with C. Ansley), *Proceedings of the Business and Economic Statistics Section--American Statistical Association*, 1981.

"Nonparametric Multiple Regression by Projection Iteration" (with C. Ansley), *Proceedings of the Business and Economic Statistics Section--American Statistical Association*, 1982.

"The Signal Extraction Approach to Nonlinear Regression and Spline Smoothing: (with C. Ansley), *Journal of the American Statistical Association*, March 1983.

"Extensions and Examples of the Signal Extraction Approach to Regression" (with C. Ansley), *Applied Time Series Analysis of Economic Data*, A. Zellner (ed.), Washington, D.C.: Bureau of the Census/ASA, 1983.

"The Signal Extraction Approach to Estimating Income and Price Elasticities: A Data Example" (with C. Ansley), *Proceedings of the Business and Economic Statistics Section--American Statistical Association*, 1983.

"A Nonparametric Bayesian Approach to the Calibration Problem," (with C. Ansley), *Proceedings of the Business and Economic Statistics Section--American Statistical Association*, 1984.

"On Dips in the Spectrum of a Seasonally Adjusted Time Series" (with C. Ansley), *Journal of Business and Economic Statistics*, October 1984.

"Estimating Damages in a Class Action Litigation" (with E. George), *Journal of Business and Economic Statistics*, April 1985.

"Statistics in Accounting, Marketing, Finance and Production" (with R. Hamada, J. Patell, R. Staelin), *Proceedings of the Business and Economic Statistics Section--American Statistical Association*, 1986.

"The Role of Statistics in Accounting, Marketing, Finance and Production" (with R. Hamada, J. Patell, R. Staelin), *Journal of Business and Economic Statistics*, 1988.

"Assessing the Accuracy of Time Series Model Forecasts of Count Observations", *Journal of Business and Economic Statistics*, October 1989.

"Impact of the Soviet Grain Embargo; A Comparison of Methods" (with A. Webb, et al ), *Journal of Policy Modeling*, pp 361 - 389, 1989.

3

"Modeling Daily Milk Yield in Holstein Cows Using Time Series Analysis" (with H. Deluyker, et al.), <u>Journal of Dairy Science</u>, pp 539 - 548, 1990.

"Controlling Emissions from Motor Vehicles: A Benefit-Cost Analysis of Vehicle Emission Control Alternatives" (with L. Lave, et al.), <u>Environmental Science & Technology</u>, August 1990.

"Statistical Estimation of Incremental Cost from Accounting Data" (with R. Weil), <u>Handbook of Litigation Services for Accountants and Lawyers</u>, John Wiley & Sons, 1990.

"Correcting for Omitted-Variables and Measurement-Error Bias in Regression with an Application to the Effect of Lead on IQ" (with M. L. Marais), <u>Journal of the American Statistical Association</u>, to appear, 1997.

4

# Exhibit 2

## List of Depositions and Trial Testimony

William E. Wecker
Deposition and Trial Testimony
January 1, 1993 – March 19, 1997

1. In the United States Bankruptcy Court, Northern District of Illinois, Eastern Division: In the Matter of: Midway Airlines, Inc., et al., Debtors, vs. Northwest Airlines, Inc., No. 91 A 01176.

2. United States District Court for the Southern District of New York: The State of New York, and the Town of Tusten, v. SCA Services, Inc., et al.; SCA Services, Inc., v. Roberts & Carlson, Inc., et al., No. 83 Civ 6402 (RPP).

3. United States District Court for the Northern District of Georgia, Atlanta Division: William P. McKinley, Executor of the Estate of Ernest Lee Marlow and Jewell Duke Marlow, et al., vs. General Motors Corporation, No. 1:92-CV-1727-MHS.

4. United States District Court for the Southern District of Texas, Houston Division: Red Eagle Resources Corporation, et al., on behalf of themselves and all others similarly situated, vs. Baker Hughes Incorporated, et al., No. H-91-627.

5. United States District Court for the District of Columbia: Federal Trade Commission vs. Abbott Laboratories, Civil Action No. 92-1364.

6. Superior Court of the State of California for the County of Orange: Kenneth Wagner, et al., vs. General Motors Corporation, et al., Case No. 60 06 02.

