# Exhibit F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

FILED
JAMES R. MANSPEAKER
CLERK

2000 DEC 27  AM 10: 48

_____DEP. CLK

BY_____

Civil Action No. 90-K-181

**MERILYN COOK,** *et al.,*

Plaintiffs,

v.

**Judge John L. Kane, Jr.**

**ROCKWELL INTERNATIONAL CORPORATION
and THE DOW CHEMICAL COMPANY,**

Defendants.

---

### JOINT SUBMISSION PURSUANT TO THE COURT'S ORDER OF NOV. 16, 2000

---

Pursuant to the Court's Order dated November 16, 2000, the parties hereby submit this joint filing in advance of the upcoming Pretrial Conference scheduled for January 11, 2001. The Court has ordered the parties to set forth, *inter alia,* a schedule for completing discovery, a list of the additional discovery that the parties seek to take, and a list of experts and the expected scope of their testimony at a property class trial. The parties' submissions are set forth below. The parties do not necessarily agree with the content of each others' submissions.

**1.  ADDITIONAL DISCOVERY.**

   **A.  Plaintiffs' Remaining Discovery.**

   The following summary represents plaintiffs' best attempt at itemizing the discovery still to be conducted prior to trial of the property claims. It is possible, of course, that the parties will subsequently develop the need for discovery on specific points they have not anticipated in this submission, but plaintiffs are concerned that any such discovery not mushroom to proportions that

would delay a trial, or constitute an end-run around the Court's previous deadlines for expert disclosures. Accordingly, an attempt to respond with specificity in this submission to the Court's inquiries will not operate, plaintiffs hope, to preclude absolutely any discovery not listed. On the other hand, we respectfully suggest that the Court should require some showing of good cause before permitting the parties to embark on any broad new discovery programs, or on discovery that could reasonably have been anticipated in this submission, but was not.

**1. Document Discovery.** Plaintiffs do not anticipate any substantial additional party discovery on the document front. Defendants should supplement their previous responses, which were made years ago. Defendants may be the best judge of how long this might take.

By way of third-party document discovery, plaintiffs will require some focused supplementation of DOE's previous responses in a few areas (e.g., reports relating to the plant). The Court's previous orders regarding DOE discovery remain in place. Assuming DOE assumes a compliant posture, this supplementation can be completed in sixty to ninety days. Plaintiffs also need to follow up on a letter from DOE's counsel, dated Nov. 8, 2000, disclosing the existence of 25 boxes of material in the possession of the FBI.

Plaintiffs may also require some third-party discovery relating to press accounts of events at Rocky Flats. Plaintiffs have no reason to believe that the media will be uncooperative.

**2. Interrogatories.** Plaintiffs do not currently anticipate the need for any substantial interrogatory discovery, except in the context of requests to admit (discussed below). A reasonable date should be set, perhaps sixty to ninety days hence, for the parties to provide responses, or supplemental responses, to interrogatories concerning the identity of trial witnesses.

**3. Expert Supplementation**. Plaintiffs may wish to submit a supplemental report by Dr. Budnitz concerning Rockwell operations. This could permit economies at trial by potentially eliminating the need for such testimony from Dr. North.

Plaintiffs may wish to supplement the reports of Mr. Hunsperger and/or Dr. Radke by including data on specific sales within the property class subsequent to the filing of the complaint. This would permit calculation of liquidated damages for class members who have sold their properties after June 6, 1989.

Plaintiffs are informed that Dr. Radford is in failing health. This may require either a preservation deposition for Dr. Radford (likely in England where he resides) or the substitution of another expert who could testify concerning the health effects of plutonium exposure.

Plaintiffs wish to have Dr. Smallwood pay another visit to the site to gauge whether his previous findings remain current. Conceivably, this could result in the discovery of facts warranting a supplemental report.

Plaintiffs estimate that the foregoing supplementation could be completed within ninety days.

Plaintiffs also respectfully suggest the setting of a date for final Rule 26(e) supplementation.

**4. Depositions**. Quite some number of fact depositions have already been conducted. The parties may wish to depose any new fact witnesses identified in the supplemental interrogatory responses. Depositions may also be appropriate in the limited cases where an expert submits a supplemental report beyond the scope of his or her previous reports. The Court should discourage redeposition of witnesses or parties previously deposed.

Plaintiffs may wish to conduct a Rule 30(b)(6) deposition of DOE officials or personnel familiar with the discovery and condition of certain computer media at the site that are reportedly contaminated with plutonium.

**5. Requests to Admit.**  Plaintiffs contemplate serving substantial requests to admit that would establish facts that are not, or should not be, in substantial dispute, and to establish the authenticity of documents. The customary companion interrogatories would inquire into the basis for any failure to admit. Plaintiffs propose to serve these requests in approximately sixty days.

**B.      Defendants' Remaining Discovery.**

This case stalled at the point of assessing whether plaintiffs' experts should be stricken. Contributing to that stoppage was the need to determine what issues would and could be tried in any class-wide trial. Determining the class-wide issues to be tried is necessarily the next step in this case. Absent that determination, the Court and parties cannot decide what, if any, additional discovery is needed or which, if any, of plaintiffs' experts' proffered testimony should be permitted – as both "fit" and "relevance" are driving factors under *Daubert, Kumho*, and their progeny.

Chief Judge Matsch acknowledged that determining the issues to be tried was the necessary next step for this case. Judge Match agreed with defendants that the parties were "really going to need some guidance from the Court about what it is that we're trying to really litigate," and stated that "we need more definition of what is the claim and exactly what we are trying." (6/26/99 Hrg. at 24, 25)  At the status hearing's conclusion, Judge Matsch chose not to fix a trial date, instead emphasizing that "I'm not sure what we're going to try....everybody has to know what it is we're going to try. I agree with that." (*Id.* at 59, 60)  Thus, to determine the specific issues to be tried, Judge Matsch requested that the parties consider the "definition of what issues are to be tried, both

4

with respect to claims and defenses," and identify the pertinent expert testimony that they anticipated would be implicated by those issues. (*Id.* at 59) In July 1999, in response to Judge Matsch's request, the parties set forth their proposals for how any class-wide trial should proceed.[1] Defendants' July 30, 1999 submission is found at docket number 1137. That submission is particularly relevant to this Court's current requests regarding what experts will testify and what further discovery might be needed.

Until the parties obtain "more definition of what is the claim and exactly what we are trying," as Judge Matsch was expecting to provide, defendants do not believe that they or the Court can determine what additional discovery, if any, would be needed to proceed to a property-class trial. Thus, focusing now on what issues will be tried will also help resolve what discovery, if any, is needed, as well as helping to resolve the pending motions to strike experts and other pretrial issues.

One key unresolved issue, for example, is what time periods will be at issue in this trial. The class membership date is June 7, 1989. Class members – those person who owned property as of June 7, 1989 – need not have owned such property after that date. Indeed, within a very short period of time after the class-membership date, many class members no longer owned their class properties. This undisputed fact raises serious implications for submitting post-6/7/89 evidence in a "class" trial. Evidence that impacts some, but definitely not all, class members is *not* class-wide evidence. Such non-class-wide evidence should not be admissible in a class trial.[2]

---

[1]Of course, defendants do not believe that either a class or a trial is appropriate here, for the reasons previously articulated.

[2]Say, for example, that a huge fire occurred in Rocky Flats in 2000 (this did not actually occur). Most class members no longer owned their class-area properties in June 2000, having (continued...)

Of course, in addition to the problems created by the class-membership date, plaintiffs have sued two defendants here, one which left the plant in 1975 and one which left in 1989. This further underscores the problems created by any post-6/7/89 evidence.

Until the Court resolves this fundamental issue as to how any post-1989 evidence can be both "class-wide" and relevant in an action brought against these two defendants, the parties should not embark upon any additional discovery.

The Court will likewise need to resolve other issues regarding what will be tried before the parties can determine what additional discovery they need. For example, Judge Matsch indicated that plaintiffs' so-called "conduct" evidence would likely not be relevant to a class property trial. (*See* 6/25/00 Hrg. at 39-41.) In short, until the Court determines "exactly what we are trying," neither party is truly in a position to describe what, if any, discovery they would need between now and trial. Nonetheless, pursuant to the Court's request, defendants list below certain classes of discovery that might be useful, depending (of course) on the parameters of the upcoming trial.

1.     Updated Discovery from Class Representatives.

It has been more than five years since defendants deposed the representative plaintiffs. Moreover, plaintiffs in the September 2000 Joint Status Report disclosed for the first time that US Bank is now a property class representative. There has not yet been any discovery regarding US Bank.

---

[2](...continued)

already sold that property at some point in the preceding eleven years following the class-membership date. Thus, this hypothetical June-2000 fire could not be shown to have impacted the "class." Evidence regarding such a non-class-wide event would be inadmissible at a class trial. This hypothetical example is discussed only to underscore the fundamental problem with post-6/7/89 plant evidence – such evidence is not class-wide.

