**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 90-cv-00181-JLK

MERILYN COOK, *et al.*,

      Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION
and THE DOW CHEMICAL COMPANY,

      Defendants.

---

**DEFENDANTS' AMENDED PROFFER OF TESTIMONY FOR PAUL VOILLEQUÉ**
**AND MOTION FOR RECONSIDERATION OF COURT'S ORDER STRIKING**
**TESTIMONY OF PAUL VOILLEQUÉ**

---

Defendants have read and understand the Court's January 2, 2006 Order on Motion to Exclude Testimony of Voillequé and Grogan. That ruling, however, reflects a fundamental misunderstanding that Mr. Voillequé's proposed testimony is expert opinion testimony. It is not. Rather, Mr. Voillequé would testify to and explain what he personally did to investigate two issues – the potential use of material unaccounted for ("MUF") to estimate releases of plutonium from Rocky Flats and the amount of plutonium burned and released from Building 71 during the 1957 fire. In giving this testimony, Mr. Voillequé (just like Dr. Biggs and Dr. Selbin) would explain the facts of ***what he did*** in performing his investigation and ***what RAC found*** during its investigation. This work bears ***centrally*** on the ***facts*** relating to MUF, the ***facts*** relating to access to classified information, and the ***facts*** relating to the 1957 fire.

This work that Mr. Voillequé performed has been known publicly since at least 1999, when RAC issued its reports, and even earlier in the 1990s, when Mr. Voillequé made presentations on his ongoing investigations to the Health Advisory Panel and the public. The basic facts are set out in three documents, all of which have been ***admitted*** into evidence:

- DX-514, *Estimated Airborne Releases of Plutonium during the 1957 Fire in Building 71*, August 1999, RAC Report No. 10-CDPHE-RFP-1999-Final (the "1957 Fire Source Term Report").

- PX-10, L. Zodtner and R. Rogers, *Study of Unaccounted for Plutonium Losses*, January 6, 1964 ( the "Rogers Report").

- DX-534, *Technical Summary Report for the Historical Public Exposures Studies for Rocky Flats Phase II*, September 1999, RAC Report No. 14-CDPHE-RFP-1999-Final (the "Technical Summary Report").

Mr. Voillequé also will offer a fifth document – his declassified notes. (DX-4101 and DX-4102, attached hereto as Exhibit A.)

The explanatory testimony about the facts of Mr. Voillequé's investigation that defendants propose to elicit from Mr. Voillequé at trial is neither expert opinion nor lay opinion testimony. Rather, because Mr. Voillequé has direct personal knowledge of what he did and what RAC found based on his own investigation of MUF and the 1957 fire, his proposed testimony is that of a fact witness and is admissible under Fed. R. Evid. 601 and 602. Below, defendants identify in more detail specifically what Mr. Voillequé did to investigate the potential use of MUF to calculate plutonium releases and to investigate releases from the 1957 fire and the conclusions that Mr. Voillequé and RAC reached based on Mr. Voillequé's investigation. These are all historical ***facts***. In light of the information presented below, defendants request that the Court reconsider its ruling excluding Mr. Voillequé's testimony and that it permit Mr. Voillequé

to testify to the facts presented in this amended proffer and in the exhibits attached as Exhibit B

(DX-2104- DX-2108) summarizing those facts.

**PROFFER**

I.     **FROM 1993-1995, RAC INVESTIGATED WHETHER MUF CAN BE USED TO ESTIMATE OFF-SITE RELEASE.**

- RAC investigated the use of plutonium inventory accountability data to evaluate its usefulness in estimating the amount of plutonium released offsite.  (DX-514, at B-3.)

- RAC did not limit its review to plant-wide accountability data, but rather, searched for, located, and reviewed accountability data relating to the room in which the 1957 fire occurred, Room 180 of Building 170.  (DX-514)

- RAC reviewed records for the plutonium loss for the 1957 fire in monthly accountability reports prepared between the time of the fire and the completion of the final cleanup of Room 180 several years later.  Mr. Voillequé took notes of the relevant information in various of these materials, including the accountability reports, to conduct the mass balance analysis.  (*Id.*)

- RAC requested and obtained declassification of all portions of classified documents necessary to its investigation of the mass balance approach.  (*Id.*) RAC requested declassification of Mr. Voillequé's notes used in his preparation of DX-514, some of which were requested for declassification in 1993, but which were not declassified by DOE until 1995.  (DX-4101 and DX-4102, attached as Exhibit A hereto.)

