# EXHIBIT 9

**United States District Court
for the District of Colorado**

**Case No. 90-K-181**

**Merilyn Cook, et al.**

**v.**

**Rockwell International Corporation,
a Delaware Corporation; and**

**The Dow Chemical Company,
a Delaware Corporation**

---

**Supplemental Expert Report of**

**Ralph C. d'Arge**

**March 18, 1997**

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

## I.    INTRODUCTION AND SUMMARY

I have been asked to prepare a supplemental report commenting on two of the approaches used by plaintiffs' experts to establish or quantify property value diminution in the "Class Area." The first part of this report (Sections II–VII) discusses these experts' interpretation of an "opinion survey" commissioned by the plaintiffs for this case. The second part of this report (Sections VIII–XI) discusses these experts' use of "analogous case studies." Based on my ongoing review[1] of the plaintiffs' expert reports and the material underlying their studies that I have received to date, I have reached the following conclusions:

- Data developed from a public opinion survey (even when the survey is properly designed and interpreted) are always less reliable indicators of market value than actual market transactions. The use of such a survey to manufacture data when ample market data are available, as is true for the area around Rocky Flats, is inappropriate and would not generally be accepted in the economics profession.

- The opinion survey conducted by the University of Maryland cannot be used as a reliable indicator of the existence or extent of any diminution in the market value of property caused by the Rocky Flats Plant.

  — *First*, for a valuation survey to have any meaning, it must be constructed so that the survey respondents have a common and complete understanding of what they are valuing. In the Decision Research Survey, the commodity being valued is so insufficiently defined that it is likely that decisions or perceptions wholly unrelated to Rocky Flats will influence the resulting economic values. This problem is exacerbated by the structure of the

---

[1] In addition to the opinions expressed herein, I intend to conduct additional analyses of the plaintiffs' claims concerning property value diminution as additional information is received from the plaintiffs about their experts' analyses. Significant information has yet to be received, or was received so recently that it was not possible to incorporate it into this report.

1

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

questions asked and their sequence. As a result, the survey is not only unreliable, it is also biased.

— *Second*, the Decision Research Survey was conducted without any apparent consideration of the *extensive* literature on the use of survey methodologies or the contingent valuation methodology (CVM), or the well-defined guidelines on the design of such surveys. The survey does not comply with many of the 1993 guidelines established by the Blue Ribbon Panel convened by the National Oceanic and Atmospheric Agency (NOAA) (see NOAA, 1993). Nor does it follow a number of important standards and practices that any such study would have to follow in order to generally be considered reliable in the economics profession.

• The opinion survey does not provide the basis for linking any diminution in the market value of property to any specific conduct by the defendants.

• The opinion survey does not provide a basis for establishing any point in time when the market value of properties within the Class Area were diminished relative to any other point in time.

• The transfer of values from studies done for one area of the country to studies done in a geographically and demographically different area is an inherently unreliable process.

• All but three of the case studies identified by Hunsperger and Clayton do not satisfy their own criteria for identifying and comparing analogous case studies. The three remaining studies were all conducted in the state of Ohio and none have been subjected to peer review through publication in scientific journals.

2

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

- None of the three Ohio case studies provide useful or reliable information for assessing the actual market reactions of property values within the Class Area to Rocky Flats.

## II.   WHEN IS A CONTINGENT VALUATION SURVEY NEEDED?

Contingent valuation (CV) evolved as a measurement technique for assessing economic values where well defined markets and market prices for commodities did not exist. Early applications attempted to estimate values for non-market commodities such as public hiking trails in Maine, Los Angeles smog, atmospheric visibility in the Southwest, publicly treasured resources and preservation of unique biological species. CV was never designed to estimate market values or prices for commodities bought and sold in markets.

Real market prices and demand and supply should be used to value economic gains and losses occurring in real markets. Synthetic or hypothetical markets developed through CV can never provide estimates of gains or losses as accurately or completely as real market transactions and data. By definition, hypothetical market studies will not include the structure or data that real markets contain. CV, at best, is a very rough approximation. Studies of real market values versus CV estimates have shown consistently that CV values are biased (generally upward), compared to real market values.

Since in this case real market data containing thousands of actual transactions exist, there is no reason to employ CV which by definition is an inferior and biased tool of analysis. In other words, there is no logical reason to use a CV survey for commodities purchased and sold in ordinary markets.

### A.   Materials Reviewed in Connection With This Report

I have reviewed the reports submitted by the plaintiffs' experts: Hunsperger and Clayton, Flynn, Slovic, Radke and Cochrane. In addition, I have reviewed the plaintiffs'

3

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

survey questionnaire and some of the underlying materials that Hunsperger and Clayton prepared. In addition, I referred to the articles and other materials cited in footnotes to this report, the materials listed at Tab 2 of this report, as well as the material cited in my report dated November 23, 1996.

## III.   OBSERVATIONS ON THE ROCKY FLATS QUESTIONNAIRE AND RESULTS

The authors of the survey documents in various places refer to the survey as a "public opinion survey," "Decision Research Survey" or "opinion survey." They do not identify it as a CV survey. However, Messrs. Hunsperger and Clayton (hereafter just Hunsperger), who commissioned the survey, provide references to "case studies" that do utilize CV. Hunsperger states further that those studies are indicative of the methodology commonly used in the profession. Since he states that the Decision Research Survey is consistent with commonly used methods, he must have intended a CV survey. Finally, the survey contains valuation questions of hypothetical or contingent situations so, by definition, it is a CV survey.

If the authors deny that Decision Research Survey is a CV survey then it allows them to conduct it utilizing only standards for general survey research. This is a reasonable conclusion. In such a case, the economic values elicited from respondents have no formal connection with market values and cannot be used to infer consumer or market losses or gains. The results are just numbers in response to hypothetical questions, without any particular meaning or significance.

Alternatively, the authors could admit that they were trying to conduct a CV survey. That is, they were trying to elicit hypothetical or contingent values that would emerge in real markets if those real markets existed. In this case, some meaning could be attached to the results if the survey was conducted under rigorously specified guidelines and protocols established by economic researchers for CV surveys. The authors cannot have it both ways. That is, they cannot postulate that the survey is nothing more than a public opinion survey, subject only to general survey guidelines,

4

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

and then use the resulting valuations as if they were derived from a legitimate CV survey. In what follows, the author's survey will be evaluated as a CV survey.

## IV.    DEFINITION OF THE COMMODITY

It has been recognized by researchers on the CVM that a precise and universally understood commodity needs to be identified to respondents so that they can make well-informed and rational responses. For example, an early study asked residents in Los Angeles how much they would pay for clean air. The question clearly did not identify a commodity that everyone would agree was the same commodity. Perceptions of the term "clean" vary widely along with what constitutes cleanliness of air. Some respondents might focus on health effects and others on visibility effects. Some may focus on local air quality while others would view it from a regional perspective. This led researchers in CVM to postulate that the economic commodity must be sufficiently defined and characterized so that all respondents have a common and complete understanding of its meaning and significance. (See Cummings, Brookshire & Schulze, 1986.) A second requirement is that respondents are bidding or otherwise revealing economic values on the same commodity. That is, CVM requires that everyone be considering for purchase, apples, and not apples or oranges, depending on the respondent. If respondents are bidding on different commodities there is no way of easily combining, aggregating or averaging their individual responses. (See Cummings, Brookshire & Schulze, 1986; or Mitchell & Carson, 1989.)

The commodity for Arvada-Westminster residents is defined by their responses to questions on the following topics:

1.    Overall impression of Rocky Flats.

2.    Desirability of location.

3.    Knowledge of Rocky Flats.

4.    Effect on property values.

5

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

For the non-residents of Arvada/Westminster, the commodity is defined by their responses to questions on the above four topics and their views on the value of adequate buffer zones from Rocky Flats (e.g., two to four miles, four to six miles). After a sequence of questions designed to lead the respondent to the conclusion that having a house near Rocky Flats is "less desirable," the respondent is asked to consider the following hypothetical situation:

> Suppose that after searching for some time, you have finally found a house that seems just right. This house is in the Arvada/Westminster area.

Would being near Rocky Flats make this house:

(1) considerably less desirable

(2) somewhat less desirable

(3) somewhat more desirable

(4) considerably more desirable

(5) or would it not make any difference one way or the other?

The interviewers then remove everyone who responded with (3) or (4), or all of the respondents who think that being near Rocky Flats would make the house "somewhat more desirable" or "considerably more desirable." Is this a check for rationality or the degree of persuasion employed by the interviewers in convincing respondents that Rocky Flats is "less desirable?"

Following this exclusion process, the respondent is reminded that the federal government does not permit homes within two miles and then is asked if they would buy the house "if it were 2 to 4 miles from Rocky Flats." With this amount of information, can the respondent make an informed choice? I very seriously doubt it as it depends on a large number of facts, perceptions and feelings of the individual respondent. For example, if the respondent had any doubts as to the federal government's reliability in making judgments on safety requirements or standards, they would probably answer "no." Apparently, about 16 percent responded "yes," placing a great deal of confidence in the federal government standards. What is troubling here is that the final value

6

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

estimates derived for the commodity depend critically on whether this percentage is 0, 16 or 50. Yet, the response rate is clearly dependent on different risk perceptions across different respondents that may be totally unrelated to Rocky Flats. A simple example will suffice to illustrate why. Hypothetically, if 84 percent of the sample had encountered direct evidence that airbags were unsafe for children even though the federal government had authorized their use, the 84 percent might have doubts on a two-mile limit, while 16 percent would not. The positive response rate of 16 percent to this question is observed but has nothing to do with Rocky Flats. From an economic perspective, the commodity is so insufficiently defined that perceptions or events totally unrelated to Rocky Flats influence the resulting economic values. Some respondents may be valuing the trustworthiness of the government rather than any contamination. This problem is induced by the structure and completeness of the questions asked as well as their sequence.

