# EXHIBIT 15

United States District Court for the District of Colorado


Case No. 90-K181


Merilyn Cook et al.

v.

Rockwell International Corporation, a Delaware Corporation; and,
Dow Chemical Company, a Delaware Corporation

---

Update of the
Rebuttal Expert Report of
Ralph C. d'Arge,


August 6, 2004


_____

Ralph C. d'Arge

I.     Introduction

This document is an update of my report, dated March 18, 1997, evaluating the Flynn et al. survey and the "analogous case studies" section of the Hunsperger and Weston report. This update is based on advances and new standards for reliability developed in the field of economics in the past seven years that relate directly to the Flynn et al. survey and Hunsperger and Weston report.

These advances uniformly add to my 1997 conclusion that neither the Flynn et al. survey nor the Hunsperger and Weston analogous case studies provide any reliable estimate of alleged property value diminution in the Rocky Flats area. Recent work on analogous case study approaches (now called benefits transfer) suggests that none of the analogous case studies proposed by Hunsperger and Weston (1996) provide any guidance as to the existence, magnitude or extent of alleged decrease in property values near Rocky Flats. The "equivalence" criterion eliminates all of the case studies for not being relevant for assessing actual value changes. The research that has occurred since my 1997 report likewise highlights fundamental deficiencies in the Flynn et al. survey. This research mandates the Flynn et al. survey is irrelevant for such assessment because, among other things, no responses to the survey were obtained from respondents sufficiently knowledgeable about Rocky Flats to make economic choices.

II.    Advances in the Field of Survey Valuation and Benefits Transfer

A.     The stated preference approach to valuation

Contingent valuation surveys, or any other valuation surveys that are based on asking a sample of respondents for their preferences, are now almost universally called "the stated preference approach" to valuation. In 1995, before my 1997 Supplemental Report was drafted, Carson reported that the contingent valuation literature contained slightly more than 2,000

2

studies. By 2001, there were more than 5,000 research studies globally. See Carson (1996) and Smith and Pattanayak (2002). A comprehensive set of criteria has been set forth for stated preference methods of valuation by a blue ribbon panel of environmental economists supported by the United States Environmental Protection Agency. These EPA Panel standards, prepared in 2000 (hereafter referenced as EPA Panel), add to the rules and requirements set forth by the 1993 NOAA Panel and Mitchell and Carson's criteria cited in the 1997 Supplemental Report.

The EPA Panel formalized requirements for commodity definitions and for the validity of the study parameters. Validity of a survey, according to the EPA Panel requirements, is established by "content validity", "construct validity", and "criterion validity."

Content validity refers to the requirement that the commodity must be "clearly and concisely defined." The commodity here, although not properly defined, at least generally relates to the value of not being subjected to alleged environmental risks and changes presumed to occur if one resides in a certain residence some distance from Rocky Flats. Also, the alleged environmental risks and disamenities require a "detailed explanation" of all salient features before a benefits transfer can be valid. For Rocky Flats, this means that all qualitative and quantitative alleged environmental risks and impacts by location need to be described to the respondent. Also, questions should be included on "comprehension and acceptance of the commodity scenario" in order to evaluate reliability of the survey.

Construct validity examines the "internal validity" of the survey by assessing whether income and other determinants of preferences are consistent with economic theory. For example, it could be expected that residents living close to Rocky Flats would have greater knowledge of the effect of Rocky Flats on "desirability" of living near Rocky Flats than

3

homeowners far from Rocky Flats. If results are not consistent with theoretical explanations, the survey should be viewed with suspicion.

Finally, criterion validity examines ways of assessing the "true" value of the environmental event in order to compare it with survey results. One such criterion is a comparison of survey results with statistical results of actual market price changes for housing close to Rocky Flats. Such independent validation by comparison can add credence to survey results if the survey yields estimates in the same direction and magnitude.

B.    The benefits transfer approach

The "analogous case studies approach" set forth by Hunsperger and Weston (1996) is now called the "benefits transfer approach" in the literature in economics. One of the major requirements that the EPA Panel mandates in order for such an analysis to be reliable is that it use only commodities that are not just similar to the one being analyzed, but are in fact "equivalent" to it. By "equivalent", economists mean that the economic services provided by the two commodities are so "closely similar" that preferences would be equally satisfied by either one. See Brookshire (1993) or Desvousges et al. (1998). That is, the commodity being measured in each of the thirteen "analogous case" studies and the commodity being measured in the Rocky Flats scenario should provide almost exactly identical or equivalent economic services. The EPA Panel also requires that "baseline values," the amount of change induced by the environmental events, and the affected population be similar.

In addition to requirements for assessing the reliability of surveys and benefits transfer set forth by the EPA Panel, Desvousges et al. have substantially advanced the field in understanding and evaluating a reliable benefits transfer study. See Desvousges, Johnson, and Banzhaf (1998). The criteria are:  scientific soundness, germaneness/relevance, and richness in

4

detail. Desvousges et al. require that for case studies to be considered reliable for transferring their results to another situation or location, the studies must be scientifically sound; have the same "changes in environmental quality," baselines, commodities and property rights; and contain sufficient analysis and content to assess the reliability of estimates.

III.     Hunsperger and Weston's "Analogous" Case Studies

Hunsperger and Weston try to infer a range of loss in property values using estimates from case studies they have arbitrarily selected. They have not shown that any of their case studies is similar or "relevant" enough to be used reliably in evaluating or quantifying any alleged impact on real estate values in the Rocky Flats area. This is substantiated with the development of new requirements on benefits transfer procedures set forth in the last seven years by the EPA Panel and Desvousges et al. Therefore, Hunsperger and Weston's analysis is flawed and yields absolutely worthless assertions.

The process of using empirical values to estimate property values or other types of diminution in value from case studies of similar environmental events is called the benefits transfer process in the field of economics. See Brookshire (1993). This is what Hunsperger and Weston were trying, but fail to accomplish, with their "analogous case studies." Hunsperger and Weston develop a section of their report containing 13 case studies with very few similarities to the area near Rocky Flats, yet conclude that "their studies suggest proximity to an environmental disamenity can result in loss in value from just over $1,000 to as much as $24,000 per home." Hunsperger and Weston, vol.1 (1996). (This is a misrepresentation by Hunsperger and Weston because one of the studies they cite (Case Study 10) contains no loss in value so the correct range of economic loss they should have reported, for the thirteen studies, was $0 to $24,000 per house.)

