# EXHIBIT 17

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

MERILYN COOK, *et al.*,　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　Plaintiffs,　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　v.　　　　　　　　　　　　)　　　**Civil Action No. 90-K-181**
　　　　　　　　　　　　　　　　　)
ROCKWELL INTERNATIONAL　　　　　)
CORPORATION and THE DOW　　　　　)
CHEMICAL COMPANY,　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　Defendants.　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)

## DECLARATION OF M. LAURENTIUS MARAIS

plutonium released to the environment. But in Dr. Cochran's own words, "one cannot distinguish between these MUF contributions," (poor estimates and measurements, etc.) and "emissions ... to the environment." He adduces no such additional information about the proportion of MUF due to environmental releases, and has no rational, scientifically valid basis for the conclusion he draws: "For this reason ...." In other words, one cannot tell — and Dr. Cochran cannot tell — what fraction of MUF arises from unrecorded releases to the environment, and his assertion that "[a]ctual releases could be orders of magnitude higher" is purely speculative.

8.     The second of Dr. Cochran's three assertions concerning the relevance of MUF to off-site releases appears on p. 17 of his Report.  Concerning plutonium releases associated with the 1957 fire he notes that the highest upper bound estimate to date of the quantity released is 25 grams, compared to about 6,000 grams of MUF associated with the fire. "The large spread in the release estimates reflects the poor quality of the environmental monitoring, and consequently the large uncertainties in the estimates. A much larger estimate of the upper bound on the release still would be consistent with the very large MUF associated with the fire." Again, any one of a very wide range of conceivable estimates, including some that are "much larger" and others that are much smaller "still would be consistent with the ... MUF" because the MUF is uninformative about the release quantity, as Dr. Cochran has confirmed in his own words.

9.     The last of Dr. Cochran's three assertions concerning the relevance of MUF to off-site releases appears on p. 17 of his Report: " ... the uncertainties in estimated plant releases ... derived from off-site contamination measurements, are very large. The upper

4

end of these estimates no doubt will be consistent with the very large MUF values at Rocky

Flats — that is, with what we do not know about the whereabouts of much of the plutonium.

The plutonium release estimates could be increased by orders of magnitude and still be

consistent with the MUF."  Again, as I have discussed in connection with (a) and (b), the

"upper end" — and the lower end — "of these estimates no doubt will be consistent" with

the MUF — because the MUF is essentially uninformative about the release quantity, as Dr.

Cochran has confirmed in his own words.  Also, the "plutonium release estimates could be

increased" — or decreased — " and still be consistent with the MUF" — because the MUF

is essentially uninformative about the release quantity, as Dr. Cochran has confirmed in his

own words.

### III.    Conclusions Concerning Hunsperger Report on Property Impact of Rocky Flats

10.    Mr. Hunsperger offers five principal categories of evidence as a foundation

for his opinions concerning the alleged impact of the Rocky Flats plant on nearby property

values: a selection of interviews and anecdotes concerning "market participant" perceptions

of the effects of Rocky Flats ("Real Estate Market Research," Hunsperger Report, p. 78);

several case studies of estimates of property value effects in circumstances and locations

unrelated to Rocky Flats (Hunsperger Report, p. 121); his analysis of real estate transaction

prices in the vicinity of Rocky Flats (Hunsperger Report, p. 178) ; the multiple regression

analysis performed by Dr. Radke (Hunsperger Report, p. 221); and Mr. Hunsperger's

interpretation of an opinion survey conducted by Drs. Slovic and Flynn (Hunsperger Report,

p. 225).  While I have formed no expert opinion concerning Mr. Hunsperger's interviews and

anecdotes, I have reviewed each of the other four elements of the foundation for his opinions

and, as a result of my review, I have the following comments. In sum, I conclude that these four elements provide no reliable foundation for Mr. Hunsperger's opinions.

A.    **Hunsperger's Analysis of Case Studies**

11.    Mr. Hunsperger's "case studies" approach attempts to generalize the results of a number of previous studies of the effects on real estate prices of proximity to a contaminated site. The particular sites analyzed in the case studies are a very small sample of all contaminated sites. Mr. Hunsperger does not appear to have used any statistically valid methodology to create this sample or interpret his results.

