# EXHIBIT 18

**The Dorchester Group**

# Report of John D. Dorchester, Jr.

**Introduction**

This report was prepared at the request of defendants' attorneys in the Merilyn Cook, et al. v. Rockwell International Corporation and Dow Chemical Company litigation in the United States District Court for the District of Colorado. I was asked to respond to two portions of the work done by Wayne L. Hunsperger, MAI, SRA of Hunsperger & Weston from the perspective of an appraiser subject to the Uniform Standards of Professional Appraisal Practice ("USPAP") of the Appraisal Foundation[1] and the requirements of the Code of Professional Ethics of the Appraisal Institute. In addition to commentary on Mr. Hunsperger's overall approach to his work as evidenced by the report dated November 21, 1996, my report responds to two of the methodologies used by Mr. Hunsperger to estimate the alleged diminution in value of real estate near the Rocky Flats Nuclear Weapons plant.

Mr. Hunsperger states that his study is a "Property Value Study[2]" and that his analysis was completed in accordance with USPAP and the Code of Professional Ethics of the Appraisal Institute.[3] USPAP identifies and defines the types of professional services which it covers, and establishes Standards for each type of service. USPAP has been codified into federal and state laws, and is applicable to services covered under the Standards regardless of who performs them. A definition of the services performed is not just elected at the discretion of an individual professional, but is determined by the nature of the services performed and the intended application of the results of the professional's services.

Although one need not have the title "appraiser" or "real estate consultant" to be covered by USPAP Standards in the performance of relevant services, Mr. Hunsperger acknowledges that USPAP Standards apply to his work. Thus, Mr. Hunsperger's services should be judged by USPAP's requirements.

Mr. Hunsperger's report states that he "performed research necessary to determine if diminution in real property values has occurred and, if so, to what extent."[4] His research applies five discrete analysis approaches that he incorrectly claims are commonly used by members of his profession to

---

[1] Appraisal Standards Board. Uniform Standards of Professional Appraisal Practice. The Appraisal Foundation, 1029 Vermont Avenue, NW, Suite 900, Washington, DC 20005-3517. 1997 Edition.

[2] Hunsperger, Wayne L. Rocky Flats Nuclear Weapons Plant Property Impact Study, November 21, 1996. Hunsperger & Weston, Ltd. 5889 S. Greenwood Plaza Blvd., Ste. 404, Englewood, Colorado 80112. Letter of Transmittal.

[3] Hunsperger. Letter of Transmittal.

[4] Hunsperger. P. 2.

Page 1

**The Dorchester Group**

identify and quantify alleged diminution in property values.[5]  My report which follows addresses two of these so-called commonly used methods: use of analogous case studies and the use of public opinion surveys.  I am prepared to respond to the other portions of his report at a later time if requested to do so.

USPAP also contains Standards for the review of an appraisal.  My response to the plaintiffs' report authored by Mr. Hunsperger, which I will refer to as the "Property Impact Study" or "the Study," is not intended as a formal review of the entirety of his work.  Instead, my focus is to respond to two unusual methods applied in that study, each referenced above.  In responding to these methods I have read Mr. Hunsperger's report, studied information recently received from Mr. Hunsperger upon which he relied in his work, and conducted additional research to better understand his approaches and conclusions.

As a foundation for my response to portions of the Property Impact Study, it is first necessary to comment upon the development of appraisal Standards, their importance, and the applicability of USPAP Standards.

**Appraisal Standards: History and Importance**

Early in this century there were no widely recognized real property appraisal Standards available to guide and protect the market.  The first two decades of the century saw the growth and general market recognition of "horseback appraisers" and "curbstone brokers."  There are fabled stories of multiple sales of the Brooklyn Bridge.  By the time our nation's economy collapsed into the Great Depression, it had become clear that the abuses of improper, unbiased, and misleading appraisals, fueled by the lack of market standards for real estate in general, contributed to the Depression, and would be an obstacle in economic recovery programs.

Following several years of organizational planning, the National Association of Real Estate Boards[6] formed the American Institute of Real Estate Appraisers ("AIREA") in 1932.  Shortly thereafter, the first set of real property appraisal Standards and an articulation of ethical practice were published.  Many of the concepts and valuation approaches fostered by the AIREA were incorporated into programs that aided economic recovery and began the establishment of market confidence in real estate and real estate practitioners.

Although the AIREA promulgated appraisal Standards in the 1930s, and they became the basis for community standards for appraisers throughout the

---

[5] To cite the Property Impact Study, it is necessary for us to use the term "property values."  The term is undefined in his report and in professional terms is, at best, a colloquial means of referring to Market Value unless explained to the contrary.  Because the issues in this litigation deal with Market Value, it would be incorrect to assume that a different type of value is intended or that some other concept is appropriate.

[6] Now called the National Association of Realtors©.

**The Dorchester Group**

nation, the principal public and court recognition of those Standards followed World War II. Massive eminent domain acquisitions of real estate in highway and urban renewal programs expanded attention on Standards, and were accompanied by more significant requirements for high quality, ethical valuation work in real estate lending.

As the leading authority on real estate valuation and appraisal Standards, the AIREA worked to educate real estate practitioners, lawyers, courts, regulatory agencies, other governmental officials, financial and lending institutions, and others regarding the importance of Market Value, and valuation methods that would meet Standards' requirements. In large manner, these became recognized as the rules for the market place and an articulation of community standards.

