# EXHIBIT 21

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

|  |  |
|---|---|
| MERILYN COOK, et. al.  ) | |
| ) | |
| Plaintiffs,   ) | |
| ) | |
| v.    ) | Civil Action No. 90-K-181 |
| ) | |
| ROCKWELL INTERNATIONAL  ) | |
| CORPORATION and THE DOW  ) | |
| CHEMICAL COMPANY,   ) | |
| ) | |
| Defendants.   ) | |
| ) | |

AFFIDAVIT OF DANIEL L. MCFADDEN
March 5, 1998

| STATE OF CALIFORNIA | ) | |
| --- | --- | --- |
| | ) | SS: |
| COUNTY OF ALAMEDA | ) | |

I, Daniel L. McFadden, being first duly sworn, depose and state that the following statements are true and based on my personal knowledge and that, if sworn as a witness, I could competently testify thereto.

## 1. PERSONAL BACKGROUND/QUALIFICATIONS

1.1. I am the E. Morris Cox Professor of Economics at the University of California, Berkeley, and Director of the Econometrics Laboratory. I received a Bachelor of Science degree in Physics, with high distinction, in 1957, and a Ph.D. degree in Behavioral Science, with specialization in Economics, in 1962. Both degrees are from the University of Minnesota. I joined the faculty of the University of California in 1963. In 1977, I became the James Killian Professor of Economics at the Massachusetts Institute of Technology. From 1988 to 1991, I was Director of the Statistics Center at MIT. In 1991, I returned to Berkeley, and assumed my current position. I have taught economic theory, econometrics, and statistics at the graduate level since 1962. I have received the John Bates Clark medal and the Fisch medal, and have been elected to the American Academy of Arts and Sciences and the National Academy of Science. I have served as Department Chair, as President of the Econometric Society, and as Vice-President of the American Economics Association.

1.2. I have published 7 books and more than 100 professional papers, the majority related to econometric methods and their applications. My resume is attached as an Appendix.

## 2. THE PURPOSE OF THIS AFFIDAVIT

2.1. This affidavit is submitted in reference to the Defendant's Motion To Compel The Production of Material Relied on by Dr. John Radke, dated January 8, 1998, and the Plaintiff's Response to Motion to Compel, dated February 18, 1998. This affidavit addresses the adequacy of Dr. Radke's Expert Report (November 25, 1996), and backup documentation to describe the data processing and statistical analysis that Dr. Radke has relied upon in forming his opinions on damages in this case.

1

2.2. At the request of attorneys for the defendants, I have reviewed the 1996 expert report *Measuring the Effects of Proximity to the Rocky Flats Nuclear Weapons Plant on Property Values*, prepared by Dr. John Radke. I have also reviewed background documents and analyses provided by Dr. Radke, including outputs from his estimation programs and descriptions of variables and procedures, and the deposition of Dr. Radke. I submitted on April 16, 1997 an Expert Report stating my opinions on Dr. Radke's work, and on July 29, 1997 an Affidavit containing the opinions stated in my April 16, 1997 Report. I consulted with the attorneys for the defendants in their preparation of the January 8 Motion to Compel, and for the preparation of this affidavit have read this Motion to Compel and the February 18 Response to Motion to Compel.

2.3. I summarize below my opinions on Dr. Radke's work that are expressed in my April 16, 1997 Expert Report and that are germane to the issues raised in this affidavit:

2.3.1. The procedures Dr. Radke has followed for documenting and retaining a record of his work fail to meet prevailing standards in econometrics. The National Science Foundation and major journals require that data, programs, and materials necessary to replicate published economic studies be archived and made available to any interested scientist. Dr. Radke reports that he has done portions of his analysis interactively, without maintaining a log. He has also provided incomplete documentation on the data he has used, and on models used to construct some of his variables, such as accessibility measures. Substantive questions on Dr. Radke's procedure, data sources, and variable construction remain unanswered.

