# EXHIBIT 10−\

1

1      IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLORADO

3                    * * *

4   MERILYN COOK, et al.        :   CIVIL ACTION
                                :
5            vs.                :
                                :
6   ROCKWELL INTERNATIONAL      :
    CORPORATION, et al.         :   NO. 90-K-181
7

8                    * * *

9

10          Oral deposition of RALPH C. d'ARGE,

11   Ph.D., taken at the law offices of BERGER &

12   MONTAGUE, P.C., 1622 Locust Street, Philadelphia,

13   Pennsylvania 19103, on Friday, March 28, 1997,

14   beginning at 9:00 a.m., before McKinley Wise, a

15   Registered Professional Reporter and an approved

16   Reporter of the United States District Court.

17

18                    * * *

19

20

21          KRAUSS, KATZ & ACKERMAN, INC.
                 Legal Support Services
22          1880 John F. Kennedy Boulevard
                     15th Floor
23            Philadelphia, PA  19103
        (215)  988-9191   FAX:  (215)  988-1821
24

COPY

RALPH C. d'ARGE, Ph.D. - 3/28/97          25

1             Slovic and Wayne Hunsperger, and associated

2             with their names was the phrase 'doing

3             contingent valuation surveys.'")

4                            * * *

5     BY MR. SORENSEN:

6             Q.      So at the time that you wrote your

7     November 23rd report, you understood that Mr.

8     Hunsperger and Dr. Slovic were doing a contingent

9     valuation survey; is that right?

10            A.      I didn't know if they were, but it

11    appeared that they had been listed to do that.

12            Q.      And your first report, essentially

13    Pages 1, 2, 3, 4, 5, are all essentially about

14    contingent valuation methodology; isn't that

15    right?

16            A.      That's correct.

17            Q.      And that includes your discussion on

18    Page 5 of what you call the benefit transfer

19    problem; is that right?

20            A.      That's correct.

21            Q.      Now, in your career, have you been

22    asked to peer review other people's work?

23            A.      Yes.

24            Q.      How many times would you estimate?

RALPH C. d'ARGE, Ph.D. - 3/28/97          26

1          A.     Hundreds.

2          Q.     Closer to 200 or closer to a

3    thousand, would you say or can you estimate more

4    closely?

5          A.     Well, I served as a managing editor

6    of a major journal for 12 years and an associate

7    editor of two other journals extending over a

8    period of 10 years.  I would guess that it would

9    be well into the thousands.

10         Q.     Among the studies work that you have

11   been asked to peer review, have any of them been

12   general surveys; in other words, not contingent

13   valuation surveys but other general surveys of

14   various types?

15               Have any of the things that you have

16   peer reviewed over the years fall into that

17   category?

18         A.     Yes.  I have reviewed manuscripts on

19   contingent behavior.  I have reviewed manuscripts

20   on public opinion polls, on rating scales, on

21   subjective indicators of environmental concern, a

22   fairly substantial number of manuscripts using

23   general opinion surveys.

24         Q.     Now, I want to make sure it is

RALPH C. d'ARGE, Ph.D. - 3/28/97          27

1     clear.

2                    My question had to do with ones that

3     did not hold themselves out to be contingent

4     valuation surveys.

5                    Is that clear to you?

6          A.       Yes, there were some.

7          Q.       In peer reviewing that set, have you

8     ever applied the criteria applicable to contingent

9     valuation surveys in your peer review of that work

10    in the same manner that you have in this case?

11         A.       No.

12         Q.       And when I said "in the same

13    manner," you understood I was referring to your

14    second report?

15         A.       I thought you were referring to more

16    or less the general criteria in the economics

17    profession for contingent valuation surveys versus

18    public opinion surveys.

19         Q.       Right.  And then when I said in the

20    same manner as in your second report, I meant in

21    the way that you apply those criteria in the

22    second report?

23         A.       That's correct.

24         Q.       You understood that?

RALPH C. d'ARGE, Ph.D. - 3/28/97          28

1        A.      Yes.

2        Q.      Now, what is Putnam, Hayes &

3    Bartlett?

4        A.      It's an international economic

5    management consulting firm.

6        Q.      And how long have you worked with

7    them?

