# EXHIBIT 10−2

RALPH C. d'ARGE, Ph.D. - 3/28/97          50

1        A.      That's correct.  It is in the wrong

2    place in the vita.

3        Q.      The water quality example that you

4    referred to in Iowa, you said it was --

5        A.      That's correct.

6        Q.      -- were you involved in that one?

7        A.      Yes.

8        Q.      And is that reference reflected in

9    your CV?

10       A.      Yes.

11       Q.      And where is that?

12       A.      It is on Page 3, see refereed

13   journal articles.  It's the second one down,

14   d'Arge and Shogren.

15       Q.      I'm going to show you what was

16   marked at the Dr. Slovic deposition as Slovic 4

17   and I ask you to take a look at that.

18       A.      Okay.

19               (Pause.)

20       Q.      Have you seen that document before?

21       A.      Yes.

22       Q.      Now, is that the survey

23   questionnaire used by Decision Research in the

24   survey that is part of the Hunsperger report, to

RALPH C. d'ARGE, Ph.D. - 3/28/97          51

1    your knowledge?

2          A.      To my knowledge.

3          Q.      Now, am I correct in thinking that

4    you did not design any of the questions in this

5    survey, the document Slovic 4?  You did not design

6    any of these questions, correct?

7          A.      No.

8                  MR. DUTTON:  Objection, bad faith.

9                  Do you have any basis for believing

10        he did?

11                 That's a bad-faith question.

12                 MR. SORENSEN:  Okay.

13   BY MR. SORENSEN:

14         Q.      You did not design any of the

15   questions in Slovic 4; correct?

16         A.      No.

17         Q.      You didn't?  No, you did not?

18         A.      No, I did not.

19         Q.      Could you turn to Page 6 of your

20   second report, please, if you could, your second

21   report.

22         A.      Okay.

23         Q.      You see at the top it states, "After

24   a sequence of questions designed to lead the

KRAUSS, KATZ & ACKERMAN, INC.

RALPH C. d'ARGE, Ph.D. - 3/28/97          52

1    respondent to the conclusion that having a house

2    near Rocky Flats is 'less desirable," the

3    respondent is asked to consider the following

4    hypothetical situation," and then it goes on.

5              Do you see that?

6        A.    Yes.

7        Q.    When you say "sequence of

8    questions," are you referring to questions in

9    Slovic 4?

10       A.    Yes.

11       Q.    And when you wrote this part of your

12   report, did you have a copy of what has been

13   marked as Slovic 4 in front of you, obviously not

14   with the Slovic 4 tab on it, but that same

15   document?

16       A.    I believe so.

17       Q.    Could you please identify for me,

18   with reference to the Slovic 4, the questions that

19   you are referring to on Page 6 of your rebuttal

20   report when you say, "After a sequence of

21   questions designed to lead the respondent," blah

22   blah?

23              Would you please identify for me the

24   questions you are referring to?

RALPH C. d'ARGE, Ph.D. - 3/28/97          53

1          A.     You mean to lead the respondent to

2     the conclusion?

3          Q.     Yes.  In other words, am I correct

4     in thinking that the question which is in -- I

5     think quoted or, if not quoted, I think

6     paraphrased at Page 6 toward the top is Question

7     50a of Slovic 4?

8               If you flip to Page 21, according to

9     the --

10         A.     Okay.

11         Q.     -- numbers in the right-hand

12    corner --

13         A.     Yes.

14         Q.     -- you see that, 50a?  That is the

15    question that is being reproduced in your --

16         A.     Right.

17         Q.     So in the sentence above it, where

18    it says, "After a sequence of questions designed

19    to lead the respondent to the conclusion that

20    having a house near Rocky Flats is 'less

21    desirable,' the respondent is asked to consider

22    the following hypothetical situation," and then

23    you quote Question 50a.

24               So my question for you is, I'm

RALPH C. d'ARGE, Ph.D. - 3/28/97                  54

1   asking you to identify the questions you are

2   referring to that lead the respondent to that

3   conclusion.

