# EXHIBIT 10−3

RALPH C. d'ARGE, Ph.D. - 3/28/97          75

1    little green men and you got cancer, were you

2    referring to actual results of the Decision

3    Research survey that you conducted?

4          A.      That's right.

5          Q.      Have you conducted any studies,

6    whether in connection with this case or outside

7    this case, of the content of media coverage in and

8    around the Rocky Flats area about Rocky Flats?

9          A.      No.

10          Q.      Do you intend to express any expert

11    opinion in this case about the content of any

12    media coverage of Rocky Flats for any period of

13    time?

14          A.      No.

15                 During this period of time?

16          Q.      For any period of time.

17          A.      No.

18          Q.      Now, back up one second.

19                 When I started asking you about

20    Question 34a, you know, I had asked you to

21    identify the questions that you contend lead to a

22    negative impression.

23                 Am I correct in thinking that that

24    leads to a negative impression of a house near

RALPH C. d'ARGE, Ph.D. - 3/28/97                76

1    Rocky Flats?  Correct?

2              In other words, on Page 6 of your

3    report, you say, "After a sequence of questions

4    designed to lead the respondent to the conclusion

5    that having a house near Rocky Flats is 'less

6    desirable.'"

7         A.    Right.

8         Q.    When you were talking about negative

9    impressions, that's the impression you are

10   speaking of; correct?

11        A.    That's correct.

12        Q.    So Question 37, I believe you said,

13   on its face is completely neutral.

14             But then in terms of how it is

15   linked, in your view, with Question 34a, it

16   creates a negative impression; correct?

17        A.    That's correct.

18        Q.    And how about Question 38?

19        A.    Since they are derivative questions

20   of 37, the same applies to them as well 39.

21        Q.    So 38 and 39 are on their face

22   completely neutral; correct?

23        A.    That's correct.

24        Q.    Now, I believe you next identified

RALPH C. d'ARGE, Ph.D. - 3/28/97          77

1       Question 43, which is on the following page.

2               A.      That's correct.

3               Q.      That question states, "When you

4       think of a nuclear weapons facility, what is the

5       first thing that comes to mind?"

6                       Now, what is it about that question

7       that can lead a person to have a negative view of

8       a house near Rocky Flats?

9               A.      As I indicated earlier, there is

10      some substantial evidence by researchers that when

11      you use the word "nuclear," you use the word

12      "weapons," you end up with a negative connotation

13      from people.

14              Q.      So that's why Question 43 creates a

15      negative impression --

16              A.      That's correct.

17              Q.      -- because it uses the words

18      "nuclear weapons facility"?

19              A.      That's right.

20                      I'm not capable of judging, but I

21      suspect that you would get a different response

22      here if you just eliminated the word "nuclear."

23              Q.      You've referred a couple of times to

24      some substantial research establishing this

negative association with the word "nuclear."

What research are you referring to specifically?

A. I gave you the list.

The first article was Robert Cameron Mitchell, who found that people, to feel safe, had to live at least a hundred miles from that nuclear facility; the Smith and Desvouges study that indicated that people had to live at least, I believe it is, 22 miles to -- I believe that they are safe; and the third study was one that Dr. Slovic was involved in which again indicates that there is a real problem when you mention those words.

Q. Okay. Anything else?

A. No.

Q. Back to the survey for a second.

Questions 44 and 45, in your view, lead to a negative impression of a house near Rocky Flats.

Can you explain why?

I'll withdraw the question.

Can you explain for me, in your view, why Questions 44 and 45 lead a person to

RALPH C. d'ARGE, Ph.D. - 3/28/97          79

1    have a negative impression of a house near Rocky

2    Flats?

3          A.      How 44 and 45?

4          Q.      44 and 45, yes.

5          A.      For the same reason as 43.

6          Q.      And how about Question 46, which

7    states, "Overall is your impression of nuclear

8    weapon facilities," and then it lists five choices

9    and plus don't know.

10         A.      This is just a record of their

11   feelings.

12         Q.      But you included it in your list of

13   questions that, in your view, lead to a negative

14   impression of a house near Rocky Flats.

15                 My question is, what about Question

16   46 does that?

17         A.      I already indicated to you that

18   there was ancillary evidence from other studies

19   that the phrase "nuclear weapons facilities"

20   denotes a very negative reaction by people.

