# EXHIBIT 22‑1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

|  |  |
|---|---|
| MERILYN COOK, et. al. | ) |
| Plaintiffs, | ) |
| v. | ) Civil Action No. 90-K-181 |
| ROCKWELL INTERNATIONAL CORPORATION and THE DOW CHEMICAL COMPANY, | ) |
| Defendants. | ) |

AFFIDAVIT OF DANIEL L. MCFADDEN
February 1, 1999

STATE OF CALIFORNIA        )
                           )        SS:
COUNTY OF ALAMEDA          )

I, Daniel L. McFadden, being first duly sworn, depose and state that the following statements are true and based on my personal knowledge and that, if sworn as a witness, I could competently testify thereto.

# TABLE OF CONTENTS

| Section | Page |
|---|---|
| 1. Personal Background and Qualifications | 1 |
| 2. The Purpose and Basis of this Affidavit | 2 |
| 3. Summary of Opinions | 2 |
| 4. Damages from Stigma:  Principles | 6 |
| 5. Hedonic Analysis of Prices:  Principles | 14 |
| 6. Documentation Standards in Applied Regression Analysis | 21 |
| 7. Dr. Radke's Improper Damage Estimation Experiment | 24 |
| 8. Dr. Radke's Failure to Meet Scientific Documentation Standards | 27 |
| 9. Dr. Radke's Improper Statistical Analysis | 42 |
| 10. Conclusions | 63 |

## 1. PERSONAL BACKGROUND AND QUALIFICATIONS

1.1. I am the E. Morris Cox Professor of Economics at the University of California, Berkeley, and Director of the Econometrics Laboratory. I received a Bachelor of Science degree in Physics, with high distinction, in 1957, and a Ph.D. degree in Behavioral Science, with specialization in Economics, in 1962. Both degrees are from the University of Minnesota. I joined the faculty of the University of California in 1963. In 1977, I became the James Killian Professor of Economics at MIT. From 1988 to 1991, I was Director of the Statistics Center at MIT. In 1991, I returned to my current position at Berkeley. In 1975, I received the John Bates Clark medal, awarded biannually to the economist under 40 judged to have made the greatest contribution to the profession. I am also the recipient of the Frisch medal (1986), awarded biannually for the best empirical paper in *Econometrica*; and the Outstanding Paper Award of the American Association of Agricultural Economics (1995). I have served as the Irving Fisher Research Professor at Yale University, and as a Fairchild Distinguished Scholar at the California Institute of Technology. I have been elected to the American Academy of Arts and Sciences and to the National Academy of Science, and hold an honorary LLD degree from the University of Chicago. I have served as Department Chair, President of the Econometric Society, and Vice-President of the American Economics Association.

1.2. I have taught economic theory, econometrics, and statistics at the graduate level since 1962. I have published 7 books and more than 100 professional papers, the majority related to econometric methods and their applications. My resume is attached as Appendix A.

1

## 2. THE PURPOSE AND BASIS OF THIS AFFIDAVIT

2.1. This affidavit is submitted at the request of attorneys for the defendants in reference to defendants' motion to strike the testimony of Dr. John Radke. This affidavit includes material that I have previously submitted: (a) an Expert Report On April 16, 1997 stating my opinions on Dr. Radke's work, (b) an affidavit on July 29, 1997 containing the opinions stated in my April 1997 report, (c) an affidavit on March 5, 1998 related to Defendant's Motion to Compel the Production of Material Relied on by Dr. John Radke, and (d) a Revised Affidavit on May 22, 1998 that updated my April 1997 report.

2.2. This affidavit, and my preceding affidavits, comment upon the 1996 expert report Measuring the Effects of Proximity to the Rocky Flats Nuclear Weapons Plant on Property Values, prepared by Dr. John Radke. I have also reviewed the background documents and analyses that Dr. Radke has provided, as well as motions and briefs submitted by counsel for the plaintiffs and the defendants. For examination of Dr. Radke's data and regressions, I have been assisted by Dr. Paul Liu of the Brattle Group.

