# EXHIBIT 22-2

The field of Geography falls within the SBER Division, so that I would expect a scholar in Geography to be aware of these standards and be guided by them.

The mechanics of maintaining documentation and auditing work are usually taught in graduate courses in econometrics as part of the practicum of doing applied regression analysis exericses, and as part of the training of research assistants.   A failure to provide full documentation increases the probability of errors that will go undetected and produce false and misleading results.  This was precisely the reason that the National Science Foundation and the major journals have adopted formal documentation standards.

In ordinary scientific discourse, the give and take of ideas and results provides some protection against an erroneous analysis. Results are rarely given unqualified acceptance unless they are established independently by other researchers, and the analyst concerned with his scientific reputation and career has strong incentives to make sure that his conclusions are correct.  That errors appear despite these incentives is indicative of the many ways in which mistakes can occur in applied regression analysis. In a litigation setting where review by opposing experts is one of the main protections against erroneous analysis,  it is my opinion that the standards for documentation and replicability should be as high or higher than they are in ordinary scientific discourse.

6.2.  Conventional documentation standards in empirical economics are that data should be retained and archived, or precisely referenced to public or commercial sources, that all data processing steps such as data transformations and selection of observations be documented with sufficient detail so that they can be replicated, and that all statistical and analytic procedures be documented with sufficient detail so that they can be replicated.   These are also the documentation standards

22

recommended for multiple regression analysis by the Federal Judicial Center Reference <u>Manual</u> <u>on</u> <u>Scientific</u> <u>Evidence</u>:

> "A party that offers data to be used in statistical work, including multiple regression analysis, should be encouraged to provide the following to the other parties: (a) a hard copy of the data when available and manageable in size, along with the underlying sources; (b) computer disks or tapes on which the data are recorded; (c) complete documentation of the disks or tapes; (d) computer programs that were used to generate the data (in hard copy, on a computer disk or tape, or both); and (e) documentation of such computer programs. A party proposing to offer an expert's regression analysis at trial should ask the expert to fully disclose: (a) the database and its sources; (b) the method of collecting the data; and (c) the methods of analysis.

6.3. The form of the documentation required for an investigator, or others, to replicate an empirical economic analysis would typically be paper documents and electronic files containing the data used in the study, along with documentation in the form of codebooks or computer programs that identify the content and formatting of these files and the definition, units, and coding of variables; the computer programs used to transform data and select observations; and the computer programs used for statistical analysis. It is important to make a clear distinction between commercial software packages for database management and statistical analysis, such as SAS or SPSS, and the computer programs that are written in the languages employed by the packages and used to carry out actual data processing and analysis tasks. In essence, the former specifies the "language" used to "communicate" with the data, and the latter specifies what the data is "instructed to do". To replicate an analysis, it is necessary to know both the language (i.e., the commercial software package used) <u>and</u> the instructions (i.e., the computer program executed using this package). It should not matter whether computer programs are delivered in electronic or paper form, although the former is "best documentation" since it is the proximate generator of the study results. The data and data transformations might be supplied in electronic spreadsheets (e.g., Excel spreadsheets), with the data transformation and selection steps memorialized in the formulas contained in the spreadsheets. Alternately, they might be supplied in the form of

instructions (e.g., computer programs) written in the language of a standard commercially available software package for database management and statistical analysis, such as SAS or SPSS, or specialized data manipulation programs such as GIS software. The essential feature of the documentation procedures just described is that they permit the investigator, or another scientist who acquires the commercial software, to replicate each step of the study, and by analyzing the spreadsheets or computer programs determine whether the data processing steps were carried out as represented, and determine and evaluate the assumptions used in the analysis. In empirical and statistical scientific analysis, the scientific standard for documentation is straightforward: an investigator should provide *no less than the information necessary to replicate the study*. If any step of the analysis, such as selection of observations or a data transformation is omitted, and this makes a portion of the study non-replicable, then this is a failure to meet the standard.

