# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

### No. 90–cv-00181-JLK

---

MERILYN COOK, et al.,

      Plaintiffs,

         v.

ROCKWELL INTERNATIONAL CORPORATION and
THE DOW CHEMICAL COMPANY,

      Defendants.

---

## PLAINTIFFS' OPPOSITION TO DEFENDANTS'
## MOTION FOR JUDGMENT AS A MATTER OF LAW

---

## TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.   PLAINTIFFS HAVE PROVIDED SUFFICIENT EVIDENCE
     OF TRESPASS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     A.   A Reasonable Jury Would Find That Plutonium From
          Rocky Flats Is Present On The Class Properties . . . . . . . . . . . . . . . . . . . . . . . . 3

     B.   A Reasonable Jury Would Find That Dow And Rockwell
          Intentionally Committed Actions That Caused The Trespass
          In The Usual Course Of Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

          1.   The 903 Barrel Storage Area . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          2.   The 1957 Fire . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

          3.   The 1969 Fire . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

          4.   Other Leaks and Accidents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

          5.   Routine Releases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

     C.   A Reasonable Jury Would Find A Continuing Trespass . . . . . . . . . . . . . . . . . . 16

II.  PLAINTIFFS HAVE PROVIDED SUFFICIENT EVIDENCE
     OF NUISANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

     A.   A Reasonable Jury Would Find That Defendants Created A
          Health Risk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

     B.   A Reasonable Jury Would Find That Defendants Created A
          Risk Of Future Harm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

     C.   A Reasonable Jury Would Find That Dow And Rockwell's
          Actions Were Intentional, Reckless Or Negligent . . . . . . . . . . . . . . . . . . . . . . . 27

          1.   Unsuitable Waste Handling Practices . . . . . . . . . . . . . . . . . . . . . . . . . 28

i

**TABLE OF CONTENTS (Cont.)**

2.       The 1969 Fire . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

3.       The 903 Area  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

4.       Other Waste Burials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

5.       Spray Irrigation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

6.       Pondcrete  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

7.       Airborne Releases (Incinerator and Filters) . . . . . . . . . . . . . . . . . . . . . . 35

8.       Surface Water Contamination  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

9.       Uncertainties in Release Estimates   . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

D.       A Reasonable Jury Would Find That The Nuisance Is Substantial  . . . . . . . . . . 44

E.       A Reasonable Jury Would Find That The Nuisance Caused By Dow
         And Rockwell Is Substantial And Unreasonable . . . . . . . . . . . . . . . . . . . . . . . . 47

F.       The Fact That Some Class Members Moved To The Area After The
         Nuisance Began Is Not Dispositive  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

III.     PLAINTIFFS HAVE PROVIDED SUFFICIENT EVIDENCE
         OF GENERIC CAUSATION OF EMOTIONAL DISTRESS  . . . . . . . . . . . . . . . . . . . . 52

A.       The Court Has Ruled That Plaintiffs May Try The Issue Of
         Generic Causation Of Emotional Distress In The Class Trial . . . . . . . . . . . . . . 52

B.       A Reasonable Jury Would Find That Defendants'
         Conduct Was Capable of Causing Fear, Anxiety, Or
         Other Mental Discomfort . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

C.       There Is No Requirement That The Class Members' Emotional
         Distress Be Based On An Extensive Scientific Investigation  . . . . . . . . . . . . . . 55

IV.      DEFENDANTS HAVE NOT PROVIDED SUFFICIENT GROUNDS TO
         WARRANT RECONSIDERING THE AFFIRMATIVE DEFENSES AND
         OTHER ARGUMENTS THAT THE COURT HAS ALREADY DECIDED  . . . . . . . . 56

**TABLE OF CONTENTS (Cont.)**

A.   Colorado Trespass Law Requires Neither A Tangible Trespass
     Nor Serious Physical Damage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

B.   Compliance With Federal Nuclear Safety Standards Is Not A
     Defense To Trespass Or Nuisance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

C.   The Fact That Contamination On Most Class Properties Does
     Not Exceed The State Plutonium-In-Soil Standard Is Not A
     Defense To Trespass Or Nuisance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

D.   The Defense of Intervening Cause Is Not Available . . . . . . . . . . . . . . . . . . . . 57

E.   Defendants Are Not Entitled To The Defense Of Statute Of
     Limitations For Trespass Or Nuisance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

F.   The Defense of Prescriptive Easement Is Not Available . . . . . . . . . . . . . . . . . 60

V.   PLAINTIFFS HAVE PROVIDED SUFFICIENT EVIDENCE THAT
     THE CLASS SUFFERED DAMAGES AS A RESULT OF
     DEFENDANTS' WRONGFUL CONDUCT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

     A.   A Reasonable Jury Would Find That Property Values In
          The Class Area Were Depressed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

          1.   Dr. John Radke's Damages Calculations Show
               The Class Was Damaged . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

          2.   Wayne Hunsperger's Damages Calculations Show
               The Class Area Was Damaged . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

          3.   The Testimony Of Property Owners And Market
               Participants Shows They Suffered A Loss Due To
               Rocky Flats. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

               Merilyn Cook . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

               Richard and Sally Bartlett . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

               Gertrude Babb . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

**TABLE OF CONTENTS (Cont.)**

William and Delores Schierkolk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

Gretchen Robb . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Karen Whalen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Other Experiences In The Market . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

4.      Class Members Who Did Not Sell Their Property
        Suffered Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

5.      Any Pre-Existing Diminution In Class Properties
        Before The FBI Raid Was Magnified By The Raid. . . . . . . . . . . . . . . . 72

B.      A Reasonable Jury Would Find A Market Stigma Due To
        Rocky Flats . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

        1.      Dr. Slovic's Testimony Regarding Stigma . . . . . . . . . . . . . . . . . . . . . . 74

        2.      Media Coverage and Market Knowledge . . . . . . . . . . . . . . . . . . . . . . 76

        3.      Public Opinion Surveys Show A Stigma As A Result
                Of The Trespass And Nuisance Caused By Defendants . . . . . . . . . . . . 78

        4.      Wayne Hunsperger's Market Research . . . . . . . . . . . . . . . . . . . . . . . . 80

        5.      Experiences of Market Participants . . . . . . . . . . . . . . . . . . . . . . . . . . 81

C.      A Reasonable Jury Would Find That The CCE Time Was
        Between June 6, 1989 (the FBI Raid) and March 26, 1992
        (the Date of the Guilty Plea) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

D.      Plaintiffs' Damages Evidence May Not Be Disregarded Under
        Defendants' "Statute Of Limitations" Theory. . . . . . . . . . . . . . . . . . . . . 85

VI.     PLAINTIFFS HAVE PROVIDED SUFFICIENT EVIDENCE FOR
        THE JURY TO AWARD PUNITIVE DAMAGES . . . . . . . . . . . . . . . . . . . . . . . 87

VII.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

iv

**TABLE OF AUTHORITIES**

**PAGE(S)**

*Allison v. Smith,*
695 P.2d 791 (Colo. Ct. App. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46, 49

*Bayer v. Crested Butte Mountain Resort, Inc.,*
960 P.2d 70 (Colo. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46

*Blueflame Gas, Inc. v. Van Hoose,*
679 P.2d 579 (Colo. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46

*Boughton v. Cotter Corp.,*
65 F.3d 823 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  55

*Boyle v. United Tech. Corp.,*
487 U.S. 500 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*Brown v. Wal-Mart Stores, Inc.,*
11 F.3d 1559 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 4, 21, 52

*Burt v. Beautiful Savior Lutheran Church of Broomfield,*
809 P.2d 1064 (Colo. Ct. App. 1990),
*cert. denied*, 1991 Colo. LEXIS 279 (Colo. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  58

*Cobai v. Young,*
679 P.2d 121 (Colo. Ct. App. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57

*Cook v. Rockwell Int'l Corp.,*
755 F. Supp. 1468 (D. Colo. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  86, 88

*Cook v. Rockwell Int'l Corp.,*
273 F. Supp. 2d 1175 (D. Colo. 2003) . . . . . . . . . . . . . . . . .  46, 53, 55, 56, 71, 85, 88, 89

*Cook v. Rockwell Int'l Corp.,*
358 F. Supp. 2d 1003 (D. Colo. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  59, 60

*Cook v. Rockwell Int'l Corp.,*
181 F.R.D. 473 (D. Colo 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

TABLE OF AUTHORITIES (Cont.)

*Crawford v. Nat'l Lead Co.*,
784 F. Supp. 439 (S.D. Ohio 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  88

*Daniels v. United States*,
254 F.3d 1180 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  88

*Hoery v. United States*,
64 P.3d 214 (Colo. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7, 56, 60, 86

*Jacobs v. Commonwealth Highland Theatres, Inc.*,
738 P.2d 6, 10 (Colo. Ct. App. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

*McAlester v. United Air Lines, Inc.*,
851 F.2d 1249 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*McEuin v. Crown Equipment Corp.*,
328 F.3d 1028, 1037 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*McIntyre v. Bd. of County Comm'rs*,
86 P.3d 402 (Colo. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  61

*Patrick v. Sharon Steel Corp.*,
549 F. Supp. 1259 (N.D. W. Va. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  60

*Public Service Co. of Colo. v. Van Wyk*,
27 P.3d 377 (Colo. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  56

*Rajala v. Allied Corp.*,
919 F.2d 610 (10th Cir.1990), *cert. denied*, 500 U.S. 905 (1991) . . . . . . . . . . . . . . .  1, 2

*Sutton v. Anderson, Clayton & Co.*,
448 F.2d 293 (10th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  58

*Webb v. Dessert Seed Co., Inc.*,
718 P.2d 1057 (Colo. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  58

*Weese v. Schukman*,
98 F.3d 542 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1, 2, 4

vi

TABLE OF AUTHORITIES (Cont.)

*Western Plains Service Corp. v. Ponderosa Development Corp.*,
769 F.2d 654 (10th Cir.1985)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

**STATUTES & MISCELLANEOUS**

6 Colo. Code Regs. 1007-1  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57

42 U.S.C. § 2014  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  86, 88

Restatement (Third) of Property - Servitudes § 2.17  . . . . . . . . . . . . . . . . . . . . . . . .  60

Restatement (Second) of Torts, § 288  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46, 89

Restatement (Second) of Torts, § 442  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  58

Restatement (Second) of Torts, § 821  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27, 47

Restatement (Second) of Torts, § 929  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

Restatement (Second) of Torts, § 930  . . . . . . . . . . . . . . . . . . . . . . . 16, 70, 71, 83, 85, 86

## INTRODUCTION

Instead of a motion for judgment as a matter of law, defendants have submitted a first draft of their closing argument. Following a familiar pattern, they attempt once again to re-argue questions of law long since decided by the Court, and tout their version of the facts as if it were dogma. However, in deciding defendants' motion, the Court must focus on the sufficiency of plaintiffs' evidence, not the sufficiency of defendants' rhetoric. Over the course of this lengthy trial, plaintiffs have painstakingly established every element of their case with solid, convincing evidence. Defendants' motion should be denied.

"A motion for a judgment as a matter of law is cautiously and sparingly granted and then only when the court is certain the evidence 'conclusively favors one party such that reasonable men could not arrive at a contrary verdict.'" *Weese v. Schukman*, 98 F.3d 542, 547 (10th Cir. 1996) (quoting *Western Plains Service Corp. v. Ponderosa Development Corp.*, 769 F.2d 654, 656 (10th Cir. 1985)). In deciding a motion for judgment as a matter of law, the Court must "determine 'whether there is evidence upon which the jury could properly find a verdict for the party [against whom the motion is directed].'" *See Brown v. Wal-Mart Stores, Inc.*, 11 F.3d 1559, 1563 (10th Cir. 1993) (quoting *Rajala v. Allied Corp.*, 919 F.2d 610, 615 (10th Cir. 1990), *cert. denied*, 500 U.S. 905 (1991)). A judgment as a matter of law is appropriate "only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party [against whom the motion is filed]." *Weese v. Schukman*, 98 F.3d 542, 547 (10th Cir. 1996).

The Court must examine not only the bare record, but also the reasonable inferences the jury could draw from the evidence. *See Brown*, 11 F.3d at 1563. In addition, the Court must "refrain from weighing the evidence, passing on the credibility of witnesses, or substituting [its] judgment

for that of the jury." *Id*.  The Court must view the evidence in the light most favorable to the non-moving party.  *Id*.

The Court should weigh the evidence in terms of the underlying burden of proof for the claims at issue.  *Rajala v. Allied Corp.*, 919 F.2d 610, 615 (10th Cir. 1990).  In this case, plaintiffs' burden of proof on their claims is a preponderance of the evidence or, more likely than not.  Jury Instr. 1.8.  On affirmative defenses, defendants have the burden of proof; plaintiffs do not bear the burden of disproof.  Although it is possible for affirmative defenses to be the subject of a motion for judgment as a matter of law, the standard in such a circumstance is even more strict:  "'a directed verdict for the party having the burden of proof [as to its affirmative defenses] may be granted only where he has established his case by evidence that the jury would not be at liberty to disbelieve.'"  *Weese*, 98 F.3d at 547 (quoting *Hurd v. American Hoist & Derrick Co.*, 734 F.2d 495, 499 (10th Cir.1984)).[1]

## I.   PLAINTIFFS HAVE PROVIDED SUFFICIENT EVIDENCE OF TRESPASS.

The evidence presented thus far would allow the jury to find that defendants caused a trespass.  The basic elements that plaintiffs must prove are:   "1.  Plutonium from Rocky Flats is present on the Class Properties ... 2. Dow or Rockwell or both of them intentionally undertook an

---

[1]  While defendants cite extensively from the deposition of Charles McKay, Mr. McKay has not testified at trial, and the Court properly excluded his deposition designations.  *See* Order of Jan. 5, 2006 [Docket #1936].  Only evidence that was actually presented at trial is considered in deciding a Rule 50 motion. *See McEuin v. Crown Equipment Corp.*, 328 F.3d 1028, 1037 (9th Cir. 2003) ("Evidence not admitted at trial cannot be used in a review of the district court's denial of judgment as a matter of law.").  The Court should disregard this and any other evidence that was not actually presented to the jury.

2

activity or activities that in the usual course of events caused plutonium from Rocky Flats to be present on the Class Properties ... 3. It appears this plutonium will continue to be present on the Class Properties indefinitely." Jury Instruction No. 3.2.

**A.    A Reasonable Jury Would Find That Plutonium From
Rocky Flats Is Present On The Class Properties.**

The evidence shows that plutonium from Rocky Flats is present on the class properties. Numerous soil sampling studies have found plutonium through the class area and beyond. *See* P-264 (Plutonium-239 and Americium-241 Contamination in the Denver Area, S.E. Poet and E.A. Martell); P-149 ( "Plutonium in Soil Around the Rocky Flats Plant", by Krey and Hardy); DX-477 (Jones & Zhang, Spatial and Temporal Analysis of the Rocky Flats Plutonium Soil Data).

Dow and Rockwell also conducted soil sampling and found plutonium off-site. For example, P-410, a 1958 document entitled, "Determination of Contamination from Rocky Flats Plant in the Environs - Interim Report," reported that "Plutonium contamination extends generally south from the 71 building stack at all locations checked to date," and finds a "[g]eneral increase in average background." *Id*. at 2. Table I attached to P-410 also show above-background readings from water samples, and Table III shows plutonium and enriched uranium (which are not naturally occurring) were found in several samples, including two off-site locations. *Id*. *See* Tr. at 5999-6005 (read to jury). P-303, a document by the U.S.

Department of Commerce, reports that Dow's own soil sampling had replicated Martell and Poet's results. *Id*. at 1; *see also* Tr. at 6165 (read to jury).

Additionally, defendants' counsel has also admitted that Rocky Flats is responsible for

contamination off-site. *See* P-637 (statements of David Bernick, at 17: "In 1970, it was apparent that there was contamination off-site of the plant. ... Your Honor made mention of the 1957 fire; it was really much more than [sic] the 903 pad that was responsible for that plume."); P-638 (statements of David Bernick, at 31: "There is no question but the fact that at least with respect to most, if not all, of the people who were described as class members, there is plutonium present on their property and it came from no place other than Rocky Flats."). While the Court has not yet decided on the admissibility of these statements, they are judicial admissions that establish the fact of a trespass. *See generally* Plaintiffs' Reply in Support of Their Motion to Admit Documents, filed Dec. 9, 2005 [Docket #1775].

In the face of overwhelming evidence that Rocky Flats has contaminated properties in the Class Area and beyond, defendants present mere argument, not even counter-proof, in an attempt to cast doubt on that proof. Hypothetical, unproven critiques of plaintiffs' evidence are simply not sufficient to meet defendants' burden of showing "the evidence points but one way and is susceptible to no reasonable inferences supporting [plaintiffs]." *Weese*, 98 F.3d at 547.

Defendants also try to argue with the proof plaintiffs have provided, even though a judgment as a matter of law must not involve the weighing of evidence. *See Brown*, 11 F.3d at 1563. Defendants' claims that the soil sampling studies which show plutonium in the class area are based on a limited sample size or could not distinguish Rocky Flats plutonium from background, are factual contentions that the jury could weigh, *if* the evidence supported them. Such inferences are irrelevant here because, first, the Court must consider the evidence in the light most favorable to plaintiffs, which means that the Court must assume that the jury will not credit defendants' proposed

inferences; and second, the evidence does not support those inferences.

The plutonium contamination on the entire class area is well above background levels. Estimates for the amount of plutonium in background fallout in this region include 1.5 millicuries per cubic kilometer (P-149, Krey and Hardy), or between 0.03 Bq/kg and 0.45 Bq/kg (or 0.0008 to 0.01 pCi/g) (DX-530 at II-8), or a mean of 0.0069 pCi/g or 0.11 Bq/kg (DX-530 at H-10, table H-7). Drs. Krey and Hardy's study discussed their method of comparing the plutonium-to-strontium ratios found in soil near Rocky Flats to that found in background fallout: "the Rocky Flats contribution ranges from 250 times fallout at a distance of 2 miles east of the plant ... to 10 times fallout in Westminster, 8 miles east of the plant ... and to several times fallout in the eastern suburbs of Denver." P-264 at 540-41.  In addition, defendants' own expert Dr. Till compared air plutonium concentrations at a few locations off-site to fallout levels, and found in every sample but one that the measurements were above fallout levels, averaging 3.5 times fallout at Indiana Street and 1.3 times fallout at Coal Creek.  P-1062 at III-17; Tr. at 7618.

Another false hurdle set up by defendants is the notion that if defendants can show that even one class property is not contaminated, the entire class' claims must fail.  *See* Def. Br. at 10.  This issue is addressed in Plaintiffs' Proposed Revisions to Jury Instructions, filed Dec. 22, 2005 [Docket #1885].  Further, this argument is not supported by the evidence.  Defendants have proffered *no evidence* that *any* class property is uncontaminated.  By comparison, plaintiffs have presented evidence of widespread contamination throughout and beyond the class area.  P-149A, the HASL soil sampling study (also known as the Krey and Hardy study), formed the basis for the class area in this case. Drs. Krey and Hardy's results show above-background plutonium levels extending even

beyond the class area.  *See id.* at 21.  In addition, DX-477, the Jones and Zhang study, summarized the CDH sampling results through 1991 and showed plutonium contamination extending throughout the class area.  *See* DX-477, Appendix A (contour maps by year).

Defendants are attempting to set an impossible burden of proof, given the nature of the contamination and the size of the class.  Sampling every class property would be prohibitively expensive and time-consuming.  *Cf.* Tr. at 7060 (Selbin) (impossible to find all of the hot spots on the plant site; "we could spend the national budget just digging holes and sampling."); P-1131 at 2 (discussing overflight to measure americium:  "Any other technique to monitor Pu-239 in an area this large would be extremely expensive and take a very long time to take the samples.  It would take even longer to get any results from the analyses.").  Additionally, although studies have found the levels of plutonium to remain relatively consistent from year to year, see DX-477, Fig. 2, some fraction of the plutonium will be resuspended and thus will continually shift around between class properties.  *See* Tr. at 3671 (Goble).  Further, the amount and destination of plutonium off-site is subject to tremendous uncertainty.  *E.g.*, Tr. at 3159-61 (Budnitz).  What is certain is that plutonium has consistently been found in soil samples taken throughout the class area and even well beyond the class area.  Given the evidence presented, it is more likely than not that the entire class area is contaminated with plutonium from Rocky Flats.

     **B.**    **A Reasonable Jury Would Find That Dow And Rockwell Intentionally Committed Actions That Caused The Trespass In The Usual Course Of Events.**

Under Colorado trespass law, "intent" means that the defendants "intentionally undertook an activity or activities that in the usual course of events caused plutonium to be deposited on the

Class Properties." Trespass Instruction No. 3.2; *Hoery v. United States*, 64 P.3d 214, 217 (Colo. 2003). The defendant need not intend that the trespass occur. *See* Colo. Jury Instr., Civil 18:1, note 4 ("Defendant's lack of intent to commit a trespass is not a defense.").

The primary events that contaminated the class area are: (1) the 903 area; (2) the 1957 fire; (3) the 1969 fire; (4) other leaks and accidents, and (5) routine releases. All of these activities were all undertaken with the requisite degree of intent.

