IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 90-cv-00181-JLK

MERILYN COOK, *et al.*,

        Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION
and THE DOW CHEMICAL COMPANY,

        Defendants.

---

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR JUDGMENT AS A
MATTER OF LAW**

---

        Defendants respond to Plaintiffs' Motion for Judgment as a matter of law, and in support thereof state:

## I.    THE LEGAL STANDARD.

        The legal standard for assessing a Motion for Judgment as a Matter of Law is whether there is a sufficient evidentiary basis for a jury to find for the non-moving party on its claims or defenses. *See* FRCP 50(a); 1/13/06 Order. In deciding this question the Court considers all evidence presented by the non-moving party and all reasonable inferences that can be drawn from it, and views this evidence in the light most favorable to the non-moving party. *See id.*

II.   **PLAINTIFFS' MOTION WITH RESPECT TO PRIOR MARKET DISCOUNT SHOULD BE DENIED.**

The Court has ruled that if the trespass or nuisance at issue benefited the class because some or all class members purchased their properties at a diminished price as a result of the same trespass or nuisance, that fact could be shown as an affirmative defense.  Instruction 3.25 provides, in relevant part:

> In order to prevail on this affirmative defense of setoff, Dow and Rockwell must prove by a preponderance of the evidence:
>
> 1.   That the trespass and/or nuisance that damaged the Plaintiff Class by diminishing the value of the property in the Class Area *also caused a diminution in the value of Class Properties in one or more specific time periods before June 7, 1989*; and
>
> 2.   *The amount of any such pre-existing diminution in the value of Class properties*, expressed as the percentage decrease in value, for each specific time period or periods for which Defendants proved a pre-June 7, 1989 diminution in Class property values caused by their trespass and/or nuisance.

(Instruction 3.25 (emphasis added).)  Consistent with this instruction, defendants have offered evidence, including through the testimony of Dr. Wise, on each of these elements.

Plaintiffs suggest that it is "dubious" for defendants to rely on an affirmative defense that is allegedly "inconsistent" with defendants' position that there has not been a diminution in property value at any time as well as defendants' attacks on the reliability of plaintiffs' experts. (Pls.' Mot. at 4-5)  Plaintiffs' arguments are premised on the incorrect legal argument that a defendant may not deny and at the same time assert an affirmative defense, and thus should be rejected.

Defendants do dispute that there was ever a diminution in value due to Rocky Flats and have presented substantial evidence to the effect that there was not, including evidence that calls into question the reliability of plaintiffs' experts' testimony.  (*E.g.,* McFadden testimony, 1/12/06 Trial Tr. 9963, 9966-67 (no statistically significant evidence of diminution during 1988-1995 using Dr. Radke's model))  However, defendants ***argue in the alternative*** – as they clearly have the right to do under Tenth Circuit law[1] – that if the jury sides with plaintiffs and determines that there was a diminution due to one or both defendants' wrongful conduct, then ***that same level of diminution*** existed ***going back to 1974***, and conferred a benefit on 97% of class members (who purchased their class property after that date), and thus offset any losses for all but 3% of class members.  Thus, if the jury accepts plaintiffs' evidence of diminution, Dr. Wise's testimony and related exhibits support a prior market discount equal to plaintiffs' claimed diminution going back to 1974.

Plaintiffs also incorrectly allege that defendants have failed to offer evidence that would allow a reasonable jury to determine both the dates of any discount prior to June 7, 1989 and the amount of such diminution.  (Pls.' Mot. at 4)  Concerning the timing of any prior market discount, Dr. Wise testified that he did a regression analysis (the same method used by Dr.

---

[1] *See, e.g.,* Fed. R. Civ. P. 8(e) ("[a] party may also state as many separate claims or defenses as the party has regardless of consistency"); *Smith v. Cashland, Inc.,* 193 F.3d 1158, 1161 (10th Cir. 1999) (court erred in requiring defendant to elect a defense); *Little v. Texaco, Inc.,* 456 F.2d 219, 220 (10th Cir. 1972) ("***a defendant is at liberty to deny and at the same time advance an affirmative defense***") (emphasis added); *Champlin v. Oklahoma Furniture Mfg. Co.*, 324 F.2d 74 (10th Cir. 1963) (chair manufacturer being sued for injuries received when rocking chair collapsed could interpose defenses which both denied that it had manufactured the faulty chair and that, if the chair was manufactured by it, the design had been changed and altered after leaving its possession).

