**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 90-cv-00181-JLK

MERILYN COOK, *et al.*,

       Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION
and THE DOW CHEMICAL COMPANY,

       Defendants.

___

**DEFENDANTS' MOTION TO STRIKE SELECTED TESTIMONY OF WAYNE HUNSPERGER, JOHN RADKE, AND THOMAS COCHRAN**
___

Defendants have repeatedly argued that plaintiffs' expert evidence fails to meet the standards set out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1998). In 1997 and 2005, defendants filed motions based upon these standards to strike the testimony of plaintiffs' expert witnesses. The Court denied those motions. Now, at the close of all the evidence, the deficiencies in plaintiffs' methodologies have become even more evident. Defendants file this Motion to Strike based upon additional grounds that have come to light during trial. Defendants respectfully request that the following testimony be stricken: all of Wayne Hunsperger's testimony purporting to calculate diminution in value, Phase I and Phase II of John Radke's regression analysis, and Thomas Cochran's testimony regarding material unaccounted for ("MUF"). None of this testimony meets the rigorous standards for admission under Federal Rules of Evidence 702 and 703 and *Daubert* and its progeny.

Defendants renew and reincorporate all previous *Daubert*-based Motions to Strike the testimony of Plaintiffs experts and the arguments made within them. Defendants do not waive any of their previous arguments to exclude; these arguments apply with even greater force now that there is a completed record.

## LEGAL STANDARD

Under *Daubert*, the Court has an obligation to keep unreliable expert testimony from the jury. *See Goebel v. Denver & Rio Grande Western R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000) ("This gatekeeper function requires the judge to assess the reasoning and methodology underlying the expert's opinion, and determine whether it is scientifically valid and applicable to a particular set of facts.")[1] This gate-keeping function does not end at the time a court makes its initial *Daubert* rulings. Rather, the Court's obligation continues up through, during, and post trial. *See id.* ("The district court may also satisfy its gatekeeper role when asked to rule on a motion in limine, on an objection during trial, or on a post-trial motion . . ."); *see also Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 362 F.3d 775, 780 (11th Cir. 2004) ("[A] trial court has broad discretion in determining how to perform its gatekeeper function and nothing prohibits it from hearing a *Daubert* motion during trial.")[2]

---

[1] This gate-keeping function is not limited to scientific testimony alone, but applies to all expert testimony. *See Kumho Tire*, 526 U.S. at 152.

[2] Note that this is not a case where a *Daubert* motion made during trial must be denied as untimely because "there has been no motion in limine or concurrent objection to an expert's participation." *Alfred v. Caterpillar, Inc.*, 262 F.3d 1083, 1087 (10th Cir. 2001). Defendants have made *Daubert* objections to plaintiffs' expert testimony throughout the duration of this case. This motion is predicated upon the new information available to the Court now that the record is complete

## ARGUMENT

### I.  MR. HUNSPERGER'S TESTIMONY PURPORTING TO CALCULATE DIMINUTION IN VALUE SHOULD BE STRICKEN

Plaintiffs' key damages expert, Wayne Hunsperger, testified at trial that damages to class properties totaled $243 million dollars in 2005 dollars.  (Hunsperger testimony, Tr. at 6422.)[3]  However, the methods Mr. Hunsperger used to make this damage calculation are flawed for several reasons and do not meet *Daubert* requirements.  Consequently, all of Mr. Hunsperger's testimony regarding quantification of diminution in value should be stricken.

#### A.  Mr. Hunsperger's Testimony Should Be Stricken Because It Does Not Comply With Appraisal Standards

Rule 702 requires a court to determine whether the testimony has "a reliable basis in the knowledge and experience of [the relevant] discipline."  *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221-22 (10th Cir. 2003).  "[A]n expert, whether basing testimony upon professional studies or personal experience, [must employ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire*, 526 U.S. at 151.  When an expert's work is governed by professional standards, it must meet those standards in order to be reliable.  *See Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 978 (M.D. Tenn. 2002) ("An expert must not compromise his or her own professional standards when acting as an "expert" in a court of law").

