**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 90-cv-181-JLK

MERILYN COOK, *et al.*,

      Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION
and THE DOW CHEMICAL COMPANY,

      Defendants.

---

**DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

---

David M. Bernick
Douglas J. Kurtenbach
Ellen Therese Ahern
Mark J. Nomellini
Stephanie Brennan
John E. Tangren
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601-6636
Phone:  312-861-2000
Fax:     312-861-2200

Joseph J. Bronesky
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, Colorado 80202
Phone:  303-297-2900
Fax:     303-298-0940

Attorneys for ROCKWELL INTERNA-
TIONAL CORPORATION and THE DOW
CHEMICAL COMPANY

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS................................................................................................. i

INTRODUCTION ........................................................................................................1

LEGAL STANDARD...................................................................................................9

ARGUMENT .............................................................................................................10

I.      DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW
        ON PLAINTIFFS' TRESPASS CLAIMS......................................................10

        A.      Plaintiffs Have Not Shown That Plutonium is Present on Each of the Class
                Properties. ...........................................................................................10

        B.      Plaintiffs Have Failed to Prove a Trespass by Rockwell.......................20

        C.      Plaintiffs Have Not Shown That Any Trespass Was Continuing, or That
                Any Trespass Occurred While All Class Members Owned Their Class
                Properties. ...........................................................................................22

        D.      Plaintiffs Have Not Introduced Sufficient Evidence That Defendants
                Intentionally Caused a Trespass..........................................................25

        E.      The Evidence Shows That Any Trespass Was Not Caused by Defendants. .........27

II.     TRESPASS ARGUMENTS THAT THE COURT HAS RULED ON AND THAT
        DEFENDANTS INCLUDE FOR PURPOSES OF PRESERVING THEIR
        RIGHTS. ......................................................................................................29

        A.      Plaintiffs Have Not Demonstrated That Any Trespass Was Either Tangible
                or Caused Serious and Substantial Physical Damage............................30

        B.      Plaintiffs Have Failed to Present Evidence Showing That Defendants Did
                Not Comply with the Applicable Federal Standards for Offsite Plutonium
                Releases...............................................................................................32

C.      Plaintiffs Have Not Shown That Plutonium Levels on Class Properties
        Exceeded the Applicable State Standards..............................................................34

III.    DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW
        ON PLAINTIFFS' NUISANCE CLAIMS.......................................................................36

        A.      Plaintiffs Have Not Shown a Class-Wide Health Risk..........................................36

                1.      Plaintiffs Have Failed to Introduce Evidence That All Class
                        Members Experienced an Unreasonable Increased Health Risk as a
                        Result of Plutonium Exposure. ..................................................................37

                2.      Plaintiffs Have Failed to Introduce Evidence That All Class
                        Members Experienced an Unreasonable Health Risk as a Result of
                        Exposure to Plutonium Released by Rockwell...........................................43

        B.      Plaintiffs Have Failed to Introduce Evidence That All Class Members Are
                at an Increased Risk as a Result of Future Releases from Rocky Flats. ................44

        C.      Plaintiffs Have Not Shown That The Harm Associated With Any Health
                Risk Outweighs the Utility Associated With the Operation of Rocky Flats..........46

        D.      Plaintiffs Have Not Shown That Any Health Risk Is Substantial. ........................47

        E.      Plaintiffs' Acquisition of Land After Any Purported Nuisance Came Into
                Existence Establishes That Any Interference Was Not Substantial and
                Unreasonable.........................................................................................................50

        F.      Plaintiffs Have Not Shown That Defendants Intentionally or Negligently
                Caused Any Health Risk........................................................................................53

        G.      The Evidence Shows That Any Health Risk Resulted From an Intervening
                Cause.....................................................................................................................54

IV.     NUISANCE ARGUMENTS THAT THE COURT HAS RULED ON, AND
        THAT DEFENDANTS INCLUDE FOR PURPOSES OF PRESERVING THEIR
        RIGHTS. .......................................................................................................................55

        A.      Plaintiffs Have Not Shown a Violation of State Standards. ..................................55

        B.      Plaintiffs Have Not Shown That Any Health Risk Was Created by
                Releases Which Did Not Comply with Federal Standards. ...................................56

        C.      Exceedingly Small Exposures Cannot Give Rise to a Nuisance. .........................57

V.     THE RECORD CONFIRMS THE ABSENCE OF REMAINING FACTUAL
       DISPUTES REGARDING DEFENDANTS' AFFIRMATIVE DEFENSES OF
       STATUTE OF LIMITATIONS AND PRESCRIPTIVE EASEMENT. ..........................58

       A.     The Evidence Shows That Plaintiffs' Trespass Claims Are Barred by the
              Statute of Limitations............................................................................58

       B.     The Evidence Shows That Plaintiffs' Nuisance Claims Are Also Barred by
              the Statute of Limitations......................................................................61

       C.     The Evidence Shows That Plaintiffs' Trespass Claims Are Barred by a
              Prescriptive Easement.............................................................................62

       D.     The Evidence Shows That Plaintiffs' Nuisance Claims Are Barred by a
              Prescriptive Easement.............................................................................64

VI.    defendants are entitled to judgment as a matter of law on the question of whether
       their conduct was Capable generically of causing fear, anxiety, or mental
       discomfort in class members...............................................................................65

       A.     The Generic Question of Emotional Distress Cannot Support a Judgment
              on Plaintiffs' Nuisance Claims. ..............................................................65

       B.     Plaintiffs Have Not Introduced Any Evidence That Defendants' Conduct
              Was Capable of Causing Emotional Distress. ........................................66

       C.     Plaintiffs Cannot Recover for Emotional Distress Without Demonstrating
              That Their Fears Were Grounded in Science...........................................67

VII.   DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW
       ON PLAINTIFFS' CLAIMS BECAUSE PLAINTIFFS HAVE NOT
       EXPERIENCED RECOVERABLE DAMAGES. ............................................69

       A.     As an Initial Matter, Plaintiffs' Damages Evidence is Not Sufficiently
              Reliable To Be Considered by the Jury and Should be Stricken in its
              Entirety....................................................................................................70

       B.     Even if Plaintiffs' Damages Evidence is Not Stricken in its Entirety,
              Plaintiffs Have Not Shown Damages Attributable to Defendants'
              Actionable Conduct:  First Principles.....................................................76

       C.     Plaintiffs' Damages Evidence is Insufficient Because It Relates to Losses
              Suffered as a Result of Non-Actionable Proximity. ...............................78

D.      Plaintiffs Cannot Recover Stigma Damages Where the Stigma Does Not Result From a Proven Trespass or Nuisance. ........................................................80

E.      Plaintiffs Have Not Shown Damages Suffered by the Class. ...............................82

F.      Plaintiffs Have Not Shown Damages Attributable to the Prospect of the Continuance of Any Tortious Invasions. ..............................................................87

G.      Plaintiffs Have Not Demonstrated That Any "Injurious Situation" Became Complete and Comparatively Enduring Between 1988 and 1995........................91

VIII.    DAMAGES ARGUMENTS THAT THE COURT HAS RULED ON AND THAT DEFENDAnTS INCLUDE FOR THE PURPOSE OF PRESERVING THEIR RIGHTS. ............................................................................................................94

A.      Plaintiffs Have Failed to Limit Evidence of Damages to the Back-Calculated Statute of Limitations Window (January 30, 1988 - January 30, 1990). ....................................................................................................................94

IX.     DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' DEMAND FOR PUNITIVE DAMAGES.........................................96

A.      Plaintiffs Have Not Shown That Defendants Engaged in Willful and Wanton Conduct. ....................................................................................................96

B.      Plaintiffs Have Not Shown That the Punitive Damages They Seek Are in Any Way Linked to Defendants' Actionable Conduct. .........................................98

X.      PUNITIVE DAMAGES ARGUMENTS THAT THE COURT HAS RULED ON AND THAT DEFENDANTS INCLUDE FOR THE PURPOSE OF PRESERVING THEIR RIGHTS.......................................................................................99

A.      Plaintiffs Have Not Shown Any Nuclear Occurrences Before August 1988..................................................................................................................99

B.      The Price-Anderson Act Bars Plaintiffs from Receiving Punitive Damages.............................................................................................................101

CONCLUSION....................................................................................................................102

## TABLE OF AUTHORITIES

Page(s)

### Cases

*Adams-Arapahoe School Dist. No. 28-S v.*
    *GAF Corp.*,
    959 F.2d 868 (10th Cir. 1992) ........................................................................ 44

*Alfred v. Caterpillar, Inc.*,
    262 F.3d 1083 (10th Cir. 2001) ..................................................................... 10

*American Stevedores v. Porello*,
    330 U.S. 446 (1947) ........................................................................................ 93

*Bennett v. Greeley Gas Co.*,
    969 P.2d 754 ................................................................................................... 99

*Blades v. Monsanto Co.*,
    400 F.3d 562 (8th Cir. 2005) ......................................................................... 11

*Boggs v. Divested Atomic Corp.*,
    No. C-2-90-840, 1997 WL 33377790
    (S.D. Ohio Mar. 24, 1997) ............................................................................ 33

*Bohrmann v. Maine Yankee Atomic*
    *Power Co.*,
    926 F. Supp. 211 (D. Me. 1996) ................................................................... 33

*Boughton v. Cotter Corp.*,
    65 F.3d 823 (10th Cir. 1995) .................................................... 67, 69, 77, 86

*Bower v. Weisman*,
    639 F. Supp. 532 (S.D.N.Y. 1986) ................................................................ 49

*Bradley v. Am. Smelting and Ref. Co.*,
    709 P.2d 782 (Wash. 1985) ............................................................................ 62

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
    155 F.3d 331 (4th Cir. 1998) ......................................................................... 12

*Buckley Powder Co. v. State*,
    70 P.3d 547 (Colo. App. 2002) ...................................................................... 85

*City of North Vernon v. Voegle,*
    2 N.E. 821 (1885)............................................................................................... 93

*City of Vernon v. S. Cal. Edison Co.,*
    955 F.2d 1361 (9th Cir. 1992) ......................................................................... 78

*Cook v. Rockwell Int'l Corp.,*
    181 F.R.D. 473 (D. Colo. 1998) ........................................................ 37, 82, 83

*Cook v. Rockwell Int'l Corp.,*
    273 F. Supp. 2d 1175 (D. Colo. 2003)........................................... 30, 32, 47, 87

*Cook v. Rockwell Int'l Corp.,*
    358 F. Supp. 2d 1003 (D. Colo. 2004).................................................... 58, 59

*Cook v. Rockwell Int'l Corp.,*
    755 F. Supp. 1479 (D. Colo. 1991).............................................. 99, 100, 101

*Corcoran v. New York Power Auth.,*
    935 F. Supp. 376 (S.D.N.Y. 1996)...................................................................... 33

*Cox v. Cambridge Square Towne Houses, Inc.,*
    236 S.E.2d 73 (Ga. 1977).................................................................................. 95

*Gassie v. SMH Swiss Corp. for Microelec. and Watchmaking Indus., Ltd.,*
    No. Civ. A. 97-3557, 1998 WL 158737
    (E.D. La. Mar. 26, 1998)................................................................................... 33

*Good v. Fluor Daniel Corp.,*
    222 F. Supp. 2d 1236 (E.D. Wash. 2002) ....................................................... 33

*Goodyear v. Discala,*
    849 A.2d 791 (Conn. 2004) ............................................................................. 93

*Henry v. Dow Chemical Co.,*
    701 N.W.2d 684, (Mich. 2005)......................................................................... 93

*Hensley v. Tri-QSI Denver Corp.,*
    98 P.3d 965 (Colo. Ct. App. Aug. 12, 2004) ................................................. 100

*Holmes v. Securities Invest. Protection Corp.,* 503 U.S. 258 (1992) ........................................... 77

*Hugunin v. McCunniff,*
    2 Colo. 367 (1874) .................................................................................... 24, 25

*In re Hanford Nuclear Reservation Litig.*,
    780 F. Supp. 1551 (E.D. Wash. 1991) ........................................................................... 101

*In re Hoery v. United States*,
    64 P.3d 214 (Colo. 2003) ............................................................. 23, 24, 34, 35, 59, 89, 94

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*,
    209 F.R.D. 323 (S.D.N.Y. 2002) ...................................................................................... 65

*In re Rhone-Poulenc-Rorer Inc.*,
    51 F.3d 1293 (7th Cir. 1995) ............................................................................................ 66

*In re TMI Litigation Cases Consol. II*,
    940 F.2d 832 (3d Cir. 1991) .............................................................................................. 33

*Lamb v. Martin Marietta Energy Sys.*,
    835 F. Supp. 959 (W.D. Ky. 1993) ................................................................................... 33

*Lobato v. Taylor*,
    71 P.3d 938 (Colo. 2002) .................................................................................................. 62

*Mangini v. Aerojet-General Corp.*,
    912 P.2d 1220, 1221 (Cal. 1996) ..................................................................................... 23

*McLandrich v. S. Cal. Edison Co.*,
    942 F. Supp. 457 (S.D. Cal. 1996) ................................................................................... 33

*Middelkamp v. Bessemer Irrigating Ditch Co.*,
    103 P. 280 (1909) .............................................................................................................. 23

*Morsey v. Chevron, USA, Inc.*,
    94 F.3d 1470 (10th Cir. 1996) ........................................................................................... 1

*Nieman v. NLO, Inc.*,
    108 F.3d 1546 ................................................................................................................... 95

*O'Conner v. Commonwealth Edison Co.*,
    13 F.3d 1090 (7th Cir. 1994) ............................................................................................ 33

*O'Connor v. Boeing N. Am., Inc.*,
    No. CV 97-1554, slip op. at 77–87
    (C.D. Cal. Aug. 18, 2005) ................................................................................................. 33

*Oklahoma City v. Hopcus*,
    50 P.2d 216 (1935) ............................................................................................................ 93

*Ortiz v. Fibreboard Corp.*,
    527 U.S. 815 (1999)............................................................................................. 2

*Platte & Denver Ditch Co. v. Anderson*,
    6 P. 515 (Colo. 1885)................................................................................... 51, 53

*Pub. Serv. Co. of Colorado v. Van Wyk*,
    27 P.3d 377 (Colo. 2001)........................... 1, 25, 30, 31, 34, 35, 44, 47, 49, 50, 54, 55, 57

*Renaud v. Martin Marietta Corp.*,
    749 F. Supp. 1545 (D. Colo. 1990)................................................................. 86

*Roberts v. Fla. Power & Light Co.*,
    146 F.3d 1305 (11th Cir. 1998) ..................................................................... 33

*Roberts v. TXU Energy Retail Co.*,
    171 S.W.3d 901 (Tex. App. 2005).................................................................. 77

*Sanjuan v. IBP, Inc.*,
    160 F.3d 1291 (10th Cir. 1998) ..................................................................... 10

*Saunders v. Hilperthauser*,
    1988 WL 42146 (S.D.N.Y. 1988).................................................................. 49

*Schiller & Schmidt, Inc. v. Nordisco Corp.*,
    969 F.2d 410 (7th Cir. 1992) ......................................................................... 78

*Smith v. State Comp. Ins. Fund*,
    749 P.2d 462 (Colo. Ct. App. 1987) .............................................................. 27

*Spanbauer v. J.R. Simplot Co.*,
    685 P.2d 271 (Idaho 1984)............................................................................. 95

*Sprague v. General Motors Corp.*,
    133 F.3d 388 (6th Cir. 1998) ......................................................................... 12

*Staley v. Sagel*,
    841 P.2d 379 (Colo. Ct. App. 1992) .............................................................. 76

*Taco Cabana v. Exxon Corp.*,
    5 S.W.3d 773 (Tex. App. 1999)..................................................................... 35

*United States v. Hess*,
    194 F.3d 1164 (10th Cir. 1999) ..................................................................... 94

*Walker Drug Co. v. La Sal Oil Co.*,
    972 P.2d 1238 (Utah 1998) .......................................................................... 95

*Weisfeld v. Sun Chem. Corp.*,
    210 F.R.D. 136 (D.N.J. 2002),
    *aff'd* 84 Fed. Appx. 257 (3d Cir. 2004) ....................................................... 12

*Weisgram v. Marley Co.*,
    528 U.S. 440, (2000) .................................................................................... 10

*Weisiger v. Harbour*,
    62 P.3d 1069, 1071 (Colo. App. 2002) ........................................................ 62

*Westric Battery Co. v. Standard Elec. Co.*, 482 F.2d 1307 (10th Cir. 1973).............................. 76

*Wilcox v. Homestake Mining Co.*,
    No. CIV-04-534, slip op. at 6–7 (D.N.M. Nov. 15, 2005)............................. 32

*Wolfgang v. Mid-America Motorsports, Inc.*,
    111 F.3d 1515 (10th Cir. 1997) ...................................................................... 9

## **Statutes**

28 U.S.C. § 2072 ............................................................................................ 2

42 U.S.C. § 2014 ................................................................................ 44, 99, 100

42 U.S.C. § 2210 ............................................................................................ 99

Colo. Rev. Stat. § 13-21-102 .................................................................... 97, 99

Colo. Rev. Stat. § 13-80-102 .................................................................... 59, 95

## **Other Authorities**

9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2524 ................ 10

CJI-Civ. 4th 18:1 (May 2004)........................................................................ 24

*Prosser and Keeton on Torts*,
    (5th ed. 1984) .................................................................................. 22, 50, 51

Pub.L. 100-104, § 20(a), Historical and Statutory Notes to 42 U.S.C.A. § 2014
    (West Supp.1990) ...................................................................................... 101

Reference Manual on Sci. Evid. (2d ed.) ......................................................... 8

Rest. 2d of Torts § 840................................................................. 50, 53, 87, 88, 91, 93, 95

Rest. 2d of Torts § 929................................................................................. 11, 87

Rest. 2d of Torts § 930......................................................................................... 87

Sen. Rep. No. 296, 85th Cong.,
    1st Sess. at 16 (1957) ................................................................... 76

*The Law of Torts*, § 57
    (West Group 2001) ..................................................................... 23

Wright & Miller, 5 Fed. Prac. & Proc. Civ.3d.............................................. 85

## **Rules**

Federal Rule of  Civil Procedure 32 ............................................................... 19

Federal Rule of Civil Procedure 50 ................................................................ 9

## **Regulations**

6 Colo. Code Regs. 1007-1, RH 4.60.1 ...................................................... 35, 56

## INTRODUCTION

Plaintiffs have attempted to construct a class-wide trespass and nuisance case within the contours of an artificial timeframe driven by the 1989 FBI raid.  However, there is an incurable tension between the legal parameters governing trespass and nuisance class-wide liability and the scientific facts of this case that first became manifest throughout plaintiffs' case-in-chief and continued through the close of evidence.  At the end of this trial, plaintiffs' patchwork quilt of "evidence" still does not fit the issues before this Court and cannot provide a basis for a finding of liability under any theory.  With all of the evidence now before the Court, plaintiffs still have not established the basic elements of their claims.  Consequently, defendants respectfully renew their request that the Court enter judgment as a matter of law in favor of defendants on all claims because "there is no legally sufficient evidentiary basis for a reasonable jury" to find for plaintiffs on any issue.  *Morsey v. Chevron, USA, Inc.*, 94 F.3d 1470, 1476 (10th Cir. 1996).

**Trespass:**  Through the close of trial, plaintiffs have failed to provide sufficient evidence allowing a reasonable juror to find that (i) defendants intentionally released "plutonium" (ii) onto each of "the Class Properties," and that (iii) "it appears that plutonium will continue to be present on the Class Properties indefinitely."  (Instruction No. 3.3, 3.4); *Pub. Serv. Co. of Colorado v. Van Wyk*, 27 P.3d 377, 387, 390 (Colo. 2001).  Instead, plaintiffs attempted to extrapolate *releases[1]* of plutonium from the Rocky Flats plant to "prove" that plutonium was deposited upon the class properties.  These extrapolations — culled from the so-called "Krey & Hardy" and

---

[1] Even this release evidence relates only to releases by Dow, an issue addressed below.

"Poet & Martell" contours — suffer from at least two fundamental deficiencies that render them insufficient as a matter of law.

*First*, neither set of researchers sampled all of the class properties.  Nor did they sample most of the class properties, or even one percent of the class properties.  Rather, Krey & Hardy sampled only 33 locations (equivalent to less than 1% of the 13,000 class properties), while Poet & Martell used even fewer samples.  (Budnitz testimony, 10/31/05 Tr. 3342; DX1167)  Many of these samples were not even in the class area.  (*See* DX1167; Budnitz testimony, 10/31/05 Tr. 3342-43 (Krey & Hardy had 33 monitoring stations, but Budnitz does not know how many were in the class area; Poet & Martell took fewer samples); Cochran testimony, 11/1/05 Tr. 3573 (Poet & Martell went out only 2-4 miles east of the plant))

As Dr. Budnitz testified, Krey & Hardy and Poet & Martell used a process of "interpolation" or "extrapolation" to turn sampling points into a "contour."  (Budnitz testimony, 10/31/05 Tr. 3338-39)  But plaintiffs' evidence is insufficient to prove that plutonium was deposited on each class member's property (or even most class members' properties).  For example, there was no evidence that the properties of class members who testified (*e.g.*, Mr. Ozaki, Ms. Robb, and Ms. Whalen) were contaminated.  In an individual trial, this process of "interpolation" or "extrapolation" from *other properties* would not be sufficient evidence to demonstrate that plutonium was present.  Nor is such evidence sufficient in a class trial, because the class device cannot be used to expand individual rights.  *See* 28 U.S.C. § 2072 (b) (class action device cannot be used to "abridge, enlarge or modify any substantive right" of any litigant); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 845 (1999).

***Second***, the Krey & Hardy and Poet & Martell contours were drawn in 1970, not as of June 7, 1989 (the date that defines the class).  (*See* P149, Plutonium in Soil Around the Rocky Flats Plant, Aug. 1, 1970; P533, Report on the Dow Rocky Flats Fire: Implications of Plutonium Releases to the Public Health and Safety, Jan. 13, 1970)  Thus, even for the smattering of properties in the Krey & Hardy and Poet & Martell studies, as of the close of evidence, plaintiffs have still introduced no evidence that plutonium remained on those properties as of 1989, and continues on those properties today.  Rather, the totality of the evidence has shown that virtually all of the class area development occurred between 1970 and 1989.  (DX454, ATSDR 5/13/05 Report, at 1-2 ("Though Rocky Flats released plutonium to the air throughout its history, the overwhelming majority (> 99.9%) of plutonium emissions occurred between 1953 and 1969."); DV1, Till video ("as of 1969, there was very little development in the class area.  By 1989, however, the class had become well developed. . . .building, concrete, and asphalt now cover what used to be undeveloped soil . . .[s]everal feet of soil are excavated when preparing the foundation of a new home."); *see also* Smallwood testimony, 11/3/05 Tr. 4083)  As of the close of evidence, plaintiffs have made no showing that notwithstanding the massive amount of soil bulldozing that accompanied that development, even the small number of properties tested remained contaminated.  All that Dr. Smallwood could say is that he "did not know" whether any class properties remained contaminated:

> Q.     You couldn't — when it comes to the developed part of the class area, you can't simply say that because the Krey and Hardy and/or Poet and Martell contours show there may have been plutonium there back in 1970, that is certainly not very good evidence that there is still plutonium there today, fair?

> A.     Where you have houses on top of the soil or warehouses or shopping mall or parking lot, I don't know, it depends on how deeply they scraped away the soil for the foundation of these structures.

> Q.      Do you know of anybody today who has actually determined whether there is, in fact, plutonium on the class properties?
>
> A.      I don't know.

(Smallwood testimony, 11/3/05 Tr. 4083)

Plaintiffs' own experts' admissions, coupled with several class representatives' testimony, confirms plaintiffs' failure to prove ongoing **contamination** and dispenses with plaintiffs' trespass claims against both Dow and Rockwell.  *See* Sections I.A-D, *infra*.  And, as detailed in Sections I.E & F, *infra*, plaintiffs' inability to provide sufficient evidence of intent and causation provide additional reasons to grant judgment as a matter of law on the trespass claims.  Plaintiffs' claims against **Rockwell** are deficient for a further reason:  after four months of trial, plaintiffs have failed to prove even a single **release** of plutonium from Rocky Flats during Rockwell's management beginning in 1975.  Because the Krey & Hardy and Poet & Martell contours relied upon sampling from 1970, they cannot be used to prove contamination caused by Rockwell.  Tellingly, **none** of plaintiffs' experts testified that Rockwell had **ever** released **any** plutonium offsite, much less onto each of the class properties.

Nor can the plaintiffs rely on the FBI raid to prove trespass against Rockwell.  None of Rockwell's conduct relating to the raid, or to Rockwell's 1992 guilty plea, caused any offsite contamination, let alone plutonium contamination offsite.  (*See* Holeman testimony, 10/18/05 Tr. 1333-34; Watkins testimony, Dep. Design. at 159-60, 167-69; Norton testimony, 12/14/05 Tr. 7958-66 ("there had been no evidence of off-site physiological or environmental damage from the operations of the facility"))  Nor did any of plaintiffs' witnesses testify that Rockwell's conduct caused offsite contamination of any of the class properties.  *See* Section I.B, *infra*.

**Nuisance:**  Plaintiffs fare no better with their nuisance claims.  To prove a nuisance under the Court's instructions, plaintiffs must demonstrate either that: (a) "the class members were exposed to plutonium in some way as a result of one or both Defendants' activities and incurred some increment of increased health risk as a result;" or (b) that "Defendants' activities at Rocky Flats interfered with Class members' use and enjoyment of their properties by creating objective conditions that pose a demonstrable risk of future harm to the Class Area."  (Instruction No. 3.7)  Any such health risk must be "unreasonable," meaning that the common harm to the class from the health risk is outweighed by the benefit to society as a whole from the operation of the Rocky Flats plant.  (Instruction Nos. 3.8, 3.10-3.12)  Throughout the entirety of this trial, plaintiffs have failed to introduce evidence of an increased health risk to "the class members."  Although plaintiffs attempted to introduce health risk evidence through Dr. Goble, Goble could only testify that there was great "uncertainty" — he could not quantify a health risk to any member of the class.  (Goble testimony, 11/2/05 Tr. 3660-61)  Indeed, Dr. Goble admitted that he could not even say what the class was, much less quantify a health risk for all class members.  (*Id*., ("the definition of the class is something that I don't actually truly know about, okay"))  *See* Section III.A.1, *infra*.

