**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 90-cv-00181-JLK

MERILYN COOK, *et al.*,

       Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION
and THE DOW CHEMICAL COMPANY,

       Defendants.
_____

**DEFENDANTS' RENEWED MOTION FOR MISTRIAL AND RELATED JUROR AFFIDAVITS**
_____

On January 25, 2006, before the jury returned its verdict, defendants expressed their concern that the jury's deliberations had gone fundamentally awry. That day, the presiding juror submitted a note requesting "immediate help" because a juror ("Juror X")[1] had left the jury room "during a heated discussion." (1/25/06 Trial Tr. at 10713-14.)[2] Defendants promptly requested an inquiry into what was happening in the jury room, including whether Juror X's departure was

---

[1] Consistent with the Court's orders, defendants refer to the dismissed juror as "Juror X." (*See, e.g.*, 2/14/06 Order at 1; 3/13/06 Order at 2.)

[2] Morning January 25, 2006 transcript citations are to Court's March 20, 2006 redacted version. Redacted portions are bracketed. The Court has not yet issued a redacted afternoon transcript.

caused by being bullied for being a minority juror.[3] Defendants further stated that such an inquiry should not be delayed until after the verdict, explaining that "[t]he idea that somehow we should wait for the verdict and then have [plaintiffs' counsel] take the position that the verdict can't be collaterally attacked is an invitation to a pig in the poke, not an invitation to have a process that is a fair and appropriate process."  (1/25/06 Trial Tr. at 10748.)  Nonetheless, the Court denied defendants' requests for a pre-verdict inquiry into the circumstances surrounding Juror X's departure.

Events since January 25 have confirmed defendants' concerns that the jury's deliberations were fundamentally flawed and that Juror X was indeed bullied off the jury. Immediately after the verdict was read on February 14, a juror's spouse approached defendants' counsel David Bernick and requested his business card.  Shortly thereafter, in February, two jurors ("Juror Y" and "Juror Z"[4]) initiated contact with Mr. Bernick to discuss the case.  Both

---

[3] (*Id.* at 10721 ("the Court has sufficient facts at this point to require that either, A, there be a mistrial, or, B, that there be an inquiry into the circumstances surrounding this juror's departure, because of strong evidence that's there that the deliberative process has broken down").)

[4] The Court has ordered the parties not to disclose juror names.  (*See* 2/14/06 Order at 1 ("any motions or other filings with the Court shall not refer to any juror, excused or otherwise, by name or public identifier.").)  Juror Z has stated that "I understand that by filing this affidavit, my name may become public."  (Ex. B, Juror Z Aff. ¶ 20.)  Nevertheless, in order to adhere to the Court's rulings, defendants do not disclose Juror Z's name in this unsealed version of their motion.  Instead, because litigation should be conducted in the public to the maximum extent possible, defendants file two versions of this motion — this public version and an unredacted version filed under seal.  *See*, *e.g.*, *Hicklin Eng'g, L.C. v. Bartell*, 439 F.3d 346, 348 (7th Cir. 2006) ("We have insisted that litigation be conducted in the public to the maximum extent . . . This means that both judicial opinions and litigants' briefs must be in the public record, if necessary in parallel versions — one full version containing all details, and another redacted version with confidential information omitted."). Defendants attach a redacted version of Juror Z's affidavit to this brief.  A full version of Juror Z's affidavit, as well as Juror Y's affidavit, is
(Continued…)

2

Juror Y and Juror Z described an atmosphere in which it was impossible to deliberate fairly due to personal attacks and insults made by certain pro-plaintiff jurors against pro-defense jurors. (*See* Ex. A, Juror Y Aff; Ex. B, Juror Z Aff.) Such bullying went "well beyond heated debate." (Ex. B, Juror Z Aff. at ¶ 7.) Indeed, Jurors Y and Z stated that (as defendants had suspected) Juror X was bullied off the jury by pro-plaintiffs jurors because Juror X had expressed pro-defendant views. (*See* Ex. A, Juror Y Aff; Ex. B, Juror Z Aff.) Juror X has also now initiated contact with defendants, and defendants intend to have substantive conversations with that juror as well, supplementing this motion as appropriate.[5]

These problems have arisen in the broader context of the Court's earlier rulings in this case, which permitted plaintiffs to focus the case on extraneous, irrelevant matters. Before the trial, defendants brought a series of motions *in limine* to prevent such irrelevant matters from coming into evidence. The Court denied virtually all of defendants' motions. The *in limine* rulings had the effect of allowing plaintiffs to introduce evidence of highly prejudicial subjects that had nothing to do with plaintiffs' claims of trespass and nuisance and that could serve only to distract and inflame jurors.

