# EXHIBIT B

# PART TWO

[REDACTED]

MR. DAVID BERWICK
C/O KIRKLAND & ELLIS
200 EAST RANDOLPH DR.
CHICAGO, ILL.
60601-6636

DENVER CO 802
13 MAR 2006 PM 6 L

60601+66365

STARTED A WEEK AFTER WE MET. SORRY I TOOK SO LONG. EXCUSE MY MISSPELLING.

MR. BERNICK,

SOME THINGS CAME TO MIND SINCE WE MET. I DON'T KNOW IF THEY'LL BE HELPFUL. BUT I THOUGHT WHILE IT WAS FRESH IN MY MIND I'D PUT IT TO PAPER. ELLEN SAID IF SOMETHING COMES TO MIND WRITE IT DOWN AND CONTACT YOU.

I WAS ASKED HOW I FELT AFTER OPENING STATEMENTS ON FIRST DAY OF COURT. I CAN SINCERELY TELL YOU I WAS MOST IMPRESSED WITH THE DEFENSE ATTORNEYS THEN THE PLAINTIFF'S OPENING STATEMENT. I FELT I HAD MADE A CONNECTION EARLY ON WITH THE DEFENSE. THERE WAS A STATEMENT MADE BY ONE OF THE LAWYERS, I CAN'T REMEMBER WHO, BUT IT STAYED WITH ME THROUGH THE WHOLE TRIAL. THAT CLASS ACTION SUITS DON'T ALWAYS MAKE IT TO TRIAL. THEY GET SETTLED OUT OF COURT MORE TIMES THEN NOT. SO I FELT STRONGLY THAT THE DEFENDANTS THOUGHT THEY WERE INNOCENT AND THAT MEANT SOMETHING WITH ME.

AT TIMES I TRIED TO SEE WHAT THE JURORS WHO VOTED YES SAW IN THE EVIDENCE. I JUST COULDN'T FIND IT. SO I THOUGHT MAYBE I WASN'T BEING VERY SMART. THIS WAS A VERY DIFFICULT CASE. BUT MY COMMON SENSE SAYS THERE WAS NOTHING WRONG WITH THE CLASS PROPERTIES, DUE TO ROCKY FLATS OPERATIONS BY DOW AND ROCKWELL. THERE WERE DAYS IT WAS SO HARD AND IT WAS, I REALIZE NOW, THERE WAS NO REAL EVIDENCE THERE WAS CONTAMINATION ON THE CLASS PROPERTIES. I CAN TELL YOU WE WERE SPLIT ON THE VERDICT RIGHT FROM THE BEGINNING OF DELIBERATIONS. AND THAT MADE THREE JURORS ANGRY. THE

THREE THAT BULLIED THOSE OTHERS TO CHANGE THEIR MIND ON THE VERDICT. I DON'T KNOW IF THIS MATTERS, BUT THOSE THREE WERE STUCK ON SOMETHING JUDGE KANE SAID BEFORE WE STARTED DELIBERATIONS. THAT HE WOULDN'T LET THIS BE A HUNG JURY. I FELT THAT WAS WRONG. BECAUSE ALL THAT HAPPENED, WAS THE JURORS WITH STRONGER PERSONALITIES WON. AND I AM VERY ANGRY ABOUT THIS. BUT I DECIDED THEY WERE NOT GOING TO CHANGE MY DECISION. I DON'T CARE HOW MAD THEY GOT. I JUST WISH SOME OF THE OTHER JURORS WOULD HAVE FELT THE SAME.

ABOUT [JUROR NAME REDACTED] THERE WAS A FEW TIMES HE HAD ISSUES WITH JURORS BEFORE DELIBERATIONS. HE WAS ANGRY AND GAVE A SPEECH TO US ABOUT OUR CONDUCT, ABOUT DISCUSSING WHAT WENT ON IN COURT. IT WAS HARD IN THE BEGINNING NOT TO TALK ABOUT IT ON OUR BREAKS. BUT WHEN I SAW HIM IN DELIBERATIONS WITH THAT ATTITUDE, HE JUST GOT WORSE. AND WHAT HE DID TO [JUROR X] WAS TOTALLY UNCALLED FOR.

