# EXHIBIT B

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**MERILYN COOK, et al.,**

      **Plaintiffs,**

**v.**

**ROCKWELL INTERNATIONAL**
**CORPORATION and THE DOW**
**CHEMICAL COMPANY,**

      **Defendants.**

**Civil Action No. 90-cv-00181-JLK**

## DECLARATION OF CHARLES W. WOLFRAM

Charles W. Wolfram, under oath, declares and says:

### <u>INTRODUCTION</u>

1. My name is Charles W. Wolfram. I am an adult and fully competent and able to make this declaration. Except as otherwise indicated, the statements contained in this declaration are within my personal knowledge and are true and correct. I have written the entirety of this declaration, using my own office equipment and other resources. I am prepared to testify to my opinions and the grounds for them as well as all aspects of the preparation of this declaration, should that be appropriate.

2. I submit this declaration at the request of counsel for defendants Rockwell International Corporation and The Dow Chemical Company (collectively "Defendants" and "Counsel for Defendants").

## QUALIFICATIONS

3. I am the Charles Frank Reavis Sr. Professor Emeritus at the Cornell Law School. (I took emeritus status in July 1999 after a year as acting dean at the law school. I am now retired (aside from professional writing and consulting work, such as this), and reside in Berkeley, California, where I am not associated with any law school.) I was first admitted to the bar in 1962 and began my career as a law professor in 1965. For more than thirty years, I have been extensively involved in research, writing, teaching, speaking, public-service activities, and consulting relating to legal and judicial ethics and the legal profession. Without implying that any organization specifically endorses the views stated in this declaration, I state that for the fourteen years beginning in 1986 I served as Chief Reporter for the American Law Institute's Restatement of the Law Governing Lawyers. The Restatement was given final approval by the Institute in May, 1998 and was published in a two-volume set in the Fall of 2000.

4. I am also the author of the West Publishing Company treatise Modern Legal Ethics, which contains a chapter on judicial ethics as well as materials on sanctionable lawyer activities. In addition to Modern Legal Ethics, I have written about the professional responsibilities of lawyers and judges in other books, scholarly articles, book chapters, and newspapers and magazines. The Restatement, my treatise, and other works that I have authored are known to and have been cited, quoted, and relied upon by scholars and courts, including the Supreme Court of the United States and the federal and state courts in Colorado, including the Colorado Supreme Court.

2

(My <u>Modern Legal Ethics</u> treatise is listed as one of the "Most Cited Treatises and Texts" published in the last twenty years in Fred R. Shapiro, The Most-Cited Legal Books, 18 *Legal Information Alert* 1, 6 (September, 1999)–the only work on legal ethics listed.) I have frequently lectured to bar associations, continuing education groups, judicial conferences and similar groups of lawyers and judges; I have consulted with lawyers and judges about problems of legal and judicial ethics; and I have testified and submitted expert opinions in litigation on issues relating to legal and judicial ethics in cases in many jurisdictions in the United States, including state and federal tribunals in Colorado, and in courts in Australia, Canada, England, and Japan. Other information on my qualifications is given in my resume, a current copy of which is attached as Exhibit 1.

<u>ANALYSIS</u>

5. This Court has stated that Federal Rule of Evidence 606(b) has a quite extensive reach, such as by precluding Counsel for Defendants from interviewing jurors after the verdict as "in direct contravention of Rule 606(b) of the Federal Rules of Evidence . . . ." <u>See</u> Order on Pending Motions Filed Under Seal (Docs. 2122, 2123, 2156) Motion to Preserve Jury Notes (Doc. 2124), at 4 (March 13, 2006) ("3/13/06 Order"). The Court further stated (id. at 6) that;

"[o]nce a jury has deliberated to verdict , . . . no reasonable argument can be made that anything other than FRE 606(b) governs a *post hoc* inquiry into a potential 'taint' in the deliberative process, particularly one that ostensibly occurred two days into an 18-day deliberation process and after a four month, exceedingly complex trial. In this case, Rule 606(b) governs the issues raised and preclude the fishing expedition requested by Defendants."

3

6. This Court has also stated, in ruling on Defendants' prior Renewed and New Motion for Mistrial, that "[e]ach of the authorities by which counsel and I are bound have prohibited the consideration of juror statements regarding the internal deliberations process requested by Defendants. . . . Further indifference to this clearly established law by counsel for either side on the issue will be deemed sanctionable." (Order of May 10, 2006 (on Defendants' Renewed and New Motion for Mistrial, filed May 9, 2006, at 4) ("5/10/06 Order"). In the current Defendants' Renewed and New Motion for Mistrial Based on Undisclosed *Ex Parte* Communications ("Renewed and New Motion for Mistrial"), Defendants and Counsel for Defendants have renewed their arguments for mistrial based on new facts previously unknown to them and hence not in the record of this proceeding. Those previously unknown facts are reflected in an affidavit of Juror X submitted in support of the Renewed and New Motion for Mistrial. As recited in Juror X's affidavit, those facts concern the content of ex parte communications between the Court and Juror X and between the Court's Deputy and Juror X, in which Juror X states she complained of bullying that was occurring in the jury room. I have been asked to provide my opinion as an expert on legal ethics concerning whether the actions of Counsel for Defendants in filing the Renewed and New Motion for Mistrial, supported by Juror X's affidavit, would constitute sanctionable advocacy as perhaps suggested by the above-quoted words in the Court's 5/10/06 Order.

7. I must confess, initially, that the import of the Court's statement in its 5/10/06 Order is ambiguous. "[F]urther indifference" could run the gamut from repeating much the same argument as the Court was addressing in that motion, even if based on new evidence not then reasonably available to Defendants, to (much more plausibly) repeating the same arguments with no additional evidence or other significant new basis, to (more plausibly yet) filing a motion under

4

circumstances indicating that it had no purpose other than to harass counsel for Plaintiffs and impose hardship upon the Court (other than the need to decide a motion). I find it difficult to believe that any federal judge would suggest that the activities of Defendants and Counsel for Defendants in filing the current Renewed and New Motion for Mistrial would in any way be sanctionable. Nonetheless, that is the issue that I address here.

