# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 90-cv-181-JLK

MERILYN COOK, *et al.*,

        Plaintiffs,

V.

ROCKWELL INTERNATIONAL CORPORATION
and THE DOW CHEMICAL COMPANY,

        Defendants.

---

TERESA YOUNGQUIST AFFIDAVIT

---

        I, Teresa Youngquist, after first being duly sworn, state the following:

    1.    My name is Teresa Youngquist. I live in Longmont, Colorado. I was a juror in the recent Denver, Colorado federal district court trial about the former Rocky Flats plant. I was dismissed from jury service on January 25, 2006.

    2.    Everything in this affidavit is accurate and true to the best of my knowledge. I am above 21 years of age and mentally competent to make these statements. If the Court had questioned me about the subjects covered by this affidavit on or about January 25, or at any time afterwards, I would have told the Court the facts that are stated in this affidavit. I am willing to testify to these facts.

    **3.**    I participated in jury deliberations in this case on four separate days: Friday, January 20 (for a partial day); Monday, January 23 (for a full day); Tuesday, January 24 (for a full day); and Wednesday, January 25 (for a portion of the morning, until around 10:00 a.m.).

**4.** While I was open minded about what the evidence might show and was willing to listen and participate in deliberations, I felt strongly that the defendants in the case had done nothing wrong. I definitely had not seen any evidence of intentional wrong doing by either company. I made comments to this effect during the four days that I participated in jury deliberations. I believe it was clear to other jurors what my perspective was as far as being pro-defense. I had made enough comments in the course of my participation in deliberations that the other jurors would have understood that I was defense-leaning.

**5.** A great deal of bullying went on in the jury room while I was present during deliberations. Two or three very vocal pro-plaintiff jurors would target certain individuals for abuse and to bring them down. The pro-plaintiff jurors would gang up on individuals such as myself and another juror who had offered pro-defense comments. The bullies targeted and attacked us for expressing views that were pro-defendant. During the four days that I participated in deliberations, defense-leaning jurors (including myself and **[Juror Y name redacted]** were made to cry by the excessive bullying and left the deliberations for the day in tears. **[Juror Z name redacted]** also seemed to have strong defense-leaning views from the few comments she did make, but, based on comments she made to me, she held back from sharing her thoughts very often because she saw the criticism that rained down on myself and others for expressing such views. This bullying hampered full participation in the deliberations by defense-leaning jurors, including myself.

**6.** During the first four days of deliberations, from what other jurors said and early votes on matters, it was clear that some jurors had not made up their minds about whether the defendants were liable. Indeed, the voting **on** the first question on the jury verdict form initially favored the defendants, though not by a sufficient number of votes to

**3**

resolve the matter. On the second question on the verdict form there was not a clear majority of votes one way or another during the period I participated in deliberations.

7. Other pro-plaintiff jurors brought their own views into deliberations. **[Juror A name redacted ]**, for example, had expressed pro-plaintiff and anti-government comments on more than one occasion throughout the trial, including prior to the beginning of deliberations. She continued to make such comments during the trial itself even after she was asked by other jurors to stop and to refrain from discussing the case before deliberations began. During deliberations, **[Juror A name redacted]** was very outspoken in her expression of anti-government views.

8. **[Juror B name redacted]** and **[Juror C name redacted]** were also dead set against the defendants from the very start of the case and were very vocal about their positions during deliberations. These two jurors had paired up from the very beginning of the trial. **[Juror B name redacted]** and **[Juror C name redacted]** spent time together during the day, they told me that they had beers together in the evening, and they carpooled to Court together. I was once invited to join the carpool (I live out in the same direction), but the invitation was made in such a way as to discourage me from accepting it. They said, "You can get a ride home with us, but we both smoke in the car, and we are planning to stop at a bar for a few beers on the way home. If you don't mind that …" Instead, I took the bus to and from Court. **[Juror B name redacted]** actively sought to be elected presiding juror. He began to campaign and lobby for the position long before deliberations began. **[Juror B name redacted]** was ultimately elected to be presiding juror.

9. During deliberations, I personally felt I was not allowed to fully express my defense-leaning views. Other jurors would interrupt and talk over me and others, and did not let us get our statements out. I was attacked, accused of bias and bullied **for** my pro-defense views. I felt pressured not to say things that were pro-defendant and, when I did try to say

things, other jurors (in particular, **[Juror B name redacted]**, **[Juror A name redacted]** and **[Juror C name redacted]**) talked over me and kept me from being heard. At one point, one pro-plaintiff juror, **[Juror C name redacted]**, made hand gestures (indicating "yak, yak, yak") when I made pro-defense comments.

**10.** Pro-plaintiff jurors would intimidate pro-defense jurors such as myself. For example, the presiding juror, **[Juror B name redacted]**, once confronted me, leaning in toward me in an aggressive position during heated discussion. **[Juror C name redacted]** was positioned nearby **[Juror B name redacted]** making hand gestures regarding my comments. Another pro-plaintiff juror, **[Juror A name redacted]**, would lean in uncomfortably close to me while expressing her views, would step in or reach into my space, and would touch or push around my notebook and belongings. I believe that they undertook these actions, perhaps intentionally, because they knew and saw that it bothered me and made me very uncomfortable.

11. On Wednesday, January 25, I told the other jurors that I had had suicidal thoughts over the weekend. The thoughts were due to the tension and bullying that took place in deliberations. I did not say I was going to commit suicide, just that I had had suicidal thoughts. For me, this is a significant distinction. I am a strong person, and would not ever act on such thoughts, nor did I ever say to anyone on the jury that I intended to act on these thoughts. I wanted to see changes in how the jurors interacted during deliberations -- I wanted to hear everyone else and I wanted to be heard myself.

