## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 90-cv-181-JLK

MERILYN COOK, *et al.*,

      Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION
and THE DOW CHEMICAL COMPANY,

      Defendants.

---

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

---

David M. Bernick
John E. Tangren
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601-6636
Phone:  312-861-2000
Fax:     312-861-2200

Joseph J. Bronesky
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, Colorado 80202
Phone:  303-297-2900
Fax:     303-298-0940

Attorneys for ROCKWELL
INTERNATIONAL CORPORATION and
THE DOW CHEMICAL COMPANY

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ..........................................................................................v

INTRODUCTION ..........................................................................................................1

LEGAL STANDARD.....................................................................................................8

ARGUMENT ...............................................................................................................10

    I.      DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF
          LAW ON PLAINTIFFS' TRESPASS CLAIMS...................................................10

          A.      Plaintiffs Did Not Show That Plutonium Was Present on Each of
                  the Class Properties.....................................................................................11

          B.      Plaintiffs Have Failed to Prove a Trespass by Rockwell...........................22

          C.      Plaintiffs Did Not Show That Any Trespass Was Continuing, or
                  That Any Trespass Occurred While All Class Members Owned
                  Their Class Properties. ...............................................................................24

          D.      Plaintiffs Did Not Introduce Sufficient Evidence That Defendants
                  Intentionally Caused a Trespass.................................................................27

          E.      The Evidence Showed That Any Trespass Was Not Caused by
                  Defendants. ................................................................................................29

    II.     OTHER TRESPASS ARGUMENTS THAT THE COURT HAS
          ALREADY RULED ON. .....................................................................................32

          A.      Plaintiffs Failed To Demonstrate That Any Trespass Was Either
                  Tangible or Caused Serious and Substantial Physical Damage.................32

          B.      Plaintiffs Failed to Present Evidence Showing That Defendants
                  Did Not Comply with the Applicable Federal Standards for Offsite
                  Plutonium Releases.....................................................................................35

          C.      Plaintiffs Have Not Shown That Plutonium Levels on Class
                  Properties Exceeded the Applicable State Standards.................................37

i

III.    DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF
        LAW ON PLAINTIFFS' NUISANCE CLAIMS....................................................38

        A.      Plaintiffs Did Not Show a Class-Wide Health Risk. .................................39

                1.      Plaintiffs Failed to Introduce Evidence That All Class
                        Members Experienced an Unreasonable Increased Health
                        Risk as a Result of Plutonium Exposure........................................39

                2.      Plaintiffs Failed to Introduce Evidence That All Class
                        Members Experienced an Unreasonable Health Risk as a
                        Result of Exposure to Plutonium Released by Rockwell. .............45

        B.      Plaintiffs Failed to Introduce Evidence That All Class Members
                Are at an Increased Risk as a Result of Future Releases from
                Rocky Flats. ...............................................................................................46

        C.      Plaintiffs Did Not Show That The Harm Associated With Any
                Health Risk Outweighs the Utility Associated With the Operation
                of Rocky Flats. ............................................................................................48

        D.      Plaintiffs Have Not Shown That Any Health Risk Is Substantial. ............49

        E.      Plaintiffs' Acquisition of Land After Any Purported Nuisance
                Came Into Existence Establishes That Any Interference Was Not
                Substantial and Unreasonable. ...................................................................53

        F.      Plaintiffs Did Not Show That Defendants Intentionally or
                Negligently Caused Any Health Risk.........................................................56

        G.      The Evidence Shows That Any Health Risk Resulted From an
                Intervening Cause. ......................................................................................57

IV.     OTHER NUISANCE ARGUMENTS THAT THE COURT HAS
        ALREADY RULED ON. ......................................................................................57

        A.      Plaintiffs Have Not Shown a Violation of State Standards. ......................58

        B.      Plaintiffs Did Not Show That Any Health Risk Was Created by
                Releases Which Did Not Comply with Federal Standards. .......................59

        C.      Exceedingly Small Exposures Cannot Give Rise to a Nuisance. ..............59

V.      THE RECORD CONFIRMS THE ABSENCE OF REMAINING
        FACTUAL DISPUTES REGARDING DEFENDANTS' AFFIRMATIVE
        DEFENSES OF STATUTE OF LIMITATIONS AND PRESCRIPTIVE
        EASEMENT. ......................................................................................61

        A.      The Evidence Shows That Plaintiffs' Trespass Claims Are Barred
                by the Statute of Limitations......................................................61

        B.      The Evidence Shows That Plaintiffs' Nuisance Claims Are Also
                Barred by the Statute of Limitations..........................................64

        C.      The Evidence Shows That Plaintiffs' Trespass Claims Are Barred
                by a Prescriptive Easement. ......................................................64

        D.      The Evidence Shows That Plaintiffs' Nuisance Claims Are Barred
                by a Prescriptive Easement. ......................................................67

VI.     DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF
        LAW ON THE QUESTION OF WHETHER THEIR CONDUCT WAS
        CAPABLE GENERICALLY OF CAUSING FEAR, ANXIETY, OR
        MENTAL DISCOMFORT IN CLASS MEMBERS............................................67

        A.      The Generic Question of Emotional Distress Cannot Support a
                Judgment on Plaintiffs' Nuisance Claims..................................67

        B.      Plaintiffs Did Not Introduce Any Evidence That Defendants'
                Conduct Was Capable of Causing Emotional Distress.............................69

        C.      Plaintiffs Cannot Recover for Emotional Distress Without
                Demonstrating That Their Fears Were Grounded in Science...................70

VII.    DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF
        LAW ON PLAINTIFFS' CLAIMS BECAUSE PLAINTIFFS DID NOT
        EXPERIENCE RECOVERABLE DAMAGES. ..................................................72

        A.      As an Initial Matter, Plaintiffs' Damages Evidence is Not
                Sufficiently Reliable To Be Considered by the Jury and Should be
                Stricken in its Entirety. ...........................................................72

        B.      Even if a Reasonable Jury Could Consider Plaintiffs' Damages
                Evidence, A Reasonable Jury Could Not Find Damages
                Attributable to Defendants' Actionable Conduct:  First Principles. ..........78

C. A Reasonable Jury Could Not Have Awarded Damages Based on Plaintiffs' Damages Evidence, Because That Evidence Relates to Losses Suffered as a Result of Non-Actionable Proximity. .....................80

D. Plaintiffs Could Not Properly Recover Stigma Damages Where the Stigma Did Not Result From a Proven Trespass or Nuisance. .................83

E. Plaintiffs Have Not Shown Damages Suffered by the Class. ...................85

F. Plaintiffs Failed to Show Any Damages Attributable to the Prospect of the Continuance of Any Tortious Invasions. ..........................90

G. Plaintiffs Failed to Demonstrate That Any "Injurious Situation" Became Complete and Comparatively Enduring Between 1988 and 1995.....................................................................................................95

VIII. OTHER DAMAGES ARGUMENTS THAT THE COURT HAS ALREADY RULED ON. ....................................................................................98

A. Plaintiffs Failed to Limit Evidence of Damages to the Back-Calculated Statute of Limitations Window (January 30, 1988 - January 30, 1990).......................................................................................98

IX. DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' DEMAND FOR PUNITIVE DAMAGES.................100

A. Plaintiffs Have Not Shown That Defendants Engaged in Willful and Wanton Conduct...............................................................................100

B. Plaintiffs Did Not Show That the Punitive Damages They Seek Are in Any Way Linked to Defendants' Actionable Conduct................104

X. OTHER PUNITIVE DAMAGES ARGUMENTS THAT THE COURT HAS RULED ON ALREADY. .........................................................................104

A. Plaintiffs Did Not Show Any Nuclear Occurrences Before August 1988.........................................................................................................104

B. The Court Should Disallow Punitive Damage Pursuant To Colorado Statute § 13-21-102 Because It Will Serve No Deterrent Purpose....................................................................................................106

C. The Price-Anderson Act Bars Plaintiffs from Receiving Punitive Damages..................................................................................................107

CONCLUSION................................................................................................108

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams-Arapahoe School Dist. No. 28 v. GAF Corp.*,
959 F.2d 868 (10th Cir. 1992) ............................................................ 47

*Alley v. Gubser Dev. Co.*,
785 F.2d 849 (10th Cir. 1986) ............................................................ 101

*American Stevedores v. Porello*,
330 U.S. 446 (1947) ............................................................................ 97

*Ario v. Metro. Airports Comm'n*,
367 N.W.2d 509 (Minn. 1985) ............................................................ 87

*Bennett v. Greeley Gas Co.*,
969 P.2d 754 (Colo. Ct. App. 1998) ................................................... 104

*Blades v. Monsanto Co.*,
400 F.3d 562 (8th Cir. 2005) .............................................................. 12

*Boggs v. Divested Atomic Corp.*,
No. C-2-90-840, 1997 WL 33377790 (S.D. Ohio Mar. 24, 1997) .................................. 35

*Bohrmann v. Maine Yankee Atomic Power Co.*,
926 F. Supp. 211 (D. Me. 1996) ......................................................... 35

*Boughton v. Cotter Corp.*,
65 F.3d 823 (10th Cir. 1995) ............................................ 51, 70, 71, 80, 89

*Bower v. Weisman*,
639 F. Supp. 532 (S.D.N.Y. 1986) ..................................................... 52

*Bradley v. Am. Smelting and Ref. Co.*,
709 P.2d 782 (Wash. 1985) ................................................................ 65

*Broussard v. Meineke Discount Muffler Shops, Inc.*,
155 F.3d 331 (4th Cir. 1998) ............................................................. 12

*Buckley Powder Co. v. Colo.*,
70 P.3d 547 (Colo. Ct. App. 2002) ..................................................... 88

*City of North Vernon v. Voegler*,
  2 N.E. 821 (Ind. 1885) ..................................................................................................... 96

*City of Vernon v. S. Cal. Edison Co.*,
  955 F.2d 1361 (9th Cir. 1992) .......................................................................................... 81

*Cook v. Rockwell Int'l Corp.*,
  181 F.R.D. 473 (D. Colo. 1998) ........................................................................... 40, 85, 86

*Cook v. Rockwell Int'l Corp.*,
  273 F. Supp. 2d 1175 (D. Colo. 2003) ................................................. 32, 33, 35, 49, 91

*Cook v. Rockwell Int'l Corp.*,
  358 F. Supp. 2d 1003  (D. Colo. 2004) ...................................................................... 61, 62

*Cook v. Rockwell Int'l Corp.*,
  755 F. Supp. 1468 (D. Colo. 1991) ........................................................... 104, 105, 106

*Corcoran v. New York Power Auth.*,
  935 F. Supp. 376 (S.D.N.Y. 1996) .................................................................................. 35

*Cox v. Cambridge Square Towne Houses, Inc.*,
  236 S.E.2d 73 (Ga. 1977) .................................................................................................. 99

*Finestone v. Fla. Power & Light Co.*,
  319 F.Supp. 2d 1347 (S.D. Fla. 2004) ............................................................................ 35

*Frick v. Abell*,
  198 Colo. 508 (Colo. 1979) ................................................................................... 101, 106

*Gassie v. SMH Swiss Corp. for Microelec. and Watchmaking Indus., Ltd.*,
  No. Civ. A. 97-3557, 1998 WL 158737 (E.D. La. Mar. 26, 1998) .................................. 35

*Good v. Fluor Daniel Corp.*,
  222 F. Supp. 2d 1236 (E.D. Wash. 2002) ....................................................................... 35

*Goodyear v. Discala*,
  849 A.2d 791 (Conn. 2004) ............................................................................................. 96

*Gruntmeir v. Mayrath Indust., Inc.*
  841 F.2d 1037 (10th Cir. 1988) ..................................................................................... 101

*Henry v. Dow Chem. Co.*,
  701 N.W.2d 684 (Mich. 2005) ......................................................................................... 96

*Hensley v. Tri-QSI Denver Corp.*,
    98 P.3d 965 (Colo. Ct. App. 2004) ............................................................. 105

*Holmes v. Sec. Invest. Prot. Corp.*,
    503 U.S. 258 (1992) ............................................................................................ 80

*Hugunin v. McCunniff*,
    2 Colo. 367 (1874) ...................................................................................... 26, 27

*In re Hanford Nuclear Reservation Litig.*,
    780 F. Supp. 1551 (E.D. Wash. 1991) ......................................................... 107

*In re Hoery v. United States*,
    64 P.3d 214 (Colo. 2003) ....................................... 25, 26, 28, 37, 38, 62, 92, 98

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
    209 F.R.D. 323 (S.D.N.Y. 2002) .................................................................... 68

*In re Rhone-Poulenc-Rorer Inc.*,
    1 F.3d 1293 (7th Cir. 1995) ............................................................................. 68

*Juarez v. United Farm Tools, Inc.*,
    798 F.2d 1341 (10th Cir. 1986) .................................................................... 101

*Lamb v. Martin Marietta Energy Sys.*,
    835 F. Supp. 959 (W.D. Ky. 1993) ................................................................ 35

*Lobato v. Taylor*,
    71 P.3d 938 (Colo. 2002) ................................................................................. 65

*Mangini v. Aerojet-General Corp.*,
    912 P.2d 1220 (Cal. 1996) ............................................................................... 25

*McLandrich v. Southern Cal. Edison Co.*,
    942 F. Supp. 457 (S.D. Cal. 1996) ................................................................ 35

*Middelkamp v. Bessemer Irrigating Ditch Co.*,
    103 P. 280 (1909) .............................................................................................. 25

*Nieman v. NLO, Inc.*,
    108 F.3d 1546 (6th Cir. 1997) .................................................................. 35, 99

*O'Conner v. Commonwealth Edison Co.*,
    13 F.3d 1090 (7th Cir. 1994) ......................................................................... 35

*O'Connor v. Boeing N. Am., Inc.*,
    No. CV 97-1554 (C.D. Cal. Aug. 18, 2005) .................................................... 35

*Oklahoma City v. Hopcus*,
    50 P.2d 216 (Okla. 1935) ................................................................................... 96

*Osarczuk v. Associated Unvs. Inc.*,
    No. 96-2836 (N.Y.-Part. 32, Suffolk Co. Mar. 10, 2005) ................................. 35

*Platte & Denver Ditch Co. v. Anderson*,
    6 P. 515 (Colo. 1885) .................................................................................... 54, 56

*Public Serv. Co. v. Van Wyk*,
    27 P.3d 377, 389 (2001)......................... 27, 32, 33, 37, 38, 47, 49, 51, 53, 58, 60

*Renaud v. Martin Marietta Corp.*,
    749 F. Supp. 1545 (D. Colo. 1990) ................................................................. 89

*Roberts v. Fla. Power & Light Co.*,
    146 F.3d 1305 (11th Cir. 1998) ........................................................................ 35

*Roberts v. TXU Energy Retail Co.*,
    171 S.W.3d 901 (Tex. App. 2005).................................................................... 80

*Sanjuan v. IBP, Inc.*,
    160 F.3d 1291 (10th Cir. 1998) .......................................................................... 9

*Saunders v. Hilperthauser*,
    No. 84 CIV. 6153 (MJL), 1988 WL 42146 (S.D.N.Y. 1988)........................... 52

*Schiller & Schmidt, Inc. v. Nordisco Corp.*,
    969 F.2d 410 (7th Cir. 1992) ........................................................................... 81

*Smith v. State Compensation Ins. Fund*,
    749 P.2d 462 (Colo. Ct. App. 1987) ............................................................... 30

*Spanbauer v. J.R. Simplot Co.*,
    685 P.2d 271 (Idaho 1984).............................................................................. 99

*Sprague v. General Motors Corp.*,
    133 F.3d 388 (6th Cir. 1998) .......................................................................... 12

*Staley v. Sagel*,
    841 P.2d 379 (Colo. Ct. App. 1992) .............................................................. 79

*Taco Cabana v. Exxon Corp.*,
        5 S.W.3d 773 (Tex. App. 1999) ........................................................... 37

*Tri-Aspen Constr. Co. v. Johnson*,
        714 P.2d 484 (Colo. 1986) ................................................................ 101

*United States v. Hess*,
        194 F.3d 1164 (10th Cir. 1999) .......................................................... 98

*Unitherm Food Sys., Inc. v. Swift Eckrich, Inc.*,
        126 S.Ct. 980 (2006) ........................................................................... 9

*Walker Drug Co. v. La Sal Oil Co.*,
        972 P.2d 1238 (Utah 1998) ................................................................ 98

*Weisfeld v. Sun Chem. Corp.*,
        210 F.R.D. 136 (D.N.J. 2002),
        *aff'd* 84 Fed. Appx. 257 (3d Cir. 2004) ........................................... 12

*Weisiger v. Harbour*,
        62 P.3d 1069 (Colo. Ct. App. 2002) ................................................. 65

*Westric Battery Co. v. Standard Elec. Co.*,
        482 F.2d 1307, 1318 (10th Cir. 1973) ............................................... 79

*Wilcox v. Homestake Mining Co.*,
        No. CIV-04-534 (D.N.M. Nov. 15, 2005) ......................................... 35


**Statutes**

42 U.S.C. § 2014 .................................................................................. 47, 105

42 U.S.C. § 2210 ................................................................................ 104, 107

Colo. Rev. Stat. § 13-21-102 ..................................... 7, 100, 101, 104, 106

Colo. Rev. Stat. § 13-25-127 ....................................................................... 101

Colo. Rev. Stat. § 13-80-102 ............................................................. 62, 99, 100

**Other Authorities**

Federal Rule of Civil Procedure 50 ............................................................................................ 7, 8

**Treatises**

6 Colo. Code Regs. 1007-1, RH 4.60.1 ........................................................................... 58

**Rules**

CJI-Civ. 4th 18:1 (May 2004) ........................................................................... 26

*Prosser and Keeton on Torts*
(5th ed. 1984) ........................................................................... 25, 51, 53

Pub.L. 100-104, § 20(a), Historical and Statutory Notes to 42 U.S.C.A. § 2014 (West
Supp.1990) ........................................................................... 107

Restatement (Second) of Torts § 929 ........................................................................... 11, 91

Restatement (Second) of Torts § 930 ........................................................ 6, 52, 91, 92, 93, 94, 99

Restatement (Second) of Torts § 158 ........................................................................... 28

Restatement (Second) of Torts § 161 ........................................................................... 65

Restatement (Second) of Torts § 840 ........................................................................... 53, 56

Restatement (Second) of Torts § 899 ........................................................................... 65

Restatement (Second) of Torts § 902 ........................................................................... 96

Sen. Rep. No. 296, 85th Cong., 1st Sess. at 16 (1957) ........................................................ 79

*The Law of Torts*, § 57 (West Group 2001) ........................................................................ 25

Wright & Miller, 5 Fed. Prac. & Proc. Civ. 3d ........................................................................ 88

## INTRODUCTION

The jury has now entered a verdict in favor of plaintiffs and against each defendant on plaintiffs' trespass and nuisance claims. But that verdict was reached in spite of plaintiffs' failure to present evidence sufficient to prove every element of their claims. It was also reached despite law that should have prevented the jury from deciding the claims. Although this Court has rejected both of defendants' previous motions for judgment as a matter of law (filed at the close of plaintiffs' evidence and at the close of all evidence), defendants respectfully renew their motion and request that this Court enter judgment as a matter of law in their favor on all claims. Judgment as a matter of law in favor of defendants is warranted for multiple reasons.

With respect to plaintiffs' trespass claims, because plaintiffs based their class-wide trespass claims against both defendants on the alleged presence of plutonium on their properties, plaintiffs had to prove, at a bare minimum, that each of the class properties actually experienced plutonium contamination from Rocky Flats. But plaintiffs failed to show that Rocky Flats plutonium was present on each and every class property. Plaintiffs' so-called evidence on this point consisted, at best, of extrapolation and interpolation from (1) a very small number of sample points taken years before the date of the class and (2) inventory difference (also known as material unaccounted for or MUF), neither of which prove that each class member's class property still had (or ever had) Rocky Flats plutonium on it. Not even the class members who testified at trial could attribute any plutonium on their properties to Rocky Flats. Moreover, evidence of development within the class area (including plaintiffs' own experts' concessions) suggests that plutonium did not remain (assuming it was ever present) on every class member's property over time. In addition, plaintiffs presented no evidence whatsoever of any plutonium

1

release from Rocky Flats during Rockwell's operation of the plant -- much less any evidence of a class-wide release of plutonium caused by Rockwell.  Thus, plaintiffs' trespass claim must fail at least with respect to Rockwell.

Sufficient evidence was similarly lacking for various other elements of plaintiffs' trespass claims.  Under this Court's rulings, plaintiffs had to show that the trespass was continuing or appeared to be continuing indefinitely during class members' property ownership.  But plaintiffs' evidence would not allow a reasonable jury to determine that a trespass was "continuing," particularly in light of evidence that development had disturbed soil in the class area.  Plaintiffs further were required, but failed, to show that defendants intentionally caused a trespass.  The evidence presented at trial did not establish that Dow intended any of the plant accidents that allegedly led to releases of plutonium.  Nor did plaintiffs prove any intentional conduct by Rockwell resulting in offsite releases.  To the contrary, the evidence demonstrated that Dow and Rockwell operated the plant in accordance with government instructions, and that governmental actions and high wind were intervening causes for any plutonium release (and consequent trespass).

Additional issues also warrant entry of judgment in defendants' favor on plaintiffs' trespass claims.  Defendants respectfully submit that a trespass is only actionable under Colorado law if it is tangible or caused serious and substantial physical damage.  Defendants further submit that, to prevail, plaintiffs must demonstrate that defendants caused releases that violated applicable federal standards.  Plaintiffs did not present any evidence to meet either of these requirements.

Plaintiffs' nuisance claims fare no better.  Plaintiffs' evidence was insufficient on multiple required elements of those claims.  Indeed, plaintiffs failed to prove the most basic element of nuisance — an interference with use and enjoyment of property.  This Court ruled that plaintiffs could show interference with class members' use and enjoyment of their properties in two ways:  (1) their exposure to plutonium and some increased risk of health problems as a result of the exposure, and (2) defendants causing objective conditions that pose a demonstrable risk of future harm to the Class Area.  (Instruction No. 3.6)  But plaintiffs proved neither.  With respect to increased health risk, plaintiffs failed to present evidence that all class members experienced an unreasonable increased health risk as a result of plutonium exposure.  Plaintiffs produced no evidence demonstrating exposure of all class members to Rocky Flats plutonium, let alone resulting increased health risk.  And because plaintiffs offered no evidence of any plutonium release during Rockwell's Rocky Flats plant operations, judgment as a matter of law should be granted to Rockwell at a minimum.  With respect to objective conditions that pose a demonstrable risk of future harm to the class area, plaintiffs produced no evidence to show that any such conditions existed.  To the contrary, the evidence demonstrated that the Rocky Flats plant was shut down, decommissioned, demolished, and remediated.

Other elements of the nuisance claims also were not proven.  Plaintiffs did not establish, as required, that the harm associated with any alleged health risk outweighed the utility associated with the operation of Rocky Flats.  Trial testimony made clear that Rocky Flats served an important national security purpose and provided local economic benefits to the Denver area generally (and the area around Rocky Flats in particular).  Plaintiffs never demonstrated that those benefits were somehow outweighed by any harm.  Plaintiffs also failed to demonstrate that

the alleged health risk was "substantial" (*i.e.*, a risk that a normal person would find offensive, annoying, or inconvenient) and failed to show a "substantial" interference because they did not prove a reduction in the property value.  To the contrary, the fact that plaintiffs acquired the land after the purported nuisance came into effect demonstrates that any interference was neither "unreasonable" nor "substantial."  Next, plaintiffs' nuisance claims fail because plaintiffs failed to demonstrate that defendants intentionally or negligently caused any health risk.  In addition, as with trespass, the evidence presented showed that any nuisance resulted from a non-actionable intervening cause.  Finally, plaintiffs' nuisance claims fail because plaintiffs did not prove any recoverable damages, a required element of nuisance.

Judgment as a matter of law on plaintiffs' nuisance claims should be granted to defendants for additional reasons. Defendants respectfully submit that because plaintiffs failed to show a violation of Colorado standards for plutonium, they cannot prove an "unreasonable" interference with use and enjoyment of their class properties.  Similarly, because plaintiffs did not show any health risk created by releases that did not comply with federal standards, their nuisance claims fail.  Moreover, defendants respectfully submit that, as a matter of law, exceedingly small exposures such as those at issue here cannot give rise to a nuisance.  Thus, plaintiffs' own expert's admission that exposures are so "very, very small" that "regulatory agencies would not have been concerned" is fatal to plaintiffs' nuisance claims.

Nor can either of plaintiffs' claims rest on plaintiffs' allegations that defendants' conduct caused them to suffer fear, anxiety or mental discomfort.  As this Court has recognized, the jury could not properly consider the generic question of whether the intentional or negligent conduct of Dow or Rockwell (or both) at Rocky Flats is capable of causing fear, anxiety or mental

discomfort in determining whether a trespass or nuisance occurred.  In any event, plaintiffs did not demonstrate that any of either defendant's conduct was capable of causing emotional distress.  None of plaintiffs' witnesses testified that any of their concerns stemmed from any specific actionable conduct by defendants (as opposed to headlines or rumors).  Furthermore, defendants respectfully submit that plaintiffs cannot recover for emotional distress without demonstrating that their fears were grounded in science.  That plaintiffs did not do.

For these reasons, plaintiffs' trespass and nuisance claims fail as a matter of law.  In the alternative, judgment as a matter of law on each of those claims should be granted based on either of two affirmative defenses.  *First*, the evidence demonstrated that plaintiffs' claims are time-barred.  The evidence, including evidence from plaintiffs' own witnesses, was undisputed that plaintiffs learned or should have learned of any alleged trespass — as well as the alleged basis for their nuisance claims — years before their claims were filed.  Plaintiffs thus missed the statute of limitations deadline for filing a claim, and the statute of limitations bars plaintiffs' claims.  *Second*, plaintiffs' claims are barred by a prescriptive easement, because defendants' alleged use of plaintiffs' land was open and notorious, continuous for the prescriptive period of eighteen years, and adverse to plaintiffs' interests.

