1    radiation released into the environment from the Rocketdyne Facilities as a result

2    of such nuclear accidents exceeded the permissible dose limitations set forth in 10

3    C.F.R. § 20.1301."

4         Defendants' admit that operations at the Rocketdyne Facilities

5    involved the use, storage, generation, and/or disposal of radioactive materials,

6    including, but not limited to, plutonium, uranium, tritium, strontium, and cesium,

7    which materials constitute source, special nuclear, or byproduct materials as

8    defined in the Atomic Energy Act 42 U.S.C. §2011, et seq. (Noël Decl., Exh. 1 at

9    ¶111).

10        Plaintiffs claim that their expert Dr. Arjun Makhijani ("Dr.

11   Makhijani"), who specializes in the application of plasma physics to nuclear

12   fusion, has opined that between July 2, 1959 and July 15, 1959, an incident

13   occurred at the Sodium Reactor Experiment ("SRE") at SSFL in which "between

14   366 and 2,540 curies of radioactive I-131, with a best estimate of 1,330 curies,"

15   was released into the atmosphere. "For comparison, our best estimate for the

16   iodine-131 released during the July 1959 SRE accident is about 80 to 100 times

17   larger than the official estimates for the amount of radioiodine released to the

18   environment from the 1979 partial core meltdown at the Three Mile Island

19   accident. The full range of our estimates is 20 to 200 times the official estimates

20   for the TMI iodine-131 release." (Noël Decl., Exh. 3 at  pp. 5-6).[22]

21   _____

22       [22]Boeing disputes this fact. Boeing also disputes and objects to this
     additional "fact" as being irrelevant. FRE 401 and 402. Plaintiffs admit, and it is
23   undisputed, that the issue raised by this Motion Re Radiological Claims—the duty
     owed by a defendant in a Price-Anderson Act PLA—is a question of law for the
24   Court. Plaintiffs' Statement of Genuine Issues and Response to Conclusions of
     Law in Opposition to Defendants' Motion for Summary Adjudication Regarding
25

26
27

28

1    Dr. Makhijani describes Rocketdyne's improper conduct as follows:

2    Early during the accident, on July 12, 1959, there

3    were clear signs of trouble that were recognized by

4    operators, including abnormal temperature

5    differences and radioactivity levels.  Repeated,

6    unplanned shutdowns of the reactor occurred during

7    July 12 to 16, indicating continuing severe problems.

8    Yet the SRE reactor was repeatedly restarted despite

9    the concerns of operators regarding the ongoing

10   problems and abnormal operation.  Further, some of

11   the safety equipment and radionuclide monitoring

12   equipment was not properly maintained.

13   Quantification of large accidental releases from the

14   stack was apparently not envisioned in design or

15   operation as a precautionary safety measure.

16   (Noël Decl., Exh. 3 at p. 6).[23]

17   Dr. Makhijani further opined that, "Rocketdyne/Atomics International

18   failed to act prudently to protect public health by not sampling the milk being

19   produced in the surrounding areas and by issuing a public assurance that was

20   _____

21   Duty of Care for Radiological Claims ("Plaintiffs' GI–Motion Re Radiological

22   Claims") (Plaintiffs' response to conclusion of law no. 3)).  Therefore, although
     Defendants and their experts do and will rebut the opinions of Plaintiffs' experts,

23   this Motion is not the appropriate time for such a challenge since those opinions
     are irrelevant to the pure legal question the Court must resolve to decide this

24   Motion Re Radiological Claims.

25   [23]See footnote 22.

26

27                                      68

28

factually wrong and, at best, premature and misleading." (Noël Decl., Exh. 3 at p. 7).[24]

Plaintiffs' expert Dr. Makhijani has opined that significant amounts of radionuclide I-131 was released to the atmosphere from the SRE at SSFL in July of 1959 and has provided the best estimate of the amount of these releases with lower and upper bounds of the I-131 released via the stacks of the SRE during the early part of Run 14.  (Noël Decl., Exh. 3 at pp. 5-8 and 91-92.)[25]

Plaintiffs state that Defendants' documentation reflects that in April 1957, the Sodium Reactor Experiment ("SRE") commenced operation at SSFL and was the first nuclear reactor to supply electricity to a commercial grid, which ceased operation in February 1964. (Noël Decl., Exh. 4 at BNA08603566 and 8603568).[26]

Plaintiffs claim that with regard to the SRE reactor partial meltdown in July 1959, Defendants admit to an environmental release of radiation and admit that the SRE reactor had a "power excursion" in July 1959, in which some of the reactor fuel assemblies of the SRE reactor partially melted.  (Noël Decl., Exh. 2 at

---

[24]See footnote 22.

[25]See footnote 22.

[26]Defendants do not dispute the document cited by Plaintiffs reflects  what Plaintiffs claim it does.  Defendants, however, dispute and object to this "fact" as being irrelevant since Plaintiffs are only claiming alleged radiation injuries related to radionuclides emitted from the SRE in July 1959.  Federal Rules of Evidence 401 and 402.  Defendants further object to this additional "fact" as being irrelevant since Plaintiffs admit, and it is undisputed, that the issue raised by this Motion—the duty owed by a defendant in a Price-Anderson Act Public Liability Action such as this one—is a question of law for the Court.

1   ¶ 146).  Defendants assert that they are not sure what Plaintiffs mean by the term

2   "environmental release" but assume Plaintiffs claim that radiation was released

3   from the SRE and into the environment as a result of the July 1959 incident.

4   Defendants maintain that neither of Plaintiffs' citations support that "fact."

5   Defendants also maintain that the fact is not true regarding Iodine-131, the only

6   radionuclide Plaintiffs are claiming caused them injuries.  (Christian Decl., ¶¶ 8-9;

7   Exh. 1).  Defendants also dispute that there was a "meltdown" at the SRE and the

8   statement that fuel assemblies partially "melted."[27]

9        It is undisputed that during Power Run 14 of SRE, which took place

10   between July 12, 1959 and July 26, 1959, an incident occurred which resulted in

11   damage to fuel elements in the SRE.  (Noël Decl., Exh. 5 at BNA08401428).

12   Atomics International concluded that during this Power Run 14 of SRE, "13 out of

13   43 fuel channels were damaged."  (Noël Decl., Exh. 6 at BNA08411828).[28]

14        Atomics International reported:

15             [s]evere overheating of some of the fuel elements is

16             known to have existed . . . . [and m]any of the fuel

17             slugs were badly swollen, cracked and spongy.  It

18             may well be that these effects were sufficient to allow

19             the release of the majority of the measured amounts

20             of fission product contamination by diffusive

21             processes. Moreover, the conditions conducive to

22

23   _____

24   [27] See objection in footnote 26.

