**EXHIBIT 5**

SHORT FORM ORDER

INDEX No. 96-2836

## SUPREME COURT - STATE OF NEW YORK
### I.A.S. PART 32 - SUFFOLK COUNTY

**PRESENT:**

Hon. __MARY M. WERNER__
Justice of the Supreme Court

MOTION DATE __10/3/03__
ADJ. DATE __3/10/05__
Mot. Seq. # 006 - MD
          # 007 - MG; CASEDISP

---------------------------------------------------------------X
BARBARA OSARCZUK, JOHN OSARCZUK,
HELGA A. DEMPSEY, GARY OSARCZUK,
DOROTHY OSARCZUK, CAROL ANGELORA,
WILLIAM FERGUSON, DEBORAH FERGUSON,
JAMES ANDREJKOVIC, JOAN WEISNER,
MICHAEL MIESEMER, BARBARA MIESEMER,
VINCENT SCAVONE, ROBERT O'GARA, JEAN
O'GARA, PAULINE MODICA, individually and
on behalf of all others similarly situated,

                      Plaintiffs,

    - against -

ASSOCIATED UNIVERSITIES, INC., commonly
known as BROOKHAVEN NATIONAL
LABORATORY,

                      Defendant.
---------------------------------------------------------------X

ALLEN & LIPPES
Attorneys for Plaintiffs
1260 Delaware Avenue
Buffalo, New York 14209


NIXON PEABODY, LLP
Attorneys for Defendant
990 Stewart Avenue
Garden City, New York 11530-4838

Upon the following papers numbered 1 to __121__ read on these motions <u>for class certification and for summary judgment</u>; Notice of Motion/ Order to Show Cause and supporting papers __1 - 40__; Notice of Motion and supporting papers __41 - 72__; Answering Affidavits and supporting papers __73-77; 78-106__; Replying Affidavits and supporting papers __107-113; 114-115__; Other __116; 117-121 (sur-reply)__; ~~(and after hearing counsel in support and opposed to the motion)~~ it is,

**ORDERED** that the motion by plaintiff for an order pursuant to CPLR 901 and 906 directing that the matter proceed as a class action, is denied; and it is further

**ORDERED** that the motion by defendant for an order pursuant to CPLR 3212 granting summary judgment dismissing the complaint, is granted.

Osarczuk v Associated Universities, Inc.
Index No. 96-2836
Page 2

Plaintiffs, all presently or formerly living or working within a ten-mile radius of Brookhaven National Laboratory (BNL), commenced this action to recover damages for personal injury and property damage alleged to be the result of various toxic emissions into their air, soil, and groundwater from BNL. Among the alleged contaminating substances are trichloroethane, tritium, strontium-90, uranium, argon-41, and cesium-137. Among the harms alleged are cancer, nausea, headaches, immunological problems; loss of use and enjoyment of property and businesses; and psychological and emotional problems associated with fear of these health problems. Plaintiffs' causes of action sound in negligence; abnormally dangerous activity; gross negligence; and private nuisance. Plaintiffs seek injunctive relief, medical monitoring, and punitive damages; and seek class certification in their instant motion.

Defendant's prior motion seeking to dismiss the action pursuant to CPLR 3211 was denied by order dated September 4, 1996 (J. Berler). Justice Berler determined that plaintiffs had sufficiently stated their causes of action and that claims for "stigma" damages were timely as measured from the date that the Department of Energy offered public water hookups to certain residents south of BNL. Defendant now moves for summary judgment arguing that the Price-Anderson Act preempts any tort claims brought in state court; that exclusive jurisdiction is vested in the federal court pursuant to the Price-Anderson Act; and that, even if considered under Price-Anderson, plaintiffs have not sufficiently alleged their causes of action or alleged that they were exposed to levels of radioactive substances in excess of the federally mandated levels.

