# EXHIBIT 1

2003 WL 21738305
--- F.Supp.2d ---
(Cite as: 2003 WL 21738305 (D.Colo.))
<KeyCite History>

**Page   1**

Only the Westlaw citation is currently available.

United States District Court,
D. Colorado.

**Merilyn COOK, et al., Plaintiffs,**
v.
**ROCKWELL INTERNATIONAL
CORPORATION and THE DOW
CHEMICAL COMPANY, Defendants.**

**No. CIV.A. 90-K-181.**

July 24, 2003.

Class action was brought by landowners against operators of nuclear weapon manufacturing plant, seeking to recover for damage to their property interests caused by releases of plutonium and other hazardous substances from plant. The District Court, Kane, J., held that: (1) federal nuclear safety regulations did not preempt state standards of care in Price-Anderson public liability actions, and therefore Price-Anderson Act did not require that plaintiffs prove defendants violated federal regulatory standards as an element of their tort claims; (2) Colorado law did not require that plaintiffs prove contamination on their properties posed a health risk or otherwise caused actual or substantial damage to their properties as an element of their trespass claim; (3) Colorado law did not require that plaintiffs prove contamination on their properties posed an actual or verifiable health risk as an element of their private nuisance claim; (4) a facility does not constitute a nuisance solely because its proximity to neighboring properties causes their value to decline, but may be a nuisance if actions at the facility result in a substantial and unreasonable interference with the use and enjoyment of neighboring properties; and (5) decrease in the value of land caused by a continuing tortious invasion of land was to be measured at the time when the injurious situation became complete and comparatively enduring.

Order in accordance with opinion.

**[1] States ⟨⟩ 18.11**

360k18.11

Ultimate touchstone of any preemption analysis is whether Congress intended federal law to preempt state law. U.S.C.A. Const. Art. 6, cl. 2.

**[2] States ⟨⟩ 18.11**
360k18.11

Congress' intent to preempt state law may be explicitly stated in the statute's language or implicitly contained in its structure and purpose; other relevant considerations are the structure and purpose of the statute encompassing the preemption provision as revealed not only in the text but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law. U.S.C.A. Const. Art. 6, cl. 2.

**[3] States ⟨⟩ 18.5**
360k18.5

**[3] States ⟨⟩ 18.7**
360k18.7

Congress' intent to preempt state law may be implied (1) where the state law regulates conduct in a field that Congress intended the Federal Government to occupy exclusively (field preemption), and (2) where state law actually conflicts with federal law (conflict preemption) either because it is impossible for a private party to comply with both state and federal requirements or state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. U.S.C.A. Const. Art. 6, cl. 2.

**[4] Nuisance ⟨⟩ 41**
279k41

Federal nuclear safety regulations did not

Copr. ® West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 21738305
(Cite as: 2003 WL 21738305 (D.Colo.))

Page   2

preempt state standards of care in Price-Anderson public liability actions; thus, Price-Anderson Act did not require that landowners prove that operators of nuclear weapon manufacturing plant violated federal regulatory standards as an element of their trespass and nuisance claims. U.S.C.A. Const. Art. 6, cl. 2; Atomic Energy Act of 1954, § 11(hh), 42 U.S.C.A. § 2014(hh).

[4] States ⬡ 18.15
360k18.15

Federal nuclear safety regulations did not preempt state standards of care in Price-Anderson public liability actions; thus, Price-Anderson Act did not require that landowners prove that operators of nuclear weapon manufacturing plant violated federal regulatory standards as an element of their trespass and nuisance claims. U.S.C.A. Const. Art. 6, cl. 2; Atomic Energy Act of 1954, § 11(hh), 42 U.S.C.A. § 2014(hh).

[4] Trespass ⬡ 16
386k16

Federal nuclear safety regulations did not preempt state standards of care in Price-Anderson public liability actions; thus, Price-Anderson Act did not require that landowners prove that operators of nuclear weapon manufacturing plant violated federal regulatory standards as an element of their trespass and nuisance claims. U.S.C.A. Const. Art. 6, cl. 2; Atomic Energy Act of 1954, § 11(hh), 42 U.S.C.A. § 2014(hh).

[5] Electricity ⬡ 8.7(2)
145k8.7(2)

Federal government completely occupies the field of nuclear safety regulation and has thereby preempted states from enforcing their own nuclear safety regulations. Atomic Energy Act of 1954, § 170, 42 U.S.C.A. § 2210.

[5] States ⬡ 18.73
360k18.73

Federal government completely occupies the field of nuclear safety regulation and has

thereby preempted states from enforcing their own nuclear safety regulations. Atomic Energy Act of 1954, § 170, 42 U.S.C.A. § 2210.

[6] Federal Courts ⬡ 191
170Bk191

Article III "arising under" jurisdiction is distinct from and broader than statutory "arising under" jurisdiction pursuant to statute granting district courts general federal question jurisdiction over any case that "arises under" the laws of the United States. U.S.C.A. Const. Art. 3, § 2; 28 U.S.C. § 1331.

[7] Federal Courts ⬡ 191
170Bk191

Article III "arising under" jurisdiction exists where every action said to arise under a federal statute necessarily involves application of a body of federal substantive law. U.S.C.A. Const. Art. 3, § 2.

[8] Federal Courts ⬡ 192
170Bk192

Price-Anderson's conferral of federal jurisdiction on public liability actions arising from source, special nuclear and byproduct materials is not a "pure jurisdictional statute," but rather is part of the entire federal program, "arising under the Laws of the United States," for controlling and managing these materials and their risks. U.S.C.A. Const. Art. 3, § 2; Atomic Energy Act of 1954, § 11(hh), 42 U.S.C.A. § 2014(hh).

[9] Trespass ⬡ 1
386k1

Elements of the tort of trespass under Colorado law are a physical intrusion upon property of another without the proper permission from the person legally entitled to possession of that property.

[10] Trespass ⬡ 14
386k14

[10] Trespass ⬡ 47
386k47

Copr. ® West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 21738305
(Cite as: 2003 WL 21738305 (D.Colo.))

Page   3

Under Colorado law, proof that the trespassory invasion caused actual damages is not required to establish liability, and plaintiff is always entitled to recover at least nominal damages.

**[11] Trespass ☞ 12**
386k12

**[11] Trespass ☞ 14**
386k14

Migration and presence of plutonium and other hazardous substances upon plaintiffs' properties, which were near former nuclear weapon manufacturing plant, constituted a physical invasion that was actionable under Colorado trespass law; thus, plaintiffs were not required to demonstrate that plutonium and other plant-derived contaminants were present on their properties at levels of toxicological concern or were otherwise causing damage to their properties in order to prevail on their trespass claim.

**[12] Nuisance ☞ 2**
279k2

**[12] Nuisance ☞ 4**
279k4

To establish liability for private nuisance under Colorado law, a plaintiff must prove the defendant engaged in an intentional, negligent, or unreasonably dangerous activity resulting in the unreasonable and substantial interference with plaintiff's use and enjoyment of her property.

**[13] Nuisance ☞ 4**
279k4

Owners of properties near former nuclear weapon manufacturing plant were not required to prove an actual or verifiable health risk in order to prove that contamination from plutonium and other hazardous substances released from plant substantially interfered with the use and enjoyment of property so as to give rise to private nuisance claim under Colorado law.

