allowing plaintiffs to recover under state law principles conflicted with Congress' intent to preclude dual federal and state regulation of radiation hazards. *Id.* at 258. Under these circumstances, there is no merit to the contention of the *TMI II* and *O'Conner* courts that state standards of care are preempted because they frustrate Congress' intent to preclude state regulation of nuclear safety. [FN15]

The second justification for preemption of state standards of care, asserted by the *O'Conner* court, invokes the 1988 Amendments Act. This justification concludes that use of state standards of care in public liability actions violates the 1988 Act's provision, codified in section 2014(hh), that state law only applies as long as it is consistent with the Price-Anderson Act. *See O'Conner,* 13 F.3d at 1105. The court bases this decision on a summary finding that federal nuclear safety regulations are part of Price-Anderson's "statutory scheme." *Id.* The basis for the court's finding on this point is unclear, but appears to be an attempted linkage of the Price-Anderson Act's undisputed intent "to protect the public," *see, e.g.,* 42 U.S.C. § 2012, with the fact that federal regulation of nuclear energy is also intended to protect the public. *See* 13 F.3d at 1105 (citing Price-Anderson's goal of protecting the public).

That both the Price-Anderson Act and federal nuclear safety regulations may serve the same broad purpose is not a basis for finding these regulations are part of the Price-Anderson Act and its statutory scheme. [FN16] As discussed earlier, the *O'Conner* court's findings that federal safety regulations are part of the Price-Anderson Act and that they therefore preempt state law-based standards of care contradict the plain language of section 2014 (hh) and section 2210, as well as the legislative history of the 1988 Amendments Act. *See supra* Section I.C.1. The *O'Conner* court's further statement that "[i]mposing a standard of care other than the federal regulations would disturb the carefully crafted balance between private involvement and safety that Congress has achieved," 13 F.3d at 1105, is contradicted by these same authorities and the forty plus year history demonstrating Congress' intent that state tort law rules, including strict liability and other state standards of care, provide the substantive rule of decision in actions arising from nuclear incidents.

*17 Without acknowledging Congress' historical intent that state tort law govern public liability actions, the *O'Conner* court attempts to rebut the relevance of this history by reciting a single statement from one of the five committee reports on the 1988 Act: "the [pre-1988] Price-Anderson system, including the waiver of defenses provisions, the omnibus coverage, and the predetermined sources of funding, provides persons seeking compensation for injuries as a result of a nuclear incident with significant advantages over the procedures and standards for recovery that might otherwise be applicable under State tort law." 13 F.3d at 1100 (citing S.Rep. No. 100-218, at 4). The court asserts this statement demonstrates Congress' explicit recognition and intent that under the 1988 Amendments Act "state law would operate in the context of a complex federal scheme which would mold and shape any cause of action grounded in state law." *Id.*

Even when read in isolation, the quoted committee statement does not support the court's conclusion, as the statement does no more than accurately report that the Price-Anderson system, both before and after the 1988 Amendments, provides less stringent federal standards (*i.e., de facto* strict liability standard in some cases, omnibus coverage) and other advantages (guaranteed pool of funds to pay damages) than would be available to injured parties in the absence of this federal system. *See, e.g.,* H.R.Rep. No. 100-104(III), at 14 (discussing how Price-Anderson's "conscious departure[s] from ordinary tort law" benefit injured members of the public). Furthermore, the committee made this statement to justify its conclusion that the Price-Anderson system should be reauthorized, not that it should be changed in the fundamental manner asserted by the *O'Conner* court. *See* S.Rep. No. 100-218, at 4, *reprinted in* 1988 U.S.C.C.A.N. at 1479.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

2003 WL 21738305
(Cite as: 2003 WL 21738305, *17 (D.Colo.))

Page 19

In deciding that federal regulatory standards preempt state common law standards in public liability actions, the *TMI II* and *O'Conner* courts also appear to have assumed to some degree that because Congress provided in 1988 that actions asserting liability for all nuclear incidents "arise under" the federal Price-Anderson Act and are thus subject to federal jurisdiction, it must also have intended to impose federal law, including federal standards of care, in these actions. *See, e.g., TMI II,* 940 F.2d at 858 (through the 1988 Amendments Act, Congress placed "an overlay of federal law upon the rights and remedies previously available under state law"). This assumption is contrary to Congress' explicit direction in the 1988 Act that state law would continue to provide the substantive laws of decision in these actions. *See* 42 U.S.C. § 2014 (hh). It also is rebutted by the legislative history of the 1966 amendments to Price-Anderson, in which Congress first extended federal jurisdiction to certain public liability actions, while also declaring its intent that all public liability actions remain subject to state law. *See supra* Section I.B.3. That Congress at the same time took steps to establish what amounts to a *de facto* standard of strict liability for the same actions for which it granted federal jurisdiction (*i.e.,* those arising from extraordinary nuclear occurrences), *see id.,* further demonstrates that Congress did not intend for the creation of the federal cause of action to impose a standard of care measured by compliance with federal regulations. *See TMI II,* 940 F.2d at 870 n. 3 (Scirica, J., concurring)

*18 Finally, the context in which the standard of care question arose appears to have influenced the *TMI II* and *O'Conner* courts in their decisions. In both cases, the sole or primary question before the courts was not the standard of care in a public liability action arising under the Price- Anderson Act, but rather whether Congress had exceeded its constitutional authority in conferring federal subject matter jurisdiction over such actions. *See TMI II,* 940 F.2d at 835; *O'Conner,* 13 F.3d at 1094-1101. The courts' concern was Article III, section 2 of the Constitution, which, as relevant here, authorizes Congress to extend subject matter jurisdiction to all cases and controversies "arising under ... the Laws of the United States."

[6][7] The Supreme Court has held that "pure jurisdictional statutes" that "seek 'to do nothing more that grant jurisdiction over a particular class of cases' cannot support Article III 'arising under jurisdiction.'" *Mesa v. California,* 489 U.S. 121, 136, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989) (quoting *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 496, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983)). It is also well established, however, that Article III "arising under" jurisdiction [FN17] exists where every action said to arise under a federal statute "necessarily involves application of a body of federal substantive law." *Verlinden,* 461 U.S. at 497. Accordingly, the conclusion of the *TMI II* and *O'Conner* courts that federal rather than state law sets the standard of care for actions "arising under" the Price-Anderson Act eliminated any question that they were correct in ultimately holding that Congress acted within its Article III authority when it conferred federal jurisdiction on such actions. *See TMI II,* 940 F.2d at 860 (Congress did not exceed its constitutional authority in conferring federal jurisdiction over public liability actions because plaintiffs' rights will necessarily be determined in part by reference to federal nuclear safety regulations, so that "important federal questions ... are indispensable ingredients of the public liability action"); *O'Conner,* 13 F.3d at 1101 (because the duty a defendant owes to a plaintiff in a public liability action is dictated by federal law, "any public liability action has significant federal ingredients which satisfy arising under jurisdiction").

The difficulty with these courts' reliance on this factor to determine the constitutionality of Congress' jurisdictional grant is at least three-fold. First, as detailed above, the courts disregarded Congress' intent that state law supply the standard of care in public liability actions. Second, they apparently assumed that Congress may *only* extend federal jurisdiction to a category of cases if *all* such cases necessarily will involve application of a

substantive body of federal law. As the Supreme Court made clear in *Verlinden,* however, this is not the case: "Congress may confer on the federal courts jurisdiction over any case or controversy that *might* call for the application of federal law." 461 U.S. at 492 (emphasis added). [FN18] Thus, there is no suggestion in *Verlinden* or the other authority cited by the *TMI II* and *O'Conner* courts that the only situation in which Congress may properly confer federal jurisdiction under Article III is when all cases within the jurisdictional grant involve application of substantive federal law.

**\*19** Third, the constitutional analysis of the *TMI II* and *O'Conner* courts fails to recognize that Congress' grant of federal jurisdiction in the Price-Anderson Act may be upheld without reference to a federal standard of care. This was the conclusion of Judge Scirica in a thoughtful concurrence in the *TMI II* action, in which, among other things, he criticized the majority's conclusion that Congress intended to preempt state standards of care that do not conform to federal regulation. 940 F.2d at 870; *see id* . at 863-64. Judge Scirica noted that the constitutionality of Congress' grant of optional federal jurisdiction to public liability actions raised the issue noted but not decided in *Verlinden:* the extent to which Congress may confer federal jurisdiction over a class of actions that may, but will not necessarily, implicate substantive federal questions. *Id.* at 865. He then carefully analyzed the ways in which substantive federal issues might be implicated in public liability actions deemed to arise under the Price-Anderson Act, *see id.* at 868-77, and concluded the likelihood that such federal questions would be present, combined with the need to protect a federal court's ability to implement the Price-Anderson system for the orderly disposition of large-scale nuclear accident litigation, were sufficient to permit the conferral of federal jurisdiction under Article III. *Id.* at 866, 876-77. I concur in his analysis and conclusion.

