## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 90-cv-181-JLK

MERILYN COOK, *et al.*,

       Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION
and THE DOW CHEMICAL COMPANY,

       Defendants.

---

## DEFENDANTS' MEMORANDUM IN SUPPORT OF ITS MOTION FOR A NEW TRIAL OR, IN THE ALTERNATIVE, FOR A REMITTITUR OF DAMAGES

---

Defendants are moving for a new trial pursuant to Federal Rule of Civil Procedure 59(a). In the alternative, defendants move for a remittitur of damages pursuant to Rule 59(e). Defendants note that they are filing this motion early. Under Rule 59(a) and (e), defendants are not required to file a motion for new trial or for remittitur until 10 days after "judgment" is entered. No judgment has been entered in this case. Accordingly, defendants file this motion early without waiver of their rights under the Federal Rules of Civil Procedure.

This Motion contains two general categories of arguments. The first category of arguments, set forth in Sections I-III, relates to the damages awarded by the jury, and advances arguments that the Court has not previously considered (unless otherwise noted). For the convenience of the Court and Court personnel, defendants note that the second category of arguments, set forth in Sections IV to VII, relates to jury instruction, evidentiary, class and mistrial issues, as to which defendants' arguments have already been rejected by the Court.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................1

LEGAL STANDARD............................................................................................5

ARGUMENT .........................................................................................................6

I.     INCONSISTENCIES IN THE JURY'S VERDICT REQUIRE A NEW TRIAL..............6

     A.     The Jury's Compensatory Damages Awards For Trespass and Nuisance Are Duplicative. ......................................................................................7

     B.     The Jury Did Not Determine The Total Damages, If Any, To Assess Against Dow or Rockwell.........................................................................7

     C.     The Jury's Punitive Damages Award Improperly Exceeds Any Compensatory Damages Award. .......................................................9

     D.     Plaintiffs' Argument About Prejudgment Interest Does Not Eliminate the Inconsistency in the Jury's Verdict.......................................................12

     E.     The Inconsistency Between Compensatory and Punitive Damages Cannot Be Resolved Simply by Reducing the Punitive Award to $176 Million. ..............14

II.     THE COMPENSATORY DAMAGE AWARD SHOULD BE SET ASIDE OR, IN THE ALTERNATIVE, SHOULD BE REDUCED.....................................................17

     A.     At A Minimum, The Compensatory And Punitive Damages Amounts Must Be Reduced To Resolve The Inconsistencies In the Jury's Verdict.............17

     B.     The Jury's Compensatory Award Exceeds The Amount Needed To Make Plaintiffs Whole, And Requires Either A Reduction In Damages Or A New Trial. ..............................................................................................17

III.     THE PUNITIVE DAMAGE AWARD IS ALSO CONTRARY TO LAW AND TO THE EVIDENCE AND MUST BE SET ASIDE........................................................28

     A.     Plaintiffs Have Not Shown Beyond a Reasonable Doubt That Punitive Damages Are Warranted In This Case................................................28

     B.     The Punitive Damage Award Should Be Vacated Due To Defendants' Compliance With Standards. ..................................................34

     C.     The Court Should Disallow or Reduce the Punitive Damage Award Pursuant to Colo. Rev. Stat. § 13-21-102. ...........................................35

# TABLE OF CONTENTS (cont'd)

**Page**

D.    The Punitive Damages Award Is Unconstitutional And Must Be Vacated Or Reduced. ..........................................................................................37

E.    The Punitive Damages Award Is Inconsistent with the Price Anderson Act.....................................................................................................43

IV.    ERRONEOUS JURY INSTRUCTIONS REQUIRE A NEW TRIAL..............................46

    A.    Legal Standard for Jury Instructions....................................................49

    B.    The General Jury Instructions Were Legally Incorrect..........................................54

    C.    The Instructions Regarding General Tort Principles Were Incorrect and Require a New Trial............................................................................62

    D.    The Trespass Jury Instructions Were Incorrect and Require a New Trial.............66

    E.    The Nuisance Instructions Were Incorrect, Which Requires a New Trial. ..........71

    F.    Damages Instructions..........................................................................77

    G.    The Instructions on the Issue of Emotional Distress Were Flawed and Require a New Trial............................................................................85

V.    THE COURT'S ADMISSION OF IRRELEVANT AND HIGHLY PREJUDICIAL EVIDENCE REQUIRES A NEW TRIAL..............................................87

    A.    Government-Conspiracy Accusations Should Have Been Excluded. ..................88

    B.    Evidence Regarding the 1989 FBI Raid, The Grand Jury Investigation, And Rockwell's Guilty Plea Should Have Been Excluded. ...............................105

    C.    False Media Stories Should Have Been Excluded................................................111

    D.    Evidence of Incidents and Conditions Occurring Wholly Within Buildings Should Have Been Excluded. ...............................................................113

    E.    Plaintiffs' Repeated Disobedience of the Court's Motions *In Limine* Requires A New Trial. ........................................................................113

    F.    Plaintiffs Should Not Have Been Permitted To Present Evidence Of Past Risks That Never Happened And Now Cannot Happen.....................................116

    G.    Plaintiffs Should Not Have Been Permitted To Introduce Evidence That Does Not Apply Class-Wide..................................................................117

# TABLE OF CONTENTS (cont'd)

**Page**

H.    The Introduction Of Improper Expert Witness Testimony Requires A New Trial...................................................................................................................120

I.    Introduction Of P 493 ("The Mary Walker Memo") Was Error. ........................137

J.    Introduction Of The Sanchini Diaries Was Error. ...............................138

K.    Introduction of P-63 (The "Putzier 30-Year History") Was Error. ....................140

L.    The Introduction Of Testimony And Exhibits Where No Foundation Was Provided Requires A New Trial................................................................141

M.    The Admission Of Hearsay Testimony And Documents Requires A New Trial..................................................................................................143

N.    The Court's Exclusion Of Defense Evidence Requires A New Trial.................144

VI.    THE COURT'S FAILURE TO GRANT DEFENDANTS' MOTIONS FOR MISTRIAL WARRANTS A NEW TRIAL. ...................................................149

A.    The Court Should Have Declared A Mistrial Based Upon The Circumstances Surrounding Juror X's Departure From the Jury.........................149

B.    The Court Should Have Granted Defendants' December 28, 2005 Motion for Mistrial Based on Plaintiffs' Consistent Suggestions That The DOE Abused Its Classification Power. ..........................................................149

C.    The Court Should Have Granted Defendants' Motion For Mistrial Based on Dr. Wing's Testimony Regarding Alleged DOE Human Experiments..........150

D.    The Court Should Have Granted Defendants' Motion for Mistrial Based On Plaintiffs' Repeated And Improper Violations Of the Court's Order on Worker Safety. ....................................................................................150

VII.    DEFENDANTS ARE ENTITLED TO A NEW TRIAL BECAUSE PLAINTIFFS' CLAIMS SHOULD NOT HAVE BEEN TRIED AS A CLASS............151

A.    Plaintiffs' Trespass Claims Should Not Have Been Tried on a Class-Wide Basis...................................................................................................152

B.    Plaintiffs' Nuisance Claims Should Not Have Been Tried on a Class-Wide Basis...................................................................................................155

C.    Plaintiffs' Damages Claims Should Not Have Been the Subject of a Class Trial....................................................................................................159

## TABLE OF CONTENTS (cont'd)

**Page**

D.     The Class Trial Left Many Issues to Be Resolved in This Case..........................162

CERTIFICATE OF SERVICE .................................................................................................165

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

**Cases**

*Adams v. Star Enter.*,
   51 F.3d 417 (4th Cir. 1995) ................................................................ 61

*Ake v. G.M.C.*,
   942 F.Supp. 869 (W.D.N.Y. 1996) ...................................................... 136

*Alley v. Gubser Dev. Co.*,
   785 F.2d 849 (10th Cir. 1986) ................................................... 29, 34, 35

*Bareford v. General Dynamics Corp.*,
   973 F.2d 1138 (5th Cir. 1992) .............................................................. 97

*Bd. of County Comm'rs v. Slovek*,
   723 P.2d 1309 (Colo. 1986)............................................... 20, 22, 23, 78

*Berry v. Armstrong Rubber Co.*,
   989 F.2d 822 (5th Cir. 1993) ................................................................ 61

*Bielicki v. Terminix Int'l Co.*,
   225 F.3d 1159 (10th Cir. 2000) ............................................................ 39

*Black v. Hieb's Enter., Inc.*,
   805 F.2d 360 (10th Cir. 1986) .............................................................. 89

*BMW of N. Am. v. Gore*,
   517 U.S. 559 (1996)....................................................... 4, 5, 37, 40, 43

*Boggs v. Divested Atomic Corp.*,
   No. C-2-90-840,
   1997 WL 33377790, (S.D. Ohio Mar. 24, 1997)............................... 41, 63

*Bohrer v. DeHart*,
   961 P.2d 472 (Colo. 1998)..................................................................... 8

*Bohrmann v. Maine Yankee Atomic Power Co.*,
   926 F. Supp. 211 (D. Me. 1996) ..................................................... 41, 63

*Borland v. Sanders Lead Co.*,
   369 So.2d 523 (Ala. 1979).................................................................... 41

*Boryla v. Pash,*
  937 P.2d 813 (Colo. Ct. App. 1996) *rev'd on other grounds,*
  960 P.2d 123 (Colo. 1998) ............................................................................ 72

*Boughton v. Cotter Corp.,*
  65 F.3d 823 (10th Cir. 1995) ................................................................. 85, 128

*Bower v. Weisman,*
  639 F. Supp. 532 (S.D.N.Y. 1986) ................................................................ 74

*Brock v. Merrell Dow Pharms., Inc.*
  874 F.2d 307 (5th Cir. 1989) ...................................................................... 128

*Broussard v. Meineke Discount Muffler Shops, Inc.,*
  155 F.3d 331 (4th Cir. 1998) .............................................. 20, 54, 119, 154

*Buckley Powder Co. v. State,*
  70 P.3d 547 (Colo. Ct. App. 2002) ............................................................... 78

*Burns v. Bd. of County Comm'rs of Jackson County,*
  330 F.3d 1275 (10th Cir. 2003) ................................................................. 139

*Carroll v. Litton Sys., Inc.,*
  1990 WL 312969 (W.D.N.C. 1990) .............................................................. 42

*Castano v. American Tobacco Co.,*
  84 F.3d 734 (5th Cir. 1996) .......................................................................... 85

*Certain Underwriters at Lloyd's v. Sinkovich,*
  232 F.3d 200 (4th Cir. 2000) .................................................................... 120

*Cimino v. Raymark Indus., Inc.,*
  151 F.3d 297 (5th Cir. 1998) ................................................................ 24, 54

*Cleveland v. Peter Kiewit Sons' Co.,*
  624 F.2d 749 (6th Cir. 1980) ....................................................................... 89

*Continental Trend Resources, Inc. v. OXY USA Inc.,*
  101 F.3d 634 (10th Cir. 1996) ....................................................... 38, 39, 42

*Cook I,*
  755 F. Supp. 1468 (D. Colo. 1991) .............................................................. 44

*Cook v. Rockwell Int'l Corp.,*
  151 F.R.D. 378 (D. Colo. 1993) ...................................................... 126, 151

*Cook v. Rockwell Int'l Corp.,*
  181 F.R.D. 473 (D. Colo. 1998) ( ...................................... 151, 152, 160

*Cook v. Rockwell Int'l Corp.*,
   233 F.R.D. 598 (D. Colo. 2005) ............................................................... 146

*Cook v. Rockwell Int'l Corp.*,
   273 F. Supp. 2d 1175 (D. Colo. 2003) .................................... 41, 43, 46, 62, 66, 67, 155, 159

*Cook v. Rockwell Int'l Corp.*,
   358 F.Supp.2d 1003 (D. Colo. 2004) .......................................................... 3, 22, 23

*Corcoran v. New York Power Auth.*,
   935 F. Supp. 376 (S.D.N.Y. 1996) ........................................................... 41, 63

*Cox v. Cambridge Square Towne Houses, Inc.*,
   236 S.E.2d 73 (Ga. 1977) ................................................................... 84

*deHaas v. Empire Petroleum Co.*,
   435 F.2d 1223 (10th Cir. 1970) ............................................................ 36

*Dept. of the Navy v. Egan*,
   484 U.S. 518 (1988) ....................................................................... 96

*Devine v. Commonwealth Edison Company*,
   No. 06-C-2383,
   2006 WL 2038593 (N.D. Ill. July 19, 2006) ................................................. 40

*Dodge v. Cotter Corp.*,
   328 F.3d 1212 (10th Cir. 2003) ........................................................... 120

*Echo Acceptance Corp. v. Household Retail Serv., Inc.*,
   267 F.3d 1068 (10th Cir. 2001) ........................................................... 140

*Eisen v. Carlisle & Jacquelin*,
   479 F.2d 1005 (2d Cir. 1973),
   *rev'd on other grounds*, 417 U.S. 156 (1974) ............................................. 20

*Ellsberg v. Mitchell*,
   709 F.2d 51 (D.C. Cir. 1983) .............................................................. 97

*Exxon Valdez v. Exxon Mobile Corp.*,
   ---F.3d ----,
   2006 WL 3755189, (9th Cir. Dec. 22, 2006) ............................................. 40, 63

*Farnsworth Cannon, Inc. v. Grimes*,
   635 F.2d 268 (4th Cir. 1980) .............................................................. 97

Fed. R. Evid. 805 ............................................................................ 139

Fed.R.Civ.P. 50(b) .......................................................................... 17

Fed.R.Civ.P. 59(e) ............................................................................................. 17

*Figures v. Bd. of Pub. Utilities of Kan. City*,
    967 F.2d 357 (10th Cir. 1992) ................................................................. 137

*Finestone v. Fla. Power & Light Co.*,
    319 F. Supp. 2d 1347 (S.D. Fla. 2004 ................................................. 40, 63

*Finnegan v. Fountain*,
    915 F.2d 817 (2d Cir. 1980) ............................................................... 13, 17

*Garcia-Martinez v. City and County of Denver*,
    392 F.3d 1187 (10th Cir. 2004) ............................................................. 143

*Gassie v. SMH Swiss Corp. for Microelec. and Watchmaking Indus., Ltd.*,
    No. Civ. A. 97-3557, 1998 WL 158737, (E.D. La. Mar. 26, 1998) .................. 41, 63

*Good v. Fluor Daniel Corp.*,
    222 F. Supp. 2d 1236 (E.D. Wash. 2002) ............................................. 41, 63

*Granite Partners v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    2002 WL 826956 a (S.D.N.Y. 2002) ....................................................... 136

*Griffin v. Hike*,
    804 F.2d 1052 (8th Cir. 1986), *cert. denied* ............................................ 89

*Hafner v. Brown*,
    983 F.2d 570 (4th Cir. 1992) ................................................................. 6

*Hauser v. Kubalak*,
    929 F.2d 1305 (8th Cir. 1991) ................................................................ 6

*Heno v. Sprint/United Mgmt. Co.*,
    208 F.3d 847 (10th Cir. 2000) ..................................................... 6, 9, 15, 16

*Hoery v. United States*,
    64 P.3d 214 (Colo. 2003) ................................................................. 63, 71

*Hughes v. Regents of the Univ. of Colo.*,
    967 F.Supp. 431, 437 (D. Colo. 1996) ..................................................... 27

*Imperial Distrib. Servs., Inc. v. Forrest*,
    741 P.2d 1251 (Colo. 1987) .................................................................. 76

*In re Hanford Nuclear Reservation Litig.*,
    780 F. Supp. 1551 n.38 (E.D. Wash. 1991) ........................................... 43, 88

*In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*,
    209 F.R.D. 323 (S.D.N.Y. 2002) ............................................................ 86

*Jetcraft Corp. v. Flight Safety Int'l*,
16 F.3d 362 (10th Cir. 1993) ............................................................................. 107

*Joseph v. Wiles*,
223 F.3d 1155 (10th Cir. 2000) .......................................................................... 148

*Kirk v. Denver Pub. Co.*,
818 P.2d 262 (Colo. 1991)................................................................................... 36

*Kopecky v. Nat'l Farms, Inc.*,
510 N.W.2d 41 (Neb. 1994) ................................................................................. 76

*Kulik v. Pub. Serv. Co.*,
605 P.2d 475 (Colo. 1979)................................................................................... 77

*Lamb v. Martin Marietta Energy Sys.*,
835 F. Supp. 959 (W.D. Ky. 1993) ................................................................. 41, 63

*Larez v. Holcomb*,
16 F.3d 1513 (9th Cir. 1994) ............................................................................... 89

*Lifewise Master Funding v. Telebank*,
374 F.3d 917 (10th Cir. 2004) .......................................................................... 133

*Lira v. Davis*,
832 P.2d 240 (Colo. 1992)..................................................................................... 8

*Maddy v. Vulcan Materials Co.*,
737 F. Supp. 1528 (D. Kan. 1990)....................................................................... 41

*Maestas v. U. S.*,
341 F.2d 493 (10th Cir. 1965) ............................................................................. 99

*Malandris v. Merrill Lynch, Pierce,
Fenner & Smith Inc.*,
703 F.2d 1152 (10th Cir. 1981) ...................................................................... 5, 17

*McCubbrey v. Boise Cascade Home & Land Corp.*,
71 F.R.D. 62 (N.D.Cal. 1976)........................................................................... 148

*McDaniel v. Anheuser-Busch, Inc.*,
987 F.2d 298 (5th Cir. 1993) ............................................................................... 86

*McLandrich v. S. California Edison Co.*,
942 F. Supp. 457 (S.D. Cal. 1996)................................................................. 41, 63

*Medite of New Mexico, Inc. v. NLRB*,
72 F.3d 780 (10th Cir. 1995) ............................................................................ 143

*Mitchell v. Gencorp, Inc.*,
    165 F.3d 778 (10th Cir. 1999) ................................................................ 131

*Montgomery Ward & Co. v. Duncan*,
    311 U.S. 243 (1940)................................................................ 5, 88, 89

*Neely v. Ethicon, Inc.*,
    2001 WL 1090204 (E.D. Tex. 2001) ............................................. 86

*Nieman v. NLO, Inc.*,
    108 F.3d 1546 (6th Cir. 1997) ................................................ 40, 63

*O'Banion v. Owens-Corning Fiberglas Corp.*,
    968 F.2d 1011 (10th Cir. 1992) ................................................... 42

*O'Conner v. Commonwealth Edison Co.*,
    13 F.3d 1090 (7th Cir. 1994................................................... 40, 63

*O'Connor v. Boeing N. Am., Inc.*,
    No. CV 97-1554, (C.D. Cal. Aug. 18, 2005) .......................... 40, 63

*Osarczuk v. Associated Univs. Inc.*,
    No. 96-2836, (N.Y.-Part. 32, Suffolk Co. Mar. 10 2005)................ 40, 63

*Pacific Mut. Life Ins. Co. v. Haslip*,
    499 U.S. 1 (1991)....................................................................... 43

*Palmer v. Krueger*,
    897 F.2d 1529, 1537-38 (10th Cir. 1990) ................................. 89

*Pub. Serv. Co. of Colo. v. Van Wyk*,
    27 P.3d 377 (Colo. 2001)........................................ 63, 64, 66, 72, 74, 155

*Renaud v. Martin Marietta Corp.*,
    749 F.Supp. 1545 (D. Colo. 1990)................................ 128, 129

*Resolution Trust [Corp. v. Stone*,
    998 F.2d 1534 (10th Cir. 1993) ................................................ 15

*Rhone-Poulenc-Rorer Inc.*,
    51 F.3d 1293 (7th Cir. 1995) ..................................................... 86

*Roberts v. Adams*,
    47 P.3d 690 (Colo. Ct. App. 2001) ............................................ 82

*Roberts v. Fla. Power & Light Co.*,
    146 F.3d 1305 (11th Cir. 1998) ............................................. 40, 63

*Rotolo v. Digital Equip. Corp.*,
   150 F.3d 223 (2nd Cir. 1998) ........................................................................ 131

*Saunders v. Hilperthauser*,
   1998 WL 42146, (S.D.N.Y. 1998) .................................................................. 74

*Seaward Const. Co., Inc. v. Bradley*,
   817 P.2d 971 (Colo. 1991) .............................................................................. 36

*Shoppin' Bag of Pueblo, Inc. v. Dillon Companies, Inc.*,
   783 F.2d 159 (10th Cir. 1986) ...................................................................... 107

*Slack v. Farmers Ins. Exch.*,
   5 P.3d 280 (Colo. 2000) ............................................................................... 8, 9

*Smith v. Isuzu Motors Ltd.*,
   137 F.3d 859 (5th Cir. 1998) ........................................................................ 138

*Southeastern Liquid Fertilizer Co. v. Chapman*,
   120 S.E.2d 651 (Ga. 1961) ............................................................................. 42

*Southwestern Ref. Co. v. Bernal*,
   22 S.W.3d 425 (Tex. 2000) ............................................................................. 20

*Sprague v. G.M.C.*,
   133 F.3d 388 (6th Cir. 1998) ........................................................................ 154

*Springer v. K-Mart Corp.*,
   1998 WL 883318 (E.D.La. 1998) .................................................................. 136

*Staley v. Segal*,
   841 P.2d 379 (Colo. Ct. App. 1992) ............................................................... 61

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
   538 U.S. 408, 417-18 (2003) ..................................................... 37, 38, 39, 40, 42

*Strauss v. Rent-A-Center*,
   2005 WL 2647893 (M.D.Fla. 2005) .............................................................. 148

*Stump v. Gates*,
   211 F.3d 527 (10th Cir. 2000) ...................................................................... 107

*TMI Litigation Cases Consol. II*,
   940 F.2d 832 (3d Cir. 1991) ........................................................................... 40

*Toole v. McClintock*,
   999 F.2d 1430 (11th Cir. 1993) .................................................................... 137

*Tucker v. Makowski*,
  883 F.2d 877 (10th Cir. 1989) .............................................. 107

*U.S. ex rel. Stone v. Rockwell Intern. Corp.*,
  282 F.3d 787 (10th Cir. 2002) .............................................. 115

*Unit Drilling Co. v. Enron Oil & Gas Co.*,
  108 F.3d 1186 (10th Cir. 1997) ............................... 2, 9, 15, 16

*United Air Lines, Inc. v. Austin Travel Corp.*,
  867 F.2d 737 (2d Cir. 1989) .............................................. 138

*United States v. Garcia*,
  291 F.3d 127 (2d Cir. 2002) .............................................. 142

*United States v. Gray*,
  852 F.2d 136 (4th Cir. 1988) .............................................. 138

*United States v. Hajda*,
  135 F.3d 439 (7th Cir. 1997) .............................................. 139

*United States v. Hess*,
  194 F.3d 1164 (10th Cir. 1999) ............................................ 83

*United States v. Jorgensen*,
  451 F.2d 516 (10th Cir. 1972 ............................................. 110

*United States v. Kiewit Const. Co.*,
  2005 WL 1277953 (D. Alaska 2005) ....................................... 136

*United States v. Lawrence*,
  2006 WL 3337472, *3 (S.D. Ohio
  Nov. 16, 2006) ......................................................... 12, 13

*United States v. Novak*,
  918 F.2d 107 (10th Cir. 1990) ............................................. 92

*United States v. Westbo*,
  576 F.2d 285 (10th Cir. 1978) ............................................. 99

*Van Leeuwan v. Nuzzi*,
  810 F. Supp. 1120 (D. Colo. 1993) ..................................... 29, 83

*Vaske v. DuCharme, McMillen & Associates, Inc.*,
  757 F.Supp. 1158 (D. Colo. 1990) ......................................... 29

*Walters v. Edgar*,
  163 F.3d 430 (7th Cir. 1998) ............................................. 148

*Weisfeld v. Sun Chem. Corp.*,
  210 F.R.D. 136 (D.N.J. 2002),
  *aff'd*, 84 Fed. Appx. 257 (3d Cir. 2004) ............................................................... 154

*Whitfield v. Melendez-Rivera*,
  431 F.3d 1 (1st Cir. 2005) .................................................................................. 17

*Wilcox v. Homestake Mining Co.*,
  No. CIV-04-534, (D.N.M. Nov. 15, 2005) ......................................................... 40, 63

*Wilson v. Amoco Corp.*,
  33 F. Supp. 2d 981 (D. Wyo. 1998) ..................................................................... 61

*Windham v. American Brands, Inc.*,
  565 F.2d 59 (4th Cir. 1977) ................................................................................ 24

*Zwick v. Simpson*,
  572 P.2d 133 (Colo. 1977) ........................................................................ 20, 23, 78

**Statutes**

4 Colo. Rev. Stat. § 30-80-102 (2002) ..................................................................... 83

42 U.S.C. § 2011 .................................................................................................... 96

42 U.S.C. § 2014(hh) .............................................................................................. 43

42 U.S.C. § 2014(q) ............................................................................................ 4, 84

42 U.S.C. § 2210 .................................................................................................... 37

Colo. Rev. Stat. § 13-21-111.5(1) ............................................................................. 8

Colo. Rev. Stat. 13-21-102(1)(b) ............................................................................ 29

Colo. Rev. Stat. 13-25-127(2) ........................................................................... 29, 30

**Other Authorities**

§§ 829 through 831 ............................................................................................... 76

66 C.J.S., New Trial ......................................................................................... 12, 13

Charles T. McCormick, Handbook of the Law of Damages,
  § 79 at 280-81 ................................................................................................. 30

Dobbs on the Law of Remedies,
§ 3.11 (2d Ed. 1993) ............................................................................................... 30

Restatement (Second) of Torts § 158(a) cmt. i ............................................................ 71

Restatement (Second) of Torts § 826.................................................................... 75, 76

Restatement (Second) of Torts § 829........................................................................... 76

Restatement (Second) of Torts § 830........................................................................... 76

Restatement (Second) of Torts, § 930....................................... 3, 18, 19, 20, 22, 23, 38, 65, 77, 78

W. Page Keeton et al., Prosser and Keeton on the Law of Torts
§ 2 at 9-10 (5th Ed. 1984) ...................................................................................... 29

**Rules**

Fed. R. Civ. P. 32(a)(1).............................................................................................. 148

Fed. R. Civ. P. 49(b) .................................................................................................. 16

Fed. R. Civ. P. 59(a) .................................................................................................... 5

Fed. R. Civ. P. 59(e) ............................................................................................... 1, 17

Fed. R. Evid. 606(b).................................................................................................... 15

Fed. R. Evid. 701(c).................................................................................................. 133

Fed. R. Evid. 703 .................................................................................... 120, 128, 141

Fed. R. Evid. 801801 (d)(2) ...................................................................................... 140

Fed. R. Evid. 803(8)............................................................................................ 137, 138

## INTRODUCTION

The jury's verdict, rendered on February 14, 2006, provides no basis for entering judgment against defendants.  First, the verdict is ambiguous and inconsistent because it does not set forth any overall amount of damages owed by either Dow or Rockwell.  The jury found Dow and Rockwell liable for both trespass and nuisance.  (Ex. 1, Jury Verdict Form, at 2-3 (trespass), 5-7 (nuisance).)  The jury further determined that (a) Dow caused 90% of the trespass damages, and 30% of the nuisance damages; and (b) Rockwell caused 10% of the trespass damages, and 70% of the nuisance damages.  (*Id.* at 16 (trespass), 25 (nuisance).)  All agree that plaintiffs cannot recover more than $176,850,340 in compensatory damages for the combination of the trespass and nuisance claims.  (Pls.' Mem. of Law in Support of Pls.' Mot for J. ("Pls.' Mem.") at 26, 29.)  Given that the trespass and nuisance damages are duplicative, the jury verdict form does not provide any guidance as to whether, in calculating the respective damages (if any) owed by Dow and Rockwell, that calculation should be made:  (i) based on the nuisance claim (70% Rockwell/30% Dow); (ii) based on the trespass claim (90% Dow/10% Rockwell), or (iii) based on some unknown combination of the two claims.  Thus, the verdict form provides no basis for answering the following two simple questions:  What overall amount of damages, if any, is owed by Dow?  What overall amount of damages, if any, is owed by Rockwell?

Plaintiffs' proposed judgment does not answer this question.  Rather, plaintiffs propose that Dow be responsible for damages "not to exceed" $159 million (i.e., 90% of the total), and that Rockwell be responsible for damages "not to exceed" $123 million (i.e., 70% of the total). (Pls.' Proposed Final J. at 3.)  Plaintiffs presumably selected those amounts because the jury's verdict is ambiguous and inconsistent.  But plaintiffs' proposal cannot form the basis of a judgment.  A judgment must define with care the obligations of the party that did not prevail, and cannot leave such obligations up in the air.  Each defendant is entitled to a separate

determination of damages.  This is particularly true where, as here, joint and several liability does not apply.  (12/7/06 Order Regarding Jury Instructions at 95-96.)  The jury's verdict provides no basis for such a determination.  As a result, a new trial is required.  *See Unit Drilling Co. v. Enron Oil & Gas Co.*, 108 F.3d 1186, 1191-93 (10th Cir. 1997).

Second, the punitive damages award is irreconcilably inconsistent with the compensatory damages award.  The jury was specifically instructed that punitive damages could not exceed compensatory damages.  (Instruction No. 3.27.)  Colorado law requires as much.  Nevertheless, the jury awarded more punitive damages than compensatory damages, in violation of the jury instructions and Colo. Rev. Stat. § 13-21-102.  (Ex. 1, Jury Verdict Form at 26-27.)  There is no way to reconcile the punitive award to the compensatory award, because there is no way to determine the basis of the jury's punitive damages award, including what ratio of punitive to compensatory damages, if any, was intended by the jury.  It is too late now to reconcile the verdict, as the jury has been discharged for nearly a year.  Because of the inconsistencies and ambiguities that remain in the jury's verdict, a new trial is required.  *See Unit Drilling*, 108 F.3d at 1189-92 (holding new trial required where the amount of damages a jury intended to award was ambiguous and district court did not ask the jury to clarify its verdict).

Third, the compensatory damages award cannot form the basis of a judgment for a variety of additional reasons.

- **The jury's damages award was based in part on properties owned by class members who cannot recover damages under Restatement (Second) of Torts § 930.**  Before the trial, the Court ordered that only class members who were also members of the Section 930 Damages sub-class (which the Court defined as class members who did not sell their properties before January 30, 1990) could recover damages in this trial.  (*See* 5/17/04 Order at 16.)  The Court further ordered that class members who were not members of the Section 930 Damages sub-class (class members who sold their properties before January 30, 1990) could not recover.  (*See id.* at 16 ("Members of this sub-class [class members who sold their properties before 1/30/90] are not entitled to § 930(3)(b) damages . . . .").)  But the jury verdict form assessed damages to all "Class Properties, as

2

a whole" — including Class Properties owned by class members who sold their properties before January 30, 1990, and who therefore are not members of the Section 930 Damages sub-class.  (*See*, *e.g.*, Ex. 1, Jury Verdict Form at 15, 23 (asking jury to find the amount by which Class Properties, as a whole, were diminished or depressed in value").)

- **The jury did not indicate whether it assessed damages as of a date when class members actually owned their properties.**  Under § 930, damages are assessed as of the time the injurious situation became "complete and comparatively enduring."  But the jury did not report on the jury verdict form (and was not asked to report on the jury verdict form) the date when the injurious situation became complete and comparatively enduring.  Rather, on the verdict form, the jury was only asked whether the complete and comparatively enduring date was between 1/1/88 and 12/31/95.  (Ex. 1, Jury Verdict Form at 15, 24.)  Thus, the jury could have found the complete and comparatively enduring date to be as early as 1/1/88 or as late as 12/31/95.  Thousands of Damages sub-class members did not own their properties on 1/1/88 and 12/31/95. As a result, the jury may have assessed damages as of a date when many, or most, of the class members did not own class properties.

- **The jury's award is improperly based upon the "average" diminution in value suffered by class properties.**  The jury's damages award is based upon the "average" diminution in value suffered by class properties.  (*Id.* at 15, 24.)  The jury did not determine, could not determine, and was not asked to determine, whether all Damages sub-class members suffered this average diminution.  Indeed, the Court specifically instructed the jury that it could calculate an "average" diminution in value even if some class members suffered less than the average.  (2/6/06 Response to Jury Question at 3 ("the percentage diminution in value suffered by some Class Properties . . . may be less than the average").)  To award "average" damages to class members who suffered less than average damages (or no damages) would:  (i) violate defendants' constitutional rights to due process, equal protection, and a fair jury trial; and (ii) violate the Rules Enabling Act, which prohibits either the abridgment and enlargement of substantive rights simply because a case was brought as a class action.

- **The jury awarded damages to class members who may not accept an easement.**  The Court structured the trial so that, at a time when a judgment could be entered, certain subclass members would receive damages in exchange for granting defendants an easement.  *Cook v. Rockwell Int'l Corp.*, 358 F.Supp.2d 1003, 1013-14 (D. Colo. 2004) ("*Cook X*").  Yet, at this point, it is unknown which class members will and which will not choose to accept an easement.  Under Section 930, damages cannot be awarded to class members who do not accept an easement.  Restatement (Second) of Torts, § 930 cmt. b.

- **The jury awarded damages to class members who have released their claims against defendants.**  Some class members, such as Charles and Perry McKay, have released their claims against defendants, and cannot recover damages from defendants.  Yet the jury's verdict was based, in part, on properties currently or previously owned by these individuals.

- **The jury awarded compensatory damages that were not supported by the evidence.** For the numerous reasons set forth in defendants' Renewed Motion for Judgment as a Matter of Law, there is insufficient evidence to support the jury's damages verdict.

  Next, the punitive damage award likewise suffers from fatal defects that require a new trial:

- **Lack of Evil Intent or Wrongful Motive.**  To be entitled to punitive damages, plaintiffs must demonstrate that defendants acted with "evil intent" or with such a reckless disregard of plaintiffs' rights as to evidence a "wrongful motive."  Plaintiffs never presented any evidence that defendants intended to harm the plaintiffs or acted with a wrongful motive.

- **Compliance With Standards.**  This Court has ruled that compliance with standards is relevant to whether punitive damages may be awarded.  The evidence at trial showed that defendants complied with applicable standards and regulations.

- **The Alleged Conduct Which Resulted In the Award Has Ceased.**  The Court should reduce or disallow punitive damages pursuant to Colo. Rev. Stat. § 13-21-102 because the conduct that resulted in the award has ceased.  *See* Colo. Rev. Stat. § 13-21-102 (court may "reduce or disallow" punitive damages if "[t]he conduct which resulted in the award has ceased").  Dow has not operated the Rocky Flats Plant in thirty-two years, and Rockwell has not operated the plant for eighteen years.  The plant is now a wildlife refuge.

- **No Deterrent Purpose Would Be Served by Punitive Damages.**  The Court should also disallow or reduce the punitive damage award because it would not achieve any deterrent purpose.  *See* Colo. Rev. Stat. § 13-21-102 (court may "reduce or disallow" punitive damages if "the deterrent effect of the damages has been accomplished," or if "the purpose of such damages has otherwise been served").  Neither defendant currently operates any nuclear plant.  And a punitive damages award would not deter others because no punitive damages can be awarded in any future Price Anderson Act case.  42 U.S.C. § 2014(q).

- **No Pre-August 20, 1988 Nuclear Incident.**  Under the Price Anderson Amendments Act of 1988, plaintiffs may be entitled to punitive damages only if, among other things, they suffered "loss of or damage to property, or loss of use of property" before August 20, 1988.  42 U.S.C. § 2014(q).  But the jury was never asked to determine whether the class suffered any "loss of or damage to property, or loss of use of property" before August 20, 1988.  Indeed, thousands of class members did not even own their properties before August 20, 1988.

- **The Punitive Damages Award is Unconstitutional.**  Under *BMW of N. Am. v. Gore*, 517 U.S. 559 (1996), plaintiffs are not entitled to punitive damages unless they can show that defendants' conduct was "reprehensible."  Yet plaintiffs presented no evidence that defendants' conduct was reprehensible.  To the contrary — defendants complied with all

pertinent standards and took appropriate steps to prevent harm.  Therefore, the award of punitive damages is unconstitutional and must be vacated.  *See BMW*, 517 U.S. at 575.

Finally, defendants respectfully submit that the Court erred in its rulings on the jury instructions, evidentiary and class issues, and in denying defendants' motions for mistrial. Therefore, defendants are entitled to a new trial on these bases as well.

Any of these problems, standing alone, is sufficient to require that the jury's verdict be vacated and a new trial granted.  A new trial is also required due to the cumulative impact of these issues.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 59(a), a new jury trial may be granted "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States."  Fed. R. Civ. P. 59(a).  The scope of Rule 59 is expansive.  A new trial should be ordered where "the verdict is against the weight of the evidence, [] the damages are excessive, or [], for other reasons, the trial was not fair to the party moving."  *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940).

A remittitur is an alternative to granting a new trial when excessive damages are awarded.  *See Malandris v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 703 F.2d 1152, 1168 (10th Cir. 1981).  "Where the court concludes there was error only in an excessive damage award, but not one also tainting the finding of liability, the appellate court may order a remittitur and alternatively direct a new trial if the plaintiff refuses to accept the remittitur, a widely recognized remedy."  *Id.*  Here, there is error tainting both liability and damages.  Accordingly, the Court should either enter judgment in favor of defendants (*see* Defs.' Renewed Mot. for J. as a Matter of Law, filed concurrently herewith) or order a new trial.  Defendants set forth the

remittitur alternative here only in the event the Court denies defendants' Motions for Judgment as a Matter of Law and New Trial.

## ARGUMENT

## I.   INCONSISTENCIES IN THE JURY'S VERDICT REQUIRE A NEW TRIAL.

There were multiple ambiguities and inconsistencies reflected in the jury's 30-page verdict form that was returned on February 14, 2006.  These include: (1) the jury awarded the same damages for trespass and nuisance, but allocated fault among Dow and Rockwell differently for each tort, and made no determination on the total damages to award against each defendant for the combination of the trespass and nuisance claims; (2) the jury's aggregate punitive damage award exceeds its compensatory award; and (3) because the Court did not follow up on its inquiry to the jury about damages, there is no longer any way to determine what relationship, if any, the jury intended between compensatory and punitive damages.

Because the Court declined to ask the jury to explain its inconsistent damages figures, there is no longer any way to reconcile the verdict, making a new trial the only appropriate remedy.  *See Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 853 (10th Cir. 2000) ("Ordinarily, a trial judge should point out apparent inconsistencies in the special verdicts to the jury and ask the jury to resolve the conflict.  This was not done and the alternative is to send the case back for a new trial") (citations omitted); *Unit Drilling*, 108 F.3d at 1191-93 (10th Cir. 1997) ("Where a court is faced with an ambiguous general verdict, and a request for clarification is made before the jury is discharged, the court's options are to explain the ambiguity to the jury and send the jury back into deliberations with instructions to clarify the ambiguity or to order a new trial."); *Hafner v. Brown,* 983 F.2d 570, 575 (4th Cir. 1992) (finding the district court has a "duty" to resubmit the case to the jury when jury returns an inconsistent verdict); *Hauser v. Kubalak*, 929 F.2d 1305, 1307 (8th Cir. 1991).

**A.      The Jury's Compensatory Damages Awards For Trespass and Nuisance Are Duplicative.**

All agree that, at best, $176,850,340 in compensatory damages can be awarded.  (*See* Pls.' Mem. at 26, 29.)  As this Court has already ruled, the $176,850,340 award for trespass and the $176,850,340 damages for nuisance are the same damages. (2/14/06 Trial Tr. at 10800.)[1]

**B.      The Jury Did Not Determine The Total Damages, If Any, To Assess Against Dow or Rockwell.**

The judgment on the jury verdict cannot include any amount of compensatory damages awarded against either Dow or Rockwell.  That is because there is no way to tell from the jury verdict form the total amount of damages, if any, to assess against Dow or Rockwell.  The jury found $176,850,340 in diminution in value for trespass and nuisance caused by Dow and Rockwell.  (Ex. 1, Jury Verdict Form at 15.)  The jury also found that:  (i) 90% of the trespass damages was caused by Dow, and 10% was caused by Rockwell (*id.* at 16); and (ii) 30% of the nuisance damages was caused by Dow, and 70% of the nuisance damages was caused by Rockwell, (*id.* at 25.; *see also* Jury Instruction No. 1.19A.)

But, contrary to what plaintiffs suggest, the jury verdict form does not answer the key questions:  What portion, if any, of the $176,850,340 is owed by Dow?  What portion, if any, of the $176,850,340 is owed by Rockwell?  The jury verdict form does not provide any means of answering these questions.  The 70/30 allocation takes into account only the nuisance claim,

---

[1]    The duplicative nature of the jury's award of damages is also plain from the jury's determination that the percent diminution in value in commercial properties is 53.03%.  (Ex. 1, Jury Verdict Form at 15, 24.)  Were the trespass and nuisance damages to be added together, this would be tantamount to a jury finding that commercial properties have lost more than 100% of their value (106.06%), which is economically, logically, and metaphysically impossible.

while the 90/10 allocation takes into account only trespass.  The jury was not asked what portion the trespass and nuisance awards respectively made of the total verdict.

Each defendant in a non-joint-and-several-liability setting is entitled to a verdict that sets forth the total amount that it owes (as opposed to the amount owed by all defendants).  *See, e.g.*, Colo. Rev. Stat. § 13-12-111.5(1)  ("In an action brought as a result of a death or an injury to person or property, no defendant shall be liable for an amount greater than that represented by the degree or percentage of the negligence or fault attributable to such defendant that produced the claimed injury, death, damage, or loss"); *Slack v. Farmers Ins. Exch.*, 5 P.3d 280, 284 (Colo. 2000)  ("As part of the tort reform movement in Colorado, the General Assembly eliminated joint and several liability wherein one tortfeasor might be liable in damages for the acts of another tortfeasor, and adopted a several liability scheme, wherein a tortfeasor is responsible only for the portion of the damages that he or she caused."); *Bohrer v. DeHart*, 961 P.2d 472, 476 (Colo. 1998)  ("Special verdict forms focus on the essential issues attendant to a finding of liability - ***total*** damages and the relative fault of the parties") (emphasis added); *Lira v. Davis*, 832 P.2d 240, 242 (Colo. 1992) ("where there are multiple defendants, after jury determination of ***total*** compensatory damages, the court applies the comparative negligence and pro rata liability statutes and enters a judgment against each defendant for compensatory damages against each defendant for compensatory damages apportioned in accordance with the percentage of fault attributable to that defendant.") (emphasis added).  There is no way here to determine "the portion of the damages" that Dow or Rockwell caused.  Accordingly, no compensatory damages can be awarded, and a new trial must be declared.

For the same reason, plaintiffs' contention that the inconsistency can be avoided by electing to recover a certain amount of a $176 million verdict from Dow (based on one claim)

and another portion of it from Rockwell (based on a separate claim) is incorrect and unprecedented.  (*See* Pls.' Proposed Final J. at 3-4.)  In a case such as this one, plaintiffs can only collect the amount of damages caused by each defendant.  *Slack*, 5 P.3d at 284.  Here, the jury provided two inconsistent answers as to the proportion of the total damages caused by Dow,[2] and two inconsistent answers as to the proportion of the total damages caused by Rockwell.  (Ex. 1, Jury Verdict Form at 16, 25.)  Plaintiffs cite no authority for being allowed to cherry-pick from these inconsistent answers in order to maximize their recovery.

The opportunity has now passed for the jury to clarify its verdict.  As a result, there is no way to determine what amount of compensatory damages is owed by either Dow or Rockwell. Therefore, a new trial is required.  *See Heno*, 208 F.3d at 853 ("alternative" to asking jury to resolve inconsistencies "is to send the case back for a new trial"); *Unit Drilling*, 108 F.3d at 1189-92 (holding new trial required where the amount of damages a jury intended to award was ambiguous and district court did not ask the jury to clarify its verdict).

### C.     The Jury's Punitive Damages Award Improperly Exceeds Any Compensatory Damages Award.

As discussed above, the jury did not determine any amount of compensatory damages for any defendant; thus, the judgment cannot award compensatory damages against Dow or Rockwell.  Because no compensatory damages can be awarded against Dow or Rockwell, it follows that, under Colo. Rev. Stat. § 13-21-102, no punitive damages can be awarded.  *See* Colo. Rev. Stat. § 13-21-102 ("The amount of such reasonable exemplary damages shall not exceed an amount which is equal to the actual damages awarded to the injured party.").  But

---

[2]     Dow cannot be simultaneously responsible for 90% and 30% of the "same damages." (2/14/06 Trial Tr. at 10801 ("They're the same damages.").)

even if, as plaintiffs contend, the jury verdict form could otherwise support an award of $176,850,340 in compensatory damages, there are still irreconcilable inconsistencies between the jury's award of compensatory damages and its award of punitive damages, thus requiring a new trial.

The jury's $200.2 million aggregate punitive damages award is inconsistent with the compensatory verdict, and thereby violates the jury instructions and Colorado law. Jury Instruction No. 3.27 states: "The sum [of punitive damages] you award may not be more than the amount you awarded as actual damages against the defendant or defendants." This instruction is based on Colo. Rev. Stat. § 13-21-102, which provides: "[t]he amount of such reasonable exemplary damages shall not exceed an amount which is equal to the actual damages awarded to the injured party." Accordingly, even assuming *arguendo* that plaintiffs were correct that the judgment could award $176,850,340 in compensatory damages, the punitive damages verdict of $200,200,000 violates both: (i) Colorado's prohibition on punitive damages awards in excess of compensatory damages awards; and (ii) the jury instructions.

Plaintiffs contend they are entitled to $200.2 million in punitive damages:

The jury found Dow's share of fault on the trespass claim to be 90%. The jury has therefore awarded $159,165,306 (90% or $176,850,340) in compensatory damages against Dow on that claim. That exceeds the $110,800,000 it awarded in exemplary damages against Dow, and so the statutory cap on exemplary damages in C.R.S. § 13-21-102(1)(a) does not come into play. The same reasoning applies to Rockwell, which the jury found to be 70% at fault on the nuisance claim. The jury's award of $123,795,238 in compensatory damages against Rockwell on the nuisance claim (70% of $176,850,340) exceeds its award of $89,400,000 in exemplary damages against Rockwell.

(Pls.' Mem. at 29.) Plaintiffs cite no authority for this approach. (*Id.*)

Plaintiffs' argument fails for several reasons. First, plaintiffs' approach depends upon the proposition that, based on the jury verdict form, the jury awarded $159,165,306 in compensatory damages against Dow and $123,795,238 against Rockwell. But, as discussed in Part I-B above,

there is no basis in the jury verdict form for determining any amount of compensatory damages owed by Dow or Rockwell, much less for determining what amounts can be collected from Dow or Rockwell.

Second, plaintiffs' approach is inconsistent with the language of Colo. Rev. Stat. § 13-21-102.  That statute provides that "exemplary damages shall not exceed an amount which is equal to the ***actual*** damages ***awarded to the injured party***."  Colo. Rev. Stat. § 13-21-102 (emphasis added).  Here, even assuming *arguendo* that the jury verdict form could support an award of compensatory damages, the jury's "award" would be $176,850,340; therefore, under the plain language of the statute, punitive damages cannot exceed $176,850,340.  *See id.*  The jury did not "award" $282,958,544 (the sum of the amounts that plaintiffs claim hypothetically is collectible from Dow and the amount that hypothetically is collectible from Rockwell).  Nor does Colo. Rev. Stat. § 13-21-102(1)(a) say that "exemplary damages shall not exceed the sum of (i) the maximum amount of compensatory damages collectible from Defendant A (assuming that the amount paid in judgment by other defendants does not decrease the amount owed by Defendant A) plus (ii) the amount of compensatory damages collectible from Defendant B (assuming that the amount paid by other defendants does not decrease the amount owed by Defendant A), *etc.*"

To illustrate one of the many fallacies in plaintiffs' argument, and the strangeness of a punitive damages cap that would work in the way that plaintiffs want, assume that, instead of 2 defendants and 2 claims, there were 10 defendants and 10 claims.  Further assume that the jury awarded the plaintiff $1 million on each of the 10 claims, and determined that a different defendant was 90% responsible for damages when filling out the sections of the verdict form relating to each of the 10 claims.  Applying plaintiffs' theory of punitive damages, the same plaintiff could recover <u>$9 million in punitive damages</u>, even though the same plaintiff could only

recover $1 million in compensatory damages.  As the amount of claims and defendants increase, so too would the amount by which a punitive damages award could exceed the compensatory damages award.  This defies reason.  Plaintiffs cite no evidence that the Colorado Legislature intended such a result.

      **D.**    **Plaintiffs' Argument About Prejudgment Interest Does Not Eliminate the Inconsistency in the Jury's Verdict.**

Plaintiffs also contend that the statutory cap on punitive damages does not apply because pre-judgment interest can be added to compensatory damages before application of the punitive damages cap.  (Pls.' Mem. at 29-30.)  Plaintiffs' argument is inconsistent with both the jury instructions and Colorado law.

First, plaintiffs' argument is contrary to the Court's jury instructions.  The Court instructed the jury that compensatory damages could not exceed punitive damages.  Jury Instruction No. 3.27 states:  "The sum [of punitive damages] you award may not be more than the amount you awarded as actual damages against the defendant or defendants."  The jury's violation of the Court's instructions is, in and of itself, a basis for a new trial.  *See, e.g.*, 66 C.J.S., New Trial § 85 ("A verdict or decision that, under the evidence, is contrary to the law governing the case must be set aside, as, for instance, a verdict contrary to the instructions given by the court"); *id.* § 100 ("Generally it is a ground for a new trial that the verdict of the jury with respect to the amount of recovery is contrary to law, as where it is contrary to the instructions given by the court"); *United States v. Lawrence*, 2006 WL 3337472, *3 (S.D. Ohio Nov. 16, 2006) (attached as Ex. 2) (rejecting method of reconciling verdict that would violate jury instructions).

Moreover, the Court's instruction that "[t]he sum [of punitive damages] you award may not be more than the amount you awarded as actual damages against the Defendant or

Defendants" would make no sense if prejudgment interest could later be added — by the Court — before application of Colo. Rev. Stat. § 13-21-102(1)(a).  The purpose of the instruction was to avoid a violation of Colo. Rev. Stat. § 13-21-102(1)(a).  (*See* 12/7/06 Order Regarding Jury Instructions at 79.)  But there would be no reason to instruct the jury not to award punitive damages in excess of compensatory damages if the Court could later add prejudgment interest to the jury's compensatory award without violating Colo. Rev. Stat. § 13-21-102(1)(a).  There would be no logical basis for such an instruction, because under plaintiffs' interpretation of Colo. Rev. Stat. § 13-21-102(1)(a), the jury *could* have awarded punitive damages *greater than* the "actual damages against the defendant or defendants."

Plaintiffs are left with the argument that: (i) the Court's jury instructions got it wrong; (ii) the jury violated the jury instructions; and (iii) as a result of violating the incorrect jury instructions, the jury verdict came out right, because the jury's punitive damages award was still less than the sum of the compensatory damages award plus prejudgment interest.  But no judgment can be rendered based on a "verdict" that is the product of a jury's violation of incorrect jury instructions.  *See* C.J.S., New Trial §§ 85, 100; *Lawrence*, 2006 WL 3337472, at * 3 (attached as Ex. 2).  Any such judgment would also be inconsistent with defendants' right to a jury verdict based on the instructions used throughout the trial and read to the jury, as opposed to a verdict based on the violation of incorrect instructions.  *See Finnegan v. Fountain*, 915 F.2d 817, 820 (2d Cir. 1980) ("The Seventh Amendment right to a jury trial precludes entry of a judgment based on an inconsistent jury verdict that thereby disregards any material jury finding").

Plaintiffs' argument also fails, of course, because plaintiffs are not entitled to any prejudgment interest.  (*See* Defs.' Resp. to Pls.' Request for Prejudgment Interest, filed concurrently herewith.)

**E.   The Inconsistency Between Compensatory and Punitive Damages Cannot Be Resolved Simply by Reducing the Punitive Award to $176 Million.**

The inconsistency between compensatory and punitive damages cannot be resolved by reducing the $200.2 million punitive damage amount to equal the compensatory damages amount ($176,850,340).

First, as discussed in Part I-B, no compensatory damages can be awarded against either Dow or Rockwell.  Because punitive damages are limited to compensatory damages by Colorado statute, it follows that no punitive damages can be awarded.  *See* Colo. Rev. Stat. § 13-21-102.

Second, there is no way to determine what ratio, if any, of compensatory to punitive damages the jury intended to accomplish with its award.  Did the jury base the punitive awards on trespass, nuisance, both, or something else entirely?[3]  Did the jury determine punitive

---

[3]   Plaintiffs repeatedly argued to the jury matters irrelevant to their disposition of this case, including whether the DOE abused its classification powers (*see*, *e.g.*, 10/11/05 Trial Tr. at 492 ("DOE used its national security, top secret rights, to conceal from you and from this court massive amounts of evidence.  Why?  To spare itself public embarrassment and to defeat damages in this and other cases"); worker safety (*id.* at 501 ("precautions were not adequate.  They were not adequate to protect either the workers or the neighbors")); that defendants and the DOE engaged in a "cover up" because "[t]hey were part of the negligent and wrongful conduct" (10/11/05 Trial Tr. at 487); cleanup costs (plaintiffs' counsel showed the jury a headline from the March 1, 1990 Rocky Mountain News stating: "Cleanup could cost $150 billion"); the *Church* settlement (10/11/05 Trial Tr. at 551) ("defendants in this case have already acknowledged, if you will, and paid money to some of the neighbors for the contamination problems it caused"); and that the DOE tainted science (11/17/05 Trial Tr. at 5757 (Dr. Stephen Wing testimony that the "DOE has been more interested in producing nuclear weapons, promoting nuclear energy, protecting its public image, and guarding against litigation than in vigorously pursuing research into radiation health effects in general and plutonium health effects in particular").

damages by using some weighting of its fault allocations for trespass and nuisance?  Or was is its intent something else entirely?  There is no way of knowing the answer to any of these questions at this point.  Hence, the Court's only option is to order a new trial.  *See Heno*, 208 F.3d at 853; *Unit Drilling*, 108 F.3d at 1193.

Defense counsel requested that the Court ask the jury how it determined its punitive damages award.  (2/14/06 Trial Tr. at 10801-05.)  The Court initially acknowledged that there was a problem with the punitive damages calculation, and asked the jury about that calculation.  (*See id.* at 10813 ("How did you determine to award punitive damages, in this sense did you determine to award damages solely on one of those claims or on both of them?"); *see also id.* ("How was the calculation made?").)  The jury indicated that it could answer the Court's questions by referring to its notes.  (*Id.*)  Although the inconsistency could thereby have been cured, the Court decided not to ask any further questions, and dismissed the jury.  (*Id.* at 10814 ("not going into any further questions about the verdict").)  Defendants objected again after the Court discharged the jury.  (*See id.* at 10185 ("This verdict makes no rhyme nor reason, everybody knows it.  We now have an outstanding question to the jury that specifically said we need to look at our notes, and now your Honor has their notes there, we can fine [sic] out the answer to the question simply by having them come back in, and yet for some reason we have to go like this and pretend that none of us can go find out what the notes say and what this jury has decided.").)  But the Court did not ask any further questions of the jury."  (*Id.).)*[4]

---

[4]   Federal Rule of Evidence 606(b) did not bar the Court from asking the jury to clarify its verdict, including asking the jury to consult its notes.  *See Unit Drilling*, 108 F.3d at 1192 ("In *Resolution Trust* [*Corp. v. Stone*, 998 F.2d 1534, 1548 n.15 (10th Cir. 1993)] we distinguished questioning that is aimed at discovering what occurred during deliberations, which is prohibited by Fed. R. Evid. 606(b), from questioning aimed at clarifying the verdict, of which we approved.").

Defendants respectfully submit that the Court's decision not to obtain clarification from the jury about inconsistencies in its verdict was contrary to Tenth Circuit precedent.  Under Tenth Circuit law, "a trial judge should point out apparent inconsistencies in the special verdicts to the jury and ask the jury to resolve the conflict."  *Heno*, 208 F.3d at 853; *see also Unit Drilling*, 108 F.3d at 1191-93 ("Where a court is faced with an ambiguous general verdict, and a request for clarification is made before the jury is discharged, the court's options are to explain the ambiguity to the jury and send the jury back into deliberations with instructions to clarify the ambiguity or to order a new trial."); Fed. R. Civ. P. 49(b) ("When the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, ***judgment shall not be entered***, but the court shall return the jury for further consideration of its answers and verdict or shall order a new trial.") (emphasis added.)

Here, as defendants recognized and brought to the Court's attention at the time the verdict was announced, the verdict is ambiguous, in part, because the punitive award exceeds the compensatory award, and there is no way to know how the punitive and compensatory damages calculations were made.  Thus the Court should award a new trial.  *See Heno*, 208 F.3d at 853; *Unit Drilling*, 108 F.3d at 1193;.

Finally, where, as here, the intent behind a jury's punitive damages award cannot be determined, the Seventh Amendment prohibits jury verdict inconsistencies from being resolved simply by disregarding jury findings.  *See Finnegan*, 915 F.2d at 820 (2d Cir. 1980) ("The Seventh Amendment right to a jury trial precludes entry of a judgment based on an inconsistent jury verdict that thereby disregards any material jury finding.  If an irreconcilable inconsistency is not noticed until after the jury has been dismissed, an appellate court on review must vacate the judgment and order a new trial.") (citations omitted).  Thus, the Court cannot simply set the

punitive award equal to the compensatory award (or set punitives at some other, equally-random, level).  *Id.*

## II.   THE COMPENSATORY DAMAGE AWARD SHOULD BE SET ASIDE OR, IN THE ALTERNATIVE, SHOULD BE REDUCED.

### A.   At A Minimum, The Compensatory And Punitive Damages Amounts Must Be Reduced To Resolve The Inconsistencies In the Jury's Verdict.

If the Court does not order a new trial, then, in the alternative, the Court should order that plaintiffs' damages be reduced.  Pursuant to Rule 59(e), a court can "alter" or "amend" a judgment by ordering that damages by remitted, or reduced.  *See Whitfield v. Melendez-Rivera*, 431 F.3d 1, 6 (1st Cir. 2005) ("The defendants filed a joint post-trial motion seeking judgment as a matter of law or a new trial, *see* Fed.R.Civ.P. 50(b), 59(a), or a remittitur of the damages award, see Fed.R.Civ.P. 59(e).") (vacating excessive compensatory damages award unless plaintiff agreed to a remittitur).  *See also Malandris*, 703 F.2d at 1168 ("Where the court concludes there was error only in an excessive damage award, but not one also tainting the finding of liability, the appellate court may order a remittitur and alternatively direct a new trial if the plaintiff refuses to accept the remittitur, a widely recognized remedy.").

### B.   The Jury's Compensatory Award Exceeds The Amount Needed To Make Plaintiffs Whole, And Requires Either A Reduction In Damages Or A New Trial.

#### 1.   The Damages Award Is Improperly Based On Properties Owned By The Subclass That Sold Before 1/30/90.

The compensatory damages award must be set aside because the jury's verdict did not distinguish between those who sold before January 30, 1990 and those who sold after.  The property class consists only of certain individuals who owned property in the class area as of June 7, 1989.  In its May 17, 2005 Order, the Court held that the class would be divided into two sub-classes.  One sub-class would consist of those who did not sell their properties, by the later

of (a) January 30, 1990 and (b) "the date on which the jury, per Restatement § 930  (1), finds it appeared the trespass and/or nuisance asserted by Plaintiffs would continue indefinitely" (the so-called Section 930 Damages sub-class).  The other sub-class would consist of all other class members (the non-Section 930 Damages sub-class) (5/17/05 Order at 15-16).  Under plaintiffs' trial plan, based on the jury verdict, these sub-classes became:  (i) class members who did not sell their properties before 1/30/90 (the Section 930 Damages sub-Class); and (ii) class members who did sell their properties before 1/30/90 (the Non-Section 930 Damages sub-Class).  (Ex. 1, Jury Verdict Form at 28-29 (indicating that it appeared before 1/30/90 that any trespass or nuisance by Dow or Rockwell would continue indefinitely).)

    In the same order, the Court also held that the sub-class of property owners who did not sell their properties before 1/30/90 (the Section 930 sub-class) could recover Section 930 damages in this class trial.  (5/17/05 Order at 15.)  The Court further ruled that, under Section 930 , the sub-class of property owners who sold their properties before 1/30/90 (the "Non-Section 930 Subclass") *could not recover damages in this trial*:

> Members of this sub-class are *not entitled* to § 930(3)(b) damages because they did not own Class property when this action was filed and/or when the right to elect to recover damages for prospective invasions *accrued* under Restatement § 930(1).  The availability and means of determining any compensatory damages due this sub-class if defendants are found liable in trespass or nuisance will be decided after this trial.

(*Id.* at 16 (emphasis added).)

    As the Court also held, plaintiffs would need to prove the value of the properties in the Damages sub-class in order for this sub-class to recover damages:

> Plaintiffs will be required to prove the following to establish damages for [the Damages] sub-class: (1) the date on which [the] injurious situation caused by defendants became complete and comparatively enduring ("CCE date"); (2) the average percentage diminution in property value that was caused by any trespass or nuisance found by the jury, as of the CCE date . . . ; (3) the value of the properties *in the Damages sub-class*, by property category, as of the CCE date;

and (4) by multiplying the total value of each property category *in this sub-class* by the average percentage diminution in value for each property category as of the CCE date, and summing these amounts, the aggregate damages for the Damages sub-class.

(5/17/05 Order at 16-17 (emphasis added).)

Yet, contrary to this Order, the jury assessed damages for all class properties, including class properties owned by the Non-Section 930 sub-class (class members who sold their properties before January 30, 1990, and who cannot recover damages from this class trial).  (*See*, *e.g.*, Ex. 1, Jury Verdict Form at 15, 23 (asking jury to find the amount "by which *Class Properties*, *as a whole*, were diminished or depressed in value" (emphasis added).)  The jury verdict form did not contain any questions asking the jury to distinguish between those class members who sold their properties before and after 1/30/90.  Accordingly, the compensatory damages award must be set aside, and a new trial ordered, to account for properties included in the damages award but owned by the Non-Section 930 subclass — persons who the Court previously ordered could not recover any damages in this trial "because they did not own Class property when this action was filed and/or when the right to elect to recover damages for prospective invasions accrued under Restatement § 930(1) ."[5]  (5/17/05 Order at 16.)

Awarding the entire compensatory amount to the Section 930 Damages sub-class (those individuals who did not sell their properties before 1/30/90) would effectively be taking damages

---

[5]   Defendants have raised this issue on repeated prior occasions.  (*See, e.g.,* Defs' Resp. to Pls' Proposed Plan for Determination of Compensatory Damages, filed July 21, 2004, at 14-15 ("'[Under plaintiffs' approach, the determination of which class members are covered by plaintiffs' damages evidence is contingent on the jury's verdict.  For example, if the jury were to determine that the complete-and-comparatively-enduring point was March 21, 1992, then the parties would learn at the conclusion of the trial that one-fourth of the class was not covered by the damages evidence that plaintiffs had presented at trial.)").  Plaintiffs have offered no response, and defendants respectfully submit that it is now too late to do so.

suffered by people who sold before 1/30/90, and randomly redistributing those damages to people who sold after 1/30/90.  Such a windfall award would violate Colorado law.  *See, e.g.*, *Bd. of County Comm'rs v. Slovek*, 723 P.2d 1309, 1316 (Colo. 1986) ("The trial court must take as its principal guidance the goal of reimbursement of the plaintiff for losses actually suffered, but must be vigilant not to award damages that exceed the goal of compensation and inflict punishment on the defendant."); *Zwick v. Simpson*, 572 P.2d 133, 134 (Colo. 1977) ("[plaintiffs'] actual loss, therefore, was and could only be the amount by which the market value of his property had diminished as a result of defendants' actions"); *see also Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 344-45 (4th Cir. 1998) ("It is axiomatic that the procedural device of Rule 23 cannot be allowed to expand the substance of the claims of class members.") (citation omitted); *Eisen v. Carlisle & Jacquelin*, 479 F.2d 1005, 1014 (2d Cir. 1973), *rev'd on other grounds*, 417 U.S. 156 (1974) ("Amended Rule 23 was not intended to affect the substantive rights of the parties to any litigation.  Nor could it do so as the Enabling Act that authorized the Supreme Court to promulgate the Federal Rules of Civil Procedure provides that "such rules shall not abridge, enlarge or modify any substantive right."); *Southwestern Ref. Co. v. Bernal*, 22 S.W.3d 425, 437 (Tex. 2000) ("Procedural devices may not be construed to enlarge or diminish any substantive rights or obligations of any parties to any civil action.") (citation and quotations omitted).

> **2.** **The Compensatory Damages Award Must Be Set Aside Because Nothing In The Jury Verdict Form Indicates That The Jury Assessed Damages As Of The Time That Class Members Owned Their Properties.**

In a Section 930 case for prospective invasions, damages are awarded as of the time "the injurious situation became complete and comparatively enduring."  Restatement (Second) of Torts § 930(3)(b) .  The jury was not asked to report on the jury verdict form the time when the

injurious situation became complete and comparatively enduring.  Instead, the jury was only asked whether the complete and comparatively enduring date was "some time between January 1, 1988 and December 31, 1995."  (Ex. 1, Jury Verdict Form at 14 (trespass), 23 (nuisance).)  The jury was then asked to assess damages as of the time the injurious situation became complete and comparatively enduring.  (Ex. 1, Jury Verdict Form at 14 ("As of the time you find the injurious situation became 'complete' and 'comparatively enduring,' what is the amount of the difference between the actual value of Class Properties and what their value would have been but for the trespass by Dow and Rockwell?"); *id.* at 23 (same for nuisance).)

Accordingly, the jury could have determined that the complete and comparatively enduring date was as early as January 1, 1988 or as late as December 31, 1995.  Thus, the jury could have assessed damages as early as January 1, 1988, or as late as December 31, 1995, or any time in between.  The date of class membership is June 7, 1989.  (*See* 2/10/95 Order Regarding Proposed Class Notice.)  Individuals did not have to own their properties on any date other than June 7, 1989 in order to be included in the class.  Thousands of class members bought and sold their properties between January 1, 1988 and December 31, 1995.  (DX 2066.)  However, the jury's verdict does not indicate whether the jury awarded damages as of a complete-and-comparatively-enduring date when the class members actually owned their properties.

For example, the undisputed evidence presented at trial demonstrated that 2,816 class members bought their properties after January 1, 1988.  (DX 2066.)  The jury could have determined that the complete and comparatively enduring date was January 1, 1988, and thus assessed damages as of January 1, 1988.  If so, then for the 2,816 class members who purchased their properties after January 1, 1988, the jury never determined that a diminution in value

21

existed at any time when these 2,816 class members owned their properties.  And there is no longer any means to determine whether the jury determined damages as of January 1, 1988 or some other date.  Therefore, the compensatory damages award must be set aside to account for any "damages" that could have been calculated by the jury for properties in the class area as of January 1, 1988 that were not owned by class members.

Similarly, the jury could have determined that the complete and comparatively enduring date was as late as December 31, 1995, and determined damages as of December 31, 1995.  But 7,684 class members (well over half the total number of class members) did not own their properties as of December 31, 1995.  (DX 2006.)  Thus, for the 7,684 class members who sold their properties before December 31, 1995, the jury may have never determined that a diminution in value existed at the time when any of these 7,684 class members actually owned their properties.  These class members cannot recover damages.  *See Slovek*, 723 P.2d at 1314 (to recover on a tort claim, a ***plaintiff*** (as opposed to a property) must have suffered a loss).  There is no longer any means to determine whether the jury determined damages as of December 31, 1995, as of the date when these 7,864 class members no longer owned their properties, or as of some other date.  Therefore, the compensatory damages award must be set aside to account for any "damages" that were calculated by the jury for properties in the class area as of December 31, 1995 that were not owned by class members.

### 3.   The Compensatory Damages Award Must Be Set Aside to Account for Class Members Who Decline to Accept an Easement.

Plaintiffs are not entitled to recover damages if they do not accept an easement on their properties.  As the Court held in its Cook Order, "a judgment awarding damages for prospective invasions, if satisfied, will confer an easement to continue the invasions thus paid for in advance.  Restatement (Second) of Torts, § 930 cmt. b."  358 F. supp. 2d at 1013-14.  Notwithstanding the

22

fact that Section 930 contemplates an "election" of remedies, no individual class member has yet elected recovery under Section 930.  Nor has any class member elected to accept an easement, which is part and parcel of any proceeding under Section 930.  Restatement (Second) of Torts, § 930 cmt. b; 358 F. Supp. 2d at 1013-14.  The class notice did not mention easements, and at no subsequent point in time has any plaintiff had an option to accept or decline the easement. At this point, therefore, it is unknown which class members will accept the easement on their properties, and which will forego recovery rather than accepting an easement.  Moreover, many class members no longer own their class-property, and therefore cannot accept or decline to accept an easement (on behalf of others) for property they do not own.

The compensatory damages awarded by the jury did not account for any class members who decline to accept an easement.  Class members who do accept an easement are not entitled to a windfall of other class members' damages simply because those other class members declined to accept an easement.  *See Slovek*, 723 P.2d at 1314; *Zwick*, 572 P.2d at 134.  Because the amount of compensatory damages awarded by the jury did not account for class members who do not accept easements, the damages award must be set aside.

> **4.    The Compensatory Damages Award Improperly Includes Class Members Who Suffered No Damages Or Less Than Average Damages.**

The jury's verdict did not purport to determine any actual damages suffered by any class member.  Rather, the jury's verdict only determined the average diminution in value suffered *overall* by properties within the class area.  (Ex. 1, Jury Verdict Form at 15, 24.)  The Court expressly instructed the jury that it did not have to find that the "average" diminution that the jury found for the class properties as of some unknown date was suffered by all class members. (2/6/06 Response to Jury Question at 3 ("the percentage diminution in value suffered by some Class Properties may be less than the average").)  But a damages award based upon average

diminution cannot be the basis of an award to individual class members.  Accordingly, the verdict must be set aside and a new trial held.

First, as a matter of law, individual class members cannot be awarded damages based upon "averages."  *See, e.g.*, *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 319-21 (5th Cir. 1998) (reversing damages award based on extrapolation rather than individual evidence); *Windham v. American Brands, Inc.*, 565 F.2d 59, 66 (4th Cir. 1977) ("Generalized or class-wide proof of damages in a private anti-trust action would, in addition, contravene the mandate of the Rules Enabling Act that the Rules of Civil Procedure 'shall not abridge, enlarge or modify any substantive right").  The Rules Enabling Act prohibits use of the class action device to expand an individual's substantive rights.  *See* 28 U.S.C. § 2072 ("Such rules shall not abridge, enlarge or modify any substantive right").  If an individual award is based upon the jury's determination of an average diminution, some individuals may recover more damages than a jury would award if it assessed individual damages.  Consequently, class members' "substantive rights" would have been enlarged simply because a class action was brought.

Second, even if damages could be based upon averages in other situations, no such award could be made in this case.  The trial evidence confirms that substantial variation exists among class properties.  While some class members claimed that Rocky Flats did have an effect on their property value (*see, e.g.*, R. Bartlett testimony, 10/14/05 Trial Tr. at 1019), others testified that it did not (s*ee*, *e.g.* Ozaki testimony, 10/20/05 Trial Tr. at 1873-74 (testifying to appreciation of $45,000); Bowman testimony, 11/21/05 Trial Tr., at 6092-94 (testifying to tenfold increase in value of land over 30-year period); Ex. 3, McKay Dep. at 187-89 (no impact on land at Cimarron Park and Great Western properties)).  Given the array of class members' individual experiences,

it would be inappropriate — and a violation of the Rules Enabling Act — to base an individual damages award upon the jury's determination of an overall damages amount.

Plaintiffs' experts similarly did not purport to find individual damages, but focused only on aggregate damages.  Numerous variables prevent determination as to whether any individual class member suffered any damages.  Dr. Radke, for example, focused on years, and found markedly different diminution estimates for different years between 1988 and 1995.  (*See* DX 1085, Radke chart.)  Yet, thousands of class properties sold each year.  (DX 2066.)  For this reason, Dr. Radke was unable to say whether any individual class member lost any money.  (*See* Radke testimony, 10/26/05 Trial Tr. at 2812 ("Q. You've not actually determined whether anybody lost money in this marketplace?  A. Correct, I haven't done that study.").)  Mr. Hunsperger focused on distance, finding that properties nearest Rocky Flats suffered more diminution in property value than those further away.  (*See* 12/6/05 Trial Tr. at 6568 ("I selected 10 percent on average, across the subject class area.  The highest diminution being closer to Rocky Flats or lowest — diminishes the further away you go from the plant.")  Drs. Flynn and Slovic likewise found that diminution in property value varied depending upon location in the class area.  In the Decision Research survey, for instance, the survey respondents reported different diminutions in value depending upon how far away the resident lived from Rocky Flats, further demonstrating the variability of individual damages within the class area.  (*See* Ex. 4, Final Report: Rocky Flats Health & Housing Survey at Figure 4.7 (16.1% of survey respondents would buy a house with no discount within 2-4 miles of Rocky Flats; an additional 15.1% of respondents would buy a home within 4-6 miles of Rocky Flats with no discount).)

Plaintiffs have admitted that not all class members suffered equal damages.  (*See* 10/21/05 Trial Tr. at 2100-02 (mini-summation of Mr. Davidoff ("The property damage evidence

that you will hear in the coming weeks is going to be an *average*, and there is going to be, as I have mentioned, I believe, a 10 percent diminution in single family homes and a 30 percent decline or decrease in the value of vacant land that you will hear about from the property experts. *But that's an average.  It's greater closer in; it's less on the edge*.") (emphasis added).)

Not only would awarding compensatory damage based upon this class trial unlawfully expand the substantive rights of some class members, but it would also "abridge" defendants' substantive rights, again in violation of the Rules Enabling Act.  *See* 28 U.S.C. § 2072 ("Such rules shall not *abridge*, enlarge or modify any substantive right") (emphasis added).  As defendants have previously argued, defendants are entitled to individual trials on damages.  (*See* Defs.' Resp. to Pls' Proposed Plan for Determination of Compensatory Damages, filed 7/21/04, at 9.)  There is no reason to believe that the aggregate amount of damages awarded in such individual trials would equal the aggregate amount of damages awarded in this class action.  Consequently, trying damages class-wide abridges defendants' right to achieve a lower aggregate damages amount through a succession of individual trials.

In sum, awarding each class member the "average" class diminution in value based upon a class trial would violate the Rules Enabling Act, and would violate defendants' rights to due process, equal protection, and a fair jury trial.  *See* U.S. Const. amend. V, VII, XIV.

### 5. Compensatory Damages Must Be Reduced Or Set Aside To Account For All Class Members Who Have Released Their Claims Against Defendants.

The amounts set forth in the jury verdict must also be reduced or set aside to account for all individuals who released their claims against defendants.  For example, the class includes individuals such as Charles and Perry McKay, both of whom (i) owned large amounts of property within the class area, (ii) released their claims arising from Rocky Flats plutonium releases as part of the settlement of the *Church* lawsuit; (iii) received notice of this class action;

and (iv) did not opt out.  (*See* Ex. 3, McKay Dep. at 74 (Charles McKay admits he released his

claims against Dow); Ex. 5, Class notice list (listing Charles and Perry McKay as class members

who did not opt out); Ex. 6, Release (releasing Dow and Rockwell from any liability for "claims

due to past or present contamination or alleged past or present contamination of the McKays'

lands situated in Jefferson County, Colorado, with radionuclides from the Rocky Flats Plant");

Ex. 7, Map Showing Property In Class Area Owned by McKays).  The jury verdict did not

account for the fact that class members such as the McKays — who owned a substantial

percentage property in the class area — released their claims.  Accordingly, the compensatory

damages amount must be reduced or set aside.

### 6.    The Compensatory Damages Award Is Clearly Unsupported by the Evidence.

The compensatory award must be set aside because it is unsupported by the evidence.  "If

a damage award is excessive or so large as to appear contrary to reason, a remittitur is the

appropriate relief.  A remittitur is in order when a trial judge concludes that a jury verdict is

'clearly unsupported' by the evidence and exceeds the amount needed to make the plaintiff

whole…" *Hughes v. Regents of the Univ. of Colo.*, 967 F.Supp. 431, 437 (D. Colo. 1996)

(citation and quotations omitted).  For a variety of reasons, the jury's compensatory damage

award cannot stand.  As set forth in Defendants' Renewed Motion for Judgment as a Matter of

Law, the damages award is unsupported by the law or the evidence, including for the following

reasons:

- Plaintiffs' damages evidence was not sufficiently reliable to be considered by the jury (*see* Defs.' Renewed Mot. for Judgment as a Matter of Law at Part VII.A.);

- A reasonable jury could not have found damages attributable to defendants' ***actionable*** conduct (*see id.* at Part VII.B.);

- A reasonable jury could not have awarded damages based on plaintiffs' damages evidence, because that evidence relates to losses suffered as a result of non-actionable proximity (*see id.* at Part VII.C.);

- Plaintiffs could not properly recover stigma damages where the stigma did not result from a proven trespass or nuisance (*see id.* at Part VII.D.);

- Plaintiffs did not show damages suffered by Class members, as opposed to damages allegedly suffered by class properties (*see id.* at Part VII.E.);

- Plaintiffs did not show that any damages suffered by class properties did not pre-date any actionable conduct by defendants (*see id.*);

- Plaintiffs failed to show any damages attributable to the prospect of the continuance of any tortious invasions (*see id.* at Part VII.F.);

- Plaintiffs failed to demonstrate that any "Injurious Situation" became complete and comparatively enduring between 1988 and 1995 (*see id.* at Part VII.G.); and

- Plaintiffs failed to prove that the class suffered damages within the back-calculated statute of limitations window (January 30, 1988 - January 30, 1990) (*see id.* at Part VIII.A.).)

Based upon these issues, and as set forth in greater detail in defendants' Renewed Motion for Judgment as a Matter of Law filed concurrently herewith, the Court should either reduce plaintiffs' damages or order a new trial.

## III.   THE PUNITIVE DAMAGE AWARD IS ALSO CONTRARY TO LAW AND TO THE EVIDENCE AND MUST BE SET ASIDE.

### A.   Plaintiffs Have Not Shown Beyond a Reasonable Doubt That Punitive Damages Are Warranted In This Case.

To recover punitive damages, plaintiffs must prove, among other things, that "the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct." Colo. Rev. Stat. § 13-21-102.  (*See also* Instruction No. 3.27 ("[Plaintiffs] must prove . . . that the conduct . . . was 'willful and wanton.'").)  Colorado law defines "willful and wanton conduct" as "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or the rights and safety of

others, particularly the plaintiff."  Colo. Rev. Stat. § 13-21-102(1)(b).  Plaintiffs must prove these elements beyond a reasonable doubt.  Colo. Rev. Stat. § 13-25-127(2) ("Exemplary damages … shall only be awarded … when the party asserting the claim proves beyond a reasonable doubt the commission of a wrong under the circumstances set forth in section 13-21-102.").

Under Colorado law, punitive damages are not available unless "the defendant acted 'with an *evil intent*, and with the *purpose of injuring the plaintiff*, or with such a wanton and reckless disregard of his rights as to *evidence a wrongful motive*.'"  *Juarez v. United Farm Tools, Inc.*, 798 F.2d 1341, 1342 (10th Cir. 1986) (*quoting Tri-Aspen*, 714 P.2d at 486 (Colo. 1987)); *see also Vaske v. DuCharme, McMillen & Associates, Inc.*, 757 F.Supp. 1158, 1166 (D. Colo. 1990) (requiring proof of "evil intent … with the purpose of injuring the plaintiff" or a "wrongful motive").  Colorado law thus places a "heavy burden" on a plaintiff to prove why punitive damages should be awarded in a given case.  *Juarez*, 798 F.2d at 1344.  It is well-settled that "[c]onduct that is merely negligent [] cannot serve as the basis for exemplary damages." *Tri-Aspen Constr. Co.*, 714 P.2d at 488 (reversing punitive damage award where defendants' conduct was merely negligent); *see also Van Leeuwan v. Nuzzi*, 810 F. Supp. 1120, 1124 (D. Colo. 1993) (Kane, J.) (striking plaintiff's request for punitive damages where claims were "based on negligence, not intentional, malicious conduct"); *Alley v. Gubser Dev. Co.*, 785 F.2d 849, 856 (10th Cir. 1986).

As several influential treatises confirm, punitive damages may be awarded only when a defendant intends to commit a harm, or where the "inherent nature" of the conduct reflects a "conscious and deliberate" disregard for the interests of others.  W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 2 at 9-10 (5th Ed. 1984).  As Prosser has observed:

> Something more than the mere commission of a tort is always required for
> punitive damages.  There must be circumstances or aggravation or outrage, such

> as spite or "malice," or a fraudulent or evil motive on the part of the defendant, or such a conscious and deliberate disregard of the interests of others that the conduct may be called willful and wanton.  There is general agreement that, because it lacks this element, mere negligence is not enough, even though it is so extreme in degree as to be characterized as "gross." . . . . Still less, of course, can such damages be charged against one who acts under an innocent mistake in engaging in conduct that nevertheless constitutes a tort.

*Id.*; *see also* Dobbs on the Law of Remedies, § 3.11 (2d Ed. 1993) ("Punitive damages are awarded only for very serious misconduct coupled with a bad state of mind involving malice or at least a reckless disregard for the rights of others"); Charles T. McCormick, Handbook of the Law of Damages, § 79 at 280-81 ("Since those damages are assessed for punishment and not for reparation, a positive element of ***conscious wrongdoing*** is ***always required***") (emphasis added).

Plaintiffs here have introduced no evidence whatsoever of any "conscious wrongdoing" or that any injury was "attended by circumstances of fraud, malice, or willful and wanton conduct" on the part of either Dow or Rockwell.  They have not proven the elements of the statute "beyond a reasonable doubt."  *See* Colo. Rev. Stat. § 13-25-127(2).  Plaintiffs' evidence against Dow focused on three incidents that occurred during Dow's tenure at Rocky Flats, all of which involved alleged accidental releases of plutonium from the plant:  a 1957 fire, a 1969 fire, and the 903-pad incident.[6]  Plaintiffs introduced no evidence to suggest that these incidents involved any intentional conduct on by Dow.  Nor did plaintiffs introduce any evidence to suggest that the incidents were attended by a "wanton and reckless disregard of plaintiffs' rights to evidence a wrongful motive."  *Juarez*, 798 F.2d at 1342.

---

[6]   (*See*, *e.g.*, 10/11/05 Trial Tr. at 502-503 (plaintiffs' counsel arguing in opening statement that "there are three areas that you will probably hear much more about than any other place at the plant.  One is building 771.  One is building 776 and 777.  And one is the 903 pad.  These are the three main areas that I would expect you will hear the most testimony about.").)

Far from showing that Dow intentionally caused any releases, the evidence demonstrated that Dow took care to avoid such releases.  (*See* Ray testimony, 10/19/05 Trial Tr. at 1551-52 (Dow responded to union's complaints regarding the 903 pad to the point they didn't know what to do with the drums), 1658-60 (plant had not yet come up with a way to take care of oils in the drums but research and development efforts were ongoing to try and deal with these materials), 1671-1673 ("hundreds" and over "60 columns" of HEPA filters in 71 building, "floor to ceiling, side to side"); Frazier testimony, 12/12/05 Trial Tr. at 7540-45 (attempts were made to keep exposure as low as reasonably achievable; 903-pad was monitored and problems were addressed).))  After the 1957 fire, for instance, Dow implemented recommendations of the 1957 fire report in buildings 776 and 777, where the 1969 fire occurred.  For example, Dow provided additional $CO_2$ fire extinguishers (Budnitz testimony, 11/01/05 Trial Tr. at 3367-68, 10/31/05 Trial Tr. at 3172), installed additional standpipes and fire hoses (Budnitz testimony, 11/1/05 Trial Tr. at 3385-86), installed heat detectors in filter plenums and gloveboxes (*id.* at 3403-3405), provided a sprinkler system in the filter plenum (*id.* at 3375-3376, 3381-3385), added fire breaks in gloveboxes (*id.* at 3401-3402), and utilized fire resistant Plexiglas and other non-combustibles in the construction of gloveboxes (*id.* at 3396-3397).  Dow also took steps to prevent harm with respect to the 903-pad.  (*See*, *e.g.*, Ray testimony, 10/19/05 Trial Tr. at 1659-60 (efforts were made to develop better methods for 903 pad materials); *id.* at 1662-63 (903-pad barrels were shipped off-site when possible and area was covered with asphalt); Budnitz testimony, 11/1/05 Trial Tr. at 3480-81 (Dow requested funding for building to store 903 pad materials); Weston testimony, 12/14/05 Trial Tr. at 8080-81 (Dow faced restrictions on shipping 903 pad barrels; Dow monitored 903 pad site).)

Likewise, plaintiffs never introduced any evidence to suggest that Rockwell released *any*
meaningful amounts of plutonium during its tenure, much less that it released plutonium
intentionally, willfully, or wantonly in order to damage plaintiffs' property values.[7]  Rockwell
did not begin to operate the plant until 1975.  (*See* 11/22/05 Trial Tr. at 6198 (contractor changed
from Dow to Rockwell in 1975).)  Plaintiffs' evidence confirmed that none of Rockwell's
conduct evidenced any disregard (intentional or otherwise) for the rights of property-owners.
(*See* Holeman testimony, 10/18/05 Trial Tr. at 1333-34 (no off-site releases from plea conduct);
P604 ("We have operated the Rocky Flats plant with integrity and high ethical standards . . . we
are committed to the welfare and safety of our Rocky Flats employees and the surrounding
communities."); P736 ("We have managed Rocky Flats with proper concern for public health,
safety and the environment.").)  Defense witnesses confirmed these facts.  (Weston testimony,
12/13/05 Trial Tr. at 7744-47 (Rockwell sought to stop pondcrete production when NTS refused
to take the waste but DOE would not allow production to cease), 7763-65 ("None of Rockwell's
conduct in my opinion contributed to any off-site pollution"), 7797 (MUF had nothing to do with
environmental releases), 7844-45 ("I can say with high confidence that it [MUF] did not get off-
site."), 12/14/05 Trial Tr. at 8081-82 (Rockwell sought an indoor storage facility for pondcrete,

---

[7]   (*See* DX454, ATSDR 5/13/05 report, at 1-2 ("Though Rocky Flats released plutonium to the
air throughout its history, the overwhelming majority (> 99.9%) of plutonium emissions
occurred between 1953 and 1969."); DV1, Till video ("Over 99 percent of the plutonium
releases from Rocky Flats occurred before 1970"); *see also* Norton testimony, 12/14/05 Trial
Tr. at 7958-66 ("there had been no evidence of off-site physiological or environmental
damage from the operations of the facility"); Weston testimony, 12/13/05 Trial Tr. at 7763-
65 ("None of Rockwell's conduct in my opinion contributed to any off-site plutonium.");
Blaha testimony, 1/4/06 Trial Tr. at 8684-87, 8793-94 (no mechanism for off-site transport of
onsite groundwater), 8764-65 (no contamination in Great Western Reservoir associated with
Rockwell era activity).)

but it took DOE almost three years to approve the request); *see also id.* at 8051, 8096-98; Norton

testimony, 12/14/05 Trial Tr. at 7961-68.)

Instead of proving that defendants' behavior was "attended by circumstances of fraud,

malice, or willful and wanton conduct," Colo. Rev. Stat. § 13-21-102, plaintiffs' own witnesses

testified that Rockwell and Dow took care to ensure against harm.  (Ray testimony, 10/19/05

Trial Tr. at 1679-80 (Ray agreeing with statement that "a number of safety procedures [] were

put in place at this plant, not only to ensure the safety of the workers but the environment and the

residents offsite"), 1683 (Dow's attitude was that "when [accidents] happened, we will do our

best to clean them up")).  Defense witnesses were even more detailed about the safety

precautions undertaken by both Dow and Rockwell took to ensure against off-site harm.

(Weston testimony, 12/13/05 Trial Tr. at 7710-11 (discussing the multiple layers of filter banks

and HEPA filters dedicated to the building 771 incinerator), 12/14/05 Trial Tr. at 8098 ("I know

our processes.  The plutonium, the way it was handled, and the glove box, the way our waste was

handled and sealed, the way all the operators were monitored before they could leave the

buildings, and anything leaving the building passed through radiation detectors, there's just no

way."); *id.* at 8089-91 ("I believed we were doing a good job, and I felt that's what the

Department of Energy thought."); Frazier testimony, 12/12/05 Trial Tr. at 7524 (The air

sampling programs at Rocky Flats "were as good or better than all of the air environmental

monitoring groups that I had measured for the total time frames that are reviewed there.  They

had good programs in place."); *see also id.* at 7540-41).)

Because plaintiffs failed to introduce evidence that defendants acted with "evil intent"

and the "purpose of injuring the plaintiff[s]," or that defendants acted with "such a wanton and

reckless disregard of plaintiffs' rights as to evidence a wrongful motive," *Juarez*, 798 F.2d at

1342, punitive damages were not warranted in this case.  Therefore, the award of punitive

damages should be vacated.

> **B.**    **The Punitive Damage Award Should Be Vacated Due To Defendants'**
> **Compliance With Standards.**

Plaintiffs' punitive damages claim is also defeated by defendants' compliance with

standards.  As the Court has ruled, compliance with standards is relevant to whether any injury

claimed by plaintiffs was "attended by circumstances of fraud, malice, or willful and wanton

conduct" sufficient to prove punitive damages.  (*See* 9/13/05 Hr'g Tr. at 6 ("Such evidence is

relevant . . . to the issue of punitive damages.").)  The Tenth Circuit has confirmed that punitive

damages may not be awarded if a defendant complies with applicable standards.  *See Alley*, 785

F.2d at 856.  ("The record fails to establish that the defendants did anything other than conform

to industry standards in producing the wood products and in constructing the mobile home.

Therefore under plaintiffs' theory, the 'wrongful conduct' sought to be deterred is the mobile

home industry's practice of constructing mobile homes with wood products containing

formaldehyde") (holding that no punitive damages could be awarded because the evidence did

not support an award).  Yet, plaintiffs introduced no evidence that any applicable standards were

violated during either the Dow or the Rockwell era.  Indeed, neither of plaintiffs' release experts

(Goble and Smallwood) even discussed applicable standards.  (*See* Goble testimony, 11/2/05

Trial Tr. at 3618-88, 3692-3709; Smallwood testimony, 11/3/05 Trial Tr. at 4064, 4067.)

To the contrary, all of the evidence showed that Rocky Flats plant releases (including

water) have not exceeded applicable standards.  (DX1651a; DX1663, DX1664; Frazier

testimony, 12/12/05 Trial Tr. at 7529-31 (air monitoring results were "always less than

standards"; the plant was always in compliance with DOE or AEC's standards for plutonium in

air); *id.* at 7534-37, 7539.)  That was true both during the Dow era (*see* Budnitz testimony,

10/31/05 Trial Tr. at 3335-36 (1970 contour below standards); *see also* S. Bartlett testimony,

10/14/05 Trial Tr. at 959-60 (test results below standards)) and during the Rockwell era (*see*

Holeman testimony, 10/18/05 Trial Tr. at 1363, 1370-71 (water met standards); *see also* DX34,

Broomfield 2004 Water Quality Report (no violations of Safe Drinking Water Act standards);

Norton testimony, 12/14/05 Trial Tr. at 7967-68 (based on surface water monitoring at the plant

borders, no safe drinking water act violations noted by Cities of Broomfield or Westminster);

Weston testimony, 12/14/05 Trial Tr. at 8096 ("I never saw anything even close to standard.")).

Plaintiffs also failed to prove a class-wide violation of Colorado's "more conservative" standard

for plutonium in soil.  (*See* DX 1262 (Jones & Zhang contours); 10/18/05 Trial Tr. at 1355

(Colorado plutonium standard "more conservative").) Because the evidence overwhelmingly

demonstrates that defendants complied with applicable standards, no punitive damages should be

awarded in this case.

C.     **The Court Should Disallow or Reduce the Punitive Damage Award Pursuant to Colo. Rev. Stat. § 13-21-102.**[8]

Under Colo. Rev. Stat. § 13-21-102, a court may "reduce or disallow" punitive damages

if *any* of three criteria are met:  "(a) The deterrent effect of the damages has been accomplished;

or (b) The conduct which resulted in the award has ceased; or (c) The purpose of such damages

has otherwise been served."  Colo. Rev. Stat. § 13-21-102; *see also Alley,*  785 F.2d at 855

(vacating punitive damage award because "[t]here is, however, no evidence in the record to show

that the defendant's conduct should be punished or deterred."); *deHaas v. Empire Petroleum Co.*,

---

[8]     The Court has not previously ruled on the merits of this argument.  In *Cook I*, the Court held that it was "premature" to address this argument because no punitive damages had yet been awarded.  755 F.Supp. 1468, 1482 (D. Colo. 1991).  Now that a jury has awarded punitive damages, the time is ripe to address this issue.

435 F.2d 1223, 1231 (10th Cir. 1970) (disallowing punitive damages in 10b-5 securities case due
to, *inter alia*, "doubt as to whether punitive damages would significantly increase the deterrent
power of securities law enforcement"); *Kirk v. Denver Pub. Co.*, 818 P.2d 262, 266 (Colo. 1991);
*Seaward Const. Co. v. Bradley*, 817 P.2d 971, 974 (Colo. 1991) ("[i]t is well-settled that "the
distinct purpose of exemplary damages [is] 'to punish and deterred.").

All three criteria set forth in Colo. Rev. Stat. § 13-21-102 are met here.  First, "[t]he
conduct which resulted in the award has ceased."  Dow has not operated the Rocky Flats Plant in
thirty-two years, and Rockwell has not operated the plant for eighteen years.  Nor is the plant
currently being operated by anyone.  It is now a wildlife refuge.  (*See* 12/8/05 Trial Tr. at 7143
(2000 legislation turned Rocky Flats into a wildlife refuge);
http://www.fws.gov/rockyflats/index.htm ("Rocky Flats, a former nuclear plant located just 16
miles northwest of Denver, Colorado will be a new refuge in the US Fish and Wildlife Refuge
System because of the clean-up efforts by the Department of Energy.").  Because "[t]he conduct
which resulted in the award has ceased," punitive damages should not be allowed under Colo.
Rev. Stat. § 13-21-102.

Second, under the first and third prongs of Colo. Rev. Stat. § 13-21-102, "[t]he deterrent
effect of the damages has been accomplished," and "[t]he purpose of such damages has
otherwise been served."  As discussed, the purpose of punitive damages is to deter future
conduct.  Here, the punitive award could not possibly deter any future conduct on the part of
Dow or Rockwell.  As discussed, operations of Rocky Flats have ceased.  Therefore, there is no
similar future conduct that could be deterred.  For the same reason, the "purpose of such
damages" (deterrence) has "otherwise been served."

Third, an exemplary damages award would not serve to deter others.  For some time, the

Price Anderson Act has prohibited punitive damage awards for future nuclear incidents.  *See* 42

U.S.C. § 2210.  Thus, a high punitive award in this case could not possibly deter any future

conduct, because there is no possibility of such damages being awarded in similar nuclear-

weapons-plant-cases in the future.

Because a punitive damage award in this case could not have any deterrent effect, either

on defendants or others, the Court should disallow the punitive damage award pursuant to Colo.

Rev. Stat. § 13-21-102.

> **D.**     **The Punitive Damages Award Is Unconstitutional And Must Be Vacated Or Reduced.**

Excessive punitive damages awards violate due process and are unconstitutional.  *State*

*Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417-18 (2003); *BMW*, 517 U.S. at 568.  As

the Supreme Court has explained, punitive damages be awarded only to "further a state's

legitimate interests in punishing unlawful conduct and deterring its repetition."  *BMW*, 517 U.S.

at 568.  Colorado here has no legitimate interest in deterrence because a punitive award could not

deter any other nuclear weapons plant contractors, and because Rocky Flats has been closed and

turned into a wildlife refuge.

The Supreme Court has established three "guideposts" to determine whether a punitive

damage award is unconstitutional:  (1) degree of reprehensibility; (2) the ratio of the punitive

award to the actual harm inflicted on the plaintiff; and (3) the civil or criminal penalties that

could be imposed for comparable misconduct.  *Id.* at 575-85.  Of these guideposts, "the most

important indicium of the reasonableness of a punitive damages award is the degree of

reprehensibility of the defendant's conduct."  *Id.* at 575.  The following factors are used to

determine whether a defendant's conduct was reprehensible: whether "the harm caused was

physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless

disregard of the health or safety of others; the target of the conduct had financial vulnerability;

the conduct involved repeated actions or was an isolated incident; and the harm was the result of

intentional malice, trickery, or deceit, or mere accident."  *State Farm*, 538 U.S. at 419; *see also*

*Continental Trend Resources, Inc. v. OXY USA Inc.*, 101 F.3d 634, 638 (10th Cir. 1996) ("among

the questions we ask are whether a defendant's behavior: causes economic rather than physical

harm; would be considered unlawful in all states; involves repeated acts rather than a single one;

is intentional, involves deliberate false statements rather than omissions; and is aimed at a

vulnerable target.").

     Under these factors, defendants' conduct cannot be reasonably characterized as

"reprehensible."  First, the supposed harm at issue was "economic," not "physical."  The jury

adjudicated plaintiffs' claims for property damage under § 930 of the Restatement of Torts.[9]  The

jury accordingly awarded damages for diminution in property value damages, not for any

physical or emotional injury.  (*See* 12/07/06 Order Regarding Jury Instructions at 69 ("Plaintiffs

did not seek damages here for annoyance and discomfort, but rather for the decrease in the value

of Class Properties as a result of the alleged continuing trespass and nuisance, which is a separate

---

[9]   (*See* Jury Instruction No. 1.1 ("Plaintiffs claim that Dow and Rockwell's trespass and nuisance have depressed the value of properties in the Class Area.  The Plaintiffs seek damages to compensate the Plaintiff Class for this lost property value."); Jury Instruction No. 3.22 ("Plaintiffs seek an award of actual damages based on the decrease in the value of properties in the Class Area caused by the trespass and/or nuisance committed by Dow or Rockwell or both of them.  This type of actual damages is sometimes called diminution in property value."); Pls.' Proposed Final J. at 2 ("The claims for relief as to which final judgment is hereby entered include all claims by Plaintiffs in this action for prospective invasions of their interests in land under Restatement (Second of Torts) § 930, and only such claims."); *see also* Defs.' Resp. to Pls.' Mem. at 23-32 (plaintiffs' claims involve diminution in property value and not personal injuries).)

and unrelated category of damages under Colorado law.”).)  Nor was any evidence presented that any class member suffered any physical injury.  Accordingly, the “reprehensib[ility]” factor requires that the Court vacate the punitive damages award.  *See State Farm,* 548 U.S. at 419; *Continental Trend Resources*, 101 F.3d at 642 (ordering remittitur of punitive damages where “[t]he harm in this case, though egregious, was entirely economic, and thus less worthy of punishment than harm to health and safety.”); *cf. Bielicki v. Terminix Int’l Co.*, 225 F.3d 1159, 1165 (10th Cir. 2000) (upholding punitive award where the “disregard of safety concerns resulted in permanent physical injuries to the plaintiffs.”).

Second, defendants’ conduct did not evidence “an indifference to or a reckless disregard of the health or safety of others.”  To the contrary, defendants at all times operated the plant with due concern for the health and safety of others.  As discussed in Part III-B, defendants complied with all applicable federal nuclear safety regulations, and plaintiffs have presented no evidence to the contrary.  And, as previously discussed in Part III-A, both Dow and Rockwell took steps to ensure against harm.  Accordingly, defendants did not disregard the health and safety of others, and their actions were not reprehensible.

Third, plaintiffs also failed to show that defendants’ conduct involved repeated omissions.  As previously discussed, defendants took steps after each incident on which plaintiffs focused to ensure the problems would not occur in the future.  After the 1957 fire, for instance, Dow took action to try to prevent similar fires in the future.  As discussed above, Dow took implemented recommendations from the 1957 fire in buildings 776 and 777, where the 1969 fire occurred.  *See supra*, Part III-A.  Similarly, with respect to the 903 pad, defendants acted diligently to address the problem.  *See id*.  Thus, far from engaging in “repeated acts and omissions,” defendants took steps to prevent past problems from recurring.

Fourth, plaintiffs presented no evidence that defendants' actions were in any way aimed at a "vulnerable target." The Supreme Court has held that a defendant's conduct might be reprehensible, even if it only inflicts economic injury, if it is inflicted on a "financially vulnerable" target. *BMW*, 517 U.S. at 576. For this factor to apply, however, the ***target*** of defendants' conduct must have been financially vulnerable. *State Farm*, 548 U.S. at 419; *Exxon Valdez v. Exxon Mobile Corp.*, ---F.3d ----, 2006 WL 3755189, * 17 (9th Cir. Dec. 22, 2006) (attached as Ex. 8) ("there must be some kind of ***intentional aiming or targeting*** of the vulnerable that did not occur here") (emphasis added). Here, none of defendants' conduct was "targeted" at plaintiffs. The conduct on which the plaintiffs focused — the two plutonium fires and the 903 pad — was on-site and was in no way targeted at the plaintiffs or intended to harm them. Furthermore, over 99% of the releases from Rocky Flats took place before 1970, and over 99% of the class members did not move into the area until after 1970. (DX 454 ATSDR Report: Over 99% of Releases Before 1970; DX 2066 (only 40 class properties purchased before 1970).) Accordingly, there is no way that defendants' conduct could have been "aimed" at plaintiffs.

Fifth, defendants' conduct would not be considered unlawful in all other states. The vast majority of courts that have considered the issue have held that compliance with federal regulations would bar the claims plaintiffs are bringing here.[10] Because defendants have

---

[10]   *See Devine v. Commonwealth Edison Company*, No. 06-C-2383, 2006 WL 2038593, at *3 (N.D. Ill. July 19, 2006) (attached as Ex. 9); *Wilcox v. Homestake Mining Co.*, No. CIV-04-534, slip op. at 6–7 (D.N.M. Nov. 15, 2005) (attached as Ex. 10); *O'Connor v. Boeing N. Am., Inc.*, No. CV 97-1554, slip op. at 77–87 (C.D. Cal. Aug. 18, 2005) (attached as Ex. 11); *Osarczuk v. Associated Univs. Inc.*, No. 96-2836, at *16 (N.Y.-Part. 32, Suffolk Co. Mar. 10 2005) (attached as Ex. 12); *Finestone v. Fla. Power & Light Co.*, 319 F. Supp. 2d 1347, 1349 (S.D. Fla. 2004). The following decisions are in accord:  *Roberts v. Fla. Power & Light Co.*, 146 F.3d 1305, 1308 (11th Cir. 1998); *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1553 (6th Cir. 1997); *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1105 (7th Cir. 1994); *In re TMI Litigation Cases Consol. II*, 940 F.2d 832, 859 (3d Cir. 1991); *Good v. Fluor Daniel*
(Continued…)

complied with all applicable federal nuclear safety standards, defendants' conduct would be

lawful in actions brought in jurisdictions in which these opinions are controlling.  Nor would

defendants have committed a trespass or nuisance in the vast majority of jurisdictions.  Most

courts hold that the release of impalpable substances cannot support a trespass in the absence of

serious and substantial physical damage to the property.[11]  Plaintiffs presented no evidence here

of such damage.  To the contrary, plaintiffs' expert, Dr. Smallwood, admitted that plutonium is

an "intangible" substance.  (11/3/05 Trial Tr. at 4039-40 ("Q. You would agree that, by any

stretch of the common sense word 'intangible,' [plutonium particles a]re intangible, right?  A.

Yes.").)  Furthermore, defendants' conduct did not amount to a nuisance in many jurisdictions,

---

*Corp.*, 222 F. Supp. 2d 1236, 1247 (E.D. Wash. 2002); *Gassie v. SMH Swiss Corp. for Microelec. and Watchmaking Indus., Ltd.*, No. Civ. A. 97-3557, 1998 WL 158737, at *4 (E.D. La. Mar. 26, 1998 (attached as Ex. 13); *Boggs v. Divested Atomic Corp.*, No. C-2-90-840, 1997 WL 33377790, at *3 (S.D. Ohio Mar. 24, 1997) (attached as Ex. 14); *Corcoran v. New York Power Auth.*, 935 F. Supp. 376, 386 (S.D.N.Y. 1996); *Bohrmann v. Maine Yankee Atomic Power Co.*, 926 F. Supp. 211, 220 (D. Me. 1996); *McLandrich v. S. California Edison Co.*, 942 F. Supp. 457, 465 (S.D. Cal. 1996); *Lamb v. Martin Marietta Energy Sys.*, 835 F. Supp. 959, 965 (W.D. Ky. 1993).

[11]   *See Maddy v. Vulcan Materials Co.*, 737 F. Supp. 1528, 1540-41 (D. Kan. 1990) (holding that plaintiffs "cannot recover in trespass since they have failed to demonstrate an injury implicating their right to exclusive possession" despite plaintiffs' allegation of the "emission and migration of airborne gases" onto their properties), *cited in Cook v. Rockwell Int'l Corp.*, 273 F. Supp. 2d 1175, 1200 (D. Colo. 2003) ("*Cook IX*") ; *Bradley v. Am. Smelting and Ref. Co.*, 709 P.2d 782 (Wash. 1985) (concluding that a "deposit of microscopic particles, undetectable by the human senses," is actionable as a trespass only with "proof of actual and substantial damages"), *cited in Cook IX*, 273 F. Supp. 2d at 1200; *Borland v. Sanders Lead Co.*, 369 So.2d 523, 529 (Ala. 1979) ("For an indirect invasion to amount to an actionable trespass, there must be an interference with plaintiff's exclusive possessory interest; that is, though the defendant's intentional conduct, and with reasonable foreseeable, some substance has entered upon the land itself, affecting its nature and character, and causing substantial damage to the Res."); *see also* Prosser & Keeton, Torts § 13, at 71 ("[T]he mere intentional introduction onto the land of another of *smoke*, *gas*, noise, and the like, without reference to the amount thereof or other factors that are considered in connection with a private nuisance, is not actionable as a trespass."), *cited in Cook IX*, 273 F. Supp. 2d at 1200 (emphasis added). The Court has rejected defendants' argument that Colorado so requires.

because they do not permit recovery for the possibility of future harm, or for **any** increment of increased risk,[12] as the Court did here.

Therefore, under all of the *State Farm* and *Continental Trend* factors, defendants' conduct was not reprehensible. Accordingly, the punitive damages award is unconstitutional, violates due process, and cannot be sustained. *See State Farm*, 538 U.S. at 419 ("The existence of any one of those factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect.")

Though a lack of reprehensibility is alone sufficient reason to vacate the punitive damages award, the award should also be vacated because the jury's punitive award vastly exceeds the harm suffered by plaintiffs. The second *BMW* guidepost is the ratio of the punitive damages award to the "**actual harm** inflicted on the plaintiff." *BMW*, 517 U.S. at 580 (emphasis added). As previously discussed, even if the compensatory damages award is not set aside, it should be significantly reduced because of a wide variety of factors set forth *infra* and in defendants' Renewed Motion for Judgment as a Matter of Law. Accordingly, the punitive

---

[12] *See Potter v. Firestone Tire & Rubber Co.*, 863 P.2d 795, 810-11 (Cal. 1993) ("A carcinogenic or other toxic ingestion or exposure, without more, does not provide a basis for fearing future physical injury or illness which the law is prepared to recognize as reasonable"); *O'Banion v. Owens-Corning Fiberglas Corp.*, 968 F.2d 1011, 1013 (10th Cir. 1992) (Oklahoma law: "to the extent that plaintiffs did not make a proffer of expert medical testimony that there was a reasonable medical probability that plaintiff Stanley O'Banion would develop a cancerous condition from his exposure to asbestos, references to cancer were properly excluded due to lack of relevance"); *Carroll v. Litton Sys., Inc.*, 1990 WL 312969 (W.D.N.C. 1990) (attached as Ex. 15) ("It is not enough for plaintiffs to show that exposure to the chemicals at issue has a *potential* for causing harm"); *Southeastern Liquid Fertilizer Co. v. Chapman*, 120 S.E.2d 651, 653 (Ga. 1961) ("it has long been recognized in Georgia that the mere apprehension of future injury from a nuisance which the complainant anticipates may be maintained in the future in the operation of a lawful business is not sufficient to authorize its abatement. If it be a nuisance, the consequences must be to a reasonable degree certain").

damages award is grossly in excess of any appropriate compensatory damages award, and thus cannot be sustained.  *See BMW*, 101 F.3d at 581 (a ratio of 4:1 is "close to the line") (*quoting Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23-24 (1991)).

     **E.**     **The Punitive Damages Award Is Inconsistent with the Price Anderson Act.**

     For the convenience of the Court and Court personnel, defendants note that this Court has previously rejected defendants' arguments on the issue set forth in this Section E.[13]  As argued previously, defendants respectfully submit that:  (i) the Price Anderson Act bars plaintiffs from pursuing punitive damages entirely; and (ii) plaintiffs are not entitled to punitive damages because they have not shown any nuclear incident before August 1988.

     First, the Price Anderson Act bars plaintiffs from pursuing punitive damages entirely. Section 2014(hh) provides that state law does not apply in a Price Anderson Act case if that state law is inconsistent with (among other things) the prohibition on punitive damages in Section 2210(h).  *See* 42 U.S.C. § 2014(hh).  Section 2014(hh) expressly applies to nuclear incidents occurring "before, on, or after the date of the enactment of this Act."  *In re Hanford Nuclear Reservation Litig.*, 780 F. Supp. 1551, 1572 n.38 (E.D. Wash. 1991); *see also* Pub. L. 100-408, § 20(b)(1) ("The amendments … shall apply to nuclear incidents occurring before, on, or after the date of the enactment of this Act.").

     Section 2014(hh) is therefore not covered by the "catch all" provision that restricts the applicability of other provisions of the act to dates "on or after August 20, 1988."  *See* Pub. L. 100-104, § 20(a), Historical and Statutory Notes to 42 U.S.C.A. § 2014 (West Supp. 1990)

---

[13] The orders in which the Court has rejected these arguments include the following:  12/7/06 Order Regarding Jury Instructions at 64-65; Cook IX, 273 F. supp. 2d at 1211-12; Cook v. Rockwell Int'l Corp., 755 F. Supp. 1468, 1479-81 (D. Colo. 1991) ("Cook I")

("Except as provided in subsection (b), the amendments made by this Act shall become effective on the date of the enactment of this Act [Aug. 20, 1988] and shall be applicable with respect to nuclear incidents occurring on or after such date.").  "[S]ubsection (b)" *does* provide a different timeline — it unambiguously states that the amendments made to Section 2014(hh) "shall apply to nuclear incidents occurring before, on, or after the date of the enactment of this Act."  Pub. L. 100-408, § 20(b)(1).

In addition, even pursuant to this Court's holding in *Cook I*, the Price Anderson Act expressly bars punitive damages for "nuclear incidents occurring on or after" August 20, 1988.  *See Cook I*, 755 F. Supp. at 1479-81  A "nuclear incident" is defined as "any occurrence . . . causing . . . bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of [nuclear materials.]"  42 U.S.C. § 2014(q).

Under the Amendments Act, to determine whether punitive damages can be awarded, the jury must first determine when the "nuclear incident" occurred.  If the nuclear incident occurred after August 20, 1988, the jury may not award punitive damages.  *See Cook I*, 755 F. Supp. at 1479-81.  A nuclear incident could have "occurred" before August 20, 1988 only if class members experienced "loss of or damage to property, or loss of use of property" before August 20, 1988.  42 U.S.C. § 2014(q).

Here, plaintiffs cannot prove "loss of or damage to property, or loss of use of property" before August 20, 1988.  First, at a minimum, because the jury was not asked to make any findings of fact with respect to when any "loss of or damage to property, or loss of use of property" occurred, a new trial would be required to answer that question.

Second, plaintiffs cannot prove an "occurrence . . . causing . . . loss of or damage to property, or loss of use of property" before August 20, 1988 on a class-wide basis.  The only requirement for class membership is that an individual have owned property in the class area as of *June 7, 1989*.  Hundreds of class members did not purchase their properties in the class area until *after August 20, 1988*.  (*See* DX 2066 (1,851 class members bought property in 1988 and 965 bought property in 1989).)  Furthermore, plaintiffs focused on alleged "damage" to their "property" from the FBI raid, which happened in 1989, *after* the effective date of the Price Anderson Amendments Act.  (*E.g.*, Whalen testimony, 11/21/05 Trial Tr. at 595, 5938-39; Schierkolk testimony, 10/20/05 Trial Tr. at 1902; Babb testimony, 10/20/05 Trial Tr. at 1962; Cook testimony, 10/21/05 Trial Tr. at 2040-41, 2055-56; S. Bartlett testimony, 10/14/05 Trial Tr. at 920; Radke testimony, 10/26/05 Trial Tr. at 2676 ("I wanted to measure — could I measure the impact of the raid and what it had — did it have any impact at all on property value.").)  It follows that plaintiffs' claims arise from a nuclear incident that occurred (at least in part, if not wholly) on or after August 20, 1988, and that Plaintiffs' claims for punitive damages are barred by even the most narrow reading of the Price Anderson Amendments Act.

Third, plaintiffs did not present any evidence that Rockwell engaged in any conduct before August 20, 1988 that could support a punitive damages award.  Plaintiffs did not separate pre-10/20/88 conduct from post-10/20/88 conduct.  Instead, the Rockwell evidence on which plaintiffs focused — the FBI raid and plea-era conduct — took place after 1988.  Accordingly, because plaintiffs failed to show any pre-10/20/88 conduct on the part of Rockwell that could support a punitive damages award, the punitive award against Rockwell cannot stand.

IV.     **ERRONEOUS JURY INSTRUCTIONS REQUIRE A NEW TRIAL.**

For the convenience of the Court and court personnel, defendants note that the Court has previously considered, and rejected, defendants' arguments in Section IV below.[14]

The jury instructions read by the Court were inconsistent with federal and state law in several fundamental respects, and were extremely prejudicial to defendants.  *See York v. AT&T,* 95 F.3d 948, 953 (10th Cir. 1996) (jury instructions must properly state the law).  For the reasons stated below, a new trial should be held using the jury instructions proposed by defendants. These jury instructions may be found in the following filings that defendants have made on jury instruction issues:

- Defendants' Proposed Trespass Jury Instructions and Jury Verdict Forms, filed July 13, 2004;

- Defendants' Revised Proposed Trespass Jury Instructions and Jury Verdict Forms, filed August 6, 2004;

- Defendants' Proposed Nuisance Jury Instructions and Jury Verdict Forms, filed August 6, 2004;

- Defendants' Proposed Phase III Jury Instructions and Verdict Form, filed September 3, 2004;

- Defendants' Proposed Supplemental Jury Instructions and Jury Verdict Form, filed September 16, 2005;

- Defendants' Proposed Limiting and Supplemental Jury Instructions, filed September 23, 2005;

- Defendants' Submission of a Limiting Statement Pursuant to the 10/7/05 Hearing and a Related Statement by defendants, filed October 10, 2005;

---

[14]   The orders in which the Court rejected these arguments include the following: December 7, 2006 Order Regarding Jury Instructions; February 6, 2006 Order re Jury Instruction 3.22; May 17, 2005 Order; *Cook IX*, 273 F. Supp. 2d 1175.

- Defendants' Motion for a Limiting Instruction Regarding the Testimony of Dr. S. Paul Slovic, filed November 6, 2005;

- Defendants' Proposed Instruction Regarding Stigma Evidence and Class Members, filed December 7, 2005;

- Defendants' Proposed Instruction Regarding the Type of Compensatory Damages That Can Be Awarded, filed December 8, 2005;

- Defendants' Memorandum in Support of defendants' Motion for Mistrial or, In the Alternative, defendants' Proposed Instructions, filed December 28, 2005;

- Defendants' Proposed Changes to Preliminary Jury Instructions, filed January 10, 2006;

- Defendants' Proposed Jury Verdict Forms, filed January 11, 2006;

- Defendants' Objections to Jury Instructions and Jury Verdict Form, filed January 18, 2006;

- Defendants' Proposed Change to Instruction No. 3.28, filed January 20, 2006;

- Defendants' Motion Regarding the Jury's Note with Respect to Jury Verdict Question 2, filed January 24, 2006;

- Defendants' Proposed Response to the Jury's February 3, 2006 Question Regarding Jury Instruction No. 3.22, filed February 3, 2006; and

- Defendants' Proposed Response to Jury's February 10, 2006 Question Regarding Jury Instruction No. 3.27, filed February 10, 2006.

Below, defendants re-assert arguments that the Court has already rejected regarding jury instructions, without waiver of any of defendants' previously-asserted arguments made in the following filings:

- Defendants' Objections to Plaintiffs' Trespass Jury Instructions and Jury Verdict Forms, filed July 13, 2004;

- Defendants' Response to Plaintiffs' Proposed Plan for Determination of Compensatory Damages, filed July 21, 2004;

- Defendants' Objections to Plaintiffs' Nuisance Jury Instructions, filed August 6, 2004;

- Defendants' Responses to Plaintiffs' Objections to defendants' Proposed Nuisance Jury Instructions, filed August 13, 2004;

47

- Defendants' Response to Plaintiffs' Brief on the Statute of Limitations, State Regulatory Standards, Ultrahazardous Liability, Spoliation, and Negligent Trespass, filed August 18, 2004;

- Defendants' Submission of Phase III Jury Instructions and Jury Verdict Forms, filed September 3, 2004;

- Defendants' Submission of Objections to Plaintiffs' Nuisance Jury Verdict Form and Res Ipsa Loquitur Instruction, filed September 7, 2004;

- Defendants' Objections to Plaintiffs' Additional and Revised Nuisance Jury Instructions, filed November 8, 2004;

- Defendants' Response to Plaintiffs' Statement Regarding Alleged Forms of Interference With Use and Enjoyment, filed November 30, 2004;

- Defendants' Submission of Their Responses to Plaintiffs' Objections to Defendants' Proposed Prior Market Discount Instructions, filed October 3, 2005;

- Defendants' Objections to Plaintiffs' Proposed Supplemental Jury Instructions, filed September 16, 2005;

- Defendants' Submission of Their Objections to Plaintiffs' Proposed Limiting Instruction, filed September 29, 2005;

- Defendants' Reply in Support of Their Proposed Instruction on Corporate Retention of Expert Witnesses, filed January 18, 2006;

- Defendants' Objections to Jury Instructions and Verdict Form, filed January 18, 2006;

- Defendants' Motion to Strike Portion of Jury Instruction No 3.5, filed January 19, 2006;

- Defendants' Motion for Clarification and Defendants' Statement Regarding the Court's Ruling Relating to Jury Instruction No. 3.5, filed January 19, 2006;

- Defendants' Objections to Additional and Revised Jury Instructions, filed January 19, 2006;

- Defendants' Response to the Court's Proposed Response to the Jury's January 31, 2006 Question Regarding Defendants' Affirmative Defense, filed January 31, 2006;

- Defendants' Response to the Court's February 1, 2006 Proposed Response to the Jury's Second January 31, 2006 Question Regarding Defendants' Affirmative Defense, filed February 1, 2006;

- Defendants' Response to the Plaintiffs' February 1, 2006 Proposed Response to the Jury's Second January 31 2006 Question Regarding Defendants' Affirmative Defense, filed February 1, 2006;

- Defendants' Repsonse to Plaintiffs' Proposed Response to the Jury's February 3, 2006 Question Regarding Jury Instruction No. 3.22, filed February 3, 2006;

- Defendants' Statement Regarding the Court's Proposed Response to the Jury's Question of February 8, 2006 Regarding Instruction 3.25, filed February 8, 2006; and

- Defendants' Response to Plaintiffs' Statement Regarding the Court's Proposed Response to the Jury's Question of February 8, 2006 Regarding Jury Instruction 3.25, filed February 8, 2006.

### A.    Legal Standard for Jury Instructions.

"In Colorado, when 'instructing the jury in a civil case, the court *shall use* such instructions as are contained in Colorado Jury Instructions (CJI) as are applicable to the evidence and the prevailing law.'" *Tafoya v. Sears Roebuck and Co.*, 884 F.2d 1330, 1336 n.12 (10th Cir. 1989) (emphasis original) (*quoting* Colo. R. Civ. P. 51.1(1)); *see also Wagner v. Case Corp.*, 33 F.3d 1253, 1255 n.2 (10th Cir. 1994) (same).  With respect to issues for which "there are no CJI instructions on the subject, or in which the factual situation or changes in the law warrant a departure from the CJI instructions, the court shall instruct the jury as to the prevailing law applicable to the evidence in a manner which is clear, unambiguous, impartial and free from argument." Colo. R. Civ. P. 51.1(2).  In such instances, the court should "us[e] CJI instructions as models as to the form so far as possible." *Id.*

Jury instructions must "properly state the applicable law *and* focus the jury on the relevant inquiry," not only when considered individually but also when "considered as a whole." *York v. AT&T Co.*, 95 F.3d 948, 953 (10th Cir. 1996); *see also United States v. Pacheco*, 154 F.3d 1236, 1238 (10th Cir.1998) (jury instructions must "accurately" state the law).

### 1.   The jury should not have been instructed that a class action is the only practical means for adjudicating plaintiffs' claims.

One of the first things that the jury was told about this case was that plaintiffs "filed this case as a class action" because "it would not be practical to conduct thousands of trials." (Instruction No. 1.1.)  It is defendants' position (as argued elsewhere) that this case never should have been certified and/or tried as a class action due to the numerous differences between the class members.  As one example, the trespass claims of the Bartletts who testified that tests for plutonium on their properties could not detect any plutonium above background levels, should not have been tried together with the trespass claims of other plaintiffs for whom there might be different evidence of plutonium contamination (or the lack thereof).   Thus, defendants believe that this statement is both incorrect as a legal matter and, because class certification is a matter only for the court to decide under Fed. R. Civ. P. 23, unnecessary and inappropriate for a jury instruction.

But this statement is also improper because of the misleading impression it leaves in the jury's mind that plaintiffs have no other means to recover on their claims if not in this class trial. Having been left with this impression, the jury likely believed that it must find in favor of the plaintiffs as a class in order for any plaintiff to recover, even if there are other plaintiffs who, if considered individually, the jury would find are not entitled to recover.  Thus, even if the jury would have found that the Bartletts and Merilyn Cook failed to prove the presence of plutonium on their properties, it may have found that other class members did produce such proof and entered its trespass verdict on the premise that those other class members had no other means of recovering under trespass.  Thus, the jury's verdict does not necessarily indicate that they found that each member of the class proved the elements of their claim, and a judgment for the whole class should not issue from it.

**2.      The instructions should not have contained commentaries.**

The instructions contained several statements purporting to describe the theoretical

underpinnings behind the plaintiffs' claims:

- "The tort of trespass protects a landowner's right to exclusive possession and control of his property, which includes the right to keep the property free from contamination deposited there by others without the landowner's consent."  (Instruction No. 3.2.)

- "The purpose of a nuisance claim is to protect a landowner's right to use and enjoy his property. . . . [T]here are countless ways that a person or company can interfere with this right . . . ."  (Instruction No. 3.7.)

- "A nuisance action for damages seeks to place the financial burden for any interference with the use and enjoyment of property on the actor that caused this harm.  The financial burden of this cost is therefore a significant factor in determining whether the conduct of causing the harm without paying for it is unreasonable."  (Instruction No. 3.12.)

- "Actual damages are a monetary award to compensate a plaintiff for the loss caused by the defendant's wrongful conduct.  The goal of an award of actual damages is to make the injured person whole or, in other words, to put them in the position they would have been in if they had not been harmed by the defendant."  (Instruction No. 3.21.)

- "This defense [of setoff] is based on the rule that if the defendant's wrongful conduct has caused harm to the plaintiff, but also has conferred a direct benefit on the plaintiff, then the value of the benefit conferred mitigates, that is reduces, the actual damages that may be recovered for the defendant's wrongful conduct."  (Instruction No. 3.25.)

This commentary serves no practical purpose in a jury instruction and likely confused the jury

more than educated them.  Any articulation of the rationale for the law is more appropriately left

to the parties' briefing as opposed to the Court's instructions on *what the law is*.  Nowhere in the

Colorado Jury Instructions (which are supposed to serve, at the very least, as a "model") can

such statements be found.

The jury considered these "mini-lectures" because they asked whether the commentary in

Instruction No. 3.25 imposed an additional element that defendants needed to prove:  "In regards

to J/I 3.25 the second paragraph starts 'based on the rule'—does this mean the defendants do or

51

do not have to prove 'conferred a direct benefit'."  (Jury Note filed 2/8/06.)  Thus, a new trial

should be held with a set of instructions that does not include this misleading and unnecessary

legal commentary.

> **3.      The jury should not have been instructed about what plaintiffs do not
> need to prove.**

Sprinkled throughout the instructions were statements regarding what the plaintiffs ***did***

***not*** need to prove.  Most of the statements reject arguments that defendants have made in this

case.  Some examples include:

- "Plaintiffs are <u>not</u> required to show . . . that they suffered any bodily harm because of
  the plutonium or that the presence of plutonium on the Class Properties damaged
  these properties in some other way."  (Instruction No. 3.3 (emphasis ***original***).)

- "In deciding the third element of Plaintiffs' trespass claim, which is whether it
  appears that plutonium will continue to be present on Class Properties indefinitely, it
  is not necessary for you to find that the plutonium will be there forever."  (Instruction
  No. 3.4.)

- "A trespass may exist even though the conduct that originally caused the invasion of
  the plaintiff's land has ceased."  (Instruction No. 3.5.)

- "To find that Plaintiffs proved this form of interference [increased health risk], you do
  not need to find that all Class members were exposed to plutonium at the same time
  or by the same methods or to the same degree or that they all incurred the same level
  of health risk as a result of exposure to plutonium."  (Instruction No. 3.7.)

- "In order for you to find interference based on the threat or risk of future harm, you
  also need not find that the future harm *will* occur and affect the whole of the Class
  Area."  (Instruction No. 3.7.)

- "You need not find that all Class members were subject to the same form of
  interference with use and enjoyment of their properties."  (Instruction No. 3.7.)

- "Evidence that Class Properties have a lower value because of any proven
  interference is not necessary, however, for you to find that the interference is
  substantial under the test I just described to you."  (Instruction No. 3.9.)

- "[The 'unreasonable' balancing test] does not mean that Dow and Rockwell can
  interfere with Class members' use and enjoyment of their properties as long as their
  activities at Rocky Flats served an important purpose or these activities are deemed

more valuable or profitable than Class members' use of their land."  (Instruction No. 3.10.)

- "You do not need to find that all of the conduct that caused any substantial and unreasonable interference was intentional or that all of it was negligent in order to find that Plaintiffs proved this element of their nuisance claim.  Proof that a substantial and unreasonable interference resulted from a combination of intentional conduct and negligent conduct is sufficient to prove this element."  (Instruction No. 3.13.)

- "In deciding this element [continuing nuisance], it is not necessary for you to find that the interference meeting these requirements will last forever."  (Instruction No. 3.17.)

- "Plaintiffs are not required to prove that any diminution in value caused by Dow or Rockwell's activities at Rocky Flats came into existence before or after the FBI raid or some other specific event."  (Instruction No. 3.24.)

- "In answering this ["generic causation of emotional distress"] question, you should know that Plaintiffs do not need to show that any actual or threatened future contamination from Rocky Flats poses an actual or verifiable health risk." (Instruction No. 3.28.)

Most, if not all, of these statements served no legitimate purpose, because there was no need for the jury to consider issues that are not elements of plaintiffs' claims.  Instructing the jury on the issues that plaintiffs do not need to prove slants the instructions in the plaintiffs' favor and unnecessarily contributes to their complex structure.  Indeed, these statements depart from the guiding principle that the Colorado Jury Instructions are to serve as a model, because such statements are not found in those pattern jury instructions.  If defendants had not raised the arguments that these statements reject during pre-trial briefing, there would have been no occasion to insert rejections of defendants' arguments into the instructions.  Thus, the effect of such statements is to punish defendants for pursuing such arguments.

**B.** **The General Jury Instructions Were Legally Incorrect.**

**1.** **The jury should have been instructed that plaintiffs must prove all elements of their claims for each class member, and the court should not have responded otherwise to the jury's question regarding damages.**

Before trial, defendants offered an instruction that would have told the jury: "If any class member has not proved his or her trespass or nuisance claims against either defendant, then your verdict on all of the class members' claims must be for that defendant." (Defs.' Proposed Suppl. General Instruction No. 2, filed 9/23/05.) It is axiomatic that a class member cannot recover on a claim through a class action if such plaintiff would have failed to prove up each element of his or her claim in an individual action. (*See* 4/14/04 Order at 4 (noting that "the substantive rights of class members [should not be] expanded by class-wide findings") (*citing* 28 U.S.C. § 2072; *Broussard*, 155 F.3d at 345.) Because this Court rejected defendants' proposed instruction without explanation, the jury was never instructed that they must not return a verdict for the plaintiffs if some class members did not have valid claims.

On February 3, 2006, the jury asked: "In considering JI 3.22 are we to consider only the amount of diminution common to the entire class as a whole?" The Court responded, "No." (*See* 2/6/06 Resp. to Jury Question re JI 3.22.) Instead, the Court instructed the jury to consider "the sum total of all diminution in value experienced by Class members," even though "[t]he percentage diminution in value suffered by some Class properties . . . may be less than the average." The jury may very well have found that some class properties suffered no diminution in value, which would have precluded the owners of those properties from recovering on an individual basis. *See, e.g.*, *Cimino*, 151 F.3d at 319–21 (reversing damages award where certain plaintiffs had no damages); 28 U.S.C. § 2072 (class action device cannot be used "to abridge, enlarge or modify any substantive right" of any litigant). Because the jury's verdict may have

included plaintiffs who the jury found did not prove the elements of their trespass or nuisance claims or suffered no damage, a new trial is necessary.

### 2.    The jury should have been instructed regarding the unequal access of plaintiffs and defendants to absent class members.

Plaintiffs enjoyed the opportunity to cherry-pick, from a class-member pool of thousands, the most sympathetic witnesses to present to the jury as being representative of the class. Defendants, on the other hand, have been prohibited from contacting any of these absent class members on their own or from conducting any discovery with respect to residential absent class members.  By coincidence, Charles Ozaki, whom plaintiffs called to testify in his capacity as a Broomfield city official, turned out to be an absent class member (to his own surprise).  (*See* 10/20/05 Trial Tr. at 1829 ("Until this moment, I didn't know I was a member.").)  Mr. Ozaki's candid testimony on his experiences as a class member—that Rocky Flats had no impact on his use and enjoyment of his class property (*see id.* at 1831–32)—is telling of the attitudes that many absent class members may have held, but who never would have been selected by plaintiffs as witnesses.  The jury should have been instructed that defendants never had the opportunity to elicit similar testimony from other absent class members to show that Mr. Ozaki's experience was the general rule among the class as a whole, rather than the exception.

### 3.    The jury should never have been instructed regarding classification.

Defendants requested, both before and during trial, that the jury should be instructed that defendants have had nothing to do with the classification of documents and the issue of classification is not an issue for the jury to consider.  (*See* Defs.' Mot. *in Limine* No. 5 to Exclude Evid. of Document Classification Issues and Discovery Conduct by the DOE; Defs.' Proposed Limiting Instruction No. 3, filed 9/23/05; Defs.' Proposed Limiting Instruction No. 1, filed 10/10/05; Defs.' Proposed Instruction re Classification, filed 12/28/05; Defs.' Proposed

Instruction No. 1.9A, filed 1/10/06.)  Nevertheless, in this Court's first set of jury instructions, which were read to the jury on October 11, 2005, this Court explicitly permitted the jury to "infer" that classified information would have been unfavorable to defendants.  (Instruction No. 1.9 (10/11/05 version).)  Plaintiffs' counsel then presented highly prejudicial evidence regarding the DOE's discovery conduct in this case and urged the jury to make that precise inference. (*See, e.g.*, 12/16/05 Trial Tr. at 8575 ("So I would argue that it cannot be favorable to them.  I would argue that it can and should be construed favorably to us.") (argument of plaintiffs' counsel).)  This Court eventually recognized that the first classification instruction was improper and withdrew the language permitting the jury to draw an inference regarding classification from the final version of the instructions.  But this Court could not "un-ring" the bell, especially when the corrected instruction was not read to the jury until the end of closing arguments, more than a month after the jury had heard the prejudicial material and the accompanying commentary of plaintiffs' counsel.

Even the revised version of Instruction No. 1.9 prejudiced defendants because it allowed plaintiffs to blame their lack of evidence on the DOE.  This Court instructed the jury that the law does not require plaintiffs to make a "proof to the degree of absolute uncertainty."  Immediately after this statement, the Court also stated that "the problem of proof is complicated because of government imposed secrecy." What followed was a four-paragraph-long explanation of the classification process to the jury.  The result of this process, according to the instruction, was that "some information is deemed secret and is not available to the public" and that other documents had "information removed" through "redaction."

Because the jury was ultimately instructed that it "may not speculate or guess about what the unavailable or redacted information might be," this entire explanation was unnecessary.

Even worse, through its suggestion that plaintiffs' "problem" of producing evidence was "complicated" by the government, this discussion of classification served both as an excuse for the plaintiffs' lack of evidence and to lay the blame for the gaps in the plaintiffs' case on the Department of Energy.  Because this discussion immediately followed an instruction regarding the plaintiffs' burden of proof, the jury likely interpreted this instruction to mean that plaintiffs should not be held to the same burden of proof as in most civil cases due to the difficulties that classification presented in building their case (an interpretation encouraged by plaintiffs' counsel).  (*See* 1/18/06 Trial Tr. at 10312-13) (closing argument of plaintiffs' counsel).) Moreover, by explaining that the government is responsible for classifying information, this instruction had the effect of reinforcing plaintiffs' improper suggestions that the Department of Energy abused its classification authority to engineer a "cover-up" to avoid paying a judgment as defendants' indemnitor.  (*See*, *e.g.*, 1/20/06 Trial Tr. at 10581 ("DOE is part of the cover-up.") (closing argument of plaintiffs' counsel).)

> **4.     Instruction No. 2.5 should not have prevented the jury from inferring that Rockwell committed no additional misconduct from the fact that prosecutors did not pursue additional counts.**

The jury was instructed that it "should not consider the plea agreement or its content, however, or the fact that Rockwell did not plead guilty to additional crimes and that the government did not seek to prosecute Rockwell for any other crimes, in determining whether Rockwell committed any particular conduct at Rocky Flats in addition to the misconduct to which it pled guilty."  (Instruction No. 2.5.)  The basis for this instruction was this Court's ruling on defendants' motions *in limine* (see Defs. MIL Nos. 1-3) to exclude evidence relating to the FBI raid, the grand jury investigation, and Rockwell's guilty plea.  The Court noted that "Rockwell intends to argue and present evidence that the Department of Justice prosecutors ultimately exonerated it of all charges of environmental misconduct except those to which it pled

guilty," and that "Plaintiffs will seek to rebut this contention by introducing evidence that there are other less innocent explanations for prosecutor's failure to pursue additional charges against Rockwell."  (8/22/05 Hr'g Tr. at 6.)  Because this Court held that the "question of whether the U.S. Attorney and the Department of Justice properly discharged their duties in investigating and prosecuting Rockwell is not relevant to the matters to be determined in this action," this Court initially intended to prevent both defendants and plaintiffs from admitting evidence regarding this issue.

However, through the testimony of Mr. Lipsky and others (*see*, *e.g.*, 10/24/05 Trial Tr. at 2207-2651, 10/27/05 Trial Tr. at 2865-2953, 11/02/05 Trial Tr. at 3709-64), plaintiffs opened the door to their allegation that additional misconduct was not pursued by the prosecution.  The Court held that, in light of Mr. Lipsky's testimony, plaintiffs had "opened the door,"[15] and defendants called Mr. Norton to respond to this testimony.  (*See*, *e.g.*, Norton testimony, 12/14/05 Trial Tr. at 7954–56 ("A principle of the plea agreement was that it would include the most serious environmental crimes we found."); 7958 (testifying that he pursued and charged every serious criminal charge that he thought could be proven); 7988 ("There were no serious environmental charges that were not pursued to my knowledge.").)

Over defendants' objection, however, Instruction No. 2.5 was never updated to reflect the fact that evidence was now in the record for the jury's consideration regarding the conduct of the prosecutors in the Rockwell investigation.  The jury should have been permitted to consider this evidence and infer that Rockwell did not commit misconduct in addition to what was contained

---

[15]   (*See* 10/25/05 Trial Tr. at 2515-19.)

in the plea agreement.  Instructing the jury otherwise unfairly prejudiced Rockwell and requires a new trial.

> **5.    The jury should have been specifically instructed to ignore the *Church* lawsuit.**

Notwithstanding the Court's ruling that nothing other than "the fact" of the *Church* litigation was admissible (*see* 8/22/05 Hr'g Tr. at 9), plaintiffs' counsel improperly informed the jury during their opening argument that there had been another lawsuit against these same defendants that settled for millions of dollars:

> MS. ROSELLE:  In 1975, after Jefferson County refused to allow some of the neighbors living very close to Rocky Flats to develop their land, Marcus Church — you remember I showed you his picture way back when here — and two neighbors sued the United States Government, Dow, and Rockwell.  And after many years, that lawsuit was settled for $9,000,000. And as part of that lawsuit, Marcus Church was required to return to the defendants all of the documents that he got during the pendency of the litigation.

> Now, during the 15 years this lawsuit has been pending, we have gotten access to the documents.  But I bring this up to you for two reasons:  One is that the defendants in this case have already acknowledged, if you will, and paid money to some of the neighbors for the contamination problems it caused.

(10/11/05 Trial Tr. at 549-50.)

Defendants proposed an instruction one day before these remarks were made that would have told the jury what this Court had ruled:  "In 1975, Marcus Church filed a lawsuit against the United States, Dow, and Rockwell, which included claims of plutonium on property in the class area from Rocky Flats.  You may consider only the fact that the Church Lawsuit existed from 1975 to 1984."  (Defs.' Proposed Limiting Instruction No. 2, filed 10/10/05.)  The failure to provide this instruction allowed the jury to find that defendants are liable based on their willingness to settle the *Church* lawsuit.

6.     **Jury should have been instructed that only evidence of media coverage or other stigma evidence relating to a proven trespass or nuisance should be considered.**

Plaintiffs relied heavily at trial on their theory that it was ***news stories*** about Rocky Flats, regardless of their accuracy, that were responsible for the alleged "stigma" that diminished property values.  In their opening arguments, plaintiffs' counsel alleged that "Rocky Flats created a stigma" (10/11/05 Trial Tr. at 489), and promised that "[w]e will talk all about stigma, and what it means, and what it has to do with this case" (*id.* at 707).  The jury was subsequently inundated with excerpts and video clips from news stories, many of which reported, as fact, highly inflammatory allegations of waste mismanagement that turned out not to be true.  For example, the media reported:

> [T]he investigation shows that Building 771, an outdated waste incinerator, was used without a proper government permit to dispose of radioactive and other hazardous waste, a criminal act, if proven in court, one that may have spewed cancer-causing toxins into the air.

(PV-3114; *see also* PV-3116 ("The FBI concludes the incinerator [in Building 771] was being operated covertly after repeated public assurances it was shut down.").)  Prosecutors later concluded that, in fact, "the incinerator was not used during the period of shutdown."  (Norton testimony, 12/14/05 Trial Tr. at 7946.)

Plaintiffs' damages experts focused on what was ***reported*** in these stories, rather than attempting to determine whether the reports were ***true*** and determining what portion of damages, if any, stem from defendants' actual, wrongful conduct.  The jury heard extensive testimony on stigma from plaintiffs' expert Dr. Paul Slovic, who discussed the meaning and causes of stigma.  (11/7/05 Trial Tr. at 4244–46.)  According to Dr. Slovic, "nuclear technologies are one of the types of technologies that are stigmatized."  (*Id.* at 4246.)  But Dr. Slovic could not establish a link between the alleged diminution in value and the alleged actual conduct by defendants, as

opposed to the conduct reported by the media or the mere fact that Rocky Flats was a nuclear facility.  (*Id.* at 4309 ("Q.  You can't say whether there was any real concern that was focused on Rockwell's actual conduct as opposed to the media, correct?  A.  We didn't study that."); *id.* at 4329–30 (acknowledging that nobody had "ever even tried to correlate bad feelings about nuclear power with market prices at Rocky Flats").)  Neither did Mr. Hunsperger distinguish between the effect caused by stigma and the effect caused by defendants' conduct.  (*See* Hunsperger testimony, 12/6/05 Tr. at 6668 ("Q.  False PR?  I think there—if you think there was false PR, we'll put that—I'll put as many factors as you thought on the board, and I still want to know, is there anywhere in your report where you allocate and say, here is how much of the stigma associated with these properties flow from each one of these different market facts that were out there?  Did you ever do that?  A.  It's not possible to do.").)  Indeed, Mr. Hunsperger defines "stigma" as a set of risks that are distinguished from "real or scientifically quantifiable risks," but are rather risks that are "perceived."  (*Id.* at 80)

It is well settled that plaintiffs would not have been able to recover for "stigma" from the Rocky Flats plant that was not caused by an actual trespass or nuisance by the defendants.  *See Staley v. Segal*, 841 P.2d 379, 382 (Colo. Ct. App. 1992) (diminution in value attributable to proximity to neighboring hog facility insufficient to establish nuisance liability); *Adams v. Star Enter.*, 51 F.3d 417, 422 (4th Cir. 1995) (dismissing nuisance claim based on allegation that "the value of [plaintiffs'] properties has been substantially reduced as a result of the 'stigma' attached to the community because of the oil spill"); *Berry v. Armstrong Rubber Co.*, 989 F.2d 822, 829 (5th Cir. 1993) (barring recovery "for reduced market value caused by a 'stigma' absent some physical damage to plaintiffs' land caused by the defendant"); *Wilson v. Amoco Corp.*, 33 F. Supp. 2d 981, 986 (D. Wyo. 1998) ("Plaintiffs in the instant matter may not recover damages

based solely on stigma absent proof of some physical injury or harm to the specific Plaintiff's

property (i.e., separate establishment of a claim for trespass, nuisance, or negligence).").

However, the jury instructions never clarified this distinction for the jury, nor even mentioned

"stigma."  The jury was instructed only that the measure of damages, if any, is the "difference

between the actual value of the Class Properties and the value these Properties would have had if

Dow or Rockwell or both of them had not committed the trespass and/or nuisance proved by

Plaintiffs."  (*See* Instruction No. 3.22.)  But they were not instructed regarding the proper role of

evidence relating to "stigma" in this determination.  Therefore, defendants twice proposed

instructions that would have provided some guidance to the jury about the proper use of such

"stigma" evidence.  (*See* Defs.' Proposed Suppl. Damages Instruction No. 2, filed 9/23/05 ("You

are not to award damages for any loss of property value from such a stigma, unless it has been

established by a preponderance of the evidence that such stigma was caused by a trespass or

nuisance committed by the defendants."); ("Stigma evidence is relevant only to the extent that it

tends to prove the difference in the actual value of Class Properties and the value of Class

Properties as it would have been absent any trespass and/or nuisance proved by Plaintiffs.").)

Neither of these instructions was provided to the jury; this warrants a new trial.

      **C.**      **The Instructions Regarding General Tort Principles Were Incorrect and Require a New Trial.**

      **1.**      **The instructions should have required plaintiffs to demonstrate non-compliance with standards.**

As defendants have previously argued, plaintiffs should have been required to

demonstrate that defendants caused releases that violated the applicable federal standards.  The

Court has already rejected defendants' position on this issue, *Cook IX*, 273 F. Supp. 2d at 1199.

Defendants note that, since this issue was addressed by this Court in the *Cook IX* opinion, more

district courts—including one in the Tenth Circuit—have agreed with the vast majority that the

Price-Anderson Amendments Act preempts state law to the extent that it creates a duty inconsistent with federal safety standards. *See Wilcox* at 6–7 (Ex. 10); *O'Connor* at 77–87 (Ex. 11); *Osarczuk* at *16 (Ex. 12); *Finestone* 319 F.Supp. 2d at 1349. The following decisions are in accord: *Roberts*, 146 F.3d at 1308; *Nieman*, 108 F.3d at 1553; *O'Conner*, 13 F.3d at 1105; *Good*, 222 F. Supp. 2d at 1247; *Gassie*, 1998 WL 158737, at *4 (Ex. 13); *Boggs*, 1997 WL 33377790, at *3 (Ex. 14); *Corcoran*, 935 F. Supp. at 386 (S.D.N.Y. 1996); *Bohrmann*, 926 F. Supp. at 220; *McLandrich*, 942 F. Supp. at 465; *Lamb*, 835 F. Supp. at 965.

In addition to this federal preemption, trespass and nuisance liability is further limited by any applicable state regulations. In *Pub. Serv. Co. of Colo. v. Van Wyk*, 27 P.3d 377 (Colo. 2001), the Colorado Supreme Court addressed the concern about over-extending trespass liability by establishing the prerequisites that, for an invasion to be significant enough to be actionable in trespass, the invasion must either be "tangible" (which the court defined as "[]capable of being felt by touch") or must cause "physical damage to the property" that is "serious or substantial." 27 P.3d at 387, 390. In this case, plaintiffs were permitted to recover for an alleged trespass by a contaminant that met neither of these requirements: (1) it indisputably cannot be experienced by the senses; and (2) it did not cause serious or substantial physical damage to property (such as killing plants, causing paint to peel, *etc.)* (Smallwood testimony, 11/3/05 Trial Tr. at 4039-40.) The Colorado Supreme Court's decision in *Hoery v. United States*, 64 P.3d 214, 222 (Colo. 2003), does not exempt plaintiffs from these requirements. The Colorado Supreme Court did not address whether the contamination in that case was an actionable trespass under its decision in *Van Wyk*; furthermore, the TCE contamination in that case *exceeded state standards*. *Hoery*, 64 P.3d at 222; *see also Taco Cabana v. Exxon Corp.*, 5 S.W.3d 773, 780 (Tex. App. 1999) ("Because the evidence presented at trial did not establish that Exxon failed to remove soil that

contained contaminants above state action levels, Taco Cabana failed to establish its trespass theory of liability.")  Plaintiffs should have been required to show contamination in excess of the state plutonium standard before defendants could be found liable for a trespass.  *Van Wyk*, 27 P.3d at 387, 390; *Hoery*, 64 P.3d at 222.

Colorado law similarly requires that an alleged nuisance must exceed any applicable regulation to be actionable.  In addressing the "unreasonable and substantial interference" element of a nuisance claim, the *Van Wyk* court held: (a) "an allegation of unreasonableness is central to a nuisance claim," and (b) a governmental entity's "determination of reasonableness sets the standard for the balance between the social utility of the [acts causing the nuisance] and possible harm to property."  27 P.3d at 393.  The *Van Wyk* court further ruled that if the governmental entity has "quantified the [invasion] level it deemed to be reasonable, then that [invasion] level would become the standard for the level at which [the invasion] would not constitute an invasion interfering with [plaintiffs'] use and enjoyment of their property."  *Id.* After extensive hearings, information gathering and scientific and other analysis, Colorado quantified the level of plutonium that it considers reasonable on properties at two disintegrations per minute of plutonium per dry gram of soil or square centimeter of surface area.  6 Colo. Code Regs. 1007-1, RH 4.60.1, Permissible Levels of Plutonium in Uncontrolled Areas.  Defendants presented evidence that any plutonium contamination from Rocky Flats on class properties fell below Colorado's standard.  (*See*, *e.g.*, Budnitz testimony, 10/31/05 Trial Tr. at 3335-36; S. Bartlett testimony, 10/14/05 Trial Tr. at 959-961; Cook testimony, 10/21/05 Trial Tr. at 2023-26; DX1261-1265 (Jones & Zhang plutonium contours).)  The jury should have been instructed that such compliance defeats plaintiffs' claims.

2. **The standard for whether an invasion "continues indefinitely" should have been whether it can be expected to end at any time, not at "a definite time."**

The jury was instructed that plaintiffs could recover damages for prospective invasions so long as "there is no reason to expect" that the trespass or nuisance will end "by a definite time." (*See* Instruction Nos. 3.4, 3.17, 3.22.)  These instructions do not reflect the comments to Section 930.  Comment b to Section 930 does not require that the invasion be expected to cease by *a* definite time in the future, but rather that the invasion be expected to cease by ***any*** definite time in the future.  *See* Restatement (Second) of Torts § 930, cmt. b ("'Indefinitely' as used in this Section does not mean that the situation may be expected to last forever, but merely that there is no reason to expect its termination at ***any*** definite time in the future.")  What is important under Section 930 is an expectation that the trespass will cease—not the expectation that the trespass will cease by some date certain.  Section 930 may only be applied "when it appears that the wrong will probably continue indefinitely."  Restatement § 930, cmt. b.  If it appears that an injurious situation will cease at some time, even if that point in time cannot be predicted definitively, Restatement § 930 cannot be applied because its underlying assumption that the injurious situation will continue indefinitely is false.

At trial, plaintiffs conceded that government regulators were planning to clean up the plant site, but argued that because the regulators could not identify the precise point in time at which the clean up would end, the "injurious situation" had become comparatively enduring. (*See*, *e.g.*, 1/6/05 Trial Tr. at 9259 ("What they were saying was it could be 20 years, 30 years, 50 years, 70 years into the future before this plant was cleaned up.").)  Thus, plaintiffs were allowed to recover under a damages measure that assumes that any harm will persist indefinitely, even in the face of evidence not only that the cleanup had been finished and that the site was designated a wildlife refuge (*see* 1/4/06 Trial Tr. at 8811), but that a cleanup was being planned

even as of the time that plaintiffs alleged the situation/condition to be complete and comparatively enduring.

### D.   The Trespass Jury Instructions Were Incorrect and Require a New Trial.

####   1.   The instructions should have required plaintiffs to prove that any plutonium contamination caused serious and substantial physical damage.

Colorado law requires that any trespass be either "tangible," defined as being capable "of being felt by touch," or cause "physical damage to the property" that is "serious or substantial." *Van Wyk*, 27 P.3d at 387, 390.  Plaintiffs presented no evidence at trial of physical damage to any class property, let alone physical damage that was "serious and substantial" or damage that was class-wide.  Thus, plaintiffs relied on this Court's finding that "the deposition of pollution . . . is after all a tangible matter." *Cook IX*, 273 F. Supp. 2d at 1201.  The instructions did not inform the jury that it must find that plutonium is tangible.

The failure of the instructions to include this requirement runs counter to the law and the evidence presented at trial.  In explaining why a trespass must be premised on a tangible invasion, the *Van Wyk* court noted that "interference with possession of another's property is central to the trespass cause of action.  If there is no invasion of tangible matter, then there would be no use or interference with possession."  *See also Cook IX*, 273 F. Supp. 2d at 1199 ("The tort of trespass is predicated upon and intended to protect the plaintiff's right to exclusive possession of its property.")  The cases and authorities following this rule uniformly reject the notion that particulate contamination is a "tangible" invasion that can interfere with possession of one's property absent physical damage. *See, e.g.*, *Maddy*, 737 F. Supp. at 1540-41 (holding that plaintiffs "cannot recover in trespass since they have failed to demonstrate an injury implicating their right to exclusive possession" despite plaintiffs' allegation of the "emission and migration of airborne gases" onto their properties), *cited in Cook IX*, 273 F. Supp. 2d at 1200; *Bradley v.*

*Am. Smelting and Ref. Co.*, 709 P.2d 782 (Wash. 1985) (concluding that a "deposit of microscopic particles, undetectable by the human senses," is actionable as a trespass only with "proof of actual and substantial damages"), *cited in Cook IX*, 273 F. Supp. 2d at 1200.

During trial, plaintiffs' own witness testified, and plaintiffs' own counsel admitted, that the plutonium contamination at issue in this case cannot be felt by touch.  (Smallwood testimony, 11/3/05 Trial Tr. at 4039-40; Pls.' opening, 10/11/05 Trial Tr. at 496 ("You can't see it, you can't smell it, you can't taste it, you can't hear it, and you can't feel it . . . .").)[16]  In light of this evidence, the alleged contamination should not have been classified as a tangible invasion.

> **2.    Instructions should not have allowed recovery for *any* amount of plutonium on a property.**

One consequence of holding that plutonium is a tangible invasion is that the jury is free to conclude that any amount of plutonium would be sufficient to establish a trespass claim, regardless of whether it causes physical damage to the property.  This Court initially disclaimed this position more than two years ago.  (*See* 7/22/04 Hr'g Tr. at 33 ("MR. BERNICK:  I certainly did not understand that your Honor's decision was designed to go that far.  THE COURT:  It doesn't.  That's the *de minimis* kind of thing; but the plutonium plume is different than a molecule of plutonium.").)  At that time, the Court indicated that it would develop a solution to this problem.  (*Id.* at 45–46)  Defendants raised the issue again during the hearings on the parties' *Daubert* motions and motions *in limine*.   (7/28/2005 Hr'g Tr. at 38.)  Two weeks before trial, defendants reminded the Court of this issue.  (9/22/05 Hr'g Tr. at 33–34.)  Defendants also

---

[16]  Plaintiffs also admitted that "the radionuclides and other hazardous substances released from Rocky Flats to which responding plaintiffs and members of the classes (and their properties) were exposed were not perceptible to the senses at the time and location of the exposures." (Ex. 16, Representative Pls.' Joint Resps. to Dow's 2d Set of Interrogs. Directed to Each Class Representative Pl., at 12.)

submitted several different instructions to address the issue of the level of plutonium necessary to establish a trespass claim.  (*See* Defs.' Proposed Trespass Instructions Nos. 3, 4, filed 7/13/04; Defs.' Revised Proposed Trespass Instructions Nos. 3, 4, filed 8/6/04; Defs.' Proposed Supplemental Trespass Instruction No. 1.)

Some threshold level of contamination must be required to give rise to an action, even if that level is not provided by government regulation.  Otherwise, absurd results would ensue; merely driving a car through a residential neighborhood would constitute a trespass on each of the properties from the trails of exhaust landing on the residents' front lawns.  However, the jury was instructed that "Plaintiffs are <u>not</u> required to show that plutonium is present on the Class Properties at any particular level or concentration . . . ."  (*See* Instruction No. 3.3 (emphasis original)).  The jury was incorrectly left free to impose liability for the presence of a single atom of plutonium on a class member's property.

> **3.** **Instructions 2.2B & 3.5 should not have withdrawn evidence of construction and consequent removal of plutonium from the jury's consideration.**

*After* the close of defendants' evidence, this Court removed from the jury's consideration defendants' argument that, even if plaintiffs could prove that plutonium was present on all Class Properties as of 1970, they could not prove that the trespass was continuing.  Defendants had presented evidence in support of this argument throughout trial.  For example, plaintiffs' expert Dr. Smallwood was extensively cross-examined on the impact of development on any plutonium contamination.  (11/3/05 Trial Tr. at 4079-83.)  Defendants introduced similar evidence through Drs. Till and Budnitz.  (10/31/05 Trial Tr. at 3346-47; 12/15/05 Trial Tr. at 8528-29.)

Notwithstanding the fact that plaintiffs bear the burden of proving continuing plutonium contamination, plaintiffs moved for judgment as a matter of law on this issue.  The Court

originally granted plaintiffs' motion only in part.  The argument that defendants were still

permitted to make was clear in this Court's initial ruling:

> MR. BERNICK:  There has been extensive testimony about the fact of there being
> development and the impact of development on the soil.
>
> THE COURT:  You can argue that, but you can't use Dr. Till to say, I don't know
> anything --
>
> MR. BERNICK:  That's fine.  I understand.

(1/17/06 Trial Tr. at 10189–90.)  Nevertheless, the Court later added a new jury instruction

stating that the jury may not consider *at all*, whether the evidence came from Dr. Till or another

source, the impact of development in determining whether plaintiffs have sustained their burden

of proving continuing contamination.  (Instruction No. 2.2B.)  Defendants were not made aware

of this until the instruction was flashed on the screen by plaintiffs' counsel during his closing

argument.  (*See* 1/18/06 Trial Tr. at 10313–14.)

The timing of these rulings was prejudicial to defendants.[17]  Defendants vigorously

pursued the development-impact argument during trial.  (12/15/05 Trial Tr. at 8528–29),[18]

(11/3/05 Trial Tr. at 4079–83).  Plaintiffs' counsel never objected.  (*See also* defendants' mini-

summation, 11/4/05 Trial Tr. at 4178.  "Where is the single shred of evidence you have seen?

Now that you've heard from their guy, where is the evidence that you've seen that there is

---

[17]  (10/12/05 Tr. at 840 ("This also shows you why, if you develop property, and you skim off
the original soil to make way for the development, you are not talking about plutonium
anymore.  So to suggest to you that lurking in the depths is this seeping, fulminating
plutonium, is completely contrary to science and completely contrary to what has happened
out there.").)

[18]  (12/15/05 Tr. at 8528-29 ("Q:  Now, once that bulldozer comes in and churns the dirt up and
the plutonium goes down where it is, or it may be off-site, are you going to have—is there
any way that you can see based upon your work that we're still going to have the same nice
little layer of plutonium on the surface of the soil?  A:  No.").)

plutonium left there?")  In light of defendants' reliance on this argument throughout trial, the

Court's grant of plaintiffs' motion for judgment as a matter of law was unfair and prejudicial to

defendants.

> **4.    Instruction No. 3.5 should not have stated that whether class members knew of plutonium when they purchased is irrelevant; plaintiffs themselves put class members' knowledge at issue.**

Instruction No. 3.5 provided "[t]hat Plaintiffs or Class Members knew or could have

known that plutonium was present on their properties when they purchased them is also

irrelevant to determining whether Dow or Rockwell are liable for trespass."  This instruction

should not have been given because, *inter alia*, plaintiffs placed the issue of class members'

knowledge squarely in issue.  Plaintiffs repeatedly asserted that defendants lied to the public.

For instance, plaintiffs' counsel represented that:

- "[T]here was intentional willful and wanton misconduct here.  There was the press release of 1971 where they trashed Dr. Martell when their own internal documents showed that Dr. Martell was right or at least he was partially right, and he said there was no contamination."  (*Id.* at 10345.)

- "We have the placement of deadly plutonium on neighbors' property and the placement of deadly plutonium on their property where it could be redistributed to neighbors' properties for 37 years, and then we have a series of lies about it."  (*Id.* at 10325.)

Through these assertions that Dow and Rockwell lied to the public, and to class members, at a

minimum plaintiffs opened the door to the relevance of the class members' knowledge, which

became a key part of plaintiffs' claims.  (*See*, *e.g.*, *id.* at 10270-71 ("[T]he problems at Rocky

Flats began to be disclosed in the 1980s . . . .  Throughout this period, as bad news kept

increasing, the neighbors felt the effect, but it was the FBI raid that was the climax.").)  In light

of these representations, the jury should not have been instructed that class members' knowledge

was not relevant to plaintiffs' trespass claims.

     5.      **The Court should have responded differently to the jury's question regarding intent (that defendants must be substantially certain that a trespass would result to commit a trespass intentionally).**

Late in the afternoon of January 23, 2006, the jury made the following request: "Please define the word 'intentionally' in Question 2."[19]  Defendants asked that the jury be provided the clarifying language quoted in *Hoery*, 64 P.3d at 217–18, which states with respect to trespass: "It is enough that an act is done with knowledge that it will to a substantial certainty result in the entry of the foreign matter."  *Id.* (quoting Restatement (Second) of Torts § 158(a) cmt. i).  (*See* Defs.' Mot. re Jury Note, filed 1/24/06.)  This Court held that Colorado law "has not adopted the provision [Restatement § 158(a) cmt. i] that was referenced today."  (1/25/06 Trial Tr. at 10732.)  The jury should have been informed that Colorado law requires that a defendant be substantially certain that its actions will result in a trespass.

    **E.**     **The Nuisance Instructions Were Incorrect, Which Requires a New Trial.**

        **1.**     **"Some increased risk," without more, is insufficient to support a nuisance claim.**

The jury instructions required plaintiffs to show, as one of the element of their nuisance claim, that Class Members were "at some increased risk of health problems" (Instruction No. 3.6.), no matter how small that increased risk was.  As argued in defendants' objections to the Court's proposed jury instructions:  (1) no Colorado court has ever recognized a nuisance claim based on a health "risk" alone; and (2) even if such a "risk" claim were recognized, the standard should be whether plaintiffs had "prove[d] to a reasonable medical probability that the future

---

19    Question 2 of Paragraphs A & B on the verdict form asks:  "Do you find that [Dow/Rockwell] intentionally undertook an activity or activities that in the usual course of events caused plutonium from Rocky Flats to be present on the Class Properties *(see Instruction 3.18)*?"

harm was more likely than not to occur."  Defendants' Objections to Jury Instructions and

Verdict Form, filed 1/18/2006, at 68 (*citing Boryla v. Pash*, 937 P.2d 813, 816-17 (Colo. Ct.

App. 1996) ("[the plaintiff] cannot recover damages for an increased risk of cancer recurrence

because she failed to prove to a reasonable medical probability that the future harm was more

likely than not to occur"), *rev'd on other grounds*, 960 P.2d 123 (Colo. 1998); *see also*

*O'Banion*, 968 F.2d at 1013 (Oklahoma law:  "to the extent that plaintiffs did not make a proffer

of expert medical testimony that there was a reasonable medical probability [of injury] . . .

references to cancer were properly excluded due to lack of relevance").  Defendants also

proposed that this instruction make clear that plaintiffs must show that any health risk was

"substantial and unreasonable."  (*See* Defs.' Proposed Changes to Instruction No. 3.6, filed

1/10/06 (*citing Van Wyk*, 27 P.3d at 395)), but this change was not adopted.  This allowed the

plaintiffs to argue in their final closing argument (with no opportunity for defendants to

respond):

> There are two ways that the plaintiffs can show interference with use and
> enjoyment, which is a requirement for nuisance.  One is by causing class
> members to be exposed to plutonium and placing them at some increased risk of
> health problems, and I want to make a point right here.  It's not substantial
> increased risk.  It's the interference that has to be substantial.  The risk does not
> have to be substantial.  Some increased risk.  (1/20/06 Trial Tr. at 10569-70.)

### 2. Future risk cannot support a nuisance claim.

The jury was instructed contrary to law that plaintiffs can establish a nuisance by proving

"objective conditions that pose a demonstrable risk of future harm to the Class Area."

(Instruction No. 3.6.)  Under both the Price-Anderson Act and the common law of nuisance,

plaintiffs must do more than show a "future risk."  *See*, *e.g*., 42 U.S.C. § 2014 (requiring that a

public liability action assert liability "arising out of or resulting from a nuclear incident," which

is further defined as an "occurrence"); *see also Adams-Arapahoe School Dist No. 28-J v. GAF*

*Corp.*, 959 F.2d 868, 872 (10th Cir. 1992) ("find[ing] nothing . . . which supports the notion that

tort liability may be premised on the mere risk of harm").

> ### 3.   The jury should not have been permitted to find class-wide nuisance with evidence that is not class-wide.

The jury instructions allowed plaintiffs to present evidence of alleged interferences that

did not relate to all class members, then combine several different types of interferences into one

composite "class-wide" harm.  For instance, the jury could have found a class-wide nuisance

made up of the following disparate elements:

> Different Means of Exposure at Different Times by Different Defendants.  "To find that Plaintiffs proved this form of interference, you do not need to find that all Class members were exposed to plutonium at the same time or by the same methods or to the same degree or that they all incurred the same level of health risk as a result of exposure to plutonium.  It is enough to find for purposes of this form of interference with use and enjoyment of property that the Class members were exposed to plutonium in some way as a result of one or both defendants' activities and incurred some increment of increased health risk as a result." (Instruction No. 3.7.)

> Current Exposure versus Risk of Future Exposure.  "You need not find that all Class members were subject to the same form of interference with use and enjoyment of their properties.  It is enough if you find the Class members were all subject to at least one form of interference described in this instruction, even if some Class members were subject only to the first form of interference, others only to the second, and still others to both."  (Instruction No. 3.7.)

Because this was a class trial, plaintiffs should only be permitted to recover for ***classwide*** harms

that can be shown through ***classwide*** evidence.  *See Blades v. Monsanto Co.*, 400 F.3d 562, 571

(8th Cir. 2005) (class certification inappropriate where "not every member of the proposed

classes can prove with common evidence that they suffered impact from the alleged

conspiracy"); *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) ("fact of damage

cannot be established for every class member through proof common to the class, the need to

establish [] liability for individual class members defeats Rule 23(b)(3) predominance."); *Newton*

*v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 188 (3d Cir. 2001) ("Proof of

injury (whether or not an injury occurred at all) must be distinguished from calculation of damages (which determines the actual value of the injury).")  The jury instructions violated this principle by permitting the jury to make a class-wide finding of nuisance liability that were not based on a class-wide injury or established by class-wide evidence.

**4.      Instruction No. 3.9 misstates the role of diminution in value to a nuisance claim; such diminution is necessary to find a nuisance.**

Contrary to what Instruction No. 3.9 stated, evidence that Class Properties have a lower value because of any proven interference *is necessary* "to find that the interference is substantial."  In order to find a nuisance, the jury must find, among other things, that the plaintiff has proved, by a preponderance of the evidence, that the interference has caused a reduction in the value of the property.  *See Van Wyk*, 27 P.3d at 392 ("[T]he interference complained of by the Van Wyks must be a substantial invasion interfering with the use and enjoyment of the land, and reducing the value of the land.") (citing W. Page Keeton et al., Prosser & Keeton on Torts 622-23); Prosser & Keeton on Torts § 87, at 623 ("The substantial interference requirement is to satisfy the need for a showing that the land is reduced in value because of the defendant's conduct."); *Saunders v. Hilperthauser*, 1998 WL 42146, at *6 (S.D.N.Y. 1998) ("Such interference must be substantial and unreasonable.  It exists only upon a showing of damages-- that is, that the land is reduced in value because of the defendant's conduct.") (internal citations and quotations omitted); *Bower v. Weisman*, 639 F. Supp. 532, 542 (S.D.N.Y. 1986) ("[A]n action for private nuisance cannot be sustained without a showing of damages.").  Thus, the jury was improperly precluded from considering evidence that not all class properties had diminished in value in determining whether plaintiffs had demonstrated a class-wide nuisance, or that any alleged impact on the value of class properties was no longer present, in determining whether plaintiffs had demonstrated a continuing nuisance.

74

**5.     Instruction Nos. 3.11 & 3.12 misapply the Restatement's balancing test.**

Instruction Nos. 3.11 and 3.12, which lay out certain factors to consider when balancing the gravity of the harm with the utility of the conduct under nuisance law, attempt to relay to the jury the balancing test from the Restatement (Second) of Torts. However, these instructions do not reflect the Restatement test in a number of ways.

*First*, Instruction Nos. 3.11 and 3.12 were wrong to apply this test to an alleged nuisance based on negligent conduct. The Restatement balancing test (utility versus harm) applies only to "intentional" conduct. *See* Restatement (Second) of Torts § 826 ("An ***intentional*** invasion of another's interest in the use and enjoyment of land is unreasonable if (a) the gravity of the harm outweighs the utility of the actor's conduct, or (b) the harm caused by the conduct is serious and the financial burden of compensating for this and similar harm to others would not make the continuation of the conduct not feasible.") (emphasis added); § 828, cmt. h (explaining that factor applies "[w]hen a person knows that his conduct will interfere with another's use or enjoyment of land"). Here, however, the jury could find defendants liable for negligent nuisance, in which case these factors should not apply.

*Second*, Instruction No. 3.12 misstates how the jury should consider "the financial burden to compensate others." Under the language of Restatement Section 826, the jury should only consider "the financial burden to compensate others" if it first determines that the "harm" is "serious." *See* Restatement § 826 (stating that an invasion is unreasonable if "the harm caused by the conduct is serious ***and*** the financial burden of compensating for this and similar harm to others would not make the continuation of the conduct not feasible") (emphasis added). The test is not whether it is reasonable for the plaintiff to bear the financial burden of the harm, but whether it is reasonable for the defendant to bear the financial burden of compensating for the

harm.  *See* Restatement (Second) of Torts § 826 cmt. f ("The extent of the burden of compensating may also affect the determination of what persons can recover.").

**Third**, the third factor of Instruction No. 3.12, the "impracticability of preventing or avoiding the interference," which is based on Restatement (Second) of Torts § 830 , is a question of law that should not be submitted to the jury.  *See Kopecky v. Nat'l Farms, Inc.*, 510 N.W.2d 41, 48 (Neb. 1994) ("[W]hether the facts of a particular case fit within one of the rules contained in §§ 829 through 831 is a question of law and, as such, must be decided by the court.  The jury, therefore, should not have been instructed as it was according to §§ 829A and 830  .").

**Fourth**, the "impracticability" factor as it appears in the jury instructions also misconstrues Restatement Section 830 because it does not require that the harm be "significant" before an interference may be found to be "unreasonable" under Section 830.  *See* Restatement Second of Torts § 830 ("An intentional invasion of another's interest in the use and enjoyment of land is unreasonable if the harm is significant and it would be practicable for the actor to avoid the harm in whole or in part without undue hardship.").

> **6.    The jury should not have been instructed that defendants' activities were inherently dangerous.**

Plaintiffs never made a showing of which activities at Rocky Flats, if any, are inherently dangerous.  To prove that an activity is inherently dangerous such that the highest standard of care applies, a plaintiff must show that "all minds concur that the defendant is engaged in an activity that poses a high risk of injury to others that the court, as a matter of law, may instruct the jury to hold the defendant to the highest standard of care."  *Imperial Distrib. Servs., Inc. v. Forrest*, 741 P.2d 1251, 1255 (Colo. 1987).  Plaintiffs did not attempt to make this showing with respect to any particular activity that defendants carried out at Rocky Flats, or to define the particular activity at issue.

Even if some particular aspect of the operation of Rocky Flats could be found to constitute an inherently dangerous activity, plaintiffs did not show that they have suffered any interference that is linked to a failure to exercise the highest degree of care in that activity.  *See Kulik v. Pub. Serv. Co.*, 605 P.2d 475, 478 (Colo. 1979) (holding that instruction on heightened standard of care would be inappropriate where "[t]here was no evidence presented linking the accident to any breakdown or error in the" dangerous activity) (emphasis added).  Furthermore, assuming that plaintiffs did show that an inherently dangerous activity at Rocky Flats caused some "interference" to some of the class members, plaintiffs cannot show such interference-caused-by-an-inherently-dangerous-activity on a class-wide basis.  Thus, this instruction should not have been given to the jury in this class trial.

>    **F.**     **Damages Instructions.**

>    >    **1.**     **The instructions fail to distinguish damages attributable to the prospect of the continuance of the invasion from damages for past invasions or other damages.**

Under the trial plan that this Court devised, the jury should only have been permitted to award damages for the "prospect of the continuance of the invasion" pursuant to Restatement (Second) of Torts § 930.  (*See* 5/17/05 Order ("[O]nly damages for prospective invasions pursuant to Restatement (Second) of Torts § 930(3)(b) will be determined in the class trial.").  But Instruction No. 3.22 asked the jury to consider the difference in property value "but for' the trespass and/or nuisance," without limiting that difference to the prospect of the continuance of the invasion.  Thus, Instruction No. 3.22 allowed recovery for damages resulting from past invasions, even though damages from past invasions are measured not under Section 930 of the Restatement but under Section 929 .  Restatement (Second) of Torts Section 930 cmt. d ("Manifestly, this element of depreciation [measured under Section 930] is distinct from the loss in value brought by the actual effects of past invasions (*see* Comment on § 929) such as damage

by floods to the soil's fertility."); Restatement (Second) of Torts Section 929 cmt. a (Section 929 measure of damages applies where "future losses are not contingent upon the continuance in the future of the defendant's wrongdoing, and hence the result follows regardless of whether the owner can recover in advance for the prospective harm of future operations of the cement plant. This is a distinct question that is dealt with in § 930.").  The jury's damages figure, therefore, is flawed, because it overstates what they would have found had they only considered damages due to the prospect of the continuance of the invasion.

> **2.      The instructions failed to account for post-1995 appreciation in property values.**

The damages instruction also did not allow the jury to consider any subsequent re-appreciation in the value of the properties of class members who did not sell before 1995.  To award such class members damages as of the 1988-1995 period, notwithstanding such post-1995 re-appreciation, would be to permit recovery where there has been no loss in violation of Colorado law.  *See Slovek*, 723 P.2d at1316 ("The trial court must take as its principal guidance the goal of reimbursement of the plaintiff for losses actually suffered."); *see also Zwick*, 572 P.2d at 134 ("[T]he goal of the law of compensatory damages is reimbursement of the plaintiff for the actual loss suffered.").

> **3.      Instruction No. 3.25 should not place the burden on defendants to prove that class members purchased their properties at a prior market discount.**

Whether a class member purchased his or her class property at a discount is not an issue relating to mitigation of damages.  (*See* Defendants' Response to Plaintiffs' Proposed Plan for Determination of Compensatory Damages, filed July 21, 2004.)  The plaintiff – not the defendant – bears the burden of proving both the fact and the amount of damages.  *See Buckley Powder Co. v. State*, 70 P.3d 547, 563 (Colo. Ct. App. 2002).  Unless a plaintiff shows that the alleged

"Rocky Flats discount" was greater when he or she sold the property than when he or she purchased the property, not even the fact of damages has been proved.  Nor is the so-called prior market discount defense an "affirmative defense."  Plaintiffs have cited no cases from any jurisdiction holding that evidence as to the price at which a plaintiff purchased his or her property is an affirmative defense.

Instruction No. 3.25 was also flawed because it required defendants to prove that a prior market discount existed for specific time periods, or in specific amounts.  Even if defendants did bear the burden of proof, uncertainty as to the length of time that the prior market discount goes back should not have precluded a determination that there was a prior market discount, so long as the jury determines that the discount went back for some length of time.  Moreover, with respect to the amount of the prior market discount, the jury should have been allowed to determine that it is simply equal to the amount of affirmative damages, if any, proved by the plaintiffs as of the complete and comparatively enduring date.  In other words, defendants should have been allowed to argue in the alternative that there were no damages, but if there were damages, then the prior market discount applies.

> **4.** **Plaintiffs should not have been permitted to expand the alleged CCE period from 1989-1992 to 1988-1995.**

Near the close of defendants' case, plaintiffs changed their alleged "complete and comparatively enduring" time period that was incorporated in Instruction No. 3.22 from (a) June 6, 1989 to March 26, 1992, to (b) January 1, 1988 to December 31, 1995.  Plaintiffs should have been estopped from making this eleventh-hour switch by their repeated statements, both before and during trial, that the only period at issue was from 1989 to 1992.  (*See* Pls.' Proposed Plan for Determination of Compensatory Damages, filed 7/13/04, at 7 n.1 ("Plaintiffs contend that the harms from Rocky Flats became complete and enduring at some point during the period between

the FBI raid on June 7, 1989, and Rockwell's guilty plea in 1992."); Pls.' Omnibus Mot. *in*

*Limine*, filed 6/3/05, at 1–3 (seeking to bar evidence of property values after 1992); 10/12/05

Trial Tr. at 632 ("Whether in 1989 or 1990, the harm appears to be complete and comparatively

enduring."); 1/6/06 Trial Tr. at 9257 ("Remember that [CCE, complete and comparatively

enduring] is going to be judged as of early 1990 or late 1989 when this case was filed.").)

> Perhaps most telling is the following excerpt from plaintiffs' opening statement:

> > Now, we believe that as of 1990 these conditions were met, or certainly between
> > the 1989 FBI raid and the 1992 guilty plea of Rockwell . . . .  The nuisance
> > became complete and comparatively enduring between the June 6, 1989, raid by
> > the FBI and EPA and March 26, 1992, when Rockwell pled guilty to
> > environmental crimes at Rocky Flats.

(11/4/05 Trial Tr. at 4151–52.)  The Court relied on plaintiffs' statements in crafting the initial

jury instructions.  Defendants relied on them in selecting the evidence to present at this trial.  It

was unfair for plaintiffs to change this period after the window for defendants to cross-examine

plaintiffs' witnesses or to present their evidence has closed.

> Indeed, plaintiffs' desire to use the 1988 to 1995 period is not a function of any coherent

theory of when the injurious situation became complete and comparatively enduring; rather, it is

simply a function of the exact time period studied by plaintiffs' damages experts Dr. Radke in

his Phase II analysis and Mr. Hunsperger in his vacant land analysis.   (10/26/05 Trial Tr. at

2755; 12/5/05 Trial Tr. at 6469.)  Their selection of the 1988 to 1995 period had nothing to do

with any theory that the injurious situation became complete and comparatively enduring over

this period.  The reason Dr. Radke chose 1988 as the beginning of the period was that he wanted

to look before and after the FBI Raid.

> Q.     Okay.  Can you tell me why you chose 1988, the first year that you studied in
> Phase II?

> A.     Right.  So if you recall, way back at the beginning of this, I was trying to—the
> second question I was trying to answer was, was there an impact of the raid in

> 1989, and I wasn't able to do that in the first phase, but in the second phase I
> wanted to be able to do that.  I was only looking at single family residential, but I
> had a very good database, lots of data.  So I wanted to go before the raid.  So the
> raid was in 1989, so I went to 1988.

(10/26/05 Trial Tr. at 2721.)  As for choosing 1995 as the end of the period, Dr. Radke chose

1995 because the latest data available to him when he prepared his 1996 report came from that

year.  (*Id.* ("And then I wanted to go after the raid as long as I could.  And I finished this project

with only 1995 sales information.  That's when it ended.  I think I finished my model in '96 or

the beginning of '96.  So that's why I ended in '95.").)  As defendants would have brought out

further on cross-examination of Dr. Radke (had plaintiffs raised this issue before the end of the

trial), his selection of the 1988 to 1995 period had nothing to do with any claim that the injurious

situation became complete and comparatively enduring within that period.  Plaintiffs gave no

justification for instructing the jury that the injurious situation must have become complete and

comparatively enduring within a time window that exists simply because it was the time period

analyzed by their experts.  Thus, this instruction should not have been changed.

### 5.    The instructions should not have permitted an award for commercial damages, which plaintiffs should have been estopped from seeking.

The damages instruction should not have allowed the jury to make an award for

commercial property.  Plaintiffs indicated in their opening statement that they were only seeking

damages for residential property and vacant land.  (10/12/2005 Trial Tr. at 643-44 ("Yesterday,

when we left off, I had explained the compensatory damages portion of the plaintiffs' case; that

Mr. Hunsperger and the other experts, but primarily Mr. Hunsperger, their opinion is there was a

10 percent — at least a 10-percent diminution or depression in the value *of houses* in the class

area.  And that that, in 1995, 10 years ago, was $169 million.  And in today's dollars, that is $216

million.  These are obviously approximate figures.  And 30-percent depression *in land* values,

which 10 years ago was $21 million, and when adjusted for the consumer price index is $27

81

million.  And the total of that, ***those two constituent elements*** is $243 million, which would be allocated among the 12,000 or more members of the class under a procedure that Judge Kane would approve and establish.") (emphasis added).)

Likewise, plaintiffs' statement of claims omitted any mention of damages for commercial properties.  (*See* Plaintiffs' Statement of Claims filed August 8, 2005, at 5 ("Those damages are sought for residential properties and vacant land within the Class Area, expressed as total class-wide damages, in 2005 dollars, and as a percentage diminution for properties in both categories.").)

Ultimately, plaintiffs' expert Dr. Radke testified as to commercial property damages (contrary to what plaintiffs had represented in their statement of claims).  However, Dr. Radke testified that the alleged impact on commercial properties only existed within a narrow band of distance from Rocky Flats:  within 5.7 miles - thus conceding that the impact was not class-wide. (10/26/05 Trial Tr. at 2772 (" I will say that less than 5.7 miles inward to Rocky Flats was the diminution effect [for commercial properties], and I averaged it over that area.").)  Dr. Radke also admitted that his Phase I estimate for commercial properties (like his other Phase I estimates) was based upon "assumption upon assumption."  (10/26/05 Trial Tr. at 2774-75) ("fuzzy logic").

Because plaintiffs' only evidence of commercial damages was based upon "assumptions upon assumptions" and "fuzzy logic," the question of commercial damages should not have been the subject of a jury instruction.  *See Roberts v. Adams*, 47 P.3d 690, 697 (Colo. Ct. App. 2001) ("[D]amages based on mere speculation and conjecture are not allowed.").

**6.**     **The jury should have been instructed that it can only award punitive damages for conduct it finds to be intentional.**

The instruction regarding punitive damages should have limited plaintiffs to punitive damages for trespass or intentional nuisance, as opposed to negligent nuisance.  Plaintiffs may not recover punitive damages for defendants' conduct found merely to be negligent.  *See Van Leeuwan*, 810 F. Supp. at 1124 ("Van Leeuwan's viable claims are based on negligence, not intentional, malicious conduct.  Her request for punitive damages is stricken.") (Kane, J.).)  Instruction No. 3.27 contained no such limitation.

**7.**     **The jury should have been instructed that plaintiffs can only recover damages that they prove occurred within the back-calculated statute of limitations period.**

Under the Colorado statute-of-limitations rules applicable to continuing torts, plaintiffs must prove that their damages are either (i) future damages; or (ii) past damages that occurred within the "statute of limitations period dating back from when plaintiff's complaint was filed" (that is, from January 30, 1988 to January 30, 1990).   *Hoery*, 64 P.3d at 217 ("For continuing torts, . . . plaintiff's recovery is limited to the statute of limitations period dating back from when plaintiff's complaint was filed.") (internal citations omitted); *United States v. Hess*, 194 F.3d 1164, 1177 (10th Cir. 1999) ("In trespass cases, where the statute of limitations has expired with respect to the original trespass, but the trespass is continuing, we and other courts have calculated the limitation period back from the time the complaint was filed, rather than forward from the date of the original trespass, or where applicable, back to the reasonable discovery date."); 4 Colo. Rev. Stat. § 30-80-102 (2002) (tort actions for trespass or nuisance shall be commenced within two years after the cause of action accrues).

The rule limiting damages for continuing torts to either future damages or past damages that occurred within the back-calculated statute of limitations period is equally applicable in

cases involving Restatement Section 930.  *See, e.g., Cox v. Cambridge Square Towne Houses, Inc.*, 236 S.E.2d 73, 75 (Ga. 1977); *see also* Restatement Section 899, comment d ("[U]nder the rules stated in § 161 and § 930, [the plaintiff] has an election to recover or is permitted to recover damages only for harm to the use of the land up to the time of trial. In cases of this type, the statute does not run from the time of the first harm except for the harm then caused. Thus, for example, when there has been the tortious emission of fumes from a factory, the plaintiff is not required to treat the harm as a unit and is entitled to recover for damages for harm that has accrued within the period provided by statute for that type of tort.").

The Court should not have rejected defendants' proposed jury instruction limiting plaintiffs' damages to the back-calculated statute of limitations period.

> **8.      The Price-Anderson Act preempts punitive damages completely, or at the very least, limits them more than Instruction No. 3.27 provides.**

Instruction No. 3.27 also did not properly reflect the limits on punitive damages imposed under the Price Anderson Amendments Act.  As discussed *supra*, the Price Anderson Act bars plaintiffs from pursuing punitive damages entirely.   In the alternative, the jury instructions should have required plaintiffs to prove "loss of or damage to property, or loss of use of property" before August 20, 1988 in order to recover punitive damages.  42 U.S.C. § 2014(q). The jury instructions should have reflected this standard, but they stated instead that it is whether the conduct occurred before August 20, 1988 (as opposed to whether the loss occurred before August 20, 1988) that matters.

**G.      The Instructions on the Issue of Emotional Distress Were Flawed and Require a New Trial.**

**1.      Instruction No. 3.28 should not have instructed the jury that fear, anxiety or mental discomfort need not have any factual or scientific basis.**

Instruction No. 3.28 was contrary to Colorado and Tenth Circuit law to the extent that it did not require "scientific foundation or other support."  The Tenth Circuit has predicted that the Colorado Supreme Court would rule that unscientific fears cannot give rise to recovery under Colorado law, even if those fears are "normal" for the community.  *See Boughton v. Cotter Corp.*, 65 F.3d 823, 831-33 & 832 n.13 (10th Cir. 1995) (predicting that Colorado Supreme Court would ***not*** follow Section 821F, under which, "[i]n determining whether the harm would be suffered by a normal member of the community, fears and other mental reactions common to the community are to be taken into account, even though they may be without scientific foundation or other support in fact," and that Colorado Supreme Court would not allow "compensation for wholly unfounded fears").

**2.      The issue of "generic causation of emotional distress" should not have been tried.**

The class trial violated the Seventh Amendment by trying "generic emotional distress" on a classwide basis.  The Seventh Amendment provides: "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." U.S. Const. Amend. VII (emphasis added).  "The Seventh Amendment entitles parties to have fact issues decided by one jury, and prohibits a second jury from reexamining those facts and issues." *Castano v. American Tobacco Co.*, 84 F.3d 734, 750 (5th Cir. 1996).  This rule is in part based on the rationale that "if two juries were allowed to pass on an issue involving the same factual and legal elements, the verdicts rendered

85

by those juries could be inconsistent, producing intolerably anomalous results." *McDaniel v. Anheuser-Busch, Inc.*, 987 F.2d 298, 305 (5th Cir. 1993). In the class action context, some courts have permitted bifurcation so long as the "the judge [does] not divide issues between separate trials in such a way that the same issue is reexamined by different juries." *In re Rhone-Poulenc-Rorer Inc.*, 51 F.3d 1293, 1303 (7th Cir. 1995). However, such division must "carve at the joint" between liability and damages. *Rhone-Poulenc*, 51 F.3d at 1302.

Instruction No. 3.28 violated the Seventh Amendment in two ways. First, one jury would determine "[t]he generic causation question of whether defendants' activities and the conditions resulting from them were capable of causing Class members to suffer fear, anxiety or other mental or emotional discomfort." (5/17/05 Order at 7.) Subsequent juries would then determine the question of whether defendants' activities did in fact cause class members fear, anxiety, or other mental or emotional discomfort. Having two or more juries reexamine the issue of causation violates the Seventh Amendment. *See In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litigation*, 209 F.R.D. 323, 352 (S.D.N.Y. 2002); *see also Neely v. Ethicon, Inc.*, 2001 WL 1090204 (E.D. Tex. 2001). As the Court further recognized in *MTBE*, "[i]t is well-settled that bifurcation of trial is authorized in federal court, but such division must 'carve at the joint' between liability and damages." *Id.* at 352 (*citing Rhone-Poulenc*, 51 F.3d at 1302).

Finally, defendants have still been unable to locate any precedent from any court regarding a trial on "general causation of emotional distress." Even apart from the fact that a trial on "general causation of emotional distress" would violate the Seventh Amendment, generic causation should not have been tried for the very first time in the United States (to the best of defendants' knowledge) as part of a case that is already filled with complex issues.

## V.       THE COURT'S ADMISSION OF IRRELEVANT AND HIGHLY PREJUDICIAL EVIDENCE REQUIRES A NEW TRIAL.

For the convenience of the Court and court personnel, in defendants' view, the Court has previously considered and rejected defendants' arguments in Section V below.[20]  Defendants made a series of *Daubert* Motions and Motions *in Limine* on June 16, 2005 and several subsequent motions to exclude evidence which the Court rejected in full or in part.  Before trial, this Court told the parties that objections made in motions *in limine* did not need to be repeated at trial to be preserved.[21]

---

[20]   The orders in which the Court rejected these arguments include the following:  December 7, 2006 Order on *Daubert* Issues and Motions *In Limine*, January 9, 2006 Order on Defendants' Motions for Reconsideration; 1/2/06 Order on Motion to Exclude Testimony of Voilleque and Grogan; 12/15/05 Order on Motion to Exclude Testimony of Shirley Fry; 11/10/05 Order Limiting Motions Practice During Trial.

[21]   MR. BERNICK:  We made all of these objections on the context in motions *in limine*, as have the plaintiffs.  Is there some practice that we should adopt for preserving those objections so we don't have to --

THE COURT:  It's preserved.  You're not waiving anything.

MR. BERNICK:  In the sense that I want to make sure that we don't have to continue to stand up and make objections with respect to matters that we — Your Honor has ruled on *in limine*, that we could be deemed to have a standing objection to --

THE COURT:  They are --

MR. BERNICK:  Those matters that we raised *in limine* to begin with.

THE COURT:  The whole idea of waiver doesn't even apply anymore, nor any — you don't have to save instructions, which I once had to do when I started practicing.  You made an objection, you saved an exception, all of that is gone.  It went out with spats, you made your record, I will have my written ruling on in the Daubert motions, motions *in limine*, as soon as my frail efforts permit to get it done.  Once that's done, those are your record.  I will have these jury instructions all done, and you can make your written objection preferably at the close of the case, if you want to make that.  But at any time from now on, you're not waiving it simply because I've already ruled, and I'm going to go ahead and do it.  So I don't want to

(Continued…)

### A.    Government-Conspiracy Accusations Should Have Been Excluded.

Rather than bringing a case focused on proving their trespass and nuisance claims, the plaintiffs skewed the focus of the trial to irrelevant issues — specifically, to an alleged conspiracy led by a non-party to the case, the DOE.  Plaintiffs were permitted to improperly invite the jury to punish defendants for actions allegedly undertaken by the government.  (*See* 10/11/05 Trial Tr. at 487 ("This was done by the Department of Energy.  The Government agency that oversees the plant for the U.S. Government to cover up the consequences.  Dow and Rockwell's wrongful conduct.  Why would DOE want to cover up?  Because they were part of the negligent and wrongful conduct.").)  Essentially, the plaintiffs successfully prosecuted a case against the DOE.

The cumulative effect of the introduction of this inflammatory but irrelevant evidence was to deny defendants a fair trial.  At this point, a new trial is the only suitable remedy.  *See Montgomery Ward*,  311 U.S. at 251 (Rule 59 motion appropriate remedy where "the trial was not fair to the party moving."); *id.*  ("[t]he motion for a new trial may raise questions of law arising out of alleged substantial errors in admission or rejection of evidence").

### 1.    Indemnification Should Have Been Excluded.

Defendants sought to exclude evidence of any indemnification by DOE.  (*See* Defs.' MIL No. 4.)[22]  The Court denied this motion.  (8/22/05 H'rg Tr. at 8.)  Thus, the jury was permitted to

---

get those kinds of things.  They interfere with the flow of the case.  (10/7/05 Trial Tr. at 379-81.)

[22]    As defendants explained in this motion, evidence of indemnification should have been excluded under Federal Rule of Evidence 411.  The Court in the *Hanford* case expressly recognized that DOE indemnification is inadmissible under Rule 411.  *See* Ex. 17, 4/18/05 Order in *In re Hanford Nuclear Reservation Litig.*, No. CV-91-3015 (E.D. Wash.) at 8.  Courts also consistently exclude evidence of insurance or other indemnity protection under

(Continued…)

learn that the DOE, in addition to overseeing Dow and Rockwell, is responsible for indemnifying those contractors for any judgment rendered against them.  (*See*, *e.g.*, 10/6/05 Trial Tr. at 238-40; 11/14/05 Trial Tr. at 5102-03 (Kaufman) ("Right.  You say DOE is not a party.  You understood that DOE was an indemnitor of defendants, correct? A   Yes. Q   And what do you understand that to mean? A   Well, they would pay any judgment in this case or settlement.")  In fact, plaintiffs used the fact of indemnification as a basis for arguing that Dr. Till's evidence was faulty (*see* 1/20/06 Trial Tr. at 10571 ("DOE is on the hook for the judgment in this case and any other cases that might be brought.  DOE's public image is on the line.")) and to call into question the adequacy of the plant site cleanup (*id.* ("DOE wants to convince the public that the plant is cleaned up.")).  Indeed, the plaintiffs were consistently allowed to argue that by finding in favor of the plaintiffs and the class, the jury could punish DOE for its wrongdoing:

> This is a DOE facility.  DOE could have prevented the contractors from doing harm, but they did not.  ***DOE is on the hook for the judgment in this case*** and any other cases that might be brought.  DOE's public image is on the line.

(1/20/06 Trial Tr. at 10571) (emphasis added).

Because evidence of indemnification was allowed to be presented at trial, plaintiffs argued in closing that $248 million compensatory and punitive damages verdicts could be used to send a message to DOE.  (1/20/06 Trial Tr. at 10603 ("I am asking you to tell Rockwell, to tell

---

Rule 411.  *See Palmer v. Krueger*, 897 F.2d 1529, 1537-38 (10th Cir. 1990) (affirming trial court's decision to bar insurance evidence under Rules 411 and 403); *Black v. Hieb's Enter., Inc.*, 805 F.2d 360, 365-66 (10th Cir. 1986) (affirming trial court's refusal to admit insurance information); *Griffin v. Hike*, 804 F.2d 1052, 1057 (8th Cir. 1986), *cert. denied*, 482 U.S. 914 (injection of fact that defendant is protected by insurance or other indemnity was prejudicial error requiring reversal); *Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 758 (6th Cir. 1980) (plaintiff's counsel's references to the fact that defendant is protected by liability insurance were prejudicial error and grounds for a mistrial); *c.f. Larez v. Holcomb*, 16 F.3d 1513, 1519-1521 (9th Cir. 1994) (refusing to allow jury instruction on damages referencing police officer's indemnification by City of Los Angeles).

Dow, corporate America, ***even DOE,*** this will not be tolerated anymore in our communities. Stop the wrongdoing. Stop the lying . . . .")(emphasis added).)

This evidence of indemnification was irrelevant, unduly prejudicial, and should have been excluded. The indemnity arrangements between defendants and the government and the DOE's statutory indemnification obligations were not probative of the trespass and nuisance issues posed by plaintiffs' claims. Nor should this evidence of indemnification have allowed the jury to impute the acts of the government to defendants.

Plaintiffs made a conscious choice not to sue the United States or have it joined as a defendant to this action, thereby avoiding the DOE's sovereign immunity and the jurisdictional and statutory limitations of the Federal Tort Claims Act, and obtaining a jury trial. Plaintiffs should not have been allowed to achieve through the indemnification what they could not have achieved pursuant to applicable law — *i.e.*, to treat the federal government as a party but without the jurisdictional and statutory impediments plaintiffs would have had to face had they so structured their lawsuit.

### 2. Evidence Regarding Document Classification Should Have Been Excluded.

Defendants moved to exclude evidence relating to document classification by the DOE. (*See* Defs.' MIL No. 5.) The Court initially denied this motion. (*See* 8/22/05 Hr'g Tr. at 8.) Plaintiffs were thus permitted, over repeated objections, to admit evidence regarding document classification. Beginning with their opening statements, plaintiffs made inflammatory assertions to the jury that DOE abused its classification powers,[23] such as:

---

[23] Plaintiffs' DOE-abuse-of-classification-power allegations included allegations that the DOE has manipulated and withheld information throughout the history of the AEA as well as information specifically related to this case.

- "The truth has been whited out by the misuse of the classification power of the DOE and the United States Government to prevent all of us in this courtroom from knowing the full truth about missing plutonium at Rocky Flats."  (10/11/05 Trial Tr. at 600.)

- "Well, there were two reasons that Dow and Rockwell got away with what happened at Rocky Flats.  The first is secrecy.  No one knew for many years what was going on at that plant.  And even in this trial, there is going to be information that is still being hidden from you."  (10/11/05 Trial Tr. at 523.)

- "[The DOE used] its national security, top secret rights, to conceal from you and from this court massive amounts of evidence.  Why?  To spare itself public embarrassment and to defeat the damages in this and other cases.  Why?  The logical conclusion, we will argue to you from the evidence, is because the DOE, under its account with Dow and Rockwell is probably responsible to pay the damages to plaintiffs and the class members."  (*Id.* at 492-93.)

- "In other words, the classification was going to be used not only for top secret military secrets, classification was going to be used because the insurance branch didn't want things getting out that would allow claims to be made against the Atomic Energy Commission or its contractors."  (*Id.* at 588.)

- "Again, worried about public relations and using classification for public — to protect the public relations and image of the plant rather than the secrets of the United States."  (*Id.* at 594.)

- "National security is supposed to prevent terrorist[s] or enemies of the United States from getting information about how to build a bomb.  That is not what these documents contained.  You saw the document from 1947 that showed their motives.  They wanted to keep claims from being made against the Atomic Energy Commission."  (*Id.* at 600.)

- "It is a misuse of power that has been going on for 50 years.  The evidence in this case, unfortunately, in part, will be that they don't want you to have the evidence."  (*Id.* at 600.)

Plaintiffs invited the jury to confuse and conflate the actions of the DOE with those of defendants: "The defendants and the DOE used the national security power to keep them [MUF documents] secret." (10/11/05 Trial Tr. at 597.)[24]

These attacks were highly prejudicial because defendants could not fully and fairly defend against these charges without disclosing classified information, which federal law prohibits. Yet it was not until after five weeks of trial during which plaintiffs continued to refer to alleged classification abuse that the Court ruled that the alleged improper classification of documents is off-limits: "The improper classification of documents is not coming in. That's just it." (11/14/05 Trial Tr. at 5230.) (*See also* Defs.' Mot. for Mistrial, or in the Alternative, Defs.' Proposed Instructions (hereinafter "Classification Mistrial Motion") at 2.)

Even then, the Court inconsistently permitted plaintiffs to raise this very issue before the jury. The Court permitted plaintiffs to read verbatim to the jury P-548/P-652, despite defendants' objections and the Court's earlier sustaining of those objections.[25] (11/22/05 Trial

---

[24] These statements regarding DOE's classification motivations alone were a sufficient basis for a mistrial. *See United States v. Novak*, 918 F.2d 107, 108 (10th Cir. 1990) (mistrial warranted by counsel's "failure to substantiate claims made during opening arguments").

[25] The Court admitted this exhibit over defendants' objections stating that (a) the exhibit was "highly probative of other matters other than declassification" and (b) it had not previously declined to admit the document: "I had to comb through the transcripts to find that out because I thought inadvertently I may have, but I didn't." (11/22/05 Tr. at 6231.) Both premises are incorrect. Plaintiffs used P548/P652 as part of their Rodney Hoffman proffer, which this Court rejected. (11/10/05 Tr. at 4969-4973 (Plaintiffs argued that "those purposes [in P548/P652] are flatly improper under the national security statutes," and represented to the Court that this document is "*being introduced for proof of the improper purpose.*") (emphasis added).) The Court also previously rejected P548/P652. For example, at the conclusion of the Hoffman proffer, plaintiffs pleaded "I think that Your Honor should at least allow us to put in these documents . . . ." The Court responded, "[b]ecause you have asked me to, I will look at them, but frankly, I have yet to hear an argument as to why the motives of anyone in this case are relevant." (11/10/05 Tr. at 5049) At least until November 22, the Court stood by its rulings and kept these exhibits out. (11/14/05 Tr. at 5224 ("[Y]ou had

(Continued…)

Tr. at 6228-32.)  Never, in the seventeen years of this case, have plaintiffs been able to establish: authorship (either individual or institutional), date of creation, distribution/use, if any, and status as a draft or final for this document.  This unauthenticated document, which dealt with the release of MUF information, stated in pertinent part:

> "Anti-nuclear environmentalists and pacifist groups consider Rocky Flats as the "Nuclear Crossroads of the Nation".  The declassification and possible release of MUF in this unfriendly environment whether due to misunderstanding, lack of knowledge or misrepresentation could seriously damage the posture of the Department of Energy, Rockwell International and former contractor, the Dow Chemical Company. . . .
>
> At the present time multi-million dollar litigation action is being carried out against the Department of Energy, Rockwell International and the Dow Chemical Company.  Declassification of MUF and subsequent release could have an adverse effect on the final court decision or settlement."

(PX-652, "Classification of Rocky Flats SNM Material Unaccounted for (MUF)," no author, undated.)  Notably, although the Court stated at the time that it believed the document to be "probative of the degree of care," the Court did not explain then, nor later as it stated that it would, how the statements in this document—particularly as to the two highly prejudicial paragraphs repeatedly read by plaintiffs to the jury—are probative of the degree of care used by Dow and Rockwell.  (*See* 11/22/05 Trial Tr. at 6230-32.)  Indeed, to underscore that plaintiffs themselves ***never*** viewed or sought to use P548 as evidence of defendants' "degree of care," but rather, as purported "evidence" of classification abuse, plaintiffs read P548 to the jury again in closing argument, further inviting the jury to take note of DOE's motivations in the classification of documents.  (1/18/06 Trial Tr. at 10278-79.)

---

asked me to review the exhibits that you had wanted to offer through Mr. Hoffman over the weekend.  I did that.  And I'm adhering to my previous rulings with the exception of Plaintiffs' Exhibit 170 . . . .").)

Nor is this the only example of the conflicting and confusing messages that the Court has permitted the jury to hear.  After the Court's ruling regarding classification, the jury still heard plaintiffs' unsubstantiated arguments in mini-summation suggesting that the DOE sped up its classification process for RAC, but intentionally delayed the classification process when Plaintiffs requested documents:

> This document---RAC requested, RAC requested in 1994 that this document be declassified.  They requested in 1994 that it be declassified.  And guess what?  Like Jiminy Cricket, at their request DOE declassified it. . . .  What had happened when the plaintiffs tried to get their notes?. . . If you would just take a look here, we tried to get them for two and a half years.  As you heard in court, they were held in contempt.  We then tried to get them for another seven or eight months.  Plaintiffs expert, Dr. Budnitz, went down there with our Q-cleared counsel, asked for 9,000 specific documents.  We ended up getting those and most of the other 1.3 million.  As Attorney Kaufman---U.S. Attorney Kaufman testified in our case, 75 percent or more of them were whited out, redacted and useless.

(12/16/05 Trial Tr. at 8573.)  Plaintiffs encouraged the jury to draw an adverse inference about the evidence against defendants based on Instruction No. 1.9, stating, "[w]e know the whited-out redacted evidence cannot be favorable to the defense side of this case." (*Id*. at 8574.)

In reality, the painstaking and exhaustive process of carefully reviewing highly sensitive materials for declassification took significant time, regardless of the requesting party.  *Compare* 10/27/05 Trial Tr. at 3006 (Budnitz describing the procedures that he was asked to follow) *with* 12/15/05 Trial Tr. at 8208-11 (Till testifying that "It's very important to understand that there are very strict rules regarding classified information and the process that one goes through to get that information declassified.  We had to follow those procedures just like anybody else.").  Far from receiving requested materials like "Jiminy Cricket," Paul Voilleque on behalf of RAC did not receive declassified notes from DOE until almost two years after they were submitted for review.  (*See* DX 4101)  Thus, DOE did not move more slowly for plaintiffs and more quickly for RAC,

but rather, applied the "same rules" to every entity seeking declassification review.  (11/14/05

Trial Tr. at 5200-01 (Kaufman testifying that "same rules" applied to plaintiffs' lawyers).)

   Plaintiffs introduced witness Richard Kaufman for the sole purpose of demonstrating that

DOE controlled documents relevant to the case and that it had been held in contempt during the

discovery process for failing to produce documents in accordance with a stipulated agreement.

This testimony further put the classification process at issue, and plaintiffs specifically used Mr.

Kaufman's testimony to suggest that plaintiffs had difficulty prosecuting their case because, of

the documents that were released, "75 percent of more of them were whited-out, redacted and

useless."  (12/16/05 Trial Tr. at 8572-73; *see also* 11/10/06 Trial Tr. at 4975 (specifically stating

during their proffer for Rodney Hoffman, "[w]e want to bring out the process of

classification.").)  Plaintiffs also introduced documents for the purpose of showing how long it

took them to be declassified.  (*See* 11/15/05 Trial Tr. at 5351-52 (drawing attention to the

declassification date to show that it was "finally declassified, 25 years later"); *Id.* at 5358-5360

(stating that Zodtner and Rogers report "was kept secret, it was at least kept secret for 30 years").

Plaintiffs attempted to show the significance of allegedly deleted portions, and to demonstrate

that certain information was unavailable to their expert due to classification. (*See* 11/16/05 Trial

Tr. at 5509-14 ("[S]ignificant parts of this document, when it was finally declassified, were still

unavailable to Dr. Cochran.")

   In addition to the above, the admission of the following testimony and exhibits regarding

document classification requires a new trial:  10/18/05 Trial Tr. at 1506-07 (defendants objected

to Mr. Davidoff's unsolicited statement, in response to Mr. Ray's question about whether he'd

violated any classification laws, that "If it were classified, we wouldn't have it, so that's for

sure," which was misleading (because plaintiffs had access to classified documents), uncalled

95

for, and prejudicial); 10/27/05 Trial Tr. at 3007-08 (allowing Budnitz to testify over objection that classified documents were relevant to this case--"I remember thinking . . . an important fraction, like a third or half of them, had some relevance, and a smaller number, perhaps dozens or a hundred or two, were of higher relevance, that is, you know more relevant than others"--despite the fact that Dr. Budnitz had no expertise to offer any opinions on classification and plaintiffs provided no foundation for this testimony); 11/15/05 Trial Tr. at 5349-50 (classification of MUF documents prevented Cochran from determining releases from the 1957 fire), 5355 ("Q  And that's more still classified information withheld in 1996; is that correct? A That is correct.").

The plaintiffs' use of this classification evidence violated the separation of powers and this Court's rulings.  It is well-established that the federal agencies have the power to classify documents in the interest of national security.  *See Dept. of the Navy v. Egan*, 484 U.S. 518, 529 (1988) (recognizing President's "authority to classify and control access to information bearing on national security"); *see id.*  ("Presidents, in a series of Executive Orders, have sought to protect sensitive information and to ensure its proper classification throughout the Executive Branch by delegating this responsibility to the heads of agencies.")  Agencies have broad discretion in controlling access to classified information and such power is unreviewable by a court, much less a jury.  *Id.*  ("For reasons . . . too obvious to call for enlarged discussion, the protection of classified information must be committed to the broad discretion of the agency responsible, and this must include broad discretion to determine who may have access to it.") (internal citation and quotation omitted).  In this case, the DOE had the power pursuant to the Atomic Energy Act ("AEA") to classify documents in the interests of national security.  42 U.S.C. § 2011, et. seq.

96

The common law state secrets privilege has much the same effect as withholding classified materials pursuant to the AEA.  And, as under the analogous common law state secrets privilege, the effect of classification under the AEA is that a factfinder may not derive a negative inference from the government's lawful non-disclosure of information.  *Farnsworth Cannon, Inc. v. Grimes*, 635 F.2d 268, 268-69 (4th Cir. 1980); *Bareford v. General Dynamics Corp.*, 973 F.2d 1138, 1141 (5th Cir. 1992); *Ellsberg v. Mitchell*, 709 F.2d 51, 64 (D.C. Cir. 1983).

This court repeatedly acknowledged these basic principles during the course of these proceedings:

- Plaintiffs "cannot go into the classification process itself as to whether it was done in good faith or not because that's beyond the purview of this Court . . . Whatever other motivations they [DOE] have, I can't go into.  That is --- I don't sit as a court of review as to the --- as to how classification are made."  (11/14/05 Trial Tr. at 5081-82.)

- "What you have are comments that people are talking about it's bad for PR, it's bad for pending litigation, bad for this, bad for that, but you still have a classification decision that's made, and the Congress says it's none of my business."  (11/10/05 Trial Tr. at 5050-51.)

- "Whether or not they [DOE] had bad faith motivations or otherwise, whether it's political, philosophical or religious doesn't matter.  What matters is the test that I set out, and I am very confident in that test."  (11/10/05 Trial Tr. at 5054.)

- "Now, whether they --- refused to give you information, the Department of Energy did, they refused to declassify MUF information on the grounds of national security, it's not something I'm going to go into."  (11/14/05 Trial Tr. at 5082.)

- "I am not going to get into the wisdom of what's in national security interests of the United States.  That's simply not a matter for me to decide."  (11/10/05 Trial Tr. at 5006.)

Despite this well-established precedent and this Court's clear rulings affirming such precedent, plaintiffs consistently told the jury that the DOE improperly withheld information through the classification process in order to shield itself from liability and embarrassment.

Plaintiffs repeatedly told the jury that they lacked access to and were unable to present relevant documents due to the classification process—a claim which remains ***completely*** unsubstantiated.  It is undisputed that plaintiffs' counsel and experts had Q clearances and were able to review documents in their classified form.[26]  In fact, plaintiffs asked the DOE to cease classification review of MUF related documents in 1997, and never in the years leading up to trial did plaintiffs ask the DOE to reinstate the review.  Yet plaintiffs consistently suggested that relevant documents were improperly withheld from them, and still unavailable to them, through the classification process.

Defendants could not defend against these allegations of classification abuse.  The DOE was never a party to the lawsuit.  Defendants were not in a position to defend against allegations that a third-party federal agency abused its classification power.  *See Westbo*, 576 F.2d 285, 292 (10th Cir. 1978) (abuse of discretion not to order a mistrial where defendant was denied "a fair opportunity to defend").

More fundamentally, however, classified material is ***classified***.  Its content cannot come before the jury.  Plaintiffs were able to exploit that fact by repeatedly suggesting that classified documents—that the jury will never see—contained information that was useful to plaintiffs' case and that such information was wrongfully being withheld by the DOE.  Such statements

---

[26]  Plaintiffs' counsel, David Sorenson, Jonathan Auerbach, and Eric Cramer, as well as plaintiffs' expert Robert Budnitz had clearances and were repeatedly invited to review, and did review, classified documents.  *See e.g.* 11/14/05 Trial Tr. at 5180, 5188 (Plaintiffs' counsel had Q-clearances and were invited to come to Rocky Flats to look at classified MUF documents over ten years ago); 10/27/05 Trial Tr. at 3002-3003 (Budnitz went with plaintiffs' counsel to review classified MUF documents on at least two occasions).  At his deposition, Budnitz testified that he requested and reviewed "broad categories of reports" and other documents, and that the DOE "did not hold back, as far as I know, any documents that I requested to look at that time."  (Defs. Mot. for Mistrial, or In the Alternative, Defendants' Proposed Instructions, filed 12/28/05 citing to Ex G, Budnitz Dep. at 48, 51-53.)

were highly prejudicial to defendants' case, because defendants could not fully and fairly defend against these charges without disclosing classified information, which federal law prohibits. Moreover, in the years after plaintiffs told the DOE to cease classification review leading up to trial, never have plaintiffs directed the Court, the DOE or defendants to any document, or group of documents, that they needed declassified for use at trial.

This inability to defend was evident during the testimony of Dr. Budnitz.  In response to a question from plaintiffs about how relevant the content of classified documents were to the case, and after an objection by defendants was overruled, Dr. Budnitz testified about allegedly relevant documents he supposedly was not able to review.  (10/27/05 Trial Tr. at 3007-08.)  Defendants could not cross-examine Dr. Budnitz on this point, however, without getting into the contents of classified documents.  (10/27/05 Trial Tr. at 3010-16.)

The Court's instruction that "[n]either this court nor the jury in this case has the authority to decide whether such classification was proper irrespective of any reasons or allegations made challenging that process," (*see* Jury Instruction No. 1.9), was insufficient to overcome plaintiffs' persistent and pervasive theme perpetuated throughout the case—the DOE improperly withheld evidence in its own selfish interests.  *See Maestas v. U. S.*, 341 F.2d 493, 496 (10th Cir. 1965) ("[W]here the character of the testimony is such that it will create so strong an impression on the minds of jurors that they will be unable to disregard it in their consideration of the case, although admonished to do so, a mistrial should be ordered.")  The DOE's motivations in its declassification process should never have come before the jury at all.  *See United States v. Westbo*, 576 F.2d 285, 292 (10th Cir. 1978) ("hold[ing] that the trial court abused its discretion in not declaring a mistrial" where counsel "violated the clear intent of the court's ruling").  From day one, plaintiffs repeatedly and persistently made DOE's classification of documents an issue

in this trial in violation of the separation of powers and of the Court's orders.  Accordingly,

defendants' motion for mistrial on this issue should have been granted.

> **3.      Evidence Regarding Inventory Difference (or "MUF") Should Have Been Excluded.**

Defendants moved to exclude evidence of MUF (*see* Defs.' MIL No. 9), but this motion

was denied by the Court (*see* 8/22/05 Hr'g Tr. at 4-5).  Capitalizing upon the Court's denial of

defendants' motion *in limine* regarding MUF, plaintiffs repeatedly argued that defendants should

be held liable due to the existence of material unaccounted for ("MUF") at the plant.  Plaintiffs'

accusations began in opening statements (*see* 10/11/05 Trial Tr. at 486-87 ("The neighbors'

rights were really violated by the fact that the plant lost 2,600 pounds of plutonium.  Lost. There

was 14.2 tons of plutonium on site and there was 2,600 pounds of plutonium missing.  You will

hear that referred to as, and we will talk about it some more this morning, and it looks like early

this afternoon, but you will hear that referred to as MUF.") and continued throughout trial.

Plaintiffs also introduced volumes of inflammatory evidence of "2600 pounds of missing

plutonium at Rocky Flats," notwithstanding the lack of any evidence linking any missing

plutonium to plaintiffs' off-site properties.  (1/18/06 Trial Tr. at 10258; *see also* 11/15/05 Trial

Tr. at 5388 (Cochran) ("And that — that plutonium, some part of that plutonium may have been

released to the environment.  We simply don't know.").)

Plaintiffs also called Mr. Kaufman to testify to the discovery period of 1993-1996, and

specifically, that the DOE was held in contempt of court for failing to comply with a stipulated

order concerning the production of MUF documents.  (11/14/05 Trial Tr. at 5073-74 (plaintiffs'

proffer for Kaufman).)  Plaintiffs went through an irrelevant examination of Mr. Kaufman, going

into painstaking detail of the plaintiffs' requests for documents, entry of a stipulated order, the

DOE's failure to comply with that order, the DOE's subsequently being held in contempt of

court, and the allegation that most of the information on the MUF documents was "whited out." (*See* 11/14/05 Trial Tr. at 5088-5150.)  Plaintiffs asserted that Mr. Kaufman was removed from his involvement in the case "because he was trying to cooperate with the plaintiffs in the orders of the Court."  (11/14/05 Trial Tr. at 5149.)  The overall import of this testimony is that DOE abused the discovery and classification process.

None of this irrelevant, prejudicial testimony should have been admitted.  The DOE's alleged discovery misconduct, including contact relating to the Contempt Order, were not admissible.  (*See* 11/10/05 Trial Tr. at 5005 (alleged "foot dragging" by the DOE inadmissible).)  Thus, the admission of Mr. Kaufman's testimony was error.[27]

Defendants also were hampered in their ability to defend against plaintiffs' claims that MUF got off-site by the Court's rulings preventing defendants from showing that RAC concluded that the MUF did not go off-site. (*See e.g.*, 10/12/05 Trial Tr. at 835-36 (prohibiting defendants from stating RAC's conclusions about MUF during opening statements); 1/2/06 Order on Mot. to Exclude Test. of Voilleque.)

---

[27]   The admission of Dr. Cochran's and Dr. Budnitz's speculation regarding MUF also was error.  (*See* 11/15/05 Trial Tr. at 5333-90 (Cochran testimony); *see* 10/27/05 Trial Tr., at 3001-02 (Budnitz).)  Dr. Budnitz also should not have been permitted to testify to MUF because no discussion of MUF was made in any of his reports, and he was not qualified to address it.  And Dr. Cochran's testimony should not have been admitted because it was impermissible speculation.

### 4.      Allegations That The DOE Tainted The Science Irreparably Prejudiced Defendants.

Over defendants' objection,[28] the Court also allowed testimony and evidence to be admitted at this trial suggesting that the DOE sought to improperly influence scientific study into plutonium and radiation.  (*See* 11/16/05 Trial Tr. at 5677, 5679-81, 11/16/05 Trial Tr. at 5754-57, 5783-84; *see also* 11/22/05 Trial Tr. at 6272-73 (plaintiffs' mini-summation); 1/20/06 Trial Tr. (closing arguments).)  Specifically, the Court allowed one of plaintiffs' experts, Dr. Stephen Wing, to testify at length about his claim that in the course of his work on DOE funded studies at Oak Ridge, he had been asked to alter his study and manipulate the data in order to reach an outcome more palatable to DOE.  (11/16/2005 at 5677.)  Dr. Wing also described hearsay accounts of other researchers who had similar experiences working on DOE funded studies. (*Id.* at 5681.)  The Court permitted Dr. Wing to speculate about the DOE's motivations in funding epidemiological studies on plutonium.  (11/17/05 at 5754 (the DOE has "an interest in pursuing the uses of plutonium . . ."), 5755 ("There has been a culture at DOE . . . that has affected their ability to investigate the health effects . . ."), 5756 (DOE conflict of interest has impacted the kind of information available to evaluate the impacts of ionizing radiation).)  Dr. Wing testified that:

> The DOE has removed funding from investigators who found evidence of radiation effects.  That a climate of research has been created [by DOE] that makes it difficult for critical research to be conducted.  And that DOE has been more interested in producing nuclear weapons, promoting nuclear energy, protecting its public image and guarding against litigation than in vigorously pursuing research into radiation health effects in general and plutonium health effects in particular.

---

[28]   (*See* Defendants' Motion to Exclude Testimony by Dr. Wing Regarding (1) Allegedly Improper Classification by the DOE/AEC; and (2) Alleged Improper Efforts by the DOE/AEC to Influence the Scientific Process, filed 11/14/05.)

(*Id.* at 5757.)  Dr. Wing was also permitted to testify about a Physicians for Social Responsibility study finding that the "AEC, DOE epidemiology program is seriously flawed, inadequate in scope and pace of work, underfunded in relation to the studies that are needed and burdened by an intrinsic conflict of interest."  (*Id.* at 5783.)  This testimony relates solely to the DOE.  Dr. Wing offered no testimony tying such criticism to either defendant.

Similarly, Dr. Wing was permitted to testify regarding documents from the 1940s commenting on AEC guidelines and policies related to classification (P1433, P1435, P1436) over defendants' objections.  These highly prejudicial exhibits did not relate to either defendant or even the Rocky Flats plant—which was not in existence until the 1950s.  (11/17/05 Trial Tr. at 5854–55, 5860.)  What is more, there is no evidence that any materials—much less materials related to Rocky Flats—were ever withheld pursuant to these classification guidelines.  Indeed, Dr. Wing testified that he was not aware of any epidemiological studies of plutonium that had ever been classified.  (*Id.* at 5860.)  Nevertheless, plaintiffs were permitted to argue in favor of defendants' liability based on these AEC policy-related documents.

Plaintiffs further argued that by funding Dr. Till and RAC's work, the DOE had purchased a pre-determined outcome:

> Now, Dr. Till and RAC have a vested interest in showing minimal problems at DOE sites.  Do you remember, ladies and gentlemen, Dr. Wing's testimony about what happens when DOE research comes out wrong?  He was sent back to Chapel Hill, North Carolina, to get it right.  Would DOE fund Dr. Till's studies at seven sites for millions and millions and millions of dollars, ask yourself this question, or who knows how much if he didn't get it right in DOE's eyes.

(1/20/06 Trial Tr. at 10571.)  Plaintiffs were thus permitted to attack DOE by arguing "that the DOE had a conflict of interest in funding the – most of the major health effects research studies while promoting nuclear weapons programs."  (11/22/05 Trial Tr. at 6272-73.)

In addition, plaintiffs did not even list Dr. Wing as a witness until after the parties' round of *Daubert* briefing in June 2005.  Defendants did not move to exclude Dr. Wing's testimony at that time in reliance on plaintiffs' failure to list him as a witness.  When plaintiffs finally notified defendants that they intended to call Dr. Wing, defendants filed a supplemental *Daubert* motion to exclude Dr. Wing's testimony.  (*See* Defs.' Mot. to Exclude Test. of Dr. Steven Wing, filed 9/16/05.)  This Court denied defendants' motion.

Despite allowing this evidence on how the DOE had tainted the relevant science, the Court refused to allow defendants to call witnesses to rebut the testimony on this subject.  (*See* Defs.' Am. Proffer re the Test. of Shirley Fry; Order on Mot. to Exclude Test. of Shirley Fry, filed 12/15/05; Order on Defs.' Mots. for Recons., filed 1/9/06.)

### 5.        Introduction Of The DOE Contempt Order Was Error.

Defendants moved to exclude evidence of the DOE contempt order (*see* Defs.' MIL No. 5), but that motion was denied (*see* 8/22/05 Hr'g Tr. at 8).  Thus, further putting the government on trial, plaintiffs informed the jury that "DOE stonewalled the plaintiffs in this case, again, refusing to turn over the documents."  (10/11/05 Trial Tr. at 598.)  Plaintiffs told the jury that "in 1995, there was a trial in this court and this court held the DOE in contempt of court; that is almost unprecedented.  This court holding a cabinet department of the United States in contempt of court for failing to turn over documents that related to the missing plutonium."  (*Id.*)   The Court also permitted the jury to hear plaintiffs' unfounded assertions that after being held in contempt, the DOE "has never come clean.  It circled the wagons.  It slammed the steel door of secrecy shut once again."  (*Id.*; *see also* 11/14/05 Trial Tr. at 5082 ("there was an agreement

made to give you [plaintiffs] certain information, and the Department of Energy was held in contempt for not complying with that, that is going to be admissible in this case.").)[29]

**B.     Evidence Regarding the 1989 FBI Raid, The Grand Jury Investigation, And Rockwell's Guilty Plea Should Have Been Excluded.**

Defendants moved to exclude evidence regarding the 1989 FBI raid, the grand jury investigation, and Rockwell's guilty plea (*see* Defs.' MIL No. 1-3); these motions were denied (*see* 8/22/05 Hr'g Tr. at 5-8).  From the very beginning of trial, in opening statements, plaintiffs made plain their intention to rely on the 1989 FBI raid to prove their trespass and nuisance claims against defendants.  (10/11/05 Trial Tr. at 483)  Throughout the trial, the plaintiffs continued to rely upon the FBI raid to prove their case.  Plaintiffs' class representatives testified about the FBI raid.  (*See*, *e.g.*, 10/14/05 Trial Tr. at 926 (S. Bartlett testimony that FBI raid affected use and enjoyment of property; *id.* at 1033 (R. Bartlett testimony that he felt "betrayed" by FBI raid); 10/20/05 Trial Tr. at 1901 (Schierkolk testimony that "I thought I was living in a reasonably safe place, and now [after the FBI raid] it's questionable about whether or not I am).) Plaintiffs also spent the better part of a week introducing testimony by Agent Lipsky, who testified about the allegations leading up to the raid, the raid itself, and the alleged conspiracy he felt took place in having lesser charges brought against Rockwell.  (10/11/05 Trial Tr. at 492) And plaintiffs introduced expert witnesses who testified that this raid — and not any actionable conduct on the part of defendants — caused the diminution in property values the plaintiffs allegedly experienced.  (*See* 10/26/06 Trial Tr. at 2781 (Radke testimony) ("Q.  Now it was you who decided in answering the question — the question was, did the F.B.I. raid have an impact on

---

[29]     (*See also* 11/14/05 Trial Tr. at 5109 (admitting P-1410 (Magistrate Judge Borchers Order certifying that DOE failed to comply with stipulated order)); 5112 (admitting P 636 (Judge Kane opinion holding DOE in contempt of Court)).

values, you're the one who decided on the approach to take in order to answer that question, correct? A. Correct.").)

Plaintiffs further put the government on trial by alleging that the FBI raid and Rockwell guilty plea were motivated by political considerations that did not get at the heart of what happened at Rocky Flats. And, notwithstanding the Court's ruling limiting references to the FBI/DOJ investigation (8/22/05 Hr'g Tr. at 7 (only the fact of the investigation is admissible); 9/22/05 Hr'g Tr. at 34-35 (same)), plaintiffs proceeded to reveal in detail the outcome of the investigation. Defendants were precluded from effectively cross-examining Mr. Lipsky through his self-selective invocation of statutory privileges. Mr. Lipsky was able to waive the privilege when he saw fit to do so, but invoked it whenever defendants asked him problematic questions during cross-examination.

None of this evidence should have been admitted. The government's actions in raiding the plant and the ensuing investigation, including whether the investigation was improperly cut short, should not have been at issue in this trial as they have nothing to do with Rockwell's (let alone Dow's) conduct or any liability for the civil claims at issue here.

### 1.     The FBI Raid, Grand Jury Investigation, and Guilty Plea Are Irrelevant to Plaintiffs' Claims.

The FBI raid is irrelevant to plaintiffs' claims. Neither the search warrant nor any of the specific accusations made in the raid had anything to do with trespass or nuisance claims.[30] Plaintiffs' trial evidence also failed to tie the FBI raid or any of its accusations into concrete evidence that Dow or Rockwell trespassed onto or interfered with the use and enjoyment of plaintiffs' properties.

---

[30]   (*See further* Defs.' MIL 1-3, filed 6/16/05.)

The Tenth Circuit has recognized that evidence that suggests that a party has committed other illegal acts is "inherently prejudicial." *Westbo*, 576 F.2d at 291 ("Evidence that Westbo had committed a forgery in prior fraudulent dealings with BULIC was inherently prejudicial.").[31] The Court's decision to allow evidence of the false FBI raid allegations to be used against defendants was fundamentally unfair and prejudicial to defendants and should have been excluded under Rules 402 and 403.

For similar reasons, evidence of the grand jury investigation was erroneous and unduly prejudicial to defendants. *See Stump v. Gates*, 211 F.3d 527, 536-37 (10th Cir. 2000) (district court committed reversible error in allowing introduction of grand jury investigation evidence); *see also* 31 A.L.R. 261 (2004) ("The rule supported by the great weight of authority is to the effect that a judgment of conviction or acquittal rendered in a criminal prosecution cannot be given in evidence in a purely civil action, to establish the truth of the facts on which it was rendered."). The mere fact of prosecution and investigation cannot be evidence of wrongdoing. The point is even more compelling where, as here, the investigation did not ultimately support plaintiffs' case. In this case, as in *Gates*, indictments were not issued after the conclusion of the grand jury investigation.

---

[31]  *See, e.g., Jetcraft Corp. v. Flight Safety Int'l*, 16 F.3d 362, 365-66 (10th Cir. 1993) (prejudicial effect of evidence pertaining to Federal Aviation Administration (FAA) enforcement actions taken against aircraft's pilot following crash outweighed its probative value in owner's action for damages where FAA characterized violation is record-keeping omission); *Tucker v. Makowski*, 883 F.2d 877, 881 (10th Cir. 1989) (improper admission of evidence of prior crimes "raises a due process issue"); *Shoppin' Bag of Pueblo, Inc. v. Dillon Companies, Inc.*, 783 F.2d 159 (10th Cir. 1986) (affirming exclusion of FTC investigation under Rule 403 on grounds that the investigation was not relevant, was too prejudicial, and risked confusing and misleading the jury).

Plaintiffs also relied upon the FBI raid to argue to the jury that the alleged trespass was complete and comparatively enduring.  (*See* 10/11/05 Trial Tr. at 605 ("We don't think you are going to have much trouble concluding that the trespass was indefinite, but we think the nuisance, too, the evidence will show, was indefinite.  What was it like in 1989 and 1990, especially after the FBI raid.").)  But the FBI raid, grand jury investigation, and guilty plea, dealt only with ***on*** (not ***off***) site releases.  Thus, the fact that the FBI raid took place is not in any way probative of whether there is plutonium on plaintiffs' class properties.  Plaintiffs' use of the FBI raid to argue that any trespass was complete and comparatively enduring was erroneous, confusing to the jury, and prejudicial.

Plaintiffs also, in violation of the Court's orders, went well beyond "the fact" of the FBI raid and grand jury investigation.  The Court ruled that only the "fact" of the FBI raid and grand jury investigation were admissible.  (8/22/05 Hr'g Tr. at 7 (only the fact of the investigation is admissible); 9/22/05 Hr'g Tr. at 34-35 (same)  Yet, plaintiffs repeatedly violated these rulings.  Plaintiffs told the jury that "[n]ever before or since has such a shocking thing happened in this country."  (10/11/05 Trial Tr. at 483.)  During opening statements, plaintiffs promised the jury: "you will hear of the violations [Agent Lipksy] found, of federal and environmental laws, how he was stonewalled by Rockwell and by DOE, the cover up that occurred of the incinerator burning at night, and publicity about his affidavit."  (10/11/05 Trial Tr. at 580.)  Plaintiffs also referred to the allegation in FBI agent Jon Lipsky's affidavit concerning discharges to Woman Creek (*See*, *e.g.*, 10/25/05 Trial Tr. at 2569-70) — a matter which was not the subject of Rockwell's guilty plea.

## 2.      Jon Lipsky Should Not Have Been Permitted To Testify.

The Court allowed Mr. Lipsky to testify at great length about the substance of the FBI investigation, even though defendants never had access to the substance of the investigation (and

it is entirely irrelevant to plaintiffs' claims). (*See*, *e.g.*, 10/24/05 Trial Tr. at 2253 (testimony about Smith's possession of Mary Walker memo); *id.* at 2255-56 (meeting with Smith and Fimberg); *id.* at 2285 (what Lipsky determined during course of year long investigation); *id.* at 2288-89 (why Lipsky had probable cause to believe incinerator was being illegally operated); *id.* at 2299-2300 (who had authority to grant access to DOE documents); *id.* at 2301 (tension between EPA and DOE about whether RCRA applied to DOE facilities); *id.* at 2302-03 (Lipksy's opinion about whether RCRA applied); 10/25/05 Trial Tr. at 2445 (EPA task force conclusions about monitoring program); *id.* at 2967-68 (testifying about photos of the spray irrigation fields).  Mr. Lipsky was also permitted to testify by reading directly from his affidavit while on the witness stand.  (*See*, *e.g.*, 10/25/05 Trial Tr. at 2417, 2425.)

     Mr. Lipsky testified that the FBI's investigation of various subjects raised by the search warrant was cut short based on improper behind the scenes governmental dealings and directives. (*See*, *e.g.*, 10/26/05 Trial Tr. at 2645-46, 10/27/05 Trial Tr. at 2865-66, 2910-11 (investigation into purported secret medial waste facility cut short, authority revoked by U.S. Attorney); *id.* at 2910-11, 2926, 3750-51 (U.S. attorney revoked authority to investigate incinerator allegations); 10/25/05 Trial Tr. at 2510-11 (investigation into false statements and prosecution of individuals cut short).)  The Court allowed such testimony despite the fact that such issues could not be explained or adequately explored on cross-examination due to various statutory privileges asserted by the government regarding Mr. Lipsky's testimony, (10/24/05 Trial Tr. at 2236 ("Q.  I think that covers most of it, doesn't it? A.  Kind of like art, I'll know it when I see it."); 10/27/05 Trial Tr. at 2913, 2915, 2943-44, 2950-51; P1272 (FBI Letter to Lipsky restricting testimony); Defs.' 1/20/05 Motion to Bar Testimony by Jon Lipsky; Defs.' 11/01/05 Objections and

Renewed Motion to Strike Portions of Lipsky Testimony.)[32]  The Court repeatedly allowed former agent Lipsky to invoke privileges to shield any meaningful exploration of his sensational allegations of governmental misrepresentation and impropriety in the criminal investigation.[33]  In light of Mr. Lipsky's refusal to answer — or the fact that he may not have been at liberty to disclose certain information — defendants could not test the credibility and accuracy of such assertions through cross examination.  Limitations that prevent cross-examination constitute error.  *See United States v. Jorgensen*, 451 F.2d 516, 519 (10th Cir. 1972) ("Clearly the right of cross examination is fundamental in our judicial system.  Indeed, we have long held a full cross-examination of the witness upon subjects of his examination in chief is the absolute right, not the

---

[32]   When former U.S. Attorney Michael Norton was to testify when subpoenaed by the defense, the Court indicated it would not recognize the deliberative process privilege if it were to be asserted by Mr. Norton.  (12/14/05 Tr. at 7920-21.)

[33]   As set forth in defendants' 11/01/05 Objections and Renewed Motion to Strike Portions of Lipsky Testimony, this testimony included: (1) Information from informants (10/25/05 Trial Tr. at 2531-32); (2) Sources of information (10/25/05 Trial Tr. at 2532); (3) Whether the investigation into the 771 incinerator allegation was continuing as of November 1989 (10/27/05 Trial Tr. at 2915); (4) When authority to pursue investigation into the Building 771 incinerator allegation was terminated prematurely (10/27/05 Trial Tr. at 2915); (5) Discussions among investigative team as the basis for assertions that public statements may have misrepresented team members' views (10/27/05 Trial Tr. at 2943-44; 2950-51); (6) Views of the investigation team concerning the sufficiency of the criminal investigation and its conclusions as to public health risk as the basis for assertions that public statements may have misrepresented team members' views (10/27/05 Trial Tr. at 2942-44); (7) Views of the investigation team concerning whether the pleas included the most serious environmental crimes found as the basis for assertions that public statements may have misrepresented team members' views (10/27/05 Trial Tr. at 2949-51); and (8) Whether the investigative team failed to reach any conclusion about the merits of allegations concerning the Building 771 incinerator before the investigation came to a close (10/27/05 Trial Tr. at 2913).

mere privilege, of the party against whom such witness is called, and denial is prejudicial error.") (internal citations and quotations omitted).[34]

### C.      False Media Stories Should Have Been Excluded.

Plaintiffs were also permitted to rely upon irrelevant media stories designed to have the maximum prejudicial impact.  Plaintiffs used these stories to argue to the jury that: "[t]his continuous bombardment of the public with many hundreds of negative news stories made the property values very cheap for many years."  (10/11/05 Trial Tr. at 490-91.)[35]  Plaintiffs were permitted to use these stories regardless of whether or not they were true.  Indeed, plaintiffs did not (and under the court's rulings did not even need to) attempt to show that these stories were true.[36]  Plaintiffs even admitted some of these stories were false.  (*See* 10/12/05 Trial Tr. at 632 ("Unfortunately, some of those articles have wildly inflated cleanup cost estimates").)  The end result of the admission of this prejudicial evidence, as the Court acknowledged, is that defendants may have been found liable based upon false and potentially slanderous news stories:

> MR. BERNICK:  I will leave it that way.  He could be — under that theory, we could be publicly defamed, something false, completely and utterly slanderous is said about us concerning the

---

[34]  In addition, in light of Mr. Lipsky's refusal (or inability) to respond to defendants' questions, Mr. Lipsky could not provide any substantiation, basis, or foundation for his assertions.  His testimony should also have been excluded because he could not provide a foundation for it. *See United States v. Garcia*, 291 F.3d 127, 140 (2d Cir. 2002) (foundation requirements goes to admissibility of evidence not merely its weight).

[35]  (*See also* 10/11/05 Trial Tr. at 609 ("Before the FBI raid, we saw that the public was becoming aware of problems at Rocky Flats.  And property values were already being hurt before the FBI raid by all of the negative publicity about Rocky Flats.  And after the FBI raid it was really bad.").)

[36]  Plaintiffs did not need to show that the stories were true before they could publish them to the jury because of the Court's ruling that "media coverage is relevant, however, to public perceptions."  (Instruction 2.7.)

operations of Rocky Flats, property values fall and they say prima facie case.

THE COURT:  If it's part and parcel of all the evidence, all the publicity, I think that's right.

(10/17/05 Trial Tr. at 1205.)  Plaintiffs took advantage of these rulings to argue that the existence of the media stories was itself a nuisance. (*See* 10/11/05 Trial Tr. at 547 ("One reason [Rocky Flats was a nuisance to the neighbors] is because of all of the negative publicity because of the way they ran the plant.").)

One of the most egregious examples of this false media is a 1994 video that described the so-called "most dangerous building in America."  (PV190.)[37]  This video also contained a variety of hearsay accounts of worker exposures at the plant, even though these alleged exposures took place after the defendants no longer operated the plant.

Thus, the introduction of the following evidence (to which defendants previously objected) was error, warranting a new trial: P-741, P-783, P-1181, P-1183 (which should also have been excluded because it was improper speculation and expert testimony), P-1184, P-1187, P-1188, P-1693, PV-3084. PV-3089 (which was also hearsay), PV-3090 (also incomplete), PV-3097 (also incomplete and improper expert opinion), PV-3114 (which should also have been excluded because it was incomplete and constituted hearsay), PV-3116, PV-3120 (which should also have been excluded because it was hearsay), PV-3121, PV-3128, PV-3130, PV-3144, PV-3091, PV-3166, and V 052C.

---

[37]   The Court initially excluded this video (11/22/05 Trial Tr. at 6147), but later admitted it. (12/13/05 Trial Tr. at 7830.)

**D.      Evidence of Incidents and Conditions Occurring Wholly Within Buildings Should Have Been Excluded.**

Defendants moved *in limine* to preclude presentation of "evidence related to releases, incidents and conditions that occurred solely within buildings at Rocky Flats and of which, accordingly, there is no evidence of any offsite environmental effects."  (Defs.' MIL No. 8.)  In the course of discovery, the Magistrate Judge held that "any releases within a building that affected only employees within that building would not affect this case."  (6/14/94 Order at 2.)  Despite the irrelevance and undue prejudice of such evidence, over defendants' objections, plaintiffs repeatedly focused on incidents and conditions occurring wholly within the buildings that bore no relation whatsoever to any demonstrated off-site contamination, or even the potential for any such contamination.  (*See*, *e.g.*, 10/25/05 Trial Tr. at 2504-07 (Lipsky reading from journal of deceased Rockwell plant manager about notes he took at meetings regarding employee moral and managerial issues); 10/18/05 Trial Tr. at 1465-67 (Plaintiff witness Ray testifying about clothing worn by workers and launduring of worker uniforms); 11/2/05 Trial Tr. at 3778-80 (Plaintiff witness Avery discussing wholly indoor leaks and relation their relation to plant workers.)  *See also* Part V.D., *infra*, regarding irrelevance of FBI Raid and other matters occurring wholly on-site and within plant.  Such evidence was irrelevant to any issue of potential off-site contamination and was highly prejudicial to Defendants.

**E.      Plaintiffs' Repeated Disobedience of the Court's Motions *In Limine* Requires A New Trial.**

Plaintiffs repeatedly violated the Court's rulings on the motions *in limine*.  By allowing the case despite the introduction or references to this testimony, the Court invited the jury to decide the case on improper grounds.  Therefore, a new trial is required.

**Worker Safety**: Notwithstanding the Court's ruling that the case is not about worker safety issues (10/11/05 at 517), plaintiffs' counsel stated in opening: "precautions were not

adequate.  They were not adequate to protect either the workers or the neighbors." (*Id.* at 501.)

And despite plaintiff's counsel's concession that "this case is about the neighbors, and we won't

be considering this case the workers at the plant" (10/11/05 Trial Tr. at 518), plaintiffs continued

to refer to worker safety through the case. (*See*, *e.g.*, 10/25/05 Trial Tr. at 2493 (note in Sanchini

diary about worker litigation); 10/18/05 Trial Tr. at 1466-67 (Ray testimony regarding

contaminated clothing worn about workers at the plant; 11/17/05 Trial Tr. at 5727-28 (Wing

testimony regarding epidemiological studies of cancer rates for workers).)

One of the most egregious violations of this Court's ruling came on October 25, 2005,

during the cross-examination of Jon Lipsky, when plaintiffs published to the jury a document

suggestive of a worker's compensation claim and knowingly and falsely suggested to the jury

that there was a nuclear reactor at Rocky Flats. (10/25/05 Trial Tr. at 2497.)  Defendants moved

for a mistrial:

> I want to make a record on this.  I have just been reflecting on what counsel did
> sequentially with respect to this document, showing where there's apparently a
> discussion with respect to a worker claim and then the Hanford reactor.
>
> He's counsel of record in the Hanford case, has been intimately involved in the
> Hanford case for many years.  He made a false representation to the jury . . .
> which is he had no knowledge of the Hanford case, and he deliberately violated
> the Court's order that this could not be gone into with respect to showing that
> little blurb with respect to what to do with a worker claim.
>
> The reason I stand  up now, your Honor, is I want to preserve my record in
> moving for a mistrial.  This must be the 15th or 20th violation of your Honor's
> order . . .
>
> This jury clearly knows that there's a worker safety problem at this plant.
> They've clearly now been shown what are apparently statements made concerning
> the defense of those claims, and it is extraordinarily prejudicial.

(10/25/05 Trial Tr. at 2497-2503.)  The motion for mistrial was denied.  *Id.*  Defendants reiterate

their request to the Court to order a new trial based on plaintiffs' improper references to worker

safety and the Hanford reactor.

**Cleanup Costs:**  The Court granted defendants' motion to exclude evidence of cleanup costs.  (9/22/05 Trial Tr. at 10.)  Nevertheless, in violation of this ruling, plaintiffs' counsel showed the jury a headline from the March 1, 1990 Rocky Mountain News stating: "Cleanup could cost $150 billion."  (PX 741)  The Court admonished the plaintiffs not to refer to cleanup costs after this statement.  (10/12/05 Trial Tr. at 642-43.)  Nevertheless, plaintiffs continued to publish to the jury other portions of documents identifying cleanup costs. (*See* P-339, P-704, P-707, P-1183, P-1185 (also improper expert opinion), P-1187, P-1188, P-1189, PV-309; PG-100.) Because the Court refused at any time to enforce its motion *in limine* ruling, the Court effectively endorsed plaintiffs' references to cleanup costs.

***Church* Litigation:**  Evidence of the settlement of other lawsuits is excluded by Federal Rule of Evidence 408 (evidence of settlement not admissible to prove liability for or invalidity of the claim or its amount).  (*See* Defs.' Mot. *in Limine* No. 14, filed 6/16/05.)  The Court ruled that only "the fact" of the *Church* litigation is admissible.  (*See* 9/22/05 Hr'g Tr. at 9; *see also* 10/12/05 Trial Tr. at 636 ("So whatever the Church case settled for has no probative value of anything, in this case.").)  Nevertheless, plaintiffs used the *Church* settlement for precisely the reasons forbidden by Rule 408 — to show that because defendants settled another case, they must be liable in this case.  During opening statements, plaintiffs contended that the settlement of the *Church* litigation showed that "defendants in this case have already acknowledged, if you will, and paid money to some of the neighbors for the contamination problems it caused." (10/11/05 Trial Tr. at 549-50.)

**Stone Litigation:**  Defendants argued in their Motion *in Limine* No. 14 that evidence of other lawsuits, specifically *U.S. ex rel. Stone v. Rockwell Intern. Corp.*, 282 F.3d 787 (10th Cir. 2002) and *U.S. ex rel. Stone v. Rockwell Intern. Corp.*, 92 Fed. Appx. 708 (10th Cir. 2004),

should be excluded.  Though the Court denied this motion, the Court stated that "[t]he only evidence plaintiff seeks to present that falls in [this] categories concerns the criminal investigation of Rockwell . . . and the Church litigation."  (8/22/05 Hr'g Tr. at 9).  Despite this, and over defendants' repeated objections, plaintiffs pushed the bounds of this ruling introducing evidence of Stone's False Claims Act suit and hailing him as a whistleblower.  (*See. e.g.,* 10/11/05 Trial Tr. at 573 (stating that Stone "blew the whistle on some of the environmental practices . . . at Rocky Flats"); 12/13/05 Trial Tr. at 7856-57 (eliciting testimony from defense witness about substance of Stone litigation over defendants' objection).  Indeed, plaintiffs were even permitted to introduce hearsay evidence from this alleged "whistleblower."  (10/17/05 Trial Tr. at 1320-21 (Defendants objecting to discussion of "whistleblower" affidavit with no ability to cross examine whistleblower).)  This evidence was irrelevant, highly prejudicial to defendants, and provided them no ability to cross-examine the alleged whistleblower.

> **F.    Plaintiffs Should Not Have Been Permitted To Present Evidence Of Past Risks That Never Happened And Now Cannot Happen.**

Defendants filed a motion to exclude evidence of past risks that never happened, (*see* Defs.' MIL No. 10), but that motion was denied (*see* 8/22/05 Hr'g Tr. at 4-5).  Plaintiffs thus embarked upon a lengthy and irrelevant sideshow by arguing that the incidents at Rocky Flats could have been much worse than they really were.  Admission of evidence regarding past risks that never materialized requires a new trial.

Dr. Budnitz testified that events at Rocky Flats could have been much worse than they were.  He testified that *if* the 1969 fire had been worse than it actually was, "I believe that ( . . .) the 1969 fire, in my view, would have been a disaster unmatched by anybody in the U.S. nuclear weapons environment, indeed, a disaster would make it among the worst in this country's history."  (10/31/05 Trial Tr. at 3200.)  Dr. Budnitz was permitted to testify to this

notwithstanding his own admission that this possibility did not have any real bearing on defendants' conduct, because he could not testify that there was even a 1% chance of such a catastrophe occurring:  "I have tried, as best I can, to estimate the probability that it might have been larger, and I can't estimate that.  Was it a 50 percent chance it might have been larger, was it a 1 percent chance it might have been larger, was it 95 percent, I can't estimate that."  (*Id.* at 3194.)

Dr. Budnitz was also permitted to testify that a criticality could have occurred at Rocky Flats, even though he was unable to testify as to whether a criticality event actually transpired. Relying upon a ScienTech report on criticality (P1317),  Dr. Budnitz testified that a "[c]riticality accident at the Rocky Flats plant ***could*** produce a potentially lethal dose of neutron and gamma radiation to workers at close range, ***could*** generate heat and fission products and, in extreme but low probability circumstances, ***could*** result in the release of radioactive materials to the environment."  (*Id.* at 3240.) (emphasis added.)   Dr. Budntiz testified that the presence of plutonium in the pipe work "could somehow find their way into a critical configuration."  (*Id.* at 3246.)  Dr. Budnitz only testified about what could happen, not what did happen.  The admission of this testimony relating to risks that never took place was highly prejudicial to defendants, and its erroneous admission warrants a new trial.

### G.    Plaintiffs Should Not Have Been Permitted To Introduce Evidence That Does Not Apply Class-Wide.

Defendants moved to exclude non-class-wide evidence, (*see* Defs.' MIL No. 12), but the Court denied that motion, (*see* 8/22/05 Hr'g Tr. at 4-5).  As a result, plaintiffs were permitted to rely upon highly individualized evidence in this class-trial.  The jury thus heard abundant testimony regarding the emotional condition experienced by the individual plaintiffs:

- **Bartletts**: "I feared for my family, for my neighbors.  It was just one of the most devastating days I can remember." (10/14/05 Trial Tr. at 917-18; *see also*  10/14/05 Trial

117

Tr. at 926-27 (S. Bartlett testimony that Rocky Flats affected the use and enjoyment of her property); 10/14/05 Trial Tr. at 928 (S. Bartlett had trouble sleeping and other problems after the FBI raid)

- **Schierkolks**: "They still live there, but they have been haunted by concerns about Rocky Flats. I think Bill will tell you his wife is very upset about Rocky Flats." (10/11/05 Trial Tr. at 560; *see also* 10/20/05 Trial Tr. at 1092 ("[Rocky Flats] just causes a lot of stress in our family for one thing. We're concerned about our safety.)

- **Cook**: "Q. And these problems, what effect did they have upon you? A. It was a really horrid time of my life. I felt like everything that had been important to me I had lost." (10/21/05 Trial Tr. at 2048.)

This evidence did not apply to any of the other 15,000 class members.

Plaintiffs were also permitted to present the highly personal stories of certain, carefully selected individuals without making any showing that they were representative of the remaining 99.9+ percent of class members. For example, the Court permitted the Bartletts to testify, over objection, that the money they had invested in their house was part of their retirement plan. (10/14/05 Trial Tr. at 916 (S. Bartlett); 10/14/05 Trial Tr. at 1026 (R. Bartlett)) The Court also permitted the class representatives to testify about their perceptions regarding the impact the FBI raid (or just "Rocky Flats") had on their ability to sell their houses. (*See* 10/14/05 Trial Tr. at 920 (S. Bartlett); 10/14/05 Trial Tr. at 1027 (R. Bartlett).) As a result, the jury was left with the impression that all class members were similarly situated when in fact no such evidence of that was presented.

The Court also disallowed the defendants from introducing any evidence to rebut this testimony. For instance, defendants sought to introduce a document in connection with Gretchen Robb's testimony that showed that Ms. Robb's property more than doubled in value between 1993 and 2004. (*See* DX 1333A, 11/10/05 Trial Tr. at 5041). This evidence would have rebutted the testimony of plaintiffs' class representatives that "Rocky Flats" caused their properties to be worth half of what they felt they should have been. (10/14/05 Trial Tr. at 922.)

But the Court struck this testimony, despite the fact that the plaintiffs opened the door to it. (*See* 11/10/05 Trial Tr. at 5041.)

Evidence that fails to have class-wide application should have been excluded because the class action device cannot be used to expand class members' substantive rights of recovery. An individual who cannot recover in an individual lawsuit cannot recover just because the case is brought as a class action. *See*, *e.g.*, *Broussard*, 155 F.3d at 344-45 ("It is axiomatic that the procedural device of Rule 23 cannot be allowed to expand the substance of the claims of class members. Thus courts considering class certification must rigorously apply the requirements of Rule 23 to avoid the real risk, realized here, of a composite case being much stronger than any plaintiff's individual action would be") (citation omitted). Such recovery would violate the Rules Enabling Act, which provides that the class action device cannot be used "to abridge, enlarge or modify any substantive right" of any litigant. *See* 28 U.S.C. § 2072; *Ortiz v. Fibreboard Corp* 527 U.S. 815, 845 (1999). Thus, admission of this individualized evidence, which invited the jury to find for the entire class, many of whom did not have similar experiences to the plaintiffs, was error.

**H.      The Introduction Of Improper Expert Witness Testimony Requires A New Trial.**

The Court has denied defendants' 6/16/05 *Daubert* motions.  (*See* 12/7/06 Mem. Op.

Regarding *Daubert* Mots. and Mots. *in Limine*; see also 1/17/06 Trial Tr. at 10188 ("the

defendants' motion to strike the testimony of Wayne Hunsperger, John Radke, and Thomas

Cochran is denied".)  Although defendants continue to believe that all of plaintiffs' expert

evidence should have been excluded, defendants here only set forth additional, record evidence

that indicates that plaintiffs' expert witnesses should have been excluded because their testimony

was unreliable.

After trial, it is even more apparent that plaintiffs' experts could not meet the most basic

requirements for admissibility under Rule 703.  The introduction of this improper expert

testimony requires a new trial. *See Dodge v. Cotter Corp.*, 328 F.3d 1212, 1229 (10th Cir. 2003)

(ordering new trial after improper admission of expert testimony).  Further, the Court permitted

numerous witnesses to testify as lay witnesses, even though their proffered testimony was

actually expert testimony that should have been governed by Rule 703.  By doing so, plaintiffs

were able to evade the requirements set forth in Rule 26 governing disclosure of experts and

expert reports and the requirements governing admissibility of expert testimony in Fed. R. Evid.

703.  Like the improper admission of expert testimony, the improper admission of lay witness

testimony also requires a new trial.  *See Certain Underwriters at Lloyd's v. Sinkovich*, 232 F.3d

200, 205-06 (4th Cir. 2000) (ordering new trial where court improperly allowed lay witness to

testify as an expert witness).

**1.      Mr. Hunsperger's Testimony Should Have Been Excluded.**

Mr. Hunsperger's analysis was unreliable.  Mr. Hunsperger was obligated to follow

appraisal standards (including Uniform Standards of Professional Appraisal Practice ("USPAP

standards")) in offering his opinion of value but failed to do so.  (Dorchester testimony, 1/09/06 Trial Tr. at 9460-61, 1/10/06 Trial Tr. at 9494, 9496-98, 9503-05, 9515-17, 9520-21, 9523-27, 9529-32, 9535-36, 9686-87)  And Mr. Hunsperger improperly disregarded limitations set by experts upon whose data he relied in violation of appraisal standards.  (*Id*. at 9523-24)  Concerning each of Mr. Hunsperger's five "approaches," the evidence showed as follows.

*First*, the evidence showed that ***analogous case studies*** could not be appropriately used under appraisal standards where market sales data exists.  (*Id.* at 9529-30; *see also id.* at 9523-24, 9665-67; d'Arge testimony, 1/9/06 Trial Tr. at 9297-98)  Mr. Hunsperger had no basis or statistical scheme that would allow him to extrapolate to this case from the other cases.  (Wecker testimony,  1/11/06 Trial Tr. at 9764-66, 9771)  In addition, the analogous cases studied each failed to meet various standards for comparison, such as equivalence, scientific soundness (peer review), germaneness, and richness in detail.  (d'Arge testimony, 1/9/06 Trial Tr. at 9346-49)  Not a single analogous case met these standards.[38]

*Second*, the evidence at trial showed that ***opinion surveys*** cannot properly be used under appraisal standards where market sales data exists.  (Dorchester testimony, 1/10/06 Trial Tr. at 9529-30; *see also id.* at 9520-21, 9667; d'Arge testimony, 1/9/06 Trial Tr. at 9297 ("when there are market prices, and accurate market price data is available, there is absolutely no reason for a contingent valuation survey") & 9340)  The main survey relied upon by Mr. Hunsperger, the Flynn and Slovic survey, was itself unreliable for its failure to conform to prevailing environmental economics standards.  (d'Arge testimony, 1/ 9/06 Trial Tr. at 9303-05)  Among

---

[38]   Plaintiffs' own expert, Dr. Flynn, conceded that analogous case studies cannot be used to measure loss.  (*See* Dorchester testimony, 1/9/06 Tr. at 9358-59 (quoting Flynn testimony designated from his deposition).)

other things, Drs. Flynn and Slovic failed to "demonstrate . . . beyond a doubt that the respondent in the survey fully understood the economic commodity and the scenario being proposed." (*Id.* at 9305)  The interviews were too complex to be done (as they were) over the telephone; yet, the survey method did not provide for any checks on the understanding levels of the participants. (*Id.* at 9306-07; 9316-17)  The survey population also was flawed in many respects:  the screening questions did not identify the relevant population and were not checked for accuracy (*id* at 9312, 9318); individuals from Arvada and Westminster were improperly excluded from the sample (*id.* at 9318-19, 9323-24, 9337); and "any individual on the valuation survey, any respondent who thought that living near Rocky Flats on balance was a positive experience [was] automatically excluded from consideration." (*id.* at 9324).  The net effect was to take out the people best qualified to answer the questions posed and improperly bias the results.  (*Id.* at 9337 & 9324)  Furthermore, queuing improperly put questions about "nuclear" weapons before questions about valuation.  (*Id.* at 9320-21)  There was no check for bias and pretesting results were not available (*id.* at 9321-22).  The discount levels were picked out of thin air and used to bias the results.  (*Id.* at 9326-28, 9336-37)  Techniques of framing and sequencing were used to improperly bias the results.  (*Id.* at 9336)  The list goes on and on, in total, rendering the survey (and Mr. Hunsperger's analysis) unreliable to show any alleged diminution.  (*Id.* at 9340-41) (the Flynn and Slovic survey "failed at least four out of the five guidelines or rules that either they must be fulfilled individually, each one, or the survey is deemed as unreliable from a scientific standpoint") & 9341 (survey failed 75% of NOAA guidelines; "[w]hen it does not satisfy four of the five essential rules and fails on 75 percent of the general guidelines, I think there's only one conclusion, and that is that the survey is unreliable for looking at property value losses") (emphasis added).)  At bottom, the survey was meaningless.  (*Id.* at 9345)

Mr. Hunsperger's use of the survey data also failed to take into account the fact that there would be no discount so long as there are sufficient buyers who are not influenced by Rocky Flats.  (d'Arge testimony, 1/9/06 Trial Tr. at 9344)   Plaintiffs' own expert who helped design the survey, Dr. Slovic, does not believe that the survey data can properly be used for the purposes for which Mr. Hunsperger used the data (*i.e.*, measuring loss).  (*See* Hunsperger testimony, 12/7/05 Trial Tr. at 6826 (Q. ". . . Dr. Slovic does not believe that the data that he gathers — gathered can be used for the purpose to which you put them?  A. Yes."). [39]

Mr. Hunsperger made fundamental errors in attempting to translate Dr. Flynn and Dr. Slovic's survey results into a calculation of loss of value, including failing to count certain numbers that would have impacted his results, randomly assigning values not stated by survey participants, and overstating the number of people who did not want to buy due to Rocky Flats.  (Wecker testimony, 1/11/06 Trial Tr. at 9767-71)  The end result was that Mr. Hunsperger's attempt to attribute diminution to Rocky Flats was "[m]istaken and in conflict with what the [survey] data actually shows."  (*Id.* at 9771)

***Third,*** Mr. Hunsperger's use of Dr. Radke's regression, an unvalidated model, did not comply with appraisal standards.  (1/10/06 at 9531-32; *see also id.* at 9523-24)  Dr. Radke's regression analysis itself – designed to test the difference between the class area and a control area before and after the 1989 FBI raid –  failed to conform to basic statistical principles,

---

[39]   In addition, the admission of the surveys themselves (P-1442B (the Flynn and Slovic survey report P-1442C, and EG&G Community Relations Survey), P-1452 (Arvada Citizens Attitudes Survey), and (P-1453 (the Talmey Drake Broomfield Survey) was erroneous because these surveys are hearsay not within any exception, and the absence of those who conducted the surveys rendered effective cross-examination impossible.  Nor were the surveys properly admitted under Rule 703 because their probative value in assisting the jury to understand Mr. Hunsperger's conclusions did not substantially outweigh their prejudicial effect.

contains fundamental errors, and was otherwise unreliable.  Dr. Radke improperly applied factor analysis, combining various factors and discarding some – improperly exaggerating the effect of remaining variables (such as proximity to Rocky Flats).  (*See* Wecker testimony, 1/11/06 Trial Tr. at 9780-84; McFadden testimony, 1/12/06 Trial Tr. at 9951-55)  He improperly used a weighting technique with no statistical justification for doing so and the weighting improperly altered his results.  (Wecker testimony, 1/11/06 Trial Tr. at 9785-87 ("it's a medicine that is not needed, and it's positively harmful"); McFadden testimony, 1/12/06 Trial Tr. at 9942-43 & 9946-51)  Neither Mr. Hunsperger nor Dr. Radke set forth ***any*** data showing a statistically significant difference between the class and any control group prior to 1988.  (*E.g.*, Wecker testimony, 1/11/06 Trial Tr. at 9795-98)  When the above errors were corrected and the Radke model re-run, there were no statistically significant results, including any year-to-year differences.  (Wecker testimony, 1/11/06 Trial Tr. at 9794-97; McFadden testimony, 1/12/06 Trial Tr. at 9937-38, 9956-58, 9963, 9966-67)

Dr. Radke's data was questionable, and his failure to keep all of his work and/or replicate it violated basic standards and prevented full replication of all aspects of the work.  (McFadden testimony, 1/12/06 Trial Tr. at 9958-59, 9972-74, 9976-77, 9979)  These problems undermined both the reliability of Dr. Radke's work and Mr. Hunsperger's conclusions, which were based in part on the Radke regression.  (*E.g.,* McFadden testimony, 1/12/06 Trial Tr. at 9979-80 ("given the lack of documentation and given the statistical flaws, my conclusion is that his original analysis is not sufficiently reliable so you should depend on it for judging losses or damages"))

***Fourth***, concerning his ***vacant land analysis,*** Mr. Hunsperger lumped property together regardless of differences such as how the property is zoned.  (Dorchester testimony, 1/10/06 Trial Tr. at 9530; *see also* Wecker testimony, 1/11/06 Trial Tr. at 9762-65)  Mr. Hunsperger

testified that he conducted no statistical analysis of the vacant land data, looked at raw data alone, and did not use any specific methodology in coming up with his alleged $21 million loss. (*See* Hunsperger testimony, 12/07/05 Trial Tr. at 6831 ("[T]here was no statistical analysis, because I used 100 percent of the sales"), 6832 ("The way I arrived at 30 percent --- the only piece of paper that I have is the report."))  Not surprisingly, the results were not statistically reliable.  (Wecker testimony, 1/11/06 Trial Tr. at 9771)  Mr. Hunsperger discarded the scrap of paper on which he conducted this analysis.  (12/7/05 Trial Tr. at 6830-31 ("Q.  You didn't preserve the scratch piece of paper from the analogous case analysis that you did? A.  That part is correct.")

 ***Fifth***, Mr. Hunsperger himself concedes that ***market participant interviews*** were not a proper basis for estimating value under the standards.  (*See* Dorchester testimony, 1/10/06 Trial Tr. at 9665)

 Simply put, Mr. Hunsperger's "judgment" cannot substitute as reliable diminution of value evidence in lieu of an appraisal that follows appraisal standards.  (*See* Dorchester testimony, 1/10/06 Trial Tr. at 9496-97 ("to be able to complete a valuation, for example, an appraisal, it's necessary to do a series of analyses and follow a series of steps that are part of USPAP and a part of the generally accepted principles rather than to simply use judgment."), 9535 ("The standards require that the appraiser develop an opinion of value from data from experts, if they're involved, but not to simply have it be a number that is a judgment number"), 9686 (Mr. Hunsperger's use of judgment "seriously detracts from his reliability"))  Indeed, the evidence demonstrated that Mr. Hunsperger's use of his own judgment in this case to determine an alleged diminution was precisely what the appraisal standards were designed to avoid. (Dorchester testimony, 1/10/06 Trial Tr. at 9535-36)

The Court also improperly allowed Mr. Hunsperger to testify to government restrictions on land.  (*See* 12/6/05 Trial Tr. at 6503.)  This testimony should have been excluded.  In its May 17, 2005 Order, this Court held that plaintiffs may not predicate a claim for nuisance on the "imposition of government restrictions on the use or development of Class properties."  (5/17/05 Order at 7.)  Nevertheless, plaintiffs admitted evidence that "Rocky Flats resulted in land use and other local government restrictions on development."  (PG 893; *see also* PG 888, PG 890, PG 891, PG 892 (detailing governmental restrictions on land development in the class area), P 1464 (community needs assessment report).)  This evidence impermissibly invited the jury to predicate liability and damages on a basis of the imposition of government restrictions, which this Court had ruled out.  (5/17/05 Order at 7-8.)  None of these restrictions were class-wide. Indeed, those that were limited to the government-owned buffer zone did not impact a single class property.  *See Cook v. Rockwell Int'l Corp.*, 151 F.R.D. 378, 382 (D. Colo. 1993) ("*Cook IV*") (defining the class "exclusive of governmental entities").

### 2.    Dr. Clapp's Testimony Should Have Been Excluded.

Plaintiffs offered Dr. Clapp to testify to the results of a study supposedly finding there was a higher incidence of cancer among residents living near Rocky Flats.  Yet this study failed to meet the most basic requirements for admissibility of scientific evidence under Rule 703 and should have been excluded.  (*See* Defs.' Mot. to Strike and Exclude Testimony of Dr. Richard Clapp and Related Exhibits, filed 11/10/2005.)

To test whether the results of a study reliably indicate a claimed association (such as a higher incidence of cancer in a certain population due to exposure to particular substances), scientists analyze whether the results are ***statistically significant***.  Ex. 18, Reference Manual on Scientific Evidence 356-57 (2d ed. 2000)  A test for statistical significance generates a value referred to as a *p*-value, which represents the probability that the results of the study could have

been the result of random chance (a p-value of .1 represents a 10 percent chance that the results could have been the product of chance). *Id.* at 357. The possibility that the association or effect shown by the study is in fact not present, and that the results of the study are due to random chance, is referred to as the null hypothesis. *Id.* at 122. For most studies, including epidemiological studies such as Dr. Clapp's, the statistically significant threshold of interest is a p-value of .05; in other words a study must show that the chance that the null hypothesis is true is less than 5 percent to be statistically significant. *Id.* at 357-58. Another way to demonstrate the statistical significance of a study is to calculate the confidence intervals associated with the p-value of .05 (a confidence level of 95 percent). *Id.* at 360-61. If the range encompassed by the confidence intervals includes 1.0 (the value of no association), then the results are not statistically significant.

Along with other plaintiffs' experts[40] and most other epidemiologists, Dr. Clapp calculated the confidence intervals at the 95 percent level for the final results of his study. Dr. Clapp's discussion of these confidence intervals demonstrate that the results of his study are not statistically significant. All of the confidence intervals that he presented regarding purported increases in cancer incidence included the value of 1.0, meaning that **none** of his results met the 95-percent confidence threshold for statistical significance. (*See* Defs.' Mot. to Strike & Exclude Testimony of Dr. Richard Clapp & Related Exhibits, filed 11/10/05.) Dr. Clapp attempted to claim that statistical significance is irrelevant to the validity of his study:

---

[40]   (*See*, *e.g.*, 10/26/05 Trial Tr. at 2778-79 (Radke testimony that "the standard error is reported at [the 95 % confidence interval]"); 11/02/05 Trial Tr. at 3698-99, 3704-3705 (Dr. Goble applied confidence intervals to the results of his study to demonstrate their inherent uncertainty); 11/07/05 Trial Tr. at 4315 ("you put an asterisk" at results that are 95% and higher).

Q.  Do you in your work generally outside of this case place particular weight or rely on this particular test of  statistical significance that you just described?

A.  I calculate it.  I don't use it in a way of, you know — it doesn't contribute to my conclusion.  It doesn't lead me to a conclusion.  It's a fact that I take into account based on the data that I — calculation that I have made.

(11/9/05 Trial Tr. at 4838-39.)[41]  Dr. Clapp's blasé attitude towards statistical significance has already been rejected by courts in the Tenth Circuit, which in other cases, including those involving radiation-health effects, has adopted statistical significance at the 95-percent confidence level as an evidentiary threshold for epidemiological studies.  In *Renaud v. Martin Marietta Corp.*, 749 F.Supp. 1545 (D. Colo. 1990), Dr. Clapp, who testified as an expert on behalf of the plaintiffs, opined that the finding of a heightened cancer rate "significant" even though "a statistician would not conclude it is significant." *Id.* at 1551.  Judge Weinschienk rejected Dr. Clapp's argument and held the study to be insufficient evidence of causation. *Id.* at 1555.  This decision was affirmed by the Tenth Circuit.  92 F.2d 304 (10th Cir. 1992).  Later, in *Boughton*, 65 F.3d 823, the Tenth Circuit affirmed the exclusion of another cancer study on the grounds that "none of the observed levels of cancer were elevated to a statistically significant level." *Id.* at 835 & n. 20 ("In every table for every kind of cancer for which there were observed cases the confidence interval included the value of 1.00"); *see also Brock v. Merrell Dow Pharms., Inc.* 874 F.2d 307, 313 (5th Cir. 1989) (finding epidemiological study to be

---

[41]  *See also* P-1380 (article by Dr. Clapp contending that statistical significance is not important for epidemiological studies).  This article should not have been admitted under Rule 703 because its probative value in assisting the jury to evaluate the expert's report does not substantially outweigh its prejudicial effect. *See* Fed. R. Evid. 703.  In addition, P-1380 should have been excluded because it was not disclosed in Dr. Clapp's expert report and because it is hearsay not within any exception.

128

insufficient evidence of causation "due to the fact that confidence intervals include 1.0"), *cited in Renaud*, 749 F.Supp. at 1554.

The admission of Dr. Clapp's study resulted in severe prejudice to defendants. Plaintiffs made great hay out of this study. For example, plaintiffs stated in closing that Dr. Clapp's study proved that those living near Rocky Flats had a ***23 to 29%*** increased chance of getting cancer due to living near Rocky Flats:

> You also heard from Dr. Richard Clapp, an epidemiologist from Boston University, who conducted a study at Rocky Flats using the Colorado Cancer Registry, and Dr. Clapp told you that for the period of 1989 to 1992, there was 23 percent more lung cancer among men living near Rocky Flats and there was 29 percent more lung cancer among women living near Rocky Flats.

(1/18/06 Trial Tr. at 10255.) Far from proving that those living near Rocky Flats had such a drastically increased chance of cancer, Dr. Clapp's study did not prove anything because it was statistically insignificant. Because Dr. Clapp's study fails to meet the test for statistical significance, and its admission resulted in great prejudice to defendants, the Court's decision to admit it was error requiring a new trial.

### 3.    Dr. Cochran's Testimony Should Have Been Excluded.

Dr. Cochran was also permitted to testify to many areas in which he is not an expert. First, Dr. Cochran was tendered as an expert in "health physics." (11/14/05 Trial Tr. at 5266.) Dr. Cochran never sat for certification as a health physicist. (*Id.* at 5262; 11/15/05 Trial Tr. at 5468.) Dr. Cochran never conducted any research, outside of the context of litigation, on health physics. (11/14/05 Trial Tr. at 5263.) Dr. Cochran has never taught a class on health physics. (*Id.*) Nor has Dr. Cochran ever been hired to teach health physics to other health physicists. (*Id.* at 5264.) Because Dr. Cochran was not qualified to offer any opinions on health physics, he should not have been admitted as an expert in this area.

129

Second, Dr. Cochran should also not have been permitted to testify about fire safety.  Dr. Cochran has never taken any courses on fire safety or fire protection, taught on courses on fire safety, reviewed any books or articles on fire safety, or been a member of any fire protection or fire safety organization.  Nor has Dr. Cochran ever been retained as an expert or fire examiner.  Nevertheless, Dr. Cochran testified about his opinions concerning the 1957 and 1969 fires.  (*See* 11/15/05 Trial Tr. at 5324-25 ("But I'm — without being a fire expert, I'm a — have some expertise in the health and safety of these toxic radioactive material, and it's — in my professional opinion, those fires should have been prevented, they should not have occurred.")  Admission of this testimony was error.[42]

Third, Dr. Cochran also has no expertise in criticality.  Dr. Cochran never drafted criticality safety procedures, has never been responsible for ensuring criticality safety in any facility, never audited criticality safety at any facility, and only reviewed one document relating to criticality at Rocky Flats, the ScienTech Report. (11/15/05 Trial Tr. at 5445-48.)  Nevertheless, Dr. Cochran testified about his views of Dow and Rockwell on criticality at Rocky Flats, including giving the contractors a "grade."

Fourth, Dr. Cochran's testimony regarding MUF was impermissible speculation.  (*See* Defs.' Mot. to Strike Selected Test. of Wayne Hunsperger, John Radke, and Thomas Cochran, filed 1/17/06.)  Although Dr. Cochran testified at length about MUF, he was unable to state with any certainty (a) that some portion of MUF had in fact been released off-site and (b) the amount of MUF purportedly released.  (*See* Cochran testimony, 11/16/05 Trial Tr. at 5596 ("you have material unaccounted for throughout this plant . . . there may have been releases. We don't

---

[42]   This testimony should also have been excluded because it was cumulative and added nothing to Dr. Budnitz's testimony.  (10/31/05 Trial Tr. at 3170-3180.)

know"); 5613 (guessing that amount of MUF possibly released ("could be more, it could be less"); 11/15/05 Trial Tr. at 5345 ("it *could* escape from the plant.  It *could be lost*") (emphasis added); 11/16/05 Trial Tr. at 5612 ("I don't want to leave the impression that a large fraction of MUF was released off-site.")  Such speculation is inadmissible.  *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 571 (1993) ("the subject of an expert's testimony must be 'scientific . . . knowledge'" and not mere "subjective belief or unsupported speculation"); *Dodge*, 328 F.3d at 1222 ("It is critical that the district court determine 'whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist") (quoting *Mitchell v. Gencorp, Inc.*, 165 F.3d 778, 781 (10th Cir. 1999)).  Because Dr. Cochran could only speculate about MUF, rather than offering any concrete opinions based upon "scientific knowledge," his testimony regarding MUF should have been stricken.[43]

Finally, Dr. Cochran should not have been permitted to rely upon a video he produced with Dr. Budnitz at trial.  Plaintiffs played a videotape in which Dr. Cochran states his views about the Rocky Flats plant and alleged deficiencies in Dow's and Rockwell's fire safety and environmental practices.  (PV188.)  This video should not have been admitted into evidence because it is nothing more than an expert report prepared in audiovisual form.  Like written expert reports, video presentations are inadmissible hearsay because they consist of out-of court statements offered for their truth.  For this reason, courts regularly preclude introduction of videos into evidence.  *See Rotolo v. Digital Equip. Corp.*, 150 F.3d 223, 225 (2nd Cir. 1998) ("Simply put, the [] videotaped was inadmissible hearsay.")  As this Court has recognized, it is

---

[43] Likewise, Dr. Cochran should not have been permitted to testify on redirect about his views of the RAC and ChemRisk source terms, because Dr. Cochran was not qualified to give this testimony, which was based only on speculation.  (*See* 11/16/05 Trial Tr. at 5578-80.)

well-settled law that expert reports are hearsay and are not admissible.  (*See* 11/7/05 Trial Tr. at

4347 ("my view [is] that expert reports are not admissible, *per se*"); 11/9/05 Trial Tr. at 4797 ("I

have already made that ruling before, reports themselves are not admissible.").)  Further,

introduction of the video was improper because it allowed Dr. Cochran to present his views

without being subject to the Federal Rules of Evidence.  Because the videotape was a canned

narrative, there was no opportunity for defense counsel to object to improper questions or

testimony.

> **4.      The Improper Introduction of Expert Witness Testimony In Lay
> Witness Clothing Requires A New Trial.**

Under Federal Rule of Evidence 701, a lay witness not testifying as an expert is not

permitted to testify to opinions based upon "scientific, technical, or other specialized knowledge

within the scope of Rule 702."  The purpose of this requirement is to "eliminate the risk that the

reliability requirements set forth in Rule 702 will be evaded through the simple expedient of

offering an expert in lay witness clothing."  Advisory Committee Notes to Rule 701.  A new trial

is required when a lay witness is improperly allowed to testify as an expert.  *See Certain*

*Underwriters*, 232 F.3d at 205-06 (ordering new trial where court improperly allowed lay

witness to testify as an expert witness).

Plaintiffs offered substantial expert testimony through lay witnesses that neither provided

expert reports, nor had the qualifications and expertise necessary to offer the opinions to which

they testified at trial.  Because plaintiffs improperly offered numerous expert witness testimony

through the guise of lay witnesses, defendants are entitled to a new trial.

**Lipsky**:  Plaintiffs called Mr. Lipsky to testify about his aerial surveillance of Rocky

Flats.  Mr. Lipksy should not have been permitted to testify about these expert matters for three

reasons.  (*See* Defs.' Mot. to Bar Testimony By Jon Lipsky, filed 10/20/05.)  First, in violation of

Rule 26(a)(2), plaintiffs never disclosed Mr. Lipsky as an expert, nor did Mr. Lipsky prepare an expert report containing a statement of Mr. Lipsky's opinions and the bases for them. Second, under Fed. R. Evid. 701(c), Mr. Lipsky should not have been permitted to testify to opinions, because he was testifying as a layperson, and his opinions "require[ed] specialized knowledge and could [not[ be reached by any ordinary person." *Lifewise Master Funding v. Telebank*, 374 F.3d 917, 929 (10th Cir. 2004) (quoting Fed. R. Evid. 701). Finally, despite having no training in infrared technology, Mr. Lipsky testified at length about this conclusions about the operation of the incinerator based upon this infrared technology. (*See*, *e.g.*, 10/25/05 Trial Tr. at 2413 (testifying that the incinerator was operating at night based upon the infrared imagery); *id.* at 2426 (testifying that the solar ponds were in use based upon the infrared imagery).) It is axiomatic that an expert must be qualified in the area to which he seeks to testify. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993) (expert's opinion must "have a reliable basis in the knowledge and experience of his discipline.")

**Biggs:** Plaintiffs proffered Dr. W. Gale Biggs to testify as a lay witness regarding "his experiences on several committees charged with the review of Rocky Flats' environmental management" and "the work of those committees and their findings and recommendations." (Plaintiffs' Witness List filed September 29, 2005).) Dr. Biggs never submitted an expert report, nor did plaintiffs ever list him as an expert witness. Defendants moved to exclude Dr. Biggs' expert testimony (*see* Defs.' MIL No. 13), but that motion was denied (*see* 9/22/05 Hr'g Tr. at 9-10). At trial, Dr. Biggs testified about matters that went well beyond his first-hand experiences on these committees. Plaintiffs first made plain that Dr. Biggs had extensive expertise in the nuclear industry. Dr. Biggs testified that he had a Ph.D. in meteorology and "did a tremendous amount of work for nuclear power plants, primarily in the process of doing the air impacts

analysis [] to assist them in getting licenses from . . . a Nuclear Regulatory Commission."

(11/8/05 Trial Tr. at 4586.)

Cloaked with this expert authority, Dr. Biggs then discussed in depth his own "expert" opinions about the quality of science at Rocky Flats.  Within minutes of the start of his testimony, Dr. Biggs stated that after reviewing ***technical*** documents that had come out of Rocky Flats, he "came away very concerned at what [he] thought was very poor ***science***."  (11/8/05 Trial Tr. at 4588 (emphasis added); *see also id.* at 4594-95 (testifying to letter he and others wrote to the Colorado Department of Health urging the Department to deny an incinerator burn permit to Rocky Flats because they "were quite concerned that the technique and methodology that they were going about to burn this waste material was neither technically nor environmentally correct.").)

Dr. Biggs proceeded to discuss in depth the duct work and air emissions systems at Rocky Flats.  Dr. Biggs testified about HEPA filters (11/8/05 Trial Tr. at 4611-12; 11/9/05 Trial Tr. at 4959-4644), that small particles would pass through the filters (11/9/05 Trial Tr. at 4669); the alleged inadequacy of meteorological monitoring (11/9/05 Trial Tr. at 4670); "alpha recoil" (11/9/05 Trial Tr. at 4766); the overall "quality control" of the monitoring systems at Rocky Flats (11/9/05 Trial Tr. at 4673 ("we were very disappointed in both the quality control and the quality assurance that we found when we were looking at their systems out there for monitoring."); and his responses to the opinions of others that reached different conclusions. (11/9/05 Trial Tr. at 4762 (Dr. Biggs "very disappointed" by Dr. Gifford's comments).)  Dr. Biggs also testified to his panel's conclusions.  (11/9/05 Trial Tr. at 4654.)

None of this testimony should have been admitted.  Dr. Biggs never submitted an expert report.  Dr. Biggs' conclusions about the ability of the Rocky Flats air filters to monitor

plutonium coming off Rocky Flats is the epitome of testimony that requires "scientific, technical, or other specialized knowledge."  A lay witness would not have the training required to formulate these conclusions about the efficacy of HEPA filters.

**Selbin**:  Like Dr. Biggs, plaintiffs also proffered Dr. Selbin as a purely lay witness.[44]  Dr. Selbin was called to testify about his experiences as a member of the Radionuclide Soil Action Level oversight panel and other Rocky Flats citizens' committees.  Nevertheless, like Dr. Biggs, plaintiffs immediately positioned Dr. Biggs as an expert, pointing out that Dr. Selbin had a Ph.D. in chemistry.  (12/8/05 Trial Tr. at 7035.)  Dr. Selbin offered testimony about the panel's discussion about the movement of plutonium, at once prefacing his remarks "as a chemist" as he discussed his beliefs about how plutonium should move underground.  (*See id.* at 7056-61.)  Despite the Court's clarifications about his appearance as a lay witness and not an expert, Dr. Selbin told the jury "I hope that people understand that I'm an expert in chemistry." (*Id.* at 7129.)  Dr. Selbin also hinted that his selection on the panel may have had something to do with his expertise in radiation issues.  (*See id.* at 7125-27.)

Having been qualified as an "expert," Dr. Selbin then offered expert testimony on how Rocky Flats should have been cleaned up.  Dr. Selbin contended that Rocky Flats should have been cleaned up to a 35pCi/g RSAL as opposed to a 50pCi/g RSAL.  (12/8/05 Trial Tr. at 7161.)  Dr. Selbin based this conclusion on his opinion that "every extra millirem of radiation causes the potential for harm or the potential to a cancer."  (*Id.* at 7159)

---

[44]   Dr. Selbin should also have been excluded because he was not disclosed as a witness until September 29, 2005, well after the discovery cutoff.  Although defendants were permitted to depose Dr. Selbin, they were prejudiced by this tardy disclosure, particularly where Dr. Selbin offered expert opinions as a lay witness and never submitted an expert report.

These expert opinions should not have been admitted.  (*See* Defs.' Mot. to Exclude the Testimony of Dr. Joel Selbin, filed 12/01/05.)  Because Dr. Selbin offered expert testimony in lay witness clothing, he should have been barred from testifying.[45]

## 5. The Introduction Of Plaintiffs' Expert Reports Was Error.

As the Court recognized, expert reports are inadmissible.  (*See* 11/7/2005 Trial Tr. at 4347 ("my view [is] that expert reports are not admissible, *per se*"; 11/3/2005 Trial Tr. at 3908 (expert report not admissible simply because it is an expert report.)[46]  Nevertheless, the Court admitted, over defense objection, the following expert reports: P-1150 (Budnitz 903 pad report); P-1151 (Budnitz fires report); P-1124 (Goble report); P-1123 (Flynn and Slovic FBI raid media study); P-1354 (Slovic report on factors influencing risk assessment), and P-1355(Flynn and Slovic survey report).   The introduction of these hearsay reports improperly allowed these witnesses to "bolster [their] substantive testimony with it is functionally the equivalent of additional written direct testimony." *Kiewit Const. Co.*, 2005 WL 1277953 at * 10 (D. Alaska 2005).  Therefore, the Court committed further error by allowing plaintiffs to introduce these expert reports into evidence.

---

[45]  Dr. Selbin's testimony should also have been excluded because it was irrelevant.  Dr. Selbin was not involved with Rocky Flats until 1998, and had nothing to say about the actions of either Dow or Rockwell.  Furthermore, his testimony was based on hearsay.  (*See* Defs.' Mot. to Exclude the Testimony of Dr. Joel Selbin, filed 12/01/05.)

[46]  *See also Ake v. G.M.C.*, 942 F.Supp. 869, 877-78 (W.D.N.Y. 1996) (excluding as hearsay report of expert who was scheduled to testify at trial); *Springer v. K-Mart Corp.*, 1998 WL 883318 at * 5 (E.D.La. 1998) (attached as Ex. 19) (excluding report of expert scheduled to testify as redundant and inadmissible hearsay); *Granite Partners v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2002 WL 826956 at *7 (S.D.N.Y. 2002) (attached as Ex. 20) (same); *United States v. Kiewit Const. Co.*, 2005 WL 1277953 at * 10 (D. Alaska 2005) (attached as Ex. 21).

6.       **Additional Expert Testimony That Should Not Have Been Admitted.**

In addition, defendants respectfully submit, the Court committed further error in its handling of expert testimony in at least two ways.  First, plaintiffs' experts were frequently permitted, over defense objections, to offer testimony that went beyond the scope of their reports.  (*See, e.g.*, 10/31/05 Trial Tr. at 3154-57 (Dr. Budnitz testimony regarding his criticisms of the Seed report); (11/7/05 Trial Tr. at 4336 (Slovic testimony about the nonlinear or nonthreshold linear model).  Second, the Court regularly admitted into evidence expert reliance materials that are inadmissible under Rules 702 and 703.  (*See, e.g.*, P 63, P1123, P1354, and P1355.)

I.       **Introduction Of P 493 ("The Mary Walker Memo") Was Error.**

The Court allowed plaintiffs to admit this exhibit, over defendants' objection, as a government report under Rule 803(8), even though it is a draft, and draft reports do not fall under this rule.  (10/17/05 Trial Tr. at 1123-24.)  Rule 803(8) provides an exception for only three classes of records or reports of governmental offices and agencies: (1) reports of the office's or agency's activities; (2) matters observed and reported to duty; and (3) factual findings resulting from an authorized investigation unless the sources of information or other circumstances indicate lack of trustworthiness.  *See* Fed. R. Evid. 803(8).  None of these exceptions applies to a draft memorandum on legal and political issues that contains no factual findings.  *See Figures v. Bd. of Pub. Utilities of Kan. City*, 967 F.2d 357, 360 (10th Cir. 1992) (trial court correctly excluded draft letter from area director of government agency as hearsay not subject to Rule 803 (8) exception); *Toole v. McClintock*, 999 F.2d 1430, 1433-34 (11th Cir. 1993) (district court

abused its discretion in admitting FDA document containing proposed factual findings pursuant to Rule 803(8)).[47]

Plaintiffs argued that this document should be admitted because it has "adverse conclusions."  (10/17/05 Trial Tr. at 1124.)  The rule does not contain any such exceptions for governmental reports, and plaintiffs offered no witness to testify that it fell within the three requirements listed in Rule 803(8).  The Court's admission of this highly prejudicial hearsay document is error, and independently warrants a new trial.

**J.     Introduction Of The Sanchini Diaries Was Error.**

Plaintiffs offered, through agent Lipsky's testimony, and the Court accepted, over defendants' objection (*see* Defendants' Objections to Exhibits Sought to be Used by Plaintiffs in Connection with Jon Lipsky, filed 10/24/05, at 5-6), diaries of Dominic Sanchini.  These exhibits were irrelevant, highly prejudicial, and contained layers of hearsay within hearsay. Their admission requires a new trial.

Mr. Sanchini's journals had little probative value, while their potential to mislead the jury and create unfair prejudice was great.  The handwriting contained in the journal was difficult to read, making Mr. Lipsky's testimony as to what the entries say entirely speculative.  More importantly, the journal entries lacked any context.  Mr. Sanchini is deceased and his journal

---

[47]  *See also Smith v. Isuzu Motors Ltd.*, 137 F.3d 859, 862-63 (5th Cir. 1998) (NHTSA memoranda embodying the positions and opinions of individual staff members not admissible under Rule 803(8)); *United Air Lines, Inc. v. Austin Travel Corp.*, 867 F.2d 737, 742-43 (2d Cir. 1989) (district court entirely within its discretion to exclude interim and inconclusive governmental reports); *United States v. Gray*, 852 F.2d 136, 139 (4th Cir. 1988) (tentative internal report not purporting to contain agency factual findings not admissible under Rule 803(8)).

entries were written in a fragmented and note-taking style.  The reader could not tell with any certainty what the entries were references to.

Mr. Lipsky also had nothing to contribute to the diaries — all he could offer was his own speculative and self-serving spin on the journals.  The journals should thus have been excluded in connection with Mr. Lipsky's testimony, under Federal Rule of Evidence 701.  *See* Advisory Committee Notes to Fed. R. Evid. 701 (Rule 701 "retains the traditional objective of putting the trier of fact in possession of an accurate reproduction of the event" and codifies "the familiar requirement of first-hand knowledge or observation").  Mr. Lipsky had no first-hand knowledge about the journals and could provide no accurate context for Mr. Sanchini's personal notes.  Mr. Lipksy was not present when Mr. Sanchini wrote in his journal, was not in attendance at any meetings that Mr. Sanchini wrote about, and had no relationship with Mr. Sanchini that would give him any insight into what Mr. Sanchini meant he made particular notations.  Because Mr. Lipsky lacked any personal knowledge about the journals, his testimony consisted only of speculation into Mr. Sanchini's state of mind.

The diaries should also not have been admitted because they contained multiple layers of hearsay within hearsay.  When a document contains hearsay within hearsay, each layer must conform with an exception.  *See* Fed. R. Evid. 805; *Burns v. Bd. of County Comm'rs of Jackson County*, 330 F.3d 1275, 1284 n.5 (10th Cir. 2003) ("Hearsay within hearsay is admissible only "if each part of the combined statements conforms with an exception to the hearsay rule.") (quoting Fed. R. Evid. 805); *United States v. Hajda*, 135 F.3d 439 (7th Cir. 1997) ("If the document contains more than one level of hearsay, an appropriate exception must be found for each level").

### K.   Introduction of P-63 (The "Putzier 30-Year History") Was Error.

Plaintiffs used in connection with their direct examination of Dr. Budnitz, over defendants' objection (*see* Defendants' Motion *in Limine* to Exclude Exhibit PX-63, filed 10/27/05), an intermingled compilation of text, handwriting, and historical documents entitled "The Past 30 Years At Rocky Flats Plant."  This compilation is largely the work of a former health physicist, Edward Putzier, who was asked by Rockwell in 1982 to prepare a history before he retired in order "to preserve some of the experiences of [the past] 30 years" in the hope that Rockwell could "benefit[] from some of them."  (P-63 at v.)  Because the document consists largely of Mr. Putzier's "recollections and perceptions," Mr. Putzier noted at the beginning of his dictated text that he is sure that "for some of it, the accuracy could be challenged."  (P-63 at v.)  The Court admitted this document.  (*See* 10/31/05 Trial Tr. at 3099.)  Because P-63 should not have been admitted into evidence, and its admission was highly prejudicial to defendants, defendants are entitled to a new trial.

First, the document is hearsay not subject to an exception.  It is not an "ancient document" because it was dictated in 1982.  It is not a "record of regularly conducted activity" under Rule 803(6) because it was not "made contemporaneously with the events."  *Echo Acceptance Corp. v. Household Retail Serv., Inc.,* 267 F.3d 1068, 1090 (10th Cir. 2001).  Mr. Putzier describes events that took place up to thirty years before he dictated the text of the document.  Furthermore, the vast majority of the document deals with Dow's conduct, and plaintiffs seek to use it against Dow.  The document cannot be used as an admission by Dow under Rule 801 (d)(2), however, because it was not made "during the existence" of Mr. Putzier's employment with Dow.  Fed. R. Evid. 801 (d)(2)(d).  Mr. Putzier dictated the report for Rockwell in 1982, seven years after his employment with Dow had ended.

Second, P-63 is replete with references to subsequent remedial measures.  Such corrective actions designed to prevent future accidents are inadmissible under Federal Rule of Evidence 407.

Third, P-63 should have been excluded because Mr. Putzier's text is interspersed with other documents and handwriting for which plaintiffs offered no foundational testimony.  Moreover, numerous documents inserted into the report are illegible.  In the case of one of these documents, an unidentified person went over the document with handwriting in an unsuccessful attempt to make it readable.  (*See* Defendants' Motion *in Limine* to Exclude Exhibit PX-63, filed 10/27/05, at 2-3.)  No one ever verified that this handwriting accurately replicates the content of the original.

Fourth, plaintiffs admitted P-63 through the testimony of Dr. Budnitz.  But this document should not have been admitted under Rule 703, which allows disclosure of materials relied upon by an expert only when their probative value in assisting the jury to evaluate the expert's opinion "substantially outweighs" their prejudicial effect.  Fed. R. Evid. 703.  Here, any marginal value the report might have had in assisting the jury to understand Dr. Budnitz's conclusions was outweighed by the danger that the jury used the otherwise inadmissible hearsay report for substantive reasons.

For these reasons, P-63 should not have been admitted into evidence.  Its admission thus constitutes yet another reason why defendants are entitled to a new trial.

### L.     The Introduction Of Testimony And Exhibits Where No Foundation Was Provided Requires A New Trial.

The plaintiffs repeatedly ignored the foundation requirement for the admission of documents and testimony.  Repeatedly, plaintiffs read documents to the witnesses and asked

them yes or no questions on whether they agreed with the documents.  Because plaintiffs were thus able to circumvent the foundation requirements, a new trial is required.

A prime example of this occurred through plaintiffs' expert witnesses.  Over defendants' objection (*see* Defendants' Objections to Exhibits Sought to be Used by Plaintiffs on Nov. 3, 2005, filed 11/2/05), plaintiffs introduced numerous historical documents through the testimony of Dr. Shawn Smallwood.  (*See* P-25, Conference on Waste Disposal at Rocky Flats; P-330, October 3, 1989 letter to Dominic Sanchini; P-1118, Historical Summation of Environmental Incidents Affecting Soils at or Near the USAEC Rocky Flats plant; P-1281, January 3, 1962 Ray letter.)  These documents should not have been admitted because Dr. Smallwood was unable to lay a proper foundation for their admission, and they were irrelevant to Dr. Smallwood's proposed testimony regarding bioturbation.  Plaintiffs retained Dr. Smallwood to "evaluate the role of soil bioturbation, or soil turnover due to biological activity, as a mechanism for exposing soil contaminates due to winds at Rocky Flats."  (Ex. 22, Smallwood Report at 1.)  The historical documents plaintiffs introduced through Dr. Smallwood do not discuss bioturbation, but instead deal with waste disposal generally.  Dr. Smallwood was qualified by this Court as an expert on bioturbation (11/3/05 Trial Tr. at 3925-26), not in the burial or disposal of radioactive waste.  Therefore, Dr. Smallwood had no foundation to testify to these exhibits, and they should not have been admitted.  (*See further* 11/17/05 Trial Tr. at 5773-74 (Wing testimony regarding classification for which no foundation had been laid).)

Admission of these testimony and documents where no foundation existed is error.  *See United States v. Garcia*, 291 F.3d 127, 140 (2d Cir. 2002) (foundational requirements goes to the admissibility of evidence not merely its weight).  Courts consistently exclude evidence where a proponent fails to lay a proper foundation for it.  *See*, *e.g.*, *Garcia-Martinez v. City and County*

*of Denver*, 392 F.3d 1187, 1195 (10th Cir. 2004) (excluding documents where no foundation for a sponsoring witness to testify regarding the documents); *Medite of New Mexico, Inc. v. NLRB*, 72 F.3d 780, 787 (10th Cir. 1995) (excluding videotape where there was an inadequate foundation of accuracy).

All of the following documents and testimony (as to which defendants have already previously objected) should have been excluded under the foundation requirements:  PV-3166 (news video clip of the FBI raid) (10/14/05 Trial Tr. at 917); PV-3114 (10/14/05 Trial Tr. at 919); PV 3120 (10/14/05 Trial Tr. at 919); 10/14/05 Trial Tr. at 1018 (R. Bartlett testimony about how much money he put into his property), 1028-29 (R. Bartlett testimony about golf project), 1030 (same (hearsay)); P-529, 10/17/05 Trial Tr. at 1127 (Holeman asked to generally describe the way Rockwell ran the plant), 1128 (Holeman asked to describe the areas of concern the governor's office had), 1175-76 (Holeman asked to testify about how ground water moves at the plant); P-314 (Johnnie Ray had never seen document before (10/18/05 Trial Tr. at 1477-81)); P-412; P-1217-1219 (photos that Ray couldn't authenticate); 10/20/05 Trial Tr. at 1859-61 (Ozaki testimony regarding guidelines from 32 years ago); P 1269, 10/25/05 Trial Tr. at 2465-66 (admitting P-1269 even though Lipsky could only say he "believed: the photos showed operation but could not conclusively say one way or the other); 11/21/05 Trial Tr. at 6101 (Bowman testimony comparing Rocky Flats publicity in the early 70s to late 80s and early 90s); PG-51A (showing class area and Bartletts location on it:  used without establishing any foundation at 10/14/05 Trial Tr. at 894).

### M.   The Admission Of Hearsay Testimony And Documents Requires A New Trial.

Hearsay testimony, which is an out-of-court statement offered to prove the truth of the matter asserted, is inadmissible.  *See* Fed. R. Evid 801(c) ("'Hearsay' is a statement, other than

one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). The admission of hearsay testimony requires a new trial. *See Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1297 (10th Cir. 1998) (admission of hearsay evidence not within any exception was substantially prejudicial to warrant a new trial).

In addition to the objections set forth elsewhere, none of the following testimony (as to which defendants have already previously objected) should have been admitted: P-64 (admitted at 10/27/05 Trial Tr. at 3047 (no authentication for ancient document, compilation not prepared "at the time," not a government report; also no foundation); P-97 (also deals with other sites); P-99; P-126; P 189; P 342 (also no foundation or authentication); P 533 (also no foundation or authentication); P 939; P1267; P 1290; P 1024; P 1025; P 1026; P 1027; P 1028; P 1029 (AEC Fire Reports) (also no foundation); P 1298; P 1317; P 1383; P 1343; 10/25/05 Trial Tr. at 2485 (hearsay testimony that plant officials were moving drums around to hide them from the CERCLA officials); 12/7/05 Trial Tr. at 6915-16 (Hunsperger relaying alleged conversation with Flynn in which he told Flynn how he would use the analogous case studies).

In addition, the following exhibits, which constitute hearsay within hearsay and as to which defendants have already previously objected, should not have been admitted: P 86, P 1234; P-1309 (also no foundation); P-193 (also no foundation)).

**N.  The Court's Exclusion Of Defense Evidence Requires A New Trial.**

**1.  The Court Should Have Allowed Dr. Fry And Mr. Voilleque To Testify.**

The Court's failure to allow defendants to call Shirley Fry and Paul Voilleque to rebut the highly prejudicial testimony of plaintiffs' witnesses warrants a new trial. Because of the Court's inconsistent rulings, factual assertions placed at issue by plaintiffs' witnesses in plaintiffs' case-in-chief went unrebutted, ultimately leaving the jury to decide the case without the benefit of all

of the facts.  Although not requiring the same of the plaintiffs' witnesses with specialized

technical knowledge, the Court held that defendants rebuttal witnesses, Dr. Fry and Mr.

Voilleque, must meet the expert disclosure requirements of Federal Rule of Evidence 26(a) in

order to testify at all.

**Dr. Shirley Fry:**  Dr. Fry should have been allowed to testify as a fact witness — based

on her personal knowledge and experience — to rebut the factual testimony of Dr. Wing.  Dr.

Wing was allowed to testify at trial that the DOE epidemiological studies were not credible, were

inadequate and that the DOE's purported "conflict of interest" affected that science.   (*See, e.g.*,

11/16/05 Trial Tr. at 5680-81, 5756-57, 5783-84.)  Despite allowing this highly prejudicial

evidence, the Court refused to allow defendants to call a single witness to rebut Dr. Wing's

testimony on this subject.  (*See* Defs.' Am. Proffer re the Test. of Shirley Fry, filed on 1/4/06;

Order on Mot. to Exclude Test. of Shirley Fry, filed 12/15/05; Order on Defs.' Mots. for

Recons., filed 1/9/06.)

Defendants timely tendered Dr. Fry as a fact witness under Federal Rule of Evidence 701,

not as an expert under Federal Rule of Evidence 702.  Dr. Fry's expected testimony would have

been based on her historical and factual knowledge of Dr. Wing and the research culture at the

DOE.  Indeed, defendants had agreed to limit Dr. Fry's testimony to two areas about which she

unquestionably has personal knowledge: (1) the allegations that Dr. Wing made about attempts

to influence or limit epidemiological studies of workers at DOE nuclear facilities, including his

own mortality study of Oak Ridge workers; and (2) the structure of the DOE radiation

epidemiology program and the studies conducted under that program.  Dr. Fry's personal

experience and observation of the program of epidemiological studies of nuclear workers in the

United States dating back to 1975 provided her with first-hand personal knowledge, establishing

her foundation to testify as a fact witness.  However, the Court refused to permit Dr. Fry to

testify at all, even regarding historical events and facts she was aware of through her personal

involvement with the DOE epidemiological research and her familiarity with Dr. Wing.

Dr. Fry spent the bulk of her career working in the field of epidemiology at DOE.  She

could have factually testified as to that work, effectively rebutting Dr. Wing's assertions.  But

she was not given that opportunity.  Instead the Court refused to allow any testimony by Dr. Fry

on the grounds that her testimony should be excluded as improper expert testimony.  *Cook v.*

*Rockwell Int'l Corp.*, 233 F.R.D. 598 (D. Colo. 2005).  Although Dr. Fry surely could have

qualified as an expert, she was not being offered as such.  Defendants did not proffer Dr. Fry to

testify in this case to any opinions based on specialized scientific or technical analysis.  Rather,

she was being offered to rebut the prejudicial *factual* testimony of Dr. Wing.  The Court's failure

to allow Dr. Fry's rebuttal testimony is grounds for a new trial.

**Paul Voilleque:**  Despite allowing plaintiffs' witnesses, Dr. Biggs and Dr. Selbin, to

testify as witnesses for the plaintiffs without submitting an expert report, the Court refused to

allow Mr. Voilleque to testify as a rebuttal witness for defendants, finding his testimony to be

improper expert testimony.  (1/2/06 Order on Motion to Exclude Testimony of Voilleque and

Grogan.)  Drs. Biggs and Selbin were permitted to testify about work involving and reflecting

their experiences and knowledge, yet Mr. Voilleque was precluded from doing the same.  There

is no meaningful distinction between Dr. Biggs' and Dr. Selbin's testimony and the proposed

testimony of Mr. Voilleque.  For example, defendants' proffer of Mr. Voilleque to testify

factually as to the work that was performed by RAC as commissioned by the Health Advisory

Panel, was no different than the factual testimony allowed by the Court when it permitted

plaintiffs' witness Dr. Biggs to testify regarding his work on the Governor's Panel and other committees.

Mr. Voilleque was offered as a fact witness to give factual and historical testimony based on his personal experience as well as his review of documents and interviews: the same sources Drs. Biggs and Selbin relied on in their testimony.  Mr. Voilleque was not retained as an expert in this lawsuit and was offered to testify about matters intrinsic to the work and conclusions that are expressed the RAC reports that were created outside of, and separate to, this lawsuit.

Defendants timely identified Mr. Voilleque as a rebuttal witnesses as soon as it became apparent that Mr. Voilleque's testimony was needed to rebut allegations made by plaintiffs in their case-in-chief.  Plaintiffs had a full and fair opportunity to depose Mr. Voilleque on the subjects of his trial testimony.  Mr. Voilleque was prepared to give factual testimony and should have been permitted to testify as a lay witness under the same standards employed by the Court in evaluating the testimony of Plaintiffs' witnesses.  The inequity resulting from the Court's rulings — allowing Plaintiffs' but not defendants' witnesses to testify — merits a new trial.

> **2.      The Court Should Have Allowed Defendants To Use Charles McKay's Deposition At Trial.**

Defendants sought to introduce Charles McKay's deposition at trial.  During his deposition, Mr. McKay offered testimony that would have rebutted many of plaintiffs' claims in this case.  For example, McKay would have testified that:

- That he repeatedly tested his property and found no contamination.  (Ex. 3, 11/15/05 McKay Dep. at 150-54.)

- That what the press wrote about Rocky Flats was "hogwash."  (*Id.* at 143.)

- That he has no concerns about his personal health from Rocky Flats.  (*Id.* at 148.)

- That Mr. McKay had no health concerns about eating fish from Rocky Flats Lake.  (*Id.* at 134-35.)

- That it was safe to drink water from Bathtub Spring, near the Rocky Flats plant.  (*Id.* at 137.)

- That he raises cattle near Rocky Flats and that they are perfectly safe to eat.  (*Id.* at 137-39.)

Introduction of this testimony would have changed the outcome of the trial.  Mr. McKay's testimony would have rebutted plaintiffs' claims that there are health risks from living near Rocky Flats.  Because Mr. McKay is a party for relevant purposes,[48] his statements can be used at any time as party admissions.  Fed. R. Civ. P. 32(a)(1) ("Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of deponent as a witness, or for any other purpose permitted by the Federal Rules of Evidence.").  Plaintiffs have cited no cases for the proposition that Fed. R. Civ. P. 32(a)(1) is inapplicable to class members.

### 3.    Dr. Till Should Have Been Allowed To Testify To The ATSDR's Conclusions.

The Court allowed Drs. Smallwood and Goble to testify about the current state of what was formerly the plant (now a wildlife refuge) even though such testimony went beyond the scope of their expert reports.  Defendants sought to have Dr. Till respond to this testimony by testifying about the conclusions of the ATSDR, that Rocky Flats does not pose any health risk today.  The Court excluded this testimony.  (12/15/05 Trial Tr. at 8286-89.)  The Court should

---

[48]   *See Joseph v. Wiles*, 223 F.3d 1155, 1168 (10th Cir. 2000) ("Mr. Joseph has effectively been a party to an action against these defendants since a class action covering him was requested but never denied); *Walters v. Edgar*, 163 F.3d 430, 432 (7th Cir. 1998) ("the suit had been certified as a class action, which would make the unnamed class members parties to the suit unless and until they opted out"); *McCubbrey v. Boise Cascade Home & Land Corp.*, 71 F.R.D. 62, 72 (N.D.Cal. 1976) ("[a]bsent class members are parties to an action, properly before the court, and are subject to its judicial orders"); *Strauss v. Rent-A-Center,* 2005 WL 2647893 at * 3 (M.D.Fla. 2005) (attached as Ex. 23) ("both Defendant and Plaintiff were parties in *Wilfong*.  Although Plaintiff was not named party in *Wilfong*, she was a class member who never exercised her right to opt-out of the lawsuit.  As a class member, plaintiff stood as a party to *Wilfong*.").

have allowed this testimony, because it was rebuttal testimony, and therefore did not need to be — indeed, could not have been — disclosed as part of an expert report.  (*See* 12/09/05 Trial Tr. at 7187-88 ("[I]f they are rebutting direct testimony that was presented in your case in chief, they have the right to do that. . . . [if] it's rebuttal testimony and refers to a specific statement made by one of your experts, then it's appropriate, even though it's not contained in his report").)

## VI.   THE COURT'S FAILURE TO GRANT DEFENDANTS' MOTIONS FOR MISTRIAL WARRANTS A NEW TRIAL.

For the convenience of the Court and court personnel, defendants note that the Court has previously considered, and rejected, defendants' arguments in Section VI below.[49]

### A.   The Court Should Have Declared A Mistrial Based Upon The Circumstances Surrounding Juror X's Departure From the Jury.

Defendants will not belabor here their mistrial motions relating to Juror X, the latest of which was filed July 20, 2006.  In its memorandum opinions of December 7, 2006 ("Order on Defendants' Second Renewed and New Motion for Mistrial"), the Court rejected the last of those motions.  Defendants respectfully disagree with the Court's December 7, 2006 opinion on Juror X for the reasons stated forth in their previous mistrial motions relating to Juror X, including in the most recent motion filed on July 20, 2006.

### B.   The Court Should Have Granted Defendants' December 28, 2005 Motion for Mistrial Based on Plaintiffs' Consistent Suggestions That The DOE Abused Its Classification Power.

As Defendants argued in their Memorandum in Support of Defendants' Motion for Mistrial or, In the Alternative, Defendants' Proposed Instructions, filed 12/28/05, and

---

[49]   The orders in which the Court rejected these arguments include the following:  December 7, 2006 Order on Defendants' Second Renewed and New Motion for Mistrial; May 10, 2006 Order re Defendants Renewed Motion for Mistrial and Related Juror Affidavits; March 13, 2006 Order on Pending Motions Filed Under Seal.

Defendants' Reply in Support of Defendants' Motion for Mistrial or, In the Alternative, Defendants' Proposed Instructions, filed 1/6/06, the Court should have ordered a mistrial based on plaintiffs' consistent improper suggestions to the jury that (a) classified material would have been useful to their prosecution of the case, but they were unable to obtain it and present it to the jury due to its classified nature; and (b) that the DOE improperly used its classification power and control of documents to prevent plaintiffs and the general public from accessing relevant information.  *See further infra* at Section V.A.2.

### C.    The Court Should Have Granted Defendants' Motion For Mistrial Based on Dr. Wing's Testimony Regarding Alleged DOE Human Experiments.

On November 17, 2005, prior to the testimony of plaintiffs' witness Stephen Wing, defendants objected to the introduction of any evidence of human experiments as being irrelevant and unduly prejudicial.  The Court ruled that plaintiffs could go into experiments generally, but specifically may not go into involuntary experiments conducted by the DOE. (11/17/05 Trial Tr. at 5717-18.)  Despite this, plaintiffs once again violated a ruling of the Court, eliciting testimony that the DOE "directed 13 experiments where people were exposed to radiation without telling anybody about it."  (*Id.* at 5785-86.)  Defendants' motion for mistrial was denied.  (*Id.* at 5787.)  Defendants reiterate their request to this Court to grant a new trial based both on attorney misconduct and upon the fact that the introduction of evidence of DOE human experiments was irrelevant and highly prejudicial.

### D.    The Court Should Have Granted Defendants' Motion for Mistrial Based On Plaintiffs' Repeated And Improper Violations Of the Court's Order on Worker Safety.

Defendants moved for a mistrial on October 25, 2005 after plaintiffs suggested to the jury that there was a nuclear reactor at Rocky Flats.  (10/25/05 Trial Tr. at 2497.)  For the reasons stated in Section V.D, this motion should have been granted.

## VII. DEFENDANTS ARE ENTITLED TO A NEW TRIAL BECAUSE PLAINTIFFS' CLAIMS SHOULD NOT HAVE BEEN TRIED AS A CLASS.

For the convenience of the Court and court personnel, defendants note that the Court has previously considered, and rejected, defendants' arguments in this Section VII.[50]

In *Cook IV*, 151 F.R.D. 378, the Court certified a medical monitoring and a property class over defendants' objections (*see* The Dow Chem. Co.'s Br. in Opp'n to Pls.' Mot for Class Certification, filed 8/16/93; Rockwell's Mem. in Opp'n to Pls.' Mot. for Class Certification, filed 8/16/93.  In doing so, the Court noted its power under Rule 23(c) to "alter or amend my decision . . . If individual questions arise during the course of litigation, which render the action unmanageable, I have the power at that time to dismiss the class action and permit each plaintiff to proceed only on behalf of himself or herself."  *Id.* at 389.  In 1998, defendants brought a motion for decertification of both classes.  Among other things, defendants argued that class certification is inappropriate in mass tort cases, that there was no track record for cases of this type, and that the inherent difficulty of proving class-wide damages meant that no efficiencies would be gained through a class-wide trial.[51]  Although the Court granted defendants' motion to decertify the medical monitoring class, it denied defendants' motion to decertify the property class.  *Cook v. Rockwell Int'l Corp.*, 181 F.R.D. 473, 480-82 (D. Colo. 1998) ("Cook VIII").  The Court's decision was premised, in part, on the notion that a class-wide trial would be more

---

[50]   The orders in which the Court rejected these arguments include the following:  May 17, 2005 Order; April 14, 2004 Opinion; *Cook IX*, 273 F. Supp. 2d 1175; *Cook v. Rockwell Int'l Corp.*, 181 F.R.D. 473 (D. Colo. 1998) ("Cook VIII"); *Cook IV*, 151 F.R.D. 378.

[51]   (*See* Defs.' Br. in Support of Their Combined Mots. for Summary J'ment and Decertification of the Classes, Filed 12/09/96 and Defs.' Reply Brs. in Support of Their December 1996 Mots for Summary J'ment and Class Decertification, filed 08/5/97.)

efficient than individual trials.[52]  The Court later decided to try the claims of the property class in a class trial over defendants' objections (*see* May 17, 2005 Order; Defs.' Resp. to Pls.' Statement Regarding Alleged Forms of Interference With Use and Enjoyment, filed November 30, 2004; Defs.' Resp. to Pls.' Proposed Plan for Determination of Compensatory Damages, filed 7/21/04, at 9.)  Now that trial has come to a close, however, it is evident that intractable obstacles remain before any final judgment can be entered in this case.  (*See* Defs.' Resp. to Pls.' Mem. of Law in Support of Pls.' Mot. for Entry of J., filed contemporaneously herewith.)

A.   **Plaintiffs' Trespass Claims Should Not Have Been Tried on a Class-Wide Basis.**

In order to recover for trespass, plaintiffs had to prove that Dow or Rockwell "caused plutonium from Rocky Flats to be present on the ***Class Properties.***"  (Instruction No. 3.3) (emphasis added.)  Tellingly, while plaintiffs called a number of experts to testify to an array of topics ranging from Dow's conduct (Budnitz) to the DOE's alleged underfunding of plutonium studies (Wing), ***not one*** expert testified that plutonium is present on all class properties today, or that it was present on all class properties as of the class date (June 7, 1989).

Instead, plaintiffs relied on two 1970s sampling studies that were done by: (1) Krey and Hardy (P149A); and (2) Poet and Martell (P939).  But these studies do not prove the existence of plutonium released by Rocky Flats on all class properties even as of the time the contours were drawn, and they certainly do not prove that plutonium was present as of June 7, 1989, much less as of today.  The scientists who conducted these studies took very few samples in the class area.

---

[52]   *Cook VIII*, 181 F.R.D. at 482 ( "significant complexities and expense incurred in the discovery to date and extensive motion practice associated with this case, support a finding of superiority of the class action as it relates to the Property Class to other available forms of adjudication.").

(*See* DX1167, Budnitz testimony, 10/31/05 Trial Tr. at 3342-43 (Krey & Hardy had 33 monitoring stations, but Budnitz does not know how many were in the class area; Poet & Martell took fewer samples); Budnitz testimony, 11/1/05 Trial Tr. at 3572 (Poet & Martell only went out 2-4 miles east of the Plant)).  And plaintiffs' own expert witness testified that, even after extrapolation and interpolation, "much of the class area is not touched by the Poet & Martell contours." (Budnitz testimony, 10/31/05 Trial Tr. at 3332.)

Not only did Krey & Hardy and Poet & Martell fail to measure plutonium throughout the class area, but the amounts their studies did find were no greater than background for a large number of locations.  (*See* Budnitz testimony, 10/31/05 Trial Tr. at 3335-37 (some plutonium levels found by Poet & Martell indistinguishable from background; some found by Krey & Hardy indistinguishable from that found from worldwide fallout in places like New York, even though Colorado historically has higher levels due to fallout patterns).)  Dr Budnitz testified: "It's most likely that those are worldwide fallout numbers, which vary, you know, from place to place, that's most likely." (*Id.* at 3337; *see also id.* at 3117 ("as they got further out, [Krey & Hardy] found it increasingly difficult to separate plutonium they measured from plutonium, that might have occurred — excuse me, that did occur, from fallout.").)  Moreover, large sections of the class area have been subject to significant development since the early 1970s.  (*See* DV1, Till video ("as of 1969, there was very little development in the class area. By 1989, however, the class had become well developed . . . building, concrete, and asphalt now cover what used to be undeveloped  soil . . . [s]everal feet of soil are excavated when preparing the foundation of a new home."); DX2188A (Dorchester video concerning development)), and plaintiffs failed to show that the soil remaining after this development contained plutonium.

Some plaintiffs had their property tested for plutonium, and results indicated plutonium concentrations below background amounts.  For example, the Bartletts each testified that they had the soil on their property tested for plutonium, and were told that the soil sample results were "not above standards," such that soil "was within normal limits" and "it was safe to build on." (S. Bartlett testimony, 10/14/05 Trial Tr. at 959-61; R. Bartlett testimony, 10/14/05 Trial Tr. at 1060-61); P962 (Bartlett property sample showing plutonium less than background).  Similarly, test results showed that the maximum concentration of plutonium on Merilyn Cook's property was well below background levels.  (*See* P1230 & P1231 ("[The samples] average 0.055 plus or minus 0.031 picocuries per gram.  The maximum value of 0.12 is 13 percent of the Colorado Department of Health guidelines of two disintegrations per minute per gram.").  Repeated tests on Charles McKay's properties likewise found no plutonium contamination.  (*See, e.g.*, McKay Dep. at 150-54)

But even if these samples had shown plutonium contamination in individual cases, they cannot be used in a class trial because they are not "common evidence" that applies to the class as a whole.  *See*, *e.g.*, *Blades*, 400 F.3d at 571 ("every member of the proposed classes" must "prove with common evidence that they suffered impact from the alleged conspiracy.").[53]  A plutonium sample on one property does not prove the existence of plutonium on another.  And many plaintiffs never had their properties tested.  (*See* Babb testimony, 10/20/05 Trial Tr. at 1971; Robb testimony, 11/10/05 Trial Tr. at 5028; Whalen testimony, 11/21/05 Trial Tr. at

---

[53]  *See also Weisfeld v. Sun Chem. Corp.*, 210 F.R.D. 136, 144 (D.N.J. 2002), *aff'd*, 84 Fed. Appx. 257 (3d Cir. 2004) ("Plaintiff must establish that each class member has, in fact, been injured by the alleged conduct."); *Broussard v. Meineke Discount Mufflers Shops, Inc.*, 155 F.3d 331, 340-42 (4th Cir. 1998); *Sprague v. G.M.C.*, 133 F.3d 388, 398-99 (6th Cir. 1998) (class relief not available where "[a] named plaintiff who proved his own claim would not necessarily have proved anybody else's claim").

5956.)  These class members cannot use plutonium samples taken on other properties to prove contamination on their own properties.

    **B.**    **Plaintiffs' Nuisance Claims Should Not Have Been Tried on a Class-Wide Basis.**

    Nuisance is a "substantial invasion of an individual's interest in the use an enjoyment of his property.  *Hoery*, 64 P.3d at 218.   In order to determine whether an interference is "substantial and unreasonable," the jury must weigh the "***extent*** of the harm" against the "utility of the conduct causing the harm."  *See Cook IX*, 273 F. Supp. 2d at 1202 ("Under Colorado law, whether the defendant has unreasonably and substantially interfered with the plaintiff's use and enjoyment of his property is a factual question to be decided by the trier of fact.  In making this determination, ***the trier of fact must weigh the <u>gravity</u> of the harm*** and the utility of the conduct causing the harm.") (emphasis added); *see also Van Wyk*, 27 P.3d at 392.  As plaintiffs themselves argued in connection with the jury instruction process, "the extent of the harm involved" is an "important" factor in the jury's weighing process.  Plaintiffs' Proposed Nuisance Jury Instruction No. 14. (emphasis added).  It follows that an individual nuisance plaintiff must prove (at a minimum) "the extent of the harm" from an alleged interference.  As defendants have argued previously, "the extent of the interference[s]" claimed by plaintiffs (and nuisance generally) should not have been part of a class-wide trial, because the evidence regarding "the extent of the interference" is not "identical or nearly identical" among class members.

    Nonetheless, the Court allowed plaintiffs to attempt to prove two forms of interference on a class-wide basis: (1) that defendants caused "Class members to be exposed to plutonium and placing them at some increased risk of health problems as a result of this exposure;" and (2) that defendants caused "objective conditions that pose a demonstrable risk of future harm to the Class Area."  (5/17 Order at 5-6.)  The Court also stated that "I will instruct the jury, however, that

they must find ***all*** class members were exposed to plutonium, and incurred some increased health

risk . . . and they may only consider the magnitude of the common class-wide health risk . . ."

(5/17/05 Order at 5 (emphasis added).)  (In fact, the Court did not instruct the jury that all class

members must have been exposed.  (*See* Instruction No. 3.6 (word "all" omitted from

instruction).)  At any rate, the trial evidence proved that some class members did not experience

any interference with the use and enjoyment of their properties.

Plaintiffs' sole exposure expert - Dr. Robert Goble - confirmed that there was tremendous

variability in alleged exposures to class members:

> For people living in the area, ***the exposures and the risks could have been really***
> ***different, depending on when people were there***.

> In particular, if people weren't there for, say, the '57 fire, they wouldn't have had
> an exposure to the '57 fire.

> So depending on where — when they were there, depending on where they —
> where they were living or spending their time, and depending on lots of other
> individual characteristics, ***there would be quite a range of exposures and quite a***
> ***range of risks***.

> Q.  Okay.  So when you say, In my judgment these exposures were significant and
> were sufficient to cause latent diseases among members of the exposed group,
> you're not talking about everyone that lived in the class area?  In other words, not
> everyone had a significant exposure?

>  A.  Well, some of the exposures for people living in the class area were really
> small.  And significance, you might call sort of a policy to when you take it
> seriously.  But ***some of these are very, very small exposures.  And, for instance,***
> ***regulatory agencies would not have been concerned about such exposures***.

(Goble testimony, 11/2/05 Trial Tr. at 3660-61) (emphasis added).  Defendants' expert evidence

underscored the variability of potential exposures.  (*See*, *e.g.*, 12/15/05 Trial Tr. at 8267-81; DV

1 (Till video).)

Some plaintiffs ***never lived*** in the class area — or even in Colorado — and thus ***could not***

have been exposed to plutonium or experienced any increased health risk.  For instance, named

plaintiff Gertrude Babb testified that she bought property in the class area so that her daughter could operate a horse farm.  (Babb testimony, 10/20/05 Trial Tr. at 1953-54.)  She never lived on this or any other class property.  (*Id.* at 1953.)  Similarly, Ms. Cook did not live on her class property.  (10/21/05 Trial Tr. at 2042.)  These plaintiffs stand in contrast to other plaintiffs, who did live on their property, such as the Schierkolks and Bartletts.  (10/20/05 Trial Tr. at 1890.)  Plaintiffs presented no evidence that those who lived on their property experienced a common health risk with those who lived off the property.

The evidence at trial showed that some class members did not experience ***any*** interference with the use and enjoyment of their properties, much less a substantial interference.  Charles Ozaki — who owned property in the middle of the class area as of 6/7/89 but who was not even aware that he was a class member until the middle of his cross-examination — testified that "[i]t didn't cross my mind" to be "worried about my property from Rocky Flats." (Ozaki testimony, 10/20/05 Trial Tr. at 1832.)  Other plaintiffs agreed that defendants did not interfere with the use and enjoyment of their properties.  Named plaintiff William Schierkolk testified that he likes his home and does not want to move.  (Schierkolk testimony, 10/20/05 Trial Tr. at 1944-45.)  Developer Charles McKay — who plaintiffs chose not to call as a witness —was not aware of any evidence of health risks on his properties, and indeed was content with having his grandchild drink water from a well close to the plant.  (Ex. 3, McKay Dep. at 56-57, 153)  Ms. Whalen's sister, another class member, had no concerns about living and owning property within the class area.  (Whalen testimony, 11/21/05 Trial Tr. at 5954.)  These class members should not be permitted to recover simply because their claims are presented in a class context instead of an individual lawsuit.

Nor did it cure the problems with this class trial to instruct the jury regarding the "least common denominator" of harm.  For example, the jury was instructed:

> In deciding whether any interference proven by Plaintiffs is substantial under this test, you must consider only the magnitude or level of interference that is common to the class as a whole, and not any more severe level of interference that may have been suffered by some class members but not by others (Instruction No. 3.9)
>
> . . .
>
> In assessing the extent of the harm, you must also consider only harm that is common to the class as a whole, and not any more severe harm that may have been suffered by some Class members but not by others (Instruction No. 3.11)

The Court's use of "least common denominator" instructions to attempt to "cure" the problems with this classwide trial is unprecedented, and only confirms the impropriety of this trial proceeding as a class action in the first place.  Where the requirements of the Federal Rules are not met, Rule 23 prohibits class action treatment.  Neither Rule 23 nor any of the caselaw interpreting Rule 23 provides that, even if the requirements of the Federal Rules are not met, a case may be tried as a class action if the jury is instructed to disregard the non-classwide elements of the claim.  Nor have plaintiffs ever cited any precedent - state or federal - for this novel approach.  The use of jury instructions to attempt to cure the fact that a "class" trial involves non-classwide claims is particularly problematic where, as here:  (i) the parties conducted no discovery as to non-classwide issues (*e.g.*, discovery regarding the quantification of the "least common denominator" of exposure among the class); (ii) the parties conducted no discovery targeted to identify which class member suffered the "least common denominator" of harm; (iii) the trial evidence was not restricted to the "least common denominator" of harm; and (iv) the parties' expert reports and testimony were not targeted to non-classwide issues, such as to the identification of what class member suffered the "least common denominator" of harm, or what the quantification of that harm was.

Finally, there was no class-wide evidence at trial of any "demonstrable risk of future
harm" - the second form of interference that the Court permitted plaintiffs to try on a classwide
basis.  (*See* Instruction No. 3.7)  For example, as discussed above, many class members did not
own property in the class area after June 7, 1989, and thus could not have been subject to such
"future harm."   In response, plaintiffs have argued in the past that, even for "future harm" that
supposedly may occur in (for example) 2008, each plaintiff who moved out of the class area in
(for example) 1990 suffered Section 930 "damages" from such future releases as of June 7, 1989
(the date that defines the class).  However, without actual health consequences to an individual
class member stemming from that "future" harm (which do not exist if that *potential* harm did
not occur before the move), "damages" from such releases cannot even begin to constitute an
"interference with use and enjoyment."  *See Cook IX*, 273 F. Supp. 2d at 1209 ("[A] decrease in
the value of Plaintiffs' properties is not, in and of itself, an interference with the Plaintiffs' use
and enjoyment of these properties.").

In sum, plaintiffs' failure to prove any classwide nuisance constitutes another reason why
plaintiffs' claims should not have been the subject of a class trial.

**C.    Plaintiffs' Damages Claims Should Not Have Been the Subject of a Class
Trial.**

Like plaintiffs' trespass and nuisance claims, plaintiffs' damages claims also should not
have been the subject of a class trial.  (*See* Defendants' Response to Plaintiffs' Proposed Plan for
Determination of Compensatory Damages, filed July 21, 2004, as well as Defendants' Motion
for Judgment as a Matter of Law, Motion for New Trial, and Opposition to Plaintiffs' Motion for
Judgment, all filed contemporaneously herewith.)

The trial evidence confirmed the individuality of plaintiffs' damages claims.  Plaintiffs
failed to prove any damages experienced ***by the class***, which is defined as individuals who

owned property in the class area as of June 7, 1989.  *See Cook VIII*, 181 F.R.D. at 475 n.3.

Plaintiffs' experts measured the value of *properties* within the class area within each year from

1988 to 1995.  (*See* DX1085, Radke Chart)  However, plaintiffs' experts did not measure

whether a diminution in value was experienced by any *class members* as a result of Rocky Flats.

(*See* Wise testimony, 1/5/06 Trial Tr. at 9073)  The class definition required only that members

own their properties as of June 7, 1989.  It did not impose any limits as to how far before June 7,

1989 class members bought their properties, or as to how long after June 7, 1989 class members

sold their properties (if at all).  *See Cook VIII*, 181 F.R.D. at 475 n.3.  Accordingly, thousands of

class members purchased their properties before 1988 (the first year analyzed by

Radke/Hunsperger), and thousands more sold their properties after 1995 (the last year analyzed

by Radke/Hunsperger).

Because Dr. Radke only studied the period from 1988-1995 — and found that there was a

pre-existing difference before 1989 between class property values and Denver metro area

property values (*see* DX1085, Radke Chart) — he admitted that he had not determined whether

anyone (much less anyone in the class) had lost money as a result of Rocky Flats:

> Q.  You've not actually determined whether anybody lost money
> in this  marketplace?
>
> A.  Correct, I haven't done that study.
>
> Q.  Right.  In order to do that study you would have to go back and
> find out for the people that owned in '88, '89, '90, etc., you have to
> find out when  they bought, at what price they bought, and when
> they sold?
>
> A.  Correct.
>
>                       *   *   *
>
> Q.  Just to be clear, you haven't done that, right?
>
> A.  That wasn't possible.

(Radke testimony, 10/26/05 Trial Tr. at 2812, 2814-15)

To illustrate this point, thousands of class members sold their properties after 1995 (or still have not sold their properties).  Because plaintiffs' experts did not measure a diminution in value after 1995, plaintiffs' experts could not say whether the thousands of class members who sold their properties after 1995 experienced a *loss* caused by Rocky Flats — that is, an *increase* in the "Rocky Flats discount" between the date they purchased their property and the date they sold their property.  In fact, Dr. Radke's own results showed the "Rocky Flats discount" decreasing between 1992 (when the discount was 9.18%) and 1995 (when the discount was 5.45%).  *See Ario v. Metro. Airports Comm'n*, 367 N.W.2d 509, 515 (Minn. 1985) ("If, for example, plaintiff buys a Zone 1 house in 1980, he presumably buys at a market price already discounted for aircraft noise existing at that time.  Plaintiff has no diminution in market value of his property unless he shows that the noise level has increased since 1980 and such increase has measurably depressed the value of his property.").  Thus, plaintiffs' experts could not say whether class members experienced a *loss* caused by Rocky Flats — that is, an *increase* in the "Rocky Flats discount" between the date they purchased their property and the date they sold their property.  (*See further* Defs.' Response to Pls.' Mot. For J'ment as a Matter of Law filed 1/17/06.)

Moreover, as discussed *supra*, while some class members claimed at trial that Rocky Flats did have an effect on the value of their properties (*e.g.*, R. Bartlett testimony, 10/14/05 Trial Tr. at 1019), others testified that it did not.  (*See*, *e.g.* Ozaki testimony, 10/20/05 Trial Tr. at 1873-74 (testifying to appreciation of $45,000); Bowman testimony, 11/21/05 Trial Tr., at 6092-94 (testifying to tenfold increase in value of land over 30-year period); Ex. 3, McKay Dep. at 187-89 (no impact on land at Cimarron Park and Great Western properties).)  Plaintiffs' expert

evidence shows the same variation among class members.  (Hunsperger testimony, 12/6/05 Trial Tr. at 6568 ("I selected 10 percent on average, across the subject class area.  The highest diminution being closer to Rocky Flats or lowest — diminishes the further away you go from the plant."); *see also* Ex. 4, Final Report: Rocky Flats Health & Housing Survey at Figure 4.7 (16.1% of survey respondents would buy a house with no discount within 2-4 miles of Rocky Flats; an additional 15.1% of respondents would buy a home within 4-6 miles of Rocky Flats with no discount); 10/21/05 Trial Tr. at 2100-02 (mini-summation of Mr. Davidoff).)

Making matters worse, now that plaintiffs' damages claims have been tried on a class-wide basis, they cannot give rise to a judgment, for reasons that are set forth in greater detail in Defendants' Response to Plaintiffs' Memorandum of Law in Support of Plaintiffs Motion for Entry of Judgment.  As set forth in that filing, these problems include:  (i) the judgment does not provide a basis for determining damages suffered by individual class members; and (ii) there is no way to record easements on each of the class properties (many of which are no longer owned by class members), as would be required for a judgment to be entered pursuant to Section 930. In short, the intractable problems with converting the jury's verdict into a judgment only confirm why the damages claims should not have been certified and tried as a class in the first place.

**D.     The Class Trial Left Many Issues to Be Resolved in This Case.**

The many issues that still need to be resolved in this case include, but are not limited to:

- The intractable problem of translating the jury's aggregate damages award into actual dollar amounts awarded to individual plaintiffs.

- The jury did not determine a damages amount for the Section 930 Subclass.

- For the members of the sub-class who sold their properties before January 30, 1990 (the Non-Section 930 Subclass), additional proceedings are necessary to adjudicate claims for non-Section 930 damages.  (*See* 5/17/05 Order at 16 ("The availability and means of determining any compensatory damages due this sub-class [of class members not entitled to prospective damages under Restatement § 930(3)(b)] if defendants are found liable in trespass or nuisance will be decided after the class trial.").

162

- The jury did not determine damages for Section 929 claims.

- Fear-based nuisance claims (the jury decided whether defendants' conduct was capable of causing fear, but the Court has determined that whether defendants' conduct actually caused fear in individual class members will require individual determinations).  *See* 4/14/04 Order at 8 (issue of whether "individual Plaintiffs or Class members are or might be fearful, anxious or otherwise disturbed by any real or perceived risks relating to Rocky Flats and the defendants' activities there or the conditions they left behind" not part of class wide trial).

- Procedures for determining the language of the easement that will be imposed on class properties, and how such an easement would be recorded.

- The named plaintiffs' medical monitoring claims.

In short, extensive proceedings are required before this case can be resolved.  These proceedings will necessarily be overwhelmingly focused on individual evidence. The very existence of these remaining proceedings highlights the shortcomings in the class trial that has taken place.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that this Court grant a new trial or, in the alternative, a remittitur.

Dated:  January 22, 2006

Respectfully submitted,

s/ John E. Tangren_____
One of the Attorneys for the Defendants
David M. Bernick
John E. Tangren
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, Illinois 60601-6636
Phone:  312-861-2000
Fax:     312-861-2200

Joseph J. Bronesky
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, Colorado 80202

Phone:  303-297-2900
Fax:      303-298-0940

Attorneys for ROCKWELL
INTERNATIONAL CORPORATION and
THE DOW CHEMICAL COMPANY

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on January 22, 2007 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses for the following:

Peter B. Nordberg, Esq.
BERGER & MONTAGUE P.C.
1622 Locust Street
Philadelphia, PA  19103
pnordberg@bm.net
kmarkert@bm.net


Gary B. Blum, Esq.
SILVER & DEBOSKEY
The Smith Mansion
1801 York Street
Denver, Colorado 80206
blumg@s-d.com


<u>s/ Courtney Biggins</u>
Courtney Biggins (legal assistant)