--- F.3d ----                                                                                                                                          Page 15
--- F.3d ----, 2006 WL 3755189 (C.A.9 (Alaska)), 06 Cal. Daily Op. Serv. 11,701
**(Cite as: --- F.3d ----)**

Exxon's disregard of the potential harm to the crew and rescuers because they are not plaintiffs to this litigation. Exxon misreads *State Farm*. *State Farm* disapproved punishing defendants for conduct in other states in which it might be lawful. 538 U.S. at 421, 123 S.Ct. 1513. Likewise, we had held in *White v. Ford Motor Company*, before *State Farm* came down, that a jury's punitive damages award based on extraterritorial conduct (plaintiff's lawyer had made a "send them a message" argument addressing nationwide conduct) violated principles of federalism established in *BMW v. Gore*. 312 F.3d 998, 1013-14 (9th Cir.2002). These cases do not prohibit consideration of the potential harm to individuals merely because they are not plaintiffs. *See* 538 U.S. at 420-22, 123 S.Ct. 1513. The lesson is that the award in the other litigation "should have been analyzed in the context of the reprehensibility guidepost only." *Id.*; *BMW v. Gore*, 517 U.S. at 574 n. 21, 116 S.Ct. 1589. *State Farm* therefore holds it is appropriate to look at the risk to others in analyzing reprehensibility. *State Farm*, 538 U.S. at 427, 123 S.Ct. 1513.

**\*17** *State Farm* does warn against considering dissimilar acts of the defendant, or what is described as acts "independent from the acts upon which liability was premised." *Id.* at 422, 123 S.Ct. 1513. The Court explained this is because "[a] defendant should be punished for the conduct that harmed the plaintiff, not for being an unsavory individual or business." *Id.* at 423, 123 S.Ct. 1513. Here, however, the conduct that threatened the safety of the crew and rescuers is the same conduct that harmed the plaintiffs, and is the conduct that underlies this punitive damages litigation: Exxon's knowingly placing a relapsed alcoholic in charge of the *Exxon Valdez*. The prohibition in *State Farm* against considering dissimilar acts does not apply here because taking into account the potential harm to the crew and rescuers punishes Exxon for the same conduct that harmed the plaintiffs. We have made this point before. See, for example, *Hangarter v. Provident Life and Accident Insurance Co.*, 373 F.3d 998, 1015 n. 11 (9th Cir.2004), where we analyzed company-wide policies in a single-plaintiff lawsuit and distinguished *State Farm's* warning against considering dissimilar acts. We said "unlike in *State Farm*, a legally sufficient nexus existed between Defendant's allegedly widespread corporate policies and the termination of [the plaintiff's] benefits." *Id.*

Accordingly, where the same conduct risked harm to all, the risk to all can be considered as a factor in assessing reprehensibility. The district court did not err in recognizing that Exxon recklessly disregarded the physical safety of the crew and rescuers, and thereby increased the reprehensibility of its conduct in putting Hazelwood in command.

c. *Financially Vulnerable Targets.*

The district court found Exxon's conduct harmed financially vulnerable subsistence fishermen. *District Court Opinion*, 296 F.Supp.2d at 1095. Exxon does not dispute that subsistence fishermen were financially vulnerable or that its reckless actions harmed them. It does contend that this factor applies only in fraud cases when a defendant intentionally defrauds financially vulnerable targets, such as the sick or elderly. While we do not believe the subfactor is so limited, we agree there must be some kind of intentional aiming or targeting of the vulnerable that did not occur here.

The purpose of reprehensibility analysis is to determine "the enormity" of the offense, which "reflects the accepted view that some wrongs are more blameworthy than others." *BMW v. Gore,* 517 U.S. at 575, 116 S.Ct. 1589. The notion of "targeting" connotes some element of intent to harm particular individuals or categories of individuals. *See Planned Parenthood*, 422 F.3d at 958-59 (holding plaintiffs were financially vulnerable because the defendants' threats attempted to scare the plaintiffs into quitting the jobs on which the plaintiffs' livelihoods depended). Exxon did not intentionally target subsistence fishermen.

**\*18** We conclude in this case that this consideration does not materially affect our assessment of the reprehensibility of Exxon's conduct.

d. *Repeated Action.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                                            Page 16
--- F.3d ----, 2006 WL 3755189 (C.A.9 (Alaska)), 06 Cal. Daily Op. Serv. 11,701
**(Cite as: --- F.3d ----)**

The district court found that the conduct was repetitive because Exxon repeatedly allowed Hazelwood to command its supertankers for three years after it knew he had resumed drinking. *District Court Opinion,* 296 F.Supp.2d at 1096. As the district court observed, Exxon did so, even though Exxon was fully aware of the tremendous risk of harm that it entailed. *Id.* "Over and over again, Exxon did nothing to prevent Captain Hazelwood [from sailing] into and out of Prince William Sound with a full load of crude oil." *Id.*

*Exxon argues that the relevant conduct is the grounding,* not the knowledge of Hazelwood's incapacity to command. That is not consistent with our description of the relevant misconduct in *Punitive Damages Opinion I* as putting (and leaving) Captain Hazelwood in command. *Punitive Damages Opinion I,* 270 F.3d at 1237-38. The district court's finding of repetitive misconduct was not clearly erroneous. *Planned Parenthood,* 422 F.3d at 954. It militates in favor of increased reprehensibility.

e. *Intentional Malice or Mere Accident.*

Putting Captain Hazelwood in command of the supertanker was knowing and reckless misconduct. We agree with the district court that this misconduct was not "mere accident." *District Court Opinion,* 296 F.Supp.2d at 1096.

Exxon points out that relieving Hazelwood of command would have denied Hazelwood an employment opportunity on the basis of alcoholism and theoretically subjected Exxon to a disability discrimination lawsuit. While Exxon's concerns may have been appropriate considerations in its evaluation of the risk, they do not justify the dangers its decision created to the livelihoods of tens of thousands of individuals. Spilling the oil was an accident, but putting a relapsed alcoholic in charge of a supertanker was not. And anyone doing so would know they were imposing a tremendous risk on a tremendous number of people who could not do anything about it. Exxon's knowing disregard of the interests of commercial fishermen, subsistence fishermen, fish processors, cannery workers, tenders, seafood brokers and others dependent on Prince William Sound for their livelihoods, cannot be regarded as merely accidental.

At the same time, we must acknowledge that Exxon acted with no intentional malice towards the plaintiffs. We have consistently treated intentional conduct as more reprehensible than other forms of conduct subject to punitive damages. *See Zhang,* 339 F.3d at 1043; *Bains LLC v. Arco Products Co.,* 405 F.3d 764, 775 (9th Cir.2005); *Southern Union Co. v. Southwest Gas Corp.,* 415 F.3d 1001, 1011 (9th Cir.2005). In this case, however, as we have already recognized, "as bad as the oil spill was, Exxon did not spill the oil on purpose." *Punitive Damages Opinion I,* 270 F.3d at 1242-43. While the reprehensibility of Exxon's conduct that produced economic harm to thousands of individuals is high, the conduct did not result in intentional damage to anyone. This subfactor thus militates against viewing Exxon's misconduct as highly reprehensible. *Id.*

f. *Mitigation of Reprehensibility.*

**\*19** In assessing reprehensibility, we must not only take into account the reprehensibility of the original misconduct, but we have held that we must also take into account what has been done to mitigate the harm that the misconduct caused. *Punitive Damages Opinion I,* 270 F.3d at 1242; *see also Swinton,* 270 F.3d at 814-15 (discussing weight and relevance of post-tort mitigation evidence). As we said in *Punitive Damages Opinion I,* mitigation is to be considered "in order to encourage such socially beneficial behavior." *Punitive Damges Opinion I,* 270 F.3d at 1242. Here, Exxon instituted a system of voluntary payments to plaintiffs and it undertook prompt cleanup efforts. We agree with what we said before: "Exxon spent millions of dollars to compensate many people after the oil spill, thereby mitigating the harm to them and the reprehensibility of its conduct." *Id.*

g. *Evaluation of Reprehensibility.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                                    Page 17

