# EXHIBIT 11

FILED
CLERK, U.S DISTRICT COURT

AUG 18 2005

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LAWRENCE O'CONNOR, et al., | CASE NO. CV 97-1554 DT (RCx) |
| Plaintiffs, | Consolidated with Case Nos: |
| vs. | CV 98-7383 DT |
| | CV 99-1548 DT |
| | CV 00-0186 DT |
| BOEING NORTH AMERICAN, INC., et al., | CV 00-1319 DT |
| | CV 01-0786 DT |
| Defendants. | CV 01-7791 DT |
| | CV 02-2758 DT |
| | CV 02-5714 DT |
| | CV 02-9192 DT |
| | CV 03-3849 DT |
| | CV 05-4589 DT |

ORDER AND OPINION **GRANTING IN PART** AND **DENYING IN PART** DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION ON TCE CLAIMS

ORDER **DENYING** DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION RE DIOXINS

ORDER AND OPINION **GRANTING** DEFENDANTS' MOTION FOR SUMMARY ADJUDICATION RE APPLICABLE DUTY OF CARE RE RADIOLOGICAL CLAIMS

ORDER AND OPINION **DENYING** PLAINTIFFS' MOTION FOR SUMMARY ADJUDICATION OF STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITIES

ENTERED
CLERK, U.S. DISTRICT COURT

AUG 19 2005

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

1411

## I.   **Background**

### A.   **Factual Summary**

This suit, when originally commenced, was purportedly a class action arising under the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., the Price-Anderson Act, 42 U.S.C. §§ 2210 et seq., the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 et seq., and applicable California law.  This action was originally brought by various plaintiffs suing on their own behalf and/or as representatives of three defined classes.  The seven original Plaintiffs filed their complaint in March 1997.  After three additional amended complaints, the following individuals are named in the Fourth Amended Complaint ("4AC") as the Representative Plaintiffs: (1) Lawrence O'Connor and Margaret O'Connor (the "O'Connors")[1], Robert Grandinetti[2] ("Grandinetti"), Donald Reed[3] ("Reed"), William Rueger ("Rueger")[4], and Mary Jane Vroman ("Vroman")[5] are named as members and representatives of Class II and Class III; and (2) Plaintiffs Harold Samuels and Joyce Samuels[6] ("the Samuels") are named as members and representatives of Class I.  The 4AC sets

---

[1] The O'Connors were dismissed from this action on March 29, 2005.

[2] Grandinetti was dismissed as class representative for Class II on September 16, 1998.

[3] Reed was dismissed as class representative for Classes II and III on September 16, 1998.

[4] Ruegar was dismissed from this action on March 29, 2005.

[5] Vroman was dismissed from this action on March 29, 2005.

[6] The Samuels were dismissed individually on November 3, 2003, when this Court granted Defendants' Motion for Summary Judgment on Medical Monitoring Claims.

2

1  forth twenty-one causes of action based on the alleged injury to the person and/or

2  property of Plaintiffs by Defendants Boeing North American, Inc. ("Boeing") and

3  Rockwell International Corp. ("Rockwell") (collectively referred to as

4  "Defendants"). Defendants allegedly conducted operations at the following sites:

5  (1) the Santa Susana Field Laboratory ("SSFL") located at the top of Woolsey

6  Canyon Road and near the crest of the Simi Hills at the western border of the San

7  Fernando Valley in Ventura County; (2) the Canoga Facility located near the

8  corners of Canoga Avenue and Victory Boulevard in Canoga Park; (3) the De Soto

9  Facility located near the corners of De Soto Avenue and Nordoff Street in the San

10 Fernando Valley; and (4) the Hughes Facility located near the northwest corner of

11 Fallbrook Avenue and Roscoe Boulevard in the San Fernando Valley (collectively

12 referred to as "the Rocketdyne Facilities"). (4AC, ¶ 108).

13           When the 4AC was filed in March 1998, the suit contained two

14 distinguishable parts: 1) a purported class action brought on behalf of property

15 damage and medical monitoring class members; and 2) personal injury and

16 wrongful death claims brought individually by fifty-nine Plaintiffs. The

17 decertification that occurred in 2000 leaves the case as a multitude of individual

18 injury claims.

19           Plaintiffs allege the following facts in their 4AC:

20           Over the past fifty-plus years, Defendants or their predecessor

21 companies operated the Rocketdyne Facilities in the San Fernando and Simi

22 Valleys of Southern California devoted to manufacture and research for various

23 agencies and departments of the federal government, including the manufacture

24 and testing of large rocket engines for NASA and its space program. (4AC, ¶¶

25 107-168). During such time, these operations released chemical and radiological

26 pollutants into the areas neighboring the Rocketdyne Facilities, causing personal

27

28                                          3

1 injuries and death. (Id.) The Rocketdyne Facilities also stored vast amounts of

2 radioactive materials including but not limited to plutonium, uranium, tritium,

3 strontium, and cesium, which all constitute source, special nuclear, or byproduct

4 materials as defined in the Atomic Energy Act 42 U.S.C. § 2011. (Id.) Due to a

5 lack of funds on the part of the Environmental Protection Agency ("EPA"), the

6 Rocketdyne Facilities went unmonitored by the EPA for the better part of five

7 decades and the facilities were left to monitor themselves. (Id.) Defendants

8 repeatedly released hazardous contaminants into neighboring communities,

9 numbering in the millions of gallons. (Id.) Plaintiffs' injuries, allegedly arising

10 from exposure to contaminants, include a wide range of cancers, disfigured

11 growths, hypothyroidism, auto-immune disorders, and tumors. (Id.)

12        **B.     Procedural Summary**

13              The parties are familiar with the procedural history of this case as set

14 forth in this Court's previous August 8, 2005 Order: (1) Denying Plaintiffs'

15 Motion to Strike Defendants' Governmental Immunity and Government

16 Contractor Defenses; (2) Granting in part and denying in part Defendants' Motion

17 for Order Specifying Issues Without Substantial Controversy (re Chromium); and

18 (3) Granting in part and denying in part Defendants' Motion for Order Specifying

19 Issues Are Without Substantial Controversy re: 1) DeSoto Facility, 2) Former

20 Sodium Disposal Facility (Sodium Burn Pit), and 3) SSFL Area I Burn Pit

21 (Thermal Treatment Facility) ("August 8, 2005 Order"). The Court includes in

22 this Order only the most recent filings from March 27, 2005 and thereafter which

23 the Court finds helpful to explain the procedural posture of this case.

24              On March 27, 2005, Defendants filed a Motion for Order Specifying

25 Issues Without Substantial Controversy (re Chromium), which this Court granted

26 in part and denied in part.

27

28                                        4

1    On the same date, Defendants filed a Motion for Summary

2    Adjudication re Applicability of Care for Radiological Claims, which is before the

3    Court.

4    On the same date, Defendants filed a Motion for Order Specifying

5    Issues Are Without Substantial Controversy re: 1) DeSoto Facility, 2) Former

6    Sodium Disposal Facility, and 3) SSFL Area II "Burn Pit," which this Court

7    granted in part and denied in part.

8    On the same March 27, 2005 date, Plaintiffs filed a Motion for

9    Summary Adjudication of Strict Liability for Ultrahazardous Activities, which is

10   before the Court.

11   On the same date, Plaintiffs filed a Motion to Strike Governmental

12   Immunity and Government Contractor Defenses, which this Court denied.

13   On the same date, Defendants Rockwell, Boeing and Boeing North

14   American filed a Motion for Summary Adjudication Regarding Dioxins, which is

15   before the Court.

16   On the same date, Defendants  Rockwell, Boeing and Boeing North

17   American filed a Motion for Summary Adjudication on TCE Claims, which is

18   before the Court.

19   On July 12, 2005, a related case, Jeffrey Barina, et al. v. Boeing North

20   America, Inc. et al., CV 05-4589 ("CV 05-4589"), was transferred from Judge

21   Manuel Real to this Court.  On August 8, 2005, this Court, on its own motion,

22   consolidated CV 05-4589 with CV 97-1554.

23

24

25

26

27

28                                        5

## II.   **Discussion**

### A.   **Standard**

#### *1.   Motion for Summary Adjudication*

Under the Federal Rules of Civil Procedure, summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Upon such a showing, the Court may grant summary judgment "upon all or any part thereof." Fed. R. Civ. P. 56(a), (b).

To prevail on a summary judgment motion, the moving party must show that there are no triable issues of fact as to matters upon which it has the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). On issues where the moving party does not have the burden of proof at trial, the moving party is required only to show that there is an absence of evidence to support the nonmoving party's case. See Celotex Corp. v. Catrett, 477 U.S. at 326.

To defeat a summary judgment, the non-moving party may not merely rely on its pleadings or on conclusory statements. Fed. R. Civ. P. 56(e). Nor may the non-moving party merely attack or discredit the moving party's evidence. Nat'l Union Fire Ins. Co. v. Argonaut Ins. Co., 701 F.2d 95, 97 (9th Cir. 1983). The non-moving party must affirmatively present specific admissible evidence sufficient to create a genuine issue of material fact for trial. See Celotex Corp v. Catrett, 477 U.S. at 324.

