1    The *Boyle* Court noted that the military makes highly

2    complex and sensitive decisions regarding the

3    development of new equipment for military usage.

4    Allowing the contractors who are hired to

5    manufacture that equipment to be sued for the injuries

6    caused by it would impinge unduly on the military's

7    decision-making process.  The contractors would

8    either refuse to produce the military equipment for the

9    Government or would raise their prices to insure

10   against their potential liablitiy for the Government's

11   designs.

12   In re Hawaii Fed. Asbestos Cases, 960 F.2d at 811; see also Tozer v. LTV Corp.,

13   792 F.2d 403, 407 (4th Cir. 1986) (explaining that in the absence of the

14   government contractor defense "there would be a decrease in contractor

15   participation in design, an increase in the cost to the military weaponry and

16   equipment, and diminished efforts in contractor research and development");

17   McKay v. Rockwell Int'l Corp., 704 F.2d 444, 450 (9th Cir. 1983) (where

18   manufacturers have been compelled to produce according to military standards,

19   "the potential for unfairly imposing liability becomes great.") (citations omitted).

20       The Court recognizes the strong public policy concerns supporting

21   the Government Contractor Defense.  However, the sheer existence of such public

22   policy concerns does not supplant Defendants' burden of clearly showing that the

23   defense is viable under the facts of this case.  Because this action involves state

24   claims, the Court begins its analysis by examining whether Defendants satisfy the

25   two prerequisites mentioned above.

26

27

28                           42

        a)     Although Defendants show (1) that the subject matter involves "uniquely federal interests," they fail to demonstrate (2) that "a significant conflict" exists between an identifiable federal policy or interest and the operation of state law or the application of state law would frustrate specific objectives of federal legislation

As stated above, Defendants in the present case must satisfy the following two legal prerequisites in order to invoke the government contractor's defense: (1) "that the subject matter involves 'uniquely federal interests,' [(citation omitted)]; and [(2) a demonstration that] 'a significant conflict exists between an identifiable federal policy or interest and the operation of state law or the application of state law would frustrate specific objectives of federal legislation[.]" Boyle, 487 U.S. at 504, 507.  Here, it is undisputed that Defendants contracted with the United States for the manufacture of rocket engine parts and rocket engine testing.  As such, under Boyle, the Court finds that there is a "uniquely federal interest" present.  Boyle, 487 U.S. at 507.  However, the existence of the second prerequisite is not as clear.  Defendants address this prerequisite only in their Reply in support of their Motion Re TCE, stating in relevant part, the following:

> Plaintiffs argue that there was no significant conflict between the government's requirements and state law. This argument blindly ignores the evidence.  As demonstrated by Dr. Roger Minear, installation of the emissions control devices touted by Mr. Tarr would

43

1  have been cost-prohibitive, particularly during the
2  1950s and 1960s when Rockeydyne was using TCE
3  for vapor degreasing. *See* Minear Decl. at ¶¶ 6.  As
4  Plaintiffs concede, the principal rationale behind the
5  government contractor defense is shielding the
6  government and its contractors from the potential
7  additional costs arising from tort liability.
8  (Reply in support of Motion Re TCE at 18:23-19:1-6).  The Court finds
9  Defendants response inadequate to satisfy the second criteria.

10                    4)      Even assuming that Defendants satisfied the initial
11                            prerequisites for bringing a Government
12                            Contractor Defense, Defendants still fail to
13                            establish each element of the defense

14          Once the initial criterion are met, for the Government Contractor
15  Defense to apply, Defendants must prove that (a) the United States approved
16  reasonably precise specifications for the activity; (b) the equipment or material
17  used conformed to those specifications; and (c) the contractor warned the United
18  States about any dangers involved in the use of the equipment or material, to the
19  extent that such dangers were known to the contractor but not to the United States.
20  Boyle, 487 U.S. at 512; Snell v. Bell Helicopter Textron, Inc., 107 F.3d 744, 746
21  (9th Cir. 1997). In applying the facts of this case to the factors above, the Court
22  concludes that summary adjudication is not warranted.

23                    a)      A genuine issue of material fact remains as
24                            to whether the United States approved
25                            reasonably precise specifications for the use
26                            of TCE

27

28                                      44

1    According to Defendants, the United States had certain specifications

2    which required the use of TCE in its manufacturing and cleaning process.

3    Defendants offer USAF and NASA issued specifications that Defendants contend

4    expressly require TCE to be used in rocket engine cleaning operations. (Bielman

5    Decl. at ¶¶ 12-13 & Exh. B-D; Halchak Decl. at ¶¶ 13-14 & Exh. B-D).

6    Defendants maintain that those specifications set forth the particular type of TCE

7    to be used and the step-by-step process required in cleaning operations. Id.

8    Defendants state that Rocketdyne was obligated to incorporate the specifications

9    into its own process specifications, "meaning that Rockeydyne had no choice but

10   to use TCE in the manner required by the government." (Motion Re TCE at 20:1-

11   3) (citation omitted).

