# EXHIBIT 15



Not Reported in F.Supp.                                                                              Page 1

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Carroll v. Litton Systems, Inc.W.D.N.C.,1990.Only the Westlaw citation is currently available.
United States District Court, W.D. North Carolina, Bryson City Division.
Martha CARROLL, James Carroll; Rosetta Edwina Rogers; James Carroll, Jr.; Keith S. Gentle; Belinda Gaddis, individually and as next friend and parent of Justin Gaddis, and Derrick Gaddis, both minors; Randy Gaddis individually and as next friend and parent of Justin Gaddis, and Derrick Gaddis, both minors; Fred Allen Chambers, individually and as next friend and parent of Rusty Chambers, a minor; Debbie Chambers, individually and as next friend and parent of Rusty Chambers, a minor; Barbara Messer; Ancy Simonds, individually and as next friend and parent of Chuck Hancock, a minor; James R. Messer, individually and as next friend and parent of Jonathan Messer, a minor; Melanie Messer, individually and as next friend and parent of Jonathan Messer; and Ann Carroll, Plaintiffs,
v.
LITTON SYSTEMS, INC., a Delaware Corporation through its Agent for Service of Process: C.T. Corporate System, Defendant.
**No. B-C-88-253.**

Oct. 29, 1990.

RECOMMENDED FINDINGS OF FACT, PART I
J. TOLIVER DAVIS, United States Magistrate Judge.
**\*1** PURSUANT TO 28, UNITED STATES CODE, SECTION 636(b) and the standing Orders of Designation entered by United States District Judge Richard L. Voorhees, the undersigned magistrate has before him the following motions: Litton Systems, Inc.'s ("Litton's") Motion in Limine to Exclude Opinion Testimony Related to Plaintiffs' Past Alleged Exposure to the Chemicals in Issue (" Motion to Exclude"), Litton's Motion for Summary Judgment on Issue of Medical Causation ("Motion

on Causation"), Litton's Motion for Summary Judgment on Alleged Increased Risk of Disease (" Motion on Risk"), Litton's Motion for Summary Judgment on Emotional Distress Claims ("Motion on Distress"), Litton's Motion for Summary Judgment on Claims of Nuisance and Trespass (" Motion on Nuisance"), Litton's Motion for Summary Judgment on Plaintiffs' CERCLA Cost Recovery Claim (Count VI) ("Motion on CERCLA" ), and Litton's Motion for Summary Judgment on Plaintiffs' RCRA Claim (Count VII) ("Motion on RCRA"). In addition, the undersigned magistrate has before him the following motions that have been filed by plaintiffs: Motion to Strike From the Record Materials Submitted by the Defendant in Support of Defendant's Motions for Summary Judgment and for Sanctions Against the Defendant and the Motion of Plaintiff Sandra Hancock, Individually, and as Next Friend and Parent of Chuck Hancock, a Minor, For Voluntary Dismissal.

Having carefully considered the motions listed above, reviewed the pleadings, and conducted a hearing, the undersigned magistrate respectfully submits the following recommended findings of fact. These recommended Findings of Fact, Part I, are released in conjunction with, and as part of, the undersigned's Conclusions of Law, Part II, and Memorandum and Recommendation, Part III.

FINDINGS OF FACT

A. *Procedural Background of the Motions*

1. The complaint in this case, filed on October 25, 1988, alleged that 29 plaintiffs had been exposed to various chemicals emanating from Litton's Clifton Precision plant ("the plant") in Murphy, North Carolina. The chemicals to which plaintiffs were allegedly exposed were trichloroethylene ("TCE") and certain other chlorinated organic compounds. Complaint, para. 12.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                Page 2

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

2. The complaint alleged that the exposure to chemicals occurred as a result of such chemicals entering plaintiffs' homes, the homes of plaintiffs' relatives, or plaintiffs' workplaces, through groundwater that was pumped into such homes and workplaces from wells on properties surrounding the plant.

3. Plaintiffs alleged that they had been physically injured as a result of exposure to such chemicals. Among other things, plaintiffs alleged that they had "sustained permanent and debilitating illnesses and injuries, including but not limited to, nervous system damage, gastrointestinal disorders, liver disease, skin disorders, and immune system damage. " Complaint, para. 16.

4. Plaintiffs further alleged that they suffer from increased risk of incurring disease in the future as a result of their exposure to the chemicals at issue.

*2 5. Plaintiffs further alleged that they suffer from emotional distress as a result of their exposure to the chemicals at issue.

6. Plaintiffs further alleged that their real property has been devalued as a result of the presence of chemicals from the plant.

7. Plaintiffs further alleged that, as a result of their exposure, they would need long-term medical monitoring "to detect the onset of any symptoms of diseases caused by the chemicals."

8. The complaint set forth five causes of action or theories of recovery for the alleged damages described above: negligence, including negligence per se, in the alleged violation of various federal and state laws (Count I), gross negligence (Count II), strict liability for ultrahazardous activities (Count III), nuisance (Count IV), and trespass (Count V). In addition, the complaint set forth two regulatory causes of action. Under Count VI, plaintiffs sought to recover alleged "response costs" as defined by the Comprehensive Environmental Response, Compensation and Liability Act (" CERCLA"), 42, United States Code, Section 9607(a), including costs for testing of groundwater and soil, costs for alternative water supplies, costs

for medical testing and surveillance, and attorneys' fees. Under Count VII, plaintiffs sought to pursue a citizens' suit under the Resource Conservation and Recovery Act ("RCRA"), 42, United States Code, Section 6971, alleging, *inter alia,* that Litton's plant was in violation of RCRA.

9. On January 12, 1989, the court entered a pretrial order giving the parties 100 days to conduct discovery.

10. On February 6, 1989, plaintiffs filed a motion seeking an indefinite extension of the time allowed in the discovery order.

11. Although the complaint had been filed on October 25, 1988, plaintiffs failed to initiate any of their own discovery until near the end of the initial discovery period specified in the January 12, 1989, Order.

12. On March 28, 1989, the undersigned conducted the first of many pretrial hearings in this matter. In response to comments by plaintiffs' counsel to the effect that counsel had been busy working on other cases, the undersigned advised counsel: "[T]his Court expects you to have the necessary equipment, horses, or whatever to carry the load, that is to do the work that is required." Transcript of March 28, 1989, Hearing at 2. At the March 28, 1989, hearing, the undersigned also advised plaintiffs' counsel that an indefinite extension of the discovery period would not be granted, but did agree to allow an extension of discovery as described below. As of the time of the hearing, plaintiffs had not begun any discovery.

13. Plaintiffs' counsel, Gary A. Davis, suggested at the March 28, 1989, hearing that the case be pursued in a "phased" manner. In response, the undersigned and counsel for both parties agreed that discovery on issues of medical causation and liability would take place first, to be followed by the identification and deposition of expert witnesses who would provide testimony on those aspects of the case and, finally, the filing of dispositive motions on such issues. In accordance with counsel's suggestion, the undersigned entered an Order on April 10, 1989, incorporating this phased

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 3

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

approach leading to dispositive motions on medical causation and liability.

**\*3** 14. Specific dates for the various steps outlined above were discussed at the March 28, 1989, hearing and agreed to by plaintiffs' counsel and Litton's counsel. The agreed-to dates were incorporated in the April 10, 1989, Order as follows: plaintiffs' were allowed until May 15, 1989, to identify their expert witnesses and the substance of the facts and opinions to which such experts were expected to testify, with their depositions to be completed by June 15, 1989; Litton's experts, in turn, were to be identified by June 30, 1989, and deposed by July 31, 1989; dispositive motions were required to be filed not later than July 31, 1989.

15. In addition to setting forth the schedule for pretrial proceedings in a "phased" approach as suggested by plaintiffs' counsel, the April 10, 1989, Order granted the following two motions to compel discovery filed by Litton: Litton's Motion to Compel Production of Documents and Litton's Motion to Compel Attendance of plaintiffs at their own depositions. Pursuant to Litton's motion to compel production, the undersigned ordered plaintiffs to provide to Litton by April 15, 1989, copies of all of their medical records.

16. Notwithstanding plaintiffs' request at the March 28, 1989, hearing for a phased approach to pretrial proceedings and their agreement on the specific dates incorporated into the April 10, 1989, Order, plaintiffs filed objections to the April 10, 1989, Order on April 12, 1989. First, plaintiffs sought an extension of the April 15, 1989, deadline for producing their medical records to Litton. Second, plaintiffs sought a stay of discovery deadlines that they had agreed to at the March 28, 1989, hearing for identification of their expert witnesses and provision of such experts' anticipated opinions. In particular, plaintiffs sought a 90-day extension of these deadlines and an 80-day extension on the subsequent dates relating to filing of dispositive motions. In seeking such extensions, plaintiffs admitted that "[t]o recover damages for their illnesses, [plaintiffs] must demonstrate that there is a connection between the illnesses that plaintiffs

have suffered and their exposure to the chemicals in their water." Mem. in Supp. of Plaintiffs' Objections to Orders of Magistrate at 4-5.

17. On May 15, 1989, plaintiffs filed with the court a motion for a temporary stay of the discovery deadlines in the April 10, 1989, Order.

18. On May 15, 1989, plaintiffs submitted a Nomination of Expert Witnesses. Among other individuals identified, plaintiffs named Gerald K. Moore, a hydrogeologist, to testify that the plant was the likely source of chemicals in plaintiffs' wells. In addition, plaintiffs stated that Mr. Moore would testify that the chemicals "likely reached plaintiff's wells several years before they were first analyzed for in late 1986 and at concentrations higher than those first determined in late 1986." In addition, plaintiffs named three expert witnesses on the issue of medical causation, Drs. Feldman, Broughton, and Marcus. Dr. Robert Feldman, M.D., a neurologist, was described as having a " preliminary" opinion that unnamed plaintiffs' alleged neurological symptoms were likely to have been caused by exposure to the chemicals at issue. Dr. Alan Broughton, M.D., was described as believing that exposure to the chemicals at issue can cause "a form of autoimmune disease." Dr. William Marcus, Ph.D., was described as having a " preliminary" opinion that "certain symptoms and conditions suffered by certain plaintiffs have been likely caused by their exposure" to the chemicals at issue.

**\*4** 19. On May 16, 1989, plaintiffs filed with the undersigned a Motion for Reconsideration of Magistrate's Orders, in which they reiterated the request for extension of deadlines that plaintiffs had previously made directly to the court, *i.e.,* a request for a 90-day extension on the deadline for identifying expert witnesses and a request for an extension, until June 15, 1989, of the deadline for providing copies of plaintiffs' medical records. Plaintiffs alleged, *inter alia,* "delays" in obtaining medical records from plaintiffs' medical treaters and alleged that it was "physically impossible" for them to conduct necessary steps to comply with the deadlines set forth in the April 10, 1989, Order.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 4

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

20. On May 25, 1989, the undersigned held a pretrial hearing to rule, *inter alia*, on plaintiffs' motion for revision of the April 10, 1989, Order. During the hearing, the undersigned advised plaintiffs: "[I]f you've got good evidence of causation, proceed with [the case]. But if you haven't, drop it." Transcript of May 25, 1989, Hearing at 13-14.

