Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

Page 25

carbon monoxide exposure, eyestrain, birth control pills, and menstruation as causes of headaches. *Id.* at 2-211-212, 2-214-16. Nor could he rule out Valium therapy as an explanation for Barbara Messer's alleged tremors. *Id.* at 2-175-76. Nor could he rule out strain, exertion, salt imbalance, and phlebitis as possible causes for Phyllis Carroll's alleged leg cramps. *Id.* at 2-135. Finally, Dr. Rodgers could not rule out the possibility that plaintiffs' symptoms were caused by "mass psychogenic illness" provoked by their own counsel. *Id.* at 2-227-28.

201. Dr. Rodgers conceded that most of the vague neurological symptoms claimed by plaintiffs could also have been caused by anxiety (*id.* at 2-185-86), somatizing disorders (*id.* at 2-189), or other types of emotional stress (*id.* at 2-191). As he stated:

If you look at this group of patients and you look at the symptoms that I am attributing as Probably Related [sic] to TCE, most of those symptoms could, in fact, be consistent with a somatic disorder....

... I will stipulate to you that the soft neurologic signs-signs like headache and anxiety, probably palpitations-are things that would be not inconsistent with a somatic disorder, of people who have those [symptoms] listed as probables. At least that component of that list, somatic disorder would be considered as an alternative diagnosis.

**\*31** *Id.* at 2-192-93.

202. Dr. Rodgers expressed the view that it was not necessary for him to rule out other potential causes of plaintiffs' complaints to opine on medical causation. *Id.* at 2-199-200.

203. Dr. Rodgers stated at his deposition that he would attribute causation to TCE even if the likelihood of other causes being responsible exceeded the likelihood of TCE being responsible. *Id.* at 2-163.

204. Litton has asserted, and plaintiffs have not attempted to dispute, that epidemiology is "[t]he study of the distribution and determinants of

health-related states and events in populations...." Last, J., *A Dictionary of Epidemiology* (Oxford Medical Publications 1983) at 32-33.

205. Litton has asserted, and plaintiffs have not attempted to dispute, that among the fundamental tenets of epidemiology that must be satisfied before an agent can be deemed the cause of an effect are the following:

1. Prevalence of the disease should be significantly higher in those exposed to the hypothesized cause than in controls not so exposed.

3. Incidence of the disease should be significantly higher in those exposed to the hypothesized cause than in those not so exposed, as shown by prospective studies.

10. All of the relationships and findings should make biological and epidemiologic sense.

*A Dictionary of Epidemiology* at 34. *See also* Lilienfeld, A. and Lilienfeld, D., *Foundations of Epidemiology* (Oxford University Press 1980) at 317-18 (Attachment 38).

206. Dr. Rodgers conceded that he had not referred to any text on epidemiology in his work on this case. Rodgers Dep. at 1-66.

207. Dr. Rodgers admitted that there were no good epidemiologic studies showing that TCE, at the alleged concentrations, is capable of causing the problems of which plaintiffs complain. Rodgers Dep. at 1-180-81.

208. Dr. Rodgers decided to disregard the lack of epidemiologic evidence in reaching his conclusions because he took the view that such evidence was "not ... necessary." *Id.* at 1-176-77.

209. In support of his opinions on medical causation, Dr. Rodgers set forth in his affidavit a so-called "correlation" between plaintiffs' alleged

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 26

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

exposure and alleged health problems.

210. In this purported correlation, Dr. Rodgers failed (1) to compare plaintiffs to a control group, (2) to control for confounding factors, (3) to weight symptoms on the basis of frequency and severity, (4) to establish plausible biological mechanisms, (5) to conduct the study in a "blind" fashion, (6) to determine statistical significance, if any, or (7) to list alleged exposures consistent with his own calculations.

211. In his deposition, Dr. Rodgers admitted that such correlations are inferior methods of determining causal relationships and that he could not find justification for his approach in any scientific text. Rodgers Dep. at 1-246, 2-91.

212. In addition to relying upon the opinions of Mr. Moore (about when chemicals first allegedly reached plaintiffs' wells) and Dr. Spencer (about the level of chemicals allegedly existing in plaintiffs' wells from 1970 to 1987), Dr. Rodgers made his own calculations for the purpose of determining the total amount of TCE to which plaintiffs allegedly were exposed. Thus, working from Dr. Spencer's figures, which provided alleged TCE levels in plaintiffs' well water, Dr. Rodgers attempted to calculate the amount of TCE that would enter each plaintiff's body through ingestion, inhalation, and dermal exposure.

**\*32** 213. Dr. Rodgers conceded in his deposition that many of the assumptions he made in the course of his exposure assessment were not accurate or were based on no data.[FN17]

214. Dr. Rodgers assumed that almost 90 percent of plaintiffs' alleged exposures came from inhalation of TCE inside their homes. In making these calculations, Dr. Rodgers' used a formula presented in an article by Dr. Julian Andelman for the maximum amount of TCE that could possibly exist in the air of a theoretical home having a given concentration of TCE in its water supply. Rodgers Dep. at 1-272. Dr. Andelman's article specifically warns that the formula should not be used for the purpose of making actual exposure assessments. *See* Andelman (Attachment 36) at 454 ("[o]ne

should be cautious ... in using these ratios as more than an example of the possible relative exposures that can occur via the drinking water and air inhalation routes").

215. Experimental data provided in the article itself disproved the assumption implicit in the theoretical formula, *i.e.*, that *all* of the TCE present in the water volatilizes and enters the air inside a house. *See id.* at 455. Dr. Rodgers conceded that his assumption of complete volatilization was contradicted by the empirical data set forth in Dr. Andelman's paper. Rodgers Dep. at 1-280-81.

216. Litton submitted an affidavit to this court from Dr. Andelman to the effect that Dr. Rodgers' use of the formula in the 1985 paper is inappropriate for any exposure assessment and is likely to overestimate exposure by at least a factor of 10.

217. Dr. Rodgers admitted at his deposition that he was "not an environmental engineer," and could not understand the derivation of Dr. Andelman's theoretical formula. Rodgers Dep. at 1-270.

### 5. *Plaintiffs' Experts' Joint Affidavit*

218. Plaintiffs submitted a Joint Affidavit from Drs. Broughton, Feldman, and Rodgers in support of their opposition to Litton's Motion on Causation. The Joint Affidavit cited a number of studies purporting to support plaintiffs' medical causation opinions. In particular, paragraph 13 of the Joint Affidavit specifically cited six items.

219. The studies cited in the Joint Affidavit do not support the opinions that plaintiffs' experts seek to provide in this case. (Copies of these studies were provided to the undersigned, not by plaintiffs or their experts, but by Litton.) For example, in Logue, J. et al. (miscited by plaintiffs as "Logi"), the authors concluded:

[C]omparisons of the exposed and control group *failed to demonstrate any significant findings* [and that] ... the data appear to indicate that there were *no observable long-term health effects which could be ascribed to long-term, low-level exposure to TCE*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                                        Page 27

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

or other volatile organic compounds.... In summary, the present study does not reveal an excess prevalence of any serious chronic health condition among individuals who were exposed to volatile organic compounds.

**\*33** Logue, J. et al. at 158-60 (emphasis added). The other studies are equally unsupportive of plaintiffs' position. Clark, et al., which the Joint Affidavit describes as relating to TCE, has nothing to do with TCE, but *did* involve a variety of other chemicals (benzene, chlordane, hexachlorobutadiene, hexachloroethane, hexachlorobicycloheptadiene, naphthalene, toluene, and xylenes) *not* found in plaintiffs' wells. *See* Clark, et al. at 11. Both Liu, et al. (Joint Affidavit cites as "Lui"), and Lilis, et al. (Joint Affidavit cites as "Liles"), involve *industrial* exposures to TCE. As plaintiffs' experts concede, however, such exposures are frequently accompanied by exposure to a breakdown product of TCE, *i.e.,* dichloroacetylene, which *could not* have been present in plaintiffs' water or homes. *See* Group Aff. at paras. 141-51; Rodgers Dep. at 1-240-42. Since plaintiffs do not take issue with Litton's analysis, the court must reject any reliance on industrial studies such as Liu, et al., and Lilis, et al. Byers, et al., as Litton pointed out (and plaintiffs have not denied) is fundamentally flawed because the researchers did not choose an appropriate control group, nor did they consider and exclude the possibility of numerous confounding factors. *See* Group Aff. at paras. 122-24. In Feldman, et al., there was no clinical difference between the group of allegedly exposed individuals and the general population.

### D. *Findings Relating to Alleged Increased Risk of Disease*

220. The undersigned incorporates herein its recommended Findings of Fact as set forth in paragraphs 1-219 above.

221. Plaintiffs concede that they are unable to demonstrate that any alleged future risk is more likely than not to materialize.

222. Dr. Rodgers testified: "I think it's unlikely that these people will develop additional problems beyond what currently exists." His effort to establish the likelihood of any plaintiff contracting cancer from the alleged exposures showed that, *at most,* no plaintiff has greater than a four-in-one thousand chance, *i.e.,* 0.4 percent, and half of the plaintiffs, by his calculations, have no greater than a three-in-one hundred thousand chance, *i.e.,* 0.003 percent.

223. By comparison, the average risk of obtaining cancer in the United States, according to Dr. Rodgers, is one in four, or 25 percent.

224. Dr. Feldman testified that, in his view, plaintiffs were recovering from some alleged disease process. Feldman Aff. at para. 17.

225. Dr. Broughton has stated: "I cannot say ... to a reasonable degree of medical certainty that any one of these plaintiffs will most probably develop any one of these diseases" including cancer. Broughton Affidavit at para. 13.

### E. *Findings Relating to Alleged Emotional Distress*

226. The undersigned incorporates herein its recommended Findings of Fact as set forth in paragraphs 1-225 above.

227. Plaintiffs have failed to adduce any expert testimony to the effect that alleged emotional distress suffered as a result of their having discovered the presence of chemicals in their drinking water caused any of them to suffer physical harm or that any plaintiffs, as a result of their alleged exposures, suffer from a serious and disabling mental or emotional disorder that is generally recognized and diagnosed by trained professionals.

**\*34** 228. Dr. Engum, the only expert witness identified by plaintiffs to render an opinion concerning plaintiffs' psychological status, could not express any opinions concerning a causal relationship between plaintiffs' alleged exposure to TCE and his purported findings.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 28

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

229. The Group Affidavit submitted by Litton stated, *inter alia*, that "the mental distress claimed to arise from fear of physical illness is not caused by TCE exposure. It appears to be generated and maintained by false beliefs, group processes (such as conformity) and/or by personal investment in the litigation process." Group Aff. at para. 186. Plaintiffs offered no expert testimony to rebut this statement.

230. Plaintiffs conceded in their memorandum in opposition to Litton's motion on emotional distress (at 11) that, with two exceptions, the emotional distress claimed by plaintiffs "has not reached pathological levels." As to the two alleged exceptions-James Carroll, Sr., and Fred Allen Chambers-plaintiffs point to testimony of Dr. Robert Byron. Dr. Byron was not named by plaintiffs as an expert witness in their filings pursuant to the court's scheduling orders. Dr. Byron also provided conflicting testimony as to his assessment of these plaintiffs, including execution of a sworn affidavit to the effect that, as a result of restrictions on his interviews imposed by plaintiffs' counsel, he was "unable to conduct a full and complete psychiatric examination" and was therefore "unable to confirm the diagnoses of any of the plaintiffs whom I examined." Dr. Byron Aff. (Att. 57).

