Not Reported in F.Supp.                                                                                        Page 50

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

response activities were "removal" actions, as defined by the statute. Even if this were so (contrary to the conclusions of law set forth above) plaintiffs still must, as a necessary element of their CERCLA cause of action, demonstrate consistency with the NCP. The NCP requires, *inter alia,* a preliminary assessment identifying the cause and nature of the release, a determination of the appropriateness of alternative removal actions, and termination of the assessment if the party allegedly responsible for the release is taking the appropriate response. 40 C.F.R. § 300.65(b)(5); *see* 40 C.F.R. § 300.71(a)(2)(ii). Again, plaintiffs' failure to offer evidence of compliance with these NCP provisions requires this court to dismiss the CERCLA claims.

11. In addition, the costs for which plaintiffs actually seek recovery are not cognizable under CERCLA. Plaintiffs claim they are entitled to recover medical testing and surveillance costs. As their papers make clear, plaintiffs are seeking the costs, *inter alia,* of the testing they have undergone by their expert witnesses in this case and for the future medical monitoring to which they claim entitlement. This claim is defective as a matter of law because medical costs are not "costs of response " but, rather, traditional tort damages, which are not available under CERCLA. Indeed, Congress explicitly considered and rejected allowing recovery of such expenses in Section 107. Thus, the original House bill would have allowed recovery for "loss due to personal injury ... including.... all out of pocket medical expenses." FN24 These provisions, however, were rejected in the final bill. As Senator Randolph noted, "[w]e have deleted the Federal cause of action for medical expenses or property or income loss." 126 Cong.Rec. S14964 (daily ed. Nov. 24, 1980), *reprinted in* 1 Legis.Hist. 685; *see* 126 Cong.Rec. H11791 (daily ed. Dec. 3, 1980), *reprinted in* 1 Legis.Hist. 787 (remarks of representative Broyhill) ("[c]ompensation for personal injury has not been included").FN25 Thus, "Congress in enacting CERCLA clearly manifested an intent not to provide compensation for economic losses or for personal injury resulting from the release of hazardous substances." *Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. at 1285.

**\*63** 12. For that reason, the courts have routinely rejected claims for medical expenses such as those presented by plaintiffs here. *See, e.g., Coburn v. Sun Chemical Corp.,* No. 88-0120 (E.D.Pa. Nov. 9, 1988), slip op. at 13 (holding that response and removal actions relate to "only the clean-up of toxic substances from the environment, and do not allow recovery of medical costs") (Exhibit I); *Lutz v. Chromatex, Inc.,* 718 F.Supp. 413, 418 (M.D.Pa.1989) (rejecting recovery for medical costs and adopting *Coburn* rationale); *Wehner v. Syntex Corp.,* 681 F.Supp. at 653 (CERCLA " provides for the removal and clean-up of hazardous waste from the environment. It does not address monitoring of individuals for personal health reasons "); *Chaplin v. Exxon Corp.,* 25 Env't Rep.Cas. at 2011 (medical detection monitoring costs are "not the type of cost recovery contemplated by Congress in the enacted statute").FN26 In addition, even if medical costs were recoverable, they could be recovered only if plaintiffs could demonstrate that they were necessary and consistent with the NCP.
In light of the rulings on Litton's other motions for summary judgment, plaintiffs cannot demonstrate that any such cost was either necessary or consistent with the NCP.

13. In addition, private parties may not recover investigative costs, such as groundwater and soil sampling, until they actually undertake cleanup efforts or unless they intend to undertake a cleanup. "By its terms, CERCLA makes no provision for investigatory cost recovery." *Thompson v. Andersen Window Corp.,* Civ. No. 4-88-229 (D.Minn.1989) (Exhibit J), 1989 WL 2330 at \*3, LEXIS op. at 5. In *Bulk Distribution Centers, Inc. v. Monsanto Co.,* 589 F.Supp. 1437, 1451-52 (S.D.Fla.1984), the court held that investigatory costs incurred prior to actually undertaking cleanup efforts were not "response" costs and hence not recoverable. *See also Environmental Defense Fund v. Lamphier,* 12 Envtl.Law.Rep. 20843 (E.D.Va. May 14, 1983), *aff'd on other grounds,* 714 F.2d 331 (4th Cir.1983) (investigatory costs are not response costs recoverable under CERCLA) (Exhibit K). Even if investigation costs are recoverable under some circumstances, the investigation must be in contemplation of cleaning up a site. *Thompson v. Andersen Window Corp.,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 51

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

1989 WL 2330 at *4, LEXIS slip op. at 7. Plaintiffs in this case have neither undertaken any "cleanup actions" nor expressed any intention of doing so. Consequently, they have no right to recover testing costs under Section 107.

14. In addition, plaintiffs have not incurred any cognizable alternative water supply costs. Instead, their interrogatory answers make clear that they seek only mileage costs for driving to their relatives' houses and, as part of their visits, obtaining bottled water. Plaintiffs' Response to Second Set of Interrogatories, at para. 5(c) (Exhibit F). Congress did not intend to include such attenuated costs as "necessary costs of response" under CERCLA. Again, even if such costs could be recoverable under CERCLA in some circumstances, plaintiffs have not demonstrated, as shown by the rulings on Litton's other motions for summary judgment, that any such costs were necessary or consistent with the NCP.

**\*64** 15. In the Complaint, plaintiffs generally seek recovery for property damages, lost rental income, and lost wages. Complaint paras. 17, 18. It is not clear, however, whether plaintiffs seek recovery of these alleged damages in their CERCLA count, because their briefs do not address the issue. Such claims could not succeed in any event. As the Supreme Court has made clear, "Superfund money [is not] available to compensate private parties for economic harms that result from discharge of hazardous substances." *Exxon Corp. v. Hunt,* 475 U.S. 355, 359 (1986). *Accord Artesian Water Co. v. Government of New Castle County,* 851 F.2d 643, 648-49 (3rd Cir.1988) (no CERCLA reimbursement for property or income loss); *Thompson v. Andersen Window Corp.,* 1989 WL 2330 at *4-5, LEXIS slip op. at 8 (economic losses and diminished property value are not compensable under CERCLA); *Piccolini v. Simons Wrecking,* 686 F.Supp. 1063, 1068 (M.D.Pa.1988) (no recovery for damages for diminution in property value and lost income); *Wehner v. Syntex Corp.,* 681 F.Supp. at 653 (CERCLA does not allow recovery for "[e]conomic damages for loss of property," including lost value of a home); *Allied Towing Corp. v. Great Eastern Petroleum Corp.,* 642 F.Supp. 1339, 1348 (E.D.Va.1986) (dismissing

a private plaintiff's claim for "economic and consequential damage to its business").[FN27]

16. Plaintiffs' claim for attorneys' fees under CERCLA is defective since plaintiffs cannot prevail otherwise on their CERCLA claim. Moreover, as a matter of law, Congress did not intend that private plaintiffs would recover attorneys' fees or costs of litigation under CERCLA. *T & E Industries, Inc. v. Safety Light Corp.,* 680 F.Supp. 696, 707 (D.N.J.1988). The court in *T & E* noted that CERCLA enables only the government to recover attorneys' fees. *Id.* at 707-08. "This Court can find no analogous portion of the statute which would entitle a private party to recover for legal action taken and refuses to create a right to recovery of attorney fees where Congress has not expressly stated such to exist." *Id.* at 708; *see Alyeska Pipeline Service Co. v. Wilderness Soc.,* 421 U.S. 240, 247 (1975) (a prevailing party is not entitled to attorneys' fees unless provided by statute). Plaintiffs, therefore, are not entitled to recover attorneys' fees as CERCLA response costs. *See United States v. Hardage,* No. CIV-86-1401-P (W.D.Okla. August 9, 1990), slip op. at 121-22 (Att. 80); *Fallowfield Development Corp. v. Strunk,* 1990 WL 52745, 1990 U.S. Dist. LEXIS 4820 (E.D.Pa. April 23, 1990), slip op. at 7-8; *Regan v. Cherry Corp.,* 706 F.Supp. 145, 149 (D.R.I.1989); *In re Hemingway Transport, Inc.,* 108 Bankr. 378, 383 (BC DC Mass.1989).[FN28]

### I. Conclusions of Law on RCRA

1. "The right of private citizens to institute civil litigation under RCRA [section 7002(a) ] is strictly limited by the jurisdictional prerequisites contained in section 7002[b], 42 U.S.C. § 6972(b)." *McGregor v. Industrial Excess Landfill, Inc.,* 709 F.Supp. at 1407; *accord Garcia v. Cecos International, Inc.,* 761 F.2d 76, 78 (1st Cir.1985) (courts must apply these statutory limits strictly). RCRA Section 7002(b) bars citizen suits unless plaintiffs can show that (a) they have given proper prior notice, (b) EPA is not already taking appropriate remedial actions at the site, and (c) the RCRA violation is continuing. Plaintiffs can meet none of these jurisdictional prerequisites.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 52

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

**\*65** 2. RCRA Section 7002(b) requires that plaintiffs give adequate notice of RCRA claims to potential defendants, the EPA and the State. 42 U.S.C. § 6972(b). Compliance with RCRA's prior notice requirement is jurisdictional. *Hallstrom v. Tillamook County,* 493 U.S. 20, 110 S.Ct. 304, 107 L.Ed.2d 237, 246 (1989). *See also Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d at 1160 (90-day notice requirement for Section 7002(a)(1)(B) claim is jurisdictional and mandatory); *McGregor v. Industrial Excess Landfill, Inc.,* 856 F.2d 39, 43 (6th Cir.1988) (compliance with 90-day notice requirement must be alleged in any complaint brought under Section 7002(a)(1)(B)); *Garcia v. Cecos International, Inc.,* 761 F.2d at 78 (60-day notice requirement of Section 7002(a)(1)(A) claim alleging non-subchapter III violations is jurisdictional); *Roe v. Wert,* 706 F.Supp. 788, 794-95 (W.D.Okla.1989) (failure to give prior notice bars claim under Section 7002(a)(1)(A) for alleged subchapter III violation); *Thompson v. Andersen Window Corp.,* Civ. No. 4-88-229 (D.Minn. Jan. 27, 1989) (Exhibit F), 1989 WL 2330 at *5, LEXIS slip op. at 8-9 (RCRA claims dismissed with prejudice where plaintiff failed to give required notice).

3. The EPA regulations implementing RCRA Section 7002(b) require:

Notice regarding an alleged violation ... under this Act shall include sufficient information to permit the recipient to identify the specific permit, standard, regulation, condition, requirement, or order which has allegedly been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the date or dates of the violation and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 254.3(a).

4. The notice letter that plaintiffs purported to send to Litton was deficient under the notice letter requirements of 40, Code of Federal Regulations, Section 254.3(a) for several reasons. First, it failed to identify the *specific* RCRA provisions that plaintiffs allege and implementing regulations that plaintiffs allege

Litton violated. The letter cited one broad provision of RCRA, "42 U.S.C. § 6925," which Litton allegedly violated by "disposal of hazardous waste into the ground at the Clifton facility without authorization in a permit." Section 6925, however, contains numerous requirements relating to hazardous waste. Plaintiffs' letter did not specify which of these many requirements Litton allegedly violated. Similarly, plaintiffs' letter asserted that Litton violated 40, Code of Federal Regulations, Section 270.10, "General Application Requirements, " which establishes numerous specific requirements pertaining to hazardous waste permits. Again, the letter did not identify the specific regulatory requirement that Litton allegedly violated, as 40, Code of Federal Regulations, Section 254.3(a) requires. Plaintiffs' letter also alleged that Litton violated 40, Code of Federal Regulations, Section 265.31 by "[m]aintaining and operating hazardous waste facilities in such a manner as to cause releases of hazardous waste into groundwater...." The cited rule simply requires facilities to be "maintained and operated to *minimize the possibility* of ... any unplanned sudden or non-sudden release of hazardous waste ... to air, soil, or surface water which could threaten human health or the environment." (Emphasis added.) Thus, an alleged release of a hazardous waste does not necessarily violate the RCRA regulation cited in plaintiffs' notice letter. The allegation thus fails in this respect as well to comply with 40, Code of Federal Regulations, Section 254.3. In addition, 40, Code of Federal Regulations, Section 254.3 requires that notices of intent to file citizen suits under RCRA Section 7002 contain the "date or dates of the violation." Plaintiffs' purported notice letter did not include this information for any of the alleged violations.

