Not Reported in F.Supp.                                                                                                   Page 75
Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

provisions therefore do not apply. *See* Conclusions of Law at paras. I.10-I-13.

Finally, even if there were otherwise jurisdiction, the undersigned believes the RCRA count should be dismissed under the primary jurisdiction doctrine. The technical issues involved with the cleanup of the Litton site are entirely within EPA's area of expertise. *See id.* at paras. I.14-I.15.

*Summary*

As shown above, and as supported in more detail in the undersigned's Findings of Fact, Part I, and Conclusions of Law, Part II, which are incorporated herein by reference, plaintiffs have failed to establish any admissible evidence on the critical issues already identified by this court: exposure, injury, and medical causation. Without such evidence, their claims for personal injury, increased risk, emotional distress, nuisance, and trespass fail.
In addition, plaintiffs have not met the requirements for pursuing actions under either CERCLA or RCRA. Accordingly, the time is now ripe for the court to dismiss this entire case with prejudice.

RECOMMENDATIONS

IT IS, THEREFORE, RESPECTFULLY RECOMMENDED, based on the findings of fact and conclusions of law entered simultaneously herewith and incorporated herein by reference, and for the reasons above stated, that:

A. Litton's Motion to Exclude be granted with respect to Mr. Moore's proposed testimony concerning when chemicals from the plant allegedly first arrived at plaintiffs' wells because such testimony would not be of "assistance to the trier of fact" and is not sufficiently grounded in fact to comport with the requirements of Federal Rules of Evidence 702-03 and, independently, because the undue prejudicial impact of such testimony would outweigh any probative value under Federal Rule of Evidence 403;

**\*94** B. Litton's Motion to Exclude be granted with respect to Dr. Spencer's proposed testimony concerning the level of chemicals allegedly present in plaintiffs' water prior to 1987, for each of the following, independently sufficient, reasons:

1. Dr. Spencer cannot be considered an expert with respect to the issues raised by his proposed testimony;

2. Dr. Spencer's purported methodology is not "demonstrably objective" within the meaning of the Fourth Circuit's decision in *United States v. Baller, supra;*

3. Dr. Spencer's opinions are too speculative to be of assistance to a jury pursuant to Federal Rule of Evidence 702;

4. Dr. Spencer's opinions are not adequately grounded in facts pursuant to Federal Rule of Evidence 703;

5. Dr. Spencer's opinions must be excluded because they rely upon Mr. Moore's excluded opinions concerning when chemicals from the plant first allegedly arrived at plaintiffs' wells; and

6. to the extent that Dr. Spencer's opinions would have any probative value, such value would be greatly outweighed by the risk of undue prejudicial effect pursuant to Federal Rule of Evidence 403;

C. Plaintiffs' personal injury claims be dismissed for the following, independently sufficient, reasons:

1. in light of the proposed exclusion of the testimony of Mr. Moore and Dr. Spencer, plaintiffs have not adduced sufficient admissible evidence of migration of chemicals to their wells and ingestion of chemicals;

2. in light of the proposed exclusion of the testimony of Mr. Moore and Dr. Spencer, plaintiffs' medical causation experts are unprepared and unable to provide evidence, to a reasonable degree of medical certainty, that any plaintiff's alleged ailment was caused by the alleged exposure to the chemicals at issue;

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  Page 76
Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

3. even if the noted testimony of Mr. Moore and Dr. Spencer were not excluded, plaintiffs are unable to adduce sufficient admissible testimony concerning medical causation;

4. the claims of Jennifer Simonds, Justin Gaddis, Derrick Gaddis, Jonathan Messer, and Chuck Hancock should be dismissed because of their failure to adduce any expert medical testimony concerning the existence of any physical injury;

5. the claims of Sandra Hancock and Melanie Messer should be dismissed because of their failure to adduce any expert medical testimony concerning medical causation; and

6. the claims of James "Kenny" Green and Marvin Garrett should be dismissed because they have disclaimed an intention of seeking any recovery for alleged physical injuries;

D. Plaintiffs' claims for alleged increased risk of disease be dismissed for the following, independently sufficient, reasons:

1. North Carolina law does not recognize such claims;

2. if such claims were recognized under North Carolina law, they could not be sustained in this case because of the lack of evidence that plaintiffs have suffered physical injury as a result of their alleged exposure to the chemicals at issue; and

3. if such claims were recognized under North Carolina law, they could not be sustained in this case because of the lack of evidence that plaintiffs are "reasonably certain" to contract any alleged disease in the future;

**\*95** E. Plaintiffs' claims for alleged costs of future medical monitoring be dismissed for the following, independently sufficient, reasons:

1. North Carolina law does not recognize such claims;

2. if such claims were recognized under North Carolina law, they could not be sustained in this case because of the lack of evidence that plaintiffs have suffered physical injury as a result of their alleged exposure to the chemicals at issue;

3. if such claims were recognized under North Carolina law, they could not be sustained in this case because of the lack of evidence that plaintiffs are "reasonably certain" to contract any alleged disease in the future as a result of their exposure to the chemicals at issue in this case; and

4. plaintiffs have not adduced sufficient evidence to create a genuine issue of material fact, sufficient to withstand summary judgment, that any additional medical monitoring is necessary or reasonable;

F. Plaintiffs' claims for emotional distress damages be dismissed for the following, independently sufficient, reasons:

1. plaintiffs cannot show that they suffer from a recognized, diagnosed severe and disabling emotional or mental disorder; and

2. plaintiffs cannot show that their alleged fears are objectively reasonable;

G. Plaintiffs' claims based on nuisance and trespass theories, and for alleged property damage, be dismissed for the following, independently sufficient, reasons:

1. plaintiffs cannot show that they suffered physical injury as a result of their alleged exposure to the chemicals at issue;

2. plaintiffs cannot show any cognizable risk of future injury as a result of their alleged exposure to the chemicals at issue;

3. plaintiffs cannot show that the alleged presence of the chemicals at issue on their property is anything more than *de minimis;* and

4. the trespass claims of James Carroll, Jr., Phyllis Ann Carroll, Rusty Chambers, Derrick Gaddis, Justin Gaddis, Keith S. Gentle, James Messer, Charles Hancock, Jr., Sandra Hancock, Jonathan Messer, Melanie Messer, Edwina Rogers, Ancy

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  Page 77
Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

Wimpey, and Jennifer (Simonds) Wimpey should be dismissed because they admittedly do not have any possessory interests in the properties in issue;

H. The CERCLA claims be dismissed for the following, independently sufficient, reasons:

1. plaintiffs' failure to present admissible evidence of the extent of their alleged exposure to the chemicals at issue, medical causation, and alleged increased risk of disease precludes any action they might have otherwise had under CERCLA for their alleged costs of medical monitoring costs and alternative water supplies;

