# EXHIBIT 18

# Reference Manual on Scientific Evidence

*Second Edition*

Federal Judicial Center 2000

This Federal Judicial Center publication was undertaken in furtherance of the Center's statutory mission to develop and conduct education programs for judicial branch employees. The views expressed are those of the authors and not necessarily those of the Federal Judicial Center.

The assertion that the pass rates in the population are the same is called the null hypothesis. The null hypothesis asserts that there is no difference between men and women in the whole population—differences in the sample are due to the luck of the draw. The *p*-value is the probability of getting data as extreme as, or more extreme than, the actual data, given that the null hypothesis is true:

$$p = \text{Probability}(\text{extreme data} \mid \text{null hypothesis in model})$$

In our example, $p = 5\%$. If the null hypothesis is true, there is only a 5% chance of getting a difference in the pass rates of 20 percentage points or more.[130] The *p*-value for the observed discrepancy is 5%, or .05.

In such cases, small *p*-values are evidence of disparate impact, while large *p*-values are evidence against disparate impact. Regrettably, multiple negatives are involved here. A statistical test is essentially an argument by contradiction. The "null hypothesis" asserts no difference in the population—that is, no disparate impact. Small *p*-values speak against the null hypothesis—there is disparate impact, because the observed difference is hard to explain by chance alone. Conversely, large *p*-values indicate that the data are compatible with the null hypothesis: the observed difference is easy to explain by chance. In this context, small *p*-values argue for the plaintiffs, while large *p*-values argue for the defense.[131]

Since *p* is calculated by assuming that the null hypothesis is correct (no real difference in pass rates), the *p*-value cannot give the chance that this hypothesis is true. The *p*-value merely gives the chance of getting evidence against the null hypothesis as strong or stronger than the evidence at hand—assuming the null hypothesis to be correct. No matter how many samples are obtained, the null hypothesis is either always right or always wrong. Chance affects the data, not the hypothesis. With the frequency interpretation of chance, there is no meaningful way to assign a numerical probability to the null hypothesis.[132]

---

130. *See infra* Appendix.
131. Of course, sample size must also be considered, among other factors. *See infra* § IV.C.
132. *See, e.g.*, The Evolving Role of Statistical Assessments as Evidence in the Courts, *supra* note 1, at 196–98; David H. Kaye, *Statistical Significance and the Burden of Persuasion*, Law & Contemp. Probs., Autumn 1983, at 13. Some opinions suggest a contrary view. *E.g.*, Vasquez v. Hillery, 474 U.S. 254, 259 n.3 (1986) ("the District Court . . . ultimately accepted . . . a probability of 2 in 1,000 that the phenomenon was attributable to chance"); EEOC v. Olson's Dairy Queens, Inc., 989 F.2d 165, 167 (5th Cir. 1993) ("Dr. Straszheim concluded that the likelihood that [the] observed hiring patterns resulted from truly race-neutral hiring practices was less than one chance in ten thousand"); Capaci v. Katz & Besthoff, Inc., 711 F.2d 647, 652 (5th Cir. 1983) ("the highest probability of unbiased hiring was $5.367 \times 10^{-20}$"). Such statements confuse the probability of the kind of outcome observed, which is computed under some model of chance, with the probability that chance is the explanation for the outcome.

In scientific notation, $10^{20}$ is 1 followed by 20 zeros, and $10^{-20}$ is the reciprocal of that number. The proverbial "one-in-a-million" is more dryly expressed as $1 \times 10^{-6}$.

*Reference Manual on Scientific Evidence*

Scientists, including epidemiologists, generally begin an empirical study with a hypothesis that they seek to disprove,[58] called the null hypothesis. The null hypothesis states that there is no true association between an agent and a disease. Thus, the epidemiologist begins by technically assuming that the relative risk is 1.0 and seeks to develop data that may disprove the hypothesis.[59]

### 1. False positive error and statistical significance

When a study results in a positive association (i.e., a relative risk greater than 1.0), epidemiologists try to determine whether that outcome represents a true association or is the result of random error.[60] Random error is illustrated by a fair coin yielding five heads out of five tosses,[61] an occurrence that would result, purely by chance, in about 3% of a series of five tosses. Thus, even though the true relative risk is 1.0, an epidemiologic study may find a relative risk greater than 1.0 because of random error. An erroneous conclusion that the null hypothesis is false (i.e., a conclusion that there is a difference in risk when no difference actually exists) owing to random error is called a false positive error or type I error or alpha error.

