B

**Transcription Services, Inc.**

29 South LaSalle Street, Suite 200          877.551.8801          312.443.1029

Chicago, Illinois 60603-1502          312.551.8818

1

```
1                    House Bill 1087

2                    3rd Reading

3         MODERATOR:  The following is the testimony

4   concerning House Bill 1087 from 1975.  This is the

5   testimony before the House as a whole in 3rd

6   reading.  This took place on May 6th, 1975, in the

7   House Chambers.  This begins at 11:58 a.m.

8         CHAIRMAN:  Will the clerk please read the

9   title of House Bill 1087.

10         CLERK:  House Bill No. 1087 by

11   Representatives Kramer, Durham and Hertzberger

12   concerning legal interest rate.

13         CHAIRMAN:  Representative Kramer.

14         REPRESENTATIVE KRAMER:  Mr. Speaker, I'd move

15   for the favorable adoption of House Bill 1087 on

16   3rd and final reading.

17         CHAIRMAN:  Further discussion.

18   Representative Kopel (phonetic).

19         REPRESENTATIVE KOPEL:  Yes, I would hope,

20   unfortunately, that we would vote no on the bill.

21   I understand the reason for the bill and that

22   portion of it made sense, which was if you had

23   certain types of judgments rendered and lawsuits

24   where the costs of the use of the 6 percent rate
```

2

1    of interest it became of more value for, let's

2    say, insurance companies to withhold payment

3    rather than make payment because they could make

4    more interest on the money in the meantime before

5    a judgment was finally rendered by the court of

6    last resort.

7        But the bill goes beyond that and the

8    bill affects every portion of Colorado business,

9    which is not covered by any other statutes.  So

10   that, in effect, we are setting a minimum rate of

11   interest of 8 percent per annum despite the fact

12   that hopefully that we will not continue always to

13   have a high rate of inflation.  And this sounds

14   poor to me to set a high rate of interest of 8

15   percent and say that whenever there is no other

16   rate of interest provided in a contract, it will

17   be 8 percent.

18       CHAIRMAN:  Further discussion?

19   Representative Kramer.

20       REPRESENTATIVE KRAMER:  Mr. Speaker, just

21   briefly, I would like to say that Representative

22   Kopel's, I think, interpretation of what the bill

23   does is correct, but I think his interpretation of

24   the result of what the bill does is incorrect.

1          What we're trying to do here is to do

2     two things, I think, as the debate illustrated

3     yesterday.  No. 1, we're trying to get people to

4     pay their just debts, so that the people to whom

5     the money is owed can, in turn, pay their debts.

6     And this is not a problem that the bill is

7     addressing itself towards helping any large

8     company or corporation because as the debate

9     indicated quite clearly yesterday, these people

10    were already charging interest at the rate of

11    1-1/2 percent per month on delinquent balances.

12         Who we're trying to help here are the

13    small shopkeepers and storekeepers who have open

14    accounts and do not have sophisticated credit

15    arrangements with their purchasers and customers.

16         These people have current obligations

17    that they must meet.  And when people can borrow

18    money from them at a cheap rate of interest, in

19    other words, 6 percent, by just not paying their

20    bill and use the money for some other purpose,

21    it's impairing their ability to stay in business.

22         I would also point out the excellent

23    argument that Representative Flannery made here at

24    the microphone yesterday, and that was simply, and

4

```
1    I think it is a quite valid argument, and that is
2    this, that when debts do not get paid and there is
3    a lot of old accounts receivables lying around,
4    any small storekeeper, to the best of his ability,
5    is going to try to pass that cost on to the other
6    customers who are paying their bills because he
7    has got to make so much money to stay in business
8    and to say solvent.  This means, in effect, that
9    many of his good paying customers are going to
10   have to subsidize his poor paying customers.  So
11   in that regard, the bill is really a consumer
12   measure and it really helps those people who pay
13   their bills by not having their prices increase by
14   these merchants.
15          For those two reasons, I would hope
16   that you would support the bill.  Admittedly, you
17   cannot borrow interest -- you cannot borrow money
18   today at the rate of 8 percent interest, but an 8
19   percent rate is much more closely aligned to what
20   the rate at which you can borrow money is than at
21   6 percent interest.
22          And what we want to do is discourage
23   people from really the free use of money from
24   somebody else by just not paying their debts.  And
```

1    I think the way to accomplish this is to pass this

2    bill.  At least it's a step in the right

3    direction.

4         CHAIRMAN:  Representative Kopel.

5         REPRESENTATIVE KOPEL:  This is a 33-1/3

6    percent increase in the amount of interest in one

7    lump sum because that's what a 6 to 8 percent

8    increase is.  One third of 6 percent is 33 and a

9    percent.  What you're doing is increasing the rate

10   of interest by a 33-1/3 percent over its present

11   function.  I think that you want to think

12   carefully before you want to do that.  You can't

13   really talk about trying to keep taxes down and,

14   in effect, in a sense do the same thing in a

15   roundabout fashion by increasing interest rates by

16   33 percent.

17        CHAIRMAN:  Representative Kramer.

18        REPRESENTATIVE KRAMER:  I think

19   Representative Kopel couldn't be wronger if he

20   tried.  Maybe he'll come back and try again, but I

21   don't think that he could be more incorrect in the

22   statement that he made.  Because the purpose of

23   this bill is, at least in part, is to keep costs

24   down.  And the way you do that is to get people to

6

1    pay their just debts when they're due so that

2    people are not forced to pass off those extra

3    costs and old accounts receivables on to their

4    paying customers.

5         So all I can say is that Representative

6    Kopel is just wrong.  We're trying to keep the

7    costs down for those who are paying their bills

8    and those are the people who really are most

9    deserving, I suspect, of keeping those costs down

10    because those who don't pay their bills really

11    don't care.

12         And, secondly, we're trying to help

13    these small merchants and businessmen stay in

14    business so they can also meet their debt, because

15    if they can't pay their bills, they can't stay in

16    business.  We're not helping any large company

17    here because they already have their own

18    sophisticated credit arrangements which are not

19    controlled by this statute and by which

20    contractually they are charging interest at the

21    rate of 18 percent per annum.

