# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

### No. 90-cv-181

_____

**MERILYN COOK, et al.,**

      **Plaintiffs,**

          **v.**

**ROCKWELL INTERNATIONAL CORPORATION and
THE DOW CHEMICAL COMPANY,**

      **Defendants.**

_____

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
### TO DEFENDANTS' MOTION FOR NEW TRIAL OR REMITTITUR

_____

**Dated: March 19, 2007**

## TABLE OF CONTENTS

**Page:**

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

OVERVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.  The Jury's Verdict Is Not Inconsistent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

        A.  Plaintiffs Do Not Seek "Duplicative" Damages . . . . . . . . . . . . . . . . . . . . . . . . . 4

        B.  The Jury's Allocations of Fault Are Not Inconsistent . . . . . . . . . . . . . . . . . . . . . 5

        C.  The Exemplary Damage Awards Are Neither Improper nor Inconsistent . . . . . . . **12**

        D.  Addition of Prejudgment Interest Prior to Any Application of the Exemplary Damages Cap Can Introduce No Impropriety or Inconsistency in the Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        E.  No New Trial Is Necessary to Cure Any Defect in the Exemplary Damage Awards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

   II.  The Compensatory Damages Should Not Be Set Aside or Reduced . . . . . . . . . . . . . . . 25

        A.  No Remittitur Should Be Ordered Based on Alleged "Inconsistencies" in the Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

        B.  The Compensatory Damages Awarded by the Jury Should Stand . . . . . . . . . . . . . 28

            1.  The Compensatory Award to the Damages Subclass Is Supported By the Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

            2.  The Jury Was Not Required to Make a Separate Determination That Class Members Owned Their Properties at the Time Governing Section 930's Damage Measure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

            3.  The Compensatory Damages Need Not and May Not Be Set Aside or Reduced to "Account for Class Members Who Decline to Accept an Easement" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

            4.  Aggregation of Damages Does Not Warrant a New Trial . . . . . . . . . . . . . . . . . . 41

**TABLE OF CONTENTS (cont'd)**

Page:

    5.  The Damages May Not Be Set Aside or Reduced to "Account for
All Class Members Who Have Released Their Claims Against
Defendants" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

    6.  The Compensatory Damages Are Not Otherwise Unsupported
By the Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

III. The Exemplary Damages Should Not Be Set Aside or Reduced . . . . . . . . . . . . . . . . . 45

    A.  The Exemplary Damage Awards Are Supported by Voluminous
Record Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

    B.  Defendants' Alleged Compliance with "Standards" Does Not Warrant
Setting Aside the Exemplary Damage Awards . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

    C.  The Court Should Not Disallow or Reduce the Punitive Damage Award
Pursuant to Colo. Rev. Stat. § 13-21-102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

    D.  The Exemplary Damage Awards Are Not Unconstitutional . . . . . . . . . . . . . . . . . . 52

    E.  Defendants' Price-Anderson Argument Has Already Been Rejected . . . . . . . . . . . . 55

IV. The Court's Previous Rejection of Defendants' Other Arguments Remains Sound . . . . 55

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

# TABLE OF AUTHORITIES

**Page:**

## Cases

*Alley v. Gubser Development Co.*, 785 F.2d 849 (10th Cir. 1986) . . . . . . . . . . . . . . . . . . . . 47, 50

*Am. Ins. Co. v. El Paso Pipe & Supply Co.,* 978 F.2d 1185 (10th Cir. 1992) . . . . . . . . . . . . . . 32

*Aves v. Shah*, 997 F.2d 762 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Bitler v. A.O. Smith Corp.*, 391 F.3d 1114 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Bd. of County Comm'rs v. Slovek*, 723 P.2d 1309 (Colo. 1986) . . . . . . . . . . . . . . . . . . . . . 4-5, 37

*BMW of North Am., Inc. v. Gore*, 517 U.S. 559 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 54

*Borland v. Sanders Lead Co.*, 369 So. 2d 523 (Ala. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Bruno v. Western Elec. Co.*, 829 F.2d 957 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Burns v. McGraw-Hill Broadcasting Co.*, 659 P.2d 1351 (Colo. 1983) . . . . . . . . . . . . . . . . . . . 26

*Carter v. Unit Rig & Equip. Co.*, 908 F.2d 1483 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . 10

*Cimino v. Raymark Indus., Inc.*, 151 F.3d 297 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Cook v. Rockwell Int'l Corp.*, 358 F. Supp. 2d 1003 (D. Colo. 2004) . . . . . . . . . . . . . . . . . . . . 40

*Coors v. Security Life of Denver Ins. Co.*, 112 P.2d 59 (Colo. 2005) . . . . . . . . . . . . . . 45-46, 47

*Covanta Onondaga Ltd. v. Onondaga County Res. Recovery Agency*,
318 F.3d 392 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Darks v. Mullin*, 327 F.3d 1001 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Domann v. Vigil*, 261 F.3d 980 (10th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Donovan v. Penn Shipping Co.*, 429 U.S. 648 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Eaton v. McClain*, 891 S.W. 2d 587 (Tenn. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**TABLE OF AUTHORITIES (cont'd)**

**Page:**

**Cases (cont'd)**

*Finnegan v. Fountain*, 915 F.2d 817 (2d Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Florey v. District Court*, 713 P.2d 840 (Colo. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Fortier v. Dona Anna Plaza Partners*, 747 F.2d 1324 (10th Cir. 1984) . . . . . . . . . . . . . . . . . . . 32

*Franklin v. Thompson*, 981 F.2d 1161 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*French v. Deane*, 19 Colo. 504, 36 P. 609 (1894) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Gasperini  v. Ctr. for Humanities, Inc.*, 518 U.S. 415 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Global Van Lines, Inc. v. Nebeker*, 541 F.2d 865 (10th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . 3

*George Carlson & Assocs. v. United States Bankruptcy Court (In re Zamora)*,
    251 B.R. 591 (D. Colo. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Gorsich v. Double B Trading Co.*, 893 P.3d 1357 (Colo. App. 1994) . . . . . . . . . . . . . . . . . . . . . 8

*Hayes v. Garcia*, No. 04-2009, 123 F. Appx. 858, 862, 2005 U.S. App. LEXIS 1280
    (10th Cir. Jan. 25, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30-31

*Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847 (10th Cir. Colo. 2000) . . . . . . . . . . . . . . . . . . 22

*Huffman v. Caterpillar Tractor Co.*, 908 F.2d 1470 (10th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . 10

*Hughes v. Regents of the Univ. of Colo.*, 967 F. Supp. 431, 437 (D. Colo. 1996) . . . . . . . . . . . . 2

*Hurd v. Am. Hoist & Derrick Co.*, 734 F.2d 495 (10th Cir. 1984) . . . . . . . . . . . . . . . . . . . . 26, 32

*In re Urban Broad. Corp.*, 401 F.3d 236 (4th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Jacobs v. Commonwealth Highland Theaters, Inc.*, 738 P.2d 6 (Colo. App. 1986) . . . . . . . . . 47

*James v. Coors Brewing Co.*, 73 F. Supp. 2d 1250 (D. Colo. 1999) . . . . . . . . . . . . . . . . . . . 15, 20

*Johnson v. ABLT Trucking Co.*, 412 F.3d 1138 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 3, 32

# TABLE OF AUTHORITIES (cont'd)

Page:

## Cases (cont'd)

*Juarez v. United Farm Tools, Inc.*, 798 F.2d 1341 (10th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . 47

*Klein v. Grynberg*, 44 F.3d 1497 (10th Cir. 1995)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Lahey v. Covington*, 964 F. Supp. 1440 (D. Colo. 1996)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Lexton-Ancira Real Estate Fund v. Heller*, 826 P.2d 819 (Colo. 1992)  . . . . . . . . . . . . . . . . . . 52

*Life Care Centers of Am., Inc. v. East Hampden Assoc. Ltd. P'ship*,
    903 P.2d 1180 (Colo. App. 1995)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Lira v. Davis*, 832 P.2d 240 (Colo. 1992)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 13, 16-18, 19, 25

*Lyon v. The Ranger III*, 858 F.2d 22 (1st Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Midway Motor Lodge v. Innkeepers' Telemanagement & Equip. Corp.*,
    54 F.3d 406, 409 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Miller v. Byrne*, 916 P.2d 566 (Colo. App. 1995)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Miller v. Carnation Co.*, 39 Colo. App. 1, 564 P.2d 127 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Miller v. Solaglas Cal., Inc.*, 870 P.2d 559, 568 (Colo. App. 1993)  . . . . . . . . . . . . . . . . . . . . . . 47

*O'Gilvie v. Int'l Playtex, Inc.*, 821 F.2d 1438 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Palmer v. A.H. Robins*, 684 P.2d 187 (Colo. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 47

*Philip Morris USA v. Williams*, 127 S. Ct. 1057 (2007)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Rasmussen Drilling, Inc. v. Kerr-McGee Nuclear Corp.*,
    571 F.2d 1144 (10th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Rawson v. Sears, Roebuck & Co.*, 615 F. Supp. 1546 (D. Colo.),
    *rev'd in part on other grounds*, 822 F.2d 908 (10th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . 26

**TABLE OF AUTHORITIES (cont'd)**

Page:

**Cases (cont'd)**

*Resolution Trust Corp. v. Stone*, 998 F.2d 1534 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . 32

*St. Anthony Hosp. v. United States Dep't of Health & Human Servs.*,
309 F.3d 680 (10th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Sandford v. Chevrolet Div. of Gen. Motors*, 292 Or. 590, 642 P.2d 624 (1982) . . . . . . . . . . . . 11

*Sanjuan v. IBP, Inc.*, 160 F.3d 1291 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Slack v. Farmers Ins. Exch.*, 5 P.3d 280 (Colo. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-10

*Slater v. Shell Oil Co.*, 58 Cal. App. 2d 864, 137 P.2d 713 (1943) . . . . . . . . . . . . . . . . . . . . . . 40

*Sprung v. Adcock*, 903 P.2d 1224 (Colo. App. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408 (2003) . . . . . . . . . . . . . . . . . . . . 53, 54

*Thompson v. State Farm Fire & Cas. Co.*, 34 F.3d 932 (10th Cir. 1994) . . . . . . . . . . . . . . . . . 32

*United Drilling Co. v. Enron Oil & Gas Co.*, 108 F.3d 1186 (10th Cir. 1997) . . . . . . . . . . . . . 22

*United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207 (10th Cir. 2000) . . . . 46, 53

*United States v. Thornburgh*, 962 F.2d 1438 (10th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Van Leeuwan v. Nuzzi*, 810 F. Supp. 1120 (D. Colo. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*Vaske v. DuCharme, McMillen & Assoc., Inc.*, 757 F. Supp. 1158 (D. Colo. 1990) . . . . . . . . 47

*Watson v. State Farm Fire & Cas. Ins. Co.*, 469 So. 2d 967 (La. 1985) . . . . . . . . . . . . . . . . . . 11

*Western Fire Truck, Inc. v. Emergency One*, 134 P.3d 570 (Colo. App. 2006) . . . . . . . . . . . . . 47

*Windham v. Am. Brands, Inc.*, 565 F.2d 59 (4th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

## TABLE OF AUTHORITIES (cont'd)

**Page:**

### Statutes and Rules

33 U.S.C. § 1319 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

42 U.S.C. § 2210 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Fed. R. Civ. P. 16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Fed. R. Civ. P. 49 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 56

Fed. R. Civ. P. 50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Fed. R. Civ. P. 51 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Fed. R. Civ. P. 59 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed. R. Evid. 103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Colo. Rev. Stat. § 13-21-102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 25, 46, 51

Colo. Rev. Stat. § 13-21-111 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Colo. Rev. Stat. § 13-21-111.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7, 10

### Other Authorities

*Restatement (Second) of Torts* § 901 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Restatement (Second) of Torts* § 930 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Restatement (Third) of Torts: Apportionment of Liability* § 8 . . . . . . . . . . . . . . . . . . . . . . . . 11

Dan B. Dobbs, *The Law of Torts* (West 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

David W. Robertson, *Eschewing Ersatz Percentages: A Simplified Vocabulary
of Comparative Fault*, 45 St. Louis L.J. 831 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Charles. A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice
and Procedure: Jurisdiction* (2d ed. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

## INTRODUCTION

Plaintiffs respectfully submit this memorandum in opposition to "Defendants' Motion for a New Trial or, in the Alternative, for a Remittitur of Damages" (filed Jan. 22, 2007) [Ct. Rec. 2224] and in response to defendants' accompanying memorandum [Ct. Rec. 2225].

## OVERVIEW

This is, in many ways, an unusual new trial motion. The Court has now presided over a four-month class trial in this matter, following very extensive pretrial preparations. During those proceedings, defendants had myriad opportunities to state their defenses, assist in structuring the class trial, provide input on the jury instructions and verdict form, and ultimately present their case to the trier of fact. They were not reticent in exploiting those opportunities. The past three years alone have seen over 1000 docket entries in this case. The Court has been deluged with filings, raising and re-raising legal arguments of every conceivable description. Nevertheless, the Court saw the process through. The claims held suitable for disposition in a class trial have now been tried successfully to verdict. That was both a formidable task and a laudable achievement.

Yet in many places, defendants' motion now treats the trial, and the proceedings leading up to it, almost as a procedural nullity. It is as though defendants envisaged the class trial as a kind of tentative first procedural step, with no real purpose except to aid the Court and the parties  in distilling various legal issues for further debate, and perhaps for ultimate resolution in some other place, time, or fashion. Certainly defendants fail, for many of the arguments they press, to point to occasions in the record, prior to the verdict, where they preserved the points now raised in the customary manner, and as prescribed by this Court's orders and the governing procedural and evidentiary rules. That failure must be counted as remarkable, given the unprecedented volume of

objections that defendants did raise.  But it is a real failure, and one that would suffice, by itself, to warrant denial of this motion in large part.

If some of defendants' arguments are new, others are of very respectable vintage, and a new trial would do nothing to silence them.  Indeed, defendants fail, in large part, to offer any proposal explaining how a new trial or remittitur might redress their longstanding objections (or their new ones, for that matter), even if those objections were now credited.  A number of arguments are seemingly interposed, on old points as well as new, not with a view toward seeking any actual, practical relief, but simply to reinforce defendants' mantra that any trial of these claims was a metaphysical impossibility in the first place; any judgment in this case, doubly so.

