**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 90-cv-181-JLK

MERILYN COOK, *et al.*,

      Plaintiffs,

v.

ROCKWELL INTERNATIONAL CORPORATION
and THE DOW CHEMICAL COMPANY,

      Defendants.

---

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR A NEW TRIAL OR,
IN THE ALTERNATIVE, FOR A REMITTITUR OF DAMAGES**

---

David M. Bernick
John E. Tangren
Kirkland & ELLIS
200 E. Randolph Drive
Chicago, Illinois  60601-6636
Phone:   312-861-2000
Fax:        303-298-0940

Joseph J. Bronesky
SHERMAN & HOWARD L.L.C.
633 Seventeenth Street, Suite 3000
Denver, Colorado  80202
Phone:   303-297-2900
Fax:        303-298-0940

Attorneys for ROCKWELL
INTERNATIONAL CORPORATION and
THE DOW CHEMICAL COMPANY

## TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........................................................................................ i

TABLE OF AUTHORITIES ............................................................................... iii

ARGUMENT .......................................................................................................1

    I.      THE COMPENSATORY DAMAGES AWARD SHOULD BE SET
           ASIDE. ..................................................................................................1

           A.     The Jury Did Not Award Damages To Properties Owned By the
                  Subclass That Sold Before January 30, 1990 ................................1

           B.     Nothing In The Jury Verdict Form Indicates That The Jury
                  Assessed Damages As Of The Time That Class Members Owned
                  Their Properties. ...........................................................................5

           C.     The Compensatory Damages Award Should Be Set Aside To
                  Account For Class Members Who Decline To Accept An
                  Easement. ......................................................................................9

           D.     The Compensatory Damages Award Improperly Includes Class
                  Members Who Suffered No Damages Or Less Than Average
                  Damages. .....................................................................................13

           E.     Compensatory Damages Must Be Set Aside Because It Includes
                  Class Members Who Have Released Their Claims Against
                  Defendants. .................................................................................14

           F.     The Compensatory Damages Are Clearly Unsupported By The
                  Evidence. .....................................................................................16

    II.     THE PUNITIVE DAMAGES SHOULD BE VACATED OR REDUCED ..........16

           A.     Plaintiffs Did Not Prove Beyond A Reasonable Doubt They Are
                  Entitled To Punitive Damages Under Colorado Law. ...............16

           B.     The Punitive Damages Award Should Be Vacated Due To
                  Defendants' Compliance With Standards. ..................................17

           C.     The Court Should Disallow or Reduce The Punitive Damages
                  Award Pursuant to Colo. Rev. Stat. § 13-21-102. ....................19

           D.     The Punitive Damages Award Is Unconstitutional. ...................20

E.      The Punitive Damages Award Is Inconsistent With The Price-Anderson Act. ...........................................................................................27

III.    A NEW TRIAL IS REQUIRED BECAUSE THE PUNITIVE DAMAGES AWARD IS AMBIGUOUS AND IRRECONCILABLY INCONSISTENT. ..................................................................................................28

        A.      The Punitive Damages Award Is Ambiguous And Irreconcilably Inconsistent. ...............................................................................................28

        B.      The Jury's Verdict Cannot Be Saved Simply By Reducing The Punitive Damages Award. ........................................................................34

IV.     A NEW TRIAL IS REQUIRED BECAUSE THE COMPENSATORY DAMAGES AWARD IS AMBIGUOUS AND IRRECONCILABLY INCONSISTENT. ..................................................................................................37

        A.      Plaintiffs Acknowledge That, Even Under Their Theory Of The Verdict, The Maximum Compensatory Damages That May Be Awarded Is $176 Million. ........................................................................37

        B.      The Compensatory Damages Verdicts Are Inconsistent And Must Be Vacated. ..................................................................................................38

V.      A NEW TRIAL IS REQUIRED DUE TO THE ERRONEOUS JURY INSTRUCTIONS, THE ADMISSION OF IRRELEVANT AND HIGHLY PREJUDICIAL EVIDENCE, THE COURT'S FAILURE TO GRANT DEFENDANTS' MOTIONS FOR MISTRIAL, AND BECAUSE THE TRIAL EVIDENCE CONFIRMED THE CASE SHOULD NOT HAVE BEEN TRIED AS A CLASS ACTION. .........................44

CONCLUSION ...........................................................................................................................46

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Action House, Inc. v. Koolik*,
    54 F.3d 1009 (2d Cir. 1995) ............................................... 35

*Alley v. Gubser Dev. Co.*,
    785 F.2d 849 (10th Cir. 1986) ..................................... 18, 20

*Anderson v. Griffin*,
    397 F.3d 515 (7th Cir. 2005) ..................................... 36, 41

*Anixter v. Home-Stake Prod. Co.*,
    77 F.3d 1215 (10th Cir. 1996) .......................................... 27

*Bangert Bros. Const. Co. v. Kiewit Western Co.*,
    310 F.3d 1278 (10th Cir. 2002) ........................................ 35

*Barton v. Adams Rental, Inc.*,
    938 P.2d 532 (Colo. 1997) ......................................... 36, 41

*Bielicki v. Terminix Int'l Co.*,
    225 F.3d 1159 (10th Cir. 2000) ........................................ 23

*BMW of N. Am., Inc. v. Gore*,
    517 U.S. 559 (1996) .................................................. 20

*Bohrer v. Dehart*,
    961 P.2d 472 (Colo. 1998) ......................................... 36, 41

*Cimino v. Raymark lndus., Inc.*,
    151 F.3d 297 (5th Cir. 1998) ........................................... 13

*Cont'l Trend Res, Inc. v. OXY USA Inc.*,
    101 F.3d 634 ....................................................... 23, 24

*Cook v. Rockwell Int'l Corp.*,
    273 F.Supp.2d 1175 (D. Colo. 2003) .................................... 24

*Cronk v. Intermountain Rural Elec. Ass'n*,
    1992 WL 16181 (Colo. Ct. App. 1992) .................................. 33

*deHass v. Empire Petroleum Co.*,
    435 F.2d 1223 (10th Cir. 1970) ........................................ 20

*Finnegan v. Fountain*,
915 F.2d 817 (2d Cir. 1990)........................................................................ 35

*Good Fund, Ltd. — 1972 v. Church*,
540 F.Supp. 519 (D. Colo. 1982)...................................................... 14, 15, 16

*Graphic Directions, Inc. v. Bush*,
862 P.2d 1020 (Colo. Ct. App. 1993) ...................................................... 32, 33

*Great Western Sugar Co. v. KN Energy, Inc.*,
78 P.2d 272 (Colo. Ct. App. 1989) ................................................................ 34

*Harper v. Va. Dep't of Taxation*,
509 U.S. 86 (1993).......................................................................................... 27

*Heno v. Sprint/United Mgmt. Co.*,
208 F.3d 847 (10th Cir. 2000) ....................................................................... 39

*Henry v. Dow Chem. Co.*,
701 N.W.2d 684 (Mich. 2005)........................................................................ 21

*Hensley v. Tri-QSI Denver Corp.*,
98 P.3d 965 (Colo. Ct. App. 2004) ................................................... 31, 32, 33

*Howard D. Jury, Inc. v. R&G Sloane Mfg. Co.*,
666 F.2d 1348 (10th Cir. 1981) ....................................................................... 8

*Hughes v. Regents of the Univ. of Colo.*,
967 F. Supp. 431 (D. Colo. 1996)................................................................... 16

*In re Exxon Valdez*,
472 F.3d 600 (9th Cir. 2006) ................................................................... 23, 24

*Jacobs v. Commonwealth Highland Theaters Inc.*,
738 P.2d 6 (Colo. Ct. App. 1986) .................................................................. 17

*James B. Beam Distilling Co. v. Georgia*,
501 U.S. 529 (1991)........................................................................................ 27

*James v. Coors Brewing Co.*,
73 F. Supp. 2d 1250 (D. Colo. 1999)...................................................... 32, 33

*Juarez v. United Farm Tools, Inc.*,
798 F.2d 1341 (10th Cir. 1986) ..................................................................... 16

*Key v. Rutherford*,
645 F.2d 880 (10th Cir. 1981) ....................................................................... 27

*Kosmynka v. Polaris Indus., Inc.*,
    462 F.3d 74 (2d Cir. 2006) ............................................................. 32

*Leeuwan v. Nuzzi*,
    810 F. Supp. 1120 (D. Colo. 1993) ................................................ 17

*Lira v. Davis*,
    832 P.2d 240 (Colo. 1992) ...................................................... passim

*McKay v. United States*,
    703 F.2d 464 (10th Cir. 1983) ....................................................... 14

*Midwest Underground Storage, Inc. v. Porter*,
    717 F.2d 493 (10th Cir. 1983) ......................................................... 8

*Miller v. Solaglas Cal., Inc.*,
    870 P.2d 559 (Colo. Ct. App. 1993) ............................................. 17

*Murphy Oil USA, Inc. v. Wood*,
    438 F.3d 1008 (10th Cir. 2006) ..................................................... 33

*Musick v. Dep't of Energy*,
    339 F.3d 1365 (Fed. Cir. 2003) ..................................................... 15

*Nance v. Gulf Oil Corp.*,
    817 F.2d 1176 (5th Cir. 1987) ....................................................... 35

*O'Connor v. Boeing N. Am., Inc.*,
    No. CV 97-1554, slip op. at 77–87
    (C.D. Cal. Aug. 18, 2005) .............................................................. 24

*Olcott v. Del. Flood Co.*,
    76 F.3d 1538 (10th Cir. 1996) ....................................................... 27

*Perlumtter v. Blessing*,
    706 P.2d 772 (Colo. 1985) ...................................................... 36, 41

*Philip Morris USA v. Williams*,
    127 S. Ct. 1057 (2007) ........................................................... 25, 27

*Richards v. Jefferson County, Ala.*,
    517 U.S. 793 (1996) ....................................................................... 11

*Robinson v. Volkswagenwerk AG*,
    56 F.3d 1268 (10th Cir. 1995) ....................................................... 11

*S.E.C. v. AbsoluteFuture.com*,
    393 F.3d 94 (2d Cir. 2004) ...................................................... 36, 41

*Slack v. Farmers Ins. Exch.*,
   5 P.3d 280 (Colo. 2000) .................................................................................... 36, 41

*Slater v. Shell Oil Co.*,
   137 P.2d 713 (Cal. Ct. App. 1943) ................................................................................ 11

*Sonoco Products Co. v. Johnson*,
   23 P.3d 1287 (Colo. App. 2001) .................................................................................... 33

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
   538 U.S. 408 (2003) .......................................................................................... 20, 23, 24

*Tri-Aspen Constr. Co. v. Johnson*,
   714 P.2d 484 (Colo. 1986) ............................................................................................ 17

*Unit Drilling v. Enron Oil & Gas Co.*,
   108 F.3d 1186 (10th Cir. 1997) ...................................................................... 8, 29, 35, 37

*United States v. Chanthadara*,
   230 F.3d 1237 (10th Cir. 2000) .................................................................................... 35

*United States v. Lawrence*,
   2006 WL 3337472 (S.D. Ohio Nov. 16, 2006) ............................................................ 33

*United States v. Nucci*,
   364 F.3d 419 (2d Cir. 2004) .................................................................................... 36, 41

*Vining ex. rel. Vining v. Enter. Fin. Gr., Inc.*,
   148 F.3d 1206 (10th Cir. 1998) .................................................................................... 33

*Westric Battery Co. v. Standard Elec. Co.*,
   482 F.2d 1307 (10th Cir. 1973) .................................................................................... 34

*Wilcox v. Homestake Mining Co.*,
   No. CIV-04-534, slip op. at 6–7 (D.N.M. Nov. 15, 2005) .......................................... 24

**Statutes**

28 U.S.C. § 2072 ........................................................................................................... 13

42 U.S.C. § 2210 ........................................................................................................... 20

Colo. Rev. Stat. § 13-12-111.5(1) ................................................................................. 36

Colo. Rev. Stat. § 13-21-102 ................................................................................. passim

Colo. Rev. Stat. § 13-21-102(1)(a) ....................................................................... passim

Colo. Rev. Stat. § 13-21-111.5 ............................................................................... 41, 43

**Other Authorities**

Charles A. Wright, Arthur R. Miller, and Mary K. Kane,
     FEDERAL PRACTICE & PROCEDURE, § 2081 ..................................................................... 45

Restatement (Second) of Torts § 930(3) ........................................................................ 6

Restatement (Second) of Torts § 930, cmt. b.................................................................. 6, 7, 10

**Rules**

Fed. R. Civ. P. 51(b) ...................................................................................................... 44

## INTRODUCTION

Plaintiffs' response fails to come to grips with the fundamental flaws that defendants discussed in their motion for new trial.  As defendants explained, there are myriad problems with the jury's verdict, which prevent any judgment from being entered in this case, and which instead require a new trial.  No compensatory damages can be entered because the jury did not determine the damages to award to the Damages Subclass, nothing in the verdict indicates that the jury assessed damages at the time that the class members owned their properties, and the compensatory award included class members who suffered no damages or less than average damages.  Furthermore, compensatory damages cannot be entered because the verdict does not account for class members who released their claims against defendants.  Similarly, no punitive damages can be entered because no evidence was presented that defendants intended to commit any harm, and defendants complied with all applicable standards.  The punitive award is also unconstitutional because defendants' conduct was not reprehensible.  Further, the jury's verdict cannot be entered because both the compensatory and punitive damages awards are ambiguous and irreconcilably inconsistent.

