# Exhibit 1

1

```
 1  IN THE UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF COLORADO
 2  CIVIL ACTION NO. 90-CV-181-JLK
 3  ────────────────────────────────────────────
 4  VIDEOTAPED DEPOSITION OF CHARLES C. McKAY
    EXAMINATION DATE:  SEPTEMBER 28, 2005
 5  ────────────────────────────────────────────
 6  MERILYN COOK, et al.,
 7  Plaintiffs,                     COPY
 8  v.
 9  ROCKWELL INTERNATIONAL CORPORATION
    and THE DOW CHEMICAL COMPANY,
10  Defendants.
11  ────────────────────────────────────────────
12         PURSUANT TO NOTICE, the videotaped deposition of
    CHARLES C. McKAY was taken at 9:04 a.m. on September 28,
13  2005, at 1801 York Street, Denver, Colorado, before
    Nathan Stormo, Registered Professional Reporter and
14  Notary Public in and for the State of Colorado, said
    videotaped deposition being taken pursuant to the
15  Federal Rules of Civil Procedure.
16
17
                      Nathan Stormo
18            Registered Professional Reporter
19
20
21
22
23
24
25
```

Stormo Reporting, Inc.   (303) 200-4792

```
                                                              21
 1   been to Colorado, as far as you know?
 2        A    Five or six years ago.
 3        Q    And during -- during the time period from 1960
 4   to the present, as far as you know, approximately what
 5   percent of his time has your brother spent in Colorado?
 6        A    Percent of his time, 1 percent.
 7        Q    Were you born in Colorado?
 8        A    No, I wasn't.
 9        Q    When did you move to Colorado?
10        A    I moved here full-time in late '83.
11        Q    And I take it from your answer that you had
12   visited Colorado prior to 1983?
13        A    Yes.  Ever since I was two years old.
14        Q    And I take it, Mr. McKay, that your family
15   owned property within the area set forth in McKay
16   Deposition Exhibit 3 prior to the time that you moved to
17   Colorado?
18        A    Yes.
19        Q    And why don't we use McKay Deposition
20   Exhibit 3, which is the big map, to show, as best as you
21   know, as of 1975 the properties that your family owned
22   on that map.
23        A    Well, the map doesn't go far enough west, but I
24   can show you, in 1975 they owned -- I'm going to take
25   them one at a time here.
```

1  Q   And why don't we begin with No. 4, because I
2  believe we got up to No. 3 in terms of properties.
3  A   Okay. Well, the first one I'm going to label
4  is the northeast quarter of Section 24, which would be
5  adjacent to 96th -- adjacent to and west of 96th and
6  Indiana. And it was about 160 acres.
7  Q   Okay. You're labeling that as No. 4 on McKay
8  Deposition Exhibit 3?
9  A   Right. Then -- I can't quite tell the way you
10 have the sections. Is the section line -- I assume that
11 that's the section line, so -- okay.
12        '75, okay. In Section 23, I'm going to say --
13 let's call that No. 5, and I'm going to guess that
14 that's plus or minus 500 acres.
15        And I'm going to label another one 6, and
16 that's plus or minus 78 acres. This has got to be
17 Section 22. See, we didn't own this; "Out." We later
18 acquired it, but -- 160 acres here in Section 22. And
19 let's see, what do we label that? 5, 6 -- 7.
20        No. 8 in Section 21, 55 acres. I'll call
21 that 8.
22        This is 30 acres; call that No. 9.
23        You need to tape a piece of paper on here.
24 It's like the old plan-ahead joke. But we also own
25 property here -- let's see, 8, 9 -- 10. And it goes

```
                                                              23
 1   this way.  And if you get me a map later, or I could try
 2   to label it on that, or if you want to -- however you
 3   want to do this.
 4        Q    Sure.  You could label No. 10 on McKay
 5   Deposition Exhibit 2.
 6        A    I'm going to say No. 10 is 114 acres, plus or
 7   minus.  My circle is, and -- and then No. 11 is 78.5
 8   acres, and that's on the corner of 72 -- Highway 72 and
 9   Highway 93.  And that would be the northeast corner.
10        Q    Okay.  And you're marking that on McKay 2?
11        A    Yes.
12             Now, No. 12 is also on the corner of 72 and 93,
13   and that's a 20.5 acre, and that would be on the
14   southeast corner.  I'm just going to put an arrow down
15   here.  It's going to get muddled up anyway, but I'll put
16   an area down to the general -- and if we blew this map
17   up ten times, it would show it.
18             So that's the southeast corner.  Then 13 --
19        Q    13 you can show on McKay Exhibit 3, I think.
20        A    I could if you want me to do it this way, but
21   it won't show.
22        Q    Okay.  It's west of the plant?
23        A    Well, it's west of here -- yes.  It's west
24   of -- what you need to do is at least get out to Highway
25   93 with your next map.
```

