# EXHIBIT 2

# PART 1 OF 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| TERESA BOGGS, et al., | : | |
| Plaintiffs, | : | |
| | | Case No. 2:90cv840 |
| vs. | : | |
| | | JUDGE WALTER HERBERT RICE |
| DIVESTED ATOMIC | : | |
| CORPORATION, et al., | : | |
| Defendants. | : | |

---

EXPANDED OPINION SETTING FORTH REASONING AND CITATIONS
OF AUTHORITY IN SUPPORT OF COURT'S DECISIONS TO SUSTAIN IN
PART AND TO OVERRULE IN PART PLAINTIFFS' MOTION TO
EXCLUDE TESTIMONY OF DEFENDANTS' EXPERT WITNESSES
(DOC. #243), AND TO SUSTAIN IN PART AND TO OVERRULE IN
PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
(DOC. #244); DECISION AND ENTRY OVERRULING, AS MOOT,
PLAINTIFFS' MOTION FOR RECONSIDERATION (DOC. #256);
CONFERENCE CALL SET

---

This litigation arises out of the alleged release of radioactivity and other

hazardous substances from the Portsmouth Gaseous Diffusion Plant ("Plant"),[1]

which is owned by the Department of Energy ("DOE") and located in Piketon, Ohio.

The Plaintiffs bring this action on behalf of themselves and a class of persons who

---

[1]According to the Plaintiffs, workers at the Plant converted solid uranium
hexafluoride into a gas and, then, enriched an isotope of that gas for use in
commercial reactors and in the nuclear weapons program.

reside in the vicinity of that facility. The Defendants, Divested Atomic Corporation, Goodyear Tire and Rubber Company and Martin Marietta Energy Systems, Inc., formerly operated the Plant. The Plaintiffs bring this action as a "public liability action" under the Price-Anderson Act, as amended by the Price-Anderson Act Amendments of 1988 ("PAAA"), 42 U.S.C. §§ 2014(hh) and 2210. In their Amended Complaint (Doc. #4), the Plaintiffs allege that the Defendants have engaged in a continuous course of conduct whereby they have permitted ongoing and continuous discharges of radioactive and non-radioactive, hazardous substances. The Plaintiffs set forth four substantive claims for relief under the common law of Ohio, to wit: negligence; absolute or strict liability, predicated upon engaging in abnormally dangerous or ultrahazardous activities; private nuisance; and trespass.[2] In addition, the Plaintiffs set forth a claim under § 107 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607. The Plaintiffs seek to recover compensatory damages for the diminution of the value of their real property, the loss of the enjoyment of that property and emotional distress in the form of increased fear of the risk of contracting cancer, as well as response costs under CERCLA. In addition, the Plaintiffs seek an order from the Court, requiring the Defendants to pay for medical monitoring. The Plaintiffs do not seek to recover damages for personal injuries suffered as a result of the Defendants' operation of the Plant.

Previously, the Court entered two Decisions in which it has sustained in part and overruled in part Plaintiffs' Motion to Exclude Testimony of Defendants' Expert

---

[2]The Plaintiffs have also set forth a claim with which they seek an award of punitive damages. That request is premised upon the legal theories of the Plaintiffs' other claims.

Witnesses (Doc. #207) and Defendants' Motion for Summary Judgment

(Doc. #192).[3]  See Docs. #243 and #244.  Herein, the Court sets forth its

reasoning and citations of authority in support of those Decisions, in the above

order.  Plaintiffs' Motion for Reconsideration (Doc. #256) is also pending.  At the

conclusion of this Expanded Opinion, the Court will address that motion.


## I.  Plaintiffs' Motion to Exclude Testimony of Defendants' Expert Witnesses

### (Doc. #207)

With this motion, the Plaintiffs requested that the Court exclude testimony

from six of the Defendants' expert witnesses, to wit: Drs. John Auxier ("Auxier"),

Lynn Anspaugh ("Anspaugh"), Phillip Guzelian ("Guzelian"), Fred Mettler

("Mettler"), Frank Mink ("Mink") and Jacob Fabrikant ("Fabrikant").  The Plaintiffs

moved pursuant to Rule 104(a) of the Federal Rules of Evidence and argued that

testimony from those expert witnesses must be excluded under Rule 702 of those

Rules, as interpreted by Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S.

579 (1993), and Rule 403 of the Federal Rules of Evidence.[4]  As a means of

---

[3]Previously, the Court had filed a Decision (Doc. #242), in which it ruled upon a
number of issues, concluding that Plaintiffs' request for injunctive relief must be
dismissed and that, consequently, the order certifying this litigation as a class
action, based upon the Plaintiffs' request for such relief, must be vacated, without
prejudice.  Therein, the Court also overruled the Plaintiffs' request for summary
judgment.

[4]This Court has not conducted an evidentiary hearing in order to determine whether
the opinions of those six expert witnesses violate Rule 702 and Daubert.  The
Sixth Circuit has stressed that the District Court possesses discretion to determine
whether to hold such a hearing.  Nelson v. Tennessee Gas Pipeline Co., 243 F.3d
244, 248 (6th Cir.), cert. denied, 534 U.S. 822 (2001).  Herein, the Court declines
to order such a hearing, because Defendants did not request same and, further,
because, in the Court's opinion, such a hearing is not necessary.

analysis, the Court will initially set forth the standards it must apply, when

determining whether to exclude the testimony of any of those expert witnesses.

Following that, the Court will turn to the parties' arguments regarding the

Defendants' six expert witnesses, discussing Auxier and Anspaugh together, as

have the parties.

