# EXHIBIT 2

# PART 2 OF 2

reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. Celotex Corp., 477 U.S. at 324. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" Hancock v. Dodson, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. Anderson, 477 U.S. at 255 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, Federal Practice and Procedure, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." Interroyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990). See also L.S. Heath & Son, Inc. v. AT&T Information Systems, Inc., 9 F.3d 561 (7th Cir. 1993); Skotak v. Tenneco Resins, Inc., 953 F.2d 909, 915 n. 7 (5th Cir.), cert. denied, 506 U.S. 832 (1992)

("Rule 56 does not impose upon the district court a duty to sift through the record
in search of evidence to support a party's opposition to summary judgment ...."). 
Thus, a court is entitled to rely, in determining whether a genuine issue of material
fact exists on a particular issue, only upon those portions of the verified pleadings,
depositions, answers to interrogatories and admissions on file, together with any
affidavits submitted, specifically called to its attention by the parties.

In their Motion for Summary Judgment (Doc. #192), the Defendants raised
three basic arguments, to wit: 1) Plaintiffs' tort claims for harms attributable to
emissions from the Plant are preempted by federal law; 2) Plaintiffs have not
established that they have suffered any legally compensable injuries which are
attributable to the operations of the Plant; and 3) the Plaintiffs have not established
the essential elements of any of their claims. As a means of analysis, the Court
will address the parties' arguments concerning those three basic contentions in the
above order.

## A. Federal Preemption

As is stated above, the Plaintiffs bring this action as a "public liability action"
under the PAAA.[26] That phrase is defined by 42 U.S.C. § 2014(hh), which
provides:

The term "public liability action", as used in section 2210 of this title, means
any suit asserting public liability. A public liability action shall be deemed to
be an action arising under section 2210 of this title, and the substantive

---

[26]In Nieman v. NLO, Inc., 108 F.3d 1546, 1550 n. 4 (6th Cir. 1997), the Sixth
Circuit noted that Congress had indicated that the PAAA applied to nuclear
incidents occurring both before and after that statute had been enacted.

> rules for decision in such action shall be derived from the law of the State in
> which the nuclear incident involved occurs, unless such law is inconsistent
> with the provisions of such section.

The Defendants argued that the Plaintiffs' common law claims (i.e., their claims of

negligence, strict liability, nuisance and trespass) are preempted by federal law.  In

particular, the Defendants contended that the standard or duty of care, by which

each of the Plaintiffs' common law claims would be assessed, was supplied by

federal regulations, rather than by state law.  In support of that argument, the

Defendants relied upon a number of cases which have held that federal law does

have such a preemptive effect, given the pervasive federal regulation of the nuclear

industry.  In other words, to allow a state law standard to apply would be

inconsistent with federal law.  However, in their Amended Complaint (Doc. #4),

the Plaintiffs alleged that the Defendants have allowed both radioactive and non-

radioactive, hazardous substances to be released from the Plant.  There is simply

no authority supporting the proposition that a plaintiff's state law claim, which is

based upon the release of a hazardous substance that is not radioactive, is

preempted by federal law.  Accordingly, the Court overruled the Defendants'

Motion for Summary Judgment (Doc. #192), to the extent that, with that motion,

the Defendants sought summary judgment on the aspects Plaintiffs' common law

claims that were predicated upon the release of non-radioactive, hazardous

substances.  With respect to the release of radioactivity, however, the Court

agreed with the Defendants that federal law preempts state law and that federal

regulations supply the applicable standard of care.

In Nieman v. NLO, Inc., 108 F.3d 1546 (6th Cir. 1997), the Sixth Circuit

addressed the issue of preemption.  Therein, the plaintiff alleged that the

defendants, the operators of the Fernald nuclear weapons facility, had committed a

trespass upon his property by allowing uranium to be discharged from that facility

and to enter the aquifer. After examining the language of the PAAA and the

relevant decisions by the Supreme Court and other Circuits, the Sixth Circuit

concluded that said statute preempts state law claims, writing:

> Because the Price-Anderson Act, as amended in 1988, specifically
> dictates that state law applies only to the extent it is not inconsistent with
> federal law and because we agree with the analyses of preemption in
> [O'Conner v. Commonwealth Edison Co., 13 F.3d 1090 (7ᵗʰ Cir.), cert.
> denied, 512 U.S. 1222 (1995)] and [In re TMI Litigation Cases Consol. II,
> 940 F.2d 832 (3ʳᵈ Cir. 1991), cert. denied, 503 U.S. 906 (1992)], we hold
> that the Price-Anderson Act preempts Nieman's state law claims; the state
> law claims cannot stand as separate causes of action. Nieman can sue
> under the Price-Anderson Act, as amended, or not at all. His federal claim
> will be derived from state law, as mandated by § 2014(hh), to the extent it
> is not inconsistent with federal law.

Id. at 1553. Accord, Rainer v. Union Carbide Corp., 402 F.3d 608, 617 (6ᵗʰ Cir.

2005). Since the Nieman court had to decide whether the District Court had

properly dismissed the plaintiff's claims on the basis of the statute of limitations,

the Sixth Circuit was not called upon to decide whether state law standards of

care are inconsistent with federal law. That issue was, however, addressed by the

Seventh and Third Circuits in the cases upon which the Sixth Circuit relied in

Nieman. For instance, in O'Conner v. Commonwealth Edison Co., 13 F.3d 1090

(7ᵗʰ Cir.), cert. denied, 512 U.S. 1222 (1995), the Seventh Circuit held that federal

regulations supply "the sole measure of defendants' duty in a public liability action"

and that "the application of something other than federal safety regulations as a

standard of care is inconsistent with the Price-Anderson scheme and consequently

cannot be applied in a public liability action." Id. at 1105. The Seventh Circuit

reasoned that "state regulation of nuclear safety, through either legislation or

negligence actions, is preempted by federal law." Id. Other Circuits have reached
the same conclusion. In In re TMI Litigation Cases Consol. II, 940 F.2d 832, 859-
60 (3rd Cir. 1991), cert. denied, 503 U.S. 906 (1992), the Third Circuit noted that
federal standards are applicable, because "any state duty would infringe upon
pervasive federal regulation in the field of nuclear safety, and thus would conflict
with federal law." See also, Roberts v. Florida Power & Light Co., 146 F.3d 1305,
1306 (11th Cir. 1998) (holding that federal safety regulations conclusively establish
the duty of care owed in a public liability action), cert. denied, 522 U.S. 1139
(1999); Nieman, 108 F.3d at 1549 (noting that "Congress recognized that state
law would operate in the context of a complex federal scheme which would mold
and shape any cause of action grounded in state law") (internal quotation marks
and citation omitted). Therein, the Sixth Circuit also acknowledged that the
Seventh Circuit had held in O'Connor that federal standards were applicable. See
Id. at 1552 ("In O'Conner, the Seventh Circuit affirmed the district court's holding
that under the Price-Anderson Act, as amended, the applicable standard of care
would be determined by federal regulations and a different standard would be
preempted by federal law.") (internal quotation marks omitted). Some District
Courts have reached the opposite conclusion. See e.g., In re Hanford Nuclear
Reservation Litigation, 350 F. Supp.2d 871 (E.D.Wash. 2004). Nevertheless, this
Court decided to follow the decisions of the Third, Seventh and Eleventh Circuits,
given that they are well-reasoned and that Sixth Circuit has followed aspects of the
Third and Seventh Circuit decisions. Accordingly, the Court concluded that the

