# EXHIBIT 3

# PART 1 OF 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JAMES STEPP, et al.,                          :

     Plaintiffs,                          :

     vs.                                          :          Case No. 3:91cv468

                                                          :          JUDGE WALTER HERBERT RICE
MONSANTO RESEARCH CORP.,           :
et al.,                                               :

     Defendants.                        :

---

EXPANDED OPINION SETTING FORTH CITATIONS OF AUTHORITY
AND REASONING IN SUPPORT OF COURT'S DECISION (DOC. #137),
SUSTAINING IN PART AND OVERRULING IN PART DEFENDANTS'
SECOND MOTION FOR SUMMARY JUDGMENT (DOC. #96) AND
OVERRULING PLAINTIFFS' MOTION TO STRIKE (DOC. #125);
CONFERENCE CALL SET

---

This action arises out of the operation of the Mound nuclear weapons

facility, located in Miamisburg, Ohio. The Mound is owned by the United States

Department of Energy ("DOE"). Defendants EG&G Mound Applied Technologies,

Inc. ("EG&G") and Monsanto Research Corporation ("Monsanto") have been its

operators. The Plaintiffs, who live in the vicinity of the Mound, brought this

litigation as a putative class action on behalf of "all persons, firms or entities who

were residents, property owners or lessees of property" within five miles of the

Mound. Plaintiffs' Complaint (Doc. #1) at ¶ 35. Plaintiffs alleged that they and

the putative class they sought to represent have been exposed to the release of radioactive and/or other hazardous wastes from the Mound. In their Complaint (Doc. #1), the Plaintiffs set forth six claims for relief, to wit: 1) negligence (Count I); 2) absolute or strict liability (Count II); 3) private nuisance (Count III); 4) trespass (Count IV); 5) violations of the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601, et seq., (Count V); and 6) for punitive damages (Count VI). The Plaintiffs sought to recover compensatory and punitive damages, requested injunctive relief and asked the Court to establish, at Defendants' expense, a medical monitoring fund which would provide future diagnostic and other medical services for the members of the putative class.

In a previous Decision (Doc. #84), this Court, inter alia, sustained in part and overruled in part Defendants' Motion for Summary Judgment (Doc. #35). In pertinent part, this Court concluded that Plaintiffs' claims, other than their claim under CERCLA,[1] would be governed, in part, by federal standards.[2] Of particular present importance, this Court held that the standard of care for Plaintiffs' claims was supplied by federal regulations relating to radioactive emissions. Therefore, liability could not be imposed upon Defendants, unless they had violated those regulations. This Court also concluded that the evidence failed to raise a genuine

---

[1]CERCLA is a strict liability statute. Kalamazoo River Study Group v. Menasha Corp., 228 F.3d 648 (6th Cir. 2000)

[2]In addition, in that Decision and in the Court's Decision (Doc. #73) ruling upon Defendants' Motion for Partial Summary Judgment (Doc. #13), the Court has concluded that the Defendants are entitled to summary judgment on Plaintiffs' trespass claim, that the Plaintiffs cannot recover medical expenses under CERCLA, that the Plaintiffs are not entitled to medical monitoring as a form of relief, and that the Plaintiffs cannot recover punitive damages from Defendant EG&G.

issue of material fact concerning the question of whether the Defendants had violated the federal regulations governing air emissions of radioactivity during 1990.

Thereafter, the Defendants filed their Supplemental Memorandum in Support of Defendants' Motion for Summary Judgment (Doc. #88), arguing that the evidence failed to raise a genuine issue of material fact as to whether they had violated the regulations as to other pertinent years. This Court, however, directed the Defendants to present that argument by filing a bare bones motion seeking summary judgment, rather than consider a memorandum filed in support of a motion on which the Court had already ruled. The Defendants complied with that directive by filing their bare bones Second Motion for Summary Judgment (Doc. #96), which they have supported by incorporating by reference their Supplemental Memorandum in Support of Defendants' Motion for Summary Judgment (Doc. #88), the evidence accompanying that document and other evidence. In response, the Plaintiffs moved, inter alia, to strike some of the evidence upon which that motion is based. See Doc. #125. This Court has sustained in part and overruled in part the Defendants' Second Motion for Summary Judgment (Doc. #96), and overruled the Plaintiffs' Motion to Strike (Doc. #125). See Doc. #137. In this Expanded Opinion, the Court sets forth citations of authority and reasoning which support those Decisions (Doc. #137). As a means of analysis, the Court will initially set forth its reasoning and citations of authority for overruling Plaintiffs' Motion to Strike (Doc. #125), following which it will turn to the Defendants' Second Motion for Summary Judgment (Doc. #96).

- 3 -

## II. Plaintiffs' Motion to Strike (Doc. #125)

With their Motion to Strike (Doc. #125), the Plaintiffs argued that the Court should strike the following evidentiary materials, to wit: ¶¶ 13 through 15, 17, 20 through 23, 25 and 26 of the affidavit of Dr. Daniel Carfagno ("Carfagno") and ¶¶ 21, 26, 30 through 35, 39 through 53, 56 through 60, 62 through 70, 76 and 78 through 81 of the affidavit of Richard Neff ("Neff").[3] In support of their motion, the Plaintiffs asserted that the neither Carfagno nor Neff made his affidavit on personal knowledge, that deposition testimony of both affiants supports the Plaintiffs' contention that the data relied upon was flawed, incomplete and inaccurate, and that the two affidavits do not meet the test for expert, scientific testimony set forth in Rule 702 of the Federal Rules of Evidence, as interpreted in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). In addition, the Plaintiffs contended that, during his deposition which was taken after he executed his affidavit, Carfagno gave answers which contradicted portions of his

---

[3]Carfagno's affidavit is attached to Defendants' Supplemental Memorandum in Support of Defendants' Motion for Summary Judgment (Doc. #88) which, in turn, was incorporated into Defendants' Second Motion for Summary Judgment (Doc. #96). Thus, Carfagno's affidavit constitutes a substantial portion of the evidence relied upon by Defendants to support their most recent request for summary judgment. Neff's affidavit (Doc. #37) was filed in support of Defendants' Motion for Summary Judgment (Doc. #35) and to oppose Plaintiffs' Motion for Class Certification (Doc. #11). Copies of those affidavits are also attached to the Plaintiffs' Motion to Strike (Doc. #125). In their motion, the Plaintiffs state that they "also note flaws" in Tables II and III to Defendants' Supplemental Memorandum in Support of Defendants' Motion for Summary Judgment (Doc. #88). See Doc. #125 at 2. The Plaintiffs do not otherwise explain what those flaws are. Therefore, the Court will not address Tables II and III further other than to note that the two purport to set forth emissions of radionuclides into the air and the water during the years 1949-1972. Table II and III are summaries rather than independent evidence. Both affidavits, therefore, were relied upon by Defendants in support of their Second Motion for Summary Judgment (Doc. #96).