7. United States District Court for the Northern District of Illinois, Eastern Division: FMC Corporation v. The United States of America, Civil Action No. 91C4784.

8. United States District Court for the Eastern District of Oklahoma: Bishop vs. General Motors Corporation, Civil Action No. 94-286-S.

9. United States District Court for the District of South Carolina, Columbia Division: Cameron vs. General Motors Corporation, Civil Action No. 3:93-1278-07, 3:93-1279-07, 3:93-1280-07.

10. Before the Interstate Commerce Commission: Burlington Northern Inc. and Burlington Northern Railroad Company - Control and Merger - Santa Fe Pacific Corporation and the Atchison, Topeka and Santa Fe Railway Company, Finance Docket No. 32549.

11. In the District Court of Starr County, Texas: Maria del Carmen Saenz, et al. vs. General Motors Corporation, et al., No. 9642.

12. United States District Court for the Central District of California: Nestlé Food Company v. Abbott Laboratories, et al., CV 93-3128 JGD.

13. USDC for the Northern District of California: Bell Atlantic Business Systems Services, Inc., vs. Hitachi Data Systems Corporation and Hitachi America, Ltd., No. C-93-20079.

14. Gregory G. Buie vs. General Motors Corporation. USDC for the District of Kansas. Case No. 93-1172-PFK.

-1-

15. Neta Marie Sparks Roberts as Administratrix of the Estate of Dennis A. Roberts, et al. vs. General Motors Corporation, et al. Superior Court of Fulton County, Georgia. Civil Action No. E-12577.

16. Cheryl Donelan, et al. v. Abbott Laboratories, Inc., et al. District Court, Sedgwick County, Kansas. Case No. 94-C-709.

17. General Motors Corporation v. Johnson Matthey, Inc., et al. USDC Eastern District of Wisconsin, No. 93-C-931.

18. Alex C. Hardy v. General Motors Corporation, et al. (File No. CV-93-56). Thelma R. Hardy v. General Motors Corporation, et al. (File No. CV-93-57). Circuit Court, Lowndes County, Alabama.

19. Sylvia Castaneda and Robert Castaneda vs. Joe Taylor Stone and General Motors Corporation. District Court, Duval County, Texas, No. 15133.

20. Elisa Lozano, et al.,v. Toyota Motor Corporation, et al. Superior Court, Sacramento County, No. 95A901428.

21. Celia Guitierrez, et al. v. Charles J. Givens Organizations, Inc., et al. Superior Court, San Diego County, California, No. 667169.

22. Carole Baker, et al., v. General Motors Corporation. USDC Eastern District of Wisconsin, No. 95C0124.

23. Jim Lynch Cadillac, Inc. v. General Motors Corporation. Circuit Court, St. Louis County, Missouri, No. 658886.

24. Naef et al. vs. Masonite Corporation et al. Circuit Court, Mobile County, Alabama, No. CV-94-4033.

25. Etak, Inc. vs. Zexel USA Corporation et al. USDC Northern District of California, San Francisco Division, No. C94-04041SC.

26. Yvonne Rogers v. R.J. Reynolds Tobacco Co., et al. Superior Court, Marion County, Indiana. No. 49D02-9301-CT-0008.

27. James T. Clark v. Liggett Group. Circuit Court, Duval County, Florida, No. 95-03333-CA.

28. Rebecca Espinoza v. General Motors Corporation et al. District Court, Hidalgo County, Texas, No. C-1678-94D.

29. Glen's Chevrolet and Subaru Company et al. v. General Motors Corporation. USDC Idaho, No. 95-049-E-BLW.

30. Dorothy Degner, et al. v. General Motors Corporation, et al. District Court, Rogers County, Oklahoma, No. C-93-233.

31. Michael D. Stephens and Robert A. Stephens v. General Motors Corporation, et al. Superior Court, San Francisco County, California, No. 951526.

32. In Re Ford Motor Company Ignition Switch Litigation. USDC New Jersey, No. 96-3125.

33. Toledo Fair Housing Center, et al., vs. Nationwide Mutual Insurance Company. Common Pleas Court of Lucas County, Ohio, No. 93-1685.