2.    Updated Discovery from Plaintiffs' Expert Witnesses.

Plaintiffs indicate herein that they seek to update their expert witness submissions. Additional expert discovery – or supplemental expert reports followed by additional discovery – is doubly troublesome. First and foremost, the expert record in this case was *set* as of May 1997 and has been the subject of pending motions to strike since August 1997. The Court should not permit the parties to supplement that record now, before resolving those motions to strike. Any such supplementation would only add to the already substantial and complete record facing the Court. Moreover, such supplementation would require an entire new round of expert discovery and almost certainly – given plaintiffs' experts' previous submissions – supplemental motions to strike. The Court should not permit the parties to unravel a record that has been set for three and a half years.

Second, it is unclear what class-wide issues – *i.e.*, issues relating to persons who owned property in June 1989 – relating to these two defendants could possibly be fairly implicated by expert supplementation at this time. Defendants are prepared to address these points more fully at the January 11th hearing.

3.    Discovery from Absent Class Members.

Plaintiffs' proffered expert evidence suggests that plaintiffs may seek to introduce evidence at trial concerning selected absent class members. Defendants have not been permitted any discovery of absent class members. If the Court rules that it will permit absent-class-member evidence at trial, then defendants will need to take discovery of absent class members.

7

4.      Trial Witnesses.

Once plaintiffs have disclosed their fact witnesses for trial, defendants will seek discovery from any such witness who has not yet been deposed.

5.      Other.

Defendants also may wish to take limited discovery from certain individuals who have information relating to the representative plaintiffs, their properties, or issues not previously fully discovered that the Court includes in the property-class trial.

6.      Schedule for Completing Discovery.

Defendants propose that the pretrial issues proceed as follows: *first*, the Court determine the issues to be tried; *second*, the Court resolve expert motions; and then, *third*, the parties conduct any additional discovery. Defendants are prepared to discuss a pretrial schedule at the January 11th hearing.

## II.     EXPERTS THE PARTIES EXPECT TO CALL AT TRIAL.

### A.      Plaintiffs' Experts.

Below, we identify the experts whose testimony plaintiffs expect to present at trial, along with a brief description of the scope of their expected testimony. We provide the Court with citations to the reports of the experts and the transcripts of their deposition testimony, all of which were submitted by plaintiffs in January 1999 in ten volumes of exhibits in connection with Plaintiffs' Response to Defendants' Motion to Strike Plaintiffs' Experts. The expected testimony is more fully set forth in those reports and transcripts. In addition, plaintiffs' experts may comment upon the testimony and methods of defendants' experts.

8

## Wayne L. Hunsperger, MAI

Mr. Hunsperger is expected to testify in person at trial. He resides in Englewood, Colorado. Mr. Hunsperger authored one report in connection with this case: *Rocky Flats Nuclear Weapons Plant Property Impact Study,* dated Nov. 21, 1996 ("Hunsperger Rep.").

A copy his report may be found in Vol. IV of the exhibits to Plaintiffs' Response to Defendants' Motion to Strike Plaintiffs' Experts, at Exh. 11. A copy of his deposition testimony may be found in Vol. IX, Exhs. 31-32.

### Scope of Expected Testimony:

The scope of Mr. Hunsperger's expected testimony is set forth in his expert report and deposition testimony. It is described briefly below:

Mr. Hunsperger conducted a multi-faceted analysis of the impact of the Rocky Flats Plant and the 1989 FBI raid on the properties in the Property Class. He has concluded, and is expected to testify, that properties in the Property Class (residential and vacant land) have suffered a diminution in value attributable to Rocky Flats of $190 million (in 1995 dollars). *See* Hunsperger Rep. at 259.

Mr. Hunsperger is expected to testify about the five complementary analytical approaches he used and relied on in reaching this conclusion: (1) real estate market research; (2) analogous case studies; (3) comparison of market sales data; (4) multiple regression analysis; and (5) public opinion survey. *See* Hunsperger Rep. at 5-6 (summary of approaches). All of these approaches are "reasonably and customarily relied upon" by experts in his field. *Id.* at 5.

**1. Market Research.** Mr. Hunsperger is expected to testify about the market research he conducted and that was conducted under his supervision. This involved gathering information from

9

leaders in government, business, real estate development and land use; and reviewing other materials

relating to land use policies and risks posed by the Rocky Flats Plant. *See* Hunsperger Rep. at 7-15,

78-120. This research was conducted to permit Mr. Hunsperger to form a qualitative judgment about

the impact of Rocky Flats and the 1989 FBI raid on surrounding property values. Based on his

research, Mr. Hunsperger concluded, and is expected to testify that, "the after effects of the 1989 FBI

raid and proximity to the Rocky Flats Nuclear Weapons Plant combine to reduce the overall market

demand for properties in this area. The resulting loss in demand clearly places downward pressure

on real estate prices." *Id.* at 15.

    **2. Analogous Case Studies.** Mr. Hunsperger is expected to testify about his analysis of the

impact of other hazardous waste sites, located in various parts of the country, on properties located

near them. Mr. Hunsperger selected these analogous or comparable sites in order to evaluate the

impact of Rocky Flats. Mr. Hunsperger studied, and is expected to testify about, analyses of the

impact of a uranium processing facility in Fernald, Ohio; a radium contaminated landfill in New

Jersey; a highway designated to transport nuclear waste in New Mexico; a lead smelter in

Globeville, Colorado; a hazardous waste landfill in Toledo, Ohio; petro-chemical plants in Corpus

Christi, Texas; and others. *See* Hunsperger Rep. at 16-22, 121-77.

    Mr. Hunsperger is expected to testify that opinion surveys and multiple regression analysis

are commonly used tools in assessing the impact of hazardous waste sites on nearby properties. *Id.*

at 123-24. He is expected to testify that analyses of these other sites showed that these waste sites

nearly always hurt property values. The diminution in values ranged up to 50 percent, and impacted

properties up to 22 miles from a site. *Id.* at 175-76. Mr. Hunsperger concluded, and is expected to

testify, that, "[t]he studies clearly indicate that the market has a more negative reaction to nuclear issues that any other." *Id.* at 22.

Mr. Hunsperger also concludes, and is expected to testify that, based on his study of analogous sites, properties in the Property Class area have suffered a diminution in value due to Rocky Flats of at least 10 percent (excluding vacant land). *Id.* at 164-77.

**3. Market Sales Data.** Mr. Hunsperger is expected to testify about his collection and analysis of data concerning the actual sale prices of houses and vacant land in the Property Class and in surrounding areas. *See* Hunsperger Rep. at 23-33, 178-220. Mr. Hunsperger is expected to testify that this data shows that, in general, residences nearer the Plant have appreciated over time at lower rates than houses farther away. *Id.* at 29-30. Vacant land within the Property Class area, compared with land in nearby areas, had the lowest average sale prices. *Id.* at 27-28.

With respect to residential properties, Mr. Hunsperger obtained data from the MLS-Metro List Service, a well-recognized source of information on property sales. *Id.* at 202. Mr. Hunsperger compared data about properties within the Property Class to other submarkets within Jefferson County, as well as nearby Broomfield and Westminster. For purposes of comparison, Mr. Hunsperger also obtained data pertaining to areas near the Rocky Mountain Arsenal and a submarket in Adams County. *Id.* Mr. Hunsperger compared sales data from the 12-month periods in 1989 and 1995. The data showed that, overall, the properties closer to Rocky Flats appreciated at lower rates than those farther away. *Id.*

With respect to vacant land, Mr. Hunsperger again obtained data to compare sale prices inside and outside the Property Class area. *Id.* at 180-90. Prices in the Property Class area had the lowest cumulative average sales price ($10,351/acre), while prices in the other areas ranged from

11

$10,621/acre to $24,477/acre. *Id.* at 191. Mr. Hunsperger also investigated a number of individual land sales in detail. *Id.* at 193-98.

Mr. Hunsperger concludes, and is expected to testify, that: "Overall, a 30% diminution in value is a reasonable estimate for vacant parcels within the class area." *Id.* at 200.

**4. Multiple Regression Analysis.** Mr. Hunsperger is expected to testify about his use of and reliance on a multiple regression study performed by Dr. Radke that demonstrates the depressive effect on property values of proximity to Rocky Flats. *See* Hunsperger Rep. at 34-35, 221-24. *See also* discussion of Dr. Radke's expected testimony, below.

**5. Public Opinion Survey.** Mr. Hunsperger is expected to testify about a public opinion survey, designed by Drs. Slovic and Flynn, of potential participants in the market for houses in the Property Class Area. *See* Hunsperger Rep. at 37-62, 225-52 and at Appendix A. The survey itself has been peer reviewed and published. *See* Flynn, Peters, Mertz and Slovic, *Risk, Media, and Stigma at Rocky Flats*, 18 Risk Analysis 715 (December 1998).

Among the survey's results were that:

- 46 percent of Denver respondents would refuse to purchase a house near Rocky Flats at any price;

- approximately 65 percent of respondents in the Arvada/Westminster and Denver areas believe that Rocky Flats poses a health risk;

- and approximately 65 percent of Arvada/Westminster respondents and 80 percent of Denver respondents believe that Rocky Flats has had a negative impact on property values.