- RAC used only declassified information in its investigation of the mass balance approach and in its determination of the source term for the 1957 fire.  This declassified information has been available to the public.

- RAC also reviewed information declassified in 1994 as part of the Openness Initiative announced by the Secretary of Energy, which included declassified information regarding the plutonium accounting for the 1957 fire, together with information on plant inventory differences at Rocky Flats.  (DX-514)

II.     **RAC DETERMINED IN 1995 THAT THE 6 KG OF MUF REPORTED IN CONNECTION WITH THE 1957 FIRE COULD NOT BE USED AS A BASIS FOR ESTIMATING OFF-SITE RELEASE.**

   A.   **RAC concluded that estimates of plutonium in waste were substantially understated and, therefore, MUF was overstated.**

- Zodtner and Rogers investigated "Unaccounted For" plutonium losses in 1963, and issued a report dated January 6, 1964. (PX 10)  As part of their investigation into the 1957 fire, RAC requested and obtained a declassified copy of this report. (DX-514)

- The Rogers Report contains a building-specific, area-specific, event-specific MUF calculation relating to the 1957 fire.  It estimates that approximately 6 kg of Pu was "unaccounted for" from Room 180 of Building 71 following the 1957 fire. (PX 10)

- The Rogers Report acknowledges that the "measuring and sampling of these wastes is a difficult problem," and that "the record shows that the credit taken for measured discards has been inadequate."  (PX 10, at 1001.)  The Rogers Report's estimate of the MUF from the 1957 fire understates the amount of plutonium removed from Room 180 in the form of waste.  (DX-514)    Specifically, the Rogers Report estimates that only 2.3 kg of plutonium had been shipped out of Room 180 in "measured discards," wastes that are actually measured and assayed for plutonium content when transferred to another building.  (*Id.*)

- RAC found that, subsequent to the Rogers Report, additional more accurate instrumentation was developed and used to better measure the quantity of plutonium in waste.  For example, a few years after the Rogers & Zodtner report, the barrel counter was introduced and used to analyze approximately eighty (80) percent of the drums of plutonium shipped from Buildings 71, 74, 76, and 77. (DX-514, at A-6.)   Other more accurate technologies developed in subsequent years, including the drum counter, the helix counter, the calorimeter, and high-resolution gamma ray spectroscopy.  Also, additional more serious attempts to measure the amounts of plutonium in drums and boxes of solid wastes that were shipped to Idaho began after the Rogers Report.  (*Id.*)

- RAC found that investigations subsequent to the 1964 Rogers Report determined that there were substantially higher amounts of plutonium in buried waste shipped to Idaho than had previously been thought (and therefore had previously been considered as "unaccounted for" plutonium).  (DX-514, at A-5 to A-6.)

- For example, in 1971 Dow estimated that approximately 17 kg of plutonium had been shipped to Idaho in waste for the period 1954-1959.  A study conducted in 1994 by the Idaho National Engineering Laboratory concluded that approximately

162 kg of plutonium had in fact been shipped to Idaho as buried waste -- an almost **ten-fold increase** from the 1971 estimate.  (DX-514, at A-5.)

▪ For the period from 1954-1961, Dow estimated in 1971 that approximately 27 kg of plutonium had been shipped in waste to Idaho.  Subsequent measurements resulted in a revised estimate in 1994 by INEL of 297 kg -- an **11-fold increase** from the 1971 estimate.  (*Id.*)

▪ RAC concluded, like Zodtner and Rogers, that the amounts of plutonium removed in solid wastes were substantially underestimated.  This also applies to the measured discard reported by Zodtner and Rogers for the 1957 fire.

▪ Therefore, RAC concluded that much of the reported Rocky Flats MUF, including much of the 6 kg of "unaccounted for" plutonium reported by the Rogers Report, was likely contained in waste sent for burial in Idaho.