After excluding respondents who live in the area (25 percent), respondents who believe Rocky Flats causes the property to be "more desirable" (3 percent), and those who would buy within two to four miles without a discount (16 percent), the interviewer then asks the potential buyers if they would purchase a house four to six miles from Rocky Flats with a $5,000 or, if necessary, a $10,000 discount. The interviewer then asks if these price reductions could induce purchase at two to four miles if they would purchase at four to six miles. What is wrong with this process? First, the survey excludes about 45 percent of the original sample from the valuation questions—those who actually live in the immediate area. They have excluded all respondents who might have claimed to have had property damages. Valuations are only for respondents in the Denver metro area who have not been potentially damaged. In my opinion, it is a significant mistake or error by omission in conducting CVM surveys to ask the wrong group what their potential damages are. It violates protocols on proper context and commodity definition. The resulting values have absolutely no meaning in assessing any potential property value damages. Further, they have excluded valuations of all respondents who even after being subjected to a list of negative questions, believed that having Rocky Flats nearby was a positive feature of the location.

7

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

To illustrate the bias of such exclusion, consider the following hypothetical example. Fifty percent of the sample believes, because of high paying jobs, economic stability and other reasons, location near Rocky Flats is worth $10,000, while 50 percent believe that it is a negative and worth a $10,000 discount per house. The net effect on property values is to increase them by $10,000, if there are sufficient buyers. The calculated and fictitious effect on property values by exclusion of the respondents who believe that Rocky Flats is desirable, is to lower property values by $10,000.

There is no supporting evidence presented from focus groups, pre-tests of surveys or other means to justify the use of $5,000 and $10,000 deductions in property values. These numbers could have been $50 and $100, $500 and $1,000 or any other combination. CVM research has recognized a bias, often referred to as anchoring bias, associated with the arbitrary choice of these suggested amounts. (See Mitchell & Carson, 1989; Rowe, d'Arge & Brookshire, 1980.) The respondent might use the magnitude of the reduction to identify potential damages. This is called implied value cues later in the report. In other words, is it a $1,000-problem or a $10,000-problem? The survey suggests it is a $10,000-problem (or at least a $5,000-problem) and that is approximately the magnitude of the estimated damages. The amount suggested is approximately the amount ultimately arrived at as property value damages. Protocols in CVM require tests of sensitivity to these values. (See NOAA Panel, 1993; or Mitchell & Carson, 1989.) No evidence is provided for such tests or why these values ($5,000 or $10,000) were used in the first place. One can only conclude that the results are severely biased by the arbitrary choice of values utilized to characterize the commodity of choice.

A further problem with the commodity definition is the characterization of the house as one that "seems just right" or "right in every way." First, by definition, there may be no house in the Arvada-Westminster area that can be "just right" regardless of Rocky Flats. The "just right" house may need to be an "old house" or be of a particular era or structural design that is just not available in the Arvada-Westminster area. It might have to be on a creek, near specialized hospital facilities or schools or a shorter

8

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

commute to a particular Denver work area. These factors are not considered when assessing the responses of the Denver area residents, and by arbitrarily excluding from the survey those respondents who have at least partially answered these questions by "voting with their feet" and living in Arvada-Westminster.

A second problem is what is the interpretation of "just right." If it includes price, then the sequence of questions that follows makes little sense. The respondent has already included a discount in price for Rocky Flats if one is necessary and then is asked about a further discount. The phrase "just right" has different meanings to different people and may or may not involve price, loans, interest rates, appraisal values, etc. If the price is "just right," why do some respondents require further discounts? The point here is that "just right" has multiple meanings and can confuse the respondent when followed up by valuation questions. There is insufficient information in this phrase for the respondents to have a clear and unambiguous perception of the economic commodity. In consequence, the responses to location and valuation questions may be for different commodities.

## V.   EVALUATION OF THE CVM SURVEY
## FROM THE PERSPECTIVE OF THE NOAA PANEL CRITERIA

In 1992 in response to controversy arising in natural resource damage assessments associated with oil pollution, the National Oceanic and Atmospheric Administration (NOAA) appointed a Blue Ribbon Panel (NOAA Panel) of economists and others to assess the use of CVM in valuing losses.[2] The panel, co-chaired by two Nobel prize winning economists, provided guidelines that *any* CV study should adhere to if the study is to produce information useful in natural resource damage assessment. How does the Decision Research Survey score in terms of the criteria set forth by the NOAA Panel? I will answer this question by addressing each of the criteria in turn.

---

[2]   U.S. Department of Commerce, National Oceanic and Atmospheric Administration, Federal Register, January 15, 1993, Vol. 58, No. 10, 4601–4614, Appendix I: Report of the NOAA Panel on Contingent Valuation

9

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

### A.    Sample Type and Size

The sample type and sizes for the Arvada-Westminster and Denver area residents appear to be structured appropriately for a region-wide problem until one realizes that Denver residents outside of Arvada-Westminster are the only respondents to the valuation questions. As discussed above, this means that the survey sample and certain key questions were mismatched.

### B.    Minimize Non-Responses

Because of a lack of information on the characteristics of the Denver area sample, I am unable to evaluate the meaning of the reported response rates for the sample. I will reserve judgment on the response rate until I have access to information identifying the total population of recent and prospective house purchasers in the Denver metropolitan area.

### C.    Personal Interview

The NOAA Panel recommends the use of personal or face-to-face interviews. The Decision Research Survey utilized telephone interviews exclusively. Preliminary tests of the time to complete a useful survey indicate that at least 35 minutes is necessary and possibly 45 minutes per survey. Such a long and complicated survey may induce substantial biases in the respondent sample, including those associated with age, employment, earnings and wealth. Typically, respondents who will dutifully plod through the questionnaire are not a representative group. No tests for sample bias were presented by Decision Research for their survey. Thus, it is impossible to judge the adequacy of the sample in representing prospective buyers. In the questionnaire, no attempt was made to discover whether the prospective buyers had sufficient economic resources to *actually* purchase a house of a particular value. Thus, there are likely to be respondents who say they might be prospective buyers who cannot be because of financial limitations.

10

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

### D.      Pre-testing for Interviewer Effects

The NOAA Panel believes that interviewers may influence responses and so checks should be made for possible biases.   No information was provided by the University of Maryland that identifies formal checks of interviewer bias.  The sequence of questions in the questionnaire almost forces the respondent to reach or form negative conclusions about Rocky Flats prior to the valuation questions, including questions, including questions or comments on the following topics:

a)  Association with Rocky Mountain Arsenal.

b)  Perceptions of nuclear weapons facility.

c)  Adequacy of two-mile safety zone established by the federal government.

d)  Closest distance to feel safe.

e)  Elimination of all respondents who believe Rocky Flats is desirable.

The impact of these questions individually and in sequence on valuation or location choices is not tested for.  It is likely that questions or comments indicating the desirability of Rocky Flats would have changed both negative location responses and valuations.  Further, since *all* of the information conveyed by interviewers is negative, a bias is likely toward the negative, which was identified by the NOAA Panel as a negative "social desirability" effect.  No test was made for the possibility of this bias. The impact of interviewer effects is unknown but could be a serious source of bias given the structure of the questionnaire.

### E.      Reporting

Decision Research has provided copies of the questionnaire as it was revised and the results of the tabulation of responses to some of the questions in the questionnaire.  It has not provided a complete tabulation of summary statistics on some questions and it has not presented a valuation function identifying the economic values to be measured (i.e., compensating variation measures of consumer surplus, or the

11

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

relationship of values to economic and other factors such as income).[3]  The Decision Research study thereby fails any reasonable evaluation of reporting on CVM-based results.

### F.     Careful Pre-testing of a CV Questionnaire

Because CV surveys often involve "new and often technical information, well beyond what is typical in most surveys, they must be subjected to "careful pilot work and pre-testing," along with evidence that "respondents understood and accepted the main description" of the event or commodity (NOAA Panel, 1993).  Since no evidence is presented by Decision Research that the "just right house" in Arvada-Westminster was either understood or accepted, their CV survey fails this guideline.  It was also shown earlier that the "just right" statement may lead to multiple definitions, some involving price and other economic parameters.  If this is the case, one must be suspicious that if such tests were conducted on the final survey, as recommended by the NOAA Panel, the survey would fail such tests.