5

Almost all of the published studies that Hunsperger and Weston cite are either hedonic
property value analyses or contingent valuation surveys, where the rules and standards for
identifying reasonable analogous studies are based in economics and not in real estate appraisal.
This distinction is a critical one. The reason that they are based in economics is straightforward.
These techniques were first developed and tested by economists in the 1960's and 1970's and
continue to be tested by economists today. The real estate appraisal community has had little
impact on the development of these techniques. Hunsperger and Weston (1996) cite an
Appraisal Institute book that contains a statement of recognition of these techniques, but they do
not identify the relevant economic criteria or literature for analogous case study evaluation or
benefits transfer processes. This lack of recognition by Hunsperger and Weston of the necessary
criteria for the application of benefits transfer demonstrates critical flaws in their analysis.

Since 1996, there have been many developments on benefits transfer processes, but many
of the most important accepted standards in the field are set forth in the 1998 Desvousges et al.
book on benefits transfer problems and a set of benefits transfer standards issued by the U.S.
Environmental Protection Agency blue ribbon panel in 2000.

A.     Failure to comply with EPA Panel standards

The EPA Panel developed precise requirements to augment the standards set forth by the
NOAA Panel and Mitchell and Carson on obtaining reliable surveys, and the early efforts of
Desvousges and others to offer principles and standards on benefits transfer. The EPA Panel
Standards were widely reviewed and received critical acclaim. One of the key issues evaluated
by the EPA Panel was requiring equivalence of commodities before a study could be used
elsewhere. Research documented that without equivalence, huge errors can easily occur in

6

valuing environmental impacts.  To reduce the chance of such large errors, the EPA Panel
required equivalence.

Not one of Hunsperger and Weston's analogous case studies meets the U.S. EPA Panel
standards requirement that the economic services provided by the analogous cases be so "closely
similar" to the Rocky Flats case that economic preferences would be "equivalent" with either
one.  That is, the commodity being measured in each of the thirteen studies and the commodity
being measured in the Rocky Flats scenario must (but do not) provide almost exactly identical or
equivalent economic services.  As described in more detail in my discussion on page 10
regarding lack of "richness in detail," Mr. Hunsperger is attempting to compare sites with mostly
different functions and concerns, in very different locations, with different distances from the
allegedly impacted properties, etc.  This does not even vaguely meet the equivalence requirement
for a reliable benefits transfer.  Likewise, socio-economic characteristics such as income,
transportation access, types of residences and other germane factors must be closely similar to
meet the equivalence requirement.  The population and economic characteristics of the people
living near Rocky Flats, like with the set of alleged environmental risks, are very different than
those analyzed in the thirteen studies.

B.     Failure to comply with Desvousges et al. criteria

Desvousges et al. set forth the generally accepted criteria for evaluating whether
particular case studies can be used as a basis for inferring possible change in value of properties
near Rocky Flats.  The standards developed by Desvousges et al. emerged from more than a
decade of research undertaken at several universities and Triangle Economic Research, a major
research firm with one specialty in benefits transfer problems.  These standards are widely
regarded as the best representation of the issues and criteria regarding benefits transfer.  The

7

EPA Panel has used many of these recommendations in their standards document. Desvousges et al. list three general categories of criteria for evaluating the transferability of existing studies to other locations and environmental events. These are (a) "scientific soundness", (b) "germaneness" (or "relevance)", and (c) "richness in detail."

*Lack of scientific soundness*

Before a study can be deemed "scientifically sound", it must at least undergo the peer-review process. All three of the survey-based case studies examined by Hunsperger and Weston had been peer reviewed, but one of these studies contained no empirical estimate of property value impact and thus, by definition, was not a credible study for Hunsperger and Weston to use as a basis for alleged property value impacts. The other two surveys did not involve nuclear waste issues. Five out of a total of twelve case studies had been peer reviewed. (The thirteenth case study was a court decision involving transportation impacts and therefore did not contain a relevant case study.) The seven studies remaining had no peer review and thus, cannot be evaluated for scientifically soundness and should not be used. Further, none of the case studies dealing with nuclear events had been peer reviewed. Without "peer review," it is impossible to judge how reliable these studies are using the Desvousges et al. criteria of scientific soundness. Therefore, Hunsperger and Weston's analogous case studies must be viewed with suspicion based on the criteria of scientific soundness for using case studies from other locations as set forth by Desvousges et al. (1998).

*Lack of germaneness/relevance*

The second Desvousges et al. criterion, "germaneness" or "relevance", is also not fulfilled by the studies selected by Hunsperger and Weston. Relevance requires that both a change in environmental quality and baseline level be precisely identified, along with "duration

8

and timing of effects." Desvousges et al. (1998). Nowhere are these changes and timing specified for the Rocky Flats area in the Hunsperger and Weston report, beyond the date of the FBI raid and potential stigma concerns following that date. The commodity to be compared and its timing and duration are never spelled out for the Rocky Flats area by Hunsperger and Weston, so it is impossible to judge whether any of the case studies are, in fact, relevant or germane. Moreover, an absolute requirement for relevance is a similarity in commodity definition and the only similarity identified by Hunsperger and Weston is the word "nuclear" in a description of a few of the case study sites. Such a lack of commodity definition eliminates any claim of relevance.

*Lack of richness in detail*

The final criterion set forth by Desvousges et al. is a general category called "richness in detail", which refers to how well a prospective study fulfills various conditions inclusive of definitions, comparison with substitutes, cost of time, and statistical analysis. The definition of the impact near Rocky Flats chosen by Hunsperger and Weston is so vague, indecisive, and potentially non-equivalent that it is impossible to assess whether a single one of the thirteen case studies is truly analogous to Rocky Flats or not. The case studies cited by Hunsperger and Weston include studies of facilities or events as wide-ranging as (a) a large scale municipal dump site, (b) a potential future low-grade nuclear waste storage site, and (c) a potential future highway accident involving nuclear waste. None of these commodity descriptions of actual or potential impacts has any equivalence to Rocky Flats, beyond the inclusion of the word "nuclear" in some. Thus, the definition of the commodity for the alleged Rocky Flats problem is unclear, beyond a reference to possible future "nuclear" related risks, whatever they are perceived to be.