12.    Mr. Hunsperger does not describe the method by which he selected his sample of case studies. Nor does he explain any reason to believe that this is a representative or unbiased sample. (Indeed, the mere fact that these particular sites are sites that were studied, for litigation or other reasons, strongly suggests a source of such a bias.) Failure to use and/or document a sampling methodology is a fundamental methodological error that makes Mr. Hunsperger's conclusions unreliable.

13.    Two conceivable bases for generalizing from a sample of previous occurrences to a new instance are (1) that the outcome being analyzed is governed by a deterministic law that can be inferred from the previous occurrences; (2) that the outcome is not deterministic but instead is governed by a statistical law that can be estimated from the previous occurrences and used to forecast the outcome (property value impact) in the new instance (Rocky Flats). Mr. Hunsperger asserts neither of these bases, nor could he. In sum,

he has presented no scientifically valid basis, deterministic or statistical, for generalizing from his disparate tabulation of verdicts and "research studies" to the case of Rocky Flats.

14.     Mr. Hunsperger does not attempt to determine a rate of error for his case study analysis. This is a serious methodological flaw that makes his conclusions unreliable. Suppose Mr. Hunsperger's case studies were treated (counterfactually) as a valid statistical sample of 12 previous occurrences of a phenomenon to be repeated a 13th time independently but under identical conditions at Rocky Flats. One of Mr. Hunsperger's 12 case studies found no loss of property value. The probability that a 13th observation of loss percentage would fall at or below the smallest of the first 12 values (i.e., that the 13th observation would be a no-loss case) is approximately 8 percent. Thus, even if the Hunsperger case studies allowed a statistical forecast of the Rocky Flats property value effect, these "data" cannot and do not establish at the generally used 95 percent confidence level that the Rocky Flats effect on property values is negative.

15.     Even if Mr. Hunsperger's case studies reliably revealed a persistent negative impact on property values of proximity to the Rocky Flats plant (which they do not), it is a conceptual error to infer class damages from such a persistent effect without identifying any incremental effect between the dates of class members' purchases and sales, or any incremental effect of the news of the FBI raid in 1989.

**B.     Hunsperger's Analysis of Multiple Listing Service (MLS) Data on Residential Real Estate Transactions**

16.     Mr. Hunsperger's analysis of compound appreciation rates in his ten selected MLS areas near Rocky Flats appears to show that the four areas closest to the plant all had

7

lower appreciation rates than any of the six areas farther away. Upon examining the source data underlying Mr. Hunsperger's MLS analysis I determined, however, that this perfect alignment of appreciation rates with Mr. Hunsperger's conclusion resulted from transcription errors in his data. Upon correction of the errors, the appreciation rates in the four closest areas are not the lowest four of the ten. Nor, in a two-sample test of the rates in the four nearby areas compared to the rates in the remaining six areas, are the differences statistically significant. Thus Mr. Hunsperger's analysis provides no statistically reliable basis for his conclusion concerning the compound appreciation rate differences.

17.     Mr. Hunsperger's MLS source data actually list 33 areas having sufficient data for analysis, from which he picked ten "areas selected for analysis" (Hunsperger Report, p. 214) without revealing his selection criteria. Among these 33 areas the four Hunsperger Rocky-Flats-related areas rank from 6th to 13th, based on Mr. Hunsperger's own compound appreciation criterion. Again, the four areas' appreciation rates are not statistically significantly different from the remaining 29. This broader comparison, again, provides no statistically reliable basis for Mr. Hunsperger's conclusion concerning the compound appreciation rate differences.

18.     Mr. Hunsperger does not attempt to determine a rate of error for his analysis of the MLS data. This is a serious methodological flaw that makes his results unreliable.

19.     My conclusion — that there is no statistically significant support in Mr. Hunsperger's analysis of MLS data for his opinion concerning compound appreciation rate differences — is corroborated by my analysis of the individual annual percent changes underlying the overall compound appreciation rates. The annual rates of change in the four

8

nearby areas are, again, not significantly different from those in the other "selected" areas, or from those in the broader set of 29 other MLS areas.

20.     Even if the differences on which Mr. Hunsperger bases his opinions concerning compound appreciation rates were statistically reliable (which they are not), these opinions would still lack a proper foundation because of other defects in his MLS analysis. For example, Mr. Hunsperger did not distinguish between sales of single-family residences and condominium units, just as he did not distinguish between agricultural and planned-development land transactions in his vacant land analysis (discussed below). This is an additional material flaw in his analysis because the MLS data reveal large average price differences between single-family and condominium units, just as there are large average price differences between agricultural and planned-development land. Moreover the proportions of single-family and condominium sales differ among MLS areas and over time.