In 1981 the AIREA established an Appraisal Standards Board and increased dialog among appraisal organizations in the United States towards adopting nationally uniform Standards. Similar effort was also instituted on a worldwide basis. By 1987 these efforts had led to establishment of USPAP. The Appraisal Standards Board (ASB) of The Appraisal Foundation develops, publishes, interprets and amends USPAP on behalf of appraisers and users of appraisal services. These Standards are used by state and federal regulatory agencies and others. Importantly, USPAP is an extension of the principles that were first articulated in the early 1930s and can be viewed as the most extensive statement of community standards in the history of real property valuation (and other matters covered by USPAP) in the United States.

USPAP Standards involve both a system and the services performed within that system. The system centers on the concept of Market Value. Market Value sets a standard that can be relied upon for performances, comparisons and decisions. The vast majority of appraisals conducted in this country are Market Value appraisals. The preponderance is so heavy that Standards generally assume that Market Value is involved if no identification is made. If Market Value is not required, acceptable practice requires that the appraiser must identify and define the type of value that is estimated.

There is no specific appraisal or consulting meaning of the term "property values." An appraiser might deal with assessed value, insurable value, or when dealing with groups of properties, a portfolio value. Any of these uses of the term "value," or others that could be applied, require specific identification and definition in order to meet the Standards requirement of avoiding misleading services and reporting.

A second key ingredient of USPAP's system is the role of the person performing services under USPAP. In large part this is determined by the intended use of the services. For example, a person cannot claim to be a real estate "consultant" if the submitted report is used as an estimate of value, such as for a mortgage loan or for court purposes where Market Value is the subject. The Standards for "consulting" services exclude real estate

**The Dorchester Group**

appraising, which is covered by a different Standard for "appraisals." Standards not only have separate provisions for appraisal and consulting services, they require that the practitioner clearly and unequivocally set forth the differences in his or her report. If both services are performed in a single engagement, the Standards for each service must be met, and the services must be clearly distinguished within the resulting report.

Because the Standards deal specifically with distinctions between appraisal and consulting services, and between Market Value and other types of value, they are particularly applicable to the Rocky Flats litigation. Their importance here mirrors the importance of the Standards to the public at large.

USPAP Standards do not just apply to those who call themselves "appraisers, consultants, reviewers" or the like. They relate to services that can be identified as falling within the aegis of the Standards regardless of what title the practitioner may claim. A person claiming to be a real estate consultant, a real estate economist, a market analyst, or a statistician, may in fact perform real estate appraisal functions, and their work should be judged by Standards applicable to appraising.

In appraisal terms, there are three recognized "approaches to value" estimates.[7] For each, there are a number of possible analysis methodologies, depending upon facts, circumstances, the purpose of the appraisal, the type of value sought, how the appraisal is to be used, available data, and the like. Public opinion polls and "analogous cases" have not been adopted as approaches, and in the main have not been favored as appraisal methodologies because, among other reasons, they are prone to error, usually highly subjective, difficult to validate or support as predictors of Market Values, and subject to abuses, misunderstandings, and/or misrepresentations.

The Standards recognize that departures from normal practice may be necessary on occasion, and provide for how such situations should be handled. Permitted departures do not *substitute* for normal acceptable practice, but *supplement* such practice when appropriate. Crucial to these concepts and practices are: 1) following Standards wherever possible; 2) disclosing departures when made by explaining the facts and circumstances, and justifying the necessity of and reason for the departure; 3) consideration of the intent of the Standards; 4) application of ethical behavior; and 5) avoidance of practice that could be misleading or misapplied. Where real property value is concerned, particularly Market Value, the public interest, the marketplace, and the profession require that there be a rigorous application of Standards by anyone performing USPAP-covered services.

---

[7] Each is briefly discussed later in this report.

**The Dorchester Group**

| | |
|---|---|
| **Response to the Plaintiffs' Property Impact Study** | The following discussions summarize my conclusions regarding portions of the plaintiffs' Property Impact Study. In particular, they include my response to his use so-called "analogous case" and "public opinion poll" approaches to the valuation of real estate. |
| **Conclusion No. 1** | **THE PLAINTIFFS' PROPERTY IMPACT STUDY IS AN "APPRAISAL" THAT DOES NOT COMPLY WITH USPAP STANDARDS. THAT IS CONTRARY TO THE STANDARDS AND PRACTICES OF THE APPRAISAL PROFESSION.** |

The letter of transmittal states that the Property Impact Study "has been completed in compliance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation and the requirements of the Code of Professional Ethics of the Appraisal Institute." Since compliance with USPAP Standards and the Code of Professional Ethics is a stated goal, we assume that these Standards are the proper foundation for the plaintiffs' report, and we respond to their report in the context of these Standards.

**A. Under USPAP the type of appraisal services provided dictate the procedures to be followed and the manner in which the appraiser must communicate the results.**

The nature of the services provided are significant to application of USPAP Standards and should be clarified at the outset. USPAP distinguishes between "appraisal," "review," and "consulting" services, and provides separate Standards for each. The Standards apply to services performed, the procedures to be followed in performing services, and the methods by which the individual must communicate the results of the services.

"Appraisal" is the "act or process of estimating value; an estimate of value.[8]" Similarly, "mass appraisal" deals with estimating value, but for a universe of properties instead of a single property. "Mass appraisal" is defined by USPAP as: "the process of *valuing* a universe of properties as of a given date utilizing standard methodology, employing common data, and allowing for statistical testing[9]." "Consulting," on the other hand, does not and under USPAP cannot, involve estimating value. USPAP defines consulting as "the act or process of providing information, analysis of real estate data, and recommendations or conclusions on diversified problems in real estate, other than estimating *value*.[10]"

---

[8] Appraisal Standards Board. P. 9.