2

2.3.2. Dr. Radke has made a serious logical error in his analysis, failing to distinguish effects of proximity to Rocky Flats that might be associated with the 1989 FBI raid and attendant publicity from persistent proximity effects. As a result, he makes claims for damages arising from persistent price depression effects without demonstrating that these persistent effects are historically related to information about releases of hazardous materials at the Rocky Flats plant, or that other probable causes of these price effects have been excluded. *Even if* there were persistent price depression linked to historical releases of hazardous materials at Rocky Flats, Dr. Radke has not established that lost property values that would result from such an effect would accrue to class members. *Only* owners who purchased property prior to the onset of a persistent price depression effect suffer lost property values as a result of this effect.

2.3.3. Dr. Radke has made several serious statistical errors in his analysis. First, he has used a factor analysis to select composite location variables. The properties of the multiple regression method used for his hedonic analysis imply that this step cannot improve his estimate of the effects of proximity to Rocky Flats, and may introduce bias. Second, he has used weighted regression, with weights related to sampling rates inside and outside the MPC. This is an unnecessary and statistically incorrect method for dealing with sample stratification which leads Dr. Radke to inefficient estimates of model parameters and biased estimates of their standard errors. Third, Dr. Radke has used a procedure for estimating cutoff values for proximity effects that leads to biased estimates of the significance of these proximity effects.

2.3.4. Dr. Radke's development of location characteristics using a GIS system is extensive and complex. Dr. Radke has failed to provide the supporting documentation needed to verify or replicate this work.

2.3.5. Dr. Radke carries out an analysis of values of multiple-family, commercial, and vacant properties, which he terms Phase I, and a second analysis of single-family residential properties, which he terms Phase II. Using the data provided by Dr. Radke for his Phase I analysis, and the description of his regression procedure given in his report, I have made an extensive effort to replicate Dr. Radke's results, and am unable to do so. Using the Phase II data provided by Dr. Radke and using the procedure that Dr. Radke states that he used in his Method 2 to determine cutoff distances, fails to reproduce his reported values for these cutoff distances. Dr. Radke has not provided copies of the computer programs, or detailed descriptions of the data transformations carried out by these programs, that would permit me to determine why these attempts at replication fail, what data processing and statistical procedures Dr. Radke actually used, and how these differ from the description that he gives in his Report. Furthermore, Dr. Radke's use in all of his regressions of inadequately documented locational variables renders his results suspect, independently of whether his statistical analysis taking these locational variables as given can be documented and reproduced.

2.4. On the basis of Dr. Radke's Report and the background documentation he *has* provided, I am able to evaluate the logical consistency of his analysis, and the validity of the regression procedures he states that he has adopted (cf. Paragraphs 2.3.2 and 2.3.3). These evaluations form the basis for the opinion stated in my April 16, 1997 Report that Dr. Radke's analysis is fundamentally flawed, and cannot be relied upon for the estimation of economic damages. Beyond this, I am able to

4

evaluate Dr. Radke's Phase II, Method 1, regression analysis, *taking as given* the sample of transactions he has drawn and the values of the variables he has constructed. I am able to evaluate a reconstruction of Dr. Radke's Phase I analysis based on transactions dates contained in the commercial data source that Dr. Radke used, and evaluate these models given the assumption that it is a correct representation of what Dr. Radke intended to do. Similarly, I am able to evaluate a reconstruction of Dr. Radke's Phase II, Method 2, analysis given the assumption that the cutoff distances I obtain employing the procedure he states that he used are a correct representation of what Dr. Radke intended to do. However, the computer instructions detailing precisely what Dr. Radke did would be necessary to pinpoint exactly the sources of the differences in Dr. Radke's report and the results obtained from my attempts to reconstruct what he has done.

2.5. As of this date, Dr. Radke has failed to provide the documentation, requested in the Motion to Compel, that would enable me to replicate and verify his construction of the locational variables that form the centerpiece of his hedonic analysis (cf. Paragraph 2.3.4), to verify that transactions were sampled and dated accurately and in conformance with good statistical practice, or to verify that the data construction and regression procedures used by Dr. Radke were valid. Analysts working under my direction have made diligent searches of the documentation Dr. Radke has provided, and have made an extensive effort to "reverse engineer" and recover the undocumented variables and procedures. The missing documentation as summarized in the Motion to Compel has not been recovered by these methods, and is central and critical to the task of replicating and evaluating these remaining elements of Dr. Radke's analysis.