8        A.      Four or five years.

9        Q.      And what is your position with them?

10       A.      Senior adviser.

11       Q.      Is that your sole source of income?

12       A.      No.

13       Q.      What other sources do you have?

14       A.      Investments.

15       Q.      In terms of professional activity?

16       A.      Professional activity?

17       Q.      Right.

18       A.      I retired from the University of

19   Wyoming.  It is an early retirement package.  The

20   University of Wyoming pays me an early retirement

21   package.

22       Q.      And how much of your income in the

23   last year would you say has derived from

24   litigation-related work?

RALPH C. d'ARGE, Ph.D. - 3/28/97          29

1        A.        20 percent.

2        Q.        And how about in the previous five

3    years?

4        A.        10 to 20 percent.

5        Q.        Now, after you submitted the first

6    report dated November 23, 1996, you understood,

7    didn't you, that plaintiffs also submitted a

8    number of expert reports?

9        A.        Yes.

10        Q.        And did the defendants' counsel send

11    you any of them?

12        A.        They sent me a couple of the

13    reports, the Hunsperger report, the Slovic report,

14    and a couple of other reports.

15        Q.        And were you asked to do anything

16    with respect to these reports by the defendants'

17    counsel?

18        A.        I was asked to review the Slovic

19    survey in terms of whether it fulfilled the

20    conditions of a normal contingent valuation

21    survey.

22        Q.        And who asked you to do that?

23        A.        I believe it was Mark Lillie.

24        Q.        Let me show you what has been

RALPH C. d'ARGE, Ph.D. - 3/28/97          30

1    previously marked as Slovic 3.  This is the Rocky

2    Flats nuclear weapons plan, property impact study,

3    dated November 21, 1996, by Husperger & Weston.

4                   And let me flip, for your

5    convenience, to Tab A and ask you to take a look

6    at that and tell me if that's what you are

7    referring to.

8                   (Pause.)

9         A.        That was one of the documents, yes.

10        Q.        Is that the survey you were

11   referring to?

12                  In other words, when you said Mark

13   Lillie asked you to evaluate it, to see whether it

14   fulfilled the conditions of a contingent valuation

15   survey, is that the survey that he was referring

16   to?

17        A.        Well, this lays out the conditions

18   of the survey.  There is also the data on the

19   survey itself as well as Hunsperger's section on

20   interpretation of the survey and results.

21        Q.        If you could turn to Page 1 of your

22   second report.

23                  Before I ask you this -- so he asked

24   you to do that.  Did he ask you to do anything

RALPH C. d'ARGE, Ph.D. - 3/28/97                    31

1    else, meaning Mark Lillie, besides asking you to

2    evaluate it in terms of contingent valuation.

3                   Did he ask you to do anything else?

4                   MR. DUTTON:  Objection, vague.

5                   MR. SORENSEN:  Well --

6                   MR. DUTTON:  Anything else with

7         respect to the survey or anything else in

8         general?

9                   MR. SORENSEN:  Sure.

10   BY MR. SORENSEN:

11        Q.        In terms of assignment requests for

12   work, I understand Mr. Lillie asked you to do what

13   you have already testified to about the survey.

14                  Were there any other tasks that Mr.

15   lillie or other lawyers for the defendants asked

16   you to perform?

17        A.        I don't recall the exact

18   conversation, but to my knowledge now, there was a

19   discussion also of Radke's study on using the GIS

20   information system and there was a discussion of

21   Hunsperger's interpretation of that study.

22        Q.        Anything else?

23        A.        I think that's all.

24        Q.        Were you asked to review Dr. Radke's

RALPH C. d'ARGE, Ph.D. - 3/28/97          32

1    regression study?

2         A.      I don't remember if it was discussed

3    in that way.

4                 Basically, the question arose, and I

5    have expert experience on hedonic property value

6    equations, and the question was was that an

7    adequate one.

8                 I don't think we left it that I was

9    formally to review it.

10        Q.      So have you formally reviewed it?

11        A.      I've read it.

12        Q.      Have you evaluated it for the

13   purpose of preparing an expert report about it?

14        A.      No.

15        Q.      Do you intend to?

16        A.      It depends on what counsel asks me

17   to do.

18        Q.      Have counsel for the defendants

19   asked you to do that to date?