4          A.      To the negative conclusion?

5          Q.      Yes.

6          A.      Okay.  You start with Question 43 --

7   maybe before that.

8          Q.      I'm sorry.  What did you say?

9          A.      Here we are.  They start with "Have

10  you heard about the Rocky Mountain Arsenal," which

11  is Question 34.

12         Q.      I'm sorry.  Hold on.  Let me get to

13  where you are.

14                 MR. DUTTON:  That would be Page

15         18 --

16         A.      Page 18.

17                 MR. DUTTON:  -- of Slovic Exhibit 4.

18  BY MR. SORENSEN:

19         Q.      That's Question 34a?

20         A.      Right.

21                 Okay.  Now, what you have done with

22  the respondent is basically identified Rocky

23  Mountain Arsenal, right, which produces chemical

24  weapons, and you have also identified the Rocky

KRAUSS, KATZ & ACKERMAN, INC.

RALPH C. d'ARGE, Ph.D. - 3/28/97                    55

1    Flats nuclear weapons facility.

2                        Right?

3         Q.        Right.

4         A.        In terms of media coverage -- and

5    I'm not referring to the Slovic report; I'm

6    referring to reading the Denver Post, since 1975,

7    just the mention of those names identifies a

8    potential set of problems.

9                        Now, then you go on in Question 37:

10                       "When you think about Rocky Flats,

11   what is the very first thing that comes to mind?"

12                       Okay.

13                       And then "What is the second thing

14   that comes to mind?"

15                       And "What is the third thing that

16   comes to mind?"

17        Q.        Those are Questions 38 and 39,

18   respectively; correct?

19        A.        Yes, that's correct.

20                       Then it goes on to Question 43:

21                       "When you think of a nuclear weapons

22   facility, what is the first thing that comes to

23   mind?

24                       "What is the second thing that comes

RALPH C. d'ARGE, Ph.D. - 3/28/97                56

1    to mind?

2              "What is the third thing that comes

3    to mind?"

4        Q.    And those are Questions 43, 44, and

5    45 respectively?

6        A.    That's correct.

7              And then 46:  "Overall is your

8    impression of nuclear weapons facilities," et

9    cetera.

10             You are not going to be thinking

11   about Mars candy bars and daisies in going through

12   these questions.

13       Q.    Have you identified now all the

14   questions --

15       A.    No.

16       Q.    Let me finish my question.

17             My original question was for you to

18   please identify the questions you are referring to

19   on Page 6 of your report that, in your view, lead

20   the respondents to a negative conclusion.

21             Now, you have identified a certain

22   set of questions.

23             Are there any others?

24             MR. DUTTON:  You asked him the

RALPH C. d'ARGE, Ph.D. - 3/28/97          57

1           questions before Question 50.

2                     MR. SORENSEN:  Right.

3                     MR. DUTTON:  I believe that was your

4           question.

5                     MR. SORENSEN:  Right, before

6           Question 50a, right.

7                     MR. DUTTON:  Right.

8           A.      And now your question is, are there

9    any others?

10   BY MR. SORENSEN:

11          Q.      No.  Any others before 50a.

12                  Let me start again.

13                  You have identified Questions 34a,

14   37, 38, 39, 43, 44, 45, 46 as questions which

15   precede Question 50a that, in your view, lead the

16   respondent to a negative conclusion about Rocky

17   Flats; correct?

18          A.      Yes, if they've read a newspaper in

19   the area, yes, or they have any idea what a

20   nuclear weapons facility is.

21          Q.      Are there any other questions

22   preceding Question 50a that you would include

23   as leading the respondent to a negative

24   conclusion?

RALPH C. d'ARGE, Ph.D. - 3/28/97          58

1               I'm just trying to get a complete

2       list, that's all.

3               A.      I think that's reasonably complete.

4               Q.      Now, let's turn to Question 34a on

5       Page 18.

6               MR. DUTTON:  If we come to a good

7           point in the examination, it is 10:30 now.