21                 Now, in terms of taking together

22   Questions 34a, 37 through 39 and 43 through 45, if

23   you look at it in the following way, you have --

24   the other is the Rocky Flats nuclear weapons

RALPH C. d'ARGE, Ph.D. - 3/28/97                80

1    facility.  Okay.

2                   So you have Rocky Flats and then

3    this negative connotation.

4                   Then you go down to 37, 38, 39,

5    which just mentions Rocky Flats.  I said in face

6    value, that's neutral.  However, 43, 44, 45 are

7    not.

8                   Now you've put a negative element

9    there, but you've already linked them in Question

10   34a.  Okay.  If people remember that, then clearly

11   how are they going to respond to 46 or, for that

12   matter, to Question 50 and on.

13        Q.       Now, in the survey, Question 50a

14   states, "Suppose that after searching for some

15   time, you have finally found a house that seems

16   just right.  This house is in the Arvada/

17   Westminster area.  Would being near Rocky Flats

18   make this house" -- and then it gives various

19   choices.

20                   MR. DUTTON:  You're referring to

21        50a?

22                   MR. SORENSEN:  Yes.

23   BY MR. SORENSEN:

24        Q.       You see that question?

RALPH C. d'ARGE, Ph.D. - 3/28/97          81

1             MR. DUTTON:  On Page 21.

2             MR. SORENSEN:  I'm sorry.

3        A.    Okay.

4    BY MR. SORENSEN:

5        Q.    Page 21.

6        A.    Okay, 50a.

7        Q.    See that question?

8        A.    Yes.

9        Q.    Now, the next question, 51a, states,

10   "The federal government does not permit homes

11   within 2 miles of the buildings that were used for

12   weapons production.  Would you buy this house if

13   it were 2 to 4 miles from Rocky Flats."

14            See that question?

15       A.    Yes.

16       Q.    Now, apart from what it states in

17   the question, do you know from any other source

18   whether it is correct that no homes are permitted

19   within 2 miles of the Rocky Flats buildings?

20       A.    Do I know?

21       Q.    Yes, do you know apart from the fact

22   that it is stated in the question.

23            Do you have any other independent

24   knowledge of that?

RALPH C. d'ARGE, Ph.D. - 3/28/97          82

1        A.      I've looked at a map.

2        Q.      In connection with this case?

3        A.      Yes.

4        Q.      And that map told you what?

5        A.      The map indicated that there was a

6    gap, looked to me about like 2 miles or more.

7        Q.      Now, for those people who answered

8    question 51a with a no, okay, isn't it likely that

9    those people believe that it is unsafe or

10   undesirable to live within 2 to 4 miles of Rocky

11   Flats?

12               MR. DUTTON:  Objection.  Calls for

13          speculation.

14   BY MR. SORENSEN:

15       Q.      You can answer.

16       A.      Let me answer the question by

17   indicating to you my concerns with the question.

18               The difficulty here is that you cite

19   the federal government does not permit homes

20   within 2 miles.  That's a limit.

21               Then you ask about a purchase right

22   at the limit, 2 miles or more.

23               Literally, then it depends on how

24   reliable that limit is, and from the studies I

RALPH C. d'ARGE, Ph.D. - 3/28/97          83

1     previously cited, people that feel safe are giving

2     us 20 miles, a hundred miles.  And suddenly now

3     we're at 2 miles, right at the limit that the

4     government seems to believe.

5               Do you believe in the government?

6               From an economic perspective, there

7     is a real problem with this question because it

8     mixes your own subjective feelings of safety

9     according to distance with how the government

10    ranks safety according to distance.

11              And if you have a lot of faith in

12    the government, then you'll say, Well, they really

13    did an adequate job here.  2 miles is safe.

14              If you have no faith in the

15    government, you will say, my subjective beliefs

16    are 20 miles and here they're talking 2 to 4

17    miles?  I wouldn't ever consider it.

18              So there is a real problem here of

19    mixing the characteristics of the question between

20    individual safety and the government's perception

21    of safety, and people are likely to be evaluating

22    both of those in their response to the question.