## 3. SUMMARY OF OPINIONS

3.1. Dr. Radke has designed a flawed experiment that is incapable of providing reliable evidence of any injury to the plaintiffs or estimates of stigma damages. He has made a serious logical error in his analysis, failing to distinguish persistent effects of proximity to Rocky Flats from effects that followed and arguably might be attributed to the 1989 FBI raid and attendant publicity regarding the conditions that led to the raid. As a result, he makes claims for damages associated with persistent price depression effects, without demonstrating that these persistent effects are historically related to information about releases of hazardous materials at the Rocky Flats plant, or that other probable causes of these price

2

effects have been excluded. *Even if* there were persistent price depression linked to historical releases of hazardous materials at Rocky Flats, Dr. Radke has not established that this causes recoverable losses to class members.   *Only* owners who purchased property *prior* to the onset of a persistent price depression effect suffer lost property values as a result of this effect.

Dr. Radke's damage estimation also contains conceptual errors. For multi-family, commercial, and vacant properties, Dr. Radke states that he calculates his mean percentage undervaluations only for properties within the cutoffs where he estimates that there is an impact from proximity to Rocky Flats. However, he applies these mean percentage undervaluation estimates to the values of *all* class properties of each type, including those that are beyond his cutoffs and therefore by his own model not impacted by Rocky Flats.  This inflates his damage estimates for these property types.

3.2. The procedures Dr. Radke has followed for documenting and retaining a record of his work fail to meet prevailing standards in econometrics.  The National Science Foundation and major journals require that data, programs, and materials necessary to replicate published economic studies be archived and made available to any interested scientist.  Dr. Radke reports that he has done portions of his analysis interactively, without maintaining a log.  He has also provided incomplete documentation on the data he has used, and on models used to construct some of his variables, such as accessibility measures.  Substantive questions on Dr. Radke's procedure, data sources, and variable construction remain unanswered.

On the basis of Dr. Radke's Report and the background documentation he has provided, I am able to evaluate the logical consistency of his analysis, and the validity of the regression procedures he states that he has adopted.  Dr. Radke carries out one analysis of values of multiple-family, commercial, and vacant properties, which he terms Phase I, and a second analysis of single-family residential

3

properties, which he terms Phase II. Using the data provided by Dr. Radke for his Phase I analysis, and the description of his regression procedure given in his Report, I have made an extensive effort to replicate Dr. Radke's results, and am unable to do so. I am able to evaluate a variant of Dr. Radke's Phase I analysis based on transactions dates contained in the commercial data source that Dr. Radke used, and evaluate this model given the assumption that it is a correct representation of what Dr. Radke did. However, this analysis still does not replicate Dr. Radke's regressions, and I am unable to determine whether this is due to use of incorrect date coding by Dr. Radke, or some other difference between his Report description and the regression he actually ran. Dr. Radke has not provided copies of the computer programs, or detailed descriptions of the data transformations carried out by these programs, that would permit me to determine if his data processing and statistical regressions were done as represented in his Report.

I am able to replicate and evaluate Dr. Radke's Phase II regression analysis, *taking as given* the sample of transactions he has drawn and the values of the variables he has constructed. However, Dr. Radke has failed to provide the documentation, requested in the Motion to Compel, that would enable me to replicate and verify his construction of the locational variables that form the centerpiece of his hedonic analysis, or to verify that transactions were sampled and dated accurately and in conformance with good statistical practice. Analysts working under my direction have made diligent searches of the documentation Dr. Radke has provided, and have made an extensive effort to "reverse engineer" and recover the undocumented variables and procedures. The missing documentation as summarized in the Motion to Compel has not been recovered by these methods, and is central and critical to the task of replicating and evaluating these remaining elements of Dr. Radke's analysis.

4

3.3. Dr. Radke has made several serious statistical errors in his analysis. First, he has used a factor analysis to select composite location variables. The properties of the multiple regression method used for his hedonic analysis imply that this step *cannot* improve his estimate of the effects of proximity to Rocky Flats, and may introduce bias. Second, he has used weighted regression, with weights reflecting sampling rates inside and outside the class boundary (MPC). This is a statistically incorrect method for dealing with sample stratification which leads Dr. Radke to inefficient estimates of model parameters and biased estimates of their standard errors. Third, Dr. Radke has used a procedure for estimating cutoff values for proximity effects that leads to biased estimates of the significance of these proximity effects.