## 7. Dr. RADKE'S IMPROPER DAMAGE ESTIMATION EXPERIMENT

7.1. Dr. Radke has made serious conceptual and logical errors in formulating his analysis of stigma effects following the 1989 FBI raid at the Rocky Flats plant. Referring to my discussion in Section 4.1 of the principles of estimation of stigma damages, note that these damages must be measured as a *price offset* loss in value in the Class area (or Impact Area) relative to the Control area *following* the 1989 raid, and this price offset must be carefully distinguished from *persistent* price differentials between the Class and Control Areas prevailing *before* the FBI raid, as such differences cannot as a matter of logic damage class members who purchased properties after the persistent price differential was established, because they "buy low" and "sell lower" only by the amount of the post-1989 price offset. The source of the persistent price differential is inmaterial to this logical conclusion. While

24

persistent price differentials between Class and Control Areas may arise for a variety of reasons that are unrelated to operation of the Rocky Flats plant, such as the historical decision to site this plant at a location that was sparsely populated because it was remote and less desirable for resdiential development, the logical conclusion that the persistent price differential by itself cannot cause a loss to Class members who purchased their properties after the persistent price effect was established continues to hold *even if* the origin of this differential was tortious operation of the Rocky Flats plant in the distant past. Dr. Radke fails to distinguish between any persistent price effect and a price offset effect in his analysis, and the result is that he assumes without examination that the entire price differential between Class and Control properties after the FBI raid is a attributable to stigma from the raid. It is clearly not Dr. Radke's opinion that he is merely establishing association, and leaving to others the task of dividing the total effect into portions caused by events surrounding the FBI raid and persistent effects not due to this cause. He states in his Report (p. 6) "The three phases of the study serve to show a causative link between Rocky Flats and depressed real estate values in the surrounding area", and goes on to report mean undervaluation percentages that are an aggregate of persistent price differentials and additional price offsets following the FBI raid, and estimate total dollar losses in the Class area based on these percentages.

Plaintiffs' attorneys argue (Brief, 1/25/99) that "defendants cite no authority for [this] contentious proposition that no other proof of damages will suffice. ... The discount observed in Dr. Radke's regressions is plainly *relevant* to proof of damages." To put this matter plainly, consider a man who buys a pair of pants on sale because they are stained, and these pants are subsequently damaged beyond repair by a dog who tears the cuff. The man's loss is not the full undiscounted price of the pants, but rather the sale price he paid for them. This is true even if the stain and the tear are the work of the same

25

dog. The relevant information for assessing damages is the price the man actually paid for the pants; and a study that produces only the full price of the pants along with a claim that this constitutes the amount of damages is both misleading and irrelevant.

7.2. Dr. Radke fails to meet one of the critical requirements for design of an experiment that can hope to reliably isolate a post-Announcement price offset effect, including in his Phase II analysis of residential properties only one year of sales data prior to the raid, rather than a sufficient period to reliably determine the level of any persistent price differential between the Class and Control areas and test for any trends in the persistent price difference. Dr. Radke goes on to attribute all estimated price differentials between Control and Impact Areas to the FBI Raid and surrounding events, which in effect assumes a zero persistent price differences. Dr. Radke does not test this assumption, nor can he reliably do so due to the lack of data for a sufficient period preceding the FBI raid. Thus, Dr. Radke has chosen an experimental design that fails in a fundamental way to meet the requirements for reliable estimation of stigma.

There are many precedents for the use of "before and after" data in hedonic price studies of the impact of environmental events, such as Announcements of hazardous waste contamination. The following list gives a sample of studies that employ this technique, and isolate offset effects:

Jack Faucett Associates, Inc. (1976) *Evaluation of Power Plant Externalities: A Land Value Approach*, Maryland Department of Natural Resources, Annapolis.
Hayes Gamble and Roger Downing (1982) "Effects of Nuclear Power Plants on Residential Property Values," *Journal of Regional Science*.
Kusum Ketkar (1992) "Hazardous Waste Sites and Property Values in New Jersey," *Applied Economics*.
Katherine Kiel and Katherine McClain (1995) "House Prices during Siting Decision Stages: The Case of an Incinerator from Rumor through Operation," *Journal of Environmental Economics and Management*.
Janet Kohlhase (1991) "The Impact of Toxic Waste Sites on Housing Values," *Journal of Urban Economics*.