### 1. The 903 Barrel Storage Area

Dow intentionally, and with full knowledge of the problem, left thousands of barrels of highly contaminated oil outdoors, unprotected, for ten years. In the natural course of events, those metal barrels rusted and leaked their contents into the soil, and the high winds that are endemic to the area carried the plutonium contamination off-site. From the time the plant opened, Dow knew the risks of storing this waste outdoors. P-281, a 1952 Dow document entitled "Disposition of Contaminated Solid Waste," states that "the Rocky Flats plant site is wholly unsuitable for such treatment of contaminated waste." *Id.* at 1; Tr. at 5989. The document adds that if waste drums are to remain on the plant site, appropriate precautions should be taken: "This treatment consists of storage in sealed containers within a waterproof, reinforced, concrete structure which would prevent the leaching of the radioactivity from the waste. Such disposal presupposes not only a concrete trough but also a roofed and curbed structure in order that the trough might not fill with water and overflow." P-281 at 3; Tr. at 5590-91. Another early document discussing spray irrigation, P-25, warns that radioactivity in the soil could easily be carried off-site by the wind: "Our major activity is very readily absorbed, especially from dilute solutions and being absorbed in the very top layer

of soil; there's a very good chance the wind would take it off and distribute it further.  This would result in the activity getting into the neighboring property . . .."  P-25 at 2.

Additionally, besides the presumed common-sense knowledge that metal barrels will rust, Dow had actual knowledge that it would not take long for barrels left outdoors to rust.  Tr. at 1504-05 (Ray); P-189 at p. 8.  The solvents in the barrels had corrosive properties.  Tr. at 3034 (Budnitz).

The record is replete with evidence that Dow knew the barrels were leaking for many years, and yet took no action to stop the leakage or prevent the contamination from spreading.  The Lamm-Wirth Congressional task force, after an extensive investigation, found that "the most serious environmental off-site release from Rocky Flats plant -- see discussion of the lip area in chapter 3, section A -- occurred with the full knowledge of the Rocky Flats plant.  The release occurred over a long period, 1958 to 1969.  It was discovered by Rocky Flats people in 1959, but no action was taken to stop the leakage until 1966."  P-338 at 5; Tr. at 6200-01 (read to jury).  P-483, a Rockwell investigation of past releases from Rocky Flats dated 1984, confirms that Dow knew as early as July, 1959 (only one year after the drums were first placed in the 903 area), that some drums had started leaking, but the only precaution Dow took was to add a corrosion inhibitor to the oil inside the drums.  P-483 at 1.  *See also* P-64 at bates #74889.  The corrosion inhibitor slowed but did not stop the deterioration of the drums.  Tr. at 3035 (Budnitz).  By 1962 a significant number of the drums were leaking.  Tr. at 3035.  At some point Dow began sending radiation monitors to monitor the 903 area.  One monitor, John Ray, testified that he observed the barrels were leaking, and estimated that "at least 10 to 15 percent" were leaking at the time he worked in that area.  Tr. at 1531.

Dow also knew that contamination from the leaking barrels was spreading.  John Ray, a

former plant worker, testified that the union complained to Dow that the 903 barrels were leaking, and that contamination could be spread by high winds.  Tr. at 1551 (Ray).  P-1281, a 1962 Dow document, shows that a rabbit caught in the area in 1961 was dissected and found to be contaminated.  P-165, a telegram between AEC officials, also shows that Dow knew that animals were spreading contamination.  *See* P-165 at 3; see also Tr. at 1509 (Ray: Dow knew that rabbits were entering and leaving the 903 storage area and running through the contaminated soil). Although Dow erected a fence around the area (to keep out either rabbits, P-165 at 3, or people, Tr. at 1552 (Ray)), Dow did nothing to prevent contamination from spreading from the 903 area.  Tr. at 1552 (Ray).  P-63, a history of environmental incidents at the plant written by a high level health physics employee, also reflects that after the drums were removed, the health physics department tried and failed to get management to cover the exposed contaminated soil: "[I]t was utmost in our minds at the time that with some haste we should cover up this area to prevent the high winds that would come on as expected in the winter months of 1968 and 1969. from carrying the soils off plantsite.  We discussed it with management and I think pretty much all the pressure that we could bear was brought on them.  Even so, it seemed like the Engineering head at the time was not excited enough about it to at least have some grave brought in and put down."  P-63 at 66; Tr. at 3103.

2.      **The 1957 Fire**

The May 11, 1957 fire released a significant amount of contamination.  The filters ignited and burned through, releasing plutonium to the atmosphere.  Tr. at 3204-05 (Budnitz); P-321 at 3, Tr. at 6155 (read to jury).  The air monitors in the main exhaust stack lost power during the fire; when power was restored on May 19, the monitors recorded emissions of 2086 disintegrations per

9

minute per cubic meter, or several thousand times the emissions of 0.68 disintegrations per minute per cubic meter recorded during the ten days before the fire.  Tr. at 3204-05 (Budnitz).  RAC estimated that between 40 and 500 grams of plutonium was released due to the fire.  DX-514 at vi.

It was part of the natural course of events that Dow would experience a fire of this magnitude.  Plutonium is pyrophoric, meaning that it can spontaneously ignite.  Tr. at 3594 (Budnitz); P-19 at 1.  The high fire risk inherent in working with plutonium was known since at least the 1950's.  *See* P-19 at p. 4-5.  DOE contractors were told to take precautions but to "expect to have a fire."  *Id*. at p. 5; Tr. at 5993-94.  Between 1955 and 1969 Rocky Flats experienced five "major" fires and 31 other reported fires involving plutonium, and an unknown number of routine, unreported fires.  P-321; Tr. at 6153-61 (read to jury).  Plutonium fires are part of the normal range of experiences for any facility that handles plutonium.

Additionally, as the investigating committee found, a number of structural problems allowed the fire to spread and eventually breach the filters, including:  the filters were flammable; heat detecting equipment was blocked or disabled; access to the filter plenum was limited to an equipment hatch; the building was handling several times the amount of plutonium it was meant to handle, plus personnel and equipment were overcrowded; and the gloveboxes were made with flammable plexiglas.  *See* P-1290 at 18-19, 24, 25.  No intervening cause or unusual events led to the 1957 fire; it was the result of the flammable nature of plutonium, the way the plant was constructed, and the crowded conditions in the production area.

3.      The 1969 Fire

The 1969 fire released contamination into the environment.  Tr. at 3205-08 (Budnitz).  Some of the filters in the main plenum had been burned.  Tr. at 1574.  There is evidence that contamination was released from the main exhaust.  The stack samplers in the main exhaust lost power during the fire, so there are no readings of exactly how much plutonium was released via the main stack.  Tr. at 3206-07.  In addition, Dr. Budnitz testified that there was evidence of fire in Booster System 1 downstream from the final HEPA filter stage, which meant the filters had likely been breached.  As a result, although the only sampler results available were taken from the main exhaust, those results do not include any plutonium released through the Booster System 1.  Tr. at 3206-07.  Estimates have been made of the releases, which indicate that a small quantity of plutonium was released.  Tr. at 3207-08.  RAC estimated that between 0.14 and 0.9 grams of plutonium were released by the fire. DX 525 at ii.

By working with a pyrophoric material in a plant that was a known fire trap, it was natural that eventually Dow would have another fire that would release plutonium into the environment. The 1957 fire should have been a wake-up call to Dow that it needed to bring its fire safety practices up to date.  Nonetheless, for twelve years Dow ignored a series of recommendations made by the AEC investigating committee in the wake of the 1957 fire.  Specifically, Dow failed to take steps to physically separate different production units; failed to install standpipes and hoses for firefighting; correct the fact that heat sensors in glove boxes were blocked and that the gloveboxes contained no sprinkler system; use non-flammable materials in gloveboxes; install fire breaks in glove box lines; and protect the electrical utilities to prevent power loss during a fire.  *See* Tr. at

3170-83; G-507A.  As a result, Building 776-777 did not meet even the minimum AEC fire safety

standards.  Tr. at 3192; P-1027 at 1.

### 4.    Other Leaks and Accidents

The history of both Dow and Rockwell's management is marred by a series of leaks and

spills.  Some of that contamination undoubtedly ended up in the class area.  Below are some

examples that were presented to the jury:

- Rockwell stored thousands of blocks of a low-level mixed waste, pondcrete, outdoors despite detecting elevated readings of contaminants including plutonium in runoff water from the storage area.  *See* Tr. at 1191-992; P-140 at 2 (chart showing elevated alpha readings)

- Dow dumped contaminated waste in various sites throughout the plant grounds, the worst of which were the 903 Pad, the 881 Hillside, the Mound, and the East Trenches.  P-339 at 16, 17; P-189 at 2, 3, 5, 11, 22-23; P-64 at 1-4.  Dow and Rockwell allowed these dump sites to remain in a hazardous, contaminated state throughout their tenures.

- Dow allowed a creek feeding into Woman Creek to become contaminated up to 30,000 disintegrations per minute per kilogram of sediment.  Tr. at 1499 (Ray); P-189.

- Between 1985 and 1989 Rockwell experienced a number of leaks of radioactive and/or hazardous waste from the valve vaults in an underground process waste line.  P-1279 at 300-19 to 300-21; Tr. at 3955-57.  A 1992 DOE report investigating this and other contaminated sites notes that "There is no information available regarding the fate of constituents released to the environment.  This is particularly true because it is unknown when some of the leaks began.  ...  In spite of the clean-up activities radiation levels were still above background when cleanup was completed."  P-1279 at 300-21; Tr. at 3956-57.

- Both Dow and Rockwell processed contaminated sewage sludge by drying the sludge in open-air drying beds.  Tr. at 3962-63; P-1279 at 200-25 to 900-26.  There were many incidents in which sludge overflowed the drying beds, plus sludge was known to have "become airborne and dispersed."  P-1279 at 200-25; Tr. at 3962.  The DOE Historical Release Report notes specific spills in 1955, 1972, and 1982.  P-1279 at 200-25 to 900-26.  It also observes that

"[i]n July 1978, ambient air data indicated that the sludge drying beds were contributing a higher than normal concentration of lutonium in the air.  No documentation was found that further detailed the fate of constituents released to the environment."  P-1279 at 900-26; Tr. at 3962.

5.      **Routine Releases**

Various estimates exist for the amount of plutonium released to the environment through routine releases.  RAC estimated the total releases to be 0.087 and 0.24 curies, with a median of 0.12.  DX-513 at iii.  While plaintiffs believe the RAC studies contain serious flaws, including the failure to account for notable deficiencies in Rocky Flats' monitoring data (as further discussed below), at the least this estimate represents a minimum amount released by the plant from routine operations.

The Lamm-Wirth Task Force warned Rockwell in 1975 that due to the uncertainties regarding the effects of low-level radiation, any releases from the plant should be kept as low as possible:

Low-level contamination is mysterious and subtle since, as we will soon point out, its long-term effects on animals and man are unknown.  The task force takes the position that the limits to be placed on radioactive release should approach zero as closely as can be attained at any given stage of technological advancement.  This is an evolutionary concept since as technology advances releases should more closely approach zero.  The factors leading to this are basically three:  (1) that we know little or nothing about long-term radiation effects; (2) that until we do, levels should be as low as possible; and (3) that virtually all standards set for radioactivity have had to be lowered as the effects of the radioactivity have become better understood and as our techniques of measurement have become more sophisticated.  Our position differs from that of ERDA who attack the proviso of economic feasibility to the lowest possible level at a given technological stage.

P-338 at 53; Tr. at 6220-21 (read to jury).

Defendants failed to adhere to the ALARA standard regarding routine releases.  ALARA, or

13

"as low as reasonably achievable," has been the standard for radiation exposures since 1950.  P-1339 at 38; Tr. at 5287.  The evidence shows that the routine airborne releases should have been much lower, and would have been lower if Dow and Rockwell had taken proper precautions.  For example, the filters in Building 771 had been damaged by the 1957 fire and ongoing production work with corrosive chemicals, and yet Dow permitted the filters to operate in this condition until at least 1970.  P-199 ("As a result of the 1957 fire, the angle iron filter frames were warped so that it has been difficult to get as good a seal as required when filters are installed.  The chemical operations that take place in this building are such that a significant portion of the filter frames are exposed to corrosive atmosphere and are gradually getting in worse and worse condition.  The result of the filter frame warpage and of the corrosion on the filter frame and its associated hardware is such that the effluent from the exhaust plenum is only slightly below the allowable discharge limits.").  Also, Ron Avery, a former plant worker, testified that he saw workers cut holes in the glove box filters in order to avoid having to change the filters.  Tr. at 3795-97.

Another likely source of excess routine releases was Rocky Flats' incinerators.  Throughout the plant's history, its waste disposal incinerators have been a constant source of higher-than-normal "routine" releases.  P-27, a 1963 document, notes a history of problems with high plutonium releases from the incinerator dating back to at least 1958.  *See* P-27 at 6 (1958: "The incinerator prefiltering system continued to allow gross plutonium contamination to enter the main filter plenum and in October this operation was shut down."), Tr. at 6120 (read to jury); *see also* P-27 at 6-8 (describing continuing problems with incinerator through 1963), Tr. at 6121-6123 (read to jury);   The author in fact recommends suspending incinerator operations:  "Since building 71 salvage incinerator

14

operation has become intermittent, it has been possible to get measurements correlating its operations with high levels out the stack.  It may be desirable to suspend all incinerator operations until the recently authorized walk-in filter plenum is operable."  P-27 at 1; Tr. at 6115-16 (read to jury).  A 1968 document, P-18, discusses the problem of "[e]xcessive discharge of radioactive waste material through main exhaust plenum" in Building 71, and notes that "[t]he incinerator has not been fired for the purpose of waste disposal since March 7, when it became readily apparent that the biggest contributor to the problem was the incinerator."  *See* Tr. at 6007-08 (read to jury).  Nonetheless, both Dow and Rockwell continued to operate the incinerators to dispose of contaminated waste.  See P-27; P-18; Tr. at 3774-75, 3780-81 (Avery).

While defendants argue that Rockwell did not contribute to the trespass, the available evidence shows that under Rockwell, excessive routine releases, leaks, and resuspension of contaminated soil continued, which more likely than not led to contamination off-site.  *See* Tr. at 3681 (Dr. Goble:  "The routine releases described on my list of things continued under Rockwell, and there was continued resuspension of plutonium from the soil.").

It would be impossible for plaintiffs, or anyone, to trace the exact path of each plutonium particle that migrated off-site, or to examine those deposited in the class area to determine whether they escaped during the Dow or Rockwell eras.  What is undisputable, however, is that the class area is contaminated with plutonium, and that plutonium came from Rocky Flats.  All plant operations contributed to the off-site pollution.  The trespass here was essentially one continuous, ongoing invasion of the class properties.

C.        **A Reasonable Jury Would Find a Continuing Trespass.**

In order to prove a continuing trespass, plaintiffs do not need to prove that the plutonium will remain on the class properties forever.  Jury Instruction No. 3.4.  A continuing trespass exists where "there is [no] reason to expect that the plutonium present on Class Properties will be removed at any definite time in the future."  *Id*.  In deciding whether it appears the plutonium will remain indefinitely, the jury must adopt the vantage point of the CCE time; the question is, at the CCE time, did it appear that the contamination would remain on the class properties indefinitely.  *See* Rest. 2d Torts § 930(3)(b) (allowing damages for "the decrease in the value of the land caused by the prospect of the continuance of the invasion measured at the time when the injurious situation became complete and comparatively enduring").

The evidence presented by plaintiffs, including soil sampling studies from the 1970's through 1990's, supports the conclusion that the plutonium is still present on the class properties today.  Defendants attempt to shift the burden to plaintiffs of proving defendants' allegation that the plutonium has been removed.  The jury is entitled to draw the conclusion that, absent proof that the plutonium has moved, it still remains on the class properties.  Moreover, plaintiffs have affirmative evidence that the plutonium remains.  For example, DX-477, the Jones and Zhang study, summarized the CDH sampling results through 1991 and found a consistent pattern of plutonium contamination throughout the class area.  DX-477 at 1 (summarizing methodology) & Appendix A (contour maps by year).  Also, an aerial gamma survey conducted in 1989 (P-1131) showed widespread gamma radiation in the class area.  *See* P-1131 at 12.  The gamma radiation comes from americium, a decay product of plutonium, which the Department of Energy has used as a means of

16

measuring the presence of plutonium. *See id.* at 2.

In addition, the evidence regarding the behavior of contaminated soil shows that it is more than likely that the contamination detected by the 1960's studies has remained in the class area. P-1118, a Dow document entitled "Environmental Inventory," states in regard to contaminated areas on-site, "while corrective action has historically been to remove the affected soils, *it is a physical impossibility to remove it all*. Therefore, 'minor' infiltration inevitably remains and relative 'hot spots' are to be expected, even if not detected." *Id*. at p.8 (emphasis added). That is, even when an affirmative attempt is made to remove plutonium, Dow admits that it is "impossib[le] to remove it all." Id. There has been no effort to remove plutonium from the class area.

Even assuming that some individual pieces of land within the class were uncontaminated at some point in time, it is more likely than not that those properties were and will be re-contaminated. Dr. Smallwood testified that the process of bioturbation continually mixes the contamination in soil, so that contamination at the surface is carried deeper into the soil, while deeper contamination will be brought to the surface. Tr. at 3998, 4115. Joel Selbin, a member of the Rocky Flats Soil Action Levels Oversight Panel, also discussed a number of ways in which plutonium travels from the plant site, including winds, vegetation fires that release plutonium that has settled on plants, and transport by surface water or groundwater. Tr at 7056-59. In other words, even if all of the plutonium were removed from a plot of land, as long as other contaminated sites exist upwind (as they do) that contamination will be resuspended and will re-contaminate that property. Tr. at 4123. Not only is contamination transported from adjacent class properties, but as discussed in more detail below (*see* Section II.B.), the Rocky Flats plant site itself retains a large portion of contaminated soil that is, and

17

will in the future be, subject to resuspension.

## II.   **PLAINTIFFS HAVE PROVIDED SUFFICIENT EVIDENCE OF NUISANCE**

Plaintiffs may prove their nuisance case either on a class-wide basis as described by the Court, or by trying the issue of "generic causation" of fear, anxiety, or other mental discomfort for the class and then resolving individual causation later through a claims procedure. *See* May 17, 2005 Order at 4-7. The elements of plaintiffs' class-wide nuisance case are as follows:

1.   Dow or Rockwell or both of them interfered with Class members' use and enjoyment of their properties in the Class Area in one or both of these two ways:

    A.   By causing Class members to be exposed to plutonium and placing them at some increased risk of health problems as a result of this exposure (see Instruction Nos. 3.7, 3.18); and/or

    B.   By causing objective conditions that pose a demonstrable risk of future harm to the Class Area (see Instruction Nos. 3.7, 3.18);

2.   This interference with Class members' use and enjoyment of their properties was both "unreasonable" and "substantial" (see Instruction Nos. 3.8 - 3.12);

3.   The activity or activities causing the unreasonable and substantial interference were either "intentional" or "negligent" (see Instruction Nos. 3.13 - 3.16); and

4.   It appears the unreasonable and substantial interference with the use and enjoyment of property caused by Dow and/or Rockwell's intentional or negligent conduct will continue indefinitely (see Instruction No. 3.17).

Jury Instruction No. 3.6.

Plaintiffs have proven their nuisance claim under all of these elements.

A.       **A Reasonable Jury Would Find That Defendants Created A Health Risk.**

Plaintiffs' experts showed that a health risk exists due to Rocky Flats.  Plutonium is an extremely dangerous material that, when inhaled by humans, can cause cancer and genetic effects.  Tr. at 5684-85. (Wing).  Even one minute particle can, when inhaled, cause lung cancer.  Tr. at 5743-44 (Wing); *see also* Tr. at 5277-78 (Cochran, explaining how large a millicurie is); *id*. at 5280 (Cochran) ("I just want you to get the understanding that we're –  we're starting with a plant that's processing tons of this a   year, and you go to dividing by a thousand and then you get to  the kilogram level and you get to the – down to the curie level and then divide it by a million, you're getting into the level that's still toxic, and then you divide it by another thousand or more to get to the human exposure levels.")

The jury heard evidence that any dose of radiation adds to an individual's risk of cancer.  Tr. at 3653 (Dr. Goble:  "Even a very small dose adds a little increment of risk.").  The consensus in the scientific community is "that low levels of radiation exposure cause detrimental effects in humans, cause harm, cancer, and genetic effects.  And the prevailing scientific opinion is those effects prevail even at very low doses."  Tr. at 5309 (Cochran).

Dr. Goble testified that, in his expert opinion, the exposures to people living in the class area from Rocky Flats were significant enough to cause latent diseases.  Tr. at 3659-60.  Dr. Goble testified that "everyone who is living there would have inhaled some amount of plutonium.  And so everyone who was – from my linear curve, everyone who was living there would have had some risk."  Tr. at 3662.

Dr. Clapp also found an increased risk of lung cancer in the class area.  Dr. Clapp examined

19

data from the Colorado Cancer Registry, which was reported by zip codes, and compared cancer rates for individuals living in zip codes closer to the plant to rates in zip codes further from the plant. Tr. at 4797, 4826.  He found that people living closer to Rocky Flats had a higher risk of lung cancer. Tr. at 4834; PG-799.  Dr. Clapp also discussed earlier cancer studies of the area near Rocky Flats, which also found higher rates of cancer.  Tr. at 4800-06.