Radke) to compare the class area with a control area going back to 1974. (Wise testimony, 1/5/06 Trial Tr. 9051) He found that, even assuming that Hunsperger/Radke are right about the **absolute difference** in prices between the class and the control, the ***rates of appreciation*** in the class area tracked rates of appreciation in the control area for each separate year from 1974 forward:

> Q.   I want to show you DX2074, which is slide 64. Does this slide reflect data that you gathered during the period 1974 to 1988?
>
> A  It's data that I gathered and analyzed with a regression.
>
> Q  Now, I see that they neatly match back in 1974. Did that just happen or did you make it happen?
>
> A  We indexed them to be 1974.
>
> . . .
>
> [W]hat you find is that even though prices are changing from year to year in both areas, the prices in the class are tracking the prices in the control throughout this entire period. And I guess more importantly, you never see a point in time when the class area prices, which is the red line, dip, you know, sharply below the blue line [control area prices] and stay there.

(1/5/06 Trial Tr. at 9072-73; *see also* DX2120, attached as Ex. C (rates of appreciation from 1974 through 2003), DX 2074, attached as Ex. B) (rates of appreciation from 1974 through 1988) Dr. Wise's analysis (set forth in his testimony and related exhibits) demonstrates that if a discount existed at any point between 1988 and 1995 (as Radke and Hunsperger claim), that discount was already in effect by 1974. Thus, Dr. Wise's analysis supports a prior market discount between 1974 and the complete and comparatively enduring date.

Critically, the Court has already twice admitted (over plaintiffs' repeated objections arguing the same points now argued by plaintiffs in their motion for judgment as a matter of law) DX2087 as a demonstrative exhibit summarizing this theory.  DX 2087 (attached hereto as Exhibit A) combines (1) Dr. Wise's analysis of rates of appreciation from 1974 forward, with (2) Dr. Wise's analysis of when class members bought and sold, and states:

> "***Even if Hunsperger/Radke were right***, class members who purchased <u>after 1973</u> (97%) would <u>not</u> have been affected"

> and

> "***Even if Hunsperger/Radke were right***, at most class members who purchased <u>before 1974</u> (3%) would have been affected."

(*See* DX 2087, attached as Ex. A (emphasis added))[2]  Thus, if plaintiffs are correct that this evidence is "purely speculative," plaintiffs' damages case fails and judgment should be awarded against them.  (Pls.' Mot. at 4)  On the other hand, if plaintiffs' evidence is considered by the jury with respect to diminution levels, the jury likewise should be allowed to consider that same evidence with respect to the diminution component of defendants' prior market discount defense.

Concerning the amount of any prior market discount, plaintiffs' contention that defendants have not presented sufficient evidence of the amount misunderstands defendants' affirmative defense and argues against their own evidence.  Defendants' position is that if the

---

[2] Dr. Wise's regression analysis does not hinge on Mr. Hunsperger or Dr. Radke's analyses being right; it simply shows that whatever diminution was there in 1988-1995 (if any) was also present in 1974.  Thus, defendants' vigorous attacks on these experts are in no way inconsistent with Dr. Wise's testimony.

jury accepts *plaintiffs' own evidence* that there was a diminution at any point between 1988 and 1995, that *very same diminution* goes back in time to 1974 and constitutes a prior market discount.  *See* DX2120, attached as Ex. C (rates of appreciation from 1974 through 2003), DX 2074, attached as Ex.B) (rates of appreciation from 1974 through 1988)  In other words, the evidence of the amount of any diminution upon which defendants would rely for their prior market discount defense is *identical* to the evidence that plaintiffs rely upon affirmatively to show diminution.

In addition, any suggestion that Dr. Wise failed to establish that a prior market discount was due to defendants' wrongful conduct must likewise fail, unless Dr. Radke's multiple regression approach (and Mr. Hunsperger's reliance on it) likewise are deemed insufficient.  Dr. Wise utilized the class properties as his study group as did Dr. Radke.  This Court repeatedly has rejected defendants' *Daubert* and judgment-as-a-matter-of-law motions with respect to plaintiffs' regression evidence and Mr. Hunsperger's reliance thereon.

Dr. Wise said nothing inconsistent with defendants' prior market discount theory, as plaintiffs imply.  Plaintiffs incorrectly claim that Dr. Wise "alleged that class properties were *never* discounted, *at any time*, including the time period before the FBI raid."  (Pls.' Mot. at 4).  Not so.  Dr. Wise did not testify that there was never a diminution.  (Wise testimony, 1/5/06 Tr. 9081 ("Q.  Do you know whether, in fact, there was any pre-1974 impact?  A.  No, I don't know *whether there's an impact or not* pre-1974.") (emphasis added).  Rather, Dr. Wise's testimony and graphics showed that, even if Hunsperger and Radke were right, and even if there was an absolute difference between class and control prices as of 1974, and even if that absolute difference continued through to 2003, the *rates of appreciation* of class and control prices were

statistically identical 1974 to 2003.  1/5/06 Trial Tr. at 9072-73; DX 2087, attached as Ex. A)