Here, Mr. Hunsperger's testimony regarding value should be stricken because it does not comply with the standards that govern his profession.  Mr. Hunsperger admitted at trial that

---

[3] Defendants continue to object to the use of the CPI to adjust plaintiffs' alleged damages into 2005 dollars.  (*See* Defs.' Mot. to Exclude Evidence of Pls.' Consumer Price Index Adjustment For Property Damages, filed 10/25/2005.)

3

"[M]y opinions have to be expressed to a reasonable degree of professional certainty based on professional standards, my professional standards." (Hunsperger testimony, Tr. at 6350.) Mr. Hunsperger's work fails to meet these standards for several reasons.

Mr. Hunsperger, an appraiser, did not perform an appraisal. (Hunsperger testimony, Tr. at 7015 ("Q. []You did not do an appraisal for the class. We know that -- you've never disputed that, right? A. Absolutely True.) The appraisal profession is governed by standards. (Dorchester testimony, Tr. at 9494 (" Following the standards is mandatory . . . both Mr. Hunsperger and I are certified journal appraisers, we must follow USPAP standards in all work that we do that falls under those standards.").) Under these standards, Mr. Hunsperger (as other appraisers) may not render opinions regarding value unless an appraisal is performed. (Dorchester testimony, Tr. at 9503 ("So if an appraiser provides an opinion of value, that act under the standards means that it must be an appraisal under standard 1.").) Because Mr. Hunsperger did not do an appraisal, he did not (and could not) comply with standards governing appraisals. (*See* Dorchester testimony, Tr. at 9516 ("Q. . . . . Are you aware of whether Mr. Hunsperger actually completed an appraisal in accordance with the standards for the value of the class properties at any point in time? A. I am aware, and he did not").)

Attempting to (unsuccessfully) do an end-run around his profession's standards, Mr. Hunsperger has labeled his work "consulting." (*See* Hunsperger testimony, Tr. at 6835 ("I'm the appraiser who did consulting but no appraisal, you're right").) But, consulting assignments cannot be used to determine value unless appraisal standards are followed. (*See* DX- 4103, Uniform Standards of Professional Appraisal Practice and Advisory Opinions ("USPAP") at 40 ("If the opinion of value is from an appraisal developed by the appraiser performing the real property appraisal consulting assignment, the appraiser must complete the steps set forth in

STANDARD 1 for the type of appraisal (Complete or Limited) pertinent to the intended use of the opinion of value to be developed"); Dorchester testimony, Tr. at 9506 ("If an opinion of value is expressed, that automatically makes the services an appraisal, and the appraisal standards must be applied").)  However, because Mr. Hunsperger never did an actual appraisal of the class properties, Mr. Hunsperger did not, and could not, fulfill the standards governing appraisal.  Consequently, Mr. Hunsperger's work cannot be used to determine loss in value under both the USPAP standards governing his profession and *Daubert*.

Mr. Hunsperger's failure to follow standards is confirmed by Advisory Opinion 9, dealing with "The Appraisal of Real Property That May Be Impacted by Environmental Contamination."  (DX-4103, USPAP at 143.)  Under this opinion, diminution in value can be calculated as "the difference between the unimpaired and impaired values of the property being appraised."  (DX-4103, USPAP at 144.)  Mr. Hunsperger fails to meet the requirements set forth in this Advisory Opinion because he never calculated value for any of the class properties, either impaired or unimpaired.  (*See* 12/7/2005 Trial Tr. at 6782 ("Q. [] Now isn't it also true that although you did your benchmark work, you do not know the market value for the class at any time? A. Sure.")  Nor did he perform a mass appraisal of the class (or any other) properties.  (Hunsperger testimony, Tr. at 6781.)  Because he never calculated the market value of any properties -- class or otherwise -- his work cannot be used to quantify any damages allegedly suffered by plaintiffs.

Because Mr. Hunsperger's work does not meet the standards of his profession, it is unreliable under *Daubert* and his testimony regarding value should be stricken.