Dr. Goble's testimony also precludes any claim by plaintiffs that class members suffered an "unreasonable" health risk.  Dr. Goble opined that, for those class members with the lowest exposures,[2] exposures from Rocky Flats would have been so "very, very small" that "regulatory

---

[2]  The Court's jury instructions require that, in determining reasonableness for purposes of assessing plaintiffs' nuisance claim, "you must also consider only harm that is common to the class as a whole, and not any more severe harm that may have been suffered by some Class members but not by others."  (Instruction No. 3.11)

agencies would not have been concerned about such exposures."  (Goble testimony, 11/2/05 Tr. 3660-61)  Defense evidence further confirms that there was no unreasonable health risk.  (*E.g.,* Raabe testimony, 12/9/05 Tr. 7339-40 ("The doses we're talking about in this case are so trivial they won't have any effect one way or another.  They're small, tiny fraction of what we get every week.  There's no way you can assign a risk or a benefit to such a small dose.  No way."))  Although plaintiffs' failure to present evidence of an increased health risk to "the class members" is dispositive of plaintiffs' nuisance claim, the complete evidentiary record, including numerous independent studies as well as defense testimony, affirmatively shows that no health risk exists.  *See* Section III.A.1, *infra.*

Plaintiffs' evidence of a health-risk based nuisance claim against Rockwell suffers from further deficiencies.  In particular, as discussed above, plaintiffs have introduced no evidence of any offsite contamination caused by Rockwell.  Because plaintiffs have not introduced evidence of contamination by Rockwell, plaintiffs cannot show that Rockwell's actions created any health risk to the class.  *See* Section III.A.2, *infra.*

**Damages:**  Finally, as discussed in Part VII, plaintiffs have failed to introduce sufficient evidence to withstand judgment as a matter of law on the issue of damages.  At the close of the case, plaintiffs have not introduced any evidence of property value diminution (however attributable) on which a reasonable jury could rely to award damages.  As an initial matter, at the close of the evidence, it is more apparent than ever that plaintiffs' damages analyses are utterly unreliable and should not be considered by the jury.[3]  Without damages evidence, judgment as a matter

---

[3] Defendants incorporate by reference herein their *Daubert* motions to exclude the testimony of plaintiffs' experts, including defendants' renewed motion to strike plaintiffs' expert testimony

(Continued…)

of law for defendants is a simple matter.  But even if plaintiffs' damage analyses are not stricken in their entirety, judgment for defendants is nonetheless appropriate for several reasons.

Plaintiffs' proffered regression expert, Dr. Radke, conceded that he did not measure damages caused by either defendant's conduct.  (Radke testimony, 10/26/05 Tr. 2752)  In fact, Dr. Radke testified that the "loss" he measured could have occurred *regardless of how well the plant was run by the defendants*:

> Q.   In fact, there could be a lot of reasons why proximity would affect value that would have nothing whatever to do with who was running the plant, right?
>
> A.   Correct.  In fact — I really don't have any opinion.  I don't know who was running the plant, I don't know what was going on.  I was looking at the impact of it being *located near Rocky Flats*.
>
> Q.   Right.   Well, for example, *if people just didn't like the idea of living near a weapons plant*, whatever — whatever — whether people were running the plant well or poorly, if they didn't like working — living near a weapons plant, and there were a significant number of those people, that would lead to a negative relationship between proximity and the value of the property, right?
>
> A.   *I measured proximity*.  I wouldn't know if the people had an opinion or not, but I measured the phenomena.
>
> Q.   Right.  There could be many reasons why proximity is a negative that's got nothing to do with how the plant was being run, right?
>
> A.   *Correct*.

(*Id*. 2753-54) (emphasis added)  In fact, defense expert Dr. Kenneth Wise's testimony criticizes Dr. Radke for failing to focus on defendants' conduct and instead focusing only on proximity. (Wise testimony, 1/05/06 Tr. 9023-26 (If someone wanted to focus on defendants' conduct to determine if that had an impact on property value, you could not "tease that out" of Dr. Radke's

---

filed January 17, 2006.  (*See* Defs.' Mot. To Strike Selected Test. of Hunsperger, Radke and Cochran)

proximity analysis)  The failure of plaintiffs' experts to tie any diminution in value to defen-dants' allegedly actionable conduct is fatal to plaintiffs' damages claims.  *See*, *e.g.*, Reference Manual on Sci. Evid. 277, 307 (2d ed.) ("If a damages analysis includes the effects not caused by the defendant, it is a defective analysis.").

Nor can plaintiffs recover for "stigma" attributable to the FBI raid.  First, the FBI raid cannot be used to prove damages against ***Dow*** because the raid did not involve any Dow con-duct.  Furthermore, as discussed earlier, the raid related to onsite conduct that had nothing to do with offsite contamination (trespass) or health risk (nuisance).  (Holeman testimony, 10/18/05 Tr. 1333-34; *see also* Watkins testimony, Dep. Design. at 159-60, 167-69; Norton testimony, 12/14/05 Tr. 7958-68)  More importantly, the FBI raid allegations were ultimately shown to be false (with the exception of onsite conduct relating to permitting processes). (*E.g.*, Holeman testimony, 10/17/05 Tr. 1292-96 (Holeman was "dubious" of claims FBI was making when they went in because some could not be true); Watkins testimony, Dep. Design. at 155-57 & 161 (FBI went in for the wrong reason); Norton testimony, 12/14/05 Tr. 7951-53 ("we did not find the kind of deceptive conduct we thought may have occurred"), 7958-60 ("we didn't find the serious public health risks we thought were there"); *see also* Norton testimony, 12/14/05 Tr. 7940, 7944-47; P604; P736)  And in any event, plaintiffs' experts failed to show that there was a statistically significant diminution of any kind after the FBI raid.  (*See, e.g.,* McFadden testimony, 1/15/06 Tr. 9937-38)

Plaintiffs also have failed to prove class members actually suffered any damages.  Plain-tiffs purport to show that, in each year between 1988 and 1995, there was a difference between the class property value and the property value in the Denver metro area generally.  But plaintiffs

fail to show that any such "difference" increased between the time any class member purchased his property and the time any class member sold his property.  And, indeed, defendants have affirmatively shown that there was no such damage.  (*E.g.,* Wise testimony, 1/5/06 Tr. 9073)  For example, for class members who purchased in 1988 and sold in 1995, the alleged "difference" between class area and metro area properties actually decreased, from 7.68% to 5.45%.  In short, while plaintiffs have introduced evidence relating to the value of class properties, at the close of the evidence, plaintiffs still have not shown that any class members actually lost money as a result of conduct by Dow or Rockwell.  This failure is independently dispositive of plaintiffs' damage claims.

Below, defendants set forth these and other arguments as bases for why plaintiffs' claims should be dismissed.  ***Some of these arguments have previously been rejected by the Court (e.g., arguments defendants raised in motions for summary judgment), but defendants re-raise the arguments here in order to preserve their rights.***  *See*, *e.g.*, *Wolfgang v. Mid-America Motorsports, Inc.*, 111 F.3d 1515, 1521 (10th Cir. 1997) ("Failure to renew a summary judgment argument — when denial was based on factual disputes — in a motion for judgment as a matter of law under Fed. R. Civ. P. 50(a)(1) at the close of all the evidence is considered a waiver of the issue on appeal.").  ***Defendants have segregated arguments that have already been ruled upon and labeled them*** as such for the Court's convenience.

## **LEGAL STANDARD**

Federal Rule of Civil Procedure 50(a) provides:

"If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim

or defense that cannot under the controlling law be maintained or defeated with-
out a favorable finding on that issue."

"Rule 50 allows the trial court to remove cases or issues from the jury's consideration when the
facts are sufficiently clear that the law requires a particular result." *Alfred v. Caterpillar, Inc.*,
262 F.3d 1083, 1089 (10th Cir. 2001) (quoting *Weisgram v. Marley Co.*, 528 U.S. 440, 448,
(2000)) (internal quotations omitted). Under this standard, a "mere scintilla of evidence is not
sufficient to submit a case to a jury." *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1298 (10th Cir.
1998); s*ee also* 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §
2524 ("The question is not whether there is literally no evidence supporting the party against
whom the motion is directed but whether there is evidence upon which the jury properly could
find a verdict for that party.")

## ARGUMENT

### I. DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' TRESPASS CLAIMS.

The trial evidence underlying plaintiffs' trespass claims suffers from several fatal defi-
ciencies. Each of these deficiencies is an independent and sufficient ground for judgment as a
matter of law in defendants' favor on plaintiffs' trespass claims.

#### A. Plaintiffs Have Not Shown That Plutonium is Present on Each of the Class Properties.

To prevail on their trespass claim, plaintiffs must show (among other things) that "Dow
or Rockwell or both of them intentionally undertook an activity or activities that in the usual
course of events caused plutonium from Rocky Flats to be present on the Class Properties," and
that "it appears that plutonium will continue to be present on the Class Properties indefinitely."

(Instruction No. 3.2, 3.4)[4]  Plaintiffs' trespass claims here are limited to plutonium; contamina-

tion involving other substances cannot give rise to a trespass claim.  (Instruction No. 3.3)  Thus,

to prove a trespass as to a particular defendant, plaintiffs must show: (1) that the defendant in

question released plutonium from Rocky Flats; (2) that the plutonium traveled onto the class

members' properties; and (3) that the plutonium remains in the soil of the class members'

properties today.

It is undisputed that, as a consequence of worldwide fallout, there is plutonium every-

where on earth, including (for example) in New York.  (Budnitz testimony, 10/31/05 Tr. 3337)[5]

Thus, to prevail on their trespass claims, plaintiffs must prove (among other things) that defen-

dants' releases caused contamination of plaintiffs' properties in an amount greater than that

which could be attributable to plutonium from worldwide fallout or otherwise identify it as

coming from Rocky Flats.

As summarized below, plaintiffs have introduced no evidence that releases resulted in

contamination of all (or even most)[6] of the class properties or that any contamination remains on

---

[4] Defendants maintain that the continued presence of plutonium is insufficient to establish a trespass where there is no ongoing wrongful conduct on the part of the defendants.  *See* Restatement (Second) of Torts Section 929, cmt. a (Section 929 (and not Section 930) applies where "future losses are ***not contingent upon the continuance in the future of the defendant's wrongdoing***, and hence the result follows regardless of whether the owner can recover in advance for the prospective harm of future operations of the cement plant. This is a distinct question that is dealt with in § 930") (emphasis added).

[5] (*See also* Raabe testimony, 12/9/05 Tr. 7220-26, 12/9/05 Tr. 7234-35 ("Colorado has one of the highest background radiation rates" in the United States);  Till testimony,  12/15/05 Tr. 8265; DV1, Till video; DX530, RAC Task 4 Envt'l Mon. Report, at VIII-5)

[6] *See Blades v. Monsanto Co.*, 400 F.3d 562, 571 (8th Cir. 2005) ("every member of the proposed classes" must "prove with common evidence that they suffered impact from the alleged
(Continued…)

any class properties today.  Plaintiffs have not even introduced any evidence of releases by Rockwell, much less evidence of contamination caused by Rockwell.  Nor has any such evidence been introduced in the balance of the case.  Plaintiffs' trespass case is largely based on two 1970 soil sampling studies that were done by (1) Krey & Hardy (P149A) and (2) Poet & Martell (P939).  But those studies fail to address the relevant question of whether plutonium was present on the class properties as of 1989, let alone whether such plutonium continues to exist on these properties to this day.

*First*, the studies' limited numbers of samples renders them wholly insufficient to show the existence of class-wide plutonium contamination.  After taking a relatively small number of samples (*e.g.*, DX1167 (Poet & Martell data points); DX530, RAC Task 4 Report, at Table VIII-1 (Poet & Martell sampled 38 locations); Budnitz testimony, 10/31/05 Tr. 3342-43 (DX1167 reflects Poet & Martell samples; Krey & Hardy had 33 sampling locations)), these researchers basically connected the dots to create contours of hypothetical plutonium concentrations through a process of "interpolation or sometimes extrapolation."  (Budnitz testimony, 10/31/05 Tr. 3338; *see also id.* at 3339-41)  As plaintiffs' expert Dr. Budnitz testified:

> Q.  And was it your understanding that the way that Krey and Hardy were drawing these contours was to simply look at their data points and take a pencil —
>
> A.  Yes, they were trying —

conspiracy"); *Weisfeld v. Sun Chem. Corp.*, 210 F.R.D. 136, 144 (D.N.J. 2002), *aff'd* 84 Fed. Appx. 257 (3d Cir. 2004) ("Plaintiff must establish that each class member has, in fact, been injured by the alleged conduct."); *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 340-42 (4th Cir. 1998); *Sprague v. General Motors Corp.*, 133 F.3d 388, 398-99 (6th Cir. 1998) (class relief not available where "[a] named plaintiff who proved his own claim would not necessarily have proved anybody else's claim").

Q.  And get the best line?

A.  Yes, and I thought that that was how Martell did his too. That is, they were trying to use their judgment to draw contours that were approximately accurate, but could not be very precise.

(*Id.* at 3341)

Similarly, RAC questioned the contours, noting that "[t]he small number of soil samples (52) resulted in significant extrapolation over large unsampled areas and relied heavily on individual data points that may not have been representative of the area." (DX530, RAC Task 4 Envt'l Mon. at VIII-14; s*ee also* Till testimony, 12/16/05 Tr. 8523-24)

*Second*, the contours drawn do not show plutonium *throughout the class area* (which was not the specific area of focus for these studies).  To the contrary, these researchers took very few samples *in the class area*.  (*See* DX1167; Budnitz testimony, 10/31/05 Tr. 3342-43 (Krey & Hardy had 33 monitoring stations, but Budnitz does not know how many were in the class area; Poet & Martell took fewer samples); Cochran testimony, 11/1/05 Tr. 3573 (Poet and Martell only went out 2-4 miles east of the plant))[7]  And even after extrapolation and interpolation, "much of the class area is not touched by th[e] Poet and Martell contours."  (Budnitz testimony, 10/31/05 Tr. 3332)

*Third*, the contours drawn by Krey & Hardy and Poet & Martell do not isolate plutonium released from Rocky Flats — let alone releases caused by defendants.  Many of their measure- ments are indistinguishable from worldwide fallout.  (Budnitz testimony, 10/31/05 Tr. 3335-37 (some plutonium levels found by Poet & Martell indistinguishable from background; some found

---

[7] The same is true of the Jones & Zhang study, which also contains very few sampling points within the class area with no sampling point east of Standley Lake.  (DX477 at Fig. 1)

by Krey & Hardy indistinguishable from that found from worldwide fallout in places like New York))  Dr. Budnitz testified:  "It's most likely that those are worldwide fallout numbers, which vary, you know, from place to place, that's most likely."  (*Id.* at 3337; *see also id.* at 3117 ("as they got further out, [Krey & Hardy] found it increasingly difficult to separate plutonium they measured from plutonium that might have occurred — excuse me, that did occur from fallout")  Consequently, the studies' inability to demonstrate the presence of classwide plutonium contamination occurring as a result of the activities of either or both defendants is yet another deficiency that precludes reliance on these studies to prove the trespass claim.

*Fourth*, both of these studies were done on undisturbed soil nearly twenty years before the class definition date (June 7, 1989, the date that all class members owned property in the class).  Plaintiffs have presented no evidence that any plutonium found by these researchers remained as of that date and would remain continuing into the future, especially in light of evidence of substantial development in the class area during the intervening years.[8]  Plaintiffs'

---

[8] The vast majority of the development in the class area took place after 1970 — by which time 99.9% of any Rocky Flats releases had already occurred.  (DX1137, Graphic Showing Low Number of 13,000 Class Members Living in Class Area as of 1969; DX2188A, Dorchester video concerning development; Dorchester testimony, 1/9/06 Tr. 9474-9475 (video accurately depicts development), 9475-76 ("[development curve] goes up rather slowly until you get past '67, '69, '71.  About 1971 you start seeing that curve climb, meaning that a lot of houses were being added starting with the early 1970s, and there was substantial and relatively continuous growth going through there until the class got to the point where it was largely built out"); DX2195-DX2207 (series of aerial photographs showing development over time); DX454, ATSDR 5/13/05 report, at 1-2 ("Though Rocky Flats released plutonium to the air throughout its history, the overwhelming majority (> 99.9%) of plutonium emissions occurred between 1953 and 1969."); DV1, Till video ("Over 99 percent of the plutonium releases from Rocky Flats occurred before 1970")  Defendants also incorporate by reference the arguments in their December 8, 2005 Motion for Judgment as a Matter of Law related to Charles McKay. (*See* 12/8/05 Defs.' Mot. for J'ment at 14-15)  In addition, the undisputed evidence has shown that class area development involved removal of several feet of soil on class properties in connection with the
(Continued…)

own expert Dr. Smallwood concedes that there is no evidence that plutonium exists/remains on

the class properties today:

> Q.  You couldn't — when it comes to the developed part of the class area, you can't simply say that because the Krey and Hardy and/or Poet and Martell contours show there may have been plutonium there back in 1970, that is certainly not very good evidence that there is still plutonium there today, fair?
>
> A.  Where you have houses on top of the soil or warehouses or shopping mall or parking lot, I don't know, it depends on how deeply they scraped away the soil for the foundation of these structures.
>
> *       *       *
>
> Q.  If we go back to 1989, are you aware of anybody who has data showing that even in 1989 there was plutonium on the soil throughout the class area from Rocky Flats?  Are you aware of anybody who has been able to show that data?
>
> A.  Outside of Rocky Flats plant?
>
> Q.  Yes.
>
> A.  I don't know.

(Smallwood testimony, 11/3/05 Tr. 4083-84)  Dr. Budnitz similarly testified:

> Q.  And so, in fact, if you had to — if you came in and took your samples 19 years later or 20 years after the release, then the plutonium by that time may have gone someplace else?
>
> A.  Well, in fact, the measurements in that later time tell you what's there then. That's what they tell you, what's there then.  And they don't tell you anything else except what is there then . . .

---

construction of houses.  (*See* Smallwood testimony, 11/3/05 Tr. 4083;  *accord* DV1, Till video ("as of 1969, there was very little development in the class area.  By 1989, however, the class area had become well developed. . . . buildings, concrete, and asphalt now cover what used to be undeveloped soil . . . . [s]everal feet of soil are excavated when preparing the foundation of a new home."))  And plaintiffs' experts have all conceded that they "did not know" of evidence that any plutonium deposited on the parcels studied by Krey & Hardy and Poet & Martell had not been removed by subsequent development.  (Smallwood testimony, 11/3/05 Tr. 4083-84; Budnitz testimony, 10/31/05 Tr. 3346-47; *see also* Clapp testimony, 11/10/05 Tr. 4915)

Q.  But certainly one mechanism for that material not even being there anymore would be that it could become resuspended again, right?

A.  Well — I don't know what you mean by "anymore," just went somewhere else, perhaps, new or far.

Q.  Okay.

A.  That's what the new pattern would reveal.

Q.  Another method for it not being there anymore, if somebody dug up the soil in the interim and carted it all off, right?

A.  Yes, of course, removing it would remove it.

Q.  One mechanism for removing it and carting it all off would be, for example, if developers came in, built huge subdivisions in that area, after the time the original measurements were taken, correct?

A.  That would be one of any number of ways that soil containing plutonium might have been removed.

(Budnitz testimony, 10/31/05 Tr. 3346-47; *see also* Clapp testimony, 11/10/05 Tr. 4915 (Dr. Clapp has not "seen any evidence that after this development took place and after these homes were built and after whatever disturbance of the soil took place that was associated with the building of those homes, that after that happened, then a soil sample was taken on such property and tested to determine whether there was plutonium in it."))

Defense evidence confirms that there has been substantial development in the class area since 1970 that would have disturbed class area soil, removing soils potentially contaminated with plutonium.  (*See* DV1, Till video ("buildings, concrete and asphalt now cover what used to be undeveloped soil"; "[s]everal feet of soil are excavated when preparing the foundation of a

new home.")[9]; DX2188A, Dorchester video; Dorchester testimony, 1/9/06 Tr. 9475-76 ("[devel-opment curve] goes up rather slowly until you get past '67, '69, '71.  About 1971 you start seeing that curve climb, meaning that a lot of houses were being added starting with the early 1970s, and there was substantial and relatively continuous growth going through there until the class got to the point where it was largely built out"); DX2195-DX2207 (series of aerial photographs showing development over time))  Thus, there has been no evidence presented to the jury that any plutonium that was on the class properties in 1970 is still there and will remain there indefinitely.[10]

   ***In short, plaintiffs have failed to introduce evidence of a single sample showing that there was any plutonium contamination on any class property as of 1989, much less today.***

   Indeed, as described below, class members called by plaintiffs as witnesses repeatedly testified that they did not know whether there was Rocky Flats plutonium on their properties.  In fact, the Bartletts had their property tested; the affirmative results demonstrated that plutonium

---

[9] Defendants incorporate by reference as if fully restated herein their Response to Plfs.' Mot. For J'ment as a Matter of Law and their Response to Plfs.' Mot. to Strike Till Testimony filed January 17, 2006.  Defendants acknowledge that this motion has been denied by the Court, but include it here for the purpose of preserving the record on this issue.

[10] Instead of introducing evidence that plutonium deposited on the class properties has remained on those properties, plaintiffs have repeated their mantra that "the half-life of plutonium is 24,000 years."  (*E.g.*, Goble testimony, 11/2/05 Tr. 3633-34)  But the half-life of plutonium is beside the point.  Even if plaintiffs had demonstrated that plutonium was deposited in class properties' soil (which they have not), plaintiffs would still be required to demonstrate that the soil in which the plutonium was deposited ***remained on those properties***.  That is to say, even if plutonium has a half-life of 24,000 years, when the soil in which the plutonium is present on particular class properties was moved outside of the class area, then the plutonium-in-the-soil did not remain on the class properties "indefinitely," as required for plaintiffs to prove their trespass claims.  (Instruction No. 3.3, 3.4)

on their class property was less than background levels.  (P962)  The testimony of other class representatives and others confirms the absence of proof of class-wide, current plutonium contamination.

- **Sally and Richard Bartlett:**  The Bartletts each testified that they had the soil on their property tested, and were told that the soil sampling results were "not above standards," the soil "was within normal limits", and it was "safe to build on."  (S. Bartlett testimony, 10/14/05 Tr. 959-61; R. Bartlett testimony, 10/14/05 Tr. 1060-61; P962 (Bartlett property sample showing Pu less than background))

- **William Schierkolk:**  Mr. Schierkolk never had his soil sampled for radioactivity, and he is not aware of any evidence that his property was contaminated with radioactive materials from Rocky Flats.  (Schierkolk testimony, 10/20/05 Tr. 1936-37)

- **Gertrude Babb:**  Mrs. Babb never tested the soil on her class property.  (Babb testimony, 10/20/05 Tr. 1971)

- **Merilyn Cook:**  During Ms. Cook's testimony, plaintiffs offered into evidence a letter indicating that samples that she collected with the assistance of the state health personnel were received by Rockwell and submitted to Accu-Labs Research, Inc., for analysis.  (Cook testimony, 10/21/05 Tr. 2023-26; *see also* P 1230 & P 1231)  The letter further stated:  "[The samples] average 0.055 plus or minus 0.031 picocuries per gram.  The maximum value of 0.12 is 13 percent of the Colorado Department of Health guideline of two disintegrations per minute per gram."  (*Id.*)  This is well below background levels.

- **Gretchen Robb:**  Gretchen Robb testified that she had never had her property tested for plutonium, and that she had no way of knowing whether plutonium was present on her property or not.  (Robb testimony, 11/10/05 Tr. 5028)

- **Karen Whalen:**  Karen Whalen testified that she never actually had her property tested, and so she did not know how much plutonium, ***if any,*** was actually on her class property. (Whalen testimony, 11/21/05 Tr. 5956, 5958) (emphasis added)

- **John Osborn**:  Mr. Osborn testified that, as a developer, he routinely does soil testing on his properties (many of which have been inside the class contour) and that there has never been "any effect of any materials released from Rocky Flats" on his developments.  (Osborn testimony, 1/05/06 Tr. 8873-74.)[11]

---

[11]  Defendants also incorporate by reference the arguments in their December 8, 2005 Motion for Judgment as a Matter of Law related to Charles McKay. (*See* 12/8/05 Defs. Mot. for J'ment at (Continued…)

Plaintiffs' suggestion that some unidentified amount of the 2,600 pounds of material unaccounted for (MUF) somehow ended up on the class properties is not supported by any record evidence.  Plaintiffs have failed to establish that any MUF was *in fact* released off-site.  Furthermore, plaintiffs admit that they cannot quantify how much MUF, if any, was released off-site.  Plaintiffs' self-proclaimed MUF expert, Dr. Thomas Cochran, testified that the amount of MUF released offsite, if any, is *unknown*.  (Cochran testimony, 11/15/05 Tr. 5387-5388 ("[S]ome part of that plutonium may have been released to the environment.  *We simply don't know.*") (emphasis added))  Under these circumstances, plaintiffs have presented *no* evidence that the existence of MUF makes it more likely than not that some plutonium escaped offsite, much less onto plaintiffs' property.[12]

---

14-15)  Because Mr. McKay is a plaintiff/class member, his statements can be used at any time as party admissions.  Fed. R. Civ. P. 32(a)(1) ("Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of deponent as a witness, or for any other purpose permitted by the Federal Rules of Evidence.").  While the Court precluded defendants from presenting deposition designations from Mr. McKay (*see* Defs.' Proposed McKay Dep. Designations filed 12/30/05; 1/5/06 Order), defendants respectfully disagree with that ruling and seek to preserve the issues in this filing.