---

attached to the sealed version. Neither Juror Y nor Juror Z's name may be redacted from the sealed version because their affidavits must be signed to be legally effective. *See Mulkey v. Meridan Oil, Inc.*, 143 F.R.D. 257, 258 (W.D. Okla. 1992) ("the affidavit submitted to support the response was neither signed or nor sworn, thus it had no legal effect.").

[5] During the week of April 10, Juror X initiated contact with defendants. The Court's prior orders, including its orders of January 20 and February 14, allow attorneys to speak with any juror if the juror initiates the contact. (*See* 1/20/06 Trial Tr. at 10670; 2/14/06 Trial Tr. at 10783 ("MR. BERNICK: What about the two jurors who were excused previously? THE COURT: The same rule applies, the same rule applies").)

Making matters worse, during the trial, plaintiffs frequently crossed even the permissive lines that had been established by the Court, in a manner that further politicized and emotionally charged the process. Not unlike the "runaway grand jury" that investigated Rocky Flats in the 1990s, the jury in this case was permitted to "deal[] in rumor and conjecture" and with "political and social issues outside the province of its duty."[6]

The evidence now shows the inevitable consequences of a process gone awry. Following Juror X's departure from the jury room during heated jury deliberations on January 25, and again after Juror X was dismissed from the jury, defendants requested a pre-verdict inquiry into the causes of Juror X's departure, but the Court denied defendants' requests. The Court subsequently ruled that defendants would not be allowed to initiate communications with Juror X. (*See* 3/13/06 Order.) In light of the Court's March 13 Order, and in light of the fact that Jurors Y and Z have come forward with affidavits confirming that Juror X was indeed bullied off the jury for holding pro-defendant views (Ex. A, Juror Y Aff.; Ex. B, Juror Z Aff.), declaration of a mistrial continues to be the appropriate relief.

---

[6] *Compare In re Grand Jury Proceedings, Special Grand Jury 89-2(Rocky Flats Grand Jury)*, 1993 WL 245557, at * 1 (D. Colo. 1993).

## FACTUAL BACKGROUND

### A. Before the Trial, Defendants Moved to Eliminate Irrelevant and Highly Prejudicial Issues from the Case.

Before this trial began, defendants repeatedly urged the Court to define the issues to be tried and focus the trial on them.[7] Defendants ultimately moved *in limine* to preclude the introduction at trial of numerous extraneous subjects because they could serve only to cause the jury to reach a verdict on improper grounds (*see generally* Defs.' MIL Nos. 1-16). These subjects included:

- **"Government Conspiracy" Allegations:** Indemnification, DOE discovery conduct, the DOE contempt order, classification issues, and any evidence that materials were withheld from discovery based on national security concerns (*see* Defs.' MIL Nos. 4-5).

- **The FBI Raid, Grand Jury, and Guilty Plea:** The FBI raid (and the reckless, unproven allegations that led up to the raid), the grand jury investigation, "runaway grand jury" allegations of conspiracy and prosecutorial misconduct, and Rockwell's 1992 guilty plea (*see* Defs.' MIL Nos. 1-3).

- **Worker Health and Safety, and Other-Lawsuit Issues:** Irrelevant but sensational matters such as worker health and safety, workers' compensation claims and other lawsuits and settlements (*see* Defs.' MIL Nos. 7, 14-15).

Almost without exception, the Court denied defendants' motions.

---

[7] Throughout the pretrial history of this case, defendants sought to focus the trial on the specific claims at issue. (*See*, *e.g.*, Defs.' Resp. to Pls.' Br. on the Statute of Limitations, State Regulatory Standards, Ultrahazardous Liability, Spoliation, and Negligent Trespass, filed 8/18/04, at 31-44; Defs.' Mot. To Exclude Expert Witness Testimony, filed 6/16/05; Defs.' Mot to Exclude the Testimony of Dr. Steven Wing, filed 9/16/05; Defs. Am. Submission of Suppl. Jury Instructions, filed 9/23/05; Defs.' Submission of Limiting Instructions Pursuant to the 10/7/05 Hr'g and a Related Statement, filed 10/10/05.)