ANOTHER THING THAT BAFFLED ME, WAS THE FBI RAID LED BY AGENT LIKSKY. IN MY MIND THAT DIDN'T PROVE ANYTHING. I WAS VERY CONFUSED BY THAT WITNESS. WHAT WERE THE PLAINTIFFS LAWYERS TRYING TO PROVE WITH HIM AND THAT VIDEO HE BROUGHT WITH HIM. MOST OF THE JURORS THOUGHT OF HIM AS A JOKE. AND WE DIDN'T USE HIS TESTOMONY IN DELIBERATIONS.

THERE WAS ONE QUESTION SOME OF THE JURORS WERE STUMPED ON THAT I FORGOT TO MENTION WHEN WE MET. THE ONE THAT HAD TO DO WITH THE DEFENDANTS ACTIONS BEING WILLFUL AND WONTON. THOSE WERE TWO POWERFUL WORDS AND SOME OF US COULDN'T BELIEVE DOW AND ROCKWELL ACTED THAT WAY INTENTUALLY. ONCE WE GOT PASSED DOW IT WAS MORE DIFFICULT FOR ROCKWELL. BUT ONCE A CERTAIN JUROR READ THE PAGE ON ENVIRONMENTAL CRIMES AGAINST ROCKWELL ON SITE, NOT OFF! THE JURORS, TWO ESPECIALLY HAD NO PROBLEM CHANGING THEIR ANSWER FROM NO TO YES. I STILL FELT STRONGLY OPPOSED.

THE MORE I THINK ABOUT THE CASE AND DELIBERATIONS, THE MORE I SEEM TO RECALL. I REALLY FEEL THERE SHOULD BE A MISTRIAL OR APPEAL. I GET ANGRY REMEMBERING HOW THINGS WENT. THE MORE I THINK ABOUT THIS, THE MORE I AM SURE THE VERDICT IS WRONG.

I JUST WANT THE PUBLIC TO KNOW, THERE IS NO THREAT TO LIVING IN THE AREA AND THERE WAS NO REAL PROOF OF PU CONTAMINATION ON THE PROPERTIES DOWN WIND OF ROCKY FLATS.

JUST LAST NIGHT MY FRIEND WHO LIVED IN THE AREA FOR 20 YRS. FROM 1977-1997, TOLD ME WHEN THEY SOLD THEIR HOUSE, THEY HAD THEIR WELL TESTED AND NOTHING WAS FOUND WRONG. SHE KNEW SHE COULDN'T TALK TO ME ABOUT THIS UNTIL THE WHOLE ORDEAL WAS DONE.

MR. BERNICK I WANT YOU TO KNOW YOU DID YOUR JOB WELL. SOME OF US WERE EITHER CONFUSED OR CONVINCED THERE IS NO THREAT FROM PU CONTAMINATION IN THE CLASS AREAS FROM ROCKY FLATS OPERATIONS. AND THERE NEVER WAS.

I WOULD LIKE TO KNOW THE NEXT STEPS OF THE CASE. IF IT IS GOING TO BE APPEALED. I DIDN'T LIKE THE VERDICT. IF YOU CAN'T SAY I UNDERSTAND. MAYBE I'LL READ ABOUT IT IN THE NEWS.

I REALLY WANT TO HELP AS MUCH AS I CAN. BECAUSE AFTER SERVING AS A JUROR, I DON'T FEEL OUR JUDICIAL SYSTEM WORKS AS IT WAS MEANT TO. THERE ARE TOO MANY CONFLICTS AMONG JURORS AND I FEEL THAT SOME DON'T HAVE A CLUE WHAT IT'S ALL ABOUT OR JUST DON'T CARE.

HERE IS A NEWS ARTICLE A FRIEND FOUND IN A LOCAL PAPER. IT MAKES JON LIPSKY SOUND LIKE A HERO. IF THE PUBLIC ONLY KNEW THAT THE JURORS THOUGHT HIS TESTOMONY WAS POINTLESS. THE MORE I READ ABOUT THIS CASE IN THE NEWS, THE MORE I DISLIKE THE NEWS MEDIA.