8. In appropriate and limited circumstances, a federal district Court is empowered to impose sanctions on an advocate under one of several different standards. Those relevant here are Rule 11 of the Rules of Federal Procedure, § 1927 of Title 28 of the United States Code, and the Court's "inherent power" to impose sanctions. See generally Hutchinson v. Pfeil, 208 F.3d 1180 (10th Cir. 2000) (discussing different substantive standards, procedural requirements, and allowable sanctions under those sources of sanctioning power); Restatement § 110 (discussing aspects of the duty of advocates to avoid "frivolous" advocacy). Rule 11 provides for sanctions when an advocate, in signing a document such as this Renewed and New Motion for Mistrial, does so either: with an improper purpose, such as to harass or cause unnecessary delay or needless increase in the cost of litigation (Rule 11(b)(1)); or based on legal contentions that are not warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law (Rule 11(b)(2)); or based on contentions that lack evidentiary support (Rule 11(b)(3)). Section 1927 empowers a district court to impose described sanctions on a lawyer who "so multiples the proceedings in any case unreasonably and vexatiously . . . ." Finally, a federal court's inherent power to impose sanctions extends to acts of a party or lawyer that are taken "in bad faith, vexatiously, wantonly, or for oppressive reasons." Chambers v. NASCO., Inc., 501 U.S. 32, 45-46, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991) (quotations omitted).

9. <u>Rule 11</u>. First, as to possible application of Rule 11, there is ample authority in support of Defendants' arguments for mistrial and supporting the admissibility of Juror X's affidavit. Among that authority are the several statements of the Tenth Circuit in its decision in <u>United States v. Scisum</u>, 32 F.3d 1479 (10th Cir. 1994), about the admissibility of a juror's affidavit concerning ex parte communications and other aspects of the jury process, as well as the other decisions cited and relied upon by Counsel for Defendants from other federal circuits. Those authorities are far more than sufficient to comply with the minimal requirements of Rule 11 that legal contentions be supported by existing law.

10. Other decisions, such as the Seventh Circuit's decision in <u>United States v. Sababu</u>, 891 F. 2d 1308 (7th Cir. 1989), persuasively hold that Rule 606(b) is entirely irrelevant in the context in which Defendants offer the affidavit of Juror X–not to impeach a verdict already reached, but to show what could have been learned as a result of Defendants' pre-verdict request for an appropriate inquiry. As the court put it in <u>Sababu</u> (891 F.2d at 1335) (emphasis in original):

> The Rule [Rule 606(b)], by its own terms, limits inquiries into "the validity of the verdict or indictment." In the instant case, the judge was requested to question the jurors *during* their deliberations and *before* they had reached a verdict. In such a situation, the Rule is inoperative and the trial judge was not restricted by it from conducting a *voir dire* of the jury as to the effect of [the claimed erroneous activity of the jurors].

To be sure, the effect of a grant of the Defendants' Renewed and New Motion for Mistrial would be to set aside the verdict. But in doing so Defendants are limiting their motion to the situation that existed pre-verdict–at the time that Juror X left the jury room and reported the bullying to, according

to her affidavit, the Court's Deputy and the Court. Defendants now complain about the Court's refusal at that point to conduct the requested inquiry of Juror X in the presence of the parties and their counsel–an inquiry that ample authority insists upon in situations similar to that confronting the Court and the parties when Juror X emerged from the jury room. In my view, the argument of Defendants and Counsel for Defendants that the affidavit of Juror X is admissible notwithstanding Evidence Rule 606(b) not only satisfies the minimal test of "nonfrivolous," but is compelling.

11. <u>§ 1927</u>. For similar reasons, sanctions here under § 1927 would also be inappropriate. In no sense can it be accurately charged that Counsel for Defendants have "multiplie[d] [these proceedings]. . . unreasonably and vexatiously" through the Renewed and New Motion for Mistrial. They are not simply rehashing old arguments that have already been rejected in the form in which they are now being pressed. Counsel for Defendants are pressing new arguments based on new evidence. That could not possibly be viewed as "unreasonable" or "vexatious," because putting Defendants' new evidence and new arguments on the trial record is imperative in order for them to rely on those arguments and that evidence on appeal, should an appeal be necessary.

12. <u>Inherent Powers</u>. Again, there is no realistic possibility that the present situation involves the kind of out-of-control "scorched earth" advocacy encompassed within the narrow confines of advocacy that is conducted in "bad faith, vexatiously, wantonly, or for oppressive reasons" (see ¶ 8, above). Again, presenting Defendants' new arguments and new evidence is critically important in building a minimally appropriate record for appellate review. Building such a record is well within the core of appropriate advocacy and is the kind of activity in which trial advocates engage in federal courts throughout the country every court day.

13. As interpreted by courts, the standards in Rule 11, § 1927, and inherent powers that govern a court's sanctioning power differ significantly in (among other things) their substantive reach, but each requires–at a minimum–that the lawyer be guilty of advocacy that radically departs from the standard of conduct that would be observed by a lawyer of ordinary care and prudence–a standard well-known in the law of legal malpractice and one that I and every legal ethics expert knows well. In other words, conduct of an advocate that comports with the negligence standard is a fortiori not sanctionable. In that sense, the negligence standard usefully serves as a litmus test to determine whether conduct in question can possibly be found sanctionable under Rule 11, § 1927, or the court's inherent power. Accordingly, I also have assessed the actions of Counsel for Defendants in urging the Renewed and New Motion for Mistrial supported by Juror X's affidavit against the standard of a lawyer of ordinary care and prudence. In my view, there can be no doubt that those actions of Counsel for Defendants fully comply with the negligence standard and thus are not subject to sanction under Rule 11, § 1927, or the Court's inherent power. It might well have been counted as negligence and a failure of counsel's duty of zealous advocacy for Counsel for Defendants not to have renewed the motion for mistrial under consideration at this time.