12. In the midst of heated discussion on an issue of defendants' possible liability, I left the jury room in tears on January 25, 2006. I had been grilled and attacked all morning for having expressed pro-defendant comments. I went downstairs to the first floor, splashed some water on my face and was standing near the vending machines when **[Juror Y name redacted]** joined me. Together **[Juror Y name redacted]** and I went to the smokers' lounge. It was there that

I was approached by the Court's clerk, LaDonne Bush. Ms. Bush promptly sent [Juror Y name redacted] away.

13. Ms. Bush did not ask me if I could continue as a juror, nor did she ask me any questions about my mental or emotional state. She did ask if I wanted to talk to a doctor or a counselor. I told Ms. Bush that jurors were being bullied by other jurors during deliberations. I said specifically that, "There is bullying going on in the jury room." I also said that the presiding juror was one of the bullies. Ms. Bush responded by covering her ears with her hands and exclaiming, "Don't tell me that! If you tell me that, that would mean a mistrial!" Ms. Bush went on to say words to the effect of: "This case has gone on for 16 years and we've all invested so much in it. The judge has invested so much. The judge is a very nice man." I am certain that Ms. Bush heard my comments about bullying before she covered her ears and that it was having heard these very comments that cause her response. Ms. Bush seemed uncomfortable and chagrined by what I said about the bullying. Ms. Bush did not ask any questions related to bullying by other jurors.

14. Ms. Bush then brought me into the Judge's offices. I sat on a chair in the middle of the room near the cubicles. Several other people were present and nearby in the judge's offices, including an intern, two clerks and a secretary. The intern seemed very concerned and focused on me. Judge Kane entered the room five to ten minutes later, still wearing his robe. When he entered the room, Judge Kane did not ask me any questions of any kind. He did not ask me about my mental or emotional state. He also did not ask any questions about whether I could continue to deliberate. The first thing Judge Kane did was to put his arm around my shoulders and say, "Don't worry, you don't have to do this anymore." I then told Judge Kane about the bullying that was occurring in the jury room. I also said that the presiding juror was one of the

bullies. I specifically recall using the word "bullying" with Judge Kane, just as I had done previously with Ms. Bush. Judge Kane then covered his ears and said, "Don't say that. I can't hear that." But Judge Kane did not cover his ears until after I had spoken the word "bully" and had told him about the "bullying." I was crying when I made these statements. I am certain that both the judge and Ms. Bush heard and understood what I was saying. Otherwise, they would not have responded as they did. Judge Kane did not ask any questions about the bullying of jurors.

15. I never asked to be released from jury duty. At no point did anyone ask what I wanted to do next, nor did anyone inquire whether I wanted to try to continue on the jury or to be dismissed. When I left the jury room, it was not my intention to quit my job of being a juror. Had I been asked on January 25 if I wanted to try to continue with the deliberations, or if I felt I could continue, I would have responded that I wanted to do so. Indeed, I now feel as if I was robbed of the opportunity to see the trial through to completion. I very much wanted to complete the deliberation process, but I would have liked to see changes. I wanted the ganging-up on jurors to stop, and I wanted the deliberations to be conducted in a more mature, responsible fashion. Neither the judge nor any of his staff told me that I had been dismissed from the jury.

16. No one asked me if I wanted to continue to deliberate or if I felt I was capable of doing so on January 25 or at any point thereafter. If I had been asked, I believe I would have been willing to participate in a hearing on January 25 into the bullying that was going on in the jury room. Because of the bullying and the attacks on me, I was crying when I left the jury room. But I believe I would have been able to compose myself for a hearing if I had been asked to do so. In fact, it would have made me feel better (not worse) to know that the bullying was

going to be addressed by a hearing. I also would have been willing and able to participate in a hearing into bullying on any day after January 25.

17. Judge Kane told me that I would be taken to health services. I sat in the judge's offices for another period of time and then Ms. Bush walked me over to another building where I met with a health services professional. During this walk, or when we reached the building, I asked Ms. Bush to retrieve my purse and my notes from the jury room.

**18.** After Ms. Bush left me, I met with a member of the Court's health services staff. The health services counselor asked me if I was suicidal. This was the first time anyone had asked me about my mental state. I responded that I was not suicidal. I also told the counselor that I had not had a mental breakdown. I explained to the health counselor what had happened, describing the bullying that had occurred in jury deliberations. The counselor told me that it was my misfortune to have gotten on a jury with a bunch of bullies.

19. I remained at the health services building until my husband picked me up. Ms. Bush returned and was in and out a couple of times while I was there. While I was at the health services building, Ms. Bush brought my purse and my notes from the courtroom as I had requested.

**20.** A few weeks after the trial was over, I used the Internet to look up contact information for David Bernick and Merrill Davidoff. I never called Mr. Davidoff. But I did initiate contact with Mr. Bernick, calling him at his office in April 2006. Later, in May and June, I met with defense counsel to discuss my recollections of the case and the circumstances surrounding my dismissal from the jury.

21. **I am** aware that my name could become public as a result of this affidavit. But I **am** very proud of my service on this jury and have nothing to hide. While I appreciate the efforts

to protect my privacy, I do not believe that such protection is necessary. I am eager to come forward because I think the Denver community should know the true facts about what happened at this trial. I do not agree that concerns for my privacy are valid reasons for keeping "secret" or "under seal" the facts about any of the bullying that occurred in this case.

_____
Teresa Youngquist

Subscribe and sworn before me
this 13th day of June, 2006

10/02/2009
My commission expires on:

*Dianne L. Vogel*