Defendants are also entitled to judgment as a matter of law on plaintiffs' claims for damages, because plaintiffs did not prove any recoverable damages at trial.  As an initial matter, plaintiffs' so-called evidence of damages was insufficiently reliable to be considered by the jury.  Even assuming that plaintiffs' evidence were sufficiently reliable, plaintiffs' damages claims still fail.  First and foremost, damages had to be proximately caused by defendants' actionable conduct.  In other words, only damages resulting directly from a trespass (contamination) or

nuisance (health risk) committed by defendants are recoverable.  Yet, plaintiffs' damages evidence relates solely to losses suffered as a result of non-actionable items, such as proximity to Rocky Flats and stigma generally surrounding Rocky Flats.  Plaintiffs' own experts did not even attempt to show any alleged diminution resulting from actionable conduct as opposed to non-actionable factors about Rocky Flats.  Second, plaintiffs failed to prove any damages actually experienced by the class.  Among other flaws, plaintiffs' damages evidence did not calculate the alleged "Rocky Flats" discount for all class member purchases of class properties and all class member sales of class properties.  Such information is needed to determine whether all class members experienced a loss related to Rocky Flats.  Third, plaintiffs failed to show any damages attributable to the prospect of the continuance of any tortious invasions and thus failed to prove any damages within the Restatement (2d) of Torts Section 930 framework adopted by the Court.  Indeed, plaintiffs did not prove any "continuing invasions," much less link those invasions to any alleged damages.  Fourth, plaintiffs failed to show that any "injurious situation" became complete and comparatively enduring between 1988 and 1995 as required to recover damages under the Court's jury instructions.  Finally, although defendants respectfully submit that plaintiffs failed to introduce sufficient evidence of a "continuing" tort, if the Court were to rule that plaintiffs proved a continuing tort, plaintiffs then were required (but failed) to prove that their damages occurred during the back-calculated statute of limitations window (January 30, 1988-January 30, 1990).  For all of these reasons, defendants are entitled to judgment as a matter of law on the issue of damages.

Defendants also should prevail as a matter of law on plaintiffs' claims for punitive damages from defendants.  Plaintiffs did not show that either defendant engaged in any willful

and wanton conduct.  To the contrary, the undisputed evidence showed that numerous safety precautions were taken by both defendants.  Furthermore, plaintiffs' punitive damages claims are defeated by defendants' compliance with standards.  Plaintiffs' punitive damages claims also fail because plaintiffs did not link such damages to defendants' actionable conduct.  Next, defendants respectfully contend that plaintiffs' punitive damages claims fail because plaintiffs failed to show any nuclear occurrences before August 1988.  Defendants further respectfully submit that this Court should disallow punitive damages here under Colorado statute § 13-21-102, because punitive damages will serve no deterrent purpose.  Finally, defendants maintain that punitive damages are not recoverable because the Price-Anderson Act bars plaintiffs from receiving punitive damages.

For all of these reasons, defendants respectfully request that the Court grant judgment as a matter of law.[1]  Defendants note that they are filing this motion early.  Under Rule 50(b), defendants are not required to file a Rule 50(b) motion for judgment as a matter of law until 10 days after "judgment" is entered.  No judgment has been entered in this case.  Accordingly, defendants file this motion early without waiver of their rights under the Federal Rules of Civil Procedure.

On several previous occasions, the Court has raised concerns about defendants raising arguments previously rejected by the Court.   Defendants respectfully disagree with the Court's statements in that regard.   However, for the convenience of the Court and its personnel,

---

[1] *See further* Defendants' Rule 59 Motion for New Trial and/or Remittitur, filed concurrently herewith and defendants' memorandum in support of that motion.

defendants note that all of defendants' arguments raised herein have, in one way or another, already been previously rejected by the Court.

## LEGAL STANDARD

Federal Rule of Civil Procedure 50(a) provides:

> If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

Federal Rule of Civil Procedure 50(b) further provides that if a request for judgment as a matter of law made at the close of evidence is not granted (and the case goes to the jury), the movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment.  In ruling on a renewed motion, the court may direct entry of judgment as a matter of law despite the verdict.  Fed. R. Civ. P. 50(b).

The advisory committee notes to Rule 50(b) set forth the standard for reviewing a renewed motion for judgment as a matter of law:

> In ruling on such a motion, the court should disregard any jury determination for which there is no legally sufficient evidentiary basis enabling a reasonable jury to make it. The court may then decide such issues as a matter of law and enter judgment if all other material issues have been decided by the jury on the basis of legally sufficient evidence, or by the court as a matter of law.

Fed. R. Civ. P. 50(b) advisory committee's note.  "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party."  *Sanjuan v. IBP, Inc.*,

8

160 F.3d 1291, 1298 (10th Cir. 1998) ("A mere scintilla of evidence is not sufficient to submit a case to a jury.").

The Supreme Court recently addressed Rule 50 in *Unitherm Food Sys., Inc. v. Swift Eckrich, Inc.*, 126 S.Ct. 980 (2006). The Court stated:

> Federal Rule of Civil Procedure 50 sets forth the procedural requirements for challenging the sufficiency of the evidence in a civil jury trial and establishes two stages for such challenges -- prior to submission of the case to the jury, and after the verdict and entry of judgment. Rule 50(a) allows a party to challenge the sufficiency of the evidence prior to submission of the case to the jury, and authorizes the District Court to grant such motions at the court's discretion . . . .
>
> Rule 50(b), by contrast, sets forth the procedural requirements for renewing a sufficiency of the evidence challenge after the jury verdict and entry of judgment.

*Id.* at 985.

This Court addressed the standard for Rule 50 motions in its denial of defendants' Rule 50(a) motion, dated January 13, 2006. The Court stated:

> Any challenge to the sufficiency of the evidence presented by Plaintiffs must consider **the evidence in terms of Plaintiffs' burden of proof on the elements of their claims <u>as set forth in the jury instructions</u>**. For the most part, Defendants did not do so in their motion, that is, they referred to the jury instructions occasionally when they thought it to their benefit, but otherwise ignored them in favor of rejected legal standards and principles. As a result, most of the legal standards on which Defendants base their motion contradict or are fundamentally inconsistent with the law governing the jury's deliberations as set forth in the jury instructions. Defendants' motion is also flawed in its repeated declaration of alleged standards of proof having no basis in law or that are based on an incomplete statement of applicable law. (1/13/06 Order at 3-4) (emphasis added)

9

In conformance with the Court's January 13, 2006 Order, defendants frame this motion in terms of the sufficiency of the evidence to support the jury's verdict in light of the Court's legal rulings.[2]  Thus, unless otherwise noted,[3] and without waiver of defendants' rights and previous arguments, defendants' motion takes the Court's legal rulings as a given, and argues that the evidence presented by plaintiffs was not sufficient to support a jury verdict within the framework of the Court's legal rulings.

## ARGUMENT

**I.      DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' TRESPASS CLAIMS.**

The Court should set aside the verdict in its entirety as to the trespass claims because the trial evidence underlying plaintiffs' trespass claims suffers from several fatal deficiencies.  Each of these deficiencies is an independent and sufficient ground for judgment as a matter of law in defendants' favor on plaintiffs' trespass claims.

---

[2] The Court previously criticized defendants for including arguments in their motion for judgment as a matter of law that were already rejected by the Court.  (1/13/06 Order at 1–2)

[3] Defendants note some, but by no means all, of their disagreements with the Court's legal rulings herein.  Defendants' disagreements with, and objections to, the Court's legal rulings are set forth, *inter alia*, in Defendants' Renewed Objections to Jury Instructions and Jury Verdict Form, filed January 20, 2006; Defendants' Response to Plaintiffs' Proposed Plan for Determination of Compensatory Damages, filed July 21, 2004; Defendants' Response to Plaintiffs' Statement Regarding Alleged Forms of Interference With Use and Enjoyment, filed November 30, 2004; Dow's Brief in Opposition to Plaintiffs' Motion for Class Certification, filed August 16, 1993; Rockwell's Memorandum in Opposition to Plaintiffs' Motion for Class Certification, filed August 16, 1993; Defendants' Brief in Support of Their Combined Motions for Summary Judgment and Decertification of the Classes, filed December 9, 1996; Defendants' Motions for Summary Judgment Based on Expert Discovery, filed August 5, 1997; Defendants' Motions in Limine Nos. 1–16, filed June 16, 2005; and Defendants' Motion to Exclude Expert Witnesses, filed June 16, 2005.

**A.      Plaintiffs Did Not Show That Plutonium Was Present on Each of the Class Properties.**

Under the Court's jury instructions, to prevail on their trespass claim, plaintiffs had to show (among other things) that "Dow or Rockwell or both of them intentionally undertook an activity or activities that in the usual course of events caused plutonium from Rocky Flats to be present on the Class Properties," and that "it appears that plutonium will continue to be present on the Class Properties indefinitely." (Instruction No. 3.3, 3.4)[4]  Plaintiffs' trespass claims here are limited to plutonium; contamination involving other substances cannot give rise to a trespass claim.  (Instruction No. 3.3)  Thus, under the Court's jury instructions, to prove a trespass as to a particular defendant, plaintiffs had to show:   (1) that the defendant in question released plutonium from Rocky Flats; (2) that the plutonium traveled onto the class members' properties; and (3) that the plutonium remained in the soil of the class members' properties at the time of trial.

It is undisputed that, as a consequence of worldwide fallout, there is plutonium everywhere on earth, including (for example) in New York.  (Budnitz testimony, 10/31/05 Tr.

---

[4] Apart from the sufficiency of the evidence under the Court's rulings, defendants maintain that the continued presence of plutonium is insufficient to establish a trespass where there is no ongoing wrongful conduct on the part of the defendants.  *See* Restatement (Second) of Torts Section 929, cmt. a (Section 929 (and not Section 930) applies where "future losses are *not contingent upon the continuance in the future of the defendant's wrong doing*, and hence the result follows regardless of whether the owner can recover in advance for the prospective harm of future operations of the cement plant.  This is a distinct question that is dealt within § 930") (emphasis added).

3337)[5]  Thus, to prevail on their trespass claims, plaintiffs had to prove (among other things) that defendants' releases caused contamination of plaintiffs' properties in an amount greater than that which could be attributable to plutonium from worldwide fallout or otherwise identify it as coming from Rocky Flats.

As summarized below, plaintiffs introduced no evidence that releases resulted in contamination of all (or even most)[6] of the class properties or that any contamination remained on any class properties at the time of trial.  Plaintiffs did not even introduce any evidence of releases by Rockwell, much less evidence of contamination caused by Rockwell.  Nor was any such evidence introduced by any party in the balance of the case.  Plaintiffs trespass case was largely based on two 1970 soil sampling studies that were done by (1) Krey & Hardy (P149A) and (2) Poet & Martell (P939).  But those studies fail to address the relevant question of whether plutonium was present on the class properties as of 1989, let alone whether such plutonium continues to exist on these properties to this day.

---

[5] (*See also* Raabe testimony, 12/9/05 Tr. 7220-26, 12/9/05 Tr. 7234-35 ("Colorado has one of the highest background radiation rates" in the United States); Till testimony, 12/15/05 Tr. 8265; DV1, Till video; DX530, RAC Task 4 Envt'l Mon. Report, at VIII-5)

[6] *See Blades v. Monsanto Co.*, 400 F.3d 562, 571 (8th Cir. 2005) ("every member of the proposed classes" must "prove with common evidence that they suffered impact from the alleged conspiracy"); *Weisfeld v. Sun Chem. Corp.*, 210 F.R.D. 136, 144 (D.N.J. 2002), *aff'd* 84 Fed. Appx. 257 (3d Cir. 2004) ("Plaintiff must establish that each class member has, in fact, been injured by the alleged conduct."); *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 340-42 (4th Cir. 1998); *Sprague v. General Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) (class relief not available where "[a] named plaintiff who proved his own claim would not necessarily have proved anybody else's claim").

***First***, the studies' limited sample size renders them wholly insufficient to show the existence of class-wide plutonium contamination.  After taking a relatively small number of samples (*e.g.*, DX1167 (Poet & Martell data points); Budnitz testimony, 10/31/05 Tr. 3342-43 (DX1167 reflects Poet & Martell samples; Krey & Hardy had 33 sampling stations)), these researchers basically connected the dots to create theoretical contours through a process of "interpolation or sometimes extrapolation."  (Budnitz testimony, 10/31/05 Tr. 3338; *see also id.* at 3339-41)  As plaintiffs' expert Dr. Budnitz testified:

> Q.  And was it your understanding that the way that Krey and Hardy were drawing these contours was to simply look at their data points and take a pencil —
>
> A.  Yes, they were trying —
>
> Q.  And get the best line?
>
> A.  Yes, and I thought that that was how Martell did his too. That is, they were trying to use their judgment to draw contours that were approximately accurate, but could not be very precise.

(*Id.* at 3341)[7]

***Second***, the contours drawn do not show plutonium ***throughout the class area*** (which was not the specific area of focus for these studies).  To the contrary, these researchers took very few samples ***in the class area***.  (*See* DX1167; Budnitz testimony, 10/31/05 Tr. 3342-43 (Krey & Hardy had 33 monitoring stations, but Budnitz does not know how many were in the class area; Poet & Martell took fewer samples); Cochran testimony, 11/1/05 Tr. 3573 (Poet & Martell only

---

[7] RAC questioned these contours, noting that "[t]he small number of soil samples (52) resulted in significant extrapolation over large unsampled areas and relied heavily on individual data points that may not have been representative of the area."  (DX530, RAC Task 4 Envt'l Mon. at VIII-14;  *see also* Till testimony, 12/16/05 Tr. 8523-24)

went out 2-4 miles east of the plant))[8]  And even after extrapolation and interpolation, "much of the class area is not touched by th[e] Poet and Martell contours."  (Budnitz testimony, 10/31/05 Tr. 3332)

*Third*, the contours drawn by Krey & Hardy and Poet & Martell do not isolate plutonium released from Rocky Flats — let alone releases caused by defendants.  Many of their measurements are indistinguishable from worldwide fallout.  (Budnitz testimony, 10/31/05 Tr. 3335-37 (some plutonium levels found by Poet & Martell indistinguishable from background; some found by Krey & Hardy indistinguishable from that found from worldwide fallout in places like New York))  Dr. Budnitz testified:  "It's most likely that those are worldwide fallout numbers, which vary, you know, from place to place, that's most likely."  (*Id.* at 3337; *see also id.* at 3117 ("as they got further out, [Krey & Hardy] found it increasingly difficult to separate plutonium they measured from plutonium that might have occurred — excuse me, that did occur from fallout")  Consequently, the studies' inability to demonstrate the presence of classwide plutonium contamination occurring as a result of the activities of either or both defendants is yet another deficiency that precludes reliance on these studies to prove the trespass claim.

*Fourth*, both of these studies were done on undisturbed soil nearly twenty years before the class definition date (June 7, 1989, the date that all class members owned property in the

---

[8] The same is true of the Jones & Zhang study, which also contains very few sampling points within the class area, with no sampling point east of Standley Lake.  (DX477 at Fig. 1)  The Jones & Zhang plutonium-in-soil contours also exclude a significant portion of the class area to the east in every year that was studied — from 1970 to 1989.  (DX1262-65)

class).[9]  Plaintiffs have presented no evidence that any plutonium found by these researchers remained as of that date and would remain continuing into the future.  Thus, there has been no evidence presented to the jury that any plutonium that was on the class properties in 1970 is still there and will remain there indefinitely.[10]

Defendants understand that the Court has rejected — as a matter of law — defendants' argument that substantial development in the class area constitutes yet another reason while plaintiffs have failed to prove a continuing trespass.  (*See generally*, 12/7/06 Order re Plutonium Removal Through Development.)  While the jury was not allowed to consider the sufficiency of this evidence, defendants note that plaintiffs' own expert Dr. Smallwood conceded that there was no evidence of plutonium on the class properties today:[11]

---

[9] The samples underlying the Jones & Zhang study were also taken from undisturbed soil. (DX477)

[10] Instead of introducing evidence that plutonium deposited on the class properties has remained on those properties, plaintiffs repeat their mantra that "the half-life of plutonium is 24,000 years." (*E.g.*, Goble testimony, 11/2/05 Tr. 3633-34)  But the half-life of plutonium is beside the point.  Even if plaintiffs demonstrated that plutonium was deposited in class properties' soil (which they did not), plaintiffs would still be required to demonstrate that the soil in which the plutonium was deposited ***remained on those properties***.  That is to say, even if plutonium has a half-life of 24,000 years, when the soil in which the plutonium is present on particular class properties was moved outside of the class area, then the plutonium-in-the-soil did not remain on the class properties "indefinitely," as required for plaintiffs to prove their trespass claims. (Instruction No. 3.3, 3.4)

[11] The vast majority of the development in the class area took place after 1970 — by which time 99.9% of any Rocky Flats releases had already occurred.  (DX1137, Graphic Showing Low Number of 13,000 Class Members Living in Class Area as of 1969; DX2188A, Dorchester video concerning development; Dorchester testimony, 1/9/06 Tr. 9474-9475 (video accurately depicts development), 9475-76 ("[development curve] goes up rather slowly until you get past '67, '69, '71.  About 1971 you start seeing that curve climb, meaning that a lot of houses were being added starting with the early 1970s, and there was substantial and relatively continuous growth
(Continued…)

15

Q.  You couldn't — when it comes to the developed part of the class area, you can't simply say that because the Krey and Hardy and/or Poet and Martell contours show there may have been plutonium there back in 1970, that is certainly not very good evidence that there is still plutonium there today, fair?

A.  Where you have houses on top of the soil or warehouses or shopping mall or parking lot, I don't know, it depends on how deeply they scraped away the soil for the foundation of these structures.

\*    \*    \*

Q.  If we go back to 1989, are you aware of anybody who has data showing that even in 1989 there was plutonium on the soil throughout the class area from Rocky Flats?  Are you aware of anybody who has been able to show that data?

A.  Outside of Rocky Flats plant?

Q.  Yes.

A.  I don't know.

_____

going through there until the class got to the point where it was largely built out"); DX2195-DX2207 (series of aerial photographs showing development over time); DX454, ATSDR 5/13/05 report, at 1-2 ("Though Rocky Flats released plutonium to the air throughout its history, the overwhelming majority (> 99.9%) of plutonium emissions occurred between 1953 and 1969."); DV1, Till video ("Over 99 percent of the plutonium releases from Rocky Flats occurred before 1970")  Defendants also incorporate by reference the arguments in their December 8, 2005 Motion for Judgment as a Matter of Law related to Charles McKay. (*See* 12/8/05 Defs.' Mot. for J'ment at 14-15)  In addition, the undisputed evidence has shown that class area development involved removal of several feet of soil on class properties in connection with the construction of houses.  (*See* Smallwood testimony, 11/3/05 Tr. 4083;  *accord* DV1, Till video ("as of 1969, there was very little development in the class area.  By 1989, however, the class area had become well developed. . . . buildings, concrete, and asphalt now cover what used to be undeveloped soil . . . . [s]everal feet of soil are excavated when preparing the foundation of a new home."))  And plaintiffs' experts have all conceded that they "did not know" of evidence that any plutonium deposited on the parcels studied by Krey & Hardy and Poet & Martell had not been removed by subsequent development.  (Smallwood testimony, 11/3/05 Tr. 4083-84; Budnitz testimony, 10/31/05 Tr. 3346-47; *see also* Clapp testimony, 11/10/05 Tr. 4915)

16

(Smallwood testimony, 11/3/05 Tr. 4083-84)[12]  Dr. Budnitz similarly testified:

> Q.  And so, in fact, if you had to — if you came in and took your samples 19 years later or 20 years after the release, then the plutonium by that time may have gone someplace else?
>
> A.  Well, in fact, the measurements in that later time tell you what's there then.  That's what they tell you, what's there then.  And they don't tell you anything else except what is there then . . .
>
> Q.  But certainly one mechanism for that material not even being there anymore would be that it could become resuspended again, right?
>
> A.  Well — I don't know what you mean by "anymore," just went somewhere else, perhaps, new or far.
>
> Q.  Okay.
>
> A.  That's what the new pattern would reveal.
>
> Q.  Another method for it not being there anymore, if somebody dug up the soil in the interim and carted it all off, right?
>
> A.  Yes, of course, removing it would remove it.
>
> Q.  One mechanism for removing it and carting it all off would be, for example, if developers came in, built huge subdivisions in that area, after the time the original measurements were taken, correct?
>
> A.  That would be one of any number of ways that soil containing plutonium might have been removed.

(Budnitz testimony, 10/31/05 Tr. 3346-47; *see also* Clapp testimony, 11/10/05 Tr. 4915 (has not

"seen any evidence that after this development took place and after these homes were built and

after whatever disturbance of the soil took place that was associated with the building of those

---

[12] Defendants acknowledge that the Court has disagreed with defendants about the significance of Dr. Smallwood's testimony.  (*See* 12/7/06 Order re Plutonium Removal Through Development at 18)

homes, that after that happened, then a soil sample was taken on such property and tested to

determine whether there was plutonium in it.”))

Defense evidence confirmed that there has been substantial development in the class area

since 1970 that would have disturbed class area soil, removing soils potentially contaminated

with plutonium.  Dr. Till testified about the presence of Rocky Flats plutonium in undisturbed

soil and the effect of development:

> Q.  Are you aware of any study that actually demonstrates that as
> of 1975, 1980, 1985, let's just pick 1989, are you aware of any
> study that actually demonstrates as of 1989 that there is
> contamination in the soil off-site of Rocky Flats and within that
> class contour throughout the contour?
>
> A.  No, there is no study of that kind.
>
> Q.  In fact, if we take a look at the post-1970 period of time, and
> you take a look at the class area, has that class area remained
> undisturbed or has the class area been developed?
>
> A.  There's tremendous development in the class area.  I mean,
> there's no question about that.  It has been disturbed.

(Till testimony, 12/15/05 Tr. 8285)  Till further testified:

> Q.  Okay.  So now in that video that you showed the jury
> yesterday, there was a section that, you know, showed a house
> being built and there was this big mound of dirt.  If the soil's
> disturbed by a bulldozer, as was described in the video, it's not that
> the plutonium is no longer in the environment, it's just that you've
> moved it around, right?
>
> A.  Well, in the first place, remember the plutonium is going to be
> near the surface of the soil.  So if a bulldozer comes in, pushes the
> stuff off – or it's hauled off somewhere, it's not there, it's gone
> somewhere else.

(*Id.* at 12/16/05 Tr. 8449)  (*See also id.* at 8528-29 (“Q:  Now, once that bull dozer comes in and

churns up the dirt and the plutonium goes down where it is, or may be off-site, are you going to

have -- is there any way that you can see based upon your work that we're still going to have the same nice little layer of plutonium on the surface of the soil?   A: No."); DV1, Till video ("buildings, concrete and asphalt now cover what used to be undeveloped soil"; "[s]everal feet of soil are excavated when preparing the foundation of a new home.")[13]; DX2188A, Dorchester video; Dorchester testimony, 1/9/06 Tr. 9475-76 ("[development curve] goes up rather slowly until you get past '67, '69, '71.  About 1971 you start seeing that curve climb, meaning that a lot of houses were being added starting with the early 1970s, and there was substantial and relatively continuous growth going through there until the class got to the point where it was largely built out"); DX2195-DX2207 (series of aerial photographs showing development over time))

In short, plaintiffs failed to introduce evidence of a single sample showing that there was any plutonium contamination on any class property as of 1989, much less today.

Indeed, as described below, class members called by plaintiffs as witnesses repeatedly testified that they did not know whether there was Rocky Flats plutonium on their properties.  In fact, the Bartletts had their property tested; the results demonstrated affirmatively that plutonium on their class property was less than background levels.  (P962)  The testimony of additional class representatives and others confirms the absence of proof of class-wide, current plutonium contamination.

- **Sally and Richard Bartlett:**  The Bartletts each testified that they had the soil on their property tested, and were told that the soil sampling results were "not above

---

[13] *See also* Defs.' Response to Plfs.' Mot. For J'ment as a Matter of law and their Response to Plfs.' Mot to Strike Till Testimony filed January 17, 2006.  Defendants acknowledge that the Court has considered and rejected defendants' arguments, including those based on Dr. Till's testimony.  (*See* 12/7/06 Order re Plutonium Removal Through Development at 8-10)

standards," the soil "was within normal limits", and it was "safe to build on."  (S. Bartlett testimony, 10/14/05 Tr. 959-61; R. Bartlett testimony, 10/14/05 Tr. 1060-61; P962 (Bartlett property sample showing Pu less than background))

- **William Schierkolk:**  Mr. Schierkolk never had his soil sampled for radioactivity, and he is not aware of any evidence that his property was contaminated with radioactive materials from Rocky Flats.  (Schierkolk testimony, 10/20/05 Tr. 1936-37)

- **Gertrude Babb:**  Mrs. Babb never tested the soil on her class property.  (Babb testimony, 10/20/05 Tr. 1971)

- **Merilyn Cook:**  During Ms. Cook's testimony, plaintiffs offered into evidence a letter indicating that samples she collected with the assistance of the state health personnel were received by Rockwell and submitted to Accu-Labs Research, Inc., for analysis.  (Cook testimony, 10/21/05 Tr. 2023-26; *see also* P1230 & P1231)  The letter further stated:  "[The samples] average 0.055 plus or minus 0.031 picocuries per gram.  The maximum value of 0.12 is 13 percent of the Colorado Department of Health guideline of two disintegrations per minute per gram."  (*Id.*)  This is well below background levels.

- **Gretchen Robb:**  Gretchen Robb testified that she had never had her property tested for plutonium, and that she had no way of knowing whether plutonium was present on her property or not.  (Robb testimony, 11/10/05 Tr. 5028)

- **Karen Whalen:**  Karen Whalen testified that she never actually had her property tested, and so she did not know how much plutonium, *if any*, was actually on her class property.  (Whalen testimony, 11/21/05 Tr. 5956, 5958) (emphasis added)

- **John Osborn:**  Mr. Osborn testified that, as a developer, he routinely does soil testing on his properties (many of which have been inside the class contour) and that there has never been "any effect of any materials released from Rocky Flats" on his developments.  (Osborn testimony, 1/05/06 Tr. 8873-74)[14]

---

[14] Defendants also incorporate by reference the arguments in their December 8, 2005 Motion for Judgment as a Matter of Law related to Charles McKay. (*See* 12/8/05 Defs. Mot. for J'ment at 14-15)  Because Mr. McKay is a plaintiff/class member, his statements can be used at any time as party admissions.  Fed. R. Civ. P. 32(a)(1) ("Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of deponent as a witness, or for any other purpose permitted by the Federal Rules of Evidence.").  While the Court precluded defendants from presenting deposition designations from Mr. McKay (*see* Defs.' Proposed McKay Dep.

(Continued…)

Plaintiffs' suggestion that some unidentified amount of the 2600 pounds of material unaccounted for ("MUF") somehow ended up on the class properties is not supported by any record evidence.[15]   Plaintiffs failed to establish that any MUF was *in fact* released offsite. Furthermore, plaintiffs admit that they cannot quantify how much MUF, if any, was released offsite.  Plaintiffs' self-proclaimed MUF expert, Dr. Thomas Cochran, testified that the amount of MUF released offsite, if any, is *unknown*.  (Cochran testimony, 11/15/05 Tr. 5387-5388 ("[S]ome part of that plutonium may have been released to the environment.  *We simply don't know*.") (emphasis added))  Plaintiffs presented *no* evidence that the existence of MUF makes it more likely than not that some plutonium escaped offsite, much less onto plaintiffs' property.[16]

In contrast to plaintiffs' speculation about the relation between MUF and offsite releases, defendants established that MUF cannot be used to determine offsite release under the present

_____

Designations filed 12/30/05; 1/5/06 Order), defendants respectfully disagree with that ruling and seek to preserve the issue in this filing.