25   [28] See objection in footnote 26.

26                                    70

27

28

1   diffusion may have persisted over a fairly long time

2   during the last reactor run, perhaps up to two weeks.

3   (Noël Decl., Exh. 5 at BNA08401428).[29]

4   Atomics International reported that ten of the thirteen fuel assemblies

5   were found to be broken and separated into multiple pieces, two were:

6   tenaciously lodged within the moderator regions . . . .

7   [and] 81 miscellaneous fuel slug pieces, numerous

8   bits of stainless steel, and approximately 2 b. of

9   low-density, frothy, carbonaceous material had been

10   removed from the reactor core; then 16 moderator

11   cans were removed and replaced.  Two of the

12   removed cans contained whole fuel elements, 10 held

13   substantial portions of broken elements, and the other

14   4 moderator units were defective because of leaks.

15   (Noël Decl., Exh. 6 at BNA08411829-830).[30]

16   Regarding the consequences of this nuclear incident during Run 14 of

17   SRE at SSFL in July of 1959, the investigations into the causes conducted by

18   Atomics International concluded that "5,000 to 10,000 curies of fission product

19   activity were unexpectedly released to the primary sodium system."  (Noël Decl.,

20   Exh. 5 at BNA08401406 and 8401430).[31]

21

22   [29] It is undisputed that the document cited by Plaintiffs reflects what

23   Plaintiffs claim it does. See objection in footnote 26.

24   [30] See footnote 29.

25   [31] See footnote 29.

26                                       71

27

28

1      Plaintiffs' expert Dr. Makhijani has also opined that the Sodium Burn

2  Pit operated at SSFL, where radioactively contaminated sodium was burned by

3  reaction with water, was operated in disregard of public health and without

4  permits between 1962 and 1975, resulting in the release of the radioactive

5  materials Cesium-137 and Strontium-90. (Noël Decl., Exh. 3 at pp. 3-5).[32]

6      Plaintiffs' expert Dr. Makhijani has explained that since no records

7  were maintained as to what was being incinerated nor was adequate radioactive

8  monitoring conducted on the gaseous and liquid effluents from the facility, it is

9  now extremely difficult to reconstruct a reliable estimate for the emissions of

10  radioactivity from the Sodium Burn Pit. (Noël Decl., Exh. 3 at pp. 4-5). While a

11  lower bound estimate was provided, a best estimate and upper bound from these

12  operation of the Sodium Burn Pit could not be calculated due to the lack of

13  documentation and information maintained by Rocketdyne. (Noël Decl., Exh. 3 at

14  pp. 4-5).[33]

15      Plaintiffs' expert Camille Sears also calculated air concentrations of

16  I-131 at each relevant receptor which resulted in the 8 plaintiffs' exposures using

17  air dispersion modeling. (Noël Decl., Exh. 8 at. pp. 12-16).[34]

18      Applying calculations provided by Dr. Mahkijani, Plaintiffs' expert

19  Dr. Bernd Frank has provided dose calculations relating to the emission from the

20  SRE at SSFL in 1959, and has provided detailed dose calculations of Iodine-131

21  exposure for each of the eight plaintiffs claiming injury due to radiation exposure:

22  _____

23      [32] See footnote 22.

24      [33] See footnote 22.

25      [34] See footnote 22.

26

27                                72

28

1   James Bern, Kathleen Bertone-Kellog, Kathy Hecker, Patrick Johnson, Power

2   Johnson, Patricia Lev, Barry Mitidiere, Denise Seth-Hunter. (Noël Decl., Exh. 9

3   at pp. i, 4-7, and Appendix A).[35]

4          Plaintiffs' expert F. Owen Hoffman, Ph.D. has further calculated the

5   uncertainty associated with the total intake of I-131 via inhalation and ingestion,

6   the uncertainty in the total dose to thyroid gland for the eight plaintiffs, and the

7   uncertainty in the risk of thyroid cancer and the probability that cancer was

8   contributed to or caused by this past exposure. (Noël Decl., Exh. 10 at pp. 9-11).[36]

9          Plaintiffs' expert A. James Ruttenber, M.D. and Ph.D., Plaintiffs'

10  expert in radiation ecology, has opined that there is strong epidemiological support

11  that I-131 increased the risk for autoimmune thyroiditis and strongly supports a

12  causal connection between exposure to I-131 and thyroid neoplasia. (Noël Decl.,

13  Exh. 11 at p. 2). Dr. Ruttenber also concluded that estimates of radiation dose to

14  the thyroid from the I-131 released from the SRE are sufficient to have contributed

15  to the development of thyroiditis by plaintiffs James Bern, Barry Mitidiere and

16  Denise Seth-Hunter, and it is reasonable for a medical doctor to conclude that this

17  exposure was a substantial factor in the development of thyroiditis in these

18  plaintiffs. (Noël Decl., Exh. 11 at p. 2). Dr. Ruttenber further concluded that the

19  estimates of radiation doses to the thyroid from the I-131 release from the SRE are

20  sufficient to have contributed to the development of thyroid cancer in plaintiffs

21  Kathleen Bertone-Kellogg, Kathy Hecker, Patrick Johnson, Power Johnson and

22  Patricia Lev, and it is reasonable for a medical doctor to conclude that this

23

24  [35] See footnote 22.

25  [36] See footnote 22.

26                                        73

27

28

1   exposure was a substantial factor in the development of thyroid cancer in these

2   plaintiffs. (Noël Decl., Exh. 11 at p. 2).[37]

3          Plaintiffs' expert Vera S. Byers, an M.D. and Ph.D., who is an expert

4   immunologist and medical toxicologist providing specific causation testimony,

5   opined to a reasonable medical probability that the emissions from the Rocketdyne

6   facility were a substantial factor contributing to the thyroid cancer in plaintiffs

7   Kathleen Bertone-Kellogg, Kathy Hecker, Patrick Johnson, Power Johnson and

8   Patricia Lev, and to the thyroiditis in plaintiffs James Bern, Barry Mitidiere and

9   Denise Seth-Hunter. (Byers Decl., Exh. 1 at pp. 80-84, 85-92, 236-243, 271-276,

10  277-283, 337-345, 399-403 and 455-458).[38]

11         Plaintiffs claim that Defendants have admitted to other radioactive

12  incidents at Rocketdyne: (1) In 1959, a Tetralin Explosion at SSFL;

13  (2) On March 25, 1959, a release of fission gas within the AE 6 reactor at SSFL

14  occurred; (3) In 1976, radiological contamination was found in a leach field at

15  SSFL. (Noël Decl., Exh. 2 at 154; Noël Decl., Exh. 1 at 146; Noël Decl., Exh. 2 at

16  146; Noël Decl., Exh. 2 at 14). Boeing admits that in 1959 there was an incident

17  known as the "Tetralin Explosion." As to the release of fission gas Boeing does

18  not dispute the document cited by Plaintiffs reflects what Plaintiffs claim it does.