## History of Associated Universities and Brookhaven National Laboratory

Associated Universities, founded by Harvard, Yale, Columbia, Cornell, Princeton, MIT, Rochester University, Johns Hopkins, and the University of Pennsylvania, was incorporated as a private, non-stock, educational and research institution under the laws of the state of New York, in 1946. It was formed to acquire, plan, construct, and operate laboratories and other facilities, either under contract with the Government of the Untied States or its agencies or otherwise, for research, development and education in the physical and biological sciences, including all aspects of the field of nuclear energy and its engineering and other applications (*Heinrich v Sweet,* 62 F Supp2d 282, 291 [1999], *affd* 308 F3d 48, 2002 [1st Cir 2002], *cert denied*, 539 U.S. 914 [2003]). In 1947, Associated Universities entered into a contract with the United States to administer Brookhaven National Laboratory (Brookhaven), a 5,625-acre facility owned by the United States and located in Upton, to conduct studies, experimental investigations and tests, "including the conduct of research and development in the atomic and related fields described in Section 3 of the Atomic Energy Act . . ." (*Id.*; 42 USC § 2011).[1] The Atomic Energy Commission's mandate under the Atomic Energy Act was to exercise its powers to insure the continued conduct of research and development activities by private or public institutions. The Commission was to conduct research in a manner which "shall contain such provisions to protect health, to minimize danger from explosion and other hazards to life or property, and to require the reporting and to permit the inspection of work performed thereunder, as the Commission may determine . . ." (*Id.*).

Functioning as an independent contractor, Associated Universities operated and managed

---

[1] Apparently, AUI was succeeded by Brookhaven Science Associates in 1998.

Osarczuk v Associated Universities, Inc.
Index No. 96-2836
Page 3

Brookhaven, including nearly 3,000 scientists[2] employed in the areas of high-energy and nuclear physics, physics and chemistry of materials, environmental and energy research, neurosciences and medical imaging, and structural biology, as well as 4,000 guest researchers annually. The director of Brookhaven was an employee of Associated Universities and reported to the Board of Trustees of the Commission. Associated Universities received a management fee plus costs and expenses for work under the contract; all rights to intellectual property and data were the sole property of the U.S., and the Commission determined which research results would be published for public dissemination and which would remain classified (*Heinrich v Sweet*, *supra* at 292).

The Commission retained oversight of the operation and conduct of Brookhaven, as a matter of legal necessity mandated by the Atomic Energy Act, through funding review. This intertwined relationship between the Commission and its contractors was reflected in an agreement in which the Commission agreed to indemnify Associated Universities for all liability awards issued against it, barring bad faith or willful misconduct (*Id*. at 293, defendant's exhibit C).

Price- Anderson Act, 42 USC §§ 2011- 2097

The Price-Anderson Act was originally adopted in 1957 to foster the commercial development of nuclear energy by establishing a public-private insurance pool and indemnification provision to cover potential damages resulting from nuclear accidents (***Duke Power Co. v Carolina Env. Study Group, Inc.***, 438 US 59, 63-65, 98 S Ct 2620 [1978]). "The Act required private nuclear power operators to obtain an amount of liability insurance available from private sources . . . and provided a supplementary federal indemnity guarantee of $500 million" (***Smith v General Elec. Co.***, 938 F Supp 70, 73 [1996]). The U.S. Supreme Court has concluded that "the safety of nuclear technology [is] the exclusive business of the Federal Government ...." (***Pacific Gas & Electric Co. v State Energy Resources Conservation & Development Commission***, 461 US 190, 208, 103 S Ct 1713, 1724 [1983]). This holding was reaffirmed one term later in ***Silkwood v Kerr-McGee Corp.***, 464 US 238, 104 S Ct 615 [1984], in which the court held that "states are precluded from regulating the safety aspects of nuclear power" (*Id.* at 240-41). Also in ***Silkwood v Kerr-McGee Corp.***, *Id.*, the Supreme Court determined that a punitive damages award under Oklahoma state law for injuries resulting from nuclear radiation contamination was not preempted by the Act. Largely in response to ***Silkwood,*** in 1988 Congress amended the Price-Andersen Act for the third time to declare a "public liability action" to be a federal cause of action falling under the original and removal jurisdiction of the federal district court, 42 U.S.C. § 2210(n)(2), and to disallow punitive damages.

The three pertinent 1988 amendments provide:

> **42 USC § 2014(q)** defines "nuclear incident," briefly, as encompassing any occurrence, including an extraordinary nuclear occurrence, within the United States causing, within or without the United States, bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or

---

[2] Defendant offers that four Brookhaven scientists have been awarded Nobel Prizes in physics.

by-product material

**42 USC § 2014 (hh)** defines the term "public liability action," briefly, as any suit arising under § 2210 and provides that the substantive rules for such decisions "shall be derived from the law of the State in which the nuclear incident occurs," "unless such law is inconsistent with the provisions of such section."

**42 USC § 2210(n)(2)** provides, briefly, that in any public liability action arising out of or resulting from a nuclear incident, the United States district court in the district where the nuclear incident takes place, shall have original jurisdiction. In any action that is or becomes removable pursuant to this paragraph, a petition for removal shall be filed within the period provided in 28 USC §1446.