**[14] Nuisance ☞ 53**
279k53

Under Colorado law, whether defendant in private nuisance action has unreasonably and substantially interfered with the plaintiff's use and enjoyment of his property is a factual question to be decided by the trier of fact; in making that determination, trier of fact must weigh the gravity of the harm and the utility of the conduct causing the harm.

**[15] Nuisance ☞ 4**
279k4

For purposes of establishing liability for private nuisance under Colorado law, whether the various factors of interference asserted by the plaintiffs as to their use and enjoyment of their property were a substantial invasion of their interests is measured by the standard of their effect upon a normal person in the same or similar circumstances.

**[16] Nuisance ☞ 4**
279k4

Under Colorado law, a threat of future harm caused by a defendant's activities may be properly considered and relied upon by a jury in private nuisance case if those circumstances cause plaintiffs fear or anxiety that substantially interferes with their use and enjoyment of property.

**[17] Nuisance ☞ 4**
279k4

Colorado law of private nuisance does not permit a finding of substantial interference with the use and enjoyment of property based solely on the existence of a neighboring facility that causes property values to diminish.

**[18] Nuisance ☞ 50(2)**
279k50(2)

In a continuing trespass and nuisance case, decrease in the value of land caused by a continuing tortious invasion of land was to be measured at the time when the injurious

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 21738305
(Cite as: 2003 WL 21738305 (D.Colo.))

Page   4

situation became complete and comparatively enduring; potential damages could not be limited to any decrease in the value of class properties immediately before and after the tortious invasion of land. Restatement (Second) of Torts § 930(3).

**[18] Trespass ⊗➡ 51**
386k51

In a continuing trespass and nuisance case, decrease in the value of land caused by a continuing tortious invasion of land was to be measured at the time when the injurious situation became complete and comparatively enduring; potential damages could not be limited to any decrease in the value of class properties immediately before and after the tortious invasion of land. Restatement (Second) of Torts § 930(3).

**[19] Nuisance ⊗➡ 49(5)**
279k49(5)

Evidence in a continuing trespass and nuisance class action that class properties had a lower value than comparable properties not in proximity to former nuclear weapon manufacturing plant, coupled with evidence of defendants' alleged contamination of those properties and mismanagement of plant, was sufficient to allow the jury to infer that diminution in the value of class properties was the result of defendants' activities and not the result solely of the proximity of those properties to the plant.

**[19] Trespass ⊗➡ 46(3)**
386k46(3)

Evidence in a continuing trespass and nuisance class action that class properties had a lower value than comparable properties not in proximity to former nuclear weapon manufacturing plant, coupled with evidence of defendants' alleged contamination of those properties and mismanagement of plant, was sufficient to allow the jury to infer that diminution in the value of class properties was the result of defendants' activities and not the result solely of the proximity of those properties to the plant.

**[20] Nuisance ⊗➡ 50(2)**
279k50(2)

In trespass and nuisance cases, Colorado law bars recovery of diminution in the market value of property, which includes compensation for prospective harm, except in cases in which the property invasion is deemed unabatable and hence permanent.

**[20] Trespass ⊗➡ 47**
386k47

In trespass and nuisance cases, Colorado law bars recovery of diminution in the market value of property, which includes compensation for prospective harm, except in cases in which the property invasion is deemed unabatable and hence permanent.

**[21] Nuisance ⊗➡ 50(2)**
279k50(2)

Continuing presence of contamination on nearby properties caused by release of plutonium and other hazardous substances from former nuclear weapon manufacturing plant was a continuing trespass and nuisance under Colorado law; thus, property owners were not barred from recovering damages based on diminution in property value. Restatement (Second) of Torts § 930(3).

**[21] Trespass ⊗➡ 50**
386k50

Continuing presence of contamination on nearby properties caused by release of plutonium and other hazardous substances from former nuclear weapon manufacturing plant was a continuing trespass and nuisance under Colorado law; thus, property owners were not barred from recovering damages based on diminution in property value. Restatement (Second) of Torts § 930(3).

**[22] Nuisance ⊗➡ 50(6)**
279k50(6)

Owners of property located near former nuclear weapon manufacturing plant could seek punitive damages on their trespass and

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 21738305
(Cite as: 2003 WL 21738305 (D.Colo.))

Page   5

nuisance claims, to the extent available under state law, with respect to occurrences, including releases of plutonium and other hazardous substances from plant, which took place before effective date of Price-Anderson Act provision barring punitive damages in any action with respect to a nuclear incident. Atomic Energy Act of 1954, § 170(s), 42 U.S.C.A. § 2210(s).

**[22] Trespass ⬯ 56**
386k56

Owners of property located near former nuclear weapon manufacturing plant could seek punitive damages on their trespass and nuisance claims, to the extent available under state law, with respect to occurrences, including releases of plutonium and other hazardous substances from plant, which took place before effective date of Price-Anderson Act provision barring punitive damages in any action with respect to a nuclear incident. Atomic Energy Act of 1954, § 170(s), 42 U.S.C.A. § 2210(s).

**[23] Federal Civil Procedure ⬯ 186**
170Ak186

Class-wide trial on damages was appropriate in property owners' class action to recover for damage to their property interests caused by releases of plutonium and other hazardous substances from nearby nuclear weapon manufacturing plant; if class-wide liability and damages were found by the jury, court would then, with the assistance of counsel, determine appropriate principles and procedures for distributing the compensatory and any exemplary damages awarded.

MEMORANDUM OPINION AND ORDER

KANE, J.

*1 This action arises from operations at the Rocky Flats Nuclear Weapons Plant ("Rocky Flats" or "Plant"), a former nuclear weapon manufacturing facility owned by the United States and once operated by Defendants Dow Chemical Company ("Dow") and Rockwell International Corporation ("Rockwell") under

government contract. Plaintiffs are individuals and businesses who own land or interests in land and/or reside near Rocky Flats. Plaintiffs, on their own behalf and as representatives of a class of others similarly situated, assert claims for trespass, private nuisance, negligence, strict liability, outrageous conduct and exemplary damages against Dow and Rockwell.

The claims arise from allegations regarding actual or threatened releases of plutonium and other hazardous substances from the Plant. Plaintiffs allege these releases have caused and continue to cause damage to Plaintiffs' and class properties and to create a risk of adverse health consequences. They seek compensatory damages relating to the properties, damages or injunctive relief to provide medical monitoring services, exemplary damages, permanent injunctive relief and attorney fees and costs.

A class has been certified as to the property-related claims, *see Cook v. Rockwell Int'l Corp.* ("*Cook IV*"), 151 F.R.D. 378 (D.Colo.1993), which is defined in part by the contours of a plutonium "plume" extending approximately six miles from the Plant based on measurements of plutonium in off-site soils. According to Plaintiffs' most recent statement, the Property Class seeks compensatory damages for diminution in the value of their properties and exemplary damages under theories of trespass, nuisance, negligence and strict liability. A separate class was initially certified with respect to Plaintiffs' request for medical monitoring services, but was later decertified. *See Cook v. Rockwell Int'l Corp.* ("*Cook VIII*"), 181 F.R.D. 473, 480 (D.Colo.1998). The Property Class claims and individual medical monitoring and other claims are bifurcated for trial, with the Property Class claims to be tried first.

In connection with certain pretrial evidentiary motions and failed efforts to prepare a stipulated pretrial order, the parties have argued and extensively briefed their disagreements regarding various elements of the Property Class claims and the issues to be tried in the first phase of this action. [FN1] As

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 21738305
(Cite as: 2003 WL 21738305, *1 (D.Colo.))