[8] I also offer an additional rationale for the constitutionality of Congress' decision to establish federal jurisdiction over Price-Anderson public liability actions. The existence of a federal question is implicit in every public liability action because every such action by definition arises out of or results from source, special nuclear or byproduct material. *See* 42 U.S.C. § 2014(q), (w), (hh). Use and possession of these nuclear materials was originally the exclusive province of the federal government, and while the AEA of 1954 authorized non-federal actors to participate in this monopoly, it did so only as to actors who obtained an appropriate federal license or contract. *See, e.g., Duke Power,* 438 U.S. at 63; 42 U.S.C. §§ 2011-2297h-13. The use and possession of these materials by federal licensees and contractors is further subject to strict regulation by federal authorities, reflecting Congress' determination in the AEA to create "a program for Government control of the possession, use, and production of atomic energy and special nuclear material, whether owned by the Government or others, so directed as to make the maximum contribution to the common defense and security and the national welfare." 42 U.S.C. § 2013(c); *see Duke Power,* 438 U.S. at 63. Congress' establishment of special liability, choice of law, federal indemnification and compensation standards and procedures for nuclear incidents is a further manifestation of the inherently federal nature of nuclear materials and activities. Under these circumstances, as in the seminal case of *Osborn v. Bank of the United States,* 22 U.S. (9 Wheat) 738, 6 L.Ed. 204 (1824), the federal nuclear program "itself is the first ingredient in the case,-is its origin,-is that from which every other part arises." *Id.* at 825. Thus, Price-Anderson's conferral of federal jurisdiction on public liability actions arising from source, special nuclear and byproduct materials is not a "pure jurisdictional statute," but rather is part of the entire federal program, "arising under ... the Laws of the United States," for controlling and managing these materials and their risks. *See id.* at 825-26.

**\*20** Perhaps motivated by a desire for a sure basis on which to uphold the constitutionality of Congress' conferral of federal jurisdiction over cases such as this, the *TMI II* and *O'Conner* courts ignored the principle that is at

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

the heart of any preemption analysis: congressional intent. *See, e.g., Medtronic,* 518 U.S. at 485-86 ("any understanding of the scope of a pre- emption statute must rest primarily on 'a fair understanding of *congressional purpose;* " ' (emphasis in original)). Relying without question on the federal preemption of state law found by *TMI II* and *O'Conner,* courts now routinely hold that public liability actions are only "nominally" governed by state law rules of decision, notwithstanding Congress' plain language to the contrary in the 1988 Amendments Act and related legislative history. *See Good v. Fluor Daniel Corp.,* 222 F.Supp.2d 1236, 1247 (E.D.Wash.2002); *see also* Dan Guttman, *Price-Anderson Act Reauthorization: Due Diligence Is in Order,* 32 Envtl. L. Rep. 10594, 10600 (May 2002) (noting conflict between Act's policy that state law principles determine damage claims and case law imposing federal duty of care). This conclusion turns congressional intent on its head and is contrary to binding Supreme Court and Tenth Circuit authority. For all of these reasons, I hold that federal nuclear safety regulations do not preempt state law standards of care in an action brought under the Price-Anderson Act and therefore reject Defendants' contention that Plaintiffs must prove Defendants violated these regulations as an element of their tort claims.

II. Trespass Claim

[9] The elements of the tort of trespass under Colorado law [FN19] are "a physical intrusion upon property of another without the proper permission from the person legally entitled to possession of that property." *In re Hoery v. United States,* 64 P.3d 214, 217 (Colo.2003); *Cook VIII,* 181 F.R.D. at 485. Defendants contend the first element, that a "physical intrusion" have occurred, can only be demonstrated in this case by proof that plutonium or other contaminants attributable to Plant operations are present on class properties *and* have caused actual and substantial damage to these properties. [FN20] This requirement, Defendants further assert, can only be satisfied by a showing that Plant contaminants have come to be located on these properties at levels "of toxicological concern," *i.e.,* at levels that scientific evidence demonstrates pose a health risk. Otherwise, Defendants contend, the presence of plutonium contamination on class properties is *de minimis* and does not, as a matter of law, constitute a trespass under Colorado law. Plaintiffs respond that the tort of trespass traditionally is complete without proof of harm and that Colorado follows this rule.

[10][11] The tort of trespass is predicated upon and intended to protect the plaintiff's right to exclusive possession of its property. *See* W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 13, at 67, 70 (5th ed.1984); Restatement (Second) of Torts § 163 cmt. d (1965). Intentionally entering or causing a person or thing to enter land in the possession of another infringes on this right, and renders a defendant liable for trespass irrespective of whether the defendant's intrusion causes actual harm to the land or its possessor. *See, e.g.,* Restatement, §§ 158, 163; Prosser and Keeton § 13, at 70-71; *Gill v. LDI,* 19 F.Supp.2d 1188, 1197-98 (W.D.Wash.1998) ("Where there is an actual entry upon the land, either by the defendant or some tangible thing intruding on the land because of the defendant's actions, interference with the exclusive right of possession is assumed."). Thus, under the traditional rule, proof that the trespassory invasion caused actual damages is not required to establish liability, and the plaintiff is always entitled to recover at least nominal damages. *See, e.g., Adams v. Cleveland-Cliffs Iron Co.,* 237 Mich.App. 51, 602 N.W.2d 215, 219 (Mich.App.1999); *In re Burbank Envtl. Litig.,* 42 F.Supp.2d 976, 984 (C.D.Cal.1998); *Bradley v. Am. Smelting & Ref. Co.,* 104 Wash.2d 677, 709 P.2d 782, 787 (Wash.1985).

*21 This rule was developed, and is readily applied, in the context of persons or things physically entering onto the property of another, *see, e.g.,* Prosser and Keeton § 13, at 70-71, and there is no question Colorado follows the traditional rule in such cases. *See, e.g., Hoery,* 64 P.3d at 217; *Gerrity Oil & Gas Corp. v. Magness,* 946 P.2d 913, 933 (Colo.1997); *Burt v. Beautiful Savior Lutheran Church,* 809 P.2d 1064, 1067 (Colo.1990). Over time,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

however, litigants have pushed the envelope of what constitutes a trespassory invasion of property by asserting trespass claims based on intangible phenomena such as light, noise, electromagnetic fields and airborne gases. Some courts and commentators deny that such "intangible intrusions" are actionable at trespass at all, because they do not, in and of themselves, infringe on the right to exclude others from property. *See, e.g., Adams,* 602 N.W.2d at 222-23. Other courts have allowed trespass claims based on intangible intrusions, but only upon proof that actual and substantial damages resulted. [FN21] *See, e.g., San Diego Gas & Elec. Co. v. Superior Court,* 13 Cal.4th 893, 55 Cal.Rptr.2d 724, 920 P.2d 669, 695 (Cal.1996); *Maddy v. Vulcan Materials Co.,* 737 F.Supp. 1528, 1540-41 (D.Kan.1990); *Bradley,* 709 P.2d at 790-91; *Borland v. Sanders Lead Co.,* 369 So.2d 523, 529-30 (Ala.1979).

Some of the courts recognizing "intangible trespass" have extended the concept of intangible intrusions triggering the requirement to prove actual damages to cases involving the deposition of contaminants on a property. These courts reason that the presence of such contaminants is not perceptible and therefore does not infringe on the right to exclusive possession of property, so actual damages must be shown. *See Bradley,* 709 P.2d at 791; *Borland,* 369 So.2d at 529-30. It is these cases Defendants invoke in asserting that Plaintiffs must prove actual harm resulting from the presence of plutonium or other Plant contaminants on their property, by proving the contamination poses a scientifically demonstrated health risk, in order to establish liability for trespass.