--- F.3d ----, 2006 WL 3755189 (C.A.9 (Alaska)), 06 Cal. Daily Op. Serv. 11,701
**(Cite as: --- F.3d ----)**

Placing a relapsed alcoholic in control of a supertanker was highly reprehensible conduct. As a result, Exxon disrupted the lives of thousands of people who depend on Prince William Sound for their livelihoods, and endangered its own crew and their rescuers. Over the span of three years, Exxon could and should have relieved Captain Hazelwood of command of supertankers, but it did not do so. At the same time, however, Exxon did not act with malice toward plaintiffs or anyone else; Exxon did not intend to damage plaintiffs' livelihoods or cause them the emotional grief that went with the economic loss.

Thus, Exxon's conduct is in the higher realm of reprehensibility, but not in the highest realm. In addition Exxon's post-grounding efforts to mitigate the harm serve materially to reduce the reprehensibility of the original misconduct. They reduce the reprehensibility for purposes of our review to, at most, a mid range.

2. *Ratio of Harm to Punitives*.

[3] The second *BMW* guidepost, as reiterated and refined by *State Farm,* is the "ratio between harm, or potential harm, to the plaintiff and the punitive damages award." *State Farm,* 538 U.S. at 424, 123 S.Ct. 1513. The goal of our review at this guidepost is to "ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered." *Id.* at 426, 123 S.Ct. 1513.

a. *Calculating The Harm*.

In this case, the figure the district court used to represent the harm to plaintiffs was $513.1 million. *District Court Opinion,* 296 F.Supp.2d at 1103. Calculating the total harm to plaintiffs proved to be difficult because, in addition to considerable economic losses, the spill caused other undeniable, if not easily quantifiable, harms. *See id.* at 1094. The district court eventually calculated the harm figure by adding the compensatory damages verdict from the second phase of the trial to the actual judgments, settlements, and other recoveries various plaintiffs obtained as a result of the spill. *Id.* at 1099-1101.

**\*20** Exxon does not dispute that the district court's finding of $513.1 million in harm is fundamentally a valid measure of the actual harm caused by the spill. However, it disagrees that it should be the figure we ultimately use as part of the ratio of punitive damages to harm that we review as the second guidepost.

Exxon's principal contention is that, before establishing the harm figure in the ratio, we must first deduct millions of dollars of payments and costs from the figure representing the total actual harm caused by the spill. Exxon would have us subtract a sum of about $493 million representing amounts paid to plaintiffs through Exxon's voluntary claims program and other settlements. Exxon would then have us use that reduced figure to represent the total harm in assessing the ratio of punitives to harm.

This brings us to the central argument Exxon makes in this appeal. Exxon focuses on the language of our prior opinion in *Punitive Damages Opinion I* where we said, in a lengthy discussion of formulating possible ratios pursuant to *BMW v. Gore,* "[t]he amount that a defendant voluntarily pays before judgment should generally not be used as part of the numerator, because that would generally deter settlements prior to judgment." 270 F.3d at 1244. Exxon contends this now means that in assessing the ratio of harm to punitives after *State Farm,* we should ignore the total harm in favor of a figure that in fact more closely approximates Exxon's remaining post-judgment liability for compensatory damages.

If we were to adopt Exxon's interpretation of that sentence as binding us now, the measure of harm would be a meager $20.3 million. Applying the ratio of close to 1 to 1 that Exxon asserts is appropriate, Exxon contends we should cap punitive damages at $25 million. Under Exxon's theory, even using a ratio of 9 to 1, which approaches the highest allowable under *State Farm,* punitive damages would be capped at $182.7 million. This would be the limit, even though

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                                   Page 18

--- F.3d ----, 2006 WL 3755189 (C.A.9 (Alaska)), 06 Cal. Daily Op. Serv. 11,701
**(Cite as: --- F.3d ----)**

Exxon's recklessness led to more than $500 million in harm. We said, in discussing the nature of the relationship between punitive damages and harm:
The "reasonable relationship" is intrinsically somewhat indeterminate. The numerator is "the harm likely to result from the defendant's conduct." [ *BMW v. Gore,* 517 U.S. at 581, 116 S.Ct. 1589]. The denominator is the amount of punitive damages. Because the numerator is ordinarily arguable, applying a mathematical bright line as though that were an objective measure of how high the punitive damages can go would give a false suggestion of precision. That is one reason why the Supreme Court has emphasized that it is not possible to "draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." [*BMW v. Gore,* 517 U.S. at 576, 116 S.Ct. 1589]....
Although it is difficult to determine the value of the harm from the oil spill in the case at bar, the jury awarded $287 million in compensatory damages, and the ratio of $5 billion punitive damages to $287 million in compensatory damages is 17.42 to 1. The district court determined that "total harm could range from $287 million to $418.7 million," which produces a ratio between 12 to 1 and 17 to 1. This ratio greatly exceeds the 4 to 1 ratio that the Supreme Court called "close to the line" in *Pacific Mutual Life Ins. Co. v. Haslip* [, 499 U.S. at 23, 111 S.Ct. 1032].
**\*21** The amount that a defendant voluntarily pays before judgment should generally not be used as part of the numerator, because that would deter settlements prior to judgment. "[T]he general policy of federal courts to promote settlement before trial is even stronger in the context of large scale class actions," such as this one. [*Cf. Icicle,* 229 F.3d at 795; *Baker,* 239 F.3d at 988].

*Punitive Damages Opinion I,* 270 F.3d at 1243-44.

The district court rejected the proposition that voluntary payments before judgment should not generally be used as part of the calculation of harm. But our prior decision did not constrain the ratio analysis so firmly as Exxon contends. We did not say that voluntary payments before judgment could not be considered in calculating the numerator for purposes of comparing the numerator with the amount of the award; we said that they "generally" could not. Considerations of settlement, critical to our analysis in *Icicle,* 229 F.3d 790, bear on the due process concerns at the heart of *BMW's* discussion. Whenever a defendant governed by a board is sued for conduct egregious enough to create a genuine risk of punitive damages, those making its litigation decisions have to try to predict what may happen in court. Some may recommend obdurate resistance, and some may recommend settlement, or prejudgment payments even without settlement, each making arguments based on predictions. Those recommending payment can reasonably predict that the entity will not be hammered as hard as if it obstinately resisted acceptance of any responsibility. And their prediction would be reasonable. Criminal penalties have always been somewhat more lenient for those who accepted responsibility prior to judgment, *see United States v. Gonzalez,* 897 F.2d 1018, 1021 (9th Cir.1990) (upholding the constitutionality of U.S.S.G. § 3E1.1 ), and punitive damages are but a civil version of punishment for wrongdoing. It makes no practical sense to disarm all those in the future who want their boards to accept some responsibility by cutting out all the benefit their firms would get.