### B.   **Analysis**[7]

---

[7] The Court is presented with a voluminous number of objections to evidence relied upon by the parties in this action. The various filings containing

6

1     Presently before the Court are the following motions: (1) Defendants'

2  Motion for Summary Adjudication on TCE Claims ("Motion Re TCE"); (2)

3  Defendants' Motion for Summary Adjudication Regarding Dioxins ("Motion Re

4  Dioxins"); (3) Defendants' Motion for Summary Adjudication Re Applicable Duty

5  of Care for Radiological Claims ("Motion Re Radiological Claims"); and (4)

6  Plaintiffs' Motion for Summary Adjudication of Strict Liability for Ultrahazardous

7  Activities ("Motion Re Ultrahazardous Activities").  The Court addresses each,

8  beginning with Defendants' Motion Re TCE.

9          *1.     Defendants' Motion Re TCE*

10             *a.     Undisputed facts*

11     The parties offer the following facts, the majority of which the parties

12  dispute:

13     Plaintiffs allege that they were injured by Rocketdyne's emission of

14  trichloroethylene ("TCE") into the atmosphere as a result of Rocketdyne's use of

15  TCE for vapor degreasing and rocket engine flushing at Boeing's Canoga Facility

16  and SSFL. (Rule 26 Report of Jim Tarr ("Tarr Report") at 7).  According to

17  Plaintiffs' expert, Jim Tarr ("Tarr" or "Mr. Tarr") also opined that TCE was

18  released not only from vapor degreasing and rocket engine flushing, but also from

19  the use of contaminated water containing TCE to cool the rocket test stands.  (See

20  Exh. B to Declaration of Dr. Roger Minear ("Minear Decl.") at pp. 4-7 and 18-20

21  (Tarr Report)).

22

23

---

24  objections to evidence are, in some cases, nearly 100 pages.  (See, e.g., Plaintiffs'

25  Objections to Evidence Offered in Support of Defendants' Motion for Summary

26  Adjudication on TCE Claims, filed on June 30, 2005).  This Court has carefully

considered the parties' objections.  To the extent this Court has relied on any

27  evidence objected to, such objection is overruled at this time.

28                           7

1   Plaintiffs allege that their injuries were caused by airborne emissions

2   of TCE resulting from (a) the use of vapor degreasers at Rocketdyne's Canoga

3   Facility and SSFL, and (b) the use of TCE to flush rocket engines during test

4   operations at SSFL.  (Tarr Report at 7, 21-23.  <u>See generally</u> 4AC).  According to

5   Plaintiffs, Tarr also opined that TCE was released not only from vapor degreasing

6   and rocket engine flushing, but also from the use of contaminated water containing

7   TCE to cool the rocket test stands.  (Exh. B to Minear Decl. at pp. 4-7 and 18-20

8   (Tarr Report)).

9   During the time period that Rocketdyne used TCE, Rocketdyne

10  performed work pursuant to contracts with the United States Air Force ("USAF"),

11  United States Army, and National Aeronautics and Space Administration

12  ("NASA").  (Declaration of John A. Halchak in Support of Defendants' Motion

13  for Summary Adjudication on TCE Claims ("Halchak Decl.") at ¶¶ 3-4;

14  Declaration of Lawrence Bielman in Support of Defendants' Motion for Summary

15  Adjudication on TCE Claims ("Bielman Decl.") at ¶¶ 3-4.  Among the machinery

16  produced by Rocketdyne for the government were rocket engines powered by a

17  combination of liquid oxygen ("LOX") and kerosene ("LOX engines").  (Halchak

18  Decl. at ¶ 7).

19  Defendants state that the United States government issued precise

20  specifications mandating decontamination standards for LOX engines.

21  (Halchak Decl. at ¶¶ 9-11; Bielman Decl. at ¶¶ 8-10).  In response, Plaintiff state

22  they are unable to controvert or admit this fact, because defendants fail to produce

23  all documentation of all standards set forth by the United States government

24  applicable to LOX engines.

25  Defendants maintain that in 1959, the technical consultant to the

26  United States Air Force ("USAF"), Space Technology Labs, issued a directive (the

27

28                                                8

1   "USAF Directive") ordering Rocketdyne to use TCE for vapor degreasing and

2   engine flushing.  (Halchak Decl. at ¶ 12 & Exh. A; Bielman Decl. at ¶ 11 & Exh.

3   A).  In response, Plaintiffs maintain that Defendants had discretion as to whether

4   they used TCE or another solvent for degreasing.  According to Plaintiffs, the

5   government did not mandate that TCE be used; the government only required that

6   the "trichloroethylene grades specified by DAC/high inhibitor [?]/ low residue

7   type/ . . . meet the requirements of the *Rocketdyne Specification*" and that the only

8   specification is that maximum permissible non-volatile residue of 10 p.p.m.,

9   "which meets both the DAC and Rocketdyne requirements and is in accord with

10   the AIA-sponsored committee[–]of which Rocketdyne is a member[–]which is

11   seeking to prepare a standard set of cleaning procedures for missile propellant

12   systems."[8]  (See Exh. A to Halchak Decl. and Bielman Decl. at ¶ 3).   Plaintiffs

13   state that no reference exists that TCE be used, only that if TCE is used which

14   grade to use.

15          Plaintiffs further state that although Rocketdyne generally concurred

16   with the USAF technical consultant, Rocketdyne rejected the USAF's technical

17   consultant's suggestion and ultimately concluded that it "cannot recommend at

18   this time the use of any other trichloroethylene than that presently described in

19   Rocketdyne Specification RB 0210-003, nor can the requirement for impact

20   testing a sample of trichloroethylene from each tank truck shipment be deleted

21   from the specification." (See Exh. 1 to Noël Decl. at BNA04633163

22   (BNA04633162-63, July 14, 1959 Interoffice Letter to W.C. Greayer from R.R.

23   Morin re use of different trichloroethylene)).  According to Plaintiff, this evidence

24   indicates that Rocketdyne dictated the terms of TCE use.

25

26   _____

27   [8]

28                                                  9

1    Defendants state that in 1961, the USAF issued Specification

2  AF/BSD Exh. 61-3A (the "USAF Specification"), which required Rocketdyne to

3  use TCE to clean engine components to be used in LOX engines.  Specifically,

4  Defendants maintain that the USAF Specification required Rocketdyne to (a) clean

5  engine components in TCE vapor degreasing units during the manufacturing

6  process, and (b) flush rocket engines both before and after "hot-fire" testing.

7  (Halchak Decl. at ¶ 13 & Exh. B; Bielman Decl. at ¶ 12 & Exh. B).  Plaintiffs

8  dispute this, to the extent that Defendants' declarants suggest that a portion cited

9  from the "Snavely letter" requires the use of TCE.  According to Plaintiffs, the

10  USAF Specification does not require TCE, and the Snavely letter itself, which

11  Defendants rely on, makes no mention of requiring TCE in vapor degreasing or

12  flushing.

13    Defendants state that the cover letter accompanying USAF

14  Specification AF/BSD Exh. 61-3A required the USAF Specification to be

15  incorporated into all contracts for the manufacture of ballistic missiles for the

16  United States, including all contracts between the USAF and Rocketdyne.

17  (Halchak Decl. at ¶ 13 & Exh. C; Bielman Decl. at ¶ 12 & Exh. C).  Plaintiffs

18  dispute this, stating that although Defendants' experts assert that the USAF

19  Specification "required Rocketdyne to use MIL-T-7003 grade and MIL-T-27602

20  grade TCE to clean liquid and gaseous rocket . . ." there is no exhibit which

21  supports their position that TCE was required.

22    Plaintiffs state that Exhibit C provides a specification regarding

23  permissible residues after cleaning, but does state the necessary procedure.

24  (Halchak Decl. at ¶ 13 & Exh. C, section 3, p. 3).  Plaintiffs further state that

25  Exhibit C on page 7 refers to the use of "carbon tetrachloride or trichloroethylene"

26  throughout subsection F, and subsection B on page 5 refers to "solvent rinse

27

28                                    10

1    method" using "trichloroethylene, or equivalent." (Halchak Decl. at ¶ 13 & Exh.

2    C). In addition, Plaintiffs indicate that a July 31, 1964 process specification

3    prepared by declarant Bielman regarding Cleaning Requirements for Facility

4    Components in Propellant and Indirect Propellant Services states, "<u>NOTE:</u> 1,1,2 -

5    Trichlorotrifluoroethane may be substituted for MIL-T-27602 as a final rinsing

6    solvent." (See Exh. 2 to Noël Decl at BNA04633292 (BNA04633291-303, July

7    31, 1964 Process Specification re Cleaning Requirements for Facility Components

8    in Propellant and Indirect Propellant Service)). According to Plaintiff, Exh. 2

9    evidences that the use of TCE was not mandated.