12    In response, Plaintiffs maintain that no language from any

13   government contract actually requires the use of TCE in vapor degreasing or

14   flushing of engines, and that specifications of TCE are referenced, but the

15   documents stating those specifications are not included.  As Plaintiffs point out, a

16   reasonable jury could find that the specifications and documentation Defendants'

17   produced as evidence demonstrate that Rocketdyne had a choice between TCE and

18   other solvents.  Due to such a reasonable interpretation of the specifications and

19   documentation offered by Defendants, summary adjudication in favor of

20   Defendants is not warranted at this time.

21            b)    A genuine issue of material fact remains

22                  with respect to whether the TCE used by

23                  Rocketdyne conformed to the government's

24                  specifications

25    Defendants contend that the cleaning specifications issued by the

26   USAF and NASA identified the particular type of TCE that was required to be

27

28                                    45

1   used in Rocketdyne's cleaning operations. (Bielman Decl. at ¶¶ 12-13; Halchak

2   Decl. at ¶¶ 13-14). According to Defendants, "[t]he TCE used by Rocketdyne was

3   precisely that which the government mandated, and Rocketdyne's use of the TCE

4   was in strict accordance with the government's instructions." (Motion Re TCE at

5   9-11). However, in reading the aforementioned USAF and NASA specifications, a

6   reasonable jury could find that the United States government provided Defendants

7   with discretion on whether to use TCE.

8                                         c)      A genuine issue of material fact exists as to

9                                                 whether Rocketdyne was aware of any

10                                                potential health hazards of TCE

11          Defendants must demonstrate that they warned the United States

12   about any dangers about TCE that were known to them but not the United States.

13   Boyle, 487 U.S. at 512. In order for the duty to warn of a potential danger to arise,

14   the contractor must have had actual knowledge of the potential danger. See

15   Sundstrom v. McDonnell Douglas Corp., 816 F. Supp. 587, 590 (N.D. Cal. 1993)

16   ("[T]he contractor is held to an actual knowledge standard whereby the contractor

17   has no duty to warn the government of hazards of which it is not actually aware.")

18   (citations omitted).

19          According to Defendants, "the record demonstrates that the

20   government had at least the same–and likely a much higher–level of knowledge

21   than Rocketdyne regarding the potential adverse health effects of TCE[.]"

22   (Motion Re TCE at 21:18-20). For support, Defendants offer the expert

23   declarations of Bielman and Halchak, who interpret and explain various

24   documents to demonstrate that Rocketdyne had no knowledge of TCE toxicity. In

25   response, Plaintiffs point to evidence such as a 1956 Chemical Safety Data Sheet

26   SD-14 for trichloroethylene, which discusses numerous health hazards posed by

27

28                                              46

1   overexposure, and includes a bolded warning in a larger font size,

2   "**TRICHLOROETHYLENE** WARNING! VAPOR HARMFUL - Use only with

3   adequate ventilation. Avoid prolonged or repeated breathing of vapor. Avoid

4   prolonged or repeated contact with skin.  Do not take internally."  (See Exh. 4 to

5   Noël Decl. at  BNA120655 (BNA120647-61, Chemical Safety Data Sheet SD-14,

6   Properties and Essential Information for Safe Handling and Use of

7   Trichloroethylene).

8            Plaintiffs also point to Rocketdyne's March 28, 1962 specification re

9   handling and use of chemicals, which states, as to the hazardous properties of the

10  solvents listed, including TCE, that "Solvents are hazardous due to their ability to

11  enter the blood stream rapidly through the lungs.  Solvents also may cause

12  dermatitis because of their ability to dehydrate and defat the skin," "[r]epeated

13  exposure to chlorinated hydrocarbons results in an accumulation of effects," and

14  "[d]etermination of the hazards of solvents to personnel requires expert

15  evaluations."  (See Exh. 8 to Noël Decl. at pp. BNA04633205-06 (BNA04633198-

16  214, Process Specification No. PR7-2 dated November 19, 1953)).

17           In addition, Plaintiffs also point to a June 2, 1958 letter from the

18  County of Los Angeles Health Department to the State Regional Water Pollution

19  Control Board No. 4 regarding the reclamation of water at the Santa Susana

20  Facility, which was file stamped as received by Rocketdyne on June 4, 1958.

21  (Exh. 10 to Noël Decl. at pp. BNA69179-80 (BNA69179-80, June 2, 1958 letter

22  from County of Los Angeles Health Department to State Regional Water Pollution

23  Control Board No. 4).  In this letter, the Health Department states: "There are

24  however certain aspects of this process that we believe will warrant more than

25  casual consideration, primarily with reference to the disposal of trichloroethylene

26  along with other liquid wastes. . . . It is therefore reasonable to conclude that this

27

28                                    47

1  material [TCE] will not be burned out of the burn-off sumps and further because

2  of the specific gravity, will not be amendable to skimming. **This coupled with**

3  **the fact that the material is toxic**, would indicate that some means of reclamation

4  should be employed prior to the discharge of the material." (See Exh. 10 to Noël