21. From the bench on May 25, 1989, and in its corresponding Order of June 7, 1989, the undersigned ruled as follows: that the April 10, 1989, Order had correctly incorporated the agreements made by plaintiffs' counsel at the March 28, 1989, hearing and that plaintiffs' attempt to appeal the April 10, 1989, Order had caused disorder in that the appropriate remedy, if any, was to seek reconsideration from the undersigned. Nonetheless, the undersigned granted an extension to plaintiffs until June 30, 1989, to submit copies of their medical records to Litton. In addition, the undersigned granted plaintiffs' motion to revise discovery deadlines, granting them additional time until June 1, 1989, to identify new expert witnesses and until June 30, 1989, to set forth the facts and opinions to which such experts were prepared to testify. The undersigned correspondingly extended until September 30, 1989, the date for filing of dispositive motions. In addition, the undersigned granted Litton's renewed motion to compel production of documents relating to three distinct categories of documents that plaintiffs had failed to produce: insurance records, income tax returns, and files they kept concerning the chemicals at issue.

22. On June 1, 1989, plaintiffs identified, *inter alia*, Eric Engum, Ph.D., a psychologist, as an additional expert witness to testify concerning "medical causation."

23. On June 30, 1989, plaintiffs submitted a Supplemental Nomination of Expert Witnesses. Mr. Moore, the hydrogeologist, was described as having the opinion that chemicals reached what has been described as the Carroll Well within one year after that well began pumping in 1969. The Supplemental Nomination also attached, *inter alia*, (1) reports prepared by Dr. Broughton concerning so-called T-lymphocytes and auto-antibodies

allegedly found in the blood of certain plaintiffs, (2) reports prepared by Dr. Engum concerning three plaintiffs (Martha Carroll, Debbie Chambers, and Fred Allen Chambers), and (3) draft reports prepared by Dr. Feldman concerning three plaintiffs (Barbara Messer, Ancy Simonds, and James Carroll). The Supplemental Nomination noted that Dr. Feldman could not provide medical opinions to a reasonable degree of medical certainty without reviewing the results of certain "blink reflex" tests performed by Dr. Berta Bergia, another neurologist, and asserted that Dr. Feldman had not yet had time to make such a review.

**\*5** 24. On July 12, 1989, plaintiffs filed a motion for another extension of time within which plaintiffs' experts would express opinions on medical causation as to specific plaintiffs. In the alternative, plaintiffs sought voluntary dismissal without prejudice under Federal Rule of Civil Procedure 41(a). At the time, depositions of plaintiffs' causation experts had been scheduled for later in July 1989. As grounds for the requested relief, plaintiffs cited alleged "breakdown in document controls" in their office relating to plaintiffs' medical records. Plaintiffs alleged that their experts were "not able to express a final opinion [on medical causation] as to each plaintiff because of a lack of information as to each and every plaintiff." Memorandum in Support of Plaintiffs' Motion to Extend the Time for Plaintiffs' Medical Experts to Express Opinions on Medical Causation as to Specific Plaintiffs or in the Alternative for Dismissal Under Rule 41(a). Plaintiffs did not specify any particular plaintiff as to whom their experts on medical causation *were* able to express opinions to a reasonable degree of medical certainty, nor did plaintiffs specify the particular plaintiffs whose claims should have been dismissed voluntarily without prejudice.

25. Litton opposed plaintiffs' motion for further extensions of time or, in the alternative, for dismissal without prejudice. In documents filed subsequent to the deposition of plaintiffs' expert witnesses on medical causation, Litton contended that none of plaintiffs' named medical experts had been able to express an opinion, to a reasonable degree of medical certainty, that any of plaintiffs'

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                               Page 5

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

alleged health complaints had been caused by their alleged exposure to TCE or the other chemicals in issue.

26. In their reply brief filed in support of their motion for an extension of time or, alternatively, dismissal without prejudice, plaintiffs admitted: "It is apparent that in several respects the plaintiffs' technical proofs of medical causation have not been met 'to a reasonable degree of medical certainty'.... " Reply Brief at 2. Plaintiffs accordingly requested voluntary dismissal without prejudice as their preferred relief.

27. On August 22, 1989, pursuant to motion, the Court involuntarily dismissed the claims of two plaintiffs, Lucille and Crystal Leatherwood, without prejudice. These plaintiffs could not be found by plaintiffs' counsel and could not respond to any discovery request.

28. On September 6, 1989, Litton filed a motion for summary judgment concerning three plaintiffs: Joe, Edna, and Terry Conley. In support of the motion, Litton argued that there was no evidence that the Conleys had been exposed to any of the chemicals at issue in the case or that any such chemicals could have migrated from the plant to their well. Litton further argued that plaintiffs' hydrogeologist, Mr. Moore, had admitted at his deposition that there were no analytical results showing the presence of any chemicals in the Conleys' water. Plaintiffs did not oppose the entry of summary judgment on Litton's behalf with respect to the Conleys. Accordingly, on October 12, 1989, the undersigned issued a Memorandum and Recommendation that the Conleys' claims be dismissed with prejudice pursuant to Litton's motion for summary judgment.
In the October 12, 1989, Memorandum and Recommendation, the undersigned noted that, *inter alia,* the following elements had to be shown by a plaintiff seeking damages or recovery as a result of alleged exposure to chemicals from groundwater:

**\*6** (1) release by defendant of complained of chemicals into the environment; (2) chemical migration into the groundwater and further migration of groundwater in the Conleys' well; (3) ingestion of these chemicals by the Conleys; (4)

injury; and (5) that the ingested chemicals were the cause of the injuries.

On December 5, 1989, the district court entered a Memorandum Opinion and Order concluding that the undersigned's "proposed findings of fact are supported by the record and that the proposed conclusions of law are consistent with current case law." Accordingly, the district court ordered, *inter alia,* that the Conleys' claims be dismissed with prejudice.

29. On September 27, 1989, the undersigned held a hearing to resolve, *inter alia,* plaintiffs' motion for an indefinite extension of time within which their experts could provide adequate testimony on medical causation or, in the alternative, dismissal without prejudice, which motion was opposed by Litton. At the hearing, plaintiffs' counsel Donna K. Holt admitted that plaintiffs had done virtually nothing to prepare their case before it was filed. Transcript of September 27, 1989, Hearing at 21. Ms. Holt advised the undersigned, however, that the reason for plaintiffs' difficulty in obtaining medical causation opinions had to do with problems in obtaining, distributing, and reviewing copies of plaintiffs' medical records. *Id.* at 2, 20. Plaintiffs' counsel specifically disavowed that plaintiffs were searching or "fishing" for new experts on medical causation. *Id.* at 8, 16. The undersigned granted plaintiffs another extension of the date by which expert opinions could be submitted, *i.e.,* until November 30, 1989. In granting their request and extending the deadline five months, the undersigned admonished plaintiffs' counsel that this extension would be the last one given to plaintiffs. *Id.* at 22.

30. In its October 12, 1989, Order, the undersigned found, as follows:

Plaintiffs are advised that this third extension will be their final extension. Plaintiffs have admitted in court that before this matter was filed the appropriate prefiling research had not been conducted.

October 12, 1989, Order, at 2. The undersigned further warned:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 6

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

[P]laintiffs' counsel is cautioned again that if they do not have the personnel to give this matter the attention these clients deserve, then it is time to retain additional assistance. Plaintiffs' case has been dropped like a foundling at the courthouse door, but this court has neither the resources nor the inclination to foster the progeny of counsel's imprudent acts.

*Id.* at 3.

31. As a result of the extension, the date for submission of dispositive motions was changed from September 30, 1989, to March 15, 1990. Litton had prepared dispositive motions to be filed on September 30, 1989, and as a result of the extension, it was put to additional costs.

32. At the September 27, 1989, hearing, the undersigned again advised plaintiffs' counsel to drop the claims if they were not valid. "If they're not valid claims, they ought to be dismissed." Transcript of September 27, 1989, Hearing at 9.

*7 33. In addition, on September 27, 1989, the undersigned determined to recommend to the district court that plaintiffs' alternative motion for voluntary dismissal without prejudice be denied because Litton would have caused defendant to go to great expense to defend itself from what is apparently a claim that has not been properly developed," and that plaintiffs had "prematurely" placed a substantial burden on the judicial process by their conduct. October 12, 1989, Memorandum and Recommendation at 5-6. Plaintiffs filed objections to the recommendation.

34. In its December 5, 1989, Memorandum of Opinion and Order, the district court, upon *de novo* review of the record, considered and rejected plaintiffs' objections to the recommendation. The court found that "the proposed findings of fact are supported by the record and that the proposed

conclusions of law are consistent with current case law." December 5, 1989, Memorandum of Opinion and Order at 2.

35. On November 30, 1989-the extended deadline for naming expert witnesses on medical causation that the undersigned had advised plaintiffs would be their last-plaintiffs filed another nomination which named two new expert witnesses, Dr. Hugh Spencer and Dr. George Rodgers. At the same time, plaintiffs filed another motion for an extension of time and renewed their motion for voluntary dismissal without prejudice. Again, plaintiffs admitted in their papers that there was a "technical failure of proof at this time for some portion of the injuries alleged by some of the plaintiffs," Memorandum in Support of Plaintiffs' Motion for Extension of Time or in the Alternative Renewed Motion for Dismissal Under Rule 42(a) [sic], at 3. Plaintiffs did not specify particular plaintiffs or particular injuries as to which there was sufficient evidence of medical causation to withstand a dispositive motion.

36. In attempting to explain their need for additional time to develop sufficient evidence, plaintiffs conceded that they had "failed to appreciate the nature and extent of the information on exposure needed by the medical experts before they could reach final opinions on medical causation," *id.* at 6, and that "the medical experts need to know when the exposure began and ended." Plaintiffs also conceded that the fact that chemicals had been found in plaintiffs' wells in 1987 and the alleged fact that Litton had stopped discharging TCE into the ground at the plant in 1974 were "not sufficient data for a medical expert to assess and distinguish which conditions and symptoms of a particular plaintiff are most likely the result of exposure to defendant's chemicals or from some other cause." *Id.* at 6-7. Plaintiffs referred to their newly named expert, Dr. Spencer, as the alleged source of the exposure information needed by plaintiffs' medical causation experts. *See* Finding of Fact 37 below. Plaintiffs contended that Dr. Spencer needed additional time to review additional test results and study chemicals other than TCE which had been found in plaintiffs' wells. *Id.* at 7.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                   Page 7

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

**\*8** 37. In addition, plaintiffs contended that additional "blink reflex" tests were necessary in order for Dr. Feldman, plaintiffs' neurologist, to form "final opinions" on plaintiffs. Motion for Extension of Time or in the Alternative Renewed Motion for Dismissal Under Rule 42(a) [sic], at 2. Plaintiffs' counsel had previously advised the undersigned, at the September 27, 1989, hearing, that the initial series of blink reflex tests run by Dr. Bergia had not been done properly, according to Dr. Feldman; that Dr. Feldman did not consider the tests reliable; and that Dr. Bergia had been " confused" and "did not follow protocol." As a result of these failures, Ms. Holt advised the undersigned that Dr. Feldman could not provide " opinions to a reasonable degree of medical certainty on any individual plaintiff." Transcript of September 27, 1989, Hearing at 2.