231. Virtually every time a plaintiff was asked during deposition whether he or she claimed that an alleged health complaint was related to the alleged ingestion of the chemicals in issue, the plaintiff contended that he or she "wasn't an expert" and refused to rule out *any* potential claim of causal connection to *any* of a myriad of subjective complaints, including everything from sties to hemorrhoids to withdrawal symptoms. *See, e.g.,* Deposition of Belinda Gaddis (Attachment 7) at 109-15 (believes that nervousness, mood changes, bumps on her skin, sore throats, viruses, colds and influenza, among other things, were or may have been caused by exposure to the chemicals at issue); Deposition of Martha Carroll (Attachment 5) at 83-90, 136 (believes that pain in her arms, itching in her feet, headaches, hives, stomach and bowel problems-including both diarrhea *and* constipation-colds, sore throats, among other things,

were or may have been caused by the alleged exposure); Deposition of Rosetta Rogers (Attachment 14) at 82-86 (believes that menstrual cramps, vaginal infections, low blood iron, and heart murmur were or may have been caused by the alleged exposure). Indeed, one of the plaintiffs contended that she suffered "withdrawal symptoms" when bottled water was supplied to her home as a precaution. *See* Deposition of Barbara Messer (Attachment 13) at 167-68.

232. Plaintiffs who use tobacco include Martha Carroll, James Carroll, Jr., Fred Chambers, Walter Randy Gaddis, Kenny Green, Peggy Green, Sandra Hancock, James Messer and Melanie Messer. *See* Shields Aff., paras. 25(h), 26(d), 30(d), 35(g), 41(e), 38(d), 39(c), 43(e), 44(d). Use of tobacco is a habit for which human epidemiological evidence proves a causal relationship to cancer. *See* Shields Aff., paras. 25-48.

**\*35** 233. Plaintiff Barbara Messer asked Dr. Robert Stahlkuppe, who treated a number of plaintiffs, to write several letters on her behalf to the effect that Mrs. Messer should no longer be required to drink the water at her house. Dr. Stahlkuppe testified that he attempted to accommodate Mrs. Messer in providing letters but that he had not, and still has not, concluded that any of her alleged symptoms were caused by TCE. Deposition of Dr. Robert Stahlkuppe (Attachment 24) at 35-36. At the time Barbara Messer asked Dr. Stahlkuppe to write these letters on her behalf, she disregarded a letter from another of her treaters, Dr. Robert Kibler at Emory University, who had concluded that her symptoms " could not possibly be related to exposure to trichloroethylene." (Attachment 54). Deposition of Dr. Robert Stahlkuppe at 33-36 (Attachment 24).

### F. Findings of Fact on Nuisance and Trespass

234. The undersigned incorporates herein its recommended Findings of Fact as set forth in paragraphs 1-233 above.

235. Plaintiffs have submitted no expert testimony on behalf of their assertion that some or all of the plaintiffs have been prevented from swimming or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 29

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

fishing in Slow Creek as a result of the alleged presence of chemicals.

236. Fourteen plaintiffs now concede that they do not have *any* trespass claim because they do "not have a property interest...." Pl.Mem. at 11. Thus, the following are admittedly precluded from pursuing trespass claims: James Carroll, Jr., Phyllis Ann Carroll, Rusty Chambers, Derrick Gaddis, Justin Gaddis, Keith S. Gentle, James Messer, Charles Hancock, Jr., Sandra Hancock, Jonathan Messer, Melanie Messer, Edwina Rogers, Ancy Wimpey, and Jennifer Wimpey.

237. The chemicals found in plaintiffs' wells are not unique to Litton. For example, a 1987 study by the United States Environmental Protection Agency found that many commonly used household products contain the chemicals at issue in this lawsuit. *See* Office of Pesticides and Toxic Substances, United States Environmental Protection Agency, "Household Solvent Products: A 'Shelf' Survey With Laboratory Analysis" at x-xii, 4-1-29 (1987) (Attachment 42).

238. The chemicals at issue in this case are ubiquitous in the environment. They occur in the air, in foodstuffs and in household products in concentrations as great and even greater than those in which they were found in plaintiffs' wells. The Health Advisories put out by the United States Environmental Protection Agency's Office of Drinking Water (Attachment 41) report the following:

*Trichloroethylene* -Production of TCE was 200 million lbs in 1982.... [T]he majority of all TCE production is released to the environment.... Because metal working operations are performed nationwide, TCE releases occur in all industrialized areas.... Because of the large and dispersed releases, *TCE occurs widely in the environment. Trichloroethylene is ubiquitous in the air with levels in the ppt to ppb range.... Trichloroethylene has been reported to occur in some foods in the ppm range.*

*1,1,1-Trichloroethane* -Production of 1,1,1-trichloroethane was 600 million lbs in 1982....

Since 1,1,1-trichloroethane is not consumed during degreasing operations, the majority of all 1,1,1-trichloroethane production is released to the environment.... *Because of the large and dispersed releases, 1,1,1-trichloroethane occurs widely in the environment. 1,1,1-Trichloroethane is ubiquitous in the air with levels in the low ppb range.... 1,1,1-Trichloroethane has been reported to occur in some foods in the ppb range ....*

**\*36** *Tetrachloroethylene* -550 million pounds were produced in 1982, most of which was released into the atmosphere. It is "*ubiquitous in the air with levels in the ppt to ppb range.... Tetrachloroethylene has been reported to occur in some foods in the ppm range ....*"

*1,2-Dichloroethane* -"Production of dichloroethane was approximately 12 billion pounds in 1983.... Because metal working operations are performed nationwide, dichloroethane releases occur in all industrialized areas." Three percent of all surface water supplies in the country have concentrations between 0.5 and 20 ppb. "For a majority of the U.S. population, the greatest source of dichloroethane exposure is from air. *Drinking water is the greatest source only for populations with drinking water levels greater than 6 [ppb].*"

*1,1-Dichloroethylene* -Approximately 200 million pounds of 1,1-DCE were produced in 1980.... Levels in the ppb range have been reported in the areas where 1,1-DCE and its polymers are manufactured.

Health Advisory for TCE (at 3); 1,1,1-trichloroethane (at 2-3); tetrachloroethylene (at 3); 1,2-dichloroethane (at 3); 1,1-dichloroethylene (at 3) (emphasis added) (Attachment 41). Plaintiffs have failed to submit any information contrary to that cited above from the EPA Health Advisories.

239. The Group Affidavit states, *inter alia,* that

the ubiquitous presence of TCE and other chlorinated solvents in chlorinated drinking water and in the atmosphere makes exposure to them inescapable. We are all exposed daily to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 30

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

concentrations of these compounds in the water we drink and in ambient air.... [C]omparison of plaintiffs' estimated exposures with those that might be expected from ambient air reveals that the amount of TCE from these two sources is within the same range.

Group Aff., para. 28. Plaintiffs have not submitted any information contrary to that portion of the Group Affidavit quoted herein.

### G. *Findings of Fact on CERCLA Claims*

240. The undersigned incorporates herein its recommended Findings of Fact as set forth in paragraphs 1-239 above.

241. Plaintiffs seek reimbursement for alleged expenditures in response to the alleged release of hazardous substances from the plant.

242. Among the activities for which plaintiffs seek recovery of response costs are: medical costs, including the costs they incurred by visiting and/or consulting with the expert witnesses they designated in this litigation, *e.g.,* Drs. Feldman, Broughton, and Rodgers; sampling and analytical costs; alternative water supplies, *i.e.,* alleged costs of obtaining water from neighbors after the discovery of the chemicals in plaintiffs' water supplies; and attorneys' fees.

243. Litton has alleged, and plaintiffs have not submitted any evidence in rebuttal, that (a) some of the response costs sought under their CERCLA claims were expended on behalf of the Conleys, who have been dismissed from this case, and (b) some of the response costs sought under their CERCLA claims have been submitted to their insurance carriers for payment.

**\*37** 244. Plaintiffs' CERCLA claim for alternative water supply costs seeks only mileage costs for driving to their relatives' houses and, as part of such visits, obtaining bottled water. Plaintiffs' Response to Second Set of Interrogatories, at para. 5(c) (Exhibit F).

245. Plaintiffs' claimed response costs began in

1988 and continue to the present. Accordingly, plaintiffs' claimed "response" activities have continued for more than six months.

246. Plaintiffs have not offered any affirmative evidence that any alleged "response costs" incurred by them as a result of the alleged release of hazardous substances from the plant were either necessary or have been incurred in compliance with the National Contingency Plan ("NCP").

### H. *Findings of Fact on RCRA Claims*

247. The undersigned incorporates herein its recommended Findings of Fact as set forth in paragraphs 1-246 above.

248. Following adoption of RCRA regulations in 1980, Litton applied for an interim status (or Part A) permit. *See* Complaint, para. 36. Litton operated under that permit until 1985, when it installed a new treatment system and began discharging its treated wastewater under a Clean Water Act (or NPDES) permit. *See* Deposition of Michael Hogsed, at 104-05, 131. As a result, Litton's plant no longer required a RCRA permit.

249. Plaintiffs do not allege a present or ongoing "disposal" of hazardous wastes from the plant. *See* Plaintiffs' Responses to Second Set of Interrogatories (dated September 19, 1989) (Exhibit B), at para. 1(c).

250. In the course of closing its then-existing RCRA treatment facility in 1986, Litton detected the presence of low levels of chlorinated solvents in soils and then in groundwater under the plant site. This discovery led to notification by Litton of state and federal authorities, provision of bottled and filtered water to nearby residents, implementation of interim remedial measures of various kinds, and entry into an administrative Consent Order under RCRA with EPA. Pursuant to this Consent Order, Litton has undertaken further interim remedial measures and is performing a complete remedial investigation of the site.[FN18] Plaintiffs do not contend that Litton has violated this Consent Order in any way.[FN19]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 31

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

251. On October 21, 1989, plaintiffs mailed Litton a letter which purported to give Litton notice that they intended to file suit under the citizen suit provisions of RCRA. This action was filed on October 25, 1989, four days later.

### SUBMISSION

IT IS, THEREFORE, RESPECTFULLY SUBMITTED that these Findings of Fact, Part I, as incorporated in the Conclusions of Law, Part II, and Memorandum and Recommendation, Part III, filed simultaneously herewith, be accepted by the district court.

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), written objections to these recommended Findings of Fact, as incorporated in the Conclusions of Law, Part II, and Memorandum and Recommendation, Part III, filed simultaneously herewith, must be filed within ten (10) days of service of same. Failure to file objections to these recommended Findings of Fact with the district court will preclude the parties from raising such objections on appeal. *Thomas v. Arn,* 474 U.S. 140 (1985), *reh'g denied,* 474 U.S. 1111 (1986); *United States v. Schronce,* 727 F.2d 91 (4th Cir.), *cert. denied,* 467 U.S. 1208 (1984).

**\*38** These recommended Findings of Fact, Part I, are entered in response to the motions noted *supra*.

PURSUANT TO 28, UNITED STATES CODE, SECTION 636(b) and the standing Orders of Designation entered by United States District Judge Richard L. Voorhees, the undersigned United States Magistrate has before him a variety of dispositive motions as noted in the Recommended Findings of Fact, Part I.

Having carefully considered the motions, reviewed the pleadings, and conducted a hearing, the undersigned magistrate respectfully submits the following recommended Conclusions of Law, Part II. These recommended Conclusions of Law are released in conjunction with, and as part of, the undersigned's Findings of Fact, Part I, and Memorandum and Recommendation, Part III.