**\*66** 5. Considered collectively, these violations of the notice requirements compel the conclusion that plaintiffs' "notice letter" did not satisfy Section 7002(b)(1). Since the only notice that plaintiffs gave prior to filing suit was inadequate, the court lacks subject-matter jurisdiction for the RCRA claim and must dismiss the claim.

6. In addition to prohibiting citizen suits in the absence of adequate prior notice, Congress also

Not Reported in F.Supp.                                                                                    Page 53

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

made clear that citizen suits could not be brought where the state or federal government is already undertaking remedial actions at a facility. Thus, RCRA prohibits citizen suits brought under Section 7002(a)(1)(A) "if the [EPA] Administrator or the State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States or a State to require compliance with such permit, standard, regulation, condition, requirement, prohibition or order." 42 U.S.C. § 6972(b)(1)(B). Similarly, RCRA Section 7002(b)(2)(B) precludes citizen suits brought under Section 7002(a)(1)(B) where EPA "has obtained a court order (including a consent decree) ... pursuant to which a responsible party is diligently conducting a removal action, Remedial Investigation and Feasibility Study (RIFS), or proceeding with a remedial action." 42 U.S.C. § 6972(b)(2)(B)(iv). *See O'Leary v. Moyer's Landfill, Inc.,* 677 F.Supp. at 819 (citizen suit barred where EPA was diligently pursuing cleanup at site).

7. "The congressional intent in enacting these restrictions on private actions was to prevent multiple and numerous instances of litigation involving private citizens, the states and the federal government ... Only when the federal and state governments fail to act to remedy the situation or file suit in either State or federal courts due to inadequate public resources did Congress envision the need for private citizens to commence actions to correct environmental hazards." *McGregor v. Industrial Excess Landfill, Inc.,* 709 F.Supp. at 1407. Moreover, Congress did not want citizen suits to interfere with ongoing EPA-supervised remedial actions. *See Utah State Department of Health v. Ng,* 649 F.Supp. 1102, 1108-09 (D. Utah 1986) (Congress intended to allow EPA to proceed with cleanup activities uninhibited by private party interference).

8. Plaintiffs claim that, under a literal reading of the statute, they cannot be precluded from pursuing a citizens suit under RCRA unless suit has actually been filed in court by EPA. This argument is contrary to common sense and not compelled by the statute. The Administrative Consent Order that Litton signed is the equivalent of a judicial action because it is expressly enforceable in federal court

at the discretion of EPA. Accepting plaintiffs' argument would mean that a company would be protected from citizen suits under RCRA if it resisted EPA's efforts to obtain voluntary compliance with closure requirements and thereby forced EPA to bring it into court, but would not be protected from citizen suits if it did as Litton has done and cooperated voluntarily. Rather than encouraging parties to take responsibility for chemicals on their property and to remediate releases, therefore, plaintiffs' interpretation of RCRA would encourage companies to defy cleanup orders and litigate every conceivable issue. Such a result would be contrary to public policy. *See, e.g., Perry v. Commerce Loan Co.,* 383 U.S. 392, 400 (1966) (statute should be construed to avoid absurd or unintended results); *Church of the Holy Trinity v. United States,* 143 U.S. 457, 461 (1892) (same); *United States v. Kirby,* 74 U.S. (7 Wall.) 482, 486-87 (1869) (same); *Chafin v. United States,* 5 F.2d 592, 592 (4th Cir.), *cert. denied,* 269 U.S. 552 (1925) (same); *United States v. Mendoza,* 565 F.2d 1285, 1288-89 (5th Cir.1978) (same).

**\*67** 9. This is the type of case in which Congress intended to prevent citizen interference. The United States and Litton have entered into a detailed consent order requiring actions which will remediate any threats to human health or the environment at the Litton site. The consent order is by its terms enforceable in federal court. *See* Consent Order at para. XX(3). Plaintiffs have provided no evidence to the court of any alleged failure on Litton's part to comply with that order and, indeed, have disclaimed any such intention. FN29 Therefore, the jurisdictional provisions of RCRA Section 7002(b) bar plaintiffs' RCRA claims.

10. In addition, RCRA Section 7002(a)(1)(A), 42, United States Code, Section 6972(a)(1)(A), permits only those actions "against any person ... who is alleged *to be in violation* of any permit, standard, regulation, condition, requirement, prohibition or order...." (Emphasis added.) Thus, the section allows a claim only where the alleged violation is a continuing one. *Coburn v. Sun Chemical,* No. 88-920 (E.D.Pa. Nov. 9, 1988), slip op. at 21 (holding that "section 7002(a)(1)(A) of RCRA bars any suit based on 'wholly past' violations of RCRA

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 54

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

"); *accord McClellan Ecological Seepage Situation (MESS) v. Weinberger,* 707 F.Supp. 1182, 1187 (E.D.Cal.1988) (RCRA is "forward looking [and] intended to remedy present and future harmful impacts, not conduct that has occurred entirely in the past and cannot be reasonably expected to result in future harm"); *see also Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d at 1159 (Section 7002(a)(1)(A) does not impose retroactive liability and requires current violation).

11. In *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.,* 484 U.S. 49 (1987), the Supreme Court held that the nearly identical provisions of the Clean Water Act permit suits only where present and future violations are alleged. Indeed, the court identified the citizen suit provision of RCRA as one of several environmental statutes that "authorize only prospective relief." *Id.* at 57, n. 2. *See Pawtuxet Cove Marina, Inc. v. Ciba-Geigy Corp.,* 807 F.2d 1089, 1094 (1st Cir.1986) (no Clean Water Act permit violation where "no reasonable likelihood that defendant's alleged infractions would continue").

12. Although the Complaint alleges that Litton's purported RCRA violations are "continuing," plaintiffs' discovery responses did not set forth the alleged basis for such violation upon which plaintiffs now seek to rely. Thus, plaintiffs now contend that they have alleged a "continuing" violation of RCRA because the mere presence of TCE and other substances in the soil around the plant constitutes "disposal" today within the meaning of RCRA, for which an RCRA permit is allegedly required. However, plaintiffs represented to Litton in their discovery responses that "disposal" of hazardous wastes, as defined by RCRA, stopped in 1986. *See* Plaintiffs' Response to Second Set of Interrogatories at para. 1(c) (no allegation of disposal of hazardous waste after 1986). If it was plaintiffs' position that a present RCRA violation is continuing because the mere presence of hazardous wastes in the soil at the plant constitutes a "disposal, " that position should have been set forth in their interrogatory responses.

**\*68** 13. Plaintiffs' claim has no merit in any event. Although plaintiffs cite other interrogatory

responses indicating that they contend that Litton is in "continuing" violation of RCRA because of its alleged failure to obtain an RCRA permit for the facility, it is undisputed that Litton does not presently operate a hazardous waste treatment, storage or disposal facility subject to RCRA.[FN30] It need not obtain (indeed, could not obtain) an RCRA TSD permit or comply with regulatory requirements imposed on a TSD facility. There is no possibility of present or future RCRA violations. Accordingly, this case is analogous to *Chaplin v. Exxon Corp.,* 25 Env't Rep. Cas. (BNA) 2009, 2015 (S.D.Tex. June 10, 1986), in which the court held that where the "only allegations as to ongoing activities are personal injuries and property damage [they] are not sufficient to show a continuing violation itself." Because no continuing violation exists, the court has no jurisdiction over the RCRA claim.

14. Even if the court were to determine that it had jurisdiction over plaintiffs' RCRA claims, the undersigned believes that it should nevertheless dismiss those claims under the doctrine of primary jurisdiction. Under that doctrine, courts will not consider the merits of a private action which squarely presents technical or policy determinations that the agency concerned has under review. *Parola v. Weinberger,* 848 F.2d 956, 959 (9th Cir.1988). "The doctrine is applied to promote uniformity of regulation and allow courts to benefit from an agency's specialized knowledge." *Id.* The doctrine "arises in cases raising issues of fact outside the conventional experience of judges or requiring the exercise of administrative discretion." *United States v. Environmental Waste Control, Inc.,* 698 F.Supp. 1422, 1439 (N.D.Ind.1988) (citing *Far East Conference v. United States,* 342 U.S. 570, 574 (1952)).[FN31] *Accord O'Leary v. Moyer's Landfill, Inc.,* 677 F.Supp. at 820-21 (deferring issues concerning implementation and funding of remedy under RCRA to primary jurisdiction of agency).

15. The facts in this case favor the exercise of primary jurisdiction. First, plaintiffs have failed to show any evidence of the presence of chemicals on their property at levels sufficient to cause harm to human health. Second, EPA is currently

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 55

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

supervising Litton's remedial investigation at the site and will make the technical determination of what remedial actions need to be taken. Litton is acting under a judicially enforceable Consent Order, and plaintiffs do not argue that Litton has failed to comply with the Consent Order or that the Consent Order is insufficient. Third, the two factors courts usually consider, *i.e.,* current agency involvement and technical and complex issues, support the exercise of primary jurisdiction in this case. Accordingly, even if the court had jurisdiction to consider plaintiffs' RCRA claims, it should dismiss those claims under the primary jurisdiction doctrine.

### J. Additional Conclusions of Law

**\*69** The motion of plaintiffs Sandra Hancock and Chuck Hancock for voluntary dismissal should be denied, for the reasons previously set forth by the undersigned upon plaintiffs' motions for voluntary dismissal and by the district court upon consideration of plaintiffs' objections to the undersigned's recommended denials of such motions.

### K. *Sanctions*

Rule 11, Federal Rules of Civil Procedure, provides:

The signature of an attorney or party constitutes a certificate by the signer ...; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact....

   If a pleading is signed in violation of this rule, the court, upon motion or its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction

While it is within the sound discretion of the district court judge to impose sanctions, the undersigned feels obligated to inform the district court that lead counsel for plaintiffs has engaged in conduct which appears sanctionable. As more fully discussed *supra* and in the proposed findings, lead counsel for

plaintiffs admittedly filed this matter without conducting adequate inquiry. Sanctions are appropriate where counsel fails to make a reasonable inquiry into the facts before filing papers with the court. *Pantry Queen Foods, Inc. v. Lifschultz Fast Freight, Inc.,* 809 F.2d 451, 453 (7th Cir.1987). It is apparent from admissions made by plaintiffs' counsel to the undersigned in open court that lead counsel for plaintiffs failed to comply with Rule 11, Federal Rules of Civil Procedure, in initiating this action. It is equally apparent that plaintiffs' failure to comply with Rule 11 compelled Litton to expend unduly tremendous resources. As discussed *supra,* other conduct may also be sanctionable.