2. medical monitoring costs, property damage costs, loss of income, and attorneys' fees are not cognizable in private recovery actions under Section 107 of CERCLA;

3. groundwater monitoring costs are not cognizable under CERCLA where, as here, plaintiffs have not attempted, and do not intend, to clean up hazardous substances; and

**\*96** 4. plaintiffs have offered no evidence of compliance with or consistency with the National Contingency Plan;

I. Plaintiffs' RCRA claims be dismissed for the following, independent sufficient, reasons:

1. the court lacks jurisdiction because plaintiffs failed to give sufficient prior notice of their RCRA claims;

2. the court lacks jurisdiction because Litton is remediating the plant pursuant to a Consent Order that is enforceable, at EPA's option, in federal court;

3. the court lacks jurisdiction, because plaintiffs have not sufficiently alleged, nor shown evidence of, any continuing RCRA violations; and

4. the court should decline jurisdiction under the doctrine of primary jurisdiction;

J. The motion of plaintiffs Sandra Hancock and Chuck Hancock for voluntary dismissal be denied,

for the reasons previously set forth by the undersigned upon plaintiffs' motions for voluntary dismissal and by the district court upon consideration of plaintiffs' objections to the undersigned's recommended denials of such motions; and

K. In order to serve the ends of justice, that the district court conduct an inquiry pursuant to Rule 11, Federal Rules of Civil Procedure.

The parties are hereby advised that, pursuant to 28, United States Code, Section 636(b)(1)(C), written objections to the memorandum and recommendations contained herein and the findings of fact and conclusions of law set forth in seperate documents entered simultaneously herewith and incorporated by reference, must be filed within ten (10) days of service of same. Failure to file such objections with the district court will preclude the parties from raising such objections on appeal. *Thomas v. Arn,* 474 U.S. 140 (1985), *reh'g denied,* 474 U.S. 1111 (1986); *United States v. Schronce,* 727 F.2d 91 (4th Cir.), *cert. denied,* 467 U.S. 1208 (1984).

This Memorandum and Recommendation, and the Recommended Findings of Fact, Part I, and Conclusions of Law, Part II, incorporated herein by reference, are entered in response to the motions pending presently before this court, as set forth above.

> FN1. According to unrebutted affidavit testimony of Litton's experts, the Roberts study is not relevant in any event to the Litton site because it was conducted in a different type of aquifer and because, according to the report itself, Dr. Roberts was not certain whether the observed decrease in TCE concentrations was due to biodegradation, adsorption, or dilution. *See* Miller/Saunders Aff. at para. 4.
>
> FN2. Plaintiffs originally named neurologists Jack Scariano and Berta Bergia as expert witnesses as well. They were named, *not* to provide opinions

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

Page 78

concerning causal relationships, however, but merely to provide data to Dr. Feldman. Drs. Bergia and Scariano almost invariably characterized their findings of plaintiffs as normal in every respect. *See* Deposition of Jack E. Scariano at 31, 41, 47-48, 54, 61, 64, 76-77, 80-84, 87, 95, 97 (Attachment 22); Deposition of Berta Bergia at 86, 93-94, 99-100, 110-11, 117-18, 128-30, 133, 138-39, 144-47, 153-54, 157-58 (Attachment 15).

FN3. Plaintiffs originally named William L. Marcus, Ph.D., as their expert toxicologist. He was withdrawn as an expert when the undersigned allowed plaintiffs to name Dr. Rodgers.

FN4. *See* Broughton Dep. at 4-69 (James Messer has no disease), 4-69-70 (Jonathan Messer has no health problems), 4-70-71 (Jennifer Wimpey has no disease), 4-71-72 (Rosetta Edwina Rogers has no disease that would be recognized by the "scientific community" or "medical community"), 4-81 (Ancy Simonds Wimpey has no disease), 4-84 (Marvin Garrett has no evidence of health effects relating to TCE), 4-85-86 (James Carroll Sr. has no disease that would be accepted as such "in the scientific community"), 4-101-02 (medical science would not conclude that Deborah Chambers has a past or present disease related to TCE exposure), 4-111 (Rusty Chambers has no past or present disease caused by TCE), 4-124 (James Carroll, Jr. has no past or present disease caused by TCE); 4-132 (same for Phyllis Ann Carroll), 4-136 (Martha Carroll has no disease related to TCE), 4-150 (Belinda Gaddis has no past or present disease related to TCE), 4-158-59 (same for Randy Gaddis), 4-162 (same for Fred Allen Chambers), 4-171 (same for Melanie Messer).

FN5. Dr. Feldman's "opinion" letter for plaintiff Rosetta Edwina Rogers provides a typical example. Dr. Feldman wrote: "I am assuming the correctness of the exposure data, electrodiagnostic study test results as reported by Dr. Bergia, with confirmation to be obtained upon repeat testing to be performed under my direction on this individual...." *See* Attachment 32. Similarly, his letter for plaintiff Martha Carroll reads, in part, that "I am ... assuming the correctness of the results of neuropsychological tests reported by Dr. Engum, with confirmation to be obtained upon repeat testing to be performed under my direction on this individual...." *See id.*

FN6. *See* White Dep. at 1-25-26 (depression can have multiple causes), 1-45, 2-36 (alleged "cognitive inflexibility" could have been caused by accident), 2-31 (shock as a result of accident could have caused hypoxia that damaged the deep temporal structures of Mr. Chamber's brain, causing difficulties in delayed memory); Feldman Dep. at 6-48-49 (person such as Mr. Chambers with blood pressure of 0/0 would usually not survive more than three to five minutes). *See also* Engum Dep. at 1-57, 172.

FN7. Dr. Feldman testified that the amount of lead known to cause neurotoxic effects is constantly getting lower and that no threshold concentration can be identified. Feldman Dep. at 4-133.

FN8. Mr. Carroll was seen in 1977 for nervous shaking by Dr. Ralph Morgan, who commented that he "has been tense since I first knew him." *See* Appendix A to Answers of James Carroll Jr. to Litton's First Set of Interrogatories at 5 (entry regarding May 30, 1977) (Attachment 52.a). Dr. Morgan later observed that Mr. Carroll "was in a lot of trouble emotionally," a view confirmed by Dr. David Cayer of Winston-Salem. *Id.* (entry regarding July 7, 1977). *See also* Admission Report, July 7, 1977 ("there was probably a psychological background for the boy's symptoms") (Attachment 52.b).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

Page 79

FN9. Mr. Carroll's medical records reveal that, as a six-year-old, he had eye surgery to correct a hereditary strabismus problem. *See id.* at 7. His ophthalmologist thereafter described his eyes as "weak." *Id.* at 9.

FN10. Mr. Carroll has testified that he chews tobacco. *See* Answer to Interrogatory 24 (Attachment 52.c).

FN11. James Carroll, Sr., stated to Dr. Feldman that he has worked with lead solder in his occupation as an electrician. *See* Feldman Dep. at 5-166-67.