Common sense leads one to believe that a large enough sample of individuals must be studied if the study is to identify a relationship between exposure to an agent and disease that truly exists. Common sense also suggests that by enlarging the sample size (the size of the study group), researchers can form a more accurate conclusion and reduce the chance of random error in their results. Both statements are correct and can be illustrated by a test to determine if a coin is fair. A test in which a coin is tossed 1,000 times is more helpful than a test in which the coin is tossed only 10 times. Common sense dictates that it is far more likely that a test of a fair coin with 10 tosses will come up, for example, with

---

58. *See, e.g.,* Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 593 (1993) (scientific methodology involves generating and testing hypotheses). We should explain that this null-hypothesis testing model may be misleading. The reality is that the vast majority of epidemiologic studies are conducted because the researcher suspects that there is a causal effect and seeks to demonstrate that causal relationship. Nevertheless, epidemiologists prepare their study designs and test the plausibility that any association found in a study was the result of sampling error by using the null hypothesis.

59. *See* DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 945 (3d Cir. 1990); Stephen E. Fienberg et al., *Understanding and Evaluating Statistical Evidence in Litigation*, 36 Jurimetrics J. 1, 21–24 (1995).

60. Hypothesis testing is one of the most counterintuitive techniques in statistics. Given a set of epidemiologic data, one wants to ask the straightforward, obvious question, What is the probability that the difference between two samples reflects a real difference between the populations from which they were taken? Unfortunately, there is no way to answer this question directly or to calculate the probability. Instead, statisticians—and epidemiologists—address a related but very different question: If there really is no difference between the populations, how probable is it that one would find a difference at least as large as the observed difference between the samples? *See* Expert Evidence: A Practitioner's Guide to Law, Science, and the FJC Manual 91 (Bert Black & Patrick W. Lee eds., 1997).

61. *DeLuca,* 911 F.2d at 946–47.

356

*Reference Guide on Epidemiology*

80% heads than will a test with 1,000 tosses. For if the test is conducted with larger numbers (1,000 tosses), the stability of the outcome of the test is less likely to be influenced by random error, and the researcher would have greater confidence in the inferences drawn from the data.[62]

One means for evaluating the possibility that an observed association could have occurred as a result of random error is by calculating a *p*-value.[63] A *p*-value represents the probability that a positive association would result from random error if no association were in fact present.[64] Thus, a *p*-value of .1 means that there is a 10% chance that if the true relative risk is 1.0, the observed relative risk (greater than 1.0) in the study was due to random error.[65]

To minimize false positive error, epidemiologists use a convention that the *p*-value must fall below some selected level known as alpha or significance level for the results of the study to be statistically significant.[66] Thus, an outcome is statistically significant when the observed *p*-value for the study falls below the preselected significance level. The most common significance level, or alpha,

---

62. This explanation of numerical stability was drawn from Brief Amicus Curiae of Professor Alvan R. Feinstein in Support of Respondent at 12–13, Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993) (No. 92-102). *See also* Allen v. United States, 588 F. Supp. 247, 417–18 (D. Utah 1984), *rev'd on other grounds*, 816 F.2d 1417 (10th Cir. 1987), *cert. denied*, 484 U.S. 1004 (1988). The *Allen* court observed that although "[s]mall communities or groups of people are deemed 'statistically unstable'" and "data from small populations must be handled with care [, it] does not mean that [the data] cannot provide substantial evidence in aid of our effort to describe and understand events."

63. *See also* David H. Kaye & David A. Freedman, Reference Guide on Statistics § IV.B, in this manual (*p*-value reflects the implausibility of the null hypothesis).

64. Technically, a *p*-value represents the probability that the study's association or a larger one would occur as a result of sampling error where no association (or, equivalently, the null hypothesis) is the true situation. This means that if one conducted an examination of 20 associations in which the true RR = 1, on average one of those examinations would result in a statistically significant, yet spurious, association.