22    CHAIRMAN:  The question before the House is

23    the adoption of House Bill 1087 on 3rd reading and

24    final passage.  Will the clerk please open the

1    machine and the members proceed to vote.

2            Representative Hamlin, would you vote,

3    please.  Representative Hertzberger, would you

4    vote, please.  Is Representative Hertzberger in

5    the chambers?  There he is.

6            Would you lock the machine, please.

7    Roll call shows 38 ayes, 27 nos.  More than the

8    majority having voted in the affirmative, House

9    Bill 1087 is (inaudible) on 3rd reading and final

10   passage.  Cosponsors?  Have all the cosponsors

11   been added?

12           Will the clerk please read the title of

13   House Bill 1659.

14

15

16

17

18

19

20

21

22

23

24

8

```
1    STATE OF ILLINOIS      )
2                           )
3    COUNTY OF C O O K       )
4         I, ANGELA M. MONTINI, a Certified Shorthand
5    Reporter, do hereby certify that said CD-ROM
6    recording of proceedings were reduced to writing
7    by means of shorthand and thereafter transcribed
8    to the best of my ability into typewritten form;
9    and that the foregoing is a true, correct, and
10   complete transcript of the said proceedings so
11   taken as aforesaid.
12        I further certify that I am not counsel for
13   nor in any way related to any of the parties, nor
14   am I in any way interested in the outcome thereof.
15        I further certify that this certificate
16   applies to the original signed IN BLUE and
17   certified transcripts only.  I assume no
18   responsibility for the accuracy of any reproduced
19   copies not made under my control or direction.
20        IN TESTIMONY WHEREOF I have hereunto set my
21   hand this 26th day of July, 2006.
22
23
24                          _____
                            ANGELA M. MONTINI, CSR
```

C

**Transcription Services, Inc.**

29 South LaSalle Street, Suite 200

Chicago, Illinois 60603-1502

877.551.8801

312.551.8818

312.443.1029

1

```
 1                    House Bill 1087

 2              Senate Finance Committee

 3         MODERATOR:  The following is the testimony

 4    concerning House Bill 1087 from 1975.  This is the

 5    testimony before the Senate Finance Committee.

 6    This took place on May 20th, 1975, in Senate

 7    Committee Room 320C.  This begins at 4:04 p.m.

 8         UNIDENTIFIED SPEAKER:  Yes, House Bill 1087

 9    is a (inaudible) bill.  It increases the legal

10    rate of interest from 6 to 8 percent.  And the

11    House thought that the rate ought to be increased,

12    but the 12 percent was too much too quickly and

13    that 8 percent would be a more appropriate figure,

14    and it passed on that basis.

15              I would hope the committee would

16    consider it on the basis that it passed the house

17    because I don't think any more would be

18    realistically feasible.  Simply, the bill was

19    really designed to do two things.  I think

20    primarily it's designed to help small

21    businessmen.  Larger businessmen generally have

22    written contractual bases on which they give

23    credit and generally that would be either

24    controlled by an instrument or some other
```

2

1    document.

2            But the small businessman who just

3    keeps open accounts very rarely have any

4    contractual relationship with their debtors on

5    which to base the rate of interest.  Often you

6    will see them attempting to charge a 12 percent

7    rate or an 18 percent rate by writing it on an

8    invoice, and there is a real question as to

9    whether or not that would have any validity, but

10   as things stand right now, there's -- there is

11   only a 6 percent rate that's called for by law.

12           Now, the committee did -- I don't know

13   whether it was this committee, but the Senate did

14   pass out a rate of interest on certain judgments

15   in personal injury cases of 10 percent that's

16   presently in the House for which this bill does

17   not really conflict, although this bill also goes

18   to a rate of interest on judgments.  But the Brown

19   bill, being more specific, would govern those

20   cases in which you were talking about personal

21   injury actions and that's the only thing that his

22   bill addresses itself to.

23           But as I'm sure all of us know, we find

24   situations, especially with tight money where --

3

1    why people wind up, in effect, borrowing money at

2    a low rate of interest from small businessmen by

3    simply not paying their bills and forcing them to

4    take legal action against them in order to collect

5    their bills.  And I don't think this is proper

6    because the small businessman must himself pay his

7    own bills to stay in business.  And if he can't

8    collect on his accounts receivable, then it's

9    virtually impossible for him to pay his

10    indebtedness.

11          The other point that was raised, not by

12    me, but they felt this really would, in effect,

13    help keep prices to obviously not limit -- defeat

14    inflation, but it would tend to help keep prices

15    down on certain commodities and that the

16    businessman is not able to receive payment and has

17    a large amount of bad debts, his only recourse,

18    really, is to raise prices to those who are

19    actually paying customers.

20          And insofar as a person would do this

21    when he, himself, can't collect on a lot of his

22    accounts receivables in order to keep enough cash

23    flowing in in order, again, to stay in business, I

24    think to the extent it encourages people to pay

4

1    their debts in a more timely fashion, it would

2    help keep prices down.

3            I think that this change is long

4    overdue and 8 percent really is not enough,

5    probably, to be completely effective, in other

6    words, to completely prevent people from borrowing

7    money from their creditors simply by not paying

8    their bills, but I think it would be a step in the

9    right direction.

10    UNIDENTIFIED SPEAKER:  Yeah, in accord with

11    the 8 percent, but down here on Line 23 on Page 2,

12    this 45 percent, I don't quite understand that.

13    UNIDENTIFIED SPEAKER:  Line 16, also.

14    UNIDENTIFIED SPEAKER:  Where is that?

15    UNIDENTIFIED SPEAKER:  Well, Line 23 on Page

16    2.

17    UNIDENTIFIED SPEAKER:  Oh, that's existing

18    law and that's -- under certain circumstances, the

19    rate of interest in Colorado, by basis of

20    contractual agreement, can be as high as 45

21    percent.  That is the legal rate of interest.