Those things are more possible than defendants suppose.  A trial has now been conducted.  A verdict has been reached.  Defendants have offered no valid ground to overturn it.  Judgment should be entered.

For ease of reference, this brief has been structured so that the headings and arguments correspond to those in defendants' memorandum.

## ARGUMENT

Appellate review of a motion for new trial under Fed. R. Civ. P. 59(a) is for abuse of discretion.  *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1296 (10th Cir. 1998).  "A motion for a new trial is not regarded with favor and should only be granted with great caution."  *Franklin v. Thompson*, 981 F.2d 1161, 1171 (10th Cir. 1992) (quoting *United States v. Thornburgh*, 962 F.2d 1438, 1443 (10th Cir. 1992)).  "Generally, courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or substantial justice has not been done."  *Hughes v. Regents of the Univ. of Colo.*, 967 F. Supp. 431, 437 (D. Colo. 1996).  A new trial will not be

granted unless "having given full respect to the jury's findings and viewing the entire evidence, the trial judge is left with the 'definite and firm conviction' that a mistake has been committed." *Id*. (citation omitted).

In addition, a motion for new trial should be denied unless the moving party can show that the alleged error – even if substantial – was sufficiently prejudicial to have affected the movant's rights or the outcome of the case. *See Rasmussen Drilling, Inc. v. Kerr-McGee Nuclear Corp*., 571 F.2d 1144, 1149 (10th Cir. 1978) ("No error in either the admission or the exclusion of evidence and no error in any ruling or order or in anything done or omitted by the trial court or by the parties is ground for granting a new trial or for setting aside a verdict unless the error or defect affects the substantial rights of the parties.").

## I.      The Jury's Verdict Is Not Inconsistent

It is defendants' burden "to show that any verdict inconsistency demonstrates 'either confusion or abuse on the jury's part.'" *Domann v. Vigil*, 261 F.3d 980, 983 (10th Cir. 2001) (quoting *Global Van Lines, Inc. v. Nebeker*, 541 F.2d 865, 868 (10th Cir. 1976)). In determining whether there is any inconsistency, the Court "must accept any reasonable explanation that reconciles the jury's verdict." *Domann*, 261 F.3d at 983. "A verdict is irreconcilably inconsistent only when 'the essential controlling findings are in conflict, the jury has failed utterly to perform its function of determining the facts, and its verdict is a nullity.'" *Johnson v. ABLT Trucking Co.*, 412 F.3d 1138, 1144 (10th Cir. 2005) (quoting Abner Eddins Lipscomb, *Special Verdicts Under the Federal Rules*, 25 Wash. U.L.Q. 185, 212 (1940)).

### A.       Plaintiffs Do Not Seek "Duplicative" Damages

The jury awarded identical compensatory damages of $176,850,340 on both the trespass claim and the nuisance claim.[1]  Plaintiffs agree[2] that under the verdict, compensatory damages in that amount should be awarded to the Damages Subclass[3] only once, not twice.  Trespass and nuisance are distinct causes of action, with distinct elements, but the same invasions may contribute, in whole or in part, to liability under both theories.  *E.g.*, *Borland v. Sanders Lead Co.*, 369 So. 2d 523, 527 (Ala. 1979) ("trespass and nuisance are separate torts for the protection of different interests invaded," but "the same conduct on the part of defendant may, and often does, result in the actionable invasion of both interests").  Under *Restatement (Second) of Torts* § 930, the measure of damages for "future invasions" is the same, regardless of whether the invasions are actionable in trespass, nuisance, or both: "the decrease in the value of the land caused by the prospect of the continuance of the invasion[s]."  *Id.* § 930(3)(b).  The total "decrease in value" found by the jury was suffered once, not twice, and the Damages Subclass is entitled to compensatory damages only to the extent of the actual "decrease in value" that the jury found, even though those damages were recoverable under multiple  theories.  *See Bd. of County Comm'rs v. Slovek*, 723 P.2d 1309, 1319

---

[1] *Compare* Jury Verdict Form, at 15 (Feb. 14, 2006) (response to question No. 13 under ¶ E)  [Ct. Rec. 2117] *with id.* at 24 (response to question No. 13 under ¶ F).

[2] As defendants correctly note, the Court has already addressed this issue.  *See* Tr. (2/14/06) at 10800:21 ("They are the same damages . . . .").

[3] Damages were tried for the Damages Subclass only.  In its Order on Scheduling and Jury Instruction Issues (May 17, 2005) (the "May 2005 Order") [Ct. Rec. 1338], the Court defined the Damages Subclass to comprise "all Class members who owned property within the Class Area on the later of: (i) January 30, 1990, the date this action was filed; or (ii) the date on which the jury, per Restatement § 930(1), finds it appeared the trespass and/or nuisance asserted by Plaintiffs would continue indefinitely."  *See* May 2005 Order, at 15.

n.8 (Colo. 1986) (compensation should be allowed "only for those losses that are separate and distinct"); *Miller v. Carnation Co.*, 39 Colo. App. 1, 5, 564 P.2d 127, 130 (1977) (unitary damage award where jury found liability based on both trespass and nuisance).

Although defendants' "duplicative damages" point is raised in a part of their brief devoted to arguing that a new trial is required due to alleged inconsistencies in the verdict, plaintiffs do not understand defendants to contend that the jury's award of compensatory damages for both trespass and nuisance constitutes such an "inconsistency," or that a new trial is required on those grounds. Nor could defendants press such an argument. The dual award reflects no confusion or abuse on the jury's part, but rather the jury's faithful adherence to the Court's instructions. *See* Jury Instructions, at 72-73 (Feb. 16, 2006) (Instruction No. 3.26, captioned "Multiple Recovery Prohibited") [Ct. Rec. 2121]. Plaintiffs understand defendants to be arguing only what plaintiffs have already conceded: under the jury's verdict, the Damages Subclass should not receive the same compensatory damages twice.

### B.     The Jury's Allocations of Fault Are Not Inconsistent

The procedural history on the fault-apportionment issue is partially summarized in the Court's Memorandum Opinion Regarding Jury Instructions (Dec. 7, 2006) (the "Jury Instruction Opinion") [Ct. Rec. 2205]. *See id.* at 91-92. Through sixteen years of pre-trial practice, defendants never raised the issue of allocating fault among themselves under Colo. Rev. Stat. § 13-21-111.5. Early in the case, Rockwell did file a series of motions for extensions of time to designate liable nonparties, the seventh of which was finally denied by Judge Babcock on January 31, 1991 [Ct. Rec. 92]. But defendants were otherwise silent on the point. Their answers pleaded the fault of plaintiffs and/or unidentified third parties as a defense, but Dow and Rockwell each failed conspicuously to

plead the fault of the other. *See* Answer of Def. Dow Chem. Co. to Second Am. Compl., at 8 (May 8, 1991) (twelfth defense) [Ct. Rec. 58]; Answer of Def. Rockwell Int'l Corp. to Second Am. Compl., at 12 (May 8, 1991) (twelfth defense) [Ct. Rec. 61]. Similarly, in the parties' joint Status Report Responding to the Court's September 11, 2003 Order (Dec. 10, 2003) [Ct. Rec. 1218], defendants argued that such "affirmative defenses" as the "comparative negligence" of individual class members could not be addressed in a class-wide trial, *id.* at 30, but they nowhere mentioned the apportionment of fault between themselves. *See, e.g., id.* at 41 (listing defenses to be tried).

Even after the Court itself raised the issue, shortly before the close of trial, defendants did not propose any comparative fault instruction, nor any jury interrogatory on that subject, but rather argued vigorously that "each defendant should be treated as if the other were never there." *See* Defs.' Proposed Jury Verdict Forms, at 2 (Jan. 11, 2006) [Ct. Rec. 1963]. With no parties affirmatively contending for the applicability of section 13-21-111.5, the Court stepped into the breach and fashioned an instruction modeled on Colo. Jury Instructions (Fourth) Civ. §§ 9:29 - 9:29B (2002 & Supp. 2004). *See* Jury Instructions, at 62 (Instruction No. 3.19A, captioned "Apportioning Fault Between Defendants"). Defendants lodged an objection "to the application of Colo. Rev. Stat. § 13-21-111.5 to this case." *See* Defs.' Objections to Additional and Revised Jury Instructions, at 16 (Jan. 19, 2006) [Ct. Rec. 2023]. The instruction was ultimately given over defendants' objection. *See* Jury Instruction Opinion, at 92.

In sum, for sixteen years of pre-trial practice, and through the trial itself, defendants' posture toward apportionment of fault as between Dow and Rockwell has ranged from benign neglect to affirmative opposition. The reasons for that posture are not hard to fathom. Defendants share a

common indemnitor, *see* 42 U.S.C. § 2210(d), which has controlled their joint defense since on or before August 1, 1996.[4]

The foregoing should dispose of any contention that the jury's verdict does not sufficiently fix the rights and responsibilities of defendants *inter se*.  On this record, that would be a matter between Dow and Rockwell – if DOE's status as the indemnitor of both defendants does not render it altogether academic.  If either defendant had wanted to protect its interests, with respect to the other, through a jury instruction or a verdict form calling for one global apportionment of fault under section 13-21-111.5 (as opposed to separate apportionments for trespass and nuisance), both defendants were free to make that request.  Neither defendant did so, perhaps because neither they nor DOE had any perceived stake in the question.  If defendants' omission to better protect their interests *vis-a-vis* one another has now resulted in some overlapping damages exposure for Dow and Rockwell, any consequent internecine dispute would be the product of defendants' own election, to be resolved between themselves in some other context.  It would not be a basis for denying recovery to the class, or for unraveling the verdict after a lengthy trial where both defendants strenuously attempted  to prevent the comparative fault issue from ever being submitted to the jury in the first place.[5]

_____

[4] *See* Rockwell Automation, Inc., Form 10-Q, at 17 (filed Feb. 4, 2004) (Ex. A) ("Effective August 1, 1996, the DOE assumed control of the defense of the contractor defendants, including the Company, in the action. Beginning on that date, the costs of the Company's defense, which had previously been reimbursed to the Company by the DOE, have been and are being paid directly by the DOE. The Company believes that it is entitled under applicable law and its contract with the DOE to be indemnified for all costs and any liability associated with this action.").

[5] Section 13-21-111.5(b) provides that the jury "shall" be asked to issue a special verdict apportioning fault in any case to which the Colorado proration statute applies.  A party's

(continued...)

*Plaintiffs' Opposition to Motion for New Trial or Remittitur – Page 7*

The jury's verdict does meanwhile fix defendants' respective damage liabilities to the Damages Subclass.  The jury awarded identical compensatory damages of $176,850,340 for both the nuisance claim and the trespass claim.  That aspect of the jury's verdict represents a factual finding that the trespass and nuisance *each* bore the legally requisite causal relationship to the *entire* diminution in value suffered by the Damages Subclass.[6]  From Dow, therefore, plaintiffs may collect compensatory damages up to $159,165,306, plus prejudgment interest on that amount – i.e., 90% of defendants' total compensatory damage liability for the trespass claim.  (The jury allocated 90% of the fault on the trespass claim to Dow, and no reason appears why Dow should be responsible for some lesser amount merely because Dow was found to be 30% at fault on a class-wide nuisance claim as well).  From Rockwell, plaintiffs may collect compensatory damages up to $123,795,238, plus prejudgment interest on that sum (70% of the compensatory award on the nuisance claim).  The phrase "up to" is chosen advisedly, because as plaintiffs have conceded, the overall compensatory damage recovery for the Damages Subclass will be limited, under the judgment on the jury's verdict, to $176,850,340 (plus prejudgment interest).  That limitation does not operate to defendants' detriment.  Quite the contrary, its likeliest result is that neither defendant will pay the full measure

---

[5](...continued)
 rights under § 13-21-111.5, however, are not entirely unwaivable.  *See Gorsich v. Double B Trading Co.*, 893 P.3d 1357, 1364 (Colo. App. 1994).

[6] The jury was specifically asked to compare the total value of the class properties with what their total value would have been "but for the trespass by Dow and Rockwell."  *See* Jury Verdict Form, at 14 (question No. 13 under ¶ E).  It was likewise asked to compare the value of class properties to what their value would have been "but for the nuisance by Dow and Rockwell."  *Id.* at 23 (question No. 13 under ¶ F).  To both questions, the jury's answer was $176,850,340.  The jury is presumed to have answered the questions it was asked, and to have followed the Court's instructions more generally.  *E.g.*, *Darks v. Mullin*, 327 F.3d 1001, 1015 (10th Cir. 2003).

of the damages it "owes," to borrow defendants' terminology.[7]  Plaintiffs concededly cannot *collect* a full 90% of their compensatory damages from Dow and also *collect* a full 70% of them from Rockwell.  That does not change the fact that each defendant *owes* those amounts, to the extent they are not collected from the other.

Nor do the jury's different apportionments of fault on the trespass and nuisance claims represent an inconsistency – let alone an irreconcilable one.  Defendants' argument to the contrary rests on the badly mistaken premise that the jury's task, in responding to the fault-apportionment questions on the verdict form, was not to apportion fault, but rather to allocate loss causation.  For this proposition, defendants rely primarily on an out-of-context quotation from the Colorado Supreme Court's opinion in *Slack v. Farmers Ins. Exch.*, 5 P.3d 280, 284 (Colo. 2000) ("a tortfeasor is responsible only for the portion of the damages that he or she caused").  Defendants' strained reading of that out-of-context quotation is at odds with the teachings of the *Slack* decision itself, with Colorado's comparative fault jurisprudence more generally, and with the plain meaning of section 13-21-111.5.

In pertinent part, the pro rata liability statute provides:

(1) In an action brought as a result of a death or an injury to person or property, no defendant shall be liable for an amount greater than that represented by the *degree or percentage of the negligence or fault* attributable to such defendant that produced the claimed injury, death, damage, or loss . . . .

(2) The jury shall return a special verdict, or, in the absence of a jury, the court shall make special findings determining the *percentage of negligence or fault* attributable to each of the parties . . . and determining the total amount of damages sustained by each claimant. The entry of judgment shall be made by the court based on the special findings . . . .

---

[7] *See* Defs.' Mem. at 7-8.

Colo. Rev. Stat. § 13-21-111.5 (emphasis added).