## ARGUMENT

### I.  THE COMPENSATORY DAMAGES AWARD SHOULD BE SET ASIDE.

#### A.  The Jury Did Not Award Damages To Properties Owned By the Subclass That Sold Before January 30, 1990.

The jury explicitly was asked to assess aggregate damages for the "Entire Class."  (Jury Verdict Form at 15, 24.)  Yet it is undisputed that over a thousand owners of properties in the "Entire Class" are not in the Damages Subclass.  (Defs.' Resp. to Pls.' Proposed Plan for Determination of Compensatory Damages, filed 7/21/04, at 11.)  None of plaintiffs' evidence focused on the Damages Subclass.  Plaintiffs submitted their expert reports in 1996, long before

they proposed their "subclass plan" on July 13, 2004 (*see generally* Defs.' Resp. to Pls.' Proposed Plan for Determination of Compensatory Damages, filed July 21, 2004), and long before it was known who was in the Damages Subclass that would have permitted any such analysis.  As a result, the Court cannot determine the amount of damages that were suffered by the Damages Subclass, because the jury was never asked that question, and plaintiffs presented no such evidence at trial.

Plaintiffs argue that defendants waived this argument because defendants requested a verdict form on January 11, 2006 that used language referring to the "Class Properties", "Class-wide", or "all of the Class Properties."  (Pls.' Mem. at 30.)  But defendants did not waive any argument.  Defendants' proposed form was based on the Court's order that "***[d]efendants' proposed verdict form shall be consistent with the current jury instructions.***"  (1/4/06 Order on Jury Instruction Submissions at 2 (emphasis original).)  The "current jury instructions" at that time used language that did not distinguish between the Damages Subclass and the other class members.  (*See*, *e.g.*, Instruction 3.22 (instructing that actual damages be awarded with reference to "the Class Properties").)  Defendants had proposed a jury verdict form that would have avoided this problem by asking the jury to determine damages for individuals, as opposed to for the "Entire Class."  (*See* Defs.' 9/3/04, Submission of Phase III Jury Instructions and Jury Verdict Forms at 83-102.)  Plaintiffs objected to defendants' proposed jury verdict form, and it was rejected.

Defendants also had already objected, at their first opportunity, to a class trial in which damages would be awarded to a subclass, the definition of which would not be known until the conclusion of the trial itself.  (Defs.' Resp. to Pls.' Proposed Plan for Determination of

Compensatory Damages, filed 7/21/04, at 14-15.)[1]  When plaintiffs first proposed the "Damages

Subclass" idea in the summer of 2004, defendants explained that it would not work.  Among

other problems, the damages evidence presented at trial would not match the Damages Subclass

that could be awarded damages based on that evidence:

> [U]nder plaintiffs' approach, the determination of which class members are
> covered by plaintiffs' damages evidence is contingent on the jury's verdict.  For
> example, if the jury were to determine that the complete-and-comparatively
> enduring point was March 21, 1992, then ***the parties would learn at the
> conclusion of the trial that one-fourth of the class was not covered by the
> damages evidence that plaintiffs had presented at trial.***

(Defs.' Resp. to Pls.' Proposed Plan for Determination of Compensatory Damages, filed 7/21/04,

at 14-15 (emphasis added).)

Defendants had also objected to plaintiffs' proposed damages plan.  (*See id*; *see also*

Defs.' Submission of Phase III Jury Instructions and Verdict Forms at 2.)  Defendants then

incorporated these objections into their objections to the Court's jury instructions and verdict

form.  (*See* Defs.' Objections to Jury Instructions and Verdict Form, filed 1/18/06, at 3

("Defendants also incorporate by reference as if fully set forth herein . . . Defendants' Response

to Plaintiffs' Proposed Plan for Determination of Compensatory Damages, filed July 21, 2004.");

*id.* at 2 ("Defendants . . . incorporate by reference as if fully set forth herein . . . Defendants'

Proposed Phase III Instructions and Jury Verdict Form, filed September 3, 2004."); Defs'

Renewed Objections to Jury Instructions and Verdict form, filed 1/20/06, at 2-4 (same).)  And,

---

[1] Plaintiffs now assert that this argument only related to the "manageability" of plaintiffs'
proposed trial plan. (Pls.' Mem. at 31 n.21.)  Not so.  Regardless of whether defendants'
argument also went to the issue of "manageability," defendants' objection hit the current
problem squarely on the head, because the parties "learn[ed] at the conclusion of the trial that"
some portion of the class "was not covered by the damages evidence that plaintiffs had presented
at trial."  (Defs.' Resp. to Pls.' Proposed Plan for Determination of Compensatory Damages,
filed 7/21/04, at 14-15.)

when defendants submitted their proposed changes to the jury instructions during trial,

defendants made clear that they were proposing jury instructions that accepted the Court's

rulings as a given:

> Defendants have sought to propose changes within the framework of the Court's preliminary instructions rather than resubmit previously rejected instructions or reargue past objections on which this Court has ruled. Defendants (1) preserve their previously-stated objections to plaintiffs' proposed instructions to the extent they apply to the current instructions, and (2) object to the extent that the current instructions depart from defendants' previously-proposed instructions.

(Defs.' Proposed Changes to the Preliminary Jury Instructions, filed Jan. 10, 2006, at 2.)  In

short, defendants have more than adequately preserved this argument.[2]

---

[2] The Court has repeatedly requested that defendants not repeat arguments:

> I would state this parenthetically:  Those issues and the objections are preserved on appeal, but I'm getting tired of hearing them.  And I think it has gotten to the point with the repetition of these same points that I've ruled on that it requires me to go back over my previous rulings and spend a lot of time doing that -- it has reached the point where it can, and hasn't yet, but it will seriously affect the persuasiveness of counsel's representation in this case if I have to continue to do that.  I may just quit listening.

(7/22/04 Hr'g Tr. at 4.)

Similarly, at the next jury instruction conference, the Court stated:

> I want to do some additional housekeeping in order to preserve the objections on appeal.  Defendants have proposed a number of instructions that are premised on issues of law that have already been rejected in this case.  I know that--I won't use the term paranoid--I know that you are exceedingly concerned about preserving a record on appeal, as well you should be, and it's my belief that the record is preserved, because it's recorded, and I ruled.  But, nevertheless, there were some that were filed again, and I want just to put those to rest.

(9/8/04 Hr'g Tr. at 17-18; *see also* 10/07/05 Hr'g Tr. at 380 (with respect to jury instructions "you're not waiving it simply because I've already ruled"); 11/10/05 Order Limiting Motions Practice During Trial.)

Plaintiffs also claim that defendants waived this argument because they did not ask for clarification of the verdict when it was announced.  (Pls.' Mem. at 32.)  The jury's verdict, however, is not ambiguous in this respect — it clearly awarded damages to the "Entire Class." (*See*, *e.g.*, Jury Verdict Form at 15, 24 (asking jury to find the aggregate damages for the "***Entire Class***." (emphasis added).)  There was no need to ask for clarification on this point before the jury was discharged.  The problem here was with the plaintiffs' trial plan, verdict form, and jury instructions, not with the manner in which the jury reported its verdict consistent with them.

In sum, plaintiffs do not address the basic points that: (1) the jury awarded damages to the "Entire Class;" (2) the jury never determined that the Damages Subclass suffered any damages, much less a certain amount of damages; and (3) because some class members sold their properties before January 30, 1990, the jury's award, if upheld, will award damages to plaintiffs who have not yet proved they are entitled to them.  The jury's award must therefore be set aside; plaintiffs have proposed no mechanism by which it could be reduced.

**B.     Nothing In The Jury Verdict Form Indicates That The Jury Assessed Damages As Of The Time That Class Members Owned Their Properties.**

Damages are awarded in a Section 930 case "at the time when the injurious situation became complete and comparatively enduring."  Restatement (Second) of Torts § 930.  The jury did not determine a specific CCE date or time.  Instead, the jury found the CCE period was between 1988 and 1995.  But thousands of class properties were sold each year between 1988 and 1995.  (*See* DX 2066; *see also* Radke Expert Report at Fig. 4.4 (listing residential properties sold each year between 1988 and 1995); Hunsperger Expert Report at 178-215 (market sales data between 1988 and 1995).)  Because the CCE time remains unknown, there is no way to know if these class members owned their properties at the time at which the jury assessed damages.

Indeed, the jury may have measured damages as of 1995, even though thousands of Damages Subclass members had already sold their properties by that time.

Plaintiffs contend that the jury did not need to select a particular time on which the injurious situation became CCE.  (Pls.' Mem. at 37-38.)  Plaintiffs' position is contrary to both the language and purpose of Section 930.  Section 930(3) provides: "The damages for past and prospective invasions of land include compensation for . . . the decrease in the value of the land caused by the prospect of the continuance of the invasion measured ***at the time*** when the injurious situation became complete and comparatively enduring . . . ."  Restatement (Second) of Torts § 930 (emphasis added).  Thus, damages are "measured at the time when the injurious situation became complete and comparatively enduring."  *Id.*

Plaintiffs make the novel argument that "post-filing sales would not matter in any event, ***under this Court's previous rulings***."  (Pls.' Mem. at 39 (emphasis added).)  Plaintiffs do not provide a citation for this assertion, and with good reason.  The Court has never held that "post-filings sales" do not "matter."  Nor could the Court have so held consistent with Section 930. The commentary to Section 930 specifically provides that the power to grant an easement and recover prospective damages ends when the land is conveyed:

> The exercise of the power of election [to elect to be compensated, once for all, for all the prospective invasions], followed by satisfaction of a judgment for damages for prospective invasions, confers an easement or privilege to continue the invasions thus paid for in advance. This power to transfer an interest in the land passes to a grantee ***when the land invaded is conveyed***. The grantor thereafter could recover only for the invasions occurring before the conveyance.

Restatement (Second) of Torts § 930, cmt. b (emphasis added).  Once the land is sold, the seller can recover "only" for invasions "before the conveyance," and not for "prospective invasions." *Id.*  Thus, Section 930 does not allow recovery for prospective invasions at any time after the property is sold.

Plaintiffs also argue that the "the power to elect a recovery of Section 930 damages vests in a property owner once it appears that the wrong will continue indefinitely."  (Pls.' Mem. at 39.)  Plaintiffs' argument conflates two questions which this Court has recognized to be separate — the question of when the injurious situation will continue indefinitely, which is used to determine when a cause of action accrues under Section 930, and the question of when the injurious situation became complete and comparatively enduring, which is used to measure damages.  The Court has held that the "continue indefinitely" time and the CCE time are not the same.  (*See* 1/27/06 Order Regarding Instruction No. 3.28 at 7 ("It is possible for the right to recover prospective damages to accrue before the most accurate time for measuring these damages occurs . . . .").)  While, under this Court's rulings, a plaintiff may have the right to elect to recover damages for prospective invasions at the time when the injurious situation will continue indefinitely, it does not follow that the full amount (or any amount) of damages existed at that time, and it does not follow that damages should be measured at that time.  The purpose of the CCE requirement is to determine the time at which damages should be measured.  *See* Restatement (Second) of Torts § 930 cmt. d ("At the time when the injurious situation has become complete and comparatively enduring, the amount of depreciation because of the prospect of future invasion can be determined with greatest accuracy.").

Plaintiffs also speculate that the jury may have found the injurious situation to be complete and comparatively enduring on January 30, 1990, the same time the jury found the injurious situation would continue indefinitely.  (Pls.' Mem. at 38-39.)  We will never know if this is true, because the jury did not determine a CCE time.  Accordingly, it is impermissible to speculate that the jury may nevertheless have found the CCE and continue indefinitely times to be the same, when the jury was never asked that question.  *Unit Drilling v. Enron Oil & Gas Co.*,

108 F.3d 1186, 1191-93 (10th Cir. 1997); *see also Midwest Underground Storage, Inc. v. Porter*, 717 F.2d 493, 501 (10th Cir. 1983) ("[I]t is well settled that a verdict will not be upset on the basis of speculation as to the manner in which the jurors arrived at it."); *Howard D. Jury, Inc. v. R&G Sloane Mfg. Co.*, 666 F.2d 1348, 1352 (10th Cir. 1981) ("[T]his Court will not invalidate a jury verdict on the basis of plaintiff's guesswork as to the manner in which the jurors arrived at that verdict.").