Stormo Reporting, Inc.   (303) 200-4792

24

1   But No. 13 -- No. 13, actually, this is west of
2   93.  No. 13 is 5.5 acres.  It's on the corner of 72/93,
3   and that would be the southwest corner.
4         And 14 would be the Mountain Plains.
5   Q   Which you've already marked?
6   A   I've already marked it, yes.
7   Q   Right.  147 acres?
8   A   More or less, that's right.  But you asked me
9   what we owned then, so I was trying to tell you what we
10  owned then.
11  Q   Right, understood.
12  A   So we'll just say -- what do you want me to do
13  with 14; good enough the way it is?
14  Q   I understand that 14 is the Mountain Plains
15  Industrial Center.
16  A   That's correct.
17  Q   Okay.
18  A   And let me think.  And these are properties
19  around Rocky Flats; what we owned then.
20  Q   Is there anything else that's on McKay
21  Deposition Exhibit 2 -- 3, which is the large map?
22  A   '75, yes.
23  Q   Anything to the east of the plant?
24  A   Well, of course, we owned No. 2, which I
25  labeled, but I don't know -- we owned that then.  See,

62

1  Q   (By Mr. Nomellini)  Is the -- is the net amount
2  of your ownership in Church Ranch Corporate Center above
3  $10 million?
4  A   It may not be.
5  Q   Is it above $5 million?
6  A   I would hope so, but I don't know.
7  Q   Is it above $3 million?
8  A   It may be.
9  Q   Is it above $1 million?
10 A   I hope so.
11 Q   What is the net value of your property assets
12 in Jefferson County?
13     MR. DAVIDOFF:  It's objected to as unfair and
14 overbroad and unduly complex for a single answer.
15 A   It is -- it is -- we can do the above/below
16 thing if you want.
17 Q   (By Mr. Nomellini)  Sure.  Is it above
18 $10 million?
19 A   I hope so.
20 Q   Is the net value of your assets in Jefferson
21 County above $5 million?
22 A   Yes.
23 Q   Is the net value of your assets in Jefferson
24 County above $7 million?
25 A   Yes, I believe so.

Stormo Reporting, Inc.   (303) 200-4792

```
                                                            69
 1      A    My Uncle Marcus.
 2      Q    And was -- was the -- among your neighbors in
 3 Jefferson County, was the presence of plutonium
 4 contamination from Rocky Flats widely known?
 5      A    Yes.
 6      Q    Among your neighbors in Jefferson County -- and
 7 that was in the 1970s?
 8           MR. DAVIDOFF:  Objection to the form.
 9 "Neighbors in Jefferson County" is an unduly vague and
10 ambiguous term.
11      Q    (By Mr. Nomellini)  Was contamination from
12 Rocky Flats in Jefferson County widely publicized in the
13 1970s?
14      A    Yes.
15      Q    Were the 1957 and 1969 fires widely publicized
16 in the 1970s?
17      A    Yes.
18      Q    Was the 903 Pad incident widely publicized in
19 the 1970s?
20      A    Yes.
21      Q    And was the Church litigation widely publicized
22 in the 1970s?
23      A    I don't think it was widely publicized ever
24 until the settlement.
25      Q    And was the settlement of the Church litigation
```

70

1  widely publicized?

2     A    Yes.

3     Q    And as a result of that settlement, you were

4  paid an amount of money, correct?

5     A    Our family was paid.

6     Q    What was the approximate amount of that

7  payment?

8     A    About $6.75 million.

9     Q    And what were the other terms of that

10 settlement; of the Church litigation?

11    A    The other terms of that litigation were the

12 most important to us, and that was there was this area

13 called the yellow zone, but it was an area that went

14 from Highway 93 to Simms -- Highway 93 to Simms and -- I

15 don't know.  It went all around here; all around.  So

16 Highway 93 to Simms, went south of -- of Highway 72 for

17 some point, and the -- Jefferson County was ordered and

18 was not issuing any building.  There was going to be no

19 building permits whatsoever issued in that area.

20    Q    What were the -- what were the events that gave

21 rise to the Church litigation?

22    A    The -- there were two things.  The Good case;

23 when Good was unable to get zoning and other appropriate

24 things that he needed to develop the property he was

25 buying from the Churches.