## A. Applicable standards

Rule 702 provides:[5]

> If scientific, technical, or other specialized knowledge will assist the trier of
> fact to understand the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience, training, or education,
> may testify thereto in the form of an opinion or otherwise, if (1) the
> testimony is based upon sufficient facts or data, (2) the testimony is the
> product of reliable principles and methods, and (3) the witness has applied
> the principles and methods reliably to the facts of the case.

In Daubert, the Supreme Court "established a general gatekeeping [or screening]

obligation for trial courts" to exclude expert testimony from trial that is unreliable

and irrelevant. Conwood Co., L.P. v. U.S. Tobacco Co., 290 F.3d 768, 792 (6th

Cir. 2002) (citations omitted). This gatekeeping function applies "when

considering all expert testimony, including testimony based on technical and other

specialized knowledge." Clay v. Ford Motor Co., 215 F.3d 663, 667 (6th Cir.

2000), citing Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141 (1999)

---

[5]Rule 702 was amended effective December 1, 2000, in order to make its
language consistent with Daubert and its progeny. Nelson, 243 F.3d at 250 n. 4.
Before its amendment, Rule 702 provided:

> If scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in issue, a
> witness qualified as an expert by knowledge, skill, experience, training, or
> education, may testify thereto in the form of an opinion or otherwise.

- 4 -

(emphasis in original). In determining whether evidence is admissible under
Daubert, the District Court must determine whether the evidence "both rests on a
reliable foundation and is relevant to the task at hand." Id. In assessing relevance
and reliability, the District Court must examine whether the expert is proposing to
testify to scientific or other specialized knowledge which will assist the trier of fact
to understand or to determine a fact in issue.[6] Jahn v. Equine Servs., PSC, 233
F.3d 382, 388 (6th Cir. 2000). This involves a preliminary inquiry as to whether
the reasoning or methodology underlying the testimony is scientifically valid and
whether that reasoning or methodology properly can be applied to the facts in
issue. Id. Some of the factors that may be used in such an inquiry include:
1) whether the theory or technique can be tested, 2) whether it has been subjected
to peer review and publication, 3) whether the potential rate of error is known, and
4) its general acceptance. Daubert, 509 U.S. at 593-94; Hardyman v. Norfolk &
W. Ry. Co., 243 F.3d 255, 260 (6th Cir. 2001). "This inquiry is a flexible one,
with an overarching goal of assessing the 'scientific validity and thus the
evidentiary relevance and reliability' of the principles and methodology underlying
the proposed expert testimony." United States v. Langan, 263 F.3d 613, 621 (6th
Cir. 2001) (citation omitted). "[A] trial judge must have considerable leeway in
deciding in a particular case how to go about determining whether particular expert
testimony is reliable." Kumho Tire Co., 526 U.S. at 152. Of course, "nothing in
either Daubert or the Federal Rules of Evidence requires a district court to admit

---

[6]Herein, the Plaintiffs do not argue that the allegedly improper opinion evidence
would not "assist the trier of fact to understand the evidence or to determine a
fact in issue." Such an argument would have been fruitless, given that the opinion
testimony in question, if otherwise admissible, will unquestionably so assist the
trier of fact.

- 5 -

opinion evidence that is connected to existing data only by the ipse dixit of the

expert." General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997). The proponent

of expert opinion evidence has the burden of demonstrating by the preponderance

of the proof that the evidence complies with Rule 702 and Daubert. Daubert, 509

U.S. at 592 n. 10; Nelson v. Tennessee Gas Pipeline Co., 243 F.3d 244, 250 (6th

Cir.), cert. denied, 534 U.S. 822 (2001). Of course, in addition to the meeting the

criteria of Daubert, testimony from a particular expert witness is admissible under

Rule 702, only if that witness is qualified by knowledge, skill, experience, training,

or education. See e.g., Morales v. American Honda Motor Co., Ltd., 151 F.3d

500, 514-16 (6th Cir. 1998).

Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is
> substantially outweighed by the danger of unfair prejudice, confusion of the
> issues, or misleading the jury, or by considerations of undue delay, waste of
> time, or needless presentation of cumulative evidence.

As the language of Rule 403 suggests, a court must balance the probative value of

and need for the evidence against the harm that is likely to flow from its

admission. Williams v. The Nashville Network, 132 F.3d 1123, 1129 (6th Cir.

1997); Cooley v. Carmike Cinemas, Inc., 25 F.3d 1325, 1330 (6th Cir. 1994). The

Supreme Court has noted that unfair prejudice "means an undue tendency to

suggest decision on an improper basis, commonly, though not necessarily, an

emotional one." Old Chief v. United States, 519 U.S. 172, 180 (1997) (internal

quotation marks and citation omitted). See also, United States v. Bonds, 12 F.3d

540, 567 (6th Cir. 1993) ("Unfair prejudice does not mean the damage to a

[party's] case that results from the legitimate probative force of the evidence;

- 6 -

rather, it refers to evidence which tends to suggest [a] decision on an improper

basis"). In the context of expert testimony, the Supreme Court has noted:

> Expert evidence can be both powerful and quite misleading because of the
> difficulty in evaluating it. Because of this risk, the judge in weighing the
> possible prejudice against probative force under Rule 403 of the present
> rules exercises more control over experts than lay witnesses.