- 32 -

standard of care, by which the Defendants' liability with regard to releases of
radioactivity from the Plant would be assessed, is supplied by federal regulations.[27]

Thus, the question became what are those standards. In In re TMI , 67 F.3d
1103 (3rd Cir. 1995), cert. denied, 516 U.S. 1154 (1996),[28] the Third Circuit
defined those standards as the specific numeric exposure limitations set forth in
federal radiation regulations. The Plaintiffs herein asserted that, in addition to the
specific numerical limitations on the amount of radioactivity which can be released,
the relevant federal regulations impose other standards. In particular, the Plaintiffs
argued that the Defendants' behavior is governed by ALARA, which is an acronym
for "as low as reasonably achievable." Rather than contending that the evidence
failed to raise a genuine issue of material fact concerning the question of whether
they have violated ALARA, the Defendants argued that ALARA is not a standard of
care, the violation of which could subject them to liability. Accordingly, the Court
turned to the question of whether ALARA is such a standard of care, assuming for
present purposes that the Defendants did violate the ALARA concept (i.e., the
releases of radioactivity by the Defendants were not as low as reasonably
achievable).[29]

_____

[27]In O'Connor, the Seventh Circuit began its analysis by considering whether
Illinois law would apply federal regulations as the standard of care. Since this
Court agreed with the decisions cited above that federal law supplies the standard
or duty of care, regardless of whether Ohio law would incorporate those standards,
it declined to analyze Ohio law. Accord, Roberts, 146 F.3d at 1308 n. 6.

[28]That decision was entered in the same litigation as In re TMI Litigation Cases
Consol. II, 940 F.2d 832 (3rd Cir. 1991), cert. denied, 503 U.S. 906 (1992).

[29]The ALARA principle was originally known as ALAP, an acronym for "as low as
practicable." As is explained above, this Court must decide whether the
Defendants could be liable if they violated ALARA and not whether there is a
genuine issue of material fact as to whether such a violation occurred. Therefore,

- 33 -

The regulations of the Nuclear Regulatory Commission ("NRC") which

provide standards for protection against radiation are contained in Part 20 of Title

10 of the Code of Federal Regulations.[30] As the Plaintiffs contended, ALARA has

long been part of the NRC's standards for protection against radiation, as they

were for its predecessor, the Atomic Energy Commission ("AEC"). Until January 1,

1993, the NRC's regulations relating to ALARA provided:

> In accordance with recommendations of the Federal Radiation Council,
> approved by the President, persons engaged in activities under licenses
> issued by the Nuclear Regulatory Commission pursuant to the Atomic Energy
> Act of 1954, as amended, and the Energy Reorganization Act of 1974
> should, in addition to complying with the requirements set forth in this part,
> make every reasonable effort to maintain radiation exposures, and releases
> of radioactive materials in effluents to unrestricted areas, as low as is
> reasonably achievable. The term "as low as is reasonably achievable"
> means as low as is reasonably achievable taking into account the state of
> technology, and the economics of improvements in relation to benefits to the
> public health and safety, and other societal and socioeconomic
> considerations, and in relation to the utilization of atomic energy in the public
> interest.

10 C.F.R. § 20.1(c) (1992).[31]  In two cases, in which the plaintiffs sought to

---

for present purposes, the Court will treat ALARA and ALAP as being
indistinguishable.

[30]Part 20 governs activity by entities which are licensed by the NRC to possess,
use, transfer or dispose of radioactive material. See 10 C.F.R. § 20.1002. The
Defendants are contractors for the DOE rather than licensees of the NRC.
However, the regulations contained in Part 20 were made applicable to such
contractors by virtue of Executive Order 12088 (1978). See 43 F.R. 47707
(1978). See also, Executive Order 11752 (1973), 38 F.R. 34793 (1973).

[31]In 1991, the NRC revised Part 20 of Title 10 of the Code of Federal Regulations,
which sets the standards for protection against radiation. See 56 F.R. 23360-
23474 (1991). Operators were required to comply with the revised regulations no
later than January 1, 1993. Id. at 23395. The revised regulations, unlike
§ 20.1(c), use the mandatory language. See 20 C.F.R. § 20.1101(b) ("The
licensee shall use, to the extent practicable, procedures and engineering controls

recover damages from the operators of the Fernald nuclear weapons facility on the basis of the release of radioactivity, Judge Spiegel concluded that the defendant's violation of ALARA would prevent them from successfully raising the government contractor defense.[32]  See Crawford v. National Lead Company, 784 F. Supp. 438 (S.D.Ohio 1989); In re Fernald Litigation, 1989 WL 267040 (S.D.Ohio 1989). In those decisions, Judge Spiegel did not, however, address the precise question before this Court, to wit: whether ALARA is a standard of care, the violation of which could subject the operator of a nuclear weapons facility to liability. In In re TMI, 67 F.3d 1103 (3rd Cir. 1995), cert. denied, 516 U.S. 1154 (1996), the Third Circuit addressed the question before this Court. The plaintiffs in that litigation sought to recover damages for harm they alleged that they had suffered as a result of the release of radioactivity from the Three Mile Island nuclear power plant in 1979. In ruling on motions for summary judgment, the District Court had concluded that ALARA was a standard of care, the violation of which could be a

---

based upon sound radiation protection principles to achieve occupational doses and doses to members of the public that are as low as is reasonably achievable (ALARA)."). In its commentary to the revised regulations, the NRC expressly stated that ALARA was a mandatory requirement. See 56 F.R. 23367 (1991) ("The final rule (§ 1101(b)) establishes a requirement for all licensees to have a radiation protection program that includes provisions for keeping radiation doses ALARA."). Since the Plaintiff filed this litigation in 1990, this Court did not apply the current version of the NRC's regulations regarding ALARA. See In re TMI, 67 F.3d 1103 (3rd Cir. 1995) (applying version of regulations which was in effect in 1979 in lawsuit arising out of release of radioactivity from Three Mile Island which occurred in 1979), cert. denied, 516 U.S. 1154 (1996). Moreover, there is no indication that the NRC intended that § 20.1101(b) should be applied retroactively. Landgraf v. USI Film Products, 511 U.S. 244 (1994) (statute should not be applied retroactively, unless Congress expresses such an intention); Rivers v. Roadway Exp., Inc., 511 U.S. 298 (1994) (same).