- 4 -

affidavit. The Plaintiffs' applied their general arguments to the two affidavits separately; therefore, the Court will set forth, separately, its reasoning and citations of authority in support of its conclusion that neither affidavit should be stricken. However, since Plaintiffs sought to strike portions of both affidavits, because they violate Rule 702 and Daubert, the Court will initially review the standards that must be applied when a court rules upon a Daubert challenge to proposed expert testimony.

Before engaging in that analysis, however, it bears emphasizing that the question before the Court was whether any of the allegedly offensive portions of Carfagno's and Neff's affidavits could be utilized in ruling on the Defendants' Second Motion for Summary Judgment (Doc. #96). With that motion, the Defendants argued that they are entitled to summary judgment, because the evidence fails to raise a genuine issue of material fact as to whether the radioactive emissions from the Mound violated the pertinent federal regulations. Neff's affidavit, in particular, contains many provisions the Plaintiffs have requested the Court to strike, which do not even address that question. Below, the Court will point out such portions of the affidavits and indicate that they will not be stricken, because they were not relied upon in ruling on the pending request for summary judgment, given that they are not germane to the issues raised therein.

A. Rule 702 and Daubert

Rule 702 provides:[4]

_____

[4]Rule 702 was amended effective December 1, 2000, in order to make its language consistent with Daubert and its progeny. Nelson, 243 F.3d at 250 n. 4. Before its amendment, Rule 702 provided:

> If scientific, technical, or other specialized knowledge will assist the trier of
> fact to understand the evidence or to determine a fact in issue, a witness
> qualified as an expert by knowledge, skill, experience, training, or education,
> may testify thereto in the form of an opinion or otherwise, if (1) the
> testimony is based upon sufficient facts or data, (2) the testimony is the
> product of reliable principles and methods, and (3) the witness has applied
> the principles and methods reliably to the facts of the case.

In Daubert, the Supreme Court "established a general gatekeeping [or screening]

obligation for trial courts" to exclude from trial expert testimony that is unreliable

and irrelevant. Conwood Co., L.P. v. U.S. Tobacco Co., 290 F.3d 768, 792 (6th

Cir. 2002) (citations omitted). This gatekeeping function applies "when

considering all expert testimony, including testimony based on technical and other

specialized knowledge." Clay v. Ford Motor Co., 215 F.3d 663, 667 (6th Cir.

2000) (emphasis in original). Accord Kumho Tire Co., Ltd. v. Carmichael, 526

U.S. 137, 141 (1999). In determining whether evidence is admissible under

Daubert, the District Court must determine whether the evidence "both rests on a

reliable foundation and is relevant to the task at hand." Id. In assessing relevance

and reliability, the District Court must examine whether the expert is proposing to

testify to scientific or other specialized knowledge which will assist the trier of fact

to understand or to determine a fact in issue. Jahn v. Equine Servs., PSC, 233

F.3d 382, 388 (6th Cir. 2000). This involves a preliminary inquiry as to whether

the reasoning or methodology underlying the testimony is scientifically valid and

whether that reasoning or methodology properly can be applied to the facts in

issue. Id. Some of the factors that may be used in such an inquiry include:

---

> If scientific, technical, or other specialized knowledge will assist the
> trier of fact to understand the evidence or to determine a fact in issue, a
> witness qualified as an expert by knowledge, skill, experience, training, or
> education, may testify thereto in the form of an opinion or otherwise.

1) whether the theory or technique can be tested, 2) whether it has been subjected to peer review and publication, 3) whether the potential rate of error is known, and 4) its general acceptance. Daubert, 509 U.S. at 593-94; Hardyman v. Norfolk & W. Ry. Co., 243 F.3d 255, 260 (6th Cir. 2001). "This inquiry is a flexible one, with an overarching goal of assessing the 'scientific validity and thus the evidentiary relevance and reliability' of the principles and methodology underlying the proposed expert testimony." United States v. Langan, 263 F.3d 613, 621 (6th Cir. 2001) (citation omitted). "[A] trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." Kumho Tire Co., 526 U.S. at 152. Of course, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997). The proponent of expert opinion evidence has the burden of demonstrating by the preponderance of the proof that the evidence complies with Rule 702 and Daubert. Daubert, 509 U.S. at 592 n. 10; Nelson v. Tennessee Gas Pipeline Co., 243 F.3d 244, 250 (6th Cir.), cert. denied, 534 U.S. 822 (2001). Of course, in addition to meeting the criteria of Daubert, testimony from a particular expert witness is admissible under Rule 702, only if that witness is qualified by knowledge, skill, experience, training, or education. See e.g., Morales v. American Honda Motor Co., Ltd., 151 F.3d 500, 514-16 (6th Cir. 1998).

## B.  Carfagno's Affidavit

In ¶¶ 1 and 2 of his affidavit, Carfagno stated that he had been employed at the Mound since 1965, being employed there in what is now called the Environment, Safety and Health Department from 1970 until 1990.[5]  In ¶¶ 4 through 11, he authenticated a number of exhibits which are attached thereto as business records in accordance with Rule 803(6) of the Federal Rules of Evidence. As indicated, the Plaintiffs requested that the Court strike ¶¶ 13 through 15, 17, 20 through 23, 25 and 26 of Carfagno's affidavit.  As a means of analysis, the Court will briefly review the allegedly offensive provisions of that document, before turning to the parties' arguments in support of and in opposition to Plaintiffs' request to strike those paragraphs.