*See* Hunsperger Rep. at 235-250.  These results are consistent with previous surveys conducted by others outside the context of litigation.  *Id.* at 37-45.

The survey showed that for a house within 2-4 miles of Rocky Flats, many respondents would require price discounts of more than $30,000 (average: $9,270).  At 4-6 miles from the Plant, discount demand exceeded $15,000 and averaged $6,048.  *Id.* at 234, 239.  Mr. Hunsperger calculated an average discount of $17,486 per home.  *Id.* at 251.

As stated, Mr. Hunsperger used all these approaches, combined with his experience and judgment, at arriving at his overall estimate of diminution in vale: $190 million (in 1995 dollars).

### S. Paul Slovic, Ph.D.

Dr. Slovic is expected to testify in person at trial.  He resides in Eugene, Oregon.  He authored or co-authored three expert reports in connection with this litigation:

1. *Factors Influencing Risk Assessment, Risk Perception, and Risk Acceptance,* dated Nov. 19, 1996 ("Slovic Rep.");

2. *The June 6, 1989 FBI Raid at Rocky Flats, Colorado:  Risk, Media, and Stigma*, dated Nov. 19, 1996 ("Media Rep."); and

3. *Final Report: Rocky Flats Health and Housing Survey*, dated July 5, 1996 ("Survey Rep.").

A copy of the Slovic Rep. may be found in Vol. VI of the exhibits to Plaintiffs' Response to Defendants' Motion to Strike Plaintiffs' Experts, Exh. 17;  a copy of the Media Rep. in Vol. III at Exh. 8; and a copy of the Survey Rep. is attached as Appendix A to  the expert report of Wayne L. Hunsperger, located in Vol. IV, Exh. 11.  A copy of Dr. Slovic's deposition testimony  may be found in Vol. X,  Exh. 39.

13

**Scope of Expected Testimony:**

The scope of Dr. Slovic's expected testimony is set forth in his expert reports and his deposition testimony, and in an affidavit submitted by plaintiffs in connection with Plaintiffs' Surreply re: Defendants' Motion to Strike Plaintiffs' Experts, dated March 11, 1999. It is described briefly below:

**1. The Concepts of Risk and Risk Assessment.** Dr. Slovic is expected to testify about the concepts of risk and risk assessment. *See* Slovic Rep. at 2-3. He is expected to testify about the different ways of defining risk, and that a purely probabilistic definition of risk fails to capture or take into account many factors that affect and influence perceptions of risk. *Id.*

**2. Factors Influencing the Perception of Risk.** Dr. Slovic is expected to testify about the factors that can and do influence people's perceptions of risk. *Id.* at 3-10. Among these factors are whether exposure to the risk is voluntary or involuntary; whether the risk is under one's control; whether the risk produces feelings of dread; whether the potential outcome is catastrophic; and whether benefits are fairly or unfairly distributed among those who bear the risk. *Id.* at 5. Two circumstances or events may, for example, carry the same numerical or probabilistic risk of injury, but may be perceived and be judged quite differently depending on the nature and source of the risk. Moreover, these factors may be legitimately considered in making public policy and other judgments about risk.

**3. Perceptions of Rocky Flats.** Dr. Slovic is expected to testify about the perception of risk and the factors that influence it as they relate to perceptions of Rocky Flats, as well as the releases of hazardous radioactive materials from the Plant. *Id.* at 10-11. The risks associated with releases of radioactive materials from Rocky Flats would be fairly characterized by people off-site as

14

uncontrollable, posing a latent threat, inducing feelings of dread, and as uncertain or unknown. *Id.*
at 10.  Research has revealed, for example, the "exceptionally dread quality of technological
accidents that expose people to radiation and chemicals." *Id.*

**4. Comparisons of Risk.** Dr. Slovic is expected to testify about comparisons of risk and
about why comparisons of probabilistic risk estimates, by themselves, may fail to capture or convey
other important factors that, once considered, may play an important and legitimate role in
determining an appropriate response to particular risks, such as a risk from radiation. *Id.* at 11-14.

**5. Media Response to the FBI Raid and its Aftermath.** Dr. Slovic is expected to testify
about the media response to the FBI raid of Rocky Flats that occurred on June 6, 1989 and its
aftermath. *See* Media Rep.  He is expected to testify about a study that he participated in of the
quantity and content of media coverage following the raid. *Id.* at 3-14.  He is expected to testify
about the conclusions of the study, including that the volume and content of the media coverage
following the 1989 FBI raid were "clearly capable of increasing concern about the safety of areas
near Rocky Flats," and, thus, stigmatizing them. *Id.* at 14.

**6. Public Opinion Survey.** Dr. Slovic is expected to testify about a public opinion survey
conducted of individuals living near Rocky Flats. *See* Survey Rep. *See also* Flynn, Peters, Mertz
and Slovic, *Risk, Media, and Stigma at Rocky Flats*, 18 Risk Analysis 715 (December 1998) (same
survey published in a peer-reviewed journal).

Among the survey's results were that:

- 46 percent of Denver respondents would refuse to purchase a house near Rocky Flats
at any price;

15

- approximately 65 percent of respondents in the Arvada/Westminster and Denver areas believe that Rocky Flats poses a health risk;

- and approximately 65 percent of Arvada/Westminster respondents and 80 percent of Denver respondents believe that Rocky Flats has had a negative impact on property values.

*See* Hunsperger Rep. at 235-250.

**James Flynn, Ph.D.**

Dr. Flynn is expected to testify in person at trial. He resides in Eugene, Oregon. He authored or co-authored two expert reports in connection with this litigation:

1. *The June 6, 1989 FBI Raid at Rocky Flats, Colorado: Risk, Media and Stigma*, dated Nov. 19, 1996 ("Media Rep."); and

2. *Final Report: Rocky Flats Health and Housing Survey*, dated July 5, 1996 ("Survey Rep.").

A copy of the Media Report may be found in Vol. III of the exhibits to Plaintiffs' Response to Defendants' Motion to Strike Plaintiffs' Experts, Exh. 8; and a copy of the Survey Rep. is attached as Appendix A to the expert report of Wayne L. Hunsperger, located in Vol. IV, Exh. 11. A copy of Dr. Flynn's deposition testimony may be found in Vol. VIII, Exh. 27.

**Scope of Expected Testimony:**

The scope of Dr. Flynn's expected testimony is set forth in his expert reports and his deposition testimony, and in an affidavit submitted by plaintiffs in connection with Plaintiffs' Surreply re: Defendants' Motion to Strike Plaintiffs' Experts, dated March 11, 1999. It is described briefly below:

16

**1. Media Response to the FBI Raid and its Aftermath**. Dr. Flynn is expected to testify about the media response to the FBI raid of Rocky Flats that occurred on June 6, 1989, and its aftermath. *See* Media Rep. *See also* discussion of Dr. Slovic's expected testimony about this same subject, above.

**2. Public Opinion Survey**. Dr. Flynn is expected to testify about a public opinion survey conducted of individuals living near Rocky Flats. *See* Survey Rep. *See also* discussion of Dr. Slovic's expected testimony about this same subject, above. Dr. Flynn has concluded, and is expected to testify, that "the results of our survey indicate that there's a resistance to housing associated with Rocky Flats and that this will exert a downward pressure on desirability and prices of homes." Flynn dep., 3/27/97, at 101:3-7.

**Dr. John Radke**

John Radke, Ph.D., is a member of the faculty at the University of California at Berkeley, with an extensive background in geographic information systems. He authored one report in connection with this case: *Measuring the Effects of Proximity to the Rocky Flats Nuclear Weapons Plant on Property Values*, dated Nov. 25, 1996. He is expected to testify in person at trial concerning substantially all the conclusions in that report.

A copy of Dr. Radke's report may be found in Vol. VI of the exhibits to Plaintiffs' Response to Defendants' Motion to Strike Plaintiffs' Experts, at Exh. 16. A copy of his deposition testimony may be found in Vol. X, Exhs. 37-38.

**Scope of Expected Testimony:**

In summary, the work reflected in Dr. Radke's report comprised three separate investigations or "phases." In Phase I, data was obtained for three types of property – commercial, multi

17

residential, and vacant – from DRESCO, a company that collects real estate transaction data in the Denver metropolitan region. The data reflected approximately 10,000 property sales and covered the eleven-year period from 1983 through 1993. A multiple regression analysis was performed, with property values as the dependent variable and numerous locational and other factors derived in part from GIS analysis as independent variables. This resulted in a statistical gauge, for each type of property, of the undervaluation of properties by virtue of proximity to Rocky Flats within the geographic bounds of the property class area. That is, it afforded one means for comparison of actual property values with what the values would have been, "but for" the environmental disamenity represented by Rocky Flats. The statistical results are summarized in Table 1 at page 6 in Dr. Radke's report.

Phase II employed similar statistical methods for single-family residential properties within the class area. The data in Phase II were drawn from sales data reflected in Multiple Listing Service Reports for each year from 1988 through 1995. The data included substantially all sales for those years within the property class area, with a sampling of sales from elsewhere in the Denver metropolitan area used for comparison. Once again, the result was one gauge of what sales values would have been, "but for" proximity to Rocky Flats, with all other factors being held equal. The results of Phase II are also summarized in Table 1 at page 6 of the Radke Report.