**B.     Rather Than Rely On "Material Unaccounted For" Estimates, RAC Calculated The Amount Of Plutonium Burned And Released In The 1957 Fire Using More Direct Data.**

• By examining contemporaneous and subsequent reports of the fire in Building 71 and processing and maintenance operations both before and after the fire, and by reviewing the transcripts of interviews conducted with Rocky Flats employees present during the fire, Mr. Voillequé attempted to calculate all likely inputs to the total amount of plutonium that was burned in the fire.  Then, by applying empirically determined airborne release fractions, Mr. Voillequé calculated the range of the total amount of plutonium that most likely was released (the "source term") from Building 71 during the fire.  All of these calculations are set forth in DX-514, the 1957 Fire Source Term Report that Mr. Voillequé prepared for RAC in 1999.

• *First*, Mr. Voillequé determined the likely amount of plutonium present in Building 71 that would have been involved in the fire.  He obtained these amounts by examining historical accountability and fire investigation reports of the amount of plutonium present in Room 180.  Mr. Voillequé also examined records pertaining to plutonium air concentrations, the air flow rates through the Building 71 ventilation system, and the filter efficiencies to calculate the amount of plutonium that most likely had collected on air filters and in the gloveboxes and ventilation lines.  From the historical records and interviews, Voillequé estimated the following amounts and uncertainty distributions:

▪ Plutonium in organic liquids:  1.7 kg. (1.0-2.4 kg.)
▪ Plutonium metal pieces and components:  12 kg. (9-16 kg.)
▪ Plutonium dioxide in can:  2.6 kg. (2.5-2.7 kg.)

5

- ▪ Plutonium collected in glovebox outlet filters that burned:  0.050 kg.
- ▪ Plutonium collected on Plexiglas glovebox walls: 0.025 kg. (0.012-0.050 kg.)
- ▪ Plutonium collected in glovebox exhaust lines: 0.025 kg. (0.012-0.050 kg.)
- ▪ Plutonium collected on booster system filters:  0.033 kg. (GM 1.5, GSD 1.6)
- ▪ Plutonium collected on main plenum filters:  0.17 kg. (GM 1.5, GSD 1.9)

(*See* DX-514, Table 3.6.)

- • ***Next***, Mr. Voillequé applied empirically determined airborne release fractions to the amounts of plutonium that were burned in the fire to determine the quantity of plutonium that actually was released to the atmosphere.  As was demonstrated in the experiments that resulted in the airborne release fractions that Mr. Voillequé used, when plutonium metal burns, only a fraction of that material actually is released to the air.  Based on the possible range of temperatures involved in the fire and the type of plutonium and other material involved, Mr. Voillequé determined that the following airborne release fractions and uncertainty distributions should be applied:

- ▪ Plutonium in organic liquids:  0.06 (0.02-0.1)
- ▪ Plutonium metal pieces and components:
  - ▪ Temperature below melting point (640 degrees Celsius): $1.3 \times 10^{-6}$ $(0.6\text{-}2 \times 10^{-6})$.
  - ▪ Temperature above melting point (640 degrees Celsius): $2.0 \times 10^{-4}$ $(0.02\text{-}2 \times 10^{-3})$.
  - ▪ Dynamic, *u* greater than 1.5 m/s:  $5 \times 10^{-4}$ $(0.25\text{-}0.75 \times 10^{-3})$.
  - ▪ Vigorous, temperature greater than 1500 degrees Celsius: 0.1 (0.05-0.15).
- ▪ Plutonium dioxide in can: $3 \times 10^{-3}$ $(0.3\text{-}6 \times 10^{-3})$.
- ▪ Plutonium collected in glovebox outlet filters that burned:  0.28 (0.24-0.32).
- ▪ Plutonium collected on Plexiglas glovebox walls:  0.035 (0.02-0.05).
- ▪ Plutonium collected in glovebox exhaust lines: $3 \times 10^{-5}$ $(1\text{-}5 \times 10^{-5})$.
- ▪ Plutonium collected by room air duct prefilters that burned: 0.45 (0.4-0.5).
- ▪ Plutonium collected on booster system filters: 0.45 (0.4-0.5), 0.15 (0.1-0.2).
- ▪ Plutonium collected on main plenum filters, burning: 0.008 (0.005-0.01).
- ▪ Plutonium collected on main plenum filters, deflagration: 0.01 (0.05-0.015).