### G.     Conservative Design

The Decision Research Survey used compensation necessary to offset perceived (but not actual) damages.  Thus, it used the Hicks compensating surplus measure as the appropriate measure of loss.  From a conceptual perspective, this is acceptable.[4]  However, almost all CVM researchers have rejected this measure because of the inherent possibility that such measures will be biased severely upward. The NOAA Panel explained its concerns as follows:

> The conceptually correct measure of...damage that has already occurred is the minimum amount of compensation that each affected individual would be willing to accept.  Nevertheless, because of concern that respondents would give unrealistically high answers to such questions, virtually all previous CV studies

---

[3]   See Mitchell & Carson (1989).

[4]   Hicks (1943).

12

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

have described scenarios in which respondents are asked to pay to prevent future occurrences of similar accidents.[5]

The NOAA Panel, as part of its conservative design guidelines, recommends the use of willingness-to-pay for *all* CV studies.[6]  The Decision Research Survey does not accept this guideline and thereby fails the NOAA Panel test for conservative design. Why do economists, almost universally, recognize this as a problem?  The answer is relatively simple.  Willingness-to-pay is bounded by ability to pay from income and wealth.  Willingness-to-accept compensation has no such constraints from an economic perspective.  Thus, respondents may tend to provide unrealistically high answers to compensation questions.  Such a bias is observable in the Decision Research Survey where 46 percent of the Denver Metro residents respond that there is not "*any* real price reduction that would prompt [them] to purchase a house near Rocky Flats?"  Such responses are not believable by economists.  It implies that, among other things, these respondents would not move near Rocky Flats if the houses were free and each family was given $1 million.  Further, if the respondents were allowed to sell the house and move after some period of time, it would pay for most of them to move, sell the house and move again.  For the above reasons, the Decision Research Survey must be viewed as not fulfilling the guideline of conservative design and, by adopting measurements discarded by CV researchers, is not a credible or useful CVM survey.

## H.   Elicitation Format

This guideline was already examined under the conservative design guideline.  It should be pointed out that the Decision Research Survey violates the guideline that willingness to pay should be used.

---

[5]   NOAA Panel (1993), 4603.

[6] Willingness-to-pay is the amount of money an individual is willing to give up in order to acquire a certain good or service.  In contrast, willingness-to-accept is the amount of money that an individual must have in order to accept the imposition of some condition, such as an environmental disamenity such as air pollution.

PUTNAM, HAYES & BARTLETT, INC.

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

### I.      Referendum Format

According to the NOAA Panel the valuation question (or questions) "should be posed as a vote on a referendum." That is, it should be structured to elicit a "yes" or "no" response. The Decision Research Survey does this by asking for a yes/no response on a $5,000 or $10,000 reduction in price. Thus, it generally complies with the guideline for a yes/no format, but fails because the referendum format was preferred by the NOAA Panel because of the analogies with voting for a new tax to pay for a relatively obscure commodity. Respondents were thought to have experience on such voting processes through municipal bond elections for parks, etc. However, here the yes/no format is used for compensation on a strictly private purchase. In consequence, it is doubtful that a referendum format would be the preferred one under the circumstances.

Of equal importance is the selection of $5,000 and $10,000 reductions in the price of the hypothetical "just right" home to induce purchase. These amounts have no relation to taxes and therefore the necessity of a referendum format. The survey provides no evidence on how these numbers were estimated or their origin. It is interesting to note that the final estimate prepared by Hunsperger from the Decision Research data is $6,825, which is between the $5,000 and $10,000 range suggested in the survey. Did the range itself determine the final estimate?

### J.      Accurate Description of the Program or Policy

Since no actual damage information is provided to the respondents it is difficult to discover what they are responding to except to the phrase "nuclear weapons facility," "safety zones," and analogies with the Rocky Mountain Arsenal. No relative risk information is provided contrasting Rocky Flats with other types of plants, industries or waste sites. No context is given for the commodity to be valued. In consequence, respondents are valuing something almost in the abstract named Rocky Flats, not unlike responding to the words killer bees or skin cancer. Since actual impacts are not

14

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

identified or quantified, the Decision Research Survey fails the guideline for an accurate description.

### K. Pre-testing of Photographs

Since no photographs were used in this survey or pretests, this guideline is irrelevant for evaluation of the Decision Research Survey.

### L. Reminder of Undamaged Substitute Commodities

The early part of the Decision Research Survey identifies alternative sites without a nuclear weapons facility nearby. Thus, alternative sites are introduced in the interview. Whether these alternatives are truly substitutes for the Arvada-Westminster location has not been evaluated. To be substitutes, the alternative locations must be substitutable to the respondent in terms of price, location and other economic factors affecting the possibility of substitution. No evidence is provided by Decision Research that Highlands Ranch, Ken Caryl, Arvada and Westminster are substitute locations between each other or that there are no superior substitutes for the area near Rocky Flats. Thus, while the survey contains the possibility of substitute commodities, justification for the selection of these particular sites or the questions asked regarding them is not provided.

### M. Adequate Time Lapse

The NOAA Panel recommends conducting the survey sufficiently beyond the time of the accident or event, in this case the 1989 FBI raid, so that respondents "regard the scenario of complete restoration as plausible." Clearly, substantial time has elapsed since 1989 so that "crisis" issues are avoided. Whether the resident population believes that complete restoration or removal of all risks is plausible is debatable. However, without acceptance of a scenario of complete future restoration it is questionable whether a CV survey will yield meaningful values of losses. Nowhere in

15

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

the survey instrument is it suggested that the potential problems at Rocky Flats or their removal will *ever* occur.

### N.     No-Answer Option

The Decision Research Survey apparently allows for the no-answer option on most relevant questions where a no-answer could be a plausible outcome. However, the no-answer option is examined or probed for reasons causing it only for respondents who said they "would not purchase a home in the area of Rocky Flats no matter how much the price was reduced." The NOAA Panel requires evaluation of don't know/no-answer options for *all* valuation questions. The Decision Research Survey did not examine no-answer explanations for the five major valuation questions. In consequence, this survey fails the no-answer option guideline in five out of six cases.

### O.     Cross-Tabulations

The survey should include a variety of other questions that help to interpret the responses to the primary valuation question(s). The final report should include summaries of willingness to pay broken down by these categories.[7]

Some of the items that the NOAA Panel felt "would be helpful for cross-tabulations" are listed below:

| DECISION RESEARCH SURVEY | | |
|---|:---:|:---:|
|  | **Recorded** | **Not Recorded** |
| Income | X | |
| Prior Knowledge of Site | X | |
| Visitation to Site | X | |
| Attitudes toward the Environment | | X |
| Attitudes toward Big Business | | X |
| Understanding of Task | | X |
| Belief in Scenarios | | X |
| Ability/Willingness to Perform Task | | X (?) |

---

[7]   NOAA Panel (1993), 4609.

16

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

It is clear that the Decision Research Survey asked respondents insufficient information for a helpful cross-tabulation of results. Further, they provided *no* cross-tabulations of results that would allow evaluation for the potential biases in the analysis.

### P.    Checks on Understanding and Acceptance

The early part of the Decision Research Survey included 20 minutes or more for respondents to compare selected communities on environmental and other grounds. These rankings were not utilized in evaluating or adjusting the valuation question responses or to test for adequate substitutes. Why these questions were included is a mystery. Since these questions appear to be largely superfluous, no apparent checks on understanding or acceptance are observable. The survey thereby fails this NOAA Panel guideline.

### Q.    Alternative Expenditure Possibilities

The NOAA Panel recommends that "willingness to pay for environmental programs...would reduce their expenditures for private goods" and consequently the respondent should be reminded of the necessity of reducing private expenditures. The symmetric equivalent in the Decision Research Survey is that respondents should be reminded that the greater the discount they requested the *more* money they would have for private purchases. Unfortunately, symmetry does not work here because the objective is to identify the *minimum* discount necessary to induce respondents to purchase near Rocky Flats. And suggesting they would have more money for private purchases is likely to deflate the minimum. The important point here is that *no* rules or guidelines have been developed for minimum compensation since it is considered to be an unreliable valuation measure.

### R.    Deflection of Transaction Value

The NOAA Panel believes that the survey should be designed to deflect the general "warm glow" of giving or dislike of "business" since such values generally do not

17

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

enter markets and do not reflect real damages or property value losses.   Since payments are not made, the "warm glow" of giving may not be present.  Alternative, the "cold glow" of receiving compensation may be present but rules for deflection do not exist.  Anti-business or anti-federal government biases are not addressed in the survey design except in positioning some questions.  No attempt is made to assess this bias, so no deflections of transaction values as suggested by the NOAA Panel are present in the survey.

### S.     Steady-State or Interim Losses

According to the NOAA Panel, it should be made apparent that respondents can distinguish interim from steady-state losses.  Since the Decision Research Survey does not distinguish between the two in any question or comment, it was impossible for the respondents to do so.  The survey flunks this guideline.

### T.     Present Value Calculations or Interim Losses

The NOAA Panel believes that "in revealing values respondents are adequately sensitive to the timing of the restoration process."  Since the timing of the actual restoration process *is never* mentioned in the survey, there can, by definition, be no "adequate sensitivity."  Interest rates and the value of time are not considered at all.

### U.     Advance Approval

The NOAA Panel concludes that "since the design of the CV survey can have a substantial effect on the responses, it is desirable that features be pre-approved by both sides in a legal action."  To my knowledge, no advance approval was sought or suggested in this legal action.