9

In addition, most of the "analogous" case studies do not evaluate substitute sites, commodities, cleanup actions, the cost of time, or explicit analysis of interest rates. The actual timing of clean up activities is not analyzed in either the Hunsperger and Weston alleged Rocky Flats problem or in most of the analogous case studies they identify. Therefore, the Hunsperger and Weston list of analogous case studies cannot fulfill the Desvousges et al. third criterion for a reliable benefits transfer study. None of the analytical characteristics necessary to fulfill this criterion are identified and defined by Hunsperger and Weston for Rocky Flats or for the case studies.

Given the findings designated earlier on the Hunsperger and Weston Analogous Case Studies, it is my opinion that:

- **Not one of Hunsperger and Weston's analogous case studies meets the EPA Panel requirements that economic services provided by the analogous cases are so "closely similar" to the Rocky Flats case that economic preferences would be equivalent.**

- **Hunsperger and Weston's analogous case studies do not meet the criteria of scientific soundness, relevance/germaneness, or richness in detail required for such studies.**

- **The correct range of property value diminution for the Hunsperger and Weston list of thirteen case studies is $0 to $24,000. Hunsperger and Weston Select only one study with no property value impacts when there are many in the environmental literature.**

- **Hunsperger and Weston try to develop an approach by arbitrarily selecting particular case studies without considering at all the substantial scientific literature in economics dealing with the issue of benefits transfer. There is no logical structure to the process of exclusion or inclusion of the studies they selected.**

- **None of the "nuclear" related case studies listed by Hunsperger and Weston has been peer reviewed in the scientific literature. Some exotic measurement approaches and methodologies were used. Whether these studies could be published and satisfied by peer review is in doubt. Therefore, those studies cannot be creditably proposed to measure property value changes. They must be viewed as totally unreliable without credibility.**

- **In summary, none of the case studies identified by Hunsperger and Weston fulfill the standards of equivalence or scientific soundness needed to justify their use in assessing**

**property value changes. All of their case studies are absolutely worthless for this purpose.**

IV.     Flynn et al. Survey

        The following section analyzes the Flynn et al. survey using the criteria for survey

evaluation from the 2000 EPA Panel requirements and benefits transfer requirements set forth in

the recent Desvouges et al. book. See EPA Panel and Desvousges et al. 1998. The Flynn et al.

survey fails each and every major requirement set forth by the EPA Panel. Additionally, since

the Flynn et al. survey applies the benefits transfer methodology, the survey must satisfy the

criteria for a reliable benefits transfer. The Flynn et al. survey fails all of these criteria. Given

that neither the EPA Panel requirements nor the Desvousges et al. benefits transfer requirements

are satisfied, the Flynn et al. survey provides no reliable estimate of economic impact or property

value diminution.

        A.      EPA Panel standards

                1.      Introduction

        In addition to setting forth the requirements for reliable analogous case studies (or

benefits transfer), the EPA describes survey criteria similar to those set forth by the NOAA Panel

and Mitchell and Carson (which are described in our 1997 Supplemental Report), but grouped

differently. As introduced in Section II of this report, among many requirements, the EPA Panel

specifically examines the standards of "content validity," "construct validity," "criterion

validity," and "equivalence." These requirements, along with how the Flynn et al. survey fails to

meet them, are described below.

11

2.   Flaws in the Flynn et al. survey based on content validity

*Lack of commodity definition*

Content validity refers to the quality of the survey instrument in obtaining accurate, unbiased, and reasonable responses. Most importantly, as discussed earlier in this report, it refers to the commodity being clearly and concisely defined within the survey. The Flynn et al. survey attempts to use the idea of a "just right" house for recent actual or potential homebuyers in the Denver area. The central idea seems to be to determine whether, if respondents located a highly desirable house in their price range, they buy the house if it were located near Rocky Flats. However, before raising this question, the Flynn interviewers furnished the respondents with no facts about Rocky Flats, except that it is a "nuclear facility." The survey starts by asking about general opinions on four residential areas of the Denver metro region and about plans to purchase a home. After these general questions, additional questions posed to respondents about Rocky Flats were to:

a.  Ask the respondent to differentiate the Rocky Flats facility from the Rocky Mountain Arsenal and identifies Rocky Flats as a nuclear facility. (Flynn et al. survey, Q34a).

a.  Ask for impressions of, ideas about, and location of Rocky Flats. (Flynn et al. survey, Q35, Q36, Q37, Q38, Q39).

b.  Ask the respondents who were acquainted with Rocky Flats for an overall impression, negative or positive, or neither. (Flynn et al. survey, Q40).

c.  Ask Arvada/Westminster residents only whether Rocky Flats "makes your house's location" more or less desirable or makes no difference. (Flynn et al. survey, Q50, Q51).

d.  Ask Denver residents only, excluding Arvada and Westminster residents, for a feasible price range on a new home and whether potential buyers would buy a "just right" house within 4-6 miles of Rocky Flats. (Flynn et al. survey, Q50a, Q53aa, Q54, Q55, Q56).

Note that in the grouping of questions, neither the Arvada/Westminster sample nor the rest of the Denver (metro) sample is given any information about the alleged risks, problems, benefits, issues, employment, or any other dimensions of the issues (or commodity) to be valued.

12

An even more egregious problem is that the valuation question comes before the respondent is informed of the FBI raid, the potential for health risks, and past alleged problems of the Rocky Flats plant. This causes problems for a number of reasons. First, because no definition is provided by the survey, "just right" is totally conceptualized by the respondent. Because no characteristics of the "just right" house are defined or collected within the survey, cross checking the validity of a potential purchase with income or other economic factors is impossible. Thus, the validation of results, as required by the NOAA and EPA Panels, cannot be accomplished.

Second, Flynn et al. ignore the problem of whether a residence near Rocky Flats could ever be "just right" because of conditions of the property market in the Rocky Flats area. Some of these conditions are: zoning regulations, type or vintage of house, existence of open space, gated communities, school location, availability of services, accessibility to and convenience of public transportation. The list of reasons why the Rocky Flats area could be potentially less than "just right" is almost endless. Flynn, et al. have made no effort to discover respondents' underlying housing preferences or how those preferences influence their desire to purchase in the Rocky Flats area. In consequence, the reasons for observing the particular offer price or choice are not clear or carefully documented.

Denver residents may have a substantial variety of perceptions of housing stock northwest of Denver, varying from small horse farms to closely spaced multi-family housing developments. Yet, Flynn et al. made no attempt to examine individual differences in perceptions beyond ranking vaguely defined individual evaluations of environmental quality, stability in real estate values, or other very general characteristics.