21.     Even if Mr. Hunsperger's analysis of residential real estate prices reliably revealed a persistent negative impact on property values of proximity to the Rocky Flats plant (which they do not), it is a conceptual error to infer class damages from such a persistent effect without identifying any incremental effect between the dates of class members' purchases and sales, or any incremental effect of the news of the FBI raid in 1989.

C.     **Hunsperger's Analysis of Vacant Land Transaction Data**

22.     I have also been asked to review Mr. Hunsperger's vacant land analysis. I have reviewed and analyzed Mr. Hunsperger's estimation, found in his November 21, 1996

9

report, of class-area vacant land property value diminution.  Mr. Hunsperger's vacant land calculations contain both mathematical and conceptual errors.  Accordingly, those calculations are unreliable, do not establish any diminution or damages to a reasonable degree of mathematical certainty, and thus do not support the conclusions reached by Mr. Hunsperger.  Indeed, after correcting Mr. Hunsperger's two major errors — his inclusion of 1988 transactions in his analysis and his failure to distinguish between agricultural and planned development land — the vacant land sales prices are not statistically significantly different for the class and non-class areas.

23.     For his vacant land analysis Mr. Hunsperger collected information about certain vacant land transactions within and outside the property class area from 1988 to 1995.  He designated each transaction as being in one of five areas: (1) the property class area (in north Jefferson County), (2) north Jefferson County outside the class area, (3) south Jefferson County, (4) the Rocky Mountain Arsenal/Adams County area, and (5) south Boulder County.  He then simply totaled the number of acres sold in each area and divided that sum by the total sales price in each area, in order to arrive at a weighted average price per acre for each of the five areas.  Because Mr. Hunsperger's calculations yielded a lower weighted average price per acre for vacant land in the property class area than elsewhere, he concluded that Rocky Flats has diminished class-area vacant land prices by 30%.

24.     The first step in my review of this analysis was to deduce, by exhaustive trial and error, which selection of the vacant land sales in Mr. Hunsperger's underlying data comes closest to replicating his results, since the supporting materials produced in

10

conjunction with Mr. Hunsperger's report do not specify the transactions he picked for his analysis.

25.     Mr. Hunsperger's analysis suffers from at least three major flaws.  First, it does not distinguish between land zoned for planned development and land zoned for agricultural use.  This undercuts Mr. Hunsperger's entire analysis, because these two dissimilar land types sell for entirely different prices.  For example, Mr. Hunsperger's south Jefferson County transactions yield a weighted average price for agricultural land of $11,185 per acre, compared to a weighted average price for planned development land of $25,250.  Most vacant land sales in the north Jefferson County region were in these two zoning categories, with a greater proportion of agricultural land than in the south Jefferson County region.  Thus Mr. Hunsperger's crude comparison of the "average price per acre" in the northern and southern portions of Jefferson County does not compare like to like.  Because the five areas compared by Mr. Hunsperger contained different ratios of agricultural to planned-development land, any analysis that does not, at a minimum, treat those two substantially different types of land separately is unreliable.

26.     Mr. Hunsperger's second major error is his failure to distinguish between sales before and after the June, 1989 FBI raid whose associated publicity allegedly depressed prices. Because Mr. Hunsperger includes in his averages transactions that pre-date the FBI raid, his weighted average calculations cannot demonstrate the effect or lack of effect on property values of any "stigma" from the FBI raid.  In fact, according to Mr. Hunsperger's underlying data, the average price per acre in the property class area was greater after the FBI raid ($12,149) than before the raid ($4,531).

11

27.     Third, Mr. Hunsperger did not examine the statistical significance of his results, i.e., he did not check to see if his calculated differences in housing prices using his small sample of transactions were reliably greater than those likely to occur by chance alone. If Mr. Hunsperger's calculations are not statistically reliable, they cannot support his conclusion of a 30% diminution in vacant land values within the property class area. As with the other quantitative methodologies employed by Mr. Hunsperger, his failure to test for statistical significance or even to present a rate of error for his analysis is a serious methodological error that makes his conclusions unreliable.