[9] Appraisal Standards Board. P. 10.

[10] Appraisal Standards Board. P. 9.

**The Dorchester Group**

Depending on the type of service being performed, USPAP also dictates and differentiates, "the procedures to be followed in performing an appraisal, review, or consulting service and the manner in which an appraisal, review or consulting service is communicated." Specifically, USPAP Standards 1 and 2 relate to the development and communication of a real property appraisal, USPAP Standard 6 sets forth criteria for the development and reporting of mass appraisals for a universe of properties. Standards 4 and 5 address the development and communication of various real estate or real property consulting functions. One salient feature of these Standards is important for this analysis: under USPAP, estimations of value cannot be made in a consulting report.

**B. To satisfy the burden of showing that the Market Value of the plaintiffs' properties in the Class area has diminished, the plaintiffs' Property Impact Study must make an estimate of Market Value.**

As I understand the legal standards that govern the measure of damages to which the plaintiffs may be entitled, the plaintiffs' expert is required to estimate Market Value to support his assertion that plaintiffs have suffered economic harm to their properties. Because an estimation of Market Value is necessary in order to measure the plaintiffs' alleged diminution in Market Value, USPAP requires an "appraisal."

**C. The plaintiffs' Property Impact Study is ambiguous as to the type of appraisal services being performed. It makes estimates of value without meeting appraisal Standards and, contrary to USPAP Standards, Mr. Hunsperger incorrectly calls the context of his work "consulting."**

As a member of the Appraisal Institute, Mr. Hunsperger must recognize that the unconventional valuation methods he purports to apply have no place as approaches to value in estimating the diminution (if any) of Market Values of properties in the Class area. His use of "analogous case studies" and "opinion surveys" as appraisal approaches is not recognized by USPAP Standards.

Mr. Hunsperger muddles the purpose of his report and the "value" by which he purports to measure diminution in several respects:

1. The Property Impact Study states that Mr. Hunsperger's work is "consulting," but does not acknowledge that it involved "appraising:"

**The Dorchester Group**

"Even though it is our position that this work constitutes a real estate consulting service, some readers may interpret it as an appraisal."[11]

If this is Mr. Hunsperger's intent, then he is precluded by USPAP from reporting estimates of Market Value (or other defined value). If one were to accept Mr. Hunsperger's assertion that his work only involves consulting, the work and its report would not be sufficient to carry plaintiffs' burden of proving that a diminution of Market Value has occurred because he could not deal with value estimates, or quantifications of Market Value effects, in a consulting role.

2.  The Property Impact Study also confuses what it is that is being measured.  For example, Mr. Hunsperger uses the term "property impact" in the title of his report and in various portions of his report including the introductory paragraph of the letter of transmittal. "Property impact" is not a term of art, is not defined in the Appraisal Institute's primary text,[12] and is not included in USPAP's definitions. The term is not defined in the Property Impact Study.  In practice, unless specifically stated to the contrary, "property impact" in a valuation sense would normally imply "Market Value effect."  In a situation where Market Value is the intended use of the services, USPAP would require that Market Value be applied.  It is the obligation of those whose services are covered by USPAP to make a clear statement of the value type, to define it, and to assure that it is appropriate for the intended application

Likewise, the second paragraph of Mr. Hunsperger's letter of transmittal states, "[experts were employed] to determine if it is more likely than not that property values in the Class Area are affected, and if so, to what extent." [13]  This statement provides evidence that Mr. Hunsperger intends to deal with Market Values, and that he is appraising, not simply consulting.  The terms "property values" and "affected" are indefinite and are subject to varied interpretations. They are particularly indistinct when combined with the dual issues of whether "Rocky Flats" has any influence, positive or negative, on Market Values of properties in its environs and/or whether the FBI raid had any such influence.

Further ambiguities in the asserted nature of Mr. Hunsperger's services appear on page 67 of his report, where he summarizes the "SCOPE OF THE EVALUATION SERVICE" and on page 69 where he

---

[11] Hunsperger. P. 64.

[12] Appraisal Institute.  The Appraisal of Real Estate.  Eleventh Edition.  870 N. Michigan Avenue, Chicago, Illinois 60611-1980.  1996.

[13] Hunsperger. P. 2.

**The Dorchester Group**

explains a "SUMMARY OF THE VALUATION METHODOLOGY." The term "evaluation" has long been associated with consulting services while "valuation" has been associated with estimates of value, or appraisal services. Because the methodologies are "valuation," it appears that Mr. Hunsperger's intentions were to perform appraisal services. Although methods applied by Mr. Hunsperger might be used in consulting, Mr. Hunsperger uses "analogous cases" and "public opinion surveys" as valuation methodologies. Thus, any assertion Mr. Hunsperger makes that his services are not valuation services is contrary to his own report and its intended use.

3. The Property Impact Study also asserts, "…we have employed a variety of technologies reasonably and customarily relied upon by experts in our field." If the relevant field of expertise is either estimating the Market Value of real estate in the Class area, or quantifying the alleged diminution in Market Value—i.e., appraising—I strongly disagree with this statement insofar as it involved analogous case studies or opinion surveys as appraisal approaches.

4. From the title of his report to its various components, Mr. Hunsperger refers to "Rocky Flats" in broad and indefinite ways. Because the subject of this lawsuit is the FBI raid of June 1989, it appears that the central application of the term "Rocky Flats" by Mr. Hunsperger is to refer to the FBI raid. If this assumption is incorrect, then Mr. Hunsperger has obscured the central issue of the lawsuit. Regardless, the term "Rocky Flats" could refer to the plant or portions thereof, the plant and its buffer areas, an area involving the broader environs, or others.