5

## 3. DOCUMENTATION STANDARDS FOR SCIENTIFIC STUDIES

3.1. There are major gaps in Dr. Radke's description and documentation of the data he has collected, the processing of these data into the variables appearing in his statistical models, and the statistical calculations he has done. These gaps make it impossible or impractical to replicate substantial portions of Dr. Radke's work, in order to determine if it is consistent with his Report, free of mechanical errors, and based on plausible assumptions. It is standard scientific practice to document work in such a manner that reported results can be replicated, by other scientists, and by the investigator himself. At a fundamental level, these standards are part of the definition of the Scientific Method, in which a *scientific* experiment is one that can be replicated and tested for conformity to scientific principles. Documentation of scientific work is essential to the scientific investigator, if for no other reason than to permit the investigator to recheck and explain his own work, and as protection against accusations of scientific fraud.

3.2. Conventional documentation standards in empirical economics are that data should be retained and archived, or precisely referenced to public or commercial sources, that all data processing steps such as data transformations and selection of observations be documented with sufficient detail so that they can be replicated, and that all statistical and analytic procedures be documented with sufficient detail so that they can be replicated. These standards are taught as part of the training of empirical economists, are incorporated into the protocols required of grantees by the National Science Foundation, and are required for publication in major journals. These are also the documentation standards recommended for multiple regression analysis by the Federal Judicial Center Reference Manual on Scientific Evidence:

> "A party that offers data to be used in statistical work, including multiple regression analysis, should be encouraged to provide the following to the other parties: (a) a hard copy of the data when available and manageable in size, along

6

with the underlying sources; (b) computer disks or tapes on which the data are recorded; (c) complete documentation of the disks or tapes; (d) computer programs that were used to generate the data (in hard copy, on a computer disk or tape, or both); and (e) documentation of such computer programs. ... A party proposing to offer an expert's regression analysis at trial should ask the expert to fully disclose: (a) the database and its sources; (b) the method of collecting the data; and (c) the methods of analysis.

3.3. The form of the documentation required for an investigator, or others, to replicate an empirical economic analysis would typically be paper documents and electronic files containing the data used in the study, along with documentation in the form of codebooks or computer programs that identify the content and formatting of these files and the definition, units, and coding of variables; the computer programs used to transform data and select observations; and the computer programs used for statistical analysis.[1] It is important to make a clear distinction between commercial software packages for database management and statistical analysis, such as SAS or SPSS, and the computer programs that are written in the languages employed by the packages and used to carry out actual data processing and analysis tasks. In essence, the former specifies the "language" used to "communicate" with the data, and the latter specifies what the data is "instructed to do". To replicate an analysis, it is necessary to know both the language (i.e., the commercial software package used) and the instructions (i.e., the computer program executed using this package). It should not matter whether computer programs are delivered in electronic or paper

---

[1] There is a grey area regarding use of data that are proprietary or confidential, or computer software that is proprietary. A common, but not universal, scientific standard is that investigators may restrict access to confidential data, but that procedures should be provided so that interested scientists have the opportunity to qualify for access to the data. Similarly, a common standard on proprietary software is that the investigator should provide a sufficient description of the operations that the software performs so that another researcher can emulate its operations using some commercially available software language. In this case, Dr. Radke does not indicate any use of proprietary or confidential data. The software that Dr. Radke names is non-proprietary, and he gives no indication that he has used proprietary software of the AEGIS Laboratory with which he is associated.

7

form, although the former is "best documentation" since it is the proximate generator of the study results. I have read the Plaintiff's Response to Motion to Compel (at page 4) which discussed the commercial software that Dr. Radke has used. This confuses the distinction above between the "language" and the "instructions". What I need in order to replicate Dr. Radke's analysis, and what the Motion to Compel requests, are these "instructions", as memorialized by the computer programs that Dr. Radke has run, or contemporaneous or reconstructed instructions for data processing and statistical analysis that if followed literally will reproduce his results. The Plaintiff's Response to Motion to Compel states that "defendants are making an unprecedented request for "any computer file that may have been used or generated ... in the course of Dr. Radke's work". To the contrary, the standard that sufficient documentation be provided to permit replication of an analysis provides a bright line requiring that an expert retain and deliver nothing less and nothing more than a sequence of procedures and programs that will reproduce his reported results and permit evaluation of the data processing steps and statistical procedures he has employed. This is not "extra work" for an expert; rather, it is a core component in a scientifically acceptable analysis that should be provided as an integral part of that analysis.