20        A.      No.

21        Q.      Now, at the bottom of Page 1 of your

22   second report, you see there is a footnote.  You

23   see that footnote?

24        A.      Yes.

RALPH C. d'ARGE, Ph.D. - 3/28/97          33

1          Q.      And it discusses possible additional

2     analysis you may conduct.  It talks about

3     information that you have yet to receive or at

4     least was received so recently.

5                     The information that was received so

6     recently, is that the same information you

7     described earlier that you received in the last

8     week or so?

9          A.      That's correct.

10         Q.      Now, "Significant information has

11    yet to be received."

12                    That part of the sentence, what is

13    that referring to?

14         A.      Well, I don't know if I have

15    received all of the datasets yet on the survey.  I

16    won't know that until I am able to examine the

17    tape, and I have not been able to examine the tape

18    besides physically hold it.

19         Q.      So, again, that also refers to that

20    same list of materials?

21         A.      That's correct.

22         Q.      This material that you described

23    earlier that you recently received, do you know

24    when it was requested formally from the

RALPH C. d'ARGE, Ph.D. - 3/28/97                34

1   plaintiffs?

2        A.     No.

3        Q.     Do you recall when you were asked to

4   prepare this second report dated March 18, 1997?

5        A.     I really do not recall the date.

6        Q.     The defendants' counsel, whether it

7   be Mr. Lillie or someone else, did they tell you

8   of any deadline that applied to the completion of

9   your second report?

10       A.     I believe that there was an earlier

11  deadline of something like March 10th or 8th or

12  something on that order.

13       Q.     And then you were told the deadline

14  changed, or do you remember?

15       A.     In terms of recollecting that, I

16  believe they said that -- and I'm not sure who

17  said it, but someone said that the deadline had

18  been extended.

19       Q.     Do you know who Ken Wise is?

20       A.     Yes.

21       Q.     He's one of the defendants' expert

22  in this case, is he not?

23       A.     I understand he is.

24       Q.     Have you had discussions with Ken

KRAUSS, KATZ & ACKERMAN, INC.

RALPH C. d'ARGE, Ph.D. - 3/28/97          35

1    Wise concerning this case?

2           A.      Yes.

3           Q.      And when did those discussions take

4    place?

5           A.      Last week.

6           Q.      Are those the only discussions

7    between yourself and Ken Wise?

8           A.      Yes.

9           Q.      And what did you talk to -- is it

10   Dr. Wise?

11          A.      Dr. Wise.

12          Q.      What did you talk to Dr. Wise about?

13          A.      Basically a study that he had done

14   in the past in Ohio.

15          Q.      And that discussion occurred last

16   week, you said?

17          A.      Yes.

18          Q.      That's after your report; is that

19   right?

20          A.      That's correct.

21          Q.      And have you had any other

22   discussions since being retained to work on this

23   case -- that's the time frame, since then to

24   date -- as we sit here, have you had any other

RALPH C. d'ARGE, Ph.D. - 3/28/97          36

1    discussions with any other of defendants' experts?

2         A.    No.

3         Q.    Now, your second report on Page 5,

4    the top of Page 5 says, "In what follows, the

5    author's survey will be evaluated as a CV survey."

6              Do you see that?

7         A.    Yes.

8         Q.    And then what follows essentially

9    from Pages 5 through 30 evaluates the Flynn-Slovic

10   survey, also known as the Decision Research

11   survey.  Your report evaluated it as a CV survey.

12   Is that right?

13        A.    That's correct.

14        Q.    Now, you attended the deposition two

15   days ago of Dr. Slovic; is that right?

16        A.    Right.

17        Q.    And did you attend the whole thing?

18        A.    Yes.

19        Q.    And you attended the deposition

20   yesterday of Dr. Flynn; is that right?

21        A.    Part of it.

22        Q.    Who asked you to attend those

23   depositions?

24        A.    I was asked by counsel to attend.

RALPH C. d'ARGE, Ph.D. - 3/28/97                37

1        Q.      Who specifically?

2        A.      Tom Dutton.

3        Q.      And did he say why he wanted you to

4    attend?

5        A.      To evaluate the arguments Dr. Slovic

6    was putting forth that his survey was reasonable

7    or useful.