8           We have been going for an hour and a half.

9               I don't have any rules on breaks,

10          but I would like to take at least one some

11          time in the middle of the morning.

12              MR. SORENSEN:  Sure.  How about a

13          few more questions?

14              MR. DUTTON:  Sure.

15      BY MR. SORENSEN:

16              Q.      Question 34a, confining yourself to

17      the question as it appears before you, can you

18      please identify for me what in the question, as it

19      appears before you, in your view, generates or

20      creates a negative impression of Rocky Flats in

21      the mind of someone who is asked that question?

22              A.      Historically, the hazardous waste

23      site in Colorado that the Colorado public has

24      focused on has been in the Rocky Mountain Arsenal,

RALPH C. d'ARGE, Ph.D. - 3/28/97          59

1    okay.  There is survey results indicating -- if

2    you will, public opinion survey results indicating

3    that that site is perceived as very negative.

4              The statement here is one is the

5    Rocky Mountain Arsenal which produced chemical

6    weapons, okay.

7              That, in my opinion, is a very

8    negative statement.

9              Further, there is a problem the

10   public has in separating the Rocky Mountain

11   Arsenal from Rocky Flats and you have both in the

12   same paragraph.

13             Guilt by association.

14        Q.    Is there anything else?

15        A.    That's it.

16        Q.    Are you from Colorado?

17        A.    I have lived in northern Colorado

18   for the past 11 years.

19        Q.    Where in Colorado do you live?

20        A.    North of Ft. Collins.

21        Q.    And prior to living in Ft. Collins,

22   where did you live?

23        A.    Laramie, Wyoming.

24        Q.    Have you done any studies, whether

RALPH C. d'ARGE, Ph.D. - 3/28/97          60

1    they be surveys or any other type of study,

2    examining the question of whether people associate

3    Rocky Flats into a weapons facility and Rocky

4    Mountain Arsenal with each other?

5              Have you done any studies addressing

6    that question?

7         A.    Yes.

8         Q.    You have.

9              And are those studies in your CV?

10        A.    There is a list under a case called

11   Idarado.

12             MR. DUTTON:  It is in your CV?

13             THE WITNESS:  It is in my CV.

14   BY MR. SORENSEN:

15        Q.    On Page 6 of your first report, the

16   actual report, Page 6, it says, "During the past

17   decade, I have conducted research and performed

18   analyses on valuation issues related to alleged

19   natural resource damages for several environmental

20   lawsuits," and then you list seven, and one of

21   them is the Idarado Mine in Colorado.

22             Is that what you were referring to?

23        A.    Yes.

24        Q.    Do you have in your possession

RALPH C. d'ARGE, Ph.D. - 3/28/97                    61

1    documents that you prepared in connection with

2    your work in the Idarado Mine case?

3        A.      I don't, but the law firms do.

4        Q.      Which law firms?

5        A.      Shea Gardner.

6        Q.      Are you aware that plaintiffs

7    approximately a month ago asked for all such

8    documents but have not received them?  Are you

9    aware of that?

10            MR. DUTTON:  All what documents?

11   BY MR. SORENSEN:

12       Q.      All documents that you prepared in

13   connection with the Idarado Mine case.

14            MR. DUTTON:  I don't think -- I just

15       want to make sure.

16            THE WITNESS:  It is Shea Gardner.

17   BY MR. SORENSEN:

18       Q.      Are you aware that plaintiffs,

19   approximately a month ago asked for all such

20   documents but have not received them?

21       A.      I'm unaware of it.

22            I received a tabulated list of

23   checkoff of documents that you requested that were

24   in my possession, and you have been sent all of

RALPH C. d'ARGE, Ph.D. - 3/28/97          62

1   those documents.

2          Q.      That was in the last couple of

3   weeks?

4          A.      In the last couple of weeks.

5          Q.      So you have no knowledge about

6   plaintiffs' requests for the Idarado Mine

7   documents?

8          A.      No.

9          Q.      Nor the requests for documents

10  relating to the other six lawsuits listed on Page

11  6 of your first report?