23         Q.    Well, regardless of why a person who

24    answers this question might answer no, respond to

RALPH C. d'ARGE, Ph.D. - 3/28/97          84

1       Question 51a with a no, putting aside the

2       possibilities as to why they're answering that

3       way, in terms of your report and your testimony

4       about whether they're possibly judging the

5       government or, as you state, putting that aside

6       for the moment -- isn't it correct that regardless

7       of why they're answering no, if they answer no,

8       that is an indication that, again, regardless of

9       why they believe this, they believe it is unsafe

10      to be within 2 to 4 miles of Rocky Flats, putting

11      aside the question of why they believe that?

12              A.      You can't put it aside.

13                      MR. DUTTON:  I don't think so,

14              either.

15      BY MR. SORENSEN:

16              Q.      I'm asking you, as we sit here, to

17      put that aside.

18                      Are you saying you refuse to do

19      that?  You won't do that?

20              A.      It is impossible with the way that

21      this question is written.

22                      Now, if you would like, you can

23      rewrite this question for me or I can rewrite it,

24      though I would prefer not to, in such a way that

RALPH C. d'ARGE, Ph.D. - 3/28/97          85

1    the problem with government trust would not be an

2    element.

3         Q.     Other than the problem of government

4    trust that you identified in your report and you

5    just testified about, are there any other

6    problems?

7                  MR. DUTTON:  With?

8                  MR. SORENSEN:  With this question.

9         A.     Note the following:  "The federal

10   government does not permit homes within 2 miles of

11   the buildings that were used for weapons

12   production."

13                 We've already indicated -- or at

14   least I've indicated in a strong opinion that the

15   word "weapons" creates this thing all over again,

16   right.

17                 So that phrases that were used for

18   weapons production sets the stage.

19                 Then the following statement:

20                 "Would you buy this house if it were

21   2 to 4 miles from Rocky Flats?"

22                 Literally, from an economic

23   standpoint, you have the people right on a knife

24   edge, and do they believe the government or do

RALPH C. d'ARGE, Ph.D. - 3/28/97          86

1   they not believe the government?

2   BY MR. SORENSEN:

3        Q.      And if they don't, it is your view

4   that they would be more likely to feel that it is

5   unsafe to be within 2 to 4 miles from Rocky Flats;

6   is that right?

7                MR. DUTTON:  Objection to the form.

8        A.      If they don't believe the

9   government, then it depends on their perceptions.

10               I give an example in my report where

11  all of the trust argument was due to observations

12  on air bags, okay, where if they transferred it to

13  this case, you would observe the same percentages

14  as you do but it is totally related to air bags,

15  has nothing to do with Rocky Flats all.

16  BY MR. SORENSEN:

17       Q.      Yes.  But take your air bag example.

18               If a person in their mind doesn't

19  trust the government because of air bags, okay,

20  they're asked about Rocky Flats --

21               MR. DUTTON:  About air bags or Rocky

22       Flats?

23               MR. SORENSEN:  Rocky Flats.

24  BY MR. SORENSEN:

RALPH C. d'ARGE, Ph.D. - 3/28/97          87

1          Q.     They have this experience with air

2     bags that you have outlined in your report.  Now

3     they're being asked about Rocky Flats in this

4     survey.  They answer Question 51a no, meaning

5     would not buy a house within to 2 to 4 miles.

6                I take it your criticism is that the

7     problem is they could be answering no because they

8     don't trust the government because of their air

9     bag experience; correct?

10         A.     That's correct.

11         Q.     But if that is the case, hasn't that

12    person also now made the decision or now expressed

13    the opinion that they also don't trust that it's

14    safe to live within 2 to 4 miles of Rocky Flats?

15               In your view, they've transferred

16    their distrust of the government to this question,

17    so they have now also distrust that it is safe to

18    live within 2 to 4 miles of Rocky Flats.

19               Correct?

20         A.     What you haven't provided them with

21    is sufficient information, okay, narrowed to the

22    Rocky Flats case so that they're responding to

23    that issue and that issue alone.

24         Q.     Well, go back to my question.

RALPH C. d'ARGE, Ph.D. - 3/28/97          88

1                    If the person asked the question has

2       had negative experience with air bags, as you

3       posited, for that reason doesn't trust the

4       government, for that reason, when they hear this

5       question, doesn't trust the government about the 2

6       to 4 miles, they answer the question no, hasn't

7       that person now expressed the opinion, because of

8       the air bag example as you posited, but they've

9       now expressed the opinion that they also think it

10      is unsafe to live within 2 to 4 miles of Rocky

11      Flats because of the air bag example?

12                    MR. DUTTON:  Objection, asked and

13            answered.