Dr. Radke's statistical errors regarding factor analysis and weighted least squares are basic and obvious violations of the Gauss-Markov theorem, the foundation upon which regression analysis is built, and the first result taught in a graduate course in econometrics. For example, a leading econometrics textbook, William Greene *Econometric Analysis* (Second Edition) states and proves the Gauss-Markov theorem just nine pages after first introducing the method of least squares (pp. 155-159, 182-183). Econometrics textbooks also explain how weighted least squares is used to correct problems of non-constant variances in regression disturbances. Sample stratification on an explanatory variable does not alter the pattern of variances, and weighting corrections for non-constant variances, if required, are unrelated to sampling rates.

Dr. Radke's statistical errors have a major effect on his conclusions, and are neither recondite nor unimportant. They are mistakes one might expect of an inexperienced student of regression analysis, but not of an expert in this subject. In my judgment, Dr. Radke is a scholar who in undertaking a statistical regression study is working outside his ordinary areas of expertise, using methods in which

5

he does not have sufficient experience to avoid obvious pitfalls. I believe that Dr. Radke does not qualify as an expert for the statistical requirements of hedonic analysis.

3.4. The portions of Dr. Radke's work that I have been able to evaluate form the basis for the opinion stated in my April 16, 1997 report that Dr. Radke's analysis is fundamentally flawed, and cannot be relied upon for the estimation of economic damages. The fact that I have detailed errors in the portions of his work that I have been able to check, and would be able to testify to the weight of these errors in evaluating his opinions, provides no argument that the remainder of his work can therefore be excused from scrutiny by opposing experts; every element of his analysis upon which he is permitted to testify should be available for examination by opposing experts.

## 4. DAMAGES FROM STIGMA: PRINCIPLES

4.1. Property values can be influenced by nearby activities and events, and the perception of these events. Thus, properties in the vicinity of an airport or industrial plant may decrease in value because of noise or traffic generated by these facilities; while construction of public facilities or highways may provide amenities that increase value. The definition of a *stigma effect* is a loss in value due to the revelation to buyers of proximity to a site that is a source of a disamenity such as releases of hazardous materials. Stigma may or may not be the result of tortious activities at a site. Thus, an airport that meets all zoning and environmental regulations may have a negative impact on values of nearby properties, but this might not result in recoverable damages.

To picture conceptually the determination of damages from stigma, consider a group of identical properties in an *Impact Area* where there may be property value losses, and a second group of identical properties in a *Control Area* that does not face such losses. Suppose there is an *Announcement*, which

6

I define to be *a revelation of new information about a disamenity* in the Impact Area.  For illustration I will assume an Announcement at the beginning of 1990 that reveals the possibility of hazardous waste contamination in the Impact Area; this might be for example a CERCLA designation and accompanying publicity that makes buyers aware of the possibility of contamination.  Example 1 below shows, with heavy curves, property prices in the Control and Impact Areas.  There is, first, a *persistent* difference in prices in the two areas, depicted before 1990 by the vertical difference between the heavy curves, and after 1990 by the vertical difference between the upper heavy curve and the light curve that continues the lower heavy curve smoothly to the right.  There is, second, a *price offset* in the Impact Area after 1990, corresponding to the downward shift in the lower heavy curve.  The light curve that continues the persistent price difference to the right after 1990 has the interpretation of the "but for" prices that would have prevailed if the Announcement had not occurred.  The gap between the "but for" light curve and the "as is" lower heavy curve after 1990 represents the loss in value following the Announcement.  Whether the Announcement is the sole cause of this loss in value is a matter to be determined, but for illustration assume that it is.  Then the price offset in the Impact Area following the Announcement is a *stigma effect* due to the Announcement.