26

Robert Mendelsohn et al (1992) "Measuring Hazardous Waste Damages with Panel Models," *Journal of Environmental Economics and Management*.
Jon Nelson (1981) "Three Mile Island and Residential Property Values: Empirical Analysis and Policy," *Land Economics*.
Alan Reichert (1994), testimony in *DeSario v. Industrial Excess Landfill*.
Stephen Sheppard (1994), testimony in *DeSario v. Industrial Excess Landfill*.
Richard Twark et al (1990) "The Effect of Nuclear Power Plants on Residential Property Values: A New Look at Three Mile Island," Working Paper No 90-10, Penn State University.
Kenneth Wise (1994), testimony in *DeSario v. Industrial Excess Landfill*.

Dr. Radke fails to use the accepted experimental design employed by these papers for measuring stigma from revelation of environmental hazards, and provides no authority for the experimental design he does adopt. Dr. Radke has not made, and can not make, a case that his experimental design permits him to separate persistent price discounts near Rocky Flats from a stigma effect following the FBI raid.

7.3. For multi-family residential and commercial property, Dr. Radke has relied upon samples that contain too few observations from the Class area to obtain reliable statistical estimates of persistent and post-Announcement price offset effects. In this situation, hedonic analysis is not a reliable approach to estimating stigma losses for these property types. Part of the requirement for proper experimental design for a hedonic analysis is to recognize situations where Nature has failed to produce a record that permits reliable use of the hedonic method, and not attempt to force through an unreliable analysis.

## 8. Dr. RADKE'S FAILURE TO MEET SCIENTIFIC DOCUMENTATION STANDARDS

8.1. There are major gaps in Dr. Radke's description and documentation of the data he has collected, the processing of these data into the variables appearing in his statistical models, and the statistical calculations he has done. These gaps make it impossible or impractical to replicate substantial

27

portions of Dr. Radke's work, in order to determine if it is consistent with his Report, free of mechanical errors, and based on plausible assumptions.

Dr. Radke has systematically violated the documentation standards described in Section 6 that are widely accepted in economic analysis and that form the basis for customary scientific practice and scientific courtesy. Section 5 details the steps in a hedonic analysis of stigma damages, and describes the documentation that is needed, for the expert himself or opposing experts, to evaluate and verify the analysis. Dr. Radke's documentation falls short at every stage, but the following gaps in documentation are critical and make it impossible to test the validity of major portions of Dr. Radke's work.

8.2.  The Motion to Compel has requested "the dates of the transactions used in 'Phase I' of Radke's study", and "computer files memorializing the steps" used in his analysis of his Phase I data. The Plaintiff's Response is that "The date of the sales transactions in the underlying database. .. were not relied upon in the analysis and are irrelevant to its conclusion" (see p. 6-2) and that "Dr. Radke's responses to defendant's demands for more information. .. is amply sufficient to enable a researcher knowledgeable in the field to understand Dr. Radke's methodology in detail and, indeed, to reproduce the same results from the same data. .. Defendant's need nothing more. .. to analyze his methodology and evaluate his results" (see p. 4-7). These statements are false. First, Dr. Radke's analysis *does* depend on transaction date, through the division of current transaction price by a consumer price index for that date to put all prices in 1993 terms (cf Radke, p. 24), and through the estimated statistical model, which contains variables $k_{TIME}$ that are described as Time of Transaction terms and are estimated by year for each of the Phase I property types (cf. Radke, p. 36 and Fig. 4.1b following p. 37). Thus, transaction year is a core input variable in Dr. Radke's analysis. Dr. Radke has provided a Phase I database containing two undocumented variables that appear from their names to be related to transactions dates,