Further, Defendants' own expert, Dr. Till, also found a heightened risk of cancer from plutonium released by Rocky Flats for the entire class area and beyond, although unsurprisingly his risk numbers were lower.  *See* DX-398 at 208.  While plaintiffs believe there are serious problems with RAC's release, dose, and risk estimates because they are based on Dow and Rockwell's inadequate or sparse environmental monitoring, at the very least these estimates confirm Dr. Clapp's finding of an increased cancer risk in the class area.

The evidence shows a health risk due to Rockwell's conduct as well as Dow's.  Dr. Goble testified that people living in the class area would have suffered some increased health risk as a result of routine releases, including routine releases during the Rockwell era.  Tr. at 3678, 3681. Additionally, the plant was littered with contaminated dump sites during Rockwell's tenure, so any exposed contaminated areas were subject to resuspension and transport downwind.  *See, e.g.,* P-330 at 2 ("Based on resuspension concepts, maximum airborne concentrations are expected to be 'downwind' of maximum concentrations on the soil surfaces."); DX-398 at 209 ("It is evident from the ambient air monitoring data and examination of the age-dated Standley Lake sediment cores that most of the Rocky Flats plutonium detected in the 1970's and 1980's was from resuspension of contaminated soil and not from routine site operations.").

The fact that other studies, all of which were financed or supported by DOE,[2] reached different results from the health risk evidence discussed above is not decisive.  To submit the issue to the jury, plaintiffs need only provide some credible evidence.  The Court should "refrain from weighing the evidence, passing on the credibility of witnesses, or substituting [its] judgment for that of the jury." *Brown*, 11 F.3d at 1563.[3]

Defendants may not defeat plaintiffs' proof of a class-wide health risk by merely suggesting that one or a few unidentified class members did not suffer a health risk.  *See* Plaintiffs' Proposed Revisions to Jury Instructions, filed Dec. 22, 2005 [Docket #1885].  In the face of proof that the entire class more likely than not suffered an increased health risk, it is defendants' burden to

_____

[2] Defendants cite the ATSDR assessment of Rocky Flats (DX-454) and the DOE and EPA's record of decision on Operable Unit 3 (the off-site area) (DX-36) as evidence that no health risk exists.  Those sources are less than convincing, and the jury is not required to credit them.  Dr. Clapp, who has done work for the ATSDR, described the agency's scientific reputation as "mixed."  Tr. at 4791.  Dr. Wing researched the history of DOE-funded studies on the health effects of radiation, especially plutonium, and found that DOE's political interests so frequently tainted the research that much of it cannot be trusted.  Tr. at 5685-86, 5688; 5754-56, 5783-84.  The ATSDR study involved little or no discernable independent research, but instead relied heavily upon DOE-sponsored research such as the RAC and ChemRisk studies. *See* DX 454 at ii ("ATSDR uses existing scientific information, which can include the results of medical, toxicological and epidemiological studies ..."); *id.* at 1 ("When preparing this PHA [Public Health Assessment], ATSDR gathered and reviewed a large volume of reports, studies and sampling data generated by numerous parties  ...  A study that weighed heavily in this evaluation was the dose reconstruction study recently completed by the CDPHE contractor.").  The OU-3 record of decision reflects DOE's decision that no further remedial action is necessary for the off-site area.  *See* DX-36 at 2 ("DOE, the lead agency under CERCLA for OU-3, concludes that no action is appropriate for OU-3.").  The potential for bias in this report is obvious.

[3] There is no requirement that proof of a health risk requires plaintiffs' experts to "quantify" the individual doses and exposures of each class member.  *Cf.* Def. Br. at 31, 33-34.  Plaintiffs may present statistical evidence showing an increased risk to the class, for example.  *Cf. McAlester v. United Air Lines, Inc.*, 851 F.2d 1249, 1258 (10th Cir. 1988) (statistical evidence may be used to prove a prima facie case of disparate impact).

establish that some identifiable subset of the class did not.  Defendants have failed to do so.

**B.      A Reasonable Jury Would Find That Defendants**
**Created A Risk Of Future Harm.**

The evidence shows that the class members are subject to a risk of future health effects and future interferences with the use and enjoyment of that property.  The plant site remained highly polluted as of the CCE time, and the cleanup (now declared "complete") has left behind a significant amount of contamination.  Considering that the half-life of plutonium is 24,000 years, P-338 at 38, the risk of future contamination will continue indefinitely.

Dr. Goble testified that, due to plutonium still on the Rocky Flats plant site and plutonium that will remain in the class area, people living in the class area will be subject to an ongoing future health risk.  Tr. at 3662-63.  Dr. Cochran also testified that contaminated sites on the plant grounds continued to release plutonium, and therefore expose the public to an ongoing dose of radiation, even after the initial spill event.  Tr. at 5520.  The ATSDR report, introduced by defendants during plaintiffs' case, contains a table showing continued ambient air concentrations of americium, plutonium, and several isotopes of uranium from 1989 through 2002.  DX-454 at B-14.

As of the CCE time (1989 to 1992), the cleanup was still very far from complete.  Mr. Hunsperger testified that at the time he wrote his report (1995), "the predictions that I saw as of that date were that it would be something like a 50- or 60-year cleanup."  Tr. at 6405.  Dr. Cochran testified that in 1996, much cleanup work remained to be done, and the estimates for how long the cleanup would take were very uncertain and stretched well into the future:

> Q   In 1996, when you made that video, we were seven years -- a little more than
> seven years past the FBI raid; is that correct?

A   That is correct.

Q   And conditions, the potential conditions that you identified in the video still existed at Rocky Flats, and at least as far as the buildings and the waste stored at the buildings would exist for roughly another eight or nine years, until the buildings were recently torn down; is that correct, sir?

A   Yes.  And there was some uncertainty as to actually how long it was going to take to clean up that site.

Q   What -- I mean, were there estimates of cleanup that went far beyond 2005 at that time?

A   Oh, yes.  Informal estimates, yes.  At least informal estimates.

Tr. at 5332-33.

The condition of the Rocky Flats plant site, both at the CCE time (between 1989 and 1992) and even today, poses a risk of future harm to the class.  In 1988, the GAO reported that there were 108 inactive waste sites at Rocky Flats, which included "a number of locations where hazardous and/or radioactive materials are known to be or are suspected of being buried."  P-512 at 3.  The Tiger Team report lists 166 inactive waste cites.  *See* P-529 at 9-13 (Tiger Team report, characterizing 166 sites listed in RCRA permit application as inactive waste sites).  Mr. Holeman testified that the "Colorado Department of Health was concerned that there was insufficient data available about the nature of the waste sites that existed on the plant and what those waste sites were doing in the way of leaking into the soil and the groundwater and moving into the soil and potentially moving into the drainage basins on the north and south side of the plant toward municipal water supplies."  Tr. at 1129.

Dr. Smallwood reviewed available information on contaminated sites at Rocky Flats before beginning his survey of the area.  Tr. at 3928-29.  He found there was a great deal of uncertainty

regarding the location of contaminated sites:  "Many of the sites, though, there was a lot of uncertainty about what was there, what the inventory was, and how deep it may be in the soil, and whether there was a 10-foot trench or 3-foot deep trench and exactly where it's located."  Tr. at 3930. After reviewing the records, including P-1279, the DOE's Historical Release Report, Dr. Smallwood chose a list of 25 of the most contaminated sites to examine.  *See* PG-561; Tr. at 3966.  When he visited these sites in 1996, protective clothing was still required at some, and he was not allowed in other areas.  Tr. at 3970.

   As of the CCE time (1992), the plant was still in a state of hopeless disarray.  The plant site was littered with areas contaminated with hazardous and radioactive waste.  *See* P-339 at 16.  Even as late as 1995 the plant still contained 14.2 tons of plutonium stored on-site.  P-1463 at 7.  An unknown quantity of plutonium contamination remained hidden in equipment and ductwork as "process holdup."  Tr. at 5344 (Cochran).  An investigation found multiple kilograms of plutonium in the ventilation ducts.  P-1317 at  ES–1; Tr. at 3242-43 (Budnitz).

   The "cleanup" of the plant site has not eliminated the risk of future harm.  Joel Selbin, a member of the Rocky Flats Soil Action Levels Oversight Panel, or RSALOP (a citizen's group), testified that DOE chose a significantly less protective soil cleanup standard than that recommended by the panel.  Tr. at 7094 (DOE did not accept RSALOP's recommendation).  The RSALOP recommended a cleanup standard of 35 picocuries per gram, with no depth limit.  Tr. at 7083-84, 7089, 7092.  However, the standard adopted by DOE is 50 picocuries per gram for the first three feet of topsoil, a more limited cleanup level of 1,000 to 7,000 pCi/g between three and six feet deep, and no cleanup beyond six feet deep.  Tr. at 7101-02; P-1470 at p. 5-19 (subsurface soil levels).  Because

the site was not cleaned to background levels, excess plutonium will continually be redistributed downwind.  Also, it is likely that isolated "hot spots" of even higher-level contamination remain on the site.  It is impossible to find all of the hot spots.  Tr. at 1597-98 (Ray); Tr. at 7060 (Selbin).  An aerial gamma survey of the plant site in 2005, at the same time DOE was touting the cleanup as nearly complete, showed several previously unknown hot spots.  *See* P-642 at 10.

The lack of any subsurface cleanup means that a considerable amount of plutonium will remain on the plant site, and some of it will likely be brought to the surface and transported downwind into the class area.  A significant amount of contamination exists below the surface.  P-1118, a document entitled "Environmental Inventory" written by Dow, acknowledges that in several buildings, "[f]oundations, footings, pilings and associated drainages must be considered both radioactively and chemically infiltrated by leaks, spills, weather actions, et cetera." *Id*. at p. 3.  Also, John Ray testified that in an area where Rocky Flats processed pure plutonium buttons, the operators would pour a cleaning solution on the floor to clean up contamination spills and observed that some of the liquid would run into a crack in the floor and disappear.  Tr. at 1593-94.

As Dr. Smallwood testified, contaminated soil below the surface will be constantly churned and brought to the surface through the process of bioturbation.  Tr. at 3998.  He confirmed that this process will continue indefinitely as long as there are still contaminants present on the site: "any contaminant that's within reach of the biology at Rocky Flats will be brought to the surface.  And chronic -- the potential for chronic exposure will continue so long as they have access to those contaminants, this process just doesn't stop unless you concrete the whole place, okay, or made it uninhabitable somehow, which is unlikely." Tr. at 4001.  The soil that is excavated tends to contain

more fine particles that are readily re-suspended in the air and redistributed downwind.  Tr. at 3926-27, 3972.  Dr. Smallwood visited many of the known contaminated sites at Rocky Flats and found evidence of burrowing animal activity or erosion by plant life.  *E.g.*, Tr. at 3972 (harvester ants near 903 pad); 3973 (harvester ants near burial mound area); *id.* at 3974 (cottontail burrows in original landfill); *id.* at 3974-75 (burrows on shore of retention pond); 3977 (plants growing through asphalt pad on 903 area); *id.* at 3978 (badger burrow in burial trench).  Dr. Smallwood also made a video of prairie dogs digging, P-1294, which shows fine soil being blown away due to this activity.  Also, because much of the cleanup involves pouring fill soil over contaminated sites, this fill attracts even more burrowing animals than regular soil, and these animals dig deeper into fill soil, which is less dense than normal soil.  Tr. at 4102-04.

Defendants' argument that no future harm may occur simply because Rocky Flats has been shut down, ignores the mess that defendants left behind at Rocky Flats:

> For example, if plutonium or other hazardous substances present on or in the vicinity of Rocky Flats is at risk of being released to the Class Area -- through natural forces, cleanup activity, the conduct of others and/or accidents -- and could cause harm to properties in the Class Area by increasing the health risk to residents or impairing the future use of their land in some way, then this would be an objective condition that poses a demonstrable risk of future harm to the Class Area.

Jury Instruction No. 3.7.  Plaintiffs need not prove that the harm will definitely materialize; it is enough to prove "that conditions exist that present the *potential* for such class-wide harm to occur." Jury Instruction No. 3.7 (emphasis added).

Defendants' second argument, that plaintiffs have not shown a risk of future harm to class members who never lived on their properties, also fails.  The type of future harm that could constitute a nuisance is not limited to health risk.  Rather, the type of risk that is actionable here is

"any risk [that] could cause harm to properties in the Class Area by increasing the health risk to residents or impairing the future use of their land in some way." Jury Instruction No. 3.7. Moreover, even if these class members were not subjected to the past or completed health impacts, they nonetheless "have property rights and privileges in respect to the use and enjoyment of the land affected." *See* Rest.2d Torts § 821E & comment f.

   **C.   A Reasonable Jury Would Find That Dow And Rockwell's
         Actions Were Intentional, Reckless, Or Negligent.**

Plaintiffs may prove the requisite state of mind for nuisance by proving that defendants acted either intentionally or negligently.  Jury Instruction No. 3.13.  "Intent" is defined as one of the following:

> (1) The defendant knew that its conduct would interfere with others' use and enjoyment of their property; or

> (2) The defendant knew it was substantially certain that its conduct would interfere with others' use and enjoyment of their property; or

> (3) The defendant learned that its conduct was interfering with or was substantially certain to interfere with others' use and enjoyment of their property and yet continued this conduct.

Jury Instruction No. 3.14.  "Negligence" is defined as a failure to uphold the appropriate duty of care; here, because Dow and Rockwell worked with highly dangerous materials, the duty of care required them to "exercise the highest possible degree of skill, care, diligence, and foresight in conducting these activities, according to the best technical, mechanical and scientific knowledge and methods that were practical and available at the time."  Jury Instruction No. 3.15.

Decades of environmental mismanagement have left the plant site riddled with contamination.  Past accidents such as the 1957 and 1969 fires and the 1973 tritium release have

loomed over the class area with the threat of future accidents.  The various incidents revealed to the

jury all evince a culture of neglect and indifference toward the environment and toward the people

living downwind, and a chronic failure by defendants to contain the many hazardous waste products

that it was their responsibility to control.

### 1.    Unsuitable Waste Handling Practices

Dow and Rockwell owed the class members a heightened duty of care due to the highly toxic

and dangerous nature of the materials that Rocky Flats handled:

> The generation, use, storage and disposal of plutonium and other hazardous
> radioactive and non-radioactive substances as part of the operation of a nuclear
> weapons plant are inherently dangerous activities. As a result, Dow and Rockwell
> were required to exercise the highest possible degree of skill, care, diligence, and
> foresight in conducting these activities, according to the best technical, mechanical
> and scientific knowledge and methods that were practical and available at the time.

Jury Instruction No. 3.15.  Both defendants violated this standard.

Both Dow and Rockwell should have known that the Rocky Flats site was unsuitable for

waste disposal.  Documents written before the plant opened show that Dow and the AEC believed

that many of the waste handling methods eventually practiced by Dow and Rockwell – including on-

site burial, spray irrigation, and solar ponds –  posed too great a risk to the neighboring population.

P-281, a memorandum dated May of 1952, cautions that "the Rocky Flats plant site is wholly

unsuitable for such treatment of contaminated waste.  In the first place, the plant site is unreasonably

small.  In the second place, the drainage and direction of the prevailing wind is toward cultivated

land on which food is produced for human consumption."  P-281 at 1.  This document also cautions

that if waste is to be left on the plant site, it must be properly protected:  "An alternative permitting

disposal on the Rocky Flats site would appear to me to require protection such as occurs at KAPL

and ANL.  This treatment consists of storage of sealed containers within a waterproof reinforced concrete structure which would prevent the leaching of the radioactivity from the waste.  Such disposal presupposes not only a concrete trough but also a roofed and curbed structure in order that the trough might not fill with water and overflow."  P-281 at 3.

Defendants should have known that any waste disposal on the plant site posed a risk to the downwind population.  P-25, a 1952 memorandum, also discusses several of these issues.  *See* P-25 at 1-2 (regarding spray irrigation: "Our major activity is very readily absorbed, especially from dilute solutions and being absorbed in the very top layer of soil; there's a very good chance the wind would take it off and distribute it further.  This would result in the activity getting into the neighboring property."); *id.* at 2 (regarding solar evaporation ponds: "In high winds experienced here, even small ponds lose water by spray, which travels many miles over the landscape.  Thus, either wet or dry such a pond could lose activity to the site and surroundings."); *id.* at 5 ("As to possibility of burial on our site, AEC doesn't look on it with favor  The site is somewhat small.").

Defendants especially should have taken notice of the high winds endemic to the front range, which blew directly toward a populated area.  Dow had been tracking the winds at Rocky Flats since at least 1953.  *See* P-303 at 2; Tr. at 6167 (read to jury).  The wind rose plotted from this sensor clearly shows the winds blowing primarily toward the south and east, that is, toward the class area.  P-303, appendix.  *See also* P-25 at 2 (discussing risk of windblown contamination from solar ponds).  Defendants should have been aware that any airborne contamination or contaminated soil could easily be transported over a wide area.

Defendants also should have known to be especially cautious to avoid releasing contaminated

surface water, because Rocky Flats was located at the intersection of several drainage ditches and streams that led to municipal water supplies.  P-404 discusses the need to control surface water releases:  "I do not have confidence in the adequacy of control of our process drains to retain all the harmful constituents.  Consequently, I recommend that the area east of the plant site be retained under our control until it has been demonstrated that the nitrate problem is solved and that laundry waste in particular will cause no difficulty."  P-411, a 1958 document, also warns of the need to protect neighboring water supplies:  "In view of our extremely sensitive position with regard to the Great Western Reservoir, the water supply for the city of Broomfield Heights, it is imperative that no noxious or toxic chemicals find their way into this water supply."

## 2.    The 1969 Fire

As discussed in more detail above (*see* Section I.B.), Dow ignored the AEC's fire safety recommendations after the 1957 fire.  *See* Tr. at 3170-83; G-507A.  Building 776-777 did not meet even the minimum AEC fire safety standards.  Tr. at 3192; P-1027 at 1.  In working with plutonium, a material known to be highly flammable (*see* P-19) in an unsafe building, Dow failed to adhere to the high standard of care required for such a dangerous operation.  It was only the heroic actions of the firefighters and sheer luck that prevented the 1969 fire from becoming an unprecedented disaster. Tr. at 3196-3201 (Budnitz).

## 3.    The 903 Area

As also discussed above, Section I.B.1., Dow allowed the 903 area releases to occur with full knowledge of the problem and despite the availability of simple preventative measures.  Dow knew since at least 1959 that the barrels were starting to leak, yet Dow allowed them to remain outdoors,

30

unprotected, until at least 1967.  P-483 at 1; P-64 at bates #74889; P-338 at 5 & Tr. at 6200-01 (read to jury).  Ideally Dow should have stored the waste indoors.  Tr. at 3039.  Moreover, Dow could have taken simple steps to prevent some of the contamination from spreading, such as covering the area with a tarpaulin, but failed to do so.  Tr. at 3037, 3039.  Dr. Budnitz concluded that, by storing waste outdoors, by failing to act when it became apparent that the drums were corroding and leaking, and by allowing the labels on the drums to deteriorate to the point of illegibility, Dow failed to use appropriate management practices that were standard to the nuclear industry.  Tr. at 3036-39.

Dow's sloppy "cleanup" of the 903 area exacerbated the spread of contamination.  As Dow began to remove drums from the 903 area in 1967, more contamination was spread by workers moving about in the field and by exposing the contaminated soil under the drums.  Tr. at 3063; P-1309 at 6.  Moreover, Dow left that soil exposed, with no protective measures in place, for over *a year* before covering the area with asphalt.  Tr. at 3063.  Dow could easily have taken steps to avoid leaving contaminated soil exposed – for example, removing a small number of drums at a time and then covering that small area with asphalt.  Tr. at 3063-64.  Further, Dow did not even ask for the funding to lay the asphalt until after the drums had been removed and the area was sitting exposed.  Tr. at 3064.

### 4.    Other Waste Burials

Rocky Flats was riddled with waste dumping sites.  The GAO noted 108 inactive waste sites in 1988, P-339 at 16, and the DOE's Historical Release Report identifies many more, P-1279 at 3-13 to 3-23.  The GAO gave priority to four sites as posing the highest risk:  (1) the 881 hillside area; (2) the 903 pad; (3) the Mound area; and (4) the east trenches.  P-339 at 16.

The 881 Hillside was used as a dumping ground for radioactive and hazardous materials, including plutonium-contaminated soil. Tr. at 1188; P-339 at 17. Over the years this material built up, and it was discovered that a plume of radioactive and toxic chemicals was moving toward Woman Creek. Tr. at 1188.

The Mound area was created in the 1950s, when Dow buried 1400 drums containing uranium and plutonium. P-189 at 2, 5; P-64 at 1-2. Dow had previously stored the "mound" barrels outdoors until one leaked contaminated liquid. At that point Dow decided to bury the barrels. P-189 at p. 11. When Dow dug up the barrels, many of them had rusted and leaked. Tr. at 1554 (Ray).

Dow used the trenches to bury assorted waste, including crushed contaminated drums, uranium scrap, uranium- and plutonium-contaminated asphalt planking, and radioactive sewage sludge. P-189 at 3, 22-23; P-339 at 17; P-64 at 3-4.

Both Dow and Rockwell allowed these hazardous sites to remain in a hazardous state for their entire tenure. *See* Tr. at 1590, 1591 (Ray: the only waste site he believes was worked on during the Rockwell years was the solar ponds). The fact that the GAO reported these were still some of the most highly contaminated sites at the plant, twenty years after the problems with those sites were identified (*see* P-189), shows a complete lack of concern regarding the risks posed by the contaminants in those sites.