("Even if Hunsperger/Radke were right, class members who purchased after 1973 (97%) would

not have been affected.   Even if Hunsperger/Radke were right, at most class members who

purchased before 1974 (3%) would have been affected."); DX2120, attached as Ex. C (rates of

appreciation from 1974 through 2003), DX 2074, attached as Ex. B) (rates of appreciation from

1974 through 1988)  The logical result is that because the appreciation rates were the same after

1974, if there were a diminution (as Dr. Radke claims), that same diminution was a prior market

discount that existed as of at least 1974.  (*Id.* at 9083-84)  Thus, Dr. Wise's testimony fully

supports defendants' prior market discount defense.

In sum, defendants may "prevail on this affirmative defense of setoff" because they have

presented sufficient evidence to meet both required elements.  (Instruction 3.25)  ***First***,

defendants have presented evidence through Dr. Wise "[t]hat the trespass and/or nuisance that

damaged the Plaintiff Class by diminishing the value of the property in the Class Area also

caused a diminution in the value of Class Properties in one or more specific time periods before

June 7, 1989**"** – specifically the time period between 1974 and June 7, 1989.  (*Id.*)  ***Second***,

defendants have presented evidence that "[t]he amount of any such pre-existing diminution in the

value of Class properties, expressed as the percentage decrease in value, for [that time period]"

would equal the amount of diminution that the jury finds, if any, from plaintiffs' own evidence.

(*Id.*)  For these reasons and any other reasons stated orally on the record, plaintiffs' motion with

respect to the prior market discount should be denied.

**III.    THE RECORD CONTAINS AMPLE EVIDENCE THAT PLUTONIUM CONTAMINATION NEVER WAS PROVEN TO BE CLASS-WIDE TO BEGIN WITH AND THAT EXISTING CONTAMINATION HAS BEEN REMOVED.**

**A.    Plaintiffs Bear The Burden Of Proving That Rocky Flats Plutonium Continues to Be Present On All Class Properties; Defendants Do Not Bear The Burden Of Showing That It Does Not Continue to be Present.**

Plaintiffs' motion is written as if the law required a burden-shifting rule that simply does not exist. Plaintiffs' proposed burden-shifting rule would require that, once plaintiffs have proved that there was some contamination on, say, 1% of class area parcels as of 1970, the burden of proof shifts such that: (1) *defendants* must prove that the contamination was *not* present on the remaining 99% of the class properties that were not sampled as of 1970, and (2) defendant must prove that the contamination is not present on the class properties today. But that is not the law. Indeed, under the current jury instructions, *plaintiffs* bear the burden of proving "by a preponderance of the evidence" *both* (1) that "Dow or Rockwell or both of them intentionally undertook an activity or activities that in the usual course of events caused plutonium from Rocky Flats to be present on the Class Properties," and (2) that "it appears that plutonium will continue to be present on the Class Properties indefinitely." (Instruction No. 3.2)

Plaintiffs seek judgment as a matter of law on an element as to which they bear the burden of proof – namely, whether plutonium continues to be present on the Class Properties. But plaintiffs have fallen short of presenting evidence sufficient to *withstand* a motion for judgment as a matter of law, much less of presenting evidence sufficient to compel the conclusion that no reasonable juror could conclude that plaintiffs have not met their burden of demonstrating that contamination has continued on the Class Properties.

**B.    Contrary To Plaintiffs' Assertions, The Record Does Not Establish That Rocky Flats Plutonium Is Present On the Class Properties.**

Plaintiffs' Motion asserts that they have "proffered abundant, convincing, and largely undisputed evidence of class-wide contamination" (Mot. at 2); elsewhere, this evidence is referred to as "overwhelming" (*id.* at 7).  As shown below, both claims are overblown and demonstrably false.  There is no evidence that plutonium released from Rocky Flats contaminated the Class Properties (defined to include the properties owned by class members within the class area, *see* Instruction No. 3.2), or even most of the Class Properties.  Accordingly, not only must plaintiffs' Motion be denied, but a verdict should be entered for the defendants on plaintiffs' trespass claim, because plaintiffs have failed to carry their burden of proving contamination of the Class Properties.[3]

**1.    The record evidence establishes that the class representatives' properties contain plutonium at levels less than background concentrations from fallout.**

First, plaintiffs' Motion cites absolutely ***no*** actual soil samples that they, or anyone else, took on class properties to support their trespass claim.  This is remarkable because plaintiffs' trespass claim depends on their ability to prove that plutonium released from Rocky Flats is ***actually*** present on the Class Properties.  (Instruction Nos. 3.2-3.4)  Although plaintiffs did submit evidence of actual soil samples taken from properties owned by two of the class representatives, Merilyn Cook and the Bartletts, those soil samples fail to prove that Rocky Flats plutonium continues to be present on those class members' properties.