### B.     Mr. Hunsperger's Testimony Should Be Stricken Because It Cannot Be Tested or Replicated

Although Mr. Hunsperger's failure to follow standards provides sufficient grounds to strike his testimony, there are other, independent reasons why it should be stricken. For each methodology used by Mr. Hunsperger to calculate loss, Mr. Hunsperger did three things: (1) he retained other experts perform the studies; (2) the experts who performed those other methods said the methods could not be used to calculate any diminution in value; and (3) Mr. Hunsperger calculated diminution in value anyway based upon his "judgment:"

> Q.     And in fact, let me go back to the same question. With respect to your ultimate judgment, your judgment in all three cases, to say that the data supports these numbers as being a decline in value, there is no plaintiffs' expert who has concurred in that particular judgment regarding impact on value, correct?
>
> A.     Sure. I'm in the appraiser.

(Hunsperger testimony, Tr. at 6834-35.) Mr. Hunsperger repeatedly emphasized at trial that his calculations were based upon his "judgment." (*See*, *e.g.*, Hunsperger testimony, Tr. at 6830 ("Q. And they were all studies that at the end of the day the key element was ultimately an element of your judgment, correct? A. That's Correct").) However, because "judgment" is not something that can be replicated or tested, any conclusions Mr. Hunsperger drew based upon his judgment must be stricken.

Expert testimony that has not or cannot be tested will be excluded as unreliable. *See*, *e.g. Daubert*, 509 U.S. at 593 ("[A] key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact [is] whether it can be (and has been) tested."); *Truck Ins. Exch. v. Magnetek, Inc.*, 360 F.3d 1206, 1212 (10th Cir. 2004) (excluding testimony where scientific theory underlying opinion "has not been subjected to sufficient testing"); *Hauck v. Michelin N. Am., Inc.*, 342 F. Supp. 2d 976, 984 (D. Colo. 2004) (excluding expert testimony not supported by testing). Indeed, the very purpose of *Daubert* is to

6

prevent experts from claiming their work is reliable solely because of *ipse dixit* statements that it is. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); (*see also* Dorchester testimony, Tr. at 9496-97 ("[T]o be able to complete a valuation, for example, an appraisal, it's necessary to do a series of analyses and follow a series of steps that are part of USPAP and a part of the generally accepted principles rather than to simply use judgment . . . .").

As these cases make clear, Mr. Hunsperger cannot rely on his "judgment" alone to overcome any and all criticisms of his work relating to value. Instead, he must show that another expert using his methodology would come to the same conclusions -- or at the very least, would be able to test his methodologies. However, because the methods used by Mr. Hunsperger depend upon his "judgment" in order to lead to quantifications of loss, there is no way that another appraiser could replicate or test Mr. Hunsperger's work. Because such "judgment" is by definition not testable or replicable, Mr. Hunsperger's testimony regarding diminution in value should be stricken.

### C. Mr. Hunsperger's Use Of "Analogous Case Studies" To Find Loss In Value Should Be Stricken

In addition to Mr. Hunsperger's damage calculation generally, several of the specific methodologies on which he relies are unreliable, unsupported by the appraisal profession and its standards, and cannot be used to determine value. As an initial matter, for the reasons discussed above, Mr. Hunsperger's testimony regarding the "analogous case studies" should be stricken to the extent Mr. Hunsperger uses them to prove diminution in value at Rocky Flats.