[12] Plaintiffs cannot justify this absence of evidence by claiming that they lack relevant evidence that would support their claims due to classification.  Plaintiffs cannot point to classified documents to suggest that any evidence relevant to MUF or any other aspect of their case remains unavailable to them.  It is uncontroverted that plaintiffs' counsels and their experts had access to classified documents for at least 10 years prior to trial.  (*See* Kaufman testimony, 11/14/05 Tr. at 5180, 5188 (Plaintiffs' counsel had Q-clearances and were invited to come to Rocky Flats to look at classified documents over 10 years ago); Budnitz testimony, 10/27/05 Tr. at 3002–03 (Dr. Budnitz went with plaintiffs' counsel to review classified MUF documents on at least two occasions))  Plaintiffs' speculation to the contrary is impermissible under the Court's instructions (Instruction 1.9 ("You may not speculate as to what the unavailable or redacted information might be.")) and unsupported by the record facts.  (*See* Defs.' Mem. in Support of Defs.' Mot. for Mistrial or, in the Alternative, Defs.' Proposed Instructions, filed 12/18/05 at 2 (collecting citations))  In sum, plaintiffs have failed to establish that they have been unable to fully present their case because specific documents remain classified.  (*See also* Defs.' Mem. in Support of

(Continued…)

In contrast to plaintiffs' speculation about the relation between MUF and offsite releases, defendants have established that MUF cannot be used to determine off-site release under the present circumstances.  (Till testimony, 12/15/05 Tr. 8300 ("This approach of using MUF, in our opinion, is just not scientific, it's not defensible."))  Dr. Till testified that RAC, specifically Dr. Voilleque, thoroughly examined the issue of whether MUF could be used to evaluate off-site releases and determined that it could not be done.  (*Id.* at 8298–99; *see also* DX542, Technical Memorandum, "Examination of Mass Balance Accounting as a Means for Estimating Plutonium Releases," May 1995 ("Although it was initially expected that a mass balance approach would be useful in the evaluation of releases from a plutonium facility, this review shows that it is not feasible to make quantitative estimates in this way."))  Dr. Till also testified that the Health Advisory Panel ("HAP") reviewed RAC's work on this point and accepted RAC's conclusions that "the mass balance accounting approach is not an effective method for estimating environmental releases of plutonium into the environment."  (Till testimony, 12/15/05 Tr. 8301–02)  Consequently, plaintiffs cannot use MUF to establish any offsite releases of plutonium, much less any plutonium deposits on class properties.

### B.    Plaintiffs Have Failed to Prove a Trespass by Rockwell.

Plaintiffs must have evidence that ***each*** defendant released plutonium onto all class members' properties.  (Instruction 1.10)  There is no evidence whatsoever that Rockwell released plutonium which was deposited upon any class members' properties, much less all of the class members' properties.

---

Mot. for Mistrial or, in the Alternative, Defs.' Proposed Instructions, filed 12/18/05 (proposing jury instruction))

***First,*** it almost goes without saying that the Krey & Hardy and Poet & Martell studies do not prove that ***Rockwell*** committed a trespass.  The Krey & Hardy and Poet & Martell studies measured plutonium concentration in the soil around Rocky Flats in 1970; however, Rockwell did not begin as plant contractor until 1975.[13]

***Second***, the only plutonium releases as to which plaintiffs have introduced any evidence occurred well before Rockwell began as plant contractor in 1975 (the 1957 fire, the 1969 fire, and the 903 pad).[14]

***Third***, plaintiffs' introduction of evidence of ***onsite*** Rockwell conduct, such as the conduct that gave rise to the 1992 guilty plea, cannot be used to support their offsite contamination elements of their trespass claim.  Plaintiffs have introduced no evidence that such onsite conduct by Rockwell resulted in offsite plutonium contamination.[15]  Plaintiffs' own witness — Timothy Holeman — testified that Rockwell's conduct, including that which gave rise to the 1992 guilty plea, did not result in offsite contamination.  (Holeman testimony, 10/18/05 Tr. 1333-34; *see also* Watkins testimony, Dep. Design. at 159-60, 167-69)  In short, plaintiffs have failed to introduce

---

[13] Even the Jones & Zhang study, which was published in 1994 and was based on annual sampling conducted by the CDH in 1970-1978,1980, 1981, 1986, 1989 and 1991, does not link any plutonium found to Rockwell conduct or any purported releases during Rockwell's watch.  (*See* DX477)

[14] As discussed elsewhere, plaintiffs have not introduced evidence that these Dow releases have resulted in ongoing plutonium contamination of class properties.

[15] For example, while plaintiffs may point to Ron Avery's testimony regarding alleged damage to 771 incinerator filters, plaintiffs fail to link that conduct with any release of plutonium to the class area, and in fact, defendants presented evidence of many additional layers of filtration before any emissions related to the 771 incinerator ever reached the stack (Weston testimony, 12/13/05 Tr. 7710-11; DX1053-58) and that 771 stack emissions from that time period did not cause any significant releases.  (DX485; DX281)

evidence of any releases of plutonium from the Rocky Flats plant that occurred during Rockwell's tenure as contractor — much less evidence of releases during Rockwell's tenure as contractor that resulted in contamination of all (or even most) of the class properties.

Witnesses who testified during defendants' case – including the U.S. Attorney in charge of the Rockwell criminal investigation – echoed the position that there was no offsite impact from Rockwell's onsite conduct.  (Norton testimony, 12/14/05 Tr. 7958-66 ("there had been no evidence of off-site physiological or environmental damage from the operations of the facility"); Weston testimony, 12/13/05 Tr. 7763-65 ("None of Rockwell's conduct in my opinion contributed to any off-site plutonium."); Blaha testimony, 1/4/06 Tr. 8684-87, 8793-94 (no mechanism for offsite transport of onsite groundwater), 8764-65 (no contamination in Great Western Reservoir associated with Rockwell era activity).

For the foregoing reasons, the Court should grant judgment as a matter of law on plaintiffs' trespass claim against Rockwell.

### C.    Plaintiffs Have Not Shown That Any Trespass Was Continuing, or That Any Trespass Occurred While All Class Members Owned Their Class Properties.

There are two types of trespasses:  continuing trespasses and permanent trespasses.  Under this Court's rulings, to prove that a trespass is "continuing," plaintiffs must show that "it appears that plutonium will continue to be on the Class Properties indefinitely."[16]  (Instruction No. 3.4)

---

[16] Defendants have previously argued that, in order for a trespass to be "continuing," plaintiffs also must prove that it is not reasonably abatable.  *See* Defendants' Response to Plaintiffs' Brief on the Statute of Limitations, State Regulatory Standards, Ultrahazardous Liability, Spoliation, and Negligent Trespass, filed Aug. 18, 2004; *see also* W. Keeton, *Prosser and Keeton on Torts* at § 89 (5th ed. 1984) (a "permanent" nuisance is one that is "unlikely to abate or to be avoided (Continued…)

Here, plaintiffs have introduced no evidence that any plutonium on class properties will "continue indefinitely" (and thus is "continuing"). As discussed above, while plaintiffs have introduced evidence about the half-life of plutonium once it gets in the soil, plaintiffs have not introduced evidence that the *soil itself* has remained on class properties. (Smallwood testimony, 11/3/05 Tr. 4067, 4083-84) Meanwhile, defendants introduced evidence that much of such soil was likely removed from the class area through development. (Dorchester testimony, 1/9/06 Tr. 9475-76) Thus, plaintiffs have not proven that any trespass is "continuing."[17]

Because plaintiffs have failed to introduce evidence of a "continuing" trespass, their claims are subject to the rules applicable to "permanent" trespasses. *See Hoery*, 64 P.3d at 217-23. In the case of a *permanent* trespass, a plaintiff must prove that the contamination came onto

---

by any reasonable expenditure of money"); D. Dobbs, *The Law of Torts*, § 57 (West Group 2001), *cited in In re Hoery v. United States*, 64 P.3d 214, 223 (Colo. 2003) (listing first among the "most significant factors favoring a classification as temporary" that "(1) the invasion can in fact be terminated or abated" and "(2) the cost of termination is not wasteful or oppressive"); *Hoery*, 64 P.3d at 216, 222-23 ("the record at this stage of the litigation indicates that the contamination is not permanent — that is, it is remediable or abatable."); *Middelkamp v. Bessemer Irrigating Ditch Co.*, 103 P. 280, 283 (1909) (when nuisance or trespass "is not practicable to remedy" or could not "by a reasonable expenditure be checked," the nuisance is considered permanent).

Plaintiffs have introduced no evidence in this regard. Defendants recognize that the Court has rejected defendants' position on this, but re-assert the argument here for the purpose of preserving it.

[17] Plaintiffs bear the burden of proving that their claim is "continuing." *See, e.g., Mangini v. Aerojet-General Corp.*, 912 P.2d 1220, 1221 (Cal. 1996) (holding that "because plaintiffs had failed to present *any* substantial evidence that the contamination of their land . . . was capable of being abated at a reasonable cost, the nuisance must be deemed permanent . . . plaintiffs' nuisance and trespass claims were time barred").

the property **during the time the plaintiff owned the property**.[18]  *See also Hugunin v. McCunniff,* 2 Colo. 367, 369-70 (1874) ("By the strict rule which anciently obtained in the English courts, trespass quare clausum fregit lay only by one having a possession, in fact, of the premises trespassed upon, at the time of the trespasses."); CJI-Civ. 4th 18:1 (May 2004) (requiring as element that "[w]hile Plaintiff was (the owner) . . . the Defendant intentionally (caused [the alleged contaminant] to come upon) that property); *Hoery*, 64 P.3d at 217-223 (holding that, where undisputed evidence showed that contamination was "not permanent — that is, it is remediable or abatable," then the cause of action does not accrue as long as "continuing property invasions remain[ed]" on plaintiff's property, regardless of whether "the United States continues to release toxic pollutants").  Here, plaintiffs have introduced no evidence that plutonium contamination of the class properties occurred after the date when all of the class members had acquired their properties — that is, after June 7, 1989.  To the contrary, the evidence at trial has shown that 99.9% of all plutonium releases from Rocky Flats occurred before 1970, a time when only a small fraction of class members owned their properties.  (DX454, ATSDR 5/13/05 Report, at 1-2; DX536 at 19-20 (highest releases and risks from 1957 fire and 903 pad in 1969; people moving into area after 1970 subject to lower concentrations of plutonium); P1334 at 7-8, 12-13 (same); Till testimony, 12/15/05 Tr. 8241, 8264-65 (after 1969, exposures from Rocky Flats drop off significantly; major releases all occurred prior to 1971); DV1, Till video;

---

[18] Defendants are uncertain as to whether the Court has ever ruled on this argument.  If the Court has ruled on this argument, defendants offer it here for the purpose of preserving their rights.

DX2188A, Dorchester video; Dorchester testimony, 1/9/06 Tr. 9474-9476; DX2195-DX2207 (aerial photographs); *see also* Goble testimony, 11/2/05 Tr. 3678)[19]

Accordingly, because plaintiffs have introduced no evidence that any trespass is "continuing" and have not proven that any trespass occurred after the class members acquired their properties, plaintiffs' claims should be dismissed.  *See Hugunin,* 2 Colo. at 369-70.

### D.   Plaintiffs Have Not Introduced Sufficient Evidence That Defendants Intentionally Caused a Trespass.

To prove a trespass, plaintiffs must also demonstrate that defendants' conduct was "intentional."   (Instruction No. 3.2) (plaintiffs must show that "Dow or Rockwell or both of them intentionally undertook an activity or activities that in the usual course of events caused plutonium from Rocky Flats to be present on the Class properties"); *see also Van Wyk*, 27 P.3d at 389 ("By *intentionally* entering the land possessed by someone else, or causing a thing or third person to enter the land, an individual becomes subject to liability for trespass, whether or not he caused harm to any legally protected interest of the landowner.") (emphasis added).

With respect to Dow, plaintiffs have introduced evidence of certain plant accidents (*e.g.*, the 903 pad incident, the 1957 fire, and the 1969 fire).  However, plaintiffs have introduced no evidence whatsoever that defendants' conduct in connection with any of these events was "intentional."   Rather, Dow took significant steps and precautions to avoid any such problems. (*See* Ray testimony, 10/19/05 Tr. 1551-52 (Dow responded to union's complaints regarding the 903 pad to the point they didn't know what to do with the drums), 1658-60 (plant had not yet

---

[19] Certainly there is no evidence in the record that any plutonium will continue to be released from Rocky Flats given that the plant site has been fully remediated.  (Blaha testimony, 1/4/06 Tr. 8637-8681, 8753)

come up with a way to take care of oils in the drums but research and development efforts were ongoing to try and deal with these materials), 1671-1673 ("hundreds" and over "60 columns" of HEPA filters in 71 building, "floor to ceiling, side to side");  Frazier testimony, 12/12/05 Tr. 7540-45).   After the 1957 fire, Dow took several of the recommendations from the 1957 fire report, and implemented them in buildings 776 and 777, where the 1969 fire occurred.   For example, Dow provided additional $CO_2$ fire extinguishers (Budnitz testimony, 11/01/05 Tr. 3367-3368, 10/31/05 Tr. 3272), installed additional standpipes and fire hoses (Budnitz testi-mony, 11/1/05 Tr. 3385-3386), installed heat detectors in filter plenums and gloveboxes (*id.* at 3403-3405), provided a sprinkler system in the filter plenum (*id*. at 3375-3376, 3381-3382), added fire breaks in gloveboxes (*id.* at 3401-3402), and utilized fire resistant Plexiglas and other non-combustibles in the construction of gloveboxes (*id.* at 3396-3397).

Similarly, with respect to Rockwell, plaintiffs have failed to prove any "intentional" con-duct resulting in offsite releases.  Plaintiffs have failed to prove any offsite releases (of pluto-nium or any other radioactive or hazardous substance or contaminant) during Rockwell's tenure, much less any releases resulting from "intentional conduct."  (Holeman testimony, 10/18/05 Tr. 1333-34 (no offsite releases from plea conduct); P604 ("We have operated the Rocky Flats plant with integrity and high ethical standards. . . . we are committed to the welfare and safety of our Rocky Flats employees and the surrounding communities."); P736 ("[W]e have managed Rocky Flats with proper concern for public health, safety and the environment."))  Defense witnesses merely confirm this fact.  (Weston testimony, 12/13/05 Tr. 7744-47 (Rockwell sought to stop pondcrete production when NTS refused to take the waste but DOE would not allow production to cease), 7763-65 ("None of Rockwell's conduct in my opinion contributed to any off-site

pollution"), 7797 (MUF had nothing to do with environmental releases), 7844-45 ("I can say with high confidence that it [MUF] did not get off-site."), 12/14/05 Tr. 8081-82 (Rockwell sought an indoor storage facility for pondcrete, but it took DOE almost three years to approve the request); *see also id.* at 8051, 8096-98); Norton testimony, 12/14/05 Tr. 7961-68)

      **E.**      **The Evidence Shows That Any Trespass Was Not Caused by Defendants.**

      Defendants are also entitled to judgment as a matter of law on the issue of causation. Under the Court's instructions, "the word 'cause' . . . means an act or failure to act that in natural or probable sequence produced the claimed effect.  It is a cause without which the claimed effect would not have happened."  (Instruction No. 3.18)

      Defendants tendered an intervening cause instruction to the Court, which apparently has been rejected.  Under the intervening cause instruction, "[a] defendant's conduct is not the cause of the claimed effect if, in order to bring about such an effect, it was necessary that the defendant's conduct combine or join with an intervening cause that also contributed to cause the claimed effect.  An intervening cause is a cause that would not have been reasonably foreseen by a reasonably careful person under the same or similar circumstances."  (Ex. 1, Defendants' Proposed Instruction No. 5); *see also Smith v. State Comp. Ins. Fund*, 749 P.2d 462, 464 (Colo. Ct. App. 1987).

      Here, plaintiffs have failed to introduce sufficient evidence of causation to withstand a motion for judgment as a matter of law.  The uncontroverted evidence has shown that the plant (including the plutonium at the plant) was owned by the government, and that defendants acted in accordance with the government's instructions as plant contractors.  (*E.g.*, 11/21/05 Tr. 5983-84 (expenditures require AEC approval); P338 & 11/22/05 Tr. 6205 (DOE must advise Colorado

of its planning, which will impact "both the nature of the mission and the level of production at the Rocky Flats plant"); Ray testimony, 10/19/05 Tr. 1659 (AEC determined whether waste could be shipped); Holeman testimony, 10/18/05 Tr. 1383 (setting limits on waste affected production, which was controlled by the federal government and national security); Pls.' opening 10/11/05 Tr. 524 ("The Atomic Energy Commission was both responsible for the production of nuclear weapons and for oversight of the facilities.")  The uncontroverted evidence also shows that there were at least two intervening causes of any trespass by defendants:  (1) the govern-ment's actions with respect to the 903 pad incident (*see* Budnitz testimony, 11/1/05 Tr. 3480-81; DX359 (Dow 8/9/68 proposal for concrete slab); DX361 (1/24/69 denial from AEC), which plaintiffs' witnesses have said is the major release incident that could have resulted in contami-nation of plaintiffs' properties (Cochran testimony, 11/16/05 Tr. 5530, 5541; Budnitz testimony, 10/27/05 Tr. 3081-82); and (2) abnormally high 100-plus mile-an-hour winds that were blowing at the time of the 903 pad incident (*see* Budnitz testimony, 11/1/05 Tr. 3493-99; DX58, Histori-cal Public Exposure Studies Summary of Findings (describing windstorms))  Plaintiffs have introduced no evidence whatsoever that either of these intervening causes were foreseeable by Dow.  To the contrary, there is no reasonable basis to conclude that Dow could have foreseen either of these intervening causes.

Likewise, with respect to Rockwell, the actions of the Federal Bureau of Investigation, the Environmental Protection Agency and the Department of Justice in undertaking the FBI raid constitute an intervening cause foreclosing liability for Rockwell.  Plaintiffs' witnesses have repeatedly stressed that the basis of their claims is the FBI raid.  (*E.g.*, Whalen testimony, 11/21/05 Tr. 5955 (the raid affected how she viewed her property) & 5938-39 (raid affected use

and enjoyment); Schierkolk testimony, 10/20/05 Tr. 1902 (could not sell property after raid); Babb testimony, 10/20/05 Tr. 1961 (raid affected her ability to sell); Cook testimony, 10/21/05 Tr. 2040-41 (FBI raid made her give up on her property); Cook testimony 10/21/05 Tr. 2055-57 (testified at her deposition that the only claim she was making was based on the FBI raid); S. Bartlett testimony, 10/14/05 Tr. 919 (raid had a tremendous impact on ability to sell her home)) Plaintiffs have introduced no evidence that the actions of governmental agents in the June 1989 FBI raid in making unsupportable allegations about Rocky Flats were reasonably foreseeable by Rockwell.   Instead, all evidence that has been presented is to the contrary.   (*E.g.*, Holeman testimony, 10/17/05 Tr. 1292-96 (Holeman was "dubious" of claims FBI was making when they went in because he knew some could not be true); Watkins testimony, Dep. Design. at 155-57, 161 (FBI went in for the wrong reason); Norton testimony, 12/14/05 Tr. 7951-53 ("we did not find the kind of deceptive conduct we thought may have occurred"); *see also* P604)

For the foregoing reasons, the Court should grant judgment as a matter of law on plain-tiffs' trespass claims.

## II.     TRESPASS ARGUMENTS THAT THE COURT HAS RULED ON AND THAT DEFENDANTS INCLUDE FOR PURPOSES OF PRESERVING THEIR RIGHTS.

To preserve their rights, defendants also move for judgment as a matter of law on various trespass-related arguments that have already been rejected by this Court, as set forth in this Section.

A.      **Plaintiffs Have Not Demonstrated That Any Trespass Was Either Tangible or Caused Serious and Substantial Physical Damage.[20]**

Another separate and independent reason why defendants should be granted a directed verdict on the issue of trespass is that, in addition to their failure to show that plutonium was deposited upon and remains on each of the class properties, plaintiffs have not demonstrated that any plutonium deposited on the class properties either (1) is "tangible"; or (2) has caused serious and substantial physical damage.  *See Van Wyk*, 27 P.3d at 387, 390.

In *Van Wyk*, the Colorado Supreme Court held:

> An intangible intrusion onto property cannot result in a trespass unless the intrusion causes physical damage to the property. . . .  The meaning of the term 'intangible' is something that is impalpable, or incapable of being felt by touch. Webster's Ninth New Collegiate Dictionary 603, 628 (1988).  . . . [A]n intangible intrusion may give rise to claim for trespass, but only if an aggrieved party is able to prove physical damage to the property caused by such intangible intrusion. . . . Moreover, a property owner forced to prove damage will be further limited to seeking redress in cases of serious or substantial invasions.

*Id.* at 387, 390.  As this Court explained in *Cook IX*:

> In *Public Service Co. of Colorado v. Van Wyk*, 27 P.3d 377 (Colo. 2001), the Colorado Supreme Court joined the modern trend by recognizing that an intangible intrusion onto another's property may constitute a trespass, but only upon proof that the intangible intrusion caused physical damage to the property. *See id.* at 390. In so doing, it distinguished between trespass based on a "physical entry" and one based on an "intangible intrusion" *id.* at 389, which it defined as "something that is impalpable, or incapable of being felt by touch."  *Id.* at 387.

*Id.* at 1200-01.

---

[20] The Court has rejected defendants' argument that plutonium contamination is not tangible. *Cook v. Rockwell Int'l Corp.*, 273 F. Supp. 2d 1175, 1201 ("*Cook IX*") (D. Colo. 2003).  Nevertheless, defendants believe that Dr. Smallwood's recent testimony that plutonium contamination is not "tangible" constitutes an intervening fact that merits reconsideration of this issue.  Defendants also re-assert this argument here for purposes of preserving their rights.

Plaintiffs have introduced no evidence that any plutonium deposited onto class properties was "tangible" (which the *Van Wyk* court defined as "palpable," or "capable of being felt by touch").  27 P.3d. at 387.  To the contrary, plaintiffs' expert Shawn Smallwood testified that plutonium is **not** "tangible."  (Smallwood testimony, 11/3/05 Tr. 4039-40 ("Q.  You would agree with that, by any stretch of the common sense word 'intangible', [plutonium particles a]re intangible, right?  A.  Yes."))  Plaintiffs and their counsel agree.  (*See* Pls.' opening, 10/11/05 Tr. 497 ("You can't see it, you can't smell it, you can't taste it, you can't hear it, and you can't feel it . . . ."); Ex. 2, Representative Pls.' Joint Resps. to Dow's 2d Set of Interrogs. Directed to Each Class Representative Pl., dated 9/15/95, at 12 ("[T]he radionuclides and other hazardous sub-stances released from Rocky Flats to which responding plaintiffs and members of the classes (and their properties) were exposed were not perceptible to the senses . . . ."))

Because plaintiffs have introduced no evidence that plutonium is tangible, plaintiffs are required under *Van Wyk* to show that plutonium deposited on the class properties caused "serious or substantial" physical damage.  *See* 27 P.3d at 390 ("[A]n intangible intrusion may give rise to claim for trespass, but only if an aggrieved party is able to prove physical damage to the property caused by such intangible intrusion. . . .  Moreover, a property owner forced to prove damage will be further limited to seeking redress in cases of serious or substantial invasions.").  But plaintiffs have not presented evidence that **any** class property — much less most class properties or all class properties — suffered serious or substantial physical damage from plutonium inva-sions.  (*See*, *e.g.*, R. Bartlett testimony, 10/14/05 Tr. 1060-61 (plutonium sampling showed property safe to build on); *see also* Schierkolk testimony, 10/20/05 Tr. 1932, 1934-35 (sampling showed well water safe); Watkins testimony, Dep. Design. at 159-60, 167-69 (no public health

risk offsite))   And this lack of offsite risk was confirmed by defendants' witnesses.   (Norton

testimony, 12/14/05 Tr. 7958-66 ("there had been no evidence of off-site physiological or

environmental damage from the operations of the facility"); Raabe testimony, 12/9/05 Tr. 7339-

40 ("The doses we're talking about in this case are so trivial they won't have any effect one way

or another.   They're small, tiny fraction of what we get every week.   There's not way you can

assign a risk or a benefit to such a small dose.   No way."); *see also id.* at 7270-71; DX536 at 23-

25 (highest risks same as risk from background plutonium in fallout, within EPA's range of

acceptable risk, and less than risk of dying from lightning strike); P1334 at 15-18 (same); Till

testimony, 12/15/05 Tr. 8273-81, 8282-83, 12/16/05 Tr. 8529-31 (cumulative 37-year doses are

thousands of times less than a single year of background radiation dose and risks are so small

that they do not show up in the real world and have to be assumed to exist); DX1187; DX1779a;

DX1843; DX1855; DX1856)

### B. Plaintiffs Have Failed to Present Evidence Showing That Defendants Did Not Comply with the Applicable Federal Standards for Offsite Plutonium Re-leases.

As defendants have previously argued, in order to prevail on their trespass claims, plain-

tiffs must demonstrate that defendants caused releases that violated the applicable federal stan-

dards.[21]   These standards were as follows:

---

[21] Defendants acknowledge that the Court has already rejected defendants' position on this issue, *Cook IX*, 273 F. Supp. 2d at 1199, and re-assert this argument here for the purpose of preserving their rights.   Defendants note that, since this issue was last addressed by this Court in the *Cook IX* opinion, two more district courts — including one in the Tenth Circuit less than a month ago — have agreed with the vast majority that the Price-Anderson Amendments Act preempts state law to the extent that it creates a duty inconsistent with federal safety standards.   *See Wilcox v. Homestake Mining Co.*, No. CIV-04-534, slip op. at 6–7 (D.N.M. Nov. 15, 2005) (attached as Ex. 3); *O'Connor v. Boeing N. Am., Inc.*, No. CV 97-1554, slip op. at 77–87 (C.D. Cal. Aug. 18,

(Continued…)

1.      2.0 picocuries per cubic meter for the period from 1953 through August 28, 1957.

2.      0.2 picocuries per cubic meter for the period from August 29, 1957 through August 11, 1963.

3.      0.33 picocuries per cubic meter for the period from August 12, 1963 through August 4, 1985.

4.      0.04 picocuries per cubic meter for the period from August 5, 1985 through June 7, 1989.