### B. Plaintiffs Went Beyond Even the Broad Parameters Allowed by the Court, Introducing Politicized and Emotionally Charged Evidence at Trial, and Inviting the Jury to Decide the Case on Improper Bases.

Defendants' fears that the plaintiffs would take advantage of the Court's *in limine* rulings to skew the focus of the trial to irrelevant issues (including an alleged conspiracy led by a non-party to the case, the DOE) were confirmed as early as plaintiffs' opening statement, where, among other things, plaintiffs argued that:

- **Alleged "Cover Up" by DOE and Defendants:** the DOE and defendants were engaged in a "cover up" because "[t]hey were part of the negligent and wrongful conduct." (10/11/05 Trial Tr. at 487.)

- **DOE "Concealed Evidence":** the DOE "used its national security, top secret rights, to conceal from you and from this court massive amounts of evidence. Why? To spare itself public embarrassment and to defeat the damages in this and other cases. Why? The logical conclusion, we will argue to you from the evidence, is because the DOE, under its account with Dow and Rockwell is probably responsible to pay the damages to plaintiffs and the class members." (*Id.* at 492-93.)

- **U.S. Government "Misused Classification Power":** "[t]he truth has been whited out by the misuse of the classification power of the DOE and the United States Government to prevent all of us in this courtroom from knowing the full truth about missing plutonium at Rocky Flats." (*Id.* at 600.)

Plaintiffs' opening statements went beyond what even the Court had initially permitted in its pre-trial rulings, further poisoning the jury's deliberations. Examples included:

- **FBI/DOJ Investigation:** Notwithstanding the Court's ruling limiting references to the FBI/DOJ investigation (8/22/05 Hr'g Tr. at 7 (only the fact of the investigation is admissible); 9/22/05 Hr'g Tr. at 34-35 (same)), plaintiffs proceeded to reveal and detail the outcome of the investigation during opening statements. For example, plaintiffs promised the jury: "you will hear of the violations [Agent Lipksy] found, of federal and environmental laws, how he was stonewalled by Rockwell and by DOE, the cover up that occurred of the incinerator burning at night and publicity about his affidavit." (10/11/05 Trial Tr. at 580.)

- **Worker Safety:** Notwithstanding the Court's ruling that the case is not about worker safety issues (*id.* at 517), plaintiffs' counsel stated in opening: "precautions were not adequate. They were not adequate to protect either the workers or the neighbors." (*Id.* at 501.)

6

- **Cleanup Costs:**  Notwithstanding the Court's grant of defendants' motion to exclude evidence of "clean-up costs" (9/22/05 Hr'g Tr. at 10), plaintiffs' counsel showed the jury a headline from the March 1, 1990 Rocky Mountain News stating:  "Cleanup could cost $150 billion."  (P-741.)

- *Church* **Settlement:**  Notwithstanding the Court's ruling that nothing other than "the fact" of the *Church* litigation was admissible (*see* 8/22/05 Hr'g Tr. at 9), plaintiffs' counsel improperly stated that the *Church* litigation had settled, and that the settlement showed that "defendants in this case have already acknowledged, if you will, and paid money to some of the neighbors for the contamination problems it caused."  (10/11/05 Trial Tr. at 550.)

Defendants moved for a mistrial based on these and other statements in plaintiffs' opening,[8] but the Court denied defendants' motion.  (*See* 10/24/05 Mins.)

Throughout trial, plaintiffs continued to introduce — and the jury was permitted to hear and rely upon — subjects that went beyond even the permissive bounds of the Court's pre-trial rulings.  The cumulative effect of the Court's decision to admit such evidence was to give the jury license to penalize defendants for alleged government wrongful conduct.  Some of the worst abuses included:

- **Sensational media:**  Irrelevant media stories designed to have the maximum prejudicial impact,[9] including (among many examples) a 1994 video that described the so-called "most dangerous building in America."  (PV190.)[10]  This video also contained a variety of hearsay accounts of worker exposures at the plant, even though these alleged exposures took place after the defendants no longer operated the plant.  Plaintiffs led off their case by inundating

---

[8] (*See* Defs' 10/12/05 Mot. Concerning Pls' Violations of the Court's *In Limine* Rulings During Opening Statements.)