I WISH YOU MUCH LUCK WITH THE NEXT STEPS OF THIS CASE. IF YOU NEED TO REACH ME YOU CAN CALL ME AT [REDACTED] [REDACTED] OR EMAIL [REDACTED] I'LL HELP ANYWAY I CAN.

SINCERELY, [JUROR Z NAME REDACTED]

*FROM A LOCAL DENVER NEWSPAPER CALLED WESTWORD.*



# CALHOUN

"You are doing something to preserve, protect and defend the integrity of our government system."

## Flats, Busted

### Lawsuits against Rocky Flats, like plutonium, last forever.

**BY PATRICIA CALHOUN**

After months of testimony and weeks of deliberation, the ten jurors considering the case of Merilyn Cook, et al., vs. Rockwell International Corporation and the Dow Chemical Company had finally reached a verdict. But before it was revealed, U.S. District Judge John Kane had a few words to say.

"Through this trial, I had a clipping from one of the newspapers that said — the headline was 'Rocky Flats Gets Its Day in Court.' It's a typical newspaper understatement," he told the jurors. "What you had is 69 days of this trial spread out from October 3 to the present time, and you deliberated all or part of seventeen days....

"So today is the last day of this, and I want — I don't know how to say this as evocatively, as forcefully as I really want to, but we are all committed to the jury system in this country, and to allow citizens to be in this particular venue of the courtroom with a jury, to be government by the people, of the people, and you have served in that capacity far more than most other jurors do because of the length and time and the complexity of the case. You have set an example and a standard that all of us respect, and I want you to carry with you the notion that you are doing something to preserve, protect and defend the integrity of our government system by the work that you've put in, the concentration, the effort and the time."

And then on February 14, more than four months after they'd first stepped foot in the federal courthouse, the jurors delivered a verdict in favor of the plaintiffs — a class of 12,000 property owners who'd owned land around Rocky Flats in 1990 — awarding them $554 million, a record judgment in this state, for the damage done to their property. For the damage done to their lives.

For the damage done by the lies.

"The jury has spoken, and they saw through the guff," says Jon Lipsky, who knows guff when he sees it. As the environmental-crimes expert for the FBI in Denver, Lipsky led the probe into alleged violations at Rocky Flats Nuclear Weapons Plant, the federal facility built sixteen miles upwind of Denver to manufacture plutonium triggers for nuclear bombs. After two years of investigation and armed with a 116-page search warrant, he led dozens of FBI and EPA agents on a spectacular dawn raid of the plant on June 6, 1989. The evidence seized in that raid went to Colorado Special Grand Jury 89-2, impaneled on August 1 of that year and charged with investigating possible federal crimes at Rocky Flats.

Lipsky testified before that grand jury, just as he would later testify before the jury considering the class-action case against Dow, which ran Rocky Flats for the federal government from 1953 until 1975, and Rockwell, which had the contract from 1975 up until the raid. After that, the plant was never again operational.

Lipsky's raid not only shut down Rocky Flats, but woke up its neighbors, who'd been assured by the government that the facility posed no threat. All that summer, they held community meetings, panicked by the stories leaking out, fearful of the plant's impact on their health, on their property. On January 30, 1990, they filed suit against the two companies that had operated Rocky Flats in almost complete secrecy for close to forty years.

More than fifteen years later, in Judge Kane's courtroom, Lipsky finally got to talk about what he'd found at Rocky Flats. Until January 2005, when he retired from the FBI, he hadn't been allowed to talk about the case in public at all. In fact, the day after a congressional subcommittee issued a report on the grand-jury investigation, Lipsky, the FBI's environmental expert, was transferred by then-U.S. Attorney Mike Norton to Los Angeles, where he was assigned to a gang unit.

But he never forgot what he'd seen at Rocky Flats. And over days of testimony in the civil case last fall, as the lead witness for the plaintiffs, he told the jurors about his work leading up to the raid, about the nighttime flights that indicated an incinerator that was supposed to be shut down was illegally burning hazardous waste, about the workers who'd come to him with stories about being told to violate plant policies.