14. The arguments in the Renewed and New Motion for Mistrial fully comport with the standard of care that would be observed by a lawyer of ordinary care and prudence. It is entirely consistent with the standard of ordinary care and prudence for a lawyer to include matters such as Juror X's affidavit in the record so that they may be cited and relied upon on appeal. To provide the basis for an appellate argument, it is fundamental appellate law that those facts must first be made a part of the record to be certified to the Court of Appeals through an appropriate proffer such as the Renewed and New Motion for Mistrial. Should this Court refuse to accept the argument of

8

Defendants and Counsel for Defendants, the affidavit will nonetheless remain part of the record for appeal purposes.

15. In attempting to address the situation presented by the post-verdict discovery of new evidence about jury bullying, in my opinion Counsel for Defendants are doing nothing more, or less, than attempting in good faith and with ample support in existing law to advance their clients' objectives in this litigation, and are doing so well within the limits of the law. Counsel for Defendants are, in short, attempting to fulfil the objective of "zealously assert[ing] the client's position under the rules of the adversary system." (ABA Model Rules of Professional Conduct, Preamble ¶ [2]; see also Restatement § 16, cmt. d (duties of diligence and competence in advocacy).) The imposition of sanctions for taking steps that in good faith are reasonably necessary to perform that duty is, in my view, entirely unwarranted and uncalled for.

16. I declare under the penalty of perjury that the foregoing is true and correct and that I executed this declaration at Boothbay Harbor, Maine on this 20th day of July, 2006.

_Charles W. Wolfram_

Charles W. Wolfram

9

<u>E X H I B I T   1   —   R E S U M E</u>

# Charles W. Wolfram

Charles Frank Reavis Sr. Professor Emeritus
        Cornell Law School

<u>Education</u>

Pre-Law:  University of Notre Dame, South Bend, Indiana.  B.A., cum laude, 1959.

Law School:  University of Texas Law School, Austin, Texas. Graduation, LL.B., with honors, 1962.  Coif.  Note Editor, Texas Law Review.  Student Assistant, Legal Aid Clinic.

<u>Practice</u>

Covington & Burling, Washington, D.C.  Associate, 1962-64.

Federal Aviation Agency.  Hearing officer for Contract Appeals Panel, 1964-65.

Since 1965 -- consultation with lawyers and law firms on professional responsibility and court procedure problems; representation of indigent clients; consultant, counsel, and expert witness in legal malpractice, disqualification, professional discipline, and other litigation involving the professional responsibility of lawyers.

Admitted:  District of Columbia and Minnesota.

<u>Academic</u>

Cornell Law School: Interim Dean, August, 1998-June, 1999; Charles Frank Reavis Sr. Professor of Law Emeritus, July, 1999--; Charles Frank Reavis Sr. Professor, 1984-99; Acting Associate Dean for Academic Affairs, January-June, 1994; Associate Dean for Academic Affairs 1986-1990; professor since 1982; visiting professor 1981-82.  University of Minnesota Law School:  professor 1970-1982; associate professor 1967-1970; assistant professor 1965-1967; acting associate dean 1978.  University of Southern California Law Center:  visiting professor 1976-1977.

Courses taught (1965-1995):  legal ethics; civil procedure; federal jurisdiction; conflict of laws; remedies; legal process.  Continuing legal education lecturer on various subjects in legal ethics, judicial ethics, and civil procedure.

Memberships

Law School. Cornell:  faculty appointments committee (1998-99); curriculum committee (chair) (1989-1991); admissions and financial aid committee (chair, 1993-95); steering committee, Cornell Journal of Law and Public Policy. Faculty editor, Cornell Law Forum (1983-86).

University.  Cornell: Member, Financial Policies Committee (elected by all-University faculty) (1994-96); Chair, University Review Board (appointed by President of Cornell University; campus review board in faculty, student and staff discipline cases) (1989-1992).

Professional.  American Law Institute: Institute member (1981 --); Chief Reporter for Restatement of the Law Governing Lawyers (1986-2000); Members Consultative Group, Restatement (Third) of Agency (1997 --); Advisory Board, Law School Network Ethics and Professional Responsibility Journal, 2000−; Member, Panel of Academic Contributors, Black's Law Dictionary−Eighth Edition, 2003-05.  American Association of Law Schools: Advisory Task Force on Pro Bono and Public Service Opportunities in Law Schools (1997-99); Section on Professional Responsibility, chair (1983-1984), member of executive committee (1981-85); Planning Committee for Professional Responsibility Teachers Workshop (1983-84).

Non-Academic.  Member, Pro Bono Professors; Stanford Center on Ethics, 2005−. Consultant, Working Group on Ethics, National Bankruptcy Review Commission, 1996-97. Committee on Legal Education and Admission to the Bar, New York State Bar Association, 1986-1990. Member, Advisory Council, Texas Center for Legal Ethics and Professionalism, 1991−. Consultant, Chief Counsel of Office of Thrift Supervision (Department of the Treasury), 1991. Consultant, Grievance Oversight Committee of the Supreme Court of Texas, 1988. At-Large Director, University of Texas Law School Association, 1980-1983.  Minnesota Student Legal Services Board of Directors, 1979-1981.  Consultant, ABA Committee on Public Understanding of the Law, 1981.  Hennepin County (Minnesota) Bar Association Ethics Committee (1979-1981).  Minnesota State Bar Association Committee on Judicial Administration (1979-1981).  Reporter, Minnesota State Bar Association Committee to Study the Kutak Commission Report (1979-80) (drafted Report of the Committee, 37 Minnesota Bench and Bar 63-89 (July/August 1979)).  Steering Committee of Minnesota State Bar Long-Range Planning Committee (1980-1981). Board of Overseers, Bayville (Maine) Village Corporation, Member, 1994--, Chairman, 1997-2003.

Recipient: Sanford D. Levy Memorial Award from Committee on Professional Ethics, New York State Bar Association, 1985; J. Morris Clark Memorial Award from Hennepin County Bar Association, 1980.

Research and Publications

Sponsored Research:
Cornell Law School Faculty Research Leave (1988-89; 1989-90; 1990-91); sabbatical leave (January-June, 1985; academic year of July, 1991-June, 1992).

2

Cornell Law School Summer Research Grant (1982, 1983, 1984).

University of Minnesota, quarter leave, 1975-1976.

Faculty Summer Research Grant, University of Minnesota Graduate School, 1967.