[15] This remains true despite the Court's ruling on the potential relevance and admissibility of MUF evidence.  (*See* 12/7/06 Order re *Daubert* and Motions in Limine at 124-127)

[16] Plaintiffs cannot justify this absence of evidence by claiming that they lack relevant evidence that would support their claims due to document classification.   It is uncontroverted that plaintiffs' counsel and their experts had access to classified documents for at least 10 years prior to trial.  (*See* Kaufman testimony, 11/14/05 Tr. 5180, 5188 (Plaintiffs' counsel had Q-clearances and were invited to come to Rocky Flats to look at classified documents over 10 years ago); Budnitz testimony, 10/27/05 Tr. 3002–03 (Dr. Budnitz went with plaintiffs' counsel to review classified MUF documents on at least two occasions))  Plaintiffs' speculation to the contrary is impermissible under the Court's instructions (Instruction No. 1.9 ("You may not speculate or guess about what the unavailable or redacted information might be.")) and unsupported by the record facts.  (*See* Defs.' Mem. in Support of Defs.' Mot. for Mistrial or, in the Alternative, Defs.' Proposed Instructions, filed 12/18/05 at 2 (collecting citations))  In sum, plaintiffs failed to establish that they were unable to present their case fully because specific documents remain classified.  (*See also id.* (proposing jury instruction))

circumstances.  (Till Testimony, 12/15/05 Tr. 8300 ("This approach of using MUF, in our opinion, is just not scientific, it's not defensible."))  Dr. Till testified that RAC, specifically Dr. Voilleque, thoroughly examined the issue of whether MUF could be used to evaluate offsite releases and determined that it could not be done.  (*Id.* at 8298–99; *see also* DX542, Technical Memorandum, "Examination of Mass Balance Accounting as a Means for Estimating Plutonium Releases," May 1995 ("Although it was initially expected that a mass balance approach would be useful in the evaluation of releases from a plutonium facility, this review shows that it is not feasible to make quantitative estimates in this way."))  Dr. Till also testified that the Health Advisory Panel ("HAP") reviewed RAC's work on this point and accepted RAC's conclusions that "the mass balance accounting approach is not an effective method for estimating environmental releases of plutonium into the environment."  (Till Testimony, 12/15/05 Tr. 8301–02)  Consequently,  plaintiffs cannot use MUF to establish any offsite releases of plutonium, much less any plutonium deposits on class properties.

### B.      Plaintiffs Have Failed to Prove a Trespass by Rockwell.

Plaintiffs must have evidence that each defendant released plutonium onto all class members' properties.  (Instruction No. 1.10)  There is **no evidence** whatsoever that Rockwell released plutonium which was deposited upon any class property, much less all of the class members' properties.

***First***, it almost goes without saying that the Krey & Hardy and Poet & Martell studies do not prove that ***Rockwell*** committed a trespass.  The Krey & Hardy and Poet & Martell studies

measured plutonium concentration in the soil around Rocky Flats in 1970; however, Rockwell did not begin as plant contractor until 1975.[17]

*Second*, the only plutonium releases as to which plaintiffs introduced any evidence (the 1957 fire, the 1969 fire, and the 903 pad) occurred well before Rockwell began as plant contractor in 1975.[18]

*Third*, plaintiffs' introduction of evidence of *onsite* Rockwell conduct, such as the conduct that gave rise to the 1992 guilty plea, cannot be used to support their offsite contamination elements of their trespass claim.  Plaintiffs introduced no evidence that such onsite conduct by Rockwell resulted in offsite plutonium contamination.[19]   Plaintiffs' own witness — Timothy Holeman — testified that Rockwell's conduct, including that which gave rise to the 1992 guilty plea, did not result in offsite contamination.  (Holeman testimony, 10/18/05 Tr. 1333-34; *see also* Watkins Testimony, Dep. Design. at 159-60, 167-69)  In short, plaintiffs failed to introduce evidence of any releases of plutonium from the Rocky Flats plant

_____

[17] Even the Jones & Zhang study, which was published in 1994 and was based on annual sampling conducted by the CDH in 1970-1978,1980, 1981, 1986, 1989 and 1991, does not link any plutonium found to Rockwell conduct or any purported releases during Rockwell's watch. (*See* DX477)

[18] As discussed elsewhere, plaintiffs did not introduce evidence that these Dow releases have resulted in ongoing plutonium contamination of class properties.

[19] For example, while plaintiffs may point to Ron Avery's testimony regarding alleged damage to Building 771 incinerator filters, plaintiffs failed to link that conduct with any release of plutonium to the class area, and in fact, defendants presented evidence of many additional layers of filtration before any emissions related to the Building 771 incinerator ever reached the stack (Weston testimony, 12/13/05 Tr. 7710-11; DX1053-58) and that 771 stack emissions from that time period did not cause any significant releases.  (DX485; DX281)

that occurred during Rockwell's tenure as contractor — much less evidence of releases during Rockwell's tenure as contractor that resulted in contamination of all (or even most) of the class properties.

Witnesses who testified during defendants' case – including the U.S. Attorney in charge of the Rockwell criminal investigation – echoed the position that there was no offsite impact from Rockwell's onsite conduct.  (Norton testimony, 12/14/05 Tr. 7958-66 ("there had been no evidence of off-site physiological or environmental damage from the operations of the facility"); Weston testimony, 12/13/05 Tr. 7763-65 ("None of Rockwell's conduct in my opinion contributed to any off-site plutonium."); Blaha testimony, 1/4/06 Tr. 8684-87, 8793-94 (no mechanism for offsite transport of onsite groundwater), 8764-65 (no contamination in Great Western Reservoir associated with Rockwell era activity).

For the foregoing reasons, the Court should grant judgment as a matter of law on plaintiffs' trespass claim against Rockwell.

### C.   Plaintiffs Did Not Show That Any Trespass Was Continuing, or That Any Trespass Occurred While All Class Members Owned Their Class Properties.

There are two types of trespasses:  continuing trespasses and permanent trespasses. Under this Court's rulings, to prove that a trespass is "continuing," plaintiffs had to show that "it appears that plutonium will continue to be on the Class Properties indefinitely."[20]  (Instruction No. 3.4)

---

[20] Defendants have previously argued that, in order for a trespass to be "continuing," plaintiffs also must prove that it is not reasonably abatable.  (*See* Defendants' Response to Plaintiffs' Brief on the Statute of Limitations, State Regulatory Standards, Ultrahazardous Liability, Spoliation, and Negligent Trespass, filed Aug. 18, 2004); *see also* W. Keeton, *Prosser and Keeton on Torts*
(Continued…)

Here, plaintiffs introduced no evidence that any plutonium on class properties will "continue indefinitely" (and thus is "continuing").  As discussed above, while plaintiffs introduced evidence about the half-life of plutonium once it gets in the soil, plaintiffs did not introduce evidence that the *soil itself* remained on class properties.  (Smallwood testimony, 11/3/05 Tr. 4067, 4083-84)  Meanwhile, defendants introduced evidence that the vast majority of such soil was likely removed from the class area through development.  (Dorchester testimony, 1/9/06 Tr. 9475-76; *see also* Till testimony, 12/15/05 Tr. 8285; DV1, Till video)  Thus, plaintiffs did not prove that any trespass was "continuing."[21]

Because plaintiffs failed to introduce evidence of a "continuing" trespass, their claims are subject to the rules applicable to "permanent" trespasses.  *See Hoery*, 64 P.3d at 217-23.  In the

---

at § 89 (5th ed. 1984) (a "permanent" nuisance is one that is "unlikely to abate or to be avoided by any reasonable expenditure of money"); D. Dobbs, *The Law of Torts*, § 57 (West Group 2001), *cited in In re Hoery v. United States*, 64 P.3d 214, 223 (Colo. 2003) (listing first among the "most significant factors favoring a classification as temporary" that "(1) the invasion can in fact be terminated or abated" and "(2) the cost of termination is not wasteful or oppressive"); *Hoery*, 64 P.3d at 216, 222-23 ("the record at this stage of the litigation indicates that the contamination is not permanent — that is, it is remediable or abatable."); *Middelkamp v. Bessemer Irrigating Ditch Co.*,103 P. 280, 283 (1909) (when nuisance or trespass "is not practicable to remedy" or could not "by a reasonable expenditure be checked," the nuisance is considered permanent).  The jury was not asked to weigh the sufficiency of such evidence, and plaintiffs introduced no evidence in this regard.

[21] Plaintiffs bear the burden of proving that their claim is "continuing."  *See*, *e.g.*, *Mangini v. Aerojet-General Corp.*, 912 P.2d 1220, 1221 (Cal. 1996) (holding that "because plaintiffs had failed to present *any* substantial evidence that the contamination of their land . . . was capable of being abated at a reasonable cost, the nuisance must be deemed permanent . . .  plaintiffs' nuisance and trespass claims were time barred").  Defendants also introduced evidence that the vast majority of such soil was likely removed from the class area through development (Dorchester testimony, 1/9/06 Tr. 9475-76) but the Court ruled as a matter of law that the jury was not to consider such evidence.

case of a ***permanent*** trespass, a plaintiff must prove that the contamination came onto the property ***during the time the plaintiff owned the property***.[22]  *See also Hugunin v. McCunniff*, 2 Colo. 367, 369 (1874) ("By the strict rule which anciently obtained in the English courts, trespass quare clausum fregit lay only by one having a possession, in fact, of the premises trespassed upon, at the time of the trespasses."); CJI-Civ. 4th 18:1 (May 2004) (requiring as element that "[w]hile Plaintiff was (the owner) . . . the Defendant intentionally (caused [the alleged contaminant] to come upon) that property); *Hoery*, 64 P.3d at 217-223 (holding that, where undisputed evidence showed that contamination was "not permanent — that is, it is remediable or abatable," then the cause of action does not accrue as long as "continuing property invasions remain[ed]" on plaintiff's property, regardless of whether "the United States continues to release toxic pollutants").

Here, plaintiffs introduced no evidence that plutonium contamination of the class properties occurred after the date when all of the class members had acquired their properties — that is, after June 7, 1989.  To the contrary, the evidence at trial demonstrated that 99.9% of all plutonium releases from Rocky Flats occurred before 1970, a time when only a small fraction of class members owned their properties.  (DX454, ATSDR 5/13/05 Report, at 1-2; DX536 at 19-20 (highest releases and risks form 1957 fire and 903 pad in 1969; people moving into area after 1970 subject to lower concentrations of plutonium); P1334 at 7-8, 12-13 (same); Till testimony, 12/15/06 Tr. 8241, 8264-65 (after 1969, exposures from Rocky Flats drop off significantly;

---

[22] Defendants are uncertain as to whether the Court has ever ruled on this argument.  If the Court has ruled on this argument, defendants offer it here for the purpose of preserving their rights.

major releases all occurred prior to 1971); DV1, Till video; DX2188A, Dorchester video; Dorchester testimony, 1/9/06 Tr. 9474-9476; DX2195-DX2207 (aerial photographs); see also Goble testimony, 11/2/05 Tr. 3678)[23]

Accordingly, because plaintiffs introduced no evidence that any trespass was "continuing" and did not prove that any trespass occurred after the class members acquired their properties, plaintiffs' claims should be dismissed.  *See Hugunin*, 2 Colo. at 369-70.

**D.      Plaintiffs Did Not Introduce Sufficient Evidence That Defendants Intentionally Caused a Trespass.**

To prove a trespass, plaintiffs also had to demonstrate that defendants' conduct was "intentional."  (Instruction No. 3.2) (plaintiffs must show that "Dow or Rockwell or both of them intentionally undertook an activity or activities that in the usual course of events caused plutonium from Rocky Flats to be present on the Class properties"); *see also Public Serv. Co. v. Van Wyk*, 27 P.3d 377, 389 (2001) ("By ***intentionally*** entering the land possessed by someone else, or causing a thing or third person to enter the land, an individual becomes subject to liability for trespass, whether or not he caused harm to any legally protected interest of the landowner.") (emphasis added).

With respect to Dow, plaintiffs introduced evidence of certain plant accidents (*e.g.*, the 903 pad incident, the 1957 fire, and the 1969 fire).  However, plaintiffs introduced no evidence whatsoever that defendants' conduct in connection with any of these events was "intentional."

---

[23] Certainly there is no evidence in the record that any plutonium will continue to be released from Rocky Flats given that the plant site has been fully remediated.  (Blaha testimony, 1/4/06 Tr. 8637-8681, 8753)

Rather, Dow took significant steps and precautions to avoid any such problems.  (*See* Ray testimony, 10/19/05 Tr. 1551-52 (Dow responded to union's complaints regarding the 903 pad to the point they didn't know what to do with the drums), 1658-60 (plant had not yet come up with a way to take care of oils in the drums but research and development efforts were ongoing to try and deal with these materials), 1662-63 (903 barrels were shipped offsite and area was covered with asphalt), 1671-1673 ("hundreds" and over "60 columns" of HEPA filters in 71 building, "floor to ceiling, side to side"); Frazier testimony, 12/12/05 Tr. 7540-45 (attempts were made at Rocky Flats to keep exposure as low as reasonably achievable; 903 pad was monitored and problems were addressed))  After the 1957 fire, Dow took several of the recommendations from the 1957 fire report, and implemented them in buildings 776 and 777, where the 1969 fire occurred.  For example, Dow provided additional $CO_2$ fire extinguishers (Budnitz testimony, 11/01/05 Tr. 3367-3368, 10/31/05 Tr. 3172), installed additional standpipes and fire hoses (Budnitz testimony, 11/1/05 Tr. 3385-3386), installed heat detectors in filter plenums and gloveboxes (*id.* at 3403-3405), provided a sprinkler system in the filter plenum (*id.* at 3375-3376, 3381-3383), added fire breaks in gloveboxes (*id.* at 3401-3402), utilized fire resistant Plexiglas and other non-combustibles in the construction of gloveboxes (*id.* at 3396-3397), and requested funding for a building to store 903 pad materials (*id.* at 3480-81).[24]

---

[24] Defendants restate their position that, under Colorado law, a trespass is intentional if it "is done with knowledge that it will to a substantial certainty result in the entry of the foreign matter", Restatement (Second) of Torts § 158 cmt. i, *quoted in In re Hoery v. United States*, 64 P.3d 214, 218 (Colo. 2003), and respectfully disagree with this Court's conclusion that the Colorado Supreme Court has not adopted this standard (*see* 1/25/06 Tr. 10732).  Plaintiffs have produced no evidence that defendants knew "to a substantial certainty" that their conduct would cause offsite releases of plutonium.

Similarly, with respect to Rockwell, plaintiffs failed to prove any "intentional" conduct resulting in offsite releases.  Plaintiffs failed to prove any offsite releases (of plutonium or any other radioactive or hazardous substance or contaminant) during Rockwell's tenure, much less any releases resulting from "intentional conduct."  (Holeman testimony, 10/18/05 Tr. 1333-34 (no offsite releases from plea conduct); P604 ("We have operated the Rocky Flats plant with integrity and high ethical standards . . . we are committed to the welfare and safety of our Rocky Flats employees and the surrounding communities."); P736 ("We have managed Rocky Flats with proper concern for public health, safety and the environment."))  Defense witnesses merely confirmed this fact.  (Weston testimony, 12/13/05 Tr. 7744-47 (Rockwell sought to stop pondcrete production when NTS refused to take the waste but DOE would not allow production to cease), 7763-65 ("None of Rockwell's conduct in my opinion contributed to any off-site pollution"), 7797 (MUF had nothing to do with environmental releases), 7844-45 ("I can say with high confidence that it [MUF] did not get off-site."), 12/14/05 Tr. 8081-82 (Rockwell sought an indoor storage facility for pondcrete, but it took DOE almost three years to approve the request); *see also id.* at 8051, 8096-98; Norton testimony, 12/14/05 Tr. 7961-68)

E.     **The Evidence Showed That Any Trespass Was Not Caused by Defendants.**

Defendants are also entitled to judgment as a matter of law on the issue of causation. Under the Court's instructions, "the word 'cause' . . . means an act or failure to act that in natural or probable sequence produced the claimed effect.  It is a cause without which the claimed effect would not have happened."  (Instruction No. 3.18)

Here, plaintiffs failed to introduce sufficient evidence of causation to withstand a motion for judgment as a matter of law.  The uncontroverted evidence showed that the plant (including

the plutonium at the plant) was owned by the government, and that defendants acted in accordance with the government's instructions as plant contractors.  (*E.g.*, P1049 & 11/21/05 Tr. 5983-84 (expenditures require AEC approval); P338 & 11/22/05 Tr. 6205 (DOE must advise Colorado of its planning, which will impact "both the nature of the mission and the level of production at the Rocky Flats plant"); Ray testimony, 10/19/05 Tr. 1659 (AEC determined whether waste could be shipped); Holeman testimony, 10/18/05 Tr. 1383 (setting limits on waste affected production, which was controlled by the federal government and national security); Pls.' opening, 10/11/05 Tr. 524 ("The Atomic Energy Commission was both responsible for the production of nuclear weapons and for oversight of the facilities.")  The uncontroverted evidence also showed that there were at least two intervening causes[25] of any trespass by defendants:  (1) the government's actions with respect to the 903 pad incident (*see* Budnitz testimony, 11/1/05 Tr. 3480-81; DX359 (Dow 8/9/68 proposal for concrete slab); DX361 (1/24/69 denial from AEC)), which plaintiffs' witnesses have said is the major release incident that could have resulted in contamination of plaintiffs' properties (Cochran testimony, 11/16/05 Tr. 5530, 5541; Budnitz testimony, 10/27/05 Tr. 3081-82); and (2) abnormally high 100-plus mile-an-hour winds that were blowing at the time of the 903 pad incident (*see* Budnitz testimony, 11/1/05 Tr. 3493-

---

[25] Defendants tendered an intervening cause instruction to the Court, which was rejected.  Under the intervening cause instruction, "[a] defendant's conduct is not the cause of the claimed effect if, in order to bring about such an effect, it was necessary that the defendant's conduct combine or join with an intervening cause that also contributed to cause the claimed effect.  An intervening cause is a cause that would not have been reasonably foreseen by a reasonably careful person under the same or similar circumstances."  (Exhibit 1, Defendants' Proposed Instruction No. 5); *see also Smith v. State Compensation Ins. Fund*, 749 P.2d 462, 464 (Colo. Ct. App. 1987).

99; DX58, Historical Public Exposure Studies Summary of Findings (describing windstorms)) Plaintiffs introduced no evidence whatsoever that either of these intervening causes were foreseeable by Dow. To the contrary, there is no reasonable basis to conclude that Dow could have foreseen either of these intervening causes.

Likewise, with respect to Rockwell, the actions of the Federal Bureau of Investigation, the Environmental Protection Agency and the Department of Justice in undertaking the FBI raid constitute an intervening cause foreclosing liability for Rockwell. Plaintiffs' witnesses repeatedly stressed that the basis of their claims was the FBI raid. (*E.g.*, Whalen testimony, 11/21/05 Tr. 5955 (the raid affected how she viewed her property) & 5938-39 (raid affected use and enjoyment); Schierkolk testimony, 10/20/05 Tr. 1902 (could not sell property after raid); Babb testimony, 10/20/05 Tr. 1961 (raid affected her ability to sell); Cook testimony, 10/21/05 Tr. 2040-41 (FBI raid made her give up on her property); Cook testimony 10/21/05 Tr. 2055-56 (testified at her deposition that the only claim she was making was based on the FBI raid); S. Bartlett testimony, 10/14/05 Tr. 919-920 (raid had a tremendous impact on ability to sell her home)) Plaintiffs introduced no evidence that the actions of governmental agents in the June 1989 FBI raid in making unsupportable allegations about Rocky Flats were reasonably foreseeable by Rockwell. Instead, all evidence that has been presented is to the contrary. (*E.g.*, Holeman testimony, 10/17/05 Tr. 1292-96 (Holeman was "dubious" of claims FBI was making when they went in because he knew some could not be true); Watkins testimony, Dep. Design. at 155-57, 161 (FBI went in for the wrong reason); Norton testimony, 12/14/05 Tr. 7951-53 ("we did not find the kind of deceptive conduct we thought may have occurred"); *see also* P604)

For the foregoing reasons, the Court should grant judgment as a matter of law on plaintiffs' trespass claims.

## II.   OTHER TRESPASS ARGUMENTS THAT THE COURT HAS ALREADY RULED ON.

Defendants also move for judgment as a matter of law on various other trespass-related arguments that have already been rejected by this Court, as set forth in this Section.

### A.   Plaintiffs Failed To Demonstrate That Any Trespass Was Either Tangible or Caused Serious and Substantial Physical Damage.

Another separate and independent reason why defendants should be granted a directed verdict on the issue of trespass is that, in addition to their failure to show that plutonium was deposited upon and remains on each of the class properties, plaintiffs did not demonstrate that any plutonium deposited on the class properties either (1) is "tangible"; or (2) has caused serious and substantial physical damage.  *See Van Wyk*, 27 P.3d at 387, 390.[26]

In *Van Wyk*, the Colorado Supreme Court held:

> An intangible intrusion onto property cannot result in a trespass unless the intrusion causes physical damage to the property. . . . The meaning of the term 'intangible' is something that is impalpable, or incapable of being felt by touch. Webster's Ninth New Collegiate Dictionary 603, 628 (1988). . . . [A]n intangible intrusion may give rise to claim for trespass, but only if an aggrieved party is able to prove physical damage to the property caused by such intangible intrusion. . . . Moreover, a property owner forced to prove damage will be further limited to seeking redress in cases of serious or substantial invasions.

---

[26] The Court has rejected defendants' argument that plutonium contamination is not tangible. *Cook v. Rockwell Int'l Corp.*, 273 F. Supp. 2d 1175, 1201 ("*Cook IX*") (D. Colo. 2003).

*Id.* at 387, 390.  As this Court explained in *Cook IX*:

> In *Public Service Co. of Colorado v. Van Wyk*, 27 P.3d 377 (Colo. 2001), the Colorado Supreme Court joined the modern trend by recognizing that an intangible intrusion onto another's property may constitute a trespass, but only upon proof that the intangible intrusion caused physical damage to the property.  *See id.* at 390. In so doing, it distinguished between trespass based on a "physical entry" and one based on an "intangible intrusion" *id.* at 389, which it defined as "something that is impalpable, or incapable of being felt by touch."  *Id.* at 387.

*Id.* at 1200-01.

Plaintiffs introduced no evidence that any plutonium deposited onto class properties was "tangible" (which the *Van Wyk* court defined as "palpable," or "capable of being felt by touch"). 27 P.3d. at 387.  To the contrary, plaintiffs' expert Shawn Smallwood testified that plutonium is ***not*** "tangible."  (Smallwood testimony, 11/3/05 Tr. 4039-40 ("Q.  You would agree with that, by any stretch of the common sense word 'intangible', [plutonium particles a]re intangible, right? A.  Yes."))  Plaintiffs and their counsel agree.  (*See* Pls.' opening, 10/11/05 Tr. 497 ("You can't see it, you can't smell it, you can't taste it, you can't hear it, and you can't feel it . . . ."); Exhibit 2, Representative Pls.' Joint Resps. to Dow's 2d Set of Interrogs. Directed to Each Class Representative Pl., dated 9/15/95, at 12 ("[T]he radionuclides and other hazardous substances released from Rocky Flats to which responding plaintiffs and members of the classes (and their properties) were exposed were not perceptible to the senses . . . ."))

Because plaintiffs introduced no evidence that plutonium is tangible, plaintiffs are required under *Van Wyk* to show that plutonium deposited on the class properties caused "serious or substantial" physical damage.  *See* 27 P.3d at 390 ("[A]n intangible intrusion may give rise to claim for trespass, but only if an aggrieved party is able to prove physical damage to the property

33

caused by such intangible intrusion. . . .   Moreover, a property owner forced to prove damage will be further limited to seeking redress in cases of serious or substantial invasions.").   But plaintiffs did not present evidence that ***any*** class property — much less most class properties or all class properties — suffered serious or substantial physical damage from plutonium invasions. (*See, e.g.*, R. Bartlett testimony, 10/14/05 Tr. 1060-61 (plutonium sampling showed property safe to build on); *see also* Schierkolk testimony, 10/20/05 Tr. 1932, 1934-35 (sampling showed well water safe); Watkins testimony, Dep. Design. at 159-60, 167-69 (no public health risk offsite))   And this lack of offsite risk was confirmed by defendants' witnesses.   (Norton testimony, 12/14/05 Tr. 7958-66 ("there had been no evidence of off-site physiological or environmental damage from the operations of the facility"); Raabe testimony, 12/9/05 Tr. 7339-40 ("The doses we're talking about in this case are so trivial they won't have any effect one way or another.  They're small, tiny fraction of what we get every week.  There's no way you can assign a risk or a benefit to such a small dose.  No way."); *see also id.* at 7270-71;  DX536 at 23-25 (highest risks same as risk from background plutonium from fallout, within EPA's range of acceptable risk, and less than risk of dying from lighting strike); P1334 at 15-18 (same); Till testimony, 12/15/05 Tr. 8273-81, 8282-83, 8529-31 (cumulative 37-year doses are thousands of times less than a single year of background radiation dose and risks are so small that they do not show up in the real world and have to be assumed to exist); DX1187; DX1779a; DX1843; DX1855; DX1856)

B.   **Plaintiffs Failed to Present Evidence Showing That Defendants Did Not Comply with the Applicable Federal Standards for Offsite Plutonium Releases.**

As defendants have previously argued, in order to prevail on their trespass claims, plaintiffs must demonstrate that defendants caused releases that violated the applicable federal standards.[27]  These standards were as follows:

1.   2.0 picocuries per cubic meter for the period from 1953 through August 28, 1957.

2.   0.2 picocuries per cubic meter for the period from August 29, 1957 through August 11, 1963.

3.   0.33 picocuries per cubic meter for the period from August 12, 1963 through August 4, 1985.

4.   0.04 picocuries per cubic meter for the period from August 5, 1985 through June 7, 1989.