19  Defendants, however, object to this "fact" as being irrelevant since Plaintiffs are

20  only claiming alleged radiation injuries related to radionuclides emitted from the

21

22

23

24  ───────────────
    [37]See footnote 22.

25
    [38]See footnote 22.
26

27                                  74

28

1  Sodium Reactor Experiment in July 1959.[39]  Boeing does not dispute that in 1976,
2  low level radiological contamination was found in a leach field.[40]

3         Plaintiffs claim that in 1969, a Rocketdyne letter acknowledged that
4  Cask B of E 1979 located at SSFL is "currently used for transporting high level
5  radioactive wastes to burial sites," and "[i]t has never been licensed, nor has it
6  been evaluated to the conditions set forth in 10 CFR 71." (Noël Decl., Exh. 12 at
7  BNA00991331).  Boeing claims that this single document is without full and
8  proper context, including any related responses by Defendants.[41]

9         Defendants do not deny that during the 1960's and 1970's, it leaked
10  radioactively contaminated water, including water containing strontium-90 and
11  yttrium-90, into a leach field at SSFL.  (Noël Decl., Exh. 1 at ¶ 149). Boeing states
12  that they do not dispute that low level radiological contamination was found in
13  1976 in a SSFL leach field but did not in their Answer admit this contamination
14  spread off-site or that strontium-90 or yttrium-90 percolated or leached into the
15  ground and into the groundwater as alleged in the second sentence of Paragraph
16  149 of Exhibit 1 to the Noël Declaration.[42]

17         Plaintiffs claim that even by June of 1986, Rocketdyne was
18  acknowledging that radiation limits were being exceeded, in a letter stating:

19  _____

20       [39]Defendants, however, object to this "fact" as being irrelevant since
     Plaintiffs are only claiming alleged radiation injuries related to radionuclides
21   emitted from the Sodium Reactor Experiment in July 1959.  Also see footnotes 1
22   and 5.

23       [40]See footnote 39.

24       [41]See footnote 39.

25
26       [42]See footnote 26.

27                                    75

28

1    you are correct that the 60-micro-R/hr requirement is

2    based on an annual average. . . . We have already

3    exceeded that limit for 1986 along the north fence

4    behind T075.  Another limit is more significant

5    because it does not consider occupancy, . . . That

6    north fence has exceeded this for at least the last 14

7    months.

8  (Noël Decl., Exh. 13 at BNA00751043).  Boeing claims that this single document

9  is without full and proper context, including any related responses by

10  Defendants.[43]

11        Plaintiffs claim the following: that by 1989, when Gregg D. Dempsey

12  of the USEPA visited the SSFL site to help assess the health hazards, health risks

13  and environmental hazards, he concluded, "The SSFL Radiological lab needs

14  updating badly and this should be highly stressed in your report to your superiors"

15  and "the SFFL sampling, placement of sample locations, and analyses cannot

16  guarantee that past actions have not caused offsite impacts."  Further, "it is clear to

17  me that Rocketdyne does not have a good 'handle' on where radiation has been

18  inadvertently or intentionally dumped onsite.  Most of the evidence of site spills is

19  incompletely documented or anecdotal." Mr. Dempsey further determined,

20  "certain conditions exist within the laboratory that make me question the validity

21  of some, if not all, of their environmental data.  Boeing claims that this single

22

23

24

25        ─────────────────

26        [43]See footnote 39.

27                                    76

28

1   document is without full and proper context, including any related responses by

2   Defendants.[44]

3           Plaintiffs claim that Defendants' expert witness, Lynn Anspaugh,

4   failed to provide an opinion regarding what he believed to be the 1959 regulatory

5   climate for radiation, and defense counsel asserted this would only be necessary if

6   and when the instant motion is granted by the Court. Therefore, Plaintiffs state that

7   they have been unable to determine what regulatory standard Defendants are

8   attempting to apply here through their motion or through their expert witness

9   testimony.

10                  b.      *Discussion – Motion Re Radiological Claims*

11          Plaintiffs allege in their Complaints that their radiation injury claims

12  are governed by the 1998 Price Anderson Amendments Act, 42 U.S.C. § 2210,

13  which establishes a Public Liability Action ("PLA") as the exclusive federal cause

14  of action for a claim for personal injury arising out of an incident involving the

15  alleged release of and exposure to radioactive materials. <u>Corcoran v. New York</u>

16  <u>Power Auth.</u>, 935 F. Supp. 376, 383-85 (S.D.N.Y. 1996) (PLA is the "sole means

17  by which a plaintiff could recover for damages sustained in a nuclear incident");

18  <u>O'Conner v. Commonwealth Edison Co.</u>, 13 F.3d 1090 (7th Cir. 1994) (same); <u>In</u>

19  <u>re Berg Litig.</u>, 293 F.3d 1127, 1131 (9th Cir. 2002) (same).  To establish a PLA

20  claim as alleged in Plaintiffs Complaints, Plaintiffs must prove that Defendants

21  breached their duty of care to Plaintiffs which resulted in Plaintiffs' injuries.

22          Defendants presently ask the Court to clearly identify the duty of care

23  element of Plaintiffs' PLA claims.  Specifically, Defendants request that the Court

24  _____

25      [44]See footnote 39.

26                                      77

27

28

1  find as a matter of law that the duty of care owed to Plaintiffs regarding their

2  radiation claims is the federal permissible dose limits for members of the public at

3  the time the alleged incident(s) occurred.

4        Plaintiffs oppose Defendants' Motion Re Radiological Claims on the

5  following three grounds: (1) Defendants are inappropriately attempting to resolve

6  a purely factual dispute; (2) Defendants fail to specify the requested relief, and (3)

7  this Court should adopt the trial court opinions in Cook v. Rockwell Int'l Corp.,

8  273 F. Supp. 2d 1175 (D. Colo. 2003) and In re Hanford Nuclear Litig., 350 F.

9  Supp. 2d 871 (D. Wash. 2004) (adopting the reasoning and holding in Cook),

10  holding that every Court of Appeal that has analyzed the duty owed in a post-1988

11  Price Anderson Amendments Act case is wrong. This Court finds Plaintiffs'

12  arguments meritless.