Following these 1988 amendments, four Courts of Appeals have held that the Act preempts state law claims that arise out of a "nuclear incident," as defined in the Act (*see*, ***Roberts v Florida Power & Light Co.***, 146 F3d 1305 [11th Cir 1998], *cert denied* 525 US 1139 [1999]; ***Nieman v NLO, Inc.,*** 108 F3d 1546, 1553 [6th Cir 1997], holding that a plaintiff "can sue under the Price-Anderson Act, as amended, or not at all" (***O'Conner v Commonwealth Edison Co.,*** 13 F3d 1090, 1105, 1099-1100 [7th Cir.], *cert denied*, 512 US 1232 [1994], noting that "a state cause of action is not merely transferred to federal court; instead, a new federal cause of action supplants the prior state cause of action"; ***In re TMI II***, 940 F2d 832, 854 [3d Cir 1991], holding that "Congress clearly intended to supplant all possible state causes of action when the factual prerequisite of the statute are met").

In ***El Paso Natural Gas Co. v Neztsosie*** (526 US 473, 119 S Ct 1430 [1999]), the Supreme Court held that "[b]y its unusual preemption provision, 42 U.S.C. § 2014(hh), the Price-Anderson Act transforms into a federal action,". . . "any public liability action arising out of or resulting from a nuclear" incident. At § 2210(n)(2) the Act not only gives a district court original jurisdiction over such a claim but provides for removal to a federal court as of right if a putative Price-Anderson action is brought in a state court. "Congress thus expressed an unmistakable preference for a federal forum, *at the behest of the defending party*, both for litigating a Price-Anderson claim on the merits and for determining whether a claim falls under Price-Anderson . . " (*Id.* at 484, emphasis added).

The court went on to reason that the statute, at 42 U.S.C. § 2014(hh), was one of "complete pre-emption," wherein a public liability action becomes a federal action, but one decided under substantive state law rules of decision that do not conflict with the Price-Anderson Act (*Id.*, footnote 6 at 485, citing to ***Caterpillar Inc. v Williams***, 482 US 386, 393, 107 S Ct 2425 [1987], under which "the pre-emptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule' "). Moreover, the Act provides clear indications of the congressional aims of speed and efficiency. Section 2210(n)(3)(A) empowers the chief judge of a district court to appoint a special caseload management panel to oversee cases arising from a nuclear incident. The functions of such panels include consolidation of claims, §2210(n)(3)(C)(I); setting of priorities, §2210(n)(3)(C)(ii); assignment to judge or special master, §2210(n)(3)(C)(iii) "promulgat[ion of] special rules of court . . . to expedite cases or allow more equitable consideration of claims," §2210(n)(3)(C)(v); and implementation of such measures "as will encourage the equitable, prompt, and efficient resolution of cases arising out of the nuclear incident,"

Osarczuk v Associated Universities, Inc.
Index No. 96-2836
Page 5

§2210(n)(3)(C)(vi).

Here, defendant never sought removal of the action to the district court even though it now argues that plaintiffs' action clearly states claims within the purview of a Price-Anderson "public liability action." Notwithstanding defendant's failure to exercise its right to remove the matter to the federal court and therefore avail itself of the discovery and case management procedure provided by Congress in §2210(n)(3), the court is unpersuaded by plaintiffs' argument that this court is without jurisdiction to entertain the motion for summary judgment. Likewise, the court finds unavailing plaintiffs' argument that a claim of latches is a bar to defendant's Price-Anderson defense.

Defendant argues that plaintiffs' failure to state a claim under Price Anderson requires dismissal of the complaint and, moreover, even if plaintiffs' action was properly commenced as a Price-Anderson action, it is entitled to summary judgment dismissing the complaint because plaintiffs have failed to allege exposure in excess of the applicable federal limits, notwithstanding their extensive discovery, including expert disclosure, sought in conjunction with class certification.