Page   6

set forth below, this memorandum opinion and order decides the issues raised by the parties and thus clarifies the scope of trial in the Property Class phase of this action.

I.   Violation of Federal Nuclear Safety Standards as an Element of Plaintiffs' Tort Claims

None dispute this is a "public liability action" arising under the Price- Anderson Act, 42 U.S.C. § 2210 ("Price-Anderson" or "Act"), because it is an action in which Plaintiffs seek to impose liability arising out of or resulting from a "nuclear incident." [FN2] *See* 42 U.S.C. § 2014(w), (hh). Section 2014(hh) of the Act directs that "the substantive rules for decision in such an action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of [the Price-Anderson Act]." 42 U.S.C. § 2014(hh). Defendants admit this statutory provision permits Plaintiffs to assert claims based on Colorado tort law in this action, but contend it nonetheless preempts the heart of these tort claims, which is imposition of a state law-based standard of care on Defendants' conduct. Preemption is required under the Act, Defendants argue, because the strict liability and negligence standards of care that would govern Plaintiffs' claims under Colorado law are inconsistent with federal nuclear safety standards for the release of plutonium in air and water. Defendants maintain, in turn, that these federal standards are part of Price-Anderson's "regulatory scheme." As a result, Defendants assert that under the Price-Anderson Act Plaintiffs must prove Defendants released plutonium in excess of federal nuclear safety standards in order to prevail on each of their otherwise state law-based tort claims.

*2 Defendants' authorities for this proposition are *In re TMI Litigation Cases Consol. II ("TMI II")*, 940 F.2d 832 (3d Cir.1991), *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090 (7th Cir.1994), and their progeny. After a careful review of these decisions, the subject statutory language and other relevant authority, however, I am persuaded that Congress did

not intend for federal regulatory standards to preempt state law standards of care in Price-Anderson public liability actions. I therefore reject Defendants' contention that Plaintiffs must prove Defendants violated federal standards as an element of their tort claims.

A. Law of Federal Preemption

[1] The law of federal preemption is founded in Congress' power to preempt state law under Article VI of the Supremacy Clause, which provides that the laws of the United States are "the supreme Law of the Land; ... any Thing in the Constitution or the Laws of any state to the Contrary notwithstanding." U.S. Const. Art. VI, cl. 2; *see United States v. Wagoner County Real Estate,* 278 F.3d 1091, 1096 (10th Cir.2002). The "ultimate touchstone" of any preemption analysis, therefore, is whether Congress intended federal law to preempt state law. *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996); *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992).

[2] "Congress' intent may be explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Cipollone,* 505 U.S. at 516 (internal quotation omitted). Congressional intent in the first instance, generally termed express preemption, is determined primarily by reference to the plain language of the clause in question, "which necessarily contains the best evidence of Congress' preemptive intent." *CSX Transp., Inc. v. Easterwood,* 507 U.S. 658, 664, 113 S.Ct. 1732, 123 L.Ed.2d 387 (1993) (quoted in *Sprietsma v. Mercury Marine,* 537 U.S. 51, 123 S.Ct. 518, 526, 154 L.Ed.2d 466 (2002) ). Other relevant considerations are the structure and purpose of the statute encompassing the preemption provision "as revealed not only in the text but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." *Medtronic,* 518 U.S. at 486.

[3] Congress' intent to preempt state law may also be implied in two situations: (1) "where

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 21738305
(Cite as: 2003 WL 21738305, *2 (D.Colo.))

Page   7

the state law regulates conduct in a field that Congress intended the Federal Government to occupy exclusively" (field preemption); and (2) where state law "actually conflicts with federal law" (conflict preemption) either because "it is impossible for a private party to comply with both state and federal requirements" or "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English v. General Electric Co.,* 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990) (internal quotation omitted); *see Sprietsma,* 123 S.Ct. at 527; *Choate v. Champion Home Builders Co.,* 222 F.3d 788, 795 (10th Cir.2000). Preemption in these instances is based on the assumption that Congress would not want state law to apply if any of these circumstances exist. *See Geier v. American Honda Motor Co.,* 529 U.S. 861, 873, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000); *see English,* 496 U.S. at 79 n. 5. This assumption may be overcome, however, by evidence that Congress was willing to tolerate continued state regulation or application of state law in circumstances in which implied preemption would otherwise be found. *See Goodyear Atomic Corp. v. Miller,* 486 U.S. 174, 186, 108 S.Ct. 1704, 100 L.Ed.2d 158 (1988) (incidental state regulation in field exclusively occupied by federal regulation not preempted because federal statute indicated Congress was willing to accept any potential conflict between federal regulation and such indirect state regulation); *Silkwood v. Kerr-McGee Corp.,* 464 U.S. 238, 256, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984) (state tort law indirectly regulating field exclusively occupied by federal regulation not preempted because relevant legislative history demonstrated Congress intended that state tort law would continue to apply in this field); *see also Geier,* 529 U.S. at 872 (Congress may enact federal law that tolerates a conflict between federal and state law that would otherwise impliedly preempt the state law).

*3 Given these standards and authority, the question presented by Defendants' contention regarding the applicable duty of care in this action is whether Congress expressly or impliedly intended to preempt state tort law

standards of care from the state law that, pursuant to the Price-Anderson Act, provides the substantive rules for deciding public liability actions brought pursuant to this Act.

B. Relevant History of Price-Anderson Act

Defendants' preemption argument is based on 42 U.S.C. § 2014(hh), which defines a "public liability action" under Price-Anderson and further provides:
A public liability action shall be deemed to be an action arising under section 2210 of this title [Price-Anderson Act], and the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of such section.

Although section 2014(hh) was added to Price-Anderson in 1988, the history and law relevant to construing and applying this statutory provision begins nearly fifty years ago.

1. Atomic Energy Act of 1954

Congress enacted the Atomic Energy Act of 1954 ("AEA") to enable the private sector to participate in what had been a federal monopoly in the use, control and ownership of nuclear technology. [FN3] Pub.L. No. 83-703, 68 Stat. 919 (1954) (codified as amended at 42 U.S.C. §§ 2011-2297h-13); *see Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,* 461 U.S. 190, 206-07, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983). The AEA provided that any private entities involved in this technology must be licensed by the Atomic Energy Commission ("AEC") [FN4] and granted the AEC exclusive jurisdiction to license and regulate the construction and operation of all nuclear facilities and the disposal of related materials to protect national security, public health and safety. *See* 42 U.S.C. § 2021(c); *English,* 496 U.S. at 81. As a result of the extensive licensing and regulatory scheme created by the Commission pursuant to this authority, the Supreme Court has consistently held that Congress intended the AEA and the federal government to

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 21738305
(Cite as: 2003 WL 21738305, *3 (D.Colo.))

**Page   8**

occupy and preempt "the entire field of nuclear safety concerns, except the limited powers expressly ceded to the states." *Pac. Gas & Elec.,* 461 U.S. at 206-08, 213.