In *Public Service Co. of Colorado v. Van Wyk,* 27 P.3d 377 (Colo.2001), the Colorado Supreme Court joined the modern trend by recognizing that an intangible intrusion onto another's property may constitute a trespass, but only upon proof that the intangible intrusion caused physical damage to the property. *See id.* at 390. In so doing, it distinguished between trespass based on a "physical entry" and one based on an "intangible intrusion," *id.* at 389, which it defined as "something that is impalpable, or incapable of being felt by touch." *Id.* at 387. The court concluded that the intruding forces at issue in *Van Wyk,* noise, electromagnetic fields and radiation waves emitted by power lines, were all intangible rather than physical invasions, *id.* at 387-88, and were only actionable as trespass upon proof that the intrusion caused specific physical damage to the plaintiff's property. *Id.* at 391.

*22 Despite its potentially expansive definition of an "intangible intrusion" in *Van Wyk,* the Colorado Supreme Court recently clarified in *In re Hoery* that the migration and presence of contaminants upon another's property constitutes a physical invasion that is actionable under the traditional rule of trespass. [FN22] *See Hoery,* 64 P.3d at 221-222. The alleged trespass in *Hoery* was the presence of the chemical TCE in groundwater and soil beneath the plaintiff's property as a result of the migration of TCE-contaminated groundwater from the defendant's property. *See id.* at 222. The Colorado court held this "constituted a trespass because the toxic pollution released by the [defendant] physically intruded upon [plaintiff's] property without his permission." *Id.* at 222. Given the distinction the court made in *Van Wyk* between physical and intangible intrusions, this conclusion necessarily means the court does not consider the deposition of pollution (which is after all a tangible matter) onto another's property to be an intangible intrusion under Colorado law, even though the pollution is present on the property in a form or at a concentration that is not perceptible to human senses. [FN23] *See Van Wyk,* 27 P.3d at 389 (distinguishing between physical entry upon the land of another, which is a trespass without more, and the question of whether an intangible intrusion may constitute a trespass); *accord San Diego Gas,* 55 Cal.Rptr.2d 724, 920 P.2d at 695 (cited with approval in *Van Wyk,* 27 P.3d at 390) (intangible intrusions actionable in trespass if accompanied by actual damage to defendant's property *or* deposition of particulate matter on the property); *Maryland Heights Leasing, Inc. v. Mallinckrodt, Inc.,* 706 S.W.2d 218, 226 (Mo.Ct.App.1985) (deposit of radioactive materials on plaintiff's property supports

traditional trespass claim). As it is well established that Colorado law does not require proof of actual damages to prove trespass based on a physical intrusion upon property, *see Hoery,* 64 P.3d at 217, Plaintiffs need not demonstrate that plutonium and other Plant-derived contaminants are present on their properties at levels of toxicological concern or are otherwise causing damage to their properties in order to prevail on their trespass claim.

III. Private Nuisance Claim

A. Health Risk as an Element of the Claim

[12][13] Private nuisance is a tort against land predicated on the right of an individual to use and enjoy his property. *See Hoery,* 64 P.3d at 218 & n. 5; Prosser and Keeton § 87, at 622 (distinguishing between right of exclusive possession underlying trespass claim and right to use and enjoy property underlying nuisance claim). To establish liability for private nuisance under Colorado law, the plaintiff must prove the defendant engaged in "an intentional, negligent, or unreasonably dangerous activity resulting in the unreasonable and substantial interference with [the] plaintiff's use and enjoyment of her property." *Van Wyk,* 27 P.3d at 391; *see Hoery,* 64 P.3d at 218; *Cook VIII,* 181 F.R.D. at 485. Continuing their theme, Defendants assert that as a matter of law Plaintiffs cannot prove Defendants unreasonably and substantially interfered with Plaintiffs' use and enjoyment of their properties unless they show plutonium contamination is present on their properties at levels posing an actual, scientifically verifiable health risk. [FN24]

*23 [14][15] Under Colorado law, whether the defendant has unreasonably and substantially interfered with the plaintiff's use and enjoyment of his property is a factual question to be decided by the trier of fact. *Van Wyk,* 27 P.3d at 391. In making this determination, the trier of fact must weigh the gravity of the harm and the utility of the conduct causing the harm. *Id.* To be substantial and unreasonable, the interference generally "must be significant enough that a normal person in the community would find it offensive, annoying, or inconvenient." *Id.* (citing Restatement § 821F); *see Haas v. Lavin,* 625 F.2d 1384, 1389 (10th Cir.1980) (quoting *Lowder v. Tina Marie Homes, Inc.,* 43 Colo.App. 225, 601 P.2d 657, 658 (Colo.Ct.App.1979)). [FN25] In other words, " '[w]hether the various factors of interference asserted by the plaintiffs as to their use and enjoyment of their home were a substantial invasion of their interests [is] measured by the standard of their effect upon a normal person in the same or similar circumstances." ' *Cook VIII,* 181 F.R.D. at 485 (quoting *Allison v. Smith,* 695 P.2d 791, 794 (Colo.App.1984)).

Plaintiffs assert Defendants have substantially and unreasonably interfered with their use and enjoyment of their properties by: (1) conducting activities at Rocky Flats that have resulted in actual contamination of the class area with plutonium from the Plant, which in turn has created measurable toxicological risks for Plaintiffs and resulted in rationally grounded apprehension regarding known and potential risks associated with this contamination; (2) improperly burying and storing hazardous waste at the Plant, giving rise to ongoing contamination of class properties and a reasonable concern these conditions will lead to additional offsite releases and risks; and (3) misleading the community as to these conditions and activities, thus increasing Plaintiffs' uncertainty and apprehension. Defendants' position is that the only relevant factor cited by Plaintiffs is the alleged current contamination of their properties and that this circumstance, as a matter of law, only constitutes a substantial interference with the use and enjoyment of property if the contamination poses a measurable and verifiable health risk.

I disagree. As previously established in this case, under the law of nuisance there are countless ways in which a defendant can substantially interfere with a plaintiff's use and enjoyment of land, " 'including interference with the physical condition of the land itself, disturbance in the comfort or conveniences of the occupant including his

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

peace of mind, and threat of future injury that is a present menace and interference with enjoyment." ' *Id.* (quoting *Adkins v. Thomas Solvent Co.,* 440 Mich. 293, 487 N.W.2d 715, 720 (Mich.1992)); *see* Prosser and Keeton § 87, at 620 ("virtually any disturbance of the enjoyment of property may amount to a nuisance" so long as it is substantial and unreasonable from the perspective of a normal person). Thus, while activities that cause a physical intrusion or detrimental change in the condition of plaintiff's land can and usually are found to constitute a nuisance, *see* Restatement § 821F cmt. d; Prosser and Keeton § 88, at 627, such a physical change or intrusion is not required to prove substantial and unreasonable interference with the plaintiff's right to use and enjoy its property. *See* Prosser and Keeton § 87, at 619-20; *Lewis v. General Elec. Co.,* 37 F.Supp.2d 55, 61 (D.Mass.1999); *Adkins,* 487 N.W.2d at 721 & n. 12. Other circumstances may properly be considered and relied upon by a jury to find nuisance liability if these circumstances result from the defendant's activities and cause fear, anxiety, discomfort or some other condition that substantially interferes with the plaintiff's use and enjoyment of property. *See, e.g., Cook VIII,* 181 F.R.D. at 485; Prosser and Keeton § 87, at 620.

*24 I am also not persuaded that verifiable health risk is required to prove nuisance in cases involving a physical intrusion or detrimental change to the property resulting from the presence of contamination there. First, the Colorado Supreme Court's recent decision in *Hoery* strongly suggests that proof of health risk is not an element of such a claim. In that case, the Colorado court held that the ongoing presence of the chemical TCE in groundwater and soil beneath the plaintiff's property as a result of the migration of TCE-contaminated groundwater from the defendant's property constituted a continuing nuisance under Colorado law. *See* 64 P.2d at 216, 222. In so holding, the court reported in a footnote that TCE was present in groundwater beneath the plaintiff's property at a concentration of 20 micrograms per liter, which is four times Colorado's health-based standard for TCE in drinking water. *Id.* at 216 n. 2. The plaintiff in *Hoery* did not use the groundwater for drinking water, but used it to irrigate his lawn and vegetable garden. *Id.* at 216. Rather than considering whether use of the contaminated water for this purpose and/or the presence of contaminated soil on the property posed a health risk of any kind, the Colorado court declared without more that the TCE contamination on the property "constituted a nuisance because [it] substantially invaded [plaintiff's] interest in the use and enjoyment of his property." *Id.* at 222. The omission of the concept of health risk from the court's discussion supports my conclusion that Colorado law does not require that contamination pose an actual or verifiable health risk in order for it to be found a private nuisance.