There is a limit, however, to how far acceptance of responsibility goes in both contexts. No criminal defendant guilty of a serious wrong ordinarily resulting in lengthy imprisonment could reasonably assume that he would receive no imprisonment at all if he promptly pleaded guilty. And no defendant's board could reasonably predict that the defendant could escape all punishment by paying predicted compensatory damages before judgment. While "generally" prepayments should not be used as part of the calculation of harm, *Punitive Damages Opinion I,* 270 F.3d at 1244, that is not a mechanical arithmetic limit, just as the nine to one limit is not a mechanical arithmetic limit. *See State Farm,* 538 U.S. at 425, 123 S.Ct. 1513; *Planned Parenthood,* 422 F.3d at 962; *Bains,* 405 F.3d at 776-77. Due process considerations limit punitive damages to what the wrongdoer could reasonably foresee, and that works both ways.

**\*22** Therefore, Exxon's argument goes too far. It

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                                                Page 19

--- F.3d ----, 2006 WL 3755189 (C.A.9 (Alaska)), 06 Cal. Daily Op. Serv. 11,701
**(Cite as: --- F.3d ----)**

would produce, in Exxon's analysis, a $25 million limit on punitive damages where the harm was $513 million but $493 million was paid before judgment. For purposes of notice to a tortfeasor of its liability risk, $25 million for causing a half billion loss would obviously be too good to be true. A defendant cannot buy full immunity from punitive damages by paying the likely amount of compensatory damages before judgment.

There is also a limit on the law of the case doctrine. One exception to this doctrine exists for an intervening change of law. *See United States v. Bad Marriage,* 439 F.3d 534, 538 (9th Cir.2006). In this case, there is such a change. Subsequent to our decision in *Punitive Damages Opinion I,* the Supreme Court decided *State Farm.* In that case, the fact that State Farm "paid the excess verdict before the complaint was filed," *State Farm,* 538 U.S. at 426, 123 S.Ct. 1513, was a mitigating factor reducing the ratio. The Supreme Court did not use it to reduce the amount of total harm. The Court in *State Farm* itself took into account, in its consideration of whether the ratio was proper, the substantiality and completeness of the compensatory award, the essentially economic nature of the harm, the likelihood that the punitive award duplicated the compensatory, and the defendant's prompt settlement of compensatory damages. *Id.* All these mitigating factors were used to assess whether the ratio itself was likely to comply with due process. *State Farm* did not use such mitigating factors to reduce the harm. *State Farm* makes untenable the idea that a defendant's voluntary, pre-judgment payment of compensatory damages may not generally be used as part of the calculation of harm. *Punitive Damages Opinion I,* 270 F.3d at 1244.

There are also some secondary issues relating to calculating harm. One concerns payments made by Alyeska Pipe Lines Service Corporation. Exxon asks us to set off $98 million that its original co-defendant Alyeska Pipe Lines Service Corporation paid in settlement of plaintiffs' claims. A consortium of oil companies, including Exxon, had contracted with Alyeska to respond to any oil spill in the area. After the *Exxon Valdez* disaster, plaintiffs sued Alyeska for negligence in its response to the spill, and eventually settled all claims against Alyeska, including punitive damages, for $98 million. Exxon's argument here is that this $98 million payment represents harm attributable to Alyeska's negligence, not Exxon's recklessness, and therefore should not be used to calculate damages designed to punish and deter Exxon's own harmful conduct.

There are two major reasons why Exxon's position is not correct. First, the harm caused by the oil spill is attributable to Exxon under tort law principles. Exxon knowingly placed a relapsed alcoholic in control of a supertanker loaded with millions of gallons of oil. When it did so, Exxon accepted the foreseeable risk from its choice of captain that the tanker would have an accident causing an oil spill, and that Alyeska might further aggravate the harm. *See* Restatement (Second) of Torts §§ 433(a) cmt. c, 447(c),[FN1] cmt. e.[FN2] In fact, William Stevens, the President of Exxon, testified before Congress that Exxon knew Alyeska was not prepared to contain a spill of the size caused by the *Exxon Valdez.* Because Exxon could be held liable for this foreseeable risk, the district court properly included the harm caused by Alyeska's response as the natural consequence of the harm caused by Exxon.

**\*23** Second, the situation Exxon now complains of is strictly of its own making. In 1994, the Supreme Court held that the proportional fault rule governs calculation of non-settling defendant's liability for compensatory damages in maritime torts. *See McDermott, Inc. v. AmClyde,* 511 U.S. 202, 114 S.Ct. 1461, 128 L.Ed.2d 148 (1994). Instead of following *McDermott,* Exxon agreed with plaintiffs to proceed as if a pro tanto rule with respect to co-defendants' settlements still governed.[FN3] Exxon apparently thought it more advantageous at the time to have the $98 million deducted from the final compensatory damage award after the fact, rather than have the jury make a proportionate fault finding. Since Exxon has already agreed that the $98 million does not represent harm attributable to Alyeska, Exxon is not warranted in asserting that this is what it represents now.

Exxon also contends that some $34 million included in the district court's harm finding should not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                               Page 20

--- F.3d ----, 2006 WL 3755189 (C.A.9 (Alaska)), 06 Cal. Daily Op. Serv. 11,701
**(Cite as: --- F.3d ----)**

properly be considered harm at all. This figure represents an apparent $9 million overpayment by the Trans-Alaska Pipeline Liability Fund, $13.4 million from the Phase IV settlement Exxon claims is already accounted for elsewhere in the district court's calculations, and $11.5 million paid to Native corporations and municipalities for environmental clean up.

We conclude that the $9 million overpayment, inadvertently included in the district court's findings, should be subtracted from the total harm. Because Exxon does not specify where the $13.4 million in double-counting is reflected in other parts of the district court's calculation, however, we are unable to determine from our own review of the record where they might be included. Therefore, Exxon has failed to convince us that this figure should be reduced from the harm.

Finally, the $11.5 million Exxon paid to the plaintiffs for clean up, like its early settlement of plaintiffs' prospective commercial losses, is a mitigating factor relevant to our judgment about whether this punitive damages award is appropriate. Like the earlier settlements the proper place for its influence is as a mitigating circumstance to be considered in our overall determination of the ratio's reasonableness. It does, however, represent a part of the total harm for which Exxon is accountable.

In sum, the district court's attempt to approximate the actual harm by adding together the various judgments, settlements, and liabilities that Exxon had already acknowledged was sound. Subtracting the $9 million Trans-Alaska Pipeline Liability Fund overpayment that the district court inadvertently overlooked, we conclude this record supports a total harm component of $504.1 million for purposes of analyzing the ratio of harm to punitives.

b. *Evaluating the Reasonableness of the Ratio of Harm to Punitives.*

After our second remand, the district court reduced the original punitive damages award of $5 billion to $4.5 billion. This yielded a punitive damages to harm ratio of 8.77 to 1. After our $9 million adjustment to the harm figure, that ratio now stands at 8.93 to 1-a proportion bordering on the presumption of constitutional questionability. *See State Farm,* 538 U.S. at 425, 123 S.Ct. 1513.

**\*24** In *State Farm,* the Supreme Court explained that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 425, 123 S.Ct. 1513. Relatively high single-digit ratios and perhaps even double-digit ratios may comply with due process where "a particularly egregious act has resulted in only a small amount of economic damages" or where "the injury is hard to detect or the monetary value of the noneconomic harm might have been difficult to determine." *Id.* (quoting *BMW v. Gore,* 517 U.S. at 582, 116 S.Ct. 1589). Conversely, lower single-digit ratios, even as low as 1 to 1, might mark the outer limits of due process where compensatory damages are substantial. *Id.* This strongly suggests the ratio here is too high.