10        Defendants state that in 1962, NASA issued Specification MSFC-

11    SPEC-164 (the "NASA Specification"), which required Rocketdyne to use TCE to

12    clean engine components to be used in kerosene/LOX-propelled engines. (Halchak

13    Decl. at ¶ 14 & Exh. D; Bielman Decl. at ¶ 13 & Exh. D). Plaintiffs dispute this,

14    pointing to the fact that Exh. D states, "the cleaning and preservation process and

15    the type of equipment to be used *shall be left to the discretion of the*

16    *manufacturer,*" with approval to be obtained. (See Exh. D to Bielman & Halchak

17    Decls. at p. 3) (emphasis added.).

18        Defendants state that Rocketdyne's Process Specification RA-0110-

19    04 explicitly incorporated the requirements of the USAF Directive, the USAF

20    Specification, and the NASA Specification, (Halchak Decl. at ¶ 15 & Exh. E;

21    Bielman Decl. at ¶ 15 & Exh. E). According to Defendants, the USAF Directive,

22    USAF Specification, and NASA Specification explicitly identify the type of TCE

23    to be used in cleaning operations. (Halchak Decl. at ¶¶ 13-14 & Exh. B-D;

24    Bielman Decl. at ¶¶ 12-13 & Exh. B-D). Plaintiffs dispute this, stating that the

25    documents cited in fact demonstrate that Defendants had discretion in whether

26

27

28            11

1   they would use TCE or another solvent for degreasing, and that it was actually the

2   permissible residue, not the solvent used, that was mandated.

3          Although Defendants maintain that Rocketdyne complied with the

4   government's specifications, using the type of TCE required and using it

5   according to the government's instructions, (Halchak Decl. at ¶ 15; Bielman Decl.

6   at ¶ 14), Plaintiffs dispute this, indicating that the use of TCE was not according to

7   government instruction in that Defendants had discretion as to which solvents to

8   use.

9          Defendants state that Government inspectors from the USAF and

10  NASA were permanently stationed at both the Canoga Facility and SSFL and were

11  present during Rocketdyne's operations and witnessed Rocketdyne's cleaning and

12  engine testing operations. (Halchak Decl. at ¶¶ 6, 22; Bielman Decl. at ¶ 5).  In

13  response, Plaintiffs state that it may be true that Bielman and Halchak saw USAF

14  and NASA government inspectors at the Canoga Facility and SSFL on unspecified

15  occasions over an unspecified period; however, how frequently Bielman and

16  Halchak visited and to what extent they witnessed the details of the operation is

17  unknown.

18         Defendants state that Rocketdyne discontinued using TCE at the

19  Canoga Facility in 1967 as a result of the adoption of a local air quality regulation

20  that restricted the use of TCE. (Halchak Decl. at ¶ 18; Bielman Decl. at ¶ 17).

21  Although Plaintiffs have made no claims based upon exposure to TCE at the

22  Canoga Facility after 1967, Plaintiffs dispute that Defendants discontinued using

23  TCE in general in 1967.  As evidence, Plaintiff offer a December 18, 1974 internal

24  memo prepared by R. D. Schmued, Rocketdyne's Environmental Control

25  Specialist, which states, "Toluene TT-T-548 and Trichloroethylene TT-T-27602

26  are also still being used.  In view of the recent adoption of L.A. APCD Rules 66.4

27

28                                    12

1   ·and 66.5, it is clearly necessary to impose stricter internal controls on the purchase

2   and issuance of photochemically reactive materials." (See Exh. 3 to Noël Decl. at

3   BNA06204298-299 (December 18, 1974 Internal Letter to Distribution from R.D.

4   Schmued re Advisory Group On Environmental Quality)).

5          Defendants further state that Rocketdyne was required to, and did,

6   obtain the express permission of the government to cease using TCE. (Halchak

7   Decl. at ¶ 18 and Exhs. G-H; Bielman Decl. at ¶¶ 17 and Exhs. G-H).  Plaintiffs

8   dispute this, maintaining that Exhs. G-H do not say that Rocketdyne was required

9   to obtain the express permission of the government to cease using TCE.

10  According to Plaintiffs, Exh. G states that "trichloroethane, as proposed by

11  Rocketdyne, is a practical substitution for trichloroethylene," and Exh. H

12  addresses "Revisions to R-3950A" which remains unidentified, so the reader does

13  not know what these revisions extend to, and it allows trichloroethane ("TCA") to

14  be used as a substitute for trichloroethylene in Los Angeles County only.

15         Defendants state that while the government permitted the use of

16  another agent for vapor degreasing at the Canoga Facility, it continued to require

17  the use of TCE for vapor degreasing and engine flushing at SSFL.  (Halchak Decl.

18  at ¶ 18; Bielman Decl. at ¶ 17).  In response, Plaintiffs assert that if defendants had

19  a document demonstrating that the government required the use of TCE in engine

20  flushing, it would have been provided.

21         Defendants claim that the United States government initially refused

22  Rocketdyne's request to eliminate TCE from its operations in the early 1990's, and

23  declared that the USAF Specification and NASA Specification for LOX engines

24  required the use of TCE.  (Halchak Decl. at ¶¶ 25, 27).  In response, Plaintiffs state

25  that Halchak's testimony is not supported by documentation, is probable hearsay,

26  and fails to demonstrate any personal knowledge or foundation on the subject.

27

28                                              13

1    Defendants claim that the United States government did not agree to

2  amend its specifications to allow for the elimination of TCE from the cleaning

3  specifications for kerosene/LOX-propelled rocket engines until 1993, when it

4  approved the use of gaseous nitrogen for engine flushing after Rocketdyne had

5  completed a lengthy testing process. (Bielman Decl. at ¶ 19 & Exh. I).  In

6  response, Plaintiffs state that simply because the United States government agreed

7  to the use of GN2 in 1993 does not mean that it prevented the use of solvents other

8  than TCE on any occasion prior to 1993.

9    According to Defendants, during the time Rocketdyne used TCE at

10 the Canoga Facility and SSFL, Rocketdyne was unaware that TCE posed risks to

11 human health when inhaled in small amounts resulting from atmospheric

12 exposure. (Halchak Decl. at ¶ 28; Bielman Decl. at ¶ 21).  Plaintiffs dispute this,

13 asserting that by the late 1950's and through the 1960's, Rocketdyne knew that

14 inhalation of sufficient levels of TCE was toxic to humans.  Plaintiffs point to the

15 1956 Chemical Safety Data Sheet SD-14 for trichloroethylene, which discusses

16 numerous health hazards posed by exposure, and included a bolded warning in a

17 larger font size, "**TRICHLOROETHYLENE** WARNING! VAPOR HARMFUL

18 - Use only with adequate ventilation. Avoid prolonged or repeated breathing of

19 vapor. Avoid prolonged or repeated contact with skin.  Do not take internally."[9]

20 (See Exh. 4 to Noël Decl. at BNA120655 (BNA120647-61, Chemical Safety Data

21 Sheet SD-14, Properties and Essential Information for Safe Handling and Use of

22 Trichloroethylene)).

23

24 _____

25    [9] Defendants state that the document and its contents are irrelevant to
   Rocketdyne's knowledge of the potential health risks of inhalation of small
26 concentrations of TCE, particularly by persons outside the workplace and in "well-
27 ventilated areas."

28    14

1    Plaintiff's also point to Rocketdyne's March 28, 1962 specification

2    regarding the handling and use of chemicals, which states, as to the hazardous

3    properties of the solvents listed, including TCE, that "Solvents are hazardous due

4    to their ability to enter the blood stream rapidly through the lungs.  Solvents also

5    may cause dermatitis because of their ability to dehydrate and defat the skin,"

6    "[r]epeated exposure to chlorinated hydrocarbons results in an accumulation of

7    effects," and "[d]etermination of the hazards of solvents to personnel requires

8    expert evaluations."[10]  (See Exh. 8 to Noël Decl. at pp. BNA04633205-06

9    (BNA04633198- 214, Process Specification No. PR7-2 dated November 19,

10    1953)).

11    As to Defendants' knowledge of the hazards of TCE, Plaintiffs

12    further point to a March 17, 1958 letter from North American Aviation, Inc. to the

13    Regional Water Pollution Control Board regarding Rocketdyne's Santa Susana

14    Facility, acknowledging, "[y]ou will undoubtedly recall that, in the past, there

15    were certain problems regarding water pollution at our Propulsion Field

16    Laboratory at Santa Susana," and requesting that "requirements be set up as

17    outlined herein, superseding the various requirements heretofore established for

18    individual operations." (Exh. 9 to Noël Decl. at pp. BNA145122, 123, and 124

19    (BNA145122-126, March 27, 1958 letter from W.C. Hobbs to Regional Water

20    Pollution Control Board No. 4).  The discharges described included 10 gallons of

21    _____

22        [10]  As Defendants point out, however, Plaintiffs misquote and omit crucial

23    language from the specification. The correct quotation is "Repeated **over**exposure
      to chlorinated hydrocarbons results in an accumulation of effects."  Moreover,

24    Defendants point out that Plaintiffs omitted the last sentence of this section of the
      specification, which states, "[t]he degree of danger varies widely [among solvents]

25    due to variations in toxicity, rate of evaporation, quantity and method of use,

26    duration of exposure, effect on skin and flammability." (Exh. 8 to Noel Decl. at

27    BNA04633206 (Process Specification No. PR7-2 (November 19, 1953)).

28                                              15

1   TCE per day from CTL-I burned off water and ultimately to reclamation reservoir

2   in open drainage trench, 15 gallons per day of TCE from Bowl Test Area burned

3   off water and ultimately to reclamation reservoir, 15 gallons per day of TCE from

4   TRE Test Area burned off and ultimately to Area I Reclamation Reservoir; and

5   solvents used in cleaning equipment ultimately released to the reclamation

6   reservoir. (Exh. 9 to Noël Decl. at pp. BNA145122, 123, and 124 (BNA145122-

7   126, March 27, 1958 letter from W.C. Hobbs to Regional Water Pollution Control

8   Board No. 4). Defendants state that this document and its contents are irrelevant

9   to Rocketdyne's knowledge of the potential health risks of inhalation of small

10   concentrations of TCE by persons outside its facilities. In addition, Defendants

11   maintain that the document deals only with release of TCE into water and that no

12   evidence has been introduced to demonstrate that Plaintiffs have been injured as a

13   result of the release of TCE into water.