5  Decl. at pp. BNA69179-80 (BNA69179-80, June 2, 1958 letter from County of

6  Los Angeles Health Department to State Regional Water Pollution Control Board

7  No. 4).

8     The parties' competing evidence creates a triable issue of fact with

9  respect to Defendants' knowledge of TCE toxicity that cannot be resolved on

10  summary adjudication. As such, the Court does not find that Defendants are

11  entitled to summary adjudication with respect to their federal Government

12  Contractor Defense.

13           d)  With respect to Plaintiffs' TCE claims,

14              Boeing fails to prove that it is immune from

15              liability under California law, and thus,

16              summary adjudication is not warranted as to

17              this issue

18     The California Supreme Court adopted its own version of the

19  government contractor defense, having held that tort claims may not be used to

20  "permit reexamination . . . of a particular discretionary decisions" undertaken by

21  government contractors. Cameron v. State, 497 P.2d 777, 782 (Cal. 1972)

22  (citation omitted). The California formulation of the doctrine is virtually

23  indistinguishable from the test set forth by the Supreme Court in Boyle. This

24  Court, for reasons stated above, has already determined that a genuine issue of

25  material facts exists as to whether the federal Government Contractor Defense

26  applies. For the same reasons, this Court finds that Defendants have failed to

27

28             48

1   demonstrate that they are entitled to immunity under California's government

2   contractor defense, and as such, summary adjudication is inappropriate as to this

3   issue.

4     Based on the foregoing discussion, this Court grants in part and

5   denies in part Defendants' Motion Re TCE.

6      2. *Motion Re Dioxins*

7       a. *Undisputed facts*

8     Boeing claims that Plaintiffs have offered Tarr as their expert

9   regarding alleged emissions of dioxins as a result of rocket engine testing at SSFL.

10  (Declaration of Peter C. Meier ("Meier Decl."), Exh. D at 7-9). Plaintiffs' expert

11  explained that the fuels themselves in the rocket engines in and of themselves

12  lacked the chlorine necessary to the production of dioxins. (Noël Decl., Exh. 1 at

13  pp. 350:22-351:11 and 353:2-5). Mr. Tarr testified that he believed the dioxins

14  were formed "[o]utside the rocket engine in the plume created by the rocket

15  engine firing and the subsequent contact with the stand, the waste water sprayed

16  onto the rocket engine exhaust, and the atmosphere around that plume." (Id. at pp.

17  370:18-24). Mr. Tarr opined, "The dioxin TEQ emission rate depends on the

18  dioxin concentration, the rate of steam generation during each rocket test and the

19  duration of each rocket test." (Meier Decl., Exh. D at p. 7). In addition, Plaintiffs

20  assert that Dr. Landolph has provided expert testimony regarding the

21  carcinogenicity of dioxin emissions. (Noël Decl., Exh. 2 at pp. 35-37).

22    Boeing claims that other than alleged emissions from rocket engine

23  testing, Mr. Tarr does not quantify alleged dioxins emissions from any other

24  sources. (Meier Decl, Exh. D at p. 11). Plaintiffs maintain that this statement is

25  misleading, as Plaintiffs have not just asserted that the emissions came from rocket

26  engine testing, but from the use of contaminated water to cool the rocket engine

27  test stands. (Noel Decl., Exh. 1 at pp. 350:22-351:11 and 353:2-5). Plaintiffs

28

1  otherwise agree that Mr. Tarr has not quantified dioxin emissions from any source

2  other than the use of contaminated water to cool the rocket engines and test stands.

3          Boeing claims that Mr. Tarr in his Rule 26 Report states that use of

4  reclaimed water to cool rocket engine test stands at the SSFL was "contrary to

5  recognized principles," but he does not explain how this practice allegedly

6  conflicted with the standard care in the aerospace industry. (Meier Decl, Exh. D).

7  Plaintiffs dispute this, stating that Mr. Tarr established the relevant standard of

8  care by opining:

9          Rocketdyne's operating practices were not consistent

10        with the industry standard of care.  Rocketdyne

11        utilized poor control systems concerning air

12        emissions from several sources at their facilities.

13        Open burning and the use of contaminated water to

14        cool rocket engine test stands at SSFL resulted in the

15        uncontrolled release of numerous carcinogens into the

16        atmosphere.

17  (Meier Decl., Exh. D at pp. 1 and 21).  Tarr further clarified this statement,

18  testifying that the use of reclaimed water, including TCE and other contaminants,

19  was contrary to the industry's standard of care in general, and that this standard

20  applied across the board, including Defendants' facilities. (Noël Decl., Exh. 1 at

21  pp. 464:5-465:7).

22          Mr. Tarr's report further detailed:

23        At least two major waste disposal related

24        activities at the Santa Susana Field Laboratory

25        (SSFL) were conducted in a manner contrary to good

26        engineering practice.  One of those operations was the

27

28                          50

1    use of contaminated water at various rocket engines

2    test stands.

3    . . .