38. As noted above, plaintiffs on November 30, 1989, submitted a revised nomination of expert witnesses naming, *inter alia,* Dr. Spencer as an expert who could testify concerning prior levels of chemicals in plaintiffs' wells. The nomination included a report from Dr. Spencer in which he estimated that the Carroll Well (otherwise referred to in this litigation as the "Old Green Well") contained as much as 27,591 parts per billion ("ppb" ) TCE in 1970. As described in the report, Dr. Spencer reached such conclusions by deriving an estimated "TCE half-life," *i.e.,* a period of time in which TCE in an aquifer supposedly degrades to one half of its original concentration, and then back-calculating from known or estimated concentrations. The 27,591 ppb estimate was premised upon an assumed TCE half-life of 1.5 years and an estimated (not measured) concentration in the Carroll Well of 108 ppb in 1986. Exhibit 4 to Plaintiffs' November 30, 1989, Nomination of Expert Witnesses ("Spencer Report" ), at 4. Dr. Spencer also estimated prior alleged concentrations of TCE assuming a TCE half-life of 2.0 years and a lower starting concentration. In these alternative calculations, the highest TCE concentrations in the Carroll Well were given as 1,728 ppb. In each scenario painted by Dr. Spencer, he assumed that TCE concentrations declined regularly and steadily until 1987, when TCE was first measured in the Carroll Well.

39. The November 30, 1989, nomination also reiterated that the blink reflex tests previously performed on plaintiffs were "of limited usefulness because of questions surrounding the validity of the results." Plaintiffs' November 30, 1989, Nomination of Expert Witnesses, at 3.

40. In support of plaintiffs' November 30, 1989, motion for further extension of the discovery schedule and renewed motion for dismissal without prejudice, plaintiffs' counsel, Donna K. Holt, submitted an affidavit. Among other things, Ms. Holt admitted in her affidavit that, as of the July 1989 deposition of Dr. Feldman, in which he testified that he was unable at that time to provide opinions on medical causation to a reasonable degree of medical certainty, Ms. Holt was aware of plaintiffs' need to find new expert witnesses on the issue of exposure and that plaintiffs had been looking for such an expert since August 1989. Affidavit of Donna K. Holt, paras. 5, 7.

**\*9** 41. Litton again opposed plaintiffs' requested extension of time, arguing, among other things, that plaintiffs' attempted addition of two new expert witnesses was neither contemplated nor approved by the undersigned in its October 12, 1989, Order and had never been mentioned as a reason for obtaining additional time. Litton further argued that any further extensions would be prejudicial and wasteful.

42. Hearing on plaintiffs' motion for additional time or dismissal occurred on December 18, 1989. Plaintiffs' counsel, Donna Holt, conceded that she had known at the time of the September 27, 1989, hearing, that "Dr. Moore's testimony [on prior alleged levels of chemicals in plaintiffs' wells] was not sufficient. I figured that out during the medical depositions." Transcript of December 18, 1989, Hearing at 21. In addition, plaintiffs' counsel admitted that the blink reflex data submitted by Dr. Bergia was an inadequate basis upon which Dr. Feldman could base an opinion on medical causation. *Id.* at 26 ("they have demonstrated in their depositions of her that she did not have the qualifications that Dr. Feldman required for someone to do the tests"), 42 ("[i]t was a mechanical technician duty that was botched ...

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 8

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

[a]nd now Feldman cannot rely on the results").

43. Again, the undersigned advised plaintiffs' counsel at the December 18, 1989, hearing that "if [plaintiffs'] claims are not valid, they ought to be dismissed." *Id.* at 23. The undersigned also advised the parties that Litton would be entitled to file a motion pursuant to Rule 11, Federal Rules of Civil Procedure, in the event that plaintiffs' claims were dismissed. *Id.* at 34.

44. Even though Litton would be put to great expense by allowing yet another continuance to plaintiffs-a continuance which included the naming of new expert witnesses not contemplated by the undersigned's prior order-the undersigned agreed to plaintiffs' motion for continuance and agreed to allow plaintiffs to name the new experts, including Dr. Spencer. In so doing, the undersigned acted out of concern for plaintiffs' interests, not wanting to penalize plaintiffs for the deficiencies of their counsel. Out of that concern, the undersigned determined to grant plaintiffs' counsel one more extension of time in which to attempt to put together a case that could survive summary judgment.

45. The undersigned accordingly entered an Order on December 26, 1989. Among other things, the December 26, 1989, Order recounted the procedural history of the case: how the undersigned had agreed to plaintiffs' suggestion to try this case in "phases" and had granted numerous extensions, and how plaintiffs had been unable to fulfill their promises to the undersigned and had, indeed, demonstrated a "lack of candor in the status of nominated experts." December 26, 1989, Order at 3. The undersigned observed that plaintiffs:

have asked for what will be the fourth enlargement of discovery, not heeded the court's instructions, not complied with the court's orders, and have been less than candid with the court.

**\*10** *Id.* at 4. The undersigned also observed that " [t]he discovery burdens of which plaintiffs' counsel complains are of their own creation through failure to prepare properly the extensive claims presented to this court." Nonetheless, the undersigned allowed plaintiffs until January 30, 1990, to revise

or supplement their experts' opinions. The date for filing dispositive motions was again moved, this time from March 15, 1990, to May 15, 1990.

46. In addition, the undersigned recommended to the district court that, at the conclusion of the litigation, it impose sanctions against plaintiffs' counsel in the amount of Litton's costs in deposing experts previously named by plaintiffs and later withdrawn when plaintiffs named new expert witnesses. Such experts include, but are not limited to, Dr. Berta Bergia and Dr. William Marcus.

47. Finally, the undersigned declined to rule on plaintiff's renewed motion for dismissal without prejudice, concluding that the district court had already ruled on plaintiffs' prior motion and that the motion for renewal should be pursued directly before the district court.

48. On April 30, 1990, the district court issued a Memorandum of Opinion denying plaintiffs' renewed motion for dismissal without prejudice. The district court concluded, *inter alia,* that Litton had gone to "great effort and expense in preparing itself for trial," April 30, 1990 Memorandum of Opinion at 5; that plaintiffs had received five formal extensions of discovery over Litton's objections, *id.* at 6; that Litton justifiably feared that a renewal of plaintiffs' complaint at a later time would require previously taken depositions to be updated at substantial expense, *id.* at 7; that such renewal would require substantial supplementation of Litton's own expert opinions at excessive expense, *id.;* that "Plaintiffs are having difficulty in finding evidence linking Defendant's conduct to Plaintiffs' ills," *id.* at 8; that "[e]xhaustive preparations have been made for trial ... [and that] this lawsuit [has] reached an advanced stage of proceedings," *id.* at 8-9; and that:

Based upon the record developed thus far, diligence on the part of the Plaintiffs has been lacking; delay has become a custom. Plaintiffs have asked for and received five extensions of discovery in order to uncover critical medical evidence including expert opinion. One would have expected such information to exist in accessible and identifiable

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                      Page 9

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

form prior to filing of the complaint. Despite the fact that each request for an extension has been granted, the Plaintiffs still seek voluntarily dismissal of their claims, apparently because of counsel's inability to meet the discovery deadlines as extended.

*Id.* at 9. In addition, the district court found that plaintiffs had lacked diligence in bringing its evidentiary problems before the court, *id.* at 11, and concluded that, since plaintiffs' only reason for requesting dismissal without prejudice was their " stated need to locate the medical and expert testimony required to prosecute the suit," the explanation was insufficient "[i]n light of the generous discovery extensions Plaintiffs already have received." *Id.* at 11-12. The district court also concluded that no conditions could be imposed upon plaintiffs that would obviate the harm to Litton in the event that the court allowed plaintiffs voluntary dismissal without prejudice.

*11 49. On May 11, 1990, plaintiffs filed a motion for voluntary dismissal of plaintiffs Sandra Hancock and her minor son, Chuck Hancock. As grounds for this motion, plaintiffs admitted that "plaintiffs' medical experts have concluded that medical causation cannot be established at this time between these plaintiffs' complaints and their exposure to the contaminated water at issue in this case." Plaintiffs' Motion for Voluntary Dismissal of Plaintiffs Sandra Hancock and Chuck Hancock, A Minor, at 1-2. In addition, plaintiffs requested that the claims of Chuck Hancock be dismissed without prejudice. As the asserted basis for this motion to dismiss, plaintiffs explained that the Hancocks had been exposed only to chemicals allegedly emanating from what is known as the Kilpatrick Well, that Dr. Spencer had provided calculations concerning the alleged level of TCE to which the Hancocks had been exposed, and that Dr. Rodgers, having been given such information, was unable to testify to a reasonable degree of medical certainty that any symptoms alleged by the Hancocks had been caused by such alleged exposure. Memorandum in Support of Motion for Voluntary Dismissal of Plaintiffs Sandra Hancock and Chuck Hancock, A Minor, at 2.

50. Litton filed a memorandum in opposition to plaintiffs' motion to voluntarily dismiss the Hancocks' claims, asserting that such claims should be addressed within the context of the summary judgment motions that had been filed on May 15, 1990, and, in any event, that any dismissal of claims should be with prejudice and with imposition of sanctions under Rules 11 and 41(A)(2), Federal Rules of Civil Procedure; 28, United States Code, Section 1927, and the court's inherent authority.

51. On May 15, 1990, Litton filed the above-listed motions for summary judgment and its motion to preclude plaintiffs' evidence of exposure, as required by the revised pretrial order. On the same date, plaintiffs filed a motion for partial summary judgment as to elements of two of their claims. As required by the pretrial order, Litton submitted its opposition to plaintiffs' motion by May 30, 1990. Plaintiffs, however, requested an extension of time within which to respond to Litton's motions until July 16, 1990. The undersigned granted plaintiffs an extension *longer* than the one they had requested and allowed plaintiffs' oppositions to be filed by July 30, 1990.

52. On June 13, 1990, the undersigned conducted yet another hearing in this case. At this hearing, the undersigned determined *inter alia,* to defer consideration of the Hancocks' motion for voluntary dismissal until after consideration of the pending summary judgment motions. It likewise determined to defer consideration of two other pending motions-Plaintiffs' Motion to Rejoin Litton Industries, Inc. as Party Defendant and Litton's Motion to Deem Admitted Requests for Admission. The undersigned also asked counsel to determine what method of arguing the pending summary judgment motions made most sense.

*12 53. In response to this request, plaintiffs' counsel advised the undersigned that Litton's Motion to Exclude should be argued first because, logically, the results of other pending motions could be affected by the undersigned's recommendations on the Motion to Exclude. Accordingly, in its Order of August 17, 1990, the undersigned designated that argument on the Motion to Exclude be heard first and set such argument for August 30,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 10

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

1990. In addition, the undersigned scheduled argument on August 30, 1990, for plaintiffs' Motion to Strike and Litton's summary judgment motion on medical causation. Arguments on the other summary judgment motions were scheduled for September 17 and October 1, 1990.