### CONCLUSIONS OF LAW

A. *Conclusions of Law on Plaintiffs' Motion to Strike*

1. As a preliminary matter, the undersigned must address plaintiffs' Motion to Strike From the Record Materials Submitted by the Defendant, Etc. The motion goes to the affidavits of Dr. Julian Andelman and Dr. Paul Roberts, cited above; to certain references to medical or scientific literature " not discussed by any of defendant's experts"; and to "[a]ll copies of medical or scientific articles that were submitted as attachments to defendant's motions." Motion at 1. As support for this motion, plaintiffs assert (1) that the submission of the noted affidavits is in violation of the undersigned's pretrial orders requiring Litton to name, not later than March 15, 1990, its expert witnesses, and (2) that the submission of the noted citations and articles violates Federal Rule of Evidence 803(18)-the hearsay exception for learned treatises.

2. First, the undersigned concludes that submission by Litton of two affidavits does not contravene the pretrial order with regard to the naming of expert witnesses. The pretrial order relates solely to the identity of witnesses expected to testify at trial, if any. Litton has submitted the affidavits of Drs. Andelman and Roberts, not as evidence that would be submitted at trial, but as information relevant to the court's pretrial determination, pursuant to Federal Rule of Evidence 104(a), which provides as follows:

Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

Nothing in the pretrial order limits a party in the nature of information that can be submitted to the court for the purpose of making Rule 104(a) pretrial determinations concerning competence of witnesses

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                              Page 32

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

and admissibility of testimony. Since the affidavits submitted by Litton from Drs. Roberts and Andelman go directly to the competence of Drs. Spencer and Rodgers, respectively, to testify and to the admissibility of their opinions, they do not run afoul of the pretrial orders.

**\*39** 3. Similarly, to the extent that the other citations and attached articles go to the admissibility of the expert opinions offered by plaintiffs, the fact that they might technically be considered hearsay does not preclude the court from considering them. Federal Rules of Evidence 104(a), 1101(d)(1) (rules of evidence other than privilege inapplicable to Rule 104 determinations); *Bourjaily v. United States,* 483 U.S. 171, 177-78 (1987).

4. In any event, plaintiffs have not shown that these citations or articles are hearsay in light of the exception to the hearsay rule provided by Rule 803(18). Rule 803(18) establishes an exception to the hearsay rule with respect to:

*Learned Treatises.* To the extent called to the attention of an expert witness upon cross-examination or relied upon by him in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

One of the articles to which plaintiffs object is the article by Dr. Andelman upon which Dr. Rodgers, plaintiffs' expert, explicitly relied. Clearly, for the purposes of this litigation, plaintiffs cannot be heard to contend that the article is not a "reliable authority." Another article to which plaintiffs object is an epidemiological study by Shindell and Ulrich, relied upon in the Group Affidavit submitted by Litton. This constitutes sufficient authority under Rule 803(18) to allow the court to consider the article. The same may be said for the citations appended to some of Litton's affidavits. Finally, Litton's citations of various epidemiological treatises does not constitute hearsay. Rather, these treatises were

cited because Dr. Rodgers did not recognize them, nor did he rely upon any other epidemiological treatise, in formulating his proposed opinions. Litton submitted them to the court, not solely for the truth of the information they contained, but to illustrate the limitations of Dr. Rodgers' alleged expertise. As such, the citations are not hearsay and may be considered by the court.

5. In any event, none of the Conclusions of Law set forth below are dependent upon the court's consideration of these materials. Thus, even if the district court should overrule the undersigned's determination on plaintiffs' Motion to Strike, the Conclusions of Law would remain as set forth herein.

B. *Conclusions of Law Generally Concerning Review of Proposed Expert Testimony*

1. In a federal diversity action, the sufficiency of evidence to create a jury question is a matter governed by federal law. *Fitzgerald v. Manning,* 679 F.2d 341, 346 (4th Cir.1982); *Bryan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 565 F.2d at 281.

2. Rule 104(a) of the Federal Rules of Evidence requires a court to make a preliminary inquiry into the admissibility of expert testimony. *In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. at 1239.

**\*40** 3. A district court has wide discretion in determining whether to admit or exclude expert testimony. *Hamling v. United States,* 418 U.S. 87, 108 (1974).

4. Plaintiffs suggest that, so long as their experts say the magic words, *e.g.,* "to a reasonable degree of scientific or medical certainty," the court must accept that testimony under the Federal Rules of Evidence. This suggestion is wrong, as the analysis set forth herein demonstrates. In arriving at its recommended conclusions in this case, however, the undersigned has not weighed the conflicting evidence presented by each side against the other's. Rather, the undersigned has determined that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 33

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

admissible evidence offered by plaintiffs' experts does not satisfy plaintiffs' burden of establishing a genuine issue of material fact sufficient to withstand summary judgment.

5. Not every opinion offered by a so-called expert is automatically admitted into evidence. Rather, an expert's opinion will be allowed into evidence only if it is of genuine assistance to the trier of fact and the scientific methods the expert uses are generally accepted in the relevant scientific community. *See, e.g., Sterling v. Velsicol Chemical Corp.,* 855 F.2d at 1207-09 (excluding testimony of experts based upon pseudo-scientific principles of "clinical ecology"); *Hull v. Merck & Co.,* 758 F.2d at 1477 (trial court correctly excluded medical causation testimony because expert's "assumptions ... rendered his seemingly firm opinion quite speculative"); *United States v. MacDonald,* 485 F.Supp. at 1096 (excluding evidence of psychiatrist concerning defendant's ability to form mental state).

6. The Court of Appeals for the Fourth Circuit has stated:

There are good reasons why not every ostensibly scientific technique should be recognized as the basis for expert testimony. Because of its apparent objectivity, an opinion that claims a scientific basis is apt to carry undue weight with the trier of fact.

*United States v. Baller,* 519 F.2d at 466 (4th Cir.); *see Viterbo v. Dow Chemical Co.,* 826 F.2d at 424 ( "without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible"). [FN1]

7. To guard against a jury giving undue weight to an expert opinion, the Federal Rules of Evidence require the court to evaluate proffered expert testimony under Rules 702, 703, and 401-03. Such evaluation ensures that the expert's opinions are sufficiently reliable to be heard by the jury. *In re " Agent Orange" Product Liability Litigation,* 611 F.Supp. at 1243.

8. Rule 702 permits testimony by expert witnesses only when "scientific, technical or other specialized knowledge will assist the trier of fact to understand

the evidence or determine a fact in issue." Rule 703 requires that the facts or data upon which the expert relies be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject...." Finally, Rule 403 authorizes the court to exclude otherwise relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury...."

***41** 9. The Federal Rules of Evidence require the exclusion of expert testimony which is merely speculative because it does not "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. *See Garwood v. International Paper Co.,* 666 F.2d at 223 (court excluded the testimony of "human factors engineer" because it was not helpful or of assistance); *In re " Agent Orange" Product Liability Litigation,* 611 F.Supp. at 1243 (helpfulness criteria considered under Rule 702).

10. "Expert testimony may not be received unless it appears that the witness is in possession of such facts as would enable him to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture." *Gilbert v. Gulf Oil Corp.,* 175 F.2d 705, 709 (4th Cir.1949); *see Horton v. W.T. Grant Co.,* 537 F.2d 1215, 1218 (4th Cir.1976) (expert testimony is inadmissible absent a " reasonably accurate conclusion").[FN2] When an expert's testimony is merely a guess or speculation and lacks reasonable factual basis, the court should exclude it. *United States v. 0.161 Acres of Land,* 837 F.2d 1036, 1040 (11th Cir.1988).[FN3]

11. The court is not required to accept into evidence all testimony proffered as expert. Instead, the court must make its own searching inquiry to determine whether the proffered testimony would be of genuine assistance to the trier of fact.[FN4] The scientific theories, principles, and methodology utilized by an expert must be generally accepted in the relevant scientific/medical community.[FN5] In addition, the expert opinion, to be admissible, must rest on an adequate foundation.[FN6] The expert must have more than just his credentials and his " subjective opinion." *See Viterbo v. Dow Chemical Co.,* 826 F.2d at 424; *Rohrbough v. Wyeth*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                        Page 34

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

*Laboratories, Inc.,* 719 F.Supp. at 475-76 (N.D.W.Va.1989).

12. The court must be vigilant against the possibility that a jury could be swayed by an expert simply because of his credentials and the scientific nature of his opinions. *See United States v. Baller,* 519 F.2d at 466-67 ("[b]ecause of its apparent objectivity, an opinion that claims a scientific basis is apt to carry undue weight with the trier of fact"); *Mid-State Fertilizer Co. v. Exchange National Bank,* 877 F.2d 1333 (7th Cir.1989) (affirming summary judgment to defendant based upon ruling that expert's affidavit did not raise sufficient factual issues, notwithstanding expert's substantial qualifications and review of the facts); *Merit Motors, Inc. v. Chrysler Corp.,* 569 F.2d 666, 673 (D.C.Cir.1977) ("[t]o hold that Rule 703 prevents a court from granting summary judgment against a party who relies solely on an expert's opinion that has no more basis in or out of the record than [this expert's] theoretical speculations would seriously undermine the policies of Rule 56"); *Brueggemeyer v. American Broadcasting Cos.,* 684 F.Supp. 452, 465 n. 15 (N.D.Tex.1988) (court is obligated to determine whether expert's proposed testimony lacks sufficient foundation, "rather than simply permit the jury to consider all expert testimony and give it appropriate weight").[FN7]

**\*42** 13. "Though courts have afforded experts a wide latitude in picking and choosing the sources on which to base opinion, Rule 703 nonetheless requires courts to examine the reliability of those sources." *Soden v. Freightliner Corp.,* 714 F.2d 498, 505 (5th Cir.1983). *See also Logsdon v. Baker,* 517 F.2d 174, 175 (D.C.Cir.1975) (opinion based upon insufficient foundation would be excluded).

14. The court's inquiry should not stop merely because plaintiffs attempt to characterize the situation as a "battle of the experts." There need be no battle, and no trial, if the court concludes that the *admissible* opinions of plaintiffs' experts would not allow a reasonable jury to find for plaintiffs on the issue of medical causation. *See, e.g., United States v. 294 Various Gambling Devices,* 718 F.Supp. 1236, 1241 (W.D.Pa.1989) (summary

judgment granted notwithstanding assertion by nonmovant that court was faced with classic "battle of the experts").

15. Novel scientific evidence must be excluded as speculative unless its proponent can show that the scientific methods employed "have gained general acceptance" in the relevant scientific community.[FN8] *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir.1923); *Ellis v. International Playtex, Inc.,* 745 F.2d 292, 304 n. 15 (4th Cir.1984); *see United States v. Gould,* 741 F.2d 45, 48-49 (4th Cir.1984) ( "new" scientific hypothesis must be substantially accepted in the discipline to be admissible).[FN9]

16. In addition, scientific testimony is not " generally accepted" unless the "scientific process is reliable, or sufficiently accurate." *United States v. Franks,* 511 F.2d 25, 33 n. 12 (6th Cir.), *cert. denied,* 422 U.S. 1042 (1975).[FN10] In *United States v. Baller, supra,* the Fourth Circuit, citing *Frye,* held that "[t]he admissibility of [scientific evidence] turns primarily on whether this theory has been *sufficiently proved* to allow a jury to give the evidence whatever weight it sees fit.... There must be a *demonstrable, objective procedure* for reaching the opinion." *Id.* at 465-66 (emphasis added).

17. Although plaintiffs may take issue with the *Frye* standard, they concede that a methodology must be reasonably reliable before it can serve as the basis for an expert opinion. The conclusions of law set forth below would be the same even if the *Frye* standard were ignored and plaintiffs' more liberal standard accepted.