In *Blue v. Harris,* --- F.2d ----, No. 88-1364 (4th Cir. Sept. 18, 1990), the Court of Appeals for the Fourth Circuit recently held:

In awarding sanctions, a district court has the discretion to consider a broad range of factors. Even though an attorney has engaged in conduct which is otherwise sanctionable, "a district court should reflect upon equitable considerations in determining the amount of the sanction."

*Id.,* at 46 (citation omitted). In order to serve the ends of justice, the undersigned will recommend that the district court conduct a Rule 11 inquiry based on Litton's motions for sanctions.

### SUBMISSION

IT IS, THEREFORE, RESPECTFULLY SUBMITTED that these recommended Conclusions of law, as incorporated in the Memorandum and Recommendation, Part III, filed simultaneously herewith, be accepted by the district court.

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), written objections to the conclusions of law contained herein and the findings of fact set forth in a separate document entered simultaneously herewith and incorporated by reference, must be filed within ten (10) days of service of same. Failure to file such objections with the district court will preclude the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 56

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

parties from raising such objections on appeal. *Thomas v. Arn,* 474 U.S. 140 (1985), *reh'g denied,* 474 U.S. 1111 (1986); *United States v. Schronce,* 727 F.2d 91 (4th Cir.), *cert. denied,* 467 U.S. 1208 (1984).

**\*70** These recommended Conclusions of Law are entered in response to the motions noted in the Findings of Fact, Part I.

MEMORANDUM AND RECOMMENDATION, PART III

PURSUANT TO 28, UNITED STATES CODE, SECTION 636(b) and the standing Orders of Designation entered by United States District Judge Richard L. Voorhees, the undersigned United States Magistrate has before him a variety of dispositive motions filed by Defendant Litton Systems, Inc. (" Litton"). Having thoroughly reviewed those motions, plaintiffs' oppositions, the affidavits and other materials submitted both in support of and in opposition to said motions, and the record in this case, and having heard oral argument, the undersigned will recommend to the district court that it grant the following motions filed by Litton:

(1) Motion in Limine to Exclude Opinion Testimony Concerning Plaintiffs' Alleged Past Exposure to the Chemicals in Issue ("Motion to Exclude");

(2) Motion for Summary Judgment on Medical Causation ("Motion on Causation");

(3) Motion for Summary Judgment on Alleged Increased Risk of Disease ("Motion on Increased Risk");

(4) Motion for Summary Judgment on Emotional Distress Claims ("Motion on Distress");

(5) Motion for Summary Judgment on Claims of Nuisance and Trespass ("Motion on Nuisance");

(6) Motion for Summary Judgment on Plaintiffs' CERCLA Cost Recovery Claim ("Motion on CERCLA"); and

(7) Motion for Summary Judgment on Plaintiffs' RCRA Claim ("Motion on RCRA").

As a preliminary matter, the undersigned has also determined to recommend denial of plaintiffs' Motion to Strike From the Record Materials Submitted by the Defendant in Support of Defendant's Motion for Summary Judgment and for Sanctions Against the Defendant ("Motion to Strike").

In addition, the undersigned has determined to recommend that the following motions be denied as moot:

(1) Plaintiffs' Motion for Partial Summary Judgment;

(2) Plaintiffs' Motion to Rejoin Litton Industries, Inc. as a Party Defendant and for Sanctions (" Motion to Rejoin"); and

(3) Litton's Motion to Deem Admitted Facts Set Forth in Requests for Admission, or Alternatively, To Determine Sufficiency of Objections ("Motion to Deem Admitted").

Finally, the undersigned will recommend to the district court that the Motion of Plaintiff Sandra Hancock, Individually, and as Next Friend and Parent of Chuck Hancock, a Minor, For Voluntary Dismissal ("Hancock Motion") be denied on the merits and that the district court consider whether sanctions should be imposed.

The undersigned has prepared detailed recommended findings of fact and conclusions of law, in two parts, which are incorporated herein by reference. Having considered the motions listed *supra,* conducted a hearing, reviewed the submissions of the parties, made recommended findings of fact and conclusions of law, the undersigned respectfully submits the following Memorandum and Recommendation.

MEMORANDUM

I. *Introductory Facts*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                              Page 57

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

**\*71** This case involves Litton's alleged liability for the release of certain chemicals from its Clifton Precision plant in Murphy, North Carolina ("the plant"). Plaintiffs are individuals who either lived, worked, or visited near the plant for various periods from 1969 to 1987.

In late 1986, Litton detected the presence of chemicals in the industrial well servicing its plant. Shortly thereafter, it also discovered that trace levels of similar chemicals were present in certain private wells near the plant. The principal chemical found-and the main chemical at issue in this litigation-is trichloroethylene ("TCE"), which the plant used as a degreasing solvent from its construction in 1967 until about 1974.[FN1] The average concentration of TCE found in plaintiffs' wells since early 1987 has been less than 20 parts per billion ("ppb"), with measured concentrations ranging from zero to 84 ppb. *See* Findings of Fact at para. 66.

After detecting TCE in the groundwater, Litton promptly implemented a variety of remedial measures, including initially providing bottled water to the individuals whose wells contained trace levels of chemicals and later installing and maintaining carbon adsorption filters on these wells. In addition, Litton entered into an administrative consent order with the United States Environmental Protection Agency ("EPA") under which longer term remedial actions have been undertaken and continue at the plant site today. *See* Findings of Fact at Para. 250.

Litton denies that any of the chemicals found in plaintiffs' wells came from the plant. Rather, it contends that it would have been hydrogeologically impossible for the chemicals to have moved from Litton's property to plaintiffs' wells. Between the plant and all but one of those wells flows Slow Creek, which Litton alleges serves as a hydrogeological barrier to groundwater flow. The noted motions, however, do not require resolution of this question. Accordingly, solely for the purpose of deciding Litton's motions, the undersigned has assumed that the plant *was* the source. Nevertheless, the undersigned has determined that summary judgment must be granted

to Litton on all claims regardless of where the chemicals originated.

II. *Procedural History of this Case*

In October 1988, plaintiffs filed suit alleging claims for personal injury, property damage, out-of-pocket expenses, and injunctive relief. Counts I through V are state common-law counts sounding in negligence (I), gross negligence (II), strict liability for ultrahazardous activities (III), nuisance (IV), and trespass (V). Count VI asserts a claim for the recovery of "response costs" under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42, United States Code, Sections 9601, *et seq.* Count VII asserts a claim under the Resource Conservation and Recovery Act ("RCRA"), 42, United States Code, Sections 6901, *et seq.* Twenty-four plaintiffs remain in the action: 18 adults and six minor children. [FN2]

**\*72** The first pretrial order in this case was entered on January 12, 1989. Among other things, it provided that discovery would conclude within 100 days, *i.e.,* on April 22, 1989. On February 6, 1989, plaintiffs moved for an indefinite extension of the discovery period. *See* Findings of Fact at paras. 9-10.

At the first pretrial conference on March 28, 1989, plaintiffs' counsel recommended that the litigation be approached in a "phased" manner. Litton agreed with this suggestion, and the undersigned issued a scheduling Order on April 10, 1989, which implemented the various agreements reached at the March 28 hearing. The April 10, 1989, Order provided that issues of liability and medical causation would be addressed first, through discovery and the filing of dispositive motions, under a schedule of dates agreed to by both parties, with remaining issues, if any, to be addressed thereafter. Under the original schedule, summary judgment motions on these matters were to have been filed in July 1989. *See* Findings of Fact at paras. 13-14.

Shortly after issuance of the April 10, 1989, Order,

Not Reported in F.Supp.                                                                                    Page 58

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

plaintiffs requested an extension of the deadlines to which they had originally agreed, claiming difficulty in obtaining and organizing their own medical records and preparing expert medical opinions based thereon.[FN3] Thus began the first of a series of repeated requests by plaintiffs for additional time in which to obtain expert opinions adequate to survive summary judgment motions.

In response to this request, the undersigned extended the filing date for summary judgment motions to September 30, 1989. *See* Findings of Fact at paras. 16-17, 19-21.

Immediately prior to that date, however, plaintiffs petitioned the undersigned for another extension, expressly admitting that they had failed in the proofs of medical causation and would be unable to survive summary judgment. As plaintiffs' counsel explained, there were two main problems: their medical experts had been hampered by lack of time within which to review medical records and a series of tests on plaintiffs constituting the basis of the proposed testimony of their primary expert, neurologist Dr. Robert G. Feldman, would have to be redone because the neurologist who had performed the tests had done so improperly. *See* Findings of Fact at paras. 24-26, 29, 37.

As an alternative request for relief, plaintiffs sought voluntary dismissal without prejudice of their entire complaint. In its October 12, 1989, Memorandum and Recommendation, the undersigned recommended to the district court that this alternative request be denied. The district court sustained this recommendation in an Memorandum of Opinion and Order dated December 5, 1989. *See* Findings of Fact at paras. 26, 29-34.

The undersigned granted plaintiffs' motion for another extension and gave them until November 30, 1989, to come up with adequate expert opinions, with summary judgment motions then to be filed by March 15, 1990. The effect of that ruling was to give plaintiffs a five-month extension of the date for developing expert opinions. In granting the extension, the undersigned advised plaintiffs that it would be their last. *See* Findings of Fact at paras. 29-31.

**\*73** Plaintiffs, nevertheless, sought another extension on November 30, 1989. In their papers in support of such an extension, plaintiffs revealed that they had found two new expert witnesses who supposedly would fill the holes in their case, but again claimed that the experts had not had sufficient time to review documents, make calculations, and coordinate with each other. It became clear that plaintiffs' attorneys had previously misled the undersigned concerning the status of their case. Indeed, when plaintiffs' counsel claimed before the undersigned in September 1989 that plaintiffs were *not* fishing for new experts, they were *in fact* looking for the two experts they announced on November 30. Despite the lack of candor of plaintiffs' counsel, the undersigned granted plaintiffs a two-month extension and the deadline for filing summary judgment motions was extended to May 15, 1990. *See* Findings of Fact at paras. 35-36.

On November 30, 1989, plaintiffs also renewed their motion for voluntary dismissal without prejudice. Because the court had already ruled on the issue, the undersigned referred plaintiffs' motion directly to the district court, which in a Memorandum of Opinion and Order dated April 30, 1990, again denied it. In that Memorandum of Opinion and Order, at 8-9, the district court noted, *inter alia,* as follows:

The Court is also aware that Plaintiffs are having difficulty finding evidence linking Defendant's conduct to Plaintiffs' ills.

Plaintiffs have asked for and received five extensions of discovery in order to uncover critical medical evidence including expert opinion. One would have expected such information to exist in accessible and identifiable form prior to filing of the complaint. Despite the fact that each request for an extension has been granted, the Plaintiffs still seek voluntary dismissal of their claims apparently because of counsel's inability to meet the discovery deadlines as extended.

*See* Findings of Fact at paras. 47-48.[FN4]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.             Page 59

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

Litton filed its summary judgment motions and Motion to Exclude on May 15, 1990. On the same day, plaintiffs filed a motion for partial summary judgment on certain liability issues related to counts VI and VII of the complaint. Litton responded to plaintiffs' motion on May 30, 1990. Plaintiffs, however, sought an extension of the time within which to respond to Litton's motions, and the undersigned granted plaintiffs an extension, longer than the one they had sought, until July 30, 1990. Plaintiffs' oppositions to Litton's motions were ultimately filed during the week after July 30, 1990. On August 17, 1990, plaintiffs filed their Motion to Strike. *See* Findings of Fact at para. 51.