FN12. Mrs. Rogers was shown to be allergic to milk, chicken, fish, coffee, and grapes, by Dr. Claude A. Frazier, who examined her in 1972. *See* January 6, 1972 Report of Dr. Frazier (Attachment 35). Nonetheless, she continues to consume two cups of coffee on a daily basis, eats chicken, turkey, or fish one to three times per week, eats grapes once a week, eats cheese and ice cream, and drinks milk. *See* Neurological Questionnaire at 9 (coffee), 15 (chicken, turkey, fish), 16 (grapes, milk, cheese, and ice cream).

FN13. Mr. Messer was exposed to machine coolants in his occupation as a dyemaker from 1981-1988.

FN14. In the accident, Mr. Messer suffered fractures of two vertebrae. Thereafter, he complained about pain in the base of his skull and headaches. Following the accident, Mr. Messer began to visit a chiropractor, whom he has now seen more than 60 times over the last five years. *See* Feldman Dep. at 5-84-88.

FN15. Dr. Engum concluded, in part, that, based on Martha Carroll's and Deborah Chambers's MMPI scores-showing elevations on the hypochondriasis, depression, and hysteria scales-both were likely to exhibit "conversion" behavior in which emotional stress is translated into physical symptoms. *See* Engum Dep. at 165-67 (Deborah Chambers), 219-24 (Martha Carroll). Similarly, John Clement, the independent neuropsychological examiner, concluded with respect to Mrs. Carroll that hers was a "Conversion profile."

FN16. Dr. Feldman agreed that cigarette smoke contains carbon monoxide, which causes behavioral changes, headaches, dizziness, and memory problems. Feldman Dep. at 6-77.

FN17. For example, Dr. Rodgers assumed that plaintiffs consumed, on average, 1.6 liters of water per day. *See* Exposure Data Analysis (Attachment 34) at A-3. He admitted, however, that he had no data to substantiate that estimate. Rodgers Dep. at 1-265-66. Indeed, the estimate exceeds by more than a factor of 10 experimentally derived values set forth in the very paper upon which Dr. Rodgers relied. We Andelman, *Inhalation Exposure in the Home to Volatile Organic Contaminants of Drinking Water,* 47 The Science of the Total Environment 443 (1985), at 445 (Attachment 36).
Dr. Rodgers also assumed that the plaintiffs who lived near the plant consumed *all* of their fluid intake, every day, in their homes, even though he recognized that many of them worked and spent a good deal of time away from home. *Id.* at 1-266-67. At the same time, he assumed that other plaintiffs who merely *visited* homes near the plant did consume water during those visits, *i.e.,* that people *did* in fact drink when they were away from their own homes. Dr. Rodgers admitted that those assumptions were mutually inconsistent and required revision of his exposure assessment. *Id.* at 1-268-69.
Dr. Rodgers further assumed that the plaintiffs breathed at the same rate when

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  Page 80
Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

they were at home as when they were at work. However, he admitted that assumption was probably in error as well. *Id.* at 1-269-71.

Finally, Dr. Rodgers assumed that all of the TCE in the air that a person breathes passes into the body through the lungs. In fact, according to Dr. Rodgers, only 40-75 percent passes into the body. *Id.* at 1-283-84. (According to the EPA TCE Health Advisory, at 7. the figure is 30 percent.) Again, Dr. Rodgers conceded the error. *Id.* Typical of Dr. Rodgers' approach, he explained that "at the time I did these calculations, I had not obtained any papers on [the] ... values in the literature, and I chose to assume high." *Id.* at 1-283.

FN18. The stated purposes of the Consent Order are:
(1) to perform Interim Measures (IM) to relieve threats to human health or the environment, (2) to perform a RCRA Facility Investigation (RFI) to determine fully the nature and extent of the presence of any release of hazardous wastes and constituents at or from the hazardous waste management facility in Murphy, North Carolina; and (3) to perform a Corrective Measures Study (CMS) to identify and evaluate alternatives for the corrective action necessary to prevent or mitigate any migration or releases of hazardous wastes to hazardous constituents at or from the facility.
Consent Order, at Section III.

FN19. *See* Plaintiffs' Response to Second Set of Interrogatories, at para. 1(i).

FN1. *See also United States v. Addison,* 498 F.2d at 744 ("scientific proof in some cases may assume a posture of mystic infallibility in the eyes of a jury of laymen"); *United States v. MacDonald,* 485 F.Supp. at 1096 (because the opinion of an expert may carry undue weight, not every ostensibly scientific technique should be recognized as the basis of expert testimony). A commentator has noted that "a Ph.D. can be found to swear to almost any 'expert' proposition, no matter how false or foolish." Huber, *Safety and the Second Best: The Hazards of Public Risk Management in the Courts,* 85 Colum.L.Rev. 277, 333 (1985).

FN2. *See also Jastremski v. United States,* 737 F.2d 666, 671 (7th Cir.1984) (an expert "must signify a probability supported by some rational basis; mere possibilities will not suffice"); *Wratchford v. S.J. Groves & Sons Co.,* 405 F.2d at 1066 ("somewhere lines must be drawn by a federal judge, for if the inference sought to be drawn lacks substantial probability, any attempted resolution of the question may well lie within the area of surmise and conjecture"); *Ralston Purina Co. v. Edmunds,* 241 F.2d at 168 ("the jury may not be permitted to guess between competing possibilities"); *Lanza v. Poretti,* 537 F.Supp. 777, 785 (E.D.Pa.1982) (testimony based on possibilities held speculative, conjectural and, therefore, inadmissible).

FN3. *See In re Air Crash Disaster at New Orleans,* 795 F.2d 1230, 1234-35 (5th Cir.1986) (loss of inheritance testimony too speculative); *Marks v. Pan American World Airways, Inc.,* 785 F.2d 539, 542 (5th Cir.1986) (damage award cannot stand when the only evidence to support it is speculative or purely conjectural); *Shu-Tao Lin v. McDonnell Douglas Corp.,* 742 F.2d 45, 49 (2d Cir.1984) (future income projections extravagant and non-probative); *Jones v. Goodlove,* 334 F.2d 90, 94 (8th Cir.1964) (court is not permitted to abuse its discretion by allowing a seemingly qualified expert witness to exceed permissible bounds of opinion testimony and enter into the realm of utter speculation and conjecture); *American Bearing Co. v. Litton Indus., Inc.,* 540 F.Supp. 1163, 1171-75

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

Page 81

(E.D.Pa.1982), *later app,* 729 F.2d 943 (3d Cir.1984), *cert. denied,* 469 U.S. 854 (1984).