Unfortunately, some have failed to appreciate the difference between a statement of the probability that the study's outcome would occur as a result of random error (the correct understanding of a *p*-value) if the true association were RR equal to 1 and a statement of the probability that the study's outcome was due to random error (an incorrect understanding of a *p*-value). *See, e.g.*, In re TMI Cases Consol. II, 922 F. Supp. 997, 1017 (M.D. Pa. 1996); Barnes v. Secretary of Dep't of Health & Human Servs., No. 92-0032V, 1997 U.S. Claims LEXIS 212, at *22 (Fed. Cl. Sept. 15, 1997) ("The *P* value . . . [measures] the probability that the results could have happened by chance alone."). Conventional statistical methodology does not permit calculation of the latter probability. However, the *p*-value is used to assess the plausibility that a positive association should be taken to disprove the null hypothesis and permit an inference, after assessing the factors discussed in section V *infra*, that the agent causes disease.

65. Technically, a *p*-value of .1 means that if in fact there is no association, 10% of all similar studies would be expected to yield an association the same as, or greater than, the one found in the study due to random error.

66. *Allen*, 588 F. Supp. at 416–17 (discussing statistical significance and selection of a level of alpha); *see also* Sanders, *supra* note 13, at 343–44 (explaining alpha, beta, and their relationship to sample size); *Developments in the Law—Confronting the New Challenges of Scientific Evidence*, 108 Harv. L. Rev. 1481, 1535–36, 1540–46 (1995) [hereinafter *Developments in the Law*].


used in science is .05.[67] A .05 value means that the probability is 5% of observing an association at least as large as that found in the study when in truth there is no association.[68] Although .05 is often the significance level selected, other levels can and have been used.[69] Thus, in its study of the effects of secondhand smoke, the Environmental Protection Agency (EPA) used a .10 standard for significance testing.[70]

---

67. A common error made by lawyers, judges, and academics is to equate the level of alpha with the legal burden of proof. Thus, one will often see a statement that using an alpha of .05 for statistical significance imposes a burden of proof on the plaintiff far higher than the civil burden of a preponderance of the evidence (i.e., greater than 50%). *See, e.g.,* Ethyl Corp. v. United States Envtl. Protection Agency, 541 F.2d 1, 28 n.58 (D.C. Cir.), *cert. denied*, 426 U.S. 941 (1976); Hodges v. Secretary of Dep't of Health & Human Servs., 9 F.3d 958, 967, 970 (Fed. Cir. 1993) (Newman, J., dissenting); Edward J. Imwinkelried, *The Admissibility of Expert Testimony in* Christophersen v. Allied-Signal Corp.*: The Neglected Issue of the Validity of Nonscientific Reasoning by Scientific Witnesses*, 70 Denv. U. L. Rev. 473, 478 (1993).

This claim is incorrect, although the reasons are a bit complex and a full explanation would require more space and detail than is feasible here. Nevertheless, we sketch out a brief explanation: First, alpha does not address the likelihood that a plaintiff's disease was caused by exposure to the agent; the magnitude of the association bears on that question. *See infra* § VII. Second, significance testing only bears on whether the observed magnitude of association arose as a result of random chance, not on whether the null hypothesis is true. Third, using stringent significance testing to avoid false positive error comes at a complementary cost of inducing false negative error. *See* DeLuca v. Merrell Dow Pharms., Inc., 911 F.2d 941, 947 (3d Cir. 1990). Fourth, using an alpha of .5 would not be equivalent to saying that the probability the association found is real is 50%, and the probability that it is a result of random error is 50%. Statistical methodology does not permit assessments of those probabilities. *See* Green, *supra* note 39, at 686; Michael D. Green, *Science Is to Law as the Burden of Proof Is to Significance Testing*, 37 Jurimetrics J. 205 (1997) (book review); *see also* David H. Kaye, *Apples and Oranges: Confidence Coefficients and the Burden of Persuasion*, 73 Cornell L. Rev. 54, 66 (1987); David H. Kaye & David A. Freedman, Reference Guide on Statistics § IV.B.2, in this manual; *Developments in the Law, supra* note 66, at 1551–56; Allen v. United States, 588 F. Supp. 247, 417 (D. Utah 1984) ("Whether a correlation between a cause and a group of effects is more likely than not—particularly in a legal sense—is a different question from that answered by tests of statistical significance . . . ."), *rev'd on other grounds*, 816 F.2d 1417 (10th Cir. 1987), *cert. denied*, 484 U.S. 1004 (1988); Turpin v. Merrell Dow Pharms., Inc., 959 F.2d 1349, 1357 n.2 (6th Cir.), *cert. denied*, 506 U.S. 826 (1992); *cf. DeLuca*, 911 F.2d at 959 n.24 ("The relationship between confidence levels and the more likely than not standard of proof is a very complex one . . . and in the absence of more education than can be found in this record, we decline to comment further on it.").