22    That is the rate usury in Colorado now.  This is

23    existing law and this does not change this.

24    UNIDENTIFIED SPEAKER:  Is that the legal

5

1    limit that we established here about three years

2    ago?

3         UNIDENTIFIED SPEAKER:  Correct.

4         UNIDENTIFIED SPEAKER:  Two?

5         UNIDENTIFIED SPEAKER:  Correct.  Well, it

6    can't be that high --

7         UNIDENTIFIED SPEAKER:  (Inaudible) it's only

8    18 percent.

9         UNIDENTIFIED SPEAKER:   It can't be that high

10   in certain consumer transactions, which are

11   governed by the UCCC, but the rate of usury, as a

12   general principle in Colorado, is now 45 percent.

13   This bill does not affect that.

14        UNIDENTIFIED SPEAKER:  In other words, this

15   doesn't change that part at all?

16        UNIDENTIFIED SPEAKER:  No.

17        UNIDENTIFIED SPEAKER:  Only the fact that

18   this is going to what I think is a reasonable

19   rate, I'm going to move the bill (inaudible).

20        UNIDENTIFIED SPEAKER:  Further motion?

21   Further discussion?  Any dissent?  Senator?

22        FEMALE SPEAKER:  A question.  Do both

23   sections of this bill -- well, I guess there are

24   five sections.  Do all of the sections refer to

6

1    the rate on judgments?

2         UNIDENTIFIED SPEAKER:  No.  Well --

3         FEMALE SPEAKER:  That's what it says in the

4    summary, that it changes legal interest rate on

5    judgments.

6         UNIDENTIFIED SPEAKER:  Right.  It's more

7    expansive than that.  The summary is not correct

8    on that.  It does change the legal rate on

9    judgments to 8 percent, but it also changes it on

10   any other written instrument or where another

11   amount was not called for by some contractual

12   arrangement.

13        FEMALE SPEAKER:  What do you mean by "any

14   other written instrument"?

15        UNIDENTIFIED SPEAKER:  Bill, bond, promissory

16   note, or other instrument in writing, or any

17   judgment.  Also on money (inaudible).  So

18   basically it covers judgments, it covers open

19   accounts.

20             For instance, if you were just buying

21   -- say a guy had a so-called charge account at a

22   lumber store or something and he went in there and

23   picked up a hammer one day and maybe they sent him

24   a bill at the end of the month and he didn't have

7

1   any written contractual arrangement on what kind

2   of interest they would be charged over 30 days for

3   it.  Well, under present law, it would be 6

4   percent.  Under this law, it would then be 8

5   percent.  That would be open accounts.

6          The other thing would be on notes and

7   other instruments of writing, but I think that

8   that would be more theoretical than practical

9   because in almost every case you would find an

10  instrument where they called for a rate in and of

11  itself, a rate specified.  So I think as a

12  practical matter, we're talking for the most part

13  about judgments and on open accounts.

14      FEMALE SPEAKER:  Well, I just wonder, I think

15  Senator Deberard (phonetic) made a good point.  I

16  wonder if maybe we should amend that 45 percent.

17      UNIDENTIFIED SPEAKER:  Well, I don't think

18  you would want to do that because the whole --

19  this is not addressed in this bill and I can't

20  remember the legislation that addressed itself to

21  that point, but when you enacted the Uniform

22  Consumer Credit Code, you made a change to a lot

23  of interest rates.

24      UNIDENTIFIED SPEAKER:  Do you think that 45%

8

1    is the wrong -- there is a limit on these

2    loan-sharks?

3         UNIDENTIFIED SPEAKER:  Right.

4         FEMALE SPEAKER:  That's a pretty high limit,

5    don't you think?

6         UNIDENTIFIED SPEAKER:  I know it is.  They

7    we're getting 2 or 300 percent sometimes.

8         FEMALE SPEAKER:  Yeah, but --

9         UNIDENTIFIED SPEAKER:  The problem is the

10   single payment.  That's where you really get into

11   -- suppose Barbara's husband sends a guy a bill

12   for $100 and he doesn't pay it and he doesn't pay

13   it within 60 days and he doesn't pay it for 90

14   days.  In the meantime, all wages going on and the

15   law firm is paying out the money.  They can

16   collect up to $145, but if they only -- let's say

17   that they only collected 10 bucks.  Instead of

18   $100, they collected 10 bucks.  And if they paid

19   on the 92nd day $110 bucks, well, 10 bucks is a 40

20   percent annual rate on that $100 if he paid within

21   90 days.  That's where you get into the problem.

22        FEMALE SPEAKER:  Doesn't that seem

23   excessive?

24        UNIDENTIFIED SPEAKER:  No, not really because

9

1    in the meantime, you've sent out dunning letters,

2    each letter is costing your law firm 2 bucks to

3    write it and send it out.  So it is like a minimum

4    charge.  A bank for a little personal loan of $100

5    will have a minimum charge.  Now under the UCCC,

6    you're allowed a minimum charge if it doesn't take

7    into account the 18 percent or it doesn't come

8    under the 18 percent rate that's in that

9    particular law.  So the 45 percent was I'm sure

10   put in because of the single payment problem.

11   Most of these are single payment problems.

12        UNIDENTIFIED SPEAKER:  I don't think the 45

13   percent would be a -- would not be a consumer

14   transaction (inaudible) under UCCC.  I don't

15   recall offhand what they are.  There is a certain

16   amount allowed on the first $300 and then there's

17   an amount allowed between $300 and 1,000.  There

18   is two ways to calculate it.  You can either do it

19   on that basis or you can do it on the basis of a

20   straight rate of, I think, 18 percent, whichever

21   is greater.

22        UNIDENTIFIED SPEAKER:  Yeah, but the minimum

23   charge under the UCCC can be as much as 300

24   percent, I believe.