The question presented in *Slack* was whether this statutory language permits a jury to apportion "negligence or fault" as between intentional tortfeasors and negligent ones.  The plaintiff argued that the statute permitted only apportionment between negligent tortfeasors, and that intentional tortfeasors should therefore be excluded from the calculus.  The *Slack* court noted, however, that the statute calls for apportionment not only of "negligence," but also of "fault."  In keeping with the maxim that statutory construction takes the plain meaning of the statutory text as its point of departure, *see* 5 P.3d at 284 (citing authorities), the court observed that *Black's Law Dictionary* defines "fault" broadly, as "'an error or defect of judgment or of conduct; any deviation from prudence or duty resulting from inattention, incapacity, perversity, bad faith, or mismanagement.'"  *Id.* at 285 (quoting *Black's Law Dictionary* 623 (7th ed. 1999)).  It also pointed to Webster's definition of fault as "'a failure to do what is right'" or "'a responsibility for wrongdoing or failure.'"  *Id.* (quoting *Webster's Third New International Dictionary* 829 (1976)).  That common understanding of the term "fault," the court held, extended beyond the narrower meaning of "negligence" to embrace blameworthy intentional conduct as well.  *Id.* at 286.  *Accord, e.g.*, *Huffman v. Caterpillar Tractor Co.*, 908 F.2d 1470, 1477 (10th Cir. 1990) (construing the word "fault" in the pro rata liability statute "as a general term encompassing a broad range of culpable behavior"); *Carter v. Unit Rig & Equip. Co.*, 908 F.2d 1483, 1486-87 (10th Cir. 1990) (same).

Under *Slack's* teachings, then, as well as the plain language of the statute and governing Tenth Circuit authorities, it is *fault*, broadly defined, that the jury apportions.  Defendants' respective damage liabilities are then *prorated* by *reference* to jury's percentage allocation of fault.  *See Lira v. Davis*, 832 P.2d 240, 242 (Colo. 1992) (compensatory damages are "apportioned in accordance

with the percentage of fault attributable to that defendant").  In some jurisdictions, the relative importance of a defendant's causal contribution to the harm or loss may be one factor that a jury may consider in apportioning comparative fault.  Whether or not Colorado falls in that category, one thing is certain: under Colorado law, causation is not the *only* relevant factor.  The jury was entitled to weigh the comparative wrongfulness of defendants' conduct in the balance.  In this respect, Colorado law is consistent with the heavy weight of authority on comparative negligence or fault in other jurisdictions.  *See, e.g.*, *Lyon v. The Ranger III*, 858 F.2d 22, 24-26 (1st Cir. 1988) (Breyer, J.) ("As far as we are aware, assessing 'comparative fault' is not so much an exercise in pure mathematics as it is an exercise in judgment."); *Watson v. State Farm Fire & Cas. Ins. Co.*, 469 So. 2d 967, 971-74 (La. 1985) (listing five nonexhaustive factors potentially bearing on apportionment of fault); *Sandford v. Chevrolet Div. of Gen. Motors*, 292 Or. 590, 642 P.2d 624 (1982) (comparison should be of fault, not causation); *Eaton v. McClain*, 891 S.W. 2d 587, 590-93 (Tenn. 1994) (collecting authorities and distilling six nonexclusive factors warranting weight in the comparative fault balance); *Restatement (Third) of Torts: Apportionment of Liability* § 8 (relevant factors include "the nature of the person's risk-creating conduct, including any awareness or indifference with respect to the risks created by the conduct"); 1 Dan B. Dobbs, *The Law of Torts* § 201, at 504 (West 2001) (courts "ordinarily compare fault, not causation").  *See generally* David W. Robertson, *Eschewing Ersatz Percentages: A Simplified Vocabulary of Comparative Fault*, 45 St. Louis L.J. 831 (2001).

Because the jury was asked to apportion fault, not loss causation, and because it was asked to do so for two different torts, with distinct legal standards and elements of proof, no inconsistency arises from the difference in its apportionments.  The jury could permissibly have concluded, for

example, that Dow's larger known releases of plutonium warranted assignment to Dow of the lion's share of responsibility for the trespassory invasions suffered by the class, whereas Rockwell's waste-management practices made it primarily responsible for the nuisance associated with the risk of future releases.  The Court's task on this motion, of course, is not to speculate about the jury's reasoning in an affirmative search for inconsistencies, but rather to reconcile the jury's determinations if possible.  Such a reconciliation is manifestly warranted here.  The jury's apportionments of fault under section 13-21-111.5 therefore afford no basis for a new trial.

### C.    The Exemplary Damage Awards Are Neither Improper Nor Inconsistent

Section I(C) of defendants' brief (at pages 9-12) conflates distinct arguments that are best considered discretely.  Once disentangled, each of defendants' arguments proves unmeritorious.

First, defendants argue that because no compensatory damages can be awarded to plaintiffs in light of the points raised in section I(B) of defendants' brief, no exemplary damages can be awarded either.  This argument rests on a false premise.  As already shown, the points raised in section I(B) of defendants' brief are without merit.

Second, defendants argue that the jury's exemplary damage awards violated the jury instructions.  Even if this second argument were correct, it would not involve any internal inconsistency in the jury's decision, of the sort that might warrant a new trial.  It would be, at most, a technical "inconsistency" with the Court's instructions, on a legal point not dependent on the jury's findings as to any issue of historical or predicative fact – one that could be addressed, that is, by means well short of a new trial.

The jury's exemplary damage awards, however, were completely harmonious with the Court's instructions.  In pertinent part, the relevant instruction reads:

> If you find beyond a reasonable doubt that one or both of the Defendants acted in a willful and wanton manner, then you may award a reasonable sum as punitive damages against the Defendant or Defendants you found acted in this manner. The sum you award may not be more than the amount you awarded as actual damages against the Defendant or Defendants.

See Jury Instructions, at 75 (Instruction No. 3.27, captioned "Punitive Damages"). Whatever may be the technical legal meaning of the word "award" as a term of art in the statutory construction of Colo. Rev. Stat. § 13-21-102(a)(1),[8] the jury was entitled to interpret the term in accordance with its everyday meaning, within the context of the sentence containing it, and in light of the tasks with which the jury was presented. The everyday meaning of the verb "award" is "to give as due or merited," or to "assign or bestow." *Random House Unabridged Dictionary* 144 (2d ed. 1993). In Instruction No. 3.27, that everyday meaning was further clarified by the word's use in context. The jury was told that the exemplary damages it assessed could not exceed the amount "you awarded" in compensatory damages "against the Defendant or Defendants." The only limitation imposed by the language of the instruction, in other words, referred to the *jury's* assessment of compensatory damages, prior to any reduction to be performed by the Court pursuant to the Colorado proration statute or other applicable law. As had already been explained to the jury in the immediately preceding instruction, it would fall to the Court, in particular, and not the jury, to apply the rule against multiple recovery.

The jury received further guidance from the Jury Verdict Form, which posed the question of exemplary damages separately for each defendant. As to Dow, it said: "What amount of punitive damages do you find should be awarded against Dow? This amount may not exceed the total

---

[8] *See Lira*, 832 P.2d at 245 (distinguishing the legislatively intended meanings of "damages assessed" and "damages awarded" in § 13-21-102(a)(1)).

amount of actual damages you found against Dow in ¶ E and ¶ F." *See* Jury Verdict Form, at 26 (question No. 2 under ¶ G). A parallel question was asked for Rockwell. *Id.* at 27 (question No. 4 under ¶ G).

The jury assessed exemplary damages against Dow in the sum of $110,800,000. Consistent with the instructions and the verdict form, that sum does not exceed: (1) "the amount [the jury] awarded as actual damages against the Defendant or Defendants" prior to any reduction by the Court; or (2) "the total amount of actual damages [the jury] found against Dow in ¶ E and ¶ F" prior to any reduction by the Court. For the reasons given earlier in this memorandum, the exemplary damages against Dow do not even exceed: (3) "the amount . . . awarded as actual damages against the Defendant or Defendants" *following* application of the rule against multiple recoveries and the proration statute; or (4) "the total amount of actual damages . . . found against Dow in ¶ E and ¶ F" *following* those same judicial adjustments. The same may be said of the jury's assessment of $89,400,000 in exemplary damages against Rockwell. Plaintiffs question whether the instructions also actually advised the jury, when read in conjunction with the Jury Verdict Form, that the *sum total* of exemplary damages against both defendants could not exceed "the amount [the jury] awarded as actual damages against the Defendant or Defendants." But even if the instructions were so construed, the jury's exemplary damage assessments would not violate them. From the jury's vantage point, *it* had "awarded" $353,700,680 in compensatory damages (the sum of its nuisance and trespass awards). From the jury's vantage point, it was for the Court to decide, at some later time, whether that sum would require judicial adjustment in light of the multiple recovery rule or for any other reason. The jury, in short, faithfully obeyed every instruction and directive it was given on this subject.

Third, defendants argue that under section 13-21-102, the total exemplary damages to be recovered against both defendants cannot exceed the total compensatory damages awarded by the Court against both defendants.  Once again, this argument alleges no internal inconsistency in the jury's verdict itself, and thus it cannot support a motion for new trial on those grounds.  Defendants argument is rather that the verdict is "inconsistent" with Colorado's statutory cap on  exemplary damages – an issue, once again, that could be addressed by means well short of a new trial, were defendants' argument valid.[9]

Defendants' statutory argument, however, is bereft of support, whether from the statutory text itself, the decisional authority interpreting it, or the legislative policies underpinning it – even if the addition of prejudgment interest to the jury's compensatory damage award is disregarded.[10]

In pertinent part, the exemplary damage statute provides:

> In all civil actions in which damages are assessed by a jury for a wrong done to the person or to personal or real property, and the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct, the jury, in addition to the actual damages sustained by such party, may award him reasonable exemplary damages. The amount of such reasonable exemplary damages shall not exceed an amount which is equal to the amount of the actual damages awarded to the injured party.

Colo. Rev. Stat. § 13-21-102(1)(a).  On its face, this statutory text does not supply unambiguous guidance on the question whether a defendant, faced with an exemplary damage award not

---

[9] *See Lira*, 832 P.2d at 246 (remanding for entry of judgment consistent with Colorado Supreme Court's opinion, rather than new trial, where jury's award of exemplary damages exceeded statutorily permissible amount).

[10] Because prejudgment interest forms part of plaintiffs' compensatory damages and must be added to the jury's award prior to any application of the exemplary damages cap, defendants' argument is unavailing in any event.  *See James v. Coors Brewing Co.*, 73 F. Supp. 2d 1250, 1255 (D. Colo. 1999).

exceeding the compensatory "damages awarded" against *it*, may nevertheless seek the statute's shelter on the ground that the total exemplary damages assessed against *all* defendants exceed the total compensatory "damages awarded" against all defendants. The Court must therefore look to additional sources in construing the statute, including legislative policy and intent. These were addressed in the Colorado Supreme Court's *Lira* decision – the leading case construing section 13-21-102 and its interplay with the Colorado proration statute.

Two questions were presented in *Lira*: (1) whether exemplary damage awards were subject to reduction under the comparative negligence statute, Colo. Rev. Stat. § 13-21-111; and (2) whether they were subject to reduction following application of the Colorado proration statute. In addressing the first question, the *Lira* court explained that Colorado's exemplary damage statute embodies two purposes: "punishing the wrongdoer and setting an example for others." *See* 832 P.2d at 243. "'Such damages,'" it said, "'rest upon the right to punish and not the right of the injured party to compensation for the wrong done.'" *Id.* (quoting *French v. Deane*, 19 Colo. 504, 511, 36 P. 609, 612 (1894)). Direct reduction of exemplary damage awards by the plaintiff's percentage of comparative negligence, said the court, would thus be "inconsistent with the purposes of punitive damages – punishment and deterrence." *See* 832 P.3d at 242-43. On those grounds, the *Lira* court "join[ed] the majority of jurisdictions" to hold that "exemplary damages are not subject to reduction by application of the comparative negligence statute." *Id.* at 243.

In addressing the second question, the *Lira* court was not confronted with the precise issue presented here, but its analysis does afford guidance. In justifying its holding that the proration statute does operate to limit a defendant's exemplary damages to the compensatory damages ultimately awarded against *it*, the court noted that the cap in section 13-21-102(1)(a) was enacted

"as part of the sweeping tort-reform legislation of 1986." *Id.* at 245. Describing the legislative intent behind the cap, the court quoted extensively from remarks by Representative Grant, one of the legislation's sponsors. In doing so, it specifically noted his remarks that "we're allowing a *doubling of the liability . . . against the wrongdoer*, over and above and twice the amount of actual damages. . . . You are providing a sufficient deterrence, sufficient punishment against that wrongdoing." *Id.* at 246 (plaintiffs' emphasis) (internal quotations and citation omitted). It also quoted Representative Grant's statement that "We're talking about a limitation that it reasonable, appropriate, that I think effectively *doubles the potential liability of a wrongdoing party*." *Id.* (plaintiffs' emphasis) (internal quotations and citation omitted). The *Lira* court then added these observations of its own:

> If the exemplary damages are limited to the reduced compensatory damages amount, then the purpose of the bill as articulated by its sponsor would be promoted because *a defendant* would be responsible for paying a maximum of twice the amount of damages *he* is determined to owe after reduction for the apportionment of fault. *Representative Grant's statements focused on the liability of the tortfeasor*. Since under the comparative negligence and pro rata liability statutes, one of several negligent persons is only responsible for damages in accordance with *his* determined percentage of fault, *that party's* liability for punitive damages should be no greater than the amount of actual damages *he* owes.

*Id.* (emphasis added).

This sharp focus on the "liability of the tortfeasor" by the legislature and the *Lira* court confirms that the cap's purpose, consistent with its tort-reform origins, was to protect a defendant against excessive exemplary damage awards through a cap on *that defendant's* liability, under which an exemplary award would result in no more than "a doubling of liability" for that defendant. To impose an additional limitation, based on the total compensatory damages awarded to *all* defendants,

would extend a measure of tortfeasor protection well beyond the bright-line "one-to-one"[11] limit that the Colorado legislature adopted, at the expense of the statute's punitive and deterrent purposes.

Defendants offer no policy justification to defend such an interpretation of section 13-21-102, nor do they cite any authority to support it (conspicuously shying away, in particular, from any mention of *Lira* in this context). They rely instead on a hypothetical of their own invention, in which they invite the Court to imagine a lawsuit involving ten claims, with each of ten defendants being held 90% at fault on one of them, and with each also being held liable for exemplary damages to the full extent of the respective compensatory damage awards against them. *See* Defs.' Mem. at 11-12. Defendants cite no occasion on which anything resembling such a scenario has actually come to pass,[12] but if the Court should care to estimate the odds of its occurrence, the Court will thereby have estimated the odds, under Colorado law, of the hypothetical outcome defendants envisage, in which a notional plaintiff with $1 million in compensatory damages is also awarded $9 million in punitives.