In any event, as discussed above, even if the CCE time were fixed to be January 30, 1990, the compensatory damages award would still need to be set aside because many class members had already sold their properties by January 30, 1990, and the jury assessed damages for the "Entire Class," not a subclass consisting of those individuals who had not sold their properties as of January 30, 1990.

Plaintiffs' only other answer is to argue that defendants waived this argument because defendants' proposed verdict form listed a CCE date between June 6, 1989, and March 26, 1992. (Pls.' Mem. at 36-37.)  In fact, defendants repeatedly argued that the jury should be required to determine a CCE date, and that the jury should determine whether damages existed as of that date and, if so, the amount of damages as of that date.[3]  Defendants thus preserved this argument.

---

[3]  (*See* Defs.' Proposed Damages Instruction No. 3.7, filed 9/3/04, at 40 ("[Y]ou must first determine the particular date after January 30, 1988 on which the plutonium invasions on the plaintiffs' property caused by the defendant became complete and comparatively enduring."); Defs.' Proposed Jury Verdict Form, filed 9/3/04, at 87 ("What was the date on which the plutonium invasions on the plaintiff's property caused by Rockwell became complete and comparatively enduring?"); *id.* at 97 ("What was the date on which the continuing or recurrent invasions onto plaintiff's property caused by Rockwell that substantially and unreasonably interfered with the plaintiff's use and enjoyment of his or her property became complete and comparatively enduring?"); *id.* at 88 ("For each plaintiff, as of the complete-and-comparatively-enduring date that you determined in response to question 16 above, what was the reduction in the value, if any, of that plaintiff's property caused by the prospect of the continuance of plutonium invasions caused by Rockwell (the Total Reduction Amount)?"); *id.* at 98-99 ("For

(Continued…)

In addition, in their proposed instructions submitted January 10, 2006, defendants again made abundantly clear that they were proposing jury instructions that accepted the Court's rulings as a given.  (*See* Defs.' Proposed Changes to the Preliminary Jury Instructions, filed 1/10/06 at 2.)  Defendants also did not waive any arguments by submitting their proposed jury verdict form on January 11, 2006, because the Court had instructed that "Defendants' proposed verdict form shall be consistent with the current jury instructions."  (1/4/06 Order on Jury Instruction Submissions at 2.)  At that time, the "current jury instructions" stated that "[p]laintiffs contend that the diminution in the value of Class properties should be measured as of the period between June 6, 1989, when the FBI and U.S. Environmental Protection Agency searched Rocky Flats as part of their investigation into alleged wrong-doing by Rockwell, and March 26, 1992, when Rockwell pled guilty to certain environmental crimes at Rocky Flats."  (Defs.' Proposed Changes to Preliminary Jury Instructions at Ex. A. at 90.)

### C.   The Compensatory Damages Award Should Be Set Aside To Account For Class Members Who Decline To Accept An Easement.

Plaintiffs apparently believe that Damages Subclass members have no choice but to accept an easement.  (*See* Pls.' Mem. at 40-41.)  But the imposition of easements on plaintiffs'

---

each plaintiff, as of the complete-and-comparatively enduring date that you determined in response to question 16 above, what was the reduction in the value, if any, of that plaintiff's property caused by the prospect of the continuance of invasions caused by Rockwell (the Total Reduction Amount)?"); Defs.' Proposed Jury Verdict Forms, filed 1/11/06, at 3, 5 ("What was the time or time period when the injurious situation resulting from the [trespass/nuisance] caused by [Dow/Rockwell] became complete and comparatively enduring?"); *Id.* ("Have plaintiffs proved by a preponderance of the evidence that, as of the time identified in your answer to [the above question], [Dow's/Rockwell's trespass/nuisance] caused the actual value of all of the class properties to be less than what the value of these properties would have been but for [Dow's/Rockwell's] nuisance); 12/07/06 Mem. Op. Regarding Jury Instructions at 61 n. 40 (rejecting argument plaintiffs needed to prove damages as of a specific complete and comparatively enduring date).)

properties would be without their consent, since they have never been notified that an easement might be placed on their properties.  A class-wide judgment also would impose easements on thousands of non-parties who purchased properties from Damages Subclass members.  Plaintiffs do not explain how this Court acquired jurisdiction over these non-parties.  Nor do plaintiffs cite authority for the proposition that, even for class members, class counsel may give up a right as significant as an easement.

For the first time, plaintiffs say that they are not really seeking an easement, but instead seek a "***more equivocal 'easement or privilege'***" that "can be 'conceptualized' by reference to ***principles of claim and/or issue preclusion***."  (Pls.' Mem. at 39-40 (emphasis added).) Plaintiffs' new theory runs contrary to the Court's December 17, 2004 Order:  "[a] judgment awarding damages for prospective invasions, if satisfied, will confer an easement to continue the invasions thus paid for in advance.  Restatement (Second) of Torts, § 930 cmt. b."  *Cook X*, 358 F. Supp. 2d at 1013-14.  Plaintiffs have never lodged an objection to the Court's December 17, 2004 Order.

Plaintiffs' theory also runs contrary to the plain text of the commentary to Section 930:

> The exercise of the power of election, followed by satisfaction of a judgment for damages for prospective invasions, confers an easement or privilege to continue the invasions thus paid for in advance. This power to ***transfer an interest in the land*** passes to a grantee when the land invaded is conveyed. The grantor thereafter could recover only for the invasions occurring before the conveyance.

Restatement (Second) of Torts § 930, cmt. b (emphasis added).  Thus, by its plain terms, Section 930 involves the "transfer" of "an interest in the land."  Plaintiffs do not explain how "transfer[ring] an interest in the land" could mean anything less than just that — "transfer[ring] an interest in the land."

Plaintiffs' suggestion that the Court should now reconsider its prior ruling regarding an "easement," and instead rely on doctrines of "claim and issue preclusion" (Pls.' Mem. at 39-40),

hurts their argument here.  The doctrines of "claim and issue preclusion" apply only to parties.

Claim and issue preclusion cannot be used offensively against a non-party.  *See Richards v.*

*Jefferson County, Ala.*, 517 U.S. 793, 798 (1996) (holding it violates due process to bind non-

parties to a lawsuit in which they were not adequately represented: "[A] judgment or decree

among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of

strangers to those proceedings.") (citation omitted); *Robinson v. Volkswagenwerk AG*, 56 F.3d

1268, 1273 (10th Cir. 1995) ("Issue preclusion will not apply, however, if the party against

whom it is asserted did not have a full and fair opportunity to litigate the issue in the earlier

case.").  Thus, claim and issue preclusion cannot be used against those who purchased property

from Damages Subclass members, and who are not parties to this litigation.  Yet most of the

class area is owned by non-class members.  (DX 2066.)  Accordingly, the "claim and issue

preclusion" doctrines relied on by plaintiffs are completely without force for the majority of the

class area.

Plaintiffs' principal authority, *Slater v. Shell Oil Co.*, 137 P.2d 713, 716 (Cal. Ct. App.

1943) (cited in Pls.' Mem. at 40), nicely makes the point that collateral estoppel does not apply

to non-parties:

> [A] former action ***between the same parties*** and upon the same subject matter
> bars this action, and that all damages for the use and occupation of plaintiff's land
> having been paid for by the satisfaction of the former judgment, plaintiff is barred
> from seeing further relief in this action for the same injury.

*Slater*, 137 P.2d at 713-14 (emphasis added).

Thus, plaintiffs' proposed non-easement "privilege" would be meaningless for the many

thousands of properties in the class that are not currently owned by "parties."  (DX 2066.)  Put

differently, many thousands of the Damages Subclass members would receive Section 930

damages, but would not have surrendered the easement that Section 930 requires in order to get those damages, because they have already sold their properties.

The weakness in plaintiffs' proposal is demonstrated by the future lawsuits that it would permit.  Under plaintiffs' proposed judgment, a class of the thousands of property owners who owned class-area property as of December 30, 1995, but who did not own it on June 7, 1989, could file new claims against defendants, relying on exactly the same evidence that plaintiffs presented at trial.  Defendants would not have been granted an easement insulating them from such a suit.  And if defendants tried to raise a "privilege" or "claim and issue preclusion" defense in such a suit, defendants would be forced to overcome arguments by such plaintiffs that no such "privilege" exists because they neither granted it, nor agreed to it when they bought their properties.

Plaintiffs assert that defendants waived this argument.  (*See* Pls.' Mem. at 41 n.35.)  But the Court already ruled on the easement issue as a matter of law in its December 17, 2004 Order. *Cook X*, 358 F. Supp. 2d at 1013-14.  Plaintiffs fail to point to any easement issue that the jury could have decided.

Nor did plaintiffs explain what easement issues defendants should have raised with the Court prior to the jury trial.  As discussed, the Court had already ruled.  Are plaintiffs suggesting that defendants should have asked the Court to reaffirm its prior ruling?  Nor would it have made sense for the Court's remaining easement work to have occurred before the jury's verdict.  At that time, no determination had been made that plaintiffs were entitled to compensation under Section 930; thus, it would have been pointless to determine how Section 930 easements should be structured.

**D.      The Compensatory Damages Award Improperly Includes Class Members Who Suffered No Damages Or Less Than Average Damages.**

The jury did not determine actual damages for any single class member; therefore, the Court cannot enter judgment for any single class member on the jury's verdict.  Instead, a new trial must be held.

Plaintiffs incorrectly contend that defendants' argument is based on the proposition that the jury verdict's resulted from "averages."  (Pls.' Mem. at 42.)  Not true.  Not only was the jury's determination impermissibly based on averages,[4] but the jury also did not render a verdict for any single class member based on those averages.  Defendants' argument would be different if, even based on evidence of averages, the jury had said:  "Based on our consideration of averages, each class member suffered a diminution in value of X" or "Based on our consideration of averages, each class member suffered a diminution in value."  The jury did not do so.  The jury only found that the "Entire Class" suffered aggregate diminution in the amount of $176 million.  (Jury Verdict Form at 15, 24.)  But this finding is entirely consistent with a finding that some members of the class suffered no diminution in value at all.  Thus, under the Rules Enabling Act, such class members cannot be awarded damages based on this judgment.  *See* 28 U.S.C. § 2072 (procedural rules cannot "abridge, enlarge or modify any substantive right" of any litigant).

Plaintiffs still have not cited a single case in which an individual was awarded damages based on a jury's assessment of damages for an "Entire Class," holding that the jury was not

---

[4] As defendants have argued in the past, in class actions, statistical proof, or "extrapolation," cannot be used as a substitute for evidence that is identical for each individual class member. *See Cimino v. Raymark lndus., Inc.*, 151 F.3d 297, 319-21 (5th Cir. 1998) (reversing damages award based on extrapolation rather than individual evidence).

required to find that each class member suffered damages.  Nor would one expect to find such a

case, given that Congress has clearly spoken to the contrary.  *Id.*

Defendants proposed a jury verdict form requiring that damages be determined for

individuals.  (*See* Defs.' 9/3/04, Submission of Phase III Jury Instructions and Jury Verdict

Forms at 83-102.)  That jury verdict form was rejected.

### E.   Compensatory Damages Must Be Set Aside Because It Includes Class Members Who Have Released Their Claims Against Defendants.

The *Church* litigation lasted nine years.  It involved an enormous expenditure of the

resources of the litigants involved, and an enormous amount of effort from the federal judiciary.

*See, e.g., Good Fund, Ltd. — 1972 v. Church*, 540 F.Supp. 519 (D. Colo. 1982); *McKay v.*

*United States*, 703 F.2d 464 (10th Cir. 1983).  The *Church* plaintiffs, including the McKays,

owned huge swaths of land in the class area.  (*See* McKay Dep. at 21-24, attached as Ex. 1;

McKay Dep. Ex. 3, attached as Ex. 2.)  The *Church* plaintiffs sued for the same claims (nuisance

and trespass for releases from Rocky Flats), against the same parties (Dow and Rockwell), and

based on the same facts (903-pad, 1957 fire, 1967 fire, etc.). (*See* Compl. *Church v. United*

*States, et. al*, No. 75 1162, attached as Ex. 3.)  The *Church* plaintiffs settled their claims.  Judge

Finesilver approved the settlement agreement and release.  (*See* 12/7/84 Order, attached as Ex. 4;

1/9/85 Order Approving Settlement Agreement, attached as Ex. 5.)  Defendants have raised the

issue of the *Church* litigation and settlement on numerous prior occasions.  (*See*, *e.g.*, Defs.'