Daubert, 509 U.S. at 595 (quotation marks and citation omitted). Although a

District Court's decision to admit or to exclude evidence under Rule 403 is

reviewed for abuse of discretion, the Sixth Circuit has indicated that a District

Court abuses its discretion when its decision under Rule 403 is so restrictive that it

prevents a party from presenting his case to the jury. Doe v. Claiborne County,

Tennessee, 103 F.3d 495, 515 (6th Cir. 1996).[7]


## B. Auxier and Anspaugh

Auxier and Anspaugh will, if permitted, give opinions concerning the dose of

radiation to which the Plaintiffs have been subjected as a result of the Defendants'

operation of the Plant. The Plaintiffs argued that the Court should exclude

testimony from these two expert witnesses, because they did not follow generally

accepted principles when reconstructing that dosage. In particular, the Plaintiffs

relied upon a study by the National Academy of Sciences ("NAS"),[8] arguing that

---

[7]In Doe, the Sixth Circuit held that the District Court had abused its discretion by
excluding all of the plaintiff's evidence concerning notice to the defendant that the
plaintiff had been the victim of sexual harassment.

[8]The Plaintiffs also cited a study conducted by the Office of Technology
Assessment of the United States Congress ("OTA"). The OTA studied past
environmental practices at some federal nuclear facilities. The Plant in question,
however, was not one of the facilities that was examined during the OTA study.
The report generated from that study was critical of those practices and of the

- 7 -

this study flowed from the consensus that the DOE and its contractors, operating

nuclear weapons facilities such as the Plant, had historically failed to provide

adequate and reliable information concerning the release of radiation from those

facilities. In addition, Plaintiffs contended that the study by the NAS had resulted

in a consensus view of how dosage should be reconstructed. According to the

Plaintiffs, the failure of Auxier and Anspaugh to follow that consensus serves as

the basis for excluding their opinions concerning the dose to which the Plaintiffs

have been exposed. The Plaintiffs asserted that Auxier and Anspaugh relied too

heavily upon summaries of data, rather than the basic data itself, such as records

made by workers involved in operations and quality control data.

The Court could not agree. The report generated by the NAS study

disclaimed that it represented a consensus. Moreover, the requirements cited by

the Plaintiffs (even if those requirements were to be generally applicable, because

they represent a consensus which Auxier and Anspaugh failed to follow) apply only

when an individual is engaging in a full-fledged dose reconstruction. Such a dose

reconstruction would need to follow the type of preliminary studies conducted by

Auxier and Anspaugh, only if there is evidence that the dose was in excess of

---

failure of the DOE and its contractors to provide adequate notification of releases
of radiation. In addition, that report stated that the DOE was not able to specify
the extent of previous releases of radioactivity and other hazardous chemicals from
its plants. Based upon these statements in the OTA report, the Plaintiffs argue
that Auxier and Anspaugh cannot give opinions on dosage, since they placed
primary reliance upon DOE summaries of releases of radioactivity from the Plant.
This Court did not agree. The OTA report did not create any type of mandatory
guidelines that must be followed in order to reconstruct dosage. Moreover, the
OTA report disclaimed that the conclusions contained therein applied to any of the
facilities which were not studied. Thus, this Court could not conclude that the
OTA report served as the basis for excluding testimony from Auxier and Anspaugh.

- 8 -

7,000 millirems. Since Auxier and Anspaugh found that the doses did not exceed

that threshold level, they did not conduct a full-fledged dose reconstruction, and,

thus, were not obligated to apply the asserted requirements developed during the

NAS study. Accordingly, the Court overruled the Plaintiffs' Motion to Exclude

Testimony of Defendants' Expert Witnesses (Doc. #207), as it related to testimony

from Auxier and Anspaugh.[9]

## C. Guzelian

Among the other types of relief, the Plaintiffs request medical monitoring for

the early detection and amelioration of diseases caused by emissions from the

Plant. If permitted, Guzelian, a physician and toxicologist, would testify that

medical monitoring is not necessary. In support of their request that the Court

exclude testimony from that expert witness, the Plaintiffs relied on three grounds,

which the Court discusses in the order presented.

Initially, Plaintiffs sought to exclude that testimony, arguing that Guzelian "is

not qualified to offer an opinion on the subject of what medical monitoring would

be appropriate for a group of individuals at a higher than average risk of a disease

due to hazardous exposures." Doc. #207 at 15. According to the Plaintiffs, only a

physician with expertise in the sub-specialty of preventive medicine known as

occupational and environmental medicine is qualified to render an opinion regarding

the need for medical monitoring. In support of that assertion, the Plaintiffs pointed

---

[9]The Plaintiffs also argued that Auxier and Anspaugh did not provide any detail of
the precise data upon which they relied, in order to form their opinions. This Court
could not agree, given that they testified as to what reports they had relied upon in
forming those opinions.

- 9 -

to the fact that their expert witnesses, who will testify concerning the necessity of medical monitoring, have expertise in that sub-speciality. In addition, Plaintiffs cited Guzelian's deposition testimony to the effect that he is neither certified nor has he attempted to become certified in occupational, environmental or in any other branch of preventive medicine and that he has never authored any articles on any subjects that remotely concern preventive medicine. While these asserted shortcomings may serve as the basis for convincing the jury to discount Guzelian's opinions, such testimony going to the weight of the evidence, this Court could not conclude that they render that expert witness unqualified to testify on the subject of medical monitoring. Dr. Guzelian testified that he has been involved in the field of medical monitoring for 10 to 15 years. Moreover, Guzelian helped establish and subsequently supervised the Environmental Medicine Clinic at the Medical College of Virginia, where individuals were medically evaluated for the treatment of adverse health conditions associated with exposure to toxic, environmental agents. Rule 702 of the Federal Rules of Evidence permits testimony from an individual who is "qualified as an expert by knowledge, skill, experience, training or education." The fact that Guzelian does not possess the credentials, which Plaintiffs asserted were a predicate to testifying as an expert concerning the need for medical monitoring, does not detract from the fact that he is a trained physician and toxicologist who has had at least ten years experience in the field of medical monitoring. Therefore, the Court rejected the Plaintiffs' assertion that it should exclude the testimony of Guzelian, because he lacks the requisite qualifications. Plaintiffs' arguments go to the weight to be given the witness's testimony, not its admissibility.