[32]The United States Supreme Court recognized the government contractor defense in Boyle v. United Technologies Corp., 487 U.S. 500 (1988).

- 35 -

basis for imposing liability upon the defendants. In Re TMI Litigation Cases

Consolidated II, 904 F. Supp. 379 (M.D.Pa. 1994), reversed in part and affirmed in

part, 67 F.3d 1103 (3rd Cir. 1995), cert. denied, 516 U.S. 1154 (1996). In other

words, the District Court concluded that, even if the release of radiation by the

defendants did not exceed the specific numerical limitations for same in the

relevant regulations, they could nevertheless be found liable if they violated

ALARA. Upon appeal,[33] the Third Circuit reversed in relevant part, concluding that

the specific numerical standards in the relevant regulations, not ALARA, supplied

the applicable standard of care. Accord, Bohrmann v. Maine Yankee Atomic Power

Co., 926 F. Supp. 211 (D.Maine 1996).[34] To reach that conclusion, the Third

Circuit relied, in part, on the fact that the adoption of ALARA as a standard of care

would result in the imposition of essentially a negligence standard. 67 F.3d at

1115. The Third Circuit then identified the reasons for rejecting ALARA as a

standard of care:

> Adopting ALARA as part of the standard of care would put juries in charge
> of deciding the permissible levels of radiation exposure and, more generally,
> the adequacy of safety procedures at nuclear plants--issues that have
> explicitly been reserved to the federal government in general and the NRC
> specifically. See Pacific Gas & Elec. [v. Energy Resources Comm'n, 461
> U.S. 190, 212 (1983)] ("[T]he Federal Government maintains complete
> control of the safety and 'nuclear' aspects of energy generation....").

___

[33]The District Court had certified its decision for an interlocutory appeal under 28
U.S.C. § 1292.

[34]In McCafferty v. Centerior Service Co., 983 F. Supp. 715 (N.D.Ohio 1997), the
court held that ALARA would be applied in a personal injury action filed by a
worker at the Davis-Besse Nuclear Power Station. Therein, the plaintiffs alleged
that they had been injured in October, 1994; therefore, the District Court applied
the ALARA principles contained in 10 C.F.R. § 20.1101(b), which were in effect
when the incident occurred. Herein, in contrast, § 20.1101(b) was not in effect at
the time the actions upon which Plaintiffs base their claims took place.

> Adoption of a standard as vague as ALARA would give no real guidance to operators and would allow juries to fix the standard case by case and plant by plant. An operator acting in the utmost good faith and diligence could still find itself liable for failing to meet such an elusive and undeterminable standard. Our holding protects the public and provides owners and operators of nuclear power plants with a definitive standard by which their conduct will be measured.

67 F.3d at 1115-16 (footnotes omitted). This Court concurs with the Third Circuit. ALARA is in essence a negligence standard which would allow juries to become the final arbiters of how much radiation can be released without violating federal law. Such a result would violate the Supreme Court's admonition that "the Federal Government maintains complete control of the safety and nuclear aspects" of nuclear energy. Pacific Gas & Elec. v. Energy Resources Comm'n, 461 U.S. 190, 212 (1983).

Accordingly, the Court concluded that ALARA is not part of the standard of care with which the Defendants were obligated to comply. The remaining question was, therefore, whether the evidence raised a genuine issue of material fact concerning a violation of the specific numerical limitations contained in the federal regulations, to which the Defendants were subject. The Defendants argued that they had not violated those regulations for any year of the Plant's existence. In support of that contention, the Defendants submitted a table, setting forth the applicable regulations and evidence which they asserted demonstrated that those regulations had not been violated.

In response, the Plaintiffs argued that the Defendants' evidence concerning the amount of emissions of radioactivity from the Plant was suspect, since the monitoring program at the Plant was inadequate. In support of that assertion, the Plaintiffs submitted evidence, including reports from their expert witnesses and

internal documents generated by the DOE, concerning the release of radioactivity
and other hazardous substances from the Plant. For instance, the reports of the
Plaintiffs' experts cited numerous documents generated by employees of the Plant
and the DOE, which indicate inaccuracies and inadequacies in the monitoring
program at the facility.[35] In essence, the Plaintiffs raised a credibility challenge to
the Defendants' evidence. It is axiomatic that a court cannot resolve credibility
disputes, while ruling upon a motion for summary judgment. At trial, if the jury
were to believe the Plaintiffs' evidence concerning the problems with the
monitoring program at the Plant, it would be entitled to discount the Defendants'
evidence concerning the doses of radiation to which the Plaintiffs have been
exposed. Therefore, the Court was unable to conclude that the evidence which
the Defendants had supplied established, as a matter of law, that they were in
compliance with the relevant federal regulations concerning the discharge of
radiation.

That said, however, it must be remembered that the Plaintiffs, not the
Defendants, will have the burden of persuasion concerning this issue at trial.
Under Celotex, supra, a party is entitled to summary judgment, if the party having
the burden of persuasion on a particular issue has no evidence to support that
issue. If the Plaintiffs do not have sufficient evidence to raise a genuine issue of
material fact concerning this issue, there is no reason to go to trial, even if the
Plaintiffs could convince the jury that the Defendants' evidence in this regard is not

---

[35]Two examples can be cited. The number of off-site monitoring stations was
deemed to be inadequate. The mechanisms which were employed to monitor the
release of radioactivity from the vents at the Plant were incapable of accurately
measuring same under all conditions.

- 38 -

worthy of credence. The Defendants made such an argument, in response to
which Plaintiffs attached reports from their expert witnesses, concerning the
release of radioactivity from the Plant, to their Memorandum in Opposition to
Defendants' Motion for Summary Judgment (Doc. #208).