In ¶ 13, Carfagno explained that, from 1949 through 1963, the contractor operating the Mound was initially required to report air and water monitoring data on a monthly basis, followed by quarterly reporting and then semi-annually, while, in ¶ 14, he stated that since 1964, such a contractor has been required to report environmental monitoring data annually.  In the following paragraph, Carfagno indicated that, in 1960, both quarterly reports on environmental data and an annual summary of same were prepared.  In ¶ 17, Carfagno explained that, from 1949 through 1972, radiation information was reported in terms of air or water concentration levels, which, while readily convertible to radiation dose levels and dose levels of radiation exposure, was not done in the environmental monitoring reports for those years.  In ¶ 20, he stated that, to his knowledge and based upon

---

[5]When he executed his affidavit, Carfagno was employed as a Senior Environmental Specialist in the Environmental Restoration, Waste Management and Decommissioning and Decontamination Department at the Mound.

his review of Mound reports and his work experience, the Mound contractor has always followed the required calculation method for determining radiation exposure and dose.

In ¶ 21, Carfagno stated that Tables II and III set forth dose figures, calculated from air and water concentration levels reported by the Mound, to assist in showing compliance with applicable federal radiation standards.[6] In ¶ 22, Carfagno explained that, for the years 1949 through 1963, the reported air and water radiation concentrations can be compared to the maximum average concentration to determine compliance with federal radiation requirements. He also indicated in that paragraph that, in order to assist in showing compliance, the multiple reports for those years have been combined and annualized to show a maximum annual concentration for air and water, that this concentration has also been converted to a radiation dose number and that these numbers can be compared to federal radiation standards.[7] In ¶ 23, Carfagno stated that, in order to get the total dose for the years 1949 through 1972, the air dose must be added to the water dose for each isotope, but the total doses for each isotope are not added together. In ¶ 25, he explained that, for the years 1958 through 1984, the organ dose totals are not added to the whole body dose totals, since the federal government required separate measurements of the organ doses and the whole body doses. In ¶ 26, Carfagno stated that negative maximum average concentrations are shown for 1967 and 1970, because natural background

---

[6]Tables II and III, which are appended to Doc. #88, set forth the dose levels of exposure for the years 1949 through 1972.

[7]Although Carfagno does not expressly so state, the information set forth in ¶ 22 of his affidavit pertains to Tables II and III.

concentrations of radionuclides were required to be subtracted from the monitoring results during those years.

In support of their contention that portions of Carfagno's affidavit must be stricken, the Plaintiffs raised a number of arguments, which the Court addresses in the order presented.

First, the Plaintiffs argued that the allegedly offensive portions of Carfagno's affidavit must be stricken, because he lacks personal knowledge regarding the facts set forth in his affidavit and, further, given that he is not an expert witness. Rule 56(e) provides that affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence and shall show affirmatively that the affiant is competent to testify."  The Sixth Circuit has consistently held that affidavits which consist of hearsay or inadmissible opinion evidence do not satisfy the requirements of Rule 56(e) and must be disregarded. Dole v. Elliot Travel & Tours, Inc., 942 F.2d 962, 968 (6th Cir. 1991); State Mutual Life Assurance Co. v. Deer Creek Park, 612 F.2d 259, 264 (6th Cir. 1979). In addition, Rule 602 of the Federal Rules of Evidence provides:

> A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness' own testimony. This rule is subject to the provisions of rule 703, relating to opinion testimony by expert witnesses.

The Plaintiffs asserted that Carfagno's affidavit did not meet the requirements of Rule 56(e) and Rule 602, because he does not have personal knowledge of data calculations and computations, relating to the release of radioactive material which occurred prior to 1970. In ¶¶ 13 through 15, 17, 21 through 23, 25 and 26 of his affidavit, Carfagno sets forth, inter alia, information

- 10 -

concerning the manner in which radioactive emissions from the Mound were computed and compiled before 1970, when he became employed in the Environment, Safety and Health Department. Although the Court agreed with the Plaintiffs that Carfagno was not personally involved with data calculations and computations, relating to the release of radioactive material which occurred prior to 1970, it could not agree that the portions of those paragraphs in his affidavit that address the method of computations and other events occurring prior to 1970, must be stricken. When he executed his affidavit, Carfagno had been employed at the Mound for nearly 30 years, the last 20 of which had been spent in the Environment, Safety and Health Department. Moreover, in ¶ 3 of his affidavit, Carfagno stated that, based upon his education and experience, he is personally knowledgeable about the environmental monitoring and reporting of environmental information at the Mound. In addition, during his deposition, Carfagno explained that he has a Ph.D. in chemistry and that he has written a number of scientific articles relating to monitoring for radioactive materials. Therefore, the Court concluded that, if his lack of participation in environmental monitoring and compliance before 1970 meant that he was without personal knowledge of such events, Carfagno nevertheless was qualified by knowledge, skill, experience, training, or education to present the information contained in his affidavit and that, therefore, it was permissible for Carfagno to present evidence of events occurring before 1970, as an expert witness for whom the lack of personal knowledge does not prevent testimony. Moreover, there is nothing in Rule 702 and/or the Daubert standards, which are set forth above, which would prevent Carfagno from presenting such evidence as an expert witness.

- 11 -

Second, Plaintiffs argued that the Court should strike Carfagno's affidavit, because the evidence presented by him is fatally flawed and cannot establish that the Defendants have complied with pertinent federal regulatory standards. Plaintiffs based this argument on three premises, to wit: 1) relying solely on environmental monitoring reports for data is inappropriate, given that the reports are both inaccurate and incomplete; 2) Carfagno inappropriately manipulated the data; and 3) other radioactive materials were emitted from the Mound which Carfagno has not included in his summaries.[8] This Court could not conclude that any of the foregoing constituted a reason to strike Carfagno's affidavit, because the Plaintiffs' three premises go to the weight to be given that affidavit and the accompanying documents, rather than to the admissibility of same. Simply stated, Carfagno authenticated the Defendants' business records and then summarized the information set forth therein. While the alleged shortcomings identified by the Plaintiffs may render that evidence unworthy of belief, they do not warrant the striking of the nine paragraphs from Carfagno's affidavit. The Plaintiffs' assertions, therefore, may serve as the basis for concluding that the Defendants failed to discharge their initial obligation under Fed. R. Civ. 56 "of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably to the nonmoving party, do not raise a genuine issue of material fact for trial." Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991). That issue is addressed below in the Court's discussion of the Defendants' Second Motion for Summary Judgment (Doc. #96), wherein many of the arguments set

---

[8]Plaintiffs' arguments in that regard did not implicate Daubert or Rule 702.

forth in the Plaintiffs' Motion to Strike will be considered in this somewhat different context.