Phase III evaluated property devaluation within the class area based in part on the results of Phases I and II. Data was gathered to calculate the number (or, for vacant land, the acreage) of properties in the class area in four property categories as of 1989, and estimates of devaluation attributable to Rocky Flats were calculated based on the mean sales prices for the respective

18

categories. The relevant calculations are summarized in Table 2 at page 7 of the Radke Report.

### Robert J. Budnitz, Ph.D.

Dr. Budnitz is expected to testify in person at trial. He resides in Berkeley, California.

Dr. Budnitz authored or co-authored three expert reports in connection with this case:

1. *The Major Rocky Flats Fires of 1957 and 1969 and Other Incidents: Insights about Management Practices*, dated Nov. 21, 1996 ("Budnitz Fires Rep.");

2. *Waste Management Practices Associated with the 903-Area Plutonium Releases*, dated Nov. 21, 1996 ("Budnitz 903 Rep.");

3. *Management of Waste, Residues and Risks by Rockwell International at the Rocky Flats Plant*, dated Nov. 21, 1996 ("Waste Rep.).

Copies of these reports may be found, respectively, in Vol. I of exhibits to Plaintiffs' Response to Defendants' Motion to Strike Plaintiffs' Experts, at Exhs. 2 and 3; and in Vol. V, Exh. 14. A copy of his deposition testimony may be found in Vol. VIII, Exhs. 22-23.

### Scope of Expected Testimony:

The scope of Dr. Budnitz's expected testimony is set forth in his expert reports and in his prior deposition testimony. It is described briefly below:

**1. 1957 Plutonium Fire.** Dr. Budnitz is expected to testify about the major plutonium fire that occurred at Rocky Flats in Building 771 on September 11, 1957, which resulted in the release of plutonium off-site. He is expected to testify concerning his review and analysis of the fire, including the official Atomic Energy Commission investigation that followed it. *See* Budnitz Fires Report at 3-11. Dr. Budnitz is expected to testify about the fire itself, its causes, and its aftermath.

19

He concludes that the 1957 Fire reflected "downright incompetence at the highest levels of Rocky Flats management." *Id.* at 4.

**2. 1969 Plutonium Fire.** Dr. Budnitz is expected to testify about the major plutonium fire that occurred at Rocky Flats in Building 776 on May 11, 1969, which resulted in the release of plutonium off-site. He is expected to testify concerning his review and analysis of the fire, including the official Atomic Energy Commission investigation that followed it. *See* Budnitz Fires Rep. at 11-18.

Dr. Budnitz also is expected to testify concerning his analysis of the failures of Dow to implement appropriate safety and fire prevention measures after the 1957 Fire, and how those failures contributed to the 1969 Fire. *Id.* at 18-38. Dr. Budnitz concludes, and is expected to testify that:

> After the 1957 fire, many recommendations were made to improve fire safety, but by the time of the 1969 fire the concerns that underlay a large fraction of these recommendations had not been properly addressed.
>
> Other serious fire-safety concerns also existed such as a failure to implement appropriate training and to follow appropriate fire codes.
>
> Taken as a whole, the pattern is clear: (i) in my view, there simply was nowhere near enough attention paid in the 1957 - 1969 period to fire-safety issues; (ii) because of this lack of attention, I believe that there was a systematic failure in that period to provide enough in the way of fire safety at Rocky Flats.

Budnitz Fires Report at 36-37 (emphasis in original).

> Dr. Budnitz also is expected to testify to the effect that:
>
> poor management practices after the 1957 fire, including the Plant's failure to implement appropriate fire-safety measures, were a major cause of the 1969 fire, and contributed to its severity;

the Rocky Flats Plant's senior management had (or should have had) full knowledge of the fire-safety needs of the facility, but failed to implement an adequate complement of them;

that the fire-safety practices at Rocky Flats were considerably poorer than at other facilities managed contemporaneously for the U.S. Atomic Energy Commission (AEC) by other contractors;

*See* Budnitz Fires Rep. at 2.

**3. Near-Catastrophic Consequences of the 1969 Fire.** Dr. Budnitz is expected to testify that the 1969 Fire nearly resulted in a catastrophically large release of plutonium into the off-site environment. *See* Budnitz Fires Rep. at 39-46.

**4. Other Incidents and Releases During Dow's tenure.** Dr. Budnitz is expected to testify about other incidents that occurred during the Dow era, including a release in 1973 of up to 2,000 curies of radioactive tritium into the environment. *See* Budnitz Fires Rep. at 46-53.

**5. 903 Pad.** Dr. Budnitz is expected to testify about the "903 Pad," an outside storage area at Rocky Flats where Dow placed thousands of barrels containing plutonium-contaminated oil. Dow left the barrels outside for a number of years, and many corroded and leaked, resulting in what have been, to date, the largest releases of plutonium into the off-site environment. Dr. Budnitz analyzed this episode, and the events, environmental monitoring lapses and waste management practices that led up to it and contributed to it. *See* Budnitz 903 Rep. He is expected to testify to the effect:

(i) that some of these practices led to important offsite releases of plutonium from the 903 Area to the environment around the plant;

(ii) that at the time the releases occurred the Dow Rocky Flats management and staff had not taken the steps necessary to understand how large these releases were or where they went;

...

21

(iv) that the principal releases of plutonium from the 903 Area occurred due to a pattern of poor waste-management practices that would not have occurred had the plant been well managed;

(v) that when the principal plutonium releases occurred, or prior to their occurrence, the Dow Rocky Flats management and staff had available to them easily implemented measures that could have prevented the major part of the releases; and

(vi) that the state-of-the-art of environmental monitoring and analysis at the time when the plutonium releases from the 903 Area occurred, and thereafter, was sufficiently mature that measurements could have been made and analyses could have been performed -- but were not -- to understand the radionuclides' transport and environmental fate.

....

For the Dow Rocky Flats Plant not to have prevented the 903-Area releases in the first place, nor to have monitored and analyzed them when and after they occurred, was an egregious breach of acceptable waste-management practice.

*See* Budnitz 903 Rep. at 2-3.

## Thomas B. Cochran, Ph.D.

Dr. Cochran is expected to testify in person at trial. He resides in Arlington, Virginia.

Dr. Cochran authored two expert reports in connection with this litigation:

1. *Overview of Rocky Flats Operations*, dated Nov. 21 1996 ("Cochran Overview");

2. *Plutonium Inventory Differences at the Rocky Flats Plant and Their Relationship to Environmental Releases*, dated Nov. 22, 1996 ("Cochran MUF Rep.").

Copies of these reports may be found, respectively, in Vol. II of the exhibits to Plaintiffs' Response to Defendants' Motion to Strike Plaintiffs' Experts, Exhs. 5 and 6. A copy of his deposition testimony may be found in Vol. VIII, Exh. 25.

22

**Scope of Expected Testimony:**

The scope of Dr. Cochran's expected testimony is set forth in his expert reports and his deposition testimony (as well as his testimony at the contempt hearing in July 1995). It is described briefly below:

**1. Nuclear Weapons and Their Manufacture.** Dr. Cochran is expected to testify briefly concerning the general principles and characteristics of nuclear weapons and their manufacture. *See* Cochran Overview at 1-5.

**2. Plutonium Operations at Rocky Flats.** Dr. Cochran is expected to testify concerning the basics of plutonium operations and weapons manufacturing at Rocky Flats. *See* Cochran Overview at 1-2, 5-9.

**3. Basics of Radioactivity and Radiation.** Dr. Cochran is expected to testify concerning basic scientific facts and principles pertaining to radioactivity and radiation, including the various types of radiation (energetic x-rays, gamma-rays, alpha particles, beta particles and neutrons), isotopes, and radioactive decay. *See* Cochran Overview at 9-12.

**4. Measuring Radiation Exposures to People.** Dr. Cochran is expected to testify about basic scientific principles pertaining to the measurement of radiation exposure to human beings. He will explain the units of measurement, including the "rad," "rem," "gray," "sievert," "dose equivalent," "effective dose equivalent," and others. *See* Cochran Overview at 12-14, 17.

**5. Basic Principles of Health Physics.** Dr. Cochran is expected to testify about the "basic" rule of health physics that "radiation exposures must be kept as low as reasonably achievable." Cochran Overview at 14-15. This is known as the "ALARA" principle or standard. *Id.*

**6. Properties of Plutonium.** Dr. Cochran is expected to testify about the physical, radiological, pyrophoric, and toxic properties and characteristics of different forms of plutonium and

plutonium compounds, both generally, and specifically in connection with forms of plutonium used at Rocky Flats.  Cochran Overview at 18-22.

**7. Toxicity of Beryllium.**  Dr. Cochran is expected to testify about the toxicity of beryllium, a non-radioactive metal used by both Dow and Rockwell at Rocky Flats.  Small amounts of beryllium dust can lead to lung disease.  Cochran Overview at 23.