(*See* DX-514, Table 4.1.)

- ***Finally***, by multiplying the amounts of plutonium calculated to have been burned by the fire and the applicable airborne release fractions, Mr. Voille/qué calculated the ranges of the largest releases of plutonium that were released by the fire:

  - Plutonium in burning organic liquids:  0.020-0.240 kg.
  - Plutonium metal oxidation category:
    - Temperature below melting point (640 degrees Celsius): 0.0000014-0.000008 kg.
    - Temperature above melting point (640 degrees Celsius): 0.000000045-0.000008 kg.
    - Dynamic, *u* greater than 1.5 m/s:  0.00056-0.0017 kg.
    - Vigorous, temperature greater than 1500 degrees Celsius: 0.11-0.34 kg.
  - Plutonium dioxide in can: 0.00075-0.016 kg.

  (*See* 1957 Fire Source Term Report, Table 5.1.)

- Mr. Voilleuqué was cross-examined extensively at his deposition about his methodology and the specific tables in his report that set forth his estimates of the source terms.  (Dep. at 225-233, 239-264.)

## C.    RAC Determined That Its 1957 Fire Release Estimates Are Reasonable When Compared To Environmental Data.

- RAC validated its estimates of the amount of plutonium released from Rocky Flats, including Mr. Voilleuqué's calculated releases from the 1957 fire, by using environmental sampling data collected from the 1950s through the 1990s.  Among the environmental sampling data that RAC used to validate its release calculations are soil sampling data, air sampling data, vegetation data, and lake sediment data.  (DX-534, at 36-45.)   By comparing its calculations of Rocky Flats releases to measured environmental data, RAC concluded that the model-predicted values are generally in good agreement with estimates of other researchers, including Krey & Hardy and Poet & Martell.  (*Id.* at 40.)

- Examining the soil sampling data, RAC concluded that the total amount of plutonium that it calculated was deposited in soil throughout the RAC model domain from all events, including the 1957 fire, was within a factor of two of the estimates made by other researchers whose studies RAC examined of the total plutonium inventory deposited in soil from Rocky Flats releases. (DX-534, at 40.)

- Other data sets, the vegetation monitoring data set in particular, suggested that RAC's 1957 fire source term overestimates actual releases to the environment.  (DX-534, at 44-45.)

7

Dated:  January 4, 2006                          Respectfully submitted,


                                                 s/ John E. Tangren_____
                                                 One of the Attorneys for the Defendants
                                                 David M. Bernick
                                                 Douglas J. Kurtenbach
                                                 Ellen Therese Ahern
                                                 Mark J. Nomellini
                                                 John E. Tangren
                                                 KIRKLAND & ELLIS LLP
                                                 200 East Randolph Drive
                                                 Chicago, Illinois 60601-6636
                                                 Phone:  312-861-2000
                                                 Fax:      312-861-2200

                                                 Joseph J. Bronesky
                                                 SHERMAN & HOWARD L.L.C.
                                                 633 Seventeenth Street, Suite 3000
                                                 Denver, Colorado 80202
                                                 Phone:  303-297-2900
                                                 Fax:      303-298-0940

                                                 Attorneys for ROCKWELL
                                                 INTERNATIONAL CORPORATION and
                                                 THE DOW CHEMICAL COMPANY

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 4 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses for the following:

Peter B. Nordberg, Esq.
c/o Karen M. Markert
Apartments at Denver Place, Apt. 2812
1880 Arapahoe Street
Denver, CO 80202
pnordberg@bm.net
kmarkert@bm.net

Gary B. Blum, Esq.
SILVER & DEBOSKEY
The Smith Mansion
1801 York Street
Denver, Colorado 80206
blumg@s-d.com

s/ Kari Knudsen_____
Kari Knudsen (legal assistant)