18

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

### V.    Burden of Proof

The NOAA Panel concludes that "the burden of proof of reliability must rest on the survey designers." The NOAA Panel suggests further that if a "CV survey suffered from any of the following maladies, we would judge its findings unreliable."

a) "A high non-response rate to the entire survey instrument or to the valuation question."

Given the information available to me as of March 19, 1997, I am unable to judge whether a high non-response rate was observed.

b) "Inadequate responsiveness to the scope of the environmental insult."

Since the scope of the human or environmental insults or damages are not identified or discussed in the questionnaire, by definition, the Decision Research Survey must be judged unreliable on the basis of the NOAA Panel guidelines.

c) "Lack of understanding of the task by the respondents."

Since the knowledge base for understanding the issue was largely left to personal recollections of past newspaper stories and other media statements, it is doubtful if there was sufficient common understanding of the problem for the tasks confronting the respondents. Respondents with potentially greater interest and knowledge due to location were excluded from the valuation questions. Therefore, it is likely that the Decision Research Survey fails on these grounds.

d) "Lack of belief in full restoration scenario."

The survey never mentions full restoration or any type of activity that might reduce perceived risks over time. It therefore fails this NOAA Panel test and must, again, be deemed unreliable.

19

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

e) "Yes" or "no" votes on the hypothetical referendum that are not followed up or explained by making reference to the cost and/or value of the program."

The "votes" on $5,000 or $10,000 are not linked to actual estimates of property value damages nor are they linked in any way to interim or steady state losses. Thus, the Decision Research Survey is unreliable on these grounds unless it can be shown that the $5,000 and $10,000 values have some connection to real damages or perceived damages. This must also be demonstrated for the respondents who stated they would not live nearby Rocky Flats for *any* price reduction on the "just right" house.

Note that the Decision Research Survey must be evaluated as *unreliable* on the basis of three of five criteria, any one of which will mandate unreliability. It is possible that after further analysis the Decision Research Survey could flunk all five of the criteria.

Additionally, the Decision Research Survey fails to pass more than 75 percent of the 21 guidelines identified by the NOAA Panel. Thus, one conclusion is inescapable—the Decision Research Survey is unreliable and cannot be used to evaluate alleged losses to property values.

## VI. SOURCES OF BIAS IN CVM SURVEYS

Since the early 1970s, it has been recognized that CVM, improperly designed or implemented, may induce biases in the valuation results. The attached Table 1 from Mitchell & Carson (1989), a standard reference work on CVM, lists some potential sources of bias. Other sources of bias are also recognized, including hypothetical bias, which is bias induced by the hypothetical nature of a CV survey. Below I use the Mitchell & Carson listing of potential sources of bias to evaluate the Decision Research Survey.

20

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

### A.   Incentives to Misrepresent Response

Biases occur when the respondent misrepresents their true willingness to pay, or willingness to be compensated. In the Decision Research Survey there is no attempt to identify a minimum compensation and no penalties for overestimating compensation. Thus, there are no incentives to reveal actual preferences as to minimum compensation. The respondents are asked if they would purchase a "just right" house four to six miles from Rocky Flats with a discount of $5,000; then $10,000 is offered if they did not respond to $5,000. If they did not respond to $5,000 or $10,000 they are then asked if there is any price reduction that would lead to purchase.

I believe this process anchors the individual respondent on the possibility that there is "no price reduction" that would induce purchase. An alternative approach would be to establish an initial price reduction and then reduce it until the respondent would no longer purchase. Such a procedure would probably reduce the 46 percent who said they would not purchase at any price reduction. Conditions identifying the purchase contract are not spelled out. This group could be thinking that they must live in the house indefinitely with no resale possibilities, or live there a minimal time and then resell, or some combination in between. If the compensation mechanism were started at something greater than the minimum and reduced, the need for spelling out the terms of purchase become apparent. In conclusion, the design of the survey can induce respondents to misrepresent preferences.

I doubt if there is strategic bias occurring in this survey because the commodity is so ill defined that strategies for misrepresentation do not emerge. Compliance bias (sponsor or interviewer bias) may be present. It depends upon the amount of training and skills of the individual interviewers.

21

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

| Table 1 |
| SOURCES OF BIAS |

**Table 11-1. Typology of Potential Response Effect Biases in CV Studies**

1. *Incentives to Misrepresent Responses*
   Biases in this class occur when a respondent misrepresents his or her true willingness to pay (WTP).

   A. *Strategic Bias:* where a respondent gives a WTP amount that differs from his or her true WTP amount (conditional on the perceived information) in an attempt to influence the provision of the good and/or the respondent's level of *payment* for the good.

   B. *Compliance Bias*

      1. *Sponsor Bias:* where a respondent gives a WTP amount that differs from his or her true WTP amount in an attempt to comply with the presumed expectations of the sponsor (or assumed sponsor).

      2. *Interviewer Bias:* where a respondent gives a WTP amount that differs from his or her true WTP amount in an attempt to either please or gain status in the eyes of a particular interviewer.

2. *Implied Value Cues*
   These *biases* occur when elements of the contingent market are treated by respondents as providing information about the "correct" value for the good.

   A. *Starting Point Bias:* where the elicitation method given or payment vehicle directly or indirectly introduces a potential WTP amount that influences the WTP amount by a respondent. This bias may be accentuated by a tendency to yea-saying.

   B. *Range Bias:* where the elicitation method presents a range of potential WTP amounts that influences a respondent's WTP amount.

   C. *Relational Bias:* where the description of the good presents information about its relationship to other public or private commodities that influences a respondent's WTP amount.

   D. *Importance Bias:* where the act of being interviewed or some feature of the instrument suggests to the respondent that one or more levels of the amenity has value.

   E. *Position Bias:* where the position or order in which valuation questions for different levels of a good (or different goods) suggests to respondents how those levels should be valued.

3. *Scenario Misspecification*
   Biases in this category occur when a respondent does not respond to the correct contingent scenario. Except in A, in the outline that follows it is presumed that the *intended* scenario is correct and that the errors occur because the *respondent* does not understand the scenario as the researcher intends it to be understood.

   A. *Theoretical Misspecification Bias:* where the scenario specified by the researcher is incorrect in terms of economic theory or the major policy elements.

   B. *Amenity Misspecification Bias:* where the perceived good being valued differs from the intended good.

      1. *Symbolic:* where a respondent values a symbolic entity instead of the researcher's intended good.

      2. *Part-Whole:* where a respondent values a larger or a smaller entity than the researcher's intended good.

   C. *Geographical Part-Whole:* where a respondent values a good whose spatial attributes are larger or smaller than the special attributes of the researcher's intended good.

   D. *Benefit Part-Whole:* where a respondent includes a broader or a narrower range of benefits in valuing a good than intended by the researcher.

   E. *Policy-Package Part-Whole:* where a respondent values a broader or a narrower policy package than the one intended by the researcher.

      1. *Metric:* where a respondent values the amenity on a different (and usually less precise) metric or scale than the one intended by the researcher.

      2. *Probability of Provision:* where a respondent values a good whose probability of provisions differs from that intended by the researcher.

   F. *Context Misspecification Bias:* where the perceived context of the market differs from the intended context.

      1. *Payment Vehicle:* where the payment vehicle is either misperceived or is itself valued in a way not intended by the researcher.

      2. *Property Right:* where the property right perceived for the good differs from that intended by the researcher.

      3. *Method of Provision:* where the intended method of provision is either misperceived or is itself valued in a way not intended by the researcher.

      4. *Budget Constraint:* where the perceived budget constraint differs from the budget constraint the researcher intended to invoke.

      5. *Elicitation Question:* where the perceived elicitation question fails to convey a request for a firm commitment to pay *the highest amount the respondent will realistically pay before preferring to do without the amenity. (In the discrete-choice framework, the commitment is to pay the specified amount.)

      6. *Instrument Context:* where the intended context or reference frame conveyed by the preliminary nonscenario material differs from that perceived by the respondent.

      7. *Question Order:* where a sequence of questions, which should not have an effect, does have an effect on a respondent's WTP amount.

Source: Mitchell, R. G. and R. T. Carson, *Using Surveys to Value Public Goods: The Contingent Valuation Method*, Washington, D.C.: Resources for the Future, Inc., (1989), 236–237 (Table 11-1).

PUTNAM, HAYES & BARTLETT, INC.

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

### B.    Implied Value Cues

Value cues occur when components of the contingent market provide information or cues to respondents on the "correct" values.

#### 1.    Starting Point Bias

The Decision Research Survey specifies that the first value to be looked at is $5,000 as compensation.  The obvious "cue" to the respondent is that the problem is a multiple thousand dollar problem.  Is this "cue" significant? No tests are performed to determine if such cues significantly affect the selected level of compensation.  The presence of "starting point" bias or lack of it cannot be assessed, but is likely to be present.

#### 2.    Range Bias

The range of possible values is $5,000, $10,000; some amount identified by the respondent greater than $10,000; an amount that is indefinitely large (i.e., a very large positive number).  Thus, the potential range may be something like $5,000, $10,000, $30,000 and $1 million.  Such large implied ranges may distort estimates of minimum compensation. Through focus groups, pretests, and other means this range could have been reduced.  It has led to the conclusion that 46 percent of the potential buyers would require at least $30,000 in compensation, which is very unlikely if the range had been thoughtfully structured and justified from focus groups or other means.