Other problems relating to the vague and undefined nature of the housing commonly include:

13

a. Wide disparities in perceptions associated with a "just right" residence. This is also an issue of content validity.

b. Variations in perceptions and beliefs on future interest rates, down payments, taxes and other economic dimensions of property transactions that would influence responses to the $5,000 or $10,000 discount questions. This also is an issue of construct validity. Flynn et al. made no effort to correct for possible disparities in the magnitude of offered discounts or even why these amounts were selected.

c. Conditions for a "just right" house may not be available near Rocky Flats. For example, note the difference in expected price, documented in Table 3 later in this report, between Arvada/Westminster respondents and the rest of Denver respondents. This is an issue of content and criterion validity.

The EPA Panel states unequivocally that the commodity "must be clearly and concisely defined." See EPA Panel (2000) If the commodity is not completely identified, as it isn't in the Flynn et al. survey, totally spurious results will occur. Because the negatives and positives of residing near Rocky Flats are not documented or described at all beyond identifying the facility with the word "nuclear," each respondent is buying whatever they internally perceive to be the problems and benefits of living near Rocky Flats (even though they have never lived there) and whatever they assume, right or wrong, about the process of cleanup. For example, some may believe that cleanup has already occurred, while others may believe it is impossible. Because the respondents were not given a definition of the commodity, or any information about the risks, benefits, or cleanup, the average valuation overall of these speculations across respondents is pure nonsense and there is no possibility of interpreting the survey results as measures of economic loss or as market impacts.

The differences across respondents about the commodity to be valued can be seen in the extreme diversity of responses to the Flynn et al. survey questions on value, ranging from no price discount to a huge price discount. This diversity proves beyond a doubt that similar information/commodity understanding does not exist across the Flynn et al. survey respondents.

14

*Perceived distance problems*

A problem related to the lack of commodity definition, as a part of content validity, is the set of distance specifications for the "just right" house to Rocky Flats (4-6 miles) and the associated questions to Arvada/Westminster residents regarding whether the Federal government's minimum buffer of 2 miles was adequate. Nowhere in the Flynn et al. survey is there an analysis of whether distance measures are meaningful to respondents or how they may bias their responses. The NOAA Panel, Mitchell and Carson, and the EPA Panel have all strongly recommended that the effect of key parameters on the accuracy and the meaning of responses to valuation questions be tested. The EPA Panel has recognized that the validity of responses depends on "respondent comprehension" and knowledge where as here, biases may affect reliability.

All of the Flynn et al. valuation questions involve specification of distance to Rocky Flats. In Table 1 are recorded estimates of distances obtained by the Flynn et al. survey and actual distances obtained from reliable mapping sources. Note that the average estimated distance to Rocky Flats by Arvada/Westminster residents was slightly more than 14 miles, while the average distance is actually 7.5 miles. The average respondent overestimated this distance by almost 100%. A similar result occurs for the survey respondents from the rest of the Denver metro area. Although Rocky Flats is about 14 miles from the center of Denver, the average distance reported by the Denver metro residents was just less than 28 miles which, if this were in fact true, would place the average resident near Watkins in an easterly direction, or Parker in a southerly direction. The Flynn et al. survey shows a consistency in the direction and magnitude of this bias, namely a 100% overestimate for distances in the 7–30 mile distance across two distinct groups of Denver area residents.

15

The cause of this systematic bias is not known. There are other inherent biases in how people perceive risks. See Kahneman and Tversky (1986). It appears that people perceive facilities that they view as negative as being further away than they in fact are. Likewise, they may perceive positive facilities such as schools, churches, malls, etc., as closer than they really are. This bias means that when a respondent is shown a line on a map connecting two points they are familiar with, but without a scale, and they are asked the distance, it generally will be twice as far as the actual distance.   If they are given a distance of 10 miles to think about, the actual distance that they are thinking about is only 5 miles. Their perceptions induce such an upward bias. How does such a bias affect responses to questions in the Flynn et al. survey where distance is a critical factor? If they are told that the federal government has established a safety zone of 2 miles around Rocky Flats, the actual distance associated with their perception of 2 miles is only 1 mile. Further, if they are asked whether a distance of 4 to 6 miles is sufficient for them to consider buying a house, the actual distance is only 2 to 3 miles. Thus, a safe distance to them is much greater in perceived miles than in actual miles. Unless this large bias is corrected for, there is no way to accurately assess their valuation discounts associated with housing "near" Rocky Flats.

Here, more than 50% of the respondents stated that a zone of more than 6 miles was safe, while 38% stated that a 2 mile zone was safe. But what they in fact were perceiving was a 3 mile zone (in actual miles) or a 1 mile zone (in actual miles) is safe given the distance bias uniformly observed in the Flynn et al. survey. This extreme bias means that the valuation responses to distance related questions are highly suspect. Further, Flynn et al. make no effort to test for this bias or develop a procedure for eliminating it or controlling for it.

16

Table 1
Respondents' Estimates of Miles to
Rocky Flats and Actual Miles

| Sample | Mean Average Estimated Miles to Rocky Flats[1] | Average Actual Miles to Rocky Flats[2] | Percent Difference |
|---|---|---|---|
| | | | |
| Arvada/ Westminster | 14.28 | 7.50 | 190% |
| Denver Metropolitan Area (excluding Arvada/Westminster) | 27.77 | 14.10 | 197% |

[1] *As reported in data sets of the Flynn et al. survey.*
[2] *As measured to assigned center of city and to the edge (eastern) of Rocky Flats using Maptitude.*

Further, Flynn et al. do not define "nearby" in distance terms until almost the end of the survey. In question 64, "nearby" is finally defined as "within 6 miles or so," even though the understanding of "nearby" is needed to answer Question 54 and Question 50a where both use the term "nearby" to elicit a ranking or valuation:

> **Question 54.** Think back to the time you chose your current house. At that time did you know the Rocky Flats facility was nearby? *This question was only asked to Arvada/Westminster respondents with an 84 percent yes response.*

> **Question 50a.** Suppose that after searching for some time, you have finally found a house that seems just right. This house is in the Arvada/Westminster area. Would being near Rocky Flats make this house: (1) considerably less desirable (34%), (2) somewhat less desirable (34%), (3) somewhat more desirable (2%), (4) considerably more desirable (.8%), or (5) would it not make a difference one way or the other? (30%)

In both questions, "nearby" vaguely defines the problem without identifying an explicit measure of distance until more than nine questions later in the survey. Thus, the respondent is left to guess what distance "nearby" means or whether "nearby" is safe or not when responding to questions 54 and 50a. Thus, there can be no confidence in the accuracy of responses to Question 54 and Question 50a. This is a clear failure to meet the criterion of content validity Note that this is in addition to the bias in perceived distances discussed earlier. One cannot have

any confidence in the responses to Question 50a on a "just right" house or confidence in responses to Question 51a, Question 52a, Question 54aa, and Question 55, the valuation questions, because actual miles are so much less than perceived miles. For a survey to be credible it must have an unbiased, complete and accurate description of the commodity. Because this is not present in the Flynn et al. survey, none of the survey results partially based on distance are credible.