28.     Accordingly, I sought to determine if the numerical differences in average vacant land prices that Mr. Hunsperger reports are statistically significant, after controlling for zoning differences and eliminating pre-FBI raid transactions. I determined that prices per acre vary so widely and their ranges overlap so much that, when similarly-zoned land is compared, the property class area average prices are not statistically significantly different from those in north Jefferson County outside the property class area, nor from those in south Jefferson County or the Rocky Mountain Arsenal vicinity (both highlighted by Mr. Hunsperger as especially relevant comparison areas; Hunsperger Report, pp. 199-200), nor, indeed, from prices in the entire, pooled non-class portion of Mr. Hunsperger's vacant land data. The sole difference between average prices of vacant land in the class region and average prices of vacant land in the non-class region that was statistically significant was the difference between the price of planned development land in the class region and planned development land in south Boulder County.

12

29.     Even if Mr. Hunsperger's vacant land analysis reliably revealed a persistent negative impact on property values of proximity to the Rocky Flats plant (which it does not), it is a conceptual error to infer class damages from such a persistent effect without identifying any incremental effect between the dates of class members' purchases and sales, or any incremental effect of the news of the FBI raid in 1989.  Mr. Hunsperger uses his erroneous calculations to estimate a 30% diminution in the value of vacant land in the class, and then applies that 30% diminution to what he believes to be the total value of vacant land in the property class area to derive a damages figure for all vacant land in the class.  Yet his analysis does not provide any basis to show *when* the supposed property value diminution occurred. Accordingly, the supposed diminution could have occurred far before the class members — owners of class properties on June 7, 1989 — purchased their properties.  Thus, Mr. Hunsperger's conclusions about the property class members' potential damages in vacant land are unsupported by his underlying analysis, and are speculative.

## D.     Hunsperger's Analysis of Decision Research Survey

30.     I have also been asked by attorneys for the defendants to evaluate the conclusions that Mr. Wayne Hunsperger has drawn from the opinion survey conducted by Decision Research (the Flynn Report).  Based on my review of the Flynn Report and related documents, it is my opinion that Mr. Hunsperger's conclusions from the survey data are not reliable.  The basis for my opinion includes the following observations.

31.     The survey inquires about the property value discounts that respondents would require to purchase housing in the areas near Rocky Flats.  It does not, however, inquire about the change in required discounts if the Rocky Flats plant did not exist, holding

13

all else constant. Thus it does not isolate the component of discount specifically associated with the presence of the plant, and it is a fundamental conceptual error to attribute the entire discount to the Rocky Flats plant per se, even if the estimated discount were otherwise scientifically valid and reliable.

32.     The self-reported required discounts elicited by the survey are shown in Exhibit 2. The distribution is extremely "skewed," with a large concentration of required discounts at zero and a sparse "tail" to the far right at $50,000. The median (middle value) and mode (most frequent value) of these data are both zero. For his damage calculation Mr. Hunsperger chooses to summarize the data in terms of the mean (arithmetic average) discount ($6,825), however, without further explanation . It is well known to statisticians that the sample mean may be quite unrepresentative and misleading when data are extremely skewed, as Exhibit 2 illustrates.

33.     It is also a fundamental error to equate the "average" self-reported required discount with a negative impact on property values near Rocky Flats. Many survey respondents required no discount at all to purchase in the vicinity of the plant (Exhibit 2). Rational sellers encountering some potential buyers who demand discounts and others who do not are more likely to sell to the former without discounts than to the latter at a discount. Thus a non-zero "average" required discount need have no real property value consequence at all.

34.     For virtually any location near Denver (or elsewhere) it is likely that a non-zero proportion of potential purchasers, preferring to live elsewhere, would require a discount to purchase in that location. Mr. Hunsperger provides no basis for concluding that

14

the distribution of self-reported discounts required for purchasing near Rocky Flats is different from that which would arise from a survey of opinions about any other suburban Denver location.

35.     Upon finding that 192 survey respondents (46.2 percent of the respondents) would not buy a home within a four-mile radius of Rocky Flats at any discount, Mr. Hunsperger assumes that their reason for not buying near Rocky Flats is the presence of the plant. This assumption is not supported by the survey data, however. In many cases it is demonstrably false. Indeed, only 5.1% of the 192 respondents mentioned Rocky Flats as the "main disadvantage" or one of the "other disadvantages" of Arvada or Westminster.