**Conclusion Number 2**

**THE METHODS APPLIED IN THE PLAINTIFFS' PROPERTY IMPACT STUDY TO ESTIMATE "PROPERTY IMPACTS" (i.e., MARKET VALUE) ARE CONTRARY TO FUNDAMENTAL APPRAISAL APPROACHES.**

Earlier in this century, appraising was referred to as "the science of appraising." More recently it has been referred to as "the art and science of appraising," but elements of the scientific method are integral to real property valuation. Given the basic requirements for any valuation engagement, the Valuation Process[14] is a systematic method that guides appraisers, and users of appraisal services, in how an appraisal is to be performed. According to the Appraisal Institute, key concepts of the Valuation Process include:

---

[14] Appraisal Institute. P. 80.

**The Dorchester Group**

- "The valuation process is a systematic set of procedures employed to provide the answer to a client's question about real property value.

- Definition of the appraisal problem is the first step in the valuation process. The appraiser identifies the real estate, the property rights to be valued, the use of the appraisal, the date of the value estimate, the scope of the appraisal, and other limiting conditions.

- The appraiser selects and collects three types of data, i.e., general data on value influences and trends, specific data on the subject and comparable properties, and competitive supply and demand data for the specific market.

- Analysis of highest and best use includes consideration of both the land as though vacant and the property as improved. The conclusion is specified in terms of use, timing, and market participants."[15]

USPAP's preamble states that the Standards are intended to reflect the standards of the appraisal profession. USPAP recognizes the concept of a Valuation Process by requiring that for estimations of value to occur, the appraiser must identify: i) the specific parcel of real estate involved, ii) the interests involved, iii) the date of valuation, iv) the type of value sought, and v) a definition of the value type. It is also incumbent upon the appraiser to apply his or her analysis within the Standard's guidelines, and to explain and justify any departures that are taken.

### A. The Property Impact Study does not adequately define the appraisal problem it purports to address.

The first step in the Valuation Process is defining the appraisal problem The appraisal profession, as reflected in USPAP, emphasizes clarity and precision in defining the appraisal problem to avoid confusion and to avoid misleading readers.

As mentioned above, the Property Impact Study in many respects causes confusion rather than clarity. The primary source of confusion is the use of the term "value." According to the Appraisal Institute:

"To avoid confusion, appraisers do not use the word value alone; instead they refer to "market value," "use value," "investment value," "assessed value," and other specific kinds of value. Market value is the focus of most real property appraisal assignments and its estimation is the purpose of most appraisals."[16]

---

[15] Appraisal Institute., P. 93.

[16] Appraisal Institute. P. 20.

**The Dorchester Group**

USPAP requires that the type of value that is being estimated must be defined and that references in the report must be sufficiently clear and precise to avoid confusion.

The Property Impact Study fails to abide by this cardinal rule. While "market value" is defined at page 64, at no time is that term used in connection with the work or reported conclusions. Instead the Study uses such indefinite terms as "impacts," "property impacts," "property values," "real estate impact," and "effects." These terms are not terms of art in real estate or in appraising, are not defined in USPAP, and are not defined in the Property Impact Study. Using such vague terminology in an appraisal report is, by itself, a violation of USPAP Standards.

A date of value is required by Standards for all appraisal assignments. Even consulting assignments must be clear as to the time frame for which any consulting response would apply. The Property Impact Study, however, is indefinite and ambiguous as to the date applicable to his work. For example, Mr. Hunsperger concludes from public opinion polls that for 12,019 residential properties "the amount of diminution in value" was $17,486 per property.[17] There is no identification of the date as of which this value estimate applies. Five pages later in his report he includes a graph that calculates "Lost Appreciation Due to Proximity to Rocky Flats[18]" for seven time periods (years), and concludes and concludes an alleged "loss" as of 1995. His analysis of analogous cases apparently results in estimates as of 1995, but the date is not actually specified. Adding to the confusion, Mr. Hunsperger reports that multiple regression analysis "…estimates of loss in value for residential property after the 1989 FBI raid…" without specifying a particular date. He then indicates that the MRA analysis was reported in 1993 dollars, which differs from at least one of the other valuation approaches he applies.

## B. The Property Impact Study collects and analyzes data that are not customarily relied upon by appraisers estimating Market Value.

Where Market Value is being estimated, the essence of valuation activities is *comparison*. The appraiser must first establish that the pool of comparative information from which the appraisal is made is truly comparable, relevant, and applicable as an indicator of Market Value for the property appraised. The "three approaches" to estimations of value, which are recognized as market norms and are included in USPAP

---

[17] Hunsperger. P. 252.

[18] Hunsperger. (Faces P. 256).

Standards, apply the Principle of Substitution[19] in which the Market Value estimate is both made and tested by substituting directly comparable alternatives. Mr. Hunsperger's use of "analogous case studies" and "opinion surveys" as approaches to estimating value ignores fundamental market concepts and does not comply with Standards' requirements.

Of crucial importance to any estimate of Market Value is an understanding of "market" concepts and an identification of the market or submarkets which are applicable to the property appraised. Appraisers carefully identify the applicable, relevant market when estimating Market Value because the comparability of data must be supportable before the data can be qualified as relevant or applicable to a specific value question. Mr. Hunsperger makes no attempt to do this. In addition, Mr. Hunsperger makes no attempt to differentiate among markets in the Class area. According to the Appraisal Institute:

> "Buyers and Sellers of different types of property interact in different areas for different reasons. Thus, real estate markets are divided into categories based on the differences among property types and their appeal to different market participants. The markets for various categories of real estate are further divided into submarkets, which correspond to the preferences of buyers and sellers. Differentiating real estate markets facilitates their study.[20]

Market differentiation is crucial to real property valuations involving Market Value because, for example, residences on opposite sides of a street (or even backing up to one another) may sell in different markets. It would be inappropriate and could be misleading to use the sales from one submarket as direct price comparisons in another market in most circumstances, and particularly where data for the target market are available.