3.4. The data and data transformations might be supplied in electronic spreadsheets (e.g., Excel spreadsheets), with the data transformation and selection steps memorialized in the formulas contained in the spreadsheets. Alternately, they might be supplied in the form of instructions (e.g., computer programs) written in the language of a standard commercially available software package for database management and statistical analysis, such as SAS or SPSS, or specialized data manipulation programs such GIS software. The essential feature of the documentation procedures just described is that they permit the investigator, or another scientist

8

who acquires the commercial software, to replicate each step of the study, and by analyzing the spreadsheets or computer programs determine whether the data processing steps were carried out as represented, and determine and evaluate the assumptions used in the analysis.

3.5. By citing specific instances, I will point out in this affidavit that Dr. Radke has failed to meet these documentation standards. I will show that the gaps in the documentation he has turned over through discovery leave substantive questions about his analysis unanswered, and make it impossible to replicate significant portions of his work. I will show that the materials requested in the Motion to Compel are essential for the completion of my evaluation of Dr. Radke's work. The Plaintiff's Response to the Motion to Compel argues that it would be unduly burdensome on Dr. Radke to comply with the motion, because the requested documentation is unavailable to Dr. Radke. However, the Motion to Compel is seeking the core documentation needed to replicate Dr. Radke's study, which he should have maintained in conformity with scientific and legal document retention standards. The Motion to Compel is not asking for new or added documentation tasks or formatting that would lie outside the documentation practices of a competent expert. The core documentation necessary to replicate Dr. Radke's analysis is an integral part of his opinion in this case.

3.6. The Plaintiff's Response to the Motion to Compel argues that in a number of instances, failure to provide documentation is harmless because the defendant's experts should be able to infer or reconstruct the information requested. There are three reasons to not accept this argument. First, in some instances, it is not in fact possible to reconstruct the missing documentation. Second, the argument places the burden on the defendant's experts to guess what the plaintiff's expert has done, and opens the defendant's expert to criticism if he guesses wrong. The resolution of

9

conflicting opinions of experts should not devolve on whether the defendant's expert is clever enough to solve puzzles set by the plaintiff's expert. Instead, there should be an even-handed and open opportunity for each expert to check the analysis and question the assumptions made by the other, so that their opinions can be weighed against the preponderance of the scientific evidence. Third, in empirical and statistical scientific analysis, the scientific standard for documentation is straightforward: an investigator should provide no less than the information necessary to replicate the study. If any step of the analysis, such as selection of observations or a data transformation are omitted, and this renders the study non-replicable, then this is a failure to meet the standard.

## 4. TRANSACTIONS DATES IN DR. RADKE'S PHASE I ANALYSIS

4.1. The Motion to Compel has requested "the dates of the transactions used in 'Phase I' of Radke's study", and "computer files memoralizing the steps" used in his analysis of his Phase I data. The Plaintiff's Response is that "The date of the sales transactions in the underlying database ... were not relied upon in the analysis and are irrelevant to its conclusion" (see p.6-2) and that "Dr. Radke's responses to defendant's demands for more information ... is amply sufficient to enable a researcher knowledgeable in the field to understand Dr. Radke's methodology in detail and, indeed, to reproduce the same results from the same data ... Defendant's need nothing more ... to analyze his methodology and evaluate his results" (see p. 4-7).

4.2. These statements are false. First, Dr. Radke's analysis does depend on transaction date, through the division of current transaction price by a consumer price index for that date to put all prices in 1993 terms (cf Radke, p. 24), and through the estimated statistical model, which contains variables $k_{TIME}$ that are

10

described as Time of Transaction terms and are estimated by year for each of the Phase I property classes (cf. Radke, p. 36 and Fig. 4.1b following p. 37). Thus, transaction year is a core input variable in Dr. Radke's analysis. Dr. Radke has provided a Phase I database containing two undocumented variables that appear from their names to be related to transactions dates, SALEYR and DATENUM, but no other variables that appear to determine transaction year. The variable SALEYR contained numbers that appear to be two-digit year of sale plus fraction, but starting at 84.18 rather than 83.0, conflicting with Dr. Radke's statement (p. 23) that the database "ranges from 1983 to the end of 1993". At the time of the submission of my expert report on April 16, 1997, I was unable to decode the DATENUM variable; to attempt to replicate Dr. Radke's regressions, I used the formula (year) = SALEYR - 1.18 to obtain a variable for year of sale that started at the beginning of 1983. This guess failed to replicate Dr. Radke's results.