8        Q.      And you now know, don't you, that

9    the survey that Dr. Slovic and Dr. Flynn

10   undertook, the Decision Research survey -- you now

11   know, don't you, that that was never intended to

12   be a contingent valuation survey; correct?

13       A.      As far as I can tell from reading

14   their documents and from what both of them said,

15   they, in fact, implemented a contingent valuation

16   survey.

17       Q.      Well, you heard Dr. Slovic testify,

18   did you not, that he did not intend this survey to

19   be a contingent valuation survey?  I mean, you

20   heard that testimony; correct?

21       A.      I heard him say that he did not

22   intend for it to be a contingent valuation survey,

23   but it is.

24       Q.      According to you; right?

RALPH C. d'ARGE, Ph.D. - 3/28/97          38

1        A.       According to any economists who walk

2    the face of the earth.

3        Q.       Well, any economists who walk the

4    face of the earth have not been asked to opine

5    about the survey.  You have been asked to opine

6    about the survey.  Correct?

7        A.       That's correct.

8        Q.       So in your opinion, it is a CV

9    survey, correct --

10       A.       It is a CV survey.

11       Q.       -- in your opinion?

12       A.       There is no opinion.

13               There is no -- it is either a CV

14   survey or it is not.  It has every precondition

15   that identifies a CV survey.  So it must be a CV

16   survey.

17       Q.       In your opinion; correct?  That is

18   your opinion.  I mean, that is the opinion you are

19   going to express in this case; correct?

20       A.       That is my opinion, yes.

21       Q.       So do you think when Dr. Slovic

22   testified that the survey is not a CV survey, do

23   you think that the was lying?

24       A.       I think he was misinformed.

RALPH C. d'ARGE, Ph.D. - 3/28/97          39

1          Q.      He designed the survey, is that

2     right, or he participated in designing the survey;

3     isn't that right, Dr. Slovic?

4          A.      Which way, participated or what?

5          Q.      Strike that.

6                  You, sir, did not design the survey

7     at issue; correct?

8          A.      That's correct.

9          Q.      Dr. Slovic did participate in

10    designing the survey at issue; correct?

11         A.      From what he said, yes.

12         Q.      Now, did you also hear Dr. Flynn

13    testify that the survey -- and for the record,

14    when I'm talking about the survey, it is the

15    Decision Research survey which is attached to the

16    Hunsperger report, unless I specify otherwise --

17    did you hear Dr. Flynn testify that the survey is

18    not a CV survey?

19         A.      No, I did not.

20         Q.      But you didn't attend a lot of the

21    deposition; is that right?

22         A.      That's right.

23         Q.      Would it surprise you to learn that

24    he testified that it's not a CV survey?

RALPH C. d'ARGE, Ph.D. - 3/28/97          40

1                     MR. DUTTON:  Objection.  Misstates

2          the testimony.

3          A.      Am I surprised?

4    BY MR. SORENSEN:

5          Q.      Would you be surprised to learn that

6    he testified that it is not a CV survey?

7          A.      Given his knowledge base, I doubt

8    that he could even make that determination.

9          Q.      Well, that wasn't my question.

10                 Could you answer my question?

11                    MR. DUTTON:  Objection, asked and

12         answered.

13                    MR. SORENSEN:  I will withdraw it.

14   BY MR. SORENSEN:

15         Q.      Dr. Flynn participated in designing

16   the survey, correct, to your knowledge?

17         A.      To my knowledge, yes.

18         Q.      Now, when you prepared your second

19   report, obviously, you had not yet heard Dr.

20   Slovic or Dr. Flynn testify; correct?

21         A.      That's correct.

22         Q.      Is there anything in the Hunsperger

23   document, the Hunsperger report marked as Slovic 3

24   that states that the Flynn-Slovic survey is a CV

RALPH C. d'ARGE, Ph.D. - 3/28/97          41

1    survey, to your knowledge?

2         A.     I've carefully reviewed that

3    document and have not found an instance where it

4    is referred to as a contingent valuation survey.

5    However, I could be in error.

6         Q.     Sir, at the time you prepared the

7    report, the bulk of which -- bulk in the sense of

8    majority of pages -- is devoted to evaluating the

9    Decision Research survey as if it were a CV

10   survey, at the time you embarked upon that

11   project, you had no -- strike that.