12         A.      They were not listed.

13         Q.      When you say "not listed," what do

14  you mean?  In your view, they weren't requested?

15         A.      They weren't requested.

16                 There is a further problem and that

17  I -- I don't know how to -- these documents are

18  held by law firms as privileged material and I

19  don't know whether they're releasable or not.

20         Q.      Well, does Putnam, Hayes & Bartlett

21  keep copies?

22         A.      They were not involved in that case.

23         Q.      Do you keep copies?

24         A.      I do not keep copies.

RALPH C. d'ARGE, Ph.D. - 3/28/97          63

1          Q.     But if asked, you could provide

2     information as to where we might obtain copies?

3          A.     I guess that I am confused.

4                 MR. DUTTON:  If you want copies,

5          counsel, you can make a request and we can

6          get those copies for you.

7                 MR. SORENSEN:  We did.  We did,

8          counsel, and we have not received them.

9                 MR. DUTTON:  Then why badger the

10         witness about them?  You should take this up

11         with me.

12                MR. SORENSEN:  I'm not badgering the

13         witness.

14                MR. DUTTON:  Are you ready to take a

15         break now?

16                MR. SORENSEN:  A couple more

17         questions.

18                MR. DUTTON:  We have been going for

19         an hour and a half.

20                MR. SORENSEN:  Are you requesting a

21         break, counsel?

22                MR. DUTTON:  Yes, I would like to

23         take a break.  We have been going for an

24         hour and 40 minutes.

RALPH C. d'ARGE, Ph.D. - 3/28/97          64

1                MR. SORENSEN:  Why don't we take a

2        break.

3                MR. DUTTON:  I just want you to

4        know, Mr. Sorensen, that yesterday --

5                MR. SORENSEN:  Are we on the record

6        or off the record?

7                MR. DUTTON:  I think we're still on

8        the record.

9                During the past two depositions, I

10       have taken breaks whenever requested of Mr.

11       Slovic and Mr. Flynn.  I think it is

12       courteous, and I would hope that you would

13       show me the same courtesy.

14               MR. SORENSEN:  We're taking a break.

15               MR. DUTTON:  Thank you.

16                          * * *

17               (Whereupon, a short recess was

18       taken.)

19                          * * *

20               MR. SORENSEN:  Can we go back on?

21               Back on at 10:45, a 15-minute break.

22       BY MR. SORENSEN:

23          Q.    Dr. d'Arge, I was asking, before we

24       broke, about Slovic Exhibit 4, the survey.

KRAUSS, KATZ & ACKERMAN, INC.

RALPH C. d'ARGE, Ph.D. - 3/28/97                    65

1                     Do you have that in front of you?

2          A.       Yes.

3          Q.       Now, I was asking you about Question

4     34 and I believe you testified that you have done

5     some research or work in the association between

6     the Rocky Mountain Arsenal and Rocky Flats nuclear

7     weapon facility; correct?

8          A.       Right.

9          Q.       And you identified your work in the

10    Idarado Mine case?

11         A.       That is correct.

12         Q.       Now, is it your opinion that

13    Question 34a, just as it is written in the

14    questionnaire, creates any negative impression of

15    the Rocky Flats facility in the mind of a person

16    who is asked this question other than because of

17    the possible association with the Rocky Mountain

18    Arsenal; in other words, other than that reason?

19         A.       I think that there is some evidence

20    by Mitchell and Smith and Desvouges, among others,

21    that the mere mention of "nuclear facility" is

22    sufficient to convey a negative impression.

23         Q.       Well, is it your opinion that

24    Question 34a, as written, conveys a negative

RALPH C. d'ARGE, Ph.D. - 3/28/97          66

1    impression merely because it includes the words

2    "Rocky Flats nuclear weapons facility"?

3         A.    No.  I think that we know that the

4    phrase "nuclear weapons" connotes a certain

5    negativity.

6              We also know that Rocky Mountain

7    Arsenal, which is listed as producing chemical

8    weapons, introduces a negative response.

9              We also have an association between

10   Rocky Mountain Arsenal and Rocky Flats because

11   they're both referred to as two different

12   facilities in the Denver area.