14          A.       The difficulty here is then you do

15      not have a clear signal between the commodity and

16      its value.  You may be valuing air bags as opposed

17      to Rocky Flats.  Okay.

18      BY MR. SORENSEN:

19          Q.       Okay.  That's a problem that --

20                    MR. DUTTON:  Are you done with your

21            answer?

22                    MR. SORENSEN:  Yes.  Sorry to

23            interrupt.

24                    THE WITNESS:  Yes.

RALPH C. d'ARGE, Ph.D. - 3/28/97          89

1   BY MR. SORENSEN:

2        Q.   I understand that criticism that you

3   have made, but that isn't directly responsive to

4   my question.  And that may, in your view, also be

5   relevant to my question, whatever.

6             But my question, again, is take what

7   you posited, take a person who has had a bad

8   experience with air bags.  They don't trust the

9   government because of that experience.  They get

10  asked this question, 51a.  Because they don't

11  trust the government because of air bags, they

12  answer no to question 51a because they've

13  transferred their distrust from the government in

14  terms of air bags to the government in terms of

15  the 2-mile limit around Rocky Flats.

16            Hasn't that person now expressed the

17  view that they don't think it is safe to live

18  within 2 to 4 miles of Rocky Flats because of

19  their experience with air bags?

20            MR. DUTTON:  Objection, asked and

21       answered three times now.

22  BY MR. SORENSEN:

23       Q.   In other words, they're not saying

24  no because they -- strike that.

KRAUSS, KATZ & ACKERMAN, INC.

RALPH C. d'ARGE, Ph.D. - 3/28/97          90

1          Can you answer the question?

2          A.     I'm sorry.  What you have here are

3     two bodies suspended up at once, right, and I

4     can't say which one is higher at any moment, I

5     mean, and the difficulty here is that if the

6     belief structure, okay, is leading to the response

7     in the question, okay, rather than the individual

8     circumstances of the case, then the response is

9     useless.

10         Q.     Were you finished?

11         A.     Yes.

12         Q.     Take another question.

13         Aside from the survey -- put the

14    survey aside for the moment -- imagine a person

15    who is looking to buy a home somewhere in the

16    Rocky Flats vicinity.  In the market, they have

17    financial resources to buy a home.  They're from

18    out of state.  They have minimal prior knowledge,

19    exposure to media coverage in the area, certainly

20    about Rocky Flats.  They start looking for a home.

21         They learn that the federal

22    government does not permit houses within 2 miles

23    of the buildings but does permit homes beyond that

24    point.

RALPH C. d'ARGE, Ph.D. - 3/28/97                91

1                     There is a home in the 2- to 4-mile
2        area that they're looking at.
3                     The person making the decision has
4        had a bad experience with the federal government
5        because they had a person who was hurt by an air
6        bag in their family and they don't trust the
7        government now because of the air bag experience.
8                     They're looking for a home.  They
9        learn the government has established this 2-mile
10       range.  They don't trust it.  They don't trust it
11       because of the air bag experience.
12                    They don't buy the house because of
13       their distrust.
14                    Regardless of the fact that the air
15       bag experience has some relationship to this
16       decision, isn't it still true that the person has
17       now decided not to buy the house because they do
18       not trust the safety of living within 2 to 4 miles
19       of Rocky Flats?
20                    MR. DUTTON:  Objection.  It is
21            vague.
22            A.      They don't buy the house because of
23       air bags, okay, and the air bag has nothing to do
24       with this case.

RALPH C. d'ARGE, Ph.D. - 3/28/97          92

1    BY MR. SORENSEN:

2         Q.     But they don't buy the house because

3    they don't trust the government's statement that

4    it is safe to live within 2 to 4 miles; correct?

5              MR. DUTTON:  Objection, no

6         foundation.

7         A.     That's part of the problem with this

8    question.

9              And that is, I said, this knife edge

10   where you say the government does not permit homes

11   within 2 miles and then you say would you buy a

12   house if it were 2 miles to 4 miles?