**Example 1**



7

The persistent difference between the prices of properties in the Control and Impact Areas may arise for the myriad reasons that make one neighborhood more desirable than another: differences in construction quality, accessability, schools, public services, or the proximity of an industrial plant. In the last circumstance, price discounts near the plant may be coincidental, the result of geography that leads to location of industrial plants in areas that are less desirable and have lower prices for residential development, or may result from tortious or non-tortious plant operations. A *persistent* price difference between properties in the Control and Impact areas causes *no* losses to property owners in the Impact Area: owners both buy and sell at the persistent discount associated with the Impact Area, with this discount reflecting the value they place on whatever the persistent factors are that differ between the Impact and Control areas. Even if the persistent discount were due to activity, perhaps tortious, at an industrial plant at some time in the past, an owner who purchased a property *after* this activity resulted in a persistent price discount would suffer no injury, because he both "buys low" and "sells low".

Now consider the stigma effect, the price offset in Impact Area property after 1990. Each individual who purchased a property *before* 1990 and sold it *after* 1990 suffers an economic loss relative to what his selling price would have been *but for* the stigma effect. Individuals who purchase property in the Impact Area *after* 1990 do *not* incur an economic loss, even if they subsequently sell, since they "buy low" and "sell low". Similarly, individuals who buy and later sell b*efore* 1990 incur no loss, since they "buy high" and "sell high". Finally, individuals who buy property before 1990 and have not sold it have no *realized* loss, but face a *potential* or *unrealized* loss which will be realized in the future *if* they sell, *if* the offset in prices that began in 1990 persists until the time that they sell, and *if* there are no other mitigating factors that reverse the offset.

8

It is possible for historical events prior to the 1990 event previously discussed to impact property values. For example, suppose an event in 1980 had a negative impact on values in the Impact Area. A first question is which individuals suffer a loss as a result of the 1980 event. The answer is that individuals who bought property in the impact area before 1980 and sold it after 1980 suffer a loss from this source. However, any property owners who sold *before* 1980, or purchased *after* 1980 suffered no loss from this source, since the negative impact did not come between their date of purchase and their date of sale. The group of property owners who own property in the Impact Area in 1990 will *include* some individuals who suffered a loss from this early event, because they purchased prior to 1980, and some individuals who suffered no loss from the early event because they purchased after 1980, and will *exclude* some individuals who suffered a loss from the 1980 event but are not in the group because they sold between 1980 and 1990. Consequently, the 1990 owners of Impact Area properties were not *as a group* the individuals damaged by the 1980 event. A second question is whether a historical event such as the one in 1980 can be bundled with and treated as part of the 1990 event, with stigma defined as the accumulation of the price offsets. The answer is no because different groups of individuals are injured by the two events, and because it is logically impossible for the 1990 event to *cause* the chronologically prior price offset. Even if the activities and publicity that caused the 1980 and 1990 events are rooted in the same source, the impact of the 1980 event is recorded in the market price prior to 1990. Even if the perception of risk attached to the 1990 event is colored by earlier events, the effect of this is only to change the size of the 1990 price offset, not in addition to reintroduce price offsets from the historical events. Then, the stigma effect from the 1990 event is limited to the price offset following this event, and realized losses are limited to individuals who were owners in the Impact Area in 1990 and who have subsequently sold their property.

9

In Example 1, the persistent price differential between Control and Impact areas was constant in percentage terms, and the stigma effect that began in 1990 remained the same percentage offset through 1998. It is possible more generally that there will be trends in the persistent price differential, and trends as well in the price offset associated with stigma. Many factors can contribute to different prices in different neighborhoods. One neighborhood may be better positioned than a second to benefit from changes in the transportation network, and hence access to shopping and jobs. There may also be different trends in different neighborhoods in quality of public services and quality of neighborhood life, for reasons unrelated to proximity to industry. If there is a stigma effect associated with an event such as the 1990 Announcement in the previous example, then the size of this stigma effect may change over time in response to dissemination of information about the nature of the hazard and remediation efforts. The next example illustrates a growing price differential between Control and Impact Areas, and a stigma effect following a 1990 event that attenuates over time and is gone by 1997.