28

SALEYR and DATENUM, but no other variables that appear to determine transaction year. The variable SALEYR contained numbers that appear to be two-digit year of sale plus fraction, but starting at 84.18 rather than 83.0, conflicting with Dr. Radke's statement (p. 23) that the database "ranges from 1983 to the end of 1993". Using Dr. Radke's SALEYR variable to reconstruct his year of sale variable in his Phase I regression models failed to replicate his regression results. By matching selected transactions in Dr. Radke's database with the original Phase I DRESCO database, I subsequently decoded Dr. Radke's variables, and have determined that

$$\text{SALEYR} = (\text{DATENUM} - 182.5)/365,$$

$$\text{DATENUM} = (\text{Year})*372 + (\text{Month})*31 + (\text{Day}),$$

where (Year) is expressed as a two-digit number, (Month) is numbered 1 to 12, and (Day) is numbered 1 to 31, and Year/Month/Day is the actual transaction date. Dr. Radke fails to include DATENUM for commercial properties in his database, and I first recover this variable for these properties using the relationship $\text{DATENUM} = 182.5 + 365*\text{SALEYR}$. The actual two-digit sale year for all properties is then given by

$$(\text{Year}) = \text{floor}((\text{DATENUM} - 32)/372),$$

where floor($\cdot$) returns the largest integer less than or equal to its argument. Using this reconstruction of the actual sale year in the Phase I database, I have again attempted to replicate Dr. Radke's regression results, and still cannot do so. It appears that either Dr. Radke has made some error in the construction of the sale year variables in the regressions contained in his Report, or made some other undocumented change in the analysis that is not reflected in his Report. This question could easily be resolved from copies of the computer programs that Dr. Radke used to process his data and run his regressions. In the absence of these programs, I cannot determine how Dr. Radke defined the sale year variables in his

29

regressions and obtained his results. Unless Dr. Radke has additional documentation on this analysis which he has failed to turn over, I doubt that he can replicate his own results. I conclude in this instance that the missing documentation is substantive, and appears to hide an error in Dr. Radke's analysis that invalidates his regression results.

8.3. Dr. Radke lists 31 "Locational Variables" (Report, Appendix A) that he constructs by processing raw data using a Geographical Information System (GIS). He presents a brief generic description (Appendix B) of how this processing is done, but has not provided sufficient documentation to replicate this construction. A key step in Dr. Radke's analysis was to use a GSI program to determine by Address Matching the x-y coordinates for each property sale in his database. Proximity or locational variables are then constructed using gravity models which he assumes will summarize the impact at each transaction location of spatially distributed features. For example, Dr. Radke's Report describes a variable QLNHAZW which is a "weighted" measure of proximity of each property sold to "CERCLA, TRIS, landfill, salt pile, and sludge" sites. As he describes the construction, this variable equals a sum of terms, with each term corresponding to one of these undesirable sites. Each term is between zero and one, equaling the exponential of minus a "friction constant" times the distance between the property and the site as determined from their respective x-y coordinates. Thus, his x-y coordinates for each property and site and his "friction constants" are critical inputs to the proximity variables that he constructs.

The assignment of location variables to transactions using a GIS system is touted in Dr. Radke's Report (pages 33-34) as one of the major innovations in his damage analysis. These x-y coordinates are a critical and essential element in the construction of Dr. Radke's location variables, and it is impossible to check the validity or plausibility of his location variables for a property without knowing these coordinates. However, Dr. Radke has not provided the x-y coordinates for the properties in his database.

30

Further, the Plaintiff's Response to Motion to Compel states that "there is apparently no existing computer file directly matching x-y coordinates with specific properties in the study". It is inexplicable, and inexcusable, that Dr. Radke would fail to retain the data that forms the centerpiece of his entire damage analysis.