### 5.  Spray Irrigation

Rockwell used spray irrigation to dispose of waste water tainted with hazardous chemicals and low levels of radionuclides. Spray irrigation was one method Rockwell used to cope with the fact that it had more waste water than it could treat. *See* Tr. at 2461-62 ("spray  irrigation was

conducted mostly because the sewage treatment plant effluent involved about 80 million gallons of effluent and that the retention ponds could only hold about – and the spray irrigation could only hold about 20 million.   So approximately 60 million gallons was either being recharged in the groundwater or caused sheet runoff going off-site through the confluences of Walnut Creek and Woman Creek."); Tr. at 1194 (Holeman:  "We were concerned about their management practices concerning spraying effluent onto fields rather than treating effluent."); *id.* at 1235-36.  The runoff contained radioactive, hazardous, and other waste.  Tr. at 2462 (Lipsky).

Rockwell knew this process would leave behind contaminants in the soil, which were then at risk of being blown by the wind into the class area.  A 1952 document warns that the plant site was not suitable for spray irrigation:  "Our major activity is very readily absorbed, especially from dilute solutions and being absorbed in the very top layer of soil; there's a very good chance the wind would take it off and distribute it further.  This would result in the activity getting into the neighboring property . . .."  P-25 at 2.

Rockwell also knew or should have known that spray irrigating when the ground was saturated, or frozen in winter, would allow the water to run off into the creeks that fed Standley Lake and Great Western Reservoir, the drinking water that supplies neighboring communities. Nonetheless, Rockwell was caught illegally spray irrigating liquid waste when the outside temperature was far below freezing, which led to sheet runoff into Woman Creek.  Tr. at 2399 (FLIR video showed thermal activity on spray fields); *id.* at 2436-37; *id.* at 2461-62 (describing spray irrigation log); *id*. at 2463-65 & P-1269 (photos showed spray irrigation sprinklers being operated during freezing weather).

### 6.      Pondcrete

Rocky Flats began producing pondcrete as a means to dispose of sludge from the solar evaporation ponds.  As part of an agreement with the state, Rockwell agreed to close and remediate the solar evaporation ponds.  Tr. at 2424-25 (Lipsky).  Rockwell mixed pond sludge with cement and (hence "pondcrete") and poured it into cardboard boxes.  The idea was that the pondcrete would harden like concrete (hence the name) and thus be suitable for shipment.  Tr. at 2424-25 (Lipsky).  However, Rockwell did not mix the pondcrete properly, so it had a putty-like consistency rather than being solid.  Tr. at 2933-34 (Lipsky); *id*. at 1193 (Holeman).  Rockwell stored the cardboard boxes outdoors on the 750 and 904 pads.  Tr. at 2933-34 (Lipsky); P-140; P-529 at 5-33.  The boxes eventually deteriorated, and some of them spilled or leached their contents.  P-529 at 5-33 ("Solidified pondcrete and saltcrete, both considered mixed (hazardous and radioactive) wastes, have been deteriorating, resulting in crumbling of waste forms, splitting of containers holding the solidified wastes, and releases of hazardous wastes in a powdered form from containers.").  As the pondcrete remained outdoors, Rockwell began to detect elevated levels of plutonium and other contaminants in water runoff on the pondcrete storage area.  P-140, a document entitled "Exceedance of Plant Control Guides by Runoff Waters from Pondcrete Storage Areas," states that "[r]eview of monitoring data for June, 1989 indicates several instances where plant control guides have been exceeded for nitrates and gross beta."  *Id*. at 1; Tr. at 6250 (read to jury).  The attached chart also shows that alpha radiation (*i.e.* plutonium or uranium) was detected in runoff from the pondcrete storage area.  *Id*. at 2; Tr. at 6251.  The runoff from the pondcrete storage area traveled to the B5 pond along South Walnut Creek, Tr. at 3718, which ultimately led to the Great Western Reservoir,

Tr. at 1319 (Lipsky).  Rockwell was cited for RCRA violations for storing pondcrete without a

permit, Tr. at 1236-37 (Holeman), P-99, and pled guilty to two felony counts of illegally storing

pondcrete, Tr. at 3715-16; Tr. at 3723.

### 7.      Airborne Releases (Incinerator and Filters)

The HEPA (high-efficiency particulate air) filters were the last defense against the release

of airborne plutonium contamination, and yet both Dow and Rockwell failed to repair or improve

filter systems that they knew were not operating properly.  For example, although Dow knew that

the filters in Building 771 had been damaged by the 1957 fire and corrosive chemicals, the company

did nothing to repair the filter bank until at least 1970.  P-199.  Also, Ron Avery, a former plant

worker, testified that he saw workers cut holes in the glove box filters in order to avoid having to

change the filters.  Tr. at 3795-97.

Due to inadequate monitoring, Rockwell's routine releases are likely to be higher than the

recorded values.  Dr. Gale Biggs, a meteorologist who worked for the governor's Scientific Panel

on Monitoring Systems at Rocky Flats, and who chaired the Panel's Air Sampling Committee,

testified that the Committee found serious problems with Rocky Flats' sampling of air emissions.

The Committee warned Rockwell that its stack samplers were not picking up all of the plutonium

that was actually being released:

> The findings of our committee were that the pitot tube [a sampling device] had never
> been calibrated since it had been put in in the 1950s, that the monitors that were
> monitoring for radioactivity had the opportunity of being in an eddy in the ductwork
> such that the air would be actually potentially flowing backwards on to these
> sampling tubes, so that we wouldn't really be getting a flow into the sampler.

Tr. at 4613-14.  The Committee discovered that the stack samplers were not calibrated properly (Tr.

at 4659).  The Committee concluded that because of inadequate monitoring, Rocky Flats "did not

know how much plutonium was coming out of their stacks."  Tr. at 4654.

Dr. Biggs' Committee also concluded that Rocky Flats' air monitoring outside the buildings

was inadequate.  They discovered that the high volume air samplers could not detect particles of the

size typically released by the plant.  Tr. at 4667-69.  The committee also concluded that the air

samplers were positioned too low to the ground to make accurate readings.  Tr. at 4663.  Ultimately

the Committee concluded "that the ambient monitors, ambient being monitors out in the air, free air,

not in the building, were not really monitoring the plutonium coming off the site *so that they did not

know what was coming off the facility.  There was no adequate way of measuring either out of the

building or off of the site*."  Tr. at 4654 (emphasis added).

These conclusions were not unique to Dr. Biggs' committee.  The Secretary of Energy's

"Tiger Team" also cited several examples of insufficient environmental monitoring at Rocky Flats.

The team's report notes: "Deficiencies in Rocky Flats Plant's (RFP) effluent air monitoring program

may adversely affect determination of radioactive materials released to the atmosphere."  P-529 at

2-7.  "There are deficiencies in the ambient air monitoring program for radionuclides.  As a

consequence, the accuracy of measured concentrations of plutonium in ambient air are questionable.

These data ... are used in calculating annual radiation dose to the public."  *Id.* at 2-11.  Further, a

Rockwell memorandum admits that the air sampling sites along Indiana Street "are not located to

measure maximum airborne plutonium concentrations caused by resuspension of plutonium on

surface soils."  P-33 at 1.

Another source of above-necessary routine releases was the incinerators. Dow and Rockwell knew that their waste incinerators were a constant source of higher plutonium emissions, *see* P-18 & P-27, and yet continued to operate the incinerators. *See* P-27; P-18; Tr. at 3774-75, 3780-81 (Avery). The jury also heard that Rockwell used the incinerator out of desperation to get rid of some of its waste, even illegally operating the incinerator when the building should have been shut down. The Building 771 incinerator was actually intended for plutonium recovery, not waste disposal, but the recovery process never worked properly. Tr. at 3774-75 (Avery). During the 1980's, Rockwell was generating many times more waste than it had legal capacity to store. Tr. at 2386-88 (Lipsky). From that evidence, Agent Lipsky concluded that the excess waste was either being illegally burned or illegally stored. *Id.* at 2388. He also testified, and the FLIR overflight video showed, that the 771 incinerator stack was thermally active on the night of December 15th, when the building was supposed to be shut down. Tr. at 2409-10 (white stack showed thermal activity); P-1278 (video); Tr. at 2388-89 (building 771 officially shut down); P-1090 (building 771 shut down); Tr. at 2414-15 (later overflight video after the incinerator was officially reopened showed same thermal activity as December 15 video). Ron Avery, the foreman in charge of the incinerator, testified that he ran the incinerator the previous weekend at management's request. Tr. at 3780-81. He was instructed to find people to work overtime who knew how to run the incinerator, Tr. at 3781, and was told that they should mark their time cards with the code for inventory cleanup, not incinerator operation, *id*. at 3783. DX-281, a summary of Building 771 stack effluent data, shows plutonium being released through the 771 stack even in December of 1988, when the building should have been shut down.

### 8.      Surface Water Contamination

The surface water contamination incidents are emblematic of Dow and Rockwell's chronic inability to control their waste water and further illustrate that defendants operated in a culture of neglect and impunity.   Additionally, the waterborne releases, coupled with the high degree of uncertainty regarding what other contaminants were released from the plant (discussed below), are indicative of the hazards of living near Rocky Flats.

In 1973, Dow leaked tritium that was detected at high levels in the Great Western Reservoir. By the time Broomfield became aware of the elevated tritium levels, Broomfield citizens had actually drunk the contaminated water.  Tr. at 1718 (Ozaki).  The source of the tritium was traced to scrap sent from another AEC plant for recycling  Tr. at 3228 (Budnitz).  At the time, Dow did not monitor for tritium, Tr. at 3228, despite the fact that this highly toxic radionuclide was used extensively in weapons production throughout the AEC complex, Tr. at 5270-71 (Cochran), and despite the fact that the plant had worked with and evidently leaked some amount of tritium in the past, *see* P-371 at 1 ("Tritium – what happened to the 1.67 grams of T in 1964?  It does not show up as a shipment or NOL and is not in the inventory.  Is this the accident referred to in your February 10 twx as being in 1968?").  When confronted with the elevated tritium levels detected by the CDH, Dow denied that it was the source of the contamination.  Tr. at 3230, 3231-33 (Budnitz), P-126 at 5.  The Lamm-Wirth Task Force noted that at the time (1975), it was predicted that it would take years for the tritium in the reservoir to diminish to background levels.  *See* P-338 at 47; Tr. at 6216 (read to jury).

The chromic acid spill was another major accident that endangered the drinking water downstream. Through human error, toxic chromic acid leaked into the sewage treatment plant, and was spray irrigated on the plant site. Tr. at 1195 (Holeman); Tr. at 1707-08. The chromium drained off the spray fields into a holding pond, and Rockwell insisted that it needed to release the contaminated water downstream into Walnut Creek. Tr. at 1708 (Ozaki). Rockwell eventually pled guilty to a Clean Water Act violation stemming from this accident. Tr. at 2941 (Lipsky). Although the City of Broomfield (after a hard fight) eventually convinced Rockwell and the DOE to release the polluted water elsewhere, Tr. at 1708, this incident demonstrates Rockwell's sloppy management and lack of concern for neighboring communities.

There is also evidence Rockwell illegally disposed of hazardous and radioactive mixed waste through its sewage treatment plant. Agent Lipsky testified that the Weston waste characterization study indicated that a number of hazardous and mixed waste streams were being sent to the sewage treatment plant buildings for final disposal. Tr. at 2418, 2421-22; PG-587; PG-588. Rockwell eventually pled guilty to illegal discharges from the sewage treatment plant, see PG-661, Tr. at 3726-27, but Agent Lipsky testified that the violations occurred on many more days than were listed in the plea, Tr. at 3727.

### 9.    Uncertainties in Release Estimates

The jury has heard varying estimates for the amount of plutonium released from Rocky Flats, however those estimates are highly uncertain because of defendants' poor record-keeping, inadequate environmental monitoring, and the unanswered question of what happened to 2600 lbs of missing plutonium (MUF).

The record-keeping at the plant was poor.  During the Dow era, in the early days of the plant's operation, Dow did not measure how much plutonium went into the waste storage drums. Tr. at 5343, 5353 (Cochran); D-654 (at 9) ("the measurement uncertainties associated with this material range from 10 to 50% most of which is estimated to be an understatement of the plutonium content of the material."); P-1132 at 109 ("in the early years, technology had not been developed to measure the material adequately").  During Rockwell's management of the plant, Mr. Holeman of the Colorado Governor's office testified concerning the paucity of data during that time period: "We discovered that they were keeping bad records, and we only had records back to, I believe 1988 in some buildings and a little bit earlier than that in other buildings but they are supposed to keep records for at least three years from the date of inspection and they were not doing that."  Tr. at 1240 (Holeman).  The Colorado Department of Health's June 1989 Compliance Order likewise cited numerous examples of poor record-keeping at the facility. Tr. at 1234-41 (Holeman).

Neither Dow nor Rockwell adequately monitored environmental releases.  Dr. Goble testified that before 1970, when several major release events occurred, "there was really very little off-site monitoring that was going on" and that he and other scientists who attempted to reconstruct the releases "[were] trying to figure out the history from very incomplete measurements and information."  Tr. at 3656-57 (Goble).  Dr. Biggs testified that the governor's Air Sampling Committee found Rocky Flats' sampling of air emissions inadequate during the 1980s. Tr. at 4613-14 (Biggs); P-1331; P-529 at 2-7 ("Deficiencies in Rocky Flats Plant's effluent air monitoring program may adversely affect determination of radioactive materials released to the atmosphere"); P-529 at 2-11 ("deficiencies in the ambient air monitoring program for radionuclides ... as a

consequence, the accuracy of measured concentrations of plutonium in ambient air are questionable"); *see also* Section II.C.7., *supra*.

Dr. Budnitz concluded that Dow's monitoring program was inadequate, especially when used to assess off-site impacts.  He identified seven problems with the program:  (1) overly narrow objective (which did not include detecting where emissions went); (2) absence of routine sampling other than for air and water; (3) sparsity of off-site air sampling locations; (4) not all filters taken from air samplers were immediately measured; (5) lack of attention to accuracy; (6) lack of adequate quality control measures; and (7) failure to understand that meeting numerical air-concentration guidelines did not confirm a lack of off-site impact.  *See* Tr. at 3148-49 (Budnitz); PG-610A.

Another issue that contributes a great amount of uncertainty to the question of how much plutonium was released from Rocky Flats is the fact that Dow and Rockwell cannot account for 2600 lbs of plutonium. Tr. at 5337 (Cochran); PG-27C (summary of missing plutonium); P-10 (1964 Zodtner & Rogers study of Unaccounted for Plutonium losses); P-542 (1977 study); 374 (History of Inventory Differences).

MUF was a major problem at Rocky Flats from the start of operations in the 1950s under Dow through the "bitter end" of Rockwell's tenure in 1989. Tr. at 5369 (Cochran); P-1143.  The cumulative amount of missing and unaccounted for plutonium at the Rocky Flats plant was first publicly revealed by Secretary O'Leary in the "openness" campaign in 1994. Tr. at 5336 (Cochran). DOE had secreted the amount of missing plutonium before then.  Tr. at 1254 (Holeman) (DOE "acknowledged that there were accounting issues regarding the accounting for all the plutonium in the system but did not share with me anything beyond. ...  They did not want those kind of numbers

41

out in the public domain").

Accurate MUF measurements are needed to keep track of the ultimate destination of plutonium, which is both carcinogenic and potentially usable as weapons material. The large amount of MUF missing from Rocky Flats over the years adds considerably to the uncertainty of calculating release or dose estimates. Tr. at 5387-88 (Cochran).   As Dr. Cochran explained:

> In estimating the exposure and health effects to individuals off-site, - you start with a source term, what is the estimated release. . . It's how much you think was released from some particular point in the plant at some particular time or over some period of time.
>
> And – as we see in the case of the 1957 fire. . . there's a substantial MUF or inventory difference. . . . [i]n the 1964, it was estimated there were 6 kilograms of plutonium that was unaccounted for in the immediate area of the fire. And that – that plutonium, some part of that plutonium may have been released to the environment. We simply don't know. ... But those numbers are so large compared to what you would estimate that would be released from other data that it leads to a large uncertainty ... in the amount of plutonium that could be released, and that uncertainty would be in the direction of increasing the amount of plutonium that would be released.
>
> So it adds tremendously to the uncertainty of what is the size of the source term ... and an immediate consequence in terms of estimating what the exposures are after you do the calculation of the transport of the radioactivity to people or areas off-site. And that large uncertainty, because of the off-site data, is rather sparse, you can have a substantial increase in the source term and still be consistent with the uncertainties associated with the off-site air monitoring and soil monitoring and vegetation monitoring.

Tr. 5387-88 (Cochran). The large amount of MUF casts a long shadow over the release estimates:

> Q. [ . . . ] On RAC II, they are somewhere between less than a pound to about 1.5 pounds of plutonium over the whole life of the plant that escaped. And we've got 2,620 pounds of MUF; is that correct, sir?
>
> A   That's approximately correct, yes.
>
> Q   So if even 1 pound escaped, one more pound of the MUF actually got off site,

that would double the RAC II estimate of the releases; is that correct?

A   Roughly, yes.

Q   And if 10 pounds got off, it would multiply it tenfold?

A   That is correct.

Tr. at 5611 (Cochran).

An undetermined amount of MUF plutonium remains at the Rocky Flats plant today after the "clean-up." Plaintiffs offered expert testimony to establish that a substantial portion of the missing plutonium ended up in the ventilation ducts, and remained there even after the plant was shut down. Tr. at 5344-45 (Cochran); PG-876. Rockwell's replacement, contractor EG&G, discovered pounds of plutonium in the plant's ductwork. Tr. at 1252 (Holeman); *see also* Tr. at 1599-1600 (Ray). Additionally, Dr. Selbin testified that 29,000 feet of pipes and ducts, plus other structures from the plant, will remain buried at Rocky Flats after the "cleanup" is finished. Tr. at 7102, 7105 (Selbin); P-1469. It is unknown how much of the missing plutonium remains held up in those underground structures or buried elsewhere at the plant site. *See* P-1118 ("[f]oundations, footings, pilings and associated drainages must be considered both radioactively and chemically infiltrated by leaks, spills, weather actions, et cetera."). There are continuing risks of resuspension and releases into the future now, and there were enormous risks with hundreds of pounds of missing plutonium in ducts and pipes and thousands of pounds in waste storage for an indefinite time after the raid.

43

**D.**  **A Reasonable Jury Would Find That The Nuisance Is Substantial.**

A nuisance is "substantial" if "the interference is significant enough that a normal person in the community would find it offensive, annoying or inconvenient."  Jury Instruction No. 3.9. Substantiality is determined from the point of view of a person with normal sensibilities, meaning "a person who is neither unusually sensitive nor unusually insensitive to the interference."  Jury Instruction No. 3.9.  The evidence is more than sufficient to support a jury verdict that the nuisance here was substantial.

Dr. Slovic explained that the type of risks posed by Rocky Flats are especially likely be perceived as substantial because they evoke a strong, fearful reaction in reasonable members of the public.  People react strongly to risks that bear certain characteristics:  "(1) exposure to the hazard is involuntary, (2) the risk is not under one's control, (3) the risk evokes feelings of dread, (4) the outcomes are catastrophic, and (5) the benefits are not fairly or equitably distributed among those who bear the risks"  *See* Slovic Report at 5.  *See also* Tr. at 4239.  These features all describe the types of risks faced by neighbors of Rocky Flats.  *See* P-1354 at 10 (risk from radiation exposure due to Rocky Flats perceived as "uncontrollable, posing latent threat, dread (leading to cancer, a dread disease), and unknown").

The record contains anecdotal evidence that the public at large considered the health risks and risk of future harm from Rocky Flats to be substantial and unreasonable.  Several class members were worried about the risk of inhaling plutonium or the risk of cancer.  *See* Tr. at 5939 (Mrs. Whalen); Tr. at 5019-20 (Mrs. Robb); Tr. at 929 (Mrs. Bartlett); Tr. at 2047 (Mrs. Cook).  Two class member witnesses actually sold their homes and moved because of Rocky Flats.  *See* Tr. at 5019

44

(Mrs. Robb); Tr. at 5939 (Mrs. Whalen).  Mrs. Whalen also testified that she told her sons not to ride their bicycles in the irrigation ditch near their home, that her family stopped using nearby open space, and they switched to bottled water.  Tr. at 5038-39.  Ms. Cook described how clients of her horse business began to leave because they were worried about their health and their horses' health.  Tr. at 2028.

The evidence also showed that the public was reasonably concerned about future releases or invasions from Rocky Flats.  The City of Broomfield chose to replace its water supply in part due to the threat of future contamination.  Tr. at 1708-09; Tr. at 1768 (Ozaki); P-209 at 1 ("Unfortunately, the history of the Rocky Flats plant is marked by numerous problems and accidents which have resulted in on- and off-site environmental contamination.  The Plant's record to date and the potential for future problems, due to human error and the deterioration of the aging facility, are grave concerns for the cities and their residents.").  Not only the City of Broomfield was concerned about its water supplies.  The cities of Westminster, Northglenn, and Thornton all petitioned for and received federal funding for the Standley Lake diversion project, which routed Woman Creek around Standley Lake to protect those cities' water supply.  Tr. at 6445 (Hunsperger).