---

[3] Defendants will file a renewed Motion for Judgment as a Matter of Law at the close of the evidence.

The undisputed evidence at trial established that the background concentration of Plutonium-239 present in all soils in the Front Range area from fallout deposited by nuclear weapons testing ranges from 0.04 to 0.06 picocuries per gram ("pCi/g") of dry soil.  (*See* DX 540 at p. VIII-7, Table VIII (RAC Task 4 Environmental Sampling Report); Tr. at 7045-46, 7138-39 (Selbin Test.).)  But the Bartletts' soil sampling results from 1979 show that Plutonium-239 was *less than* 0.03 pCi/g.  (P-962; Tr. 954-59, 1055-58, 1061.)  In other words, because any plutonium deposited on the Bartletts' property from Rocky Flats would be *in addition to* global fallout, the fact that the soil on the Bartletts' property contains levels of plutonium that are less than fallout alone fails to show the presence of any plutonium released by Rocky Flats.

Similarly, one of the parcels of property owned by Merilyn Cook (Parcel C) was sampled for plutonium in 1984.  (Tr. 2025-2026; P-1230.)  The result of that testing shows plutonium concentrations on Parcel C of 0.008 and 0.009 pCi/g, nearly ten times less than background.  (*Id.*)  Again, the lack of proof that Parcel C contains plutonium above background indicates that plaintiffs have no proof that plutonium released from Rocky Flats, which would be additive to background, was present, or continues to be present, on Parcel C.

> **2.    The soil sampling contours to which plaintiffs cite similarly fail to carry their burden of proving actual or continuing plutonium contamination from Rocky Flats on all class properties.**

Instead of introducing evidence of actual soil sampling on each class property to demonstrate the presence of Rocky Flats plutonium on those properties, plaintiffs attempt to sustain their burden of proof of actual contamination through contamination contours appearing in three soil sampling studies.  (*See* Mot. at 7-8.)  Specifically, plaintiffs cite as proof of trespass the following three studies:

- The Poet & Martell soil sampling study, which analyzes soil samples taken at 38 locations in 1969.  (*See* P-149, cited in Mot. at 7-8.[4])

- The Jones & Zhang soil sampling study, which analyzes soil samples taken at 22 locations between 1970 and 1991.  (*See* DX-477, cited in Mot. at 8.)

- The Krey & Hardy soil sampling study, which analyzes soil samples taken at 33 locations in 1970.  (*See* P-149, cited in Mot. at 8.[5])

As is demonstrated below, the contours set out in these three studies fail to demonstrate *actual* contamination on of the Class Properties for several reasons.

        a.      **At best, the Krey & Hardy, Poet & Martell, and Jones & Zhang studies show that Rocky Flats plutonium was present at only a few sampling points inside the class contour at certain points in time.**

In an effort to prove their trespass case, plaintiffs attempt to extrapolate *releases* of plutonium from the Rocky Flats plant to "prove" that plutonium was deposited upon the class properties.  These extrapolations — culled from the so-called "Krey & Hardy," "Poet & Martell," and Jones & Zhang contours — suffer from several fundamental deficiencies that render them insufficient.

*First*, none of the three sets of researchers sampled all of the class properties.  Nor did they sample even most of the Class Properties, or even one percent of the Class Properties. Rather, Krey and Hardy collected samples at 33 locations extending up to 40 miles from Rocky Flats, with less than ten of those locations within the class contour.  (DX-476 at p. 11, Figure 4.)

---

[4] The other version of the Poet & Martell study to which plaintiffs cite, P-264, is not in evidence and therefore cannot be relied upon in plaintiffs' Motion.

[5] Defendants introduced a more legible copy of the same study into the record as DX-476. Because DX-476 is easier to read than P-149, defendants will cite to DX-476.

Even assuming that Krey and Hardy took samples on ten class properties (and there is no record evidence that they did), those samples would constitute less than 1% of the 13,000 class properties.  Poet and Martell took samples in even fewer locations, again, only a few of which appear to fall within the class contour.  (10/31/05 Trial Tr. at 3342–43 (Budnitz), DX 1167; P-533 at pp. 5-6 and Figure 1; 12/6/05 Trial Tr. at 8524 (Till).)  Similarly, the contours prepared by Jones and Zhang are based on a limited number of sampling sites, which fall almost entirely outside the class area.  (DX-477 at Figure 1; *see also* 12/16/05 Trial Tr. at 8524-25 (Till).)