7

Mr. Hunsperger's "analogous case studies" methodology is not a recognized technique within the appraisal profession.  Accepted techniques include the sales comparison approach, income approach, cost approach, and, in rare situations, other specialized valuation methods. (*See* DX-4103, USPAP, at 117 (" In general, the unimpaired value of the property being appraised can be estimated using the sales comparison approach, income approach, and cost approach.  Estimating the effects of environmental contamination on real property value usually involves the application of one or more specialized valuation methods.  These methods should be consistent with the requirements related to the valuation approaches in USPAP.")  Analogous case studies do not fall within any of these categories and may not be used by appraisers where sales data are available.  (*See* Dorchester testimony, Tr. at 9529 ("Q.  [] Let's talk about case studies.  Where there is a market that is sales data, do the standards provide for the use of analogous case studies to appraise value? A.  If there are pertinent sales that are available, those sales must be used and analyzed.")  Because analogous case studies are not an acceptable methodology in the appraisal industry where, as here, market data exists, testimony by Mr. Hunsperger relying on them to find diminution in value should be stricken.  *See Dodge*, 328 F.3d at 1221-22  "[A]n expert, whether basing testimony upon professional studies or personal experience, [must employ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."; *see also Kumho Tire*, 526 U.S. at 151; *Coffey*, 187 F.Supp.2d at 978 ("An expert must not compromise his or her own professional standards when acting as an "expert" in a court of law").

Furthermore, Mr. Hunsperger disregarded the limitations imposed by the experts on whom he relied.  Dr. Flynn, who supplied Mr. Hunsperger with some of the case studies on which he relied (Flynn Dep. at 21 ("I think we probably sent him some information that we had

8

on potential analogous cases because we, you know, keep a library file"), stated that the case studies "obviously" couldn't be used to prove diminution in value. (*See id.* at 19 ("Since these analogies obviously have limited compatibility, they can't be used to valuate property at Rocky Flats).) However, Mr. Hunsperger disregarded Dr. Flynn's warnings about the use of analogous case studies. (*See*, *e.g.*, Hunsperger testimony, Tr. at 7013 ("[Dr. Flynn's] view is completely irrelevant to me").)

Finally, the analogous case study technique is flawed in any event, and cannot be used to prove diminution in value at Rocky Flats. (*See*, *e.g.*, d'Arge testimony, Tr. at 9360 (" [The analogous case studies] have to be considered unreliable and not usable"), Wecker Testimony, Tr. at 9766 ("Q. Any basis on -- based upon your analysis, do you see any statistically reliable basis for Mr. Hunsperger to use the case studies in order to determine impact on value? A. None.").)

### D. Mr. Hunsperger's Use Of "Public Opinion Surveys" To Find Loss In Value Should Be Stricken

The "public opinion survey" that Mr. Hunsperger commissioned Decision Research, and Drs. Flynn and Slovic, to conduct likewise cannot be used to prove diminution in value. As an initial matter, Mr. Hunsperger is not even qualified to asses the validity, of lack there of, of the Flynn and Slovic survey. (*See* Hunsperger testimony, Tr. at 6761 ("Q. You agree with me, not an expert in formal surveys, correct? A. Correct.").) Mr. Hunsperger's lack of qualifications in this area, standing alone, provides a sufficient reason for striking his testimony relating to surveys. *See Lifewise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004).

However, Mr. Hunsperger went even further and ignored the views of the very experts he hired to conduct the survey for him. Dr. Slovic did not believe the survey could be used to calculate loss. (*See* Hunsperger testimony, Tr. at 6826 ("Q[] Would you agree with me that Dr.

9

Slovic does not believe that the data that he gathers -- gathered can be used for the purpose to which you put them? A. Yes).)  Mr. Hunsperger's disregard for the experts he hired to conduct an analysis he could not is unprecedented.

Moreover, like the analogous case studies, public opinion surveys are not permitted under appraisal standards.  (*See* Dorchester testimony, Tr. at 9529-30.)  Surveys cannot be used to determine loss in value unless they comply with a comprehensive set of guidelines designed to prevent unreliable surveys from being used to prove loss in value.  (*See*, *e.g.* d'Arge testimony, Tr. at 9340 ("[U]nless [the survey] is carefully documented and follows the NOAA guidelines, it's very likely to be extremely biased.").)  Because the Flynn and Slovic survey failed to satisfy these guidelines, "the survey is deemed as unreliable from a scientific standpoint."  (*Id.* at 9341.)  Because the survey was unreliable, Mr. Hunsperger's use of it to find diminution in value is likewise unreliable, and his testimony to that effect should be stricken.