(*See also* DX1638)

Plaintiffs have introduced no evidence that any of these standards were violated during either the Dow era or the Rockwell era.  Indeed, neither of plaintiffs' release experts (Goble and Smallwood) even discussed federal standards.  (*See* Goble testimony, 11/2/05 Tr. 3618-88, 3692-3709; Smallwood testimony, 11/3/05 Tr. 4064, 4067)

To the contrary, all of the evidence has shown that Rocky Flats plant releases (including water) have not been in excess of the federal standards.  (DX1651a; DX1663, DX1664; Frazier testimony, 12/12/05 Tr. 7529-31 (air monitoring results were "always less than standards"; the plant was always in compliance with DOE or AEC's standards for plutonium in air); *id*. at 7534-37, 7539)  This has been true both during the Dow era (*see* Budnitz testimony, 10/31/05 Tr.

_____

2005) (attached as Ex. 4).  The following decisions are in accord:  *Roberts v. Fla. Power & Light Co.*, 146 F.3d 1305, 1308 (11th Cir. 1998); *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1105 (7th Cir. 1994); *In re TMI Litigation Cases Consol. II*, 940 F.2d 832, 859 (3d Cir. 1991); *Good v. Fluor Daniel Corp.*, 222 F. Supp. 2d 1236, 1249 (E.D. Wash. 2002); *Gassie v. SMH Swiss Corp. for Microelec. and Watchmaking Indus., Ltd.*, No. Civ. A. 97-3557, 1998 WL 158737, at *4 (E.D. La. Mar. 26, 1998); *Boggs v. Divested Atomic Corp.*, No. C-2-90-840, 1997 WL 33377790, at *3 (S.D. Ohio Mar. 24, 1997); *Corcoran v. New York Power Auth.*, 935 F. Supp. 376, 386 (S.D.N.Y. 1996); *Bohrmann v. Maine Yankee Atomic Power Co.*, 926 F. Supp. 211, 220 (D. Me. 1996); *McLandrich v. S. Cal. Edison Co.*, 942 F. Supp. 457, 465 (S.D. Cal. 1996); *Lamb v. Martin Marietta Energy Sys.*, 835 F. Supp. 959, 962 (W.D. Ky. 1993).

3335-36 (1970 contour below standards); *see also* S. Bartlett testimony, 10/14/05 Tr. 959-60, 960 (test results below standards); DX1252 (graphic depicting Krey & Hardy soil contours)), and during the Rockwell era (*see* Holeman testimony, 10/18/05 Tr. 1363, 1370-71 (water met standards); *see also,* DX34, Broomfield 2004 Water Quality Report (no violations of Safe Drinking Water Act standards); Norton testimony, 12/14/05 Tr. 7967-68 (based on surface water monitoring at the plant borders, no safe drinking water act violations noted by Cities of Broomfield or Westminister); Weston testimony, 12/14/05 Tr. 8096 ("I never saw anything even close to standard.")

In sum, plaintiffs' failure to introduce any evidence that defendants violated federal standards constitutes another reason why defendants are entitled to judgment as a matter of law on plaintiffs' trespass claim.

### C.    Plaintiffs Have Not Shown That Plutonium Levels on Class Properties Exceeded the Applicable State Standards.[22]

In *Van Wyk*, the Colorado Supreme Court addressed the concern about over-extending trespass liability by establishing the prerequisites that, for an invasion to be significant enough to be actionable in trespass, the invasion must either be "tangible" (which the court defined as "[]capable of being felt by touch") or must cause "physical damage to the property" that is "serious or substantial."  27 P.3d at 387, 390.  Since *Van Wyk*, the only Colorado decision to allow a trespass claim on the ground that there was allegedly physical damage to the property was the Colorado Supreme Court's decision in *Hoery*.  In *Hoery*, the Court held that an ***above-***

---

[22] Defendants realize that the Court has ruled that plaintiffs need not prove a violation of these state standards to prevail on their trespass claims (*see* 12/17/04 Order re Proposed Trespass Instructions at 5), but assert this argument for the purpose of preserving their rights.

*state-standards* TCE invasion constituted a continuing trespass based on the record in that case. *Hoery*, 64 P.3d at 222; *see also Taco Cabana v. Exxon Corp.*, 5 S.W.3d 773, 780 (Tex. App. 1999) ("Because the evidence presented at trial did not establish that Exxon failed to remove soil that contained contaminants above state action levels, Taco Cabana failed to establish its trespass theory of liability.")

In this case, plaintiffs seek to recover for an alleged trespass by a contaminant that: (1) indisputably cannot be experienced by the senses; and (2) is not alleged to have caused any perceptible impact to the property (such as killing plants, causing paint to peel, *etc.*). (Smallwood testimony, 11/3/05 Tr. 4039-40) Accordingly, plaintiffs are required to show contamination in excess of the state plutonium standard before defendants can be found liable for a trespass. *Van Wyk,* 27 P.3d at 387, 390; *Hoery,* 64 P.3d at 222.

The Colorado plutonium standard is two disintegrations per minute of plutonium per dry gram of soil or square centimeter of surface area. 6 Colo. Code Regs. 1007-1, RH 4.60.1, Permissible Levels of Plutonium in Uncontrolled Areas. Plaintiffs have introduced no evidence whatsoever that either defendant caused class properties to become contaminated with plutonium in excess of this standard. To the contrary, the only evidence that was introduced at trial showed that any contamination of class properties was in an amount far less than the state standard. (*See*, *e.g.*, Budnitz testimony, 10/31/05 Tr. 3335-36; S. Bartlett testimony, 10/14/05 Tr. 959-60, 961; Cook testimony, 10/21/05 Tr. 2023-26; *see also* Frazier testimony, 12/12/05 Tr. 7529-31 (air monitoring results were "always less than standards"; the plant was always in compliance with DOE or AEC's standards for plutonium in air); *id*. at 7534-37, 7539; DX1638; DX1651a; DX1663; DX1664; Weston testimony, 12/14/05 Tr. 8096 ("I never saw anything even close to

35

standard.")  Plaintiffs' failure to introduce any evidence that defendants' conduct resulted in contamination of the class properties in excess of the state plutonium standard constitutes sufficient grounds for judgment as a matter of law as to the trespass claims.

## III.    DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' NUISANCE CLAIMS.

As with trespass, the trial evidence underlying plaintiffs' nuisance claims suffers from fatal deficiencies.  These deficiencies are independent and sufficient grounds for judgment as a matter of law in defendants' favor on plaintiffs' nuisance claims.

### A.    Plaintiffs Have Not Shown a Class-Wide Health Risk.

Under the Court's jury instructions, to prove a nuisance, plaintiffs must demonstrate that "Dow or Rockwell or both of them interfered with Class members' use and enjoyment of their properties in the Class Area in one or both of these two ways:

A.    By causing Class members to be exposed to plutonium and placing them at some increased risk of health problems as a result of this exposure (*see* Instruction Nos. 3.7, 3.18); and/or

B.    By causing objective conditions that pose a demonstrable risk of future harm to the Class Area (*see* Instruction Nos. 3.7, 3.18)"

(Instruction No. 3.6)

Plaintiffs have proved neither of these interferences.  There is no evidence of "class members" experiencing "increased risk of health problems as a result" of "expos[ure] to plutonium."  (Instruction No. 3.7)  Nor is there any evidence of any "objective conditions that pose a demonstrable risk of future harm to the Class Area."  (Instruction No. 3.6)

1.    **Plaintiffs Have Failed to Introduce Evidence That All Class Members Experienced an Unreasonable Increased Health Risk as a Result of Plutonium Exposure.**

With respect to past health risk, the Court's jury instructions require plaintiffs to prove that "***the Class members*** were exposed to plutonium in some way as a result of one or both Defendants' activities and incurred some increment of increased health risk as a result." (Instruction 3.7) (emphasis added) Any such "increment of health risk" must be "unreasonable."[23] (Instruction 3.8)

The property class is defined "with reference to geographical representations of the area bounded by the plutonium contour and the complaint supplies the ***operative date of ownership as June 7, 1989***." *See Cook v. Rockwell Int'l Corp.*, 181 F.R.D. 473, 476 n.3 ("*Cook VIII*") (D. Colo. 1998) (emphasis added). Plaintiffs have introduced no evidence that "the class members" either (a) were exposed to plutonium; or (b) incurred an increased health risk as a result of that exposure.

Plaintiffs' witness on this issue, Dr. Goble, could not quantify any exposures or health risks to the class. Rather, he merely claimed that there was tremendous "uncertainty" in such exposures and health risks. (Goble testimony, 11/2/05 Tr. 3660-61) Dr. Goble opined as follows:

> Q.    Okay. So when you say, in my judgment these exposures were significant and were sufficient to cause latent diseases among members of the exposed group, you're not talking about everyone that lived in the class area? In other words, not everyone had a significant exposure?

---

[23] Under the Court's jury instructions, in determining "unreasonableness," is necessary to "consider both harm that has actually been incurred and the risk of future harm." (Instruction No. 3.11) The "risk of future harm" is addressed in Part III.B, *infra.*

> A.     Well, some of the exposures for people living in the class area were really
> small.  And significance, you might call sort of a policy to when you take it seri-
> ously.  But ***some of these are very, very small exposures.  And, for instance,
> regulatory agencies would not have been concerned about such exposures.***

(Goble testimony, 11/2/05 Tr. 3661) (emphasis added)[24]  And, as discussed above (Section I.A),

plaintiffs cannot use evidence of MUF to suggest that the risks are any higher, because there is

no evidence that any MUF was released offsite, much less any evidence that any MUF was

released onto plaintiffs' properties (and the evidence is to the contrary).

Plaintiffs' experts Drs. Cochran, Smallwood and Clapp also presented no evidence of

increased health risk to class members.  Dr. Cochran did not calculate dispersion, dose or risk for

anyone, including members of the class.  (Cochran testimony, 11/16/05 Tr. 5527)  Dr.

Smallwood, like Dr. Cochran, did not calculate the amount of plutonium that got offsite, let

alone dose or risk to class members. (Smallwood testimony, 11/3/05 Tr. 4060-61, 4064, 4069)

And Dr. Clapp did not study the class itself, nor did he determine whether anyone he did study

was actually exposed to any Rocky Flats releases.[25]  (Clapp testimony, 11/9/05 Tr. 4862-63,

11/10/05 Tr. 4908-10, 4918-19)[26]

---

[24] Defense witnesses testified similarly.  (*See, e.g.,* Raabe testimony, 12/9/05 Tr. 7339-40 ("The doses we're talking about in this case are so trivial they won't have any effect one way or another.  They're small, tiny fraction of what we get every week.  There's no way you can assign a risk or a benefit to such a small dose.  No way."); *see also id.* at 7270-71)

[25]  Dr. Clapp failed to find any increased results that were statistically significant at a 95% confidence level and cannot draw any conclusion from his data that cancer rates are higher.  (*See* Wecker testimony, 1/11/06 Tr. 9745-47, 9752, 9755-56 & 9759-60 ("the data are strongly consistent with no difference"))  And Dr. Clapp's failure to find anything is consistent with the work of Dr. Till and RAC.  (*Id.* at 9757-58 ("[I]f you have a one in a million chance in a lifetime, it would take a million people for a lifetime to get the first one.  And he was looking at fewer people, less time.  When he then goes out and looks at this study, it's obvious, if you credit these
(Continued…)

As argued above regarding plaintiffs' lack of release evidence, plaintiffs cannot justify the absence of risk evidence by pointing to the fact that some discovery materials may have remained classified.  (Instruction 1.9)  For example, plaintiffs cannot point to classified documents to suggest that any evidence relevant to MUF or any other aspect of their case remains unavailable to them.  It is uncontroverted that plaintiffs' counsel and their experts had access to classified documents for at least 10 years prior to trial.  (*See* Kaufman testimony, 11/14/05 Tr. 5180, 5188; Budnitz testimony, 10/27/05 Tr. 3002–03)  Plaintiffs' speculation to the contrary is unsupported by the record facts.  (*See* Defs.' Mem. in Support of Defs.' Mot. for Mistrial or, in the Alternative, Defs.' Proposed Instructions, filed 12/18/05 at 2 (collecting citations); Instruction 1.9)[27]  Accordingly, plaintiffs have failed to establish that they have been unable to fully

---

results here, that he's not going to find anything, so there's no surprise that there was nothing to be found."))

[26] Like plaintiffs' experts, plaintiffs' fact witnesses also fail to present any evidence of increased health risk to class members.  In fact, plaintiffs' fact witness testimony demonstrates that there is ***not*** an increased health risk.  (*E.g.,* Holeman testimony, 10/18/05 Tr. 1337;  Watkins testimony, Dep. Design. at 159-60, 167-69; Ozaki testimony, 10/20/05 Tr. 1804, 1808-09)  Defendants' witnesses agree.  (E.g., Till testimony, 12/15/05 Tr. 8270-71, 8273-79, 12/16/05 Tr. 8529-31, Raabe testimony, 12/9/05 Tr. 7209-10, 7240-42, 7339-40; Norton testimony, 12/14/05 Tr. 7958-66 ("there had been no evidence of off-site physiological or environmental damage from the operations of the facility")

[27] Notably, defendants produced evidence that RAC reviewed thousands of boxes of classified documents and concluded that most were not useful to their dose reconstruction project in light of the unreliability of the underlying accountability data. (*Id*. at 8207–08.)  The evidence also establishes that plaintiffs and RAC had to follow the same procedures to review classified materials and to obtain declassified information.  (*Compare* Budnitz testimony, 10/27/05 Tr. 3006 (describing the procedures that he was asked to follow) *with* Till testimony, 12/15/05 Tr. 8208–11 ("It's very important to understand there are very strict rules regarding classified information and the process that one goes through to get that information declassified.  We had to follow those rules like anyone else."); *see also* Kaufman testimony, 11/14/05 Tr. 5200–01 (the "same rules" applied to plaintiffs' lawyers))

present their case because specific documents remain classified.  (*See also* Defs.' Mem. in Support of Mot. for Mistrial or, in the Alternative, Defs.' Proposed Instructions, filed 12/18/05 (proposing jury instruction))

Although plaintiffs' failure to present evidence of an increased health risk to "the class members" is dispositive of plaintiffs' nuisance claim, the evidence affirmatively shows that no health risk exists.  For example, EPA's Operable Unit 3 ("OU3") study (which is comprised of all offsite areas around Rocky Flats) investigated the media for exposure to people in the offsite community, including soil, surface water, air, groundwater and sediment.  The EPA's Record of Decision ("ROD") for OU3 concluded "No hazardous substances, pollutants or contaminants will remain within the boundaries of OU3 above levels that allow for unlimited use and unrestricted exposure."  (DX36, OU3 ROD at 2)  The OU3 ROD further concluded that all sites within the OU3 study area "are already in a state protective of human health and the environment." (*Id.*; *see also* DX454, ATSDR 5/13/05 report, at 56 ("Therefore, no past, current, or future public health hazard exists from exposure to offsite surface soils, even at the most contaminated locations."))

In addition, defendants presented a study by the ATSDR, the principal federal health agency involved with hazardous waste issues, that considered any possible health risks associated with Rocky Flats and found no health risks associated with exposure to Rocky Flats plutonium.  In evaluating Rocky Flats plutonium emissions, the ATSDR concluded that:

- "Exposures to plutonium were well below levels associated with adverse health effects." (DX454, ATSDR 5/13/05 report, at 12)

- "[P]lutonium emissions from routine operations at Rocky Flats Plant (1953-1989) had minimal air quality impacts at offsite locations; these impacts were estimated to be com-

parable to the plutonium levels that have been attributed to fallout from past testing of nuclear weapons."  (*Id.* at 45)

- "Overall, ATSDR finds past and current inhalation exposures to site-related air emissions to be no apparent public health hazard."  (*Id.* at 78)

This study also found that "levels of offsite surface soil contamination are no apparent public health hazard for past, current and future exposures."  (*Id.* at 76)

The nine-year, multi-million-dollar dose reconstruction and risk assessment conducted by the CDPHE and overseen by a state-appointed Health Advisory Panel comprising scientists, anti-nuclear activists, and citizens (including a member of the property class), similarly establishes the lack of any real health risk to class members.  (DX1689; DX536 at 30-34; P1334 at 4-6, 62-64)  The study was conducted in two phases by contractors selected by the HAP.  Phase I (1990-1994) was conducted by ChemRisk; Phase II (1992-1999) was by Risk Assessment Corporation ("RAC") and its president, John Till.  (DX1689; P1334 at 5-6)

The essential dose reconstruction and risk assessment model that RAC created calculated source terms (or release estimates) for the releases of materials from Rocky Flats that had the most significant potential impact on the health of off-site residents; used meteorological data to predict the concentration of those materials in the off-site environment; calculated doses from those exposures; quantified excess cancer risks arising from the exposures, and then compared the study results with historical, measured environmental data to validate the model.   (Till testimony, 12/15/05 Tr. 8242-43)  Among the historical environmental monitoring data that RAC used to validate its model are many studies of plutonium in the soil on and around Rocky Flats. (DX530, RAC Task 4 Environmental Monitoring Report, at Table VIII-1)  As Dr. Till testified, none of the many soil sampling studies conducted around Rocky Flats demonstrates contamina-

tion in class contour in 1989.  Finally, RAC took into account the various uncertainties in the data and the calculations on which RAC's results and conclusions are based.  (Till testimony, 12/15/05 Tr. 8227-29, 8299-8300, 12/16/05 Tr. 8507-08)  Indeed, both the HAP and the ATSDR have lauded the quality of RAC's work as producing "the most comprehensive risk assessments ever performed for Rocky Flats."  (DX536 at 28; DX454 at 46.)

Based on its analyses, RAC found that the vast majority of Rocky Flats releases occurred by 1969 (Till testimony, 12/15/05 Tr. 8241, 8264-65) and that the potential cancer incidence risk for even the most highly exposed individual was very small (*id.* at 8277-78, 8279).  The HAP compared that level of risk to the risk of contracting cancer from exposure to weapons fallout, which, HAP noted, equates to a 0.00005% increased risk, more than 400,000 times lower than the average Coloradoan's risk of dying from cancer caused by all sources.  (DX536 at 24-25)  Although RAC studied exposures to Rocky Flats releases in an area much larger than the class area, RAC's study area encompasses the class properties, and it is possible to use RAC's results to assess historical risks to the class.  When Dr. Till assessed RAC's data and results as applied only to class properties, he found that the cumulative 37-year historical doses are so low that they are hundreds or thousands of times lower than the doses from background radiation that the average Coloradan is subjected to every year, that they do not present real-world risks, and that any risk from those doses is based on an assumption that is made out of prudence.  (Till testimony, 12/15/05 Tr. 8273-81, 8282-83, 12/16/05 Tr. 8529-31; DX-1187; DX-1779a; DX-1843; DX-1855; DX-1856)

Consequently, with all the evidence before the Court, it is clear that there is no evidence of a past health risk that can withstand judgment as a matter of law.

2.     **Plaintiffs Have Failed to Introduce Evidence That All Class Members Experienced an Unreasonable Health Risk as a Result of Exposure to Plutonium Released by Rockwell.**

As discussed in the trespass section above, plaintiffs have failed to introduce evidence that Rockwell caused releases of plutonium to the class area.  It follows that plaintiffs cannot show that "the [class members] incurred some increment of increased health risk" as a result of exposure to any "plutonium" released by Rockwell.  (Instruction No. 3.7)  This is an additional reason why defendants are entitled to judgment as a matter of law on plaintiffs' nuisance claims with respect to Rockwell.

Nor have plaintiffs' experts introduced any evidence of any exposures or health risk attributable to Rockwell's conduct.  Rockwell operated the plant beginning in 1975.  All of the exposure estimates created by plaintiffs' dose/risk expert, Dr. Goble, are derived from releases that occurred for the period from 1965-1970.  (P1124, Goble Report, at 35)  To derive exposure estimates for 1971-1989, Dr. Goble applies a "multiplier" of .003 to his exposure estimates for 1965-1970.  But Goble's multiplier has nothing to with activities by Rockwell; rather, Goble's multiplier relates, at best, to the continuing migration of plutonium released by Dow.  (*Id*. at 49) (***Goble has made "no estimate" for contamination in or after 1990***).

Plaintiffs have no expert or other evidence of any exposures or health risk caused by Rockwell's conduct.  What is more, the evidence developed by defendants at trial indicates there was no such health risk caused by Rockwell.  (*See, e.g.,* Norton testimony, 12/14/05 Tr. 7958-66 ("there had been no evidence of off-site physiological or environmental damage" from Rockwell's operations of the facility) Therefore, if the Court elects not to grant judgment as a matter

of law on all of plaintiffs' nuisance claims, the Court should nevertheless grant judgment as a matter of law on plaintiffs' nuisance claims against Rockwell.

> **B.     Plaintiffs Have Failed to Introduce Evidence That All Class Members Are at an Increased Risk as a Result of Future Releases from Rocky Flats.**

Aside from past health risk, the only other possible interference that plaintiffs could prove to sustain a nuisance claim is that "one or both of Defendants' activities at Rocky Flats interfered with Class members' use and enjoyment of their properties by creating objective conditions that pose a demonstrable risk of future harm to the Class Area."[28]  (Instruction No. 3.7)  Any such "future harm" must likewise be "unreasonable."  (Instruction No. 3.7, 3.11) Plaintiffs have not introduced sufficient evidence to meet these standards.

Plaintiffs have introduced no evidence of any "objective condition[] that pose[s] a demonstrable risk of future harm to the Class Area."[29]  (Instruction No. 3.7)  The Rocky Flats plant has been shut down for approximately 15 years, has been decommissioned, demolished, and remediated, and is being converted to a wildlife preserve.  (*See* Smallwood testimony, 11/3/05

---

[28] Defendants maintain their position (rejected by the Court) that a threat of future harm may not form the basis of a nuisance claim.  *See, e.g.*, 42 U.S.C. § 2014(w) (requiring that a public liability action assert liability "arising out of or resulting from a nuclear incident," which is further defined as an "occurrence"); *see also Adams-Arapahoe School Dist. No. 28-S v. GAF Corp.*, 959 F.2d 868, 872 (10th Cir. 1992) ("find[ing] nothing . . . which supports the notion that tort liability may be premised on the mere risk of harm"); *Van Wyk*, 27 P.3d at 391 (defining theory of nuisance predicated on invasion that is "unintentional and otherwise actionable under the rules for negligent or reckless conduct").

[29] The example of such an "objective condition" set forth in the jury instructions is "if plutonium or other hazardous substances present on or in the vicinity of Rocky Flats is at risk of being released to the Class Area — through natural forces, cleanup activity, the conduct of others and/or accidents — and could cause harm to properties in the Class Area by increasing the health risk to residents or impairing the future use of their land in some way."  (Instruction No. 3.7)

Tr. 4024; Holeman testimony, 10/17/05 Tr. 1252; *see also* Blaha testimony, 1/4/06 Tr. 8637-8681, 8753)  The special nuclear materials themselves were all shipped offsite by August 2003.  (Blaha testimony, 1/4/06 Tr. 8669)  In fact, the last plant building was demolished in September 2005 and DOE certified the cleanup and closure in October 2005.  (*Id.* at 8669-70, 8687, 8693)  Plaintiffs have introduced no evidence that, notwithstanding the cleanup, there continues to be any "plutonium or other hazardous substances present [at] . . . Rocky Flats" that could "cause harm to properties in the Class Area by increasing the health risk."  (Instruction No. 3.7; s*ee* Holeman testimony, 10/18/05 Tr. 1392-1398; DX69, EPA Superfund ROD; DX43, Agreement in Principle; DX454)  Instead, the record is to the contrary.  (*See generally* Blaha testimony, 1/4/06 Tr. 8637-8823)[30]  As the ATSDR concluded:  "[L]evels of offsite surface soil contamination are no apparent public health hazard for past, current and future exposures."  (DX454, ATSDR 5/13/05 report, at 76; *id.* at 1-2, 45, 55, 57;  Blaha testimony, 1/4/06 Tr. 8814-16;  Raabe testimony, 12/9/05 Tr. 7210, 7240-42, 7270-71, 7339-40)[31]

---

[30] Indeed, Dr. Till testified that the Rocky Flats site clean up levels were protective of human health.  (Till testimony, 12/15/05 Tr. 8290-93)

[31] In addition, plaintiffs have introduced no evidence of a future health risk **to class members**, as distinct from a health risk to persons now living within the 1970 Krey & Hardy contour.  As an initial matter, some class members, such as Mrs. Babb and Mr. Bowman, never lived on their class properties.  (Babb testimony, 10/20/05 Tr. 1954; Bowman testimony, 11/21/05 Tr. 6032)  Many other class members no longer live in the class area.  (*See*, *e.g.*, R. Bartlett testimony, 10/14/05 Tr. 1004; Robb testimony, 11/10/05 Tr. 5015, 1521; Whalen testimony, 11/21/05 Tr. 5932)  Accordingly, defendants preserve the argument rejected by the Court that, even if there were an "objective condition" that "pose[d] a demonstrable risk of future harm" (*e.g.*, "plutonium or other hazardous substances present on or in the vicinity of Rocky Flats [that] is at risk of being released **to the Class Area**"), it would **not** be a "risk of future harm" **to members of the class who do not live there.**

For these reasons, defendants should be granted judgment as a matter of law on plaintiffs' claim of future health risk.

**C.     Plaintiffs Have Not Shown That The Harm Associated With Any Health Risk Outweighs the Utility Associated With the Operation of Rocky Flats.**

Dr. Goble's testimony about the miniscule nature of the risks is dispositive for plaintiffs' nuisance claim.  However, there is also a second, independently sufficient, reason why the Court should grant judgment as a matter of law on the issue of the unreasonableness of the nuisance. Here, plaintiffs have failed to introduce any evidence as to the utility (or lack of utility) of defendants' conduct.  (*See* Instruction No. 3.10 (jury must weigh harm versus utility))  Defendants nevertheless have brought out evidence of the utility and benefit of their conduct.  Mr. Holeman testified that "Rocky Flats was a plant that was built for and operated for national security purposes" and agreed that "Rocky Flats was important not only for national security, but it was also important economically to the area."  (Holeman testimony, 10/18/05 Tr. 1378; *see also* Cochran testimony, 11/14/05 Tr. 5287 ("First is there's got to be a net benefit.  And I said, you know, that's a given at Rocky Flats.  It was cold war, and we were making warheads for national security purposes."); P394*, 3/23/51 AEC Press Release ("About 2,000 construction workers will be employed at the site during the peak of building in early 1952.");  Hunsperger testimony, 12/6/05 Tr. at 6602-04 (noting that survey respondents recognized that Rocky Flats was a source of jobs); P338, Lamm Wirth Task Force Report at 35-36)

Because plaintiffs bear the burden of proof as to their nuisance claim, plaintiffs' failure to introduce any evidence on the balance between the utility and harm of defendants' conduct requires the grant of defendants' motion for judgment as a matter of law on that claim.