[9] Plaintiffs did not need to show that the stories were true before they could publish them to the jury because of the Court's ruling that "media coverage is relevant, however, to public perceptions."  (Instruction 2.7.)

[10] The Court initially excluded this video (11/22/05 Trial Tr. at 6147), but later admitted it. (12/13/05 Trial Tr. at 7830.)

7

the jury with these kinds of stories, showing twelve video clips in the first two days of testimony. (*See* 10/14/05 & 10/17/05 Trial Trs.)

- **DOE Tainted Science:** Plaintiffs called Dr. Stephen Wing, who claimed that the "DOE has been more interested in producing nuclear weapons, promoting nuclear energy, protecting its public image and guarding against litigation than in vigorously pursuing research into radiation health effects in general and plutonium health effects in particular." (11/17/05 Trial Tr. at 5757.)

- **Declassification:** Similarly, Dr. Wing was permitted (over defendants' objections) to testify regarding documents from the 1940s — before the Rocky Flats plant even came into existence, and which did not relate to either defendant — commenting on AEC guidelines and policies related to classification. (P1433, P1435, P1436.) There is no evidence that any materials — much less materials related to Rocky Flats — were ever withheld pursuant to these classification guidelines. Plaintiffs also used documents to suggest (improperly) that the DOE was not declassifying certain materials because of litigation against the DOE, Dow, and Rockwell. (11/22/05 Trial Tr. at 6230-31.)

- **Material Unaccounted For ("MUF"):** Plaintiffs introduced volumes of inflammatory evidence of "2600 pounds of missing plutonium at Rocky Flats," notwithstanding the lack of any evidence linking any missing plutonium to plaintiffs' offsite properties. (1/18/06 Trial Tr. at 10258.)

In these and many other instances, defendants moved for a mistrial after the introduction of such extraneous matters, but defendants' motions were denied.[11]

### C. The Highly Politicized and Emotionally Charged Atmosphere Created by the Court's Rulings Carried Over into Deliberations.

Against this backdrop, it is not surprising that the atmosphere created by the Court's rulings — and plaintiffs' successful efforts to go beyond those rulings — poisoned jury deliberations. Affidavits provided by two jurors ("Juror Y" and "Juror Z") demonstrate that a pro-defendant juror ("Juror X") was bullied off the jury due to holding pro-defendant views.

---

[11] (*See*, *e.g.*, 10/25/05 Trial Tr. at 2497-98 (workers' compensation); 11/17/05 Trial Tr. at 5765 (DOE manipulation of science); 12/16/05 Trial Tr. at 8578 (improper classification).)

(Ex. A, Juror Y Aff. at ¶ 8; Ex. B, Juror Z Aff. at ¶¶ 7-9.)  Had the Court conducted the inquiry requested by defendants on January 25, 2006, the Court would have learned these facts, and would have been required to declare a mistrial.  The Court's decision not to investigate violated defendants' rights to due process and to a fair jury trial.

Certain of the circumstances surrounding Juror X's sudden departure from the jury are by now well known.  On Tuesday, January 24, 2006, the presiding juror sent a note that said:  "I need to request a meeting with Judge Kane @12:45 Today if Possible."  (Ex. C, 1/24/06 note from presiding juror.)  The Court responded that a meeting would not be possible except on the record in open Court with counsel present, and no meeting was held.  (Ex. D, 1/24/06 note from Judge Kane.)

On Wednesday, January 25, the Court informed the parties during oral argument on an unrelated matter that "[w]e have a juror that's having a mental breakdown . . . . I think it's already sufficient that I excuse [Juror X] from the case."  (1/25/06 Trial Tr. at 10713.)  Defendants' counsel urged that Juror X should not be dismissed without first "making a record" as to the circumstances surrounding the departure:  "I think that we have to have some record made of what it is that this [] believes is happening and the effect that it's having on [].  We can't simply take a note that comes from somebody else as being facts of what happened."  (*Id.* at 10714-15.)

Following a brief recess, defendants' counsel stated that either:  (a) there should be an inquiry into the circumstances surrounding Juror X's departure; or (b) if there were no inquiry, then a mistrial was required:  "I believe that there is — the Court has sufficient facts at this point to require that either, A, there be a mistrial, or, B, that there be an inquiry into the circumstances

9

surrounding this juror's departure . . .  (*Id.* at 10721.)  Defendants later stated that "our motion for mistrial stands."  (*Id.* at 10748.)  In a subsequent exchange, the Court stated that it did not know whether Juror X was being bullied by other jurors, or whether some other factor was at work.  (*Id.* at 10725.)