While he wasn't in the courtroom to hear the verdict, Lipsky was there in spirit. "I'm ecstatic," he says. "It's very important that what the government used, its cloak of secrecy, is now uncovered. The jury got it, there's no doubt."

Jon Lipsky made his first public statements about Rocky Flats in January 2005, in support of a bill introduced by Representative Wes McKinley — the math-teaching, poetry-writing rancher who was elected to the Colorado House in 2004 and who had served as

> "It also proves that there has been contamination, and will be, for 24,000 years."

foreman of the grand jury investigating Rocky Flats. Those jurors spent two years listening to testimony and sorting through the evidence, ultimately determining that eight individuals — some from Rockwell, some from the Department of Energy — should be charged with environmental crimes. Instead, the grand jurors were dismissed and U.S. Attorney Norton offered Rockwell a deal in March 1992, fining the company $18.5 million in exchange for a guilty plea to ten counts — five felonies, five misdemeanors — that named no individuals.

Outraged, the grand jurors wrote a report that described an "ongoing criminal enterprise" at Rocky Flats and asked that it be made public; U.S. Judge Sherman Finesilver ordered it sealed. Although a redacted version was eventually released, the grand jurors have never been allowed to talk about how the Department of Justice prevented them from doing their duty in this case, how justice was denied. They are still under a gag order imposed by the judge.

Last year, McKinley asked legislators to approve a bill that would require signs outside Rocky Flats — the site of a $7 billion, six-year cleanup to allow its conversion to a nature and wildlife refuge — letting people know what might be underfoot on their nature hikes. The measure failed, but McKinley reintroduced it this year, and he has much higher hopes for its success in the wake of the jury's verdict in the class-action suit. "It took them four months to come to the same conclusion that I had known and could have told them in four minutes. Thank you to the jury," he says. "It also proves that there has been contamination, and will be, for 24,000 years at Rocky Flats. It would be nice to keep people out, but we fought for our rights to make our own decisions. So the people going out there have a right to decide for themselves that they want to go — but it is our moral duty to let the facts be known so that they can make educated decisions."

Jonathan Turley, a law professor at George Washington University, has represented Wes McKinley's fellow grand jurors for more than a decade. Initially, he hoped that they would be released from grand-jury confidentiality in order to testify before Congress. When that effort failed, he filed a petition on behalf of the grand jurors that they be allowed to tell their story in court. And in 1997, in a special hearing room with all its windows blocked, those grand jurors did testify before U.S. Judge Richard Matsch — not about what had happened in the jury room, but about how government employees and Justice lawyers had conducted themselves improperly. Perhaps illegally.

The transcripts of that hearing were never released. Even the hearing itself remained a secret until January 11, when Turley appeared before three U.S. Court of Appeals judges. A block continued on page 13



**Calhoun** continued from page 10

away, the jurors in Judge Kane's courtroom were going on three months and were up to exhibit 2251 in the class-action case; Turley himself was going on a dozen years. "Since this case," he says, "I have gotten married, gotten tenure and a chair, had four kids and gained fifty pounds." But he has not yet secured the grand jurors their right to speak; Turley is still waiting to hear if the trial court will be reversed and the case remanded.

"The amazing thing about places like Rocky Flats is that not only do the injuries continue, but you have litigation for decades," Turley says. "You have a group of managers who engaged in gross misconduct. Most of those managers faced no repercussions at all, yet we are going to have decades of litigation and millions of dollars of costs for the mess they created, and there is no meaningful punishment of any government official connected with Rocky Flats. The government is covering its own.

"The thing that disturbs me most is that even after all these years and all this money, the people still do not know what motivated the grand jurors to take their historic stand. When people learn that, they are going to finally understand what has motivated these grand jurors to keep this fight going."

Jim Stone knows just how long the fight can take. He's the former Rocky Flats engineer who blew the whistle on the plant's poor practices, who provided leads for the FBI — even suggested those overflights to check out the incinerator — and filed suit against Rockwell under the federal False Claims Act in July 1989. Ten years passed before a jury finally ruled in Stone's favor.