Minnesota Law Alumni Association Summer Research Grants (1969, 1972, 1974, 1977, 1980); Goodrich Fund Summer Research Grant (1978); Fesler Summer Fellowship Grant (1979).

American Bar Foundation National Class Action Project (1973-1975; 1978-1983).

Working Group on Ethics in the Legal Profession, University of Maryland Center for Philosophy and Public Policy (1980-1982).

American Law Institute, chief reporter for the *Restatement of the Law Governing Lawyers* (1986-2000).

**PUBLICATIONS:**

**Books:**

*Restatement of the Law Governing Lawyers* (two volumes) (American Law Institute 2000) (student edition, 2001) (served as chief reporter; wrote Chapters 1, 5, and 6 and extensively edited all five other chapters in course of producing large number of reporter drafts, preliminary drafts, council drafts, tentative drafts and proposed final drafts).

*Modern Legal Ethics* (West Publishing Company, 1986; Practitioner's and Student's Editions). (Listed among "Most Cited Treatises and Texts" published in last twenty years in Fred R. Shapiro, The Most-Cited Legal Books, 18 *Legal Information Alert* 1, 6 (September, 1999).)

(With the late Professor J. Morris Clark) *Professional Responsibility: Issues for Minnesota Attorneys* (two volumes) (Minnesota Continuing Legal Education 1976).

**Articles, Book Chapters, and Miscellany:**

"A Cautionary Tale: Breach of Fiduciary Duty as Legal Malpractice," 54 *Hofstra Law Review* ___ (forthcoming, 2006) (invited paper delivered at conference at Hofstra University School of Law, October 30, 2005).

"Ethics 2000 and Conflicts of Interest: The More Things Change . . . ," 70 *Tennessee Law Review* 27 (2002) (invited paper delivered at conference at University of Tennessee College of Law, April 4, 2002).

3

"Comparative Multidisciplinary Practice of Law: Paths Taken and Not Taken," 52 *Case Western Law Review* 961 (2002) (invited paper in symposium issue on multidisciplinary practice controversy).

"Expanding State Jurisdiction to Regulate Lawyers," 30 *Hofstra Law Review* 1015 (2001) (invited paper in symposium issue on legal ethics reform).

"Lawyer Crimes–Beyond the Law?" 37 *Valparaiso Law Review* 73 (2001) (invited lecture given at Valparaiso School of Law).

"Toward a History of the Legalization of American Legal Ethics–I. Origins," 8 *University of Chicago Law School Roundtable* 469 (2001) (invited paper in symposium issue on history of legal ethics).

"Toward a History of the Legalization of American Legal Ethics–II. The Modern Era," 15 *Georgetown Journal of Legal Ethics* 205 (2002) (invited paper delivered at Georgetown Law School).

"The ABA and MDPs: Context, History, and Process," 85 *Minnesota Law Review* 1625 (2000) (invited paper included in symposium issue on multidisciplinary practice).

"Multidisciplinary Partnerships in the Law Practice of European and American Lawyers" (chapter 11 in *Lawyers' Practice and Ideals–A Comparative View* (John J. Barceló & Roger C. Cramton, eds., 1999)).

"Corporate Family Conflicts," 2 *Journal of the Institute for the Study of Legal Ethics* 295 (1999) (invited paper included in symposium issue on legal ethics) (also available on WestLaw at 2 JISLE 295) .

"Bismarck's Sausages and the ALI's Restatements," 26 *Hofstra Law Review* 817 (1998) (invited paper in symposium issue on political influences on the process of the American Law Institute in generating restatements of the law).

"The Boiling Pot of Lawyer Conflicts in Bankruptcy," 18 *Mississippi College Law Review* 383 (1998) (invited paper included in symposium on bankruptcy).

"Inherent Powers in the Crucible of Lawyer Self-Protection: Reflections on the LLP Reform Legislation," 39 *South Texas Law Review* 359 (1998) (invited paper published as part of symposium on law practice in organizations).

"Selecting Clients: Are You Free to Choose?,"*Trial Magazine* 21 (January 1998) (invited paper on Massachusetts agency decision requiring woman divorce lawyer to represent male clients).

4

"Former Client Conflicts," 10 *Georgetown Journal of Legal Ethics* 677 (1997) (invited paper published as part of symposium issue on the Restatement of the Law Governing Lawyers).

"Lights, Camera, Litigate: Lawyers as Media Figures in the U.S. and Canada," 19 *Dalhousie Law Journal* 373-410 (1996) (invited paper based on lecture at Dalhousie University, Halifax, Nova Scotia).

"Regulation of the Legal Profession" (Chapter 1 of *Restatement of the Law Governing Lawyers*; Preliminary Draft No. 12, May 15, 1996) (together with revised versions of Chapters 6 and 7).

"The Vaporous and the Real in Former-Client Conflicts," 1 *Journal of The Institute for the Study of Legal Ethics* 133-40 (1996).

"Screening" (Chapter Six in *Conflicts of Interest in Clinical Practice and Research*, Roy G. Spece, David S. Shimm & Allen E. Buchanan, eds. (Oxford University Press, 1996).

"Sneaking Around in the Legal Profession: Interjurisdictional Unauthorized Practice by Transactional Lawyers," 36 *South Texas Law Review* 665-713 (1995).

"Mass Torts--Messy Ethics," 80 *Cornell Law Review* 1228 (1995).

"Representing Clients" (Chapter 6A of *Restatement of the Law Governing Lawyers*; Preliminary Draft No. 10, May 13, 1994).

"The Substantial-Relationship Concept in Former-Client Conflicts of Interest," in *Fiduciary Duties/Conflicts of Interest* at 163-95 (A. MacInnes & B. Hamilton eds.; Winnipeg, Manitoba (1994)).

"Legal Ethics and the Restatement Process--the Sometimes-Uncomfortable Fit," 46 *Oklahoma Law Review* 13 (1993).

"Parts and Wholes: The Integrity of the Model Rules," 6 *Georgetown Journal of Legal Ethics* 861-902 (1993).

"Assisting Clients Outside Litigation," (Chapter Seven in *Restatement of the Law Governing Lawyers*; Preliminary Draft No. 8; August 14, 1992).