---

[27] Defendants acknowledge that the Court has already rejected defendants' position on this issue, *Cook IX*, 273 F. Supp. 2d at 1199.  Defendants note that, since this issue was last addressed by this Court in the *Cook IX* opinion, four more district courts — including one in the Tenth Circuit — have agreed with the vast majority that the Price-Anderson Amendments Act preempts state law to the extent that it creates a duty inconsistent with federal safety standards.  *See Wilcox v. Homestake Mining Co.*, No. CIV-04-534, slip op. at 6–7 (D.N.M. Nov. 15, 2005) (attached as Exhibit 3); *O'Connor v. Boeing N. Am., Inc.*, No. CV 97-1554, slip op. at 77–87 (C.D. Cal. Aug. 18, 2005) (attached as Exhibit 4); *Osarczuk v. Associated Unvs. Inc.*, No. 96-2836, at *16 (N.Y.-Part. 32, Suffolk Co. Mar. 10, 2005)(attached as Exhibit 5); *Finestone v. Fla. Power & Light Co.*, 319 F.Supp. 2d 1347, 1349 (S.D. Fla. 2004).   The following decisions are in accord: *Roberts v. Fla. Power & Light Co.*, 146 F.3d 1305, 1308 (11th Cir. 1998); *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1553 (6th Cir. 1997); *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1105 (7th Cir. 1994); *Good v. Fluor Daniel Corp.*, 222 F. Supp. 2d 1236, 1247 (E.D. Wash. 2002); *Gassie v. SMH Swiss Corp. for Microelec. and Watchmaking Indus., Ltd.*, No. Civ. A. 97-3557, 1998 WL 158737, at *4 (E.D. La. Mar. 26, 1998)(attached as Exhibit 6); *Boggs v. Divested Atomic Corp.*, No. C-2-90-840, 1997 WL 33377790, at *3 (S.D. Ohio Mar. 24, 1997)(attached as Exhibit 7); *Corcoran v. New York Power Auth.*, 935 F. Supp. 376, 386 (S.D.N.Y. 1996); *Bohrmann v. Maine Yankee Atomic Power Co.*, 926 F. Supp. 211, 220 (D. Me. 1996); *McLandrich v. Southern Cal. Edison Co.*, 942 F. Supp. 457, 465 (S.D. Cal. 1996); *Lamb v. Martin Marietta Energy Sys.*, 835 F. Supp. 959, 965 (W.D. Ky. 1993).

(*See also* DX1638)

Plaintiffs introduced no evidence that any of these standards were violated during either the Dow era or the Rockwell era. Indeed, neither of plaintiffs' release experts (Goble and Smallwood) even discussed federal standards. (*See* Goble testimony, 11/2/05 Tr. 3618-88, 3692-3709; Smallwood testimony, 11/3/05 Tr. 4064, 4067)

To the contrary, all of the evidence showed that Rocky Flats plant releases (including water) have not been in excess of the federal standards. (DX1651a; DX1663, DX1664; Frazier testimony, 12/12/05 Tr. 7529-31 (air monitoring results were "always less than standards"; the plant was always in compliance with DOE or AEC's standards for plutonium in air); *id.* at 7534-37, 7539) That was true both during the Dow era and during the Rockwell era (*see* Holeman testimony, 10/18/05 Tr. 1363, 1370-71 (water met standards); *see also*, DX34, Broomfield 2004 Water Quality Report (no violations of Safe Drinking Water Act standards); Norton testimony, 12/14/05 Tr. 7967-68 (based on surface water monitoring at the plant borders, no safe drinking water act violations noted by Cities of Broomfield or Westminister); Weston testimony, 12/14/05 Tr. 8096 ("I never saw anything even close to standard.")

In sum, plaintiffs' failure to introduce any evidence that defendants violated federal standards constitutes another reason why defendants are entitled to judgment as a matter of law on plaintiffs' trespass claim.

**C.      Plaintiffs Have Not Shown That Plutonium Levels on Class Properties Exceeded the Applicable State Standards.[28]**

In *Van Wyk*, the Colorado Supreme Court addressed the concern about over-extending trespass liability by establishing the prerequisites that, for an invasion to be significant enough to be actionable in trespass, the invasion must either be "tangible" (which the court defined as "[]capable of being felt by touch") or must cause "physical damage to the property" that is "serious or substantial."  27 P.3d at 387, 390.  Since *Van Wyk*, the only Colorado decision to allow a trespass claim on the ground that there was allegedly physical damage to the property was the Colorado Supreme Court's decision in *Hoery*.  In *Hoery*, the Court held that an ***above-state-standards*** TCE invasion constituted a continuing trespass based on the record in that case. *Hoery*, 64 P.3d at 222; *see also Taco Cabana v. Exxon Corp.*, 5 S.W.3d 773, 780 (Tex. App. 1999) ("Because the evidence presented at trial did not establish that Exxon failed to remove soil that contained contaminants above state action levels, Taco Cabana failed to establish its trespass theory of liability.")

In this case, plaintiffs seek to recover for an alleged trespass by a contaminant that:  (1) indisputably cannot be experienced by the senses; and (2) is not alleged to have caused any perceptible impact to the property (such as killing plants, causing paint to peel, *etc.*). (Smallwood testimony, 11/3/05 Tr. 4039-40)   Accordingly, plaintiffs are required to show

---

[28] Defendants realize that the Court has ruled that plaintiffs need not prove a violation of these state standards to prevail on their trespass claims (*see* 12/17/04 Order re Proposed Trespass Instructions at 5) but assert this argument for the purpose of preserving their rights.

contamination in excess of the state plutonium standard before defendants can be found liable for a trespass. *Van Wyk*, 27 P.3d at 387, 390; *Hoery*, 64 P.3d at 222.

The Colorado plutonium standard is two disintegrations per minute of plutonium per dry gram of soil or square centimeter of surface area.  6 Colo. Code Regs. 1007-1, RH 4.60.1, Permissible Levels of Plutonium in Uncontrolled Areas.  Plaintiffs introduced no evidence whatsoever that either defendant caused class properties to become contaminated with plutonium in excess of this standard.  To the contrary, the only evidence that was introduced at trial showed that any contamination of class properties was in an amount far less than the state standard.  (*See, e.g.*, Budnitz testimony, 10/31/05 Tr. 3335-36; S. Bartlett testimony, 10/14/05 Tr. 959-60, 961; Cook testimony, 10/21/05 Tr. 2023-26; *see also* Frazier testimony, 12/12/05 Tr. 7529-31 (air monitoring results were "always less than standards"; the plant was always in compliance with DOE or AEC's standards for plutonium in air); *id.* at 7534-37, 7539; DX1638; DX1651a; DX1663; DX1664; Weston testimony, 12/14/05 Tr. 8096 ("I never saw anything even close to standard.")  Plaintiffs' failure to introduce any evidence that defendants' conduct resulted in contamination of the class properties in excess of the state plutonium standard constitutes sufficient grounds for judgment as a matter of law as to the trespass claims.

## III.   DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' NUISANCE CLAIMS.

As with trespass, the Court should set aside the verdict as to the nuisance claims.  The trial evidence underlying plaintiffs' nuisance claims suffered from fatal deficiencies.  These deficiencies are independent and sufficient grounds for judgment as a matter of law in defendants' favor on plaintiffs' nuisance claims.

A.      **Plaintiffs Did Not Show a Class-Wide Health Risk.**

Under the Court's jury instructions, to prove a nuisance, plaintiffs had to demonstrate that "Dow or Rockwell or both of them interfered with Class members' use and enjoyment of their properties in the Class Area in one or both of these two ways:

A.      By causing Class members to be exposed to plutonium and placing them at some increased risk of health problems as a result of this exposure (*see* Instruction Nos. 3.7, 3.18); and/or

B.      By causing objective conditions that pose a demonstrable risk of future harm to the Class Area (*see* Instruction Nos. 3.7, 3.18)"

(Instruction No. 3.6)

Plaintiffs proved neither of these interferences.  There is no evidence of "class members' experiencing "increased risk of health problems as a result" of "expos[ure] to plutonium." (Instruction No. 3.7)   Nor is there any evidence of any "objective conditions that pose a demonstrable risk of future harm to the Class Area."  (Instruction No. 3.6)

1.      **Plaintiffs Failed to Introduce Evidence That All Class Members Experienced an Unreasonable Increased Health Risk as a Result of Plutonium Exposure.**

With respect to past health risk, the Court's jury instructions required plaintiffs to prove that "***the Class members*** were exposed to plutonium in some way as a result of one or both Defendants' activities and incurred some increment of increased health risk as a result." (Instruction No. 3.7) (emphasis added)   Any such "increment of health risk" had to be "unreasonable."[29]  (Instruction No. 3.8)

_____

[29] Under the Court's jury instructions, in determining "unreasonableness," it was necessary to "consider both harm that has actually been incurred and the risk of future harm."  (Instruction No. 3.11)  The "risk of future harm" is addressed in Part III.B, *infra.*

The property class is defined "with reference to geographical representations of the area bounded by the plutonium contour and the complaint supplies the ***operative date of ownership as June 7, 1989***."  *See Cook v. Rockwell Int'l Corp.*, 181 F.R.D. 473, 476 n.3 ("*Cook VIII*") (D. Colo. 1998) (emphasis added).  Plaintiffs introduced no evidence that "the class members" either (a) were exposed to plutonium; or (b) incurred an increased health risk as a result of that exposure.

Plaintiffs' witness on this issue, Dr. Goble, could not quantify any exposures or health risks to the class.  Rather, he merely claimed that there was tremendous "uncertainty" in such exposures and health risks.  (Goble testimony, 11/2/05 Tr. 3660-61)  Dr. Goble opined as follows:

> Q.  Okay.  So when you say, in my judgment these exposures were significant and were sufficient to cause latent diseases among members of the exposed group, you're not talking about everyone that lived in the class area?  In other words, not everyone had a significant exposure?
>
> A.  Well, some of the exposures for people living in the class area were really small.  And significance, you might call sort of a policy to when you take it seriously.  But ***some of these are very, very small exposures.  And, for instance, regulatory agencies would not have been concerned about such exposures***.

(Goble testimony, 11/2/05 Tr. 3661) (emphasis added)[30]  And, as discussed above (Section I.A), plaintiffs cannot use evidence of MUF to suggest that the risks are any higher, because there is

---

[30] Defense witnesses testified similarly.  (*See, e.g.,* Raabe testimony, 12/9/05 Tr. 7339-40 ("The doses we're talking about in this case are so trivial they won't have any effect one way or another.  They're small, tiny fraction of what we get every week.  There's no way you can assign a risk or a benefit to such a small dose.  No way."); *see also id.* at 7270-71; DX536 at 23-25 (highest risks same as risk from background plutonium from fallout, within EPA's range of
(Continued…)

no evidence that any MUF was released offsite, much less any evidence that any MUF was released onto plaintiffs' properties (and the evidence is to the contrary).

Plaintiffs' experts Drs. Cochran, Smallwood and Clapp also presented no evidence of increased health risk to class members.  Dr. Cochran did not calculate dispersion, dose or risk for anyone, including members of the class.  (Cochran testimony, 11/16/05 Tr. 5527)   Dr. Smallwood, like Dr. Cochran, did not calculate the amount of plutonium that got offsite, let alone dose or risk to class members. (Smallwood testimony, 11/3/05 Tr. 4060-61, 4064, 4069) And Dr. Clapp did not study the class itself, nor did he determine whether anyone he did study was actually exposed to any Rocky Flats releases.[31]   (Clapp testimony, 11/9/05 Tr. 4862-63, 11/10/05 Tr. 4908-10, 4918-19)[32]

---

acceptable risk, and less than risk of dying from lighting strike); P1334 at 15-18 (same); Till testimony, 12/15/05 Tr. 8273-81, 8282-83, 12/16/05 Tr. at 8529-31 (cumulative 37-year doses are thousands of times less than a single year of background radiation dose and risks are so small that they do not show up in the real world and have to be assumed to exist); DX1187; DX1779a; DX1843; DX1855; DX1856))

[31] What is more, Dr. Clapp failed to find any increased results that were statistically significant at a 95% confidence level and cannot draw any conclusion from his data that cancer rates are higher.  (*See* Wecker testimony, 1/11/06 Tr. 9745-47, 9752, 9755-56 & 9759-60 ("the data are strongly consistent with no difference"))  Dr. Clapp's failure to find anything is consistent with the work of Dr. Till and RAC.  (*Id.* at 9757-58 ("[I]f you have a one in a million chance in a lifetime, it would take a million people for a lifetime to get the first one.  And he was looking at fewer people, less time.  When he then goes out and looks at this study, it's obvious, if you credit these results here, that he's not going to find anything, so there's no surprise that there was nothing to be found."))

[32] Like plaintiffs' experts, plaintiffs' fact witnesses also failed to present any evidence of increased health risk to class members.  In fact, plaintiffs' fact witness testimony demonstrates that there is ***not*** an increased health risk.  (*E.g.,* Holeman testimony, 10/18/05 Tr. 1337;  Watkins testimony, Dep. Design. at 159-60, 167-69; Ozaki testimony, 10/20/05 Tr. 1804, 1808-09) Defendants' witnesses agree.  (*E.g.*, Till testimony, 12/15/05 Tr. 8270-71, 8273-79, 12/16/05 Tr.

(Continued…)

As argued above regarding plaintiffs' lack of release evidence, plaintiffs cannot justify the absence of risk evidence by pointing to the fact that some discovery materials may have remained classified. (Instruction No. 1.9) For example, plaintiffs cannot point to classified documents to suggest that any evidence relevant to MUF or any other aspect of their case remains unavailable to them. It is uncontroverted that plaintiffs' counsel and their experts had access to classified documents for at least 10 years prior to trial. (*See* Kaufman testimony, 11/14/05 Tr. 5180, 5188; Budnitz testimony, 10/27/05 Tr. 3002–03) Plaintiffs' suggestion to the contrary is unsupported by the record facts. (*See* Defs.' Mem. in Support of Defs.' Mot. for Mistrial or, in the Alternative, Defs.' Proposed Instructions, filed 12/18/05 at 2 (collecting citations); Instruction No. 1.9)[33] Accordingly, plaintiffs failed to establish that they have been unable to fully present their case because specific documents remain classified. (*See also* Defs.' Mem. in Support of Mot. for Mistrial or, in the Alternative, Defs.' Proposed Instructions, filed 12/18/05 (proposing jury instruction))

---

8529-31, Raabe testimony, 12/9/05 Tr. 7209-10, 7240-42, 7339-40; Norton testimony, 12/14/05 Tr. 7958-66 ("there had been no evidence of off-site physiological or environmental damage from the operations of the facility")

[33] Notably, defendants produced evidence that RAC reviewed thousands of boxes of classified documents and concluded that most were not useful to their dose reconstruction project. (*Id.* at 8207–08) The evidence also established that Plaintiffs and RAC had to follow the same procedures to review classified materials and to obtain declassified information. (*Compare* Budnitz testimony, 10/27/05 Tr. 3006 (describing the procedures that he was asked to follow) *with* Till testimony, 12/15/05 Tr. 8208–11 ("It's very important to understand there are very strict rules regarding classified information and the process that one goes through to get that information declassified. We had to follow those rules like anyone else."); *see also* Kaufman testimony, 11/14/05 Tr. 5200–01 (the "same rules" applied to plaintiffs' lawyers))

Although plaintiffs' failure to present evidence of an increased health risk to "the class members" is dispositive of plaintiffs' nuisance claim, the evidence affirmatively showed that no health risk exists.  For example, EPA's Operable Unit 3 ("OU3") study (which is comprised of all offsite areas around Rocky Flats) investigated the media for exposure to people in the offsite community, including soil, surface water, air, groundwater and sediment.  The EPA's Record of Decision ("ROD") for OU3 concluded "No hazardous substances, pollutants or contaminant will remain within the boundaries of OU3 above level that allow for unlimited use and unrestricted exposure."  (DX36, OU3 ROD at 2)  The OU3 ROD further concluded that all sites within the OU3 study area "are already in a state protective of human health and the environment." (*Id.*; *see also* DX454, ATSDR 5/13/05 report, at 56 ("Therefore, no past, current, or future public health hazard exists from exposure to offsite surface soils, even at the most contaminated locations."))

In addition, defendants presented a study by the ATSDR, the principal federal health agency involved with hazardous waste issues, that considered any possible health risks associated with Rocky Flats and found no health risks associated with exposure to Rocky Flats plutonium.  In evaluating Rocky Flats plutonium emissions, the ATSDR concluded that:

- "Exposures to plutonium were well below levels associated with adverse health effects." (DX454, ATSDR 5/13/05 report, at 1-2)

- "[P]lutonium emissions from routine operations at Rocky Flats Plant (1953-1989) had minimal air quality impacts at offsite locations; these impacts were estimated to be comparable to the plutonium levels that have been attributed to fallout from past testing of nuclear weapons."  (*Id.* at 45)

- "Overall, ATSDR finds past and current inhalation exposures to site-related air emissions to be no apparent public health hazard."  (*Id.* at 78)

This study also found that "levels of offsite surface soil contamination are no apparent public health hazard for past, current and future exposures."  (*Id.* at 76)

The nine-year, multi-million-dollar dose reconstruction and risk assessment conducted by the CDPHE and overseen by a state-appointed Health Advisory Panel comprising scientists, anti-nuclear activists, and citizens (including a member of the property class), similarly established the lack of any real health risk to class members.  (DX1689; DX536 at 30-34; P1334 at 4-6, 62-64)  The study was conducted in two phases by contractors selected by the HAP.  Phase I (1990-1994) was conducted by ChemRisk; Phase II (1992-1999) was by Risk Assessment Corporation ("RAC") and its president, John Till.  (DX1689; P1334 at 5-6)

The essential dose reconstruction and risk assessment model that RAC created calculated source terms (or release estimates) for the releases of materials from Rocky Flats that had the most significant potential impact on the health of offsite residents; used meteorological data to predict the concentration of those materials in the offsite environment; calculated doses from those exposures; quantified excess cancer risks arising from the exposures, and then compared the study results with historical, measured environmental data to validate the model.  (Till testimony, 12/15/05 Tr. 8242-43)  Among the historical environmental monitoring data that RAC used to validate its model are many studies of plutonium in the soil on and around Rocky Flats. (DX530, RAC Task 4 Environmental Monitoring Report, at Table VIII-1)  As Dr. Till testified, none of the many soil sampling studies conducted around Rocky Flats demonstrates contamination in the class contour in 1989.  Finally, RAC took into account the various uncertainties in the data and the calculations on which RAC's results and conclusions are based. (Till testimony,  12/15/05 Tr. 8227-29, 8299-8300, 12/16/05 Tr. 8507-08)  Indeed, both the HAP and the ATSDR lauded the quality of RAC's work as producing "the most comprehensive risk assessments ever performed for Rocky Flats."  (DX536 at 28; DX454 at 46)

Based on its analyses, RAC found that the vast majority of Rocky Flats releases occurred by 1969 (Till testimony, 12/15/05 Tr. 8241, 8264-65) and that the potential cancer incidence risk for even the most highly exposed individual was very small (*id.* at 8277-78, 8279).  The HAP compared that level of risk to the risk of contracting cancer from exposure to weapons fallout, which, HAP noted, equates to a 0.00005% increased risk, more than 400,000 times lower than the average Coloradan's risk of dying from cancer caused by all sources.  (DX536 at 24-25) Although RAC studied exposures to Rocky Flats releases in an area much larger than the class area, RAC's study area encompasses the class properties, and it is possible to use RAC's results to assess historical risks to the class.  When Dr. Till assessed RAC's data and results as applied only to class properties, he found that the cumulative 37-year historical doses are so low that they are hundreds or thousands of times lower than the doses from background radiation that the average Coloradan is subjected to every year, that they do not present real-world risks, and that any risk from those doses is based only on an assumption that is made out of prudence.  (Till testimony, 12/15/05 Tr. 8273-81, 8282-83, 12/16/05 Tr. 8529-31; DX1187; DX1779a; DX1843; DX-1855; DX1856)

Consequently, with all the evidence presented at trial, it is clear that there is no evidence of a past health risk that can withstand judgment as a matter of law.

> 2.    **Plaintiffs Failed to Introduce Evidence That All Class Members Experienced an Unreasonable Health Risk as a Result of Exposure to Plutonium Released by Rockwell.**

As discussed in the trespass section above, plaintiffs failed to introduce evidence that Rockwell caused releases of plutonium to the class area.  It follows that plaintiffs could not show that "the [class members] incurred some increment of increased health risk" as a result of

exposure to any "plutonium" released by Rockwell.  (Instruction No. 3.7)  This is an additional reason why defendants are entitled to judgment as a matter of law on plaintiffs' nuisance claims with respect to Rockwell.

Nor did plaintiffs' experts introduce any evidence of any exposures or health risk attributable to Rockwell's conduct.  Rockwell operated the plant beginning in 1975.  All of the exposure estimates created by plaintiffs' dose/risk expert, Dr. Goble, are derived from releases that occurred for the period from 1965-1969.  (P1124, Goble Report, at 35)  To derive exposure estimates for 1970-1989, Dr. Goble applies a "multiplier" of .003 to his exposure estimates for 1965-1969.  But Goble's multiplier has nothing to with activities by Rockwell; rather, Goble's multiplier relates, at best, to the continuing migration of plutonium released by Dow.  Goble's report states that Goble has made "no estimate" for contamination in or after 1990.  (*Id.* at 49)

Plaintiffs presented no expert or other evidence of any exposures or health risk caused by Rockwell's conduct.  What is more, the evidence developed by defendants at trial indicates there was no such health risk caused by Rockwell.  (*See, e.g.*, Norton testimony, 12/14/05 Tr. 7958-66 ("there had been no evidence of off-site physiological or environmental damage" from Rockwell's operations of the facility)  Therefore, if the Court elects not to grant judgment as a matter of law on all of plaintiffs' nuisance claims, the Court should nevertheless grant judgment as a matter of law on plaintiffs' nuisance claims against Rockwell.

### B.     Plaintiffs Failed to Introduce Evidence That All Class Members Are at an Increased Risk as a Result of Future Releases from Rocky Flats.

Aside from past health risk, the only other possible interference that plaintiffs could prove to sustain a nuisance claim under the Court's rulings is that "one or both of Defendants' activities at Rocky Flats interfered with Class members' use and enjoyment of their properties by

creating objective conditions that pose a demonstrable risk of future harm to the Class Area."[34]

(Instruction No. 3.7)  Any such "future harm" must likewise be "unreasonable."  (Instruction No.

3.7, 3.11)   Plaintiffs did not introduce sufficient evidence to meet these jury instruction

standards.

Plaintiffs introduced no evidence of any "objective condition[] that pose[s] a

demonstrable risk of future harm to the Class Area."[35]   (Instruction No. 3.7)  The Rocky Flats

plant has been shut down for approximately 15 years, has been decommissioned, demolished,

and remediated, and is being converted to a wildlife preserve.  (*See* Smallwood testimony,

11/3/05 Tr. 4024; Holeman testimony, 10/17/05 Tr. 1252; *see also* Blaha testimony, 1/4/06 Tr.

8637-8681, 8753)  The special nuclear materials themselves were all shipped offsite by August

2003.  (Blaha testimony, 1/4/06 Tr. 8669)  In fact, the last plant building was demolished in

September 2005 and DOE certified the cleanup and closure in October 2005.  (*Id.* at 8669-70,

8687, 8693)  Plaintiffs introduced no evidence that, notwithstanding the cleanup, there continues

---

[34] Defendants maintain their position (rejected by the Court) that a threat of future harm may not form the basis of a nuisance claim.  *See, e.g.*, 42 U.S.C. § 2014(w) (requiring that a public liability action assert liability "arising out of or resulting from a nuclear incident," which is further defined as an "occurrence"); *see also Adams-Arapahoe School Dist. No. 28 v. GAF Corp.*, 959 F.2d 868, 872 (10th Cir. 1992) ("find[ing] nothing . . . which supports the notion that tort liability may be premised on the mere risk of harm"); *Van Wyk*, 27 P.3d at 391 (defining theory of nuisance predicated on invasion that is "unintentional and otherwise actionable under the rules for negligent or reckless conduct").

[35] The example of such an "objective condition" set forth in the jury instructions is "if plutonium or other hazardous substance present on or in the vicinity of Rocky Flats is at risk of being released to the Class Area — through natural forces, cleanup activity, the conduct of others and/or accidences — and could cause harm to properties in the Class Area by increasing the health risk to residents or impairing the future use of their land in some way."  (Instruction No. 3.7)

to be any "plutonium or other hazardous substances present [at] . . . Rocky Flats" that could "cause harm to properties in the Class Area by increasing the health risk."  (Instruction No. 3.7; *see* Holeman testimony, 10/18/05 Tr. 1392-1398; DX69, EPA Superfund ROD; DX43, Agreement in Principle; DX454)  Instead, the record is to the contrary.  (*See generally* Blaha testimony, 1/4/06 Tr. 8637-8823)[36]  As the ATSDR concluded:  "[L]evels of offsite surface soil contamination are no apparent public health hazard for past, current and future exposures." (DX454, ATSDR 5/13/05 report, at 76; *id.* at 1-2, 45, 55, 57;  Blaha testimony, 1/4/06 Tr. 8814-16;  Raabe testimony, 12/9/05 Tr. 7210, 7240-42, 7270-71, 7339-40)

For these reasons, defendants should be granted judgment as a matter of law on plaintiffs' claim of future health risk.

**C.     Plaintiffs Did Not Show That The Harm Associated With Any Health Risk Outweighs the Utility Associated With the Operation of Rocky Flats.**

Dr. Goble's testimony about the miniscule nature of the risks is dispositive for plaintiffs' nuisance claim.  However, there is also a second, independently sufficient reason why the Court should grant judgment as a matter of law on the issue of the unreasonableness of the nuisance. Here, plaintiffs failed to introduce any evidence as to the utility (or lack of utility) of defendants' conduct.  (*See* Instruction No. 3.10 (jury must weigh harm versus utility))  Defendants nevertheless brought out evidence of the utility and benefit of their conduct.  Mr. Holeman testified that "Rocky Flats was a plant that was built for and operated for national security purposes" and agreed that "Rocky Flats was important not only for national security, but it was

---

[36] Indeed, Dr. Till testified that the Rocky Flats site clean up levels were protective of human health.  (Till testimony, 12/15/05 Tr. 8290-93)

also important economically to the area."   (Holeman testimony, 10/18/05 Tr. 1378; *see also*

Cochran testimony, 11/14/05 Tr. 5287 ("First is there's got to be a net benefit.  And I said, you

know, that's a given at Rocky Flats.  It was cold war, and we were making warheads for national

security purposes."); P394, 3/23/51 AEC Press Release ("About 2,000 construction workers will

be employed at the site during the peak of building in early 1952.");  Hunsperger testimony,

12/6/05 Tr. 6602-04 (noting that survey respondents recognized that Rocky Flats was a source of

jobs); P338, Lamm Wirth Task Force Report, at 35-36)

Because plaintiffs bear the burden of proof as to their nuisance claim, plaintiffs' failure to

introduce any evidence on the balance between the utility and harm of defendants' conduct

requires the grant of defendants' motion for judgment as a matter of law on that claim.

### D.      Plaintiffs Have Not Shown That Any Health Risk Is Substantial.

In order to prevail on their nuisance claim, plaintiffs were required to demonstrate not

only that any health risk is "unreasonable," but also that it is "substantial."  (Instruction No. 3.8);

*Van Wyk*, 27 P.3d at 391.   Plaintiffs' failure to demonstrate that any interference was

"substantial" constitutes yet another ground for granting defendants' motion for judgment as a

matter of law.