13        First, contrary to Plaintiffs' position, this Motion Re Radiological

14  Claims does not resolve a factual issue.[45]  As the Ninth Circuit has held, the duty a

15  defendant owes in a PLA is a question of law for the Court.  Ileto v. Glock Inc.,

16  349 F.3d 1191, 1203 (9th Cir. 2003) (existence of duty is a question of law);

17  O'Conner v. Commonwealth Edison Co., 748 F. Supp. 672, 677 (C.D. Ill. 1990);

18  Merrill v. Navegar, Inc., 26 Cal. 4th 465, 477 (2001) ("The existence and scope of

19  duty are legal questions for the court.").

20        To address Plaintiffs' remaining contentions, the Court examines the

21  Price-Anderson Act, beginning with the most recent amendments to the Act.  In

22

23      [45] Plaintiffs concede in their Statement of Genuine Issues that the duty owed

24  by a defendant in a Price-Anderson Act PLA is a question of law for the Court.

25  (Plaintiffs' GI – Motion Re Radiological Claims (response to conclusion of law

26  no. 3)).

27

28

1    1998 Congress enacted the Price-Anderson Amendments Act, which transformed

2    the "Price-Anderson landscape" and resolved the "tension" between the exclusive

3    federal regulation of nuclear safety and state law compensation for injuries.  See

4    O'Conner, 13 F.3d at 1105; In re TMI Litig. Cases Consol. II, 940 F.2d at 857.

5    Prior to the 1998 Amendments Act, there was no federal cause of action for a non-

6    ENO[46] under the pre-existing Price-Anderson Act, and there was no federal

7    subject matter jurisdiction for ordinary nuclear accident cases.  In re TMI, 67 F.3d

8    at 1105.  Thus, prior to the 1988 Amendment Act, persons claiming injury from

9    radiation emitted from certain radioactive material could file state law claims in

10   state or federal courts, and could recover under any theory of liability available in

11   any of the fifty states.  In re TMI, 67 F.3d at 1105; Bohrmann v. Maine Yankee

12   Atomic Power Co., 926 F. Supp. 211, 216 (D. Me. 1996).

13          In the 1998 Amendments Act, however, Congress broadly defined

14   "public liability action" to mean "**any** suit asserting public liability," 42 U.S.C. §

15   2014(hh) (emphasis added), and defined "public liability" to mean "**any** legal

16   liability arising out of or resulting from a nuclear accident . . . ." 42 U.S.C. §

17   2014(w) (emphasis added).  Congress then broadly defined "nuclear accident" to

18   include:

19          **any** occurrence, including an extraordinary nuclear

20          occurrence, including an extraordinary nuclear

21          occurrence, . . . **causing** . . . bodily injury, sickness,

22   

23   [46] "ENO" is the acronym for "extraordinary nuclear occurrence," and is

24   defined as a substantial offsite release of radiation which the NRC officially
     determines to be an ENO.  42 U.S.C. § 2014(j); 42 U.S.C. § 2210(n)(1); 10 C.F.R.

25   § 140.83 (1968).  No ENO has been declared by the NRC or the United States to
     date; not even the Three Mile Island ("TMI") accident was declared an ENO.

26   

27   

28

1  disease, or death, or loss of or damage to property, or

2  loss of use of property, arising out of or resulting

3  from the radioactive, toxic, explosive, or other

4  hazardous properties of source, special nuclear, or

5  byproduct material.

6  42 U.S.C. § 2014(q) (emphasis added).  Further, Congress provided that a "public

7  liability action shall be deemed to be an action arising under section 2210 of this

8  title . . . ."  42 U.S.C. § 2014(hh).

9          By defining public liability broadly to include "**any** legal liability,"

10  Congress preempted all state causes of action for damages arising from nuclear

11  materials covered under the Act.  In re TMI Litig. Cases Consol. II, 940 F.2d at

12  854.  As the Third, Sixth, Seventh, Ninth, Tenth and Eleventh Circuits have held,

13  "After the Amendments Act, **no state causes of action based upon public**

14  **liability exists**.  A claim growing out of any nuclear incident is compensable

15  under the terms of the Amendments Act or **it is not compensable at all**."  In re

16  TMI Litig. Cases Consol. II, 940 F.2d at 854 (emphasis added); accord, Roberts

17  v. Florida Power & Light Co., 146 F.3d 1305, 1306 (11th Cir. 1998) ("Congress

18  passed the Price-Anderson Amendments Act of 1988 . . . , creating an exclusive

19  federal cause of action for radiation injury."); O'Conner, 13 F.3d at 1100 ("a new

20  federal cause of action supplants the prior state cause of action."); Nieman v.

21  NLO, Inc., 108 F.3d 1546, 1552 (6th Cir. 1997) ("state law claims cannot stand as

22  separate causes of action. [A plaintiff] can sue under the Price-Anderson Act, as

23  amended, or not at all."); Kerr-McGee Corp. v. Farley, 115 F.3d 1498, 1504 (10th

24  Cir. 1997) (1998) ("[The Act's] provisions [are] broad enough to create a federal

25  forum for any tort claim even remotely involving atomic energy production.  The

80

1  PAA on its face provides the sole remedy for the torts alleged . . . ."); see also El

2  Paso Natural Gas Co. v. Neztsosie, 526 U.S. 473, 485 n.6 (1999) (Price Anderson

3  "resembles what we have spoken of as a 'complete pre-emptive doctrine'"); In re

4  Berg Litig. 293 F.3d 1127, 1132 (9th Cir 2002) (PLA is a plaintiff's "exclusive-

5  means" for pursuing claims arising from nuclear incident).

6       In addition to preempting state law causes of action, Congress also

7  preempted any state law rules for decision that are "inconsistent" with the Price-

8  Anderson Act. 42 U.S.C. § 2014(hh).  After creating the PLA, Congress did not

9  go on to provide a "complete and self-sufficient body of federal law" to be

10  applied in a PLA.  In re TMI Litig. Cases Consol. II, 940 F.2d at 854.  Rather, the

11  "Price-Anderson system, by design, alters state tort law to forward the goals of

12  [the A]ct."  Nieman, 108 F.3d at 1552 (quoting O'Conner, 13 F.3d at 1100).

13       In amending the Price Anderson Act,[47] Congress was well aware that

14  the Price-Anderson compensation system must operate as a consistent part of a

15  larger federal framework governing the safe use of nuclear energy.  O'Conner, 13

16  F.3d at 1100 ("Congress recognized that state law would operate in the context of

17  a complex federal scheme which would mold and shape any cause of action

18  grounded in state law."); Id. at 1105 (Price-Anderson operates within "a stringent

19  regulatory background").  Congress knew that "[n]umerous federal questions will

20  necessarily arise in the course of litigation under this Act, which questions must

21  be resolved consistent with the pervasive federal scheme."  See O'Conner v.