Duty of care owed to plaintiffs

As previously stated, the U.S .Supreme Court has concluded that "the safety of nuclear technology [is] the exclusive business of the Federal Government ...." (*Pacific Gas & Electric Co. v State Energy Resources Conservation & Development Commission, supra*) and that "states are precluded from regulating the safety aspects of nuclear power" (*Silkwood v Kerr-McGee Corp., supra* at 240-41). Therefore, "state regulation of nuclear safety, through either legislation or negligence actions, is preempted by federal law" and "federal regulations must provide the sole measure of the defendants' duty in a public liability cause of action" (*O'Conner v Commonwealth Edison Co., supra; see also, Nieman v NLO, Inc., supra*). This is because "any state duty would infringe upon pervasive federal regulation in the field of nuclear safety, and thus would conflict with federal law" (*TMI II, supra* at 859). "Moreover, the federal statutory scheme limits the liability of operators of nuclear facilities and provides for indemnification but does so against a stringent regulatory background" (*Roberts v Florida Power & Light Co., supra* 1308). Therefore, "imposing a standard of care other than the federal regulations would disturb the carefully crafted balance between private involvement and safety that Congress has achieved" (*O'Conner v Commonwealth Edison Co., supra* at 1105). Since, "federal safety regulations conclusively establish the duty of care owed in a public liability action" (*Roberts v Florida Power & Light Co., supra* at1308; *see also, TMI III*, 67 F3d 1119 [1995]; 10 CFR Part 20), a failure to allege an exposure "in excess of the maximum permissible amount allowed by federal regulation" is fatal to plaintiffs' causes of action for negligence and strict liability (*Id.* citing to *McLellan v Mississippi Power & Light Co.*, 545 F2d 919 [5th Cir 1977]; *Lokos v Detroit Edison,* 67 F Supp2d 740 [1999]).[3] Further, only those regulations applicable at the time of the alleged nuclear incident are applicable (*see, Corcoran v New York Power Authority*, 935 F Supp 376, 388 [1999], *affd* 202 F3d 530 [1999], *cert denied* 529 US 1109 [2000]; ***Bohrmann v Maine Yankee Atomic Power***

---

[3] The court notes that *In re Hanford Nuclear Reservation Litigation,* 350 F.Supp2d 871 [2004] and *Cook v Rockwell International Corp. & Dow Chemical Co.,* 273 F.Supp2d 1175 [2003], do not agree, and declines to follow as to plaintiffs' negligence and strict liability claims (*see also, Smith v Carbide & Chemicals Corp.*, 298 F.Supp2d 561, 571 [2004], which also declines to follow *Hanford* and *Cook*).

Osarczuk v Associated Universities, Inc.
Index No. 96-2836
Page 6

***Company,*** 926 F Supp 211, 218-220 [1996]).

Here, the Report to The Suffolk County Legislature from the Brookhaven National Laboratory Environmental Task Force (utilized by both plaintiffs and defendant) states at section 4.7 that the limits on the concentration of radioactive materials that can be released into the environment as provided by New York State statute (DEC regulations and DOH regulations) are the same as "set nationally by the Nuclear Regulatory Commission (NRC)." The report found that in estimating the radiation dose due to the radioactive contamination of well water by water flow from BNL, only the dose from the intake of tritium needed to be considered, as the other contaminants were negligible or were not traceable to BNL.[4] It also concluded, at section 3.6, that the tritium plume was at a depth well below the level for private wells. "Thus, it is expected that the private wells in North Shirley have not been affected by the plumes and that no radiation exposure resulted from drinking the water from these wells." The report concluded, at section 8.1, that the projected potential doses to the maximally exposed individual from air releases fell into three distinct periods. For the period ending in 1969 the doses were in the range of 100-200 mrem/year; the period ending in 1984 the range was 1-10 mrem/year, and the third period the dose was less than 1 mrem/year. All three levels were below the federal limits for the relevant time frame. Plaintiffs' own expert does not dispute that the levels did not exceed the federal limits.[5] Moreover, as to doses off-site of BNL due to water release pathways and direct exposures, the report concluded that "*the off-site radiation doses from all pathways have always been within the applicable regulatory limits*" (emphasis added). Accordingly, since there is no dispute that the release of radioactive materials (radionuclides) never exceeded federal limits (10 CFR 20.1301), plaintiffs' causes of action sounding in negligence and strict liability (here "count two" as to defendant's conduct in an abnormally dangerous activity) are dismissed (*see*, ***Bohrmann v Maine Yankee Atomic Power Company***, *supra* at 220, finding that strict liability is inconsistent with federal regulatory scheme in that plaintiff would have to first establish defendant breached a federally imposed standard of care). Likewise, the claims as to emotional damages based upon the fear of health problems related to the emissions are also dismissed, as well as any claim for medical monitoring (***Berg v E.I. Dupont De Nemores & Co.,*** 293 F3d 1127 [9th Cir 2002], holding that physical harm is a jurisdictional prerequisite pursuant to 42 USC §2014[q]).[6]