Notwithstanding the allowances granted in the AEA, private industry was reluctant to enter the nuclear field unless it had protection from the potentially vast liability that would result from a significant accident at a nuclear power plant. *See Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 64, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); S.Rep. No. 85- 296 (1957), *reprinted in* 1957 U.S.C.C.A.N. 1803, 1803-05. Congress responded in 1957 by enacting the Price-Anderson Act as an amendment to the AEA. *See* Pub.L. No. 85-256, 71 Stat. 576 (1957) (codified in 42 U.S.C. § 2210, with relevant definitions included in 42 U.S.C. § 2014); *Duke Power,* 438 U.S. at 63-64.

2. 1957 Price-Anderson Act

*4 Congress' purpose in Price-Anderson was two-fold: "to remove the economic impediments in order to stimulate the private development of electric energy by nuclear power while simultaneously providing the public compensation in the event of a catastrophic nuclear incident." *Duke Power,* 438 U.S. at 83; *see id.* at 64;   42 U.S.C. § 2012(i). To achieve these objectives, Congress created a comprehensive, compensation-oriented system of liability insurance and indemnification for federal nuclear contractors and licensees that both limited their potential financial exposure in the event of a "nuclear incident" (defined to include any incident that results in any form of damages arising from the hazardous properties of materials used in the atomic energy program)   [FN5] and created a ready source of funds from which to compensate victims of nuclear incidents. *See* S.Rep. No. 100-70, at 14 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1424, 1426.

The basic components of the Price-Anderson liability and compensation system as originally enacted were: (1) a cap on the aggregate liability arising out of or resulting from any single nuclear incident; (2) the requirement that federal nuclear licensees obtain private insurance or other financial protection up to a stated amount for such public liability; (3) the federal government's agreement to indemnify licensees and other potentially liable persons for public liability in excess of this private financial protection up to the amount of the liability cap;   [FN6] (4) "omnibus coverage" that effectively channeled liability for a nuclear incident to federal licensees or contractors even though others would be liable under ordinary tort principles; and (5) provisions for the federal courts to determine if liability for a nuclear incident exceeds the statutory liability cap and, if it does, to manage and allocate the pool of available funds to those damaged as a result of the incident. *See* Pub.L. No. 85-256, § 4, 71 Stat. at 576-77 (codified as amended at 42 U.S.C. § 2210); S.Rep. No. 85-296 (1957), *reprinted in* 1957 U.S.C.C.A.N. 1803; H.R.Rep. No. 100-104(I), at 5 (1987); *see generally* Berkowitz, 13 Harv. Envtl. L.Rev. at 7-11.

The Price-Anderson Act as enacted in 1957 and the insurance and indemnity system it created were not intended by Congress to create a federal cause of action or to preempt application of state tort law in public liability actions. Instead, as stated by the Joint Committee on Atomic Energy in 1957, one of the "basic principles" of the Price-Anderson system was its limited interference with State law:

Since the rights of third parties who are injured are established by State law, there is no interference with the State law until there is a likelihood that the damages exceed the amount of financial responsibility required together with the amount of the indemnity. At that point the Federal interference is limited to the prohibition of making payments through the State courts and to prorating the proceeds available.

*5 S. Rep. 85-296, *reprinted in* 1957 U.S.C.C.A.N. at 1810 (quoted in *Silkwood,* 464 U.S. at 252). Thus, while the Price-Anderson system authorized the federal court "to issue orders declaring the liability limited and staying the payment of claims and the execution of court judgments[,] ... the right of the State courts to establish the liability of the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 21738305
(Cite as: 2003 WL 21738305, *5 (D.Colo.))

persons involved in the normal way is maintained." *Id.* at 1823.

### 3. 1966 Price-Anderson Amendments Act

In 1966, Congress extensively considered the role of federal and state law in public liability actions as part of its reauthorization and amendment of the Price-Anderson Act and system. *See, e.g.,* S.Rep. No. 89-1605 (1966), *reprinted in* 1966 U.S.C.C.A.N. 3201. The comments of the Joint Committee on Atomic Energy on this amendment begin by reiterating that "[s]ince its enactment by Congress in 1957 one of the cardinal attributes of the Price- Anderson Act has been its minimal interference with State law." *Id.* at 3206. The Committee reported this attribute reflected Congress' "policy decision to refrain from establishing the basis of liability under the statute," with the result that "[u]nder the Price-Anderson system, the claimant's right to recover from the fund established by the act is left to the tort law of the various States." *Id.*

By 1966, however, Congress and others were concerned that some aspects of state tort law might interfere with Price-Anderson's goal of providing speedy and equitable compensation to victims of nuclear incidents. In particular, Congress was concerned that the tort law of some states might not impose strict liability on defendants in the event of a nuclear incident, which the Joint Committee on Atomic Energy reported was contrary to Congress' assumptions and intent in establishing Price-Anderson's compensation system. *See id.* at 3206-07 (policy decision not to establish statutory standard of liability based on knowledge of strict liability doctrine and belief that courts would "ignore legal niceties and impose liabilities upon someone on one ground or another in the event of a nuclear incident"); *id.* at 3209 ("existing Price-Anderson system rests on assumption" that courts would apply "legal principles akin to those of strict liability in the event of a serious nuclear incident"). Congress was also concerned the many state tort statutes of limitation were too short for the results of radiation exposure to be known and acted

upon by those injured as a result of a nuclear incident. *Id.* at 3208, 3220-21. In both instances, Congress determined that reform was necessary, with the only question being "whether reform should be accomplished by State or Federal law." *Id.* at 3208.

Congress took an intermediate approach to these issues. It opted not to enact a "new body of Federal tort law" and instead addressed its concerns by authorizing the AEC "to require participants in the nuclear industry to waive certain key defenses to liability that might otherwise be permissible under applicable State or Federal law." S.Rep. No. 89-1605, *reprinted in* 1966 U . S.C.C.A.N. at 3209; *see* Pub.L. No. 89-645, § 3, 80 Stat. 891, 892 (codified as amended at 42 U.S.C. § 2210(n)(1)). The defenses to be waived included any issue or defense based on the fault of the nuclear actor or the conduct of the injured party or any statute of limitations that would bar a suit filed within ten years of the nuclear incident and within three years of when the claimant knew or reasonably could have known of the injury and its cause. *Id.* Congress anticipated and intended that the effect of these waivers would be, among other things, to impose strict liability on affected defendants. [FN7] S.Rep. No. 89-1605, *reprinted in* 1966 U.S.C.C.A.N. at 3209; *Duke Power,* 438 U.S. at 65-66. Congress believed this approach was preferable to direct federal legislation imposing a strict liability standard of care in public liability actions because it was "in keeping with the approach followed in enacting the original Price-Anderson Act- namely, interfering with State law to the minimum extent necessary." S.Rep. No. 89-1605, *reprinted in* 1966 U.S.C.C.A.N. at 3209; *Duke Power,* 438 U.S. at 65-66.

**\*6** Congress further limited the effect of the 1966 amendments on state tort law by applying the new defense waiver provision only to public liability actions arising from an "extraordinary nuclear occurrence" ("ENO"), defined as a nuclear incident the Commission finds is "substantial" and "has resulted or will probably result in substantial damages" to offsite persons or property. *See* Pub.L. No. 89-645, §§ 1(a)(2), 3, 80 Stat. at 891, 892 (codified

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 21738305
(Cite as: 2003 WL 21738305, *6 (D.Colo.))