This conclusion is also consistent with relevant statements of law in the Restatement of Torts and Prosser and Keeton on the Law of Torts, both of which are frequently relied upon by the Colorado courts in deciding questions of nuisance law. *See, e.g., Hoery,* 64 P.3d at 218 & n. 5; *Van Wyk,* 27 P.3d at 391-92, 394-95; *Baughman v. Cosler,* 169 Colo. 534, 459 P.2d 294, 299 (Colo.1969). Section 821F of the Restatement and its supporting commentary, relied upon by the Colorado Supreme Court in *Van Wyk,* states that a significant invasion of another's interest in the use and enjoyment of property exists "[i]f normal persons living in the community would regard the invasion in question as definitely offensive, seriously annoying or intolerable." [FN26] Restatement § 821F & cmt. d; *see Van Wyk,* 27 P.3d at 391 (citing Restatement § 821F). The comments to this section further provide as relevant here: "In determining whether the harm would be suffered by a normal member of the community, fears and other mental reactions common to the community are to be taken into account, *even though they may be without scientific foundation or other support in fact."* Restatement, § 821F cmt. f (emphasis added). Thus, the Restatement explains, a landowner's fear of possible contagion from a neighboring leprosy sanatarium can disturb his peace of mind sufficiently for it to constitute a private nuisance, even though the possibility of contagion is so remote that this fear is

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

unfounded as a practical matter. *See id.* Prosser and Keeton make statements to the same effect. *See* Prosser and Keeton § 87, at 620, § 88, at 629. Likewise, under this rule, the existence of contamination on a property may constitute a nuisance, even if it does not pose a currently measurable or verifiable risk to the property or its occupants, if the jury finds the contamination, alone or in combination with other alleged factors of interference, would cause a normal member of the community in the same or similar circumstances to experience sufficient fear, anxiety or other discomfort that the community member would find the contamination (and/or other factors of interference) seriously offensive, annoying or inconvenient. *See* Restatement § 821F & cmt. d; *Van Wyk,* 27 P.3d at 391 (stating test for substantial and unreasonable interference). [FN27]

*25 The Tenth Circuit in dicta has questioned whether the Colorado Supreme Court or any court would follow the Restatement rule allowing nuisance liability to be premised on a landowner's unfounded fear of risks associated with a neighboring property. *See Boughton v. Cotter Corp.,* 65 F.3d 823, 832 n. 13 (10th Cir.1995). The court's apparent concern, quoting from the Michigan Supreme Court's decision in *Adkins v. Thomas Solvent Co.,* 440 Mich. 293, 487 N.W.2d 715 (Mich.1992), was that such a rule could lead to "anachronistic" results such as a group home for AIDS patients or disabled persons being held nuisances based on the unfounded fears of neighbors the such facilities posed a health risk to them. [FN28] 65 F.3d at 832 n. 13 (citing *Adkins,* 487 N.W.2d at 726). The issue in *Adkins,* however, was not whether a landowner's concerns must be grounded in fact before a jury can decide that these concerns substantially interfered with the landowner's use and enjoyment of property. Rather it was whether the unfounded fears of *unrelated third parties* that cause a decline in a property's value can constitute a substantial interference with *the landowner's* interest in the use and enjoyment of the property. *See Adkins,* 487 N.W.2d at 724-26 & nn. 32, 34. The Michigan court held it could not because depreciation in a property's market value, standing alone, is not a substantial interference with an individual's use and enjoyment of the property. [FN29] *See id.* at 725. The Michigan court further noted the *Adkins* plaintiffs had failed to allege either actual or potential contamination of their properties or that the conditions created by the defendants caused them fear, anxiety or other discomfort. *Id.* at 725-26. As a result, the Michigan court held the plaintiffs had failed to allege any interference at all in their use and enjoyment of property and hence had failed to state a nuisance claim as a matter of law. *Id.* at 725, 726.

[16] I read the Michigan court's discussion as suggesting that the result would have been different if the *Adkins* plaintiffs had alleged actual contamination of their properties as a result of the defendant's actions or that the defendant's actions had caused them personal fear, annoyance or discomfort. [FN30] *See Lewis,* 37 F.Supp.2d at 61 (also reading *Adkins* in this manner). In fact, courts continue to approve nuisance claims based on actual property contamination and landowners' concerns regarding this contamination, without regard to whether the contamination poses an actual health risk. *See, e.g., id.* (allegations of personal fear of contamination and of health risk to family sufficient to state private nuisance claim); *Berry v. Armstrong Rubber Co.,* 989 F.2d 822, 829 (5th Cir.1993) (under Mississippi law, actual contamination of property supports nuisance claim even if contamination does not reach dangerous levels); *Phillips v. Davis Timber Co.,* 468 So.2d 72, 78 (Miss.1985) (same); *see also* Prosser and Keeton § 88, at 627 (noting courts normally impose nuisance liability on defendants whose knowing contamination of plaintiff's land has affected the land's rental or market value). [FN31]

*26 A concern about "anachronistic" results in nuisance suits should also be ameliorated by the legal principle, incorporated in the Restatement and followed in Colorado, that substantial interference with the plaintiff's use and enjoyment of property is measured by the reaction of a normal member of the

community facing the same or similar conditions as the plaintiff. Restatement § 821F & cmt. d; *Van Wyk,* 27 P.3d at 391. In assessing how a member of the community would react, the finder of fact takes in account the character and habits of the relevant community, [FN32] as well as the experiences, attitudes and knowledge of its members. *See* Restatement § 821F cmt. e; Prosser and Keeton § 88, at 627-29. These factors change over time as communities change, social attitudes evolve and more and better information about health and other risks posed by contamination and other potentially offending conditions becomes available to and accepted by the community. Thus, the leprosy sanatorium or the AIDS treatment center that might have disturbed the peace of mind of community members and constituted a nuisance in the past likely would not be deemed a nuisance in most communities today because their members now have a better understanding of the actual risk, or non-risk, posed by such facilities. *See Exxon Corp. v. Yarema.* 69 Md.App. 124, 516 A.2d 990, 1003 (Md.Ct.Spec.App.1986). That the reaction of the normal community member is the standard for deciding substantial interference with a property owner's use and enjoyment of property therefore protects against findings of nuisance that do not reflect current social attitudes and scientific information.

Defendants also cite the Tenth Circuit's decision in *Boughton* as establishing a rule that nuisance and trespass claims require scientific proof of real harm or current risk. The legal issue considered and decided by the Tenth Circuit in *Boughton,* however, was whether an unfounded fear of contracting a disease is compensable under Colorado law as an item of "annoyance and discomfort" damages in a nuisance or trespass action. [FN33] 65 F.3d at 831-33 & n. 13. In holding it was not, the Tenth Circuit was careful to distinguish between evidence relevant to proving liability for nuisance and evidence relevant to proving any annoyance and discomfort damages once liability is established. 65 F.3d at 832-33. The court stated that fear of disease might prove nuisance liability by showing how the utility or desirability of a property had been affected by the defendant's activities, even though these same fears would not be compensable as annoyance and discomfort damages once liability was found. *Id.* at 833. The court also declared that if nuisance liability was established based on fear of disease, damages could still be awarded for loss of value to the property. [FN34] *Id.* The Tenth Circuit's decision does not, therefore, support Defendants' contention that proof of verifiable health risk is necessary to establish liability for nuisance.