Our own decisions are also helpful. In *Planned Parenthood,* we used this guidance from *State Farm* to construct a "rough framework" for determining the appropriate ratio of punitive damages to harm. *See* 422 F.3d at 962. We held that in cases where there are "significant economic damages" but behavior is not "particularly egregious," a ratio of up to 4 to 1 "serves as a good proxy for the limits of constitutionality." *Id.* (citing *State Farm,* 538 U.S. at 425, 123 S.Ct. 1513). In cases with significant economic damages and "more egregious behavior," however, a single-digit ratio higher than 4 to 1 "might be constitutional." *Id.* (citing *Zhang,* 339 F.3d at 1043-44; *Bains,* 405 F.3d at 776-77). Finally, in cases where there are "insignificant" economic damages and the behavior is "particularly egregious," we said that "the single-digit ratio may not be a good proxy for constitutionality." *Id.*

The circumstances of this case fit into the second class of cases in the *Planned Parenthood* framework. Exxon's reckless decision to risk the livelihood of thousands by placing a relapsed alcoholic in command of a supertanker, while mollified by its prompt settlement and clean up

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----    Page 21

--- F.3d ----, 2006 WL 3755189 (C.A.9 (Alaska)), 06 Cal. Daily Op. Serv. 11,701
**(Cite as: --- F.3d ----)**

policies, was "particularly egregious." Moreover, the $500 million of loss is well within the range of " significant" economic damages. Thus, under *Planned Parenthood,* an appropriate ratio would be above 4 to 1.

Our review of the reprehensibility and mitigation under the first guidepost of reprehensibility, however, compels us to conclude the award should be toward the lower end of that range. Our cases have generally reserved high single-digit ratios for the most egregious forms of intentional misconduct, such as threats of violence and intentional racial discrimination. *See Zhang,* 339 F.3d at 1044 (upholding a ratio of 7:1 for intentional racism); *Bains,* 405 F.3d at 776-77 (remanding for district court to set a ratio between 6:1 and 9:1 for intentional racism); *Planned Parenthood* 422 F.3d at 952, 963 (remitting to a 9:1 ratio for threats of violence). Exxon's conduct in this case, while inexcusable, did not involve any intentional conduct that would normally be required to support a punitive damages award with a high single-digit ratio.

**\*25** Here mitigating factors also come into play. Exxon instituted prompt efforts to clean up the spill and to compensate the plaintiffs for their economic harm. As we earlier observed, if a defendant acts promptly to ameliorate harm for which it is responsible, the size of a punitive damages award should be reduced to encourage socially beneficial behavior. *Punitive Damages Opinion I,* 270 F.3d at 1242. Moreover, the costs that Exxon incurred in compensating the plaintiffs and cleaning up the oil spill have already substantially served the purposes of deterrence, lessening the need for a high punitive damages award. *Id.* at 1244.

Thus, Exxon's conduct was particularly egregious and involved significant economic damages. Nevertheless, its conduct was not intentional and it promptly took steps to ameliorate the harm it caused. With these considerations in mind, we conclude that a punitive damages to harm ratio of more than 5 to 1 would violate due process standards under current controlling Supreme Court and Ninth Circuit authority.

3. *Comparable Penalties.*

The third *BMW v. Gore/State Farm* guidepost is comparable legislative penalties. Given the emphasis on this factor in *BMW v. Gore,* we went to some lengths in *Punitive Damages Opinion I* to extrapolate the comparable penalties that would be imposed under state and federal law for the spill, the highest being approximately $1.03 billion dollars.

In *State Farm,* however, the Supreme Court stated that "need not dwell long on this guidepost." *State Farm,* 538 U.S. at 428, 123 S.Ct. 1513. In that case, the comparable penalties were not particularly informative: the comparable civil penalty was easily "dwarfed" by the punitive award, and as to criminal penalties, the Court explained that although their existence "does have bearing on the seriousness with which a State views the wrongful action," they had "less utility" "[w]hen used to determine the dollar amount of the award." *Id.*

In our own circuit's more recent post-*BMW v. Gore* and *State Farm* cases, we have generally not attempted to quantify legislative penalties. We have looked only to whether or not the misconduct was dealt with seriously under state civil or criminal laws. *See, e.g., Planned Parenthood,* 422 F.3d at 963. In several recent decisions we have not discussed the factor at all. *See Southern Union Co.,* 415 F.3d at 1009-11 (9th Cir.2005); *Hangarter,* 373 F.3d at 1014-15. This may be because legislative judgments, unlike jury verdicts, do not represent an individualized assessment of reprehensibility.

Here, the matter of spilling oil in navigable water has clearly been taken quite seriously by legislatures, with Congress enacting a specific statute after the spill, and state and federal law having already authorized substantial penalties. *See Punitive Damages Opinion I,* 270 F.3d at 1245-46. Thus, the third *BMW v. Gore/State Farm* factor, substantial legislative penalties, supports our conclusion that Exxon's reckless conduct merits substantial punitive damages.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                                    Page 22

--- F.3d ----, 2006 WL 3755189 (C.A.9 (Alaska)), 06 Cal. Daily Op. Serv. 11,701
**(Cite as: --- F.3d ----)**

IV. CONCLUSION

**\*26** For the foregoing reasons, Exxon's reckless misconduct in placing a known relapsed alcoholic in command of a supertanker, loaded with millions of barrels of oil, to navigate the pristine and resource abundant waters of Prince William Sound was reckless and warrants severe sanctions. The misconduct did not, however, warrant sanctions at the highest range allowable under the due process analysis, as explained in the Supreme Court's most recent opinion in *State Farm*.

The district court's imposition of punitive damages of $4.5 billion, entered after our remand to reconsider due process in light of *State Farm*, represents damages at the very highest range, and is not warranted. It is not consistent with the Supreme Court's opinion in *State Farm* or with the most important tenets of our prior opinion in *Punitive Damages Opinion I* relating to Exxon's mitigation of reprehensibility. Although a one to one ratio marked the upper limit in *State Farm*, the conduct here was far more egregious and justifies a considerably higher ratio. An award of damages representing a ratio of punitives to harm of 5 to 1 is consistent with both.

The judgment of the district court is VACATED, and the matter is remanded with instructions that the district court further reduce the punitive damages award to the amount of $2.5 billion. We have decided pursuant to the *de novo* standard of review imposed by *Leatherman,* 532 U.S. at 436, 121 S.Ct. 1678, that this is the appropriate limit on punitive damages in this case under the prevailing legal precedent. Thus, we do not remand for further consideration of what the limit may be. It is time for this protracted litigation to end.

VACATED AND REMANDED.

BROWNING, Circuit Judge, dissenting.
Because I believe the punitive damages award in this case is not "grossly excessive," I would affirm. In reviewing the size of a punitive damages award, our sole duty is to ensure its imposition does not violate due process. Where an award lies within the bounds of due process, as this one does, we may not substitute a figure we consider more reasonable for one fairly awarded by a jury and properly reviewed by a district court. Therefore, I respectfully dissent.

### *1. Due Process Review of Punitive Damages*

To comport with the Constitution, a punitive damages award must strike the proper balance between the state goals of deterrence and retribution and a defendant's due process right to be free from arbitrary punishment. *See State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 416-17, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). The Supreme Court has determined the balance is upset at the point an award becomes "grossly excessive," reasoning that, "[t]o the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *Id.* at 417, 123 S.Ct. 1513 (citing *Pac. Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 42, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)).

But as the majority notes, *ante* at ----, the Court has shown little inclination to define "grossly excessive" more concretely. *See State Farm,* 538 U.S. at 424, 123 S.Ct. 1513; *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 582, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). While it has several times hinted at the possibility of establishing a 4 to 1 bench-mark ratio of punitive damages to compensatory damages, it has never explicitly done so. *See State Farm,* 538 U.S. at 425, 123 S.Ct. 1513 (citing *BMW,* 517 U.S. at 581, 116 S.Ct. 1589; *Haslip,* 499 U.S. at 23-24, 111 S.Ct. 1032). Instead, the one constitutional limit the Court has identified is that generally found between single-digit and double-digit multipliers. *See id.* ("[F]ew awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.... Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1 [or] 145 to 1." (internal citations omitted)).