14          Plaintiff also points to a June 2, 1958 letter from the County of Los

15   Angeles Health Department to the State Regional Water Pollution Control Board

16   No. 4 regarding the reclamation of water at the Santa Susana Facility, which was

17   file stamped as received by Rocketdyne on June 4, 1958 ("June 2, 1958 Letter").

18   (Exh. 10 to Noël Decl. at pp. BNA69179-80 (BNA69179-80, June 2, 1958 Letter

19   from County of Los Angeles Health Department to State Regional Water Pollution

20   Control Board No. 4). In this letter, the Health Department states: "There are

21   however certain aspects of this process that we believe will warrant more than

22   casual consideration, primarily with reference to the disposal of trichloroethylene

23   along with other liquid wastes. . . . It is therefore reasonable to conclude that this

24   material [TCE] will not be burned out of the burn-off sumps and further because

25   of the specific gravity, will not be amendable to skimming. **This coupled with**

26   **the fact that the material is toxic,** would indicate that some means of reclamation

27

28                                          16

1   should be employed prior to the discharge of the material." (See Exh. 10 to Noël

2   Decl. at pp. BNA69179-80 (BNA69179-80, June 2, 1958 Letter)). It further notes,

3   "at the time of our visit to the facilities, Campbell stated that the main use of this

4   solvent was in the degreasing process, however the proposal of North American

5   Aviation Company indicated that approximately eighty gallons a day will become

6   co-mingled with other liquid wastes and evidently be discharged to Bell Canyon."

7   June 2, 1958 Letter concluded, "it is our opinion that surface drainage of liquid

8   wastes will generally be acceptable, provided that: 1. **Such steps as necessary are**

9   **taken in order to preclude the discharge of trichloroethylene along with other**

10   **wastes,** . . . ." (See Exh. 10 to Noël Decl. at pp. BNA69179-80 (BNA69179-80,

11   June 2, 1958 letter from County of Los Angeles Health Department to State

12   Regional Water Pollution Control Board No. 4) (emphasis added).

13        Defendants state that the 1991 Material Safety Data Sheet ("MSDS")

14   for TCE indicated that TCE was not a human carcinogen. (Halchak Decl. at ¶ 28

15   & Exh. I; Bielman Decl. at ¶ 21 & Exh. J). However, Plaintiffs dispute this,

16   stating that the MSDS does state that "Repeated exposure may cause central or

17   possibly even peripheral nervous system effects; high levels have caused liver or

18   kidney effects in laboratory animals. A positive carcinogenic response has

19   occurred only in mice given large does of trichloroethylene. Data suggest a non-

20   mutagenic mechanism for tumor formation implying that non-toxic doses of

21   trichloroethylene should pose little or no carcinogenic hazard to man," in

22   additional to numerous other health hazards through skin absorption, ingestion and

23   inhalation. (See Exh. I to Halchak Decl. at p. 3). In addition, Plaintiffs point to

24   the 1956 revision of the Chemical Safety Data Sheet SD-14 for trichloroethylene,

25   which discusses numerous health hazards posed by exposure, and included a

26   warning in increased font size and in bold, "**TRICHLOROETHYLENE**

27

28                   17

1  WARNING! VAPOR HARMFUL - Use only with adequate ventilation. Avoid

2  prolonged or repeated breathing of vapor. Avoid prolonged or repeated contact

3  with skin. Do not take internally." (See Exh. 4 to Noël Decl. at BNA120655

4  (BNA120647-61, Chemical Safety Data Sheet SD-14, Properties and Essential

5  Information for Safe Handling and Use of Trichloroethylene). Plaintiffs also refer

6  to a July 15, 1957 Rocketdyne Inter-Office Letter re Engine Flushing and Purging

7  Fluids which states that "Trichloroethylene . . . must be handled without breathing

8  excessive quantities of vapor coming from the solvent . . . For this reason when

9  personnel are to work in thrust chambers or other enclosed areas immediately after

10 flushing, oxygen breathing equipment should be made available to the personnel."

11 (Exh. 5 to Noël Decl. at ACE03947 (ACE03946-50, July 15, 1957 Rocketdyne

12 Inter-Office Letter re Engine Flushing and Purging Fluids)). Again, Defendants

13 maintain that this document and its contents are irrelevant to Rocketdyne's

14 knowledge of the potential health risks of inhalation of small concentrations of

15 TCE by persons outside its facilities. In addition, Defendants maintain that the

16 document deals only with release of TCE into water and that no evidence has been

17 introduced to demonstrate that Plaintiffs have been injured as a result of the

18 release of TCE into water.

19         Defendants state that the government had knowledge of the risks of

20 TCE. (National Cancer Institute, Carcinogenesis Bioassay of Trichloroethylene,

21 NCI-CG-TR-2 (1976)). In response, Plaintiffs state that the document cited does

22 not support that the contracting agencies (NASA and USAF) had more knowledge

23 than Defendants (specifically, the defense contractor).

24         Defendants state that Plaintiffs have not introduced any expert

25 opinion testimony regarding the standard of care for TCE usage at SSFL.

26 (Tarr Report at 21-23). Plaintiffs dispute this, stating the following:

27

28                                    18

1    Mr. Tarr opined, "Rocketdyne's operating

2    practices were not consistent with the industry

3    standard of care.  Rocketdyne utilized poor control

4    systems concerning air emissions from several

5    sources at their facilities."  See Exh. B to Minear

6    Decl. at p. 1 and ¶7 [Tarr Rule 26 R eport].

7    Mr. Tarr further opined, "Rocketdyne's

8    operating practices were not consistent with the

9    industry standard of care.  Open burning and the use

10   of contaminated water to cool rocket engine test

11   stands at SSFL resulted in the uncontrolled release of

12   numerous carcinogens into the atmosphere.

13   Inadequate emission control systems at the Canoga

14   facility resulted in the high rate of emissions of

15   hexavalent chromium and TCE.

16   "Certain of Rocketdyne's operating practices and

17   air emission control efforts were at best a reflection of

18   an indifferent attitude and at worst exhibited a studied

19   disregard for human health and environmental safety.

20   Had Rocketdyne espoused a better standard of care,

21   substantial quantities of carcinogenic air emissions

22   would have been greatly reduced or eliminated."  See

23   Exh. B to Minear Decl. at p. 24 (¶¶2 and 3) [Tarr Rule

24   26 Report].

25   Mr. Tarr further opined, "Rocketdyne's

26   operating practices were not consistent with the

27

28                          19

industry standard of care.  At SSFL, the use of
contaminated water to cool rocket engine test stands
and the open burning of waste fuels and other
chemicals caused the uncontrolled release of chemical
carcinogens into the atmosphere."  See  Exh. B to
Minear Decl. at  p. 21 (¶2) [Tarr Rule 26 Report],
plus Mr. Tarr opined that at the Canoga facility,
inadequate emission controls led to unnecessarily
high emission rates of TCE and $Cr^{+6}$." *Ibid.*

Mr. Tarr further explained that the "[a]t least two
major waste disposal related activities at the Santa
Susana Field Laboratory (SSFL) were conducted in a
manner contrary to good engineering practices.  One
of those operations was the use of contaminated water
at various rocket engine test stands," which he further
describes. See Exh. B to Minear Decl. at pp. 21-23
(¶3) [Tarr Rule 26 Report].

Additionally, defendants' expert has testified and
confirmed the following:

"Q: With regard to the standard of care in the
aerospace engineering, what qualifies you to offer an
opinion regarding the use of TCE in vapor degreasing
in the manufacturing process in the 50's and 60's at
any of the Rocketdyne facilities?

"A. Well, I think pointing out specifically the
aerospace industry and implying that their use of

20

1   degreasers or their use of metal processing is

2   somehow distinct from industry in general is not

3   correct. Those processes are universal.

4          "Q:  You do believe that although you have

5   never worked in the aerospace industry, you are

6   qualified to offer a standard of care opinion as to the

7   proper handling of hazardous and chemical wastes at

8   an industrial setting in an aerospace industry in the

9   1950's, 60's and 70's, right?

10          "A. Yes, I do."

11   See also, Exh. 6 to Noël Decl. at 116:23- 118:1

12   [Minear Deposition].

13   (Plaintiffs' Statement of Genuine Issues and Response to Conclusion of Law In

14   Opposition to Defendants' Motion for Summary Adjudication on TCE Claims

15   ("Plaintiff's GI Re TCE"), ¶ 23).

16          Defendants state that Plaintiffs have failed to allege that Rocketdyne

17   violated any statute or regulation governing the release of TCE into the

18   atmosphere.  Plaintiffs dispute this, stating that Plaintiffs have alleged that

19   Defendants:

20          [u]ntil at least July 26, 1994, . . . continued to treat,

21          store and dispose of hazardous mixed wastes and to

22          discharge hazardous wastes into water and

23          groundwater in violation of, *inter alia*, RCRA, the

24          Clean Air and Water Act, the Porter-Cologne Water

25          Quality Control Act, and the Safe Drinking Water and

26          Toxic Enforcement Act.

27

28                              21

1   (See Exh. 7 to Noël Decl. at ¶ 121 (Plaintiffs' 4AC, filed on March 30, 1998)).