4         A predominant activity at SSFL was the

5    test firing of rocket engines.  Tens of thousands of

6    rocket engine tests were conducted over several

7    decades.  The tests were carried out at a number of

8    metal structures located around the grounds of the

9    facility known as test stands.  Given the tremendous

10   amount of very hot gases released during a typical

11   rocket engine test firing, it was necessary to apply a

12   large amount of water to the test stands in order to

13   minimize heat related damage.

14        Beginning in 1967, North American

15   Aviation, Inc. began to use 'reclaimed' water for

16   cooling purposes at test stands (BNA04022522).

17   Reclaimed water was actually industrial wastewater

18   collected from various sites around SSFL and

19   recycled to the test stands (BNA79211-BNA79215).

20   Reclaimed water was contaminated with a variety of

21   fuels, solvents, and miscellaneous chemicals.  The

22   practice of using reclaimed water apparently

23   continued throughout the life of the rocket testing

24   activity carried out at SSFL.  The primary

25   justification for the choice of reclaimed was for test

26   stand cooling was cost savings.

27

28                              51

1    · · ·

2            One problem related to the use of

3    reclaimed water for test stand cooling purposes was

4    that a very large quantity of water and the attendant

5    chemical contaminants were emitted into the air as a

6    result.  Stated another way, this practice created the

7    release of many chemical carcinogens into the area on

8    and around SSFL.  Another consideration relates to

9    the realization that the reclaimed water was in fact a

10   waste disposal methodology.  Furthermore, it was a

11   waste disposal methodology conducted contrary to

12   recognized principles.  As one historian has

13   documented, as early as the 1930s, industrial

14   operators were urged to develop safe protocols for the

15   handling and manufacture of chemicals.  In terms of

16   industrial hygiene practice, it was argued that 'It is

17   the duty of every engineer, whether he be chemical,

18   mechanical, structural, electrical, or architectural, to

19   determine for new products and new processes

20   whether or not there exists therein dangers to workers

21   who may be engaged in the manufacture or to the

22   public who may utilize or consume the products.

23          · · ·

24            In particular, physical evidence related to

25   dioxins and hydrazine show the use of reclaimed

26   water caused the release of substantial quantities of

27

28                         52

1   those chemicals into the atmosphere.  A portion of

2   dioxins that formed during the combustion of fuels

3   during the rocket engine tests were likely to end up in

4   the reclaimed water system.  The presence of dioxins

5   well above background levels in soil samples

6   collected at some of the reclamation system ponds

7   substantiates that conclusion. [fn27] Hydrazines were

8   one of the few chemicals targeted in the sampling of

9   water in the water reclamation system and were

10  consistently found at parts per million (ppm) levels in

11  several ponds. [fn28] A mortality study of workers at

12  Rocketdyne showed that employees who worked in

13  the vicinity of the test stands were more likely to die

14  from certain cancers that have been linked to

15  hydrazine exposure. [fn29]

16  . . . .

17      In summary, operating practices at SSFL

18  were not consistent with the industry standard of care.

19  Waste disposal by the operation of the reclaimed

20  water system and by the practice of open burning of

21  industrial waste was contrary to good engineering

22  practice, and resulted in the uncontrolled release of a

23  wide variety of chemical carcinogens to the

24  atmosphere.

25

26

27

28

53

1   (Meier Decl., Exh. D at pp. 21-23). Plaintiffs claim that no ambiguity exists that

2   Mr. Tarr has asserted the use of this type of contaminated water for cooling

3   purposes is an unacceptable engineering practice throughout all industry,

4   including the aerospace industry.

5        Boeing states that Mr. Tarr has not disclosed an opinion regarding the

6   applicable standard of care during the relevant period for rocket engine testing at

7   the SSFL. (Meier Decl, Exh. D). Plaintiffs dispute this statement asserting that Mr.

8   Tarr claimed that the use of reclaimed water including TCE and other

9   contaminants was contrary to the standard of care of industry in general, and this

10  standard applied across the board, which would include Defendants' facilities.

11  (Noël Decl., Exh. 1 at pp. 464:5-465:7).

12       Boeing claims that Mr. Tarr in his deposition said he was not offering

13  an opinion regarding the standard of care in the defense industry or the rocket

14  engine industry. (Meier Decl., Exh. E at 465:4-10). Plaintiffs maintains that no

15  ambiguity exists that Mr. Tarr has asserted the use of this type of contaminated

16  water for cooling purposes is an unacceptable engineering practice throughout all

17  industry, including the aerospace and rocket engine industry.

18       Boeing claims that the first published report on dioxin emissions from

19  a combustion device was published in 1977, addressing municipal solid waste

20  incinerators in Belgium. (Meier Decl., Exh. F at 26).  Plaintiffs reply that

21  Defendants' own expert admitted that this fact is not definitive and that he failed

22  to conduct research to determine whether his memory of the 1977 publication was

23  actually the first such report. (Noël Decl., Exh. 4 at  pp. 316:2-318:25).