54. On the morning of August 30, 1990, the parties appeared before the undersigned and argued the Motion to Exclude. The undersigned determined to cancel the afternoon's scheduled argument of the Motion on Causation, however, in deference to the asserted ill health of one of plaintiffs' counsel. At that time, the undersigned invited the parties' views on the appropriate procedural disposition of the Motion on Causation and the Motion to Strike. After discussion, the parties agreed that these motions could and should be submitted on the papers without need for oral argument. The undersigned so ordered, noting that, as to the Motion on Causation, the record was complete and the issues fully and well briefed.

55. In accordance with such order, the undersigned will issue a recommendation as to the Motion to Exclude and the Motion on Causation and address the remaining motions simultaneously. Accordingly, in the Order of September 5, 1990, the undersigned canceled the hearings previously set for September 17 and October 1, 1990, with provision for rescheduling argument in the event that any issues remain after the Memorandum and Recommendation filed simultaneously herewith is disposed of by the district court.

### B. Findings on the Motion to Exclude

56. Plaintiffs have offered two witnesses who, together, propose to establish the levels of TCE to which plaintiffs were allegedly exposed prior to 1987. They are Gerald Moore, a hydrogeologist, and Dr. Hugh Spencer, described by plaintiffs as a " biochemist."

57. With the exception of the Hancocks, plaintiffs claim that they were exposed to TCE that allegedly migrated from Litton's plant, through groundwater, to wells located generally north of the plant. A

stream, Slow Creek, divides Litton's property from that of the plaintiffs. Plaintiffs' case against Litton requires a demonstration that Litton's chemicals migrated underneath this stream. Although Litton contests that its plant was the source of chemicals found in plaintiffs' wells, its pending motions do not require resolution of this dispute.

58. Mr. Moore's opinions were presented in a report that he authored entitled *Hydrogeology and Groundwater Pollution in the Peachtree Community Area, Cherokee County North Carolina* (July 17, 1989) ("Moore Report"). According to the report and Mr. Moore's testimony, groundwater normally discharges into Slow Creek from both sides of the creek and thus normally would *not* carry chemicals under Slow Creek from the plant to plaintiffs' wells. Moore Report at 3, 5; *see also* Moore Dep. (July 17, 1989) at 149-50 (groundwater would not flow uphill from Slow Creek to plaintiffs' wells based upon conditions observed by Mr. Moore in 1989). Mr. Moore believes, though, that during dry periods, when the level of water in plaintiffs' wells was allegedly very low, the wells *would* have drawn groundwater from the Clifton site under Slow Creek. Moore Report at 1c, 5; Moore Dep. (July 17, 1989) at 151. The Moore Report does not provide any opinion to the effect that chemicals from the plant arrived at plaintiffs' wells in 1970 or at any other particular time prior to 1987.

**\*13** 59. Mr. Moore has not performed any tests nor made any calculations to determine when, if ever, low water conditions occurred in plaintiffs' wells. Moore Dep. (July 17, 1989) at 154-55.

60. Mr. Moore has not reviewed historical rainfall data. Moore Dep. (Feb. 8, 1990) at 53, 86, 147-49, 91.

61. In 1989, when Mr. Moore actually measured the water level in plaintiffs' wells, he found it to be, not low at all, but barely below the surface of the ground. In such conditions, he conceded, water would not flow from the plant site into the plaintiffs' wells. Moore Dep. (July 17, 1989) at 149.

62. Mr. Moore cannot say when or how often groundwater allegedly flowed under Slow Creek

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 11

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

from the plant to plaintiffs' wells, *id.* at 151, 153; Moore Dep. (July 26, 1989) at 143.

63. Mr. Moore admitted in his deposition that he could not state any opinion as to when in the past chemicals at various concentrations would have been found in plaintiff's wells:

Q: Have you been asked to provide an opinion on that?

A: I have been told, if I remember correctly that it would be desirable to determine when the highest concentrations occurred, yes. I don't know how to do that.

*Id.* at 91. Similarly, Mr. Moore later testified:

Q. ... Do you have any opinion at all about how often, since the time the plant was constructed, that conditions on the north side of Slow Creek were sufficient to cause groundwater to flow under the creek?

A. I don't ... we do not have a lot of records on how often the well went dry or anything like that.

Q. Do you have any anecdotal evidence about that the plaintiffs told you how often that-

A. Nothing-I'm sorry.

Moore Dep. (July 26, 1989) at 143-45.

64. In opposition to the Motion to Exclude, plaintiffs submitted an Affidavit of Gerald Moore. The Moore Affidavit asserts in conclusory fashion that chemicals from the plant arrived at plaintiffs' wells as early as 1970. No effort was made in the Moore Affidavit to address any of the specific points made by Litton that are described in Findings of Fact at paragraphs 58-63 above. Instead, the bulk of the Moore Affidavit addressed the issue of whether the plant *could* have been the source of the chemicals found in 1987. As noted above, Litton has not contested that the plant is the source of the chemicals for the purposes of these motions.

65. Plaintiffs also originally designated Mr. Moore

to opine that the concentrations in plaintiffs' wells were "likely significantly higher in previous years than those found since January 1987 when testing was begun." Plaintiffs' Supplemental Nomination of Expert Witnesses (June 30, 1989) at 12. In fact, the Moore Report suggests that, at some unknown time in the past, the concentration of TCE in the Carroll Well was approximately 600 ppb.

66. The average measured level of TCE in the Carroll Well is less than 20 ppb. Group Aff. Submitted In Support of Litton's Motions for Summary Judgment ("Group Aff.) at Table 1. (Throughout these Recommended Findings of Fact, the undersigned will cite or refer to only those portion of Litton's supporting affidavits that plaintiffs have not properly challenged in their oppositions.) Thus, Mr. Moore's conclusions, as set forth in the Moore Report, suggest that concentrations of TCE were roughly 30 times higher than average measured concentrations from 1987 to date.

**\*14** 67. Mr. Moore admitted that "there is not a standard procedure for the calculation of pollutant concentrations in the past." Moore Report at 9.

68. Mr. Moore also admitted that he did not consider himself an expert in the fate of organic chemicals in the environment. Moore Dep. (Feb. 8, 1990) at 164.

69. Mr. Moore admitted that "[t]he chemical analyses of groundwater from on-site and off-site wells do not show a decrease in the concentrations of pollutants during the sampling period (1987-1989)." Moore Report at 9.

70. Plaintiffs introduced Dr. Hugh Spencer in November 1989 as a witness who could supposedly supply what Mr. Moore could not, *i.e.,* expert opinion testimony concerning alleged prior concentrations of chemicals in plaintiffs' wells during particular years. To this end, Dr. Spencer prepared the report described above.

71. Dr. Spencer's controlling assumption is that it is meaningful to posit an "environmental half-life" for TCE, *i.e.,* to posit a fixed period of time in which

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                   Page 12

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

any given concentration of TCE in the environment degrades to one-half of its original concentration. Dr. Spencer attempted to derive such an "environmental half-life" for TCE by reviewing the scientific literature, most of which relates to laboratory, not field, studies. Then, choosing two half-lives, without giving particular citations for such half-lives, Dr. Spencer worked backward from measured or assumed concentrations in the Carroll Well. Letter from Hugh Spencer to Donna Holt, November 30, 1989 ("Nov. 30 Letter").

72. As set forth above, Dr. Spencer's estimates of TCE concentrations in prior years for the Carroll Well range to 27,000 ppb. This is more than 1,000 times the average measured concentration of less than 20 ppb.

73. This case is the first time in which Dr. Spencer has attempted to back-calculate an environmental concentration of TCE. Spencer Dep. at 1-176-77.

74. Dr. Spencer is not aware of any scientific literature which describes, let alone validates, a back-calculation of this type. *Id.* at 1-180, 2-76-77.

75. Dr. Spencer admitted that it was fair for Litton's counsel to characterize his calculations as "speculative." *Id.* at 2-236.

76. Plaintiffs filed an Affidavit of Dr. Hugh Spencer in opposition to the Motion to Exclude. In the Spencer Affidavit, Dr. Spencer admitted that his environmental half-life calculations constitute, at best, a "first approximation when ... [the facts concerning alleged degradation of TCE in the environment] are not understood." Spencer Aff. at para. 10.

77. Mr. Moore testified that he had never come across the concept of an "environmental half-life" in the scientific literature. Moore Dep. (Feb. 8, 1990) at 225.

78. Mr. Moore admitted that he had never in his career as a hydrogeologist worked with or relied upon anyone who had tried to back-calculate environmental concentrations for a 16-year period. Moore Dep. (Feb. 8, 1990) at 243-44.

79. A difference of about 1,400 percent exists between the two numbers that Dr. Spencer submitted for the high concentrations of TCE alleged to be present in the Carroll Well from 1970-1974.

**\*15** 80. Dr. Spencer admitted that he was unaware of any methodology to reduce the margin of error in such calculations. Spencer Dep. at 2-235.

81. In arriving at his opinions concerning an alleged environmental half-life of TCE, Dr. Spencer has virtually ignored available site data.

82. During his deposition, Dr. Spencer explained how one could derive an "environmental half-life" of a chemical by performing a regression analysis on a set of field data containing at least three different points. *Id.* at 1-105-07. Having derived the formula, Dr. Spencer then opined that it would be generally applicable and that he could have applied his statistical method to any well at or around the plant site. *Id.* at 1-125-26, 1-132-34. Dr. Spencer admitted that, although he believed that the data collected from the site were valid, he had not performed any calculations to determine a particular half-life for the Carroll Well, or any other plaintiff's well. *Id.* at 2-72-73, 2-138.

83. In his deposition, Dr. Spencer was shown actual data from the Carroll Well (from fall 1987 through fall 1989) and asked to calculate the "half-life" of TCE based on those data. After he had performed the calculation, Dr. Spencer refused to testify about the "half-life" he derived. *Id.* at 3-278. He conceded, however, that he could *not* observe any change of TCE concentrations at the Carroll Well over time, *id.* at 3-281, 3-284-85, that he thus could *not* observe a half-life of 1.5 to 2.0 years, *id.* at 3-285-87, and that he had no explanation for that discrepancy, *id.* at 3-288-89. *See generally id.* at 3-278-89.

84. Dr. Spencer acknowledged in his deposition that an expert would rather have site-specific numbers for environmental half-lives than numbers derived from the literature. *Id.* at 3-224.

85. Dr. Spencer conceded that, in the event

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 13

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

site-specific data yielded a longer half-life than half-lives "derived" from the literature, the site-specific information would have to be used in attempting to back-calculate historical levels of chemicals. *Id.* at 3-227. Nevertheless, in his Affidavit submitted in opposition to Litton's Motion to Exclude, Dr. Spencer continued to ignore, without explanation, the Carroll Well site data.

86. According to Dr. Spencer, biodegradation is a major determinant in the environmental fate of chemicals. Dr. Spencer conceded that biodegradation rates vary from site to site. Spencer Dep. at 3-173, 3-175. He listed myriad site-specific factors that have to be taken into account in order to determine what is actually going on at any particular site. *Id.* Dr. Spencer admitted that he had failed to examine or obtain data concerning any of these factors, however. *Id.* at 3-174, 3-179, 3-181.

87. From Dr. Spencer's calculations for the Carroll Well itself, the maximum concentration of TCE in that well in 1970-if any chemicals were there at all-would have been virtually identical to the average measured concentrations.