18. For any scientific method to be sufficiently reliable, it must be possible to validate the method by comparing its estimates to real world data. *See, e.g., Ohio v. United States Environmental Protection Agency,* 784 F.2d 224, 226 (6th Cir.), *reaff'd,* 798 F.2d 880, 881 (6th Cir.1986) (EPA acted arbitrarily in using a model to set emission limits "without adequately validating, monitoring, or testing its reliability or its trustworthiness in forecasting pollution ...").[FN11]

**\*43** 19. A court should grant summary judgment

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 35

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Federal Rule of Civil Procedure 56(c). The Supreme Court has explained that the moving party's burden may be discharged "by ' showing'-that is, pointing out to the [trial] court-that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett, supra.* The *Celotex* Court held:

[Summary judgment is appropriately entered] against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which [he or] she has the burden of proof.

*Id.* at 322-23; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S at 249 ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party").

### C. *Conclusions of Law Concerning Motion to Exclude*

1. Because the asserted opinions of Gerald Moore and Dr. Hugh Spencer fail to meet the standards for admissibility under the Federal Rules of Evidence and carry substantial danger of unfair prejudice, confusion of issues, and misleading the jury, the court should exclude them, as set forth more fully below.

2. Mr. Moore's opinion concerning the date when chemicals from the plant first allegedly reached plaintiffs' wells is speculative, at best. Mr. Moore conducted no testing of the wells that allegedly pumped groundwater under Slow Creek. His conclusion that chemicals arrived at such wells from

the plant in 1970 is based upon an assumption that, in dry weather, the water level in plaintiffs' wells was low enough to induce a reversal in the normal flow of groundwater. Yet, Mr. Moore did not examine any historical rainfall records nor could he otherwise testify concerning when waters in plaintiffs' wells were allegedly low enough to cause this phenomenon.

3. Mr. Moore could not point to any support in the scientific literature concerning the methods employed by other hydrogeologists for determining the specific times in the past alleged pumping of wells had in fact caused a reversal of normal groundwater flow sufficient to pull groundwater under a creek.

4. Mr. Moore's proposed opinion concerning when chemicals from the plant first allegedly arrived at plaintiffs' wells is not based upon "demonstrably objective" methodology, as required by the Fourth Circuit in the *Baller* case.

**\*44** 5. Because Mr. Moore's proposed testimony is inherently speculative and not based upon " demonstrably objective" methodology, it should be excluded under Rules 702 and 703 of the Federal Rules of Evidence.

6. In addition, even if Mr. Moore's proposed opinions *were* admissible under Rules 702 and 703, they should be excluded under Rule 403 of the Federal Rules of Evidence, because the danger of unfair prejudice to Litton greatly outweighs any probative value.

7. Similarly, Dr. Spencer's proposed testimony concerning the levels of chemicals supposedly existing in plaintiffs' wells prior to 1987 should be excluded.

8. First, Dr. Spencer cannot be considered an expert within the meaning of the Federal Rules of Evidence on the particular issues upon which he has been offered. This case requires an expert with expertise in determining the fate of chemicals in groundwater. This is an exercise that Dr. Spencer has never before performed. In addition, this case specifically involves determining the fate of TCE in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

the environment. Again, this is an exercise that Dr. Spencer has never before performed. It is apparent from the record, and plaintiffs do not dispute, that the entire basis for Dr. Spencer's theories rests upon his having reviewed a small portion of the scientific literature. Yet, Dr. Spencer admitted that he had read only a portion of that literature and "hoped" to review the remainder during the next *decade*. In addition, the author of the particular study upon which Dr. Spencer placed great reliance, Dr. Paul Roberts of Stanford University, reviewed Dr. Spencer's efforts in this case and submitted an affidavit to the court to the effect that such reliance was not justified. Accordingly, Dr. Spencer cannot be considered an expert competent to testify concerning the fate of TCE in an aquifer.

9. Second, Dr. Spencer's calculations are not based upon any "demonstrably objective" methodology, as required by the *Baller* case. He is unable to cite any scientific support for his use of an "environmental half-life" technique or methodology for the back-calculation of TCE over a period of 16 years or for any other time. Mr. Moore himself conceded that he had never heard of the technique that Dr. Spencer was purporting to use. Plaintiffs have offered no support in the scientific literature for Dr. Spencer's calculations. Although "half-lives" may be used scientifically to forward-calculate various parameters, such use is not equivalent to the back-calculation that Dr. Spencer has attempted. In a forward calculation, conditions can be controlled, frequent measurements can be taken, and estimates can be changed repeatedly to comport with actual data. Nothing of a similar nature is available with respect to alleged back-calculations. Because of its lack of support in the scientific literature, Dr. Spencer's approach is, at best, a "novel" approach that has not found general (or even limited) acceptance in the scientific community. Accordingly, it is too speculative to be considered by a jury under Rules 702 and 703 of the Federal Rules of Evidence.

**\*45** 10. Third, Dr. Spencer's calculations are admittedly speculative: he admitted during his deposition that it was fair for counsel to describe the calculations as such; he admitted in his affidavit that his calculations could best be described as "

first approximations when ... [the facts] are not understood"; and he admitted that he could not reduce the error range of his calculations to less than 1,400 percent. Again, based upon such admissions, Dr. Spencer's conclusions are too speculative to be considered by a jury under Rules 702 and 703 of the Federal Rules of Evidence.

11. Fourth, Dr. Spencer's calculations are not supported by, and are in fact contradicted by, actual data from the Carroll Well. Based upon Dr. Spencer's own deposition testimony, he would have expected the concentrations of TCE in the Carroll Well to have decreased steadily from their discovery in 1987, *i.e.,* showing a half-life of between 1.5 and 2.0 years. Instead of showing such a decline, however, Dr. Spencer conceded that the Carroll Well data demonstrated *no* half-life, *i.e.,* that concentrations of TCE were steady. He offered no explanation. Because his opinions concerning historical TCE concentrations at the Carroll Well are not based upon actual data *from* the Carroll Well, and in fact are contradicted by such data, there is no reasonable basis for Dr. Spencer's opinions under Rules 702 and 703 of the Federal Rules of Evidence.

12. Fifth, in light of the exclusion of Mr. Moore's testimony concerning when chemicals from the plant first allegedly arrived in plaintiffs' wells, there is no reasonable basis in the record for Dr. Spencer's opinion, which assumes that TCE had arrived in plaintiffs wells in 1970.

13. Accordingly, the proposed testimony of Mr. Moore concerning when chemicals from the plant first allegedly arrived at plaintiffs' wells should be excluded.

14. Consequently, the proposed testimony of Dr. Spencer concerning the levels of TCE that allegedly occurred in plaintiffs' wells from 1970 to 1987 should be excluded.

D. *Conclusions of Law Concerning Motion on Causation*

1. The following elements, among others, must be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 37

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

shown by a plaintiff seeking damages or recovery as a result of alleged exposure to chemicals from groundwater:

(1) release by defendant of complained of chemicals into the environment; (2) chemical migration into the groundwater and further migration of groundwater into the plaintiffs' water supply; (3) ingestion of these chemicals by the plaintiff; (4) injury; and (5) that the ingested chemicals were the cause of the injuries.

December 5, 1989, Memorandum Opinion and Order, affirming October 12, 1989, Memorandum and Recommendation as "consistent with current case law."

2. The exclusion of the testimony of Mr. Moore concerning *when* chemicals from the plant allegedly migrated to plaintiffs' water supply, and the exclusion of the testimony of Dr. Spencer concerning the levels of chemicals to which plaintiffs allegedly were exposed, leave plaintiffs with inadequate admissible evidence to satisfy their burdens of proof under elements (2) and (3) (migration and ingestion, respectively) set forth above. Accordingly, their claims for personal injury, as a result of the alleged exposure to chemicals from the plant, should be dismissed.

**\*46** 3. North Carolina, as elsewhere, places on a plaintiff the burden of proving that a defendant actually caused his injuries. *Starnes v. Taylor,* 272 N.C. at 391 ("to establish liability ... there must be proof of [action] ... by the defendant, which was the proximate cause of the plaintiff's injury ..."); *Azzolino v. Dingfelder,* 71 N.C.App. at 298; *Lindsey v. Clinic for Women, P.A.,* 40 N.C.App. at 462.

4. In order to establish a *prima facie* case of medical causation, plaintiffs must show by a preponderance of the evidence that, but for their alleged exposures, they would not have developed their specific illnesses or complaints. *See In re " Agent Orange" Product Liability Litigation,* 611 F.Supp. at 1261-63 (testimony of expert rejected because he "does not rule out the myriad other possible causes of the veterans' afflictions"); *In re*

*Swine Flu Immunization Products Liab. Litigation, supra.*

5. It is not enough for plaintiffs to show that exposure to the chemicals at issue has a *potential* for causing harm. *Richardson v. Richardson-Merrell, Inc.,* 857 F.2d at 828 (a mere possibility of medical causation is insufficient); *Sterling v. Velsicol Chemical Corp.,* 855 F.2d at 1199-201; *In re "Agent Orange" Product Liability Litigation,* 818 F.2d at 164-65; *In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. at 1231-34. For that reason, mere exposure to a potentially toxic substance does not constitute a " physical injury" upon which a claim can be based. [FN12] Each individual plaintiff also has the burden of establishing that he had, in fact, suffered a physical injury or illness as a result of exposure to the chemicals at issue. *See, e.g., Novak v. United States,* 865 F.2d at 721 ("plaintiff must show that any antigen reaction she may have had was a reaction to the swine flu shot"); *see also Fitzgerald v. Manning,* 679 F.2d at 346. [FN13]

6. In cases such as this, in which the alleged connection between exposure and plaintiffs' alleged injuries is strongly disputed, plaintiffs must produce expert testimony concerning causation. The expert testimony must establish, *to a reasonable degree of medical certainty,* that the alleged injuries stem from the exposures in question. *Owens v. Bourns, Inc.,* 766 F.2d at 149-50; *Fitzgerald v. Manning,* 679 F.2d at 350; *see also Ralston Purina Co. v. Edmunds,* 241 F.2d at 168 ("the jury may not be permitted to guess between competing possibilities" ).[FN14]

7. The Federal Rules of Civil Procedure require that meritless cases be disposed of on summary judgment, without regard for whether they are complicated or simple, heavily laden or lightly burdened with paper. The Fourth Circuit has noted that, even in complex cases, summary judgment is appropriate. *Terry's Floor Fashions, Inc. v. Burlington Indus., Inc.,* 763 F.2d 604, 610 (4th Cir.1985).

8. Because the medical causation opinions of Drs. Broughton, Feldman, and Rodgers are dependent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 38

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

upon their reliance on Dr. Spencer's proposed testimony concerning levels of TCE that allegedly occurred in plaintiffs' wells from 1970 to 1987, they fall of their own weight and cannot satisfy plaintiffs' burden on motion for summary judgment.

**\*47** 9. Plaintiffs offer no evidence concerning medical causation other than that offered by Drs. Broughton, Feldman, and Rodgers. Because the testimony of Drs. Broughton, Feldman, and Rodgers must be excluded, Litton's Motion on Causation should be granted.

10. In addition, even if the proposed testimony of Mr. Moore and Dr. Spencer were accepted into evidence in this case, Litton's Motion on Causation demonstrates that plaintiffs do not have sufficient admissible evidence of medical causation to allow a reasonable jury to find in plaintiffs' favor on this element of their claims. Accordingly, the undersigned concludes that the Motion on Causation should be granted even if the Motion to Exclude were denied and the Spencer/Moore testimony allowed. The undersigned's analysis with respect to this issue is set forth more fully below.