The undersigned subsequently requested the advice of counsel in structuring arguments on the pending motions. Since Litton's motions, unlike those of plaintiffs, would, if granted, be dispositive of the entire case, the undersigned decided to hold Plaintiffs' Motion for Partial Summary Judgment in abeyance pending resolution of Litton's motions. [FN5] In addition, upon the advice of plaintiffs' counsel, the undersigned determined to hear argument first on Litton's Motion to Exclude, which itself acts as a dispositive motion in the circumstances of this case, and then to hear argument on the Motion to Strike. Argument on the Motion on Causation was to be heard later the same day, and argument on the other motions was to be held on subsequent dates. *See* Findings of Fact at paras. 52-53.

**\*74** Accordingly, the undersigned heard argument on the Motion to Exclude on August 30, 1990. The parties also agreed on August 30, 1990, to submit the Motion to Strike and the Motion on Causation on the briefs. Because the undersigned's recommended disposition of the initial motions will substantially determine the remaining motions as well, the undersigned has subsequently decided to prepare its recommended findings and conclusions on all remaining pending motions on the basis of the briefs. *See* Findings of Fact at paras. 54-55.

III. *The Issues Involved in this Case*

The foundation of virtually all of plaintiffs' claims

in this case is their allegation that they have suffered physical injury as a result of alleged exposures to the chemicals at issue. As has already been decided in this case, such claims require proof of at least five *prima facie* elements:

(1) release by defendant of complained of chemicals into the environment;

(2) chemical migration into the groundwater and further migration into [plaintiffs'] wells;

(3) ingestion of these chemicals by [plaintiffs];

(4) injury; and

(5) that the ingested chemicals were the cause of the injuries.

Memorandum and Recommendation (October 12, 1989) at 4, *aff'd*, Memorandum of Opinion and Order (December 5, 1989).

The allegations of the complaint thus raise a number of critical questions. First, is there admissible evidence concerning the *amount* of TCE to which each plaintiff was allegedly exposed and the *onset and duration* of such alleged exposure? Second, does each plaintiff actually suffer from any physical disease or injury? Third, assuming there is admissible evidence concerning the amount of TCE to which the plaintiff has been exposed and that the plaintiff is actually suffering from a physical disease or injury, is there admissible evidence, to a reasonable degree of medical certainty, that the alleged exposure caused the disease or injury? As previously held in this case, plaintiffs must "show ... that [they have] sufficient evidence which would permit finding in [their] favor with respect to each element essential to [their] case." *Id.* at 5; Memorandum of Opinion and Order (December 5, 1989) at 2. A failure on any one of them requires that the claims of personal injury be dismissed.[FN6]

Litton contends that plaintiffs cannot meet certain of the prerequisites for maintaining this action. The Motion to Exclude seeks to preclude testimony of two of plaintiffs' experts who are critical to the remainder of their case: Mr. Gerald Moore, a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 60

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

hydrogeologist, who purports to testify concerning *when* chemicals from the plant first arrived at plaintiffs' wells; and Dr. Hugh Spencer, a biochemist, who purports to testify concerning the *levels* of chemicals to which plaintiffs allegedly were exposed in years prior to 1987, the first year for which any actual data exist.[FN7] The basis for Litton's motion is that the proposed testimony does not comply with Federal Rules of Evidence 702 and 703 regarding expert witnesses and should also be excluded pursuant to Federal Rule of Evidence 403. The Motion on Causation, in turn, seeks summary judgment on the grounds that (1) certain plaintiffs cannot make a *prima facie* case that they have suffered any injuries and (2) plaintiffs' medical causation experts either do not provide sufficient evidence of causation to allow plaintiffs' claims to go to a jury or do not provide opinions which are admissible under the standards established by Federal Rules of Evidence 702, 703, and 403.

**\*75** In response to the Motion to Exclude, plaintiffs have submitted affidavits from Mr. Moore and Dr. Spencer. In response to the Motion on Causation, plaintiffs have submitted individual affidavits from Dr. Alan Broughton, a pathologist; Dr. Robert Feldman, a neurologist; and Dr. George Rodgers, Jr., an M.D. toxicologist. In addition, plaintiffs have submitted a Joint Affidavit from Drs. Broughton, Feldman, and Rodgers. In reaching its recommended findings and conclusions, the undersigned has reviewed these affidavits with particular care, as well as those submitted by Litton.

The dispositive motions have been fully briefed, and the undersigned has had the opportunity to review a great volume of documentation submitted both in favor of and in opposition to such motions. The motions are, therefore, ripe for decision.

IV. *The Appropriate Standard of Review*

In evaluating the pending motions and preparing the proposed findings, conclusions, and recommendations, the undersigned has borne in mind the following governing principles. A court should grant summary judgment where there is no genuine issue as to any material fact and the moving

party is entitled to judgment as a matter of law. Fed.R. of Civ.P. 56(c). The Supreme Court has explained that the moving party's burden may be discharged "by 'showing'-that is, pointing out to the [trial] court-that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). The *Celotex* Court held:

[Summary judgment is appropriately entered] against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which [he or] she has the burden of proof.

477 U.S. at 322-23; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party").

As an initial matter, the undersigned must determine what level of review is necessary and appropriate under the Federal Rules of Evidence when a court is faced with attacks on the admissibility of expert testimony. Plaintiffs suggest that any such review must be minimal; that as long as an expert uses the appropriate words, *i.e.,* couches his conclusions in the phrase "to a reasonable degree of scientific (or medical) certainty," scrutiny of the expert's opinions must end; that any effort on the part of the court to ascertain whether an expert's opinions are speculative, or not based upon principles and methodologies that are generally accepted in the relevant medical or scientific community, or not reasonably based in facts, constitutes usurpation of the jury's function; and that as long as experts can be found to support both sides of a question, the court is left with a so-called "battle of the experts" that cannot be resolved save by trial to a jury.[FN8]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                          Page 61

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

Litton contends, conversely, that the court is required to do more; that the court must in fact determine whether the proposed expert testimony would be admissible within the parameters set forth in Federal Rules of Evidence 702, 703, and 403; that testimony is speculative, not based upon principles and methodologies that are generally accepted in the relevant medical or scientific community, or not reasonably based in facts, must be excluded; and that a party's mere naming of an expert willing to use certain "magic words" does not end the court's scrutiny, but begins it. Since this issue is of importance to the undersigned's recommended rulings on the pending motions, it is addressed first.

**\*76** After careful consideration, the undersigned concludes that the court is not required to accept into evidence all testimony proffered as expert. As an initial matter, Federal Rule of Evidence 104(a) requires the court to make preliminary determinations concerning the admissibility of evidence. [FN9] Nothing in Rule 104(a) suggests that expert testimony should be exempted from this requirement. Accordingly, the court must review admissibility under the structure provided by Rules 702, 703, and 403.

Federal Rule of Evidence 702 requires, first, that the court determine whether proposed testimony " will assist the trier of fact to understand the evidence or determine a fact in issue." [FN10] Rule of Evidence 703 establishes that the facts or data upon which the expert relies must be "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject...." [FN11] Finally, Federal Rule of Evidence 403 authorizes exclusion of otherwise relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." [FN12]

To determine whether an expert will "assist the trier of fact," the court must do more than note that there has been a statement of opinion and reasons from a credentialed individual. In addition, the proponent of the evidence must establish that the theories, principles, and methodologies utilized by an expert

are reasonably relied upon in the relevant scientific/medical community. [FN13] When the Court of Appeals for the Fourth Circuit addressed this question in *United States v. Baller,* 519 F.2d 463, 466 (4th Cir.), *cert. denied,* 423 U.S. 1019 (1975), it noted:

There are good reasons why not every ostensibly scientific technique should be received as the basis for expert testimony. Because of its apparent objectivity, an opinion that claims a scientific basis is apt to command undue weight with the trier of fact .... In order to prevent deception or mistake ... *there must be a demonstrable, objective procedure for reaching the opinion* ....

(Emphasis added.)

In addition, an expert opinion must rest on an adequate factual foundation. [FN14] In the absence of such a foundation, an expert's purported opinion cannot "assist the trier of fact" and thus cannot be allowed into evidence.

Plaintiffs do not take issue with these legal standards. They argue, however, that so long as an expert claims to be using a reliable methodology, the court cannot look behind the claim. This argument is incorrect. Indeed, if it were correct, no expert testimony could ever be excluded, no matter how flimsy the factual basis or how unreliable the methodology, because the expert's incantation of the "magic words" would preclude judicial review.

The undersigned concludes that the court is required to look behind the surface of an expert's claims of reliability in making its preliminary determination concerning admissibility under Federal Rules of Evidence 702 and 703. When inquiry reveals that proffered testimony would be based upon mistaken assumptions or speculative theories, for example, the testimony must be excluded.[FN15] The court must be vigilant against the possibility that a jury could be swayed by an expert simply because of his credentials and the purported scientific nature of his opinions. *See United States v. Baller,* 519 F.2d at 466-67.[FN16] Such review by the court does not mean that the court is resolving a so-called "battle of the experts"

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 62

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

weighing the evidence, or otherwise usurping the function of the jury. It means that the court is doing its job to determine what evidence may be *heard* by the jury. It is the function of the court to determine what evidence is or is not heard by the jury. It is further the responsibility of the court, pursuant to Rule 56 of the Federal Rules of Civil Procedure, to determine whether a nonmovant plaintiff can adduce *admissible* evidence that would allow a reasonable jury to rule in his favor on any contested element of the nonmovant's case. With these general principles in mind, the undersigned now turns to the specific motions before it.

### V. *The Motion to Exclude the Testimony of Mr. Moore and Dr. Spencer*

**\*77** As noted above, plaintiffs rely on two witnesses for opinion evidence concerning the length of time to which plaintiffs allegedly were exposed to TCE and the degree of alleged exposure. The undersigned concludes that neither can show that the method used in forming his opinions is generally accepted in the relevant scientific community or otherwise can show an adequate basis for his opinion. In addition, the undersigned concludes that one of the witnesses, Dr. Spencer, is not an "expert" within the meaning of Rule 702 for purposes of his proposed opinions in this case.

### A. *Opinions of Mr. Moore*

The first witness, Gerald Moore, is a hydrogeologist upon whom plaintiffs rely for testimony that chemicals from the plant did in fact migrate to plaintiffs' wells. As noted, although Litton denies such migration, the pending motions do not require resolution of that dispute. In addition, however, plaintiffs rely upon Mr. Moore for testimony that chemicals from the plant arrived at plaintiffs' wells not later than 1970. This is a conclusion that is critical to plaintiffs' medical causation experts, as plaintiffs themselves have admitted, because it is essential for them to know that exposure preceded plaintiffs' alleged symptoms in order for the exposure to be considered as a possible cause of those symptoms and, ultimately, to know the

alleged dose of TCE to which plaintiffs were exposed.

Mr. Moore's opinions were the subject of detailed deposition examination by Litton. Review of that testimony, submitted by the parties, shows that Mr. Moore acknowledges that for chemicals to move from the plant side of Slow Creek to the plaintiffs' side, the normal flow of groundwater (which is *into* Slow Creek from both sides) would have to be reversed. Mr. Moore is unable to testify, however, when or how often such supposed reversals took place. [FN17] His official report to plaintiffs' counsel concerning this case offers no such information. The affidavit that Mr. Moore submitted on behalf of plaintiffs' opposition to Litton's Motion to Exclude provides little additional assistance. Although Mr. Moore states in a conclusory fashion his opinion that chemicals arrived at plaintiffs' wells in 1970, he does not address any of the points raised by Litton. Instead, the bulk of the affidavit is devoted to an apparent defense of his opinion that the plant was the source of the chemicals. As noted above, this is an issue that Litton has not contested for the purposes of its motion.