FN4. As Judge Weinstein has noted, "[a]n expert can be found to testify to the truth of almost any factual theory, no matter how frivolous." Weinstein, *Improving Expert Testimony,* 20 U.Rich.L.Rev. 473, 482 (1986). *See also* Graham, *Expert Witness Testimony and the Federal Rules of Evidence: Insuring Adequate Assurance of Trustworthiness,* 1986 U.Ill.L.Rev. 43, 45 ("[t]oday practicing lawyers can locate quickly and easily an expert witness to advocate nearly anything the lawyers desire").

FN5. *See also Ackerson v. Dow Chemical Corp.,* Nos. 808161, 818398, 830603, 810701, 837362, and 862021, California Superior Court, San Francisco, April 4, 1989, slip. op. at 5 (Attachment 43):
The threshold screening by the Court sitting at the frontier of an ever-expanding legal plane of toxic chemical litigation will insure that the traditional role of the jury is preserved for reliable complaints while sparing the expenditure of massive public and private resources for resolving claims which do not pass scientific muster.

FN6. *See Rohrbough v. Wyeth Laboratories, Inc.,* 719 F.Supp. 470, 474 (N.D.W.Va.1989) ("an expert opinion, submitted in opposition to a summary judgment motion, may be disregarded if it is not supported by facts"); *United States v. Certain Land,* 214 F.Supp. at 151 (if the assumptions upon which an expert opinion is based are not true, the opinion is worthless).

FN7. *See, e.g., Anderson v. Liberty Lobby, Inc., supra* ("[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff")

(emphasis added); *Wratchford v. S.J. Groves & Sons Co.,* 405 F.2d at 1066 (4th Cir.1969) ("somewhere lines must be drawn by a federal judge, for if the inference sought to be drawn lacks substantial probability, any attempted resolution of the question may well lie within the area of surmise and conjecture"); *Ford Motor Co. v. McDavid,* 259 F.2d at 266 ("[p]ermissible inferences must still be within the range of reasonable probability, however, and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture").

FN8. *See Head v. Lithonia Corp.,* 881 F.2d 941, 944 (10th Cir.1989) (admission of doctor's testimony based on topographical brain mapping held to be an abuse of discretion because it lacked acceptance in the scientific community); *Novak v. United States,* 865 F.2d at 723-24 (excluding expert's medical theory which was based on a speculative "experimental body of information," not accepted by the scientific community); *Hull v. Merck & Co.,* 758 F.2d at 1477-78 (medical testimony excluded for lack of scientific acceptance, expert's assumptions rendered opinion speculative); *United States v. Brady,* 595 F.2d 359, 362 (6th Cir.), *cert. denied,* 444 U.S. 862 (1979) (to be admissible, expert testimony must conform to a generally accepted explanatory theory); *United States v. Brown,* 557 F.2d 541, 556 (6th Cir.1977) (to be admissible, the principle on which scientific evidence is based must be sufficiently established to have gained general acceptance in particular field); *United States v. Alexander,* 526 F.2d 161, 163 (8th Cir.1975) (scientific evidence must be reliable and have gained general acceptance); *Wilkinson v. Rosenthal & Co.,* 712 F.Supp. 474 (E.D.Pa.1989) (court excluded expert opinion based on a "novel" statistical approach when reliability of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.      Page 82
Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

method not proven).

FN9. *See also Spencer v. General Electric Co.,* 688 F.Supp. 1072, 1076 (E.D.Va.1988), *aff'd,* 894 F.2d 651 (4th Cir.1990) (testimony regarding rape-related psychological disorders excluded as "not a scientifically reliable means of proving that a rape occurred"); *United States v. Grant,* 473 F.Supp. 720, 723 (D.S.C.1979).

FN10. *See Wilder Enterprises, Inc. v. Allied Artists Pictures, Corp.,* 632 F.2d 1135, 1143-44 (4th Cir.1980) (expert's testimony properly excluded under Rule 703 when no facts were presented to support his calculations nor was there any proof that underlying data was of a type reasonably relied upon by experts in the field); *Viterbo v. Dow Chemical Co.,* 826 F.2d at 424 (summary judgment granted on issue of causation because tests upon which expert relied were so unreliable and lacking in probative value that no reasonable expert would base an opinion on them); *United States v. Esle,* 743 F.2d 1465, 1474 (11th Cir.1984) (unreasonable to rely on untrustworthy radio station market surveys); *Barrel of Fun, Inc. v. State Farm Fire & Casualty Co.,* 739 F.2d 1028, 1033 (5th Cir.1984) (court excluded expert testimony based on the results of a voice stress analyzer because there was insufficient foundation establishing its trustworthiness or its acceptance in the relevant scientific community); *Soden v. Freightliner Corp.,* 714 F.2d at 503 (court excluded statistical data and opinion based on them when not shown to be of a type reasonably relied upon by experts in the field); *United States v. Cox,* 696 F.2d 1294, 1297 (11th Cir.), *cert. denied,* 464 U.S. 827 (1983) (affirming exclusion of expert testimony based on hearsay not reasonably relied upon by experts in the field); *United States v. Tranowski,* 659 F.2d 750, 756-57 (7th Cir.1981) (trial court erred in admitting "scientific evidence" consisting of astronomer's calculations without general acceptance in the relevant scientific community).

FN11. *See Cleveland Elec. Illuminating Co. v. Environmental Protection Agency,* 572 F.2d 1150, 1161 (6th Cir.), *cert. denied,* 439 U.S. 910 (1978) ("dispersion modeling requires detailed information on all factors that affect the dispersion of emissions"); *United States v. Hooker Chemical & Plastics Corp,* 607 F.Supp. 1052, 1061 (W.D.N.Y.1985), *aff'd,* 776 F.2d 410 (2d Cir.1985) (groundwater models must be calibrated against sufficient real world data).

FN12. *See, e.g., De Stories v. Phoenix,* 154 Ariz. at 607 (exposure to asbestos dust and increased risk of cancer do not create legal injury); *Morrissy v. Eli Lilly & Co.,* 76 Ill.App.3d at 761 (exposure to drug and increased risk of medical problems); *Cathcart v. Keene Indus. Insulation,* 324 Pa.Super. at 151-52 (ingestion of asbestos fibers does not constitute a compensable injury).

FN13. As the court in *Fitzgerald* stated:
A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant.
*Fitzgerald v. Manning* 679 F.2d at 348, *quoting* Prosser, Torts at 245 (3d ed.1964).

FN14. In a federal diversity action, the sufficiency of evidence to create a jury question is a matter governed by federal law. *Fitzgerald v. Manning,* 679 F.2d at 346; *Bryan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 565 F.2d at 281; *Wratchford v. S.J. Groves & Sons Co.,* 405 F.2d at 1066; *Owens v. International Paper Co.,* 528 F.2d at 609.