68. This means that if one conducted an examination of a large number of associations in which the true RR equals 1, on average 1 in 20 associations found to be statistically significant at a .05 level would be spurious. When researchers examine many possible associations that might exist in their data—known as data dredging—we should expect that even if there are no associations, those researchers will find statistically significant associations in 1 of every 20 associations examined. *See* Rachel Nowak, *Problems in Clinical Trials Go Far Beyond Misconduct,* 264 Science 1538, 1539 (1994).

69. A significance test can be either one-tailed or two-tailed, depending on the null hypothesis selected by the researcher. Since most investigators of toxic substances are only interested in whether the agent increases the incidence of disease (as distinguished from providing protection from the disease), a one-tailed test is often viewed as appropriate. For an explanation of the difference between one-tailed and two-tailed tests, see David H. Kaye & David A. Freedman, Reference Guide on Statistics § IV.C.2, in this manual.

70. U.S. Envtl. Protection Agency, Respiratory Health Effects of Passive Smoking: Lung Cancer and Other Disorders (1992); *see also Turpin*, 959 F.2d at 1353–54 n.1 (confidence level frequently set at

critical of using strict significance testing, which rejects all studies with an observed *p*-value below that specified level. Epidemiologic studies have become increasingly sophisticated in addressing the issue of random error and examining the data from studies to ascertain what information they may provide about the relationship between an agent and a disease, without the rejection of all studies that are not statistically significant.[74]

Calculation of a confidence interval permits a more refined assessment of appropriate inferences about the association found in an epidemiologic study.[75] A confidence interval is a range of values calculated from the results of a study, within which the true value is likely to fall; the width of the interval reflects random error. The advantage of a confidence interval is that it displays more information than significance testing. What a statement about whether a result is statistically significant does not provide is the magnitude of the association found in the study or an indication of how statistically stable that association is. A confidence interval for any study shows the relative risk determined in the study as a point on a numerical axis. It also displays the boundaries of relative risk

---

and their use as an alternative to statistical significance in *DeLuca v. Merrell Dow Pharmaceuticals, Inc.*, 911 F.2d 941, 948–49 (3d Cir. 1990). *See also* Turpin v. Merrell Dow Pharms., Inc., 959 F.2d 1349, 1357 (6th Cir.) ("The defendant's claim overstates the persuasive power of these statistical studies. An analysis of this evidence demonstrates that it is possible that Bendectin causes birth defects even though these studies do not detect a significant association."), *cert. denied*, 506 U.S. 826 (1992); *In re* Bendectin Prod. Liab. Litig., 732 F. Supp. 744, 748–49 (E.D. Mich. 1990) (rejecting defendant's claim that plaintiff could not prevail without statistically significant epidemiologic evidence); Berry v. CSX Transp., Inc., 709 So. 2d 552, 570 (Fla. Dist. Ct. App. 1998) (refusing to hold studies that were not statistically significant inadmissible).