10

```
 1          UNIDENTIFIED SPEAKER:  On the first --

 2          UNIDENTIFIED SPEAKER:  Minimum charge, yeah.

 3          UNIDENTIFIED SPEAKER:  That's fairly high.

 4          UNIDENTIFIED SPEAKER:  Yeah.

 5          UNIDENTIFIED SPEAKER:  I have a motion that

 6     this bill would be reported out favorably.

 7     Further discussion?  (Inaudible) take a look at

 8     that.  All right.  Call roll, please.  We've got

 9     enough here to call.

10          UNIDENTIFIED SPEAKER:  Aye.

11          UNIDENTIFIED SPEAKER:  Chaplin (phonetic)?

12          MR. CHAPLIN:  Aye.

13          UNIDENTIFIED SPEAKER:  Heberick (phonetic).

14          MR. HEBERICK:  Aye.

15          UNIDENTIFIED SPEAKER:  Ballard (phonetic).

16          MR. BALLARD:  Aye.

17          UNIDENTIFIED SPEAKER:  Thank you,

18     Mr. Chairman.

19

20

21

22

23

24
```

11

```
 1    STATE OF ILLINOIS     )

 2                          )

 3    COUNTY OF C O O K     )

 4        I, ANGELA M. MONTINI, a Certified Shorthand

 5    Reporter, do hereby certify that said CD-ROM

 6    recording of proceedings were reduced to writing

 7    by means of shorthand and thereafter transcribed

 8    to the best of my ability into typewritten form;

 9    and that the foregoing is a true, correct, and

10    complete transcript of the said proceedings so

11    taken as aforesaid.

12        I further certify that I am not counsel for

13    nor in any way related to any of the parties, nor

14    am I in any way interested in the outcome thereof.

15        I further certify that this certificate

16    applies to the original signed IN BLUE and

17    certified transcripts only.  I assume no

18    responsibility for the accuracy of any reproduced

19    copies not made under my control or direction.

20        IN TESTIMONY WHEREOF I have hereunto set my

21    hand this 26th day of July, 2006.

22

23

24                     _____
                       ANGELA M. MONTINI, CSR
```

D

**Transcription Services, Inc.**

29 South LaSalle Street, Suite 200
Chicago, Illinois 60603-1502
877.551.8801
312.551.8818
312.443.1029

1

```
1                    Senate Bill 463

2              Senate Judiciary Committee

3         MODERATOR:  The following is the testimony

4    concerning Senate Bill 463 from 1979.  This is the

5    testimony before the Senate Judiciary Committee.

6    This took place on March 12th, 1979, in Senate

7    Committee Room 320C.  This begins at 4:30 p.m.

8         UNIDENTIFIED SPEAKER:  That's all right.

9         UNIDENTIFIED SPEAKER:  Do it quietly, that's

10   all.

11        UNIDENTIFIED SPEAKER:  All right.  This is

12   463.  And the reason why I have introduced this

13   bill is pretty apparent.

14                   (Laughter.)

15        UNIDENTIFIED SPEAKER:  That's good enough, is

16   it, Mr. Chairman?

17        UNIDENTIFIED SPEAKER:  I'm going to go into

18   that.  Today in Colorado (inaudible) in a very

19   contradictory way.  For example, on a liquidated

20   claim for damages, i.e., for example, on a note

21   that provides a fixed interest rate, interest runs

22   from the date it was due.  All right.

23             On an automobile accident or a tort

24   action, it runs from the time the plaintiff files
```

2

1    his action in court, not from the time of the

2    accident when the injuries occurred, but from the

3    time he files his action in court.

4         And then a person who has a contract

5    action for damages, for example, arising out of a

6    failure to deliver potatoes, for example, interest

7    is allowed only from the time of judgment, even if

8    5 or 10 or 12 years has gone by before a judgment

9    is rendered.

10        Now, you can see the contradictory way

11   that interest is allowed in the courts of

12   Colorado.  Now, in addition, from territorial

13   days, there was another doctrine that allowed

14   interest known as moratory interest.  And it was

15   interest based not upon the injuries to the person

16   who sustained injuries, whether it was contract or

17   what, but rather on the benefit that was derived

18   by the man who violated the contract upon which

19   the claim for damages is based.

20        Ordinarily, interest and a judgment are

21   rendered for the injuries sustained, but under

22   moratory interest, it is based upon the benefit to

23   the wrongdoer.  So you see there are four

24   doctrines.  And the worst of those doctrines is

3

1    the one that says no interest until judgment.  And

2    that is based upon our statute, which doesn't say

3    that, but which we borrowed from Illinois.  And

4    the Illinois Court said that if it was an

5    unliquidated claim, interest only from the time of

6    judgment.  Some more judicial legislation.  And

7    our courts picked up that doctrine on unliquidated

8    damages.  Now this, this bill, picks up

9    additionally one more thing, and that is compound

10   interest.

11          Now, in the lawsuit that I talked to

12   you about, the Colorado Supreme Court said our

13   client was entitled to the difference between the

14   market value in 1967 of 2500 acres of land and

15   what the Martin Company paid for it.  Fine.  But

16   it -- and it says interest is provided by law.

17   And that sounds good.  But it was an unliquidated

18   claim.  And in the period between '67 and 19 --

19   December of '78, the purchasing power of the

20   dollar went down -- what was it, a half?  Or put

21   another way, it took $2 in December of '78 to buy

22   what $1 would have purchased in '67.  And because

23   it was an unliquidated claim, we were running the

24   risk that the court would say, sure, you may have,

4

1    let's say, a million dollars, but no interest.

2            And during that time the interest rate

3    averaged over a period of years better than 8

4    percent compounded.  So we ran the risk in that

5    lawsuit of getting a million dollars as of '67 and

6    then having the Martin Company have that amount of

7    money invested for almost 12 years and doubling

8    the original principal, so that they could have,

9    if we hadn't settled it and if they had convinced

10   the judge we were not entitled to interest because

11   it was unliquidated, paid off what we were

12   entitled to with their earnings on that money.