---

[11] *Lira*, 832 P.2d at 245.

[12] It bears passing mention that defendants' hypothetical departs from this case in more ways than a simple difference in the numerosity of the tortfeasors. Only one of the two defendants here was held 90% at fault on any claim. Neither defendant, moreover, faces an exemplary damage award even approaching the prorated compensatory damages owed by that defendant. The exemplary damages assessed against Dow represent only about 63% of the compensatory damages found by the jury on the trespass claim ($110,800,000 ÷ $176,850,340), although the jury found Dow 90% at fault on that claim. The exemplary assessment against Rockwell represents only about 51% of the compensatory damages awarded by the jury on the nuisance claim ($89,400,000 ÷ $176,850,340), whereas the jury apportioned 70% of the fault to Rockwell on the nuisance count.

It is unclear, in any event, why defendants feel moved, by this hypothetical, to say it "defies reason"[13] that the total quantum of exemplary damages capable of being imposed in a civil action might vary depending on the number of tortfeasor defendants having engaged in willful and wanton misconduct, and/or the number of torts they committed. Perhaps defendants' incredulity stems from a feeling that the plaintiff in their hypothetical would be compensated to an unduly munificent extent. If that were the problem, defendants might assuage their concern by developing a more realistic hypothetical. Such a concern would have no relation, however, to the underlying policies of Colorado's exemplary damages statute. Those policies, as already seen, focus on punishment and deterrence, "not the right of the injured party to compensation for the wrong done." *Lira*, 832 P.2d at 243 (internal quotations and citation omitted). They focus, that is, on damages paid by the tortfeasor, not compensation received by the plaintiff.

The jury's exemplary damage awards were faithful to the instructions the jury was given, and neither defendant will be liable for exemplary damages exceeding the compensatory damages awarded against it, under the one-to-one ratio adopted by the Colorado legislature and confirmed in *Lira*. The jury's assessments of exemplary damages should therefore be upheld, and defendants' request for a new trial on these grounds rejected.

### D. Addition of Prejudgment Interest Prior to Any Application of the Exemplary Damages Cap Can Introduce No Impropriety or Inconsistency in the Verdict

In section I(D) of their brief, defendants argue that the addition of prejudgment interest to the verdict prior to any application of the damages cap would not cure the alleged inconsistency of the exemplary damage awards with the Court's instructions. Plaintiffs have already explained why

---

[13] Defs.' Mem. at 12.

there exists no such inconsistency to cure.  The jury's exemplary damage awards are fully consistent with the Court's instructions (and with Colorado law as well).

Defendants also argue that plaintiffs' position on prejudgment interest *vis-a-vis* the cap – i.e., the position that Chief Judge Babcock's analysis in *James v. Coors Brewing Co.*, 73 F. Supp. 2d 1250, 1255 (D. Colo. 1999), was and is correct – is somehow contrary to the jury instructions.  As plaintiffs understand this argument, defendants essentially contend that Instruction No. 3.27 embodies a tacit, unarticulated legal ruling that the damages cap must be applied *before* addition of prejudgment interest.  This is so, according to defendants, not because the matter was ever raised, briefed, argued, or consciously and explicitly adjudicated in connection with the jury instructions.  Rather, it is so, according to defendants, because otherwise, there would have been "no logical basis," in defendants' estimation, for the instruction.  *See* Defs.' Mem. at 13.

A party's conviction that a jury instruction has "no logical basis," however deeply felt, is not, by itself, a ground for new trial.  The truth is that no one ever raised the prejudgment interest issue in the context of the jury instructions – perhaps because prejudgment interest (like application of the proration statute and the exemplary damage cap) is a matter for the Court, not the jury.  Nor has the Court ever ruled on the prejudgment interest issue in this case.  Because the issue was never raised, the jury may have received an instruction less generous to plaintiffs than plaintiffs were entitled to. If plaintiffs were now to allege error on that account, plaintiffs would presumably face a substantial waiver argument.  But plaintiffs have sought no post-trial relief on this basis, and defendants do not and cannot contend that the instruction worked to *their* prejudice.

**E.      No New Trial Is Necessary to Cure Any Defect in the Exemplary Damage Awards**

Even if defendants were correct that plaintiffs' total exemplary damages are capped at $176,850,340, no new trial would be required.  The Court could simply adopt the same approach that plaintiffs have elsewhere proposed in connection with the compensatory damage awards.[14]  The Court's judgment, that is, could simply direct that the Damages Subclass recover up to $110,800,000 in exemplary damages (plus interest) from Dow, and up to $89,400,000 in exemplary damages (plus interest) from Rockwell, with the total recovery of exemplary damages not to exceed $176,850,340.  Such a judgment would not violate: (1) Dow's right, under *Lira*, to have its exemplary damages capped at the same level as its compensatory damage liability; (2) Rockwell's parallel right; or (3) defendants' notional right to limit the total exemplary damages in this action to $176,850,340.

Nor would such a judgment contradict, in a fashion operating to defendants' prejudice, any finding rendered by the jury.  Defendants' reliance on *Finnegan v. Fountain*, 915 F.2d 817 (2d Cir. 1990), is misplaced in this context.  In *Finnegan*, there was an actual internal inconsistency in the jury's findings.  As the Second Circuit explained, "The jury concluded in question six that Fountain had acted in good faith, applying no more force than he thought necessary, but, on the very next day, it found [in a second special verdict] that Fountain acted maliciously, wantonly, or oppressively." *Id.* at 820.  Judgment could not be entered in a manner that disregarded either of these contradictory factual findings, and so a new trial was required.  *Id.*  This case presents no such circumstance.[15]

---

[14] *See* Pls.' Mem. of Law in Supp. of Pls.' Mot. for Entry of J., at 26 (May 4, 2006) [Ct. Rec. 2170]; *id.* Ex. H, ¶¶ 6-8, at 3 (plaintiffs' proposed form of judgment).

[15] Still less does *Finnegan*, the Seventh Amendment, or any other authority, whether binding or persuasive, require that the jurors be cross-examined, or their notes surveyed,

(continued...)

There having been no contradiction or inconsistency in the jury's findings, the Court committed no error in discharging the jury rather than calling for further clarification or additional deliberations.[16]  It does appear that the Court and the parties might have been spared some post-trial *controversy* (a different matter entirely) had the verdict form called for the jury to state, separately and explicitly, whether its exemplary damage awards were associated with the trespass claim, the nuisance claim, or both.  Any complaint that the verdict form failed to do so, however, has been waived several times over, and would lack substantive merit even if defendants had not waived it.

---

[15](...continued)
to ascertain: "what ratio of compensatory to punitive damages, if any, the jury intended to accomplish," Defs.' Mem. at 14; whether the jury "determine[d] punitive damages by using some weighting," *id.* at 14-15; or "the intent behind [its] punitive damages award," *id.* at 16.  Such an approach would turn every civil action into a bifurcated proceeding in which the parties first litigated with each other, and then, after the verdict, with the jury.

[16] In *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847 (10th Cir. 2000), on which defendants rely, the jury's findings did contain an actual inconsistency: a finding that the corporation acted from racially discriminatory motives in failing to promote the plaintiff, despite a separate finding that the corporate officer actually making the promotion decision did not.  A corporation can act only through its human agents, and so discriminatory motivations could not be imputed to the corporation consistently with a finding that its agent lacked such motivations.  *Id.* at 851-53.  *United Drilling Co. v. Enron Oil & Gas Co.*, 108 F.3d 1186 (10th Cir. 1997), on which defendants also rely, is likewise inapposite.  The plaintiff in *United Drilling* sought recovery on unpaid invoices of $157,262.  The defendant asserted a setoff defense.  The jury returned separate general verdict forms in which it "assessed the plaintiff's recovery" at $70,768 and "assess[ed] the defendant's setoff recovery" at $86,494.  *Id.*  Despite substantial indications that the jury's assessment of plaintiff's damages already incorporated the setoff ($157,262 - $86,494 = $70,768), the trial court entered judgment in the defendant's favor, on the theory that the setoff exceeded the damages awarded on the plaintiff's claim.  The Tenth Circuit held that under those circumstances, the trial court abused its discretion in awarding judgment to the defendant without first confirming with the jury that its primary award of $70,768 did not already account for the setoff.  The Tenth Circuit took pains to distinguish cases where courts had gone further and conducted impermissible inquiries into the jury's reasoning or deliberations.  *Id.* at 1192.

Defendants point to no place in the record where defendants requested that the verdict form parse the exemplary damages by claim.  In fact, defendants affirmatively requested precisely the opposite in the two proposed verdict forms (one for Dow and one for Rockwell) that defendants submitted on January 11, 2006 – the day before the close of evidence.  *See* Defs.' Proposed Verdict Forms (Jan. 11, 2006) [Ct. Rec. 1963].  As to Dow, defendants requested that the verdict form ask the jury:

> 18.    Did Plaintiffs prove beyond a reasonable doubt that Dow's conduct in committing a *trespass or nuisance* was "willful and wanton," as defined in jury instruction 3.27? (In deciding this question, you may consider only Dow's conduct up through August 20, 1988.)
>
> YES    NO
>
> ____    ____
>
> 19.    What is the amount, if any, of punitive damages that should be assessed against Dow as a direct result of any conduct by Dow that you have determined to be both willful and wanton and a *trespass or nuisance*? That amount cannot exceed the greater of (a) the class-wide dollar amount of actual damages you awarded in response to question 7 and (b) the class-wide dollar amount of actual damages you awarded in response to question 14.

*Id.* Ex. A, at 7 (emphases added) (navigational instructions omitted).  Defendants requested an identical pair of questions in their proposed verdict form for Rockwell.[17]  The pertinent questions on the verdict form adopted by the Court (and eventually answered by the jury) bore a very close

---

[17] *Id.* Ex. B, at 7. In neither requested verdict form did defendants advance any proposal, even under protest, concerning the form or content of any question on the apportionment of fault.

resemblance to the questions defendants had proposed. *See* Jury Verdict Form, at 26 (questions No. 1 & No. 2 under ¶ G).[18]

Only after the verdict was finally announced did defendants reverse field and ask that the jury attribute its exemplary damage awards to the nuisance claim, the trespass claim, or both. Despite the tardiness of defendants' request,[19] the Court agreed to make that inquiry, and did so. *See* Tr. (2/14/06) at 10813:7-9 ("How did you determine to award punitive damages, in this sense, did you determine to award damages solely on one of those claims or on both of them?"). Defense counsel, however, now proceeded to *object* to the Court's inquiry, *id.* at 10813:10-11 ("Your Honor, I would object to the form of that question."), insisting that the Court must instead probe the jury more broadly about "how that calculation was made." *Id.* at 10813:15.

Defense counsel's open-ended inquiry ("how that calculation was made") would have led to impermissible intrusions into the jury's deliberative process, and the Court properly declined to pursue it. The inquiry originally posed by the Court ("solely on one of those claims or on both of them?") was tailored to resolve the narrower question that defendants now renew ("Did the jury base

---

[18] On January 18, 2006, defendants filed a comprehensive set of objections to the Court's instructions and verdict form. In that submission, they objected to the Court's verdict form "to the extent" it departed from defendants' own proposed forms. *See* Defs.' Objections to Jury Instructions and Verdict Form ¶ 3, at 2 (Jan. 18, 2006) [Ct. Rec. 2015]. They also raised several specific objections to the Court's verdict form, *id.* at 171-72, but these included no objection (even in the alternative) that the verdict form should parse exemplary damages by claim. On January 20, 2006, defendants filed another round of objections, again objecting to the Court's verdict form "to the extent" the Court's form departed from the forms defendants had requested. *See* Defs.' Renewed Objections to Jury Instructions and Verdict Form, at 3-4 (Jan. 20, 2006) [Ct. Rec. 2029]. Defendants again failed to raise any objection that the verdict form should tie exemplary damages to particular claims. *See id.* at 184-85.

[19] Plaintiffs drew this untimeliness issue to the Court's attention in prompt fashion. *See* Tr. (2/14/06) at 10812:19-21.

the punitive awards on trespass, nuisance, [or] both?"),[20] but defendants objected to the inquiry in that narrower form when the Court attempted to pose it, and defendants cannot be heard now to complain that the Court should have proceeded notwithstanding their objection.  *See St. Anthony Hosp. v. United States Dep't of Health & Human Servs.*, 309 F.3d 680, 696 (10th Cir. 2002) (invited error).

Nothing requires, in any event, that the jury's exemplary damage awards be parsed as between the trespass and nuisance claims.  Section 13-21-102(1)(a) imposes no requirement that a jury associate an exemplary damage award with particular theories of liability.  It requires only a jury finding that "the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct."   Under *Lira*, the damages cap in section 13-21-102 is then applied by reference to compensatory "damages awarded," not by direct reference to the jury's apportionment of fault.   Allocation of fault comes into play only indirectly, through its effect on the total compensatory damages ultimately awarded by the Court against the defendant.  When the nuisance and trespass claims against each defendant are merged, it is, of course, the larger of the two compensatory damage awards that survives – not the smaller.  *Sprung v. Adcock*, 903 P.2d 1224, 1226 (Colo. App. 1995).   It is only that larger, surviving award, therefore, that operates to cap exemplary damages against each respective defendant.  For neither defendant does the smaller of the two compensatory awards have any bearing on the cap.

## II.    The Compensatory Damages Should Not Be Set Aside or Reduced

A motion for new trial or remittitur based on a jury's award of allegedly excessive damages is governed, in its procedural aspects, by federal law – including the general rule that a plaintiff in

---

[20] *See* Defs.' Mem. at 14.

federal court, whether prosecuting a state or federal cause of action, ordinarily "may not appeal from a remittitur order he has accepted." *Donovan v. Penn Shipping Co.*, 429 U.S. 648, 650 (1977); *cf. O'Gilvie*, 821 F.2d at 1447-48. A district court's denial of remittitur is subject to appellate review for abuse of discretion. *Gasperini  v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 438-49 (1996).