Mot. *in Limine* No. 14, filed 6/16/05; Status Report Responding to the Court's 9/11/03 Order,

filed 12/10/03, at 5; Defs.' Report Concerning Opinion Testimony Pertinent to Trial Issues, filed

7/30/99, at 6.)

Plaintiffs do not dispute[5] that Charles and Perry McKay settled and released their claims against defendants, but argue that defendants did not preserve this issue because they did not argue it at trial.  (Pls.' Mem. at 43-44.)  But the *res judicata/*collateral estoppel effect of Judge Finesilver's approval of the settlement and release is precisely the kind of undisputed legal issue determined by a Court, and not by a jury.  *See Musick v. Dep't of Energy*, 339 F.3d 1365, 1369 (Fed. Cir. 2003) ("A settlement agreement is a contract, the interpretation of which is a question of law.").  There certainly was nothing in the settlement agreement, or in Judge Finesilver's order approving the settlement, requiring that the settlement be the subject of a future jury trial in order to be enforceable.  In any event, plaintiffs never explain what "questions" the jury was to answer.  Should the jury have been asked:  "Do you, the jury, find that the attached is a true and correct copy of Judge Finesilver's order approving the settlement of the McKays' claims against defendants?"  Should the jury have been allowed to revisit the terms of the settlement?

Defendants respectfully request that the Court reject plaintiffs' novel proposal that the entire 9-year *Church* litigation and settlement be rendered a "nullity," and that additional monies now be paid to the same plaintiffs by the same defendants for the same claims.  Among other deficiencies, plaintiffs' proposal gives no effect whatsoever to Judge Finesilver's order approving the settlement and release.[6]

---

[5] Plaintiffs complain that defendants did not attach an executed copy of the McKays' Settlement Agreement.  An executed copy of the settlement agreement is attached to this brief as Exhibit 6.  Mr. McKay admitted at his deposition that he did settle and release his claims against defendants.  (*See* Ex. 1, McKay Dep. at 69-70.)  That settlement and release was approved by Judge Finesilver.  (*See* 12/7/84 Order, attached as Ex. 4; 1/9/85 Order Approving Settlement Agreement, attached as Ex. 5.)

[6] Plaintiffs are unclear in their brief as to whether their proposed judgment would void the entire *Church* settlement, including both the obligations running from the *Church* defendants to the *Church* plaintiffs and the obligations running from the *Church* plaintiffs to the *Church*

(Continued…)

F.     **The Compensatory Damages Are Clearly Unsupported By The Evidence.**

The compensatory damages award is clearly unsupported by the evidence.  (*See* Defs.'

Mem. of Law in Support of Their Renewed Mot. for J. as a Matter of Law at 72-100; Defs.'

Reply in Support of Their Renewed Mot. for J. as a Matter of Law at Part IV.)  Accordingly, the

compensatory award should be set aside.  *Hughes v. Regents of the Univ. of Colo.*, 967 F. Supp.

431, 437 (D. Colo. 1996).

II.     **THE PUNITIVE DAMAGES SHOULD BE VACATED OR REDUCED.**

A.     **Plaintiffs Did Not Prove Beyond A Reasonable Doubt They Are Entitled To Punitive Damages Under Colorado Law.**

In order to recover punitive damages under Colorado law, plaintiffs must have proved

"beyond a reasonable doubt" that "the defendant acted 'with an ***evil intent***, and with the ***purpose***

***of injuring the plaintiff***, or with such a wanton and reckless disregard of ***his*** rights as to

evidence a wrongful motive.'"  Colo. Rev. Stat. § 13-21-102; *Juarez v. United Farm Tools, Inc.*,

798 F.2d 1341, 1342 (10th Cir. 1986) (emphasis added).  There is no evidence — and plaintiffs

do not provide any in their response — that defendants had any "evil intent" or any "wrongful

motive," the "purpose" of which was "injuring the plaintiff."  (*See further* Defs.' Mem. of Law

in Support of Their Renewed Mot. for J. as a Matter of Law at 100-104; Defs.' Reply in Support

of Their Renewed Mot. for J. as a Matter of Law at 24-27.)

Plaintiffs cite to snippets of testimony, but none of this testimony indicates that

defendants intended to injure the plaintiffs or had any wrongful motive at all, much less "beyond

a reasonable doubt."  None of plaintiffs' testimony indicates that defendants knew or should

---

defendants to the *Church* plaintiffs.  Defendants certainly would object to any such possibility.
Nor do plaintiffs even indicate if they have consulted with the *Church* plaintiffs on this matter.

have known that injury to the class or the Damages Subclass would result from the conduct.

Indeed, defendants could not have been aware of any risk to the class or the Damages Subclass,

given that plaintiffs did not even move into the neighborhood until virtually all of the conduct

that allegedly resulted in the off-site releases occurred.  (*See* DX 2066 (less than 50 class parcels

purchased before 1970); *see also* DX 2070 (showing class members in 1969).)  In fact, plaintiffs'

witnesses testified that defendants did not have the requisite evil intent directed at plaintiffs.[7]

Thus, at most this testimony would indicate defendants were negligent (which defendants

dispute).  Mere negligence cannot support an award of punitive damages.  *Tri-Aspen Constr. Co.*

*v. Johnson*, 714 P.2d 484, 488 (Colo. 1986) (reversing punitive damage award where defendants'

conduct was merely negligent); *see also Leeuwan v. Nuzzi*, 810 F. Supp. 1120, 1124 (D. Colo.

1993) (Kane, J.) (striking plaintiff's request for punitive damages where claims were "based on

negligence, not intentional, malicious conduct").  Plaintiffs' cases are not to the contrary.  *See*

*Miller v. Solaglas Cal., Inc.*, 870 P.2d 559, 568 (Colo. Ct. App. 1993) (requiring conduct

"purposely performed"); *Jacobs v. Commonwealth Highland Theaters Inc.*, 738 P.2d 6, 10 (Colo.

Ct. App. 1986) (same).

### B.   The Punitive Damages Award Should Be Vacated Due To Defendants' Compliance With Standards.

Under both this Court's rulings and Colorado law, punitive damages cannot be awarded

where, as here, a party complies with all applicable standards.[8]  (*See* 9/13/05 Hr'g Tr. at 6 ("Such

---

[7] (*See, e.g.*, Cochran testimony, 11/14/05 Trial Tr. at 5287 ("It was cold war, and we were making warheads for national security purposes."); Ray testimony, 10/19/05 Trial Tr. at 1683 ("I believe there was an attitude that things are going to happen and we are not going to be able to prevent all of them, but when they happened, we will do our best to clean them up.").)

[8] Plaintiffs complain that defendants do not identify the standards with which they complied. (Pls.' Mem. at 50.)  As defendants explained in their renewed motion for judgment as a matter of

(Continued…)

evidence is relevant . . . to the issue of punitive damages."); *Alley v. Gubser Dev. Co.*, 785 F.2d 849, 856 (10th Cir. 1986) (holding that punitive damages could not be awarded due to defendants' compliance with industry standards).  Plaintiffs attempt to distinguish *Alley* on the ground that it involved "industry standards" and that defendants allegedly violated any "reasonable industry standard of care."  (Pls.' Mem. at 50.)  Yet plaintiffs fail to cite to any actual "industry" standard of care, or explain how "industry standards" might be different from federal nuclear safety standards.  Plaintiffs also ignore this Court's ruling that federal nuclear safety standards are relevant to punitive damages.  (9/13/05 Hr'g Tr. at 6.)

Tellingly, plaintiffs fail to cite any standards (industry, federal, state, regulatory, or otherwise) that defendants supposedly violated.  Plaintiffs' (uncited) references to a tri-party agreement in the 1980s and allegedly inaccurate environmental monitoring do not prove that defendants' failed to comply with any applicable standards.  (Pls.' Mem. at 51.)  There is no "standard" that bars "tri-party agreements," or that requires "environmental monitoring" that

---

law (see Defs.' Mem. in Support of Their Renewed Mot. for J. as a Matter of Law, filed 1/22/07, at 35-36), the applicable federal standards for the allowable average annual concentrations of plutonium in effluent air were as follows: (1) 2.0 picocuries per cubic meter for the period from 1953 through August 28, 1957; (2) 0.2 picocuries per cubic meter for the period from August 29, 1957 through August 11, 1963; (3) 0.33 picocuries per cubic meter for the period from August 12, 1963 through August 4, 1985; and (4) 0.04 picocuries per cubic meter for the period from August 5, 1985 through June 7, 1989.  (*See also* DX 1638.)  The evidence presented at trial showed that Dow and Rockwell complied with these standards throughout their operation of the plant.  (DX 1651a; DX 1663, DX 1664; Frazier testimony, 12/12/05 Trial Tr. at 7529-31 (air monitoring results were "always less than standards"; the plant was always in compliance with DOE or AEC's standards for plutonium in air); *id.* at 7534-37, 7539.)  Similarly, Colorado enacted an "ultraconservative" plutonium-in-soil standard of 2.0 dpm/g after Rocky Flats had been operating almost two decades.  Before the subdevelopments that encompass thousands of class properties could be built — including all developments within the class area — they had to pass that standard.  Plaintiffs introduced no evidence that any of these standards were violated during either the Dow era or the Rockwell era, nor did plaintiffs introduce any evidence of violation of other standards that affected the Entire Class or the Damages Subclass as a whole.

complies with plaintiffs' uncited standard.  Nor have plaintiffs connected any allegation of environmental monitoring deficiencies with any intentional, malicious misconduct directed toward the Entire Class or the Damages Subclass.  Disputes between environmentalists, on the one hand, and nuclear plant regulators and operators, on the other, as to the sensitivity or frequency of sampling cannot be transformed into intentional, malicious misconduct intended to cause specific plaintiffs harm.

    **C.**    **The Court Should Disallow or Reduce The Punitive Damages Award Pursuant to Colo. Rev. Stat. § 13-21-102.**

Under Colo. Rev. Stat. § 13-21-102, a court may "reduce or disallow" punitive damages if any of three criteria are met:  "(a) The deterrent effect of the damages has been accomplished; or (b) The conduct which resulted in the award has ceased; or (c) The purpose of such damages has otherwise been served."  Colo. Rev. Stat. § 13-21-102.

All three criteria set forth in Colo. Rev. Stat. § 13-21-102 are met here.  First, "[t]he conduct which resulted in the award has ceased."  Dow has not operated the Rocky Flats Plant in 32 years, and Rockwell has not operated the plant for eighteen years.  Nor is the plant currently being operated by anyone.  It is now a wildlife refuge.  (*See* Smallwood testimony, 11/3/05 Trial Tr. 4024; Holeman testimony, 10/17/05 Trial Tr. 1252.)  Because "[t]he conduct which resulted in the award has ceased," punitive damages should not be allowed under Colo. Rev. Stat. § 13-21-102.

Against these facts, plaintiffs have made no showing that the conduct has not ceased.  Plaintiffs assert that "the fact that the Rocky Flats plant is no longer open for business — operations having been shut down in 1989 precisely by reason of defendants' misconduct — does not lessen the need for exemplary damages."  (Pls.' Mem. at 51.)  Plaintiffs cite no

authority for this proposition.  In any event, the reason why the "conduct has ceased" is not a factor under Colo. Rev. Stat. § 13-21-102.  All that matters is that the "conduct has ceased."

The other statutory factors also weigh heavily in defendants' favor.  Under the first and third prongs of Colo. Rev. Stat. § 13-21-102, "[t]he deterrent effect of the damages has been accomplished," and "[t]he purpose of such damages has otherwise been served."  The purpose of punitive damages is to deter future conduct.  *See Alley*, 785 F.2d at 855; *deHass v. Empire Petroleum Co.*, 435 F.2d 1223, 1231 (10th Cir. 1970).  Here, the punitive award could not possibly deter any future conduct on the part of Dow, Rockwell, or others.  Not only have all Rocky Flats operations ceased, but the Price Anderson Act prohibits punitive damage awards for future nuclear incidents.  *See* 42 U.S.C. § 2210.  Thus, a high punitive award in this case could not possibly deter any future conduct, because there is no possibility of such damages being awarded in similar cases in the future.  For these reasons, the "purpose of such damages" (deterrence) has "otherwise been served."  *See* Colo. Rev. Stat. § 13-21-102.

**D.      The Punitive Damages Award Is Unconstitutional.**

In addition to violating Colorado law, the punitive damages award also violates federal law and the United States Constitution.  The punitive damages award is unconstitutional, in part because defendants' conduct was not reprehensible.  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417-18 (2003); *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996);.