- 10 -

Alternatively, Plaintiffs argued that Guzelian's testimony should be excluded,

because his opinions are not based upon methods and principles of the relevant

scientific discipline. According to the Plaintiffs, Guzelian himself demonstrated that

his opinions lack such a basis, by testifying during his deposition that he was not

even aware of the medical literature relevant to medical monitoring. The Court did

not agree with that assertion. For instance, Guzelian testified that he was familiar

with most of the major authorities that have written about or discussed medical

monitoring. If Guzelian is unfamiliar with a leading authority in the area of medical

monitoring (the Plaintiffs did not identify what that authority might be), that fact

can be brought out to the jury and might convince that body to discount his

testimony. The Plaintiffs failed to cite a single decision in which a court excluded

testimony from an expert witness merely because he was not familiar with all of

the authorities in the particular discipline that was the subject of his testimony. In

addition, the Court rejected the other contentions raised by the Plaintiffs in this

regard, such as the assertion that Guzelian had unduly relied upon a publication

entitled Guide to Clinical Preventive Services, An Assessment of the Effectiveness

of 169 Interventions ("Guide").[10] Although Guzelian testified that he had found the

Guide to be useful, he did not testify that his opinions were based solely or even

primarily upon that publication. Similarly, Plaintiffs' assertion that Guzelian was

not familiar with the recommendations of the American Cancer Society was

unavailing. On the contrary, he testified that he was familiar with same. He was

merely unable to remember peer reviewed articles that discussed the rationale

behind those recommendations, nor could he identify by name a peer reviewed

---

[10]The Plaintiffs took the position that the Guide is not applicable in this case.

- 11 -

article on them. Finally, the fact that Guzelian had not reviewed the medical monitoring program for workers at the Plant does not disqualify him as an expert witness. The Plaintiffs bring this litigation on behalf of those who reside in the vicinity of the Plant, rather than those who have been employed there. Therefore, the Court rejected the Plaintiffs' assertion that it should exclude the testimony of Guzelian, because his opinions are not based upon methods and principles of the relevant scientific discipline.

Finally, the Plaintiffs requested that the Court exclude Guzelian's testimony, because he has attempted to rationalize his lack of qualifications and knowledge by referring to the pseudo science of decision analysis. The Plaintiffs asserted that decision analysis is a "non-existent medical specialty." Doc. #207 at 20. Guzelian's testimony concerning decision analysis occurred in the context of his discussion of the factors that one must apply to determine whether medical monitoring is warranted. Among other factors, Guzelian explained that one must consider whether there is an effective test for a particular disease and whether the disease is expected to be prevalent in the population being tested, so as to avoid producing a large number of false positive results. In analyzing the effectiveness of a test, one will want to know both what percent of the people who have the disease will test positive (the sensitivity of the test) and what percent of those who test positive will actually have the disease (the positive predictive value of the test). Guzelian explained that, when the positive predictive value of a test is low (and, thus, the risk of false positives is high), the prevalence of the disease in the population should be high, since that will diminish the probability that the test _ result for a particular person will be a false positive. If the prevalence of the

disease is low, there will be an increased risk that a positive result for any
particular person will false. According to Guzelian, decision analysis is a form of
risk-benefit test, in which the practitioner considered what could happen after the
patient got the results from a test, before deciding to recommend that the test be
administered. For example, hypothetically, given the effectiveness of the test and
prevalence of the disease in the tested population, do the risks of false positive
results, with the possibility that such results could cause a patient to undergo
needless and perhaps life-threatening procedures, outweigh the benefits of early
detection of a disease in some individuals.[11] As an example of how this type of
analysis has been employed, he cited a paper on decision analysis that had been
published in the Annals of Internal Medicine, wherein the usefulness of a test for a
form of ovarian cancer was disputed, even though the test was 90% effective.
The authors of that report questioned the propriety of employing that test, because
the incidence of the cancer was so rare that using the test could cause an
unacceptable rate of false positives, with the concomitant need to perform
unnecessary and invasive procedures upon those who received false positive
results on the test. Quite simply, the use of a risk-benefit or decision analysis to
determine whether to employ a scheme of medical monitoring is hardly
revolutionary. Indeed, it would be surprising if a medical practitioner did not utilize
such an analytical framework to determine whether any medical procedure was

---

[11]Guzelian explained that this type of analysis was necessary in order for a medical
practitioner to advise his patients and to obtain informed consent from them,
concerning the question of whether to participate in a particular medical monitoring
plan. Risk-benefit analysis is hardly uncommon in the law. See e.g., United States
v. Carroll Towing Co., 159 F.2d 169 (2nd Cir. 1947) (employing risk-benefit
analysis to determine whether actor an was negligent).

- 13 -

warranted. Therefore, the Court rejected the Plaintiffs' contention that it should

exclude testimony from Guzelian, because he had utilized the allegedly pseudo

science of decision analysis.

Accordingly, the Court overruled Plaintiffs' Motion to Exclude Testimony of

Defendants' Expert Witnesses (Doc. #207), to the extent that, with that motion,.