With regard to the release of radionuclides into the air, Bernd Franke
("Franke") and Arjun Makhijani ("Makhijani"), two of Plaintiffs' expert witnesses,
state in their report dated April 30, 1996, that, while the official estimates of the
amount of radioactivity are understated, it is not possible to estimate the dosage of
radiation to which the Plaintiffs have been exposed.[36] Simply stated, accepting as
true everything contained in that report, the Court was compelled to conclude that
it is not sufficient to raise a genuine issue of material fact regarding the question of
whether the Defendants violated any of the relevant federal regulations concerning
the release of radioactivity from the Plant. The federal regulations establish
specific numerical limitations on dosage. For instance, from 1958 through 1984,
the limitation was 300 millirems per year. Since then, the limitation has been 100
millirems per year. Allowing the jury to find that the Defendants' violated those
regulations, on the basis of the opinion of Franke and Makhijani to the effect that
the Defendants' estimate of dosage is understated, would result in the entry of a
judgment against the Defendant on the basis of speculation, rather than upon
evidence. Accordingly, the Court concludes that the Plaintiffs have failed to meet
their burden of demonstrating that the evidence raises a genuine issue of material

---

[36]In their 1992 report, Franke and Makhijani had come to certain conclusions
concerning the dosage of radiation to which Plaintiffs have been subjected, on the
basis of their analysis of materials accounting data, i.e., an analysis of the
accounting for the radioactive materials used at the Plant. In their 1996 report,
they concluded that it was not possible to reconstruct dosage from such data.

fact concerning the question of whether the Defendants have released radioactivity into the air from the Plant, in an amount that exceeds the pertinent federal regulations.

With regard to the discharge of radioactivity into the water supply, the Plaintiffs also attached a report from Linda Lehman ("Lehman"), their expert witness in the field of hydrology, who had examined the question of water pollution caused by radioactivity released from the Plant. In that report, Lehman cites a number of incidents in which the Defendants permitted non-radioactive, hazardous chemicals to be released. However, she provided very little information concerning the release of radioactivity. Under regulations adopted by the Environmental Protection Agency, pursuant to the Clean Water Act, nuclear facilities are prohibited from discharging radioactive materials into the water that will result in a dosage of more than 4 millirem of radiation per year. See 40 C.F.R. § 141.66(d).[37] Lehman did not state in her report that the Defendants had violated that regulation. However, she did reference 40 C.F.R. § 141.26(b), by indicating that tests conducted in 1980, on the well at the Wakefield rest area and one belonging to Jack Dunham, demonstrated a violation of the 50 pico-Curies per liter limitation contained within such section. That evidence, accepted as true, was not sufficient to raise a genuine issue of material fact concerning a violation of federal standards. Section 141.26(b) applies to community water systems. Such a water system is defined as "a public water system which serves at least 15 service connections used by year round-residents or regularly serves at least 25 year-round

---

[37]The regulation of radionuclides in water was formerly contained in 40 C.F.R. § 141.16. See National Resources Defense Council, Inc. v. U.S. E.P.A., 824 F.2d 1258, 1268 (1st Cir. 1987).

residents." 41 C.F.R. § 141.2. There was neither evidence nor argument that either of the two wells served the requisite number of service connections or year-round residents. Accordingly, the Court concluded that the Plaintiffs' evidence concerning water pollution was insufficient to raise a genuine issue of material fact concerning a violation of federal water pollution regulations by the discharge of radioactivity from the Plant.

Accordingly, the Court concluded that the Defendants were entitled to summary judgment on the Plaintiffs' state law claims, to the extent that said claims were predicated upon the release of radioactivity from the Plant.

## B. Absence of compensable harm

The Defendants argued that there is no evidence that the Plaintiffs have suffered any compensable harm that is attributable to their (Defendants') operations at the Plant. Although the Defendants focused upon four types of harm for which the Plaintiffs seek compensation (emotional distress, medical monitoring, diminution of property values and response costs under CERCLA), the Court found it necessary to address only the Plaintiffs' request for response costs under CERCLA.[38]

---

[38]The Court found it unnecessary to address the Defendants' request for summary judgment on the harm of emotional distress, since the Defendants had predicated that request upon the Plaintiffs' exposure to radioactive emission from the Plant, given that the Court has concluded that the Defendants are entitled to summary judgment on Plaintiffs' claims predicated upon exposure to radioactive emissions. In addition, based upon the following reasoning, the Court concluded that medical monitoring is not a viable remedy in an action for response costs under CERCLA. Since Plaintiffs had requested such a remedy only for their claims predicated upon the release of radioactivity and CERCLA, the Court found it unnecessary to address otherwise the Defendants' request for summary judgment on that remedy.

- 41 -

Whether the Defendants can be held liable for response costs under CERCLA

is not governed by the federal regulations concerning the release of radioactivity;

rather, that statute imposes strict liability. Indeed, § 107(a) of CERCLA, 42 U.S.C.

§ 9607(a), provides, inter alia, that a person who disposes of hazardous waste

"shall be liable for– ... (B) any other necessary costs of response incurred by any

other person consistent with the national contingency plan ...." The Defendants

argued that they are entitled to summary judgment on the Plaintiffs' claim under

CERCLA, because there is no evidence that the Plaintiffs have incurred such

response costs. The Court begins with a discussion of the types of actions taken,

suffered or incurred by an aggrieved party that qualify as such.

Although the term "response costs" is not defined by CERCLA, the words

"respond" and "response" are defined as "remove, removal, remedy, and remedial

action." 42 U.S.C. § 9601(25). Those terms are defined by the preceding

subsections:

(23) The terms "remove" or "removal" means (sic) the cleanup or removal
of released hazardous substances from the environment, such actions as
may be necessary[,] taken in the event of the threat of release of hazardous
substances into the environment, such actions as may be necessary to
monitor, assess, and evaluate the release or threat of release of hazardous
substances, the disposal of removed material, or the taking of such other
actions as may be necessary to prevent, minimize, or mitigate damage to the
public health or welfare or to the environment, which may otherwise result
from a release or threat of release. The term includes, in addition, without
being limited to, security fencing or other measures to limit access, provision
of alternative water supplies, temporary evacuation and housing of
threatened individuals not otherwise provided for, action taken under section

---

Defendants also sought summary judgment on the Plaintiffs' request for
compensatory damages for diminution of property values. For reasons set forth
below, the Court concluded that the Plaintiffs could not recover such damages on
their nuisance claim.

- 42 -

9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act.