Third, Plaintiffs identified what they asserted were flaws in ¶¶ 15 and 20 of Carfagno's affidavit.[9] In ¶ 15, he stated that, in 1960, both quarterly reports concerning emissions of radionuclides from the Mound and an annual summary of same were prepared. The Plaintiffs argued that the statement in ¶ 15 should not be considered, given that Carfagno testified during his deposition that he was not aware of the location of the environmental monitoring reports for the first three quarters of 1960 and, therefore, did not consider them when preparing Table III.[10] Plaintiffs also stated that Carfagno had failed to consider or even to read the classified reports for 1960, which, according to Plaintiffs, showed greater emissions than the publically released environmental monitoring reports. While these two shortcomings may well be enough for this Court to conclude that the evidence raises a genuine issue of material fact as to the emissions which occurred during 1960, they do not serve as the basis for striking ¶ 15 from Carfagno's affidavit, wherein he merely indicated that, in 1960, both quarterly reports on environmental data and an annual summary of same were prepared. It bears emphasis that the Plaintiffs have not disagreed with that statement. Indeed, their primary concern appears to be that Carfagno did not consider all of the quarterly reports.

---

[9]Plaintiffs also noted flaws in ¶¶ 13, 14, 16, 17, 21 through 23 and 25, which they chose not to identify or elaborate upon.

[10]The Court rejected any implication that there is a contradiction between the statements in ¶ 15 of Cargafno's affidavit, wherein he stated that environmental monitoring reports were prepared on a quarterly and annual basis in 1960, and his deposition testimony.

In § 20 of his affidavit, Carfagno stated that, to his knowledge and based upon his review of Mound reports and his work experience, the Mound contractor has always followed the required calculation method for determining radiation exposure and dose. The Court need not discuss Plaintiffs' objections to § 20, given that it will not consider Carfagno's belief that the contractors at the Mound have always followed the required method of calculation when ruling upon Defendants' Second Motion for Summary Judgment (Doc. #96).[11]

Accordingly, the Court overruled the Plaintiffs' Motion to Strike (Doc. #125), as it relates to Carfagno's affidavit.

## C. Neff's Affidavit

As indicated, the Plaintiffs requested that this Court strike §§ 21, 26, 30 through 35, 39 through 53, 56-60, 62 through 70, 76 and 78 through 81 of Neff's affidavit. As a means of analysis, the Court will briefly review the content of Neff's affidavit, following which it will discuss the parties' argument in favor of and in opposition to the Plaintiffs' request to strike same.[12]

---

[11]Daubert and Rule 702 were not implicated by the Plaintiffs' request to strike § 15 of Carfagno's affidavit. Although the Plaintiffs relied upon that decision, when arguing that § 20 should be stricken, it was unnecessary for the Court to address that argument, given that it will not consider that part of Carfagno's affidavit when it rules upon the Defendants' Second Motion for Summary Judgment (Doc. #96).

[12]The Defendants argued that the Plaintiffs had waived their objections to the use of Neff's affidavit, by not objecting to it when it was originally submitted in support of their (Defendants') Motion for Summary Judgment (Doc. #35). See Doc. #128 at 2 n. 2. The Court has rejected that argument. While Plaintiffs's belated discovery that portions of Neff's affidavit are objectionable does not serve as the basis for revisiting the Court's ruling on Defendants' earlier request for summary judgment, the Defendants have failed to cite any authority in support of the proposition that the failure to object to an affidavit when it is used for one

- 14 -

In his 81-paragraph, 30-page affidavit,[13] Neff initially set forth his educational background and his employment history at the Mound, indicating that he has a Master of Science in Nuclear Physics from The Ohio State University and that he began working at the Mound in 1964, filling the position of Manager of Environmental Compliance and Remedial Action at the time he executed his affidavit. Therein, Neff also briefly delineated the geographical layout of the Mound and explained the history of many of the buildings located on that facility. He also described the radioactive materials that had been processed and used at the Mound, to wit: polonium-210, from the early days of the Mound through 1974;[14] tritium, from 1955 until the date upon which Neff executed his affidavit; and plutonium-238, from 1955 through 1982.[15] In addition, he explained the activities at the Mound which used non-radioactive materials.

In ¶ 21 of his affidavit, Neff stated that tritium does not present a significant health risk.[16] In ¶ 26, he indicated that everyone has lived with radiation since

_____

purpose in a lawsuit means that it cannot be objected to when used for any other purpose.

[13]Two appendices of exhibits accompanied Neff's affidavit.

[14]Polonium was no longer used at the Mound after 1971. Neff Aff. at ¶ 10. The decontamination and decommissioning of the polonium facilities were completed in 1974. Id.

[15]No unencapsulated plutonium-238 had been handled at the Mound since 1979, although plutonium recovery operations continued there until 1982, when they were moved to the DOE's Savannah River facility. Neff Aff. at ¶ 12. The decontamination and decommissioning of the plutonium processing buildings at the Mound were ongoing when Neff executed his affidavit. Id.

[16]In ¶ 13 of his affidavit, Neff explained that tritium is a radioactive isotope of hydrogen. See also, Id. at ¶ 20 (describing tritium).

- 15 -

birth and that it has always existed on the Earth. Therein, Neff also explained that heat, light, radiowaves and microwaves are forms of radiation. In ¶¶ 30 through 34, he listed a number of other sources of and ways in which individuals are exposed to radiation, such as medical x-rays, color television sets, video display terminals, luminous dial watches, air travel,[17] living at higher altitudes and smoking cigarettes. In ¶ 35, Neff stated that the Atomic Energy Commission ("AEC") promulgated radiation standards for the general public in 1958, under which the maximum permissible exposure for individuals in the general public was 500 millirem per year.