**8.  Major Off-site Releases and Waste Management Practices at Rocky Flats.**  Dr. Cochran is expected to testify about the major known releases of plutonium from Rocky Flats into the off-site environment, and the waste management practices of Dow and Rockwell. He will testify about: the 1957 and 1969 plutonium fires;  the 903 Pad episode;  the stack releases of plutonium; defendants' mismanagement of criticality risks; and the waste management practices of Rockwell that culminated in their pleading guilty to ten environmental crimes.  Cochran Overview at 23-30.

Dr. Cochran concludes, and is expected to testify that,

The contractors placed highest priority on meeting warhead component production quotas, and failed to exercise the due diligence and meticulous attention to detail required to insure the public's health and safety.  As a consequence there were fires that could have been prevented and should not have occurred.  In violation of the ALARA principle, there were releases of plutonium to the environment that could have been prevented and should not have occurred, unnecessarily exposing the public to an increased risk of cancer. Private property was contaminated effectively forever. One contractor, Rockwell International, in 1992 pleaded guilty to committing ten environmental crimes, five of which were felonies.  There was a huge unnecessary buildup of radioactive waste.  When the plant was shut down in 1989 for safety violations, it was left in a condition that has made cleanup of the site an expensive nightmare for the government.  There were 12.7 metric tons (t) of plutonium left at the plant. Some of the plutonium was stored in temporary plastic packaging, which has since begun to deteriorate, producing hydrogen gas that can contribute to pyrophoric conditions. Even today there are thousands of drums of hazardous wastes stored in available spaces throughout the various buildings at Rocky Flats -- another fire hazard waiting to happen. The site may never be cleaned up adequately, largely because of the egregious manner in which the plant was operated for more than three

25

decades resulting in extensive contamination of the site and the accumulation of large volumes of toxic wastes.

Cochran Overview at 30 (citations omitted).

**9. Material Unaccounted For (MUF).**  Dr. Cochran is expected to testify about "material unaccounted for" or "MUF."  This refers to plutonium, uranium and other nuclear material used at Rocky Flats that neither defendants nor DOE can find or account for.  During Dow and Rockwell's stewardship of Rocky Flats, the amount of "missing" plutonium climbed to more than 2,600 pounds, enough to make hundreds of nuclear weapons.  Cochran MUF Rep. at 9.  (Dr. Cochran briefly discusses the MUF problem in his Overview Report as well, *see* Cochran Overview at 27).

Dr. Cochran has concluded, and is expected to testify, that:

(a) Defendant Dow was "grossly negligent" for allowing the amount of missing plutonium to routinely top a hundred pounds in a single year; even into Rockwell's tenure, annual MUF measured in the tens of pounds, and the Department of Energy itself characterized Rockwell's performance in one year as "deplorable."  Cochran MUF Rep. at 12, 15.

(b) Defendant Dow made no serious effort to analyze its massive MUF problem until 1964, and by then the amount of plutonium that Dow could not find exceeded a thousand pounds.  *Id.* at 10.

(c) The sheer quantity of plutonium that cannot be accounted for casts doubt on official estimates of the amount of plutonium released to the off-site environment.  *Id.* at 16-17.

(d)  Defendants' indemnitor, the Department of Energy, has withheld large amounts of MUF data, "severely" impacting plaintiffs' ability to perform a quantitative analysis of MUF.  *Id.* at 1.

26

### D. Warner North, Ph.D

Dr. North may testify at trial. Dr. North co-authored, with Dr. Budnitz, one expert report in connection with this litigation: *Management of Waste, Residues and Risks by Rockwell International at the Rocky Flats Plant*, dated Nov. 21, 1996 ("Waste Rep.).

A copy of this report may be found in Vol. V of the exhibits to Plaintiffs' Response to Defendants' Motion to Strike Plaintiffs' Experts, Exh. 14. A copy of Dr. North's deposition testimony may be found in Vol. IX, Exh. 35.

#### Scope of Expected Testimony:

The scope of Dr. North's expected testimony is set forth in his expert report and his deposition testimony. It is described briefly below. (Dr. Budnitz, who co-authored the Waste Rep., may testify in place of Dr. North).

1. **Waste Management Practices at Rocky Flats.** Dr. North is expected to testify about the history of waste management practices at Rocky Flats. This testimony would cover the operations at Rocky Flats (such as the machining of plutonium, beryllium, and other radioactive and/or toxic metals and materials) that resulted in the build up of large amounts of radioactive and hazardous waste. *See* Waste Rep. at 5-7.

2. **Dow's Management of Waste.** Dr. North is expected to testify about the deficiencies of Dow's waste management practices, and the lessons that Dow's successor, Rockwell, should have learned and heeded, but didn't. Waste Rep. at 7-8.

3. **Rockwell's Management of Waste.** Dr. North is expected to testify about the deficiencies of Rockwell's management of waste and waste-related issues at Rocky Flats. This testimony would encompass a discussion of the regulatory environment in which Rockwell operated,

27

*see* Waste Rep. at 10-13; Rockwell's failure to comply with environmental regulations, *id.* at 13-16; Rockwell's failure to implement effective management of wastes, *id.* at 16-17; and Rockwell's responsibility to manage the Rocky Flats plant, as compared with the Department of Energy. *Id.* at 8-10, 18-20.

**4. Rockwell's Guilty Pleas.** Dr. North is expected to testify about the conduct of Rockwell that led to the FBI raid on Rocky Flats on June 6, 1989, and later led to Rockwell's pleading guilty in 1992 to ten federal environmental crimes, including five felonies. *See* Waste Rep. at 20-43. This would include testimony about pondcrete, a semi-solid mixture of hazardous waste and concrete, *id.* at 20-35; saltcrete (similar to pondcrete), *id.* at 35-36; the plant's sewage treatment plant and the chromic acid spill that occurred on Feb. 22, 1989, *id.* at 36-39; spray irrigation (Rockwell's practice of, literally, spraying contaminated water onto fields), *id.* at 39-43.

**5. Other issues not addressed in the Criminal Investigation.** Dr. North is expected to testify about other practices and conduct of Rockwell, not specifically the subject of any of its ten guilty pleas, that nevertheless evidence a "widespread pattern of management deficiencies". *See* Waste Rep. at 43. This includes issues pertaining to beryllium use and exposures; radiological safety; groundwater contamination; safeguards and security; fire risks; plutonium residues; and criticality. *Id.* at 43-64.

**6. Safety analyses and Risk Assessments.** Dr. North is expected to testify concerning analyses of the safety and risks at Rocky Flats that have been conducted, and Rockwell's failures to address the safety and risk issues that existed at the plant. *See* Waste Rep. at 65-73. He concludes, and is expected to testify, that, "In our judgment, toward the end of the Rockwell era Rocky Flats was the most dangerous facility across the entire DOE weapons complex in the sense

of elevated offsite risk.  While other factors may have contributed, it is our judgment that Rockwell's negligence and poor management contributed substantially to this elevated risk." *Id.* at 74 (footnote omitted).

### Dr. Robert Goble

Robert Goble, Ph.D., will testify in person at trial.  He is Research Professor of Environmental Science and Policy, and Adjunct Professor of Physics, at Clark University.  He has prepared one report in connection with this litigation: *Exposures from Releases of Plutonium and Other Toxic Substances at Rocky Flats*, dated Nov. 24, 1996.

A copy of Dr. Goble's report appears in Vol. III of the exhibits to Plaintiffs' Response to Defendants' Motion to Strike Plaintiffs' Experts, at Exh. 9.  A copy of his deposition testimony can be found in Vol. IX,  Exhs. 28-29.

**Scope of Expected Testimony**:

Dr. Goble's work relates primarily to characterizing and estimating releases, exposures, and dose ranges for several categories of hazardous substances released from Rocky Flats, including plutonium and americium, volatile chlorinated hydrocarbons, ethylene oxide, and beryllium.  With the severance of the medical monitoring claims, the overall scope of Dr. Goble's testimony will not change dramatically.  A few passages in his report, easily identified,[3] expressly and specifically relate exclusively to the implications of Dr. Goble's estimates for a program of medical monitoring, and the testimony reflected in those passages will not be proffered in support of the property claims.

---

[3]  *See, e.g.,* Goble Report at 22-23 (listing and discussing three requirements that should be satisfied for a medical monitoring program); *id.* at 72 (ethylene oxide exposures should be addressed in any medical monitoring program); *id.* at 78 (discussing exercise of medical judgment in defining extent of medical monitoring program).

In the main, however, characterizations of the risks associated with releases from the plant (and the scope of uncertainty of those risks) remain relevant to the property claims, in part because they show that concerns about the safety of properties in the class area do enjoy rational and scientific foundation.

But if the overall scope of Dr. Goble's testimony will be largely unaffected by the severance of the medical monitoring claims, that testimony's import and emphases will nevertheless be different. For example, estimates relating to volatile organic compounds (and ethylene oxide) should recede in importance, because unlike plutonium and beryllium, VOC's will not have persisted in the environment for years after the plant was closed and its operations shut down. Releases of VOC's remain illustrative of the general hazards associated with the plant over the years, but this essentially illustrative point can be adduced without the need for lengthy and elaborate quantification of human doses (of the sort that might be felt appropriate in assessing whether health risks rise to some numerical threshold perceived to be a prerequisite for large scale medical monitoring intervention).