#### 3.    Relational

The survey links the Rocky Mountain Arsenal and Rocky Flats through some identification but does not identify any other potential sites.  It is likely that respondents with negative perceptions of the Rocky Mountain Arsenal will transfer these to Rocky Flats even if they know nothing about Rocky Flats, given the linkage in the questionnaire.  While "relational bias" is not tested for, its presence should be expected given the structure of the survey questions.

23

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

### 4.  Importance Bias

The composition and sequence of the questions alerts the respondent to a negative image of Rocky Flats (i.e., safety zones) without providing information to interpret logically these negative images. For example, the survey suggests the federal government has established a two-mile safety zone from the buildings engaged in weapons production but does not discuss why such a safety zone was thought to be necessary or how reliable it is. The respondent is left to probe their own imagination.

### 5.  Position Bias

The positioning and ordering of questions may have led to a negative response on subsequent valuation questions. Earlier introduction of the discussion of the FBI raid might have significantly changed the responses to the valuation questions.

## C.  Scenario Manipulation

### 1.  Theoretical Misspecification

This occurs when the scenario is incorrect in terms of economic theory or the policy elements.

No scenario is proposed for evaluation except for the negative impacts of the respondents along with a few negative issues in the survey. Not only is the scenario incorrect, it does not exist in any meaningful way. It should be noted that the Decision Research Survey does not introduce the 1989 FBI raid until after valuation questions are elicited. Thus, there is no connection between the values obtained in the survey and the FBI raid unless the respondent remembers it from other sources of information and has some retained knowledge of the details.

24

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

### 2.    Amenity Misspecification

Amenity or commodity misspecification refers to the case where the perceived commodity "differs from the intended" commodity.

Given the lack of specification on what the commodity is that respondents are receiving compensation for, it is difficult to determine the extent of the commodity misspecified, since respondents are likely to have very different perceptions of the type and amount of risk (if any) associated with Rocky Flats. If different perceptions exist, it is likely that respondents are perceiving that they are receiving different bundles of attributes or different commodities for the compensation received. If I am receiving $5,000 for perceived health risks and you are receiving $10,000 for perceived ecological risks, the amounts of money taken together are for different amenities.

### 3.    Symbolic

It is possible that the mention of the Rocky Mountain Arsenal in the survey prompts thoughts of other environmental disamenities or hazards, and that viewpoints and valuations are affected by this symbolism as opposed to responses to any actual health or environmental factors related to Rocky Flats.

### 4.    Part-Whole

This misspecification occurs because the respondent values a larger or smaller commodity than the researcher's intended good.

It has been observed that because of symbolism, moral satisfaction, or "warm glow" respondents often perceive the commodity as larger than it actually is. For example, respondents' willingness to pay to clean up one lake in Ontario is similar to other (similar) respondents' willingness to pay to clean up all lakes in Ontario (see Kahneman, 1985; and Kahneman & Knetsch, 1993). Are there likely to be these kinds of effects going on in the Decision Research Survey? The answer is a partial yes, since

25

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

Rocky Flats and the Rocky Mountain Arsenal are not sufficiently distinguished from each other in the survey.

### 5.      Metric

This misspecification occurs because the respondent is measuring or assessing the commodity on a different metric scale than the researcher.  Since no identifiable metric scales of scope or impacts are identified in the Decision Research Survey, differences in metric scales do not matter.

### 6.      Probability of Provision

Since there is no scope evaluation or changes in the commodity being provided through time, differences in the probability of provision do not matter.

### 7.      Context Misspecification Bias

This bias may occur because there is a difference between the perceived context of the (constructed) market and the intended context.

### 8.      Payment Vehicle

Compensation is paid to the prospective buyer through a lower selling price. There appears to be little difference between perceived and intended context here. However, the impact of a lower price on conditions of the sale are not identified.  For example, a lower price may cause a lower loan value, changes in interest rates, changes in payments of points, appraised value, etc. which could influence actual sales price.

### 9.      Property Right

By asking compensation questions, the Decision Research Survey implicitly vested rights to compensation to prospective property owners.  Whether such rights should be vested with property owners is outside the domain of economics.  However,

26

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

the respondent is given these rights by asking compensation questions as opposed to willingness to pay questions. The issue of how these rights are perceived by the respondent is not addressed in the Decision Research Survey.

### 10.    Method of Provision

The problem here is that the method of providing the commodity is misperceived "or is itself valued in a way not intended by the researcher." The commodity does not change, only the price in the survey. The method of provision should therefore not influence responses.

### 11.    Budget Constraint

Since there are no budget constraints on responses based on compensation, such a bias should not arise. The lack of limiting factors on compensation creates another set of bias problems described earlier.

### 12.    Elicitation Question

Where the elicitation question(s) "fails to convey a request for a firm commitment to pay the highest amount" or accept the minimum compensation a bias can result. As was stated earlier, no effort was made in the Decision Research Survey to reduce the compensation to a minimum amount. Thus, the elicitation question format is likely to be faulty and lead to bias.

### 13.    Instrument Context

The bias issue here is whether "the context or reference frame conveyed by the preliminary non-scenario material differs from that perceived by the respondent."

Since most of the material in the early part of the survey was framed as self reported opinions there should be little or no difference between context and perceptions.

27

**Tab 1**
## Supplemental Expert Report of Ralph C. d'Arge

In addition to the Mitchell & Carson listing of biases, there is the issue of hypothetical bias. That is, since the survey is a hypothetical market, reducing the price on "just right" houses in a particular location, do biases occur that would not be observed in actual markets? This potential bias is referred to as hypothetical bias. (See Schulze, d'Arge and Brookshire,1981; Cummings and Harrison, 1992.)

In several studies, economists have observed that responses to hypothetical willingness to pay questions tend to be substantially greater than actual payments made in real or experimental markets (See NOAA Panel, 1993). In one study, using comparisons across many studies, Carson, et al. found the difference to be less than 15 percent (Carson et al., 1996). Another study, involving a less well defined commodity, such as is the case in the Decision Research Survey, the difference exceed 500 percent (Brown, et al., 1996). Cummings and Harrison found differences of 200 to 300 percent.

What is important is that there is likely to be a substantial difference in willingness to pay derived from hypothetical markets using CVM surveys and actual markets. Hypothetical markets will tend to overestimate willingness to pay. There is also evidence that minimum compensation will exceed maximum willingness to pay for a large number of reasons (see D. Coursey, et al., 1987). Since compensation amounts are unconstrained by income or other economic limiting factors, it can be anticipated that the biases for overstating compensation are even larger. However, analytical studies of this phenomenon have not been done largely because of the rejection of compensation as a reliable economic measure. Thus, a potentially very large source of bias in the Decision Research Survey cannot be evaluated because they employ an exotic and distrusted value measure.

In summary, there are a number of potential and actual sources of bias in the Decision Research Survey. Most are not corrected for or even tested as to possible existence. Past studies on sources of bias have shown that biased surveys can lead to estimates that are five to 20 times larger than could be observed in actual markets.

28

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

Nowhere does the Decision Research Survey attempt to assess the significance of such biases or provide checks to test for such survey biases.

## VII.  ECONOMIC EVALUATION OF THE DEMAND FOR HOUSING IN THE AREA NEAR ROCKY FLATS

Anything that affects the supply or demand for housing besides price, which changes, causes the supply and demand curves to shift.  For example, the downturn of the Denver economy during the 1980s and early 1990s caused the demand curve for housing to shift inward.  Lower interest rates will cause it to shift outward.  The supply curve also shifts in response to increased builder's cost, migration patterns, availability of jobs and a long list of other factors.  Neither demand nor supply are static or fixed entities but shift in response to a whole plethora of causes and events.

Figure 1 is a depiction of both demand and supply changing from Period 0 to the Period 1.  Price does not change but the equilibrium (or market clearing) quantity increases.



Will the presence of buyers willing to purchase houses near Rocky Flats only with a discount affect market price?  The answer is that it depends.  If all potential buyers require a discount, clearly properties will only be sold if a discount is offered.  If only one buyer requires a discount and there are 38,000 other potential buyers for one house willing to buy without a discount, no discount would emerge.  Thus, whether a discount to properties by some buyers results in a decrease in price depends on the number of buyers requiring no discount in relation to the number of sellers.

29

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

If there are 38,000 sales of residential properties in the Denver metropolitan area per year and 16 percent would buy without a discount, this amounts to a minimum of 6,080 prospective buyers without discounts per year. There are 12,019 detached and attached homes in the Class Area. If the cycle is that each house sells every eight years, then 1,502 houses enter the market each year. Thus, supply per year is 1,502 and demand is 6,080. There are at least four potential buyers, with-



Figure 2
THE IMPACT OF SOME BUYERS
REQUIRING A DISCOUNT TO PURCHASE

Net impact of buyer discounts on market price is zero. Only if supply was greater than the number of buyers requiring no discount would there be an impact on market price.

out discounts for every house.   Thus, prospective demand far exceeds supply at existing prices. The existence of some buyers in this market desiring discounts, would not cause a discount to occur. Buyers requiring discounts would simply buy in another location more advantageous to their individual needs. Alternatively, buyers without discounts and buyers willing to pay a premium to live in the area near Rocky Flats would tend to purchase there.