3.    Flaws in the Flynn et al. survey based on construct validity

*Flaws in survey structure*

In addition to the equivalence rule violations, commodity definition problems, and perceived distance problems, there are substantial bias problems with both individual survey questions and the overall survey structure. One such problem arises because Flynn et al. use a telephone survey to record responses to approximately 105 to 117 questions, some of which include complex economic choices. The EPA Panel recognized that such complexities may require in-person interviews as opposed to telephone surveys. Such a telephone survey requires a minimum of one hour of time. Dillman has found that telephone surveys that exceed 12 pages of questions may run into difficulties with maintaining interest in the survey and continued participation. See Dillman (1978). The Flynn et al. survey is 32 pages plus notes to interviewers on key questions. Thus, the Flynn et al. survey is more than 2½ times the maximum recommended length of telephone surveys as suggested by a survey expert.

Also, nowhere in the University of Maryland record of eligible survey responses is the number of surveys identified that were started but not completed. Because the partial results were not tabulated in the report, were they discarded? Did they confirm or deny findings observed for those completing the entire survey? It appears that refusals amounted to 25.5% of

18

those respondents actually contacted. The reasons for such a high refusal rate were not recorded, or if they were, they were not placed in the University of Maryland's report. A related problem of missing or misplaced responses exists with questions on the Highland Ranch area. There was a substantial difference between the number of individuals eligible to respond and the number of actual recorded responses.

*Inconsistent response rate*

A total of 604 respondents were each asked if they were familiar with the Arvada, Westminster, and Ken Caryl areas of Denver. Their response rates where they indicate they were familiar with the area were: *Arvada*, 95% for Arvada/Westminster area and 70% for the rest of Denver; *Westminster*, 95% for Arvada/Westminster area and 70% for the rest of Denver; *Ken Caryl*, 59% for Arvada/Westminster area and 63% for the rest of Denver. If the respondent answered no on Ken Caryl, they were asked about Highlands Ranch. For *Highlands Ranch*, 29% of the Arvada/Westminster area respondents had heard of it, and 54% of the rest of Denver respondents had heard of it. The rate of familiarity with Highlands Ranch markedly decreased for Arvada/Westminster respondents, but not for the rest of Denver. However, what decreased dramatically for Highlands Ranch was the actual response number of 69 for Question 18c as contrasted with 105 possible responses. That is, a marked decrease in response rates occurred when the question on familiarity with Highlands Ranch was asked. This decrease amounted to an instantaneous decrease in response rate of more than 30%. Lower response rates continued for most of the questions following the Highlands Ranch questions until the questions pertinent to Rocky Flats were asked. At that time, the number of responses jumped back up to 602.

These results are listed in Table 2, which shows two substantial swings in response rates. Such extreme variations in response rates should not occur in a well designed survey that is

19

properly structured. A 30-40% swing in response rates to individual questions means that the sample is <u>never</u> representative of the population, but contains different sub-samples for the estimates of response for each question. See Dillman (1978). In fact, one question, Q23c, had a 53% reduction. Such extreme variations in responses to a telephone survey can only come about because: (1) the respondent cannot or will not answer the question, (2) the interviewer skips the question entirely for some of the interviews, or (3) the interviewer does not provide the respondent sufficient time or understanding to answer before proceeding to the next question. The second or third reasons identify problems with the interview process that cause totally unreliable survey responses.

Such procedures are not acceptable to obtain credible, unbiased surveys and violate the EPA Panel requirements of content validity and construct validity. The first type of omitted response may occur for many reasons, but the most likely explanation is that the question requires too much thought or is too complex for use in a long telephone survey. Such a problem is very likely in the Flynn et al. survey because it contains over 100 questions.

20

Table 2

Total Recorded Responses by Question in the
Flynn et al. Survey for Rocky Flats, 1996

| Question Number | Total Number of Recorded Responses | Percent Response Rate* |
|---|---|---|
| | | |
| Date of Interview | 604 | 100 |
| Q6 | 604 | 100 |
| Q6a | 604 | 100 |
| Q6b | 604 | 100 |
| Q18c | 69/105** | 66 |
| Q22 | 429 | 71 |
| Q23a | 336 | 56 |
| Q23c | 49/105 | 47 |
| Q30 | 352 | 58 |
| Q32 | 328 | 54 |
| Q34b | 602 | 99 |
| Q62 | 537 | 89 |
| Q67 | 175 | 29 |
| Q72 | 398 | 66 |
| HINC | 575 | 95 |

* The maximum number of responses is 604.
**The total number is the sum of actual responses to the question. The numerator is the estimated
number of available responses derived from the previous question in sequence. For example, there
was a proportion of the 604 respondents who were familiar with Ken Caryl so were not asked
questions on Highlands Ranch.

The Flynn et al. survey contains substantial redundancy and repetition in asking about
rankings of neighborhoods in the Denver metro region. Some of the low rate of response results
were for those neighborhood rankings. Whether there was boredom, lack of interest, lack of
understanding, or some combination of reasons for the extreme variation in response rates is
unclear. Flynn et al. made no effort to test why such extremes occurred in the interview process.
Results of pre-tests of the survey are not provided so if this problem of response rates was
observed, it was never corrected for. In consequence, the survey is fundamentally flawed and
little confidence can be placed in the degree of unbias or accuracy of the responses.

21

*Sequencing biases*

The survey answers offered for questions asked to Arvada/Westminster residents were sequenced from more desirable first to less desirable, while the Denver metropolitan survey answer options were sequenced from less desirable first to more desirable. It has been known for a long time that such changes in sequencing can bias the results, thereby making them unreliable. See Mitchell and Carson (1989) and the EPA Panel (2000). Respondents tend to focus on what they are confronted with first and what appears most harmful to them. Thus, due to the sequencing, the Denver residents are likely to provide a greater negative response to Rocky Flats (which they did). For close-ended, ordered survey questions, one of the cardinal rules is to make the order logical. See Dillman (1978). For example, proceeding from more to less, faster to slower, or greater, equal to, lesser are examples of logical ordering. Reversing them would also be logical.