36.     The survey responses to the open-ended questions reveal several potential reasons, other than the presence of the plant, for a preference not to buy a house near the Rocky Flats plant. Indeed, 53.7% of the 192 respondents mention other disadvantages of the area. For example, "transportation" and "growth/development" are listed as the "main disadvantages" of both Arvada and Westminster. In Mr. Hunsperger's interpretation of the survey data, discounts demanded by potential buyers for any of these reasons are attributed to the presence of the Rocky Flats plant.

37.     For his damage calculation Mr. Hunsperger imputes a required discount of $30,000 to each potential buyer represented by the 46.2 percent of respondents who prefer not to buy houses near the Rocky Flats plant. Even if Mr. Hunsperger's calculation of the effect of this imputed discount on housing prices near Rocky Flats were correct, which it is not, it is wrong to attribute to the presence of Rocky Flats the effects of buyer preferences

15

which depend on a variety of factors, as illustrated above, and not primarily on the presence of Rocky Flats.

38.     For his damage calculation Mr. Hunsperger attributes a required discount of $6,825 to each potential buyer represented by the other 53.8 percent of respondents, i.e., the complement of the 46.2 percent of respondents. He includes in this group respondents who reported that they had never heard of Rocky Flats, and others who were not asked the discount questions because they had indicated that "being near Rocky Flats" makes a house "somewhat more desirable" or "considerably more desirable". It is clearly wrong to attribute to Rocky Flats a decline in housing prices induced by such respondents. Furthermore, the preferences of those respondents who are correctly included in the 53.8 percent depend on a variety of factors, as illustrated above, and in several cases not primarily on the presence of Rocky Flats. Thus it is wrong to attribute their effect on housing prices near the plant solely to the presence of the Rocky Flats plant.

39.     Mr. Hunsperger's analysis of the survey data is based on several apparently arbitrary methodological choices. For example, for those subjects who reported a required discount in more than one zone near Rocky Flats, Mr. Hunsperger retains only one reported discount and discards the rest. For a different group of subjects a required discount of zero in the four-to-six mile zone can be inferred from their zero required discount in the two-to-four mile zone, but Mr. Hunsperger uses the zero discount in only the two-to-four mile zone.

40.     For his damage calculation involving potential buyers' required discounts, Mr. Hunsperger chose to analyze only the responses of residents of the Denver metropolitan area, not including Arvada/Westminster. This choice influences his results in a predictable

16

direction. By choosing to live near the Rocky Flats plant the residents of Arvada/Westminster, who constituted over 30 percent of the survey respondents, revealed preferences different from those of the Denver metropolitan area residents. These differences are reflected, for example, in that 79 percent of Arvada/Westminster residents answered "no difference" when asked their "opinions about the influence of Rocky Flats on the desirability of homes in the Arvada/Westminster area," compared to 33 percent of the Denver metropolitan area residents.

41.     Mr. Hunsperger reports that "the margin of error for a total sample size of 604 respondents is 4.1% at the 95% confidence level" (p. 234). This calculation falsely assumes a 100 percent response rate, however, while at a response rate of 63.9 percent — the highest of several response rate estimates contained in the report — the corresponding, corrected "margin of error" is 21.1 percent.

42.     Even if the opinion survey reliably revealed a persistent negative impact on property values of proximity to the Rocky Flats plant (which it does not), it is a conceptual error to infer class damages from such a persistent effect without identifying any incremental effect between the dates of class members' purchases and sales, or any incremental effect of the news of the FBI raid in 1989.

IV.     **Conclusions Concerning Radke Regression Analysis of Real Estate Transaction Data**

43.     The work papers and computer files underlying Dr. Radke's analysis in this matter that have been provided to me to date are grossly inadequate for a detailed replication and comprehensive assessment of his statistical analyses of real estate prices in the vicinity

17

of Rocky Flats. Many of the defects and deficiencies of Dr. Radke's disclosures have been laid out in the McFadden Affidavit, with whose substance I concur. Although my review of Dr. Radke's work has been hampered and obstructed by the inadequacy of his disclosure, I have been able to reconstruct sufficient portions of his work for me to conclude that it is not a competent application of statistical science and does not form a reliable foundation for any of Mr. Hunsperger's conclusions about the real estate impact of the Rocky Flats plant.

A.      Radke's Incorrect Use of Standard Statistical Methods and Inappropriate Ad Hoc Creation of Non-Standard Statistical Methods

44.      Rather than include in his "exhaustive" hedonic regression models of the determinants of property values all the explanatory variables he assembled for those models, Dr. Radke employs a form of "factor analysis" to select a limited number of explanatory variables actually used.