The term "market" has many possible interpretations. According to the Appraisal Institute:

> "Each market for a particular type of property can be subdivided into smaller, more specialized markets called *submarkets*. Submarkets for urban, suburban, and rural residential property can be further divided in terms of the purchasers' preference for high-, medium-, or low-priced properties."[21]

---

[19] "The principle of substitution states that when several similar or commensurate commodities, goods, or services are avaialble, the one with the lowest price attracts the greatest demand and widest distribution" Appraisal Institute. P. 43.

[20] Appraisal Institute. P. 55.

[21] Appraisal Institute. P. 58.

**The Dorchester Group**

In practice, the term "market" could be applied to the overall market for all residences in the Denver metropolitan area or the "market" for a particular type of home. The Property Impact Study does not engage in market segmentation or disaggregation. According to the Appraisal Institute:

> "The process of identifying and analyzing submarkets within a larger market is called market segmentation. Segmentation usually applies to groupings of consumers, differentiating the potential users of a subject property from the general population by their characteristics. Disaggregation is a related term that applies to the property. Disaggregartion differentiates the subject property from other properties by [22]creating subclassifications with differing product characteristics."

For an appraiser in the practice of estimating the Market Value of real property, it is inappropriate to use properties in different states and different cities as "comparables" for single family dwellings in typical subdivisions. It is even further afield to calculate aggregate statistics for a group of properties in other cities and states, and then to apply them as "comparables" to groups of properties in another city. Such practices which were applied by Mr. Hunsperger in his work are contrary to our basic concepts of appraisal comparisons using the Principle of Substitution, create an appearance or assertion of appraisal-level comparability where no such comparability exists, and are further examples of USPAP Standards violations.

From the Property Impact Study, it appears that his use of the word "market" and his application of market concepts in the sense of market comparisons is ambiguous, indefinite, and neither explainable nor supportable. For example, public opinion surveys are treated as though they were taken among persons who constitute "the market" for properties in the Rocky Flats area, and the Class area in particular. They clearly do not. Most of the respondents neither evidenced that they lived in the Rocky Flats area nor were interested in doing so. Yet the results of these surveys are used to make direct conclusions regarding "value" losses. The use of survey research as a direct comparison approach is anything but "reasonable and customary". Survey research is at best an indirect means by which inferences may be drawn, and is certainly not an acceptable substitute for real comparable sales data that are available.[23]

---

[22] Appraisal Institute. P. 58.

[23] Appraisal courses teach methods of qualifying data as relevant, comparable data for appraisal purposes. In a typical appraisal, many factual sales will be considered by the appraiser, but some will receive little if any weight in final comparison analysis. Where data are scarce, appraisers are taught how to perform even more detailed research to develop comparison information. It is not acceptable to ignore, or to fail to gather,

**The Dorchester Group**

**C.  The Property Impact Study does not use the common and recognized methods applied by the appraisal profession in estimating Market Values.**

"Analogous case studies" and "opinion surveys" are not recognized valuation approaches.  Once data and surrounding facts are properly analyzed and qualified, the appraiser then has three basic appraisal approaches available.  Each applies a separate type of comparison based on the Principle of Substitution:

> **Cost Approach** - The market value of a property is derived by adding the estimated market value of the land to the current cost of construction a reproduction or replacement for the improvements, and then subtracting the amount of market depreciation in the structures from all causes.

> **Sales Comparison Approach** - Sales prices of similar properties are used to compare with a particular property being appraised; these sales are referred to as "comparable sales" or "comps."  Sales prices of properties that are judged to be the most comparable tend to indicate a range in which the value indication for the appraised property will fall.

> **Income Capitalization Approach** - This approach measures the present value of a property's future benefits considering its market-anticipated income streams and resale value at a defined later date.

There are many methodologies which are available within these three approaches, but identification of the particular category is necessary to understand a particular method so that its results can be understood and applied.  The Property Impact Study does not use any of these methods.

**D.  Methods applied in the Property Impact Study do not qualify as mass-appraisals.**

Mass-appraising by definition deals with universes of properties rather than individual property valuations.  According to The Appraisal Foundation:

> "Standard 6 is directed toward the substantive aspects of developing and communicating competent analyses, opinions, and conclusions in the appraisal of a universe of properties.  Mass Appraisals are used primarily for purposes of ad valorem taxation.  But depending upon the purpose of the appraisal and the availability of statistical data, mass appraisal procedures may also be appropriate for the valuation of any

relevant information where such information is available, or to substitute analyses for more relevant direct comparisons.

**The Dorchester Group**

universe of properties, but only when written reports are made and the results of statistical testing are fully disclosed and explained....The validity of mass appraisal conclusions is frequently tested or contested by single-property appraisals.   Single-property appraisals should conform to Standards 1 and 2 for real property..."[24]

Some market analysis tools, such as multiple regression analysis ("MRA") or public opinion surveys, can be applied in diverse ways.  For example, MRA may be used in broad econometric models where the focus is other than individual properties. When valuation is intended, however, such studies must comply with USPAP Standard 1 when individual properties are valued, and Standard 6 when mass-appraisals are involved. Conversely, where these Standards are not met, either the Standards have been violated or the engagement does not deal with valuation estimates.