4.3. By matching selected transactions in Dr. Radke's database with the original Phase I DRESCO database, I have subsequently decoded Dr. Radke's variables, and have determined that

$$SALEYR = (DATENUM - 182.5)/365,$$

$$DATENUM = (Year)*372 + (Month)*31 + (Day),$$

where (Year) is expressed as a two-digit number, (Month) is numbered 1 to 12, and (Day) is numbered 1 to 31, and Year/Month/Day is the actual transaction date. Dr. Radke fails to include DATENUM for commercial properties in his database, and I first recover this variable for these properties using the relationship

$$DATENUM = 182.5 + 365*SALEYR.$$

The actual two-digit sale year for all properties is then given by

11

$$(\text{Year}) = \text{floor}((\text{DATENUM} - 32)/372),$$

where floor(·) returns the largest integer less than or equal to its argument. Using this reconstruction of the actual sale year in the Phase I database, I have again attempted to replicate Dr. Radke's regression results, and still cannot do so. It appears that either Dr. Radke has made some error in the construction of the sale year variables in the regressions contained in his Report, or made some other undocumented change in the analysis that is not reflected in his Report. This question could easily be resolved from copies of the computer programs that Dr. Radke used to process his data and run his regressions. In the absence of these programs, I cannot determine how Dr. Radke defined the sale year variables in his regressions and obtained his results. Unless Dr. Radke has additional documentation on this analysis which he has failed to turn over, I doubt that he can replicate his own results. I conclude in this instance that the missing documentation is substantive, and appears to hide an error in Dr. Radke's analysis that invalidates his regression results.

## 5. PHASE II PROXIMITY VARIABLES

5.1. Dr. Radke lists 31 "Locational Variables" (Report, Appendix A) that he constructs by processing raw data using a Geographical Information System (GIS). He presents a brief generic description (Appendix B) of how this processing is done, but has not provided sufficient documentation to replicate this construction. A key step in Dr. Radke's analysis was to use a GIS program to determine by Address Matching the x-y coordinates for each property sale in his database. Proximity or locational variables are then constructed using gravity models which he assumes will summarize the impact at each transaction location of spatially distributed features. For

12

example, Dr. Radke's Report describes a variable QLNHAZW which is a "weighted" measure of proximity of each property sold to "CERCLA, TRIS, landfill, salt pile, and sludge" sites.

5.2. The assignment of location variables to transactions using a GIS system is touted in Dr. Radke's Report (pages 33-34) as one of the major innovations in his damage analysis. These x-y coordinates are a critical and essential element in the construction of Dr. Radke's location variables, and it is impossible to check the validity or plausibility of his location variables for a property without knowing these coordinates. However, Dr. Radke has not provided the x-y coordinates for the properties in his database. Further, the Plaintiff's Response to Motion to Compel states that "there is apparently no existing computer file directly matching x-y coordinates with specific properties in the study". It is inexplicable, and inexcusable, that Dr. Radke would fail to retain the data that forms the centerpiece of his entire damage analysis.

5.3. The defendants have attempted to construct x-y coordinates for the transactions in Dr. Radke's data by using their own GIS program. This is not successful in attaching x-y coordinates to all the properties to which Dr. Radke has assigned location variables, nor is it possible to determine whether the coordinates obtained by this exercise agree with Dr. Radke's. This makes it impossible to replicate Dr. Radke's assignment of location variables to individual properties.