12             MR. SORENSEN:  Let me mark Exhibit

13        2.

14                  *  *  *

15             (Whereupon, d'Arge Exhibit 2 was

16        marked for identification.)

17                  *  *  *

18   BY MR. SORENSEN:

19        Q.     What I have just handed you, sir,

20   marked as Exhibit d'Arge 2, is a copy printed out

21   from Westlaw of the National Oceanic and

22   Atmospheric Administration document, which I

23   believe is referenced in your second report at Tab

24   2, No. 6.

RALPH C. d'ARGE, Ph.D. - 3/28/97          42

1            Could you take a look at it and

2      confirm that that is correct?

3                  (Pause.)

4      A.       It appears to be.

5      Q.       Now, this NOAA panel, this

6      document -- you are not a member of the NOAA

7      panel, were you?

8      A.       No.

9      Q.       Now, on page -- and the page number

10     references I'll use will be the Westlaw pages in

11     the top right-hand corner.

12                This document, in case you are not

13     familiar with Westlaw, also gives the original

14     pagination, but I will refer to the top right-hand

15     corner.

16                On Page 2, it identifies the members

17     of the NOAA panel, is that right, towards the top,

18     Kenneth Arrow, Robert Solow?

19     A.       That's correct.

20     Q.       In preparing either of your reports

21     in this case, did you speak with any of the

22     members of this panel, the NOAA panel?

23     A.       In preparing my report?

24     Q.       Yes.

RALPH C. d'ARGE, Ph.D. - 3/28/97                43

1         A.       No.

2         Q.       Now, the NOAA panel was assembled,

3    was it not, to evaluate methods of determining

4    damages in cases involving the Oil Pollution Act

5    of 1990, was it not?

6         A.       That's correct.

7         Q.       The Oil Pollution Act of 1990, cited

8    Superior 33 U.S.C. Section 2701, to your

9    knowledge, is that Act implicated in any way in

10   this case, that Act?

11        A.       No.

12               I might add, however, that the

13   nature of the commodity, from an economic

14   perspective in the case that they were considering

15   in NOAA, were inadvertent oil spills.

16               In the case of Rocky Flats we're

17   looking at alleged releases and the general

18   question of radioactive safety associated with

19   private housing.

20               So the type of question and the

21   domain of question and commodity, from the

22   standpoint of economics we're talking about

23   similar types of problems.

24        Q.       When you said "alleged releases," to

RALPH C. d'ARGE, Ph.D. - 3/28/97          44

1     your knowledge, have any radioactive materials

2     ever been released from Rocky Flats?

3          A.     I do not know.  I have heard

4     assertions in newspapers.  I've read assertions in

5     newspapers over a period of years.

6                 But in terms of my own knowledge

7     base, the answer is I do not know.

8          Q.     You made no effort, is that correct,

9     to contact any member of the NOAA panel to ask any

10    member of the NOAA panel whether it would be

11    appropriate to apply their report, the report

12    marked as Exhibit 2, to this case; correct?

13         A.     That's correct.

14                However, over the past several

15    years, I have talked to both Ken Arrow and Robert

16    Solow on the panel document and on where it is

17    applicable and where it is not.

18         Q.     Is there anything in the document

19    marked Exhibit 2, the NOAA report, I'll call it --

20    is there anything in the document itself that

21    states that its guidelines are applicable to any

22    surveys other than a CV survey?

23         A.     To my knowledge, that is not the

24    case.

RALPH C. d'ARGE, Ph.D. - 3/28/97                    45

1          Q.       I'm sorry?

2          A.       The NOAA panel was not trying to

3     apply general guidelines to opinion surveys.  They

4     were concerned with the application of CVM to

5     these near-market and nonmarket commodities.

6          Q.       So it is correct, is it not, that

7     there is nothing in the NOAA report, Exhibit 2,

8     that states that its guidelines should be applied

9     to anything other than a CV survey?