13             I think the combination leads to a

14   negative connotation.

15        Q.    And when you use the word "negative"

16   in your testimony -- you used the word "negative"

17   in your testimony just now -- do you mean fear?

18             In other words, when you said that

19   their work shows the mere mention of the words

20   "nuclear facility" creates a negative impression,

21   just by hearing the word "nuclear," people fear

22   it?

23        A.    The understanding of fear and other

24   emotions, okay, is outside of the province of

RALPH C. d'ARGE, Ph.D. - 3/28/97          67

1    economists.  It's really a question in behavioral

2    psychology.  And the only thing that economists

3    are concerned with, I can say, is that in

4    contingent valuation surveys, one tries to not

5    convey an impression or an implicit valuation

6    before the value questions are asked.

7              And the grouping of the Rocky

8    Mountain Arsenal and Rocky Flats together in this

9    question along with the identification of the

10   arsenal as producing chemical weapons I believe

11   creates a negative impression.

12        Q.      I'm just trying to flesh out a

13   little bit more by what you mean by "negative

14   impression."

15              Do you mean that just those words

16   that are in the question preceding a valuation

17   question could lead the person to place a lower

18   value on a home near Rocky Flats?

19        A.      It could lead to them telling you

20   that they would place a lower value on such a

21   location.

22        Q.      Because they fear the word

23   "nuclear"?  Is that why?

24        A.      Because they have difficulty with

RALPH C. d'ARGE, Ph.D. - 3/28/97          68

1    the word "chemical," the word "weapon," with the

2    word "nuclear."

3         Q.     When you say "difficulty" -- if you

4    are not comfortable with the word "fear," I'm not

5    asking you to use it.

6              Difficulty, they don't want to be

7    around it, they -- people don't -- I mean, I'm

8    trying to understand what you mean?

9         A.     Well, economists view those problems

10   as examples of negative externalities.  They are

11   essentially out there.  People are concerned about

12   them.  They are not readily bought or sold, but

13   basically they're there.

14              To give you another example, what if

15   I told you there is this house here and it is a

16   very nice house, except that it has approximately

17   a thousand rattle snakes living in it and around

18   it.  As long as I told you about the house itself,

19   there was no concern.  If I told you about a

20   rattle snake in a zoo, that would be something.

21   When I can combine the two, there is a real

22   negative connotation.

23              That's what I mean by a negative

24   connotation.

RALPH C. d'ARGE, Ph.D. - 3/28/97          69

1          Q.      And that's what you mean when you

2     say that Question 34a of Slovic 4 has a negative

3     connotation; is that right?

4          A.      That's correct.

5          Q.      Now, have you, in connection with

6     this case, conducted any -- how should I say --

7     mock surveys using the survey marked as Slovic 4?

8              In other words, once having

9     possession of it, have you asked someone to call

10    someone over the phone and ask these questions and

11    begin to, you know, test for yourself what kind of

12    results you might get?  Have you done anything

13    like that?

14         A.      I haven't gone through it from the

15    standpoint of mock to see how the questions

16    relate.  I have not done that yet.

17             But I have asked the questions to my

18    wife and to some relatives to see how long it

19    would take me or someone else to administer this

20    questionnaire.

21         Q.      And when did you do that?

22         A.      Sometime in early February.  Maybe

23    February.  I'm not sure.

24         Q.      And who played the role of the

RALPH C. d'ARGE, Ph.D. - 3/28/97          70

1    person asking the questions other than yourself?

2    Anyone else?

3          A.     No.

4          Q.     So just yourself; correct?

5          A.     That's correct.

6          Q.     And who did you ask in addition to

7    your wife?

8          A.     I believe a neighbor.

9          Q.     One neighbor?

10         A.     Just one neighbor.

11         Q.     You mentioned relatives before.  You

12   said your wife and --

13         A.     I was thinking if I tried this

14   particular one on the phone.  The answer is no.

15         Q.     So you asked, you said, several

16   questions of your wife and one neighbor; is that

17   correct?