13              Okay.  It is a knife edge.

14              You have that complicating factor

15   and you have a complicating factor of government

16   trust and you have the complicating factor of them

17   responding to that government trust for some

18   reason unrelated to Rocky Flats entirely.  Okay.

19   BY MR. SORENSEN:

20        Q.     Try one more time.  I do believe I

21   understand what you're saying.

22              MR. DUTTON:  He's saying he can't

23        answer the question as you are posing it.

24        He doesn't have enough information.  If you

RALPH C. d'ARGE, Ph.D. - 3/28/97          93

1           want to ask him again, I'll go ahead and let

2           you ask it.

3       BY MR. SORENSEN:

4           Q.      A hypothetical person looking at

5       this house who decided not to buy it because there

6       is danger of air bags in the house; right?  That's

7       obvious; correct?  And there is no danger from air

8       bags in the house.  It goes without saying; right?

9               You agree with me on that?

10              MR. DUTTON:  Does the house have air

11          bags or not?

12          A.      He doesn't buy the house because of

13      the radiation effects.  He buys the house because

14      of the fear of air bags.  Okay.

15              Has nothing to do with Rocky Flats.

16      BY MR. SORENSEN:

17          Q.      But he's not fearing any danger from

18      air bags in the house; correct?

19              It is a simple -- not a trick

20      question.

21          A.      Okay.  Go ahead.

22          Q.      But you agree with that.  There is

23      no danger of air bags in the house?

24              MR. DUTTON:  If there are no air

RALPH C. d'ARGE, Ph.D. - 3/28/97          94

1          bags in the house?

2                    MR. SORENSEN:  Correct.

3     BY MR. SORENSEN:

4          Q.     Most houses don't have air bags; is

5     that right?

6          A.     Yes, I would agree with you on that.

7          Q.     Okay.  All right.  We have some

8     agreement.  We have a house without air bags.

9                    The person doesn't trust the

10    government because of air bags.  They're looking

11    at a house with no air bags.

12                    Isn't it true that what is going on

13    here is the person is transferring, in your view,

14    their distrust of the government in terms of their

15    proclamations about air bags, to the government's

16    proclamations about how safe it is to live within

17    2 miles of the plant?  Right?

18                    They're transferring.

19                    So now having transferred it,

20    they're now saying to themselves, I don't trust

21    the government's statement that it is safe to live

22    2 miles away; correct?

23                    Is that a yes?

24         A.     Yes.

RALPH C. d'ARGE, Ph.D. - 3/28/97          95

1          Q.        That's it.  That's all I have.

2          A.        Except for one thing, and that is

3    you can't get away from the idea that the

4    government is permitting, okay, and that is

5    phrasing this entire question.  Okay.

6                    From ancillary evidence, we know

7    that people, to feel safe, must live a hundred

8    miles or 20 miles away from a nuclear facility.

9                    This question is postulating 2 to 4

10   miles and postulating a government permit process

11   on top of it.  It is what economists call a

12   compound question where you cannot control the

13   responses.  In consequence, you have no idea of

14   what people are telling you.

15                   People trained in contingent

16   valuation have spent years trying to get rid of

17   this kind of a problem.  If you look at the '60s

18   and '70s, there are a lot of CVM studies with

19   compound questions.  A lot of them were rejected

20   for publication.

21                   Why do we see it here?

22                   The only reason that I can see it

23   here is that the researchers involved in this

24   study have not spent the requisite time to know

RALPH C. d'ARGE, Ph.D. - 3/28/97          96

1     how to prepare a survey to elicit values.

2          Q.     On Page 8 of your second report, you

3     talk about something you call anchoring bias.

4               You see that?

5          A.     Yes.

6          Q.     Now, am I correct in thinking that

7     anchoring bias is in effect the phenomenon that if

8     I suggest to you an amount, whether we're talking

9     about money or other amounts, whatever the amount

10    is, percentages, just neutral units -- if I

11    suggest a number to you, whatever answer you give,

12    if you are permitted to give an answer different

13    from that number, the anchoring bias is that your

14    number will be influenced by the number that I

15    have suggested; is that right?

16         A.     That's correct.

17         Q.     I mean, it is sort of lay terms.

18         A.     That's correct.

19         Q.     So that if I say five, you're more

20    likely to respond with seven, which is close to

21    five because I suggested five; correct?