**Example 2**



10

This price pattern has several implication for measurement of damages. First, the "but for" prices in the absence of the 1990 event that created the stigma effect should reflect the continuation of the long-term trend in the price differential between Control and Impact Areas. Second, individuals who own property in the Impact Area in 1990 will be injured to different degrees depending on when they sell their property, with the relevant price percentage given by the price offset remaining at the time of sale. In this example, the post-Announcement price offset has disappeared by 1997, so that individuals who sell their properties in 1997 or later incur no loss. Then, damages are incurred *only* by owners who have realized losses from sales between 1990 and 1997.

If the events leading to stigma develop over a period of time rather than at a single Announcement point, then the price offset may also be gradual in its onset. One implication of this situation is that an experiment that can distinguish the stigma effect from a persistent price effect must start well before the events leading to stigma unfold. A second implication is that if the events leading to stigma unfold slowly, then groups of individuals who buy and sell at various stages suffer different degrees of loss of value, and each must be handled separately for the purpose of estimating damages. For example, suppose revelation of contamination in an Impact Area started at the beginning of 1988, and was completed at the beginning of 1990, and that the price offset followed the same pattern, starting first at the beginning of 1988 and peaking after the beginning of 1990. Suppose that the group of owners of record in the Impact Area at the beginning of 1990 seek to recover for diminution in value. Then, within this group are subgroups of owners who bought before 1988 and sold after 1990 and suffer the loss of value corresponding to the full price offset, subgroups of owners who bought near the end of 1989 and sold after 1990 who suffer almost zero loss in value because the price offset already in effect when they purchased enabled them to "buy low", and individuals not in the group who purchased

11

before 1988 and sold just before 1990 who suffer almost the full loss in value. It would be inconsistent to argue on one hand that the onset of stigma occurred over a period of time, and then fail to take the implications of this into account in designing an experiment to measure the effect and to estimate damages for the various subgroups that are impacted differently.

4.2. The discussion and examples in Section 4.1 show that the foundation for an argument for a stigma effect on property prices is the ability to identify price offsets between Impact and Control Area properties following an Announcement, and differentiate these price offsets from persistent price differentials between Impact and Control Areas. Failure to do this confounds true stigma losses with price differentials that do not result in losses to class members, even if it can be argued successfully that they originate from the same source as the Announcement that triggers the stigma. These observations have important implications for the design of a scientifically sound experiment to measure price offsets due to stigma and estimate damages. First, it is essential to measure property sales prices over periods *before* and *after* an event that is alleged to cause stigma, in both Impact and Control Areas, so that both persistent price differentials and price offsets can be measured reliably, and trends detected if they are present. Second, it is essential to select Control Areas to minimize the possibility of extraneous factors that influence prices and confound the measurement of price offsets that can be attributed solely to the Announcement. Third, it is essential to identify the subgroups of individuals that could be damaged to various degrees, because their purchases and sales of property in the Impact Area span the Announcement, and to estimate the damages actually incurred by the members of each subgroup. If the geographical locus of damages is not uniform, then the subgroups need to also be differentiated by location.

12

4.3. A critical step in establishing that an event *causes* damages is to establish that there is a significant price offset following the event, and that there are no other contending events that could possibly or plausibly contribute to this price offset. To do this, one must first identify all possible events that could be a factor, such as rezonings, opening of new highways, shopping centers, parks, or airports, development of new areas offering employment, changes in the school system, and so forth. Then, one must ask whether the timing or geographical pattern of impact of these alternative events could confound the measurement of a price offset between the Control and Impact Areas following the Announcement. Even under ideal circumstances, detecting a price offset following an Announcement does not *prove* causality, but it can quantify the magnitude of an impact if assessment of all the possible events leads to the conclusion that the most probable cause of the offset *is* the Announcement. If there are indeed multiple events that potentially contribute to a price offset, then it is possible, but not guaranteed, that by statistical analysis one can allocate responsibility for the price offset to the different events.

4.4. Unrealized losses by property owners who bought before the onset of diminished value following an event, and who have not yet sold, present a difficult issue for damage estimation. On one hand, if a price offset due to stigma persists indefinitely into the future, then these individuals or their heirs will eventually book losses. However, it is necessarily speculative as to whether stigma effects will persist indefinitely. If a site is no longer a source of hazardous materials and remediation reduces exposure to previous releases, and if there is no subsequent history of medical or other adverse impacts, then it is plausible that stigma effects will eventually attenuate and disappear.