ICF-Kaiser, a consulting firm retained by the defendants, has attempted to construct x-y coordinates for the transactions in Dr. Radke's data by using their own GIS program. This is not successful in attaching x-y coordinates to all the properties to which Dr. Radke has assigned location variables, nor is it possible to determine whether the coordinates obtained by this exercise agree with Dr. Radke's. This makes it impossible to replicate Dr. Radke's assignment of location variables to individual properties. To study the question of whether Dr. Radke's undocumented Address Matching procedure and the Address Matching procedure used by ICF-Kaiser agree, the distance of residential properties in Dr. Radke's database to the Rocky Flats plant, as reported by Dr. Radke, was plotted against the same distance as calculated from the GIS program used by ICF-Kaiser. This scatter plot is shown in the figure on the following page. Note first that the properties in the database range up to 40 miles away from Rocky Flats. It strains credulity to argue that neighborhoods over this range of distances have prices that except for the impact of proximity to Rocky Flats are moving in lock step over time, even when a fairly broad range of proximity variables are accounted for. If Dr. Radke's assignments were replicated exactly by the address matchine routine used by ICF-Kaiser, then the points in the figure would all lie on the 45 degree line. While most of the properties lie near the 45-degree line, so that ICF-Kaiser's reconstruction may be successful in coming close to the x-y coordinates that Dr. Radke used for these properties, there are substantial numbers of properties where there are large enough differences to materially affect the construction of proximity variables based on the x-y coordinates.

# Attempt to Replicate x-y Coordina
## (Distance from Rocky Flats)



Of the total of 6392 sales observed in Dr. Radke's Phase II data set, there are 289 properties for which

ICF-Kaiser found no address match, and 171 properties where the ICF-Kaiser match yields a distance

from Rocky Flats that differs by more than one-fourth mile from Dr. Radke's match. Thus, for more that

7.5 percent of Dr. Radke's sample, experts retained by the defendants either cannot get an address match

or find an address match that yields a disagreement of more than one-fourth mile in the distance from

Rocky Flats. I do not have an opinion as to whether the commercially available GIS software available

to ICF-Kaiser is more accurate than the GIS software and adjustments made by Dr. Radke. However,

the scatter of points in the figure certainly indicate that if Dr. Radke has *not* made errors in his

assignment of x-y coordinates, then it must be the case that the commercial GIS software available to

the defendants differs substantially from that used by Dr. Radke, or that Dr. Radke has used additional

information to adjust his x-y coordinates which he has not made available to the defendants, such as his

enhanced TIGER files. In my opinion, Dr. Radke should provide his x-y coordinates as part of his

documentation, rather than claiming that other experts can easily replicate them from scratch.

The following figures give details of the previous figure for properties within ten miles of Rocky

Flats, or between 20 and 30 miles of Rocky Flats. The discrepancies are frequent enough and large

enough to substantially impact the estimated coefficients of a regression in which proximity to Rocky

Flats is an explanatory variable, and therefore substantially impact Dr. Radke's damage estimates. In

my opinion, variables and results that flow from Dr. Radke's GIS analysis are inherently unreliable

unless Dr. Radke reconstructs his x-y coordinates and gives opposing experts the opportunity to evaluate

the accuracy and plausibility of his proximity variable construction.

33

# Attempt to Replicate x-y Coordinates
## (Distance from Rocky Flats)





**Attempt to Replicate x-y Coordinate**
(Distance from Rocky Flats)

8.4.  An important part of Dr. Radke's construction of his location variables is the use of "gravity models" to summarize the impact at a particular geographic point of features that are dispersed around that point.  These models contain variables (e.g., distance, travel time) and parameters (e.g., friction constants) that determine how features with different densities and locations are valued.  These characteristics of the gravity model should be related to behavior; e.g., they should be estimated based on spatial patterns of property prices, or at minimum chosen on the basis of a literature review to have values that are plausibly consistent with spatial distributions of property prices.  To evaluate the plausibility of the gravity models that Dr. Radke employs, it is necessary to know the values of the parameters (e.g., friction constants) they use, and the foundations for the selection of these values.  To replicate the construction of Dr. Radke's location variables, it is necessary to have the databases giving the spatial arrays of features that he considers, along with the x-y coordinates associated with each point location of these features.  Dr. Radke has not provided this documentation.  Dr. Radke's failure to provide the numerical values of the parameters he employed in his gravity models for construction of proximity variables, or any indication that they were estimated or defined in a reasonable way, is a gross violation of scientific standards.  No responsible scientist would use variables, but refuse to disclose their definition.