The fact that class properties were depressed in value also demonstrates the public's reaction to the problems at Rocky Flats.  *See infra* Section V; Jury Instruction No. 3.9 ("[E]vidence that the value of Class members' properties has diminished because of this interference is evidence that the interference is substantial.").

Defendants' brief misstates the standard for determining what is "substantial."  It is the interference, not the health risk, that must be substantial; that is, a nuisance exists if reasonable

people in the community would find the nuisance (including health risk and other factors) substantial.  *See* Jury Instruction No. 3.9 ("[Y]ou must determine whether a reasonable landowner of normal sensibilities would find the proven interference caused by Dow or Rockwell to be offensive, annoying or inconvenient"); *Cook IX*, 273 F. Supp. 2d 1175, 1203-04 (D. Colo. 2003); *Cook VIII*, 181 F.R.D. 473, 485 (D. Colo. 1998); *Allison v. Smith*, 695 P.2d 791 (Colo. Ct. App. 1984).  What is "substantial" is judged by the normal member of the community, not by medical or regulatory standards.

Nor does the health risk need to attract the attention of regulatory agencies before it is actionable.  As plaintiffs have repeatedly explained in response to this argument, and as the Court has repeatedly found, Colorado law sets the duty of care independently of any regulatory standards. *See Bayer v. Crested Butte Mountain Resort, Inc.*, 960 P.2d 70 (Colo. 1998) (compliance with Colorado Passenger Tramway Act and/or Colorado Ski Safety and Liability Act does not bar claim in tort for negligence); *Blueflame Gas, Inc. v. Van Hoose*, 679 P.2d 579, 590-92 (Colo. 1984) (compliance with state regulation on odorization of propane does not bar negligence or products liability claim); Rest. 2d Torts § 288C ("Compliance with a legislative enactment or an administrative regulation does not prevent a finding of negligence where a reasonable man would take additional precautions.").

Defendants' argument that some class members were not bothered by Rocky Flats appears to confuse two forms of nuisance:  health risk, and emotional distress.  Plaintiffs have introduced evidence of a class-wide health risk.  The fact that a few individuals did not perceive their health risk to interfere with their use and enjoyment of their properties is irrelevant; the standard is, what would

a *reasonable person* of normal sensibilities in the community find offensive.  The Restatement

(Second) of Torts, Section 821F, demonstrates this point:

> A operates a slaughterhouse, which gives off highly offensive odors, sufficient to make life unendurable for any normal person living near it. B, who lives next door is without any sense of smell, and is not personally troubled by the odors. B can recover from A for a private nuisance.

*Id.*, comment d, illustration 3.

### E.     A Reasonable Jury Would Find That The Nuisance Caused By Dow And Rockwell Is Substantial And Unreasonable.

Whether a nuisance is unreasonable depends on a balancing of the social utility of the

conduct, versus the harm caused to the class.  Jury Instruction No. 3.10.  The fact that Dow and

Rockwell provided a benefit to this country's national security does not lead to the conclusion that

the class members must bear a disproportionate share of the costs.  Nor does the national security

benefit mean that Dow and Rockwell were excused from their duty to take reasonable precautions

to protect their neighbors.  The jury must weigh that benefit against the harm caused.  In deciding

this balance, the jury may take into account:  (1) the suitability of the conduct to the location where

it occurred; and (2) whether it was unreasonable for plaintiffs to bear the cost of Rocky Flats'

operations without compensation.  Jury Instruction No. 3.12.  Additionally,"if it was practicable for

Dow or Rockwell to avoid causing any interference with Class members' use and enjoyment of

property, and they did not take the necessary measures to do so, then the law considers their conduct

to have no utility, regardless of its social value."  Jury Instruction No. 3.12.

First, the evidence shows that Rocky Flats' location, directly upwind of a major city and a

growing suburban population, was indeed unsuitable for a nuclear weapons plant and for many of

the waste disposal methods Dow and Rockwell used. The Lamm-Wirth Task Force found that Rocky Flats' location was unsuitable: "It seems certain that if the criteria evaluated for the original siting of the Rocky Flats plant were applied for siting today, the Rocky Flats plant would not be located near a densely populated area." P-338 at 6; Tr. at 6202 (read to jury). Dow cannot blame the site selection entirely on the AEC/ DOE, as Dow's contract obligated the company to assist the AEC in choosing a site for the plant. *See* P-1049 at 1-2; Tr. at 5982 (read to jury). P-25, a document dated 1952, recognizes both the existence of high winds at Rocky Flats and the risk of resuspension of contamination. The document lists high winds as the main reason why solar ponds were not recommended: "[i]n the high winds experienced here, even small ponds lose water by spray, which travels many miles over the landscape. Thus, either wet or dry, such a pond could lose activity to the site and surroundings." *Id*. at 2. The document also reflects that spray irrigation and on-site solid waste disposal were not recommended due to the plant's proximity to populated areas and the fact that the drainage would eventually reach bodies of water that were used for drinking and irrigation water. *Id*. at 2, 5.

Second, plaintiffs have offered sufficient evidence for the jury to find that it would be unjust for plaintiffs to bear the nuisance without compensation. For example, Dr. Cochran testified:

> We don't go out and say, okay, since 15 percent of us are going to get cancer, maybe we should – shouldn't worry about it if we increase that to 16 percent. We don't allow industries to increase our risk of cancer by 1 percent because -- even though we voluntarily take risks, personal risks, ourselves, that are even greater than that, for reasons of justice, we don't let other people increase our risks by more than a very small fraction.

Tr. at 5315. Dr. Slovic also explained that a risk that is uncontrollable or to which people are unwillingly exposed, as opposed to a risk they assume voluntarily, is perceived as more serious. *See*

48

Tr. at 4239.

Third, the evidence shows that Dow and Rockwell could have avoided the nuisance, but through neglect and a lack of concern for their neighbors, chose not to. As explained in more detail above, *see* Section II.C., defendants could have avoided the incidents that led to the health risk and risk of future invasions, but failed to exercise proper care. For example, Dow could have avoided the 903 area releases by storing the barrels indoors or placing a tarpaulin over them. Tr. at 3037, 3039. Dow could have avoided the 1969 fire by heeding the recommendations the 1957 fire investigating committee made twelve years earlier. Tr. at 3170-83; G-507A Dow could have avoided continuing releases from its dumping grounds if it had chosen to properly dispose of its waste, rather than burying it in the Mound or in trenches. Rockwell could have avoided further resuspension and dispersion of plutonium from its site by storing the pondcrete indoors, not spray irrigating contaminated waste water over the plant grounds, paying attention to its stack releases and not using the incinerator, and remediating the contaminated areas left over from the Dow era.

F.     **The Fact That Some Class Members Moved To The Area
       After The Nuisance Began Is Not Dispositive.**

Defendants' argument that class members bought their property after the nuisance began (Def. Br. at 42-44) appears to be an attempt to revive the "coming to the nuisance" defense, which Colorado law rejects. *See Allison*, 695 P.2d at 794-95; May 28, 2004 Order at 6-7. Defendants cite the Court's May 28, 2004 Order as support for the resurrection of this defense in the guise of a factor to be considered in deciding nuisance liability. The Court's exact language was: "Whether Defendants are correct that the timing of the class members' acquisition of class properties is a factor for the jury to consider in determining liability for nuisance is a matter to be decided in the jury

instruction process." *Id.* at 7.  Defendants did in fact propose such an instruction, *see* Defendants'

Proposed Nuisance Instruction, filed Aug. 6, 2004 [Docket #1257], Proposed Instruction No. 10.

The Court apparently rejected that instruction, as it was not included in the final list of instructions

given to the jury, *see* Jury Instructions at 1 ("all instructions proposed by the parties, including the

recent supplemental instructions, were considered in preparing these instructions.").

      Even if, as defendants claim, that the timing of the class members' purchases may be relevant

to determining whether the class members (or possibly an objective reasonable person) would

consider the interference to be "substantial and unreasonable," such evidence is not dispositive.

Defendants cite no legal authority for the proposition that a nuisance may only be "substantial and

unreasonable" if no one will live in the area.

      Moreover, the full extent of the nuisance was not known until after the FBI raid.  Plant

operations were highly secretive, often including environmental problems.  For example, in the

1970's, even the governor was required to obtain a "Q" clearance before Dow could discuss with

him the waste burials at Rocky Flats.  Tr. at 1516-17 (Ray).  Many witnesses testified they had not

heard about the fires or the off-site contamination, which is not surprising given that these events

took place one or two decades before they moved to the class area.  Tr. at 1900 (Mr. Schierkolk:  first

learned about contamination at public meetings after the FBI raid); Tr. at 5015 (Mrs. Robb:  "Q. Did

you have any fears or worries about living near Rocky Flats when you bought that home?  A.  I

didn't know about it."); Tr. at 5939 (Mrs. Whalen learned about contamination "for the first time"

from news stories after the FBI raid).

      Additionally, before the raid Rocky Flats and the DOE were able to counter any negative

publicity through their own public relations efforts. For example, the press release that followed the 1957 fire claimed that "tests made have indicated no spread of radioactive contamination of consequence." P-93; Tr. at 5994-95. By contrast, on the day of the fire, Dow personnel had monitored radiation from the smoke plume. P-408 at 1 ("Owen found positive activity in his preliminary survey between buildings 81 and 91 which eventually turned out to contain plutonium at half tolerance level."); *id.* at 2 ("Three off-site locations are suspected of possible plutonium contamination.").

As another example, after the Martell and Poet study was released to the public, announcing for the first time that contamination was found off-site, Dow issued a press release claiming that "Edward Martell's statements on the concentration of plutonium in the Denver metropolitan area are not based on any known scientific evidence," *id.* at 1, Tr. at 6190 (read to jury). By contrast, Dow's own soil sampling had confirmed Poet and Martell's results. *See* P-303 at 1 ("Hammond of Dow, Rocky Flats, confirms similar quantitative results from a lesser number of samples.").

One of Dow's employees even criticized the company for giving the press misleading information. See P-214 (memorandum entitled, "The Credibility Gap"). Responding to misleading statements in an article (P-431) based on a press release "largely authored by Dow." P-214 at 1; Tr. at 6186 (read to jury), the author observes that Dow has mislead the public regarding the extent of offsite air samplers, P-214 at 2; the amount of plutonium in the 903 area barrels and how long they were allowed to leak, *id.* at 3; and the extent of contamination found after the 1957 fire, *id.* at 3.

This public relations effort had the desired effect. Richard Bartlett explained how the reassuring statements in the news affected his view of Rocky Flats: "I think my suspicions of the

plant were going on over a period of time.  And -- but I had no proof.  I had nothing other than, you know, it was going back and forth and back and forth."  Tr. at 1025.

Viewing the evidence in the light most favorable to plaintiffs, *see Brown*, 11 F.3d at 1563, the jury could find that the nuisance created by Rocky Flats was substantial and unreasonable, even though many class members moved to the area after the nuisance began.

### III.   PLAINTIFFS HAVE PROVIDED SUFFICIENT EVIDENCE OF GENERIC CAUSATION OF EMOTIONAL DISTRESS.

#### A.   The Court Has Ruled That Plaintiffs May Try The Issue Of Generic Causation Of Emotional Distress In The Class Trial.

Defendants misread the Court's instructions on generic causation.  The Court cautioned the jury not to consider any individual plaintiffs' emotional distress when deciding whether Rocky Flats caused a health risk or a risk of future harm.  *See* Jury Instruction No. 3.7.  However, the Court also instructed the jury that the capacity of Rocky Flats to cause emotional distress is relevant to later proceedings.  *See* Jury Instruction No. 3.28.  The Court has held that emotional distress is one form of interference with use and enjoyment, and that this form of interference can be tried in two phases, with generic emotional distress as a class-wide issue, and specific emotional distress actually suffered by each class member as an individual issue for a later proceeding.  *See* May 17, 2005 Order at 7.  Thus, as plaintiffs have proffered sufficient evidence for the jury to find that Dow and Rockwell's conduct was capable of causing a normal member of the community to experience fear or anxiety, defendants are not entitled to judgment as a matter of law on this issue.

**B.     A Reasonable Jury Would Find That Defendants' Conduct Was
Capable Of Causing Fear, Anxiety, Or Other Mental Discomfort.**

Generic emotional distress is defined as, "intentional or negligent conduct of Dow or
Rockwell or both of them at Rocky Flats, and/or actual or threatened harms caused by such conduct,
[that] created a situation that is capable of causing fear, anxiety or mental discomfort in individual
Class members." Jury Instruction No. 3.28. While defendants argue that plaintiffs need to link the
class members' concerns with "specific actionable conduct by defendants," Def. Br. at 56, the
evidence of a decades-long pattern of negligent and reckless conduct at Rocky Flats, including the
mismanagement of highly dangerous substances, satisfies this requirement. Generic emotional
distress need not be based on the other forms of interference with use and enjoyment alleged by
plaintiffs (namely, health risk and a risk of future harm). *See* Jury Instruction No. 3.28 ("Plaintiffs
do not need to show that any actual or threatened future contamination from Rocky Flats poses an
actual or verifiable health risk."); Cook *IX*, 273 F. Supp. 2d at 1203-04 (verifiable health risk not
required).

The general public's reaction to the publicity about Rocky Flats was generally one of anxiety.
After the FBI raid, the City of Broomfield received thousands of phone calls from concerned
citizens. Tr. at 1739. Mrs. Cook testified that her clients became apprehensive about their own
health and their horses, *see* Tr. at 2028. Both Mrs. Robb and Mrs. Whalen observed an increase in
homes for sale in their neighborhoods after the raid, *see* Tr. at 5026, 5943, and Mrs. Whalen noticed
foreclosed homes as well, *id*. at 5943. Further the fact that a stigma existed on properties near Rocky
Flats, and that the stigma is reflected in lower property values (*see* infra SectionV), is also evidence
that reasonable people in the community perceive Rocky Flats with anxiety, fear, or mental

discomfort.

Not only the general public, but also people who were directly involved with and more thoroughly informed about Rocky Flats issues were concerned about the health risks and the potential for future releases of contamination. The City of Broomfield officials were concerned enough about the risk that Rocky Flats was releasing harmful substances in their water runoff, that immediately after the FBI raid the city began building a diversion ditch to separate Great Western Reservoir from Walnut Creek. Tr. at 1739-41 (Ozaki). Even after the initial excitement about the raid died down, Broomfield chose to replace its water supply due to the threat of future contamination and due to its citizens' fear and distrust of Rocky Flats. Tr. at 1708-09; Tr. at 1768 (Ozaki); P-209 at 1 ("The community has longstanding concerns about Rocky Flats' potential to affect public drinking water supplies. ... Unfortunately, the history of the Rocky Flats plant is marked by numerous problems and accidents which have resulted in on- and off-site environmental contamination. The Plant's record to date and the potential for future problems, due to human error and the deterioration of the aging facility, are grave concerns for the cities and their residents."). Not only the City of Broomfield was concerned about its water supplies. The cities of Westminster, Northglenn, and Thornton all petitioned for and received federal funding for the Standley Lake diversion project, which routed Woman Creek around Standley Lake to protect those cities' water supply. Tr. at 6445 (Hunsperger).

Further, as discussed below (*see* Section V.B.), there is an abundance of evidence that the public reacted to Rocky Flats with fear and anxiety. Witnesses who lived in the class area discussed their own worries and the reactions of their neighbors and potential buyers. Also, the behavior of

the marketplace – the fact that class properties were depressed in value – is further evidence that the average, reasonable member of the community was afraid to live near Rocky Flats.

### C.  There Is No Requirement That The Class Members' Emotional Distress Be Based On An Extensive Scientific Investigation.

Under Colorado nuisance law, the standard for determining whether a nuisance is substantial and unreasonable depends on the perceptions of a normal member of the community; it does not require that the class members' emotional distress must be "grounded in science." (Def. Br. at 57). *See Cook IX*, 273 F. Supp. 2d at 1203-07. The only authority defendants cite in support of their attempt to overturn this Court's earlier ruling is dictum from a footnote in *Boughton v. Cotter Corp.*, 65 F.3d 823, 831-33 & 832 n.13 (10th Cir. 1995). This Court considered the *Boughton* dictum and rejected the defendants' interpretation. *Cook IX*, 273 F. Supp. 2d at 1204.

Defendants again attempt to blame the publicity or the FBI raid for the community's dissatisfaction with their management of Rocky Flats. The FBI raid and negative publicity were not intervening causes. These events were simply the vehicles through which the public learned about the reckless, negligent, and dangerous conditions at Rocky Flats. Moreover, the argument that the FBI's allegations "turned out to be false" (Def. Br. at 58) is not supported by the evidence. Rockwell pled guilty to ten counts of environmental crimes, including five felonies, which is a judicial admission that those violations occurred. *See* Tr. at 2930 (Lipsky); PG-657 - PG-666. The jury has also heard testimony that probably the most shocking allegation behind the FBI raid, the illegal operation of the incinerator, did in fact occur. Agent Lipsky's testimony and the FLIR video established that the incinerator stack was thermally active during the shutdown. Tr. at 2409-10 (white stack showed thermal activity); P-1278 (video); Tr. at 2388-89 (building 771 officially shut

down); Tr. at 2414-15 (later overflight video after the incinerator was officially reopened showed same thermal activity as December 15 video). Also, Ron Avery, the foreman in charge of the incinerator, testified that he indeed operated the incinerator during the shutdown, and that at management's direction told his employees to falsify their time cards. Tr. at 3780-83.

IV. **DEFENDANTS HAVE NOT PROVIDED SUFFICIENT GROUNDS
TO WARRANT RECONSIDERING THE AFFIRMATIVE DEFENSES
AND OTHER ARGUMENTS THAT THE COURT HAS ALREADY DECIDED.**

   A. **Colorado Trespass Law Requires Neither A
   Tangible Trespass Nor Serious Physical Damage.**

   Colorado recognizes a claim for trespass based on contamination by pollutants, even if those pollutants cannot be seen or perceived with the human senses. *Cook v. Rockwell Int'l Corp.*, 273 F. Supp. 2d 1175, 1200-01 (D. Colo. 2003) ("*Cook IX*"); *Hoery*, 64 P.3d at 221-22. Where physical contaminants are present, as opposed to intrusions by light, sound, or radiation, the trespass is not considered "intangible," and thus the special requirement of proof of serious physical damage is not triggered. *Cook IX*, 273 F. Supp. 2d at 1200-02; *compare Hoery*, 64 P.3d at 221-222 (trespass by pollutants; traditional rules apply) *with Public Service Co. of Colo. v. Van Wyk*, 27 P.3d 377, 387-88, 391 (Colo. 2001) (intrusion by electromagnetic waves constitutes intangible trespass; additional proof of substantial physical damage required).

   B. **Compliance With Federal Nuclear Safety Standards
   Is Not A Defense To Trespass Or Nuisance.**

   The Court has rejected the affirmative defense of compliance with federal nuclear safety standards. *See Cook IX*, 273 F. Supp. 2d at 1198-99; May 28, 2004 Order at 5-6.

**C.     The Fact That Contamination On Most Class Properties
Does Not Exceed the State Plutonium-in-Soil Standard Is
Not A Defense To Trespass Or Nuisance.**

Colorado does not recognize compliance with state standards as a defense to trespass.  *See*

Dec. 17, 2004 Order Regarding Proposed Trespass Instructions [Docket #1311]; *Cobai v. Young*,

679 P.2d 121, 124 (Colo. Ct. App. 1984) (rejecting contention that compliance with applicable

regulation defeated liability for trespass).  Plaintiffs' arguments against this defense are set forth in

more detail in Plaintiffs' Brief on the Statute of Limitations, State Regulatory Standards,

Ultrahazardous Liability, Spoliation, and Negligent Trespass, filed Aug. 4, 2004 [Docket #1254],

which plaintiffs incorporate herein by reference.   Additionally, Colorado's plutonium-in-soil

standard is not even applicable here:  the regulation does not govern defendants or their conduct in

operating the Rocky Flats plant, but rather sets forth safety measures to be taken during construction

activities on contaminated sites.  *See* 6 Colo. Code Regs. 1007-1, R.H. 1.3 & R.H. 4.60.1.

**D.     The Defense Of Intervening Cause Is Not Available.**

The Court rejected defendants' earlier request for an intervening cause instruction, which was

based on two of the three supposed intervening causes advanced by defendants:  high winds that

distributed plutonium off-site, and the FBI raid  *See* Jury Instructions at 1 ("all instructions proposed

by the parties, including the recent supplemental instructions, were considered in preparing these

instructions."); *cf.* Defendants' Memorandum Regarding the Facts and Evidence Warranting an

Intervening Cause Instruction, filed Jan. 14, 2005 [Docket #1316]; Plaintiffs' Response, filed Jan.

26, 2005 [Docket #1322].  Plaintiffs incorporate herein by reference their arguments against

defendants' purported proof of intervening causes, and briefly summarize those arguments as

follows.  First, intervening cause is a negligence-based concept, *see* Colo. Jury. Instr., Civ. 9:20 (4th ed.), but trespass liability is not grounded in negligence, *see Burt v. Beautiful Savior Lutheran Church of Broomfield*, 809 P.2d 1064, 1067 (Colo. Ct. App. 1990), cert. denied, 1991 Colo. LEXIS 279 (Colo. 1991).  Second, no intervening cause exists because the harm that occurred was within the scope of the risk created by defendants' conduct, *see Webb v. Dessert Seed Co., Inc.*, 718 P.2d 1057, 1062-63 (Colo. 1986); Rest.2d Torts § 442B, and the FBI raid in particular was a dependent intervening cause that arose out of Rockwell's illegal conduct, *see Sutton v. Anderson, Clayton & Co.*, 448 F.2d 293, 296-97 (10th Cir. 1971).