In addition to these studies' shortcomings because of the lack of samples taken on class properties, the contours also fail to demonstrate class-wide contamination because they do not encompass the entire class area.  (*See* DX 1167; P-533; DX-477; 10/31/05 Trial Tr. at 3342–43 (Budnitz); 11/1/05 Trial Tr. at 3572 (Budnitz) (testifying that Poet and Martell only went out 2–4 miles east of the plant).)  And, even where the contours overlap with the class area, large portions of the overlap are at plutonium concentrations below background plutonium from fallout, thus failing to demonstrate that there is Rocky Flats plutonium in those areas.  (*See, e.g.*, DX-477 at Appendix B.)

As Dr. Budnitz testified, Krey & Hardy and Poet & Martell used a process of "interpolation" or "extrapolation" to turn sampling points into a "contour."  (Budnitz testimony, 10/31/05 Tr. 3338-39)  But plaintiffs' evidence is insufficient to prove that plutonium was deposited on each class member's property (or even most class members' properties), much less that it continues to be present on the class properties.  For example, there was no evidence that the properties of class members who testified (*e.g.*, Mr. Ozaki, Ms. Robb, and Ms. Whalen) were contaminated.  In an individual trial, this process of "interpolation" or "extrapolation" from **other**

*properties* would not be sufficient evidence to demonstrate that plutonium was present.  Nor is such evidence sufficient in a class trial, because the class device cannot be used to expand individual rights.  *See* 28 U.S.C. § 2072 (class action device cannot be used to "abridge, enlarge or modify any substantive right" of any litigant); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845 (1999).

*Second*, and most important for the present purposes, **the Krey & Hardy and Poet & Martell contours were drawn in 1970, not as of June 7, 1989 (the date that defines the class)**. (See P 149, Plutonium in Soil Around the Rocky Flats Plant, Aug. 1, 1970; P 533, Report on the Dow Rocky Flats Fire: Implications of Plutonium Releases to the Public Health and Safety, Jan. 13, 1970)  Thus, even for the smattering of properties in the Krey & Hardy and Poet & Martell studies, as of the close of evidence, plaintiffs have still introduced no evidence that plutonium remained on those properties as of 1989 and continues on those properties today.[6]  Neither plaintiffs' nor defendants' experts have seen a study demonstrating present contamination.  (*See, e.g.*, 11/3/05 Trial Tr. at 4083 (Smallwood); 12/15/05 Trial Tr. at 8284-85, 8526 (Till).)

Moreover, the totality of the evidence has shown that virtually all of the class area development occurred between 1970 and 1989.  *See, e.g.,* DX 2188A (Dorchester video); DX 2193 (graphic depicting level of development over time); DX 2195–2207 (aerial photographs depicting development); 1/9/06 Trial Tr. at 9474–77, 9482–86 (Dorchester); DX 2309 (90% of

---

[6] The Jones & Zhang study, which reflects sampling conducted between 1970 and 1991, is not to the contrary.  The sampling locations depicted in the Jones & Zhang study fail to identify when samples were taken at the sampling locations.  Thus, the study does not establish that any above-background concentrations of plutonium existed in soil at specific sampling points at any particular point in time.  (*See* DX 477 at Figure 1.)

class development occurred after 1970); DV1, Till video ("as of 1969, there was very little development in the class area.  By 1989, however, the class had become well developed. . . .building, concrete, and asphalt now cover what used to be undeveloped soil . . .[s]everal feet of soil are excavated when preparing the foundation of a new home."); 12/16/05 Trial Tr. at 8392, 8527 (Till); *see also* 11/3/05 Trial Tr. at 4077, 4083 (Smallwood); (DX 454, ATSDR 5/13/05 Report, at 1-2 ("Though Rocky Flats released plutonium to the air throughout its history, the overwhelming majority (> 99.9%) of plutonium emissions occurred between 1953 and 1969.").) The interceding residential and other property development since the soil studies were taken is fatal to plaintiffs' attempt to prove their trespass case through soil sampling studies that pre-date the class membership date by nearly 20 years.  As the evidence established, the soil sampling studies were conducted in ***undisturbed*** soil and showed that plutonium resides in the surface layer of the soil, essentially the top several centimeters. (12/15/05 Trial Tr. at 8284; 12/16/05 Trial Tr. at 8524-25 (Till).)  The evidence further demonstrates that extensive development, such has occurred throughout the class area since 1970, will disturb or remove that plutonium. (11/3/05 Trial Tr. at 4079-4085 (Smallwood); 12/15/05 Trial Tr. at 8284; 12/16/05 Trial Tr. at 8449, 8527-29 (Till).)  Thus, plaintiffs' evidence that plutonium was present at a small number of locations within the class in 1970 is not sufficient to discharge plaintiffs' burden of proving that "it appears this plutonium will continue to be present indefinitely."  (Instruction No. 3.2)

     **b.**    Nor Do Plaintiffs' Experts Provide Evidence of Continuing Contamination; Dr. Smallwood Testified That "He Did Not Know" Whether Plutonium Continued to Be Present in the Class Area, *and That It Would "Depend on the Nature of Development"*.