### E. Mr. Hunsperger's Vacant Land Analysis Should Be Stricken To The Extent Mr. Hunsperger Uses It To Determine Loss In Value

Mr. Hunsperger's vacant land analysis must also be stricken to the extent that Mr. Hunsperger uses it to quantify damages.  Mr. Hunsperger did not follow appraisal standards in his vacant land analysis because he improperly lumped properties together regardless of differences between them such has how they are zoned.  (*See* Dorchester testimony, Tr. at 9530; Wecker testimony, Tr. at 9762-65.)  Further, Mr. Hunsperger testified that he conducted no statistical analysis of the vacant land data, looked at raw data alone, and did not use any specific methodology in coming up with his alleged $21 million loss.  (*See* Hunsperger testimony, Tr. at 6831 ("[T]here was no statistical analysis because I used 100 percent of the sales"), 6832 ("The way I arrived at 30 percent --- the only piece of paper that I have is the report.").  It is not an answer for Mr. Hunsperger to say he looked at 100% of the sales, because the question is not

10

whether Mr. Hunsperger looked at all sales, but rather whether he was making a meaningful comparison. If the sales Mr. Hunsperger looked at were not comparable, they would not provide any information on diminution in value. (*See* Dorchester testimony, Tr. at 9530 ("[I]t was just throw everything into a pocket, and that is not an acceptable valuation practice"); *see also* Wecker testimony, Tr. at 9771 (Hunsperger's analysis not statistically reliable).) This lack of any kind of statistical analysis dooms Mr. Hunsperger's testimony. *See Boughton v. Cotter Corp*, 65 F.3d 823, 835 (10th Cir. 1995) (affirming exclusion of cancer study because "none of the observed levels of cancer were elevated to a statistically significant level."); *Brock v. Merrell Dow Pharms., Inc.*, 874 F.2d 307, 313 (5th Cir. 1989) (finding epidemiological study to be insufficient evidence of causation "due to the fact that the confidence intervals include 1.0"); *Renaud v. Martin Marietta Corp*, 749 F. Supp. 1545, 1551 (D. Colo 1990), *aff'd*, 872 F.2d 304 (10th Cir 1992) (excluding expert testimony where "a statistician would not conclude it is significant").

### F.     Mr. Hunsperger's Trial Testimony Regarding Pre-1988 Stigma Should Be Stricken

Finally, all of Mr. Hunsperger's testimony that purports to find diminution in value before 1988 should be stricken. Mr. Hunsperger has no basis for his testimony that Rocky Flats stigmatized property prior to 1988 because he performed no analysis of pre-1988 values. (*See* Hunsperger testimony, Tr. at 6715 ("I haven't done any specific analysis pre-1988").) Because Mr. Hunsperger did not perform any actual analysis of market values before 1988, his testimony does not meet *Daubert* standards and should be stricken. *See Daubert*, 509 U.S. at 590 ("[T]he

subject of an expert's testimony must be 'scientific . . . knowledge'" and not mere "subjective belief or unsupported speculation")[4].

## II. JOHN RADKE'S PHASE I AND PHASE II ANALYSES SHOULD BE STRICKEN BECAUSE THEY ARE NOT STATISTICALLY SIGNIFICANT AND CANNOT BE USED TO FIND PRICE DISCOUNTS ASSOCIATED WITH THE FBI RAID

Defendants move to strike two portions of Dr. Radke's testimony -- testimony regarding his "Phase I" and "Phase II" analyses. These analyses should be stricken to the extent they are used by either Dr. Radke, or Mr. Hunsperger, or any other of plaintiffs' experts to find diminution in value.

Dr. Radke's "Phase I" analysis is flawed because it is based upon assumptions and speculation. (*See* Radke testimony, Tr. at 2774 ("Q. What I'm saying is that you have in Phase I an effort that is assumption built upon assumption, correct? A. Correct."), 2774-75 ("But you have to look at that value with the assumptions, you can't divorce it from the assumptions . . . . So you know, in fuzzy logic you shade it gray.").) Such "fuzzy logic" is not admissible. *See Daubert*, 509 U.S. at 590 ("[T]he subject of an expert's testimony must be 'scientific . . . knowledge'" and not mere "subjective belief or unsupported speculation").