### D.      Plaintiffs Have Not Shown That Any Health Risk Is Substantial.

In order to prevail on their nuisance claim, plaintiffs must demonstrate not only that any health risk is "unreasonable," but also that it is "substantial."  (Instruction No. 3.8); *Van Wyk*, 27 P.3d at 391.  Plaintiffs' failure to demonstrate that any interference was "substantial" constitutes yet another ground for granting defendants' motion for judgment as a matter of law.

As set forth in the Court's jury instructions, "[a]n interference with a person's right to use and enjoy their land is 'substantial' if the interference is significant enough that a normal person in the community would find it offensive, annoying or inconvenient."  (Instruction No. 3.9)[32] Here, plaintiffs' own witnesses testified that any health risk that resulted from defendants' conduct was ***not*** "offensive, annoying or inconvenient" on a class-wide level.  (Instruction No. 3.7, 3.9)  For example, class member Charles Ozaki testified that, even as of the time of his trial testimony, he was not even "aware of any — anything, any possibility that there was plutonium on my property."  (Ozaki testimony, 10/20/05 Tr. 1832)  Mr. Ozaki further testified that, following the FBI raid, "[i]t didn't cross my mind" to be "worried about my property from Rocky Flats."  (*Id.*)  Similarly, Ms. Whalen testified that her sister, a class member, had not expressed any concern about living and owning property within the class area.  (Whalen testimony, 11/21/05 Tr. 5954)  Ms. Whalen herself sold her house after the FBI raid to a couple who was from the area, knew about Rocky Flats, and wanted to move in.  (*Id.* at 5966-67)  Mr. Schierkolk,

---

[32] As set forth in *Cook IX*, the correct standard is that for an invasion to be substantial, it must be "definitely offensive, seriously annoying or intolerable."  273 F. Supp. 2d at 1203-04; *see also id.* ("Section 821F of the Restatement and its supporting commentary, relied upon by the Colorado Supreme Court in *Van Wyk*, states that a significant invasion of another's interest in the use and enjoyment of property exists '[i]f normal persons living in the community would regard the invasion in question as definitely offensive, seriously annoying or intolerable.'").

a named plaintiff, testified that, despite what he knows about the plant, he likes his home and does not want to move.  (Schierkolk testimony, 10/20/05 Tr. 1944-45)  Ms. Bini Abbott, a neighbor of the named class members who has been a member of the Health Advisory Panel related to Rocky Flats, also has continued to live in the area and buy more property there, as has Mr. Coleman, one of the investors in the Alkire group.  (Holeman testimony, 10/18/05 Tr. 1347; Bowman testimony, 11/21/05 Tr. 6064-65, 6113)  In addition, Mr. Ozaki and Mr. Cassidy explained that Broomfield continued to annex land within the class area after the FBI raid. (Ozaki testimony, 10/20/05 Tr. 1793; Cassidy testimony, 11/8/05 Tr. 4538)

What is more, as discussed above, plaintiffs' own dose/exposure expert Dr. Goble admitted that the alleged health risk at issue resulted from exposures that were so small that regulatory agencies would not have been concerned about them.    (Goble testimony, 11/2/05 Tr. 3661) Defense experts agree.  (Raabe testimony, 12/9/05 Tr. 7339-40 ("The doses we're talking about in this case are so trivial they won't have any effect one way or another.  They're small, tiny fraction of what we get every week.  There is no way you can assign a risk or a benefit to such a small dose.  No way."); *id.* at 7270-71, 7339-40; Till testimony, 12/15/05 Tr. 8265, 8270-71, 8273-79 (as of 1971, exposure is equal to background; doses are very small, risk is 1 in a million); *id.* at 8273-81, 8282-83, 8529-31; DX1187; DX1779a; DX1843; DX1855; DX1856)

Defendants also preserve the position (rejected by the Court) that, in addition to proving that the interference is "significant enough that a normal person in the community would find it offensive, annoying or inconvenient," in order to prove that the interference is "substantial,"

plaintiffs must prove that the interference has caused a reduction in the value of the property.[33] *See Van Wyk*, 27 P.3d at 392 ("[T]he interference complained of by the Van Wyks must be a substantial invasion interfering with the use and enjoyment of the land, and reducing the value of the land.") (citing *Prosser & Keeton on Torts* § 87, at 622-23); *Prosser & Keeton on Torts* § 87, at 623 ("The substantial interference requirement is to satisfy the need for a showing that the land is reduced in value because of the defendant's conduct."); *Saunders v. Hilperthauser*, 1988 WL 42146, at *6 (S.D.N.Y. 1988) ("Such interference must be substantial and unreasonable.  It exists only upon a showing of damages — that is, that the land is reduced in value because of the defendant's conduct.") (internal citations and quotations omitted); *Bower v. Weisman*, 639 F. Supp. 532, 542 (S.D.N.Y. 1986) ("[A]n action for private nuisance cannot be sustained without a showing of damages.").

As explained in Part VII, plaintiffs have failed to prove any classwide damages for several reasons:  (1) their damages evidence is not sufficiently reliable to go before the jury; (2) plaintiffs have failed to demonstrate any damages attributable to defendants' actionable conduct, as distinguished from damages attributable to proximity to Rocky Flats or from some "stigma" not arising from any trespass or nuisance by defendants; (3) while plaintiffs purport to measure a diminution in the value of class properties, plaintiffs have failed to measure any damages suffered by class members, because plaintiffs' experts have not determined whether class members

---

[33] Defendants recognize that the Court has rejected this argument, and reassert it here in order to preserve defendants' position.

bought or sold their properties at a pre-existing discount attributable to Rocky Flats;[34] (4) plaintiffs have not proved that any trespass or nuisance became complete and comparatively enduring between 1988 and 1995; (5) plaintiffs have not demonstrated that any trespass or nuisance was continuing, as required to prove damages under Section 930 of the Restatement (Second) of Torts; and (6) plaintiffs have not proved damages attributable to the prospect of the continuance of any tortious invasions, as also required under Section 930.

Because a showing of a reduction in the value of the property is required to prove a nuisance claim,[35] and because plaintiffs have not made this showing of class-wide damages, plaintiffs cannot show that any interference was substantial, which is fatal to plaintiffs' nuisance claims.  *See Van Wyk*, 27 P.3d at 392; *Prosser & Keeton on Torts* § 87, at 623.

E.      **Plaintiffs' Acquisition of Land After Any Purported Nuisance Came Into Existence Establishes That Any Interference Was Not Substantial and Unreasonable.**

In determining whether a plaintiff has proved that any interference to his or her use and enjoyment of property was substantial and unreasonable, it is necessary to consider whether the plaintiff acquired the land after the interference with the land had come into existence.[36]  *See* Restatement § 840D ("The fact that the plaintiff has acquired or improved the land after a

---

[34] Defendants recognize that the Court has ruled that defendants bear the burden of proof on this issue, and re-assert this argument for the purpose of preserving their rights.

[35] The Court has apparently ruled that a showing of damages is not required in order to prevail on a nuisance claim.  (*See* Instruction No. 3.7)  Nevertheless, defendants re-assert that argument here for the purpose of preserving it.

[36] Although this Court has ruled that the "coming to the nuisance" defense is not an absolute bar to liability, this Court's May 28, 2004 Order left open the question of whether "the timing of class' members acquisition of class properties" is relevant to nuisance.  (5/28/04 Order at 7)

nuisance interfering with it has come into existence is . . . a factor to be considered in determining whether the nuisance is actionable."); *see Prosser and Keeton on Torts* § 88, at 630, 635 ("Whether or not the plaintiff or the defendant should be required to bear the loss of substantial interference to plaintiff from defendant's reasonable conduct depends upon[, among other factors,] priority in time as to the respective activities of the plaintiff and the defendant . . . .  If a plaintiff comes to a 'nuisance' in the sense that he comes to an area where the defendant has already been making a particular kind of use of his property, and then is allowed successfully to maintain a suit either for damages or for abatement of the nuisance, the court could frequently be in the position of giving the plaintiff a windfall capital gain . . . ."); *Platte & Denver Ditch Co. v. Anderson*, 6 P. 515, 521 (Colo. 1885) ("Where one buys a city lot bordering upon ground set apart or dedicated to any public use, he takes it subject to all the annoyances incident to the purposes of the dedication.").

Here, the undisputed evidence shows the following sequence of events.  **First**, there was virtually no development of the class area in the 1950s or 1960s.  (*See* DX1138 (graphic showing class members present in the class area in 1955); DX1137 (graphic showing class members present in the class area in 1969); Dorchester testimony, 1/09/06 Tr. 9476 ("[development curve] goes up rather slowly until you get past '67, '69, '71."); DV1, Till video ("as of 1969, there was little development in the class area"))  **Second**, 99.9% of all releases of plutonium from Rocky Flats occurred before 1970, in connection with the 1957 fire, 903 pad incident, and 1969 fire. (*E.g.,* DX454, ATSDR Report, at 1-2; DV1, Till video ("Over 99 percent of plutonium released from Rocky Flats occurred before 1970."); Till testimony, 12/15/05 Tr. 8241 (after 1969, exposures from Rocky Flats drop off significantly))  **Third**, these pre-1970 release events, and the

associated health risks, were heavily publicized in the early 1970s. (*See, e.g.*, Defendants' Group Exhibit 1 (various media articles); DX11 (2/11/70 Denver Post article, "Radioactive Soil Pollution Tied To Rocky Flats Plant"); DX63 (8/7/73 Denver Post article, "Atom Wastes Buried in Tons at Rocky Flats"); DX568 (11/29/71 Denver Post article, "Plutonium Safety Doubted"); DX365 (8/20/70 Rocky Mountain News article, "AEC makes report on contamination at Rocky Flats"); DX567 (3/6/70 Denver Post article, "AEC Veracity Challenged: Area Plutonium Peril Claimed"); DX568 (11/29/71 Denver Post article, "Rocky Flats Plant: Plutonium Safety Doubted"); DX572 (6/20/74 Arvada Citizen Sentinel article, "Plutonium contamination in area presents high risk, scientist says"); DX575 (10/13/75 Denver Post article, "Soil East of Rocky Flats: New Test Rates Plutonium Above Limits); DX2292 (showing Dorchester data re publicity)) ***Fourth,*** following the extensive publicity surrounding these release events, the class members moved into the class. (DX1137 (graphic showing class members present in the class area in 1969); DV1, Till video ("the overwhelming majority of the class moved into the area in the 1970s and 1980s"; "as of 1969, there was very little development in the class area. By 1989, the class area had become well developed."); DX2188A, Dorchester video; Dorchester testimony, 1/09/06 Tr. 9475-76 ("About 1971 you start seeing that curve climb, meaning that a lot of houses were being added starting with the early 1970s, and there was substantial and relatively continuous growth going through there until the class got to the point where it was largely built out"); DX2195-DX2207 (aerial photographs showing development over time); DX2292 (comparing timing of publicity and class area development, and illustrating that the vast majority of class area development occurred after substantial amounts of Rocky Flats publicity, a fact not

disputed by plaintiffs); s*ee also* Dorchester testimony, 1/10/06 Tr. 9653-54 ("you can see that once there appeared a substantial number of articles that it didn't deter the construction"))

 The undisputed evidence at the close of trial shows that over 99% of the class bought into the class area after 1969 — long after the release incidents at issue had been extensively publicized.  (*See* DX1137)[37]  Hence, the undisputed fact that over 99% of class members had "acquired . . . [their] land after a nuisance interfering with it has come into existence" is fatal to plaintiffs' nuisance claims here.  Restatement § 840D; *Platte & Denver Ditch Co.*, 6 P. at 521.

  **F.** **Plaintiffs Have Not Shown That Defendants Intentionally or Negligently Caused Any Health Risk.**

 To prevail on their nuisance claim, plaintiffs must prove that "[t]he activity or activities causing the unreasonable and substantial interference were either 'intentional' or 'negligent.'" (Instruction No. 3.6)  Plaintiffs have failed to introduce sufficient evidence that Dow or Rockwell intentionally[38] or negligently caused a health risk to class members to withstand a motion for judgment as a matter of law.

 First, as set forth in Part I, *supra*, plaintiffs have failed to introduce any evidence that Dow or Rockwell intentionally released plutonium to the class area.  Accordingly, plaintiffs have also failed to introduce evidence that Dow or Rockwell intentionally caused any health risk resulting from plutonium released to the class area.  Nor have plaintiffs introduced any evidence

---

[37]  Defendants also incorporate by reference the arguments in their December 8, 2005 Motion for Judgment as a Matter of Law related to Charles McKay.  (*See* 12/8/05 Defs.' Mot. for J'ment at 44)

[38]  Defendants recognize that the Court has rejected the argument that plaintiffs waived their claim of intentional nuisance by not including that claim in plaintiffs' December 2003 Status Report, but preserve that argument.

that Dow or Rockwell (1) "knew that [their] conduct would interfere with others' use and enjoyment of their property"; (2) "knew that it was substantially certain that [their] conduct would interfere with others' use and enjoyment of their property"; or (3) "learned that [their] conduct was interfering with or was substantially certain to interfere with others' and enjoyment of their property and yet continued this conduct."[39]  (Instruction No. 3.14)

In addition, plaintiffs have not introduced evidence sufficient to support a finding that Rockwell negligently created a nuisance.  Because there is no evidence that Rockwell caused *any releases* of plutonium to the class area, *see* Part I, *supra*, or *any health risk* to people living in the area, *see* Part II.A, *supra*, there is no evidence that Rockwell negligently caused any interference with plaintiffs' use and enjoyment of their properties.

Accordingly, there is no evidence that Dow or Rockwell intentionally or that Rockwell negligently caused a nuisance, and defendants should be granted judgment as a matter of law on that ground.

### G.   The Evidence Shows That Any Health Risk Resulted From an Intervening Cause.[40]

As discussed in Section II.D, *infra*, the evidence shows that any trespass resulted from an unforeseeable intervening cause.  Because any *contamination* of the class area resulted from a

---

[39] To prove an intentional nuisance, plaintiffs must demonstrate that defendants knew that defendants' conduct was interfering with plaintiffs' use and enjoyment of their property, or was substantially certain to interfere with plaintiffs' use and enjoyment of their property.  *See Van Wyk*, 27 P.3d at 394.

[40] Given that the Court has already rejected defendants' intervening cause argument, defendants assert that argument here for the purpose of preserving their rights.

non-actionable intervening cause, any **health risk** attributable to that contamination also resulted from a non-actionable intervening cause.

## IV.   NUISANCE ARGUMENTS THAT THE COURT HAS RULED ON, AND THAT DEFENDANTS INCLUDE FOR PURPOSES OF PRESERVING THEIR RIGHTS.

As in the case of nuisance, the Court has already ruled against defendants on certain arguments relating to plaintiffs' nuisance claims.  Defendants re-assert those arguments here for the purpose of preserving their rights.

### A.   Plaintiffs Have Not Shown a Violation of State Standards.[41]

To prove nuisance, plaintiffs must show, among other things, an "unreasonable and substantial interference with a plaintiff's use and enjoyment of her property."  *See Van Wyk*, 27 P.3d at 391.  In addressing the "unreasonable interference" element of a nuisance claim (as distinct from the "wrongful conduct" element), the *Van Wyk* court held that "an allegation of unreasonableness is central to a nuisance claim," as well as that a regulatory entity's "determination of reasonableness sets the standard for the balance between the social utility of the [acts causing the nuisance] and possible harm to property."  *Id.* at 393.  The *Van Wyk* court further ruled that if the governmental entity has "quantified the [invasion] level it deemed to be reasonable, then that [invasion] level would become the standard for the level at which [the invasion] would not constitute an invasion interfering with [plaintiffs'] use and enjoyment of their property."  *Id.*

Here, the Colorado Department of Health **has** "quantified" the level of plutonium that it considers reasonable on properties.  Accordingly, to recover on their nuisance claims, plaintiffs

---

[41] Defendants acknowledge that the Court has ruled that plaintiffs need not establish a violation of state standards to prevail on their nuisance claim, and re-assert this argument for the purpose of preserving their rights.

must demonstrate that any plutonium released by defendants resulted in contamination of class properties in excess of the Colorado plutonium standard (two disintegrations per minute of plutonium per dry gram of soil or square centimeter of surface area).  6 Colo. Code Regs. 1007-1, RH 4.60.1, Permissible Levels of Plutonium in Uncontrolled Areas.  Plaintiffs have introduced no such evidence.  To the contrary, the evidence has shown that any contamination of class properties was in an amount far less than the state standard.  (DX1663; DX1651a; DX1664; Frazier testimony, 12/12/05 Tr. 7529-31, 7534-37, 7539; Budnitz testimony, 10/31/05 Tr. 3335-36; S. Bartlett testimony, 10/14/05 Tr. 959-60, 961; Cook testimony, 10/21/05 Tr. 2023-26; Holeman testimony, 10/18/05 Tr. 1363, 1370-71; *see also* DX34, Broomfield 2004 Water Quality Report (no exceedences of Safe Drinking Water Act standards); DX1245 (Poet & Martell soil contours); DX1252 (Krey & Hardy soil contours); DX1265 (Jones & Zhang 1986 and 1989 soil contours); Weston testimony, 12/14/05 Tr. 8096; Norton testimony, 12/14/05 Tr. 7967-68)

Plaintiffs' failure to introduce any evidence that defendants violated state standards constitutes an independently sufficient basis for dismissing plaintiffs' nuisance claims.

## B.   Plaintiffs Have Not Shown That Any Health Risk Was Created by Releases Which Did Not Comply with Federal Standards.[42]

In order to prevail on their nuisance claims, plaintiffs must demonstrate that defendants caused releases which violated the applicable federal standards.  As discussed, plaintiffs have not

---

[42] Defendants acknowledge that the Court has ruled that plaintiffs need not establish a violation of state standards to prevail on their nuisance claim, and re-assert this argument for the purpose of preserving their rights.

done so (*see* Section II.B, *supra*), and the Court should thus grant judgment as a matter of law on plaintiffs' nuisance claims.

### C.      Exceedingly Small Exposures Cannot Give Rise to a Nuisance.

As a matter of law, exposures that are so "very, very small" that "regulatory agencies would not have been concerned" about them cannot give rise to a nuisance.  Rather, to be actionable as a nuisance, an interference must be "substantial and unreasonable."  (Instruction No. 3.8)  In determining what is unreasonable, it is necessary to "balance the gravity of the harm to Class members against the utility of Dow and Rockwell's conduct at Rocky Flats and determine whether the gravity of this harm outweighs the utility of this conduct."  (Instruction No. 3.10)  Importantly, "[i]n assessing the extent of the harm, [the jury] must also consider only harm that is common to the class as a whole, ***and not any more severe harm that may have been suffered by some Class members but not by others***."  (Instruction No. 3.11) (emphasis added)  Thus, in weighing "the gravity of the harm" versus "the utility" of defendants' conduct, the trier of fact may only consider the "lowest common exposure" and "lowest common risk" experienced by the class — namely, "very, very small exposures" that even "regulatory agencies would not have been concerned about."  (Goble testimony, 11/2/05 Tr. 3661; *see also* Raabe testimony, 12/9/05 Tr. 7339-40 ("The doses we're talking about in this case are so trivial they won't have any effect one way or another.  They're small, tiny fraction of what we get every week.  There is no way you can assign a risk or a benefit to such a small dose.  No way."))

As a matter of law, such exposures are ***not*** an "unreasonable" exposure.  Indeed, the Colorado Supreme Court held in *Van Wyk* that regulatory standards establish the standard for reasonableness under Colorado nuisance law:

> Thus, because an allegation of unreasonableness is central to a nuisance claim, the **[Colorado Public Utilities Commission] determination of reasonableness sets the standard** for the balance between the social utility of the transmission of electricity and possible harm to property against which the Van Wyks must argue.

27 P.3d at 393 (emphasis added).  It follows that, because plaintiffs' own expert concedes that (even for people "living in the area") the lowest common denominator of exposure is so "very, very small" that "regulatory agencies would not have been concerned" (Goble testimony, 11/2/05 Tr. 3661), there is no evidence that any interference is "unreasonable" (as required to prove a nuisance claim).  (*Id.*)

## V.    THE RECORD CONFIRMS THE ABSENCE OF REMAINING FACTUAL DISPUTES REGARDING DEFENDANTS' AFFIRMATIVE DEFENSES OF STATUTE OF LIMITATIONS AND PRESCRIPTIVE EASEMENT.

The Court has already rejected defendants' argument of statute of limitations and prescriptive easement.  *Cook v. Rockwell Int'l Corp.*, 358 F. Supp. 2d 1003 ("*Cook X*")(D. Colo. 2004) (statute of limitations); (5/28/04 Order at 7-10).  Nonetheless, defendants reassert those arguments here for the purpose of preserving their rights.

### A.    The Evidence Shows That Plaintiffs' Trespass Claims Are Barred by the Statute of Limitations.[43]

In *Cook X*, this Court ruled that, **if plaintiffs prove a continuing trespass**, then the statute of limitations does not apply.  *See Cook X*, 358 F. Supp. 2d 1003, 1004 (D. Colo. 2004) ("the continuing presence of plutonium on the Class Properties, **if proven**, would constitute a continuing trespass"; in such circumstances, "Defendants do not have a limitations defense to liability on the trespass claim because the statute of limitations has not yet begun to run on this claim").

---

[43] Although the Court has rejected this argument, defendants include it here for the purpose of preserving it.

Under this Court's rulings, to prove that a trespass is "continuing," plaintiffs must show that "it appears that plutonium will continue to be on the Class Properties indefinitely."[44] (Instruction No. 3.4)   As discussed above, plaintiffs have introduced no evidence of such a "continuing" trespass.  While plaintiffs have introduced evidence about the half-life of plutonium once it gets into the soil, plaintiffs have not introduced evidence that any plutonium-contaminated *soil itself* has remained on the class properties, notwithstanding the massive development that has  occurred on those lands during the last four decades.  (Smallwood testimony, 11/3/05 Tr. 4067, 4083-84;  *accord* DV1, Till video (buildings, concrete, and asphalt now cover what used to be undeveloped soil" . . . "[s]everal feet of soil are excavated when preparing the foundation of a new home."); Dorchester video; Dorchester testimony, 1/09/06 Tr. 9474-9475 & 9475-76; DX2195-DX2207 (aerial photographs))

Because plaintiffs have failed to introduce evidence that any trespass was "continuing," the statute of limitations defense applies.  *See Cook X*, 358 F. Supp. 2d at 1004; *Hoery*, 64 P.3d at 216-17.  The statute of limitations for trespass actions is two years.  Colo. Rev. Stat. § 13-80-102 (tort actions for trespass "shall be commenced within two years after the cause of action accrues, and not thereafter").  Under Colorado statute of limitations rules, a claim "accrues the later of when the injury first occurs or when the plaintiff learned or should have learned of his injury and its cause."  *Hoery*, 64 P.3d at 216-17.  Thus, if plaintiffs' claims accrued on or before January 30, 1988 (two years before plaintiffs filed their Complaint), they are time-barred.

---

[44] As discussed above, defendants have previously argued that, in order for a trespass to be "continuing," plaintiffs also must prove that it is not reasonably abatable.  Plaintiffs have introduced no evidence in this regard.  Defendants recognize that the Court has rejected defendants' position, but re-assert this argument here for the purpose of preserving it.

Here, there is ample evidence that class plaintiffs "learned or should have learned of [their] injury [in the case of trespass, plutonium contamination on their properties] and its cause" well before January 30, 1988:

- **Bartlett:** Sally Bartlett testified that she learned that people questioned the safety of Rocky Flats in the mid to late 1960s, and was fully aware of such claims before she moved to the property on Alkire.

- **Ozaki:** Mr. Ozaki, another class member, testified that it was "common knowledge" in the 1970s that nuclear materials were handled at Rocky Flats, that such materials were danger-ous, that there had been offsite releases from plant manufacturing processes, and that there were concerns about offsite impact. (Ozaki testimony, 10/20/05 Tr. 1826-27)

- **Schierkolk:** William Schierkolk, a named plaintiff and class member, testified that he recalled reading newspaper articles in February 1970 discussing the release of radioactive materials from Rocky Flats offsite which stated: "Radioactive plutonium from the Dow Chemical Company plant at Rocky Flats has polluted soils over a radius of several miles . . . ." (Schierkolk testimony, 10/20/05 Tr. 1944-45; *see also* DX11)

- **Bowman:** Joseph Bowman, an Alkire investor and a class member, testified that he knew about media relating to the 1969 Rocky Flats fire and protesting at the plant that followed the fire in the 1970s. He further testified that he and his Alkire investment group partners learned of the Rocky Flats-related health concerns of Dr. Carl Johnson in the 1970s. Mr. Bowman agreed that by about early 1970 it was the view of the Alkire Investment Company partners that Rocky Flats had begun to influence the Alkire property value. (Bowman testi-mony, 11/21/05 Tr. 6081-85)[45]

- **Dorchester**: Mr. Dorchester showed the results of a survey of articles concerning Rocky Flats as compared to development in the class area. They showed that there was a substantial amount of publicity concerning Rocky Flats dating back to the 1970s and that class area de-velopment was not deterred by such publicity. *See* DX2292 (showing Dorchester data re publicity)

- **Trial Exhibits:** In addition to witness testimony, several admitted newspaper articles show that plutonium contamination from Rocky Flats has been known at least since the early 1970s. They include DX11 (2/11/70 Denver Post article, "Radioactive Soil Pollution Tied

---

[45]  Defendants also incorporate by reference the arguments in their December 8, 2005 Motion for Judgment as a Matter of Law related to Charles McKay. (*See* 12/8/05 Defs.' Mot. for J'ment at 50-51)

To Rocky Flats Plant"), DX63 (8/7/73 Denver Post article, "Atom Wastes Buried in Tons at Flats Plant"), and DX568 (11/29/71 Denver Post article, "Plutonium Safety Doubted"); Defendants' Group Exhibit 1 (various newspaper articles))

In short, the undisputed evidence shows not only that plaintiffs' claims were not continuing, but also that plaintiffs knew or should have known of their injuries — and the causes of those injuries — before January 30, 1988.  Accordingly, plaintiffs' claims are barred by the statute of limitations, and defendants are entitled to judgment as a matter of law.