Before Juror X left the courthouse for the last time, the Court told the parties it would interview Juror X with counsel present.  (*Id.* at 10715 ("And I will certainly do what I've done in the past with one other juror in this case, and that's to bring one counsel from each side into my chambers to talk with [].").)  But the Court later dismissed Juror X without interviewing the juror with counsel present, or providing for any other inquiry into the reasons for the juror's departure.  It appears from the record, however, that the Court itself did converse with Juror X to some extent (*see id.* at 10719), although the Court declined to disclose any communications that occurred between court personnel and Juror X in its March 13 Order or otherwise.

Before the verdict was read, defendants asked the Court whether, independent of Juror X being allowed to initiate contact with them, defendants would be permitted to initiate contact with Juror X.  (2/14/06 Trial Tr. at 10783.)  The Court responded that "there's some merit to that. I would prefer that you put it in writing and I'll look at it and we'll see."  (*Id.*)  In response, defendants filed a written motion asking for permission to initiate contact with Juror X, and for the Court to reveal the substance of any communications it had with Juror X.  (*See* Defs.' Mot. to Speak With Juror, filed 2/16/06.)  The Court denied defendants' requests.  (3/13/06 Order at 2.)

After the verdict, defendants were approached by two jurors, Jurors Y and Z.  Affidavits signed by these jurors confirm that, if the Court had made a pre-verdict inquiry on January 25 into the circumstances of Juror X's departure, the Court would have learned that Juror X was

10

forced from the jury due to heavy criticism for favoring defendants (*see* Ex. A, Juror Y Aff.; Ex. B, Juror Z Aff.), and would have been required to declare a mistrial.

## ARGUMENT

### I.     The Court's Refusal to Conduct an Inquiry into the Circumstances Surrounding Juror X's Departure Requires a Mistrial.

Defendants have repeatedly asked the Court to inquire into the circumstances surrounding Juror X's departure — both before the jury returned its verdict and after the verdict. Each time, the Court rejected defendants' requests. On the first such occasion, January 25, 2006, defendants moved for a mistrial, and the Court "deferred" ruling on defendants' motion. (*See* 1/25/06 Minute Entry for Proceedings ("Defendants' oral motion for mistrial. Ruling is deferred.").)

Notwithstanding defendants' January 25 mistrial motion, the Court stated in its March 13 Order that defendants "failed to formalize their motion for mistrial or provide the briefing they promised was forthcoming." (3/13/06 Order at 4.) Respectfully, defendants' mistrial motion, as made, was sufficient.[12] Nevertheless, in light of the Court's March 13 Order, as well as the affidavits of Jurors Y and Z, defendants now file this renewed mistrial motion.

The circumstances surrounding Juror X's departure — and the Court's responses to those circumstances — warrant a mistrial for two independently sufficient reasons. First, a mistrial is required because of the Court's decision not to make (or allow) any inquiry into the

---

[12] *See, e.g.,* Fed. R. Civ. P. 7(b)(1) ("An application to the court for an order shall be by motion which, unless made during a hearing or trial, shall be made in writing . . ."); 56 Am. Jur. 2d Motions, Rules, and Orders § 15 ("[A] motion made during a hearing or trial generally need not also be put in writing.").

circumstances concerning Juror X's dismissal, notwithstanding defendants' repeated requests. The Court has also now ruled that it will not disclose any communications that occurred between Juror X and Court personnel after Juror X left the jury room. (3/13/06 Order at 2.)[13]  Based on the Court's repeated refusal to formally inquire whether Juror X was bullied off the jury, and based on the Court's decision not to disclose any informal communications between Juror X and Court personnel, defendants formally renew their request for a mistrial.

Second, there is now additional evidence that, if the Court had conducted the pre-verdict investigation that defendants requested *on January 25*, it would have learned that Juror X was indeed bullied off the jury for expressing pro-defendant views, and would have been required to order a mistrial.  Such a pre-verdict inquiry would not have been covered by Rule 606(b), because it does not go to "the validity of the verdict" (as there was no verdict at that time).  *See* F.R.E. 606(b) ("***Upon an inquiry into the validity of a verdict or indictment,*** a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations . . . ") (emphasis added); *see also United States v. Resko*, 3 F.3d 684, 695 n.9 (3d Cir. 1993) ("[T]here is a doctrinal distinction between those situations in which evidence of intra-jury misconduct comes to light during trial and those situations in which such evidence is discovered only after the verdict has been entered").  Nor can defendants' right to a pre-verdict inquiry be circumvented by forestalling that inquiry until after the verdict, and then arguing after the verdict that post-verdict inquiries are barred by Rule 606(b).