Rockwell appealed, of course. "I understand why they delayed," he says. "They were caught with their hands in the till and don't want to pay it back." What he couldn't understand was why the appeals ruling had also been delayed. "The claimed 'cleanup' at Rocky Flats has not taken as long as my case," he continues. "The moral of the story, and my advice for the plaintiffs in the current Rocky Flats trial, is that they still have a long way to go, and the only thing they can count on is delay upon delay."

Stone wasn't well enough to testify in that trial. By the time the appeals court finally ruled in his favor two months ago, he'd moved into assisted living. Rockwell will have to file a petition by early April if it wants the Supreme Court to consider taking on the case. And in the meantime, says Hartley Alley, Stone's longtime attorney, "Rockwell has applied in the claims court for $20 million in attorneys' fees to defend the Stone case that they lost."

Rockwell's legal fees in the class-action case, like Dow's, are being paid by the federal government, which indemnified both companies when they contracted to run the plant. Those legal fees have already topped $60 million, and there are years of appeals left. The government will foot the bill for the jury verdict, too — unless, Alley suggests, it instead argues that the companies violated their contracts by "committing fraud. That's what the government argued in the Stone case."

His client has yet to see a penny of the $4.2 million judgment.

The plaintiffs in the class-action case have waited almost as long as Stone. The past sixteen years have taken a toll — some plaintiffs have passed on — and yet they fought on. "It's a classic struggle of the people versus the biggest institutions in America," says Bruce DeBoskey, the Denver lawyer who already had a history of taking on Rocky Flats when he filed the case back in 1990. "We recognized that it would be a monumental struggle. It's amazing that the plaintiffs stood their ground and waited."

They waited while the courts considered the two lawsuits DeBoskey originally filed — one on behalf of Rocky Flats workers, the other on behalf of nearby residents. They waited while the latter suit made its way through the courts, and the 11,000 to 12,000 property owners around Rocky Flats were officially certified as a class in the mid-'90s. They waited while Kane held the DOE in contempt of court and fined the agency half a million dollars because it had stonewalled on document production.

They waited while DeBoskey and the two major plaintiffs' firms he'd enlisted in the cause — all working on contingency — fought a defense "with a blank check signed by the government," a defense that showed no interest in settling. Ultimately, DeBoskey couldn't wait as long as the plaintiffs — he took a job as a regional director of the Anti-Defamation League — but his heart remained with them, and he was in court the day the verdict was read.

"For 25 years in this community, there have been people accusing not just the companies, but the government of lying to the people," says DeBoskey. "And finally, after all that, the citizens got to tell their story to an impartial panel of citizens."

"One of the golden rules we learned in kindergarten is that if you make a mess, you clean it up," Louise Roselle, one of the plaintiffs' attorneys, said in closing arguments. "Dow and Rockwell messed up big time with one of the most dangerous substances on earth."

The jurors agreed. And after their verdict was read, lead defense attorney David Bernick — a kindergarten classmate of mine, by the way — demanded that the ten remaining jurors be quizzed to determine if any pressure had been put on them to side with the rest. "As a juror," one juror told the court, "I'm insulted that we're even going into this."

The jury verdict has already been cut down to about $350 million to comply with state laws. And both sides have filed motions with the judge regarding jury confidentiality and other issues that are no doubt bound for "the court of second conjecture," Kane says.

But in the meantime, for so many who have waited so long, the justice of that verdict is sweet enough.

After his many days of testimony, but still months before the verdict came down, Jon Lipsky visited the one Rocky Flats building he'd never seen during all of his time at the plant — the old payroll office on Highway 93, now converted to the Rocky Flats Lounge. "I've been to every building," he said, "except here."

Business has been slow at the bar since the plant closed, since the cleanup ended. But you can still buy cold beer, as well as the T-shirt that Lipsky picked up: "I got nuclear wasted at Rocky Flats."

Didn't we all.

Contact the author at patricia.calhoun@westword.com