"The U.S. Law of Client Confidentiality: Framework for an International Perspective," 15 *Fordham International Law Journal* 529 (1992), reprinted as Chapter 7 in Mary C. Daly & Roger J. Goebel eds., *Rights, Liability, and Ethics in International Law Practice* (1995).

"Scottsboro Boy in 1991: The Promise of Adequate Criminal Representation Through the Years," 1 *Cornell Journal of Law and Public Policy* 61 (1992).

"Lawyers and Advocacy," (Chapter Six in *Restatement of the Law Governing Lawyers*; Preliminary Draft No. 7; August 8, 1991--Council Draft No. 9; November 16, 1992).

"Foreword" to Robert W. Hillman, *Law Firm Breakups* (Little Brown 1990), at xv-xviii.

"Lawyer Turf and Lawyer Regulation--The Role of the Inherent-Powers Doctrine," 12 *University of Arkansas--Little Rock Law Journal* 1 (1989).

"The Concept of a Restatement of the Law Governing Lawyers," 1 *Georgetown Journal of Legal Ethics* 195 (1987).

"Legal Process and Social Change in the History of Industrial Accidents," 12 *Cornell Law Forum* 10 (February 1985).

"The Ethics of Lawyers," 11 *Cornell Law Forum* 10 (June 1984).

"The Duty of a Lawyer to Represent Clients, Repugnant and Otherwise," in *The Good Lawyer* (D. Luban ed.; Rowman and Allenheld, 1984).

"The Second Set of Players:  Lawyers, Fee Shifting and the Limits of Professional Discipline," 47 *Law and Contemporary Problems* 293-320 (1984).

"Client Perjury:  The Kutak Commission and the Association of Trial Lawyers on Lawyers, Lying Clients, and the Adversary System," 1980 *American Bar Foundation Research Journal* 964-980.

"In Memoriam:  J. Morris Clark," 63 *Minnesota Law Review* 764-766 (1979).

"The Code of Professional Responsibility as a Measure of Attorney Liability in Civil Litigation," 30 *South Carolina Law Review* 281-319 (1979).

"Barriers to Effective Public Participation in Regulation of the Legal Profession," 62 *Minnesota Law Review* 619-647 (1978).

"Client Perjury," 50 *Southern California Law Review* 809-870 (1977).

"The Antibiotics Class Actions," 1976 *American Bar Foundation Research Journal* 251-363.

"The Constitutional History of the Seventh Amendment," 57 *Minnesota Law Review* 639-747 (1973).

6

"Maynard E. Pirsig:  Idealism in the Service of Judicial Administration," 54 *Minnesota Law Review* 908-915 (1970).

Book Review of Cound, Friedenthal & Miller, Civil Procedure:  Cases and Materials (1968), in 21 *Journal of Legal Education* 355-363 (1969).

"Notes from a Study of the Caseload of the Minnesota Supreme Court:  Some Comments and Statistics on Pressures and Responses," 53 *Minnesota Law Review* 939-976 (1969).

**Speeches, Lectures, Interviews, Unpublished Research, and Works in Progress:**

*Modern Legal Ethics* (second edition in progress).

"A Cautionary Tale: Breach of Fiduciary Duty as Legal Malpractice" (invited paper, delivered at Hofstra University School of Law *Symposium on Lawyers' Ethics in an Adversary System*, October 30, 2005, to be published with symposium papers in 54 Hofstra Law Review (2006), above).

Presentation on lawyer fee-splitting rules and proposals with State Bar of Texas Referral Fee Task Force (March 27, 2004, via video conference from Berkeley, California).

Commentary on conflicts of interest questions raised by Justice Scalia's association with Vice President Cheney and Justice Ginsburg's association with National Organization of Women, with Keith Olderman on MSNBC national television program "Counter Point" (March 18, 2004).

"Enron: Where Were the Lawyers?" (Continuing Legal Education Program of the Cornell Law School in Rochester, New York, on October 24, 2002).

"The Concept of the Entity Client: (1) The Lawyers of Enron; and (2) Corporate-Client Conflicts of Interest" (Continuing Legal Education presentation to Dallas and (by video conference) Houston offices of law firm of Gardere Wynn, in Dallas, Texas on October 21, 2002).

"Corporate Family Conflicts Redux" (invited paper, delivered at University of Illinois Law Review Symposium–*Ethics 2000 and Beyond: Reform or Professional Responsibility as Usual?* on April 5, 2002.

"Distinguished Visiting Professorship in Advocacy and Dispute Resolution" (March 25-28, 2002, visiting appointment at University of Tennessee College of Law, spent teaching, presenting paper to faculty, and writing).

"American Lawyers and the "Exercise of Independent Professional Judgment" (invited paper give at Symposium on the Future Structure and Regulation of Law Practice at the

University of Arizona James E. Rogers College of Law on February 23, 2002; and to Faculty Colloquium at University of Tennessee College of Law, March 27, 2002).

"Comparative Multidisciplinary Practice of Law: Paths Taken and Not Taken," (invited paper presented during Case-Western Law School Jonathan M. Ault Symposium on "Professional Responsibility and Multi-Disciplinary Practice," November 9,. 2001, published with symposium papers in 52 *Case Western Law Review*, above).

"Toward a Limited Expansion of State Jurisdiction to Regulate Lawyers" (invited paper presented during Hofstra University School of Law Symposium on "Legal Ethics: What Needs Fixing?" September 9-11, 2001, published with symposium papers in 30 *Hofstra Law Review*, above).

"The Sorcerer's Apprentice and the Emperor's Clothes: Who's the Client When Dealing with Entities?" (CLE lecture, Broome County Bar Association, Binghamton, New York, April 26, 2001).

"Lawyers Crimes–Beyond the Law?" (invited endowed Tabor Lecture, given at Valparaiso School of Law, Friday, April 20, 2001, with eventual publication in the Valparaiso Law Review, above).

"Multi-Jurisdictional Practice and Unauthorized Practice by Lawyers and Others" (CLE lecture at Valparaiso School of Law, Valparaiso, Indiana, April 20, 2001; substantially repeated as CLE lecture to Tompkins County (New York) Bar Association, May 10, 2001).