As set forth in the Court's jury instructions, "[a]n interference with a person's right to use

and enjoy their land is 'substantial' if the interference is significant enough that a normal person

in the community would find it offensive, annoying or inconvenient."  (Instruction No. 3.9)[37]

---

[37] Defendants respectfully submit that the standard set forth in the instruction is incorrect.  As set forth in *Cook IX*, the correct standard is that for an invasion to be substantial, it must be "definitely offensive, seriously annoying or intolerable."  273 F. Supp. 2d at 1203; *see also id.*
(Continued…)

Here, plaintiffs' own witnesses testified that any health risk that resulted from defendants' conduct was ***not*** "offensive, annoying or inconvenient" on a class-wide level.  (Instruction No. 3.7, 3.9)  For example, class member Charles Ozaki testified that, even as of the time of his trial testimony, he was not even "aware of any — anything, any possibility that there was plutonium on my property."  (Ozaki testimony, 10/20/05 Tr. 1832)  Mr. Ozaki further testified that, following the FBI raid, "[i]t didn't cross my mind" to be "worried about my property from Rocky Flats."  (*Id.*)  Similarly, Ms. Whalen testified that her sister, a class member, had not expressed any concern about living and owning property within the class area.  (Whalen testimony, 11/21/05 Tr. 5954)  Ms. Whalen herself sold her house after the FBI raid to a couple who was from the area, knew about Rocky Flats, and wanted to move in.  (*Id.* at 5966-67)  Mr. Schierkolk, a named plaintiff, testified that, despite what he knows about the plant, he likes his home and does not want to move.  (Schierkolk testimony, 10/20/05 Tr. 1944-45)  Ms. Bini Abbott, a neighbor of the named class members who has been a member of the Health Advisory Panel related to Rocky Flats, also has continued to live in the area and buy more property there, as has Mr. Coleman, one of the investors in the Alkire group.  (Holeman testimony, 10/18/05 Tr. 1347; Bowman testimony, 11/21/05 Tr. 6064-65, 6113)  In addition, Mr. Ozaki and Mr. Cassidy explained that Broomfield continued to annex land within the class area after the FBI raid. (Ozaki testimony, 10/20/05 Tr. 1793; Cassidy testimony, 11/8/05 Tr. 4538)

---

("Section 821F of the Restatement and its supporting commentary, relied upon by the Colorado Supreme Court in *Van Wyk*, states that a significant invasion of another's interest in the use and enjoyment of property exists '[i]f normal persons living in the community would regard the invasion in question as definitely offensive, seriously annoying or intolerable.'").

What is more, as discussed above, plaintiffs' own dose/exposure expert Dr. Goble admitted that the alleged health risk at issue resulted from exposures that were so small that regulatory agencies would not have been concerned about them.  (Goble testimony, 11/2/05 Tr. 3661)  Defense experts agree.  (Raabe testimony, 12/9/05 Tr. 7339-40 ("The doses we're talking about in this case are so trivial they won't have any effect one way or another.  They're small, tiny fraction of what we get every week.  There's no way you can assign a risk or a benefit to such a small dose.  No way."); *id.* at 7270-71, 7339-40; Till testimony, 12/15/05 Tr. 8265, 8270-71, 8273-79 (as of 1971, exposure is equal to background; doses are very small, risk is 1 in a million); *id.* at 8273-81, 8282-83, 8529-31; DX1187; DX1779a; DX1843; DX1855; DX1856)[38]

Defendants also reassert the position (rejected by the Court) that, in addition to proving that the interference is "significant enough that a normal person in the community would find it offensive, annoying or inconvenient," in order to prove that the interference is "substantial," plaintiffs must prove that the interference has caused a reduction in the value of the property.[39] *See Van Wyk*, 27 P.3d at 392 ("[T]he interference complained of by the Van Wyks must be a substantial invasion interfering with the use and enjoyment of the land, and reducing the value of the land.") (citing *Prosser & Keeton on Torts* § 87, at 622-23); *Prosser & Keeton on Torts* § 87, at 623 ("The substantial interference requirement is to satisfy the need for a showing that the

---

[38] Defendants recognize that the Court has ruled that a health risk may constitute a nuisance even if it is not supported by scientific evidence, depending upon how a "normal" person would regard the risk, but respectfully disagree with the Court's ruling in that regard.  *See infra* at 71 (*citing Boughton v. Cotter Corp.*, 65 F.3d 823, 831-33 & 832 n.13 (10th Cir. 1995)).

[39] Defendants recognize that the Court has rejected this argument.

land is reduced in value because of the defendant's conduct."); *Saunders v. Hilperthauser*, No. 84 CIV. 6153 (MJL), 1988 WL 42146, at *6 (S.D.N.Y. 1988) ("Such interference must be substantial and unreasonable.  It exists only upon a showing of damages — that is, that the land is reduced in value because of the defendant's conduct.") (internal citations and quotations omitted)(attached as Exhibit 8); *Bower v. Weisman*, 639 F. Supp. 532, 542 (S.D.N.Y. 1986) ("[A]n action for private nuisance cannot be sustained without a showing of damages.").

As explained in Part VII, plaintiffs failed to prove any classwide damages for several reasons:  (1) plaintiffs' damages evidence is not sufficiently reliable to go before the jury; (2) plaintiffs failed to demonstrate any damages attributable to defendants' actionable conduct, as distinguished from damages attributable to proximity to Rocky Flats or from some "stigma" not arising from any trespass or nuisance by defendants; (3) while plaintiffs purported to measure a diminution in the value of class properties, plaintiffs failed to measure any damages suffered by class members, because plaintiffs' experts did not determine whether class members bought or sold their properties at a pre-existing discount attributable to Rocky Flats;[40]  (4) plaintiffs did not prove that any trespass or nuisance became complete and comparatively enduring between 1988 and 1995; (5) plaintiffs did not demonstrate that any trespass or nuisance was continuing, as required to prove damages under Section 930 of the Restatement (Second) of Torts; and (6) plaintiffs did not prove damages attributable to the prospect of the continuance of any tortious invasions, as also required under Section 930.

---

[40] Defendants recognize that the Court has ruled that defendants bear the burden of proof on this issue.

Because a showing of a reduction in the value of the property is required to prove a nuisance claim,[41] and because plaintiffs did not make this showing of class-wide damages, plaintiffs cannot show that any interference was substantial, which is fatal to plaintiffs' nuisance claims.  *See Van Wyk*, 27 P.3d at 392; *Prosser & Keeton on Torts* § 87, at 623.

      **E.**      **Plaintiffs' Acquisition of Land After Any Purported Nuisance Came Into Existence Establishes That Any Interference Was Not Substantial and Unreasonable.**

In determining whether a plaintiff has proved that any interference to his or her use and enjoyment of property was substantial and unreasonable, it is necessary to consider whether the plaintiff acquired the land after the interference with the land had come into existence.[42]  *See* Restatement § 840D ("The fact that the plaintiff has acquired or improved the land after a nuisance interfering with it has come into existence is . . . a factor to be considered in determining whether the nuisance is actionable."); *see Prosser and Keeton on Torts* § 88, at 630, 635 ("Whether or not the plaintiff or the defendant should be required to bear the loss of substantial interference to plaintiff from defendant's reasonable conduct depends upon[, among other factors,] priority in time as to the respective activities of the plaintiff and the defendant . . . .  If a plaintiff comes to a 'nuisance' in the sense that he comes to an area where the defendant has already been making a particular kind of use of his property, and then is allowed successfully

---

[41]  The Court has apparently ruled that a showing of damages is not required in order to prevail on a nuisance claim.  (*See* Instruction No. 3.7)

[42]  The Court has ruled that the "coming to the nuisance" defense is not even a "factor" to be considered in determining whether any nuisance is substantial and unreasonable.  (03/13/06 Order at n.2)

to maintain a suit either for damages or for abatement of the nuisance, the court could frequently

be in the position of giving the plaintiff a windfall capital gain . . . ."); *Platte & Denver Ditch Co.*

*v. Anderson*, 6 P. 515, 521 (Colo. 1885) ("Where one buys a city lot, bordering upon ground set

apart or dedicated to any public use, he takes it subject to all the annoyances incident to the

purposes of the dedication.").

      Here, the undisputed evidence shows the following sequence of events. *First*, there was

virtually no development of the class area in the 1950s or 1960s. (*See* DX1138 (graphic showing

class members present in the class area in 1955); DX1137 (graphic showing class members

present in the class area in 1969); Dorchester testimony, 1/09/06 Tr. 9476 ("[development curve]

goes up rather slowly until you get past '67, '69, '71."); DV1, Till video ("as of 1969, there was

little development in the class area")) *Second*, 99.9% of all releases of plutonium from Rocky

Flats occurred before 1970, in connection with the 1957 fire, 903 pad incident, and 1969 fire.

(*E.g.*, DX454, ATSDR Report, at 1-2; DV1, Till video ("Over 99 percent of plutonium released

from Rocky Flats occurred before 1970."); Till testimony, 12/15/05 Tr. 8241 (after 1969,

exposures from Rocky Flats drop off significantly)) *Third*, these pre-1970 release events, and

the associated health risks, were heavily publicized in the early 1970s. (*See, e.g.*, Defendants'

Group Exhibit 1 (various media articles); DX11 (2/11/70 Denver Post article, "Radioactive Soil

Pollution Tied To Rocky Flats Plant"); DX63 (8/7/73 Denver Post article, "Atom Wastes Buried

in Tons at Rocky Flats"); DX568 (11/29/71 Denver Post article, "Plutonium Safety Doubted");

DX365 (8/20/70 Rocky Mountain News article, "AEC makes report on contamination at Rocky

Flats"); DX567 (3/6/70 Denver Post article, "AEC Veracity Challenged: Area Plutonium Peril

Claimed"); DX568 (11/29/71 Denver Post article, "Rocky Flats Plant: Plutonium Safety

Doubted"); DX572 (6/20/74 Arvada Citizen Sentinel article, "Plutonium contamination in area presents high risk, scientist says"); DX575 (10/13/75 Denver Post article, "Soil East of Rocky Flats:   New Test Rates Plutonium Above Limits); DX2292 (showing Dorchester data re publicity))  **Fourth**, following the extensive publicity surrounding these release events, the class members moved into the class.  (DX1137 (graphic showing class members present in the class area in 1969); DV1, Till video ("the overwhelming majority of the class moved into the area in the 1970s and 1980s"; "as of 1969, there was very little development in the class area.  By 1989, the class area had become well developed."); DX2188A, Dorchester video; Dorchester testimony, 1/09/06 Tr. 9475-76 ("About 1971 you start seeing that curve climb, meaning that a lot of houses were being added starting with the early 1970s, and there was substantial and relatively continuous growth going through there until the class got to the point where it was largely built out"); DX2195-DX2207 (aerial photographs showing development over time); DX2292, (comparing timing of publicity and class area development, illustrates that the vast majority of class area development occurred after substantial amounts of Rocky Flats publicity, a fact not disputed by plaintiffs); *see also* Dorchester testimony, 1/10/06 Tr. 9653-54 ("you can see that once there appeared a substantial number of articles that it didn't deter the construction"))

The undisputed evidence at the close of trial also shows that over 99% of the class bought into the class area after 1969 — long after the release incidents at issue had been extensively publicized.  (*See* DX1137)[43]   Hence, the undisputed fact that over 99% of class members had

---

[43] Defendants also incorporate by reference the arguments in their December 8, 2005 Motion for Judgment as a Matter of Law related to Charles McKay.  (*See* 12/8/05 Defs.' Mot. for J'ment at 44)

"acquired . . . [their] land after a nuisance interfering with it has come into existence" is fatal to plaintiffs' nuisance claims here.  Restatement § 840D; *Platte & Denver Ditch Co.*, 6 P. at 521.

      **F.     Plaintiffs Did Not Show That Defendants Intentionally or Negligently Caused Any Health Risk.**

To prevail on their nuisance claim, plaintiffs were required to prove that "[t]he activity or activities causing the unreasonable and substantial interference were either 'intentional' or 'negligent.'"  (Instruction No. 3.6)  Plaintiffs failed to introduce sufficient evidence that Dow or Rockwell intentionally[44] or negligently caused a health risk to class members to withstand a motion for judgment as a matter of law.

First, as set forth in Part I, *supra*, plaintiffs failed to introduce any evidence that Dow or Rockwell intentionally released plutonium to the class area.  Accordingly, plaintiffs also failed to introduce evidence that Dow or Rockwell intentionally caused any health risk resulting from plutonium released to the class area.  Nor did plaintiffs introduce any evidence that Dow or Rockwell (1) "knew that [their] conduct would interfere with others' use and enjoyment of their property"; (2) "knew that it was substantially certain that [their] conduct would interfere with others' use and enjoyment of their property"; or (3) "learned that [their] conduct was interfering with or was substantially certain to interfere with others' and enjoyment of their property and yet continued this conduct."[45]  (Instruction No. 3.14)

---

[44] Defendants recognize that the Court has rejected the argument that plaintiffs waived their claim of intentional nuisance by not including that claim in plaintiffs' December 2003 Status Report.

[45] To prove an intentional nuisance, plaintiffs were required to demonstrate that defendants knew that defendants' conduct was interfering with plaintiffs' use and enjoyment of their property, or

(Continued…)

In addition, plaintiffs did not introduce evidence sufficient to support a finding that Rockwell negligently created a nuisance.  Because there is no evidence that Rockwell caused *any releases* of plutonium to the class area, *see* Part I, *supra*, or ***any health risk*** to people living in the area, *see* Part II.A, *supra*, there is no evidence that Rockwell negligently caused any interference with plaintiffs' use and enjoyment of their properties.

Accordingly, there is no evidence that Dow or Rockwell intentionally or that Rockwell negligently caused a nuisance, and defendants should be granted judgment as a matter of law on that ground.

> **G.      The Evidence Shows That Any Health Risk Resulted From an Intervening Cause.**

As discussed in Section II.D, *infra*, the evidence shows that any trespass resulted from an unforeseeable intervening cause.[46] Because any **contamination** of the class area resulted from a non-actionable intervening cause, any ***health risk*** attributable to that contamination also resulted from a non-actionable intervening cause.

## IV.      OTHER NUISANCE ARGUMENTS THAT THE COURT HAS ALREADY RULED ON.

As in the case of nuisance, the Court has already ruled against defendants on certain arguments relating to plaintiffs' nuisance claims.

---

was substantially certain to interfere with plaintiffs' use and enjoyment of their property.  *See Van Wyk*, 27 P.3d at 394.

[46] Defendants again note that the Court rejected defendants' proposed intervening cause instruction.

A.      **Plaintiffs Have Not Shown a Violation of State Standards.**[47]

To prove nuisance, plaintiffs were required to show, among other things, an "unreasonable and substantial interference with a plaintiff's use and enjoyment of her property." *See Van Wyk*, 27 P.3d at 391. In addressing the "unreasonable interference" element of a nuisance claim (as distinct from the "wrongful conduct" element), the *Van Wyk* court held that "an allegation of unreasonableness is central to a nuisance claim," as well as that a regulatory entity's "determination of reasonableness sets the standard for the balance between the social utility of the [acts causing the nuisance] and possible harm to property." *Id.* at 393. The *Van Wyk* court further ruled that if the governmental entity has "quantified the [invasion] level it deemed to be reasonable, then that [invasion] level would become the standard for the level at which [the invasion] would not constitute an invasion interfering with [plaintiffs'] use and enjoyment of their property." *Id.*

Here, the Colorado Department of Health ***has*** "quantified" the level of plutonium that it considers reasonable on properties. Accordingly, to recover on their nuisance claims, plaintiffs had to demonstrate that any plutonium released by defendants resulted in contamination of class properties in excess of the Colorado plutonium standard (two disintegrations per minute of plutonium per dry gram of soil or square centimeter of surface area). 6 Colo. Code Regs. 1007-1, RH 4.60.1, Permissible Levels of Plutonium in Uncontrolled Areas. Plaintiffs introduced no such evidence. To the contrary, the evidence at trial showed that any contamination of class

---

[47] Defendants acknowledge that the Court has ruled that plaintiffs need not establish a violation of state standards to prevail on their nuisance claim.

properties was in an amount far less than the state standard.  (DX1663; DX1651a; DX1664; Frazier testimony, 12/12/05 Tr. 7529-31, 7534-37, 7539; Budnitz testimony, 10/31/05 Tr. 3335-36; S. Bartlett testimony, 10/14/05 Tr. 959-60, 961; Cook testimony, 10/21/05 Tr. 2023-26; Holeman testimony, 10/18/05 Tr. 1363, 1370-71; *see also* DX34, Broomfield 2004 Water Quality Report (no exceedences of Safe Drinking Water Act standards); DX1245 (Poet & Martell soil contours); DX1252 (Krey & Hardy soil contours); DX1265 (Jones & Zhang 1986 and 1989 soil contours); Weston testimony, 12/14/05 Tr. 8096; Norton testimony, 12/14/05 Tr. 7967-68)

Plaintiffs' failure to introduce any evidence that defendants violated state standards constitutes an independently sufficient basis for dismissing plaintiffs' nuisance claims.

### B.    Plaintiffs Did Not Show That Any Health Risk Was Created by Releases Which Did Not Comply with Federal Standards.[48]

In order to prevail on their nuisance claims, plaintiffs had to demonstrate that defendants caused releases which violated the applicable federal standards.  As discussed, plaintiffs did not do so (*see* Section II.B, *supra*), and the Court should thus grant judgment as a matter of law on plaintiffs' nuisance claims.

### C.    Exceedingly Small Exposures Cannot Give Rise to a Nuisance.

As a matter of law, exposures that are so "very, very small" that "regulatory agencies would not have been concerned" about them cannot give rise to a nuisance.  Rather, to be actionable as a nuisance, an interference must be "substantial and unreasonable."  (Instruction

---

[48] Defendants acknowledge that the Court has ruled that plaintiffs need not establish a violation of federal standards to prevail on their nuisance claim.

No. 3.8)  In determining what is unreasonable, it is necessary to "balance the gravity of the harm to Class members against the utility of Dow and Rockwell's conduct at Rocky Flats and determine whether the gravity of this harm outweighs the utility of this conduct."  (Instruction No. 3.10)  Importantly, "[i]n assessing the extent of the harm, [the jury] must also consider only harm that is common to the class as a whole, and not any more severe harm that may have been suffered by some Class members but not by others."  (Instruction No. 3.11)  Thus, in weighing "the gravity of the harm" versus "the utility" of defendants' conduct, the trier of fact may only consider the "lowest common exposure" and "lowest common risk" experienced by the class — namely, "very, very small exposures" that even "regulatory agencies would not have been concerned about."  (Goble testimony, 11/2/05 Tr. 3661; *see also* Raabe testimony, 12/9/05 Tr. 7339-40 ("The doses we're talking about in this case are so trivial they won't have any effect one way or another.  They're small, tiny fraction of what we get every week.  There's no way you can assign a risk or a benefit to such a small dose.  No way."))

As a matter of law, such exposures are ***not*** an "unreasonable" exposure.  Indeed, the Colorado Supreme Court held in *Van Wyk* that regulatory standards establish the standard for reasonableness under Colorado nuisance law:

> Thus, because an allegation of unreasonableness is central to a nuisance claim, the ***[Colorado Public Utilities Commission] determination of reasonableness sets the standard*** for the balance between the social utility of the transmission of electricity and possible harm to property against which the Van Wyks must argue.

27 P.3d at 393 (emphasis added).  It follows that, because plaintiffs' own expert conceded that (even for people "living in the area") the lowest common denominator of exposure is so "very, very small" that "regulatory agencies would not have been concerned" (Goble testimony,

11/2/05 Tr. 3661), there is no evidence that any interference is "unreasonable" (as required to prove a nuisance claim).  (*Id.*)

## V.     THE RECORD CONFIRMS THE ABSENCE OF REMAINING FACTUAL DISPUTES REGARDING DEFENDANTS' AFFIRMATIVE DEFENSES OF STATUTE OF LIMITATIONS AND PRESCRIPTIVE EASEMENT.

The Court has already rejected defendants' argument of statute of limitations and prescriptive easement.  *Cook v. Rockwell Int'l Corp.*, 358 F. Supp. 2d 1003 ("*Cook X*") (D. Colo. 2004) (statute of limitations); (5/28/04 Order at 7-10).

### A.     The Evidence Shows That Plaintiffs' Trespass Claims Are Barred by the Statute of Limitations.

In *Cook X*, this Court ruled that, *if plaintiffs prove a continuing trespass*, then the statute of limitations does not apply.  *See Cook X*, 358 F. Supp. 2d at 1004 ("the continuing presence of plutonium on the Class Properties, *if proven*, would constitute a continuing trespass"; in such circumstances, "Defendants do not have a limitations defense to liability on the trespass claim because the statute of limitations has not yet begun to run on this claim").

Under this Court's rulings, to prove that a trespass is "continuing," plaintiffs had to show that "it appears that plutonium will continue to be on the Class Properties indefinitely."[49] (Instruction No. 3.4)   As discussed above, plaintiffs introduced no evidence of such a "continuing" trespass.  While plaintiffs introduced evidence about the half-life of plutonium once it gets into the soil, plaintiffs did not introduce evidence that any plutonium-contaminated *soil*

---

[49] As discussed above, defendants have previously argued that, in order for a trespass to be "continuing," plaintiffs also had to prove that it is not reasonably abatable.  Plaintiffs introduced no evidence in this regard.  Defendants recognize that the Court has rejected defendants' position.

*itself* has remained on the class properties, notwithstanding the massive development that has occurred on those lands during the last four decades.  (Smallwood testimony, 11/3/05 Tr. 4067, 4083-84; Budnitz testimony, 10/31/05 Tr. 3346-47; *accord* DV1, Till video ("buildings, concrete, and asphalt now cover what used to be undeveloped soil" . . . "[s]everal feet of soil are excavated when preparing the foundation of a new home."); Dorchester video; Dorchester testimony, 1/09/06 Tr. 9474-9475 & 9475-76; DX2195-DX2207 (aerial photographs))

Because plaintiffs failed to introduce evidence that any trespass was "continuing," the statute of limitations defense applies.  *See Cook X*, 358 F. Supp. 2d at 1004; *Hoery*, 64 P.3d at 216-17.  The statute of limitations for trespass actions is two years.  Colo. Rev. Stat. § 13-80-102 (tort actions for trespass "shall be commenced within two years after the cause of action accrues, and not thereafter").   Under Colorado statute of limitations rules, a claim "accrues the later of when the injury first occurs or when the plaintiff learned or should have learned of his injury and its cause." *Hoery*, 64 P.3d at 216-17.  Thus, if plaintiffs' claims accrued on or before January 30, 1988 (two years before plaintiffs filed their Complaint), they are time-barred.

Here, there is ample evidence that class plaintiffs "learned or should have learned of [their] injury [in the case of trespass, plutonium contamination on their properties] and its cause" well before January 30, 1988:

- **Bartlett:**  Sally Bartlett testified that she learned that people questioned the safety of Rocky Flats in the mid to late 1960s, and was fully aware of such claims before she moved to the property on Alkire.

- **Ozaki:**  Mr. Ozaki, another class member, testified that it was "common knowledge" in the 1970s that nuclear materials were handled at Rocky Flats, that such materials were dangerous, that there had been offsite releases from plant manufacturing processes, and that there were concerns about offsite impact.  (Ozaki testimony, 10/20/05 Tr. 1826-27)

- **Schierkolk:**  William Schierkolk, a named plaintiff and class member, testified that he recalled reading newspaper articles in February 1970 discussing the release of radioactive materials from Rocky Flats offsite which stated:  "Radioactive plutonium from the Dow Chemical Company plant at Rocky Flats has polluted soils over a radius of several miles . . . ."  (Schierkolk testimony, 10/20/05 Tr. 1944-45; *see also* DX11)

- **Bowman:**  Joseph Bowman, an Alkire investor and a class member, testified that he knew about media relating to the 1969 Rocky Flats fire and protesting at the plant that followed the fire in the 1970s.  He further testified that he and his Alkire investment group partners learned of the Rocky Flats-related health concerns of Dr. Carl Johnson in the 1970s.  Mr. Bowman agreed that by about early 1970 it was the view of the Alkire Investment Company partners that Rocky Flats had begun to influence the Alkire property value.  (Bowman testimony, 11/21/05 Tr. 6081-85)[50]

- **Dorchester:**  Mr. Dorchester showed the results of a survey of articles concerning Rocky Flats as compared to development in the class area.  They showed that there was a substantial amount of publicity concerning Rocky Flats dating back to the 1970s and that class area development was not deterred by such publicity.  (*See* DX2292 (showing Dorchester data re publicity))

- **Trial Exhibits:**  In addition to witness testimony, several admitted newspaper articles show that plutonium contamination from Rocky Flats has been known at least since the early 1970s.  They include: DX11 (2/11/70 Denver Post article, "Radioactive Soil Pollution Tied To Rocky Flats"); DX63 (8/7/73 Denver Post article, "Atom Wastes Buried in Tons at Flats Plant"); DX568 (11/29/71 Denver Post article, "Plutonium Safety Doubted"); Defendants' Group Exhibit 1 (various newspaper articles).

        In short, the undisputed evidence shows not only that plaintiffs' claims were not continuing, but also that plaintiffs knew or should have known of their injuries — and the causes of those injuries — before January 30, 1988.  Accordingly, plaintiffs' claims are barred by the statute of limitations, and defendants are entitled to judgment as a matter of law.

---

[50] Defendants also incorporate by reference the arguments in their December 8, 2005 Motion for Judgment as a Matter of Law related to Charles McKay. (*See* 12/8/05 Defs.' Mot. for J'ment at 50-51)

**B.      The Evidence Shows That Plaintiffs' Nuisance Claims Are Also Barred by the Statute of Limitations.[51]**

For the same reasons that support judgment as a matter of law on plaintiffs' trespass claims, *see* Part I, *supra*), the Court should also rule that plaintiffs' nuisance claims are time-barred.  Just as the alleged contamination that is the basis for plaintiffs' trespass claims was heavily publicized by the early 1970s, the alleged health risks that are the basis for plaintiffs' nuisance claims were also widely publicized during that period.  (*See, e.g.*, DX11 (2/11/70 Denver Post article, "Radioactive Soil Pollution Tied To Rocky Flats Plant"); DX63 (8/7/73 Denver Post article, "Atom Wastes Buried in Tons at Rocky Flats"); DX568 (11/29/71 Denver Post article, "Plutonium Safety Doubted"); Defendants' Group Exhibit 1)  Moreover, plaintiffs' witnesses consistently testified that they were aware of health risks from Rocky Flats before January 30, 1988, the date on which the statute of limitations began to run.  (Ozaki testimony, 10/20/05 Tr. 1826-27;  Schierkolk testimony, 10/20/05 Tr. 1899, 1929, 1944-45, 10/21/05 Tr. 1995-96; S. Bartlett testimony, 10/14/05 Tr. 949-50, 953; Bowman testimony, 11/21/05 Tr. 6081-85; Avery testimony, 11/2/05 Tr. 3813-14)  Thus, like plaintiffs' trespass claims, plaintiffs' nuisance claims are barred by the statute of limitations.