22

23  _____

24  [47]Approximately every ten years since enacting the Price-Anderson Act in
    1957, Congress has amended it, continually building a comprehensive federal

25  structure that has governed and regulated the nuclear industry.  In re TMI Litig.
    Cases Consol. II, 940 F.2d at 852-53.

26

27                                       81

28

1   Commonwealth Edison Co., 770 F. Supp. 448, 454 (C.D. Ill. 1991), aff'd, 13 F.3d

2   1090 (7th Cir. 1994).

3         By directing federal courts to "derive" federal rules for decision only

4   from state law that is consistent with existing federal regulatory and statutory law,

5   Congress delineated the scope of field preemption, and set the entire preexisting

6   federal framework it had already established as the guiding light by which the

7   federal judiciary should follow as it establishes federal law interpreting the PLA.

8   In re TMI Litig. Cases Consol. II, 940 F.2d at 854; O'Conner, 13 F.3d at 1105;

9   Nieman, 108 F.3d at 1552.  In O'Conner v. Commonwealth Edison Co., 13 F.3d

10   1090 (7th Cir. 1994), the Seventh Circuit affirmed the district court's ruling that

11   the existing federal framework was the standard by which the consistency of state

12   rules for decision must be measured:

13         [W]e look at the Amendments Act in the context

14         of the entire federal statutory scheme on nuclear

15         power.  The Amendments Act is simply the last

16         addition to the federal law of nuclear energy that

17         has been evolving since 1946 when Congress

18         enacted the Atomic Energy Act. . . . Thus, the

19         Amendments Act is the latest installment in nearly

20         fifty years of congressional work.  During that

21         time, Congress has attempted to encourage the

22         development of domestic nuclear power to the

23         fullest extent through licensing, indemnification,

24         limitation of liability, and consolidation of

25         litigation.  Nevertheless, Congress has balanced

26

27               82

28

1       this encouragement of private sector activity with

2       an acute concern for public safety by authorizing

3       extensive regulation . . . by the Nuclear Regulatory

4       Commission, and by imposing a carefully

5       constructed measure of liability should nuclear

6       accidents occur.

7   O'Conner, 13 F.3d at 1095-97.

8           As part of the federal preemption of nuclear safety and the extensive

9   federal regulation over the nuclear industry, Congress delegated licensing and

10  strict regulatory supervision of nuclear matter to the Atomic Energy Commission

11  ("AEC"), which was replaced by the Nuclear Regulatory Commission ("NRC") in

12  1974.  Duke Power Co. v. Envtl. Study Group, Inc., 438 U.S. 59, 63.  Congress

13  gave the NRC authority to regulate nuclear materials to protect "public health and

14  safety."  10 C.F.R. § 1.11(b).  The United States Supreme Court recognized that

15  "the [AEC] was more qualified to determine to determine what type of safety

16  standard should be enacted in this complex area. . . . Congress . . . provided for

17  continued federal control over [radiation] because 'the technical safety

18  considerations are of such complexity that it is not likely that any State would be

19  prepared to deal with them'."  Silkwood v. Kerr-McGee Corp., 464 U.S. 238,  250

20  (1984); see also Corcoran, 935 F. Supp. at 389 ("It would be inconsistent with the

21  Act to allow the plaintiffs to state a claim of any kind that is premised on an

22  exposure to radiation which a federal agency, in its expertise, has concluded is

23  not unsafe.").  Through this federal regulatory scheme, "the Federal Government

24  maintains compete control of the safety and 'nuclear' aspects of energy

25

26

27

28

83

1   generation . . . ." <u>Pac. Gas & Elec. Co. v State energy Resources Conservation &</u>

2   <u>Dev. Comm'n</u>, 461 U.S. 190, 212 (1983).

3         Thus, starting in 1957, the AEC (and later, the NRC) promulgated

4   radiation safety standards to protect both nuclear workers (all adults) and

5   members of the pubic (which included pregnant women and children) from the

6   potentially harmful effects of high levels of radiation and to establish permissible

7   radiation doses that can be received by certain category of persons. <u>See, e.g.,</u> 10

8   C.F.R. § 20.101 (22 Fed. Reg. 548, 550-51 (Jan. 29, 1957)) (occupational dose

9   limits for adults); 10 C.F.R. § 20.102 (22 Fed. Reg. at 551) (dose limits for

10  individual members of the public); <u>O'Conner</u>, 748 F. Supp. at 678.

11        Case law holds that a PLA is the exclusive federal cause of action for

12  radiation injury, <u>Corcoran</u>, 935 F. Supp. at 383-85; <u>O'Conner</u>, 13 F.3d at 1099.

13  An essential element of any PLA is that the plaintiff's exposure exceed the

14  federal dose limits. <u>O'Conner v. Commonwealth Edison Co.</u>, 807 F. Supp. 1376,

15  1378 (C.D. Ill. 1992) (holding that one of the relevant issues in a PLA is "whether

16  the duty owed was breached" as determined by federal dose limits); <u>Lokos v.</u>

17  <u>Detroit Edison</u>, 67 F. Supp. 2d 740, 743 (E.D. Mich. 1999) ("To prevail in their

18  PLA, plaintiffs must prove two essential elements: (1) Mrs. Lokos' exposure

19  exceeded the federal numerical dose limits; and (2) such overexposure caused her

20  to suffer a compensable injury under the Amendments Act."); <u>see also</u> <u>Roberts,</u>

21  146 F.3d at 1308 (plaintiffs failed to state a PLA claim where they failed to allege

22  a dose in excess of the federal dose limits); <u>Bohrmann</u>, 926 F. Supp. at 220 (a

23  plaintiff must "establish a breach" of the federal dose limits); <u>Corcoran</u>, 935 F.

24  Supp. 376, 385 (same). The federal regulations, which set the permissible dose

25  limits, have consistently and appropriately provided government contractors,

26

27

28

1   Price-Anderson Act licensees, workers and members of the public with clear

2   directions as to permissible radiation dose limits. O'Conner, 748 F. Supp. at 678

3   ("[A] defendant public utility should also be provided with some clear statement

4   regarding how it may limit a worker's dose without exposing the worker to injury

5   or itself to liability."). Government contractors, such as Defendants, must be

6   allowed to rely upon compliance with those regulations as a defense to any

7   liability claim in the absence of an ENO, which is the only circumstance where

8   the waiver of defenses provisions of the Act can come into play. See 42 U.S.C. §

9   2210(n)(1).