Plaintiffs' remaining claim is for a private and continuing nuisance (count four). In a case similar to the case a bar, ***Smith v Carbide & Chemicals Corp.*** (298 F Supp2d 561 [2004]), plaintiffs sought damages for the alleged diminution in the market value of their properties due to alleged soil and groundwater contamination due defendant's releases of radioactive substances. Plaintiffs there argued that the groundwater and soil contamination constituted, among other claims, an intentional trespass and a permanent private nuisance which substantially and unreasonably interfered with the use and enjoyment of their property. The District Court in Kentucky found that the action stated claims which

---

[4] Therefore, no other contaminants need be addressed.

[5] Plaintiffs' expert, Douglas Crawford-Brown, Ph.D., does not dispute the data but concludes that the risk from radionuclide exposure is exasperated when combined with chemical exposures such as trichlorethane.

[6] *See also*, ***Acuna v Brown & Root, Inc.***, 200 F3d 335 [5th Cir 2000], which held that plaintiffs would need information regarding the nature of injuries and circumstances of exposure.

were preempted by Price Anderson, and granted summary judgment dismissing plaintiffs' negligence[7] cause of action. The court also found that Kentucky law would still provide the substantive rules for deciding plaintiffs' claims for trespass and nuisance, so long as such law was not inconsistent with §2014(hh). Here, the court likewise finds that plaintiffs' claims of private nuisance are not inconsistent with §2014(hh), but only to the extent that the private nuisance is intentional[8], and that the court may look to applicable New York law. "Federal safety standards have no bearing on a defendant's liability for its intentional acts" (***Bohrmann v Maine Yankee Atomic Power Company***, *supra* at 221).

Private Nuisance



"A private nuisance threatens one person or a relatively few, an essential feature being an interference with the use or enjoyment of land. It is actionable by the individual person or persons whose rights have been disturbed" (***Copart Indus. v Consolidated Edison Co.***, 41 NY2d 564, 568, 394 NYS2d 169 [1977]). To be subject to liability for a private nuisance, the plaintiff must establish that the defendant's conduct was the legal cause of the invasion of the interest in the private use and enjoyment of land and that such invasion is (1) intentional and unreasonable, (2) negligent or reckless, or (3) actionable under the rules governing liability for abnormally dangerous conditions or activities (*Id.* at 569).

The elements of a private nuisance cause of action, premised on an intentional and unreasonable invasion, are: "(1) an interference substantial in nature, (2) intentional in origin, (3) unreasonable in character, (4) with a person's property right to use and enjoy land, (5) caused by another's conduct in acting or failure to act" (*Id.* at 570). In particular, an invasion of another's interest in the use and enjoyment of land is "intentional in origin" "when the actor (a) acts for the purpose of causing it; or (b) knows that it is resulting or is substantially certain to result from his conduct" (*Id.* at 571; ***Scribner v Summers***, 138 F3d 471 [2d Cir 1998]). Therefore, those plaintiffs without a property interest cannot assert a claim for nuisance, i.e. Florence Carrano, who sold her property in 1989, and the Osarczuk children, who do not own the property (***Dixon v New York Trap Rock Corp.***, 293 NY 509 [1944]; PJI 3:16).

A brief review of the plaintiffs' bills of particulars evinced the following allegations as to their claims of nuisance: interference with the use and enjoyment of property; reduced property value; inability to use property in usual manner, such as gardening or sports; inability to refinance in 1996 and 1997 (although this plaintiff was able to refinance in 1999); inability to sell home (one plaintiff in 1996; another household did not state any date); sale of home at a depressed price (one plaintiff in 1997); fear of becoming ill; cost of purchasing bottled water; lost wages due to cancer and lost wages due to caring for ill spouse. The plaintiffs responding to the question about the nuisance cause of action stated a general response about being unable to use their property in the usual manner due to contamination and fear of health risks or disease. As to depressed values, plaintiffs have

---

[7] Apparently, plaintiffs did not oppose dismissal of their negligence cause of action (p564, footnote #1).

[8] As held in ***Carey v Kerr-McGee Chem. Corp.***, 60 F.Supp2d 800 (1999), this court finds that the federal levels of exposure must be exceeded for all claims based upon negligence, including nuisance.