Page  10

as amended at 42 U.S.C. §§ 2014(j), 2210(n)(1) ). The Joint Committee reported this limitation was based on its determination that "the traditional system of tort law" was adequate to address nuclear incidents not deemed ENOs. S.Rep. No. 89-1605, *reprinted in* 1966 U.S.C.C.A.N. at 3211. Under the Price-Anderson Act and system as amended in 1966, therefore, Congress intended non- ENO incidents to "remain subject to the traditional rules of tort law," *id.*, including "a rule of strict liability if applicable State law so provides." *Id.* at 3212.

Even as it reaffirmed the Price-Anderson system's deference to state law in public liability actions, Congress also in 1966 for the first time provided a grant of federal jurisdiction for certain actions arising from nuclear incidents. Pub.L. No. 89-645, § 3, 80 Stat. at 892. Specifically, the 1966 Amendments Act added to Price-Anderson a provision conferring upon the United States district court in the district in which an extraordinary nuclear occurrence takes place original jurisdiction with respect to any public liability action arising out of or resulting from such an ENO, without regard to the citizenship of the parties or the amount in controversy. *Id.* The provision, codified at 42 U.S.C. § 2210(n)(2), further granted defendants and the Commission the absolute right to remove any ENO-related actions pending in state court or another federal court to the federal district court in the district in which the ENO occurred. *Id.* "If the circumstances of the occurrence and the damage actions did not appear to the Commission or the defendant to necessitate removal to a single Federal court, [however,] an action started in State court or other Federal court could of course proceed to judgment in that court." *Id.* at 3215; *see Kerr-McGee Corp. v. Farley,* 115 F.3d 1498, 1504-05 (10th Cir.1997) (rejecting contention that section 2210(n)(2) creates exclusive federal court jurisdiction over covered incidents). Congress' purpose in providing the option of federal jurisdiction was to provide a mechanism for consolidating before the same court all cases arising from the same ENO so that case management could be coordinated

and more expeditious, equitable and uniform results achieved. *See* S.Rep. No. 89-1605, *reprinted in* 1966 U.S.C.C.A.N. at 3208, 3214-15.

4. *Silkwood* Decisions

It was against this backdrop that the Tenth Circuit had the opportunity in *Silkwood v. Kerr-McGee Corp.,* 667 F.2d 908 (10th Cir.1981) , to consider the same issue presented by the Defendants in this action: whether federal nuclear safety regulations preempt state tort standards of care in an action arising from a nuclear incident. In *Silkwood,* much like this case, the plaintiff asserted claims based on state tort law to recover compensatory and punitive damages for property and other damage caused by plutonium releases from a nuclear facility. *Id.* at 912, 920-21. As in this case, the defendant plant operator asserted it could not be liable for such releases if it had substantially complied with applicable federal safety regulations because the pervasive federal regulation of nuclear energy had preempted strict liability and other state law-based standards of care. *Id.* at 920.

*7 The Tenth Circuit began its analysis of this issue by reiterating the rule that "the determination whether the federal scheme precludes state rules is primarily a matter of the intent of Congress." *Id.* Based on the legislative history of the Price-Anderson Act discussed above, the court found Congress intended for claims arising from nuclear incidents below the level of an ENO to be subject to state tort law, including standards of care such as strict liability. *See id.* at 921. Accordingly, the court rejected the defendant's argument that federal nuclear safety regulations had preempted state tort standards of care and affirmed the jury's property damage award under a state law strict liability standard. *Id.*

The Tenth Circuit did, however, find that federal law impliedly preempted any award of punitive damages under state law. The court based this holding on the AEA's complete occupation of the field of nuclear safety regulation and precedent holding that this

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 21738305
(Cite as: 2003 WL 21738305, *7 (D.Colo.))

Page   11

federal regulation preempted states from exercising regulatory authority over radiation hazards. *Id.* at 922 (citing *Northern States Power Co. v. Minnesota,* 447 F.2d 1143 (8th Cir.1971), *aff'd mem .,* 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972)). The court reasoned that a judicial award of punitive damages pursuant to state law was preempted under these circumstances because it "competes substantially with the AEC (NRC) in its regulation of radiation hazards associated with plants handling nuclear material" and because such an award, "as punishment for bad practices or to deter future practices involving exposure to radiation[,] is no less intrusive than direct legislative acts of the state." *Id.* at 923. The court acknowledged this holding was somewhat at odds with its conclusion that Congress intended for nuclear tort actions to be determined under state rather than federal standards, but justified this result by finding that the Price- Anderson Act and its legislative history implicitly assumed that only compensatory damages would be awarded in such actions. *See id.* at 922.

On appeal, the Supreme Court reversed the Tenth Circuit's ruling that state authorized punitive damage awards were impliedly preempted by the federal government's occupation of the field of nuclear safety. [FN8] *Silkwood v. Kerr-McGee Corp.,* 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). The Court began its analysis by confirming its ruling in *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission,* 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983), that the AEA preempts states from regulating the safety aspects of nuclear materials. 464 U.S. at 249-50. The Court also acknowledged that this fact, standing alone, "arguably would disallow resort to state-law remedies by those suffering injuries from radiation in a nuclear plant" because such remedies can indirectly regulate nuclear safety. *Id.* at 250-51; *see id.* at 249.

Based on a thorough examination of the substance and legislative history of the AEA and the Price-Anderson Act, however, the Court concluded there was "ample evidence

that Congress had no intention of forbidding the states from providing such remedies," even though Congress was fully aware of and intended for regulation of nuclear safety issues to be an exclusively federal matter. *Id.* at 251; *see id.* at 251-256 (analyzing acts and relevant legislative history). Rather, the Court found, based on the Price-Anderson Act legislative history set out above, that "Congress assumed that traditional principles of state tort law would apply with full force unless they were expressly supplanted," *id.* at 255, and that "state-law remedies, in whatever form they might take, were available to those injured by nuclear incidents." *Id.* at 256. Thus, the Court held, "insofar as damages for radiation injury are concerned, preemption should not be judged on the basis that the federal government has so completely occupied the field of safety that state remedies are foreclosed but on whether there is an irreconcilable conflict between the federal and state standards or whether the imposition of a state standard in a damages action would frustrate the objectives of federal law." *Id.* The Court found, based on the extensive legislative history described above, that there was no such conflict or frustration of federal objectives in the award of punitive damages under state tort law in public liability actions and therefore held such awards were not preempted by federal law. *Id.* at 256, 258.

*8 Given the Tenth Circuit's and Supreme Court's *Silkwood* decisions, there is no question that the AEA and the Price-Anderson Act as they existed at the time of the Supreme Court's 1984 *Silkwood* decision did not expressly or impliedly preempt state tort law standards of care in favor of a federal standard of compliance with applicable federal safety regulations. Defendants essentially concede this point but argue that a change in the law since the *Silkwood* decisions compels a different result today. That change occurred in 1988 when once again Congress extended and amended the Price-Anderson Act.