*27 Defendants also rely on authority from other jurisdictions for the proposition that proof of actual health risk is required to establish substantial interference with the use and enjoyment of property in environmental contamination cases. These decisions, however, either: set out no authority or rationale for this holding, *see In re Wildewood Litig.,* 52 F.3d 499, 503 (4th Cir.1995); *Brooks v. E.I. Du Pont de Nemours & Co.,* 944 F.Supp. 448, 449 (E.D.N.C.1996); fail to provide any basis in nuisance law for this rule, *see Graham v. Canadian Nat'l Railway Co.,* 749 F.Supp. 1300, 1318-19 (D.Vt.1990); rely on an incomplete account of the relevant Restatement rules, *see Lamb v. Martin Marietta Energy Sys. ., Inc.,* 835 F.Supp. 959, 969-70 (W.D.Ky.1993) (relying on Restatement § 821F and its comments without considering comment f); improperly merge the question of nuisance liability with the question of whether damages may be awarded for the property owner's mental distress once liability is established, *see Bradley v. Am. Smelting & Refining Co.,* 635 F.Supp. 1154, 1157-58 (W.D.Wash.1986); rely on other factors not present here, *see Lamb,* 835 F.Supp. at 969 (finding health risk must be proved in part because liability precluded on other grounds if contamination was below federally mandated safety levels); or do not stand for the proposition asserted, *see Nat'l Tel. Coop. Ass'n v. Exxon Corp.,* 38 F.Supp.2d 1, 13-14 (D.D.C.1998) (private nuisance claim fails because only cited interference with use and enjoyment of property was diminution in property value). As a result, to the extent these authorities support Defendants' arguments, I do not find them persuasive.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Finally, a rule requiring Plaintiffs to prove an actual or verifiable health risk in order to prove contamination substantially interferes with the use and enjoyment of property would also be inconsistent with Colorado law assigning the jury the task of making this determination based on the reaction of a normal community member to the contamination. *See, e.g., Van Wyk,* 27 P.3d at 391; *Northwest Water Corp. v. Pennetta,* 29 Colo.App. 1, 479 P.2d 398, 401 (Colo.Ct.App.1971) (substantial interference question must be submitted to jury unless the evidence and reasonable inferences therefrom are such that reasonable persons could only reach one conclusion). Defendants' proposed rule would strip the jury of much of this function by decreeing that a normal member of the affected community would not and could not experience fear, annoyance or discomfort amounting to substantial interference with the use and enjoyment of property unless current science has determined the contamination poses a "real" and unacceptable level of health risk. This conclusion ignores other factors that might be present and might influence a community member's reaction to the contamination, including but not limited to: uncertainty regarding the extent of past, present and future contamination and exposure; a lack of unanimity in the scientific community regarding the short and long-term risks posed by a particular contaminant; uncertainty based on the possibility that future science may determine a contaminant poses a greater risk than is currently believed; and the extent to which reliable information regarding these and related topics is available to the community. [FN35] The rule is also inconsistent with Colorado law because it relies on the experience and knowledge of the scientific community to determine whether substantial interference has occurred, rather than on the reaction of a member of the community affected by the contamination.

B. Other Alleged Limitations on Nuisance Claim

*28 [17] Defendants also complain that Plaintiffs in this case impermissibly seek recovery in nuisance based on the mere proximity of their properties to Rocky Flats. I concur that Colorado law does not permit a finding of substantial interference with the use and enjoyment of property based solely on the existence of a neighboring facility that causes property values to diminish. *See, e.g., Staley v. Sagel,* 841 P.2d 379, 382 (Colo.Ct.App.1992) (diminution in value attributable to proximity to neighboring hog facility insufficient to establish nuisance liability). As *Staley* makes clear, however, proof of actions at the facility that result in substantial interference with a plaintiff's interests are sufficient to establish nuisance. *See id.* at 381; *see also Allison,* 695 P.2d at 794 (legitimate activity may become private nuisance if it is unreasonably operated). Plaintiffs' allegations that Defendants' actions at the Plant resulted in actual contamination of their properties and a risk of future contamination that substantially interfere with their use and enjoyment of property meet this test.

Defendants next seek to limit Plaintiffs' nuisance claim by asserting that Colorado law does not permit recovery in nuisance based on a threat of future harm. As noted above, however, it is already established in this case and recognized in other courts that a threat of future harm caused by a defendant's activities may be properly considered and relied upon by a jury if these circumstances cause plaintiffs fear or anxiety that substantially interferes with their use and enjoyment of property. [FN36] *See, e.g., Cook VIII,* 181 F.R.D. at 485; *Lewis,* 37 F.Supp.2d at 61 (legitimate concern regarding risk of future contamination and associated health risks sufficient to state claim for private nuisance); *Adkins,* 487 N.W.2d at 720 ("threatening or impending danger to the property rights or health of persons" may constitute private nuisance).

Defendants' primary authority for a departure from this general rule is *Green v. Castle Concrete Co.,* 181 Colo. 309, 509 P.2d 588 (Colo.1973), a case in which the Colorado Supreme Court considered whether operation of a quarry could be enjoined as a nuisance before operations began. The court reversed the injunction issued by the lower court on the

grounds that it was based on speculation as to the quarry's future harmful effects on neighboring properties and that the quarry operator had not been given the opportunity to demonstrate it could use methods that would avoid these effects. *Id.* at 591. The court cautioned that its decision was "merely a holding that broad injunctive powers may not be used in advance to prohibit lawful business activity which may not be a nuisance." *Id.* This case has little application here, where concern regarding the risk of future harm is not the sole basis for Plaintiffs' nuisance claim and where both the alleged current and future harm arise from decades of operations and alleged wrongful activities at Rocky Flats. [FN37]

*29 Finally, the parties directly and indirectly debate the role that Plaintiffs' proof of decreased property values has with respect to their nuisance claim. As suggested earlier, a decrease in the value of Plaintiffs' properties is not, in and of itself, an interference with the Plaintiffs' use and enjoyment of these properties. *See Adkins,* 487 N.W.2d at 725; *Oliver v. AT & T Wireless Servs.,* 76 Cal.App.4th 521, 90 Cal.Rptr.2d 491, 500 (Cal.Ct.App.1999); *Edgecomb v. Lower Valley Power & Light, Inc.,* 922 P.2d 850, 860 (Wyo.1996). In order to prove such interference, Plaintiffs must demonstrate actual contamination of their property and/or other circumstances, such as their own fear regarding current or potential health risks posed by Rocky Flats, that interfere with their use and enjoyment of their land.

Evidence that the affected property's value has depreciated may be evidence, however, that actual contamination or other claimed factors of interference are substantial and unreasonable enough to give rise to nuisance liability. *See* Prosser and Keeton § 88, at 627-28. This conclusion flows again from the rule that the reaction of a normal member of the affected community is the measure of whether a claimed interference is substantial and unreasonable. *See id.* So long as the "market" on which the property values are based has substantially the same general characteristics and information base as the affected community, the reaction of the market to the claimed interference, as demonstrated by the value it places on the property, is also evidence of the normal community member's reaction to the claimed interference and whether the member would view the interference as substantial and unreasonable. [FN38]

V. Determination and Measure of Damages

A. Compensatory Damages

Defendants have also assailed Plaintiffs' theory and evidence regarding compensatory damages on a number of legal and other grounds. Many of these issues were addressed but not finally resolved by Judge Matsch at the June 25, 1999 Status Hearing in this action.

One such issue is Defendants' contention that Colorado law requires Plaintiffs to prove a diminution in property values before and after a specific event in order to prevail on their trespass and nuisance claims. The specific event Defendants have in mind is the June, 1989 FBI raid on Rocky Flats that establishes the date for membership in the Property Class. Plaintiffs retort that Colorado law is not as rigid as Defendants contend and allows it to prove damages caused by Defendants' conduct by demonstrating the value class properties would have "but for" Defendants' alleged nuisance and trespass.

[18] At the Status Conference, Judge Matsch rejected Defendants' attempt to limit potential damages to any decrease in the value of class properties immediately before and after the FBI raid. In Judge Matsch's view, this damages approach is not appropriate in a continuing trespass and nuisance case such as this one. The proper approach, he suggested, is that stated in section 930 of the Restatement (Second) of Torts, which provides that the decrease in the value of land caused by a continuing tortious invasion of land is measured "at the time when the injurious situation became complete and comparatively enduring." *Id.* § 930(3).

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

*30 I agree with Judge Matsch's preliminary assessment and therefore hold the approach set forth in Restatement section 930(3), rather than the before-and-after model advocated by Defendants, is the proper method for measuring Plaintiffs' diminution in value damages (if any) in this action. This conclusion is consistent with the Colorado Supreme Court's decision in *Board of County Commissioners v. Slovek*, 723 P.2d 1309 (Colo.1986), in which the court stated "the measure of damages for injury to real property is not invariable" and the goal in all cases is to compensate the property owner for the actual loss suffered. *Id.* at 1314 (quotation omitted); *see id.* at 1316. "[N]o one rule is sufficient or desirable as a measure of damages in realty-damage cases" and the "older tendency to seek a single rule has now largely given way in practice to a more flexible approach" as needed to achieve the goal of reimbursing the plaintiff for losses actually suffered. *Id.* at 1316 n. 6 (quoting D. Dobbs, Handbook on the Law of Remedies § 5.1, at 311 (1973)). The approach initially outlined by Judge Matsch achieves this result.