**\*27** The Supreme Court's reluctance to establish a more concrete limit, or to adopt any other sort of categorical approach, counsels that in cases such as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                           Page 23

--- F.3d ----, 2006 WL 3755189 (C.A.9 (Alaska)), 06 Cal. Daily Op. Serv. 11,701
**(Cite as: --- F.3d ----)**

the one at bar, "[t]he judicial function is to police a range, not a point." *Mathias v. Accor Econ. Lodging, Inc.*, 347 F.3d 672, 678 (7th Cir.2003) (citing *BMW*, 517 U.S. at 582-83, 116 S.Ct. 1589; *TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 458, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993)). We should let this punitive damages award stand unless the *BMW* factors indicate with some certainty that it was the product of caprice or bias such that its imposition violates Exxon's right to due process.[FN1] "Assuming that fair procedures were followed, a judgment that is a product of that process is entitled to a strong presumption of validity. Indeed, there are persuasive reasons for suggesting that the presumption should be irrebuttable, or virtually so." *TXO*, 509 U.S. at 457, 113 S.Ct. 2711 (plurality opinion) (internal citations omitted).

No procedural concerns are present here that, at the outset, might weaken the "strong presumption of validity" to which this award is entitled. *See BMW*, 517 U.S. at 586-87, 116 S.Ct. 1589 (Breyer, J., concurring) (citing *TXO*, 509 U.S. at 457, 113 S.Ct. 2711; *Haslip*, 499 U.S. at 40-42, 111 S.Ct. 1032); *see also id.* at 583, 116 S.Ct. 1589 ("In most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis."). The jury received thorough, almost prescient, punitive damages instructions.[FN2] And although Exxon is a large corporation, there is no indication that the size of this punitive damages award resulted from an improper "emphasis on the wealth of the wrongdoer" at trial, *see TXO*, 509 U.S. at 464, 113 S.Ct. 2711, or from an attempt by Plaintiffs or the jury to "make up for the failure of other factors, such as 'reprehensibility,' " *see BMW*, 517 U.S. at 591, 116 S.Ct. 1589 (Breyer, J., concurring).[FN3]

Furthermore, Exxon's conduct implicates a strong state interest in punishing reckless behavior and deterring its future repetition. Our constitutional review must consider punitive damages in the context of these state interests. *See id.* at 568, 116 S.Ct. 1589 ("Only when an award can fairly be categorized as 'grossly excessive' *in relation to these interests* does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." (emphasis added)). In both *State Farm* and *BMW*, the Court's guidepost analysis was not an entirely separate endeavor, but instead gave structure to its constitutional concern that the defendants' due process rights were violated by judgments incorporating punishment for conduct not properly before the awarding court. *See State Farm*, 538 U.S. at 419-24, 123 S.Ct. 1513 (discussing out-of-state conduct and conduct unrelated to plaintiffs' injuries); *BMW*, 517 U.S. at 568-73, 116 S.Ct. 1589 (describing out-of-state conduct).

In stark contrast, there is no concern here that the scope of appropriate state interests has been exceeded. This punitive damages award was imposed pursuant to strong, but properly circumscribed, state interests. As the district court noted, Plaintiffs' collection of federal and state claims all arise out of harm to "Alaska fisheries, Alaska business,[and] Alaska property" caused by Exxon's conduct having "a direct nexus with the grounding of the Exxon Valdez on Bligh Reef in Prince William Sound." *See In re Exxon Valdez*, 296 F.Supp.2d at 1090-91.

**\*28** Thus, before engaging in the multi-factored analysis introduced in *BMW* and reiterated in *State Farm*, it is important to note that we are not faced here with any of the major constitutional concerns present in those cases.

### 2. BMW *Guidepost Analysis*

Although I agree with much of the majority's analysis under *BMW* and *State Farm*, I cannot agree with it all. Despite clear guidance from the Court that reprehensibility is the critical factor, the majority, *ante* at ----, ----, gives defining weight to a consideration entirely of its own creation. It then engages, *ante* at ---- - ----, in what appears to be the very "categorical approach" the Supreme Court has consistently rejected. *See BMW*, 517 U.S. at 582, 116 S.Ct. 1589. An appropriate evaluation of the award in question demonstrates it is constitutionally permissible.

### (a) Reprehensibility

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ---- Page 24

--- F.3d ----, 2006 WL 3755189 (C.A.9 (Alaska)), 06 Cal. Daily Op. Serv. 11,701
**(Cite as: --- F.3d ----)**

In its most recent punitive damages opinion, the Supreme Court gave direct instruction to courts evaluating reprehensibility. *State Farm,* 538 U.S. at 419, 123 S.Ct. 1513. As the majority correctly notes, *ante* at ----, we must weigh five factors: (1) whether the harm was solely economic, (2) whether the conduct showed indifference to or reckless disregard for others' health and safety, (3) whether the conduct's target was financially vulnerable, (4) whether the conduct involved repeated actions, and (5) whether the harm resulted from intentional malice or mere accident. *State Farm,* 538 U.S. at 419, 123 S.Ct. 1513. Somewhat inexplicably, though, the majority adds to the *State Farm* factors one of its own creation-post-tort mitigation. *See ante* at ---- ("We must also consider mitigating factors."); *id.* at ----. I do not agree that mitigation should be considered in a reprehensibility analysis. Furthermore, unlike the majority, I believe that all five *State Farm* factors weigh in favor of finding that Exxon's reckless conduct was highly reprehensible.

### (i) Mitigation

I cannot agree with the majority's assertion that we must consider Exxon's post-tort mitigation in evaluating the reprehensibility of its original misconduct. *See ante* at ----. The majority is correct that when we previously considered Exxon's conduct, we suggested mitigation should be considered as part of the reprehensibility analysis. *See Baker v. Hazelwood (In re the Exxon Valdez ),* 270 F.3d 1215, 1242 (9th Cir.2001) [hereinafter *Punitive Damages Opinion I*]. However, subsequent to our decision in *Punitive Damages Opinion I,* the Supreme Court decided *State Farm,* which significantly refined the Court's punitive damages jurisprudence. The analysis of reprehensibility in *State Farm* differs from our analysis in *Punitive Damages Opinion I,* and, as intervening controlling authority, gives us reason to reconsider our prior approach. *See United States v. Bad Marriage,* 439 F.3d 534, 538 (9th Cir.2006) (noting that a court may reexamine an issue it previously decided if "intervening controlling authority makes reconsideration appropriate").

*29 When we considered mitigation in *Punitive Damages Opinion I,* Supreme Court precedent provided limited guidance for the reprehensibility analysis. In *State Farm,* however, the Supreme Court explained that courts should use five specific factors to evaluate reprehensibility. 538 U.S. at 419, 123 S.Ct. 1513. Although there was evidence of mitigation in *State Farm, id.* at 426, 123 S.Ct. 1513, the Court did not include mitigation as one of the factors in the reprehensibility analysis. Given such explicit guidance, this omission acquires particular significance and suggests we reconsider our prior statement about mitigation.[FN4] As explained below, upon reconsideration I find that including mitigation in the reprehensibility analysis is neither good law nor good policy.