2   Plaintiffs have further alleged that:

3           [m]any of the releases alleged herein have been and

4           continue to be airborne releases.  Radioactive

5           contaminants and hazardous, non-radioactive

6           substances were released into the air, either as vapors

7           or in the form of particles of the order of microns in

8           size, and were transported to the environment

9           surrounding the Rocketdyne Facilities by the winds in

10          dispersal patterns depending in part on the

11          meteorological conditions prevailing at the time of

12          each release.  The sources of such airborne releases

13          have included volatilization from spills, resuspension

14          of dust and droplets from past spills and from

15          ongoing remediation activities, direct airborne

16          releases not captured by vents, evaporation and wind

17          causing escape from contaminated holding tanks,

18          direct burning of hazardous materials, and accidental

19          fires.

20  (See Exh. 7 to Noël Decl. at ¶ 122 (Plaintiffs' 4AC)).

21      Plaintiffs also point to the fact that they have alleged that:

22          Defendants' generation, handling, storage, treatment,

23          and disposal of hazardous, non-radioactive substances

24          at the Rocketdyne Facilities, and their failure to

25          control and contain the same within the confines of

26          the facilities, constituted numerous and repeated

27

28

1                    violations of state and federal environmental health

2                    and safety statutes and regulations, including, *inter*

3                    *alia*, CERCLA, and the California Water Code

4                    Section 13000 et seq.  Accordingly, Defendants'

5                    actions have been negligent as a matter of law.

6 (See Exh. 7 to Noël Decl. at ¶ 211 (Plaintiffs' 4AC)).

7          Plaintiff offer the following additional facts:

8          Plaintiff state that as early as the 1930s, industrial operators were

9 urged to develop safe protocols for handling and manufacture of chemicals.  In

10 terms of industrial hygiene practices, it is the duty of every engineer, whether

11 chemical, mechanical, structural, electrical, or architectural, to determine for new

12 products and new processes whether or not there exists therein a danger to workers

13 who may be engaged in the manufacture or to the public who may utilize or

14 consume these products. (Exh. B to Minear Decl. at pp. 21-22 (Tarr Report)).  In

15 response, Defendants, among other things, state that Plaintiffs' assertion is

16 irrelevant because it addresses only the purported duty of care of engineers in

17 dealing with "new products and new processes" and that this case deals with the

18 use of TCE for engine flushing and vapor degreasing, neither of which were "new

19 processes" when Rocketdyne began using them.  Defendants also note the

20 vagueness of the term "industrial operators."

21          On October 16, 1958, the State of California Pollution Control Board

22 No. 4 adopted Resolution No. 58-77, "Prescribing Requirements for the Disposal

23 of Industrial Wastes from the Propulsion Field Laboratory of North American

24 Aviation, Incorporated Santa Susana, Ventura County, California" pursuant to the

25 Division 7 of the California Water Code, and pursuant to Section 13054, requiring

26 the SSFL facility in disposing of wastes by surface drainage, "not contain any

27

28                                    23

1  substances in concentrations toxic to human, animal, plant, or bird life," and

2  ordering the monthly testing of chlorinated hydrocarbons (among other chemicals)

3  of discharges to Simi Valley and Bell Canyon, along with requiring complete

4  records be maintained of the monitoring program and results. (Exh. 11 to Noël

5  Decl. at BNA00260048 (1), BNA00260049 (§C.1.), BNA00260050-51 and

6  BNA00260045 (BNA00260043-52, State of California Regional Water Pollution

7  Control Board No. 4 Resolution No. 58-77 (Adopted October 16, 1958)). This

8  Resolution further acknowledged the receipt of the June 2, 1958 letter from the

9  Los Angeles County Health Department, which as set forth in Plaintiffs'

10 Additional Fact No. 5 confirms that TCE is "toxic." (Exh. 11 to Noël Decl. at

11 BNA00260048 (1), BNA00260049 (§C.1.), BNA00260050-51 and BNA00260045

12 (BNA00260043-52, State of California Regional Water Pollution Control Board

13 No. 4 Resolution No. 58-77 (Adopted October 16, 1958)).

14       In 1966 when it prohibited discharges in excess of 40 pounds a day of

15 certain photochemically reactive solvents defined to include trichloroethylene, Los

16 Angeles County Air Pollution Control Rule 66 provided that emissions of organic

17 materials into the atmosphere could be controlled by adsorption (or by other

18 sufficiently effect method set forth in subsection (f) or by the Air Pollution

19 Control Officer). (Exh. 12 to Noël Decl. at BNA06899816 §§a-b, BNA06899817

20 § f and BNA06899818 § k (BNA06899815-819, L.A. County Rule 66 (Adopted

21 July 28, 1966)).

22       Plaintiffs' expert has opined that, "Rocketdyne's operating practices

23 were not consistent with the industry standard of care. (Exh. B to Minear Decl. at

24 pp. 1 (7) and 23 (Tarr Report)). Rocketdyne utilized poor control systems

25 concerning air emissions from several sources at their facilities." (Exh. B to

26 Minear Decl. at pp. 1 (7) and 23 (Tarr Report)). Further elaborating on one area in

27

28                                  24

1   which Defendants violated the standard of care, Plaintiffs' expert opined that they

2   should have used adsorption methods to increase the recovery of TCE and

3   decrease the TCE emissions. (Exh. B to Minear Decl. at pp. 1 (7) and 23 (Tarr

4   Report)).   In response, Defendants state that Tarr does not opine, as implied by

5   Plaintiffs' statement, that Rocketdyne's failure to utilize carbon adsorption

6   constituted a  violation of the standard of care and that Tarr states only that "[t]he

7   most effective emission control system for vapor degreasers at the time

8   Rocketdyne was using TCE was activated carbon adsorption."  (Exh. B to Minear

9   Decl. at p. 23 (Tarr Report)).

10          Plaintiffs' expert Tarr opined that: (1) Rocketdyne's operating

11   practices were not consistent with the industry standard of care; (2) Open burning

12   and the use of contaminated water to cool rocket engine test stands at SSFL

13   resulted in the uncontrolled release of numerous carcinogens into the atmosphere;

14   (3) Inadequate emission control systems at the Canoga facility resulted in the high

15   rate of emissions of hexavalent chromium and TCE; (4) Certain of Rocketdyne's

16   operating practices and air emission control efforts were at best a reflection of an

17   indifferent attitude and at worst exhibited a studied disregard for human health and

18   environmental safety; (5) Had Rocketdyne espoused a better standard of care,

19   substantial quantities of carcinogenic air emissions would have been greatly

20   reduced or eliminated.  (Exh. B to Minear Decl. at pp. 21-24 (Tarr Report)).

21          Mr. Tarr further opined, "Rocketdyne's operating practices were not

22   consistent with the industry standard of care.  At SSFL, the use of contaminated

23   water to cool rocket engine test stands and the open burning of waste fuels and

24   other chemicals caused the uncontrolled release of chemical carcinogens into the

25   atmosphere." (Exh. B to Minear Decl. at pp. 21-24 (Tarr Report)).  Mr. Tarr

26   further explained that the "[a]t least two major waste disposal related activities at

27

28                                                      25

1   the Santa Susanna Field Laboratory (SSFL) were conduced in a manner contrary

2   to good engineering practices. One of those operations was the use of

3   contaminated water at various rocket engine test stands," which he further

4   describes. (Exh. B to Minear Decl. at pp. 21-24 (Tarr Report)).

5          According to Plaintiffs, Rocketdyne was able to negotiate the terms

6   under which trichloroethylene was used and did in fact reject suggestions made by

7   governmental technical consultants. (*See* Exh. 1 to Noël Decl. at BNA04633163

8   (BNA04633162-63, July 14, 1959 Interoffice Letter to W.C. Greayer from R.R.

9   Morin re use of different trichloroethylene)). Defendants dispute this, stating that

10  the document cited indicates that Rocketdyne had input into what **type** of TCE

11  was used; the document does not indicate that Rocketdyne was able to negotiate

12  "the terms under which" TCE was used. (Exh. 1 to Noël Decl. at BNA04633163

13  (July 14, 1959 Interoffice Letter to W.C. Greayer from R.R. Morin regarding use

14  of different type of TCE)).

15         Plaintiffs state that Defendants had discretion as to whether they

16  would use TCE or other substances. Plaintiff further state that  the document

17  referenced by Defendants as Exh. C to Halchak and Bielman Declarations

18  provides a specification regarding permissible residues after cleaning but does

19  state the necessary procedure. (Exh. C to Halchak Decl. at the beginning of

20  section 3 on page 3). Page 7 of Exhibit C refers to the use of "carbon tetrachloride

21  or trichloroethylene" in the process throughout subsection F, and subsection B on

22  page 5 refers to "solvent rinse method" using "trichloroethylene, or equivalent."