24       The 1986 U.S. Environmental Protection Agency ("EPA") "Tier 4"

25  report upon which Mr. Tarr relies for his opinions does not mention rocket engine

26

27

28

1   test stands as a potential dioxin source. (Meier Decl., Exh. F at 26). Plaintiffs

2   argue that Mr. Tarr did not suggest that the EPA Tier 4 report included the release

3   of dioxins from rocket engine test stands.  Mr. Tarr testified that he determined

4   which of the Tier 4 sources described in the EPA report were most applicable to

5   the rocket engine testing process, and he applied the principle of similarity

6   between the rocket engine combustion system and other industrial combustion

7   systems.  (Noël Decl., Exh. 1 at pp. 395:20-396:4; Meier Decl., Exh. D at p. 7).

8   Plaintiffs claim that Mr. Tarr testified that he chose the emission sources shown as

9   a database from which to calculate rocket engine emissions, and he chose these

10  dioxin emitters because Table 8, p. 19 of the EPA Dioxin study offers a wide

11  variety of industrial waste combustion systems from which to draw emission

12  analogs. Plaintiffs state that these systems are similar to rocket engine test systems

13  in that both involve combustion and similar chemical constituents, and the

14  materials combusted at Rocketdyne are various rocket engine fuels and other

15  materials such as oxidizers, trichloroethylene used in flushing the system, and

16  toxic chemicals in the waste water used to cool the test stands.  Noël Decl., Exh. 1

17  at pp. 612:20-615:6.

18          Furthermore, Plaintiffs claim that one would not expect to see rocket

19  engine test stands to be considered as a source of dioxins by the EPA, because

20  only through Defendants' improper waste disposal methodology of using

21  contaminated water to cool the test stands did the test stands pose a hazard of

22  dioxin release.

23          Plaintiffs are not contending that they were injured by any chemical

24  independently emitted from the test stands, but are claiming the water

25

26                                              55

27

28

1  contaminated with toxic chemicals placed on the test stands caused toxic clouds of

2  chemicals causing them injury.

3           Boeing claims that the EPA's 2003 National Emission Standards for

4  Hazardous Air Pollutants do not require rocket engine test stands to meet any

5  emission limits. (Meier Decl., Exh. F at 27). In response, Plaintiffs assert that the

6  EPA's 2003 National Emission Standards for Hazardous Air Pollutants is

7  irrelevant here, and it is not directed at the use of contaminated water to cool

8  rocket engine test stands. Mr. Cudahy admitted at his deposition that he does not

9  even know if the U.S. EPA regulation considered the use of reclaimed water to

10 cool rocket test stands. (Noël Decl., Exh. 4 at pp. 229:25-231:10).

11          Plaintiffs claim the following additional facts:

12          Plaintiffs claim that a large variety of hazardous and toxic chemicals

13 were released to the reclamation water. On March 17, 1958, North American

14 Aviation, Inc. sent the Regional Water Pollution Control Board a letter regarding

15 Rocketdyne's Santa Susana Facility, acknowledging, "[y]ou will undoubtedly

16 recall that, in the past, there were certain problems regarding water pollution at our

17 Propulsion Field Laboratory at Santa Susana," and described the discharges to the

18 reclamation water as follows: 1. Kerosene, nitric acid, sulphuric acid,

19 hydrochloric acid and caustic soda from Lower Research Area; 2. Residual engine

20 fuels, solvents, kerosene and 10 gallons of TCE per day from CTL-I burned off

21 water and ultimately to reclamation reservoir in open drainage trench; 3. Fuel

22 oils, solvents and 15 gallons per day of TCE from Bowl Test Area burned off

23 water and ultimately to reclamation reservoir; 4. Fuel oils, solvents, 60 gallons a

24 day of kerosene, and 15 gallons per day of TCE from TRE Test Area burned off

25 and ultimately to Area I Reclamation Reservoir; and 5. Lubricating oils, kerosene

26

27                                          56

28

1   fuels, hydrochloric acid and solvents used in cleaning equipment from TCE

2   Equipment Lab ultimately released to the reclamation reservoir.[15]  (Noël Decl.,

3   Exh. 6 at pp. BNA145122, 123, and 124).

4        Plaintiffs claim that the 1956 Chemical Safety Data Sheet SD-14 for

5   TCE discusses numerous health hazards posed by exposure, and included a bolded

6   warning in a larger font size, "**TRICHLOROETHYLENE** WARNING! VAPOR

7   HARMFUL - Use only with adequate ventilation. Avoid prolonged or repeated

8   breathing of vapor. Avoid prolonged or repeated contact with skin.  Do not take

9   internally."[16]  (Noël Decl., Exh. 7 at  BNA120655 BNA120647-61).  Plaintiffs

10  also point to Rocketdyne's March 28, 1962 specification re handling and use of

11  chemicals.  It includes hydrochloric acid, nitric acid and sulfuric acid among the

12  acids, and requires that "ACCIDENTAL EXPOSURE TO ACIDS MUST BE

13  REPORTED TO THE MEDICAL SECTION IMMEDIATELY," along with the

14  warning, "Do not store acids near . . , water, or combustible materials such as

15  fuels, oils, [etc,.]"  Regarding the hazardous properties of the solvents listed,

16  including TCE, it states that, "Solvents are hazardous due to their ability to enter

17  the blood stream rapidly through the lungs.  Solvents also may cause dermatitis

18  because of their ability to dehydrate and defat the skin," "[r]epeated overexposure

19  to chlorinated hydrocarbons results in an accumulation of effects," and

20

21

22  _____

23  [15]Boeing claims that this mischaracterizes the document.  Furthermore,
Defendants object to this additional "fact" as being irrelevant.