**\*16** 88. Dr. Spencer did perform certain calculations with respect to well IW-1, which is the main industrial well at the plant and thus supplies the water used in the plant. At the time he performed the calculations, he was unaware that IW-1 was a pumping well and was unaware of the interim remedial measures that Litton has implemented at that well. *Id.* at 1-90, 1-92-93, 1-123. Both of these factors would significantly affect changes in concentration of TCE over time and, according to Litton's experts on the fate of chemicals, *see* Affidavit of Drs. Cass T. Miller and F. Michael Saunders, University of North Carolina, Chapel Hill, and Georgia Institute of Technology, Atlanta ("Miller/Saunders Aff."), para. 6, invalidate the use that Dr. Spencer attempted to make of IW-1 data. Plaintiffs did not take issue with the reasoning offered by Drs. Miller and Saunders. Instead, without explanation, Dr. Spencer simply repeated in his affidavit his reliance on data from IW-1.

89. Plaintiffs failed to offer any explanation concerning the admission in Dr. Spencer's deposition that calculations from actual data for the Carroll Well contradicted Dr. Spencer's belief in an "environmental half-life of TCE" of from 1.5 to 2.0 years.

90. In his opinion letter, Dr. Spencer cited a paper by Dr. Paul Roberts, Stanford University, concerning a 1983 study of the fate of chemicals in a specific aquifer near Palo Alto, California. In his deposition, Dr. Spencer repeatedly cited the Dr. Roberts' paper as support for the type of calculations that Dr. Spencer was purporting to make. Spencer Dep. at 1-56, 2-43, 2-46, 2-49, 2-53, 3-206.

91. In support of its Motion to Exclude, Litton submitted an Affidavit from Dr. Roberts ("Roberts Aff.") Having reviewed a transcript of Dr. Spencer's deposition and Dr. Spencer's report, Dr. Roberts opined that Dr. Spencer's "extrapolation approach is imprudent and prone to enormous error." Roberts Aff. at para. 1.[FN1]

92. Litton's experts, Drs. Miller and Saunders, testified by affidavit that "neither the Roberts paper, nor any other peer reviewed paper supports the notion that a so-called environmental half life can be used to calculate concentrations 17 years in the past." Miller/Saunders Aff. at para. 4. They concluded:

[W]e have reviewed the scientific literature and can find no reference to the use of such a methodology for the back-calculation of environmental concentrations, as Dr. Spencer has attempted. In our experience, we have never before seen or heard of such a method, and we find that Dr. Spencer's methods violate well-established precepts of subsurface investigation and modeling.

*Id.* at para. 3.

93. In response to the Miller/Saunders affidavit, plaintiffs contended that half-lives are commonly used in science to predict the *future* fate of chemicals. However, neither plaintiffs nor Dr. Spencer have offered any citation to any report,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 14

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

published or unpublished, in which Dr. Spencer's methodology has ever been used, approved, or even discussed for the purpose of back-calculating concentrations of chemicals in groundwater.

**\*17** 94. Dr. Spencer is a Professor of Chemical Engineering at the Speed Scientific School of the University of Louisville. He is not a registered professional engineer. Spencer Dep. at 1-139.

95. Dr. Spencer never took any courses in geology or hydrogeology. *Id.* at 1-136, 1-140, 1-142. He admitted that he did not consider himself an expert in hydrogeology or in the modeling of groundwater flow. *Id.* at 1-219.

96. Dr. Spencer admitted that he received no formal training concerning the fate of organic chemicals in the environment, *id.* at 1-137, 1-139, 1-142-44, and never did any environmental modeling throughout his academic training, *id.* at 1-141-42.

97. Dr. Spencer never directed research on the fate of chemicals in an underground regime, *id.* at 1-203, or on the fate of TCE in any milieu, *id.* Dr. Spencer has never published anything concerning the movement of contaminants in groundwater or the fate of TCE anywhere in the environment. *Id.* at 1-206.

98. Dr. Spencer admitted at his deposition that he had not read all of the pertinent articles concerning TCE, but hoped to do so during the next five or ten years. *Id.* at 1-67.

99. Dr. Spencer assumed that TCE was in plaintiffs' wells in 1970. He is unable to provide expert testimony on that issue, however. *Id.* at 3-161. Accordingly, he assumed that Gerald Moore, plaintiffs' hydrogeologist, would provide an adequate basis for that opinion. *Id.* at 3-162.

100. Both Dr. Spencer and Mr. Moore admitted that adsorption slows the movement of certain chemicals in groundwater, including TCE, even assuming *water* from the plant site reached the plaintiffs' wells in 1970. *See* Spencer Dep. at 3-163, 4-148-49 (to estimate hypothetical travel time to plaintiffs' wells, one would need to know the

retardation factor, which is based on adsorption); Moore Dep. (Feb.1990) at 133; *see also* Spencer Dep. at 1-231 (TCE would be adsorbed); Moore Dep. (Feb.1990) at 77 (same).

101. Dr. Spencer admitted that there were circumstances from which one could reasonably conclude that retardation was particularly significant near the Clifton plant. Spencer Dep. at 3-209, 4-231-32.

102. Neither Dr. Spencer nor Mr. Moore made any site-specific measurements to quantify the effect of adsorption. Spencer Dep. at 4-149; Moore Dep. (Feb.1990) at 134, 237. Thus, it is impossible for Dr. Spencer or Mr. Moore to say, to a reasonable degree of scientific certainty, how long TCE would have taken to get to the plaintiffs' wells-if in fact contaminated water from the plant ever migrated there in defiance of the hydrogeological barrier of Slow Creek.

C. *Findings of Fact on Litton's Motion on Causation*

103. Plaintiffs have been unable to obtain any opinions to a reasonable degree of medical certainty that the actual measured concentrations of chemicals in plaintiffs' wells caused any of plaintiffs' alleged health effects.

104. Plaintiffs admitted, without developing new evidence establishing higher levels of chemicals at specific earlier times, that their expert witnesses were unable to establish a *prima facie* case on medical causation.

**\*18** 105. In opposition to Litton's Motion on Causation, plaintiffs submitted to the court, *inter alia,* a Joint Affidavit of their three experts on medical causation: Drs. Feldman, Broughton, and Rodgers. The Joint Affidavit, paragraph 26, admits, in part, that these experts are unable at this time, without reliance on the opinions of Dr. Spencer, to provide any opinion evidence on medical causation, to a reasonable degree of medical certainty, with respect to any plaintiff. Rather, plaintiffs' experts aver that, in the event that Dr. Spencer's conclusions are excluded from the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                                                            Page 15

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

case, they would need additional time to review the facts before determining what additional opinions, if any, they might be prepared to offer.

106. Plaintiffs have no expert evidence at this time, to a reasonable degree of medical certainty, that TCE at the measured concentrations in the Carroll Well caused any of plaintiffs' claimed health effects.

107. Plaintiffs lived, worked, or visited for varying periods of time near Litton's plant in Murphy, North Carolina.

108. In early 1987, Litton discovered that certain wells near the plant contained extremely low levels of chlorinated organic compounds, *i.e.,* levels averaging in the low parts per billion. As a point of reference, one part per billion (ppb) is the equivalent of one second in 31.7 years. Upon discovery of the presence of such chemicals, Litton supplied plaintiffs with bottled water. Subsequently, Litton installed carbon adsorption filters on plaintiffs' wells.

109. A panel of distinguished experts in toxicology, epidemiology, immunology, neurology, and internal medicine jointly submitted an affidavit in support of Litton's motion for summary judgment on medical causation ("Group Aff."). In addition, Litton submitted a separate affidavit of Dr. Peter Shields, who is board-certified in the fields of internal medicine and oncology and who has substantial experience in the area of occupational medicine (" Shields Aff.") The undersigned will cite only those portions of the Group Affidavit and Shields Affidavit that were not contradicted by plaintiffs' experts in the affidavits submitted in opposition to Litton's motions for summary judgment.

110. Plaintiffs have been examined by numerous physicians, including more than 120 treating physicians (some of whom were consulted specifically as a result of plaintiffs' alleged exposure) and independent medical examiners pursuant to court order. *Not one* of the examining physicians has been able to ascribe any of plaintiffs' physical complaints to the alleged exposure to chemicals.

111. Dr. Kendall Green, a toxicologist and board-certified internist at Duke University Medical Center who has studied the alleged toxic effects of TCE, was visited in April 1987 by Fred Allen Chambers and Barbara Messer because of their alleged exposures. After having thoroughly examined and tested them, Dr. Green concluded, with respect to both, that "I am unable to relate any of [their] complaints and symptoms to a possible intoxication with trichloroethylene...." Dr. Green's Reports (Att. 73). *See* Deposition of Dr. Kendall Green, M.D., Ph.D. (Att. 61) at 6, 12, 17-18, 22-23, 27-33.

**\*19** 112. Plaintiffs' experts concede that risk is not attendant upon every measurable dose; at some sufficiently low level of exposure or dose, virtually all compounds carry no measurable or predicted risk of noncarcinogenic effects. The "break-point" or "threshold" is that nonzero dose at which the risk of an adverse response cannot be distinguished from zero. As a qualitative and quantitative matter, essentially all chemicals have been shown or are considered to have thresholds for noncancer health effects. One cannot consider even the potential that exposure to a chemical caused a particular result without comparing the actual dosage to the known threshold levels for the various chemicals.

113. The types of physical complaints that plaintiffs' experts attribute to plaintiffs' alleged exposure to chemicals includes headaches, dizziness, tingling sensations, numbness, anxiety, forgetfulness, back, leg, and arm pains, among others.

114. There are many studies of *occupational* (*i.e.,* substantially higher) exposures to some of these chemicals, TCE in particular, which fail to show adverse health effects. The United States Occupational Safety and Health Administration (" OSHA") has set a permissible daily exposure limit ( "PEL") of 50 ppm and a short-term exposure limit of 200 ppm. Group Aff. at paras. 23, 45. Even if the alleged historical concentrations assumed by Dr. Spencer are considered, TCE air concentrations in plaintiffs' homes from 1970 to 1974 would still have been "18-fold lower than those considered safe by OSHA." Group Aff. at para. 23.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                   Page 16

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

115. None of plaintiffs' asserted injuries are uniquely associated with chemical exposures at any level. Plaintiffs attribute all manner of ordinary, everyday complaints to their exposure to TCE, including headaches, fatigue, nausea, and so forth. Plaintiffs' experts do not dispute that there are innumerable causes of these frequent human problems.

116. Many of plaintiffs' alleged symptoms appear to have worsened since 1987, despite the fact that exposure to the chemicals substantially stopped when they were discovered. Thus, some plaintiffs who visited neurologist Dr. Jack Scariano in 1989 complained about facial numbness, a nonspecific complaint that is found in a variety of ailments. Shields Aff. at para. 11. Plaintiffs had generally never complained about such facial numbness prior to their visits to Dr. Scariano. Similarly, in a medical evaluation sheet dated February 18, 1987, plaintiff Keith Scott Gentle indicated that he did not have problems with dizziness, frequent headaches, or shortness of breath. On an April 21, 1988, questionnaire, answered when this litigation was contemplated, he *did* complain of shortness of breath, but still declined complaint of dizziness or headaches. On a December 17, 1988, questionnaire, answered after this lawsuit had begun, he complained for the first time about dizziness and headaches. *See* Medical Evaluation Sheet for Feb. 18, 1987 (Attachment 50 to Litton's Appendix in Support of Motion on Causation); Keith Scott Gentle's Neurological Questionnaires (Attachment 53.b).