11. Plaintiffs failed in many respects to address or rebut the points made in Litton's Group Affidavit, among other authorities. Such points that were not specifically refuted by the affidavits of plaintiffs' experts should be accepted as conceded for purposes of this case. *See Bloodgood v. Garraghty,* 783 F.2d 470, 474-75 (4th Cir.1986) (counteraffidavits that did not specifically refute points made in movant's affidavits were insufficient to create genuine issue of material fact); *White v. Boyle,* 538 F.2d 1077, 1079-80 (4th Cir.1976) (summary judgment granted where plaintiff failed to contradict by affidavit specific allegations in defendants' supporting affidavits); *Howard v. Malcolm,* 658 F.Supp. 423, 430 (E.D.N.C.1987) (summary judgment granted when affidavit of nonmovant "d[id] not respond to many of the [movant's] specific factual assertions).

12. The following plaintiffs have offered no expert medical testimony of injury in fact: Jennifer Simonds, Jonathan Messer, Chuck Hancock, Jr.,

Justin Gaddis, Derrick Gaddis, and Rusty Chambers. Accordingly, their personal injury claims should be dismissed with prejudice. *See, e.g., Washington v. Armstrong World Indus., Inc.,* 839 F.2d 1121 (5th Cir.1988) (affirming summary judgment granted to defendant because plaintiff's expert could not express opinion that there was an actionable injury caused by exposure to allegedly toxic substance).

13. The following plaintiffs have offered no expert medical testimony, to a reasonable degree of medical certainty, that any alleged health complaints were caused by their alleged exposure to TCE: Sandra Hancock and Melanie Messer. Accordingly, their personal injury claims should be dismissed with prejudice.

14. The following plaintiffs, at their depositions, testified that they were not seeking to recover in this case for any alleged physical injuries they had suffered: Marvin Garrett and James "Kenny" Green. Accordingly, their personal injury claims should be dismissed with prejudice.

15. As an alternative, independent basis for the recommendation as to Litton's Motion on Causation, the undersigned concludes that an opinion on medical causation should not be admitted unless it is based upon valid human data. *Brock v. Merrell Dow Pharmaceuticals, Inc., supra* ("lack of statistically significant epidemiological proof ... fatal to the ... case"); *Richardson v. Richardson-Merrell, Inc.,* 857 F.2d at 830-32; *In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. at 1241.

**\*48** 16. In addition, a critical aspect of any claim of medical causation in a toxic tort setting must be the performance, on behalf of plaintiffs, of differential diagnoses. *In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. at 1250 ("[c]entral to the inadequacy of plaintiffs' case is their inability to exclude other possible causes of plaintiffs' illnesses-those arising out of their service in Vietnam as well as those that all of us face in military and civilian life"). That is, plaintiffs must produce expert medical testimony to the effect that alternative possible causes for plaintiffs' symptoms

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                              Page 39

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

have been considered and ruled out for specific reasons. Where plaintiffs' medical experts do *not* rule out other potential causes for plaintiffs' complaints, plaintiffs' claims of medical causation cannot be sustained.

17. "Subclinical" findings such as those reported by Dr. Broughton do not qualify as "injury in fact." *See Sterling v. Velsicol Chemical Corp.,* 855 F.2d at 1207-09 (proffered expert testimony by "clinical ecologists" concerning alleged immune system damage rejected as without foundation); *Burns v. Jaquays Mining Corp., supra* (alleged "subclinical injury" insufficient to support a cause of action); *Caputo v. Boston Edison Co.,* C.A. No. 88-2126-Z (D.Mass. July 9, 1990) (1990 WL 98694, LEXIS, Genfed library. Dist. file) (alleged subclinical injury insufficient to withstand summary judgment). Plaintiffs have cited no foundation whatsoever in North Carolina law for the recovery of damages for such alleged "subclinical" injuries.

18. Dr. Broughton's alleged findings in this case are "subclinical," *i.e.,* they cannot testify that any plaintiff has a disease or a clinical injury. Indeed, Dr. Broughton admitted that there is no agreement in the medical profession concerning whether the appearance of his purported subclinical findings were part of any disease process at all or were, instead, "beneficial." Accordingly, even if Dr. Broughton's opinions were admissible, they do not constitute cognizable evidence of the "injury" element of plaintiffs' cause of action.

19. Dr. Broughton's proposed testimony is not admissible, because he does not have an adequate factual basis under Federal Rules of Evidence 702 and 703 for associating plaintiffs' alleged exposure to TCE with the subclinical findings he purportedly made. First, Dr. Broughton admitted in his affidavit that the control group he allegedly used for comparison purposes to plaintiffs was not, in fact, controlled for age, geographical location, or confounding factors. In addition, because Dr. Broughton cannot rule out the possibility that many other factors, such as the common cold and prescription medications, caused the alleged appearance of T-lymphocytes and autoantibodies in plaintiffs, his testimony should be excluded as well

under Federal Rule of Evidence 403. The risk of undue confusion from such testimony would greatly outweigh any probative value.

**\*49** 20. Dr. Engum, whom plaintiffs had at one time named as an expert on "medical causation," disavowed any ability to testify to that issue, and plaintiffs did not submit any affidavit from him in response to Litton's Motion on Causation.

21. Dr. Feldman's opinions in this case were expressly conditioned on several assumptions that have proven unfounded. He *assumed* that electrophysiological testing would confirm the blink reflex data submitted earlier by Dr. Bergia, even though he recognized that her data were "severely in question." In fact, testing by Dr. Niles showed that the plaintiffs were normal. He *assumed* that neuropsychological testing would be done on plaintiffs to show that they had been injured. In fact, no additional testing was done, and Dr. White, upon whom Dr. Feldman relies, discredited the earlier opinions of Dr. Engum concerning the only two plaintiffs to whom Dr. Engum had given diagnoses. (Dr. Feldman's purported opinion that Fred Allen Chambers has suffered organic brain damage is deficient and inadmissible because (a) Dr. Feldman has no expertise in neuropsychology, (b) his opinion is unsupported by the deposition testimony of Dr. Roberta White, upon whom he relies, and (c) his opinion is contradicted by the testimony of Dr. Engum-the only neuropsychologist named as an expert witness by plaintiffs. Dr. Feldman assumed that plaintiffs' statements on the neurological questionnaires would be reliable, but examination showed that those statements were *not* reliable. Furthermore, he *assumed* that he would be able to rule out other causes of plaintiffs' complaints, but could not rule out many other causes.

22. In *Rohrbough v. Wyeth Laboratories, Inc.,* 719 F.Supp. at 474-75, the court disregarded subsequent opinions offered by an expert when those opinions contradicted the expert's earlier sworn testimony and the expert provided no adequate explanation for the change in his position. The court's statement in *Rohrbough* is equally applicable to Dr. Feldman's position here: "This sudden change of tone ...

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 40

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

suggests that the [latest opinion] may not represent the considered opinion of the doctor himself, but rather an effort on the part of the plaintiffs to create an issue of fact." *Id.* at 475.

23. Dr. Feldman's professed opinions on medical causation run contrary to the very principles and conditions he established in his "opinion" letters and his earlier testimony. Accordingly, his opinions are purely speculative, have no adequate basis in fact, and would be of no assistance to the trier of fact under Federal Rules of Evidence 702 and 703.

24. Any probative value that Dr. Feldman's opinions might have would be greatly outweighed by their undue prejudicial impact. For example, Dr. Feldman is apparently prepared to testify that, even when plaintiffs' electrophysiological tests are normal, plaintiffs may be "sick." Such testimony would cause undue confusion to the jury if admitted. Accordingly, Dr. Feldman's opinions should be excluded under Federal Rule of Evidence 403.

**\*50** 25. Dr. Rodgers' proposed testimony in this case is speculative and has no reliable factual basis. The studies upon which he and plaintiffs' other experts rely are admittedly not on point and, as shown above, have serious weaknesses conceded by Dr. Rodgers.

26. In an effort to add the appearance of substance to their proposed opinions, plaintiffs' experts listed numerous studies in the Joint Affidavit as a supposed basis for those opinions. Plaintiffs must do more, however, than just cite prior studies; they must show a demonstrably objective means of drawing their conclusions from those studies. *United States v. Baller,* 519 F.2d at 465-66. The mere recitation of a list of studies is not a magical incantation paving the way to the witness stand unless it is accompanied by reasoned and scientifically accepted analysis. In the plaintiffs' case, the required analysis is nowhere to be found.

27. In addition, Dr. Rodgers has not adequately ruled out other potential causes of plaintiffs' alleged complaints. Although Dr. Rodgers and other

plaintiffs' experts purport to have performed differential diagnoses, they have offered no support for that assertion. In light of their contradictory admissions during their depositions, their bald assertions will not be accepted by the court as sufficient basis for admissibility of their opinions.

28. When a plaintiff does not come forth with sufficient admissible evidence to prove an essential element of his cause of action,

trial would be a bootless exercise, fated for an inevitable result but at continued expense for the parties, the preemption of a trial date that might have been used for other litigants waiting impatiently in the judicial queue, and a burden on the court and the taxpayers.

*Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1195 (5th Cir.1986). Thus, the Supreme Court has held that " [s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' " *Celotex Corp. v. Catrett, supra.*

29. Here, even if the opinions of Mr. Moore and Dr. Spencer were deemed admissible, plaintiffs have clearly failed in their burden of showing sufficient admissible evidence to raise a jury question on the issue of medical causation. Dr. Broughton admitted that no plaintiff has any immune system disease attributable to TCE. Dr. Feldman ignored negative test results and the absence of test data that he previously viewed as indispensable. He failed as well to rule out other possible causes of plaintiffs' alleged complaints. Dr. Rodgers also failed to perform adequate differential diagnoses, ignored the science of epidemiology, and based his opinions upon admittedly flawed studies and an admittedly flawed exposure assessment.

30. The plaintiffs have offered no other expert witness whose testimony relates to the issue of medical causation. In short, plaintiffs simply cannot establish a genuine issue of material fact on this critical element of their tort claims. Therefore, Litton's Motion on Causation should be granted and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                     Page 41

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

all of the personal injury claims should be dismissed for failure on the issue of medical causation.

E. *Conclusions of Law on Alleged Increased Risk of Disease or For Medical Monitoring*

**\*51** 1. Plaintiffs have not cited this court to any statute or case law in the State of North Carolina giving rise to a tort based upon alleged increased risk of disease.

2. In *Eagle-Picher Indus., Inc. v. Cox,* 481 So.2d 517, 520 (Fla.App.1985), the court faced whether to create a new tort based upon increased risk of future disease and ruled that claims for increased risk of cancer could *not* be maintained, regardless of the degree of certainty expressed by plaintiffs' experts concerning the likelihood of cancer. That court reasoned that disallowing an action for the plaintiffs' increased risk of cancer "most assuredly promotes judicial economy by discouraging the filing of anticipatory lawsuits and the concomitant protraction of pending lawsuits" and that allowing such an action would only "encourage ... the use of speculative testimony and lead ..., necessarily, to inequitable results." *Id.* at 521. Among the inequitable results that would arise, the *Cox* court noted, was that plaintiffs who did not contract the future disease would obtain a windfall. *Id.* at 524.