Among other things, a review of the materials submitted shows that Mr. Moore has never run any scientific tests on plaintiffs' wells; he has never observed such wells in the condition that he says would have been necessary to pull chemicals under Slow Creek; he has never taken any groundwater measurements between Slow Creek and plaintiffs' wells to determine in which direction the groundwater is flowing; and he has never reviewed any rainfall data to confirm or refute his hypotheses about flow during periods of dry weather. In short, he has offered opinions that are completely lacking of an adequate factual basis as to when in the past chemicals allegedly arrived from the plant at plaintiffs' wells. *See* Findings of Fact at paras. 58-63.

**\*78** During oral argument plaintiffs argued that since TCE was found in plaintiffs' wells in 1987, and since TCE has not generally been used at the plant as a degreaser since the mid-1970's (a point that Litton does not contest), it is a matter of "

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                         Page 63

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

common sense" that TCE must have been in plaintiffs' wells since the 1970's. Unfortunately for plaintiffs, this is not a matter of "common sense" at all. Plaintiffs do not dispute that groundwater normally does not flow under Slow Creek from the plant to plaintiffs' wells. As Mr. Moore admitted at his deposition, special conditions were necessary before such flow could theoretically take place. *See* Finding of Fact at supra. 58. If the plant is the source of the chemicals at plaintiffs' wells, therefore, it is entirely possible that they arrived there shortly before they were found. Because plaintiffs need to establish otherwise for the purposes of their case on medical causation, it is their burden to adduce admissible expert testimony as to when the chemicals arrived.

Accordingly, the undersigned has determined that the proposed testimony of Mr. Moore concerning when chemicals from the plant allegedly arrived at plaintiffs' wells is speculative and not based upon the kind of facts or data that would be relied upon by experts in the field. Nor could Mr. Moore show a "demonstrably objective" methodology, within the meaning of the Fourth Circuit's *Baller* decision, for determining the date when chemicals from the plant first allegedly arrived at plaintiffs' wells. Consequently, the proposed testimony is not admissible under Rules 702 and 703. In addition, the probative value of Mr. Moore's proposed testimony is greatly outweighed by the undue prejudice that would accrue to Litton were his testimony to be admitted, and it should be excluded under Rule 403 as well.

### B. *Opinions of Dr. Hugh Spencer*

In addition, plaintiffs rely upon the opinions of Dr. Hugh Spencer. Dr. Spencer is not a licensed professional engineer, but styles himself as an expert in "chemodynamics," which the undersigned understands as referring to a field of science that addresses the fate of chemicals in the environment. Dr. Spencer's affidavit submitted by plaintiffs was devoted, in part, to defending the field of "chemodynamics" as a legitimate scientific discipline. The undersigned's conclusions concerning the admissibility of Dr. Spencer's

testimony assume (without deciding) that it is a legitimate field in which expert opinions can be adduced. Nonetheless, the undersigned concludes that Dr. Spencer's testimony should be excluded.

Dr. Spencer opines that concentrations of TCE between 1970 and 1974 were between 100 and 1,000 times higher than actually measured concentrations in 1987 and that, after 1974, such concentrations decreased steadily until 1987. These opinions are based upon Dr. Spencer's hypothesis of a "TCE environmental half-life," *i.e.*, a period of time in which any amount of TCE in the environment decreases to one-half of its starting concentration. Using assumed half-lives of both 1.5 and 2.0 years, Dr. Spencer "back-calculated" from measured or theoretical concentrations in the Carroll Well (the well from which most of plaintiffs drank at some point in time) and repeatedly doubled concentrations until the hypothesized concentrations were, as noted, 100 to 1,000 higher than any measured concentrations. It is upon these estimates of past exposures that plaintiffs' medical causation experts rest their opinions.

**\*79** After having reviewed the detailed submissions of the parties, the undersigned concludes that Dr. Spencer's testimony must be excluded for a number of reasons, each of which is sufficient to compel that result. First, Dr. Spencer has agreed (as has Mr. Moore) that his method of determining historical concentrations has no recognition, or even reference, in any scientific literature, in any learned treatise, or in any actual application. Although Dr. Spencer and plaintiffs assert that the concept of " half-life" is regularly used in science, they admit that it is used prospectively only, as an approximation for what may happen in the future (an approximation that is, of course, subject to confirmation and alteration as data are collected). Plaintiffs and Dr. Spencer have failed to show any scientific treatise or paper or research of any kind supporting a theory that such a concept can be used retroactively for the very different purposes involved in a tort case such as this. Indeed, the author of the study upon which Dr. Spencer supposedly placed substantial reliance submitted an affidavit to the court excoriating the use that Dr. Spencer had made of his paper and the calculations

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                  Page 64

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

that Dr. Spencer attempted.[FN18] *See* Findings of Fact at paras. 38, 71-76, 90-92.

Second, although Dr. Spencer admitted that the scientific community considers that site-specific data are best and should be used over literature-derived values, he concededly ignored site-specific data in forming his opinions. Indeed, Litton has demonstrated that actual data from the Carroll Well directly contradicts Dr. Spencer's theories about the site.[FN19] Thus, there has been no validation of Dr. Spencer's hypothesis at the very location to which it supposedly applies, and his own ground rules require rejection of his conclusions.

Third, Dr. Spencer's formula for deriving prior concentrations of TCE is so imprecise and inaccurate that Dr. Spencer himself conceded it would be fair to characterize his technique as "speculative." Indeed, Dr. Spencer conceded that his calculations incorporated a 1,400 percent margin of error that could not be reduced.

Fourth, Dr. Spencer cannot be considered an "expert" within the meaning of Rule 702 for the purposes of rendering his proposed opinions. He has never before in his professional career attempted to assess the fate of organic chemicals in an underground setting, has had no formal training in this realm of science, has done no research in this area, and has published nothing in this area. Furthermore, he admitted that he has never before studied the fate of TCE. He attempted to derive so-called "half-lives" from the scientific literature, but admitted that he was not familiar with all of the literature and stated that he hoped to be able to read everything in the next "five to ten years." As liberal as the undersigned wishes to be in allowing a purported expert to qualify as an expert with the meaning of Rule 702, Dr. Spencer falls far short of the mark.

**\*80** Finally, Dr. Spencer's opinions must be excluded because they are completely dependent on Mr. Moore's opinions concerning when chemicals from the plant first arrived at plaintiffs' wells. That is, before Dr. Spencer's testimony can be meaningful, even with all of its other failings, he must *assume* that the chemicals were present in plaintiffs' wells in 1970. Since the undersigned has

concluded that Mr. Moore's testimony concerning that issue should be excluded, Dr. Spencer's testimony would have no foundation.

In summary, the undersigned concludes that Dr. Spencer's proposed opinions are speculative, find no support in the scientific literature, are not based upon a reliable, demonstrated methodology, are not reasonably based upon facts, and would not be of assistance to the trier of fact. His opinions should, therefore, be excluded under Rules 702 and 703. In addition, the undersigned finds that the probative value of Dr. Spencer's opinions, if any, would be greatly outweighed by the likelihood of substantial undue prejudice to Litton and should, therefore, also be excluded under Rule 403. In the absence of the testimony of Mr. Moore and Dr. Spencer, plaintiffs cannot meet elements (2) and (3) of the five elements set forth above, *i.e.,* the exposure aspects of their personal injury claims.

### VI. *Analysis of Motion on Causation*

The exclusion of Mr. Moore's and Dr. Spencer's testimony requires the court to exclude as well the testimony of plaintiffs' experts on medical causation. As set forth in paragraph 26 of the Joint Affidavit submitted by plaintiffs, their medical causation experts are not prepared to render causation opinions in this case in the absence of Dr. Spencer's back-calculations. Instead, before any opinions could even be considered, these experts assert that they would need to conduct "another review of the information" and perhaps come forward with additional opinions.[FN20]

As set forth above, the undersigned has granted plaintiffs numerous extensions of time. Litton has already been required to go through two cycles of reviewing plaintiffs' expert nominations, preparing to respond to such nominations, and conducting lengthy and expensive depositions. The suggestion by plaintiffs that their experts be given yet *another* chance to reformulate opinions would require Litton to go through a third cycle. All litigation must come to an end. Plaintiffs were clearly and repeatedly instructed that final expert opinions were to be submitted and that no further extensions

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 65

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

would be allowed. Since plaintiffs' medical causation experts cannot present evidence of causation to a reasonable degree of medical certainty at this time without Dr. Spencer's back-calculations, and such back-calculations should be excluded, the testimony of plaintiffs' medical causation experts fails as well.

In any event, Litton's Motion on Causation requires dismissal of plaintiffs' personal injury claims even if Mr. Moore's and Dr. Spencer's evidence were admitted.[FN21] First, many of the plaintiffs have not demonstrated that there is anything physically wrong with them, *i.e.,* they cannot demonstrate the " injury" element of their claims. In this regard, the six minor plaintiffs have been examined by Dr. Harold Schutte, a Board-certified pediatrician and independent medical examiner. Dr. Schutte has concluded, with respect to each, that he or she is in good or excellent health and is normal in every way. *See* Findings of Fact at paras. 117-118. Plaintiffs have offered no expert testimony to refute these findings. *See* Findings of Fact at para. 119. Accordingly, the personal injury claims of the minor plaintiffs must be dismissed.

**\*81** Similarly, two adult plaintiffs, Sandra Hancock (who has moved the court for an order of dismissal) and Melanie Messer, have been unable to present any expert testimony on medical causation that even purports to find, to a reasonable degree of medical certainty, that any of their alleged health complaints were caused by exposure to the chemicals at issue. *See* Findings of Fact at para. 120. Accordingly, their personal injury claims must also be dismissed.

Two plaintiffs, James Kenny Green and Marvin Garrett, admitted in their depositions that they were not alleging that they had suffered any personal injury as a result of their alleged exposures to the chemicals at issue. *See* Findings of Fact at paras. 121-122. Accordingly, their personal injury claims must also be dismissed.

With respect to the remaining plaintiffs, the undersigned has carefully reviewed the proposed opinions, and bases for those opinions, offered by Drs. Broughton, Feldman, and Rodgers. Based upon its review, the undersigned concludes that the

proposed opinions are either (1) insufficient to establish a genuine issue of fact, (2) inadmissible, or (3) both. Accordingly, they are inadequate to establish a *prima facie* case sufficient to withstand summary judgment. Before discussing these witnesses and their proposed testimony with more particularity, the undersigned reviews in more detail some of the fundamental principles that govern its analysis.

A. *Requirements for Establishing Medical Causation*

Under North Carolina law, a plaintiff bears the burden of proving that a defendant actually caused his or her injuries. *Starnes v. Taylor,* 272 N.C. 386, 391, 158 S.E.2d 339, 343 (1968); *Azzolino v. Dingfelder,* 71 N.C.App. 289, 298, 322 S.E.2d 567, 575 (1984), *aff'd in part and rev'd in part on other grounds,* 313 N.C. 327, 327 S.E.2d 887 (1985), *cert. denied,* 479 U.S. 835 (1986); *Lindsey v. Clinic for Women, P.A.,* 40 N.C.App. 456, 462, 253 S.E.2d 304, 308 (1979).

Plaintiffs must show by a preponderance of the evidence that, but for their alleged exposures, they would not have developed their specific illnesses or complaints. *See In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. at 1261-63; *In re Swine Flu Immunization Products Liab. Litigation,* 508 F.Supp. 897, 906 (D.Colo.1981), *aff'd sub nom. Lima v. United States,* 708 F.2d 502 (10th Cir.1983).