FN15. *Accord Exxon Corp. v. Hunt,* 475

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                                    Page 83
Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

U.S. 355, 360 (1986) ("Superfund money may not be used to pay for injury to persons or property caused by hazardous wastes"); *Artesian Water Co. v. Government of New Castle County,* 851 F.2d 643, 648 (3rd Cir.1988) ("the Act was not intended to compensate third parties for damages resulting from hazardous substance discharge"); *Boone v. Du Bose,* 718 F.Supp. 479 (M.D.La.1988) (action to recover damages for injuries caused by a hazardous waste site did not arise under CERCLA); *Versatile Metals, Inc. v. Union Corp.,* 693 F.Supp. 1563, 1582 (E.D.Pa.1988) ("there is a difference between an action for response costs under CERCLA and an action for damages in tort"); *Wehner v. Syntex Corp.,* 681 F.Supp. 651, 653 (N.D.Cal.1987) ("[t]he plain language of CERCLA only provides for the cleanup of toxic substances from the environment").

FN16. *See also Amland Properties Corp. v. Aluminum Co. of America,* 711 F.Supp. 784, 794 (D.N.J.1989); *Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. at 1277-79.

FN17. At the time plaintiffs filed suit, the 1985 version of the NCP was in effect. 50 Fed.Reg. 47911, 47978 (Nov. 20, 1985); 40 C.F.R. §§ 300.1, *et seq.* (1986). EPA adopted revisions to the NCP in 1990, 55 Fed.Reg. 8666-8865 (March 8, 1990). Consistency with the NCP must be determined in light of the NCP in effect at the time the response costs were incurred. *Wickland Oil Terminals v. ASARCO, Inc.,* 792 F.2d 887, 891 (9th Cir.1986); *NL Industries, Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986); *Versatile Metals, Inc. v. Union Corp.,* 693 F.Supp. at 1575; *Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. at 1294. In this case, the 1985 NCP applies to plaintiffs' claimed costs. No different result would obtain, however, under the current NCP.

FN18. *See J.V. Peters & Co. v. Administrator, Environmental Protection Agency,* 767 F.2d 263, 266 (6th Cir.1985); *Amland Properties Corp. v. Aluminum Co. of America,* 711 F.Supp. at 794; *Lykins v. Westinghouse Elec. Corp.,* 27 Env't Rep.Cas. (BNA) 1590, 1593 (E.D.Ky. Feb. 29, 1988) (Exhibit B); *Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. at 1277 n. 8.

FN19. "Congress plainly contemplated that the NCP would be a standard against which response actions would be judged appropriate or inappropriate in the first instance, not merely a limit on the amount of damages recoverable from liable parties." *Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. at 1291-92. In *Artesian Water Co.,* the court held that it should "address consistency with the NCP [prior to trial] in order to determine whether [plaintiff] is entitled to recover *any* of its response costs, and to avoid the risk of a pointless trial at some later date." *Id.* at 1292. Where "there is a complete factual record upon which to make the determination of consistency *vel non,* there is nothing to be gained by delaying that determination until trial." *Amland Properties Corp. v. Aluminum Corp. of America,* 711 F.Supp. at 794.

FN20. *See also BCW Associates Ltd. v. Occidental Chemical Corp.,* Civ. No. 86-5947, 1988 WL 102641 at 20, n. 3, 1988 U.S.Dist. LEXIS 11275 (E.D.Pa. Sept. 29, 1988), LEXIS slip op. at 23, n. 3 (compliance with NCP required, not only " an inquiry into whether the clean-up was cost efficient and environmentally sound") (Exhibit C); *Jersey City Redevelopment Authority v. PPG Indus.,* 28 Env't Rep.Cas. (BNA) 1873, 1879, n. 5 (3rd Cir. Dec. 28, 1988) (courts "required compliance with the NCP in order to recover clean-up costs") (Exhibit D); *Versatile Metals, Inc. v. Union Corp.,* 693 F.Supp. at 1576 (failure to comply with the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Page 84
Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

detailed substantive and procedural provisions of NCP in remedial actions is a "barrier to recovery of response costs"); *Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. at 1291-92 (" Congress plainly contemplated that the NCP would be a standard against which response actions would be judged appropriate or inappropriate in the first instance").

FN21. *See Amland Properties, Corp. v. Aluminum Co. of America,* 711 F.Supp. at 798 (RI/FS requirement applies to private actions); *Versatile Metals, Inc. v. Union Corp.,* 693 F.Supp. at 1579 (same); *Artesian Water Co. v. Government of New Castle County,* 659 F.Supp. at 1296 (same).

FN22. The public comment requirement pertains to all response costs incurred subsequent to February 18, 1986. *Amland Properties Corp. v. Aluminum Co. of America,* 711 F.Supp. at 801; *Versatile Metals, Inc. v. Union Corp.,* 693 F.Supp. at 1577. *See County Line Investment Co. v. Tinney,* 30 Env't Rep. Cas. (BNA) 1062, 1063 (N.D.Okla. June 16, 1989) (private action barred where no public comment period) (Exhibit E). In *Artesian Water Co. v. Government of New Castle County,* the court noted that plaintiffs' report was the subject of public hearings, but held that since the report was not an RI/FS, " [p]ublic comment on a document that does not determine the nature and extent of a hazardous release or evaluate proposed remedies is not consistent with Section 300.67(d)." 659 F.Supp. at 1294-96.

FN23. The cost-effectiveness determination includes evaluation of whether a measure "is necessary." *United States v. Northeastern Pharmaceutical and Chemical Co.,* 810 F.2d 726, 748 (8th Cir.1986), *cert. denied,* 484 U.S. 848 (1987). *See Jersey City Redevelopment Authority v. PPG Industries, Inc.,* 28 Env't Rep.Cas. at 1877 (no recovery for disposal of relatively uncontaminated soil at hazardous waste site because it would have been "practical, feasible and cost-effective to segregate [the] soil"); *United States v. Northernaire Plating Co.,* 685 F.Supp. 1410, 1415 (W.D.Mich.1988) (cost effectiveness discussed in government response action); *Lone Pine Steering Comm. v. United States E.P.A.,* 600 F.Supp. 1487, 1499 (D.N.J.), *aff'd,* 777 F.2d 882 (3rd Cir.1985), *cert. denied,* 476 U.S. 1115 (1986) (plaintiffs must analyze " relative cost and means of assuring that remedial measures are cost effective").

FN24. S. 1480, 96th Cong., 2d Sess. §§ 4(a)(2)(A)-(G), *reprinted in* 1 Legislative History of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (Superfund), Pub.L. 96-510, Committee on Environmental and Public Works, U.S. Senate ("Legis.Hist.") (Exhibit G) 462, 485-88; *see* H.R. 7020, 96th Cong., 2d Sess. § 3071(b), *reprinted in* 2 Legis.Hist. 3, 40 (liability included "all damages for personal injury").