Although the trial court had relied in part on the absence of statistically significant epidemiologic studies, the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), did not explicitly address the matter. The Court did, however, refer to "the known or potential rate of error" in identifying factors relevant to the scientific validity of an expert's methodology. *Id.* at 594. The Court did not address any specific rate of error, although two cases that it cited affirmed the admissibility of voice spectrograph results that the courts reported were subject to a 2%–6% chance of error owing to either false matches or false eliminations. One commentator has concluded, "*Daubert* did not set a threshold level of statistical significance either for admissibility or for sufficiency of scientific evidence." *Developments in the Law*, *supra* note 66, at 1535–36, 1540–46. The Supreme Court in *General Electric Co. v. Joiner*, 522 U.S. 136, 145–47 (1997), adverted to the lack of statistical significance in one study relied on by an expert as a ground for ruling that the district court had not abused its discretion in excluding the expert's testimony.

74. *See* Sanders, *supra* note 13, at 342 (describing the improved handling and reporting of statistical analysis in studies of Bendectin after 1980).

75. Kenneth Rothman, Professor of Public Health at Boston University and Adjunct Professor of Epidemiology at the Harvard School of Public Health, is one of the leaders in advocating the use of confidence intervals and rejecting strict significance testing. In *DeLuca*, 911 F.2d at 947, the Third Circuit discussed Rothman's views on the appropriate level of alpha and the use of confidence intervals. In *Turpin*, 959 F.2d at 1353–54 n.1, the court discussed the relationship among confidence intervals, alpha, and power. The use of confidence intervals in evaluating sampling error more generally than in the epidemiologic context is discussed in David H. Kaye & David A. Freedman, Reference Guide on Statistics § IV.A, in this manual.

*Reference Guide on Epidemiology*

consistent with the data found in the study based on one or several selected levels of alpha or statistical significance. An example of two confidence intervals that might be calculated for a study is displayed in Figure 4.

Figure 4. Confidence Intervals



The confidence interval shown in Figure 4 represents a study that found a relative risk of 1.5, with boundaries of 0.8 to 3.4 for alpha equal to .05 (equivalently, a confidence level of .95) and boundaries of 1.1 to 2.2 for alpha equal to .10 (equivalently, a confidence level of .90). Because the boundaries of the confidence interval with alpha set at .05 encompass a relative risk of 1.0, the study is not statistically significant at that level. By contrast, since the confidence boundaries for alpha equal to .10 do not include a relative risk of 1.0, the study does have a positive finding that is statistically significant at that level of alpha. The larger the sample size in a study (all other things being equal), the narrower the confidence boundaries will be (indicating greater statistical stability), thereby reflecting the decreased likelihood that the association found in the study would occur if the true association is 1.0.[76]

---

76. Where multiple epidemiologic studies are available, a technique known as meta-analysis (*see infra* § VI) may be used to combine the results of the studies to reduce the numerical instability of all the studies. *See generally* Diana B. Petitti, Meta-analysis, Decision Analysis, and Cost-Effectiveness Analysis: Methods for Quantitative Synthesis in Medicine (2d ed. 2000). Meta-analysis is better suited to pooling results from randomly controlled experimental studies, but if carefully performed it may also be helpful for observational studies, such as those in the epidemiologic field. *See* Zachary B. Gerbarg & Ralph I. Horwitz, *Resolving Conflicting Clinical Trials: Guidelines for Meta-Analysis*, 41 J. Clinical Epidemiology 503 (1988).

In *In re Paoli Railroad Yard PCB Litigation*, 916 F.2d 829, 856–57 (3d Cir. 1990), *cert. denied*, 499 U.S. 461 (1991), the court discussed the use and admissibility of meta-analysis as a scientific technique. Overturning the district court's exclusion of a report using meta-analysis, the Third Circuit observed that meta-analysis is a regularly used scientific technique. The court recognized that the technique might be poorly performed, and it required the district court to reconsider the validity of the expert's work in performing the meta-analysis. *See also* E.R. Squibb & Sons, Inc. v. Stuart Pharms., No. 90-1178, 1990 U.S. Dist. LEXIS 15788, at *41 (D.N.J. Oct. 16, 1990) (acknowledging the utility of meta-analysis but rejecting its use in that case because one of the two studies included was poorly performed); Tobin v. Astra Pharm. Prods., Inc., 993 F.2d 528, 538–39 (6th Cir. 1992) (identifying an error in the performance of a meta-analysis, in which the Food and Drug Administration (FDA) pooled data from