13           Now, am I going too fast?  And you all

14   know that even at 6 percent compounded, the

15   principal doubles itself in 12 years.  So this

16   bill is addressed to compound interest.  It

17   maintains the principal moratory interest, or it

18   says that, in effect, a plaintiff or for that

19   matter a defendant who counterclaims is entitled

20   to interest from the time the action accrued, not

21   from the time the suit was started, not from the

22   time the judgment was entered, but from the time

23   somebody was wronged.

24           Now, that's an awful short explanation

5

1   of it.  Yes.

2        UNIDENTIFIED SPEAKER:  Convince me that it

3   shouldn't be from the time the suit started in

4   order to be fair to all parties.  Now, you're just

5   being fair to the one who is suing, but how about

6   the one that is being sued?

7        UNIDENTIFIED SPEAKER:  Well, the trouble with

8   that is, really, based on morality as well as law,

9   when a person is injured, why shouldn't interest

10  run from the time of the injury?

11        Now, I'll tell you what a lot of

12  insurance companies will do.  They'll stall around

13  if their lawyer will let them or if the client

14  will, and make counteroffers and proposals.  A

15  year or two will go by.  And if you wait until

16  then, they have gained the use of that money for

17  that period of time.  And sometimes --

18        UNIDENTIFIED SPEAKER:  Why don't we say the

19  suit or the time that we tried to get a

20  settlement, from that time?

21        UNIDENTIFIED SPEAKER:  Well --

22        UNIDENTIFIED SPEAKER:  The time they actually

23  started an action -- or not an action, it wouldn't

24  be an action.  It would be less than an action.

6

1     UNIDENTIFIED SPEAKER:  Sometimes you can't

2 get service, you know, they reside out of state or

3 you never know what the problems are, but --

4     UNIDENTIFIED SPEAKER:  I think you might be

5 going a little bit too far out.  I don't know.

6     UNIDENTIFIED SPEAKER:  Well, why shouldn't

7 they have interest from the time of the injury?

8 Are you going to let the wrongdoer benefit by a

9 delay in bringing a suit?

10     UNIDENTIFIED SPEAKER:  Well, no, I don't want

11 to do that, but I want to be fair to all parties,

12 and that seems kind of like middle ground.

13     UNIDENTIFIED SPEAKER:  Why is it unfair from

14 the time of the injury or from the time that the

15 debt is due?

16     UNIDENTIFIED SPEAKER:  When did we change it

17 from 6 percent to 8 percent, two years ago?

18     UNIDENTIFIED SPEAKER:  I think about that.

19     UNIDENTIFIED SPEAKER:  That's a 33-1/3

20 percent increase then.

21     UNIDENTIFIED SPEAKER:  Well, that's true.

22     UNIDENTIFIED SPEAKER:  And Block (phonetic)

23 wanted to go to 20 percent.  By God, make them

24 settle.  Wham.  I remember it.  Remember that?

7

```
 1        UNIDENTIFIED SPEAKER:  I think so.

 2        UNIDENTIFIED SPEAKER:  Well, of course, at

 3   that time, Harold, that was cheap interest.  Now,

 4   to give you one more case that's interesting, the

 5   sugar growers get -- have a contract with Great

 6   Western.

 7        UNIDENTIFIED SPEAKER:  I hate to bother you,

 8   but they started (inaudible).

 9        UNIDENTIFIED SPEAKER:  All right.  All

10   right.  Great Western in '74 had a contract with

11   sugar growers.  And a part of it was that there

12   would be an advance payment, an advance payment

13   based upon the reasonable expectations of what the

14   growers were going to get.  And they underpaid by

15   some 50 or $60 million.  And the sugar growers

16   sued.  And it turned out that it was an

17   underpayment.

18           And the plaintiffs, the growers, proved

19   that Great Western was able to borrow about $60

20   million at 11-1/2 percent interest.  They would

21   have had to double that borrowing if they had paid

22   the growers what they were entitled to.

23           And so Judge Winter said, you benefited

24   by not having to borrow that additional $60
```

8

1    million, therefore, I'm going to give the growers

2    the 11-1/2 percent because that's what they would

3    have had to pay for that additional 60 million.

4    And that was appealed to the Circuit Court of

5    Appeals and affirmed.

6           But, you know, a lot of people don't

7    realize how a wrongdoer, if he can postpone the

8    payment of a judgment, can really benefit.  And if

9    he does it for 12 years even at 6 percent

10    compounded, he can pay off the original amount

11    that was due under the unliquidated theory and

12    keep the principal with his earnings.

13        UNIDENTIFIED SPEAKER:  Well, I don't know if

14    I can explain how I feel about that.  The

15    wrongdoer, he isn't really a wrongdoer until he's

16    been proven a wrongdoer.  But it seems to me that

17    the interest, I'm not saying that the interest

18    should not start accruing, I don't want to wait

19    until there is an actual judgment, but until there

20    is something started, negotiations at least, maybe

21    not a suit filed, but negotiations or something or

22    accusations, an accusation that you owe me, I hate

23    to start accruing interest because the individual,

24    he didn't know that he was -- in some cases he

9

```
1    might not even know that he's going to be accused,

2    let alone the judgment against him.  So how can he

3    avoid?  He has no opportunity to avoid the payment

4    of that interest.

5         UNIDENTIFIED SPEAKER:  I don't know how many

6    cases --

7         UNIDENTIFIED SPEAKER:  Do you understand what

8    I'm getting at?

9         UNIDENTIFIED SPEAKER:  I don't know how many

10   cases you could find where the guy doesn't really

11   know that he owes something.  I suppose it's

12   conceivable.

13        UNIDENTIFIED SPEAKER:  What do you mean?  He

14   doesn't know by the technicalities of the law.  A

15   lot of times the individual doesn't know that he's

16   been --

17        UNIDENTIFIED SPEAKER:  Served a year later.

18        UNIDENTIFIED SPEAKER:  Yeah, all of a

19   sudden.  And through some technicality, by golly,

20   he is.

21        UNIDENTIFIED SPEAKER:  But what's he doing

22   with the money that he's had during that time?  It

23   is earning money for him.

24        UNIDENTIFIED SPEAKER:  What do you mean?
```

1   What money?

2        UNIDENTIFIED SPEAKER:  Let's suppose that he

3   ends up with a judgment for $1,000 he should have

4   paid on the 1st of January of 1978, and he's sued

5   and a couple of years later it is determined that

6   he was liable for it.  In the meantime, he's had

7   the use of that $1,000.