Except insofar as a federal constitutional challenge is raised, state law governs the substantive question whether damages are excessive. *Gasperini*, 518 U.S. at 418-39; *O'Gilvie v. Int'l Playtex, Inc.*, 821 F.2d 1438, 1448 (10th Cir. 1987); 42 U.S.C. § 2014(hh). In general terms, Colorado's standards for excessiveness are the same as those for claims in which federal law supplies the rule of decision. *See Florey v. District Court*, 713 P.2d 840, 860-61 (Colo. 1985). A new trial may be granted only if the jury's damage award is "so excessive or inadequate as to shock the judicial conscience and to raise an irresistible inference that passion, prejudice, corruption or other improper cause invaded the trial." *Hurd v. Am. Hoist & Derrick Co.*, 734 F.2d 495, 503 (10th Cir. 1984) (internal quotations and citations omitted); *Rawson v. Sears, Roebuck & Co.*, 615 F. Supp. 1546, 1549-52 (D. Colo.) (Kane, J.) (quoting *Hurd*), *rev'd in part on other grounds*, 822 F.2d 908 (10th Cir. 1985); *Florey*, 713 P.2d at 860-61. Remittitur is available where a damage award does not reflect bias, passion, or prejudice but is "manifestly excessive in light of the evidence presented at trial." *Burns v. McGraw-Hill Broadcasting Co.*, 659 P.2d 1351, 1356 (Colo. 1983). It is not for a court to say that a jury's assessment of damages is wrong merely because the court itself might have arrived at a different figure. *Rawson*, 615 F. Supp. at 1553.

### A.  No Remittitur Should Be Ordered Based on Alleged "Inconsistencies" in the Verdict

In section II(A) of their brief, defendants appear to be asking the Court to reduce plaintiffs' damages on some or all of the grounds raised by defendants in section I of their memorandum, if the

Court does not order a new trial on those grounds.  *See* Defs.' Mem. at 17.  Yet defendants do not say which particular points or arguments from that section of their brief would support a reduction of plaintiffs' damages, or what reductions they propose, or whether any such reductions should be effected via remittitur (a remedy they do mention, albeit only in general terms) or via some other method.

How defendants would answer the questions just posed is far from self-evident.  In section I(B) of their brief, for example, defendants argue that the jury's apportionments of fault on the nuisance and trespass claims are inconsistent and do not permit definite calculation of the precise amounts owing from each respective defendant.  Plaintiffs have already explained why that argument is specious and affords no basis for a new trial.  It is unclear to plaintiffs, however, whether defendants also purport to seek reduction of plaintiffs' damages on these grounds.  If they do, it is mysterious to plaintiffs what reduction defendants seek, or how one could even be calculated in a manner consistent with defendants' position that "there is no way to determine what amount of compensatory damages is owed by either Dow or Rockwell."  *See* Defs.' Mem. at 9.

Matters are only slightly clearer for the point raised in section I(C) of defendants' brief.  Assuming the Court does not award a new trial because the total exemplary damages exceed $176,850,340, it might be supposed that defendants would wish the Court to adjust the exemplary damages in some fashion, so that they sum to only that amount (or perhaps less).  But this, of course, would require a determination of what reduced award each defendant should pay.  Defendants not only fail to make any specific request, even in the alternative, on that front; they also affirmatively deny any possibility of resolving the issue.  *Id.* at 14-17.

Plaintiffs' ability to respond is therefore limited.  Plaintiffs do wish to note that remittitur is not a necessary or appropriate procedure for such routine judicial exercises as implementing the jury's apportionment of fault or giving effect to statutory damage caps.  That caveat is important, because of potential implications for the appealability of any rulings adverse to plaintiffs on such issues.

**B.**     **The Compensatory Damages Awarded by the Jury Should Stand**

      **1.**     **The Compensatory Award to the Damages Subclass Is Supported by the Evidence**

Defendants argue that the compensatory damages should be set aside or reduced because the language of the verdict form asked the jury to assess diminution in value for "Class Properties, as a whole," without explicitly distinguishing between "those who sold before January 30, 1990 and those who sold after."  Defs.' Mem. at 17.

Defendants invited the alleged error in the verdict form of which they now complain.  In addition, they later waived objection to the verdict form, and to the verdict, on this ground.  Nor have defendants raised a substantively valid ground for remittitur, even if they had not waived the point.  If defendants believed themselves to possess evidence warranting a reduction in the damages claimed, they had every opportunity to offer it at trial.  To the extent they did so, it was for the trier of fact to weigh that evidence.  To the extent they did not, defendants' omission was the product of their own election.  The remittitur procedure is not intended as a second phase of trial, where litigants disappointed with the jury's verdict, or remorseful over their strategic choices at trial,  may retry their damages case to the Court.

Defendants submitted their own proposed verdict forms on January 11, 2006.  As to the trespass claim against Dow, they requested that the Court pose the following interrogatories to the

jury on compensatory damages:

    A.      Compensatory Damages for Trespass

    4.      Did Plaintiffs prove by a preponderance of the evidence that the injurious situation resulting from the trespass caused by Dow became "complete" and "comparatively enduring" between June 6, 1989 and March 26, 1992?

        YES   NO

        _____ _____

    5.      What was the time or time period when the injurious situation resulting from the trespass caused by Dow became complete and comparatively enduring?

        _____

    6.      Have Plaintiffs proved by a preponderance of the evidence that, as of the time identified in your answer to question 5 above, Dow's trespass caused the actual value of *all of the Class Properties* to be less than what the value of these properties would have been but for Dow's trespass?

        YES   NO

        _____ _____

    7.      What is the amount of the difference between the actual value of *Class Properties* and what the value of the *Class Properties* would have been but for Dow's trespass? Show your answer below in terms of a percent diminution and a dollar amount of diminution.

| Dow Trespass Damages | | |
|---|---|---|
| | Percent Diminution | Dollar Amt. of Diminution |
| Vacant Land | % | |
| Commercial | % | |
| Residential | % | |
| *Class-wide* | % | |

*See* Defs.' Proposed Verdict Forms Ex. A, at 3-4 (Jan. 11, 2006) (emphases added) (navigational

instructions omitted) [Ct. Rec. 1963]. Defendants proposed a substantially identical set of questions

for compensatory damages on the nuisance claim against Dow. *Id.* at 5-6 (questions No. 11-14).

In addition, defendants proposed the following questions for inclusion in Dow's verdict form:

> D.     Total Damages
>
> 20.     What is the total dollar amount of the difference between the actual value of
> *Class Properties* and what the value of the *Class Properties* would have been but for
> Dow's trespass, if any, and Dow's nuisance, if any?
>
> _____
>
> 21.     What is the total dollar amount of the difference between the actual value of
> *Class Properties* and what the value of the *Class Properties* would have been but for
> Dow's trespass, if any, Dow's nuisance, if any, Rockwell's trespass, if any, and
> Rockwell's nuisance, if any, on this verdict form and on Rockwell's verdict form?
>
> _____

*Id.* at 7-8 (emphases added). A substantially identical verdict form was proposed for Rockwell. *Id.*

Ex. B.

In short, each of defendants' proposed verdict forms affirmatively requested, on no fewer

than eight separate occasions apiece, that the Court use the language "Class Properties," "Class-

wide," or "all of the Class Properties" in connection with the jury's assessment of compensatory

damages. Defendants cannot now be heard to complain that the Court's verdict form adopted the

very language they proposed. *Aves v. Shah*, 997 F.2d 762, 766 (10th Cir. 1993). Nor do defendants

even claim to have objected on this ground when the Court's own verdict form was promulgated.

In fact, they did not do so. In failing to do so, they waived the objection now advanced. *See, e.g.,*

*Hayes v. Garcia*, No. 04-2009, 123 F. Appx. 858, 862, 2005 U.S. App. LEXIS 1280 (10th Cir. Jan.

25, 2006) (unpublished) ("Plaintiffs waived this argument by failing to object to the wording at trial and by using the exact language in their own proposed special verdict form.").[21]

Nor did defendants raise the point even after the verdict was finally rendered. Defendants appear to believe that the jury issued a general verdict accompanied by answers to interrogatories. *See, e.g.*, Defs.' Mem. at 16. If that is so,[22] then in addition to inviting the alleged error of which

---

[21] Relegating their failure to object to a footnote, defendants now say they have "raised this issue on repeated prior occasions," *see* Defs.' Mem. at 19 n.5, but defendants point to *no* such occasion, save to cite an inapposite quotation from a brief they filed in July 2004 (almost a year before the Court's May 2005 Order was even issued) in connection with plaintiffs' proposed trial plan. Even if objections to the language and form of the Court's January 2006 verdict form could somehow have been lodged precognitively, in legal memoranda from 18 months and approximately 700 docket entries gone by, the statement quoted by defendants addressed a different point: the alleged unmanageability of a trial plan under which "the determination of which class members are covered by plaintiffs' damages evidence" was contingent on the jury's verdict. The boilerplate incorporation by reference of defendants' entire July 2004 memorandum in defendants' objections to the verdict form (as one of over two dozen previous submissions thus incorporated) omitted any substantive mention of this manageability point, or even a reference to the page or section of the July 2004 memorandum where it had been raised. *See* Defs.' Objections to Jury Instructions and Verdict Form ¶ 4, at 3 (Jan. 18, 2006) [Ct. Rec. 2015]; Defendants' Renewed Objections to Jury Instructions and Verdict Form, at 3-5 (Jan. 20, 2006) [Ct. Rec. 2029]. It was therefore insufficient to preserve even the manageability point that the quotation from defendants' July 2004 memorandum addressed (and which the Court's May 2005 Order resolved) – let alone the very different objection defendants now propound. To compound the problem, defendants did specifically object to the Court's verdict form (*see id.*) to the extent it departed from defendants' own proposed forms, which used the very language of which defendants now complain. The Court was not required to scour defendants' prior submissions for material from which, with the aid of sufficient exegetic ingenuity, some notional objection to the Court's verdict form might now be laboriously extracted. Nor was the Court required to resolve previous "objections" with which defendants' subsequent use-our-forms objection was inconsistent. *See Bitler v. A.O. Smith Corp.*, 391 F.3d 1114, 1127-28 (10th Cir. 2004) (objecting party must make its position "abundantly clear" and must state grounds in terms that are "obvious, plain, or unmistakable") (citations and internal quotations omitted).

[22] Defendants' seeming preference for the "general verdict" characterization may be

(continued...)

---

*Plaintiffs' Opposition to Motion for New Trial or Remittitur – Page 31*

they now complain, and in addition to waiving the point by their failure to object to the Court's verdict form in timely fashion, defendants waived the point yet again through their failure to object after the verdict was issued and before the jury was discharged. *See Resolution Trust Corp. v. Stone*, 998 F.2d 1534, 1547 (10th Cir. 1993). Defendants showed, on February 14, 2006, that they knew how to draw the Court's attention to perceived ambiguities in the jury's verdict. On *this* point, defendants were silent until many months after the jury was discharged. No challenge to the verdict can be raised on this ground now.

Even if defendants had not waived the point, they would not be entitled to a new trial or remittitur on this ground. Even defendants do not argue, first of all, that the predicates for a *new trial* are satisfied. They do not argue, that is, that the compensatory damage award should "shock the judicial conscience," or that the size of the damage award gives rise to any "irresistible inference" of bias, passion, or corruption. *Hurd*, 734 F.2d at 503.

---

[22](...continued)
    motivated, in part, by a hope of sidestepping the provisions in Fed. R. Civ. P. 49(a) under which a party waives the right to trial by jury on any issue not submitted to the jury for decision under a special verdict, unless the party draws the omission to the Court's attention before the jury retires. *See Am. Ins. Co. v. El Paso Pipe & Supply Co.,* 978 F.2d 1185, 1187-88 & n.1 (10th Cir. 1992); *Bruno v. Western Elec. Co.*, 829 F.2d 957, 961-62 (10th Cir. 1987). Whether a general verdict was actually rendered in this case is open to some debate under the Tenth Circuit's precedents. *Compare Johnson v. ABLT Trucking Co.*, 412 F.3d 1138, 1141-43 (10th Cir. 2005) (finding special verdict where "[t]he jury's answers to the special verdict questions did not decide the winner of the case") *and Thompson v. State Farm Fire & Cas. Co.*, 34 F.3d 932, 944-45 (10th Cir. 1994) (finding general verdict with interrogatories where verdict form asked whether plaintiffs "should recover on their contract claim against defendant") *with Fortier v. Dona Anna Plaza Partners*, 747 F.2d 1324, 1336-37 (10th Cir. 1984) (treating verdict form as governed by Rule 49(a) although "the jury was asked which party prevailed on each of the theories of liability"). For present purposes, little may depend on the distinction, except definitive identification of each precise occasion on which defendants waived the point.

Nor, secondly, can defendants satisfy even the standards for remittitur. Under those standards, defendants would be required to show that the evidence is insufficient to sustain an award of $176,850,340 to the Damages Subclass. Defendants have made no such showing. Indeed, their motion does not even make the attempt. Although it is defendants themselves who purport to seek a reduction in plaintiffs' award, defendants offer no figure or amount by which they contend the award should be reduced. Nor do defendants undertake any analysis of the evidence in support of such a contention.

That is not for want of evidence bearing on the question. From plaintiffs' experts, the jury heard testimony on aggregate damages in each of the three property categories for which damages were tried,[23] along with estimates of the total acreage, square footage, and/or number of class properties in each category – including testimony from Mr. Hunsperger putting the total number of vacant and residential properties in the class at 13,481.[24] From defendants, it heard evidence, presented through Dr. Wise, from which it could permissibly have inferred that there were 1473 sales of class properties between June 7, 1989, and January 30, 1990.[25] A reasonable trier of fact,

---

[23] *See, e.g.*, Tr. (12/5/05) at 6422:2-5 (Mr. Hunsperger) ($216 million for residential properties and $27 million for vacant land, in 2005 dollars); *id.* (10/26/05) at 2717:15 to 2718:11 (Dr. Radke) (53% undervaluation for commercial properties).

[24] *See, e.g.*, Tr. (10/26/05) at 2725:16 to 2728:2 (Dr. Radke) (class included 8979 single family dwellings and 4812 acres of vacant property, in addition to multi-residential units and commercial properties measured by square footage); *id.* (12/5/05) at 6422:9 to 6423:2 (Mr. Hunsperger) (conservative estimate of 13,481 vacant and residential properties within class boundaries).