Plaintiffs assert that "physical character of the harms at issue plainly supports the exemplary damage awards."  (Pls.' Mem. at 53.)  But plaintiffs do not point to any evidence

showing that they suffered any "physical" harms.  There are no physical harms here.  No person

was injured.[9]  Plaintiffs repeatedly have conceded as much.[10]

Instead of alleging a physical injury, plaintiffs allege that they experienced a "health risk"

or "risk of future harm."  (Instruction 3.7.)  But plaintiffs fail to cite a single authority for the

proposition that a "health risk" qualifies a "physical" harm for purposes of the *BMW/State Farm*

analysis.  Nor have plaintiffs even been required to prove a significantly increased risk.  Rather,

plaintiffs have been allowed to pursue claims of "some increment of increased health risk."

(Instruction No. 3.7.)

The jury heard evidence, based on ten-year, comprehensive, and publicly overseen

studies, that any "risks" here are purely theoretical "risks" on the order of one in one billion —

risks that are orders of magnitude less than the risk of getting hit by lightning.  (*See* DX 1856;

*see also* Holeman testimony, 10/18/05 Trial Tr. at 1359-60 (testifying that mortality risk from

plutonium fallout from Rocky Flats to a worker "is almost 200 times less than the risk of being

---

[9] As defendants have argued elsewhere, injury is usually a necessary prerequisite of a lawsuit. *See, e.g., Henry v. Dow Chem. Co.*, 701 N.W.2d 684, 689 (Mich. 2005) ("[A]n individual is entitled to relief under a tort theory only when he has suffered a present injury.").

[10] (*See* 8/3/05 Hr'g Tr. at 1-2 ("And the battleground area in modern toxic tort litigation over modern epidemiological evidence involves a context that we are not and a lot of the decisional law involves a context that we are not in.  And that involves the context of trying to prove personal injury from a carcinogen or another toxin in a personal injury case."); 10/12/2005 Trial Tr. at 654 ("This is not a trial for personal injury.  Nobody is trying to prove a personal injury in this case."); 11/10/2005 Trial Tr. at 4894 ("[T]his is not a personal injury case such as the cases on which, as I understand it, defendants relied."); 11/4/2005 Trial Tr. at 4138 ("You've heard a lot about doses, and you heard a lot about, you know, uptake and human doses.  And those kinds of testimony are relevant in personal injury cases . . . We do not believe, and we believe when you review the judge's instructions at the end of the case, that you will not believe that that's relevant to the property damage case."); 11/22/05 Trial Tr. at 6261 ("We do not have to show bodily harm because of the plutonium.  This is not a personal injury case.  And a lot of the evidence on dose that would be relevant in a personal injury case is not relevant in this case."); 1/20/06 Trial Tr. at 10573 ("You know, in this trial we are not trying a personal injury case.").)

struck by lightning").)  Plaintiffs' own expert testified that the "risks" to class members were so

"very, very small" that regulatory agencies would not have been concerned about them:

> Well, some of the exposures for people living in the class area were really small.
> And significance, you might call sort of a policy to when you take it seriously.
> But some of these are very, very small exposures.  And, for instance, regulatory
> agencies would not have been concerned about such exposures.[11]

(Goble testimony, 11/2/05 Trial Tr. at 3661.)

The jury's verdict could have been based on health risks that do not yet exist.  Plaintiffs

were allowed to recover without past exposures if they could demonstrate "objective conditions"

that "pose[d] some demonstrable risk of future risk of harm."  (Instruction No. 3.7.)  But any

"objective conditions" posing any "future risk" are even less real and more hypothetical than any

existing health risks.  The Rocky Flats plant has been shut down for approximately 15 years, has

been decommissioned, demolished, remediated, and is being converted to a wildlife preserve.

(*See* Smallwood testimony, 11/3/05 Trial Tr. at 4024; Holeman testimony, 10/17/05 Trial Tr. at

1252; *see also* Blaha testimony, 1/4/06 Trial Tr. at 8637-8681, 8753.)  The special nuclear

materials themselves were all shipped offsite by August 2003.  (Blaha testimony, 1/4/06 Trial Tr.

at 8669.)  In fact, the last plant building was demolished in September 2005, and DOE certified

the cleanup and closure in October 2005.  (*Id.* at 8669-70, 8687, 8693.)  The miniscule amounts

that had escaped previously did not inflict personal injury either.  The ATSDR concluded:

"[L]evels of offsite surface soil contamination are no apparent public health hazard for past,

current and future exposures."  (DX 454, ATSDR 5/13/05 report, at 76; *id.* at 1-2, 45, 55, 57;

---

[11] Similarly, plaintiffs' argument that "the misconduct endangered not just a small number of
individuals, but thousands of nearby residents" (Pls.' Mem. at 54), conflicts with plaintiffs'
expert's testimony that any risks were so "very, very small" that "regulatory agencies would not
have been concerned about such exposures."

Blaha testimony, 1/4/06 Trial Tr. at 8814-16;  Raabe testimony, 12/9/05 Trial Tr. at 7210, 7240-42, 7270-71, 7339-40.)

Thus, the harms at issue were not physical, but economic.  The jury accordingly awarded damages only for economic loss.  (*See* 12/7/06 Mem. Op. Regarding Jury Instructions at 69 ("Plaintiffs did not seek damages here for annoyance and discomfort, but rather for the decrease in the value of Class Properties as a result of the alleged continuing trespass and nuisance, which is a separate and unrelated category of damages under Colorado law.").)  Because the nature of the harms at issue in this trial were economic, not physical, and because the jury awarded damages only for economic loss, the punitive award should be set aside.  *See State Farm*, 538 U.S. at 419; *Cont'l Trend Res, Inc. v. OXY USA Inc.*, 101 F.3d 634, 642 (10th Cir. 1996); *cf. Bielicki v. Terminix Int'l Co.*, 225 F.3d 1159, 1165 (10th Cir. 2000).

Turning to factors other than the non-physical nature of the harms, plaintiffs also assert, without citation, that "a home (or other real property) can represent by far the most substantial economic assets that many individuals posses," and that "[t]he testimony of the class representatives establishes that class members were therefore highly vulnerable to substantial economic hardship caused by defendants' misconduct." [12]  (Pls.' Mem. at 54.)  A plaintiff's financial vulnerability in and of itself is not sufficient.  Instead, the target of defendants' conduct must have been financially vulnerable.  *State Farm*, 548 U.S. at 419; *In re Exxon Valdez*, 472 F.3d 600, 617 (9th Cir. 2006) ("there must be some kind of **intentional aiming or targeting** of the vulnerable that did not occur here") (emphasis added).  Here, none of defendants' conduct

---

[12] Plaintiffs cannot contend that these uncited assertions apply on anything close to a classwide basis, as they must to have relevance to this class trial.  For example, plaintiffs do not dispute that some of the class members, such as Charles McKay, own property valued at over $5 million. (Ex. 3, McKay Dep. at 62 (value of assets in Jefferson County over $5 million).)

was "targeted" at plaintiffs.  It is undisputed that over 99% of the releases from Rocky Flats took place before 1970, and that over 99% of the class members did not move into the area until after 1970.  (DX 2066 (only 39 class properties purchased before 1970)).)  Virtually no class members owned property in the area during Dow's tenure.  And Rockwell's operations were not shown to result in any off-site impact.  Plaintiffs do not attempt to explain how, in light of these circumstances, defendants' conduct could have been "targeted" at plaintiffs.  *In re Exxon Valdez*, 472 F.3d at 617; *State Farm*, 548 U.S. at 419.

Importantly, plaintiffs also do not dispute one crucial factor — that defendants' conduct would not be unlawful in all other states.  *See Cont'l Trend Res.*, 101 F.3d at 634 ("[A]mong the questions we ask are whether a defendant's behavior . . . ***would be considered unlawful in all states*** . . .") (emphasis added).  As the Court has acknowledged, nearly every other court to address the issue has held that federal nuclear safety standards supply the standard of care.  *See Cook v. Rockwell Int'l Corp.*, 273 F.Supp.2d 1175, 1193 (D. Colo. 2003) (*Cook IX*) ("[M]y holding that federal regulations do not preempt state standards of care is contrary to the existing weight of authority on the issue.").  Since this Court's 2003 ruling, ***five*** courts to address the issue have disagreed with this Court's minority view.[13]  Plaintiffs have never shown that defendants violated any applicable federal nuclear safety standards, as discussed above.  Because defendants' conduct would therefore have been lawful in the vast majority of jurisdictions (*see*

---

[13] *See Koller v. Pinnacle W. Capital Corp.*, No. CIV-06-2031, 2007 WL 446357, at *2-3 (D. Ariz. Feb. 6, 2007); *Wilcox v. Homestake Mining Co.*, No. CIV-04-534, slip op. at 6–7 (D.N.M. Nov. 15, 2005); *O'Connor v. Boeing N. Am., Inc.*, No. CV 97-1554, slip op. at 77–87 (C.D. Cal. Aug. 18, 2005); *Osarczuk v. Associated Unvs. Inc.*, No. 96-2836, at *16 (N.Y.-Part. 32, Suffolk Co. Mar. 10 2005); *Finestone v. Fla. Power & Light Co.*, 319 F.Supp. 2d 1347, 1349 (S.D. Fla. 2004).

Defs' Mem. at 40-42 (also discussing law in other jurisdictions on trespass and nuisance)),

defendants did not act reprehensibly, and the punitive award should be vacated.

In addition, the punitive damages instruction given in this case is unconstitutional under

the Supreme Court's recent decision in *Philip Morris USA v. Williams*, 127 S. Ct. 1057 (2007)

(cited in Pls.' Mem. at 53).  *Phillip Morris* holds that, while harm to non-plaintiffs may be

considered in determining reprehensibility, "the Constitution's Due Process Clause [does not]

permit[] a jury to base that award in part upon its desire to *punish* the defendant for harming

persons who are not before the court (*e.g.,* victims whom the parties do not represent)":

> We are asked whether the Constitution's Due Process Clause permits a jury to
> base that award in part upon its desire to *punish* the defendant for harming
> persons who are not before the court (*e.g.,* victims whom the parties do not
> represent). We hold that such an award would amount to a taking of "property"
> from the defendant without due process.

*Philip Morris*, 127 S.Ct. at 1060.  Here, the jury instruction on punitive damages violated

defendants' constitutional rights under *Philip Morris*.  The pertinent instruction is

Instruction 3.27, which provides in relevant part:

> 'Willful and wanton' conduct means an act or omission purposefully committed
> by the Defendant in question, who must have realized that the conduct was
> dangerous, and which conduct was done heedlessly and recklessly, either without
> regard to the consequences, or ***without regard to the rights and safety of others,***
> particularly the Plaintiff Class.

(Instruction No. 3.27 (emphases omitted, and added)); *see also* Colo. Rev. Stat. § 13-21-102

(same).

Jury Instruction No. 3.27 is unconstitutional under *Phillip Morris*.  It permits punitive

damages to be awarded if the conduct is "without regard to the rights and safety of others."

(Conduct aimed "particularly" at the plaintiff is not conduct aimed only at the plaintiff.)  Because

the jury instruction permitted the jury to consider harm to others in deciding whether to punish

defendants, and because plaintiffs were allowed to introduce irrelevant  evidence of harm to others,[14] it violated defendants' constitutional right to due process and to be

---

[14] The evidence presented by plaintiffs of harm to others included, but was not limited to, the following:

(1) Plaintiffs' cancer study, which included in the study group many people outside the class.  (*See* Clapp testimony, 11/9/05 Trial Tr. at 4815 (study "includes zip codes in the class area, but goes beyond it").)  This study also included in the study group many other persons who did not own property in the class area as of June 7, 1989.

(2) Plaintiffs' exposure/dose study, which  included many people outside the class.  (*See* Goble testimony, 11/2/05 Trial Tr. at 3660 ("the definition of the class is something I don't actually truly know about, okay.").)

(3) Plaintiffs argued that, because of Rocky Flats, part of the class had been transformed into an enterprise zone, but the enterprise zone was mostly outside the class boundary.  (*See* Cassidy testimony, 11/8/05 Trial Tr. 4561, 4577 ("part of the enterprise zone is in the plutonium contour and part is not").)

(4) The property sale data used in plaintiffs' damages analysis included data from sales not involving class members.  For example, the property sale data included sales from within the geographic class boundary in 1995.  But a sale in 1995 may not have involved a class member, because the class consisted only of people who owned within the geographic boundary as of June 7, 1989.  (Radke testimony, 10/26/05 Trial Tr. at 2758 ("I took a sample of the properties that were sold in that time period [1989-1995]").)  Plaintiffs also relied on sales in all years outside the class boundary.

(5) Plaintiffs presented evidence of activities at the plant from 1990-2005, which would not have impacted class members but instead would have impacted people who owned in 1990 and after.  (*See, e.g.*, Selbin testimony, 12/8/05 Trial Tr. at 7034-7170 (testifying as to his service on the Rocky Flats Soil Action Oversight Panel, which was formed in 1996).)