Plaintiffs requested that the Court exclude testimony from Guzelian.

## D. Mettler

Mettler is a physician with expertise in the area of the hazards posed to

human health by exposure to radiation. The Plaintiffs conceded as much in their

motion. See Doc. #207 at 20. If permitted to testify, he would opine, inter alia,

that the doses of radiation to which the Plaintiffs have been exposed do not pose a

risk to human health. The Plaintiffs' concern was that Mettler would also give an

opinion as to what those doses were. They argued that Mettler was not qualified

to give such an opinion and that he had failed to follow the proper procedures in

calculating those doses. The Defendants did not argue that Mettler had followed

the proper procedures for reconstructing doses or that he had even attempted to

reconstruct same. Moreover, Mettler testified during his deposition that he had not

attempted to reconstruct the dosage of radiation. Although it is by no means clear

that Mettler will attempt to give an opinion on dosage (as opposed to relying upon

the opinions of Auxier and Anspaugh on that subject), the Court, in an abundance

of caution, sustained this branch of the Plaintiffs' Motion to Exclude Testimony of

Defendants' Expert Witnesses (Doc. #207). Accordingly, Mettler will not be

permitted to give an opinion, at trial, as to the dose of radiation to which the

Plaintiffs have been subjected. This ruling will not, however, prevent him from

giving an opinion as to the effect on the Plaintiffs' health from the doses of

radiation, as those doses are contained in the opinions of Auxier and Anspaugh or

one or more of the Defendants' other expert witnesses.[12]

Additionally, the Plaintiffs argued that the Court must exclude Mettler's

opinion to the effect that the Plaintiffs have experienced health problems that are

"representative" of the general population and that they are reasonably healthy.[13]

According to the Plaintiffs, Mettler's opinions concerning those matters constitute

nothing more than his personal opinions, rather than being based upon a scientific

or medical methodology. For instance, Plaintiffs asserted that "representative" is

not a medical term of art and that no expert could opine that the Plaintiffs have

experience "representative" health problems, unless he has conducted

epidemiological comparisons between the Plaintiffs and a control group.[14]  The

Court rejected the Plaintiffs' argument. Mettler is a trained physician, with

---

[12]The Plaintiffs also argued that it would be improper for Mettler to rely upon the
opinions of Auxier and Anspaugh, since testimony from those experts must be
excluded. For reasons set forth above, the Court declined to exclude testimony
from Auxier and Anspaugh; therefore, it rejected the Plaintiffs' contention that
Mettler could not present testimony that relied upon the opinions of those two
expert witnesses.

[13]Mettler excluded Theresa Boggs, who suffers from Hodgkin's disease, from that
opinion.

[14]Plaintiffs also asserted that Mettler was not competent to give an opinion that the
Plaintiffs are, in general, reasonably healthy, since he has not conducted medical
examinations of them. Although he has not conducted such examinations, he did
review their medical records. Therefore, the Court rejected the Plaintiffs' assertion
that Mettler's testimony concerning the "representative" nature of the Plaintiffs'
health problems should be excluded, because he failed to conduct examinations of
each Plaintiff.

- 15 -

expertise in the area of the effects on health from exposure to radiation. He has

reviewed the Plaintiffs' medical records and histories and, thus, gained knowledge

of the types of ailments from which they suffer. He has helped develop medical

screening programs for workers exposed to radiation, which required considering

what diseases generally affect individuals. In addition, he has studied epidemiology

and conducted research in that area. Therefore, the Court concluded that Mettler

had sufficient education, experience and training to have acquired knowledge

concerning the health problems the general population faces and, thus, to opine

that the Plaintiffs' health problems are representative of those experienced by

members of that population. Accordingly, the Court overruled the branch of

Plaintiffs' Motion to Exclude Testimony of Defendants' Expert Witnesses

(Doc. #207), with which they sought to preclude testimony from Mettler that the

Plaintiffs have experienced health problems that are "representative" of the general

population and that they are reasonably healthy.

Plaintiffs also challenged Mettler's opinion that the Plaintiffs are not

psychologically or behaviorally impaired as a result of exposure to radiation.[15] They

_____

[15]In addition, the Plaintiffs argued that Mettler should not be permitted to testify
that their concerns are not unusual and would be generally representative of the
population as a whole. The Plaintiffs contended that Mettler had not conducted
studies concerning the fears and concerns of individuals who do not live in the
vicinity of a nuclear weapons plant and who have not been exposed to radiation.
Given that the Defendants did not address that argument, the Court agreed with
the Plaintiffs. Simply stated, there is no evidence that Mettler has conducted any
type of public opinion survey to determine what concerns and fears the general
population experiences, nor is there evidence that Mettler has gained such
knowledge through his education, experience or training. Accordingly, the Court
concluded that Mettler would not be permitted to testify that the Plaintiffs'
concerns are not unusual and would be representative of the population as a
whole.

argued that he does not have the expertise to render such an opinion, since he is
not a trained psychologist or psychiatrist. Although the Defendants did not
challenge the assertion that Mettler lacks such training,[16] they argued that his
experience in designing a study of the psychological effects of the nuclear disaster
at Chernobyl gives him sufficient experience to render an opinion on any
psychological or behavioral impairment the Plaintiffs may have suffered as a result
of their exposure to radiation. The Court could not agree. Mettler testified that he
had designed that study regarding Chernobyl and described its results.[17] However,
he did not indicate that his participation in that study included the assessment of
whether any of the individuals, who were studied, had suffered a psychological or
behavioral impairment as a result of the events that occurred at that facility. On
the contrary, Mettler testified that psychologists had been involved in that study
and referred to what those psychologists had found from the data that had been
collected. See Mettler Dep. at 137. Thus, the Court concluded that Mettler's
experience with the Chernobyl study did not qualify him to give an opinion
concerning the psychological and behavioral impairments suffered by the Plaintiffs,

---

[16]Indeed, during his deposition, Plaintiffs' counsel questioned Mettler extensively
on his training and experience. Nothing in that deposition testimony or Mettler's
curriculum vitae indicates that he is a trained psychologist or psychiatrist.