(24) The terms "remedy" or "remedial action" means (sic) those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

42 U.S.C. § 9601(23) and (24).

In their Amended Complaint, the Plaintiffs allege that they have incurred and will incur "necessary response costs" and seek to hold the Defendants liable for those costs. Doc. #4 at ¶ 66 and ¶ 68. The Plaintiffs do not otherwise specify what those costs might be.[39] However, courts have consistently interpreted

---

[39]Courts, including the Sixth Circuit, have held that a plaintiff seeking to recover response costs under CERCLA must allege in his complaint the type of costs that he has incurred. McGregor v. Industrial Excess Landfill, Inc., 856 F.2d 39 (6th Cir. 1988); Ascon Properties, Inc. v. Mobil Oil Co., 866 F.2d 1149 (9th Cir. 1989) (noting that, given the extensive litigation over what may be recovered as response

§ 9601(23-25), as preventing a plaintiff from recovering, as response costs under CERCLA, two of the primary types of relief the Plaintiffs seek in this litigation, to wit: expenses for medical monitoring and damages for the diminution of property values. See e.g., Durfey v. E.I. Dupont De Nemours Co., 59 F.3d 121, 125 (9th Cir. 1995) (expenses for medical monitoring not response costs); Redland Soccer Club v. Department of Army, 55 F.3d 827, 848-50 (3rd Cir. 1995) (same), cert. denied, 516 U.S. 1071 (1996); Daigle v. Shell Oil Co., 972 F.2d 1527, 1532-37 (10th Cir. 1992) (same); Struhan v. City of Cleveland, 7 F. Supp.2d 948, 952-53 (N.D.Ohio 1998) (same); One Wheeler Road Associates v. Foxboro Co., 843 F. Supp. 792, 795 (D.Mass. 1994) (damages for diminution of property values cannot be recovered as response costs under CERCLA); Piccolini v. Simon's Wrecking, 686 F. Supp. 1063, 1068 (M.D.Pa. 1988) (same). Thus, to the extent that the Plaintiffs sought to recover expenses for medical monitoring or damages for diminution of property values under CERCLA, the Court concluded that the Defendants were entitled to summary judgment.

---

costs, it makes sense to require a plaintiff to allege at least one type of response cost that is cognizable under CERCLA). Relying upon those cases, the Defendants argued that the Court should dismiss the Plaintiffs' claim under CERCLA, since the Plaintiffs have failed to specify the response costs they have incurred. The Court declined that request. This case came before the Court on the Defendants' Motion for Summary Judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, rather than a motion to dismiss under Rule 12(b)(6) of those Rules. Since the Defendants also argued that the evidence fails to raise a genuine issue of material fact as to whether the Plaintiffs incurred response costs, the Court preferred to address only that question. Moreover, even if the Court had treated this branch of the Defendants' motion as one to dismiss for failure to state a claim, it would have afforded the Plaintiffs the opportunity of filing a further amended complaint. If there were evidence that the Plaintiffs did indeed incur response costs, it is inconceivable that they would have had difficulty curing the asserted pleading deficiency.

- 44 -

With respect to any other expenses that one or more of the Plaintiffs may have incurred, the Defendants argue that the deposition testimony of the named Plaintiffs establishes that they did not incur any such expenses, nor, for that matter, claim such. The Court agreed. The Plaintiffs did not present evidence, direct or circumstantial, tending to establish that any of them has incurred expenses that could be recovered as response costs under CERCLA.[40] For instance, none incurred costs to test for or to remove radioactive or non-radioactive hazardous substances generated by the Defendants from his or her property.[41]

Accordingly, the Court sustained the Defendants' Motion for Summary Judgment (Doc. #192), to the extent that, with that motion, the Defendants sought summary judgment on the Plaintiffs' claim under CERCLA.

---

[40]In their Memorandum in Opposition to Defendants' Initial Motion for Summary Judgment, the Plaintiffs argued that they had incurred response costs in the form of fees that they have paid to their attorneys to prosecute this litigation. See Doc. #83 at 32. The Court rejected that contention, since the Supreme Court has held that attorney's fees incurred to prosecute an action under CERCLA cannot be recovered as response costs. Key Tronic v. United States, 511 U.S. 809 (1994).

[41]Plaintiff Bernadette Hannah ("Hannah") testified that she has occasionally purchased bottled water, when the water that was supplied to her by the Scioto Water Company became discolored or smelled bad. While the purchase of alternative water supplies can constitute a CERCLA response cost (see 42 U.S.C. § 9601(23) and (24)), there is no evidence that Hannah incurred those costs as a result of the release of either radioactive or non-radioactive, hazardous substances by the Defendants. Indeed, Hannah testified that she did not know whether the discoloration and bad smell of her water was caused by the Defendants.

## C.  Elements of Plaintiffs' claims

The Defendants also argued that they are entitled to summary judgment,
since the Plaintiffs cannot establish the essential elements of their claims of
trespass and nuisance.[42]  As a means of analysis, the Court addresses those two
claims in the above order.  The law of Ohio governs the resolution of the parties
arguments in this regard, since the Court has concluded that the Defendants are
entitled to summary judgment on that aspect of Plaintiffs' claims which are
governed by federal standards (i.e., the release of radioactivity).

### 1.  Trespass

In their Amended Complaint, the Plaintiffs alleged that they were entitled to
recover on this claim, because the Defendants' release of radioactivity and other
hazardous substances into the air, water and soil constituted a continuing trespass.

---

[42]The Defendants also argued that the Plaintiffs could not establish their negligence
claim, because there is no evidence that they (Defendants) violated applicable
federal regulatory standards governing the release of radioactivity.  Above, this
Court concluded that the evidence failed to raise a genuine issue of material fact as
to whether the Defendants had violated those regulatory standards.  It is not
necessary to address Defendants' assertion again.

In addition, the Defendant argued that they are entitled to summary
judgment on the Plaintiffs' claim predicated upon strict liability for ultrahazardous
or abnormally dangerous activity.  With that argument, the Defendants addressed
only the aspect of that claim which is predicated upon the release of radioactivity
from the Plant.  Based upon reasoning set forth above, the Court concluded that
the Defendants cannot be held liable, unless they violated federal regulations
concerning the release of radioactivity and, further, that the evidence failed to raise
a genuine issue of material fact on that question.  Accordingly, regardless of
whether operating a nuclear weapons facility constitutes an ultrahazardous activity,
liability cannot be imposed upon the Defendants for the release of radioactivity
under that theory.  Accordingly, the Court found it unnecessary to address the
Defendants' request for summary judgment on this claim.