In ¶ 39, Neff stated that off-site exposure from tritium was almost non-existent, supporting that statement by indicating that the maximum calculated off-site exposure from the Mound was 0.29 millirem in 1988, 0.14 millirem in 1989, and 0.11 in 1990.[18] In ¶ 40, he indicated that the off-site exposure from plutonium was also almost non-existent, supporting that statement by reporting that the maximum calculated off-site exposure from plutonium from the Mound was 0.27 millirem for 1988, 0.26 millirem in 1989, and 0.13 millirem in 1990.[19] With ¶¶ 41 through 43, Neff authenticated three exhibits which show comparisons of annual radiation doses from the Mound to common background activity, a coast-to-coast commercial flight and the maximum annual dose for water allowed under

[17]According to ¶ 31 of his affidavit, a coast to coast flight results in an individual being exposed to about 5 millirem of radiation.

[18]In ¶ 39, Neff also stated that it would have been unlikely that anyone would have received that much exposure, since calculations of off-site tritium doses were made using conservative assumptions.

[19]As he did in ¶ 39, Neff indicated in ¶ 40 that off-site doses of plutonium were calculated using conservative assumptions.

regulations issued by the United States Environmental Protection Agency ("EPA"). With ¶ 44, he identified an exhibit which compares historical radiation standards for the general public to natural background radiation doses.

In ¶¶ 45 through 48, Neff described the monitoring that had historically been performed at the Mound. In those paragraphs, he has also described and authenticated a number of exhibits concerning the release of radiation from the Mound which accompanied his affidavit. In ¶ 49, he stated that no off-site dose of radiation from the Mound had ever been calculated to be anywhere near the level where it posed a health risk to human beings.

In ¶¶ 50 and 51, Neff described the method by which air monitoring for radioactive emissions from the Mound was conducted. He stated in ¶ 52 that the Mound has engaged in continuous efforts over the years to reduce the amount and type of emissions from the Mound to a level as low as reasonable achievable, and in ¶ 53, that the results from air monitoring for non-radiological materials indicated that the Mound's operations did not have an impact on the environment.

In ¶ 56, Neff continued his explanation of sampling of the surface waters in the vicinity of the Mound,[20] and stated that there had never been an indication that the levels of contamination in the surface waters off-site posed any kind of health hazard to human beings. In ¶ 57, he stated that, when he executed his affidavit, the average concentrations of tritium in the Great Miami River reflected average background concentrations. In ¶ 58, he indicated that, when he executed his

---

[20]That explanation began with ¶¶ 54 and 55, portions of Neff's affidavit which the Plaintiffs did not challenge.

affidavit, the concentrations of plutonium-238 in the Great Miami River were essentially equal to average background levels.

In ¶ 59, Neff discussed the groundwater testing that had been conducted at the Mound, in order to determine whether there had been any off-site contamination of the groundwater. Therein, he indicated that, when he executed his affidavit, 63 test wells were being monitored and that, to his knowledge, there had never been an indication of any off-site contamination of groundwater for human consumption which had posed any kind of health hazard to human beings. In ¶ 60, Neff stated that tritium concentrations were measured at 63 on-site and off-site locations, including the Miamisburg municipal drinking wells, and that, when he executed his affidavit, none of Plaintiffs' wells that had been tested indicated the presence of tritium.

In ¶ 62, Neff described the plant and animal testing programs at the Mound, indicating that grass, potatoes, fish, tomatoes and other types of vegetation were tested in order to determine whether there had been any significant uptake or accumulation of radionuclides by plant or animal life. Therein, he also stated that no evidence of significant uptake or accumulation of plutonium or tritium in plant or animal life had been found.

In ¶ 63, Neff indicated that the Mound tested soil and river silt and sediment from the Great Miami River and private ponds and that no evidence of any significant concentrations of plutonium had been found.

In ¶¶ 64 through 70, Neff described the an incident that occurred in 1969, when an underground waste line at the Mound ruptured, releasing a waste solution containing plutonium-238 to the surrounding soils on the Mound site. He explained

further that, during the ensuing clean-up, a severe rainstorm occurred, causing some of the contaminated soil to be washed off-site into an abandoned section of the Miami-Erie Canal. In 1974, personnel at the Mound prepared a study, which concluded that the plutonium-contaminated soil in the Miami-Erie Canal adjacent to the Mound did not present a future hazard to human health. Indeed, Neff also indicated that the Ohio Department of Health, the Ohio Environmental Protection Agency and the EPA had all concluded that the levels of plutonium contamination at that location and in the ponds located at the Miamisburg Municipal Park did not present an imminent or immediate threat to the public health and that there was no reason to restrict the use of the land at the Park. In addition, Neff stated that the predicted lifetime risk for cancer from the plutonium-238 contamination of the section of the Miami-Erie Canal is about one twenty-thousandth of the predicted lifetime risk for cancer from normal background radiation, and that, as a result of the plutonium contamination of the Miami-Erie Canal, the estimate of the maximum committed effective dose equivalent was 0.039 millirem per year for adults. He also indicated that no plutonium-238 from the Miami-Erie Canal had reached the Miamisburg municipal wells and that, therefore, individuals using the municipal water system have had no exposure in their drinking water to the plutonium-238 in contaminated soil that washed off-site into an abandoned section of the Canal.

In ¶¶ 76 and 78 through 81, Neff discussed tests and contamination (or lack thereof) of the named Plaintiffs' wells. In ¶ 76, he identified a number of exhibits as the test results from those wells. In ¶¶ 78 through 81, Neff set forth information concerning bacterial contamination of the wells of the named Plaintiffs who live in the Hillview Plat. According to Neff, those wells had been

contaminated as a result of the close proximity of the residents' septic systems to their wells. He also stated that the residents had known about that contamination since 1975. As a result, the residents had been permitted to tap into the municipal water and sewer systems.[21]

As indicated the Plaintiffs requested that the Court strike the foregoing paragraphs from Neff's affidavit because, inter alia, he lacks personal knowledge about the statements therein and given that he is not qualified under Daubert to testify as an expert witness on those matters. As an initial matter, the Court declined to strike ¶¶ 21, 49, 52, 53, 56 (concluding sentence), 57, 58, 59 (concluding sentence), 60, 62 (concluding sentence), 63 (concluding sentence), 76 and 78 through 81, because they were not germane to the issue at hand and, therefore, were not utilized when ruling on Defendants' Second Motion for Summary Judgment (Doc. #96).[22] As a result, the Court did not consider whether Plaintiffs were correct that those portions of Neff's affidavit had to be stricken.[23] By way of example, in the concluding sentences of ¶¶ 56, 59, 62 and 63, Neff indicated that to his knowledge the substances referred to in those paragraphs did

---

[21]Neff also described two exhibits, to wit: letters sent by Miami Township, in 1983, and the Montgomery County Combined Health District, in 1974, to the residents of the Hillview Plat. Neff Aff. at ¶¶ 80 and 81. Those letters confirm the statements in Neff's affidavit concerning pollution of the wells in the Hillview Plat and the cause of that pollution.