Even with longer-lived environmental contaminants (e.g., plutonium and beryllium), the import of risk estimation is different for the property claims than for the medical monitoring claims, at least as defendants seem to envision the latter. If we understand defendants' position correctly, each plaintiff in a medical monitoring claim is required to prove that he or she was personally exposed at specific times to precisely quantified doses of a specific toxin, with a precisely quantified concomitant risk of disease, and moreover to show that favorable diagnostic intervention is feasible and that its probable benefits outweigh its risks. These conditions could be difficult to satisfy if, for example, the uncertainties surrounding the size of releases were large, or if the diseases for which the exposed plaintiffs were at risk happened to be effectively incurable.

30

By contrast, it is not a prerequisite to a property claim, under anyone's theory of the law, to show the feasibility and efficacy of medical intervention in response to the toxic exposure. For example, it can be inferred that the market will stigmatize properties in a contaminated area even (or especially) if the cancers and other diseases for which inhabitants are at risk are generally resistant to medical treatment. In addition, property values are largely a function of the *market's* overall reaction to perceived environmental risks associated with a substantial *geographic area* over a significant time period (as opposed to the precise actual concentration of this or that toxin at a point location at a particular moment in time). Consequently, whereas substantial *uncertainties* concerning the nature and extent of contamination might be thought (albeit wrongly) to constitute an evidentiary *demerit* in the medical monitoring context, such uncertainties actually tend to *support* the property claims, insofar as they afford a reasonable and objective foundation for adverse market judgments.

As Dr. Goble has explained at length, any insistence on pinpoint mathematical certainty in dose reconstruction is scientifically misplaced even for purposes of the medical monitoring claims. For the property claims, it should be still more evident that the relevant issue is the probable *range* of potential exposures and doses, given all the uncertainties. That, of course, is the form in which Dr. Goble has proffered his estimates.

### Steve Wing, Ph.D.

Dr. Wing is expected to testify in person at trial. He resides in Pittsboro, North Carolina. He authored one expert report in connection with this litigation: *A Critical Review of the United State Department of Energy Efforts to Investigate the Human Health Effects of Radiation*, dated Nov. 21, 1996 ("Wing Rep.").

31

A copy of his report may be found in Vol. VII of the exhibits to Plaintiffs' Response to Defendants' Motion to Strike Plaintiffs' Experts, Exh.20.  A copy of his deposition testimony may be found in Vol. X,  Exh. 42.

### Scope of Expected Testimony:

The scope of Dr. Wing's expected testimony is set forth in his expert report and his deposition testimony.  It is briefly described below:

**1.  Health Effects of Exposure to Plutonium.**  Dr. Wing is expected to testify about the health effects of exposure to plutonium.  *See* Wing Rep. at 6-21.

**2. Role and Influence of the DOE on Plutonium Health Effects Research.**  Dr. Wing is expected to testify about the role and influence of the Department of Energy in and upon research into the health effects of exposure to plutonium.  *Id.* at 21-34.

### Baruch S. Blumberg, M.D.

Dr. Blumberg is expected to testify in person at trial.  He resides in Philadelphia, Pennsylvania.  He authored one expert report in connection with this litigation: *Report to Berger & Montague, P.C., in Reference to the Rocky Flats Fires Litigation*, dated Nov. 21, 1996 ("Blumberg Rep.").

A copy of his report may be found in Vol. I of the exhibits to Plaintiffs' Response to Defendants' Motion to Strike Plaintiffs' Experts, Exh. 1.  A copy of his deposition testimony may be found in Vol. VIII, Exh. 21.

### Scope of Expected Testimony:

The scope of Dr. Blumberg's expected testimony is set forth in his expert report and his deposition testimony.  It is briefly described below:

32

**1. Individual Variation in Susceptibility to Radiation.** Dr. Blumberg is expected to testify that individuals vary considerably in their susceptibility to developing cancer or other illness as a result of exposure to radiation. *See* Blumberg Rep. at 4-13. This variability results from, among other things, differences in genetic makeup. *Id.*

**2. Susceptibility to Chronic Beryllium Disease.** Dr Blumberg is expected to testify about inherited susceptibility to chronic beryllium disease ("CBD"). The main consequence of CBD is chronic inflammation of the lower respiratory tract. *See* Blumberg Rep. at 16-17.

At a trial of the property claims only, two parts of Dr. Blumberg's expert report would *not* be offered. These are: (1) a detailed section on hepatitis B and liver cancer, *see* Blumberg Rep. at 13-16; and (2) the section on medical monitoring, *see* Blumberg Rep. at 17-19. As part of his expected testimony pertaining to his qualifications as an expert, however, Dr. Blumberg would be expected to testify generally about his work pertaining to hepatitis for which he was awarded a Nobel prize in 1976.

### Lawrence S. Mayer, Ph.D., M.B. (British medical degree)

Dr. Mayer is expected to testify in person at trial. He resides in Phoenix, Arizona. He authored one expert report in connection with this litigation: *Report on Statistical Issues Arising from the Rocky Flats Litigation,* dated Nov. 25, 1996 ("Mayer Rep.").

A copy of his report may be found in Vol. V of the exhibits to Plaintiffs' Response to Defendants' Motion to Strike Plaintiffs' Experts, at Exh. 13. A copy of his deposition testimony may be found in Vol. IX, Exh. 34.

**Scope of Expected Testimony:**

The scope of Dr. Mayer's expected testimony is set forth in his expert report and his deposition testimony. It is briefly described below:

**1. Treatment of Extreme Data.** Dr. Mayer is expected to testify about the tendency in official measurements of releases of hazardous substances from Rocky Flats to disregard or discount extreme values, thus creating a risk of underestimation of the correct values. *See* Mayer Rep. at 4-19.

**2. Variation in Susceptibility to Disease.** Dr. Mayer is expected to testify about the variation in susceptibility to disease that exists among a population exposed to radiation, and how calculations of risk for a given exposure may fail to adequately account for individual variation in susceptibility. *Id.* at 19-22.

## Linda Lehman, M.S.

Ms. Lehman is expected to testify in person at trial. She resides in Prior Lake, Minnesota. She authored one expert report in connection with this litigation: *Report on Groundwater at the Rocky Flats Plant*, dated Nov. 24, 1996 ("Groundwater Rep.").

A copy of her report may be found in Vol. IV of the exhibits to Plaintiffs' Response to Defendants' Motion to Strike Plaintiffs' Experts, at Exh. 12. A copy of her deposition testimony may be found in Vol. IX, Exh. 33.

**Scope of Expected Testimony:**

The scope of Ms. Lehman's expected testimony is set forth in her expert report and her deposition testimony. It is briefly described below:

**1. Hydrogeology of the Plant Site and Area.** Ms. Lehman is expected to testify about the hydrogeological characteristics of the Rocky Flats Plant site and environs. *See* Groundwater Rep. at 1-2.

**2. Groundwater Contamination.** Ms. Lehman is expected to testify about the contamination of the groundwater at the Rocky Flats plant, and its movement off-site. *Id.* at 2-7.

### Richard W. Clapp, MPH, D. SC.

Dr. Clapp is expected to testify in person at trial. Dr. Clapp submitted one expert report in connection with this litigation: *Report of Dr. Richard W. Clapp*, dated Nov. 13, 1996 ("Clapp Rep.").

A copy of this report may be found in Vol. II of the exhibits to Plaintiffs' Response to Defendants' Motion to Strike Plaintiffs' Experts, at Exh. 4. A copy of his deposition testimony may be found in Vol. VIII, Exh. 24. He also submitted an affidavit, in response to arguments raised by Defendants in their Reply Brief in Support of their Motion to Strike Plaintiffs' Expert Evidence, that was attached as Exh. 15 to Plaintiffs' Surreply Re: Defendants' Motion to Strike Plaintiffs' Experts, dated March 11, 1999.

### Scope of Expected Testimony:

The scope of Dr. Clapp's expected testimony is set forth in his expert report, his deposition testimony, and his affidavit. It is described briefly below:

Dr. Richard Clapp is expected to testify that the residential areas immediately adjacent to the Rocky Flats Plant, specifically those areas bounded by the inner plutonium dispersion contours derived by Atomic Energy Commission scientists, have an increased incidence of lung and bone cancers compared to more distant areas of Jefferson County.

35

Dr. Clapp is expected testify about a study he conducted utilizing cancer incidence data supplied by the Colorado Central Cancer Registry, which compared the odds of persons having lung or bone cancer in geographic areas to the immediate South and East of the Rocky Flats plant with the odds of persons having those cancers in more distant, but adjoining areas of Jefferson County.

Dr. Clapp is expected to testify specifically that his study found an increased incidence of both bone and lung cancers in the study area, and concluded that there was a significant "on-going health effect" directly related to proximity to Rocky Flats. *See* Clapp Rep. at ¶¶ 8-12.