This case is depicted in Figure 2 where supply is much less than demand as represented by buyers willing to purchase without a discount.

## VIII.   INTRODUCTION TO REVIEW OF "ANALGOUS CASE STUDIES"

Messrs. Hunsperger and Clayton (hereafter Hunsperger) provide a list of 13 pollution-related studies which they suggest "assists us in understanding how the market reacts to contamination...and how that reaction translates to effect on value."

30

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

No criteria are provided as to why these studies were included and others excluded from the existing literature except to assert that "findings are compared to similar studies for reasonableness." The absence of criteria for selection suggests that the selection process was biased.

The 13 studies include one study, listed as number 8 in "Analogous Case Studies," which contains a list of 13 distinct studies purporting to show linkages between property values and contamination. One of these studies appears also in the Hunsperger listing of 13 studies. Thus, there is a total of 25 (13+13-1) studies cited by Hunsperger as relevant for "understanding how the market reacts to contamination." A revised listing by number of the Hunsperger data summary (pp. 123–124) with corrected numbers is listed in Table 2. A thorough review of all of these studies has not been possible in the time available. Therefore, for purposes of this report I will exclude the list of 13 studies examined within the number 8 study listed by Hunsperger from consideration except to state that one of these studies does not demonstrate any connection between property values and contamination even though the authors of analogous study number 8 (Schulze, et al.) assert that it does. The referenced study by Mendelsohn, et al. attempted to examine the effects of PCB contamination on the value of residential properties near New Bedford, Massachusetts. However, I have previously evaluated this study and found that the study's finding of an alleged impact disappears when the effect of interest rates on property sales is taken into account. Other studies in this list proposed by Schulze, et al. may also contain fatal flaws.

Hunsperger also includes a study of a landfill in Los Angeles where no impact on property values is observed but excludes a study germane to this case on Three Mile Island that also found no impact (Nelson, 1981). Hunsperger asserts (p. 121) that "nuclear cases are in a class of their own." If this is true, Hunsperger has contradicted his own guideline for the selection of analogous case studies to include. He should include all "nuclear cases" and exclude landfills and other non-nuclear-related waste facilities. If this criterion were faithfully followed, Hunsperger's "analogous case studies"

31

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

would be reduced from 13 to six, and only one of the 13 hedonic property value studies listed in case study number 8 would be relevant.

One of the most difficult questions confronting resource economists since the 1980s is when it is reasonable and proper to "transfer" value estimates derived from one or a group of studies and use these to infer values in different contexts, for different geographic regions or populations, or for different time periods. This problem has become known as the "benefits transfer problem" (Brookshire and Neill, 1992; V. Kerry Smith, 1992). No formal listing of general criteria has emerged in the economics profession which identifies when a benefits transfer (values from one situation can be used to infer or measure non-observed values in another situation) is appropriate. However, if the commodity is distinctly different like apples and oranges, or landfills and nuclear-related sites, benefit transfer is likely to yield unreliable results. Even benefit transfers for the same commodity with different populations (Parsons and Kealy, 1994) or economic modeling processes (Luken, Jonnson, Kibler, 1992; Desvouges, Naughton, Parsons, 1992) can lead to vastly different and thereby unreliable results. I am aware of no studies that have been published or peer reviewed suggesting that "benefits transfer" is an appropriate method for valuing diminution in real estate values due to contamination.

In this case, there is no evidence that Hunsperger reviewed the applicable literature relating to benefits transfer and no indication that he arrived at a principled basis for determining whether, with respect to any of the case studies, benefits transfer is appropriate. Without more, it cannot be said that inferring diminution in market values in the Class Area by reference to allegedly analogous case studies is a method upon which an economist would necessarily rely.

32

**Tab 1**

**Supplemental Expert Report of Ralph C. d'Arge**

Table 2
HUNSPERGER TABLE NUMBERED AND REVISED

SUMMARY OF DATA

| | Authors | Source of Pollutants | Location | Methodology | Type of Contaminants | Impact Zone | Property Type | Diminution in Value |
|---|---|---|---|---|---|---|---|---|
| 1 | Beron Gartside Rosen Burke | Feed Materials Production Center | Fernald, Ohio | Descriptive Statistics and Multiple Regression Analysis | Uranium Trioxide | 1) Only those with view 2) Up to 4 miles | Single-family residential | Beron—negligible Burke & Rosen—Avg. of $6,500/house, or approximately 10% |
| 2 | Kinnard | Radium contaminated fill material | New Jersey | Statistics and Multiple Regression Analysis | Radon & Gamma Radiation | Within Superfund area outward to 500 feet | Single-family residential | No significant loss unless there was a sensory impact |
| 3 | Hunsperger | Lead smelter | Denver, Colorado | Opinion survey; Analogy | Arsenic, lead, cadmium | Entire neighborhood | Single-family residential | 10% to 30% per house ($2,300 to $9,900 per house) |
| 4 | Center for Real Estate Education and Research, Ohio State University | Hazardous waste landfill | Toledo, Ohio | Multiple Regression Analysis | Hazardous waste (including nuclear) | 2.6 miles to 5.75 miles | Single-family residential | 20% to 50% depending on location ($9,000 to $14,000/house) |
| 5 | Smith Barton | Petro chemical facilities | Corpus Christi, Texas | Multiple Regression Analysis | Benzene, Toluene, etc. | Up to ±3 miles | Primarily SFR; some commercial | $10,000 per property on avg. (±13% to 50%) |
| 6 | New Mexico Supreme Court Justice Franchini's Opinion | Potentially transportation corridor to Waste Isolation Pilot Project | Santa Fe, New Mexico | Opinion survey | Nuclear waste material | Transportation corridor to WIPP | Single-family residential | 11% to 30% |
| 7 | Kohlhase | 10 NPL sites | Houston, Texas | Multiple Regression Analysis | Various | Up to 6 miles | Single-family residential | Approx. $1,000 to $18,000/house (2% to 36%) |
| 8 | W. Schulze, et al.[8] | | | | | | | |

[8] W. Schulze, et al.  "An Evaluation of Public Preferences for Superfund Site Cleanup," Department of Agricultural, Resource and Managerial Economics (Ithaca, New York: Cornell University, December 1994), pp. 1–36.

33

PUTNAM, HAYES & BARTLETT, INC.

Tab 1

Supplemental Expert Report of Ralph C. d'Arge

Table 2

HUNSPERGER TABLE NUMBERED AND REVISED

SUMMARY OF DATA

| | Authors | Source of Pollutants | Location | Methodology | Type of Contaminants | Impact Zone | Property Type | Diminution In Value |
|---|---|---|---|---|---|---|---|---|
| 9 | Reichert Sheppard Wise | 30-acre landfill containing some radioactive waste | Uniontown, Ohio | Multiple Regression Analysis | Solid waste, ethane radio-active contaminants (proper-ties themselves were not contaminated) | Depending on the researcher, < 2,500 feet out to approx. 1 mile | Primarily single-family residential | Nominal to 15%; verdict equates to ±$3,900/house |
| 10 | Bleich, et al. | Landfill (no mention of possible pollutants) | Los Angeles, California | Multiple Regression Analysis | No known contamination | Immediate area | Single-family residential | No significant loss |
| A | Slovic, et al. | Potentially, trans-portation corridor from Hanford, WA plutonium proces-sing site | Hanford, Washington | Opinion survey | Nuclear material | Transportation corridor through Oregon | Single-family residential | Rates risk but does not quantify diminution to value |
| B | Smith & Desvouges | Hazardous waste site nuclear power plant | Hypothetical (Boston, Massachusetts) | Opinion survey | Hazardous waste site power plant | 10 miles for waste site; 22 miles for power plant | Single-family residential | On avg. $4,100 for those closets to waste site. |
| C | McClelland, Schulze & Hurd | Off landfill | Los Angeles, California | Telephone survey and regression analysis | No known contamination | Immediate area | Single-family residential | Approx. 7% before closure of the landfill and 3.5% after closure $4,800 to $9,500/house) |

34

PUTNAM, HAYES & BARTLETT, INC.

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

## IX.   EVALUATION OF THE THIRTEEN STUDIES

According to Hunsperger, "nuclear cases are in a class of their own." Mitchell and Smith and Desvouges also observed this strong distinction in terms of perceived risk (Mitchell, 1980; Smith and Desvouges, 1986). Further, Hunsperger cites a study by Slovic, Flynn and Layman that purports to document an "extremely negative association with nuclear waste" (Hunsperger, 1997, p. 172). Thus, in order to exclude studies that for comparative purposes with Rocky Flats are likely to yield unreliable results, we must eliminate all that are unrelated to nuclear cases.

For comparative purposes, it defies logic to assert that a nuclear case in terms of perceptions is uniquely different than ordinary landfills or contaminants, and then use measures of alleged property value losses for ordinary landfills to infer possible losses for nuclear cases. Following this obvious criterion makes the following "analogous case studies" not analogous:

| | | |
|---|---|---|
| Analogous Case Study 3 | Hunsperger | Lead smelter near Denver, Colorado Ground water and soil contamination |
| Analogous Case Study 5 | Barton Smith | "Negative externalities" of residences near petro-chemical plants, Corpus Christi, Texas |
| Analogous Case Study 7 | Kohlhase | The alleged effect of EPA announcements on waste sites near Houston, Texas |
| Analogous Case Study 8 | Schulze, McClelland, et al. | Summary of other studies on Superfund site alleged impact on property values. Focus on landfill problems. {Not listed in original Hunsperger table} |
| Analogous Case Study C | McClelland, Schulze, et al. | Focus on Los Angeles landfill |
| Analogous Case Study 10 | Bleich, et al. | Focus on Los Angeles landfill |

With these irrelevant cases removed, the Hunsperger list of remaining cases totals seven.