The Flynn et al. survey generally follows this pattern. In question 46, strongly negative, negative, neither negative or positive, positive, or strongly positive constitutes the logical ordering of choices. However, for questions 50 and 50a, this rule is violated by Flynn et al. In these questions, the neutral response is at the end so the question ordering is much more desirable, more desirable, somewhat less desirable, considerably less desirable, and does not make a difference. The ordering on less and more is reversed for the question given to Denver residents not residing in Arvada/Westminster. Why was such an illogical ordering introduced for these questions dealing with Rocky Flats impacts? That is, why is the ordering violated by placing the neutral response at the end of the order instead of the middle where it logically belongs? Why was this done only for the Rocky Flats questions and not for all the other

22

questions involving rankings?  There is also no apparent reason why the ordering was reversed for part of the sample.

These anomalies raise serious questions as to whether the researchers were attempting to influence the survey outcomes.  Any known biases from sequencing should be minimized. Because Flynn et al. made no effort to do so, their survey fails the EPA Panel's construct validity requirement.

*Other biases*

Biases in reported results exist because of processes of exclusion followed by Flynn et al. Respondents living near Rocky Flats were excluded regardless of whether or not they were potential buyers.  Therefore, buyers who had already decided that they liked the area and had acted on that preference were explicitly excluded.  Long-term residents from the Rocky Flats area were also excluded, which omits another relevant segment of the property market near Rocky Flats.  Further, long-term residents of the Denver area away from Rocky Flats were excluded even though they may have already identified a "just right" residence unrelated to avoiding Rocky Flats.  In fact, people who had no inclination to move in the five years prior to 1996 and therefore were excluded from the survey may be the only group who had successfully identified a "just right" house.  This group, whether they were near Rocky Flats or not, may or may not have been influenced by the existence of Rocky Flats.  Respondents who thought Rocky Flats was beneficial to the community were underlined_excluded automatically from further valuation responses.  Yet such individuals may also influence or negate any potential price discounts by offering higher prices.  Sufficient numbers who believe the benefits outweigh the risks, believe the risks are minimal, or who otherwise do not change their economic behavior because of Rocky Flats would completely eliminate any alleged price discounts.  Thus, because of the

23

survey design, the hypothetical commodity is only being purchased by respondents who have negative views about nuclear facilities. Individuals with other viewpoints are omitted from the survey.

This is a clear bias toward overstating any possible price discount or creating a fictitious one when one does not exist. Thus, the Flynn et al. sample is staged to emphasize the "less desirability" of the Rocky Flats area, but not to sort out which negative effects made the area less desirable. A less biased sample would examine all residents now living in the area and those who have moved away and the reasons why they are living where they are and whether Rocky Flats impacted this decision. This is also an issue of construct validity. Unfortunately, the Flynn et al. survey only obtains loss in value estimates from those who have never lived near Rocky Flats and, for a large (but unknown) number of reasons, never intended to.

*Irrelevant questions*

The extreme drop off in number of responses to the questions on residential areas[1] near Denver suggests that interviewers either skipped questions in this category or did not pursue answers diligently. This bias in response rates raises further issues regarding construct validity. Specifically, it causes a large uncertainty on the magnitude of effort each respondent made in evaluating subjective characteristics of various neighborhoods and the resulting sample providing accurate price discounts. Indirectly, this could have a pronounced effect on the estimates. Almost 50% of the total survey questions, by pages, are devoted to these broad categorizations that are not extensively analyzed for bias problems or used in evaluating price discounts. Therefore, roughly half of the survey provides little or no information to aid in the assessment of price discounts or their credibility. Such obvious wasted efforts undoubtedly led

---

[1] Residential area categories were: school quality, access to shopping, stability of house values, access to work, air quality, water quality, overall environmental quality, personal safety, reputation, overall evaluation as a place to live, plus open-ended questions on "what comes to mind" about these areas.

24

to much lower response rates for these largely valueless questions. Dillman suggests making

telephone questions reasonably brief, understandable, and, most importantly, known by the

respondent to be important. Dillman (1978).   To include superfluous and irrelevant questions in

the beginning of the survey, as Flynn et al. did, may frustrate the respondent and totally defeat

the usefulness of the survey. A worse design to illicit reliable responses is hard to imagine.

*Failure to pass scope tests*

Construct validity refers to the degree of internal consistency "incorporated into the study

design." See EPA Panel (2000). The NOAA Panel identified a similar set of requirements in

their study, which includes: (1) substitutes, (2) scope tests, (3) alternative expenditure

possibilities, and (4) cross-tabulations. These are listed and described in sections O, Q, and V in

the d'Arge 1997 Supplemental Report.

One example of construct validity is a test of the sensitivity to scope of the environmental

event. A scope test varies the amount of the commodity or environmental event and determines

whether there is an observed change in value as a response. For example, if the amount of

environmental risk is increased at a site, willingness to pay to avoid it should also increase as

should necessary minimum compensation.    If there is no variation in value as quantity or

another attribute change, the scope test fails and construct validity is not satisfied. The Flynn et

al. survey did not vary the intensity or risk, but only varied distance to Rocky Flats. Other

aspects or characteristics of the commodity, including the alleged number and intensity of

nuclear or non-nuclear spills or events, the amount of on-site waste treatment, or the amount of

radioactive material removed, were not examined. Thus, at best, only one dimension of scope is

evaluated in the Flynn et al. survey. Construct validity requires other tests of impact on property

values including income, price and location of close substitutes, and other key economic factors

25

affecting housing preferences.  None of these tests were conducted by Flynn et al. to evaluate or

justify their findings on economic discounts.  In consequence, the Flynn et al. survey fails in

fulfilling the EPA and NOAA Panel criterion of construct validity.

        4.      Flaws in the Flynn et al. survey based on criterion validity

*"True" value versus stated preference*

      The third requirement set forth by the EPA Panel is called "criterion validity," which

examines the accuracy of the stated preference approach as compared to other approaches

measuring the "true" value of the change.  Actual market prices for residential housing exist for

both the Rocky Flats area and many comparable areas.  Thus, the stated preference approach can

be validated by comparing the survey results with results from actual market transactions.

(Carson 1996).  Unfortunately, this was not done.