45.      Dr. Radke invokes the problem of "multicollinearity" to justify this procedure. "Multicollinearity" occurs when a model contains redundant explanatory variables, e.g., explanatory variables that are mere combinations of other explanatory variables already included in the model. Various ill effects arise in regression models affected by this condition. It is well known to trained statisticians, however, that such ill effects do not in general affect all the coefficients of the regression model and may not affect the coefficient of particular interest at all.

18

46.     Statisticians have developed refined diagnostic methods for tracing the precise sources and consequences of multicollinearity in regression models.[1]  Dr. Radke appears to have arrived at his judgements concerning multicollinearity without benefit of any of these diagnostic tools, however.  Where his defective disclosure permits, I applied the multicollinearity diagnostics to his models and determined that (1) the multicollinearity in Dr. Radke's regression data is not a fundamental feature of the data but an artifact of his method of constructing explanatory variables; (2) it is easily cured by deleting two redundant, constructed variables (concerning access to employment); and (3) it does not, in any case, involve or affect the estimation of the effect of the Rocky Flats plant on property values.  I have also reviewed the comments of Dr. Daniel McFadden on these issues and concur with them (McFadden Report).

47.     For his Phase II analyses Dr. Radke employs a regression estimation method known as "weighted least squares" (WLS) instead of the standard "ordinary least squares" (OLS) method.  WLS estimation is well known to trained statisticians as an appropriate, specialized tool for dealing with the condition of "heteroscedasticity," a form of variability in data that causes OLS estimation to have undesirable properties.  To justify his use of WLS instead of the OLS method Dr. Radke adduces only his own prior decision to use only a fraction of the available observations outside the property class area in his Phase II data.[2]

---

[1] Belsley, Kuh and Welsch, Regression Diagnostics: Identifying Influential Data and Sources of Collinearity, Wiley; Judge et al., The Theory and Practice of Econometrics, Wiley.
[2] The Radke Report refers to a contour Dr. Radke uses for certain portions of his study as the "Medium Plutonium Contour" ("MPC").  This apparently refers to one of several contours in Krey and Hardy, "Plutonium in Soil Around the Rocky Flats Plant," 1970.  I understand that the plaintiff motion for class certification referred to this contour, but that Dr. Radke actually uses a somewhat different contour in his analysis. Nevertheless, for purposes of this declaration I refer to Dr. Radke's MPC region as the "property class area" or "class area."

19

48.     The conditions under which the properties of the WLS method are superior to those of the OLS method are well known to trained statisticians.[3]  Dr. Radke does not invoke these valid considerations, however, nor do they pertain to his use of WLS regression in his Phase II calculations.  Indeed, I determined in the course of my replication of his Phase II calculations that his inappropriate use of WLS created rather than resolved the condition of "heteroscedasticity," for which WLS would be an appropriate remedy.  I have reviewed the related comments of Dr. Daniel McFadden on these issues and concur with them (McFadden Report).

49.     Dr. Radke's invention of an ad hoc method of estimating "cutoff" distances within which the alleged Rocky Flats property value impact occurs is not a valid statistical method and is not generally recognized in authoritative statistical texts.  Valid statistical methods for the cutoff estimation problem can, however, be derived using standard statistical theory and methods as explained by Dr. McFadden, with whose comments on this issue I concur (McFadden Report).  In sum, Dr. Radke's Phase I and Phase II, Method 2 calculations using this ad hoc creation do not provide a scientifically reliable foundation for his conclusions.

50.     Upon correction of the unnecessary and inappropriate features of Dr. Radke's regression method, the estimated property value effects of proximity to Rocky Flats are not statistically significantly different from zero.  Thus Dr. Radke's Phase I and II regression analyses, stripped of his unnecessary and inappropriate "improvements" to the data, provide no statistically reliable indication of any negative impact on property values at all.  In

---

[3] DuMouchel and Duncan, "Using sample survey weights in multiple regression analyses of stratified

addition, the estimated calendar-year specific effects in Phase II are not statistically significant from each other. Thus Dr. Radke's regression analyses, stripped of his unnecessary and inappropriate "improvements" to the data, provide no statistically reliable indication of an incremental negative impact on property values of proximity to Rocky Flats after the 1989 FBI raid.