The Property Impact Study makes no reference to USPAP Standard 6, and there is no evidence that a mass appraisal was intended.

**Conclusion Number 3**

**THE PROPERTY IMPACT STUDY'S USE OF SURVEY RESEARCH AS A DIRECT VALUATION METHODOLOGY DOES NOT APPLY AN APPROACH THAT IS CUSTOMARILY RELIED UPON BY EXPERTS VALUING PROPERTY UNDER USPAP.**

Using public opinion surveys as a valuation methodology is not an approach that is "...reasonably and customarily relied upon by experts..." in the valuation field, particularly where, as in this lawsuit, ample sales transaction data are available for analysis.  I have been a real estate appraiser for more than 40 years.  I have served on the Governing Council of the Appraisal Institute, on its Appraisal Standards Council, and as its National President.  I have been involved in national appraisal standards issues for over 30 years and in international standards matters for over 15 years.   I have researched available literature in this field in the course of my engagement in this lawsuit. The use of public opinion surveys as a valuation methodology is without parallel in all these experiences.

It is notable that, although the Study does include references to public opinion polls in its use of literature for comparisons, none of the articles cited to our knowledge deal with real property valuation issues, USPAP Standards, or the field of real estate consulting.  None to our knowledge involves individuals who acknowledge that their work is, or may be, subject to USPAP Standards or professes training or background in the field of real estate appraising.[25]

---

[24] The Appraisal Foundation.  P. 29.

[25] The Property Impact Study does not contain conventional reference citations that permit the reader to specifically identify authors, source documents, publishers, dates, page references, and the like. Upon request, Mr. Hunsperger apparently furnished some or all of his backup information used as the basis for references in his report. We

**The Dorchester Group**

I am unaware of any studies that have tested the validity of public opinion polls as a valuation approach and am unaware that anyone has suggested to The Appraisal Foundation or to the Appraisal Institute that public opinion polls be added to the list of valuation approaches. From experience I can state that public opinion polls are subject to significant error, and that the degree of error for valuation purposes in the studies performed by those commissioned by Mr. Hunsperger would be unacceptable for valuation purposes. Further, there has been no disclosure that any validation of Mr. Hunsperger's public opinion polls was made for valuation purposes, or that the ingredients are present for such validations to be made.

It is without question that public opinion surveys such as Mr. Hunsperger commissioned are not generally accepted by the appraisal community or customary users of appraisal services as an approach to estimating Market Value of real estate.

### A. The use of "Public opinion polls" here appears to be an attempt to apply the "Contingent Valuation" method or a similar methodology to make Market Value estimates of real property.

*Contingent Valuation* ("CV") is an analysis method that attempts to estimate values for either economic or non-economic goods by asking people hypothetical questions about their *willingness to pay* for such goods. CV is roughly a referendum or ballot approach to quantifying an answer to a (defined) value question. CV is not based on market data caused by real-world decisions made by participants in applicable markets.

Unlike empirical valuation methods contemplated by USPAP, CV exists in a hypothetical world, where hypothetical commodities trade in hypothetical markets. In addition to dealing with hypothetical and speculative issues, CV is frequently measured among parties who have no involvement with, and often any actual knowledge of, the issues to which CV conclusions may be applied.

Applications of CV in the field of economics have been studied principally by those dealing with "non-use values" such as possible losses to public natural resources. Others in the fields of economics, econometrics, or public finance have studied and written on the topic. Despite these efforts, CV has not become a prominent issue or method in the field of real property valuation. In fact, many studies have shown CV to be a poor predictor of known Market Values even when the commodity under measurement is well defined.

---

cannot tie the discovery materials to his references without further communication from Mr. Hunsperger. Accordingly, our statement above is based upon what we believe he relied upon based upon his discovery production.

**The Dorchester Group**

### B. It is not customary to use opinion surveys to estimate the market value of real property.

In the valuation discipline, random sample opinion surveys have been considered, at most, as an indirect method to analyze markets, not as an approach to estimating Market Value. Thus, it cannot be said that the use of survey research is customarily applied in appraisal assignments.[26] Survey research is frequently applied in certain types of land use and development situations, and in some studies of highest and best use, but less frequently across the spectrum of real estate consulting practice.

The Property Impact Study uses the survey research information from public opinion polls as though it were a separate and distinct valuation approach. In the Valuation Process, comparable sales and other comparable market information used for comparison purposes must, by contemporary practice and Standards, be confirmed, qualified, and weighed for its relevance prior to the drawing of final conclusions. Based upon explanations in the Study, these Standards have not been met.

To conclude Market Value effects for the properties that are the subject of this litigation from the types of survey research considered by Mr. Hunsperger is unprecedented in my experience. Even if necessary requisites were met to attempt to apply survey research to Market Valuation processes, Mr. Hunsperger has not, in my opinion, made proper and accurate use of the results of the survey research he considered.

The representation that these methods are "reasonably and customarily relied upon by experts in our field[27]" is not correct. It cannot be said that "our field" is that of consulting, because the consulting field according to USPAP cannot deal with the estimation of Market Values of properties. If "our field" is that of appraising, the Study has departed from USPAP Standards.

**Conclusion Number 4**

**THE ANALOGOUS CASE STUDY METHOD IS MISLEADING IN THAT IT APPLIES DATA THAT ARE NOT TRULY COMPARABLE TO THE PROPERTIES INVOLVED IN THE ROCKY FLATS LITIGATION IN SUCH A WAY THAT IT APPEARS DIRECT**

---

[26] Market interviews are a form of "survey research,": but the comments here are directed to Mr. Hunsperger's assertions that he scientifically applied public opinion polls in his work. These methods differ from those more normally applied in real estate appraisal which involve market inquiries in the market or markets applicable to the property being valued.