5.4. An important part of Dr. Radke's construction of his location variables is the use of "gravity models" to summarize the impact at a particular geographic point of features that are dispersed around that point. These models contain variables (e.g., distance, travel time) and parameters (e.g., friction constants) that determine how features with different densities and locations are valued. These characteristics of the gravity model should be related to behavior; e.g., they should

13

be estimated based on spatial patterns of property prices, or at minimum chosen on the basis of a literature review to have values that are plausibly consistent with spatial distributions of property prices. To evaluate the plausibility of the gravity models that Dr. Radke employs, it is necessary to know the values of the parameters (e.g., friction constants) they use, and the foundations for the selection of these values. To replicate the construction of Dr. Radke's location variables, it is necessary to have the databases giving the spatial arrays of features that he considers, along with the x-y coordinates associated with each point location of these features. Dr. Radke has not provided this documentation.

5.5. Dr. Radke employs in his regression analysis four locational variables related to proximity to CERCLA or toxic waste sites, QCRCL16, QCRCL32, QTOXIC8, and QTOXIC16, which are described as measures of proximity to a "a weighted sum of all types of hazardous waste sites" (Report, p. 29). Dr. Radke does not explain how his "weighted sum" is formed, what parameters enter his gravity model for proximity to these sites, or what foundation he relies on for this construction. At my direction, a preliminary analysis has been done to "reverse engineer" Dr. Radke's variables such as QCRCL16 to determine how they were defined. At this point, we have been unable to discover how Dr. Radke constructed these variables. The only effective resolution of such issues is for Dr. Radke to provide the documentation necessary to replicate the construction of his locational variables.

## 6. SAMPLING OF TRANSACTIONS FROM MLS BOOKS

6.1. The Motion to Compel asks for "Dates of transactions used in 'Phase II' of Dr. Radke's study. Dr. Radke's controls were obtained by sampling from these books. The statistical standard for sampling is that it should be done randomly, either by simple or stratified random sampling. Statistics rejects the use of non-random

14

samples because they are highly vulnerable to bias and manipulation on the part of an investigator. The way a simple random sample is ordinarily drawn is to enumerate the members of the population, and then to use a random number table to select observations from this enumeration list. In the MLS application, this would require enumerating all transactions in the relevant geographical areas in a year, and then sampling randomly from this enumeration list. A stratified random sample might first sample a MLS book with a probability proportional to the number of transactions it contains, and second sample one or a specified number of transactions at random from these transactions. Standard practice in sampling is to document the sample frame, including the enumeration list, the probabilities used for each stage of sampling if a stratified sample design is used, and an identifier of each observation drawn from the enumeration list, such as Book, page, and line numbers.

    6.2. Dr. Radke's report and the background documentation he has supplied is silent on the method he used to draw his sample of single-family residential transactions from the MLS books. He states in his deposition (252-12) that he used stratified random sampling. However, the stratifications and strata sampling probabilities have not been documented, and the transactions drawn have not been indexed to the MLS books so that it is feasible to test for the randomness of the sample and the accuracy of data transcription from the MLS books. Aside from the exclusion of specific geographical areas, no documentation is provided that describes protocols followed for selecting or eliminating transactions during the sampling process. Typically, a MLS book will contain some transactions for which the data are incomplete, the transaction fails to fit the definition of a single-family transaction (e.g., the sale of a property that contains both a residential and a commercial structure), or the transaction price appears to be miscoded or to be an non-arms-length sale. A researcher will ordinarily write down the protocols to be

followed by coders in handling these transactions when they are drawn, and archive them to provide a basis for checking the consistency of the coder's work. Dr. Radke has provided no documentation for this stage in his data preparation.

## 7. CONCLUSIONS

The documentation that Dr. Radke has provided is insufficient to determine whether critical variables used in his analysis are defined sensibly, and whether their construction is consistent with the descriptions in his Report. In my April 16, 1997, Report, I have identified what are in my opinion major errors in the parts of Dr. Radke's work that are sufficiently documented to determine what he did. On the basis of this track record, I believe that the undocumented portions of Dr. Radke's work should not be excused from scrutiny by the defense's experts, and therefore that Dr. Radke should provide the required documentation, as described in the Motion to Compel.

I declare under penalty of perjury that the foregoing is true and correct. Executed at Berkeley, California, this 5th day of March, 1998.

*Daniel McFadden* (signature)

Daniel L. McFadden

16