10         A.       That's correct.

11         Q.       What is a nonuse value?

12                  I'm here referring to Page 3 of the

13    NOAA document.

14         A.       Nonuse values refer to the values

15    that you might obtain or anyone might obtain from

16    knowing a particular commodity or event is

17    available or exists.  An example of that would be

18    the Grand Canyon, where you may not intend to use

19    the Grand Canyon but you still would obtain value

20    from knowing that it exists as it does.  And, in

21    fact, you might be even willing to provide money

22    to maintain its existence even though you did not

23    intend to use it.

24         Q.       Am I correct in thinking that

RALPH C. d'ARGE, Ph.D. - 3/28/97          46

1    contingent valuation methodology has been

2    developed in an attempt to place a dollar figure

3    on the type of satisfaction and loss thereof that

4    you have just described?

5              In other words, something happens to

6    the Grand Canyon, it gets polluted, and contingent

7    valuation methodology has been developed in an

8    attempt to place some kind of dollar figure on

9    what that damage is; is that right?

10       A.       Actually, no.

11              Contingent valuation was first

12   applied in, actually, 1961 in trying to evaluate

13   the value of hiking trails in the Maine woods and

14   it was used to value various forms of recreation,

15   then forms of water-based recreation, in the '60s

16   and '70s, then smog in the latter part of the

17   '70s.  And only in the latter part of the '80s was

18   an attempt made to use contingent valuation to

19   value option and existence values, these nonuse

20   values.

21       Q.       Well, in connection with smog, how

22   was it used?

23       A.       Well, basically, smog is a negative

24   externality.  Smog is a negative externality.  It

RALPH C. d'ARGE, Ph.D. - 3/28/97          47

1   has been recognized by economists for decades.

2   And the real issue with it is whether markets

3   value in it or not.  And then the answer is, there

4   are many studies documenting this, that air

5   pollution has a distinct and significant effect on

6   property value.

7              Also, if you ask people their

8   preferences with regard to smog, they will

9   indicate that they are willing to pay a certain

10  amount of money to avoid it.

11             Smog is kind of a near-market

12  commodity then because it is really reflected in

13  markets; in property markets, particularly.

14             And the studies that have been done

15  with contingent valuation indicates that

16  contingent valuation provides a fairly close

17  estimate of that value.  In one study that I was

18  involved with in Los Angeles, the differential in

19  property values observed was in the order of

20  $61,000, 1981 dollars, in Los Angeles.  The amount

21  that people would be willing to pay to live in a

22  clean air area was in the order of $59,000, very

23  close replication between actual differences in

24  property values and contingent valuation.

RALPH C. d'ARGE, Ph.D. - 3/28/97          48

1          There have been other such

2     confirming studies of that closeness.  One has

3     been with strawberries, where strawberries were

4     sold to people and the prices that they were

5     willing to pay were recorded.  Then another random

6     sample was asked, If we arrived at your door with

7     strawberries, how much would you be willing to pay

8     for them?

9          Not surprisingly, the two estimates

10    are not far apart.

11          A third example is in water quality.

12    A study on Lake Okoboji in Iowa demonstrated that,

13    again, contingent valuation estimates and property

14    value differences that were actually observed in

15    markets were very close together.

16       Q.     The strawberry example that you

17    gave, isn't that mentioned somewhere in the NOAA

18    panel document?

19       A.     Yes, it is.

20       Q.     The Los Angeles example you gave,

21    the one you said you were involved in, is that

22    identified somewhere in your CV?

23       A.     Yes.

24       Q.     Could you tell me where that is?

RALPH C. d'ARGE, Ph.D. - 3/28/97          49

1        A.      That's the American Economic Review

2    article with Brookshire, Thayer, and Schulze.

3               MR. DUTTON:  Off the record.

4                          *  *  *

5               (Whereupon, a discussion was held

6        off the record.)

7                          *  *  *

8               THE WITNESS:  I don't know where it

9        is.

10               The one you pointed to it contains

11        the results in it.

12               MR. DUTTON:  The one that I pointed

13        to?

14               THE WITNESS:  Yes.

15        A.      Oh, on Page 6, if you will look at

16    the document --

17    BY MR. SORENSEN:

18        Q.      Page 6 of your first report?

19        A.      Of my vita.

20        Q.      Right, okay,

21        A.      The third document from the bottom

22    is that reference.

23        Q.      Valuing Public Goods:  A Comparison

24    of Survey and Hedonic Approaches?