18         A.     That's correct.

19         Q.     And did you do this in person?

20         A.     That's correct.

21         Q.     On both occasions?

22         A.     On both occasions.

23         Q.     And did you time it with a stop

24   watch or watch?

RALPH C. d'ARGE, Ph.D. - 3/28/97          71

1        A.      With a wall clock.

2        Q.      And is that the basis for your

3    statement in your second report on Page 10, where

4    you say, "Preliminary tests of the time to

5    complete a useful survey indicate that at least 35

6    minutes is necessary and possibly 45 minutes per

7    survey"?

8        A.      That's correct.

9        Q.      Did you do that questioning of your

10   wife and neighbor on your own or were you asked to

11   do it by defendants' counsel?

12       A.      I did it on my own.

13       Q.      Have defendants' counsel asked you

14   to do any other kind of study or survey along the

15   lines of -- when I say "mock," I think you

16   understand what I mean, you know, giving it to

17   some other group of people, just sort of

18   generating your own results?

19               Have defendants' counsel asked you

20   to do anything like that?

21       A.      They haven't asked me directly and I

22   haven't proposed any such mock test.

23       Q.      Now --

24       A.      That doesn't mean that I will not

RALPH C. d'ARGE, Ph.D. - 3/28/97                72

1    propose it in the future.

2         Q.     But you're currently working on no

3    such project?

4         A.     That's correct.

5         Q.     And is it your wife that it took 35

6    minutes or your neighbor or either?

7         A.     I don't remember.

8                It took longer than 35 minutes for

9    both of them.

10               The 35 minutes was my optimistic

11   estimate of what a trained interviewer might be

12   able to do with this questionnaire.

13        Q.     In your work outside of litigation,

14   have you ever actually asked people questions in a

15   survey --

16        A.     Yes.

17        Q.     -- in person?

18        A.     Over my career, I have run

19   contingent valuation surveys using a mail format,

20   a telephone format, and person to person.  I've

21   done at least 50 over the years and I've always

22   participated in each one in the question process.

23        Q.     Meaning, in other words, for a

24   survey done by telephone, you have actually manned

RALPH C. d'ARGE, Ph.D. - 3/28/97                73

1    the phones and called people and asked them the

2    series of questions?

3         A.    That's correct.

4         Q.    Same thing with person to person:

5               You have actually gone to the

6    person's residence, wherever you were asking these

7    questions?

8         A.    That's correct.

9         Q.    Would you turn back to the survey

10   for a second, Slovic 4, Exhibit Slovic 4.

11              Do you have it in front of you?

12        A.    Yes.

13        Q.    If you could look at Question 37,

14   this was another question you identified as

15   leading to a negative impression.  The question

16   states, "When you think about Rocky Flats, what is

17   the very first thing that comes to mind?"

18              Now, how is it that question as

19   written can lead someone to have a negative

20   impression of Rocky Flats?

21        A.    That question in and of itself is

22   completely neutral.  Okay.

23              What you suggest is in 34a, though,

24   that Rocky Flats is a nuclear weapons facility.

KRAUSS, KATZ & ACKERMAN, INC.

RALPH C. d'ARGE, Ph.D. - 3/28/97                74

1                       Right.

2                       What is the first thing that you

3       think about in terms of Question 37?

4                       One response that I think is very

5       typical you did receive is little green men.

6                       Okay.

7                       Another response that you did

8       receive was cancer.

9                       Okay.

10                      In other words, when people think of

11      something, literally, if all they've heard about

12      it is negative and all they've heard about it is

13      essentially problems to humans, that's what you're

14      going to get back.

15                      These are what in a CVM are called

16      open-ended questions.  That means, literally, you

17      get people to tell you what's ever is in their

18      mind, and obviously what they give you is what

19      they can remember they've heard.  And what they've

20      heard, if they've read any newspaper over the last

21      20 years, has been largely negative.

22          Q.      Are you finished?

23          A.      Yes.

24          Q.      Before, when you were saying you got