22               Is that a yes?

23         A.     Yes.

24         Q.     Whereas, if I said nothing, you

RALPH C. d'ARGE, Ph.D. - 3/28/97          97

1    might say seven and you might say something else?

2          A.    That's correct.

3          Q.    Now, am I correct in thinking that

4    if there is anchoring going on, a large of number

5    of responses given will be close to the suggested

6    number; is that right?

7          A.    It depends.

8          Q.    Well, is there any standard

9    percentage or are there any measures of anchoring

10   in terms of, you know, the number of people who

11   give an answer within a certain percentage of the

12   suggested answer, that it is generally agreed in a

13   profession demonstrates anchoring?

14         A.    There are, I would say, at least 20

15   studies showing anchoring effects in various ways.

16               One example -- and I cite my own

17   work here of an anchoring effect -- was an

18   examination by Robert Rowe and David Brookshire

19   and myself on the degree of the anchoring effect,

20   and what we did was we took stratified random

21   samples of people and we anchored some of them at

22   a thousand dollars, some at 2,000, some at 4,000,

23   some at 8,000, et cetera, and then observed

24   whether the magnitude of the anchoring effect

RALPH C. d'ARGE, Ph.D. - 3/28/97          98

1    influenced their final bid or final value amount.

2                    And what we found was that for every

3    dollar that we increased the suggested amount, the

4    individual would give us a 40 cent higher

5    additional bid, okay. And the relationship tended

6    to be linear, okay, which means that if you wanted

7    the bid or payment or compensation amount to be

8    larger, all you needed to do is start with a

9    larger number.

10                    Now, psychologists have studied this

11   phenomenon and economists have studied this

12   phenomenon, and what it led to was the idea that

13   if you suggest a number to someone, you better be

14   able to prove that that suggested number did not

15   bias your results. Okay.

16                    That means structuring a study so

17   that you reveal the effects of your suggested

18   number on the ultimate value. Economists dislike

19   that because it means structuring some added

20   random samples of people facing different numbers

21   to see how sensitive the study is to differences

22   in that number.

23                    I've had enough experience with

24   evaluating the anchoring bias to know that if you

RALPH C. d'ARGE, Ph.D. - 3/28/97          99

1    took the $5,000 and the $10,000 that were utilized

2    and you made it $500 and $1,000, the average

3    amount would be substantially lower than the

4    reported number by Hunsperger.

5                   I also know from past evidence that

6    if they would have selected $50,000 and $100,000,

7    that the number would have been substantially

8    different.

9                   That is the problem.

10                  Now, remember what we're trying to

11   do here.  We're trying to measure the minimum

12   compensation that it takes, the minimum amount of

13   dollars and reduction in property values, right,

14   so the person literally is compensated for

15   whatever alleged effects of Rocky Flats are there.

16   That's the appropriate economic measure.

17                  What I have just said is, though,

18   that number can vary by an order of magnitude

19   depending on what values are used.

20                  The way economists and psychologists

21   have come to try to get around anchoring bias is

22   to use what are called focus groups, and focus

23   groups are nonrandom samples of individuals who,

24   through asking them open-ended questions, you get

RALPH C. d'ARGE, Ph.D. - 3/28/97          100

1    an idea of how much they're willing to pay and how

2    much they're willing to, at minimum, be

3    compensated.

4              By "open-ended," I mean, you don't

5    give them a number.  You say, What would you pay?

6    And then you run a bunch of tests on it, and

7    typically that gives you the appropriate range.

8              That's what the NOAA panel calls for

9    sort of standard practice today.

10             I do not know how $5,000 and $10,000

11   were arrived at.  They were not arrived at by

12   focus groups or by the usual procedures employed

13   by either psychologists or economists.

14             That's why I'm worried about the

15   anchoring bias problem here.

16        Q.    Dr. d'Arge, on Page 8 of your second

17   report, where you are talking about anchoring,

18   there are several citations, Mitchell and Carson

19   in '89; Rowe, d'Arge and Brookshire in 1980.

20             We're down to the NOAA panel being

21   Mitchell and Carson.  See these cites?

22        A.    Yes.

23        Q.    Now, am I correct in thinking that

24   all of these citations refer to work concerning CV