13

## 5. HEDONIC ANALYSIS OF PRICES: PRINCIPLES

5.1. The measurement of market prices for Impact and Control Area properties is more complex than is pictured in the Section 4 discussion of the principles of damage assessment from a stigma effect, because properties are rarely completely comparable, either within an Area or between Areas, and because many factors other than the Announcement Event buffet real estate prices. Among the factors that enter the price of a particular property sale are (1) overall conditions in the economy of the region, particularly changes in the numbers and locations of jobs, changes in price and income levels and industrial and commercial activity, and patterns of migration and relocation, (2) changes in neighborhood-level conditions such as transportation access, safety, congestion, and school quality, (3) changes in the condition of individual properties such as maintenance levels, enhancements, and the status of immediate neighbors, and (4) variations in the motivation and bargaining of individual buyers and sellers. These factors cause variations in sales prices that can confound or blur detection of the price offset due to stigma. The scientifically accepted method for tackling this problem is to collect sales data on a large sample of properties, and use statistical analysis to control for confounding factors and average out random variations; this is termed *hedonic analysis.*

There is a body of standard statistical technique for hedonic analysis, and clear standards for acceptable procedure. The basic principles are clear: The final objective of a hedonic analysis is to obtain a reliable estimate of post-Announcement price offsets in an Impact Area relative to a Control Area, controlling for extraneous and confounding factors. The purpose is then to achieve, by statistical means, sales prices for comparable, standardized properties in the Impact and Control Areas both before and after the Announcement, to carefully distinguish post-Announcement price offsets from persistent effects, and to eliminate potential confounding events as possible causes of the post-Announcement

14

price offset, so that the Announcement stands alone as the probable cause of these price offsets. The elements in a hedonic study are (1) choice of a sample frame, including identification of Impact and Control Areas, the time period for observation, rules that determine what property sales are eligible to be sampled, and specification of sample sizes; (2) determination of the variables on which data will be collected for each sampled property; (3) specification of statistical models to relate sales prices to variables that may impact these prices, including physical attributes, locational characteristics, and general market fluctuations, and offset effects for the Impact Area following the Announcement Event; (4) estimation, specification analysis, and proofing of the model using accepted statistical procedures; and (5) use of the model to predict "but for" sales prices of sampled properties in the Impact Area following the Announcement, and estimation of lost value for various groups of property owners at the time of the Announcement.

Hundreds of scientific papers have been published on hedonic analysis of real estate prices, and there is a substantial body of scientific experience with each step, and acknowledged standards for acceptable procedure. Taken together, steps (1)-(5) define a *Scientific Experiment* to detect and measure stigma. The following paragraphs outline some of the critical requirements for the proper design of this scientific experiment.

5.2. The initial step in a hedonic study of real property prices is definition of the *sample frame*, including the geographical area, the time period over which sales will be observed, and the characteristics of sales that will be accepted as observations. The experiment will have to distinguish between a post-Announcement price offset and the potentially confounding effects of overall variations in market prices over time, and variations in prices between neighborhoods for reasons unrelated to the Announcement. To achieve this, it is necessary first to set a *geographical frame* that includes both the

15

Impact Area and a Control Area that is arguably not affected by the Announcement. The Control Area should be chosen to be as similar to the Impact Area as possible, to minimize extraneous neighborhood differences whose trends can confound estimation of the stigma effect. The greater the extent to which the analyst is able to measure and control for extraneous differences, the more broadly the Control Area can be taken. Nevertheless, whenever possible, one should avoid crossing political boundaries or choosing controls from areas which are substantially different from the Impact Area in terms of development history, location, land use mix, density, and access; to do otherwise may place too great a burden on statistical procedures to remove the extraneous factors that are introduced, and render the results unreliable. One should particularly avoid selecting Control Areas that are likely to have trends in prices that differ substantially from the Impact Area before the Announcement, as this is likely to confound estimates of the price offsets caused by the Announcement.