Dr. Radke employs in his regression analysis four locational variables related to proximity to CERCLA or toxic waste sites. These variables are QCRCL16 and QCRCL8, which Dr. Radke's list of variables describes as measures of proximity to CERCLA sites within 1600 and 3200 meters, respectively, and QTOXIC8 and QTOXIC!6, which Dr. Radke's list of variables describes as measures of proximity to non-CERCLA hazardous waste sites within 800 and 1600 meters, respectively.  Dr. Radke's description of how these locational variables are constructed is limited to a statement (Report

36

p. 29) that a flow chart in his Appendix A (Chart N) and a gravity model in his Appendix B generate the variables. Neither these Appendices, nor any backup material provided by Dr. Radke, give any weights, parameter values, cutoff rules, or other information that can be used to determine how Dr. Radke's construction of these variables was actually done. Consequently, Dr. Radke provides no foundation on which the validity of these constructions can be assessed.

This paragraph describes my attempt to "reverse engineer" the QCRCL16, QCRCL32, QTOXIC8, and QTOXIC 16 variables. For this study, I use the ICF-Kaiser x-y coordinates of properties and sites to determine distances between the two, since x-y data from Dr. Radke are not available. I restrict attention to properties for which the Radke and ICF-Kaiser measures of distance from Rocky Flats agree within one-fourth mile, so that disagreements between the two address mapping procedures do not appear to be large. The figure below is an example of a gravity model measure of proximity to a single site that is set to have a value of 0.12 at distance zero, a friction constant of 0.001,. and a cutoff at 1600 meters. The curve declines smoothly as distance increases. This is the qualitative shape Dr. Radke's proximity variables should display if they have been constructed as his Report claims.



37

I describe the analysis of QCRCL16 in some detail; the remaining variables were handled analogously. I take all properties from Dr. Radke's database that are within 1600 meters of a primary CERCLA site, and at least 2000 meters from any other CERCLA site; giving a 400 meter buffer zone so that QCRCL16 should reflect only proximity to the primary CERCLA site. I then plot in the figure below Dr. Radke's QCRCL16 variable against distance from the site for the selected properties.



Obviously, there is no smooth, declining relationship between Dr. Radke's proximity measure and distance from a CERCLA site. Further, the gross fluctuations in this variable with distance suggest that some mechanical error in its construction has produced garbage. The following figures show similar plots for QCRCL32, QTOXIC8, and QTOXIC16.







In each case, there is no consistent pattern of decline of the variable with distance, as one would expect for a gravity-model measure of proximity, and there are large fluctuations in these variables so that nearby properties have very different values for these variables. Again, there appear to be mechanical errors that have produced garbage variables.

It appears that Dr. Radke's constructions for the four proximity variables above contain major mechanical errors, so that instead of being gravity model based measures of proximity to hazardous waste sites, they are garbage. The only other possibility is that Dr. Radke's undocumented x-y coordinates differ drastically from the x-y coordinates produced by ICF-Kaiser, but if this is the case, there is no way for the defendants to evaluate Dr. Radke's constructions without obtaining his x-y coordinates. A prerequisite for an expert to use material in testimony should be at minimum that the expert can show that the material is not simply garbage produced by mechanical error.

39

8.5.  Dr. Radke's Phase II sample was obtained by sampling from Multiple Listing Service (MLS) books, which are voluminous.  Dr. Radke's Report and the background documentation he has supplied are silent on the method he used to draw his sample of single-family residential transactions from the MLS books.  He states in his deposition (252-12) that he used stratified random sampling. However, the stratifications and strata sampling probabilities have not been documented, nor are the transactions drawn indexed to the MLS books so that it is feasible to test for the randomness of the sample and the accuracy of data transcription from the MLS books.  Aside from the exclusion of specific geographical areas, no documentation is provided that describes protocols followed for selecting or eliminating transactions during the sampling process.  Typically, a MLS book will contain some transactions for which the data are incomplete, the transaction fails to fit the definition of a single-family property sale (e.g., the sale of a property that contains both a residential and a commercial structure), or the transaction price appears to be miscoded or to be a non-arms-length sale.  A researcher will ordinarily write down the protocols to be followed by coders in handling these transactions when they are drawn, and archive them to provide a basis for checking the consistency of the coder's work.  Dr. Radke has provided no documentation for this stage in his data preparation.  Consequently, neither opposing experts nor Dr. Radke himself have a basis for concluding that the sampling and coding was done properly and to an acceptable standard of accuracy. .  Dr. Radke has failed to provide the transaction dates for his observations, information requested in the Motion to Compel that is essential  for checking his data against MLS sources and checking his assignment of sale year and other variables that depend on transaction date.