Defendants' third alleged intervening cause, that defendants were just following orders issued by the DOE, is actually an attempt to shift the blame to another entity.[4]  However, defendants have offered no proof that DOE ordered defendants to engage in any of the dangerous or illegal actions proven at trial.  To address defendants' examples (*see* Def. Br. at 22-23), DOE never ordered Dow to store the contaminated drums outdoors on the 903 pad, and never prevented Dow from placing the drums within a building or at least covering them with a tarpaulin; never ordered Rockwell to

---

[4] It can also be seen as an attempt to circumvent the elements of the "government contractor defense" announced in *Boyle v. United Tech. Corp.*, 487 U.S. 500 (1988).  It is not generally a defense, in a trespass action, that the acts causing the trespass were performed in furtherance of some contractual obligation.  If defendants suppose it to be a defense here, it could only be on the theory that the relevant contractual obligations ran to the federal sovereign. Even if such a defense were available in this Price-Anderson action (as it is not), and even if defendants had preserved their right to assert it at trial (as they have not), its requirements would still be governed by *Boyle* and its progeny.  Under *Boyle*, the "government contractor defense" is an *affirmative* defense, and defendants would bear the burden of proving its elements; it would not be plaintiffs' burden to disprove them as part of plaintiffs' prima facie case.  Even if it were, the defense could not be sustained where, as here, the acts creating the trespass were violative of the very contracts defendants would invoke (*see infra*, this section).

use the incinerator to dispose of excess waste;[5] and never ordered either defendant to dispose of waste through other illegal methods.  Both Dow and Rockwell's contracts placed the contractors in charge of operations at the plant.  *See* P-606 (Rockwell contract:  Rockwell was to "manage, operate, and maintain the Rocky Flats Plant" (p. 4); P-1049 at 2 (Dow contract:  "The contractor shall operate the project and do all things necessary to carry out the program of work . . .."), Tr. at 5982 (read to jury).  The contracts also required both defendants to take all reasonable steps to protect the public. *See* P-606 at 55 (Rockwell:  contractor will "take all reasonable precautions in the performance of the work under this contract to protect the health and safety of employees and of members of the public and to minimize the danger from all hazards to life and property, and shall comply with all health, safety, and fire protection regulations and requirements (including reporting requirements) of the Commission."); P-1049 at 18 (Dow:  "The contractor shall take all steps and all precautions to protect health and to minimize danger from all hazards to life and property."); Tr. at 5986 (read to jury).  Ultimately, defendants are responsible for their own actions.

### E.   Defendants Are Not Entitled To The Defense Of Statute Of Limitations For Trespass Or Nuisance.

Because the continued presence of plutonium on the class members' properties constitutes a continuing trespass, the statute of limitations defense is not available.  *See Cook X*, 358 F. Supp.

---

[5] In fact, Rockwell purposely waited until the DOE employees left before secretly running the building 771 incinerator while the building should have been shut down:  "He [Mr. DeWitt, the supervisor of plutonium operations for Building 771] said that we were going to run the incinerator, that they had some drums that they wanted to run, and they were going to run the incinerator that weekend, and it was going to start up after DOE left at 5 o'clock.  It was going to start up on the p.m. shift and run until these drums  were burnt. ... And the area was going to be cleaned up by Monday morning as if nothing had ever happened."  Tr. at 3788 (Avery).

2d 1003 (D. Colo. 2004); *In re Hoery*, 64 P.3d 214, 218 (Colo. 2003). Plaintiffs have proven a continuing trespass. *See* Section I.C., supra. Similarly, the statute of limitations defense does not apply to plaintiffs' nuisance claim because the evidence is sufficient to show that Rocky Flats is a continuing nuisance. *See* Section II.A. and B, supra. A continuing nuisance exists if there is "no reason to expect the interference to end by a definite time." Jury Instruction No. 3.17. Plaintiffs' evidence that, for example, the health risk from Rocky Flats will continue into the future, *see supra* Section III.B. (continuing nuisance), and that as of the CCE time it appeared that the cleanup (and thus continued resuspension of plutonium on the plant site) would take several decades, *see infra* Section V.D., is sufficient to support a finding of continuing nuisance.

Additionally, Colorado law does not recognize defendants' argument that a continuing trespass must be impossible to abate at a reasonable cost. *See Cook X*, 358 F. Supp. 2d at 1008.

## F. The Defense Of Prescriptive Easement Is Not Available.

The Court held that the prescriptive easement defense was waived. *See* May 28, 2004 Order at 7-10. Additionally, as plaintiffs argued in their Position Statement on Affirmative Defenses Pursuant to Order Dated April 14, 2004, filed Apr. 28, 2004 [Docket #1224], the affirmative defense of prescriptive easement is legally unavailable. Plaintiffs incorporate their previous arguments by reference, and briefly summarize them again here. First, defendants cite no precedent in Colorado law for a finding of prescriptive easement for pollution of neighboring properties. There are, however, strong public policy arguments against allowing such a defense. *See Patrick v. Sharon Steel Corp.*, 549 F. Supp. 1259, 1266-67 (N.D. W. Va. 1982) (easement would be "completely foreign to justice and contrary to all principles of fairness and common sense"); Rest.3d Property - Servitudes

60

§ 2.17 (2000) ("Servitudes for uses that create nuisances are particularly likely to violate public policy.")

Second, defendants have failed to establish that their "use" of the class members' properties was "open and notorious."  *See McIntyre v. Bd. of County Comm'rs*, 86 P.3d 402 (Colo. 2004). Defendants, in the same Motion, point out that plutonium particles are not perceptible by the human senses (Def. Br. at 25), so the nuisance and trespass cannot be "open or notorious."

## V. PLAINTIFFS HAVE PROVIDED SUFFICIENT EVIDENCE THAT THE CLASS SUFFERED DAMAGES AS A RESULT OF DEFENDANTS' WRONGFUL CONDUCT.

Plaintiffs' proof regarding causation and damages consists of two major prongs:  evidence of the market's perception of Rocky Flats (including the existence of plutonium contamination in the class area and the nuisance created by the plant), and evidence that actual property values in the class area are lower.  A reasonable jury could find from the confluence of these two factors that Dow and Rockwell's tortious conduct at Rocky Flats caused class properties to be depressed in value.

Plaintiffs have presented both expert and fact witnesses who have shown that Rocky Flats created a stigma on class properties, and that stigma was manifested in lower property values. Plaintiffs proffered the work of four expert witnesses whose work showed the class has suffered damages: Dr. Radke, whose regression analysis showed depressed property values in the class area; Drs. Flynn and Slovic, who researched media coverage of the FBI raid and conducted a public opinion survey that found overriding negative perceptions of property in the class area; and Mr. Hunsperger, who compared sales data and found lower prices in the class area, and who also relied on Drs. Radke, Flynn, and Slovic's work and other research to conclude that class property values

were in fact depressed because of Rocky Flats.  In addition, the class representatives and several class property owners testified regarding their experiences in the market.

Mr. Hunsperger concluded that the real estate in the class area was stigmatized and that property values were lower as a result.  Tr. at 6404.  His conclusions were based on five methodologies:  (1) real estate market research; (2) analogous case studies;  (3) comparison of market sales data;  (4) multiple regression analysis;  and (5) public opinion surveys.  Tr. at 6406-07. Two of the methodologies, market sales data and regression analysis, measure the amount of the loss. Tr. at 6464, 6579-80.  Two other methodologies, market research and public opinion surveys, determines whether a stigma exists in the minds of market participants.  Tr. at 6406-07, 6439.  One methodology, analogous case studies, serves a number of purposes:    to compare how other communities and markets reacted to environmental contamination, to compare whether communities react differently to different types of contaminants, to see how that reaction affects property values, and to test the reasonableness of the results from the other methods.  Tr. at 6534.

Defendants devote a good deal of effort to pointing out that plaintiffs' various damages experts have not proven matters that are not within the scope of their expertise.  In arguing that plaintiffs have proven that their losses are due to mere proximity, defendants neglect to consider the totality of plaintiffs' damages evidence.  Taken together, plaintiffs' proof establishes each necessary link in the causal chain:  defendants' wrongful acts (trespass and nuisance) were reported by the media, which led to a stigma on class properties, which caused property values to be depressed. Plaintiffs will address these steps in reverse order.

A.    **A Reasonable Jury Would Find That Property
Values In The Class Area Were Depressed.**

1.    **Dr. John Radke's Damages Calculations Show
The Class Was Damaged.**

Dr. Radke's regression analysis shows that property values in the class area were persistently lower than the prices for comparable properties. Dr. Radke found the following results for the amount of undervaluation for different types of properties in the class area:

Multi-Residential Properties:          21.58%

Vacant Land:                                      32.14%

Commercial Properties:                     53.03%

Tr. at 2716-18. For single-family residential properties, Dr. Radke found that class properties were undervalued for every year that he examined, up through 1995, or six years after the FBI raid. Tr. at 2720-24. The amount of undervaluation ranged from 5.45% to 9.33%. *Id*. Additionally, Dr. Radke calculated the aggregate damages for each type of property (except multi-residential, due to a lack of data) based on his data for percentage diminution, the total number of such properties in the class area, and the average value for that type of property. Tr. at 2725-27; *see also* P-1323, slide G582A.

2.    **Wayne Hunsperger's Damages Calculations Show
The Class Area Was Damaged.**

Mr. Hunsperger concluded that the value of single-family homes was depressed by 10% and vacant land about 30% due to Rocky Flats. Tr. at 6416-17. He calculated the aggregate damages for the class for these kinds of properties in 1995 dollars, finding $169 million total for residential properties and $21 million for vacant land. Tr. at 6417. Converted to 2005 dollars, these figures are

$216 million for residential properties and $27 million for vacant land.  Tr. at 6422.

Mr. Hunsperger determined these values based on Dr. Radke's regression analysis (discussed above), and also on his comparison of market data.  By comparing the weighted average of sale prices for vacant land inside the class area, versus other nearby areas, and determined that Rocky Flats properties were undervalued by an average of 30%.  Tr. at 6478-79, 6480.  For residential properties, Mr. Hunsperger compared rates of appreciation in the class area, to rates for other suburban MLS zones.  Tr. at 6483-87.  Of the five areas he studied, Mr. Hunsperger found that home prices in the zones that included the class area were the lowest of the five.  Tr. at 6478.  He also found that the rate of appreciation for those zones was the lowest, ranging from 6.08% to 6.90%, whereas the five areas farther away from Rocky Flats saw appreciation rates of 7.43% to 8.44%.  Tr. at 6486; PG-834.  Additionally, in reliance on Dr. Radke's regression analysis, Mr. Hunsperger took the average of Dr. Radke's results to arrive at a figure of 8% depression of value for single-family homes.  Tr. at 6579.

### 3.   The Testimony Of Property Owners And Market Participants Shows They Suffered A Loss Due To Rocky Flats.

The experiences of property owners in the class area confirm the results found by Mr. Hunsperger and Dr. Radke.  Several witnesses stated that there was very little new development in the class area through at least the mid-1990s.  Tr. at 1030 (Mr. Bartlett); Tr. at 934 (Mrs. Bartlett); Tr. at 4481 (Cassidy); Tr. at 6462 (Hunsperger).  Mr. Cassidy testified that in the mid-1990s, the land near Rocky Flats was "dirt cheap" and there was a lot of vacant land available.  Tr. at 4476.  Property owners in the area that Mr. Cassidy represented had given him the authority to sell the land for $1000 to $3000 an acre, or even to give land away for the right buyer, and yet he still could not find anyone

willing to move to the class area.  Tr. at 4478.

The property owner witnesses described how their land appreciated very little, or even lost

value, as a result of the problems at Rocky Flats:

**Merilyn Cook**

Merilyn Cook owned two horse properties and some vacant land in the class area.  She had

previously bought another horse property in the class area, and in 1983 sold it at a substantial profit.

Tr. at 2000-03.  At that time, she knew about Rocky Flats but it never had any effect on her or on

the properties she bought and sold.  Tr. at 2006.  In 1983 she bought two adjoining parcels of land

in the class area for $306,000, Tr. at 2005, and subdivided them to make six parcels total, Tr. at

2010.  She built a house and an equestrian center on one parcel, Tr. at 2011-12, and built a barn on

another parcel, Tr. at 20.

Around 1985 her business was slowing down, which coincided with an increase in publicity

about Rocky Flats, and her clients were expressing concerns.   Tr. at 2028.   As her business

worsened, she gradually sold off two of the parcels.  Tr. at 2029-31.  One parcel she gave back to

the original seller (who had loaned her part of the purchase price) because she could no longer afford

to pay the loan.  Tr. at 2032.  One parcel was foreclosed, and the two other parcels were purchased

by a buyer who bought the loan from the bank, in lieu of foreclosure.  Tr. at 2037-39.  The FBI raid

was the final blow:

Q.  And what did you think when you saw that on TV?

A.  I thought I am finished.  I was very upset.

Q.  Why did you think you were finished?

A.  Because the -- what was coming out on the news was the final blow in a long line of trying to battle the effects of Rocky Flats on my finances, my property values and my life.

Q.  And what decision did you make after the FBI raid?

A.  I decided to give up and leave the area and try to start over.

Tr. at 2040.  Although she had invested $300,000 of her money in the properties, and borrowed much more, she ended up with nothing.  Tr. at 2044.  She believed her property was worth $2.2 million.  Tr. at 2046.

### **Richard and Sally Bartlett**

Richard and Sally Bartlett owned a residential and horse property in the class area.  They bought their property in 1978 as vacant land for $55,000.  Tr. at 892-93, 894.  They built a house on the land, as well as a barn, an equestrian center, and a modular home.  Tr. at 899.  Mr. Bartlett estimated that they spent $600,000 to $650,000 on the land plus improvements.  Tr. at 1018.  They decided to sell the property in 1988 because they needed more room for their daughter's horse business, and Mr. and Mrs. Bartlett wanted to downsize to a smaller home.  Tr. at 913.  There was very little interest in the property.  Tr. at 914.  Only two or three prospective buyers came to see the property in the years after the raid.  Tr. at 923.  It ultimately took them ten or eleven years to sell the property.  Tr. at 922.  They finally sold the property in 1999 for $700,000.  Tr. at 923, 924.  Mr. Bartlett estimates that after 21 years, they actually lost $50,000 on the property.  Tr. at 1019.  Both Mr. and Mrs. Bartlett believe the property should have been worth double that amount.  Tr. at 924; Tr. at 1028.  Mrs. Bartlett believes the FBI raid and the negative publicity about Rocky Flats had "a tremendous impact" on their ability to sell their home.  Tr. at 919.  In the first two years after the

raid, only two or three prospective buyers even looked at the property.  Tr. at 923.

### Gertrude Babb

Gertrude Babb owned a horse property in the class area that she and her husband purchased for their son and daughter-in-law.  Tr. at 1953-54.  She bought the property in 1985 for $178,000.  Tr. at 1955.  She invested about $70,000 in improvements.  Tr. at 1957-58.  She decided to sell the property after her son's marriage broke up.  Tr. at 1958.  She listed the property around 1989 at $200,000, Tr. at 1958-59.  The property stayed on the market for around six months, Tr. at 1960, and eventually sold for $137,000, Tr. at 1959.  Ms. Babb believed the FBI raid, which occurred at the same time she needed to sell the land, affected the value of her land:

Q.  Do you think that the FBI raid affected your ability to sell the property?

A.  Yes, I do.

Q.  In what way?

A.  Everybody that didn't know about it found out about it, so everyone knew about it.  And everybody that came out to look at it, that's the first thing they said.

Tr. at 1961.

### William and Delores Schierkolk

William and Delores Schierkolk still own their class property, which is a single-family residence.  Tr. at 1899 .  Mr. Schierkolk testified that they bought the property in 1978 for $92,000.  Tr. at 1896.  Over the years they have spent $34,729 on improvements.  Tr. at 1899.  Some time a few years after they moved in, Mrs. Schierkolk began to worry about Rocky Flats, and called the health department with her concerns.  Tr. at 1899.  After the FBI raid, Mr. Schierkolk testified that he and his family were concerned for their health.  Tr. at 1901, 1902.  However, he did not try to sell

his home because he could not afford to take a loss:  "For one thing, it wouldn't have any value.  I

couldn't sell it for the money that I had in it probably.  There wouldn't be any buyers."  Tr. at 1902.

In 1993 the Schierkolks successfully appealed a tax valuation of their home by citing the problems

with Rocky Flats.  Tr. at 1903-06.  They cited as evidence the fact that there had been no recent sales

in the area, and attached the Krey and Hardy contour map as evidence that Rocky Flats had harmed

their property value.  Tr. at 1905.  They succeeded in reducing their tax valuation from $167,700 to

$150,940, which remained the value for the following year as well.  Tr. at 1906.

### Gretchen Robb

Gretchen Robb, a class member, sold her home in 1990 because of her fears about Rocky

Flats.  Tr. at 5015.  She had bought her home in 1986 for $100,000, and sold for $102,500 in 1990.

Tr. at 5037-38.  During the time she owned the home, she had made improvements.  Tr. at 5024.

Her house stayed on the market for a long time before she finally received the first and only offer,

which she accepted.  Tr. at 5024.  After liquidating her entire investment in her home, she received

only $4,000 in return for her initial down payment and her investments in improvements.  Tr. at

5025.

### Karen Whalen

Karen Whalen bought a home in the class area in 1984 for $71,209.  Tr. at 5936-37.  She

spent about $5000 on improvements.  Tr. at 5937.  She decided to sell her home as a result of the

FBI raid and her concerns about her and her family's health.  Tr. at 5939.  She sold her home in 1990

for $77,708, of which she received only $1183.  Tr. at 5942-43.

### Other Experiences In The Market

Sam Cassidy, who was president of the Jefferson County Economic Council from 1995 to 1997.  Tr. at 4460.  He discussed one local developer, Charles McKay, who was struggling to develop his property.  Tr. at 4471-72.  Mr. Cassidy testified that Nike wanted to build a major campus in the Denver area, and Mr. Cassidy created a proposal for a site that would have included land then owned by Mr. McKay and some owned by another local developer, Howard Lacy.  Tr. at 4476, 4479.  However, Nike rejected a site because it was too close to Rocky Flats.  Tr. at 4480.

Mr. Cassidy described another project, his attempt to re-lease a building owned by Mr. Lacy.  He was unable to re-lease the building for his entire three-year tenure with the JEC.  Tr. at 4482-83.  Mr. Cassidy testified that the area near Rocky Flats was economically depressed.  Tr. at 4484.  He succeeded in having the area designated an enterprise zone, a special development designation for blighted areas, that offers tax benefits to encourage development.  Tr. at 4484-85, 4487-88.  Mr. Cassidy stated that although the JEC was very successful at promoting growth in other areas, during his tenure it did not succeed in convincing a single company to invest near Rocky Flats.  Tr. at 4511-12.  This was despite the fact that the area had sufficient infrastructure, Tr. at 4514, the recreational amenities and education level were the same as the rest of Jefferson County, Tr. at 4509, and northern Jefferson County (near Rocky Flats) had better access to the downtown area and the local airport, Tr. at 4509-10.

Mr. Bartlett described another development, a plan to build a golf course, that was stymied by Rocky Flats.  Mr. Bartlett represented the Alkire Investment Group, and North JeffCo and Jefferson County's open space department approached him with a plan to build a golf course on the

Alkire land.  Tr. at 1029.  The plan had been approved by the relevant authorities, but then they received a letter from DOE saying that they needed to "study the ground," and asked the group to suspend the project.  Tr. at 1030.

Mr. Hunsperger also discussed some examples of how the Rocky Flats stigma affected actual property values.  He described how one vacant parcel, the Bormer property, lost 70% of its value, declining from $2,001 an acre in 1985, to $1710 an acre in 1992, and then to $612 an acre when it was re-sold in 1992.  Tr. at 6471.  The Brauch property, another vacant parcel, was appraised at $3500 an acre in 1992, but sold that year for only $1291 an acre, or 63% less than its true value.  Tr. at 6472.  Mr. Hunsperger testified that generally, development was slow in the area:

> In the vicinity of Rocky Flats, particularly to the south, there have been little development.  Some of the development that had been started in 1985, 1986, in fact, had been discontinued and picked up again in the early 2000s.  There were a couple of subdivisions that had been dormant for years and years and years.

Tr. at 6490.  He also observed that the land use patterns in the class area changed from "active" uses, such as residential or industrial development, to "passive" uses, such as open space.  Tr. at 6490-91.  All told, Mr. Hunsperger found this evidence to be indicative of a stigma.  Tr. at 6490.

### 4.      Class Members Who Did Not Sell Their Property Suffered Damages.

Class members who did not sell their properties, or who sold after 1995, the last year for which Mr. Hunsperger and Dr. Radke calculated damages, are nonetheless entitled to damages for the diminution in value of their properties.  Dr. Radke's regression analysis shows the amount by which property values were depressed as of the CCE time, which is between 1989 and 1992.  This depression in value is the measure of damages dictated by section 930 of the *Restatement of Torts*.