Nor did plaintiffs' experts provide testimony sufficient to discharge plaintiffs' burden of proving continuing contamination of the class.  All that Dr. Smallwood could say, for example, is that he "did not know" whether any class properties remained contaminated, notwithstanding the development that occurred over the course of the last four decades:

> Q.  You couldn't—when it comes to the developed part of the class area, you can't simply say that because the Krey and Hardy and/or Poet and Martell contours show there may have been plutonium there back in 1970, that is certainly not very good evidence that there is still plutonium there today, fair?
>
> A.  Where you have houses on top of the soil or warehouses or shopping mall or parking lot, I don't know, it depends on how deeply they scraped away the soil for the foundation of these structures.
>
>          *       *       *
>
> Q.  If we go back to 1989, are you aware of anybody who has data showing that even in 1989 there was plutonium on the soil throughout the class area from Rocky Flats?  Are you aware of anybody who has been able to show that data?
>
> A.  Outside of Rocky Flats plant?
>
> Q.  Yes.
>
> A.  I don't know.

(11/3/05 Trial Tr. at 4083–84.)[7]

---

[7] Dr. Budnitz similarly testified:

> Q.  And so, in fact, if you had to—if you came in and took your samples 19 years later or 20 years after the release, then the plutonium by that time may have gone someplace else?

                                                (Continued…)

Moreover, Dr. Smallwood testified that whether plutonium would continue to be present

"***would depend on the nature of the development***":

> Q.  Where a disturbance has occurred, can you say with reasonable scientific certainty, yes, I actually know plutonium from Rocky Flats is still there?

> A.  I don't know.  ***It would depend on the nature of the development***.

---

> A.  Well, in fact, the measurements in that later time tell you what's there then. That's what they tell you, what's there then.  And they don't tell you anything else except what is there then . . .

> Q.  But certainly one mechanism for that material not even being there anymore would be that it could become resuspended again, right?

> A.  Well—I don't know what you mean by "anymore," just went somewhere else, perhaps, new or far.

> Q.  Okay.

> A.  That's what the new pattern would reveal.

> Q.  Another method for it not being there anymore, if somebody dug up the soil in the interim and carted it all off, right?

> A.  Yes, of course, removing it would remove it.

> Q.  One mechanism for removing it and carting it all off would be, for example, if developers came in, built huge subdivisions in that area, after the time the original measurements were taken, correct?

> A.  That would be one of any number of ways that soil containing plutonium might have been removed.

(10/31/05 Trial Tr. at 3346–47; *see also* 11/10/05 Trial Tr. at 4915 (Clapp) (testifying he has not "seen any evidence that after this development took place and after these homes were built and after whatever disturbance of the soil took place that was associated with the building of those homes, that after that happened, then a soil sample was taken on such property and tested to determine whether there was plutonium in it.").)

(11/3/05 Tr. at 4081) (emphasis added).  Dr. Smallwood testified, as common sense would

suggest, that because of the extensive development in the area around Rocky Flats, he could not

tell whether there is Rocky Flats plutonium on the class representatives' properties "without

going there and measuring."  (11/3/05 Trial Tr. at 4082-4083.)

Thus, plaintiffs' own expert admitted that (depending upon the nature of the

development) development could remove plutonium from class properties and that the only way

to tell whether any plutonium still remains is to sample the soil on the property.  This admission,

combined with the abundant evidence in the record (discussed below) that *extensive*

development has occurred and that no one has sampled the plaintiffs' properties for the presence

of Rocky Flats plutonium after 1984, is more than sufficient to allow the jury to conclude that,

even assuming that plutonium was present on Class Properties in 1970, plaintiffs have failed to

prove that such plutonium continues to be present today.

### 3.    Defendants Provided Extensive Evidence of Development Through the Testimony of Mr. Dorchester

Following Dr. Smallwood's testimony (that whether plutonium would continue to be

present would depend upon the nature of the development), defendants' expert Don Dorchester

presented evidence of *extensive* development within the class during the 1970s, 1980s, and

1990s.  (DX 2188A (Dorchester video); DX 2193 (graphic depicting level of development over

time); DX 2195–2207 (aerial photographs depicting development); 1/9/06 Trial Tr. at 9474–77,

9482–86 (Dorchester).).   As discussed above, the ATSDR Report concluded that greater than

99.9% of emissions from Rocky Flats occurred *before 1970*. (DX 454, at 1-2)   The evidence

presented through Mr. Dorchester showed over 90% of class area development occurred in years

*after 1970*.  (DX 2309)  Mr. Dorchester's testimony thus *further* undermines any claim by plaintiffs that they have demonstrated by that any plutonium present on class properties as of 1970 still remains there today.