Furthermore, Dr. Radke's Phase I analysis is not statistically significant. (*See* Radke Testimony, Tr. at 2779 ("Q. And, again, if we applied that [95 percent confidence interval], none of these results for Phase I were statistically significant, we're in agreement on that, aren't we?

---

[4] Additionally, there is no basis for this testimony in Mr. Hunsperger's expert report, as it was focused on comparing values before and after the FBI raid. (*See*, *e.g.*, Ex. A, Hunsperger Report at 194) ("By way of comparison, we have included nine pre-1989 sales located in the vicinity of Rocky Flats  . . . . The same buyers and sellers were also involved [in one of Mr. Hunsperger's "individual land sales"] but the post 1989 price was less than half the pre-1989 price").) Mr. Hunsperger's trial testimony regarding pre-1988 diminution in value is thus a fundamental departure from his own prior analysis.

12

A. We're in agreement they are what they are, correct.").)  Defendants' experts agree. (*See*, *e.g.*, Wecker testimony, Tr. at 9791 ("Q. So looking back at Phase I, you say he was looking to see whether there was statistical significance, and he is looking to see 95 percent.  Did he find that there was statistical significance to a 95 percent degree of confidence? A. He did not."); McFadden testimony, Tr. at 9935-36 (Phase I analysis not statistically significant.).)  Because the conclusions from Radke's Phase I analysis are not statistically significant, opinions based upon them should be stricken under *Daubert*. *See Boughton*, 65 F.3d at 835 (affirming exclusion of cancer study because "none of the observed levels of cancer were elevated to a statistically significant level."); *Brock*, 874 F.2d at 313 (finding epidemiological study to be insufficient evidence of causation "due to the fact that the confidence intervals include 1.0"); *Renaud*, 749 F. Supp. at 1551 (excluding expert testimony where "a statistician would not conclude it is significant").

Similarly, Radke's Phase II analysis should be stricken to the extent it purports to find diminution in value attributable to the FBI raid.  Both plaintiff and defense experts agree that Radke's analysis cannot find a statistically significant discount attributable to the FBI raid. (*See* Hunsperger testimony, Tr. at 6847 ("Q. That was easy enough. Now, if you have this normal fluctuation -- let's just -- let's just go on to the next step.  Is it also true that, based upon Dr. Radke's work and your own assessment, that this 8 percent diminution actually predated the FBI raid? A. Right.  I think stigma started before the '89 FBI raid.");  Wecker testimony, Tr. at 9796 ("Q. Okay.  Did Dr. Radke even try to see if there was a statistically significant change over time either before and after the F.B.I raid or at any point in time?  A.  No."); McFadden testimony, Tr. at 9931 ("[H]e never asked the question was there -- for example, was there a statistically significant diminution as a result of the raid.").)  Indeed, Mr. Hunsperger testified that pre and

13

post FBI raid data were just "normal fluctuations." (Hunsperger testimony, Tr. at 6899 ("Looking at an eight-year statistical analysis of property values, one wouldn't expect the diminution to be precisely the same every year. There are small statistical fluctuations, and that's what happened in this case.") Dr. McFadden confirmed this point when he tested Dr. Radke's analysis for statistical significance and found none. (McFadden testimony, Tr. at 9936 ("The result is that that is not statistically significant.").)

Because statistical significance cannot be attached to Radke's Phase II analysis, it should be stricken. *See Boughton*, 65 F.3d at 835 (affirming exclusion of cancer study because "none of the observed levels of cancer were elevated to a statistically significant level."); *Brock*, 874 F.2d at 313 (finding epidemiological study to be insufficient evidence of causation "due to the fact that the confidence intervals include 1.0"); *Renaud*, 749 F. Supp. at 1551 (excluding expert testimony where "a statistician would not conclude it is significant").