### B.    The Evidence Shows That Plaintiffs' Nuisance Claims Are Also Barred by the Statute of Limitations.[46]

For the same reasons that support judgment as a matter of law on plaintiffs' trespass claims, see Part I, supra), the Court should also rule that plaintiffs' nuisance claims are time-barred.  Just as the alleged contamination that is the basis for plaintiffs' trespass claims was heavily publicized by the early 1970s, the alleged health risks that are the basis for plaintiffs' nuisance claims were also widely publicized during that period.  (See, e.g., DX11 (2/11/70 Denver Post article, "Radioactive Soil Pollution Tied To Rocky Flats Plant"), DX63 (8/7/73 Denver Post article, "Atom Wastes Buried in Tons at Rocky Flats"), and DX568 (11/29/71 Denver Post article, "Plutonium Safety Doubted"); Defendants' Group Exhibit 1)  Moreover, plaintiffs' witnesses have consistently testified that they were aware of health risks from Rocky Flats before January 30, 1988, the date on which the statute of limitations began to run.  (Ozaki testimony, 10/20/05 Tr. 1826-27;  Schierkolk testimony, 10/20/05 Tr. 1899, 1929, 1944-45, 10/21/05 Tr. 1995-96; S. Bartlett testimony, 10/14/05 Tr. 949-50, 953; Bowman testimony,

---

[46] See the immediately preceding footnote.

11/21/05 Tr. 6081-85; Avery testimony, 11/2/05 Tr. 3813-14)   Thus, like plaintiffs' trespass claims, plaintiffs' nuisance claims are barred by the statute of limitations.

> **C.   The Evidence Shows That Plaintiffs' Trespass Claims Are Barred by a Prescriptive Easement.**

Under Colorado law, "[a]n easement by prescription is established when the prescriptive use is: 1) open or notorious, 2) continued without effective interruption for the prescriptive period [eighteen years], and 3) the use was either a) adverse or b) pursuant to an attempted, but ineffective grant."  *Lobato v. Taylor*, 71 P.3d 938, 950 (Colo. 2002); *see also Weisiger v. Harbour*, 62 P.3d 1069, 1071, 1073 (Colo. App. 2002) ("An easement by prescription is acquired when the use is open or notorious, continuous without effective interruption for the prescriptive period and either adverse or pursuant to an attempted but ineffective grant. . . . To satisfy the open and notorious element, the use must be sufficiently obvious to apprise the owner of the servient estate, in the exercise of reasonable diligence, that another is making use of the burdened land so that the owner may object.  However, actual knowledge by the owner need not be proved."); *Bradley v. Am. Smelting and Ref. Co.*, 709 P.2d 782, 792-93 (Wash. 1985) (holding that "[t]he defense of easement by prescription is available" where defendant deposited heavy metal particles on plaintiffs' property); Rest. 2d Torts § 899 cmt. d ("In other cases when there is a series of continuing harms, . . . the defendant may have acquired a right by prescription to continue the tortious act."); Rest. 2d Torts § 161, cmt. d.

Here, the uncontroverted evidence establishes that: (1) the presence of any plutonium released by defendants onto plaintiffs' property was open and notorious; and (2) the presence of any plutonium released by defendants onto plaintiffs' property continued without interruption for eighteen years before plaintiffs filed their claim on January 30, 1990 (that is, the presence of

plutonium continued at least during the eighteen years from January 30, 1972 through January 30, 1990).[47]

The evidence introduced by plaintiffs shows that the releases from the 1957 fire, the 1969 fire, and the 903 pad incident all occurred before 1970.  ATSDR reports demonstrate that 99.9% of any Rocky Flats releases had already occurred by 1970.   (DX454, ATSDR 5/13/05 report, at 1-2) ("Though Rocky Flats released plutonium to the air throughout its history, the overwhelming majority (> 99.9%) of plutonium emissions occurred between 1953 and 1969.") The uncontroverted evidence shows that the existence of these releases was "open and notorious."  For example, class member William Schierkolk testified that, in early 1970, he read Denver Post newspaper articles discussing the release of radioactive materials from Rocky Flats offsite, including related offsite soil contamination.  He specifically recalled reading a February 1970 article entitled "Radioactive Soil Pollution Tied to Rocky Flats" that stated that "radioactive plutonium from the Dow Chemical Company plant at Rocky Flats has polluted soils over a radius of several miles . . . " (Schierkolk testimony, 10/20/05 Tr. 1944-45; *see also* DX11) Likewise, class member Joseph Bowman testified that he knew about media relating to the 1969 Rocky Flats fire in the 1970s and agreed that, by about early 1970, he and his Alkire Investment Company partners believed that Rocky Flats had influenced the Alkire property value.  (Bowman testimony, 11/21/05 Tr. 6081-85)  Former plant employee Ron Avery testified that he remembers "publicity about plutonium discovered offsite of Rocky Flats, big bold headlines, people being worried about that" in 1970.  (Avery testimony, 11/2/05 Tr. 3813-14; *see also* DX11, DX63 &

---

[47] Defendants respectfully disagree with this Court's finding that the defense of prescriptive easement has been waived and tender this instruction to preserve their objection.

DX568 (Denver Post articles from early 1970s); Defendants' Group Exhibit 1 (various newspaper articles)[48])

Accordingly, the uncontroverted evidence establishes that alleged plutonium contamination from Rocky Flats had been "open and notorious" for over eighteen years, and that plaintiffs' claims are therefore barred by the affirmative defense of prescriptive easement.

### D.   The Evidence Shows That Plaintiffs' Nuisance Claims Are Barred by a Prescriptive Easement.

Like plaintiffs' trespass claims, plaintiffs' nuisance claims are barred by the prescriptive easement rule.[49]  Here, the uncontroverted evidence shows that the existence of any health risk resulting from defendants' conduct was "open and notorious" by January 30, 1972.  (*See* DX11 (2/11/70 Denver Post article, "Radioactive Soil Pollution Tied To Rocky Flats"); DX568 (11/29/71 Denver Post article, "Plutonium Safety Doubted"); Schierkolk testimony, 10/20/05 Tr. 1944-45; S. Bartlett testimony, 10/14/05 Tr. 949-50, 953; Bowman testimony, 11/21/05 Tr. 6081-85; Avery testimony, 11/2/05 Tr. 3813-14; Babb testimony, 10/20/05 Tr. 1963)  Accordingly, like plaintiffs' trespass claims, plaintiffs' nuisance claims are barred by the affirmative defense of prescriptive easement.

---

[48] Defendants also incorporate by reference the arguments in their December 8, 2005 Motion for Judgment as a Matter of Law related to Charles McKay. (*See* 12/8/05 Defs.' Mot. for J'ment at 54)

[49] Because plaintiffs filed their Complaint on January 30, 1990, plaintiffs' nuisance claims are time-barred if the prescriptive use was established on or before January 30, 1972.

VI.     **defendants are entitled to judgment as a matter of law on the question of whether their conduct was Capable generically of causing fear, anxiety, or mental discomfort in class members.**

A.     **The Generic Question of Emotional Distress Cannot Support a Judgment on Plaintiffs' Nuisance Claims.**

Pursuant to the Court's jury instructions, the jury is to answer the following question:

Have plaintiffs proved by a preponderance of the evidence that the intentional or negligent conduct of Dow or Rockwell or both of them at Rocky Flats, and/or actual or threatened harms caused by such conduct, created a situation that is capable of causing fear, anxiety or mental discomfort in individual Class members? (Instruction No. 3.28)

As this Court has recognized, regardless of what the jury determines with respect to this question, the jury is not to consider this issue in determining whether a trespass or nuisance has occurred.  (Instruction No. 3.28) ("Because this is a trial of claims by the whole Class, I earlier instructed you *not* to consider whether individual plaintiffs or Class members suffered this form of interference in deciding whether plaintiffs had proved their class-wide nuisance claim.") Thus, regardless of how this issue is resolved, it does not help plaintiffs to escape a judgment as a matter of law on the trespass and nuisance claims.  Nevertheless, as defendants have made clear in the past, defendants object to any trial of this partial claim for several reasons, which defendants will not belabor here.[50]

---

[50] Defendants respectfully disagree with the Court's May 17, 2005 Order's holding that "[t]he generic causation question of whether Defendants' activities and the conditions resulting from them were capable of causing Class members to suffer fear, anxiety or other mental or emotional discomfort . . . may be decided by the jury in the class trial" (5/17/05 Order at 7), for a number of reasons, including but not limited to the four reasons set forth below.  ***First***, trying the issue of emotional distress to two juries — first on a generic basis and second on an individual basis — violates defendants' Seventh Amendment rights.  *See, e.g., In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 352 (S.D.N.Y. 2002) ("[S]uch division must 'carve at the joint' between liability and damages.") (quoting *In re Rhone-Poulenc-Rorer Inc.*, 51 (Continued…)

### B.    Plaintiffs Have Not Introduced Any Evidence That Defendants' Conduct Was Capable of Causing Emotional Distress.

To prevail on their generic emotional distress claim, plaintiffs must demonstrate that ***defendants' actionable conduct***, or the "actual or threatened harm caused by such conduct," was "capable of causing fear, anxiety or mental discomfort."  (Instruction No. 3.28)  However, while some of plaintiffs' own witnesses have testified that they had concerns (e.g., Whalen, Robb), none linked their emotional distress to any specific actionable conduct by defendants.  (*See, e.g.,* Whalen testimony, 11/21/05 Tr. 5938 ("when I read the ***headlines in the paper about the FBI raid***, it really terrified me") (emphasis added); Robb testimony, 11/10/05 Tr. 5019-20 (did not feel safe due to "[a]ll the information that was spreading about the high cancer risks in that area"; got information from ***newspaper articles*** and ***neighbors***) (emphasis added); *id.* at 5022 (in response to a question about whether Rockwell's conduct caused her fear, answering "I think the biggest fear that I had and what I — really sticks in my mind was the raid, you know, that they

---

F.3d 1293, 1302 (7th Cir. 1995)).  ***Second***, the Court has previously ruled that "whether defendants' activities caused Class members to suffer fear or other emotional disturbance raises individual causation questions and thus is not capable of class-wide determination."  (5/17/05 Order at 7)  It follows that, in determining trespass and nuisance liability and damages, the jury may not consider evidence relating to "[t]he generic causation question of whether Defendants' activities and the conditions resulting from them were capable of causing Class members to suffer fear, anxiety or other mental or emotional discomfort."  *Id.*  There is no effective method of ensuring that the jury does not consider evidence relating to generic emotional distress in determining trespass and nuisance liability and damages. The instructions to the jury do not solve this problem, because such instructions, at the least, would have to identify all of the evidence (including testimony and exhibits) relating to the issue of generic emotional distress, as well as all of the argument relating to the issue of generic emotional distress.  Any such identification is doomed to failure, *inter alia*, by the sheer mass of evidence to which it would relate.  Moreover, it would be impossible for the jury to completely disregard such evidence in deciding trespass and nuisance liability and damages.  ***Third***, plaintiffs have pointed to no precedent for a class-wide trial on the issue of generic emotional distress.  ***Fourth***, plaintiffs have cited no Colorado authority for the proposition that generic emotional distress can give rise to a nuisance.

weren't doing things the way they were supposed to be doing things out there.")) Accordingly, defendants are entitled to judgment as a matter of law on plaintiffs' partial claim that defendants' conduct was capable of causing emotional distress.

### C.   Plaintiffs Cannot Recover for Emotional Distress Without Demonstrating That Their Fears Were Grounded in Science.

Even if the Court were to reject defendants' position that defendants are entitled to judgment as a matter of law on the generic emotional distress claim as the jury instructions are currently structured, the Court should reconsider its prior rulings and instructions on the generic emotional distress issue.[51] In particular, the Court should reconsider the following instruction:

> In answering this question [pertaining to generic emotional distress], you should know that Plaintiffs do not need to show that any actual or threatened future con- tamination from Rocky Flats poses an actual or verifiable health risk. An individ- ual Class members' [sic] fear, anxiety or mental discomfort can also be based on concerns that may be without scientific foundation or other support in fact. (In- struction 3.28)

This instruction is contrary to Colorado and Tenth Circuit law. The Tenth Circuit has predicted that the Colorado Supreme Court would rule that unscientific fears cannot give rise to recovery under Colorado law, even if those fears are "normal" for the community. *See Boughton v. Cotter Corp.*, 65 F.3d 823, 831-33 & 832 n.13 (10th Cir. 1995) (predicting that Colorado Supreme Court would *not* follow Section 821F, under which, "[i]n determining whether the harm would be suffered by a normal member of the community, fears and other mental reactions common to the community are to be taken into account, even though they may be without

---

[51] Defendants recognize that the Court has previously rejected their position on this issue and, if the Court does not wish to reconsider this question, include this argument for the purpose of preserving it.

scientific foundation or other support in fact," and that Colorado Supreme Court would not allow "compensation for wholly unfounded fears")  Accordingly, defendants respectfully request that the Court reconsider its prior ruling, and hold that unscientific fears are not actionable.  Were the Court to reconsider this decision, such a ruling would constitute yet another basis for judgment as a matter of law on the generic emotional distress issue, because plaintiffs have introduced no evidence whatsoever of any reasonable fears that are consistent with science.  Nor **could** plaintiffs introduce such evidence.  Plaintiffs' own exposure and risk expert, Dr. Goble, has testified that any class-wide exposures were so low that "regulatory agencies would not have been concerned" about them.  (Goble testimony, 11/2/05 Tr. 3661)  Defendants' risk experts agree that any fears plaintiffs may have had are unreasonable and not grounded in science. (Raabe testimony, 12/9/05 Tr. 7339-40 ("The doses we're talking about in this case are so trivial they won't have any effect one way or another.  They're small, tiny fraction of what we get every week.  There is no way you can assign a risk or a benefit to such a small dose.  No way."); *see also id.* at Tr. 7270-71; Till testimony, 12/15/05 Tr. 8273-81, 8282-83, 12/16/05 Tr. 8529-31; DX1187; DX1779a; DX1843; DX1855; DX1856)

The class representatives have admitted that their claims arise from the FBI raid. (Schierkolk testimony, 10/20/05 Tr. 1902; Babb testimony, 10/20/05 Tr. 1961; Cook testimony, 10/21/05 Tr. 2040-41, 2057; S. Bartlett testimony, 10/14/05 Tr. 919-20)  Yet plaintiffs cannot base a claim for nuisance on emotional distress arising from the FBI raid under the Tenth Circuit's ruling in *Boughton*.  As an initial matter, the FBI raid is unrelated to plaintiffs' trespass and nuisance claims, because it did not relate to offsite contamination or a health risk from that contamination.  (*E.g.,* Holeman testimony, 10/17/05 Tr. 1288-89, 1296, 10/18/05 Tr. 1333-34)

Moreover, the FBI raid allegations turned out to be false.  (Watkins testimony, Dep. Design. at 155-57, 161; Holeman testimony, 10/17/05 Tr. 1294-95, 10/18/05 Tr. 1325; P604; *see also* Norton testimony, 12/14/05 Tr. 7951-53 ("we did not find, however, the kind of deceptive conduct we thought may have occurred"))  Defendants are not liable for emotional distress resulting from false allegations.  *See Boughton*, 65 F.3d at 831-33 & 832 n.13 ("unfounded fears" cannot give rise to recovery).  Thus, defendants respectfully request that the Court grant judgment as a matter of law on plaintiffs' generic emotional distress "partial claims," because plaintiffs have failed to introduce any evidence of fears by class members that are grounded in scientific fact.

## VII.   DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' CLAIMS BECAUSE PLAINTIFFS HAVE NOT EXPERIENCED RECOVERABLE DAMAGES.

Defendants should also be granted judgment as a matter of law on plaintiffs' claims for damages.  Furthermore, because plaintiffs must show damages in order to establish nuisance liability, *see* Section III.D, *supra*, plaintiffs' failure in this regard is also fatal to plaintiffs' nuisance claims.

**A.** **As an Initial Matter, Plaintiffs' Damages Evidence is Not Sufficiently Reliable To Be Considered by the Jury and Should be Stricken in its Entirety.[52]**

It is clear at the close of the evidence that plaintiffs' proffered damages evidence is not sufficiently reliable to be considered by the jury.  Under these circumstances, judgment for defendants is appropriate as a matter of law.

Mr. Hunsperger's analysis setting forth alleged diminution in value due to Rocky Flats is seriously flawed to the point that it is unreliable, as pointed out by various defense experts.  Mr. Dorchester explained that Mr. Hunsperger was obligated to follow appraisal standards (including Uniform Standards of Professional Appraisal Practice ("USPAP standards")) in offering his opinion of value but failed to do so.  (Dorchester testimony, 1/10/06 Tr. 9460-61, 9494, 9496-98, 1/10/06 Tr. 9503-05, 9515-17, 9520-21, 9523-27, 9529-32, 9535-36, 9686-87)  For instance, USPAP does not recognize as proper techniques the analogous case studies, opinion surveys, spatial analysis based on regression, vacant land area comparison, or market interviews on which Mr. Hunsperger bases his analysis.  Other defense experts also explained why these methods are not sound bases for Mr. Hunsperger's diminution opinion.  And Mr. Hunsperger improperly disregarded limitations set by experts upon whose data he relied in violation of appraisal standards.  (*Id*. at 9523-24)  Concerning each of Hunsperger's five "approaches," the evidence shows as follows.

---

[52]  *See further* defendants' *Daubert* motions to exclude the testimony of plaintiffs' experts, including defendants' renewed motion to strike plaintiffs' expert testimony filed January 17, 2006.  (*See* Defs.' Mot. To Strike Selected Test. of Hunsperger, Radke and Cochran)  Defendants hereby incorporate those motions in their entirety.  Defendants acknowledge that these motions have been denied but include this argument for the purpose of preserving their record.

*First*, the evidence shows that ***analogous case studies*** cannot be appropriately used under appraisal standards where market sales data exists.  (*Id.* at 9529-30; *see also id.* at 9523-24, 9665-67; d'Arge testimony, 01/9/06 Tr. 9297-98)  Mr. Hunsperger had no basis or statistical scheme that would allow him to extrapolate to this case from the other cases.  (Wecker testimony,  01/11/06 Tr. 9764-66, 9771)  In addition, the analogous cases studied each fail to meet various standards for comparison, such as equivalence, scientific soundness (peer review), germaneness, and richness in detail.  (d'Arge testimony, 01/9/06 Tr. 9346-49)  Not a single analogous case met all standards.  (*Id.* at 9350)  Given these and other problems, Dr. d'Arge concluded that "the case studies that were selected by Hunsperger did not provide any real information with regard to property losses or diminution."  (*Id.* at 9353; *see also id.* at 9359)[53]

*Second*, ***opinion surveys*** cannot properly be used under appraisal standards where market sales data exists.  (Dorchester testimony, 01/10/06 Tr. 9529-30; *see also id.* at 9520-21, 9667; d'Arge testimony, 01/9/06 Tr. 9297 ("when there are market prices, and accurate market price data is available, there is absolutely no reason for a contingent valuation survey") & 9340)  The evidence also shows that the main survey relied upon by Mr. Hunsperger, the Flynn and Slovic survey, was itself unreliable for its failure to conform to prevailing environmental economics standards.  (d'Arge testimony, 01/9/06 Tr. 9303-05)  Among other things, Drs. Flynn and Slovic failed to "demonstrate . . . beyond a doubt that the respondent in the survey fully understood the economic commodity and the scenario being proposed."  (*Id.* at 9305)  The interviews were too complex to be done (as they were) over the telephone; yet, the survey method did not provide for

---

[53]  Plaintiffs' own expert, Dr. Flynn, concedes that analogous case studies cannot be used to measure loss.  (*See* Dorchester testimony, 01/10/06 Tr. at 9358-59)

any checks on the understanding levels of the participants.  (*Id.* at 9306-07, 9316-17)  The survey population also was flawed in many respects:  the screening questions did not identify the relevant population and were not checked for accuracy, (*Id.*. at 9312, 9318); individuals from Arvada and Westminister were improperly excluded from the sample, (*Id.* at 9318-19, 9323-24 & 9337); and "any individual on the valuation survey, any respondent who thought that living near Rocky Flats on balance was a positive experience [was] automatically excluded from consideration," (*Id.* at 9324).  The net effect was to take out the people best qualified to answer the questions posed and improperly bias the results.  (*Id.* at 9337 & 9324)  Furthermore, queuing improperly put questions about "nuclear" weapons before questions about valuation.  (*Id.* at 9320-21)  There was no check for bias and pretesting results were not available (*id.* at 9321-22).  The discount levels were picked out of thin air and used to bias the results.  (*Id.* at 9326-28 & 9336-37)  Techniques of framing and sequencing were used to improperly bias the results.  (*Id.* at 9336)  The list goes on and on, in total, rendering the survey (and Hunsperger's analysis) unreliable to show any alleged diminution.  (*Id.* at 9340-41 (the Flynn and Slovic survey "failed at least four out of the five guidelines or rules that either they must be fulfilled individually, each one, or the survey is deemed as unreliable from a scientific standpoint") & 9341 (survey failed 75% of NOAA guidelines; "[w]hen it does not satisfy four of the five essential rules and fails on 75 percent of the general guidelines, ***I think there's only one conclusion, and that is that the survey is unreliable for looking at property value losses***"))  At bottom, the survey was "a waste of resources.  It's meaningless."  (*Id.* at 9345)

What is more, Mr. Hunsperger also made fundamental errors in attempting to translate Flynn and Slovic's survey results into a calculation of loss of value, including failing to count

certain numbers that would have impacted his results, randomly assigning values not stated by survey participants, and overstating the number of people who did not want to buy due to Rocky Flats.  (Wecker testimony, 01/11/06 Tr. 9767-71)[54]  The end result is Hunsperger's attempt to attribute diminution to Rocky Flats is "[m]istaken and in conflict with what the [survey] data actually shows."  (*Id.* at 9771)

*Third,* Mr. Hunsperger's use of Dr. Radke's regression, an unvalidated model, did not comply with appraisal standards.  (*Id.* at 9531-32; *see also id. at* 9523-24)  And the evidence demonstrated that Dr. Radke's regression analysis itself – designed to test the difference between the class area and a control area before and after the 1989 FBI raid[55] –  fails to conform to basic statistical principles, contains fundamental errors, and is otherwise unreliable.  Both Drs. Wecker and McFadden explained that Dr. Radke improperly applied factor analysis in doing his regression, through which he combined various factors and discarded some, which improperly exaggerated the effect of remaining variables (such as proximity to Rocky Flats).  (*See* Wecker

---

[54]  Plaintiffs' own expert who helped design the survey, Dr. Slovic, does not believe that the survey data can properly be used for the purposes for which Hunsperger used the data (*i.e.*, measuring loss).  (*See* Hunsperger testimony, 12/7/05 Tr. 6826 (Q. ". . . Dr. Slovic does not believe that the data that he gathers -- gathered can be used for the purpose to which you put them?  A. Yes."); *see further* d'Arge testimony, 01/9/06 Tr. 9338 ("[E]conomics has recognized this for a long time, that people in responding to telephone or other kinds of surveys will state that they will do things or they won't do things or they will pay something in these hypothetical situations that, in fact, they won't carry out.  And so in economics, therefore, the best and most accurate estimate of actual loss is the market price change if it exists.")  Hunsperger's use of the survey data also failed to take into account the fact that there would be no discount so long as there are sufficient buyers who are not influenced by Rocky Flats.  (d'Arge testimony, 01/9/06 Tr. 9344)

[55] Neither Mr. Hunsperger nor Dr. Radke set forth **any** data showing a statistically significant difference between the class and any control group prior to 1988.  (*E.g.,* Wecker testimony, 01/11/06 Tr. 9795-98)

testimony, 01/11/06 Tr. 9780-84; McFadden testimony, 01/12/06 Tr. 9951-55)  They further testified that Dr. Radke improperly used a weighting technique with no statistical justification for doing so and that the weighting improperly altered his results.  (Wecker testimony, 01/11/06 Tr. 9785-87 ("it's a medicine that is not needed, and it's positively harmful"); McFadden testimony, 01/12/06 Tr. 9942-43, 9946-51)  When these errors are corrected and the Radke model re-run, there are no statistically significant results, including any year-to-year differences.  (Wecker testimony, 01/11/06 Tr. 9794-97; McFadden testimony, 01/12/06 Tr. 9937-38, 9956-58, 9963, 9966-67)  Plus, Dr. Radke's data was questionable, and his failure to keep all of his work and/or replicate it raises questions about its validity.  (McFadden testimony, 01/12/06 Tr. 9958-59, 9972-74, 9976-77, 9979)  These problems call into question the reliability of both Dr. Radke's work and Mr. Hunsperger's conclusions, which are based in part on the Radke regression.  (*E.g.,* McFadden testimony, 01/12/06 Tr. 9979-80 ("given the lack of documentation and given the statistical flaws, my conclusion is that his original analysis is not sufficiently reliable so you should depend on it for judging losses or damages"))

*Fourth*, concerning Mr. Hunsperger's ***vacant land analysis,*** Mr. Hunsperger did not fol-low standards, because he lumped property together regardless of differences such as how the property is zoned.  (Dorchester testimony, 1/10/06 Tr. 9530; *see also* Wecker testimony, 01/11/06 Tr. 9762-65)  In addition, Hunsperger's vacant land results are not statistically reliable.  (Wecker testimony, 01/11/06 Tr. 9771)  Further, Mr. Hunsperger testified that he conducted no statistical analysis of the vacant land data, looked at raw data alone, and did not use any specific methodology in coming up with his alleged $21 million loss.  (*See* Hunsperger testimony,

12/7/05 Tr. 6831 ("[T]here was no statistical analysis because I used 100 percent of the sales"), 6832 ("The way I arrived at 30 percent --- the only piece of paper that I have is the report."))