---

[13] Such *ex parte* communications would not be covered by Rule 606(b). *See United States v. Scisum*, 32 F.3d 1479, 1483 (10th Cir. 1994).

Following the verdict, Juror Y initiated contact with defendants. (Ex. A, Juror Y Aff. at ¶ 9.) Juror Y's affidavit states that, if *pre-verdict inquiry* had been made of her concerning the reasons for Juror X's departure, she would have made the following observations:

- "[Juror X] was among the pro-defense jurors . . . . One or more of the vocal pro-plaintiff jurors attacked [Juror X] for [Juror X's] comment [that Rockwell would not intentionally cause harm to neighboring property owners], said [Juror X] was biased and told [Juror X that Juror X] had no business being on the jury." (*Id..* at ¶ 6.)

- "[Juror X] expressed dismay at the tendency of certain pro-plaintiff jurors to dominate the conversation and talk over [Juror X] — denying [Juror X] and other jurors a chance to have their say." (*Id.* at ¶ 7.)

- "Initially there were several pro-defense jurors. Jurors despaired of reaching a verdict at all after the deliberations went on so long. The bullying tactics, together with the passage of time, swayed many pro-defense jurors to the ultimate verdict." (*Id.* at ¶ 5.)

- "The pro-plaintiff, majority jurors were very vocal and would strongly criticize, belittle and intimidate other jurors who expressed views supporting the minority, pro-defendant position. Sometimes the bullying and attacks by the pro-plaintiff jurors against the pro-defendant jurors became quite personal." (*Id.* at ¶ 4.)

Juror Y also wrote a letter to the Court detailing some of her concerns (*see id.* at ¶ 3); to defendants' knowledge, no such letter was filed by the Court.

Juror Y's observations were confirmed by another juror who initiated contact with defendants, Juror Z. (Ex. B, Juror Z Aff. at ¶ 4.) Juror Z's affidavit confirms that Juror X was bullied off the jury for pro-defendant views. Had *pre-verdict inquiry* been made of Juror Z regarding the circumstances surrounding Juror X's departure (*id.* at ¶ 5), Juror Z would have said the following:

- "[P]ro-plaintiff jurors were angry that any jurors supported the defense. These pro-plaintiff jurors were outspoken and aggressive. They would bully and criticize other jurors who expressed views supporting Dow and Rockwell or who suggested there was no harm to the class plaintiffs or class properties. It went well beyond heated debate." (*Id.* at ¶ 7.)

13

- "The presiding juror was one of the worst bullies.  He never looked at or discussed the defendants' exhibits; he reviewed only the plaintiffs' exhibit binders.  He would allow unlimited discussion of pro-plaintiff points, but would cut off any jurors who tried to offer comments supporting the defense case. . . . He was hostile towards and bullied pro-defense jurors, sometimes cursing while he did so."  (*Id.* at ¶ 8.)

- "Another man on the jury was also an outspoken critic of anyone expressing a defense view. . . . This other male juror would become angry with defense-leaning jurors, display extreme temper, make ugly personal comments and attack individuals who made pro-defense comments.  He made particularly vicious attacks toward one defense-leaning juror [Juror X] (who was later dismissed from the jury) and upset [Juror X] emotionally.  ***This male juror's actions, together with the attacks of other pro-plaintiff jurors, caused [Juror X] to leave the jury***.  This male juror's attacks on pro-defense jurors in general, and on [Juror X] who was dismissed from the jury in particular, were ugly, totally uncalled for, hypocritical and out of proportion to anything that the defense jurors had said."  (*Id.* at ¶ 9) (emphasis added.)

- "It was difficult to participate in deliberations when confronted with angry, mean personal attacks and criticism from the pro-plaintiff jurors.  The attacks by pro-plaintiff jurors made pro-defense jurors, including myself, hold back from active participation and caused me to consider dropping out of the deliberations."  (*Id.* at ¶ 12.)