"Toward a History of the Legalization of American Legal Ethics" (lecture at annual symposium of Georgetown Journal of Legal Ethics, April 9, 2001; published as two articles in Chicago Law School Roundtable and Georgetown Journal of Legal Ethics, above).

"Turf Wars: Multi-Jurisdictional Practice and Unauthorized Practice by Lawyers and Others" (continuing legal education presentation at 23rd Annual Conference on Securities Regulation and Business Law Problems in Dallas, Texas, February 16, 2001; sponsored by the University of Texas School of Law, the Fort Worth District Office of the SEC, the Texas State Securities Board, and the Business Law Section of the State Bar of Texas).

"Multi-Jurisdictional Practice: The Brave New World" (keynote speaker at Multi-Jurisdictional Practice Symposium of Connecticut State Bar Foundation in New Britain, Connecticut, December 7, 2000).

"Ethics in Practice: Case Studies for the Bankruptcy Lawyer" (continuing legal education presentation at Fifth Annual Bankruptcy Symposium, sponsored by the Connecticut Bar Association Commercial Law and Bankruptcy Section and the United States Bankruptcy Court, Quinnipiac University School of Law, Hamden, Connecticut, November 17, 2000).

8

"Investing in Your Clients: Profits and Pitfalls" (presentation at meeting of New York Intellectual Property Lawyers Association meeting, Tarrytown, New York, October 14, 2000).

"The Ethical American Lawyer" (presentation at annual meeting of Canadian Bar Association, Halifax, Nova Scotia, August 23, 2000).

"Presidential Showcase: May It Please the Court, I am From Arthur Price & Deloitte: MDPs, Should Trial Lawyers Care?" (panel presentation at annual meeting of ABA Litigation Section, New York City, July 8, 2000).

"Perspectives on the Restatement of the Law Governing Lawyers" (morning-long presentation, with Professor John Leubsdorf, at Heritage Conference of Pennsylvania Superior Court Judges, in Boston, Massachusetts, May 9, 2000).

"The Conflicts of Migratory Lawyers" (presentation at meeting of ABA Section on Environmental Law, Keystone, Colorado, March 12, 2000).

"In-House MDPs?" (column in "Corporate Brief" Section of National Law Journal, March 6, 2000, at B6).

"The ABA and MDPs: Context, History, and Process" (paper presented at "The Future of the Profession: A Symposium on Multidisciplinary Practice" at University of Minnesota Law School, February 26, 2000; published with other symposium papers, above).

"Reflections on the Drafting of a Restatement" (faculty colloquium at University of Kentucky College of Law, February 10, 2000).

"Lawyers of Integrity" (invited lecture at University of Kentucky College of Law, February 10, 2000).

"Multidisciplinary Practice of Law: The Dawn of a New Age?" (invited Centennial Public Square Lecture at William Mitchell College of Law, St. Paul, Minnesota, November 9, 1999).

"Changes in the Practice of Law: Multidisciplinary and Multi-Jurisdictional Practice" (presentation at Colorado Bar Association Annual Convention in Vail, Colorado, September 24, 1999).

"The Threat and Promise of Multidisciplinary Practice" (presentation to Professional Responsibility Seminar of Minnesota Board of Lawyers Professional Responsibility in St. Paul, Minnesota, September 10, 1999).

"Ethical Dilemmas in the Courtroom" (panelist with members of federal and state judiciary discussing judicial independence and related issues, at Cornell Law School Reunion meeting, June 11, 1999).

"The Restatement of the Law Governing Lawyers" (panelist at plenary session of Fifth Circuit Judicial Conference in Houston, Texas on Thursday, April 29, 1999, discussing selected provisions of Restatement, including those on lawyer liability to non-clients, lawyer contact with a represented person, and conflicts in insurance-defense representations).

"American Lawyers in a Golden Age" (invited lecture at Saint Louis University School of Law, March 20, 1999).

"Trans-jurisdictional Law Practice: The Emerging Issues" (panelist at joint session of Association of Professional Responsibility Lawyers and National Organization of Bar Counsel in Los Angeles California, February 5, 1999, in conjunction with mid-year meeting of American Bar Association).

"Public Service in the Golden Age of Lawyering" (speech to Admittees to Bar of the New York Appellate Division, Third Department, Albany, New York, January 26, 1999).

"The Restatement and Client-Lawyer Confidentiality," (talk in course of Association of the Bar of the City of New York Professional & Judicial Ethics Committee Symposium on the Proposed Restatement (Third) of the Law Governing Lawyers, New York City; November 3, 1998).

"The Restatement of the Law of Lawyering," (speech to State Bar of Michigan Institute of Continuing Legal Education program on Ethics and Professional Responsibility: Present and Future," Troy, Michigan; October 22, 1998).

"Multistate Practice by In-House Corporate Lawyers" (invited paper given at conference of General Electric Corporation Intellectual Property Lawyers Group in Canadensis, Pennsylvania, on June 3, 1998).

"Corporate Family Conflicts" (invited paper presented during Hofstra University School of Law Symposium on "Ethics and Access to Justice," April 7, 1998, published with symposium papers in 2 *Journal of the Institute for the Study of Legal Ethics* 295 (1999)).

"The Bermuda Triangle of Ethics: Insurance Company, Policyholder, and Defense Counsel" (participant in panel discussion before Association of the Bar of the City of New York, February 3, 1998).

"What Will the Tobacco Fees Set in Motion?," National Law Journal, Dec. 3, 1998-Jan. 4, 1999, p. A 25 (analyzing the size and effects of the fee-arbitration award to the plaintiffs' lawyers in the Florida, Mississippi, and Texas litigations).

*NBC News Today Show* (interviewed by Matt Lauer on December 1, 1997 (along with attorney Lawrence J. Fox of Philadelphia) on whether the D. C. Circuit correctly ruled that Vincent Foster's lawyer could be ordered to testify before special prosecutor Starr's grand jury about confidential disclosure made by Foster to his lawyer days before his suicide). Similar

interview on same topic on *NBC News Today Show* on June 8, 1998, and taped with *CBS Television News* and *NBC Nightly News* on June 5, 1998, broadcast in news programs over weekend and on Monday, June 8, 1998 in connection with oral argument in United States Supreme Court.