**C.      The Evidence Shows That Plaintiffs' Trespass Claims Are Barred by a Prescriptive Easement.**

Under Colorado law, "[a]n easement by prescription is established when the prescriptive use is: 1) open or notorious, 2) continued without effective interruption for the prescriptive period [eighteen years], and 3) the use was either a) adverse or b) pursuant to an attempted, but

---

[51] *See* the immediately preceding footnote.

ineffective grant." *Lobato v. Taylor*, 71 P.3d 938, 950 (Colo. 2002); *see also Weisiger v. Harbour*, 62 P.3d 1069, 1071, 1073 (Colo. Ct. App. 2002) ("An easement by prescription is acquired when the use is open or notorious, continuous without effective interruption for the prescriptive period and either adverse or pursuant to an attempted but ineffective grant. . . . To satisfy the open and notorious element, the use must be sufficiently obvious to apprise the owner of the servient estate, in the exercise of reasonable diligence, that another is making use of the burdened land so that the owner may object.  However, actual knowledge by the owner need not be proved."); *Bradley v. Am. Smelting and Ref. Co.*, 709 P.2d 782, 792-93 (Wash. 1985) (holding that "[t]he defense of easement by prescription is available" where defendant deposited heavy metal particles on plaintiffs' property); Restatement § 899 cmt. d ("In other cases when there is a series of continuing harms, . . . the defendant may have acquired a right by prescription to continue the tortious act."); Restatement § 161, cmt. d.

Here, the uncontroverted evidence established that the presence of any plutonium released by defendants onto plaintiffs' property:  (1) was open and notorious; and (2) continued without interruption for eighteen years before plaintiffs filed their claim on January 30, 1990 (that is, the presence of plutonium continued at least during the eighteen years from January 30, 1972 through January 30, 1990).[52]

The evidence introduced by plaintiffs shows that the releases from the 1957 fire, the 1969 fire, and the 903 pad incident all occurred before 1970.  ATSDR reports demonstrate that 99.9%

---

[52] Defendants respectfully disagree with this Court's finding that the defense of prescriptive easement has been waived.

of any Rocky Flats releases had already occurred by 1970.  (DX454, ATSDR 5/13/05 report, at 1-2 ("Though Rocky Flats released plutonium to the air throughout its history, the overwhelming majority (> 99.9%) of plutonium emissions occurred between 1953 and 1969.")) The uncontroverted evidence shows that the existence of these releases was "open and notorious." For example, class member William Schierkolk testified that, in early 1970, he read Denver Post newspaper articles discussing the release of radioactive materials from Rocky Flats offsite, including related offsite soil contamination.  He specifically recalled reading a February 1970 article entitled "Radioactive Soil Pollution Tied to Rocky Flats" that stated that "radioactive plutonium from the Dow Chemical Company plant at Rocky Flats has polluted soils over a radius of several miles . . ." (Schierkolk testimony, 10/20/05 Tr. 1944-45; *see also* DX11) Likewise, class member Joseph Bowman testified that he knew about media relating to the 1969 Rocky Flats fire in the 1970s and agreed that, by about early 1970, he and his Alkire Investment Company partners believed that Rocky Flats had influenced the Alkire property value.  (Bowman testimony, 11/21/05 Tr. 6081-85)  Former plant employee Ron Avery testified that he remembers "publicity about plutonium discovered offsite of Rocky Flats, big bold headlines, people being worried about that" in 1970.  (Avery testimony, 11/2/05 Tr. 3813-14; *see also* DX11, DX63 & DX568 (Denver Post articles from early 1970s); Defendants' Group Exhibit 1 (various newspaper articles)[53])

---

[53] Defendants also incorporate by reference the arguments in their December 8, 2005 Motion for Judgment as a Matter of Law related to Charles McKay.  (*See* 12/8/05 Defs.' Mot. for J'ment at 54)

Accordingly, the uncontroverted evidence establishes that alleged plutonium contamination from Rocky Flats had been "open and notorious" for over eighteen years, and that plaintiffs' claims are therefore barred by the affirmative defense of prescriptive easement.

### D. The Evidence Shows That Plaintiffs' Nuisance Claims Are Barred by a Prescriptive Easement.

Like plaintiffs' trespass claims, plaintiffs' nuisance claims are barred by the prescriptive easement rule.[54]  Here, the uncontroverted evidence shows that the existence of any health risk resulting from defendants' conduct was "open and notorious" by January 30, 1972.  (*See* DX11 (2/11/70 Denver Post article, "Radioactive Soil Pollution Tied To Rocky Flats"); DX568 (11/29/71 Denver Post article, "Plutonium Safety Doubted"); Schierkolk testimony, 10/20/05 Tr. 1944-45; S. Bartlett testimony, 10/14/05 Tr. 949-50, 953; Bowman testimony, 11/21/05 Tr. 6081-85; Avery testimony, 11/2/05 Tr. 3813-14; Babb testimony, 10/20/05 Tr. 1963) Accordingly, like plaintiffs' trespass claims, plaintiffs' nuisance claims are barred by the affirmative defense of prescriptive easement.

## VI. DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THE QUESTION OF WHETHER THEIR CONDUCT WAS CAPABLE GENERICALLY OF CAUSING FEAR, ANXIETY, OR MENTAL DISCOMFORT IN CLASS MEMBERS.

### A. The Generic Question of Emotional Distress Cannot Support a Judgment on Plaintiffs' Nuisance Claims.

Pursuant to the Court's jury instructions, the jury was to answer the following question:

Have plaintiffs proved by a preponderance of the evidence that the intentional or negligent conduct of Dow or Rockwell or both of

---

[54] Because plaintiffs filed their Complaint on January 30, 1990, plaintiffs' nuisance claims are time-barred if the prescriptive use was established on or before January 30, 1972.

> them at Rocky Flats, and/or actual or threatened harms caused by
> such conduct, created a situation that is capable of causing fear,
> anxiety or mental discomfort in individual Class members?
> (Instruction No. 3.28)

As this Court has recognized, the jury was not to consider this issue in determining whether a trespass or nuisance has occurred.  (Instruction No. 3.28) ("Because this is a trial of claims by the whole Class, I earlier instructed you **not** to consider whether individual plaintiffs or Class members suffered this form of interference in deciding whether plaintiffs had proved their class-wide nuisance claim.") (emphasis original)  Thus, this issue does not help plaintiffs to escape a judgment as a matter of law on the trespass and nuisance claims.  Nevertheless, as defendants have made clear in the past, defendants continue to object to the trial of this partial claim for several reasons, which defendants will not belabor here.[55]

---

[55] Defendants respectfully disagree with the Court's May 17, 2005 Order's holding that "[t]he generic causation question of whether Defendants' activities and the conditions resulting from them were capable of causing Class members to suffer fear, anxiety or other mental or emotional discomfort . . . may be decided by the jury in the class trial" (5/17/05 Order at 7) for a number of reasons, including but not limited to the four reasons set forth below.  *First*, trying the issue of emotional distress to two juries — first on a generic basis and second on an individual basis — violates defendants' Seventh Amendment rights.  *See, e.g., In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 352 n.54 (S.D.N.Y. 2002) ("[S]uch division must 'carve at the joint' between liability and damages.") (quoting *In re Rhone-Poulenc-Rorer Inc.*, 51 F.3d 1293, 1302 (7th Cir. 1995)).  *Second*, the Court has previously ruled that "whether defendants' activities caused Class members to suffer fear or other emotional disturbance raises individual causation questions and thus is not capable of class-wide determination."  (5/17/05 Order at 7)  It follows that, in determining trespass and nuisance liability and damages, the jury may not consider evidence relating to "[t]he generic causation question of whether Defendants' activities and the conditions resulting from them were capable of causing Class members to suffer fear, anxiety or other mental or emotional discomfort." (*Id.*)  There is no effective method of ensuring that the jury does not consider evidence relating to generic emotional distress in determining trespass and nuisance liability and damages. The instructions to the jury did not solve this problem, because in order to resolve the issue the instructions, at the least, would have had to identify all of the evidence (including testimony and exhibits) relating to the issue of

(Continued…)

### B.    Plaintiffs Did Not Introduce Any Evidence That Defendants' Conduct Was Capable of Causing Emotional Distress.

To prevail on their generic emotional distress claim, plaintiffs were required to demonstrate that ***defendants' actionable conduct***, or the "actual or threatened harm caused by such conduct," was "capable of causing fear, anxiety or emotional distress."   (Instruction No. 3.28)   However, while some of plaintiffs' own witnesses testified that they had concerns (*e.g.*, Whalen, Robb), none linked their emotional distress to any specific actionable conduct by defendants.   (*See, e.g.*, Whalen testimony, 11/21/05 Tr. 5938 ("when I read the ***headlines in the paper about the FBI raid***, it really terrified me") (emphasis added); Robb testimony, 11/20/05 Tr. 5019-20 (did not feel safe due to "[a]ll the information that was spreading about the high cancer risks in that area"; got information from ***newspaper articles*** and ***neighbors***) (emphasis added); *id.* at 5022 (in response to a question about whether Rockwell's conduct caused her fear, answering "I think the biggest fear that I had and what I — really sticks in my mind was the raid, you know, that they weren't doing things the way they were supposed to be doing things out there."))   Accordingly, defendants are entitled to judgment as a matter of law on plaintiffs' partial claim that defendants' conduct was capable of causing emotional distress.

---

generic emotional distress, as well as all of the argument relating to the issue of generic emotional distress.  In any event, any such identification would have been doomed to failure, *inter alia*, by the sheer mass of evidence to which it would have related.  Moreover, it would have been impossible for the jury to completely disregard such evidence in deciding trespass and nuisance liability and damages.  ***Third***, plaintiffs have pointed to no precedent for a class-wide trial on the issue of generic emotional distress.   ***Fourth***, plaintiffs have cited no Colorado authority for the proposition that generic emotional distress can give rise to a nuisance.

**C.    Plaintiffs Cannot Recover for Emotional Distress Without Demonstrating That Their Fears Were Grounded in Science.**

Even if the Court were to reject defendants' position that defendants are entitled to judgment as a matter of law on the generic emotional distress claim as the jury instructions are currently structured, defendants take issue with the Court's prior rulings on the generic emotional distress issue.[56]  In particular, the following instruction was given to the jury:

> In answering this question [pertaining to generic emotional distress], you should know that Plaintiffs do not need to show that any actual or threatened future contamination from Rocky Flats poses an actual or verifiable health risk.  An individual Class members' [sic] fear, anxiety or mental discomfort can also be based on concerns that may be without scientific foundation or other support in fact.  (Instruction No. 3.28)

This instruction is contrary to Colorado and Tenth Circuit law.  The Tenth Circuit has predicted that the Colorado Supreme Court would rule that unscientific fears cannot give rise to recovery under Colorado law, even if those fears are "normal" for the community.  *See Boughton v. Cotter Corp.*, 65 F.3d 823, 831-33 & 832 n.13 (10th Cir. 1995) (predicting that Colorado Supreme Court would ***not*** follow Section 821F, under which, "[i]n determining whether the harm would be suffered by a normal member of the community, fears and other mental reactions common to the community are to be taken into account, even though they may be without scientific foundation or other support in fact," and that Colorado Supreme Court would not allow "compensation for wholly unfounded fears").   Thus, unscientific fears are not actionable.  Plaintiffs introduced no evidence whatsoever of any reasonable fears that are consistent with

---

[56] Defendants recognize that the Court has previously rejected their position on this issue.

science.  Nor **could** plaintiffs have introduced such evidence.  Plaintiffs' own exposure and risk expert, Dr. Goble, testified that any class-wide exposures were so low that "regulatory agencies would not have been concerned" about them.  (Goble testimony, 11/2/05 Tr. 3661)  Defendants' risk experts agreed that any fears plaintiffs may have had are unreasonable and not grounded in science. (Raabe testimony, 12/9/05 Tr. 7339-40 ("The doses we're talking about in this case are so trivial they won't have any effect one way or another.  They're small, tiny fraction of what we get every week.  There's no way you can assign a risk or a benefit to such a small dose.  No way."); *see also id.* at Tr. 7270-71; Till testimony, 12/15/05 Tr. 8273-81, 8282-83, 12/16/05 Tr. 8529-31; DX1187; DX1779a; DX1843; DX1855; DX1856)

The class representatives admitted that their claims arise from the FBI raid.  (Schierkolk testimony, 10/20/05 Tr. 1902; Babb testimony, 10/20/05 Tr. 1961; Cook testimony, 10/21/05 Tr. 2040-41, 2055-57; S. Bartlett testimony, 10/14/05 Tr. 919-920)  Yet plaintiffs cannot base a claim for nuisance on emotional distress arising from the FBI raid under the Tenth Circuit's ruling in *Boughton*.  As an initial matter, the FBI raid is unrelated to plaintiffs' trespass and nuisance claims, because it did not relate to offsite contamination or a health risk from that contamination.  (*E.g.*, Holeman testimony, 10/17/05 Tr. 1288-89, 1296, 10/18/05 Tr. 1333-34) Moreover, the FBI raid allegations turned out to be false.  (Watkins testimony, Dep. Design. at 155-57, 161; Holeman testimony, 10/17/05 Tr. 1294-95, 10/18/05 Tr. 1325; P604; *see also* Norton testimony, 12/14/05 Tr. 7951-53 ("we did not find the kind of deceptive conduct we thought may have occurred"))  Defendants are not liable for emotional distress resulting from false allegations.  *See Boughton*, 65 F.3d at 831-33 & 832 n.13 (("unfounded fears" cannot give rise to recovery).  Thus, defendants respectfully request that the Court grant judgment as a matter

71

of law on plaintiffs' generic emotional distress "partial claims," because plaintiffs failed to introduce any evidence of fears by class members that are grounded in scientific fact.

## VII.   DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' CLAIMS BECAUSE PLAINTIFFS DID NOT EXPERIENCE RECOVERABLE DAMAGES.

Defendants should also be granted judgment as a matter of law on plaintiffs' claims for damages.  Furthermore, because plaintiffs had to show damages in order to establish nuisance liability, *see* Section III.D, *supra*, plaintiffs' failure in this regard is also fatal to plaintiffs' nuisance claims.

### A.   As an Initial Matter, Plaintiffs' Damages Evidence is Not Sufficiently Reliable To Be Considered by the Jury and Should be Stricken in its Entirety.[57]

It was clear from the evidence that plaintiffs' proffered damages evidence was not sufficiently reliable to be considered by the jury.  No reasonable jury, considering proper evidence, could have awarded plaintiffs damages in this case.  Under these circumstances, judgment for defendants is appropriate as a matter of law.

Mr. Hunsperger's analysis setting forth alleged diminution in value due to Rocky Flats was seriously flawed to the point that it was unreliable, as pointed out by various defense experts.  Mr. Dorchester explained that Mr. Hunsperger was obligated to follow appraisal standards (including Uniform Standards of Professional Appraisal Practice ("USPAP

---

[57] *See further* defendants' *Daubert* motions to exclude the testimony of plaintiffs' experts, including defendants' renewed motion to strike plaintiffs' expert testimony filed January 17, 2006.  (*See* Defs.' Mot. To Strike Selected Test. Of Hunsperger, Radke and Cochran) Defendants hereby incorporate those motions in their entirety.  Defendants acknowledge that these motions have been denied.

standards")) in offering his opinion of value but failed to do so.  (Dorchester testimony, 1/09/06 Tr. 9460-61, 01/10/06 Tr. 9494, 9496-98, 9503-05, 9515-17, 9520-21, 9523-27, 9529-32, 9535-36, 9686-87)  For instance, USPAP does not recognize as proper techniques the analogous case studies, opinion surveys, spatial analysis based on regression, vacant land area comparison, or market interviews on which Mr. Hunsperger based his analysis.  Other defense experts also explained why these methods were not sound bases for Mr. Hunsperger's diminution opinion. And Mr. Hunsperger improperly disregarded limitations set by plaintiffs' own experts upon whose data he relied in violation of appraisal standards.  (*Id.* at 9523-24)  Concerning each of Hunsperger's five "approaches," the evidence showed as follows.

*First*, the evidence showed that ***analogous case studies*** could not be appropriately used under appraisal standards where market sales data exists.  (Dorchester testimony, 1/10/06 Tr. 9529-30; *see also id.* at 9523-24, 9665-67; d'Arge testimony, 01/9/06 Tr. 9297-98)  Mr. Hunsperger had no basis or statistical scheme that would allow him to extrapolate to this case from the other cases.  (Wecker testimony,  01/11/06 Tr. 9764-66, 9771)  In addition, the analogous cases studied each failed to meet various standards for comparison, such as equivalence, scientific soundness (peer review), germaneness, and richness in detail.  (d'Arge testimony, 01/9/06 Tr. 9346-49)  Not a single analogous case met all standards.  (*Id.* at 9350) Given these and other problems, Dr. d'Arge concluded that "the case studies that were selected by Hunsperger did not provide any real information with regard to property losses or

diminution." (*Id.* at 9353, 9359)[58]

     **Second**, the evidence at trial showed that **opinion surveys** cannot properly be used under appraisal standards where market sales data exists. (Dorchester testimony, 01/10/06 Tr. 9529-30; *see also id.* at 9520-21, 9667; d'Arge testimony, 01/9/06 Tr. 9297 ("when there are market prices, and accurate market price data is available, there is absolutely no reason for a contingent valuation survey") & 9340) The evidence also showed that the main survey relied upon by Mr. Hunsperger, the Flynn and Slovic survey, was itself unreliable for its failure to conform to prevailing environmental economics standards. (d'Arge testimony, 01/9/06 Tr. 9303-05) Among other things, Drs. Flynn and Slovic failed to "demonstrate . . . beyond a doubt that the respondent in the survey fully understood the economic commodity and the scenario being proposed." (*Id.* at 9305) The interviews were too complex to be done (as they were) over the telephone; yet, the survey method did not provide for any checks on the understanding levels of the participants. (*Id.* at 9306-07, 9316-17) The survey population also was flawed in many respects: the screening questions did not identify the relevant population and were not checked for accuracy (*id.* at 9312, 9318); individuals from Arvada and Westminister were improperly excluded from the sample (*id.* at 9318-19, 9323-24, 9337); and "any individual on the valuation survey, any respondent who thought that living near Rocky Flats on balance was a positive experience [was] automatically excluded from consideration" (*id.* at 9324). The net effect was to take out the people best qualified to answer the questions posed and improperly bias the results.

---

[58] Plaintiffs' own expert, Dr. Flynn, concedes that analogous case studies cannot be used to measure loss. (*See* d'Arge testimony, 01/9/06 Tr. 9358-59)

(*Id.* at 9337 & 9324)  Furthermore, queuing improperly put questions about "nuclear" weapons before questions about valuation.  (*Id.* at 9320-21)  There was no check for bias and pretesting results were not available (*id.* at 9321-22).  The discount levels were picked out of thin air and used to bias the results.  (*Id.* at 9326-28, 9336-37)  Techniques of framing and sequencing were used to improperly bias the results.  (*Id.* at 9336)  The list goes on and on, in total, rendering the survey (and Hunsperger's analysis incorporating it) unreliable to show any alleged diminution. (*Id.* at 9340-41) (the Flynn and Slovic survey "failed at least four out of the five guidelines or rules that either they must be fulfilled individually, each one, or the survey is deemed as unreliable from a scientific standpoint") & 9341 (survey failed 75% of NOAA guidelines; "[w]hen it does not satisfy four of the five essential rules and fails on 75 percent of the general guidelines, *I think there's only one conclusion, and that is that the survey is unreliable for looking at property value losses*"))  At bottom, the survey was "a waste of resources.  It's meaningless."  (*Id.* at 9345)

What is more, Mr. Hunsperger made fundamental errors in attempting to translate Flynn and Slovic's survey results into a calculation of loss of value, including failing to count certain numbers that would have impacted his results, randomly assigning values not stated by survey participants, and overstating the number of people who did not want to buy due to Rocky Flats. (Wecker testimony, 01/11/06 Tr. 9767-71)[59]  The end result was that Hunsperger's attempt to

---

[59] It was undisputed at trial that plaintiffs' own expert who helped design the survey, Dr. Slovic, does not believe that the survey data can properly be used for the purposes for which Hunsperger used the data (*i.e.*, measuring loss).  (*See* Hunsperger testimony, 12/7/05 Tr. 6826 (Q. ". . . Dr. Slovic does not believe that the data that he gathers -- gathered can be used for the purpose to which you put them?  A. Yes."); *see further* d'Arge testimony, 01/9/06 Tr. 9338 ("[E]conomics
(Continued…)

attribute diminution to Rocky Flats was "[m]istaken and in conflict with what the [survey] data actually shows." (*Id.* at 9771)

*Third*, Mr. Hunsperger's use of Dr. Radke's regression, an unvalidated model, did not comply with appraisal standards. (*Id.* at 9531-32; *see also id.* at 9523-24) The evidence demonstrated that Dr. Radke's regression analysis itself – designed to test the difference between the class area and a control area before and after the 1989 FBI raid[60] – also failed to conform to basic statistical principles, contained fundamental errors, and was otherwise unreliable. Both Drs. Wecker and McFadden explained that Dr. Radke improperly applied factor analysis, combining various factors and discarding some – improperly exaggerating the effect of remaining variables (such as proximity to Rocky Flats). (*See* Wecker testimony, 01/11/06 Tr. 9780-84; McFadden testimony, 01/12/06 Tr. 9951-55) They further testified that Dr. Radke improperly used a weighting technique with no statistical justification for doing so and that this weighting improperly altered his results. (Wecker testimony, 01/11/06 Tr. 9785-87 ("it's a medicine that is not needed, and it's positively harmful"); McFadden testimony, 01/12/06 Tr. 9942-43 & 9946-51) When these errors were corrected and the Radke model re-run, there were

---

has recognized this for a long time, that people in responding to telephone or other kinds of surveys will state that they will do things or they won't do things or they will pay something in these hypothetical situations that, in fact, they won't carry out. And so in economics, therefore, the best and most accurate estimate of actual loss is the market price change if it exists.")) Hunsperger's use of the survey data also failed to take into account the fact that there would be no discount whatsoever so long as there are sufficient buyers who are not influenced by Rocky Flats. (d'Arge testimony, 01/9/06 Tr. 9344)

[60] Neither Mr. Hunsperger nor Dr. Radke set forth *any* data showing a statistically significant difference between the class and any control group prior to 1988. (*E.g.,* Wecker testimony, 01/11/06 Tr. 9795-98)

no statistically significant results, including any year-to-year differences.  (Wecker testimony, 01/11/06 Tr. 9794-97; McFadden testimony, 01/12/06 Tr. 9937-38, 9956-58, 9963, 9966-67)  Plus, Dr. Radke's data was questionable, and his failure to keep all of his work and/or replicate it raised questions about its validity.  (McFadden testimony, 01/12/06 Tr. 9958-59, 9972-74, 9976-77, 9979)  These problems called into question the reliability of both Dr. Radke's work and Mr. Hunsperger's conclusions, which were based in part on the Radke regression.  (*E.g.*, McFadden testimony, 01/12/06 Tr. 9979-80 ("given the lack of documentation and given the statistical flaws, my conclusion is that his original analysis is not sufficiently reliable so you should depend on it for judging losses or damages"))

*Fourth*, concerning Mr. Hunsperger's *vacant land analysis*, Mr. Hunsperger did not follow standards, because he lumped property together regardless of differences such as how the property is zoned.  (Dorchester testimony, 01/10/06 Tr. 9530; *see also* Wecker testimony, 01/11/06 Tr. 9762-65)  In addition, Hunsperger's vacant land results were not statistically reliable.  (Wecker testimony, 01/11/06 Tr. 9771)  Further, Mr. Hunsperger testified that he conducted no statistical analysis of the vacant land data, looked at raw data alone, and did not use any specific methodology in coming up with his alleged $21 million loss.  (*See* Hunsperger testimony, 12/7/05 Tr. 6831 ("[T]here was no statistical analysis because I used 100 percent of the sales"), 6832 ("The way I arrived at 30 percent --- the only piece of paper that I have is the report."))

*Fifth*, Mr. Hunsperger himself concedes that *market participant interviews* were not a proper basis for estimating value under the standards.  (*See* Dorchester testimony, 01/10/06 Tr. 9665)

Simply put, Mr. Hunsperger's "judgment" cannot substitute as reliable diminution of value evidence in lieu of an appraisal that follows appraisal standards. (*See* Dorchester testimony, 01/9/06 Tr. 9496-97 ("to be able to complete a valuation, for example, an appraisal, it's necessary to do a series of analyses and follow a series of steps that are part of USPAP and a part of the generally accepted principles rather than to simply use judgment . . . ."), 9535 ("The standards require that the appraiser develop an opinion of value from data from experts, if they're involved, but not to simply have it be a number that is a judgment number"), 9686 (Mr. Hunsperger's use of judgment "seriously detracts from his reliability"))  Indeed, the evidence demonstrated that Mr. Hunsperger's use of his own judgment in this case to determine an alleged diminution was precisely what the appraisal standards were designed to avoid.  (Dorchester testimony, 01/10/06 Tr. 9535-36)

Plaintiffs set forth no contradictory evidence to the effect that Mr. Hunsperger actually followed any of these standards.  If Mr. Hunsperger's damages analysis and the underlying data (*e.g.* the Radke regression) had been stricken, judgment for defendants would be appropriate.  No reasonable jury could have determined that plaintiffs incurred property-diminution damages in the light of all of this evidence.

### B.    Even if a Reasonable Jury Could Consider Plaintiffs' Damages Evidence, A Reasonable Jury Could Not Find Damages Attributable to Defendants' Actionable Conduct:  First Principles.

In order to be actionable, any damages claimed by plaintiffs had to be proximately caused by defendants' actionable conduct — that is, a trespass (contamination) or nuisance (health risk)

committed by defendants.[61]   (Instruction No. 3.24) ("[Y]ou must follow my directions in Instruction No. 3.22 to award damages for diminution in value you find was caused by any trespass or nuisance you find Dow or Rockwell or both of them committed.")  While plaintiffs could recover damages proximately caused by a trespass or nuisance created by defendants, they could not recover for:  (1) damages caused by proximity to Rocky Flats; or (2) damages caused by negative public perceptions that do not result from a trespass or nuisance that has been proved by plaintiffs.

*First*, as reflected in this Court's instructions, plaintiffs were not to recover damages caused by the proximity of class members' properties to Rocky Flats.  (Instruction No. 3.24) ("In determining any actual damages to be awarded in this case, you should not consider or award any diminution in value caused solely by the proximity of the Class Area to Rocky Flats.")[62]

*Second*, plaintiffs could not properly have recovered for damages caused by the public perception of Rocky Flats (*i.e.*, "stigma"), unless that public perception directly concerned the trespass (contamination) or nuisance (past or future health risk).  Any public perception of contamination or health risk had to be based on what plaintiffs proved about the contamination

---

[61] *See*, *e.g.*, *Westric Battery Co. v. Standard Elec. Co.*, 482 F.2d 1307, 1318 (10th Cir. 1973) (it is "only the damage flowing legally from the defendant's misdeeds which count").