10          Every Court of Appeals that has decided the duty or standard of care

11   issue has held that the plaintiff must prove a dose in excess of the federal

12   permissible dose limits in order to show a breach of duty in a Price-Anderson Act

13   PLA. In re TMI, 67 F.3d at 1113 (Third Circuit); O'Conner, 13 F.3d at 1105

14   (Seventh Circuit); Nieman, 108 F.3d at 1553 (Sixth Circuit); Roberts, 146 F.3d at

15   1308 (Eleventh Circuit); TNS, Inc. v. NLRB, 296 F.3d 384, 398 (6th Cir. 2002)

16   ("[T]he Sixth Circuit has joined with almost every other circuit in holding that

17   NRC safety regulations conclusively establish the duty of care owed by

18   defendants in radiation safety personal injury cases governed by the 1998

19   amendments to the Price-Anderson Act."). Imposing a standard of care based on

20   the federal regulations achieves coherence and consistency between the Atomic

21   Energy Act, the Price-Anderson Act, and the federal preemption of nuclear safety

22   effectuated through the federal regulations governing permissible doses.

23   O'Conner, 13 F.3d at 1105 (the federal dose limits "are part of this statutory

24   scheme. Imposing a standard of care other than the federal regulations . . . is

25

26

27                                         85

28

1  inconsistent with the Price-Anderson scheme and consequently cannot be applied

2  in a public liability action.").

3          Plaintiffs contend that this Court forgo the analysis and rulings of

4  every Court of Appeals regarding this legal issue and apply reasoning in Cook, a

5  single Colorado district court, who itself acknowledged its opinion "is contrary to

6  the existing weight of authority." Cook, 273 F. Supp. 2d at 1193 (emphasis

7  added).  Against all prevailing circuit court law, Cook held "that Congress did not

8  intend for federal regulatory standards to preempt state law standards of care in

9  Price Anderson public liability actions." Cook, 273 F. Supp. at 1180.  The

10  analysis in Cook is not only unsupported by established authority, but ignores the

11  United States Supreme Court opinion in El Paso Natural Gas Co. v. Neztsosie,

12  526 U.S. 473, 484 and n.6 (1999), which specifically recognized the unique and

13  complete preemption that exists regarding any radiation injury lawsuit after the

14  1998 Price Anderson Act Amendments.  The Court finds no grounds to adopt the

15  analysis and holding of Cook.

16          Based on the foregoing analysis and overwhelming Circuit Court

17  authority, this Court finds that Defendants are entitled to summary adjudication as

18  a matter of law that, to establish a breach of duty by Defendants, Plaintiffs must

19  prove exposure to radiation in excess of the permissible radiation dose standards

20  in effect at the time of the alleged incident.[48]  Plaintiffs must therefore prove that

21  Defendants breached the applicable federal permissible dose limits in effect at the

22  _____

23          [48] The Court notes that the 10 C.F.R. Section Plaintiffs cite in their
    Complaints does not apply to Plaintiffs' radiation claims because it was not in
24  effect at the time the relevant events allegedly occurred.  Defendants state that
    they will submit the relevant federal permissible dose limit with their proposed
25  jury instructions pursuant to the schedule established by the Court.

26                                  86

27

28

1   time of the July 1959 Sodium Reactor Experiment incident.  See In re TMI Gen.

2   Pub. Utils. Corp., 67 F.3d 1103, 1108 n.10 (3d Cir. 1995) (holding that "the

3   relevant federal regulations **were those in place at the time** of the TMI accident

4   in 1979.") (emphasis added); Carey v. Kerr-McGee Chem Corp., 60 F. Supp. 2d

5   800, 809 (N.D. Ill 1999) ("[T]his Court concludes that the standard of care is set

6   forth by the Radiation Dose Limits for Individual Members of the Public

7   **applicable for the time of the releases in question.**") (emphasis added);

8   Corcoran, 935 F. Supp. at 388 (S.D.N.Y. 1996), aff'd, 202 F.3d 530 (2d Cir.

9   1999) (same); Bohrmann, 926 F. Supp. at 218-20 (same).

10              *4.    Ultrahazardous Activities*

11                  *a.    Undisputed facts*

12          It is undisputed that the recorded number of rocket engine tests from

13   1958 through 1972 at SSFL ranged between 3,160 in 1959 to 113 in 1971, and

14   that starting in 1957, "reclaimed" water was used at SSFL.  (Cappello Decl., Exh.

15   16 BNA04022522; Id., Exh. 15 BNA05482183). It is undisputed that diluted

16   waste water was reused as of March 27, 1958, the "reclaimed" water was

17   industrial wastewater collected from various sites around SSFL and sent to the

18   test stands.

19          Plaintiffs claim that the "reclaimed" water sent to the Reclamation

20   Reservoir included, but was not limited to, the following: 1. Kerosene, alcohol,

21   nitric acid, sulphuric acid, hydrochloric acid and caustic soda from the lower

22   research area; 2. Residual fuel oil, engine fuel and solvents, including kerosene

23   and trichloroethylene, burned and sent through skimmer in open drainage trench

24   to reclamation reservoir; 3. Wastes including lubricating oils, kerosene fuels and

25   hydrochloric acid from the TCA Equipment Lab. (Cappello Decl., Exh. 18 at

26

27

28

1  BNA79213).  Boeing argues that the document refers to use of primary retention

2  basins and catch ponds to capture wastes, and skimming of certain wastes prior to

3  delivery of water to the common reservoir.

4        Plaintiffs claim that the primary justification for using reclaimed

5  water for cooling the rocket test stands was cost savings.  (Cappello Decl., Exh.

6  19 p. BNA00213262; Cappello Decl., Exh. 20 at BNA04022421-422).  Boeing

7  states that although Plaintiffs' evidence supports the conclusion that one of the

8  reasons reclaimed water was used for cooling the rocket test stands was cost

9  savings, none of their evidence states or supports the conclusion that the "primary

10  justification" for using reclaimed water was cost savings.  (Cappello Decl., Exh.

11  20 at BNA04022421-422).

12        Boeing does not dispute that Plaintiffs present evidence that in 1958,

13  after passing from a common reservoir at SSFL where the effluents were

14  compounded, a "reclamation system [had] been constructed at the location which

15  recycled the water to the two large engine test facilities for reuse as coolant

16  water."  (Cappello Decl., Exh. 18 at final ¶, p. BNA79213).

17        Plaintiffs claim that SSFL employees present at SSFL during rocket

18  engine test firings witnessed excess coolant, fuel, emissions and chemicals used

19  to flush the rocket engines being allowed to flow downhill into collection ponds,

20  along with water, and the water from these collection ponds was used to fill the

21  large tanks located near the rocket test stands.  (Carr Decl., at ¶ 9; Declaration of

22  William R. Mueller ("Mueller Decl."), at ¶ 6).[49]  Plaintiffs claim that SSFL

23  employees saw the contaminated water from these large tanks being applied to the

24  _____

25      [49]Defendants dispute this based on evidentiary objections.  Defendants
    claim that the allegation is also irrelevant to any claimed exposures to Plaintiffs.