Osarczuk v Associated Universities, Inc.
Index No. 96-2836
Page 8

submitted an expert affidavit as to real estate values in the subject area. Their expert states that, by examination of closing data and tax maps, he could ascertain an area of 1.5 miles[9] from "the [underground] chemical leak" in which property values had an average decrease of 7.6 % and did not experience a growth in value (as opposed to 16 % in the control area), thereby losing 24% in value from 1996 to mid-1998. He offers that approximately one thousand homes in this 1.5-mile area were adversely affected.

It is well settled that discomfort and inconvenience caused by the disturbance of property are valid grounds for recovery in an action for nuisance (*see, Dixon v New York Trap Rock Corp.*, 293 NY 509, 514 [1944]). However, "[t]o constitute a nuisance, the use must be such as to produce a tangible and appreciable injury to neighboring property or such as to render its enjoyment specially uncomfortable or inconvenient" (*Campbell v Seaman*, 63 NY 568, 577 [1876]). "But not every intrusion will constitute a nuisance" (*Nussbaum v Lacopo*, 27 NY2d 311, 315, 317 NYS2d 347 [1970]). The disturbances to plaintiff must not be "fanciful, slight or theoretical, but certain and substantial, and must interfere with the physical comfort of the ordinary reasonable person" (*Dugway, Ltd. v Fizzinoglia*, 166 AD2d 836, 837, 563 NYS2d 175 [1990]).

As previously stated, the task force report (*see above*) found at section 8.1 that "the off-site radiation doses for all pathways have always been within the applicable regulatory limits." The on-site contamination, although certainly disconcerting, is not germane to plaintiffs' nuisance claim and needs not be addressed here. As to the underground water plume, the task force report (*see above*) discussion 3.6 states:

> Monitoring wells have shown that tritium has migrated into populated areas in North Shirley south of the BNL site in a number of plumes. The contamination in these plumes, however, is found at a depth well below the level at which water is drawn by household wells. Thus, it is expected that the private wells in North Shirley have not been affected by the plumes and that no radiation exposure resulted from drinking the water from these wells.

Therefore, plaintiffs' private wells were never contaminated, and their claims relative to their wells cannot be sustained (*Nalley v General Electric Company*, 165 Misc2d 803, 630 NYS2d 452 [1995]). Further, any alleged air or soil exposure was, at all times, within the limits set by state and federal regulations. Therefore, the court concludes that any exposure could not be characterized as intentional or unreasonable and could only be based upon a theory of negligence, which the Court finds specifically preempted by Price Anderson (§2014[hh]). Accordingly, defendant met its initial burden by establishing a prima facie entitlement to summary judgment as a matter of law, and it became plaintiffs' burden to submit admissible evidence demonstrating a triable issue of fact (*see, Alvarez v Prospect Hosp.*, 68 NY2d 320, 508 NYS2d 923 [1986]; *Zuckerman v City of New York*, 49 NY2d 557, 427 NYS2d 595 [1980]).

While there was a plethora of negative publicity which accompanied the study of BNL, including

---

[9] Not the ten miles alleged in the complaint.

Osarczuk v Associated Universities, Inc.
Index No. 96-2836
Page 9

the connections to public water paid for by the DOE, plaintiffs' claims regarding the diminution in property values are not traceable to contamination of their property which violated any federal or state regulations (*see,* ***Halliday v Norton Co.,*** 265 AD2d 614, 617, 696 NYS2d 549 [1999], *appl denied/dismissed* 94 NY2d 894, 706 NYS2d 696 [2000]); ***Mehlenbacher v Akzo Nobel Salt, Inc.,*** 71 F.Supp2d 179 [1999]), and, therefore, cannot form the basis for claims for intentional or unreasonable nuisance (***Smith v Carbide & Chemicals Corp,*** *supra;* ***Little Joseph Realty, Inc. v Babylon,*** 41 NY2d 738, 745, 395 NYS2d 428 [1977]). Moreover, the negative publicity and alleged concomitant diminution in value, standing alone, are insufficient to defeat defendant's motion for summary judgment (***Borenkind v Consolidated Edison,*** 164 Misc2d 808, 810, 626 NYS2d 414 [1995]; ***Smith v Carbide & Chemicals Corp,*** *supra; compare,* ***Criscuola v Power Authority,*** 81 NY2d 649, 602 NYS2d 588 [1993], where public fears accompanied by a diminution in value could be considered in an eminent domain compensation case).

Accordingly, plaintiffs' remaining cause of action is dismissed and plaintiffs' motion for class certification is correspondingly denied.

Dated: 5/18/05

_____
J.S.C.

__X__ FINAL DISPOSITION    ____ NON-FINAL DISPOSITION