5. 1988 Amendments Act

The focus of the 1988 Price-Anderson

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Amendments Act was on extending and increasing the pool of funds available to compensate victims of a nuclear incident and on extending, clarifying and in some cases expanding the reach of various aspects of the existing Price-Anderson system. *See, e.g.,* Pub.L. No. 100-408, 102 Stat. 1066 (1988); S.Rep. No. 100-218, at 4-13 (1987) (summarizing major provisions), *reprinted in* 1988 U.S.C.C.A.N 1476, 1479-1488. One of the issues considered by Congress in this process was whether to expand Price-Anderson's grant of optional federal jurisdiction to include all actions asserting liability relating to a nuclear incident, rather than limiting it only to actions arising from ENOs as was provided in the 1966 amendments. Based on the difficulties encountered in consolidating the multitude of actions that arose from the 1979 accident at Three Mile Island, which the NRC did not designate an ENO, [FN9] Congress determined that "[t]he need for consolidation of claims to ensure equitable and uniform treatment of victims and the orderly distribution of funds is just as great whether the claims arise from a nuclear incident that ultimately is deemed not to be an extraordinary nuclear occurrence or from an incident that is." H.R.Rep. No. 100-104(I), at 18; *see* S.Rep. No. 100-218, at 13, *reprinted in* 1988 U.S.C.C.A.N. at 1488; H.R.Rep. No. 100-104(II), at 19 (1987); *El Paso Natural Gas Co. v. Neztsosie,* 526 U.S. 473, 477, 119 S.Ct. 1430, 143 L.Ed.2d 635 (1999). Accordingly, Congress amended section 2210(n)(2) of the Act, which had conferred original and removal jurisdiction to actions arising from ENOs, so that it applied to any action arising from a nuclear incident. *See* Pub.L. No. 100-408, § 11(a), 102 Stat. at 1076 (codified at 42 U.S.C. § 2210(n)(2)); H.R.Rep. No. 100-104(I), at 18; S.Rep. No. 100-218, at 13, *reprinted in* 1988 U.S.C.C.A.N. at 1488; H.R.Rep. No. 100-104(II), at 19.

In so doing, Congress recognized that Article III of the Constitution limits the types of cases that federal courts may hear to those "arising under ... the Laws of the United States." *See* H.R.Rep. No. 100-104(I), at 18. To avoid any questions as to the constitutionality of federal jurisdiction over all actions arising from a

nuclear incident, Congress added a new provision to the AEA defining a "public liability action" as used in the Price- Anderson Act, and stating that any such action "shall be deemed to be an action arising under" the Price-Anderson Act. Pub.L. No. 100-408, § 11(b), 102 Stat. at 1076; *see* H.R.Rep. No. 100-104(I), at 18; S.Rep. No. 100-218, at 13, *reprinted in* 1988 U.S.C.C.A.N. at 1488. In this same new provision, codified at 42 U.S.C. § 2014(hh), Congress further directed that "the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of such section." *Id.*

C. Preemption Analysis

**\*9** [4] As stated earlier, the question presented here is whether Congress intended through the 1988 Amendments Act, expressly or by implication, to preempt state tort law standards of care from the state law that, pursuant to the section 2014(hh) of the Price-Anderson Act, provides the substantive rules for deciding Price-Anderson public liability actions. Each possibility is examined in turn.

1. Express preemption

The crucial language added to the Price-Anderson Act in 1988 as relevant here is Congress' provision that "the substantive rules for decision in [a public liability action arising under 42 U.S.C. § 2210] shall be derived from the law of the State in which the nuclear incident involves occurs, *unless such law is inconsistent with the provisions of such section.*" *Id.* § 2014(hh) (emphasis added). Section 2210 sets out the system of insurance, indemnification, limited liability and compensation procedures established by the Price-Anderson Act, as amended, to deal with personal injury or property loss resulting from a nuclear accident. *See* 42 U.S.C. § 2210 (codifying § 170 of the AEA as enacted in 1957 and subsequently amended).

In interpreting these statutory provisions, I begin, as always, with the plain language of the statute, as it necessarily contains the best

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 21738305
(Cite as: 2003 WL 21738305, *9 (D.Colo.))

Page 13

evidence of Congress' preemptive intent. *See CSX Transp., Inc.,* 507 U.S. at 664; *New Mexico Cattle Growers Ass'n v. U.S. Fish and Wildlife Serv.,* 248 F.3d 1277, 1281-82 (10th Cir.2001). In so doing, I must assume Congress expressed its legislative intent through the ordinary meaning of the words it chose to use. *New Mexico Cattle Growers,* 248 F.3d at 1282. Unless the language of the statute is ambiguous, it is improper for me to consult legislative history in determining congressional intent. *Id.*

Defendants assert that the federal regulatory standards governing nuclear safety "are part of Price-Anderson's regulatory scheme" so that reliance on anything other than a federal standard of care would be "inconsistent with" section 2210 and thus barred by section 2014 (hh). They fail to point to any language in section 2210 supporting this contention, however, and my review of this provision has revealed none. The Price-Anderson Act as amended and codified in section 2210 did not create a regulatory scheme addressing nuclear safety concerns, but rather established a system for insuring and managing the consequences of nuclear accidents. The federal nuclear safety regulations upon which Defendants rely were and are promulgated and imposed pursuant to other provisions of the AEA, *see, e.g.,* 42 U.S.C. § 2201(b) (authorizing Commission to establish health, safety and other standards governing the possession and use of special nuclear, source and byproduct materials); *id.* §§ 2073, 2093, 2111, 2133, 2134 (granting Commission exclusive jurisdiction to license and regulate transfer, delivery, receipt, acquisition, possession and use of such materials), and are not referenced or otherwise incorporated in section 2210 or the insurance and compensation system it creates. Nothing in the plain language of section 2210, therefore, suggests there is any inconsistency between this section and the imposition of liability based on state tort law standards of care that differ from the standard set by federal nuclear safety regulations.

*10 The plain language of section 2014(hh), providing as it does that "the substantive rules for decision in [public liability] actions

shall be derived from state law ...," also indicates Congress intended for state law, including state standards of care, to continue as the substantive law governing public liability actions brought under the Price-Anderson Act. Congress is presumed to know the existing law pertinent to the legislation it enacts, *see e.g., Goodyear Atomic Corp.,* 486 U.S. at 184-85, and absent "clear manifestations of contrary intent," it is also presumed that Congress intended a new or revised statute to be harmonious with existing law and its judicial construction. *United States v. Langley,* 62 F.3d 602, 605 (4h Cir.1995); *Estate of Wood v. Comm'r,* 909 F.2d 1155, 1160 (8th Cir.1990). At the time of the 1988 Amendments Act, the state of the law, pursuant to the Tenth Circuit and Supreme Court's decisions in *Silkwood,* was that state tort law, including state standards of care, was the governing law in actions seeking to impose liability for a nuclear incident, notwithstanding the federal government's complete occupation of the field of nuclear safety.

If Congress had intended to change this law and preempt state law relating to nuclear safety issues, it could have omitted the direction to apply state law in section 2014 (hh), employed standard preemption language barring resort to state standards of care or at least provided that state law would govern unless inconsistent with "federal law." It did none of these things. Instead Congress specifically provided in section 2014(hh) that public liability actions brought pursuant to Price-Anderson would remain subject to state law and carefully limited preemption of state law only to instances in which it conflicted with section 2210, *i.e.,* the Price-Anderson system. [FN10] Far from clearly manifesting an intent to change the existing law of non-preemption of state standards of care, therefore, the plain language of section 2014 (hh) demonstrates Congress intended to preserve it. *Cf. Day v. NLO, Inc.,* 3 F.3d 153, 154 n. 1 (6th Cir.1993) (1988 amendments "not intended to alter the state law nature of the underlying tort claims").