[19] Defendants have also complained repeatedly that Plaintiffs' "but for" model for measuring decreased property values must be rejected because it does not prove that Defendants' alleged trespass and/or nuisance, rather than mere proximity to Rocky Flats, caused the claimed diminution in value. I disagree. Evidence that class properties have a lower value than comparable properties not in proximity to Rocky Flats, coupled with evidence of Defendants' alleged contamination of these properties and mismanagement of Rocky Flats, is sufficient to allow the jury to infer that diminution in the value of class properties is the result of Defendants' activities and not the result solely of the proximity of these properties to the Plant. [FN39]

[20] Defendants also argue Plaintiffs are precluded as a matter of law from recovering damages for diminution in property value under their trespass and nuisance claims because their claims are for continuing trespass and nuisance as opposed to permanent trespass and nuisance. [FN40] This is so because, under the traditional rule, a continuing trespass or nuisance is defined as a harm that can be abated, making any damages suffered as a result of the continuing tort temporary in nature. *See, e.g., Miller v. Cudahy Co.*, 858 F.2d 1449, 1454 (10th Cir.1988) (applying Kansas law). As a result, courts following the traditional rule generally limit damages in such cases to the reasonable cost of repairing the damage, diminution in the rental or use value of the property and the like during the limitations period preceding commencement of the suit. *See id.* at 1456-57. If the trespass or nuisance is not abated, the plaintiff is required to bring successive actions for these temporary damages until abatement occurs. *See, e.g., FDIC v. Jackson-Shaw Partners No. 46, Ltd.*, 850 F.Supp. 839, 842 (N.D.Cal.1994). The traditional rule bars recovery of diminution in the market value of the property, which includes compensation for prospective harm, except in cases in which the property invasion is deemed unabatable and hence permanent. *See Miller*, 858 F.2d at 1456; *Jackson-Shaw*, 850 F.Supp. at 842.

*31 [21] As a result of the Colorado Supreme Court's recent decision in *Hoery*, there is no longer any question that the continuing presence of contamination on a plaintiff's property is a continuing trespass and nuisance. *See* 64 P.3d at 222 ("failure of [the defendant] to remove the pollution from [the plaintiff's] property which it wrongfully placed there constitutes a continuing property invasion for the entire time the contamination remains"). This determination does not bar Plaintiffs from recovering damages based on diminution in property value, however, assuming Defendants are found liable on one or both of these continuing tort claims. As described earlier, the Colorado Supreme Court has embraced a flexible approach to determining the appropriate measure of damages for injury to real property. *See Slovek*, 723 P.2d at 1314-1316 & n. 6. This flexibility allows a departure from the ordinary rule when necessary to compensate for the plaintiffs' actual loss. *Id.* at 1314-15.

As acknowledged by Defendants, section 930

of the Restatement provides such a departure from the ordinary rule by allowing a party injured by continuing tortious invasions on its property to elect to recover damages for both past and future invasions, including diminution in property value, so as to avoid the necessity of having to bring successive actions as the invasions continue. Restatement § 930(1) & cmt. b. I agree with Judge Matsch that this approach to measuring damages is appropriate under the circumstances of this case to compensate Plaintiffs and class members for losses they claim to have suffered as a result of Defendants' alleged trespass and nuisance.

B. Exemplary Damages

[22] Defendants have also renewed their contention that Plaintiffs are precluded by section 2210(s) of the Price-Anderson Act from seeking exemplary or punitive damages in this action. This section provides: "No court may award punitive damages in any action with respect to a nuclear incident ... against a person on behalf of whom the United States is obligated to make payments under an agreement of indemnification covering such incident...." 42 U.S.C. § 2210(s). This provision only applies, however, "with respect to nuclear incidents occurring on or after" August 20, 1988, its date of enactment. Pub.L. No. 100-408, § 20(a), 102 Stat. at 1084; *TMI III*, 67 F.3d at 1124. Defendants argue Plaintiffs' punitive damage claim is barred under this provision because the "nuclear incident" at issue here is property damage that, under Plaintiffs' theory of the case, necessarily occurred after June, 1989.

This issue was previously addressed in *Cook v. Rockwell Int'l Corp.* ("*Cook I* "), 755 F.Supp. 1468 (D.Colo.1991). In that decision, which remains the law of the case, the court denied Defendants' motion for summary judgment against Plaintiffs' punitive damages claim on the ground Plaintiffs had alleged distinct nuclear incidents occurring before August 20, 1988. *Id.* at 1480-81. This holding was based on the statutory definition of "nuclear incident," which, as relevant here, is "any *occurrence* within the United States causing ... damage to property ... arising out of or resulting from the radioactive, toxic, explosive or other hazardous properties of source, special nuclear, or byproduct material." 42 U.S.C. § 2014(q) (emphasis added); *see Cook I*, 755 F.Supp. at 1480. The *Cook I* court deemed a release of plutonium to be an "occurrence" under this definition and this conclusion is consistent with recent case law. *See* 755 F.Supp. at 1480-81; *Carey v. Kerr-McGee Chemical Corp.*, 60 F.Supp.2d 800, 805 (N.D.Ill.1999) ("occurrence" as used in definition of "nuclear incident" means "happening or event"). It is the date of such occurrences, not the date on which the relevant occurrences caused property damage, that determines application of the section's bar on punitive damage awards. *See* 755 F.Supp. at 1481; Pub.L. 100-408 § 20(a), 102 Stat. at 1084. Accordingly, it remains the law of the case that Plaintiffs may seek punitive damages, to the extent available under Colorado law, with respect to occurrences, including releases of plutonium, they prove took place before August 20, 1988. *See Cook I*, 755 F.Supp. at 1481.

C. Class-wide Damages

*32 [23] Finally, Defendants continue to insist that a class-wide trial on damages is not possible because of individual issues such as exposure, dose, notice, property valuation and notice. Plaintiffs respond that damages can and should be decided in a class-wide trial in which they will present an aggregate damage theory in percentage and perhaps dollar amount, which (if accepted by the jury) would be applied or allocated after trial under a plan or formula approved by the court.

As a result of the Colorado Supreme Court's *Hoery* decision and the scope of trial issues resolved in this decision, many of the individualized determinations posited by Defendants are no longer a part of this case. The class-wide damages approach advocated by Plaintiffs is consistent with the general practice in mass tort and other class actions. *See* Albe Conte and Herbert B. Newberg, Newberg on Class Actions chs. 10, 17 (4th ed.2002). Accordingly, Plaintiffs may present

2003 WL 21738305                      Page 31
(Cite as: 2003 WL 21738305, *32 (D.Colo.))

evidence, consistent with evidentiary standards, and attempt to prove aggregate damages that fairly represent the collective value of the claims of individual class members in the same trial in which Defendants' liability, if any, to the Property Class is determined. Assuming Plaintiffs' compensatory damages are based solely on diminution in property value, such damages may be expressed as either a percentage reduction in the value of class members' properties caused by Defendants' allegedly tortious conduct or as an aggregate lump sum representing the total decrease in the value of class properties.

If class-wide liability and damages are found by the jury, the court will then, with the assistance of counsel, determine appropriate principles and procedures for distributing the compensatory and any exemplary damages awarded. These principles and procedures will address, at a minimum, the division of damages among Property Class members, the disposition of any unclaimed funds and the measure and method of payment of attorney fees due to class counsel. *See Strey v. Hunt Int'l Res. Corp.*, 696 F.2d 87 (10th Cir.1982) (identifying these as necessary elements to final judgment based on jury's class-wide damage award); *see generally* Conte and Newberg §§ 10:12-10:25.

VI. Conclusion

In summary, for the reasons stated above I rule as follows:
1. The Price-Anderson Act does not require that Plaintiffs prove Defendants violated federal regulatory standards as an element of their tort claims.
2. Colorado law does not require that Plaintiffs prove contamination on their properties poses a health risk or otherwise caused actual or substantial damage to their properties as an element of their trespass claim.
3. Colorado law does not require that Plaintiffs prove contamination on their properties poses an actual or verifiable health risk as an element of their private nuisance claim.
4. Under Colorado law, a facility does not constitute a nuisance solely because its proximity to neighboring properties causes their value to decline, but may be a nuisance if actions at the facility result in a substantial and unreasonable interference with the use and enjoyment of neighboring properties.
*33 5. That Plaintiffs' and class properties have decreased in value is not an interference with Plaintiffs' and class members' use and enjoyment of their properties. Evidence that these properties have decreased in value, however, may be relevant to the jury's determination of whether any legitimate factors of interference are substantial and unreasonable enough to constitute a nuisance and to its determination of damages if it finds liability for nuisance and/or trespass.
6. Under the circumstances of this case, Colorado law permits recovery in nuisance based on a threat of future harm.
7. Compensatory damages, if any, in this case will be determined in accordance with section 930 of the Restatement (Second) of Torts.
8. Plaintiffs may seek punitive damages, to the extent available under Colorado law, with respect to releases of plutonium and other occurrences they prove took place before August 20, 1988.
9. Defendants' liability to the Property Class on the Property Class claims and related damages, if any, will be tried and determined in a single trial.