Aside from a single mention of mitigation in *Punitive Damages I,* the majority's approach is supported by neither Supreme Court precedent nor our own precedent. The majority cites *Swinton v. Potomac Corp.,* 270 F.3d 794 (9th Cir.2001), as support, even though *Swinton,* like *Punitive Damages Opinion I,* was decided prior to *State Farm.* Therefore, it did not have the benefit of the Supreme Court's most recent and comprehensive analysis of reprehensibility. Furthermore, *Swinton* did not consider whether mitigation warrants a reduction in a punitive damages award imposed by a jury. Rather, our analysis was limited to the question of whether the district court erred in excluding evidence of mitigation efforts in an employment discrimination suit. *See id.* at 811, 815. We refused in that case to create a generalized rule in the employment context or anywhere else. *See id.* at 814-15. Instead, we left it to the discretion of the district courts to decide the relevancy of mitigation efforts on a case-by-case basis.

We also expressly rejected the idea that the Supreme Court endorses the categorical relevance of mitigation in punitive damages calculations. *See id.* at 812 ("We do not interpret the language in *BMW* and *Cooper* as relying on evidence of post-occurrence remediation for overturning the punitive damages awards; rather the Court appears simply to have been recounting a full history of the litigation to give a complete picture of the proceedings."). While post-tort mitigation by a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                                                      Page 25

--- F.3d ----, 2006 WL 3755189 (C.A.9 (Alaska)), 06 Cal. Daily Op. Serv. 11,701
**(Cite as: --- F.3d ----)**

defendant may or may not be relevant to a jury's determination of whether and in what amount to award punitive damages, *Swinton* gives no support to the majority's position that mitigation is properly considered as part of the reprehensibility analysis in a constitutional review.

Additionally, the majority's approach makes little sense as a matter of policy, for it runs directly counter to the twin goals of punitive damages: deterrence and retribution. *See State Farm,* 538 U.S. at 416, 123 S.Ct. 1513 ("[P]unitive damages serve a broader function; they are aimed at deterrence and retribution."); Theodore Eisenberg, *Damage Awards in Perspective,* 36 Wake Forest L.Rev. 1129, 1145 (2001) ("[A] wrongdoing party's voluntary-to the extent payments are truly voluntary after being 'caught'-remediation payment does not reduce the propriety of punishing or deterring."). While including mitigation in the reprehensibility analysis doubtlessly increases the incentive to remediate, it does so at the expense of undermining deterrence and retribution. The majority's approach minimizes deterrence by creating a post-tort means of limiting punitive damages. This allows potential tortfeasors to engage in risky behavior, safe in the knowledge they can minimize liability for any resulting harm by prompt payment of foreseeable damages. It also cripples the state's interest in retribution, as it allows the tortfeasor, rather than the jury, to recharacterize the reprehensibility of its misconduct after a tort has been committed. *Cf. Cooper,* 532 U.S. at 432, 121 S.Ct. 1678 (recognizing that the "imposition of punitive damages is an expression of [the jury's] moral condemnation").

**\*30** Nonetheless, the majority insists that including mitigation in the reprehensibility analysis is good public policy because it encourages socially beneficial conduct. *Ante* at ----. A company in Exxon's position, however, already has significant incentives to clean up its mess. Had Exxon not taken prompt action to clean up the oil spill and compensate injured parties, *see ante* at ----, the actual harm caused could well have exceeded the $504.1 million figure we use as the numerator in our ratio analysis. *See ante* at ----. Specifically, if eleven billion gallons of oil were left indefinitely in Prince William Sound, and injured parties were without resources to start their lives anew, both economic and social harm would have grown. This would have increased Exxon's liability not only for compensatory damages, but also for punitive damages. Greater actual harm translates to a larger punitive damages numerator and a higher ceiling for the punitive damages award. Thus, mitigation is already reflected in the calculation of compensatory damages and in our constitutional review of the jury's punitive damage award.

Moreover, I am not convinced the majority's approach will ultimately encourage defendants to settle. *Cf. Franklin v. Kaypro Corp.,* 884 F.2d 1222, 1229 (9th Cir.1989) (noting there is an " overriding public interest" in promoting settlement). Instead, I fear it has the unintended consequence of giving tortfeasor defendants a way to reduce the risk of litigation *without* reaching a settlement with injured parties. Under our past precedent, the threat of a significant punitive damages award created a strong incentive for defendants to pay injured parties in exchange for a release or similar arrangement.[FN5] The majority's approach, however, allows defendants to limit their exposure to punitive damages by taking unilateral steps, even token ones, to remediate harm. I am concerned this will frequently lead to more protracted litigation, as injured parties will not necessarily be satisfied with defendants' mitigation efforts, and defendants will have less incentive to reach settlement agreements. Thus, policy implications support the legal conclusion that it is not appropriate to add mitigation to the *State Farm* factors.

*(ii)* State Farm *Factors*

Because I see no basis for the majority's inclusion of mitigation in our due process reprehensibility analysis, I consider only the five factors outlined by the Supreme Court. I agree with the majority that the first, second, and fourth factors [FN6] suggest Exxon's conduct was highly reprehensible and capable of supporting a substantial award. However, I cannot agree with the analysis concerning the fifth factor, whether "the harm was the result of intentional malice, trickery, or deceit,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                                                      Page 26

--- F.3d ----, 2006 WL 3755189 (C.A.9 (Alaska)), 06 Cal. Daily Op. Serv. 11,701
**(Cite as: --- F.3d ----)**

or mere accident." *State Farm,* 538 U.S. at 419, 123 S.Ct. 1513. As the majority recognizes, Exxon's decision to put a relapsed alcoholic in charge of a supertanker constituted knowing and reckless misconduct, which was neither intentionally malicious nor a mere accident. *Ante* at ---- - ----. However, faced with conduct that does not fit squarely in either category mentioned in *State Farm,* the majority arbitrarily determines this factor weighs against high reprehensibility because Exxon "did not spill the oil on purpose." *Id.,* at ----. I cannot agree with this conclusion for two reasons.

**\*31** First, if we read this *State Farm* factor to recognize only two categories of conduct, the fact that Exxon's acts fall in neither category could suggest this is a neutral factor, weighing neither for nor against high reprehensibility. However, if the majority is correct that we must determine whether Exxon's conduct is more similar to one category or the other,[FN7] I believe it is closer to "intentional malice, trickery, or deceit" than to "mere accident." *State Farm,* 538 U.S. at 419, 123 S.Ct. 1513; *cf. Black's Law Dictionary* 968 (7th ed.1999) (defining malice as, *inter alia,* "[r]eckless disregard of the law or of a person's legal rights"). The jury held Exxon responsible not merely for spilling oil, but rather for knowingly giving command of a supertanker "carrying over 53 million gallons of volatile, toxic, crude oil" to a relapsed alcoholic. *See In re Exxon Valdez,* 296 F.Supp.2d at 1097. Exxon did so for three years with full knowledge of the tremendous risk of serious harm to the health, safety, and livelihood of many people. *See ante* at ----. This cannot fairly be described as an accident. Given the extreme recklessness of Exxon's conduct, I would conclude the fifth factor militates in favor of finding Exxon's behavior highly reprehensible. *Accord Swinton,* 270 F.3d at 818 (holding that conduct which was, at most, reckless disregard for others' health and safety, easily "constitutes highly reprehensible conduct justifying a significant punitive damages award").

Thus, unlike the majority, I find that all five of *State Farm's* reprehensibility factors suggest that Exxon's reckless conduct in this case-the malicious endangerment of the property and livelihood of thousands of Alaskans-was highly, if not extremely, reprehensible and capable of "warrant[ing] a substantial penalty." *See BMW,* 517 U.S. at 576, 116 S.Ct. 1589.