23  In response, Boeing states that its witnesses have stated, based on personal

24  knowledge and many years of experience dealing with Rocketdyne's government

25  contracts, that TCE was the only solvent available that was capable of satisfying

26

27

28                                          26

1    the government's stringent cleanliness criteria.  (See Bielman Decl. at ¶ 15;

2    Halchak Decl. at ¶ 16).

3          In the July 31, 1964 process specification produced by Defendants,

4    regarding Cleaning Requirements for Facility Components in Propellant and

5    Indirect Propellant Services, it states, "NOTE: 1,1,2 - Trichloro-trifluoroethane

6    may be substituted for MIL-T-27602 as a final rinsing solvent. (Exh. 2 to Noël

7    Decl. at BNA04633292 (BNA04633291-303, July 31, 1964 Process Specification

8    re Cleaning Requirements for Facility Components in Propellant and Indirect

9    Propellant Service)).  According to Defendants, this fact does not mean that TCE

10   was not required for facility components cleaning.  Additionally, Defendants state

11   that simply because 1,1,2-trichlorotrifluorethane could be used for final rinsing,

12   the July 31, 1964 process specification does not indicate that a solvent other than

13   TCE could be used.

14         Plaintiffs state that Defendants had discretion as to whether they

15   would use trichloroethylene of other substances pursuant to Exh. D.  Exh. D states

16   that "[t]he cleaning and preservation process and the type equipment to be used

17   shall be left to the discretion of the manufacturer; however, approval of the

18   process and the type of equipment to be used shall be obtained from the procuring

19   activity prior to cleaning and handling."  Boeing's witnesses stated that based on

20   personal knowledge and many years of experience dealing with Rocketdyne's

21   government contracts, that TCE was the only solvent available that was capable of

22   satisfying the government's stringent cleanliness criteria.  (Bielman Decl. at ¶ 15;

23   Halchak Decl. at ¶ 16).

24         Company officials have admitted that they lost their monitoring

25   records on workplace levels of carcinogenic chemicals such as hydrazine and

26   TCE. (See Exh. 13 to Noël Decl. at BNA03713042 (BNA03713042, July 11,

27

28                                    27

1   1995 Los Angeles Times, "Dispute Surfaces on Rocketdyne Deaths Study")).

2   Plaintiffs assert that no fact or document cited by Defendants suggest that any

3   government contract or specification encompassed what emission controls were

4   necessary at the Canoga Facility.  (Plaintiffs' Additional Facts in Opposition to

5   Motion Re TCE, ¶ 20).

6          Plaintiffs' expert Tarr's Rule 26 Report states the following: (1) Tarr

7   is the President of Stone Lions Environmental Corporation; (2) He is a registered

8   Professional Engineer in the State of Texas and a Diplomat of the American

9   Academy of Environmental Engineers; (3) He received his Bachelor of Science

10   and Masters degrees in Chemical Engineering; (4) He has worked in a large

11   chemical plant and spent six years with the Texas Air Control Board; (5) He has

12   devoted most of his professional career to investigating, studying and evaluating

13   the atmospheric emission of chemicals from industrial facilities.  (Exh. B to

14   Minear Decl. at p. 1 (Tarr Report)).

15          Defendants designated Stephen Lafflam as their person most

16   knowledge regarding, inter alia, the types of processes and work done at each of

17   the Rocketdyne Facilities and the past and present use, disposal, maintenance,

18   storage, and release of hazardous substances, including TCE, at each of the

19   Rocketdyne Facilities.  (Exh. 14 to Noël Decl. at pp. 1-2 (Notice of Deposition of

20   Person(s) Most Knowledgeable at Rockwell International Corporation (Re

21   Operations), which is Exh. 125 to Lafflam Deposition taken on February 26, 2001;

22   Exh. 15 to Noël Decl. at pp. 1-2 (Notice of Deposition of Person(s) Most

23   Knowledgeable at Boeing North American, Inc., Now Doing Business as The

24   Boeing Company (Re Operations), which is Exh. 126 to Lafflam Deposition taken

25   on February 26, 2001)).  Mr. Lafflam confirmed at his deposition that he was the

26   person most knowledgeable on those issues and specifically confirmed that he was

27

28                                   28

1   the person most knowledgeable regarding TCE. (Exh. 16 to Noël Decl. at 15:19-

2   25, 17:13-23, 18:1-5 (Lafflam Deposition)).

3                    b.      Discussion – Motion Re TCE

4            Plaintiffs' claims are significantly based upon Rocketdyne's use of

5   trichloroethylene ("TCE") to manufacture and test rocket engines.  Plaintiffs allege

6   through their Rule 26 Report of Tarr that Rocketdyne emitted large amounts of

7   TCE into the atmosphere during the vapor degreasing and engine flushing process.

8   According to Defendants, Plaintiffs' claims fail as a matter of law for three

9   reasons: (1) Plaintiffs failed to establish a prima facie case of negligence by not

10  producing competent expert testimony regarding the standard of care governing

11  Rocketdyne's use of TCE; (2) Under California law, the use of TCE is not an

12  ultrahazardous activity and thus cannot give rise to strict liability; and (3)

13  Rocketdyne's use of TCE was mandated by, and done in accordance with, precise

14  contractual specifications promulgated by the United States government, rendering

15  Defendants immune from liability based on Rocketdyne's use of TCE.

16                   1)      Plaintiffs' negligence claims are not deficient as a

17                           matter of law[11]

18           As an initial matter, the Court notes that Plaintiffs' claims alleging

19  harm as a result of the release of TCE into the atmosphere are properly before the

20  Court.  Defendants argue that Plaintiffs' claims alleging harm as a result of the

21  release of TCE into the atmosphere are not before the Court because Plaintiffs'

22  4AC only alleges that TCE was released into the groundwater, (4AC at ¶¶ 124-7),

23  _____

24       [11]  Boeing argues, for the first time in their Reply, that Plaintiffs fail to offer
     certain causation evidence in relation of Plaintiffs' exposure expert, Dr. Owen
25   Hoffman.  By addressing this issue solely in their Reply, Plaintiffs are not given an
     opportunity to respond, and therefore, in the interests of fairness to Plaintiffs, the
26   Court does not consider Boeing's argument.
27

28                                      29

1 and that Plaintiffs made no mention of harm due to atmospheric releases of TCE

2 until they filed their expert reports in 2004, seven years after the case was initially

3 filed.   Defendants are incorrect.  Plaintiffs have alleged that:

4         [m]any of the releases alleged herein here been and

5         continue to be airborne releases. . . . [H]azardous,

6         non-radioactive substances were released into the air,

7         either as vapors or in the form of particles . . . and

8         were transported to the environment surrounding the

9         Rocketdyne Facilities by the winds . . . . The sources

10         of such airborne releases have included volitization

11         from spills, resuspension of dust and droplets from

12         past spills and from ongoing remediation activities,

13         direct airborne releases not captured by vents,

14         evaporation and wind causing escape from

15         contaminated holding tanks, direct burning of

16         hazardous materials, and accidental fires.

17 (4AC at ¶ 122).  With regard to the "total quantity of TCE released into the

18 environment, Plaintiffs allege "1 to 2 million gallons of TCE may have been

19 released into the environment."  (4AC ¶¶ 125, 179).

20         Defendants contend that Plaintiffs' negligence claims are deficient as

21 a matter of law because Plaintiffs fail to establish through the use of competent

22 expert testimony the standard of care governing Rocketdyne's use and handling of

23 TCE.  Specifically, Defendants argue that Plaintiffs' expert: (1) offers a

24 conclusory and unsupported opinion regarding the standard of care governing

25 TCE use at Rocketdyne's Canoga Facility; and (2) offers no opinion whatsoever

26 regarding the use of TCE at Rocketdyne's SSFL.  As such, Defendants contend

27

28                          30

1   that Plaintiffs have failed to establish a prima facie case of negligence based on

2   TCE usage.

3       It is well-settled that to recover for negligence Plaintiffs must prove

4   the following: (1) injury; (2) Defendant owed them a duty of care; (3) what

5   standard of care was owed; (4) if the standard of care was breached; and (5)

6   causation. In re Northern Dist. of California Dakon Shield IUD Prods Liab. Litig.,

7   693 F.2d 847, 854-55 (9th Cir. 1982). At summary judgment, a plaintiff's failure

8   to demonstrate any factor placed in issue results in the dismissal of the negligence

9   claim. Id.

10       With respect to the relevant standard of care, Plaintiffs are only

11   required to establish the standard of care of someone engaged in a particular

12   activity. Dixon v. City of Livermore, 127 Cal. App. 4th 32 (2005); Miller v. Los

13   Angeles County Flood Control Dist., 8 Cal. 3d 689, 702-3 (1973). For reasons

14   discussed in detail in this Court's August 8, 2005 Order, Plaintiffs need not

15   provide expert testimony as to the standard of care of a particularized industry

16   engaging in a particular activity. With respect to the use and handling of TCE,

17   Plaintiffs must prove the appropriate standard of care for the use of TCE in the

18   rocket engine manufacturing and testing process.

19       In circumstances where the standard of care in the relevant industry is

20   not within the common knowledge of a layperson, expert testimony is required to

21   establish the standard of care. Miller v. Los Angeles Cty. Flood Control Dist., 8

22   Cal. 3d 689, 702 (1973). This rule has been applied in negligence cases involving

23   alleged environmental contamination. See Nat'l Telephone Co-Op Ass'n v.

24   Exxon Mobil Corp., 244 F.3d 153, 157-58 (D.C. Cir. 2001) (reversing finding of

25   negligence where the plaintiffs failed to introduce expert testimony on the

26   standard of care for performing an environmental remediation). Expert testimony

27

28                           31

1  must establish what standard of care should be applied to people in the particular

2  industry, for example, the rocket engine testing and manufacturing industry.