24  [16]Boeing does not dispute that the document cited by Plaintiffs reflects what

25  Plaintiffs claim it does.  Defendants object, however, to this additional "fact" as
being irrelevant.

26

27                                          57

28

1   "[d]etermination of the hazards of solvents to personnel requires expert

2   evaluation."[17]  (Noël Decl., Exh. 8 at pp. BNA04633202-BNA04633206).

3        Plaintiffs argue that as early as the 1930s, industrial operators were

4   urged to develop safe protocols for handling and manufacture of chemicals. It

5   stated that in terms of industrial hygiene practices, it is the duty of every engineer,

6   whether chemical, mechanical, structural, electrical, or architectural, to determine

7   for new products and new processes whether or not there exists therein a danger to

8   workers who may be engaged in the manufacture or to the public who may utilize

9   or consume these products.[18]  (Meier Decl., Exh. D at pp. 21-22).

10        Plaintiffs claim that Defendants' own expert, James Cudahy

11   ("Cudahy" or "Mr. Cudahy"), testified that Defendants probably had an obligation

12   to inform regulatory agencies that they were disposing of industrial waste water by

13   spraying it on rocket engines at the test stands at SSFL.  Plaintiffs further claim

14   that Cudahy did not look at soil samples of dioxin around the rocket engine test

15   stands and did not determine whether any governmental agency had been looking

16   at dioxin and dioxin emissions from the test stands.  Even though Cudahy admitted

17   that any governmental agency investigation into those issues would be important

18   for him to consider,  Mr. Cudahy admitted that he had not been provided, and

19   therefore did not consider, a copy of the California EPA DTSC's presentation on

20   its RCRA Facility Investigation at SSFL for Dioxin.  That investigation found

21   dioxins in a myriad of places throughout the SSFL, including the rocket engine

22   test stands.  Mr. Cudahy admitted that he would want to look at any such

23   

24       [17]See footnote 16.

25   

26       [18]See footnote 16.

27

28

1  investigation to see whether there was dioxins at any of the test stands.[19] (Noël

2  Decl., Exh. 4 at pp. 296:10-19; 259:1-267:10; Id., Exh. 9 at pp. 7, 12, 20).

3        Plaintiffs state that Defendants' expert, Cudahy, admitted that he was

4  not aware of whether a study is being conducted regarding rocket engine testing

5  and the potential of hazardous air pollutant from such testing.  Cudahy also

6  admitted that he had never seen a copy of the UCLA Santa Susana Field

7  Laboratory (SSFL) Public Health Initiative, Exposure Pathways and Community

8  Exposures presentation, which has identified rocket engine testing as a source of

9  dioxin at SSFL and admitted that such information would have been helpful to

10  him and that he would have like to have considered such information.[20]  (Noël

11  Decl., Exh. 4 at pp. 268:4-270:15; Noël Decl., Exh. 10 at pp. UCLA00951, 00968,

12  00977, 00979, 00984).

13            *b.*    *Discussion – Motion Re Dioxins*

14        Defendants contend summary adjudication is appropriate because

15  Plaintiffs: (1) Failed to explain how the use of reclaimed water used to cool rocket

16  engine test stands at the SSFL violated the standard of care in the aerospace

17  industry; and (2) Failed to disclose an opinion regarding the applicable standard of

18  care during the relevant period.  This Court disagrees.

19        As an initial matter, the Court notes that Plaintiffs claim that

20  reclaimed water used to cool rocket engine test stands at SSFL emitted significant

21  quantities of dioxins.  Plaintiffs' expert Tarr stated that this practice was an

22

23

24      [19]See footnote 16.

25      [20]See footnote 16.

26

27

28

1  improper "waste disposal method" that was "contrary to recognized principles."

2  (Meier Decl., Exh. D at 21).

3         Under California law, "negligence is conduct which falls below the

4  standard established by law for the protection of others against unreasonable risk

5  of harm." Flowers v. Torrance Memorial Hosp. Med. Center, 8 Cal. 4th 992, 997

6  (1994). It is well-settled that to recover for negligence Plaintiffs must prove the

7  following: (1) injury; (2) Defendant owed them a duty of care; (3) what standard

8  of care was owed; (4) if the standard of care was breached; and (5) causation. In re

9  Northern Dist. of California Dakon Shield IUD Prods Liab. Litig., 693 F.2d 847,

10  854-55 (9th Cir. 1982).  At summary judgment, a plaintiff's failure to demonstrate

11  any factor placed in issue results in the dismissal of the negligence claim. Id.