**\*20** 117. A number of plaintiffs cannot even be said to be suffering from illnesses or injuries, let alone illnesses or injuries related to exposure to chemicals.

118. Dr. Harold Schutte is a Board-certified pediatrician and has been teaching and practicing at Memorial Mission Hospital for many years. Pursuant to court order, he examined the child plaintiffs (Charles Hancock, Jr., Rusty Chambers, Walter Derrick Gaddis, Justin Gaddis, Jennifer Simonds, and Jonathan Messer). His reports (Attachment 30 to Litton App.) show that all of the children are normal and healthy. The most pertinent observations are set forth below:

*Jonathan Messer*-This patient's health is excellent ... This patient has done exceptionally well ... He is in the 93rd percentile for height [and] the 75th percentile for weight. [He] shows no evidence of any neurological impairment.... Urinalysis ... normal ... Blood liver profile studies ... WNL [within normal limits] for a child.

*Justin Gaddis*-[H]is general health has been good ... This child developed all milestones on time and toilet trained at two years ... his grades were average or a little above in the range of "A" & "B" ... [t]his patient is an oriented, well-developed, well-nourished, eight year old white male ... mature for his stated age ... essentially a normal blood count ....

*Walter Derrick Gaddis*-[T]his young man's general health has been good.... All developmental parameters have been met on time to date. He walked at 8 1/2 months which is actually early ... he had the usual amount of recurrent ear and respiratory tract congestion problems ... he has had no major injury or illness ... 75th percentile [height] [and] 78th percentile for weight.... Laboratory studies ... WNL.....

*Jennifer Wimpey*-This patient's general health is excellent.... This patient's development has been right on schedule with all parameters of development within the normal limits.... Normal four-year old white female patient, who is slightly above weight, but is in good health otherwise. Urinalysis ... within normal range.... Blood liver profile studies ... within normal range.... 3 atypical lymphs [which is] a slightly elevated count but not significant clinically.

*Rusty Chambers*-In general, this patient's health is good ... he made very high grades in the first year [of school] ... has no learning disorders and ... has done very well ... He is fully ambulatory. He interacts with the examiner, and his mother, appropriately. Normal seven year old white male patient, in good health.... Laboratory studies ... WNL.

*Charles Hancock, Jr.*-This patient's general health is good.... His developmental history reveals that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                      Page 17

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

he met most of the early developmental milestones on time. The patient has been seen in the last year for a football physical ... no major problems.... [He is] 95th percentile for height, and he is one standard deviation above the 95th percentile for weight.... Normal 11 1/2 year old white male who is above average in stature. Laboratory studies ... WNL....

**\*21** 119. Similarly, plaintiffs' expert, Dr. George Rodgers, concluded that none of the children had any symptoms that were probably related to exposure to TCE. *See* Dr. Rodgers' Table of Symptoms (Attachment 31 to Litton's App. in Supp. of Summary Judgment Motions).

120. Plaintiffs offered no medical expert testimony that plaintiffs Melanie Messer and Sandra Hancock suffered from any illnesses or injuries related to their alleged exposure to TCE.

121. During his deposition, James "Kenny" Green admitted that he was *not* claiming that he, himself, had suffered any nervous-system damage, gastrointestinal disorders, liver damage, skin disorders, immune-system damage, or any other " symptoms, ailments, injuries of any kinds that [he] attribute[d] to the chemicals in [his] water." Deposition of James "Kenny" Green at 51-52 (Attachment 11). Nor had any physician ever told him that his alleged exposure to chemicals put him at risk for any disease. *Id.* at 53.

122. During his deposition, Marvin Garrett, too, admitted that he was not "alleging in this lawsuit that [he has] suffered any physical injury as a result of being exposed to chemicals that have come from the ... plant either in the groundwater or in the air." Deposition of Marvin Garrett at 27. Instead, he testified that he is participating in the lawsuit, apparently, to recover money that he gave to Barbara Messer, his fiance, for doctors' visits, travel, telephone bills, and "power bills." *Id.* at 27-29.

123. Independent medical examiner Dr. Cecil Durham, a neurologist, examined the adult plaintiffs whose alleged exposure to TCE was among the highest and concluded that they are neurologically normal. *See* Dr. Durham's Reports (Attachment

28) for Ancy Wimpey ("normal neurological examination"), Barbara Messer (same), Keith Scott Gentle (same), Debbie Chambers (same), Fred Allen Chambers (same), Martha Carroll (same), James Carroll, Jr. (normal examination).

124. A number of adult plaintiffs were examined by neurologist Dr. Jack E. Scariano at the request of plaintiffs' attorneys. Dr. Scariano was originally named as an expert witness by plaintiffs, but then withdrawn. Dr. Scariano concluded from his examinations of plaintiffs that most were clinically normal in virtually every respect. *See* Deposition of Jack E. Scariano at 31 ("didn't see any problems" in James Carroll, Jr.'s examination), 41 (Rosetta Rogers "completely normal"), 47-48 (nothing in Martha Carroll's examination to corroborate her complaints), 54 (Debbie Chamber's examination negative), 61 (Fred Allen Chambers normal), 80-84 (Belinda Gaddis' examination "totally normal"), 87 (James Kenny Green's examination "completely normal"), 95 (neurological examination of Peggy Green "completely normal"), 97 (James Messer had "completely normal neurological examination") (Attachment 22).

125. Plaintiffs identified four witnesses who would assertedly opine that some plaintiffs' complaints were caused by exposure to the chemicals at issue. [FN2] First, plaintiffs named Dr. Alan Broughton to opine that plaintiffs suffered from immunological problems caused by the alleged exposure. Second, plaintiffs named Eric Engum, Ph.D., to opine that certain cognitive or emotional problems of some plaintiffs were caused by the alleged exposure to chemicals. Third, plaintiffs named Dr. Robert G. Feldman to opine that plaintiffs suffered from neurological problems caused by the alleged exposure to the chemicals at issue. Finally, plaintiffs named George C. Rodgers, M.D., Ph.D., a toxicologist.[FN3] Dr. Rodgers offers opinions that a limited set of plaintiffs' alleged physical problems has been caused by their alleged exposure to TCE.

**\*22** 126. Litton's Motion on Causation is based upon the alleged inadmissibility and insufficiency of the proposed testimony of Drs. Broughton, Engum, Feldman, and Rodgers. They are discussed below, *seriatim.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                                                       Page 18

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

### 1. *Dr. Alan Broughton*

127. Dr. Alan Broughton is a pathologist who does not treat patients. Broughton Dep. at 93.

128. Dr. Broughton never examined or interviewed the plaintiffs. *Id.* at 1-91-92, 1-326, 3-54-55.

129. Dr. Broughton runs a laboratory where he attempts to measure various aspects of the human immune system. *Id.* at 1-57-59. He ran certain tests upon blood drawn from many, but not all, of the plaintiffs.

130. Litton challenges the methodology of Dr. Broughton's analyses on a variety of grounds, but such challenges are not germane to Litton's Motion on Causation with respect to Dr. Broughton.

131. Dr. Broughton purported to find two types of effects in plaintiffs' immune systems. First, he purported to find increased levels of certain T-lymphocytes, suggesting immune system activation. Second, he purported to find increased levels of autoantibodies, *i.e.,* immune cells that might improperly regard certain human cells as foreign.

132. Dr. Broughton was unable to testify that any plaintiff has a disease or injury caused, or probably caused, by that plaintiff's alleged exposure to TCE. Broughton Dep. at 1-369, 1-372. In Dr. Broughton's words: "The defense claims that I have not made a diagnosis in these patients. They are correct." Broughton Aff., para. 17.[FN4]

133. Dr. Broughton admitted that he did not know whether the levels of T-lymphocytes he found in plaintiffs were significant in any respect. Broughton Dep. at 1-306.

134. Dr. Broughton admitted that, notwithstanding the alleged presence of autoantibodies in plaintiffs, he could not testify that any plaintiff in fact had an autoimmune disease. *Id.* at 1-91.

135. Dr. Broughton affirmatively testified that plaintiffs "don't have immune system disease." *Id.* at 3-100.

136. Dr. Broughton testified that there were numerous other possible causes of the subclinical findings he made in plaintiffs, such as: residential exposure to chemicals not in issue here-chlordane and formaldehyde-(Broughton Dep. at 1-123-24), various diseases (*id.* at 1-125), drugs (*id.* at 1-407, 3-247), the common cold and allergies (*id.* at 1-408), viral infections (*id.* at 2-440), arthritis (*id.* at 2-441), alcohol (*id.* at 3-246), workplace exposure to chemicals (*id.* at 4-39-41, 4-44-46, 4-65-68), and prescription medications (*id.* at 4-50, 4-63).

137. Dr. Broughton attempted to compare the immune-system data gathered from plaintiffs to those of a purported "control" group. He testified, however, that his "control" group was "admittedly not age matched," (*see* Broughton Affid. at paras. 5, 7, 8(2)), nor was it matched geographically (*id.* at para. 8(1)), nor was it controlled for the presence of non-TCE-related diseases that could have caused the appearance of autoantibodies (*id.* at para. 8(3)), such as the common cold.

**\*23** 138. Dr. Broughton admitted that there is no evidence in the medical or scientific literature that ingestion of *any* chlorinated solvents such as TCE can induce the production of autoantibodies. *Id.* at 1-69-71.

139. Dr. Broughton admitted that the presence of autoantibodies was not regarded in the scientific community as an indicator of TCE exposure. *Id.* at 4-36, 4-39.

140. Dr. Broughton could not say what risk, if any, the plaintiffs allegedly had for developing any immune disease in the future. *Id.* at 89, 3-110-12. He could not state whether *any* plaintiff would likely ever develop clinical manifestations relating to his subclinical findings. *Id.* at 1-89, 1-108-09, 1-416-18, 3-110-12, 3-149-50.

141. Dr. Broughton admitted that the medical community would not regard his laboratory findings as evidence of the existence of any illness. *Id.* at 2-416-17.

142. Dr. Broughton conceded that there is "not general agreement in the scientific community ... as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

Page 19

to whether autoantibodies are an indicator of future disease or an indicator of beneficial influence." *Id.* at 3-234; *see also id.* at 2-416, 3-232 ("significance of ... autoantibodies in healthy individuals ... is not yet clear").

### 2. *Dr. Eric Engum*

143. Dr. Engum testified that, in his opinion, two of the plaintiffs (Martha Carroll and Debbie Chambers) suffer from some type of "atypical organic brain syndrome."

135. Dr. Feldman asked that Dr. Engum's report concerning Mrs. Carroll and Mrs. Chambers be reviewed by Dr. Roberta White, a colleague of Dr. Feldman. Dr. White testified that the neuropsychological test results upon which Dr. Engum based his opinion could not be attributed to " organic brain syndrome" because of the very low Intelligence Quotients ("IQ's") of Mrs. Carroll and Mrs. Chambers. White Dep. at 1-8-13.