3. Here, too, any recognition of a claim by any plaintiff for "increased risk" of disease necessarily means that some-if not all-plaintiffs would be compensated when, in fact, no harm would accrue to them in the future. Such a holding, creating a new tort under North Carolina law, would inevitably result in unfair distribution of scarce resources, bringing undeserved riches to some and lack of compensation to others. It would also encourage the filing of speculative lawsuits based upon equally speculative assumptions. If this is to be the course of North Carolina law, it should be enunciated in the first instance by the North Carolina legislature or the North Carolina Supreme Court.

4. Similarly, this court should not recognize a common law claim for the costs of medical monitoring in the absence of clear direction from the North Carolina courts or legislature.

5. If a North Carolina court were faced with the question of whether to create a tort based upon alleged increased risk of disease or for medical monitoring costs, the undersigned has concluded that it would decline to create such a tort. Instead, it would look to the legislature for guidance. In the absence of an legislative directive creating such a tort, the North Carolina courts would refuse to countenance such a claim. *See Gardner v. North Carolina State Bar,* 316 N.C. 285, 341 S.E.2d 517 (1986) (it is the court's "duty ... to interpret our own state's law according to the policies expressed by our legislature and the best interests of our state. In the first instance, and absent constitutional restraint, questions as to public policy are for legislative determination"); *Northcutt v. Clayton,* 269 N.C. 428, 152 S.E.2d 471 (1967) (it is prerogative of legislature "in the first instance" to extend provisions of Consumer Finance Act); *In re Will of Parker,* 76 N.C.App. 594, 334 S.E.2d 97 (1985), *review den In re Will of Parker,* 315 N.C. 184, 337 S.E.2d 859 (1985), *disapproved by Daniels v. Montgomery Mut. Ins. Co.,* 320 N.C. 669, 360 S.E.2d 772 (1987) (it is the prerogative of the legislature, and not the courts, to increase bond requirements); *Simmons v. Wilder,* 6 N.C.App. 179, 169 S.E.2d 480 (1969) ("[w]hat laws shall be changed and when they are to be changed is within the prerogative of the Legislature, not the Judiciary" ). *See also Hatfield v. Palles,* 537 F.2d 1245, 1248-49 (4th Cir.1976) (cited by plaintiffs) ("it is quite clear ... that rules of common law are not to be changed ... except by clear and unambiguous statutory language").

**\*52** 6. Plaintiffs refer to cases in which damages have been awarded for reasonably certain future injuries as well as present injuries; however, the cases to which they refer are totally inapplicable here. In the cases cited by plaintiffs, damages for reasonably certain future injuries were awarded only after plaintiff had established a clear present physical injury caused by defendant's conduct, *e.g.,* mouth or head injuries in automobile accidents, burns from a job site accident. Here, plaintiffs cannot demonstrate any injuries caused by their

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 42

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

alleged exposure to TCE. Accordingly, even if North Carolina would allow actions based upon increased risk of disease, plaintiffs' action fails because of their lack of a *prima facie* case on medical causation. *See Deleski v. Raymark Indus., Inc.,* 819 F.2d 377, 380-81 (3d Cir.1987) (likelihood of future cancer from exposure to asbestos in the absence of present physical injury does not give rise to cause of action for increased risk under Pennsylvania and New Jersey law); *Amendola v. Kansas City S.R. Co.,* 699 F.Supp. 1401, 1403-06 (W.D.Mo.1988) (inhalation of asbestos fibers alone, without proof of present physical injury, does not constitute sufficient basis for increased risk claim); *Plummer v. Abbott Laboratories,* 568 F.Supp. 920, 922 (D.R.I.1983) (" [i]t is an abecedarian principle of tort law that an individual must be injured to recover for the negligent acts of another"); *Laswell v. Brown,* 524 F.Supp. 847, 850 (W.D.Mo.1981), *aff'd,* 683 F.2d 261 (8th Cir.1982), *cert. denied,* 459 U.S. 1210 (1983) ("[a] lawsuit for personal injuries cannot be based upon the possibility of some future harm"); *Mink v. University of Chicago,* 460 F.Supp. at 719 ( "[t]he mere fact of risk without any accompanying physical injury is insufficient to state a claim"); *Caputo v. Boston Edison Co., supra* (claim for increased risk of disease dismissed on summary judgment in absence of sufficient evidence that plaintiff suffered any injury caused by allegedly excessive exposure to radiation); *Burns v. Jaquays Mining Corp., supra* (alleged "subclinical injury" insufficient to support cause of action for increased risk of asbestosis); *Morrissy v. Eli Lilly & Co., supra* (heightened risk of cancer and other diseases insufficient basis for claim in absence of present injury).

7. Even if plaintiffs had established a *prima facie* case on the issue of medical causation, *i.e.,* even if plaintiffs had shown a genuine issue of fact on whether they suffered injuries as a result of their alleged exposure to the chemicals at issue, their claims based on alleged increased risk of disease would fail because plaintiffs have not shown that they are "reasonably certain" to contract any disease in the future. *See Short v. Chapman,* 261 N.C. at 682; *Callicutt v. Hawkins,* 11 N.C.App. at 547; *Dickson v. Queen City Coach Co.,* 233 N.C.

167, 174, 63 S.E.2d 297, 302 (1951); *see also Fisher v. Rogers,* 251 N.C. 610, 112 S.E.2d 76, 78 (N.C.1960). Indeed, plaintiffs' medical experts have specifically disavowed any ability to state, to a reasonable degree of medical certainty, that any plaintiff is likely to suffer from any disease in the future as a result of the alleged exposure. Dr. Feldman has testified that he believes that plaintiffs are recovering from any problems they may have had in the past. Dr. Rodgers similarly has testified that he believes that it is unlikely that plaintiffs will develop any additional problems beyond what they currently purportedly have. In light of these admissions, plaintiffs here fail to meet the " reasonably certain" test that has been adopted for those cases in which compensation is sought for the future consequences of present injuries caused by a defendant.

**\*53** 8. Even if the undersigned were to hold that North Carolina would recognize a claim, in some circumstances, for medical monitoring, no such relief can be obtained by plaintiffs here. Given both the lack of admissible evidence that plaintiffs' alleged medical problems were caused by the alleged exposure to the chemicals at issue and the lack of evidence that plaintiffs are more likely than not to contract any disease in the future, their medical monitoring claims must be dismissed. *See Catasauqua Area School District v. Eagle-Picher Indus., Inc.,* 1988 WL 102689, at *2, 1988 U.S.Dist. LEXIS 11316, at 3 (Civ. Action No. 85-3743, E.D.Pa., Sep. 23, 1988) (absent evidence of reasonable or substantial likelihood that anyone will get disease in the future as a result of exposure to asbestos, claim for medical monitoring costs would not lie); *see Mateer v. U.S. Aluminum* 1989 WL 60442, 1989 U.S.Dist. LEXIS 6323, Civ. Action No. 88-2147, at 10 (E.D.Pa.1989) (granting summary judgment on claim for medical monitoring absent present manifestation of disease or reasonable likelihood of contracting disease).

9. One court that has analyzed a claim for so-called medical monitoring costs held that such costs could be obtained only if surveillance is "reasonable and necessary" based, among other things, on "the significance and extent of exposure." *De Stories v. Phoenix,* 154 Ariz. at 610. Here, plaintiffs have

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                  Page 43

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

failed to adduce admissible evidence that their alleged exposure was significant in any respect. Accordingly, plaintiffs have not carried their burden of showing that medical monitoring, beyond that which anyone in the general population should undergo as part of normal good health practice, is reasonable and necessary as a matter of law.

### F. *Conclusions of Law Concerning Emotional Distress*

1. Due to the vagueness of emotional distress claims, the susceptibility for abuse, and the possibility that such claims could flood the courts, the law has wisely established limitations on recovery of such damages. As one court cautioned:

Despite the law's recognition of fear as a debilitating emotional injury worthy of redress under certain circumstances, the spectre of unlimited liability from an army of plaintiffs parading their tumescent fears into the courtroom supported by a corps of psychiatrists has resulted in proper judicial restraint in this area. Fear is a widespread phenomenon, highly subjective, contagious and capable of being feigned. Thus the courts have proceeded cautiously and insisted on numerous safeguards and conditions before permitting claims of emotional distress in general and fear in particular to go to the jury.

*Arnett v. Dow Chemical Co.,* No. 729586, *slip op.* at 19 (Cal.Super.Ct., San Francisco County, March 21, 1983); *see Ackerson v. Dow Chemical Co.,* No. 808161, slip op. at 15 (Cal.Super.Ct., San Francisco County, April 4, 1989). Another court has emphasized:

Every emotional upset cannot constitute a cause of action. Indiscriminate allowance of actions for mental anguish would encourage neurotic overreactions to trivial hurts, and the law should aim to toughen the psyche of the citizen rather than pamper it.

**\*54** *Mink v. University of Chicago,* 460 F.Supp. at 724. As set forth more fully below, plaintiffs have not met their burden under *Celotex* with respect to

the preconditions which must be met for an emotional distress claim to succeed under North Carolina law.

2. Until recently the law of North Carolina, as in most other jurisdictions, required proof of some physical injury caused by defendant which accompanies the claimed emotional distress. *See e.g., Campbell v. Pitt County Memorial Hosp., Inc.,* 352 S.E.2d at 909; *Crews v. Provident Finance Co.,* 271 N.C. 684, 689, 157 S.E.2d 381, 385 (1967); *Mateer v. U.S. Aluminum,* C.A. No. 88-2147 (E.D.Pa. June 2, 1989) (1989 WL 60442, LEXIS, Genfed library, Dist. file); *Deleski v. Raymark Indus., Inc., supra; Bubash v. Philadelphia Elec. Co.,* 717 F.Supp. 297 (M.D.Pa.1989); *Wilkie v. State,* 161 Ariz. 541, 779 P.2d 1280 (App.1989); *De Stories v. Phoenix,* 154 Ariz. at 610. Similarly, plaintiffs in North Carolina and elsewhere were required to show that the emotional distress, in and of itself, caused additional subsequent physical injury (or physical manifestation). *See, e.g., Woodell v. Pinehurst Surgical Clinic,* 78 N.C.App. at 232; *Edwards v. Advo Systems, Inc.,* 93 N.C.App. 154, 376 S.E.2d 765 (1989) (*disapproved by Johnson v. Ruark Obstetrics & Gynecology Assoc., P.A,* 327 N.C. 283, 395 S.E.2d 85 (1990)); *Stites v. Sundstrand Heat Transfer Corp.,* 660 F.Supp. 1516, 1526 (W.D.Mich.1987); *Wilkie v. State, supra; De Stories v. Phoenix,* 154 Ariz. at 610; *Houston v. Texaco, Inc.,* 371 Pa.Super. 399, 538 A.2d 502 (1988), *app. denied,* 520 Pa. 575, 549 A.2d 136 (1988). For the reasons set forth in the preceding portions of these conclusions, plaintiffs' proof in this case would fail under *Celotex* on both of these issues.

3. As discussed *supra,* however, the North Carolina Supreme Court issued an opinion in *Johnson v. Ruark Obstetrics and Gynecology Associates, P.A., supra,* which partially overruled earlier North Carolina appellate decisions and held that, in at least some circumstances, proof of physical injury and subsequent physical manifestation would not be required to recover under a claim for negligent infliction of emotional distress. *Id.,* slip op. at 23-24. *Johnson* involved a claim brought by two parents for emotional distress suffered as a result of the stillbirth of their child. Nevertheless, plaintiffs'

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                 Page 44

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

claims cannot survive under even the *Johnson* standards for at least two reasons.