It is not enough for plaintiffs to show that exposure to the chemicals at issue has a potential for causing harm. *Richardson v. Richardson-Merrell, Inc.,* 857 F.2d 823, 828 (D.C.Cir.1988); *Sterling v. Velsicol Chemical Corp.,* 855 F.2d 1188, 1199-201 (6th Cir.1988); *In re "Agent Orange" Product Liability Litigation,* 818 F.2d 145, 164-65 (2d Cir.1987); *In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. at 1231-34. For that reason, mere exposure to a potentially toxic substance does not constitute a "physical injury" upon which a claim can be based.[FN22] Rather, each individual plaintiff has the burden of establishing that he has, in fact, suffered a physical injury or illness *as a result of*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 66

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

*exposure to the chemicals at issue. See, e.g., Novak v. United States,* 865 F.2d 718, 721 (6th Cir.1989); *see also Fitzgerald v. Manning,* 679 F.2d 341, 346, 348 (4th Cir.1982) (court must direct verdict for defendant when probabilities are evenly balanced).

**\*82** Not only must plaintiffs produce expert testimony on the issue of medical causation, such testimony must establish, to a reasonable degree of medical certainty, that the alleged injuries stem from the exposures in question. *Owens v. Bourns, Inc.,* 766 F.2d 145, 149-50 (4th Cir.), *cert. denied,* 474 U.S. 1038 (1985); *Fitzgerald v. Manning,* 679 F.2d at 350; *see also Ralston Purina Co. v. Edmunds,* 241 F.2d 164, 168 (4th Cir.), *cert. denied,* 353 U.S. 974 (1957) ("the jury may not be permitted to guess between competing possibilities").[FN23] In this regard, part of plaintiffs' burden is to exclude, to a reasonable degree of medical certainty, other possible causes for their symptoms. *In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. at 1250 ("[c]entral to the inadequacy of plaintiffs' case is their inability to exclude other possible causes of plaintiffs' illnesses"); *see Viterbo v. Dow Chemical Co.,* 826 F.2d 420, 424 (5th Cir.1987), *affirming* 646 F.Supp. 1420, 1424 (E.D.Tex.1986); *Rohrbough v. Wyeth Laboratories, Inc.,* 719 F.Supp. 470, 475-76 (N.D.W.Va.1989).

Finally, a causation opinion should not be admitted unless it is based upon valid human, epidemiological data. *Brock v. Merrell Dow Pharmaceuticals, Inc.,* 874 F.2d 307, *as modified,* 884 F.2d 166 (5th Cir.1989), *cert. denied,* --- U.S. ----, 4 Tox.L.Rep. 1178 (March 19, 1990); *Richardson v. Richardson-Merrell, Inc.,* 857 F.2d 823, 830-32 (D.C.Cir.1988); *Viterbo v. Dow Chemical Co.,* 826 F.2d at 424; *In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. at 1241.[FN24] With these principles in mind, the undersigned turns to the specific evidence offered by plaintiffs.

### B. The Testimony Offered by Dr. Broughton

Dr. Alan Broughton would testify, if allowed, that

plaintiffs exhibit various alleged abnormalities in their immune systems, *i.e.,* alleged increased levels of certain T-lymphocytes and autoantibodies. Dr. Broughton, however, has admitted that none of the plaintiffs has any immunological disease or injury. Broughton Aff. at para. 17. He has also admitted that he cannot testify that any of the plaintiffs will likely develop such a disease in the future. *Id.* at 13. Indeed, in deposition testimony, he admitted that the medical community would not regard his laboratory findings as evidence of the existence of any illness. Broughton Dep. at 2-416-17, 3-232, 3-234.

In short, it is clear that Dr. Broughton cannot provide testimony that any of these plaintiffs has an illness or injury, let alone an illness or injury caused by their alleged exposure to chemicals. At most, his testimony suggests the existence of certain subclinical effects of the alleged exposure. Plaintiffs have failed to satisfy the undersigned, however, that alleged subclinical effects can constitute an "injury" under North Carolina law.[FN25] Accordingly, his testimony would be inadmissible under Federal Rules of Evidence 401 -02, because it is not relevant, and under Rule 403, because any probative value would be greatly outweighed by the likelihood of jury confusion, *i.e.,* between "injury" as Dr. Broughton proposes to use the term and what constitutes a cognizable injury under the law.

**\*83** In addition, Dr. Broughton's testimony would be inadmissible for other reasons. He admitted at his deposition that the alleged subclinical effects can arise from a host of other causes in addition to exposure to the chemicals at issue. He was unable to rule out those other causes, such as prescription medications, viruses, arthritis, exposure to chemicals not related to Litton, and so on. Accordingly, he has effectively admitted that there is no reasonable basis for his belief that the alleged effects he found in plaintiffs stemmed from their alleged exposure. *See* Findings of Fact at paras. 127-142. Thus, his testimony is too speculative and would not be of "assistance to the trier of fact" as required by Rule 702.

Furthermore, Dr. Broughton's hypothesis that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

plaintiffs' levels of lymphocytes and autoantibodies is high is based upon a comparison with a control group that Dr. Broughton admitted in his affidavit were *not* age-matched (Broughton Aff. at paras. 5, 8(2)), *not* matched geographically (*id.* at para. 8(1)(b)), *not* matched on the basis of origin of patients (*id.* ), and *not* matched on the basis of symptomatology (*id.* at para. 8(3)). Any testimony to the effect that plaintiffs have "high" levels of these parameters would, therefore, constitute speculation without an adequate factual basis, as proscribed by Rules 702 and 703. In addition, the probative value, if any, of such testimony would be greatly outweighed by the likelihood of undue prejudice under Rule 403. Accordingly, Dr. Broughton's proposed testimony is inadequate to create a material issue of fact sufficient to defeat summary judgment.

### C. *The Testimony Offered by Dr. Feldman*

Dr. Feldman, plaintiffs' proffered expert in neurology, purports to offer opinions "to a reasonable degree of medical certainty" that some of the plaintiffs suffer from a variety of neurological complaints caused by their alleged exposure to TCE. Examination of the bases for these opinions demonstrates, however, that the requirements for admissibility pursuant to Federal Rules of Evidence 702 and 703 cannot be met as to his testimony.

Most importantly, Dr. Feldman's opinions directly violate the prerequisites that he himself set for expression of medical causation opinions. On January 30, 1990, plaintiffs' deadline for providing final expert opinions, Dr. Feldman issued separate "opinion" letters for each of 12 plaintiffs: James Carroll, Sr., Martha Carroll, James Carroll, Jr., Belinda Gaddis, Randy Gaddis, Rosetta Edwina Rogers, Keith Scott Gentle, Barbara Messer, Ancy Simonds, James Messer, Deborah Chambers, and Fred Allen Chambers. The "opinion" letters failed to include any final opinion, to a reasonable degree of medical certainty, that plaintiffs' alleged neurological complaints were, in fact, caused by exposure to TCE. Instead, the letters noted that any such opinions would be conditional on the following:

subsequent receipt of confirmatory positive blink reflex data from a reliable electrophysiologist[;]

**\*84** subsequent receipt of evidence of neuropsychological impairment obtained by a qualified neuropsychologist[;]

reliability of self-reporting on neurological questionnaires[; and]

ability to rule out other possible causes for plaintiffs' complaints.

Litton has demonstrated, and plaintiffs have not refuted, that the conditions have not been met. *See* Findings of Fact at paras. 152-154, 161.

For example, Dr. Feldman views abnormal performance on the blink reflex test as the cardinal indicator of TCE's alleged adverse effects on human beings, and it was upon his advice that plaintiffs were given the test initially. When Dr. Bergia administered the test and generally found that plaintiffs were normal, Dr. Feldman criticized her techniques and called for a second round of tests, this time by one of his colleagues, Dr. Niles. Plaintiffs' counsel informed the undersigned that Dr. Bergia had "botched" the blink reflex tests and that Dr. Feldman could not rely upon them. *See* Findings of Fact at paras. 37-39, 159-160. Partially on the basis of these representations, the undersigned allowed plaintiffs what amounted to a five-month continuance in this case.

The second round of blink reflex tests indisputably confirmed that plaintiffs were completely normal. Rather than reformulate his opinions, however, Dr. Feldman chose to rely on these normal results as evidence of disease. He states in his affidavit that "[v]alues that lie within the range of normal do not assure that the individual is disease-free" (Feldman Aff. at para. 20) and that "some individuals with the [unspecified] disease will have values that lie within normal limits" (*id.*). Dr. Feldman thus proposes to ignore completely the prior condition he set for his own opinions and his own objective test results.

Similarly, Dr. Feldman assumed as a fundamental basis of his opinions that abnormal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 68

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

neuropsychological data would be obtained for a number of plaintiffs. Again, when subsequent testing either contradicted his conclusions or was not conducted at all, Dr. Feldman simply chose to ignore the very conditions he had placed on his own opinions. Likewise, he has ignored other conditions that he put on his opinions: the reliability of plaintiffs' answers to certain " neurological questionnaires" and his ability to rule out other possible causes of plaintiffs' ailments. Litton has demonstrated, without any serious attempt at refutation by plaintiffs, that the answers to the questionnaires are not reliable (*see* Findings of Fact at paras. 175-181) and that Dr. Feldman has not ruled out a myriad of other potential causes of plaintiffs' alleged symptoms (*see* Findings of Fact at paras. 182-183). Differential diagnosis is, however, essential to provision of expert medical testimony on causation, as plaintiffs' experts have themselves admitted.

Plaintiffs have failed to respond coherently to these deficiencies in Dr. Feldman's proposed testimony. Indeed, many of the issues raised by Litton have been completely ignored by plaintiffs.[FN26] Since Dr. Feldman's proposed testimony contradicts the conditions he set out previously for expressing opinions on causation to a reasonable degree of medical certainty, it is clear that such testimony is speculative, without foundation in the facts of the case, and of no "assistance to the trier of fact" within the meaning of Rules 702 and 703. In addition, the probative value of such testimony, if admitted, would be greatly outweighed by the likelihood of confusion of the jury and thus should be excluded pursuant to Rule 403.

### D. *The Testimony Offered by Dr. Rodgers*

**\*85** Most of the symptoms addressed by Dr. Rodgers, as were those addressed by Dr. Feldman, are vague, subjective neurological complaints such as headaches, forgetfulness, and anxiety. Dr. Rodgers purports to express opinions that a number of these complaints were "probably" caused by plaintiffs' alleged exposure to TCE. His opinions, however, fail in a variety of ways to meet the requirements of the Federal Rules of Evidence.

First, Dr. Rodgers conceded that, if he were to submit a report containing his conclusions on causation to a respected medical journal for publication, the journal would reject the report because Dr. Rodgers' opinions were not based upon "objective scientific factual proof." Rodgers Dep. at 2-11. Second, Dr. Rodgers (as did Dr. Feldman) based his opinions upon "results" in studies that were either uncontrolled or not shown to be statistically significant by the very scientists conducting those studies. Indeed, Dr. Rodgers admitted that there were no studies that were " appropriate" to the circumstances in this case. Nevertheless, he insisted on relying upon such studies because of a desire to be "fair" to plaintiffs. [FN27] Third, although Dr. Rodgers opined that some of plaintiffs' subjective symptoms were caused by exposure to the chemicals, he admittedly failed, as did Dr. Feldman, to rule out many of the other possible causes of those symptoms. *See* Findings of Fact at paras. 188, 191-192, 196-202.