FN25. *See also* Superfund Section 301(E) Study Group, *Injuries and Damages from Hazardous Wastes-Analysis and Improvement of Legal Remedies,* Serial No. 97-12, printed for the use of the Senate Committee on Environment and Public Works, 97th Cong., 2d Sess. (Sept.1982), Part I at 59 (CERCLA does " not provide benefits to individuals for personal injury or for property damage or loss") (Exhibit H).

FN26. In further support of this conclusion, the courts have noted that Congress explicitly established the Agency for Toxic Substances and Disease Registry to undertake medical testing and collection of information in certain circumstances. 42 U.S.C. § 9604(i); *Coburn v. Sun Chemical Corp.,* slip op. at 13; *Chaplin v. Exxon Corp.,* 25 Env't Rep.Cas. at 2012. "

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.    Page 85
Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

Such medical testing costs clearly differ from either the response costs or the clean-up costs allowed in section 9607." *Chaplin v. Exxon Corp.,* 25 Env't Rep.Cas. at 2012. "Certainly, when Congress wanted to provide for medical care and testing, it knew how to do so in explicit language." *Coburn,* slip op. at 14.

FN27. The original CERCLA bill would have allowed recovery for economic loss. *See* S. 1480, 96th Cong., 2d Sess. §§ 4(a)(2)(A)-(G); H.R. 7020, 96th Cong., 2d Sess. § 3071(b). This provision also was rejected in the final legislation. As noted above, Senator Randolph stated that "[w]e have deleted the Federal cause of action for ... income loss." 126 Cong.Rec. S14964 (daily ed. Nov. 24, 1980).

FN28. The so-called contrary authority cited by plaintiffs should be rejected. In *General Electric Co. v. Litton Business Systems, Inc.,* 715 F.Supp. 949 (W.D.Mo.1989), *appeal pending,* No. 89-2845 WM (8th Cir.), the court granted attorneys' fees on the basis of what it described as specific statutory authority for the award. *Id.* at 959. The court failed however, to identify the section it was referring to; thus, it is possible that the court mistakenly based its award on Section 310(f), not Section 107. (Section 301(f) is not in issue here because plaintiffs have disavowed their reliance upon Section 301, the citizen suit provisions of CERCLA.) This deficiency has led both courts that have subsequently addressed the issue to dismiss the *General Electric* decision as ill-founded. *Fallowfield Development Corp. v. Strunk, supra,* slip op. at 7; *In re Hemingway Transport, Inc.,* 108 Bankr. at 383. Similarly, the award approved in *Jersey City Redevelopment Authority v. PPG Indus., Inc., supra,* appears from the opinion to have been based on the fee provision of Section 310(f). *See id.* at 1878. The opinion thus does not hold that attorneys' fees are recoverable response costs under Section 107.

FN29. Plaintiffs do not claim that Litton failed to comply with any corrective action order, nor do they contend that EPA has not been diligent in supervising the remedial action at Litton's property. Plaintiffs' Response to Second Set of Interrogatories at paras. 1(i) and 7.

FN30. As noted earlier, the plant's process wastewater is treated and discharged under a permit issued under the Clean Water Act. Such permits are excluded from RCRA coverage. RCRA § 1004(27), 42 U.S.C. § 6903(27); 40 C.F.R. § 261.4(2) (1988).

FN31. *See Nader v. Allegheny Airlines, Inc.,* 426 U.S. 290, 303-04 (1976) (primary jurisdiction applies where there are technical questions uniquely within expertise of administrative agency); *Hansen v. Norfolk & Western R. Co.,* 689 F.2d 707, 710-11 (7th Cir.1982) (court referred complex transportation policy issues to Interstate Commerce Commission); *Mississippi Power & Light Co. v. United Gas Pipe Line Co.,* 532 F.2d 412, 417-20 (5th Cir.1976) (court deferred to agency to determine complex energy issues which agency was already considering); *Ryan v. Chem-Lawn,* No. 88-C-6788, Slip op. (N.D.Ill. Feb. 6, 1989) (court deferred to agency to determine technical issue of pesticide safety) (Exhibit J); *In re "Agent Orange" Product Liability Litigation,* 475 F.Supp. 928, 931-33 (E.D.N.Y.1979) (court deferred to EPA to determine whether to ban herbicide); *United States v. Virginia Elec. & Power Co.,* 412 F.Supp. 165, 168-70 (E.D.N.C.1976) (court deferred to agency to determine whether course of conduct violated law).

FN1. Although not necessary to this opinion, it bears noting that evidentiary materials submitted by Litton and not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                         Page 86
Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

disputed by plaintiffs show that the chemicals found in plaintiffs' wells are neither unusual nor unique to Litton. Instead, they are ubiquitous. For example, EPA's Health Advisory for Trichloroethylene noted that 200 million pounds had been manufactured in 1982 alone and that "TCE occurs widely in the environment." *See* Attachment 41. (All references to Attachments are to the Appendix of Attachments in Support of Litton System, Inc.'s Motions for Summary Judgment on Medical Causation, Etc.) Over the years, millions of tons of TCE have been used annually in this country for a variety of purposes, including degreasing. TCE has also been widely used in medicine as a general anaesthetic and self-administered analgesic. An EPA survey of household products in 1987 showed that about half of 1,026 common household products contain measurable amounts of chlorinated solvents such as TCE, 1,1,1-trichloroethane, and methylene chloride. EPA Office of Pesticides and Toxic Substances, Household Solvent Products: A "Shelf" Survey with Laboratory Analysis, at xi-xii (Attachment 42) (product categories with high percentages of chlorinated organic compounds included brake cleaners, suede protectors, VCR cleaners, paint removers, water repellents, aerosol spray paints, and adhesive removers).

FN2. The original complaint named 30 plaintiffs. One plaintiff was named twice in the complaint, under different names. Two plaintiffs, Lucille and Crystal Leatherwood, were voluntarily dismissed without prejudice because they could no longer be found by plaintiffs' counsel. *See* Findings of Fact at para. 27. The complaints of three other plaintiffs-Joe, Edna, and Terry Conley-were dismissed with prejudice, on an earlier motion for summary judgment, because no chemicals had been shown to have been present in their well water. *See* Findings of Fact at para. 28.

FN3. On September 27, 1989, plaintiffs' counsel Donna K. Holt admitted in open court that plaintiffs' counsel had done virtually nothing to prepare for this litigation prior to filing suit.

FN4. In its April 30 Opinion, the district court also noted that "plaintiffs' counsel have never indicated 'specific plaintiffs' on whom experts are not 'prepared to state a final opinion on medical causation.' A review of the file indicates that this is quite probably every plaintiff currently in the suit." *Id.* at 11.

FN5. Similarly held in abeyance were Litton's Motion to Deem Admitted, the Hancock Motion, and Plaintiffs' Motion to Rejoin.

FN6. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986) (summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case"); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) ("there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party"); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (" opponent [of motion for summary judgment] must do more than simply show that there is some metaphysical doubt as to the material facts").