8        UNIDENTIFIED SPEAKER:  I'm saying that the

9   interest should not start accruing until there is

10   some kind of an action taken.

11        UNIDENTIFIED SPEAKER:  Well, all you do then

12   is you force them into court right away.  You

13   force them into court right away where --

14        UNIDENTIFIED SPEAKER:  That isn't all wrong,

15   is it?

16        UNIDENTIFIED SPEAKER:  Probably in many cases

17   they're settled without a lawsuit.  But if you're

18   not going to get interest until you start your

19   lawsuit, then you're going to get jollied into

20   court.

21        UNIDENTIFIED SPEAKER:  No, I'm saying at the

22   time of an action, it doesn't have to be a court

23   action, but at the time that --

24        UNIDENTIFIED SPEAKER:  A demand is made.

1          UNIDENTIFIED SPEAKER:  -- a demand is made.

2     Maybe that's the appropriate way.

3          UNIDENTIFIED SPEAKER:  Not at the time that,

4     let's say, an injury occurred.  You know, they

5     might wait.  You can wait how long?

6          UNIDENTIFIED SPEAKER:  Six years.

7          UNIDENTIFIED SPEAKER:  And the person can

8     say --

9          UNIDENTIFIED SPEAKER:  Yeah.  And all right,

10    during that six years' time, the person says,

11    well --

12         UNIDENTIFIED SPEAKER:  I'm fine today.  Boy,

13    oh, boy.

14         UNIDENTIFIED SPEAKER:  You know, evidently, I

15    didn't -- there's not going to be anything.

16    Evidently this person wasn't injured as badly or

17    evidently he feels it wasn't my fault and, you

18    know, sometimes people genuinely say --

19         UNIDENTIFIED SPEAKER:  That's true.

20         UNIDENTIFIED SPEAKER:  -- it isn't my fault,

21    when it really is his fault.

22         UNIDENTIFIED SPEAKER:  Yeah.

23         UNIDENTIFIED SPEAKER:  And they take him to

24    court and they prove it is.  And so I just wonder

12

1    if you're not going a little too far.  You know,

2    maybe in the past it's been balanced in the wrong

3    way.  Maybe it's been against the injured person

4    in the past, but I think you want to go maybe too

5    far the other way now, you know?

6         UNIDENTIFIED SPEAKER:  Well, it's hard for

7    people.  And I grant you, it's hard for people to

8    see why interest should accrue from the time the

9    action, you know, had all its elements that

10   entitles a person to damages.  On the other hand,

11   the wrongdoer has the use of that money all that

12   time.

13        UNIDENTIFIED SPEAKER:  Well, let them make a

14   demand if they feel that there's been an injury.

15        UNIDENTIFIED SPEAKER:  Well, I see some of

16   these cases where a guy has had the use of all

17   that money all that time and you take it away from

18   him and he's a little bankrupt.

19        UNIDENTIFIED SPEAKER:  Sure, but whose money

20   was it?

21        UNIDENTIFIED SPEAKER:  And that you look at

22   the ski liability thing that we had here.  You

23   take some of those actions that could have

24   occurred under that and make them at 8 percent

Victoria's Transcription Services, Inc.

13

1   compounded annually, and, boy, the amount of money

2   just skyrockets up and the claims are so huge

3   already.  Well, we see claims today --

4        UNIDENTIFIED SPEAKER:  I think I'd like

5   (inaudible).

6        UNIDENTIFIED SPEAKER:  I don't have any

7   particular objection to it running from the demand

8   except let's take my case that I gave you the

9   facts on.

10       The Martin Company never recorded their

11   option until 1966.  They got their lease with an

12   option in 1956.  They kept it off record and they

13   did it deliberately so that our old clients, they

14   hoped, they won't admit that, but they hoped

15   they'd die and never know about it.

16       Now, our client had no reason to make

17   any demand.  He didn't know about the option that

18   Martin had.  And the testimony of one of the

19   attorneys for Martin was that they took a

20   calculated risk, and they used the term "let

21   sleeping dogs lie," and we'll cross that bridge,

22   referring to the Atchisons' contract, "we'll cross

23   that bridge when we come to it."  And they said,

24   maybe the Atchisons have forgotten their rights.

Victoria's Transcription Services, Inc.

14

1    And mind you, the Atchisons had recorded their

2    agreement.  So it was notice to the world.  Now,

3    you see, if you tie it to a demand in that case,

4    it would automatically cut out interest between

5    '56 and '66 or rather '67.

6           And there is no doubt in that case that

7    they had the use of the money.  And on top of

8    that, that land appreciated in 18 months -- 1100

9    acres of that land appreciated from $175 an acre

10   to $1500 an acre because that's what the federal

11   government paid Martin for 1100 acres.  And 18

12   months before, they paid $175 an acre for it.  And

13   all that time, up to the time of the flood, when

14   Martin had to elect, then they recorded their

15   agreement.  Then the old couple found out about --

16        UNIDENTIFIED SPEAKER:  Were they in violation

17   because they did not record that agreement?

18        UNIDENTIFIED SPEAKER:  No.

19        UNIDENTIFIED SPEAKER:  There was no violation

20   of any law?

21        UNIDENTIFIED SPEAKER:  No.  No.

22        UNIDENTIFIED SPEAKER:  Maybe that's the law

23   you ought to go after.