[25] *See* DX-2067. This exhibit is a bar graph, admitted under Fed. R. Evid. 1006 after much controversy and a lengthy colloquy (*see* Tr. (1/6/06) at 9229:12 to 9233:3) as a summary of data discussed in Dr. Wise's supplemental report of August 6, 2004. *See* Kenneth T. Wise, *Supplemental Expert Report for the Cook Case* (2004) (the "Wise

(continued...)

of course, could also have rejected Dr. Wise's evidence, in whole or in part, as less than fully credible and persuasive.[26]  For immediate purposes, the key point is that under the evidence, even a factfinder affording some weight to Dr. Wise's testimony could reasonably award to the Damages Subclass the compensatory damages that the jury did.  The jury's verdict was not for the full measure of compensatory damages that plaintiffs had sought.  For the numerically dominant category of residential properties, in particular, the jury awarded only about 66.76% of the $216 million that plaintiffs requested.

Perhaps the jury would have reduced plaintiffs' compensatory damages by a still greater amount, from the level requested, if defendants had presented better and clearer evidence, or if they had placed greater emphasis, when they argued their case to the jury, on such evidence as they did present.  To the extent defendants failed to do so, that failure may be attributable to ordinary human frailty, or it may have been a carefully considered strategic choice.  Defendants certainly argued vigorously to the jury, throughout the trial, that any verdict in plaintiffs' favor had to be based on findings embracing *all* class members – "every God's one of them."[27]  They also pursued the time-

---

[25](...continued)
Supplemental Report") (Ex. B).  According to the Wise Supplemental Report, the data portrayed in DX-2067 show that "1,473 class members with available deed information apparently sold their properties between the class date (June 7, 1989) and the complaint date of January 30, 1990."  *See* Wise Supplemental Report, at 1; *see also id.* Ex. 1 (table captioned "The Years in Which Class Member Parcels Were Bought and Sold"); Tr. (1/5/06) at 9076:12 to 9077:1 (DX-2067 accurately portrays data exhibited in report).

[26] That DX-2067 was *admitted* says nothing about its *weight*, which was for the jury to decide.

[27] In the following partial listing of examples, all emphases are added: Tr. (10/12/05) at 709:14-20 ("This is only a claim case [sic] where the *class, as a whole,* has or doesn't have a claim.  *It is kind of like an on/off switch, black/white.*  There is a class claim or

(continued...)

[27](...continued)

there is not a class claim. That's it. *Damages. There are class-wide damages or there aren't class-wide damages*."); *id.* at 710:21-24 ("We have class-wide liability, up or down, *class-wide damages*. *They are there or they are not there*. That is what this case is about. *It is right in the instructions*."); *id.* at 714:5-11 ("[T]he reason this lawsuit is being prosecuted on behalf of everybody and doesn't depend on any one individual, is that it is focused on whether the conduct of these defendants has caused *everybody in the class to suffer what is basically an indefinite loss of value, ongoing, enduring, loss of value*, as a result of Rocky Flats."); *id.* at 715:10-13 ("The reason this is a class action is that the courts determined that the overall question of whether there is an *ongoing loss to the whole class* can be determined on a *class-wide basis up or down*."); *id.* (11/4/05) at 4162:17 to 4163:1 ("All of these things have to be for the class. The harm has to be class-wide, the harm has to be enduring class-wide, and the *damages have to be class-wide*; otherwise, we wouldn't be spending a lot of time talking about why the class is really so different. It's very important, because the recovery does not take place unless the class claim is proven. These are all part of the same basic question of, is there a liability. There is no liability, *there is no damage*, there is no risk, unless it's to the class. *Very, very critical point*."); *id.* at 4178:18-19 ("the question is *class, class, class*"); *id.* (11/22/05) at 6300:22 to 6301:2 ("So you see how it works, is that the *class as a whole* has got to have a claim. When the -- if you were to *award money*, it's true that the allocation to the individuals is not up to you, but you have to think about *whether all of the members of the class are entitled to recover*, because if they're not all entitled, you don't have a class claim."); *id.* at 6304:4-7 ("So when you think about the class, you have to think about to what extent is there a common claim. And when these individuals come, what are they telling you that says that *the class as a whole, every God's one of them, should recover*."); *id.* (1/19/06) at 10489:11 to 10490:12 ("I want to address something very specific that was said to you yesterday. Yesterday it was said, don't you worry your heads about what's going to happen to the *allocation of this money*. Remember that? Say, well, we will figure it out. And the suggestion that was made, and I am not sure -- well, whatever, *the suggestion that was implied was it may be that not everybody is as deserving as some other people and we will kind of sort that out later on. That's not true*. That's not what this case is about. *This case is about a claim that everybody has to have for it to be valid, everybody*. They have to establish a claim, that is liability, that attaches to the class as a whole, the class as a whole. If it's not the kind of liability or claim that attaches to the class as a whole, it's not a class claim, and that's not going to be sorted out later on. You are here to decide a class claim. Mr. Ozaki has got to be just as entitled in your mind as Ms. Cook to recover on the class claim for you to decide in favor of that class claim. *There is no differentiation between people in the class. They are all the same*. If you find that, jeez, there really isn't anything these people have in common, as I see them in the instructions, then the class claim fails. It says must be proved for the *class as a whole*. Very powerful concept. Allocation of damages assumes

(continued...)

honored defense tactic of avoiding engagement on the *amount* of damages, lest the jury take this as

a tacit confession that plaintiffs' claims were valid. It was defendants' prerogative, perhaps, to make

such choices. That their strategic decisions proved infelicitous, however, does not give defendants

the right to retry their damages case now.

2. **The Jury Was Not Required to Make a Separate Determination That Class Members Owned Their Properties at the Time Governing Section 930's Damage Measure**

Defendants say that plaintiffs' compensatory damages must be set aside or reduced (again

by some unspecified amount) because the jury "could have determined" that "the complete and

comparatively enduring date" fell at a time when some class members did not own their properties.

*See* Defs.' Mem. at 20-22. This argument suffers from at least five crippling deficiencies.

First, defendants' argument is again predicated on an alleged defect in the verdict form, but

defendants point to no occasion where they proposed a verdict form calling on the jury to fix a

"complete and comparatively enduring date," nor to any occasion where they objected on this

ground to the verdict form adopted by the Court. The verdict forms proposed by defendants called

for the jury to determine whether the injurious situation became "complete and comparatively

enduring" ("CCE") within a 29-month interval between June 6, 1989, and March 26, 1992. Only

if the jury answered that question in the negative did defendants propose that the jury go further and

answer an open-ended question about the "time or time period" when the injurious situation became

CCE. *See, e.g.*, Defs.' Proposed Verdict Forms, Ex. A, at 3 (questions 4 & 5) (Jan. 11, 2006)

---

[27](...continued)
     that there is liability that *runs for everybody's benefit* because their claim has been
     proven. It assumes that. We don't get to allocation if there is not proof of the class claim.
     So you have to decide that issue in this case.").

(trespass instructions for Dow) [Ct. Rec. 1963].  When they lodged objections to the Court's verdict form, defendants objected generally, to the extent the Court's form departed from defendants' own proposed versions,[28] but again voiced no demand that the verdict form call on the jury to specify a "date" when the injurious situation became CCE.[29]  In short, this alleged error was invited, and objection to it was also later waived.

Second, to the extent that the jury returned a general verdict in this case, defendants again waived the point, by failing to raise the alleged ambiguity after the verdict was rendered and before the jury was discharged.  *See supra*, at 31-32 & n.22.

Third, even if defendants had not waived the point, nothing in section 930, this Court's rulings, or other applicable law[30] required the jury to fix (even in its private deliberative contemplations, let alone via special interrogatory) what defendants now blithely call "the complete

---

[28] See Defs.' Objections to Jury Instructions and Verdict Form ¶ 3, at 2 (Jan. 18, 2006) [Ct. Rec. 2015]; Defs.' Renewed Objections to Jury Instructions and Verdict Form, at 3-4 (Jan. 20, 2006) [Ct. Rec. 2029].

[29] *See* Defs.' Objections to Jury Instructions and Verdict Form, at 171-72 (Jan. 18, 2006) [Ct. Rec. 2015]; Defs.' Renewed Objections to Jury Instructions and Verdict Form, at 184-85 (Jan. 20, 2006) [Ct. Rec. 2029]

[30]  Defendants invoke no legal authority in this section of their brief, except for a vague and cursory citation to *Slovek*.  *See* Defs.' Mem. at 22.  Defendants appear to be referring to the following language from *Slovek*: "[T]he goal in compensating the property owner is to reimburse that owner for the actual loss suffered.  Worded another way, 'the law of torts attempts primarily to put an injured person in a position as nearly as possible equivalent to his position prior to the tort.'"  723 P.2d at 1314 (quoting *Restatement (Second) of Torts* § 901 cmt. a).  With these broad observations from *Slovek* and the *Restatement* about some of the goals and policies embodied in "the law of torts," plaintiffs have no special quarrel, subject to the caveat that neither the *Slovek* court's remarks nor the quoted comment to *Restatement* § 901 were addressed to the § 930 damage measure.

*Plaintiffs' Opposition to Motion for New Trial or Remittitur – Page 37*

and comparatively enduring date." As this Court has already noted, section 930 does not demand that the trier of fact select a "date" on which the injurious situation became CCE. *See* Jury Instruction Opinion, at 61 n.40. Nor, for that matter, does section 930 impose any requirement that the jury make *any* separate and explicit finding on even a CCE "time." Section 930 demands only that the jury's damage determinations be guided by the temporal standard it specifies. Any need for the jury in *this* case to answer a specific question on the subject arose not from the bare requirements of section 930, but rather from the confluence of two additional factors: (1) the bounded temporal scope of plaintiffs' expert evidence on damages; and (2) the existence of a sharp factual dispute over whether the injurious situation became CCE at any time within that bounded temporal scope. Had the jury concluded that the injurious situation became CCE at some time *not* covered by plaintiffs' expert damage evidence, the section 930 claims might have foundered on the shoals of a failure of proof. *See* Jury Instruction Opinion, at 72. That possibility, however, has now been negated by the jury's answers on the verdict form.

Fourth, defendants fail to recognize that speculation about what the jury "could have determined" must be bounded by reference to what the jury did determine, and also in light of the record in this case. For example, the jury has now found that on or before January 30, 1990, it appeared that the trespass and nuisance committed by Rockwell and Dow would continue indefinitely.[31] It also found that the same appearance persisted through the time of trial.[32] If those findings can be harmonized with defendants' theory that the jury may have believed the injurious

---

[31] *See* Jury Verdict Form, at 28-29 (question Nos. 1 & 3 under ¶ H).

[32] *See id.* at 2 (question No. 3 under ¶ A) (Dow's trespass); *id.* at 3 (question No. 3 under ¶ B) (Rockwell's trespass); *id.* at 5 (question No. 4 under ¶ C) (Dow's nuisance); *id.* at 7 (question No. 4 under ¶ D) (Rockwell's nuisance).

situation to have become "comparatively enduring" only at some time *after* January 30, 1990, defendants do not explain how.  *Cf.* Order Regarding Instruction No. 3.28, at 7 (Jan. 27, 2006) (contrasting "continue indefinitely" and "comparatively enduring," on the one hand, with "complete," on the other) [Ct. Rec. 2064].  Similarly, if there are arguments that the injurious situation was still not "complete" by January 30, 1990, when both Dow and Rockwell had left the site, defendants have not articulated them.  Defendants, in sum, have offered no plausible interpretation of the jury's verdict under which *any* member of the Damages Subclass will have sold before what defendants call "the complete and comparatively enduring date."

Fifth, and dispositively, post-filing sales would not matter in any event, under this Court's previous rulings.  The Court has already held that the power to elect a recovery of section 930 damages vests in a property owner once it appears that the wrong will continue indefinitely, as the jury found had occurred by the time suit was commenced in this case.  Under this Court's rulings, the time at which the injurious situation becomes complete and comparatively enduring governs only the measure of damages, not the right to seek and recover them.  These points were addressed in the Court's May 2005 Order, and also in the Court's Order Regarding Instruction No. 3.28.

### 3.  The Compensatory Damages Need Not and May Not Be Set Aside or Reduced to "Account for Class Members Who Decline to Accept an Easement"

Defendants' "easement" argument is utterly without merit.  Defendants cite no authority for the proposition that there will be, must be, should be, or ever has been some post-verdict procedural step in which a section 930 plaintiff is called upon to "accept an easement."  So far as plaintiffs can determine, no such authority exists.

It is true, as this Court has previously noted,[33] that according to a comment by the authors of the *Restatement*, satisfaction of a judgment for damages for prospective invasions "confers an easement or privilege to continue the invasions thus paid for in advance."  *Restatement (Second) of Torts* § 930 cmt. b.  Defendants have chosen to focus on the word "easement," rejecting comment b's more equivocal "easement or privilege" characterization, but courts elsewhere have suggested that the issue addressed in comment b is more appropriately conceptualized by reference to principles of claim and/or issue preclusion:

> The respondent pleaded that the former judgment and satisfaction was a bar to this proceeding. The text writers are not in accord whether the doctrine applicable is res judicata, estoppel, merger of judgment, or election of remedies.  The latter doctrine is an extension of the law of estoppel.  Merger of judgments is also an application of the same doctrine. Res judicata has many of the features of estoppel particularly when based upon the same cause of action. Whatever the doctrine applicable all unite in the principle that one who has had his day in court should not be permitted to further vex his adversary by a subsequent action for the same relief.

*Slater v. Shell Oil Co.*, 58 Cal. App. 2d 864, 872, 137 P.2d 713, 716 (1943) (award of damages for impaired value of property in first action barred second action for harms arising from same invasions).