6) Plaintiffs repeatedly introduced evidence of workers' health and safety, other lawsuits, and alleged DOE misconduct that did not in any way implicate defendants.  (*See* Defs.' Mem. in Support of Their Mot. for a New Trial or, in the Alternative, for a Remittitur of Damages, filed 1/22/07, at 88-104, 113-14, 115-16, 149-50.)

free from takings without just compensation under the Fifth and Fourteenth Amendments to the United States Constitution.  *See Phillip Morris*, 127 S.Ct. at 1060.[15]

      **E.**      **The Punitive Damages Award Is Inconsistent With The Price-Anderson Act.**

      The punitive damages award is inconsistent with the Price-Anderson Act in two ways. First, the Price Anderson Act forbids punitive damages entirely.  (*See* Defs.' Mem. at 43-44.) Second, plaintiffs did not show any pre-August 20, 1988 nuclear incidents.  (*Id.* at 44-45.) Nothing in plaintiffs' opposition memorandum changes or undermines defendants' arguments on these points.

---

[15] *Phillip Morris* was decided on February 20, 2007.  A supervening Supreme Court decision that announces a new rule of constitutional or statutory interpretation will apply in any applicable pending civil case where the Supreme Court has applied the new rule to the parties in the case before it.  *See Harper v. Va. Dep't of Taxation*, 509 U.S. 86, 96 (1993) ) ("After the case announcing any rule of federal law has applied that rule with respect to the litigants before the court, no court may refuse to apply that rule retroactively.") (citing *James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 540 (1991)) (internal quotations and alterations omitted); *see also Olcott v. Del. Flood Co.*, 76 F.3d 1538, 1547-48 (10th Cir. 1996).  The Supreme Court applied the new rule set forth above to the parties in *Phillip Morris*.  Accordingly, *Phillip Morris* applies here even though it was decided post-trial.  Moreover, where a Supreme Court case (like *Phillip Morris*) does "not make a clean break with prior cases but instead represent[s] the evolution of the law on this issue," defendants were not required to object to Jury Instruction No. 3.27 at trial in order to preserve their record.  *See Key v. Rutherford*, 645 F.2d 880, 883 & n.3 (10th Cir. 1981) (remanding for a new trial after jury was improperly instructed in light of Supreme Court decision handed down after judgment was entered, notwithstanding lack of objection to instruction during trial); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1228-29 (10th Cir. 1996) (remanding for a new trial after jury was improperly instructed in light of Supreme Court decision handed down after judgment was entered, notwithstanding lack of objection during trial).

III.   **A NEW TRIAL IS REQUIRED BECAUSE THE PUNITIVE DAMAGES AWARD IS AMBIGUOUS AND IRRECONCILABLY INCONSISTENT.**

   A.   **The Punitive Damages Award Is Ambiguous And Irreconcilably Inconsistent.**

   The jury awarded $176 million in actual damages.  The jury also awarded $200 million in punitive damages.  Under Colorado law, "[t]he amount of such reasonable exemplary damages shall not exceed an amount which is equal to the amount of the actual damages awarded to the injured party."  Colo. Rev. Stat. § 13-21-102(1)(a).  The Court accordingly instructed the jury that "[t]he sum [of punitive damages] you award may not be more than the amount you awarded as actual damages against the Defendant or Defendants."  (Instruction No. 3.27.)  Thus, the jury's punitive award is contrary to Colorado law and the jury instructions, and a new trial is required.

   Plaintiffs' position to the contrary hinges on the speculation that maybe the jury thought it was awarding $353 million in compensatory damages, and so from the jury's vantage point the compensatory award did not exceed the punitive award.  (Pls.' Mem. at 14.)  Plaintiffs further state that, even though the compensatory verdict must be reduced to $176 million, that reduction is not to be considered in applying the punitive damages cap.  (*Id.*)  Plaintiffs' arguments fail on several levels.

   First, plaintiffs' arguments are directly foreclosed by the Colorado Supreme Court's decision in *Lira v. Davis*, 832 P.2d 240 (Colo. 1992).  *See id.* at 244-45 (holding that "actual damages awarded" in Colo. Rev. Stat. § 13-21-102 refers to the "reduced compensatory amount," not the total compensatory damages awarded to a plaintiff prior to adjustment for comparative fault).  Second, there is no basis for plaintiffs' speculation that the jury believed it was awarding $353 million.  Plaintiffs never asked for anything approaching $353 million in compensatory damages.  Rather, the maximum amount in compensatory damages requested by

plaintiffs was $248 million.  (*See* 1/18/06 Trial Tr. at 10350 ("[T]he total we believe the evidence supports is $248 million.").)  In any event, speculation as to what the jury "thought" it was awarding — including plaintiffs' speculation that the jury thought it was awarding $353 million in compensatory damages — is impermissible.  *See* Part I.B., *supra*; *Unit Drilling,* 108 F.3d at 1191-93.

Plaintiffs also suggest, without citation to authority, that Colo. Rev. Stat. § 13-21-102(1)(a) applies differently in cases where there are multiple claims and multiple parties.  (*See* Pls.' Mem. at 15-19.)  Not so.  Colo. Rev. Stat. § 13-21-102(1)(a) does not provide any exceptions for cases with multiple claims and multiple parties.  Similarly, the Court's jury instructions provide that the amount of exemplary damages cannot exceed the sum total of compensatory damages awarded against both defendants: "[t]he sum [of punitive damages] you award may not be more than the amount you awarded as actual damages against the Defendant *or Defendants*."  (Instruction No 3.27 (emphasis added).)  Because the jury's punitive verdict exceeds its compensatory verdict, it is inconsistent with that verdict.

Plaintiffs claim that defendants' position depends upon the *total* punitive damages award exceeding the total compensatory damages award.  (*See* Pls.' Mem. at 15-16.)  But here, not only will the total punitive damages exceed the total compensatory damages — the individual punitive damages will exceed the individual compensatory damages for one or both of the defendants under plaintiffs' proposal.  Plaintiffs' creative mathematics cannot avoid this point.  Consider the following chart:

| PUNITIVES EXCEED COMPENSATORIES UNDER PLAINTIFFS' PROPOSALS | | | | |
|---|---|---|---|---|
| | PERCENTAGE OF COMPENSATORIES "COLLECTED" | COMPENSATORIES "COLLECTED" | PUNITIVES "COLLECTED" | RESULT |
| **DOW** | 90% | $159,165,306 | $110,800,000 | Rockwell Punitives Exceed Rockwell Compensatories |
| **ROCKWELL** | 10% | $17,685,034 | $89,400,000 | |
| **DOW** | 30% | $53,055,102 | $110,800,000 | Dow Punitives Exceed Dow Compensatories |
| **ROCKWELL** | 70% | $123,795,238 | $89,400,000 | |
| **DOW** | 50% | $88,425,170 | $110,800,000 | Punitives Exceed Compensatories For Both Dow & Rockwell |
| **ROCKWELL** | 50% | $88,425,170 | $89,400,000 | |

Thus, regardless of how plaintiffs choose to collect their damages, they will recover punitives that exceed compensatories, in violation of Colorado law. In sum, it is the text of the statute, not what plaintiffs claim to be their possible collection choices, that controls. *See* Colo. Rev. Stat. § 13-21-102(1)(a).

Plaintiffs' lengthy discussion of *Lira v. Davis* only strengthens defendants' position here: nothing in that case holds that punitive damages can exceed exemplary damages if there are multiple claims and multiple defendants. In *Lira*, the Colorado Supreme Court held that Colo. Rev. Stat. § 13-21-102 "places a ***maximum*** on a plaintiff's exemplary damages award recovery which is measured by the amount of compensatory damages ***after*** reduction for comparative negligence and pro rata liability." *Lira*, 832 P.2d at 246 (emphasis added). *Lira* so held in order to "effectuate [] the legislature's intent" in enacting the punitive damages cap, which was "to limit excessive punitive damages awards." *Id.* at 245-46. Thus, *Lira* stands for the proposition

that Colorado law limits punitive damages awards, and any ambiguity in what the Colorado legislature may have intended should err on the side of limiting an award. It certainly does not support plaintiffs' position that punitive awards exceeding compensatory awards are permissible so long as there are multiple claims and defendants. Indeed, plaintiffs' interpretation contravenes the legislative purpose of the punitive damages cap as recognized in *Lira* — which is to limit, not increase, the amount of punitive damages awarded against a defendant. *See Lira*, 832 P.2d at 246 ("There is no doubt that the purpose of House Bill 1197 [which amended § 13-21-102] was to limit excessive punitive damages awards.").

Plaintiffs also reiterate their belief that prejudgment interest can be added to the jury's compensatory damages award before application of the punitive damage cap. (Pls.' Mem. at 19.) Plaintiffs' position is flatly inconsistent with the jury instructions and this Court's December 7, 2006 opinion. (Instruction No. 3.27; 12/07/06 Mem. Op. Regarding Jury Instructions at 79.) In response, plaintiffs state that "[a] party's conviction that a jury instruction has 'no logical basis,' however deeply felt, it not, by itself, a ground for a new trial." (Pls.' Mem. at 20.) But defendants' position is not that the instructions have "no logical basis," only that they would have "no logical basis" under plaintiffs' view of the world. Indeed, defendants' point is that the instructions did (and still do) have a logical basis — namely, that the amount of punitive damages awarded by the jury may not exceed the amount of compensatory damages awarded by the jury. Colo. Rev. Stat. § 13-21-102(1)(a); (12/07/06 Mem. Op. Regarding Jury Instructions at 79.) That is why Colorado courts, like this court, routinely instruct juries that they should limit punitive damages to compensatory damages. *See, e.g., Hensley v. Tri-QSI Denver Corp.*, 98 P.3d 965, 967 (Colo. Ct. App. 2004) (instruction stated: "[Y]ou may award a reasonable sum as punitive damages that may not be more than the amount awarded as actual damages") (emphasis

omitted); *Graphic Directions, Inc. v. Bush*, 862 P.2d 1020, 1025 (Colo. Ct. App. 1993) (jury instructed "it could assess a reasonable sum not to exceed the amount awarded as actual damages").  Colorado courts do not say that the jury should "limit its punitive damages awards to the amount that of compensatory damages that the jury awards, plus any amounts later added to the jury's compensatory damages award by the Court in the form of prejudgment interest."  Such a hypothetical instruction would be nonsensical, given that a jury is not privy to a court's adjustments to its compensatory damages award (*e.g.*, awards of interest, *etc.*).

Plaintiffs argue that "the jury may have received an instruction less generous than plaintiffs were entitled to."  (Pls.' Mem. at 20.)  But even if plaintiffs were entitled to a more generous instruction (they are not), they should have raised that argument in an objection to defendants' proposed instruction.  Plaintiffs made no objection to defendants' proposed instruction.  Even more importantly, the instruction given to the jury was the most "generous" instruction that plaintiffs were entitled to under Colorado law.  *See, e.g., Hensley*, 98 P.3d at 967; *Graphic Directions*, 862 P.2d at 1025; Colo. Rev. Stat. § 13-21-102(1)(a); (12/07/06 Mem. Op. Regarding Jury Instructions at 79.).

Plaintiffs cite no Colorado law in support of their theory that prejudgment interest is added to compensatory damages before application of the punitive damages cap.  Plaintiffs do cite one lone federal district court case, *James v. Coors Brewing Co.*, 73 F. Supp. 2d 1250, 1255 (D. Colo. 1999).  But there is no evidence that the jury in *Coors* was instructed (and then violated the instruction) that punitive damages could not exceed compensatory damages (as the jury in this case was and did).  *Coors* does not stand for the proposition that an ambiguous and inconsistent punitive damages award can be entered even if it violates a Court's jury instructions. *See Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 87 (2d Cir. 2006) (ordering new trial where

"jury ignored or misunderstood that clear instruction" and thereby rendered an inconsistent

verdict); *United States v. Lawrence*, 2006 WL 3337472, at *3 (S.D. Ohio Nov. 16, 2006)

(rejecting method of reconciling verdict that would violate jury instructions).  Plaintiffs make no

effort to reconcile *Coors* with Colorado state cases stating that the jury should limit its punitive

damages awards to the jury's compensatory damages award.  *Hensley*, 98 P.3d at 967; *Graphic*

*Directions*, 862 P.2d at 1025.