[17]According to Mettler's deposition testimony, that study examined the effects of
the accident at the Chernobyl power plant on individuals living in its vicinity. In
particular, the intent of the study was to determine whether those individuals were
radiophobic, in other words whether they were acting irrationally because of their
concern about radiation. The study concluded that, rather than being radiophobic,
those individuals were acting rationally and their reactions were reasonable, given
the circumstances (such as the government failing to provide adequate information,
the media providing false information, being forced to leave homes and concerns
about their children).

- 17 -

as a result of their exposure to radiation. See Braun v. Lorilard, Inc., 84 F.3d 230, 235 (7th Cir. 1996) (noting that, since modern science is highly specialized, courts cannot assume that an expert in one field has expertise in others). In the absence of any other evidence or argument from the Defendants regarding Mettler's qualifications to give an opinion concerning the psychological or behavioral impairment suffered by the Plaintiffs as a result of their exposure to radiation, the Court sustained the branch of Plaintiffs' Motion to Exclude Testimony of Defendants' Expert Witnesses (Doc. #207), with which they sought to preclude testimony from Mettler regarding such impairment.

Finally, the Plaintiffs argued that the Court must prevent Mettler from giving an opinion concerning the need for medical monitoring. In his report, Mettler indicated that he was in general agreement with statements concerning medical monitoring that appeared in Fabrikant's deposition. According to the Plaintiffs, Mettler does not possess the necessary qualifications, permitting him to give an opinion concerning medical monitoring. The Defendants responded by pointing out that Mettler has published articles on medical monitoring and that he has designed medical screening tests for individual workers exposed to radiation and other hazardous substances. Given this experience, as well as Mettler's expertise in the area of the effects of exposure to radiation, the Court found that Mettler is qualified to give his opinion on the need, or lack thereof, to test the Plaintiffs in the future. Accordingly, the Court overruled the branch of Plaintiffs' Motion to Exclude Testimony of Defendants' Expert Witnesses (Doc. #207), with which they sought to preclude testimony from Mettler on medical monitoring.

In sum, the Court sustained in part and overruled in part, Plaintiffs' Motion to Exclude Testimony of Defendants' Expert Witnesses (Doc. #207), as that motion relates to Mettler. The Court sustained that motion as it relates to opinions from Mettler concerning the doses of radiation to which the Plaintiffs were exposed, the psychological of behavioral impairment they might have suffered as a result of that radiation and whether their concerns about such exposure are representative of the population as a whole. Otherwise, the Court overruled that motion as it relates to Mettler.

## E. Mink

Mink is a toxicologist, who, if permitted to testify, would opine that the fluorine compounds to which the Plaintiffs have been exposed do not constitute a hazard to their health. The Plaintiffs sought to exclude Mink's testimony, arguing that the bases of his opinions do not comport with accepted scientific methodologies and that his conclusions are inconsistent with the evidence in this litigation. In particular, the Plaintiffs focused upon Mink's proposed testimony concerning the quantity of fluorine compounds to which the Plaintiffs have been exposed. In part, Mink would base his testimony that the exposure to fluorine compounds does not constitute a health hazard, upon computations concerning the dispersal of fluorine compounds released from the Plant, which were generated after he input information into a model.[18] The Plaintiffs set forth a number of

---

[18]Based upon those computations, Mink concluded that the concentration of fluorine compounds in the soil surrounding the Plant was in excess of 100,000 times less than allowed by the EPA, and that the amount in the air was in excess of 800 times less than the amount permitted by that agency.

- 19 -

objections to the assumptions or information that went into the model and
generated the computations concerning such exposure, adopting, in essence, a
position of "garbage-in, garbage-out." For instance, they pointed to Mink's
statement that fluorine compounds were released from four stacks at the Plant and
that approximately 20 tons were released annually. According to the Plaintiffs,
that statement is contradicted by other evidence in the record, such as the
statements in a 1974 report by W.D. Netzer ("Netzer"), an employee at the Plant,
that there were several sources for the release of fluorine compounds and that 34
tons of Halogens, 98% of which were fluorides, were vented annually from the
Plant.[19] Plaintiffs also argued that, rather than conducting a scientific investigation
of the sources and amounts of fluorine compounds released, Mink merely relied
upon information supplied by Defendants' counsel, concerning the annual amount
of fluorine compounds released from the Plant and the emission rate, exit velocity
and exit temperature of those releases. In addition, the Plaintiffs asserted that
Mink's opinions are unreliable, because he relied upon meteorological data from
Huntington, West Virginia,[20] rather than from the local area, and because he limited
his analysis to the most recent 20 years of the Plant's operations, rather than
examining its entire 42 year history.[21] Plaintiffs also contended that Mink's model

---

[19]Mink has not met or spoken with Netzer, nor is there evidence that he reviewed
Netzer's report.

[20]Meteorological data is important in order to assess how the fluorine compounds
released into the air from the Plant may have dispersed.