See Doc. #4 at ¶ 59. Defendants argued that they are entitled to summary judgment on Plaintiffs' trespass claim, because there is no evidence that such activity caused an actual injury to the land, which is an essential element of this common law tort. The Plaintiffs did not oppose this branch of Defendants' motion for summary judgment. For reasons which follow, the Court agreed with the Defendants. The gravamen of a trespass claim is the wrongful entry of a person onto the property of another. See e.g., Elite Designer Homes, Inc. v. Landmark Partners, 2006 WL 2270832 (Ohio App. 2006) (holding that to prevail on a claim of trespass, plaintiff must establish that defendant made an unlawful entry onto its (plaintiff's) property); Blood v. Hartland Twp., 2005 WL 1793767 (Ohio App. 2005) (indicating that common law tort of trespass occurs when the defendant enters the plaintiff's property without authority or privilege); Kimble v. Universal TV Rental, Inc., 65 Ohio Misc. 17, 417 N.E.2d 597, 603 (1981) (noting that a trespass is an unlawful entry upon the real property of another). See also, Pembaur v. City of Cincinnati, 745 F. Supp. 446, 456 (S.D.Ohio 1990), affirmed, 947 F.2d 945 (6th Cir. 1991) (table). As a result of modern industrial society, courts have been confronted with the question of whether air and water pollution (including pollution from radioactivity), which typically travels from a defendant's manufacturing facility to the plaintiff's property, can be considered an entry upon the real property of another, and thus a trespass. Those courts have held that for such pollution to be considered a trespass, the plaintiff's land must have suffered physical damage as a result of the pollution. Hager v. Waste Technologies Industries, 2002 WL 1483913 (Ohio App. 2002); Williams v. Oeder, 103 Ohio App.3d 333, 659 N.E.2d 379 (1995); Brown v. Scioto County Bd. Of Commrs.,

- 47 -

87 Ohio App.3d 704, 622 N.E.2d 1153 (1993); Bradley v. American Smelting &

Refining Co., 104 Wash.2d 677, 709 P.2d 782 (1985); Borland v. Sanders Lead

Co., 369 So.2d 523 (Ala. 1979); Mock v. Potlack Corp., 786 F. Supp. 1545

(D.Idaho 1992); Maddy v. Vulcan Materials Co., 737 F. Supp. 1528 (D.Kan.

1990). Herein, the Plaintiffs merely alleged that the value of their property had

been diminished; they do not contend that it has been physically damaged. See

Bradley v. American Smelting & Refining Co., 635 F. Supp. 1154 (W.D.Wash.

1986) (evidence of diminished value of property does not create a genuine issue of

material fact as to physical damage to that property). Moreover, they did not

present any evidence that the Defendants' release of radioactivity or other

hazardous substances caused an actual injury to their land. Accordingly, the Court

sustained Defendants' Motion for Summary Judgment (Doc. #192), to the extent

that, with that motion, they sought summary judgment on Plaintiffs' trespass

claim.


## 2. Nuisance

The Plaintiffs have set forth a claim of private nuisance, which is predicated

upon the release of radioactivity and other hazardous substances from the Plant.

The Plaintiffs seek to recover for loss of enjoyment of their property, diminution of

the value of that property and emotional distress in the form of increased fear of

contracting cancer. The Defendants argued that they were entitled to summary

judgment on the Plaintiffs' nuisance claim, because a nuisance claim cannot be

predicated upon irrational fears of a non-existent peril. According to the

Defendants, the emissions from the Plant do not create an unreasonable risk of

harm to area residents; therefore, liability under nuisance cannot be imposed upon them (Defendants), merely because some of those residents have superstitious or idiosyncratic fears which interfere with the enjoyment of their properties.[43]

In support of this branch of their motion, the Defendants relied upon cases in which courts have concluded that the public's unfounded fears concerning the defendant's pollution, that had caused the value of plaintiff's property to diminish, could not serve as the basis for recovery for nuisance. For instance, the Supreme Court of Michigan has held that plaintiffs could not recover in nuisance for diminution in value of property due to public's unfounded fears about dangers from contamination. Adkins v. Thomas Solvent Co., 440 Mich. 293, 487 N.W.2d 715 (1992). Accord Adams v. Star Enterprise, 851 F. Supp. 570 (E.D.Va. 1994), affirmed, 51 F.3d 417 (4th Cir. 1995). See also, Boughton v. Cotter Corp., 65 F.3d 823, 834 (10th Cir. 1995) (under Colorado law plaintiff cannot recover on nuisance theory for fear of contracting disease resulting from contamination of land, in the absence of evidence that the fears are reasonable and have a sound foundation in medical and scientific evidence). The Defendants also cited Eller v. Koehler, 68 Ohio St. 51, 67 N.E. 89 (1903), a case in which the plaintiff sought damages allegedly caused by the defendant's maintenance of a nuisance, a manufacturing facility.[44] Therein, the Ohio Supreme Court concluded that the trial

---

[43]In their Memorandum in Opposition (Doc. #208), the Plaintiffs did not respond to this particular argument; however they did address their nuisance claim in their Motion for Summary Judgment on Liability (Doc. #184). The Court considered those arguments when ruling upon this branch of the Defendants' Motion for Summary Judgment (Doc. #192).

[44]In addition, the Defendants cited Powell v. Craig, 113 Ohio St. 245, 148 N.E. 607 (1925), wherein the Ohio Supreme Court reversed the entry of an injunction preventing the defendant from constructing a gas station in what had previously

court had erred by refusing the defendant's requested jury instruction that, to determine whether the plaintiff had suffered harm as a result of the alleged nuisance, the jury must consider the location of the parties' properties and the uses to which other properties in the area were put.[45]  During the course of its decision, the Ohio Supreme Court said that to subject one to an action for nuisance, the plaintiff's injury "must be material and substantial ... not ... a figment of the imagination."  Id. at 55.

Based upon Eller and other decisions applying Ohio law (see e.g., Crawford v. National Lead Co., 784 F. Supp. 438, 445 (N.D.Ohio 1989)), this Court concluded that the Plaintiffs could not recover for nuisance, unless they suffered substantial or significant harm, as a result of the Defendants' activities. The Eller court did not, however, remotely address the issues presented by this case, to wit: does a plaintiff suffer significant or substantial harm as a result of the diminution of property values caused by the public's unfounded perception of the harm caused by the defendant's activities. In DeSario v. Industrial Excess Landfill, Inc., 68 Ohio App.3d 117, 587 N.E.2d 454 (1991), the Ohio Fifth District Court of Appeals indicated that the plaintiffs could recover under a nuisance theory predicated upon the public's perception of the contamination of their land.[46]  The result in DeSario

---

been a residential neighborhood. Simply stated, neither the result, the reasoning nor the language employed in Powell provided support for the Defendants' assertion that the Plaintiffs do not have a valid nuisance claim.