[22]As has been previously stated, see Fn 3, supra, Neff's affidavit was submitted, in part, to oppose Plaintiffs' request for class certification.

[23]Parenthetically, the Plaintiffs objected to many of those paragraphs on the basis of Daubert and Rule 702. The Plaintiffs did not otherwise rely upon that decision or Rule 702, in challenging the other allegedly objectionable portions of Neff's affidavit.

- 20 -

not present a health hazard or that there was no evidence of significant
concentrations of radioactivity having been found. Simply stated, since those
concluding sentences did not demonstrate that the evidence fails to raise a genuine
issue of material fact as to whether the Defendants violated the pertinent federal
regulations pertaining to emissions of radioactivity from a nuclear site, the Court
did not consider them when ruling on the Defendants' request for summary
judgment. Similarly, the issue of whether the wells in the Hillview Plat were or
were not polluted as a result of being in close proximity to the residents' septic
systems, will also not make it more or less likely that the Defendants violated the
pertinent federal regulations.[24]

Turning to the other challenged portions of Neff's affidavit, the Plaintiffs
argued that the Court should strike them, because he lacked personal knowledge of
the matters set forth therein and, further, he lacked the requisite expertise to attest
to those matters.[25] This Court did not agree. When he executed his affidavit, Neff
had been employed at the Mound since 1964. Much of that time was spent

---

[24]Some of the other allegedly offensive paragraphs in Neff's affidavit are not,
strictly speaking, germane to the issue of whether the Defendants violated the
regulations. Nevertheless, they provided helpful background on the testing that
has been conducted at the Mound, as well as the risks presented by tritium and
plutonium-238.

[25]The Plaintiffs argued extensively that Neff lacks personal knowledge and is
without the requisite expertise to testify about dose reconstruction. See
Doc. #125 at 24-26. It was not necessary to resolve that question, given that
Neff's affidavit does not contain information concerning dose reconstruction,
unless the Plaintiffs deemed the concluding sentences of ¶¶ 56, 59, 62 and 63 to
constitute testimony concerning such. It bears emphasis that the Court did not
consider those portions of Neff's affidavit when ruling upon the Defendants'
Second Motion for Summary Judgment (Doc. #96).

working in the area of environmental compliance. Indeed, he was the manager of environmental compliance when he executed his affidavit. Additionally, Neff stated in ¶ 2 of his affidavit that he had personal knowledge of the matters set forth in that document, as a result of his experience with the Mound and his familiarity with its business records. With ¶¶ 47 and 48, he identified business records of the Mound, in accordance with Rule 803(6) of the Federal Rules of Evidence. Of course, that Rule requires that the foundation for the admission of such records must be accomplished by their custodian or another qualified witness. The Sixth Circuit recently reiterated that a qualified witness under Rule 803(6) need not have personal knowledge of the creation of the record itself, as long as he or she is familiar with the record keeping-procedures of the organization. United States v. Baker, 458 F.3d 513, 518 (6th Cir. 2006). Simply stated, through his long service working at the Mound, Neff has acquired sufficient knowledge of its record keeping procedures to be considered a qualified witness.[26] Moreover, he indicated, in ¶ 2 of his affidavit, that he had familiarity with the business records kept at the Mound. In this regard, Plaintiffs paid particular attention to Exhibit QQ, which Neff discussed in ¶ 48 of his affidavit. That exhibit compared by way of bar graphs the maximum effective whole body dose equivalent of plutonium and tritium, in millirem/year, for the years 1985 through 1990, to the DOE standard.

---

[26]The Plaintiffs pointed out that, during his deposition, Neff indicated that he was not familiar with the monitoring which had occurred at the Mound in the early 1960's. See Doc. #125 at 26-28. They contended that this lack of familiarity demonstrated that Neff was without personal knowledge about monitoring during that time period. Regardless of whether he possessed such knowledge, Neff did not indicate in his affidavit the extent of the emissions of radioactivity from Mound during those years. Rather, in ¶ 47, he merely described exhibits, business records of the Mound, which contained information concerning that subject.

The bar graph showed that, except for 1987, the whole body dose equivalent from the Mound was less than 1% of the DOE standard. In 1987, the whole body dose equivalent was 1.03%. During his deposition, Neff testified that Exhibit QQ was created from the annual monitoring at the Mound. Plaintiffs pointed out that Neff had not created Exhibit QQ or the annual monitoring reports. That did not cause this Court to disregard Exhibit QQ, given Neff's familiarity with the business records of the Mound and his involvement in the preparation of that exhibit. Accordingly, this Court concluded that the documents Neff had referred to in ¶¶ 47 and 48 were properly considered in accordance with Rule 803(6).

In ¶¶ 26, 30 through 34 and 41 through 44 of his affidavit, Neff provided background information concerning radiation and identified exhibits which compared exposure to radiation from the Mound to other sources, such as coast-to-coast air travel. Assuming for present purposes that Neff did not have personal knowledge of those matters, he qualified, by virtue of his education and experience, to present evidence, as an expert, identifying a number of charts which compared exposure from emissions from the Mound in particular years to pertinent federal regulatory standards, and stating that all on Earth have constantly lived with radiation.[27] In addition, the Court concluded that he had sufficient knowledge, gained through his education and experience, to identify a number of common sources of radiation or increased radiation, such as medical devices, color televisions, coast-to-coast air travel and living at higher altitudes.

---

[27]Moreover, there is nothing in the Daubert standards which would prevent him from presenting such evidence.

- 23 -

With respect to the other allegedly offensive portions of Neff's affidavit, the vast majority of the information set forth therein pertains to events which occurred while he was employed at the Mound.[28]  Simply stated, Neff's experience and presence, as an employee of the Mound when the events about which he has provided information occurred, caused this Court to conclude that he had personal knowledge of the information set forth in his affidavit.