He is also expected to testify that his study reported an elevated incidence of lung and bone cancer for men and women during the most recent period he studied, 1989-1992 (*see* Clapp Rep. at ¶¶ 8,9,11), and consistently increasing lung cancer risk for women from 1979-1983 through 1989-1992, with odds ratios that are elevated during the 1989-1992 period with confidence intervals nearly reaching statistical significance at the stringent 95% confidence level. *See* Clapp Rep. at Appendix 2.

### Edward P. Radford, M.D.

Dr. Radford is expected to testify in person at trial.[4]  He resides in Surrey, England. He authored one expert report in connection with this litigation: *Comments on Medical Monitoring of People Exposed to Hazards from Rocky Flats Nuclear Facility in Colorado*, submitted November 1996 ("Radford Rep.")

---

[4]       Due to his failing health, it may be necessary to conduct a trial deposition by videotape in the near future.

36

A copy of his report can be found in Vol. V of Plaintiffs' Response to Defendants' Motion to Strike Plaintiffs' Experts, Exh. 15. A copy of Dr. Radford's deposition testimony may be found in Vol. X, Exh. 36 ("Radford Dep.").

**Scope of Expected Testimony:**

The scope of Dr. Radford's expected testimony is set forth in his expert report and his deposition. It is described briefly below:

Dr. Radford is expected to testify about the relationship between radioactive contaminants, and other hazardous substances, released from the Rocky Flats Plant and increased risks of cancer and other diseases in the exposed off-site population.

**1. Causation and Cancer Mechanisms.** Dr. Radford is expected to testify that exposure to ionizing radiation of the type released from Rocky Flats can both initiate and promote the cancer disease process. *See* Radford Rep. at 7-11.

**2. Physical and Chemical Characteristics of Plutonium-239 and Other Hazardous Substances Released From Rocky Flats.** As part of his testimony, Dr. Radford is expected to characterize several of the hazardous radioactive and non-radioactive chemicals emitted from Rocky Flats, and describe the harmful biological effects of exposure to each of them. *Id.* at 11-26.

**3. Risks of Cancer From Radiation Exposure.** Dr. Radford is expected to testify about the nature and extent of the health risks associated with exposures to the radionuclides (and beryllium) released from Rocky Flats. *Id.* at 26-40. He is expected to testify further that "radiation effects are directly proportional to the dose of radiation exposure," and that radiation can cause cancer down to the lowest doses. *Id.* at 31. He is also expected to testify that plutonium exposures may effect certain bodily organs, such as the lung, liver and bone, more than others. *Id.* at 40-62.

37

**4. Cancer Susceptibility.** Dr. Radford is expected to testify that due to genetic and other differences, individuals have varying susceptibilities to carcinogens such as radiation and beryllium, with some individuals 25 to 100 times more sensitive to environmental carcinogens than average. *Id.* at 62.

### K. Shawn Smallwood, Ph. D.

Dr. Smallwood is expected to testify in person at trial. He resides in Davis, California. He authored one expert report in connection with this litigation: *Soil Bioturbation and Wind Affect Fate of Hazardous Materials that were Released at the Rocky Flats Plant, Colorado*, dated Nov. 23, 1996 ("Smallwood Rep.").

A copy of this report may be found in Vol. VII of the exhibits to Plaintiffs' Response to Defendants' Motion to Strike Plaintiffs' Experts, at Exh. 18. A copy of Dr. Smallwood's deposition testimony may be found in Vol. X, Exh. 40.

### Scope of Expected Testimony:

The Scope of Dr. Smallwood's expected testimony is set forth in his expert report and his deposition testimony. It is described briefly below:

**1. The Role of Biological Activity In Moving Hazardous Substances Off-Site.** Dr. Smallwood, a systems ecologist, specializing in wildlife, ecosystem and landscape ecology, is expected to testify about a study he performed evaluating the role of bioturbation – soil turnover due to biological activity – in exposing soil contaminants to winds at the Rocky Flats site. He is expected to testify, based on his study, that substantial quantities of the hazardous materials Dow and Rockwell spilled, buried, dumped, and released at the Rocky Flats site were exposed to winds by burrowing animals and other biological phenomena, and subsequently entrained by winds and

38

moved off-site. *See* Smallwood Rep. at 29-44, 45-47. He is expected to testify further that due to bioturbation, and the poor waste management practices of the Plant's former operators, residents downwind of the Rocky Flats Plant can expect a continued chronic resuspension of hazardous contaminants, including plutonium, to settle on their properties for many years to come. *Id.* at 48-49.

**2. Observations of Continued Biological Activity at Rocky Flats.** Dr. Smallwood is expected to testify about observations he made as a result of his study of the Rocky Flats Plant and surrounding environs. *Id.* at 3-14. He is expected to testify, for instance, that: burrowing animals were abundant on the shorelines of dried out pond beds loosening soils historically contaminated with plutonium and other hazardous substances;[5] animal burrowing, and harvester and honey ant mounds, occurred all around the perimeter of the 903 Pad, which is the acknowledged source of a large percentage of the plutonium historically released from the Plant into the off-site environs;[6] there was extensive burrowing underneath the "protective" asphalt cover on the 903 Pad; foraging animals had denuded of vegetation and loosened much of the ground surface of the 903 Lip Area;[7] and cracks were developing across the entire expanse of the asphalt pad through which sizable plants were sticking through.[8]

**3. Review of Waste Disposal History at Rocky Flats.** Dr. Smallwood is expected to testify regarding his review of a vast array of documentation on historical contaminant releases and burials,

---

[5]     *Id.* at 5.

[6]     *Id.* at 8-9.

[7]     *Id.* at 9.

[8]     *Id.* at 9.

and on the physical and biological characteristics of the Rocky Flats Plant and surrounding environs. *See* Smallwood Rep. at 14.

**4. Annual Soil Turnover Rate.** Dr. Smallwood is also expected to testify regarding the annual soil turnover rate at Rocky Flats, the percentage of the ground covered by excavated soils, and the loss of control by the Rocky Flats operators over the contaminants stored and buried at the site.

**5. Environmental Surveillance and Monitoring at Rocky Flats.** Dr. Smallwood is expected to testify further that the Rocky Flats Plant's ambient environmental monitoring system was inadequate to measure the chronic releases of hazardous substances from the Plant caused by biological activity. *Id.* at 25-28. He is expected to testify specifically that the ambient air monitoring stations on and off the Plant site were poorly positioned in terms of height and spacing, and insufficiently numerous to detect the past and continuing chronic releases of contaminants.[9]

**6. Conclusions of Dr. Smallwood's Study.** Dr. Smallwood will testify regarding the following conclusions of his study:

    a)    the process of bioturbation threatens the structural integrity of buried waste trenches and landfills, permitting the buried waste to come to the surface;[10]

    b)    all contaminated materials that spilled, leaked, or were buried on-site at the Rocky Flats Plant can be subject to soil bioturbation and wind entrainment, and are thus available for dispersion off-site;[11]

---

[9]    *See* Smallwood Dep. at 64:1-5; 69:7-70:2; 225:6-12; 228:2-22. *See also* Smallwood Rep. at 25-28.

[10]    *See* Smallwood Rep. at 3-14.

[11]    *See* Smallwood Dep. at 205:3-206:16.

    c)      the suspended and resuspended plutonium and other chemicals pose a significant risk of respiration and ingestion by nearby inhabitants as borne out by local animal sampling showing ingestion and uptake of plutonium;[12]

    d)      Dow and Rockwell failed to account for the impacts and effects of bioturbation in their waste management practices and policies;[13] and,

    e)      chronic releases of plutonium and other contaminants will accelerate into the future, posing a continuing risk of exposure to off-site residents.[14]

**B.**    **Defendants' Experts.**

Until the issues to be tried are defined, there is no reasonable manner by which defendants can list which experts they will need at trial. The proceeding thirty pages submitted by plaintiffs – listing fifteen different experts – underscore the need to resolve now the issues to be tried. To cite just one example, Chief Judge Matsch questioned why *any* conduct evidence would be pertinent to a trial on the class property claims (*see* 6/25/00 Hrg. at 39-41).[15]

Defendants believe that most experts listed by plaintiffs are unnecessary and irrelevant to a class-wide property trial, as is set forth at pages 31-40 of defendants' July 30, 1999 submission (docket number 1137) in response to Judge Matsch's requests on that issue. The Court may be better able to determine whether plaintiffs' experts' proffered testimony is relevant to the issues to be tried once those issues are defined.

---

[12]      *See* Smallwood Rep. at 48-49.

[13]      *See* Smallwood Rep. at 14.

[14]      *See* Smallwood Rep. at 48-49.

[15]Three years ago, defendants moved to strike all plaintiffs' so-called experts who propose to testify as to "conduct" for reasons fully explained in previous submissions.

Pursuant to the Court's request, defendants list those experts who could possibly be called, without waiving any rights to amend this disclosure once the Court determines the trial issues. Until the issues to be tried are defined and plaintiffs' expert testimony is appropriately limited, defendants are in no position to limit further their proffered expert testimony.

- **Daniel L. McFadden, Ph.D.** - Property Damage; Use and Enjoyment; Real Estate Values and Valuation; Statute of Limitations; Multiple Regression Analysis; Statistical and Mathematical Methodologies; Plaintiffs' Experts and their Methods and Opinions.