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

Two of the remaining seven cases can be excluded on logical grounds. Analogous Case Study 2 by Kinnard for New Jersey found no property value loss associated with radium contaminated fill material (Kinnard, 1990). It is one of two studies in Hunsperger's list that show no property value losses due to the proximity of landfills. Since no property value losses were discovered, this study provides no information on "market reactions" to potential or actual nuclear contaminants. Thus, this study should be excluded.[9]

Analogous Case Study A by Slovic, et al. examines public perceptions of transportation for a plutonium processing site but does not examine or measure property value losses. In consequence, "market reactions" to potential or actual contaminants are not analyzed or measured. The study is therefore not useful for measuring property value losses, or providing analogies of such losses.

The elimination on logical grounds of Analogous Case Study 2 and Analogous Case Study A leaves five remaining "analogous" case studies on Hunsperger's list. These are:

| | | |
|---|---|---|
| Analogous Case Study 1 | Multiple Studies | Fernald, Ohio properly values |
| Analogous Case Study 4 | Center for Real Estate Education, Ohio State University | Toledo, Oho property values |
| Analogous Case Study 6 | New Mexico Supreme Court | Santa Fe, New Mexico opinion survey on WIPP Corridor |
| Analogous Case Study 9 | Reichart, et al. | Uniontown, Ohio landfill containing radioactive waste |
| Analogous Case Study B | Smith & Desvouges | Boston, Massachusetts Hypothetical nuclear power plant or hazardous waste site Contingent Valuation survey |

---

[9] This case could be included if no market reaction is specified as part of "market reaction." The case provides no supporting evidence of the alleged property value effects of Rocky Flats.

PUTNAM, HAYES & BARTLETT, INC.

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

Two of the above studies involve hypothetical or expectations of future losses and not actual market reactions to contaminants. In Analogous Case Study 6, anticipated "market reactions" to a WIPP Corridor are included in a property valuation. Since "market reaction" is estimated but not observed in this case, it provides little or no guidance as to actual market reactions. In Analogous Case Study B, a hypothetical nuclear power plant is cited to elicit household valuation responses. Since Hunsperger's criterion is actual market reactions to contaminants, this study provides no evidence as to magnitude of response to be expected for Rocky Flats. The commodity is distinctly different (nuclear power plant versus nuclear-related production facility) and also is completely hypothetical.

Using Hunsperger's own criteria for identifying and comparing analogous case studies, we have been able to logically reduce the number of "analogous" studies to three. All of these studies were conducted within the state of Ohio and none have been subjected to peer review through publication in scientific journals.

In Table 3, a statistical comparison is made between three communities in Colorado and three communities in Ohio. The Ohio communities were included because of their proximity to the sites examined in the three remaining studies. The Colorado communities were selected because of their proximity to Rocky Flats. Note that per capita income, educational attainment, birth rate and median value for owner-occupied housing is greater for the three Colorado communities compared with the Ohio communities. These differences in basic socio-economic characteristics of the cities suggest that there may well be substantial difficulties in drawing analogies on values or achieving reliable benefit transfers between these geographic areas.

37

Tab 1
## Supplemental Expert Report of Ralph C. d'Arge

Table 3

### CENSUS DATA: ARVADA, DENVER AND WESTMINSTER, COLORADO AND OREGON, TOLEDO AND UNIONTOWN, OHIO

| 1990 Census Data (unless otherwise noted) | Arvada, CO | Denver, CO | Westminster, CO | Oregon, OH | Toledo, OH | Uniontown, OH |
|---|---|---|---|---|---|---|
| Land Area (sq. km.) | 57.3 | 397.0 | 69.4 | 75.6 | 208.7 | 6.5 |
| Total Persons | 89,235 | 467,610 | 74,625 | 18,334 | 332,943 | 3,074 |
| Persons per sq. km. | 1,557 | 1,178 | 1,075 | 243 | 1,595 | 473 |
| **Race Distribution** | | | | | | |
| Percent White | 94.28 | 72.11 | 90.64 | 96.77 | 76.96 | 99.38 |
| Percent Black | 0.57 | 12.84 | 0.99 | 1.11 | 19.70 | 0.10 |
| Percent American Indian, Eskimo, Aleut | 0.53 | 1.15 | 0.63 | 0.16 | 0.28 | 0.20 |
| Percent Asian & Pacific Islander | 1.98 | 2.35 | 3.69 | 0.52 | 1.05 | 0.26 |
| Percent Other Race | 2.63 | 11.54 | 4.04 | 1.43 | 2.01 | 0.07 |
| Percent Hispanic (Any Race) | 7.44 | 22.96 | 11.48 | 3.41 | 3.97 | 0.20 |
| **Age** | | | | | | |
| Percent 65 Years and Over | 7.60 | 13.90 | 4.80 | NA | 13.60 | NA |
| **Household Statistics** | | | | | | |
| Number of Households | 32,744 | 210,952 | 27,828 | NA | 130,883 | NA |
| Persons per Household | 2.71 | 2.17 | 2.67 | NA | 2.50 | NA |
| **Birth and Death Statistics** | | | | | | |
| Birth Rate (per 1000 residents) 1984 | 17.0 | 17.7 | 17.0 | NA | 16.3 | NA |
| Death Rate (per 1000 residents) 1984 | 4.4 | 9.2 | 3.3 | NA | 10.3 | NA |
| **Educational Attainment** | | | | | | |
| Educational Attainment—Percent completing 12 years or more | 85.6 | 74.7 | 84.4 | NA | 63.9 | NA |
| Educational Attainment—Percent completing 16 years or more | 21.8 | 24.8 | 19.0 | NA | 12.2 | NA |
| **Income Statistics** | | | | | | |
| Per Capita Income (1985 dollars) | 12,927 | 12,490 | 12,161 | 11,273 | 10,050 | NA |
| Percent Below Poverty Level (persons) | 3.9 | 13.7 | 5.6 | | 13.6 | NA |
| Percent Below Poverty Level (families) | 2.8 | 10.3 | 4.4 | | 10.7 | NA |
| **Housing Statistics** | | | | | | |
| Total Housing Units | 34,541 | 239,636 | 29,868 | 7,265 | 142,125 | 1,195 |
| Total Occupied Units | 32,744 | 210,952 | 27,828 | NA | 130,883 | NA |
| Percent of Total Occupied Units that are Owner-Occupied | 72.8 | 49.2 | 65.2 | NA | 60.7 | NA |
| Percent Change in Housing Units (1980–1990) | 15.0 | 4.9 | 37.9 | NA | -0.8 | NA |
| Median Value of Owner-Occupied Housing Units (1990 dollars) | 89,800 | 79,000 | 85,700 | NA | 48,900 | NA |
| Median Rent of Renter-Occupied Units (1990 dollars) | 400 | 339 | 418 | NA | 286 | NA |
| **Employment Statistics** | | | | | | |
| Civilian Labor Force | 54,112 | 266,954 | 32,644 | NA | 174,118 | NA |
| Unemployment Rate (Percent of total civilian labor force) | 4.2 | 5.4 | 4.6 | NA | 8.0 | NA |

Source: 1992 County and City Extra: Annual Metro, City and County Data Book, Bernan Press, Lanham, MD, 1992

38

PUTNAM, HAYES & BARTLETT, INC.

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**


## X.    EVALUATION OF THE THREE OHIO STUDIES

1.    Analogous Case Study 4

> G.E. Smolen, G. Moors and L.V. Conway, "Economic Effects of
> Hazardous Waste Landfills on Surrounding Real Estate Values in Toledo,
> Ohio." Published by Center for Real Estate Education and Research,
> College of Business, The Ohio State University, Research Report No. 44,
> (February 1991) pp. 1–22 and appendix.

This study contains two evaluations of hazardous waste sites near Toledo, Ohio.
One was for the proposed Riga Nuclear Dump site for storage of low-level nuclear
wastes which "showed a clear, initial negative impact on housing sales prices upon
announcement, but the negative effect on prices dissipated soon after extensive public
resistance became evident." The impact on property values appears to have had a
duration of less than one year.

Further, the results do not conform to common sense or the predictions of
economic theory. The results indicate that properties from 2.6 to 5.75 miles away from
the proposed site were affected by the Riga announcement in a statistically significant
manner (at the 1-percent level), while properties located less than 2.6 miles from the
proposed site were not affected in a statistically significant manner. By implication, the
closer the sale property to the Riga site, the less significant was the property loss, if
any. The study uses only two variables, in addition to distance, to "explain" property
value differences. Such a small number is not common in the economics literature (see
Atkinson, Crocker and Shogren, 1992). The effect of omitting variables can be to
increase the significance of the "distance" variable. This study does not contain
compelling evidence as to property value impacts of low-level nuclear waste dumps.
The statistical results defy both logic and economic theory and must be dismissed as
unreliable.