      There are doubts by economists "concerning whether stated preference methods can

provide useful information" and on whether there is any validity to "individual's responses to

hypothetical questions."  See EPA Panel (2000).  Until these doubts and concerns are eliminated

by further research or market results replicate survey outcomes for Rocky Flats, the survey

results must be viewed as less accurate and meaningful than analyses based on actual market

transactions.  In consequence, the Flynn et al. survey must be viewed as less reliable than market

based analyses from the perspective of the EPA Panel's criterion validity requirement.

        5.      Flaws in the Flynn et al. survey based on the equivalence rule

      The Flynn et al. survey utilizes the benefits transfer procedures by using responses of

Denver area residents far from Rocky Flats to infer values of residences near Rocky Flats (while

not collecting relevant data for nearby residents).  The EPA Panel requires that the benefits

transfer be made only for equivalent commodities.  Since a Denver resident views a "just right"

house differently than does a current resident of Arvada/Westminster, who is closer to Rocky Flats, Flynn et al. creates a problem of benefits transfer. By definition, Denver respondents would have less information about and different perceptions on Rocky Flats than nearby residents. Their perceptions would be different, which is verified by the results of the Flynn et al. survey.

For example, almost 80% of residents in the Flynn et al. survey living in Arvada/Westminster expressed that the existence of Rocky Flats had <u>no</u> effect on the "desirability" of living in that area. This difference is recorded in Table 3. Alternatively, 67% of those in other areas of Denver expressed that the existence of Rocky Flats had a strong <u>negative</u> effect on the "desirability" of the nearby area. This striking difference in perceptions on Rocky Flats means that the estimates derived from Denver area residents cannot be equivalent to those residing on property near Rocky Flats.

27

Table 3

Characteristics of the Arvada/Westminster and Denver Statistical Samples
taken from the Flynn et al. Survey (1996)

| Category/Questions | Arvada/ Westminster | Sample Size | Denver Metropolitan Area (excluding Arvada/Westminster) | Sample Size |
|---|---|---|---|---|
| | | | | |
| Estimated miles from Rocky Flats you now live. | 14.3 | 177 | 27.8 | 390 |
| Does Rocky Flats make your actual or potential new house more or less desirable or makes no difference? | 79% (no difference) | 185 | 33% (no difference) | 209 |
| Do you have friends or relatives that work or have worked at Rocky Flats? | 58% (yes) | 188 | 35% (yes) | 414 |
| What price range for a new home would you target? | $140,850* (average price) | – | $229,000** (average price) | 271 |

*Average 1996 price in class area as specified by Hunsperger and Weston in Rocky Flats Nuclear Weapons Plant Property Impact Study (November 21, 1996, p. 256).
**Average expected price of a prospective purchaser for Denver residents recorded by the Flynn et al. survey.
Source: Maptitude 4.5, Caliper Corporation.

Omitting responses of nearby residents to Rocky Flats would only be reasonable if all areas around Denver were identical and provided similar or identical public and private services, inclusive of types and vintages of houses and neighborhoods, transportation services, access to markets and jobs, and all individuals had identical tastes, preferences, and incomes. This is not the case in Denver and most other cities. A Denver resident has already self-selected away from Arvada/Westminster for a multitude of reasons. Thus, they cannot be considered to be, by definition, representative of individuals who would typically purchase a home in the Westminster/Arvada area. Because of available housing and individual wealth, their housing needs may not be accommodated in the Westminster/Arvada area regardless of whether Rocky

28

Flats is nearby. Because the two samples do not have identical tastes and housing is also not

identical, the Flynn et al. survey does not and cannot satisfy the EPA equivalence rule.

      B.    Desvousges et al. benefits transfer criteria

          1.    Introduction

As mentioned earlier in reference to the EPA Panel's equivalence rule, there is a further

problem from the perspective of benefits transfer issues applied to properties near Rocky Flats.

The Flynn et al. survey did not ask valuation questions on the impact of Rocky Flats to

respondents who actually live near Rocky Flats (e.g., those residing in or near Arvada and

Westminster). The Flynn et al. survey is bifurcated such that only respondents currently living

far from Rocky Flats are asked valuation questions. Because those distant respondents' answers

are being used to estimate values in the Rocky Flats area, the benefits transfer criteria of (a)

"scientific soundness", (b) "germaneness (or relevance)", and (c) "richness in detail" must be

applied to the Flynn et al. survey. The Flynn et al. survey fails to meet these essential criteria for

reliability.

          2.    Problems in the Flynn et al. survey based on the Desvousges et al. criteria

*Lack of scientific soundness of the Arvada/Westminster and Denver samples*

Table 3 contains several selected response rates by survey respondents from the Flynn et

al. survey. The substantial variation in respondent type is demonstrated by the marked

differences in response rates between residents in Arvada/Westminster and residents of the rest

of the Denver. There are substantial differences in: distance estimates, perceived effects of

Rocky Flats; and relevant price ranges for new housing. For example, the housing value

question was posed only to the Denver area respondents, and the average of this group was

$229,000. By contrast, the average selling price in the Arvada/Westminster area, as reported by

Hunsperger and Weston, was $140,850 for recent homebuyers. Thus, the average expected home price reported by Denver area residents was about 63% greater than the average actual price paid by buyers in Arvada/Westminster. Many buyers who purchased in Arvada/Westminster would not be able to purchase in some other areas of Denver because of financial limitations. Assuming an annual interest rate of 7.75% (approximate 1996 annual average)[2] for a 20 year loan with 15% down on a $140,850 purchase price would result in a PITI of $1,576 per month. See www.ginniemae.gov. Using a 25% payment-to-income ratio would result in a required annual family income of $75,648. For a house costing $229,000, PITI would be $2,536, and the required income level would be $121,728. Increasing the payment-to-income ratio to .35 reduces the Arvada/Westminster required income to $54,034 and to $86,949 for Denver, respectively. This 60.1% higher required income for Denver area residents indicates that the average home buyer in Arvada/Westminster is distinctly different, on the basis of income, from the average home buyer in Denver, at least for those responding to the Flynn et al. survey.