**B.    Additional Methodological Errors in Radke's Phase I  Analysis (Multi-Family Residential, Commercial and Vacant Land Transactions)**

51.    Straightforward application of the statistical methods that Dr. Radke claims to have used in his "Phase I" analysis to the Phase I data he has produced does not replicate the Phase I results in his Report. Thus I conclude that there are defects in Dr. Radke's description of his methods, and/or in the data he has produced, and/or in his execution of the calculations. In any case his Phase I results, as disclosed, are unreliable. I concur with the related comments of Dr. Daniel L. McFadden (McFadden Affidavit and Report).

52.    Using the data produced by Dr. Radke, correctly executed ordinary least squares regression estimates of the property value impact of Rocky Flats are not statistically significantly different from zero. Thus Dr. Radke's Phase I data, after removal of his unnecessary and inappropriate "improvements" to the data (in the form of factor analysis), provides no statistically reliable indication of any negative impact on property values at all, for any of the three property classes he considers.

53.    Dr. Radke reports and discusses the "Confidence Levels" of his Phase I estimates of the property value impact of Rocky Flats, ranging from 85.27% to 93.30%

samples," Journal of the American Statistical Association, September, 1983..

(Radke Report, pp. 41-42). Dr. Radke's interpretation of a "confidence level" does not conform to the concept of "confidence level" as defined in statistical science (e.g., Reference Manual on Scientific Evidence, Federal Judicial Center, 1994, p. 396), with which he appears unfamiliar. The elements of his regression outputs that he terms "confidence levels" are actually the complements of what are known to trained statisticians as "p-values" (Reference Manual on Scientific Evidence, Federal Judicial Center, 1994, p. 396). The values of his "confidence levels" correspond to p-values (ranging from 14.73% to 6.70%) that exceed the generally used statistical threshold of 5% and, hence, indicate that his results are not "statistically significant" (Reference Manual on Scientific Evidence, Federal Judicial Center, 1994, p. 410). In sum, Dr. Radke's own reported Phase I results, upon correction of his non-standard description and interpretation of his "confidence levels," provide no statistically reliable evidence of a negative impact on property values of proximity to Rocky Flats.

54.    Even if Dr. Radke's Phase I results reliably revealed a persistent negative impact on property values of proximity to the Rocky Flats plant (which they do not), it is a conceptual error to infer class damages from such a persistent effect without identifying any incremental effect between the dates of class members' purchases and sales, or any incremental effect of the news of the FBI raid in 1989.

**C.    Additional Methodological Errors in Radke's Phase II, Method 1 Analysis (Single-Family Residential Property within the Property Class)**

55.    For his "Phase II, Method 1" hedonic regression analysis Dr. Radke assumes that the alleged negative impact of Rocky Flats on property values is uniform everywhere inside the property class area, beyond which there is no effect. It is necessary for the

validity of Dr. Radke's inferences from this model that it be complete, in the sense that his
explanatory variables must account correctly and fully for every property attribute that
affects value (Radke Report, p. 50). If that were so, then any remaining relationship
between property values and proximity to the Rocky Flats plant can only reflect the impact
of the plant itself. I tested the completeness of Dr. Radke's regression model by adding to it
additional terms allowing for systematic differences in property values between the various
cities in the Denver metropolitan area. This extended model encompasses Dr. Radke's
model as a special case (whose systematic city effects simply equal zero). If Dr. Radke's
own hedonic regression model were in fact complete, then the city effects would indeed be
zero and the regression calculation should so indicate.

56. Exhibit 3 shows in graphic form the estimated impact of Rocky Flats in this
extended Radke hedonic regression model, as well as the estimated city effects. The
extended Radke model reveals large, statistically significant city effects not accounted for by
Dr. Radke's set of valuation-relevant attributes. In other words, there exist valuation-
relevant attributes left out of Dr. Radke's model that differ systematically between cities near
Denver. In that case the model is incomplete, its purported isolation of the property value
impact of Rocky Flats is spurious, and Dr. Radke's conclusion from it is defective and
unreliable.

**D.      Additional Methodological Errors in Radke's Phase II, Method 2 Analysis
         (Single-Family Residential Property within Estimated Cutoff Distances)**

57. For his "Phase II, Method 2" hedonic regression analysis Dr. Radke assumes
that the alleged negative impact of Rocky Flats on property values decreases linearly in

23