[27] Hunsperger. P. 5.

**The Dorchester Group**

## COMPARISONS CAN BE MADE AS AN APPRAISAL APPROACH TO ESTIMATING MARKET VALUE.

My analysis of the Study's "analogous case studies" indicates that they are neither "analogous" in the sense of their comparability to the matters involved in this lawsuit nor in the main are they "case studies." They do not deal with elements of either the Cost Approach or the Income Approach to a valuation estimate. Therefore, they apparently are most associated with the Comparable Sales Approach. The Principle of Substitution cannot be applied by substituting articles contained in the literature which report research, opinions, and/or experiences in other locales for direct market experience in the Rocky Flats area. Further, opinions expressed in the literature cannot be substituted for the facts that are required for proper comparions.

A. **The Property Impact Study's use and application of "analogous case studies" is not appropriate and is misleading as an estimate of Market Value.**

USPAP requires that appraisers and consultants report their analyses, opinions, and conclusions in a clear and understandable way, and in a manner that is not misleading. The imprecision of language is one of the most difficult aspects of the Property Impact Study.

The word "analogous," which is seldom used in appraising, presumably equates to "comparable" or "similar" in at least some respects. Because the Study does not define the term, and does not state that the examples are "comparable," it is difficult to understand how any value conclusions are drawn about properties in a specific location, the Class area, from sources that do not even reference these properties and are not established as even being comparable. The proper use of comparables requires considerably more analysis and reconciliation of data studied than is contained in the Property Impact Study.

The Property Impact Study cites 13 "cases," some of which combine several separate sources of information. We did not find a bibliography or footnote reference to properly identify the studies considered and are still uncertain whether we have all the source documents he considered and relied upon. Accordingly, it may be necessary to update our comments at a later date.

Three purposes are cited for the "analogous case study" considerations:

"To illustrate the appropriate methodology,

To illustrate market reaction to pollution and

**The Dorchester Group**

To provide an indication of possible loss in value around Rocky Flats.[28]"

Illustration of "the appropriate methodology" is an indefinite statement. My analysis does not indicate that any of the studies deal with the FBI raid or the aftermath, or any comparable circumstances. Thus, "appropriate methodology" is, at best, a fuzzy reference with no established relevance. By inference, the Study may be trying to establish the bona fides of public opinion surveys, multiple regression analyses, or other methods applied for valuation elsewhere in the Study. I do not find from these "cases" that they establish any methodology is a property methodology for the Rocky Flats lawsuit even if they may have had relevance elsewhere.

The notion of illustrating market reaction to "pollution" is difficult to associate with measurements of the effects of an FBI raid. The Study contains no definition of "pollution", cites no specific types or instances of the pollution as a reference point for research, and specifies no time frame. Although contamination issues may be involved in the Rocky Flats litigation, the Study casts a wide net for generalization purposes, even though it draws very specific conclusions. What is meant by "pollution" as it relates to the Rocky Flats litigation and what relevance "pollution" has with the FBI raid are left unspoken.

In the main, the material upon which the Study relies are only opinions, not relevant market facts, relating to situations not directly comparable to the Rocky Flats litigation. The Study narratively attempts to draw conclusions from a discussion of the case studies, but it appears that it looks only to the research materials to draw evidences or inferences that support its views, contrasted with objective study of each beginning with establishment of a degree of comparability with Rocky Flats issues. Such methods are inappropriate in appraising and are neither reasonable nor customary.

B.  **The individual "case studies" relied upon are inherently unreliable as a means to estimate Market Value of properties in the Class area, and thereby are unreliable as potential indicators of economic loss to the properties involved in the Rocky Flats litigation.**

The Property Impact Study states, "...we have considered a number of analogous cases...to assist us in understanding how the market reacts to contamination (or negative environmental conditions) and how that reaction translates to effect on value.[29]" Because "effect on value" is an appraisal issue when (defined) value quantifications are involved,

---

[28] Hunsperger. P. 22.

[29] Hunsperger. P. 121.

**The Dorchester Group**

"analogous case studies" are in effect "comparables" in this approach to estimating value.

Although a discussion of issues contained in the Study's references is possible, and I am prepared to do so if asked at a later date, such a discussion might tend to obscure facts that are more relevant to the Rocky Flats litigation: there is no "comparable sales" information in these references as that term is understood by USPAP.

The Property Impact Study says that the cases are relevant in at least one of several respects: "1) they are illustrative of methodology commonly relied upon, 2) they are illustrative of findings in similar court cases, or 3) they are illustrative of reaction to a similar environmental issue.[30]" Let us first examine what is said and then what is not said.

With regard to "illustrative methodologies," a method of analysis is a tool or procedure within an appraisal approach. Several articles deal with regression analysis, a tool, but do not establish that the results of the article can be used for direct comparison. Such methodologies are not commonly applied in making value estimates.

Mr. Hunsperger's attempt to cite *results of other court cases* as a comparable for this litigation raises many questions of propriety. From an appraisal viewpoint, appraisers do not cite settlements or court awards as "comparables" because they do not meet the tests of a Market Value transaction. Similarly, the use of settlement information elsewhere could lead to an erroneous inference that the data serve as a comparable for Rocky Flats, and could mislead others who may consider this information.