The time frame of the hedonic experiment should be established to give sufficient time *before* and *after* the Announcement Event so that one can reliably distinguish persistent and post-Announcement price offset effects. If there is more than one Announcement Event, or a longer history of revelation of the extent of a hazard, then the time frame should span the entire history, including a period prior to any revelation, so that the stigma impacts of each element in the history can be detected. This is necessary in order to estimate the losses of the various subgroups of property owners, which will now differ because they have bought and sold at various times that span stigma impacts of various levels, and also to sort out the standing of various claims under statutes of limitations.

The sample frame will determine the specification of property types and sales transactions that are eligible for sampling. Keeping in mind the final objective of measuring persistent and offset price effects for standardized properties, it is better to set objective screening criteria and consider only

16

relatively homogeneous properties fitting these criteria than to select properties without such screening. For example, if middle-class suburban tract homes are the major but not exclusive property use in the Impact Area, then the most reliable estimates of post-Announcement price offset effects are likely to be obtained if sampling in the Impact and Control Areas is restricted to properties meeting this description. Put another way, a principal criterion for the sample frame is comparability of properties across the Areas, as opposed to representativeness of the sample for all properties in the Impact Area. The need to estimate damages for different types of properties should be tackled by drawing and analyzing different samples for each type, rather than working with a heterogeneous sample that mixes types. The sampling frame should also screen transactions, and limit selection to sales that are arms-length, open-market transactions between principles. Again, since the final objective is to measure true market sales prices, one should exclude sales within families, foreclosure sales, chained sales involving intermediaries, and other transactions that may be sheltered from full market competition. Sample sizes should be sufficient so that if stigma effects of an anticipated size are indeed present, then they will be statistically significant and reliably estimated. Good scientific practice requires that the sampling frame and criteria be articulated and documented, and an audit trail established to explain the sampling process and disposition of each sampled sale.

5.3. The second step in the design of the experiment is to specify the variables that will be collected. The final objective is to remove statistically all factors that might contaminate measurement of post-Announcement price offsets caused by the Announcement. Then, the first priority for collection will be variables that are expected to materially influence property prices and which vary across properties and/or across time. While opportunities for variable collection may be constrained by availability in administrative records, at minimum the list should include characteristics of the property

17

that are collected and used in the administrative records of sales (e.g., assessor records or in MLS listings) to describe, appraise, or price property. The variables should also include neighborhood characteristics that appraisers identify as important to property values, such as use of surrounding properties, traffic, public services, and access to the transportation. Since the most critical use of these variables will be to control for *changes* in property values that might be confounded with a stigma effect, it is particularly important to account for changes in these variables over time. It is not sufficient to look at the snapshot afforded by one Census or the current transportation network. For example, it is a fundamental error to introduce a variable such as proximity to a hazardous waste site, and assume *de facto* that it has an impact on prices of nearby properties that is uniform over time, when the data include sales from a period before the existence of this site became known to the public. Similarly, access to employment should be determined by the distribution of jobs and the transportation network in place *at the date of sale.* If the job distribution or the transportation system change over time, then an employment access variable should be calculated for each sale year using the historical job and transportation data for that year. The only satisfactory way to construct such proximity variables is period by period, taking into account the situation actually prevailing in each period.

There are likely to be influences on prices that are not identified with specific measured variables, such as general fluctuations in the overall real estate market, and persistent differences in different neighborhoods due to myriad factors such as differences in construction quality. To avoid confounding estimation of post-Announcement price offset effects, one should include in the database and in hedonic models indicator or dummy variables to control for these influences; e.g., year dummies to control for overall market fluctuations, and Control Area and/or housing tract dummies to control for persistent differences in Control and Impact Areas.