8.6.  Dr. Radke has failed to provide the computer code and other supporting documents necessary to validate the variable transformations and estimation steps he has used.  Specifically, he has failed to provide the following critical elements needed to understand and evaluate his work:

40

a. As discussed in Section 8.4, Dr. Radke has constructed proximity variables that purport to measure geographical factors that are likely to influence property prices, and touts this construction as the centerpiece of his analysis. He has provided no documentation on the mechanics of these constructions, not the computer code used to carry out the constructions, not the parameter values that enter the constructions, and not all the variables that enter these constructions (e.g., his x-y coordinates). It appears that Dr. Radke did not take into account in his proximity variable construction the variation over time in the factors entering these proximity variables, such as variations over time in the distribution of jobs that may impact different neighborhoods differently and cause them to exhibit changing price differentials for this reason. This is a critical issue of variable specification, as time variation in proximity variables is particularly likely to confound the measurement of stigma following an Announcement. Unfortunately, Dr. Radke does not even provide sufficient documentation to determine whether he has handled this specification problem correctly.

b. Dr. Radke has failed to provide the computer code used to produce his Phase I regressions. I am unable to replicate his regression results using his data and his model as described in his Report. I conclude that his Phase I work may contain gross errors, and cannot be validated without documentation on what he actually did.

c. Dr. Radke has used factor analysis as a preliminary tool for reducing the dimensionality of the variables in his hedonic regression. Factor analysis is a mechanically straightforward procedure, but one whose results depend on parameters and options set by the analyst. Dr. Radke has not provided the computer code used to carry out his factor analysis, and without this code I am unable to determine how he set the parameters and options in this procedure, or to replicate his factor analysis output.

d. Dr. Radke has failed to provide the computer code used to run his Phase II regressions. In this instance, I am able to replicate his regression outputs based on the description of the model and variables

41

given in his Report. In this limited case, Dr. Radke has violated scientific standards for documentation, but it has not materially hindered my ability to evaluate his work.

## 9. Dr. RADKE'S IMPROPER STATISTICAL ANALYSIS

9.1.  Dr. Radke's hedonic analysis is broken into Phase I, which deals with multi-family residential, commercial, and vacant land properties, Phase II, which deals with signle family residential properties, and Phase III which is the damage estimation. I will discuss the Phases in turn, describing what he has done and indicating where he has used improper statistical procedures.

9.2.  In Phase I of his analysis, Dr. Radke studies three types of property in the Denver metropolitan area, multifamily residential property, commercial property, and vacant land. The data for this analysis come from a computerized file of property sales records obtained from the DRESCO company, containing 1021 multifamily residential property transactions, 2114 commercial property transactions, and 3444 vacant parcel transactions, over the period 1983-1993. Comparing these numbers with the total number of transactions contained in the DRESCO database, about 5700 transactions were in the data base, but not used, due to missing values or inappropriate property type. Of the transactions not used, 985 were multi-family residential. Thus, 49.1 percent of the observations in the multiple-family category are excluded from the analysis, a sufficiently high rate to raise a concern that the observations used may not be representative. In addition, the DRESCO data appear to under represent small properties, such as vacant parcels with low acreage. Each property in the DRESCO database was located within a cell approximately one square mile in area.

A critical problem with the DRESCO data is that it contains small numbers of observations within the MPC. Taking six miles from the center of Rocky Flats as the approximate outer edge of the MPC, Dr. Radke uses only 20 multifamily residential transactions and only 17 commercial transactions