In addition, Dr. Radke testified that those property owners had suffered damage:

> [P]eople seem to think that you need to sell a house, and you get the money for it, and then you have devalued or you have value, but that's not true. Their homes were devalued by whatever the percent, I had it in the different years, 7 percent, 9 percent, and they were devalued over the other homes in the region. That's what I wanted to show, and I was able to show that, and it was significantly -- or statistically significant. And then I wanted to know, Well, how much value -- how much in total value was that. And it turned out to be quite high.

> Now if I had owned all of those houses, if I owned all of those houses, and I wanted to -- and I wanted to go to the bank and use that for -- as collateral, then that would be significant. If I owned the same number of houses outside the plume, I wouldn't have had the loss. That's what I was trying to show in that graph.

Tr. at 2831.

In order to dispute plaintiffs' damages evidence, defendants argue that the amount of damages is dependent on when a class member sold his or her property. *See* Def. Br. at 65-70. This argument echoes the "before and after" damages measure that the Court has repeatedly rejected. *See Cook IX*, 273 F. Supp. 2d at 1209-10. Moreover, defendants confuse the *injury*, which is the nuisance and/or trespass, with the *measure of damages*, which is the diminution in value. A class member need not sell his or her property in order to have suffered an injury; the injury is the continuing trespass or nuisance. Neither section 930, nor any governing Colorado damages law, requires that a party must have sold his or her property in order to recover damages for a trespass or nuisance. In addition, plaintiffs do not need to show any discount past 1995, as the measure of damages is chosen at the time the harm becomes complete and comparatively enduring. The evidence shows that the harm was complete and comparatively enduring by 1992, *see infra* Section V.D..

**5.    Any Pre-Existing Diminution In Class Properties
Before The FBI Raid Was Magnified By The Raid.**

Plaintiffs "are not required to prove that any diminution in value caused by Dow or Rockwell's activities at Rocky Flats came into existence before or after the FBI raid or some other specific event." *See* Jury Instruction No. 3.24.   However, plaintiffs have offered voluminous evidence that events surrounding the raid and its aftermath contributed not only to negative public perceptions surrounding activities at the plant, but also to diminution in the value of class properties.

Mr. Hunsperger testified that, although prices for single-family homes and vacant land in the class area were already slightly depressed in 1988, the FBI raid exacerbated the problem.   Tr. at 6474-75, 6476.  Mr. Hunsperger observed that a spike in diminution occurred after the FBI raid.   Tr. at 6979.   Dr. Radke also found that the impact worsened in the aftermath of the FBI raid.   Tr. at 2785-86.   This effect on the market is to be expected, considering that Drs. Flynn and Slovic observed that negative media stories about Rocky Flats spiked at the time of the raid, and continued to occur more frequently afterward.  *See* P-1123 at Fig. 3.

Mr. Hunsperger's conclusions are supported by the experiences of other witnesses.  Joseph Bowman, an investor in the Alkire Investment Group partnership that owned a large tract of undeveloped land in the class area, received what he described as a "reasonable" rate of return on his investment through the mid-1980's.  Tr. at 6047.   He testified that the negative publicity about Rocky Flats was much greater around the time of the FBI raid than ever before:  "[the publicity] built up, for whatever reason, that it was far, far greater negative publicity in the late '80s than it was prior to that."  Tr. at 6101-02; *see also id.* at 6107-08.  Merilyn Cook cited the FBI raid as the final straw that led her to give up on ever recovering her business.  Tr. at 2040.  Richard Bartlett also saw a

marked increase in the amount and tenor of media coverage after the FBI raid:

> A.  It was an ongoing, you know, something would happen out there, and that would be in the paper, the media, then there would be an answer back to it.  So it was this thing that just kept on for that period of time.  ...

> Q.   Was Rocky Flats getting more and more adverse media at that time?

> A.  Yes.  Especially in the '90s, it was starting to be -- increase the number of things that were being talked about.

Tr. at 1022.  Gretchen Robb similarly saw a dramatic increase in media attention as time went on:

> Q.  Do you recall approximately what year that was that you started learning about the increased cancer rates in the area near Rocky Flats?

> A.  You know, it's been so long, I just -- I can't tell you.  I know it was a couple of years after I moved in, but it just seemed to crescendo.  It started out little, and then it seemed to get bigger and bigger.

Tr. at 5021.  These witnesses' perceptions of the media coverage of Rocky Flats correspond to Dr. Radke and Mr. Hunsperger's findings that the diminution in value increased after the FBI raid.

### B.     A Reasonable Jury Would Find A Market Stigma Due To Rocky Flats.

Plaintiffs' witnesses established that a stigma attached to properties in the class area due to the nuisance and trespass caused by Rocky Flats.  The media attention following the FBI raid contributed a major portion of the public's knowledge about the problems at Rocky Flats and therefore, the associated market stigma.  Although defendants attempt to portray this media coverage as limited to the mere fact of the raid, *see* Def. Br. at 64-65, the important point is the FBI raid shone a light on the chronic mismanagement and unsafe practices at Rocky Flats.  Although many witnesses cite the raid as the pivotal event in their perception of Rocky Flats, they also refer to the ensuing revelations about the dangers posed by Rocky Flats as the basis for their negative perception

of the facility.[6]  The monetary damages measured by Dr. Radke and Mr. Hunsperger can be traced to defendants' conduct.[7]

Moreover, plaintiffs are not required to verify every fact reported in every story and trace their effects to the marketplace with pinpoint accuracy, as defendants argue (Def. Br. at 60-61, 64). Rather, the *general* knowledge in the marketplace, as illustrated by the media coverage *as a whole*, supports plaintiffs' claim that defendants' trespass and nuisance in the class area lowered property values there.  Plaintiffs' claim for damages is based on the nuisance and trespass caused by defendants' negligent and reckless operation of Rocky Flats, which was communicated to the marketplace by the media.  This general body of knowledge led to the stigma on the class properties.

### 1.      Dr. Slovic's Testimony Regarding Stigma

Dr. Slovic described how the risks of Rocky Flats are especially likely to stigmatize neighboring properties.  A stigma arises depending on both people's perception of a risk and acceptance of that risk, and the impact of the event is expanded through a process called social amplification of risk.  People's perception of risks is affected by the type of risk.  He gave the

---

[6] In addition, the allegations behind the FBI raid were not "proven false" as defendants insist.  *See supra* Section III.C.  In any event, plaintiffs' claims do not depend on whether the FBI's allegations were proven either in this Court or before the Grand Jury; it is the total effect of all the publicity about Rocky Flats, including publicity about off-site plutonium contamination, the health threat posed by that contamination, and the threat of future releases and resuspension of contamination, that depressed property values in the class area.

[7] It is also important to note that plaintiffs' experts' comparisons of the class area to other areas inherently account for the trespass because the class area in this case was defined by the medium plutonium contour from the Krey and Hardy study.  Accordingly, when plaintiffs' damages experts considered the class area as compared to other areas, by necessity they compared the area where the trespass was more acute, to areas with less or no Rocky Flats plutonium contamination.  *E.g.,* Tr. at 2725 (Radke).

example of comparing people's perceptions of the risks from nuclear power versus medical x-rays:

> Nuclear power invokes feelings of dread and to a much greater extent than x-rays.  It's seen as more likely to be fatal if something goes wrong.  It's seen as somewhat less known as a risk, to have more delayed consequences, and less well-known to science as well.

> Nuclear power is seen as less controllable, the risks are less controllable than those of x-rays and seen as a newer hazard.  It's not old and familiar.

Tr. at 4235.

Dr. Slovic also discussed how people's acceptance of risk differs based on the type of risk. The type of factors that make people less willing to accept a risk include: (1) exposure to the hazard is involuntary; (2) the risk is not under one's control; (3) the risk evokes feelings of dread; (4) the outcomes are catastrophic; and (5) the benefits are not fairly or equitably distributed among those who bear the risks.  *See* Slovic Report at 5; *see also* Tr. at 4239.  These features all describe the types of risks faced by neighbors of Rocky Flats.  *See* P-1354 at 10 (risk from radiation exposure due to Rocky Flats perceived as "uncontrollable, posing latent threat, dread (leading to cancer, a dread disease), and unknown").

Dr. Slovic described how risks can create a stigma through the process called social amplification of risk.  Through this process, the degree of media coverage of a catastrophe, plus the nature of the catastrophe (i.e. whether it is controllable, evokes dread, etc.) interact to create ripple effects through other people's reactions to the risk (such as government regulators or potential home-buyers).  Tr. at 4243-44.  In other words, "you go beyond the inner circle, that the effects on the victims, that the consequences don't stop with the victims.  It goes beyond that.  It's amplified by the quality of the hazards interacting with things like media coverage."  *Id.* at 4244.

75

Based on his knowledge of the interaction of these three concepts – perception and acceptance of risk, and social amplification of risk – Dr. Slovic described what he called "a common recipe for stigma":

> It happens when the risk is judged uncontrollable, and there are many elements of being uncontrollable. What is it that people think that science doesn't understand, that, therefore, we don't have the knowledge to control it; that there is widespread and nonvoluntary exposure; that the contamination is not observable; that the effects might not be seen for a long time so that they are kind of late and just kind of waiting to emerge; and that the officials in charge of managing whatever it is that caused the problem are distrusted. That all leads to a sense of uncontrollability which is part of stigma.
>
> The other element is that dread element. You know, the consequences are considered fatal and horrific, that the contamination is long lasting, that there is no end to it, and the consequences are latent like there is a time bomb ticking, so things that happen with radiation, radiation contamination often fit very closing to this model. And the risk is abnormal; that is, it shouldn't be there.

*Id.* at 4245-46. Dr. Slovic's testimony shows that the risks posed by Rocky Flats were particularly likely to stigmatize neighboring properties if something went wrong, which in fact it did.

## 2.    Media Coverage And Market Knowledge

Evidence of the amount and content of media coverage of Rocky Flats may be used to prove the market's knowledge of the problems at Rocky Flats. *See, e.g.* Aug. 22, 2005 Hearing Tr. at 8 ("publicity [about the FBI raid and Grand Jury] is relevant and admissible because it goes to the market's knowledge of Rockwell's alleged misconduct and alleged risks caused by it."). Media coverage is an important link between the conditions at Rocky Flats and the public's perception of Rocky Flats. *E.g.* Flynn Dep. at 171-72 ("the media coverage that the population is exposed to should be considered as a factor in shaping people's perceptions of risk or even stigma, if that's the nature of the media coverage. I think that the media does have an influence on how people

understood conditions when they are exposed to ..."); Tr. at 6326 (read to jury).

Drs. Flynn and Slovic conducted a comprehensive survey of the media coverage before and after the FBI raid. *See* P-1123 ("Final Report, The June 6, 1989 FBI Raid at Rocky Flats, Colorado: Risk, Media, and Stigma"). They recorded a spike in news stories in the aftermath of the FBI raid. P-1123 at Fig. 2. After the raid, the overwhelming majority of the articles were negative, as opposed to neutral or positive. P-1123 at Fig. 3.

Plaintiffs also presented many examples of the type of news stories that were appearing around the time of the FBI raid and thereafter. *See, e.g.* P-1175 ("Families Fear Test on Nuclear Waste," 4/23/1987); P-704A ("Flats can't be cleaned up, GAO says," 2/9/1989); P-706 ("Feds Raid Rocky Flats", 6/7/1989); P-1191 ("Neighbors' concerns on the rise" and "Quick action vowed if health threats found", 6/7/1989); P-707A ("Federal Agents Raid Rocky Flats. Illegal storage, disposal of hazardous waste alleged," 6/7/1989); P-1363 ("Doctors call for shutdown of Rocky Flats," 6/18/1989); P-1368 ("Radiation accidents revealed in 1981-87 Flats reports," 7/5/1989); P-1367 ("Grand jury to probe Flats," 6/29/1989); P-1369 ("Plutonium in Flats ducts enough to spark radiation," 10/7/1989); P-1372 ("1989: Top Colo. Stories played"); P-783 ("No More Glowing with the Flow. $73 million project will ensure no water tainted at Rocky Flats can get into drinking supplies," 2/16/1992); PV-3103 (Ch. 4 "FBI/EPA Investigation", PV-3110.

Witnesses also described the media attention to Rocky Flats around the time of the FBI raid. Mrs. Bartlett testified that news of the raid received extensive coverage in the local and national media. Tr. at 917-18. Mr. Holeman also recalled increased news coverage of Rocky Flats that year:

> Yeah, there were plenty of stories. There was no end to the ink that the two major dailies used to write stories about Rocky Flats. They seemed to take a particular

interest in Rocky Flats that year, and the raid provided them with a lot of opportunity to talk about the plant site.

There was coverage in the national press as well, given the unprecedented nature of one federal agency invading another, and it generated a great deal of press in the state of Colorado.

Tr. at 1248.

### 3.    Public Opinion Surveys Show A Stigma As A Result Of The Trespass And Nuisance Caused By Defendants.

Drs. Flynn and Slovic's survey (P-1355) found a significant degree of stigma associated with Rocky Flats, and this stigma included negative perceptions of housing in the class area due to Rocky Flats. The survey was designed to measure whether the public attitudes existed that would be conducive to an economic stigma on class properties. As Dr. Flynn put it, "As the result of this study of the media, I believe that the conditions, as described in the social amplification of risk, assisted in the Denver metropolitan area as a result of this raid and that they could produce the conditions to have an affect [sic] on people's perceptions and economic behaviors." Flynn Dep. at 191; Tr. at 6326 (read to jury).

The Flynn and Slovic survey study did not attempt to quantify what percentage of the stigma resulted from various events, such as Rocky Flats' earlier bad reputation, the FBI raid, or other publicity. Flynn Dep. at 198, Tr. at 6326 (read to jury). However, the evidence is plain that the stigma associated with Rocky Flats was largely due to the extraordinary media attention given the plant as a result of the FBI raid. *E.g.* Flynn Dep. at 197-98 ("this information on the media reporting of the raid strongly suggests that the raid contributed to the influence of Rocky Flats on people's attitudes and perceptions. That this is consistent with this theory of the social amplification of risk

and that it's consistent with the data that we got in the survey when we asked people if they had heard about the raid. And those who answered yes were more likely to have a negative opinion about property in Arvada, Westminster."), Tr. at 6326 (read to jury).

The survey shows the problems at Rocky Flats created a negative view of housing there. *See* Flynn Dep. at 101 ("the condition of Rocky Flats and related to residential property in the communities Arvada and Westminster, that the results of our survey indicate that there's resistance to housing associated with Rocky Flats and that this will exert a downward pressure on desirability and prices of homes."), Tr. at 6326 (read to jury).

Mr. Hunsperger also relied on surveys conducted by the cities of Broomfield and Arvada. The results of the City of Broomfield survey indicated a stigma on housing near Rocky Flats: "just to hit the high points, more than half of Broomfield's residents were more concerned about Rocky Flats after the raid. Two-thirds believed property values were affected by Rocky Flats after the raid. Two-thirds believed Rocky Flats was a health threat." Tr. at 6441-42. The Arvada survey revealed that "[t]wo-thirds of the respondents in that survey believed or were unsure whether Rocky Flats was a health threat." Tr. at 6443.

These surveys all trace the source of the stigma to risks from past and future releases from Rocky Flats. Drs. Flynn and Slovic's survey reveals that the market stigma is tied to negative perceptions of Rocky Flats' environmental problems. *E.g.* Flynn Dep. at 197-98, Tr. at 6326 (read to jury). For example, the majority of respondents felt that Rocky Flats is probably or definitely unsafe, that even very small amounts of contaminants from Rocky Flats in residential areas posed a health risk, and that the FBI raid and Rockwell's guilty plea had adversely affected the desirability

of housing near the plant.  *See* P-1355 at 17-19.

The other surveys relied upon by Mr. Hunsperger also show a heightened concern about environmental contamination.  82% of the Broomfield survey respondents said they were concerned about radioactivity in the Broomfield water supply.  Tr. at 6590.  83% of Broomfield survey respondents and 42% of the Arvada survey respondents believed that Rocky Flats was a health threat.  Tr. at 6599, 6604.  Also, 34% of the Broomfield survey respondents identified plutonium specifically as a contaminant of concern:  "[t]hat means that there was a lot of exposure, a lot of media coverage in the marketplace.  These people had heard the word plutonium a lot and had some knowledge about what it is."  Tr. at 6598-99 (Hunsperger).

### 4.    Wayne Hunsperger's Market Research

Mr. Hunsperger undertook market research to determine whether the class area was stigmatized.  This research involved "reading documents, talking to market participants, getting some sense of what the attitudes were in the marketplace."  Tr. at 6406.  His firm interviewed a wide variety of market participants, including lenders, home builders, government officials, appraisers, and others.  Tr. at 6434.  This research showed that the class area was a more difficult place to build or to sell homes:

> We also concluded, based on these -- the results of these interviews and our own investigation, that the negative perception in the mid 1990s at the time was almost impossible to overcome.  Nobody was successful in doing it.

Tr. at 6444.

### 5.       Experiences Of Market Participants

The experiences of land owners and other market participants demonstrate that negative

publicity about Rocky Flats, and specifically about the contamination off-site and the risks of living

nearby, caused the depression in real estate values found by Dr. Radke and Mr. Hunsperger.

Karen Whalen decided to sell her home solely due to her worries about the health risks from

living near Rocky Flats.  Tr. at 5939.  Mrs. Whalen described the type of news coverage she had

seen:

> Q.  Could you tell the jury a little bit about what you were reading in the
> newspaper that led you and your husband to decide that you should move?
>
> . . .
>
> THE WITNESS:  I read for the first time that there were drums of
> radioactivity that had been buried in the ground that hadn't been sealed and had been
> allowed to leak.  And I read for the first time that there had been fires and
> incinerators that allowed contamination to go into the area.  And I read for the first
> time that there were trace plutonium elements in the water.

Tr. at 5940.  She even consulted a newspaper article about contamination in the area, in order to help

her choose a new place to live:  "I recall specifically that there was a picture in the newspaper

showing the wind currents.  And that -- inside of this area was contamination.  It might have looked

like something like this map [the Class Area map].  I can't recall.  It seemed like it had wind

currents, too.  So we took that map, and we looked for homes outside of that area."  Tr. at 5940.

Gretchen Robb also left her home because of her concerns about the health risk from Rocky

Flats:  "I left my dream home because of my health, more than my health, my daughter's health.  I

was fearful living there any longer."  Tr. at 5019.  She specifically remembers hearing in the media

that cancer rates near Rocky Flats were higher.  Tr. at 5020.

Sally Bartlett similarly testified that she was afraid for her health.  Tr. at 929.  Mrs. Bartlett

clearly expressed that her concerns arose from the contractors' negligent or reckless conduct, not

mere proximity to a nuclear weapons plant:  "I mean, to think that 16 miles from a metropolitan area

that they would use such sloppy techniques in doing such dangerous tasks that they had to do."  Tr.

at 927.

Merilyn Cook described how her clients reacted to the publicity about Rocky Flats.  As the

media reported bad news about the plant in the 1980's, her clients began to go elsewhere.  Tr. at

2028.  As Ms. Cook described it,

> I had less horses on the facility, less people wanting to do business with me in that
> location, concerned about their children drinking the water, breathing in the dust.  A
> lot of the horses that I boarded were very valuable, expensive animals  that I boarded
> in the past, some of them as much as a hundred thousand.  People were not willing
> to be there.

Tr. at 2030.  She also began to worry about possible risks from Rocky Flats:

> After the experience as it went on through those years, I was not able to watch the
> kids out there riding their horses or be out there myself and breathe that dust and not
> worry.  I didn't feel comfortable in the horses drinking the water.  It had just -- I just
> lost my enjoyment of this beautiful place.

Tr. at 2047.

### C.     A Reasonable Jury Would Find That The CCE Time Was Between June 6, 1989 (The FBI Raid) And March 26, 1992 (The Date Of The Guilty Plea).

Plaintiffs have offered evidence amply sufficient to support a jury finding that the injurious

situation at Rocky Flats became complete and comparatively enduring ("CCE") between the time

of the FBI raid and Rockwell's guilty plea.[8]

Under section 930(2), the reference point for calculation of damages occurs at the time when the "injurious situation" is both "complete" and "comparatively enduring." The "injurious situation" comprises more than particular episodes of tortfeasor misconduct, as seen from the tortfeasor's point of view. It embraces the overall harm to which both these tortfeasors contributed – and not just the bare fact of harm, but its nature and extent.

As discussed earlier in this brief, plaintiffs have offered evidence showing releases of plutonium from the site for the entire period of its operations. This includes not only undisputed evidence of routine releases (e.g., through the stacks), but also evidence from which other ongoing releases may be circumstantially inferred (e.g., Rockwell's waste-handling practices, MUF, bioturbation). Indeed, the revelations surrounding the FBI raid (as addressed, for example, in Mr. Lipsky's testimony) document reckless and felonious practices, in the handling of *mixed* radioactive and hazardous wastes, in ways and to a degree never previously disclosed, and continuing through the time of the raid itself. Those practices not only involved the release of radioactive contaminants into the great outdoors, where they were subject to dispersal by the same natural forces that spread plutonium and other contaminants into the class area during previous releases; they also escalated

---

[8] Plaintiffs believe it should suffice, to withstand a motion for judgment as a matter of law on this issue, that plaintiffs have offered evidence from which a jury could find that the injurious situation became "complete and comparatively enduring" during *any* time period for which plaintiffs have also offered sufficient evidence of damages under section 930's "but for" measure – as plaintiffs have done for a time period extending beyond the interval between the FBI raid and Rockwell's guilty plea. For purposes of this motion, however, the choice of temporal window should be unimportant, because plaintiffs have offered sufficient evidence to support a jury finding that the injurious situation became "complete and comparatively enduring" during the shorter temporal interval, between the raid and the plea bargain.

the risks of future releases – risks that the jury could find not to have stabilized until production operations at the site, and the concomitant generation of plutonium-contaminated wastes, were finally halted.