### C.    Dr. Till's Testimony Further Rebuts Plaintiffs' Claim of Continuing Contamination.

Dr. Till likewise presented evidence that further undermines any claim that plaintiffs' have satisfied their burden of proving continuing contamination of the class area (or even contamination as of 1989).  (12/15/05 Trial Tr. at 8284–85 (Till); DV 1 (Till video).)  For example, Dr. Till's video, which was admitted into evidence over plaintiffs' objection, states in pertinent part:

> "as of 1969, there was very little development in the class area.  By 1989, however, the class had become well developed. . . .building, concrete, and asphalt now cover what used to be undeveloped soil . . .[s]everal feet of soil are excavated when preparing the foundation of a new home."

(DV1, Till video (emphasis added).)  Thus, Dr. Till likewise provided persuasive evidence that, even if plaintiffs have proved that plutonium was present in the Class Area as of 1970, they have not proved that it continued to the present day.

### D.    Plaintiffs' Argument That There Is No Evidence That Plutonium Has Been Removed From "Particular Locations" Should Be Rejected

Finally, plaintiffs' argument that development is only relevant if it relates to a "particular location" in the class is without merit.  As an initial matter, holding plaintiffs to this standard would result in the dismissal of plaintiffs' trespass claim.  Plaintiffs, who bear the burden of proof, have not established that *any* "particular location" within the class is contaminated.  And plaintiffs' failure to prove continuing contamination relates not to a "particular location," but to

the numerous locations in the class that have been developed since 1970.  (11/3/05 Tr. at 4083 (Smallwood); 1/9/06 Trial Tr. at 9474–77, 9482–86 (Dorchester).)

Moreover, if evidence of contamination were relevant only if it related to "particular locations" within the class area, then the entire testimony of Dr. Smallwood would have to be stricken.  Dr. Smallwood's theory of continuing migration of plutonium is not linked to the class area, much less to any particular parcel within the class area.  (11/3/05 Trial Tr. at 4066–67 (Smallwood) ("Q.  Could you tell us whether you would expect there to be plutonium on the surface of all of the class properties at all, or maybe we wouldn't find it at all?  Could you tell us?  A.  I couldn't tell you beyond what they measured there already.").)

In any event, even if plaintiffs were correct that *defendants* were obligated to provide evidence relating to "particular" parcels (defendants certainly are not so obligated), that evidence is present in the record here.  (Trial Tr. at 7045-46, 7138-39 (Selbin Test.).)  Take but two of many examples:  Merilyn Cook and the Bartletts.  The Bartletts' soil sampling results from 1979 show that Plutonium-239 was *less than* 0.03 pCi/g - compared to a background range of 0.04 and 0.06 picocuries per gram ("pCi/g") of dry soil.  (*See* DX 540 at p. VIII-7, Table VIII (RAC Task 4 Environmental Sampling Report);.  (P-962; Tr. 954-59, 1055-58, 1061.)  Similarly, the result of testing one of the parcels of property owned by Merilyn Cook (Parcel C) in 1984 shows plutonium concentrations on Parcel C of 0.008 and 0.009 pCi/g, nearly ten times less than background.  (P-1230; Trial Tr. 2025-26.)  Again, these results indicate that no plutonium from

Rocky Flats was present on either the Bartlett property or the Cook property in 1979 and 1984, respectively.[8]

### E. Defense Counsel's Statements At Pretrial Hearings Are Not Admissions Nor Do They Estop Defendants From Arguing That Plaintiffs Have Failed To Meet Their Burden Of Proof To Show Actual Contamination.

The doctrine of judicial estoppel is inapplicable in this case.  Contrary to Plaintiffs assertion, Defendants never "conceded the issue of the contamination's existence." (Pls. Mot. for Judgment as a Matter of Law at 6.)  The two statements of Defendants' counsel that Plaintiffs hand select have been taken completely out of context.  Nowhere in the June 25, 1999 hearing does Defendants' counsel concede that the existence of contamination was not an issue.  (*See generally*, 6/25/99 Hearing.)  At best Defense counsel agrees with the Court's statement that "these elements that are manmade are out there off-site."  (*Id.* at 20.)  There is no concession that plutonium was released onto the Class Properties, much less that it continued to be present on the Class Properties to the present day.