Finally, Radke's Phase I and Phase II analyses are inadmissible because Dr. Radke did retain the data he used for his calculations in contravention of the standards of the field in which he was operating. (*See* McFadden testimony, Tr. at 9974 ("But it is a major concern in a scientific study like this if you cannot determine how things were constructed, reconstruct what was actually done . . . . And it's unfortunate that it happened, and I would say a responsible scientist in that situation should replicate the study, should replicate the preparation of the data.").) Phase I could not be replicated. (McFadden testimony, Tr. at 9977.) Phase II had to be reverse engineered because of Dr. Radke's lack of retention of data. (McFadden testimony, Tr. at 9978.) Where, as here, an expert has failed to document his work and make it available for review -- thereby rendering his opinions non-replicable and non-testable -- courts have consistently excluded such testimony under *Daubert*. *See*, *e.g.*, *Reed v. Binder*, 165 F.R.D. 424,

430 (D.N.J. 1996); *Nguyen v. IBP, Inc.*, 162 F.R.D. 675, 681 (D. Kan. 1995) ("[i]f the expert is unable or unwilling to make the disclosures he should be excluded as a possibility for retention as an expert witness in the case.")

### III. THOMAS COCHRAN'S TESTIMONY REGARDING MUF SHOULD BE STRICKEN BECAUSE IT IS IMPERMISSIBLE SPECULATION

Although Dr. Thomas Cochran testified at length about MUF, he was unable to state with any certainty (a) that some portion of MUF had in fact been released off-site and (b) the amount of MUF purportedly released. (*See* Cochran testimony, Tr. at 5596 ("you have material unaccounted for throughout this plant . . . that there may have been releases. We don't know"), 5613 (guessing that amount of MUF possibly released "could be more, it could be less"), 5345 ("[I]t *could* escape from the plant. It *could* be lost") (emphasis added), 5612 ("I don't want to leave the impression that a large fraction of MUF was released off site"). Such speculation is inadmissible under *Daubert*. *See Daubert*, 509 U.S. at 590 ("[T]he subject of an expert's testimony must be 'scientific . . . knowledge'" and not mere "subjective belief or unsupported speculation"); *Dodge*, 328 F.3d at 1222 ("It is critical that the district court determine 'whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist") (quoting *Mitchell v. Gencorp, Inc.*, 165 F.3d, 778, 781 (10th Cir. 1999)). Because Dr. Cochran could only speculate about MUF, rather than offering any concrete opinions based upon "scientific knowledge" his testimony regarding MUF should be stricken.

### CONCLUSION

For the foregoing reasons, defendants respectfully request that this Court strike the following testimony: any testimony by Mr. Hunsperger purporting to quantify diminution in value, Dr. Radke's testimony regarding his Phase I and Phase II analyses, and Dr. Cochran's testimony regarding MUF.

15

Dated:  January 17, 2006                    Respectfully submitted,


                        s/ John E. Tangren_____
                        One of the Attorneys for the Defendants
David M. Bernick
Douglas J. Kurtenbach
Ellen Therese Ahern
Mark J. Nomellini
John E. Tangren
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601-6636
Phone:  312-861-2000
Fax:     312-861-2200

Joseph J. Bronesky
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, Colorado 80202
Phone:  303-297-2900
Fax:     303-298-0940

Attorneys for ROCKWELL
INTERNATIONAL CORPORATION and
THE DOW CHEMICAL COMPANY

16

**CERTIFICATE OF SERVICE**

   I hereby certify that on January 17, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses for the following:

Peter B. Nordberg, Esq.
c/o Karen M. Markert

Apartments at Denver Place, Apt. 2812

1880 Arapahoe Street

Denver, CO 80202

pnordberg@bm.net

kmarkert@bm.net


Gary B. Blum, Esq.
SILVER & DEBOSKEY
The Smith Mansion
1801 York Street
Denver, Colorado 80206

blumg@s-d.com


                s/ Kari Knudsen_____
                Kari Knudsen (legal assistant)