*Fifth*, Mr. Hunsperger himself concedes that **market participant interviews** are not a proper basis for estimating value under the standards.  (*See* Dorchester testimony, 01/10/06 Tr. 9665)

Simply put, Mr. Hunsperger's "judgment" cannot substitute as reliable diminution of value evidence in lieu of an appraisal that follows appraisal standards.  (*See* Dorchester testimony, 01/10/06 Tr. 9496-97 ("to be able to complete a valuation, for example, an appraisal, it's necessary to do a series of analyses and follow a series of steps that are part of USPAP and a part of the generally accepted principles rather than to simply use judgment . . . ."), 9535 ("The standards require that the appraiser develop an opinion of value from data from experts, if they're involved, but not to simply have it be a number that is a judgment number"), 9686 (Mr. Hunsperger's use of judgment "seriously detracts from his reliability"))  Indeed, the evidence demonstrates that Mr. Hunsperger's use of his own judgment in this case to determine an alleged diminution is precisely what the appraisal standards were designed to avoid.  (Dorchester testimony, 01/10/06 Tr. 9535-36)

Plaintiffs set forth no contradictory evidence to the effect that Mr. Hunsperger actually followed any of these standards.  If Mr. Hunsperger's damages analysis and the underlying data (*e.g.* the Radke regression) is stricken, judgment for defendants is appropriate.

**B.    Even if Plaintiffs' Damages Evidence is Not Stricken in its Entirety, Plaintiffs Have Not Shown Damages Attributable to Defendants' Actionable Conduct: First Principles.**

In order to be actionable, any damages claimed by plaintiffs must be proximately caused by defendants' actionable conduct — that is, a trespass (contamination) or nuisance (health risk) committed by defendants.[56]  (Instruction No. 3.24) ("[Y]ou must follow my directions in Instruction No. 3.22 to award damages for diminution in value you find was caused by any trespass or nuisance you find Dow or Rockwell or both of them committed.")  While plaintiffs can recover damages proximately caused by a trespass or nuisance created by defendants, they cannot recover for:  (1) damages caused by proximity to Rocky Flats; or (2) damages caused by negative public perceptions that do not result from a trespass or nuisance that has been proved by plaintiffs.

*First*, as reflected in this Court's instructions, plaintiffs may not recover damages caused by the proximity of class members' properties to Rocky Flats.  (Instruction No. 3.24) ("In determining any actual damages to be awarded in this case, you should not consider or award any diminution in value caused solely by the proximity of the Class Area to Rocky Flats.")[57]

---

[56] *See*, *e.g.*, *Westric Battery Co. v. Standard Elec. Co.*, 482 F.2d 1307, 1318 (10th Cir. 1973) (it is "only the damage flowing legally from the defendant's misdeeds which counts").

[57] *See also* Sen. Rep. No. 296, 85th Cong., 1st Sess. at 16 (1957) (Price Anderson Act legislative history) ("It is not the intention of the committee to have the damage to property which is included in the term 'nuclear incident' include the diminution in value or other similar causes of action which may occur, namely, from the location of an atomic energy activity at a particular site."); *Westric Battery*, 482 F.2d at 1318; *Staley v. Sagel*, 841 P.2d 379, 382 (Colo. Ct. App. 1992) ("[Plaintiffs] are not entitled to recover for any claimed diminution in their property's value caused by any of defendant's actions that do not constitute a nuisance or other actionable wrong.").

***Second***, plaintiffs cannot recover for damages caused by the public perception of Rocky Flats (*i.e.*, "stigma"), unless that public perception directly concerns the trespass (contamination) or nuisance (past or future health risk).  Moreover, any public perception of contamination or health risk must be based on what plaintiffs have proved about the contamination or health risk. For example, if a newspaper article stated that Rocky Flats was a health risk that regulatory agencies would be concerned about, but plaintiffs have not proved that Rocky Flats is a health risk that regulatory agencies would be concerned about (*see* Goble testimony, 11/2/05 Tr. 3661), then any damages resulting from such an article **would not be actionable**.  *See*, *e.g.*, *Boughton*, 65 F.3d 823, 831-33 & 832 n.13 (predicting that Colorado Supreme Court would not adopt Restatement Section 821F, and would not allow "compensation for wholly unfounded fears"). Among other barriers to recovery, such damages would be too "remote" from the alleged conduct to permit recovery.  *See Holmes v. Sec. Invest. Prot. Corp.*, 503 U.S. 258, 271 (1992) (in civil RICO action, "the link is too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers."); *Roberts v. TXU Energy Retail Co.*, 171 S.W.3d 901, 903 (Tex. App. 2005) ("At some point in time in the causal chain, the defendant's conduct may be too remotely connected with the plaintiff's injury to constitute legal causation.")

### C.   Plaintiffs' Damages Evidence is Insufficient Because It Relates to Losses Suffered as a Result of Non-Actionable Proximity.

Here, plaintiffs have not proved any damages attributable to any trespass (contamination) or nuisance (health risk).  Rather, plaintiffs' proffered regression expert,[58] Dr. Radke, admitted that he measured damages attributable to proximity to Rocky Flats.  (Radke testimony, 10/26/05 Tr. 2753 ("I measured proximity."))  Dr. Radke conceded that he did not measure damages caused by either defendant's conduct.  (*Id.* at 2752)[59]  In fact, Dr. Radke testified that the "loss" he measured could have occurred ***regardless of how well the plant was run by the defendants****.* (*Id.* at 2752-53)  Dr. Radke's failure to segregate any diminution in value attributable to defendants' allegedly actionable conduct (trespass and nuisance) from any diminution in value attributable to non-actionable conduct (*e.g.*, "people just didn't like the idea of living near a weapons plant") is fatal to plaintiffs' damages claims.[60]

---

[58] Defendants incorporate by reference their *Daubert* motions to exclude the testimony of plaintiffs' experts, including defendants' renewed motion to strike plaintiffs' expert testimony filed January 17, 2006.  (*See* Defs.' Mot. To Strike Selected Test. of Hunsperger, Radke and Cochran)  Defendants acknowledge that these motions have been denied but include this argument for the purpose of preserving their record.

[59] Defense expert Dr. Kenneth Wise criticizes Dr. Radke for failing to focus on the conduct of defendants and instead focusing only on proximity.  (Wise testimony, 1/5/06 Tr. 9023-26 (If you wanted to focus on defendants' conduct to determine if that had an impact on property value, you "could not tease that out" of Dr. Radke's proximity analysis))

[60] *See, e.g., Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415-16 (7th Cir. 1992) ("For years we have been saying, without much visible effect, that people who want damages have to prove them, using methodologies that need not be intellectually sophisticated but must not insult the intelligence. . . . The expert should have tried to separate the damages that resulted from the lawful entry of a powerful competitor — Nordisco — from the damages that resulted from the particular forms of misconduct allegedly committed by that competitor."); *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1372 (9th Cir. 1992) ("[The expert] study failed to segregate the losses, if any, caused by acts which were not antitrust violations from those that

(Continued…)

Like Dr. Radke, Drs. Flynn and Slovic have failed to segregate impact attributable to defendants' actionable conduct from impact attributable to non-actionable factors such as proximity.  In studying public attitudes about Rocky Flats, they did not attempt to distinguish between attitudes stemming from defendants' wrongful conduct and attitudes stemming from conduct that was reported but did not actually happen.  (Slovic testimony, 11/7/05 Tr. 4305-06, 4308-09, 4311-12)  Neither did they attempt to discern between any impact resulting from the FBI raid and impact from other factors.  (Flynn testimony, Dep. Design. 102-03, 198)  They did not even attempt to identify and distinguish public concern over the mere fact that Rocky Flats is a nuclear facility.  (Slovic testimony, 11/7/05 Tr. 4317-18)

Mr. Hunsperger likewise failed to measure damages caused by defendants' conduct.  First, Mr. Hunsperger did not even attempt to discern whether the "stigma" purportedly attached to class properties was caused by defendants.  Mr. Hunsperger testified at trial that stigma caused by the FBI raid or just the influence of Rocky Flats was all "one ball of wax" and could not be distinguished.  (Hunsperger testimony, 12/6/05 Tr. 6683, 12/7/05 Tr. 6788 (for MLS analysis, "we just looked at those that were closer to Rocky Flats for indications of stigma."))  Further, Mr. Hunsperger testified that he did not even know what Dow or Rockwell did when it was at the plant:

---

were. . . . The question remaining is whether the district court was nevertheless required to allow Vernon to go the jury with its erroneous approach or to give it still another opportunity to refine a study that, according to Vernon, could not be refined.  We think not.").  (*See also* Defs.' Am. Br. in Supp. of Their Mot. to Exclude Expert Witness Test. re Damages, filed 6/21/05, at 9–11 (citing additional authority))

Q.      Then it ought to be pretty simple to answer my question.  My question is very, very simple.  Do you know what Dow did during the period of time it was at the plant, yes or no?

A.      Of course not.

(Hunsperger testimony, 12/6/05 Tr. 6687)

Likewise, Mr. Hunsperger testified that he did not "specifically" know what Rockwell did.  (*Id.* at 6687-88)  Indeed, Mr. Hunsperger testified that stigma could be associated based upon proximity to the plant, even without any evidence of contamination:

Q.      What this stands for is the proposition that you can have stigma associated with proximity to the plant even without evidence of actual contamination, right?

A.      Without my evidence of contamination, you can, sure.

(Hunsperger testimony, 12/6/05 Tr. 6672)

Because Mr. Hunsperger focused solely on proximity, and made no attempt to tie his damages calculation to any actionable conduct by defendants, his analysis is not sufficient to withstand judgment as a matter of law.

**D.      Plaintiffs Cannot Recover Stigma Damages Where the Stigma Does Not Result From a Proven Trespass or Nuisance.**

The concept of "stigma" has taken a prominent role in plaintiffs' case.  In their opening arguments, plaintiffs' counsel alleged that "Rocky Flats created a stigma" (Pls.' Opening, 10/11/05 Tr.  489), and promised that "[w]e will talk all about stigma, and what it means, and what it has to do with this case" (*Id.* at 10/12/05 Tr. 707).  The jury has since heard extensive testimony on stigma from plaintiffs' expert Dr. Paul Slovic, who discussed the meaning and causes of stigma.  (Slovic testimony, 11/7/05 Tr. 4244-46)  According to Dr. Slovic, "nuclear technologies are one of the types of technologies that are stigmatized."  (*Id.* at 4246)  Mr. Hunsperger defines "stigma" as a set of risks that are distinguished from "real or scientifically

quantifiable risks," but rather are risks that are "perceived." (Hunsperger testimony, 12/5/05 Tr. 6415)

As defendants have previously argued, plaintiffs should not be permitted to recover any stigma-based damages.  *See* Defs.' Combined Mots. for Summ. J. and Decertification of the Classes, filed December 9, 1996.  Although defendants renew that argument here, defendants recognize that the Court has rejected defendants' position that stigma damages are not recoverable.

However, even if stigma damages were recoverable in this action, any effort to prove stigma damages must meet two tests:  (1) the stigma (negative public perception) must arise from defendants' actionable conduct — either conduct that caused a trespass (contamination) or conduct that caused a nuisance (past or future health risk); and (2) the stigma must arise from facts that have been proved to be true by plaintiffs (*e.g.*, plaintiffs cannot seek damages from a newspaper article reporting "X" if plaintiffs have not proved that "X" is true).

Here, plaintiffs have failed to show damages resulting from any stigma triggered by any trespass (contamination) or nuisance (health risk).  Rather, plaintiffs claim that their losses stem from the FBI raid.  (*E.g.,* Whalen testimony, 11/21/05 Tr. 5955 (the raid affected how she viewed her property) & 5938-39 (raid affected use and enjoyment); Schierkolk testimony, 10/20/05 Tr. 1902 (could not sell property after raid); Babb testimony, 10/20/05 Tr. 1961 (raid affected her ability to sell); Cook testimony, 10/21/05 Tr. 2040-41 (FBI raid made her give up on her property), 2055-56 (testified at her deposition that the only claim she was making was based on the FBI raid); S. Bartlett testimony, 10/14/05 Tr. 920-922 (raid had a tremendous impact on ability to sell her home); Radke testimony, 10/26/05 Tr. 2676 ("I wanted to measure — could I

measure the impact of the raid and what it had—did it have any impact at all on property value.")) But the FBI raid related to onsite conduct that has not been proven to have anything to do with offsite contamination (trespass) or health risk (nuisance). (Holeman testimony, 10/18/05 Tr. 1333-34; *see also* Watkins testimony, Dep. Design. at 159-60, 167-69) Except for allegations relating to onsite conduct about certain permitting processes, the FBI raid allegations were ultimately shown to be false. (*E.g.,* Holeman testimony, 10/17/05 Tr. 1292-96 (Holeman was "dubious" of claims FBI was making when they went in because knew some could not be true); Watkins testimony, Dep. Design. at 155-57, 161 (FBI went in for the wrong reason); P604; P736; *see also* Norton testimony, 12/14/05 Tr. 7951-53 ("we did not find the kind of deceptive conduct we thought may have occurred"), 7958-60 ("we didn't find the serious public health risks we thought were there"); *see also* Norton testimony, 12/14/05 Tr. 7940, 7944-47, 7965-67) Because the FBI raid did not stem from any conduct proven by plaintiffs that could even conceivably have resulted in a trespass or nuisance, plaintiffs may not recover any stigma damages attributable to the FBI raid.

### E.  Plaintiffs Have Not Shown Damages Suffered by the Class.

Another fundamental flaw in plaintiffs' damages proof — which independently requires judgment as a matter of law on plaintiffs' damages claims — is that plaintiffs have failed to prove any damages experienced *by the class*, which is defined as individuals who owned property in the class area as of June 7, 1989. *See Cook VIII*, 181 F.R.D. at 476 n.3.

Plaintiffs' experts measure the value of ***properties*** within the class area within each year from 1988 to 1995. (*See* DX1085, Radke Chart) However, plaintiffs' experts do not measure whether a diminution in value was experienced by any ***class members*** as a result of Rocky Flats.

82

(*See* Wise testimony, 1/5/06 Tr. 9073)  The class definition requires only that members own their properties as of June 7, 1989.  It does not impose any limits as to how far before June 7, 1989 class members bought their properties, or as to how long after June 7, 1989 class members sold their properties (if at all).  *See Cook VIII*, 181 F.R.D. at 476 n.3.  Accordingly, thousands of class members purchased their properties before 1988 (the first year analyzed by Radke/Hunsperger), and thousands more sold their properties after 1995 (the last year analyzed by Radke/Hunsperger).

Because Dr. Radke only studied the period from 1988-1995 — and found that there was a pre-existing difference before 1989 between class property values and Denver metro area property values (*see* DX1085, Radke Chart) — he admitted that he had not determined whether anyone (much less anyone in the class) had lost money as a result of Rocky Flats:

> Q.   You've not actually determined whether anybody lost money in this marketplace?
> A.   Correct, I haven't done that study.
> Q.   Right.  In order to do that study you would have to go back and find out for the people that owned in '88, '89, '90, etc., you have to find out when they bought, at what price they bought, and when they sold?
> A.   Correct.
>
> * * *
>
> Q.   Just to be clear, you haven't done that, right?
> A.   That wasn't possible.

(Radke 10/26/05 Tr. 2812, 2814-15)

To illustrate this point, thousands of class members sold their properties after 1995 (or still have not sold their properties).  Because plaintiffs' experts did not measure a diminution in value after 1995, plaintiffs' experts cannot say whether the thousands of class members who sold their properties after 1995 experienced a *loss* caused by Rocky Flats — that is, an ***increase*** in the

"Rocky Flats discount" between the date they purchased their property and the date they sold their property.  In fact, Dr. Radke's own results show the "Rocky Flats discount" decreasing between 1992 (when the discount was 9.18%) and 1995 (when the discount was 5.45%).  Hypothetically, even if the "Rocky Flats discount" were the same in 1996 as measured by Radke and Hunsperger in 1995 (5.45%), then a class member who purchased in 1988 (a year for which Radke and Hunsperger measure the "Rocky Flats discount" as 7.68%) and sold in 1996 would have suffered no loss attributable to Rocky Flats (that is, the "Rocky Flats discount" would have *decreased* over the time the class member owned the property).  In fact, because Radke and Hunsperger have not measured the "Rocky Flats discount" for 1996, they have no evidence of what loss (if any) was suffered by class members who sold in that year.

The same defect in plaintiffs' proof exists with respect to the thousands of class members who purchased their properties before 1988.  Because plaintiffs' experts did not measure a diminution in value before 1988, plaintiffs' experts cannot say whether the thousands of class members who purchased their properties before 1988 purchased at a price that already reflected a pre-existing "discount" attributable to Rocky Flats.  *See Ario v. Metro. Airports Comm'n*, 367 N.W.2d 509, 515 (Minn. 1985) ("If, for example, plaintiff buys a Zone 1 house in 1980, he presumably buys at a market price already discounted for aircraft noise existing at that time.  Plaintiff has no diminution in market value of his property unless he shows that the noise level has increased since 1980 and such increase has measurably depressed the value of his property.").  Thus, plaintiffs' experts cannot say whether class members who purchased their properties before 1988 experienced a *loss* caused by Rocky Flats — that is, an *increase* in the "Rocky Flats discount" between the date they purchased their property and the date they sold their

property.[61]   (*See further* Defs.' Response to Plfs.' Mot. For J'ment as a Matter of Law filed 1/17/06, which defendants incorporate by reference.)

Because plaintiffs must prove their claims on a class-wide basis, the failure of plaintiffs' experts to measure a loss either for class members who purchased before 1988 or class members who sold after 1995 is independently fatal to plaintiffs' claims.  Plaintiffs cannot plausibly claim that the experience of class members who both bought after 1988 and sold before 1995 is a fair representation of the gains or losses of the class as a whole.  But plaintiffs' experts have also failed to prove a loss even for class members who happened to both purchase and sell within the period studied by Radke and Hunsperger (1988-1995).  For example, a class member who purchased in 1988 and sold in 1995 would have experienced no net loss attributable to Rocky Flats (given that she purchased at a "Rocky Flats discount" of 7.68% and sold at a "Rocky Flats

---

[61] To the extent the Court has ruled that the "prior market discount" argument is an affirmative defense with respect to which defendants bear the burden of demonstrating a pre-existing discount, defendants preserve their disagreement with the Court's ruling.  The plaintiff — not the defendant — bears the burden of proving both the fact and the amount of damages.  *See Buckley Powder Co. v. State*, 70 P.3d 547, 563 (Colo. App. 2002).  Unless a plaintiff shows that the alleged "Rocky Flats discount" was greater when he or she sold the property than when he or she purchased the property, not even the fact of damages has been proved.  Nor is the so-called prior market discount defense an "affirmative defense."   Plaintiffs have cited no cases from any jurisdiction holding that evidence as to the price at which a plaintiff purchased his or her property is an affirmative defense.   According to Wright & Miller, an affirmative defense "encompasses two types of defensive allegations: those that admit the allegations of the complaint but suggest some other reason why there is no right of recovery, and those that concern allegations outside of the plaintiff's prima facie case that the defendant therefore cannot raise by a simple denial in the answer."  Wright & Miller, 5 Fed. Prac. & Proc. Civ. 3d § 1271.  Defendants do not "admit the allegations of the complaint" by arguing for a prior market discount – to the contrary, the existence of a prior market discount negates the allegations of the complaint because plaintiffs have not suffered any damages.  For the same reason, a prior market discount does not concern "allegations outside of the plaintiff's prima facie case" because a plaintiff is required to plead and prove damages as part of his prima facie case.

discount" of 5.45%).  In fact, Radke and Hunsperger never determined a ***between-year*** statistically significant increase in the Rocky Flats discount for any period between 1988 and 1995.[62] The failure of plaintiffs' damages expert to determine a statistically significant increase in the alleged "Rocky Flats discount" for any class member (much less for most or all class members) is dispositive of plaintiffs' claims that defendants' conduct caused damages to the class.  *See Boughton*, 65 F.3d at 835 & n. 20 (study must establish statistical significance to prove causation); *Renaud v. Martin Marietta Corp.*, 749 F. Supp. 1545, 1551 (D. Colo. 1990) (same).[63]

Moreover, even if plaintiffs' experts had shown a statistically significant increase in the alleged "Rocky Flats discount" (they have not), plaintiffs still have not shown that such an increase could be attributable to the FBI raid, much less to Dow and Rockwell's actionable conduct (especially with respect to Dow, whose last day at Rocky Flats preceded the FBI raid by 14 years).  Dr. Radke claimed that the diminution in value following the 1989 FBI raid was 2%.[64]  However, Dr. Radke could not say that the drop ***following*** the FBI raid was ***caused*** by the FBI raid, much less caused by defendants' actionable conduct:

---

[62] (Radke testimony, 10/26/05 Tr. 2810 ("The only statistical significance that you analyzed was within the data set for each year, correct?  A.  It was of statistical significance for the entire multiple regression, and then each year had its own significant value, yes.  Q.  If you wanted to you could have looked for a trend from '88 to '89 to '90 to '91 statistically, couldn't you?  A.  You could if you wanted.  That wasn't my goal."))

[63] Indeed, Dr. Wise testified that even if Hunsperger and Radke were right about the absolute difference in value between class and control properties, any such difference went back at least to 1974 (when only 3 % of class member owed their properties) because rates of appreciation after 1974 were identical for the class and control.  (Wise testimony, 1/5/06 Tr. 9072-73, DX1120; DX2074; DX2087)

[64] Dr. Radke could not say that the 2% drop following the FBI raid was statistically significant.  (Radke testimony, 10/26/05 Tr. 2809; *see also* McFadden testimony, 01/12/06 Tr. 9936-37)

Q.  The first question I am going to ask you, and put down here, is the two percent — can you say that, in fact, the two percent decline is caused by the F.B.I. raid?  Can you say that the two percent drop actually was caused by the F.B.I. raid?

A.  No.  I can only say that these are the numbers that I got, there was a devaluation, and then something occurred that year, and it was the raid at the plant, that something occurred in the area to drop the values almost two percent that year.  And it had to be in the previous two years.

Q.  Right.  All you can say is that something happened to drop the value, but you don't have the data to say that it was the F.B.I. raid, correct?

A.  Correct.

(Radke testimony, 10/26/05 Tr. 2786-87)

Because plaintiffs have failed to measure damages for the class, defendants are entitled to judgment as a matter of law on plaintiffs' damages claims.

### F.  Plaintiffs Have Not Shown Damages Attributable to the Prospect of the Continuance of Any Tortious Invasions.

As this Court has previously ruled, to recover damages in this class trial, plaintiffs must prove damages within the framework established by Section 930 of the Restatement (Second) of Torts.  *Cook IX*, 273 F. Supp. 2d at 1209-10; (5/17/05 Order at 15-16).[65]  Under Section 930, a

---

[65] Defendants preserve their position that, in order for the trespass or nuisance to be "continuing" within the meaning of Section 930, the following conditions must be met:  (1) the defendant's operational activities which give rise to the trespass or nuisance must be continuing; (2) the defendant's intent to cause a class-wide trespass or nuisance must be continuing; and (3) the resulting plutonium contamination or health risk must be continuing.  *See* Restatement (Second) of Torts Section 930 ("(1) If one causes continuing or recurrent tortious invasions on the land of another *by the maintenance of a structure or acts or operations not on the land of the other* . . .") (emphasis added); Restatement (Second) of Torts Section 930, cmt. d ("Manifestly, this element of depreciation is distinct from the loss in value brought by the actual effects of past invasions (see Comment on § 929) such as damage by floods to the soil's fertility."); Restatement (Second) of Torts Section 929, cmt. a (Section 929 (and not Section 930) applies where "future losses are *not contingent upon the continuance in the future of the defendant's wrongdoing*, and hence the result follows regardless of whether the owner can recover in advance for the

(Continued…)

plaintiff may recover damages caused by "diminution in the value of the land caused by the prospect of the continuance of the invasion."  Restatement § 930.  Accordingly, the Court has ruled that plaintiffs may recover "the average percentage diminution in property value" that was "*caused by the prospect* of the alleged trespass and/or nuisance (if proved by Plaintiffs) ***continuing into the future***, measured at the time when the injurious situation became complete and comparatively enduring."  (5/17/05 Order at 15-16 (emphasis added))

Damages caused by the continuing effects of prior invasions — such as the continuing impact of past contamination — are not recoverable under Section 930.  Restatement § 930 cmt. d ("Manifestly, this element of depreciation is distinct from the loss in value brought by the ***actual effects of past invasions*** (see Comment on § 929) such as damage by floods to the soil's fertility.") (emphasis added)[66]  Only damages arising from the prospect of ***future invasions*** (*i.e.*, future contamination or a future health risk) is recoverable under this Section.  *Id.*

Plaintiffs have failed to introduce sufficient evidence of damages attributable to "the prospect of the continuance of the invasions" to withstand a motion for judgment as a matter of law.  As an initial matter, plaintiffs have failed to produce evidence of "continuing invasions" on a classwide basis.[67]  As shown above, plaintiffs' failure of proof exists regardless of whether the

---

prospective harm of future operations of the cement plant. This is a distinct question that is dealt with in § 930") (emphasis added).

[66] To the extent that the Court has ruled that the continuing effects of past invasions are recoverable under Section 930, defendants disagree with that ruling as being contrary to Section 930. *See* Restatement § 930 cmt. d.

[67] Defendants recognize that the Court has ruled that the continued presence of plutonium on plaintiffs' properties would constitute a continuing invasion, but respectfully disagree with the

(Continued…)

"continuing invasions" are viewed as "continuing plutonium contamination or a "continuing health risk."