- "***One pro-defense juror did end up leaving the jury due to the ugly comments against [Juror X]***, the harsh confrontations and the bullying [Juror X] experienced for [Juror X's] defense-leaning views.  This juror was often animated and tried to express [Juror X's] views during the early days of deliberations.  *[Juror X] was subjected to particularly mean attacks because of the pro-defense comments [Juror X] made and the pro-defense positions [Juror X] took*.  Pro-plaintiff jurors, including the presiding juror and the two other pro-plaintiffs jurors described above, repeatedly attacked the juror who was later dismissed, said [Juror X] was biased and told [Juror X that Juror X] had no business being on the jury."  (*Id.* at ¶ 13) (emphasis added.)

Had the Court conducted a pre-verdict query into Juror X's departure on January 25, 2006, it would have learned these facts (including that Juror X was bullied off the jury for holding pro-defense views), and would have been required to order a mistrial.

## II.   The Relevant Legal Authorities Further Support Defendants' Renewed Motion for Mistrial.

Defendants' motion for mistrial is further supported by the relevant legal authorities.

14

First, neither *United States v. Samet*, 207 F.Supp.2d 269 (S.D.N.Y. 2002), nor any of the cases cited by plaintiffs[14] supports the argument that a Court may refuse to conduct an inquiry to determine the reasons for a juror's departure during deliberations, particularly when that departure occurs in the midst of a heated discussion. In fact, the case law in the Tenth Circuit and elsewhere (including the case law cited by plaintiffs) affirmatively undermines plaintiffs' "see no evil, hear no evil" position.[15]

Second, this Court stated in its March 13 Order that "[t]here is absolutely no indication anywhere, however, that Juror X held any particular views on the merits of the case, favorable to Defendants or otherwise and contrary to the views of a majority of jurors, at the time she was excused" (3/13/06 Order at 11) and that there "is no indication of such pressure" (*id.* at 12). But, respectfully, defendants are aware of no case that holds that there must be an "indication" of a juror's status as a dissenter in order for the trial court to inquire into the circumstances. The relevant question cannot be whether an "indication" exists **before** an inquiry is made. Here, the Court declined to conduct such an inquiry, thus **preventing** the discovery of further indices that Juror X was a dissenter. If an investigation **had** been conducted on January 25, jurors such as Jurors Y and Z would have supplied such additional "indications" in spades. (Ex. A, Juror Y

---

[14] (*See* Pls.' Mem. in Opp'n to Defs.' Mot. to Speak with Juror, filed February 24, 2006.)

[15] *See, e.g., United States v. Samet*, 207 F.Supp. 2d 269, 271 (S.D.N.Y. 2002) ("After consultations with counsel were concluded, I voir dired her in the presence of counsel and the defendants."); *United States v. Baca*, 494 F.2d 424, 427-29 (10th Cir. 1974) (conducting *in camera* examination of juror, who was afraid to continue serving, with counsel present); *see also Lowe v. Norfolk & Western Ry. Co.*, 463 N.E.2d 792, 813 (Ill. App. Ct. 1984) ("[W]hile the court by observation can determine good cause in the case of an emotionally upset juror, it must go one step further and make a sufficient inquiry to negate any element of coercion or duress").

15

Aff.; Ex. B, Juror Z Aff.)  Asking whether an "indication" exists before an inquiry is made puts the cart before the horse.[16]

Even without an inquiry, the record evidence belies the conclusion that there was "no indication" of "pressure" on Juror X.  At the time deliberations began, Juror X had sat through a four-month jury trial without event.  However, two days into deliberations, Juror X experienced significant emotional distress and left the jury room, indicating that it was the deliberations themselves that caused the distress.  Indeed, Juror X left the jury room *during* "heated discussions."  Under the relevant authorities, "any possibility" that a juror may be a holdout necessarily requires that the juror cannot be discharged; where, as here, the juror cannot continue with deliberations, a mistrial must be declared.[17]

Most importantly, defendants' agreement to a non-unanimous verdict was not an agreement to a jury from which dissenters could be selectively excised.  The Court's observation

---

[16] Were the law otherwise, then had the *Samet* juror not happened to leave on an answering machine a message suggesting she was dissenter, the defendant would have been denied his rights to due process and a fair jury trial.  The right to a fair trial does not turn on such happenstance.