"Inherent Powers in the Crucible of Lawyer Self-Protection: Reflections on the LLP Reform Movement" (invited paper presented at Symposium at South Texas Law School in September, 1997 on ethical problems in practicing in groups).

"'Multi-Disciplinary Partnerships' in the Law Practice of European and American Lawyers," (invited paper presented at Cornell Law School-W. M. Keck Foundation Symposium on "Lawyers' Practice and Ideals: A Comparative View," on July 5, 1997, at the Cornell Law School-Université de Paris I (Panthéon-Sorbonne) Summer Institute of International and Comparative Law, and at Presidential Showcase panel discussion of American Bar Association Section of International Law, San Francisco, August 3, 1997).

"The Georgetown Journal of Legal Ethics and the Restatement," (introductory remarks to symposium in Washington, D.C., on February 7, 1997, commemorating tenth anniversary of Georgetown Journal); "The Corporate Privilege and Immunity from Lawyer Investigators: Other Possible Perspectives" (discussion of corporate attorney-client privilege and application of anti-contact rule to corporate agents and employees, delivered at same symposium).

"Lights, Camera, Litigate: Lawyers as Media Figures in the U.S. and Canada" (F.B. Wickwire Memorial Lecture at Dalhousie University Law School (Halifax, Nova Scotia) on November 14, 1996; revised version printed as article in the *Dalhousie Law Journal*, above).

"The Vaporous and the Real in Former-Client Conflicts of Interest" (delivered as lecture on March 11, 1996 at Hofstra University School of Law in Hempstead, New York, and subsequently published in *Journal of the Institute for the Study of Legal Ethics*, above).

"Insurance-Defense Lawyers as Targets: The Restatement as the Cross Hairs?" (materials prepared as part of panel presentation at University of Texas School of Law Insurance Law Institute, Austin, Texas, September 27, 1996).

Discussions with Ethics Working Group of National Bankruptcy Review Commission, Sante Fe, New Mexico, September 19, 1996, and Washington, D.C., January 22, 1997, and presentation to members of Commission on May 15, 1997 (participation in discussion of possible revisions of federal Bankruptcy Code on lawyer conflicts of interest).

"Lawyers Retained by Liability Carriers to Represent Insureds in the Restatement of the Law Governing Lawyers," (co-authored with Professor Thomas D. Morgan) (published in ABA Section of Litigation--Committee on Insurance Coverage Litigation publication *Coverage* (volume 6, number 2; March/April, 1996).

11

"The Ethics of Bankruptcy Practice and the *Restatement of the Law Governing Lawyers*" (presentation as part of panel at meeting of American Bar Association, Section of Business Law (Bankruptcy), August 8, 1995).

"Law Firm Conflict-of-Interest Screening: Steps That Will Minimize the Risks in Former-Client Situations," *Law Firm Partnership and Benefits Report* (Vol. 1, No. 4; May 1995).

"Do Ethics Codes Matter?" (presentation as part of panel discussion of legal and judicial ethics at plenary session of Fifth Circuit Judicial Conference, New Orleans, Louisiana, May 23, 1995).

"Sneaking Around in the Legal Profession: Interjurisdictional Unauthorized Practice by Transactional Lawyers" (lecture at University of South Texas School of Law, February 24, 1995 --subsequently published in revised form in *South Texas Law Review*, above).

"What to Do If Management Does Not Support Recommended Disciplinary Actions" (presentation as part of panel discussion of ethical issues at Money Laundering Enforcement Seminar of American Bankers Association, Washington, D.C., October 28, 1994)
"The Changing Face of Judicial Ethics--From Aspiration to Regulation" (lecture to Canadian Institute for Advanced Legal Studies, Cornell Law School, July 14, 1994).

"An Unhealthy Bloom of Federal Court Rules Governing Lawyers?" (remarks at panel discussion on *Ethics in the United States Court of Appeals and District Courts* at Second Circuit Judicial Conference, Bolton Landing, New York, June 17, 1994); see 160 F.R.D. 345-50.

"Opposing Counsel: Deposition Conduct--Con" in *Litigation News*, Vol. 19, No. 5 (June, 1994) (written remarks on judicial attempt to solve witness-coaching problem).

"Horseshoes and Hand Grenades: Corporate Counsel Advice to Clients About White-Collar Crime" (CLE presentation to the Corporate Counsel Section of the Utah State Bar, April 8, 1994, Salt Lake City, Utah).

"The Substantial-Relationship Concept in Former-Client Conflicts of Interest" (Isaac Pitblado Lecture before Law Society of Manitoba, Winnipeg, November 19, 1993--published 1994, above).
"New Questions for Lawyers in Meeting Ethical Standards for the Practice of Law" (luncheon speech at annual meeting of the Federation of Bar Associations of the Sixth Judicial District, Ithaca, New York, September 11, 1993).

"Trends and Emerging Ethical Issues in Attorney Liability Cases" (remarks during panel discussion of attorney and accountant liability issues at 10th Anniversary Bank and Thrift Supervision, Enforcement and Compliance Conference, Washington, D.C., September 10, 1993).

"Ethical Implications in Syndicating Lawsuits" (panel presentation at meeting of Business Law Section of American Bar Association at annual ABA meeting, New York City, August 8, 1993).

"Confidentiality, Conflicts, Corporate Clients and the Texas Disciplinary Rules of Professional Conduct" (opening speech at program on Professionalism, sponsored by Texas Center for Legal Ethics and Professionalism at annual meeting of Texas State Bar Association, Fort Worth, Texas, June 18, 1993).

"Institute on the Future of the Legal Profession" (invited program participant at Case-Western Reserve Law School, Cleveland, Ohio, June 1-3, 1993).

"Kaye-Scholer–Will It Affect Future Grievance Cases" (presentation to Midyear Meeting of the Association of Professional Responsibility Lawyers, Boston, Massachusetts, February 6, 1993).

"Legal Ethics and the Restatement Process: The Sometimes-Uncomfortable Fit" (paper presented to Professional Responsibility Section of American Association of Law Schools, meeting in San Francisco, January 8, 1993; published in slightly revised form in *Oklahoma Law Review*, above).