[62] *See also* Sen. Rep. No. 296, 85th Cong., 1st Sess. at 16 (1957) (Price Anderson Act legislative history) ("It is not the intention of the committee to have the damage to property which is included in the term 'nuclear incident' include the diminution in value or other similar causes of action which may occur, namely, from the location of an atomic energy activity at a particular site."); *Westric Battery*, 482 F.2d at 1318; *Staley v. Sagel*, 841 P.2d 379, 382 (Colo. Ct. App. 1992) ("[Plaintiffs] are not entitled to recover for any claimed diminution in their property's value caused by any of defendant's actions that do not constitute a nuisance or other actionable wrong.").

or health risk.  For example, if a newspaper article stated that Rocky Flats was a health risk that regulatory agencies would be concerned about, but plaintiffs did not prove that Rocky Flats was a health risk that would concern regulatory agencies (*see* Goble testimony, 11/2/05 Tr. 3661), then any damages resulting from such an article **would not be actionable**.  *See, e.g., Boughton*, 65 F.3d 823, 831-33 & 832 n.13 (predicting that Colorado Supreme Court would not adopt Restatement Section 821F, and would not allow "compensation for wholly unfounded fears").  Among other barriers to recovery, such damages would be too "remote" from the alleged conduct to permit recovery.  *See Holmes v. Sec. Invest. Prot. Corp.*, 503 U.S. 258, 271 (1992) (in civil RICO action, "the link is too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker-dealers."); *Roberts v. TXU Energy Retail Co.*, 171 S.W.3d 901, 903 (Tex. App. 2005) ("At some point in time in the causal chain, the defendant's conduct may be too remotely connected with the plaintiff's injury to constitute legal causation.")

   C.   **A Reasonable Jury Could Not Have Awarded Damages Based on Plaintiffs' Damages Evidence, Because That Evidence Relates to Losses Suffered as a Result of Non-Actionable Proximity.**

   Here, plaintiffs did not prove any damages attributable to any trespass (contamination) or nuisance (health risk).  Rather, plaintiffs' proffered regression expert,[63] Dr. Radke, admitted that he measured damages attributable to proximity to Rocky Flats.  (Radke testimony, 10/26/05 Tr.

---

[63] Defendants incorporate by reference their *Daubert* motions to exclude the testimony of plaintiffs' experts, including defendants' renewed motion to strike plaintiffs' expert testimony filed January 17, 2006.  (*See* Defs.' Mot. To Strike Selected Test. of Hunsperger, Radke and Cochran)  Defendants acknowledge that these motions were denied but include this argument for the purpose of preserving their record.

2753 ("I measured proximity."))  Dr. Radke conceded that he did not measure damages caused by either defendant's conduct.  (*Id.* at 2752)  In fact, Dr. Radke testified that the "loss" he measured could have occurred **regardless of how well the plant was run by the defendants**.  (*Id.* at 2752-53)[64]  Dr. Radke's failure to segregate any diminution in value attributable to defendants' allegedly actionable conduct (trespass and nuisance) from any diminution in value attributable to non-actionable conduct (*e.g.*, "people just didn't like the idea of living near a weapons plant") was fatal to plaintiffs' damages claims.[65]

Like Dr. Radke, Drs. Flynn and Slovic failed to segregate impact attributable to defendants' actionable conduct from impact attributable to non-actionable factors such as proximity.  In studying public attitudes about Rocky Flats, they did not attempt to distinguish between attitudes stemming from defendants' wrongful conduct and attitudes stemming from

---

[64] Defense expert Dr. Kenneth Wise criticized Dr. Radke for failing to focus on the conduct of defendants and instead focusing only on proximity.  (Wise testimony, 1/5/06 Tr. 9023-26 (If you wanted to focus on defendants' conduct to determine if that had an impact on property value, you "could not tease that out" of Dr. Radke's proximity analysis))

[65] *See, e.g., Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415-16 (7th Cir. 1992) ("For years we have been saying, without much visible effect, that people who want damages have to prove them, using methodologies that need not be intellectually sophisticated but must not insult the intelligence. . . . The expert should have tried to separate the damages that resulted from the lawful entry of a powerful competitor — Nordisco — from the damages that resulted from the particular forms of misconduct allegedly committed by that competitor."); *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1372 (9th Cir. 1992) ("[The expert] study failed to segregate the losses, if any, caused by acts which were not antitrust violations from those that were. . . . The question remaining is whether the district court was nevertheless required to allow Vernon to go the jury with its erroneous approach or to give it still another opportunity to refine a study that, according to Vernon, could not be refined.  We think not.").  (*See also* Defs.' Am. Br. in Supp. of Their Mot. to Exclude Expert Witness Test. re Damages, filed 6/21/05, at 9–11 (citing additional authority))

conduct that was reported but did not actually happen.  (Slovic testimony, 11/7/05 Tr. 4305-06, 4308-09, 4311-12)  Neither did they attempt to discern between any impact resulting from the FBI raid and impact from other factors.  (Flynn testimony, Dep. Design. at 102-03, 198)  They did not even attempt to identify and distinguish public concern over the mere fact that Rocky Flats was a nuclear facility.  (Slovic testimony, 11/7/05 Tr. 4317-18)

Mr. Hunsperger likewise failed to measure damages caused by defendants' conduct. First, Mr. Hunsperger did not attempt to discern whether the "stigma" purportedly attached to class properties was caused by defendants.  Mr. Hunsperger testified at trial that stigma caused by the FBI raid or just the influence of Rocky Flats was all "one ball of wax" and could not be distinguished.  (Hunsperger testimony, 12/6/05 Tr. 6683, 12/7/05 Tr. 6788 (for MLS analysis, "we just looked at those that were closer to Rocky Flats for indications of stigma."))  Further, Mr. Hunsperger testified that he did not even know what Dow or Rockwell did when it was at the plant:

> Q.  Then it ought to be pretty simple to answer my question.  My question is very, very simple.  Do you know what Dow did during the period of time it was at the plant, yes or no?
>
> A.  Of course not.

(Hunsperger testimony, 12/6/05 Tr. 6687)  Likewise, Mr. Hunsperger testified that he did not "specifically" know what Rockwell did.  (*Id.* at 6687-88)  Indeed, Mr. Hunsperger testified that stigma could be associated based upon proximity to the plant, even without any evidence of contamination:

> Q.  What this stands for is the proposition that you can have stigma associated with proximity to the plant even without evidence of actual contamination, right?

A.  Without my evidence of contamination, you can, sure.

(Hunsperger testimony, 12/6/05 Tr. 6672)

Because Mr. Hunsperger focused solely on proximity, and made no attempt to tie his damages calculation to any actionable conduct by defendants, his analysis was not sufficient for a reasonable jury to award damages, or to withstand judgment as a matter of law.

> **D.      Plaintiffs Could Not Properly Recover Stigma Damages Where the Stigma Did Not Result From a Proven Trespass or Nuisance.**

The concept of "stigma" took a prominent role in plaintiffs' case.  In their opening arguments, plaintiffs' counsel alleged that "Rocky Flats created a stigma" (Pls.' Opening, 10/11/05 Tr. 489), and promised that "[w]e will talk all about stigma, and what it means, and what it has to do with this case" (*id.* at 10/12/05 Tr. 707).  The jury has since heard extensive testimony on stigma.  Mr. Hunsperger defined "stigma" as a set of risks that are distinguished from "real or scientifically quantifiable risks," but rather are risks that are "perceived." (Hunsperger testimony, 12/5/05 Tr. 6415)  Plaintiffs' expert Dr. Paul Slovic also discussed the meaning and causes of stigma.  (Slovic testimony, 11/7/05 Tr. 4244-46)  According to Dr. Slovic, "nuclear technologies are one of the types of technologies that are stigmatized."  (*Id.* at 4246)

As defendants have previously argued, plaintiffs should not have been permitted to recover any stigma-based damages.   (*See* Defs.' Combined Mots. for Summ. J. and Decertification of the Classes, filed December 9, 1996)  Although defendants renew that argument here, defendants recognize that the Court has rejected defendants' position that stigma damages are not recoverable.

However, even if stigma damages were recoverable in this action, any effort to prove stigma damages must meet at least two tests:  (1) the stigma (negative public perception) must arise from defendants' actionable conduct — either conduct that caused a trespass (contamination) or conduct that caused a nuisance (past or future health risk); and (2) the stigma must arise from facts that have been proved to be true by plaintiffs (*e.g.*, plaintiffs cannot seek damages from a newspaper article reporting "X" if plaintiffs have not proved that "X" is true).

Here, plaintiffs failed to show damages resulting from any stigma triggered by any trespass (contamination) or nuisance (health risk).  Rather, plaintiffs claimed that their losses stemmed from the FBI raid.  (*E.g.*, Whalen testimony, 11/21/05 Tr. 5955 (the raid affected how she viewed her property) & 5938-39 (raid affected use and enjoyment); Schierkolk testimony, 10/20/05 Tr. 1902 (could not sell property after raid); Babb testimony, 10/20/05 Tr. 1961 (raid affected her ability to sell); Cook testimony, 10/21/05 Tr. 2040-41 (FBI raid made her give up on her property), 2055-56 (testified at her deposition that the only claim she was making was based on the FBI raid); S. Bartlett testimony, 10/14/05 Tr. 920-22 (raid had a tremendous impact on ability to sell her home); Radke testimony, 10/26/05 Tr. 2676 ("I wanted to measure—could I measure the impact of the raid and what it had—did it have any impact at all on property value."))  But the FBI raid related to onsite conduct that was not proven to have anything to do with offsite contamination (trespass) or health risk (nuisance).  (Holeman testimony, 10/18/05 Tr. 1333-34; *see also* Watkins testimony, Dep. Design. at 159-60, 167-69)   Except for allegations relating to onsite conduct about certain permitting processes, the FBI raid allegations were ultimately shown to be false.  (*E.g.*, Holeman testimony, 10/17/05 Tr. 1292-96 (Holeman was "dubious" of claims FBI was making when they went in because knew some could not be

true); Watkins testimony, Dep. Design. at 155-57, 161 (FBI went in for the wrong reason); P604; P736; *see also* Norton testimony, 12/14/05 Tr. 7951-53 ("we did not find the kind of deceptive conduct we thought may have occurred"), 7958-60 ("we didn't find the serious public health risks we thought were there"); *see also* Norton testimony, 12/14/05 Tr. 7940, 7944-47, 7965-67) Hence, the FBI raid was not caused by actionable conduct of either defendant, and certainly not actionably Dow conduct.  Because the FBI raid did not stem from any conduct proven by plaintiffs that could even conceivably have resulted in a trespass or nuisance, plaintiffs were not entitled to recover any stigma damages attributable to the FBI raid.

> **E.      Plaintiffs Have Not Shown Damages Suffered by the Class.**

Another fundamental flaw in plaintiffs' damages proof — which independently requires judgment as a matter of law on plaintiffs' damages claims — is that plaintiffs failed to prove any damages experienced ***by the class***, which is defined as individuals who owned property in the class area as of June 7, 1989.  *See Cook VIII*, 181 F.R.D. at 475 n.3.[66]

Plaintiffs' experts measured the value of ***properties*** within the class area within each year from 1988 to 1995.  (*See* DX1085, Radke Chart)  However, plaintiffs' experts did not measure whether a diminution in value was experienced by any ***class members*** as a result of Rocky Flats. (*See* Wise testimony, 1/5/06 Tr. 9073)  The class definition required only that members own their properties as of June 7, 1989.  It did not impose any limits as to how far before June 7, 1989

---

[66] Defendants acknowledge the Court's ruling on evidence that is not class-wide (*see* 12/7/06 Order re *Daubert* and Motions in Limine at 130-31), but nevertheless respectfully assert that the plaintiffs have failed to ***prove*** damages to the class even taking into account the Court's broad approach to admissibility.

class members bought their properties, or as to how long after June 7, 1989 class members sold their properties (if at all).  *See Cook VIII*, 181 F.R.D. at 475 n.3.  Accordingly, thousands of class members purchased their properties before 1988 (the first year analyzed by Radke/Hunsperger), and thousands more sold their properties after 1995 (the last year analyzed by Radke/Hunsperger).

Because Dr. Radke only studied the period from 1988-1995 — and found that there was a pre-existing difference before 1989 between class property values and Denver metro area property values (*see* DX1085, Radke Chart) — he admitted that he had not determined whether anyone (much less anyone in the class) had lost money as a result of Rocky Flats:

> Q.  You've not actually determined whether anybody lost money in this  marketplace?
>
> A.  Correct, I haven't done that study.
>
> Q.  Right.  In order to do that study you would have to go back and find out for the people that owned in '88, '89, '90, etc., you have to find out when  they bought, at what price they bought, and when they sold?
>
> A.  Correct.
>
> *   *   *
>
> Q.  Just to be clear, you haven't done that, right?
>
> A.  That wasn't possible.

(Radke testimony, 10/26/05 Tr. 2812, 2814-15)

To illustrate this point, thousands of class members sold their properties after 1995 (or still have not sold their properties).  Because plaintiffs' experts did not measure a diminution in value after 1995, plaintiffs' experts could not say whether the thousands of class members who sold their properties after 1995 experienced a **loss** caused by Rocky Flats — that is, an **increase**

86

in the "Rocky Flats discount" between the date they purchased their property and the date they sold their property.   In fact, Dr. Radke's own results showed the "Rocky Flats discount" decreasing between 1992 (when the discount was 9.18%) and 1995 (when the discount was 5.45%).  Hypothetically, even if the "Rocky Flats discount" were the same in 1996 as measured by Radke and Hunsperger in 1995 (5.45%), then a class member who purchased in 1988 (a year for which Radke and Hunsperger measure the "Rocky Flats discount" as 7.68%) and sold in 1996 would have suffered no loss attributable to Rocky Flats (that is, the "Rocky Flats discount" would have *decreased* over the time the class member owned the property).   In fact, because Radke and Hunsperger did not measure the "Rocky Flats discount" for 1996, they presented no evidence of what loss (if any) was suffered by class members who sold in that year.

The same defect in plaintiffs' proof exists with respect to the thousands of class members who purchased their properties before 1988.   Because plaintiffs' experts did not measure a diminution in value before 1988, plaintiffs' experts could not say whether the thousands of class members who purchased their properties before 1988 purchased at a price that already reflected a pre-existing "discount" attributable to Rocky Flats.  *See Ario v. Metro. Airports Comm'n*, 367 N.W.2d 509, 515 (Minn. 1985) ("If, for example, plaintiff buys a Zone 1 house in 1980, he presumably buys at a market price already discounted for aircraft noise existing at that time. Plaintiff has no diminution in market value of his property unless he shows that the noise level has increased since 1980 and such increase has measurably depressed the value of his property.").  Thus, plaintiffs' experts could not say whether class members who purchased their properties before 1988 experienced a *loss* caused by Rocky Flats — that is, an *increase* in the "Rocky Flats discount" between the date they purchased their property and the date they sold

their property.[67]   (*See further* Defs.' Response to Plfs.' Mot. For J'ment as a Matter of Law filed 1/17/06, which defendants incorporate by reference)

Because plaintiffs were required to prove their claims on a class-wide basis[68], the failure of plaintiffs' experts to measure a loss either for class members who purchased before 1988 or class members who sold after 1995 is independently fatal to plaintiffs' claims.  Plaintiffs cannot plausibly claim that the experience of class members who both bought after 1988 and sold before 1995 is a fair representation of the gains or losses of the class as a whole.  But plaintiffs' experts also failed to prove a loss even for class members who happened to both purchase and sell within the period studied by Radke and Hunsperger (1988-1995).  For example, a class member who

---

[67] To the extent the Court has ruled that the "prior market discount" argument is an affirmative defense with respect to which defendants bear the burden of demonstrating a pre-existing discount, defendants preserve their disagreement with the Court's ruling.  The plaintiff — not the defendant — bears the burden of proving both the fact and the amount of damages.  *See Buckley Powder Co. v. Colo.*, 70 P.3d 547, 563 (Colo. Ct. App. 2002).  Unless a plaintiff shows that the alleged "Rocky Flats discount" was greater when he or she sold the property than when he or she purchased the property, not even the fact of damages has been proved.  Nor is the so-called prior market discount defense an "affirmative defense."  Plaintiffs have cited no cases from any jurisdiction holding that evidence as to the price at which a plaintiff purchased his or her property is an affirmative defense.  According to Wright & Miller, an affirmative defense "encompasses two types of defensive allegations: those that admit the allegations of the complaint but suggest some other reason why there is no right of recovery, and those that concern allegations outside of the plaintiff's prima facie case that the defendant therefore cannot raise by a simple denial in the answer."  Wright & Miller, 5 Fed. Prac. & Proc. Civ. 3d § 1271.  Defendants do not "admit the allegations of the complaint" by arguing for a prior market discount – to the contrary, the existence of a prior market discount negates the allegations of the complaint because plaintiffs have not suffered any damages.  For the same reason, a prior market discount does not concern "allegations outside of the plaintiff's prima facie case" because a plaintiff is required to plead and prove damages as part of his prima facie case.

[68] The plaintiffs' need to *prove* class-wide damages remains unchanged by the Court's determination that evidence need not be class-wide in order to be admissible.  (*See* 12/7/06 Order re *Daubert* and Motions in Limine at 130-31)

purchased in 1988 and sold in 1995 would have experienced no net loss attributable to Rocky Flats (given that she purchased at a "Rocky Flats discount" of 7.68% and sold at a "Rocky Flats discount" of 5.45%).   In fact, Radke and Hunsperger never determined a ***between-year*** statistically significant increase in the Rocky Flats discount for any period between 1988 and 1995.[69]  The failure of plaintiffs' damages expert to determine a statistically significant increase in the alleged "Rocky Flats discount" for any class member (much less for most or all class members) is dispositive of plaintiffs' claims that defendants' conduct caused damages to the class.  *See Boughton*, 65 F.3d at 835 & n. 20 (study must establish statistical significance to prove causation); *Renaud v. Martin Marietta Corp.*, 749 F. Supp. 1545, 1551 (D. Colo. 1990) (same).[70]

Even if plaintiffs' experts showed a statistically significant increase in the alleged "Rocky Flats discount" (they did not), plaintiffs still did not prove that such an increase could be attributable to the FBI raid, much less to Dow and Rockwell's actionable conduct (especially with respect to Dow, whose last day at Rocky Flats preceded the FBI raid by 14 years).   Dr.

---

[69] (Radke testimony, 10/26/05 Tr. 2810 ("The only statistical significance that you analyzed was within the data set for each year, correct?   A. It was of statistical significance for the entire multiple regression, and then each year had its own significant value, yes.   Q. If you wanted to you could have looked for a trend from '88 to '89 to '90 to '91 statistically, couldn't you? A. You could if you wanted.  That wasn't my goal."))

[70] Indeed, Dr. Wise testified that even if Hunsperger and Radke were right about the absolute difference in value between class and control properties, any such difference went back at least to 1974 (when only 3% of class member owed their properties) because rates of appreciation after 1974 were identical for the class and control.   (Wise testimony, 1/5/06 Tr. 9072-73, DX1120; DX2074; DX2087)

Radke claimed that the diminution in value following the 1989 FBI raid was 2%.[71]  However, Dr. Radke could not say that the drop *following* the FBI raid was *caused* by the FBI raid, much less caused by defendants' actionable conduct:

> Q.  The first question I am going to ask you, and put down here, is the two percent — can you say that, in fact, the two percent decline is caused by the F.B.I. raid?  Can you say that the two percent drop actually was caused by the F.B.I. raid?
>
> A.  No.  I can only say that these are the numbers that I got, there was a devaluation, and then something occurred that year, and it was the raid at the plant, that something occurred in the area to drop the values almost two percent that year.  And it had to be in the previous two years.
>
> Q.  Right.  All you can say is that something happened to drop the value, but you don't have the data to say that it was the F.B.I. raid, correct?
>
> A.  Correct.

(Radke testimony, 10/26/05 Tr. 2786-87)

Because plaintiffs failed to measure damages for the class, and no reasonable jury could have awarded damages for the same, defendants are entitled to judgment as a matter of law on plaintiffs' damages claims.

### F.    Plaintiffs Failed to Show Any Damages Attributable to the Prospect of the Continuance of Any Tortious Invasions.

As this Court previously ruled, to recover damages in this class trial, plaintiffs were required to prove damages within the framework established by Section 930 of the Restatement

---

[71] Dr. Radke could not say that the 2% drop following the FBI raid was statistically significant. (Radke testimony, 10/26/05 Tr. 2809; *see also* McFadden testimony, 01/12/06 Tr. 9936-37)

(Second) of Torts.  *Cook IX*, 273 F. Supp. 2d at 1209-10; (5/17/05 Order at 15-16).[72]  Under Section 930, a plaintiff may recover damages caused by "diminution in the value of the land caused by the prospect of the continuance of the invasion."  Restatement § 930.  Accordingly, the Court has ruled that plaintiffs may recover "the average percentage diminution in property value" that was "***caused by the prospect*** of the alleged trespass and/or nuisance (if proved by Plaintiffs) ***continuing into the future***, measured at the time when the injurious situation became complete and comparatively enduring."  (5/17/05 Order at 15-16 (emphasis added))

Damages caused by the continuing effects of prior invasions — such as the continuing impact of past contamination — are not recoverable under Section 930.  Restatement § 930 cmt. d ("Manifestly, this element of depreciation is distinct from the loss in value brought by the ***actual effects of past invasions*** (*see* Comment on § 929) such as damage by floods to the soil's

---

[72] Defendants maintain that, in order for the trespass or nuisance to be "continuing" within the meaning of Section 930, the following conditions must be met:  (1) the defendant's operational activities which give rise to the trespass or nuisance must be continuing; (2) the defendant's intent to cause a class-wide trespass or nuisance must be continuing; and (3) the resulting plutonium contamination or health risk must be continuing.  *See* Restatement (Second) of Torts Section 930 ("(1) If one causes continuing or recurrent tortious invasions on the land of another ***by the maintenance of a structure or acts or operations not on the land of the other*** . . .") (emphasis added); Restatement (Second) of Torts Section 930, cmt. d ("Manifestly, this element of depreciation is distinct from the loss in value brought by the actual effects of past invasions (*see* Comment on § 929) such as damage by floods to the soil's fertility."); Restatement (Second) of Torts Section 929, cmt. a (Section 929 (and not Section 930) applies where "future losses are ***not contingent upon the continuance in the future of the defendant's wrongdoing***, and hence the result follows regardless of whether the owner can recover in advance for the prospective harm of future operations of the cement plant. This is a distinct question that is dealt within § 930") (emphasis added).

fertility.") (emphasis added)[73]  Only damages arising from the prospect of ***future invasions*** (*i.e.*,

future contamination or a future health risk) are recoverable under this Section.  *Id.*

Plaintiffs failed to introduce sufficient evidence of damages attributable to "the prospect

of the continuance of the invasions" to withstand a motion for judgment as a matter of law.  As

an initial matter, plaintiffs failed to produce any evidence of "continuing invasions" on a

classwide basis.[74]  As shown above, plaintiffs' failure of proof exists regardless of whether the

"continuing invasions" are viewed as "continuing plutonium contamination or a "continuing

health risk."

With respect to "continuing contamination," the vast majority of the development in the

class area took place after 1970 — by which time 99.9% of any Rocky Flats releases had already

occurred.  (DX454, ATSDR 5/13/05 report, at 1-2 ("Though Rocky Flats released plutonium to

the air throughout its history, the overwhelming majority (> 99.9%) of plutonium emissions

occurred between 1953 and 1969."); Till testimony, 12/15/05 Tr. 8241, 8264-65 (after 1969,

exposures dropped significantly; all major releases are prior to 1971);  DV1, Till video ("the

overwhelming majority of class members moved into the class area in the 1970s and 1980s,

---

[73] To the extent that the Court has ruled that the continuing effects of past invasions are recoverable under Section 930, defendants disagree with that ruling as being contrary to Section 930.  *See* Restatement § 930 cmt. d.

[74] Defendants recognize that the Court has ruled that the continued presence of plutonium on plaintiffs' properties would constitute a continuing invasion, but respectfully disagree with the Court's ruling in that regard.  Nor is the Colorado Supreme Court's decision in *Hoery* to the contrary.  In *Hoery*, the Supreme Court followed the long-established rule that contamination is continuing where it is abatable.  *See Hoery*, 64 P.3d at 222-223 (stating that "contamination is not permanent" where "it is remediable or abatable").  Where, as here, contamination is not abatable, it is not continuing solely by virtue of its continued presence.

when any risks from Rocky Flats were even lower than the risks to people living in the area in the 1960s"); DX1137, Graphic Showing Class Members as of 1969)  Plaintiffs introduced no evidence at trial that, given the development that took place following 1970, any contaminated soil that was present on each class property as of 1970 remained on class property. Consequently, plaintiffs introduced no evidence of a continuing, class-wide trespass.  Thus, from a trespass perspective, plaintiffs failed to introduce class-wide evidence of a "continuance of the invasions" from which damages could be assessed under Section 930.  Nor, as described in Part III, *supra*, did plaintiffs demonstrate a "continuing nuisance" — that is, a "continuing health risk," or a "continuing threat of a future health risk."  (DX454, ATSDR 5/13/05 Report, at 56 ("[N]o past, current, or future public health hazard exists from exposure to offsite surface soils, even at the most contaminated locations."))

What is more, the evidence in this case demonstrated that the Rocky Flats plant has been completely cleaned up and will be turned into a National Wildlife Refuge within the next several years.  (Blaha testimony, 01/4/06 Tr. 8687, 8786-87)  After production ceased in 1992, the site was extensively characterized and remedial plans were developed to clean up all remaining onsite contamination.  (*Id.* at 8820-23)  Over the past ten years, numerous individual sites at the plant were cleaned up to the standards set forth by the EPA and CDPHE in the Rocky Flats Cleanup Agreement.  (*Id.* at 8656-87; DX777 Rocky Flats Cleanup Agreement)  For instance, the Solar Ponds were removed, cleaned and regraded in 2002 (Blaha testimony, 01/4/06 Tr. 8656-59; DX4090; DX4092); the spray fields were assessed and found to require no further remediation in 2003 (Blaha testimony, 01/4/06 Tr. 8663-64; DX4088; DX4089); groundwater plumes were remediated and contained (Blaha testimony, 01/4/06Tr. 8664-65, 8680-87, 8732,

8806-07; DX4093), and all onsite soils were cleaned to the RSAL  (Blaha testimony, 01/4/06 Tr. 8709, 8713, 8715).[75]   Further, during that time period, all pondcrete and saltcrete were sent offsite for disposal, all special nuclear material and all TRU waste were shipped offsite, and all buildings were dismantled and sent offsite.  (*Id.* at 8669-70)  The evidence at trial showed that the process was completed in October of 2005 when the current site contractor certified that the physical cleanup had been completed.  (*Id.* at 8687; DX4083, KH Certification Letter)

In short, because plaintiffs failed to demonstrate "continuing invasions" (either in the form of a "continuing trespass" or a "continuing nuisance"), it follows that plaintiffs did not prove damages "attributable to the prospect of the continuance of the invasions" under Section 930.  Restatement § 930.  Indeed, plaintiffs' failure to prove "continuing invasions" demonstrates that Section 930 is completely inapposite to this action.  *See id.* (by its terms, applicable only if "[one] causes continuing or recurrent tortious invasions on the land of another").