26

27                                    · 88

28

1   rocket engine test stands to cool them during rocket engine testing.  (Carr Decl. at

2   ¶ 9; Mueller Decl. at ¶ 6).  Excess water from this cooling was also allowed to

3   flow downhill into the collection ponds with the other chemicals, to be re-used in

4   this cooling process. This cooling process of the rocket engine test stands

5   produced a huge cloud.  (Carr Decl. at ¶ 9; Mueller Decl. at ¶ 6).[50]

6          Plaintiffs state that SSFL employee Michael Primak also witnessed

7   many rocket engine test firings, which were located on elevated terrain and were

8   named Alpha, Bravo, Coca, and Delta.  (Primak Decl. at ¶ 8).  At a lower

9   elevation from the test stands Mr. Primak observed ponds into which the runoff

10  excess rocket fuel and coolants flowed.  (Primak Decl. at ¶ 8).[51]

11         Plaintiffs argue that water from these collection ponds was used to

12  fill the tanks, and the water in those tanks, located near the test stands, was used

13  to cool the rockets every time they were test fired.  (Primak Decl. at ¶ 8; Carr

14  Decl. at ¶ 9).  When the water was poured into the deflectors at the base of the

15  test stands, a large cloud formed.  (Primak Decl. at ¶ 8; Carr Decl. at ¶ 9).  The

16  cloud would rise into the air and be carried off depending on the strength and

17  direction of the wind.  (Primak Decl. at ¶ 8; Carr Decl. at ¶ 9).[52]

18         Plaintiffs claim that when the cloud from the rocket engine test firing

19  did not move away but instead rained down on top of the SSFL, the firemen

20  experienced burning sensations on their arms and neck and required medical

21  treatment.  (Carr Decl. at ¶ 10).  In addition, their uniforms were burned by the

22  _____

23   [50]See footnote 49.

24   [51]See footnote 49.

25   [52]See footnote 49.

26

27                                   89

28

1   particulates falling from the sky, and the vehicles in the parking lots at SSFL

2   were covered with films of dust. (Carr Decl. at ¶ 10).[53]

3            Plaintiffs claim that the firemen also, during the graveyard shift,

4   burned excess rocket fuel, and other waste, that had accumulated on the surface

5   of the various catch ponds located at SSFL. (Mueller Decl. at ¶ 4).  The rocket

6   fuel and other waste in the catch ponds resulted from the rocket engine test

7   firings. (Mueller Decl. at ¶ 4).  After they burned off the excess fuel from the

8   surface of the pond, the water was recycled back into the cooler tanks to be used

9   again to cool the rocket engines when they were test fired the next time.  (Mueller

10  Decl. at ¶ 4).  The firemen were not given any specialized training in how to

11  handle such assignment, other than being told it could only be done at night.

12  (Mueller Decl. at ¶ 4).[54]

13            On the nights when assigned the duty to burn the catch ponds, the

14  fireman would check the ponds at SSFL to see how much rocket fuel had

15  accumulated on the surface. (Mueller Decl. at ¶ 4).  The rocket fuel would not

16  burn on its own, so they would pour gasoline on the rocket fuel stain to get it

17  started and then stand back and wait for it to burn out. (Mueller Decl. at ¶ 4).

18  The fire produced heavy black smoke which rose into the air and was carried off

19  by the wind currents. (Mueller Decl. at ¶ 4).  On the few occasions when the

20  cloud of smoke did not move away from overhead, the firemen would feel

21  particulate rain back down on them. (Mueller Decl. at ¶ 4).[55]

22  _____

23       [53]See footnote 49.

24       [54]See footnote 49.

25       [55]See footnote 49.

26                           90

27

28

b.   *Discussion – Motion Re Ultrahazardous Activities*

1)   Strict liability is not available to Plaintiffs with respect to their Price-Anderson claims

The questions presented by Plaintiffs are: (1) Whether strict liability is consistent with the Price-Anderson Act; and (2) Whether the nuclear activity Defendants allegedly engaged in is an ultrahazardous activity. For the reasons discussed below, this Court determines that strict liability is inconsistent with the Act, and that Defendants alleged activity–using reclaimed water to cool rocket engine test stands–is not an ultrahazardous activity.

The Supreme Court has ruled that "the safety of nuclear technology [is] the exclusive business of the Federal Government . . . ." <u>Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n</u>, 461 U.S. 190, 208 (1983); <u>Silkwood v. Kerr-McGee Corp.</u>, 464 U.S. 238, 240-41 (1984) ("[S]tates are precluded from regulating the safety aspects of nuclear power."). As a result "state regulation of nuclear safety, through either legislation or negligence actions is preempted by federal law." <u>O'Conner v. Commonwealth Edison Co.</u>, 13 F.3d 1090, 1105 (7th Cir. 1994), <u>cert. denied</u>, 512 U.S. 1232 (1994).

It is well established that federal regulations provide the sole measure of a defendant's duty under Price-Anderson. Strict liability is inconsistent with Price-Anderson if it would enable a plaintiff to recover from a defendant in a public liability actions without first establishing that the defendant breached a federally imposed duty of care. <u>Roberts v. Florida Power & Light Co.</u>, 146 F.3d 1305, 1308 (11th Cir. 1998). Because the Price-Anderson Act establishes a federal standard of care, the act preempts state law standards of care.

1    Every circuit court of appeals to consider this issue has ruled that

2  "federal regulations must provide the sole measure of the defendants' duty in a

3  public liability cause of action." O'Conner, 13 F.3d at 1105; Nieman v. NLO,

4  Inc., 108 F.3d 1546 (6th Cir. 1997); In re TMI Litig. Cases Consol. II, 940 F.2d

5  832 (3d Cir. 1991); Roberts v. Florida Power & Light Co., 146 F.3d 1305 (11th

6  Cir. 1998).  However, as addressed above in relation to Defendants' Motion Re

7  Radiological Claims, two recent district court opinions, Cook v. Rockwell Int'l

8  Corp., 273 F. Supp. 2d 1175 (D. Col. 2003) and In re Hanford Nuclear Litigation,

9  350 F. Supp. 2d 871 (D. Wash. 2004), disagree with the circuit courts. Both Cook

10  and Hanford hold that state law standards of care are consistent with the Price-

11  Anderson Act, and thus ruled that strict liability could be imposed on public

12  liability cause of actions arising out of the Price-Anderson Act.[56]

13

14    _____

15  [56]Cook and Hanford stand for the proposition that, rather than preempting

16  state law standards of care, the language of the 1998 Price-Anderson Amendments
    Act supports the conclusion that state law standards of care should be applied.