An examination of the legislative history of

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 21738305                                                                    **Page   14**
(Cite as: 2003 WL 21738305, *10 (D.Colo.))

the 1988 amendments, although unnecessary given the plain language of the relevant statutory provisions, also fails to reveal any evidence that Congress intended by these amendments to preempt state negligence or strict liability standards of care in favor of a federal standard. This history recounts, without a hint of criticism, that under the Price-Anderson system liability in case of a nuclear incident "is determined according to applicable state tort law," H.R.Rep. No. 100-104(III), at 16 (1987); H.R.Rep. No. 100-104(I), at 5. Even more to the point, Congress stated in 1988 that claims regarding nuclear incidents not subject to the special defense waiver provisions for ENOs are determined under "the standard of proof specified by state tort law." H.R.Rep. No. 100- 104(III), at 15.

*11 The various committee reports further indicate that Congress' sole reason for expanding federal jurisdiction under the Price-Anderson Act to all actions arising from a nuclear incident was to simplify and improve compensation procedures by allowing consolidation of these actions in a single federal court. *See* S.Rep. No. 100-218, at 13, *reprinted in* 1988 U.S.C.C.A.N. at 1488; H.R.Rep. No. 100-104(I), at 17-18; H.R.Rep. No. 100-104(II), at 19; H.R.Rep. No. 100-104(III), at 30. The committee reports also echo the plain language of section 2014(hh) that the substantive law of decision in these new federal actions is to be derived from the law of the state in which the nuclear incident occurred unless that law is inconsistent with the Price- Anderson Act. *See* S.Rep. No. 100-218, at 13 (1987), *reprinted in* 1988 U.S.C.C.A.N. at 1488; H .R. Rep. No. 100-104(I), at 17; H.R.Rep. No. 100- 104(II), at 19; H.R.Rep. No. 100-104(III), at 30-31. Nothing in the legislative history of the 1988 amendments, therefore, suggests that Congress intended to change the existing law that public liability actions were to be determined under state tort law, including state standards of care.

2. Implied preemption

a. Field preemption

[5] It was well-established even before the 1988 Amendments Act that the federal government completely occupies the field of nuclear safety regulation and has thereby preempted states from enforcing their own nuclear safety regulations. *See, e.g., Silkwood,* 464 U .S. at 250; *Pacific Gas & Elec. Co.,* 461 U.S. at 212-13. As the Supreme Court acknowledged in *Silkwood* and elsewhere, the prospect of an award of compensatory or punitive damages for radiation-based injuries under state common law can also indirectly regulate nuclear safety matters by affecting the conduct and policy of nuclear operators. *See Silkwood,* 464 U.S. at 249-51, 256; *English,* 496 U.S. at 85-86 (1990); *Goodyear Atomic Corp.,* 486 U.S. at 185-86; *see also Cipollone,* 505 U.S. at 521 (1992) (state regulation can be as effectively exerted through an award of damages under common law as affirmative state enactments).

In *Silkwood,* the Supreme Court nonetheless expressly found that Congress did not intend for "traditional principles of state tort law," including the prospect of punitive damage awards, to be preempted by the federal government's occupation of the nuclear safety field. 464 U.S. at 255-56. The Court recognized the apparent incongruity of its holding but held it was bound by what Congress intended:
No doubt there is tension between the conclusion that safety regulation is the exclusive concern of the federal law and the conclusion that a state may nevertheless award damages based on its own law of liability. But as we understand what was done over the years in the legislation concerning nuclear energy, Congress intended to stand by both concepts and to tolerate whatever tension there was between them. We can do no less. It may be that the award of damages based on the state law of negligence or strict liability is regulatory in the sense that a nuclear plant will be threatened with damages liability if it does not conform to state standards, but that regulatory consequence was something that Congress was quite willing to accept.
*12 *Id.* at 256. Accordingly, the Court held that "insofar as damages for radiation injuries are concerned," preemption could *not* be

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 21738305
(Cite as: 2003 WL 21738305, *12 (D.Colo.))

**Page 15**

implied from the federal government's occupation of the field of nuclear safety. *Id.*

Once again, there is nothing in the plain language or legislative history of the 1988 amendments suggesting Congress believed this analysis was in error or that it had a different preemptive intent when it enacted section 2014(hh) and the rest of the 1988 Amendments Act. This is particularly noteworthy because Congress specifically considered the Supreme Court's *Silkwood* decision during its deliberations on the 1988 amendments. Some members of Congress were concerned that the Supreme Court's determination that punitive damages could be imposed under state tort law in public liability actions could, in some circumstances, result in the federal government becoming obligated to pay punitive damages and diminish the limited funds available to compensate actual injuries resulting from a nuclear incident. H.R.Rep. No. 100-104(I), at 19; *see* S.Rep. No. 100-218, at 12, *reprinted in* 1988 U.S.C.C.A.N. at 1487. Congress ultimately resolved these concerns by amending Price-Anderson to prohibit courts from awarding punitive damages against any person "on behalf of whom the United States is obligated to make payments under an agreement of indemnification covering" the relevant nuclear incident. [FN11] Pub.L. No. 100-408, § 14, 102 Stat. at 1078 (codified at 42 U.S.C. § 2210(s)); *see In re TMI ("TMI III"),* 67 F.3d 1119, 1126 (3rd Cir.1995).

The legislative history for this provision states that the 1988 Amendments Act "does not otherwise affect current law regarding punitive damages," S.Rep. No. 100-218, at 12, *reprinted in* 1988 U.S.C.C.A.N. at 1488, and the Tenth Circuit and other courts that have considered the issue in any depth have concluded Congress did not intend for the 1988 Amendments Act to change the result or overturn the reasoning of the Supreme Court in *Silkwood. See, e.g., Farley,* 115 F.3d at 1503 (1988 Amendments Act did not supersede Supreme Court's *Silkwood* decision but rather responded to its holding that punitive damages could be awarded in any public liability action); *TMI III,* 67 F.3d at 1124-25

(unambiguous language of 1988 Act makes clear that Congress did not intend to change *Silkwood* result). There is no question, therefore, that the Supreme Court's analysis of congressional intent and field preemption in *Silkwood* remains good law today.

Nor is there any question that this Supreme Court analysis compels the conclusion that Congress did not intend for federal occupation of the field of nuclear safety regulation to preempt state tort law standards of care. In *Silkwood,* the Court specifically found Congress intended to allow a state to "award damages based on its law of liability," to permit "the award of damages based on the state law of negligence or strict liability," and to make "state-law remedies, in whatever form they might take," available "to those injured by nuclear incidents." *Silkwood,* 464 U.S. at 256. These findings encompass and preserve from preemption the state law standards of care Defendants seek to supplant in this action.

*13 The Supreme Court's subsequent characterization of its *Silkwood* decision bolsters this conclusion. In 1988, for example, the Court stated *Silkwood* stood for the proposition that "Congress was willing to accept [the] regulatory consequences of application of state tort law to radiation hazards even though direct state regulation of safety aspects of nuclear energy was preempted." *Goodyear Atomic Corp.,* 486 U.S. at 186. In more recent decisions, the Court has reiterated it found in *Silkwood* that Congress did not intend for the Price-Anderson Act to preempt "state tort remedies for radiation-based injuries" and "traditional state tort principles of the duty of care." *English,* 496 U.S. at 85-86 (*Silkwood* decision largely based on "legislative history suggesting that Congress did not intend to include in the pre-empted field state tort remedies for radiation-based injuries"); *Buckman Co. v. Plaintiff's Legal Comm. .,* 531 U.S. 341, 352, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001) (*Silkwood* decision concerned "traditional state tort law principles of the duty of care" and turned on "specific statutory evidence" of Congress' intent). This authority further supports the conclusion that state standards of care are not impliedly

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

preempted by the federal government's undisputed occupation of the field of nuclear safety regulation and preemption of affirmative state regulation of nuclear safety concerns. [FN12]

b. Conflict preemption

As noted earlier, congressional intent to preempt state law may also be implied if state law actually conflicts with federal law because "it is impossible for a private party to comply with both state and federal requirements" or "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English,* 496 U.S. at 79. In its *Silkwood* decision, the Tenth Circuit implicitly found no such conflict when it held that state tort law rules, including a strict liability standard of care, are not preempted by federal nuclear safety regulations. *See* 667 F.2d at 920-21.