The parties will be contacted shortly to schedule a conference at which a trial date will be set.

    FN1. The parties' arguments regarding the issues addressed in this memorandum opinion and order were set forth in connection with all or some of the following proceedings: briefing and oral argument regarding Defendants' Motion to Strike Plaintiffs' Experts, filed August 29, 1997; the June 25, 1999 hearing before Judge Matsch and pre- and post-hearing submissions filed in May and July, 1999; the February 28, 2001 status conference; the parties' proposed pretrial plans and Class Plaintiffs' Response to Defendants' Report Concerning Opinion Testimony Pertinent to Trial Issues, filed March 21, 2001. In some instances, the parties and the court

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

also addressed these issues in whole or in part in connection with dispositive motions filed earlier in this action.

FN2. A "nuclear incident" is "any occurrence, including an extraordinary nuclear occurrence, within the United States causing, within or outside the United States, bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material ...." 42 U.S.C. § 2014(q).

FN3. The AEA of 1954 amended the original Atomic Energy Act, enacted in 1946, which had granted the federal government exclusive authority over the possession and use of nuclear materials. See Pub.L. No. 79-585, 60 Stat. 755 (1946).

FN4. Congress abolished the AEC in 1974 and transferred most of its functions to the Nuclear Regulatory Commission ("NRC"). See Pub.L. No. 93-438, § 104, 88 Stat. 1233, 1237 (1974) (codified as amended at 42 U.S.C. § 5814). Both are referred to herein as "the Commission."

FN5. See Pub.L. No. 85-256, § 3, 71 Stat. 576 (1957) (codified as amended at 42 U.S.C. § 2014(q) ); supra n. 2.

FN6. Congress phased out the federal indemnity for nuclear incidents at commercial facilities as part of its 1975 amendment and extension of the Price-Anderson scheme. See Pub.L. No. 94-197, 89 Stat. 1111 (1975); S.Rep. No. 100-70, at 15 (1987), reprinted in 1988 U.S.C.C.A.N. at 1428; see generally Dan M. Berkowitz, Price-Anderson Act: Model Compensation Legislation?The Sixty-Three Million Dollar Question, 13 Harv. Envtl. L.Rev. 1, 14-16 (1989). This second-tier of Price-Anderson financial protection was replaced by an industry-funded self-insurance pool consisting of "retrospective premiums" paid by NRC licensees in the event of an accident exceeding the coverage available from private insurance. See Pub.L. No. 94-197, 89 Stat. 1111 (1975); S.Rep. No. 100-70, at 15 (1987), reprinted in 1988 U.S.C.C.A.N. at 1428.

FN7. Congress also intended the statute of limitations defense waiver would effectively supplant any state statutes of limitation that were more restrictive than the limitations period stated in Price-Anderson. See S.Rep. No. 89-1605, reprinted in 1966 U.S.C.C.A.N. at 3220-21.

FN8. The Tenth Circuit's decision on the applicable standard of care was not before the Supreme Court, but, as discussed infra, the Court's analysis of the punitive damages preemption issue is fully consistent with and supportive of the Tenth Circuit's decision on this issue.

FN9. Neither the AEC before its demise nor the NRC has designated a nuclear incident as an ENO.

FN10. There are undoubtedly attributes of the Price-Anderson system that are or might be inconsistent with state law and thus could preempt conflicting state law pursuant to section 2014(hh). One obvious example is Price-Anderson's limit on damage awards from a single nuclear incident. See 42 U.S.C. § 2210(e). Other possible conflicts between Price-Anderson and state tort law include application of Price-Anderson's limits on the availability of fault-based and other defenses in some instances, on who may be held liable for a nuclear incident and on when an injured party may recover evacuation costs or be awarded punitive damages. See John F. McNett, "Nuclear Indemnity for Government Contractors Under the Price-Anderson Act: 1988 Amendments," 19 Pub. Cont. L.J. 1, 6 (Fall 1989) (citing 42 U.S.C. § 2210(q), (s), (r), (d)(1)(B)(i)(II)). The Ninth Circuit has also applied section 2014(hh) to hold that Washington law permitting a claim for emotional distress without bodily injury is inconsistent with the Price-Anderson Act and preempted by it because bodily injury is a jurisdictional prerequisite to a public liability action under the Act. In re Berg Litigation, 293 F.3d 1127, 1131 (9th Cir.2002).

FN11. This limitation only applies "with respect to nuclear incidents occurring on or after Aug. 20, 1988." 42 U.S.C. § 2210 note (1988) (effective date of 1988 Amendments Act); see supra Section V.B.

FN12. The Supreme Court has also recognized in the years since Silkwood that there are legitimate reasons for Congress to preserve state tort law claims, including their jury-imposed standards of care, in the face of federal regulation of the relevant field. It has stated, for example, that it is "perfectly rational for Congress not to pre-empt [state]

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

common-law claims, which-unlike most administrative and legislative regulations-necessarily perform an important remedial role in compensating accident victims." *Sprietsma,* 123 S.Ct. at 527. Congress' preservation of such claims even when they may impose a different standard than required under federal regulations reflects "a congressional determination that occasional nonuniformity [between federal safety standards and jury-imposed state safety standards] is a small price to pay for a system in which juries not only create, but also enforce, safety standards, while simultaneously providing necessary compensation to victims." *Geier,* 529 U.S. at 871. While this analysis is not directly on point in this action, which does not involve complete preemption of state tort law, it is instructive given that one of the overarching objectives of the Price-Anderson system is to ensure that those injured by nuclear incidents receive just and equitable compensation.

FN13. The Third Circuit's decision in *TMI II* also ignores its own prior authority that the Price-Anderson Act's legislative history is "replete with indications that Congress never intended to displace state tort law with respect to the issues of liability and recoverable damages for nuclear accidents." *Kiick v. Metropolitan Edison Co.,* 784 F.2d 490, 493 (3rd Cir.1986).

FN14. Judge Scirica did not join the majority's determination of the preemption issue. *See TMI II,* 940 F.2d at 870.

FN15. The *TMI II* court tries to distinguish the Supreme Court's decision on conflict preemption by stating it was based on the Court's conclusion that an award of punitive damages would not impede Congress' goal of promoting nuclear safety. 940 F.2d at 859 (citing *Silkwood,* 464 U.S. at 257). The textual basis for this characterization of the Supreme Court's decision is unclear, however, and in any event is overwhelmed by the Court's discussion in *Silkwood* of Congress' specific intent that state law govern public liability actions even though states are preempted from regulating the safety aspects of nuclear development. *See* 464 U.S. at 250-56.

FN16. The court's apparent rationale also ignores that the two federal regimes actually serve quite different purposes, as federal nuclear safety regulations are intended to protect the public at large by preventing the occurrence of a nuclear incident, while the Price-Anderson Act and system are intended to protect members of the public injured as a result of such an incident by ensuring that they receive compensation for their injuries. *Compare* 42 U.S.C. § 2201(b) (authorizing NRC to promulgate regulations "to protect health or to minimize danger to life and property") *with id.* § 2210 (establishing indemnification and compensation system in case of nuclear incident).

FN17. Article III "arising under" jurisdiction is distinct from and broader than statutory "arising under" jurisdiction pursuant to 28 U.S.C. § 1331, the statute granting district courts general federal question jurisdiction over any case that "arises under" the laws of the United States. *See Verlinden,* 461 U.S. at 494-95. Thus, the "well-pleaded complaint" rule, which requires that a federal question appear on the face of a well-pleaded complaint for federal question jurisdiction to exist pursuant to section 1331, is not relevant to determining the constitutional power of Congress to confer jurisdiction on the federal courts through the Price-Anderson Act or some other statute. *Id.* at 495 (quoting *Romero v. Int'l Terminal Operating Co.,* 358 U.S. 354, 379 n. 51, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959)).