### (b) Ratio

Under the second *BMW* guidepost, we must analyze "the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award." *See id.* at 418, 123 S.Ct. 1513. While I agree with the majority's "calculation of harm," or "numerator," analysis, *ante* at ----, I cannot agree with its conclusion, *id.* at ----, that the Constitution prohibits a ratio in this case above 5 to 1. The majority arrives at this constitutional limit through two steps. First, it uses the "rough framework" of *Planned Parenthood of Columbia/Willamette, Inc. v. American Coalition of Life Activists,* 422 F.3d 949 (9th Cir.2005), to arrive at the conclusion that the appropriate ratio in this case is above 4 to 1, but no greater than 9 to 1. *Ante* at ---- - ----. However, it then asserts the proper ratio cannot be much greater than 4 to 1 because Exxon's conduct was not intentional and because Exxon attempted to mitigate the harm it caused. *Ante* at ----. I cannot agree with this.

In *Planned Parenthood,* we established a three-tiered "rough framework" to guide us in determining an appropriate ratio.[FN8] Applying *Planned Parenthood* to this case, the majority concludes a 4 to 1 benchmark is appropriate based on its determination that the economic damages are "significant." *Ante* at ---- - ----. As an initial matter, the majority's assessment of economic damages focuses on a number devoid of its context. An award is significant not because it is numerically large, but rather because it approaches full compensation for the plaintiff's harms. *See State Farm,* 538 U.S. at 426, 123 S.Ct. 1513 ("The compensatory award in this case was substantial;[the plaintiffs] were awarded $1 million for a year and a half of emotional distress. This was complete compensation."). I am not convinced that a compensatory damages award that equates to a mere $10,000 per plaintiff is actually "substantial" in the way the Supreme Court uses the term. *Cf. id.* at 425, 123 S.Ct. 1513 (providing, as an example of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                                    Page 27

--- F.3d ----, 2006 WL 3755189 (C.A.9 (Alaska)), 06 Cal. Daily Op. Serv. 11,701
**(Cite as: --- F.3d ----)**

"small" economic damages, cases where the injury was hard to detect or not fully economic in nature).

**\*32** Even if the majority were correct that the economic damages awarded in this case are "significant," *Planned Parenthood* still does not support a 4 to 1 benchmark in this case. In *Planned Parenthood*, we refused to remit the award to less than a 9 to 1 ratio because not all of the plaintiff's damages were quantifiable, not all of it was compensated, and the plaintiffs were likely to incur further costs. 422 F.3d at 963. All three are true here as well. The oil spill disrupted the social fabric of the plaintiffs' community. *See In re Exxon Valdez,* 296 F.Supp.2d at 1094. This type of harm is not easily quantifiable. Moreover, the plaintiffs' recovery in this case was limited to economic harm. It therefore did not compensate the plaintiffs for harm attributable to increased "social conflict, cultural disruption and psychological stress." *Id.* Finally, there is evidence the plaintiffs have incurred substantial further costs. *See id.* Thus, it cannot be said the compensatory damages in this case are so large or sufficiently comprehensive they warrant a lower punitive damages award.

Nor, in my mind, does the majority find support in *Zhang v. American Gem Seafoods, Inc.,* 339 F.3d 1020 (9th Cir.2003), or *Bains LLC v. Arco Products Co.,* 405 F.3d 764 (9th Cir.2005). That we upheld an award in the 7 to 1 range in *Zhang,* and remanded for a similar award in *Bains*-both for intentional racial discrimination in the employment context-says little if nothing about the constitutionality of this award for the reckless endangerment of the property and livelihood of tens of thousands of people. While it is true any given conduct is more reprehensible if intentional than if reckless, it does not necessarily follow that all intentional conduct is more reprehensible than all reckless conduct. Indeed, because we are the first court to review an award for misconduct resulting in harm of the type and scale at issue here, I find it unhelpful to note that our cases to date "have generally reserved high single-digit ratios for the most egregious forms of intentional misconduct, such as threats of violence and intentional racial discrimination." *See ante* at ----. Instead, every indicator in this case suggests that Exxon's reckless conduct-leaving for three years a known alcoholic in command of a supertanker in treacherous waters upon which thousands of people depend-is egregious enough to support an award within the 9 to 1 range. *Accord Swinton,* 270 F.3d at 818-20 (upholding a 28 to 1 ratio despite recognizing that the conduct at issue involved no acts or threats of violence and, therefore, "[did] not amount to the worst kind of tortious conduct a defendant can commit").

One final consideration convinces me that the 8.93 to 1 ratio in this case does not indicate that Exxon has been subject to a "grossly excessive" punitive damages award. In *State Farm,* the Supreme Court reiterated that it is appropriate to consider for purposes of ratio calculation not only the actual harm caused, but the potential harm that a defendant's misconduct could have foreseeably caused. *See* 538 U.S. at 418, 123 S.Ct. 1513 (describing the second guidepost as requiring consideration of "the actual *or* potential harm suffered" (emphasis added) (citing *BMW,* 517 U.S. at 575, 116 S.Ct. 1589)); *accord TXO,* 509 U.S. at 460, 113 S.Ct. 2711 ("Taking account of the potential harm that might result from the defendant's conduct in calculating punitive damages was consistent with the views we expressed in *Haslip.*" (internal citation omitted)). As the majority recognizes, *ante* at ----, the potential harm from Exxon's decision to keep Hazelwood in command of the *Exxon Valdez* was both massive and foreseeable. But despite the propriety of such consideration, the calculation of harm in this case explicitly incorporates only an estimate of actual, and not of potential, harm. *See In re Exxon Valdez,* 296 F.Supp.2d at 1103; *ante* at ----. Thus, if anything, the jury's punitive damages award potentially undervalued the harm.

*Conclusion*

**\*33** In accordance with *State Farm* and its predecessors, we are required to subject this award to "exacting [de novo] appellate review" in order to ensure it is "based upon an application of law, rather than a decisionmaker's caprice." *See* 538 U.S. at 418, 123 S.Ct. 1513 (internal quotation marks

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                                    Page 28
--- F.3d ----, 2006 WL 3755189 (C.A.9 (Alaska)), 06 Cal. Daily Op. Serv. 11,701
**(Cite as: --- F.3d ----)**

omitted) (quoting *BMW,* 517 U.S. at 587, 116 S.Ct. 1589 (Breyer, J., concurring)). But that review does not empower us to substitute our own, perhaps more finely-tuned, award for one that was fairly awarded and already lies within the range of constitutional awards. See *BMW,* 517 U.S. at 583, 116 S.Ct. 1589 (noting that most awards fall within a " constitutionally acceptable *range* " (emphasis added)).

After thorough and concerned analysis of this punitive damages award, I conclude that its imposition does not violate Exxon's constitutional right to due process. The award was levied as a result of fair procedure and in pursuit of the undisputedly strong, and properly circumscribed, state interests in punishing Exxon for its misconduct, and in deterring any similar behavior by Exxon in waters it continues to frequent. While the award is large, it addresses what must be characterized as extremely reprehensible misconduct. There is simply no excuse for allowing a relapsed alcoholic to pilot a supertanker in any waters, much less for three years in the treacherous and treasured waters of Prince William Sound. Exxon's knowing decision to do so was a malicious one that placed at massive risk, and ultimately seriously injured, the property and livelihood of tens of thousands of Alaskans. There is every indication the award before us reasonably addresses that egregious behavior, and nothing in the record that suggests it 19761 resulted from passion, bias, or caprice. I therefore agree with the district court's assessment that there is no principled means by which this award should be reduced. See *In re Exxon Valdez,* 296 F.Supp.2d at 1110. Accordingly, and with respect, I dissent.

> FN1. "The fact that an intervening act of a third person is negligent in itself or is done in a negligent manner does not make it a superseding cause of harm to another which the actor's negligent conduct is a substantial factor in bringing about, if ... (c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent."