3  Evidence of common practices within a particular type of facility can be helpful,

4  but are not dispositive. <u>Doe</u>, 971 F.2d at 383.

5                         a)     The Conoga facility – Plaintiffs have

6                              established the requisite standard of care

7          The record reflects that Plaintiffs have adequately established the

8  standard of care with respect to the use of TCE at the Conoga facility.  Plaintiffs'

9  expert Tarr opined that TCE was released from vapor degreasing at the Canoga

10  facility, and that Defendants fell below the standard of care by not using TCE

11  carbon adsorption methods to increase the recovery of TCE and decrease the TCE

12  emissions.[12]  In response, Defendants offer the Declaration of Dr. Roger Minear

13  ("Minear") to rebut Tarr's opinion.  Although Minear opines that Defendants did

14  not breach the standard of care, such an opinion creates a triable issue of material

15  fact, and does not justify summary adjudication in favor of Defendants.  Moreover,

16  the Court notes that Plaintiffs make arguments in their Reply that should have

17  been raised in their moving papers, and for the Court to rely on Defendants'

18

19  _____

20      [12] Defendants contend that Tarr's opinion does not establish the relevant

21  standard of care because Tarr's opinion identifies the "most effective" or "best

   method."  For support, Defendants cite <u>Munoz v. City of Union City</u>, 120 Cal.

22  App. 4th 1077, 1108 (2004) and <u>Roe v. McDonald's Corp.</u>, 129 Cal. App. 4th

23  1107 (2005).  Although the Court agrees that "the reasonable standard refers to a

   person . . . of 'reasonable and ordinary prudence,' not one 'extraordinarily

24  cautious' or 'exceptionally skillful[,]'" the Court does not conclude that Tarr's

25  opinion falls within this category.  Tarr opines that a carbon adsorption system

   should have been in place.  This Court is reluctant to find that implementing such

26  a system would have been considered extraordinarily cautious or exceptionally

27  skillful.

1  representations without permitting Plaintiffs an opportunity to respond would not

2  be in the interests of fair play and justice.

3  　　　　This Court therefore finds that Plaintiffs have established the

4  necessary standard of care.  As such, Defendants are not entitled to summary

5  adjudication as to this issue.

6  　　　　　　　　　　　　　　b)　　SSFL – summary adjudication is warranted

7  　　　　　　　　　　　　　　　　　in favor of Defendants with respect to

8  　　　　　　　　　　　　　　　　　Plaintiffs claims relating to Defendants' use

9  　　　　　　　　　　　　　　　　　of TCE in rocket engine flushing and

10  　　　　　　　　　　　　　　　　reclaimed water

11  　　　　　　　　　　　　　　*(1) rocket engine flushing*

12  　　　　Plaintiffs state that TCE was released from rocket engine flushing and

13  from the use of contaminated water containing TCE to cool the rocket test stands

14  at SSFL.  (Opposition to Motion Re TCE, at 4:11-14).  With respect to rocket

15  engine flushing, although Tarr stated that TCE was used, he did not opine that

16  Rockeydyne's engine flushing violated any standard of care.  (See Exh. B. to

17  Minear Decl. at 21 (Tarr Report)).  Furthermore, Tarr conceded at this deposition

18  that he would not offer any opinion concerning rocket engine flushing:

19  　　　　　　Q:　　Do you intend to offer an opinion concerning the standard of

20  　　　　　　　　　care about Santa Susana operations other than on the subjects

21  　　　　　　　　　of open burning and use of contaminated water?

22  　　　　　　A;　　No, I don't intend to do that.

23  (See Exh. B to Schofield Decl. at 466:11-15 (Tarr Depo.") (March 23, 2005)).

24  　　　　However, Plaintiffs now attempt to establish the standard of care for

25  rocket engine flushing by offering the following statements by Tarr:

26

27

28  　　　　　　　　　　　　　　　　33

1     Rocketdyne's operating practices were not consistent

2     with the industry standard of care.  Rockeydyne

3     utilized poor control systems concerning air

4     emissions from several sources at their facilities. . . .

5     Certain of Rockeydyne's operation practices and air

6     emission control efforts were at best a reflection of an

7     indifferent attitude and at worst exhibited a studied

8     disregard for human health and environmental safety.

9     Had Rocketdyne espoused a better standard of care,

10     substantial quantities of carcinogenic air emissions

11     would have been greatly reduced or eliminated.

12 (See Exh. B to Minear Decl. At pp. 21-24 (Tarr Report)).  The Court does not find

13 Tarr's conclusory generalizations sufficient to establish the requisite standard of

14 care.  Such bare assertions are entitled to no weight on summary judgment.  See

15 Broussard v. Univ. of Calif., 192 F.3d 1252, 1259 (9th Cir. 1999) (finding expert's

16 conclusory affidavit insufficient to preclude summary judgment).  Due to

17 Plaintiffs' failure to provide a standard of care for rocket engine flushing, the

18 Court finds that Defendants' are entitled to summary adjudication as a matter of

19 law with respect to this issue.

20      (2)  reclaimed water

21   Plaintiffs maintain that Tarr opined  that Defendants' use of TCE

22 contaminated water to cool the engine test stands was a violation of the standard

23 of care.  However, a review of Tarr's report and deposition testimony reveals that

24 Tarr never opined that TCE was released as a result of the use of reclaimed water

25 to cool test stands.  While Tarr's report discusses Rocketdyne's use of reclaimed

26 water generally, his report states only that hydrazine and unsymmetrical 1,1-

27

28        34

1   dimethylhydrazine ("UDMH") were released as a result of the evaporation of the

2   cooling water.  (See Exh. B to Minear Decl. At 4, 9-11 (Tarr Report)).  There is no

3   mention of TCE was in the water.  (See Exh. B to Minear Decl. At 4, 9-11 (Tarr

4   Report)).  Without evidence that TCE in the reclaimed water, Plaintiffs cannot

5   succeed on its claim that Defendants' violated the standard of care by using

6   reclaimed water containing TCE.

7           In addition, as Defendants point out, when Tarr was questioned at this

8   deposition about the chemical contents of the reclaimed water, he stated:

9           We've looked at the waste water analysis for certain

10          purposes.  One of the purposes that we looked at it for

11          had to do with the hydrazine calculations that were

12          done.  Another purpose that we looked at it for related

13          to understanding the degree and extent of

14          contamination of the water with chlorinated

15          hydrocarbons [which include TCE].  I don't

16          remember any of the chlorinated hydrocarbon data,

17          whether it was there or wasn't there.

18   (Exh. C to Schofield Decl. at 600:6-13 (Tarr Depo. (April 21, 2005)).

19          Plaintiffs have not adequately designated where in the record Tarr

20   states that the reclaimed water contained TCE.  Moreover, even after perusing the

21   evidence submitted, this Court could not find evidence to demonstrate that the

22   reclaimed water at issue was contaminated with TCE.  As such, Plaintiffs

23   argument that using TCE contaminated water to cool engine test stands is a

24   violation of the standard of care is irrelevant.

25          With respect to the SSFL, this Court finds that Plaintiffs have failed

26   to meet their burden of establishing the relevant standard of care with respect to

27

28                                   35

1   rocket engine flushing, and have failed to prove that the reclaimed water

2   Defendants used to cool hot engines was tainted with TCE.[13]

3                    2)     Plaintiffs' strict liability claims are deficient as a

4                           matter of law

5        Defendants contend that the use of TCE does not constitute an

6   ultrahazardous activity under California law. This Court agrees.

7

8

              ———————————————

9       [13] In a footnote in their moving papers, Defendants argue that Plaintiffs'

10 negligence per se claim against Rocketdyne relating to the use of TCE must be
dismissed for failure to allege that Rocketdyne violated any statute or regulation

11 governing emissions of TCE into the air. It is well-settled California law that to
prevail on a negligence per se claim, the plaintiff must prove that (a) the defendant

12 violated a statute, regulation, or ordinance of a public entity, (b) the violation
proximately caused injury to the plaintiff, (c) the injury resulted from conduct

13 which the statute or regulation was designed to prevent, and (d) he was a member
of a class of persons for whose protection the statute was adopted. Cal. Evid.

14 Code § 669 (Deering 2005); see also Spates v. Dameron Hosp. Ass'n, 114 Cal.

15 App. 4th 208, 218 (2003).

16       Plaintiffs do not dispute Defendants' assertion that the 4AC only alleges

17 violations of CERCLA and the California Water Code. (4AC at ¶¶ 211, 239, 267).
On a motion for summary judgment or summary adjudication, this Court need not

18 consider evidence that the opposition fails to designate and reference. Carmen v.
San Francisco Unified School Dist., 237 F.3d 1026, 1029 (9th Cir. 2001). As

19 such, the court is not required to search for helpful evidence that may exist

20 somewhere in the record. Id.; see Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir.
1996) (not the task of the court "to scour the record in search of a genuine issue of

21 triable fact" for the non-moving party). Because Plaintiffs do not respond to

22 Defendants' contention that neither statute deals with airborne emissions of TCE,
and Plaintiffs' experts make no allegation that Rocketdyne's release of TCE into

23 the air violated any statue or regulation, the Court finds grounds to dismiss

24 Plaintiffs' negligence per se claims relating to Rocketdyne's use of TCE.
Therefore, the Court finds that Defendants are entitled to summary adjudication as

25 a matter of law with respect to Plaintiffs' negligence per se claims relating to

26 Rocketdyne's use of TCE.

27

28                          36

1    Plaintiffs claim that Rocketdyne's use of TCE constituted an

2  ultrahazardous activity triggering strict liability.  (4AC at ¶¶ 216-20, 245-50, 272-

3  6).  However, a case similar to the present one, where the plaintiffs alleged harm

4  as a result of a company's use of solvents, including TCE, courts hold that the use

5  of TCE is not an ultrahazardous activity.  See In re Burbank Envtl. Litig., 42 F.