12         Defendants argue that Plaintiffs must offer expert testimony as to the

13  standard of care of a particularized industry engaging in a particular activity.  For

14  example, with respect to rocket testing, Boeing argues that Plaintiffs must prove

15  the standard of care of the rocket engine industry or at least the broader defense

16  industry.  However, the cases Defendants cite do not support their position.

17         Relying on the California Supreme Court case, Dixon v. City of

18  Livermore, 127 Cal. App. 4th 32 (2005), Defendants maintain, for example, that

19  the standard of care of an aerospace company disposing of hazardous waste is

20  somehow different from the standard of care of non-rocketry companies engaged

21  in the same conduct.  Dixon does not support Defendants' contentions.

22  As this Court has already stated in it's August 8, 2005 order:

23            In Dixon, the plaintiff argued that the standard of care

24            in the air show industry demands that pilots have

25            higher qualifications than those pilots engaged in

26

27

28

1   commercial flying. The <u>Dixon</u> Court specifically held

2   that the air show industry would be held to the same

3   standard required by the Federal Aviation

4   Administration ("FAA") of regular pilots. The court

5   did not distinguish between the standard of care in the

6   air show industry and the commercial flying industry

7   in that the FAA certified commercial pilot was held to

8   the same standard of care as an air show pilot. In

9   <u>Dixon</u>, the plaintiff presented no evidence showing

10  that the standard of care in the air show industry

11  demands that pilots have higher qualifications, and

12  thus, the court deemed the standard of care is the

13  same as flying in general. Therefore, in accordance

14  with case law, Plaintiffs are only required to establish

15  the standard of care of someone engaged in a

16  particular activity.[21]

17  ───────────────

18  [21] This Court provided the following example in its August 8, 2005 Order:

19  Where the plaintiff brings a claim for negligent construction of a building, the plaintiff must provide

20  the standard of care expected of a person engaged in construction of a building. If the defendant is, for

21  example, an aerospace company, the plaintiff need not prove the standard of care expected of an

22  aerospace company constructing an office building as opposed to an independent contractor. Both are

23  expected to follow the standard of care expected of someone engaged in the construction of a building.

24  <u>Miller v. Los Angeles County Flood Control Dist.</u>, 8

25

26

27

28

1   (August 8, 2005 Order at 48:14-49:2) (footnote in original).

2   In addition, the Court rejects Defendants' arguments that to prove the

3   standard of care in a relevant industry, Plaintiff must show that industry's practice

4   or custom. "It is well settled that proof of adherence to an industry practice or

5   custom is not dispositive on the issue of negligence." Doe v. Cutter Biological

6   Inc., 971 F.2d 375, 383 (9th Cir. 1992); Sheward v. Virtue, 20 Cal. 2d 410, 414

7   (1942). Contrary to Defendants' position, the standard of care is not synonymous

8   with the actual practices or custom of a particular industry. A party's actions can

9   fall well below the standard of care expected of a particular industry while still

10  being practiced by all or most of the parties in that industry. With regards to an

11  aerospace company, such as Boeing, this problem is particularly acute. Doe, 971

12  F.2d at 383  ("The possibility that industry standards may fall short of reasonable

13  care is particularly acute, we believe, in a situation such as this where the entire

14  industry is comprised of only four manufacturers.").

15  In circumstances where the standard of care in the relevant industry is

16  not within the common knowledge of a layperson, expert testimony is required to

17  establish the standard of care. Miller v. Los Angeles Cty. Flood Control Dist., 8

18  Cal. 3d 689, 702 (1973). Expert testimony must establish what standard of care

19  should be applied to people in the particular industry, for example, people

20  disposing of hazardous material. Evidence of common practices within a

21  particular type of facility can be helpful, but are not dispositive. Doe, 971 F.2d at

22  383.

23  _____

24  Cal. 3d 689, 702-3 (1973).

25  August 8, 2005 Order at 49 n.19.

26

27

28

1          Plaintiffs' expert Tarr has opined that the standard of care was

2  breached by using water contaminated with hazardous wastes to cool hot rocket

3  stands. This cooling procedure allegedly released substantial amounts of dioxins,

4  thus causing Plaintiffs' injury. Plaintiffs' expert Tarr offers a standard of care

5  opinion as to the proper handling of hazardous wastes in an industrial setting.

6  Tarr asserts that he has stated a standard of care for "industry in general" regarding

7  disposal of such waste:

8          Beginning in 1967, North American Aviation, Inc.

9          began to use 'reclaimed' water for cooling purposes

10        at test stands (BNA04022522). Reclaimed water was

11        actually industrial wastewater collected from various

12        sites around SSFL and recycled to the test stands

13        (BNA79211-BNA79215), Reclaimed water was

14        contaminated with a variety of fuels, solvents, and

15        miscellaneous chemicals. The practice of using

16        reclaimed water apparently continued throughout the

17        life of the rocket testing activity carried out at SSFL.

18        The primary justification for the choice of reclaimed

19        was for test stand cooling was cost savings . . . .

20        One problem related to the use of reclaimed water for

21        test stand cooling purposes was that a very large

22        quantity of water and the attendant chemical

23        contaminants were emitted into the air as a result.