144. In any event, Dr. Engum repeatedly admitted that he could not draw any causal relationship between such alleged conditions in Mrs. Carroll and Mrs. Chambers and the alleged exposure in this case. Engum Dep. at 84, 95, 226-27.

145. Plaintiffs did not offer any affidavit from Dr. Engum in opposition to Litton's Motion on Causation.

146. Dr. Engum examined three other plaintiffs: Belinda Gaddis, Rosetta Rogers, and Fred Chambers. He found that Mrs. Rogers and Mrs. Gaddis were perfectly normal neuropsychologically. *Id.* at 68, 78. Although Dr. Engum found minor deficits in Mr. Chambers' functioning, he also found Mr. Chambers to do very well in certain areas. Accordingly, Dr. Engum could not diagnose " organic brain syndrome" in Mr. Chambers. *Id.* at 136.

### 3. *Dr. Robert Feldman*

147. Dr. Feldman admitted that he knew of no

scientific literature that has shown that chronic consumption of drinking water with average concentration of TCE less than 20 ppb can cause any neurological impact. Feldman Dep. at 1-81-84.

148. Dr. Feldman admitted that TCE has been "very useful as an analgesic or general anaesthetic agent in clinical medicine." He admitted that he still believes that TCE can be used successfully in that manner. Feldman Dep. at 2-58 to 2-61.

149. Anaesthesia involves inhalation of TCE at concentrations of approximately 10,000 parts per *million* ("ppm") in air. *See* Group Aff. at paras. 126, 157. By contrast, based on measured concentrations, plaintiffs could have been exposed, at most, to 0.032 ppm in their air, *i.e.,* 300,000-fold less. *Id.* at para. 23.

*24 150. Dr. Feldman testified that he is unaware of any report of injury to the nervous system as a result of TCE *per se.* Feldman Dep. at 2-7 to 2-8. This admission is significant. Plaintiffs did not even attempt to rebut Litton's expert testimony that earlier studies of industrial or medical exposures involving TCE associated those exposures with some neurological impairments; that careful analysis of the circumstances of those events leaves no doubt today, however, that they were likely caused by dichloroacetylene, a breakdown product of TCE when it is exposed to high temperatures, metal surfaces, and strongly alkaline conditions; and that such conditions could not have occurred in plaintiffs' homes. Group Aff. at paras. 141-45, 149-51.

151. During the initial session of his deposition, in July 1989, Dr. Feldman admitted that he could not, with respect to *any* of the plaintiffs, express an opinion on causation to a reasonable degree of medical certainty. Feldman Dep. at 1-61-62, 1-130, 1-134-35, 3-149 (Dr. Feldman has "no opinions as to causation as to any of the plaintiffs to a reasonable degree of medical certainty").

152. Dr. Feldman stated that, in order to render any such opinion, he would, among other things, have to rule out all other possible causes of the alleged illness or impairment. *Id.* at 1-71, 3-79-80.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 20

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

153. Dr. Feldman also declared that, before he could render a reliable opinion concerning causation, he would need to correlate exposure data with the alleged appearance and course of the various physical complaints. *Id.* at 1-71-73.

154. In addition, Dr. Feldman refused to render any opinions to a reasonable degree of medical certainty until a colleague, Roberta White, Ph.D., reviewed neuropsychological reports on all of the plaintiffs. *Id.* at 1-113. None of the plaintiffs had been administered the complete neuropsychological test battery that Dr. Feldman required. *Id.* at 1-68-69, 1-71.

155. As of July 1989, virtually the only data that Dr. Feldman felt supported plaintiffs' claims of injuries were the results of some blink reflex tests conducted by Dr. Berta Bergia in 1988 and 1989.

156. Dr. Bergia herself believed that the blink reflex data she collected from plaintiffs in April 1989 were within normal limits. *See* Bergia Dep. at 86, 93-94, 99-100, 110-11, 117-18, 128-30, 133, 138-39, 144-47, 153-54, 157-58.

157. Dr. Feldman disregarded Dr. Bergia's interpretations of the data and characterized them as suggesting neurological damage in some plaintiffs. *See* Feldman Dep. at 1-118-19, 3-12.

158. After his July 1989 deposition, however, Dr. Feldman reviewed the transcript of Dr. Bergia's deposition, at plaintiffs' request, to determine whether Dr. Bergia was actually qualified to administer the tests upon which Dr. Feldman was relying as the basis for his opinions. *Id.* at 4-88.

159. After review of Dr. Bergia's deposition transcript, Dr. Feldman concluded:

**\*25** *[Bergia] disqualified herself....* [by revealing that her] training in blink reflexes was *only two additional* patients ... [that] [s]he is confused about direct response vs. facial nerve response ... [that] she did not provide her own controls ... [that] [s]kin temperature was not always measured ... [and that] she did not keep to the protocol....

*Id.* at 4-88-98, *discussing* Letter from Dr. Feldman to Donna Holt (11/14/89) (emphasis in original).
Dr. Feldman concluded that Dr. Bergia's "blink reflex data are severely in question." *Id.; see* Feldman Dep. at 4-87, 4-98.

160. Plaintiffs' counsel repeatedly told the undersigned, on the basis of Dr. Feldman's November 14, 1989, letter to counsel, that Dr. Bergia's blink reflex data were invalid and that, as a result, plaintiffs should be entitled to further extensions of the discovery deadlines. *See* Findings of Fact at paras. 42, 155-159 above. The undersigned granted the requested extensions in part for that reason.

161. On January 30, 1990, just prior to the last cut-off date for provision of expert opinions established in the discovery schedule, Dr. Feldman issued separate "opinion" letters for each of 12 plaintiffs: James Carroll, Sr., Martha Carroll, James Carroll, Jr., Belinda Gaddis, Randy Gaddis, Rosetta Edwina Rogers, Keith Scott Gentle, Barbara Messer, Ancy Simonds, James Messer, Deborah Chambers, and Fred Allen Chambers. The "opinion" letters failed to include any final opinion, to a reasonable degree of medical certainty, that plaintiffs' alleged neurological complaints were, in fact, caused by exposure to TCE. Instead, the letters noted that any such opinions would be conditional on the following:

subsequent receipt of confirmatory positive blink reflex data from a reliable electrophysiologist;

subsequent receipt of evidence of neuropsychological impairment obtained by a qualified neuropsychologist;

reliability of self-reporting on neurological questionnaires; and

ability to rule out other possible causes for plaintiffs' complaints.[FN5]

162. Ten plaintiffs visited Dr. Feldman and Dr. Clyde Niles, a colleague of Dr. Feldman, in *February* 1990 (after Dr. Feldman's final opinions were required to have been provided by the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                       Page 21

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

undersigned's Order). Of the 12 plaintiffs for whom Dr. Feldman had written "opinion" letters, two-Ancy Wimpey and Randy Gaddis-did not go to Boston for examination by him and Dr. Niles.

163. Dr. Niles has testified that he has had substantial experience in his career in measuring the blink reflexes of people allegedly exposed to TCE. Niles Dep. at 14; Feldman Dep. at 6-44-45. Dr. Niles is certified by the American Board of Neurology and Psychiatry and by the Board of Electrodiagnostic Medicine. Niles Dep. at 6. He had three intensive years of training in electromyography. *Id.* at 6-7. Significantly, he testified that he had intensive training in the administration of the blink reflex test. *Id.* at 11-12 (six months of training and administration of 60 blink reflex tests under supervision).

***26** 164. At Dr. Feldman's request, Dr. Niles administered the tests to the 10 plaintiffs and obtained normal results for each. Indeed, for nine plaintiffs, the results were substantially better than the results obtained by Dr. Bergia. Dr. Niles, despite his expertise, was not asked by Dr. Feldman to review Dr. Bergia's data. Niles Dep. at 31.

165. According to Dr. Niles, the plaintiffs' data did *not* look like what he would have expected if they had, in fact, been exposed to the alleged concentrations of TCE for the alleged length of time. Niles Dep. at 24 (one would expect to see abnormal R1 latencies), 80 (one would *not* expect to see 10 out of 10 people with normal blink reflex data if they had been exposed to TCE in their drinking water for 15-18 years).

166. As noted above, Dr. Bergia considered her own blink reflex results on plaintiffs to be normal. Similarly, Dr. Niles opined that the tests *he* ran on plaintiffs proved normal. Dr. Feldman's apparent response to these opinions in his affidavit is to dispute whether a normal result really means normal. Feldman Aff. at para. 19-20. His explanation is that "some individuals with the [unspecified] disease will have values that lie within normal limits." *Id.* at 20.

167. Dr. Feldman concluded that Rosetta Rogers

had a "normal neurological examination." Feldman Dep. at 5-45.

168. Dr. Feldman concluded that Belinda Gaddis's "neurological examination was completed within normal limits." *Id.* at 5-6-7.

169. Dr. Feldman could not provide any clinical diagnosis for Deborah Chambers. *Id.* at 6-186-87.

170. Dr. Feldman concluded that James Messer's examination "was within normal limits, except for hypoactive reflex ... related to an old gunshot injury." *Id.* at 5-68.

171. With respect to plaintiffs Martha Carroll and Deborah Chambers, Dr. Feldman's "opinions" were qualified on the basis of expected confirmation of the neuropsychological deficits allegedly observed by Dr. Engum. *See, e.g.,* Feldman Dep. at 5-204. The confirmations were to be obtained "on repeat testing." *Id.* at 5-204-06. None of the plaintiffs, however, was sent for repeat testing as Dr. Feldman required.

172. In addition, Dr. White, to whom Dr. Feldman sent Dr. Engum's data concerning Martha Carroll and Deborah Chambers, could not confirm that the observed deficits were typical of what she describes as "TCE encephalopathy."

173. With respect to Fred Allen Chambers, Dr. White could not identify any alleged neuropsychological impairment that could not have resulted from an automobile accident in 1975, in which Mr. Chambers' infant daughter was killed and in which Mr. Chambers himself was critically injured, suffering a severe concussion, fractured nose, blood pressure of 0/0, and pneumothorax, among other injuries, and requiring him to spend months in the hospital.[FN6] Although Dr. Feldman's affidavit asserts that Mr. Chambers "has suffered organic brain damage," Dr. Feldman has no expertise in neuropsychology, and his statement conflicts with the testimony of Dr. Engum, the only neuropsychologist designated by plaintiffs as an expert in this case.

***27** 174. Dr. Feldman admitted that lack of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                              Page 22

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

complete information about plaintiffs' medical histories might confound his ability to render opinions concerning medical causation. Feldman Dep. at 3-25-26, 4-86-87.

175. Dr. Feldman admitted that before an alleged exposure can be considered as a possible cause of an alleged effect, one must establish that the exposure preceded the effect. Feldman Dep. at 5-32. For that reason, Dr. Feldman's questionnaire asked each plaintiff to state when his or her alleged complaint began. Most of the plaintiffs failed to provide the required information, however. *See, e.g.,* Feldman Dep. at 5-32 (Belinda Gaddis), 5-66 (Rosetta Rogers), 5-236-39 (Martha Carroll), 6-187-88 (Deborah Chambers).