4. First, although the North Carolina Supreme Court in *Johnson* eliminated the physical injury and physical manifestation requirements for recovery for emotional distress, it emphasized the importance of another substantial limitation on such claims. Specifically, the court in *Johnson* held that recovery for negligent infliction of emotional distress is limited to instances of "severe emotional distress" suffered as a foreseeable result of the defendant's negligent conduct. *Id.,* slip op. at 28. The court defined this term to mean:

**\*55** [A]ny emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so.

*Id.* To survive summary judgment on their emotional distress claims, therefore, plaintiffs must show, by admissible expert testimony, that they suffer from a recognized, diagnosed severe and disabling emotional or mental disorder. Plaintiffs have not done so.

5. The only expert named by plaintiffs to testify about their mental and emotional status was Dr. Eric Engum, a psychologist who examined only five plaintiffs. Plaintiffs offered no affidavit, however, from Dr. Engum in opposition to Litton's motion for summary judgment. Moreover, in deposition testimony Dr. Engum offered a diagnosis of a mental disorder for only two of those plaintiffs, Martha Carroll and Debbie Chambers. As to *all* of the plaintiffs (including those two), however, Dr. Engum disclaimed any opinion that they suffer any disorder that is causally related to their exposure to TCE or any other chemical. Plaintiffs have offered no other expert to supply that missing opinion. In addition, Dr. Engum's proffered diagnoses for Mrs. Carroll and Mrs. Chambers were expressly rejected by the chosen expert neuropsychologist of Dr. Feldman, plaintiffs' designated expert in neurology. Dr. Engum's opinions thus do not suffice to meet plaintiffs' burden under *Celotex* to resist summary

judgment.

6. In addition, in their memorandum in opposition to Litton's motion for summary judgment on plaintiffs' emotional distress claims, plaintiffs expressly conceded that as to virtually all of the plaintiffs, their emotional distress "has not reached pathologic levels." Plaintiffs' Mem. in Opp. to Motion on Emotional Distress, at 11. With respect to the only two exceptions to that statement claimed by plaintiffs, James Carroll, Sr., and Fred Allen Chambers, plaintiffs refer to the testimony of Dr. Robert Byron. As to even these two plaintiffs, however, plaintiffs' proffer is inadequate. Dr. Byron was not named by plaintiffs in response to the court's scheduling orders requiring plaintiffs to name their expert witnesses. Therefore, plaintiffs are precluded from using him as an expert. Moreover, Litton has identified sufficient deficiencies and inconsistencies in Dr. Byron's testimony (even if it were permissible under the court's orders) as to render ineffective plaintiffs' reliance on it as the sole basis for resisting summary judgment. *See, e.g.,* Litton Reply Mem. at 36 n. 47; Group Affid. at 29, 69. *See also* Findings of Fact at para. 230, *supra.*

7. To the extent that plaintiffs allege that such vague symptoms as headaches and other transitory phenomena have been caused by their alleged emotional distress, such complaints do not constitute the severe and disabling emotional or mental condition that the law requires for maintenance of an action. *See Johnson v. Ruark Obstetrics and Gynecology Associates, P.A., supra. See also Burns v. Jaquays Mining Corp., supra* (acid indigestion, weeping, muscle spasms, depression and insomnia not types of harm required for emotional distress claim); *Edwards v. Advo Systems, Inc., supra* (vague statements of physical problems resulting from emotional distress such as loss of sleep, worry and weight loss not sufficient to preclude summary judgment); *Falzone v. Busch,* 45 N.J. 559, 569, 214 A.2d 12 (1965), *quoted in Ayers v. Jackson Township,* 189 N.J.Super. 561, 569, 461 A.2d 184 (1983) ("where fright does not cause *substantial* bodily injury or sickness, it is to be regarded as too lacking in seriousness and too speculative to warrant the imposition of liability").

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 45

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

**\*56** 8. Second, when the alleged emotional distress is, as in this case, the fear of future disease (primarily cancer), such fear must be reasonable; irrational beliefs cannot form the basis for recovery for fear of disease. *See, e.g., Broussard v. Olin Corp.,* 546 So.2d 1301 (La.App. 3d Cir.1989) (where plaintiff failed to show that cancer was likely to result from phosgene gas incident, court held that "mere speculation concerning an event cannot provide the basis for an award for anxiety") (Att. 46); *Mateer v. U.S. Aluminum, supra* (granting summary judgment for defendant because of plaintiffs' failure to establish a reasonable basis for fear of future illness arising from ingestion of well water containing certain chemicals); *Arnett v. Dow Chemical Co.,* slip op. at 24-25 (plaintiffs must show reasonable fear by proving an objective basis therefor) (Att. 44). Similarly, under North Carolina law, a personal injury plaintiff can recover for fear of cancer *only* where the disease or condition feared by the plaintiff "might *reasonably* be apprehended to result from the injury...." *Bullock v. Newman,* 93 N.C.App. 545, 378 S.E.2d 562, 565 (1989) (emphasis added). *See also Alley v. Charlotte Pipe & Foundry Co.,* 159 N.C. 327, 74 S.E. 885 (1912); *Bowers v. Western Union Tel. Co.,* 135 N.C. 504, 47 S.E. 597 (1904) (dismissing emotional distress claim where "[i]t was [plaintiff's] own misapprehension which caused him any uneasiness, and not the negligence and delay of the defendant," quoted with approval in *Johnson v. Ruark Obstetrics and Gynecology Associates, P.A., supra* ).

9. In this case, plaintiffs have been unable to submit admissible evidence sufficient to carry their burden on a motion for summary judgment of showing that their alleged fears of cancer or other diseases could be considered reasonable. Plaintiffs do not have any present illnesses that can be attributed to their alleged chemical exposure and have offered to the court no admissible evidence to show that their alleged exposure to these chemicals at the levels objectively measured, or even at the levels speculatively suggested by Dr. Spencer, can or did cause adverse health effects. Furthermore, the only calculations of increased risk of disease offered by plaintiffs' experts, *i.e.,* Dr. Rodgers' calculations for alleged excess risk of cancer, show that plaintiffs

are singularly *unlikely* to contract cancer. According to Dr. Rodgers, the plaintiff at highest risk bears a risk of contracting cancer as a result of her alleged exposure of only four out of 1,000, compared to an admitted background risk of one in four. As a matter of law, "fear" of such alleged increased risk is not reasonable (apart from its not rising to the level of a recognized and diagnosed mental disorder) and cannot be compensated.

10. Because plaintiffs' fears are not objectively reasonable, they cannot be compensated. *See Williamson v. Bennett,* 251 N.C. 498, 507, 112 S.E.2d 48, 55 (1960). In *Williamson,* the plaintiff was involved in an automobile accident and feared that she had hit an imaginary child on a bicycle. Plaintiff experienced no physical injury, but shortly after the accident began to experience emotional distress, for which she sought damages. The North Carolina Supreme Court held that "[t]he defendant was under no duty to anticipate or to take precautions against a mere possibility that plaintiff or other persons might imagine a state of facts that did not exist." *Id.* at 55. The claims for emotional distress by plaintiffs in this case fail for this reason as well.

*G. Conclusions of Law on Nuisance and Trespass*

**\*57** 1. Plaintiffs who do not have a possessory interest in the properties in issue cannot maintain an action in trespass. *See State ex rel. Rhodes v. Simpson,* 325 N.C. 514, 385 S.E.2d at 332 (no action for trespass absent possessory interest); *Kent v. Humphries,* 303 N.C. 675, 281 S.E.2d at 45 (plaintiff must show sufficient property interest to maintain nuisance action); *Matthews v. Forrest,* 235 N.C. 281, 69 S.E.2d 553, 555 (1952) (plaintiff must be in possession of property to maintain trespass action); *Keziah v. Seaboard A.L.R. Co.,* 272 N.C. 299, 158 S.E.2d 539, 548 (1968); *Kuykendall v. Turner,* 61 N.C.App. 638, 301 S.E.2d 715, 718 (1983) (possession by plaintiff is one of the required elements of trespass). Many of the plaintiffs admittedly do not have such an interest.

2. There are strong and sound policy reasons why a showing of more than a *de minimis* encroachments

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 46

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

of chemicals (all that plaintiffs have been able to show here) is necessary to allow claims for trespass and nuisance to proceed. First, in the absence of proof to a reasonable degree of medical certainty that the chemicals did cause injury, any verdict would necessarily be based upon speculation and irrational fear. This is a consequence that courts should zealously avoid. Second, because of the ubiquitous nature of these chemicals, there are millions of potential targets for those litigious individuals who wish to make modern industry an insurer for all of their real and imagined health complaints. Thus, if liability can arise from the mere presence of chemicals, *i.e.,* without a showing of medical causation to a reasonable degree of medical certainty, innocent businesses and individuals can be hauled into court by plaintiffs virtually at random.

3. Plaintiffs have failed to adduce admissible expert testimony to create a *prima facie* case that they have incurred any illnesses or are likely to incur any illnesses as a result of the alleged exposures. Instead, the only competent evidence submitted reveals that level of chemicals to which plaintiffs were allegedly exposed was minuscule, at best. The chemical found in the highest average concentration in any of plaintiffs' wells-TCE-has been measured at an average concentration of less than 20 parts per billion ("ppb"). At these levels, the chemicals found in plaintiffs' wells are indistinguishable from zero with respect to any alleged effect they might have on the human body.

4. North Carolina does not recognize torts of nuisance or trespass based on trivial invasions of property. In *Twitty v. State,* 85 N.C.App. 42, 354 S.E.2d at 302, for example, the court held that for liability to exist under a nuisance theory plaintiffs must demonstrate "(1) that defendant's maintenance and operation of [an] enterprise is *unreasonable* and (2) that because of the unreasonable conduct there has been *substantial* injury and loss of value to plaintiffs' property." (Emphasis in original.) The court thus held that the operation of a PCB disposal facility was neither a public nor a private nuisance. *See also* Dobbs, *Trespass to Land in North Carolina, Part 1-The Substantive Law,* 47 N.C.L.Rev. 31, 34 (1968) (trivial trespass does not

impose liability in North Carolina). *Cf. Williams v. South & South Rentals, Inc.,* 82 N.C.App. 378, 346 S.E.2d 665, 669 (1986) (in considering a remedy for an alleged trespass, court must consider the fact that "the encroachment is minimal").

**\*58** 5. Plaintiffs cited this court to a number of other North Carolina cases, including *Holton v. Northwestern Oil Co., supra.* In *Holton,* a case in which alleged physical encroachment caused by an overflowing ditch and noxious odors was held not to preclude summary judgment, the court stated that the law:

does not recognize every business or use of property as a nuisance that imparts a degree of impurity to the air, for if such were the case, towns could not be built, nor life in compact communities tolerated and even the ordinary uses of property would be seriously interfered with ... *The law only deals with real, substantial injuries ... and will not lend its aid ... simply because his neighbor is annoyed, or even damaged thereby, unless the use complained of is both in violation of that neighbor's right and unreasonable* ... when the matters complained of are such as are common and usual, and no unreasonable and unnecessary injuries are inflicted, the law does not interfere.

*Id.* at 393 (emphasis added).

6. Similarly, in *Watts v. Pama Manufacturing Co.,* 256 N.C. 611, 124 S.E.2d 809, 815 (1962), where a judgment for plaintiffs was reversed, the North Carolina Supreme Court stated:

By substantial [injury] is meant an invasion that involves more than slight inconvenience or petty annoyance. The law does not concern itself with trifles. Practically all human activities, unless carried on in a wilderness, interfere to some extent with others or involve some risk of interference.... Each individual in a community must put up with a certain amount of annoyance, inconvenience or interference....