In opposition to Litton's Motion on Causation, Dr. Rodgers submitted an affidavit in which he purported to outline the process he utilized for designating various alleged symptoms as "probably" related to TCE. At best, the affidavit can be said to be conclusory. It made no effort to address the most important issues raised by Litton. Significantly, Dr. Rodgers failed in his affidavit to address his admission that his opinions in this case would not be worthy of publication in a reputable medical journal because they lack "objective scientific factual proof." Rodgers Dep. at 2-10-11. His admission provides an excellent reason for this court to reject the evidence as well.[FN28]

In addition, Dr. Rodgers failed to address his admission that the studies upon which he relied were subject to numerous weaknesses and could not be taken as any support for his opinions. *See* Findings of Fact at para. 192. Dr. Rodgers merely ignored these arguments and continued to rely on the same articles. *See* Rodgers Aff. at para. 4 (reviewing unspecified medical literature to support opinions).

Finally, Litton demonstrated in its Motion for Causation that Dr. Rodgers, in formulating his

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                              Page 69

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

opinions in this case, ignored the basic principles of epidemiology. Thus, he could not say whether the incidence of the alleged ailments in the plaintiffs exceeded what would be expected from a group of unexposed individuals; could not say whether the alleged causal relationships made any biological sense; and could not cite to any valid epidemiological study showing that TCE, at the levels alleged in this case, causes any of the alleged complaints. *Id.* In his affidavit, Dr. Rodgers again disregarded these points.[FN29]

**\*86** The undersigned concludes that plaintiffs have not demonstrated a legally sufficient foundation for Dr. Rodgers' testimony under Rules 702 and 703 of the Federal Rules of Evidence.[FN30]

### E. *The Opinions Set Forth in the Joint Affidavit*

The Joint Affidavit submitted by plaintiffs similarly does not provide adequate support for the admissibility of the testimony of Drs. Broughton, Feldman, and Rodgers. First, although the Joint Affidavit cites a number of studies that purportedly support the views of plaintiffs' experts, review of those studies demonstrates that they do not. Paragraph 13 of the Joint Affidavit specifically cited six items. (Copies of these studies were provided to the undersigned, not by plaintiffs or their experts, but by Litton.) For example, in Logue, J. et al. (miscited by plaintiffs as "Logi"), the authors concluded that:

comparisons of the exposed and control group *failed to demonstrate any significant findings* [and that] ... the data appear to indicate that there were *no observable long-term health effects which could be ascribed to long-term, low-level exposure to TCE* or other volatile organic compounds.... In summary, the present study does not reveal an excess prevalence of any serious chronic health condition among individuals who were exposed to volatile organic compounds.

Logue, J. et al. at 158-60 (emphasis added). Thus, plaintiffs' experts cited this court to a *negative* study as alleged support for their opinions.[FN31]

As stated above, a prerequisite for submission of an opinion on medical causation is performance of a differential diagnosis in which other potential causes of an alleged complaint are ruled out. Plaintiffs have not taken issue with this requirement. Instead, they purport to comply with it. Again, however, plaintiffs' experts have provided the court with only the blanket assertion that the requirement has been met, without a glimmering of specific reasons for their decisions.

The alleged symptoms upon which the experts attempt to offer positive causation opinions are almost entirely vague, subjective, unverifiable complaints such as headaches, anxiety, arm and leg pains, and fatigue. These are symptoms with thousands of causes in daily life, none of which can be ruled out by plaintiffs' experts. Their assertion that differential diagnoses were performed and alternative explanations ruled out is contrary to the admissions that these experts made in their depositions.

For example, Dr. Rodgers admitted that most of the plaintiffs' vague neurological complaints could have been caused by anxiety, somatizing disorders, or emotional stress, all of which he regarded as " alternative diagnos[e]s." Causation Mem. at 50. Yet, most of the symptoms he now says are " probably" related to TCE are these very same subjective, unverifiable complaints: headaches, tingling, anxiety, numbness, fatigue, dizziness, lightheadedness, moodiness, forgetfulness, and facial neuralgia. Thus, the purported differential diagnoses performed by plaintiffs' experts cannot stand as valid support for their proposed opinions. They continue to assert that TCE has caused plaintiffs' complaints even when they admit that there are numerous reasonable "alternative diagnoses." Such testimony does not pass muster under Rules 702 and 703. *See In re "Agent Orange " Product Liability Litigation,* 611 F.Supp. at 1250, 1261-63 (expert causation testimony rejected because of failure to rule out other causes of plaintiffs' ailments).

### F. *Conclusions Concerning Motion on Causation*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                            Page 70

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

**\*87** Ten plaintiffs have not established any evidence of injury or have disavowed that they are seeking recovery for alleged personal injury. Their personal injury claims should, therefore, be dismissed.

With respect to all of the plaintiffs, the proposed testimony of Drs. Broughton, Feldman, and Rodgers is not admissible under Federal Rules of Evidence 702, 703, and 403. Accordingly, plaintiffs cannot show medical causation to a reasonable degree of medical certainty. This failure to establish a *prima facie* case on a key element of their personal injury claims requires that these claims be dismissed.[FN32]

Finally, even if admissible, Dr. Broughton's proposed testimony concerning alleged subclinical injury does not create any genuine issues of material fact sufficient to defeat Litton's motion for summary judgment.

VI. *Conclusions Concerning Remaining Tort Claims*

A. *Claims Based Upon Alleged Increase Risk of Disease*

Plaintiffs seek to recover damages based on their alleged increased risk of contracting disease in the future. In conjunction with this argument, they seek to recover compensation for additional medical monitoring they claim is necessary as a result of their alleged exposures. As set forth below, these claims should be dismissed because the State of North Carolina has not recognized them as valid tort claims. In addition, the undersigned's conclusions concerning lack of admissible evidence of medical causation requires dismissal of these aspects of plaintiffs' claims.

No statute or case in North Carolina creates causes of action based upon claims of increased risk of disease or for medical monitoring costs. Other courts faced with these types of claims have rejected them. *See, e.g., Eagle-Picher Indus., Inc. v. Cox,* 481 So.2d 517, 520 (Fla.App.1985). The creation of such causes of action implicates policy

issues that should be left to the legislature in the first instance. Since there is no basis in North Carolina law to support the type of action that plaintiffs pursue, the undersigned will recommend denial of those claims. *See* Findings of Fact at paras. 221-225 and Conclusions of Law at paras. E.1-E.7.

In addition, in jurisdictions in which such claims are recognized, the courts have held that they cannot be maintained in the absence of physical injury caused by exposure to the chemicals at issue. As shown above, plaintiffs' evidence does not create a jury question on either injury-in-fact or medical causation. Accordingly, for this independently sufficient reason, the "increased risk" and "medical monitoring" aspects of their claims must be rejected. *See, e.g., Mink v. University of Chicago,* 460 F.Supp. 713, 719 (N.D.Ill.1978) ("[t]he mere fact of risk without any accompanying physical injury is insufficient to state a claim ..."); *Catasauqua Area School District v. Eagle-Picher Indus., Inc.,* No. Civ. Action No. 85-3743 (E.D.Pa., Sep. 23, 1988) (1988 WL 102689, LEXIS, Genfed library, Dist. file) (Attachment 47); Risk Mem. at 5-6, 16-18.

**\*88** Finally, plaintiffs' claims for alleged increased risk and for costs of medical monitoring fail because plaintiffs cannot show that they are " reasonably certain" to contract any illness in the future. *See, e.g., Short v. Chapman,* 261 N.C. 674, 682, 136 S.E.2d 40 (1964) (evidence must show future injuries with "reasonable certainty" and must be more than "purely speculative or conjectural"); *Callicutt v. Hawkins,* 11 N.C.App. 546, 181 S.E.2d 725 (1971) (same). None of plaintiffs' experts has even offered any such opinion. The only plaintiffs' expert who has attempted to quantify plaintiffs' alleged risk, Dr. Rodgers, believes that, in the worst exposure scenario (*i.e.,* accepting Dr. Spencer's highest alleged concentration of TCE) the plaintiff most at risk has no more than a four in one-thousand increased chance of contracting cancer as a result of her alleged exposure.[FN33] Far from the "reasonable certainty" needed to establish a claim for increased risk of disease, these figures demonstrate that plaintiffs' alleged increased risk, at worst, is *de minimis,* particularly when compared

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                         Page 71

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

with the normal background risk of cancer (one in four). Plaintiffs are, therefore, unable to meet their burden under *Celotex*.

### B. *Claims Based Upon Alleged Emotional Distress*

Similarly, the undersigned's conclusions concerning Litton's Motion to Exclude, Motion on Causation, and Motion on Increased Risk require that plaintiffs' claims for damages as a result of alleged emotional distress be dismissed. These claims, as did the others, depend on the back calculations of Dr. Spencer, and exclusion of Dr. Spencer's testimony is equally damaging to the emotional distress claims. Moreover, plaintiffs make an inadequate showing on the prerequisites for maintaining such claims to survive summary judgment.

In so deciding, the undersigned has taken into account the recent decision of the North Carolina Supreme Court in *Johnson v. Ruark Obstetrics and Gynecology Associates, P.A.,* No. 177PA88-Wake (N.C. August 28, 1990), which addressed the showing required to recover on a claim for negligent infliction of emotional distress under North Carolina law. Prior to the *Johnson* decision, the law in North Carolina, as in most other jurisdictions, required that a plaintiff seeking to recover for negligent infliction of emotional distress establish, *inter alia,* both a physical injury caused by defendants which accompanied the distress, *see, e.g., Campbell v. Pitt County Memorial Hosp., Inc.,* 84 N.C.App. 314, 352 S.E.2d 902, 909, *aff'd,* 321 N.C. 260, 362 S.E.2d 273 (1987); and some subsequent physical manifestation of the emotional distress, *see e.g., Woodell v. Pinehurst Surgical Clinic, P.A.,* 78 N.C.App. 230, 336 S.E.2d 716, 718 (1985), *aff'd,* 316 N.C. 550, 342 S.E.2d 523 (1986). FN34

In *Johnson,* the North Carolina Supreme Court overruled that line of cases, at least in part, and held that, in at least some circumstances, proof of physical injury and subsequent physical manifestation would not be required to recover for negligent infliction of emotional distress. *Johnson,* slip op. at 23-24. Although the undersigned has reservations about the appropriateness and

applicability of the *Johnson* decision, which involved a claim for parental distress resulting from the stillbirth of a child, to the circumstances of this case, it has assumed for the purposes of these recommendations that the *Johnson* standards govern plaintiffs' emotional distress claims herein. Nevertheless, plaintiffs still cannot meet their burden under *Celotex* for at least two reasons.

**\*89** First, although the *Johnson* court liberalized the availability of emotional distress claims, it emphasized the importance of one substantial limitation on such claims. Specifically, *Johnson* emphasized that to recover for emotional distress a plaintiff must prove that he or she suffered "severe emotional distress" as a foreseeable result of the defendant's negligent conduct. *Johnson,* slip op. at 28. This court defined as a "type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." *Id.* As detailed in the accompanying Recommended Findings of Fact and in the conclusions of law, *infra,* plaintiffs have not made, and apparently cannot make, the requisite showing under *Celotex* on this element of their emotional distress claims. *See* Findings of Fact at paras. 227-228, 230; Conclusions of Law at paras. F3-F7. Dismissal is warranted for that reason alone.