FN7. Taken together, the proposed testimony of Mr. Moore and Dr. Spencer represents plaintiffs' effort to establish the *dose* of TCE to which they were exposed. Evidence concerning dose is essential to plaintiffs' proposed testimony on medical causation because a standard tenet of toxicology first articulated by the 16th century Swiss physician Paracelsus-undisputed by plaintiffs-is that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  Page 87
Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

*all* substances are poisons and the right dose differentiates between a remedy and a poison. It has become apparent, for example, that the Hancocks sought voluntary dismissal of their claims because their evidence concerning dose was insufficient to enable any plaintiffs' medical expert to render an affirmative opinion on causation.

FN8. Plaintiffs cite *Jackson v. Garrison,* 495 F.Supp. 9, 10-11 (W.D.N.C.1979). *Jackson* relied heavily on the Fourth Circuit's opinion in *United States v. Baller,* 519 F.2d 463 (1975). Since the undersigned's recommendations herein also rely heavily on *Baller,* there is no inconsistency between such recommendations and the *Jackson* decision.

FN9. Rule 104(a) provides that:
Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges.

FN10. Rule 702 provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

FN11. Rule 703 provides:
The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

FN12. Rule 403 provides:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

FN13. As plaintiffs themselves have stated (Plaintiffs' Memorandum in Opposition to Litton's Motion in Limine at 5), "what is necessary is that the expert arrived at his ... opinion by relying upon *methods* that other experts in his field would reasonably rely upon in forming their own ...," *quoting Osburn v. Anchor Laboratories, Inc.,* 825 F.2d 908 (5th Cir.1987).

FN14. *See Rohrbough v. Wyeth Laboratories, Inc.,* 719 F.Supp. 470, 474 (N.D.W.Va.1989) ("an expert opinion, submitted in opposition to a summary judgment motion, may be disregarded if it is not supported by facts"); *United States v. Certain Land,* 214 F.Supp. 148, 151 (M.D.Ala.1963) (if the assumptions upon which an expert opinion is based are not true, the opinion is worthless).

FN15. *See, e.g., Sterling v. Velsicol Chemical Corp.,* 855 F.2d at 1207-09 (excluding testimony of experts based upon pseudoscientific principles of "clinical ecology"); *Hull v. Merck & Co.,* 758 F.2d 1474, 1477 (11th Cir.1985) (trial court correctly excluded medical causation testimony because expert's "assumptions ... rendered his seemingly firm opinion quite speculative"); *United States v. MacDonald,* 485 F.Supp. 1087, 1096 (E.D.N.C.1979), *aff'd,* 688 F.2d 224 (4th Cir.1982), *cert. denied,* 459 U.S. 1103 (1983) (excluding evidence of psychiatrist concerning defendant's ability to form mental state).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  Page 88
Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

FN16. *See also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986) ("[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff") (emphasis added); *Wratchford v. S.J. Groves & Sons Co.,* 405 F.2d 1061, 1066 (4th Cir.1969); *Ford Motor Co. v. McDavid,* 259 F.2d 261, 266 (4th Cir.), *cert. denied,* 358 U.S. 908 (1958); *Viterbo v. Dow Chemical Co.,* 826 F.2d 420, 424 (5th Cir.1987) (" without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible"); *Garwood v. International Paper Co.,* 666 F.2d 217, 223 (5th Cir.1982) (court excluded the testimony of "human factors engineer" because it was not helpful or of assistance); *United States v. Addison,* 498 F.2d 741, 744 (D.C.Cir.1974) ("scientific proof in some cases may assume a posture of mystic infallibility in the eyes of a jury of laymen"); *In re "Agent Orange" Product Liability Litigation,* 611 F.Supp. 1223, 1239 (E.D.N.Y.1985), *aff'd,* 818 F.2d 187 (2d Cir.1987), *cert. denied,* 487 U.S. 1234 (1988); Conclusions of Law at paras. B2-B19.

FN17. Mr. Moore has opined that, during dry seasons, when plaintiffs drew down heavily on their water supply, their wells would have been able to pull chemicals from the plant side of Slow Creek to the plaintiffs' side. Mr. Moore testified, however, that he does not have any historical records of plaintiffs' water usage, nor has he examined historical meteorological data to determine when, if ever, the conditions were such that the normal flow of water at Slow Creek would have been reversed; Findings of Fact at paras. 58-63.

FN18. The Affidavit of Dr. Paul Roberts referenced above is one of the items addressed by plaintiffs' Motion to Strike. The undersigned concludes that plaintiffs' objections to this affidavit and other materials addressed by the Motion to Strike are without merit and denies the motion. *See* Findings of Fact at paras. 90-92 and Conclusions of Law at paras. A1-A5.

FN19. As noted, Dr. Spencer assumed that TCE in the environment has a "half-life" of between 1.5 and 2 years. When he was asked in deposition to determine the half-life of TCE at the Carroll Well from 1987 to 1989, based on actual data, the calculated half-life was more than 5,000 years. Contrary to Dr. Spencer's hypothesis, the concentration of TCE at the Carroll Well did not appreciably change during the time that actual data were available. Dr. Spencer has made no attempt to explain this inconsistency. *See* Findings of Fact at paras. 86-89.

FN20. Paragraph 26 of the Joint Affidavit reads in full as follows:
Even if Dr. Rodgers [sic] calculations [based upon those of Dr. Spencer] were adjusted by the factor of 10 suggested by the defendants [sic] alternative calculation for respiratory exposure, or were otherwise adjusted downward, this would not affect the opinions expressed on causation in this case for the plaintiffs who have had long term exposures. *If Dr. Spencer's back calculations were dismissed entirely, this would not require a change in our opinions as to all plaintiffs for whom we have expressed a positive opinion on medical causation. It would, however, require another review of the information on each plaintiff to ascertain the length of time that the particular plaintiff was exposed to the well water.* As we have all testified in our depositions, studies have shown adverse health effects in persons chronically exposed to drinking water with substantially less than 100 ppb of TCE.
The actual test results in this case have shown levels from 1 to 84 ppb.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  Page 89
Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

Emphasis added.

FN21. Although resolution of the Motion on Causation under the assumption that the proposed testimony of Mr. Moore and Dr. Spencer would be admitted is not necessary to dispose of this case, given the undersigned's conclusions on the Motion to Exclude, the undersigned believes that resolution of these issues now would be the most efficient means of addressing all matters before the court. Otherwise, there is a risk that motions would be brought before the district court on appeal of the undersigned's rulings *seriatim,* consuming even more of the court's limited time.

FN22. *See, e.g., De Stories v. Phoenix,* 154 Ariz. 604, 607, 744 P.2d 705, 711 (App.1987); *Morrissy v. Eli Lilly & Co.,* 76 Ill.App.3d 753, 761, 394 N.E.2d 1369, 1376 (1979); *Cathcart v. Keene Indus. Insulation,* 324 Pa.Super. 123, 151-52, 471 A.2d 493, 508 (1984) (en banc).