24        UNIDENTIFIED SPEAKER:  Well, it was a very

```
1    complicated case, as you can see.

2         UNIDENTIFIED SPEAKER:  Sure, I can see that.

3         UNIDENTIFIED SPEAKER:  But not only did you

4    see that they stand -- they got out of 1100 acres

5    more than the full purchase price of what they

6    paid for the land 18 months before, had the use of

7    the land, and had the appreciation of the

8    remainder.

9         UNIDENTIFIED SPEAKER:  Right.

10        UNIDENTIFIED SPEAKER:  You can't really start

11   interest from demand.

12        UNIDENTIFIED SPEAKER:  Well, my suggestion is

13   a moderate, middle-of-the-road approach.  Yours is

14   rather radical.

15        UNIDENTIFIED SPEAKER:  Not radical at all.

16        UNIDENTIFIED SPEAKER:  I think it's a little

17   radical.

18        UNIDENTIFIED SPEAKER:  Well, you see, it is

19   the law --

20        UNIDENTIFIED SPEAKER:  It forces --

21        UNIDENTIFIED SPEAKER:  It is the law --

22   excuse me for interrupting you -- on a promissory

23   note.  If you look at all your promissory notes,

24   you waive, present and demand, and it runs and the
```

```
 1    court will allow interest from the day it's due.

 2    It's only, you see, on unliquidated claims and on

 3    tort actions that a different rule has been

 4    applied historically since (inaudible).

 5         UNIDENTIFIED SPEAKER:  Where do they get the

 6    45 percent on the promissory note?  How long has

 7    that been in the law?

 8         UNIDENTIFIED SPEAKER:  45 percent?

 9         UNIDENTIFIED SPEAKER:  Yeah, look at Page 3,

10    Line 12.  An annual rate of 45 percent.

11         UNIDENTIFIED SPEAKER:  Yeah, that's in the

12    current law, and it's been there for ages,

13    Harold.

14         UNIDENTIFIED SPEAKER:  Can you help me get a

15    couple thousands dollars out at 45 percent?  I

16    could live with that.

17         UNIDENTIFIED SPEAKER:  I'll look that up for

18    you.  You can see that that's been in the law.

19         UNIDENTIFIED SPEAKER:  Yeah, I understand

20    that.  And I tell you, for the committee, I keep

21    coming back.  I see year after year in skilled

22    hands far able to plow me under ever since I was

23    in the House of Representatives, Trial Lawyers

24    Association coming up here and walking away with
```

17

1    things that are just neat for the Trial Lawyers

2    Association.

3              Now, I know that a lot of times there

4    are poor beggars who desperately have to have some

5    help and these same trial lawyers are Gods in

6    shining white armor to them, and bless them for

7    that.  But boy, oh, boy, people say, ain't it

8    great that somebody got this big settlement?  And

9    I happen to know that in some cases if it weren't

10   for a skilled lawyer who worked far beyond the

11   call of duty for long hours, and I think that's

12   true in your case, Ralph, there probably would

13   never have been a settlement.

14             I know that there's some others that

15   are barracudas lying out there in the shallows,

16   sharpening their teeth, waiting for some poor

17   devil to come cruising by at 40 percent of the

18   take.  40 percent of the take.  I've seen it in

19   writing.

20        UNIDENTIFIED SPEAKER:  Is that right, Senator

21   Cole?

22        UNIDENTIFIED SPEAKER:  On occasion, it's

23   correct.  You know, you can find doctors that

24   operate at the drop of a hat, and you can find

Victoria's Transcription Services, Inc.

18

1    real estate brokers that are crooks, and you can

2    find people in the food business that are crooked,

3    and you can go in every walk of life.

4          UNIDENTIFIED SPEAKER:  Except for teachers.

5          UNIDENTIFIED SPEAKER:  Yeah.  Yeah, that's

6    right, they're an exception.

7          UNIDENTIFIED SPEAKER:  Theater operators

8    (inaudible) --

9          UNIDENTIFIED SPEAKER:  But, you know --

10         UNIDENTIFIED SPEAKER:  I've never seen a

11   theater operator that was that way, though.

12         UNIDENTIFIED SPEAKER:  Is that right,

13   Harold?

14         UNIDENTIFIED SPEAKER:  Well, do you want my

15   amendment or do you want to hold off?

16         UNIDENTIFIED SPEAKER:  No, because I showed

17   you the transparent unfairness of requiring notice

18   when the person doesn't know -- doesn't have the

19   facts to give notice.

20         UNIDENTIFIED SPEAKER:  I think that's a --

21   that case that you're talking about, your case, I

22   think that's something very, very, very unusual.

23         UNIDENTIFIED SPEAKER:  No, it is not.  And

24   you will find it in fraud cases.  You'll find

19

1    fraud cases where a person may not discover the

2    fraud for five or even ten years.  And it so

3    happens that the statute of limitations doesn't

4    start to run until the discovery of a fraud or a

5    breach of trust.

6         UNIDENTIFIED SPEAKER:  So you think your bill

7    is just right the way you have it framed, starting

8    from the date of the injury?

9         UNIDENTIFIED SPEAKER:  From the time that the

10   action accrues, yes.  And Harold makes a very good

11   case.  But forget money and just suppose I take

12   your cow and I keep that cow for a year or two

13   years.  And during that time, I milk it and I get

14   two or three calves that I sell.

15        Now, should the wrongdoer who takes the

16   cow and who converts the milk to his own use and

17   sells the calves, be able to say, well, I'll keep

18   all those things until the time that McManus

19   (phonetic) gives me notice that he wants the cow

20   back and he wants the proceeds of the calves and

21   of the milk?  And, obviously, it should start from

22   the time somebody's property has been taken and

23   used.

24        UNIDENTIFIED SPEAKER:  The cow (inaudible)

Victoria's Transcription Services, Inc.

20

1    coming back to you.

2         UNIDENTIFIED SPEAKER:  Yeah.

3         UNIDENTIFIED SPEAKER:  Yeah, okay, the entire

4    proceeds, or did it cost him a dime to raise

5    12 cents worth of calf?

6         UNIDENTIFIED SPEAKER:  Well, you see, Harold,

7    that's one of the things that the court can allow

8    for.  It can allow for that.

9         UNIDENTIFIED SPEAKER:  (Inaudible.)

10        UNIDENTIFIED SPEAKER:  On the other hand, did

11   the man whose cow was taken ask that it be taken

12   from him?