For present purposes, questions of terminology may be secondary, so long as the substantive operation of section 930 is properly understood.  An award of damages under section 930 is not some mere "put option," entitling the plaintiff, upon its exercise, to sell an easement to the defendant at some predetermined "strike" price.  According to the authors of the *Restatement*, any "easement or privilege" of the sort contemplated in comment b is rather conferred *by operation* of the judgment, *ex proprio vigore*, upon its satisfaction.  There is no post-verdict "election" for plaintiffs

---

[33] *See Cook v. Rockwell Int'l Corp.*, 358 F. Supp. 2d 1003, 1013-14 (D. Colo. 2004).

to make, by way of "accepting an easement," beyond the pre-verdict election already made through their assertion of claims seeking section 930's diminution remedy.[34]

Nor may the damage award be retried, reduced,[35] or held in some state of suspense pending other proceedings in this Court relating to the "easement or privilege" issue.  There are no such proceedings to conduct.  It is settled law that the existence and scope of any preclusive effect attaching to the judgment are not matters for determination in the underlying action where the judgment is entered.  They are matters for adjudication in any later proceeding where the judgment is asserted as a defense.  *E.g.*, *In re Urban Broad. Corp.*, 401 F.3d 236, 245 (4th Cir. 2005); *Covanta Onondaga Ltd. v. Onondaga County Res. Recovery Agency*, 318 F.3d 392, 397-98 (2d Cir. 2003); *GE v. Deutz AG*, 270 F.3d 144, 158 (3d Cir. 2001); *Midway Motor Lodge v. Innkeepers' Telemanagement & Equip. Corp.*, 54 F.3d 406, 409 (7th Cir. 1995); Fed. R. Civ. P. 23, 1966 advisory committee notes ("[T]he court . . . cannot predetermine the res judicata effect of the judgment; this can be tested only in a subsequent action."); 18 Charles. A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction* § 4405 (2d ed. 2002).

### 4.    Aggregation of Damages Does Not Warrant a New Trial

Section II(B)(4) of defendants' brief (at pages 23-26) mounts no real challenge to the sufficiency of the evidence to support the jury's compensatory damage awards.  It mostly reprises defendants' longstanding objections to holding a class trial on damages in the first place.  The Court

---

[34] *See, e.g.*, *Restatement* § 930 cmt. b; May 2005 Order, at 16; Order Regarding Instruction No. 3.28, at 5.

[35] Among myriad other reasons why the damages may not be retried or reduced on this account, defendants' motion does not identify any occasions in the record on which defendants took the requisite steps to assert and/or preserve any defense or right of reduction in plaintiffs' damages that defendants now seek to invoke.

has already addressed those objections repeatedly, in its May 2005 Order and at various other times in the pre-trial, trial, and post-trial processes.

As the Court knows, the jury did not merely determine what defendants call "the average diminution in value suffered overall by properties within the class area." *See* Defs.' Mem. at 23 (emphasis omitted).  The jury determined the *actual* "diminution in value suffered overall" by properties in the Damages Subclass, fixing $176,850,340 in aggregate damages as the sum total of all such diminution.[36]  Nor was the jury asked to calculate its award by extrapolating from some putatively "average" sample of individual exemplars to the Damages Subclass as a whole.  As defendants concede, plaintiffs presented *aggregate* damage evidence – figures representing the total damages for all properties in each category.  *See* Defs.' Mem. at 25.  That evidence did rely, in part, on statistical methods, as would have been true in the trial of even a single individual claim (because damages are measured, under section 930, by reference to a benchmark that statistical methods can be useful in analyzing).  Plaintiffs did not rely, however, on the kind of sampling technique disapproved in *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 319-21 (5th Cir. 1998).  On this factual record, and given the framework under which the instructions and verdict form called on the jury to assess damages in this case, the Seventh Amendment concerns raised in *Cimino* are not implicated.  *See* Jury Instruction Opinion, at 62-64.[37]

---

[36] That the jury also found average diminution *percentages* in each of three property categories does nothing to change this fact, assist though it will in the allocational process.

[37] Defendants also cite the Fourth Circuit's 30-year-old decision in *Windham v. American Brands, Inc.*, 565 F.2d 59 (4th Cir. 1977) (en banc), but leave the purpose for which they cite it somewhat obscure.  The *Windham* opinion affirmed denial of class certification (on manageability grounds) as within the district court's sound discretion, in light of the

(continued...)

Because the jury did award aggregate damages, representing the *actual* total diminution in property value suffered by the collective membership of the Damages Subclass, the remaining arguments in this section of defendants' brief go solely to issues of allocation, which the Court has already ruled will be addressed in subsequent proceedings. They do not go to the size of the damage award, and they therefore constitute no basis for a new trial. *See* Jury Instruction Opinion, at 64.

### 5.    The Damages May Not Be Set Aside or Reduced to "Account for All Class Members Who Have Released Their Claims Against Defendants"

If any class members have released their claims against Dow and/or Rockwell, defendants have long been in a position to know. Defendants mention only the McKays, who are now alleged, on the occasion of this post-trial motion, to have released certain claims in connection with the settlement of the *Church* litigation. It is fair to infer that when defendants speak of "all class members" who may have released claims against Dow and/or Rockwell, they are referring to exactly *two* class members: Charles and Perry McKay.[38]

---

[37](...continued)
special damage issues posed by the claims and facts in that case. *See id.* at 62-64, 70-72.

[38] An unexecuted copy of the McKays' alleged release is attached to defendants' brief as Exhibit 6. On its face, its applicability to these claims would be factually and legally dubious, at best. With exceptions not relevant here, it purports to apply only to claims arising from "past or present contamination" (as of 1985), by radionuclides, on properties not specified in the document – and it purports to apply to even those claims only insofar as they "were pled or raised or might have been pled or raised in Civil Action Nos. 75-M-1162 and 75-M-1296." The document, which contains no integration clause, further provides that it "shall not adversely affect the rights of the McKays under, nor shall it diminish, discharge or release the obligations of defendants under, the Settlement Agreement." What rights the McKays may have (and what obligations defendants may owe) under the "Settlement Agreement" cannot be gleaned from defendants' motion, which omits to append the document.

*Plaintiffs' Opposition to Motion for New Trial or Remittitur – Page 43*

For present purposes, plaintiffs can leave to one side the question whether defendants preserved this issue for trial.[39]  Assuming for argument's sake that they did, nothing prevented them from *raising* it at trial, whether as a defense to liability to the McKays or as evidence relating to damages.  As defendants correctly note, Charles McKay was deposed in this case.  *See* Defs.' Mem. at 27.  He was even questioned at deposition about the alleged release agreement now at issue.  *Id.* The deposition occurred *during* the trial.  Defendants do not deny that he was also available, and within the range of a subpoena, to testify at trial.   Indeed, the Court specifically authorized defendants to call him as a witness.  *See* Order (Jan. 5, 2006) [Ct. Rec. 1936].  Defendants never called him, and they point to no occasion on which they otherwise presented evidence about the alleged release to the jury, or argued to the jury that plaintiffs' requested damages should be reduced to account for it.  Rule 59 does not make a new trial or remittitur available to defendants as a remedy for their failure or refusal to try their own defenses to the jury.

---

[39] The question, however, is not an idle one.  For example, on September 11, 2003, the Court directed the parties to submit a status report, to include (among other things) a list of "the claims and defenses to be tried."  *See* Order, at 2 (Sept. 11, 2003) [Ct. Rec. 1212]. The parties complied.  *See* Status Report Responding to the Court's September 11, 2003 Order (Dec. 10, 2003) [Ct. Rec. 1218].  In their portion of the status report, defendants included a lengthy discussion of various defenses they asserted – including a discussion of defenses (and other issues) that could not, they said, be tried on a class-wide basis. *See, e.g.*, *id.* at 41-45.  Defendants' only colorable reference to the McKays occurred in connection with an argument that publicity about the *Church* litigation put area residents on prior notice of problems at Rocky Flats.  *Id.* at 5.  Defendants made no reference at all to releases (except for "releases" of plutonium from the site).  Moreover, defendants cite no occasion where they requested an instruction or verdict-form question on this subject, or where they objected to the instructions or verdict form adopted by the Court on the ground that the instructions and/or verdict form failed to address class members having released their claims.

6.      **The Compensatory Damages Are Not Otherwise Unsupported by the Evidence**

Defendants' arguments in section II(B)(6) of their brief (at pages 27-28) are identical to those raised in Defendants' Renewed Motion for Judgment as a Matter of Law (Jan. 22, 2007) [Ct. Rec. 2220] and defendants' supporting memorandum [Ct. Rec. 2221]. Plaintiffs rest on their response to that motion, filed contemporaneously herewith, which rests in turn on plaintiffs' responses to defendants' previous motions under Fed. R. Civ. P. 50. *See* Plaintiffs' Opposition to Defendants' Motion for Judgment as a Matter of Law (Jan. 11, 2006) [Ct. Rec. 1962]; Plaintiffs' Response to Defendants' [First] Renewed Motion for Judgment as a Matter of Law (Jan. 20, 2006) [Ct. Rec. 2028].

**III.      The Exemplary Damages Should Not Be Set Aside or Reduced**

After reviewing months of trial evidence during weeks of deliberations, the jury awarded exemplary damages against Dow and Rockwell based on evidence of defendants' egregious, "willful and wanton," ongoing, secretive, and harmful misconduct that occurred over span of nearly four decades.[40] Having failed to convince the jury that exemplary damages were unnecessary, defendants now try to convince the Court (through selective recitation of only limited portions of the record evidence) that the jury's exemplary damage awards are insupportable, even though, at trial, plaintiffs introduced voluminous evidence of "willful and wanton" misconduct against both defendants comporting with the jury's determination that exemplary damages were appropriate to punish these defendants for past misconduct and to deter future transgressions. *See Coors v. Security Life of Denver Ins. Co.*, 112 P.2d 59, 65 (Colo. 2005) ("the general purposes of punitive damages under

_____

[40]  As already discussed in sections I(B) & ( C) above, the jury's exemplary damage awards complied with the Court's jury instructions.

section 13-21-102 are punishment of the defendant and deterrence against the commission of similar offenses by the defendant or others in the future."). Defendants' challenge to the sufficiency of that evidence is devoid of merit. Defendants' arguments that Colorado law and/or the United States Constitution somehow require a reduction of the exemplary damage awards are likewise unavailing.

### A.    The Exemplary Damage Awards Are Supported by Voluminous Record Evidence

Colorado permits the imposition of exemplary damages "in all civil actions in which damages are assessed by a jury for a wrong done to the person or to personal or real property, and the injury complained of is attended by circumstances of fraud, malice or willful and wanton conduct." Colo. Rev. Stat. § 13-21-102(1)(a). Willful and wanton conduct is "conduct purposefully committed which the actor must have realized as dangerous, done *heedlessly and recklessly*, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." *Id.* § 13-21-102(b) (emphasis added).

Under the Colorado statute, a jury determines whether to award exemplary damages and how large the award should be in the first instance. The amount of exemplary damages must be reasonable and normally may not exceed the amount of compensatory damages ultimately awarded against the defendant. *Id.* § 13-21-102(a). A jury's exemplary damages determination may be overturned or reduced only when a court, viewing the evidence in a light most supportive of the verdict, finds that no "reasonable jury could find beyond a reasonable doubt that [defendant's] injury-causing conduct was 'attended by circumstances of fraud' or a 'wanton and reckless disregard of the injured party's rights and feelings' as provided in section 13-21-102." *Palmer v. A.H. Robins,* 684 P.2d 187, 218 (Colo. 1984); *see also United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 210 F.3d 1207, 1231 (10th Cir. 2000); *Life Care Centers of Am., Inc. v. East Hampden Assoc. Ltd.*

*Plaintiffs' Opposition to Motion for New Trial or Remittitur – Page 46*

*P'ship,* 903 P.2d 1180, 1188 (Colo. App. 1995).

The Colorado Supreme Court has held that exemplary damages are appropriate to punish and deter "conduct that creates a substantial risk of harm to another and is purposefully performed with an awareness of the risk in disregard of the consequences." *Palmer v. A.H. Robins Co.*, 684 P.2d at 215. Contrary to defendants' suggestion (*see* Defs.' Mem. at 29), wanton and reckless conduct, without any evil intention, forms a sufficient predicate for the imposition of exemplary damages. *See Miller v. Solaglas Cal., Inc.*, 870 P.2d 559, 568 (Colo. App. 1993) ("'wanton and reckless' conduct which will support award of exemplary damages is conduct which creates substantial risk of harm to another and is purposely performed with an awareness of the risk and disregard of the consequences").[41] Although "mere negligence cannot support award of exemplary damages, *repeated failure to correct a known dangerous condition may convert mere negligence into wanton and reckless disregard*; this is so if failure to act creates substantial risk of harm to another and purposefully occurs with awareness of risk in disregard of consequences, or if defendant, while conscious of its conduct, and cognizant of existing conditions, knew or should have known that injury would probably result from its omissions." *Jacobs v. Commonwealth Highland Theaters, Inc.*, 738 P.2d 6, 10 (Colo. App. 1986) (citations omitted) (emphasis added).

_____

[41] *See also, e.g., Lahey v. Covington*, 964 F. Supp. 1440, 1446 (D. Colo. 1996) (Nottingham, J.); *Coors v. Security Life of Denver Ins. Co.*, 112 P.3d at 66; *Western Fire Truck, Inc. v. Emergency One*, 134 P.3d 570, 578 (Colo. App. 2006); *Razi v. Schmitt*, 36 P.3d 102 (Colo. App. 2001); *Miller v. Byrne*, 916 P.2d 566, 580 (Colo. App. 1995). None of the cases cited by defendants warrants any different conclusion. *Juarez v. United Farm Tools, Inc.*, 798 F.2d 1341 (10th Cir. 1986), involved a single worker injured while cleaning out a grain cart who sued the cart's manufacturer; *Vaske v. DuCharme, McMillen & Assoc., Inc.*, 757 F. Supp. 1158 (D. Colo. 1990), was an employment case; *Van Leeuwen v. Nuzzi*, 810 F. Supp. 1120 (D. Colo. 1993), involved a chiropractor; *Alley v. Gubser Development Co.*, 785 F.2d 849 (10th Cir. 1986), involved construction of mobile home.

As explained more fully in plaintiffs' response to defendants' motion for judgment as a matter of law,[42] there is ample evidence to support the exemplary damage awards.  Defendants' contention that there is "no evidence whatsoever" of defendants' "conscious wrongdoing," *see* Defs.' Mem. at 30, is simply absurd.  The evidence against Dow is not confined, as defendants would have it, to three discrete "incidents."  Rather there was an ongoing failure to monitor and safely operate the waste management functions of nuclear facility properly over the course of decades.  The record evidence of Rockwell's willful and wanton misconduct is at least as compelling.  Defendants studiously ignore the fact that Rockwell routinely failed to monitor and to comply with environmental standards, and omit any mention to Rockwell's criminal conviction for environmental violations.