Furthermore, Colo. Rev. Stat. § 13-21-102(1)(a) provides that "[t]he amount of such

reasonable exemplary damages shall not exceed an amount which is equal to the amount of

actual damages awarded to the injured party."  Colo. Rev. Stat. § 13-21-102(1)(a) (emphasis

added).  Perhaps based on the briefing before the *Coors* Court, that court concluded that there

was "no Colorado state authority on whether prejudgment interest should be considered 'actual

damages.'"  *Id.* at 1255 ("No Colorado cases address whether prejudgment interest should be

considered "actual damages" for purposes of C.R.S. § 13-21-102(1)(a).")  In fact, Colorado state

courts consistently treat "prejudgment interest" as being separate and distinct from "actual

damages."[16]

---

[16] *See, e.g., Sonoco Products Co. v. Johnson*, 23 P.3d 1287, 1288 (Colo. App. 2001) ("The court awarded Sonoco **$4,653,822 in actual damages** against both defendants jointly and severally, and $22,165.50 in separate damages against Johnson. Additionally, it awarded punitive damages of $2,300,000 jointly and severally against both defendants. The court **also awarded prejudgment interest**, attorney fees, and costs.") (emphasis added); *Cronk v. Intermountain Rural Elec. Ass'n*, 1992 WL 16181 (Colo. Ct. App. 1992) ("Cronk received **prejudgment interest on his actual damages** for all claims in the amount of $260,589.49.") (emphasis added); *Western Fire Truck,* 134 P.3d at 578 ("[W]e remand the case to the trial court to recalculate the award of prejudgment interest entered against E-One based upon specific findings of when the actual damages were incurred"); *see also Murphy Oil USA, Inc. v. Wood*, 438 F.3d 1008, 1012 (10th Cir. 2006) (Oklahoma law: "[T]he court entered JMOL on Murphy's breach of contract claim, awarding Murphy awarding Murphy $80,702.06 for actual damages and an additional $9,074.75 in prejudgment interest); *Vining ex. rel. Vining v. Enter. Fin. Gr., Inc.*, 148 F.3d 1206, 1212 (10th Cir. 1998) (Oklahoma law: "A jury verdict was rendered for Vining in March of 1996 in

(Continued…)

Of course, as defendants have argued elsewhere, prejudgment interest (and punitive damages based upon prejudgment interest) cannot be awarded here because plaintiffs already had their compensatory damages award adjusted to 2005 dollars.  (*See* Jury Verdict Form at 15, 24.) Having received this adjustment to 2005 dollars, plaintiffs are not entitled to the double recovery they would receive if they were also awarded prejudgment interest.  *See Great Western Sugar Co. v. KN Energy, Inc.*, 778 P.2d 272, 276 (Colo. Ct. App. 1989) (an award providing double compensation "cannot stand"); *Westric Battery Co. v. Standard Elec. Co.*, 482 F.2d 1307, 1317 (10th Cir. 1973) ("Unquestionably double or duplicative recoveries are invalid."); *see also* Defs.' Reply Br. in Support of the Mot. for Certification of Interlocutory Appeal, at 8-17 (citing federal and state cases prohibiting prejudgment interest where the jury's award compensated plaintiffs for the time value of money).

**B.    The Jury's Verdict Cannot Be Saved Simply By Reducing The Punitive Damages Award.**

Plaintiffs suggest that the Court could cure the jury's inconsistent verdict by reducing the punitive award to $176 million, with the plaintiffs entitled to choose how to collect their award:

> The Court's judgment, that is, could simply direct that the Damages Subclass recover up to $110,800,000 in exemplary damages (plus interest) from Dow, and up to $89,400,000 in exemplary damages (plus interest) from Rockwell, with the total recovery of exemplary damages not to exceed $176,850,340.

(Pls.' Mem. at 21.)  Plaintiffs' proposal fails for several reasons.

---

the amount of $800,000: $400,000 in actual damages and $400,000 in punitive damages. The district court also awarded $163,000 in prejudgment interest at the statutory rate and $94,223.75 in attorneys' fees to Vining").

First, plaintiffs' proposal does not answer the most basic questions:  What is the amount of punitive damages owed by Dow, and what is the amount of punitive damages owed by Rockwell?

Second, reducing the punitive award to $176,850,340 does not cure the inconsistency. Plaintiffs assert, with no explanation, that "[t]his case presents no such circumstance" where judgment could not be entered without disregarding either of the jury's contradictory factual findings."  (Pls.' Mem. at 21.)  Given the Court's jury instructions limiting punitive damages to compensatory damages — which the jury is presumed to have followed[17] — the Court cannot enter a judgment on compensatory damages without disregarding the punitive award, and it cannot enter a judgment on punitive damages without disregarding the compensatory award. Entry of such a judgment would violate defendants' rights under the Fifth, Seventh, and Fourteenth Amendments.[18]  Nor can the Court or the parties speculate as to what the jury meant to award.  *Unit Drilling*, 108 F.3d at 1191-93.  Consequently, a new trial is required.  *Id.*

Third, plaintiffs' proposal that they should be permitted to choose which defendant to collect punitive damages from runs afoul of this Court's ruling that joint-and-several liability

---

[17] *See United States v. Chanthadara*, 230 F.3d 1237, 1251 (10th Cir. 2000) ("Generally, we assume that jurors follow the judge's instructions.").

[18] *See Bangert Bros. Const. Co. v. Kiewit Western Co.*, 310 F.3d 1278, 1301 (10th Cir. 2002) ("[I]t was inconsistent for the district court to find that Bangert received a benefit at Meridian's expense. We conclude the district court's judgment in favor of Meridian on the quantum meruit claim must be set aside under principles of issue preclusion, as well as to preserve Bangert's Seventh Amendment rights.");  *Action House, Inc. v. Koolik*, 54 F.3d 1009, 1017 (2d Cir. 1995) ("What is necessary to protect the parties' Seventh Amendment rights to a jury trial is that the judgment not disregard any material jury finding.")(citation and quotations omitted); *Finnegan v. Fountain*, 915 F.2d 817, 820 (2d Cir. 1990) ("The Seventh Amendment right to a jury trial precludes entry of a judgment based on an inconsistent jury verdict that thereby disregards any material jury finding."); *c.f. Nance v. Gulf Oil Corp.*, 817 F.2d 1176, 1178 (5th Cir. 1987) (holding it did not violate Seventh Amendment to resubmit inconsistent verdict to jury).

will not be imposed in this case.  (12/7/06 Order Regarding Jury Instructions at 91-92.)

Specifically, what plaintiffs' proposal amounts to is a suggestion that they be allowed to choose

from whom to collect the first $89,400,000 in punitive damages.  (Pls.' Mem. at 21.)  This

proposal constitutes joint-and-several liability.  *See Anderson v. Griffin*, 397 F.3d 515, 532 (7th

Cir. 2005) (joint-and-several liability leaves claimant "free to pick and choose if he wants to

collect the total entitlement from one of several liable parties"); *United States v. Nucci*, 364 F.3d

419, 423 (2d Cir. 2004) ("At common law, joint and several liability does not permit double

recovery.  As we have held, the effect of joint liability in a tort context is to excuse one

defendant from paying any portion of the judgment if the plaintiff collects the full amount from

the other.") (citation and quotations omitted).  Joint-and-several liability can apply, as plaintiffs

attempt to do here, to a portion of a judgment.  *See S.E.C. v. AbsoluteFuture.com*, 393 F.3d 94,

97 (2d Cir. 2004) ("We direct the district court on remand to provide that DeTrano shall be

jointly and severally liable with AFTI for $150,000, plus prejudgment interest, of his total

disgorgement of $499,694.82"); *see also Perlmutter v. Blessing*, 706 P.2d 772, 774, 776 (Colo.

1985) (holding two parties jointly and severally liable for $37,037 of $67,037 judgment after

reducing judgment to account for settlement).

Thus, plaintiffs' proposal ignores the Court's ruling that joint-and-several liability will

not be imposed in this case.  (12/7/06 Order Regarding Jury Instructions at 91-92.)  In every

Colorado case that has ever been decided in a non-joint-and-several-liability setting, a particular

damages amount is fixed against each defendant against whom damages is awarded.  *See, e.g.,*

*Slack v. Farmers Ins. Exch.*, 5 P.3d 280, 284-84 (Colo. 2000); *Barton v. Adams Rental, Inc.*, 938

P.2d 532, 535-36 (Colo. 1997); *Lira*, 832 P.2d at 242; *Bohrer v. Dehart*, 961 P.2d 472, 476

(Colo. 1998); Colo. Rev. Stat. § 13-12-111.5(1).  Plaintiffs do not to cite a single case to the

contrary.  Thus, a judgment that reduces the punitive damages award to $176,850,340, and provides that "up to" a certain amount of punitive damages may be collected against each defendant (Pls.' Mem. at 21), does nothing to solve the inconsistency in the jury's verdict, and would violate this Court's ruling on joint-and-several liability.

Fourth, plaintiffs assert that "[n]othing requires . . that the jury's exemplary damages awards be parsed as between the trespass and nuisance claims."  (Pls.' Mem. at 25.)  A new trial is required because the punitive damages award exceeds the compensatory award in violation of Colorado law and the jury instructions; parsing the verdict by claim would not have solved that inconsistency.  Following the verdict, defendants properly requested that the Court ask the jury not to "parse" the punitive damages award "as between the trespass and nuisance claims," but instead to ask "how that calculation was made."  (2/14/06 Trial Tr. at 10813.)  Recognizing the inconsistency in the jury's verdict, the Court asked the question to the jury.  (*Id.* ("How did you determine to award punitive damages…").)  Although the inconsistency could thereby have been cured, the Court decided not to ask any further questions, and dismissed the jury.  (*Id.* at 10814 ("not going into any further questions about the verdict").)  Because it is too late now to reconcile the verdict, a new trial is required.  *See Unit Drilling*, 108 F.3d at 1189-92.

## IV.   A NEW TRIAL IS REQUIRED BECAUSE THE COMPENSATORY DAMAGES AWARD IS AMBIGUOUS AND IRRECONCILABLY INCONSISTENT.

### A.   Plaintiffs Acknowledge That, Even Under Their Theory Of The Verdict, The Maximum Compensatory Damages That May Be Awarded Is $176 Million.

Plaintiffs agree that:  "The jury awarded identical compensatory damages of $176,850,340 on both the trespass claim and the nuisance claim."  Plaintiffs further "agree that under the verdict, compensatory damages in that amount should be awarded to the Damages Subclass only once, not twice."  (Pls.' Mem. at 4.)  The Court has ruled, and plaintiffs have

agreed, that the "trespass damages" and the "nuisance damages" are "the same damages."

(2/14/06 Trial Tr. at 10800; *see also* Pls.' Mem. 4.)

      **B.     The Compensatory Damages Verdicts Are Inconsistent And Must Be Vacated.**

Plaintiffs offer nothing to cure the fundamental inconsistency in the jury's damages

awards.  The jury verdict form asked:

> 14.     Taking as 100 percent the combined trespass that caused the damages you have found, what percentage, if any, was caused by the trespass by Dow and the trespass by Rockwell (*see Instruction 3.19A)*:
>
> . . .
>
> 14.     Taking as 100 percent the combined nuisance that caused the damages you have found, what percentage, if any, was caused by the nuisance by Dow and the nuisance by Rockwell (*see Instruction 3.19A)*

(Jury Verdict Form at 15, 24.)

Jury Instruction No. 3.19A, in turn, states:

> If you find both Dow and Rockwell committed a trespass and/or nuisance in this action, and that Plaintiffs have proved actual damages resulted from both Defendants' trespass and/or nuisance under the instructions I will give you in a moment (see Instruction Nos. 3.20-3.22), then you must also determine to what extent Dow's trespass or nuisance and Rockwell's trespass or nuisance contributed to the Class' actual damages.  In making this determination, you must express ***Dow's contribution to the Class' damages*** (if any) and ***Rockwell's contribution to the Class' damages*** (if any) as a percentage of 100.

(Jury Instruction No. 3.19A (emphasis added).)

The jury provided inconsistent answers to these questions.  On pages 15 and 16 of the

jury verdict form, the jury determined that Dow's contribution to the Class' damages was $159.2

million (90% of $176.9 million) and Rockwell's contribution was $17.6 million (10% of $176.9

million).  But on pages 24 and 25 of the jury verdict form, the jury determined that Dow's

contribution to the Class' damages was $53.1 million (30% of $176.9 million) and that

Rockwell's contribution to the Class' damages was $123.8 million (70% of $176.9 million).  The

jury's verdict is inconsistent.  Dow's "contribution to the Class' damages" could not have been both $159.2 million and $53.1 million.  Rockwell's "contribution to the Class' damages" could not have been both $17.6 million and $123.8 million.

Put another way, Dow could not have been responsible for 90% of the $176.9 million in compensatory damages at the same time it was responsible for 30% of the $176.9 million in compensatory damages.  Rockwell could not have been responsible for 70% of the $176.9 million in compensatory damages at the same time it was responsible for 10% of the $176.9 million in compensatory damages.