[21]The Plaintiffs also complained about Mink's failure to concede that exposure to
fluorine compounds through inhalation or ingestion can cause cancer. For
instance, they pointed to deposition testimony where he discounted certain studies
which suggested such a link. To the extent that Plaintiffs sought to prevent Mink
from testifying that there is no evidence that such exposure can cause cancer, the

was unreliable, since he was forced to invent some unknown other source concerning the release of fluorine compounds in order to rationalize evidence concerning high concentration of fluorine compounds at a particular monitoring site located south of the Plant.

In response, the Defendants initially argued that the Plaintiffs had taken an overly narrow view of the basis for Mink's opinion, regarding the lack of adverse health effects from exposure to fluorine compounds. For instance, they pointed out that Mink had supported that opinion with a number of factors, including the amount of those substances that had been released. Indeed, Mink testified during his deposition that his opinion concerning the absence of such health risks was supported, inter alia, by the fact that the only health hazards, posed by chronic exposure to such substances, are spotted teeth and skeletal fluorosis, both of which are visible and unmistakable. Since neither of those conditions had been observed in the Plaintiffs, Mink was able to deduce that they had not been exposed

---

Court rejected said request. Mink supported his opinion in that regard with citations to studies by the Environmental Protection Agency and the National Research Council. Moreover, the fact that Mink discounted certain studies concerning an asserted link between exposure to fluorine compounds and cancer did not cause the Court to conclude that his testimony concerning the absence of evidence establishing such a link must be excluded. For instance, Mink testified that a study of cancer rates among workers exposed to fluorides was discounted, because the workers studied were also exposed to other known carcinogens and that, therefore, it could not be said that their cancers had been caused by fluorides.

In addition, the Plaintiffs argued that Mink's opinions must be excluded because he did not consider the combined effect of exposure to fluorine compounds and other hazardous chemicals, such as uranium, technetium and plutonium. Although the Plaintiffs' assertion that Mink failed to consider such a combined effect is unassailable, the Court could not conclude that said failure is fatal to his testimony. The Plaintiffs cited neither evidence nor law in support of the proposition that an expert witness may not testify on the impact to health that the exposure to one chemical can cause, without also considering the combined effect of exposure to other substances.

- 21 -

to hazardous levels of fluorine compounds. Defendants pointed out that this
aspect of Mink's proposed testimony is unrelated to the computations on exposure
that Mink had generated through his model. The Court agreed with Defendants
that, assuming arguendo that Mink were not permitted to testify concerning those
computations, he could base his opinion concerning the absence of adverse health
effects on the fact that the Plaintiffs show none of visible manifestations of such
effects.

The Defendants also argued that Mink could base his opinion on the lack of
adverse health effect on the computations generated through his model. In effect,
the Defendants asserted that the Plaintiffs' challenges to the assumptions or
information upon which Mink relied are nothing more than fodder for cross-
examination. In the main, the Court agreed with the Defendants. For instance,
Mink explained that he relied upon meteorological data from Huntington, West
Virginia, because that city had the closest National Weather Service facility to the
Plant, being approximately 40 miles away. Thus, the Court did not conclude that
reliance upon such meteorological data was the basis for excluding his opinion
concerning exposure. In addition, the matter of Mink's rationalization about the
highest concentrations of fluorine compounds being reported at a monitoring
station located south of the Plant is not the basis for excluding his testimony, since
that station was downwind. Mink explained that, just as it is a physical
impossibility for water to travel uphill, larger amounts of fluorine compounds could
not travel upwind than those that had traveled downwind. However, the Court
was concerned about the source of the information upon which Mink had relied.
Defendants' counsel supplied information to Mink concerning the annual amount of

- 22 -

fluorine compounds released from the Plant and the emission rate, exit velocity and
exit temperature of those releases, and Plaintiffs had challenged the accuracy of
some of that data.  Courts have held that testimony from an expert witness is not
helpful, under Rule 702, if it is based upon erroneous factual assumptions.
Lighting Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1175 (3rd Cir. 1993).  See also,
Macaluso v. Herman Miller, Inc., 2005 WL 563169, at *8 (S.D.N.Y. 2005)
(concluding that an expert's testimony must be excluded under Daubert "because it
is based on incorrect factual assumptions that render all of his subsequent
conclusions purely speculative").  However, as long as the factual assumptions are
based upon evidence in the record, the source of that information is not
determinative.  For instance, courts have indicated that an expert witness may
base his opinion on information supplied by counsel to the party that retained him,
as long as such information is supported by other evidence in the record.[22]  In re
TMI Litigation Cases Consolidated, 166 F.R.D. 8 (M.D.Pa. 1996) (expert could
testify that plaintiff's cancer was caused by exposure to radiation, even though he
obtained information concerning the amount of such exposure from plaintiff's
counsel, since the information so provided was substantiated by the record).
Herein, there is no evidence that the assumptions upon which Mink relied have
been substantiated.  Nevertheless, since the parties did not focus upon that issue,
the Court declined to enter an order, preventing Mink from testifying concerning

---

[22]Indeed, Rule 703 of the Federal Rules of Evidence allows an expert witness to
base his opinion upon information obtained outside of trial, if the information is the
type that is customarily relied upon by experts in the particular field.  Defendants
neither argued nor presented evidence that it is customary for toxicologists, such
as Mink, to base their opinions upon fanciful information, the genesis of which is
counsel's imagination.  Moreover, such testimony would hardly qualify as reliable
under Daubert, since basing an opinion on imaginary data is not good science.

the quantity of fluorine compounds to which the Plaintiffs have been exposed. However, Mink will not be permitted to give an opinion on that subject until the Defendants have presented evidence supporting the assumptions, which were provided to him by Defendants' counsel and upon which that opinion was, in part, based.