[45]The Ohio Supreme Court also held that the trial court had erroneously excluded evidence that noise and vibration coming from the trains that traveled on the railroad tracks adjoining the plaintiff's property caused the damages for which she had sought compensation.

[46]In DeSario, the court of appeals addressed the question of whether the trial court had properly certified that litigation as a class action. In the course of its decision,

is in conformity with the approach adopted by the Restatement (second) of Torts.[47]

Section 821F states the rule, which is applied by courts in Ohio, that a nuisance is

actionable only if it has caused "significant harm, of a kind that would be suffered

by a normal person in the community or by property in normal condition and used

for a normal purpose." Comment f to § 821F addresses the issue raised in this

litigation:

> f. Normal mental reactions. In determining whether the harm would be
> suffered by a normal member of the community, fears and other mental
> reactions common to the community are to be taken into account, even
> though they may be without scientific foundation or other support in fact.
> Thus the presence of a leprosy sanatarium in the vicinity of a group of
> private residences may seriously interfere with the use and enjoyment of
> land because of the normal fear that it creates of possible contagion, even
> though leprosy is in fact so rarely transmitted through normal contacts that
> there is no practical possibility of communication of the disease.

Thus, under the Restatement approach, a plaintiff could maintain a nuisance

action, even though the fears occasioned by the defendant's activity (such as the

harm caused by release of hazardous substances and the concomitant reduction in

the value of property) do not have a basis in scientific fact.

In a later decision, the Fifth District Court of Appeals has concluded that

DeSario is without precedential value. Ramirez v. Akzo Nobel Coatings, Inc., 153

Ohio App.3d 115, 120, 791 N.E.2d 1031, 1034 (2003). Therein, the plaintiffs

brought suit seeking to recover from the defendants under a number of common

---

it approved the statement by the trial court that public perception of the harm
caused by the defendant's actions could support a claim of nuisance.

[47]Ohio courts have long referred to the Restatement, when fashioning the common
law of nuisance. See e.g., Taylor v. City of Cincinnati, 143 Ohio St. 426 (1944);
Crown Property Dev., Inc. v. Omega Oil Co., 113 Ohio App.3d 647, 681 N.E.2d
1343 (1996).

law tort theories, including nuisance. The plaintiffs alleged that the defendants had
dumped hazardous waste on a nearby property, which had diminished the value of
their properties because of a public perception that those properties may be
contaminated with toxic or other hazardous substances. After the trial court had
dismissed that lawsuit, the Fifth District Court of appeals affirmed, concluding,
inter alia, that stigma damages based upon an environmental hazard are not
available in Ohio, in the absence of a showing that the property was physically
damaged. In reaching that conclusion, the Ramirez court relied exclusively upon
the decision of the Ohio Supreme Court in Chance v. BP Chemicals, Inc., 77 Ohio
St.3d 17, 670 N.E.2d 985 (1996). Since Chance was central to the Fifth District's
decision in Ramirez to essentially abrogate DeSario, this Court initially examines
Chance in some detail.

The plaintiffs in Chance sought to recover damages on behalf of a class of
owners of real property that was alleged to have been damaged by the operation of
the defendant's chemical refining plant in Lima, Ohio. Plaintiffs set forth claims of
trespass, negligence, nuisance, strict liability predicated upon ultrahazardous
activity and fraudulent concealment. Those claims were based upon the
defendant's use of deepwell injection technology to dispose of hazardous wastes.
The plaintiffs had alleged that these hazardous wastes had migrated to a point
below their properties, violating their rights as property owners. At the close of
plaintiffs' case-in-chief, the common pleas court granted defendant a directed
verdict on all claims except the trespass claim, following which the jury returned a
verdict in favor of the defendant on that claim. The court of appeals affirmed the
judgment in favor of the defendant. Upon further appeal, the Ohio Supreme Court

also affirmed, devoting the majority of its opinion to the trespass claim.[48]  The

plaintiffs argued that the common pleas court had erred by failing to grant a

directed verdict in their favor on that claim. The Ohio Supreme Court disagreed,

initially rejecting the plaintiffs' premise that they enjoyed absolute ownership in

everything below the surface of their properties. The Chance court held that the

migration of the hazardous substances injected into the deepwell to a point below

plaintiff's properties constituted an indirect invasion of those properties and that,

therefore, some type of physical damage or interference with use had to be shown.

Id. at 27, 670 N.E.2d at 993. The plaintiffs argued that they could have

established sufficient damages, if the common pleas court had permitted them to

introduce evidence of stigma damages. In rejecting that assertion, the Ohio

Supreme Court wrote:

> For example, appellants argue that the trial court should have allowed
> appellants to present evidence that environmental stigma associated with
> the deepwells had a negative effect on appellants' property values due to the
> public perception that there may have been injectate under appellants'
> properties and that the injectate may be dangerous. We find that the trial
> court did not abuse its discretion in the circumstances of this case in

---

[48]The Ohio Supreme Court disposed of plaintiffs' nuisance claim in the following
manner:

> We also affirm the court of appeals' holding that the trial court
> properly directed a verdict in favor of appellee on the issues of nuisance,
> fraud, and ultrahazardous activity. Appellants desired to introduce evidence
> of problems, such as earthquakes and contamination of drinking water, at
> other deepwell sites, but were prevented from doing so by rulings of the trial
> court. Appellants had no evidence of specific problems at appellee's site,
> other than speculative opinion testimony that problems may arise in the
> future. As mentioned above, appellee's operation of the wells is fully
> authorized by the regulating bodies, and in the absence of evidence that
> appellee's wells were a nuisance or that appellee was negligent in some
> way, appellants could not recover on their nuisance claim.

77 Ohio St.3d at 23, 670 N.E.2d at 990.

foreclosing appellants from presenting evidence of speculative stigma damages. Therefore, the trial court was correct in requiring appellants to prove some physical damages or interference with use proximately caused by the deepwells as part of their trespass claim in the circumstances of this case, thus placing on appellants the burden of establishing that the injectate interfered with the reasonable and foreseeable use of their properties.

Id.