Plaintiffs also argued that, as with Carfagno's affidavit, the allegedly offensive portions of Neff's affidavit should be stricken, because the sole reliance on environmental monitoring reports was inappropriate. In particular, the Plaintiffs contended that the use of improper data by Neff rendered the statements in his affidavit inadmissible, rather than merely providing a basis of impeaching those statements. This Court could not agree. In support of this argument, Plaintiffs relied upon Christophersen v. Allied-Signal Corp., 939 F.2d 1106 (5th Cir 1991), cert. denied, 503 U.S. 912 (2002). Therein, in the context of a discussion of Rule 703 of the Federal Rules of Evidence,[29] the Fifth Circuit wrote that "only when the

---

[28]An exception is ¶ 35, wherein Neff stated that the AEC promulgated radiation regulations in 1958, under which the maximum permissible exposure level for members of the general public from AEC facilities was 500 millirem per year. Quite simply, Neff's experience in the area of environmental compliance for a lengthy period of time, gave him sufficient personal knowledge about the regulations of the AEC to permit him to provide this information.

[29]Rule 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference

- 24 -

facts and data are critically inaccurate or incomplete, as determined by what other
experts would or would not be willing to base opinions upon, would the facts and
data lack the necessary requisites of Rule 703." id. at 1115. Given that the facts
and data relied upon by Neff are part of the evidentiary record, given that they are
contained in the Defendants' business records which are attached to and
authenticated by his affidavit, the concern of Rule 703 concerning facts and data
which are not otherwise admissible is not implicated herein.[30] Therefore, as it did
in response to the similar argument raised with respect to Carfagno's argument,
this Court concluded that Neff's alleged shortcomings in that regard did not serve
as the basis for striking his affidavit, although those shortcomings could cause the
Court to conclude that the evidence raised a genuine issue of material fact as to
whether the Defendants violated the applicable federal regulations.[31]

    Accordingly, the Court overruled the Plaintiffs' Motion to Strike (Doc. #125),
to the extent that it related to Neff's affidavit.[32]

_____

      unless the court determines that their probative value in assisting the jury to
      evaluate the expert's opinion substantially outweighs their prejudicial effect.

[30]For reasons set forth below, this Court could not agree with Plaintiffs that the
data relied upon by both Neff and Carfagno are "critically inaccurate and
incomplete." Therefore, such an alleged shortcoming would not serve as the basis
for striking either affidavit.

[31]Plaintiffs also criticized Neff's failure to consider the as low as reasonably
achievable ("ALARA") concept, which, for reasons set forth below, the Court has
concluded is not a federal standard, the violation of which could subject the
Defendants to liability. Therefore, Neff's failure to discuss ALARA did not serve as
the basis either for striking any portion of his affidavit or for discounting the
credibility of the statements therein.

[32]Plaintiffs also argued that Neff's testimony during his deposition demonstrated
that he lacks familiarity with some of the matters set forth in his affidavit and that,
therefore, his affidavit contradicts his deposition testimony. See Doc. #125 at 26-

Based upon the foregoing, the Court overruled the Plaintiffs' Motion to Strike
(Doc. #125), in its entirety.

### III. Defendants' Second Motion for Summary Judgment (Doc. #92)

In its Decision sustaining in part Defendants' Motion for Summary Judgment

(Doc. #35), this Court concluded that this is a public liability action under the Price-

Anderson Act, as amended by the Price-Anderson Act Amendments of 1988

("PAAA"), 42 U.S.C. §§ 2014(hh) and 2210,[33] and that the duty of care which

governs the Plaintiffs' claims against the Defendants is supplied by federal law, in

particular the federal regulations governing radioactive emissions.[34] See

Doc. #84 at 29-30. Accord, Roberts v. Florida Power & Light Co., 146 F.3d

---

28. For instance, Plaintiffs pointed to Neff's deposition testimony to the effect
that he could not remember the particulars of the air monitoring conducted during
the early 1960's. The Plaintiffs claimed that this was inconsistent with ¶ 50 of his
affidavit, wherein he discussed air monitoring for tritium emissions. Since Neff did
not expressly discuss air monitoring for tritium in the early 1960's in his affidavit,
this Court could not conclude that his failure to remember the particulars of such
monitoring served as the basis for striking ¶ 50.

[33]The term "public liability action" is defined by 42 U.S.C. § 2014(hh), which
provides:

> The term "public liability action", as used in section 2210 of this title, means
> any suit asserting public liability. A public liability action shall be deemed to
> be an action arising under section 2210 of this title, and the substantive
> rules for decision in such action shall be derived from the law of the State in
> which the nuclear incident involved occurs, unless such law is inconsistent
> with the provisions of such section.

In Nieman v. NLO, Inc., 108 F.3d 1546, 1550 n. 4 (6th Cir. 1997), the Sixth
Circuit noted that Congress had indicated that the PAAA applied to nuclear
incidents occurring both before and after that statute had been enacted.

[34]Those regulations do not apply to Plaintiffs' claim under CERCLA.

1305, 1306 (11th Cir. 1998) (holding that federal safety regulations conclusively

establish the duty of care owed in a public liability action), cert. denied, 522 U.S.

1139 (1999); O'Conner v. Commonwealth Edison Co., 13 F.3d 1090 (7th Cir.)

(holding that federal regulations supply "the sole measure of defendants' duty in a

public liability action" and that "the application of something other than federal

safety regulations as a standard of care is inconsistent with the Price-Anderson

scheme and consequently cannot be applied in a public liability action"), cert.

denied, 512 U.S. 1222 (1994); In re TMI Litigation, 940 F.2d at 858-60 (noting

that federal standards are applicable, because "any state duty would infringe upon

pervasive federal regulation in the field of nuclear safety, and thus would conflict

with federal law);[35] Whiting v. Boston Edison Co., 891 F. Supp. 12 (D.Mass.

1995); Hennessy v. Commonwealth Edison Co., 765 F. Supp. 495 (N.D.Ill.

1991).[36] After the Court had so concluded, it was decided that the Defendants

_____

[35]In In re TMI Litigation, the Third Circuit held that the state standard would be pre-
empted, regardless of whether the state standard was stricter or more lenient than
the federal regulations. 940 F.2d at 860 n. 22.