- **Kenneth T. Wise, Ph.D.** - Property Damage; Use and Enjoyment; Real Estate Values and Valuation; Statue of Limitations; Validity, Reliability and Application of Multiple Regression Analysis; Plaintiffs' Experts and their Methods and Opinions.

- **John D. Dorchester, Jr. MAI, CRE** - Property Damage; Use and Enjoyment; Real Estate Values and Valuation; Property Development and Trends; Statute of Limitations; Plaintiffs' Experts and their Methods and Opinions.

- **William E. Wecker, Ph.D./ Laurentius Marais, Ph.D.** - Multiple Regression Analysis; Property Damage; Statistical and Mathematical Methodologies; Compliance with Standards; Plaintiffs' Experts and their Methods and Opinions.

- **Ralph d'Arge, Ph.D.** - Property Damage; Use and Enjoyment; Public Opinion Surveys; Analogous Case Studies; Multiple Regression Analysis; Diminution in Property Value; Decision Research Survey; Plaintiffs' Experts and their Methods and Opinions.

- **Daniel Kahneman, Ph.D.** - Property Damage; Use and Enjoyment; Public Opinion Surveys; Decision Research Survey; Diminution in Property Value; Plaintiffs' Experts and their Methods and Opinions.

- **Daniel M. Conway** - Property Damage; Use and Enjoyment; Real Estate Values and Valuation; Property Development and Trends; Undeveloped Property; Commercial Property; Statute of Limitations; Plaintiffs' Experts and their Methods and Opinions.

- **Laurie Van Court, MAI** - Property Damage; Use and Enjoyment; Statute of Limitations; Economic Benefit of Rocky Flats; Diminution in Property Value; Property Value and Valuation; Plaintiffs' Experts and their Methods and Opinions.

- **Geneva Austin Smart, SRA** - Property Damage; Use and Enjoyment; Statute of Limitations; Economic Benefit of Rocky Flats; Diminution in Property Value; Property Value and Valuation; Plaintiffs' Experts and their Methods and Opinions.

- **Bonnie D. Roerig, MAI** - Appraisal Methodology and Standards; Plaintiffs' Experts and their Methods and Opinions.

- **F. Ward Whicker, Ph.D.** - Deposition, Concentration and Transport of Radionuclides in the Environment/Biosphere Surrounding Rocky Flats; Analysis of Soil, Sediment and Other Sampling in the Rocky Flats Area; Compliance with Standards; Health Physics; Background; Physical Intrusion; Use and Enjoyment; Exposure; Dose; Risk; Radioecology; Statute of Limitations; Industry Standards/State-of-the-art; Environmental Monitoring; Plaintiffs' Experts and their Methods and Opinions.

- **John A, Auxier, Ph.D, CHP/John R. Frazier, Ph.D.**[16] - Radiation; Dose; Dosimetry; Background; Exposure; Compliance with Standards; Risk; Health Effects; Health Physics; Environmental Monitoring; Use and Enjoyment; Physical Intrusion; Statute of Limitations; Industry Standards/State-of-the-art; Plaintiffs' Experts and their Methods and Opinions.

- **Otto G. Raabe, Ph.D., CHP** - Radiation; Radioactivity; Plutonium; Exposure; Dosimetry; Dose; Metabolism; Risk; Health Effects; Health Physics; Environmental Transport and Fate of Radionuclides; Background; Toxicology; Compliance with Standards; Statute of Limitations; Industry Standards/State-of-the-art; Plaintiffs' Experts and their Methods and Opinions.

- **Geoffrey R. Howe, Ph.D.** - Epidemiology; Exposure; Dose; Risk; Health Effects; Use and Enjoyment; Statute of Limitations; Plaintiffs' Experts and their Methods and Opinions.

- **Fred A. Mettler, Jr., M.D., M.P.H.** - Exposure; Dose; Dosimetry; Background; Biological Plausibility; Health Effects; Health Physics; Epidemiology; Risk; Use and Enjoyment; Compliance with Standards; Statute of Limitation; Plaintiffs' Experts and their Methods and Opinions.

- **Joseph V. Rodricks, Ph.D.** - Non-Radioactive Hazardous Chemicals; Toxicology; Risk Assessment; Environmental Transport and Fate of Chemicals; Exposure; Risk; Dose; Health Effects; Physical Intrusion; Use and Enjoyment; Industry Standards/State-of-the-art; Plaintiffs' Experts and their Methods and Opinions.

- **Frank J. Blaha, M.S., P.E.** - Waste Management; Industry Standards/State-of-the-art; Radioactive Materials Management; Environmental Monitoring; Industry Standards for Environmental Monitoring; Physical Intrusion; Remediation; Surface Water and Groundwater; Regulatory Requirements; Hydrogeology; Surface Water and Groundwater; Regulatory Requirements; Hydrogeology; Plant Topography; Potential for Offsite Migration

---

[16]Defendants have health concerns with Dr. Auxier, as explained previously. Dr. Frazier – Dr. Auxier's long-time partner – would adopt Dr. Auxier's existing report.

43

of Contaminants; "Future" Risk; Use and Enjoyment; Statute of Limitations; Compliance with Standards; Plaintiffs' Experts and their Methods and Opinions.

- **Edward A. Putzier, CHP** - Radionuclide Air Effluent Control; Air Cleaning; Air Monitoring; Compliance with Standards; Exposure; Risk; Use and Enjoyment; Health Physics; Statute of Limitations; Industry Standards/State-of-the-art; Governmental Privilege; Public Necessity; Plaintiffs' Experts and their Methods and Opinions.

- **Richard G. Hewlett, Ph.D.** - History of AEC/ERDA/DOE; Development of the weapons complex, including Rocky Flats; Sovereign Immunity; Governmental Privilege; Public Necessity; Discretionary Function; Plaintiffs' Experts and their Methods and Opinions.

- **Chris G. Whipple, Ph.D.** - Risk and "Future Risk;" Risk Assessment Methodologies; Waste Management; Property Damage; Use and Enjoyment; Industry Standards/State-of-the-art; Plaintiffs' Experts and their Methods and Opinions.

- **James E. Martin, Ph.D., CHP** - Containment of Radioactivity, Radioactive Materials, Beryllium, and Effluent Air; Radioactive Effluent Monitoring; Beryllium Monitoring; Air Sampling; Air Cleaning Systems; Compliance with Standards; Use and Enjoyment; Industry Standards/State-of-the-art; Plaintiffs' Experts and their Methods and Opinions.

Dated: December 27, 2000                    Respectfully submitted,

_____                    _____
Counsel for Plaintiffs                      Counsel for Defendants

Merrill G. Davidoff                         David M. Bernick, P.C.
Peter Nordberg                              Douglas J. Kurtenbach
David F. Sorensen                           Thomas E. Dutton
Eric L. Cramer                                   KIRKLAND & ELLIS
BERGER & MONTAGUE, P.C.                      200 East Randolph Drive
1622 Locust St.                             Chicago, Illinois 60601
Philadelphia, PA 19103                      312/861-2000
215-875-3000

Bruce H. DeBoskey                           Joseph J. Bronesky
Steven W. Kelly                             Christopher Lane
SILVER & DEBOSKEY, P.C.                      SHERMAN & HOWARD LLC
1801 York St.                               633 17th Street
Denver CO 80206                             Suite 3000
303-399-3000                                Denver, Colorado 80202
                                            303/297-2900

Stanley Chesley
WAITE, SCHNEIDER, BAYLESS & CHESLEY
Central Trust Tower, Suite 1513
Cincinnati, Ohio 45202

Additional Counsel:

Kenneth Jacobsen
Law Offices of Kenneth A. Jacobsen
22 W. Front Street
Media PA 19063

Ronald Simon
Simon & Assoc.
1742 N. Street N.W.
Washington DC 20036

Dated: December 22, 2000

Respectfully submitted,

_____
Counsel for Plaintiffs

_____
Counsel for Defendants

Merrill G. Davidoff
Peter Nordberg
David F. Sorensen
Eric L. Cramer
BERGER & MONTAGUE, P.C.
1622 Locust St.
Philadelphia, PA 19103
215-875-3000

David M. Bernick, P.C.
Douglas J. Kurtenbach
Thomas E. Dutton
KIRKLAND & ELLIS
200 East Randolph Drive
Chicago, Illinois 60601
312/861-2000

Bruce H. DeBoskey
Steven W. Kelly
SILVER & DEBOSKEY, P.C.
1801 York St.
Denver CO 80206
303-399-3000

Joseph J. Bronesky
Christopher Lane
SHERMAN & HOWARD LLC
633 17th Street
Suite 3000
Denver, Colorado 80202
303/297-2900

Stanley Chesley
WAITE, SCHNEIDER, BAYLESS & CHESLEY
Central Trust Tower, Suite 1513
Cincinnati, Ohio 45202

Additional Counsel:

Kenneth Jacobsen
Law Offices of Kenneth A. Jacobsen
22 W. Front Street
Media PA 19063

Ronald Simon
Simon & Assoc.
1742 N. Street N.W.
Washington DC 20036