The second waste dump is an existing one called the Envirosafe Landfill in
Oregon, Ohio near Toledo. According to Smolen, et al., the landfill "accepts a low level
category of hazardous (toxic) wastes" but nuclear wastes are not mentioned. Further, it

39

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

is cited by Smolen, et al., that "applicable state and various federal agencies attest to its proper design and continued safety." Since this is a landfill without nuclear contaminants, following Hunsperger's criterion evoked earlier, this part of the study cannot be used for value comparison purposes.

In conclusion, Analogous Case Study 4 contains an unreliable analysis of an announcement for a proposed low-level nuclear dump site, and a property value analysis of an ordinary modern landfill. Neither study provides reasonable analogies for market reactions to the Rocky Flats case.

2.    Analogous Case 9

K.T. Wise, "Analysis of Property Value Impacts in the Uniontown Class Area," Cambridge, Massachusetts, The Brattle Group (October 1994) pp. 1–12, plus appendix.

A.K. Reichert, "Summary of Opinion Regarding Property Damages associated with the Industrial Excess Landfill, (September 15, 1994) pp. 1–4.

S. Sheppard, Letter to Anthony Z. Roisman dated October 7, 1994. Re: *Marie Desario, et al. v. Industrial Excess Landfill*, pp. 1–2, with appendix.

The study by Wise found a statistical impact in the Class area as compared to the Control area commencing in 1988 and dissipating almost entirely by 1992. Wise also found "that homes within 2,500 feet of the landfill experienced a greater initial property value impact than more distant homes." By September 1994 the impact was "not statistically significant." He also finds the possibility of "an additional impact which began in the third quarter of 1992 as a result of considerable publicity concerning radioactivity at the site." The magnitude of the radioactivity is not measured.

Thus, the magnitude of "market reactions" due to radioactivity is unknown from this study. Therefore, the Wise study is not useful for comparative purposes with Rocky Flats using Hunsperger's criterion. It only provides evidence, at best, of property value losses associated with a typical landfill. The Wise study also indicates that much of the

40

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

property value loss occurred less than .5 miles from the landfill. This provides little supporting evidence for the purported impacts at Rocky Flats of two miles or more.

The Reichert study contains distance rings from the landfill of 0 to .43 miles, .431 to .85 miles, .851 to 1.28 miles and from 1.281 to 1.7 miles. Note that the Reichert "rings" are all within something less than two miles from the landfill, whereas Rocky Flats starts at a minimum of two miles or more. This closeness in proximity suggests that traditional "externalities" of landfills such as dust, odor, congestion and visual aesthetics might be playing a key role in the impact on property values. Such impacts have no analogy and provide no information on potential market reactions to Rocky Flats.

More than 50 percent of the property value damages that are alleged by Reichert occur within .43 miles of the landfill and he does not identify any damages beyond 1.28 miles.

The Sheppard letter contains insufficient information to evaluate the methods used in estimating property value losses. However, one point becomes clear. Sheppard compares average property values in the interval 1988–1994 with those in 1977–1987. Therefore, no differentiation is made between the alleged impacts of 1988 (toxic waste dump) and 1992 (radioactive waste.) Thus, Sheppard's results do not differentiate between causes of potential reductions in property values.

To summarize the findings on Analogous Case Study 9, none of the research studies identifies a causal link or independent estimate of the effect of radioactive wastes on property values. Thus, no evidence is provided on potential market reactions to nuclear-related facilities or wastes. Most of the estimated impact on property values by plaintiffs' or defendants' experts was within 1.28 miles of the landfill, which cannot be compared with Rocky Flats where the alleged damage may occur from two to six miles from the site. Any analogies with Rocky Flats would be both misleading and unreliable.

41

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

3. Analogous Case Study 1

> Real Estate Counseling Group of Connecticut, Inc., "Patterns of Real
> Estate Market Behavior Around the Feed Materials Production Center,
> Fernald, Ohio," Volume I (October 1987) chaps. 1-1 through 17-8.

> G.L. Beron, "Measuring the Effects of Proximity to a Uranium Processing
> Facility," in Appraisal Institute Technical Report, *Measuring the Effects of
> Hazardous Materials Contamination on Real Estate Values: Techniques
> and Applications* (1992) pp. 67–100.

> P.S. Gartside, "Independent Analysis of Patterns of Real Estate Market
> Prices Around the Feed Materials Production Center, Fernald, Ohio,
> undated, pp. 1–5.

> H.S. Rosen and J.F. Burke, Jr., "The Property Value Effects of the Feed
> Materials Production Center at Fernald, Ohio on Single Family
> Residences Only," preliminary report prepared for Mr. Stanley M. Chesley,
> Attorney at Law (November 30, 1987).

The Fernald, Ohio case is relatively unique in terms of analogous case studies
examined by Hunsperger because is does contain a nuclear-related facility.  It is not
relevant for the Rocky Flats case because no actual, large scale release of radioactive
material has been suggested or identified for the Rocky Flats plant.  In consequence,
the nature of perceived damages and thereby impact on property values is
fundamentally different.

The expert and related reports are contradictory with regard to actual property
value losses in the Fernald case.  Beron found that price trends increased after the
actual release when 12 housing characteristics and distance to the plant were taken
into account.  The view of the plant and its water tower reduced property values as
would be expected for residential properties located near any industrial complex.
However, this negative impact decreased after the actual release.  Thus, the release
decreased the negative visibility effect.  The Beron study does not conclude "that only
those properties with a view of the plant were impacted" as suggested by Hunsperger,
but rather that there were no negative impacts of any kind associated with the release.
The Beron study contained the most comprehensive hedonic price evaluation of all of
the studies and included all sales within a five-mile radius of the Fernald plant.

42

**Tab 1**
**Supplemental Expert Report of Ralph C. d'Arge**

Gartside also developed a hedonic price equation for the same data set in the Class area but eliminated the data set for the Control area.   He postulated the existence of exponential function between distance and selling price, "i.e., a shorter distance would produce an increasing detrimental effect on selling price."   In later analyses, he found a "reciprocal square root function of distance" increased statistical significance.

Whether removing the Control group and adding an exact specification of the distance function improves or diminishes accuracy and reliability, is an open question. There is no way except in particular circumstances, to know which technique is superior.  Gartside provides no proof on which technique is superior except to state that "based on the author's previous experience with studies of the environment, it was conjectured that effects of distance on selling price might behave according to the inverse function."   This obviously is not conclusive evidence of the superiority of one technique over another.

Gartside's results indicate a sharp decline in housing values for the distance zero to one mile from the plant for 1985 and 1986.  For distances of one to two miles and two to four miles, sharp declines occurred in 1985 with general recovery in 1986.  For the four- to six-mile zone prices continued to rise in 1985 and 1986.  Thus, the Gartside relationships indicate that most of the property value loss per residence was within one mile of the plant given an actual radioactive release.  Losses to property outside of the one-mile zone were transitory in nature and lasted less than two years.

The Gartside results, if applied to Rocky Flats, would be totally transitory effects of a duration of less than two years on residences two to four miles from the plant.  No impacts from four to six miles would be observed.

The study by Rosen and Burke used variants of a hedonic regression model to compare sales prior to the uranium trioxide release and after it.   The variability of coefficients between the pre-release and post-release samples make this analysis suspect.  The coefficient on year built doubles in size between the two samples.  The

43

Tab 1
**Supplemental Expert Report of Ralph C. d'Arge**

coefficient on brick construction increases by five times. The presence of garages goes from positive significant to negative and insignificant. These are signs that the two samples are distinctly different. That is, the characteristics of the average house sold prior to the release are distinctly different than the average house sold after the release. Otherwise, the magnitude and significance of the coefficients should be approximately the same. If a distinctly different type of house sold post-release, was it the cause of an observed price reduction or was it the release, or both. It is likely that the Rosen and Burke hedonic relationships are basically flawed by the non-equivalence of the pre- and post-release sample of houses sold. At minimum, their analysis must be judged as unreliable.

## XI.   CONCLUSIONS REGARDING "ANALOGOUS CASE STUDIES"

Hunsperger has proposed 13 case studies from different geographical regions of the United States to provide evidence as to market reaction to contaminants. He also asserts that "nuclear cases are in a class of their own." Other authors have also. Using Hunsperger's own criteria, ten of the 13 case are ruled out on the basis of logic. They do not conform to the Rocky Flats case. The remaining three cases are from the state of Ohio. The first Ohio case was found to contain an unreliable analysis of a proposed low-level nuclear dump site and a non-useful evaluation of a landfill. The second Ohio case contained no evidence of the impact of radioactive waste discovered in 1992. Further, much of the property value diminution discovered by plaintiffs or defendants was within .43 miles of the landfill with very little if any effect beyond 1.28 miles. This finding lends no support or even understanding on the Rocky Flats case where the alleged losses start at two miles or more.

The final Ohio case provides no useful analysis on market reactions because no significant releases have been identified for Rocky Flats. Defendant's experts found no property damages inclusive of damages associated with visual contact of the site after the release. Plaintiff's experts found substantive, non-transitory property value reductions only within one mile of the plant. Property value reductions between one

44