What does such a finding on differences between Denver home buyers and Arvada/Westminster home buyers mean for the reliability and accuracy of a Flynn et al. benefits transfer? Note that in order to use the Flynn et al. survey results to estimate empirical property value reduction, Hunsperger and Weston assume these two groups of respondents are the same, i.e. that the commodity is equivalent and the populations are very similar. As discussed above and in the section *Violation of the EPA equivalence rule*, the commodity is different between those that live near Rocky Flats and those that do not. Further, because of differences in income, purchasing power, and knowledge about Rocky Flats, as suggested by the differences outlined in Table 3, the survey results based on a Denver sample cannot be used, via a benefits transfer, to

---

[2] As reported on the Federal Home Loan Mortgage Company weekly Primary Mortgage Market Survey.

estimate actual losses near Rocky Flats. The survey fails the benefits transfer tests for reliability and therefore cannot be used as a basis for assessing alleged property value diminution.

These problems are exacerbated by the Flynn et al. use of "just right" house questions. As stated earlier, under the EPA Panel's criterion of content validity, the "just right" house near Rocky Flats or in the Arvada/Westminster area may be impossible to obtain. Almost one-third (31.8%) of the total respondents in the Flynn et al. survey identified transportation problems as a major disadvantage for them to consider Arvada/Westminster. Also, growth and development of the community were considered major factors for 14% of the respondents. Both of these factors substantially exceed the impact of Rocky Flats being nearby, which was identified as a major disadvantage by only about 7% of the total sample. Thus, a "just right" house may have been impossible in Arvada/Westminster for 46% of the Denver sample without even considering Rocky Flats. The Flynn et al. survey made no attempt to adjust the concept of "just right" for this extremely high rate of attrition for the area being considered or to discover the actual percentage that would opt out of this market solely or primarily because of Rocky Flats. Because up to one-half of the survey respondents would be neither buyers nor sellers, they would never be a part of that residential property market. They should not be part of the sample. Accordingly, the sample is not scientifically sound and is, therefore, totally unreliable.

*Lack of germaneness/relevance*

The Desvousges et al. criterion of "germaneness" or "relevance" is also not fulfilled by the Flynn et al. survey. The Flynn et al. survey contained <u>no</u> questions regarding the expected risk, benefits, or any other characteristics of being close to Rocky Flats beyond a few vague comments in questions about past fires and spills, and the FBI raid, as stated earlier under the EPA Panel's criterion of content validity. These statements were not given to the respondents

31

until the end of the interview, after the respondent had answered the valuation questions, so they had no effect on housing price or discounts. Therefore, it is unclear what commodity the respondent was purchasing in the survey. The lack of a definition provided to the respondent for the commodity leaves the criterion of germaneness or relevance unsatisfied.

*Lack of richness in detail*

The final criterion set forth by Desvousges et al. is a general category called "richness in detail", which refers to how well a survey fulfills various conditions inclusive of definitions, inclusion of substitutes, cost of time, and statistical analysis. The Flynn et al. survey report contains no systematic statistical analysis of results, i.e., how discount and interest rates on houses relate to socio-economic factors, such as income and job availability, or other factors affecting housing value. The Flynn et al survey report contains only a brief description of possible correlations on a few socio-economic factors. This is not sufficient on the basis of richness in detail with regard to statistical analyses, thus the Flynn et al. survey fails the final Desvousges criterion.

      C.     Attitudes and economic preferences

In recent studies, social scientists have concluded that stated preference approaches are measuring attitudes and not actual economic preferences. See Kahneman et al. (1999). An attitude is an expression of feelings about a topic or event as distinct from a statement of actual economic preferences which would be observed in a market if the market existed. An attitude indicates how an individual feels about a commodity without necessarily being willing or able to pay for it. Economic preferences, by contrast, indicate what an individual would actually pay for a given quantity of a commodity at a given price. Perhaps the phrase "put your money where your mouth is" captures the essential difference. If respondents are only indicating a general set

of attitudes in a hypothetical survey where no money changes hands and will not change hands, then such a value is completely meaningless as a guide to actual economic values and prices. In consequence, the stated preference approach, if rigorous standards of survey design and analysis are not precisely adhered to, often only reveals an individual's attitude and not an actual economic preference. Thus, the survey results must be viewed as less reliable than market-based analyses from the perspective of the EPA Panel's criterion validity requirement.

An attitude also does not necessarily reflect a rational response to the potential negative impacts. In the Flynn et al. survey, more than 164 of the 239 respondents queried stated that there isn't "any price reduction that would prompt [them] to purchase" the house near Rocky Flats. But such a statement is irrational unless the respondent is required to live in the house for the rest of their lives. Because the Flynn et al. survey did not in any way specify that they must live in the house, the respondent could buy the house for a steep discount, sell it, and buy another house away from Rocky Flats. The necessary discount would be whatever minimum the respondent needed to make the transactions. However, observing that more than 70% of a subset of the respondents are supposedly unwilling to buy at any price means that no rational economic evaluation is being identified by the survey and, therefore, actual economic preferences are not being measured. The respondents are providing an attitude about certain poorly defined risks, rather than expressing what they would do in real markets. Thus, the Flynn et al. survey is not providing meaningful estimates reductions in market prices.

Given the findings recorded in various sections of this report on the Flynn et al. survey, it is my opinion that:

- **The Flynn et al. survey does not meet the U.S. EPA Panel requirements of construct validity, content validity, or criterion validity.**

33

- The Flynn et al. survey totally omits a description of the economic commodity being purchased in the survey. This omission violates an absolute requirement of the EPA Panel.

- The Flynn et al. survey fails to meet the U.S. EPA Panel requirement that all economic services provided to Arvada/Westminster or other areas close to Rocky Flats are equivalent to those for the rest of Denver.

- The Flynn et al. survey contains a well defined bias in the direction and magnitude of respondent distance estimates. This extreme bias associated with people estimating distances with no guidance given by the survey interviewer means that the valuation estimates to distance-related questions are totally unreliable.

- The Flynn et al. survey shows substantial variations in response rates to individual questions, resulting in lack of consistency and obvious inherent biases. Such variations indicate a basic flaw in the length and complexity of the survey design.

- The Flynn et al. survey contains sequencing bias. There was no logical reason for the change in survey sequencing. Rather, it appears to be either an oversight and therefore a sign of sloppy survey design, or a planned effort to bias the outcomes toward greater price discounts and concerns with Rocky Flats.

- The Flynn et al. survey does not meet the criterion of richness in detail set forth in the 1998 Desvousges et al. book on benefits transfer problems.

- It is shown that the Flynn et al. survey is undoubtedly measuring attitudes rather than true economic preferences. In consequence, the Flynn et al. survey approach yields unmeaningful and biased values that are not reflections of what would occur in an actual market.