To the extent that the articles reflect a "reaction to a similar environmental issue," The Property Impact Study never identifies what that issue is with regard to the Rocky Flats litigation. The report never specifies the environmental issue being considered. Thus, there is no basis for comparison, even in the few articles some parallels might have been drawn.

The use of these articles does not permit calculation of "units of comparison" for direct valuation purposes. For example, if a residence sells for $100,000 and contains 2,000 square feet, we can develop a unit of comparison of $50 per square foot. Similar calculations for similar properties would develop a range of square foot price indicators. Ultimately we can then study each sales property's similarities and dissimilarities with the appraised property, make necessary adjustments, and develop a value indication for the appraised property. Failure to develop meaningful units of comparison a clear and substantial departure from USPAP Standards.

---

[30] Hunsperger. P. 121.

**The Dorchester Group**

There are additional problems with the comparisons being made. The properties contained in any particular analysis, Fernald, Ohio, or Houston for instance, are not similar to those in the Rocky Flats area. The economic conditions at the times of the case study articles are not similar. The circumstances reported in the references are not similar. In short the cases are not "analogous" at all.

C. **The plaintiffs' Property Impact Study conclusion of "loss in value after the 1989 FBI raid", which he reaches from "analogous cases", is an appraisal conclusion arrived at and reported in a manner that is inconsistent with appraisal Standards and conventional appraisal practice.**

Mr. Hunsperger reports, "We have concluded from the analogies that loss in value after the 1989 FBI raid would likely have been at least an average of 10% across the class area. This equates to $10,444 per attached residence and $15,000 per detached residence. This is based on 1995 average sales prices reported by the Multiple Listing Service.[31]" Omitted are the data, reasoning, and analysis that are necessary to support his appraisal conclusion. The inference from general information and discussions to "therefore there is a 10% loss in value" is contrary to USPAP and conventional Standards.

It is customary and appropriate for an appraiser to provide a summary of the "elements of comparison[32]" in an appraisal report so the reader can view and judge the degree of similarity between the property appraised and others with which it is being compared. No such summary is provided and one cannot be reasonably inferred.

According to the Appraisal Institute, "To apply the sales comparison approach, an appraiser follows a systematic procedure. A general outline of the basic procedure follows:

1. Research the market for information on sales transactions, listings, and offers to purchase or sell involving properties that are similar to the subject property in terms of characteristics such as property type, date of sale, size, physical condition, location, and zoning.

2. Verify the information by confirming that the data obtained are factually accurate and that the transactions reflect arm's-length, market considerations. Verifications may elicit additional information about the market.

---

[31] Hunsperger. P. 177.

[32] Appraisal Institute. P. 403.

**The Dorchester Group**

3.   Select relevant units of comparison (e.g., price per acre, price per square foot, price per front foot) and develop a comparative analysis for each unit.

4.   Compare comparable sale properties with the subject property using the elements of comparison and adjust the price of each comparable to the subject property or eliminate the sale property as a comparable.

5.   Reconcile the various value indications produced from the analysis of comparables into a single value indication or a range of values. In an imprecise market subject to varying occupancies and economies, a range of values may be a better conclusion than a single value estimate."[33]

The Property Impact Study does not follow such procedures. This. the conclusion of a "loss in value" averaging "at least 10% across the Class area" without justification or support.

**Conclusion Number 5**

**APPLICATION OF "ANALOGOUS CASE STUDIES" AND "PUBLIC OPINION POLLS" AS APPRAISAL APPROACHES DEALS WITH GROUPS OF PROPERTIES AS THOUGH THEY WERE A SINGLE ENTITY AND IS AN INCORRECT APPLICATION OF PROPERTY APPRAISAL METHODOLOGIES; CONSIDERATIONS OF INDIVIDUAL PROPERTIES ARE IGNORED.**

A classic and common example of appraisers considering many properties at once is mass appraising, defined and discussed earlier in this report. Mass appraisals, commonly performed for valuations of individual properties by property tax assessors, involve less rigorous analyses of individual properties, but still conclude assessed values; fair cash market values, or other defined types of value for individual properties. The plaintiffs' report, however, makes no conclusions regarding the Market Value (or other defined value) of any particular property.

Analogies, public opinion polls, and the like generalize and are incapable of individual property validation in the way they are applied. Thus, there is no proof of being either right or wrong.

Appraisers are responsible for estimating Market Value (or other defined value) of individual properties, even when masses of properties are involved. USPAP Standard 6 permits slightly different procedures for mass appraisals than are required where properties are individually appraised under USPAP Standard 1. A property Class area is designated for the convenience of particular litigation, but does not alter underlying markets or appraisal

---

[33] Appraisal Institute. PP 401-402.

**The Dorchester Group**

procedures.  Whether a property falls within a property Class or not does not relieve the appraiser from normal Standards requirements

It is not inappropriate for an appraiser or a consultant to make area, rather than specific property, studies.    Identification, description, and analysis of neighborhoods and their trends is an example.  It is inappropriate, however, that an appraiser ignore the analysis of individual properties if an effect of a particular stimulus is to be measured.  It is inappropriate for value conclusions to be developed from remote, incomparable, and irrelevant sources and then applied as though they were proper appraisal conclusions.  Under USPAP and the Appraisal Institute's Code of Professional Ethics, it is an appraiser's duty not only to comply with the Standards, but to make certain that the work does not mislead.  That was not done here.

It is my opinion that considering properties *en mass* as though they were a separate entity, failing to apply applicable appraisal Standards to that task, applying various methodologies such as public opinion polls and "analogous cases" as valuation approaches, and the manner in which the plaintiffs' Property Impact Study draws "value loss" conclusions fail those tests.