18

Both persistent and stigma offset price effects may vary with proximity to an industrial site. Then, such proximity measures should be included in the list of collected variables, along with measures of proximity to other amenities and disamenities that may be influencing prices. If any of these other amenities and disamenities change over time, then variables should be collected that are sufficient to capture the history of their impacts on property prices. There is no logical requirement that perception of hazards, and resulting post-Announcement price offset effects, vary in lock step with physical distance or physical concentration measures. However, it is reasonable to expect that locations where the possibility of contamination is higher in terms of physical measures would also be locations where stigma is larger. If post-Announcement price offset effects are found that vary in a different way, such as being larger at intermediate distances than at distances closer or further away from the site, then other factors and proximity effects may be confounding estimation of stigma from the primary site. When there is evidence of stigma effects that diminish with distance or another proximity measure, and this relationship is not simply forced by the choice of variable transformation, then the statistical model can provide information on the extent of the Impact Area, and corroboration that selected Control Areas are beyond the range of impact.

5.4. An important part of hedonic model estimation and testing will be a formal test for the statistical significance of post-Announcement price offset effects. A finding of significance is essential if the analysis is to conclude that property value losses occurred. It is important to emphasize here what hedonic analysis can and cannot do. In any given application, there will typically be some lower limit such that if losses are below this limit, the existence of losses cannot be established reliably by hedonic analysis. In part, this is a question of sample sizes, and larger samples permit sharper discrimination. However, in part it is a fundamental limitation on the experiment imposed by Nature. The analysis may

19

be for a property type where there are an insufficient number of transactions in the universe to reliably separate stigma effects from other factors. There may be measured factors influencing prices that taken together mimic a stigma effect so closely that no statistical analysis can reliably tell them apart. On the other hand, it will often be possible to use an estimated hedonic model to place a reliable upper bound on the size of a stigma effect: if the effect exceeds a certain threshold, then with high probability the hedonic model should return the result that there is a statistically significant post-Announcement price offset effect. Conversely, failure to find a statistically significant effect leads to the conclusion that if there is indeed an effect, then with reasonable scientific certainty it cannot exceed this threshold.

5.5. The final step in hedonic analysis is use of the model to predict "but for" sales prices in the Impact Area (or a legally-defined Class Area) following the Announcement. A well-specified hedonic regression model with log price as the dependent variable that controls for the potentially confounding effects of attributes of individual properties, overall market conditions, and persistent price differentials between the Impact and Control Areas is necessary for reliable estimation of aggregate value loss of properties that sold in the Impact Area during the post-Announcement study period. Important steps in this calculation are to obtain a census of properties in the Class Area, and a complete listing of sales and prices of these properties, and identify sales by owners who were owners of record at the time of the Announcement. It is necessary to collect sufficient information on these properties to categorize them reliably by type, date of sale, and proximity to the industrial site, in accordance with the classification used in the hedonic modeling.

## 6. DOCUMENTATION STANDARDS IN APPLIED REGRESSION ANALYSIS

6.1. At a fundamental level, documentation standards are part of the definition of the Scientific Method, in which a *scientific* experiment is one that can be replicated and tested for conformity to scientific principles. Documentation of scientific work is essential to the scientific investigator, if for no other reason than to permit the investigator to recheck and explain his own work, and as protection against accusations of scientific fraud. The National Science Foundation and major journals require that data, programs, and materials necessary to replicate published economic studies be archived and made available to any interested scientist. This is also the customary standard for research results circulated among economists.

The documentation policy of the leading economics journal, published in each issue, makes it clear that the standard is that research be replicable:

> "It is the policy of the *American Economic Review* to publish papers only if the data used in the analysis are clearly and precisely documented and are readily available to any researcher for purposes of replication. Details of the computation sufficient to permit replication must be provided."

For research supported by the Social, Behavioral, and Economic Sciences Division of the National Science Foundation, *SBER Archiving Policy* sets out archiving guidelines "to facilitate the process of making data ... available to other researchers." The policy states with respect to computer models:

> "Investigators should plan to make these models available to others wanting to apply them to other data sets or experimental situations. In rare cases, the descriptions in published articles are sufficient; more often, it will be necessary for investigators to prepare fully documented and robust versions of these models, typically on disk, so that they can be provided to others."

With respect to quantitative economic and social data sets, the policy states:

> "For appropriate data sets, researchers should be prepared to place their data in fully cleaned and documented form in a data archive or library..."