From this evidence, the jury could legitimately find that the "injurious situation" was not fully mature, and disclosed to its full extent – that is, was not "complete" – until at least the time of the raid in 1989. The evidence shows that the public did not become fully informed of the "injurious situation" until after the raid. Indeed, the dose-reconstruction work performed by ChemRisk and RAC was not even undertaken until the 1990's. The jury has also heard testimony that many elements of the "injurious situation" came to light only in the aftermath of the FBI raid and its attendant publicity. *E.g.*, Tr. at 5940 (Mrs. Whalen: news about fires, barrels, contamination in her neighborhood); Tr. at 919 (Mrs. Bartlett: "We felt betrayed that the Government had been telling us all along that everything was fine, and now this raid came up . . ."). The future harms also were defined and limited by the shutdown of the plant in 1990 and widespread uncertainty as to when the cleanup would begin, let alone be completed. In addition, the guilty plea marked the end of the criminal investigation, and (ostensibly) the total history of the environmental damage caused by Dow and Rockwell was laid bare.

Through the 1990's, it was predicted that the cleanup would take many, many years, if the plant could even be cleaned up at all. Tim Holeman, who worked in the governor's office, described the predictions at that time about the future of Rocky Flats:

> There were varied opinions on that, some within the Department of Energy and the GAO. Their preliminary assessments were that it could take 30 to 70 years to ultimately remediate the plant site based on their estimates of the willingness of Congress and others to appropriate dollars.

84

There were others who believed that you could do it in an accelerated fashion with enough investment of dollars and investment of manpower, and specialists, people who knew about environmental management. So in the end, there was some who claimed that we should not even attempt to fully remediate the site, and the term of art at the time going around was called national sacrifice zone, which was a disturbing term of art where some believed that the contaminants were to such an extent buried in the soils that the Government would be better off putting a fence around some of these sites and calling it a day.

Tr. at 1216-17. *See also* P-704A (Rocky Mountain News, "Flats can't be cleaned up, GAO says"); P-512 at 15 (GAO Report, "Summary of Major Problems at DOE's Rocky Flats Plant," discussing timetable for cleanup extending to an indefinite period of time beyond 1995).

The fact that the degree of property value diminution spiked in the 1990 through 1992 time period, *see supra* Section V.A.5., and that property values remained depressed through at least 1995, is further evidence that the harm was complete and comparatively enduring at that time. *Cf. Cook IX*, 273 F. Supp. 2d at 1209 (diminution in value is "evidence of the normal community member's reaction to the claimed interference and whether the member would view the interference as substantial and unreasonable.")

### D.   Plaintiffs' Damages Evidence May Not Be Disregarded Under Defendants' "Statute Of Limitations" Theory.

Defendants contend that plaintiffs' evidence on damages should be disregarded on the theory that if defendants' tort is deemed "continuing," plaintiffs may recover only for "future damages" or for "past damages that occurred [within the limitations period]." Def. Br. at 75.

Defendants advance this argument fresh from having warned against the conceptual peril of confusing the underlying legal injury with the compensable damages therefor. *See id.* at 74 n.50. Their argument suffers from precisely that confusion. Section 930 does not speak of "past damages"

or "future damages."  It speaks of damages for "past and future invasions."  If plaintiffs elect a remedy under section 930, damages for "past invasions"(compensable under *Restatement (Second) of Torts* § 929) are limited to damages for harms suffered prior to the time when the injurious situation became complete and comparatively enduring.  *See id.* § 930 illustration 1.  Such damages are not at issue in this trial, because of the individual issues they present.  In this class trial, the only damages at issue are for "future invasions" – i.e., for "prospective" harms occurring after the injurious situation is found to have become complete and comparatively enduring.  The *damages* for those "future" harms are *measured* by the diminution in value caused by the injurious situation, as of the time when it became complete and comparatively enduring.

Were the statute of limitations at issue in this trial, plaintiffs would respond here to defendants' incorrect assumption that the applicable limitations period, under Colorado law, would be two years, as opposed to six, *see Cook v. Rockwell Int'l Corp.*, 755 F. Supp. 1468, 1482-83 (D. Colo. 1991) ("*Cook I*"), as well as to defendants' incorrect assumption that the federal accrual rules described in defendants' quotation from *Hoery* apply, to the extent they may be at variance with the state accrual rules that would actually govern in this litigation under 42 U.S.C. § 2014(hh), *see Cook I*, 755 F. Supp. at 1482.  Plaintiffs would also observe that even where the statute of limitations is a defense, it is an *affirmative* defense that plaintiffs would not be required to disprove in their case-in-chief.  *Id.*  The Court, however, has already ruled that the statute of limitations defense is unavailable to defendants for the claims and damages at issue in this trial.

## VI.    PLAINTIFFS HAVE PROVIDED SUFFICIENT EVIDENCE
##         FOR THE JURY TO AWARD PUNITIVE DAMAGES

The evidence shows that Dow and Rockwell engaged in willful and wanton conduct that harmed the class members.  "'Willful and wanton' conduct means an act or omission purposefully committed by the Defendant in question, who must have realized that the conduct was dangerous, and which conduct was done heedlessly and recklessly, either without regard to the consequences, or without regard to the rights and safety of others, particularly the Plaintiff Class." Jury Instruction No. 3.27.  Not only deliberate actions, but also a failure to act, may warrant punitive damages, as Colorado courts consider a repeated failure to correct a known, dangerous condition to be willful and wanton conduct.  *See Jacobs v. Commonwealth Highland Theatres, Inc.*, 738 P.2d 6, 10 (Colo. Ct. App. 1986).

Defendants' wrongful conduct discussed at length in this brief evidence a shocking degree of indifference toward the off-site population.  The 903 area releases occurred with the full knowledge of Dow, despite the fact that simple, common-sense measures such as moving the barrels indoors or covering them could have prevented the contamination from spreading.  *See* P-338 at 5; P-483; *see also* Sections I.B. and II.C., *supra*.  The 1969 fire happened only because Dow ignored safety recommendations made by the AEC after another catastrophic fire twelve years earlier.  *See* Tr. at 3170-83; G-507A; *see also* Sections I.B. and II.C., *supra*.

Rockwell simply continued the bad precedent set by Dow.   Even after the DOE agreed to subject mixed waste to EPA regulation, Rocky Flats refused to accept the EPA's authority until the 1986 tri-party agreement.  Tr. at 2301-02 (Lipsky). At the same time Rockwell finally agreed in 1986 to accept the authority of the Colorado Health Department and the EPA, see P-557 (compliance

agreement), the company was hiding numerous environmental violations.  *See* P-493 at 4:

> Rocky Flats, an NPL candidate, is in poor condition generally in terms of environmental compliance.
>
> We have basically no RCRA groundwater monitoring wells, our permit applications are grossly deficient (some of the waste facilities there are potentially "illegal").  We have serious contamination, we have extremely limited environmental and waste characterization data for a site of this complexity.
>
> Much of the good press we have gotten from the Agreement in Principle has taken attention away from just how really bad the site is.

Defendants' willful and wanton conduct described above is the same conduct that forms the basis of plaintiffs' claims.  First, the examples discussed above (especially the 903 Pad) caused the plutonium contamination that gave rise to plaintiffs' trespass claim.  Second, those activities contributed to plaintiffs' emotional distress, health risk, and a threat of future harm to their health and their properties.

All of these incidents took place before August 20, 1988, when the Price-Anderson Act was passed.[9]  The Court has ruled that plaintiffs may pursue punitive damages for nuclear incidents occurring before that date.  *See Cook I*, 755 F. Supp. at 1481; *Cook IX*, 273 F. Supp. 2d at 1211-12. The Price-Anderson Act defines a "nuclear incident" as " any occurrence within the United States causing ... damage to property ... arising out of or resulting from the radioactive, toxic, explosive or other hazardous properties of source, special nuclear, or byproduct material." 42 U.S.C. § 2014(q).

---

[9]  The Act's ban on punitive damages is not retroactive.  *See Crawford v. Nat'l Lead Co.*, 784 F. Supp. 439, 447 (S.D. Ohio 1989).  Defendants have not shown the requisite clear, unambiguous Congressional intent to trigger retroactive application of the statute.  *See Daniels v. United States*, 254 F.3d 1180, 1187 (10th Cir. 2001) (clear Congressional intent needed to overcome presumption against retroactivity).

The Court previously ruled that "[i]t is the date of such occurrences, not the date on which the relevant occurrences caused property damage, that determines application of the section's bar on punitive damage awards." *Cook IX*, 273 F. Supp. 2d at 1212.  Accordingly, the incidents describe above may all be considered by the jury in assessing plaintiffs' claim for punitive damages.

The fact that defendants took some safety precautions is not enough to defeat plaintiffs' punitive damages claim.  *Cf.* Def. Br. at 78.  It is their failure to take *adequate* precautions, and their total disregard for the rights of their neighbors, that warrants an award of punitive damages.  *Cf.* Rest.2d Torts § 288C ("Compliance with a legislative enactment or an administrative regulation does not prevent a finding of negligence where a reasonable man would take additional precautions.").

Moreover, defendants' supposed compliance with standards carries little weight in this case. First, the standards governing defendants' conduct were far from clear.  In the early years, often no standard existed that applied to defendants' conduct.  Tr. at 3055 (Budnitz).   There is not even agreement among the various regulatory agencies about the acceptable standards or degree of risk for the public, or the type of models used to calculate that risk.  P-1145 is a 1994  GAO report entitled, "Consensus on Acceptable Radiation Risk to the Public is Lacking."  The report compared the various agencies' exposure limits and protective strategies, and concluded that "the radiation standards that have been developed reflect an overall lack of interagency consensus on how much radiation risk to the public is acceptable.  Because the standards have different regulatory applications and are based on different technical methodologies, the estimated risks to the public that are associated with these standards and guidelines vary considerably."  P-1145 at 1.  Dr. Cochran also testified that "[t]here are significant differences between the regulatory agencies – for example,

between EPA and the Department of Energy – with regard to what health risks should be imposed, for example, following cleanup of a site. And there are differences in the computer models that those agencies use or prefer to use in calculating what the health risks are to a class of people or a group of people that are exposed." Tr. at 5314. In the case of Rocky Flats, while the EPA uses a risk standard of one in 1 million, the risk level for the Rocky Flats cleanup adopted by DOE and other regulatory agencies is one in 100,000. Tr. at 5590-91 (Cochran).

Second, there were also many instances in which defendants violated the governing rules and regulations. The committee investigating the 1969 fire found that Building 771 did not meet even the minimum AEC fire safety standards. Tr. at 3192; P-1027 at 1. P-479, a 1980 Rockwell document, lists sixteen citations for environmental violations at the plant between 1975 and 1980. *Id*. at 2-3, Tr. at 6248-49 (read to jury). In 1988 the CDH issued a compliance order listing seven violations of the Colorado Hazardous Waste Act, pertaining to Rocky Flats' treatment and storage of waste. P-507. Six of those violations were also likely criminal violations of the RCRA. Tr. at 2335-36 (Lipsky). At the conclusion of the criminal investigation, Rockwell pled guilty to ten counts of environmental crimes, and Agent Lipsky testified that on many counts he was aware of evidence that the violations went further than what was charged. *See* Tr. at 3720-21 (Count 1); *id*. at 3722-23 (Count 2); *id*. at 3724-25 (Count 3); *id*. at 3725-26 (Count 4); *id*. at 3726-27 (Count 5); *id*. at 3732-33 (Count 6); *id*. at 3733-35 (Count 7); *id*. at 3735 (Count 8); *id*. at 3737 (Count 9); *id*. at 3743 (Count 10).

Defendants also neglect to mention that ALARA was the DOE's standard that should have guided their actions since the plant was opened, and yet all of the negligent and deliberate releases

of contaminants to the environment violated that standard.  Tr. at 5287.

Defendants compounded their reckless behavior by misleading the public about the true extent of the harm.  The deception began early.  P-93, the press release that followed the 1957 fire, claimed that "tests made have indicated no spread of radioactive contamination of consequence." P-93; Tr. at 5994-95.  By contrast, on the day of the fire, Dow personnel had monitored radiation from the smoke plume.  P-408 at 1 ("Owen found positive activity in his preliminary survey between buildings 81 and 91 which eventually turned out to contain plutonium at half tolerance level.") and 2 ("Three off-site locations are suspected of possible plutonium contamination.").

After the Martell and Poet study revealed that Dow had contaminated the area around Rocky Flats with plutonium, and Dow and AEC were forced to respond, they chose to downplay the actual extent of the contamination while omitting any mention of Dow's recklessness and negligence that caused the problem.  P-431, a news article detailing the AEC's response to Poet and Martell's study, was based on a press release that was "largely authored by Dow."  P-214 at 1; Tr. at 6186 (read to jury).  The press release, P-431, claims that "widely distributed offsite air samplers have never shown a level of radioactivity in excess of the natural background radiation."  *See* Tr. at 6178 (read to jury).  The AEC's statement reported in the article also discusses the major release events, but downplays their significance.  It describes the 903 area barrels as containing "slightly contaminated machine oil" and only mentions one year, 1968, when the leakage occurred.  The AEC's discussion of off-site contamination from the 1957 fire was limited to the following:  "a small amount of vegetation off the site was found to be slightly contaminated."  *See* Tr. at 6180 (read to jury).  One of Dow's own employees found these statements to be so misleading as to prompt him to write a

91

memo entitled, "The Credibility Gap," which was marked as P-214.  Regarding the Dow/AEC claim that air samplers had not detected radioactivity above background, the memo responds:  "in the second sentence we lead the uninitiated to think that this amount of plutonium is so minute that the 'Pu radioactivity' detected by the off-site samples is no higher than background.  How would the public react if they knew we didn't routinely analyze our on-site air samples and off-site air samples for plutonium?"  P-214 at 2.  The memorandum also takes issue with the Dow/AEC description of the contamination from the 1957 fire:  "What is a small amount of vegetation?  What is slightly contaminated?  What date did the fire occur?  When were the vegetation samples taken?  How many samples?  Location?  Did it rain or snow after the fire before the vegetation samples were taken?  Were the samples analyzed for plutonium or only total alpha?  Was an estimate of the plutonium release made based on the vegetation and other samples results?  If so, why wasn't it reported?  If not, why not?"  *Id*. at 3.  Further, the memorandum points out that the description of the 903 area is misleading:  "The second paragraph under the 1957 Fire is really bad.  It may be true that we still had some leaking barrels in 1968 ( I can't remember if they were all worked off before 1968)  but it sounds as though 1968 was the only time they leaked.  We all know better than that, don't we?  Also, as I recall (I may be badly in error) estimates of plutonium in each barrel was 25 grams.  This is far greater than 'slightly' contaminated."  *Id*. at 3.

Despite Mr. Love's warnings regarding Dow's "credibility gap," Dow later attempted to discredit Dr. Martell.  P-95, a press release issued by Dow, claims that "Edward Martell's statements on the concentration of plutonium in the Denver metropolitan area are not based on any known scientific evidence," *id.* at 1, Tr. at 6190 (read to jury).  By contrast, Dow's own soil sampling had

92

confirmed Poet and Martell's results.  *See* P-303 at 1 ("There is ample evidence to show that more

than normal background amounts of Pu-239 exists in the soil environment surrounding the Rocky

Flats facility.  Martell and Poet of NCAR, Boulder, have found this existance in some twenty odd

soil samples, plus water and sediment samples.  Hammond of Dow, Rocky Flats, confirms similar

quantitative results from a lesser number of samples.").

The press release marked as P-95 attempts to falsely reassure the public regarding the extent

of Dow's sampling regime.  The statement also claims, "[w]e have been making measurements of

radioactive releases into air, water and vegetation since the plant was constructed 20 years ago" and

"[c]ontrary to Martell's reported remarks, samples of air, vegetation, water and soil have been taken

to the east of the plant on a well-planned and comprehensive schedule.  Soil is sampled in all

directions from the plant within a 315 square-mile grid."  *Id*. at 2. By contrast, P-412, a 1960 Dow

internal document, shows that Dow's off-site sampling program was practically nonexistent.  The

company checked its samplers only once every two weeks, and by then dust loading had rendered

the results inaccurate.  P-412 at 1; Tr. at 3129-30 (Budnitz).  In addition, Dow had not collected soil

or vegetation samples since 1958, two years before this document was written, and even those

samples had not been analyzed.  P-412 at 1; Tr. at 3131-32 (Budnitz).[10]

_____

[10] Even after the FBI raid, Rockwell continued its PR campaign.  The company paid for two full-page advertisements in local newspapers to try to convince the public that it was innocent.  P-604 claims that "Rockwell's investigation shows the principal allegations in the affidavit are just not true," and argues specifically that the incinerator had not been operated illegally.  The advertisement also claims that "We have operated the Rocky Flats plant with integrity and high ethical standards. ... [W]e are committed to the welfare and safety of our Rocky Flats employees and the surrounding communities."  *See* Tr. at 6254-55 (read to jury).  The second advertisement, P-736, also portrays the allegations against Rockwell as "sensational charges of irresponsible acts that are demonstrably untrue."

Defendants knew from the early 1950s that their conduct was wrong.  Dow documented even before the plant opened that storing radioactive and hazardous materials on the ground at Rocky Flats should not be done.  Nevertheless, throughout the history of the plant, radioactive and hazardous materials were stored, dumped, buried and burned on the ground.  In the case of the 903 pad, Dow continued to store the radioactive and hazardous materials on the ground even after learning that the drums were leaking.  By the late 1960s, Dow had contaminated the soil both on and offsite.  Even after that experience that required years of clean up and monitoring of the 903 pad, Rockwell turned around and did the same thing at the 904 and 750 pads, where pondcrete was stored.  The only difference was, Rockwell did not even use metal drums.  They stored the wastes in cardboard boxes on the 904 and 750 pad.  This wrongful conduct, coupled with the preexisting knowledge that the conduct was wrongful and harmful, makes the conduct sanctionable through punitive damages.

In 1975, the Lamm-Wirth report laid out problems at Rocky Flats. P-338.   Yet, nothing changed for the next fourteen years while Rockwell ran the plant.  For example, Lamm-Wirth recommended that ERDA and Rockwell should carry out a complete particle size analysis of all stack effluents containing hazardous materials. P-338 at 21.  Yet, Dr. Biggs testified that the particle sizes were still not known at the time that the plant closed.  The Lamm-Wirth Task Force also stated that no static water supply should be used for human consumption while it is still subject to potential contamination from the Rocky Flats Plant. P-38 at 10.  Yet, Broomfield was still using the Great Western Reservoir at the time of the FBI raid.

Dominic Sanchini, Rockwell's plant manager in 1988 and 1989, told his managers in August 1988 that Rocky Flats was last in safety.  Yet, by June 1989 the situation had escalated to the point

that the FBI, the leading law enforcement agency in the country, determined that Rocky Flats should be raided to collect documentation on the violations of environmental laws. The wrongful conduct which began when Dow in the early 1950s started storing, dumping, burning and burying radioactive and hazardous wastes at Rocky Flats and continued until the last day that Rockwell operated the plant was punitive conduct. In addition to the conduct on the plant site, Dow and Rockwell allowed plutonium and other radioactive and hazardous materials to be released offsite and to contaminate the Great Western Reservoir, Standley Lake, Walnut Creek, Woman Creek and the soil in the neighborhood. This contamination has increased the risk of cancer as evidenced by Dr. Clapp's findings and even the RAC reports. In addition to the admitted increases in cancer risks, there are the unknown cancer risks from the unknown releases. The wrongful conduct also resulted in a very expensive clean up and the need for monitoring of air, water and soil for the foreseeable future. The plant site is so contaminated that even after the bogus "clean up," the land can never be inhabited by human beings. Public access must be restricted for the foreseeable future.

This conduct most certainly satisfies the requirements for willful and wanton conduct.

**VII.** **CONCLUSION**

For all of the foregoing reasons, plaintiffs respectfully request that the Court deny defendants'

motion for judgment as a matter of law.

Respectfully submitted,

Dated: January 11, 2006                   ___/s   Jennifer MacNaughton_____
                                          Merrill G. Davidoff
                                          Peter Nordberg
                                          Ellen Noteware
                                          Jennifer MacNaughton
                                          BERGER & MONTAGUE, P.C.
                                          1622 Locust Street
                                          Philadelphia, PA 19103
                                          (215) 875-3000
                                          fax (215) 875-4604
                                          *jmacnaughton@bm.net*

                                          Louise Roselle
                                          WAITE SCHNEIDER BAYLESS &
                                          CHESLEY
                                          Central Trust Tower, Suite 1513
                                          Cincinnati, OH 45202
                                          (513) 621-0267

                                          Gary B. Blum
                                          Steven W. Kelly
                                          SILVER & DEBOSKEY, P.C.
                                          1801 York Street
                                          Denver, CO 80206
                                          (303) 399-3000

                                          *Attorneys for Plaintiffs*