Likewise - seeking to revisit an argument that has already been rejected by this Court on several occasions (this time under the guise of "judicial estoppel") - plaintiffs have misconstrued the July 22, 2004 statements of counsel.  On December 17, 2004, the Court issued an order stating its belief that the parties had stipulated that:  "Plutonium from the Rocky Flats plant has been deposited on the Class Properties and continues to be present there," but offering either party the opportunity to object to the stipulations identified in the order.  Shortly thereafter,

---

[8] Plaintiffs may dispute the fact or the meaning of the Cook or the Bartlett testing results, but such a dispute would go to the *weight* of the evidence, not to the question of whether the issue should go to the jury.

Defendants explained that they would not stipulate to that fact and explained the statements of

counsel:

> Counsel's statement was an effort to determine the extent of this Court's July
> 2003 ruling regarding trespass.  Mr. Bernick was explaining that he did not
> understand that the ruling went so far as to hold that if there were even one atom
> of plutonium on a class member's property, that Court considered that to
> constitute a legally recognizable trespass under Colorado law.  Had the ruling
> gone that far, counsel was proposing that this case might be cast in an entirely
> different posture.  However the Court indicated in response to counsel's argument
> that, in fact, the Court's ruling was "designed to go that far."  (7/22/04 Hr'g Tr. at
> 33:8–10.)

(Defs. Objections to Identification of Stipulated Facts, filed 1/14/05 at 5.)

> The Court implicitly accepted that Defendants did not concede the point, stating in its

instructions at the beginning of this case:

> Defendants admit that plutonium from Rocky Flats is present in the Class Area,
> but dispute that it is located throughout this area or that they are liable for
> trespass.  They also deny that plutonium is present in the Class Area at levels that
> pose any significant health risk or that there is a threat of future releases of
> plutonium or other hazardous substances from the Rocky Flats site to the class
> area.

(Jury Inst. No. 1.1.)  Further, the Court listed the "Presence of Plutonium" as the "First Element"

that Plaintiffs must prove:  "The first element of the trespass claim requires that Plaintiffs prove

that plutonium is present on the Class Properties."  (*Id*. at 3.3.)  Contrary to Plaintiffs' assertion,

Defendants never "disclaimed the need for any jury determination on [the existence of plutonium

from Rocky Flats in the class area]."  (Pls. Mot. for Judgment as a Matter of Law at 7.)  Instead,

Defendants have always and still actively contest that plutonium contamination exists on all the

class properties.

As there is no inconsistency on the part of Defendants, judicial estoppel is inapplicable. A Court considers the following factors when making a judicial estoppel determination: (1) that "a party's later position" is "clearly inconsistent with its earlier position," (2) that the "party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or second court was misled," and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose and unfair detriment on the opposing party if not estopped." *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001) (internal quotation omitted). First, as discussed above, Defendants have never advanced an inconsistent position on this issue. Second, Defendants never "***succeeded in persuading a court to accept that party's earlier position***," such that accepting Defendants' current position would create "the perception that [ ] the [] court was [previously] misled." *New Hampshire*, 532 U.S. At 750 (emphasis added); *see also* (*Johnson v. Lindon*, 405 F.3d 1065, 1069 (10th Cir. 2005) (second requirement "ensures that judicial estoppel is applied in the narrowest of circumstances.")(internal quotation omitted.) Finally, there would be no unfair detriment to Plaintiffs if judicial estoppel is not applied. Defendants have never advanced an inconsistent position, and Plaintiffs have been aware since the initial jury instructions were read that the issue of the existence of plutonium on the class properties was fairly in issue.

Dated:  January 17, 2006                              Respectfully submitted,


                                                      s/ Stephanie A. Brennan_____

One of the Attorneys for the Defendants
David M. Bernick
Douglas J. Kurtenbach
Ellen Therese Ahern
Mark J. Nomellini
Stephanie A. Brennan
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601-6636
Phone:  312-861-2000
Fax:      312-861-2200

Joseph J. Bronesky
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, Colorado 80202
Phone:  303-297-2900
Fax:      303-298-0940

Attorneys for ROCKWELL
INTERNATIONAL CORPORATION and
THE DOW CHEMICAL COMPANY

## CERTIFICATE OF SERVICE

I hereby certify that on January 11, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses for the following:

Peter B. Nordberg, Esq.
c/o Karen M. Markert
Apartments at Denver Place, Apt. 2812
1880 Arapahoe Street
Denver, CO 80202
pnordberg@bm.net
kmarkert@bm.net

Gary B. Blum, Esq.
SILVER & DEBOSKEY
The Smith Mansion
1801 York Street
Denver, Colorado 80206
blumg@s-d.com

s/ Kari Knudsen_____
Kari Knudsen (legal assistant)