With respect to "continuing contamination," the vast majority of the development in the class area took place after 1970 — by which time 99.9% of any Rocky Flats releases had already occurred.   (DX454, ATSDR 5/13/05 report, at 1-2 ("Though Rocky Flats released plutonium to the air throughout its history, the overwhelming majority (> 99.9%) of plutonium emissions occurred between 1953 and 1969."); Till testimony, 12/15/05 Tr. 8241, 8264-65 (after 1969, exposures dropped significantly; all major releases are prior to 1971);  DV1, Till video ("the overwhelming majority of class members moved into the class area in the 1970s and 1980s, when any risks from Rocky Flats were even lower than the risks to people living in the areas in the 1960s"); DX1137, Graphic Showing Class Members as of 1969  Plaintiffs have introduced no evidence that, given the development that took place following 1970, any contaminated soil that was present on each class property as of 1970 remained on class property.  Consequently, plaintiffs have introduced no evidence of a continuing, class-wide trespass.  Thus, from a tres-pass perspective, plaintiffs have failed to introduce class-wide evidence of a "continuance of the invasions" from which damages could be assessed under Section 930.  Nor, as described in Part III, *supra*, have plaintiffs demonstrated a "continuing nuisance" — that is, a "continuing health risk," or a "continuing threat of a future health risk."  (DX454, ATSDR 5/13/05 Report, at 56)

---

Court's ruling in that regard.  Nor is the Colorado Supreme Court's decision in *Hoery* to the contrary.  In *Hoery*, the Supreme Court followed the long-established rule that contamination is continuing where it is abatable.  *See Hoery*, 64 P.3d at 218 n.6 (stating that "contamination is not permanent" where "it is remediable or abatable").  Where, as here, contamination is not abatable, it is not continuing solely by virtue of its continued presence.

("[N]o past, current, or future public health hazard exists from exposure to off-site surface soils, even at the most contaminated locations.")

What is more, the evidence in this case demonstrates that the Rocky Flats plant has now been completely cleaned up and will be turned into a National Wildlife Refuge within the next several years.  (Blaha testimony, 01/4/06 Tr. 8687, 8786-87)  After production ceased in 1992, the site was extensively characterized and remedial plans were developed to clean up all remaining onsite contamination.  (*Id.* at 8820-23)  Over the past ten years, numerous individual sites have been cleaned up to the standards set forth by the EPA and CDPHE in the Rocky Flats Cleanup Agreement.  (*Id.* at 8656-87; DX777 Rocky Flats Cleanup Agreement)  For instance, the Solar Ponds were removed, cleaned and regraded in 2002 (Blaha testimony, 01/4/06 Tr. 8656-59; DX4090; DX4092); the spray fields were assessed and found to require no further remediation in 2003 (Blaha testimony, 01/4/06 Tr. 8663-64; DX4088; DX4089); groundwater plumes were remediated and contained (Blaha testimony, 01/4/06 Tr. 8664-65, 8680-87, 8732, 8806-07; DX4093), and all onsite soils were cleaned to the RSAL  (Blaha testimony, 01/4/06 Tr. 8709, 8713, 8715).[68]  Further, during that time period all pondcrete and saltcrete were sent offsite for disposal, all special nuclear material was shipped offsite, all TRU waste was shipped offsite, and all buildings were dismantled and sent offsite.  (*Id.* at 8669-70)  The process was completed in October of 2005 when the current site contractor certified that the physical cleanup had been completed.  (*Id.* at 8687; DX4083, KH Certification Letter)

---

[68] Dr. Till also confirmed the appropriateness of the clean up levels. (Till testimony, 12/15/05 Tr. 8290-93)

In short, because plaintiffs have failed to demonstrate "continuing invasions" (either in the form of a "continuing trespass" or a "continuing nuisance"), it follows that plaintiffs cannot prove damages attributable to "the prospect of the continuance of the invasion" under Section 930. Restatement § 930. Indeed, plaintiffs' failure to prove "continuing invasions" demonstrates that Section 930 is completely inapposite to this action. *See id.* (by its terms, applicable only if "[one] causes continuing or recurrent tortious invasions of the land of another").

In any event, even if plaintiffs could demonstrate "continuing invasions," in order to recover under Section 930, plaintiffs would still be required to demonstrate ***damages caused by*** "the prospect of the continuance of the invasion[s]." *Id.* In fact, plaintiffs have introduced no evidence of damages attributable to "invasions," much less damages attributable to "the prospect of the continuance of the invasions." Rather, plaintiffs have only introduced damages attributable to "proximity" to Rocky Flats. (*See, e.g.,* Radke testimony, 10/26/05 Tr. 2753 (Dr. Radke: "I measured proximity."); Slovic testimony, 11/7/05 Tr. 4317-18; *see also* Hunsperger testimony, 12/7/05 Tr. 6788 ("we just looked at those that were closer to Rocky Flats for indications of stigma.")) Because plaintiffs have failed to introduce any evidence of damages attributable to the "prospect of the continuance of the invasions," defendants are entitled to judgment as a matter of law on the issue of damages.

### G.  Plaintiffs Have Not Demonstrated That Any "Injurious Situation" Became Complete and Comparatively Enduring Between 1988 and 1995.

Under the Court's jury instructions, in order to recover damages, plaintiffs must prove that the injurious situation became complete and comparatively enduring between January 1, 1988 and December 30, 1995. (Instruction No. 3.22) (plaintiffs must prove that the "injurious situation became 'complete' and 'comparatively enduring' (as defined in this instruction) be-

tween January 1, 1988 and December 30 1995")  However, regardless of whether the "injurious situation" is viewed as a trespass (contamination) or nuisance (health risk), plaintiffs have failed to introduce any evidence that the injurious situation became complete and comparatively enduring in between these dates.

First, with respect to trespass, plaintiffs have introduced no evidence that the injurious situation (alleged plutonium contamination) became complete and comparatively enduring between January 1, 1988 and December 30, 1995.  According to plaintiffs' own evidence, the contamination occurred before 1970.  (*See* P1150, Budnitz 903 Pad Report at 2 ("in the 1950s and 1960s it was the Dow Rocky Flats Plant's poor waste-management practices that led to the principal release of plutonium from the 903 Area to the nearby environment around the Plant"); P1151, Budnitz Fires Report at 2 (report discusses two major fires at Rocky Flats Plant in 1957 and 1969); P149A & P939 (Krey & Hardy and Poet & Martell studies measuring contamination as of 1970))  The ATSDR Report confirms that 99.9%[69] of all releases of plutonium from Rocky Flats occurred before 1970.  (DX454, ATSDR 5/13/05 Report, at 1-2)  Defendants' experts agree.  (DV1, Till video (the releases of plutonium that contributed most significantly to offsite doses and risks occurred before 1970; "Over 99 percent of plutonium releases from Rocky Flats occurred before 1970"))  Given that it is undisputed that 99.9% of plutonium releases occurred before 1970, plaintiffs cannot show, in the case of plaintiffs' trespass claim, the "injurious

---

[69] Plaintiffs have introduced no evidence that even the 0.1% of Rocky Flats releases that occurred after 1970 traveled in the direction of the class area.

situation"[70] became complete and comparatively enduring at any date after 1970, much less during the period from 1988 to 1995.  Because plaintiffs have failed to introduce any evidence that any trespass or contamination became complete and comparatively enduring between 1988 and 1995, the Court should grant judgment as a matter of law on plaintiffs' trespass claim.

Similarly, with respect to plaintiffs' nuisance claim, plaintiffs have introduced no evidence that the "injurious situation" (a past or future health risk) became complete and comparatively enduring between 1988 and 1995.  Even according to the report of plaintiffs' risk/exposure expert Dr. Goble, the amount of exposure to people living within the class contour after 1970 was only 0.003 times the amount of exposure to people living within the class contour before 1970.[71]  (P1124, Goble Report, at 49)  Thus, even according to plaintiffs' expert evidence, any

---

[70] The "injurious situation" is the trespass or nuisance itself, not damages allegedly flowing from the trespass or nuisance.  "Damages" are a separate concept from "injury."  Restatement § 902 ("The word 'damages' is used in the Restatement of this subject in the same sense in which it is used in the Restatement of Contracts. It has reference to an award which is made to a person by a competent judicial tribunal in a proceeding at law or in equity because of a legal wrong done to him by another.  Damages flow from an injury. As stated in § 7 vol. 1, injury denotes the invasion of any legally protected interest."); *Henry v. Dow Chem. Co.*, 701 N.W.2d 684, 691 (Mich. 2005) ("plaintiffs attempt to blur the distinction between 'injury' and 'damages'"); *Goodyear v. Discala*, 849 A.2d 791, 799 (Conn. 2004) ("The concept of 'damages,' however, is distinct from the legal injury from which damages arise."); *Oklahoma City v. Hopcus*, 50 P.2d 216, 218 (Okla. 1935) ("[t]here is a clear distinction between injury and damages . . . '[t]he word 'injury' denotes the illegal act; the term 'damages' means the sum recoverable as amends for the wrong. The one is the legal wrong to be redressed, the other the scale or measure of recovery.'"); *City of North Vernon v. Voegle*, 2 N.E. 821, 824 (Ind. 1885) ("['Injury' and 'damages'] are ... words of widely different meaning .... [T]hey describe essentially different things."; *see also American Stevedores v. Porello*, 330 U.S. 446, 450, n. 6 (1947) (term "damages" connotes "a compensation in money for a loss or damage" [internal quotation marks omitted]).  Thus, whether media that appeared during the 1988-1995 period caused plaintiffs ***damages*** is irrelevant to the question of when the "***injurious*** situation" became complete and comparatively enduring.

[71] Defendants preserve the argument that Dr. Goble's expert report, like plaintiffs' other expert reports, should not have been admitted into evidence.

health risk reached its maximum extent (and thus became "complete and comparatively endur-

ing") by 1970, not during the period from 1989 to 1992.  Indeed, plaintiffs have introduced

evidence of no post-1970 event, and no post-1970 conduct by either defendant, that increased the

amount of actual or threatened health risk relative to the amount of health risk that existed as of

1970.  Accordingly, if any nuisance caused by defendants ever became complete and compara-

tively enduring, it became complete and comparatively enduring by 1970, not during the 1988-

1995 period.  In short, plaintiffs' failure to introduce evidence that the injurious situation caused

by any trespass or nuisance became complete and comparatively enduring constitutes yet another

basis for granting defendants' motion for judgment as a matter of law as to plaintiffs' damages

claim here.

## VIII. DAMAGES ARGUMENTS THAT THE COURT HAS RULED ON AND THAT DEFENDAnTS INCLUDE FOR THE PURPOSE OF PRESERVING THEIR RIGHTS.

### A. Plaintiffs Have Failed to Limit Evidence of Damages to the Back-Calculated Statute of Limitations Window (January 30, 1988 - January 30, 1990).

As discussed above, plaintiffs have failed to introduce sufficient evidence of a "continu-

ing" trespass or nuisance to withstand a motion for judgment as a matter of law.  However, if the

Court were to rule that plaintiffs had proved a continuing tort, then plaintiffs must prove that

their damages are either (i) future damages; or (ii) past damages that occurred within the "statute

of limitations period dating back from when plaintiff's complaint was filed" (that is, from

January 30, 1988 to January 30, 1990).  *Hoery*, 64 P.3d at 217 ("For continuing torts, . . . plain-

tiff's recovery is limited to the statute of limitations period dating back from when plaintiff's

complaint was filed.") (internal citations omitted); *United States v. Hess*, 194 F.3d 1164, 1177

(10th Cir. 1999) ("In trespass cases, where the statute of limitations has expired with respect to

the original trespass, but the trespass is continuing, we and other courts have calculated the limitation period back from the time the complaint was filed, rather than forward from the date of the original trespass, or where applicable, back to the reasonable discovery date."); *Walker Drug Co. v. La Sal Oil Co.*, 972 P.2d 1238, 1246 n.8 (Utah 1998) ("To recover for trespass or nuisance, a plaintiff must draw a causal connection between contamination occurring within the limitations period and a decrease in value to the affected property."); *Spanbauer v. J.R. Simplot Co.*, 685 P.2d 271, 274 (Idaho 1984) ("To recover for his injury, Spanbauer was required to prove the value of the property at the beginning of the limitation period, before the damage done within that period occurred, so that a comparison could be made between the market value of the land before the compensable damage began and the value of the land after the compensable damage occurred.  Spanbauer totally failed to enter any proof into the record of the market value of his land at or near the beginning of the limitations period."); Colo. Rev. Stat. § 13-80-102 (2002) (tort actions for trespass or nuisance shall be commenced within two years after the cause of action accrues).

The rule limiting damages for continuing torts to either future damages or past damages that occurred within the back-calculated statute of limitations period is equally applicable in cases involving Restatement Section 930.  *See Nieman v. NLO, Inc.*, 108 F.3d 1546, 1557, 1559 ("[Plaintiff's] time frame for assessing damages is limited to the statute of limitations window, i.e., four years prior to the filing of the complaint in the instant action.") (citing Restatement § 930); *Cox v. Cambridge Square Towne Houses, Inc.*, 236 S.E.2d 73, 75 (Ga. 1977) ("Since it clearly appears that this situation 'will continue indefinitely' (Restatement § 930(1)(a)), *the appellant has the right to elect to treat the nuisance as temporary and sue for all those dam-*

*ages which have occurred within the past four years*, or he may elect to sue for all *future damages* as well and put an end to the matter.") (emphasis added).  Here, plaintiffs have not introduced sufficient evidence of damages resulting from defendants' actionable conduct that is isolated to the two years prior to the filing of their Complaint –- that is, between January 30, 1988 and January 30, 1990.[72]  Indeed, plaintiffs' damages expert Dr. Radke conceded that he did not assess the statistical significance of any change in the value of class properties between 1988 and 1990.  (Radke testimony, 10/26/05 Tr. 2810)  Nor could Dr. Radke say whether any change from 1988 to 1990 was attributable to the FBI raid, much less to conduct by Dow or Rockwell.  (*Id.* at 2786-87)

In sum, if the Court holds that defendants are not entitled to judgment as a matter of law on the ground that plaintiffs have failed to introduce evidence of a continuing tort, the Court should nonetheless grant judgment as a matter of law because plaintiffs have failed to prove damages within the back-calculated statute of limitations window applicable to continuing torts.

IX.   **DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' DEMAND FOR PUNITIVE DAMAGES.**

A.   **Plaintiffs Have Not Shown That Defendants Engaged in Willful and Wanton Conduct.**

To prove punitive damages, plaintiffs must show, among other things, that "the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct."

---

[72] Two years is the applicable statute of limitations period in Colorado.  *See* Colo. Rev. Stat. § 13-80-102 (2002) (tort actions for trespass or nuisance shall be commenced within two years after the cause of action accrues).

Colo. Rev. Stat. § 13-21-102.  (*See also* Instruction No. 3.27) ("[Plaintiffs] must prove . . . that the conduct . . . was 'willful and wanton.'")

Here, plaintiffs have introduced no evidence that any injury was "attended by circumstances of fraud, malice, or willful and wanton conduct." Colo. Rev. Stat. § 13-21-102.  To the contrary, plaintiffs' witnesses testified that Rockwell[73] and Dow took care to ensure against harm.  (Holeman testimony, 10/18/05 Tr. 1333-34; Ray testimony, 10/19/05 Tr. 1679-80 (Ray agreeing with statement that "a number of safety procedures [] were put in place at this plant, not only to ensure the safety of the workers but the environment and the residents offsite), 1683 (Dow's attitude was that "when [accidents] happened, we will do our best to clean them up"))[74]

_____

[73] While plaintiffs may point to a draft internal DOE document for the proposition that there were "patent" or known regulatory violations during Rockwell period as plant contractor, this memorandum was generated shortly before the DOE entered into the 1986 compliance agreement with EPA and CDH and underscored the amount of effort that would be required to bring the plant into compliance if DOE changed its regulatory position and agreed to submit additional portions of the plant to RCRA's authority. At that time it was known that  the plant would not be in full compliance with RCRA at the time the 1986 agreement was inked.  "The regulators understood that we were not -- we were not storing our waste per RCRA regulations at that point. I'm not saying it wasn't stored safely, but per RCRA.  So we would be given a period of time to bring that plant into compliance . . .[once the 1986 agreement was signed.]"  (Weston testimony, 12/13/05 Tr. 7694-97)  This DOE change in regulatory application is hardly sort of malicious, willful or wanton circumstance that would give rise to Rockwell punitive damages.

[74] Plaintiffs attempt to create a factual issue with regard to whether the Building 771 incinerator was operated on an isolated occasion in December 1988 contrary to a shutdown announcement. Substantial evidence indicates that this event did not occur.  (Weston testimony, 12/13/05 Tr. 7723-24, 7729, 7732-33, 7840, 7842; DX295; DX273a; DX291)  Indeed, the main prosecutor in charge of the criminal investigation testified that the investigation "did not have any credible evidence" that clandestined use of the 771 incinerator occurred.  (Norton testimony, 12/14/05 Tr. 7944-48, 7958, 7988)  No criminal charges were brought on this issue.  In any event, there is uncontested evidence that no plutonium was release from the plant site as a result of any Building 771 activities in December 1988.  (Weston testimony,  12/13/05 Tr. 7728-29; DX485, DX281)  In light of the full record on this issue, there is no basis for punitive damages against Rockwell related to this allegation.

Defense witnesses were ever more explicit about the safety precautions that Dow and Rockwell took to ensure against offsite harm.  (Weston testimony, 12/13/05 Tr. 7710-11 (discussing the multiple layers of filter banks and HEPA filters dedicated to the building 771 incinerator), 12/14/05 Tr. 8098 ("I know our processes.  The plutonium, the way it was handled, and the glove box, the way our waste was handled and sealed, the way all the operators were monitored before detectors, there's just no way."); *Id.* at 8089-91 ("I believed we were doing a good job, and I felt that's what the Department of Energy thought.");  Frazier testimony, 12/12/05 Tr. 7524 (The air sampling programs at Rocky Flats "were as good or better than all the air environmental monitoring groups that I had measured for the total time frames that are reviewed there.  They had good programs in place."); *see also id.* at 7540-41)

Plaintiffs' punitive damages claim is also defeated by defendants' compliance with standards.  *See* Part II.B, *supra*.  As the Court has ruled, whether defendants complied with standards is relevant to whether any injury claimed by plaintiffs was "attended by circumstances of fraud, malice, or willful and wanton conduct" sufficient to prove punitive damages.  (*See* 9/13/05 Hr'g Tr. at 6 ("Such evidence is relevant . . . to the issue of punitive damages."))

Because of plaintiffs' failure to introduce any evidence that any injury was attended by willful and wanton conduct, or that defendants violated federal or state standards, defendants are entitled to judgment as a matter of law on plaintiffs' punitive damages claim.

**B.     Plaintiffs Have Not Shown That the Punitive Damages They Seek Are in Any Way Linked to Defendants' Actionable Conduct.**

To recover punitive damages, plaintiffs must demonstrate that any such damages are linked to the same conduct that caused plaintiffs' injuries.  *See Bennett v. Greeley Gas Co.*, 969 P.2d 754, 761 ("[T]he conduct referred to is that causing the injuries.  It is the quality of that

tortious act, not the character of the wrongdoer, that justifies exemplary damages.")  Plaintiffs have introduced no such evidence here.  Indeed, as discussed *supra*, plaintiffs have failed even to introduce evidence of any **compensatory** damages resulting from defendants' allegedly actionable conduct.  Because Colorado law limits the amount of punitive damages to the amount of compensatory damages, *see* Colo. Rev. Stat. § 13-21-102 (jury's award of punitive damages is limited to "the amount of the actual damages awarded to the injured party"), it follows that, because plaintiffs have not introduced evidence of any compensatory damages, they may not recover any punitive damages.

## X.   PUNITIVE DAMAGES ARGUMENTS THAT THE COURT HAS RULED ON AND THAT DEFENDANTS INCLUDE FOR THE PURPOSE OF PRESERVING THEIR RIGHTS.

### A.   Plaintiffs Have Not Shown Any Nuclear Occurrences Before August 1988.

Any determination of punitive damages must be consistent with the Price Anderson Act. Under the Price Anderson Amendments Act of 1988, "[n]o court may award punitive damages in any action with respect to a nuclear incident . . . ."  42 U.S.C. § 2210(s).  Under this Court's interpretation of that provision, the Act bars punitive damages only for "nuclear incidents occurring on or after" August 20, 1988.  *See Cook v. Rockwell Int'l Corp.*, 755 F. Supp. 1468, 1479-81 ("Cook I") (D. Colo. 1991).  A "nuclear incident" is defined as "any **occurrence** . . . **causing** . . . bodily injury, sickness, disease, or death, or **loss of or damage to property, or loss of use of property**, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of [nuclear materials.]"  42 U.S.C. § 2014(q) (emphasis added)

Under the Amendments Act, to determine whether punitive damages can be awarded, the jury must first determine when the "nuclear incident" happened.  If the nuclear incident occurred

after August 20, 1988, the jury may not award punitive damages.  *See Cook I*, 755 F. Supp. at 1479-81.  If a portion of the "nuclear incident" (or "nuclear incidents") occurred before August 20, 1988, and a portion of the "nuclear incident" (or "nuclear incidents") occurred after August 20, 1988, then the maximum amount of punitive damages that may be awarded is limited to the amount of damages attributable to the "nuclear incidents" occurring prior to August 20, 1988.[75]  Thus, a nuclear incident could have "occurred" before August 20, 1988 only if class members experienced "loss of or damage to property, or loss of use of property" before August 20, 1988. 42 U.S.C. § 2014(q).

Here, plaintiffs cannot prove "loss of or damage to property, or loss of use of property" before August 20, 1988 on a class-wide basis.[76]  Some class members did not even purchase their properties in the class area until after August 20, 1988, and thus could not possibly have suffered any loss or damage before August 1988.   Also, plaintiffs claim that any "damage" to their "property" occurred at the time of the FBI raid, which happened in 1989, after the effective date of the Price Anderson Amendments Act.  (*E.g.,* Whalen testimony, 11/21/05 Tr. 5935, 5938-39; Schierkolk testimony, 10/20/05 Tr. 1902; Babb testimony, 10/20/05 Tr. 1961; Cook testimony, 10/21/05 Tr. 2040-41, 2055-56; S. Bartlett testimony, 10/14/05 Tr. 920-22; Radke testimony,

---

[75] *See Hensley v. Tri-QSI Denver Corp.*, 98 P.3d 965, 967-68 (Colo. Ct. App. 2004) (if punitive damages are not allowed for a particular claim, then compensatory damages awarded pursuant to that claim do not increased the amount of punitive damages may be awarded; *e.g.*, if $2,500 is awarded for a claim for which punitives are allowed, and $7,500 is awarded for a claim for which punitive damages are not allowed, then the maximum amount of punitive damages that may be awarded is $2,500).

[76] Defendants recognize that the Court has rejected this argument, but include it here for the purpose of preserving it.

10/26/05 Tr. 2676 ("I wanted to measure — could I measure the impact of the raid and what it had — did it have any impact at all on property value."))  It follows that plaintiffs' claim arises from a nuclear incident that occurred (at least in part, if not wholly) on or after August 20, 1988, and that plaintiffs' claims for punitive damages are barred by Price Anderson Amendments Act. *See Cook I*, 755 F. Supp. at 1479-81 (D. Colo. 1991).

**B.**      **The Price-Anderson Act Bars Plaintiffs from Receiving Punitive Damages.**

Defendants preserve the position — which the Court has rejected — that the Price Ander-son Act bars plaintiffs from pursuing punitive damages entirely.  *See In re Hanford Nuclear Reservation Litig.*, 780 F. Supp. 1551, 1572 n.38 (E.D. Wash. 1991) (Section 2014(hh) of the Act, which provides that state law does not apply in a Price Anderson Act case if that state law is inconsistent with (among other things) the prohibition on punitive damages in Section 2210(h), ***expressly*** applies to nuclear incidents occurring "***before, on, or after*** the date of the enactment of this Act," and thus is not covered by the "catch all" provision that restricts the applicability of ***other*** provisions of the act to dates "on or after August 20, 1988); *see also* Pub.L. 100-104, § 20(a), Historical and Statutory Notes to 42 U.S.C.A. § 2014 (West Supp.1990) ("(a) ***Except as provided in subsection (b)***, the amendments made by this Act [enacting section 2282a of this title, amending this section and sections 2210 and 2273 of this title, and enacting provisions set out as notes under sections 2011 and 2210 of this title] shall become effective on the date of the enactment of this Act [Aug. 20, 1988] and shall be applicable with respect to nuclear incidents occurring on or after such date.  (b)(1) The amendments made by section 11 [***enacting subsec. (hh)*** and (jj) of this section and section 2210(m)(3) of this title and amending section 2210(m)(2)

and (o) of this title] shall apply to nuclear incidents occurring *before, on, or after* the date of the enactment of this Act [Aug. 20, 1988].") (emphasis added)

<u>**CONCLUSION**</u>

For the foregoing reasons, defendants respectfully request that the Court grant judgment as a matter of law on plaintiffs' claims of trespass and nuisance, on plaintiffs' claim for damages, and on plaintiffs' partial claim of generic emotional distress.

Dated:  January 17, 2006                          Respectfully submitted,


<u>/s/ John E. Tangren</u>
One of the Attorneys for the Defendants
David M. Bernick
Douglas J. Kurtenbach
Ellen Therese Ahern
Mark J. Nomellini
Stephanie Brennan
John E. Tangren
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601-6636
Phone:  312-861-2000
Fax:      312-861-2200

Joseph J. Bronesky
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, Colorado 80202
Phone:  303-297-2900
Fax:      303-298-0940

Attorneys for ROCKWELL INTERNA-
TIONAL CORPORATION and THE DOW
CHEMICAL COMPANY

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on January 17, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses for the following:

Peter B. Nordberg, Esq.
c/o Karen M. Markert
Apartments at Denver Place, Apt. 2812
1880 Arapahoe Street
Denver, CO 80202
pnordberg@bm.net
kmarkert@bm.net

Gary B. Blum, Esq.
SILVER & DEBOSKEY
The Smith Mansion
1801 York Street
Denver, Colorado 80206
blumg@s-d.com

/s/ Kari Knudsen_____
Kari Knudsen (legal assistant)