[17] *See, e.g., United States v. Thomas*, 116 F.3d 606, 621-22 (2d Cir. 1997) ("[I]f the record evidence discloses *any possibility* that the request for discharge stems from the juror's view of the sufficiency of the government's evidence, the court must deny the request") (*quoting United States v. Brown*, 823 F.2d 591, 596 (D.C. Cir. 1987) (emphasis added)).  Other courts have held that a juror may not be dismissed if there is "any reasonable possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case."  *United States v. Symington*, 195 F.3d 1080, 1087 (9th Cir. 1999); *see also People v. Gallano*, 821 N.E.2d 1214, 1224 (Ill. App. Ct. 2004).  Here, such a "reasonable possibility" exists based upon several facts in the record, not the least of which is that Juror X left the jury room during a "heated discussion."  Because Juror X could not continue deliberating, a mistrial should have been declared.  *See United States v. Samet*, 207 F. Supp. 2d 269, 281 (S.D.N.Y. 2002) (declaring mistrial because court could neither dismiss juror nor permit her to continue deliberating).

that "whether Juror X's hypothetical dissent in favor of Defendants on January 25th would have remained static through the remaining three weeks of deliberations is unknowable, by Juror X or anyone else" (3/13/06 Order at 11) is, defendants respectfully maintain, not relevant. The question is not whether Juror X would have remained a defense vote throughout deliberations had she not left, but rather whether an effort should have been made on January 25 to determine if Juror X was bullied off the jury for holding pro-defense views. In any event, the affidavits of Jurors Y and Z provide further evidence that, if a pre-verdict inquiry had been conducted *on January 25*, it would have shown that Juror X was indeed bullied off the jury because of pro-defendant views.[18]

## CONCLUSION

For the foregoing reasons, defendants respectfully renew their request that the Court grant a mistrial.

---

[18] In its March 13 Order, the Court also noted that *Samet* was a criminal case involving Rule 23(b). The Court explained that in criminal cases, "unanimous verdict considerations significantly impact the discharge of a juror for cause during the course of deliberations." (3/13/06 Order at 3 n.2.) Respectfully, any suggestion that dismissal of a dissenting juror to reach a verdict in a civil trial would not implicate defendants' rights to a fair trial is without merit. *See, e.g., Thomas*, 116 F.3d at 622 n.11 ("We do not intend to confine the limitation set out in *Brown* to criminal cases or cases in which the record evidence raises the possibility that the juror's request to be discharged, or the allegations of his fellow jurors, stems from the juror's doubts about the sufficiency of the prosecution's case. The courts must in all cases guard against the removal of a juror — who aims to follow the court's instructions — based on his view on the merits of a case."); *see also Lowe v. Norfolk & Western Ry. Co.*, 463 N.E.2d 792, 813 (Ill. App. Ct. 1984) (holding, in civil case, that "while the court by observation can determine good cause in the case of an emotionally upset juror, it must go one step further and make a sufficient inquiry to negate any element of coercion or duress").

Dated:  May 9, 2006                                            Respectfully submitted,


                    s/ John E. Tangren
                    One of the Attorneys for the Defendants
                    David M. Bernick
                    Douglas J. Kurtenbach
                    Ellen Therese Ahern
                    Mark J. Nomellini
                    John E. Tangren
                    KIRKLAND & ELLIS LLP
                    200 East Randolph Drive
                    Chicago, Illinois 60601-6636
                    Phone:  312-861-2000
                    Fax:     312-861-2200

                    Joseph J. Bronesky
                    SHERMAN & HOWARD L.L.C.
                    633 Seventeenth Street, Suite 3000
                    Denver, Colorado 80202
                    Phone:  303-297-2900
                    Fax:     303-298-0940

                    Attorneys for ROCKWELL
                    INTERNATIONAL CORPORATION and
                    THE DOW CHEMICAL COMPANY

**CERTIFICATE OF SERVICE**

  I hereby certify that on May 9, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses for the following:

Peter B. Nordberg, Esq.
BERGER & MONTAGUE P.C.
1622 Locust Street
Philadelphia, PA  19103
pnordberg@bm.net
kmarkert@bm.net

Gary B. Blum, Esq.
SILVER & DEBOSKEY
The Smith Mansion
1801 York Street
Denver, Colorado 80206
blumg@s-d.com

                s/ Kari Knudsen_____
                Kari Knudsen (legal assistant)