"Ethical Considerations for Corporate Counsel: Advising and Disclosing in an Uncertain Legal World" (outline published in *Sixth Annual Institute on Corporate Law Department Management* (PLI 1992; available on WestLaw), lecture to Practising Law Institute Practice Course, PLI Training Center, New York, N.Y., December 4, 1992).

"Regulatory Agencies and Ethical Duties to Corporate Clients" (remarks at Ninth Annual Bank and Thrift Supervision, Enforcement, and Compliance Conference on September 18, 1992 in Washington, D.C.).

"Mapping the Minefield--The Applicable Ethics Rules and Conflicting Duties" (outline published in *The Attorney-Client Relationship After Kaye-Scholer* (PLI 1992; available on WestLaw), lecture to Practising Law Institute Practice Course, Washington, D.C., June 15, 1992).

"Kaye-Scholer and the Tempered Role of Regulatory Counsel" (talk given as part of panel discussion on June 11, 1992 in Banff Springs, Alberta during annual meeting of Attorneys' Liability Assurance Society).

"Sex, Power and the Profession" (remarks, published in *ABA 18th National Conference on Professional Responsibility* (ABA Center for Professional Responsibility, 1992), given in Palm Beach, Florida on June 4, 1992; also revised version published in *Twelfth Annual Virginia State Bar Disciplinary Conference* (1992)).

"American Law Firms and Their Culture in the Twenty-first Century" (luncheon speech at firm retreat of New York City firm of Haight, Gardner, Poor & Havens on May 9, 1992).

13

"Lessons from the Kaye-Scholer Debacle: Lawyer Advise on the Margins of Legality and the Duty-to-Disclose Conundrum" (12th Annual Ray Garrett, Jr. Corporate and Securities Law Institute, Northwestern University School of Law, May 1, 1992).

"Screening for Conflicts of Interest: The American Perspective" (panel discussion on February 21, 1992, at Federation of Law Societies of Canada in Vancouver, B.C.).

"Reporting Misconduct of Another Lawyer" (panel discussion on February 20, 1992, at Association of the Bar of the City of New York).

"Restating the Law Governing Lawyers--Legal Doctrine or Law Day Revisited?" (speech to the New York City Cornell Law Association, January 31, 1992).

"The American Law of Client Confidentiality: Framework for an International Perspective" (invited paper given October 10, 1991 at Fordham University School of Law Symposium on Internationalization of the Practice of Law; revised version published in *Fordham International Law Journal*, above).

"Legal Ethics and Counsel for Financial Institutions--and for Regulatory Agencies" (speech at ABA Section on Business Laws National Institute on The Closing of a Bank or Thrift, Washington, D.C., June 6, 1991).

"A Consumer's Guide to the Restatement of the Law Governing Lawyers" (speech to the Los Angeles Cornell Law Association, May 14, 1991).

"Scottsboro Boy in 1991: The Promise of Adequate Criminal Representation Through the Years" (lecture at Cornell Law School 1991 Law and Public Policy Symposium, April 20, 1991; revised version published in *Cornell Journal of Law and Public Policy*, above).

"Introduction to the American Law Institute's Restatement of the Law Governing Lawyers" (speech to ABA Section of Business Law, Williamsburg, Virginia, April 12, 1991).

"The Uncertain Realm of Former-Client Conflicts" (outline published in *Legal Ethics 1990: What Every Lawyer Needs to Know* (PLI 1990; available on WestLaw), lecture to Practising Law Institute Legal Ethics Program, PLI Training Center, New York, N.Y., October 25, 1990).

"Of Wild Bulls and Nose Rings: Controls on Lawyer Forensic Excesses" (speech at annual meeting of Attorneys' Liability Assurance Society in Quebec, June 29, 1990; a revised version of the speech was delivered at the annual meeting of Delaware Bar Association in Hershey, Pennsylvania, August 18, 1990).

"Lawyers, Client, Insurers: The Insurance Lawyer's Three-Cornered Hat" (invited lecture to Field Litigation Professional Issues and Standards Seminar of The Travelers Insurance Company, Winston-Salem, North Carolina, January 18, 1990).

14

"The Process of 'Restating' Ethics; the Challenge of the *Restatement of the Law Governing Lawyers*" (lecture before the annual Professional Responsibility Seminar of the Minnesota Office of Lawyers Professional Responsibility, September 29, 1989) (related remarks delivered at a Faculty Workshop, University of Minnesota Law School, same date).

"The Self-Regulation Stumbling Block" (debate with former president of California State Bar on bar proposal to remove most restrictions on unauthorized practice before conference sponsored by HALT, San Francisco, California, September 8, 1989).

"The Privileged World of a Lawyer's Office" (invited lecture to the Annual Meeting of the Tort and Insurance Practice Section of the ABA in Orlando, Florida, in May, 1989).

"Lawyer Turf and Lawyer Regulation--Lawyers and Courts Versus the Public Interest" (delivered as the Ben J. Altheimer Endowed Lecture at the University of Arkansas-Little Rock Law School in April 1989--a revised version published in the *University of Arkansas-Little Rock Law Journal*, above) (an earlier version was delivered as "Who Should Control the Practice of Law?" at the Annual Meeting of HALT in Washington, D.C. in April 1988).

"The Secret Sharer: Can an Attorney Be Compelled to Reveal His Client's Identity" (commentary article in *Manhattan Lawyer*, April 17, 1989, and other legal newspapers of the American Lawyer News Service--*e.g., Legal Times*, April 3, 1989, p. 23).

"The *Brief* Interview: Charles W. Wolfram Thinking about the Privilege," (interview) *The Brief* 21-25, 38-41 (Winter 1989).

"Client-Lawyer Confidentiality and the Constitution," Robert A. Nelson Memorial Lecture, University of Nebraska Law School, November 1987.

"Ethics," (interview) *The Student Lawyer* 36-38 (April 1987).

"Public-Interest Fee-Shifting After *Jeff D*," paper delivered before the Remedies Section of the Association of American Law Schools Annual Meeting, January 1987.

June, 2006

15