In any event, even if plaintiffs had demonstrated "continuing invasions," in order to recover under Section 930, plaintiffs would still have been required to demonstrate ***damages caused by*** "the prospect of the continuance of the invasion[s]." *Id.*  In fact, plaintiffs introduced no evidence of damages attributable to "invasions," much less damages attributable to "the prospect of the continuance of the invasions."   Rather, plaintiffs only introduced damages attributable to "proximity" to Rocky Flats.  (*See, e.g.*, Radke testimony, 10/26/05 Tr. 2753 ("I measured proximity."); Slovic testimony, 11/17/05 Tr. 4317-18; *see also* Hunsperger testimony,

---

[75] Dr. Till also confirmed the appropriateness of the clean up levels. (Till testimony, 12/15/05 Tr. 8290-93)

12/7/05 Tr. 6788 ("we just looked at those that were closer to Rocky Flats for indications of stigma.")) Because plaintiffs failed to introduce any evidence of damages attributable to the "prospect of the continuance of the invasions," and no reasonable jury could thus award any damages under Section 930, defendants are entitled to judgment as a matter of law on the issue of damages.

### G.   Plaintiffs Failed to Demonstrate That Any "Injurious Situation" Became Complete and Comparatively Enduring Between 1988 and 1995.

Under the Court's jury instructions, in order to recover damages, plaintiffs had to prove that the injurious situation became complete and comparatively enduring between January 1, 1988 and December 30, 1995.[76] (Instruction No. 3.22 (plaintiffs must prove that the "injurious situation became 'complete' and 'comparatively enduring' (as defined in this instruction) between January 1, 1988 and December 30 1995")) However, regardless of whether the "injurious situation" is viewed as a trespass (contamination) or nuisance (health risk), plaintiffs failed to introduce any evidence that the injurious situation became complete and comparatively enduring in between these dates.

First, with respect to trespass, plaintiffs introduced no evidence that the injurious situation (alleged plutonium contamination) became complete and comparatively enduring between January 1, 1988 and December 30, 1995. According to plaintiffs' own evidence, the

---

[76] This time period was expanded at the eleventh hour from the original time period of June 6, 1989 to March 26, 1992, and defendants preserve their objection to such expansion on the grounds that plaintiffs were estopped from making this change after defendants' opportunity to present evidence had passed. (*See* Defs.' Objections to Jury Instructions, filed 1/18/06, at 129-32) Defendants thus also renew their motion under the original (1989-1992) standard, which has now been rejected by the Court.

contamination occurred before 1970.  (*See* P1150, Budnitz 903 Pad Report at 2 ("in the 1950s and 1960s it was the Dow Rocky Flats Plant's poor waste-management practices that led to the principal release of plutonium from the 903 Area to the nearby environment around the Plant"); P1151 Budnitz Fires Report at 2 (report discusses two major fires at Rocky Flats Plant in 1957 and 1969); P149A & P939 (Krey & Hardy and Poet & Martell studies measuring contamination as of 1970))  The ATSDR Report confirms that 99.9%[77] of all releases of plutonium from Rocky Flats occurred before 1970.  (DX454, ATSDR 5/13/05 Report, at 1-2)  Defendants' experts agreed.  (DV1, Till video ("the releases of plutonium that contributed most significantly to offsite doses and risks occurred before 1970"; "Over 99 percent of plutonium releases from Rocky Flats occurred before 1970")  Given that it was undisputed at trial that 99.9% of plutonium releases occurred before 1970, plaintiffs could not show, in the case of plaintiffs' trespass claim, that the "injurious situation"[78] became complete and comparatively enduring at

---

[77] Plaintiffs introduced no evidence that even the 0.1% of Rocky Flats releases that occurred after 1970 traveled in the direction of the class area.

[78] The "injurious situation" is the trespass or nuisance itself, not damages allegedly flowing from the trespass or nuisance.  "Damages" are a separate concept from "injury."  Restatement § 902 ("The word 'damages' is used in the Restatement of this subject is the same sense in which it is used in the Restatement of Contracts. It has reference to an award made to a person by a competent judicial tribunal in a proceeding at law or in equity because of a legal wrong done to him by another.  Damages flow from an injury. As stated in § 7, injury denotes the invasion of any legally protected interest."); *Henry v. Dow Chem. Co.*, 701 N.W.2d 684, 691 (Mich. 2005) ("plaintiffs attempt to blur the distinction between 'injury' and 'damages'"); *Goodyear v. Discala*, 849 A.2d 791, 799 (Conn. 2004) ("The concept of 'damages,' however, is distinct from the legal injury from which damages arise."); *Oklahoma City v. Hopcus*, 50 P.2d 216, 218 (Okla. 1935) ("[t]here is a clear distinction between injury and damages . . . '[t]he word 'injury' denotes the illegal act; the term 'damages' means the sum recoverable as amends for the wrong. The one is the legal wrong to be redressed, the other the scale or measure of recovery.'"); *City of North Vernon v. Voegler*, 2 N.E. 821, 824 (Ind. 1885) ("['Injury' and 'damages'] are ... words of
(Continued…)

any date after 1970, much less during the period from 1988 to 1995.  Because plaintiffs failed to introduce any evidence that any trespass or contamination became complete and comparatively enduring between 1988 and 1995, no reasonable jury could have decided otherwise, and the Court should grant judgment as a matter of law on plaintiffs' trespass claim.

Similarly, with respect to plaintiffs' nuisance claim, plaintiffs introduced no evidence that the "injurious situation" (a past or future health risk) became complete and comparatively enduring between 1988 and 1995.  Even according to the report of plaintiffs' risk/exposure expert Dr. Goble, the amount of exposure to people living within the class contour after 1970 was only 0.003 times the amount of exposure to people living within the class contour before 1970.[79]  (P1124, Goble Report, at 49)  Thus, even according to plaintiffs' expert evidence, any health risk reached its maximum extent (and thus became "complete and comparatively enduring") by 1970, not during the period from 1989 to 1992.  In fact, plaintiffs introduced evidence of no post-1970 event, and no post-1970 conduct by either defendant, that increased the amount of actual or threatened health risk relative to the amount of health risk that existed as of 1970.  Accordingly, if any nuisance caused by defendants ever became complete and comparatively enduring, it became complete and comparatively enduring by 1970, not during the

---

widely different meaning .... [T]hey describe essentially different things."); *see also American Stevedores v. Porello*, 330 U.S. 446, 450, n. 6 (1947) (term "damages" connotes "a compensation in money for a loss or damage" [internal quotation marks omitted]).  Thus, whether media that appeared during the 1988-1995 period caused plaintiffs ***damages*** is irrelevant to the question of when the "***injurious*** situation" became complete and comparatively enduring.

[79] Defendants preserve the argument that Dr. Goble's expert report, like plaintiffs' other expert reports, should not have been admitted into evidence.

1988-1995 period.  In short, plaintiffs' failure to introduce evidence that the injurious situation caused by any trespass or nuisance became complete and comparatively enduring constitutes yet another basis for granting defendants' motion for judgment as a matter of law as to plaintiffs' damages claim here.

## VIII.  OTHER DAMAGES ARGUMENTS THAT THE COURT HAS ALREADY RULED ON.

### A.  Plaintiffs Failed to Limit Evidence of Damages to the Back-Calculated Statute of Limitations Window (January 30, 1988 - January 30, 1990).

As discussed above, plaintiffs failed to introduce sufficient evidence of a "continuing" trespass or nuisance to withstand a motion for judgment as a matter of law.  However, if the Court were to rule that plaintiffs proved a continuing tort, then plaintiffs were required to prove that their damages occurred after the start of the "statute of limitations period dating back from when plaintiff's complaint was filed" (that is, from January 30, 1988 to January 30, 1990). *Hoery*, 64 P.3d at 217 ("For continuing torts, . . . plaintiff's recovery is limited to the statute of limitations period dating back from when plaintiff's complaint was filed.") (internal citations omitted); *United States v. Hess*, 194 F.3d 1164, 1177 (10th Cir. 1999) ("In trespass cases, where the statute of limitations has expired with respect to the original trespass, but the trespass is continuing, we and other courts have calculated the limitation period back from the time the complaint was filed, rather than forward from the date of the original trespass, or where applicable, back to the reasonable discovery date."); *Walker Drug Co. v. La Sal Oil Co.*, 972 P.2d 1238, 1246 n.8 (Utah 1998) ("To recover for trespass or nuisance, a plaintiff must draw a causal connection between contamination occurring within the limitations period and a decrease in value to the affected property."); *Spanbauer v. J.R. Simplot Co.*, 685 P.2d 271, 274 (Idaho

1984) ("To recover for his injury, Spanbauer was required to prove the value of the property at the beginning of the limitation period, before the damage done within that period occurred, so that a comparison could be made between the market value of the land before the compensable damage began and the value of the land after the compensable damage occurred.  Spanbauer totally failed to enter any proof into the record of the market value of his land at or near the beginning of the limitations period."); Colo. Rev. Stat. § 13-80-102 (2002) (tort actions for trespass or nuisance shall be commenced within two years after the cause of action accrues).

The rule limiting damages for continuing torts to either future damages or past damages that occurred within the back-calculated statute of limitations period is equally applicable in cases involving Restatement Section 930.  *See Nieman v. NLO, Inc.*, 108 F.3d 1546, 1557, 1559 ("[Plaintiff's] time frame for assessing damages is limited to the statute of limitations window, i.e., four years prior to the filing of the complaint in the instant action.") (citing Restatement § 930); *Cox v. Cambridge Square Towne Houses, Inc.*, 236 S.E.2d 73, 75 (Ga. 1977) ("Since it clearly appears that this situation 'will continue indefinitely' (Restatement § 930(1)(a)), ***the appellant has the right to elect to treat the nuisance as temporary and sue for all those damages which have occurred within the past four years***, or he may elect to sue for all ***future damages*** as well and put an end to the matter.") (emphasis added).  Here, plaintiffs did not introduce sufficient evidence of damages resulting from defendants' actionable conduct that is isolated to the two years prior to the filing of their Complaint –- that is, between January 30,

1988 and January 30, 1990.[80]  Indeed, plaintiffs' damages expert Dr. Radke conceded that he did not assess the statistical significance of any change in the value of class properties between 1988 and 1990.  (Radke testimony, 10/26/05 Tr. 2810)  Nor could Dr. Radke say whether any change from 1988 to 1990 was attributable to the FBI raid, much less to conduct by Dow or Rockwell. (*Id.* 2786-87)

In sum, if the Court holds that defendants are not entitled to judgment as a matter of law on the ground that plaintiffs failed to introduce evidence of a continuing tort, the Court should nonetheless grant judgment as a matter of law because plaintiffs failed to prove damages within the back-calculated statute of limitations window applicable to continuing torts.

IX.  **DEFENDANTS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS' DEMAND FOR PUNITIVE DAMAGES.**

A.  **Plaintiffs Have Not Shown That Defendants Engaged in Willful and Wanton Conduct.**

To prove punitive damages, plaintiffs were required to show, among other things, that "the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct."  Colo. Rev. Stat. § 13-21-102.  (*See also* Instruction No. 3.27) ("[Plaintiffs] must prove . . . that the conduct . . . was 'willful and wanton.'")  The statute defines "willful and wanton conduct" as "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or the rights and safety of others, particularly the plaintiff."  Colo. Rev. Stat. § 13-21-102.  Plaintiffs must prove these

---

[80] Two years is the applicable statute of limitations period in Colorado.  *See* Colo. Rev. Stat. § 13-80-102 (2002) (tort actions for trespass or nuisance shall be commenced within two years after the cause of action accrues).

elements beyond a reasonable doubt.  *Frick v. Abell*, 198 Colo. 508, 511 (Colo. 1979); Colo. Rev. Stat. § 13-25-127.

Applying Colorado law, the Tenth Circuit has held that "there must be evidence that the act causing the injuries was done with evil intent and with the purpose of injuring the plaintiff or with such a wanton and reckless disregard of plaintiffs' rights as to evidence a wrongful motive." *Gruntmeir v. Mayrath Indust., Inc.* 841 F.2d 1037, 1040 (10th Cir. 1988).  Colorado law places a "heavy burden" on a plaintiff to prove why punitive damages should be awarded in a given case. *See Juarez v. United Farm Tools, Inc.*, 798 F.2d 1341, 1342 (10th Cir. 1986) (affirming district court's reversal of  jury award of punitive damages where plaintiff was not able to satisfy the Colorado statutory requirements); *Alley v. Gubser Dev. Co.*, 785 F.2d 849, 856 (10th Cir. 1986) (holding that district court erred in submitting issue of punitive damages to the jury).  It is well-settled that "[c]onduct that is merely negligent [] cannot serve as the basis for exemplary damages."  *Tri-Aspen Constr. Co. v. Johnson*, 714 P.2d 484, 488 (Colo. 1986) (reversing punitive damage award where defendants' conduct was merely negligent.)

Here, plaintiffs introduced no evidence that any injury was "attended by circumstances of fraud, malice, or willful and wanton conduct." Colo. Rev. Stat. § 13-21-102.  Plaintiffs' evidence against Dow focused on three incidents that occurred during Dow's tenure at Rocky Flats:  a 1957 fire, a 1969 fire and a January 1969 event where uncharacteristic winds struck the plant's 903 pad.  By their very nature these incidents did not involve any intentional conduct on Dow's part, and plaintiffs introduced no evidence to suggest that they were done so with such a "wanton and reckless disregard of plaintiffs' rights to suggest a wrongful motive."  *Gruntmeir*, 841 F.2d at 1040.  Likewise, plaintiffs never introduced any evidence to suggest that Rockwell released

*any* plutonium during its tenure, much less that it released plutonium willfully or wantonly in order to damage plaintiffs' property values.[81]

     To the contrary, plaintiffs' witnesses testified that Rockwell and Dow took care to ensure against harm.  (*E.g.*, Holeman testimony, 10/18/05 Tr. 1333-34; Ray testimony, 10/19/05 Tr. 1679-80 (Ray agreeing with statement that "a number of safety procedures [] were put in place at this plant, not only to ensure the safety of the workers but the environment and the residents offsite), 1683 (Dow's attitude was that "when [accidents] happened, we will do our best to clean them up"))[82]

_____

[81] While plaintiffs may point to a draft internal DOE document for the proposition that there were "patent" or known regulatory violations during Rockwell period as plant contractor, the evidence at trial was that this memorandum was generated shortly before the DOE entered into the 1986 compliance agreement with the EPA and the CDH and underscored the amount of effort that would be required to bring the plant into compliance if DOE changed its regulatory position and agreed to submit additional portions of the plant to RCRA's authority. The evidence at trial demonstrated that at that time it was known that the plant would not be in full compliance with RCRA at the time the 1986 agreement was inked.  "The regulators understood that we were not -- we were not storing our waste per RCRA regulations at that point.  I'm not saying it wasn't stored safely, but per RCRA.  So we would be given a period of time to bring that plant into compliance . . . [once the 1986 agreement was signed.]"  (Weston testimony, 12/13/05 Tr. 7694-97)  This DOE change in regulatory application is hardly sort of malicious, willful or wanton circumstance that could give rise to Rockwell punitive damages.

[82] Plaintiffs attempt to create a factual issues with regard to whether the Building 771 incinerator was operated on an isolated occasion in December 1988 contrary to a shutdown announcement. Substantial evidence indicated that this event did not occur.  (Weston testimony, 12/13/05 Tr. 7723-24, 7729, 7732-33, 7840, 7842; DX295; DX273a; DX291)  Indeed, the main prosecutor in charge of the criminal investigation testified that the investigation "did not have any credible evidence" that clandestined use of the 771 incinerator occurred.  (Norton testimony, 12/14/05 Tr. 7944-48, 7958, 7988)  No criminal charges were brought on this issue.  In any event, it was uncontested that no plutonium was release from the plant site as a result of any Building 771 activities in December 1988.  (Weston testimony, 12/13/05 Tr. 7728-29; DX485, DX281)  In light of the full record on this issue, there is no basis for punitive damages against Rockwell related to this allegation.

Defense witnesses were ever more explicit about the safety precautions that Dow and Rockwell took to ensure against offsite harm.  (Weston testimony, 12/13/05 Tr. 7710-11 (discussing the multiple layers of filter banks and HEPA filters dedicated to the building 771 incinerator), 12/14/05 Tr. 8098 ("I know our processes.  The plutonium, the way it was handled, and the glove box, the way our waste was handled and sealed, the way all the operators were monitored before they could leave the buildings, and anything leaving the building passed through radiation monitors, there's just no way out."); *id.* at 8089-91 ("I believed we were doing a good job, and I felt that's what the Department of Energy thought."); Frazier testimony, 12/12/05 Tr. 7524 (The air sampling programs at Rocky Flats "were as good or better than all the air environmental monitoring groups that I had measured for the total time frames that are reviewed there.  They had good programs in place."); *see also id.* at 7540-41.

Plaintiffs' punitive damages claim was also defeated by defendants' compliance with standards.  *See* Part II.B, *supra*.  As the Court ruled, defendants' compliance with standards is relevant to whether any injury claimed by plaintiffs was "attended by circumstances of fraud, malice, or willful and wanton conduct" sufficient to prove punitive damages.  (*See* 9/13/05 Hr'g Tr. at 6 ("Such evidence is relevant . . . to the issue of punitive damages."))

Because of plaintiffs' failure to introduce any evidence that any injury was attended by willful and wanton conduct, or that defendants violated federal or state standards, no reasonable jury could have awarded punitive damages and defendants are entitled to judgment as a matter of law on plaintiffs' punitive damages claim.

**B.      Plaintiffs Did Not Show That the Punitive Damages They Seek Are in Any Way Linked to Defendants' Actionable Conduct.**

To recover punitive damages, plaintiffs were required to demonstrate that any such damages are linked to the same conduct that caused plaintiffs' injuries.  *See Bennett v. Greeley Gas Co.*, 969 P.2d 754, 761 (Colo. Ct. App. 1998) ("[T]he conduct referred to is that causing the injuries.  It is the quality of that tortious act, not the character of the wrongdoer, that justifies exemplary damages.")  Plaintiffs have introduced no such evidence here.  Indeed, as discussed *supra*, plaintiffs have failed even to introduce evidence of any **compensatory** damages resulting from defendants' allegedly actionable conduct.  Because Colorado law limits the amount of punitive damages to the amount of compensatory damages, *see* Colo. Rev. Stat. § 13-21-102 (jury's award of punitive damages is limited to "the amount of the actual damages awarded to the injured party"), it follows that, because plaintiffs have not introduced evidence of any compensatory damages, they may not recover any punitive damages.

**X.      OTHER PUNITIVE DAMAGES ARGUMENTS THAT THE COURT HAS RULED ON ALREADY.**

**A.      Plaintiffs Did Not Show Any Nuclear Occurrences Before August 1988.**

Any determination of punitive damages must be consistent with the Price Anderson Act.  Under the Price Anderson Amendments Act of 1988, "[n]o court may award punitive damages in any action with respect to a nuclear incident . . . ."  42 U.S.C. § 2210(s).  Under this Court's interpretation of that provision, the Act bars punitive damages only for "nuclear incidents occurring on or after" August 20, 1988.  *See Cook v. Rockwell Int'l Corp.*, 755 F. Supp. 1468, 1479-81 ("*Cook I*") (D. Colo. 1991).  A "nuclear incident" is defined as "any **occurrence** . . . **causing** . . . bodily injury, sickness, disease, or death, or **loss of or damage to property, or loss of**

***use of property***, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of [nuclear materials.]"  42 U.S.C. § 2014 (q) (emphasis added).

Under the Amendments Act, to determine whether punitive damages can be awarded, the jury must first determine when the "nuclear incident" happened.  If the nuclear incident occurred after August 20, 1988, the jury may not award punitive damages.  *See Cook I*, 755 F. Supp. at 1479-81.  If a portion of the "nuclear incident" (or "nuclear incidents") occurred before August 20, 1988, and a portion of the "nuclear incident" (or "nuclear incidents") occurred after August 20, 1988, then the maximum amount of punitive damages that may be awarded is limited to the amount of damages attributable to the "nuclear incidents" occurring prior to August 20, 1988.[83] Thus, a nuclear incident could have "occurred" before August 20, 1988 only if class members experienced "loss of or damage to property, or loss of use of property" before August 20, 1988. 42 U.S.C. § 2014 (q).

Here, plaintiffs could not prove "loss of or damage to property, or loss of use of property" before August 20, 1988 on a class-wide basis.  Some class members did not even purchase their properties in the class area until after August 20, 1988, and thus could not possibly have suffered any loss or damage before August 1988.  Also, plaintiffs claimed that any "damage" to their "property" occurred at the time of the FBI raid, which happened in 1989, after the effective date

---

[83] *See Hensley v. Tri-QSI Denver Corp.*, 98 P.3d 965, 967-68 (Colo. Ct. App. 2004) (if punitive damages are not allowed for a particular claim, then compensatory damages awarded pursuant to that claim do not increase the amount of punitive damages that may be awarded; *e.g.*, if $2,500 is awarded for a claim for which punitives are allowed, and $7,500 is awarded for a claim for which punitive damages are not allowed, then the maximum amount of punitive damages that may be awarded is $2,500).

of the Price Anderson Amendments Act.  (*E.g.*, Whalen testimony, 11/21/05 Tr. 5935, 5938-39;

Schierkolk testimony, 10/20/05 Tr. 1902; Babb testimony, 10/20/05 Tr. 1961; Cook testimony,

10/21/05 Tr. 2040-41, 2055-56; S. Bartlett testimony, 10/14/05 Tr. 919-920; Radke testimony,

10/26/05 Tr. 2676 ("I wanted to measure — could I measure the impact of the raid and what it

had — did it have any impact at all on property value."))  It follows that plaintiffs' claim arose

from a nuclear incident that occurred (at least in part, if not wholly) on or after August 20, 1988,

and that plaintiffs' claims for punitive damages are barred by Price Anderson Amendments Act.

*See Cook I*, 755 F. Supp. at 1479-81 (D. Colo. 1991).

> **B.**      **The Court Should Disallow Punitive Damage Pursuant To Colorado Statute § 13-21-102 Because It Will Serve No Deterrent Purpose.**

Under Colorado Statute § 13-21-102, a court may "reduce or disallow" punitive damages

if certain criteria are met:  "(a) The deterrent effect of the damages has been accomplished; (b)

The conduct which resulted in the award has ceased; or (c) The purpose of such damages has

otherwise been served."  *Id.*; *see also Frick*, 602 P.2d at 853 (purpose of punitive damages is to

deter future conduct from the defendant and those similarly situated).  In this case, neither

defendant operates the plant any longer.  Dow ceased operation in 1975, and Rockwell ceased

operation in 1989.  Indeed, neither defendant is even involved in the business of plutonium

processing any more.  Any conduct which could have even arguably resulted in punitive

damages has long since ceased.  Hence, punitive damages could not possibly have any additional

deterrent effect on Dow or Rockwell.

Furthermore, an exemplary damages award would not serve to deter other weapons

contractors from engaging in like conduct in the future because all such contractors are now

required to, and do, have indemnification agreements with the United States government.  Plus,

under the Price Anderson Act, no punitive damages can be awarded with respect to any future nuclear incidents.  *See* 42 U.S.C. § 2210.  Consequently, a punitive award here could not possibly deter any future conduct.  Accordingly, defendants are entitled to judgment as a matter of law on plaintiffs' claim for punitive damages.

### C.      The Price-Anderson Act Bars Plaintiffs from Receiving Punitive Damages.

The Court has rejected defendants' position that the Price Anderson Act bars plaintiffs from pursuing punitive damages entirely.  *See In re Hanford Nuclear Reservation Litig.*, 780 F. Supp. 1551, 1572 n.38 (E.D. Wash. 1991) (Section 2014(hh) of the Act, which provides that state law does not apply in a Price Anderson Act case if that state law is inconsistent with (among other things) the prohibition on punitive damages in Section 2210(h), *expressly* applies to nuclear incidents occurring "*before, on, or after* the date of the enactment of this Act," and thus is not covered by the "catch all" provision that restricts the applicability of *other* provisions of the act to dates "on or after August 20, 1988); *see also* Pub.L. 100-104, § 20(a), Historical and Statutory Notes to 42 U.S.C.A. § 2014 (West Supp.1990) ("(a) *Except as provided in subsection (b)*, the amendments made by this Act [enacting section 2282a of this title, amending this section and sections 2210 and 2273 of this title, and enacting provisions set out as notes under sections 2011 and 2210 of this title] shall become effective on the date of the enactment of this Act [Aug. 20, 1988] and shall be applicable with respect to nuclear incidents occurring on or after such date.  (b)(1) The amendments made by section 11 [*enacting subsec. (hh)* and (jj) of this section and section 2210(m)(3) of this title and amending section 2210(m)(2) and (o) of this title] shall apply to nuclear incidents occurring *before, on, or after* the date of the enactment of this Act [Aug. 20, 1988]." ) (emphasis added).

107

## <u>CONCLUSION</u>

For the foregoing reasons, defendants respectfully request that the Court set aside the jury's verdict in its entirety and grant judgment as a matter of law on plaintiffs' claims of trespass and nuisance, on plaintiffs' claim for damages, and on plaintiffs' partial claim of generic emotional distress.  In the alternative, for the reasons stated herein and in defendants' Motion for a New Trial filed concurrently herewith, defendants' respectfully request a new trial.

Dated:  January 22, 2007                             Respectfully submitted,


<u>/s/ John E. Tangren</u>
One of the Attorneys for the Defendants
David M. Bernick
John E. Tangren
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601-6636
Phone:  312-861-2000
Fax:      312-861-2200

Joseph J. Bronesky
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, Colorado 80202
Phone:  303-297-2900
Fax:      303-298-0940

Attorneys for ROCKWELL
INTERNATIONAL CORPORATION and
THE DOW CHEMICAL COMPANY

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 22, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses for the following:

Merrell G. Davidoff
Peter B. Nordberg, Esq.
BERGER & MONTAGUE
1622 Locust Street
Philadelphia, PA   19103-6365
mdavidoff@bm.net
pnordberg@bm.net


Gary B. Blum, Esq.
SILVER & DEBOSKEY
The Smith Mansion
1801 York Street
Denver, Colorado 80206
blumg@s-d.com


/s/ Courtney Biggins
Courtney Biggins