17  The Price-Anderson Amendments Act granted federal courts exclusive jurisdiction
    over nuclear claims and changed and extended the compensation scheme, e.g.

18  indemnification.  The Price-Anderson Amendments Act requires that the
    substantive rules of decision to be applied by the courts "shall be derived from the

19  law of the state in which the nuclear incident involved occurs, unless such law is

20  inconsistent with the provisions of" Section 2210 of the Act. 42 U.S.C § 2014(hh).
    Relying on this language, both Cook and Hanford held that only section 2210,

21  which governs indemnification for plant operators, abrogation of certain defenses

22  in public liability actions, and limitations on aggregate liability, preempts state
    law.

23    Cook and Hanford also cite to Silkwood, 464 U.S. 238, to support their

24  finding that the field of nuclear safety has not been completely preempted.
    However, the circuit courts have properly distinguished the holding in Silkwood

25  as a pre-1988 Amendments case that involved a diversity tort action governed by

26

27                    92

28

1    However, as the circuit courts aptly point out, a comprehensive

2  federal nuclear regulatory framework clearly exists which completely preempts

3  the field of nuclear safety. "The federal statutory scheme limits the liability of

4  operators of nuclear power facilities and provides for indemnification but does so

5  against a stringent regulatory background." Roberts, 146 F.3d at 1308. Thus, "any

6  state duty would infringe upon pervasive federal regulation in the field of nuclear

7  safety, and thus would conflict with federal law." TMI, 940 F.2d at 859;

8  O'Conner, 13 F.3d at 1105 ("[I]mposing a standard of care other than the federal

9  regulations would disturb the carefully crafted balance between private

10  involvement and safety that Congress has achieved.").

11    It is clear that the safety of nuclear technology and the regulations

12  that govern the industry are the exclusive business of the federal government.

13  Pacific Gas, 461 U.S. at 208. Because this Court refuses to read sections 2014(hh)

14  and 2210 (which preempts the state standards of care) out of context of the

15  regulatory framework, any state law rule of decision which is inconsistent with

16  this statutory and regulatory framework has no force. Thus, this Court determines

17  that strict liability is inconsistent with the Price-Anderson Act and is unavailable

18  to Plaintiffs.

19  ———————————————

20  Oklahoma law. Additionally, Silkwood involved punitive damages, and thus, it
    was based on the Courts conclusion that an award of punitive damages would not
21  impede Congress goal of promoting nuclear safety. TMI, 940 F.2d at 859. With
22  regards to standard of care, it would impede Congress's goal of promoting nuclear
    safety in that a person who follows all regulations can still be held strictly liable.
23  Moreover, the plaintiff in Silkwood was exposed to radiation that was two and a
24  half times the amount allowed by federal regulations, and thus, the district court
    never needed to address the standard of care issue.  Silkwood v. Kerr-McGee
25  Corp., 485 F. Supp. 566, 583 (W.D. Okla. 1979).

26
                                                93
27

28

1       This Court does not need to consider whether nuclear activity is

2   ultrahazardous because it cannot be applied under the Price-Anderson Act.

3           2)    Use of reclaimed water to cool rocket engine test

4                     stands is not an ultrahazardous activity.

5       Courts generally apply six factors when deciding whether a

6   particular activity is ultrahazardous: "(a) existence of a high degree of risk of

7   some harm to the person, land or chattels of others; (b) likelihood that the harm

8   that results from it will be great; (c) inability to eliminate the risk by the exercise

9   of reasonable care; (d) extent to which the activity is not a matter of common

10   usage; (e) inappropriateness of the activity to the place where it is carried on; and

11   (f) extent to which its value to the community is outweighed by its dangerous

12   attributes." Restatement (Second) of Torts § 520; SFK Farms v. Superior Court,

13   153 Cal. App. 3d 902 (1984). Risks associated with the use, storage and/or

14   disposal of industrial solvent such as TCE and PCE can be avoided through the

15   exercise of reasonable care. Schwartzman, Inc. v. Gen. Elec. Co., 848 F. Supp.

16   942, 945 (D.N.M. 1993), In re Burbank Envt'l Litig., 42 F. Supp. 2d 976, 983

17   (C.D. Cal. 1998) ("While there is a high risk of harm of disposing of chemicals in

18   the ground near a highly populated area, the act of using solvents to clean metal

19   parts in an industrial site was not an unltrahazardous activity. Many industries use

20   or have used TCE, PCE and hexavelent chromium, including other industrial

21   plants and dry cleaners. These chemicals are used widely as solvents. It is not the

22   use of these chemicals that is likely to cause harm. Rather, it is Lockheed's

23   alleged behavior in using and disposing the chemicals that created hazards.").

24   Similarly, risks associated with the use and disposal of reclaimed water can be

25   avoided through the exercise of reasonable care.  Moreover, with respect to the

26

27                             94

28

1    last factor, Defendants' facilities employed numerous workers and created rockets

2    essential for the national defense and space exploration culminating in the Apollo

3    moon landings.

4            A balance of the above factors weighs strongly in favor of finding

5    the use of reclaimed water to cool rocket stands is not an ultrahazardous activity.

6    Accordingly, Plaintiffs are not entitled to summary adjudication as to this issue.

7            In light of the foregoing, Plaintiffs' Motion Re Ultrahazardous

8    Activity is denied in its entirety.[57]

9

10

11

12

13

14

15

16

17

18

19

20

21

22
_____

23    [57] The Court notes that, with respect to Plaintiffs' burn pit claims, the Court
     has already determined in its August 8, 2005 Order that such claims cannot
24    succeed as a matter of law.  (August 8, 2005 Order, section dealing with Motion
     Re Burn Pit).  Therefore, Plaintiffs' contentions that the alleged burn pit activities
25    constitute ultrahazardous activities is moot.

26                                        95

27

28

**III.   Conclusion**

Accordingly, this Court:

(1)   **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion for Summary Adjudication on TCE Claims;

(2)   **DENIES** Defendants' Motion for Summary Adjudication Regarding Dioxins;

(3)   **GRANTS** Defendants' Motion for Summary Adjudication Re Applicable Duty of Care for Radiological Claims; and

(4)   **DENIES** Plaintiffs' Motion for Summary Adjudication of Strict Liability for Ultrahazardous Activities.

IT IS SO ORDERED.

DATED:   AUG 1 8 2005

**DICKRAN TEVRIZIAN**

Dickran Tevrizian, Judge
United States District Court

96