The Supreme Court addressed the conflict preemption issue more directly in its *Silkwood* decision, holding that there was no conflict or frustration of congressional purpose in the application of state tort law to award punitive damages in a public liability action. 464 U.S. at 256, 258. The Court's conclusion, based as it was on Congress' repeated declarations that state tort law was to govern in such actions, also demonstrates that there was not, under the pre-1988 Price-Anderson Act, any conflict or frustration of congressional purpose in the application of state tort law to award compensatory damages based on state tort standards of care.

Congress' enactment of the 1988 Amendments Act does not change this conclusion. First and most importantly, as described earlier, the plain language of the Amendments Act and its legislative history indicate Congress maintained its historic intent that state tort law, including state standards of care, govern actions seeking to impose liability for a nuclear incident. As in all preemption analyses, this intent is determinative. *See Medtronic,* 518 U.S. at 485; *Cipollone,* 505 U.S. at 516.

*14 Nothing in the 1988 Amendments Act, its legislative history or any other law, moreover, suggests it is physically impossible for a private party to comply with both federal nuclear safety requirements and state common laws standards of care. *Cf. Cleveland v. Piper Aircraft Corp.,* 985 F.2d 1438, 1444-45 (10th Cir.1993) (finding no irreconcilable conflict between federal regulation and common law standards, especially where Congress indicated it did not want to bar states from imposing additional or more stringent standards). There also can be no frustration of "the full purposes and objectives of Congress" in the use of state tort standards of care when those purposes and objectives specifically include the use of such traditional principles of state law to decide public liability actions. *See* 42 U.S.C. § 2014(hh); *supra* Section I.B (discussing relevant legislative history and *Silkwood* decisions).

The conclusion that there is no frustration of congressional purpose in application of a state rather than federal regulatory standard of care is further demonstrated by Congress' explicit intent to create, through waiver of affirmative defenses, what amounts to *de facto* strict liability for extraordinary nuclear occurrences. *See TMI II,* 940 F.2d at 870 n. 3 (Scirica, J., concurring). This strict liability standard of care is fundamentally inconsistent with a federal standard of care that precludes liability absent proof of non-compliance with federal safety regulations, yet it has been part of the Price-Anderson system since 1966. Congress, in fact, specifically reiterated its intent that strict liability be the standard of care for ENOs when it reauthorized the waiver requirements in the 1988 Amendments Act, *see, e.g.,* H.R.Rep. No. 100-104(III), at 15 (Price-Anderson imposes "Federal strict liability or 'no-fault' standard" for any extraordinary nuclear occurrence), and earlier expressed its intent that strict liability, when available under state tort law, would apply in cases arising from non-ENO nuclear incidents. *See* S.Rep. No. 89-1605, *reprinted in* 1966 U.S.C.C.A.N. at 3212. If Congress intended to permit strict liability in these cases, it follows that it also intended to permit less intrusive, fault-based state standards of care that might

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

be more stringent than federal regulatory standards. *See TMI II,* 940 F.2d at 870 n. 3 (Scirica, J. concurring).

### 3. *TMI II, O'Conner* and their progeny

I am aware my holding that federal regulations do not preempt state standards of care in Price-Anderson public liability actions is contrary to the existing weight of authority on the issue. Virtually all of this authority relies, with little independent analysis, on two decisions: *In re TMI Litigation Cases Consol. II,* 940 F.2d 832 (3rd Cir.1991), and *O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090 (7th Cir.1994). The courts in these decisions justify their finding of preemption on two grounds, neither of which survives careful scrutiny.

**\*15** First, the courts in *TMI II* and *O'Conner* found that federal nuclear safety regulations preempt state standards of care under standard conflict preemption analysis: "[p]ermitting the states to apply their own nuclear regulatory standards, in the form of the duty owed by nuclear defendants in tort, would ... frustrate the objectives of federal law" because "any state duty would infringe upon pervasive federal regulation in the field of nuclear safety, and would thus conflict with federal law." *TMI II,* 940 F.2d at 859-60 (citing *Pac. Gas & Elec. Co.,* 461 U.S. at 204); *see O'Conner,* 13 F.3d at 1105. This justification, however, while facially consistent with the general law of implied preemption, is flawed in several important respects. First, it does not rely in any fashion on the 1988 Amendments Act, and thus is based on the same law and legislative history in existence when *Silkwood* was decided. It is therefore contrary to binding pre-1988 authority in this circuit, stated in *Silkwood,* that federal standards do not preempt state standards of care in public liability actions. *See* 667 F.2d at 920-21.

Just as importantly, this justification is directly contrary to the Supreme Court's *Silkwood* decision. The Supreme Court found Congress intended to allow "a state [to] award damages based on its own law of liability," notwithstanding the federal government's exclusive authority to regulate nuclear safety

matters and the consequent preemption of direct state regulation of such matters. 464 U.S. at 256; *see id.* at 249-50. As a result, the Court mandated that the question of preemption in damage claims for radiation injury "should not be judged on the basis that the federal government has so completely occupied the field of safety that state remedies are foreclosed." 464 U.S. at 256. By basing their preemption decisions on the "pervasive federal regulation in the field of nuclear safety," *TMI II,* 940 F.2d at 859, and findings that "the field of nuclear safety has been occupied by federal regulation; there is no room for state law," *O'Conner,* 13 F.3d at 1105, the *TMI II* and *O'Conner* courts violated the Supreme Court's directive and its binding determination of congressional intent. [FN13]

The majority opinion in *TMI II* [FN14] attempts to evade the force of the Supreme Court's holding in *Silkwood* by seizing on the Court's acknowledgment in that decision that there might be instances in which federal law would preempt the recovery of damages under state law based on "an irreconcilable conflict between the federal and state standards" or the conclusion that "the imposition of a state standard in a damages action would frustrate the objectives of the federal law." *TMI II,* 940 F.2d at 859 (quoting *Silkwood,* 464 U.S. at 256). The Third Circuit then concluded that such conflict preemption must be implied because imposition of state standards of care would frustrate Congress' intent that the federal government exclusively regulate nuclear safety. *Id.*

**\*16** This rationale, however, is merely a repackaging of the field preemption argument the Supreme Court rejected in *Silkwood* based on the undisputed legislative history that Congress had intended for state tort law rules, including "the state law of negligence or strict liability," to apply in public liability actions notwithstanding the pervasive federal regulation of nuclear safety. 464 U.S. at 256. Consistent with this determination, the Court in *Silkwood* also found no conflict or frustration of congressional purpose in the application of state law in these actions, *id.,* and specifically rejected the defendant's submission that

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works