FN18. The Supreme Court was fully aware that this statement of Article III "arising jurisdiction" was so broad as to raise questions about the precise boundaries of Congress' constitutional authority, but found it unnecessary to decide the issue because the suit before them, and the federal statute on which it was based, necessarily and in all instances "raised questions of substantive federal law at the very outset, and hence clearly 'arises under' federal law, as that term is used in Article III." *Id.*

FN19. As Plaintiffs' tort claims are governed by Colorado law, my task is to ascertain and apply Colorado law so that the result obtained in federal court is the same as would be reached in a Colorado court. *See Adams-Arapahoe School Dist. No. 28-J v. GAF Corp.,* 959 F.2d 868, 870 (10th Cir.1992). Where there is no authoritative precedent from Colorado's highest court on a given issue, I must predict how the Colorado Supreme Court would rule. *Id.* at 871.

FN20. In *Cook VIII,* I denied summary judgment on Plaintiffs' trespass claim on the ground that genuine

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

issues of fact exist as to the actual physical invasion of Plaintiffs' land through contamination emanating from Rocky Flats. 181 F.R.D. at 485-86.

FN21. In these jurisdictions, the tort of "intangible trespass" more closely resembles the tort of nuisance than traditional trespass. *See, e.g.,* Prosser and Keeton § 13, at 71-72; *Adams,* 602 N.W.2d at 219-22.

FN22. The Colorado Supreme Court issued *Hoery* earlier this year in response to the Tenth Circuit's certification to it of unresolved questions of Colorado law that controlled a 2001 appeal of an environmental contamination action from this court. *See Hoery,* 64 P.3d at 215. The *Hoery* decision resolved or clarified a number of difficult issues of Colorado trespass and nuisance law that had previously perplexed litigants and this court and contributed to the delay and uncertainty in proceeding with diversity environmental contamination actions here.

FN23. The TCE was detected in groundwater underlying plaintiff Hoery's property at a concentration of 20 micrograms per liter. 64 P.3d at 216 n. 2.

FN24. Defendants previously made this argument in a motion for summary judgment that was denied because of genuine issues of fact regarding Plant-related contamination and its effects. *See Cook VIII,* 181 F.R.D. at 485-86.

FN25. Others have stated distinct standards for unreasonable and substantial interference: substantial interference means significant harm to the plaintiff as measured by the reaction of a normal member of the community, Prosser and Keeton § 88, at 626; Restatement § 821F; and unreasonable interference means it would be unreasonable to permit the defendant to cause such an amount of harm without compensating for it. Prosser and Keeton § 88, at 626; *see* Restatement § 826 cmt. b.

FN26. This standard is intended to prevent a finding of nuisance for property owners who are hypersensitive to the allegedly offending conditions and to allow nuisance to be found even where the property owners have, by continued exposure, become inured to the conditions. *See* Restatement, § 821F cmt. d.

FN27. Actual contamination that does not pose a demonstrable health risk to property occupants might also substantially interfere with the use and enjoyment of property in other ways, such as by causing government authorities to place restrictions on the property's use and sale, *see, e.g., Exxon Corp. v. Yarema,* 69 Md.App. 124, 516 A.2d 990, 1005 (Md.Ct.Spec.App.1986), or by putting plants or animals on the property at risk.

FN28. The use of the term "anachronistic" in the 1995 *Boughton* and 1992 *Adkins* decisions to describe the Restatement rule approving reliance on unfounded fears of landowners is itself questionable given that the rule had been stated and endorsed in the Restatement and Prosser and Keeton a relatively few years before these decisions were issued. *See* Restatement, § 821F cmt. f (published 1979); Prosser and Keeton § 87, at 620, § 88, at 629 (published 1984).

FN29. The *Adkins* court did recognize that property depreciation is generally a proper element of damages in a nuisance action to be considered when and if liability for nuisance is otherwise established by proof that defendant's activities substantially interfered with the property owner's use and enjoyment of property. 487 N.W.2d at 725. The court also specified that it was not deciding whether unfounded public fears that depress property values could support an award of damages where a basis for nuisance liability was otherwise established. *Id.* at 721 n. 13.

FN30. For example, the *Adkins* court criticized the proposed rule that nuisance liability could be established based solely on decreased property value caused by third party fear of contamination because it would permit recovery "even if the polluted groundwater had neither strayed from defendants' own property nor disturbed a plaintiff's enjoyment by fear that it would do so." 487 N.W.2d at 725-27.

FN31. Other courts have also allowed nuisance claims based on environmental contamination to proceed even where there was no evidence that the plaintiffs' property was in fact contaminated. *DeSario v.Industrial Excess Landfill, Inc.,* 68 Ohio App.3d 117, 587 N.E.2d 454, 461 (Ohio App.1991) (class damages recoverable on private nuisance theory based on perception of contamination irrespective of actual contamination) (called into

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

question by *Chance v. BP Chemicals, Inc.,* 77 Ohio St.3d 17, 670 N.E.2d 985 (Ohio 1996)); *Allen v. Uni-First Corp.,* 151 Vt. 229, 558 A.2d 961, 963-65 (Vt.1988) (evidence that property values decreased based on public perception of contamination sufficient for jury to find private nuisance). The courts in these cases necessarily did not view proof of verifiable health risk from contamination to be a prerequisite to nuisance liability. As previously noted, however, there is a split in authority regarding whether nuisance liability premised on contamination attributable to the defendant can be proved absent present contamination of the plaintiff's property. *See Cook v. Rockwell ("Cook III"),* 147 F.R.D. 237, 244-45 (D.Colo.1993). It does not appear that this issue need be addressed in this case given Plaintiffs' assertions that both their properties and the class properties are contaminated with plutonium from Rocky Flats.

FN32. The community to be considered is the community in which the affected property is located, rather than a community encompassing the general public as a whole. *See* Restatement, § 821F cmt. e.

FN33. Under Colorado law, annoyance and discomfort damages are a separate element of damages compensating the plaintiff for personal injury suffered as a result of injury to plaintiff's property. *Board of County Commrs. v. Slovek,* 723 P.2d 1309, 1318 (Colo.1986); *see Webster v. Boone,* 992 P.2d 1183, 1185 (Colo.App.2000) (distinguishing between nuisance damages based on diminution in property values and damages based on discomfort and annoyance to the property owner).

FN34. The court's different treatment of these damage elements likely reflects that the interest in being free from discomfort and annoyance in the use of land is in the nature of a property interest and hence receives greater legal protection than a plaintiff's personal interest in being free from discomfort and annoyance. *See* Restatement § 821D cmt. b; *cf. Slovek,* 723 P.2d at 1318 (discomfort and annoyance damages reflect personal injury to the landowner resulting from injury to property).

FN35. Defendants' proposed rule also ignores other factors of interference that contamination might cause a property owner, such as legal and practical limitations on the use of the property. *See supra* n. 27.

FN36. Some courts do not recognize a private nuisance based solely on the plaintiff's fear of future injury. *See Koll-Irvine Ctr. Prop. Owners Ass'n v. County of Orange,* 24 Cal.App.4th 1036, 29 Cal.Rptr.2d 664, 667-68 (Cal.Ct.App.1994). This rule has no application where, as here, nuisance is alleged based on both current and potential future injury.

FN37. Defendants' reliance on *Adams-Arapahoe School Dist. No. 28-J v. GAF Corp.,* 959 F.2d 868 (10th Cir.1992), is also misplaced. In this case, the Tenth Circuit held negligence liability requires proof of actual physical injury and therefore could not be premised solely on the possibility of future contamination of the plaintiff's property. *Id.* at 872. Not only was this decision based on negligence rather than nuisance principles, to the extent it is applicable, the requirement of actual physical injury is met here if, as alleged, the class properties are contaminated with plutonium from Rocky Flats.

FN38. As discussed in the following section, evidence regarding a diminution in the value of class properties is also relevant to determining the damages to be awarded if the jury finds Defendants liable for nuisance.

FN39. Defendants are, of course, entitled to argue and present evidence challenging Plaintiffs' assertion that any decrease in the value of their properties was caused by Defendants' alleged trespass and nuisance, rather than by mere proximity to the Plant or other factors.

FN40. Whether the claimed trespass and nuisance are permanent or continuing in character also has implications for when these claims are deemed to accrue under Colorado law. *See, e.g., Hoery,* 64 P.3d at 223 ("Under Colorado law, a tortfeasor's liability for continuing trespass and nuisance creates a new cause of action each day the property invasion continues.").

2003 WL 21738305, 2003 WL 21738305 (D.Colo.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works