FN2. "The words 'extraordinarily negligent ' denote the fact that men of ordinary experience and reasonable judgment, looking at the matter after the event and taking into account the prevalence of that ' occasional negligence,' which is one of the incidents of human life,' would not regard it as extraordinary that the third person's intervening act should have been done in the negligent manner in which it was done. Since the third person's action is a product of the actor's negligent conduct, there is good reason for holding him responsible for its effects, even though it be done in a negligent manner, unless the nature of the negligence is altogether unusual."

FN3. The stipulation between the parties reads in relevant part:
"[N]otwithstanding the rule of proportionate shares set out in *McDermott, Inc. v. AmClyde,* credit for the Aleyska settlement ... shall be deducted from the sum that would, in the absence of this stipulation, be the aggregate amount of any judgment or judgment in favor of plaintiffs ... and the liability of Exxon and Shipping for compensatory damages to any and all plaintiffs herein shall be reduced by the aggregate sum of $98 million.... The parties expressly recognize and agree that the sum of $98 million is not necessarily a fair measure of what would be Alyeska's proportionate share of liability to plaintiffs[,] but the parties are entering into this Stipulation in order to avoid the alteration of their trial preparation that would result from a last-minute overturning of the parties' assumption that[the pro tanto approach] would govern at trial and from requiring litigation of Alyeska's proportionate share."

FN1. The majority correctly recognizes, *ante* at ----, that a determination that an award is "grossly excessive" is reviewed de novo. *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,* 532 U.S.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                           Page 29

--- F.3d ----, 2006 WL 3755189 (C.A.9 (Alaska)), 06 Cal. Daily Op. Serv. 11,701
**(Cite as: --- F.3d ----)**

424, 436, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001). De novo review, however, is only applied to determine the constitutional upper limit on a punitive damages award in a given case. If the award does not exceed this ceiling, we owe deference to the determination of the district court and jury. *See id.* at 433-34, 121 S.Ct. 1678 (noting that within substantive limits on an award, the jury has discretion in establishing the precise number). *Cooper* does not give us free reign to pick the number we would have chosen had we sat as the jury or district court.

FN2. The district court explained the retributive and deterrent purposes of punitive damages and the "appropriate," i.e., non-environmental, countervailing " Alaska-oriented" interests of the plaintiffs; cautioned the jury that punitive damages must have a rational basis in the record and bear a reasonable relationship to the harm; admonished the jury not to be arbitrary; and, perhaps most importantly, alerted them that they could take Exxon's mitigation efforts into account when determining both whether punitive damages were warranted and, if so, the size of the award. *See In re Exxon Valdez,* 296 F.Supp.2d 1071, 1091 (D.Alaska 2004). Considering that *BMW* and *State Farm* were decided after the jury trial, these instructions indeed were, as the majority notes, *ante* at ----, "in retrospect, quite forward looking."

FN3. Indeed to the contrary, there is evidence in the record comparing this award to Exxon's wealth in a manner that suggests the award was neither capricious nor an instance of over-deterrence. *See In re Exxon Valdez,* 296 F.Supp.2d at 1105-06 ("[A]fter judgment was entered on the punitive damages award, Exxon's treasurer advised the court that 'the full payment of the Judgment would not have a material impact on the corporation or its credit quality.' ").

FN4. The majority suggests *State Farm* is distinguishable because the dispute concerned an insurance contract rather than a toxic tort. *See ante* at ----, ----. However, the five-part reprehensibility analysis in *State Farm* is designed to evaluate a broad range of conduct, and nothing in the opinion indicates this framework applies only to insurance cases. Furthermore, despite factual differences between the cases, majority itself recognizes *State Farm* as intervening controlling authority with respect to calculation of the punitive damages " numerator." *See ante* at ---- ("*State Farm* makes untenable the idea that a defendant's voluntary, pre-judgment payment of compensatory damages may not generally be used as part of the calculation of harm." ). Just as the Supreme Court's decision not to include mitigation in the calculation of harm requires us to reconsider our prior statements about that issue, its decision not to include mitigation in the reprehensibility analysis compels similar reconsideration.

FN5. In this case, the certification of a mandatory punitive damages class meant that individual plaintiffs could not reduce the ultimate punitive damages award by releasing their claims. *See In re Exxon Valdez,* 229 F.3d 790, 793 (9th Cir.2000) ( "Claims for compensatory damages could be easily disposed of by exchanging payment for releases, but a plaintiff's release of its slice of the future lump-sum punitive damages award merely reduced the number of claimants sharing the punitive damages pie, not the size of the pie itself."). However, several plaintiffs nonetheless used the looming punitive damages award as a bargaining chip by allocating Exxon a portion of any award they might receive. *See ante* at ----.

FN6. I am not convinced by the majority's analysis of the third factor, but I do agree

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

--- F.3d ----                                                                                                                                           Page 30
--- F.3d ----, 2006 WL 3755189 (C.A.9 (Alaska)), 06 Cal. Daily Op. Serv. 11,701
**(Cite as: --- F.3d ----)**

that it plays a relatively small role in this case and therefore does not warrant an extended discussion. The majority classified as neutral the third factor, whether "the target of the conduct had financial vulnerability," *see State Farm,* 538 U.S. at 419, 123 S.Ct. 1513. As the majority admits, *ante* at ----, by recklessly placing a "relapsed alcoholic in charge of a supertanker," Exxon knew that it was "imposing a tremendous risk on a tremendous number of people who could not do anything about it." Not only were many of those people "financially vulnerable" by virtue of being subsistence fishermen, but they were also particularly vulnerable to the specific risk imposed on them by Exxon. *See In re Exxon Valdez,* 296 F.Supp.2d at 1094-95. Thus, I would find this factor indeed suggests Exxon's reckless conduct was highly reprehensible. *See BMW,* 517 U.S. at 576, 116 S.Ct. 1589 ("To be sure, infliction of economic injury, especially ... when the target is financially vulnerable, can warrant a substantial penalty.").

FN7. Contrary to the majority's assertion, *ante* at ----, I do not suggest it views Exxon's conduct as a largely excusable accident. Rather, I note that in finding this factor "militates against viewing Exxon's misconduct as highly reprehensible," *ante* at ----, the majority treats Exxon's reckless misconduct as it would treat an accident. This is not consistent with the majority's own statement that "the reprehensibility of Exxon's conduct that produced economic harm to thousands of individuals is high ..." *Id.*

FN8. Where the economic damages are significant but the behavior not "particularly egregious," a ratio of less than 4 to 1 is warranted. *Planned Parenthood,* 422 F.3d at 962. If the economic damages are significant but the behavior "more egregious," a ratio greater than 4 to 1 might be acceptable. *Id.* Finally, if the economic damages are insignificant but the behavior is "particularly egregious," ratios beyond single digits may be appropriate. *Id.*

C.A.9 (Alaska),2006.
In re Exxon Valdez
--- F.3d ----, 2006 WL 3755189 (C.A.9 (Alaska)), 06 Cal. Daily Op. Serv. 11,701

Briefs and Other Related Documents (Back to top)

• 2004 WL 3049454 (Appellate Brief) Reply Brief of Plaintiffs/Cross-Appellants (Nov. 19, 2004)
• 2004 WL 3079605 (Appellate Brief) Reply Brief of Plaintiffs/Cross-Appellants (Nov. 19, 2004)
• 2004 WL 3960330 (Appellate Brief) Brief of Plaintiffs (Oct. 27, 2004)
• 04-35183 (Docket) (Mar. 8, 2004)
• 04-35182 (Docket) (Mar. 8, 2004)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.