6  Supp. 2d 976, 983 (C.D. Cal. 1998).  The Burbank Court carefully analyzed the

7  six factors for applying strict liability under California law and held that because

8  the risks associated with the use of TCE can be avoided through the exercise of

9  reasonable care, such use is not an ultrahazardous activity and the strict liability

10  doctrine does not apply.  See id.  As the Court stated:

11           While there is a higher risk of harm of disposing of

12           chemicals in the ground near a highly populated area,

13           the act of using solvents to clean metal parts in an

14           industrial site was not an ultrahazardous activity.

15           Many industries use or have used TCE, PCE and

16           hexavalent chromium, including other industrial

17           plants and dry cleaners.  These chemicals are used

18           widely as solvents.  It is not the use of these

19           chemicals that is likely to cause harm.  Rather, it is

20           Lockheed's alleged behavior in using and disposing

21           of the chemicals that created hazards.

22  Id.  Other courts have agreed with this assessment of solvent use.  See City of

23  Portland v. Boeing Co., 179 F. Supp. 2d 1190, 1204-05 (D. Or. 2001) (holding

24  that because TCE can be used safely with reasonable precautions, such use is not

25  an ultrahazardous activity); Greene v. Prod. Mfg. Corp., 842 F. Supp. 1321, 1326-

26  7 (D. Kan. 1993) (same).

27

28                                    37

1        In California, the use of TCE has never been considered so hazardous

2    to the public generally that liability must be imposed in the absence of negligence.

3    The cases Plaintiffs cite–See Luthringer v. Moore, 31 Cal.2d 489, 498-50 (1948)

4    (fumigation of building with known poisonous gas is ultrahazardous activity);

5    Balding v. Stutsman, 246 Cal. App. 2d 559, 564 (use of explosives in or near a

6    residential area is ultrahazardous activity); Potter v. Firestone Tire & Rubber Co.,

7    6 Cal. 4th 965, 977 (1993) (dumping toxic substances in a landfill not suit for such

8    chemicals found to be ultra hazardous or abnormally dangerous); Chavez v.

9    Southern Pacific Transp. Co., 413 F. Supp. 1203 (E.D. Cal. 1976) (transportation

10   of bombs by common carrier is ultrahazardous activity)–do not support the contra

11   view.  Contrary to Plaintiffs contentions, the fact that reclaimed water Rocketdyne

12   used to cool engine test stands may have contained TCE does not make such an

13   activity ultrahazardous.

14        Under California law, the use of TCE is not proven to be an

15   ultrahazardous activity.  As such, Plaintiffs' strict liability claims based on TCE

16   fail as a matter of law and are therefore dismissed.

17                    3)      There is a genuine issue of material fact whether

18                            Defendants are shielded from liability under the

19                            Government Contractor Defense

20        Defendants contend that the undisputed facts of this case plainly

21   demonstrate that applicability of the government contractor defense as recognized

22   under both federal and California law.  According to Defendants, the undisputed

23   evidence demonstrates the following: (1) Rocketdyne's use of TCE was done in

24   accordance with precise specifications issued by the federal government; (2) The

25   United States government required the use of TCE after concluding that TCE was

26   the safest and most effective cleaning agent available; (3) When Rocketdyne

27

28                                          38

1 sought to replace TCE with alternative cleaning methods as a result of an
2 increasingly restrictive regulatory climate in California, the federal government
3 continued for several years to require its use; and (4) There is no evidence that
4 Rocketdyne ever had any greater knowledge than the United States government of
5 any perceived or potential dangers associated with TCE, and in fact, the record
6 demonstrates that the government had full knowledge of TCE's properties and the
7 manner in which it was used by Rocketdyne.  However, upon careful
8 consideration of the evidence presented by the parties, this Court disagrees with
9 Defendants.

10      In certain specific instances, government contractors are immune
11 from tort liability for acts within the scope of the contract that were undertaken at
12 the government's direction.  This defense, known as the Government Contractor
13 Defense, has been described by the United States Supreme Court as a necessary
14 and critical extension of the FTCA,  <u>Boyle v. United Techs Corp.</u>, 487 U.S. 500,
15 507 (1988),[14] and the Ninth Circuit has stated that the government contractor
16 defense "protects a government contractor from liability for acts done by him
17 while complying with government specifications during execution of performance

18

19 _____

20    [14] In Boyle, a marine pilot died when unable to escape from a helicopter that
21 crashed at sea off the Virginia coast during a training exercise.  The helicopter's
   escape hatch opened outwards, rather than inwards, and was therefore inoperable
22 when the helicopter was submerged.  The pilot's father brought a diversity action
23 against the helicopter's manufacturer, alleging that the outward-opening escape
   hatch was defectively designed under Virginia products liability law.  The
24 manufacturer defense was that it had built the helicopter pursuant to federal
25 military specifications, which specifically mandated that the hatch open outward.
   The Fourth Circuit held as a matter of law, that the military procurement contract's
26 binding specifications for the helicopter's escape hatch preempted state law claims
27 founded on allegations that the design was defective.

28                    39

1   of a contract with the United States." <u>United States ex rel. Ali v. Daniel, Mann,</u>

2   <u>Johnson & Mendenhall</u>, 355 F.3d 1140, 1146 (9th Cir. 2004) (citation omitted).

3        It is well-settled that the government contractor defense may preempt

4   state law where the challenged conduct would, in the first instance, be entitled to

5   protection under the "discretionary function" exception to the Federal Torts

6   Claims Act where it is proven that the alleged wrongful act was undertaken

7   directly by the government.  <u>See</u> <u>Boyle v. United Techs. Corp.</u>, 487 U.S. 500, 507

8   (1988) (holding that government contractors must be shielded from tort liability

9   arising from their performance of contracts according to the government's

10  specifications); 28 U.S.C. § 2680(a).  The discretionary function exception

11  "prevent[s] judicial 'second guessing' of legislative and administrative decisions

12  grounded in social, economic, and political policy through the medium of an

13  action in tort." <u>United States v. Varig Airlines</u>, 467 U.S. 797, 814 (1984).  Failure

14  to protect contractors from tort liability arising from their performance of a

15  government contract weakens the effect of the discretionary function exception.

16  <u>See</u> <u>id</u>. ("The imposition of liability on Government contractors will directly affect

17  the terms of Government contracts: either the contractor will decline to

18  manufacture the design specified by the Government, or it will raise its price.

19  Either way, the interests of the United States will be directly affected.").  Here, the

20  record demonstrates that the government contracted with Rocketdyne for engine

21  flushing and vapor degreasing.  If the government is found to have mandated that

22  Rocketdyne use TCE for such activities, Rocketdyne's actual use of TCE may be

23  shielded from scrutiny under the discretionary function exception to the FTCA.

24  <u>See</u> <u>Aragon v. United States</u>, 146 F.3d 819, 826 (10th Cir. 1998).

25       Under <u>Boyle</u>, where a case involves state law claims, the defendant

26  must satisfy the following two legal prerequisites in order to invoke the

27

28                      40

1  government contractor's defense: (1) "that the subject matter involves 'uniquely

2  federal interests,' [(citation omitted)]; and [(2) a demonstration that] 'a significant

3  conflict exists between an identifiable federal policy or interest and the operation

4  of state law or the application of state law would frustrate specific objectives of

5  federal legislation[.]" Boyle, 487 U.S. at 504, 507.  A uniquely federal interest

6  may exist where a contractor performs according to a contract with the United

7  States. McKay v. Rockwell Int'l. Corp., 704 F.2d 444, 448 (9th Cir. 1983); Boyle,

8  487 U.S. at 507 (procurement of federal military equipment was held to constitute

9  a uniquely federal interest).

10       After the defendant overcomes his initial hurdle(s), the Government

11  Contractor Defense will bar imposition of tort liability against a government

12  contractor if three facts can be shown: (a) the federal government has approved

13  reasonably precise specifications for the challenged act; (b) the contractor

14  followed the specifications promulgated by the government; and (c) the contractor

15  warned the government about any risks involved in following the specifications, to

16  the extent that such risks were known to the contractor but not to the government.

17  Boyle, 487 U.S. at 512; Snell v. Bell Helicopter Textron, Inc., 107 F.3d 744, 746

18  (9th Cir. 1997).

19       In the present case, Defendants maintain that Rocketdyne was tasked

20  with producing equipment crucial to national security and defense, that thus, the

21  application of the government contractor defense is particularly critical, as

22  contractors would otherwise be unwilling to undertake this critical work for fear of

23  liability resulting from their adherence to the government's demanding and

24  generally inflexible directives.  In making this argument, Defendants quote the

25  Ninth Circuit in In re Hawaii Fed. Asbestos Cases, 960 F.2d 806 (9th Cir. 1992):

26

27

28