24        Stated another way this practice created the release of

25        many chemical carcinogens into the area on and

26

27                             63

28

1    around SSFL. Another consideration relates to the

2    realization that the reclaimed water was in fact a

3    waste disposal methodology. Furthermore, it was a

4    waste disposal methodology conducted contrary to

5    recognized principle. As one historian documented,

6    as early as the 1930's, industrial operators were urged

7    to develop safe protocols for the handling and

8    manufacture of chemicals . . . .

9    In summary, operating practices at SSFL were not

10   consistent with the industry standard of care. Waste

11   disposal by the operation of the reclaimed water

12   system and by the practice of open burning of

13   industrial waste was contrary to good engineering

14   practice, and resulted in the uncontrolled release of a

15   wide variety of chemical carcinogens to the

16   atmosphere.

17   (Plaintiffs' Statement of Genuine Issues (Motion Re Dioxins), Plaintiffs'

18   Additional Fact No. 3) (quoting the Tarr Report).

19        In addition, even Defendants' expert Cudahy testified that Defendants

20   probably had an obligation to inform regulatory agencies that they were disposing

21   of industrial waste water by spraying it on rocket engine test stands. PSGI PAF

22   No. 5.

23        Defendants argue that Mr. Tarr's opinion regarding the standard of

24   care is unsupported and is merely a speculative and conclusory statement that

25   Boeing has violated the standard of care.  For support, Defendants cite Roe v.

26

27                                           64

28

1   McDonald's Corp., 129 Cal. App. 4th 1107 (2005), for the proposition that an

2   expert must provide some factual basis for his conclusion that Defendants violated

3   the standard of care.  In McDonald's Corp. a restaurant customer brought a

4   negligence action against the fast food restaurant defendant after she was sexually

5   assaulted in a restroom by a man whom the plaintiff previously had informed the

6   restaurant and a security guard was acting suspiciously. Id., at 1110-1. Plaintiff's

7   expert claimed that the restaurant was negligently designed and could have been

8   designed to provide better security.  Id., at 1110-1. The court explained that the

9   expert "did not explain how that might have been done, nor did he make any effort

10   to compare the design of the restaurant to others in the industry." Id., at 1110-1.

11   Plaintiff's expert claimed that the restaurant could have "easily" designed in such

12   a way as to provide better security.  Id., at 1112. However, the expert had "failed

13   to explain what standards, if any, he was applying to reach those conclusions."

14   Id., at 1112.

15           Boeing is incorrect in asserting that Mr. Tarr's opinion is insufficient

16   in establishing breach of the standard of care. Boeing allegedly took affirmative

17   action by using reclaimed water to cool rocket stands as a waste disposal method.

18   Mr. Tarr has asserted that disposing of hazardous waste in this manner breached

19   the standard of care by releasing large amounts of dioxins and other carcinogens.

20   Mr. Tarr explained that this goes against good engineering practice when handling

21   hazardous waste and was unjustifiable as a cost saving method.  Implicit in this

22   statement is the suggestion that the standard of care demanded that Boeing should

23   have disposed of the reclaimed water and cooled the rocket stands through

24   different means. Plaintiffs need not explicate the exact manner in which the

25   disposal should have taken place, rather, they are only required to show that this

26

27                                         65

28

1   particular waste disposal methodology was inconsistent with industry standards of

2   care. Mr. Tarr is an expert who claims that Boeing violated the standard of care set

3   as early as the 1930's to handle chemicals in a careful manner.

4          As an additional argument for summary adjudication, Boeing

5   contends that Plaintiffs have no evidence that Defendants should have known that

6   dioxins would be emitted during rocket engine testing at SSFL.  Boeing claims

7   that there was no evidence at that time linking rocket testing to dioxins.  This

8   argument fails.  The conduct sued upon is not dioxin releases as a result of rocket

9   testing, it is dioxin releases as a result of inappropriate handling of hazardous

10   waste. Boeing knowingly used reclaimed water in a manner that can be construed

11   as violating the standard of care in regards to waste disposal.  Defendants' own

12   expert Cudahy testified that Defendants probably had an obligation to inform

13   regulatory agencies that they were disposing of industrial waste water by spraying

14   it on rocket engine test stands. Plaintiffs do not need to prove that Boeing knew

15   that rocket engine testing would lead to dioxin releases, they need to prove that

16   Boeing violated the standard of care for disposing of hazardous waste in the

17   manner alleged.

18          Accordingly, this Court concludes that Plaintiffs have adequately

19   established the standard of care as related to Plaintiffs' dioxin claims.  As such,

20   this Court denies Defendants' Motion Re Dioxins.

21         *3.*     *Radiological Claims*

22           *a.*     *Undisputed facts*

23          It is undisputed that in the Complaints in these Related Cases,

24   Plaintiffs allege that Defendants are subject to "public liability under 42 U.S.C. §

25   2210 of the Price Anderson Act." It is also undisputed that Plaintiffs allege "the

26

27

28