176. When Dr. Feldman interviewed the 10 plaintiffs for the purpose of supplementing their questionnaire responses, he failed to ascertain from them when their symptoms began. Dr. Feldman testified that he was more concerned about plaintiffs' present status than about establishing causation. Feldman Dep. at 5-32 (Belinda Gaddis), 5-66 (Rosetta Rogers), 5-236-39 (Martha Carroll).

177. Dr. Feldman admitted that using questionnaires as a basis for rendering opinions concerning medical causation was fraught with weaknesses. Feldman Dep. at 4-112. He admitted that it was "very difficult" to rely on such questionnaires in coming to opinions on medical causation. *Id.* at 5-91.

178. Prior to the lodging of this lawsuit in October 1988, plaintiff Keith Gentle filled out a questionnaire in which, among other things, he admitted that he had surgery and had sustained various football injuries, including trauma to his hands. He also represented that his headaches were "occasional." He also denied having dizziness or trouble sleeping. *See* Attachment 53.b to Litton's Motion on Causation.

179. In December 1988, after the lodging of the lawsuit, Mr. Gentle filled out another questionnaire in which he denied prior surgery and denied ever having had a traumatic injury to his hands. In addition, he claimed that he had "frequent"

headaches and that he *did* suffer from dizziness and insomnia. *See id.*

180. When Dr. Feldman interviewed Mr. Gentle, he did not question Mr. Gentle about the discrepancies between the May 1988 and December 1988 questionnaires. Feldman Dep. at 5-278-90. Dr. Feldman could not explain why Mr. Gentle's alleged headaches, dizziness, and insomnia should have increased between May 1988 and December 1988, when exposure to TCE was nil. *Id.* at 5-288, 5-290.

181. Plaintiff James Carroll, Jr., denied having headaches in an April 1988 questionnaire, but asserted that he *did* suffer from headaches in a December 1988 questionnaire. *See generally id.* at 5-134-37. Dr. Feldman chose to believe the latter representation and "chose not to consider" the earlier denial of headaches. *Id.* at 5-135.

182. Dr. Feldman could not rule out many other potential explanations of plaintiffs' alleged neurological complaints. Thus, he could not rule out the possibility that the complaints of James Carroll, Jr., were due to lead poisoning (Feldman Dep. at 3-132, 4-133-34) [FN7] emotional problems ( *id.* at 5-141) [FN8] eye surgery (*id.* at 5-145) [FN9] or chewing tobacco (*id.* at 5-150-54).[FN10] He also could not rule out the possibility that the complaints of James Carroll, Sr., were due to lead poisoning. [FN11] With respect to Belinda Gaddis, Dr. Feldman could not state that her complaints of mood changes, memory lapses, and decreased concentration were any different from those experienced by the majority of people from time to time (*id.* at 5-18-19) nor could he conclude that her migraine headaches were not brought on by causes other than alleged exposure to TCE (*id.* at 5-22-23). He admitted that tension could be a possible cause of her headaches, for example (*id.* at 5-24) as well as sinus infections and birth control medication (*id.* at 5-28-29). With respect to Rosetta Rogers, Dr. Feldman could not rule out the possibility that her complaints were due to her documented allergies to a variety of foods. *Id.* at 5-64-65.[FN12] Similarly, Dr. Feldman could not rule out the possibility that James Messer's headaches were caused by exposure to chemicals at his workplace (*id.* at 5-76-77) [FN13] nor could he rule out the possibility that they were

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 23

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

caused by a 1985 automobile accident (*id.* at 5-84-88).[FN14] He likewise could not rule out the possibility that Martha Carroll's complaints were the result of psychosomatic syndromes (*id.* at 5-224),[FN15] estrogen imbalance due to her hysterectomy (*id.* at 5-231-35) smoking (*id.* at 5-239)[FN16] adverse reactions to prescription medications (*id.* at 5-245-47) or tension and sinusitis (*id.* at 5-247).
He similarly could not rule out the possibility that Fred Allen Chambers's alleged tingling sensations resulted from his 1975 automobile accident (*id.* at 6-177) nor could he rule out the possibility that Deborah Chambers's alleged hypoactive reflexes were caused by a thyroid problem (*id.* at 6-194-95, 6-198).

**\*28** 183. Neither the Affidavit of Dr. Robert Feldman nor the Joint Affidavit submitted on behalf of plaintiffs purports to set forth a differential diagnosis with respect to any plaintiff or any particular complaint or attempts to show how any alternative potential causes of such complaints were ruled out. Instead, these documents state in a conclusory fashion that such differential diagnoses were performed.

184. The Affidavit of Dr. Feldman largely does not respond to the issues raised by Litton in its Motion on Causation. For example, Litton showed that Dr. Feldman could point to no evidence that TCE acts as a neurotoxin at the measured levels in this case.
In response, Dr. Feldman cited a number of sources-many of them involving intentional inhalation of TCE to "get high"-without making reference to the levels of TCE involved or how they compare with the levels pertinent to this case. Feldman Aff. at paras. 1-4.

185. Many of the studies cited by Dr. Feldman in his affidavit do not support the statements he makes in the affidavit. (Copies of these studies were provided to the undersigned, not by plaintiffs or by Dr. Feldman, but by Litton.) For example, Dr. Feldman cites McLeod, et al. as pertinent to TCE.
In fact, the study deals principally with the combined effects of trichloroethane and "halothane," *i.e.*, 2-bromo-2-chloro-1,1,1-trifluoroethane, which has nothing to do with the facts of this case. *See* Feldman Aff. at para. 3; McLeod, et al. (Att.

70). Similarly, Levy (1986), involved a combination of TCE and dextroamphetamine (" speed"), another substance not involved in this case. In yet another instance, Stephens (1945) (Att. 72), one patient consumed whiskey in conjunction with swallowing TCE; the doctor reported that "[t]he odor of her breath was mainly that of whisky."
Virtually all of the studies cited in the Feldman Affidavit at paragraphs 2-4 show that the patients recovered completely in a matter of hours or days. *See, e.g.,* Martinelli, et al. (Att. 69) (despite temporary loss of consciousness, patient fully recovered; matter described as "benign"); Naish (1945) (Att. 71) (within 24 hours, patient was " perfectly fit"). These studies are consistent with TCE's value as an anaesthetic, which Dr. Feldman admitted.

186. Dr. Feldman has not cited any scientific or medical literature justifying departure from the fundamental tenet of toxicology that the dose makes the poison. *See* Group Aff. at paras. 80-81.

### 4. *Dr. George Rodgers*

187. Most of the alleged complaints that Dr. Rodgers categorized as "probably" related to alleged TCE exposure were symptoms such as headaches, numbness and tingling, anxiety or nervousness, weakness or fatigue, arm or leg pains or cramps, and palpitations. These are symptoms that neither plaintiffs' experts nor the independent medical examiners could objectively measure.

188. Dr. Rodgers conceded that if he submitted a report containing his conclusions on causation to a respected medical journal, the report would be rejected for lack of "objective scientific factual proof." Rodgers Dep. at 2-10-11.

**\*29** 189. In reviewing possible causes of a particular plaintiff's complaints other than the alleged exposure to TCE, Dr. Rodgers looked only for such alternative explanations that were both " obvious" and "highly probable." In the absence of "obvious" and "highly probable" alternative explanations, Dr. Rodgers concluded that the complaint was "probably" caused by the alleged

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                  Page 24

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

exposure to TCE.

190. In formulating his opinions concerning medical causation, Dr. Rodgers purported to rely on a variety of studies that he brought with him to his deposition. Similarly, the Joint Affidavit, at paragraph 11, refers to a series of reports-including mere abstracts-allegedly concerning TCE.

191. Dr. Rodgers has admitted, with respect to the sources referred to above, that these sources were of limited value because (1) they did not necessarily show health effects of TCE but other substances not relevant to this case, (2) there was no way to correlate the amount of exposure to the facts of this case, and (3) many of the "results" were not statistically significant. *See* Causation Mem. at 47-49.

192. Dr. Rodgers conceded during his deposition: " [T]he problem we've got in this case is the lack of studies that are appropriate, truly appropriate, to this set of circumstances." Rodgers Dep. at 1-237 (emphasis added); *see also id.* at 1-244 (virtually all of the studies could be thrown out on the basis of possible confounding factors).

193. For example, Dr. Rodgers relied on an abstract published by Drs. Bernad and Spyker, although he admitted that (1) there was no control group, (2) there was no attempt by the authors to rule out other potential causes, (3) he did not know whether the technique used by the authors had general acceptance in the medical community, and (4) the authors had failed to provide Dr. Rodgers with additional information that he had requested concerning the study. Rodgers Dep. at 1-92-93. Without addressing these points, the Joint Affidavit continues to rely on the abstract.

194. Dr. Rodgers conceded that it "may be" speculative to rely on studies which "are not comparable [to this case] in their characteristics with respect to levels of exposure and [routes] of exposure ... and other chemicals involved." *Id.* at 1-238.

195. The other studies on which Dr. Rodgers relies all have comparable or identical problems. He

relies upon a study by Lillis, et al., for a connection between TCE and headaches, but the study was not controlled with respect to headaches. Rodgers Dep. at 2-207. He relies upon a study by El Ghawabi with respect to headaches, but there was no statistical analysis demonstrating that the results were meaningful. *Id.* at 2-208. He relies upon a study by Grandjean but, again, the study was not controlled. *Id.* at 2-209. *See also id.* at 3-74-75 (Lillis and Bernad studies not controlled), 3-102 (Byers study not controlled), 3-136-38 (Logue study confounded by presence of other chemicals).

**\*30** 196. Dr. Rodgers did not rule out the following possible causes of Phyllis Carroll's alleged leg cramps: trauma, gout, arthritis, fever, strain, unusual amount of exercise, salt imbalance, phlebitis, and effects of birth control medication. *Id.* at 2-132-34, 2-137-38.

197. Dr. Rodgers did not rule out the possibility that Keith Gentle's alleged muscle cramps were caused by exertion at work. *Id.* at 2-153.

198. Dr. Rodgers did not rule out the possibility that Martha Carroll's complaint of forgetfulness was merely an effect of aging (*id.* at 2-173) or that Barbara Messer's alleged tremors were a side effect of Valium (*id.* at 2-175-76).

199. Dr. Rodgers admitted that Fred Chambers' skin rash was not related to TCE, but was most likely a form of contact dermatitis. *Id.* at 3-139-41.

200. Similarly, Dr. Rodgers was unable to rule out the possibility that plaintiffs' headaches and skin rashes came from exposure to formaldehyde from various household sources (Rodgers Dep. at 1-161-62, 1-165-66) or from other sources of indoor air pollution such as cigarette smoke (*id.* at 2-41-42). Nor could he rule out exertion and anxiety as causes of alleged palpitations (*id.* at 3-105-06), obesity as a cause of Debbie Chambers' alleged fatigue (*id.* at 3-71), hormone imbalance as a cause of Martha Carroll's alleged fatigue and weakness (*id.* at 3-52), overwork as a cause of Scott Gentle's alleged fatigue (*id.* at 3-48), and medications as a cause of Barbara Messer's alleged fatigue (*id.* at 3-51). Nor could he rule out tension,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.