7. Other cases cited by plaintiffs are clearly distinguishable or otherwise not inconsistent with the cases relied upon herein. For example, in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                   Page 47

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

*Masten v. Texas Co.,* 194 N.C. 540, 140 S.E. 89, 90 (1927), a premise of the court's holding was that plaintiffs' water had been rendered "unfit for use." Here, plaintiffs cannot show any actual or probable medical injuries related to the chemicals in their water. Accordingly, their water has not been rendered "unfit for use." *Stowe v. Gastonia,* 231 N.C. 157, 56 S.E.2d 413 (1949), involved only the issue of whether there was a misjoinder and did not address whether particular facts were actionable. In *Aydlett v. Carolina By-Products Co.,* 215 N.C. 700, 2 S.E.2d 881 (1939), the court did not address the sufficiency of the evidence to constitute an actionable injury; rather, the issue was the reasonableness of defendant's conduct. The reasonableness of Litton's conduct is not before the court at this time.

8. Review of well-reasoned cases from other jurisdictions also shows that a *de minimis* encroachment such as the instant case presents cannot serve as the basis for an action in trespass and nuisance. In *Bradley v. American Smelting & Refining Co., supra,* plaintiffs brought an action for trespass and nuisance based upon the deposit of microscopic airborne particles of arsenic and cadmium on their property from defendant's copper smelter. The court granted summary judgment to defendant, noting:

*59 While at common law any trespass entitled a landowner to recover nominal or punitive damages for invasion of his property, such a rule is not appropriate under the circumstances before us. No useful purpose would be served by sanctioning actions in trespass by every landowner within a hundred miles of a manufacturing plant. Manufacturers would be harassed and the litigious few would cause the escalation of costs to the detriment of many.... [T]he plaintiff who cannot show that actual and substantial damages have been suffered should be subject to dismissal of his cause upon a motion for summary judgment.

*Id.* at 1156.

9. Similarly, in *Good Fund, Ltd.-1972 v. Church, supra,* land developers brought a trespass action alleging contamination of their property located

near a nuclear arms plant. Finding no actual damages, the court held that "the plaintiffs can show nothing more than a potential harm from the deposition levels on their property and that is not a sufficient invasion of their property interest to be actionable." *Id.* at 533. *See also Martin v. Arundel Corp.,* 216 Md. 184, 140 A.2d 146 (1958) (affirming directed verdict for defendant in nuisance action for plaintiff's failure to prove damages beyond mere "trifles"); *Amphitheaters, Inc. v. Portland Meadows,* 184 Or. 336, 198 P.2d 847, 850 (1948) (mere casting of light upon plaintiffs' premises did not constitute a trespassory invasion); *Powell v. Superior Portland Cement, Inc.,* 15 Wash.2d 14, 17, 129 P.2d 536, 539 (1942) (persons dwelling near manufacturing plant may not recover for a certain amount of smoke, fumes or gas emitted by plant); *see also Fargason v. Economy Furniture, Inc.,* 356 S.W.2d 212, 213 (Tex.Civ.App.1962) (jury not required to speculate in nuisance cases as to damages from inconvenience resulting from smoke, sawdust and fumes blown onto plaintiffs' property).

10. In light of plaintiffs' failure to demonstrate a *prima facie* case that they have suffered any harm as a result of the alleged presence of chemicals or that they are "reasonably certain" to suffer such harm in the future, and in light of the ubiquitous nature of these chemicals in the environment and the fact that they are commonly found in many household products, the alleged incursion of chemicals from the plant can only be regarded as trivial and not constituting a basis for an action in trespass or nuisance.

11. In addition, damage to the plaintiff from the alleged trespass is one of the elements of the tort of trespass. *See Matthews v. Forrest,* 235 N.C. at 283 ("[i]f a plaintiff would recover compensatory damages for a trespass to realty, he must allege facts showing actual damages"). Similarly, a nontrespassory "invasion" of another's property can be considered a nuisance only if it "caused substantial injury." *Pendergrast v. Aiken,* 293 N.C. 201, 236 S.E.2d 787, 798 (1977). Since plaintiffs are unable to show to a reasonable degree of medical certainty that they have been or will likely be injured by the chemicals at issue, there is no

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 48

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

actionable damage and the alleged invasion has not " caused substantial injury."

**\*60** 12. Plaintiffs have failed to show that any of their alleged injuries were caused by exposure to the chemicals at issue. Plaintiffs have also failed to show that they have incurred any cognizable risk of injury in the future from the alleged exposures. In these circumstances, plaintiffs should not be allowed to use the torts of trespass and nuisance to obtain what they cannot obtain through claims based in negligence, gross negligence, and strict liability for ultrahazardous activities.

### H. Conclusions of Law on CERCLA Claims

1. Plaintiffs' claims under CERCLA and their citizen suit under RCRA must be considered in the context in which they were brought, *i.e.*, as adjuncts to what is essentially a private tort action. In this regard, the CERCLA and RCRA claims must be considered in light of plaintiffs' failure to adduce admissible evidence of any particular exposure to hazardous substances or hazardous wastes, their failure to demonstrate a *prima facie* case of medical causation or to demonstrate any cognizable increased risk of disease in the future, their failure to demonstrate a *prima facie* case for entitlement to damages for alleged emotional distress, and their failure to demonstrate more than a *de minimis* interference with their alleged property interest. Considering their claims sounding in trespass and nuisance in such light, the claims must be dismissed. As the separate findings of fact and these conclusions of law attempt to illustrate, plaintiffs filed the instant action without adequate investigation, misrepresented the status of this case to the undersigned, and, ultimately have failed to present sufficient evidence to allow any of their common law claims to proceed. Although plaintiffs' CERCLA and RCRA claims must be addressed on their own merits, if any, the court must assure that plaintiffs do not receive from their CERCLA and RCRA claims what they clearly are not entitled to pursuant to the other claims they have presented.

2. Plaintiffs' failure to present admissible evidence

of the extent of their alleged exposure to the chemicals at issue, medical causation, and alleged increased risk of disease precludes any action they might have otherwise had under CERCLA for their alleged costs of medical monitoring costs and alternative water supplies. However, as the discussion below demonstrates, plaintiffs have failed in other respects to show any cognizable action under CERCLA.

3. CERCLA-42, United States Code, Sections 9601-9675-was enacted in 1980 to establish a federal program for the cleanup of abandoned or inactive hazardous waste sites. *See generally Allied Corp. v. Acme Solvents Reclaiming, Inc.,* 691 F.Supp. 1100, 1105 (N.D.Ill.1988). Among other things, CERCLA created a private right of action whereby private parties could, in certain circumstances, conduct cleanup activities and recover the incurred costs from responsible third parties. Thus, Section 107(a)(4)(B) provides that responsible parties are liable for "necessary costs of response incurred by any other person consistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B). It is this provision under which plaintiffs apparently seek to recover in Count VI of their complaint.

**\*61** 4. The private cost recovery cause of action created by Section 107 of CERCLA, however, was not intended to serve as a federal toxic tort remedy:

Congress did not intend for CERCLA, a narrowly drawn federal remedy, to make injured parties whole or to be a general vehicle for toxic tort actions.

*Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. at 1299-300.[FN15] Rather, the section allows only for recovery of costs actually incurred in cleaning up a hazardous waste site. *Adams v. Republic Steel Corp.,* 621 F.Supp. at 376. Moreover, as a further limitation on the section's availability, only such cleanup costs may be recovered as were incurred "consistent with the national contingency plan." 42 U.S.C. § 9607(a)(1), (4); *see Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1152-53 (9th Cir.1989).[FN16]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 49

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

5. The National Contingency Plan ("NCP") adopted by EPA details methods of identifying sites where hazardous substances have been released, methods for remedying those releases, and criteria to determine the appropriate extent of response activities. *See* 42 U.S.C. § 9605; 40 C.F.R. Part 300. "The NCP was regarded as a means of assuring that response actions would be both cost-effective and environmentally sound," *Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. at 1291 n. 42 (citing 126 Cong.Rec. S14, 965) (daily ed. Nov. 24, 1980).[FN17]

6. In private CERCLA cost recovery actions, plaintiffs have the burden of proving that the costs they claim to have incurred are necessary, valid and recoverable CERCLA response costs. *Ascon Properties v. Mobil Oil Co.,* 866 F.2d at 1154.[FN18] "[A] party, before seeking declaratory relief or damages under [section 9607(a)(4)(B) ] must ' affirmatively demonstrate that it has incurred necessary costs of response.' " *Chaplin v. Exxon Corp.,* 25 Env't Rep.Cas. (BNA) 2009, 2013 (S.D.Tex. June 10, 1986) (Exhibit A). Moreover, plaintiffs bringing a private action under CERCLA Section 107 must also prove that their response costs are "consistent with the national contingency plan" as an element of their liability case. *Ascon Properties v. Mobil Oil Co.,* 866 F.2d at 1152; *Versatile Metals, Inc. v. Union Corp.,* 693 F.Supp. at 1574; *New York v. Shore Realty Corp.,* 648 F.Supp. 255, 262 (E.D.N.Y.1986).[FN19] In this regard, the courts have held "that the requirements of the NCP must be adhered to in order to permit a private party to recover its response costs, unless the party seeking recovery explains why a specific requirement is not appropriate to the specific site and problem." *Amland Properties Corp. v. Aluminum Co. of America,* slip op. at 26. *See Versatile Metals, Inc. v. Union Corp.,* 693 F.Supp. at 1575 (private plaintiffs must comply with the NCP); 40 C.F.R. § 300.71 (1989), 50 Fed.Reg 47,934-35 (Nov. 20, 1985) (same).[FN20]

7. The alleged costs for which plaintiffs seek recovery, if cognizable at all under CERCLA, are " remedial" costs, as that term is used in the statute, because they have admittedly been undertaken for a period in excess of six months. *See Versatile*

*Metals, Inc. v. Union Corp.,* 693 F.Supp. at 1576-77 (E.D.Pa.1988); 40 C.F.R. § 300.65(b)(3) (1985).

**\*62** 8. The NCP in effect when plaintiffs brought their action required that plaintiffs seeking to recover remedial costs must:

(1) Prepare a remedial investigation/feasibility study ("RI/FS") which includes the results of site investigation, analysis of the release and determination of the threat it poses, evaluation of response actions, screening remedial alternatives, and selection of "a cost-effective remedial alternative that effectively mitigates and minimizes threats to and provides adequate protection of public health and welfare and the environment," 40 C.F.R. § 300.68(d), (i)(1) (1989).[FN21]

(2) Provide "an opportunity for appropriate public comment concerning the selection of a remedial action." 40 C.F.R. § 300.71(a)(2)(ii)(D) (1989). The public comment requirement must be consistent with § 300.67 which requires public notice, opportunity for comment, and a public meeting. [FN22]

(3) Select a cost effective remedy. 40 C.F.R. § 300.68(i)(1) (1989). The NCP defines " cost-effective" as "the lowest cost alternative that is technologically feasible and reliable and which effectively mitigates and minimizes damage to and provides adequate protection of public health, welfare or the environment." 40 C.F.R. § 300.68(i)(3) (1989).[FN23]

Each and every one of these requirements must be met to recover private response costs under Section 107.

9. Plaintiffs have not submitted to the court any evidence that their alleged response costs were undertaken in compliance with the requirements of the National Contingency Plan. This failure requires the court to dismiss the CERCLA claims.

10. Instead of showing evidence of compliance with the NCP's requirements for remedial actions, plaintiffs argued to the court that their alleged

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.