Second, however, where the claimed emotional distress is, as it is in this case, the fear of future disease (primarily cancer), the law requires that plaintiffs prove as well that such fear is objectively reasonable. Irrational beliefs cannot form the basis for recovery for fear of disease. *See, e.g., Broussard v. Olin Corp.,* No. 88-392 546 So.2d 1301 (3d Cir. 1989). Plaintiffs have not met their burden of producing sufficient admissible evidence that any fears they experience (even if they could be said to rise to the level of a serious diagnosable illness) are objectively reasonable. To the contrary, any fears they may have in this case appear to be based upon erroneous beliefs about the supposed dangers arising from their alleged exposures. Plaintiffs' experts cannot say that plaintiffs are likely to contract, or even face a significant chance of contracting, future illness as a result of their alleged exposures, even at the inflated

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 72

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

levels calculated by Dr. Spencer and certainly not at the levels actually measured in their wells. FN35 Because plaintiffs cannot show that their alleged fears are objectively reasonable, such fears cannot support any recovery.

In conclusion, as a result of their inability to adduce sufficient admissible evidence concerning their alleged doses of TCE, medical causation, and alleged increased risk of disease, plaintiffs have also failed to meet the burden established by Rule 56 and *Celotex* with respect to their claims based upon alleged emotional distress. Accordingly, those claims should be dismissed as well.

### C. *Claims Based Upon Alleged Nuisance and Trespass*

The undersigned's resolution of plaintiffs' other claims requires dismissal of their claims in trespass and nuisance as well. First, an essential element of an action in trespass is a possessory interest in real property. *See State ex rel. Rhodes v. Simpson,* 325 N.C. 514, 385 S.E.2d 329, 332 (N.C.1989); *Kent v. Humphries,* 303 N.C. 675, 281 S.E.2d 43, 45 (N.C.1981). *See* Conclusions of Law at para. G.1. Most of the remaining plaintiffs admittedly have no such interest.

**\*90** Second, and more importantly, North Carolina does not recognize torts of trespass or nuisance based upon trivial invasions of property. *See, e.g., Twitty v. State,* 85 N.C.App. 42, 354 S.E.2d 296, 302, *review denied,* 320 N.C. 177, 358 S.E.2d 69 (1987). *See* Conclusions of Law at paras. G.4-G.7. In this regard, North Carolina's law is consistent with the well-reasoned views of courts in other jurisdictions. *See, e.g., Bradley v. American Smelting & Refining Co.,* 635 F. 1154, 1156 (W.D.Wash.1986); *Good Fund, Ltd.-1972 v. Church,* 540 F.Supp. 519, 533 (D.Colo.1982), *rev'd,* 703 F.2d 464 (10th Cir.1983). *See* Conclusions of Law at paras. G.8-G.9. As the court in *Bradley* aptly held:

While at common law any trespass entitled a landowner to recover nominal or punitive damages for invasion of his property, such a rule is not

appropriate under the circumstances before us. No useful purpose would be served by sanctioning actions in trespass by every landowner within a hundred miles of a manufacturing plant. Manufacturers would be harassed and the litigious few would cause the escalation of costs to the detriment of many.... [T]he plaintiff who cannot show that actual and substantial damages have been suffered should be subject to dismissal of his cause upon a motion for summary judgment.

*Bradley v. American Smelting & Refining Co.,* 635 F.Supp. at 1156. Because plaintiffs have failed, for the reasons set forth above, to offer sufficient admissible evidence to resist summary judgment on their claims of exposure, injury, and causation (including the satellite claims of emotional distress and increased risk), they have done no more than make out a claim for a trivial, *de minimis* encroachment of their interest. This is an inadequate basis, as a matter of law, for their claims for trespass and nuisance.

Moreover, application of these principles to this case well illustrates their wisdom. As unrebutted studies of the United States Environmental Protection Agency submitted by Litton document, the chemicals found in plaintiffs' wells are not unique to Litton.FN36 Rather, they are ubiquitous in the environment, occurring in the air, in foodstuffs and in household products in concentrations as great and even greater than those in which they have been measured in plaintiffs' wells. For example, the Health Advisories put out by the United States Environmental Protection Agency's Office of Drinking Water report the following:

*Trichloroethylene*-Production of TCE was 200 million lbs in 1982.... [T]he majority of all TCE production is released to the environment(4)27 Because metal working operations are performed nationwide, TCE releases occur in all industrialized areas.... Because of the large and dispersed releases, TCE occurs widely in the environment. Trichloroethylene is ubiquitous in the air with levels in the ppt to ppb range.... Trichloroethylene has been reported to occur in some foods in the ppm range.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 73

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

**\*91** Health Advisory for TCE (at 3). This report offers similar observations concerning the other chemicals in issue in this case. Common daily exposures to these compounds are thus comparable to exposures that plaintiffs incurred in this case. *See* Findings of Fact at paras. 237-39.

As the technology for detecting microscopic particles has advanced to the level of parts per billion-indeed, parts per trillion or parts per quadrillion-it is possible to demonstrate that human activities of all kinds have objective, measurable impacts on nearby individuals. Yet, the law cannot sanction all such impacts; rather, its reach must be limited to instances where real, substantial harm is alleged and shown. As the North Carolina Supreme Court noted in a case cited by plaintiffs:

[The law] does not recognize every business or use of property as a nuisance that imparts a degree of impurity to the air, for if such were the case, farms could not be built, nor life in compact communities tolerated and even the ordinary uses of property would be seriously interfered with.... The law only deals with real, substantial injuries ... and will not lend its aid ... simply because his neighbor is annoyed, or even damaged thereby, unless the use complained of is both in violation of that neighbor's right and unreasonable.... [W]hen the matters complained of are such as are common and usual, and no unreasonable and unnecessary injuries are inflicted, the law does not interfere.

*Holton v. North Western Oil Co.,* 201 N.C. 744, 161 S.E. 391, 393 (N.C.1931).

Given the lack of sufficient admissible evidence on exposure, injury, and causation, the concentration of chemicals found in plaintiffs' wells cannot be distinguished from zero for all practical purposes. In these circumstances, where there has been, at worst, a *de minimis* encroachment on plaintiffs' property, and where the same chemicals are ubiquitous in the environment at comparable concentrations, plaintiffs' claims for nuisance and trespass must also fail. Accordingly, their action for alleged property damages should be dismissed. *See* Conclusions of Law at paras. G.1-G.12.

VII. *Analysis of Regulatory Claims*

Plaintiffs' claims under CERCLA and their citizen suit under RCRA must be considered in the context in which they were brought, *i.e.,* as adjuncts to what is essentially a private tort action. In this regard, the CERCLA and RCRA claims must be considered in light of plaintiffs' failure to adduce admissible evidence of any particular exposure to hazardous substances or hazardous wastes, their failure to demonstrate a *prima facie* case of medical causation or to demonstrate any cognizable risk of increased risk of disease in the future, their failure to demonstrate a *prima facie* case for entitlement to damages for alleged emotional distress, and their failure to demonstrate more than a *de minimis* interference with their alleged property interests, such that their claims sounding in trespass and nuisance must be dismissed. As this Memorandum and Recommendation demonstrates, plaintiffs filed the instant action without adequate investigation, misrepresented the status of this case to the undersigned, and, ultimately have failed to present sufficient evidence to allow any of their common law claims to proceed. Although plaintiffs' CERCLA and RCRA claims must be addressed on their own merits, if any, the court must assure that CERCLA and RCRA are not misemployed to provide plaintiffs what they clearly are not entitled to under the other claims they have presented.

A. *Conclusions on CERCLA*

**\*92** Plaintiffs attempt to use CERCLA as a surrogate for their common law tort suit. This contradicts the legislative history of CERCLA, the statutory language, and a wealth of case law written since CERCLA's inception. As the court held in *Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. 1269, 1299-300 (D.Del.1987), *aff'd,* 851 F.2d 643 (3d Cir.1988),

Congress did not intend for CERCLA, a narrowly drawn federal remedy, to make injured parties whole or to be a general vehicle for toxic tort actions.

Rather, the section allows only for recovery of "

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                         Page 74

Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

response costs" actually incurred in cleaning up a hazardous waste site. *Adams v. Republic Steel Corp.,* 621 F.Supp. 370, 376 (W.D.Tenn.1985). *See* Conclusions of Law at para. H.4.

The claims here clearly fall outside the scope of " response costs" that can be recovered in a CERCLA cost recovery action. Thus, plaintiffs' claims for alleged costs of medical testing and surveillance, property damage and other economic costs, and attorneys' fees are not cognizable under CERCLA. *See* Conclusions of Law at paras. H.12-H.13, H.15-H.16. Similarly, plaintiffs cannot recover their alleged costs of sampling and analytical costs or their alleged costs of alternative water supplies because plaintiffs are not engaged in a cleanup of a site and, in any event, have failed to offer any affirmative evidence of compliance with the National Contingency Plan established pursuant to CERCLA. *See id.* at paras. H.13-H.14. On these issues, plaintiffs indisputably bear the burden of proof (*see id.* at para. H.6), and their failure to address such evidence is fatal under *Celotex.*

In addition, the undersigned has concluded that, as a result of its recommended decisions on the Motion to Exclude, Motion on Causation, and Motion on Increased Risk, plaintiffs cannot show that they are entitled to recover, as a factual matter, damages for medical monitoring. The same reasoning precludes any award of such damages under CERCLA, even if CERCLA were construed in some manner to allow for recovery of such damages, because plaintiffs are unable to show that any such monitoring is reasonably necessary or consistent with the NCP. *See* Conclusions of Law at para. H.2. In short, plaintiffs' CERCLA claims must be dismissed.

### B. Conclusions on RCRA

Plaintiffs have also attempted to assert a claim under the citizen suit provisions of Section 7002(a) of RCRA, 42, United States Code, Section 6972(a). Although plaintiffs have been extremely vague about what relief they hope to obtain under RCRA, it appears to the undersigned that they seek (1) for the court to impose some type of unspecified

injunction against Litton to remediate the alleged chemical migration and (2) imposition of civil penalties in the amount of $25,000 per day.

If the court had jurisdiction over the RCRA claim, it would clearly have no factual basis upon which to grant the first type of relief requested, *i.e.,* imposition of an injunction against Litton. As shown above, plaintiffs have failed to adduce sufficient evidence of anything more than a *de minimis* encroachment of chemicals upon their property. There is no admissible evidence that such alleged encroachment caused harm or could cause harm. Moreover, Litton is already conducting remedial actions under its consent order with the United States Environmental Protection Agency. *See* Findings of Fact at para. 108. Accordingly, even if there were jurisdiction, at least half of the RCRA claim would fail as a result of the failures in plaintiffs' case outlined above.

**\*93** In any event, however, plaintiffs' ability to maintain any action under RCRA depends upon their satisfaction of the jurisdictional prerequisites set forth in Section 7002(b) of RCRA, 42, United States Code, Section 6972(b). *See* Conclusions of Law at para. I.1. Plaintiffs have failed each of the three jurisdictional hurdles.

First, plaintiffs did not provide Litton with adequate prior notice of the RCRA suit. Among other reasons, the purported notice letter issued on October 21, 1988, failed to indicate the specific RCRA provisions that Litton allegedly violated or the dates of such violations. *See id.* at paras. I.2-I.5. Second, jurisdiction does not exist because Litton is already undertaking remedial activities at its plant, under the supervision of the United States Environmental Protection Agency, pursuant to a judicially enforceable RCRA consent order. *See McGregor v. Indus. Excess Landfill, Inc.,* 709 F.Supp. 1401, 1407 (N.D.Ohio 1987), *aff'd,* 856 F.2d 39 (6th Cir.1988); *O'Leary v. Moyer's Landfill, Inc.,* 677 F.Supp. 807, 819 (E.D.Pa.1988); Conclusions of Law at paras. I.6-I.9. Third, the RCRA suit is barred because plaintiffs have not alleged or demonstrated any continuing violation of the statute. Rather, they allege violations that took place, if at all, wholly in the past. The citizen suit

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.