FN23. In a federal diversity action, the sufficiency of evidence to create a jury question is a matter governed by federal law. *Fitzgerald v. Manning,* 679 F.2d at 346; *Bryan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 565 F.2d 276, 281 (4th Cir.1977), *cert. denied,* 435 U.S. 943 (1978); *Wratchford v. S.J. Groves & Sons Co.,* 405 F.2d 1061, 1066 (4th Cir.1969); *Owens v. International Paper Co.,* 528 F.2d 606, 609 (5th Cir.1976).

FN24. Plaintiffs take strong exception to this principle. The undersigned concludes that even if valid, human epidemiological data were not required, Litton is entitled to summary judgment on medical causation for the other reasons set forth in this opinion.

FN25. Subclinical findings do not qualify as "injury in fact." *See, e.g., Sterling v. Velsicol Chemical Corp.,* 855 F.2d at 1207-09; *Caputo v. Boston Edison Co.,*  C.A. No. 88-2126-z (D.Mass. July 9, 1990) (1990 WL 98694) (LEXIS, Genfed library Dist. File); *Burns v. Jaquays Mining Corp.,* 156 Ariz. 375, 752 P.2d 28 (App.1987).

FN26. The undersigned could, therefore, have treated these issues as conceded by plaintiffs but, in an abundance of caution, has determined to examine them.

FN27. To the extent that Dr. Rodgers seeks to rely upon inappropriate and inadequate studies in a desire to be "fair" to plaintiffs, he attempts improperly to lower the level of scientific evidence required in a court of law and to place the burden of proof not on plaintiffs, where it properly rests, but on Litton, where it does not.

FN28. *See Ealy v. Richardson-Merrell, Inc.,* 897 F.2d 1159 (D.C.App.1990) (expert "reanalysis" of previous studies excluded because it had not been published and subjected to peer review); *Turpin v. Merrell Dow Pharmaceuticals, Inc.,* 736 F.Supp. 737, 743 (E.D.Ky.1990) (same); *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 727 F.Supp. 570, 575 (S.D.Cal.1989) (same). Dr. Rodgers himself has noted that opinions that *are* published in scientific and medical journals are "much more persuasive" than opinions (such as his) set forth in affidavits hidden from open, critical peer review. *See* Rodgers Aff. at para. 9.

FN29. Dr. Rodgers attempted to use a so-called "correlation" to support his opinions. He has testified, however, that he has had no training or expertise in epidemiology or biostatistics, and he did not cite any scientific or medical treatise showing that his purported methodology is accepted by the medical community as a basis for rendering opinions on causation. Litton's experts, by contrast, have pointed out that "[t]he fields of medicine and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  Page 90
Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

epidemiology would give no credence or weight to [Dr. Rodgers'] purported correlation as a basis for formulating opinions on medical causation." *See* Supplemental Affidavit of Philip Cole, M.D., Dr.P.H. and Sidney Shindell, M.D., LL.B., at para. 3. This further underscores the undersigned's conclusions that these opinions lack the necessary foundation for admissibility established by the Fourth Circuit.

FN30. Dr. Rodgers claims to have reached his opinions on causation on the basis of his alleged experience as a physician. He admitted at his deposition, however, that the Poison Control Center he heads has never dealt with chronic TCE exposure and that he himself had never worked on an environmental or occupational case relating to chronic TCE exposure. Rodgers Dep. at 1-82-86. He further admitted that none of his publications or research relate to the alleged effects of chronic exposure to TCE or any other organic solvent. *Id.* at 1-97-98, 1-102, 1-104. Finally, although almost all of the symptoms he suggested were "probably related" to TCE are vague, neurological complaints, Dr. Rodgers admitted that he is not an expert in neurology. *Id.* at 2-30.

FN31. The other studies are equally unsupportive of plaintiffs' position. For example, Clark, et al., which the Joint Affidavit describes as relating to TCE, has nothing to do with TCE, but *did* involve a variety of other chemicals *not* found in plaintiffs' wells. Both Liu, et al. (Joint Affidavit cites as "Lui"), and Lilis, et al. (Joint Affidavit cites as "Liles"), involve *industrial* exposures to TCE. However, as Litton's experts stress, and as plaintiffs' experts concede, such exposures are frequently accompanied by exposure to a breakdown product of TCE, *i.e.*, dichloroacetylene, which *could not* have been present in plaintiffs' water or homes. Since plaintiffs do not take issue with Litton's analysis, the court must reject any reliance on industrial studies such as Liu, et al. and Lilis, et al.

FN32. Even if the testimony of Drs. Feldman and Rodgers were admitted on the issue of medical causation, that would not necessarily get all plaintiffs past summary judgment, in view of the serious, lingering questions concerning whether plaintiffs' alleged, vague, unverifiable neurological complaints could be considered injuries sufficient to support a cause of action. For example, Dr. Feldman admitted that he could find no clinical neurological problems with certain plaintiffs. *See* Findings of Fact 167-70 (examinations of Rosetta Rogers, Belinda Gaddis, Deborah Chambers, and James Messer all normal). The court need not make a determination on this question at this time in light of the recommendations made herein.

FN33. The alleged increased risks to plaintiffs for which they seek recovery range as low as less than one in ten million. Even these calculated risks depend upon the back-calculation opinions of Dr. Spencer, which, as noted above, must be excluded as inadmissible.

FN34. For all of the reasons discussed in the preceding sections of this memorandum, plaintiffs could not satisfy these requirements.

FN35. Although unnecessary to support this decision, the undersigned notes that some plaintiffs admittedly smoke or chew tobacco in spite of recognized, substantial danger of cancer and other serious health risks. Plaintiffs who use tobacco include James Carroll, Jr., Martha Carroll, Fred Chambers, Walter Randy Gaddis, Kenny Green, Peggy Green, Sandra Hancock, James Messer, and Melanie Messer. *See* Shields Aff., paras. 25, 26, 30, 33, 38, 39, 41, 43, 44 (Attachment 2). This voluntary

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  Page 91
Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)
**(Cite as: Not Reported in F.Supp.)**

acceptance of significant risk casts substantial doubt on plaintiffs' claims of fear based on the *de minimis* risks calculated by Dr. Rodgers.

FN36. For example, a 1987 study by the United States Environmental Protection Agency found that many commonly used household products contain the chemicals at issue in this lawsuit. *See* Office of Pesticides and Toxic Substances, United States Environmental Protection Agency, " Household Solvent Products: A 'Shelf' Survey With Laboratory Analysis" at x-xii, 4-1-29 (1987) (Attachment 42).

W.D.N.C.,1990.
Carroll v. Litton Systems, Inc.
Not Reported in F.Supp., 1990 WL 312969 (W.D.N.C.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.