13        UNIDENTIFIED SPEAKER:  No.

14        UNIDENTIFIED SPEAKER:  Maybe it wasn't

15   taken.  Maybe it wasn't converted.

16        UNIDENTIFIED SPEAKER:  Maybe it was a

17   contract case.

18        UNIDENTIFIED SPEAKER:  Maybe it was an honest

19   dispute.  Maybe it was an honest misunderstanding

20   and old Sharpie over here didn't find out he could

21   hook me until a couple years later.

22        UNIDENTIFIED SPEAKER:  Well --

23        UNIDENTIFIED SPEAKER:  You'd know.

24        UNIDENTIFIED SPEAKER:  -- actually, the cases

1    do allow for upkeep and even for improvements on

2    real property, for example.  The Court of Equity

3    has that power.  But it just seems common justice

4    and equity to say that when somebody else uses

5    your property that you ought to have the income

6    from it, whether it be money or a horse or a cow

7    or whatever during the time that he's held that.

8        UNIDENTIFIED SPEAKER:  I wish that I were a

9    wiser man.  I was reading the Constitution again

10   yesterday and some provisions of the Bill of

11   Rights about the right to a trial by jury, and

12   that's in the Constitution.  And I think of what

13   action we, in general, and you, as one in

14   particular, have taken to reduce the right to

15   trial by jury and to have a trial in the court and

16   to reduce the number of jurors.  Sometimes that's

17   good.  But always, it seems to me, that it's

18   sliding one way there, in my opinion, if I were

19   the guy requesting the trial by jury, and in some

20   cases today, I think it would be extremely hard to

21   get.

22       UNIDENTIFIED SPEAKER:  Well, let me tell you

23   something, Harold.  You were in the House when I

24   did it.  When they wanted to take away from a man,

22

1    who could be put in jail up to six months, the

2    right to a jury trial, I went to every single

3    member of the House of Representatives and I got

4    him as a cosponsor on that bill.  And the governor

5    and the chief justice of the State of Colorado

6    were opposed to me.  And the governor called me in

7    and told me that he thought it was wrong.  And I

8    didn't back down one bit.

9            And the United States Supreme Court,

10   not any lawyers, the United States Supreme Court

11   said in petty offenses where you can be put into

12   jail up to six months, you're not entitled to a

13   jury trial under the Federal Constitution, but I,

14   I got that guaranteed in the House of

15   Representatives and in the Senate, and it went

16   through slick as a whistle.

17       UNIDENTIFIED SPEAKER:  And it is the law of

18   Colorado today.

19       UNIDENTIFIED SPEAKER:  It is the law of

20   Colorado today.

21       UNIDENTIFIED SPEAKER:  And in other cases, we

22   have removed the right for jury trial or reduced

23   the number of jurors.

24       UNIDENTIFIED SPEAKER:  We have reduced the

1    number of jurors to six, but if you demand it, you

2    can have a jury of 12.

3         UNIDENTIFIED SPEAKER:  And you pay and --

4         UNIDENTIFIED SPEAKER:  Yes, but we have

5    removed the right to have a jury trial.  Just in

6    the last four years there was -- it seems to me

7    about four years ago, Ralph, there was a bill that

8    went through here.

9         UNIDENTIFIED SPEAKER:  No.  I tried it.

10        UNIDENTIFIED SPEAKER:  It failed then.

11        UNIDENTIFIED SPEAKER:  In England where we

12   got our jury --

13        UNIDENTIFIED SPEAKER:  That's what it was.

14        UNIDENTIFIED SPEAKER:  -- they have taken the

15   right to trial by jury away in civil cases except

16   for breach of promise, slander and libel.

17        UNIDENTIFIED SPEAKER:  That's what it was, in

18   civil cases.

19        UNIDENTIFIED SPEAKER:  And what's the other?

20   Seduction.  Still a jury trial in those cases.

21   Otherwise there isn't.  And you know the cost of

22   their court system over there is so much smaller

23   than ours and justice is so much swifter.

24        UNIDENTIFIED SPEAKER:  The jury is chosen

24

1   forthwith.

2       UNIDENTIFIED SPEAKER:  Oh, you bet.

3       UNIDENTIFIED SPEAKER:  Can we adjourn?

4       UNIDENTIFIED SPEAKER:  Yeah, I won't put it

5   on the table today.  At least I introduced you to

6   it.

7       UNIDENTIFIED SPEAKER:  (Inaudible.)

8       UNIDENTIFIED SPEAKER:  If this bill comes

9   back on this table, I observe that that 45 percent

10  is fair game.

11      UNIDENTIFIED SPEAKER:  Well, Harold, you and

12  I will look at it.  I don't care to see that.

13      UNIDENTIFIED SPEAKER:  I can hear old Block

14  saying, by God, make it 20 percent and we'll make

15  them settle.

16      UNIDENTIFIED SPEAKER:  Go get 'em.

17      UNIDENTIFIED SPEAKER:  The young buck's

18  getting older.

19      UNIDENTIFIED SPEAKER:  Thank you very much.

20

21

22

23

24

25

```
 1    STATE OF ILLINOIS      )

 2                           )

 3    COUNTY OF C O O K      )

 4         I, ANGELA M. MONTINI, a Certified Shorthand

 5    Reporter, do hereby certify that said CD-ROM

 6    recording of proceedings were reduced to writing

 7    by means of shorthand and thereafter transcribed

 8    to the best of my ability into typewritten form;

 9    and that the foregoing is a true, correct, and

10    complete transcript of the said proceedings so

11    taken as aforesaid.

12         I further certify that I am not counsel for

13    nor in any way related to any of the parties, nor

14    am I in any way interested in the outcome thereof.

15         I further certify that this certificate

16    applies to the original signed IN BLUE and

17    certified transcripts only.  I assume no

18    responsibility for the accuracy of any reproduced

19    copies not made under my control or direction.

20         IN TESTIMONY WHEREOF I have hereunto set my

21    hand this 26th day of July, 2006.

22

23                       _____

24                       ANGELA M. MONTINI, CSR
```