For example, both Dr. Budnitz and former union representative and long-time Rocky Flats employee Johnny Ray testified about Dow's knowing, blatant, reckless misconduct in operating Rocky Flats over the years.  Dr. Budnitz, himself a DOE contractor and also a physicist, testified that Dow knew or should have known that: plutonium was going off-site; that monitors were not properly installed or maintained; that the 903 pad was uncovered and 5200 barrels of plutonium-contaminated waste were left outside, open to the elements without even a tarp covering them, in violation of any standard of good practice; and that changes were not made after the 1957 fire that could have prevented the 1969 fire.  *See* Tr. (10/27/05) at 2967:21 to 3093:15; *id.* (10/31/05) at 3101:1 to 3218:15; *id.* at 3221:17 to 3249:24.

---

[42] Plaintiffs' separately filed response to defendants' renewed motion for judgment as a matter of law rests in turn on plaintiffs' previous response to defendants' original motion. *See* Pls.' Opp'n to Defs' Mot. for Judgment as a Matter of Law, at 87-95 (Jan. 11, 2006) (addressing exemplary damages) [Ct. Rec. 1962].

Mr. Ray, a Rocky Flats supervisor in the Dow era, testified about the meetings between union officials and Dow management about waste burial and other improper waste disposal practices that Dow officials brushed off.  Mr. Ray also testified about early concerns over the 903 area and other nuclear waste, given the sheer volume of buried material and barrels of nuclear waste left open to the elements throughout the plant site.  *See* Tr. (10/18/05) at 1455:18 to 1537:14; *id.* (10/19/05) at 1550:12 to 1604:16; PX-189.

As for the Rockwell era, Messrs. Holeman and Lipsky testified extensively about egregious, knowing, and reckless misconduct by Rockwell predating August 20, 1988, as did Dr. Cochran as well.  Mr. Holeman, Governor Romer's assistant in charge of Rocky Flats issues, testified about the lack of data available to the state, the violations of state and federal environmental laws and standards, the groundwater contamination, run-off from the plant and the intentional lack of responsiveness and evasiveness and deception he encountered from Rockwell management.  *See, e.g.*, Tr. (10/17/05) at 1128-38; 1147; 1177; 1189-95.

Mr. Lipsky, the former FBI agent in charge of the Rocky Flats criminal investigation, described Rockwell's lack of compliance with environmental standards and its unwillingness to provide state and federal regulators with complete information about their nuclear waste practices.  *See, e.g.*, Tr. (10/24/06) at 2252:21 to 2292:18; *id.* at 2301:4 to 2309:10; *id.* at 2314:6 to 2338:3.

Dr. Cochran testified to egregious violations of safe and sound practice by Rockwell on issues ranging from fire safety to criticality to waste management to missing plutonium ("material unaccounted for," or "MUF").  *See, e.g.*, Tr. (11/14/05) at 5267:16 to 5288:17; *id.* (11/15/05) at 5382:16 to 5390:15.

Defendants ignore this and considerable other evidence of defendants' knowing and reckless disregard. The question is not, as defendants would have it, whether defendants took some steps to prevent catastrophic contamination of surrounding lands. It is rather whether a reasonable trier of fact could find that their overall course of conduct represented reckless and wanton behavior. The entirety of the evidence supports the jury finding of exemplary damages. Even the few examples cited above demonstrate that defendants' characterization of the evidence is inappropriate based on the evidence at trial. "The presence of conflicting testimony need not prevent a jury from deciding that one side has proven the existence of facts beyond a reasonable doubt." *Klein v. Grynberg*, 44 F.3d 1497, 1504 (10th Cir. 1995).

### B.   Defendants' Alleged Compliance with "Standards" Does Not Warrant Setting Aside the Exemplary Damage Awards

Defendants cite *Alley v. Gubser Dev. Co.*, 785 F.2d 849 (10th Cir. 1986), for the proposition that exemplary damages may not be awarded if defendants have complied with something defendants call "standards." Defendants do not identify the "standards" with which they allege compliance, and leave it somewhat mysterious whether their intended reference is to industry "standards" or regulatory ones. In either event, *Alley* held only that the mere manufacture of mobile homes with wood products containing formaldehyde, in a manner consistent with prevalent industry practice, was not enough, without more, to sustain an exemplary damage award. In this case, by contrast, the jury heard extensive testimony, from Drs. Budnitz, Cochran, and others, from which it could have found that defendants' conduct was not only willful and wanton, but violated any reasonable standard of industrial care.

Defendants' brief does not actually cite any *regulatory* standards with which defendants claim compliance, and the jury made no determination that defendants complied with *any* standard.

A trier of fact *could* perhaps have found that defendants were in compliance with *some* legal and regulatory standards, based on some of the evidence invoked in defendants' brief, but defendants simply ignore the extensive evidence of their noncompliance with others. For example, defendants ignore the existence of the tri-party agreement in the 1980s that sought to bring the plant into environmental compliance. They ignore record evidence that environmental monitoring was grossly inaccurate at the plant, rendering suspect the records through which claims of compliance could be tested. And they ignore the evidence of defendants' longstanding efforts to shield their handling of hazardous radioactive waste from regulatory scrutiny and review – as documented, for example, in Rockwell's guilty plea. The exemplary damage award may not be set aside on this ground.

### C. The Court Should Not Disallow or Reduce the Punitive Damage Award Pursuant to Colo. Rev. Stat. § 13-21-102

Defendants also assert that the Court should exercise its discretion to reduce or disallow the award pursuant to its authority under Colo. Rev. Stat. § 13-21-102(2)(a)-( c). This the Court should not do.

The fact that the Rocky Flats plant is no longer open for business – operations having been shut down in 1989 precisely by reason of defendants' misconduct – does not lessen the need for exemplary damages. Both Dow and Rockwell (or its corporate successors) operate or oversee other hazardous facilities, and/or may do so in the future. The exemplary damages awarded by the jury can therefore have their intended deterrent effect on these defendants' future conduct. The exemplary damages will also stand as a warning to other operators of hazardous manufacturing facilities, including facilities not owned by DOE.

### D.       The Exemplary Damage Awards Are Not Unconstitutional

Defendants claim that the exemplary damage awards somehow fail to comply with the United States Constitution and must be vacated or reduced.  Defendants' argument is again based on an excessively narrow view of the misconduct at issue in the case.

In *BMW of North Am., Inc. v. Gore*, 517 U.S. 559 (1996), the Supreme Court established a multi-step analysis to determine if an award of punitive damages is constitutionally infirm.  First, "punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition."  *Id.* at 562; *cf. Lexton-Ancira Real Estate Fund v. Heller*, 826 P.2d 819, 822 (Colo. 1992) (the general purposes of exemplary damages are punishment of the defendant and deterrence against the commission of similar offenses by the defendant and others in the future).  Here, the goal of punishing or deterring reckless environmental management practices generally, and specifically at hazardous facilities located near residential areas, passes constitutional muster under this standard.  The exemplary damage awards will punish defendants for environmental misconduct that affected blameless nearby landowners, and will deter future manufacturers and defense contractors from knowingly using grossly improper manufacturing and waste management practices in handling hazardous and nuclear materials.

Next, a court must determine if the defendant received "fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *Id.* at 574.  The *BMW* court articulated three factors to guide analysis of whether a defendant received adequate notice: (1) the degree of reprehensibility of the defendants' conduct; (2) the ratio of the punitive damages award to the actual or potential harm inflicted on the plaintiff; and (3) a comparison of the punitive damages award with the civil or criminal penalties that could be imposed

for comparable misconduct. *Id.* at 575.  The Court defined some conduct as more reprehensible than others, particularly: (1) where physical harm results; (2) if the harm is economic, where it was suffered by a particularly vulnerable target; (3) where there evidence that the defendant acted intentionally or with reckless disregard for the safety of others; or (4) where such conduct was recidivist in nature. *Id.* at 576-77.

The Supreme Court noted a fifth reprehensibility factor in *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408 (2003): whether the harm suffered resulted from some form of malice, trickery, or deceit as opposed to mere accident.  *Id.* at 419.[43]  And in *Philip Morris USA v. Williams*, 127 S. Ct. 1057 (2007), the Supreme Court recently recognized a sixth consideration: "[C]onduct that risks harm to many is likely more reprehensible than conduct that risks harm to only a few.  And a jury consequently may take this fact into account in determining reprehensibility."  *Id.* at 1065.

The factors established by the Supreme Court for considering the constitutionality of a punitive damages award are all satisfied in this case, and thus the awards in this case cannot be held unconstitutional.

As to reprehensibility: First, the physical character of the harms at issue plainly supports the exemplary damage awards.  Punitive damages do not run afoul of the Due Process clause merely because economic rather than physical harm is at issue.  *United Int'l Holdings, Inc. v. Wharf (Holding) Ltd.*, 210 F.3d 1207 (10th Cir. 2000), *aff'd* 532 U.S. 588 (2001) (punitive damages awarded in business dispute involving promised option to invest in company in violation of securities laws).  In this case, however, the claims are *not* for purely economic harm.  Indeed, this

---

[43] The Court also confirmed in *State Farm* that the absence of any particular factor or factors does not render a punitive damages award unconstitutional.  *Id.*

Court has repeatedly held that mere economic loss would not constitute an actionable basis for plaintiffs' tort claims. The health risks posed by past and potential future releases of radioactive carcinogens, and the contamination of class properties, are physical, not economic facts, and the jury has found them to represent a substantial interference with use and enjoyment of class properties. *See, e.g.*, Jury Verdict Form, at 4 (question No. 1 under ¶ C); *id.* at 5-6 (question No. 1 under ¶ D).

Second, a home (or other real property) can represent by far the most substantial economic assets that many individuals possess. The testimony of the class representatives and other witnesses establishes that class members were therefore highly vulnerable to substantial economic hardship caused by defendants' misconduct. Third, the jury heard ample evidence from which to conclude that the misconduct was intentional and/or undertaken with conscious disregard of class members' safety and welfare. Fourth, the misconduct at issue was not an isolated occurrence, or but rather spanned decades. Fifth, ample evidence was offered to show that defendants' conduct was attended by circumstances of dishonesty, subterfuge, and deceit. Sixth, the misconduct endangered not just a small number of individuals, but thousands of nearby residents.

As for the ratio of exemplary to compensatory damages: that ratio is well within the single-digit range. Indeed, it is capped, by statute, at a 1:1 ratio for each defendant, and actually falls *below* that level for both defendants under the jury's awards. *See supra*, at 18 n.12. The ratios in this case fall nowhere near any constitutionally suspect territory. *See BMW*, 517 U.S. at 580-83; *State Farm*, 538 U.S. at 424-25.

As for comparing the exemplary damages to the amount of civil and criminal penalties that could be imposed on defendants for comparable misconduct: corporations that knowingly pollute the lands, air and/or waterways are subject to very substantial fines under the federal environmental

laws.  *See, e.g.,* Clean Water Act, 33 U.S.C. § 1319(c)(2) (fines up to $100,000 per day for repeat offenders).  Comparison of the award to civil or criminal penalties, however, is only one of the indicators of whether a defendant is on notice of the magnitude of the award that may be imposed based on the defendants' misconduct.  *Int'l Holdings*, 210 F.3d at 1233.  As the Tenth Circuit has explained:

> In Colorado, a defendant is on notice of the magnitude of the penalty by virtue of C.R.S. § 13-21-102(1)(a).  That section generally prohibits a punitive damages award in excess of the compensatory award. Thus, a defendant is on notice that a potential punitive damages award varies with the magnitude of the actual harm caused by the defendant, but only rarely will it exceed the amount reflective of the actual harm.  In other words, the greater the harm, economic or otherwise, inflicted by the defendant, the greater the potential punitive award.

*Id.*

### E.   Defendants' Price-Anderson Argument Has Already Been Rejected

Defendants' final argument against punitive damages, based on the 1988 amendments to the Price-Andersen Act, has been and rejected by this Court in various past rulings, as defendants freely admit.

## IV.   The Court's Previous Rejection of Defendants' Other Arguments Remains Sound

In sections IV through VII of their brief (at pages 46-163), defendants raise only arguments that the Court has already rejected in previous rulings (according to defendants themselves). Defendants have alleged no change in the law or new facts that would warrant revisiting those earlier rulings.  Nor have defendants shown clear error or manifest injustice.  They have offered no valid ground, therefore, for the Court to reconsider its prior decisions.  *See George Carlson & Assocs. v. United States Bankruptcy Court (In re Zamora)*, 251 B.R. 591, 595 (D. Colo. 2000) (standards for reconsideration).  Plaintiffs rest on the Court's previous rulings in these matters, and

on the submissions and arguments previously offered by plaintiffs in connection with them.

Plaintiffs note, for purposes of the appellate record, that to the extent defendants have already failed to take appropriate procedural steps to preserve error (prior to and/or subsequent to the Court's previous rulings), such waivers are not cured by the assertion or reassertion of waived arguments and/or objections in a post-verdict submission. *See, e.g.*, Fed. R. Civ. P. 16; Fed. R. Civ. P. 49(a); Fed. R. Civ. P. 50(a); Fed. R. Civ. P. 51(c); Fed. R. Evid. 103(a).

## CONCLUSION

For the reasons given above, plaintiffs' respectfully ask that defendants' motion for new trial or remittitur be denied, and for entry of judgment on the jury's verdict.

Dated: March 19, 2007                    Respectfully submitted,


                                         s/ Peter Nordberg
                                         Merrill G. Davidoff
                                         Peter Nordberg
                                         David F. Sorensen
                                         Ellen T. Noteware
                                         Berger & Montague, P.C.
                                         1622 Locust Street
                                         Philadelphia, PA 19103
                                         (215) 875-3000

                                         Gary B. Blum
                                         Steven W. Kelly
                                         Silver & DeBoskey, P.C.
                                         1801 York Street
                                         Denver, CO 80206
                                         (303) 399-3000

Louise Roselle
Jean M. Geoppinger
Waite, Schneider, Bayless
  & Chesley Co., L.P.A.
1513 Central Trust Tower
Cincinnati, OH 45202
(513) 621-0267


Attorneys for Plaintiffs
And the Class

## CERTIFICATE OF SERVICE

I hereby certify that on March 19, 2007, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will effect service of such pleading upon:

       David M. Bernick, Esq.
       Kirkland & Ellis LLP
       200 East Randolph Drive
       Chicago, IL 60601

          and

       Joseph J. Bronesky, Esq.
       Sherman & Howard, LLC
       633 Seventeenth Street, Suite 3000
       Denver, CO 80202

       Attorneys for Defendants

                                 s/ Peter Nordberg
                                 Peter Nordberg