When a jury gives inconsistent answers, the inconsistencies should be pointed out to the jurors and the jurors should be asked to resolve the conflict.  *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 853 (10th Cir. 2000) ("Ordinarily, a trial judge should point out apparent inconsistencies in the special verdicts to the jury and ask the jury to resolve the conflict.  This was not done and the alternative is to send the case back for a new trial") (citations omitted).  That was not done here (2/14/06 Trial Tr. 10813-15), and a new trial is required.

Plaintiffs offer no response as to how this inconsistency might be reconciled.[19]  Plaintiffs' response avoids the questions of whether the jury's damages verdicts are inconsistent, by focusing instead on an irrelevant question of whether the jury's "allocations of fault" are inconsistent.  Plaintiffs contend that "defendants never raised the issue of allocating fault," and "defendants strenuously attempted to prevent the comparative fault issue from going to the jury." (Pls.' Mem. at 5-7.)  But the issue is not one of "***allocating fault***" or "***comparative fault***" or

---

[19] In their reply in support of their motion for entry of judgment, plaintiffs attach a revised form of judgment that purports to set each defendant's damages, but in reality just restates plaintiffs' erroneous and unsupported position that they can choose how to collect their damages.  (*See* Pls.' Revised Proposed Final J. at ¶¶ 6-8.)

"*loss causation*" as plaintiffs claim— instead, it is the jury's inconsistent answers as to the (i) *damages* caused by Dow and (ii) *damages* caused by Rockwell.  That is, the issue is not whether it is "consistent" for Dow to be responsible for 90% of the trespass damages and Rockwell to be responsible for 10% of the trespass damages.  Rather, the issue is whether it is consistent for (i) Dow to be simultaneously responsible for both 90% and 30% of the same $176.9 million in damages; and (ii) Rockwell to be simultaneously responsible for both 70% and 10% of the same $176.9 million in damages.

Plaintiffs again fail to come to terms with the Court's rejection of plaintiffs' request to impose joint-and-several liability.  (12/7/06 Order Regarding Jury Instructions at 91-92.)  Under plaintiffs' proposal, Dow would pay "up to" $159,165,306, and Rockwell would pay "up to" $123,795,238, of the $176 million verdict.  (*See* Pls.' Mem. at 8.)  Yet that would leave $106,110,204 — 60% of the verdict — up for grabs.  Plaintiffs do not explain which defendant must pay that 60% of the verdict, or who would decide such a question, or when it would be decided.  Instead, plaintiffs simply put forward a judgment in which both defendants are jointly and severally liable for 60% of the verdict, in violation of Colorado law:

| Defendant | Minimum | Maximum | Joint & Several Liability |
|---|---|---|---|
| Dow | $53,055,102[20] | $159,165,306 | $106,110,204 |
| Rockwell | $17,685,034[21] | $123,795,238 | $106,110,204 |

Plaintiffs' proposal constitutes joint and several liability.  *See Anderson*, 397 F.3d at 532; *Nucci*, 364 F.3d at 423.  Joint and several liability can apply, as plaintiffs attempt to do here, to a portion of a judgment.  *See AbsoluteFuture.com*, 393 F.3d at 97; *see also Perlmutter*, 706 P.2d at 774, 776.  Thus, plaintiffs' proposed judgment would violate the Court's ruling that joint-and-several liability will not be imposed in this case.  (12/7/06 Order Regarding Jury Instructions at 91-92.)  Plaintiffs' proposal also violates Colorado law holding that, in a non-joint-and-several-liability setting, a particular damages amount is fixed against each defendant against whom damages are awarded.  *See, e.g., Slack,* 5 P.3d at 284-84;  *Barton*, 938 P.2d at 535-36; *Lira*, 832 P.2d at 242; *Bohrer*, 961 P.2d at 476; Colo. Rev. Stat. §  13-12-111.5(1).

Plaintiffs rely heavily on waiver arguments, suggesting that defendants did not propose a jury verdict form that would have avoided the inconsistent verdict problem.  (Pls.' Mem. at 5-12.)  In addition to being wrong, because defendants did submit an alternative jury verdict form, plaintiffs ignore that there is a possibility with any jury verdict form that a jury can give inconsistent answers, as the jury gave here.

In any event, defendants did propose at least two alternative jury verdict forms.  For example, in defendants' September 3, 2004 submission of jury verdict forms, defendants did not

---

[20] $176,850,340 (jury verdict) minus $123,795,238 (maximum recovery from Rockwell).

[21] $176,850,340 (jury verdict) minus $159,165,306 (maximum recovery from Dow).

propose "percentage allocations of fault" (as plaintiffs now suggest), but instead proposed that the jury simply determine four separate damage amounts in dollars:  Dow's trespass damages (in dollars), Dow's nuisance damages (in dollars), Rockwell's trespass damages (in dollars), and Rockwell's nuisance damages (in dollars).  (*See* Defs.' 9/3/04, Submission of Phase III Jury Instructions and Jury Verdict Forms at 84-101; *see also* Defs.' 1/11/06 Proposed Jury Verdict Forms at 3-5 (same).)   Defendants' proposed verdict form would not have invited the jury to answer the same question in two different ways (as it has here).[22]  Plaintiffs successfully objected to the defendants' proposed verdict form.  (*See* Pls.' 9/3/04 Proposed Phase III Jury Instructions, Verdict Form, and Objections, at 78.)

On January 11, 2006, defendants again proposed jury verdict forms that provided an alternative to the form ultimately used by the Court.[23]  Defendants submitted separate jury verdict forms for Dow and Rockwell, which separately broke out trespass damages and nuisance damages for Dow and Rockwell.  (01/11/06 Proposed Verdict Forms at Exhibit A at 4 (asking for Dow nuisance damages in dollars); 6 (asking for Dow trespass damages in dollars); *id.* at Ex. B at 4 (asking for Rockwell nuisance damages in dollars); 6 (asking for Rockwell trespass

---

[22] To the extent that there were any duplication in the damages amounts awarded by the jury, defendants proposed that the Court apply rules preventing any multiple recovery.  (Defs.' 9/3/04 Submission of Phase III Jury Instructions and Jury Verdict Forms at 64.)

[23] Defendants' January 11, 2006 Proposed Jury Verdict Forms stated:  "These jury verdict forms are submitted in view of the current jury instructions.  Defendants preserve their objections to those instructions, including as set forth in defendants' jury instructions submission filed January 10, 2006, and in defendants' jury instruction objections filed throughout 2004 and 2005."  (Defs.' Proposed Jury Verdict Forms, filed 1/11/06, at 1 n.1.)

damages in dollars).)  Again, defendants' proposed form would not have invited the jury to

answer the same question in two different ways.  Defendants' proposed form was rejected.[24]

Defendants also preserved their objections to the Court's proposed verdict form.  As

plaintiffs acknowledge (*see* Pls.' Mem. at 6), defendants "lodged an objection to the application

of Colo. Rev. Stat. § 13-21-111.5 to this case."  (*See* Defs.' Objections to Additional and Revised

Jury Instructions, filed 1/19/06, at Ex. A. at 16.)  Moreover, in their Objections to Jury

Instructions and Verdict Form, filed on January 18, 2006, defendants objected to the Court's jury

verdict form to the extent it was inconsistent with defendants' proposed verdict forms, including

the verdict forms submitted by defendants on September 3, 2004 and January 11, 2006.  (Defs.'

Objections to Jury Instructions and Verdict Form, filed 1/18/06 at 2.)

Plaintiffs also do not discuss the history of the Court's submission of its verdict form to

the parties.  At 10:07 p.m. on January 17, 2006, the Court sent its proposed jury verdict form to

plaintiffs, by e-mail.  (*See* Defs.' Objections to Additional and Revised Jury Instructions, filed

January 19, 2006.)  But, because the Court sent the jury verdict form to an incorrect e-mail

address for defendants (using a ".net" address rather than a ".com" address), defendants did not

receive the Court's 30-page jury verdict form (or even a draft of the form) until closing

arguments on the afternoon of January 18, 2006.  Further, plaintiffs repeatedly referred to the

---

[24] Nor was defendants' proposed verdict form the only viable alternative.  The court could also
have used Colo. Jury Instr., Civil 4:20, which asks :"[W]hat percentage of the plaintiff's
damages was caused by the (negligence) (or) (fault), if any, of  (a) the plaintiff; and (b) each of
the defendants from whom you have found the plaintiff is entitled to recover; (c) (the designated
nonparty) (any one or more of the designated nonparties)?"  Unlike the verdict form used at trial,
Colo. Jury Instr., Civil 4:20 does not invite two different answers by asking the same question
twice.  Nor does the form require that a plaintiff or non-party be at fault to be used.  *Id.* at n.4.

verdict form during closing arguments.[25]  Defendants should have been permitted a chance to object to the verdict form outside of the presence of the jury before closing arguments, but were afforded no such opportunity here.  *See* Fed. R. Civ. P. 51(b) ("The court: (1) must inform the parties of its proposed instructions and proposed action on the requests before instructing the jury and before final jury arguments; (2) ***must give the parties an opportunity to object*** on the record and out of the jury's hearing to the proposed instructions and actions on requests ***before*** the instructions and ***arguments are delivered***.") (emphasis added).  In an effort to object as soon as possible, defendants immediately filed their objections to the verdict form as soon as it was brought from the Court to defendants' trial offices (at 1:58 p.m. on January 18).  (*See* Defs.' Objections to Jury Instructions and Verdict Form, filed 1/18/06.)  Nonetheless, given the circumstances, defendants could not possibly have reviewed the 30-page form, much less thoroughly objected to it, before "arguments" were "delivered," as Rule 51(b) requires.  Addressing this issue, the Court stated:  "I am sorry.  I can tell you that when people who work for me are handling the e-mail it's done correctly."  (*See* 1/18/06 Trial Tr. at 10356.)

**V.      A NEW TRIAL IS REQUIRED DUE TO THE ERRONEOUS JURY INSTRUCTIONS, THE ADMISSION OF IRRELEVANT AND HIGHLY PREJUDICIAL EVIDENCE, THE COURT'S FAILURE TO GRANT DEFENDANTS' MOTIONS FOR MISTRIAL, AND BECAUSE THE TRIAL EVIDENCE CONFIRMED THE CASE SHOULD NOT HAVE BEEN TRIED AS A CLASS ACTION.**

In responding to the remaining arguments in defendants' motion, plaintiffs state that the Court has already rejected defendants' arguments.  (Pls.' Mem. at 55-56.)  Defendants do not dispute that, in one way or another, defendants' arguments have been previously rejected by the Court.  However, a motion for new trial gives the Court the opportunity to reexamine its previous

---

[25] (*See, e.g.*, 1/18/06 Trial Tr. at 10318, 10332, 10338-41, 10346-52.)

rulings.  *See* Charles A. Wright, Arthur R. Miller, and Mary K. Kane, FEDERAL PRACTICE & PROCEDURE, § 2081 ("Rule 59 recognizes the common-law principle that it is the duty of a judge who is not satisfied with the verdict of a jury to set the verdict aside and grant a new trial"); *see also* 5/10/06 Order at 2 n.1 ("To the extent the Motion challenges evidentiary and related pretrial and trial rulings, these matters are more properly the subject of motions under Rules 59 and/or 60 and are premature at this point.").[26]

---

[26] Defendants certainly intend no disrespect by re-asserting this issues, which is why defendants have attempted to flag in their brief for the Court and Court personnel issues had already been addressed.  (*See, e.g.,* Defs.' Mem. at i, 43, 46, 87, 149, 151.)

## CONCLUSION

Defendants respectfully request that the Court grant defendants' motion for new trial or, in the alternative, a remittitur of damages.


Dated: May 1, 2007                                          Respectfully submitted,


                                                            s/ John E. Tangren
                                                            One of the Attorneys for the Defendants
                                                            David M. Bernick
                                                            John E. Tangren
                                                            KIRKLAND & ELLIS LLP
                                                            200 East Randolph Drive
                                                            Chicago, Illinois 60601-6636
                                                            Phone:  312-861-2000
                                                            Fax:      312-861-2200

                                                            Joseph J. Bronesky
                                                            SHERMAN & HOWARD L.L.C.
                                                            633 Seventeenth Street, Suite 3000
                                                            Denver, Colorado 80202
                                                            Phone:  303-297-2900
                                                            Fax:      303-298-0940

                                                            Attorneys for ROCKWELL
                                                            INTERNATIONAL CORPORATION and
                                                            THE DOW CHEMICAL COMPANY

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 1, 2007 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses for the following:

Peter B. Nordberg, Esq.
BERGER & MONTAGUE P.C.
1622 Locust Street
Philadelphia, PA  19103
pnordberg@bm.net
kmarkert@bm.net


Gary B. Blum, Esq.
SILVER & DEBOSKEY
The Smith Mansion
1801 York Street
Denver, Colorado 80206
blumg@s-d.com

<u>s/ Courtney Biggins</u>
Courtney Biggins (legal assistant)

47