Accordingly, the Court overruled Plaintiffs' Motion to Exclude Testimony of Defendants' Expert Witnesses (Doc. #207), as that motion relates to Mink.

### F. Fabrikant

Fabrikant was a physician who used radiation to treat patients with diseases of the brain, including cancer. He served on a number of committees regarding the nuclear industry, including one concerning safety at nuclear facilities. Fabrikant died after he was deposed. The Plaintiffs argued that the fact of Fabrikant's death is a sufficient reason to exclude his previously recorded deposition testimony from the trial of this litigation, since they subsequently received additional information in discovery which they were not able to employ to cross-examine him. According to the Plaintiffs, Fabrikant's deposition, which consisted primarily of Defendants' counsel asking him questions on direct examination, was taken very early in this litigation, solely for purposes of a class certification hearing. Plaintiffs also asserted that the Defendants would not suffer prejudice if Fabrikant's deposition testimony were to be excluded, since they have named an alternative expert witness, Mettler, who will provide testimony on the same issues.[23] While it is certainly possible that the Plaintiffs have been denied an adequate opportunity to

---

[23]For some reason, the Defendants found it unnecessary to address that argument.

cross-examine Fabrikant, they did not supply evidence tending to establish that fact. Indeed, they did not specify what additional information they have discovered since Fabrikant's death, which would have permitted them to cross-examine and, therefore, to impeach Fabrikant more effectively. Accordingly, the Court rejected the Plaintiffs' argument that it should prevent the Defendants from reading Fabrikant's deposition, because of his death.

Plaintiffs also presented a number of challenges to the certain specific areas of testimony by Fabrikant. The Court considered each of the Plaintiffs' challenges, both singly and in combination, and could not conclude that they served as the basis for excluding the entirety of Fabrikant's deposition testimony. That said, however, the Court did not conclude that every statement contained therein will be admissible at trial. It must be remembered that this particular branch of the Plaintiffs' motion focuses upon one specific deposition, which the Defendants will presumably seek to read to the jury at trial, rather than general testimony from a particular expert witness. In other words, Fabrikant's direct testimony, unlike that of the other expert witnesses challenged by the Plaintiffs, is set in stone. Since the Court has decided not to strike the entirety of this witness's testimony, it concluded that it would not be an efficient use of time to comb through that deposition to determine whether particular portions of that deposition are admissible, well in advance of trial, without having received the parties' designations, without specific input from them as to whether particular testimony is admissible and, finally, without full knowledge and understanding of the context

of the evidence developed at trial.[24]  Rather, after the Defendants have designated

the portions of Fabrikant's deposition which they will want to read to the jury and

the Plaintiffs have indicated what portions of the designated testimony are

objectionable to them, the Court will rule upon the Plaintiffs' remaining

objections.[25]

Accordingly, the Court overruled Plaintiffs' Motion to Exclude Testimony of

Defendants' Expert Witnesses (Doc. #207), as that motion relates to Fabrikant.


II.  Defendants' Motion for Summary Judgment (Doc. #192)

As an initial matter, the Court will set forth the standards which govern all

motions for summary judgment.  Summary judgment must be entered "against a

party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden

of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Of course,

the moving party:

> always bears the initial responsibility of informing the district court of
> the basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions on
> file, together with the affidavits, if any," which it believes
> demonstrate the absence of a genuine issue of material fact.

---

[24]Indeed, the transcript of Fabrikant's deposition is replete with objections, which
the Court will need to address in any event.

[25]An example of the testimony which the Plaintiffs had argued was objectionable
will demonstrate the Court's reluctance to address their objections to specific
testimony at this time.  Plaintiffs asserted that Fabrikant was not qualified to give
an opinion concerning any psychological or behavioral impairment they may have
suffered as a result of the Defendants' activities at the Plant.  If this Court were to
agree with the Plaintiffs, the question of what portion of Fabrikant's deposition on
this topic to exclude would remain.

Id. at 323.  See also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991)

(The moving party has the "burden of showing that the pleadings, depositions,

answers to interrogatories, admissions and affidavits in the record, construed

favorably to the nonmoving party, do not raise a genuine issue of material fact for

trial.") (quoting Gutierrez v. Lynch, 826 F.2d 1534, 1536 (6th Cir. 1987)).  The

burden then shifts to the nonmoving party who "must set forth specific facts

showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).  Thus, "[o]nce the

moving party has met its initial burden, the nonmoving party must present

evidence that creates a genuine issue of material fact making it necessary to

resolve the difference at trial."  Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d

1241, 1245 (6th Cir. 1995).  Read together, Liberty Lobby and Celotex stand for

the proposition that a party may move for summary judgment by demonstrating

that the opposing party will not be able to produce sufficient evidence at trial to

withstand a directed verdict motion (now known as a motion for judgment as a

matter of law. Fed.R.Civ.P. 50).  Street v. J.C. Bradford & Co., 886 F.2d 1472,

1478 (6th Cir. 1989).

Once the burden of production has so shifted, the party opposing summary

judgment cannot rest on its pleadings or merely reassert its previous allegations.  It

is not sufficient to "simply show that there is some metaphysical doubt as to the

material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

586 (1986).  See also Michigan Protection and Advocacy Service, Inc. v. Babin, 18

F.3d 337, 341 (6th Cir. 1994) ("The plaintiff must present more than a scintilla of

evidence in support of his position; the evidence must be such that a jury could

- 27 -