One might argue that in Ramirez the Fifth District Court of Appeals overstated the effect of the holding in Chance, by concluding that damages for nuisance cannot be established by evidence of environmental stigma, given that, in Chance the Ohio Supreme Court was addressing trespass claims arising out of the disposal of hazardous waste though the deepwell injection system which may have migrated under the plaintiffs' real estate. Nevertheless, in Ramirez, the Fifth District Court of Appeals in effect overruled its earlier decision in DeSario and held that stigma damages will not support a nuisance claim arising out of environmental hazards. Thus, there is no longer any authority from an Ohio court that diminution of property values, flowing from the public's perception that the property may be contaminated with toxic or other hazardous substances, constituted significant or substantial harm.[49]

Accordingly, this Court has concluded that the Plaintiffs could not establish one of the elements of a nuisance action, to wit: significant or substantial harm, and has sustained the Defendants' Motion for Summary Judgment (Doc. #192), to

---

[49]It bears noting that this Court has not relied upon the holding of the Ohio Supreme Court in Chance, in order to conclude herein that the diminution of the value of the Plaintiffs' property, flowing from the public's perception that such property may be contaminated with toxic or other hazardous substances, does not constitute a significant or substantial harm supporting a claim of nuisance. Rather, this Court has discussed Chance in order to explain the decision of the Fifth District Court of Appeals in Ramirez to disregard its earlier precedent.

- 54 -

the extent that, with that motion, they sought summary judgment on the Plaintiffs' claim of nuisance.

In sum, the Court sustained in part and overruled in part the Defendants' Motion for Summary Judgment (Doc. #192). The Court sustained that motion with respect to the Plaintiffs' claims of trespass and nuisance and for response costs under CERCLA, as well with respect to that aspect of their claims of negligence and strict liability based upon ultrahazardous or abnormally dangerous activity, which are based upon the release of radioactivity from the Plant. Of course, the Plaintiffs will not be able obtain the remedy of medical monitoring on that aspect of their claims predicated upon the release of radioactivity from the Plant or on their claim under CERCLA, given that the Court has sustained the Defendants' request for summary judgment on same. Otherwise, the Court overruled that motion. As a result of those rulings, that aspect of Plaintiffs' claims of state law negligence and strict liability, which are predicated upon the release of non-radioactive, hazardous substances, remain in this litigation.[50]

---

[50]As one of their remedies, the Plaintiffs seek to recover damages for the fear of increased risk of cancer. Given that the Court concluded that the Defendants are entitled to summary judgment on Plaintiffs' claims, to the extent that they are predicated upon the release of radioactivity from the Plant, Plaintiffs will not be entitled to recover for the fear of such an increased risk, arising out of the release of radioactivity. Nothing herein, however, will prevent them from attempting to recover for the fear of such an increased risk, stemming from the release non-radioactive, hazardous substances from that facility.

### III. Plaintiffs' Motion for Reconsideration (Doc. #256)

With this motion, the Plaintiffs request that the Court reconsider its Decision

to overrule, without prejudice, the renewal of their motion for class certification.

See Doc. #254. The predicate for the Court's Decision was that it was appropriate

to give counsel an opportunity to brief the propriety of maintaining this litigation as

a class action, after they had received the Court's Expanded Opinion, addressing

the Defendants' Motion for Summary Judgment (Doc. #192).  Given that the Court

has now issued that Expanded Opinion, the Court overrules the Plaintiffs' Motion

for Reconsideration (Doc. #256), as moot.  The Plaintiffs may now file a renewed

motion for class certification, if desired.  If same is to be filed, it must be done by

the close of business on a date to be set at the upcoming conference call between

the Court and counsel.  Responses will be filed pursuant to the time for responses

set forth in S.D. Ohio Civ. R. 7.2(a)(2).

The Court does deem it appropriate to address an issue the parties have

briefed in their memoranda, to wit: the effect on the statute of limitations of this

Court's decisions to decertify the class in this litigation and to overrule, without

prejudice to renewal, the Plaintiffs' renewed motion seeking certification.  The

Supreme Court has recognized that the pendency of a class action tolls the statute

of limitations for members of the putative class, until class certification is denied.

American Pipe and Construction Co. v. Utah, 414 U.S. 538 (1974).  The Plaintiffs

argue that, since this Court has not decided the question of class certification with

finality, the statute of limitations for members of the putative class has not begun

to run.  The Defendants argue that the statute of limitations has indeed begun to

run.  Although the Court will not issue an advisory opinion on the question of

whether the running of the statute of limitations has commenced, the following review of the procedural background concerning this dispute demonstrates conclusively that the question of certification has not been decided with finality.

This Court decertified the class in this litigation, because Judge Kinneary, focusing upon the Plaintiffs' request for injunctive relief, had certified this litigation, pursuant to Rule 23(b)(1)(A) (Boggs v. Divested Atomic Corp., 141 F.R.D. 58 (S.D.Ohio 1991)), a request for relief the Court later dismissed. See Doc. #242. However, the Court also noted that Judge Kinneary had indicated that this litigation could be certified pursuant to Rule 23(b)(3), but that he had based his decision upon Rule 23(b)(1)(A), in order to prevent members from opting-out. Rather than reviewing the evidence that had been submitted before Judge Kinneary in 1991, this Court deemed it appropriate to decide whether to certify this lawsuit under Rule 23(b)(3) on the basis of then current evidence. Id. Accordingly, the Court directed the Plaintiffs to file a renewed motion for class certification. Id. Before the Plaintiffs were able to renew their motion for certification, the Defendants filed a motion, requesting a stay of briefing on a renewed motion for class certification, until the Court had issued its Expanded Opinion on their Motion for Summary Judgment. See Doc. #246. The Court ultimately agreed with the Defendants and overruled Plaintiffs' Renewed Motion for Class Certification (Doc. #249), without prejudice to renewal. Thus, this Court has always anticipated that the Plaintiffs would be permitted to file a renewed motion for class certification and that its decision to decertify this litigation and to overrule, without prejudice, Plaintiffs' renewed motion for certification, were not intended to serve as the final disposition of the class certification issue.

Counsel should note that the Court has scheduled a telephone conference call beginning at 8:45 a.m. on Tuesday, September 4, 2007, for the purpose of establishing procedures leading to the resolution of this litigation and of <u>Adkins v. Divested Atomic Corp.</u>, Case No. 2:98cv595, a matter previously stayed pending this Court's ruling herein.

August 23, 2007

/s/ Walter Herbert Rice
WALTER HERBERT RICE, JUDGE
UNITED STATES DISTRICT COURT

Copies to:

All counsel of record.
Counsel of record in <u>Adkins v. Divested Atomic Corp.</u>, Case No. 2:98cv595.

- 58 -