[36]Although the Sixth Circuit has not addressed this precise issue, it has cited the
decisions of the Seventh Circuit in O'Connor and the Third Circuit in In re TMI
Litigation:

> Because the Price-Anderson Act, as amended in 1988, specifically
> dictates that state law applies only to the extent it is not inconsistent with
> federal law and because we agree with the analyses of preemption in
> [O'Conner v. Commonwealth Edison Co., 13 F.3d 1090 (7th Cir.), cert.
> denied, 512 U.S. 1222 (1995)] and [In re TMI Litigation Cases Consol. II,
> 940 F.2d 832 (3rd Cir. 1991), cert. denied, 503 U.S. 906 (1992)], we hold
> that the Price-Anderson Act preempts Nieman's state law claims; the state
> law claims cannot stand as separate causes of action. Nieman can sue
> under the Price-Anderson Act, as amended, or not at all. His federal claim
> will be derived from state law, as mandated by § 2014(hh), to the extent it
> is not inconsistent with federal law.

Nieman v. NLO, Inc., 108 F.3d 1546, 1553 (6th Cir. 1997). Accord, Rainer v.
Union Carbide Corp., 402 F.3d 608, 617 (6th Cir. 2005).

- 27 -

would file a further motion for summary judgment, addressing the question of
whether they have violated those standards. The Defendants filed such a motion,
Defendants' Second Motion for Summary Judgment (Doc. #96), which this Court
has sustained in part and overruled in part. See Doc. #137. Herein, this Court
sets forth its reasoning and citations of authority in support of that Decision.

In their Memorandum in Opposition to the Defendants' Second Motion for
Summary Judgment (Doc. #126), the Plaintiffs have presented a number of
arguments which may be classified in two broad categories, to wit: 1) even if the
Defendants did not violate the federal regulatory standards governing the release of
radiation, they are not entitled to summary judgment, because other standards are
applicable; and 2) there are genuine issues of material fact as to whether
Defendants violated the applicable federal regulations. As a means of analysis, the
Court will initially set forth the procedural standards which must be applied
whenever it rules upon a motion seeking summary judgment, following which it will
turn to the two broad categories of arguments raised by the Plaintiffs, discussing
them in the above order.


A. Procedural Standards Applicable to Motions for Summary Judgment

Summary judgment must be entered "against a party who fails to make a
showing sufficient to establish the existence of an element essential to that party's
case, and on which that party will bear the burden of proof at trial." Celotex Corp.
v. Catrett, 477 U.S. 317, 322 (1986). Of course, the moving party:

> always bears the initial responsibility of informing the district court of
> the basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions on

- 28 -

file, together with the affidavits, if any," which it believes
demonstrate the absence of a genuine issue of material fact.

Id. at 323. See also Boretti v. Wiscomb, 930 F.2d 1150, 1156 (6th Cir. 1991)
(The moving party has the "burden of showing that the pleadings, depositions,
answers to interrogatories, admissions and affidavits in the record, construed
favorably to the nonmoving party, do not raise a genuine issue of material fact for
trial.") (quoting Gutierrez v. Lynch, 826 F.2d 1534, 1536 (6th Cir. 1987)).  The
burden then shifts to the nonmoving party who "must set forth specific facts
showing that there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).  Thus, "[o]nce the
moving party has met its initial burden, the nonmoving party must present
evidence that creates a genuine issue of material fact making it necessary to
resolve the difference at trial."  Talley v. Bravo Pitino Restaurant, Ltd., 61 F.3d
1241, 1245 (6th Cir. 1995).  Read together, Liberty Lobby and Celotex stand for
the proposition that a party may move for summary judgment by demonstrating
that the opposing party will not be able to produce sufficient evidence at trial to
withstand a directed verdict motion (now known as a motion for judgment as a
matter of law, Fed.R.Civ.P. 50).  Street v. J.C. Bradford & Co., 886 F.2d 1472,
1478 (6th Cir. 1989).

Once the burden of production has so shifted, the party opposing summary
judgment cannot rest on its pleadings or merely reassert its previous allegations.  It
is not sufficient to "simply show that there is some metaphysical doubt as to the
material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
586 (1986).  See also Michigan Protection and Advocacy Service, Inc. v. Babin, 18
F.3d 337, 341 (6th Cir. 1994) ("The plaintiff must present more than a scintilla of

- 29 -

evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff."). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. Celotex Corp., 477 U.S. at 324. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are ... 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" Hancock v. Dodson, 958 F.2d 1367, 1374 (6th Cir. 1992) (citation omitted). Of course, in determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. Anderson, 477 U.S. at 255 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, Federal Practice and Procedure, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." Interroyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989), cert. denied, 494 U.S. 1091 (1990). See also L.S. Heath & Son, Inc. v. AT&T Information Systems, Inc., 9 F.3d 561 (7th Cir. 1993); Skotak v. Tenneco

Resins, Inc., 953 F.2d 909, 915 n. 7 (5th Cir.), cert. denied, 506 U.S. 832 (1992)

("Rule 56 does not impose upon the district court a duty to sift through the record

in search of evidence to support a party's opposition to summary judgment ....").

Thus, a court is entitled to rely, in determining whether a genuine issue of material

fact exists on a particular issue, only upon those portions of the verified pleadings,

depositions, answers to interrogatories and admissions on file, together with any

affidavits submitted, specifically called to its attention by the parties.


### B. Are Standards Other than Federal Regulations Applicable?

As indicated, this Court has previously concluded that the standard of care

which governs the Plaintiffs' claims (other than their claim under CERCLA) is

supplied by the federal regulations governing radioactive emissions, in particular,

those of the Department of Energy ("DOE") and its predecessors,[37] the Nuclear

Regulatory Commission ("NRC") and the EPA, regarding the release of radioactivity

into the air, and the regulations by both the DOE and the EPA, regarding the

release of radioactivity into water. The Court also held that liability cannot be

imposed upon the Defendants unless they violated those regulations, which set

specific numerical limits regarding radioactive emissions. The Plaintiffs argued

that, in addition to those numerical limitations, certain other federal regulatory and

statutory provisions govern the release of radioactive emissions from nuclear

weapons plants. In addition, the Plaintiffs contended that state law standards

must apply for the years 1949 through 1958, given that no specific federal

---

[37]The Atomic Energy Commission ("AEC") and the Energy Research and
Development Administration ("ERDA") are the predecessors of the DOE.